UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF CHRISTOPHER BROOK FISHBECK, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE ISLAMIC REPUBLIC OF IRAN, et al., )<br>)<br>Defendants )<br>) | Civil Action No. 1:18-cv-02248-CRC |

**DECLARATION OF PATRICK L. CLAWSON, Ph.D.**

## DECLARATION OF PATRICK L. CLAWSON, Ph.D.

Under 28 U.S.C. § 1746, I, Patrick L. Clawson, Ph.D., hereby declare under penalty of perjury as follows:

### Purpose of Declaration

1. I have been asked to explain the relationship of the National Iranian Oil Company ("NIOC") to the government of the Islamic Republic of Iran ("Iran") for the purpose of assessing whether NIOC's activities are predominantly governmental or commercial in nature generally, and if so, whether NIOC's activities were predominantly governmental or commercial in nature from the time period of September 2018 through January 2019.

### Summary of Opinions

2. Based on the sources I have consulted, I conclude that NIOC's activities are predominantly commercial in nature, and were predominantly commercial in nature from the time period of September 2018 through January 2019.

3. NIOC is primarily a commercial entity involved in the production and sale of oil and oil products. While NIOC does fulfill some governmental and quasi-governmental functions ancillary to the production and sale of oil, those functions are not its principal activities.

### Qualifications and Information Assembled and Consulted to Form Opinions

4. My qualifications are set forth on **Exhibit 1**, attached hereto.

5. This declaration is based upon the case materials I have been provided as well as my independent research and general knowledge of this matter.

6. My knowledge about Iran comes as a result of my routine and in-depth access to facts concerning that country, its politics, its economy, and my extensive study as outlined herein, including my professional research and publishing in this field over the course of many

1

years. Indeed, as part of my work, I spend at least an hour a day reviewing writings, including online sources, from and about Iran. Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism. Iran even has many internet sites that publish information on these subjects. From my years studying Iranian politics and given the competing sources that can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible. Indeed, I use this information as a source to brief the United States and other governments. Furthermore, Iran and many political actors in Iran have been openly boastful about activities that violate Iranian law and/or international norms, at times describing them in detail.

7.     My opinions set forth below are based upon my education, research, and experience, as well as my review and analysis of documents typically relied upon by experts in my field. The bases for the opinions set forth herein include, but are not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries; my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English language press and Persian language press). I rely extensively on statements from the U.S. government.

8.     More specifically, I made extensive use of the U.S. Treasury Department statements about Iran.[1] I also used the Treasury Department's Office of Foreign Assets Control

---

[1] Collected at https://www.treasury.gov/resource-center/sanctions/programs/pages/iran.aspx.

website, which has detailed fact sheets and lists of individuals and entities designated under various Executive Orders (E.O.), such as E.O. 13224.[2]

9. I consulted a variety of material from the State Department.[3]

10. I used the statements I prepared for court cases in which I have been an expert witness, listed separately in this Declaration.

11. I used material from a variety of international organizations, particularly material from the International Monetary Fund (IMF); the Financial Action Task Force (FATF), an inter-governmental body with 36 members including the United States; and the Council of Europe, Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism.

12. I used materials from reputable newspapers and news services, especially *The New York Times*, the *Washington Post*, the *Wall Street Journal*, the *Financial Times* (UK), and *Reuters*.

13. I used material from Iranian entities' websites. I have tried to identify material in English which I could cite here, though in almost every case I was able to cross-check that against the Persian language material.

14. Material I used included the National Iranian Oil Company's website.[4]

15. I used material from reliable Iranian news sources available online, including the English-language *Financial Tribune* and its sister Persian-language economic news source *Donya Eqtesad.*

---

[2] Available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.
[3] Some of their Iran material is at https://www.state.gov/countries-areas/iran/.
[4] Available at http://www.nioc.ir/portal/home/?generaltext/81026/81171/82507/#a18.

16. I consulted a wide array of scholarly articles and books about Iran, its economy, and its banking system.

17. I consulted with my colleagues at The Washington Institute for Near East Policy, including Matthew Levitt, a former Treasury Department Deputy Assistant Secretary, who has testified in many court cases about Iranian-supported terrorism; Katherine Bauer, a former Treasury Department official who has worked on and written about Iranian financial practices; and Mehdi Khalaji, who was educated in Qom religious seminaries for 14 years and has written extensively about the Iranian political system.

## ANALYSIS

### National Iranian Oil Company—Operations and Ownership

16. NIOC is responsible for "exploration, drilling, production, research and development, refining, distribution and export of oil, gas, and petroleum products."[5] It also performs state policy functions in encouraging the development of the Iranian oil industry:

> NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities. The company has taken major steps toward establishing business enterprises, funded financial resources for development, helped to update technologies for exploration, drilling and production with reliance on the knowledge of Iranian experts."[6]

17. While the encouragement of the Iranian oil industry is a quasi-governmental function of NIOC, such actions also have a strong commercial rationale. Given the sanctions to

---

[5] "NIOC at a Glance" section of the NIOC's Persian website, available at https://www.nioc.ir/portal/home/?generaltext/97296/96775/99107/. That passage, which used to be on their English website, is translated on another Iranian government website, available at https://www.investiniran.ir/en/sectors/oilandgas. *See also* U.S. Energy Information Administration, Country Analysis Executive Summary: Iran, https://www.eia.gov/international/content/analysis/countries_long/Iran/pdf/iran_exe.pdf at 3 ("The state-owned National Iranian Oil Company is responsible for all upstream oil and natural gas projects.").

[6] "NIOC at a Glance" on the NIOC Persian website cited above, which used to be on their English website and now appears on the Iranian government website cited above.

which Iran has been subject for most of the last 40 years, NIOC cannot count on regular, uninterrupted access to foreign equipment, technology, and investment. Therefore it is NIOC's commercial interest to have Iranian suppliers of oil field equipment and oil services, as well as Iranian companies with which it can partner for drilling oil wells and developing oil fields. Encouraging such companies is both a quasi-governmental activity and a commercial interest.

18.     According to NIOC's website, "it is estimated that the company holds 156.53 billion barrels of liquid hydrocarbons and 33.79 trillion cubic meters of natural gas,"[7] making it one of the largest oil companies in the world.

19.     NIOC is entirely owned by the government of Iran, as explained on its website, at NOIC.ir.  Iran's Petroleum Minister Bijan Zanganeh is Chairman of NIOC's Board; his predecessors as minister also held that position with NIOC while in office. The day on which the oil industry was nationalized in 1951 is a public holiday in Iran. Government control over the oil industry is such an important principle that Iranian politicians have for years fought over whether it was appropriate to bring foreign investors into the industry even in a *secondary* role. Retaining complete government ownership and control over NIOC has never been brought into question.  As the U.S. Treasury Department put the matter in a September 24, 2012, press release: "NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."[8]

---

[7] *Id.* for the passage in Persian on the NIOC's website. For an English-language citation of the same data, *see* Europetrole, June 12, 2018, available at https://www.euro-petrole.com/opec-players-frustrated-with-saudis-russia-n-i-17895.

[8] U.S. Department of the Treasury, Press Center, *Treasury Submits Report To Congress On NIOC And NITC*, September 24, 2012, available at https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

20. In the extensive litigation over more than a decade between Ashland Oil and NIOC (Civ. A. No J85-1064 (L)), including the rulings of the Fifth Circuit, many issues were raised, including issues about sovereign immunity. To quote the U.S. District Court for the Southern District of Mississippi in 716 F. Supp. 268, 270 (S.D. Miss. 1989): "The FSIA [Foreign Sovereign Immunities Act] specifically includes in its definition of a 'foreign state' entities that are owned by the sovereign, 28 U.S.C. § 1603, and in this case, there is no dispute that NIOC is a 'foreign state' within the meaning of the FSIA."[9] The Court includes the following footnote thereafter, directing the reader to § 1603(b):

> Section 1603(b) of the FSIA defines an "agent or instrumentality of a foreign state" as an entity:
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under laws of any third country.[10]

I read this as stating that NIOC is government-owned, without reference to the question of whether NIOC is primarily commercial or primarily governmental.

21. NIOC generates billions of dollars in revenue each year for the Iranian government, in addition to generating the revenue to fund its operations and investment in developing Iran's oil industry. Depending on changes in the price of oil, revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue (this is in addition to the sums NIOC pays in taxes).

---

[9] *National Iranian Oil Co. v. Ashland Oil*, 716 F. Supp. 268, 270 (S.D. Miss. 1989), available at https://law.justia.com/cases/federal/district-courts/FSupp/716/268/2345171/.

[10] *Id.* at 270, Note 3.

22. There are credible reports, including from Iranian sources, that some of this oil revenue is not officially reported, making it even more directly available for purposes such as support for terrorism. An Iranian government audit in 2009 found that more than one billion in oil revenue from the previous year was missing from the state coffers.[11] The practice continues, with recent Iranian reports referring to billions in revenues going unaccounted for each year.[12] Credible reports provide strong reasons to suspect that some of this missing revenue is directly controlled by Iranian government agencies, especially the Islamic Revolutionary Guard Corps (IRGC), rather than going to the treasury and then being allocated to these agencies.[13] The IRGC, which reports directly to Iran's Supreme Leader rather than to the President and Parliament, has long maintained it has authority to engage in many activities on its own rather than going through normal governmental processes. The IRGC, along with the Ministry of Information and Security (MOIS), are the principal agencies through which Iran engages in terrorism abroad and supports terrorist organizations abroad.

23. While there is little information in the public realm about the oil or oil sale revenue which goes to the IRGC, it would appear that NIOC sells oil to IRGC-affiliated

---

[11] UPI, *Iran looking for missing oil revenue*, November 20, 2009, available at https://www.upi.com/Business_News/Energy-Industry/2009/11/20/Iran-looking-for-missing-oil-revenue/UPI-97311258729114/.

[12] Aftabnews, *? What $ 8 billion of Ahmadinejad's oil revenue was spent on development in the country*, May 21, 2008, available at https://aftabnews.ir/fa/news/297462/%DB%B8%DB%B0%DB%B0-%D9%85%DB%8C%D9%84%DB%8C%D8%A7%D8%B1%D8%AF-%D8%AF%D9%84%D8%A7%D8%B1-%D8%AF%D8%B1%D8%A2%D9%85%D8%AF-%D9%86%D9%81%D8%AA%DB%8C-%D8%AF%D9%88%D8%B1%D9%87-%D8%A7%D8%AD%D9%85%D8%AF%DB%8C%E2%80%8C%D9%86%DA%98%D8%A7%D8%AF-%D8%B5%D8%B1%D9%81-%DA%A9%D8%AF%D8%A7%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87-%D8%AF%D8%B1-%DA%A9%D8%B4%D9%88%D8%B1-%D8%B4%D8%AF.

[13] *See* Mark Gregory, *Expanding business empire of Iran's Revolutionary Guards*, BBC News, July 26, 2010, available at http://www.bbc.com/news/world-middle-east-10743580.

middlemen at below market prices and/or pays such middlemen commissions for oil sales. That would be consistent with the many non-transparent techniques NIOC has used to sell oil to customers who wish to disguise their purchases given the U.S. sanctions on entities which purchase Iranian oil or which handle the shipping or the financial transactions associated with such oil sales. The U.S. Treasury Department warns that all "who knowingly engage in significant transactions for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran — or knowingly provide significant support to an Iranian person on OFAC's List of Specially Designated Nationals and Blocked Persons (SDN List), such as the National Iranian Oil Company (NIOC) . . . are at serious risk of being targeted by the United States for sanctions . . . ."[14] Given its expertise in clandestine operations, the IRGC would seem well placed to assist in such disguise efforts.

24.     Granted that NIOC is providing oil and/or oil sale revenue to the IRGC, it is by no means clear that this is a government function. As the sole owner of NIOC, the government of Iran is perfectly entitled to direct that some of its revenue and/or some of its output be provided to whatever institution the government shall so direct. An analogy would be the government directing the national airline to make available a plane to fly the country's president on an official visit — that does not make the national airline primarily a government institution.

---

[14] Department of the Treasury, *OFAC Advisory to the Maritime Petroleum Shipping Community*, September 4, 2019, available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran_advisory_09032019.pdf. This Advisory includes much information about Iran's "deceptive shipping practices."

8

## **CONCLUSION**

25. In my expert opinion, based on the sources I have consulted, NIOC is, and was during the time period of September 2018 through January 2019, primarily a commercial entity involved in the production and sale of oil and oil products.

26. NIOC does fulfill some governmental and quasi-governmental functions ancillary to the production and sale of oil, but those are not its principal activities.

27. I declare under penalty of perjury that the foregoing is true and correct.

DATED: *March 25, 2020*

PATRICK L. CLAWSON, Ph.D.

## EXHIBIT 1

### Witness Qualifications

1. I am an adult citizen who resides in the District of Columbia.

2. I am an expert on the Islamic Republic of Iran ("Iran") and have extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics. This Declaration is submitted to provide the Court with facts and evidence concerning the National Iranian Oil Company ("NIOC").

3. I am the Director of Research at the Washington Institute for Near East Policy (which I will refer to from now on as "The Washington Institute"), where I have been employed since 1997. My previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund. Most of my professional life has been spent studying the Middle East, and in particular, Iran. My first scholarly article on the Middle East was published approximately 30 years ago, and the first work I did on the region for the Central Intelligence Agency was approximately 20 years ago.

4. The Washington Institute is a think tank, in other words, a 501(c)(3) organization, which receives funding from a variety of individuals, only Americans, to conduct studies about U.S. foreign policy interests and concerns in the Middle East. The Washington Institute also studies domestic and internal issues relating to the Iranian government. My work includes extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the Iranian Revolutionary Guard Corps (the "IRGC"), and its Qods Force ("Qods Force" or "IRGC-QF").

5. I have done contract consulting work on Iran and the Middle East for several U.S. government agencies over the last 30 years, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and, through various contractors, the National Security Agency and the Defense Intelligence Agency. While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on issues of Middle Eastern politics, including close work with the Central Command (the U.S. military command responsible for the Middle East), and its subordinate commands, and with the staff of the Joint Chiefs of Staff.

6. For the past 22 years, I have been the Director for Research (or, before staff reorganization, Deputy Director) at the Washington Institute, a think tank focusing on contemporary issues of the Middle East. In this capacity, I, inter alia, supervise a staff of about 20 senior researchers who study Middle East politics and terrorism, with considerable focus on Iran and Syria. Researchers with whom I have worked at the Washington Institute include Dennis Ross, President Clinton's chief Middle East peace process negotiator, and who was for four years the individual at the Obama Administration's National Security Council responsible for the "Central Region," the Central Command covering the Middle East; former Deputy Assistant Secretary of the Treasury for Intelligence, Matthew Levitt, responsible inter alia for following Iranian terror financing; and several former U.S. ambassadors, including James Jeffrey, Ambassador to Turkey and Iraq (at different times), as well as currently, State Department Special Envoy to the Global Coalition to Defeat ISIS (the Islamic State in Iraq and Syria), and Barbara Leaf, Ambassador to the United Arab Emirates. I also brief and receive briefings from senior United States military officials and senior officials of other governments friendly to the United States.

7. I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy, and other issues, and have given live or written testimony in various cases brought against Iran for its sponsorship of terrorism. In the last four years, those cases were:

- *Weinstock v. Islamic Republic of Iran* [S.D. Fla. October, 2018, No. 1:17-cv-23272].

- *Hake et al v. Bank Markazi Jomhouri Islami Iran et al* [D.D.C., May 2018, No. 17-cv-114 (TJK)].

- *Havlish v. Islamic Republic of Iran* [BCSC October, 2017, No. S-168272].

- *Allan et al v. Islamic Republic of Iran* [D.D.C. May, 2017, No. 1:17-cv-00338 (RJL)].

- *Parhamovich et al v. Islamic Republic of Iran et al* [D.D.C. April 2017, No. 1:17-cv-00061].

- *Force v. Islamic Republic of Iran* [D.D.C. January, 2017, No. 16-01468 (RDM)].

- *Hirshfeld v. Islamic Republic of Iran* [D.D.C. December 27, 2016, No. 15-cv-2272 (RBW)].

- *Braun v. Islamic Republic of Iran* [D.D.C. May, 2016, No. 15-01136 (BAH)].

- *Lelchook v. Islamic Republic of Iran* [D. Mass. May, 2016, No. 15-13715 (PBS)].

- *Kaplan v. Central Bank of Iran* [D.D.C. November, 2015, No. 10-483 (RCL)].

8. Older cases in which I have given live or written testimony include: *Cicippio v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 96-01805 (1996); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999);

*Stethem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at *3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan, et al.*, No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), and *In Re: 650 Fifth Avenue and Related Properties*, 08 Cv. 10934 (KBF), among others.

9. I have testified about Iran and/or Syria before the House International Relations, National Security, and Banking and Financial Services Committees, as well as the Senate Foreign Relations and Banking Committees.

4

10. From 2009 through 2014, I served on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory, which is the lead actor on many nuclear security issues.

11. I have made presentations about the foreign and economic policy of Iran and U.S. policy towards Iran at conferences sponsored by, amongst other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, Iran; the Royal Institute for International Affairs in London, UK; the Royal United Services Institute in London, UK; the Japanese Foreign Ministry in Tokyo, Japan; the Institute for Defense Studies and Analysis in New Delhi, India; the Shanghai Institute for International Studies in Shanghai, China; the Jaffee Center of Tel Aviv University in Tel Aviv, Israel; the Council for Foreign Relations in New York City, New York; the Nixon Center (part of the Nixon Presidential Library); and the Carnegie Endowment for International Peace in Washington, D.C.; and a great many universities. I have given presentations concerning Middle Eastern politics and security at more than 200 symposiums in more than 20 countries.

12. My most recent co-authored book, *The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013), with Rudi Matthee and Willem Floor, won the Middle East Studies Association of North America's Pourshariati Award for best book about Iran. My books and monographs published in the last ten years are: *Tactical Issues Surrounding a U.S. Withdrawal from the Iran Nuclear Agreement* (The Washington Institute, 2018); *Reinforcing the Role of Sanctions in Restraining Iran* (The Washington Institute, 2017, with Katherine Bauer and Matthew Levitt); *Syrian Kurds as a U.S. Ally: Cooperation and Complications* (The Washington Institute, 2016, with six Institute fellows); Energizing Policy: America and the Middle East in an Era of Plentiful Oil (The Washington Institute, 2016, with

Simon Henderson); *How Iranians Might React to a Nuclear Deal* (The Washington Institute, 2014, with Mehdi Khalaji); *Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute, 2012, with David Makovsky); *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2012); *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute, 2010); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); and *Engaging Iran: Lessons from the Past* (The Washington Institute, 2009, edited). In the last ten years, I also wrote about 100 articles which appeared in various publications. A complete list of those publications can be found on The Washington Institute for Near East Policy website,[15] and in the page about me.[16]

13. My older books and monographs about Iran include: *The Last Resort: Consequences of Preventative Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years, 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business as Usual? Western Policy Options Towards Iran* (American Jewish

---

[15] Available at https://www.washingtoninstitute.org/.

[16] Available at https://www.washingtoninstitute.org/policy-analysis/#authors=14611&page=100|0.

Committee 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Why* (the Washington Institute for Near East Policy, 1993). I have also written or edited several monographs and books on other issues, such as the Andean cocaine trade.

14.  I have written about the contemporary Middle East for *The New Republic*. I have also authored op-ed articles in *The New York Times, Wall Street Journal*, and *Washington Post*, amongst other newspapers. I am the author of more than 40 scholarly articles in *Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals.

15.  From 1995 to 2012, I was senior editor of *Middle East Quarterly*, a journal of Middle Eastern affairs, which regularly publishes on Iranian and Syrian politics and foreign policy. From 1990 through 1994, I was editor of *Orbis*, a foreign policy journal.

16.  My Ph.D. in economics is from the New School for Social Research and my B.A. is from Oberlin College.

17.  I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

18.  I am being compensated by counsel for the Plaintiffs for my time expended on this matter. My hourly rate for my research, analysis and the preparation of this report is $150. To date, I have expended approximately 11 hours on this matter.