1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2     - - - - - - - - - - - - - - - - x
      ESTATE OF CHRISTOPHER BROOK
3     FISHBECK, et al.,
                                   CA No:  1:18-cv-02248-CRC
4              Plaintiffs,
                                   Washington, D.C.
5     vs.                          Tuesday, July 20, 2021
                                   11:09 a.m.
6
      ISLAMIC REPUBLIC OF IRAN,
7     et al.,

8              Defendants.
      - - - - - - - - - - - - - - - - x
9     _____

10               TRANSCRIPT OF STATUS CONFERENCE
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the Plaintiffs:      **CHRISTOPHER GUS PAULOS, ESQ.**
                               **LEVIN, PAPANTONIO, THOMAS, MITCHELL**
14                             **RAFFERTY & PROCTOR, P.A.**
                               316 South Baylen Street, Suite 600
15                             Pensacola, FL 32502
                               (850) 435-7067
16                             cpaulos@levinlaw.com

17                             **DUSTIN B. HERMAN, ESQ.**
                               **SPANGENBERG SHIBLEY & LIBER, LLP**
18                             1001 Lakeside Avenue East
                               Suite 1700
19                             Cleveland, OH 44114
                               (216) 696-3232
20                             dherman@spanglaw.com

21    For the Defendant:       (No one appeared for the defendants)

22
      Court Reporter:          Lisa A. Moreira, RDR, CRR
23                             Official Court Reporter
                               U.S. Courthouse, Room 6718
24                             333 Constitution Avenue, NW
                               Washington, DC  20001
25                             202-354-3187

```
1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Your Honor, we're on the

3    record for Civil Case 18-2248, Estate of Christopher Brook

4    Fishbeck, et al. vs. Islamic Republic of Iran, et al.

5              Counsel, if you could please identify yourselves

6    for the record.

7              MR. PAULOS:  Chris Paulos on behalf of the

8    plaintiffs.

9              MR. HERMAN:  Dustin Herman, Your Honor, on behalf

10   of the plaintiffs.

11             THE COURT:  Okay.  Good morning, gentlemen.

12   Thanks for calling in.  Obviously no one from the defendants

13   has appeared this morning.

14             All right.  I guess you all requested this

15   opportunity to talk about sort of case management issues, so

16   I will turn it over to you.  But just as a prefatory matter,

17   what I would like for you to do, in addition to whatever

18   else you want to tell me, is to orient me as to the

19   relationship between this case and what appear to be very

20   similar cases that are pending before Judge Kelly, which is

21   the Hake -- H-A-K-E -- case; Judge Bates, the Zambon case;

22   and Judge Moss, the Holladay case.  Those three cases all

23   predate this case.

24             My first question is, why aren't they related

25   under our related case rule?  And second, how -- you know,
```

1     this bellwether procedure that you all have proposed, how

2     any such procedure that I would adopt would relate to

3     similar proceedings in those other cases, particularly given

4     that this is the fourth out of four, and -- who knows --

5     there may be more.

6            I'd also like to hear a little bit more from you

7     all about the theory of the case generally.  I'm familiar

8     with the *Karcher* case.  I have a case, *Peter Burk vs. Iran*,

9     that is -- we've just completed discovery and/or discovery

10    is almost over and we're moving towards a liability and

11    jurisdiction hearing at some point, but that case strikes me

12    as being more narrow in scope than this and the similar

13    cases that we've just discussed.

14           So in addition to whatever else you want to tell

15    me, if you all could address those issues, I would

16    appreciate it.

17         MR. PAULOS:  Yes, Your Honor.  This is Christopher

18    Paulos, and I'll be handling most of the issues today.

19    Dustin Herman is on the line in case we have any questions

20    or need to talk about our ongoing discovery efforts, and I

21    will address the issues that you've asked us to kind of in

22    the order that you asked us.

23           First, in terms of the relatedness of this case,

24    the cases such as *Karcher* or *Zambon*, *Hake*, and the *Holladay*

25    case, these cases are cases very similar to those cases.  It

1   involves different plaintiffs and different attacks;

2   however, they're similar in the sense that the groups

3   responsible are the same and that the relevant time period

4   and location of the attacks are the same.  The overarching

5   theories of liability in terms of Iran are also the same.

6          There are some other distinctions however.  The

7   cases like the *Hake* case are solely focused on defendants

8   that are agencies to powers of Iran and not Iran itself,

9   including Bank Markazi, Bank Melli, and NIOC.  Iran is not a

10  defendant in that case.

11         The *Hake* case is very similar to the *Karcher* case

12  which was focused on Iran.

13         The *Zambon* case is primarily focused on Iran's

14  support for groups in Afghanistan, and there are some Iraq

15  attacks that have been alleged in that case.  Judge Bates

16  has consolidated the Afghanistan portion of that case with a

17  case before him, which is referred to as *Cabrera*.

18         So different plaintiffs and different attacks are

19  at issue in our case, but the theories of liability, the

20  theories of material support, and the relationship amongst

21  the defendants are essentially the same.

22         THE COURT:  Okay.  But why don't they fall under

23  the related case rule?  I know we're years into these cases,

24  but did you all relate them in the first instance, or no?

25         MR. PAULOS:  So I'm counsel -- I'm co-lead counsel

1    in the *Holladay* case, which was the first case that my group

2    has filed in front of Judge Moss.  We actually sought to

3    consolidate this case and others with *Holladay* and were

4    instructed not to do so because it involved different

5    plaintiffs and different attacks.

6              THE COURT:  But is there an overlap in the

7    attacks?  So, in other words, if there's an attack on, you

8    know, a particular date in a particular town, are there some

9    plaintiffs before me and other plaintiffs before Judge Moss,

10   and we're going to decide liability and causation on -- you

11   know, for the same attack?

12             MR. PAULOS:  No.  My understanding, based on the

13   attacks that are before you and the attacks that are before

14   Judge Moss, is that they are different attacks.

15             THE COURT:  Okay.

16             MR. PAULOS:  Now, the groups that we allege are

17   responsible are the same groups, and, Your Honor is right,

18   there are cases that are in front of ours that have been

19   asked to answer the question of Iran's liability and some of

20   the liability of the other defendants, which we think can,

21   with the assistance of a bellwether process, which I can get

22   to in a little bit, will actually help streamline our

23   presentation of evidence and this Court's consideration of

24   that evidence and the issues that are relevant to these

25   plaintiffs and these attacks.

1          So that's my understanding of the relatedness of

2     the cases.

3          We were able to successfully relate a case --

4          THE COURT:  And, I'm sorry, when you say you were

5     instructed not to relate them, was that by Judge Moss or by

6     the clerk's office or by somebody else?

7          MR. PAULOS:  That was Judge Moss.  We were allowed

8     to relate a case called the *Williams* case, which we are in

9     the process of consolidating with *Holladay*, but that's

10    because it involved different victims of the same attacks at

11    issue in *Holladay*.

12          THE COURT:  Okay.

13          MR. PAULOS:  So the line that's being drawn is the

14    attack line.  If there's different attacks and different

15    plaintiffs, then it's not considered related, as I

16    understand it.

17          THE COURT:  Now, *Karcher* obviously, and the *Burk*

18    case before me, which is modeled on *Karcher* or has

19    substantial overlap with *Karcher*, deals with the use of a

20    specific weapon, these EFPs.  As I read your complaint, it

21    is not focused on a particular weapon, but essentially your

22    theory -- and correct me if I'm wrong -- is that any U.S.

23    service member injured in Iraq over a certain period of time

24    may proceed against Iran because Iran generally supported

25    Shia militia and other so-called terrorist groups in Iraq.

1      Is that fair?

2              MR. PAULOS:  Not exactly, Your Honor.  It's not --

3      our case is not that broad.  Our case does focus on attacks

4      other than explosively formed penetrators.  We focus on

5      attacks involving specific groups that Iran was materially

6      supporting in Iraq during late 2003 to the end of 2011.  So

7      our case is primarily driven by groups responsible for the

8      attack and the type of material support that those groups

9      were receiving from Iran, and that could include explosively

10     formed penetrators but other Iranian munitions and other

11     forms of material support, which include safe haven, safe

12     harbor, expert training and knowledge, and other forms of

13     material support besides just pure provision of munitions.

14             THE COURT:  Okay.  And those groups were resident

15     in Iraq, or were they Iranian groups who entered Iraq?

16             MR. PAULOS:  Both, Your Honor.  So the groups that

17     are at focus in our case are the Shia militias that were

18     working with Hezbollah on the IRGCs.  Very similar to your

19     case *Burk* as well as that of *Karcher*.

20             We also have three other groups that were involved

21     that were receiving material support from Iran at the time

22     attacks occurred.  That includes Al-Qaeda and Al-Qaeda in

23     Iraq as well as a group called Ansar al-Sunna also known as

24     Ansar al-Islam.  So those are the totality of the groups

25     that are at issue in our case.

1          Now, Iran used specific types of material support

2     depending on which group it was providing that support to.

3          THE COURT:  Okay.  And these are all Shia-related

4     groups, correct?

5          MR. PAULOS:  Well, they're not all Shia.  The

6     Sunni groups that are at issue are Al-Qaeda, Al-Qaeda in

7     Iraq, and Ansar al-Islam; so there's that Shia/Sunni divide.

8     And, as I mentioned before, the type of material support

9     that Iran gave those groups was impacted by which sect the

10     groups adhered to.  And so we, in our case, believe that

11     based on the attack location, the time, the target

12     selection, the munition that was used and the group

13     responsible, that certain types of material support from

14     Iran can be tied to those attacks.

15          THE COURT:  Okay.

16          MR. PAULOS:  That's the scope of the case.

17          THE COURT:  Okay.

18          MR. PAULOS:  Now, the overarching goal of Iran

19     that ties this all together is the same no matter what group

20     that they were supporting.  The goal, as we allege in our

21     complaint, is that Iran was seeking to protect itself and

22     its interests in the region, expand its influence in the

23     region, export, you know -- what our experts say is export

24     their revolution extraterritorially, which included waging

25     jihad against nonbelievers in Western interests.  And the

1    United States and the coalition support presence in Iraq

2    gave Iraq, then, the opportunity to do so using its proxies

3    in the region as the main tools to effectuate those.

4         THE COURT:  Now, let me just play devil's

5    advocate.  And, again, I've not read the briefs or, you

6    know, the complaint in any significant detail.  But the

7    United States was in Iraq pursuant to an authorization to

8    use military force, correct?

9         MR. PAULOS:  For a certain period of time, and

10   then at some point it became a U.S.-sanctioned peace-keeping

11   mission, Your Honor.

12        THE COURT:  Okay.  So we're in an authorized war

13   zone, correct?

14        MR. PAULOS:  Yes.  I'll agree with that.

15        THE COURT:  Okay.  And certain people in Iraq

16   don't want us to be there, right?  They want control of

17   their country, and they respond with attacks against our

18   forces in Iraq.  And they are supported, allegedly, in that

19   effort by Iran because, as you say, Iran wants to maximize

20   its sphere of influence and have some control over the

21   future destiny of Iraq, however it may shake out.  And so I

22   guess what -- and obviously Iran is a state sponsor of

23   terror.  But how does Iran's funding and support of the

24   defense of the U.S. invasion constitute terrorism as opposed

25   to any other effort to support one side or the other in a

1    war zone?

2         MR. PAULOS:  So, as Your Honor points out, first,

3    Iran is a state sponsor of terrorism, and then --

4         THE COURT:  And so does that mean that it cannot

5    help a country defend itself, and that's -- I'm not saying

6    that that's what happened here, but, again, playing devil's

7    advocate, and there's no one from the defendant to make

8    these arguments, does that mean that Iran cannot defend --

9    help another country defend itself in an authorized war

10   involving U.S. forces without being liable under the

11   terrorism exception to the Foreign Sovereign Immunities

12   Act?

13        MR. PAULOS:  Well, I think that Iran could assist

14   one of its allies, if it so chose.  First, Iraq was not an

15   Iranian ally.  In fact, they were enemies and were embroiled

16   in a decade-long war prior --

17        THE COURT:  But once the Iraqi government fell

18   there were different factions competing for the future

19   control of Iraq, and certainly some of them were Iranian

20   allies, right?

21        MR. PAULOS:  And Iran did use its influence with

22   political groups in Iraq.  There's a group called SCIRI,

23   which was in exile while Saddam Hussein was in power, which

24   was the Shia political party that Iran did support.  And

25   Iran -- its maligned influence campaign included both

1      terrorism and legitimate political efforts that it undertook

2      to support its -- the parties that it had interest in in

3      Iraq.  However --

4              THE COURT:  Okay.  But putting aside political

5      efforts, any military-related efforts you would place in the

6      terrorism bucket because Iran is a state sponsor?

7              MR. PAULOS:  No.  I wouldn't do that.  I would put

8      any effort that Iran took to support foreign terrorist

9      organizations and terrorist organizations that were

10     attacking U.S. forces and Iraqi civilians and populations

11     based on their religious ideologies, I would put that in the

12     terrorism bucket.

13             THE COURT:  Okay.

14             MR. PAULOS:  Not every group that Iran was

15     supporting was a terrorist organization by any means.

16             THE COURT:  Okay.  All right.  That clarifies

17     things.

18             MR. PAULOS:  I can provide you more on the theory

19     of our case, if you want, Your Honor.  If you want me to

20     move on to the bellwether topic, I can.

21             THE COURT:  Why don't you move on to the broader

22     topic of sort of where we go from here.  And obviously, you

23     know, my concern is, you know, the plaintiffs in *Burk* wanted

24     to go first, and they wanted to have a bench trial, and, you

25     know, my suggestion and where we wound up was to let Judge

1   Kollar-Kotelly go first; and she conducted a bench trial and

2   made certain factual findings on jurisdiction and liability.

3   I can then use those, to the extent I think they're

4   appropriate, in making similar determinations in my *Karcher*

5   and the *Burk* case, perhaps without live testimony.  Damages

6   is another issue obviously.

7           But, you know, the question is do we need, you

8   know, four judges to have four bellwether proceedings?  And

9   if this case is the fourth filed out of four, why shouldn't

10   we wait to see how those other proceedings come out, what

11   facts are developed, what findings are made by the Court

12   before scheduling bellwether trials in this case.

13           MR. PAULOS:  Okay.  So in terms of what *Karcher*

14   determined and the findings of fact and conclusions of law

15   that have been provided by Judge Kollar-Kotelly, as Your

16   Honor pointed out before, *Karcher* was primarily focused on a

17   specific type of attack involving the Shia militia, and the

18   Court found there that Iran did materially support the Shia

19   militias in providing the specific munitions that were

20   alleged to have occurred in those attacks and has found Iraq

21   liable using a bellwether process and then applying the

22   findings of those bellwether cases to about 75 other attacks

23   that were not part of the bellwether process there.

24           That can be applied by Your Honor in this case to

25   a certain subset of the attacks that we have that involve

1     explosively formed penetrators as well as Shia militia

2     groups that we allege and can substantiate were responsible

3     for the attack.

4             THE COURT:  You may have misunderstood me, or I

5     may not have been clear.

6             Let's put *Karcher* to the side.  When I talk about

7     the four cases, I'm referring to *Hake*, *Zambon*, and *Holladay*,

8     which are all before or were previously filed, and then the

9     fourth being this one.

10            MR. PAULOS:  Okay.

11            THE COURT:  Assuming that -- you know, if these

12    are all based on a similar theory involving different

13    attacks, where are you all with the scheduling of any trials

14    in *Hake*, *Zambon*, or *Holladay*?

15            MR. PAULOS:  All right.  So in *Zambon*, the Court

16    is going to be conducting a hearing in October only on the

17    issue of Afghanistan cases.  So the findings of fact and

18    conclusions of law in that case will not impact the cases

19    involving attacks in Iraq.

20            THE COURT:  Okay.

21            MR. PAULOS:  *Hake*, which is not a case that I'm

22    involved in, Your Honor, but I'm watching closely, of

23    course, has essentially agreed to a bellwether process, but

24    they are going to be using the same bellwether cases that

25    were at issue in *Karcher*.  They're the same attacks, the

1    same victims.  And the Court is going to be analyzing the

2    liability of the defendants:  Bank Melli, Bank Markazi, and

3    NIOC.  That question has not been addressed yet by the

4    Courts when it comes to case -- attacks in Iraq.

5            Those defendants, however, were just found liable

6    just last week in an attack involving a family in Israel.

7    That case is called *Henkin*, and the case number is 1:19-cv-

8    01183 [sic] in front of Judge Lamberth.  So in terms of the

9    liability for the defendants that are in our case and the

10   attacks that are in our case, no court has presently set a

11   hearing to determine Iran's support for non-EFP and non-Shia

12   militia groups.

13           THE COURT:  Okay.  Have you proposed the same

14   approach to Judge Moss in *Holladay*?

15           MR. PAULOS:  We proposed a bellwether approach to

16   Judge Moss in *Holladay*, and he did not reject it.  He simply

17   asked us to provide him with a presentment of evidence

18   related to all of the attacks in that case.  That case

19   involves 42 separate attacks, so it's a much smaller case

20   than this.  And he asked us to provide a paper submission in

21   kind of one fell swoop as it relates to the questions of

22   liability for the groups and attacks in that case.

23           That --

24           THE COURT:  And so are those 42 included in

25   however many there are in this case?

 1          MR. PAULOS:  No.

 2          THE COURT:  No, totally different.

 3          MR. PAULOS:  Totally different attacks.

 4          THE COURT:  Okay.

 5          MR. PAULOS:  And my experience with putting this

 6    paper submission together for Judge Holladay [sic] has

 7    strengthened my conviction for the need of a bellwether

 8    process in these cases.  The reason being is we're -- and I

 9    think Your Honor is aware of some of the issues in getting

10    material from the Department of Defense from your experience

11    in the *Burk* case.  We are presently prepared to present

12    evidence to Judge Moss in a significant number of attacks in

13    that case but are waiting to get additional information and

14    some straggling information for just a few of the cases in

15    that matter, and we're unable to move the case until we

16    have -- we feel like we've got the necessary evidence for

17    everybody that's involved in that case.

18          THE COURT:  Okay.  I was going to ask you about

19    discovery in this case.  Obviously in *Burk* there was an

20    assertion of the state secret privilege, and the process did

21    take quite a while.  Do you anticipate similar difficulties

22    here, or no?

23          MR. PAULOS:  So I think the -- I think anybody

24    that is seeking discovery from the Department of Defense,

25    whether in a terrorism context or not, right now is running

1    into just a very slow process.  My firm has other cases

2    involving the Department of Defense Touhy requests that are

3    not terrorism related, and we're seeing the same thing.

4    There's just a backlog.

5            We, in anticipation and in our experience based on

6    our discovery requests in *Holladay* and other matters and

7    watching *Burk*, have really narrowed the scope of our

8    requests and have worked very closely with the Department of

9    Defense and DOJ attorneys that are representing it to laser

10   focus our requests on documents that we believe will strike

11   to the heart of the elements of our claims and that our

12   experts have asked us to seek to obtain.

13           Right now we are actually doing quite well with

14   what we're getting from our subpoena requests in this case.

15   We've gotten three productions of documents from the FBI

16   TEDAC lab so far that have provided photographic evidence

17   and other analyses and other attacks in our case, and we're

18   working with the Department of Justice attorneys

19   representing DOD on narrowing the scope and focusing on the

20   documents that we believe CENTCOM and the DOD agencies like

21   MARCENT and ARCENT and others have.  And so we're hopeful

22   that they will continue to provide us information.

23           We do think that -- and in kind of anticipation of

24   adopting a bellwether process, we kind of front-loaded a

25   series of cases or series of attacks with the Department

1    of Defense in our first subpoena request and have them

2    focusing on those cases primarily and, through that

3    process, are going to further refine the requests that we

4    have.

5           So we are hopeful that the DOD will continue to

6    produce documents to us.  We haven't had to go to the mat

7    with them in any of our other terrorism cases like you have

8    seen in *Burk* in terms of motions to compel.  My

9    understanding -- and I'm sure Your Honor knows much better

10   than me -- is there the issue is getting the requisite

11   documents to confirm the use of an EFP and also seeking

12   documents that may mention specifically Iran as being

13   connected to those attacks, and, you know, our understanding

14   of the law is plaintiffs need only establish that Iran's

15   material support was a proximate cause of their injuries,

16   which does not require that Iran's support be directly

17   traceable to a particular terrorist attack.

18          And so we have been asking the DOD to get us

19   documents and information that confirm the date, the

20   location, the munitions used, and an assessment of the area

21   in which the attack occurred, on or near the time of the

22   attack occurred, which usually provides information about

23   those deemed responsible or likely responsible for the

24   attack, which we, you know, are able to connect to Iran

25   through their various streams of material support to the

1    specific groups that I mentioned before.

2              THE COURT:  All right.  So where do you suggest we

3    go from here?

4              MR. PAULOS:  Well, Your Honor, we would request

5    that the Court consider allowing us to proceed with a

6    bellwether presentment of evidence to it.  We think that the

7    claims in this case can be fairly developed and presented in

8    a bellwether process, and we believe that in doing so the

9    Court will be able to address issues of law and fact that

10   are common amongst all of the claims.  It will certainly

11   streamline the presentation of evidence as we get it for the

12   particular cases that are selected and help us eliminate all

13   nonessential third-party discovery and ultimately, for Your

14   Honor's benefit, produce reliable information using specific

15   plaintiffs and their specific claims that are representative

16   of the totality of the claims in the case so that your Court

17   and Your Honor can determine the nature and strength of

18   those specific claims.

19              And so if the Court is amenable to a bellwether

20   process, my recommendation would be to allow us to come back

21   to you with a selection of cases that we can explain to the

22   Court why we believe that they are representative and what

23   issues we believe they address and how those issues can be

24   applied essentially across the board; and then, based on the

25   number of cases that are selected in order to perform that

1    job, we'll develop a case management calendar that's

2    reasonable in light of what we know about the DOD and what

3    fits best with what the Court deems is necessary for it to

4    hear evidence.  Whether that be through a hearing process or

5    a paper submission process, you know, we'll leave that up to

6    Your Honor, but that would be my suggestion for where we go

7    from here.

8              THE COURT:  Okay.  This is somewhat virgin

9    territory for me.  I have experience in other terrorism

10   cases and Iran cases obviously, but I will -- I'll let you

11   submit a proposal, and then we can get together and talk

12   about it.

13             I may confer with some of my colleagues here as

14   well to get their views on how these cases globally ought

15   to be handled in the most efficient way, but I'm happy to

16   have you file something in writing suggesting a path

17   forward.

18             MR. PAULOS:  Okay.  Thank you.

19             THE COURT:  And when you say "bellwether" -- I

20   know *Karcher* involved, I believe, seven plaintiffs or seven

21   attacks.  Would that be just -- you know, would it be one

22   trial involving a subset of attacks, or would you envision a

23   series of bench trials?

24             MR. PAULOS:  So I actually attended the trial or

25   the hearing in *Karcher* for the entire length of it.  It was

1    a four-day hearing before Judge Kollar-Kotelly.  There were

2    seven bellwether cases that were selected to assist the

3    Court there in determining liability in about 93 attacks

4    that were at issue in the case.  The Court to date has ruled

5    on about 83 of those attacks, if I recall correctly.

6         The other courts that are using a bellwether

7    process, including *Cabrera*, *Zambon* and *Hake*, *Hake* has the

8    same number -- approximately the same number -- of attacks

9    and is using the same bellwether cases as *Karcher*.

10        *Zambon* is doing a bellwether hearing in October

11   that's going to focus on anywhere between I believe it's

12   eight to 15 attacks, and they have developed a

13   categorization process of attack based on location of

14   attack, munition used, and date, and they are going to be

15   putting on evidence there.

16        THE COURT:  Okay.  I'd like for you to lay out the

17   proceedings that are scheduled or contemplated in those

18   other cases as well so that I can figure out how this one

19   might fit in with those, okay?

20        MR. PAULOS:  We can certainly provide a survey for

21   Your Honor that discusses that.

22        THE COURT:  Okay.

23        MR. PAULOS:  And then what I think in this case is

24   that we can -- we've created internally for ourselves a

25   universe of about 49 attacks that we think are categorized

1    based on representative case type and group involvement.  We

2    believe that can be narrowed down to somewhere between 10

3    and 15 attacks that would cover the waterfront in terms of

4    group involvement and the theories of material support by

5    Iran.  And based on what we've seen in the *Karcher* hearing

6    and what may go forward in *Zambon* and *Cabrera* in October,

7    that that would be a reasonable amount of cases that we

8    could put on in a hearing or in a paper submission to Your

9    Honor to makes some initial rulings.

10            So we will put that into an official proposal for

11   you and provide you some background information and kind of

12   give you the lay of the land of everything else that we

13   understand is going on in these other cases so you have all

14   of that at your fingertips.

15            THE COURT:  Okay.  How long do you need?

16            MR. PAULOS:  I think we could probably put that

17   together for you in the next 30 to 45 days.

18            THE COURT:  That's fine.

19            All right.  We'll look forward to that and then go

20   from there, I suppose.

21            MR. PAULOS:  Thank you very much, Your Honor.

22            THE COURT:  All right.  Anything else?

23            MR. PAULOS:  Not at this time from the plaintiffs.

24            THE COURT:  All right.  Okay.  We'll wait to hear

25   from you, and we'll enter a minute order to that effect.

1    We'll give you 45 days.

2              MR. PAULOS:  Thank you, Your Honor.

3              THE COURT:  Okay.  Very well.

4                    (Whereupon the hearing was

5                     concluded at 11:40 a.m.)

6

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10             I, LISA A. MOREIRA, RDR, CRR, do hereby

11   certify that the above and foregoing constitutes a true and

12   accurate transcript of my stenographic notes and is a full,

13   true and complete transcript of the proceedings to the best

14   of my ability.

15       **NOTE:**  This hearing was held during the COVID-19

16   pandemic stay-at-home restrictions and is subject to the

17   technological limitations of court reporting remotely.

18              Dated this 22nd day of July, 2021.

19

20                         /s/Lisa A. Moreira, RDR, CRR
                           Official Court Reporter
21                         United States Courthouse
                           Room 6718
22                         333 Constitution Avenue, NW
                           Washington, DC 20001
23

24

25