**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER** | ) | |
| **BROOK FISHBECK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 1:18-cv-02248-CRC** |
| **v.** | ) | |
| | ) | |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| _____ | ) | |

**PLAINTIFFS' PROPOSED CASE MANAGEMENT PLAN**

## <u>TABLE OF CONTENTS</u>

I.    Nature of the Case .................................................................................................. 1

II.   Procedural Posture ................................................................................................. 6

III.  The Elements of Plaintiffs' Claims ....................................................................... 6

    A. Subject matter jurisdiction - *Does the Court have subject-matter jurisdiction over Plaintiffs' claims?* ............................................................................................. 7

    B. Personal jurisdiction - *Does the Court have personal jurisdiction over the defendants?* .. 8

    C. Civil Liability under 28 U.S.C. § 1605(A) – *Have Plaintiffs established the elements of the causes of action?* .......................................................................................... 8

IV.   Proposed Case Management Plan.......................................................................... 13

    A. Stage One - Establishing the Court's Subject Matter Jurisdiction. ................................. 14

    B. Stage Two - Establishing Iran's Material Support for the Terrorist Groups that Committed the Subject Attacks. ............................................................................................. 14

    C. Stage Three - Establishing the Subject Attacks Were Committed by the Terrorist Groups Iran Materially Supported. ........................................................................................ 15

    D. Stage Four - Damages ............................................................................................. 17

V.    Proposed Schedule................................................................................................. 18

VI.   Status of Ongoing FSIA Cases that Involve Iran's Support for Terrorism in Iraq................ 19

    A. *Karcher, et al., v. Islamic Republic of Iran*, No. 16-cv-00232-CKK (DDC).................. 19

    B. *Hake, et al. v. Bank Markazi, et al.*, No. 17-cv-00114-TJK (DDC). .............................. 20

    C. *Holladay, et al. v. Islamic Republic of Iran, et al.*, No. 17-cv-00915-RDM (DDC)........ 21

    D. *Hartwick, et al., v. Islamic Republic of Iran, et al.*, No. 18-cv-01612-CKK (DDC). ...... 21

    E. *Zambon, et al., v. Islamic Republic of Iran*, No. 18-cv-02065-JDB (DDC)................... 22

VII.  Conclusion............................................................................................................. 23

Pursuant to this Court's Minute Order of July 20, 2021, Plaintiffs set out below (1) their proposed Bellwether Case Management Plan; and (2) a summary of proposed case management plans and orders entered in other cases that have used or considered a bellwether process to address claims against Iran under the terrorism exception to sovereign immunity in the Foreign Sovereign Immunity Act ("FSIA"). 28 U.S.C. § 1605A *et seq*.

## I.     Nature of the Case

Plaintiffs are American service members and contractors killed or injured in terrorist attacks while serving in Iraq and their family members. Each attack was committed by terrorist organizations materially supported by Iran through its agencies and instrumentalities. Amended Complaint, ECF Dkt. No. 10, ¶¶ 1-14; 168-192; 199; 453-464. After major combat operations in Iraq ended on May 1, 2003, and U.S. peacekeeping operations commenced under United Nations mandate,[1] Iran increased its flow of support and resources to terrorist groups in Iraq to target U.S. and other Coalition peace-keeping forces. *Id*., ¶¶ 328-341; 405-445. Iran provided this support through its paramilitary force, the Islamic Revolutionary Guard Corps[2] ("IRGC"); the IRGC's special operations branch, the Qods Force, *id*., ¶¶ 4; 11; 31; 45; 47; 58-71; 111; 114; 179-192; 323; Iran's terrorism proxy Hezbollah,[3] *id*., ¶¶ 4; 11; 31; 41; 45; 47; 51; 54; 161; 169; 176; 193-221;

---

[1] *See* United Nations Security Council Resolution 1483 (May 22, 2003), available at: http://unscr.com/en/resolutions/doc/1483 (last visited September 3, 2021).

[2] The IRGC was designated a Foreign Terrorist Organization ("FTO") on April 15, 2019, for its long history of supporting and committing terrorism, specifically including attacking and killing Americans in Iraq. *See* https://eg.usembassy.gov/secretary-pompeo-announces-intent-to-designate-irgc-as-a-foreign-terrorist-organization/ (last visited September 3, 2021).

[3] Hezbollah was designated a FTO on October 8, 1997. *See* https://www.state.gov/foreign-terrorist-organizations/ (last visited September 3, 2021).

323; and Iran's Ministry of Intelligence and Security[4], *id.*, ¶¶ 4, 11, 31, 45, 47, 72-91; 315; 323. Iran cultivated and supported multiple groups simultaneously and across sectarian divides. *Id.*, ¶¶ 4; 5; 12; 56; 234-235; 253; 271; 275.

First, Iran supported Sunni terrorist groups Al Qaeda and Ansar al Islam by providing the early funding and training necessary to the groups' formation and growth. Iran then provided these groups with critical safe haven and operational support within Iran while they focused on attacking victims in Iraq, including Plaintiffs. *Id.*, ¶¶ 5; 149; 150; 201; 237-317; 3525.

Second, Iran created and worked with Shia terrorist groups in Iraq (called Special Groups by the U.S. military) to sow division amongst the Iraqi populace and disrupt the fledgling Iraqi democracy. *Id.*, ¶¶ 4; 176; 234 318-341. For example, Iran provided critical funding to the Special Groups, along with expert training and knowledge on how to successfully attack American security forces in Iraq. Iran also provided sophisticated weapons to the Special Groups, including Explosively Formed Penetrators ("EFPs") and Improvised Rocket-Assisted Munitions. *Id.*, ¶¶ 173; 322; 368; 372; 383; 402-404; 406-445. These became the deadliest weapons used against U.S. personnel in Iraq. *Id.* ¶¶ 657-658; 737-738; 764-765; 786-787; 872-873; 910-911; 923-924; 947-948; 954-955; 1048-1049; 1149-1151; 1211-1212; 1609-1610; 1646-1647; 1687-1688; 1858-1860; 1951-1952; 2008-2009; 2025-2026; 2062-2063; 2107-2019.

The Amended Complaint alleges that Iran funded its terror campaign in Iraq with the knowledge and assistance of co-defendants National Iranian Oil Company, Bank Melli Iran, and Bank Markazi (the Central Bank of Iran), which laundered more than $100 million in assets for

---

[4] The Ministry was deemed a Specially-Designated Global Terrorist organization on February 16, 2012, for supporting and committing terrorism, including specifically its support for FTOs Hezbollah, Al Qaeda, and Al Qaeda in Iraq. *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx (last visited September 3, 2021).

the benefit of Hezbollah and the IRGC. *Id.,* ¶¶ 94-96; 110-118; 121; 136; 139; 446-452. Hezbollah and the IRGC used these funds to direct, train, arm, supply and fund the Special Groups, Al Qaeda, and Ansar al Islam. *Id*., ¶¶ 405-445.

In short, this case is about Iran's singularly focused and systematic terrorism campaign that targeted U.S. soldiers and contractors in Iraq. While Iran could have chosen to use legal diplomatic, political, and humanitarian efforts to influence the outcome of Iraq's emergence from the brutal regime of Saddam Hussein, it instead chose to shower its largesse upon designated Foreign Terrorist Organizations ("FTOs"), which used extraordinary violence to promote Iran's long-term regional goals. *Id*., ¶¶145; 148-178; 452.[5]

The 437 subject attacks were part of Iran's coordinated terrorism campaign in Iraq and have common characteristics that establish Iran's responsibility for each attack:

- **The specific terrorist groups that committed the attacks**. The group responsible for an attack can be determined from a number of factors and characteristics, in particular, the specific tactics, techniques and procedures ("TTPs") used to carry out the attack. Indeed, because Iran trained and armed the terrorists, the TTPs used to carry out the attacks usually fit a pattern that evinces a reasonable connection to the material support provided by Iran, including the use of complex ambush tactics, suicide bombings, targeting of armored vehicles, and other distinct methods.

- **The specific weapons used in the attacks**. Iranian manufactured or sourced mortars, rockets, small arms, and bomb making materials were supplied by Iranian agents to terror groups in Iraq. For example, EFPs made with a precision-milled concave copper disk and a package of highly explosive material and capable of piercing military armor. Like other Iranian munitions, EFPs require sophisticated technologies to manufacture and assemble and expert training to detonate. EFPs were one type of signature Iranian weapon used in Iraq against Plaintiffs.

- **The specific location, time and target of the attacks**. In combination with the weapons used, methods employed, and victims targeted, the specific date and

---

[5] Congress clarified that violent acts of designated FTOs and Specially Designated Global Terrorists ("SDGTs") are acts of international terrorism and cannot be characterized as legitimate acts of a military force. Iran's use of Sunni and Shia FTOs and SDGTs to attack U.S. and coalition forces, American and Iraqi civilians, and international peacekeeping personnel, constituted grave violations of international humanitarian law. 18 U.S.C. § 2331(1), (6).

geography of the attack can be used to assess the flow of material support from Iran to a specific group in the area, the strategic relevance of the attack, and the motive and opportunity of a particular group to commit the attack. For example, attacks by Shia militias launched against U.S. bases along known IRGC-supply routes using Iranian weapons and tactics and originating in areas controlled by Iranian-backed terror groups are among the most readily identifiable instances of Iran's material support of terrorism in Iraq.

While the attacks span time and location, each attack was the result of a singular objective, effectuated through a deliberately designed scheme, utilizing a well-organized system and furthering Iran's common purpose—the extrajudicial killing and maiming of Americans, including Plaintiffs, to influence, intimidate, and affect the conduct and policies of the United States.[6]

Numerous U.S. government reports have identified the Defendants' roles in supplying material support to these terrorist organizations, detailing the devastating effect such support had on Coalition forces and Iraqi citizens. *Id.*, ¶¶ 67; 85; 133-134; 163, 165-167; 171; 174; 175; 186; 198; 234; 249; 321; 367; 422; 427; 432-436.

Multiple district courts have evaluated evidence of Iran's material support to Hezbollah, the Special Groups, and Al Qaeda, and have found Iran liable for attacks occurring in Iraq, Israel, and the United States. *See, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (finding Iran liable for Shia militia attacks in Iraq in 2007); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 14 (D.D.C. 2019) (finding Iran liable for Shia militia EFP and rocket attacks in Iraq from 2004 to 2011); *Henkin v. Islamic Republic of Iran*, No. 1:18-CV-1273-RCL,

---

[6] *See* 18 U.S.C. § 2331, defining "international terrorism" as "…activities that—(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii ) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]"

2021 WL 2914036, (D.D.C. July 12, 2021) (finding Iran, including Banks Melli and Markazi, liable for kidnapping and shooting the Henkin family in Israel in 2015); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) (finding Iran liable for rocket attacks, stabbings, and shootings in Israel from 2008 to 2016); *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) (finding Iran liable for materially supporting Al Qaeda in dual U.S. Embassy bombings in Kenya and Tanzania on August 7, 1998); *Alshaar v. Islamic Republic of Iran*, No. 1:15-cv-2343-GAYLES (March 18, 2020) (finding Iran liable for an IED attack on Sept. 13, 2005 in Basra, Iraq); *In re Terrorist Attacks on Sept. 11*, 2001, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *1 (S.D.N.Y. Dec. 22, 2011) (finding Iran liable for materially supporting Al Qaeda in the 9-11 attacks).

There are other cases pending in this district asserting similar claims under similar (but not identical) theories of Iran's liability involving different attacks committed by some of the same terrorist groups at issue here. *See, e.g.*, *Cabrera/Zambon, et al. v. Islamic Republic of Iran*, No. 1-19-CV-03835-JDB (involving approximately 350 attacks in both Afghanistan and Iraq, bellwether hearing is set for October 18, 2021); *Hake, et al. v. Bank Markazi, et al.*, No. 1:17–CV–00114-TJK (approximately 90 EFP, rocket and complex attacks in Iraq by Shia militia); *Holladay, et al. v. Islamic Republic of Iran*, *et al.*, No. 1:17-CV-00915-RDM (42 attacks by Shia and Sunni groups in Iraq*); Hartwick, et al. v. Islamic Republic of Iran, et al.*, 1:18-cv-01612-CKK (341 attacks by Shia and Sunni groups in Iraq); and *Martino, et al. v. Islamic Republic of Iran*, No. 1:21-cv-01808-RDM (approximately 126 attacks by Sunni groups in Iraq). *See, e.g.*, Exhibits 1-11 (discussed further below).

Plaintiffs are mindful of the scale of this case and their obligation to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs are also cognizant of the

need to litigate this case in a manner that promotes judicial economy. This proposed case management plan has been drafted with those objectives in mind.

## II.     Procedural Posture

Plaintiffs commenced this case in 2018 and served process on the Defendants as required under the FSIA. *See* ECF Dkt. No. 55 (finding service of process was perfected on defendants). The Defendants failed to appear, and the Clerk entered default. ECF Dkt. Nos. 32, 33, 34, and 38. Plaintiffs subsequently served discovery requests on third parties, including ten subpoenas on United States government agencies and nine subpoenas on financial institutions. Plaintiffs have received document productions from five of the nine financial institutions. Plaintiffs' counsel continue to conduct regular meet-and-confers with counsel from Department of Justice for the subpoenas served on governmental agencies. ECF Dkt. No. 68.

On May 28, 2021, Plaintiffs filed a Status Report proposing the use of "bellwether" cases to address legal and factual issues common to all attacks. ECF Dkt. No. 59. On July 20, 2021, the Court held a Status Conference to discuss the proposal and subsequently ordered Plaintiffs to file a report outlining the proposed "bellwether" approach along with proposed case management plans and case management orders that have been entered in similar cases. *See* Minute Orders of July 1, 2021 and July 20, 2021. *See also* ECF Dkt. No. 67.

## III.    The Elements of Plaintiffs' Claims

Plaintiffs' proposed case management plan is designed to track the elements of their FSIA claims and places in sequence the Court's consideration of threshold issues so that the presentation of evidence is streamlined by the rulings and findings preceding each subsequent stage of the plan. Proceeding in stages based upon the elements of their claims, Plaintiffs' plan intends to assist the

Court in prioritizing issues and to avert the Court's consideration of redundant or unnecessary information.

The following section breaks down the legal elements of Plaintiffs' claims. The next section describes the stages of Plaintiffs' proposed case management plan and how the specific elements will be established at successive stages of the plan.

## A. Subject matter jurisdiction - *Does the Court have subject-matter jurisdiction over Plaintiffs' claims?*

Plaintiffs assert claims against Defendants under 28 U.S.C § 1605(A)(c) for Defendants' providing material support to the acts of extrajudicial killing (or attempted killings) that resulted in personal injury and, in some instances, deaths. Plaintiffs consist of individuals who were injured or killed in the attacks (*i.e.*, direct victims of the attacks) and family members of those victims (*i.e.,* solatium claimants).

Federal "district courts" "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity" under the FSIA. 28 U.S.C. § 1330(a). The pertinent sovereign immunity exception for this case is the state-sponsored terrorism exception under 28 U.S.C. § 1605A. Two requirements must be met for the exception to apply. First, the foreign state must have been designated a state sponsor of terrorism at the time the act of extrajudicial killing occurred or was attempted and at the time the lawsuit was filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, direct victims of the attack must have been U.S. nationals, members of the U.S. armed forces, or U.S. government employees or contractors at the time of the terrorist act. 28 U.S.C. § 1605A(a)(2)(A)(iii). These elements can be established with a streamlined presentation of evidence to the Court as detailed in section IV.A. below.

**B. Personal jurisdiction -** *Does the Court have personal jurisdiction over the defendants?*

A federal district court has personal jurisdiction over a foreign state "where service has been made under section 1608" of the FSIA. 28 USC 1330(b). *See Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). This Court has already ruled that service of process has been effectuated on all the defendants in this case, thus establishing personal jurisdiction over Defendants. ECF Dkt. No. 55.

**C. Civil Liability under 28 U.S.C. § 1605(A) –** *Have Plaintiffs established the elements of the causes of action?*

The FSIA's state-sponsored terrorism exception applies for claims involving "personal injury or death that was caused by...the provision of material support or resources for" an "act of...extrajudicial killing." 28 U.S.C. 1605A(a)(1). *See Force*, 464 F. Supp. 3d at 364. Thus, the liability elements of Plaintiffs' claims are: (1) Iran provided material support for (2) an act of extrajudicial killing that (3) caused personal injury or death.

**1. "Provision of material support or resources" -** *Did Iran provide material support to the terrorist groups during the time period of the attacks at issue in this case?*

"Material support or resources" is defined under 28 U.S.C. § 1605A(h)(3) by reference to 18 U.S.C. § 2339A, which in turn defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Examples of such material support in FSIA terrorism cases include weapons, weapons technology, training, intelligence, money, and safe haven to terrorist groups. *See Force*, 464 F. Supp. 3d at 365; *Fritz*, 320 F. Supp. 3d at 86. To establish Defendants' material

support to the specific terrorist groups around the time the subject attacks occurred, Plaintiffs will present evidence in the form of prior court rulings, expert testimony, fact witness testimony, and government documents at the specific stages outlined below.

        a.  **Causation -** ***Was Iran's material support to the terrorist group a proximate cause of the terrorist attack?***

To meet the "material support" element, a causal connection must be established between the material support provided and the attack that caused the plaintiff's injury. The Court must consider whether the attack was "caused by provision of material support to" the terrorist group that carried out the attack. *Force*, 464 F. Supp. 3d at 371. This does not require proof that the defendant "specifically knew of or intended its support to cause" the particular attacks in question. *Owens*, 864 F.3d at 798; *Force*, 464 F. Supp. 3d at 368. And it does not require proof that the defendant's material support was a "but for" cause of the attack. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004); *Force*, 464 F. Supp. 3d at 368. Nor does it require evidence that the defendant's material support was traceable or "tied to each of the attacks that caused [the plaintiffs'] injuries." *Kilburn*, 376 F.3d at 1130; *Force*, 464 F. Supp. 3d at 368. Such a "nexus" is not necessary because certain material support—such as funds, arms, and other support for terrorist organizations—are "fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [a terrorist organization's] careful bookkeeping." *Kilburn*, 376 F.3d at 1130; *Force*, 464 F. Supp. 3d at 368.

Rather, the FSIA requires a "showing of proximate cause," which is satisfied where the plaintiffs show "some reasonable connection between the" defendant's conduct and "the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368. This requires plaintiffs to show two things. First, the defendant's material support was a "substantial factor in the sequence of events that led to the plaintiff's injury." *Kilburn*, 376 F.3d at 1128; *Force*,

464 F. Supp. 3d at 368; *Fritz*, 320 F. Supp. 3d at 85. Second, the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368; *Fritz*, 320 F. Supp. 3d at 85.

> **b. "Substantial factor" - *Did Iran provide material support to the terrorist group in the time period leading up to the attack? And was this support essential to the group's operating capacity?***

All that is required to satisfy the "substantial factor" component of the "proximate cause" element is evidence that a defendant's aid to the terrorist organization "was essential to" the organization's "operating capacity and that, without [the defendant's] backing," the organization "would be substantially weakened." *Force*, 464 F. Supp. 3d at 368. Thus, for example, in *Force*, the Court "found that, during the years leading up to and surrounding the attacks at issue, Iran provided tens—if not hundreds—of millions of dollars' worth of currency to Hamas and PIJ" and "also provided substantial operational capacity to both groups, including rockets and other weapons, weapons technology, and training of operatives." *Force*, 464 F. Supp. 3d at 364-365. Even though plaintiffs in that case had "not offered evidence that" this "support was tied to each of the attacks that caused their injuries," the Court still found that "Iran's support to both PIJ and Hamas was a substantial factor in the eight attacks that caused the Plaintiff's injuries." *Force*, 464 F. Supp. 3d at 368.

In sum, the "substantial factor" test is met by showing Iran provided material support to the terrorist organization that committed the attack in the time period leading up to and surrounding the attack and that this material support was essential to the organization's operating capacity.

   c. **"Reasonably foreseeable" or "natural "consequence" -** *Were terrorist attacks reasonably foreseeable or a natural consequence of Iran's material support to the terrorist group?*

The second component of the proximate cause element requires evidence that the terrorist attacks were "reasonably foreseeable" or a "natural consequence" of Iran's material support. *Owens*, 864 F.3d at 794; *Force*, 464 F. Supp. 3d at 368. While this depends to a certain extent on the nature and degree of support Iran provided, it is established by evidence of Iran's active encouragement of terrorism and widespread support for terrorist groups, which serve as proxies for Iran's "geopolitical strategy" of fomenting terrorism throughout the Middle East. *See Force*, 464 F. Supp. 3d at 337-338, 369. Indeed, Courts have had little difficulty finding that a reasonably foreseeable consequence of supporting a terrorist organization is terrorism—even when the support is not expressly earmarked for terrorism. *See Kilburn*, 376 F.3d at 1127-1130 (finding that Sudan's "general awareness of the group's terrorist aims" satisfies the proximate cause element of a FSIA terrorism claim); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (affirming liability for donors to terrorist organizations whose donations were made for non-terrorism purposes: "Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities.").

To establish the nature of the injuries caused by the attacks at issue, and the reasonable connection of Iran's material support to the groups responsible for each attack, Plaintiffs will present evidence in the form of expert testimony, government documents, and military and medical records at the specific stages outlined below.

11

**2. Acts of "extrajudicial killing" (or attempted extrajudicial killing) -** *Were the attacks acts of extrajudicial killing or acts of attempted extrajudicial killing?*

Plaintiffs must also establish that the subject attacks meet the definition of "extrajudicial killing." 28 U.S.C. § 1605A(a)(1). In defining "extrajudicial killing," the FSIA looks to the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1065A(h)(7). The TVPA defines the "extrajudicial killing" to mean "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73. The D.C. Circuit has explained that this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. Decisions from this circuit and from other jurisdictions have uniformly held that the statutory term "killing" also covers attempted killings. *Force*, 464 F. Supp. 3d at 360; *Karcher*, 396 F. Supp. 3d at 58; *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017). Accordingly, "the waiver of sovereign immunity includes attempted extrajudicial killings that result in serious physical injuries, even if no one is killed in the attack." *Force*, 464 F. Supp. 3d at 360. *See also Karcher*, 396 F. Supp. 3d at 57.

The types of terrorist attacks at issue in this case readily meet the definition of "extrajudicial killing." They involved, for example, attacks perpetrated with the use of rockets, grenades, explosively-formed penetrators (EFP), mortars, improvised explosive devices (IED), snipers, and suicide bombs—all resulting in death or serious physical injuries. ECF Dkt. No. 10, Amended Complaint, ¶¶ 580, 636-638,657-659, 672-674, 728-730, 802-804, 903-905. These are the types of attacks that have been held to meet the FSIA's/TVPA's definition of "extrajudicial killing." *See, e.g.*, *Force*, 464 F. Supp. 3d 323 (stabbing attacks and rocket attacks); *Karcher*, 396

F. Supp. 3d at 12 (EFP attacks); *Gill*, 249 F. Supp. 3d at 88 (shooting attack); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017) (bombing attack).

Plaintiffs will, at the proposed stage as discussed below, satisfy the "extrajudicial killing" element by presenting evidence about each attack, including the weapons used to carry out the attacks, the sophistication and coordination of the attacks, and the damage wrought by the attacks, including the deaths or serious injuries suffered by the direct victims of the attack.

### 3. "Personal injury or death" - *Did Plaintiffs suffer personal injury or death as a result of the subject attacks?*

The final element requires proving the subject terrorist acts caused "personal injury or death." 28 U.S.C. § 1605A(a)(1); *Force*, 464 F. Supp. 3d at 359. This element can be established by declarations of the injured persons, eyewitness declarations, after-action reports, medical records, and, in the case of death, death certificates—or a combination thereof. *See, e.g., Force*, 464 F. Supp. 3d at 359 (citing plaintiffs' declarations in finding the personal injury requirement of § 1605A(a)(1)). The FSIA also encompasses claims—known as solatium claims—by family members of those injured or killed. 28 U.S.C. § 1605A(c); *Force*, 464 F. Supp. 3d at 359. These claims, which are to redress psychological and emotional harm, are considered claims for personal injury under the statute. *Force*, 464 F. Supp. 3d at 359; *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012).

## IV. Proposed Case Management Plan

With the foregoing legal elements in mind, Plaintiffs propose the following case management plan for the efficient presentation of evidence. The proposal aims to minimize the burden on the Court by relying on judicial findings in similar cases, presenting evidence in a streamlined fashion through documentary submissions, and referring out much of the work to special masters and/or magistrates. Although Plaintiffs must establish their claims "by evidence

satisfactory to the court," 28 U.S.C. § 1608(e), the Court has considerable latitude to determine the degree and kind of such evidence and the manner in which such evidence is presented and evaluated. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

### A. Stage One - Establishing the Court's Subject Matter Jurisdiction.

In the first stage of the proposed case management plan, Plaintiffs will present evidence establishing the Court's subject-matter jurisdiction. As noted above, Plaintiffs must show two things. First, Iran was a designated state sponsor of terrorism at the time the act occurred and at the time the lawsuit was filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, the direct victims were U.S. nationals, members of the U.S. armed forces, or U.S. government employees or contractors at the time of the terrorist act. 28 U.S.C. § 1605A(a)(2)(A)(iii).

Plaintiffs can prove these two straightforward elements by written motion and brief accompanied by documentary evidence. Plaintiffs will ask the Court to take judicial notice of the fact that Iran has been a designated state sponsor of terrorism since 1984 and remains so designated to this day. *See, e.g.*, *Force*, 464 F. Supp. 3d at 358. To meet the second element each Plaintiff will present a declaration, birth certificate, and/or military records. *See id.* at 371 (accepting plaintiffs' declarations as sufficient proof of this element).

### B. Stage Two - Establishing Iran's Material Support for the Terrorist Groups that Committed the Subject Attacks.

Once jurisdiction is established, the claims will proceed to stage two, during which Plaintiffs will begin proving the "material support" element of their claims by establishing that Iran provided material support to the terrorist organizations who committed the subject attacks in the time period leading up to the attacks. Plaintiffs will also prove this support by Iran was essential to the terrorist groups' operating capacity. This will satisfy the requirement of showing Iran

14

provided material support to the terrorist groups, that the material support was essential to the groups' operating capacity, and that terrorist attacks in general were reasonably foreseeable or a natural consequence of that material support.

This case involves attacks committed by a discrete number of terrorist groups—namely, Hezbollah, Al Qaeda and Al Qaeda in Iraq, Ansar al Islam, and the Special Groups (consisting of the Badr Corps, Kata'ib Hizballah, Jaysch al Mahid, the Promised Day Brigade, and Asa'Ib ahl al Haq). Given the limited number of terrorist groups perpetrating the subject attacks, Plaintiffs envision, for this stage, seeking judicial notice of certain factual findings from other cases. For the facts that cannot be judicially noticed, Plaintiffs will present their evidence primarily through expert reports and declarations. These experts include those who have testified in this Court in other Iran FSIA terrorism cases and who have been recognized as experts in their respective fields related to international terrorism. They include, among others, Matthew Levitt, PhD, Patrick Clawson, PhD, Daveed Gartenstein-Ross, PhD, and Michael Pregent. *See, e.g.*, *Cohen*, 238 F. Supp. 3d at 71 (Levitt and Clawson); *Fritz*, 320 F. Supp. 3d at 48 (Gartenstein-Ross); *Karcher*, 396 F.Supp. 3d at 23 (Pregent).

By proving Iran's material support for each of these terrorist groups in the time period before, during and after the subject attacks, Plaintiff will satisfy the "material support" element of their claims. This proof will then be linked to the subject attacks during the next stage of the presentation.

**C. Stage Three - Establishing the Subject Attacks Were Committed by the Terrorist Groups Iran Materially Supported.**

In stage three, Plaintiffs will present evidence that the specific subject attacks were committed by the terrorist groups that Iran materially supported and occurred during the time of Iran's material support. Stage three consists of two parts.

### 1.  Part One: Bellwether Attacks

The first part of this stage involves the presentation of evidence related to selected bellwether, or exemplar, attacks. Plaintiffs will present evidence about two terrorist attacks committed by each of the above-mentioned terrorist groups for a total of approximately eight attacks. Plaintiffs will provide evidence about the details of the attacks and ultimately prove two things directly relevant to the legal elements above. First, Plaintiffs will prove which terrorist group committed the attack (*i.e.*, attribution). This will connect the elements from the previous stage, thereby proving Iran's material support for the specific attacks at issue in the exemplar cases. Second, evidence will be presented to show which Plaintiffs suffered death or personal injury as a result of those attacks. *See generally Force*, 464 F.Supp.3d at 323 (separately analyzing the issues of "attribution"—*i.e.*, which terrorist group committed the attack—and personal injury or death).[7]

These bellwether cases will be selected with the Court's approval, based upon their representativeness, using factors such as tactics, techniques, and procedures, locations, and attack dates to determine their appropriateness for bellwether treatment.

Plaintiffs can make this presentation via paper submission—that is, a brief supported by documentary evidence, including Plaintiffs' declarations, eyewitness declarations, medical records, after-action reports, and expert witness declarations and reports. Alternatively, if the Court prefers, Plaintiffs can present these exemplar cases at a hearing, which Plaintiffs would estimate lasting no more than three days. Following the hearing, Plaintiffs would submit proposed findings of fact and conclusions of law.

The Court's decision on these exemplar cases will serve as a framework for the analysis of and rulings on the remaining attacks at issue in this case.

---

[7] The magnitude of Plaintiffs' harm will be covered in the damages stage.

### 2.  Part Two: Non-Bellwether Attacks

Part two of this stage will apply the Court's decision on the exemplar cases to the remaining terrorist attacks. For this part, Plaintiffs recommend involving either a magistrate judge or a special master (pursuant to Fed.R.Civ.P. 53), who could submit a report and recommendation to the Court on the additional attacks guided by the Court's prior decision regarding the exemplar cases. For the sake of efficiency, Plaintiffs could present individual plaintiff fact sheets (supported by declarations under 28 U.S.C. § 1746) containing the necessary information (along with supporting documentary evidence) for the magistrate or special master to make the reports and recommendations. Use of plaintiff fact sheets has been endorsed by the federal judiciary in complex multi-plaintiff cases as a way of streamlining the presentation of evidence. *See* Man. for Comp. Litig., 4th Ed., Fed. Jud. Ctr. (2004) at. 436, §22.83 (discussing plaintiff facts sheets used successfully in mass action litigation).

### D.  Stage Four – Damages

The final stage of Plaintiffs' proposed case management plan will address appropriate compensatory and punitive damages for claims on which the Court has made a finding of liability. This stage could be implemented for any attack as to which a liability finding has been made and can occur concurrently as other attacks are being presented in the preceding stages. For claims reaching this stage, Plaintiffs propose the usual and customary practice of the Court appointing a special master under 28 U.S.C. § 1605A(e) to hear the damages claims and to report to the Court recommending an appropriate award to each qualifying Plaintiff. *See, e.g*., *Karcher*, 396 F. Supp. 3d 12 at ECF Dkt. Nos. 125 and 128 (orders appointing special masters at different phases and directing them to consider damages for bellwether and non-bellwether plaintiffs); *Force*, 464 F.Supp.3d at 376 (following entry of default judgment on liability, appointing special master to

hear damages claims and to report to the Court regarding the appropriate award); *Fritz*, 320 F.

Supp. 3d at 92 (same); *Cohen*, 238 F. Supp. 3d at 75 (same).

## V.   Proposed Schedule

### Stage One – Subject Matter Jurisdiction

- Motion asking the Court to take judicial notice of the fact that Iran has been a designated state sponsor of terrorism since 1984.
- Motion establishing Plaintiffs' Status as U.S. nationals, members of the U.S. armed forces, etc.

### Stage Two – Iran's Material Support for the Terrorist Groups that Committed the Subject Attacks

- Motion for findings of fact and conclusions of law related to Iran's provision of material support to the terrorist groups that committed the subject attacks during the relevant time period.

### Stage Three – The Subject Attacks Were Committed by the Terrorist Groups Iran Materially Supported

- Part One – Bellwether Attacks
  - Motion for findings of fact and conclusions of law regarding attack attribution (*i.e.*, which terrorist group committed the attack) and injury to Plaintiffs in the attacks.
- Part Two – Non-Bellwether Attacks
  - Motion to appoint magistrate or special master for non-bellwether liability reports and recommendations.

### Stage Four – Damages:
- Motion to appoint special master for damages report and recommendations.
- Motions for entry of final judgments.
- Motions to serve default judgments.[8]

---

[8] The above-outlined case management plan addresses Plaintiffs' plan for the presentation of evidence; it does not detail non-substantive procedural activity that may occur, such as a motion for leave to amend the complaint to correct typographical errors and include a claim for pre-judgment interest and discovery-related issues.

**VI.     Status of Ongoing FSIA Cases that Involve Iran's Support for Terrorism in Iraq**

Pursuant to the Courts Minute Order of July 20, 2021, this section reports on the cases that were discussed with the Court during the July 20th status conference. Some of these cases have considered or used a bellwether process. As directed by the Court, attached are the proposed and actual case management plans for the cases discussed below.[9]

**A.   *Karcher, et al., v. Islamic Republic of Iran*, No. 16-cv-00232-CKK (DDC).**

*Karcher* alleged that Iran, through the IRGC and Hezbollah, trained and supplied weapons to Shia Special Groups in Iraq who attacked American forces. The attacks included 73 EFP attacks, a complex attack and kidnapping, and 19 rocket/IRAM attacks. The plaintiffs proposed, and the court permitted, a bellwether process and bench trial for submission of evidence. In advance of the bench trial, the plaintiffs outlined the evidence they would present. Exhibits 2 and 3, "Status Report" and "Pretrial Scheduling and Procedures Order" (*Karcher*, ECF Dkt. Nos. 36, 39). A three-day bench trial was held. The court subsequently entered default judgment on liability as to six of the bellwether EFP attacks. The Court then appointed a special master make a report and recommendation on damages for the bellwether plaintiffs. In its order, the court made findings of fact based on testimony presented at the bench trial, as well as the evidence submitted before, during, and after the trial. *See* "Memorandum Opinion" p. 8 (*Karcher*, ECF Dkt. No. 124). These bellwether findings provided a framework for the evidentiary submissions and liability analyses of the remaining non-bellwether attacks. *Id*. The court then permitted the plaintiffs to file additional expert reports and case-specific evidence for the non-bellwether attacks.

---

[9] Plaintiffs also provide Exhibit 1, which details all pending cases in this District of which Counsel is aware involving similar Iranian defendants, attack types, and alleged FSIA liability.

The plaintiffs submitted a consolidated expert report addressing an additional seventy-two non-bellwether EFP attacks. *Id.* at 9. The plaintiffs also submitted an evidentiary appendix containing the records considered and relied upon by their expert in arriving at the opinions set forth in his consolidated expert report. *Id.* The court found Iran liable for 73 attacks. *Id.* at 152. The plaintiffs requested the appointment of five special masters to prepare damages reports and recommendations for the remaining 73 attacks. *See "*Plaintiffs' Status Report in Response to the Court's January 14, 2021 Order" (*Karcher*, ECF Dkt. No. 127).

**B.   *Hake, et al. v. Bank Markazi, et al.*, No. 17-cv-00114-TJK (DDC).**

*Hake* is a case against Bank Melli Iran, Bank Markazi, and the National Iranian Oil Company and involves the same attacks at issue in *Karcher*.  *Hake* was consolidated with *Brooks v. Bank Markazi,* 1:17-cv-00737-TJK and *Field v. Bank Markazi,* 1:17-cv-02126-TJK. The three combined cases involve 154 separate attacks committed by Hezbollah, the IRGC, and Shia Special Groups. Of those attacks, 62 were not already adjudicated in *Karcher*. The plaintiffs filed a status report outlining two case management options. Exhibit 4, "Plaintiffs' Status Report in Response to the Court's July 16, 2020 Order" (*Hake,* ECF Dkt. No. 101).  They noted that those 62 attacks are being presented in other cases that are nearly identically to *Karcher* and suggested take judicial notice of the ultimate findings in those cases. The second option was for the court to address attacks not resolved in *Karcher*. They proposed providing, as was done in *Karcher*, a consolidated expert report for those attacks along with a selection of evidence previously submitted in *Karcher*  If the evidence were deemed satisfactory, the court would issue liability judgments and appoint special masters for damages. *Id*. 7-9. The court elected to focus on the "low hanging fruit" and use a bellwether process similar to what the same counsel had used with both Judge Mehta and Judge

Kollar-Kotelly. *See* Exhibit 5, *Hake,* ECF Dkt. No. 103) (memorializing the bellwether process adopted by the court) and Exhibit 6, *Hake* October 1, 2020 and October 26, 2020 Minute Orders.

## C. *Holladay, et al. v. Islamic Republic of Iran, et al*., No. 17-cv-00915-RDM (DDC).[10]

*Holladay* alleges that Iran, through co-defendants IRGC, the Ministry of Intelligence and Security, Bank Melli Iran, Bank Markazi and the National Iranian Oil Company, materially supported Shia and Sunni terror groups who targeted Americans in Iraq from 2003 to 2011. *Holladay,* ECF Dkt. No. 129. The terror groups include Hezbollah, IRGC, Al Qaeda/Al Qaeda in Iraq, Ansar al Islam, and Shia Special Groups. The case involves 42 attacks, including a high-profile suicide bomb attack on December 21, 2004 at Forward Operating Base Marez in Mosul, Iraq which accounts for the claims of approximately a quarter of the victims in the case. *Id.* *Holladay* is in the discovery phase, with plaintiffs awaiting documents from the U.S. Departments of Defense, Treasury and Justice. ECF Dkt. Nos. 127 and 130. The plaintiffs requested a bellwether case management plan. *See* Exhibit 7, Proposed Case Management Plan; *Holladay,* ECF Dkt. No. 73. The *Holladay* court has not yet issued a case management order governing submission of evidence but has instructed the plaintiffs to file their default motions and supporting evidence. *Holladay,* ECF Dkt. No. 97. *See also* Exhibit 8, *Holladay,* November 1, 2018 Minute Order. This liability briefing is anticipated to be submitted to the Court within the next six months.

## D. *Hartwick, et al., v. Islamic Republic of Iran, et al*., No. 18-cv-01612-CKK (DDC).[11]

*Hartwick* alleges that Iran, through co-defendants IRGC, the Ministry of Intelligence and Security, Bank Melli Iran, Bank Markazi and the National Iranian Oil Company, materially supported Shia and Sunni terror groups which targeted and attacked Americans in Iraq from 2003

---

[10] Plaintiffs in *Holladay* are being represented by Counsel of record in this matter.
[11] Plaintiffs in *Hartwick* are being represented by Counsel of record in this matter.

to 2011. *Hartwick,* ECF Dkt. No. 11. The case involves approximately 341 separate attacks. The plaintiffs' motions regarding sufficiency of service of process and third-party discovery remain pending. *Hartwick,* ECF Dkt. No. 61. To date, the *Hartwick* court has not issued a case management order. The plaintiffs anticipate requesting a bellwether case management plan.

E. ***Zambon, et al., v. Islamic Republic of Iran*, No. 18-cv-02065-JDB (DDC).**

*Zambon* was filed against Iran on behalf of American service members and civilians injured in 56 terrorist attacks committed by the Taliban, Al Qaeda, and Special Groups in Iraq and Afghanistan. *Zambon,* ECF Dkt. No. 1. The court agreed to coordinate the litigation of the Afghanistan-based claims with *Cabrera, et al. v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), which alleges 208 Iranian-sponsored attacks in Afghanistan. Exhibit 9, "Order on Coordinating Afghanistan-Based Claims" (*Zambon*, ECF Dkt. No. 30). The *Cabrera* plaintiffs requested a bellwether case management process. Exhibit 10, "Plaintiffs Motion for Entry of a Case Management Order" (*Cabrera,* ECF Dkt. No. 22). The Court granted their request for bellwether treatment and determined that the Afghanistan based *Zambon* claims will be litigated based on written submissions, including findings of fact and conclusions of law the court makes as to the bellwether plaintiffs in *Cabrera*. Exhibit 11, "Revised Case Management Order" (*Zambon,* ECF Dkt. No. 34). The bellwether hearing for the Afghanistan attacks will be on October 18, 2021. *Id* at 2. The hearing will involve the presentation of evidence on overarching liability issues relevant to all of the attacks and specific evidence pertaining to no more than eleven bellwether attacks. *Id.* The bellwether attacks will include one attack representing each of the relevant Afghan geographical regions and each of the attack types at issue. *Id.* Some plaintiffs will present live damages evidence at the hearing. The plaintiffs will then file proposed findings of fact and conclusions of law, evidence related to damages for family members of the direct victims of the

bellwether attacks, and a proposed administrative plan governing the appointment of special masters. *Id.* The plaintiffs are also to propose special masters for the other plaintiffs associated with bellwether attacks who did not present damages evidence at the hearing. The court will then adjudicate liability for the non-bellwether attacks based on written submissions. *Id.* at 3.

## VII.   Conclusion

The foregoing case management proposal aims to minimize the burden on the Court while fulfilling Plaintiffs' obligation to present evidence satisfactory to the Court but in an efficient manner. In fact, the trend in these FSIA terrorism cases is to use a bellwether process in conjunction with paper submissions in cases involving more than 50 attacks. This streamlined approach to the presentation of evidence promotes judicial economy and facilitates the timely resolution of Plaintiffs' claims.

Plaintiffs respectfully request a teleconference with the Court to discuss this proposed case management plan further and address any questions the Court may have about this proposal.

Dated: September 3, 2021                     Respectfully submitted,

By: */s/ Christopher G. Paulos*
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,**
**BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6067
Email: cpaulos@levinlaw.com

*/s/ Howard L. Nations*
Howard L. Nations
DC Bar No. TX143
**THE NATIONS LAW FIRM**
9703 Richmond Avenue, Suite 200
Houston, TX 77042
Telephone: (713) 807-8400

23

Facsimile: (713) 807-8423
Email: howard@howardnations.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served by electronic filing with the

Clerk via the CM/ECF system, which electronically notifies all registered participants.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 3, 2021                          Respectfully submitted,

*/s/ Christopher G. Paulos*