# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA L. HOLLADAY, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 1:17-cv-00915-RDM ) ) |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) ) |
| Defendants | ) ) ) |

**PLAINTIFFS' PROPOSED CASE MANAGEMENT PLAN**

Plaintiffs submit this proposed case management plan pursuant to the Court's minute entries of August 31, 2018, and September 12, 2018. A proposed order reflecting the plan is attached hereto.

    **I.**    **Overview of the Case and Relatedness of the Subject Attacks**

This case, brought against the Islamic Republic of Iran and certain of its political subdivisions and agencies and instrumentalities pursuant to the terrorism exception under the Foreign Sovereign Immunities Act (28 U.S.C. § 1605A), involves 43 terrorist attacks materially supported by Iran and perpetrated against U.S. peacekeeping forces, including U.S. soldiers and government contractors,[1] in Iraq between 2003 and 2011. The 43 attacks were part and parcel of Iran's cohesive, unified, and coordinated campaign in Iraq the goal of which was to destabilize Iraq, push the United States (and Western forces more generally) out of the country, and expand Iran's influence there. To that end, Iran provided training, intelligence, technology, weapons, funding, transportation, and safe haven to the terrorists in Iraq. The campaign was coordinated by

---

[1] The plaintiff-victims of the 43 attacks were U.S. nationals, members of the armed forces, and/or employees of U.S. government contractors. *See* 28 § 1605A(a)(2)(A)(ii).

1

Iran through its Ministry of Intelligence Services and the Islamic Revolutionary Guard Corps-Qods Force—a division of Iran's military whose mission is to further Iran's political objectives abroad—by creating, solidifying, and controlling an operational network that included Hezbollah and its Special Groups (a designation given to Shia militants in Iraq who were, and still are, backed by Iran), Al Qaida, and Ansar al Islam. In short, this case is about Iran's singularly focused and systematic campaign of terror targeting U.S. soldiers and contractors in Iraq, including Plaintiffs.[2]

In addition to the fact that all 43 terrorist attacks were part of Iran's highly coordinated terrorism campaign in Iraq, many of the attacks have other features in common that demonstrate Iran's legal responsibility for them:

- The weapons deployed, such as Explosively Formed Penetrators (EFPs). EFPs are made with a manufactured concave copper disk and a package of highly explosive material. When detonated, the copper becomes a high-velocity molten slug, traveling at over a mile per second, which is capable of piercing military-grade armor. EFPs require sophisticated technologies to manufacture, assemble, and detonate. EFPs were signature Iranian weapons used in Iraq. Similarly, specific rockets, mortars, and small arms were manufactured and/or supplied by Iran, and the skilled use of these weapons required extensive training and expertise.

- The terrorist groups responsible for the attacks. The group responsible for any given attack can be determined based on a number of factors, including the location of the attack, the date of the attack, and the particular methods used to carry out the attack. Indeed, because Iran armed and trained the terrorists, the tactics, techniques,

---

[2] *See* Fed.R.Civ.P. 20 (permitting persons to "join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) **any** question of law or fact common to all plaintiffs will arise in the action.") (emphasis added); Wright & Miller et al., 7 Fed. Prac. & Proc. Civ. § 1652 (3d ed.) (noting that the purpose of Rule 20 is to avoid "the unnecessary loss of time and money to the court and the parties that the duplicate presentation of evidence relating to facts common to more than one demand for relief would entail"); *Id.* at § 1653 ("Rule 20(a) does not require that every question of law or fact in the action be common among the parties; rather, the rule permits party joinder whenever there will be at least one common question of law or fact."); *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 35 (D.D.C. 2008) ("Permissive joinder is used to promote convenience and expedite resolution," and is a "flexible test" that "requires some common question of law or fact in the plaintiffs' claims, but not all issues have to be common to all plaintiffs.").

2

and procedure used to carry out the attacks usually fit a pattern that in effect bears Iran's unique imprint.

- A combination of the weapons used, the methods employed, the locations of the attacks, the targets selected, and the involvement of Iranian-backed groups that planned, committed, and/or authorized the attacks. For example, mortar and rocket attacks by Shia militias launched against U.S. bases using Iranian weapons and tactics and originating in areas controlled by Iranian-backed terror groups, were among the most identifiable instances of Iran's material support of terrorism in Iraq.

While the attacks span time and location, each attack was the result of a singular objective, effectuated through a deliberately designed scheme, utilizing a well-organized system and furthering a common purpose—the extrajudicial killing and terroristic injury of Plaintiffs intended to influence, intimidate, and affect the conduct and policies of the United States.

Plaintiffs are mindful of their obligation to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs are also cognizant of the need to litigate this case in a manner that promotes judicial economy. This proposed case management plan has been drafted with those objectives in mind.

## II. Procedural Posture of the Case

Plaintiffs filed their Complaint on May 15, 2017, and then filed their Amended Complaint as of right on September 14, 2017. Doc. 1; Doc. 16. Plaintiffs had the Amended Complaint translated to Farsi (the official language of Iran) and then served on Defendants. *See* Doc. 68. Default was subsequently entered by the Clerk against all Defendants. *Id.*; Doc. 71. Plaintiffs' efforts to serve each Defendant was detailed in their recent motion seeking an order finding that service has been made on all Defendants such that the Court may exercise personal jurisdiction over them. Doc. 68. That motion is pending.

Within the next few weeks, undersigned counsel will be filing a new case on behalf of co-victims of the 43 subject attacks and family members of the attack victims. The new case will be designated as related to this one. The new case will *not* involve any new attacks.[3]

Plaintiffs have already voluntarily dismissed one of the originally named defendants: Melli Bank Plc. Doc. 70. Plaintiffs are considering dismissing the other agency-and-instrumentality defendants in order to streamline the case.[4]

### III. Major Components of the Case Management Plan

Plaintiffs envision this case proceeding in three general phases: a pre-hearing discovery phase; a liability phase; and a damages phase. Plaintiffs propose the liability phase, in turn, be broken into discrete parts, as explained below.

#### A. Pre-Hearing and Discovery Phase

While Plaintiffs have conducted substantial informal discovery and pre-suit investigation, Plaintiffs seek leave to engage in discovery before the liability hearings begin. Plaintiffs anticipate seeking discovery from third parties and gathering additional evidence in support of their claims, which may require depositions and subpoenas as well protective orders to ensure sensitive or confidential information not be disclosed publicly. Based on the number of case-specific fact witnesses, as well Plaintiffs' experience to date related to their efforts to obtain information via Freedom of Information Act requests, Plaintiffs anticipate this phase lasting approximately 10 months.

#### B. Liability Phase

---

[3] This new complaint will be served on Defendants pursuant to 28 U.S.C. § 1608. Plaintiffs do not believe the current proceedings should be stayed while such efforts are undertaken.
[4] Plaintiffs believe third-party discovery will facilitate this consideration and therefore have included a period for such discovery in the proposed case management plan.

4

In the liability phase, Plaintiffs would be prepared to prove—through a combination of expert witnesses, lay witnesses, documentary evidence, and prior judicial findings—Defendants' legal responsibility for the 43 attacks.

### 1. The Big Picture: Iran's Terror Campaign; Iran's Terror Proxies; and Signature Iranian Weapons

Before presenting evidence regarding the specific attacks, Plaintiffs propose a hearing (lasting two to three days) that would cover overarching issues applicable to every case, including the following:

    i. **Iran's Terror Campaign in Iraq**. This will include background information on Iran's long history of materially supporting terrorism and will also provide a broad, but thorough, overview of Iran's malign influence in Iraq from 2003 to 2011.Plaintiffs will show the top-down structure of Iran's terror apparatus and the manner in which the following Defendants, organizations, and groups formed an integral part of Iran's terror infrastructure: the Islamic Revolutionary Guard Corp-Qods Force; Ministry of Intelligence Services; Bank Markazi; Bank Melli Iran; National Iranian Oil Company; Hezbollah; Mahan Air; Khatam al-Anbiya Construction Company; Islamic Republic of Iran Shipping Lines; and The Headquarters for the Restoration of Holy Shrines. This topic will explain the manner in which Iran controlled, commanded, and supported the terrorist groups in Iraq using its terror apparatus and how Iran's material support—both the nature, method, and amount of support—evolved over time.

    ii. **Iran's Terror Proxies**. The second topic will focus on Iran's terror proxies in Iraq—that is, the groups that received Iran's material support to carry out Iran's campaign by helping plan, authorize, and commit attacks against U.S. forces. Those proxies include Hezbollah, the Special Groups (including Kata'ib Hezbollah, Jaysch al Mahdi, and Asa'ib Ahl Al Haq), Al Qaida, Al Qaida in Iraq, and Ansar al Islam (a radical Sunni group with close ties to Al Qaida). Plaintiffs will present evidence about each group's formation, history, leadership, organizational structure, geographic areas of command and control, supply lines, tactics, techniques, and procedures for carrying out attacks, and, most importantly, connection to Iran—that is, how Iran trained, weaponized, and otherwise provided material support to the group. The terror proxies can be generally divided along sectarian lines. Hezbollah and the Special Groups are Shia; Al Qaida, Al Qaida in Iraq, and Ansar al Islam are predominantly Sunni.

5

  iii. **Signature Iranian Weapons and Tactics**. As noted above, Iran supplied unique weapons to the terror proxies in Iraq. These signature weapons include EFPs and Improvised Rocket Assisted Munitions (IRAMs), which are rocket-fired improvised explosive devices made from a large metal canister that is filled with explosive, scrap metal, and ball bearings and propelled by rockets, usually 107 mm rockets. These weapons require highly sophisticated technology to construct and detailed training to deploy. Because of the sophisticated nature of these weapons, it was not enough for an individual or group to get their hands on these weapons; they also needed special training on how to deploy the weapons effectively—training Iran provided. Iran also provided specialized training to its terror proxies on how to prepare, plan, and execute complex attacks against U.S. forces. These specific tactics were developed by Iran and Hezbollah and taught to Iraqi terror operatives in highly organized training camps in Iran.

At this hearing, Plaintiffs would present, among other evidence, live expert testimony. Some of the experts Plaintiffs have retained to address the foregoing topics include the following:

- Matthew Levitt, PhD, who is the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. He previously served as Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Treasury Department, where he focused on terrorism and financial intelligence branch and acted as deputy chief of the Office of Intelligence and Analysis. He also served as a State Department counterterrorism advisor to the special envoy for Middle East regional security, General James L. Jones. Dr. Levitt has authored a leading scholarly book on Hezbollah and has also been qualified as an expert on numerous occasions in both civil and criminal terrorism cases. For this case, Dr. Levitt will testify about Iran's material support for terrorism, including its use of the Lebanese Foreign Terrorist Organization Hezbollah as a proxy for its terrorist activities and its deployment of the IRGC to finance, train, supply, and arm terrorist groups in Iraq. In addition, Dr. Levitt will testify about Iran's history of supporting Al Qaeda and non-Shia terrorist groups whose terroristic goals align with Iran's, including Iran's provision of safe harbor and sanctuary to Al Qaeda leadership. Along those same lines, he will explain the flow of material and fighters from Iran to Sunni groups in Iraq.

- Patrick Clawson, PhD, who is the Director of Research at the Washington Institute for Near East Policy, where he directs the Iran Security Initiative. Dr. Clawson, who speaks Farsi, has been qualified as an expert in numerous cases relating to Iran and its role in supporting terrorism. Dr. Clawson will testify about Iran's objectives in supporting terrorists to attack Americans and will provide background information describing the role in Iran's terrorism infrastructure of Defendants IRGC, MOIS, Bank Markazi, and Bank Melli. He will further testify about Al

6

Qaeda and Ansar al Islam and Iranian provision of material support to Al Qaeda and Ansar al Islam for operations against Americans in Iraq.

- Daveed Gartenstein-Ross, PhD, is the Chief Executive Officer of Valens Global, a Non-Resident Fellow at the Foundation for Defense of Democracies, and an Associate Fellow at the International Centre for Counter-Terrorism – The Hague. He is also a member of the Editorial Board of the leading peer-reviewed journal Studies in Conflict & Terrorism, and previously served as a Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships, an Adjunct Assistant Professor in Georgetown University's Security Studies Program, and a Fellow at Google's think tank Jigsaw. Dr. Gartenstein-Ross specializes in jihadist movements, including undertaking detailed research into Sunni and Shia terrorist groups operating in Iraq. He will testify about the specific Iranian-supported terrorist groups in Iraq, including their formation, evolution, areas of operation, tactics, and involvement in and responsibility for specific attacks.

- Michael Pregent, a retired U.S. intelligence officer, who served as an embedded advisor with Kurdish forces in Mosul from 2005-2006. He also served as a political and military advisor in Iraq from 2007-2011 and as a civilian analyst for U.S. Central Command in Iraq from 2011-2013. He will provide information on the role of the IRGC and Hezbollah in supporting terror attacks in Iraq between 2004 and 2011, including targeted attacks on U.S. service members. He will also testify regarding material support of Shia and Sunni insurgents in Iraq from mid-2003 through 2011, the tactics, techniques and procedures used by Sunni and Shia Special Groups, as derived from Iranian/Hezbollah training, and the flow of material, funds, and training from Iran to the terror proxies in Iraq. He will also provide an historical overview of the Sunni and Shia areas of operation and control and explain the permissive environments they created to allow terror attacks in Iraq.

- Michael Rubin, PhD, is a Resident Scholar at The American Enterprise Institute and a Senior Editor of the Middle East Quarterly. He served as a Political Adviser to the Coalition Provisional Authority in Baghdad from 2003-2004 and Staff Adviser, Iran and Iraq for the Office of the Secretary of Defense from 2002-2004. Dr. Rubin has authored several books about Iran. In addition, he has written dozens of scholarly articles and has briefed over 100 military units before deployment to the Middle East from 2004 to the present. Dr. Rubin will testify about: Iran's operational support of Al Qaeda, Ansar al-Islam, and Hezbollah, and the Special Groups; Iranian funding of terrorists groups targeting Americans; and Iranian training of terrorists.

- General (Ret.) Michael Oates. Mr. Oates is a retired U.S. Army lieutenant general who served in Iraq from November 2003 to February 2007 in several capacities. From June 2008 until May 2009, he served as the commanding general of the 10th Mountain Division, Multi-National Division-Center, Iraq. From December 2009 until April 2011, he served as Director of the Joint Improvised Explosive Device

7

> Defeat Organization, the Defense Department's lead agency for providing counter-IED capabilities in support of combat forces in Iraq and Afghanistan. He will testify about the use of Improvised Explosive Devices (IEDs), including EFPs, by certain Sunni extremists and Shia militias supported by Iran.

- General (Ret.) Michael Barbero. Mr. Barbero is a retired U.S. Army lieutenant general who served for 46 months over three combat tours in Iraq and retired from active duty in 2013 after 38 years of service. From March 2011 until May 2013, he served as Director of the Joint Improvised Explosive Device Defeat Organization JIEDDO. His testimony will cover the Coalition forces' operational history in Iraq, areas of operation for Coalition forces, and the evolution of the counter-insurgency strategy in Iraq. He will also discuss the supply lines of material support from Iran to its terror proxies in Iraq.

Three weeks before the hearing, Plaintiffs contemplate submitting a brief containing a statement of facts and evidence[5] as well as a complete list of anticipated witnesses and exhibits. After the hearing, Plaintiffs would submit proposed findings of fact and conclusions of law, which would lay the evidentiary foundation for the attack-specific proof in the next part of the liability phase.

### 2. Attack-Specific Proof: Establishing Defendants' Responsibility for the 43 Attacks

In order to establish Defendants' legal responsibility for the 43 attacks, Plaintiffs propose a tripartite division of the attacks into the following categories, with a hearing for each category: EFP attacks; attacks carried out by Shia groups; attacks carried out by Sunni groups.

> i. **Iranian EFP Attacks.** As explained above, EFPs are signature Iranian weapons. Iran provided the technology and equipment necessary to construct and assemble the EFPs as well as the training to deploy and detonate the weapons. Prior judicial decisions have explained Iran's provision of EFPs to terrorists in Iraq. *See, e.g., Fritz v. Islamic Republic of Iran*, No. 15-CV-456, 2018 U.S. Dist. LEXIS 130008 (Aug. 3, 2018 D.D.C.). By one estimate, EFPs killed nearly 200 U.S. soldiers and

---

[5] As the Manual for Complex Litigation (4th Ed.) suggests, "[o]ne method used by judges to ensure adequate preparation, streamline the evidence, and prevent unfair surprise is to have each party prepare and submit a statement listing the facts it intends to establish at trial and the supporting evidence." *Id.* at p. 124 (available at https://public.resource.org/scribd/8763868.pdf, last visited October 11, 2018).

8

      injured over 800 others between 2005 and 2011. A significant number of the attacks in this case (potentially more than half of the 43) were committed using EFPs.[6]

    ii.    **Iranian-Supported Shia-Group Attacks.** The Shia terrorist groups in Iran who served as Iran's proxies include the Special Groups, such as Kata'ib Hezbollah, Jaysch al Mahdi, and Asa'ib Ahl Al Haq. The subject attacks that were carried out by Shia terrorist groups were carried out by these specific groups. We know this based on a combination of factors, including the time and location of attack (generally speaking, each terrorist group in Iraq dominated and controlled a distinct geographical area at specific times). We can further establish Iran's legal responsibility for the attacks based on the munitions and the tactics, techniques, and procedures used to carry out the attacks. Among the non-EFP attacks, approximately 11 attacks were committed by one of these three Shia groups.

    iii.    **Iranian-Supported Sunni-Group Attacks.** Iran provided material support to Sunni terrorist groups who shared the common goal of killing Americans and ejecting the United States from Iraq. These groups include Al Qaida (including the closely allied organization Al Qaida in Iraq) and Ansar al Islam—the groups responsible for the subject attacks that were carried out by Sunni terrorists. The particular group responsible for a given attack can be established based on time and location of attack. And the link between the attack and Iran can further be established based on the munitions and tactics, techniques, and procedures. Fewer than five subject attacks were carried out by Sunni groups.

---

[6] As an alternative to presenting live testimony and evidence at the hearing about each and every EFP attack, Plaintiffs could present a limited number of exemplar, or bellwether, EFPs attacks at the hearing and then provide a package of written evidence for the remaining EFP attacks to a Special Master appointed by the Court who can then make a recommendation as to whether those attacks were materially supported by Iran. The package would include the following: declarations and reports by the expert witnesses; declarations by the victims detailing the attack; and military documents about the attack—the same type of evidence (albeit in written format) that would otherwise be presented live at a hearing before the Court. This method of proof could be a more efficient way of handling these attacks and is allowed under the Civil Rules and consistent with the flexibility permitted in cases under the terrorism exception of the Foreign Sovereign Immunities Act. *See* FED.R.CIV.P. 53; *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("The district court also has an unusual degree of discretion over evidentiary rulings in a[n] FSIA case against a defaulting state sponsor of terrorism."); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-50 (D.C. Cir. 2014) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting declarations in an FSIA default proceeding).

9

At the hearings, Plaintiffs would present evidence in the form of lay witness testimony (including the testimony of the attack victims and, if available, eyewitnesses), expert testimony (including the experts who testify at the first hearing in the liability phase), and documentary evidence (after-action reports, government reports, etc.).

Before each hearing, Plaintiffs' proposed schedule contemplates our submitting a brief containing a statement of facts and evidence along with a list of anticipated witnesses and exhibits. After each hearing, Plaintiffs envision filing a motion for judgment as to liability for the claims covered by said hearing.[7]

### C. Damages Phase

For the damages proceedings, Plaintiffs propose adopting the procedure regularly used in this Court in FSIA cases against defaulting state sponsors of terrorism. This procedure, which is specifically authorized by the FSIA, allows the Court to appoint a Special Master "to hear damage claims brought under" the terrorism exception. 28 U.S.C. § 1605A(e). Pursuant to that statute, and in conjunction with FED.R.CIV.P. 53(a)(1)(B), the Special Master can hold damages proceedings and "make or recommend findings of fact" on the scope of each Plaintiff's economic and noneconomic damages. The Special Master in turn submits a report to the Court containing recommended findings of fact and conclusions of law, including an evaluation of each item of damages for each eligible claim. This procedure has been used repeatedly by this Court, most recently in *Fritz v. Islamic Republic of Iran*, No. 15-456, Doc. 87, 90, 94 (D.D.C.). *See also Estate*

---

[7] The timing of this motion could be modified if the Court adopts the bellwether approach discussed in the previous footnote. Or, if the Court prefers, Plaintiffs could simply submit a single omnibus motion once all the liability hearings are concluded and the Special Master's reports and recommendations are issued. Furthermore, the EFP attacks that occurred less than 10 years before the case was filed could be presented first so that the Court would not have to address any statute-of-limitations issues with respect to those attacks.

*of Brown v. Islamic Republic of Iran*, No. 08-cv-531, 2012 WL 2562368 (D.D.C. July 3, 2012); *Davis v. Islamic Republic of Iran*, No. 07-cv-1302, 2012 WL 1059700 (D.D.C. Mar. 30, 2012); *O'Brien v. Islamic Republic of Iran*, No. 06-cv-690, 2012 WL 1021471 (D.D.C. Mar. 28, 2012); *Anderson v. Islamic Republic of Iran*, No. 08-cv-535, 2012 WL 928256 (D.D.C. Mar. 20, 2012); *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150 (D.D.C. 2011); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010). Plaintiffs are willing and able to propose specific individuals to serve as Special Masters.

During the damages phase, Plaintiffs would submit evidence and testimony related to the physical injuries, pain, suffering, emotional and psychological harm, past and future economic harm, and loss of solatium for each Plaintiff. This evidence will be provided in the form of declarations, depositions, photographs, medical records, financial records, and case-specific reports by experts in the military, medical, economic, and psychiatric fields.

### IV. Other Components of the Case Management Plan

#### A. Third Party Discovery

According to FED.R.CIV.P. 26(d)(1), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Because Defendants have failed to appear in this case, Plaintiffs' proposed case management plan includes a provision permitting Plaintiffs to commence discovery.

Plaintiffs anticipate the scope of this discovery to include subpoena and *Touhy* requests of several non-party and governmental agencies that possess potentially relevant information related to Plaintiffs claims. *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

#### B. Leave to Take More than 10 Depositions

11

Plaintiffs hereby seek leave under FED.R.CIV.P. 30(a)(2) to take more than 10 depositions by oral examination and, likewise, to take more than 10 depositions by written questions pursuant to FED.R.CIV.P. 31(a)(2). Plaintiffs' counsel anticipates taking depositions of those Plaintiffs who were victims of the subject attacks as well as of non-party fact witnesses, including eyewitnesses to the attacks. Plaintiffs' counsel also anticipates taking depositions of family members of the attack victims and, potentially, of damages experts (*e.g.*, economists, medical providers). These depositions would be used during the damages proceeding. Counsel may also seek to present deposition testimony in lieu of live testimony at the liability hearings. *See* FED.R.CIV.P. 32(a)(4) (allowing the use of depositions in court proceedings where the witness is more than 100 miles from the place of hearing, where the witness cannot attend because of age, illness, or infirmity, or where "exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used."). To the extent Plaintiffs intend to use depositions in lieu of live testimony pursuant to FED.R.CIV.P. 32, Plaintiffs will file a motion expressly seeking permission to do so. Such depositions may obviate the need for live testimony and streamline the presentation of evidence.

### C. Periodic Status Conferences

Plaintiffs propose regular status conferences with the Court every 90 days or so in order for counsel to update the Court on the progress of the litigation and, if necessary, to apprise the Court of any issues that arise that could affect the case schedule or require Court intervention (such as disputes related to third-party subpoenas). Plaintiffs envision these conferences being conducted in person with the option for Plaintiffs to seek leave to participate by telephone, should the need arise. Plaintiffs would submit a status report one week before each such conference.

### V. Proposed Case Schedule

In accordance with all of the foregoing, Plaintiffs propose the following schedule:

- **November 1, 2018**: Plaintiffs may commence third party discovery and may take more than 10 depositions by oral examination and more than 10 depositions by written questions.

- **January 25, 2019**: Plaintiffs' status report due.

- **February 1, 2019**: Status conference.

- **April 24, 2019**: Plaintiffs' status report due.

- **May 1, 2019**: Status conference.

- **July 25, 2019**: Plaintiffs' status report due.

- **August 1, 2019**: Status conference.

- **August 7, 2019**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the hearing on Iran's terror campaign, Iran's terror proxies, and signature Iranian weapons. Plaintiffs shall also submit a witness list and exhibit list.

- **August 27-29, 2019**: First liability hearing on Iran's terror campaign, Iran's terror proxies, and signature Iranian weapons.

- **October 23, 2019**: Plaintiffs shall submit proposed findings of fact and conclusions of law relative to the first liability hearing.

- **December 11, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the second hearing on EFP attacks. Plaintiffs shall also submit a witness list and exhibit list.

- **January 15-16, 2020**: Second liability hearing on EFP attacks.

- **March 13, 2020**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the second liability hearing on EFP attacks.[8]

- **May 8, 2020**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the second liability hearing on EFP attacks.

- **June 5, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the third liability hearing on Shia attacks. Plaintiffs shall also submit a witness list and exhibit list.

- **June 24-25, 2020**: Third liability hearing on Shia attacks.

- **August 14, 2020**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the third liability hearing on Shia attacks.

- **October 2, 2020**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the third liability hearing on Shia attacks.

- **November 6, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the fourth liability hearing on Sunni attacks. Plaintiffs shall also submit a witness list and exhibit list.

- **December 9, 2021**: Fourth liability hearing on Sunni attacks.

- **January 22, 2021**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the fourth liability hearing on Sunni attacks.

---

[8] The schedule relative to the EFP attacks can be modified if the Court decides to implement the bellwether approach mentioned in the previous footnotes.

- **March 5, 2021**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the fourth hearing on Sunni attacks.

Dated: October 18, 2018    Respectfully submitted,

By: /s/ *Christopher G. Paulos*
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY AND PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6123
Email: cpaulos@levinlaw.com

*Counsel for Plaintiffs*

15

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served by electronic filing with the Clerk via the CM/ECF system, which electronically notifies all registered participants.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 18, 2018                         Respectfully submitted,

                                                                    */s/ Christopher G. Paulos*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA L. HOLLADAY, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 1:17-cv-00915-RDM |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) |
| Defendants | ) |

## [PROPOSED] ORDER

Upon consideration of Plaintiffs' Proposed Case Management Plan, Plaintiffs' Proposal is hereby **GRANTED.**

The following schedule is hereby **ORDERED**:

1. **November 1, 2018**: Plaintiffs may commence third party discovery and take more than 10 depositions by oral examination and more than 10 depositions by written questions.

2. **January 25, 2019**: Plaintiffs' status report due.

3. **February 1, 2019**: Status conference.

4. **April 24, 2019**: Plaintiffs' status report due.

5. **May 1, 2019**: Status conference.

6. **July 25, 2019**: Plaintiffs' status report due.

7. **August 1, 2019**: Status conference.

8. **August 7, 2019**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the hearing on Iran's terror campaign, Iran's terror proxies, and signature Iranian weapons. Plaintiffs shall also submit a witness list and exhibit list.

1

9. **August 27-29, 2019**: First liability hearing on Iran's terror campaign, Iran's terror proxies, and signature Iranian weapons.

10. **October 23, 2019**: Plaintiffs shall submit proposed findings of fact and conclusions of law relative to the first liability hearing.

11. **December 11, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the second hearing on EFP attacks. Plaintiffs shall also submit a witness list and exhibit list.

12. **January 15-16, 2020**: Second liability hearing on EFP attacks.

13. **March 13, 2020**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the second liability hearing on EFP attacks.

14. **May 8, 2020**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the second liability hearing on EFP attacks.

15. **June 5, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the third liability hearing on Shia attacks. Plaintiffs shall also submit a witness list and exhibit list.

16. **June 24-25, 2020**: Third liability hearing on Shia attacks.

17. **August 14, 2020**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the third liability hearing on Shia attacks.

18. **October 2, 2020**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the third liability hearing on Shia attacks.

19. **November 6, 2020**: Plaintiffs shall submit a brief containing a statement of facts and evidence relative to the fourth liability hearing on Sunni attacks. Plaintiffs shall also submit a witness list and exhibit list.

20. **December 9, 2021**: Fourth liability hearing on Sunni attacks.

21. **January 22, 2021**: Plaintiffs shall file a motion for judgment as to liability for the claims covered by the fourth liability hearing on Sunni attacks.

22. **March 5, 2021**: Plaintiffs shall file a motion to appoint one or more Special Masters to administer damages proceedings for claims covered by the fourth hearing on Sunni attacks.

Dated: _____                            _____
                                                Hon. Randolph D. Moss
                                                United States District Judge