# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AUGUST CABRERA, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>        Defendant. | Case No. 19-cv-3835-JDB |

## PLAINTIFFS' MOTION FOR ENTRY OF A CASE MANAGEMENT ORDER

This is a civil action against the Islamic Republic of Iran ("Iran") under the terrorism exception to the Foreign Sovereign Immunities Act (28 U.S.C. § 1605A). Plaintiffs are American service members and civilians, and their family members, who were attacked by Taliban and al-Qaeda terrorists while serving their country in Afghanistan. Iran, which has been designated as a State Sponsor of Terrorism since 1984, sponsored those terrorist attacks in an effort to undermine American foreign policy in Afghanistan. *See* First Amended Complaint (Dkt. 8, "FAC"), ¶¶ 2, 5.

With leave of this Court, *see* April 14, 2020 Minute Order, Plaintiffs served the FAC on Iran pursuant to 28 U.S.C. § 1608(a)(4). Service was completed on August 16, 2020. *See* Dkt. 19. Iran was required to respond within sixty days of service, by October 15, 2020, and failed to do so. On October 16, 2020, Plaintiffs filed an Affidavit In Support of Default against Iran. *See* Dkt. 20. The Clerk entered default against Iran that same day. *See* Dkt. 21. Plaintiffs now respectfully move the Court to enter a full case management order for the efficient and timely adjudication of Plaintiffs' claims. Plaintiffs have simultaneously filed a Motion for Leave to

Conduct Third-Party Discovery. Plaintiffs also request the opportunity to discuss these motions at a status conference, should the Court find such a conference helpful.

## I. Factual Background

Plaintiffs allege that Iran provided material support for terrorist attacks by Taliban and al-Qaeda terrorists against American service members and civilians in Afghanistan between approximately 2007 and 2019. FAC ¶ 1. This case involves 731 plaintiffs, who consist of the families of 278 victims who were killed or injured in 208 different Taliban and al-Qaeda terrorist attacks. *Id.* ¶¶ 160-1700. Iran's support for these attacks was part of its systematic effort to undermine American foreign policy in Afghanistan and to promote the Taliban's terrorist insurgency. *Id.* ¶¶ 2, 91-114. Iran, through the Islamic Revolutionary Guard Corps ("IRGC") and the Islamic Revolutionary Guard Corps-Qods Force ("Qods Force"), provided Taliban and al-Qaeda terrorists operating in Afghanistan with material support in a variety of forms. *Id.* The Taliban and al-Qaeda used this support to attack Plaintiffs or their family members. *Id.* ¶ 159.

## II. Proposed Phases

Plaintiffs have developed a proposed case management plan with five phases: a discovery phase; a bellwether-hearing phase focused on representative attacks; a damages phase for plaintiffs harmed by the bellwether attacks; a liability phase for non-bellwether plaintiffs; and a damages phase for non-bellwether plaintiffs. As explained further below, Plaintiffs request that the Court, at times, permit certain phases to proceed simultaneously. Plaintiffs believe that this structure will provide the Court with satisfactory evidence of Iran's liability as required by 28 U.S.C. § 1608(e) and move the case forward efficiently. Although Plaintiffs have suggested five phases, Plaintiffs request that the Court enter a full case management order governing all five phases at this time. Plaintiffs obviously defer to the Court's scheduling preferences, but we

believe that entering a full case management order now will enable Plaintiffs (and their experts) to prepare most efficiently for a timely presentation of evidence in a format that will be most useful for the Court. For example, with a full case management order in place, Plaintiffs will be able to prepare evidence for the Court's desired distribution of bellwether attacks, ensure experts are available for the evidentiary hearing, structure third-party discovery efforts accordingly, and prepare live damages evidence from a subset of bellwether attacks as necessary.

### A. Discovery Phase

Although Plaintiffs have conducted a thorough pre-suit investigation, as reflected in their Complaint, Plaintiffs believe that additional formal discovery is important. As set forth in the concurrently filed discovery motion, Plaintiffs intend to seek third-party discovery from various government agencies. Specifically, Plaintiffs will seek additional government records demonstrating Iran's support for the Taliban and al-Qaeda, as well as documents describing the particular terrorist attacks that killed or injured Plaintiffs or their family members. Plaintiffs have filed FOIA requests seeking these documents but have received no substantive response. Plaintiffs will be prepared to update the Court on their progress in pursuing this discovery in status reports submitted monthly (or at whatever interval the Court prefers). Plaintiffs will prioritize the discovery necessary to move to the bellwether hearing phase, and once that is completed, request that they be permitted to continue discovery for non-bellwether attacks while the bellwether hearing phase proceeds. Plaintiffs anticipate that this first discovery phase will last approximately 7 months before Plaintiffs are prepared to move to the bellwether hearing phase, although this estimate is subject to the responsiveness of various government agencies.

### B. Bellwether Hearing Phase

Plaintiffs allege that Iran provided material support and resources for each of the attacks at issue in this case by providing the terrorist groups that committed the attacks with weapons, explosives, lethal substances, lodging, training, expert advice or assistance, safehouses, personnel, transportation, and financial support. *See* FAC ¶¶ 114-158. Because of the large number of attacks at issue and the general similarity of Iran's support for each, Plaintiffs propose conducting a bellwether hearing focusing on a set of representative attacks. Another court in this District recently used a similar bellwether approach, holding a hearing on seven of 92 attacks. *See Karcher v. Islamic Republic of Iran,* 396 F. Supp. 3d 12, 14 (D.D.C. 2019). Plaintiffs anticipate being prepared for the bellwether hearing any time after July 1, 2021, and respectfully request that the Court schedule a hearing for the earliest convenient time after that date.

At that hearing, Plaintiffs propose first presenting testimony about the overarching liability issues relevant to all of the attacks. Plaintiffs will present evidence about the Taliban, al-Qaeda, and other associated terrorist groups active in Afghanistan, including evidence about the areas where these terrorist groups were particularly active and the tactics, techniques, and procedures used by each. Plaintiffs will also present evidence about Iran's material support for these terrorist groups and their attacks, including evidence about Iran's history of using terrorist groups to achieve its political aims and evidence of Iran's specific support for the Taliban's and al-Qaeda's attacks. Plaintiffs have retained two experts to address these topics:

– Colin P. Clarke, Ph.D., who is an Adjunct Senior Political Scientist at the RAND Corporation, an Assistant Teaching Professor at Carnegie Mellon University, an Associate Fellow at the International Centre for Counter-Terrorism (ICCT) in The Hague, a non-resident Senior Fellow at the Foreign Policy Research Institute (FPRI), and a Senior Research Fellow at The Soufan Center in New York City. Dr. Clarke's research focuses on transnational terrorism, criminal networks, counter-narcotics, and the counterinsurgency in Afghanistan. He is the author of *Terrorism, Inc.: The Financing of Terrorism, Insurgency and Irregular Warfare*; *Terrorism: The Essential*

*Reference Guide; After the Caliphate: The Islamic State and the Future Terrorist Diaspora*; and numerous journal articles, book chapters, and news articles, including many on counterterrorism operations in Afghanistan. He has testified before Congress on terrorism issues on multiple occasions and presented his research in a variety of other fora. Dr. Clarke's current curriculum vitae is attached as Exhibit A.

– William Roggio, who is a Senior Fellow at the Foundation for Defense of Democracies ("FDD") and the Editor of FDD's *Long War Journal*. Mr. Roggio's analysis focuses on the global war on terror and American counterterrorism operations, with a particular focus on Iran's role in sponsoring anti-American terrorism in the Middle East and Central Asia. He is a military veteran and was embedded with the U.S. Marine Corps, U.S. Army, and Iraqi forces in Iraq between 2005 and 2008, and with the Canadian Army in Afghanistan in 2006. Mr. Roggio has published numerous journal and news articles and has testified before Congress on terrorism issues on multiple occasions. Mr. Roggio's current curriculum vitae is attached as Exhibit B.

Plaintiffs propose conducting a bellwether evidentiary hearing at which they will simultaneously present documentary evidence, live testimony, and possibly (with the Court's leave) testimony by affidavit about approximately seven bellwether attacks. For this purpose, Plaintiffs have chosen attack categories that represent a cross section of the attack types and geographies covered by the attacks in this case. Specifically, Plaintiffs propose using at least one attack from each of the following geographies, which collectively encompass all of the attacks in this case:

a. Southern Afghanistan – the Taliban's traditional stronghold in Kandahar and Helmand Provinces. *See, e.g.*, FAC ¶¶ 32, 37, 38. There are 121 direct victims[1] who were killed or injured in Kandahar and Helmand Provinces. *See, e.g.*, *id.* ¶ 189.

b. Loya Paktia – a culturally Pashtun area in southeastern Afghanistan comprising primarily Khost, Paktia, and Paktika Provinces. It is the traditional stronghold of the

---

[1] For ease of reference, Plaintiffs distinguish between "plaintiffs" and "direct victims." The "direct victims" are the individuals who were killed or severely physically injured by the terrorist attacks. The plaintiffs in this case are the direct victims who were severely wounded in terrorist attacks, as well as the family members of direct victims who were killed or severely injured. There are 708 plaintiffs associated with 278 direct victims in this case. In many instances, multiple direct victims were killed or injured in the same attack.

Haqqani Network, a part of the Taliban.  *See*, *e.g.*, *id.* ¶¶ 45-65.  There are 38 direct victims who were killed or injured in this area. *See*, *e.g.*, *id.* ¶ 261.

c.   Southeastern Afghanistan – the area of Afghanistan south of the capital, Kabul, and west of Loya Paktia comprising Ghanzi, Logar, Wardak, Zabul, and Uruzgan Provinces where the Haqqani Network element of the Taliban is also active.  *See*, *e.g.*, *id.* ¶ 49.  There are 57 direct victims who were killed or injured in this area.  *See*, *e.g.*, *id.* ¶ 379.

d.   N2KL – an area of eastern Afghanistan comprising Nangarhar, Nuristan, Kunar, and Laghman Provinces where al-Qaeda is particularly active in sponsoring the Taliban. *See*, *e.g.*, *id.* ¶¶ 83, 85.  There are 27 direct victims who were killed or injured in this area.  *See*, *e.g.*, *id.* ¶ 228.

e.   Kabul – Afghanistan's capital city located in Kabul Province and the site of spectacular terrorist attacks committed jointly by the Taliban, al-Qaeda, and other terrorist groups.  *See*, *e.g.*, *id.* ¶¶ 86-90.  There are 16 direct victims who were killed or injured in Kabul Province.  *See*, *e.g.*, *id.* ¶ 160.

f.   North Central Afghanistan – the areas north of Kabul, including Parwan, Kapisa, Baghlan, and Kunduz Provinces.  *See*, *e.g.*, *id.* ¶¶ 83, 132.  There are 13 direct victims who were killed or injured in this area.  *See*, *e.g.*, *id.* ¶ 627.

g.   Western Afghanistan – the area of Afghanistan bordering Iran and Turkmenistan, including Nimruz, Farah, Herat, Badghis, Ghor, and Faryab Provinces.  *See*, *e.g.*, *id.* ¶¶ 118, 119, 124, 125, 135, 140-41.  There are 6 direct victims who were killed or injured in this area.  *See*, *e.g.*, *id.* ¶ 1368.

In selecting attacks from these geographies, Plaintiffs further propose using at least one attack from each of the following terrorist attack types, which also collectively encompass all of the attacks in this case:

a.   Improvised Explosive Device ("IED") – an improvised bomb often placed on roads using a passive detonation system to target Coalition Forces.  *See*, *e.g.*, *id.* ¶ 42.  There are 184 direct victims who were killed or injured in IED attacks.[2]  *See*, *e.g.*, *id.* ¶ 221.

---

[2] The Taliban frequently combined IEDs with an assault on the rest of the convoy using other weapons.  These attacks are classified as "complex attacks" and are not included in the above count.  It is possible that additional discovery will demonstrate that some of the IED attacks included in this number are properly classified as complex attacks.

b. Complex attack – a violent assault involving multiple attackers and types of weapons. *See, e.g.*, *id.* ¶ 63. There are 27 direct victims who were killed or injured in complex attacks. *See, e.g.*, *id.* ¶ 185.

c. Suicide bombing – an attack where the explosives are placed on the body of the bomber or in their vehicle and the attacker is killed when they are detonated. *See, e.g.*, *id.* ¶¶ 36, 39, 43, 55, 76. There are 20 direct victims who were killed or injured in suicide bombing attacks. *See, e.g.*, *id.* ¶ 160.

d. Insider attack – also referred to as a "green on blue attack," insider attacks involve members of the Afghan armed forces turning on their American and Coalition Forces trainers. *See, e.g.*, *id.* ¶¶ 44, 55, 63. There are 13 direct victims who were killed or injured in insider attacks. *See, e.g.*, *id.* ¶ 189.

e. Indirect Fire – attacks with weapons that do not rely on a direct line of sight. *See, e.g.*, *id.* ¶¶ 137, 142. There are 11 direct victims who were killed or injured in indirect fire attacks. *See, e.g.*, *id.* ¶ 379.

f. Small arms, rocket propelled grenade, and anti-aircraft attacks – attacks involving handheld weapons, including sniper attacks, and grenade launchers, which were often used against aircraft, particularly helicopters. *See, e.g.*, *id.* ¶¶ 120, 130, 135, 137, 142. There are 23 direct victims who were killed or injured in these attacks. *See, e.g.*, *id.* ¶ 185.

Plaintiffs request permission to present the Court with a final list of the bellwether attacks two weeks before the hearing. In the interest of efficiency, Plaintiffs are working now on preparing the liability evidence for multiple attacks to ensure that the necessary witnesses and documents for the bellwether attacks become available as soon as possible. Because that process is ongoing, Plaintiffs are not currently in a position to designate the specific attacks that will be part of a bellwether hearing. That said, Plaintiffs believe that a case management plan providing for a future bellwether hearing on the attack types and geographies listed above will enable Plaintiffs to proceed efficiently with their ongoing and proposed discovery efforts, and will also promote judicial economy.[3]

---

[3] It is possible that more than seven bellwether attacks will be required to represent each of the attack geographies and attack types listed above. But in no event will Plaintiffs' final list of proposed bellwether attacks include more than ten attacks.

At the bellwether hearing, Plaintiffs will be prepared to present documentary evidence, live testimony, and possibly (with the Court's leave) testimony by affidavit about each of the bellwether attacks. Plaintiffs intend to offer expert testimony about the Iran-backed terrorist group(s) responsible for committing each of the bellwether attacks, as well as Iran's support for these terrorist attacks and the terrorist groups operating in Afghanistan more generally. Plaintiffs have retained one expert to address these topics:

– Steven Wood, LTC, USA (Ret.), who is currently the Director of Corporate Development for Data Machines Corporation, an artificial intelligence start-up. LTC Wood (Ret.) has previously held military, government agency, and government contractor positions and has extensive experience in intelligence and weapons analysis related to U.S. counterterrorism operations, particularly in the Afghanistan theater of operations. He deployed multiple times to Afghanistan, including serving as senior U.S. Military Operations and Intelligence Consultant to Afghan Ground Forces Command in Kabul, Afghanistan from March 2013 through May 2014. LTC Wood (Ret.) has particular experience in counter-IED operations. He was a member of Directors Initiative Group of the U.S. Army's Joint Improvised Explosive Device Defeat Organization and the Senior Intelligence Officer for Combined Joint Task Force Paladin at Bagram Airbase. Mr. Wood's current curriculum vitae is attached as Exhibit C.

For the bellwether attacks, Plaintiffs also propose offering documentary evidence, such as government reports and analysis of the attacks – which are one of the most important types of documents that Plaintiffs will be pursuing through third-party discovery. When possible, Plaintiffs may also offer live testimony from direct eyewitnesses to the attack(s).

Plaintiffs request that the Court also accept at the hearing evidence relevant to damages for a subset of the plaintiffs whose claims arise out of the bellwether attacks. Plaintiffs believe that, were the Court to enter a liability decision in Plaintiffs' favor on the bellwether attacks, it would be beneficial for the Court to also issue a bellwether damages decision. This bellwether decision would provide guidance to Special Masters who could adjudicate additional damages claims after the Court enters subsequent liability determinations. *See infra* Section II.D. In the

interest of moving rapidly and efficiently – especially as Plaintiffs anticipate at least some plaintiffs will provide live testimony relevant to both liability and damages – Plaintiffs request that the Court accept evidence on both issues at a single evidentiary hearing. This is consistent with the proceedings this Court used in *Dammarell v. Islamic Republic of Iran*, 01-cv-02224-JDB (D.D.C.), where it received damages evidence for 29 plaintiffs along with the liability evidence, before referring the remaining damages claims to a Special Master. Plaintiffs predict that the presentation of evidence to the Court on liability and damages will collectively require four or fewer full trial days.

One month prior to the bellwether hearing, Plaintiffs propose formally moving for default judgment and filing a memorandum of law in support of their motion covering personal jurisdiction, subject matter jurisdiction, liability, and damages. Two weeks prior to the hearing, Plaintiffs propose conducting a pre-trial conference and filing the final bellwether attack list, final exhibit list, final expert reports, and final witness list. Then, three weeks following the hearing, Plaintiffs propose filing proposed findings of fact and conclusions of law. Plaintiffs will also file a motion to appoint a Special Master to administer damages proceedings for plaintiffs whose claims arise out of the bellwether attacks but who did not present damages evidence during the bellwether hearing. *See infra* Section II.C.

C.       **Bellwether Attack Damages Phase**

Special Masters are authorized to hear damages claims in these cases under 28 U.S.C. § 1605A(e). If the Court issues a liability decision in Plaintiffs' favor on the bellwether attacks, Plaintiffs suggest that the Court use Special Masters to determine damages for all plaintiffs associated with the bellwether attacks who did not present damages evidence at the bellwether hearing. Plaintiffs will propose individuals to serve as Special Masters and will file a proposed

Administrative Plan Governing the Appointment of Special Masters within three weeks of the bellwether hearing. In general, Plaintiffs propose that the Special Masters be empowered to accept documentary evidence and affidavits to establish a Plaintiff's eligibility to bring a claim under 28 U.S.C. § 1605A(c), the relationship of each non-direct victim Plaintiff to a direct victim, and each Plaintiff's damages. The Special Masters would issue recommendations on damages, informed by this Court's bellwether damages decision and numerous precedents arising from similar cases in this District. This Court would then review the Special Masters' reports and enter final judgment for all other plaintiffs associated with bellwether attacks.

Plaintiffs propose that this phase occur simultaneously with the non-bellwether liability phase discussed immediately below.

### D.      Non-Bellwether Liability Phase

Plaintiffs propose that, following the Court's liability determination for the bellwether attacks, the Court adjudicate liability for the non-bellwether attacks based on written submissions. As the D.C. Circuit has explained, the "district court also has an unusual degree of discretion over evidentiary rulings in a[n] FSIA case against a defaulting state sponsor of terrorism." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). "[A]n evidentiary hearing is not required; a 'plaintiff may establish proof by affidavit.'" *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). *See also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 12 (D.D.C. 2009).

Plaintiffs anticipate first filing a model expert report, attaching as exhibits the documents the expert relied upon, for a single attack for the Court's review. In general, this expert report will be very similar to the expert report submitted for the bellwether attacks and will rely on the

same types of evidence. If the Court finds the report satisfactory, Plaintiffs will submit a consolidated expert report demonstrating Iran's liability for each of the non-bellwether attacks, consistent with the Court's bellwether findings.

Plaintiffs propose that this phase occur simultaneously with the Bellwether Attack Damages phase discussed immediately above. *See supra* Section II.C.

### E.    Non-Bellwether Damages Phase

If the Court issues a liability decision in favor of Plaintiffs on non-bellwether attacks, Plaintiffs suggest that the Court use Special Masters to assess damages for all plaintiffs with claims arising from non-bellwether attacks. Plaintiffs will propose additional individuals to serve as Special Masters, if needed, within three weeks of any liability decision. These Special Masters would be subject to the same Administrative Plan Governing the Appointment of Special Masters and follow the same guidelines discussed in Section C above. *See supra* Section II.C.

### III.    Proposed Schedule

Plaintiffs propose the following schedule, subject to this Court's availability:

- Immediately after the Court's disposition of this motion and/or any status conference: Plaintiffs begin serving third-party discovery with leave of the Court. Plaintiffs respectfully request that the Court allow Plaintiffs to commence discovery as soon as possible, to maximize the time that government agencies have to process the relevant requests.

- December 1, 2020, and the first of every month thereafter until the Bellwether Hearing: Plaintiffs file status report.

- One month prior to scheduled Bellwether Hearing: Plaintiffs file a motion for default judgment and motion to submit evidence under seal (if necessary).

- Two weeks prior to scheduled Bellwether Hearing: Plaintiffs file final bellwether attack list, final exhibit list, final expert reports, and final witness list; and Court holds a final pre-trial conference.

- Bellwether Hearing:  Commencing on a date convenient for the Court on or after July 1, 2021 and scheduled to last four or fewer full trial days.

- Three weeks after conclusion of the Bellwether Hearing:  Plaintiffs file proposed findings of fact and conclusions of law and proposed administrative plan governing the appointment of Special Masters, and propose Special Masters for other plaintiffs associated with the bellwether attacks who did not present damages evidence at the Bellwether Hearing.

Pursuant to Local Civil Rule 7(c), Plaintiffs attach to this motion a proposed order entering the relief requested above.

Dated: October16, 2020

Respectfully submitted,

/s/ Joshua D. Branson

| | |
|---|---|
| Michael J. Gottlieb (D.C. Bar No. 974960) | Joshua D. Branson (D.C. Bar No. 981623) |
| Randall Jackson (D.C. Bar No. 490798) | Andrew E. Goldsmith (D.C. Bar No. 1007074) |
| Nicholas Reddick (D.C. Bar No. 1670683) | Grace W. Knofczynski (D.C. Bar No. 15000407) |
| Willkie Farr & Gallagher LLP | Kellogg, Hansen, Todd, |
| 1875 K Street, N.W. | Figel & Frederick, P.L.L.C. |
| Washington, DC 20006-1238 | 1615 M Street, N.W., Suite 400 |
| Tel: (202) 303-1000 | Washington, D.C. 20036 |
| Fax: (202) 303-2000 | Tel: (202) 326-7900 |
| MGottlieb@willkie.com | Fax: (202) 326-7999 |
| RJackson@willkie.com | jbranson@kellogghansen.com |
| NReddick@willkie.com | agoldsmith@kellogghansen.com |
| | gknofczynski@kellogghansen.com |

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Joshua D. Branson
Joshua D. Branson