```
                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
    - - - - - - - - - - - - - - - x
    ESTATE OF CHRISTOPHER BROOK
    FISHBECK, et al.,
                                            CA No:  1:18-cv-02248-CRC
                  Plaintiffs,
                                            Washington, D.C.
                                            Tuesday, October 19, 2021
    vs.                                     2:00 p.m.

    ISLAMIC REPUBLIC OF IRAN,
    et al.,

                  Defendants.
    - - - - - - - - - - - - - - - x
    _____

                    TRANSCRIPT OF STATUS CONFERENCE
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
    _____
    APPEARANCES:

    For the Plaintiffs:    CHRISTOPHER GUS PAULOS, ESQ.
                           LEVIN, PAPANTONIO, THOMAS, MITCHELL
                           RAFFERTY & PROCTOR, P.A.
                           316 South Baylen Street, Suite 600
                           Pensacola, FL 32502
                           (850) 435-7067
                           cpaulos@levinlaw.com

                           JEREMY A. TOR, ESQ.
                           SPANGENBERG SHIBLEY & LIBER, LLP
                           1001 Lakeside Avenue East
                           Suite 1700
                           Cleveland, OH 44114
                           (216) 696-3232
                           jtor@spanglaw.com

    For the Defendant:     (No one appeared for the defendant)


    Court Reporter:              Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
                                 U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
                                 Washington, DC  20001
                                 202-354-3187
```

P R O C E E D I N G S

THE COURTROOM DEPUTY: Your Honor, we're on the record for Civil Case 18-2248, *Estate of Christopher Brook Fishbeck vs. The Islamic Republic of Iran, et al.*

Counsel, if you can please identify yourselves for the record.

THE COURT: You're on mute, Mr. Paulos.

MR. PAULOS: Sorry about that, Your Honor.

THE COURT: It's only been a year and a half now.

MR. PAULOS: You're right.

THE COURT: Who else do we have?

MR. TOR: Jeremy Tor from the Spangenberg law firm in Ohio on behalf of the plaintiffs.

THE COURT: Okay. Good afternoon, gentlemen, and obviously there is no one here on behalf of the defendants so we are proceeding ex parte.

All right. So I've reviewed the case management plan and the materials that you've submitted from other courts in this district who are handling similar cases, and despite some overall reservations just about the scope of this case and all of the others combined, I think the bellwether approach makes perfect sense to me. You all have obviously put a fair amount of thought into how you would present the various stages of the case and what evidence the Court would be presented with in, you know, making the

1    various findings.
2            I did -- let me just -- and you can sort of flesh
3    out the plan that you've submitted, if you'd like, but just
4    on sort of the overall scope of the case, this case before
5    me involves some 440 attacks, thereabouts, if you add up all
6    of the various attacks in the other cases, and you've told
7    me that there is no overlap in those attacks with the ones
8    in this case.  You're probably up to -- I don't know -- 600,
9    800.
10           I mean, is your theory -- and the collective
11   theory of all of these cases in this district -- that
12   essentially any attack after the, you know, formal
13   hostilities in the Gulf War ended against U.S. service
14   members is the responsibility of Iran as a result of its
15   material support for various groups, either Shia groups or
16   Sunni groups; that, in essence, Iran is responsible for
17   virtually every attack that occurred in Iraq?  Or is it
18   narrower than that?
19           MR. PAULOS:  Your Honor, the theory of liability
20   in our case is much narrower than that.
21           THE COURT:  Okay.
22           MR. PAULOS:  Our case involves both Sunni and Shia
23   groups that did receive material support from Iran, but, you
24   know, we understand that there's, you know, tens of
25   thousands of casualties against American nationals in Iraq.

1    Not all of those -- not nearly, I would say, even half of
2    those -- were caused by the groups that are at issue in our
3    case.
4             I believe the last projection that I saw from
5    Department of Defense is about 25 percent of the casualties
6    in Iraq were caused by groups that received material support
7    from Iran at some point in time.  And, of course, not every
8    single one of those attacks is there going to be sufficient
9    evidence to link up to material support from Iran.
10            We have endeavored, prior to filing these cases,
11   to do extensive pre-suit investigation into the facts of
12   these attacks and have experts look at these to determine
13   the nature -- you know, the tactics that were employed, the
14   timing of the attack, the location of the attack, and have a
15   good faith basis to allege that Iran was involved with the
16   groups that were responsible.
17            THE COURT:  Okay.
18            MR. PAULOS:  So the scope is -- it's much narrower
19   than just anybody who was injured by the result of an IED in
20   Iraq after, say, May of 2003 can bring one of these cases.
21   By no means do we want our case to imply that.  We believe
22   that, you know, to make that link you have to involve a
23   specific group and have evidentiary support for that through
24   expert testimony and other available evidence.
25            So we believe that this is a rather narrow case in

1       the grand scope of the amount of injuries that have been
2       sustained by American nationals in Iraq.
3                    THE COURT:  Okay.  And in terms of the evidence
4       that you will have to muster to make the connection that you
5       just described, you say that discovery is still ongoing as
6       to both the Iranian corporate defendants as well as the USG.
7       Do you need to wait until that discovery is complete before
8       these bellwether proceedings commence, or how do those two
9       things interrelate?
10                   MR. PAULOS:  So, you know, we have structured our
11      discovery requests with the Department of Defense in
12      anticipation of handling the cases in phases or in kind of
13      chunks of cases and particularly with the bellwether focus
14      in mind.  So we've asked the DOD to focus essentially on a
15      first wave of cases of about 49 attacks that we believe are
16      representative attacks of the whole, and we're hoping to get
17      that information related to those attacks from the DOD
18      before -- you know, before any of the other attacks.
19                   I do think doing the bellwether process and doing
20      this in stages allows the DOD some time to respond to our
21      requests in the waves and how we've grown accustomed to how
22      they search for, locate, and then produce the materials to
23      us.
24                   At this point, you know, we believe that there are
25      some documents related to various attacks, like significant

1   activity reports or EOD assessments that are available that
2   we know exist that DOD is searching for.  In most cases we
3   believe we can get those.  I don't think, in working with
4   our experts, that we believe that those -- all of those
5   documents are entirely necessary for them to come to the
6   opinion of who is responsible and whether or not that group
7   is receiving material support from Iran.  It just is kind of
8   attack-specific.
9              I do think that we are able to move forward with
10  the bellwether process focusing on some attacks from that
11  first set of 50 rather expeditiously once a case management
12  order is entered.
13             THE COURT:  Okay.  So a couple of questions.
14             MR. PAULOS:  Yes.
15             THE COURT:  One, so I take it if we -- if I did
16  decide to take live testimony with respect to at least the
17  first or second bellwether trial or evidentiary hearing, you
18  estimate that would be three days; so I take it that would
19  be just three days for the first one and then there would be
20  another trial for the, I guess, you know, two through four.
21             MR. PAULOS:  Yes, so I think it depends on the
22  number of bellwether attacks that we select.  I think we
23  recommended somewhere between, you know, six to ten attacks
24  that involve each one of the groups and kind of give a
25  representative sample.

1              I believe, if we follow the phase -- the stages
2    that we've outlined, and their threshold matters are
3    addressed by the Court on paper pleadings and briefing, that
4    the bellwether would focus on the specific facts surrounding
5    the attacks themselves, and you would hear testimony from
6    our clients and from our experts that are providing the
7    attribution opinions and their opinions related to the
8    support and its reasonable connectedness to those specific
9    attacks.
10             You would not have to hear a day's long testimony
11   about the general history of Iran supporting these groups
12   and how these groups evolved over time.  I believe that
13   would be addressed in Stage 2 prior to you taking evidence
14   at a hearing.
15             I think that we could put the evidence on for, you
16   know, anywhere between six and ten attacks with those
17   experts and our clients within three days.
18             THE COURT:  Okay.
19             MR. PAULOS:  So we could follow the factual kind
20   of the who, what, when, where, and why of the attacks in
21   that brief three-day hearing with you.
22             Similarly, what's going on --
23             THE COURT:  But that would then require you to
24   obtain all of the necessary discovery for those six to eight
25   before we began instead of doing --

1          MR. PAULOS:  That's correct.

2          THE COURT:  -- you know, two, two, two, two or

3    whatever.

4          MR. PAULOS:  That would be correct, and I think

5    having, you know, a case management order entered that

6    provides for the bellwether process and gives us, perhaps, a

7    date when the bellwether hearing would be gives us a

8    backstop to work with the DOD to get any information that we

9    believe is necessary from them to support the allegations.

10         THE COURT:  Okay.  Roughly speaking, when would

11   that -- when do you think you could get to that date?

12         MR. PAULOS:  So we believe that if you entered a

13   case management order as it looks like in our present

14   proposal to you -- and what I'd also propose is that we give

15   you some time frames or some windows for each stage to

16   occur.  We think that within 60 days of the case management

17   order being entered we could provide to the Court the

18   briefing and the evidence necessary to satisfy Stage 1.

19         Of course, the proposal relies on getting a result

20   from the Court on those initial stages, so my hope is that

21   if we get an order from your Court on Stage 1, we could then

22   proceed with filing our briefing on Stage 2 within 60 days

23   of that order.  And then within 60 days of the order on

24   Stage 2, we could have the bellwether cases selected and by

25   that point have a good understanding, in selecting the

1   cases, what evidence has been produced by the DOD so that we
2   can pick cases that we have sufficient evidence for to
3   present to you.
4            I would hope -- my hope is that we could
5   accomplish Stage 1, Stage 2, and be ready to proceed into
6   Stage 3 by the end of next year.
7            THE COURT:  Okay.  So I'm presiding over the *Burk*s
8   case, and there were some discovery disputes in that case
9   with DOD, and there was a state secrets invocation.  Do you
10  anticipate any issues like that, or have you folks been
11  working cooperatively with DOD to get what you need?
12           MR. PAULOS:  So that's a really good question.
13  Our experience with the DOD to date has been rather
14  cooperative; albeit, you know, they are producing things
15  very slow.  I think you've seen that in the *Burk*s case.
16           We haven't asked the DOD to unredact anything
17  because our experts haven't needed that done, and we haven't
18  had an issue with any of the redactions.  I think the
19  distinction is in the *Burk*s case, you know, the linchpin to
20  their case is determining the munition as an EFP, and, as
21  you know, the redactions of vehicle damage and other things
22  which experts can rely on to determine if an EFP was at play
23  can find itself redacted because of a state secrets
24  privilege.
25           You know, our focus -- the central focus for us is

1    group attribution, and so while, yes, knowing it's an EFP
2    makes the tie to Iran a lot stronger, we don't necessarily
3    need some of the things that have been redacted in the
4    documents in *Burk*s for our experts to come to a conclusion
5    as to who's responsible.
6             So I would love to say I don't foresee that issue,
7    and I presently don't.  We haven't had that issue percolate
8    in any of our other cases, and none of our experts have said
9    that the documents they've gotten from DOD to date have any
10   problematic redactions on it, so my hope is that we wouldn't
11   have that hindrance here.
12            THE COURT:  Okay.  So where should we go from
13   here?  Do you want to submit a proposed case management plan
14   that has those sort of date ranges set out and the trigger
15   dates for when we will move from one phase to another?
16            MR. PAULOS:  Yes, that would be my request, is
17   that we -- the Court permit us to do a detailed schedule.
18   We left some of the mechanics of the proposal unwritten in
19   what we submitted to the Court just because we wanted to get
20   your read on things and what you might prefer in terms of
21   the process.
22            You know, we referenced the use of fact sheets and
23   perhaps bringing in special masters at the liability phase
24   to help offset the work that the Court might find itself
25   having to do, and we can add more detail into the proposal

1    that we give you that would provide time frames and dates
2    for those things to occur.
3                THE COURT:  Yes, I would agree with the use of
4    special masters.  I've done that for damages claims in other
5    FSIA terrorism cases, but not at the liability stage.  But
6    given the volume of cases here, I think it makes sense at
7    the liability stage as well.
8                I would suggest special masters as opposed to
9    magistrates just because of how busy our magistrate judges
10   are at this point in time.
11               MR. PAULOS:  Certainly, Your Honor.
12               THE COURT:  And Judge Bates is conducting an
13   evidentiary hearing.  Is that just for Afghanistan-based
14   attacks, or does that include Iran-based attacks?
15               MR. PAULOS:  The hearing going on right now before
16   Judge Bates -- their openings and their experts testified
17   yesterday -- is solely focused on Afghanistan attacks.  He
18   has set the Iran- or, excuse me, the Iraq-based attacks off
19   to the side while he's dealing with the novel questions of
20   the Afghanistan material support allegations in that case.
21   And I believe that hearing will be going all week.
22               So that's my understanding of where they're at in
23   that case.
24               THE COURT:  Okay.  Well, obviously, you know, if
25   we embark on this bellwether process, it will be important

1    not to -- and obviously you all have the same interest in
2    mind, I suppose, but not to overlap with bellwethers that
3    might be going on before Judge Bates or Judge Moss or Judge
4    Kelly or anyone else who adopts a similar approach.
5             MR. PAULOS:  Certainly, and our --
6             THE COURT:  And I raised the issue of sort of
7    related cases the last time.  You know, it may be that some
8    of these cases are related, but it seems to me that, given
9    the volume of them, that's just -- that's something that it
10   is what it is, and we should just go forward with our own
11   cases but understanding that we should be as efficient as
12   possible in taking evidence and making rulings that aren't
13   potentially inconsistent with things that have come before.
14            MR. PAULOS:  Absolutely.  We're going to monitor
15   all the other cases that we've identified for Your Honor,
16   and if there's rulings that are made or findings of fact and
17   conclusions of law that are made that we believe that we can
18   put before you and take judicial notice of and essentially
19   reduce the amount of information that this Court needs to
20   analyze anew, we will do that and work with the Court to
21   take judicial notice or to apply those findings where
22   necessary.
23            THE COURT:  Okay.  And just out of curiosity, I
24   mean, obviously Iran has chosen not to appear in this and
25   the other cases in this district, but has any Court ever

1    appointed amicus to represent its interest on either the
2    immunity issues or on the liability issues or anything like
3    that?  Has there ever been someone else on the other side of
4    the courtroom in any of these cases?
5           MR. PAULOS:  Not at the -- this is just my
6    understanding, Your Honor, and I like to think I've looked
7    at a lot of these.  I have not seen that done at the trial
8    court level.
9           I know at the appellate court level that they have
10   appointed, you know, counsel to represent Iran or other
11   defaulting defendants at oral argument.  Most recently there
12   was an oral argument I attended involving I believe it's the
13   Maloof opinion relating to sua sponte raising of statute of
14   limitations.  There --
15          THE COURT:  I think I was on the wrong side of one
16   of those rulings.
17          MR. PAULOS:  I think you might have been, Your
18   Honor.
19          THE COURT:  It was with Judge Bates so I was in
20   good company.
21          MR. PAULOS:  You were in good company for sure.
22          I know that they had amicus there representing and
23   making the arguments that had been appointed, but that's the
24   only time I've ever seen it.
25          THE COURT:  But not in the district court --

```
 1                    MR. PAULOS:  Not in the district court.
 2                    THE COURT:  -- as far as you know, okay.
 3                    MR. PAULOS:  As far as I'm aware.
 4                    THE COURT:  All right.  Anything else, Counsel?
 5              How long do you need to get me a more detailed
 6     proposed case management plan?
 7                    MR. PAULOS:  I think we could probably do that for
 8     you rather quickly.
 9              Jeremy, I don't want to put you behind the gun.
10     What do you think?
11                    MR. TOR:  We can get it to you before the end of
12     the month, Your Honor.
13                    THE COURT:  All right.  So we'll give you 21 days
14     just to be safe, and we'll hear from you then, okay?
15                    MR. TOR:  Thank you very much for your time.
16                    MR. PAULOS:  Thank you very much.
17                    THE COURT:  All right.  Thanks for your time,
18     gentlemen.  Have a good day.
19                    MR. PAULOS:  Take care.
20                        (Whereupon the hearing was
21                         concluded at 2:18 p.m.)
22
23
24
25
```

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

**NOTE:** This hearing was held during the COVID-19 pandemic stay-at-home restrictions and is subject to the technological limitations of court reporting remotely.

Dated this 21st day of October, 2021.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001