**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF CHRISTOPHER** | ) | |
| **BROOK FISHBECK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 1:18-cv-2248-CRC** |
| **v.** | ) | |
| | ) | |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION REGARDING DEFENDANTS' MATERIAL SUPPORT**
**FOR THE SUBJECT TERRORIST ORGANIZATIONS**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     OVERVIEW OF THE CASE ..................................................................................... 2

III.    ELEMENTS OF PLAINTIFFS' CLAIMS ................................................................ 3

IV.     EVIDENTIARY STANDARD .................................................................................... 4

V.      FACTUAL OVERVIEW ........................................................................................... 14

VI.     DEFENDANTS' PROVISION OF MATERIAL SUPPORT FOR THE TERRORIST GROUPS THAT COMMITTED THE SUBJECT TERRORIST ATTACKS ............................ 15

        A.      Iran's Campaign of International Terrorism ........................................................16

        B.      Iran's Terrorism Network ..................................................................................19

                1.      IRGC .....................................................................................................24

                2.      NIOC .....................................................................................................29

                3.      Bank Melli .............................................................................................30

                4.      Bank Markazi .........................................................................................31

                5.      MOIS ......................................................................................................32

                6.      Hezbollah ...............................................................................................34

        C.      Defendants' Material Support of Shia Militias in Iraq ..........................................40

                1.      The Badr Organization ...........................................................................47

                2.      Jaysh al Mahdi ("JAM") and the Promise Day Brigade ("PDB") ..............50

                3.      Asa'Ib Ahl al-Haq ("AAH") ...................................................................57

                4.      Kata'ib Hizballah ("KH") .......................................................................63

                5.      The Sheibani Network ...........................................................................67

                6.      Summary of Defendants' Material Support for the Shia Terrorist Groups .....................................................................................................71

        D.      Defendants' Material Support of Sunni Terrorist Groups in Iraq .........................76

                1.      Al Qaeda ("AQ") ....................................................................................78

(a)    Summary of Defendants' Material Support to AQ ........................87

2.    The Zarqawi Organization & Al Qaeda in Iraq ("AQI")..........................92

(a)    Summary of Defendants' Material Support to the Zarqawi Organization and AQI..................................................................100

3.    Ansar al Islam ("AAI") a/k/a Ansar al Sunna ("AAS") ........................105

(a)    Summary of Defendants' Material Support to AAI/AAS............113

4.    Summary of Iran's Material Support for these Sunni Groups ................116

E.    Defendants NIOC, Bank Melli Iran, and Bank Markazi's Provision of Material Support to the Terrorist Groups Responsible for the Subject Attacks ..............................................................................................121

1.    NIOC..........................................................................................122

2.    Bank Melli ..................................................................................131

3.    Bank Markazi ..............................................................................136

4.    NIOC, Bank Melli, and Bank Markazi Laundered Money Through the International Financial System To Divert Funds to Iran's Terror Network......................................................................................149

5.    Defendants' Money Laundering Scheme Enabled Them to Divert U.S. Dollar Funds to IRGC and MOIS to Fund Terror Groups in Iraq. ..........................................................................................151

6.    Defendants' Money Laundering Scheme Enabled Iran to Acquire Restricted Items for Use in Terrorism. ....................................152

VII.    TERROR ATTACKS WERE A FORESEEABLE CONSEQUENCE OF DEFENDANTS' MATERIAL SUPPORT. ..................................................................... 153

VIII.    CONCLUSION........................................................................................... 157

## I.     INTRODUCTION

Plaintiffs have brought this civil action against Defendants under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, on behalf of U.S. nationals and members of the U.S. armed forces who were killed or injured in terrorist attacks in Iraq between 2003 and 2011.[1] Amended Complaint, ECF Dkt. No. 10, ¶¶ 8, 12-13, 5819-5841. Defendants are The Islamic Republic of Iran ("Iran"), Iran's Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Intelligence and Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and the National Iranian Oil Company ("NIOC").[2]

Plaintiffs submit this memorandum pursuant to stage two of the case management plan. ECF Dkt. No. 75. With this memorandum, Plaintiffs begin proving the "material support" element of their claims by establishing that Iran and its co-Defendants provided material support to the terrorist organizations that committed the subject attacks in the time period leading up to and surrounding the attacks.[3] This proof satisfies the requirement under the FSIA of showing Defendants provided material support to the terrorist groups, that the material support was essential to the groups' operating capacity, and that terrorist attacks in general were reasonably foreseeable or a natural consequence of that material support. *See* ECF Dkt. No. 69, Plaintiffs' Proposed Case Management Plan, pp. 14-15 (describing stage two of the case management plan).

The memorandum begins with an overview of the case and a review of the elements

---

[1] On March 15, 2022, Plaintiffs filed a motion with exhibits to establish their status as U.S. nationals or members of U.S. armed forces at the time of the attacks. *See* ECF Dkt. No. 81. As set forth in that motion, and subject to the Court's ruling thereon, Plaintiffs have standing to assert claims under the terrorism exception provided in the FSIA, 28 U.S.C. § 1605A(c).

[2] On March 1, 2021, this Court found that Iran is a "foreign state" and that IRGC and MOIS are "political subdivisions" thereof. ECF Dkt. 55. This Court also held that NIOC, Bank Markazi, and Bank Melli are "agencies or instrumentalities" of Iran. *Id*.

[3] In subsequent stages of the case management plan, Plaintiffs will show that the subject attacks were committed by the terrorist organizations Defendants materially supported.

Plaintiffs must prove to establish Defendants' liability. The heart of this memorandum—*i.e.*, evidence showing Defendants' provision of material support to the terrorist organizations that committed the subject attacks—is contained in section VI below.

## II.   OVERVIEW OF THE CASE

Plaintiffs are victims of terrorist attacks committed in Iraq by terrorist organizations materially supported by Iran through its agencies and instrumentalities. Amended Complaint, ECF Dkt. No. 10, ¶¶ 1-14; 168-192; 199; 453-464. After major combat operations in Iraq ended on May 1, 2003, Iran increased its flow of support and resources to terrorist groups in Iraq to target U.S. forces. *Id*., ¶¶ 328-341; 405-445. Iran cultivated and supported multiple groups simultaneously and across sectarian divides. *Id*., ¶¶ 4; 5; 12; 56; 234-235; 253; 271; 275.

Iran supported Sunni terrorist groups al Qaeda and Ansar al Islam by providing the early funding and training necessary for the groups' formation and growth; Iran then provided these groups with critical safe haven and operational support within Iran while they focused on attacking victims in Iraq, including Plaintiffs. *Id*., ¶¶ 5; 149; 150; 201; 237-317; 3525. Iran also created and worked with Shia terrorist groups in Iraq (called Special Groups by the U.S. military) to sow division amongst the Iraqi populace and disrupt the fledgling Iraqi democracy. *Id*., ¶¶ 4; 176; 234 318-341. Iran executed its terror campaign in Iraq with the active assistance of co-Defendants IRGC, MOIS, National Iranian Oil Company, Bank Melli Iran, and Bank Markazi, as detailed below in sections VI.B. and VI.E. *Id*., ¶¶ 94-96; 110-118; 121; 136; 139; 446-452.

This case is, in short, about Iran's singularly focused and systematic terrorism campaign that targeted U.S. soldiers in Iraq. While Iran could have chosen to use legal diplomatic, political, and humanitarian efforts to influence the outcome of Iraq's emergence from the brutal regime of Saddam Hussein, it instead chose to shower its largesse upon designated Foreign Terrorist Organizations ("FTOs"), which used extraordinary violence to promote Iran's long-term regional

goals. *Id.*, ¶¶145; 148-178; 45; *see also Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 22 (D.D.C. 2019) ("Among Iran's foreign activities, its campaign in Iraq figures prominently."). While the 437 subject attacks span time and location, each was the result of a singular objective, effectuated through a deliberately designed scheme, utilizing a well-organized system and furthering Iran's common purpose—the extrajudicial killing and maiming of Americans, including Plaintiffs, to influence, intimidate, and affect the conduct and policies of the United States. *Id.*, at 23 (detailing "the long-held Iranian desire to push the United States out of the Gulf region… while causing the United States continued setbacks in its efforts to promote democracy and stability there." (internal quotations omitted).

The attacks in this case were committed as part of Iran's campaign in Iraq by terrorist groups that received material support from Defendants.[4] At subsequent stages of the case management plan, Plaintiffs will prove which specific groups committed each attack. Here, Plaintiffs submit evidence for the Court to consider and find that Iran and its co-Defendants were, during the relevant time frame, providing materials support to those groups.

## III.   ELEMENTS OF PLAINTIFFS' CLAIMS

Plaintiffs' claims against Defendants are brought under the state-sponsored terrorism exception to the FSIA, which applies to claims involving "personal injury or death that was caused by" "the provision of material support or resources for" an "act of" "extrajudicial killing." 28 U.S.C. 1605A(a)(1). *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 364 (D.D.C. 2020). The elements Plaintiffs must prove are thus: (1) the Defendants provided material support

---

[4] This Court previously found Iran liable for providing material support to groups who executed terrorist attacks against U.S. Nationals in Iraq involving the IRGC, IRGC-QF, Hezbollah, JAM and the Special Groups. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 33, 35, 38, 40, 42, 45, 52 (D.D.C. 2019); *Karcher v. Islamic Republic of Iran*, No. 16-232 (CKK), 2019 WL 4305482, at *2 (D.D.C. Sept. 11, 2019).

for (2) an act of extrajudicial killing that (3) caused personal injury or death. This memorandum focuses on the first element.

To satisfy the "material support" element, the plaintiff must prove a "reasonable connection" between the defendant's provision of material support and the attack that caused the plaintiff's injury. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1228 (D.C. Cir. 2004); *Force*, 464 F. Supp. 3d at 368. This requires the plaintiff to show two things. First, the defendant's material support was a "substantial factor in the sequence of events that led to the plaintiff's injury." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368; *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 85 (D.D.C. 2018). Second, the injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Kilburn*, 376 F.3d at 1128; *Force*, 464 F. Supp. 3d at 368; *Fritz*, 320 F. Supp. 3d at 85.

The evidence in support of this "material support" element is set forth below in section VI.

## IV.   EVIDENTIARY STANDARD

The applicable evidentiary standard is set forth at 28 U.S.C. § 1608(e), which provides that, to obtain default judgment in a FSIA case like this, the plaintiff must demonstrate a right to relief "by evidence satisfactory to the court." *Force*, 464 F. Supp. 3d at 336. This standard may be met "through uncontroverted factual allegations" that are supported by "documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010). A hearing is not necessary. *Marziliano v. Heckler*, 728 F. 2d 151, 158 (2d. Cir. 1984). A district court's decision will be affirmed so long as "there is an adequate basis in the record for inferring that the district court…was satisfied with the evidence submitted" in support of the plaintiff's claims. *Id.*; *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) ("[W]e do not believe that § 1608(e) requires evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.").

Findings previously made by federal courts in other terrorism cases in which Iran was found to have provided material support to terrorist groups responsible for the attacks (thus making Iran legally liable under the FSIA) are also suitable evidence. *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings."); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) ("[T]he FSIA does not require this Court to relitigate issues that have already been settled in previous decisions…Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence.").

Where default is sought against a foreign state for materially supporting acts of terrorism, as in this case, courts evaluate the type and quantum of evidence necessary to enter a default judgment "in light of Congress's purpose in enacting §1605A – that is, to 'compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future,' – and the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign.'" *Fritz*, 320 F. Supp. 3d at 57 (internal citations omitted); *see also Force,* 464 F. Supp. 3d at 336. District courts thus have "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). In *Owens*, the court explained this unusual degree of discretion:

> For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial…This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak…Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the

> outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems.

*Id.*, at 785-86 (internal quotation marks and citations omitted).

With respect to expert opinions, this Court has observed that such evidence "is not only entirely proper, but often sufficient, and even indispensable in 'terrorism cases…because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz*, 320 F. Supp. 3d at 57 (quoting *Owens*, 864 F.3d at 787-88); *Force*, 464 F. Supp. 3d at 336-37, 366. Moreover, "an expert is not limited to relying on admissible evidence in forming his opinion," since "experts don't characteristically base their expert judgments on legally admissible evidence; the rules of evidence are not intended for the guidance of experts." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 704 (7th Cir. 2008) (interpreting expert opinion evidentiary rules). Indeed, the Federal Rules of Evidence expressly provide that expert opinions are admissible even if based on inadmissible facts or data provided such facts and data are the kind "experts in the particular field would reasonably rely on." *See* Fed. R. Evid. 703. Expert testimony has special importance in FSIA default cases because "[t]he types of records or direct evidence available in civil litigation are unlikely to be available in FSIA cases – particularly when, as here, plaintiffs have no access to discovery." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016).

## A. Plaintiffs' Expert Witnesses

This case, like most terrorism cases under § 1605A, relies heavily on expert opinions. Plaintiffs present in this memorandum and proffer evidence and opinions from several preeminent experts in their respective fields, including the following:

- **Patrick Clawson, PhD**, is the Director of Research at the Washington Institute for Near East Policy, where he directs the Iran Security Initiative. Dr. Clawson, who speaks Farsi, has been qualified as an expert in numerous cases relating to Iran's role in supporting

6

terrorism. Dr. Clawson offers expert opinions about Iran's objectives in supporting terrorists who attack Americans and provides background information describing the role in Iran's terrorism infrastructure of Defendants IRGC, MOIS, Bank Markazi, and Bank Melli. He further offers expert opinions about al Qaeda and al Qaeda in Iraq and Iran's provision of material support to those groups for operations against Americans in Iraq. Dr. Clawson provides a general overview of Iran's support for and sponsorship of terrorism, including its designation as a state sponsor of terrorism, and how Iran has institutionalized terrorism over time. Dr. Clawson also provides background information on Iran's internal operations and infrastructure. He opines on the following additional topics: (1) Iran's objectives in supporting terrorism, and why Iran works with extremist groups; (2) the use of Iranian agents and instrumentalities globally and as related to terrorist attacks occurring in Iraq, including: the Islamic Revolutionary Guard Corps (IRGC); the IRGC's Qods Force (IRGC-QF); and Iran's Ministry of Intelligence (MOIS); (3) Iran's use of its banking system for sponsorship of terrorism, including Bank Markazi and Bank Melli; (4) the critical role that Bank Markazi and Bank Melli play in Iran's terrorism by proxy; (5) Iranian entities connected to terrorism, including the National Iranian Oil Company (NIOC), the Islamic Republic of Iran Shipping Lines (IRISL), Mahan Air, and Khatam al-Anbiya (an Iranian engineering firm controlled by the IRGC); and (6) Iran's role in providing material support to terrorists in Iraq, including Hezbollah, JAM and the Special Groups, al Qaeda, al Qaeda Iraq, and Abu Musa'ab Al-Zarqawi. Dr. Clawson's expert analysis and opinions are set forth in his attached written report and accompanying declaration.

- **Matthew Levitt, PhD**, is the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. He previously served as

Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Treasury Department, where he focused on terrorism and financial intelligence branch and acted as deputy chief of the Office of Intelligence and Analysis. He also served as a State Department counterterrorism advisor to the special envoy for Middle East regional security. Dr. Levitt has authored a leading scholarly book on Hezbollah and has also been qualified as an expert on numerous occasions in both civil and criminal terrorism cases. For this case, Dr. Levitt offers expert opinions about Iran's material support for terrorism, including its use of the Lebanese FTO Hezbollah as a proxy for its terrorist activities and its deployment of the IRGC to finance, train, supply, and arm terrorist groups in Iraq. In addition, he will explain the flow of material and fighters from Iran to terrorist groups in Iraq. Dr. Levitt opines on the following topics: (1) Iran's interest in Iraq and use of FTO proxies, including Hezbollah and other terrorist groups; (2) Iran's support of Hezbollah and an overview of Hezbollah generally, including its founding, ideology, and structure; (3) Hezbollah's role in Iraq as a proxy of Iran; (4) Hezbollah's relationships with and training of Jaysh al-Mahdi and the Special Groups in Iraq; and (5) Iran's strategic goals in Iraq post-2003, including Iran's agents and instrumentalities and their presence and roles in Iraq, Iran's terrorist proxies in Iraq, and Iran's material support of Hezbollah and other terrorist groups in Iraq. Dr. Levitt's expert analysis and opinions are set forth in his attached written report and accompanying declaration.

- **Michael Rubin, PhD,** is a Resident Scholar at The American Enterprise Institute and a Senior Editor of the Middle East Quarterly. He served as a Political Adviser to the Coalition Provisional Authority in Baghdad from 2003-2004 and was country advisor for Iraq and Iran in the Office of the Secretary of Defense at the Department of Defense from 2002-

2004. Dr. Rubin has authored several books about Iran and written dozens of scholarly articles and briefed over 100 military units before deployment to the Middle East from 2004 to the present. Dr. Rubin has traveled through Iran and Iraq and met face-to-face with, and interviewed, many members and leaders of militant groups operating in Iraq. Dr. Rubin offers expert opinions and analysis about Iran's operational support of al Qaeda, Ansar al-Islam, Hezbollah, JAM, and the Special Groups; Iran's funding of terrorist groups targeting Americans; and Iran's training of terrorists.  Dr. Rubin provides an overview of Iran's support of Sunni terror groups, the underlying purposes and goals behind such support, and the distinct characteristics of Iran's support to these groups. He then focuses on Iran's support of specific Sunni groups in Iraq, including these groups' unique histories, backgrounds, and areas of operation, as well as the impact that Iran's support had on these aspects and each group's ability to exist and effectively operate. In this report Dr. Rubin provides information on Iran's support to both Shia and Sunni groups in Iraq, mainly focusing on Iran's support for al Qaeda and its network in the region, to include: Ansar al Islam/Ansar al Sunna, and the Zarqawi Organization (and its various iterations) as it evolved into al Qaeda in Iraq (AQI) and then to the Islamic State of Iraq, as well as the AQI-led Mujahedeen Shura Council formed in Iraq in 2006 (and its member organizations). He discusses the various methods and types of Iranian material support received by these Sunni terrorist groups in Iraq, including training, safe haven, funding and logistical support. If so called, Dr. Rubin's expert analysis and opinions are set forth in his attached written report and accompanying declaration.

- **Daveed Gartenstein-Ross, PhD**, is the Chief Executive Officer of Valens Global, a Non-Resident Fellow at the Foundation for Defense of Democracies, and an Associate Fellow

at the International Centre for Counter-Terrorism – The Hague. He previously served as a Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships and an Adjunct Assistant Professor in Georgetown University's Security Studies Program. Dr. Gartenstein-Ross specializes in studying jihadist movements, including undertaking detailed research into Sunni and Shia terrorist groups operating in Iraq. He has provided two separate declarations for this case based upon the Shia/Sunni divide that separates Islamic terrorist groups and explains when and why such groups cross the sectarian divide to commit terrorism. In his Sunni declaration, Dr. Gartenstein-Ross provides an overview of Iran's support of Sunni terrorist groups in Iraq, including Iran's ability to overcome the ideological divide during the U.S. presence in Iraq, and how Iran and the Sunni terrorist groups shared strategic common ground. He discusses Iran's support for al Qaeda, and the Zarqawi Organization (which later became al Qaeda in Iraq), as well as Ansar al Islam (a/k/a Ansar al Sunna). In his Shia declaration, Dr. Gartenstein-Ross focuses on Iran's support of Hezbollah and the Badr Corps, and their support, along with the IRGC-QF, of Shia militias in Iraq, specifically JAM and the Special Groups. In these declarations, Dr. Gartenstein-Ross details the specific Iranian-supported terrorist groups operating in Iraq, including their formation, evolution, areas of operation, tactics, and involvement. At subsequent stages of the case management plan, he will provide expert opinions regarding the specific terrorist groups that committed the subject attacks and Iran's responsibility for them. Dr. Gartenstein-Ross's expert analysis and opinions are set forth in his attached written reports and accompanying declaration.

- **Peter Medvedev Piatetsky** is the Chief Financial Officer of Castellum.AI, a technology company that enables deep dive research on global sanctions and compliance data. He

obtained a Master of Professional Studies in Persian from the University of Maryland, College Park, a preeminent graduate program on Iran in the United States. He then worked as a civilian contractor in Afghanistan providing intelligence reports and briefings before moving to the U.S. Treasury Department as a sanctions investigator. From 2013-2015 he served as the Treasury Department's Lead Analyst on Europe, Russia, and the former Soviet Union. In 2015, he became a Policy Advisor for Iran in the Treasury's Office of Terrorist Financing and Financial Crimes and later also the representative to the Financial Action Task Force of Bahrain. Starting in 2018 he was the Compliance Supervisor at Woori Bank in New York, where he provided advice on trade, banking, and credit matters related to Iran and North Korea before co-founding Castellum.AI in 2019. He has also served as an adjunct professor at American University. Mr. Piatetsky explains how Iran and the IRGC utilized banks and companies owned by the government of Iran to provide funding to terrorists in Iraq. Specifically, he explains how Iran and its government-owned entities used deceptive banking practices to obscure their role in transactions, bypass sanctions, and move U.S. dollars internationally to terrorist groups. He further explains how those same practices were used to supply illicit materials to terrorist groups. Mr. Piatetsky also explains the process by which countries and entities are designated by the United States as sponsors of terrorism. He explains that the timing of a designation does not mean that that country/entity just started sponsoring terrorism. Rather, the designation confirms that the country/entity has been engaged in sponsoring terrorism for an extended period of time. Finally, Mr. Piatetsky provides detailed analysis of sampled transactions to show how Iran and its government-owned entities utilized the U.S. and international financial system to provide money to terrorist groups. Mr. Piatetsky's expert analysis and opinions are set forth

in his attached written report and accompanying declaration.

Several of these experts have been qualified for expert testimony in other terrorism-related cases. *See, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017) (Clawson and Levitt); *Fritz*, 320 F. Supp. 3d at 48 (Levitt, Gartenstein-Ross); *Karcher*, 396 F.Supp.3d at 23 (Clawson and Levitt). All of the experts' qualifications, opinions, and the bases for their opinions are more fully detailed in their individual reports and declarations, which are attached hereto as PX1–PX7.[5]

## B. Plaintiffs' Exhibits

In addition to expert analysis and opinions, Plaintiffs also rely herein on documentary evidence. These documents are of the same source, type, and nature as those routinely admitted in other similar FSIA terrorism cases, and consist of official U.S. government designations, reports, records, and statements regarding the support for terrorism of Iran, the IRGC, MOIS, the IRGC-QF, Hezbollah, NIOC, Bank Melli, Bank Markazi, al Qaeda, Ansar al Islam/Ansar al Sunna, Jaysh al-Mahdi and the Special Groups and their involvement in Iran's terrorism network generally as well as their involvement in Iran's terrorism campaign in Iraq specifically, including terrorist attacks by these groups against U.S. Nationals. These exhibits are authenticated under Fed.R.Evid. 901-902 with evidence showing the exhibits were obtained from the U.S. government and other sources either directly or the public domain.[6]

This Court has previously found similar (or in some instances, the same) government records admissible pursuant to Fed. R. Evid. 803(8). *Karcher*, 396 F. Supp. 3d 12, 16. In *Karcher*,

---

[5] Plaintiffs' exhibits are marked for identification purposes as "**PX_**." Plaintiffs also attach an Exhibit List, which identifies each exhibit. Plaintiffs will also provide the Court with a hard drive that will contain this memorandum and all exhibits in a hyperlinked format to allow the Court to readily click citations and retrieve the sources.

[6] *See, e.g.*, **PX7**, Declaration of Ripley Quinby IV, United States Treasury.

the Court admitted ninety-six exhibits under Rule 803(8), stating:

> Under Circuit precedent, "[t]he district court . . . has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). That discretion extends to the admission of evidence under somewhat relaxed evidentiary standards. *See id.* (*citing Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014)) (recognizing that "plaintiffs [have been allowed] to prove their claims using evidence that might not be admissible in a trial"). "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Id*. at 785-86.

*Karcher*, No. 16-232 (CKK), ECF No. 64, p. 1 (Nov. 27, 2018 D.D.C.).

Admission is proper under Rule 803(8) if a document is "[a] record or statement of a public office" that "sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report … ; or (iii) in a civil case … factual findings from a legally authorized investigation[.]" Fed.R.Evid. 803(8)(A). As the D.C. Court of Appeals stated in *Owens*, "[p]ursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record." 864 F.3d at 792 (*citing Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988)). *See also Beech Aircraft Corp*., 488 U.S. at 170 ("[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report.").

Additionally, some statements in the exhibits are admissible under Fed.R.Evid. 801(d)(2), as they were made by agents or co-conspirators of Defendants, and under Fed.R.Evid. 804(b)(3) as statements against interest (admissions of illegal conduct), including statements by Iranian officials and various leaders and members of Defendants' terrorist proxy groups.

Most of Plaintiffs' exhibits are the same or similar to those admitted by the courts in *Karcher* and *Fritz*. Examples include expert reports, government designations of terrorists and

terrorist organizations, investigative reports following terrorist attacks, interrogation reports of detainees, and State Department Country Reports on Terrorism. *See Fritz*, 320 F. Supp. 3d at 59 n.3 (admitting these types of documents under Fed.R.Evid. 803(8), 804(b)(2)-(3), and 804(a)(5)); *Karcher*, 396 F. Supp. 3d 12, 16 (finding proper foundation for admission of expert reports is laid if experts adopted the facts and conclusions therein); *see also Flanagan*, 87 F. Supp. 3d at 99-100, 102, 107 (relying on agency press releases and State Department reports in a § 1605A case); *Owens*, 864 F.3d at 792-93 (holding that the State Department Country Reports "fit squarely within the public records exception" and were therefore admissible under Rule 803(8)).

Statements contained in certain exhibits are also admissible under Fed.R.Evid. 803(18) because they are "statements in learned treatise, periodicals, or pamphlets," and have been relied upon by an expert witness within their declaration testimony. Moreover, as Plaintiffs' experts set forth in their declarations, they have used these exhibits because they consider them reliable authorities in their fields of expertise as the bases for the opinions and conclusions they have reached. Fed.R.Evid. 703. *See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1309-10 (5th Cir. 1991) ("[M]any government reports, as with many expert witnesses, have to rely in part on hearsay evidence, and the reports are not generally excluded for this reason.").

## V. FACTUAL OVERVIEW

This memorandum focuses on two intersecting issues that implicate Iran's and co-Defendants' liability for providing material support to the terrorist groups that attacked Plaintiffs. The first is the evidence of how Iran has used its IRGC, IRGC-QF, MOIS, NIOC, Bank Markazi, and Bank Melli in concert with Hezbollah[7] to direct a multifaceted terror campaign against

---

[7] Numerous other decisions from this Court have found Hezbollah to be an Iranian proxy. *See, e.g.*, *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 54-55 (D.D.C. 2018); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003).

Coalition Forces in Iraq between 2003 and 2011. The second is the evidence of how Iran uses these entities to develop, supply, and deploy specific terrorist groups against U.S. service members in Iraq, and to finance, train, permit and direct their Iraq-based terrorist proxies to commit attacks against U.S. service members in Iraq. In later stages of the case management plan, Plaintiffs will present evidence that confirms the subject attacks were committed by one or more of Iran's terrorist proxies.

## VI.   DEFENDANTS' PROVISION OF MATERIAL SUPPORT FOR THE TERRORIST GROUPS THAT COMMITTED THE SUBJECT TERRORIST ATTACKS

In this section, Plaintiffs describe the entities within Iran's terrorist network, the terrorist groups that perpetrated the subject attacks, and the material support Defendants provided to those terrorist groups. This evidence is relevant to the "material support" element of Plaintiffs' claims. Specifically, the evidence in this section shows: 1) Defendants provided material support to the terrorist organizations that committed the subject attacks during the time period leading up to and surrounding the subject attacks; and 2) this material support was essential to the organizations' operating capacity.[8]

---

[8] "Material support or resources" is defined under 28 U.S.C. § 1605A(h)(3) by reference to 18 U.S.C. § 2339A, which in turn defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Examples of such material support in FSIA terrorism cases include weapons, weapons technology, training, intelligence, money, and safe haven to terrorist groups. *See Force*, 464 F. Supp. 3d at 365; *Fritz*, 320 F. Supp. 3d at 86.

## A.     Iran's Campaign of International Terrorism

Iran has been actively involved in supporting and promoting terrorism in Iraq since before the U.S. invasion in 2003 and has established itself as the world's leading state sponsor of terror.[9] Following the end of major combat operations in Iraq in May 2003, Iran increased its flow of material support to terrorist groups in Iraq targeting U.S. and other Coalition Forces.[10] Iran has openly acknowledged its terroristic goals in Iraq. In 2003, for example, Ayatollah Ahmad Janati, the Secretary General of Iran's Council of Guardians, called on Iraqis to commit attacks against U.S. forces in Iraq.[11] Two months later, Coalition Forces uncovered a fatwa (religious edict) issued by Iran urging "holy fighters" in Iraq to attack U.S. nationals.[12]

Since 2003, Iran has bolstered insurgent groups in Iraq—both Sunni and Shia—as they targeted Coalition Forces, Iraqi security forces, and the Iraqi government itself.[13] Iran has often backed opposing parties and movements to secure its interests.[14] By doing so, Iran has been able to rely on different terrorist groups for different activities, increasing Iran's ability to pursue its overarching goals.[15] In October 2017, the President stated:

> In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to

---

[9] *See* ECF Dkt. No. 81 at pp. 1-4 (detailing the evidence of Iran's status as a "state sponsor of terrorism" during all times relevant in this case, including information from the Federal Register, U.S. Department of State, and previous decisions from this Court).

[10] Declaration & Expert Report on Sunni Militant Groups of Daveed Gartenstein-Ross ("Gartenstein-Ross Sunni Decl."), **PX5**, p. 65; Declaration & Expert Report of Michael Rubin ("Rubin Decl."), **PX6**, ¶ 142; Declaration and Expert Report of Peter Medvedev Piatetsky ("Piatetsky Decl.), **PX3**, ¶ 28.

[11] **PX670** Kimberly Kagan, "Iran's Proxy War Against the United States and the Iraqi Government," Iraq Report, May 2006-August 20, 2007, at pp. 2, 3, 5, 17, 20.

[12] *Id.*, pp. 3, 5.

[13] Declaration and Expert Report on Shia Militant Groups of Dr. Daveed Gartenstein-Ross ("Gartenstein-Ross Shia Decl."), **PX4**, pp. 2, 43 (*citing* **PX356**); Gartenstein-Ross Sunni Decl., p. 65; Rubin Decl., ¶¶ 202-205; Piatetsky Decl., ¶ 303.

[14] Declaration and Expert Report of Dr. Matthew Levitt ("Levitt Decl."), **PX2**, ¶ 25.

[15] *See id.*

this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks.[16]

Iran has continually and purposefully provided material support to terrorist groups in Iraq by way of funding, weapons, training, safe haven, travel and transportation, intelligence, expert advisors, and assistance in attack planning.[17] Indeed, over the years, Iranian transfers to state and nonstate actors have included: communications equipment; small arms (*e.g.*, assault rifles, sniper rifles, machine guns, mortars, and rocket-propelled grenades (RPGs)) and ammunition; artillery systems, including battlefield rockets and launchers; armored vehicles; equipment for unmanned explosives boats; UAVs; ground-attack aircraft; and C/SRBMs and associated technology.[18] Iran provides such weapons to a wide array of actors.

In Iraq in particular, Defendants have provided: advanced rockets; small arms; automatic weapons; RPGs; 60mm-120mm mortars;[19] 107-mm, 122-mm and 240-mm rockets; advanced large-caliber sniper rifles; improvised explosive devices (IEDs), including explosively-formed penetrators (EFPs), explosives and component parts for IEDs and improvised rocket assisted munitions (IRAMs), including critical targeting, triggering and detonating mechanisms, anti-aircraft weapons, and more.[20] In 2012, the Small Arms Survey found that, of the weapons recovered in arms caches in Iraq in 2008 and 2009, including more than 30,000 small arms, light weapons, and rounds of light weapons ammunition and more than 500,000 rounds of small-caliber ammunition, **29% were Iranian in origin.**

---

[16] **PX137**, "Remarks by President Trump on Iran Strategy," The White House (October 13, 2017).
[17] Levitt Decl., ¶¶ 5, 176; Gartenstein-Ross Shia Decl., pp. 2, 45-46; Gartenstein-Ross Sunni Decl., p. 65.
[18] Levitt Decl., ¶105 (citing Iran Military Power: Ensuring Regime Survival and Securing Regional Dominance," Defense Intelligence Agency, August 2019).
[19] **PX205**, "Country Reports on Terrorism, 2009," U.S. State Department, August 2010, p. 193.
[20] *See* Levitt Decl., ¶¶104-1010.

In addition to transferring weaponry, Iran created specialized training programs for its terror proxy groups, which included: (1) a basic paramilitary skills and weapons course, offering introductory training on mortars, improvised explosive devices, and firearms;[21] (2) an advanced paramilitary course that provided training in advanced operations and tactics, logistics and support, and information operations;[22] and (3) a master-trainer course to create a subset of Iraqi fighters that could take these combat skills and teach them to Iraqis locally.[23] To advance in the training program, Iraqi recruits made multiple trips to Iran or camps in Lebanon maintained by Hezbollah.[24]

All of this material support solidified an operational nexus between the terrorist organizations al Qaeda ("AQ"), al Qaeda in Iraq ("AQI"), Ansar al Islam/Ansar al Sunna ("AAI/AAS"), Hezbollah, The Badr Organization/Badr Corps, Iraq-based Shia Militia Jaysh al-Mahdi ("JAM") and its splinter cells  known as "Special Groups" (including the Promised Day Brigades ("PDB"), Kata'ib Hezbollah (KH),  Asa'ib Al Haq ("AAH"), and The Sheibani Network ("SN")). These terrorist groups were components of Iran's terrorism network in Iraq and perpetrated the attacks against Plaintiffs, and Iranian support for these groups was "official policy of the Iranian government."[25] Officials at the highest levels and within the course and scope of their positions within the Islamic Republic's state structure knew and approved of Defendants' conduct and participation in Iran's material support given to each of these terrorist groups.[26]

---

[21] Levitt Decl., ¶ 142.

[22] *Id.*

[23] *Id.*, ¶ 143; Gartenstein-Ross Shia Decl., p. 36 (*citing* **PX203**, U.S. Department of State, Country Reports on Terrorism 2007 (April 2008)).

[24] *See* Levitt. Decl., ¶¶ 143-147 (*citing* **PX346**, U.S. Congress, Senate Committee on Armed Services, The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Committee on Armed Services, 110th Cong., 2d sess., April 8-10, 2008, Statements of Gen. David H. Petraeus and Ambassador Ryan Crocker).

[25] Declaration and Expert Report of Patrick Clawson ("Clawson Decl."), **PX1**, ¶¶ 22, 99, 213-214.

[26] *See* Clawson Decl., ¶¶ 209- 217; and Levitt Decl. ¶¶ 92, 95, 99.

B.      **Iran's Terrorism Network**

With the assistance of the NIOC, Bank Melli, and Bank Markazi, Iran provided the above-referenced terrorist groups material support primarily through the IRGC, the IRGC-QF, MOIS, and Iran's Lebanon-based terror proxy, Hezbollah. These entities worked directly and indirectly with the terrorist groups that perpetrated the attacks against Plaintiffs in Iraq.[27]

At various times, multiple U.S. agencies have designated these entities as Specially Designated Terrorist ("SDT") entities and/or Foreign Terrorist Organizations ("FTO").[28] Numerous references to such designations appear throughout this brief. Such designations are the result of a review of a significant body of source information, including both classified and open source information, that the entity supports terrorism.[29] To qualify for this designation, the proposed designee must be: (1) owned or controlled by designated persons or entities; (2) acting for or on behalf of designated persons or entities; (3) assisting or sponsoring designated persons or acts of terrorism; (4) providing material, financial, or technological support for designated

---

[27] *See generally* Clawson Decl., ¶¶ 163-169; Gartenstein-Ross Sunni Decl., p. 65; Rubin Decl., ¶¶ 199, 202-204; Piatetsky Decl., ¶ 143.

[28] Iran's terrorist network includes agents and proxies (*i.e.*, entities and individuals) listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Sanctions Lists including, but not limited to, Iran's co-Defendants: (1) Bank Markazi Jomhouri Islami Iran; (2) Bank Melli Iran; (3) National Iranian Oil Company; (4) the Islamic Revolutionary Guard Corps (designated an FTO on April 15, 2019); (5) Islamic Revolutionary Guard Corps-Qods Force; and (6) the Ministry of Intelligence and Security. These entities were sanctioned, in part or in whole, for their conduct related to Iran's terrorist proxies in Iraq. Iran's terrorist proxies in Iraq, from 2003 to 2011, included, Hezbollah (designated a Foreign Terrorist Organization "FTO" on October 8, 1997); al Qaeda (designated an FTO on October 8, 1999); al Qaeda in Iraq  (designated an FTO on December 17, 2004); Ansar al Islam/Ansar al Sunna (designated an FTO on March 22, 2004)), the Special Groups (including Jaysh al Mahdi, Badr Organization/Badr Brigades, Kata'ib Hizballah (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq (designated an FTO on January 10, 2020), the Promised Day Brigades, and the Abu Mustafa Al-Sheibani network). If not designated as Foreign Terrorist Organizations, these groups or several of their members were designated as Specially Designated Global Terrorists, Specially Designated Terrorists, and/or Specially Designated Nationals.

[29] Piatetsky Decl., ¶ 16.

persons or acts of terrorism; (5) providing financial or other services to or in support of designated persons or acts of terrorism; or (6) otherwise associated with designated persons.[30] The evidentiary record to support a designation undergoes several rounds of review for legal sufficiency.[31] Due to this rigorous review, many potential designees that undergo the review process are ultimately not designated.[32] No legal challenge to a designation has ever entirely succeeded.[33]  A majority of designations assigned to IRGC, IRGC-QF, MOIS, NIOC, Bank Melli, and Bank Markazi are specifically based upon their support to the terrorist groups at issue here, and/or for their actions taken on behalf of Iran's terrorism network that supported Iran's efforts in Iraq from 2003 to 2011.[34]

To understand the relationship between the co-Defendants and the state-sponsored nature of their actions, it is necessary to understand who commands this entire terrorism apparatus. Iran's political and religious institutions are overseen by a single person, the Supreme Leader,[35] who has the authority to make any religious or political decision.[36] The Supreme Leader's power is unmatched and unchecked.[37] Iran's political structure is split into two parts: (1) a formal governmental structure, and (2) a revolutionary structure.[38] The Supreme Leader bears full

---

[30] *Id.*, ¶ 17.

[31] *Id.*, ¶ 19.

[32] *Id.*

[33] *Id.*, ¶ 21.

[34]  *See, e.g.*, U.S. Treasury designation activity to components of Iran's terrorism network at **PX118** (Bank Markazi), **PX36** (Bank Melli, MODAFL, IRGC front companies), and **PX63** (IRGC-QF and Terror Proxies). Mr. Piatetsky discusses in detail the sanctions placed on the relevant entities in his report.

[35]  At the time of the 1979 Iranian Revolution, the Supreme Leader was Ayatollah Ruhollah Khomeinei. He was succeeded by the current Supreme Leader, Ayatollah Ali Khamenei—the second person ever to hold the title. Clawson Decl., ¶ 49.

[36] *Id.*, ¶¶ 45, 47.

[37] *See id.*, ¶¶ 47-48, 50.

[38] *Id.*, ¶ 51.

responsibility for actions taken by the set of institutions under his control (including co-Defendants) and provides directives to both institutions, which "he rarely allows to be publicly revealed."[39] Accordingly, the institutions controlled by the Supreme Leader also do not publicly report their actions and have long been engaged in illegal activities.[40]

The following schematic demonstrates the hierarchy of Iran's terrorism network:



The IRGC-QF, also known as the Qods Force, is a special branch of the IRGC, which is generally responsible for foreign operations and supporting Iranian proxies abroad in "liberating

---

[39] *Id.*, ¶¶ 51, 54.
[40] *Id.*, ¶ 18.

Muslim" lands.[41] To that end, Iran's terrorism campaign in Iraq is directly overseen by the IRGC-QF, and it worked with MOIS, Hezbollah, and cell leaders on the ground in Iraq. In order to accomplish its goals in Iraq, Iran provided material support to multiple groups in various regions of the country, who used the support to plan, authorize, and commit attacks against U.S. forces.[42] These groups include Hezbollah, the Badr Organization, JAM and the Special Groups, AQ, AQI, and AAI/AAS (a radical Sunni group with close ties to AQ/AQI).[43]

Bank Melli and Bank Markazi serve as primary funding components of Iran's terrorism network, working in concert with the IRGC, NIOC, and other front companies. Iran uses these entities to avoid the detection of the illicit flow of U.S. dollars from Iran's seemingly legitimate oil, construction, and charitable businesses to Iran's terrorism proxies.[44] American officials estimate that Iran, through its terrorism network, supplied $100-$200 million per year to Iraqi terrorist groups, in addition to $70 million per year to the Badr Organization (discussed in more detail below) and $700-$800 million per year to Hezbollah.[45]

Iran acquires much of the funds it spends on terrorism by selling, through the NIOC, its petrochemical resources. In 2000, the Iranian government began depositing some of its oil revenues into an Oil Stabilization Fund.[46] Iran doles out money from this fund, through state-

---

[41] Piatetsky Decl., ¶ 27 (*citing* **PX626**, Center for Strategic and International Studies, 11 March 2019, War by Proxy: Iran's Growing Footprint in the Middle East).

[42] *See* Levitt. Decl., ¶ 5; *see also* Gartenstein-Ross Shia Decl., p. 2.

[43] *See* Gartenstein-Ross Sunni Decl., p. 65 (AQ, AQI, AAI); Rubin Decl., ¶ 204 (AQ, AQI, AAI); Piatetsky Decl., ¶¶ 184 (KH), 194 (AAH), 203 (JAM and PDB), 209-11 (BO) (*citing* **PX634**); and Gartenstein-Ross Shia Decl., pp. 19-20 (JAM) (*citing* **PX212**, **PX679**, **PX677**), 20-22 (AAH) (*citing* **PX679**, **PX934**), 22-25 (The Special Groups) (*citing* **PX934**, **PX212**, **PX250**, **PX251**, **PX365**, **PX22**, **PX951**, **PX67**, **PX202**).

[44] **PX36**, U.S. Dept. of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, United States Department of the Treasury (October 25, 2007).

[45] Piatetsky Decl., ¶¶ 31, 163.

[46] *See Id.*, ¶ 57.

owned banks, including Bank Melli and Bank Markazi, to IRGC-controlled businesses and other state-owned agencies, including NIOC, which in turn have direct relationships with Iran's terror proxies.[47]

Recognizing Iran's prolific funding of terrorism, Iran has been on the Financial Action Task Force ("FATF") Black List since its creation in 2008.[48] The Black List identifies "high-risk jurisdictions" in which member-states are advised to apply heightened countermeasures to protect the international financial system from money laundering and terror financing.[49] Iran has routinely failed to comply with FATF recommendations, which is due in large part to its exemption of "liberation organizations" from the FATF-recommended counter-terrorist financing ("CTF") provisions. Iran's exemption of such groups from counter-terrorist financing countermeasures permits designated terrorist groups, such as Hezbollah and Iran's proxies in Iraq (among others), to continue to use Iran's state-owned banks (Bank Melli and Bank Markazi) to launder money and access funds, as well as to permit Iran's agents and instrumentalities to provide financial services to those groups.[50]

In October 2007, when issuing a series of designations against Iranian entities (including Defendants IRGC and Bank Melli), the U.S. Secretary of Treasury noted that "[t]he IRGC is so

---

[47] One of these IRGC-controlled businesses is the construction company Khatam Al-Anbiya, which was utilized by Iran to smuggle money and weapons to Special Groups in Iraq. For further details regarding the role Khatam Al-Anbiya played in Iran's support of terrorism in Iraq, *see* Clawson Decl., ¶¶ 205-208 (*citing* **PX33**, **PX126**); Rubin Decl., ¶¶ 125-137 (*citing* **PX280**, **PX642**, **PX36**, **PX30**, **PX521**); Piatetsky Decl., ¶¶ 262-266.

[48] FATF is a 200 member inter-governmental body that sets international standards intended to prevent illegal activity. FATF Recommendations/Standards facilitate a global response to organized crime, corruption and terrorism. FATF continuously strengthens its standards to address new risks. It monitors countries to ensure full and effective compliance with its Standards, and holds those who do not comply to account by "naming and shaming" them on the Black List. Piatetsky Decl., ¶¶ 38-43.

[49] *See* Piatetsky Decl., ¶ 43.

[50] *Id.*, ¶ 48.

deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC," which has been responsible for "providing material support to the Taliban and other terrorist organizations."[51]

In summarizing the lethal effectiveness of the Iranian terrorism network, in 2019 when designating the IRGC as a Foreign Terrorist Organization, the U.S. government stated, "The Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003. This accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011, and is in addition to the many thousands of Iraqis killed by the IRGC's proxies."[52]

The following sections discuss the relevant Iranian proxies and agents, including Iran's co-Defendants, and the respective roles each played in sponsoring terrorism in Iraq.

### 1. IRGC

The IRGC is accountable exclusively to the Supreme Leader.[53] Indeed, the IRGC defines itself "as an instrument of the Supreme Leader, to whom IRGC cadres pledge their unflinching loyalty."[54] IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror."[55] In the years following the Islamic Revolution of 1979, the Tehran regime sponsored terrorist acts both to "export the revolution" and to further its national interests. Iran gave special focus to its own backyard, where Shia minorities lived under Sunni monarchies that not only oppressed Iran's co-religionists but also stood in the way of the new regime's regional ambitions.[56]

---

[51] Piatetsky Decl., ¶ 35 (*quoting* **PX73**, U.S. Department of Treasury Press Release, Statement by Secretary Paulson on Iran Designations (October 25, 2007)).

[52] **PX21**, U.S. Department of State, Designation of the Islamic Revolutionary Guard Corps (Apr. 8, 2019).

[53] Clawson Decl., ¶ 87; Rubin Decl., ¶46.

[54] Piatetsky Decl., ¶ 26.

[55] **PX34**, U.S. Treasury Department Press Notification, Notification of designation of the IRGC for providing support to the IRGC-QF (Oct. 13, 2017).

[56] Levitt Decl., ¶ 80 (*citing* **PX25**); Rubin Decl., ¶¶ 34-38 (*citing* **PX268**).

"While the Iranian armed forces would 'protect the borders of Iran,' the IRGC with its 'parallel' military structure was tasked with 'protect[ing] the revolution.'" *Karcher*, 396 F. Supp. 3d at 22. "A subsidiary of the IRGC—the Qods Force, or IRGC-QF—is responsible for its international operations, including training Muslim groups to support the revolution through insurgency and terrorism." *Id*. Following the 2003 U.S. deployment of troops in Iraq, "the IRGC-QF was the main Iranian organization supporting and directing those in Iraq attacking Americans."[57]

As a result, the IRGC-QF was designated as a Specially Designated Global Terrorist ("SDGT") in October 2007. Described as the "sharp end of the spear for Iran's extraterritorial activities," the IRGC-QF's directives include supporting insurgents and terrorists attacking U.S. forces and U.S.-backed governments, such as in Iraq. The Treasury Department's report designating the IRGC-QF as a SDGT specifically linked the group to specific groups of Iraqi militants who target and kill Coalition Forces. Moreover, the IRGC in its entirety was designated an FTO in April 2019. The State Department stated, "the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."[58] That same month, the White House released the "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization" formally announcing the Administration's plan to "designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a FTO under Section 219 of the Immigration and Nationality Act." The Statement further provided:

---

[57] Piatetsky Decl., ¶ 28.
[58] **PX21**, U.S. Department of State, Designation of the Islamic Revolutionary Guard Corps (Apr. 8, 2019).

> [T]he Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the ***IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft.*** The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign.
>
> This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. This action will significantly expand the scope and scale of our maximum pressure on the Iranian regime. It makes crystal clear the risks of conducting business with, or providing support to, the IRGC. If you are doing business with the IRGC, you will be bankrolling terrorism.[59]

On April 15, 2019, the Treasury Department's designation of the IRGC and the IRGC-QF as an FTO took effect.[60] Although the designation of the IRGC and IRGC-QF as a FTO is recent, their underlying conduct and the bases for these designations stretch back two decades.[61]

From 1998 until his death in January 2020, the IRGC-QF was commanded by General Qasem Soleimani, who reported directly to Supreme Leader Ayatollah Ali Khamenei.[62] Soleimani was directly responsible for Iranian policy in Iraq.[63] The United States designated Soleimani three times for his roles in the IRGC.[64] The IRGC-QF set up different regional commands for its worldwide activities. The First Corps, also referred to as the "Ramazan Headquarters," "Ramazan Corps," or "Department 9000," and headquartered in Tehran, was (and is) focused on implementing Iranian government policy in Iraq.[65] Parallel to the Ramazan Corps, Hezbollah

---

[59] **PX80**, "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization," The White House (April 8, 2019) (emphasis added).

[60] *Counter Terrorism Designations; IRGC Foreign Terrorist Organization Designation*, U.S. Department of the Treasury (Apr. 15, 2019).

[61] *See generally* Gartenstein-Ross Shia Decl. (describing the creation and activities of the IRGC and IRGC-QF from 1979-2003).

[62] Levitt Decl., ¶ 98; Rubin Decl., ¶¶ 53-54 (*citing* **PX634**).

[63] *See, e.g.*, **PX942**, p. 56 ("Soleimani told Waeli that he (Soleimani) is the sole decision-maker on Iranian activities in Iraq and he offered to make a deal involving our release of Qais Khazali in exchange for decreased JAM Special Group activity.").

[64] Levitt Decl., ¶¶ 39 (*citing* **PX77**), 85 n.107, 175 (*citing* **PX47**).

[65] *Id.*, ¶¶ 20 (*citing* **PX359**), 37 (*citing* **PX251**), 87.

established Unit 3800 to assist and coordinate with the IRGC-QF to implement Iranian policy in Iraq.[66] These two "subagencies" of the IRGC-QF and Hezbollah, respectively, were responsible for directing and orchestrating a sophisticated terror campaign against U.S. service members in Iraq.[67]

The fact that "the IRGC-QF spearheaded a closely coordinated campaign to equip the Shi'a militia for proxy warfare" "is well attested to in U.S. Government documents." *Karcher*, 396 F. Supp. 3d at 24. In early 2008, IRGC-QF Brigadier General Ahmed Foruzandeh was designated by the U.S. Treasury Department, which identified him as the Commanding Officer of the Ramazan Corps and noted that he "leads terrorist operations against Coalition Forces and Iraqi Security Forces, and directs assassinations of Iraqi figures."[68] The Office of the Secretary of Defense also confirmed that the "IRGC-QF Ramazan Corps is responsible for carrying out Iran's policy in Iraq."[69] It noted that "the IRGC-QF posts its officers in Iran's diplomatic missions throughout Iraq, including Iran's outgoing Ambassador to Iraq, Hassan Kazemi-Qomi. The incoming Ambassador to Iraq, Hassan Danafar, is also a Qods Force officer."[70]

In Iraq, the IRGC-QF's role within Iran's terrorism apparatus has been to establish, train and support a network of cells in Iraq, the aim of which has been to assassinate key leaders, support death squads, and distribute highly lethal weapons for use against American forces and Iraqi citizens.[71] The IRGC-QF developed a distribution channel for the terrorism network to transfer

---

[66] *Id.*, ¶¶ 32, 111 (*citing* **PX371**), 122.

[67] *See Id.*, ¶¶ 20 (*citing* **PX34**, **PX36**, **PX359**), 32.

[68] **PX67**, Press Release, U.S. Dep't of Treasury, Treasury Designates Individuals, Entity Fueling Iraqi Insurgency (Jan. 9, 2008).

[69] **PX928**, U.S. Department of Defense, *Unclassified Report on Military Power of Iran* (April 2010).

[70] *Id.*

[71] *See* Levitt Decl., ¶¶ 98 (*citing* **PX663**, James Glanz, "U.S. Says Arms Link Iranians to Iraqi Shiites," The New York Times, February 12, 2007), 141 (*quoting* **PX665**, Jim Garamone, "Iran

weapons (including mortars, rockets, sniper rifles, roadside bombs,[72] bullets, and rocket propelled grenades) through the Mehran and Ilam regions in Iran to the Diyala and Maysan provinces in Iraq.[73] Similarly, using the northwestern border between Iraq and Syria, the IRGC-QF and MOIS established supply routes for arms and equipment to Sunni terrorist groups, including a network of "ratlines"[74] and safe houses through which Sunni foreign fighters, travelling across Iran to and from Afghanistan and elsewhere, could infiltrate and exfiltrate Iraq.[75]

The IRGC-QF uses Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") to illegally procure and develop weapons and equipment for its use.  To facilitate this process, Bank Markazi maintained a Eurodollar credit facility at a Western bank's branch in Dubai.[76]

The subsequent sections below outline Iran's use of the IRGC to establish, manage and oversee its terrorism network, and to direct material support through the network to the specific terrorist groups at issue in this case.

---

Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says," American Forces Press Service, July 2, 2007); *see also* Gartenstein-Ross Shia Decl., p. 34 (*quoting* **PX202**, U.S. Department of State, Country Reports on Terrorism 2006 (April 30, 2007)).

[72] One of the signature weapons supplied by the IRGC-QF is a device known as an explosively formed penetrator ("EFP"). EFPs are highly lethal explosive devices capable of penetrating tank armor. EFPs have been used in terrorist attacks in Iraq against U.S. forces since 2004 and were used in some of the terrorist attacks that injured or killed Plaintiffs.

[73] *See* Gartenstein-Ross Shia Decl., pp. 29-30.

[74] Originally a nautical term, "ratline" has become a synonym for a "last-ditch escape route." *See* https://slate.com/news-and-politics/2003/07/where-does-the-word-ratline-come-from.html.

[75] *See* Rubin Decl., ¶ 160 (*citing* **PX503**, "Review of the re-listing of Ansar al-Sunna, JeM, LeJ, EIJ, IAA, AAA and IMU as terrorist organisations," Parliamentary Joint Committee on Intelligence and Security, June 2007, Canberra); and Gartenstein-Ross Sunni Decl., pp. 35, 41-42, 57-59 (*quoting* **PX130**, U.S. Department of Treasury Press Release, Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point (July 28, 2011); **PX127**, U.S. Department of Treasury Press Release, Treasury Further Exposes Iran-Based Al-Qa'ida Network (October 18, 2012)).

[76] Piatetsky Decl., ¶ 89.

2.      **NIOC**

Iran controls vast oil and gas reserves, including "the world's third-largest and second-largest reserve holder of oil and natural gas, respectively"[77] These reserves, which are worth hundreds of billions of dollars,[78] and typically priced in U.S. dollars,[79] are central to Iran's economy. *See United States v. Atilla*, No. 15-cr-867 (RMB), 2018 WL 791348, at *35-36 (S.D.N.Y. Feb. 7, 2018) ("[T]he Iranian economy is primarily petroleum based. The petroleum industry is predominantly U.S. dollar based. In order for the Iranian economy to function, it, therefore, must conduct a lot of its business in U.S. dollars.").[80]

The NIOC is entirely owned by the government of Iran[81] and was designated as a Specially Designated National ("SDN") in 2008.[82] The NIOC is an affiliate of the IRGC and controls nearly all of Iran's oil.[83] Iran's Petroleum Minister is Chairman of NIOC's Board; his predecessors also held that position with NIOC while in office.[84] The IRGC's control and influence over NIOC was exemplified when, on August 3, 2011, "Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum…Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC."[85] As the U.S.

---

[77] **PX262 –** *Country Analysis Executive Summary: Iran,* U.S. Dep't of Energy (2021).
[78] U.S. Dep't of Energy, Analysis: Iran, available at https://www.eia.gov/beta/international/analysis.cfm?iso=IRN.
[79] *See* Piatetsky Decl., ¶ 55 (*citing* Lan Cao, *Currency Wars and the Erosion of Dollar Hegemony*, 38(1) MICH. J. INT'L L. 57, 67 (2016)) ("Any country that buys Gulf oil must pay in dollars – hence the term petrodollars.").
[80] *See* Clawson Decl., ¶ 53.
[81] *See* Clawson Decl., ¶¶ 25, 161 (*citing* **PX125**), 169, 217; *see also* **PX125**, Press Release, U.S. Dep't of Treasury, Treasury Submits Report To Congress On NIOC And NITC (Sept. 24, 2012).
[82] Clawson, ¶ 167 (*quoting* **PX59**).
[83] *See* Rubin Decl., ¶¶ 50-51.
[84] Piatetsky Decl., ¶ 102.
[85] **PX125**, Press Release, Dep't of Treasury, Treasury Submits Report To Congress On NIOC And NITC (Sept. 24, 2012).

Treasury Department put the matter in a September 2012 press release: "NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."[86] The NIOC functions within Iran's terrorism network in several important ways. First, it served as the primary source of dollar-denominated currency that was critical to Iran for directly financing its terrorist operations in Iraq.[87] Second, NIOC provided logistical support and cover for IRGC and MOIS operatives in areas in which NIOC and other NIOC-affiliated front companies purported to operate legitimate oil exploration and production, particularly in Iraq.[88]

For further discussion of the facts and evidence relevant to NIOC's provision of material support to the terrorist groups responsible for the subject attacks see section VI.E. below.

### 3.    Bank Melli

Bank Melli Iran was founded in 1928 as Iran's first domestically owned commercial bank. Its name means "National Bank of Iran." Until 1959 (shortly before Bank Markazi was established), Bank Melli Iran was in effect the country's central bank. Bank Melli Iran is central to the Iranian government's banking needs.[89] Working in concert with Iran's other agents (namely, Bank Markazi, IRGC, NIOC, and other IRGC and MOIS front companies), Bank Melli facilitated the unimpeded flow of U.S. dollars from Iran's oil revenues to Iran's terrorist proxies by providing

---

[86] *Id.*

[87] Iran required undetectable access to and use of U.S.-dollar denominated currency to support its terrorist proxies in Iraq because dollar-denominated currency was more widely accepted, more easily transferrable, less prone to fluctuations in value, and not least, less obviously traceable back to Iran. *See* Piatetsky Decl., ¶ 267.

[88] *See* Rubin Decl., ¶¶ 21, 50, 53, 202; *see also* Clawson Decl., ¶¶ 163-164.

[89] *See also* Clawson Decl. ¶¶ 24, 123 (*quoting* **PX801**, 2014/15 Annual Report of Bank Melli Iran, Chapter 29, "Capital," p. 70).

financial services directly to the IRGC-QF to be dispensed to the Shia militia groups in Iraq.[90] In doing so, Bank Melli helped advance the policies and goals of the Iranian government, including its goals regarding terrorist activities targeting the United States in Iraq.[91] Bank Melli has long been used by the IRGC and IRGC-QF to provide support to terrorist groups.[92]

For further discussion of the facts and evidence relevant to Bank Melli's provision of material support to the terrorist groups responsible for the subject attacks see section VI.E. below.

### 4.     Bank Markazi

Defendant Bank Markazi Jomhouri Islami Iran, is also known as the Central Bank of Iran or CBI. Bank Markazi acts at the direction of Iran, pursuant to Iran's policies.[93] Iran's 1972 Monetary and Banking Law ("MBL") provides that Bank Markazi is a joint-stock company whose capital is "wholly owned by the Government."[94] In practice, the Iranian government exercises tight control over Bank Markazi and gives it direct orders.[95] By law and in practice, Bank Markazi is

---

[90] Piatetsky Decl., ¶¶ 96-99 (*quoting* **PX36**, U.S. Department of Treasury Press Release, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (October 25, 2007); **PX51**, U.S. Department of Treasury Press Release, U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign (November 5, 2018); **PX122**, U.S. Department of Treasury Press Release, Fact Sheet: Treasury Strengthens Preventative Measures Against Iran (November 6, 2008); Rubin Decl., ¶¶ 60-63 (*quoting* **PX36**; **PX51**; **PX217**, U.S. Department of State, Subject: Information on Bank Melli for Italy, S Consideration in EU Discussions on Autonomous Sanctions (March 8, 2007); **PX405**, Finding That the Islamic Republic of Iran Is a Jurisdiction of Primary Money Laundering Concern, 76 Fed. Reg. 72756 (Nov. 25, 2011).

[91] Clawson Decl., ¶ 127.

[92] *Id*., ¶ 24. Rubin Decl., ¶¶ 60-61 (*quoting* **PX36**, U.S. Department of Treasury Press Release, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (October 25, 2007); **PX51**, U.S. Department of Treasury Press Release, U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign (November 5, 2018); **PX217**, U.S. Department of State, Subject: Information on Bank Melli for Italy, S Consideration in EU Discussions on Autonomous Sanctions (March 8, 2007)), 72.

[93] Clawson Decl., ¶ 100; Rubin Decl., ¶ 60.

[94] Clawson Decl., ¶ 101.

[95] *Id*., ¶ 102.

the Iranian government's banker.[96] Government revenue is deposited in Bank Markazi and government expenditures are carried out through Bank Markazi.[97] The Iranian government's funding for various ministries, including Defendants MOIS and IRGC, also flows through Bank Markazi.[98] Through these transactions, Iran has long used Bank Markazi (including the years 2003-2011) to transfer millions of dollars to terrorist groups, including those in Iraq targeting Americans.[99]

Bank Markazi was designated a SDGT in 2019 for its continuous and significant role in supporting Iran's efforts to commit terrorism and specifically for "provid[ing] billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah."[100]

For further discussion of the facts and evidence relevant to Bank Markazi's provision of material support to the terrorist groups responsible for the subject attacks see section VI.E. below.

### 5.    MOIS

MOIS is Iran's foreign and domestic intelligence service.[101] In addition to the IRGC, MOIS is the other principal organization Iran has used to carry out its terrorist support activities.[102] Iran routinely uses MOIS to facilitate terrorist attacks.[103] It does so regardless of the sect of the group it supports.[104] In providing support to terrorist groups, MOIS acts as a ministry of the Iranian

---

[96] *Id*., ¶ 103.
[97] *Id*.
[98] *Id*.
[99] *Id*., ¶¶ 23, 103; Piatetsky Decl., ¶¶ 73 (*quoting* **PX303**, 7/12/07 Press Roundtable with Under Secretary of Treasury Stuart A. Levey), 89.
[100] **PX48**, U.S. Department of Treasury Press Release, Treasury Sanctions Iran's Central Bank and National Development Fund (September 20, 2019).
[101] Clawson Decl., ¶ 95.
[102] *Id*.
[103] *Id*., ¶ 98.
[104] Rubin Decl., ¶ 57.

government whose activities are tightly and carefully controlled by the Supreme Leader and his representatives.[105] According to a 2019 Defense Intelligence Agency report, "MOIS collection and influence operations beyond Iran's borders are typically embassy- and consulate-based under official, commercial, academic, or nongovernmental organization cover. The ministry liaises with other foreign intelligence agencies, as well as organizations such as Hizballah that protect and promote Iran's foreign agenda."[106] In short, the terrorism training provided to terrorist groups by MOIS is an official policy of the Iranian government.[107] According to a report published by the Federal Research Division of the Library of Congress, "MOIS conducts liaison with other foreign intelligence agencies as well as with organizations such as Lebanese Hezbollah that protect and promote the Islamic Republic's foreign agenda."[108] In February 2012, the Treasury Department designated MOIS and subjected it to economic sanctions under Executive Orders 13224, 13553, and 13572.[109] The Treasury Department stated, "MOIS provides financial, material, or technological support for, or financial or other services to Hizballah… MOIS also provided money and weapons to [AQI], a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."[110]

Even prior to the United States' involvement in Iraq in 2003, MOIS and the IRGC were co-opting and cooperating with Sunni terrorist groups, including core al Qaeda and Ansar al-Islam

---

[105]  Clawson Decl. ¶ 99.
[106]  **PX260**, U.S. Defense Intelligence Agency, "Iran Military Power" (August 2019), pp. 9, 19, 37.
[107]  Clawson Decl., ¶ 99.
[108]  **PX275**, "*Iran's Ministry of Intelligence and Security: A Profile,*" Federal Research Division, Library of Congress (December 4, 2012).
[109]  *Id.,* ¶ 94.
[110]  **PX68**, U.S. Department of Treasury Press Release, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (February 16, 2012).

personnel, and laying the groundwork with them and with IRGC-trained militia leaders for a broad-based terror campaign against the United States. The U.S. presence in Iraq provided the ultimate opportunity and setting for this campaign.[111]

For further discussion of the facts and evidence relevant to MOIS's provision of material support to the terrorist groups responsible for the subject attacks see section VI.E. below.

### 6.     Hezbollah

This section discusses the terrorist group Hezbollah, which was an essential conduit for the provision of Iran's material support to JAM/PDB, KH, AAH, SN, AQ, AQI, and AAS/AAI in carrying out a number of terrorist attacks.

Hezbollah, a Shia Islamist militant group based in Lebanon, is one of the world's longest lasting and lethal terrorist groups and is considered "Iran's main terrorist ally." *Karcher*, 396 F. Supp. 3d at 23).[112] Iran, through the IRGC and MOIS, was responsible for the creation of Hezbollah in 1983.[113] Iran assisted Hezbollah's formation by dispatching 1,500 IRGC officers to help the fledgling organization.[114] Iran's MOIS began training Hezbollah, and the IRGC began providing operational advice to Hezbollah's military wing.[115] Iran's close partnership with Hezbollah has endured since the militant group's founding. The Court in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003), found: "It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which

---

[111] Rubin Decl., ¶¶ 42-45, 196.
[112] **PX283**, Annual Threat Assessment of the U.S. Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006), at 13.
[113] *See* Levitt Decl., ¶¶ 31, 42-43, 47-53, 111.
[114] *Id.*, ¶ 47.
[115] Gartenstein-Ross Shia Decl., p. 12.

funds and supports terrorist activities."

Hezbollah's longevity and lethality is due almost entirely to the continuous support of the IRGC, IRGC-QF and MOIS, and Iran has sought to duplicate this "success" with other groups, especially in Iraq.[116] As Iran's primary external terrorist proxy, Hezbollah has for many years played a central role in Iran's use of international terrorism and militancy by acting at Iran's direction while allowing Iran to maintain plausible deniability.[117] Through the IRGC and MOIS, Iran has trained, indoctrinated, substantially funded, and helped run Hezbollah's operations.[118] Indeed, in 2014, General Amir Ali Hajizade, head of the IRGC Aerospace Force, explained that "the IRGC and Hezbollah are a single apparatus joined together."[119]

In January 1995, the United States designated Hezbollah an SDT.[120] In October 1997, Hezbollah was designated a FTO[121] based on findings that the organization engages in terrorist activity that threatens the security of U.S. nationals or the national security of the United States. In addition, in October 2001, pursuant to E.O. 13224, Hezbollah was designated a SDGT by the United States.[122]

---

[116] *See* Levitt Decl., ¶¶ 31, 49 ("It was also clear from the start that Hezbollah would be a force to be reckoned with."), 53 ("Since 1982, Hezbollah has built an extensive global network with operational capabilities to attack western interested beyond the Middle East."); Rubin Decl., ¶ 55; Gartenstein-Ross Shia Decl., pp. 14, 19, 32, 34.

[117] *See* Levitt Decl., ¶ 111.

[118] *See* Gartenstein-Ross Shia Decl., p. 12.

[119] Piatetsky Decl., ¶ 30 (*quoting* **PX209**, U.S. Department of State Bureau of Counterterrorism, "Country Reports on Terrorism 2014," (June 2015), p. 286).

[120] **PX81**, Notice Prohibiting Transactions with Terrorists Who Threaten To Disrupt the Middle East Peace Process, E.O. 12947, 62 Fed. Reg. 5079-80 (January 23, 1995); Levitt Decl., ¶ 63, Fn. 79.

[121] **PX412**, U.S. Department of State, Designation of Foreign Terrorist Organizations – Public Notice No. 2612, 62 Fed. Reg. 5260-61 (October 8, 1997); Levitt Decl., ¶ 63, Fn. 79.

[122] **PX61**; Levitt Decl., ¶ 63, Fn. 79, 8 U.S.C. § 1189.

Over time, and with Iran's patronage, Hezbollah expanded its involvement in and with other militant groups, working in close coordination with Iran to achieve Iran's goal of "exporting the revolution" by routinely attacking western targets in the Middle East.[123] Hezbollah itself identifies as a movement transcending its Lebanese origins.[124] A Hezbollah commander told the Financial Times in 2015: "We shouldn't be called Party of God. We're not a party now, we're international. We're in Syria, we're in Palestine, we're in Iraq and we're in Yemen."[125]

By October 2003, at Iran's direction and with its support, Hezbollah had begun to establish a resistance movement in Iraq to conduct mass casualty attacks."[126] To do so, Hezbollah and Iran began moving fighters across the porous Syrian/Iraqi border.[127] Iran sought to inject battle-hardened foreign fighters into Iraq that would attack American interests there, and worked with Hezbollah (and its closest regional ally, Syria) to establish ratlines into the country that foreign fighters could transit safely. These foreign fighters included both Sunnis affiliated with AQ and Shias associated with Hezbollah.[128] By January 2004, approximately 800 Hezbollah operatives were on the ground in Iraq, including assassination teams, agents, and clerics that infiltrated post-war Iraq at Iran's behest,[129] and AQ, with its core leadership being provided sanctuary in Iraq by the IRGC, had established relationships with groups and individuals that would soon become its local franchise, AQI. Following its established *modus operandi* in Lebanon, Hezbollah established charitable front organizations in Iraq "to create a favorable environment for recruiting." In 2004,

---

[123] Levitt Decl., ¶¶ 47-53.
[124] Piatetsky Decl., ¶ 30.
[125] Piatetsky Decl., ¶ 30 (*quoting* Erika Solomon, "Lebanon's Hizbollah and Yemen's Houthis Open up on Links," Financial Times (May 8, 2015)).
[126] Levitt Decl., ¶ 118.
[127] *Id.*, ¶ 119.
[128] *Id.*
[129] *Id.*, ¶ 118.

U.S. and British Intelligence reporting confirmed that weapons from Iran were being used by insurgent groups in Iraq, and in particular, sophisticated roadside bombs that later became known as explosively-formed penetrators (EFPs), which had been developed by Hezbollah and Iran in Lebanon for use against Israeli Defense Forces.[130] In 2006 and 2007, Coalition Forces in Iraq detained multiple members of Hezbollah, who were determined to have participated in the planning and commission of attacks against U.S. forces or were found with documents detailing Iran and Hezbollah's work with and support for terrorist groups in Iraq.[131] By 2008, it was clear that "Iran provided hundreds of millions of dollars to Hezbollah and trained thousands of Hezbollah fighters at camps in Iran."[132]

Hezbollah and the IRGC-QF's network of terrorist cells were responsible for firing Iranian rockets and mortars at Americans in Baghdad and at bases throughout Iraq during the time of the terrorist attacks at issue in this matter.[133] Hezbollah also wielded significant influence over Special Group leadership, including personally leading the Special Groups during critical times or during specific attacks.[134] Special Groups were modeled after Hezbollah and had deep personal ties to Hezbollah's leaders.[135] Hezbollah used its close relationship with the Special Groups to authorize

---

[130] Gartenstein-Ross Shia Decl., pp. 29-30 (*citing* **PX959**); Levitt Decl., ¶ 101 (*citing* **PX670**, **PX684**).

[131] Levitt Decl., ¶¶ 87-96 (*citing* **PX680**, **PX696**, **PX637**, **PX611**, **PX663**), 100 (*citing* **PX670**, **PX684**), 102-103 (*citing* **PX634**, **PX612**), 163-174 (**PX964**, **PX300**, **PX42**, **PX42**, **PX939**, **PX40**).

[132] Piatetsky Decl., ¶ 162 (*citing* **PX365**).

[133] *See id.*, ¶¶ 108 (*citing* **PX72**), 130, 144.

[134] Levitt Decl., ¶¶ 151-162 (*citing* **PX505**, **PX519**, **PX22**, **PX374**, **PX942**).

[135] *See id.*, ¶¶ 124, 130 ("In seeking to lead from behind and put an Arab face on its efforts, the Islamic Republic [of Iran] sent a Hezbollah master trainer—Ali Musa Daqduq—to Iran to coordinate the training program and make periodic visits to Iraq . . . His overall instructions were simple: 'He was tasked to organize the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.'") (*citing* **PX665**), 162 ("[I]n the aftermath of the attack, coalition forces exposed the extent to which Iranian and Hezbollah agents were involved in training, equipping, organizing, and in some cases directing Shia militants in Iraq.").

and incite the Special Groups to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.[136]

During his interrogation, AAH founder and former JAM member Qais Khazali confirmed that Hezbollah's relationship with the Special Groups was militaristic (command and control) and that in the beginning Hezbollah operatives had used Iranian passports and had spoken Farsi.[137] This helped conceal the fact that Hezbollah was operating in Iraq, and that "[a]nything the Iranians asked of Hezbollah they would get as they considered Hezbollah a product of the IRGC."[138] Qais Khazali also confirmed that FTO Hezbollah played an authoritative role in Iraq, "where its vast experience and knowledge is being brought to bear in an advisory capacity. Access to [Hezbollah] advisors is possible through the IRGC by using proper channels."[139]

Iran and FTO Hezbollah provided training for terrorists, including the Special Groups at IRGC bases inside Iran.[140] Qais Khazali personally received training at the IRGC Imam Khomeini base in Iran.[141] For purposes of training, the IRGC were considered experts in conventional warfare, while Hezbollah were experts in urban or guerilla warfare.[142] Hezbollah trained the Special Groups in the use of weapons and tactics that were not only designed specifically to target Americans in Iraq, but also used successfully by the Special Groups to perpetrate such terrorist attacks.[143]

Hezbollah provided basic training intended to give new Special Group recruits a broad

---

[136] *See id.*, ¶ 118.

[137] Levitt Decl., ¶ 63 n. 79.

[138] **PX979**, *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 59 (April 22, 2007).

[139] **PX977**, *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 28 (April 5, 2007).

[140] *See* Levitt Decl., ¶¶ 136-146.

[141] Levitt Decl., ¶ 63 n. 79.

[142] **PX919**, Report No. 200243-008 (June 18, 2007).

[143] *See* Levitt Decl., ¶¶ 136-150 (*citing* **PX371**, **PX964**).

overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.[144] In addition, Hezbollah provided the Special Groups with intense training regarding the use, creation, manufacture, and deployment of improvised explosive devices, EFPs, rocket launchers, anti-aircraft missiles, mortars (120mm, 81mm, and 60mm), anti-tank missiles (including assembly, firing procedures, target acquisition, and the use of various kinds of munitions), and complex attacks that combine different types of attacks by different members of a team.[145] For example, by October 2008, Iraqi forces discovered EFP assembly factories throughout Iraq, in JAM and Special Group strongholds.[146] As a declassified British intelligence report concluded, EFPs used in Iraq during this time period were "exclusively associated with Hizballah."[147]

Hezbollah's extensive capabilities are a result of the widespread support the group receives from Iran and its co-Defendants in the form of financial assistance, weapons, training, intelligence, and more.[148] Beyond the group's intimate ties to the IRGC-QF, Hezbollah also enjoys substantial support from Iran's intelligence service, MOIS. Hezbollah used this support to assist Iran with developing militant groups in Iraq in its own highly-skilled and lethal image.

---

[144] *Id.,* ¶¶ 104-110 (*citing* **PX205**, **PX620**, **PX928**, **PX281**), 136-150 (outlining Hezbollah's meticulous training program for Shia militant groups) (*citing* **PX371**, **PX964**).

[145] *See Id.,* ¶¶ 110-112; 114-115; 122-123; 124-126; 133-150.

[146] *See* **PX242**, Joel D. Rayburn et al. eds., *The U.S. Army in the Iraq War Volume 2*, (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 222-224; **PX713** - DVIDS - Images - *CLC Tip Leads Coalition Troops to EFP Factory* [Image 5 of 5]; *See also* Michael R. Gordon & Gen. Bernard E. Trainor, The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama (1st ed. 2012), pp. 151-157 (discussing EFP smuggling by Badr/Sheibani in as early as 2001, with effective deployment against U.S. armored vehicles no later than August 2003, and the increase of IRGC and MOIS gathering intelligence, including moving a section of QF's headquarters to Mehran, Iran, near the Iraq border - the same area where a suspected EFP manufacturing site was located).

[147] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

[148] Levitt Decl., ¶ 64.

C.     **Defendants' Material Support of Shia Militias in Iraq**

In this section, Plaintiffs present evidence about the Shia terrorist groups responsible for the subject attacks and Iran's role in supporting these groups by training, weaponizing, and otherwise providing material support to them.

The majority of Iraqi citizens are believers in the Shia form of Islam.[149] The Shia population (mainly concentrated in southern Iraq) was often oppressed by the Hussein Regime (a Sunni regime).[150] Shortly after the Iranian Revolution in 1979, the Islamic Republic of Iran initiated a campaign to export the principles of the Iranian Revolution to areas with large communities of Shia Muslims by using local groups as proxies.[151] The IRGC played a critical role in this effort.

Iran's support for Iraqi Shia militias it deployed against Coalition Forces began as early as 2003, after Supreme Leader Ayatollah Ali Khamenei and his war council adopted a policy to prevent any so-called dangers to Iran that might result from the U.S.'s regime-change operations in Iraq.[152] As such, Iran's subsequent support for Shia militia groups in Iraq was not a haphazard response; it was planned and approved at the highest levels of the Iranian government.[153] As demonstrated herein, the Shia terrorist groups that served as Iran's proxies include JAM and the Special Groups—PDB, AAH, KH, and SN.

Many of the subject attacks were carried out by these Shia groups. Moreover, Iran provided active guidance, training, intelligence support, and financial and material support to these Shia militant groups through the IRGC, MOIS and its proxy Lebanese Hezbollah.[154] This is shown by,

---

[149] *See* Gartenstein-Ross Shia Decl., p. 16 (*citing* **PX266**).
[150] *See id.*, p. 15.
[151] *See* Clawson Decl., ¶ 64.
[152] Gartenstein-Ross Shia Decl., p. 26.
[153] *Id.*
[154] *See* Levitt Decl., ¶¶ 5, 136-150 (*citing* **PX371**, **PX964**).

among other things, the fact these Special Groups employed similar munitions, tactics, techniques, and procedures to carry out the subject attacks, and operating out of specific areas of Iraq, predominantly Shia enclaves. Indeed, the IRGC-QF desired to develop these groups into a network similar to Hezbollah.[155]

Iran sought to foster unity among Iraq's various Shia parties and movements to consolidate Shia political control (Shias constitute about 60 percent of the country's population) over the new Iraqi government.[156] "Following the U.S. invasion of Iraq in 2003, Iran pursued 'a Lebanonization strategy' in Iraq to 'co-opt elements of the local Shia community and use them as . . . instruments of Iranian force.'" *Fritz*, 320 F. Supp. 3d 48, 61 (quoting Ryan Crocker, the U.S. Ambassador to Iraq in 2008 and former U.S. Ambassador to Lebanon).[157] This Lebanonization strategy included Hezbollah's creation of "Unit 3800," an entity dedicated to supporting Iraqi Shia terrorist groups targeting Multi-National Forces in Iraq.[158] Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request, and has trained and advised various Shia militias in Iraq.[159] Unit 3800 trainers and operatives worked alongside the IRGC-QF to target Coalition Forces in Iraq.[160] Thus, Hezbollah was integral to Iran's Lebanonization strategy.

Unit 3800 provided militias the training and technology to conduct kidnappings, small unit operations, and the ability to deploy sophisticated IEDs.[161] One prominent example of the effects of this was the January 20, 2007 attack on the Joint Coordination Center in Karbala, which killed

---

[155] Piatetsky Decl., ¶ 174.
[156] Levitt Decl., ¶ 27 (*citing* **PX373**, **PX683**).
[157] After a detailed analysis, this Court admitted Ambassador Crocker's statement in *Fritz* pursuant to the public records exception to the hearsay rule (Fed.R.Evid. 803(8)). *Fritz*, 320 F. Supp. 3d at 15, n.6.
[158] Levitt Decl., ¶¶ 32, 114 (*citing* **PX27**, **PX66**).
[159] *Id.*, ¶ 115 (*citing* **PX20**).
[160] *Id.*, ¶ 32.
[161] Piatetsky Decl., ¶ 165 (*citing* **PX711**).

four American soldiers.[162] Both Hezbollah and IRGC-QF helped plan this attack.[163] "Iran had several goals. Most significantly, it sought to transform Iraq into a 'weakened, decentralized, and Shia-dominated' state that would be 'incapable of posing a threat to Iran.'" *Fritz*, 320 F. Supp. 3d 48, 61. "In addition, Iran sought 'to push the United States out of the Gulf region,' including out of Iraq." *Id*. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Id*. "But, while seeking 'to bloody coalition forces in Iraq,' Iran was '[c]areful not to provoke a direct confrontation with U.S. and coalition forces' and thus 'trained[] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition.'" *Id. See also Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d at 24 ("In order to bolster its influence in Iraq, and counter American efforts there, Iran continued to sponsor Shia political movements—now vying for control of the post-Hussein government—while funding and facilitating the training of Shia militia groups, with Hezbollah's help.").[164]

---

[162] *Id*.
[163] *Id*.
[164] *See also* Levitt, ¶¶ 27-28 (*citing* **PX373**, **PX683**).

Hezbollah's expertise and special knowledge was instrumental in establishing and organizing the IRGC-QF's terror proxy groups in Iraq. A Department of Defense report on Hezbollah detainees explained:

> Additional detainee reporting further highlights the significant role that L[ebanese] H[ezbollah] plays in the training of Shi'a extremist groups in Iraq. Senior Shi'a extremist leaders obtain administrative, logistics, financial, religious and small-unit tactics, leadership training in Lebanon. Multiple detainees have claimed that the training received from LH instructors in Iran is of notably higher quality than those from Iranian instructors, also noting the difficulty overcoming language obstacles.[165]

Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.[166] According to Coalition spokesman Brig. Gen. Kevin Bergner, Hezbollah brought "a technical skill, a level of sophistication and some street credibility" with regard to their interactions with the Special Groups.[167] The direct involvement of the IRGC and MOIS with Hezbollah and its terror proxies in Iraq is further evidenced by recently declassified interrogation reports involving AAH founder and leader Qais Khazali.[168]

In a raid on March 20, 2007, Ali Musa Daqduq and Qais Khazali (as well as a brother of

---

[165] **PX960**, Strategic Debriefing Element, Recommendation for Continued Internment, October 5, 2008, declassified by BG David Julazadeb on March 28, 2018-Ali Musa DaqDuq & Layth Khazali.
[166] *See* Levitt Decl., ¶¶ 136-150 (*citing* **PX371**, **PX964**) ("[T]he Iraqi Shia militias . . . were provided active guidance, training, intelligence, and financial and material support by Iran through its IRGC and its proxy Lebanese Hezbollah.").
[167] **PX356**, Multi-National Forces-Iraq, Brig. Gen. Kevin Bergner, Press Conference (July 2, 2007).
[168] "The Khazali Papers" were declassified and released in August 2018 and contained the notes and transcripts from U.S. armed forces' questioning of him while in custody. Khazali details the methods of Iran's support for anti-American forces, revealing the existence of Iranian training camps for Iraqi militia in Iran, as well as Iranian funding for the Sadr trend. As the official responsible for smuggling weapons from Iran, Khazali also provides a detailed description of how Iran smuggled weapons into Iraq to aid anti-American forces. *See, e.g.*, **PX934**, Summary of Tactical Interrogation of Qayis al-Khazali (August 13, 2007).

Khazali) were captured by Coalition Forces.[169] From interrogations of Ali Musa Daqduq, Qais Khazali, and numerous other individuals, U.S. intelligence learned how Special Group trainees were provided military style training by IRGC operatives inside Iraq as well as at complexes in Iran manned by uniformed IRGC personnel.[170] These complexes were all run by the IRGC-QF, and the trainers were all either members of the IRGC-QF or Hezbollah.[171]

As Iran's intelligence service, MOIS was also a primary facilitator and conduit for Iranian weapons, personnel, money, and technologies into Iraq.[172] For example, according to Qais Khazali, JAM Leader Muqtada al Sadr ("al-Sadr") worked closely with a person named "Hajj Yusif/Sheikh Yusi," who was an Iranian official, and member of Iranian "intal'at" (a/k/a MOIS) and the IRGC.[173] Khazali was a former JAM spokesman.[174] He reported directly to Hajji Yusif, the Deputy Commander of the IRGC-QF, Department of External Special Operations.[175] Khazali further confirmed Yusif was a member of the Qods Force. Hajji Yusif also acted as the "chief of protocol" for the first visit of al-Sadr to Iran, and subsequent visits to Iran from the al-Sadr movement or JAM visitors.[176] Al-Sadr and JAM worked with another MOIS agent referred to as "Shekh Ansari,"

---

[169] Levitt Decl., ¶¶ 163-164 (*citing* **PX264**).

[170] *Id.,* ¶¶ 167-170, 174 (*citing* **PX964**); Gartenstein-Ross Shia Decl., pp. 32-33.

[171] Gartenstein-Ross Shia Decl., p. 33; Levitt Decl., ¶¶ 136-137.

[172] *See* Clawson Decl., ¶¶ 94-99 (*citing* **PX68**, **PX270**); *see also* Levitt Decl., ¶ 64 ("One reason Hezbollah is so capable is the extensive support the group receives from Iran and its national institutions in the form of financial assistance, weapons, training, intelligence, and more . . . Hezbollah also enjoys extensive support from Iran's intelligence service, the Ministry of Intelligence and Security (MOIS).").

[173] **PX974**, *Summary of Tactical Interrogation of Qayis al-Khazali,* Report No. 1 (March 21, 2007).

[174] **PX975**, *Summary of Tactical Interrogation of Qayis al-Khazali,* Report No.42 (April 13, 2007); *see also* Gartenstein-Ross Shia Decl., p. 22

[175] **PX274**, Bryce Loidolt, *Iranian Resources and Shi'a Militant Cohesion: Insights from Khazali Papers*, p. 3, CTC Sentinel Vol 12, Issues 1 (January 2019).

[176] **PX974**.

according to Khazali.[177] Khazali reported that this person was also a member of the IRGC-QF.[178] Khazali also verified that, during the second battle of Najaf from approximately July 2004 to September 2004, Ansari was operating in Najaf in support of JAM against Coalition Forces and was taking part in combat operations with JAM.[179] Khazali also revealed "the best way to access support from the Iranians" for those in Iraq was to go through MOIS.[180] By early 2005, the presence of Hezbollah (and thus IRGC and MOIS) operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.[181]

Along with Hezbollah, the IRGC-QF was heavily involved in recruiting and training JAM and Special Group members, most of whom hailed from the predominantly Shia towns of southern Iraq and Shia enclaves in Baghdad such as the neighborhood locally referred to as Sadr City.[182] For instance, on September 16, 2008, the U.S. Treasury Department designated Abdul Reza Shahlai, an IRGC-QF deputy commander, noting that he was responsible for:

> [P]lanning Jaysh al-Mahdi (JAM) Special Groups attacks against Coalition Forces in Iraq. Shahlai has also provided material and logistical support to Shia extremist groups—to include JAM Special Groups—that conduct attacks against U.S. and Coalition Forces. In one instance, Shahlai planned the January 20, 2007 attack by JAM Special Groups against U.S. soldiers stationed at the Provincial Joint Coordination Center in Karbala, Iraq. Five U.S. soldiers were killed and three were wounded during the attack.

---

[177] *Id.*

[178] *Id.*

[179] *Id.*; **PX946**, *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 4 (March 23, 2007).

[180] **PX980 -** *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 37 (April 10, 2007).

[181] Levitt Decl., ¶ 120 (*citing* **PX903**).

[182] Gartenstein-Ross Shia Decl., p. 27.

In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.

Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.[183]

In a July 2, 2007 press briefing, Brigadier General Kevin J. Bergner noted that the Special Groups were trained in Iran by Hezbollah instructors in a four-week course titled "Artillery." According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."[184]

Iran's support went beyond supplying and training, and extended to command and control of Shia militias in Iraq, in particular JAM and the Special Groups. This is evidenced by Iran's ability to regulate the amount and intensity of attacks being committed be the Special Groups in particular areas or at specific times. For example, "IRGC-QF commander Qassem Soleimani was integral in reducing Special Groups' activity in both Basra and Sadr City."[185] In each case, Iraqi delegations were sent to Tehran to meet with Soleimani and other Iranian officials to discuss a ceasefire and their support for Shi'a militias. A reduction in Iranian-backed militant violence followed.[186]

---

[183] **PX42**, U.S. Treasury Department Press Notification (September 16, 2008). "RPGs" are rocket-propelled grenades.
[184] **PX356**, Department of Defense Press Briefing, Brig. Gen. Kevin Bergner, Multi-National Force-Iraq (July 2, 2007).
[185] Cochrane, Marisa, *Iran's Hard Power Influence in Iraq*, IranTracker.org (April 10, 2009).
[186] *Id*.

Iran's ability to exert influence in Iraq was facilitated by its efforts over decades to establish its terrorism network's reach into the country, and with several organizations it had cultivated for that very purpose: the Supreme Council for Islamic Revolution in Iraq and the Badr Organization.[187]

### 1.  The Badr Organization

This section discusses the terrorist group the Badr Organization (a/k/a "Badr Corps" or "Badr Brigade"), which was an essential conduit for the provision of Iran's material support to JAM/PDB, KH, AAH, and SN in planning, committing or authorizing  out a portion of the subject terrorist attacks.[188]

Even before the American invasion in March 2003, the then-called "Badr Corps" was a critical tool of Iranian policy inside Iraq (operating primarily in Shia-controlled Southern Iraq), and it served as a de facto arm of the IRGC-QF.[189] The Badr Corps was established in 1983 as the military wing of the Supreme Council for Islamic Revolution in Iraq ("SCIRI").[190] SCIRI was a Shia political party operating in Iran and working to export the Iranian revolution to Iraq. To that end, SCIRI formed the Badr Corps "under the same model of military discipline as Lebanese Hezbollah."[191] The Badr Corps fought alongside Iranian forces during the Iran-Iraq War. Following the end of the war, Badr Corps forces returned to Iran, though the Islamic Republic would periodically activate them in attempts to undermine Iraq's government. By the early 1990s,

---

[187] **PX212**, Brian Fishman and Joseph Felter, *Iranian Strategy in Iraq: Politics and "Other Means"* (West Point, NY: Combating Terrorism Center at West Point, 2008); *see also* Gartenstein-Ross Shia Decl., pp. 13-14.
[188] The subject attacks involving the Badr Organization will be established in later stages of the case management plan.
[189] *See* Levitt Decl., ¶¶ 84-86.
[190] Gartenstein-Ross Shia Decl., p. 14 (*citing* **PX622**, **PX212**).
[191] *Id.* (*citing* **PX622**); Rubin Decl., ¶¶ 139-140.

Iran had built the Badr Corps into a fully functional militia.[192] From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s.[193] The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.[194] The Badr Corps received training and weapons from Iran through the IRGC and Hezbollah.[195] After Saddam Hussein's overthrow, the Badr Corps pledged to disarm (but did not) and renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi Security Forces.[196] Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Agents and Proxies and the terrorist groups in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis, who later led Special Group KH (discussed below).[197]

During the 1980s and the 1990s, Iran financed and supported SCIRI and its military arm, the Badr Corps.[198] SCIRI filled varying niches in the Shia political sphere and benefited from Iranian support. *Karcher*, 396 F. Supp. 3d at 24. The IRGC used the so-called "mainstream" Shia political movements to secure Iran's influence over the growing Iraqi government while it used JAM and PDB to target U.S. personnel in Iraq and drive the U.S. out of the country.[199] While

---

[192] Levitt Decl., ¶ 20 (*citing* **PX34**, **PX36**, **PX359**).

[193] *See* Gartenstein-Ross Shia Decl., p. 14 (*citing* **PX622**, **PX212**).

[194] *See* Levitt Decl., ¶¶ 29-31 (*citing* **PX697**, **PX346**).

[195] *See Id.*, ¶ 24; *see also* Gartenstein-Ross Shia Decl., pp. 13-14 (*citing* **PX622**, **PX212**).

[196] Levitt Decl., ¶ 24; *see also* Gartenstein-Ross Shia Decl., p. 14 (*citing* **PX622**, **PX212**); Rubin Decl., ¶¶ 139-141 (*citing* **PX364**, **PX615**), 144 (*citing* **PX925**) (based upon Dr. Rubin's personal interviews and debates with Hadi al-Amiri, the head of the Badr Corps in Iraq).

[197] *See* Levitt Decl., ¶¶ 85 (leadership roles of Sheibani and Muhandis), 120 (Sheibani's smuggling of IEDs) (*citing* **PX903**); Gartenstein-Ross Shia Decl., pp. 23-24 (Muhandis's leadership of KH) (*citing* **PX251**, **PX365**).

[198] *See* Gartenstein-Ross Shia Decl., pp. 13-14 (*citing* **PX622**, **PX212**); *see also* Levitt Decl., ¶ 84.

[199] **PX212**, Brian Fishman and Joseph Felter, Iranian Strategy in Iraq: Politics and "Other Means" (West Point, NY: Combating Terrorism Center at West Point, 2008).

SCIRI largely pursued a political route to power, it also placed numerous Badr Organization operatives into the Iraqi Security Forces.[200]

Iran provided material support to the Badr Organization in the form of training, financing, and the provision of armament.[201] In fact, following the U.S. deployment of troops in Iraq, many fighters carried rifles that bore the phrase "Property of the Iranian Revolutionary Guard Corps."[202] Badr Organization members would also receive Iranian identification, which would allow them to travel in Iran and register their children in Iranian schools.[203] The IRGC and the IRGC-QF were particularly supportive of the Badr Organization.[204] In a 2015 interview, Badr Organization leader Hadi al-Amiri stated that IRGC-QF General Qasem Soleimani advised the Badr Organization.[205] The closeness of the Badr Organization and the IRGC-QF, its success in infiltrating Iraq's bureaucracy, and its nexus with the Iraq Shia militias is exemplified by the fact that Abu Mahdi al-Muhandis, an Iranian citizen and member of the Iraqi Parliament, was a commander of the Badr Corps before founding Special Group KH. At the same time, Muhandis was a personal advisor to Iranian General Qasem Soleimani, the commander of the IRGC-QF with whom he was killed in a U.S. missile strike in Iraq in January 2020.[206]

According to Qais Khazali, a high-value detainee:

All of the provinces that border Iran are controlled by Badr Corps and this causes some troubles with other groups in the area. Badr Corps is more militarily oriented than the other groups and generally target U.S. forces. They are better equipped than the other groups and have superior weapons such as SAM and RPG-29s. In

---

[200] Levitt Decl., ¶¶ 23-24.
[201] Piatetsky Decl., ¶ 208.
[202] *Id*., ¶ 205.
[203] *Id*., ¶ 207.
[204] *Id*., ¶ 208.
[205] *Id*., ¶ 209.
[206] *See Id*., ¶¶ 177-181; *see also* Gartenstein-Ross Shia Decl., pp. 23-24.

general, the Badr Corps are fewer in numbers but more effective than other groups.[207]

There can be no question the Badr Organization was heavily and materially supported by Iran and its affiliated entities, and was critical to the Iran terrorism network's sponsorship of attacks against Americans in Iraq.

## 2. Jaysh al Mahdi ("JAM") and the Promise Day Brigade ("PDB")

This section discusses the terrorist groups Jaysh al Mahdi ("JAM") and the Promise Day Brigade ("PDB") that planned, committed, or authorized a portion of the subject attacks, and Defendants' provision of material support to this group.[208]

JAM was founded in 2003 by Muqtada al-Sadr ("al-Sadr"), a prominent young Shia cleric cultivated by Iran.[209] Al-Sadr was the son and grandson of two prominent Ayatollahs, both killed by Saddam Hussein's regime.[210] Founded with assistance from the IRGC and Hezbollah, JAM is an armed military wing of al-Sadr's Office of the Martyr Sadr ("OMS") and is closely affiliated with IRGC-QF. *Karcher*, 396 F. Supp. 3d at 24; *see also Fritz*, 320 F. Supp. 3d at 62.

> Sadr modeled his movement in Iraq, the "Sadrist Trend," on Hezbollah. Each group had a political wing and a terrorist wing. In each, the two wings were closely connected, sharing funding and leadership. [JAM], the terrorist wing of the Sadrist Trend, was a deadly force in Iraq. Its attacks likely killed over five hundred Americans and injured many more. By July 2007, General David Petraeus concluded that [JAM] was 'more of a hindrance to long-term security in Iraq' than was al-Qaeda in Iraq.[211]

---

[207] **PX926**, *Summary of Tactical Interrogation of Qayis al-Khazali,* Report No. 10 (March 26, 2007).

[208] The subject attacks involving JAM/PDB will be established in later stages of the case management plan.

[209] Gartenstein-Ross Shia Decl., pp. 17-19 (describing the background of the Sadrist movement and Muqtada al-Sadr's rise to a leadership role).

[210] *Id.*, pp. 16-18.

[211] Michael R. Gordon & Gen. Bernard E. Trainor, The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama (1st ed. 2012), p. 422.

In approximately April 2003, Hezbollah's chief terrorist mastermind, Imad Mugniyeh sought to collaborate with the powerful Shiite cleric Muqtada al-Sadr to establish his militia (JAM) as a fighting force in Iraq to violently expel the Americans from Iraq.[212] Notably, in the summer of 2003 (shortly before announcing JAM's formation) al-Sadr visited Tehran where he reportedly met with several important leaders, including Supreme Leader Ayatollah Ali Khamenei, Brigadier General Murtada Rexha'i (Head of the IRGC's intelligence service), and Brigadier General Qasem Soleimani (who commanded the IRGC-QF).[213] Tellingly, Iran ramped up its support for JAM and began cultivating al-Sadr and training large numbers of JAM fighters after this meeting.[214]

Al-Sadr's cultivation was managed by Muhammad Kawtharani, a member of Hezbollah's Political Council. Kawtharani was tasked with overall responsibilities for the terrorist organization's Iraq portfolio. As the U.S. Treasury Department noted when it designated him an SDGT on August 22, 2013, Kawtharani was "the individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups."[215]

According to declassified detainee interrogation reports, Kawtharani made contact with Sadr's deputy soon after (and possibly before) the overthrow of the Hussein regime in 2003:

> Mustafa al-Yaqubi has frequent contact with Lebanese Hezbollah. He speaks often by phone with al-Kawtharani, who is Lebanese Hezbollah's political spokesperson on Iraq issues. Al-Kawtharani has served in that position since shortly after Saddam Hussein's regime fell. Al-Kawtharani is a former student of the Najaf al-Hawza. But

---

[212] **PX700**, Matthew Levitt, "Hezbollah's Regional Activities in Support of Iran's Proxy Networks," The Middle East Institute (July 2021), at pg. 14.
[213] Gartenstein-Ross Shia Decl., p. 27.
[214] *Id.* (*citing* **PX670**).
[215] **PX82**, Press Release, U.S. Dep't of Treasury, Treasury Designation of Hezbollah Leadership (Aug. 22, 2013).

he is Lebanese-one of two Lebanese students who attended. He and Mustafa discuss major events that take place in Iraq.[216]

As former Badr Corps leader and Special Group Kata'ib Hezbollah founder Abu Mahdi al-Muhandis (discussed *infra*) later explained to the Hezbollah-affiliated channel Al-Mayadeen:

| | |
|---|---|
| **Al-Muhandis:** | Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq. |
| **Host:** | Training Iraqis here, to fight the Americans? |
| **Al-Muhandis:** | Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003. |
| **Host:** | After 2003… |
| **Al-Muhandis:** | They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.[217] |

During these early days of JAM, al-Sadr also received financial support from Iran to the tune of $750,000 to $1,000,000 per month, sometimes rising to $2,000,000 to $3,000,000 per month.[218] A later U.S. intelligence report dated August 5, 2007, noted Sadr's movement received approximately a third of its funding (or more) from Iran.[219] This investment paid dividends to Iran.[220] JAM injured or killed hundreds of United States service members and civilians as part of its years-long campaign to harm Americans and drive the United States military presence out of

---

[216] **PX977**, Summary of Tactical Interrogation of Qayis al-Khazali, Report No. 28 (April 5, 2007).
[217] David Daoud, *PMF deputy commander Muhandis details Hezbollah ops in Iraq*, FDD's Long War Journal (Jan. 9, 2017). Video and transcript will be provided to the Court.
[218] Piatetsky Decl., ¶ 200 (*citing* **PX274** West Point Combatting Terrorism Center, Iranian Resources and Shi`a Militant Cohesion: Insights from the Khazali Papers (January 2019).
[219] **PX227**, Combined Intelligence Operations Center Information Paper (August 5, 2007), p. 317.
[220] *See* Gartenstein-Ross Shia Decl., p. 27.

Iraq.[221] In the period leading up to and during the attacks on Plaintiffs, JAM used the support from its Iranian benefactors and Hezbollah, to gain total control of Iraq's Ministry of Health and used it as a vehicle for terrorist activity.[222] Further, several credible news reports support the fact that JAM controlled the Ministry during the relevant period. For example, a 2005 *New York Times* article explained that "Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation," benefited "from the new cabinet lineup" because "the health minister . . . belong[ed] to Mr. Sadr's political movement."[223] *The Guardian* reported that "[m]ost of the security guards in the morgue and the ministry are affiliated to [Sadr's] militia, the Mahdi army, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[224] And *CBS News*, relying on a U.S. intelligence report, announced "[h]ospitals have become command and control centers for the Mahdi Army militia," the "militia is keeping hostages inside some hospitals, where they are tortured and executed," and "[t]hey're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[225] Due largely to its early support from Iran and Hezbollah, along with its 2005-era control of the Ministry of Health, JAM became one of the deadliest terrorist groups in the country.

As JAM took root and grew, Hezbollah recruited, trained and armed its fighters. It was Iran, through Hezbollah and the IRGC-QF, that provided JAM with EFPs and trained the group's fighters how to use them.[226] Recognized as a signature Hezbollah tool, EFPs are sophisticated and

---

[221] *Id.*, p. 33 (discussing large number of U.S. casualties from Iranian weaponry in Iraq (*citing* **PX260**, **PX685**)).
[222] **PX213**, Office of Inspector General Report, Hard Lessons- The Iraq Reconstruction Experience (February 2009), pp. 250-251.
[223] Robert F. Worth, *The Struggle for Iraq: Politics; Iraq's Assembly Accepts Cabinet Despite Tension,* N.Y. Times (Apr. 29, 2005).
[224] Ghaith Abdul-Ahad, *Inside Iraq's Hidden War,* Guardian (May 19, 2006).
[225] Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).
[226] Gartenstein-Ross Shia Decl., pp. 30, 34, 35 (*citing* to **PX613**, **PX202**).

highly destructive weapons that JAM used in many terrorist attacks, including against several of the Plaintiffs herein. JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering protection and social services to the Shia population.[227] The organization was then able to quickly establish significant influence in the poorer, eastern neighborhoods of Baghdad and throughout southern Iraq. [228] During the height of the insurgency, when JAM was regularly attacking U.S. and Coalition Forces, JAM was receiving millions of dollars and an assortment of weaponry from Iran.[229]

In April and August of 2004, al-Sadr used the growing military nature of his movement to engage in two uprisings to confront Coalition Forces in the city of Najaf, both of which ultimately failed.[230] Though the attacks on U.S. and British troops gave JAM some prominence, the failed uprisings resulted in heavy losses to JAM, with al-Sadr eventually agreeing to a ceasefire.[231] It was a decision some prominent JAM leaders and fighters disagreed with, and the failed uprisings became the catalyst for the fracture of the Sadrist movement.[232] Some militants broke rank with al-Sadr and formed rival organizations, one of which was Asa'ib al Haq (AAH) led by Qais Khazali.[233]

The U.S. Treasury Department in 2009 formally recognized the links between Hezbollah and JAM when it designated a JAM commander as a Specially Designated Global Terrorist, noting

---

[227] Gartenstein-Ross Shia Decl., p. 19 (*citing* **PX679**, Marisa Cochrane, The Fragmentation of the Sadrist Movement, Washington, D.C.: Institute for the Study of War (2009), p. 12).
[228] *See* Gartenstein-Ross Shia Decl., p. 27; Levitt Decl., ¶¶ 108, 121, 162, 139.
[229] Piatetsky Decl., ¶ 199.
[230] Gartenstein-Ross Shia Decl.*,* p. 19.
[231] *Id.*
[232] *Id.*, p. 20.
[233] *Id.*

that Hezbollah prepared JAM to fight Coalition Forces.[234] The Treasury did so again in 2012 when it found that Hezbollah helped form, train, and advise militants in JAM.[235] JAM itself proclaimed its identification with Hezbollah: al-Sadr declared that he was "Hezbollah's 'striking arm in Iraq,'"[236] and publicly acknowledged JAM's "formal links with Hizbollah."[237] JAM fighters marched under Hezbollah flags, waved Hezbollah banners at demonstrations, and shouted chants including "Mahdi Army and Hezbollah are one."[238]

In the spring and summer of 2008, U.S. and Iraqi offensives took their toll on JAM.[239] Al-Sadr sent delegations to meet with advisors in Iraq and Iran to discuss the possibility of disbanding JAM.[240] Soon after, "al-Sadr announced the formation of the Promise Day Brigade . . . which could be called a JAM Special Group of his own." *Karcher*, 396 F. Supp. 3d at 29. PDB was to be "a small, highly trained, group of fighters, who would exclusively attack U.S. forces."[241] PDB became "one of the most effective and dangerous Shia organizations fighting Coalition forces in Iraq during the period between 2007 and 2011."[242] PDB was not only responsible for its own string of

---

[234] **PX66**, Press Release, U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009).

[235] **PX40**, Press Release, U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012).

[236] Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, BUFFALO NEWS (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/).

[237] Levitt Decl., ¶ 189; Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizballah in Lebanon'*, Independent (Aug. 20, 2007).

[238] *Iraq's Shia March for Hezbollah,* Al-Jazeera (Aug. 4, 2006), www.aljazeera.com/archive/2006/08/200849131615702691.html).

[239] Levitt Decl., ¶ 131.

[240] *Id.*

[241] Piatetsky Decl., ¶ 197 (*citing* **PX703** Stanford Center for International Security and Cooperation, Mahdi Army (November 23, 2021)).

[242] Levitt Decl., ¶ 133 (*quoting* Nicholas A. Heras, *Shia Popular Mobilization Units in a Post-Islamic State Iraq: A Look at Peace Brigade Commander Shaykh Kazim al-Issawi*, Militant Leadership Monitor, Jamestown Foundation (May 2, 2017)).

attacks on U.S. and Coalition Forces,[243] but sometimes even collaborated with members of the Special Groups KH and AAH to attack U.S. forces.[244] PDB was also "supported by the IRGC-QF and Hezbollah, 'in keeping with the IRGC's long-time policy of investing in all Shia factions.'" *Karcher*, 396 F. Supp. 3d at 29. Iran, in usual form, provided PDB with significant amounts of funding, in the hundreds of millions of dollars.[245] This support not only advanced Iran's terroristic agenda, but it also allowed Iran to exert influence over PDB.[246]

As an example of JAM's terrorist activities similar to the attacks here, on June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. That same month, the PDB also claimed responsibility for 52 attacks on U.S. forces.[247] Prior to that, on January 10, 2010, a PDB sniper shot and killed an American soldier.[248]  PDB posted a video of this attack.[249]

Iran provided substantial material support to Shia militia groups like JAM and PDB in the form of weapons, training, financing, safe haven, and planning attacks.[250] This support took place both through the direct arms of Iran's instrumentalities (i.e. the IRGC-QF and MOIS) and also by its non-state proxy, Hezbollah.[251] According to a 2009 report from the RAND Corporation, al-Sadr may have been receiving up to ***$80 million per month*** from Iran.[252]

---

[243] Levitt Dec., ¶ 135; Gartenstein-Ross Shia Decl., p. 25; Rubin Decl. ¶ 147.
[244] Levitt Dec., ¶ 135.
[245] *Id.*, ¶ 134.
[246] *See id.*
[247] Rubin Decl., ¶ 147.
[248] Piatetsky Decl., ¶ 198.
[249] *Id.*
[250] Gartenstein-Ross Shia Decl., p. 26.
[251] *Id.*, p. 27.
[252] *Id.*, p. 38 (*citing* **PX641**, Wehrey et al., Dangerous but not Omnipotent: Exploring the Reach and Limitations of Iranian Power in the Middle East, p. 117).

Providing further aid, Hezbollah brought JAM recruits to Iran and Lebanon and trained them to use their methods against American forces in Iraq.[253] The training covered the use of basic weapons, improvised explosive devices, EFPs, rockets, and more.[254] Hezbollah spelled out in a "planning guide" how JAM fighters should deploy the training and weaponry it provided.[255] Importantly, Hezbollah did not just provide deadly EFPs, it also instructed JAM and other groups to use such weaponry against American targets and taught those special groups how to do so with lethal effectiveness.[256] In addition to training and expert assistance, Iran also offered safe haven to the leaders and fighters of the militia groups, a protection al-Sadr himself enjoyed.[257] In the mid-2000s, amid a surge of U.S. forces and on the heels of the arrest of a high-profile Sadrist cleric, al-Sadr secretly fled to Iran and did not return until 2011.[258]

But Iran's material support for Shia Special Groups did not stop when al-Sadr fled Iraq.

### 3. Asa'Ib Ahl al-Haq ("AAH")

This section discusses the terrorist group Asa'Ib Ahl Al Haq ("AAH") that planned, committed, or authorized a portion of the subject attacks, and Defendants' provision of material support to this group.[259]

AAH is another Shia Special Group supported by Iran (through Hezbollah and the IRGC-QF) that conducted assassinations and operations in Iraq against Coalition Forces and U.S.

---

[253] *See* Levitt Decl., ¶¶ 136-150.

[254] *Id.*

[255] Levitt Decl., ¶¶ 135, 170; **PX300** Press Briefing Slides regarding Ali Musa Daqduq, briefing given by Brigadier General Kevin Bergner, spokesman for the American Army in Iraq, July 2, 2007.

[256] Gartenstein-Ross Shia Decl., pp. 33-34.

[257] Gartenstein-Ross Shia Decl., pp. 39-40 (*quoting* **PX242**, The U.S. Army in the Iraq War: Volume 2, p. 77).

[258] *Id.*

[259] The subject attacks involving AAH will be established in later stages of the case management plan.

nationals. AAH was designated as a Foreign Terrorist Organization on January 3, 2020. In doing

so, the U.S. State Department, detailed just some of AAH's activities in Iraq, stating:

> AAH and its leaders are ***violent proxies of the Islamic Republic of Iran***…
> Acting on behalf of their masters in Tehran, they use violence and terror to
> further the Iranian regime's efforts to undermine Iraqi sovereignty. ***AAH is***
> ***extensively funded and trained by Iran's Islamic Revolutionary Guard***
> ***Corps (IRGC) Quds Force***, an entity that was part of the IRGC designation
> as an FTO in April 2019[…] AAH, led by Qays and Laith al-Khazali, is an
> Iran-backed, militant organization that has claimed responsibility for more
> than ***6,000 attacks against U.S. and Coalitions forces since its creation in***
> ***2006****.* AAH has carried out highly sophisticated operations, including
> mortar attacks on an American base, the downing of a British helicopter,
> and an attack on the Karbala Provincial Headquarters that resulted in the
> capture and murder of five American soldier[…] Today's actions notify the
> U.S. public and the international community that this group is a terrorist
> organization and its leaders, the Khazali brothers, who have participated in
> its terrorist acts, are SDGTs.[260]

(Emphasis added.)

AAH rose to prominence following JAM's failed attempts at inspiring Shia uprisings in

Najaf in 2004. At that time, Qais al-Khazali, a prominent JAM commander and spokesman, began

to distance himself and his followers from al-Sadr and JAM. The difference between al-Sadr and

Khazali were both tactical and political, with the latter desiring to focus on insurgent activities

separate from the political machinations of the newly forming Iraqi government.[261]  Shortly after

JAM's failures in 2004, Khazali and his group began conducting operations separately from JAM,

albeit with the shared reliance upon Iran for its resources. However, AAH's split from al-Sadr's

JAM wasn't openly acknowledged until 2006.[262] Iran did not see this break from JAM as defiance

of Iran; rather, it saw this break as a significant opportunity.[263]

---

[260] **PX79**, U.S. State Department, Terrorist Designations of Asa'ib Ahl al-Haq and Its Leaders,
Qays and Laith al-Khazali (January 3, 2020).
[261] Gartenstein-Ross Shia Decl., pp. 20-21.
[262] *See Id.,* p. 22.
[263] *Id*. (*citing* **PX934**).

"Declassified military intelligence indicates that the Supreme Leader asked Mr. Khazali to start AAH, a further special group outside of al-Sadr's auspices and awareness." *Karcher*, 396 F. Supp. 3d at 25.[264] "Qais Khazali, who (as discussed above) commanded one or more JAM Special Groups, traveled to Iran in 2006 and met with IRGC-QF leadership as well as Supreme Leader Ayatollah Khamenei." *Id. at* 24.[265] "Iran viewed Qais Khazali's AAH as a complement to Muqtada al-Sadr's JAM […] and thus 'leapt at the opportunity to diversify its investment in Iraqi militant groups.'" *Fritz*, 320 F. Supp. 3d at 62. "As the 'primary leader' of the Special Groups, Qais Khazali 'had significant links to Iran.'" *Id*. "He was familiar with 'Iranian surrogate networks operating in Iraq' and their leadership structures and with 'the facilitation and movement of personnel and equipment across the Iran-Iraq border.'" *Id*. "He also met with Quds Force officers 'on multiple occasions.'" *Id*. Finally, "Qais Khazali's brother, Laith Khazali, 'effectively' served as 'his deputy.'" *Id*. Thus, "Iran played a central role in Qais Khazali's ascent and AAH's formation." *Id*.

Hezbollah, at Iran's direction, also provided support to Khazali and AAH. A senior Hizballah operative, Ali Musa Daqduq, provided training to AAH fighters. In May 2006, Daqduq traveled to Iran with Youssef Hashim, the head of Hezbollah Special Operations. There, Daqduq and Hashim received guidance from Abdul Reza Shahlai, IRGC-QF's external operations director, as well as from IRGC-QF's commander Qasem Soleimani. Daqduq was instructed to travel in and out of Iraq to lead training and report on progress made in arming and training Shia militant groups "in mortars and rockets, manufacturing and employing IEDs, and kidnapping operations." [266]By June 2006 Daqduq was serving as the Chief Advisor and IRGC-QF liaison for AAH leader Qais al-Khazali.

---

[264] **PX57**, Declassified Detainee Document Regarding Qais Khazali, at 000324 (Aug. 13, 2007).
[265] *See also* **PX57**.
[266] Gartenstein-Ross Shia Decl., p. 22.

Khazali was detained and interrogated by U.S. forces in 2007.[267] During his interrogation, Khazali admitted the IRGC-QF trained the AAH at three bases near Tehran, including the Imam Khomeini base.[268] He also admitted that Iranian officials suggested that Iraqi Shiite militias, such as AAH, should target British troops in the Basra area and American troops elsewhere in order to force the withdrawal of Coalition Forces.[269] Finally, he admitted that Iranians supplied militias with EFPs and specialized training, and was doing so for any group willing to travel to Iran to receive instruction.[270]

AAH was so effectively organized and supported that, "[a]lthough AAH was later deprived for some time of the leadership of Qais Khazali and his brother, Layth, during their detention by U.S. forces, the group 'was able to maintain a fairly high-level offensive tempo' and 'operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF' from 2006 through 2011." *Karcher*, 396 F. Supp. 3d at 25.

Like JAM, AAH received, along with EFPs, a host of weapons and munitions from Iran, that were smuggled across the eastern border of Iraq, this included rockets, mortars, rocket propelled grenades, and improvised explosive devices (IEDs). For instance, the Shia militant groups used 107mm and 240mm rockets provided by Iran, as well as improvised rocket assisted munitions (IRAMs), military grade plastic explosives, and sophisticated triggering mechanism for IEDs.[271] Part and parcel to these weapons shipments was the Iranian- and Hezbollah-conducted

---

[267] Piatetsky Decl., ¶ 189.

[268] *Id*. (*quoting* American Enterprise Institute, The Qayis al-Khazali Papers, Tactical Interrogation Reports #1 through #70 (November 2021)).

[269] *Id.*

[270] *Id*.; Rubin Decl. ¶¶ 144-146.

[271] Gartenstein-Ross Shia Decl., p. 30 (*citing* **PX678**, Marisa Cochrane, "Special Groups Regenerate," Institute for Study of War, August 29, 2008, p. 4).

training in their use, as well as tactics and techniques for complex attack strategies that increased the effectiveness and survivability of the groups and individuals receiving it.[272]

AAH represents an Iranian effort to organize trained militia cells into a network resembling Lebanese Hezbollah. *See Fritz*, 320 F. Supp. 3d 48, 62. Like JAM, AAH was "'[f]unded, trained and armed by' [IRGC-QF] operatives." *Fritz*, 320 F. Supp. 3d at 62. AAH and other "Special Groups 'planned and executed . . . bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking, and other attacks' against Iraqi civilians, Iraqi forces, and coalition forces." *Id*.

As detailed above, Iran provided material support in the form of, among other things, financial support, training, weapons, intelligence, and safe harbor to AAH before, during, and after the extrajudicial killings and attempted killings at issue in this case. This material support qualifies as property, currency, financial services, lodging, training, expert advice and assistance, safe houses, weapons and explosives under 18 U.S.C. § 2339A. These statutory terms are self-explanatory, and Iran's provision of a safe harbor within its territory for the training and support of AAH qualifies as a "safe house." *Owens v. Republic of Sudan*, 826 F. Supp. 2d at 150-51, *aff'd Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safe house' under 18 U.S.C. § 2339A(b) (internal citation omitted).

From mid to late 2006, AAH conducted frequent IED, mortar, rocket, and sniper attacks on Coalition Forces.[273] AAH continued to attack Coalition Forces in the summer and fall of 2008 with EFPs; it also engaged in kidnapping, intimidation, and sectarian violence.[274] In addition to

---

[272] Gartenstein-Ross Shia Decl., pp. 35-39.
[273] **PX356**, Department of Defense Press Briefing, with Brig. Gen. Kevin Bergner, Multi-National Force-Iraq (July 2, 2007).
[274] **PX384**, Multi-National Force – Iraq Press Release A081123a-120, "Coalition Forces continue to target Asa'ib Ah al-Haq Criminals (Baghdad)" (November 23, 2008).

equipment and training, AAH also received funding from Iran.[275] In particular, in a Department of State press release, then Secretary of State Mike Pompeo explained that AAH has been "extensively funded and trained" by the IRGC-QF.[276] In October 2008, during a series of raids against the AAH network, Coalition Forces seized more than $400,000 from AAH financiers.[277]

"The AAH initiative demonstrated Iran's effort to foster dependence on its aid for Iraqi militia to carry out attacks on Coalition Forces." *Karcher*, 396 F. Supp. 3d at 25. "Although AAH was later deprived for some time of the leadership of Qais Khazali and his brother, Laith, during their detention by U.S. forces, the group 'was able to maintain a fairly high-level offensive tempo' and 'operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF' from 2006 through 2011." *Karcher*, 396 F. Supp. 3d at 25 (discussing AAH's successes without the Khazalis, and identifying the release of Laith in June 2009 and Qais in January 2010).

As a result of Iran's efforts and support of AAH, by July 2007 the Special Groups were able to significantly increase the amount and sophistication of their attacks on Coalition Forces in Iraq.[278] For example, AAH is one of the Iranian entities determined to be legally responsible (along with Iran) for an attack in January 2007 in Iraq that killed and injured U.S. Nationals. See *Fritz*, 320 F. Supp. 3d at 54 "[I]RGC-QF funding and equipment for Special Groups reached an estimated $750,000 to $3 million per month by August 2007." *Karcher*, 396 F. Supp. 3d at 24.[279] And Iran

---

[275] Gartenstein-Ross Shia Decl., pp. 24, 43 (*citing* **PX356**).

[276] **PX79**, U.S. State Department, State Department Terrorist Designations of Asa'ib Ahl al-Haq and Its Leaders, Qays and Laith al-Khazali (January 3, 2020).

[277] **PX383**, Multi-National Force-Iraq Press Release A081018a-105, "Coalition Forces strike blow to criminal network" (October 18, 2008).

[278] *See* Levitt Decl., ¶¶ 46-50; Gartenstein-Ross Shia Decl., pp. 42-43 (detailing the IRGC-QF/Hezbollah/AAH 2007 attack on JCCP in Karbala, Iraq).

[279] *See also* Levitt Decl., ¶ 148.

provides bereavement payment of up to $5,000 for the families of killed AAH fighters—and Iran will often pay for the fighter's burial.[280]

When reporting to U.S. Secretary of Defense Robert Gates, General David Petraeus corroborated the reports of Iran's substantial support of Shia militants in Iraq, stating that, Iranian sponsorship of insurgents in Iraq was having "an obvious operational impact" on U.S. forces.[281]

In addition to the Shia terrorist groups JAM, PDB and AAH, Iran also provided substantial and material support to another Foreign Terrorist Organization, the Special Group KH.

### 4.      Kata'ib Hizballah ("KH")

This section discusses the terrorist group Kata'ib Hizballah ("KH") that was responsible for several of the subject attacks.[282]

In 2006, and thereafter, Iran directed the IRGC to facilitate the creation of yet another splinter Special Group from JAM. *Karcher*, 396 F. Supp. 3d at 24-25. To this end KH was formed in 2007.[283] KH's operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Treasury Department as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq."[284] According to the U.S. government, "Ghanimi has organized KH military related training in Iran from the IRGC-QF and Lebanese Hizballah. Ghanimi has sent money provided by the IRGC-QF to KH leaders in Iraq."

---

[280] Piatetsky Decl., ¶ 191.
[281] Gartenstein-Ross Shia Decl., pp. 39 (*citing* **PX949**).
[282] The subject attacks involving KH will be established in later stages of the case management plan.
[283] Levitt Decl., ¶ 114 (*citing* **PX27**).
[284] **PX72**, U.S. Department of Treasury Press Release, Sanctions on Iranian Government and Affiliates (November 8, 2012).

The purpose behind KH's formation was to create a vehicle by which the IRGC-QF could deploy its most experienced operators and its most expensive equipment.[285] KH received the most sophisticated training and sensitive equipment from Iran.[286] This has included training in small arms, constructing and planting IEDs, coordinating and carrying out rocket attacks, and guerilla warfare tactics.[287] Like JAM, AAH, and PDB, KH was deployed by Iran to hasten the withdrawal of U.S. forces, destabilize the national government, and pressure the national government into reducing the long-term presence of U.S. forces in Iraq.[288]

Unlike many other terrorist groups, such as AQ, KH operated with Iranian support overtly.[289] In fact, the group's founder, Abu Mahdi al Muhandis, a former Badr Corps leader who worked for Iran in the 1990s, lived in Iran for much of his life as an Iranian citizen and pledged his allegiance to Iran Supreme Leader Khamenei in a 2017 interview.[290] Further demonstrating his devotion to Iran, Muhandis was a senior advisor to the IRGC's Qasem Soleimani. *Karcher*, 396 F. Supp. 3d at 29.

"Since 2007, KH has been 'responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq,' the U.S. Department of State noted when it designated [KH] as a Foreign Terrorist Organization in June 2009." *Karcher*, 396 F. Supp. 3d at 29. When designating KH as a FTO, the U.S. State Department announced:

---

[285] Piatetsky Decl., ¶ 179 (*citing* **PX251**).
[286] Levitt Decl., ¶ 114 (*citing* **PX27**).
[287] Piatetsky Decl., ¶ 183.
[288] *See* Clawson Decl., ¶¶ 59 (Iran "has defined itself by its enmity to the United States[.]"), 63 ("Iran has provided material support to a wide array of groups willing to attack U.S. interests."); *see also* Levitt Decl., ¶ 176 (opining "that the Iraqi Shia militias, including JAM [and] Special Groups like AAH, Kata'ib Hezbollah and Promised Day Brigades, were provided active guidance, training, intelligence, and financial and material support by Iran through its IRGC and its proxy Lebanese Hezbollah.").
[289] Piatetsky Decl., ¶ 180.
[290] *Id.*, ¶ 180.

Kata'ib Hizballah is a radical Shia Islamist group with an anti-Western establishment and jihadist ideology that *has conducted attacks against Iraqi, U.S., and Coalition targets in Iraq. Kata'ib Hizballah has ideological ties to Lebanese Hizballah and gained notoriety in 2007 with attacks on U.S. and Coalition forces designed to undermine the establishment of a democratic, viable Iraqi state.* The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hizballah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.[291]

(Emphasis added.)

The U.S. government also stated "the IRGC provides lethal support to KH and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."[292] A 2009 press release announcing KH's designation as a SDGT further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq:

Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG-29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The

---

[291] Gartenstein-Ross Shia Decl., pp. 23-24 (*citing* **PX251**, **PX365**, **PX22**).

[292] https://www.justice.gov/opa/pr/united-states-seizes-websites-used-iranian-islamic-radio-and-television-union-and-kata-ib (last visited May 2, 2022).

four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.[293]

Indeed, while KH used signature Iranian/Hezbollah TTPs, it became notorious for its attacks on U.S. forces involving IRAMs, which KH received from Iran.[294] These attacks would at times be followed by the release of polished recruiting videos in which KH would credibly claim responsibility for numerous attacks by a montage evidencing their gruesome acts.[295]

Since its inception, KH has remained firmly under the IRGC-QF's control and has received extensive support from Hezbollah.[296] The U.S. Department of Treasury has indicated that KH, in particular, was a beneficiary of IRGC-QF funding.[297] There is no doubt that the abundance of financial assistance Iran funneled to terrorist organizations such as KH and those mentioned above was to enable attacks against U.S. forces.[298] The interagency Iraq Survey Group revealed that "Iran

---

[293] **PX66**, Press Release, U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009).

[294] Piatetsky Decl., ¶ 183.

[295] *See* **PX1001** – Video of Claim of Responsibility published by KH showing IRAMs being fired at FOB Loyalty in Baghdad on June 6, 2011, resulting in the death of six soldiers, including Plaintiff Christopher Brook Fishbeck, and wounding twenty-two others (file to be provided to the Court).

[296] Gartenstein-Ross Shia Decl., pp. 23, 33.

[297] *Id*., pp. 36-37 (*citing* **PX66**).

[298] *Id*., pp. 42.

had reportedly placed a bounty on U.S. forces of $2,000 for each helicopter shot down, $1,000 for each tank destroyed, and $500 for each U.S. Military personnel killed."[299] It is abundantly clear that Iran's substantial financial support for Shia militias in Iraq was specifically designed to encourage and facilitate attacks like those at issue in this case.[300]

In addition to providing substantial and material support to JAM and Shia Special Groups PDB, AAH and KH, Iran also provided substantial and material support to the Special Group known as the Sheibani Network operating in Iraq.

### 5.   The Sheibani Network

This section discusses the Sheibani Network, another Special Group that planned, committed, or authorized a portion of the subject attacks, and Defendants' provision of material support to this group.[301]

Like KH, The Sheibani Network (SN), traces its emergence back to the Badr Corps, and Iran's early support for it and SCIRI in their efforts to destabilize Iraq while under the Sunni Ba'athist regime of Saddam Hussein.[302]

During that time, the Badr Corps established smuggling routes and ratlines running between Iran and Iraq to support SCIRI and its operations against the regime. Iran tapped those with this prior smuggling experience and so, after 2003, senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011. This included Abu Mahdi al-Muhandis, who later led KH (discussed above), and Abu

---

[299] *Id.* (*quoting* Edward T. Pound, "The Iran Connection," *U.S. News & World Report*, November 22, 2004).

[300] *Id.*

[301] The subject attacks involving SN will be established in later stages of the case management plan.

[302] **PX241**, Joel D. Rayburn et al. eds., The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 14.

Mustafa al-Sheibani, who became a key smuggler of Iranian weapons and funds.[303] In 2003, Al-Sheibani was directed by Iran to leave the Badr Organization and build a new militant group to attack Americans, the Sheibani Network. Iran provided Sheibani with $40 million in seed money to build his network and "he went on to finance and supply other key networks and remained a key node in the Quds Force's controlled distribution of advanced weaponry."[304]

Based in Baghdad, but supervised from nearby Baktaran, Iran, Sheibani's group developed extensive smuggling routes for moving weapons, relief supplies, men, money, and propaganda from Iran into Iraq to resource Badr activities in Baghdad, Diyala, and Wasit. By the summer of 2003, SN was disrupting Coalition Force operations, particularly those of the U.S. Army's 4th infantry Division. SN's smuggling networks and Iran's involvement with the Badr Organization would later be instrumental in funneling lethal support such as EFPs into Iraq to be used against Iran's enemies and the coalition military.[305]

In 2007, taking advantage of Coalition Forces' renewed focus against Sunni militants elsewhere, Shi'a militants increased their attacks in the first half of the year, conducting, at least, 65 EFP attacks against Coalition troops in April alone. These attacks were connected to well-established networks of Iranian-sponsored militants smuggling EFP devices and other weapons across the Iran-Iraq border in the south and in the Diyala Valley. Abu Mustafa al-Sheibani and his brother Abu Yaser al-Sheibani were the most active EFP smugglers at the time and moved the Iranian weapons through Maysan and Wasit Provinces to deliver them to JAM and other militant groups. In addition to the border crossings near Amarah and Kut, Coalition analysts suspected the

---

[303] *See* Gartenstein-Ross Shia Decl., pp. 24-25.
[304] **PX242**, The U.S. Army in the Iraq War Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 65.
[305] **PX241**, The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 181.

Sheibani brothers and other smugglers were using routes through the vast marshes that spanned the border south of Amara, just as they had done in their shadowy war against Saddam's regime during and after the Iran-Iraq War. Though Coalition special operators were able to capture Abu Yaser al-Sheibani on April 20, 2007, the incidence of EFP attacks nevertheless increased as the summer approached, eventually rising to 99 attacks during July 2007.[306]

In early July, JAM leader Muqtada al-Sadr fled Iraq and sought refuge in Iran to avoid capture. Al-Sadr left JAM under the command of Abu Mustafa al-Sheibani who took over the group back in Iraq. JAM immediately mounted large-scale indirect fire attacks in Baghdad. Coalition Forces increased their operations in response to these JAM attacks, focusing on longtime JAM sanctuaries in Baghdad and elsewhere, and forcing Al-Sheibani to flee to Iran as well.[307]

On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran. In designating Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. ***The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers.*** Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. ***Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.***

---

[306] **PX242**, The U.S. Army in the Iraq War Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 222.
[307] **PX242**, The U.S. Army in the Iraq War Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 230.

Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. ***As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran.*** As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early May 2007, Al-Sheibani's network ***assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.***

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. ***Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Force***s in southern Iraq, particularly British forces.[308]

(Emphasis added).

During his interrogation by Coalition Forces after he was captured, AAH leader Qais Khazali alleged that Sheibani's "resistance group belongs to" Ayatollah Khamenei and said that the members of Sheibani's network were "well-trained" and "specialize in attacks against CF [Coalition Forces]."[309] Indeed, SN operatives became known as master emplacers of EFPs and IEDs, and for their precision rocket and mortar attacks on Coalition bases. Even more so, SN was considered masterful with smuggling and assembling EFPs, and supplied these munitions to JAM and the other Special Groups. Iran also used SN to target and assassinate Iraqi police and government officials who opposed its efforts in Iraq, being trained by Hezbollah in these specific types of operations.

SN's peripatetic operations meant that al-Sheibani mainly sought sanctuary in Iran, avoiding detection and capture, but while Khazali was in prison SN assisted AAH with the delicate

---

[308] **PX67**, U.S. Department of Treasury Press Release, Treasury Designates Individuals, Entity Fueling Iraqi Insurgency (January 9, 2008).

[309] *See* Gartenstein-Ross Shia Decl., p. 25 (*citing* **PX951**, Multi-National Force – Iraq, Shi'a SDE, "Tactical Interrogation Report: Qais Hadi Said al-Khazali," May 30, 2008, p. 2).

balancing act of trying to negotiate his release while still attacking U.S. Forces. In 2010, Al-Sheibani reportedly returned to Iraq from Tehran to join AAH.[310]  Later, in approximately May 2013, Al-Sheibani founded yet another pro-IRGC Iraqi militia, Kata'ib Sayyid al Shuhada (KSS) with the support of the Badr organization and KH, and purportedly traveled with 500 Iraqi militants to Syria to fight alongside the Iranian-backed regime there.[311] KSS expanded its presence in Iraq with the rise of ISIS, and operates as a member of the Iraq Popular Mobilization Forces designated as Brigade 14, which was, until his death in January 2020, tacitly commanded by IRGC-QF Commander General Qassem Soleimani.[312] KSS is still presently being funded by the IRGC-QF.[313]

### 6. Summary of Defendants' Material Support for the Shia Terrorist Groups

The following provides a summary of Defendants' material support to the foregoing Shia militia groups between 2003 and 2011, as established in the attached expert declarations of Dr. Clawson, Dr. Levitt, and Dr. Gartenstein-Ross. In their declarations, these experts discuss and identify the following categories of material support Defendants provided to Hezbollah, the Badr Organization, JAM and the Special Groups PDB, AAH, KH and SN, during the relevant time period: 1) safe haven; 2) transportation and travel facilitation; 3) false documentation; 4) lodging; 5) facilities; 6) weapons; 7) explosives; 8) personnel; 9) smuggling services; 10) money; 10) financial services; and 11) expert advice and assistance.

Dr. Clawson concludes, "Iran has provided material support to a wide array of groups willing to attack U.S. interests. Some of those groups are largely controlled by Iran, especially

---

[310] *See* https://www.counterextremism.com/extremists/abu-mustafa-al-sheibani (last visited May 2, 2022).

[311] *Id.*

[312] *Id.*

[313] *Kata'ib Sayyid al-Shuhada*, Mapping Militants, Stanford University Cntr. For Intl. Sec. & Coop (last modified July 2019).

Lebanon's Hezbollah and many (but not all) of the Iraqi Shia militias… The Islamic Republic of Iran's material support to terrorism targeting Americans has been with the objectives of reducing U.S. presence and influence in the Middle East and U.S. influence around the world."[314] This support was the "official policy of the Iranian government."[315] Iran implemented its policy to support terrorist groups in Iraq through its agents, instrumentalities and political subdivisions— IRGC, MOIS, NIOC, Bank Melli, and Bank Markazi.[316]

Dr. Mathew Levitt concludes, "Iraqi Shia militias, including JAM, and so-called Special Groups like AAH, Kata'ib Hezbollah and Promised Day Brigades, were provided active guidance, training, intelligence, and financial and material support by Iran through its IRGC and its proxy Lebanese Hezbollah."[317] Iran, through Hezbollah began these efforts as early as 2003.[318] Iran's material support was used to conduct "thousands of attacks on U.S. and coalition forces… between 2004 and 2011 by Iraqi Shia militias with the IRGC's and Lebanese Hezbollah's active logistical support."[319]

Dr. Gartenstein-Ross similarly concludes that, historically, Iran, through "MOIS provided training to Hizballah, and IRGC provided 'operational advice' to Hizballah… The IRGC's Qods Force directly managed its relationship with Hizballah" in Iraq.[320] "The Hizballah-Iran partnership largely pioneered Iran's use of proxy forces to conduct terrorist attacks against U.S. troops" in Iraq, which "follow[ed] the 2003 U.S. invasion."[321] Iran's "planning for this support seemingly

---

[314] Clawson Decl., ¶ 63

[315] Clawson Decl., ¶¶ 22, 99, 213-214.

[316] *Id.,* ¶¶ 86-90 (IRGC); ¶¶ 95-99 (MOIS); ¶¶ 107-122 (Markazi); ¶¶ 155-160(Melli); ¶¶ 163-169 (NIOC).

[317] Levitt Decl., ¶ 176.

[318] *Id.,* ¶¶ 104, 115, 118-119,

[319] *Id.,* ¶¶ 5, 176.

[320] Gartenstein-Ross Shia Decl., pp. 12-13.

[321] *Id.,* p. 12.

began in 2002" and "was not a haphazard, post-invasion response. It was planned and approved at the highest levels of the Iranian government."[322] This is evidenced by Iran's Supreme Leader Ayatollah Ali Khamenei and his war council creating policies related to Iran's anticipation of U.S.-led regime change in Iraq, as well as pre-2003 Iraqi intelligence reporting of Iran's "dual-tracked" strategy of "public support for some organizations in post-Saddam Iraq (such as the Islamic Supreme Council of Iraq, the Badr Organization, and the Dawa political party) and covertly backing others."[323]

Dr. Gartenstein-Ross details how Iran implemented this "dual-tracked" strategy through its use of Hezbollah and other terrorist proxies in Iraq to "further its interests." To do so, Iran provided substantial and lethal material support to Shia militia groups in Iraq, including JAM, AAH, and the various Special Groups, in the form of weapons, training, financing, safe haven, and assistance in planning attacks. Iran intended for this support to help kill and injure U.S. service members and civil servants. By harming U.S. personnel, Iran aimed to further a series of foreign policy objectives, including dissuading the U.S. from invading Iran, weakening U.S. forces in Iraq, and allowing Iran to heavily influence Iraqi politics.[324] Dr. Gartenstein-Ross further explains how, in using Hezbollah, Iran leveraged the group's "extensive experience with guerilla, insurgent, and general paramilitary activities" to organize and train Iraq terror groups to maximize their lethal effectiveness against U.S. forces.[325] Iran was deeply involved in providing this material support for JAM and the Special Groups, which was provided directly through agencies "of the Iranian state like the Quds Force and MOIS, and also by non-state proxies like Lebanese Hizballah."[326]

---

[322] *Id.,* p. 26.
[323] *Id.,* p. 26.
[324] Gartenstein-Ross Shia Decl., pp. 25-26, 44.
[325] *Id.,* pp. 28, 39, 42.
[326] *Id.,* pp. 26-27.

Dr. Gartenstein-Ross identifies the multitude of material support Iran gave to the Shia militia groups relevant to this case, taking the form of:

- **Weapons** - specifically including "EFPs, IRAMS, rockets, mortars, and small arms."[327]

- **Smuggling routes and services** - specifically including "a sophisticated transport network to supply these weapons to militants in Iraq."[328] This network involved Iranian agents who distributed them "them to individuals who wanted to attack coalition forces."[329]

- **Travel facilitation and safe haven** - which Iran ran "through an organized facilitation network" that provided the groups, particularly their senior leadership, the ability "to launch attacks against U.S. forces in Iraq with little fear of being killed or captured," and "likely emboldened these leaders to conduct more aggressive attacks [,]" and "gave these leaders the ability to more closely coordinate with Iran." This material support also included a network of safe houses where militants were introduced to others, and guided safely across the Iran/Iraq border.[330]

- **Expert knowledge, assistance and training** - that occurred in Iraq, Iran, and Lebanon, the locations of which demonstrate that training these groups and others to attack U.S. Nationals was a matter of "official Iranian state policy."[331] This training was part of a "robust training programming" that was "both comprehensive and strategic," spanning "rudimentary" to "high-level" topics, running the "gamut of skill sets: including: weapons, explosives, bomb-making, intelligence, assassinations."[332] In providing this training, Iran,

---

[327] *Id.,* p. 46.
[328] *Id.,* p. 33.
[329] *Id.,* p. 29.
[330] *Id.,* pp. 37, 40.
[331] *Id.,* p. 35.
[332] *Id.,* pp. 37, 40.

advised and armed these groups with expert knowledge that "created a high risk that it would spread like wildfire among militant groups."[333] This training, expert advice and assistance "equipped the Special Groups and other Shia militias with more effective capabilities,"[334] the impact of which was "significant and highly lethal[,]"[335] and directly affected the "sophistication" of the tactics, techniques, and procedures employed by the Shia groups, which in turn had an "an obvious operational impact" on U.S. forces.[336]

- **Financing** - from Iran, was substantial and directed to an "array of Shia militias in Iraq" and "it is clear" that this financial support "was specifically designed to encourage and facilitate attacks on Coalition forces, such as those at issue in this case."[337]

Dr. Gartenstein-Ross further provides specific examples of these types of material support being provided by Defendants and Hezbollah to the Badr Organization, JAM and the Special Groups PBD, AAH, KH and SN, and identifies some of the individuals Iran used to implement and oversee its policy of providing material support to these groups for the specific purpose of attacking and killing Americans, such as the Plaintiffs.[338]

Dr. Gartenstein-Ross summarizes the overall effect of the foregoing and concludes:

- The Islamic Republic of Iran has an extensive history of using violent non-state actors as proxy groups to advance its foreign policy goals. Among other things, Iran has used these groups to launch attacks against U.S. forces in Iraq while retaining plausible deniability regarding Iranian involvement.

---

[333] *Id.,* p. 34.
[334] *Id.,* p. 39.
[335] *Id.,* p. 33.
[336] *Id.,* p. 32, 34, 39.
[337] *Id.,* p. 21, 45.
[338] *Id.,* pp. 25-40, 45-46.

- Following the 2003 U.S. invasion of Iraq, Iran provided substantial material support and resources to an array of Shia militant groups, including Badr Corps, Jaysh al-Mahdi, and Special Groups such as the Promised Day Brigade, Asa'ib Ahl al-Haq (AAH), and Kata'ib Hizballah. Iran's support to these groups took the form of training; funding; weapons; safe haven; travel and transportation; provision of expert knowledge and assistance in tactics, techniques, and procedures; and assistance in attack planning.

- The best available evidence indicates Shia militants needed Iranian support to obtain, assemble, and/or utilize certain weapons and munitions used by these groups in Iraq, including sophisticated explosively formed penetrators (EFPs) and improvised rocket assisted munitions (IRAMs). Shia militants also obtained Iranian support in obtaining and using rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations.

- Given the nature, duration, and magnitude of Iranian material support to these specific Shia militant groups, Iran's assistance was essential to the formation, growth, and survival of these organizations, and significantly increased their capabilities. As such, certain attacks in Iraq committed by these groups from, at least, 2003 to 2011, bear a reasonable connection to Iran's sponsorship and support.[339]

### D.   Defendants' Material Support of Sunni Terrorist Groups in Iraq

In addition to providing substantial and material support to the foregoing Shia groups, Defendants have for decades provided material support to Sunni terrorist groups that shared the goal of killing Americans, including the FTOs al Qaeda/al Qaeda in Iraq ("AQ/AQI") and Ansar al Islam ("AAI" a/k/a "AAS"), two Sunni groups responsible for several of the terrorist attacks at

---

[339] *Id.,* p. 46.

issue in this lawsuit. Iran's support to Sunni terror groups in Iraq, including to AQ/AQI and AAI, is a result of pragmatic decision-making by Iran. Although Iran (a Shia country) is ideologically at odds with Sunni groups, they share the common goal of attacking U.S. interests and expelling the U.S. from the region.[340] The U.S. District Court for the Southern District of New York recognized Iran's willingness to bridge the Sunni-Shia divide in its decision evaluating Iran's support to AQ and finding Iran liable, on the basis of that support (albeit indirect), for the 9/11 attacks. *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, *11-12 (S.D.N.Y. Dec. 22, 2011).

This willingness stems from the results of the Islamic Revolution in 1979, which created the world's first Shi'ite theocracy.[341] Iranians do not view themselves as solely a Shi'ite power, but rather as representative of all Muslims, regardless of sect.[342] The Islamic Republic's broader ideological goals and aims include animosity toward the United States, Israel, and the West, in general.[343] The Supreme Leader placed antipathy toward the U.S. and Israel as a cornerstone of his philosophy.[344]

Defendants' material support for AAI dates back to the Iran-Iraq war in the 1980s while its support for AQ generally (and, later, AQI) began in the 1990s. The material support included Defendants providing money, weapons, training, expert advice, safe passage, and safe haven. This is the same type of material support and resources Iran provided AQ, which AQ used to commit a

---

[340] *See* **PX282**, *The 9/11 Commission Report*, at pp. 61 ("The relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations… al Qaeda contacts with Iran continued in ensuing years."), *see also id.,* pp. 240-241.; *and* Gartenstein-Ross Sunni Decl., pp. 42-46.

[341] Rubin Decl., section H.

[342] *Id.*, ¶ 77.

[343] *Id.*

[344] *Id.*, ¶ 78.

number of terrorist attacks against Americans, including the U.S. embassy bombings in Kenya and Tanzania, the October 2000 suicide bombing attack on the USS Cole, and the 9/11 attacks. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011); *Flanagan*, 87 F. Supp. 3d 93; *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011).

### 1.      Al Qaeda ("AQ")

This section discusses the terrorist group al Qaeda ("AQ") that planned, committed and/or authorized a portion of the subject terrorist attacks, and Defendants' provision of material support to this group.[345]

Despite AQ's identity as a Sunni organization and Iran's Shia identity, Iran has provided significant material support to AQ and to its Iraq-based franchise AQI.[346] Iran's support to AQ began in the 1990s and continued through the 9/11 attacks.[347] Between 2001 and 2004, this support included not only AQ but the backing of the predecessor groups and individuals who would later go on to form AQI in 2004.[348] Iran continued to support AQ and AQI from that time through 2011, and still provides material support to AQ today.[349]

Iran's early support for AQ was managed by and through Hezbollah, at the behest of the IRGC and MOIS, allowing Iran to channel support for AQ in a covert manner.[350] During the 1990s, Iran's material support to AQ included training in explosives, suicide operations, intelligence

---

[345] The subject attacks involving AQ will be established in later stages of the case management plan.

[346] Gartenstein-Ross Sunni Decl., p. 61-64.

[347] *Id.*, pp. 42-46.

[348] *Id.*, p. 58.

[349] AQ is a designated Foreign Terrorist Organization, and has been since October 8, 1998.

[350] *Id.*, pp. 43, 45.

gathering, surveillance, and communications.[351] As noted in the *9/11 Commission Report*, much of this assistance was provided at Hezbollah training camps in Lebanon.[352] For instance, Hezbollah provided tactical support for bin Laden's 1983 bombing in Beirut of U.S. military barracks that killed 241 American service members.[353] AQ likewise used the tactical support and instruction provided by Hezbollah to carry out its 1998 bombings of American embassies in Africa.[354] Regarding the U.S. embassy bombings in Kenya and Tanzania, another court in this District found:

> Prior to their meetings with Iranian officials and agents, bin Laden and al-Qaeda did not possess the technical expertise required to carry out the embassy bombings in Nairobi and Dar es Salaam. The Iranian defendants, through Hezbollah, provided explosives training to bin Laden and al-Qaeda and rendered direct assistance to al-Qaeda operatives.

*Owens*, 826 F. Supp. 2d at 135.

Iran also provided support to AQ in the Arabian Peninsula.[355] Specifically, Iran helped transform AQ's influence in the region by serving as a transit route for AQ members to and from the Gulf.[356] The groundwork for this travel facilitation was laid in the mid-90s, when a senior AQ leader "negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan."[357] Pursuant to that relationship, Iran established "a series of guest houses for" AQ "fighters making the long journey" through Iranian

---

[351] *Id.*, pp. 16-17 (*citing* **PX35**, U.S. Department of the Treasury, "Fact Sheet: Abu Musa'ab al-Zarqawi," (September 23, 2003)).

[352] **PX282**, *The 9/11 Commission Report*, p. 68.

[353] Gartenstein-Ross Sunni Decl., p. 43.

[354] *Id.*, p. 45.

[355] *Id.*

[356] *Id.*

[357] **PX129** "Treasury Targets al Qaeda Operatives in Iraq," U.S. Dept. of Treasury, press release, Jan. 16, 2009.

territory. *Flanagan*, 87 F. Supp. 3d 93. In fact, during the late 90s and through 2000, Iran was a primary route for AQ members traveling between Afghanistan and Yemen.[358]

Iran, "through the provision of material support and resources (the financial support, support for training, and facilitation of travel) to Bin Laden and AQ facilitated the planning and execution of" the October 2000 suicide bombing attack on the USS Cole." *Flanagan*, 87 F. Supp. 3d at 115. In finding Iran legally responsible for the attack, the court in *Flanagan* determined "Iran took primary responsibility for transferring, via Lebanese Hizballah, extensive technical expertise to Al-Qaeda and other terrorist organizations." *Id*. at 117. The court further found AQ "used Iran as a 'transit point' for moving money and fighters." *Id*. Moreover, in the "years leading up to the Cole bombing, Iran was directly involved in establishing Al-Qaeda's Yemen network and supported training and logistics for Al-Qaeda in the Gulf region." *Id*.

The travel facilitation Iran provided to AQ helped it commit the 9/11 attacks. Several of the 9/11 Saudi hijackers passed through Iran *en route* to Afghanistan between October 2000 and February 2001.[359] Not only did Iran facilitate AQ's travel, Iran also directed border guards not to stamp the passports of the AQ operatives, thereby cloaking their movements.[360] Such actions not only aided AQ's  evasion of detection and capture, but also served to conceal Iran's support for AQ.[361] Federal courts have found this travel facilitation constituted direct material support to AQ and, therefore, held Iran liable for the 9/11 attacks, for example:

---

[358] Gartenstein-Ross Sunni Decl., p. 45 (*quoting Flanagan*, 87 F. Supp. 3d 93).
[359] **PX282**, *The 9/11 Commission Report*, p. 240; Gartenstein-Ross Sunni Decl., p. 46.
[360] Gartenstein-Ross Sunni Decl., p. 46.
[361] *Id*.

> [T]he Islamic Republic of Iran provided material support and resources to al Qaeda for acts of terrorism, including the extrajudicial killing of the victims of the September 11, 2001 attacks. The Islamic Republic of Iran provided material support or resources, within the meaning of 28 U.S.C. § 1605A, to al Qaeda generally. Such material support or resources took the form of, inter alia, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, *39 (S.D.N.Y. Dec. 22, 2011).

Iran's substantial support for AQ continued after the 9/11 attacks. A deal brokered with the IRGC-QF gave safe passage and sanctuary to hundreds of jihadists fleeing Afghanistan in the wake of the U.S.-led invasion to overthrow the Taliban.[362] In fact, General Qassem Soleimani, the former head of the IRGC-QF, took personal responsibility for helping bin Laden's family and senior AQ operatives flee from Afghanistan, and providing them sanctuary in Iran.[363] Iran's policy and practice of permitting AQ members entry into and shelter within Iran applied to foot soldiers and high-ranking members alike.[364] In late 2002 and early 2003, U.S. government officials held face-to-face discussions with Iranian officials demanding the regime deport AQ leaders to their countries of origin. Iran refused, but around the same time, MOIS took control of AQ members and their families."[365] Iran placed the prominent AQ leadership and their families in IRGC facilities under a relaxed "house arrest" that still permitted them freedom of movement, contact with each other, and the ability to communicate freely with AQ members across the globe.[366]

---

[362] *Id.*; *see also* **PX382** – Congressional Testimony of Brigadier General Anthony J. Tata, U.S. Army (Retired), Before the House Committee on Homeland Security, January 15, 2020.
[363] *Id.*, p. 47.
[364] *Id.*, pp. 46-47.
[365] **PX699**, Seth G. Jones, "Al Qaeda in Iran," *Foreign Affairs* (January 29, 2012).
[366] Gartenstein-Ross Sunni Decl., pp. 46-52.

This state-sanctioned safe haven in Iran was provided to many of AQ's highest-ranking members, including but not limited to, Saif al-Adl, Abu Muhammad al-Masri (a leading AQ figure who was involved in the 1998 East African embassy attacks), Abu Musab al-Suri (one of AQ's most influential strategic voices), Sa'ad and Hamza Bin Laden (Osama's sons), Abu Musab al-Zarqawi (the future leader of AQI), Atiyah Abd al-Rahman (a key AQ manager, responsible for maintaining communications between al-Adl in Iran and bin Laden in Pakistan), Thirwat Saleh Shihata (a former deputy to Zawahiri), and Muhammad Islambouli (an Egyptian fighter who was a prominent AQ member).[367] Iran provided similar safe haven to "hundreds" of other AQ members seeking refuge there, and to those it did not afford its protection it facilitated their travel to countries of their choosing, in some instances providing them with "special traveling papers" to facilitate their exit from Iran.[368]

While safely ensconced within Iran's borders, AQ operatives were permitted wide latitude in carrying out their roles for the militant organization. Saif al-Adl was "living freely in Shiraz when the United States invaded Iraq," and "he continued to play a key role in al-Qaeda's broader command structure."[369] Al-Adl's "captors clearly gave him leeway to remain a productive member of al-Qaeda's leadership" during this period. From his safe haven in Iran, al-Adl produced and disseminated the "master plan," a highly consequential strategic document that would be used to justify AQ's cooperation with Zarqawi and the group's expansion into Iraq.[370] Al-Adl's master

---

[367] *See id*., p. 47 (*citing* **PX906**, **PX907**, **PX224**, **PX130**); Adam Goldman, *Senior al-Qaeda Figure Leaves Iran Amid a Series of Departures by Terrorist Suspects*, The Washington Post (Feb. 14, 2014).

[368] *See* Rubin Decl., ¶ 113; and Gartenstein-Ross Sunni Decl., p. 47 (*citing* **PX906**, "Letter Dated 13 Oct 2010," released in Bin Laden's Bookshelf, Office of the Director of National Intelligence).

[369] Gartenstein-Ross Sunni Decl., p. 48 (*citing* Brian Fishman, The Master Plan: ISIS, al-Qaeda, and the Jihadi Strategy for Final Victory (New Haven, CT: Yale University Press, 2016)).

[370] *Id*.

plan is now considered one of the most consequential jihadist strategic documents ever produced. Additionally, after the U.S. entered Iraq, al-Adl drafted "detailed guidance to Iraqis on how to confront the United States militarily," including instructions on the specific type of vehicles to use in their operations.[371]  The fact that al-Adl was able to conceive, write, and distribute some of his most influential jihadist writings during his time in Iran is indicative of the latitude that Iran provided to him, and to other AQ leaders, as well as the substantial benefit that safe haven confers upon terrorists who receive it.

Moreover, Iran's provision of safe haven to AQ's core leadership perfectly supported the terrorist organization's structure and overarching leadership principle known as "centralization of decision and decentralization of execution."[372]  This leadership and command style allowed strategic targeting decisions to be made by AQ's core leaders inside Iran, but the planning and execution of attacks were undertaken by their members and affiliates in Iraq and elsewhere. AQ's leadership style was purposefully designed so that the organization could operate even when its senior leaders were physically separated from field operatives.[373] Safe haven provided by Iran not only played perfectly to this command tactic, allowing AQ to direct its cells in Iraq from afar, but totally protected the core AQ leadership from detection or capture by U.S. forces or others unwilling or unable to encroach Iran's borders.[374]

Iran's policy of facilitating travel through its territory allowed it to monitor and surveil AQ members—essentially keeping an eye on AQ to make sure it was not targeting Iranian interests.[375] This achieved the twin goals of maximizing the benefit AQ could provide to Iranian foreign policy

---

[371] *Id.*, p. 50.
[372] *Id.*
[373] *Id.*
[374] *Id.* (*citing* **PX631**, **PX224**, **PX699**).
[375] *Id.*, p. 47.

objectives while also staving off dangers the group might have otherwise posed to Iran.[376] In 2012,

a statement from the U.S. Treasury explained Iran's motive behind its decision to embrace AQ

within its borders, formally detailing a nonaggression pact between Iran and AQ. In the pact, AQ

promised to stop conducting operations on Iranian soil and keep Iranian authorities apprised of its

activities, and, in return, Iran provided AQ's freedom of movement and uninhibited travel.[377]  This

was a significant benefit to AQ, as it provided a secure base of operations for its senior leadership

and long term insulation from U.S. drone strikes.[378]

State-sponsored safe haven in Iran provided AQ with critical financial support as well. At

a time when AQ's monetary reserves were dwindling and being interdicted by post-9/11 banking

regulations, safe haven in Iran provided AQ with access to unrestricted banking services and

cash.[379] Documents obtained from bin Laden's compound in Pakistan, following his death in 2011,

included a letter written in 2007 by bin Laden highlighting Iran's critical role in AQ's operations:

***"Iran is our main artery for funds, personnel, and communication."[380]*** Another letter, written in

November 2008 by al-Zawahiri, who was then AQ's deputy emir and succeeded as the emir after

bin Laden's death, underscored AQ's reliance on Iran.[381] The letter was written in the aftermath

of AQ's September 2008 bombing of the U.S. embassy in Yemen, which killed a number of

civilians, including an American.[382] Zawahiri's letter cited Iran's "monetary and infrastructure

---

[376] *Id.*
[377] *Id.*, p. 54 (*citing* **PX127**, U.S. Department of the Treasury, press release, "Treasury Further Exposes Iran-Based Al-Qa'ida Network," October 18, 2012).
[378] *Id.*
[379] Rubin Decl., ¶ 117.
[380] *Id.*, p. 53 (*quoting* **PX911**-  "Letter to Karim," released in Bin Laden's Bookshelf, Office of the Director of National Intelligence).
[381] *Id.*, p. 54.
[382] *Id.*

assistance" as essential to the group's success in carrying out the attack.[383] He also thanked Iran for having the "vision" to help the organization establish bases of operations.[384]

In 2011, the U.S. Treasury Department formally accused Iran of forging an alliance with AQ and moving money and terrorist operatives to the organization's leadership in Afghanistan, Pakistan, and Iraq, with the money and operatives moving through Iran.[385]  Then-Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, underscored the benefits AQ reaped from Iran. Specifically, he stated "Iran's secret deal with al-Qa'ida" allowed the group "to funnel funds and operatives through" Iran's territory, which is "yet another aspect of Iran's unmatched support for terrorism."[386] Under Secretary Cohen further identified the deal between AQ and Iran as providing a "key network" and "much-needed support" to AQ's senior leadership.[387] In 2012, when the U.S. designated Iran's MOIS for its ongoing and systematic sponsorship of a variety of terrorist organizations, the U.S. listed AQI as a direct recipient of Iranian money and weapons.[388] Most recently, the U.S. Department of State, in the 2017 *Country Reports on Terrorism*, singled out Iran's ongoing support for AQ as a serious issue.[389]

---

[383] *Id*. (*quoting* **PX628**, Con Coughlin, "Iran Receives al Qaeda Praise for Role in Terrorist Attacks," The Telegraph, December 2, 2019).
[384] *Id*. (*quoting* Coughlin).
[385] Gartenstein-Ross Sunni Decl., pp. 53.
[386] *Id*., p. 54 (*quoting* **PX130**, U.S. Department of the Treasury, press release, "Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point," July 28, 2011).
[387] *Id*. (*quoting* **PX130**, Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point).
[388] *Id*., p. 61 (**PX68**, U.S. Department of the Treasury, press release, "Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism," February 16, 2012).
[389] **PX210**, Bureau of Counterterrorism and Countering Violent Extremism, Country Reports on Terrorism 2017 (Washington D.C.: U.S. Department of State, 2018), p. 218.

AQ's ability to operate from Iran was a strategic "boon" to the group.[390] After 9/11, AQ and its members were the focus of the largest global manhunt in history. In the aftermath of the 2001 attacks, all of Iraq's neighbors instituted a "zero-tolerance" approach to AQ cells within their territory. Thus, Iran provided the necessary territory from which AQ could infiltrate men and equipment into Iraq.[391] Documents captured in the 2011 raid on bin Laden's compound confirmed the strong, formal ties between Iran and AQ.[392] These documents included a 19-page document detailing negotiations between AQ and the IRGC and the funding and arming of AQ to support strikes against American targets in the Middle East.[393] Lower level AQ operatives initially hesitant to operate in Iran were assuaged to learn that, "…there's an organization that takes care of helping the mujahedin brothers cross the border. There's total collaboration with the Iranians."[394] This organization was the IRGC.[395]

In sum, Iran's provision of safe haven to the AQ core leadership saved the group from near total annihilation in Afghanistan by U.S. forces, and significantly bolstered its ability to plan, fundraise, recruit, resupply, and maintain the *espirit de corps* of the organization.[396] AQ's respite in Iran, under the ever-present eyes of the IRGC and MOIS, ensured AQ's ability to expand its reach into Iraq and oversee the killing and maiming of hundreds of U.S. soldiers at the hands of its affiliate, AQI.

---

[390] Rubin Decl., ¶ 114.

[391] *Id*.

[392] *Id*., p. 38; *see, e.g.*, **PX920**, "SOCOM-2012-0000011-HT: Letter from Unknown to Hafiz Sultan" (March 28, 2011); **PX921**, Letter from Osama Bin Laden to Sheikh Mahmud" (May 2010).

[393] *Id*.

[394] Rubin Decl., ¶ 115.

[395] *Id*.

[396] *See Id*., ¶¶ 113-119, 200.

### (a)   Summary of Defendants' Material Support to AQ

Defendants' material support to AQ began prior to 2003 and continued through 2011, as demonstrated by the expert declarations of Dr. Rubin and Dr. Gartenstein-Ross. Having reviewed the available evidence in this case, Dr. Gartenstein-Ross concludes that, despite its "Shia identity, Iran has at times provided significant material support to al-Qaeda, as well as to its al-Qaeda in Iraq (AQI) affiliate."[397] Prior to 2003, there existed an "informal understanding between Iran and al-Qaeda that they would coordinate politically and militarily to confront the United States"… and in performance of this agreement, "Iran made considerable use of Hizballah as a conduit for channeling covert support to al-Qaeda."[398] The "al-Qaeda-Hizballah relationship, stretching from 1992 through at least 2001, spanned multiple Iranian political administrations."[399] Along with Hezbollah, "[m]uch of Iran's support for al-Qaeda was rendered through its Ministry of Intelligence and Security (MOIS) and the IRGC."[400] With this material support, "Iran played a causal role [in AQ]… attacks" including by providing training, arming, tactical expertise, travel facilitation, safe haven to AQ.[401] AQ and its operatives used Iran as a "preferred route… as Tehran instructed its border guards not to stamp the passports of these operatives, effectively cloaking their movements. Among other things, neglecting to stamp the passports was an attempt by Iran to disguise its support for al-Qaeda."[402]

Dr. Gartenstein-Ross further concludes that Iran's support for AQ continued following the 9/11 attacks.[403] At that time, AQ "[f]ighters in the first wave fleeing Afghanistan were detained

---

[397] Gartenstein-Ross Sunni Decl., p. 42.
[398] *Id.,* p. 43.
[399] *Id.,* p. 46.
[400] *Id.,* p. 45.
[401] *Id.,* pp. 44-46.
[402] *Id.,* p. 46.
[403] *Id.*

but then deported to countries *of their choice* after being documented, with Iran issuing some of them special traveling papers to facilitate their exit."[404] Iran's harboring of AQ terrorists was discussed between the United States and Tehran, with the U.S. demanding that the AQ members be deported to their countries of origin…Iran refused, but around the same time MOIS took control of AQ members and their families."[405] Afterward, "Iran provided al-Qaeda operatives with wide latitude in carrying out their roles for the militant organization" while safely within Iranian borders.[406] By 2003, MOIS and the IRGC-Q were "deeply involved in supporting al Qaeda."[407] This included Iran continuing to allow recruits and senior leaders alike "access guest houses operated by Tehran" which "also directly supported the operations of al-Qaeda leaders and facilitators[.]"[408] Iran's support for AQ, particularly its provision of safe have, was later revealed to be the result of "an alliance with al-Qaeda to move money and recruits from the Persian Gulf to the group's leadership in Afghanistan, Pakistan, and Iraq, with these personnel and assets moving through Iran."[409]

Similarly, Dr. Rubin concludes, "The anti-American alliance between Iran and Al Qaeda is well-developed… [and that] early training by Iranian proxies, such as Hezbollah, and Iran's logistical support were critical to the group's early development and evolution."[410] "In subsequent years, senior Al Qaeda leaders remained under Iranian protection. Iran has provided refuge to 'hundreds' Al Qaeda members and the family members of core leaders like Bin Laden."[411]

---

[404] *Id.,* pp. 46-47 (emphasis added).
[405] *Id.,* p. 47.
[406] *Id.,* p. 53.
[407] *Id.,* p. 50.
[408] *Id.,* p. 52.
[409] *Id.,* p. 53.
[410] Rubin Decl., ¶¶ 91, 105.
[411] *Id.,* ¶ 54.

Dr. Rubin states that, "Al Qaeda's extensive administrative network in Iran and its multiple liaisons with Iranian authorities belie the notion that Iranian authorities are unaware of the group's actions,"[412] and "[i]n providing support to Al Qaeda and Hezbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives."[413]

Dr. Rubin further points out that, by harboring its senior leaders in Iran with the full knowledge of Tehran, "Al Qaeda, in effect, trusted Iran with its brain trust."[414] Dr. Rubin also contextualizes the significance of Iran's support to AQ over the last thirty years, in concluding that, "In short, behind Bin Laden, Iran was Al Qaeda's *longest and most generous supporter*. Senior Al Qaeda leaders both before and after Bin Laden's death, considered *Iran to be a crucial supporter of its efforts to target American personnel in Iraq*."[415] Due to the Iranian largesse showered upon AQ and the group's resulting ability to not just survive but to thrive, it is no surprise that Dr. Rubin further concludes, "The tight relationship between the Iranian government and Al Qaeda has continued."[416]

Taken together, Dr. Rubin and Dr. Gartenstein-Ross identify and detail a multitude of material support Iran gave to AQ that is summarized in the following categories:

**Expert knowledge, assistance and training** – including early training of AQ operatives to conduct mass casualty bombings and other related skills to shape al-Qaeda's future capacity to carry out attacks.[417]

---

[412] *Id.,* ¶ 59.
[413] *Id.,* ¶ 47.
[414] *Id.,* ¶ 51.
[415] *Id.,* ¶ 61 (emphasis added).
[416] *Id.,* ¶ 60.
[417] Gartenstein-Ross Sunni Decl., pp. 57; Rubin Decl., ¶¶ 91, 100, 104, 146, 158-159, 173-176.

**Safe haven** – for two decades, Tehran has been providing sanctuary and refuge to al-Qaeda operatives. After 9/11, this safe haven allowed AQ senior leadership to avoid capture, in addition to providing the organization with time and space to regroup, and to develop its ideological underpinnings and strategic plans (and disseminate the same).[418]

**Smuggling routes and services** – For AQ, Iran served as a critical transit point for moving funds, weapons, supplies, and personnel.[419]

**Travel facilitation** - Iranian provided travel facilitation and assistance to AQ members that often made a difference in helping AQ expand its influence into new countries. This also helped AQ move operatives avoid arrest, and when preparing large-scale attacks around the world.[420]

**Financial and infrastructure** - Iranian provided financial and infrastructure assistance to AQ, including banking and electronic communications, used to maintain organizational continuity, direct its regional affiliates, distribute resources and funds, establish new bases, and to plan, authorize and carry out attacks.[421]

Dr. Gartenstein-Ross further concludes these categories of material support were: "critical to the survival and growth" of AQ; prevented the capture or killing of its members, is "connected to the group's ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations;" and "significantly enhanced" and "significantly increased" AQ's ability to conduct operations in Iraq.[422]

---

[418] Gartenstein-Ross Sunni Decl., pp. 48-50, 57, 59-60; Rubin Decl., ¶¶ 116.

[419] Gartenstein-Ross Sunni Decl., pp. 45-46, 52, 57, 65; Rubin Decl., ¶¶ 113, 150, 160.

[420] Gartenstein-Ross Sunni Decl., pp. 45-46, 52, 57-58, 65; Rubin Decl., ¶¶ 91, 100, 102, 117-119, 175, 199, 200.

[421] Gartenstein-Ross Sunni Decl., pp. 58; Rubin Decl., ¶¶ 117-118, 151-153, 202, 204.

[422] Gartenstein-Ross Sunni Decl., pp. 57-58, 64-65.

Dr. Rubin further concludes: prior to 2003 IRGC and MOIS was cooperating with AQ to lay the groundwork for a terror campaign against the United States;[423] without Iran's support AQ would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq;[424] Iran's support to AQ' was equally vital to the group's ability to sustain itself after 2002, and facilitated the evolution of then-AQ affiliate Zarqawi to an AAI/AAS chief and then to the founding Emir of al Qaeda in Iraq (discussed further below);[425] The support of IRGC and MOIS to AQ included the provision of safe-haven, travel facilitation, logistics, funding, weapons, specialized training, expert assistance and intelligence, not only in Baghdad, but also in predominantly Sunni governorates. IRGC and MOIS's support to AQ was also significant and continuous, and afforded AQ the means to sustain and grow its operations, expand its influence and operational capacities, and increase its lethal effectiveness and sophistication as a violent extremist organization;[426] Further, Iran's support to AQ was essential to its cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and for its ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and civilians.[427] In short, without Iran's significant support, AQ would not have been the potent lethal threat it posed in Iraq from 2003 through 2011.[428]

---

[423] *Id.,* ¶ 196.
[424] *Id.,* ¶ 200.
[425] *Id.,* ¶ 201.
[426] *Id.,* ¶ 199.
[427] *Id.,* ¶ 204.
[428] *Id.,* ¶ 205.

2.      **The Zarqawi Organization & Al Qaeda in Iraq ("AQI")**

This section discusses the terrorist group al Qaeda in Iraq ("AQI"), which planned, committed and/or authorized a portion of the subject terrorist attacks, and Defendants' provision of material support to this group.[429]

AQI, designated by the U.S. as a FTO on December 17, 2004, was an iteration of the Sunni militant group sometimes referred to as the Zarqawi Organization, known as such because of its founding leader, Abu Musab al-Zarqawi.[430] The current iteration is the Islamic State, known commonly as ISIS.[431] Although the Zarqawi organization underwent various name changes over the years, at every step, the organization has remained essentially the same.[432]

Zarqawi, born in Jordan in 1966, traveled to Afghanistan where he met other jihadists, including fellow Jordanian Abu Muhammad al-Maqdisi.[433] While in Afghanistan, Zarqawi and Maqdisi started Bayat al-Imam.[434] This organization comprised a dozen men who engaged in terrorist attacks in and around Jordan.[435] Zarqawi was ultimately arrested, convicted of terrorism, and imprisoned.[436] His prison time was pivotal to his career as a militant; he developed a strong leadership style and cultivated a loyal following.[437]

In 1999, the King of Jordan granted amnesty to Jordanian prisoners, including Zarqawi, who returned to Afghanistan.[438] There he met with AQ's security chief, who facilitated AQ's

---

[429] The subject attacks committed by AQI will be established in later stages of the case management plan.

[430] Gartenstein-Ross Sunni Decl., p. 13.

[431] *Id.*

[432] *Id.*

[433] *Id.*, pp. 13-14.

[434] *Id.*, p. 14.

[435] *Id.*, p. 14-15.

[436] *Id.*

[437] *Id.*, p. 15.

[438] *Id.*

partnership with Zarqawi.[439] The benefit of the partnership from AQ's perspective was to enable AQ to gain a foothold in Jordan and Palestine.[440] With bin Laden's approval, Zarqawi established a military camp in Afghanistan, for which AQ provided funding and equipment.[441]

In 2001, Zarqawi enlisted a fellow Jordanian militant to expand his network into northern Iraq.[442] That new network of militants merged with AAI.[443] The U.S. invasion of Afghanistan in late 2001 forced Zarqawi and a number of his followers out of Afghanistan; they then, with the assistance of the IRGC-QF, moved through Iran and settled in northern Iraq, finding refuge with AAI.[444] From there, Iran allowed Zarqawi to establish new camps and safehouses for his operatives within Iran in Zahedan, Isfahan, and Tehran.[445] These facilities were used to send forged passports, money, and operational orders across the Middle East and into Europe, transforming Iran into a critical hub for Zarqawi's fast-growing militant network.[446] The organization's communications were channeled by satellite, cell phone, and landlines, and handled through middlemen – all with the IRGC's support.[447]

At this point, Zarqawi began to focus his organization's main operational efforts in Iraq.[448] The establishment of an Islamic state was a core goal of Zarqawi when he relocated to Iraq.[449] When the United States invaded Iraq, Zarqawi's organization, along with AAI, set forth in planning, committing and authorizing attacks against Coalition Forces.

---

[439] *Id.*
[440] *Id.*, pp. 15-16.
[441] *Id.*
[442] *Id.*, p. 18.
[443] *Id.*
[444] *Id.*
[445] *Id.*, p. 60.
[446] *Id.*
[447] *Id.*
[448] *Id.*
[449] *Id.*, p. 21.

By mid-2003, shortly after the U.S. invaded Iraq, U.S. intelligence officials were openly acknowledging and discussing Iran's support for AQ inside Iraq.[450] As one news report published in June 2003 noted, "American intelligence officials said that Iran's Ministry of Intelligence and Security and the Qods Division of the Islamic Revolutionary Guards Corps … are deeply involved in supporting terrorists, including al Qaeda."[451] The U.S. intelligence officials were specifically aware that the Iranian government was protecting senior AQ leaders like Zarqawi. *Id.*

In October 2004, Zarqawi pledged allegiance to bin Laden.[452] Zarqawi's organization thereafter became AQ's first official affiliate organization, which became known as AQ in Iraq.[453] Zarqawi's pledge both quelled prior perceptions that he intended to rival AQ and constituted a recruiting statement for the Iraqi insurgency.[454]

Iran had direct contact with AQI and provided financial and logistical assistance specifically for AQI's campaign of violence between 2003 and 2011.[455] During this time, and in support of the organizations' terror campaign, Zarqawi and his supporters enjoyed the permissive travel environment in Iran.[456] For instance, Muhammah Khalil al-Hakaymah a Zarqawi loyalist who would later rise to prominence within the AQ organization, was able to transit through Iran en route to Afghanistan after 9/11.[457] With the knowledge and assistance from the IRGC- QF, al-Hakaymah, "like so many Zarqawi supporters before him, he would travel across Iran."[458]

---

[450] *Id.*, p. 50.
[451] *Id.*, p. 50 fn. 269 (*quoting* "U.S. Says Iran Harbors al Qaeda Associate," *Washington Times*, June 10, 2003).
[452] *Id.*, p. 19.
[453] *Id.*
[454] *Id.*
[455] *Id.*, p. 58.
[456] *Id.*
[457] *Id.*, pp. 58-59.
[458] *Id.*, p. 58 ((*quoting* Brian Fishman, The Master Plan: ISIS, al-Qaeda, and the Jihadi Strategy for Final Victory Kindle ed. (New Haven, CT: Yale University Press, 2016), p. 21).

Even as AQI grew and sectarian tensions in Iraq were exacerbated as a result of the organization's ruthless attacks on Iraq's Shia population, Iran continued supporting AQI.[459] This was because Iran's greatest priority was destabilizing the American efforts in Iraq.[460] Iran funneled weapons and mines to Zarqawi strongholds in Fallujah and elsewhere in the Sunni-dominated Anbar Province.[461]

Zarqawi and AQI's ruthless tactics and targeting of civilians came at cost to them with the local Iraqi populace. In the fall of 2006, Iraq Sunni tribal leaders who had either joined AQI or resisted Coalition Force offers of assistance, renounced AQI and joined Coalition Forces in pushing the group out of their tribal area. In an April 9, 2010 interview, Sheikh Jassim al-Suwaydawi of the Albu-Souda tribe, who renounced allegiances with AQ after the battle of Sofia in 2006, stated that AQ and AQI were "terrorists that had been backed and paid by Iranian and Syrian intelligence for a special purpose: to prevent democracy from spreading in Iraq, which they were afraid would trickle down to other countries."[462] Following several battles against AQI, resulting in the deaths of his brother and three cousins, Sheik Jassim was offered a diya (blood money) of $1 billion Iraqi dinars, which he understood to have been supplied to AQI by Iran.[463]

Additional evidence of Iran's support to AQI emerged when two IRGC-QF operatives were arrested in Baghdad in December 2006.[464] According to U.S. defense officials, the operatives possessed "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational

---

[459] *Id.*, p. 60.

[460] *Id.*

[461] *Id.*, p. 60 (*citing* Bill Roggio, "Iran and al Qaeda in Iraq," The Long War Journal, January 6, 2007).

[462] Rubin Decl., ¶ 186 (*citing* Dr. William Knarr, et al., Al-Sahawa-The Awakening Vol. IV-A: Area of Operations Topeka, East Ramadi and the Shark Fins, Institute for Defense Analysis, p. B-4 – B-7 (August 2019)).

[463] *Id.*

[464] Gartenstein-Ross Sunni Decl., p. 61.

charts, telephone records and maps," and other sensitive intelligence information.[465] The operatives "had information about importing modern, specifically shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[466] The information gleaned from the two operatives showed "how the Quds Force [was] working with individuals affiliated with Al Qaeda in Iraq and Ansar al-Sunna."[467]

In 2008, a leading Sunni militant admitted Iran was providing money and weapons to AQI and facilitating the movement of AQI fighters across the Middle East and South Asia.[468] This admission was significant considering the source—a Kuwaiti national, Mubarak Mushakhas Sanad al-Bathali, who acted as one of AQ's principal fundraisers for years, and who was known to have sent money to AQI between 2003 and 2004.[469] Al-Bathali was added to the U.S. Treasury Department's list of Specially Designated Global Terrorists in July 2006.[470]

In 2014, General Raad Hamdani, the former commander of the 2nd Republican Guards Corps under Saddam Hussein, and Walid al-Obeidi, a Saddam-era Iraqi intelligence agent who had joined the Iraq Sunni insurgency were interviewed and described a mechanism of Iranian support for Sunni insurgent groups operating in Iraq, such as AQI. They confirmed that in the initial four or five years after the U.S. intervention in Iraq, shell companies in Al-Anbar (the primary area of operation for the Zarqawi Organization) would import electronics and other consumer goods supplied by IRGC-linked entities. These would be shipped to warehouses in

---

[465] *Id.* (*quoting* Sudarsan Raghavan & Robin Wright, "Iraq Expels 2 Iranians Detained by U.S.," Washington Post, December 30, 2006).
[466] *Id.* (*quoting* Raghvan & Wright).
[467] *Id.* (*quoting* Raghvan & Wright).
[468] *Id.*
[469] *Id.*
[470] *Id.* (*citing* **PX70**, U.S. Department of the Treasury, press release, "Treasury Designations Target Terrorist Facilitators," Dec. 7, 2006).

predominantly Sunni areas of Iraq along with invoices that would never be paid. Instead, the proceeds from the sales of such goods would be used to fund the groups attacking Americans in Al-Anbar while cannibalized products could provide electronic components for improvised explosive devices.[471]

In a 2021 interview, Gen. Hatem Abu Risha, advisor to the president of Iraq, and a key Iraqi figure in fighting the Zarqawi-led Sunni insurgency which erupted in Al Anbar in 2004, affirmed that his forces faced insurgents supported financially and supplied by Iran. He based his conclusion both on intercepts of supplies and interrogations of captured insurgents.[472]

AQI's reliance on foreign fighters and foreign largesse, coupled with its indiscriminate methods, continued to garner criticism from local Iraqis, who accused it of following a foreign agenda. AQI envisioned MSC as a way to rebrand, highlighting its local connections in an effort to regain the support of other Iraqi factions and the population.[473] On January 15, 2006, AQI deputy emir Abu Maysarah al-Iraqi announced the establishment of the Majlis Shura al-Mujahidin fi-l-Iraq (better known as the Mujahedin Shura Council, or MSC), an umbrella group composed of six Iraqi Sunni militant factions, the "brainchild" of and led by AQI.[474]

The MSC was a minor adaptation of AQI's existing strategy in response to the shifting political climate in Iraq and its formation exemplifies Zarqawi's strategy of rebranding and expanding his organization in an effort to gain greater support and legitimacy within the current insurgent landscape.[475] On June 7, 2006, Zarqawi was killed by Coalition Forces in a targeted

---

[471] Rubin Decl., ¶ 152.
[472] *Id.*, ¶ 153.
[473] Gartenstein-Ross Sunni Decl., pp. 20-21.
[474] *Id.*
[475] *Id.*

airstrike.[476] AQ's second-in-command, Ayman al-Zawahiri used his eulogy for the slain terrorist to reemphasize AQ's strategic priority of establishing an Islamic emirate.[477] Abu Ayyub al-Masri, an Egyptian who came to Iraq by way of Afghanistan, succeeded him. He continued to be an effective liaison between al Qaeda's senior leadership in Pakistan and al Qaeda in Iraq until his death in a 2010 U.S.-Iraq joint operation.[478] After Zawahiri's eulogy, Zarqawi organization members began to lay the groundwork and build support for the establishment of the Islamic State of Iraq.[479]

On October 15, 2006, the Majlis Shura al-Mujahidin fi-l-Iraq (better known as the Mujahedin Shura Council, or MSC) announced its establishment of the Islamic State of Iraq (ISI).[480] According to Saif al-Adl, author of the master plan, establishing an Islamic state was one of Zarqawi's core goals when he relocated to Iraq, and thus, ISI's formation advanced AQ and AQI's longstanding strategic objectives.[481]

While the AQI-led MSC absorbed more insurgent groups with the formation of ISI, it remained dominated by the Zarqawi organization, with its key leaders all being AQI members or affiliated with the group prior to ISI's formation.[482]

Though the Zarqawi organization had tried to mask its activities in Iraq under the pretense of an Iraqi-led insurgent coalition, many Sunni tribal leaders saw the organization as brutal, foreign in its conception, and forcibly imposing an oppressive form of the Islamic faith that was alien to

---

[476] Rubin Decl. ¶ 183.
[477] Gartenstein-Ross Sunni Decl., p. 21.
[478] Rubin Decl., ¶ 183.
[479] Gartenstein-Ross Sunni Decl., p. 21.
[480] *Id.*
[481] *Id.*
[482] *Id.*, pp. 22-23.

Iraq.[483] This was the genesis of what would popularly become known as the "Awakening" movement, which was instrumental in the weakening of the Zarqawi organization in the years to come. Nevertheless, AQ and AQI continued to benefit from Iran's support, these benefits would flow to the newly formed ISI through 2010.[484]

In April 2010, U.S. and Iraqi forces raided a safe house north of Baghdad and killed ISI leaders Abu Ayyub al-Masri and Abu Umar al-Baghdadi.[485] Around one month later, on May 16, 2010, ISI announced the selection of a new emir, Abu Bakr al-Baghdadi al-Husayni al-Qurashi, who would in a few years become the notorious leader of the Zarqawi Organization/ISI's next organizational mutation, ISIS.[486]

The value of AQ's strategic alliance with Iran and the importance of its Iran-based leadership and facilitation network became more apparent in 2014 as AQ's competition with now "breakaway erstwhile affiliate" ISIS deepened.[487] ISIS spokesman Abu Muhammad al-Adnani released a statement in May 2014 in which he "made a startling admission: Al Qaeda has ordered its fighters and branches to refrain from attacking the Iranian state in order to preserve the terror group's network in the country."[488] Al-Adnani confirmed that his group had been following the orders of AQ leadership in Iran to refrain from attacking Shia Muslims there, and he ended his statement, proclaiming, "***Let history record that Iran owes al Qaeda invaluably***."[489]

---

[483] *Id*., p. 27.

[484] *Id.*

[485] *Id.*

[486] *Id*.

[487] *Id*., p. 54.

[488] *Id*., at pp. 54-55 (*quoting* Bill Roggio, "'Iran Owes al Qaeda Invaluably,' ISIS Spokesman Says," Long War Journal, May 12, 2014.).

[489] *Id*., p. 55.

The Zarqawi Organization and AQI were responsible for some of the worst atrocities committed in Iraq[490] which spanned nearly a decade long wave of assassinations, hostage takings, and beheadings.[491]

### (a)   Summary of Defendants' Material Support to the Zarqawi Organization and AQI

Defendants' material support the Zarqawi Organization began prior to 2003, and continued through 2011, as that organization evolved to eventually become the Islamic State of Iraq. Dr. Rubin and Dr. Gartenstein-Ross discuss and identify the following the forms of material support Defendants provided to the Zarqawi Organization/AQI during the relevant time period, including: 1) safe haven; 2) transportation and travel facilitation; 3) false documentation; 4) lodging; 5) facilities; 6) weapons; 7) explosives; 8) personnel; 9) smuggling services; 10) money; 10) financial services; and 11) expert advice and assistance.

Dr. Gartenstein-Ross concludes, "Iran had contact with AQI and was willing to provide financial and logistical assistance specifically for its campaign of violence in Iraq between 2003 and 2011."[492] This included permitting the Zarqawi Organization/AQI to build camps and use safe houses within or near its territory, and that "Iran's permissiveness was an explicit and deliberate policy."[493] From its camps and bases within Iran, the Zarqawi Organization/AQI would "send forged passports, money and operational orders across the Middle East to Turkey and even into Europe, thus transforming Iran into a critical hub for [the] fast growing militant network."[494] Moreover, the Zarqawi Organization/AQI's "Communications were channeled by satellite, cell

---

[490] *Id.*, p. 13.
[491] *Id.*
[492] Gartenstein-Ross Sunni Decl., pp. 63.
[493] *Id.*, pp. 58-60.
[494] *Id.*, p. 60.

and land phones, and handled through middlemen with the IRGC's support."[495] Iran funneled the Zarqawi Organization/AQI's weapons and mines to its strongholds in Iraq, and permitted continuous use of its territory by the group's members for transit, as well as refuge at safe houses in Iran.[496] As it was so willing to do for its parent organization, AQ, Iran "harbored facilitators with links to AQI" within its borders and refused to detain or disrupt their efforts.[497] If and when Iran did ever detain AQI members, MOIS would "provide intermediary services to help secure the release of its imprisoned operatives."[498] Not only did MOIS provide these services but it also provided money and weaponry, and Iran would arm AQI and "facilitat[e] movement of its fighters across the Middle East and South Asia" with the apparent intent 'to deter the United States, in order for it not to give its entire attention to Iran.'"[499]

Likewise, Dr. Rubin's review of the case materials caused him to conclude Iran permitted the leaders of the Zarqawi Organization/AQI to knowingly use its territory to plan far reaching attacks.[500] In 2003, when confronted by the United States about AQ and Zarqawi Organization/AQI members operating in Iran and suspected of being involved in cross-border operations, Tehran continued to reject intelligence sharing and coordination with the United States.[501] The Zarqawi Organization likely used known smuggling routes from Syria to move weapons and personnel into Iraq from staging areas and stockpiles supplied by Iran there.[502] Once in Iraq, the Zarqawi Organization/AQI used Iranian support to establish strongholds in the Anbar

---

[495] *Id.*
[496] *Id.*
[497] *Id.*
[498] *Id.*, p. 61.
[499] *Id.*
[500] Rubin Decl., ¶ 175.
[501] *Id.*, ¶ 179.
[502] *Id.*, ¶¶ 150, 176-177.

and Nineveh provinces, inciting sectarian bloodshed.[503] Moreover, the Zarqawi Organization/AQI's ability to kidnap foreigners in both Sunni and Shi'ite-dominated regions suggested an ability to coordinate and de-conflict if not cooperate with Shi'ite militias, and used money from Iran to pay its blood debts to local Iraqis.[504]

Taken together, Dr. Rubin and Dr. Gartenstein-Ross identify and detail a multitude of material support Iran gave to the Zarqawi Organization/AQI that is summarized in the following categories:

**Weapons** – including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations. Provided by IRGC-QF and MOIS.[505]

**Financing** – Including funds provided by MOIS, and the use of IRGC-QF front companies to launder money and goods to finance and supply cells in Iraq with IED components, and pay AQI's debts.[506]

**Safe Haven** – In Iran, for bases, camps and critically important Zarqawi organization leaders and enabling these individuals to carry out tasks and duties for the Zarqawi organization from within Iranian borders. As well as for rank-and-file members seeking refuge/resupply in or travel through, Iran. And from which communications to and from senior AQ leaders would flow.[507]

**Smuggling routes and services** – Established and maintained by Iran, into northern Iraq from Syria and Iran. Used to move fighters, weapons and funds from or through Iran into Iraq.[508]

---

[503] *Id.*, ¶ 181.
[504] *Id.,* ¶¶ 181, 186.
[505] Gartenstein-Ross Sunni Decl., pp. 63-65; Rubin Decl., ¶¶ 143, 146, 152.
[506] Gartenstein-Ross Sunni Decl., pp. 61, 64; Rubin Decl., ¶¶ 152, 186.
[507] Gartenstein-Ross Sunni Decl., pp. 61-64; Rubin Decl., ¶¶ 152, 176, 179, 182.
[508] Gartenstein-Ross Sunni Decl., pp. 60-61, 63-64; Rubin Decl., ¶¶ 152; 184; 186.

**Travel facilitation** – used by Zarqawi organization leaders, facilitators, and fighters to help expand the organization's reach, moving fighters through the region, including into and out of Iraq, with Iran's assistance.[509]

**Intermediary services** – MOIS provided negotiations and mediations between the Zarqawi Organization/AQI and Iran when its members would be detained, and facilitated their release.[510]

Dr. Gartenstein-Ross further concludes these categories of material support, "helped the Zarqawi organization to become a lethal and formidable insurgent force."[511] Moreover, "Iranian material support was critical for the Zarqawi organization to function as an insurgent group in Iraq… [and] the Zarqawi organization required weapons, money, safe haven, popular support, and senior leader guidance. Tehran ultimately either provided or otherwise empowered the Zarqawi organization to obtain all of these various needs."[512] Dr. Gartenstein-Ross also confirms that this support was "critical to the survival and growth" of the Zarqawi Organization/AQI; prevented the capture or killing of its members, is "connected to these groups' ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations;" and "significantly enhanced" and "significantly increased" the Zarqawi Organization/AQI's ability to conduct operations in Iraq.[513]

Dr. Rubin further concludes: "the Iranian regime worked directly and indirectly with the founding members and leaders of Al Qaeda in Iraq, and facilitated the group's operations which

[509] Gartenstein-Ross Sunni Decl., pp. 60, 64; Rubin Decl., ¶¶150, 176-177, 175, 179.
[510] Gartenstein-Ross Sunni Decl., pp. 61, 64.
[511] Gartenstein-Ross Sunni Decl., pp. 63.
[512] *Id.*
[513] *Id.,* pp. 63-64.

targeted, wounded, and killed U.S. forces in Iraq. Al Qaeda in Iraq simply would not have been able to maintain its existence, pace or the lethality of its attacks absent this Iranian assistance;" Iran's material support to the Zarqawi Organization/AQI also inured to the benefit of other Sunni terrorist cell members of the Mujahedeen Shura Council.[514] Prior to 2003, IRGC and MOIS were cooperating with Zarqawi to lay the groundwork for a terror campaign against the United States.[515] Without Iran's support the Zarqawi Organization/AQI would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq.[516] Iran's support to the Zarqawi Organization/AQI was equally vital to its ability to flourish after 2003, and that same material support facilitated the evolution of Zarqawi from an AAI/AAS chief to the founding Emir of al Qaeda in Iraq.[517] IRGC and MOIS's support to the Zarqawi Organization/AQI included the provision this material support, not only in Baghdad, but also in predominantly Sunni governorates throughout Iraq. Iran's material support to the Zarqawi Organization/AQI was significant and continuous, and afforded the Zarqawi Organization/AQI the means to sustain and grow its operations, expand its influence and operational capacities, and increase its lethal effectiveness and sophistication as a violent extremist organization.[518] Iran's support to the Zarqawi Organization/AQI was essential to its cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and for its ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and

---

[514] Rubin Decl., ¶¶ 178, 190-195.
[515] Id., ¶ 196.
[516] Id., ¶ 200.
[517] Id., ¶ 201.
[518] Id., ¶ 199.

civilians.[519] Finally, without Iran's significant support, the Zarqawi Organization/AQI would not have been the potent lethal threat it posed in Iraq from 2003 through 2011.[520]

###### 3. Ansar al Islam ("AAI") a/k/a Ansar al Sunna ("AAS")

This section discusses the terrorist group Ansar al Islam ("AAI") (also known as Ansar al Sunna, "AAS") that planned, committed or authorized a portion of the subject terrorist attacks, and Defendants' provision of material support to this group.[521]

AAI, a Sunni terrorist organization, emerged from a conglomeration of several smaller Kurdish Sunni extremist groups based in Iraq's Kurdistan region.[522] The group has been designated by the U.S. as a FTO since March 22, 2004.[523] The roots of the organization stretch back to 1987 with the founding of Iraq's Islamic Movement in Kurdistan ("IMK") by Othman Abdul Aziz.[524] In 1984, Aziz fled the persecution of Saddam Hussein's regime and sought sanctuary in Iran.[525]

During the Iran-Iraq war (1980-1988), Iran funded a variety of Iraqi Kurdish groups with the goal of inciting domestic unrest and forcing Hussein to fight a two-front war.[526] With funding from Iran, and supported by the IRGC, Aziz returned to Iraqi Kurdistan in 1987 to lead the newly formed IMK.[527] In addition to the IRGC, IMK was also supported by Iran's MOIS.[528] Indeed, IMK forces fought alongside Iranian forces during the Val Fajr-10 offensive in 1988.[529] Under Aziz's

---

[519] *Id.*, ¶ 204.
[520] *Id.*, ¶ 205.
[521] The subject attacks committed by AAI will be established in later stages of the case management plan.
[522] Gartenstein-Ross Sunni Decl. p. 27.
[523] **PX22**, United States Department of State, Foreign Terrorist Organizations.
[524] Gartenstein-Ross Sunni Decl., p. 27.
[525] *Id.*, pp. 27-28.
[526] *Id.*
[527] *Id.*
[528] *Id.*
[529] *Id.*

leadership, IMK promoted the idea of jihad against Saddam Hussein and viewed the Ba'athist government as an infidel regime occupying Islamic lands in Kurdistan.[530] During this time, Iraqi Kurdish Islamists began establishing ties with AQ.[531] With financial backing and military training provided by Iran, IMK was able to expand its influence and increase its militant activities.[532]

IMK eventually separated from other Kurdish groups in Iraq and became the target of a large-scale military campaign by secular Kurdish groups, which forced the majority of IMK members to flee to Iran.[533] In 1996, Iran pressured those Kurdish groups to cede control of the Halabja-Howraman region to the IMK, resulting in a truce.[534] This truce alienated many of IMK's more extreme Islamist members.[535] In December 2001, after a series of reconciliations and reorganizations under various names, the splinter groups of IMK merged with other Islamist groups to form AAI.[536] The new organization was led by former IMK member Mullah Krekar.[537] Krekar had studied under Abdullah Azzam, Usama bin Laden's mentor, and considered AQ's leader "a jewel in the crown of Islam."[538]

Once the group formed, members of AAI who had trained alongside AQ in Afghanistan then began to further develop the group's ties with AQ.[539] As the U.S. Treasury revealed when designating AAI in 2003, "AAI came into being with the blessing of bin Laden after its leaders visited al-Qa'ida in Afghanistan in 2000 and 2001. Bin Laden provided AAI with an estimated

---

[530] *Id.*

[531] *Id.*

[532] Gartenstein-Ross Sunni Decl., pp. 27-30.

[533] *Id.*, p. 29.

[534] *Id.*, p. 30.

[535] *Id.*

[536] *Id.*

[537] *Id.*, pp. 31-32.

[538] *Id.*, p. 30.

[539] *Id.*, p. 31.

$300,000 to $600,000 in seed money."[540] According to former high-ranking members of AAI, bin Laden regularly provided the group with installments of $10,000 via courier from 2001 to 2003.[541] Interviews with captured members of AAI have corroborated these financing claims.[542]

AQ leaders considered its alliance with AAI as an opportunity to expand their foothold in the Middle East, and to that effect, AQ provided resources, training, and guidance to the group, enabling it to first carve out a miniature Islamic state in the Halabjah area in eastern Iraq, less than 5 miles from the Iranian border. From there, Ansar al-Islam, with the support provided by al-Qaeda and Iran built out its operations base further by incorporating underground Sunni extremist networks in Iraq's northern Nineveh Province.[543]

After fleeing Afghanistan and regrouping in Iran, Abu Mussab al-Zarqawi (prior to his founding of AQI) was provided refuge with AAI in Iraqi Kurdistan, thereafter establishing himself as a dominant presence within AAI. Zarqawi received the group's blessing to establish two bases for his organization (then-named Jamaat al-Tawhid wa-l-Jihad ("JTJ")) at Dar Ghayish Khan and Sarghat, the latter being less than 3 miles from the Iranian border.[544]

In 2002, AAI renewed its operations against the Kurdish army PUK, and AAI's ability to sustain its campaign of violence against secular Kurds in Iraq was due, in part, to support from Iran.[545] In particular, AAI used the safe haven of Iran to maintain its military-grade supplies, and

---

[540] **PX39**, U.S. Dep't of Treasury, Treasury Department Statement Regarding the Designation of Ansar al-Islam (Feb. 20, 2003).
[541] Gartenstein-Ross Sunni Decl., p. 31.
[542] *Id.*
[543] **PX241**, The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), at pg. 47-48.
[544] Gartenstein-Ross Sunni Decl., pp. 31-32 (*citing* **PX241**).
[545] *Id.*, pp. 32-33.

received funds from Iran who used the group as a means of leverage with Kurdish secular parties.[546]

In early 2003, with the prospect of U.S. Forces entering Iraq, JTJ and AAI congregated at Dar Ghayish Khan, finding the location ideal due to its remoteness. Members of AQ joined them there.[547]

Coalition military actions against AAI began on March 21, 2003, with missile strikes against villages in the AAI northern Iraq enclave.[548] Code-named "Operation Viking Hammer" and involving Coalition Special Forces along with coalition-aligned Kurdish Peshmerga units, the strike was intended to address the threat of AAI to the safety and stability of Iraq. AAI suffered enormous casualties, such that the operation appeared so decisive that CF commanders, at the time, considered the group "destroyed." Intelligence exploitation of the identifications and documents on many of the dead AAI fighters "revealed a melting pot of fighters from all over the Arab world, with troves of documents linking Al-Islam to Al-Qaida, Hezbollah and Hamas."[549] While a number of AAI members were killed in the operation, in fact, 700 or so had escaped to Iran.[550] The IRGC facilitated this escape of AAI members into Iran, provided medical treatment to injured AAI members, and provided fake identification cards to those who desired to return to Iraq.[551]

From Iran, AAI worked with local Iranian smugglers to facilitate the movement of members seeking to return to Iraq.[552] By summer 2003, "Signs emerged that AAI having survived

---

[546] *Id*. p. 33 (*citing* **PX39**).
[547] *Id*.
[548] *Id*., p. 33.
[549] *Id*., pp. 33-34 (*quoting* Mike Perry, "Operation Viking Hammer," SOFREP – Military, Foreign Policy and Defense News (May 20, 2012)).
[550] *Id*., pp. 34-35.
[551] *Id*.
[552] *Id*., p. 35.

the coalition's attack on it in early April, was beginning to reestablish itself in northern Iraq with support from al-Qaeda."[553]  In short order, AAI re-established its network of safe houses and other logistics operations for foreign fighters inside Iraq. AAI members who escaped the Coalition operations in March/April 2003 were able to use that network to regroup and broaden their appeal to Iraqis beyond its eastern enclaves in Iraqi Kurdistan with assistance from Zarqawi. It was determined that AAI had relationships with Islamist foreign fighters numbering in the hundreds, expanding beyond northern Iraq and into Fallujah, Tikrit, Bayji, and Baghdad. AAI's ties to AQ, influenced the group to develop a cell-based structure similar to AQ's, each of which was organized into small units of 10 to 15 members led by an emir or commander. "As in al-Qaeda, only a small handful of people in the entire organization were aware of or connected to, multiple cells, making the organization more difficult to destroy. As the group's membership grew, it reorganized some of its members and cells into battalions consisting of both Iraqi nationals and foreign fighters from al-Qaeda" seeking to attack CF and disrupt the effort to establish a democratic government in Iraq.[554] The preferred method of attack for the re-organized AAI was suicide bombings. Around April 2003, AAI leadership announced on their website that, "300 jihad martyrs" had "renewed their pledge to Allah . . . in order to be suicide bombers in the victory of Allah's religion," indicating that plans for suicide attacks were underway.[555]

As AAI's areas of operation spread across Iraq, Coalition Force leaders discovered that the Sunni terrorist groups and Shia Special Groups were operating in tandem. This included exchanging weapons and personnel, as well as issuing joint statements and propaganda urging

---

[553] **PX241**, The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 155.
[554] *Id.*
[555] *Id.*, p. 175.

Iraqi's to pick up arms against Coalition Forces or warning them to avoid areas and roadways where the groups intended to attack U.S. targets.[556]

In late 2003, the AAI leadership announced the establishment of Ansar al-Sunna as the group's national organization.[557] Following the announcement, attacks conducted by AAI members were claimed under the name Ansar al-Sunna, as the two groups became essentially one and the same within Iraq.[558] In February 2004, AAI/AAS released videos claiming responsibility for 285 attacks since October 2003.[559]

In early 2004, Kurdish leaders, including those who met directly with Iranian consuls, and Iraqi/Kurd news sources, routinely reported that Iran (through MOIS) was providing training to AAS/AAI and AQ members, similar to what it offered Iran's Shia Special Groups, in training camps along the Iranian border in the Hamrin mountain region and near the city of Mariwan in Iran.[560]

Abu Musab al-Zarqawi, who at this time had departed AAS/AAI to transform his organization into AQI concentrated his operations in western Iraq's al-Anbar Province. In response, Coalition Forces focused its operations there, finally pressuring AQI out of Fallujah in November 2004 with Operation Al Fajr. Many JTJ/AQI fighters sought refuge in and around Mosul, teaming up with the well-established AAS/AAI cells there.[561] In November 2004, a dozen Sunni insurgent groups, including AAI/AAS and AQI, signed a joint statement pledging to

---

[556] *Id.*, p. 293. *See also*: Interview with AAS Leader Abu Abdalah al Hasan bin Mahmud, Al-Muharrir, reported in *Iran Report: September 13, 2004*, RadioFreeEurope (Sept. 13, 2004).
[557] Gartenstein-Ross Sunni Decl., p. 36.
[558] *Id.*
[559] *Id.*, p. 37.
[560] **PX673**, Lydia Khalil, *The Hidden Hand of Iran in the Resurgence of Ansar Al-Islam*, Terrorism Monitor 5:11 (June 7, 2007).
[561] William G. Robertson, Ed., *In Contact: Case Studies from the Long War, 35* (2006).

continue attacking Coalition Forces.[562] On 10 November 2004, a mere two days after U.S. troops began their operation in Fallujah, AQI and AAS/AAI members conducted a coordinated attack on Mosul, taking advantage of the Coalition's smaller presence there. The attack led to the swift collapse of Mosul's government security forces within 24 hours.[563] By December 2004, AAS/AAI controlled insurgent activity in Mosul and maintained its strong alliance with AQI throughout northern and western Iraq.

The comingling of fighters between AQI and AAS/AAI not only made sense to the groups as a force-multiplying strategy but also a financial one; the starting salary for an AQI fighter ranged from $190 to $1,000 per month whereas AAS/AAI paid $250 per month. AQI also funded bonuses: $200 for a successful IED attack, $500 to $700 for destroying a High Mobility Multi-Purpose Wheeled Vehicle (HMMWV), and $7,000 for shooting down a helicopter.[564] Due to the sheer number of attacks being committed by these groups vast sums of money were required, and the fact that AAI/AAS and AQI's joint campaign of terror continued for years indicates that they were capable of honoring their payment obligations.

During 2004-2005, AAI/AAS' attacks took place in northern and central Iraq.[565] In early 2006, U.S. military intelligence officials described AQI, AAI, and AAS as "three interconnected groups [that] are the most powerful actors in the Iraqi insurgency."[566] By then, Iran was helping

---

[562] Gartenstein-Ross Sunni Decl., p. 38.
[563] **PX241**, The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), at pg. 351-352.
[564] **PX241**, The U.S. Army in the Iraq War Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), at pg. 603-604.
[565] Gartenstein-Ross Sunni Decl., pp. 35-36, 38-39.
[566] Gartenstein-Ross Sunni Decl., p. 39 (*quoting* **PX237** Home Office Immigration and Nationality Directorate, *Operational Guidance Note: Iraq (*January 12, 2006)).

AAI/AAS recruit fighters by paying monthly salaries of $1,500 in exchange for submitting to ideological and military training.[567]

AAI's continued existence after March 2003 rests entirely with Iran's material support, and AAI would not have been able to carry out subsequent terror attacks in Iraq without Iran's ongoing support.[568] After AAI's revival (due to Iran's support), it began recruiting Iraqi military and security personnel to conduct attacks in return for cash payments, and also recruited suicide bombers.[569] AAI became known for its well-timed, well-planned, and precise attacks, along with its highly developed and sophisticated ambush techniques utilizing IEDs and suicide attacks.[570]

Iran also provided safe haven for AAS in exchange for their willingness to fight alongside members of the IRGC against a Kurdistan militant group in Iran.[571] This safe haven was critical, as there were few other places AAI could go.[572] Most Middle Eastern governments refused to have any association with AAI/AAS.[573] Had Iran taken a zero-tolerance approach to AAI, it could have potentially eradicated the group entirely.[574] Instead, by allowing AAI safe haven, AAI was able to regroup on Iranian territory, expand its operations, develop more lethal tactics, and subsequently kill numerous American soldiers in Iraq.[575]

---

[567] *Id*., p. 40 (*citing* **PX606**).
[568] Rubin Decl., ¶ 101 (*quoting* to *Radical Islam in Iraqi Kurdistan: The Mouse that Roared?*, International Crisis Group (February 7, 2003)) (In a 2003 report, for example, the International Crisis Group found it "indisputable" "that the group could not survive without the support of powerful factions in neighboring Iran, its sole lifeline to the outside world.").
[569] Gartenstein-Ross Sunni Decl. p. 35.
[570] *Id*., p. 36 (*quoting* Home Office Immigration and Nationality Directorate, Operational Guidance Note: Iraq (January 12, 2006)).
[571] *Id*., p. 41.
[572] Piatetsky Decl., ¶ 237.
[573] *Id*., ¶ 238.
[574] *Id*., ¶ 246.
[575] *Id*.

### (a)  Summary of Defendants' Material Support to AAI/AAS

Defendants' material support to AAI/AAS spanning 2003 through 2011 is evidenced by Dr. Michael Rubin's and Dr. Daveed Gartenstein-Ross's expert declarations attached hereto. They discuss and identify the following categories of material support Defendants provided to AAI/AAS during the relevant time period, including: 1) safe haven;[576] 2) transportation and travel facilitation; 3) false documentation; 4) lodging; 5) facilities; 6) weapons; 7) explosives; 8) personnel; 9) smuggling services; 10) money; 10) financial services; and 11) expert advice and assistance.

In sum, the material support Iran gave to AAI/AAS can be summarized by the following categories:

**Operational support** - Iran bolstered AAI/AAS as a fighting and terrorist force. AAI/AAS's ability to sustain its operations was due to significant external support from Iran. This support came in the form of military supplies and serving as a transit point for militants.[577] Moreover, IRGC operatives captured in Iraq were found in possession of contact information for AAS/AAI members, and Iran purposefully did not intervene in the group's operations within Iran.

**Safe haven** - Iran provided safe haven to AAI/AAS members, and the IRGC facilitated the escape of these leaders and provided refuge for them inside Iran in 2003, ensuring the survival of AAI/AAS as a coherent organization. Iran's provision of safe haven to AAI/AAS continued for years. Iran arranged a quid pro quo with AAI/AAS in 2008 in which AAI/AAS fought alongside members of the IRGC for continued safe haven in Iran. This bolstered the full range of its capabilities, and enhanced AAI/AAS's ability to conduct operations in Iraq.[578]

---

[576] Gartenstein-Ross Sunni Decl., pp. 41-42.

[577] Gartenstein-Ross Sunni Decl., at pp. 30-32, 41; Rubin Decl., ¶¶ 160-162; 168; 170-172.

[578] Gartenstein-Ross Sunni Decl., pp. 31, 33, 41-42; Rubin Decl., ¶¶ 168.

**Travel facilitation** - Iran provided travel facilitation to AAI/AAS in multiple ways. These included allowing fighters to pass through the Iran-Iraq border, providing them with fake identification cards and coordinating the movement of AAI/AAS fighters with local smugglers, further allowing AAI/AAS to smuggle goods, money, and personnel to its areas of operation in Iraq.[579]

**Personnel** – Iran not only allowed AAI/AAS fighters to regroup and return to Iran in late 2003-2004, it further actively aided AAI/AAS's recruitment during a period of the group's weakness in 2006, when Iran paid AAI/AAS members monthly salaries of $1,500, which bolstered AAI/AAS's operations in Iraq. AAS/AAI also exchanged personnel with JAM.[580]

**Financing** – Along with paying the salaries of its members, AAI/AAS's sustained operations after 2003, Iran's support to AQ/AQI financial facilitation networks inured to the benefit of AAI/AAS. Further, allowing AAI/AAS access to Iranian smuggling routes facilitated the group's movement of funds in the region.[581]

**Smuggling routes and services** – As stated above, Iran's safe haven and travel facilitation involved the use of the IRGC in connecting and coordinating with AAI/AAS and Iranian smuggling networks, provision of false documents for passage across borders, and Iranian territory as a transit route for its members.[582]

Having reviewed the available evidence in this case, Dr. Gartenstein-Ross further concludes that Defendants' material support was: "critical to AAI/AAS's survival and growth as an organization;" "bolstered" its ability to move freely, access money, weapons and supplies;

---

[579] Gartenstein-Ross Sunni Decl., pp. 28, 33, 35, 42; Rubin Decl., ¶¶ 160-162.
[580] Gartenstein-Ross Sunni Decl., pp. 34-36, 40, 42; Rubin Decl., ¶ 169.
[581] Gartenstein-Ross Sunni Decl., pp. 32, 40-41.
[582] Gartenstein-Ross Decl., at pp 35, 41-42; Rubin Decl., ¶¶ 160-162.

increased and replenished its ranks; prevented the capture or killing of its members, "connected to these groups' ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations;" and "significantly enhanced" and "significantly increased" AAI/AAS's ability to conduct operations in Iraq.[583]

Based upon his review of the materials, Dr. Rubin further concludes that: safe haven in Iran allowed AAI/AAS to re-group and re-emerge in Iraq to effectively attack Coalition forces for years afterwards;[584] Iranian ties with AAI/AAS were not passive but rather Iranian officials facilitated and supported the AAI/AAS's attacks on U.S. personnel;[585] AAI/AAS worked operationally in tandem at times with JAM and the Special Groups;[586] The IRGC-QF and AAI/AAS maintained an operational relationship;[587] Iran's material support to AAI/AAS also inured to the benefit of other Sunni terrorist cell members of the Mujahedeen Shura Council;[588] prior to 2003, IRGC and MOIS were cooperating with AAI to lay the groundwork for a terror campaign against the United States;[589] without Iran's support AAI/AAS would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq;[590] Iran's support to AAI/AAS and Zarqawi was equally vital to their ability to flourish after 2003 and up through the evolution of Zarqawi from an AAI/AAS chief to the founding Emir of al Qaeda in Iraq;[591] IRGC and MOIS's support to AAI/AAS included the

---

[583] *Id.*, pp. 41-42, 64-65.
[584] Rubin Decl., ¶ 101.
[585] *Id.*, ¶ 164.
[586] *Id.*, ¶ 169-170.
[587] *Id.*, ¶ 170-172.
[588] *Id.*, ¶ 178, 190-195.
[589] *Id.*, ¶ 196.
[590] *Id.*, ¶ 200.
[591] *Id.*, ¶ 201.

provision of safe-haven, travel facilitation, logistics, funding, weapons, specialized training, expert assistance and intelligence, not only in Baghdad, but also in predominantly Sunni governorates; IRGC and MOIS's support to AAI/AAS was significant and continuous, and afforded AAI/AAS the means to sustain and grow its operations, expand its influence and operational capacities, and increased its lethal effectiveness and sophistication as a violent extremist organization;[592] Iran's support to AAI/AAS was essential to its cooperation, leadership structure, organizational infrastructure, financial solvency, recruitment and growth, and for its ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and civilians;[593] and without Iran's significant support, AAI/AAS would not have been the potent lethal threat that it posed in Iraq from 2003 through 2011.[594]

### 4.    Summary of Iran's Material Support for these Sunni Groups

Overall, Dr. Gartenstein-Ross summarizes the material support Iran provided to the subject Sunni groups as follows:

- "While Iran has provided substantial support to Shia proxy groups throughout the Middle East, the Islamic Republic has also backed Sunni militant groups, including al-Qaeda, the Zarqawi organization (aka al-Qaeda in Iraq), and Ansar al-Islam/Ansar al-Sunnah, when such support aligned with Iran's state interests."[595]

- "Iran provided substantial support to al-Qaeda, the Zarqawi organization, and Ansar al-Islam/Ansar al-Sunnah, in the form of training, financial support, weapons, safe haven,

---

[592] *Id.*, ¶ 199.
[593] *Id.*, ¶ 204.
[594] *Id.*, ¶ 205.
[595] Gartenstein-Ross Sunni Decl., p. 64.

lodging, travel and transportation, and expert knowledge and assistance in tactics, techniques, procedures, and attack planning."[596]

- "The best available evidence indicates that Sunni militants needed Iranian support to establish safe havens, routes of communication, and travel and supply routes." Iranian support was also "connected to these groups' ability to obtain, assemble, and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations."[597]

- "Given the nature and extent of Iranian material support to al-Qaeda, the Zarqawi organization, and Ansar al-Islam/Ansar al-Sunnah, Iran's assistance was critical to the survival and growth of these militant organizations, and significantly increased their capabilities," including to commit attacks in Iraq from 2003 to 2011."[598]

Dr. Rubin summarizes the material support Defendants provided to the subject Sunni groups as follows:

- The Islamic Republic of Iran is a designated state sponsor of terrorism that supported multiple foreign terrorist organizations who operated in Iraq and attacked American and Iraqi nationals during the 2003 to 2011 timeframe.

- The Islamic Republic of Iran justified its intervention in Iraq on religious and historical grounds, as well as in the Islamic Republic's call for the "export of revolution."

- The Islamic Republic of Iran sees itself more as an Islamic power than simply a Shi'ite one. It has reached across the Sunni-Shi'ite sectarian divide for the entirety of its more

---

[596] *Id.*, p. 65.
[597] *Id.*
[598] *Id.*

than four decade existence including to Sunni militant groups like al Qaeda, al Qaeda in Iraq, and Ansar al-Islam.

- The primary mechanisms by which the Islamic Republic of Iran sponsors and supports terrorist groups and pursues asymmetric violence abroad are through the Islamic Revolutionary Guards Corps (IRGC), the IRGC Qods Force, the Ministry of Intelligence and Security (MOIS), and Lebanese Hezbollah.

- The IRGC uses Iran's state-controlled banking infrastructure, including Bank Melli Iran and its Central Bank, Bank Markazi, in order to facilitate and fund terrorism such as attacks on U.S. nationals in Iraq.

- The IRGC, in turn, relies upon state-owned commercial businesses such as the NIOC and the Khatam-al Anbiya Construction Company to both fund and provide cover for its terrorist operations, including those in Iraq.

- The Islamic Republic of Iran used the IRGC, Qods Force, MOIS and Hezbollah to provide material support to al Qaeda, al Qaeda in Iraq, Ansar al-Islam and others who used this support to commit terrorism against American and Iraqi nationals in Iraq.

- The leadership of Iran, including its Presidents and Supreme Leader, as well as those responsible for overseeing its military and intelligence services, were aware of the Islamic Republic's support for Shia and Sunni terror groups in Iraq, and directed and sanctioned this support.

- Iran's coordination and cooperation with Sunni terror groups is more the rule than the exception to Iranian strategy and the Islamic Republic's past actions.

- Specifically, Iranian officials at the most senior levels were both aware of and approved the IRGC and MOIS' coordination not only with Shi'ite militias but also with Sunni

terrorist groups in Iraq. Such support included provision of safe-haven, travel facilitation, logistics, funding, weapons, specialized training, expert assistance and intelligence, not only in Baghdad, but also in predominantly Sunni governorates like al-Anbar, Samarra, Ninewa [Mosul], and Kirkuk. This support was significant and continuous, and afforded these groups the means to sustain and grow their operations, expand their influence and operational capacities, and increased their lethal effectiveness and sophistication as violent extremist organizations.

- Iran's provision of safe haven within, and safe passage into and through, its borders to al Qaeda senior leadership and operatives permitted al Qaeda to conduct strategic planning, coordinate with its factions and franchises, fundraise, train, and travel freely and in relative safety. This operational support was crucial to the survival of al Qaeda as an organization, increased its apparent legitimacy as a jihadist movement, and allowed it to continue to commit violence against Americans, particularly in Iraq. Without this support al Qaeda and its affiliates in Iraq would have been much weaker, more isolated, and unable to sustain operations or even grow or expand its operations into and throughout Iraq.

- Iran's support to Ansar al-Islam and Abu Musab al-Zarqawi was equally vital to their ability to sustain operations and flourish after the U.S.-led liberation of Iraq in 2003 and up through the subsequent evolution of Zarqawi from an Ansar al Islam/Al Tawhid chief to the founding Emir of al Qaeda in Iraq and its eventual progression to the Islamic State of Iraq.

- The IRGC and its affiliated companies NIOC, Bank Melli Iran, Bank Markazi and Khatam al-Anbiya were crucial elements in Iranian support for terrorists in Iraq. NIOC

and KAA were used by Iran to generate and source funds used to finance the Islamic Republic's terror networks. Financial institutions such as Bank Markazi and Bank Melli Iran permitted the Islamic Republic to access, transfer and move the funds to terror groups. Banks Melli and Markazi used a variety of deceptive practices, including front companies, fraudulent documents, exchange houses, seemingly legitimate businesses and government officials to structure financial transactions to avoid international counterterrorism financing sanctions, and to channel funds and materials directly and indirectly to Shia and Sunni terrorist groups in Iraq for the purpose of attacking and killing Americans.

- Just as they did with Shi'ite militias, Iranian leaders and top IRGC generals sought to support multiple Sunni terrorist groups in Iraq, specifically Ansar al Islam, al Qaeda, and al Qaeda in Iraq. Supporting various groups and sects not only allowed Tehran to effectively deflect responsibility, but also to further encourage attacks on Americans by forcing the groups to compete with one another to earn or maintain Iran's support.

- Simply put, Iranian support for and cooperation with not only Shi'ite militias but also with al Qaeda, al Qaeda in Iraq and Ansar al-Islam, was essential to these groups' cooperation, leadership structures, organizational infrastructure, financial solvency, recruitment and growth, and for their ability to plan, commit, and authorize sophisticated terror attacks against American servicemen, contractors, and civilians.

- Without Iran's significant support, al Qaeda, al Qaeda in Iraq, and Ansar al Islam would not have been the potent lethal threats that they posed in Iraq from 2003 through 2011.

E.    **Defendants NIOC, Bank Melli Iran, and Bank Markazi's Provision of Material Support to the Terrorist Groups Responsible for the Subject Attacks**

While Iran provided all of the above-described substantial and material support through the IRGC, IRGC-QF, MOIS, and Hezbollah, Iran could not have done so without co-Defendants NIOC, Bank Melli Iran, and Bank Markazi. Indeed, Iran uses co-Defendants NIOC, Bank Melli, and Bank Markazi as key facilitators for funneling funds and other material support to terrorist groups in Iraq, including to the Shia and Sunni terrorist groups referenced above.

Iran's use of NIOC, Bank Melli, and Bank Markazi to transfer billions of U.S. dollar-denominated assets to the IRGC, MOIS, and Hezbollah. This money constitutes "material support" for terrorist acts. Indeed, the definition of "material support" under the FSIA includes "financial services," as well as "currency or monetary instruments," which Defendants provided to the IRGC and Hezbollah. *See, e.g.*, *Kilburn*, 376 F.3d at 1130 (holding that providing "financial assistance" to a terrorist group meets the FSIA's jurisdictional requirements). Furthermore, liability for the "provision of material support and resources" under the FSIA applies to foreign states and their agencies and instrumentalities alike. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *8, 9, 39 (finding defendants NIOC and CBI[599] liable under 28 U.S.C. § 1605A for having "provided several kinds of material support to al Qaeda," detailing "[a] large cash flow of money was funneled to terrorist organizations through the NIOC" and how "the Central Bank of Iran facilitates the transfer of money to terrorist groups.").

The material support all Defendants provided to the terrorist groups that carried out the attacks at issue here was provided by Iran through Defendants. Moreover, as described herein, Defendants' provision of material support was part of their official policies, not random or

---

[599] The Central Bank of Iran, or CBI, is also known as Bank Markazi. For purposes of this brief, and unless part of a quote, Plaintiffs refer to CBI as Bank Markazi.

incidental acts of rogue employees. Indeed, the acts of NIOC, Bank Melli, and Bank Markazi were critical to the overall success of Iran's terrorism operations, as their active participation allowed (and continues to allow) Iran to sow terror on a global scale.

### 1. NIOC

Plaintiffs' experts have opined that NIOC knowingly provided material support to the IRGC and IRGC-QF during the relevant period.[600] NIOC is wholly owned by the Iranian government and used by Iran for vital support for its illicit activities, including funding terrorism.[601] Though at times NIOC has directly provided support to terrorist groups carrying out attacks in Iraq, its more common role has been to support the IRGC-QF and other Iranian institutions in financing terrorism.[602] Iran has diverted significant revenues generated by NIOC to its other agencies for use in supporting Iran's terrorist proxies in the region, particularly Iraq.[603] At times during the U.S. mission in Iraq after 2003, NIOC assets, including helicopters and personnel, were used to provide even more direct support to Iranian-sponsored terrorism occurring in Iraq.[604] The vast sums NIOC generates in oil sales and taxes were the principal source of the revenue used by the Iranian government to fund terrorist activities during the relevant period.[605] The NIOC-generated revenues provided Iran an important source of funding for its material support to terrorist groups, including the terrorist groups which planned, committed, or authorized the attacks against Plaintiffs.[606]

NIOC is responsible for "exploration, drilling, production, research and development,

---

[600] Piatetsky Decl., ¶ 112. Clawson Decl. ¶¶ 167, 169.
[601] Clawson Decl., ¶ 169.
[602] *Id.*, ¶ 25.
[603] *Id.*, ¶ 169.
[604] *Id.*, ¶ 163.
[605] *Id.,* ¶¶ 166, 169; Piatetsky Decl., ¶ 109.
[606] Clawson Decl., ¶ 169; Rubin Decl., ¶¶ 51-52.

refining, distribution and export of oil, gas, petroleum products."[607] It also performs state policy functions:

> NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities. The company has taken major steps toward establishing business enterprises, funded financial resources for development, helped to update technologies for exploration, drilling and production with reliance on the knowledge of Iranian experts.[608]

According to its website, "it is estimated that the company holds 156.53 billion barrels of liquid hydrocarbons and 33.79 trillion cubic meters of natural gas,"[609] making it the second largest oil company in the world, after Saudi Arabia's Aramco.[610] NIOC, which is entitled under Iranian law to retain 14.5% of the oil revenues it generates, provides little transparency concerning the use of these funds. Some of this revenue was likely directly controlled by the IRGC itself.[611]

NIOC generates billions of dollars in revenue each year for the Iranian government.[612] It has been reported, and it is generally accepted, that a significant portion of these oil revenues are unreported, making them available for nefarious purposes such as corruption or support for terrorism.[613] An Iranian government audit in 2009 found that more than one billion dollars in oil revenue from the previous year was missing from the state coffers.[614] The Iranian regime also

---

[607] Piatetsky Decl. ¶ 100 (*citing* **PX810**, NIOC, *Introduction to National Iranian Oil Company*, p. 7; *See also* **PX262**, U.S. Dep't of Energy, *Analysis: Iran* (July 20, 2021) ("The state-owned National Iranian Oil Company is responsible for all upstream oil and natural gas projects.")).

[608] Piatetsky Decl., ¶ 100 (*citing* **PX810**, *Introduction to National Iranian Oil Company*, supra at n. 514, p. 7.

[609] Mohammad Soltanieh, et al., *A review of global gas flaring and venting and impact on the environment: Case study of Iran*, Int'l J. Greenhouse Gas *Ctrl*, vol. 49, 488, 509, p. 500 (Mar. 30, 2016).

[610] Piatetsky Decl. ¶ 101 (*citing* **PX233**, Fed. Trade Comm., *Gasoline Price Changes and the Petroleum Industry: An Update* (Sept. 2011)).

[611] *Id.*, ¶ 59 (*citing* Mark Gregory, Expanding Business Empire of Iran's Revolutionary Guards, BBC News (Jul. 26, 2010)).

[612] *Id.*, ¶ 103.

[613] Clawson Decl., ¶ 166.

[614] Piatetsky Decl. ¶ 58 (*citing Iran looking for Missing Oil Revenue*, UPI (Nov. 20, 2009).

offered a subsidy of free (or significantly discounted) gasoline to the IRGC. In turn, the IRGC has generated billions of additional USD revenue from exporting portions of its gasoline subsidy.[615] "Facilities such as the Martyr Rajai Port Complex in Hormuzgan province are reportedly used to export state subsidized gasoline outside the country. The IRGC is estimated to yield a 200–300 percent profit on such illegal sales."[616]

Furthering its involvement in Iran's terrorism apparatus, NIOC used its own helicopters to conduct surveillance on key smuggling routes through oil fields in eastern Iraq, as well as U.S. bases in the area.[617] The Iran Threat Reduction and Syria Human Rights Act of 2012 reflects Congress' finding that NIOC "provide[s] significant support to Iran's Revolutionary Guard Corps and its affiliates."[618] Indeed, NIOC's leadership includes key IRGC commanders who oversee the IRGC's direct work on behalf of and within NIOC, including guarding most NIOC operations, overseeing contracts to lay the pipelines, operating the tankers, running refineries, and conducting exploration and exploitation of Iran's onshore and offshore oil and gas fields.[619]

In 1995, Under Secretary of State Peter Tarnoff testified before the Senate that "a straight-line links Iran's oil income and its ability to sponsor terrorism, build weapons of mass destruction, and acquire sophisticated armaments."[620] In 1996, Congress directly linked Iran's revenues from

---

[615] Piatetsky Decl., ¶ 61 (*citing* **PX642**, Frederic Wehrey, et. al., *The Rise of the Pasdaran: Assessing the Domestic Roles of Iran's Islamic Revolutionary Guards Corps*, p. 65, National Defense Research Institute (2009)).

[616] *Id.* fn. 36.

[617] Clawson Decl., ¶ 163.

[618] Piatetsky Decl., ¶ 107; **PX408**, Iran Threat Reduction and Syria Human Rights Act of 2012, 158 Cong Rec H 5552 (Aug. 1, 2012).

[619] Rubin Decl., ¶¶ 49-52.

[620] Piatetsky Decl., ¶ 63 (*citing* **PX407**, Iran Oil Sanctions Act of 1996, HR Rep 104-523, pt. 1, 104th Cong, 2d Sess. (1996)).

its export sales of crude oil to the regime's ability to materially support international terrorism, acquire nuclear weapons and develop ballistic missile delivery systems:

> The Congress declares that it is the policy of the United States to deny Iran the ability to support acts of international terrorism and to fund the development and acquisition of weapons of mass destruction and the means to deliver them by limiting the development of Iran's ability to explore for, extract, refine, or transport by pipeline petroleum resources of Iran.[621]

NIOC's critical role in Iran's support for terror is to provide a consistent and clandestine source of funds channeled to Iran's terrorist proxies.[622] As stated by former Treasury Secretary Steven Mnuchin, "Treasury's action against [NIOC] makes it explicitly clear that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force."[623] The Treasury statement specified, "[t]he crude oil and condensate sold by this IRGC-QF network originates with the [NIOC]."[624]   NIOC generates billions in revenue each year that goes unreported, making these funds directly available for purposes such as terrorism support.[625] Credible reports demonstrate that at least some of these billions of unreported monies are directly controlled by Iranian government agencies, including the IRGC.[626]

To further the murkiness of these transactions, NIOC, as a part of its "General Terms and Conditions," required purchasers of Iranian crude oil to obtain letters of credit from multinational banks.[627] A number of these banks, including Bank Markazi and Bank Melli, have been willing to

---

[621] *Id*., ¶ 64 (*citing* Iran and Libya Sanctions Act of 1996).
[622] Clawson Decl., ¶¶ 166-69.
[623] *Id*., ¶ 165.
[624] *Id*., ¶ 165. **PX63**, U.S. Department of the Treasury, Press Center, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies*, September 4, 2019.
[625] *Id*., ¶ 166.
[626] *Id.*
[627] **PX802**, Annex B of *NIOC–Tehran's General Terms and Conditions for Purchasing Crude Oil.*

enable unlawful economic sanctions evasion activities.[628] NIOC's commercial activities generate between one-third and two-thirds of the billions of dollars in revenues Iran requires each year, a portion of which Iran uses to fund terrorism.[629] This is in addition to taxes paid by NIOC and its affiliates. To generate these revenues, NIOC structures many of its oil transactions in ways intended to hide the ultimate beneficiaries of the accounts to which the proceeds flow, and from which they are distributed for Iran's terroristic purposes.[630] To then move these revenues undetected, Bank Markazi and NIOC worked together to structure transactions to avoid scrutiny in the United States.[631]

In addition, in November 2012, NIOC was placed on the Office of Foreign Assets Control ("OFAC") List of Specially Designated Nationals and Blocked Persons ("OFAC SDN List") under Executive Order No. 13382 for NIOC's role in assisting the IRGC with the proliferation of weapons of mass destruction.

In January 2020, the Treasury reaffirmed NIOC "helps to finance Iran's [IRGC-QF] and its terrorist proxies," and designated four international petrochemical and petroleum companies that "have collectively transferred the equivalent of hundreds of millions of dollars' worth of exports from the NIOC, an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies."[632]

---

[628] Clawson Decl., ¶¶ 112-113, 157-60.
[629] Piatetsky Decl., ¶ 247 (c*iting* **PX125**, Press Release, *Treasury Submits Report to Congress on NIOC and NITC,* Dep't of Treasury (Sept. 24, 2012)).
[630] *Id*., ¶¶ 106, 248.
[631] *Id*. (*Quoting* **PX63**, *supra*).
[632] *Id.*, ¶ 110 (*citing* **PX133**, Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, U.S. Dep't of the Treasury (Jan. 23, 2020)).

Also in 2020, Treasury designated five additional United Arab Emirates-based entities for having "purchased hundreds of thousands of metric tons of petroleum products from [NIOC]."[633] Treasury again stressed that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign activities throughout the Middle East, including the support of terrorist groups."[634]

The Treasury also designated a worldwide Iranian petroleum shipping Network originating with NIOC for "financially support[ing] [the IRGC-QF] and its terror proxy Hizballah" in a "vast oil-for-terror shipping network."[635] It found that the shipping network "*is directed by* [the IRGC-QF] and its terrorist proxy Hizballah," and declared "that those purchasing Iranian oil *are directly supporting Iran's militant and terrorist arm*, [the IRGC-QF]."[636]  The Treasury noted "the Iranian regime is leveraging a terrorist organization as its chief conduit for obfuscating and selling hundreds of millions of dollars of oil to fuel its nefarious agenda" and observed that "Iran's exportation of oil [by and through NIOC] directly funds acts of terrorism by Iranian proxies."[637]

---

[633] **PX132**, Press Release, *Treasury Targets Companies Facilitating Iran's Petroleum Sales,* Dep't of Treasury (March 19, 2020); The Treasury also designated Iran's largest petrochemical holding group, Persian Gulf Petrochemical Industries Company ("PGPIC"), for providing financial support to U.S.-designated Khatam al-Anbya Construction Headquarters, the engineering conglomerate of the IRGC, along with its vast network of 39 subsidiary petrochemical companies and foreign-based sales agents. **PX76**, Press Release, *Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents*, Dep't of Treasury (June 7, 2019).

[634]  **PX133**, Press Release, Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries, U.S. Dep't of the Treasury (Jan. 23, 2020)).

[635] Piatetsky Decl., ¶ 252 (*citing* **PX63**, Treasury Press Release, Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies, Dep't of Treasury (Sept. 4, 2019)).

[636] *Id.*

[637] *Id*.

Notably, this network was overseen by senior IRGC-QF official and former Iranian Minister of Petroleum (2011-2013) Rostam Qasemi.[638] Before serving as Minister of Petroleum (and Chairman of NIOC), Qasemi was Commander of the IRGC construction affiliate Khatam al Anibya, which further underscores the close relationship between various IRGC affiliates and NIOC.[639] Qasemi was first designated as a SDN under E.O. 13382 for his role with IRGC affiliate Khatam al Anbiya in 2010 and under E.O. 13224 in September 2019, along with the broader petroleum-shipping network that he oversaw.[640]

In July 2020, when designating a Chinese company, Zhuhai Zhenrong Company Limited, for purchasing hundreds of millions of dollars in oil from NIOC, Secretary of State Mike Pompeo explained the designation was intended to "deny the [Iranian] regime critical income to fund terror around the world, engage in foreign conflicts, and advance its ballistic missile development."[641]

In October 2020, Treasury designated NIOC a SDGT, along with the Iranian Ministry of Petroleum and the National Iranian Tanker Company, "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)."[642] According to the Treasury press release, "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF."[643] Treasury also concluded "[t]he cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC

---

[638] *Id.*, ¶ 112.

[639] *Id.*, ¶ 112 n. 82.

[640] *Id.* (*citing* **PX63**, Treasury Press Release, Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies, Dep't of Treasury (Sept. 4, 2019)).

[641] *Id.*, ¶ 113 (*citing* **PX28**, Press Release, *The United States to Impose Sanctions on Chinese Firm Zhuhai Zhenrong Company Limited for Purchasing Oil from Iran*, U.S. Dep't of State (July 22, 2019)).

[642] **PX50**, Press Release, T*reasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force, Dep't of Treasury (*October 26, 2020)).

[643] *Id.*

and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF."[644]

As the Treasury Department reported to Congress in 2012, "NIOC is an agent or affiliate of the IRGC."[645] The Iran Threat Reduction and Syria Human Rights Act of 2012 states that "[i]t is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates." *Id.* Later in 2012, Treasury further designated NIOC for, among other things, "providing, or attempting to provide, financial, material, or other support for and services in support of the IRGC."[646]

As one of the largest oil companies in the world,[647] NIOC provided crucial funding for the IRGC throughout the relevant period. As Treasury explained, "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign activities throughout the Middle East, including the support of terrorist groups."[648]

More recently, Treasury has reaffirmed that NIOC "helps to finance Iran's [IRGC-QF] and its terrorist proxies" and has described NIOC as "an entity … which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies."[649] Finally, as stated

---

[644] *Id.*

[645] Piatetsky Decl., ¶ 107 (q*uoting* **PX124**, Letter from Adam J. Szubin, OFAC Director, to Congress, dated September 24, 2012).

[646] *Id.*, ¶ 108.

[647] *Id.*, ¶ 101.

[648] *Id.*, ¶ 111 (*quoting* **PX133**, Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries,* Dep't of Treasury (January 23, 2020)).

[649] *Id.*, ¶ 250 (*quoting* **PX133**, Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries,* Dep't of Treasury (January 23, 2020)).

above, NIOC *itself* deployed "helicopters and border guards" to the scene of Iranian-backed attacks on Multi-National Forces in Iraq.[650]

As stated above, the Southern District of New York District Court has identified NIOC as an agency or instrumentality of Iran that materially supports terrorism. *See In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *8 ("[T]he National Iranian Oil Company is owned, controlled, and managed by the Government of Iran. A large cash flow of money was funneled to terrorist organizations through the NIOC.") (citations omitted).

Dr. Clawson has concluded: "NIOC is wholly owned by the Iranian government and is used by that government as vital support for its activities, including the funding of terrorism. There is credible reason to believe that significant revenues from oil sales have been diverted by NIOC into the pockets of the IRGC. At times during the U.S.-led war against terrorists in Iraq after 2003, NIOC assets, including its helicopters, have been used to provide more direct support to Iranian terrorism."[651]

Mr. Piatetsky likewise concluded: "…based on my professional experience and materials and sources generally relied upon by experts in my field, …, … [NIOC] purposefully used deceptive trade and finance practices to illicitly circumvent U.S. banking laws and counterterrorism financing regulations. [NIOC] did so in order to finance [Iran's] established network of agents and proxies used by [it] to sponsor acts of terrorism. [NIOC's] access to and use of the international financial system permitted [it] to knowingly provide material support to [,] the Islamic Revolutionary Guard Corps-Qods Force, Hizbollah, Kata'ib Hizballah, Asa'ib Ah al Haq, Jaysch al Mahdi and The Promised Day Brigades, The Badr Corps/Badr Organization, the Al

---

[650] Clawson Decl., ¶¶ 163, 169.
[651] *Id*., ¶ 169.

Qaida Network, Abu Musab Zarqawi and Al Qa'ida in Iraq, and Ansar al Islam during the relevant period. These groups in turn used this support from the Defendants to commit attacks against Americans in Iraq. The support provided by the Defendants was critical to their ability to function and survive, as well as significantly enhanced their operational abilities in Iraq."[652]

### 2.     Bank Melli

Plaintiffs' experts opine that during the relevant period Bank Melli provided banking services to the IRGC and the IRGC-QF.[653] When the U.S. Treasury sanctioned Bank Melli for its role in terrorism, it noted that Bank Melli facilitated transactions for the IRGC and engaged in deceptive financial practices to hide the IRGC's involvement.[654]

The Treasury Department has identified Bank Melli and Bank Markazi (discussed in the next section) as entities that provide crucial banking services to the IRGC-QF to enrich and support its violent terrorist agenda.[655] As an example of Bank Melli's provision of material support for Iran's terror network, Bank Melli worked with HSBC to illegally manipulate the international financial system in a manner that would allow HSBC to process payments received from Bank Melli successfully through HSBC's U.S. subsidiary.[656] The U.S. Senate investigated HSBC for this conduct, issuing a 339-page report on HSBC's practices in manipulating the U-turn exemption

---

[652] Piatetsky Decl., ¶ 303.

[653] Piatetsky Decl., ¶ 92 ("Melli concedes that the Property is a 'blocked asset' under the [Terrorism Risk Insurance Act] and that Bank Melli is an 'agency or instrumentality' of Iran.")). *See also Id.*, ¶ 99 ("In my expert opinion, during the relevant time period, Bank Melli provided banking services that provided significant funding to the IRGC-QF to support terrorist activities."); Clawson Decl., ¶¶ 157, 216.

[654] **PX36**, U.S. Dept. of Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, Dep't of Treasury (October 25, 2007).

[655] Levitt Decl., ¶¶ 73-78.; Piatetsky Decl., fn. 69.

[656] Piatetsky Decl., ¶ 129 (*citing* **PX409**, Settlement Agreement, U.S. Dep't of the Treasury (Dec. 11, 2012)), ¶ 4.

on behalf of Bank Markazi and Bank Melli, two of its clients.[657] HSBC admitted to processing

nearly $20 billion in transfers during the same period, the vast majority of which were for Iran.[658]

Other banks moved similarly large amounts on Iran's behalf.[659]

The U.S. Treasury Department designated Bank Melli in October 2007, and in a press

release stated:

> From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods
> Force. When handling financial transactions on behalf of the IRGC, Bank Melli has
> employed deceptive banking practices to obscure its involvement from the
> international banking system. For example, Bank Melli has requested that its name
> be removed from financial transactions.[660]

The Treasury further noted that Bank Melli also obfuscated the involvement of other

Iranian entities in financial transactions, including the IRGC:

> Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took
> precautions not to identify Bank Sepah in transactions. Bank Melli also has
> employed similar deceptive practices to obscure its involvement from the
> international banking system when handling financial transactions on behalf of the
> IRGC.[661]

Likewise, in a November 2008 press release, the Treasury Department stated:

> In a number of cases, Iran has used its state-owned banks to channel funds to
> terrorist organizations. . . . . Iran's Bank Melli, which has been designated by the
> United States under E.O. 13382 for proliferation-related activities, was used to
> transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.[662]

---

[657] *Id.*, fn. 93 (*citing* **PX257**, Senate Perm. Subcomm. on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History* (July 17, 2012) (pages 123-24 identify Bank Markazi and Bank Melli as HSBC customers) ("HSBC Senate Report")).

[658] *Id.*, ¶ 131 (*citing* HSBC Senate Report at 6, 14).

[659] *Id.*

[660] *Id.*, ¶ 96 (*citing* **PX36**, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. Dep't of the Treasury (Oct. 25, 2007)).

[661] *Id.*, ¶ 97 (*citing* **PX122**, Press Release, *Fact Sheet: Treasury Strengthens Preventative Measures Against Iran,* Dep't of the Treasury (Nov. 6, 2008)).

[662] *Id.*, ¶ 97.

In May 2018, Treasury designated Bank Melli a SDGT "for assisting in, sponsoring or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF," determining that "[a]s of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli," "Bank Melli has acted as a conduit for payments to the IRGC-QF," and "[t]he IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups." Treasury specifically concluded that "[s]ince the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy."[663]

In November 2018, the Treasury said: "Bank Melli is being designated pursuant to E.O. 13224 [i.e., for support for terrorism] for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF…"[664] The statement continued:

> As of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli. Bank Melli has acted as a conduit for payments to the IRGC-QF. The IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups, and Bank Melli's presence in Iraq was part of this scheme. Since the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy. Bank Melli has enabled the IRGC and its affiliates to move funds inside and outside of Iran…[665]

This designation expanded and extended the earlier designation of Bank Melli under E.O. 13382 based upon its support for proliferation of weapons of mass destruction and missiles, as well as its direct financial support of the IRGC-QF.[666]

---

[663] Clawson Decl., ¶ 156 (*quoting* **PX51**, Press Release, *U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign*, U.S. Dep't of the Treasury (Nov. 5, 2018)).

[664] *Id.*

[665] *Id.*

[666] *Id.*, ¶ 157.

The U.S. Treasury Department's designations of Bank Melli and its affiliates caused substantial financial losses to Bank Melli.[667] The fact that Bank Melli did not react is further proof it is controlled by Iran and does not act independently or in a reasonable commercial manner, but instead, acts to further Iran's foreign policy interests.[668] Bank Melli had ample warning that banks which support terrorism will face actions by the U.S. government, and it had strong financial incentive to either contest the U.S. government concerns or change the behavior which concerned the U.S. government.[669] Bank Melli has not changed its behavior in order to become de-designated because to do so would be against the policy of the government of Iran, for which the transfer of funds to terrorist groups, Hezbollah in particular, has been an important priority.[670] In other words, Bank Melli has continued a course of action against its financial interest because that course is consistent with Iranian foreign policy.[671]

Iran also used Bank Melli to funnel material support through Iran's Defense Industries Organization that, in turn, was provided to terror groups operating in Iraq.[672]  Weapons and munitions manufactured by the Defense Industries Organization, an Iranian government-owned defense manufacturer, comprised a significant portion of the material used by those targeting and attacking U.S. forces in Iraq.[673] This was extensively documented by the U.S.-led forces in Iraq, whose findings can be found in a 2008 study released by the U.S. Military Academy at West Point's Center for Countering Terrorism. The study includes a "compilation and assessment of caches recovered by Coalition and Iraqi Security Forces containing suspected Iranian weapons and

---

[667] *Id.*, ¶ 128.
[668] *Id.*
[669] *Id.*, ¶ 135.
[670] *Id.*, ¶ 136.
[671] *Id.*
[672] Piatetsky Decl., fn. 62.
[673] *Id.*

munitions," including arms that Iran "openly markets" on the Defense Industries Organization's website.[674]  In fact, "[t]his site even offers to allow purchases of lethal munitions by credit card! Significantly, many of the photos of Iranian munitions such as mortar rounds and rockets provided on this open site closely match photos of munitions recovered in Iraq."[675] Bank Melli's support for the Defense Industries Organization has been documented.

In addition to providing services to the IRGC, Bank Melli has provided funding to entities that support the IRGC's terrorism, providing at least $140 million in direct financing for Mahan Air[676] as well as financial services to Iran's Defense Industries Organization.[677]

Bank Melli has also helped Iran illegally acquire U.S.-sourced items restricted from export to Iran due to their use for terrorist purposes. Bank Melli facilitated the illegal purchase of a restricted General Electric aircraft engine for a subsidiary of Iran's Mahan Air, the SDGT was designated for flying IRGC and Hezbollah weapons and personnel, including into Iraq.[678] As detailed in Peter Piatetsky's Expert Report and Declaration, Bank Melli, working with SCB, structured the transaction to omit references to Bank Melli's role in financing the letter of credit from the component of the transactions processed in the United States.[679] Bank Melli also facilitated (with SCB's assistance) the purchase of restricted components of hydraulic presses of the type used to create EFPs.[680]

Mr. Piatetsky concluded:

---

[674] *Id.*

[675] *Id.*

[676] *See Mahan Air and Blue Sky Aviation Co FZE v. Blue Sky One Limited et al.*, EWCA Civ 544 ¶ 28 (11 May 2011).

[677] Piatetsky Decl., fn. 62.

[678] *Id.*, ¶ 133.

[679] *Id.* ¶¶ 133-143.

[680] *Id.* ¶ 132.

[Based on my professional experience and materials and sources generally relied upon by experts in my field… I have concluded that the Defendants…purposefully used deceptive trade and finance practices to illicitly circumvent U.S. banking laws and counterterrorism financing regulations. The Defendants [including Bank Melli Iran] did so in order to finance their established network of agents and proxies used by them to sponsor acts of terrorism. The Defendants' access to and use of the international financial system permitted them to knowingly provide material support to [among others] The Islamic Revolutionary Guard Corps-Qods Force during the relevant period. These groups in turn used this support from the Defendants [including Bank Melli Iran] to commit attacks against Americans in Iraq. The support provided by the Defendants was critical to their ability to function and survive, as well as significantly enhanced their operational abilities in Iraq.[681]

In addition to Iran utilizing Bank Melli as a conduit to illegally provide substantial and material support to terrorist groups, Iran also utilizes Bank Markazi to further its terroristic goals.

### 3.    Bank Markazi

Plaintiffs' experts have opined that during the relevant period Iran also used Bank Markazi to transfer funds to support terrorism, principally to the IRGC-QF and Hezbollah.[682] As Dr. Clawson stated, "Markazi, as Iran's central bank, is subject to the control of the Iranian government both in law and in practice. Iran has used Merkazi for many years, including 2003-2011, to transfer funds to support terrorism."[683]

Bank Markazi (a/k/a Central Bank of Iran) has long been the route by which the Iranian government has provided many millions of dollars to terrorist groups[684] and has for years provided high ranking members of the Iranian government a secret channel for illicit funds to be used by terrorist organizations abroad, as well as to sustain state-owned companies and financial institutions.[685] For instance, the Iranian government requires Bank Markazi to extend loans that

---

[681] *Id.*, ¶ 303.
[682]  *Id.*, ¶ 89, Clawson Decl., ¶¶ 118-119, 122, 215.
[683] Clawson Decl., ¶ 23.
[684] *Id.*, ¶¶ 67-68.
[685] Rubin Decl., ¶ 60.

ultimately have disastrous effects on the Iranian economy.[686] Such control and dominion by the Iranian government over Bank Markazi further allows the Iranian government to use Bank Markazi as a tool by which Iran funds and supports terrorism.

In early 2001, Bank Markazi was in search of non-Iranian banks to perform correspondent banking services for it so that it could access U.S. dollars. Bank Markazi approached Standard Chartered Bank (SCB) "to act as its recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company."[687] SCB agreed to work with Bank Markazi, as it "viewed this engagement as 'very prestigious' because 'in essence, SCB would be acting as Treasurer to the CBI…'[688] As part of Bank Markazi's agreement with SCB, SCB instructed its staff that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."[689] Furthermore, "SCB's Iranian Clients"—including Bank Markazi and Bank Melli— "insisted that 'no other banks processed their payments with full disclosure and it was not industry practice to do so.'"[690] SCB "instructed" Bank Markazi to transmit MT-202s with SCB's "business identifier code" ("BIC" or SWIFT "address") rather than Markazi's, so that "the payments going to NY do not appear to NY to have come from an Iranian Bank."[691]

As a result, and between 2001 and 2007 alone, SCB illegally processed approximately 59,000 transactions through its New York branch for Iranian customers, totaling approximately $250 billion.[692] The purpose of the manipulated transactions was clear, according to NY-DFS—in

---

[686]Clawson Decl., ¶ 104.
[687] Piatetsky Decl., ¶ 77 (*citing* August 6, 2012 Consent Order between SCB and the New York Department of Financial Services, attached as Exhibit B to Piatetsky Decl.).
[688] *Id*., ¶ 12, Exhibit B, ¶ 22.
[689] *Id*., ¶ 126, Exhibit B, ¶ 24.
[690] *Id*., ¶ 126, Exhibit B, ¶ 25.
[691] *Id*., ¶ 127; Exhibit B, ¶ 27.
[692] *Id.*, ¶ 131, Exhibit B, ¶¶ 1, 18.

addition to financing its WMD program, "[t]he U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah … and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers."[693]

Additionally, U.S. government officials have made repeated statements highlighting Bank Markazi's support for terrorism.[694] At a Press Roundtable in Germany in July 2007, U.S. Under Secretary of the Treasury for Terrorism and Financial Intelligence explained:

> The [Iranian] regime does **use its banks** to pursue not only its proliferation ambitions but also its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money **from the Central Bank of Iran** to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also **its banks engage in deceptive practices in order to engage in that business**.[695]

Undersecretary Levey testified similarly before the United States Congress on April 1, 2008, stating that "Iran uses its state-owned banks … for financing terrorism."[696] Bank Markazi and its officers have been sanctioned for masking the bank's commercial activities to fund terrorism in Iraq and provide support to Iraq-based terrorist groups.[697]

Another example of Bank Markazi funding terrorism was cited in an October 2007, U.S. Department of Treasury Press Release: "… from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran [*i.e.* Bank Markazi] through its subsidiary in London to its branch in Beirut for the benefit of [Hezbollah] fronts in Lebanon that support acts of violence."[698]

---

[693] *Id.*, ¶ 129.
[694] Clawson Decl., ¶ 107.
[695] *Id.*, ¶ 108.
[696] *Id.*, ¶ 109.
[697] Rubin Decl., ¶¶ 60-66.
[698] Piatetsky Decl., ¶ 74 (*citing* **PX36**, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, Dep't of the Treasury (Oct. 25, 2007)).

As a direct result of such deceptive financial practices, the U.S. subjected Bank Markazi and other

Iranian banks to sanctions.[699] Deputy Assistant Secretary of Treasury for Terrorism Financing and

Financial Crimes Daniel Glaser stated,

> Iran uses its global financial ties to pursue both the threat of terrorism and a nuclear
> program through an array of deceptive practices specifically designed to avoid
> suspicion and evade detection from the international financial community *[One]*
> *method Iranian banks use to evade controls is to ask other financial institutions*
> *to remove their names when processing transactions through the international*
> *financial system....This practice is even used by the Central Bank of Iran* to
> facilitate transactions for sanctioned Iranian banks.[700]

Similarly, in a March 2008 Advisory, the Department of Financial Crimes Enforcement Network

(FinCEN) stated,

> Through state-owned banks, the Government of Iran disguises its involvement in…
> terrorism activities through an array of deceptive practices specifically designed to
> evade detection. *The Central Bank of Iran and Iranian commercial banks have*
> *requested that their names be removed from global transactions in order to make*
> *it more difficult for intermediary financial institutions to determine the true*
> *parties in the transaction* [emphasis added] … The U.S. Department of the
> Treasury is particularly concerned that the Central Bank of Iran may be facilitating
> transactions for sanctioned Iranian banks.[701]

Bank Melli and the Central Bank of Iran also provide *crucial* banking services to the Qods

Force, the IRGC's terrorist supporting arm that was headed by Commander Soleimani.[702] Bank

Melli is particularly active in international transactions.[703] According to the 2014/15 annual report,

"[d]ue to its prominent position in the country's banking system and because of benefiting from

its extensive and powerful international network; BMI [Bank Melli Iran] bears the responsibility

---

[699] *Id.*, ¶¶ 78-81.

[700] *Id.*, 78 (emphasis added).

[701] *Id.*, 76 (emphasis added) (*quoting* **PX116**, *Financial Crimes Enforcement Network Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity*, Dep't of Treasury (March 20, 2008)).

[702] Piatetsky Decl., fn. 69, ¶ 192.

[703] *Id.*, ¶ 94.

of a major part of the country's foreign currency transactions."[704] These Bank Melli operations are closely supervised by Bank Markazi, as described on Bank Melli's own website, which states, "[t]he branches of Bank Melli Iran dealing in foreign exchange transactions will be ready to address the requirements of both exporters and importers in line with the country's foreign exchange policies and on the basis of the guidelines issued by Central Bank of the Islamic Republic of Iran."[705]

This deleterious conduct by Bank Markazi and other Iranian financial entities led the U.S. to take action to curb these abuses, including reversing the "U-turn exemption"[706] on November 6, 2008. In revoking the U-turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.
>
> *      *      *
>
> The Central Bank of Iran (CBI), the sole Iranian entity that regulates all Iranian banks, has not only engaged in deceptive practices itself – such as asking for its name to be removed from transactions – but has also encouraged such practices among Iran's state-owned banks. For example, prior to EU and UN sanctions, the CBI attempted to help Banks Sepah and Melli protect their assets from being frozen. Later, the CBI instructed non-sanctioned Iranian state-owned banks to issue payment instructions on behalf of Sepah in order to circumvent sanctions. In the case of Bank Melli, the CBI provided substantive assistance to minimize the impact of sanctions. In fact, between January and March 2008, the CBI handled tens of

---

[704] *Id.*

[705] *Id.*

[706] The term "U-turn" describes payments initiated offshore by a non-Iranian, non-U.S. financial institution and that passed through the U.S. financial system only en route to another offshore, non-Iranian, non-U.S. financial institution. *Id.*, ¶ 94.

millions of dollars in transactions to and from the accounts of U.S.- and Undesignated banks held at the CBI.[707]

FinCEN reiterated the "serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran" in a June 22, 2010, Advisory.[708] FinCEN added:

> As noted in prior FinCEN guidance, the Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned banks, and notes that the Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.[709]

In November 2011, the U.S. Department of the Treasury issued a finding that:

> identified the Islamic Republic of Iran as a ***jurisdiction of primary money laundering concern*** under Section 311 of the USA PATRIOT Act (Section 311) based on Iran's support for terrorism; pursuit of weapons of mass destruction (WMD); reliance on state-owned or controlled agencies to facilitate WMD proliferation; ***and the illicit and deceptive financial activities that Iranian financial institutions – including the Central Bank of Iran*** – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions.[710]

Congress passed a series of provisions concerning Bank Markazi as part of the National Defense Authorization Act for FY2012 (codified as 22 U.S.C. § 8513), including the finding that:

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011
>
> *       *       *
>
> The financial sector of Iran, including the Central Bank of Iran, is designated as a primary money laundering concern for purposes of section 5318A of title 31

---

[707] **PX122**, Press Release, *Fact Sheet: Treasury Strengthens Preventive Measures Against Iran*, Dep't of Treasury (Nov. 6, 2008).

[708] **PX121**, 6/22/2010 Advisory FIN-2010-A008, Department of the Treasury, Financial Control Enforcement Network, "Update on the Continuing Illicit Finance Threat Emanating from Iran."

[709] *Id.*

[710] Piatetsky Decl., ¶ 79 (emphasis added) (*citing* **PX29**, Press Release, *Fact Sheet: New Sanctions on Iran*, Dep't of Treasury (Nov. 21, 2011)).

because of the threat to government and financial institutions resulting from the illicit activities of the Government of Iran, including its pursuit of nuclear weapons, support for international terrorism, and efforts to deceive responsible financial institutions and evade sanctions.[711]

In FinCen's 2019 "Imposition of Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern: A Rule by the Financial Crimes Enforcement Network" (Nov. 4, 2019), FinCEN reiterated its prior findings that Iran has "developed covert methods for accessing the international financial system and pursuing its malign activities," including by "masking illicit transactions using senior officials, including those at the Central Bank of Iran," which "efforts often serve to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC-QF), [and] Lebanese Hizballah … terrorist groups."[712]

On May 15, 2018, the Treasury Department designated Bank Markazi Governor [head] Valiollah Seif as an SDN, stating in its press release:

> Iran's Central Bank Governor covertly funneled millions of dollars on behalf of the IRGC-QF through Iraq-based al-Bilad Islamic Bank to enrich and support the violent and radical agenda of Hizballah. It is appalling, but not surprising, that Iran's senior-most banking official would conspire with the IRGC-QF to facilitate funding of terror groups like Hizballah, and it undermines any credibility he could claim in protecting the integrity of the institution as a central bank governor,' said Treasury Secretary Steven T. Mnuchin."[713]

In addition to these sanctions, OFAC has also previously detailed Bank Markazi's involvement in currency exchange schemes used to fund terrorism. Specifically, on May 10, 2018, OFAC stated:

---

[711] *Id.*, ¶ 80 (*citing* 22 U.S.C. § 8513).

[712] *Id.*, ¶ 83 (*citing* **PX235**, FinCEN, Imposition of Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern (Nov. 4, 2019), 84 Fed. Reg. 59302, 59304).

[713] *Id.*, ¶ 85 (*citing* **PX118**, Press Release, Dep't of Treasury, Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force (May 15, 2018)).

[A]n extensive currency exchange network in Iran and the UAE… has procured and transferred millions in U.S. dollar-denominated bulk cash to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to fund its malign activities and regional proxy groups… Iran's Central Bank was complicit in the IRGC-QF's scheme and actively supported this network's currency conversion and enabled its access to funds that it held in its foreign bank accounts. This network of exchangers and couriers has converted hundreds of millions of dollars.

*      *      *

The Iranian regime and its Central Bank have abused access to entities in the UAE to acquire U.S. dollars to fund the IRGC-QF's malign activities, including to fund and arm its regional proxy groups, by concealing the purpose for which the U.S. dollars were acquired.[714]

Further, in April 2019, Robert Palladino, deputy spokesman for the U.S. Department of State, and Brian Hook, Special Representative for Iran and senior advisor to the Secretary of State, conducted a Press Briefing wherein Hook stated the US sanctions, particularly against Iran's oil and financial network, were "constraining [Iran's] ability to operate freely in the region[,]… are draining Iran's support to its proxies, and for the first time in a very long time, they have less access to revenue to spread terror and militancy."[715] The fact Iran has used Bank Markazi to transfer funds to terrorists is also clear from other sources.[716]

In summary, Bank Markazi, as Iran's central bank, is controlled by the Iranian government and has long been used by Iran to transfer funds to support terrorism.[717] And Iran's financial institutions, led by Bank Markazi, have engaged in deceptive financial practices to surreptitiously

---

[714] *Id.*, ¶ 87 (*citing* **PX58**, Press Release, *United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC-QF*, Dep't of Treasury (May 10, 2018)).

[715] Rubin Decl., ¶ 71 (*citing* **PX378**, U.S. Dept. of State, Press Briefing (April 2, 2019)), video of this statement is available at: https://www.state.gov/briefings/department-press-briefing-april-2-2019/).

[716] Clawson Decl., ¶ 121.

[717] *Id.*, ¶ 122.

transfer funds to terrorist groups.[718] Bank Markazi and other state-owned Iranian banks were used by Iran to funnel oil proceeds through its military and political entities and state-owned businesses, specifically IRGC, MOIS, and NIOC, to finance acts of terrorism in Iraq against Coalition Forces.[719] Bank Markazi has engaged in these activities for many years, including during the period 2003-2011.[720] Without the active involvement Bank Markazi and Bank Melli, as well as NIOC, Iran's largesse could not have been so effectively, covertly, or substantially showered upon the groups responsible for such acts.[721]

Additionally, Bank Markazi's material support was a substantial factor contributing to the subject terrorist attacks. As described above, Bank Markazi was specifically designated under Executive Order 13224 for having "provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah."[722] The Treasury Department explicitly noted that "Iran's Central Bank was complicit in the IRGC-QF's scheme and actively supported this network's currency conversion and enabled its access to funds that it held in its foreign bank accounts."[723]

The Treasury Department had already identified Bank Markazi's provision of material support for terrorism in 2007, when it cited findings that "from 2001 to 2006, Bank Saderat

---

[718] *Id*.; *see also* Rubin Decl., ¶ 72.

[719] Rubin Decl., ¶ 72.

[720] *See, e.g.*, *Id.* ¶¶ 62-63; *see also*, Clawson Decl., ¶ 122 ("It is also my expert opinion that Merkazi has engaged in these activities for many years, including during the period 2003-2011.").

[721] *Id., ¶* 72.

[722] Piatetsky Decl. ¶ 84 (*quoting* **PX48**, Press Release, *Treasury Sanctions Iran's Central Bank and National Development Fund*, Dep't of Treasury (Sept. 20, 2019)).

[723] *Id.*, ¶ 87 (*quoting* **PX135**, Press Release, *United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC-QF*, Dep't of Treasury (May 10, 2018)).

transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch

in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence."[724]

These billions of dollars required processing through the United States, where U.S. federal

and state authorities could monitor transfers for terror financing.[725] "Put simply, the CBI, NIOC

and Bank Melli were significant players in Iran's efforts to 'disguise its involvement in

proliferation and terrorism activities through an array of deceptive practices specifically designed

to evade detection.' The illicit flow of funds detailed above could not have been effectuated

without the guidance and complicity of the Defendants in this case."[726]

As FinCEN reported:

> Through state-owned banks, the Government of Iran disguises its involvement in
> proliferation and terrorism activities through an array of deceptive practices
> specifically designed to evade detection. The Central Bank of Iran and Iranian
> commercial banks have requested that their names be removed from global
> transactions in order to make it more difficult for intermediary financial institutions
> to determine the true parties in the transaction.[727]

---

[724] *Id.*, ¶ 74 (*quoting* **PX36**, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, Dep't of the Treasury (Oct. 25, 2007)); **PX303**, July 12, 2007 Press Roundtable with Under Secretary of the Treasury Stuart A. Levey ("The [Iranian] regime does use its banks to pursue not only its proliferation ambitions but also its funding of terrorism we in the United States have taken action against Bank Saderat for its role in funneling money from the Central Bank of Iran to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also its banks engage in deceptive practices in order to engage in that business.") (emphasis added).

[725] *See* Piatetsky Decl., ¶ 114 ("The vast majority of U.S. dollar-denominated funds transfers effected abroad must ultimately clear across the books of the U.S. Federal Reserve Bank of New York ('FRB-NY'), providing the United States with a key opportunity to monitor these transfers for misuse, including terror financing.").

[726] *Id.*, ¶ 143 (*citing* **PX122**, Press release, *Fact Sheet: Treasury Strengthens Preventive Measures Against Iran*, Dep't pf Treasury (November 6, 2008)).

[727] *Id.*, ¶ 76 (*citing* **PX116**, *Financial Crimes Enforcement Network Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity*, Dep't of Treasury (March 20, 2008)); *See also id.*, ¶ 79 (describing "the illicit and deceptive financial activities that Iranian financial institutions – including the Central Bank of Iran – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions").

Iran used these "deceptive practices in order" "to pursue … its funding of terrorism."[728]

Treasury concluded that "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation."[729] *Id.* However, Defendants and their co-conspirators were able to continue accessing the U.S. financial system—for instance, Treasury reiterated its findings in identifying Iran as a jurisdiction of primary money laundering concern in 2011 and 2019.[730] In fact, in the 2019 findings, Treasury noted that Iran's "covert methods for accessing the international financial system … including those at the Central Bank of Iran," "often serve[d] to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC- QF), Lebanese Hizballah … terrorist groups."[731]

A Southern District of New York district court has also found Bank Markazi liable for its provision of material support to Hezbollah, noting that "[t]he transfers of huge sums of Iranian money to terrorist organizations such as HAMAS and Hizballah … can only be accomplished with the complicity and/or knowledge and acquiescence of [Bank Markazi]. The same must be true in the case of banking transactions between Iranian agencies and instrumentalities and terrorist organizations. ***The Central Bank of Iran facilitates the transfer of money to terrorist groups***." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *9 (citations omitted; emphasis added). The same court also found:

> The entire apparatus of the Iranian state and government, and many parts of Iran's private sector, including corporations (*e.g.*, National Iranian Oil Company, Iran Air, Iran Shipping Lines); ***banks*** (***e.g.***, ***Central Bank [of Iran]***, Bank Sepah); state-run

---

[728] *Id.*, ¶ 73 (*quoting* **PX303**, July 12, 2007 Press Roundtable with Under Secretary of the Treasury Stuart A. Levey).

[729] *Id.*, ¶ 121 (*quoting* **PX122**, Press Release, *Fact Sheet: Treasury Strengthens Preventive Measures Against Iran*, Dep't of Treasury (Nov. 6, 2008)).

[730] *Id.*, ¶ 79-84.

[731] *Id.*, ¶ 83 (*quoting* **PX235**, *FinCEN, Imposition of Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern,* 84 Fed. Reg. 59302, 59304 (Nov. 4, 2019)).

media (e.g., IRIB television, the Islamic Revolution News Agency ("IRNA"), KAYHAN, and other daily newspapers); private individuals; and even charities are at the service of [Iran's] Supreme Leader, the IRGC, and the [Ministry of Intelligence] **when it comes to support of terrorism**.

*Id*. at *6 (emphasis added).







148

4.   **NIOC, Bank Melli, and Bank Markazi Laundered Money Through the International Financial System To Divert Funds to Iran's Terror Network.**

Defendants NIOC, Bank Melli, and Bank Markazi played crucial roles in moving billions of dollars through the global financial system for the ultimate benefit of the IRGC, MOIS and other components of Iran's terror network.[743] Defendants roles centered on manipulation of the U.S. and global financial system.[744] This was a decades-long money-laundering scheme that evolved and adapted as certain pieces of it were exposed by regulatory and enforcement actions.[745] This scheme occurred throughout the relevant time period in this case.[746] Iran's government revenues are derived from its oil exports and natural gas sales, which, because of their nature, are denominated in U.S. dollars. Those sales, in turn, have helped fuel the IRGC's support for international terrorism.[747]

The dollar denomination of these fund transfers effected abroad must ultimately clear across the books of the U.S. Federal Reserve Bank of New York, providing the United States with a key opportunity to monitor these transfers for misuse, including terror financing.[748] Therefore, the dollar-denomination of these transactions requires Iran to create transaction methods to mask the flow of funds from international regulatory agencies and its own citizens, but also allows Iran to fund terrorism using the most widely accepted global currency, while also providing Iran the plausible deniability that comes with not using Iranian Rials.[749]

---

[743] *Id.*, ¶¶ 114, 130, 143, 303.

[744] *Id.*, ¶ 114.

[745] *Id.*, ¶¶ 114-143.

[746] *Id.*

[747] *Id.*, ¶ 62.

[748] *Id.*, ¶ 114.

[749] *Id.*, ¶ 56.

The scope of Iran's money laundering scheme was massive, and the amount of U.S. dollar-denominated funds Defendants were able to access and clandestinely divert to the IRGC and MOIS in support of Iranian-sponsored terrorism was significant.[750] Iran's global money-laundering scheme also helped the regime acquire items restricted for their military applications and use in terrorism, including in the acts of terrorism against Plaintiffs.[751] This global scheme is dependent on Iran being able to turn Iranian oil into U.S. dollars.



**How Iran receives dollars for oil**

Despite the intent of OFAC and other regulators to prevent terrorism financing but to allow Iran some limited access to the global financial system and U.S. currency derived from purportedly legitimate oil sales, Iran quickly learned to exploit the international financial system to continue fueling its terrorist goals. By 2008, Iran, using NIOC, Bank Melli and Bank Markazi (and with the cooperation of several non-Iranian financial institutions) had so thoroughly exploited the international financial system that Treasury revoked the most exploited aspect of the international financial system (the "U-turn Exemption") altogether. In doing so, Treasury specifically

---

[750] *Id.*, ¶ 130.

[751] *Id.*, ¶ 132.

highlighted "the significant terrorist financing and proliferation risks posed by Iran," concluding that "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation."[752] Iran's support for terrorism at this time was of such concern that the U-turn revocation attempted to "close the last general entry point for Iran to the U.S. financial system."[753] Despite the revocation of the U-turn transaction exemption, Defendants Iran, NIOC, Bank Melli and Bank Markazi's roles in moving billions of dollars through the international financial system for the benefit of the IRGC, MOIS, and other elements of Iran's terror network continued. The evolved efforts to skirt detection focused upon the manipulation of the messaging and data reporting protocols in the U.S. and global financial systems.[754]

Both before and after OFAC's revocation of the U-turn exemption, Iran, through NIOC, Bank Melli, and Bank Markazi, used illegal methods to blind U.S. and state regulators, preventing them from identifying Iranian parties to cross-border electronic funds transactions—constituting many of the "deceptive practices" repeatedly identified by Treasury as central to Iran's terror financing.[755]

### 5.   Defendants' Money Laundering Scheme Enabled Them to Divert U.S. Dollar Funds to IRGC and MOIS to Fund Terror Groups in Iraq.

With the money laundered by Iran through its agents and operatives (NIOC, Bank Melli, and Bank Markazi), Iran used Hezbollah, IRGC and MOIS to provide substantial support to Shia and Sunni Special Groups within Iraq. The illicit funds Iran provided to these Shia and Sunni Special Groups allowed them to authorize, plan, and commit attacks against Americans in Iraq.

---

[752] *Id.*, ¶ 121 (*citing* **PX122**, Press Release, *Fact Sheet: Treasury Strengthens Preventive Measures Against Iran*, Dep't of Treasury (Nov. 6, 2008)).
[753] *Id.*
[754] *Id.*, ¶ 114.
[755] *Id.*, ¶¶ 73-79, 81, 93-97, 122, 143.

For example, Iran, through MOIS and the IRGC, offered bounty rewards for every killed or captured American Special Forces soldier.[756] Under Iran's Constitution, the Supreme Leader sets the direction of foreign and domestic policies, controls intelligence operations, and is the commander-in-chief of the armed forces.[757]  Hence both MOIS and IRGC-QF report directly to the Supreme Leader.[758] They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes, primarily via acts of international terrorism).[759] On June 10, 2003, American intelligence officials recognized that MOIS and the IRGC-QF are deeply involved in supporting AQ.[760]

Iran, through MOIS, provided material support to Sunni and Shia terrorist groups in Iraq by providing safe haven, safe passage, financing, training, personnel, and equipment.[761] With the assistance of state-owned banks and businesses (including Defendants NIOC, Bank Markazi, and Bank Melli), MOIS utilized funds from Iran's oil sales to support AQ and the Special Groups in Iraq, thereby increasing these groups' operational capacities.

> ### 6.    Defendants' Money Laundering Scheme Enabled Iran to Acquire Restricted Items for Use in Terrorism.

Iran's money-laundering scheme helped the regime acquire items that are restricted due to their application in military settings and use in terrorism.[762] For instance, with SCB's assistance, Bank Melli facilitated the purchase of restricted components of hydraulic presses of the type used

---

[756] Piatetsky Decl., fn. 103.

[757] **PX275**, *Iran's Ministry of Intelligence and Security: A Profile*, p. 13 Library of Congress (December 2012).

[758] *Id.*

[759] Stratfor, *Iranian Intelligence and Regime Preservation* (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

[760] *U.S. says Iran Harbors al Qaeda 'associate'*, The Washington Times (June 10, 2003).

[761] Piatetsky Decl., ¶¶ 218-226; Clawson Decl., ¶¶ 94-99; Levitt Decl., ¶¶ 64-72.

[762] Piatetsky Decl., ¶ 132.

to create EFPs, the signature Iranian weapon used against Coalition Forces in Iraq.[763] Bank Melli
also facilitated the illegal purchase of a restricted General Electric aircraft engine for a subsidiary
of Iran's Mahan Air (a SDGT) for flying IRGC and Hezbollah weapons and personnel into Iraq.[764]
The transaction was structured to omit Bank Melli's role in financing the letter of credit from the
component of the transactions processed in the United States.[765] Regarding these activities,
FinCEN explained:

> For many years, the Iranian commercial airline Mahan Air has transferred weapons,
> funds, and people on behalf of the IRGC-QF and provided support to the Syrian
> Assad regime and Lebanese Hizballah. In 2011, OFAC designated Mahan Air for
> providing financial, material, and technological support to the IRGC-QF. To evade
> sanctions, Mahan Air front companies have negotiated sales contracts and obtained
> U.S. parts and services for Mahan Air's aircraft in violation of U.S. sanctions.[766]

As demonstrated above, NIOC, Bank Melli, and Bank Markazi all provided substantial and
material support to Iran's terrorism network. It was this material support that further enabled Iran
and its agents of terror to commit the subject terrorist attacks.

## VII.   TERROR ATTACKS WERE A FORESEEABLE CONSEQUENCE OF DEFENDANTS' MATERIAL SUPPORT.

If a defendant provides substantial material assistance to a terrorist organization knowing
of its violent character, it is reasonably foreseeable this may lead to terrorist attacks. *See Owens*,
864 F.3d at 794; *Force*, 464 F. Supp. 3d at 368. Iran's active encouragement of terrorism and
widespread support for terrorist groups, which serve as proxies for Iran's "geopolitical strategy"
of fomenting terrorism throughout the Middle East, made terrorist attacks in Iraq (including the
subject attacks) reasonably foreseeable. *See Force*, 464 F. Supp. 3d at 337-338, 369. Indeed,

---

[763] *Id.*
[764] *Id.*, ¶ 133 and fn. 96 (*citing* **PX101**, *Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System*, FinCEN (Oct. 11, 2018)).
[765] *Id.*, ¶¶ 133-143 (describing transaction details).
[766] *Id.*, ¶ 133 (*citing* **PX101**, *Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System*, FinCEN (October 11, 2018)).

Courts have had little difficulty finding that a reasonably foreseeable consequence of supporting a terrorist organization is terrorism. *See Kilburn*, 376 F.3d at 1127-1130 (finding that Sudan's "general awareness of the group's terrorist aims" satisfies the proximate cause element of a FSIA terrorism claim); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (affirming liability for donors to terrorist organizations whose donations were made for non-terrorism purposes: "Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities."); *Karcher*, 396 F. Supp. 3d at 55 ("It is enough, the D.C. Circuit held [in Kilburn], to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act.") (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005)).

In *Owens*, for example, the court found that, as Sudan's "relationship with al Qaeda deepened, Sudan undoubtedly became aware of al Qaeda's hostility to the United States and its intention to launch attacks against American interests." 864 F.3d at 798. The court further found evidence of Sudan's knowledge because, although al Qaeda openly boasted about attacking Americans, "Sudan continued to assist the group in moving people and resources throughout the region." *Id.* A defendant need not have awareness of specific attacks: "Sudan's claimed ignorance of al Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." *Id.*

In *Karcher*, a case dealing with similar attacks and material support allegations as here, the court concluded that "[t]here is more than a 'reasonable connection' between Iran's material support and the personal injuries and deaths" of the plaintiffs. 396 F. Supp. 3d, at 55. Thus, as

against Iran, "[t]he 'substantial factor' and 'reasonable foreseeability' prongs of the proximate cause analysis are easily satisfied." *Id*., at 56- 57. Although that support included provision of weapons, training, and other types of "kinetic" support, courts routinely find financial services, such as that provided here by the NIOC, Bank Melli, and Bank Markazi Defendants, as sufficient material support for proximate cause purposes. *See Kilburn*, 376 F.3d at 1130 (holding that providing money to a terrorist group can establish causation for violent acts as "[m]oney, after all, is fungible"). For instance, in *Shoham*, this Court found that Bank Saderat's provision of material support satisfied the "proximate cause" standard. *Shoham v. Islamic Republic of Iran*, 2017 WL 2399454, at *11-12 (quoting *Kilburn*, 376 F.3d at 1128).

Likewise, the D.C. Circuit Court of Appeals in *Owens* credited evidence of Sudan's "financial assistance" for al Qaeda as grounds for establishing proximate cause. 864 F.3d at 795. The evidence showed that "the partially state-owned al Sharmal Islamic Bank gave al Qaeda access to the formal banking system, which proved useful for laundering money and financing terrorist operations." *Id.* The court concluded that "although Sudan did not directly fund al Qaeda or its business, the court reasonably concluded its in-kind assistance had the same practical effect." *Id.* Similarly, the court credited evidence showing "that after al Qaeda started its businesses, Sudan fostered their growth through tax exceptions and customs privileges," "allow[ing] al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization." *Id*. at 794.

Here, Defendants, as key participants in Iran's terrorism apparatus, were unquestionably aware of the nature of their involvement in terrorism generally and of the support they provided to IRGC and Hezbollah in particular. As the State Department has explained, the IRGC's "support for terrorism is foundational and institutional" and the IRGC "has engaged in terrorist activity or

terrorism since its inception 40 years ago."[767] Treasury found that "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror."[768] Hezbollah is "Iran's main terrorist ally," *Karcher*, 396 F. Supp. 3d at 23 (quoting Annual Threat Assessment of the Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006), PX283, at 13), and Hezbollah has been "open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, are from the Islamic Republic of Iran." *Supra* at 19. *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 54 ("From defendants' actions of supplying resources and training to Hezbollah for this attack, it was entirely foreseeable that innocent people would be killed or injured by the detonation of a van filled with explosives."). As Hezbollah's leader described it in a 2016 speech, "[a]s long as Iran has money, we have money."[769] Moreover, the IRGC-QF and Hezbollah were Defendants' co-conspirators in their massive money- laundering and terror-financing scheme.

As for Defendants NIOC, Bank Melli, and Bank Markazi, these entities actually transferred much of the money Iran provided to the IRGC and Hezbollah, as Mr. Piatetsky explains. Moreover, as explained by Drs. Gartenstein-Ross and Rubin, the safe haven afforded to AQ and AQI fighters in Iran allowed those groups to access the Iran-state controlled banking system and establish the AQ Iran Facilitation Network that sustained the groups' financial services and fundraising for years. AQ's financial facilitation network was so critical to the group that it negotiated a non-

---

[767] **PX21**, *Designation of the Islamic Revolutionary Guard Corps*, Dep't of State (April 8, 2019). *See also* Clawson Decl. ¶¶ 212-213.

[768] **PX34**, Press Release, *Treasury Designates IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority*, Dep't of Treasury (October 13, 2007).

[769] *Id.*, ¶ 158 (*quoting* **PX676**, Majid Rafizadeh, *In first, Hezbollah confirms all financial support comes from Iran*, Al Arabiya News (June 25, 2016)).

aggression pact with Iran so that it could continue to benefit from the access and from use of Iran's financial system and the safe harbor from global counterterrorism enforcement that it provided.

The subject attacks in Iraq were indeed foreseeable to Defendants. As founded by the *Karcher* Court, "[a]mong Iran's foreign activities, its campaign in Iraq figures prominently." 396 F. Supp. 3d at 22. The *Karcher* court noted, "[t]he 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region. To that end Iran employed an 'all elements of national power' approach in exploiting the outcome of this seminal event. This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies." 396 F. Supp. 3d at 22-23.[770]

## VIII.   CONCLUSION

Based on the foregoing, as well as the evidence cited herein and attached hereto, Plaintiffs respectfully ask the Court to enter an order making the following findings:

- Defendants provided material support to the Shia terrorist groups the Badr Corps, Jaysh al-Mahdi, the Promised Day Brigade, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network during the relevant time period of 2003-2011.

- Defendants' provision of material support to the above-mentioned Shia terrorist groups was essential to the groups' operating capacity and terrorist attacks were reasonably foreseeable and a natural consequence of that material support.

- Defendants provided material support to the Sunni terrorist groups al Qaeda and al Qaeda in Iraq and Ansar al Islam during the relevant time period of 2003-2011.

- Defendants' provision of material support to the above-mentioned Sunni terrorist

---

[770] *See also* Levitt Decl., ¶ 22.

groups was essential to the groups' operating capacity and terrorist attacks were reasonably foreseeable and a natural consequence of that material support.

Dated: May 2, 2022             Respectfully submitted,

            By: */s/ Christopher G. Paulos*
            Christopher G. Paulos
            DC Bar No. 1615782
            Florida Bar No. 0091579
            **LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,**
            **BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
            316 South Baylen Street, Suite 600
            Pensacola, Florida 32502
            Telephone: (850) 435-7067
            Facsimile: (850) 436-6067
            Email: cpaulos@levinlaw.com

            Jeremy A. Tor (*Pro Hac Vice*)
            Ohio Bar No. 0091151
            **SPANGENBERG, SHIBLEY & LIBER LLP**
            1001 Lakeside Ave., East., Suite 1700
            Cleveland, Ohio 44114
            Telephone: 216-696-3232
            Facsimile: 216-696-3924
            Email: jtor@spanglaw.com

            *Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing has been served by electronic filing with the

Clerk via the CM/ECF system, which electronically notifies all registered participants.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 2, 2022                                    Respectfully submitted,

                                                     */s/ Christopher G. Paulos*

159