PX35

# FACT SHEET                                              *September 23, 2003*

**ABU MUSA'AB AL-ZARQAWI**

*AKAs: KHALAILAH, Ahmed Fadee Ii AL-KHALAYLAH, Ahmad Fadi1 Nazza1i ABU AL-MU'TAZ*

Abu Musa'ab a1-ZARQAWI, a Jordanian citizen, has ties to a1-Qaida, Asbat a1-Ansar and Hizba11ah.   In addition to providing the financial and material support for the assassination of a U.S. diplomat, he has participated in acts of terrorism, trained terrorist, led terrorist cells, facilitated transport of terrorists and is being cited in the international press as a suspect in the recent devastating bombing of the Jordanian embassy in Baghdad.

ZARQAWI has arranged training for terrorists at a1-Qaida camps. While he was in Pakistan, ZARQAWI made contact with a1-Qaida to train Jordanians. His operatives (called "Jund a1-Sham") began to arrive in Afghanistan in large numbers in 1999. Some of these operatives trained at a1-Qaida's a1-Faruq Camp, where they received full support   from a1-Qaida. ZARQAWI eventually established his own cell and camp in Herat, Afghanistan.

Plans were made to send ZARQAWI's operatives to meet with Asbat a1-Ansar (designated under E.O. 13224 as a Specially Designated Global Terrorist on September 24, 2001 and as a Foreign Terrorist Organization on March 27, 2002), Hizballah and any other group that would enable them to smuggle mujaheddin into Palestine. This plan was launched by ZARQAWI with other terrorist leaders in order to smuggle operatives into Israel to conduct operations. In addition to being tasked with finding a mechanism that would enable more suicide martyrs to enter Israel, these operatives were also sent to provide training on explosives, poisons, and remote controlled devices.

In October 2000, ZARQAWI was indicted in absentia in Jordan for his role in the al-Qaida Millennium bombing plot targeting the Radisson SAS hotel in Amman as well as other American, Israeli, and Christian religious sites in Jordan.

In mid 2001, ZARQAWI returned to Qandahar from Herat. At this time, he had received more than U.S. $35,000 for work in Palestine. ZARQAWI planned to use the money to bring more Jordanian and Palestinian mujaheddin to the camp in Herat, to purchase passports, and to facilitate travel to Lebanon. He received assurances that further financing would be provided for attacks against Israel. In early 2002, ZARQAWI was reported to have found a way into Palestine.

On October 28, 2002, U.S. diplomat Laurence Foley, an officer with the U.S. Agency for International Development, was assassinated in Amman, Jordan. ZARQAWI provided financial and material support for this assassination. Key individuals involved in both the planning and execution of the operation had strong ties to Afghan Jihad, the International Mujaheddin Movement, and al-Qaida. One of these individuals, Salim Sa'd Salim Bin-Suwayd, a member of al-Qaida, received more than U.S. $50,000 for his cooperation in planning assassinations in Jordan against U.S., Israeli, and Jordanian government officials. ZARQAWI instructed Suwayd to hide after he had completed his first operation and to plan to pursue additional operations against Israeli and Jordanian targets in Amman in the future. Jordanian authorities arrested Suwayd for the murder. The trial of Suwayd, a Libyan national, is currently underway in Jordan.

In late 2002, ZARQAWI traveled to Iraq where he initiated plans to smuggle additional small arms, explosives, and rockets (NFI) into Jordan for use by his terrorist cell.

DOB: 20 October 1966

POB: Zarqa, Jordan

Passport Number: Z264958; Issued 4 April 1999, valid through 4 April 2004 (also using fraudulent Lebanese and Saudi passports (NFI))

Citizenship: Jordan

National No. 9661031030

# PX35

Additional information on ZARQAWI can be found in excerpts from Secretary of State Colin L. Powell's Remarks to the United Nations Security Council on 5 February 2003 at www.state.gov//document/organization/20124.pdf .

**ZARQAWI 'S GERMAN CELL**

The German government has established that ZARQAWI is the operational leader of Al Tawhid, an organization with close personal and organizational links to the al-Qaida network. Al Tawhid, which has the figurative meaning of "unity of all the faithful" -is the name of a Palestinian Sunni movement with roots in Jordan. It is waging a campaign against the Jordanian monarchy, which it rejects as "un-Islamic." Based on a militant interpretation of Islam, the Al Tawhid movement promotes and supports the "jihad" of all fellow-believers worldwide; in particular, the "fight against non-believers and crusaders" led by Usama bin Laden and al-Qaida.

The German government notes that an independent Al Tawhid cell was formed in Germany by September 2001. Formed around Mohamed ABU DHESS, the cell worked in both an isolated and clandestine manner. In addition to ZARQAWI, members of the cell included Mohamed ABU DHESS, Shadi ABDALLA, Aschraf AI-DAGMA, and Ismail SHALABI, who were living in Beckum, German. In early September 2001, ZARQAWI met his confidant, Mohamed ABU DHESS, in Iran and instructed him to commit terrorist attacks against Jewish or Israeli facilities in Germany with "his people."

According to the German government, the group was involved in gathering donations, smuggling "fighters" and forging passports, but then increasingly concentrated on planning the attacks in Germany. ZARQAWI urged them to carry out his instructions swiftly. The members of the cell planned to use a pistol fitted with a silencer to carry out an attack on a busy square in a German town or city and to explode hand grenades in another German town in the immediate vicinity of an Israeli or Jewish property with the aim of killing as many people as possible. The attacks were supposed to be carried out by Shadi ABDALLA, Aschraf AL-DAGMA and Ismail SHALABI.

The German government has also stated that Shadi ABDALLA, a trusted ally of ZARQAWI with close contacts to Mohamed ABU DHESS, was instructed to identify potential targets in German cities and, above all, to obtain the necessary weapons. In March 2002 he ordered a pistol fitted with a silencer and a crate of hand grenades from Djamel MOUSTFA, a supporter of the cell based in Dusseldorf. However, before the weapons could be delivered, Shadi ABDALLA, Mohamed ABU DHESS, Aschraf AL-DAGMA, Ismail SHALABI and Djamel MOUSTFA were arrested along with other suspects on April 23, 2002. All five of them are currently in detention awaiting trial.

Shadi ABDALLA was indicted by the German Public Prosecutor General of the Federal Court of Justice on May 15, 2003 before the State Security Division of the

Dusseldorf Higher Regional Court
for being a member of a terrorist organization and for the organized forging of passports. The investigations against Mohamed ABU DHESS, Aschraf AL-DAGMA, Ismail SHALABI, and Djamel MOUSTFA are still ongoing.

In addition to ZARQAWI, the German government submitted several Al Tawhid members to the United Nations to be added to the UN Security Council Resolution 1267-list of terrorists and terrorist supporters. The U.S. supports the UN action to designate the following individuals:

- Mohamed ABU DHESS

- Shadi ABDALLA

- Aschraf AL-DAGMA

- Ismail SHALABI

- Djamel MOUSTFA

**EXCERPTS FROM REMARKS TO THE UN SECURITY COUNCIL BY SECRETARY OF STATE COLIN POWELL**

PX35

New York City
February 5, 2003

Iraq today harbors a deadly terrorist network headed by Abu Musab al-Zarqawi an associate and collaborator of Usama bin Laden and his al-Qaida lieutenants.

Zarqawi, Palestinian born in Jordan, fought in the Afghan war more than a decade ago. Returning to Afghanistan in 2000, he oversaw a terrorist training camp. One of his specialties, and one of the specialties of this camp, is poisons.

When our coalition ousted the Taliban, the Zarqawi network helped establish another poison and explosive training center camp, and this camp is located in northeastern Iraq. You see a picture of this camp.

The network is teaching its operatives how to produce ricin and other poisons. Let me remind you how ricin works. Less than a pinch -- imagine a pinch of salt -- less than a pinch of ricin, eating just this amount in your food, would cause shock, followed by circulatory failure. Death comes within 72 hours and there is no antidote. There is no cure. It is fatal.

Those helping to run this camp are Zarqawi lieutenants operating in northern Kurdish areas outside Saddam Hussein's controlled Iraq. But Baghdad has an agent in the most senior levels of the radical organization Ansar al-Islam that controls this corner of Iraq. In 2000, this agent offered al-Qaida safe haven in the region.

After we swept al-Qaida from Afghanistan, some of those members accepted this safe haven. They remain there today.

Zarqawi's activities are not confined to this small corner of northeast Iraq. He traveled to Baghdad in May of 2002 for medical treatment, staying in the capital of Iraq for two months while he recuperated to fight another day.

During his stay, nearly two dozen extremists converged on Baghdad and established a base of operations there. These al-Qaida affiliates based in Baghdad now coordinate the movement of people, money and supplies into and throughout Iraq for his network, and they have now been operating freely in the capital for more than eight months.

Iraqi officials deny accusations of ties with al-Qaida. These denials are simply not credible. Last year, an al-Qaida associate bragged that the situation in Iraq was "good," that Baghdad could be transited quickly.

We know these affiliates are connected to Zarqawi because they remain, even today, in regular contact with his direct subordinates, include the poison cell plotters. And they are involved in moving more than money and materiel. Last year, two suspected al-Qaida operatives were arrested crossing from Iraq into Saudi Arabia. They were linked to associates of the Baghdad cell and one of them received training in Afghanistan on how to use cyanide.

From his terrorist network in Iraq, Zarqawi can direct his network in the Middle East and beyond. We in the United States, all of us, the State Department and the Agency for International Development, we all lost a dear friend with the cold-blooded murder of Mr. Laurence Foley in Amman, Jordan, last October. A despicable act was committed that day, the assassination of an individual whose sole mission was to assist the people of Jordan. The captured assassin says his cell received money and weapons from Zarqawi for that murder. After the attack, an associate of the assassin left Jordan to go to Iraq to obtain weapons and explosives for further operations. Iraqi officials protest that they are not aware of the whereabouts of Zarqawi or of any of his associates. Again, these protests are not credible. We know of Zarqawi's activities in Baghdad. I described them earlier.

Now let me add one other fact. We asked a friendly security service to approach Baghdad about extraditing Zarqawi and providing information about him and his close associates. This service contacted Iraqi officials twice and we passed details that should have made it easy to find Zarqawi. The network remains in Baghdad. Zarqawi still remains at large, to come and go.

As my colleagues around this table and as the citizens they represent in Europe know, Zarqawi's terrorism is not confined to the Middle East. Zarqawi and his network have plotted terrorist actions against countries including France, Britain, Spain, Italy, Germany and Russia. According to detainees Abu Atiya, who graduated from Zarqawi's terrorist camp in Afghanistan, tasked at least nine North African extremists in 2001 to travel to Europe to conduct poison and explosive attacks.

Since last year, members of this network have been apprehended in France, Britain, Spain and Italy. By our last count, 116 operatives connected to this global web have been arrested. The chart you are seeing shows the network in Europe.

We know about this European network and we know about its links to Zarqawi because the detainees who provided the information about the targets also provided the names of members of the network. Three of those he identified by

# PX35

name were arrested in France last December. In the apartments of the terrorists, authorities found circuits for explosive devices and a list of ingredients to make toxins.

The detainee who helped piece this together says the plot also targeted Britain. Later evidence again proved him right. When the British unearthed the cell there just last month, one British police officer was murdered during the destruction of the cell.

We also know that Zarqawi's colleagues have been active in the Pankisi Gorge, Georgia, and in Chechnya, Russia. The plotting to which they are linked is not mere chatter. Members of Zarqawi's network say their goal was to kill Russians with toxins.

We are not surprised that Iraq is harboring Zarqawi and his subordinates. This understanding builds on decades-long experience with respect to ties between Iraq and al-Qaida. Going back to the early and mid-1990s when bin Laden was based in Sudan, an al-Qaida source tells us that Saddam and bin Laden reached an understanding that al-Qaida would no longer support activities against Baghdad. Early al-Qaida ties were forged by secret high-level intelligence service contacts with al-Qaida, secret Iraqi intelligence high-level contacts with al-Qaida.

We know members of both organizations met repeatedly and have met at least eight times at very senior levels since the early 1990s. In 1996, a foreign security service tells us that bin Laden met with a senior Iraqi intelligence official in Khartoum and later met the director of the Iraqi intelligence service.

Saddam became more interested as he saw al-Qaida's appalling attacks. A detained al-Qaida member tells us that Saddam was more willing to assist al-Qaida after the 1998 bombings of our embassies in Kenya and Tanzania. Saddam was also impressed by al-Qaida's attacks on the *USS Cole* in Yemen in October 2000.

Iraqis continue to visit bin Laden in his new home in Afghanistan. A senior defector, one of Saddam's former intelligence chiefs in Europe, says Saddam sent his agents to Afghanistan sometime in the mid-1990s to provide training to al-Qaida members on document forgery.

From the late 1990s until 2001, the Iraqi Embassy in Pakistan played the role of liaison to the al-Qaida organization.

Some believe, some claim, these contacts do not amount to much. They say Saddam Hussein's secular tyranny and al-Qaida's religious tyranny do not mix. I am not comforted by this thought. Ambition and hatred are enough to bring Iraq and al-Qaida together, enough so al-Qaida could learn how to build more sophisticated bombs and learn how to forge documents, and enough so that al-Qaida could turn to Iraq for help in acquiring expertise on weapons of mass destruction.

And the record of Saddam Hussein's cooperation with other Islamist terrorist organizations is clear. Hamas, for example, opened an office in Baghdad in 1999 and Iraq has hosted conferences attended by Palestine Islamic Jihad. These groups are at the forefront of sponsoring suicide attacks against Israel.

Al-Qaida continues to have a deep interest in acquiring weapons of mass destruction. As with the story of Zarqawi and his network, I can trace the story of a senior terrorist operative telling how Iraq provided training in these weapons to al-Qaida. Fortunately, this operative is now detained and he has told his story. I will relate it to you now as he, himself, described it.

This senior al-Qaida terrorist was responsible for one of al-Qaida's training camps in Afghanistan. His information comes firsthand from his personal involvement at senior levels of al-Qaida. He says bin Laden and his top deputy in Afghanistan, deceased al-Qaida leader Muhammad Atif, did not believe that al-Qaida labs in Afghanistan were capable enough to manufacture these chemical or biological agents. They needed to go somewhere else. They had to look outside of Afghanistan for help.

Where did they go? Where did they look? They went to Iraq. The support that this detainee describes included Iraq offering chemical or biological weapons training for two al-Qaida associates beginning in December 2000. He says that a militant known as Abdallah al-Iraqi had been sent to Iraq several times between 1997 and 2000 for help in acquiring poisons and gasses. Abdallah al-Iraqi characterized the relationship he forged with Iraqi officials as successful.

As I said at the outset, none of this should come as a surprise to any of us. Terrorism has been a tool used by Saddam for decades. Saddam was a supporter of terrorism long before these terrorist networks had a name, and this support continues. The nexus of poisons and terror is new. The nexus of Iraq and terror is old. The combination is lethal.

With this track record, Iraqi denials of supporting terrorism take their place alongside the other Iraqi denials of weapons of mass destruction. It is all a web of lies.

PX35

# PX36

# U.S. DEPARTMENT OF THE TREASURY

## Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism

October 25, 2007

*(Archived Content)*

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

hp-644

The U.S. Government is taking several major actions today to counter Iran's bid for nuclear capabilities and support for terrorism by exposing Iranian banks, companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S. financial system.

Today, the Department of State designated under Executive Order 13382 two key Iranian entities of proliferation concern: the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) and the Ministry of Defense and Armed Forces Logistics (MODAFL). Additionally, the Department of the Treasury designated for proliferation activities under E.O. 13382 nine IRGC-affiliated entities and five IRGC-affiliated individuals as derivatives of the IRGC, Iran's state-owned Banks Melli and Mellat, and three individuals affiliated with Iran's Aerospace Industries Organization (AIO).

The Treasury Department also designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to the Taliban and other terrorist organizations, and Iran's state-owned Bank Saderat as a terrorist financier.

Elements of the IRGC and MODAFL were listed in the Annexes to UN Security Council Resolutions 1737 and 1747. All UN Member States are required to freeze the assets of entities and individuals listed in the Annexes of those resolutions, as well as assets of entities owned or controlled by them, and to prevent funds or economic resources from being made available to them.

The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. Last week, the Treasury Department issued a warning to U.S. banks setting forth the risks posed by Iran. (For the text of the Treasury Department statement see: http://www.fincen.gov/guidance_fi_increasing_mlt_iranian.pdf.) Today's actions are consistent with this warning, and provide additional information to help financial

PX36

institutions protect themselves from deceptive financial practices by Iranian entities and individuals engaged in or supporting proliferation and terrorism.

**Effect of Today's Actions**

As a result of our actions today, all transactions involving any of the designees and any U.S. person will be prohibited and any assets the designees may have under U.S. jurisdiction will be frozen. Noting the UN Security Council's grave concern over Iran's nuclear and ballistic missile program activities, the United States also encourages all jurisdictions to take similar actions to ensure full and effective implementation of UN Security Council Resolutions 1737 and 1747.

Today's designations also notify the international private sector of the dangers of doing business with three of Iran's largest banks, as well as the many IRGC- affiliated companies that pervade several basic Iranian industries.

**Proliferation Finance – Executive Order 13382 Designations**

E.O. 13382, signed by the President on June 29, 2005, is an authority aimed at freezing the assets of proliferators of weapons of mass destruction and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the Order prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

The Islamic Revolutionary Guard Corps (IRGC): Considered the military vanguard of Iran, the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747.

The IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD. The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3. The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs.

Ministry of Defense and Armed Forces Logistics (MODAFL): The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile

PX36

research, development and production activities and organizations, including the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382- designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

Bank Melli, its branches, and subsidiaries: Bank Melli is Iran's largest bank. Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs. This includes handling transactions in recent months for Bank Sepah, Defense Industries Organization, and Shahid Hemmat Industrial Group. Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Sepah in transactions. Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.

Bank Melli also provides banking services to the IRGC and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

Bank Mellat, its branches, and subsidiaries: Bank Mellat provides banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747. Bank Mellat services and maintains AEOI accounts, mainly through AEOI's financial conduit, Novin Energy. Bank Mellat has facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003. Transfers from Bank Mellat to Iranian nuclear-related companies have occurred as recently as this year.

IRGC-owned or -controlled companies: Treasury is designating the companies listed below under E.O. 13382 on the basis of their relationship to the IRGC. These entities are owned or controlled by the IRGC and its leaders. The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including

PX36

petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others.

- Khatam al-Anbya Construction Headquarters
- Oriental Oil Kish
- Ghorb Nooh
- Sahel Consultant Engineering
- Ghorb-e Karbala
- Sepasad Engineering Co
- Omran Sahel
- Hara Company
- Gharargahe Sazandegi Ghaem

IRGC Individuals: Treasury is designating the individuals below under E.O 13382 on the basis of their relationship to the IRGC. One of the five is listed on the Annex of UNSCR 1737 and the other four are listed on the Annex of UNSCR 1747 as key IRGC individuals.

- General Hosein Salimi, Commander of the Air Force, IRGC
- Brigadier General Morteza Rezaie, Deputy Commander of the IRGC
- Vice Admiral Ali Akhbar Ahmadian, Most recently former Chief of the IRGC Joint Staff
- Brigadier Gen. Mohammad Hejazi, Most recently former Commander of Bassij resistance force
- Brigadier General Qasem Soleimani, Commander of the Qods Force

Other Individuals involved in Iran's ballistic missile programs: E.O. 13382 derivative proliferation designation by Treasury of each of the individuals listed below for their relationship to the Aerospace Industries Organization, an entity previously designated under E.O. 13382. Each individual is listed on the Annex of UNSCR 1737 for being involved in Iran's ballistic missile program.

- Ahmad Vahid Dastjerdi, Head of the Aerospace Industry Organization (AIO)
- Reza-Gholi Esmaeli, Head of Trade & International Affairs Dept., AIO
- Bahmanyar Morteza Bahmanyar, Head of Finance & Budget Department, AIO

**Support for Terrorism -- Executive Order 13224 Designations**

E.O. 13224 is an authority aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the E.O. prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

IRGC-Qods Force (IRGC-QF): The Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas,

PX36

Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. This support contravenes Chapter VII UN Security Council obligations. UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

<u>Bank Saderat, its branches, and subsidiaries</u>: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas.

**REPORTS**

- Treasury and State Department Iran Designations Identifier

PX36

PX39

# Treasury Department Statement Regarding the Designation of Ansar al-Islam

home.treasury.gov/news/press-releases/js48

*(Archived Content)*

JS-48

The United States government is taking action today to designate Ansar al-Islam (AI), formerly known as Jund al-Islam, as a terrorist group with links to Al-Qaida and to notify the United Nations to ensure that any assets or transactions related to this group are frozen internationally.  AI is a terrorist group operating in northeastern Iraq with close links to and support from al-Qaida.  Al-Qaida and Usama bin Laden participated in the formation and funding of Ansar al-Islam, and AI has provided safe haven to al-Qaida in northeastern Iraq.  AIs predecessor, Jund al-Islam, was formed in September 2001.  AI came into being with the blessingof bin Laden after its leaders visited al-Qaida in Afghanistan in 2000 and 2001.  Bin Laden provided AI with an estimated $300,000 to $600,000 in seed money.  AI has acknowledged that it contracted Islamic figures abroadbefore declaring jihad in northeastern Iraq.

Ansar al-Islam has received training and logistical assistance from al-Qaida.  Groups of AIs Kurdish members have traveled to Afghanistan to train with al-Qaida, while AIs foreign members are believed to be al-Qaida-trained veterans of conflicts in Afghanistan and Chechnya.

Ansar al-Islam has a close association with senior al-Qaida operative Abu Musab al-Zarqawi, a poisons and chemical weapons expert whose network has established a poison and explosives training camp in the area of northeastern Iraq that is controlled by Ansar al-Islam.  Zarqawis lieutenants help run this camp, which teaches operatives how to produce ricin and other poisons.

Ansar al-Islam (whose cadres include Kurdish, Arab, and Pashtun members) has declared jihadagainst secular and non-Islamic groups in northeastern Iraq and conducts violent attacks against Kurdish groups in the region, such as the Patriotic Union of Kurdistan (PUK).

 This action today is yet another step in uncovering the tangled web of al Qaida and its alliances throughout the world.  Including todays action there are 260 individuals, entities and organizations listed pursuant to the Presidents Executive Order 13224, whose assets must be frozen in the United States and with whom U.S persons may not do business or support.  Since September 11, 2001, $124.5 million has been blocked worldwide.  Of that

PX39

amount, $36.2 million has been blocked in the United States.  Over 165 countries and jurisdictions have taken concrete actions to disrupt the financing of terrorism.

PX39

PX40

# Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq

home.treasury.gov/news/press-releases/tg1775

*(Archived Content)*

**WASHINGTON –** The U.S. Department of the Treasury today designated Ali Mussa Daqduq al-Musawi (Daqduq) pursuant to Executive Order (E.O.) 13224 for acting on behalf of Hizballah. Daqduq is a senior Hizballah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.

On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq, who falsely claimed to be a deaf mute at the time and produced a number of false identity cards using a variety of aliases.  From January 2009 until December 2011, U.S. military forces held Daqduq in Iraq under the terms of the 2008 Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq (the Security Agreement).  In December 2011, the United States transferred Daqduq to Iraq's custody in accordance with our obligations under the Security Agreement.  He was subsequently tried in Iraq on terrorism and other charges.  On May 7, 2012, an Iraqi court dismissed terrorism and false documents charges against him.  Daqduq remained in Iraqi custody until last week when the Iraqi government determined that it no longer had a legal basis to hold him, and he was released Friday.

Ali Mussa Daqduq al-Musawi is a dangerous Hizballah operative responsible for planning and carrying out numerous acts of terrorism in Iraq, said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. The United States is extremely disappointed he was allowed to go free and we will continue our efforts to bring him to justice.

Today's action further highlights the fact that Hizballah's terrorist activities stretch beyond the borders of Lebanon.  These terrorist acts are in some cases funded, coordinated, and carried out in concert with the Iranian Revolutionary Guard Corps-Qods Force (IRGC-QF). Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks against Coalition and Iraqi forces.

Daqduq has been a member of Hizballah since 1983 and has served in multiple Hizballah leadership positions, including as commander of a Hizballah special forces unit and chief of a protective detail for Hizballah Secretary-General Hassan Nasrallah.

PX40

In approximately 2005, Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq.  In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups, now known as Asa'ib Ahl al-Haq.

As of 2006, Daqduq had been ordered by Hizballah to work with IRGC-QF to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops.

**Identifying Information**

**Individual:  Ali Mussa Daqduq al-Musawi**
AKA:  Ali Musa Daqduq
AKA:  Hamid Muhammad Jabur al-Lami
AKA:   Hamid Muhammad al-Lami
AKA:   Husayn Muhammad Jabur al-Musui
AKA:   Hamid Muhammad Jabur al-Musui
AKA:   Hamid Muhammad Daqduq al-Musawi
AKA:   Hamid Muhammad Jabur al-Musawi
AKA:   Hamid Majid 'Abd al-Yunis
Nationality:  Lebanese
DOB No. 1:  1 September 1969
DOB No. 2:  31 December 1971
DOB No. 3:  9 August 1971
DOB No. 4:  9 September 1970
DOB No. 5:  9 August 1969
DOB No. 6:  5 March 1972
POB No. 1:  Beirut, Lebanon
POB No. 2:  Al-Karradah, Baghdad, Iraq

###

PX40

# PX42

# Treasury Designates Individuals and Entities Fueling Violence in Iraq

**home.treasury.gov**/news/press-releases/hp1141

*(Archived Content)*

HP-1141

**Washington, DC**--The U.S. Department of the Treasury today designated five individuals and two entities under Executive Order (E.O.) 13438 for threatening the peace and stability of Iraq and the Government of Iraq.  Four of the individuals designated today commit, direct, support, or pose a significant risk of committing acts of violence against Iraqi citizens, Iraqi government officials, and Coalition Forces.

These individuals are targeting and planning attacks against innocent Iraqis, the Government of Iraq, Coalition Forces, and U.S. troops. Their lethal and destabilizing tactics, especially by Iran's Qods Force, are intended to undermine Iraq as it strives for peace and prosperity, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence.

One of the individuals designated today is a member of Iran's Qods Force, the arm of the Islamic Revolutionary Guard Corps (IRGC) that is responsible for providing material support to Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine – General Command. Further, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shia militants who target and kill Coalition and Iraqi forces and Iraqi civilians. The IRGC–Qods Force was named a Specially Designated Global Terrorist by the Treasury Department on October 25, 2007.

The Syria-based individual and entities designated today act for and on behalf of, or are owned and controlled by, Syria-based Specially Designated National Mish'an Al-Jaburi, who was designated by Treasury under E.O. 13438 in January 2008 for providing financial, material, and technical support for acts of violence that threaten the peace and stability of Iraq.

Today's action follows President Bush's issuance of E.O. 13438 on July 17, 2007, which targets insurgent and militia groups in Iraq and their supporters. Designations under E.O. 13438 are administered by Treasury's Office of Foreign Assets Control and prohibit all transactions between the designees and any U.S. person and freeze any assets the designees may have under U.S. jurisdiction. Treasury previously designated four individuals and one entity under E.O. 13438 in January 2008.

## **Identifying Information**

PX42

**ABDUL REZA SHAHLAI**
AKAs:
Abdol Reza Shahlai
Abdul Reza Shala'i
`Abd-al Reza Shalai
`Abdorreza Shahlai
Abdolreza Shahla'i
Abdul-Reza Shahlaee
Hajj Yusef
Haji Yusif
Hajji Yasir
Hajji Yusif
`Yusuf Abu-al-Karkh'
Year of Birth:
Circa 1957
Location:
Kermanshah, Iran
Alt. Location:
Mehran Military Base, Ilam Province, Iran

Iran-based Abdul Reza Shahlai--a deputy commander in the IRGC–Qods Force--threatens the peace and stability of Iraq by planning Jaysh al-Mahdi (JAM) Special Groups attacks against Coalition Forces in Iraq.  Shahlai has also provided material and logistical support to Shia extremist groups--to include JAM Special Groups--that conduct attacks against U.S. and Coalition Forces.  In one instance, Shahlai planned the January 20, 2007 attack by JAM Special Groups against U.S. soldiers stationed at the Provincial Joint Coordination Center in Karbala, Iraq.  Five U.S. soldiers were killed and three were wounded during the attack.

In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.

Shahlai also approved and coordinated the training of JAM Special Groups.  As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq.  In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

**AKRAM 'ABBAS AL-KABI**
AKAs:
Akram Abas al-Ka'bi
Sheik Akram al-Ka'abi
Shaykh Abu-Akram al-Ka'abi
Abu-Muhammad

PX42

Karumi
Abu 'Ali
Nationality:
Iraqi
Year of Birth:
Circa 1976
Alt. Year of Birth:
Circa 1973
Place of Birth:
al 'Amarah, Iraq
Alt. Place of Birth:
al Kalamiy, Iraq

JAM Special Groups leader Akram 'Abbas al-Kabi threatens the peace and stability of Iraq and the Government of Iraq by planning and leading attacks against members of the Government of Iraq and Coalition Forces.  As of early-2008, al-Kabi was planning multiple attacks against Coalition Forces in order to show that JAM Special Groups were capable of conducting operations even when there was a freeze.  In one instance, in late-February 2008, JAM Special Groups led by al-Kabi claimed responsibility for mortar and rocket attacks against Coalition and Iraqi Security Forces in Baghdad's International Zone.  In March 2008, al-Kabi also led JAM Special Groups members who launched rockets into the International Zone.  Additionally, as of February 2008, al-Kabi sanctioned attacks targeting Coalition Forces to include indirect fire attacks against the International Zone.

Al-Kabi also provided financial and material support to Shia militia groups that committed acts of violence in Iraq.  In one instance, in early-April 2008, al-Kabi paid a JAM Special Groups leader 50 million Iraqi dinars (approximately $41,684 USD) for carrying out three separate improvised explosive device (IED) attacks against Coalition Forces in Baghdad.  As of February 2008, al-Kabi had also allegedly provided funding to JAM Special Groups for recruitment purposes.  Separately, as of early-2008, al-Kabi was providing weapons for large-scale military operations against Coalition Forces.

**HARITH SULAYMANAL-DARI**
AKAs:
Harith Al-Dari
Harith Al-Dhari
Harith Al-Dari Al-Zawbai
Harith S. Al-Dhari
Hareth Al Dari
Hareth Al-Dauri
Harith Dari Al-Zawba'i
Harith Al-Duri
Year of Birth:

PX42

1941
Place of Birth:
Baghdad, Iraq
Citizenship
Iraqi
Nationality:
Iraqi
Passport Number:
N348171/IRAQ
Title:
Secretary General of the Muslim Ulema Council
Alt. Title:
Leader of the Muslim Scholars Association
Location:
Jordan
Alt Location:
Akashat, Iraq
Alt Location:
Abu Ghuraib, Iraq
Alt Location:
Qatar
Alt Location:
Egypt

Jordan-based Harith Al-Dari-the Secretary General of the Muslim Ulama Council (MUC)-threatens the peace and stability of Iraq and the Government of Iraq by ordering and directing attacks against civilians and Iraqi and Coalition Forces.  As of mid-May 2008, Al-Dari ordered leaders of Al-Qa'ida in Iraq (AQI)-affiliated cells to attack Coalition Forces and the Sons of Iraq--local citizens who support Coalition and Iraqi Security Force operations against AQI and Sunni extremists by serving as auxiliary police forces. Two of these cells--both under Al-Dari's control--emplace IEDs along Coalition convoy routes and conduct small arms fire attacks against the Sons of Iraq at checkpoints.  Previously, in early-December 2005, Al-Dari ordered and was responsible for the kidnapping of four foreign nationals in Iraq by a group under Ansar al-Sunna, a Specially Designated Global Terrorist.

Separately, in early-October 2006, Al-Dari directed a plot to bring IEDs into the International Zone, Baghdad.  Although foiled, the plot was intended to be part of other coordinated attacks, to include plans to assassinate the commander of U.S. Forces in Iraq and the U.S. and British ambassadors to Iraq.  Al-Dari also ordered a MUC advisor to plan and direct late-November 2005 attacks against Coalition and Iraqi forces.

PX42

Al-Dari has also provided financial and material support to terrorist and insurgent groups that conduct attacks against Coalition and Iraqi Forces.  As of mid-April 2008, Al-Dari continuously travels between Lebanon, Syria, Jordan, and Saudi Arabia to elicit monetary and material donations that finance two Sunni terrorist groups in Baghdad.  The groups-- using funds provided by Al-Dari to purchase large amounts of bomb-making material, explosives, and weapons--emplace IEDs, launch mortars and rockets, and conduct sectarian violence.  Additionally, as of mid-April 2008, Al-Dari was in charge of funding for the AQI- affiliated Mujahidin Army (MA), to include distributing funds collected by foreign investors to support MA operations.  As of mid-2008, Al-Dari allegedly arranged financing for an AQI- affiliated group whose operational plans included emplacing IEDs, launching rockets, and conducting assassinations of political and religious figures that cooperated with the United States.  Additionally, as of early-2008, Al-Dari provided financial support to a Sunni extremist cell formed for the purpose of carrying out attacks on Multi-National Force – Iraq.

Previously, in June 2006, Al-Dari provided financial and logistical support for an attack against Iraqi forces.  Al-Dari owned a front company that received a money transfer of $5 million USD to finance a chemical mortar attack against Iraqi forces.  The money transfer was intended to provide logistical support for the attack, to include facilitating the use of Al- Dari's farm house and complex as a staging area and paying for the billeting of the foreign fighters slated to carry out the attack.

**AHMAD HASSAN KAKA AL-UBAYDI**
AKAs:
Ahmed Hassan Kaka al-Obeidi
Ali Al Nobani
Hazim Kaka
Nationality:
Iraqi
Year of Birth:
1949
Place of Birth:
Baghdad, Iraq
Passport Number:
F032516
Date of Issue:
19760504
Place of Issue:
Baghdad, Iraq
Location:
Al Humayra village, Taza sub district, Iraq
Alt. Location:
Kurdi Al Nasir village, Iraq

PX42

Iraq-based Ahmad Hassan Kaka Al-Ubaydi--a former Iraqi Intelligence Service officer and a Ba'th Party official--leads a network of Kirkuk, Iraq-based insurgents that commits and poses a significant risk of committing acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Kaka also provides financial support for acts of violence that have the purpose or effect of threatening the peace and stability of Iraq and the Government of Iraq.

In 2005, Kaka was identified as the leader of a Kirkuk-based network that attacked Coalition and Iraqi forces with IEDs and plotted assassinations of Iraqi government officials. As of late-October 2007, Kaka directs assassinations of Iraqi Kurds and in one instance authorized a member of his network to assassinate tribal leaders because of their cooperation with U.S. and Iraqi forces.

Kaka also plans acts of violence targeting Kirkuk. In February 2007, Kaka planned to take over Kirkuk using sophisticated weapons and numerous armed fighters.

In addition to directing and planning acts of violence against Coalition and Iraqi forces, Kaka provided financial support for vehicle borne improvised explosive devices (VBIED) attacks in Iraq. As of August 2007, Kaka and his group purchased sedans to use as VBIEDs against Coalition and Iraqi government forces in Kirkuk, and certain government facilities in Mosul, Iraq. Previously, in May 2007, Kaka was providing funding to a group that manufactured IEDs to attack Coalition Forces.

**RAW'A AL-USTA**
AKAs:
Raw'a al-Ousta
Raw'ah al-Usta
Raw'ah al-Ustah
Rawa al-`Usta
Rawaa Alousta
Raw'ah Al-Astah
Nationality:
Syrian
Year of Birth:
1982
Location:
Damascus, Syria

**AL-RA'Y SATELLITE TELEVISION CHANNEL**
AKAs:
Satellite Television Channel Al Ra'y
Al-Ra'y Satellite Channel
Al-Ra'i Satellite Channel
Al Ra'y satellite television station

PX42

Al Raie TV Channel
Arrai TV
Al Ra'y TV
The Opinion satellite television channel
Internet Address:
www.arrai.tv
Email Address:
info@arrai.tv
Location:
Near Damascus in the Yaafur area, Syria

**SURAQIYA FOR MEDIA AND BROADCASTING**
AKAs:
Soraqia for Media and Broadcasting
Soraqiya for Media and Broadcasting
SBC Television
SBC TV
Location:
Al Sufara' Street in the Ya'fur district of Damascus, Syria

Syria-based Al-Ra'y Satellite Television Channel is owned and controlled by Syria-based
Specially Designated National Mish'an Al-Jaburi.  Although Al-Jaburi publicly denied
owning Al-Ra'y and claimed it was owned by a Syrian woman named Raw'a Al- Usta, Al-
Jaburi established Al-Ra'y in Syria, is the real owner of the station, and manages it through
Al-Usta-his wife.  Al-Usta works for and on behalf of Al-Jaburi as Al-Ra'y's general manager--
dealing with the station's personnel and technical issues and making requests on behalf of
the station.  Syria-based Suraqiya for Media and Broadcasting--Al-Ra'y's parent company--is
also owned and controlled by Al-Jaburi.

In addition to the reasons for which Al-Ra'y is being designated, as of late-March 2008,
despite experiencing technical difficulties, Al-Ra'y had transmitted videos of Iraqi insurgent
groups conducting operations.

-30-

PX42

# PX47

# Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States

home.treasury.gov/news/press-releases/tg1320

*(Archived Content)*

**WASHINGTON** – The U.S. Department of the Treasury today announced the designation of five individuals, including four senior Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) officers connected to a plot to assassinate the Saudi Arabian Ambassador to the United States Adel Al-Jubeir, while he was in the United States and to carry out follow-on attacks against other countries' interests inside the United States and in another country. As part of today's action, Treasury also designated the individual responsible for arranging the assassination plot on behalf of the IRGC-QF.

Designated today pursuant to Executive Order (E.O.) 13224 for acting for or on behalf of the IRGC-QF were: **Manssor Arbabsiar**, a naturalized U.S. citizen holding both Iranian and U.S. passports who acted on behalf of the IRGC-QF to pursue the failed plot to assassinate the Saudi ambassador; IRGC-QF commander **Qasem Soleimani**; **Hamed Abdollahi**, a senior IRGC-QF official who coordinated aspects of the plot and oversaw the other Qods Force officials directly responsible for coordinating and planning this operation; **Abdul Reza Shahlai**, an IRGC-QF official who coordinated this operation; and **Ali Gholam Shakuri**, an IRGC-QF official and deputy to Shahlai, who met with Arbabsiar on several occasions to discuss the assassination and other planned attacks.

Arbabsiar and Shakuri were named by the U.S. Attorney for the Southern District of New York in a criminal complaint unsealed today connected with the IRGC-QF plot. Among the charges brought against them was conspiracy to engage in foreign travel and use interstate and foreign commerce facilities in the commission of murder-for-hire. According to the criminal complaint, Arbabsiar arranged for $100,000 to be sent from Tehran to the U.S. as a down payment for the assassination of the Saudi ambassador. Two wire transfers totaling approximately $100,000 were sent from a non-Iranian foreign bank to a bank in the United States, to the account of the person recruited by Arbabsiar to carry out the assassination.

"Iran once again has used the Qods Force and the international financial system to pursue an act of international terrorism, this time aimed against a Saudi diplomat," said David S. Cohen, Under Secretary for Terrorism and Financial Intelligence. "The financial transactions at the heart of this plot lay bare the risk that banks and other institutions face in doing business with Iran."

As a result of today's designations, U.S. persons are prohibited from engaging in transactions with these individuals, and any assets they may hold in the U.S. are frozen.

1/5

PX47

**Manssor Arbabsiar**

Arbabsiar met on a number of occasions with senior IRGC-QF officials regarding this plot and acted on behalf of senior Qods Force officials – including his cousin Abdul Reza Shahlai and Shahlai's deputy Gholam Shakuri – to execute the plot. During one such meeting, a $100,000 payment for the murder of the Saudi ambassador was approved by the IRGC-QF. After this meeting, Arbabsiar arranged for approximately $100,000 to be sent from a non-Iranian foreign bank to the United States, to the account of the person he recruited to carry out the assassination.

**Qasem Soleimani**

As IRGC-QF Commander, Qasem Soleimani oversees the IRGC-QF officers who were involved in this plot. Soleimani was previously designated by the Treasury Department under E.O. 13382 based on his relationship to the IRGC. He was also designated in May 2011 pursuant to E.O. 13572, which targets human rights abuses in Syria, for his role as the Commander of the IRGC-QF, the primary conduit for Iran's support to the Syrian General Intelligence Directorate (GID).

**Hamed Abdollahi**

Abdollahi is also a senior IRGC-QF officer who coordinated aspects of this operation. Abdollahi oversees other Qods Force officials – including Shahlai – who were responsible for coordinating and planning this operation.

**Abdul Reza Shahlai**

Shahlai is an IRGC-QF official who coordinated the plot to assassinate the Saudi Arabian Ambassador to the United States Adel Al-Jubeir, while he was in the United States and to carry out follow-on attacks against other countries' interests inside the United States and in another country. Shahlai worked through his cousin, Mansour Arbabsiar, who was named in the criminal complaint for conspiring to bring the IRGC-QF's plot to fruition. Shahlai approved financial allotments to Arbabsiar to help recruit other individuals for the plot, approving $5 million dollars as payment for all of the operations discussed.

Shahlai was designated by Treasury in September 2008 pursuant to E.O. 13438 for threatening the peace and stability of Iraq and the Government of Iraq.

**Ali Gholam Shakuri**

Shakuri is an IRGC-QF officer and deputy to Abdul Reza Shahlai who acted on behalf of Shahlai in support of this plot. Shakuri provided financial support to Arbabsiar and met with Arbabsiar several times to discuss the planned assassination and other attacks. With Shakuri's approval, Arbabsiar arranged for the $100,000 down payment to be sent from a non-Iranian foreign bank to the United States.

PX47

**Background on Iran's Islamic Revolutionary Guard Corps-Qods Force**

The IRGC-QF is the Government of Iran's primary foreign action arm for executing its policy of supporting terrorist organizations and extremist groups around the world. The IRGC-QF provides training, logistical assistance and material and financial support to militants and terrorist operatives, including the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command.

IRGC-QF officers and their associates have supported attacks against U.S. and allied troops and diplomatic missions in Iraq and Afghanistan. The IRGC-QF continues to train, equip and fund Iraqi Shia militant groups – such as Kata'ib and Hizballah – and elements of the Taliban in Afghanistan to prevent an increase in Western influence in the region. In the Levant, the IRGC-QF supports terrorist groups such as Lebanese Hizballah and Hamas, which it views as integral to its efforts to challenge U.S. influence in the Middle East.

The Government of Iran also uses the IRGC and IRGC-QF to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups. These activities include economic investment, reconstruction, and other types of aid to Iraq, Afghanistan and Lebanon, implemented by companies and institutions that act for or on behalf of, or are owned or controlled by, the IRGC and the Iranian government.

The IRGC-QF was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support for terrorism, and was listed in the Annex to E.O. 13572 of April 2011 as the conduit for Iran's support to Syria's GID, the overarching civilian intelligence service in Syria which has been involved in human rights abuses in Syria.

Indentifying Information:

| Individual: | **Manssor Arbabsiar** |
|---|---|
| AKA: | Mansour Arbabsiar |
| DOB: | March 15, 1955 |
| Alt. DOB: | March 6, 1955 |
| POB: | Iran |
| Citizenship: | United Staes |
| Driver's License: | 07442833 (United States); expires March 15, 2016 |
| Passport: | C2002515 (Iran) |
| Alt. Passport: | 477845448 (United States) |

PX47

**Individual:**          **Ali Gholam Shakuri**

DOB:                 1964

Alt. DOB:            1965

Alt. DOB 2:          1966

Location:            Tehran, Iran

**Individual:**          **Abdul Reza Shahlai**

AKA:                 Abdol Reza Shala'i

AKA:                 Abd-al Reza Shalai

AKA:                 'Abdorreza Shahlai

AKA:                 Abdolreza Shahla'i

AKA:                 Abdul-Reza Shahlaee

AKA:                 Hajj Yusef

AKA:                 Haji Yusif

AKA:                 Hajji Yasir

AKA:                 Hajji Yusif

AKA:                 'Yusuf Abu-al-Karkh'

DOB:                 Circa 1957

Location:            Kermanshah, Iran

Alt. Location:       Mehran Military Base, Ilam Province, Iran

**Individual:**          **Hamed Abdollahi**

AKA:                 Mustafa Abdullahi

DOB:                 August 11, 1960

Passport:            D9004878

Citizenship:         Iran

**Individual:**          **Qasem Soleimani**

4/5

PX47

| | |
|---|---|
| AKA: | Ghasem Soleymani |
| AKA: | Qasmi Sulayman |
| AKA: | Qasem Soleymani |
| AKA: | Qasem Solaimani |
| AKA: | Qasem Salimani |
| AKA: | Qasem Solemani |
| AKA: | Qasem Sulaimani |
| AKA: | Qasem Sulemani |
| DOB: | March 11, 1957 |
| POB: | Qom, Iran |
| Passport: | 1999 Diplomatic Passport 008827 (Iran) |

PX47

PX48

# Treasury Sanctions Iran's Central Bank and National Development Fund

home.treasury.gov/news/press-releases/sm780

September 20, 2019

*Action targets major sources of funding for the regime's proxies and terrorist arms, including the IRGC, the Qods Force, Hizballah and the Houthis*

WASHINGTON- Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action against the Central Bank of Iran (CBI), the National Development Fund of Iran (NDF), and Etemad Tejarate Pars Co. under its counterterrorism authority, Executive Order (E.O.) 13224. Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah. Iran's NDF, which is Iran's sovereign wealth fund and whose board of trustees include Iran's president, oil minister, and the governor of the Central Bank, has been a major source of foreign currency and funding for the IRGC-QF and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL). Etemad Tejarate Pars, also designated today, is an Iran-based company that is used to conceal financial transfers for MODAFL's military purchases, including funds originating from the NDF.

"Iran's brazen attack against Saudi Arabia is unacceptable. Treasury's action targets a crucial funding mechanism that the Iranian regime uses to support its terrorist network, including the Qods Force, Hizballah, and other militants that spread terror and destabilize the region. The United States will continue its maximum pressure campaign against Iran's repressive regime, which attempts to achieve its revolutionary agenda through regional aggression while squandering the country's oil proceeds," said Treasury Secretary Steven T. Mnuchin. "Iran's Central Bank and the National Development Fund were ostensibly intended to safeguard the welfare of the Iranian people, but have been used instead by this corrupt regime to move Iran's foreign currency reserves for terrorist proxies."

"We are putting governments on notice that they are risking the integrity of their financial systems by continuing to work with the Iranian regime's arm of terror finance, its Central Bank," said Sigal Mandelker, Under Secretary for Terrorism and Financial Intelligence. "We will vigorously enforce our sanctions to cut off the Iranian regime's funding of global terrorism and its domestic oppression of the Iranian people, who are the regime's longest suffering victims."

## Central Bank of Iran Funds the IRGC, its Qods Force and Hizballah

Today's action targets the CBI for its financial support to the IRGC-QF and Hizballah. In May 2018, OFAC designated the CBI's then-Governor Valiollah Seif, and the Assistant Director of the International Department Ali Tarzali, for facilitating financial transfers for the IRGC-QF and Hizballah. Also, in November 2018 and as part of Treasury's disruption of an international oil-for-terror network, OFAC designated the CBI's International Department Director Rasul Sajjad, and the CBI's International Department Director, Hossein Yaghoobi, for conducting financial transactions for the IRGC-QF.

PX48

Since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC-QF to facilitate CBI's financial support to the IRGC-QF. In 2017, the IRGC-QF oversaw the transfer of tens of millions of euros to Iraq from the CBI. Then-Governor of the CBI Valiollah Seif directed the transfer.

During 2018 and early 2019, the CBI facilitated the transfer of several billion of U.S. dollars and euros to the IRGC-QF and hundreds of millions to MODAFL from the NDF. Additionally, millions were to be transferred to the Houthis. CBI has also coordinated with the IRGC-QF to transfer funds to Hizballah.

OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF and Hizballah.

The IRGC-QF, which was designated pursuant to E.O. 13224 on October 25, 2007, is a branch of the IRGC responsible for external operations and has provided material support to numerous terrorist groups, including the Taliban, Hizballah, HAMAS, and the Palestinian Islamic Jihad, making it a key component of Iran's destabilizing regional activities. The IRGC, including its external arm, the IRGC-QF, was designated as a Foreign Terrorist Organization on April 8, 2019.

Hizballah was designated by the Department of State as a Foreign Terrorist Organization in October 1997 pursuant to E.O. 13224 in October 2001.  It was also designated in August 2012 pursuant to E.O. 13582, which targets the Government of Syria and its supporters.

## National Development Fund: A Slush Fund for the IRGC-QF and MODAFL

According to Article 84 of the Fifth Development Plan of the Islamic Republic of Iran, the NDF was established to serve the welfare of the Iranian people by allocating revenues that originated from selling oil, gas, gas condensate, and oil products to durable wealth and productive economic investments.  However, the NDF has been used as a slush fund for the IRGC-QF, which has, for years, received hundreds of millions of dollars in cash disbursements from the NDF.

The NDF, in coordination with the CBI, provided the IRGC-QF with half a billion U.S. dollars in 2017 and hundreds of millions of dollars in 2018. Also, despite an increase in the IRGC's overall budget for 2019, the Rouhani administration withdrew some $4.8 billion from the NDF in January 2019 to amend the budget allocated to the IRGC and the Islamic Republic of Iran Broadcasting (IRIB).

The IRIB was designated pursuant to E.O. 13628 in February 2013 for assisting or denying the free flow of information to or from the Iranian people. IRIB was implicated in censoring multiple media outlets and airing forced confessions from detainees.

During 2018 and early 2019, the CBI facilitated the transfer of hundreds of millions to both the Atomic Energy Organization and MODAFL from the NDF.  Some of the funds to be transferred via Iran-based Etemad Tejarate Pars Co. were intended to be used for military purchases.

PX48

As of early 2019, Etemad Tejarate Pars Co. planned to send tens of millions in various currencies, including euros, to Wilmington General Trading LLC in Dubai, UAE, the Embassy of the Islamic Republic of Iran in Moscow, Russia, and to companies on behalf of MODAFL.

OFAC is designating NDF for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF and MODAFL.

OFAC is designating Etemad Tejarate Pars Co. for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, MODAFL.

On March 26, 2019, OFAC designated MODAFL pursuant to E.O. 13224 for its role in assisting the IRGC-QF. Wilmington General Trading LLC was also designated on March 26, 2019 for being owned or controlled by Asadollah Seifi who obfuscated millions of dollars' worth of transactions benefiting the Iranian regime and the purchase of foreign currency for the IRGC.

## Sanctions Implications

As a result of today's action, all property and interests in property of these entities that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC.  OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.

In addition, persons that engage in certain transactions with the entities designated today may themselves be exposed to designation.  Furthermore, any foreign financial institution that knowingly facilitates a significant financial transaction or provides significant financial services for entities designated in connection with Iran's support for international terrorism or any Iranian person on OFAC's List of Specially Designated Nationals and Blocked Persons could be subject to U.S. correspondent account or payable-through account sanctions.

The United States has a long standing policy of allowing for the sale of agricultural commodities, food, medicine and medical devices, and OFAC will continue to consider requests related to humanitarian trade with Iran as appropriate.

Identifying information on the entities designated today.

####

PX48

# PX50

U.S. DEPARTMENT OF THE TREASURY

Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps–Qods Force

October 26, 2020

*Treasury Designates Iranian Ministry and Minister of Petroleum, National Iranian Oil Company, and National Iranian Tanker Company*

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is designating the Iranian Ministry of Petroleum, the National Iranian Oil Company (NIOC), and the National Iranian Tanker Company (NITC) pursuant to E.O. 13224, as amended, a counterterrorism authority, for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), an entity designated under E.O. 13224. Senior NIOC and NITC personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF. OFAC is also designating multiple entities and individuals associated with the Ministry of Petroleum, NIOC, and NITC, including front companies, subsidiaries, and senior executives. In addition, OFAC is designating four persons involved in the recent sale of Iranian gasoline to the illegitimate Maduro regime in Venezuela.

"The regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF," said Secretary Steven T. Mnuchin. "The Iranian regime continues to prioritize its support for terrorist entities and its nuclear program over the needs of the Iranian people."

In spring 2019 alone, an IRGC-QF-led network employed more than a dozen NITC vessels to transport nearly 10 million barrels of crude oil, mostly destined for the Assad regime. Iran continues to perpetuate the Syrian conflict with these kinds of transactions. These shipments, taken collectively, sold for the equivalent of more than half a billion dollars. Today's action targets those who supply and transport the oil that generates revenue for the IRGC-QF.

## NIOC, NITC, AND MINISTRY OF PETROLEUM

**NIOC**, overseen by the **Ministry of Petroleum**, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran. **NITC**, a subsidiary of **NIOC**, is responsible for the transportation of Iranian crude exports. **NIOC** and **NITC** provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF. The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between **NIOC** and the Central Bank of

PX50

Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF.

**NITC** has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. **NITC** personnel coordinated with the IRGC-QF on the loading of oil provided by **NIOC**, and **NITC** Managing Director **Nasrollah Sardashti** (**Sardashti**) worked with Hizballah on logistics and pricing for oil shipments to Syria. **Sardashti** also worked with Qatirji Group representative **Viyan Zanganeh** (**Zanganeh**) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC. In 2018, OFAC designated Syrian regime-affiliated Qatirji Group for facilitating fuel trades between the Syrian regime and the Islamic State of Iraq and al Sham (ISIS), including providing oil products to ISIS-controlled territory. As of early 2020, the Qatirji Group's **Zanganeh** continued to work closely with the IRGC-QF to coordinate **NIOC**'s provision of millions of barrels of oil and petroleum products to be shipped to Syria, as well as millions of dollars in payments back to Iran. In mid-2020, **Zanganeh** continued to act as an intermediary between the IRGC-QF and a Syrian regime-affiliated business, arranging for the funding of the release of a seized vessel and additional shipments of fuel oil.

The Iranian **Ministry of Petroleum** has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme. In mid-2019, the **Ministry of Petroleum** arranged the loading of hundreds of thousands of barrels of oil for shipments to Syria, and in mid-2020 the IRGC-QF and senior regime officials coordinated to use the **Ministry of Petroleum** to procure U.S. dollars for the benefit of the IRGC-QF.

Furthermore, in order to obfuscate its involvement in shipping activity, **NITC** set up a front company in the United Arab Emirates (UAE), **Atlas Ship Management**. **NITC** officials also arranged to create a separate UAE-based front company, **Atlantic Ship Management Company**, ostensibly as an entity to replace **Atlas Ship Management**.

**NIOC**, **NITC**, the **Ministry of Petroleum**, and **Viyan Zanganeh** are being designated pursuant to E.O. 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF. The **Ministry of Petroleum** is also being designated pursuant to E.O. 13224, as amended, for owning or controlling, directly or indirectly, **NIOC**.

**Atlas Ship Management** and **Atlantic Ship Management Company** are being designated pursuant to E.O. 13224, as amended, for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, directly or indirectly, **NITC**.

## KEY FACILITATORS AND ASSOCIATED ENTITIES

**Ali Akbar Purebrahim** (**Purebrahim**), managing director of NIOC's Switzerland-based subsidiary Naftiran Intertrade Company (NICO), has worked with the IRGC-QF on petroleum sales contracts, and worked with

PX50

senior IRGC-QF official Ghasemi to arrange the shipment of oil, including pricing and payment for the shipment. Under **Purebrahim**'s leadership, NICO carried thousands of tons of liquified petroleum gas (LPG) belonging to **NIOC** as part of an arrangement to transport multiple shipments of LPG per month.

**Ali Akbar Purebrahim** is being designated pursuant to E.O. 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, Rostam Ghasemi.

OFAC is also designating key subsidiaries of the Ministry of Petroleum. The **National Iranian Oil Refining and Distribution Company** (**NIORDC**), **National Iranian Oil Products Distribution Company** (**NIOPDC**), **Iranian Oil Pipelines and Telecommunications Company**, **National Iranian Oil Engineering and Construction Company**, **Abadan Oil Refining Company**, **Imam Khomeini Shazand Oil Refining Company**, and the **National Petrochemical Company** (**NPC**) are being designated pursuant to E.O. 13224, as amended, for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, directly or indirectly, the Ministry of Petroleum.

OFAC is targeting several leaders or officials of the designated entities, all of whom are being designated pursuant to E.O. 13224, as amended, including: Minister of Petroleum **Bijan Zanganeh**, for being a leader or official of the **Ministry of Petroleum**; **NIOC** Managing Director **Masoud Karbasian**, for being a leader or official of **NIOC**; **NITC** Managing Director **Nasrollah Sardashti**, for being a leader or official of **NITC**; **NIORDC** Director **Alireza Sadiqabadi**, for being a leader or official of **NIORDC**; and **NPC** Managing Director **Behzad Mohammadi**, for being a leader or official of the **NPC**.

OFAC is also identifying the vessels **Longbow Lake** and **Wu Xian** as property in which **NIOC** has an interest.

## GASOLINE SHIPMENTS TO VENEZUELA

In January 2020, **Mahmoud Madanipour** (**Madanipour**) and UAE-based **Mobin International Limited** (**Mobin**) entered into an agreement with designated Venezuelan state-owned oil company Petroleos de Venezuela, S.A. (PdVSA) to ship gasoline obtained from **NIOC** to the illegitimate Maduro regime in Venezuela. Upon the request of **NIOC**'s subsidiary **NIOPDC**, **Madanipour** and **Mobin** chartered multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela.

**Mobin International Limited** is being designated pursuant to E.O. 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the **NIOPDC**. **Mahmoud Madanipour** is being designated for having acted or purposed to have acted for or on behalf of, directly or indirectly, **Mobin International Limited**.

OFAC is also targeting two United Kingdom-based companies of **Madanipour**; **Mobin Holding Limited** and **Oman Fuel Trading Ltd**. **Mobin Holding Limited** and **Oman Fuel Trading Ltd** are being designated

PX50

for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, directly or indirectly, **Mahmoud Madanipour**.

## SANCTIONS IMPLICATIONS

All property and interests in property of these persons designated today subject to U.S. jurisdiction are blocked, and U.S persons are generally prohibited from engaging in transactions with them. Any entities that are owned, directly or indirectly, 50 percent or more by such persons are also blocked. In addition, foreign financial institutions that knowingly facilitate significant transactions for, or persons that provide material or certain other support to, the persons designated today risk exposure to sanctions that could sever their access to the U.S. financial system or block their property and interests in property under U.S. jurisdiction.

Concurrent with today's action, OFAC is issuing amended General License 8A, issued pursuant to the Global Terrorism Sanctions Regulations and the Iranian Transactions and Sanctions Regulations, to continue to allow certain humanitarian trade transactions involving NIOC or any entities in which it owns, directly or indirectly, a 50 percent or greater interest.

View additional information on the individuals and entities designated and vessels identified today.

PX50

PX51

# U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign

home.treasury.gov/news/press-releases/sm541

**WASHINGTON** – Today, in its largest ever single-day action targeting the Iranian regime, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) sanctioned more than 700 individuals, entities, aircraft, and vessels.  This action is a critical part of the re-imposition of the remaining U.S. nuclear-related sanctions that were lifted or waived in connection with the Joint Comprehensive Plan of Action (JCPOA).  OFAC's action is designed to disrupt the Iranian regime's ability to fund its broad range of malign activities, and places unprecedented financial pressure on the Iranian regime to negotiate a comprehensive deal that will permanently prevent Iran from acquiring a nuclear weapon, cease Iran's development of ballistic missiles, and end Iran's broad range of malign activities.  This brings to more than 900 the number of Iran-related targets sanctioned under this Administration in less than two years, marking the highest-ever level of U.S. economic pressure on Iran.

"Treasury's imposition of unprecedented financial pressure on Iran should make clear to the Iranian regime that they will face mounting financial isolation and economic stagnation until they fundamentally change their destabilizing behavior.  Iran's leaders must cease support for terrorism, stop proliferating ballistic missiles, end destructive regional activities, and abandon their nuclear ambitions immediately if they seek a path to sanctions relief," said Treasury Secretary Steven Mnuchin.  "The maximum pressure exerted by the United States is only going to mount from here.  We are intent on making sure the Iranian regime stops siphoning its hard currency reserves into corrupt investments and the hands of terrorists."

Today's action includes the designation of 50 Iranian banks and their foreign and domestic subsidiaries; the identification of more than 400 targets, including over 200 persons and vessels in Iran's shipping and energy sectors, and an Iranian airline and more than 65 of its aircraft; and the placement on the list of Specially Designated Nationals and Blocked Persons ("SDN List") of nearly 250 persons and associated blocked property that appeared until today on the List of Persons Identified as Blocked Solely Pursuant to Executive Order (E.O.) 13599 ("E.O. 13599 List").  OFAC has deleted the E.O. 13599 List as part of the cessation of the United States' participation in the JCPOA.  For a complete list of targets sanctioned today, please click here.

As of today, significant transactions with most persons moved from the E.O. 13599 List to the SDN List (other than those Iranian financial institutions identified solely pursuant to E.O. 13599) could be sanctionable.  Such persons will have a notation of "Additional Sanctions Information – Subject to Secondary Sanctions" in their SDN List entries.

PX51

This action targets the Iranian regime, not the Iranian people.  OFAC continues to maintain humanitarian authorizations and exceptions to our Iran sanctions that allow for the sale of agricultural commodities, food, medicine, and medical devices to Iran.

## OVERVIEW OF TODAY'S ACTION

On May 8, 2018, the President ceased the United States' participation in the JCPOA.  That same day, the President issued National Security Presidential Memorandum–11, instructing the Secretary of State and the Secretary of the Treasury to begin taking steps to re-impose all U.S. sanctions lifted or waived in connection with the JCPOA, including to prepare to relist persons removed from U.S. sanctions lists in connection with the JCPOA as appropriate.  The President directed that these steps be accomplished as expeditiously as possible, and in no case later than 180 days from May 8, 2018.

Yesterday marked the end of the 180-day wind-down period.  As of today, all U.S. sanctions lifted or waived in connection with the JCPOA are re-imposed and in full effect.  OFAC has published additional frequently asked questions (FAQs) with respect to the re-imposition of these sanctions here.

As part of the re-imposition of U.S. sanctions and the relisting of persons removed from U.S. sanctions lists in connection with the JCPOA, hundreds of targets were designated or identified and added to the SDN List today.  Among those identified are 92 entities owned or controlled by Ghadir Investment Company, which OFAC previously identified as an investment firm affiliated with the Execution of Imam Khomeini's Order (EIKO).

Additionally, persons and associated blocked property that were previously included on the E.O. 13599 List have been moved to the SDN List.  OFAC has removed the E.O. 13599 List, which was created on January 16, 2016 to denote the continued status as blocked of persons solely identified pursuant to E.O. 13599 as meeting the definition of the terms "Government of Iran" or "Iranian financial institution."

Moreover, an amendment to the Iranian Transactions Sanctions Regulations (ITSR) takes effect today that reflects the re-imposition of sanctions pursuant to certain sections of Executive Order 13846 and the changes to the SDN List and E.O. 13599 List.

## BANKING SECTOR

Today marks the largest single-day OFAC action targeting the Iranian regime's abuse of Iran's banking sector to fund its destabilizing activities.  For example, the Iranian regime has funneled the equivalent of billions of dollars for the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) through the banking sector.  The action targets, in particular, Iranian banks that have provided support to, or are owned or controlled by, persons designated in connection with the Iranian regime's support to international terrorism, proliferation of weapons of mass destruction (WMD) or their means of delivery, and human rights abuses.

PX51

Some of the banks designated today have served as financial conduits for the IRGC-QF, the Ministry of Defense and Armed Forces Logistics (MODAFL), the Islamic Republic of Iran Broadcasting (IRIB), the Martyrs Foundation, Mahan Air, and Iran's Law Enforcement Forces (LEF) — all entities that remained designated throughout the JCPOA.

"As the Iranian people suffer from fiscal mismanagement and a plummeting rial, the Iranian regime abuses the country's banking system to enrich its elite and finance repressive state institutions.  The IRGC and other destabilizing entities leverage their access to the global financial system to fund proxies fighting in Syria, Iraq, and Yemen, subsidize the proliferation of WMD or their means of delivery, and arm those who abuse the human rights of Iranian citizens," said Treasury Under Secretary Sigal Mandelker.  "This action is aimed at cutting off Iranian banks that facilitate Iran's domestic repression and foreign adventurism from the international financial system, and will highlight for the world the true nature of the regime's abuse of its domestic banking system."

Today, more than 70 Iran-linked financial institutions and their foreign and domestic subsidiaries were designated or identified and placed on the SDN List.

Bank Melli is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF, which was previously designated pursuant to E.O. 13224 on October 25, 2007.  As of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli.  Bank Melli has acted as a conduit for payments to the IRGC-QF.  The IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups, and Bank Melli's presence in Iraq was part of this scheme.  Since the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy.  Bank Melli has enabled the IRGC and its affiliates to move funds inside and outside of Iran.  The IRGC was designated pursuant to E.O. 13224 on October 13, 2017.

Bank Melli has also provided financial services to MODAFL, which was designated pursuant to E.O. 13382 on October 25, 2007.

Arian Bank, a Bank Melli subsidiary, is being designated pursuant to E.O. 13224 for being owned or controlled by Bank Melli.

Along with Arian Bank, OFAC designated another 12 entities pursuant to E.O. 13224 for being owned or controlled by Bank Melli or one of Bank Melli's subsidiaries:  Bank Kargoshaee, Melli Bank PLC, Tose-E Melli Group Investment Company, Tose-E Melli Investment Company, National Industries and Mining Development Company, Behshahr Industrial Development Corp., Cement Industry Investment and Development Company, Melli International Building & Industry Company, BMIIC International General Trading LLC, Shomal Cement Company, Persian Gulf Sabz Karafarinan, and Mir Business Bank (MB Bank).

PX51

Future Bank B.S.C. is being identified as a person whose property and interests in property are blocked due to the fact that Bank Melli and Bank Saderat, entities whose property and interests in property are blocked pursuant to E.O. 13224, hold a 50 percent or greater aggregate interest in the bank.

The Export Development Bank of Iran (EDBI) is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, MB Bank.  Three other entities are being designated pursuant to E.O. 13224 for being owned or controlled by, or for acting for or on behalf of, EDBI:  EDBI Stock Exchange, EDBI Exchange Brokerage, and Banco Internacional de Desarrollo, C.A.  Additionally, the Iran-Venezuela Bi-National Bank is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, EDBI.

Ghavamin Bank is being designated pursuant to E.O. 13553 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Iran's LEF.  Ghavamin Bank has provided extensive banking services and facilitated routine financial transactions for the LEF.  The LEF was designated in 2011 for being responsible for or complicit in serious human rights abuses in Iran, including operating detention centers where detained protestors were deprived of basic needs such as medical care.

Bank Sepah is being designated pursuant to E.O. 13382 for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services in support of, MODAFL.  As of 2017, Bank Sepah served as a financial platform for MODAFL to pay its agents abroad.

Bank of Industry and Mine (BIM) is being designated pursuant to E.O. 13382 for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services in support of, Bank Sepah.  As of 2018, BIM provided bank account services for Bank Sepah, including engaging in the exchange of Iranian rials for euros for the benefit of Bank Sepah.  BIM coordinated the transfer of the equivalent of millions of dollars' worth of euros for the benefit of Bank Sepah.

Europaisch-Iranische Handelsbank AG (EIH) is being designated pursuant to E.O. 13382 for being owned or controlled by BIM, and for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services in support of, Bank Sepah.  As recently as 2018, EIH maintained active account services for Bank Sepah, including processing the equivalent of millions of dollars' worth of euro payments in support of Bank Sepah.

Post Bank of Iran is being designated pursuant to E.O. 13382 for having provided, or attempted to provide, financial, material, or other support for, or goods or services in support of, Bank Sepah.  As recently as 2018, Post Bank of Iran engaged in the

PX51

exchange of Iranian rials for euros for the benefit of Bank Sepah through active euro accounts.

Bank Tejarat is being designated pursuant to E.O. 13382 for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services in support of, Bank Sepah.  As recently as 2018, Bank Tejarat provided critical financial services for Bank Sepah.  Bank Tejarat also is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Mahan Air, a designated Iranian airline that provides transportation, funds transfers, and personnel travel services to the IRGC-QF.  Mahan Air was designated pursuant to E.O. 13224 on October 12, 2011.  Belarus-based Trade Capital Bank (TC Bank) is being designated pursuant to E.O. 13382 and E.O. 13224 for being owned or controlled by Bank Tejarat.

Ayandeh Bank is being designated pursuant to E.O. 13846 and the Iran Threat Reduction Act of 2012 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, IRIB, Iran's state-media apparatus that routinely broadcasts false news reports and propaganda, including forced confessions of political detainees.  IRIB was designated pursuant to E.O. 13628 in February 2013 for restricting or denying the free flow of information to or from the Iranian people.  IRIB was implicated in censoring multiple media outlets and airing forced confessions from political detainees.

Day Bank is being designated pursuant to E.O. 13224 for being owned or controlled by, and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Martyrs Foundation, an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ).  The Martyrs Foundation, which was designated pursuant to E.O. 13224 in July 2007, has established branches in Lebanon staffed by leaders and members of terrorist groups to serve the families of killed or imprisoned Hizballah and PIJ members.  Day Bank provides significant financial support and banking services to the Martyrs Foundation.

Additionally, 14 entities are being designated pursuant to E.O. 13224 for being owned or controlled by Day Bank.  These 14 subsidiaries, which engage in a wide range of business activities across different Iranian economic sectors, are Atieh Sazan Day, Buali Investment Company, Tejarat Gostar Fardad, Day Exchange Company, Day Leasing Company, Day Bank Brokerage Company, Tose-e Didar Iranian Holding Company, Royay-e Roz Kish Investment Company, Day E-Commerce, Tose-e Donya Shahr Kohan Company, Damavand Power Generation Company, Omid Bonyan Day Insurance Services, Omran Va Maskan Abad Day Company, and Day Iranian Financial and Accounting Services Company.

PX51

Persia International Bank PLC, First East Export Bank PLC, and Mellat Bank Closed Joint-Stock Company are being designated pursuant to E.O. 13224 for being owned or controlled by Bank Mellat.  Bank Mellat was designated pursuant to E.O. 13224 on October 16, 2018.

## SHIPPING SECTOR

Among those in Iran's shipping sector placed on the SDN List today are Iran's national maritime carrier, the Islamic Republic of Iran Shipping Lines (IRISL), and oil transport giant National Iranian Tanker Company (NITC), both of which were identified pursuant to E.O. 13599 for meeting the definition of the term "Government of Iran."  In addition, these entities have been determined to be part of the shipping sector of Iran.  As a result, the knowing provision of significant financial, material, technological, or other support to, or goods or services in support of, these entities could be sanctionable.

OFAC added to the SDN List 65 IRISL subsidiaries and associated individuals pursuant to E.O. 13599.  In addition, 122 vessels also were identified as property in which IRISL has an interest.

One IRISL subsidiary, Valfajr Shipping Company PJS, has been used regularly by the IRGC to transfer passengers, cargo, containers, and IRGC personnel from IRGC-controlled ports in Iran to major ports in the Persian Gulf region.

Another IRISL subsidiary, Hafez Darya Arya Shipping Company, has shipped cargo to at least one known cover company for Iran's Defense Industries Organization (DIO).  DIO was previously designated pursuant to E.O. 13382 on March 30, 2007 for engaging in activities that materially contributed to the development of Iran's nuclear and missile programs.

In 2017, IRISL subsidiary Safiran Payam Darya Shipping Company shipped more than 136,000 metric tons of Iranian light crude oil from Iran to Syria.

Additionally, pursuant to E.O. 13599, OFAC identified 37 NITC-affiliated entities and vessels in which NITC has an interest.  Identifying information for another 52 vessels confirmed as being property in which NITC has an interest was updated as well.  Each year, these vessels move tens of millions of barrels' worth of Iranian oil, as well as Iranian natural gas, which constitute a major source of revenue to fund the Iranian regime's malign activities.  It is essential to close off this funding stream to Tehran.

The Iranian shipping industry is reviving previously employed deceptive practices in an effort to obfuscate IRISL or NITC's interests in vessels and other property.  Among the IRISL vessels identified today are four vessels that recently underwent name and partial ownership changes but that are still property in which IRISL has a blockable interest.  The global maritime industry should be on alert for Iran's use of such tactics and make every effort to thwart Iran's use of their jurisdictions to create front companies; to revoke their flags from

PX51

IRISL and NITC vessels; and to deny other means that enable Iran to conceal its interest in the vessels.  For additional information related to Iran's deceptive practices, please click here for FinCEN's recent Iran Advisory.

## ATOMIC ENERGY ORGANIZATION OF IRAN

Today, OFAC added to the SDN List the Atomic Energy Organization of Iran (AEOI) as well as 23 AEOI subsidiaries and associated individuals, and identified them as meeting the definition of the term "Government of Iran" pursuant to E.O. 13599 and section 560.211 of the ITSR.  AEOI has operational and regulatory control over Iran's nuclear program and bears responsibility for nuclear research and development.

Additionally, OFAC designated Morteza Ahmadali Behzad pursuant to E.O. 13382 for acting or purporting to act for or on behalf of, directly or indirectly, Pishro Company.  Pishro Company, which is responsible for research and development efforts across Iran's nuclear program, was designated pursuant to E.O.13382 on May 9, 2013.

## AVIATION

Today OFAC identified Iran Air, the national airline of Iran, pursuant to E.O. 13599 for being owned or controlled by the Government of Iran.  OFAC also added to the SDN List 67 aircraft operated by Iran Air.

## SANCTIONS IMPLICATIONS

As a result of today's action, all property and interests in property of these targets that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC.  OFAC's regulations generally prohibit all dealings by U.S. persons or within the United States (including transactions transiting the United States) that involve any property or interests in property of blocked or designated persons.

In addition, persons that engage in certain transactions with the entities designated and identified today may themselves be exposed to enforcement action, designation, or blocking sanctions.  Furthermore, unless an exception applies, any foreign financial institution that knowingly facilitates a significant transaction for any of the entities designated today or for certain other Iranian persons on the SDN List (other than Iranian financial institutions solely identified as "Government of Iran") could be subject to U.S. correspondent or payable-through account sanctions.

Identifying information on the entities designated today.

####

PX51

PX57

# OFAC Identifies Entities Owned or Controlled by the Government of Iran

home.treasury.gov/news/press-releases/hp1299

Press Releases

November 26, 2008

*(Archived Content)*

HP-1299

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has identified the National Iranian Oil Company (a.k.a. NIOC), Naftiran Intertrade Company Ltd. (a.k.a. NICO), and Naftiran Intertrade Co. Sarl as entities owned or controlled by the Government of Iran.

The Iranian Transaction Regulations (ITR) include an appendix that contains a non-exhaustive list of entities determined by OFAC to be owned or controlled by the Government of Iran.  The appendix can be accessed through OFAC's website: http://www.treasury.gov/offices/enforcement/ofac/programs/iran/iran.shtml (see Overview of Sanctions).  OFAC is adding National Iranian Oil Company, Naftiran Intertrade Company Ltd., and Na ftiran Intertrade Co. Sarl to this appendix. Certain entities listed in this appendix may be subject to further sanctions under other sanctions programs.

To date, the appendix has listed only financial institutions that were determined to be owned or controlled by the Government of Iran.  The inclusion of the National Iranian Oil Company, Naftiran Intertrade Company Ltd., and Naftiran Intertrade Co. Sarl marks the first non-financial institutions to be added to the appendix.  Moving forward, OFAC will continue to list both financial institutions and other entities that are determined to be owned or controlled by the Government of Iran.

While the ITR do not impose an asset freeze, they do prohibit most commercial and financial transactions with entities owned or controlled by the Government of Iran, regardless of where such entities are located or incorporated.  Most transactions with any branches or subsidiaries of these entities are also prohibited, regardless of where such branches or subsidiaries are located and incorporated.

This appendix serves as a tool to assist U.S. persons in complying with the ITR.  The identified entities are considered to be owned or controlled by the Government of Iran when they operate not only from the locations listed in the appendix, but also from any other location.  The ITR prohibitions apply to all entities owned or controlled by the Government of Iran, regardless of where they are located or incorporated, even if they are not listed in the appendix.   The prohibitions in the ITR also apply to transactions with entities located in Iran that are not owned or controlled by the Government of Iran.

PX57

Naftiran Intertrade Company Ltd. is a subsidiary of the National Iranian Oil Company that is registered in the United Kingdom and located in Jersey, Channel Islands, United Kingdom. NICO, in turn, has a subsidiary, called Naftiran Intertrade Co. (NICO) Sarl, which is incorporated and located in Switzerland.  The ITR prohibit most transactions with NIOC, NICO and NICO Sarl, in any locations worldwide, because these companies are entities owned or controlled by the Government of Iran.

The Iranian Transactions Regulations, 31 C.F.R. part 560, define the term Government of Iran, in section s 560.304, to include any entity owned or controlled by the Government of Iran, a term which is itself defined in section 560.313.  The relevant ITR language can be accessed through the following link:

http://www.access.gpo.gov/nara/cfr/waisidx_07/31cfr560_07.html

-30-

PX57

PX58

# CURRENCY EXCHANGE NETWORK TRANSFERRING MILLIONS OF DOLLARS TO THE IRGC-QF



PX58

# PX59



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

### OFAC Advisory to the Maritime Petroleum Shipping Community

**Issued:**        **September 4, 2019**
**Subject:**       **Sanctions Risks Related to Shipping Petroleum and Petroleum Products from Iran**

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing this advisory to alert persons globally to the significant U.S. sanctions risks for parties involved in shipping petroleum or petroleum products from Iran after the expiration of any applicable significant reduction exceptions on May 2, 2019.  These shipments create significant sanctions risk for entities and individuals in the shipping industry, including shipping companies, vessel owners, managers, operators, insurers, and financial institutions. Those who knowingly engage in significant transactions for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran — or knowingly provide significant support to an Iranian person on OFAC's List of Specially Designated Nationals and Blocked Persons (SDN List), such as the National Iranian Oil Company (NIOC), the National Iranian Tanker Company (NITC), and the Islamic Republic of Iran Shipping Lines (IRISL) — are at serious risk of being targeted by the United States for sanctions, regardless of the location or nationality of those engaging in such activities. Further, persons providing bunkering services to vessels transporting petroleum or petroleum products from Iran risk being subject to sanctions unless an applicable waiver or exception applies.  The United States continues to take strong action to deny the Government of Iran funds derived from the illicit exportation of petroleum or petroleum products from Iran.

The United States is committed to aggressively enforcing our sanctions against the Iranian regime, denying it the financial means to sponsor terrorism and advance its ballistic missile program while permitting humanitarian trade benefitting the Iranian people.  Targeting shipments of petroleum and petroleum products from Iran is a critical element of denying the Iranian regime access to financial resources to support its malign activities.

In connection with these activities, the United States is targeting private and public sector entities around the world that engage in sanctionable conduct, including those involved in procuring petroleum and petroleum products from Iran to Syria, China, and elsewhere.  For example, in November 2018, August 2019, and September 2019, OFAC sanctioned individuals and entities in a number of countries involved in schemes in which the sale and shipment of Iranian oil to Syria provided hundreds of millions of dollars to Iran's terror proxy groups, including the Islamic Revolutionary Guard Corps Qods Force (IRGC-QF), Hizballah, and Hamas.

This advisory contains an annex providing a list of vessels that were identified on OFAC's

PX59

SDN List as property in which persons blocked pursuant to E.O. 13224 have an interest on September 4, 2019.[1]  These blocked persons are part of an IRGC-QF-led network that shipped Iranian crude oil and condensate to Syria.

## Sanctions Risks and OFAC's Iran-related Authorities

Individuals and entities knowingly engaged in certain transactions relating to the purchase, acquisition, sale, transport, or marketing of petroleum and petroleum products from Iran or providing material support to certain Iran-related persons on the SDN List risk being sanctioned under U.S. sanctions authorities relating to Iran, unless an exception applies.

Below is a high-level overview of OFAC's Iran-related sanctions authorities; however, this overview is not intended to be a comprehensive summary of all U.S. sanctions authorities related to Iran.  Please note this section is current as of the date of this advisory.  The most up-to-date information can be found on Treasury's website and the hyperlinks listed in the footnotes below.

OFAC administers and enforces a comprehensive trade embargo against Iran, as set forth in the Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560 (ITSR), issued under the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, among other authorities.  The ITSR prohibits most direct and indirect transactions with Iran by U.S. persons or within the United States, unless authorized by OFAC or exempted by statute.[2] Further, absent an applicable exemption or OFAC authorization, foreign persons, including foreign financial institutions, are prohibited from processing transactions to or through the United States in violation of these prohibitions, including transactions through U.S. correspondent accounts for or on behalf of Iranian financial institutions, other persons located in Iran, or where the benefit of those services is otherwise received in Iran.

In addition, non-U.S. persons — including foreign financial institutions — may be subject to U.S. sanctions for knowingly conducting significant transactions for, or knowingly providing significant support to, certain Iran-related persons on OFAC's SDN List, including NIOC, NITC, and IRISL, unless an exception applies.  Further, non-U.S. persons that knowingly own, operate, control, or insure a vessel that transports crude oil exported from Iran after the expiration of any applicable significant reduction exception could be subject to secondary sanctions under the Iran Sanctions Act.  Even if an exception applies, the involvement of the IRGC or any other person designated in connection with Iran's support for international terrorism or its proliferation of weapons of mass destruction or their means of delivery is nonetheless subject to U.S. sanctions.  The IRGC is identified by the United States as

---

[1] NOTE: Blocked persons subject to sanctions and additional vessels identified as property in which a blocked person has an interest can be found on the SDN List, which can be searched here.  Please note that the transport of petroleum and petroleum products exported from Iran before May 2, 2019 to a country that received a significant reduction exception pursuant to section 1245 of the National Defense Authorization Act for Fiscal Year 2012 could be subject to a sanctions exception.

[2] The ITSR also prohibits entities owned or controlled by a United States person and established or maintained outside the United States ("U.S.-owned or -controlled foreign entities") from knowingly engaging in any transaction directly or indirectly with the Government of Iran or any person subject to the jurisdiction of the Government of Iran that would be prohibited by the ITSR if the transaction were engaged in by a United States person or in the United States.

PX59

a Foreign Terrorist Organization.

## Deceptive Shipping Practices

As the global community increases its pressure on the Iranian regime, persons associated with the petroleum shipping industry continue to deploy deceptive practices to facilitate Iranian transactions. Actors such as Iran's IRGC-QF attempt to evade U.S. and European sanctions by obfuscating the origin, destination, and recipient of oil shipments, including those in the Mediterranean Sea ultimately destined for Syria.

The following list provides examples of the types of tactics used to obfuscate the origin and destination of petroleum and petroleum products from Iran.

**Falsifying Cargo and Vessel Documents:** Complete and accurate shipping documentation is critical to ensuring all parties to a transaction understand the parties, goods, and vessels involved in a given shipment. Bills of lading, certificates of origin, invoices, packing lists, proof of insurance, and lists of last ports of call are examples of documentation that typically accompanies a shipping transaction. Shipping companies have been known to falsify vessel and cargo documents to obscure the destination of petroleum shipments.

**Ship to Ship (STS) Transfers:** STS transfers are a method of transferring cargo from one ship to another while at sea rather than while located in port. STS transfers can conceal the origin or destination of cargo.

**Disabling Automatic Identification System (AIS):** AIS is a collision avoidance system, which transmits, at a minimum, a vessel's identification and select navigational and positional data via very high frequency (VHF) radio waves. While AIS was not specifically designed for vessel tracking, it is often used for this purpose via terrestrial and satellite receivers feeding this information to commercial ship tracking services. Ships meeting certain tonnage thresholds and engaged in international voyages are required to carry AIS at all times, consistent with applicable requirements; however, vessels carrying petroleum from Iran have been known to intentionally disable their AIS transponders or modify transponder data to mask their movements. This tactic can conceal the cargo's Iranian origin, or create uncertainty regarding the location of Iranian vessels and obfuscate STS transfers of Iranian cargo.

**Vessel Name Changes**: The owners of vessels that have engaged in illicit activities are known to change the name of a vessel in an attempt to obfuscate its prior illicit activities. For this reason, it is essential to research a vessel not only by name, but also by its International Maritime Organization (IMO) number.

## Risk Mitigation Measures

The risk of engaging in sanctionable activity or processing prohibited transactions can be potentially mitigated by implementing the following types of measures, many of which were

3

PX59

outlined in previous OFAC publications:

**Insurance:** There is sanctions risk related to the provision of underwriting services or insurance or reinsurance to certain Iranian energy- or maritime-related persons or activity. In particular, persons who knowingly provide underwriting services or insurance or reinsurance to any Iranian person on the SDN List — such as NIOC, NITC, or IRISL — are exposed to sanctions. Additionally, transactions involving the designated entity Kish Protection & Indemnity Club (aka Kish P&I), a major Iranian insurance provider, are considered sanctionable activity. The United States is not alone in its concerns with Kish P&I. Many countries' flagging registries do not accept vessels insured by Kish P&I to their registries.

**Verify Cargo Origin:** Individuals and entities receiving petroleum or petroleum products shipments should conduct appropriate due diligence to corroborate the origin of such goods when transported or delivered by vessels exhibiting deceptive behaviors or where connections to sanctioned persons or locations are suspected. Testing samples of the cargo's composition can reveal chemical signatures unique to Iranian oil fields. Publicizing cases where certificates of origin are known to be falsified can deter efforts to resell the goods to alternative customers.

**Strengthen Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) Compliance:** Financial institutions and companies are strongly encouraged to employ risk mitigation measures consistent with Financial Action Task Force standards designed to combat money laundering, and terrorist and proliferation financing. This includes the adoption of appropriate due diligence policies and procedures by financial institutions and non-financial gatekeepers and promoting beneficial ownership transparency for legal entities, particularly as related to the scenarios outlined above.

**Monitor for AIS Manipulation:** Ship registries, insurers, charterers, vessel owners, or port operators should consider investigating vessels that appear to have turned off their AIS while operating in the Mediterranean and Red Seas and near China. Any other signs of manipulating AIS transponders should be considered red flags for potential illicit activity and should be investigated fully prior to continuing to provide services to, processing transactions involving, or engaging in other activities with such vessels.

**Review All Applicable Shipping Documentation:** Individuals and entities processing transactions pertaining to shipments potentially involving petroleum or petroleum products from Iran should ensure that they request and review complete and accurate shipping documentation. Such shipping documentation should reflect the details of the underlying voyage and reflect the relevant vessel(s), flagging, cargo, origin, and destination. Any indication that shipping documentation has been manipulated should be considered a red flag for potential illicit activity and should be investigated fully prior to continuing with the transaction. In addition, documents related to STS transfers should demonstrate that the underlying goods were delivered to the port listed on the shipping documentation.

**Know Your Customer (KYC):** As a standard practice, those involved in the maritime petroleum shipping community, including vessel owners and operators, are advised to conduct

PX59

KYC due diligence.  KYC due diligence helps to ensure that those in the maritime petroleum shipping community are aware of the activities and transactions they engage in, as well as the parties, geographies, and country-of-origin and destination of the goods involved in any underlying shipments.  This includes not only researching companies and individuals, but also the vessels, vessel owners, and operators involved in any contracts, shipments, or related maritime commerce.  Best practices for conducting KYC on a vessel include researching its IMO number, which may provide a more comprehensive picture of the vessel's history, travel patterns, ties to illicit activities, actors, or regimes, and potential sanctions risks associated with the vessel or its owners or operators.

**Clear Communication with International Partners:**  Parties to a shipping transaction may be subject to different sanctions regimes depending on the parties and jurisdictions involved, so clear communication is a critical step for international transactions.  Discussing applicable sanctions frameworks with parties to a transaction can ensure more effective compliance.

**Leverage Available Resources:** There are several organizations that provide commercial shipping data, such as ship location, ship registry information, and ship flagging information.  This data should be incorporated into due diligence best practices, along with available information from OFAC as outlined below in the "Sanctions Resources" section of this advisory.

## Consequences of Violating U.S. Sanctions or Engaging in Sanctionable Conduct

Individuals and entities engaged in certain transactions involving petroleum or petroleum products from Iran or certain Iran-related persons on the SDN List should be aware that engaging in such conduct may result in designation or other sanctions under U.S. sanctions authorities unless an exception applies.

In addition, violations of the ITSR could result in civil enforcement actions or criminal penalties for persons or transactions subject to U.S. jurisdiction.

Persons that violate the ITSR can be subject to significant civil monetary penalties.[3]  OFAC investigates and enforces violations of its regulations as outlined in its Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, Appendix A.  For more information regarding civil monetary penalties and other administrative actions taken by OFAC, see the Civil Penalties and Enforcement Information portion of OFAC's web site.

---

[3] Pursuant to Section 4 of the Federal Civil Penalties Inflation Adjustment Act (1990 Pub. L. 101-410, 104 Stat. 890; 28 U.S.C. 2461 note), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. 104-134, 110 Stat. 1321-373) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Pub. L. 114-74, 129 Stat. 599, 28 U.S.C. 2461 note) (collectively, the FCPIA Act), requires each federal agency with statutory authority to assess civil monetary penalties (CMPs) to adjust CMPs annually for inflation according to a formula described in section 5 of the FCPIA Act.

PX59

**<u>Sanctions Resources</u>**

For additional guidance regarding the U.S. sanctions programs on Iran, please consult OFAC's Iran Sanctions <u>FAQs</u> pages.  For questions or concerns related to OFAC sanctions regulations and requirements, including to disclose a potential violation of U.S. sanctions regulations, please contact OFAC's Compliance Hotline at 1-800-540-6322 or via <u>OFAC_Feedback@treasury.gov</u>.  To submit a request for a specific OFAC license, see <u>OFAC Licensing</u>.

PX59

# ANNEX

*The following vessels were identified on OFAC's SDN List on September 4, 2019 as property in which persons blocked pursuant to E. O. 13224 have an interest.  This list is in addition to the nearly 200 vessels identified as blocked property pursuant to Executive Order 13599 on November 5, 2018.  Please see OFAC's March 25, 2019 Advisory to the Maritime Petroleum Shipping Community for additional information on sanctions risks related to petroleum shipments involving Iran and Syria.*

**Non-Exhaustive List of Vessels in Which Persons Blocked Pursuant to E.O. 13224 Have an Interest**

| Vessel Name | IMO |
| --- | --- |
| ADRIAN DARYA 1[4] | 9116412 |
| BONITA QUEEN[5] | 9105906 |
| DELICE[6] | 9125138 |
| DESTINY[7] | 9177155 |
| DEVREZ | 9120994 |
| HAPPINESS I | 9212905 |
| JASMINE[8] | 9105085 |
| SARAK[9] | 9226968 |
| SINOPA | 9172038 |
| SOBAR[10] | 9221970 |
| SOLAN[11] | 9155808 |
| TOUR 2 | 9364112 |

---

[4] Formerly GRACE 1
[5] Formerly KAMILA
[6] The DELICE and the DEVREZ also are identified pursuant to E.O. 13599 as property in which IRISL has an interest.
[7] The DELICE, DESTINY, DEVREZ, HAPPINESS I, and SINOPA also are identified pursuant to E.O. 13599 as property in which NITC has an interest.
[8] Formerly EMMA
[9] Formerly RISE DESTINY
[10] Formerly RISE DIGNITY
[11] Formerly RISE GLORY

PX59

PX61

# Office of Foreign Assets Control - Sanctions Programs and Information

home.treasury.gov/policy-issues/office-of-foreign-assets-control-sanctions-programs-and-information

The Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States.

## OFAC Sanctions Lists

OFAC publishes lists of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.

## Search OFAC's Sanctions List

OFAC provides a free, online application to enable users to simultaneously search all of its sanctions lists. View more information about OFAC's sanctions list search tools.

## Apply for an OFAC License

A license is an authorization from OFAC to engage in a transaction that otherwise would be prohibited (e.g. release of blocked funds). Read more information about OFAC licenses.

## Sanctions Programs & Country Info

OFAC administers a number of different sanctions programs. The sanctions can be either comprehensive or selective, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals.  Read more information about an OFAC "Country List."

## General OFAC Information & Guidance

In addition to providing guidance on specific sanctions programs, OFAC provides information on a number of sanctions-related issues that span multiple programs or that may affect specific industries.

PX61

# PX63

# Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies

home.treasury.gov/news/press-releases/sm767

*Network of vessels and facilitators has moved hundreds of millions of dollars to Assad regime, Hizballah, and illicit actors*

**WASHINGTON** – The Department of the Treasury's Office of Foreign Assets Control (OFAC) took action against a large shipping network that is directed by and financially supports the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy Hizballah.  Over the past year, the IRGC-QF has moved oil worth hundreds of millions of dollars or more through this network for the benefit of the brutal Assad regime, Hizballah, and other illicit actors.  Senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi oversees this sprawling network, which features dozens of ship managers, vessels, and facilitators.  This complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil.  The IRGC-QF also relies heavily on Hizballah officials and front companies to broker associated contracts.  OFAC also is issuing a new shipping advisory to the maritime community warning of these types of schemes and the sanctions risks associated with blocked persons.

"Iran continues to take provocative actions to destabilize the region and the world. Treasury's action against this sprawling petroleum network makes it explicitly clear that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force," said Treasury Secretary Steven Mnuchin. "Our actions over the last two weeks should serve as a strong warning to anyone considering facilitating the Qods Force's oil sales that there will be swift consequences."

"The Iranian regime is leveraging a terrorist organization as its chief conduit for obfuscating and selling hundreds of millions of dollars of illicit oil to fuel its nefarious agenda.  Iran's exportation of oil directly funds acts of terrorism by Iranian proxies and atrocities by the Assad regime against innocent people," said Sigal Mandelker, Under Secretary for Terrorism and Financial Intelligence.  "This vast oil-for-terror shipping network demonstrates how economically reliant Tehran is on the IRGC-QF and Hizballah as financial lifelines.  The international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these networks fund."

In spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime.  These shipments, taken collectively, sold for more than half a billion dollars.  The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.

PX63

Iranian officials increasingly seek to deceive potential customers into buying Iranian oil.  The network, run by IRGC-QF official Rostam Qasemi, attempted on multiple occasions to pass off Iranian cargo as Iraqi-origin.

Today, OFAC is announcing the designation of some 16 entities and 10 individuals pursuant to E.O. 13224, and is also identifying 11 vessels as property in which blocked persons have an interest.  The IRGC and Hizballah, both identified as Foreign Terrorist Organizations by the U.S. Department of State under Section 219 of the Immigration and Nationality Act, are also designated pursuant to E.O. 13224.

**OFAC SHIPPING ADVISORY**

Today OFAC also issued a new advisory to the maritime community to warn of the risks involved with participating in illicit schemes such as the IRGC-QF's oil-for-terror shipping network.  This advisory is in addition to the Maritime Petroleum Shipping Community issued by OFAC on March 25, 2019, which warns of sanctions risks related to oil shipments to Syria, including those from Iran.

**IRGC-QF NETWORK OVERSIGHT**

The IRGC-QF's highest-ranking officials have long overseen exports of Iranian oil, often masking its origins and sending it to the Syrian regime or IRGC-QF proxies across the region.

IRGC-QF Commander Qasem Soleimani (Soleimani) supervises fellow IRGC-QF official Rostam Qasemi, who has continued taking advantage of his domestic and international connections in the energy industry since his tenure as Iran's Minister of Petroleum from 2011 to 2013.

IRGC-QF official Rostam Qasemi, who is also the head of the Iranian-Syrian Economic Relations Development Committee, manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil.  Qasemi relies on trusted IRGC-QF officials and associates to run the network, including his son, Morteza Qasemi.  Morteza Qasemi has helped finalize the network's oil contracts.

Ali Qasir, a Lebanese national and IRGC-QF associate, also serves as a lynchpin for this IRGC-QF-orchestrated network.  His responsibilities for the network's financial affairs include negotiating sales prices for the goods and settling vessel-related payments.  Additionally, Ali Qasir assigns vessels to conduct shipments for the network based on the IRGC-QF's guidance.

Rostam Qasemi is being designated pursuant to E.O. 13224 for acting for or on behalf of the IRGC-QF and IRGC-QF Commander Qasem Soleimani.  Rostam Qasemi previously was designated pursuant to E.O. 13382 on February 10, 2010; in his role as an IRGC general at the time, he served as the commander of Khatam al-Anbiya Construction Headquarters, the

engineering arm of the IRGC whose projects fund the IRGC's operations.  Morteza Qasemi and Ali Qasir are being designated pursuant to E.O. 13224 today for acting for or on behalf of Rostam Qasemi.

**VESSELS AND SHIPPING MANAGERS**

The IRGC-QF leverages trusted persons who operate or manage tankers to export Iranian oil and condensate, and has acquired several vessels of its own.  For example, Iranian Law Enforcement Forces (LEF) official Shamsollah Asadi helped Rostam Qasemi obtain tankers for the network's use.  Shamsollah Asadi collaborated with Ali Qasir to cover expenses and facilitate an Iranian oil shipment by the ADRIAN DARYA 1 for the benefit of the IRGC-QF. He also helped arrange payments in support of vessel management transfers, ultimately benefiting the same IRGC-QF -run shipping network.

Accordingly, Shamsollah Asadi is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Ali Qasir.  The LEF was designated pursuant to E.O. 13572 and E.O. 13553 in June 2011 for human rights abuses in Syria and Iran, respectively.

**MEHDI GROUP**

India-based Mehdi Group and its director, Ali Zaheer Mehdi, have managed vessels and found additional ones to move Iranian oil.  Mehdi Group bears responsibility for crewing and managing at least seven of the vessels used by the network.

Mehdi Group officials, including Ali Zaheer Mehdi, have spread responsibility for managing the vessels across at least ten subsidiaries and shell companies.

India-based Mehdi Group subsidiaries Bushra Ship Management Private Limited and Khadija Ship Management Private Limited (Khadija), under director Ali Ghadeer Mehdi, handle the day-to-day operations of the network's vessels.  These vessels include the BONITA QUEEN, the DEVREZ, and the TOUR 2, which are being identified today as blocked property in which Khadija has an interest.

Other Mehdi Group officials work to ensure the vessels remain available for the network's use.  Anuj Bhardwaj arranges vessel inspections and registrations.  Zafar Anis Ishteyaq Hussain tracks and processes millions of dollars in expenses incurred by the vessels.

A third Mehdi Group subsidiary, Vaniya Ship Management Private Limited, helped Mehdi Group set up three shell companies in the Marshall Islands.  Under Ali Ghadeer Mehdi's management, the shell companies purchased three crude oil tankers:  the SARAK, the SOBAR, and the SOLAN.  The SOBAR and the SOLAN previously appeared in an OFAC advisory to the maritime petroleum shipping community, which warned of the sanctions

PX63

risks associated with shipments of petroleum to the Government of Syria. Both vessels, as well as the SARAK, are identified today as blocked property in which Mehdi Group has an interest. Notably, the SARAK falsified the Iranian origin of its cargo to port authorities.

Additionally, Mehdi Group has two branch offices: Singapore-based Mehdi Offshore and Ship Management Pte. Ltd. (Mehdi Offshore) and United Arab Emirates (UAE)-based Penta Ocean Ship Management & Operation LLC (Penta Ocean). Mehdi Offshore ostensibly provides various support services, while Penta Ocean and UAE-based Mehdi Group subsidiary Fourteen Star Shipping Management manages billing and payments. Mehdi Group also is able to draw on expertise in oil-related logistics, including refining and storage, through its UAE-based subsidiary Five Energy Oil Trading.

Mehdi Group found a partner outside of the company to supplement its efforts to assist the IRGC-QF. Lebanon-based Africo 1 Off-Shore SAL assists in, sponsors, or provides financial, material, or technological support for, or financial or other services to or in support of, Mehdi Group subsidiary Vaniya Ship Management by operating the tanker JASMINE for the network. The JASMINE also is being identified today pursuant to E.O. 13224 as blocked property in which Africo 1 Off-Shore SAL has an interest.

Ali Zaheer Mehdi is being designated pursuant to E.O. 13224 today for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, IRGC-QF official Rostam Qasemi. Anuj Bhardwaj is being designated pursuant to E.O. 13224 for acting for or on behalf of Mehdi Group. Ali Ghadeer Mehdi and Zafar Anis Ishteyaq Hussain are being designated pursuant to E.O. 13224 for acting for or on behalf of Mehdi Group subsidiaries Khadija Ship Management and Fourteen Star Shipping Management, respectively.

Bushra Ship Management Private Limited, Khadija Ship Management Private Limited, Mehdi Offshore and Ship Management Pte. Ltd., Penta Ocean Ship Management & Operation LLC, Fourteen Star Shipping Management, and Five Energy Oil Trading are being designated pursuant to E.O. 13224 today for being owned or controlled by Mehdi Group. Vaniya Ship Management Private Limited is being designated pursuant to E.O. 13224 for being owned or controlled by, or acting for or on behalf of, Mehdi Group.

On August 30, 2019, Mehdi Group was designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Rostam Qasemi. The ADRIAN DARYA 1, formerly known as the GRACE 1, was identified as blocked property in which Mehdi Group has an interest pursuant to E.O. 13224 on August 30, 2019. Akhilesh Kumar was designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Mehdi Group on the same day.

**CONNECTIONS WITH THE IRANIAN ENERGY, SHIPPING, AND INSURANCE SECTORS**

PX63

The crude oil and condensate sold by this IRGC-QF network originates with the National Iranian Oil Company (NIOC), and ultimately is delivered to Syria.  The IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things.

National Iranian Tanker Company (NITC) vessels have been used in the IRGC-QF-run operation.  These vessels include the DESTINY, the HAPPINESS I, and the SINOPA, which were identified on November 5, 2018, as blocked property in which NITC has an interest.  The DEVREZ and the DELICE also were identified on that day as blocked property in which the Islamic Republic of Iran Shipping Lines (IRISL) has an interest.

Safiran Payam Darya Shipping Company (SAPID) official Mohammadreza Ali Akbari (Akbari) serves as an interlocutor between the IRGC-QF and vessel managers, and is being designated pursuant to E.O. 13224 today for acting for or on behalf of IRGC-QF official Rostam Qasemi accordingly.  Akbari also helped the IRGC-QF skirt sanctions in previous years.

The provision of services, including protection and indemnity (P&I) insurance, and future dealings in blocked property can expose parties to sanctions.  Iran's Kish P&I Club has provided discounted P&I coverage for multiple vessels in the IRGC-QF-run network.  Given its the provision of these services, Kish P&I Club is being designated pursuant to E.O. 13224 today for assisting in, sponsoring, or providing financial, material or technological support for, or financial or other services to or in support of, Mehdi Group.

NIOC and SAPID were identified pursuant to E.O. 13599 on November 5, 2018 as part of the broad re-imposition of sanctions against Iran.  State-owned SYTROL was designated pursuant to E.O. 13574 on August 10, 2012.

**TIES TO HIZBALLAH AND ASSOCIATED FRONT COMPANIES**

The IRGC-QF also uses several front companies to mask its role in selling the crude oil, condensate, and gas oil.  The companies are overseen by Hizballah officials Muhammad Qasir and Muhammad Qasim al-Bazzal (al-Bazzal), both of whom were designated pursuant to E.O. 13224 in 2018 in connection with another oil-for-terror scheme.

Hokoul S.A.L. Offshore (Hokoul) and Talaqi Group are front companies run by Hizballah official al-Bazzal.  Al-Bazzal has sought to continue operating his network since being designated by OFAC by purporting to transfer ownership of his companies, including Nagham al Hayat and Tawafuk.  In early 2019, al-Bazzal sought to remove his name as an owner and shareholder from all company documents, presumably in order to evade U.S. sanctions.

Lebanon-based Hokoul supplies SYTROL with Iranian crude under IRGC-QF auspices.  Al-Bazzal and other Hizballah officials have control over the contractual and financial obligations of Hokoul, while Ali Qasir represents Hokoul in negotiating its supply of Iranian

PX63

crude to Syria.  NITC vessels including the DELICE, the DESTINY, the HAPPINESS I, and the SINOPA transport such petroleum and petroleum products, and are identified pursuant to E.O. 13224 today as property in which Hokoul has an interest.  Ali Qasir also is the managing director of Talaqi Group, which finances oil shipments for the IRGC-QF.

Since late 2018, al-Bazzal has leveraged his companies, including Talaqi Group, to finance and coordinate various IRGC-QF-linked oil shipments.  In his role as chairman of the board of directors at Talaqi Group, al-Bazzal is responsible for the company's finances, procedures, administration, and contracts.

Al-Bazzal and his wife are co-founders of Talaqi Group.  Al-Bazzal oversaw Talaqi Group's partnership with ALUMIX for shipments of aluminum to Iran, while his wife, as ALUMIX's general manager, supplies Talaqi Group with payment information.  ALUMIX was known as "Dogmoch" until late 2018.

Two additional companies fall under al-Bazzal's purview.  He owns Syria-based Nagham Al Hayat and serves on its board of directors, managing the company's assets, personnel, legal, and financial issues.  Al-Bazzal is a founder and owner of Tawafuk, where he is involved in day-to-day activities as general manager.

Hokoul S.A.L. Offshore, Talaqi Group, Nagham Al Hayat, Tawafuk, and ALUMIX are being designated pursuant to E.O. 13224 today for being owned or controlled by Muhammad Qasim al-Bazzal.

**EXPORTS DIVERSIFICATION**

In addition to Iranian petroleum and petroleum goods, the same IRGC-QF-led network is diversifying its exports, adding iron and metal to its repertoire.

Mahmud Ashtari is the managing director of Hamrahan Pishro Tejarat Trading Company (Hamrahan Pishro Tejarat), which charters tankers and transports cargo to international destinations, such as Syria and China.  Ali Qasir worked with Mahmud Ashtari, Hamrahan Pishro Tejarat, and Hizballah-linked Talaqi Group to facilitate the sale of tens of millions of dollars' worth of steel debar.

Mahmud Ashtari has received hundreds of thousands of dollars for vessel expenses and contracts, often related to iron or metal shipments from Iran.  He also ensures ports can accommodate the vessels and advances their discharged goods toward their final destination.

Mahmud Ashtari is being designated pursuant to E.O. 13224 today for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Ali Qasir.

**SANCTIONS IMPLICATIONS**

PX63

As of November 5, 2018, the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran is sanctionable pursuant to E.O. 13846.  Knowingly providing insurance or re-insurance for the transport of Iranian petroleum and petrochemical products also is sanctionable.  The U.S. Treasury Department urges international companies to ensure they are conducting the necessary due diligence to avoid engaging in sanctionable activity with entities that support the Iranian regime's malign activity.  The U.S. government is systematically enforcing sanctions and denying Tehran the revenue flows it needs to support destructive and destabilizing activities around the world.

As a result of today's action, all property and interests in property of these entities that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC.  OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.

In addition, persons that engage in certain transactions with the entities designated today may themselves be exposed to designation.  Furthermore, any foreign financial institution that knowingly facilitates a significant financial transaction or provides significant financial services for entities designated in connection with Iran's proliferation of weapons of mass destruction or any Iranian person on OFAC's List of Specially Designated Nationals and Blocked Persons could be subject to U.S. correspondent account or payable-through account sanctions.

For identifying information on the entities designated today click here.

Link designated network

####

PX63

PX66

# Treasury Designates Individual, Entity Posing Threat to Stability in Iraq

home.treasury.gov/news/press-releases/tg195

*(Archived Content)*

WASHINGTON – The U.S. Department of the Treasury today targeted Iran-based individual Abu Mahdi al-Muhandis and Iraq-based Shia extremist group Kata'ib Hizballah for threatening the peace and stability of Iraq and the Government of Iraq. Al-Muhandis and Kata'ib Hizballah have committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces and as a result are designated today under Executive Order (E.O.) 13438, which targets insurgent and militia groups and their supporters.

These designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence.

Abu Mahdi al-Muhandis is an advisor to Qasem Soleimani, the commander of Iran's Qods Force, the arm of the Islamic Revolutionary Guard Corps (IRGC) responsible for providing material support to Lebanon-based Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine – General Command.  Further, the IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces.  The IRGC-Qods Force was named a Specially Designated Global Terrorist by the Treasury Department on October 25, 2007.

The U.S. Department of State also today designated Kata'ib Hizballah as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and under section 1(b) of E.O. 13224 for committing or posing a significant risk of committing acts of terrorism.

Designations under E.O. 13438 and E.O. 13224 are administered by Treasury's Office of Foreign Assets Control and prohibit all transactions between the designees and any U.S. person and freeze any assets the designees may have under U.S. jurisdiction.

Identifying Information:

**ABU MAHDI AL-MUHANDIS**

AKAs:
Abu Mahdi al-Muhandes
Abu Mehdi al-Mohandess

1/4

PX66

Abu-Mahdi al-Mohandas
Abu-Muhannad al-Muhandis
Abu Mahdi al-Madan
Abu Mahdi al-Basri al-Muhandis
Abu-Mahdi al-Mohandis al-Basri
Abu Mahdi al Baseri
Abu Mahdi al-Basari
Jamal Ja'far al-Ibrahimi
Jamal Ja'afar Muhammad Ali al-Ibrahimi
Jamal Jafaar Mohammed Ali Ebrahimi
Jamal Fa'far 'Ali al-Ibrahimi
Jamal al-Ibrahimi
Jamal al-Madan al-Tamimi
Jamal Ja'afar Ibrahim al-Mikna Bihaj
Jamal Jaafar Mohammed
Jaafar Jamal Jaafar
Jamal Ibrahimi
Citizenships:
Iranian
Iraqi
Nationality:
Iraqi
Year of Birth:
1953
Place of Birth:
Ma'ghal, Basrah, Iraq
Locations:
Al Fardoussi Street, Tehran, Iran
Al Maaqal, al Basrah
Velayat Faqih Base, Kenesht Mountain Pass Northwest of Kermanshah, Iran
Mehran, Iran

As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

PX66

Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

### KATA'IB HIZBALLAH

AKAs:
Hizballah Brigades
Hizballah Brigades in Iraq
Hizballah Brigades-Iraq
Hizballah Brigades-Iraq of the Islamic Resistance in Iraq
Islamic Resistance in Iraq
Katibat Abu Fathel Al A'abas
Katibut Karbalah
Katibat Zayd Ebin Ali
Variants:
Kata'ib Hezbollah
Khata'ib Hizballah
Khata'ib Hezbollah
Kata'ib Hizballah fi al-Iraq
Khattab Hezballah
Locations:
Iraq
Najaf, Iraq

PX66

Website:

www.alaseb.com

Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG-29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

###

PX66

PX67

U.S. DEPARTMENT OF THE TREASURY

## Treasury Designates Individuals, Entity Fueling Iraqi Insurgency

January 9, 2008

*(Archived Content)*

The U.S. Department of the Treasury today designated four individuals and one entity under Executive Order 13438 for threatening the peace and stability of Iraq and the Government of Iraq. The individuals and entity designated today commit, direct, support, or pose a significant risk of committing acts of violence against Iraqi citizens, Iraqi government officials, and Coalition Forces.

Iran and Syria are fueling violence and destruction in Iraq. Iran trains, funds, and provides weapons to violent Shia extremist groups, while Syria provides safe-haven to Sunni insurgents and financiers, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence. Today's action brings to light the lethal actions of these individuals, and we call on the international community to stand with us in isolating them from the global economy.

By committing, directing, and supporting violent attacks in Iraq, these extremists threaten peace and stability and undermine efforts to promote economic reconstruction in Iraq.

Today's action follows President Bush's issuance of E.O. 13438 on July 17, 2007, which targets insurgent and militia groups and their support. Designations under E.O. 13438 are administered by Treasury's Office of Foreign Assets Control and prohibit all transactions between the designees and any U.S. person and freeze any assets the designees may have under U.S. jurisdiction.

*Identifying Information*

AHMED FORUZANDEH
*AKAs: Ahmad Foruzandeh*
*Ahmad Fruzandah*
*Ahmad Fayruzi*
*Jafari*
*Ahmad Foroozandeh*
*Abu Shahab*
*Abu Ahmad Ishab*
*Title: Brigadier General, Commanding Officer of the Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) Ramazan Corps*

PX67

*Former Title: Deputy Commander of the Ramazan Headquarters and Chief of Staff of the Iraq Crisis Staff*
*POB: Kermanshah, Iran*
*DOB: Circa 1958-1963*
*Alt. DOB: 1957*
*Alt. DOB: Circa 1955*
*Education: Husayni Political University*
*Location: Qods Force Central Headquarters in the former U.S. Embassy Compound in Tehran, Iran*

Iran-based Ahmed Foruzandeh, a Brigadier General in the IRGC-QF, leads terrorist operations against Coalition Forces and Iraqi Security Forces, and directs assassinations of Iraqi figures. The Qods Force, designated under E.O. 13224 for providing material support to terrorists, is the regime's primary mechanism for cultivating and supporting terrorists and Islamic militants to advance Iranian national interests. The Qods Force provides training, weapons, and financial support to surrogate groups and terrorist organizations including: Lebanese Hizballah; Palestinian terrorists; Iraqi Shia militant groups; the Taliban and Islamic militants in Afghanistan, the Balkans and elsewhere. The Qods Force plays a central – yet often hidden – role in security interests, including Iraq and Afghanistan. Qods Force officers often use various cover mechanisms – including diplomatic, non-governmental organization, humanitarian, and media – for conducting operational activity, belying their military affiliation.

As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hizballah, to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

Foruzandeh and his subordinates provide financial and material support for acts of violence against Coalition Forces and Iraqi Security Forces. In early-April 2007, Foruzandeh provided $25,000 USD to help fund military operations against Coalition Forces in Salah Ad Din Province, Iraq. Foruzandeh provided the funds to two men claiming to be members of a Sunni terrorist organization in Iraq, promising the men additional funds if they would deliver videos of attacks against Coalition Forces. Foruzandeh also offered to deliver weapons to the border, if the two men could transport the weapons into Iraq in order to fight Coalition Forces. Previously, in August 2004, Foruzandeh drove explosives and associated materials into Iraq from Iran for use in suicide bombings.

In addition to providing financial and material support for attacks against Coalition Forces, Foruzandeh supplied a certain Shia militia group with a target for execution. On July 25, 2005, Foruzandeh held a meeting with representatives of Iraqi Hizballah and other Shia militia groups, calling upon them to continue liquidating all enemies of the Islamic revolution, including security and intelligence personnel, tribal chiefs, and religious clerics.

PX67

**ABU MUSTAFA AL-SHEIBANI**

AKAs: Hameid Thajeil Wareij Al-Attabi

Hamid Al-Shaybani

Abu Mustafa Al-Shebani

Abu Mustafa Al-Shaybani

Mustafa Al-Sheibani

Hamid Thajil

Hamid Thajeel Al-Sheibani

DOB: Circa 1960

Alt. DOB: 1959

POB: Nasiriyah, Iraq

Citizenship: Iranian

All Citizenship: Iraqi

Location: Tehran, Iran

Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.

Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.

In an effort to cause instability in Iraq, Al-Sheibani and his network targeted Iraqi government officials. Al-Sheibani conducted attacks against the Iraqi Police Chief of Najaf, Iraq, and the Iraqi Deputy Governor in Najaf, Iraq. Al-Sheibani's network also killed Muhammad al-Friji, a colonel in the Iraqi Ministry of Interior.

PX67

**ISMA'IL HAFIZ AL LAMI (ABU DURA)**

AKAs: Abu Dura

Abu Diri

Abu Dar'a

Abu Haydar

Ismail Hafeth Izajawi

Ismail al-Lami

Isma'il Hafith Abid `Ali al-Lami

Ismai'il Hafuz al-Zarqawi

DOB: Circa 1957

POB: Baghdad, Iraq

Citizenship: Iraq

Location 1: Iran

Location 2: Sadr City, Baghdad, Iraq

As of 2007, Iran-based Shia extremist Abu Dura and his group were actively targeting Iraqi government officials, Sunni community leaders, and anyone who cooperated with Coalition Forces. In a brazen daylight attack, Abu Dura and his group kidnapped employees from the Ministry of Higher Education in November 2006. Sunni hostages were then singled out, tortured, and killed by men under Abu Dura's control. Abu Dura was also responsible for the July 2006, kidnapping of Taysir Najih Awad al-Mashadani, a Sunni member of the Iraqi Parliament. He also planned to kidnap Sunni Iraqi politician Adnan al-Dulaymi and planned a mortar attack against the residence of Iraqi Vice President Tariq al-Hashimi.

Abu Dura also directs acts of violence against Iraqi civilians. Abu Dura uses members of a Baghdad-based Shia militia to gather information on potential targets. Abu Dura then uses this information to plan and coordinate potential kidnapping and assassination operations. In July 2006, men under Abu Dura's control routinely executed Iraqi citizens in Sadr City, Baghdad.

In addition to directing acts of violence against Iraqi government officials and citizens, Abu Dura supported acts of violence against U.S. and Coalition Forces. In July 2006, men under Abu Dura's control attacked a U.S. forces patrol in Sadr City, Baghdad. The purpose of the attack was to kidnap U.S. soldiers and use them as a tool to make U.S. forces leave Iraq. After fleeing to Iran to avoid capture by Coalition Forces, Abu Dura continued to direct attacks in Iraq against Coalition Forces and Sunnis in Iraq during early-2007. Abu Dura maintained contact with proxies in Iraq who carried out those attacks.

**MISH'AN RAKIN THAMIN AL-JABURI**

AKAs Mushan al-Jaburi

Meshaan al-Juburi

Mishan Jibouri

Mishan al-Jabouri

PX67

Mashaan Aljabouri

Mashaan Jabouri

Mash'an el-Jburi

Mish'an al-Juburi

Mush'an al-Jiburi

Mashan Juburi

Mishan al-Jabburi

Meshan Thamin al Jabouri

Mishan Riqardh Damin al Jabouri

Mishaan al-Jubouri

Mashaan Rakadh Dhamin Al Jabbury

Misham Al Jaburi

Mish'an Rakkad Damin al-Jabburi

Nationality: Iraq

Citizenship: Syrian

DOB: 1 August 1957

POB: Ninwa, Iraq

Passport number: 01374026

Location 1: Latakia, Syria

Location 2: Damascus, Syria

Syria-based Mish'an Al-Jaburi provides financial, material, and technical support for acts of violence that threaten the peace and stability of Iraq. In February 2006, Al-Jaburi was expelled from the New Iraqi Parliament and fled Iraq to Syria for embezzling government funds and supporting Iraq-based insurgents. Al-Jaburi also owns Syria-based Al-Zawra, a television station that considers itself to be part of the fight against the U.S. In one instance, Al-Jaburi agreed to broadcast open-coded messages through patriotic songs to the Sunni terrorist group Islamic Army of Iraq. Additionally, Al-Jaburi utilized his nephew, Hasib Ismail Dandan, to provide storage sites for weapons, funds, and footage transiting in and out of Iraq.

Despite being publicly critical of al-Qa'ida in Iraq (AQI), Al-Jaburi is reported to have provided financial support and services to AQI. Al-Jaburi worked with an AQI jihadist umbrella organization, the Mujahadin Shura Council, to fund Sunni extremist operations. Additionally, Al-Jaburi's television station broadcast recruitment videos for AQI's Abu Bakr Al-Sadiq Al Salafi Battalion.

### AL-ZAWRA TELEVISION STATION

AKAs Alzawraa TV

Al-Zawraa TV

El-Zawra satellite station

Zorah Channel

PX67

Al Zoura TV station

Al-Zawara satellite television station

Al Zawrah Television

Zawrah TV station

Al Zaoura network

Location: Syria

Syria-based Al-Zawra television station is owned and controlled by Mish'an Al-Jaburi. Publicly stating that he owns Al-Zawra and that no one outside his family controlled its content, Al-Jaburi privately agreed to broadcast open-coded messages through patriotic songs to the Sunni terrorist group the Islamic Army of Iraq. Al-Zawra, which has received financing from Al-Qa'ida, is also used as a venue to broadcast graphic videos of attacks against U.S. forces. Additionally, Al-Zawra broadcast recruitment videos for AQI's Abu Bakr Al-Sadiq Al-Salafi Battalion. In November 2006, Al-Zawra's Iraq office was closed by the Government of Iraq for airing programs inciting violence.

In addition to the reasons for which Al-Zawra is being designated, it is a pro-insurgency station that broadcasts graphic videos of insurgent attacks against U.S. forces, advocates violence against Shia, and calls upon Iraqis to unite and take up arms against Coalition Forces.

-30-

PX67

PX68

# TREASURY DESIGNATES IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY FOR HUMAN RIGHTS ABUSES AND SUPPORT FOR TERRORISM

content.govdelivery.com/accounts/USTREAS/bulletins/2f1cdf

**FOR IMMEDIATE RELEASE: February 16, 2012**

**CONTACT: Treasury Public Affairs (202) 622-2960**

**TREASURY DESIGNATES IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY FOR HUMAN RIGHTS ABUSES AND SUPPORT FOR TERRORISM**

*Ministry Targeted for its Role in Facilitating Abuses by the Iranian and Syrian Regimes*

**WASHINGTON** – The U.S. Department of the Treasury today announced the designation of the Iranian Ministry of Intelligence and Security (MOIS), Iran's primary intelligence organization, for its support to terrorist groups as well as its central role in perpetrating human rights abuses against the citizens of Iran and its role in supporting the Syrian regime as it continues to commit human rights abuses against the people of Syria.

Today's actions were taken in consultation with the Department of State and other agencies, as applicable, pursuant to Executive Orders (E.O.) 13224, 13553 and 13572, which target terrorists and their supporters and those responsible for human rights abuses in Iran and Syria, respectively. Any property or property interests in the United States or in the possession or control of U.S. persons in which the MOIS has an interest are blocked, and U.S. persons are prohibited from engaging in transactions with it. As a result of today's action all members of the MOIS are also ineligible to receive visas from the Department of State.

"Today we have designated the MOIS for abusing the basic human rights of Iranian citizens and exporting its vicious practices to support the Syrian regime's abhorrent crackdown on its own population," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "In

PX68

addition, we are designating the MOIS for its support to terrorist groups, including al Qa'ida, al Qa'ida in Iraq, Hizballah and HAMAS, again exposing the extent of Iran's sponsorship of terrorism as a matter of Iranian state policy."

The United States first exposed Iran's assistance to the Syrian government in its violent crackdown against the Syrian population when, on April 29, 2011, President Obama identified Iran's Islamic Revolutionary Guard Corps - Qods Force (IRGC-QF) as subject to sanctions pursuant to E.O. 13572. The IRGC-QF serves as a conduit for Iranian material support to the Syrian General Intelligence Directorate (GID), the overarching civilian intelligence service in Syria. On May 18, 2011, Treasury imposed sanctions on two IRGC-QF senior officers, Qasem Soleimani, the Commander of the IRGC-QF, and Mohsen Chizari, a senior IRGC-QF officer who serves as the Commander of IRGC-QF Operations and Training. A little over a month later, on June 29, 2011, Treasury designated Iran's Law Enforcement Forces (LEF), which is commonly referred to as Iran's national police. Like the IRGC-QF, the LEF provided material support to the Syrian GID; it also dispatched personnel to Damascus in April to assist the Syrian government in its efforts to suppress the Syrian people. Ismail Ahmadi Moghadam, the chief of Iran's LEF, and Ahmad-Reza Radan, the deputy chief of Iran's LEF were also designated at that time. In April 2011, Radan traveled to Damascus, where he met with Syrian security services and provided expertise to aid in the Syrian government's crackdown on the Syrian people.

**<u>Executive Order 13224 (Terrorism)</u>**

The U.S. Department of the Treasury today designated MOIS pursuant to E.O. 13224 for its support to Hizballah, HAMAS and al Qa'ida.

MOIS provides financial, material, or technological support for, or financial or other services to Hizballah, a terrorist organization designated under E.O. 13224. MOIS has participated in multiple joint projects with Hizballah in computer hacking.

MOIS provides financial, material, or technological support for, or financial or other services to HAMAS, a terrorist group also designated under E.O. 13224.

MOIS has facilitated the movement of al Qa'ida operatives in Iran and provided them with documents, identification cards, and passports.

PX68

MOIS also provided money and weapons to al Qa'ida in Iraq (AQI), a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives.

**Executive Order 13572 (Syria Human Rights Abuses)**

The U.S. Department of the Treasury today also designated MOIS pursuant to E.O. 13572 for providing support to the Syrian regime's violent repression of dissent in Syria. MOIS, like the IRGC-QF, and the Iranian LEF, has provided financial, material, or technological support to the Syrian GID, whose property and interests in property are blocked pursuant to E.O. 13572. MOIS has provided substantial technical assistance to the Syrian GID for the purpose of assisting the Syrian regime in its violent crackdown on protesters.

**Executive Order 13553 (Iran Human Rights Abuses)**

The U.S. Departments of the Treasury and State also today imposed sanctions against MOIS pursuant to E.O. 13553 for being responsible for or complicit in the commission of serious human rights abuses against the Iranian people since June 12, 2009.   MOIS agents are responsible for the beatings, sexual abuse, prolonged interrogations, and coerced confessions of prisoners, particularly political prisoners, which occurred in Ward 209 of Evin Prison, which is controlled by MOIS, following the June 2009 elections in Iran.

More generally, MOIS is known to have used abhorrent methods of interrogation such as mock executions and forms of sexual violence. MOIS agents have also arrested and detained members of the Bahai religion without charges.

**Identifying Information:**

Entity: IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY

PX68

AKA: MOIS

AKA: VEZARAT-E ETTELA'AT VA AMNIAT-E KESHVAR

AKA: VEVAK

Address: Headquarters located in Tehran, Iran; bounded roughly by Sanati Street on the west, 30th Street on the south, and Iraqi Street on the east.

Address: Ministry of Intelligence, Second Negarestan Street, Pasdaran Avenue, Tehran, Iran.

###

PX68

# PX70

# Treasury Designations Target Terrorist Facilitators

🏛 **home.treasury.gov**/news/press-releases/hp191

December 7, 2006

*(Archived Content)*

HP-191

The U.S. Department of the Treasury today designated five individuals for providing financial support to al Qaida and other terrorist organizations, as well as facilitating terrorist activity. The individuals were designated pursuant to Executive Order 13224 and added to the Treasury's list of Specially Designated Global Terrorists.

These individuals support every stage of the terrorist life-cycle, from financing terrorist groups and activity, to facilitating deadly attacks, and inciting others to join campaigns of violence and hate.  The civilized world must stand united in isolating these terrorists, said Stuart Levey, Treasury's Under Secretary for Terrorism and Financial Intelligence.

This designation freezes any assets the designees may have under U.S. jurisdiction and prohibits all financial and commercial transactions by any U.S. person with the designees. In addition, in accordance with U.N. Security Council Resolution 1624, the U.S. Government condemns those who incite others to acts of terrorism and violence.

## Identifying Information

**Najmuddin Faraj Ahmad**
Name: Najmuddin Faraj Ahmad

AKAs: Mullah Krekar
Fateh Najm Eddine Farraj
Faraj Ahmad Najmuddin

DOB: 7 JULY 1956
Alt. DOB: 17 JUNE 1963
POB: Olaqloo Sharbajer Village, Al-Sulaymaniyah Governorate, Iraq
Citizenship: Iraq
Address: Heimdalsgate 36-V, 0578 Oslo, Norway

**Krekar Provides Support to Ansar al-Sunnah**
Najmuddin Faraj Ahmad, a.k.a. Mullah Krekar (Krekar), founded in December 2001 the Kurdish terrorist group Ansar al-Islam (AI), now known as Ansar al-Sunnah (AS), and served as AI's first leader.

As of spring 2005, a non-governmental organization founded by Krekar sent money to terrorist organizations and actively recruited European citizens into terrorist organizations. Branches of the NGO were, as of spring 2005, overtly and covertly gathering money and recruiting personnel for AS. Krekar has visited Germany several times and during these trips

PX70

conducted fundraising for AS and performed logistical activities. Information shows that in January 2006, Krekar may have routed funds through associates in Bulgaria and Iraq to support AS in Iraq.

As of fall 2005, AS reportedly had established at least two sniper teams in Iraq; the founder of these teams claimed to be Krekar's representative in Iraq. Krekar also traveled regularly from Norway to the Iraqi Kurdish area. During one of his longer stays in northern Iraq, Krekar appears to have recruited and trained combatants.

**Other Information**
Apart from the instances of direct facilitation of terrorist groups which form the basis for his designation, Krekar has exhorted others to violence and supplied religious justifications for murder. In a 2004 interview, Krekar supported holy war in Iraq and identified legitimate targets, stating Not just the officers, but also the civilians who help the Americans. If anyone so much as fetches them a glass of water, he can be killed. ... Everyone is a target. If an aid organization gives the Americans as much as a glass of water, they will become a target.

**Hamid Al-Ali**
Name: Hamid Al-Ali
AKAs: Dr. Hamed Abdullah Al-Ali
Hamed Al-`Ali
Hamed bin `Abdallah Al-`Ali
Hamid bin Abdallah Ahmed Al-Ali
Hamid `Abdallah Ahmad Al-`Ali
Abu Salim
Hamid `Abdallah Al-`Ali

DOB: 20 JANUARY 1960
Citizenship: Kuwait

Hamid Al-Ali is a Kuwait-based terrorist facilitator who has provided financial support for al Qaida-affiliated groups seeking to commit acts of terrorism in Kuwait, Iraq, and elsewhere.

**Al-Ali Provides Support for al Qaida in Iraq**
Evidence shows that Al-Ali's efforts include providing support for terrorist organizations, including those in Iraq. Along with Jaber Al-Jalamah and Mubarak Mushakhas Sanad Al-Bathali, also designated today, Al-Ali recruits jihadists in Kuwait for terrorist activity including for al Qaida in Iraq. Al-Ali has provided financial support for recruits, including paying for their travel expenses to Iraq.

**Al-Ali Provides Funds for al Qaida-Associated Terrorist Cells in Kuwait**
Al-Ali was a religious leader and financier for a Kuwait-based terrorist cell that plotted to attack U.S. and Kuwaiti targets in early 2005. The al Qaida-associated terrorist cell appears to have been under his supervision. Al-Ali reportedly visited the group's terrorist camps in Kuwait, providing funds supporting acts of terrorism.

In addition to financial support and recruiting services, Al-Ali also provided opportunities for potential recruits to obtain explosives training in 2004. He also used his website to provide technical advice for making explosives, chemical, and biological weapons.

PX70

**Other Information**

Separate from the financial and other services in support of terrorist groups for which Al-Ali is being designated, he has issued fatwas legitimizing suicide operations. One such fatwa sanctions the permissiveness, and sometimes necessity, of suicide operations, on the condition of crushing the enemy … or causing moral defeat to the enemy, to obtain victory. According to this fatwa, in modern time(s) this can be accomplished through the modern means of bombing, or by bringing down an airplane on an important site that causes the enemy great casualties.

**Jaber Al-Jalamah**

Name: Jaber Al-Jalamah
AKAs: Jabir `Abdallah Jabir Ahmad Al-Jalamah
Jabir Abdallah Jabir Ahmad Jalahmah
Jaber Al-Jalahma
Abu Muhammad Al-Jalahmah
Abu Muhammad
Jabir Al-Jalhami
`Abdul-Ghani

DOB: 24 SEPTEMBER 1959
Nationality: Kuwaiti
Passport #: 101423404

Jaber Al-Jalamah is a Kuwait-based terrorist facilitator who has provided financial and logistical support to the al Qaida network in Afghanistan, Iraq and Kuwait. Al-Jalamah has also provided recruits for these efforts.

**Al-Jalamah Recruits and Provides Financial Support for al Qaida in Iraq**

As of 2006, Al-Jalamah supports activities and operations against coalition forces in Iraq. As early as 2004, Al-Jalamah was coordinating a recruitment effort to send fighters and funds to al Qaida in Iraq. He facilitated travel for men he recruited and for men recruited by Kuwaiti imams. Al-Jalamah sent three kinds of people into Iraq: suicide bombers, anti-coalition fighters, and couriers who go to Iraq to provide funds for anti-coalition fighters.

Al-Jalamah has sent a significant number of men to join al Qaida in Iraq. These operatives carried funds collected by Al-Jalamah for provision to the terrorist group. Trusted associates were sometimes given thousands of dollars to transport from Kuwait into Iraq.

**Al-Jalamah Provides Support for al Qaida Associates in Kuwait, Afghanistan and Pakistan**

As of 2004, Al-Jalamah was considered the leader of a group of terrorists in Kuwait, some of whom he recruited for activity in Afghanistan. Al-Jalamah collected and funneled money to al Qaida-associated individuals in Kuwait, providing thousands of Kuwaiti dinars to al Qaida-associated operatives on a regular basis, including to Muhsin al-Fadhli. Al-Fadhli is listed at the UN 1267 Sanctions Committee.

Soon after September 11, 2001, Al-Jalamah sent supplies to Afghanistan for use by trainees. In mid-2001, Al-Jalamah sent a Kuwaiti individual to Afghanistan where he attended the al Qaida-associated al-Faruq training camp. Al-Jalamah gave the Kuwaiti money to transfer to

PX70

al Qaida. Al-Jalamah also sent recruits and supplies to al Qaida camps in Afghanistan. In the late 1990s/early 2000s, Al-Jalamah also visited the al-Faruq training camp, supplying global-positioning systems, laptop computers, and a video camera.

Al-Jalamah's role with al Qaida includes dealing personally with Usama bin Laden. Al-Jalamah went to Afghanistan three times in the late 1990s/early 2000s to provide bin Laden large sums of money. During a 2001 meeting, bin Laden agreed to set up a training camp especially for Kuwaitis in Afghanistan. This plan was reportedly never put into action.

**Al-Jalamah Provided Support for an Attack against Americans**
Al-Jalamah was involved in the planning of the January 21, 2003, al Qaida-linked terrorist attack on two U.S. civilian contractors in Kuwait. He provided support and assistance to one of the perpetrators.

**Mubarak Mushakhas Sanad Al-Bathali**
Name: Mubarak Mushakhas Sanad Al-Bathali
AKAs: Mubarak Al-Bathali
Mubarak Mishkhis Sanad Al-Bathali
Mubarak Mishkhas Sanad Al-Bathali
Mubarak Mishkhis Sanad Al-Badhali
Mubarak Mishkhas Sanad Al-Bazali
Mobarak Meshkhas Sanad Al-Bthaly

DOB: 1 OCTOBER 1961
Passport: 101856740 Kuwait
Citizenship: Kuwait

Mubarak Mushakhas Sanad Al-Bathali is a Kuwait-based terrorist facilitator. He also serves as a fundraiser and recruiter for the al Qaida network. Al-Bathali has spoken at several mosques in Kuwait to raise funds for provision to al Qaida operatives. As of 2006, Al-Bathali continues to facilitate travel for extremists planning to fight in Iraq and Afghanistan.

**Al Bathali Provides Support to the al Qaida Network**
Al-Bathali has raised funds in Kuwait for terrorist organizations for years. In 2004, Al-Bathali gathered several hundred Kuwaiti dinars each week for terrorist organizations, including al Qaida, Ansar al-Islam and Lashkar E-Tayyiba. In 2003 and 2004, Al-Bathali provided funds to al Qaida in Iraq through intermediaries. In 2002-2003, Al-Bathali contributed $20,000 to Ansar al-Islam through contacts in Syria. In 2001, Al-Bathali sent a courier to carry approximately $20,000 to an al Qaida finance manager in Pakistan. Prior to this, in 1999, Al-Bathali met with several top al Qaida members and gave them roughly $100,000.

**Other Information**
In 2002, Al-Bathali traveled to Saudi Arabia to meet with several radical leaders who were involved with al Qaida to discuss jihad and arrange for the transfer of funds to him.

In 2003, Al-Bathali reiterated his objectives of recruiting Muslim youth in the Arabian Gulf, especially in Saudi Arabia and Kuwait, to support the fighters in Iraqi Kurdistan. This support was to include collecting donations for Muslim fighters and distributing CDs about

**PX70**

Ansar al-Islam.

In January 2003, Al-Bathali and Al-Jalamah met with an individual who was involved in the shooting of two U.S. contractors outside of Camp Doha, Kuwait, and discussed financing his militant training operations.

**Mohamed Moumou**
Name: Mohamed Moumou
AKAs: Mohamed Mumu
Abu Shrayda
Abu Amina
Abu `Abdallah
Abou Abderrahman

DOB: 30 JULY 1965
Alt. DOB: 30 SEPTEMBER 1965
POB: Fez, Morocco
Citizenship: Morocco
Citizenship: Sweden
Passport: 9817619, Expires 14 DECEMBER 2009 (Sweden)
Address: Storvretsvagen 92, 7 TR. C/O Drioua, 142 31 Skogas, Sweden
Address: Jungfruns Gata 413, Postal Address Box: 3027, 13603 Haninge, Sweden
Address: London, England
Address: Dobelnsgatan 97, 7 TR C/O Lamrabet, 113 52 Stockholm, Sweden
Address: Trodheimsgatan 6, 164 32 Kista, Sweden

Mohamed Moumou's extremist activities date back to the mid-1990's, when he traveled to Afghanistan to participate in the al Qaida-run Khalden terrorist training camp. A Moroccan national with Swedish citizenship, Moumou was the uncontested leader of an extremist group centered around the Brandbergen Mosque in Stockholm, Sweden. Moumou's leadership derives from connections to senior al Qaida leaders, some of whom he had met in Afghanistan and Pakistan in the late-1990s. Moumou reportedly served, at some time in the past, as Abu Mus'ab al-Zarqawi's representative in Europe for issues related to chemical and biological weapons. Moreover, Moumou reportedly maintains ties to al-Zarqawi's inner circle in Iraq.

PX72

# Treasury Sanctions Iranian Government and Affiliates

home.treasury.gov/news/press-releases/tg1760

November 8, 2012

*(Archived Content)*

### *Action Targets the Iranian Regime's Continued Human Rights Abuses, WMD Proliferation, and Support for Terrorism*

**WASHINGTON** – The U.S. Department of the Treasury today announced a set of targeted sanctions against 17 individuals and entities related to the Iranian government's human rights abuses, its support of terrorism, and Iran's Islamic Revolutionary Guard Corps (IRGC).  These designations are part of the United States government's commitment to intensify sanctions against the Iranian government so long as it refuses to address in a meaningful and productive way the international community's concerns about its nuclear program as well as the Iranian government's continued abuse of human rights and support for terrorism.  Today's actions coincide with amendments to the Iranian Financial Sanctions Regulations, 31 CFR Part 561, which further strengthen financial sanctions against the Iranian government and fulfill a number of requirements set forth in the Iran Threat Reduction and Syria Human Rights Act of 2012 (TRA), which was signed into law by the President on August 10, 2012.

"Today's designations further demonstrate our resolve to put a stop to the Iranian regime's continued efforts to deny the Iranian people access to information and the ability to speak freely," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "We will continue to expose this repressive behavior, as well as Iran's continued proliferation activities and support to terrorists worldwide."

Today's actions are being taken under three different Executive Orders (E.O.).  Any property or interests in property in the United States or in the possession or control of U.S. persons in which the designated entities or individuals have an interest are blocked, and U.S. persons are generally prohibited from engaging in transactions with them.

The first set of designations is being taken pursuant to E.O. 13628, which implements the TRA by sanctioning individuals and entities who have engaged in censorship or other activities with respect to Iran on or after June 12, 2009, that prohibit, limit, or penalize the exercise of freedom of expression or assembly by citizens of Iran, or that limit access to print or broadcast media.  These sanctions target those in Iran who restrict or deny the free flow of information to or from the Iranian people, and who limit or prohibit the exercise of freedoms of expression or assembly.  These designations include, Reza Taghipour the Minister of

PX72

Communications and Information Technology, the Ministry of Culture and Islamic Guidance as well as a number of officials and other entities involved in the Iranian regime's ongoing attempts to repress and silence Iran's people.

The second set of actions is being taken pursuant to E.O. 13224, which target terrorists and supporters of terrorism around the world.  These sanctions further expose the nefarious activities of Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) as it coordinates terrorist operations in the region, particularly by supporting Kata'ib Hizballah (KH) officials who operate out of Iran and Iraq.  KH, which was listed as a Foreign Terrorist Organization by the U.S. Department of State in June 2009, has conducted attacks against Iraqi, U.S. and Coalition forces in Iraq and continues to act as a destabilizing force in Iraq and the region.

The final set of actions today is being taken pursuant to E.O. 13382, which targets proliferators of weapons of mass destruction and their support networks.  Today's action targets the support network of Iran's IRGC, which was designated by the U.S. Department of State in October 2007 for having engaged, or attempted to engage, in proliferation related activities.  The IRGC is a powerful actor in Iran's economy, dominating the energy, construction, banking and other key sectors.  Today's designations include two IRGC-linked universities and companies, including the National Iranian Oil Company, which was determined by the U.S. Treasury Department in September 2012 to be an agent or affiliate of the IRGC. These entities are being designated for the important technological and commercial support they provide to the IRGC.

*For more information on today's designations, please see the fact sheet: fact sheet.*

### ###

PX72

PX73

# U.S. DEPARTMENT OF THE TREASURY

## Statement by Secretary Paulson on Iran Designations

October 25, 2007

*(Archived Content)*

HP-645

Washington, DC-- Treasury released the following statement by Secretary Henry M. Paulson, Jr. on Iran designations announced today:

Treasury released the following statement by Secretary Henry M. Paulson, Jr. on Iran designations announced today: Iran exploits its global financial ties to pursue nuclear capabilities, develop ballistic missiles and fund terrorism. Today, we are taking additional steps to combat Iran's dangerous conduct and to engage financial institutions worldwide to make the most informed decisions about those with whom they choose to do business.

The Iranian regime's ability to pursue nuclear and ballistic missile programs in defiance of UN Security Council Resolutions depends on its access to the international commercial and financial systems. Iran also funnels hundreds of millions of dollars each year through the international financial system to terrorists. Iran's banks aid this conduct, using a range of deceptive financial practices intended to evade even the most stringent risk-management controls. In dealing with Iran, it is nearly impossible to know one's customer and be assured that one is not unwittingly facilitating the regime's reckless conduct. The recent warning by the Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, confirms the extraordinary risks that accompany doing business with Iran.

We have been working closely and intensely with our international partners to prevent one of the world's most dangerous regimes from developing the world's most dangerous weapons. Part of that strategy involves denying supporters of Iran's illicit conduct access to the international financial system; these actors should find no safe haven in the reputable world of finance and commerce. The UN Security Council has required member states to freeze the assets of, and prohibit persons from doing business with, a number of entities and individuals supporting Iran's nuclear or ballistic missile activities, including Iran's state-owned Bank Sepah.

Today, we are designating Iran's Bank Melli, Bank Mellat, and Bank Saderat. These are three of Iran's largest banks, and they all have facilitated Iran's proliferation activities or its support for terrorism. We are also designating the Islamic Revolutionary Guard Corps for proliferation activities and its Qods Force for providing material support to the Taliban and other terrorist organizations. The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC. We call on responsible banks and companies around the world to terminate any business with Bank Melli, Bank Mellat, Bank Saderat, and all companies and entities of the IRGC.

PX73

As awareness of Iran's deceptive behavior has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be the bankers for this dangerous regime. We will continue to work with our international partners to prevent Iran from abusing the international financial system to advance its illicit conduct.

PX73

PX76

## U.S. DEPARTMENT OF THE TREASURY

# Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents

June 7, 2019

*PGPIC Awards IRGC Construction Firm Hundreds of Millions of Dollars in Contracts*

**WASHINGTON** – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action today against Iran's largest and most profitable petrochemical holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for providing financial support to Khatam al-Anbiya Construction Headquarters (Khatam al-Anbiya), the engineering conglomerate of the Islamic Revolutionary Guard Corps (IRGC).  In addition to PGPIC, OFAC is designating PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-based sales agents.  PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports.

"By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC," said Treasury Secretary Steven T. Mnuchin.  "This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

"The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities," said Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker.

The IRGC and its major holdings, such as the Basij Cooperative Foundation and Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses.  The profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.

In 2018, Iran's Ministry of Petroleum awarded the IRGC's Khatam al-Anbiya ten projects in oil and petrochemical industries worth the equivalent of 22 billion dollars, a value four times the official budget of the IRGC.  In late 2016, Iran's Minister of Petroleum asked the IRGC's Khatam al-Anbiya to increase its investment and presence across Iran's oil and petrochemical industries.

## OVERVIEW OF TODAY'S ACTION

Today's action targets PGPIC for its connection to Khatam al-Anbiya, the economic arm of the IRGC, along with PGPIC's network of major petrochemical companies across Iran and its foreign-based subsidiaries and their sales agents.  This extensive network of petrochemical companies represents Iran's most profitable petrochemical holding.  Its parent corporation, PGPIC, has awarded major engineering, procurement, and construction contracts to the IRGC's Khatam al-Anbiya, generating hundreds of millions of dollars for an IRGC economic conglomerate that stretches across Iran's major industries.

OFAC is designating PGPIC for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services to or in support of, Khatam al-Anbiya, a person whose property and interests in property

PX76

are blocked pursuant to Executive Order (E.O.) 13382, which authorizes sanctions on WMD proliferators and their supporters.

The following are Iran-based PGPIC subsidiary petrochemical companies that OFAC is also designating pursuant to E.O. 13382 for being owned or controlled by PGPIC.

- Arvand Petrochemical Company
- Bandar Imam Abniroo Petrochemical Company
- Bandar Imam Besparan Petrochemical Company
- Bandar Imam Faravaresh Petrochemical Company
- Bandar Imam Kharazmi Petrochemical Company
- Bandar Imam Kimiya Petrochemical Company
- Bandar Imam Petrochemical Company
- Bu Ali Sina Petrochemical Company
- Fajr Petrochemical Company
- Hengam Petrochemical Company
- Hormoz Urea Fertilizer Company
- Iranian Investment Petrochemical Group Company
- Iranian Petrochemical Investment Development Management Company
- Karoun Petrochemical Company
- Khouzestan Petrochemical Company
- Lordegan Urea Fertilizer Company
- Mobin Petrochemical Company
- Modabberan Eqtesad Company
- Nouri Petrochemical Company
- Pars Petrochemical Company
- Pazargad Non Industrial Operation Company
- Persian Gulf Apadana Petrochemical Company
- Persian Gulf Bid Boland Gas Refinery Company
- Persian Gulf Petrochemical Industry Commercial Co.  (PGPICC)
- Persian Gulf Fajr Yadavaran Gas Refinery Company
- Petrochemical Industries Development Management Company
- Rahavaran Fonoon Petrochemical Company
- Shahid Tondgoyan Petrochemical Company
- Urmia Petrochemical Company
- Hemmat Petrochemical Company
- Petrochemical Non-Industrial Operations & Services Co.

OFAC is designating Ilam Petrochemical Company, Gachsaran Polymer Industries, and Dah Dasht Petrochemical Industries pursuant to E.O. 13382 for being owned or controlled by Iranian Investment Petrochemical Group Company, itself being designated for being owned or controlled by PGPIC.  Broojen Petrochemical Company also is identified as

PX76

property in which Iranian Investment Petrochemical Group Company, Dah Dasht Petrochemical Industries, and Modabberan Eqtesad Company have an interest.

Additionally, the UK-based NPC International and Philippines-based and NPC Alliance Corporation also are being designated by OFAC pursuant to E.O. 13382 for being owned or controlled by PGPIC.  OFAC is designating two UAE-based entities that have acted as sales agents for PGPIC and its subsidiaries.  Atlas Ocean and Petrochemical is being designated for having provided, or attempted to provide, financial, material, technological, or other support for, or goods or services to or in support of, Ilam Petrochemical Company.  Naghmeh FZE is being designated for acting for or on behalf of PGPICC

## GLOBAL IMPACT

A number of entities designated today export products and have known business ties with companies around the globe. International companies that continue to partner with PGPIC and its designated subsidiaries and sales agents will themselves be exposed to U.S. sanctions.  Treasury urges international companies to ensure they are conducting the necessary due diligence to avoid engaging in sanctionable activity with entities that support the Iranian regime's malign activity.

## SANCTIONS IMPLICATIONS

As of November 5, 2018, the purchase, acquisition, sale, transport, or marketing of petrochemical products from Iran is sanctionable pursuant to E.O. 13846.  Also, knowingly providing insurance or re-insurance for the transport of Iranian petroleum and petrochemical products is sanctionable.  The U.S. government intends to vigorously enforce those sanctions in order to prevent Iran from generating revenue to support its destructive and destabilizing activities around the world.

As a result of today's action, all property and interests in property of these entities that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC.  OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.

In addition, persons that engage in certain transactions with the entities designated today may themselves be exposed to designation.  Furthermore, any foreign financial institution that knowingly facilitates a significant financial transaction or provides significant financial services for entities designated in connection with Iran's proliferation of weapons of mass destruction or any Iranian person on OFAC's List of Specially Designated Nationals and Blocked Persons could be subject to U.S. correspondent account or payable-through account sanctions.

Identifying information on the entities designated today.

####

PX76

PX77

# Treasury Sanctions Key Hizballah, IRGC-QF Networks in Iraq

home.treasury.gov/news/press-releases/sm546

*Action follows signing of new Hizballah sanctions legislation
and re-imposition of Iran-related sanctions*

**Washington** – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action today to target four Hizballah-affiliated individuals who lead and coordinate the group's operational, intelligence, and financial activities in Iraq.  Specifically, OFAC designated Shibl Muhsin 'Ubayd Al-Zaydi, Yusuf Hashim, Adnan Hussein Kawtharani, and Muhammad 'Abd-Al-Hadi Farhat as Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

"Hizballah is a terrorist proxy for the Iranian regime that seeks to undermine Iraqi sovereignty and destabilize the Middle East.  We are targeting terror facilitators like Al-Zaydi who smuggle oil for Iran, raise funds for Hizballah, and send fighters to Syria for the IRGC-Qods Force on behalf of Qasem Soleimani," said Sigal Mandelker, Under Secretary of the Treasury for Terrorism and Financial Intelligence.  "Treasury's concerted actions aim to deny Hizballah's clandestine attempts to exploit Iraq to launder funds, procure weapons, train fighters, and collect intelligence as a proxy for Iran.  This administration will impose severe consequences on anyone assisting Hizballah and their global support networks, and those who engage in business relationships with these terrorists expose themselves to serious sanctions risk."

These designations follow the signing into law on October 25, 2018, of the Hizballah International Financing Prevention Amendments Act of 2018, which reinforces the U.S. Government's efforts to protect the international financial system by targeting Hizballah's supporters, financial networks, and those that facilitate and enable its destabilizing activities worldwide.  Today's designations specifically target individuals enabling Hizballah's activities that undermine security and stability in Iraq, and carry significant risks for those attempting to conduct business with Hizballah globally.  Today's action continues Treasury's historic level of Hizballah-related designations, which have reached record numbers in 2018.

Treasury's actions today again highlight the degree to which Hizballah operates as a clandestine, terrorist arm of the Iranian regime.  On November 5, 2018, in its largest ever single-day action targeting the Iranian regime, OFAC sanctioned over 700 individuals, entities, aircraft, and vessels.  This action completed the re-imposition of U.S. nuclear-related sanctions that were lifted or waived under the Joint Comprehensive Plan of Action (JCPOA).

PX77

The individuals designated today are subject to secondary sanctions pursuant to the Hizballah Financial Sanctions Regulations, which implements the Hizballah International Financing Prevention Act of 2015. Pursuant to this authority, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for Hizballah.

All property and interests in property of those persons designated today that are subject to U.S. jurisdiction are now blocked, and U.S. persons are generally prohibited from engaging in transactions with them.

### Shibl Muhsin 'Ubayd Al-Zaydi (Al-Zaydi)

Al-Zaydi was designated for acting for or on behalf of the Islamic Revolutionary Guard Corps–Qods Force (IRGC-QF), and assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah.

Al-Zaydi has served as a financial coordinator between the IRGC-QF and sectarian armed groups in Iraq and assisted in facilitating Iraqi investments on behalf of IRGC-QF Commander Qasem Soleimani, whom OFAC designated on October 11, 2011, for acting for or on behalf of the IRGC-QF. Al-Zaydi has also coordinated the smuggling of oil from Iran on behalf of Iran, the smuggling of oil into Syria on behalf of Iran, and has sent Iraqi fighters to Syria allegedly at the IRGC-QF's request. Al-Zaydi has appeared publically with IRGC-QF Commander Qasem Soleimani at least four times (see photos below).

 

PX77

 

Al-Zaydi has maintained close business ties to Hizballah officials and Hizballah financier Adham Tabaja (Tabaja).  These activities have included providing protection for companies in Iraq allegedly financed by Hizballah and facilitating the movement of Hizballah funding into Iraq for investments.  Al-Zaydi has also worked with senior Hizballah officials to transfer large sums of money to Lebanon to help fund Hizballah's participation in the Syrian civil war.  Moreover, Al-Zaydi has transferred large sums of money to Tabaja and worked with OFAC-designated Muhammad Al-Mukhtar Kallas to facilitate the movement of bulk cash from Iraq to Lebanon on Tabaja's behalf.  OFAC designated Tabaja on June 6, 2015, for acting for or on behalf of Hizballah.  Tabaja maintains direct ties to senior Hizballah officials and Hizballah's operational component, the Islamic Jihad, and holds properties in Lebanon on behalf of the group.

In addition, Al-Zaydi is a partner and founder of Global Cleaners S.A.R.L., which OFAC designated on October 20, 2016, as an SDGT pursuant to E.O. 13224 for being owned or controlled by Tabaja.  Also, since its founding in 2014, Al-Zaydi has been the Secretary General of an Iran-aligned Iraqi sectarian armed group.  This armed group primarily operates in Iraq, but has also dispatched fighters to Syria, and its members have trained in Iran and with Hizballah in Lebanon.

## Yusuf Hashim (Hashim)

Hashim was designated for acting for or on behalf of Hizballah.

  Hashim oversees all Hizballah-related operational activities in Iraq and is in charge of protecting Hizballah interests in Iraq.  Additionally, Hashim arranges for the protection of Tabaja inside of Iraq.

PX77

Hashim has also managed Hizballah's relations with sectarian armed groups in Iraq, including the coordination of the deployment of fighters to Syria.

## Adnan Hussein Kawtharani (Kawtharani)

Kawtharani was designated for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah.

Kawtharani facilitates business transactions for Hizballah inside Iraq and has attended meetings in Iraq with sectarian armed groups and Hizballah officials.  Kawtharani has also been involved in securing a significant source of funding for Hizballah, and has served as the right hand man for his brother and senior Hizballah member Muhammad Kawtharani, whom OFAC designated on August 22, 2013, pursuant to E.O. 13224, for being in charge of Hizballah's Iraq activities and working on behalf of Hizballah leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi sectarian armed groups.

Further, as of 2016, Kawtharani worked to obtain a weapons contract in order to raise funds for Hizballah fighters.

Kawtharani is also a partner in the company Global Cleaners S.A.R.L.

## Muhammad 'Abd-Al-Hadi Farhat (Farhat)

Farhat was designated for acting for or on behalf of Hizballah.

Farhat has been involved in advising sectarian armed groups in Iraq on behalf of Hizballah. As of 2017, Farhat was tasked with collecting security and intelligence information in Iraq and subsequently providing reports to senior Hizballah and Iranian leadership.  Farhat has been involved in a project to analyze and report on the Iraqi security situation for Hizballah and the IRGC-QF.

View identifying information on the individuals designated today.

####

4/4

PX77

PX79

# State Department Terrorist Designations of Asa'ib Ahl al-Haq and Its Leaders, Qays and Laith al-Khazali

🌐 **2017-2021.state.gov**/state-department-terrorist-designations-of-asaib-ahl-al-haq-and-its-leaders-qays-and-laith-al-khazali/index.html



Today, the Secretary of State announced his intent to designate Aas'ib Ahl al-Haq — also known as AAH — as a Foreign Terrorist Organization (FTO) under section 219 of the Immigration and Nationality Act. Additionally, the Secretary has designated AAH and two of its leaders, brothers Qays and Laith al-Khazali, as Specially Designated Global Terrorists (SDGT) under Executive Order (E.O.) 13224.

"AAH and its leaders are violent proxies of the Islamic Republic of Iran," said Secretary of State Mike Pompeo. "Acting on behalf of their masters in Tehran, they use violence and terror to further the Iranian regime's efforts to undermine Iraqi sovereignty." AAH is extensively funded and trained by Iran's Islamic Revolutionary Guard Corps (IRGC) Quds Force, an entity that was part of the IRGC designation as an FTO in April 2019.

These designations seek to deny AAH and its leadership the resources to plan and carry out terrorist attacks. Among other consequences of designations, all of AAH and the al-Khazali brothers' property and interests that are within the United States or that come within the United States or that come within the possession or control of U.S. persons, are blocked, and U.S. persons are generally prohibited from engaging in any transactions with them. In addition, as a designated FTO, it is a federal crime to knowingly provide, or attempt or conspire to provide, material support or resources to AAH.

AAH, led by Qays and Laith al-Khazali, is an Iran-backed, militant organization that has claimed responsibility for more than 6,000 attacks against U.S. and Coalitions forces since its creation in 2006. AAH has carried out highly sophisticated operations, including mortar

PX79

attacks on an American base, the downing of a British helicopter, and an attack on the Karbala Provincial Headquarters that resulted in the capture and murder of five American soldiers.

Today's designations follow an action taken by the U.S. Department of the Treasury on December 6, 2019, to designate Qays and Laith al-Khazali pursuant to E.O. 13818 for their involvement in serious human rights abuses in Iraq, including approving the use of lethal force against protesters for the purpose of public intimidation. The FTO designation of AAH will take effect after a statutory 7-day congressional notification period. The SDGT designations of AAH and the al-Khazali brothers are effective immediately.

Today's actions notify the U.S. public and the international community that this group is a terrorist organization and its leaders, the Khazali brothers, who have participated in its terrorist acts, are SDGTs. Terrorist designations expose and isolate entities and individuals, and deny them access to the U.S. financial system. Moreover, designations can assist the law enforcement activities of U.S. agencies and other governments.

A list of State Department-designated FTOs and SDGTs is available here: http://2017-2021.state.gov/j/ct/list/index.html.

PX79

PX80

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**STATEMENTS & RELEASES**

# Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization

**FOREIGN POLICY** | Issued on: **April 8, 2019**



Today, I am formally announcing my Administration's plan to designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act.  This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft.  The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign.

This designation will be the first time that the United States has ever named a part of another government as a FTO.  It underscores the fact that Iran's actions are fundamentally different from those of other governments.  This action will significantly expand the

PX80

scope and scale of our maximum pressure on the Iranian regime.  It makes crystal clear the risks of conducting business with, or providing support to, the IRGC.  If you are doing business with the IRGC, you will be bankrolling terrorism.

This action sends a clear message to Tehran that its support for terrorism has serious consequences.  We will continue to increase financial pressure and raise the costs on the Iranian regime for its support of terrorist activity until it abandons its malign and outlaw behavior.

**The White House**

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Economic Advisers

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

PX80

PX81

## DEPARTMENT OF STATE

### Office of the Coordinator for Counterterrorism

[Public Notice 2612]

### Designation of Foreign Terrorist Organizations

**AGENCY:** Department of State.

**ACTION:** Designation of Foreign Terrorist Organizations.

Pursuant to Section 219 of the Immigration and Nationality Act ("INA"), as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 302, 110 Stat. 1214, 1248 (1996), and amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, 110 Stat. 3009 (1996), I hereby designate, effective October 8, 1997, the following organizations as foreign terrorist organizations:

*Abu Nidal Organization*

also known as the ANO, also known as Black September, also known as Fatah Revolutionary Council, also known as the Arab Revolutionary Council, also known as the Arab Revolutionary Brigades, also known as the Revolutionary Organization of Socialist Muslims

*Abu Sayyaf Group*

also known as Al Harakat Al Islamiyya

*Armed Islamic Group*

also known as GIA, also known as Groupement Islamique Arme, also known as AIG, also known as Al-Jama'ah al-Islamiyah al-Musallah

*Aum Shinrikyo*

also known as Aum Supreme Truth, also known as A.I.C. Sogo Kenkyusho, also known as A.I.C. Comprehensive Research Institute

*Democratic Front for the Liberation of Palestine-Hawatmeh Faction*

also known as the Democratic Front for the Liberation of Palestine, also known as the DFLP, also known as the Red Star Forces, also known as the Red Star Battalions

*Euzkadi Ta Askatasuna*

also known as Basque Fatherland and Liberty, also known as ETA

*Gama'a al-Islamiyya*

also known as the Islamic Group, also known as IG, also known as al-Gama'at, also known as Islamic Gama'at, also known as Egyptian al-Gama'at al-Islamiyya

*HAMAS*

also known as the Islamic Resistance Movement, also known as Harakat al-Muqawama al-Islamiya, also known as Students of Ayyash, also known as Students of the Engineer, also known as Yahya Ayyash Units, also known as Izz Al-Din Al-Qassim Brigades, also known as Izz Al-Din Al-Qassim Forces, also known as Izz Al-Din Al-Qassim Battalions, also known as Izz al-Din Al Qassam Brigades, also known as Izz al-Din Al Qassam Forces, also known as Izz al-Din Al Qassam Battalions

*Harakat ul-Ansar*

also known as HUA, also known as al-Hadid, also known as al-Hadith, also known as al-Faran

*Hizballah*

also known as Party of God, also known as Islamic Jihad, also known as Islamic Jihad Organization, also known as Revolutionary Justice Organization, also known as Organization of the Oppressed on Earth, also known as Islamic Jihad for the Liberation of Palestine, also known as Organization of Right Against Wrong, also known as Ansar Allah, also known as Followers of the Prophet Muhammad

*Japanese Red Army*

also known as Nippon Sekigun, also known as Nihon Sekigun, also known as the Anti-Imperialist International Brigade, also known as the Holy War Brigade, also known as the Anti-War Democratic Front, also known as the JRA, also known as the AIIB

*al-Jihad*

also known as Egyptian al-Jihad, also known as Vanguards of Conquest, also known as Vanguards of Victory, also known as Talai'i al-Fath, also known as Tala'ah al-Fatah, also known as Tala'al al-Fateh, also known as Tala' al-Fateh, also known as Talaah al-Fatah, also known as Tala'al-Fateh, also known as New Jihad, also known as Egyptian Islamic Jihad, also known as Jihad Group

*Kach*

also known as the Repression of Traitors, also known as Dikuy Bogdim, also known as DOV, also known as the State of Judea, also known as the Committee for the Safety of the Roads, also known as the Sword of David, also known as Judea Police

*Kahane Chai*

also known as Kahane Lives, also known as the Kfar Tapuah Fund, also known as The Judean Voice

*Khmer Rouge*

also known as the Party of Democratic Kampuchea, also known as the National Army of Democratic Kampuchea

*Kurdistan Workers' Party*

also known as the PKK, also known as the Partiya Karkeran Kurdistan

*Liberation Tigers of Tamil Eelam*

also known as LTTE, also known as Tamil Tigers, also known as Ellalan Force

*Manuel Rodriguez Patriotic Front Dissidents*

also known as the FPMR/D, also known as the Frente Patriotico Manuel Rodriguez—Autonomos, also known as the FPMR/A, also known as the Manuel Rodriguez Patriotic Front, also known as the Frente Patriotico Manuel Rodriguez, also known as the FPMR

*Mujahedin-e Khalq Organization*

also known as MEK, also known as MKO, also known as Mujahedin-e Khalq, also known as People's Mujahedin Organization of Iran, also known as PMOI, also known as Organization of the People's Holy Warriors of Iran, also known as Sazeman-e Mujahedin-e Khalq-e Iran

*National Liberation Army*

also known as the ELN, also known as the Ejercito de Liberacion Nacional

*Palestine Islamic Jihad-Shaqaqi Faction*

also known as PIJ-Shaqaqi Faction, also known as PIJ, also known as Islamic Jihad in Palestine, also known as Islamic Jihad of Palestine, also known as Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis

*Palestine Liberation Front—Abu Abbas Faction*

also known as the Palestine Liberation Front, also known as the PLF, also known as the PLF-Abu Abbas

*Popular Front for the Liberation of Palestine*

also known as the PFLP, also known as the Red Eagles, also known as the Red Eagle Group, also known as the Red Eagle Gang, also known as the Halhul Gang, also known as the Halhul Squad

PX81

*Popular Front for the Liberation of Palestine—General Command*

also known as PFLP-GC

*Revolutionary Armed Forces of Colombia*

also known as FARC, also known as Fuerzas Armadas Revolucionarias de Colombia

*Revolutionary Organization 17 November*

also known as 17 November, also known as Epanastatiki Organosi 17 Noemvri

*Revolutionary People's Liberation Party/ Front*

also known as Devrimci Halk Kurtulus Partisi-Cephesi, also known as the DHKP/C, also known as Devrimci Sol, also known as Revolutionary Left, also known as Dev Sol, also known as

Dev Sol Silahli Devrimci Birlikleri, also known as Dev Sol SDB, also known as Dev Sol Armed Revolutionary Units

*Revolutionary People's Struggle*

also known as Epanastatikos Laikos Agonas, also known as ELA, also known as Revolutionary Popular Struggle, also known as Popular Revolutionary Struggle

*Shining Path*

also known in Spanish as Sendero Luminoso, also known as SL, also known as the Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui), also known as Partido Comunista del Peru (Communist Party of Peru), also known as PCP, also known as Socorro

Popular del Peru (People's Aid of Peru), also known as SPP, also known as Ejercito Guerrillero Popular (People's Guerrilla Army), also known as EGP, also known as Ejercito Popular de Liberacion (People's Liberation Army), also known as the EPL

*Tupac Amaru Revolutionary Movement*

also known as the Movimiento Revolucionario Tupac Amaru, also known as the MRTA

I further direct that these designations be published in the **Federal Register** on October 8, 1997, as required by section 219(a)(2)(A)(ii) of the INA.

Dated: October 2, 1997.

**Madeleine K. Albright,**

*Secretary of State.*

[FR Doc. 97–27030 Filed 10–7–97; 5:00 pm]

BILLING CODE 4710–25–P

PX82

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Sanctions Hizballah Leadership

August 22, 2013

*(Archived Content)*

### *Action Targets Hizballah's Leadership Responsible for Operations Outside of Lebanon*

**WASHINGTON –** The U.S. Department of the Treasury today designated four members of Hizballah's leadership responsible for operations throughout the Middle East, further exposing Hizballah's pernicious activities that reach beyond the borders of Lebanon.  These designations include senior members of Hizballah responsible for activities ranging from assisting fighters from Iraq to support the Assad regime in Syria, to making payments to various factions within Yemen, and to military leaders responsible for terrorist operations in Egypt, Jordan, Turkey, Cyprus, Israel, the Palestinian territories, and Iraq.

Belying Hizballah's claim to be a domestic Lebanese "resistance" organization, its expansive global network seeks to extend its malign influence, and the influence of Hizballah's patron Iran, throughout the Middle East and beyond.  The Treasury Department will continue to combat Hizballah's terrorist activity inside and outside Lebanon with all available tools and will continue to work with partners around the world to make it clear that Hizballah's militant and extremist activities should not be tolerated by any nation.

"Whether ferrying foreign fighters to the front lines of the Syrian civil war or inserting clandestine operatives in Europe, the Middle East, and elsewhere, Hizballah remains a significant global terrorist threat," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen.  "So long as Hizballah spreads instability, conducts terrorist attacks and engages in criminal and illicit activities around the world, we will continue to sanction Hizballah's operatives, leaders and businesses, wherever they may be found."

PX082

The individuals sanctioned today were designated pursuant to Executive Order 13224, which targets terrorists and their supporters for acting for, or on behalf of Hizballah.  U.S. persons are generally prohibited from engaging in any transactions with the individuals designated today, and any assets of those designees subject to U.S. jurisdiction are frozen.

Khalil Harb

In the years prior to Israel's withdrawal from southern Lebanon in 2000, Khalil Harb served as the deputy commander for Hizballah's central military unit's southern Lebanon region from 1988 to 1992, and as the commander for this region from 1992 to 1994.  From 1994 to 1997, Harb served as the commander of Hizballah's central military operations.  By 2000, Harb supervised Hizballah military operations inside Israel, Jordan, Cyprus, and Turkey.

In late November 2000, Harb was given responsibility for overseeing work of the Islamic Resistance, including assisting with the smuggling of Hamas and Palestinian Islamic Jihad operatives from Syria into the West Bank via Jordan.  By late 2003, Harb was head of the Syrian/Jordan/Israel/Egypt operations unit, which was subordinate to Hizballah's Islamic Jihad council.

In March 2006, Harb served as Hizballah's chief of military liaison with the Palestinian factions and Iran, dealing almost exclusively with Palestinians and Iranians inside and outside the territories.  Prior to this posting, Harb had served as Hizballah's chief of military special operations.  During the summer of 2006, Harb was given command of a Hizballah special operations unit in southern Lebanon, which engaged the Israeli Defense Forces (IDF) in July 2006, at the Lebanese-Israeli border where IDF Special Forces entered Lebanon.  In early 2007, Khalil Harb was chief of Hizballah's Unit 1800, also known as Hizballah's Nun Unit, the Hizballah entity responsible for supporting Palestinian militants and conducting Hizballah operations in the countries surrounding Israel, and he travelled to Iran for meetings regarding coordination between Hizballah, Iran, and the Palestinians.

In February 2010, Harb, serving as the leader of the Palestinian activities for Hizballah, planned unspecified attacks against Israeli officials in Israel, in retaliation for the assassination of former Hizballah External Security Organization (ESO) chief Imad Mughniyah.  By mid-May 2010,

PX082

Hizballah created a new position for Harb as "advisor to the Secretary General," which provided Harb oversight of Hizballah Unit 1800, which he previously commanded.

As of 2012, Harb was responsible for Hizballah's Yemen activities and was involved in the political side of Hizballah's Yemen portfolio.  Harb also served as commander of a Lebanon-based Hizballah special unit that focused on Israel.  Since the summer of 2012, Harb has been involved in the movement of large amounts of currency to Yemen, through Saudi Arabia and the U.A.E., and in late 2012, Harb advised the leader of a Yemeni political party that the party's monthly Hizballah funding of $50,000 was ready for pick up.

Muhammad Kawtharani

As the individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.  A member of Hizballah's Political Council, Kawtharani also helped secure the release from Iraqi custody of Hizballah operative Ali Musa Daqduq, a senior Hizballah commander designated by the Treasury Department in November 2012 who was responsible for numerous attacks against Coalition Force in Iraq, including planning a January 20, 2007 attack on the Karbala Joint Provincial Coordination Center that resulted in the deaths of five U.S. soldiers.

Over the last year, Kawtharani has assisted in getting fighters to Syria to support the Assad regime.

Muhammad Yusuf Ahmad Mansur

Muhammad Yusuf Ahmad Mansur (Mansur), a member of Hizballah since at least 1986, once served in a Hizballah military unit operating in south Lebanon.  Around 2004, Mansur was transferred to Hizballah's Unit 1800.  Mansur was subsequently dispatched to Egypt to work with Unit 1800 under Muhammad Qabalan, and in 2008, the cell escalated its operations to target tourist destinations in Egypt.  Mansur served as the Egypt-based cell leader.  By early 2009, Egyptian authorities had disrupted the Hizballah cell and arrested and detained Mansur and dozens of other individuals for planning to carry out terrorist operations against Israeli and other tourists in Egypt.  Hizballah Secretary-General Hassan Nasrallah in November 2009

PX082

publicly acknowledged that Mansur was a Hizballah member involved in transporting arms and equipment to Palestinian militants.  In April 2010, an Egyptian court sentenced Mansur to 15 years for his involvement in the cell, which was subordinate to Hizballah's Unit 1800.  However, in late January 2011, the imprisoned members of the Hizballah cell escaped and Mansur returned to Lebanon.  In February 2011, Mansur appeared on Lebanese television with Hizballah officials at a Hizballah rally in Beirut.

Muhammad Qabalan

Hizballah terrorist cell leader Muhammad Qabalan (Qabalan) once served as the head of a Hizballah infantry platoon.  In 2008, Qabalan, as a leader in Hizballah's Unit 1800, was serving as the Lebanon-based head of the Hizballah Egypt-based terrorist cell targeting tourist destinations in Egypt and was coordinating the cell's activities from Lebanon.  In April 2010, an Egyptian court sentenced Qabalan in absentia to life imprisonment for his involvement in the cell, which was subordinate to Hizballah's Unit 1800.  As of late 2011, Qabalan worked in a separate Hizballah covert unit operating in the Middle East.

Identifying Information

Name: Khalil Yusif Harb

AKA: Khalil Yusuf Harb

AKA:  Hajj Ya'taqad Khalil Harb

AKA: Mustafa Khalil Harb

AKA:  Sayyid Ahmad

AKA:  Abu Mustafa

DOB: 9 October 1958

Name: Muhammad Kawtharani

AKA: Muhammad Al-Kawtharani

AKA: Mohammad Kawtharani

AKA: Muhammad Kawtarani

AKA: Jafar al-Kawtharani

Nationality #1: Lebanon

Nationality #2: Iraq

PX082

DOB #1: 1945

DOB #2: 1959

DOB #3: 1961

POB: Najaf, Iraq


Name: Muhammad Qabalan

AKA: Hassan al-Ghul

AKA: Muhammad Qablan

DOB: 1969

Citizenship: Lebanese

Location: Southern Suburbs, Beirut, Lebanon


Name: Muhammad Yusuf Ahmad Mansur

AKA: Sami Hani Shihab

AKA: Salem Bassem Sami

AKA: Jamal Hani Hillawi

AKA: Muhammad Yusuf Mansur Sami Shihab

AKA: Mohammad Yousef Mansour

AKA: Mohammad Youssef Mansour

AKA: Muhammad Yusuf Mansur

AKA: Mohammad Yusuf Ahmad Mansur

AKA: Muhammad Yusif Ahmad Mansur

AKA: Sami Shehab

AKA: Sami Shihab

AKA: Hani Halawi

DOB No. 1: September 14, 1970

DOB No. 2: January 1, 1974

DOB No. 3: 1980

POB: Bint Jubayl,  Lebanon

Location: Beirut, Lebanon


###

PX082

PX082

PX101

# FinCEN Issues Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System

**Contact:** Steve Hudak
703-905-3770
**Immediate Release:** October 11, 2018

WASHINGTON—The Financial Crimes Enforcement Network (FinCEN) issued an advisory (https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2018-a006) today to help financial institutions better detect and report potentially illicit transactions related to the Islamic Republic of Iran. The advisory is also intended to help foreign financial institutions better understand the obligations of their U.S. correspondents, to avoid exposure to U.S. sanctions, and to address the Anti-Money Laundering/Combating the Financing of Terrorism (AML/CFT) risks that Iranian activity poses to the international financial system. The advisory provides information on the threats the Iranian regime poses to the U.S. financial system as well as to institutions that have correspondent banking relationships with U.S. financial institutions, describes deceptive financial strategies that the Iranian regime uses to evade sanctions, and provides red flag indicators related to specific malign activities and typologies.

"This advisory lays out in great detail the extent to which the Iranian regime uses deceptive practices, including front companies, fraudulent documents, exchange houses, seemingly legitimate businesses and government officials, to generate illicit revenues and finance their malign activities. Iran's deceptive practices have been orchestrated not only by elements of their government such as the IRGC-Qods Force, but also by Central Bank of Iran officials who were at the highest levels. Any country that allows its Central Bank to be involved in deception in support of terrorism requires the highest levels of scrutiny, particularly when the country itself is the world's largest state sponsor of terrorism," said Sigal Mandelker, Under Secretary of the Treasury for Terrorism and Financial Intelligence. "Governments, financial institutions of all types around the world, and other companies need to be on high alert to the types of schemes described in this advisory. More than that, as we expect Iran to continue to attempt to engage in wide scale sanctions evasion while simultaneously using its resources to fund a broad array of malign activity, financial institutions should continue to sophisticate their compliance programs to keep these actors from exploiting them."

On June 5, 2018, Under Secretary Mandelker delivered extensive remarks (https://home.treasury.gov/news/press-releases/sm0406) on the surreptitious means by which the Iranian regime finances itself.

"Crucial insight provided through Suspicious Activity Reports (SARs) and other valuable information conveyed by the financial sector have been instrumental in identifying money laundering and other financial schemes associated with the Iranian regime," added FinCEN Director Kenneth A. Blanco. "This advisory focuses financial institutions' attention on the current risks associated with transactions involving the Iranian regime. It also provides concrete red flags and typologies to help them identify potentially illicit Iran-linked activity. In so doing, this advisory not only increases industry awareness; it also enhances the future value of related SAR reporting and ultimately strengthens the safety and security of the U.S. financial system."

The advisory details how the Iranian regime has abused the international financial system through illicit means. For example, the Iranian regime has masked illicit transactions using senior officials of the CBI, who used their official capacity to procure hard currency and conduct transactions for the benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised to exercise appropriate due diligence when dealing with transactions involving exchange houses that may have exposure to the Iranian regime and/or designated Iranian persons, and the advisory details examples of exchange house-related schemes. Iran-related actors use front and shell companies around the world in procurement networks through which the Iranian regime has gained goods and services related to currency counterfeiting, dual-use equipment, and the commercial aviation industry.

The advisory further warns financial institutions to be on the lookout for possible evasive practices involving Iranian shipping companies. Financial institutions should also be aware of possible Iranian abuses of virtual currency and precious metals to evade sanctions and gain access to the international financial system and to conceal their nefarious actions.

In order to help financial institutions identify deceptive activity potentially linked to the Iranian regime, FinCEN has included red flags in its advisory. For example, CBI officials' routing transactions to personal accounts rather than central bank or government-owned accounts, and individuals or entities with no central bank or government affiliation withdrawing funds from such accounts, may be a red flag for financial institutions to investigate. Similarly, wire transfers or deposits that do not contain any information on the source of funds, contain incomplete information about the source of funds, do not match the customer's line of business, or that involve jurisdictions where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions.

Following the full re-imposition on November 5, 2018 of sanctions lifted under the Joint Comprehensive Plan of Action (JCPOA), FinCEN expects that Iranian financial institutions, the Iranian regime, and its officials will increase their efforts to evade U.S. sanctions to fund malign activities and secure hard currency for the Government of Iran. Treasury and the U.S. Government are interested in information related to the Iranian regime's efforts outlined in this advisory, as well as information pertaining to how the Iranian regime or Iranian entities subject to sanctions, including the CBI, otherwise evade the sanctions and access the U.S. financial system.

When filing a SAR, financial institutions should provide all pertinent available information in the SAR form and narrative. FinCEN requests that financial institutions reference this advisory by including the key term "Iran FIN-2018-A006" in the SAR narrative and in appropriate SAR fields to indicate a connection between the suspicious activity being reported and the persons and activities highlighted in the advisory.

---

*FinCEN's mission is to safeguard the financial system from illicit use, combat money laundering, and promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.*

**Financial Institution:**
Casinos
Depository Institutions
Insurance Industry
Money Services Businesses
Mortgage Co/Broker
Precious Metals/Jewelry Industry
Securities and Futures

---



Home (/)

Resources (/resources)

Contact (/contact)

About (/what-we-do)

PX101

Careers (/cutting-edge-opportunities)

Newsroom (/news-room)

Contract Opportunities (/about/contract-opportunities)

Get News Updates (https://service.govdelivery.com/accounts/USFINCEN/subscriber/new)

USA.gov (https://www.USA.gov) | Regulations.gov (https://www.Regulations.gov) | Treasury.gov (https://www.treasury.gov) | IRS.gov (https://www.IRS.gov) | Freedom of Information Act (FOIA) (/freedom-information-act-foia-and-guide-accessing-fincen-information) | NO FEAR Act (https://home.treasury.gov/footer/no-fear-act) | Vote.gov (https://vote.gov/) | Accessibility (/accessibility) | EEO & Diversity Policy (/equal-employment-opportunity-and-diversity-policy) | Privacy Policy (/privacy-security) | Public Posting Notice of Finding of Discrimination (https://home.treasury.gov/footer/no-fear-act)

PX104

# DFS FINES INTESA SANPAOLO $235 MILLION FOR REPEATED VIOLATIONS OF ANTI-MONEY LAUNDERING LAWS

**dfs.ny.gov**/reports_and_publications/press_releases/pr1612151

Press Release

December 15, 2016

Contact: Richard Loconte, 212-709-1691

*Misconduct Included Processing Numerous Suspicious Transactions Involving Shell Companies through the New York Branch and Deliberately Concealing Information from Bank Regulators*

*Intesa Compliance Officer Said that Transactions Were Being Cleared in a Manner Outside of the Bank's Procedures Because it Allegedly Was More Efficient and that a Risk-Based Policy Meant that "If You Miss One, You Miss One"*

*DFS Directs Bank to Strengthen Compliance Procedures at New York Branch, Extend Engagement of Independent Consultant and Submit Revised Compliance Plans*

Financial Services Superintendent Maria T. Vullo today announced that Intesa Sanpaolo S.p.A. and its New York branch bank will pay a $235 million fine and extend the term of engagement with its current independent consultant as part of a consent order entered into with the New York State Department of Financial Services (DFS) for significant violations of New York anti-money laundering and Bank Secrecy Act (AML/BSA) laws. The violations announced today include severe compliance failures over several years stemming from deficiencies in the implementation and oversight of its transaction monitoring system. In addition, an investigation by DFS found that the Bank deliberately concealed information from bank examiners. Since being confirmed in June, Superintendent Vullo has led DFS enforcement actions for violations of AML laws, against Mega Bank of Taiwan, which was fined $185 million for violating AML laws and Agricultural Bank of China, which was fined $215 million, and has finalized a new AML regulation effective January 1, 2017.

"Global financial institutions must be the first line of defense in the war against international terrorism, cybercrime and tax evasion," Superintendent Vullo said. "Effective and responsible transaction monitoring systems are an essential tool in the battle against illicit transactions and terrorist financing in this age of risk. There is little doubt that the negligent conduct of this bank is the type of conduct that can fuel international criminal activity,

PX104

thereby seriously compromising the security of the international financial system. DFS uncovered sweeping violations requiring that this institution must make immediate and fundamental changes in the way it conducts business."

Today's action further highlights the importance of DFS's new risk-based anti-terrorism and anti-money laundering regulation that requires regulated institutions to maintain programs to monitor and filter transactions for potential BSA/AML violations and prevent transactions with sanctioned entities. The final regulation requires regulated institutions to submit an annual board resolution or senior officer compliance finding confirming the steps taken to ascertain compliance with the regulation.

DFS found that the Bank's compliance staff utterly mismanaged its transaction monitoring system and repeatedly failed to properly identify suspicious transactions until they were discovered by a DFS-appointed independent consultant. DFS installed a consultant in the Bank's New York branch due to serious issues related to the Bank's anti-money laundering compliance that had been identified by regulators going back to 2002.

DFS's investigation of Intesa's New York branch uncovered AML/BSA violations which included the following:

- An Intesa compliance officer, when questioned about unauthorized clearing practices, said that transactions were being cleared in a manner outside of the Bank's prescribed written procedures because it was more efficient. The Bank's computerized clearing system, he claimed, had generated a large number of "false positives." The unauthorized process being used was acceptable, he said, because a risk-based policy meant (at least to him) that "if you miss one, you miss one."
- The Bank missed thousands of alerts generated by the Bank's automated system, which employs keywords and algorithms to identify suspicious transactions. An electronic alert is generated when a keyword or algorithm spots a suspicious transaction. The transaction is then supposed to be screened through another electronic system so it can be reviewed in more detail.
- In 2014 alone, approximately 41 percent of the alerts improperly closed through the unauthorized and ad hoc clearing process were not "false positives" but were proper alerts that required further investigation, of which some may have required further escalation.
- Intesa specially trained certain employees to handle transactions involving Iran to obfuscate the money-processing activities so they could not be readily flagged as transactions tied to a sanctioned entity.
- In another situation, the anti-money laundering compliance officer in the New York branch left it to individual reviewers to decide for themselves how to review transactions based on what "works best" for them – against the Bank's written guidelines and contrary to established industry practices.

The DFS investigation discovered that from approximately 2002 to 2006 Intesa used opaque methods and practices to conduct more than 2,700 U.S. dollar clearing transactions, amounting to more than $11 billion, on behalf of Iranian clients and other entities possibly

PX104

subject to U.S. economic sanctions.  By processing transactions involving entities possibly subject to U.S. sanctions using these non-transparent methods, Intesa subverted controls designed to detect illegal transactions in the New York branch and thwarted the effective supervision of the New York branch by regulators.

The consent order requires Intesa to extend the engagement of its independent consultant for up to two years to further analyze and test the Bank's efforts to remediate its BSA/AML violations.  DFS retains the right to extend the term of the engagement if it is determined that an extension is necessary for the Bank to complete necessary remediation plans.  The Bank is required to review New York branch transactions from 2014 to the present to ensure compliance with anti-money laundering laws, federal sanctions laws, and New York laws, rules and regulations.  The independent consultant will perform an audit of those efforts and issue an audit report to DFS.

Within 60 days of the consultant's report, the Bank must submit to DFS the following:

- A revised BSA/AML compliance program;
- A program to ensure the identification and timely reporting of all known or suspected violations of law or suspicious transactions to law enforcement and supervisory authorities;
- An enhanced customer due diligence program;
- A revised internal audit program; and
- A plan to enhance oversight by Bank management of the New York branch's compliance with BSA/AML requirements, state laws and regulations, and OFAC regulations,

A copy of the consent order can be found here.

###

PX104

PX116



# Department of the Treasury
# Financial Crimes Enforcement Network

**Advisory**

**FIN-2008-A002**
**Issued: March 20, 2008**
**Subject: Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity**

---

The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided[1] on serious deficiencies present in the anti-money laundering systems of the Islamic Republic of Iran.  The Financial Action Task Force (FATF) stated in October 2007 that Iran's lack of a comprehensive anti-money laundering and combating the financing of terrorism (AML/CFT) regime represents a significant vulnerability in the international financial system.  In response to the FATF statement, Iran passed its first AML law in February 2008.  The FATF, however, reiterated its concern about continuing deficiencies in Iran's AML/CFT system in a statement on February 28, 2008.  Further, on March 3, 2008, the United Nations Security Council passed Resolution 1803 (UNSCR 1803), calling on all states to exercise vigilance over activities of financial institutions in their territories with all banks domiciled in Iran and their branches and subsidiaries abroad.  The FATF statement, combined with the UN's specific call for vigilance, illustrates the increasing risk to the international financial system posed by the Iranian financial sector, including the Central Bank of Iran.

Iran's AML/CFT deficiencies are exacerbated by the Government of Iran's continued attempts to conduct prohibited proliferation related activity and terrorist financing.  Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection.  The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.  They have also continued to provide financial services to Iranian entities designated by the UN Security Council in its Resolutions 1737 and 1747 as entities involved in nuclear proliferation activities.  The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks.

UNSCR 1803 calls on member states to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, and their branches and subsidiaries abroad.  While Bank Melli and Bank Saderat were specifically noted, the United States urges all financial institutions to take into account the risk arising from the deficiencies in Iran's AML/CFT regime, as well as all applicable U.S. and international sanctions programs, with regard to any possible transactions with the following Iranian institutions:

---

[1]    *See* "Guidance to Financial Institutions on the Increasing Money Laundering Threat Involving Illicit Iranian Activity," FIN-2007-A001, October 16, 2007.

[This list has been updated as of June 22, 2010.  Please see FIN-2010-A008 at (http://www.fincen.gov/statutes_regs/guidance/html/fin-2010-a008.html)]

| NAME | LOCATION |
| --- | --- |
| AGRICULTURAL BANK (a.k.a. BANK KESHAVARZI) | Tehran, Iran |
| AGRICULTURAL COOPERATIVE BANK OF IRAN (a.k.a. BANK TAAVON KESHAVARZI IRAN) | Tehran, Iran |
| AGRICULTURAL DEVELOPMENT BANK OF IRAN (a.k.a. BANK JOSIAIYI KESHAHVARZI) | Tehran, Iran |
| ARIAN BANK (a.k.a. ARYAN BANK) | Kabul, Afghanistan |
| BANCO INTERNACIONAL DE DESARROLLO SA | Caracas, Venezuela |
| BANK KARGOSHAEE | Tehran, Iran |
| BANK MASKAN (a.k.a. HOUSING BANK (of Iran)) | Tehran, Iran |
| BANK MELLAT | Tehran, Iran |
| BANK MELLAT | Seoul, South Korea |
| BANK MELLAT | Ankara, Istanbul, Izmir, Turkey |
| BANK MELLI IRAN | Tehran, Iran |
| BANK MELLI IRAN | Paris, France |
| BANK MELLI IRAN | Hamburg, Germany |
| BANK MELLI IRAN | Central, Hong Kong |
| BANK MELLI IRAN | Baghdad, Iraq |
| BANK MELLI IRAN | Muscat, Oman |
| BANK MELLI IRAN | Al Ain, Deira, Dubai City, Fujairah, Ras al-Khaimah, and Sharjah, United Arab Emirates |
| BANK MELLI IRAN ZAO | Moscow, Russia |
| BANK OF INDUSTRY AND MINE (of Iran) (a.k.a. BANK SANAD VA MADAN) | Tehran, Iran |
| BANK REFAH (f.k.a. WORKERS WELFARE BANK, f.k.a. BANK REFAH KARGARAN) | Tehran, Iran |
| BANK SADERAT IRAN | Tehran, Iran |
| BANK SADERAT | Paris, France |
| BANK SADERAT | Frankfurt, Hamburg, Germany |
| BANK SADERAT | Athens, Greece |
| BANK SADERAT | Baalbak, Beirut, Saida, Lebanon |
| BANK SADERAT | Muscat, Oman |
| BANK SADERAT | Doha, Qatar |
| BANK SADERAT | Ashgabat, Turkmenistan |
| BANK SADERAT | Abu Dhabi, Ajman, Al Ain, Dubai City, Sharjah, United Arab Emirates |

PX116

| | |
|---|---|
| BANK SADERAT PLC | London, United Kingdom |
| BANK SADERAT TASHKENT | Tashkent, Uzbekistan |
| BANK SEPAH | Tehran, Iran |
| BANK SEPAH | Paris, France |
| BANK SEPAH | Frankfurt, Germany |
| BANK SEPAH | Rome, Italy |
| BANK SEPAH INTERNATIONAL PLC | London, United Kingdom |
| BANK TEJARAT | Tehran, Iran |
| BANK TEJARAT | Paris, France |
| BANK TEJARAT | Dusanbe, Tajikistan |
| THE CENTRAL BANK OF IRAN (a.k.a. BANK MARKAZI JOMHOURI ISLAMI IRAN) | Tehran, Iran |
| EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) | Hamburg, Germany |
| EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) | Tehran, Iran |
| EXPORT DEVELOPMENT BANK OF IRAN (a.k.a. BANK TOWSEH SADERAT IRAN) | Tehran, Iran |
| FUTURE BANK B.S.C. | Manama, Bahrain |
| IRAN OVERSEAS INVESTMENT BANK PLC (a.k.a. IRAN OVERSEAS INVESTMENT CORPORATION LIMITED) | London, United Kingdom |
| KARGOZARI BANK TEJARAT | Tehran, Iran |
| MELLAT BANK DB AOZT (a.k.a. MELLAT BANK S/B CJSC) | Yerevan, Armenia |
| MELLAT BANK S/B CJSC (a.k.a. MELLAT BANK DB AOZT) | Yerevan, Armenia |
| MELLI BANK PLC. | London, United Kingdom |
| PERSIA INTERNATIONAL BANK PLC. | London, United Kingdom |
| PERSIA INTERNATIONAL BANK PLC. | Dubai City, United Arab Emirates |

Privately Owned Iranian Financial Institutions

| NAME | LOCATION |
|---|---|
| BANK PASARGAD | Tehran, Iran |
| EN BANK PJSC (a.k.a. EGHTESAD-E-NOVIN BANK) | Tehran, Iran |
| KARAFARIN BANK | Tehran, Iran |
| PARSIAN BANK | Tehran, Iran |
| POST BANK OF IRAN | Tehran, Iran |
| SAMAN BANK CORPORATION | Tehran, Iran |
| BANK SARMAYE | Tehran, Iran |

PX116

Financial institutions also are reminded of the existing U.S. sanctions that are administered by the Department of the Treasury's Office of Foreign Assets Control (OFAC) with respect to Iran and the Government of Iran, including but not limited to Iranian Government-owned banks, as well as other sanctions imposed on Iranian entities that have been linked to terrorist activity and the proliferation of weapons of mass destruction. Information about these sanctions is available on OFAC's website at http://www.treasury.gov/offices/enforcement/ofac/.

PX116

PX118

# Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force

home.treasury.gov/news/press-releases/sm0385

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) imposed sanctions on the Governor and a senior official of the Central Bank of Iran, an Iraq-based bank and its chairman, and a key Hizballah official, all of whom have moved millions of dollars on behalf of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to Hizballah.  They were designated as Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

"Iran's Central Bank Governor covertly funneled millions of dollars on behalf of the IRGC-QF through Iraq-based al-Bilad Islamic Bank to enrich and support the violent and radical agenda of Hizballah.  It is appalling, but not surprising, that Iran's senior-most banking official would conspire with the IRGC-QF to facilitate funding of terror groups like Hizballah, and it undermines any credibility he could claim in protecting the integrity of the institution as a central bank governor," said Treasury Secretary Steven T. Mnuchin.  "The United States will not permit Iran's increasingly brazen abuse of the international financial system.  The global community must remain vigilant against Iran's deceptive efforts to provide financial support to its terrorist proxies."

Today's action cuts off Iran's use of a critical banking network and follows last Thursday's disruption of an IRGC-QF-associated currency exchange network procuring millions of dollars through the UAE.  Both actions seek to stifle Iran's ability to abuse the U.S. and regional financial systems.  These actions continue the aggressive campaign against the IRGC and its proxies that the Treasury Department has led under this Administration.  These actions build upon President Trump's May 8 decision to cease the United States' participation in the Joint Comprehensive Plan of Action (JCPOA) and begin reimposing U.S. sanctions that had been lifted under the JCPOA, including against the Central Bank of Iran.

The IRGC-QF was designated pursuant to E.O. 13224 on October 25, 2007.  The IRGC-QF's parent organization, the Islamic Revolutionary Guard Corps (IRGC) itself was also designated on October 13, 2017 pursuant to E.O. 13224 for its support to the IRGC-QF, and consistent with the Countering America's Adversaries Through Sanctions Act.

Hizballah was designated by the Department of State as a Foreign Terrorist Organization in October 1997 and as an SDGT pursuant to E.O. 13224 in October 2001.  It was listed in January 1995 in the Annex to E.O. 12947, which targets terrorists who threaten to disrupt the

PX118

Middle East peace process, and also designated in August 2012 pursuant to E.O. 13582, which targets the Government of Syria and its supporters.

## Iran's Central Bank Governor and a Senior Staff Officer

OFAC is designating Valiollah Seif, Iran's Central Bank Governor, for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Seif has conspired with the IRGC-QF to move millions of dollars through the international financial system in a variety of foreign currencies to allow the IRGCQF to fund its activities abroad. Seif has also supported the transfer of IRGC-QF-associated funds to al-Bilad Islamic Bank, an Iraq-based bank which is also being designated today.

OFAC also is designating Ali Tarzali, the assistant director of the International Department at the Central Bank of Iran, for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Tarzali has worked with Hizballah and proposed that the terrorist group send funds through Iraq-based al-Bilad Islamic Bank.

As a result of today's actions, Veifollah Seif and Ali Tarzali are subject to secondary sanctions pursuant to the Iranian Financial Sanctions Regulations (IFSR), which implement, among other authorities, the Comprehensive Iran Sanctions and Divestment Act of 2010 (CISADA). Pursuant to the IFSR, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for designated agents or affiliates of the IRGC or persons designated pursuant to E.O. 13224 in connection with Iran's support for international terrorism or E.O. 13382 in connection with Iran's proliferation of weapons of mass destruction and their means of delivery.

Today's designations of Valiollah Seif, Iran's Central Bank Governor, and Ali Tarzali, assistant director of the International Department at the Central Bank of Iran, do not extend to the Central Bank of Iran. However, due to President Trump's May 8, 2018 decision to cease the United States' participation in the JCPOA, as of August 7, 2018, the United States Government will re-impose sanctions that extend to certain transactions with the Central Bank of Iran, including sanctions on the purchase or acquisition of U.S. dollars banknotes by the Government of Iran. Furthermore, on November 5, 2018, additional sanctions will be re-imposed on persons knowingly engaging in certain significant transactions with the Central Bank of Iran.

## Al-Bilad Islamic Bank and Its Chairman and Chief Executive

OFAC is designating Aras Habib, the Chairman and Chief Executive of Al-Bilad Islamic Bank, for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Aras Habib enabled the IRGC-

PX118

QF's exploitation of Iraq's banking sector to move funds from Tehran to Hizballah, jeopardizing the integrity of the Iraqi financial system.  Habib, who has a history of serving as a conduit for financial disbursements from the IRGC-QF to Iranian-backed Iraqi groups, has also helped provide IRGC-QF financial support to Lebanese Hizballah.  Al-Bilad Islamic Bank is being designated for being owned or controlled by Aras Habib.

As a result of today's actions, Aras Habib and Al-Bilad Bank are subject to secondary sanctions pursuant to the IFSR, which implement, among other authorities, CISADA. Pursuant to the IFSR, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for designated agents or affiliates of the IRGC or persons designated pursuant to E.O. 13224 in connection with Iran's support for international terrorism or E.O. 13382 in connection with Iran's proliferation of weapons of mass destruction and their means of delivery.

## Hizballah Official Working with IRGC-QF

OFAC is designating Muhammad Qasir (Qasir) for acting for or on behalf of Hizballah.  Qasir acted as a critical conduit for financial disbursements from the IRGC-QF to Hizballah.  Qasir has worked with the IRGC-QF to transfer funds.

Qasir is subject to secondary sanctions pursuant to the Hizballah Financial Sanctions Regulations, which implements the Hizballah International Financing Prevention Act of 2015.  Pursuant to this authority, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for Hizballah, or a person acting on behalf of or at the direction of, or owned or controlled by, Hizballah.

Identifying information on the individuals and entities designated today.

####

3/3

PX118

PX121



**Department of the Treasury**
**Financial Crimes Enforcement Network**

**Advisory**

**FIN-2010-A008**
**Issued: June 22, 2010**
**Subject: Update on the Continuing Illicit Finance Threat Emanating from Iran**

The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on the serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran,[1] and to provide guidance to financial institutions regarding United Nations Security Council Resolution (UNSCR) 1929, adopted on June 9, 2010.

UNSCR 1929 contains a number of new provisions which build upon and expand the financial sanctions imposed in previous resolutions (UNSCRs 1737, 1747, and 1803) and which are designed to prevent Iran from abusing the international financial system to facilitate its illicit conduct. The resolution's measures include a call for States, in addition to implementing their obligations pursuant to resolutions 1737, 1747, 1803, and 1929, to prevent the provision of any financial service – including insurance and reinsurance – or asset that does or could contribute to Iran's proliferation activities; and to prohibit on their territories new relationships with Iranian banks, including the opening of any new branches of Iranian banks, if there is a suspected link to proliferation. The UNSCR also requires States to ensure their nationals exercise vigilance when doing business with any Iranian firm, including the Islamic Revolutionary Guard Corps (IRGC) and the Islamic Republic of Iran Shipping Lines (IRISL), when there is a possibility that such business could contribute to Iran's proliferation activities.

These Security Council actions, in addition to Financial Action Task Force (FATF) statements regarding the risks posed by Iran and calling for countries to impose countermeasures,[2] illustrate the increasing risk to the integrity of the international financial system posed by:

- the Iranian financial sector, including the Central Bank of Iran;

---

[1] *See*, "Guidance to Financial Institutions on the Increasing Money Laundering Threat Involving Illicit Iranian Activity," (FIN-2008-A002, March 20, 2008) and "Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity (FIN-2007-A001, October 16, 2007)

[2] FinCEN's advisory "Guidance to Financial Institutions Based on the Financial Action Task Force Public Statement on Anti-Money Laundering and Counter-Terrorist Financing Risks" (FIN-2010-A002) reminded institutions of FATF's statements addressing the risks that Iran's substantially deficient AML/CFT regime presents to the international financial system (*See* also "FATF Statement on Iran," October 11, 2007; "FATF Statement," February 28, 2008; and "FATF statement," October 16, 2008, available at http://www.fatf-gafi.org). In addition, FATF has issued three sets of guidance to assist States in implementing their financial obligations pursuant to United Nations Security Council resolutions 1737 (*See* http://www.fatf-gafi.org/dataoecd/43/17/39494050.pdf), 1747 (*See* http://www.fatf-gafi.org/dataoecd/23/16/39318680.pdf), and 1803 (*See* http://www.fatf-gafi.org/dataoecd/47/41/41529339.pdf) to address proliferation finance risks associated with Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems.

PX121

- commercial enterprises that are owned or controlled by the IRGC, which was designated by the State Department under Executive Order 13382 in 2007; and

- other Iranian entities supporting proliferation-related activities, particularly IRISL, which was designated by the Department of the Treasury's Office of Foreign Assets Control (OFAC) in 2008 and specifically highlighted as a proliferation risk in UNSCRs 1803 and 1929.

Iran's record of illicit and deceptive activity, coupled with its extensive integration into the global financial system, increases the risk that responsible financial institutions will unwittingly become involved in Iran's illicit activities.  Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian banks, leaving Iran's financial institutions increasingly isolated.  Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally.

Public sources indicate that Iranian banks operate globally, including seven state-owned commercial banks, four specialized government banks, and six privately owned Iranian financial institutions[3] with more than four dozen overseas branches and subsidiaries in Asia, Europe, South America, and the Middle East.[4]  Many of these banks report significant relationships in key global financial centers.[5]  The Department of the Treasury is also concerned that Iranian banks (both designated and non-designated) are seeking to expand their international presence in order to circumvent the impact of sanctions on Iran's state-owned banks, presenting a risk that Iran's illicit conduct will shift to those banks that are able to maintain ties to the international financial sector.[6]

This advisory does not describe any new legal obligations upon U.S. persons.  Existing U.S. sanctions – in particular, those under the Iranian Transactions Regulations[7] and Executive Orders 13382[8] and 13224[9] – already ensure that U.S. financial institutions have very limited direct exposure to Iranian financial or commercial transactions.  Nonetheless, FinCEN continues to advise all U.S. financial institutions to take commensurate risk-mitigation measures to diminish threats emanating from Iran.

In that regard, FinCEN is highlighting today the following financial-services related provisions of UNSCR 1929 that may affect current or future correspondent relationships of U.S. financial institutions:

**UNSCR 1929:**

---

[3] Central Bank of the Islamic Republic of Iran.). http://www.cbi.ir/simplelist/1462.aspx
[4] The Bankers Almanac, May 2010.
[5] *Id.*
[6] For example, OFAC designated Post Bank of Iran on June 16, 2010 for providing financial services to, and acting on behalf of, Bank Sepah, a previously designated Iranian financial institution.
[7] 31 CFR Part 560.
[8] Executive Order 13382 of June 28, 2005, "Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters."
[9] Executive Order 13224 of September 23, 2001, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism."

2

PX121

- Preambular Paragraph 16:  *Welcoming the guidance issued by the Financial Action Task Force (FATF) to assist States in implementing their financial obligations under resolutions 1737 (2006) and 1803 (2008), and recalling in particular the need to exercise vigilance over transactions involving Iranian banks, including the Central Bank of Iran, so as to prevent such transactions contributing to proliferation-sensitive nuclear activities, or to the development of nuclear weapon delivery systems.*

This preambular paragraph references UNSCR 1803, which called upon all States to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, and the branches and foreign subsidiaries of these banks, and draws particular attention to the potential role of the Central Bank of Iran in illicit conduct.  As noted in prior FinCEN guidance, the Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned banks, and notes that the Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.[10]

- Operative Paragraph 8:  *Decides that all States shall prevent the direct or indirect supply, sale or transfer to Iran, from or through their territories or by their nationals or individuals subject to their jurisdiction, or using their flag vessels or aircraft, and whether or not originating in their territories, of any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts, or items as determined by the Security Council or Committee established pursuant to resolution 1737 (2006) ("the Committee"), decides further that all States shall prevent the provision to Iran by their nationals or from or through their territories of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, provision, manufacture, maintenance or use of such arms and related materiel, and, in this context, calls upon all States to exercise vigilance and restraint over the supply, sale, transfer, provision, manufacture and use of all other arms and related materiel.*

- Operative Paragraph 21:  *Calls upon all States, in addition to implementing their obligations pursuant to resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, to prevent the provision of financial services, including insurance or re-insurance, or the transfer to, through, or from their territory, or to or by their nationals or entities organized under their laws (including branches abroad), or persons or financial institutions in their territory, of any financial or other assets or resources if they have information that provides reasonable grounds to believe that such services, assets or resources **could contribute to** Iran's proliferation-sensitive nuclear activities, or the development of nuclear weapon delivery systems, including by freezing any financial or other assets or resources on their territories or that hereafter come within their territories, or that are subject to their jurisdiction or that hereafter become subject to their jurisdiction, that are related to such programmes or activities and applying*

---

[10] FIN-2008-A002, March 20, 2008, *supra* FN 1.

PX121

*enhanced monitoring to prevent all such transactions in accordance with their national authorities and legislation* (emphasis added).

The first operative paragraph requires that States "prevent the provision… of financial resources or services to Iran… related to the supply, sale, transfer, provision, or manufacture of" prohibited arms.  The second operative paragraph calls upon States to "prevent the provision of financial services… if they have information that provides reasonable grounds to believe such services, assets, or resources could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems."  In light of Iran's use of deceptive practices and abuse of the international financial system to facilitate proliferation-sensitive activities, FinCEN advises all U.S. financial institutions to take commensurate risk-mitigation measures.

As required under 31 CFR § 103.176(a), covered financial institutions should ensure that their due diligence programs, which address correspondent accounts maintained for foreign financial institutions, include appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to detect and report known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered, or managed in the United States.

With respect to correspondent accounts held with financial institutions that maintain relationships with Iran, FinCEN reminds institutions of the increasing likelihood that Iran will use its existing correspondent relationships to hide illicit conduct in an attempt to circumvent existing sanctions.  Financial institutions should be vigilant in dealing with banks that might have a connection to Iran.[11]

FATF has also issued guidance[12] advising jurisdictions to consider all customers and transactions associated with Iran as a primary risk determinant for the purposes of applying risk-based identification and enhanced scrutiny of high-risk customers and transactions that may be related to activity prohibited by various UNSCR provisions.

- Operative Paragraph 22:  *Decides that all States shall require their nationals, persons subject to their jurisdiction and firms incorporated in their territory or subject to their jurisdiction to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC and IRISL, and any individuals or entities acting on their behalf or at their direction, and entities owned or controlled by them, including through illicit means, if they have information that provides reasonable grounds to believe that such business **could contribute to** Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems or to violations of resolutions 1737 (2006), 1747 (2007), 1803 (2008) or this resolution* (emphasis added).

---

[11]For example, with respect to high-risk financial transactions with Iranian banks, the FATF guidance to assist States in implementing their financial obligations under UNSC 1803 includes encouraging financial institutions to obtain information on the:  (i) parties to the transaction; (ii) source of funds; (iii) beneficial ownership of the counterparty; and (iv) purpose of the transaction or payment.

[12] FATF "Guidance Regarding the Implementation of Activity-Based Financial Prohibitions of United Nations Security Council Resolution 1737," October 12, 2007.

PX121

The increasing infiltration of Iran's legitimate economy by designated entities, including especially the IRGC, exposes international financial institutions and companies that do business with entities incorporated in Iran or subject to Iran's jurisdiction to increased risk of doing business with entities directly involved in Iran's proliferation-sensitive activities. Also of note is the exposure of international financial institutions and companies to entities owned, controlled, or otherwise affiliated with the IRGC and other designated entities. To address this concern, the Security Council decided that States must require their nationals, persons subject to their jurisdiction, and firms incorporated in their territory or subject to their jurisdiction, to exercise vigilance over business with certain entities or individuals if they have information that provides reasonable grounds to believe that such business could contribute to Iran's proliferation-sensitive activities, the development of nuclear weapon delivery systems, or violations of existing UNSCRs regarding Iran, including UNSCR 1929.

Iran's demonstrated use of deceptive practices makes it difficult to determine whether designated entities or proliferation-related activities are associated with any particular transaction involving Iran. For example, since OFAC's designation of IRISL in 2008, IRISL has employed deceptive practices to evade scrutiny, including renaming and reflagging its vessels and adjusting the information associated with financial transactions to conceal IRISL's involvement. FinCEN notes that the International Maritime Organization (IMO) registration number assigned to each vessel is a unique identifier that cannot be reassigned to another ship and remains with the ship throughout the life of the vessel. IMO numbers could provide a useful indication of whether an IRISL vessel is involved in a transaction.[13] The IMO numbers for IRISL vessels previously identified by the U.S. are provided on the Specially Designated Nationals and Blocked Persons List (SDN List) published by OFAC.

The focus in this Operative Paragraph is on vigilance when doing business with businesses incorporated in Iran, including the IRGC and IRISL. FATF has previously issued guidance[14] advising jurisdictions to consider all customers and transactions associated with Iran as a primary risk determinant for the purposes of applying risk-based identification and enhanced scrutiny of high risk customers and transactions that may be related to activity prohibited by UNSCR provisions.

- Operative Paragraph 23: *Calls upon States to take appropriate measures that prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also that prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction to prevent the provision of financial services if they have information that provides reasonable grounds to believe that these activities could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems.*

---

[13] For a more complete discussion of IMO numbers, *see*
http://www.imo.org/includes/blastDataOnly.asp/data_id%3D17028/1886-Rev3.pdf
[14] FATF "Guidance Regarding the Implementation of Activity-Based Financial Prohibitions of United Nations Security Council Resolution 1737," October 12, 2007.

5

PX121

- Operative Paragraph 24: *Calls upon States to take appropriate measures that prohibit financial institutions within their territories or under their jurisdiction from opening representative offices or subsidiaries or banking accounts in Iran if they have information that provides reasonable grounds to believe such financial services could contribute to Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems.*

FinCEN remains concerned that Iranian financial institutions are seeking to compensate for the loss of access to financial sectors by establishing new financial relationships, including the opening of new foreign branches, subsidiaries, representative offices, or correspondent or other accounts either outside or within Iran, and the pursuit of joint ventures.  Financial institutions should be vigilant in dealing with banks that might have a connection to Iran.

FinCEN reminds financial institutions of the existing U.S. sanctions that are administered by OFAC with respect to Iran and the Government of Iran, including but not limited to Iranian Government-owned banks, as well as other sanctions imposed on Iranian entities that have been linked to terrorist activity or to the proliferation of weapons of mass destruction.  Information about these sanctions is available on OFAC's website at http://www.treasury.gov/offices/enforcement/ofac/.

Additionally, as required under 31 CFR §§ 103.15 - 103.21, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or another violation or attempted violation of law or regulation, the financial institution shall then file a Suspicious Activity Report.[15]

The Department of the Treasury has encouraged financial institutions worldwide to take similar precautions as those described above and urges all financial institutions to also take into account all applicable U.S. and international sanctions programs with regard to any possible transaction with Iranian institutions.  To assist both domestic and international institutions in applying enhanced scrutiny, FinCEN is updating in this advisory the list of Iranian banks previously provided in March 2008:[16]

| NAME | LOCATION |
|---|---|
| ARIAN BANK (a.k.a. ARYAN BANK) | Kabul, Afghanistan |
| BANCO INTERNACIONAL DE DESARROLLO SA | Caracas, Venezuela |
| BANK KARGOSHAEE | Tehran, Iran |
| BANK KESHAVARZI *(added June 22, 2010)*[17] | Tehran, Iran |

---

[15] FinCEN has previously clarified that suspicious activity reporting obligations are sometimes deemed to be satisfied by reports filed with OFAC.  *See* 69 Federal Register 76847 and "Revised Guidance of Filing Suspicious Activity Reports Relating to the Office of Foreign Assets Control" in SAR Activity Review, Issue 8 (http://www.fincen.gov/news_room/rp/files/sar_tti_08.pdf).

[16] *Supra* FN1.

[17] Formerly listed Agricultural Bank in Tehran, Agricultural Cooperative Bank of Iran (a.k.a. Bank Taavon Keshavarzi Iran) in Tehran, and Agricultural Development Bank of Iran (a.k.a. Bank Josiaiyi Keshahvarzi) in Tehran have all been assumed under Bank Keshavarzi.

PX121

| BANK MASKAN (a.k.a. HOUSING BANK (of Iran)) | Tehran, Iran |
|---|---|
| BANK MELLAT | Tehran, Iran |
| BANK MELLAT | Seoul, South Korea |
| BANK MELLAT | Ankara, Istanbul, Izmir, Turkey |
| BANK MELLI IRAN | Tehran, Iran |
| BANK MELLI IRAN | Paris, France |
| BANK MELLI IRAN (*added June 22, 2010*) | Baku, Azerbaijan |
| BANK MELLI IRAN | Hamburg, Germany |
| BANK MELLI IRAN | Central,Hong Kong |
| BANK MELLI IRAN | Baghdad, Iraq |
| BANK MELLI IRAN | Muscat, Oman |
| BANK MELLI IRAN | Al Ain, Deira, Dubai City, Fujairah, Ras al-Khaimah, and Sharjah, United Arab Emirates |
| BANK MELLI IRAN ZAO | Moscow, Russia |
| BANK OF INDUSTRY AND MINE (of Iran) (a.k.a. BANK SANAD VAMADAN) | Tehran, Iran |
| BANK OF REGIONAL COOPERATION ISLAMIC FOR DEVELOPMENT AND INVESTMENT (*added June 22, 2010*) | Baghdad, Iraq |
| BANK REFAH (f.k.a. WORKERS WELFARE BANK, f.k.a. BANK REFAH KARGARAN) | Tehran, Iran |
| BANK SADERAT IRAN | Tehran, Iran |
| BANK SADERAT | Paris, France |
| BANK SADERAT | Frankfurt, Hamburg , Germany |
| BANK SADERAT | Athens, Greece |
| BANK SADERAT | Baalbak, Beirut, Saida, Lebanon |
| BANK SADERAT | Muscat, Oman |
| BANK SADERAT | Doha, Qatar |
| BANK SADERAT | Ashgabat, Turkmenistan |
| BANK SADERAT | Abu Dhabi, Ajman, Al Ain, Dubai City, Sharjah, United Arab Emirates |
| BANK SADERAT PLC | London, United Kingdom |
| BANK SADERAT TASHKENT | Tashkent, Uzbekistan |
| BANK SEPAH | Tehran, Iran |
| BANK SEPAH | Paris, France |
| BANK SEPAH | Frankfurt, Germany |
| BANK SEPAH | Rome, Italy |
| BANK SEPAH INTERNATIONAL PLC | London, United Kingdom |
| BANK TEJARAT | Tehran, Iran |
| BANK TEJARAT | Paris, France |

7

PX121

| | |
|---|---|
| BANK TEJARAT | Dushanbe, Tajikistan |
| THE CENTRAL BANK OF IRAN (a.k.a. BANK MARKAZI JOMHOURI ISLAMI IRAN) | Tehran, Iran |
| EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a.DEUTSCH-IRANISCHE HANDELSBANK AG) | Hamburg, Germany |
| EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) | Tehran, Iran |
| EXPORT DEVELOPMENT BANK OF IRAN (a.k.a. BANK TOWSEH SADERAT IRAN) | Tehran, Iran |
| FIRST EAST EXPORT BANK (added June 22, 2010) | Labuan, Malaysia |
| FUTURE BANK B.S.C. | Manama, Bahrain |
| IRAN OVERSEAS INVESTMENT BANK PLC (a.k.a. IRAN OVERSEAS INVESTMENT CORPORATION LIMITED) | London, United Kingdom |
| KARGOZARI BANK TEJARAT | Tehran, Iran |
| MELLAT BANK DB AOZT (a.k.a. MELLAT BANK S/B CJSC) | Yerevan, Armenia |
| MELLAT BANK S/B CJSC (a.k.a. MELLAT BANK DB AOZT) | Yerevan, Armenia |
| MELLI BANK PLC. | London, United Kingdom |
| MELLI BANK PLC. (added June 22, 2010) | Hong Kong, China |
| PERSIA INTERNATIONAL BANK PLC. | London, United Kingdom |
| PERSIA INTERNATIONAL BANK PLC. | Dubai City, United Arab Emirates |
| POSTBANK OF IRAN (relisted from private to state-owned bank) | Tehran, Iran |

Privately Owned Iranian Financial Institutions

| NAME | LOCATION |
|---|---|
| BANK PASARGAD | Tehran, Iran |
| EN BANK PJSC (a.k.a. EGHTESAD-E-NOVIN BANK) | Tehran, Iran |
| KARAFARIN BANK | Tehran, Iran |
| PARSIAN BANK | Tehran, Iran |
| SAMAN BANK CORPORATION | Tehran, Iran |
| BANK SARMAYE | Tehran, Iran |

8

PX121

PX122

U.S. DEPARTMENT OF THE TREASURY

**Press Center**



## Fact Sheet: Treasury Strengthens Preventive Measures Against Iranp1258

11/6/2008

HP-1258

On October 16, the Financial Action Task Force (FATF), which has members representing 32 jurisdictions and is the world's premier standard-setting body for anti-money laundering and counter-terrorist financing (AML/CFT), warned for the fourth time about the risks posed to the international financial system by continuing deficiencies in Iran's AML/CFT regime.   The FATF called for all countries to strengthen preventive measures to protect their financial systems from this risk.   Additionally, the UN Security Council called upon all states in March 2008 to exercise vigilance over the activities of financial institutions in their territories with all Iranian banks.

Consistent with these multilateral calls for action, the Treasury Department is revoking the "U-turn" general license today to protect U.S. financial institutions individually, and the U.S.financial system as a whole, from the significant terrorist financing and proliferation risks posed by Iran.   This regulatory action will close the last general entry point for Iran to the U.S. financial system.

Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies.   Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.   The Treasury Department encourages all jurisdictions to adopt robust preventive measures consistent with the FATF warnings and relevant UN Security Council Resolutions (UNSCRs).

<u>Iran Misuses the International Financial System to Support Terrorism</u>

Iran is the world's most active state sponsor of terror.   The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

•      **Iran's Support to Terror.**  The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations.   For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

•      **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups**.   Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America.   The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad.   Qods Force-supported groups include: Lebanese Hizballah; Palestinian terrorists; certain Iraqi Shi'a militant groups; and Islamic militants in Afghanistan and elsewhere.   The Qods Force is especially active in the Levant, providing Lebanese Hizballah with funding, weapons and training.   It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year.   The Qods Force continues to provide the Taliban in Afghanistan with limited weapons, funding, logistics and training in support of anti-U.S. and anti-coalition activities.

•      **Iran Uses its Banks to Finance Terrorism**.   In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations.   Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence.   Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat as of early 2005.   The Treasury Department designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ.   Australia has also designated Bank Saderat.   Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

•      **Iran Lacks a Counter-Terrorist Financing Legal Regime.**  In addition to its regime-directed support to terrorist organizations, Iran continues to lack a legal framework to counter the risk of terrorist financing and has not indicated a willingness to address this

PX122

deficiency.   The FATF's October statement on Iran notes that, while Iran has taken some steps towards implementing an anti-money laundering regime, there is a lack of even such a minimal "corresponding effort" by Iran in the area of counter-terrorist financing.

<u>**Iran Misuses the International Financial System to Facilitate Proliferation**</u>

•        **Iran Continues to Pursue Nuclear Capabilities and Develop Ballistic Missiles**.   In addition to its active support to terrorist and militant activities, Iran continues to defy the international community by pursuing nuclear capabilities and developing ballistic missiles in violation of five UNSCRs.   Iran's failure to comply with these various resolutions has resulted in the UN Security Council's imposing sanctions against Iran.   These have included specific provisions aimed at preventing Iran from abusing banks and the international financial system to pursue nuclear capabilities and develop ballistic missiles.

•        **Iran Uses its Banks to Finance its Nuclear and Missile Programs.** Multiple Iranian financial institutions have been implicated in facilitating Iran's nuclear and ballistic missile programs.

➢**Bank Sepah.**  Iran's state-owned Bank Sepah has been designated in the United States under E.O. 13382 and by the UN Security Council under UNSCR 1747.   Bank Sepah has provided direct and extensive financial services, such as arranging financing and processing dozens of multi-million dollar transactions, for the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), two Iranian missile firms designated by the UN Security Council in UNSCR 1737 and identified by President Bush in the Annex to E.O. 13382 for their direct roles in advancing Iran's ballistic missile programs.   Bank Sepah also has provided financial services to SHIG's and SBIG's parent entity, Iran's Aerospace Industries Organization (AIO), which also was identified by President Bush in the Annex to E.O. 13382 for its role in overseeing all of Iran's missile industries.

➢**Bank Melli.**  Iran's largest state-owned bank, Bank Melli, has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs on behalf of UN-designated entities.   In doing so, Bank Melli has provided a range of financial services to known proliferators, including letters of credit and the maintenance of accounts. The United States, the European Union, and Australia have designated Bank Melli.

➢**Bank Mellat.**  Iran's state-owned Bank Mellat has provided banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company.   Bank Mellat, which was designated pursuant to E.O. 13382 in October 2007, has serviced and maintained AEOI accounts, mainly through AEOI's financial conduit, Novin Energy.   Bank Mellat has facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003.

➢**Export Development Bank of Iran.**  On October 22, 2008, the Treasury Department designated the Export Development Bank of Iran (EDBI) under E.O. 13382 for providing or attempting to provide financial services to Iran's Ministry of Defense and Armed Forces Logistics (MODAFL), which had been designated by both the European Union and the United States for its involvement in Iranian proliferation activities.   Some MODAFL scientists and officials have also been designated by the UN.   The EDBI provides financial services to multiple MODAFL-subordinate entities that permit these entities to advance Iran's WMD programs.   Furthermore, the EDBI has facilitated the ongoing procurement activities of various front companies associated with MODAFL-subordinate entities.   In addition, since Bank Sepah's designation by the United States and the UN Security Council, the EDBI has served as one of the leading intermediaries handling Bank Sepah's financing, including WMD-related payments.   The EDBI has also facilitated financing for other proliferation-related entities sanctioned under U.S. and UN authorities.

•        **International Focus on Proliferation Risks Associated with Iranian Financial Institutions.**   The role that Iranian financial institutions play in Iranian proliferation activities is underscored by UNSCR 1803, which was adopted in March 2008 and calls upon states to exercise vigilance over the activities of their financial institutions with all Iranian banks.   The FATF issued guidance in October 2008 to assist countries in implementing this provision.   That guidance recommends that jurisdictions encourage their financial institutions to take strong preventive measures for the mitigation of risks posed by Iranian banks, including refusing to process transactions involving Iranian banks when full information regarding the parties to the transaction is unavailable.   The FATF guidance also recommends that jurisdictions encourage their financial institutions to reassess, and if necessary, terminate correspondent relationships with Iranian banks, and take steps to satisfy themselves that their correspondent relationships with non-Iranian financial institutions are not used to circumvent the risk-mitigation practices in place for Iranian banks.

<u>**Iran Uses Deceptive Financial Practices to Evade Sanctions**</u>

•        **Iranian Commercial Banks.**   It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions.   For example, Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to determine the true parties to a transaction.   Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Bank Sepah in transactions.   Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC.   In addition, when Iranian assets were targeted in Europe, branches of Iranian state-owned banks in Europe took steps to disguise ownership of assets on their books in order to protect assets from future actions.

•        **Central Bank of Iran.**   The Central Bank of Iran (CBI), the sole Iranian entity that regulates all Iranian banks, has not only engaged in deceptive practices itself – such as asking for its name to be removed from transactions – but has also encouraged such practices among Iran's state-owned banks.   For example, prior to EU and UN sanctions, the CBI attempted to help Banks Sepah and

PX122

Melli protect their assets from being frozen.   Later, the CBI instructed non-sanctioned Iranian state-owned banks to issue payment instructions on behalf of Sepah in order to circumvent sanctions. In the case of Bank Melli, the CBI provided substantive assistance to minimize the impact of sanctions.   In fact, between January and March 2008, the CBI handled tens of millions of dollars in transactions to and from the accounts of U.S.- and UN-designated banks held at the CBI.

•       **Use of Front Companies and Misuse of Bank Accounts.**   Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its nuclear or missile programs.   Iranian entities form front companies outside of Iran for the sole purpose of exporting dual-use items to Iran that can be used in these programs.   These front companies enable the regime to obtain materials that the country of origin would typically prohibit from being exported to Iran.   Iran also has a history of using accounts set up for one purpose to facilitate activities with designated entities.

•       **Use of Money Service Business Accounts.**  Iran also has exploited its relationship with certain foreign money service businesses, capitalizing on a business model where the absence of an ongoing account relationship may mean that less information is collected on certain transactions.

### Effect of the Revocation of U-Turn License

OFAC has revoked the authorization of "U-turn" transfers for the direct or indirect benefit of Iran, through an amendment of the Iranian Transactions Regulations, 31 CFR part 560, to narrow the scope of existing § 560.516.   This action affects the "U-turn" class of funds transfers, which are so named because, while they are conducted on behalf of Iranian account holders and banks or in connection with Iran-related transactions, they only pass through the U.S. financial system on their way from one offshore non-Iranian financial institution to another.

As a result of today's action, U.S. depository institutions are no longer allowed to process "U-turn" transfers to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran.   The prohibition on U-turns applies not only to state-owned Iranian banks and the Central Bank of Iran, but also to privately-owned Iranian banks, Iranian companies, and the settlement of third-country trade transactions that involve Iran.

### Allowable Transactions

Today's action will not affect funds transfers by U.S. depository institutions,through intermediary third-country banks, to or from Iran or for the direct or indirect benefit of the Government of Iran or a person in Iran arising from several types of underlying transactions including:

- A non-commercial remittance to or from Iran (e.g., a family remittance not related to a family-owned enterprise);
- The exportation to Iran or importation from Iran of information and informational materials;
- A travel-related remittance;
- Payment for the shipment of articles to relieve human suffering; or
- An underlying transaction authorized by OFAC through a specific or general license. Allowable funds transfers would include, for example, payments arising from over-flights of Iranian airspace, legal services, intellectual property protection, and authorized sales of agricultural products, medicine, and medical devices to Iran pursuant to the Trade Sanctions Reform and Export Enhancement Act.

**-30-**

PX122

PX124
Placeholder

PX125

# Treasury Submits Report To Congress On NIOC And NITC

home.treasury.gov/news/press-releases/tg1718

*(Archived Content)*

*Report Announces Determination that the National Iranian Oil Company*
*Is an Agent or Affiliate of Iran's Islamic Revolutionary Guard Corps*

**WASHINGTON** – The U.S. Department of the Treasury today submitted its report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHRA), informing the Congress that the Treasury Department has determined that the National Iranian Oil Company (NIOC) is an agent or affiliate of Iran's Islamic Revolutionary Guard Corps (IRGC) and that, at this time, there is insufficient information to determine whether the National Iranian Tanker Company (NITC) is an agent or affiliate of the IRGC.

## The IRGC and NIOC

The IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking.  The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.  The IRGC and certain IRGC-related entities and individuals have been sanctioned for activities related to Iran's nuclear program, support for terrorism, commission of serious human rights abuses, and most recently for activities related to human rights abuses in Syria, including repression against the Syrian people.

Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012. NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.

Under the current Iranian regime, the IRGC's influence has grown within NIOC.  For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum.  Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC.  Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.  As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

PX125

**<u>Effects of Today's Determination</u>**

As a result of this ITRSHRA section 312 determination, NIOC now is also a person – the legal definition of an individual or an entity –  described under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA) as an agent or affiliate of the IRGC whose property or interests in property are blocked pursuant to the International Emergency Economic Powers Act (IEEPA).  This means that foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC will be subject to CISADA sanctions, including the prohibition or the imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States.

The Treasury Department's determination that NIOC is an agent or affiliate of the IRGC also implicates section 302 of ITRSHRA, which requires the imposition of sanctions on foreign persons determined to have knowingly provided certain material support to, or engaged in significant transactions with, the IRGC or its officials, agents, or affiliates whose property or interest in property is blocked.  ITRSHRA Section 312 provides for an exception to these sanctions for those transactions or services involving NIOC for the purchase of petroleum or petroleum products from Iran if the Secretary of State has determined that the country is significantly reducing its purchases of Iranian oil.

Because both NIOC and NITC are part of the Government of Iran, they are both blocked under Executive Order 13599.

To access the FAQs, please use the following URL:
http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/ques_index.aspx#itrshra

###

2/2

PX125

PX126

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Targets Iran's Islamic Revolutionary Guard Corps

February 10, 2010

*(Archived Content)*

TG - 539

**WASHINGTON** -- The U.S. Department of the Treasury today took further action to implement existing U.S. sanctions against Iran's Islamic Revolutionary Guard Corps (IRGC) by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters. Today's action focuses in particular on Khatam al-Anbiya Construction Headquarters, an arm of the IRGC designated pursuant to E.O. 13382 in 2007.

Today's designations include IRGC General Rostam Qasemi, who is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations.  Khatam al-Anbiya is owned or controlled by the IRGC and is involved in the construction of streets, highways, tunnels, water conveyance projects, agricultural restoration projects, and pipelines. Treasury also today designated four companies that are owned or controlled by, or that act on behalf of, Khatam al-Anbiya.

As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world, said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.

The following are subsidiary companies that are owned or controlled by Khatam al-Anbiya, or that act on its behalf, and directly support various mining and engineering projects:

- Fater Engineering Institute
- Imensazen Consultant Engineers Institute (ICEI)
- Makin Institute
- Rahab Institute

PX126

The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism.

The U.S. has previously acted against the IRGC and the IRGC-Qods Force for their involvement in proliferation and terrorism support activities, respectively. In joint actions on October 25, 2007, the State Department designated the IRGC, under E.O. 13382, for having engaged, or attempted to engage, in proliferation-related activities, and Treasury designated the IRGC-Qods Force pursuant to E.O. 13224 for providing material support to the Taliban and other terrorist organizations.  Treasury at that time also designated nine IRGC-affiliated entities, including Khatam al-Anbiya, and five IRGC-affiliated individuals as derivative designations of the IRGC. Those entities and individuals are:

- Khatam al-Anbya Construction Headquarters
- Oriental Oil Kish
- Ghorb Nooh
- Sahel Consultant Engineering
- Ghorb-e Karbala
- Sepasad Engineering Co
- Omran Sahel
- Hara Company
- Gharargahe Sazandegi Ghaem
- General Hosein Salimi, Commander of the Air Force, IRGC
- Brigadier General Morteza Rezaie, Deputy Commander of the IRGC
- Vice Admiral Ali Akhbar Ahmadian, in his former capacity as Chief of the IRGC Joint Staff
- Brigadier Gen. Mohammad Hejazi, in his former capacity as Commander of Bassij resistance force
- Brigadier General Qasem Soleimani, Commander of the Qods Force

Elements of the IRGC have also been designated for UN sanctions pursuant to UN Security Council Resolutions (UNSCRs) 1737 and 1747. All UN Member States are required to freeze the assets of entities and individuals listed in the Annexes of those resolutions, or designated by the UNSCR 1737 Committee, as well as assets of entities owned or controlled by them or by persons or entities acting on their behalf or at their direction and to prevent funds or economic resources from being made available for their benefit. The European Union has also designated IRGC-affiliated companies, including Khatam al-Anbiya, for their support to Iranian ballistic missile and nuclear programs.

###

PX126

PX127

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Further Exposes Iran–Based Al–Qa'ida Network

October 18, 2012

*(Archived Content)*

***Action Targets Key Al-Qa'ida Facilitator Supporting Terrorist Activities in South Asia and the Middle East***

**WASHINGTON –** The U.S. Department of the Treasury today announced the designation of Adel Radi Saqr al-Wahabi al-Harbi (al-Harbi), a key member of an al-Qa'ida network operating in Iran and led by Iran-based al-Qa'ida facilitator Muhsin al-Fadhli (al-Fadhli).  Today's action, taken pursuant to Executive Order (E.O.) 13224, follows Treasury's designation in July 2011 of Ezedin Abdel Aziz Khalil (AKA Yasin al-Suri) and five other al-Qa'ida members, and underscores that Iran continues to allow al-Qa'ida to operate a core pipeline that moves al-Qa'ida money and fighters through Iran to support al-Qa'ida activities in South Asia.  This network also sends funding and fighters to Syria.

"Today's action, which builds on our action from July 2011, further exposes al-Qa'ida's critically important Iran-based funding and facilitation network," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen.  "We will continue targeting this crucial source of al-Qa'ida's funding and support, as well as highlight Iran's ongoing complicity in this network's operation."

Today's designation freezes any assets Al-Harbi holds under U.S. jurisdiction and prohibits U.S. persons from engaging in transactions with this individual.  E.O. 13224 targets terrorists, terrorist organizations, individuals and entities owned or controlled by or acting for or on behalf of designated terrorists or terrorist organizations, and those providing financial, material, or technological support or financial or other services to designated terrorists or terrorist organizations, or for acts of terrorism.

Al-Harbi is an Iran-based al-Qa'ida facilitator who serves as the deputy to al-Fadhli.  Al-Fadhli took over the Iran-based facilitation network from Yasin al-Suri in late 2011.  In his capacity as the deputy to al-Fadhli in Iran, al-Harbi facilitates the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qa'ida, and is believed to have sought funds to support al-Qa'ida attacks.  Before joining the Iran-based al-Qa'ida network in early 2011, al-Harbi appeared on the Saudi Arabian Ministry of Interior's Most Wanted List and was charged with traveling to Afghanistan to join al-Qa'ida and providing technical support on the Internet to the terrorist group.

PX127

Al-Fadhli is a veteran al-Qa'ida operative who has been active within the terrorist network for years. Treasury previously designated al-Fadhli pursuant to E.O. 13224 in February 2005 for providing financial and material support to the al-Zarqawi Network and al-Qa'ida. At that time, al-Fadhli was considered an al-Qa'ida leader in the Gulf and provided support to Iraq-based fighters for attacks against U.S. and multinational forces. Al-Fadhli was also considered a major facilitator for Abu Musab al-Zarqawi and prior to that was involved in several terrorist attacks that took place in October 2002 including the attacks on the French ship MV Limburg and against U.S. Marines on Faylaka Island in Kuwait.

Al-Fadhli began working with al-Qa'ida's Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from Yasin al-Suri later that year.

In addition to providing funding for al-Qa'ida activities in Afghanistan and Pakistan, this network is working to move fighters and money through Turkey to support al-Qa'ida-affiliated elements in Syria. Al-Fadhli also is leveraging his extensive network of Kuwaiti jihadist donors to send money to Syria via Turkey.

Treasury previously took action against this al-Qa'ida funding and support network in July 2011 when it designated Yasin al-Suri and five other al-Qa'ida members pursuant to E.O. 13224. This network uses Iran as a critical transit point and operates under an agreement between al-Qa'ida and the Iranian government. Under the terms of the agreement between al-Qa'ida and Iran, al-Qa'ida must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families. Al-Qa'ida members who violate these terms run the risk of being detained by Iranian authorities. Yasin al-Suri agreed to the terms of this agreement with Iran with the knowledge of now-deceased al-Qa'ida leader 'Atiyah 'Abd al Rahman.

The Treasury Department's action today against al-Harbi is taken in coordination with the State Department's announcement that it is offering multi-million dollar rewards for information on al-Harbi and al-Fadhli under its Rewards for Justice Program. In particular, the State Department's Bureau of Diplomatic Security has announced a reward of up to $7 million for information leading to the location of al-Fadhli and $5 million for information leading to the location of al-Harbi. Previously, the State Department announced a $10 million reward for information leading to the location of Yasin al-Suri. That reward remains available. The Rewards for Justice Program administered by the State Department's Bureau of Diplomatic Security has helped target terrorists and prevent terrorism worldwide.

**Identifying Information**

Individual: Adel Radi Saqr Al-Wahabi Al-Harbi

PX127

AKA: 'Adil Radi Saqr al-Wahbi al-Harbi

AKA: Adel Radhi Sager Alharbi

AKA: Muharib

AKA: Abu Ali Muharib

Nationality: Saudi Arabian

POB: Buraydah, Saudi Arabia

DOB: December 1, 1986

National Identity Number: 1059887057

Saudi Passport: J110141; issued April 18, 2010, expiration date February 22, 2015

###

PX127

PX129

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Targets Al Qaida Operatives in Iran

January 16, 2009

*(Archived Content)*

hp-1360

**Washington, D.C. -** The U.S. Department of the Treasury today designated four al Qaida associates under Executive Order 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaida, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence.  Global efforts to financially isolate al Qaida have made it difficult for the core leadership to raise funds and sustain itself.  Nevertheless, al Qaida remains a very dangerous threat, and it is crucial to keep targeting the support lines of al Qaida and its affiliates.

Under E.O. 13224, any assets held by these individuals under U.S. jurisdiction are frozen and U.S. persons are prohibited from engaging in any transactions with the designees.

Even though individual terrorist attacks are relatively inexpensive to carry out, it costs a great deal of money for al Qaida to operate globally.  These realities demand that we keep up the financial pressure against al Qaida and like-minded terrorist organizations, Levey continued. Designations have a far reaching impact, deterring would-be donors from providing financial support to terrorism and leaving al Qaida leadership struggling to identify much-needed funding resources.

### *MUSTAFA HAMID*

| AKAs: | Mustafa Muhammad `Atiya Hamid<br>Mustafa Atiya<br>Abu Walid al-Misri<br>Abu al-Walid al-Masri<br>Abu al-Walid<br>Hashim al-Makki |
|---|---|
| POB: | Alexandria, Egypt |
| DOB: | March 1945 |

PX129

| Nationality: | Egyptian |
| --- | --- |
| | Pakistani |

Mustafa Hamid is a senior al Qaida associate who served as a primary interlocutor between al Qaida and the Government of Iran. Before the fall of the Taliban, Hamid served as an instructor at a terrorist camp near Jalalabad that trained in the use of explosives. Hamid is the father-in-law of senior al Qaida military commander Sayf al-Adl. He formerly served as a correspondent for a satellite television station, at the request of senior al Qaida leadership. While living in Iran, Hamid was harbored by the Islamic Revolutionary Guard Corps (IRGC), which served as Hamid's point of contact for communications between al Qaida and Iran.

In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan.

In the late 1990s, Mustafa Hamid passed communications between Usama bin Laden and the Government of Iran.  When tensions were high between Iran and Afghanistan, Mustafa Hamid traveled multiple times from Kandahar to Tehran as an intermediary for the Taliban.

In late 2001, Mustafa Hamid was in Tehran delivering messages from the Taliban to the Government of Iran. Hamid also negotiated on behalf of al Qaida in an attempt to relocate al Qaida families to Iran. As part of this effort, senior al Qaida member Abu Hafs the Mauritanian traveled with Hamid and two IRGC members to Tehran for meetings. Beginning in late 2001, the family of a senior al Qaida military commander lived with Mustafa Hamid's family in Iran. Separately, in 2002 Mustafa Hamid facilitated contacts between the IRGC and another senior al Qaida military commander.   In mid-2003, Mustafa Hamid was arrested in Iran along with other al Qaida members and associates.

### *MUHAMMAD RAB'A AL-SA YID AL-BAHTIYTI*

| AKAs: | Muhammad Mahmud Rabi' al-Zayd al-Bahtiti |
| --- | --- |
| | Muhammad Mahmud al-Bahtiti |
| | Muhammad Rabi' al-Sa'id al-Hatiti |
| | Muhammad Rabi' al-Bahtiti |
| | Abu Dujana al-Masri |
| DOB: | 1971 |
| P013 | Al-Sharqiyyah, Egypt |
| Nationality: | Egyptian |

PX129

Pakistani

Muhammad Rab'a al-Sayid al-Bahtiyti is a senior member of the Egyptian Islamic Jihad (EIJ) and an al Qaida operative. Bahtiyti has served as a trusted aide to his father- in-law Ayman al-Zawahiri.

In the mid-1990s, Bahtiyti served on an al Qaida military committee and provided military training that included urban warfare tactics for al Qaida members. Bahtiyti drafted training manuals for al Qaida as well as a book on security that was used as a template for al Qaida's surveillance operations.

In 1995, Bahtiyti reportedly was involved in the bombing of the Egyptian Embassy in Islamabad, Pakistan.

After September 11, 2001, Ayman al-Zawahiri instructed Bahtiyti to take al-Zawahiri's family to Iran. Bahtiyti reportedly traveled to Iran with al-Zawahiri's daughters, where he was subsequently responsible for them. In January 2003, while working from Iran, Bahtiyti arranged housing on behalf of al Qaida. Bahtiyti reportedly was arrested by Iranian authorities in mid-2003.

### ALI SALEH HUSAIN

| AKAs: | Abu Dahhak |
| | 'Ali Salih Husayn al-Dhahak al-Tabuki |
| | Ali Saleh Husain al-Tabuki |
| | 'Ali Salih Husayn 'Ula'lah |
| | 'Ali Salih Husayn |
| | 'Ala'lah Dhahhak al-Tabuki |
| | Abu Dhahak al-Yemeni |
| DOB: | Circa 1970 |
| POB: | al-Hudaydah, Yemen |
| Nationality: | Yemeni |
| Height: | 5'9 |

Ali Saleh Husain is a senior al Qaida associate who had close relations with Usama bin Laden. Husain was responsible for logistics pertaining to al Qaida-affiliated fighters and acted as an interlocutor between al Qaida and its Chechnya-based affiliates. Husain coordinated with Usama bin Laden on the training of fighters in terrorist camps in Afghanistan who were preparing to travel to Chechnya.

Circa early 2001, Husain reportedly arranged a meeting that included a senior al Qaida operations chief to discuss operations planned against Israel. In April 2002, al Qaida senior official Abu Zubaydah indicated that the responsibility for operational meetings for attacks against Israel had been handed over to Husain.

PX129

Husain also was reportedly Abu Zubaydah's secondary point of contact for obtaining fraudulent passports.

In 2001 after the fall of the Taliban, Husain facilitated the move of al Qaida-associated fighters, including an al Qaida military commander, from Afghanistan to Iran. After leaving Afghanistan, Husain was responsible for smuggling al Qaida members and associates via networks in Zahedan, Iran. In early 2002, Husain sent $20,000 to a senior al Qaida lieutenant who had requested financial assistance. Husain was detained by the Government of Iran in early 2003.

### SA'AD BIN LADEN

| | |
|---|---|
| AKAs: | Sad Bin Laden<br>Sa'ad Muhammad Awad Abud<br>Muhammad Awad<br>Muhammad 'Awad Adbud<br>Sa'ad Muhammad Baabood<br>Abdul Rahman Al-Kahtane<br>Bin Muhammad Awad Abbud |
| DOB: | 1982 |
| POB: | Saudi Arabia |
| Nationality: | Saudi Araibian |
| Passport No. | 520951 (Sudan) |
| | 530951 (Sudan) |

Sa'ad bin Laden, one of Usama bin Laden's sons, has been involved in al Qaida activities. For example, in late 2001, Sa'ad facilitated the travel of Usama bin Laden's family members from Afghanistan to Iran. Sa'ad made key decisions for al Qaida and was part of a small group of al Qaeda members that was involved in managing the terrorist organization from Iran. He was arrested by Iranian authorities in early 2003.

As of September 2008, it was possible that Sa'ad bin Laden was no longer in Iranian custody.

**-30-**

PX129

PX130

# Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point

home.treasury.gov/news/press-releases/tg1261

*(Archived Content)*

**WASHINGTON** – The U.S. Department of the Treasury today announced the designation of six members of an al-Qa'ida network headed by Ezedin Abdel Aziz Khalil, a prominent Iran-based al-Qa'ida facilitator, operating under an agreement between al-Qa'ida and the Iranian government. Today's action, taken pursuant to Executive Order (E.O.) 13224, demonstrates that Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan. This network serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia, including to Atiyah Abd al-Rahman, a key al-Qa'ida leader based in Pakistan, also designated today.

"Iran is the leading state sponsor of terrorism in the world today. By exposing Iran's secret deal with al-Qa'ida allowing it to funnel funds and operatives through its territory, we are illuminating yet anotheraspect of Iran's unmatched support for terrorism," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "Today's action also seeks to disrupt this key network and deny al-Qa'ida's senior leadership much-needed support."

As a result of today's action, U.S. persons are prohibited from engaging in commercial or financial transactions with the designees, and any assets they may hold under U.S. jurisdiction are frozen. Treasury designated the following individuals today:

### Ezedin Abdel Aziz Khalil

Khalil (a.k.a. Yasin al-Suri)is an Iran-based senior al-Qa'ida facilitator currently living and operating in Iran under an agreement between al-Qa'ida and the Iranian government. Iranian authorities maintain a relationship with Khalil and have permitted him to operate within Iran's borders since 2005. Khalil moves money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of al-Qa'ida senior leaders, including Atiyah Abd al-Rahman. Khalil has collected funding from various donors and fundraisers throughout the Gulf and is responsible for moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq. He has also facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran. Khalil requires each operative to deliver $10,000 to al-Qa'ida in Pakistan.

As al-Qa'ida's representative in Iran, Khalil works with the Iranian government to arrange releases of al-Qa'ida personnel from Iranian prisons. When al-Qa'ida operatives are released, the Iranian government transfers them to Khalil, who then facilitates their travel to Pakistan.

### Atiyah Abd al-Rahman

Al-Rahman is al-Qa'ida's overall commander in Pakistan's tribal areas and as of late 2010, the leader of al-Qa'ida in North and South Waziristan, Pakistan. Rahman was previously appointed by Usama bin Laden to serve as al-Qa'ida's emissary in Iran, a position which allowed him to travel in and out of Iran with the permission of Iranian officials.

### Umid Muhammadi

Muhammadi is an al-Qa'ida facilitator and key supporter of al-Qa'ida in Iraq (AQI). Muhammadi has petitioned Iranian officials on al-Qa'ida's behalf to release operatives detained in Iran. Muhammadi has been involved in planning multiple attacks in Iraq and has trained extremists in the use of explosives. He has also received training in Afghanistan on the use of rockets and chemicals.

### Salim Hasan Khalifa Rashid al-Kuwari

Al-Kuwari provides financial and logistical support to al-Qa'ida, primarily through al-Qa'ida facilitators in Iran. Based in Qatar, Kuwari has provided hundreds of thousands of dollars in financial support to al-Qa'ida and has provided funding for al-Qa'ida operations, as well as to secure the release of al-Qa'ida detainees in Iran and elsewhere. He has also facilitated travel for extremist recruits on behalf of senior al-Qa'ida facilitators based in Iran.

### Abdallah Ghanim Mafuz Muslim al-Khawar

Al-Khawar has worked with Kuwari to deliver money, messages and other material support to al-Qa'ida elements in Iran. Like Kuwari, Khawar is based in Qatar and has helped to facilitate travel for extremists interested in traveling to Afghanistan for jihad.

### 'Ali Hasan 'Ali al-'Ajmi

Al-'Ajmi is a Kuwait-based associate of Khalil who provides financial and facilitation support to al-Qa'ida, AQI and the Taliban. 'Ajmi has collected money from individuals in Gulf countries and provided these funds to AQI facilitators as well as to the Taliban. He has also supported al-Qa'ida by facilitating travel for individuals associated with the group so that they could take part in fighting in Afghanistan.

Identifying Information:

**Individual:    Ezedin Abdel Aziz Khalil**

PX130

AKA:        Izz al-Din Abd al-Farid Khalil

AKA:        Yasin al-Suri

AKA:        Yaseen al-Suri
AKA:        Zayn al-Abadin

DOB:        1982

POB:        al-Qamishli, Syria


**Individual:    Umid Muhammadi**

AKA:        Omid Muhammadi

AKA:        'Umid 'Abd al-Majid Muhammad 'Aziz Muhammadi
AKA:        Umid al-Kurdi
AKA:        'Amid al-Kurdi
AKA:        Abu Sulayman al-Kurdi

AKA:        Arkan Mohammed Hussein Darwesh

AKA:        Hamza al-Kurdi

AKA:        Shahin Rawansari

DOB:        Circa 1967


**Individual:    Atiyah Abd al-Rahman**

AKA:        'Atiyah 'Abd al-Rahman al-Libi

AKA:        Jamal Ibrahim Muhammad al-Shitaywi

AKA:        Jamal al-Shtiwi

AKA:        Jamal al-Shitiwi

AKA:        Jamal al-Shatiwi

AKA:        Shaykh Mahmud al-Libi

DOB:        1969

Alt. DOB:   1965 – 1967

Alt. DOB:   1957 – 1960

POB:        Misrata, Libya

PX130

**Individual:    Salim Hasan Khalifah Rashid al-Kuwari**

AKA:        Salim Hassan Khalifa Rashid Al Kuwari

AKA:        Salim Hasan Khalifa Al Kawari

AKA:     Salim Al-Kowari

AKA:       Salem Al-Kuwari

DOB:        Circa 1977

Alt. DOB:     Circa 1978


**Individual:    Abdallah Ghanim Mahfuz Muslim Khawar**

AKA:        Abdullah Ghalib Mahfuz Muslim al-Khawar

AKA:        Abdullah Khowar

AKA:      Abdullah Al-Khowar

AKA:        Abdullah Ghanem Mahfouz Muslim Khawar

DOB:        August 17, 1981

Passport:     28163402296


**Individual:    Ali Hasan 'Ali al-Ajmi**

AKA:        'Ali Abu Hasan al-Yami

AKA:        'Ali bin Hasan

AKA:        'Ali Hasan al-'Ajami

AKA:        'Ali Hassan 'Ali al `Ajmi

AKA:        Abu al-Hassan

AKA:        Abu al-Hassan al-Ajmi

AKA:        Hassan al-Yami

AKA:        Husayn al-Yami

DOB:        January 14, 1979

Passport:     002981367 (Kuwait)

PX130

PX132

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Targets Companies Facilitating Iran's Petroleum Sales

March 19, 2020

**WASHINGTON** – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today took action against five United Arab Emirates (UAE)-based companies that facilitate the Iranian regime's petroleum and petrochemical sales.  In 2019, these five companies collectively purchased hundreds of thousands of metric tons of petroleum products from the National Iranian Oil Company (NIOC).  Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign activities throughout the Middle East, including the support of terrorist groups.  At least three of these companies have falsified documents to conceal the Iranian origin of these shipments.

"The Iranian regime uses revenues from petroleum and petrochemical sales to fund its terrorist proxies, like the IRGC-QF, instead of the health and well-being of the Iranian people," said Secretary Steven T. Mnuchin.  "The Trump Administration will continue to target and isolate those who support the Iranian regime and remains committed to facilitating humanitarian trade and assistance in support of the Iranian people."

OFAC's action follows similar designations of key revenue sources that enable Iran's malign regional activity.  In January, OFAC designated a network of four international petrochemical and petroleum companies that collectively transferred the equivalent of hundreds of millions of dollars' worth of exports from NIOC, as well as more than a dozen Iranian metals manufacturers and international customers and sales agents.  In June 2019, OFAC designated Iran's largest petrochemical holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for providing financial support to U.S.-designated Khatam al-Anbya Construction Headquarters, the engineering conglomerate of the Islamic Revolutionary Guard Corps (IRGC).  In addition to PGPIC, OFAC designated PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-based sales agents.

Today, OFAC designated **Petro Grand FZE, Alphabet International DMCC, Swissol Trade DMCC, Alam Althrwa General Trading LLC**, and **Alwaneo LLC Co.** In 2019, these UAE-based companies collectively purchased hundreds of thousands of metric tons of petroleum products from NIOC for delivery to the UAE.

Petro Grand FZE has concealed the origin of Iranian petrochemical products shipped to the UAE. Petroleum products purchased by Swissol Trade DMCC from NIOC were falsified as Iraqi-origin. In 2019,

PX132

Alwaneo Trade DMCC falsified the origin of Iranian petroleum products shipped to the UAE.

Petro Grand FZE, Alphabet International DMCC, Swissol Trade DMCC, Alam Althrwa General Trading LLC, and Alwaneo LLC Co. are all designated pursuant to E.O. 13846 for on or after November 5, 2018, having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, a person included on the List of Specially Designated Nationals and Blocked Persons whose property and interests in property are blocked pursuant to E.O. 13599.

**Sanctions Implications**

All property and interests in property of these persons designated today subject to U.S. jurisdiction are blocked, and U.S persons are generally prohibited from engaging in transactions with them.  In addition, foreign financial institutions that knowingly facilitate significant transactions for, or persons that provide material or certain other support to, the persons designated today risk exposure to sanctions that could sever their access to the U.S. financial system or block their property and interests in property under U.S. jurisdiction.

For identifying information on the entities designated today, click here.

####

PX132

PX133

# Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries

home.treasury.gov/news/press-releases/sm885

January 23, 2020

**WASHINGTON** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action against four international petrochemical and petroleum companies that have collectively transferred the equivalent of hundreds of millions of dollars' worth of exports from the National Iranian Oil Company (NIOC), an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies. Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East. The entities targeted today facilitate Iran's petrochemical and petroleum exports in contravention of U.S. economic sanctions.

"Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people," said Secretary Steven T. Mnuchin.

Today's action follows on the heels of similar actions that have targeted key sources of funding for Iranian regional adventurism, including a recent action targeting the Iranian metals sector. Also, in June 2019, OFAC designated Iran's largest petrochemical holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for providing financial support to U.S.-designated Khatam al-Anbya Construction Headquarters, the engineering conglomerate of the Islamic Revolutionary Guard Corps (IRGC).  In addition to PGPIC, OFAC designated PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-based sales agents.

Today's action targets **Triliance Petrochemical Co. Ltd.** (Triliance), a Hong Kong-based broker with branches in Iran, United Arab Emirates, China, and Germany.

In 2019, Triliance ordered the transfer of the equivalent of millions of dollars to NIOC as payment for Iranian petrochemicals, crude oil, and petroleum products shipped to the United Arab Emirates and China after the expiration of any applicable significant reduction exceptions.  In facilitating these shipments, Triliance worked to conceal the Iranian origin of these products.  Triliance has also facilitated the sale of millions of dollars' worth of petroleum products involving Naftiran Intertrade Company, a subsidiary of NIOC, to companies in China.

Additionally, Triliance Kish Petrochemical Company, which is the Iran-based branch of Triliance, recently changed its name and operates as Tiba Parsian Kish Petrochemical.

PX133

Similarly, in 2019, Hong Kong-based **Sage Energy HK Limited** (Sage Energy) and Shanghai-based **Peakview Industry Co. Limited** (Peakview) each ordered the transfer of the equivalent of millions of dollars to NIOC for exports after the expiration of any applicable significant reduction exceptions.

In 2019, Dubai-based **Beneathco DMCC** also ordered the transfer of the equivalent of several million dollars to NIOC.  In late 2018, Beneathco DMCC offered to assist NIOC in hiding the origin of Iranian products destined for the United Arab Emirates.

Triliance, Sage Energy, Peakview, and Beneathco DMCC are all designated pursuant to E.O 13846 for on or after November 5, 2018, having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, a person included on the List of Specially Designated Nationals and Blocked Persons whose property and interests in property are blocked pursuant to E.O. 13599.

Concurrently with the U.S. Department of Treasury's designations, the U.S. Department of State designated several companies and senior executives pursuant to E.O. 13846 in connection with significant transactions for the transport of petrochemical products from Iran, on or after November 5, 2018.

### Sanctions Implications

All property and interests in property of these persons designated today subject to U.S. jurisdiction are blocked, and U.S persons are generally prohibited from engaging in transactions with them.  In addition, foreign financial institutions that knowingly facilitate significant transactions for, or persons that provide material or certain other support to, the persons designated today risk exposure to sanctions that could sever their access to the U.S. financial system or block their property and interests in property under U.S. jurisdiction.

For identifying information on the individuals and entities listed today.

####

PX133

PX135

## U.S. DEPARTMENT OF THE TREASURY

# United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC–QF

May 10, 2018

**Washington** – Today the United States and the United Arab Emirates (UAE) jointly took action to disrupt an extensive currency exchange network in Iran and the UAE that has procured and transferred millions in U.S. dollar-denominated bulk cash to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to fund its malign activities and regional proxy groups. Specifically, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated nine Iranian individuals and entities. Iran's Central Bank was complicit in the IRGC-QF's scheme and actively supported this network's currency conversion and enabled its access to funds that it held in its foreign bank accounts. This network of exchangers and couriers has converted hundreds of millions of dollars.

"The Iranian regime and its Central Bank have abused access to entities in the UAE to acquire U.S. dollars to fund the IRGC-QF's malign activities, including to fund and arm its regional proxy groups, by concealing the purpose for which the U.S. dollars were acquired. As I said following the President's announcement on Tuesday, we are intent on cutting off IRGC revenue streams wherever their source and whatever their destination. Today we are targeting Iranian individuals and front companies engaged in a large-scale currency exchange network that has procured and transferred millions to the IRGC-QF," said Treasury Secretary Steven T. Mnuchin. "The Treasury Department thanks the UAE for its close collaboration on this matter. Countries around the world must be vigilant against Iran's efforts to exploit their financial institutions to exchange currency and fund the nefarious actors of the IRGC-QF and the world's largest state sponsor of terror."

The IRGC-QF was designated pursuant to Executive Order (E.O.) 13224 on October 25, 2007. The IRGC itself was also designated on October 13, 2017 pursuant to E.O. 13224 for it support to the IRGC-QF, and consistent with the Countering America's Adversaries through Sanctions Act.

Mas'ud Nikbakht, Sa'id Najafpur, and Mohammad Hasan Khoda'i

Mas'ud Nikbakht, Sa'id Najafpur, and Mohammad Hasan Khoda'i are being designated pursuant to E.O. 13224 for acting for or on behalf of the IRGC-QF. Nikbakht, an IRGC-QF official, has worked with Meghdad Amini, a currency exchanger also being designated today, to conduct financial activities on behalf of the IRGC-QF. Najafpur is the managing director of Jahan Aras Kish, an IRGC-QF front company which is also being designated today. Khoda'i partnered with Mohammadreza Khedmati, another currency exchanger also being designated today, to establish front companies for the benefit of the IRGC-QF, and worked with Sa'id Najafpur and his associate, Meghdad Amini, to conduct financial activities on behalf of the IRGC-QF. Khoda'i also is an official at IRGC-QF front company, Jahan Aras Kish.

Mohammadreza Khedmati Valadzaghard, Meghdad Amini, and Foad Salehi

Mohammadreza Khedmati and Meghdad Amini are being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Foad Salehi is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF and Mohammadreza Khedmati.

PX135

IRGC-QF financial facilitators Mohammadreza Khedmati, along with Meghdad Amini and Foad Salehi, transferred cash out of Iran to the UAE and converted it into USD banknotes with the help of currency exchange enablers, including Rashed Exchange, which is also being designated today.

Khedmati, the managing director Rashed Exchange, worked with the IRGC-QF to forge documents to conceal their illicit financial activities from UAE authorities. Meghdad Amini is an official at the IRGC-QF front company Jahan Aras Kish, which is also being designated today.

Salehi has assisted Khedmati in exchanging currency for the IRGC-QF and has transferred large amounts of currency to the UAE and exchanged it for the benefit of the IRGC-QF.

Jahan Aras Kish, Rashed Exchange, and Khedmati and Company Joint Partnership

Jahan Aras Kish is being designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Jahan Aras Kish, and IRGC-QF front company, is involved in transferring and converting funds for the IRGC-QF, and was involved in retrieving oil revenue from foreign bank accounts held by the Central Bank of Iran for IRGC-QF activities.

Rashed Exchange is being designated pursuant to E.O. 13224 for being owned or controlled by Mohammadreza Khedmati. Rashed Exchange was used to convert currency for the IRGC-QF.

Iran-based Khedmati and Company Joint Partnership is being designated pursuant to E.O. 13224 for being owned or controlled by Mohammadreza Khedmati and Mohammad Hasan Khoda'i.

As a result of these actions, all property and interests in property of those designated today subject to U.S. jurisdiction are blocked, and U.S. persons are generally prohibited from engaging in transactions with them. In addition, foreign financial institutions that knowingly facilitate significant transactions for, or persons that provide material or certain other support to, the individuals and entities designated today risk exposure to sanctions that could sever their access to the U.S. financial system or block their property and interests in property under U.S. jurisdiction.

As a reminder, due to President Trump's May 8, 2018 decision to cease the United States' participation in the Joint Comprehensive Plan of Action (JCPOA), as of August 7, 2018, the United States Government will re-impose sanctions on the purchase or acquisition of U.S. dollar banknotes by the Government of Iran.

For identifying information on the individuals and entities designated today.

View chart describing the financial exchange network operated by individuals and entities designated today 📄.

View the chart in Farsi describing the financial exchange network operated by individuals and entities designated today 📄.

####

PX135

PX137

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



REMARKS

# Remarks by President Trump on Iran Strategy

—  **NATIONAL SECURITY & DEFENSE**

Issued on: **October 13, 2017**

★  ★  ★

Diplomatic Reception Room

12:53 P.M. EDT

THE PRESIDENT: Thank you very much. My fellow Americans: As President of the United States, my highest obligation is to ensure the safety and security of the American people.

History has shown that the longer we ignore a threat, the more dangerous that threat becomes. For this reason, upon taking office, I've ordered a complete strategic review of our policy toward the rogue regime in Iran. That review is now complete.

Today, I am announcing our strategy, along with several major steps we are taking to confront the Iranian regime's hostile actions and to ensure that Iran never, and I mean never, acquires a nuclear weapon.

Our policy is based on a clear-eyed assessment of the Iranian dictatorship, its sponsorship of terrorism, and its continuing aggression in the Middle East and all around the world.

Iran is under the control of a fanatical regime that seized power in 1979 and forced a proud people to submit to its extremist rule. This radical regime has raided the wealth of one of the world's oldest and most vibrant nations, and spread death, destruction, and chaos all around the globe.

PX137

Beginning in 1979, agents of the Iranian regime illegally seized the U.S. embassy in Tehran and held more than 60 Americans hostage during the 444 days of the crisis. The Iranian-backed terrorist group Hezbollah twice bombed our embassy in Lebanon — once in 1983 and again in 1984. Another Iranian-supported bombing killed 241 Americans — service members they were, in their barracks in Beirut in 1983.

In 1996, the regime directed another bombing of American military housing in Saudi Arabia, murdering 19 Americans in cold blood.

Iranian proxies provided training to operatives who were later involved in al Qaeda's bombing of the American embassies in Kenya, Tanzania, and two years later, killing 224 people, and wounding more than 4,000 others.

The regime harbored high-level terrorists in the wake of the 9/11 attacks, including Osama bin Laden's son. In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel.

The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks. It develops, deploys, and proliferates missiles that threaten American troops and our allies. It harasses American ships and threatens freedom of navigation in the Arabian Gulf and in the Red Sea. It imprisons Americans on false charges. And it launches cyberattacks against our critical infrastructure, financial system, and military.

The United States is far from the only target of the Iranian dictatorship's long campaign of bloodshed. The regime violently suppresses its own citizens; it shot unarmed student protestors in the street during the Green Revolution.

This regime has fueled sectarian violence in Iraq, and vicious civil wars in Yemen and Syria. In Syria, the Iranian regime has supported the atrocities of Bashar al-Assad's regime and condoned Assad's use of chemical weapons against helpless civilians, including many, many children.

Given the regime's murderous past and present, we should not take lightly its sinister vision for the future. The regime's two favorite chants are "Death to America" and "Death to Israel."

PX137

Realizing the gravity of the situation, the United States and the United Nations Security Council sought, over many years, to stop Iran's pursuit of nuclear weapons with a wide array of strong economic sanctions.

But the previous administration lifted these sanctions, just before what would have been the total collapse of the Iranian regime, through the deeply controversial 2015 nuclear deal with Iran. This deal is known as the Joint Comprehensive Plan of Action, or JCPOA.

As I have said many times, the Iran Deal was one of the worst and most one-sided transactions the United States has ever entered into. The same mindset that produced this deal is responsible for years of terrible trade deals that have sacrificed so many millions of jobs in our country to the benefit of other countries. We need negotiators who will much more strongly represent America's interest.

The nuclear deal threw Iran's dictatorship a political and economic lifeline, providing urgently needed relief from the intense domestic pressure the sanctions had created. It also gave the regime an immediate financial boost and over $100 billion dollars its government could use to fund terrorism.

The regime also received a massive cash settlement of $1.7 billion from the United States, a large portion of which was physically loaded onto an airplane and flown into Iran. Just imagine the sight of those huge piles of money being hauled off by the Iranians waiting at the airport for the cash. I wonder where all that money went.

Worst of all, the deal allows Iran to continue developing certain elements of its nuclear program. And importantly, in just a few years, as key restrictions disappear, Iran can sprint towards a rapid nuclear weapons breakout. In other words, we got weak inspections in exchange for no more than a purely short-term and temporary delay in Iran's path to nuclear weapons.

What is the purpose of a deal that, at best, only delays Iran's nuclear capability for a short period of time? This, as President of the United States, is unacceptable. In other countries, they think in terms of 100-year intervals, not just a few years at a time.

The saddest part of the deal for the United States is that all of the money was paid up front, which is unheard of, rather than at the end of the deal when they have shown they've played by the rules.

PX137

But what's done is done, and that's why we are where we are.

Iranian regime has committed multiple violations of the agreement. For example, on two separate occasions, they have exceeded the limit of 130 metric tons of heavy water. Until recently, the Iranian regime has also failed to meet our expectations in its operation of advanced centrifuges.

The Iranian regime has also intimidated international inspectors into not using the full inspection authorities that the agreement calls for.

Iranian officials and military leaders have repeatedly claimed they will not allow inspectors onto military sites, even though the international community suspects some of those sites were part of Iran's clandestine nuclear weapons program.

There are also many people who believe that Iran is dealing with North Korea. I am going to instruct our intelligence agencies to do a thorough analysis and report back their findings beyond what they have already reviewed.

By its own terms, the Iran Deal was supposed to contribute to "regional and international peace and security." And yet, while the United States adheres to our commitment under the deal, the Iranian regime continues to fuel conflict, terror, and turmoil throughout the Middle East and beyond. Importantly, Iran is not living up to the spirit of the deal.

So today, in recognition of the increasing menace posed by Iran, and after extensive consultations with our allies, I am announcing a new strategy to address the full range of Iran's destructive actions.

First, we will work with our allies to counter the regime's destabilizing activity and support for terrorist proxies in the region.

Second, we will place additional sanctions on the regime to block their financing of terror.

Third, we will address the regime's proliferation of missiles and weapons that threaten its neighbors, global trade, and freedom of navigation.

And finally, we will deny the regime all paths to a nuclear weapon.

PX137

Today, I am also announcing several major steps my administration is taking in pursuit of this strategy.

The execution of our strategy begins with the long-overdue step of imposing tough sanctions on Iran's Islamic Revolutionary Guard Corps. The Revolutionary Guard is the Iranian Supreme Leader's corrupt personal terror force and militia. It has hijacked large portions of Iran's economy and seized massive religious endowments to fund war and terror abroad. This includes arming the Syrian dictator, supplying proxies and partners with missiles and weapons to attack civilians in the region, and even plotting to bomb a popular restaurant right here in Washington, D.C.

I am authorizing the Treasury Department to further sanction the entire Islamic Revolutionary Guard Corps for its support for terrorism and to apply sanctions to its officials, agents, and affiliates. I urge our allies to join us in taking strong actions to curb Iran's continued dangerous and destabilizing behavior, including thorough sanctions outside the Iran Deal that target the regime's ballistic missile program, in support for terrorism, and all of its destructive activities, of which there are many.

Finally, on the grave matter of Iran's nuclear program: Since the signing of the nuclear agreement, the regime's dangerous aggression has only escalated. At the same time, it has received massive sanctions relief while continuing to develop its missiles program. Iran has also entered into lucrative business contracts with other parties to the agreement.

When the agreement was finalized in 2015, Congress passed the Iran Nuclear Agreement Review Act to ensure that Congress's voice would be heard on the deal. Among other conditions, this law requires the President, or his designee, to certify that the suspension of sanctions under the deal is "appropriate and proportionate" to measure — and other measures taken by Iran to terminate its illicit nuclear program. Based on the factual record I have put forward, I am announcing today that we cannot and will not make this certification.

We will not continue down a path whose predictable conclusion is more violence, more terror, and the very real threat of Iran's nuclear breakout.

That is why I am directing my administration to work closely with Congress and our allies to address the deal's many serious flaws so that the Iranian regime can never threaten the world with

PX137

nuclear weapons. These include the deal's sunset clauses that, in just a few years, will eliminate key restrictions on Iran's nuclear program.

The flaws in the deal also include insufficient enforcement and near total silence on Iran's missile programs. Congress has already begun the work to address these problems. Key House and Senate leaders are drafting legislation that would amend the Iran Nuclear Agreement Review Act to strengthen enforcement, prevent Iran from developing an inter- — this is so totally important — an intercontinental ballistic missile, and make all restrictions on Iran's nuclear activity permanent under U.S. law. So important. I support these initiatives.

However, in the event we are not able to reach a solution working with Congress and our allies, then the agreement will be terminated. It is under continuous review, and our participation can be cancelled by me, as President, at any time.

As we have seen in North Korea, the longer we ignore a threat, the worse that threat becomes. It is why we are determined that the world's leading sponsor of terrorism will never obtain nuclear weapons.

In this effort, we stand in total solidarity with the Iranian regime's longest-suffering victims: its own people. The citizens of Iran have paid a heavy price for the violence and extremism of their leaders. The Iranian people long to — and they just are longing, to reclaim their country's proud history, its culture, its civilization, its cooperation with its neighbors.

We hope that these new measures directed at the Iranian dictatorship will compel the government to reevaluate its pursuit of terror at the expense of its people.

We hope that our actions today will help bring about a future of peace, stability, and prosperity in the Middle East –- a future where sovereign nations respect each other and their own citizens.

We pray for a future where young children — American and Iranian, Muslim, Christian, and Jewish — can grow up in a world free from violence, hatred, and terror.

And, until that blessed day comes, we will do what we must to keep America safe.

Thank you, God bless you, and God bless America. Thank you.

PX137

END

1:11 P.M. EDT

**The White House**

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Budget & Spending

Education

PX137

Immigration

National Security & Defense

Healthcare

---

Council of Economic Advisers

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright    Privacy Policy

PX137