# PX202



United States Department of State

# COUNTRY REPORTS ON TERRORISM 2006

United States Department of State Publication 11409

Office of the Coordinator for Counterterrorism

Released April 2007

Country Reports on Terrorism 2006 is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

PX202

# COUNTRY REPORTS ON TERRORISM 2006
## TABLE OF CONTENTS

**CHAPTER 1.   STRATEGIC ASSESSMENT** ......................................................... 8

**CHAPTER 2.  COUNTRY REPORTS** ................................................................ 16

**AFRICA OVERVIEW** ........................................................................ 16

Trans-Sahara Counterterrorism Partnership
The African Union
Botswana
Burundi
Comoros
Djibouti
Ethiopia
Kenya
Liberia
Madagascar
Mali
Mauritania
Nigeria
Rwanda
Senegal
Sierra Leone
Somalia
South Africa
Tanzania
Uganda
Zimbabwe

**EAST ASIA AND PACIFIC OVERVIEW** ...................................................... 27

Australia
Burma
Cambodia
China
• Hong Kong
• Macau
Indonesia
Japan
Republic of Korea
Laos

PX202

Malaysia
Mongolia
New Zealand
Philippines
Singapore
Taiwan
Thailand

## EUROPE OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Albania
Andorra
Armenia
Austria
Azerbaijan
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Lithuania
Macedonia
Malta
Moldova
Montenegro
The Netherlands
Norway
Poland
Portugal
Romania
Russia
Serbia
• Kosovo
Slovakia

PX202

Slovenia
Spain
Sweden
Switzerland
Turkey
United Kingdom
• Northern Ireland

**MIDDLE EAST AND NORTH AFRICA OVERVIEW** ............................................. **91**

The Summer War
Algeria
Bahrain
Egypt
Iraq
Israel, West Bank, and Gaza
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**SOUTH AND CENTRAL ASIA OVERVIEW** ................................................. **113**

Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyzstan
Nepal
Pakistan
Sri Lanka
Tajikistan
Turkmenistan
Uzbekistan

**WESTERN HEMISPHERE OVERVIEW** ................................................. **126**

Inter-American Committee Against Terrorism (CICTE)
Tri-Border Area
Argentina
Bolivia
Brazil
Canada

PX202

Chile
Colombia
Ecuador
El Salvador
Guatemala
Mexico
Nicaragua
Panama
Paraguay
Peru
Suriname
Trinidad and Tobago
Uruguay
Venezuela

**CHAPTER 3.  STATE SPONSORS OF TERRORISM OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **145**

Cuba
Iran
North Korea
Sudan
Syria

**CHAPTER 4.  THE GLOBAL CHALLENGE OF WMD TERRORISM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **150**

**CHAPTER 5.  TERRORIST SAFE HAVENS (7120 REPORT)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **156**

*(Update of Information Originally Reported Under Section 7120(b) of the Intelligence
Reform and Terrorist Prevention Act)*

1. Terrorist Safe Havens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **156**
   Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens . . . . . . . . . . . . . . . . . **161**
   International Conventions and Protocols (Signatories) . . . . . . . . . . . . . . . . . . . . . . . . . . **175**
2. Support for Pakistan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **184**
3. Collaboration with Saudi Arabia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **188**
4. Struggle of Ideas in the Islamic World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**
5. Outreach through Foreign Broadcast Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **196**
6. Visas for Participants in United States Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **212**
7. Basic Education in Muslim Countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **212**
8. Economic Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **226**

**CHAPTER 6.  TERRORIST ORGANIZATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **236**

Abu Nidal Organization (ANO)
Abu Sayyaf Group (ASG)
Al-Aqsa Martyrs Brigade
Ansar al-Sunna (AS)
Armed Islamic Group (GIA)
Asbat al-Ansar
Aum Shinrikyo (Aum)
Basque Fatherland and Liberty (ETA)

PX202

Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
HAMAS
Harakat ul-Mujahedin (HUM)
Hizballah
Islamic Jihad Union (IJU)
Islamic Movement of Uzbekistan (IMU)
Jaish-e-Mohammed (JEM)
Jemaah Islamiya Organization (JI)
Al-Jihad (AJ)
Kahane Chai (Kach)
Kongra-Gel (KGK/PKK)
Lashkar e-Tayyiba (LT)
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Libyan Islamic Fighting Group (LIFG)
Moroccan Islamic Combatant Group (GICM)
Mujahedin-e Khalq Organization (MEK)
National Liberation Army (ELN)
Palestine Liberation Front (PLF)
Palestinian Islamic Jihad (PIJ)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qaida (AQ)
Al-Qaida in Iraq (AQI)
Al-Qaida in the Islamic Maghreb (AQIM)
        Formerly Salafist Group for Preaching and Combat (GSPC)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Nuclei (RN)
Revolutionary Organization 17 November
Revolutionary People's Liberation Party/Front (DHKP/C)
Shining Path (SL)
United Self-Defense Forces of Colombia (AUC)

**OTHER GROUPS OF CONCERN** .................................................................**280**

Al-Badhr Mujahedin (al-Badr)
Al-Ittihad al-Islami (AIAI)
Alex Boncayao Brigade (ABB)
Anti-Imperialist Territorial Nuclei (NTA)
Cambodian Freedom Fighters (CFF)
Communist Party of India (Maoist)
Communist Party of Nepal (Maoist)/United People's Front (CPN/M)
Democratic Forces for the Liberation of Rwanda (FDLR)
East Turkistan Islamic Movement (ETIM)
First of October Antifascist Resistance Group (GRAPO)
Harakat ul-Jihad-I-Islami (HUJI)

PX202

Harakat ul-Jihad-I-Islami/Bangladesh (HUJI-B)
Hizb-I Islami Gulbuddin (HIG)
Hizbul-Mujahedin (HM)
Irish National Liberation Army (INLA)
Irish Republican Army (IRA)
Islamic Army of Aden (IAA)
Islamic Great East Raiders–Front (IBDA-C)
Islamic International Peacekeeping Brigade (IIPB)
Jamaatul-Mujahedin Bangladesh (JMB)
Jamiat ul-Mujahedin (JUM)
Japanese Red Army (JRA)
Kumpulan Mujahedin Malaysia (KMM)
Lord's Resistance Army (LRA)
Loyalist Volunteer Force (LVF)
New Red Brigades/Communist Combatant Party (BR/PCC)
People Against Gangsterism and Drugs (PAGAD)
Rajah Solaiman Movement (RSM)
Red Hand Defenders (RHD)
Revolutionary Proletarian Initiative Nuclei (NIPR)
Revolutionary Struggle (RS)
Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs (RSRSBCM)
Sipah-I-Sahaba/Pakistan (SSP)
Special Purpose Islamic Regiment (SPIR)
Al-Tawhid w'al Jihad (TWJ)
Tenrik Mifaz-E-Shariah Mohammadi (TNSM)
Tunisian Combatant Group (TCG)
Tupac Amaru Revolutionary Movement (MRTA)
Turkish Hizballah
Ulster Defense Association/Ulster Freedom Fighters (UDA/UFF)
Ulster Volunteer Force (UVF)
United Liberation Front of Assam (ULFA)

**CHAPTER 7:  LEGISLATIVE REQUIREMENTS AND KEY TERMS** .................................... 317

**NCTC STATISTICAL ANNEX** ................................................................. 321

**SUPPLEMENT ON TERRORISM DEATHS, INJURIES, KIDNAPPINGS OF PRIVATE U.S. CITIZENS** ................................................................. 331

PX202

# CHAPTER 1.
## STRATEGIC ASSESSMENT

This chapter highlights terrorism trends and ongoing issues, focusing on calendar year 2006 that will provide a framework for detailed discussion in later chapters. Since this issue of the Country Reports on Terrorism falls five years after the attacks of September 11, 2001, the chapter commences with a review of progress against the terrorist threat to date.

## FIVE YEARS ON, PROGRESS IS MIXED

### SIGNIFICANT ACHIEVEMENTS

Five years after 9/11, the international community's conflict with transnational terrorists continues. Cooperative international efforts have produced genuine security improvements — particularly in securing borders and transportation, enhancing document security, disrupting terrorist financing, and restricting the movement of terrorists. The international community has also achieved significant success in dismantling terrorist organizations and disrupting their leadership. This has contributed to reduced terrorist operational capabilities and the detention or death of numerous key terrorist leaders.

Working with allies and partners across the world, through coordination and information sharing, we have created a less permissive operating environment for terrorists, keeping leaders on the move or in hiding, and degrading their ability to plan and mount attacks. Canada, Australia, the United Kingdom, Saudi Arabia, Turkey, Pakistan, Afghanistan, and many other partners played major roles in this success, recognizing that international terrorism represents a threat to the whole international community.

Through the Regional Strategic Initiative, the State Department is working with ambassadors and interagency representatives in key terrorist theaters of operation to assess the threat and devise collaborative strategies, action plans, and policy recommendations. We have made progress in organizing regional responses to terrorists who operate in ungoverned spaces or across national borders. This initiative has produced better intra-governmental coordination among United States government agencies, greater cooperation with and between regional partners, and improved strategic planning and prioritization, allowing us to use all tools of statecraft to establish long-term measures to marginalize terrorists. (See Chapter 5 – Terrorist Safe Havens (7120 Report) for further information on the Regional Strategic Initiative.)

### CONTINUING CHALLENGES

Despite this undeniable progress, major challenges remain. Several states continue to sponsor terrorism. Iran remains the most significant state sponsor of terrorism and continues to threaten its neighbors and destabilize Iraq by providing weapons, training, advice, and funding to select Iraqi Shia militants. Syria, both directly and in coordination with Hizballah, has attempted to undermine

PX202



*UNITED STATES, Washington:  US President George W. Bush ( C ) speaks beside Afghan President Hamid Karzai ( R ) and Pakistan President Pervez Musharraf (L) in the Rose Garden following a meeting in the Oval Office of the White House on 27 September 2006 Washington, DC.  AFP Photo/Mandel Ngan*

the elected Government of Lebanon and roll back progress toward democratization in the Middle East. Syria also supports some Iraqi Baathists and militants and has continued to allow foreign fighters and terrorists to transit through its borders into Iraq.

International intervention in Iraq has brought measurable benefits. It has removed an abusive totalitarian regime with a history of sponsoring and supporting regional terrorism and has allowed a new democratic political process to emerge. It also, however, has been used by terrorists as a rallying cry for radicalization and extremist activity that has contributed to instability in neighboring countries.

Afghanistan remains threatened by Taliban insurgents and religious extremists, some of whom are linked to al-Qaida (AQ) and to sponsors outside the country. In Afghanistan public support for the government remains high, national institutions are getting stronger and the majority of Afghans believe they are better off than under the Taliban. But to defeat the resurgent threat, the international community must deliver promised assistance and work with Afghans to build counterinsurgency capabilities, ensure legitimate and effective governance, and counter the surge in narcotics cultivation.

The Israeli/Palestinian conflict remains a source of terrorist motivation. The holding of free elections in the Palestinian Territories was a welcome sign of democratization, but HAMAS' subsequent refusal to disavow terrorism or accept Israel's internationally-accepted right to exist undermined the election's impact. Terrorist activity emanating from the Palestinian Territories remains a key destabilizing factor and a cause for concern.

PX202



*UNITED NATIONS, New York:  US Secretary of State Condoleezza Rice (2R) speaks at a press conference of the Middle East Quartet group with Russian Foreign Minister Sergei Lavrov (L), United Nations Secretary General Kofi Annan (2L) and Javier Solana ( R ), European Union High Representative for the Common Foreign and Security Policy, 09 May 2006 at UN headquarters.  AFP Photo/Stan Honda*



*LEBANON, Shebaa:  Lebanese troops are welcomed by civilians upon their arrival to the Lebanese village of Shebaa, 18 August 2006.  AFP Photo/Joseph Barrak*



*IRAQ, Baghdad:  An Iraqi policeman reads a newspaper with the picture of killed al-Qaida leader in Iraq, Abu Musab al-Zarqawi, published on the front page in central Baghdad, 10 June 2006. AFP Photo/Ali Al-Saadi*

PX202

The summer war in Lebanon between Israel and Hizballah was a prime example of how Hizballah's continued efforts to manipulate persisting grievances along the Israeli/Lebanese border can quickly escalate into open warfare. The conflict did force the international community again to demand Hizballah's complete disarmament, in UN Security Council Resolution (UNSCR) 1701, and generated a renewed international commitment to support a peaceful, stable, multi-sectarian democracy in Lebanon. Even so, Hizballah, a designated foreign terrorist organization, in combination with state sponsors of terrorism Iran and Syria, continues to undermine the elected Government of Lebanon and remains a serious security threat in the Middle East.

AQ and its affiliates have adapted to our success in disrupting their operational capability by focusing more attention and resources on their propaganda and misinformation efforts. They exploit and interpret the actions of numerous local, pseudo-independent actors, using them to mobilize supporters and sympathizers, intimidate opponents and influence international opinion. Terrorists consider information operations to be a principal part of their effort. The international community has yet to muster a coordinated and effectively resourced counter to extremist propaganda.

Overall, AQ and its loose confederation of affiliated movements remain the most immediate national security threat to the United States and a significant security challenge to the international community.

## KEY AL-QAIDA TRENDS

Single terrorist events, like the Askariya mosque bombing in Samarra, Iraq on February 22, 2006, which provoked widespread sectarian violence and changed the character of the war in Iraq, can become triggers for broader conflict or templates for copycat attacks. Because terrorism is fundamentally political, the political significance of major events is vital in determining meaningful responses. Thus, the trends presented in this section are interpretive – they provide qualitative insight to complement the statistical detail covered in later chapters.

## TRANSITION FROM "EXPEDITIONARY" TO "GUERRILLA" TERRORISM

Early AQ terrorist attacks were largely expeditionary. The organization selected and trained terrorists in one country, then clandestinely inserted a team into the target country to attack a pre-planned objective. The 1998 U.S. embassy bombings in Nairobi and Dar es-Salaam, the 2000 attack on the USS Cole, and the 9/11 attacks were examples of this. Improved international border security, transportation security and document control have made this type of attack more difficult. Clandestine insertion across borders is harder, reconnaissance is more risky, and international movement of funds and equipment is more likely to be detected.

Thus we have seen a trend toward guerrilla terrorism, where the organization seeks to grow the team close to its target, using target country nationals. Through intermediaries, web-based propaganda, and subversion of immigrant expatriate populations, terrorists inspire local cells to carry out attacks which they then exploit for propaganda purposes. This circumvents the need to insert a team across borders or clandestinely transfer funds and materiel. The 2004 Madrid bombing, the London attacks of July 2005, and the thwarted August 2006 attempt to attack passenger jets operating from British airports include elements of this approach.

PX202

Both expeditionary and guerrilla approaches co-exist, alongside true "home-grown" terrorism involving local cells acting spontaneously rather than being consciously inspired by trans-national terrorists. Rather than adopting a single modus operandi, AQ and its affiliated movements continue to be highly adaptive, quickly evolving new methods in response to countermeasures.

## TERRORIST PROPAGANDA WARFARE

As identified in the 2005 Country Reports, the international community's success in disrupting terrorist leadership and operational capacity led AQ to focus greater efforts on misinformation and anti-Western propaganda. This trend accelerated this year, with AQ cynically exploiting the grievances of local groups and attempting to portray itself as the vanguard of a global movement. AQ still retains some operational capability and the intent to mount large-scale spectacular attacks, including on the United States and other high-profile Western targets. Overall, however, AQ's current approach focuses on propaganda warfare — using a combination of terrorist attacks, insurgency, media broadcasts, Internet-based propaganda, and subversion to undermine confidence and unity in Western populations and generate the false perception of a powerful worldwide movement.

## THE TERRORIST "CONVEYOR BELT"

Radicalization of immigrant populations, youth and alienated minorities in Europe, the Middle East, and Africa continued. It became increasingly clear, however, that such radicalization does not occur by accident, or because such populations are innately prone to extremism. Rather, there was increasing evidence of terrorists and extremists manipulating the grievances of alienated youth or immigrant populations and then cynically exploiting those grievances to subvert legitimate authority and create unrest.

Terrorists seek to manipulate grievances represent a "conveyor belt" through which terrorists seek to convert alienated or aggrieved populations, convert them to extremist viewpoints, and turn them, by stages, into sympathizers, supporters, and ultimately, members of terrorist networks. In some regions, this includes efforts by AQ and other terrorists to exploit insurgency and communal conflict as radicalization and recruitment tools, especially using the Internet to convey their message. Countering such efforts demands that we treat immigrant and youth populations not as a source of threat to be defended against, but as a target of enemy subversion to be protected and supported. It also requires community leaders to take responsibility for the actions of members within their communities and act to counteract extremist subversion.

# A NEW KIND OF ENEMY

## AL-QAIDA AS A GLOBAL INSURGENCY

The surface events mentioned above highlight a deeper trend:  the transformation of international terrorism from the traditional forms that Congress intended to address when it established the annual Country Reports series into a broader, multifarious approach to transnational non-state warfare that now resembles a form of global insurgency. We have entered a new era of conflict that may demand new paradigms and different responses from those of previous eras.

AQ and its core leadership group represent a global action network that seeks to aggregate and exploit the effects of widely dispersed, semi-independent actors. It openly describes itself as a transnational guerrilla movement and applies classic insurgent strategies at the global level. AQ

PX202

applies terrorism, but also subversion, propaganda, and open warfare, and it seeks weapons of mass destruction in order to inflict the maximum possible damage on its opponents. It links and exploits a wider, more nebulous community of regional, national, and local actors who share some of its objectives, but also pursue their own local agendas. Finally, it works through regional and cross-border safe havens that facilitate its actions while hampering government responses.

## DISAGGREGATING THE THREAT

To the extent that AQ succeeds in aggregating this broader constellation of extremist actors, it can begin to pursue more frequent and geographically extensive terror attacks. Therefore, we must act to disaggregate the threat, through international cooperation, counterpropaganda, counter subversion, counterinsurgency, and traditional counterterrorism.

Disaggregation breaks the links in the chain that exploit ordinary people's grievances and manipulates them into becoming terrorists. It seeks to provide those who are already radicalized with a way out and to create pathways for alienated groups to redress their legitimate grievances without joining the terrorist network. Disaggregation denies AQ its primary objective of achieving leadership over extremist movements worldwide and unifying them into a single movement. It does not remove the threat but helps reduce it to less dangerous local components, which can be dealt with by individual governments and communities working together.

## TRUSTED NETWORKS

Such cooperation requires the creation of trusted networks to displace and marginalize extremist networks. While killing and capturing key terrorist actors is fundamental in combating terrorism, it can have detrimental effects. These actions do not eliminate the threat and, if mishandled, can be actively counterproductive. Instead, we must seek to build trusted networks of governments, private citizens and organizations, multilateral institutions, and business organizations that work collaboratively to defeat the threat from violent extremism.

Such networks, over time, help wean at-risk populations away from subversive manipulation by terrorists and create mechanisms to address people's needs and grievances, thus marginalizing terrorists. Youth organizations, educational networks, business partnerships, women's empowerment, and local development initiatives can all play a role, with government as a supportive partner.

## LEADERS, SAFE HAVENS, UNDERLYING CONDITIONS

To make such active measures effective, the three strategic components of the terrorist threat that must be neutralized are leaders, safe havens, and underlying conditions. Leaders provide a motivating, mobilizing, and organizing function and act as symbolic figureheads. Safe havens, which are often in ungoverned or under-governed spaces, provide a secure environment for training, planning, financial and operational support; and a base for mounting attacks. They may be physical or virtual in nature. In addition, underlying conditions provide the fuel, in the form of grievances and conflicts that power the processes of radicalization.

Treating this new era of conflict as a form of global insurgency implies that counterinsurgency methods are fundamental in combating the new form of transnational terrorism. These methods include firstly, a focus on protecting and securing the population; and secondly, politically and physi-

PX202

cally marginalizing the insurgents, winning the support and cooperation of at-risk populations by targeted political and development measures, and conducting precise intelligence-led special operations to eliminate critical enemy elements with minimal collateral damage.

## INTEGRATING ALL ELEMENTS OF NATIONAL POWER

All elements of national power including diplomatic, military, economic, and intelligence, must be integrated and applied in a coordinated whole-of-government fashion. The intellectual and psychological dimensions of the threat are at least as important as its physical dimension, so countermeasures must be adequately coordinated and resourced. Thus, the military component of national power plays only a supporting role in this effort; the primary focus is on non-military influence.

Because the enemy is a non-state actor who thrives among disaffected populations, private sector efforts are at least as important as government activity. Citizen diplomacy, cultural activity, person-to-person contact, economic cooperation and development, and the application of media and academic resources are key components of our response to the threat. Motivating, mobilizing, and supporting such privately led activities are key leadership tasks in the new environment.

## COMMITMENT—THE KEY TO SUCCESS

Experience since 9/11 has shown that the key success factor in confronting violent extremism is the commitment by governments to work with each other, with the international community, with private sector organizations, and with their citizens and immigrant populations.

Where governments cooperate, build trusted networks, seek active informed support from their people, provide responsive, effective and legitimate governance, and engage closely with the international community, the threat from terrorism has been significantly reduced.

Where governments have lacked commitment in working with their neighbors and engaging the support of their people, terrorism and the instability and conflict that terrorists exploit remain key sources of threat.

## SUMMARY

This chapter sets the scene for the detailed analysis that follows. In reviewing events since 9/11, it is clear that progress has been mixed. Significant achievements in border security, information sharing, transportation security, financial controls, and the killing or capture of numerous terrorist leaders have reduced the threat. But the threat still remains, and state sponsorship, the terrorist response to intervention in Iraq, improved terrorist propaganda capabilities, the pursuit of nuclear weapons by state sponsors of terrorism, and terrorist exploitation of grievances represent ongoing challenges. Recent trends include the emergence of "guerrilla" terrorism in parallel with traditional "expeditionary" approaches, improved AQ propaganda warfare capacity, and emerging evidence of terrorist "conveyor belt" that seeks to deliberately manipulate and exploit grievances in at-risk populations.

A deeper trend is the shift in the nature of terrorism, from traditional international terrorism of the late 20th century into a new form of transnational non-state warfare that resembles a form of global insurgency. This represents a new era of warfare, and countering this threat demands the application of counterinsurgency techniques that focus on protecting, securing, and winning the support of at-risk populations, in addition to targeting violent extremist networks and individual terrorists.

PX202

Trusted networks of private and government organizations and individuals, and the application of integrated civil-military measures across all elements of national power are keys to this approach. Terrorist leaders, safe havens, and the underlying conditions that terrorists exploit are the principal strategic targets that we must address. The key success factor that has emerged so far is commitment by governments to work with the international community, their own populations, and at-risk immigrant or youth populations, to counter the threat collaboratively.

PX202

# CHAPTER 2.
## COUNTRY REPORTS ON TERRORISM

### AFRICA OVERVIEW

> *"We also resolve, as all civilized nations have, to join the global effort to fight terrorism anywhere in the world recognizing that it is today the most single challenge to world peace and collective freedom..."*
>
> **—Ellen Johnson Sirleaf,** President, Republic of Liberia Remarks, UN General Assembly, 61st Session New York City, September 19, 2006

A small number of al-Qaida (AQ) operatives in East Africa, particularly Somalia, continued to pose the most serious threat to American and allied interests in the region. Although elements were severely disrupted at year's end, AQ continued to operate in Somalia and elsewhere in East Africa. Somalia remains a concern, as the country's unsecured borders and continued political instability provide opportunities for terrorist transit and/or organization. AQ remains likely to keep making common cause with Somali extremists in an attempt to disrupt international peacemaking efforts in Somalia.

There were few significant international terrorist incidents in Africa, but civil conflict and ethnic violence continued in a number of countries. AQ-affiliated terrorist groups were present and operated in Northwest Africa. These groups conducted small scale attacks on host governments and U.S. interests, raised funds, recruited, and conducted other support activities across the Trans-Sahara. The Salafist Group for Preaching and Combat (GSPC) merged with al-Qaida in September and changed its name to Al-Qaida in the Islamic Maghreb (AQIM). AQIM/GSPC continued to operate in the Sahel region, crossing difficult-to-patrol borders between Mali, Mauritania, Niger, Algeria, and Chad to recruit extremists within the region for training and terrorist operations in the Trans-Sahara and, possibly, for operations outside the region. Its new alliance with al-Qaida potentially has given it access to more resources and training.

Hizballah continued to engage in fundraising activities in Africa, particularly in West Africa, but did not engage in any terrorist attacks within the region. Many African governments improved their cooperation and strengthened their efforts in the War on Terror. Both the African Union (AU) and African regional organizations continued initiatives to improve counterterrorism cooperation and information sharing.

### TRANS-SAHARA COUNTERTERRORISM PARTNERSHIP (TSCTP)

The Trans-Sahara Counterterrorism Partnership is a multi-faceted, multi-year strategy aimed at defeating terrorist organizations by strengthening regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security forces, promoting democratic governance, discrediting terrorist ideology, and reinforcing bilateral military ties with the United States. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel

PX202

(Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the region and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) in combating terrorism.

The need for TSCTP stemmed from the potential for expansion of operations by Islamic terrorist organizations in the Sahel. TSCTP was developed as a follow-on to the very successful Pan-Sahel Initiative, which focused solely on the states of the Sahel. Ongoing concern that Islamist terrorists continue to seek to create safe havens and support networks in the remote expanses of the Sahel, as well as the public affiliation of some terrorist groups with AQ, led to its formal approval by the U.S. Government in early 2005.

TSCTP is a five-year program of counterterrorism, democratic governance, and military assistance and includes a public diplomacy component.  Its main elements include:

• Counterterrorism (CT) programs to create a new regional focus for trans-Saharan cooperation, including use of established regional organizations like the African Union and its new Center for the Study and Research on Terrorism in Algiers. These programs include training to improve border and aviation security and overall CT readiness;

• Continued specialized Counterterrorism Assistance Training and Terrorist Interdiction Program (TIP) activities in the trans-Sahara region and possible regional expansion of those programs;

• Public diplomacy programs that expand outreach efforts in the Sahel and Maghreb regions, Nigeria, and Senegal and seek to develop regional programming embracing this vast and diverse region. Emphasis is on preserving the traditional tolerance and moderation displayed in most African Muslim communities and countering the development of extremism, particularly in youth and rural populations;

• Democratic governance programs that strive, in particular, to provide adequate levels of U.S. Government support for democratic and economic development in the Sahel, strengthening those states' ability to withstand internal threats; and

• Military programs intended to expand military-to-military cooperation, to ensure adequate resources are available to train, advise, and assist regional forces, and to establish institutions promoting better regional cooperation, communication, and intelligence sharing.

## THE AFRICAN UNION

The African Union (AU) has several counterterrorism legal instruments, including a Convention on Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention, and a 2004 Plan of Action. The Addis Ababa-based AU Commission provided guidance to its 53 member states on ratification and implementation of continental and international counterterrorism commitments, and coordinated assistance to cover member states' counterterrorism gaps. The AU maintained that Africa's colonial legacy made it difficult to accept a definition of terrorism that excluded an exception for "freedom fighters." Still, the AU is on record strongly condemning acts of terrorism, such as those that occurred in Sharm El Sheik, Egypt, and London, England. Although AU Commission's political will to act as an effective counterterrorism partner was strong, capacity remained relatively weak. The AU sought to create a counterterrorism unit at its headquarters to promote member state counterterrorism efforts more effectively. The AU welcomes technical and financial assistance from international partners/donors to bolster both AU headquarters and African Centre for the Study and Research on Terrorism (ACSRT) activities approved by member states.

PX202

## BOTSWANA

Botswana established its National Counterterrorism Committee to address issues pertaining to terrorism and weapons of mass destruction and regularly participated in Antiterrorism Assistance (ATA) Programs offered at the International Law Enforcement Academy in Gaborone. The Botswana Defense Forces designated a squadron as its counterterrorist unit and several of its officers had counterterrorism training. The Bank of Botswana listed suspected terrorist assets and informed all banking institutions in the country by circulating an updated list of suspicious accounts. Although Botswana had no Financial Intelligence Unit, the Directorate on Corruption and Economic Crimes had a dedicated unit investigating suspicious transactions. As a member of the Southern Africa Development Community's (SADC) Organization on Politics, Defense, and Security, Botswana was responsible for the organization's counterterrorism efforts. SADC capabilities and its efforts in fighting terrorism were limited, however.

## BURUNDI

The Government of Burundi attempted to improve its domestic efforts in the fight against international terrorism. With assistance from the United States, Burundi endeavored to pass new legislation on terrorist financing and other statutes that would specifically outlaw terrorist acts. Although members of the security sector were responsive to requests to assist the United States, their training and meager resources severely limited their ability to prevent international terrorist acts. Burundi's porous border, coupled with daily incoming flights from East Africa, could allow terrorists easy entry into the country.  Through its participation in the Tripartite Plus One group, Burundi joined with Rwanda, Uganda, and the Democratic Republic of Congo to identify and prevent regional insurgent forces from operating in its territory.

## COMOROS

International terrorism concerns in Comoros focused on Comorian national Fazul Abdullah Mohammed (a.k.a. Harun Fazul), who is suspected of involvement in the 1998 bombings of U.S. embassies in Nairobi and Dar es Salaam. His whereabouts were unknown, but he was believed to have maintained contacts in Comoros. The Comorian government's security forces had limited resources and training in counterterrorism and maritime security, so the country remained vulnerable to terrorist transit or safe haven. Comorian police and security forces continued to participate in U.S. antiterrorism assistance programs and cooperated with the Rewards for Justice Program.

President Sambi, a devout Muslim democratically elected in May, reconfirmed Comoros' rejection of terrorism and, with Comoros' religious leaders, publicly rejected Islamist extremism.  President Sambi has sought close partnership with the United States to develop Comoros and to create opportunities for the country's youth. In September, President Sambi and agreed to establish a joint committee to improve bilateral relations, including cooperation on counterterrorism.

## DJIBOUTI

Djibouti hosted the only U.S. military base in Sub-Saharan Africa for U.S. and Coalition Forces and remained a staunch supporter of U.S. counterterrorism efforts. Djibouti was one of the most forward-leaning Arab League members supporting ongoing efforts against terrorism. President

PX202

Ismail Omar Guelleh and many top leaders in Djibouti repeatedly expressed their country's full and unqualified support for the War on Terror. Djibouti was one of the very first Arab League nations to do so following September 11, 2001, even in the face of adversity and criticism from its neighbors.

U.S. security personnel continued to work closely with Djiboutian counterparts to monitor intelligence and follow up on prospective terrorism-related leads. Although the government's capabilities were limited, Djiboutian counterparts were very proactive, and were highly receptive and responsive to U.S. requests for cooperation. The Djiboutian National Security Services took extraordinary measures with its limited resources to ensure the safety and security of American citizens, the U.S. embassy, and the U.S. military base at Camp Lemonier.

## ETHIOPIA

Although a developing nation with constrained resources in a tough neighborhood, Ethiopia demonstrated political will and intent to tackle the problem of terrorism. Ethiopia's counterterrorist capabilities were limited, but increasing. The government agreed to a number of new initiatives and cooperated in efforts to collect and share intelligence on terrorist groups.

In response to increasing threats against its security in December, the Government of Ethiopia conducted a counteroffensive in support of the internationally recognized Transitional Federal Government (TFG) of Somalia against the extremist dominated Council of Islamic Courts (CIC). Mid-year, the CIC gained control of Mogadishu and in a series of offensives in the second half of the year, extended its control over most of southern Somalia. The CIC made claims to large areas of Ethiopia and Kenya inhabited by ethnic Somalis. By the end of the year, Ethiopian and TFG advances routed the CIC out of Mogadishu, though there was concern that some CIC extremists would continue to reject peace overtures and could initiate an insurgency with AQ support.

The highest levels of the Ethiopian government recognized Ethiopia's vulnerability to financial crimes including terrorist financing and counterfeiting. The Penal Code adopted in early 2005 criminalized money laundering and a number of other financial crimes. The Central Bank (National Bank of Ethiopia) drafted specific anti-money laundering legislation, which included the establishment of a Financial Intelligence Unit.

Ethiopia's National Intelligence and Security Service (NISS), with broad authority for intelligence, border security, and criminal investigation, was responsible for overall counterterrorism management. Federal and local police counterterrorism capabilities were primarily focused on being able to respond to terrorist incidents. Draft counterterrorism legislation was before Parliament at year's end.

Ethiopia was an active participant in African Union (AU) counterterrorism efforts, was nominated as a focal point for the AU's Center for Study and Research on Terrorism, and participated in meetings of the Committee of Intelligence and Security Services of Africa.

## KENYA

Kenya and the United States maintained generally good cooperation against terrorism throughout 2006, to the mutual benefit of both countries. Kenya was a capable and willing partner and took steps to interdict and apprehend terror suspects. Its cooperation, however, was uneven and constrained by domestic political pressures and considerations. Key among these were Kenyan Muslim and ethnic-Somali communities unsympathetic to cooperation with the United States, an inadequate legal and regulatory framework, and concerns about possible retribution from Somali Islamic extremists.

PX202

Kenya proved itself a solid and proactive partner during the Somali crisis that began in December, when Islamic extremists fleeing the Ethiopian advance threatened Kenya's national security. Kenya's borders remained porous and vulnerable to movement of potential terrorists as well as small arms and other contraband. In response to the crisis in Somalia, Kenya deployed its forces along its border with Somalia and at sea to apprehend fleeing CIC extremist fighters and prevent them from establishing safe haven in Kenya. Beginning in late 2006, the Kenyan government banned all flights to and from Somalia except for humanitarian aid flights and flights to the TFG's center of Baidoa. The order remained in effect, despite objections from growers of miraa, or qat, who were deprived of their main market (Somalia) by the ban.

Important Kenyan officials spoke out publicly about the dangers of terrorism and key elements of the Kenyan security apparatus took concrete steps to increase counterterrorism efforts, including the formation of an interagency Coastal Security Steering Committee. At the same time, however, political and bureaucratic resistance remained to the formation of an interagency Kenyan Joint Terrorism Task Force (JTTF).

Kenya still lacked counterterrorism legislation. In April 2003, Kenya published a draft "Suppression of Terrorism Bill," only to withdraw it after harsh criticism from human rights groups and Kenyan Muslim communities. The Kenyan government wrote another draft of the bill in May, according to the UN Office on Drugs and Crime, but did not officially publish the document or submit it to Parliament. In the absence of such legislation, it is difficult to detain terror suspects and to prosecute them effectively. Nonetheless, ATA-trained police investigators and counterterrorism prosecutors were credited with the re-arrest and successful prosecution of Kikambala bombing suspect Omar Said Omar after his acquittal on the main terrorism charge.[1] Omar was subsequently found guilty on April 4 and sentenced for illegal possession of a firearm, ammunition, and explosives.

The government made some progress on combating money laundering and terrorist financing. In November, the government published the text of the Proceeds of Crime and Money Laundering Bill for public comment and it is expected to be submitted to Parliament in March 2007. The Central Bank of Kenya issued guidelines effective January 1, 2007, under Section 33K of the Central Bank of Kenya Act, to strengthen controls over foreign exchange bureaus to regulate their use of third party checks and telegraphic transfers, transactions that may have previously been used for money laundering or terrorist finance. Kenya took a major step to combat money laundering through the closure of Charterhouse Bank.

Senior Kenyan officials made clear their desire to achieve a Safe Skies agreement, but much work remained to be done to bring Kenya up to international standards. U.S. Federal Aviation Administration and Transportation Security Administration training efforts in recent years improved aviation security, but consistent planning and enforcement of security procedures remained a challenge in 2006, particularly at Wilson Airport in Nairobi. Security improved, however, at Kenya's main air entry point, Nairobi's Jomo Kenyatta International Airport.

## LIBERIA

Despite limited resources, untrained personnel, and a weak judicial system, all products of 14 years of civil war, the Government of Liberia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism. Through rule of law and security sector reform assistance programs, the United States supported a number of initiatives that addressed Liberia's vulnerabilities, which included porous borders, rampant identification document fraud, lax

---

[1]     Fifteen people were killed in the 2002 bombing of the Paradise Hotel in Kikambala, Kenya.

PX202

immigration controls, wide-scale corruption, and underpaid law enforcement, security, and customs personnel. The Liberian government was eager to engage the United States on counterterrorism, international crime issues, and security sector reform.

There have never been any acts of transnational terrorism in Liberia. Of concern, however, were reports that hundreds of Middle Eastern businessmen purchased legitimately issued but fraudulently obtained Liberian diplomatic passports from Ministry of Foreign Affairs (MFA) officials. These documents would permit free movement between the Middle East and West Africa. The government took steps to stop this Charles Taylor-era practice by requiring that diplomatic passports be issued only by the MFA in Monrovia.

The government's failure to surrender fugitives for extradition was a source of frustration in bilateral relations. In January, a circuit court erroneously held that the bilateral extradition treaty between the United States and Liberia expired in 1944. The Government of Liberia appealed that decision, and it is pending in the Supreme Court.

Since 2003, there has been a resurgence in the number of visits by foreign Islamic proselytizing groups, overwhelmingly Sunni organizations from Pakistan, Egypt, and South Africa. Liberian security services reported that none of these groups publicly espoused militant or anti-U.S. messages. Liberia's indigenous, war-weary, and predominantly Sunni Islamic community, which represented roughly 20 percent of the country's population, has demonstrated no interest in militant strains of Islam to date. That said, outstanding land disputes negatively affecting large numbers of Muslim land owners in Nimba and other counties could fan ethnic and religious tensions with the predominantly Christian central government.

As in other West African states, reports of possible Hizballah connections within the Lebanese community in Liberia indicated that Lebanese businessmen provided financial support and engaged in fundraising activities for Hizballah. There were no other terrorist groups known to be operating within Liberia.

## MADAGASCAR

International terrorism was a concern in Madagascar because of the island nation's inadequately monitored 3,000 mile coastline. Limited equipment, personnel, and training for border control increased the risks of penetration. The Ministry of Defense and the U.S. Embassy co-hosted an International Maritime Security Conference in July with military and civilian participants from ten countries in the Indian Ocean and along the east coast of Africa. Malagasy police, military, intelligence, and security forces have not had much training in counterterrorism and maritime surveillance, but despite limited resources, government officials were willing to cooperate with the United States; the international maritime conference and the Rewards for Justice Program were two examples of cooperative ventures. At the main port in Tamatave, which handled 80 percent of maritime traffic and more than 90 percent of container traffic, access control and overall security improved substantially. The U.S. Coast Guard Port Security Liaison removed Tamatave Port from its Port Security Advisory for Madagascar, with an acknowledgement that the Port met minimum standards under the International Ship and Port Facility (ISPS) Code.

PX202

## MALI

Inadequate resources continued to hamper the Malian government's ability to control its long and porous borders, thus limiting the effectiveness of military patrols and border control measures. Mali cooperated with U.S. efforts, and remained one of the largest recipients in the sub-region of military training and assistance through the Trans-Sahara Counterterrorism Partnership and other U.S. assistance programs. Northern Mali served as a potential safe haven for terrorists, traffickers, and smugglers due to the region's remoteness, harsh desert climate, and size. The AQIM/GSPC maintained a regular, small-scale presence, moving essentially without hindrance in the northern part of Malian territory, although it did not maintain any permanent facilities and was constantly on the move. In September and October, a group of Malian Tuareg rebels, known as the Alliance for Democracy and Change (ADC), engaged in two firefights with the AQIM/GSPC in northern Mali. The Malian government did not announce an official position on the violence between the ADC and AQIM/GSPC, nor did it attempt to confront AQIM/GSPC elements in the North or prevent their use of Malian territory. There were no confrontations between the Malian military and the AQIM/GSPC in 2006.

## MAURITANIA

Mauritanian leaders continued to cooperate with the United States in the War on Terror. The transitional government took several positive steps toward creating an inclusive political environment that allowed moderate Islamic groups to participate in the political process. While the government continued not to recognize Islamic political parties, it did allow these groups to submit legislative and municipal candidates on independent lists.

On April 26, three suspected terrorists escaped from the central prison and apparently fled the country. Between May and August, the government arrested approximately ten individuals it claimed had links to terrorist groups. This brought the number of suspected terrorists in custody to approximately 20. The government did not try any of the suspected terrorists it held.  Mauritanian officials dismantled a AQIM/GSPC network in May and June. The government did not tolerate the presence of AQIM/GSPC members on its territory, and several AQIM/GSPC members who attempted to infiltrate the country were arrested. In contrast with the previous year, there were no terrorist attacks on Mauritanian soil. However, fighting between the AQIM/GSPC and Tuareg rebels in Northern Mali occasionally threatened the border region. The Mauritanian Group for Preaching and Jihad (GMPJ) was not active during the year because most of its members were arrested in May 2005. Although eight of its members were released this year, the group's leaders remained in Mauritanian custody.

## NIGERIA

Although Nigeria wanted to be viewed as taking a leading counterterrorism role in West Africa, its security agencies remained reactive. Nigerian intelligence and security services worked hard, however, to improve intelligence sharing on counterterrorism issues, and the Nigerian military worked to establish units with counterterrorism capability. Nigerian security services were cooperative when asked to investigate potential terrorist threats to U.S. interests.

Nigeria took the lead in the Economic Community of West African States (ECOWAS) and the AU in sponsoring joint intelligence and security conferences on counterterrorism. The New Partnership for African Development (NEPAD), an organization founded by African heads of state, condemned terrorism and called for African nations to take concrete measures to combat it. Nigeria initiated legislative and regulatory steps to shore up its anti-money laundering regime to fight terrorism.

PX202

While Nigeria's current criminal law did not contain specific counterterrorism provisions, the penal code proscribed acts of violence that included terrorism. In August, the Nigerian cabinet approved a draft counterterrorism bill and sent it to the National Assembly for consideration. Under the new legislation, anyone convicted of a terrorist offense could be sentenced to as much as 35 years in prison. The National Assembly had not acted on the bill by year's end.

There was no special examining magistrate with specific powers in the counterterrorism area. In Nigeria, suspects by law must be charged within 48 hours, but in practice were held as long as deemed necessary. Most criminals were photographed and fingerprinted by security elements, but DNA samples were not taken due to resource constraints and a lack of scientific infrastructure.

While the Nigerian government did not support international terrorism or terrorists, there were some individuals and private groups in Nigeria with ties to probable terrorist elements in Sudan, Iran, Pakistan, and Libya. Members of terrorist groups, including al-Qaida and the AQIM/GSPC, have operated and recruited in Nigeria.

## RWANDA

The Rwandan government made efforts to combat terrorism financing and continued to increase its border control measures to identify potential terrorists. Rwanda had an intergovernmental counterterrorism committee and a counterterrorism reaction team in the police intelligence unit. Central Bank and Ministry of Finance officials continued to provide outstanding cooperation on terrorist financing issues. While the Government of Rwanda had not yet fully developed its laws and regulations in accordance with international conventions and protocols concerning terrorism, it had the authority under local law to identify, freeze, and seize terrorist-related financial assets. Rwanda participated in regional initiatives on international counterterrorism cooperation, including active participation in the East African Stand-by Brigade. In September, it hosted the Third Regional Counter-Terrorism Conference for Chiefs of Security and Intelligence Services in Kigali, and it assumed the chairmanship of the organization. In October, Police Commissioner General Andrew Rwigamba was appointed the World Regional Chair for sub-Saharan Africa for the International Association of Chiefs of Police (IACP).

The Democratic Forces for the Liberation of Rwanda (FDLR)[2], an armed rebel force that included former soldiers and supporters of the previous government that orchestrated the 1994 genocide, continued to operate in the Democratic Republic of the Congo. Rwanda pressed for international action to pursue the FDLR. A unit of this organization was responsible for the kidnapping and murder of nine persons, including two American tourists, in Bwindi Park in 1999. The Rwandan government assisted U.S. law enforcement officials in an attempt to prosecute three individuals, suspected in the 1999 attack, who were transferred to the United States in 2003.

## SENEGAL

The Government of Senegal cooperated with the United States in identifying terrorist groups operating in Senegal. More work remained to be done, however, to develop first responder services, to facilitate the quick sharing of information between agencies, and to control porous borders where police and security services are undermanned and ill-equipped to prevent illicit cross-border trafficking. The Government of Senegal affirmed its commitment to United States government-assisted efforts to augment its border security.

---

2       *The Democratic Forces for the Liberation of Rwanda was known as the Army for the Liberation of Rwanda (ALIR) until 2001.*

23

PX202

Senegal continued to enhance its ability to combat terrorism, prosecute terror suspects, and respond to emergencies. Despite advances, however, Senegal lacked specific counterterrorism legislation and current laws made it difficult to prosecute terror suspects. As participants in the Trans-Saharan Counterterrorism Partnership, more than 180 Senegalese government officials took part in ATA programs. Senegalese military officials attended a counterterrorism seminar in Algiers and attended the Chiefs of Defense and Directors of Military Intelligence conferences. The Defense International Institute of Legal Studies, the U.S. Treasury's Office of Technical Assistance, and the United Nations Office on Drugs and Crime (UNODC) gave separate seminars on the legal aspects of fighting terrorism.

During the year, President Wade met again with Imam Mamour Fall, a Senegalese deported from Italy in 2003 for praising Usama bin Laden, to counsel "moderation." President Wade also criticized members of the Senegalese press for exaggerating the level of public support for extremism.

## SIERRA LEONE

Sierra Leone's armed forces focused on border control because potential unrest in neighboring countries remained a threat. The government did not detect any radical Islamic activities.

There were no identified terrorist groups or organizations in Sierra Leone, however, there were allegations that members of the Lebanese business community in Sierra Leone, many of whom are diamond traders, were sympathetic to and made financial contributions to Hizballah. The Bank of Sierra Leone established a Financial Investigations Unit, but it lacked the capacity to effectively monitor financial transactions. Financial constraints, corruption, and insufficient capacity continued to hinder Sierra Leone's counterterrorism and law enforcement capabilities.

## SOMALIA

Somalia's weak central government, protracted state of violent instability, long unguarded coastline, porous borders, and proximity to the Arabian Peninsula made it a potential location for international terrorists seeking a transit or launching point for conducting operations in Somalia or elsewhere. The rise of the Council of Islamic Courts (CIC) and their expansion of control into southern and central Somalia created a more permissive operating environment and safe haven for foreign terrorists. In June, the CIC gained control of Mogadishu and were initially welcomed as bringing a modicum of peace and stability to the city. Over the course of the following months, the broader CIC organization was hijacked by al Shabaab (The Youth), a small, extremist group affiliated with AQ that consists of radicalized young men, between 20 and 30 years of age. Many of its senior leaders are believed to have trained and fought with AQ in Afghanistan. The CIC began to pursue an increasingly hostile strategy of military expansion and aggression designed to provoke a broader regional conflict. Al Shabaab militia participated in CIC military offensives and served as something akin to a "special forces" unit for the CIC.  Although not formally a part of the CIC structure, members of al Shabaab held senior positions within the CIC, particularly in the security, finance, and education departments. The group was reputed to be extremely violent and brutal, and its members are suspected of murdering an Italian nun in Mogadishu in September, targeted assassinations of dozens of Somali nationals inside Somalia, including the murder of peace activist Abdulqadir Yahya Ali in July 2005 and the murder of foreign aid workers in the self-declared Republic of Somaliland in late 2003 to early 2004. In late June, the CIC elected Hassan Dahir Aweys chairman of the CIC Shura Council. Aweys is designated as a terrorist by the United States and the United Nations because of his links to AQ, the Taliban, or Usama bin Laden.

PX202



*SOUTH AFRICA, Pretoria:  Hundreds of Muslims protested outside the  Danish Embassy in Pretoria 10 February 2006 demanding an "immediate and unwavering" apology from the Danish Government to the global Muslim community.  AFP Photo/Fati Moalusi*

Among the foreign AQ operatives believed to have enjoyed protection by the CIC and al Shabaab leadership are individuals wanted for the 1998 embassy bombings in Kenya and Tanzania and a 2002 hotel bombing in Kenya, including Fazul Abdallah Mohammed (aka Harun Fazul), Abu Talha al-Sudani, and Saleh Ali Saleh Nabhan. At the end of the year, the Transitional Federal Government (TFG), backed by Ethiopia, succeeded in ending CIC control of Mogadishu and southern and central Somalia. Regional efforts to bring about national reconciliation and establish peace and stability in Somalia are ongoing. Although the capability of the TFG and other Somali local and regional authorities to carry out counterterrorism activities was limited, some have taken actions.

## SOUTH AFRICA

South Africa continued to publicly support global efforts to combat terrorism and shared financial, law enforcement, and limited intelligence information with the United States. President Mbeki reiterated his support for such cooperation during his December meeting with President Bush.  On several occasions President Mbeki voiced his opinion that "no circumstances whatsoever can ever justify resorting to terrorism." Members of Parliament from other parties, including Muslim legislators, have echoed Mbeki's sentiments.

The Government of South Africa supported multilateral counterterrorism efforts and bolstered its enforcement agencies. Resource constraints, however, limited the extent to which South Africa could fund its security forces for counterterrorist initiatives. The South African government is sensitive to distinctions between "terrorist organizations" and "liberation movements," since the ruling African National Congress was long branded a terrorist group during the struggle against apartheid.

PX202

Fraudulently obtained documents remained a significant problem for South African authorities. Although South African documents often include good security measures, but efforts to limit potential terrorists' access to passports and South African identity documents were limited by low capacity in the Department of Home Affairs, which handled identity documentation.

It was unclear to what extent terrorist groups were present in South Africa. Many analysts believed that AQ and other extremist groups have a presence within South Africa's generally moderate Muslim community. The South African government does not provide any type of material assistance to any group designated as a Foreign Terrorist Organization by the United States.

## SUDAN

*See Chapter 3, State Sponsors of Terrorism.*

## TANZANIA

Tanzania took significant steps to establish a National Counterterrorism Center. The purpose of this Center was to build Tanzania's capacity to prevent and respond to terrorist attacks. Working closely with the United States, Tanzania continued to disrupt terrorist networks to prevent acts of terrorism. Tanzanian law enforcement cooperated with the United States to exchange evidence and testimony on cases related to the 1998 bombing of the U.S. Embassy in Dar Es Salaam. Tanzania continued its participation in several multi-year programs to strengthen its law enforcement and military capacity, improve aviation and border security, and combat money laundering and terrorist financing. The Ministry of Finance and the Bank of Tanzania showed ongoing willingness to combat terrorist financing. Tanzania cooperated with the United States and complied with its obligations under UN Security Council resolutions. In November, the Tanzanian Parliament passed the Anti-Money Laundering (AML) Bill, ending a legislative process that began in 2002 with support from the United States. The AML Bill will lay the legal groundwork for Tanzania to create a Financial Intelligence Unit (FIU) and bolster Tanzania's ability to combat financial crime, including counterterrorist financing. With the Millennium Challenge Account Threshold Program, the United States will support Tanzania as it establishes a fully functional FIU. Tanzanian law enforcement and security forces attempted to identify and monitor terrorist activities and deny use of Tanzanian territory as a safe haven for terrorists. The government was aware that terrorists could use its territory for transit purposes and did not provide any kind of material assistance to terrorists or terrorist groups.

## UGANDA

The Ugandans have proved willing to locate, capture, and hold terror suspects. The Government of Uganda was actively involved in regional counterterrorism efforts, conferences, and workshops, and had a strong regional voice in opposing international terrorism and supporting U.S. counterterrorism initiatives. Although Uganda actively worked to root out possible terrorist threats, it was hampered by shortages in fuel, equipment, funding, and personnel.

Since 1987, the Lord's Resistance Army (LRA), which is on the U.S. Terrorist Exclusion List, has waged an insurgency in northern Uganda using camps in southern Sudan as bases for attacks on government forces and civilians. The LRA's tactics include murder, looting, burning houses, torture, mutilation, and abduction of children for the purposes of forced conscription, labor, and sexual servitude. The Government of Uganda deployed 45,000 troops in northern Uganda to protect civilians and combat the LRA. Uganda and Sudan also expanded an agreement that permitted the Ugandan military to attack LRA units operating in southern Sudan.

PX202

The Government of Uganda and the LRA began peace negotiations in July. The process yielded a Cessation of Hostilities Agreement (CHA) on August 26 that was poorly monitored and repeatedly violated. The CHA was renewed with strengthened monitoring provisions on November 1. The Government of Uganda remained committed to the ongoing peace process.

## ZIMBABWE

Despite the Government of Zimbabwe's self-imposed isolation on most diplomatic issues, local intelligence and criminal investigative agencies were responsive to U.S. needs in the War on Terror. Government agencies routinely provided assistance by conducting investigative inquiries, traces, and border checks of individuals thought to be threats to U.S. government facilities or personnel. In May, the Reserve Bank of Zimbabwe (RBZ) released new guidelines on anti-money laundering and combating the financing of terrorism for financial institutions and non-financial businesses and professionals. In August, Zimbabwe assumed the Presidency for the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) for the 2006/2007 administrative year and, in this capacity, hosted the group's Council of Ministers of Finance meeting in August. In August, Zimbabwe and the Republic of South Africa signed a memorandum of understanding for the exchange of information in combating money laundering and the financing of terrorism.

# EAST ASIA AND PACIFIC OVERVIEW

*"Our cause is a just cause. Terrorism respects no value system; terrorism does not respect the tenets of the great religions of the world; terrorism is based on evil, intolerance, and bigotry. And no free societies, such as Australia and the United States, can ever buckle under to bigotry and intolerance."*

**—John Howard,** Prime Minister of Australia Remarks at the White House Washington, DC, May 16, 2006

The Jemaah Islamiya regional terrorist network remained a serious threat to Western and regional interests, particularly in Indonesia and the Southern Philippines, although its capabilities were degraded due in large part to regional counterterrorism successes in 2005-2006. As 2007 began, DNA analysis conducted by the FBI confirmed the death of Abu Sayyaf Group's (ASG) nominal leader, Khaddafy Janjalani, at the hands of the Armed Forces of the Philippines (AFP). Early in 2007, Philippine forces also eliminated ASG spokesperson, Abu Solaiman. In August, the AFP killed a significant ASG sub commander, Ismin Sahiron. These deaths represented a major blow to JI, but did not eliminate the overall threat to U.S. interests in the Philippines. JI bombers Dulmatin and Patek remained on the run, probably on Jolo Island. Other terrorists remained at large in Southeast Asia, such as key JI operative Noordin Mat Top, in Indonesia.

Geography makes effective border control problematic for archipelagic states like Indonesia and the Philippines. Monitoring remote locations among the thousands of islands in the Sulawesi Sea and Sulu Archipelago that span the boundaries between Indonesia, Malaysia, and the Philippines is extremely difficult, which makes this tri-border area well suited to terrorist activities, including movement of personnel, equipment, and funds. Therefore, regional capacity building has emerged as a priority goal, in addition to bilateral cooperation and national capacity building. Institutes like the

27

PX202

U.S.-Thailand International Law Enforcement Academy (ILEA) in Bangkok and the Southeast Asia Regional Center for Counterterrorism (SEARCCT) in Malaysia continued to expand their activities to provide effective counterterrorism training to law enforcement officers throughout the region. Likewise, the Australian-Indonesian Jakarta Center for Law Enforcement Cooperation (JCLEC) is a promising additional regional center for capacity building. Multilateral fora, including the United Nations Security Council's Counterterrorism Committee (UNCTC), the G8's Roma-Lyon Group and Counterterrorism Action Group (CTAG), the Asia-Pacific Economic Cooperation (APEC) forum, the Association of Southeast Asian Nations (ASEAN), which adopted a new ASEAN Convention on Counterterrorism pending ratification, and the ASEAN Regional Forum (ARF), continued their important roles as key organizations for regional counterterrorism cooperation.

Australia worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of initiatives, both bilaterally and in regional fora such as APEC, the ASEAN ARF, and the Pacific Island Forum (PIF). Australia increased its four-year counterterrorism assistance to the region by about $70 million to boost the capacity to combat terrorism, bringing the total amount committed to offshore counterterrorism activities since 2004 to $350 million. In March, Australian police arrested three suspected terrorists in Melbourne as part of an ongoing counterterrorism operation, disrupting a significant threat to the city.

China supported several operational and logistical aspects of the War on Terror. China participates in the United States Megaports Initiative designed to improve the security of U.S.-bound cargo. Container Security initiative programs are operating in the ports of Shanghai and Shenzhen. China increased its efforts to build its domestic counterterrorism capabilities with a focus on improving security for the 2008 Beijing Olympics. Beijing continued to express concern that terrorists operate on Chinese territory and has asserted that some members of the Uighur minority in Xingjiang Province pose a threat to China's domestic stability.

Japan strengthened its own security by contributing to counterterrorism capacity-building among Asian countries and by participating in a second trilateral counterterrorism dialogue with the United States and Australia in October. Japan is using Official Development Assistance (ODA) grants to expand counterterrorism capacity building in Southeast Asia. This $60 million dollar annual program, initiated in FY-2006, includes projects aimed at increasing maritime and port security. The Republic of Korea is shifting its attention to possible acts of terror beyond the Korean Peninsula. Reflecting this shift, the Ministry of Foreign Affairs and Trade (MOFAT) appointed its first Director for International Counterterrorism Cooperation in February.

Thailand's military staged a coup in September. An interim government has been attempting to address the ongoing violence connected to a separatist movement in the ethnic Malay, Muslim south. Although the roots of the problem are ethnic and not religious, there is concern that southern unrest has the potential to attract international terrorist groups such as JI and al-Qaida that may attempt to capitalize on the increasingly violent situation for their own purposes.

## AUSTRALIA

In addition to its substantial ongoing efforts to combat domestic and international terrorism, Australia launched new initiatives working with its regional neighbors to assist in building their resolve and capacity to confront terrorism. The Australian Federal Police (AFP) Joint Counterterrorism Teams' (JCTT) multi-agency effort to address domestic and international terrorism concerns in Australia's six largest cities became fully operational this year. In March, Australian police arrested three suspected terrorists in Melbourne as part of an ongoing counterterrorism operation, disrupting

PX202

a significant threat to the community. In August, an Australian court sentenced Faheem Khalid Lodhi to 20 years in prison for plotting to bomb Australia's national electricity grid. Regional cooperation between Australian and Southeast Asian government agencies continued to disrupt terrorist operations. Active cooperation with immigration agencies in the region strengthened border controls and impeded terrorists' ability to travel, recruit, train, and operate.

In December, Australia enacted new anti-money laundering and counterterrorism financing (AML/CTF) legislation that would make the Australian Transaction Reports Analysis Centre (AUSTRAC), which monitors financial transactions, the national AML/CTF regulator with supervisory, monitoring, and enforcement functions over a diverse range of industry sectors. Australia strengthened its intelligence capabilities by funding additional staff and technical capabilities, and established identity security strike teams to investigate and prosecute people and syndicates involved in manufacturing false identities.

As part of measures Australia undertook in response to the 2005 Wheeler Report on Aviation Security and Policing at Australian Airports, airport police commanders began their new role overseeing crime and security-related matters at eleven counterterrorism first response airports in the country. Australia announced in its budget that it would enhance closed circuit television monitoring and analysis capability at its international airports. This will expand the deployment of explosives trace-detection equipment for the examination of domestic air cargo at each of Australia's major airports and will improve the quality of security training for cargo handlers. Australia committed to enhancing its capability to identify, inspect, and respond to high-risk export air cargo through the deployment of additional explosives detector-dog teams; the provision of additional mobile X-ray vans; and the trial of communications technology to achieve real-time air cargo reporting. The Australian government provided additional funding to enhance its ability to detect, deter, and respond to illegal activity near its borders, including illegal fishing and trafficking in persons, through increased surveillance and patrolling.

Australia used its position as Chair of the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies (WA) to increase awareness of the Man-Portable Air Defense Systems (MANPADS) threat and the need for more effective export controls, and to solicit greater cooperation, particularly from states that produce, export, or stockpile MANPADS. Australia also led outreach missions to non-Wassenaar states China, India, Belarus, Kazakhstan, and Singapore. In June, Australia hosted an international seminar in Geneva to promote the need for practical action to counter the global MANPADS threat. In the same month, Australia, the United States, and the Philippines hosted a workshop in Manila on the methodology of conducting airport MANPADS vulnerability assessments. In August, Australia advocated for increased efforts to counter the proliferation of MANPADS at the UN Conference on Disarmament. In October, Australia co-chaired with Thailand an ASEAN Regional Forum workshop on stockpile security of MANPADS and small arms and light weapons to help regional countries strengthen their domestic inventory controls.

The Australian ambassador for counterterrorism chaired the International Counterterrorism Coordination Group, Australia's interagency counterterrorism working group. Australia increased its four-year regional counterterrorism assistance package by about $70 million to boost the capacity of neighbor countries to combat terrorism, bringing the total amount committed to offshore counterterrorism activities since 2004 to $350 million. Building on successful regional cooperation among law enforcement, intelligence, and border control authorities, the package included new measures and a new emphasis on expanding regional cooperation. Cooperation will focus on countering the threat of terrorists acquiring or using weapons of mass destruction, building regional capability for

PX202

responding to terrorist attacks, and commencing activities to promote tolerance and counteract terrorist propaganda. Key programs included funding for enhancing law enforcement counterterrorism capacity and liaison networks, expanding intelligence cooperation capabilities, improving border control capability and coordination in Southeast Asia, further developing the APEC Regional Movement Alert System, enhancing Indonesia's border alert system at major ports, building regional awareness of the terrorist WMD threat and strengthening regional controls on chemical, biological, radiological, and nuclear materials, and improving regional emergency response capacity and coordination. In July, Australia became an initial partner nation in the U.S. Global Initiative to Combat Nuclear Terrorism and, in October, it participated in a second Trilateral Counterterrorism Dialogue with the United States and Japan.

Australia continued to provide legal drafting assistance to regional states, including the South Pacific islands, seeking to adopt international conventions and protocols against terrorism and to bring their domestic laws into conformity with these conventions. In February, Australia opened the upgraded Transnational Crime Centre in Jakarta which was first established as a joint initiative between Australia and Indonesia in the aftermath of the 2002 Bali bombings. The center housed Indonesia's first national intelligence database, linking 30 locations throughout the country. The joint Australian-Indonesian Jakarta Centre for Law Enforcement Cooperation (JCLEC) located in Semarang, Indonesia has offered more than 50 courses and trained more than 1,200 officers to date. The AFP committed additional agents to Jakarta and Manila to work closely with those governments and the FBI to apprehend JI fugitives.

The AFP received funding to expand its investigative and specialist training, currently delivered to regional law enforcement partners through facilities like JCLEC. Funding was also targeted toward conducting offshore exercises and training with regional partners, increasing the number of counterterrorism advisers working in the AFP's international liaison officer network, introducing to high priority locations a custom-built Case Management and Information System developed for use in overseas jurisdictions, and enhancing specialist forensic and technical training for law enforcement agencies in the region. The Australian government substantially increased the AFP's International Deployment Group by over 400 personnel and created an Operational Response Group ready to respond on short notice to emerging law and order issues and to conduct stabilization operations.

Australia contributed an additional 500 troops to Afghanistan as part of a Dutch-led provincial reconstruction team. By year's end, there were 1,000 Australian troops in Iraq and 800 in Afghanistan. Australia designated a total of 19 terrorist organizations under its domestic criminal code.

The Government of Australia and its Muslim advisory body, the Muslim Community Reference Group, continued efforts begun in 2005 to develop and implement a National Action Plan to promote social cohesion, harmony, and security. The plan committed almost $30 million for a range of activities to address extremism and intolerance in the Australian community. Activities will include integration enhancement and crisis management training for Muslim communities, and education and employment programs that work to bring law enforcement agencies and Muslim communities together to resolve issues of conflict and discrimination.

## BURMA

Bilateral relations between Burma and the United States remained strained. The Burmese regime's willingness to cooperate and coordinate on counterterrorist activities within the country and throughout the region remains limited. However, Burma has cooperated with the United States on

PX202

both transnational terrorist threats and law enforcement efforts to stem narcotrafficking and money laundering. Burmese Special Branch police created a new counterterrorism unit headquartered in Rangoon.

The Burmese judicial system lacked independence and transparency and suffered from corruption. The government defined almost all anti-regime activities "acts of terrorism" and made little distinction between peaceful political dissent and violent attacks by insurgents or criminals. Suspected perpetrators of any acts that opposed the regime were subject to lengthy detention without trial or due process. The government was quick to characterize dissident groups as aligned with terrorist organizations and used this as justification to scrutinize and disrupt their activities. The regime regularly labeled exile leaders and political activists as "terrorists." No reliable evidence existed that any terrorists, terrorist organizations, or affiliations, were using Burma as a safe haven.

No known anti-American terrorist groups were operating in Burma. However, some observers posited possible links between known terrorist organizations and two local insurgent groups: the Rohingya Solidarity Organization, and the Arakan Rohingya National Organization. There were few signs that either group remained active inside of Burma, although the Burmese regime's severe repression of the Rohingya Muslim population inside Burma could foster sympathy with extremist methods and objectives.

Indigenous violence in Burma generally was targeted against the ruling regime. Various insurgent groups in ethnic minority areas near borders with China, India, Bangladesh, Laos, and Thailand conducted small-scale actions against the Burmese authorities. The Government of Burma attributed several recent bombings in the capital and elsewhere to anti-regime elements, but did not publicly file charges against specific individuals.

On January 3, two small-scale bombings occurred in Bago. No deaths or injuries were reported. Police conducted an initial investigation and blamed ethnic Karen groups for attempting to disrupt the National Convention and Burmese Independence Day, which is January 4. On April 20, five small improvised explosive devices went off in downtown Rangoon; police reported minimal damage and no injuries. On September 21, Embassy contacts in the Burmese Special Branch Police reported that a small bomb exploded inside a women's bathroom at the Teachers Training College in Rangoon, but that no one was injured and the explosion caused very little damage. The Burmese police politely refused the Embassy's request to view either the scene or any remaining fragments. As in most such incidents, the Government of Burma claimed the incident was a subversive act, "committed by a group of insurgent destructive elements who wanted to disturb and destroy stability of the state." Authorities did not make public any evidence of a genuine investigation or identify the specific perpetrator(s).

## CAMBODIA

Cambodia's ability to investigate potential terrorist activities was limited by a lack of training and resources. An absence of comprehensive domestic legislation to combat terrorism also hindered the government's ability to arrest and prosecute terrorists. Cambodia's political leadership, however, demonstrated a strong commitment to take aggressive legal action against terrorists.

There were no indications that specific terrorist groups operated in Cambodia, but porous borders and endemic corruption could make the country vulnerable to a terrorist presence. The Cambodian government believed that the Cambodian Freedom Fighters (CFF), which carried out an

PX202

armed attack in November 2000 that killed eight people, are still capable of carrying out attacks in Cambodia. The leader of this group was arrested in California in 2005. The Cambodian government was working with the FBI to bring the leader of the CFF to trial in the United States.

Various officials were identified to take positions in Cambodia's National Counterterrorism Committee (NCTC), a policy level decision-making body established by the government in 2005 and chaired by the prime minister. The Australian military conducted a conference with the NCTC in August and expressed its intention to follow-up with a tabletop exercise with the Center.

In addition to providing assistance for the NCTC, the Australian government was helping Cambodia draft a new counterterrorism law. The draft law was being reviewed by the relevant legislative committee and the national legislature was expected to adopt it. The Australian and U.K. governments jointly sponsored a National Seminar on Counterterrorism in April to help train the Cambodian military and police. The Malaysian government cooperated with the Cambodian government on Malaysia-specific cases.

In December, following the visit of the Sri Lankan prime minister, the Cambodian government announced that a Sri Lankan military intelligence official would work with police and defense officials on intelligence matters. His announcement followed Prime Minister Hun Sen's assurance to his Sri Lankan counterpart that the Tamil Tiger rebels would not receive arms smuggled from Cambodia, although the government acknowledged it was likely this has occurred in the past. Cambodia has destroyed 200,000 small arms over the last several years with EU assistance, and, with U.S. assistance, has destroyed its stockpile of MANPADS.

With U.S. assistance, the Government of Cambodia installed computerized border control systems at Phnom Penh and Siem Riep airports and at the land border crossing of Poipet and Koh Kong. The Cambodian government also cooperated fully with U.S. requests to monitor terrorists and terrorist entities listed as supporters of terrorist financing.

## CHINA

As Beijing prepares to host the 2008 Olympics, China increasingly reached out to the United States and other nations on counterterrorism cooperation. No acts of terrorism were committed in China this year, but Chinese citizens were victims of terrorist acts in Afghanistan, Iraq, Lebanon, and Pakistan.

China participated in the United States Megaports Initiative designed to improve security for United States-bound cargo. The U.S. Department of Energy and its Chinese counterparts made progress toward implementation of the November 2005 agreement allowing the installation of equipment at China's ports to detect hidden shipments of nuclear and other radioactive materials. China became an initial partner nation in the U.S. Global Initiative to Combat Nuclear Terrorism, attending the first meeting of the Global Initiative in Rabat, Morocco in October. China also continued its participation in the Container Security Initiative.

Chinese officials signed statements with counterterrorism counterparts in the Association of Southeast Asian Nations (ASEAN) Regional Forum (ARF), Asia Pacific Economic Cooperation (APEC), and the Shanghai Cooperation Organization (SCO). In April, China co-hosted the Fourth ARF Meeting on Counterterrorism and Transnational Crime in Beijing. China is a founding member of the SCO and has made counterterrorism one of the group's main objectives. In June, China hosted an SCO summit in Shanghai that included India, Iran, Pakistan, and Mongolia as observers.  At the summit, the member states agreed to hold joint counterterrorism military exercises in Russia in 2007, with troops from all six SCO member states participating. In August, China and Kazakhstan held their

first-ever joint counterterrorism exercises in Kazakhstan. In August, China signed agreements with Pakistan on border control, terrorism, and crime and, in December, held joint counterterrorism exercises in Pakistan.

China ratified the UN International Convention for the Suppression of the Financing of Terrorism in February and worked to expand its international cooperation on terrorist finance through mutual legal assistance agreements with foreign jurisdictions. In October, China passed a new Anti-Money Laundering Law, which took effect January 1, 2007, broadening the scope of existing anti-money laundering regulations to hold a greater range of financial institutions liable and to expand the powers of the People's Bank of China (PBOC). With the PBOC as the lead agency for all anti-money laundering activities in China, the Ministry of Public Security (MPS) is responsible for criminal investigations, and the State Administration of Foreign Exchange (SAFE) is the primary agency for countering illicit foreign exchange transactions.

Institutional obstacles and rivalries between domestic financial and law enforcement authorities hampered Chinese anti-money laundering work and other financial law enforcement aimed at countering terrorists. Still, China's Financial Intelligence Unit (FIU), established in 2004 to track suspicious transactions, worked closely with the Financial Crimes Enforcement Network (FINCEN) in the United States to develop its capabilities. China began requiring banks and financial institutions to establish anti-money laundering systems, record customer identities, and report suspicious transactions. In January, China launched a national credit information system to more efficiently monitor transactions, information collection, and dissemination. Nonetheless, anti-money laundering efforts were hampered by the prevalence of counterfeit identity documents and cash transactions conducted by underground banks, which, in some regions, reportedly accounted for over one-third of lending activities.

China refused to recognize the Egmont Group, an umbrella body coordinating the activities of over 100 FIUs worldwide, because the Group includes an FIU from Taiwan. Joining the Financial Action Task Force (FATF) remained an important priority for China. In 2004, China joined the Eurasia FATF-style regional group, and, in 2005, China was granted FATF observer status. In November 2006, an FATF Mutual Evaluation Team comprehensively reviewed China's anti-money laundering and counterterrorism finance regime. The results of the review and China's bid to join FATF will be discussed at the June 2007 FATF Plenary Meeting.

Human rights organizations have accused China of using counterterrorism as a pretext to continue efforts to suppress Uighurs, a predominantly Muslim ethnic group that comprises the majority of the population of the Xinjiang Uighur Autonomous Region. In August, Chinese police officials announced that since 1990 they have seized 41 tons of explosives from separatists in Xinjiang, including grenades and materials to make bombs. Also in August, China convicted a Canadian citizen of Uighur ethnicity of involvement in East Turkistan terrorist activities. In November, China gave Canada assurances that he would not be executed for his alleged crimes; he remains in prison.

In May, the United States released five ethnic Uighur Chinese national detainees found not to be Enemy Combatants from Guantanamo (GTMO) to Albania. The Chinese government denounced the move as a violation of international law and demanded the return of the men to China. Some of the remaining Uighur detainees at GTMO were designated for transfer or release and others will have their status reviewed annually.

Formally established in 2004, the FBI Legal Attaché Office in Beijing bolstered U.S.-China cooperation on counterterrorism investigations. China provided substantive intelligence in some counterterrorism cases, but more work remained to be done in terms of its overall responsiveness to U.S.

PX202

requests. In July, the first meeting between a standing Chinese Minister of Public Security and the Director of the FBI was held in Washington, D.C., where FBI Director Robert Mueller hosted Minister Zhou Yongkang, principally to discuss terrorism matters.

Following Secretary of Homeland Security Michael Chertoff's visit to Beijing in April, the United States and China signed a Memorandum of Understanding (MOU) to allow United States Federal Air Marshals (FAMS) to fly to China and Chinese air marshals to fly into the United States. In addition, the MOU provided for training and information exchanges. The first FAMS mission was completed in August, and the Chinese air marshals completed training at the FAMS Training Facility in September.

In February, the United States Coast Guard Liaison Office was established in Beijing as a focal point for United States-China exchanges to enhance the safety and security of ports around the world in compliance with the Maritime Transportation Safety Act. Activities included a visit by the U.S. Coast Guard Commandant, three expert-level delegations to conduct training and exchanges, two port visits in China by U.S. Coast Guard cutters, and one international exercise.

Although not publicly attributing any particular incident to terrorism, Chinese authorities asserted that terrorists, primarily based in Xinjiang, continued to operate clandestinely on Chinese territory. The Chinese government attempted to restrict foreign support for perceived terrorism and increased the number of deployed security personnel in response to perceived terrorist activities in Xinjiang. The United States has sanctioned Chinese entities for missile and chemical weapons proliferation activities, including transfers to Iran, North Korea, and Libya.

## HONG KONG

Hong Kong's role as a major transit point for cargo, finances, and people makes it an important counterterrorism partner, and the Hong Kong Special Administrative Region Government (HKSARG) continued to cooperate with the United States on counterterrorism efforts.

The high level of cooperation and the successful implementation of the Container Security Initiative (CSI) by Hong Kong Customs officials received continued praise from visiting U.S. government delegations, which described it as a model for CSI implementation. The U.S. government continued to work with one of Hong Kong's port terminal operators to develop and refine integrated container security architecture.

Hong Kong law enforcement agencies provided full support and cooperation to their overseas counterparts in tracing financial transactions suspected of being linked to terrorist activities. Hong Kong actively participated in various anti-money laundering and counterterrorist financing initiatives, including the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering. Hong Kong's Joint Financial Intelligence Unit (JFIU), operated by Hong Kong Police and the Customs and Excises Department, is a member of the Egmont Group.

The UN International Convention for the Suppression of Financing Terrorism became applicable to Hong Kong when ratified by the People's Republic of China on April 19. The Hong Kong regional government published the list of individuals and entities designated as terrorists or terrorist associates under UNSCR 1267 and the financial regulators circulated the lists to financial institutions, advising them to check the lists and report any suspicious transactions to law enforcement agencies.

PX202

The Hong Kong Monetary Authority recently coordinated the establishment of an Industry Working Group on Anti-Money Laundering that included representatives from some 20 authorized institutions. The group established three sub-groups to address terrorist financing, transaction monitoring systems, and private banking issues.

## MACAU

The Macau Special Administrative Region Government (MSARG) passed both anti-money laundering and counterterrorism finance legislation. Still, Macau's lack of judicial and law enforcement experience in combating financial crimes, combined with its expanding casino industry and history as a base for organized crime, provided a potential site for money laundering and terrorist financing activities.

On March 23, the Macau government passed new counterterrorism legislation aimed at strengthening counterterrorist financing measures. The law made it illegal to conceal or handle finances on behalf of terrorist organizations. Individuals were liable even if they were not members of designated terrorist organizations themselves. The legislation also allowed, in certain cases, prosecution of persons who committed terrorist acts outside of Macau and mandated stiffer penalties. On the same day, the government also passed a money laundering bill that strengthened its oversight of financial institutions. The new law imposed requirements for the mandatory identification and registration of financial institution shareholders, customer identification, and external audits that includes reviews of compliance with anti-money laundering statutes.

The Macau government has the authority to freeze terrorist assets, although a judicial order is required. Macau financial authorities directed the institutions they supervise to conduct searches for terrorist assets using the UN 1267 Sanctions Committee consolidated list and the list of Specially Designated Global Terrorists designated by the United States pursuant to E.O. 13224.  Bank examiners reviewed customer profiles, large cash transaction records, and suspicious bank reports. They also interviewed frontline staff, senior management and money laundering compliance officers.

The Government of Macau continued to exchange information with the Hong Kong Special Administrative Region and counterparts in mainland China. Additionally, Macau continued to cooperate internationally in counterterrorism efforts, through INTERPOL and other security-focused organizations within the Asia Pacific Region.

## INDONESIA

Since late 2004, the Indonesian government increased counterterrorism efforts and counterterrorism cooperation with both the United States and the international community. The Indonesian National Police (INP) had several successes in breaking-up terrorist cells and arresting terrorists with links to Jemaah Islamiya (JI). INP investigations into the October 2005 suicide attacks on Bali led to numerous successes for Indonesia's counterterrorism investigators. Links among violent Islamic radicals and extremist organizations, including JI and its associates, remained a serious security threat to both Western and domestic targets in Indonesia, although no major anti-Western terrorist incident occurred. Physical security at major hotels and tourist venues in Jakarta and Bali was upgraded significantly. At year's end, the main target of Indonesian CT units remained Malaysian JI operative and recruiter Noordin Mohammed Top, suspected in nearly every major terrorist attack in Indonesia since 2002.

PX202



*INDONESIA, Denpasar:  Locals and foreign tourists light candles at the Kuta beach in Denpasar, on Bali Island, 12 October 2006, in remembrance of the 2002 Bali Bombing victims.  AFP Photo/Sonny Tumbelaka*

The security situation in the previously strife-torn Maluku region improved, absent major incidents of interfaith violence. In central Sulawesi, where terrorist attacks in 2005 claimed several lives, a special taskforce led by the INP's top CT investigators identified and arrested several JI-linked terrorists responsible for the October 2005 Poso schoolgirl beheadings and other previously unresolved cases. The three main suspects arrested in April were brought to trial in Jakarta. In September, several days of street violence in Indonesia's eastern provinces followed the executions in Palu of three Christian men for their role in inciting deadly attacks against Muslims in 2000. However, the perpetrators behind the October shooting death of a Christian priest in Palu remained at large. Also at large were more than two dozen terrorist suspects in central Sulawesi who continued to evade INP investigators. The INP feared aggressive police operations would provoke the militants, and, in November, the INP unsuccessfully sought cooperation from the suspects' families to encourage the suspects to surrender.

The Indonesian attorney general's office continued to seek convictions in more than two dozen terrorism cases tried this year. Among those convicted were terrorist recruiter and trainer Subur Sugiyarto, terrorist financier Abdullah Sunata, and trained bomb maker Mohammad Cholily. In July, Indonesia's attorney general staffed the long awaited Terrorism and Transnational Crime Task Force, designed to oversee counterterrorism trials nationwide through a cadre of special terrorism prosecutors. Task Force members immediately began to take on over a dozen counterterrorism cases, including the three central Sulawesi cases.

PX202

Indonesia's policy of routinely granting sentence remissions to nearly all prisoners continued to benefit convicted terrorists, resulting in several early releases. JI figure Emir Abu Bakar Ba'asyir, sentenced in 2005 to 30 months in prison for his involvement in a "sinister conspiracy" to carry out the 2002 Bali attacks, was released in June after several routine sentence reductions. In December, the Indonesian Supreme Court overturned Ba'asyir's conviction based on a judicial review in which Ba'asyir's defense presented new evidence. Also released were several lesser known JI-linked figures and Rusman "Gun-gun" Gunawan, the younger brother of Indonesian-born Riduan bin Isomuddin, also known as Hambali, who was an operational leader in JI and served as the middleman between JI and al-Qaida from 2000 until his capture in 2003.[3] Hambali, a high value detainee, was transferred to Guantanamo Bay in September.

The Indonesian government continued its efforts to develop an effective anti-money laundering regime, but investigations and prosecutions in these cases continued to fall short. Indonesian police froze terrorist financial assets uncovered during investigations, but the government's implementation of the sanctions regime established pursuant to UNSCR 1267 was hampered by poor interagency coordination and by human and technical capacity deficits in both government and financial institutions. The USAID is promoting capacity building through its Financial Crimes Prevention Project, a multi-year program to provide technical advisors and support to Indonesia's effort to develop an effective and credible regime against money laundering and terrorism finance.

Indonesian counterterrorism efforts remained hindered by weak laws and enforcement, serious internal coordination problems, and systemic corruption that further limited already strained government resources. Lawmakers and other senior elected officials continued their slow pace toward needed legal reforms. A widely discussed plan to establish an official counterterrorism coordinating agency appeared to have been shelved after awaiting final presidential approval. Prospective members of the independent police commission designed to help guide police reform were identified this year, but they still need a formal presidential appointment before assuming their responsibilities. The government has not yet submitted a revision of the 2003 Counterterrorism Law to the House of Representatives. Indonesian authorities recognized that more effective prosecution of terrorism cases would require a revision of the law to include updated standards for introducing evidence in terror cases and comprehensive articles on conspiracy.

## JAPAN

Domestically, Japan continued to bolster its defenses against terrorism. In March, the Cabinet approved emergency contingency plans for 47 prefectures to better protect the public from terrorist attacks. In May, Japan revised the Immigration Control and Refugee Recognition Act to enable immigration officials to collect and electronically store fingerprint and facial imagery from foreigners. The Ministry of Justice Immigration Bureau continued testing began in 2004 on a biometric fingerprint and facial recognition system at Narita and Kansai airports with the aim of identifying people trying to enter Japan on fake passports. In June, the government developed legislation designed to combat money laundering and terrorist financing and plans to submit the bill to the Diet. In a bid to clamp down on money laundering, the Ministry of Finance announced in August that Japanese financial institutions would be required to confirm the identity of customers sending 100,000 yen or more overseas. The Financial Services Agency announced a similar change for domestic remittances. On December 1, the Diet passed the Infectious Disease Law to prohibit possession and production of 12 pathogens, including Anthrax and the Ebola Virus to help prevent bioterrorism.

---

3    Hambali helped plan the first Bali bombings in 2002 that killed more than 200 persons and facilitated al-Qaida financing for the Jakarta Marriott Hotel bombing the following year.

PX202

Japan used USAID's Official Development Assistance (ODA) grants to expand counterterrorism capacity in Southeast Asia. The Ministry of Foreign Affairs (MOFA) Economic Cooperation Bureau initiated the grant for Cooperation on Counterterrorism and Security Enhancement. This nearly US$ 60.86 million annual program included projects aimed at bolstering piracy prevention, increasing maritime and port security, and preventing weapons proliferation.

Japan made valuable contributions to building counterterrorism capacity among Asian countries. In January, Japan hosted a two-day ministerial conference on international transport security to promote cooperation on ground transportation security; representatives from 14 countries attended. In June, Foreign Minister Aso signed a counterterrorism capacity building plan with Uzbekistan, Tajikistan, Kyrgyzstan, and Kazakhstan offering equipment and support for border control. In June, Japan hosted the ASEAN-Japan Counterterrorism Dialogue.

In July, the Japanese government held a seminar on the prevention and crisis management of bioterrorism to strengthen mechanisms to combat CBRN (chemical, biological, radiological, nuclear) terrorism in the Asia Pacific. In attendance were officials from 14 countries and representatives from the World Health Organization, the Institute of Defense and Strategic Studies, and the Southeast Asia Regional Centre for Counterterrorism (SEARCCT). Japan was an active partner in the Proliferation Security Initiative, participating in exercises, attending all meetings for intelligence experts and operational experts, and leading regional outreach efforts. In October, Japan became an initial partner nation in the U.S. Global Initiative to Combat Nuclear Terrorism, and attended its first Global Initiative meeting in Rabat, Morocco. Also in October, Japan hosted a counterterrorism trilateral meeting with the United States and Australia; the following month, these three countries participated in a trilateral strategic dialogue to better synchronize regional activities. Participants from 19 countries discussed measures to tighten nuclear and radiological security at the November International Atomic Energy Agency (IAEA)-Government of Japan Seminar on Strengthening Nuclear Security in Asia.

Japan continued to reach beyond the region in its fight against terrorism. In December, the Abe Cabinet approved the extension of Japan Air Self-Defense Force (JSDF) airlift operations until July 2007, enabling Japan to continue its support for Iraq. In October, the Diet extended for one year the Antiterrorism Special Measures Law that allows for JSDF support of Operation Enduring Freedom (OEF). The Japan Maritime Self-Defense Force (JMSDF) provided approximately 124 million gallons of fuel to U.S. and allied naval vessels engaged in OEF.

Bilaterally, Japan was a responsive partner in the fight against terrorism. In February, Japanese air marshals trained at the United States Federal Air Marshal Training Facility. Japan remained an advocate and active participant in the International Port Security Program (IPSP). Widely considered a regional leader in maritime security collaboration, the Government of Japan hosted a number of bilateral and multilateral maritime security events. Japan continued its participation in the Port State Control Officer exchange program with the U.S. Coast Guard, which worked to exchange best practices in implementing international ship security requirements.

The National Police Agency (NPA) and the Public Security Intelligence Agency (PSIA) continued to monitor the activities of Aum Shinrikyo, renamed Aleph. In January, the Public Security Examination Commission extended PSIA's legal authority to monitor Aleph for an additional three years. The Tokyo District Court, in August, upheld the death sentence for Aum Shinrikyo member Masami Tsuchiya, who was charged with making the sarin nerve gas used in the deadly 1995 attack on the Tokyo subway system. In September, the Supreme Court upheld the death sentence for Aum

PX202

Shinrikyo founder Chizuo Matsumoto; he is not eligible to file future appeals. In February, the Tokyo High Court upheld the death sentence for Tomomitsu Niimi, convicted in 2002 for murdering 26 individuals in seven Aum Shinrikyo-related cases, including the 1995 sarin attack.

The Tokyo District Court sentenced Fusako Shigenobu, a former Japanese Red Army (JRA) member, to 20 years in prison in February. Members of the JRA were responsible for seizing the French Embassy in The Hague in 1974 and the U.S. Embassy in Kuala Lumpur in 1975. Prosecutors argued for a life sentence for Shigenobu, claiming she was the alleged mastermind of the "Hague Incident," but the court ruled that even though she conspired to take over the French Embassy, she was not physically present during the Embassy seizure. As of mid-December, former JRA member Jun Nishikawa remained on trial for his suspected role in a 1977 Japan Airlines hijacking.

## KOREA, NORTH

*(See Chapter 3, State Sponsors of Terrorism.)*

## KOREA, SOUTH

The Republic of Korea (ROK) demonstrated excellent law enforcement and intelligence capabilities, and provided terrorism-related training to law enforcement officials from various developing countries. Traditionally focused on potential terrorism from the Democratic People's Republic of Korea (DPRK, or North Korea), the Korean government broadened its attention to possible acts of terror from beyond the Korean Peninsula. Reflecting this shift, the Ministry of Foreign Affairs and Trade (MOFAT), appointed the first Director for International Counterterrorism Cooperation in February. Seoul supported U.S. goals in Afghanistan and maintained the third-largest foreign troop contingent in Iraq, where it has committed $260 million in assistance since 2004. The Korean government remained a valued international partner in the fight against terror financing and money laundering.

In December, the Republic of Korea agreed to participate in the Secure Freight Initiative, which will provide screening for radiation of all cargo bound for the United States. On aviation security, the government participated in the International Civil Aviation Organization (ICAO)'s Universal Safety Oversight Audit Program and contributed over 500,000 US$ to ICAO activities. In November, the Republic of Korea joined other APEC member nations in endorsing U.S. security initiatives on aviation security, bioterrorism and food defense, and the protection of commercial and financial sectors from abuse by proliferators of weapons of mass destruction. It also took a number of bilateral antiterrorism measures in the region. In November, the governments of Korea and the Philippines launched a joint study on the development of a national computer emergency response team to combat cyber crime. In December, Korea and Indonesia agreed to continue cooperation against transnational crime, including terrorism and security in the Malaka and Singapore Straits. The Korean government also held bilateral counterterrorism consultations with Australia, Singapore, India, Vietnam, Russia, and China.

Korean immigration and law enforcement agencies have an excellent record of tracking suspicious individuals entering their territory and reacting quickly to thwart potential terrorist acts. The government conducted a Man Portable Air Defense System (MANPADS) vulnerability assessment of Incheon International Airport in September, and began examining various countermeasures, including a three-level alert system, increased local patrols, and enhanced public education.

PX202

Seoul continued its active participation in regional training and capacity building programs. The Korean government hosted representatives from the Middle East, Latin America, and elsewhere in Asia for training in crime prevention, criminal justice, counterterrorism, forensic science, anti-piracy and terrorism management, prevention of money laundering, and narcotics law enforcement.

## LAOS

Although the Government of Laos had positive intentions regarding counterterrorism, weak enforcement procedures, inefficient security organizations, and a fundamental misunderstanding of how its law applies to the UNSC counterterrorism conventions, all served to hamper the implementation of multilateral agreements. Border security was negligible. Since 2002, Laos consistently denounced international terrorism and expressed a willingness to cooperate with the international community on counterterrorism. Its actions, however, have mostly been disappointing, due to both a lack of resources and an attitude among Lao officials that Laos could not become a target of international terrorism. In spite of the presence of a domestic insurgency that has employed terrorist tactics, such as ambushing civilian buses and bombing civilian targets, Lao officials at many levels saw terrorism as an issue of only marginal relevance to Laos; they believed that Laos, as a small and neutral country, would not be targeted by international terrorists.

The Bank of Laos vetted government and commercial bank holdings for possible terrorist assets, as identified by U.S.-provided lists of terrorist organizations and individuals, and has issued freeze orders for assets of organizations and individuals named on these lists. However, the Bank has yet to require the freezing of assets of individuals and entities included on the UN 1267 Sanctions Committee consolidated list.

In accordance with its obligations under UNSCR 1373, the Bank of Lao issued freeze orders for assets of organizations and individuals named in lists provided by the United States. Lao authorities issued orders limiting the amount of cash that could be withdrawn from local banks or carried into or out of the country and strengthened reporting requirements of state and privately owned commercial banks. Banking regulation remained extremely weak, however, and the banking system was vulnerable to money laundering and other illegal transactions.

Laos does not have a separate counterterrorism law, but the Lao judicial system was prepared to prosecute acts of terrorism as serious crimes under the Lao criminal code, and recent amendments to the criminal code sought to strengthen counterterrorism sanctions. Still, a November UN-sponsored workshop on counterterrorism illustrated a myriad of shortcomings and vagaries in the theoretical application of the Lao criminal code to deal with terrorism-related crimes, and successful prosecution under these laws is speculative.

Laos' border security was weak; border officials could not effectively control access to the country even at its most sophisticated border checkpoints. Border crossing along the Mekong River into the surrounding countries of Burma, Thailand, and Cambodia could be accomplished easily and without detection. In more remote sections of the country, along borders with Vietnam and China, it is likely that unmonitored border crossings by locals occurred on a daily basis. Since 9/11, Lao authorities have strengthened airport security, but security procedures at both airport and land immigration points remained lax compared with most other countries in the region. In addition, official Lao identity documents, including passports and ID cards, were easy to purchase from corrupt officials. Laos has a small insurgency numbering perhaps 1,000 to 2,000 persons, including women and children, based in very remote areas of north/central Laos.

PX202

## MALAYSIA

The Government of Malaysia took significant steps to improve its legal framework to deal with terrorists and their enablers. New provisions were added to Malaysia's Penal Code and Criminal Procedures Code that include clearer definitions of terrorism and related crimes and penalties including the death penalty or life in prison for terrorist-related crimes. In the Spring, police arrested 12 members of Darul Islam in Sabah, including citizens of Malaysia, Indonesia and the Philippines. The group was believed to have supported JI terrorists operating in Indonesia and the Philippines, and they were reportedly caught with illegal firearms and bomb making directions at the time of their arrest. Media reports also indicated that police made multiple interdictions of explosives and bomb making material transiting Malaysia via Eastern Sabah.

The police in Malaysia took the lead in counterterrorist investigations and operations. Malaysian police forces fall under the authority of the Ministry of Internal Security which is headed by Prime Minister Abdullah Badawi. To date, suspected terrorists have not been brought to trial but are held in detention under the country's Internal Security Act (ISA) where they undergo a program of rehabilitation. While in theory, ISA detentions can last indefinitely, sentences are for two years and must be renewed by a determination that the detainee remains a threat to national security. In October, the government unexpectedly released 17 individuals from ISA detention stating that they had been rehabilitated. Because they had been released before completing their sentences, these individuals were placed in probationary status and must periodically report to the authorities. Five of the released detainees had been members of the Kumpulan Mujahedin Malaysia (KMM), while the other eleven were believed to have had ties to Jemaah Islamiya (JI).

Counterterrorism finance-related amendments to the Anti-Money Laundering Act, the Subordinate Courts Act and the Courts of Judicature Act came into effect on January 1, 2007. Malaysia and the United States also signed a Mutual Legal Assistance Treaty.

The Malaysian government engaged with its neighbors on issues related to counterterrorism and transnational crime. It continued to operate and hoped to expand the Southeast Asian Regional Center for Counterterrorism (SEARCCT), an international center for training.  Malaysian mediators continued to work in the southern Philippines to help end the dispute between the Philippine government and the separatist Moro Islamic Liberation Front (MILF). With the "Eyes in Sky" program, Malaysian military forces were working with Singapore and Indonesia to provide enhanced security to the Straits of Malacca, the world's busiest shipping lane. In December, the Malaysian Defense Minister/Deputy Prime Minister and his Indonesian counterpart announced an initiative to enhance bilateral police cooperation along the land border on Borneo.

## MONGOLIA

There were no known terrorist groups operating in Mongolia and no known bases of support. However, Mongolian government officials cited more than 6,000 kilometers of porous borders, easy entry for foreign travelers, and poverty as conditions that terrorists could exploit and moved to increase awareness of terrorism and to consider new laws. On July 8, a law to combat money laundering and terrorist financing offenses was approved by the Mongolian Parliament. The Mongolian police, Ministry of Justice, and the General Intelligence Agency's counterterrorism branch all cooperated with the U.S. to willingly provide requested support. As a result of resource and technical limitations, however, law enforcement capacities, including those related to counterter-

PX202

rorism, remained modest. Mongolia deployed a seventh rotation of 100 Mongolian soldiers to Iraq in October in support of Operation Iraqi Freedom, as well as a sixth rotation of 21 Mongolian soldiers to Afghanistan to train the Afghan National Army.

## NEW ZEALAND

In June, the New Zealand Parliament passed the Terrorism Suppression Amendment Act 2005, which expanded criminalization of terrorist financing to include the intentional financing of non-designated organizations that engage in terrorism. New Zealand designated 68 terrorist organizations in 2006, bringing its total number of designated terrorist organizations to 488. Under the Financial Transactions Reporting Act of 1996, banks are required to report suspicious activities to the Financial Intelligence Unit (FIU) housed in the National Police Department. The FIU had received about 4,200 Suspicious Transaction Reports and referred 616 of these to various law enforcement agencies and units for investigation. The FIU received approximately 53 Suspicious Property Reports; none were found to have connections to terrorist entities or associated individuals.

New Zealand remained active in Operation Enduring Freedom in Afghanistan, where it has commanded the Provincial Reconstruction Team (PRT) in Bamiyan Province since September 2003. New Zealand also participated actively in the Proliferation Security Initiative (PSI) and took part in a U.S.-sponsored PSI tabletop exercise in October. On March 27, New Zealand and the U.S. signed a Memorandum of Understanding (MOU) through which New Zealand joined the United States and Australia in the Regional Movement Alert List (RMAL) passport alert system, an APEC forum initiative. In the Fall, an officer from the New Zealand police was seconded to the Joint Inter-Agency Task Force (JIATF-West) in the Pacific Command Center in Hawaii. New Zealand offered assistance to Pacific Islands Forum member countries to help them submit reports pursuant to UN Security Council Resolutions 1267, 1373, and 1540. Nine Pacific Island countries responded positively to this offer.

## PHILIPPINES

The Philippines, one of the earliest supporters of the War on Terror, continued its bilateral and multilateral counterterrorism efforts. In August, the Armed Forces of the Philippines (AFP) launched "Operation Ultimatum", a concerted effort to capture or kill the top Jemaah Islamiya (JI) and Abu Sayyaf Group (ASG) operatives on Jolo Island in the South. The operation has been highly successful to date as a number of ASG and JI members have been captured or killed since its inception. Philippine forces recently eliminated both Khadaffy Janjalani, the nominal leader of the Abu Sayyaf Group, and ASG spokesperson, Abu Solaiman. Operation Ultimatum is one feature of a U.S.- assisted strategy to strengthen the rule of law in the Sulu archipelago. Joint U.S.-Philippines military exercises know as "Balikatan" supported the Philippine government's campaign to separate terrorists from the general population and diminish support for their cause. The Antiterrorism Task Force arrested, captured, or killed 88 suspected terrorists, and seized over 900 kilograms of explosive materials. Philippine authorities also made some progress in tracking, blocking, and seizing terrorists' assets.

Despite some successes, major evidentiary and procedural obstacles in the Philippines continued to hinder the building of effective terrorism cases. A large and growing case backlog and the absence of consistent trials against terrorists were impediments to the prosecution of suspected terrorists. Despite plans dating back to 2001, the Philippine Department of Foreign Affairs (DFA) had yet to introduce a digitized, machine-readable passport. While the Philippines cooperated with U.S. requests for prosecutions for persons who had tampered or altered travel documents, the prosecutions carried low-level penalties for those convicted of such fraud. In addition, there was a

PX202



*PHILIPPINES, Jolo: Protesters holding US and Philippine flags hold a pro-Balikatan rally in Jolo, 11 February 2006, in support of a counterterrorism exercise by US and Philippine troops.  AFP Photo/Therence Koh*

reluctance to investigate or charge vendors or users of false documents. Under current Philippine law, the suspect must present the fraudulent document to a Philippine government authority in order for a crime to have been committed. At year's end, a counterterrorism bill approved in April by the House of Representatives remained in the Senate.

The Philippines experienced 93 bombings, ranging from improvised explosive devices and grenades to landmines, including:

- In February, the bombing of a karaoke bar located near a Philippine military base in Jolo left one dead and 22 injured.

- In March, a bomb exploded at the Sulu Consumers Cooperative in Jolo killing nine people and injuring 20.

- In June, a roadside bombing in Shariff Aguak killed three people and injured eight.

- In August, two bombs exploded almost simultaneously in Kidapawan City injuring three people.

- In September, a bomb exploded at a public market in General Santos City killing two people and injuring six.

- In October, a bomb exploded near the headquarters of the Sulu Philippine National Police in Jolo injuring two persons.

- In a separate October attack, three bombs exploded in Tacurong, Sultan Kudurat; Makilala, North Cotabato; and Cotabato City killing eight people and injuring over 30.

PX202

The Anti-Money Laundering Council (AMLC) was empowered by the Philippines Anti-Money Laundering Act of 2001 (AMLA), as amended in 2003, to investigate and prosecute money laundering. The AMLC is the lead agency responsible for implementing the asset freeze measures called for by the UN Security Council 1267 Sanctions Committee. Under current law, however, the AMLC cannot take direct action against suspected terrorists or those supporting terrorism, but must apply for a court order to inquire into bank accounts and direct the freezing of assets and transactions. The AMLC sometimes needed several months to issue the relevant resolution to the Court of Appeals after receiving information about a newly-listed terrorist entity and circulating it to the financial institutions. The AMLC has 91 cases pending in various stages with the courts, including 34 for money laundering, 24 for civil forfeiture, and the rest pertaining to freeze orders and bank inquiries. The slow judicial process hindered efforts by the AMLC to see these cases through to conclusion; a trial can take up to seven years to complete.

In April, a bilateral U.S. - Philippines Security Engagement Board (SEB) was inaugurated to address non-traditional security issues, including counterterrorism and maritime security. The SEB set the stage for the "Kapid Bisig" (Shoulder-to-Shoulder) counterterrorism framework that focused on civil affairs, capability upgrades, and support for AFP operations. The United States assisted the Philippines in establishing an interagency intelligence fusion center in Zamboanga City to support both maritime interdictions against transnational criminal/terrorist organizations, and the "coast watch" system in Mindanao, established with Australian assistance.

## SINGAPORE

Singapore continued its bilateral and multilateral intelligence and law enforcement cooperation to investigate terrorist groups, focusing on Jemaah Islamiya (JI). In February, Indonesia extradited Mas Selamat bin Kastari to Singapore. Mas Selamat, reportedly the Singaporean leader of a local JI network, fled Singapore in 2001 following the arrest of other JI members by the Internal Security Department (ISD).

Singapore detained five members of the regional terrorist group JI, including Mas Selamat, under the Internal Security Act (ISA). As of November, 34 people with links to terrorist groups were in detention. Detainees included members of JI who had plotted to carry out attacks in Singapore in the past and members of the Moro Islamic Liberation Front (MILF). Under detention orders, the detainees were required to undergo a program of religious counseling with a group of volunteer religious counselors. Singapore enlisted the support of religious teachers and scholars to study JI's ideology, develop teachings to counter the group's spread within Singapore's Muslim community, and provide counseling to detainees.

In April, the Government of Singapore and the U.S. Department of Energy commenced joint operation of a Second Line of Defense (SLD) Megaports pilot project at Singapore's Pasir Panjang Terminal. Radiation detectors monitored export containers and a limited number of inter-terminal transshipped cargo containers. In July, Singapore announced a voluntary plan to enhance supply chain security. The plan included security guidelines and goals for companies to adhere to, in order to improve the security of their operations.

Since August, all new Singaporean passports were biometrically enabled. Singapore shared lost and stolen passport information with the U.S. and was working with its Association of Southeast Asian Nations (ASEAN) partners to develop similar data-sharing. Singaporean officials took strong measures to enhance maritime security in nearby waters, especially the Strait of Malacca, including countering terrorist threats, piracy, and other criminal attacks. In April, Singapore, Malaysia, and

Indonesia signed the Malacca Strait Patrols (MSP) agreement linking naval and air patrols over the Strait of Malacca by the three littoral states. In November, Singapore hosted the inaugural meeting of the 14-member governing council of the Regional Cooperation Agreement on Combating Piracy and Armed Robbery Against Ships in Asia (ReCAAP). Singapore provided significant funding for the organization's Information Sharing Centre, based in Singapore. Singapore actively participated in counterterrorism efforts through various international fora, including the ASEAN Regional Forum, and continued to take part in the Proliferation Security Initiative (PSI), including the October Leading Edge PSI interdiction training exercise.

## TAIWAN

Taiwan is not a member of the United Nations and, therefore, is not subject to UNSC  Resolutions and cannot join UN conventions and protocols related to terrorist financing.  Nonetheless, Taiwan sought to implement, to the maximum extent possible, all UN resolutions relating to combating terrorism and terrorist finance issues. Taiwan continued to provide rapid and thorough responses on terrorism financing issues to the American Institute in Taiwan (AIT).  Taiwan's Executive Yuan submitted an "Anti-terrorist Action Law" to the Legislative Yuan. This bill would empower the Finan- cial Supervisory Commission to seize assets of entities involved in terrorist activities, and employ a package of trade, travel, and financial sanctions against North Korea in response to UNSCR 1718. These items are under review.

The cabinet-level Counterterrorism Office conducted several large-scale training exercises. While its primary mission was counterterrorism, its focus broadened to include crisis management, disaster preparedness, and island-wide civilian military mobilization.

In September, the Container Security Initiative began operations at Taiwan's port of Kaohsiung and subsequently was expanded to Keelong harbor. Inspections in Kaohsiung have already yielded seizures of counterfeit currency and illegal drugs. In May, AIT and the Taipei Economic and Cultural Representative Office signed a Memorandum of Agreement to implement the U.S. Department of Energy's Megaports program in Kaohsiung to help prevent trafficking in radioactive materials. Taiwan's Ministry of Economic Affairs announced a more comprehensive requirement for official approval of commodities exported from or transshipped through Taiwan ports to Iran and North Korea. The Ministry of Foreign Affairs tightened regulations for issuing visas to nationals of North Korea and Iran.

## THAILAND

On December 31, a series of eight bomb attacks took place at six separate locations in Bangkok. The bombs killed three Thai citizens and injured dozens, including six foreign tourists. The locations targeted in the attacks were not specifically identified with foreign interests or tourists. The perpe- trators of the attacks were not identified. Thailand's biggest domestic security challenge remained the ongoing separatist movement in the far southern provinces of Narathiwat, Yala, Pattani, and Songkhla. This region, bordering Malaysia, has experienced episodic, separatist-related violence for decades among the predominantly ethnic Malay-Muslim population. Since January 2004, violence increased dramatically and continued on a near daily basis. Suspected separatist militants carried out shootings, beheadings, and several coordinated bombings using improvised explosive devices, including an August 31 attack on 22 bank branch offices in Yala province.

PX202

In an effort to address local grievances, the interim government[4] made a series of conciliatory gestures towards southern ethnic-Malay Muslims, including a pledge to seek talks with separatist leaders. Additionally, on November 1, the government reconstituted the Southern Border Provinces Administrative Center (SBPAC) and the Civilian, Military, and Police Command, two entities credited with effectively coordinating Thai government efforts in the region prior to their disbandment in 2002. The militants have not responded positively to these conciliatory gestures, and the violence continued.

The Government of Thailand maintained that the situation was a domestic issue. Elements of the government expressed concern, however, that militants involved in the violence may have received funding or training from outside Thailand. In November, interim Prime Minister Surayud said that militants were financing their activities in part through restaurants owned by Thai nationals living in Malaysia. Malaysian officials vehemently denied this allegation. Relations between Thailand and Malaysia remained strained as violence continued in Thai territory near their common border, but improved following visits to Kuala Lumpur by Surayud and other senior officials. The ongoing unrest received international attention and the concern of international Islamic organizations, including the Organization of the Islamic Conference, which expressed support for the reconciliation efforts made by the interim government.

Police forensics and ballistics work often failed to produce evidence that led to arrests following separatist attacks, and government prosecutors struggled to develop cases that could stand up in court. On November 18, three southern Thai Islamic teachers were convicted of criminal conspiracy charges related to their membership in the outlawed separatist group Pattani United Liberation Organization (PULO) and were sentenced to ten years in prison. This was one of the few successful prosecutions of southern militants by the government since the dramatic escalation in violence that began in 2004. In August, the Thai Attorney General held the first ever conference of Thai police and prosecutors working in the South, in part to improve cooperation between police and prosecutors. The newly reinstated SBPAC will also, for the first time, incorporate a special Ministry of Justice component offering legal aid to local citizens as well as serving to enhance police and prosecutor work in the South.

Thai security forces cooperated with the U.S. and other countries to deny safe haven for terrorists within their territory. In the past, Thailand has served as a transit point for regional terrorists, as evidenced by the 2003 capture in Central Thailand of Nurjaman Riduan bin Isomuddin (a.k.a. Hambali), JI's operations chief and the architect behind the 2002 Bali bombing. Thai and U.S. officials were concerned that transnational terror groups could establish links with southern Thailand-based separatist groups. However, there were no indications that transnational terrorist groups were directly involved in the violence, and there was no evidence of direct operational links between southern Thai separatist groups and regional terror networks.

There were several militant domestic separatist groups implicated in the ongoing violence besides PULO, including the Pattani Islamic Mujahideen Movement (GMIP) and the Barisan Revolusi Nasional Coordinate (BRN-C). Some Thai officials have publicly labeled the operational arm of the BRN-C as the Ruanda Kumpulan Kecil (RKK), which they blame for a significant number of attacks in the South. Some of these separatist groups may share elements of ideology and general rejection

---

4       On September 19, a bloodless coup d'etat removed the elected civilian government of Prime Minister Thaksin Shinawatra from power, triggering congressionally mandated Section 508 sanctions that limited selected military training and exchange programs. Most counterterrorism programs were not subject to the sanctions, however.

of Western influence held by international Islamic terrorists, but by all indications they remained primarily focused on seeking autonomy for the far southern provinces and historical grievances against the Thai state.

There was no evidence that foreign governments provided financial, military, or diplomatic support for militant separatist operations in the South of Thailand. However, Thai separatist groups such as PULO reportedly operated openly in Syria and a number of self-declared separatist leaders received asylum in Europe or were believed to be hiding in Malaysia.  Officials in the Thai government expressed concern that money from Middle Eastern charities that supported religious or educational objectives could be diverted to support separatist activities, but there was no evidence of a direct link. Thai officials expressed concern that Thai students studying in madrassas in Pakistan and the Middle East might be exposed to extremist indoctrination. In November, Royal Thai Army Commander General Sonthi Boonyaratglin met with Thai students in Karachi, in part to address these concerns.

Since 2004, the militants appear to have limited their attacks to the geographic far South and have not specifically targeted U.S. persons or interests. On September 16, a U.S. citizen tourist was killed in Songkhla province by one of five coordinated bombs and on November 19, the local Ford and Chevrolet showrooms were among six car dealerships in Yala City targeted by bombers. No group claimed responsibility for these attacks.

Thai police and security officials participated in U.S. government training programs. The U.S. and Thai militaries conducted a number of joint exercises and training programs that supported counterterrorism. Bangkok's International Law Enforcement Academy (ILEA) began a series of training modules for Thai security officials and police that included post-blast and crime scene investigation courses. Under the auspices of the Container Security Initiative and the Megaport Initiative, Thailand engaged in a range of port security programs.

The Thai Anti-Money Laundering Office (AMLO) acted as the center for interdicting terrorist finance. UN 1267 resolutions were quickly implemented by Thai banks under instructions from AMLO. Thailand has engaged with the G-8 Counterterrorism Action Group on increasing penalties for document fraud, which is an ongoing problem in Thailand.

The Government of Thailand participated actively in international counterterrorism efforts through ASEAN and other fora, but areas of concern remained. Thailand was party to only six of the 13 international conventions and protocols relating to terrorism. Thailand has not endorsed the Proliferation Security Initiative (PSI), which negatively affects regional counter-proliferation cooperation given Thailand's regional leadership role and strategic location.

PX202

## EUROPE AND EURASIA OVERVIEW

> "We must always keep in mind that terrorism, as an age-old method of coercion, has no deeper links to any culture or religion. Hence, we should be cautious not to associate any faith with terrorism."
>
> —**Mr. Abdullah Gul,** Deputy Prime Minister and Minister of Foreign Affairs, Republic of Turkey
> Remarks, UN General Assembly, 61st Session New York City, September 22, 2006

While no major terrorist attacks took place in Europe in 2006, foiled plots and concerns over increasing radicalization among immigrant youth served as stimulus for increased cooperation and efforts to strengthen counterterrorism capabilities. Italy and Germany worked closely with neighboring countries and held a successful and incident-free Winter Olympics and World Cup, respectively. European nations continued to work in close partnership with the United States on the global counterterrorism campaign and continued to enhance both their individual and collective abilities to deal with a terrorist threat characterized by both external and, increasingly, internal components. The contributions of European countries in sharing intelligence, arresting members of terrorist cells, and interdicting terrorist financing and logistics were vital elements in the War on Terror.

At the June 2004 U.S. - EU Summit, the sides agreed on a Declaration on Combating Terrorism that renewed the transatlantic commitment to develop measures to maximize capacities to detect, investigate and prosecute terrorists, prevent terrorist attacks, prevent access by terrorists to financial and other economic resources, enhance information sharing and cooperation among law enforcement agencies, and improve the effectiveness of border information systems. These commitments were reconfirmed at the 2006 Summit and work continued on implementation.







UNITED KINGDOM, London:  A combination of handout images obtained 08 November 2006 from Britain's Metropolitan Police shows books, notes, maps and a room used by British al-Qaida terrorist Dhiren Barot. AFP Photo/Metropolitan Police Handout

48

PX202

In 2006, the ratification/implementation of the Extradition and Mutual Legal Assistance Treaties between the U.S. and EU Member States was ongoing. (In the United States, the treaties were submitted to the Senate Foreign Relations Committee.)  In October, the U.S. and EU reached an interim agreement on the transferring of passenger name record data, which was necessitated by the nullification of the earlier agreement by a European court. On November 6, the U.S. and the EU signed an agreement to facilitate U.S. participation in Eurojust, the EU's prosecutorial liaison organization. Also in November, the U.S. and EU launched a formal dialogue to develop common data protection standards to facilitate efforts to share terrorist information.

European nations are active participants in a variety of multilateral organizations that contribute to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF), the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). The United States and its partners work through these organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and help fight the War on Terror globally. OSCE members committed themselves to becoming parties to the 13 UN terrorism conventions and protocols, to work together to modernize travel documents and shipping container security, to prevent and suppress the financing of terrorist organizations, and to implement UNSC Resolution 1540 to counter WMD (related materials and the means of delivery) proliferation. (See Chapter 5 for further information on the G8, NATO, FATF, and OSCE.)

Terrorist activity and the presence of terrorist support networks in Europe remained a source of concern. Efforts to combat the threat in Europe were sometimes slowed by legal protections that made it difficult to take firm judicial action against suspected terrorists, asylum laws that afforded loopholes, inadequate legislation, or standards of evidence that limited the use of classified information in holding terrorist suspects. Terrorists are also able to take advantage of the ease of travel among Schengen countries[5]. Some European states have at times not been able to prosecute successfully or hold some of the suspected terrorists brought before their courts. The EU as a whole remained reluctant to take steps to block the assets of charities associated with HAMAS and Hizballah.

European governments were increasingly concerned about radicalization among their indigenous populations and sought greater understanding of the process of "radicalization" and how to prevent it. Several governments increased outreach to Muslim communities living within their countries and made attempts to gain support from within those communities to counter the appeal of extremist ideology.

The announcement by al-Qaida in the Islamic Maghreb (AQIM), formerly the Salafist Group for Preaching and Combat (GSPC), that it was merging with al-Qaida sparked concerns throughout Europe, in particular in France, after the AQIM/GSPC made more threats against what it termed "crusading" westerners, particularly American and French citizens.

In March, the Basque Fatherland and Liberty (ETA) terrorist group declared a "permanent cease-fire," leading to hopes that its long campaign would at last come to an end.  On December 30, however, following street violence by ETA supporters and the organization's theft of 350 handguns from an armory in France, ETA set off a huge car bomb at the Madrid International Airport that killed two Ecuadorian immigrants.

---

5       *In June 1985, seven European Union countries signed a treaty in Schengen, Luxembourg, to end internal border checkpoints and controls.  At present, there are 15 Schengen countries, all in Europe. The Schengen countries are: Austria, Belgium, Denmark, Finland, France, Germany, Iceland, Italy, Greece Luxembourg, Netherlands, Norway, Portugal, Spain, and Sweden.*

PX202

In July, terrorists planted suitcase bombs that failed to detonate on two German trains.

In August, in cooperation with the U.S. and Pakistan, British authorities disrupted a terrorist plot to blow up aircraft traveling between the United Kingdom and the United States. Some 15 persons suspected of being involved in the UK-based plot were arrested.

Political progress in Northern Ireland continued, resulting in a marked decrease in terrorist incidents. The Independent Monitoring Commission (IMC), which monitors progress by paramilitary groups in ending violent activities, reported in October that evidence showed the leadership of the Provisional Irish Republican Army (IRA) was committed to following a peaceful path.

Cooperation among European law enforcement agencies was important to counterterrorism successes. France and Spain continued to cooperate effectively against ETA. Belgian courts convicted individuals connected to the 2003 Madrid bombings and several countries, including France, Spain and Italy, broke up terrorist networks facilitating travel by foreign fighters to Iraq.

U.S.- European bioterrorism cooperation expanded. The topic was addressed at high-level U.S.- EU counterterrorism talks and at the U.S.- Russia Counterterrorism Working Group.  Switzerland and the U.S. co-sponsored the successful "Black Ice" bioterrorism coordination exercise in Montreux, hosting senior officials from numerous multilateral organizations. During its 2006 G8 presidency, Russia worked closely with the U.S. to launch the Global Initiative to Combat Nuclear Terrorism.

Several significant terrorist leaders were killed in Russia. In July, Russia's most wanted terrorist, Chechen separatist Shamil Basayev, was killed. In November, Russian security forces killed Abu Hafs al-Urdani, the al-Qaida-linked, Jordanian-born commander of foreign fighters in Chechnya. Central and Eastern European states made strides in countering terrorism in 2006. Many states across the Balkans, Baltics, and Caucasus sent troops to Iraq, Afghanistan, and Kosovo.

## ALBANIA

Albania contributed troops to both Afghanistan and Iraq, froze bank accounts related to money laundering and terrorism financing, and worked with the U.S. and other countries to combat terrorism. Albania made progress in identifying vulnerabilities at land and sea borders, but the government and police forces faced substantial challenges to fully enforce border security and combat organized crime and corruption.

In May, Albania granted political asylum to five Guantanamo Bay detainees, after the U.S. determined they were no longer considered enemy combatants. In November, Albania admitted an additional three former detainees who were designated for release. Albania has publicly committed to maintaining its presence in Iraq as long as required, and has a contingent of around 120 soldiers operating in the country. In Afghanistan, Albania deployed 26 troops to ISAF, including four members of a joint medical unit.

Although no new groups' assets were frozen this year under the Terrorism Financing Freeze (TFF) law enacted in 2004, the Albanian government found an additional seven holdings by already identified groups that were subsequently frozen. While the Albanian State Intelligence Service (SHISH) is the foremost counterterrorism unit within the Albanian government, much of their success went unnoticed due to the clandestine nature of their work. We note that the effectiveness of the govern-

PX202

ment's counterterrorist financing efforts was hampered by inadequate financial resources, poor communications, a lack of data processing infrastructure, and the lack of experienced personnel due to frequent turnover.

## ANDORRA

The Government of Andorra worked to build law enforcement capacity, enhance border security, and combat money laundering and terrorist financing. In September, the Minister's Council approved the ratification of the Council of Europe's Convention on Terrorism prevention signed by the Andorrans in Warsaw on May 16, 2005, and the Convention is pending approval by the Andorran Parliament. The Andorran government contributed to UNESCO's solidarity and international cooperation programs by sending financial support to Afghanistan, and provided financial support to OSCE to implement a rocket buster destruction project in Tajikistan.

## ARMENIA

With substantial U.S. assistance, Armenia continued to strengthen its capacity to counter the country's few perceived terrorist threats. Armenia's geographic location, porous borders, and loose visa regime presents opportunities for traffickers of illicit materials, persons, and finances.

Armenia's reliance on ties with neighboring Iran have dampened Armenian criticism of Iranian extremism and led to closer trade relations between the two countries. Diplomatic and trade relations with Iran are seen as a geographic and strategic necessity for the landlocked country, in light of closed borders with Turkey and Azerbaijan, and the perceived risk of instability in Georgia. President Kocharian spoke out in November against the possibility of international sanctions against Iran.

The Financial Monitoring Center (FMC), a U.S. - supported financial intelligence unit within the Central Bank, is still developing as a regulatory body. Established in 2005, the FMC began to make investigative strides this year. The FMC received 23 suspicious transaction reports in 2006. After analyzing the reports, the FMC developed five suspicious transaction cases; three of the cases were subsequently referred to the Prosecutor General's office for further investigation. To date, the FMC has received no reports of transactions involving watch-list designees. The heavy flow of remittances, however, may hinder efforts to detect fund transfers in support of terrorism. The FMC has applied for Egmont Group membership.

Armenia introduced additional security features into the production of passports, continued to install passport readers at border posts, and continued efforts to increase the security of its vital documents, such as birth certificates. On November 1, the government implemented mandatory fingerprinting for travelers departing Zvartnots Airport, Armenia's only international airport. The National Security Service (NSS) and police shared information with the U.S. Embassy when they discovered fraudulent U.S. visas or other such documents.

In May, the UN Analytical Support and Sanctions Monitoring Team for al-Qaida and the Taliban visited Armenia to monitor the implementation of sanctions under UNSCR 1267 and successor resolutions. The team met with the Central Bank, the Ministry of Defense, the National Security Service and the Police, as well as the Ministry of Foreign Affairs. According to the MFA, the team said it was satisfied with Armenia's level of preparedness. Armenia supported U.S. efforts in Iraq with troops on the ground and provided overflight authorization in support of Operation Enduring Freedom.

PX202

In September, Armenia participated in a CIS-wide exercise called "Atom-Antiterror 2006." The Armenian Special Forces together with the Russian Federal Security Service, ran counterterrorism and hostage release drills at the Armenian Nuclear Power Plant.

## AUSTRIA

In May, during its EU Presidency, Austria welcomed Attorney General Alberto Gonzales and Department of Homeland Security Deputy Secretary Michael Jackson to a conference of Justice and Interior Ministers from the EU and Russia. The participants signed a declaration to increase cooperation against terrorism, organized crime, corruption, and illegal migration. In June, President Bush attended the U.S.-EU Summit in Vienna and discussed developing biometric standards and preventing WMD proliferation, terrorist financing, and radicalization and recruitment.

Austria promoted intercultural dialogues as a preventive strategy against radicalization and the isolation of ethnic and religious groups. In April, it hosted the second European Conference of Imams and convened a "Dialogue between Cultures and Religions" for high-ranking government and religious leaders from around the world in May. Austria has a comprehensive legal framework to combat money laundering and terrorism financing. It achieved a good level of compliance with FATF's nine Special Recommendations. Also in April, Austria hosted a joint EU-Gulf countries seminar in Brussels to strengthen international cooperation among financial intelligence units, non-profit organizations, and formal and informal banking systems. Austria allocated 12 million euros for counterterrorism measures and amended its export control legislation to further restrict transfers of chemicals, software, and weapons. In June, Austria hosted a U.S.-EU workshop on terrorist financing for 120 representatives from EU member state governments, and the private financial sector. The meeting focused on identifying best practices for ensuring private sector compliance with financial sanctions.

Austria maintained three instructors at the International Police Training Center in Jordan to train Iraqi police and four Austrian liaison officers served in the International Security Assistance Force (ISAF) headquarters in Kabul.

## AZERBAIJAN

Azerbaijan's counterterrorism cooperation with the United States included granting blanket over-flight clearance, engaging in information sharing and law-enforcement cooperation, and approving numerous landings and refueling operations at its civilian airport in support of OEF. Azerbaijan has supported peacekeeping operations in Iraq since August 2003 with an infantry company of approximately 150 soldiers stationed at the Haditha dam. A platoon of Azerbaijani soldiers has been working with the Turkish peacekeeping contingent in Afghanistan since November 2002, and President Aliyev announced plans to double this number to between 40 and 44 soldiers.

Azerbaijan stepped up its efforts and had some success in reducing the presence and hampering the activities of international mujahedin with ties to terrorist organizations seeking to move people, money, and material throughout the Caucasus. Azerbaijan took steps to combat terrorist financing and identify possible terrorist-related funding by distributing lists of suspected terrorist groups and individuals to local banks. In December, the inter-ministerial experts group responsible for drafting anti-money laundering and counterterrorist finance legislation,  provided its most recent draft to the U.S. Department of Justice and the Council of Europe (COE) for comment. The draft law included the establishment of a Financial Intelligence Unit (FIU) and would expand the predicate crimes for money laundering beyond narcotics trafficking.

PX202

In April, the Azerbaijani Serious Crimes court sentenced six men in a group called Al-Muvahhidun Jamaat to prison terms ranging from ten to fifteen years. The group was convicted of purchasing illegal weapons, armed robbery, illegal border crossing, fabricating documents and resisting arrest. According to the Azerbaijani Ministry of National Security, the members of the group planned to travel to Afghanistan, Pakistan, Iran and Turkey for military training. The group was accused of planning bomb attacks on the U.S., Israeli and Russian embassies, the State Oil Company of the Azerbaijan Republic (SOCAR) building, and the National Bank of Azerbaijan; and "seeking the physical elimination of the leaders of Azerbaijan's government and security forces." (Members of the group were first arrested on July 13, 2005.)

Also in April, in a trial involving a group called al-Qaida Caucasus (separate from a group of the same name sentenced in 2005), 16 group members were sentenced to terms of up to life in prison. The group was convicted of the illegal purchase and bearing of firearms and for the July 2005 assassination of an officer of the Azerbaijani Ministry of Internal Affairs. The group consisted of citizens of Azerbaijan, Turkey, Russia and Yemen. Most of them were activists of various radical religious organizations that had undergone training at a camp in Georgia's Pankisi Gorge.

Azerbaijan extradited to Russia a terrorism suspect accused of a bombing in Dagestan in 2002. The suspect was originally arrested in Azerbaijan and, in April, was sentenced by an Azerbaijani court to seven years in prison. He was subsequently extradited to Russia.

## BELGIUM

The Belgian government continued efforts to improve its ability to combat and control terrorist financing, including disrupting the possibility for untraced money flows through phone shops and other alternate remittance systems, value added tax refund carousels, laundered proceeds through narcotics trafficking or prostitution, and the diamond trade. Separately, the Belgian government enacted new legislation that broadened the definition of "bank account" to include insurance, stocks or other securities, and other financial instruments, for the purpose of investigating financial crimes, including the financing of terrorism. The burden of proof on judges to freeze terrorist assets was relatively high. To constitute a criminal offense, authorities had to demonstrate that support was given "with the knowledge that it would contribute to the commission of a crime by the terrorist group."

Belgium contributed 340 troops to the International Security Assistance Force (ISAF) in Afghanistan. The government also provided support for Afghan reconstruction. Belgium plans to expand its technical assistance efforts in Iraq and has begun implementing debt forgiveness within the framework of Paris Club agreements. It expanded its participation in the Jordan International Police Training Center in Amman, increasing the number of Belgian police officers at the facility from two to four. Other programs included training for Iraqi diplomats and magistrates in Belgium and training for Iraqi servicemen in Abu Dhabi, in cooperation with Germany.

Belgium is not a significant safe haven for terrorist groups, although the PKK operated television production facilities in the country. Belgian authorities were concerned about potential terror activities involving groups from Algeria and North Africa, and investigated groups such as the Moroccan Islamic Combatant Group (GICM), the Revolutionary People's Liberation Front (DHKP-C), and a far right group with links to neo-Nazi groups.

In February, a Belgian court convicted members of the GICM for belonging to a terrorist group linked to attacks in Madrid and Casablanca and providing logistical and financial support to the GICM. Under the antiterrorism law, prosecutors focused on the material support the suspects provided to

PX202

terrorists, including lodging and false documents. Three of the 13 defendants were sentenced to terms of six to seven years. Six received three to five year sentences under the 2003 antiterrorism law, which criminalized membership in a terrorist group and broadened the definition of terrorist acts. In September, a Belgian appeals court upheld the convictions of five GICM members and imposed sentences ranging from 40 months to eight years.

In another case, also prosecuted pursuant to the 2003 antiterrorism law, members of the DHKP-C were convicted for membership in a terror organization and for providing material support to a terrorist group. In November, the Belgian court of appeals upheld those convictions. In September, Belgian authorities arrested 17 members of a loosely-organized far right group with links to neo-Nazi groups that was allegedly planning attacks to disrupt Belgian democratic institutions.

## BOSNIA AND HERZEGOVINA

Bosnia and Herzegovina's law enforcement organizations cooperated with the United States on international counterterrorism. Bosnia remained a weak state, however, with multiple semi-autonomous centers of power, vulnerable to exploitation as a terrorist safe haven or as a potential staging ground for terrorist operations in Europe. Nevertheless, there were notable signs of increased local operational capability to combat terrorism and terrorism finance.

Bosnian authorities continued to strengthen existing counterterrorism mechanisms and develop new ones. The Inter-Ministerial Counterterrorism Task Force (IMCTF), formed in December 2004, and currently responsible for coordinating all State-level institutions with counterterrorism responsibilities, directed two successful terrorism-related deportations in 2006. On February 8, the State Investigative and Protection Agency (SIPA), the State Border Police (SBP), the Foreigners Affairs Service (FAS), and the State Prosecutor worked together to remove convicted terrorist Said Atmani from the country. Atmani, a Moroccan national who fought in Bosnia during the war, served three years in jail for a bombing in France in the mid-1990s, before returning to Bosnia in 2005. On August 30, these agencies deported Tunisian national Bedrudin Ferchicij (a.k.a. Abu Malik), a mujahedin fighter who had remained illegally in Bosnia after the war. Despite these successes, the Task Force's operational effectiveness was generally hampered by insufficient coordination, such as infrequent communication and a lack of clear divisions of labor among the agencies.

In January, the Government of Bosnia and Herzegovina formed the Citizenship Review Commission (CRC). The Commission reviewed the status of foreign Mujahadin fighters and others who obtained Bosnian citizenship during and after the 1992-95 war, and withdrew citizenship from those who had obtained it improperly. In October the Council of Ministers adopted the Commission's interim progress report.  According to the report, the CRC has completed preliminary reviews of approximately 600 cases (about half the total number pending), adjudicated 150 decisions, and stripped about 50 individuals of their citizenship.  Among those stripped were three men listed under UNSC 1267 Committee for links with the Taliban, UBL and/or al-Qaida. The Foreigner Affairs Service had responsibility for determining the appropriate legal status of people stripped of citizenship and of initiating deportations when mandated under the Law on Movement and Stay of Aliens and Asylum. Although created in August 2005, vacant leadership positions stalled FAS institutional development until summer 2006. The process of drafting a revised Law on Movement and Stay of Aliens that would define and strengthen the FAS, which also began in 2005, remained unfinished.

The Bosnian State Court heard opening arguments in its first state-level terrorism trial in July. The trial remained underway with three individuals that were arrested in October 2005 and charged with terrorism, and two others charged with illegal possession of explosives. During the arrests,

54

PX202

authorities confiscated weapons, explosives, a crudely fashioned suicide belt, and a video depicting masked men supposedly preparing to attack unspecified European targets. Lead defendants Mirsad Bektasevic (a Swedish citizen) and Abdulkadir Cesur were linked to terrorist networks elsewhere in Europe, and Cesur was also a named defendant in a terrorism trial concurrently underway in Denmark.

The Bosnian organization Aktivna Islamska Omladina (Active Islamic Youth, or AIO)  spread extremist and anti-American rhetoric through its weekly print and on-line publication SAFF Maga-zine. AIO was founded in Zenica in 1995 by individuals with ties to the so-called "El Mujahid Brigade," a wartime unit comprised mainly of foreign extremists. There were indications that AIO conducted youth outreach in Bosnia during the year and maintained a presence in Western Europe.

In December, the Ministry of Defense pledged to donate 50,000 AK-47 rifles and necessary ammu-nition to security forces in Afghanistan in support of OEF.  Bosnia and Herzegovina deployed a 36-member Explosive Ordinance Disposal (EOD) unit in Iraq in support of Operation Iraqi Freedom. The unit began its fourth rotation in Iraq in November.

## BULGARIA

Bulgaria participated in both Operation Iraqi Freedom and the International Security Assistance Force (ISAF) in Afghanistan. Bulgaria's OIF contribution included a year-long deployment of a 154-person security company to Camp Ashraf in March, peace support operations training for 27 Iraqi officers at the National Military University in Veliko Turnovo in August as part of the NATO Training Mission in Iraq, and deployment of four officers to the NATO Training Mission in Iraq in October. In Afghanistan, Bulgaria maintained approximately 150 military personnel throughout the year, including soldiers assigned to HQ SEEBRIG; a separate mechanized infantry platoon assigned to the Kabul Multinational Brigade; a military police and counterintelligence platoon in Kabul; three military medical teams in Kabul and Herat; and Air Force personnel operating Kabul International Airport from October through December.

The Financial Intelligence Agency (FIA) continued efforts against terrorist financing and cooperated with the U.S. government on identifying terrorist assets. The FIA distributed lists of individuals and organizations linked to terrorism to all Bulgarian banks, the Ministry of Interior, Customs, and the Border Police. Parliament further strengthened the FIA's investigative powers by passing amend-ments enabling the FIA to obtain bank information without a court order.

## CROATIA

The Croatian government increased its contribution to the International Stabilization and Assistance Force (ISAF) in Afghanistan from 50 to 147 soldiers who served in military police, medical support and training roles. In addition, Croatia maintained a small civilian and police team deployment to the German-led Provincial Reconstruction Team in Feyzabad. On December 8, the Croatian Parliament approved a further increase to 200 troops in 2007, and to 300 troops in 2008.

Croatia's long land and sea borders presented a monitoring and enforcement challenge and guided continued efforts to improve its border integrity, its export control regime, and to prevent the prolif-eration of weapons of mass destruction. In November, Croatian police arrested in two men who

PX202

were carrying explosives in Zadar, Croatia. The case was initially investigated as a terrorist plot to target and detonate the explosives on a ferry in the Adriatic Sea. Subsequent information pointed to the more likely scenario of an organized crime operation.

## CYPRUS

Despite limited resources, Cyprus took a clear stand against international terrorism and supported U.S. counterterrorism efforts. The government continued to allow blanket overflight and landing rights to U.S. military aircraft supporting operations in Iraq and Afghanistan. However, the government raised concerns about the allegations in a Council of Europe report identifying Cyprus as a "staging post" for U.S. rendition flights. Cyprus was generally supportive of international efforts to block and freeze terrorist assets, implemented Financial Action Task Force (FATF) recommendations, and conformed to EU directives on counterterrorism. In 2005, the Director of the Cyprus Central Intelligence Service (KYP) drafted and submitted to parliament legislation to restructure, modernize, and strengthen Cyprus's intelligence-gathering capabilities.

Third-country nationals comprised approximately ten percent of the Republic of Cyprus population, and the asylum community was growing. The government had concerns that this population was a potential source of recruits for terrorist groups looking to extend their reach into Europe. Moreover, the UN-patrolled "Green Line" dividing north and south is relatively porous. Immigration controls were uneven, and it was relatively easy for asylum seekers to cross from the Turkish Cypriot-administered area. Such border conditions posed a potential vulnerability and access point for terrorist groups seeking entry into an EU member state (the EU's "acquis communitaire" currently is suspended in the north of Cyprus).

Cyprus's eastern Mediterranean location and the large volume of container traffic moving through its ports made the island potentially convenient for terrorist organizations seeking transshipment points for WMD and other items of concern. While Cypriot agencies responsible for nonproliferation assessed there was only a small risk that illicit materials might move through transit cargo, the United States continued to work for increased maritime cooperation.

In addition to EXBS activities, there was increased collaboration between the U.S. Embassy and the U.S. Defense Threat Reduction Agency (DTRA) in providing antiterrorism programming to Cyprus through the Department of Defense's International Counterproliferation Program (ICP).  In October, the ICP provided an "Executive Seminar" on terrorist applications of weapons of mass destruction for 40 senior Republic of Cyprus officials.

The Kongra Gel/Kurdistan Workers' Party (KGK/PKK) maintained an active presence throughout Cyprus and reportedly used the island as both a fundraising and transit point.  Experts estimated the Kurdish community in the government-controlled area to number 1,500.  Among Kurdish-origin Turkish settlers in the north, the KGK/PKK reportedly enjoyed significant support. Cyprus maintained that it was fulfilling all responsibilities with respect to the EU designation of the KGK/PKK as a terrorist organization. Authorities in both the area under government control and in the area administered by Turkish Cypriots believed there was little risk the KGK/PKK would conduct operations on Cyprus and were reluctant to take any action that they perceived could make the island a potential target for PKK action. In addition, Turkish authorities believed that the large Turkish troop presence in the north acted as a significant deterrent to open KGK/PKK activity.

PX202

## CZECH REPUBLIC

The Government of the Czech Republic provided military assistance in Iraq and Afghanistan, cooperated in routine investigations, and worked with the U.S. to protect the Prague headquarters of Radio Free Europe/Radio Liberty. The Czech Republic contributed 101 troops to Coalition efforts in Iraq, 148 troops to the International Security Assistance Force (ISAF) in Afghanistan, and 120 Special Forces troops under Operation Enduring Freedom.

In December 2005, pursuant to a U.S. arrest warrant and INTERPOL Red Notice, Czech authorities arrested Oussama Kassir, a Lebanese-born Swedish national, in transit from Stockholm to Lebanon. Kassir was wanted in the United States on allegations that he conspired to provide material support to terrorists in the planned establishment of a terrorist training camp in Bly, Oregon. In June, a hearing was held to consider the extradition. Kassir remained in Czech custody pending continued consideration of the U.S. extradition request.

## DENMARK

Denmark implemented several new measures as part of two anti-terror packages adopted by Parliament. These new measures criminalized the recruitment of persons to terrorism, and the training of others to assist in committing terrorist acts, including financing terrorism.

These new counterterrorism packages also enhanced the Danish government's ability to investigate and prevent terrorism and other serious crimes. Under the new acts, police may jam or disrupt communications to prevent criminal acts relating to terrorism or the security of Denmark. Information sharing between the Danish Security Intelligence Service (PET) and other agencies was made easier; and phone and internet providers must retain certain data for one year. In addition, the new legislation expanded the scope of certain warrants, allowing the police to conduct repeated searches under one warrant and to obtain intercept warrants covering an individual, rather than a particular phone number or single means of communication.

In January, the Danish government established the Center for Terrorism Analysis under the PET, which was composed of 15 analysts from five agencies. The government also transferred 150 employees from the national police to the PET to strengthen investigative capabilities within the intelligence service for terrorism and other serious crimes. In addition, the government proposed legislation that would prohibit private persons from purchasing fertilizer with ammonium nitrate levels of more than 28 percent, which could be used for improvised explosive devices.

Danish police and prosecutors cooperated closely on terror-related cases. Acting under the new counterterror measures and under provisions of its 2002 counterterrorism law, which explicitly criminalized both terrorism and providing financial and other support to terrorist groups, Danish authorities made several arrests on terrorism-related charges. In September, Danish officers arrested nine individuals suspected of planning a terrorist attack in Denmark in a suburb of Odense, Denmark's third-largest city.  Five of the individuals remained in custody.

Danish authorities proceeded with several court trials on terrorism charges. In August, Danish prosecutors indicted four individuals, all born in Denmark, for attempting to conduct terrorist acts in cooperation with two men arrested in Bosnia in 2005. The four were charged under the terrorism statute; the trial began in December.

PX202

The trial continued against three members of the Danish branch of the Al-Aqsa Foundation (a Palestinian charity with suspected links to HAMAS) charged with supporting terrorism. They were indicted in 2003 for funneling money collected in Denmark, ostensibly for humanitarian purposes, to terrorist-related groups abroad. Danish authorities seized approximately $89,406 in funds from the organization. The case is Denmark's first prosecution under its financing of terrorism legislation.

The trial of Said Mansour, a Danish citizen originally from Morocco, began in December.  Mansour was arrested in September 2005, by Danish police, for making and distributing CDs and videos throughout Europe that showed beheadings and killings and called for a violent jihad against the Western world. He was charged under the counterterrorism statute for attempting to recruit terrorists and facilitate terrorism, the first such case in Denmark. Mansour previously served a 90-day sentence from December 2004 on weapons possession charges.

Patrick MacManus, the spokesman of the Danish Non-Governmental Organization, "Opror" (Revolt) was indicted in October for violating Danish counterterrorism legislation by transferring approximately $17,000 to the Revolutionary Armed Forces of Colombia (FARC) and the Popular Front for the Liberation of Palestine (PFLP). In 2005, MacManus informed local media that the group's actions were a means to challenge Denmark's counterterrorism laws.

Denmark deployed more than 450 military personnel in southern Iraq to assist with security and reconstruction efforts, and contributed more than 350 military personnel to the International Security Assistance Force in Afghanistan. Denmark served as chair of the UN Security Council's Counterterrorism Committee.

### ESTONIA

Estonia contributed 132 soldiers to participate in the UK-led provincial reconstruction team in Helmand, Afghanistan. The Estonian contribution consisted of an explosive ordnance disposal team, a national support element, a military observation team, a human intelligence team, a platform maintenance team in Kabul, and infantry. Estonia also sent 38 soldiers to participate in international peace support operations in Iraq. In addition, two staff officers served in the NATO-led training mission along with one police trainer in the Iraq training mission in Jordan.

 In April, Estonian law enforcement, security police, and defense forces took part in Shamrock Key 2006, a regional counterterrorism exercise held in Lithuania, Latvia, and Estonia. The U.S., Norway, and Poland also participated as NATO partners. The exercise's objective was to improve cooperation and coordination between the various NATO allies' counterterrorism units, including synchronization of communications systems, coordination of logistical support, and cooperation on combat tactics.

On August 17, the Government of Estonia's antiterrorism council approved its antiterrorism policy's basic principles and action plan. The council consisted of representatives from the Ministries of Defense, Justice, Foreign Affairs, Economic Affairs and Communication, Internal Affairs (which included Security Police and Central Criminal Police), and the State Chancery's National Security Coordination Office. The Ministry of Internal Affairs headed the council.

PX202

## FINLAND

Finland held the EU Presidency from July-December and made counterterrorism a top priority. The government led ongoing efforts within the EU to remove institutional barriers to counterterrorism cooperation and championed EU cooperation with the U.S. and international community. In November, Interior Minister Rajamaki visited Washington for discussions with Justice and Homeland Security officials, and FBI officials participated in Finnish-sponsored EU seminars.

Approximately 100 Finnish troops were deployed in Afghanistan in support of ongoing NATO operations, and a number of Finnish civilian crisis management experts were working in Afghanistan as well. Finland aims to provide ten million euros in development and humanitarian assistance to Afghanistan on an annual basis.

On October 1, 2005, new regulations entered into force requiring ships to submit security-related information prior to entry into port. Finland signed a Mutual Legal Assistance Treaty (MLAT) with the United States; the treaty is awaiting ratification by the Finnish Parliament.

In cases when another government presented a legal request for action or when an individual or organization was suspected of having committed an offense within Finland's borders, Finland implemented regulations that allowed it to freeze assets without EU or UN approval. Finland amended its criminal code to make it possible to sentence leaders of terrorist groups to 15 years in jail, although the group would have to have actually committed an act of terrorism in Finland before investigation or prosecution could begin. If the charge included murder, the maximum sentence would be life imprisonment.

## FRANCE

France pursued aggressive counterterrorism measures, including dismantling terror networks on its territory, notably those assisting in the recruitment or financing of terrorists to Iraq. In total, French authorities arrested 317 people in connection with terrorism: 140 for links to Islamic terrorism,150 for attacks in Corsica, and 27 with ties to Basque Fatherland and Liberty (ETA).  Since 2002, French police have arrested 1,422 persons on terrorism related charges.

In September, the Salafist Group for Preaching and Combat (GSPC) announced its merger with al-Qaida, changed its name to al-Qaida in the Islamic Maghreb (AQIM), and declared France its number one target. Several high profile events -- including the local publication of the Danish Mohammed cartoon pictorials, heated debate on the interdiction of the veil in French public institutions, and the presence of French troops in Afghanistan and Lebanon -- were cited by various French authorities as factors manipulated by Islamic extremists to incite violence.

In May, 29 people were detained in France for suspected association with Iraq-related terror networks. In September, officials noted that at least nine terrorists, whose journey to Iraq began in France were killed, two were incarcerated, and another twelve-to-fifteen were likely still engaged in combat against Coalition Forces. Increasing Islamic radicalization in the prison system also continued to worry French officials.

On January 23, the French government adopted new counterterrorism legislation that considerably strengthened police powers in criminal law and codified some current practices. Preliminary detention for terrorism suspects was extended from a maximum of four to up to six days. Current legislation allowed the state to thereafter place suspects in pre-trial detention for up to four years when the evidence is strong or when they present an imminent threat. The law gave the government

PX202

additional powers for the freezing of assets, video and telephone surveillance, allowed increased monitoring of public transport records, and granted broader powers of official access to connection data held by internet cafes and to various personal data records. Sentences for convicted terrorists were increased from 20 to 30 years for leading or organizing an attack, and from ten to twenty years for assisting a terrorist organization or operation. The new law also reinforced existing legislation that allowed for the revocation of French nationality and eventual expulsion if the terrorist became a citizen through naturalization within the preceding 15 years.

The French government published its White Paper on terrorism on March 7. The paper, a publicly available document, sets out the government's overall policy efforts to combat terrorism. It included attack scenarios, threat analyses, and technical as well as political responses to terrorism.

France continued its active engagement with the United Nation's Security Council (UNSC) Counter-terrorism Committee (CTC), the G8's Counterterrorism Action Group (CTAG), the UN's 1267 Sanctions Committee (for the Taliban and al-Qaida), and the European Council's Anti-Terrorism Strategy action plan. In response to increasing calls, especially in some European and NAM delegations, that the process of listing and delisting of terrorist groups and entities under UNSCR 1267 lacked transparency, the United States and France co-sponsored UNSCR 1730, which made improvements in the process. The resolution was adopted in December. France is a founding member of the joint U.S./Russia Global Initiative to Combat Nuclear Terrorism that was inaugurated in October. France is a member and contributor to both the Proliferation and Container Security Initiatives. The U.S. and France maintained regular bilateral counterterrorism consultations.

On the military front, French Special Forces participated in coalition operations in Afghanistan as part of OEF. France was also a key participant in Coalition Task Force (CTF) 150, a multinational naval force that patrols the Red Sea and Gulf of Yemen to interdict the movement of suspected terrorists between Afghanistan, the Arabian Peninsula and the Horn of Africa. It has twice commanded the Task Force. France's overall contributions in Afghanistan increased.

French police cooperated closely with Spanish authorities in the Basque region. Several arms caches were discovered in France, and a number of arrests of Basque Fatherland and Liberty (ETA) suspects were made throughout the year. Several ETA members were extradited to Spain. One attack, allegedly claimed by Ipparetarek (a defunct French Basque nationalist group) or an Ipparetarek sympathizer, occurred in France on June 11 against the Hotel Ostap. There were no injuries and only minimal damage.

France continued to develop competencies and capabilities of TRACFIN, the Ministry of Finance's terrorism financing coordination and investigation unit. Within the European

Union, France played an active role in the Clearinghouse, the EU process for designation of terrorist organizations. France did not designate HAMAS-affiliated charities, such as the French based Comite de Bienfaisance et Secours aux Palestiniens (Committee for the Well-Being and Assistance to Palestinians), arguing that it had no proven links to terrorism. France also opposed EU designation of Lebanese Hizballah as a terrorist organization, although it supported Hizballah's eventual disarmament, maintaining that disarmament would result in Hizballah's gradual integration into Lebanese politics.

Attacks on the French island of Corsica were up approximately 38 percent in 2006, totaling over 225. A majority of these attacks were claimed by the National Front for the Liberation of Corsica-Combatants Union, or by the National Front for the Liberation of Corsica of October 22. Three terrorists were killed during the year by accident while attempting to carry out attacks. The government had a widespread police presence in the region and arrested dozens of people throughout

PX202

the year in connection with various attacks. The groups tended to target secondary residences, and avoided serious damage or casualties. Separatist groups appeared to have largely given up their political battle for independence but continued to wage an intimidation campaign aimed at foreigners or mainland French citizens interested in permanent residence or secondary homes on the small island.

Key judicial proceedings on Islamic terrorism related crimes included:

—On June 13, 25 Islamic militants tied to a Chechen extremist network that allegedly planned to bomb a commercial center in Paris and the Eiffel Tower were sentenced. Several members of the group, including Menad Benchellali and Merouane Benhamed, received the maximum sentence of ten years.[6]

—Five of six former Guantanamo detainees expelled to France in 2004 and 2005 were no longer in detention (they were initially detained for many months after their arrival in France). One, Brahim Yadel, remained in custody for violating the terms of his conditional release. All six former detainees faced further charges in France for terrorist conspiracy.  In September the trial was halted when a judge ordered further investigations into the role of alleged visits of French intelligence authorities to Guantanamo.

—On October 26, Karim Mehdi, a Moroccan national, was sentenced to nine years for terrorism related activities. Mehdi is alleged to have ties with September 11 terrorists (Ramzi bin al Shaibah and Ziad Jarrah) and is suspected of planning an attack on the island of Reunion in 2003. Mehdi will be deported following his sentence and not allowed in France for a minimum of six years.

—On March 29, Rachid Ramda, who was extradited to France from the UK in December 2005 after ten years in detention, was sentenced to ten years for his role in the 1995 Paris subway and train attacks.

—On November 12, France's chief counterterrorism judge, Jean-Louis Bruguiere, sent tothe Paris Court of Assises the cases of three suspects allegedly connected to the 2002 Djerba, Tunisia attacks. Khalid Sheikh Mohammed (KSM), Christian Ganczarski, and Walid Nawar are suspected of assisting convicted terrorist Belgacem Nawar in the Djerba AQ attacks whose victims included two French citizens.  Khalid Sheikh Mohammed remained in U.S. custody at Guantanamo.

—In late November, three individuals were detained in France after being expelled from Syria; they were suspected of attempting to transit through Syria to join insurgents fighting against Coalition Forces in Iraq. Another nine individuals were deported from Egypt in mid-December under similar charges.  All were released after a brief period of detention.

—On July 19, Adel Tebourski, a Tunisian and French dual-national citizen, who was arrested in 2001 and sentenced in 2005 for his contribution to the September 9, 2001 assassination of Afghan War Chief Ahmad Shah Massood, was stripped of his French nationality by decree and expelled to Tunisia on August 7.

—Karim Bourti, a French AQIM/GSPC supporter, was also stripped of his citizenship in May.

---

6 *The French government continued its policy of expelling non-French citizens engaged in terrorist activities or speech that promoted hate or incited violence.  Among those ordered expelled from France were at least 20 imams from Algeria, Bangladesh, Morocco, and Pakistan.*

61

PX202

——Since May 2005, the Government of France revoked the security clearances of 72 individuals working in private companies at Charles de Gaulle international airport. The majority of those were announced in early November. A few of those concerned brought legal action against the government and were subsequently reinstated. The government claimed that the individuals, while not terrorists, posed a security risk to the airport because background checks showed they had sympathies with Islamic extremists.

## GEORGIA

Georgia is improving border security operations and made efforts to close its borders to those who wished to smuggle money, weapons, and supplies, but was hindered by corruption at border checkpoints, a general lack of resources, and obstructionism by Georgian separatists.  Russia's July closure of its single legal border crossing with Georgia at Verkkhniy Lars (ostensibly a temporary closure for repairs) further hampered Georgia's control over its borders. All commerce and transit from Russia into Georgia had to thus pass illegally through the separatist regions of Abkhazia and South Ossetia, where Georgian authorities have no way to monitor or control the movement of goods and people as a result of the refusal of Russia and the separatists to permit joint monitoring of Georgia's borders between these separatist regions and Russia.  Georgian internal troops carried out anti-terrorist operations in the Pankisi Gorge. The identification and safe removal of hidden weapons caches in Pankisi enabled Georgian security forces to better improve security in the area.[7]

7       *Russia continued to charge Georgia with allowing Islamic fundamentalists that support Chechen insurgents to use Georgia, specifically the Pankisi Gorge region, as a staging area and transit point for fighters and materiel.*



*GERMANY, Hamburg:  Moroccan Mounier El Motassadeq (2nd L) awaits the start of his hearing for his role in the September 11, 2001 attacks on the United States at a court in Hamburg.  Motassadeq was convicted in November as an accessory to murder in the attacks on New York and Washington and belonging to a terrorist organization.  AFP photo/Christian Charisius*

PX202

The Georgian Ministry of Internal Affairs and the Prosecutor General's Office worked closely with U.S. law enforcement on counterterrorism. On January 12, a Georgian court sentenced Vladimir Arutunyan, who was convicted of throwing a grenade at President George Bush in 2005, to life in prison.

## GERMANY

Germany participated in military operations overseas, provided leadership in multilateral settings, and fought terrorism within its borders. While no terrorist attacks took place in Germany, terrorists planted suitcase bombs that failed to detonate on two German trains, and German authorities uncovered a plot to smuggle a bomb aboard an Israeli jetliner. These incidents received extensive press coverage and were pointed to by German officials as reasons for Germany to take additional counterterrorism actions.

Germany was a leading contributor of troops to the International Security Assistance Force (ISAF) in Afghanistan with nearly 3000 troops deployed. The German Navy also participated in Operation Enduring Freedom off the Horn of Africa with roughly 330 military personnel involved.  On October 25, a German Ministry of Defense White Paper outlined that, in the future, the international fight against terrorism would be a central task for the German military. Germany has resisted sending forces to Iraq, but provided equipment and training for the Iraqi military and training for the Iraqi police in the United Arab Emirates.

Eight EU member states joined the "Pruem" agreement, a German initiative from May 2005, to deepen law enforcement cooperation. The agreement enables faster sharing of car registration, DNA, and finger-print data. Germany was active in the Global Initiative to Combat Nuclear Terrorism, in the Egmont Group of Financial Intelligence Units, and in seeking additional EU listings of terrorists.

The German government implemented legislation to strengthen its ability to fight terrorism. Federal reforms, enacted in July, granted the Federal Office of Criminal Investigation broader powers for terrorism investigations and for preventive arrest of would-be terrorists. On December 1, the German Bundestag approved two bills: one created a unified terrorism database, combining information from federal and state agencies as well as from law enforcement and security agencies; the second bill broadened and simplified the ability of German security agencies to obtain travel, financial, and telephone data.

The June 9 – July 9 Soccer World Cup brought millions of fans from around the world to 64 matches in 12 German cities. Germany sought vigorous cooperation with law enforcement officials from neighboring and participating countries to prevent terrorist incidents. Several U.S. agencies developed new bilateral cooperative arrangements with German counterparts.

During the year, German law enforcement authorities arrested and investigated numerous individuals suspected of involvement in terrorism. At the end of the year, German authorities were investigating nearly 200 cases of terrorism-related crimes nationwide. Prominent new actions and arrests included:

- The November 17 raids and detention of six individuals who tried to bribe another person to smuggle a bomb aboard an Israeli aircraft during the summer. German authorities indicated the plot had been at an early stage; they released all individuals later in the day except for one wanted on another charge.

PX202

- The October 10 arrest of an Iraqi for posting AQ and other terrorist messages on the Internet.

- The August 19 and 25 arrests of a Lebanese and a Syrian, respectively, connected with the July 31 planting of two suitcase bombs aboard German regional trains in Dortmund and Koblenz. German prosecutors ordered the release of the Syrian on September 14 due to lack of evidence. German authorities worked closely with their Lebanese counterparts, who arrested another individual implicated in the plot.

- The July 6 arrest of a German citizen of Moroccan heritage charged with recruiting extremist fighters for battle in Iraq as well as for fundraising and providing logistical support for AQ.

- The June 12 arrest of an Iraqi charged with providing financial and logistical support for Ansar al-Islam.

- Additional arrests resulted in German prosecutors charging several with leadership of and fundraising for the Kurdistan Workers' Party (PKK) and the Revolutionary People's Liberation Party/Front (DHKP-C).

German courts began trials or reached verdicts in some notable counterterrorism cases. As in previous years, German laws and traditional procedures, as well as the courts' long-standing and expansive view of civil liberties, sometimes limited the success of cases prosecutors brought to trial:

- On November 16, ruling on an appeal, the Federal High Court convicted Moroccan citizen and 9/11 Hamburg cell member Mounir el Motassadeq of both membership in a terrorist organization and of 246 counts of accessory to murder (the 246 figure represented the number of passengers aboard the hijacked airliners of 9/11).[8]

- On July 14, German prosecutors closed their investigation of Syrian-German dual national Mamoun Darkazanli, wanted in Spain on terrorism charges.

- On June 20, a Stuttgart court began the trial of three Iraqi alleged members of Ansar al-Islam: Ata Abdoulaziz Rashid, Rafik Mohamad Yousef, and Mazen al-Hussein. German prosecutors have charged the three, who have been in detention since December 2004, with a plot to assassinate former Iraqi Prime Minister Allawi during his visit to Berlin that month. Prosecutors also charged them with financial crimes and membership in, financing, and recruiting for a foreign terrorist organization.

- On May 9, a Düsseldorf court began the trial of one Iraqi (Ibrahim Mohamed Khalil) and two Palestinian defendants (brothers Yasser Abu Shaweesh and Ismail Abu Shaweesh) accused of membership in and/or support of Ansar al-Islam, insurance fraud, and attempted procurement of enriched uranium for a "dirty bomb." The three have been in German custody since their arrests in January and May 2005.

---

8    German courts convicted Motassadeq in 2003 of membership in a terrorist organization and accessory to 3,000 murders, but the Federal High Court subsequently ordered a retrial in 2004 due to the perceived lack of access to potentially exculpatory testimony from such individuals as Khaled Sheik Mohammed, whom the court presumed to be in U.S. custody.  In August 2005, a Hamburg court convicted Motassadeq on the charge of membership in a terrorist organization and sentenced him to seven years in jail.  As is possible in Germany, both the prosecution and the defense appealed.  On February 6, the court released Motassadeq from custody pending the outcome of the appeal.  Police re-arrested Motassadeq on November 17, the day after the Federal High Court's guilty verdict.

PX202

• On January 12, a Bavarian court convicted Iraqi citizen Lokman Amin Mohammed of membership in Ansar al-Islam and Ansar al-Sunna, providing them financial and logistical support, and smuggling terrorists into Iraq; he was sentenced to seven years in jail.

The German Interior Ministry used its authority under the Law on Associations to ban organizations that it believed were connected to terrorism. Germany banned a number of such organizations in recent years, including the DHKP-C, Dev Sol, Hizb-ut Tahrir, the PKK, and organizations connected with HAMAS. On January 25, a German court rejected an appeal of the ban against Hizb-ut Tahrir.

Germany participated in several U.S. programs to combat terrorism, including the Container Security Initiative in the ports of Hamburg and Bremerhaven. The Transportation Security Administration's presence in Frankfurt, together with U.S. and German air marshals, formed key parts of bilateral efforts to provide air transport security for the six German airports with flights to the United States.

## GREECE

With improved counterterrorism infrastructure in place following the 2004 summer Olympic Games in Athens, Greece continued to fight domestic and international terrorism. Greece sustained its participation in the International Security Assistance Force (ISAF) in Afghanistan by providing a unit from the Greek Corps of Engineers (511 troops) and a NATO medical unit in Kabul (209 troops). From October 2005 through April, Greece had the lead for security at Kabul International Airport. On October 12, Greece signed the Council of Europe Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime and on the Financing of Terrorism.

In July, convicted 17 November (17N) terrorist Nikos Papanastasiou, was released from prison for health reasons. Papanastasiou was sentenced to eight years imprisonment in 2003, for setting up and participating in the 17N terrorist group. Papanastasiou is the third convicted 17N terrorist to be granted an early release from prison on health grounds, being preceded by Konstantinos Telios and Pavlos Serifis in 2005. On April 12, an appellate criminal court unanimously acquitted Constantinos Avramidis, a self-confessed member of anarchist organizations who was arrested and indicted as a member of 17N in 2003, for lack of evidence.

Despite these early releases, on October 10, a Greek court denied 17N prisoner Savvas Xiros' pleas for release on medical grounds for the second time. Xiros' first plea was denied in October 2005. Xiros' botched bombing attempt in 2002 led to his arrest and the subsequent arrest and trial of several members of the November 17 organization.

In 2003, Greek courts handed down multiple life sentences to key 17N members who were responsible for hundreds of crimes and the murders of 13 Greeks and five U.S. government employees over a course of almost 30 years. A group appeals trial for 15 17N convicts and two previously acquitted individuals opened in December 2005. The appeals trials essentially represented a new trial for the convicts, since the Greek judicial system allows new facts and evidence to be introduced in the appeals phase.

The appeals trial lasted far longer than the original trial, in part due to the defense team's tactics and the court's decisions allowing defendants great leeway to make statements and interrupt witnesses. The defense attorney's strategy had been to dismiss defendant confessions rendered in the first trial as void due to alleged illegal interrogation methods. Investigation of 17N continued despite the arrest, trial, and conviction of what has been identified as "the main body" of the 17N terrorist group.

PX202

The Revolutionary Struggle (RS), an anti-Greek establishment radical leftist group, claimed responsibility for a May bomb explosion near the residence of former Minister of Public Order Giorgos Voulgarakis. The remotely detonated bomb was placed next to a school along the minister's usual route to work and exploded just minutes before he was due to pass. The explosion wrecked several cars but did not cause any injuries. Police have made no arrests in the case. Police officials have not closed their investigation into the 2004 killing of a Greek Special Guard at his post outside the residence of the British Defense Attaché, which they regarded as a domestic terrorist incident.

Self-styled anarchists attacked "imperialist-capitalist targets" with tools such as firebombs and Molotov cocktails. Since these attacks usually occurred in the middle of the night, few persons were seriously injured and there were no deaths. Several U.S. businesses were targeted. Police officials pursued a more pro-active approach to deterring violent attacks by anarchists and arrested perpetrators.

## HUNGARY

Hungary deployed a provincial reconstruction team to Afghanistan and continued to fully implement domestic legislation to ensure compliance with EU norms regarding financial transactions and money laundering. Cooperation with U.S. and regional officials on export and border controls remained outstanding as Hungary continued its preparations to join the Schengen zone. Hungarian officials aggressively developed and pursued leads in cooperation with U.S. officials to prevent the transshipment of hazardous materials. Efforts to improve its technical ability to trace and control dangerous materials continued, consistent with EU membership obligations.

## ICELAND

Although Iceland does not have its own military, the government undertook efforts to review its national security policy following the withdrawal of U.S. military forces from Iceland. The Icelandic government made strong efforts to ensure that Iceland was not a haven for terrorist groups. In June, Iceland passed the "Act to Counter Money Laundering and the Financing of Terrorist Acts," which brought Icelandic law fully into compliance with FATF's recommendations regarding terrorist financing. In support of efforts to prevent trafficking in weapons of mass destruction, Iceland was a member of the Proliferation Security Initiative and participated in the U.S. Coast Guard's International Port Security Program. Through its participation in the Schengen Agreement, the Icelandic government consulted closely with other Schengen states on border control and security matters.

In September, the National Police Commissioner's Office confirmed it was investigating a case involving a resident who showed an interest in researching explosives and bomb making. No charges were brought in the case, but this was the first public confirmation that Iceland's police conduct preemptive investigations of possible terrorist activity.

On September 26, the government announced efforts to strengthen its security and counterterrorism capabilities, including: a legal review of intelligence and information sharing with foreign governments, the planned establishment of a national security unit within the National Police Commissioner's Office, and purchases of a new fixed-wing aircraft, helicopters, and a patrol vessel for the Icelandic Coast Guard (ICG).

PX202

On October 12, Iceland's Prime Minister and Foreign Minister and the U.S. Secretary of State signed a Joint Understanding on Defense and Security Issues, detailing new initiatives in training, exercises, and intelligence. The government conducted several joint counterterrorism training activities with the United States.

Iceland supported NATO counterterrorism operations in Afghanistan through the deployment of a mobile observation team to the provincial reconstruction team in Ghor Province and through its role as lead NATO nation at Kabul International Airport. Iceland also deployed personnel to the Sri Lanka Monitoring Mission, which reported violations of the cease-fire between the Sri Lankan government and the Liberation Tigers of Tamil Eelam (LTTE).

## IRELAND

The Irish government permitted the transit of U.S. military personnel and material through Irish airspace and airports for deployment to Iraq. The government also took steps to strengthen bilateral dialogue on terrorism issues, including establishing a security liaison office at the Irish Embassy in Washington and the visit of an Irish Justice Department delegation to meet with U.S. Government agencies to discuss terrorism. Ireland focused largely on implementing recent terrorism-related domestic legislation and on negotiations to bring republican groups into a political power-sharing arrangement in Northern Ireland.

The Irish media focused on concerns about the possible radicalization of small numbers of people within Ireland's 40,000-strong Muslim community. One imam told the press that recruits were targeting some Muslim youth to participate in terrorist activity, although most Muslim leaders strongly denied this claim.

The Irish government continued to work with the British government to bring republican groups into the Northern Ireland political process, the objective of the 1998 Good Friday Agreement. In October, representatives of Sinn Fein, formerly the political wing of the Provisional IRA (PIRA), and the Democratic Unionist Party announced their support for the Ireland/UK-brokered "St. Andrews Agreement." The Agreement envisions a power-sharing arrangement between the two sides and a Sinn Fein endorsement of joint policing. The negotiation process leading to the Agreement followed steps by the IRA in 2005 to decommission its weapons and to announce an end to armed struggle.

In October, the Independent Monitoring Commission (IMC), a four-person body established by the Irish and British governments in 2004, published its twelfth report which concluded that the IRA "is firmly set on a political strategy, eschewing terrorism and other forms of crime." The IMC reported no acts of crime or violence that could be regarded as sanctioned by the PIRA. In April, however, former Sinn Fein leader Denis Donaldson was murdered in Ireland, roughly four months after his public admission that he had acted as an informant for the British government. While no suspects were apprehended in his murder, there is widespread suspicion that his murder was an act of republican retribution for his work as a double-agent.

## ITALY

Italy aggressively fought terrorism and dismantled terrorist-related cells within its borders, while it maintained high-level professional cooperation with its international partners. The Italian security services maintained a high-state of readiness at the 2006 Winter Olympic Games in Turin in February and during national elections in April, and closely collaborated with U.S. and other inter-

PX202

national partners to ensure that both events remained free of terrorist-related incidents. There was no discernible change in either the pace or scope on counterterrorism cooperation with the political change in government from the center-right to the center-left.

Italy contributed to Coalition peacekeeping activities in Iraq, Afghanistan, and Lebanon. Italy was an important partner in the Proliferation Security Initiative and the Container Security Initiative. In October, Italy became an initial partner nation of the Global Initiative to Combat Nuclear Terrorism, developed by the United States and Russia.

Italy's judiciary continued to be engaged in counterterrorism efforts, with several noteworthy cases during the reporting period. In September, a Milan court sentenced five members of an Ansar al-Islam cell to sentences ranging from five to ten years. The ruling overturned a January 2005 decision by another court that released two of the individuals and reduced the sentences of the other three, based on a judgment that their activities to recruit fighters for the insurgency in Iraq did not necessarily constitute terrorist activity.

In October, Italy's Court of Cassation (Italy's highest appellate court) overturned acquittals by two lower appellate courts for three individuals: Mohamed Daki, Maher Abdelaziz Bouyahia, and Ali Ben Sassi Toumi, suspected of supporting international terrorism. The higher court maintained there was sufficient evidence for a retrial of their alleged involvement in recruiting fighters for Iraq and facilitating the movement of suspected terrorists. In November, a court in Milan sentenced Rabei Osman Sayed Ahmed, an Egyptian national, to ten years in prison on charges of subversive association aimed at international terrorism for having recruited suicide bombers in Italy for Iraq. Rabei Osman will be extradited to Spain to stand trial on charges of being a key plotter in the 2004 Madrid bombings.

In July, the new Parliament, dominated by the center-left, approved a universal pardon in an effort to relieve prison overcrowding. The pardon allowed anyone serving a prison sentence (except for certain specified offenses) to be released from prison three years early. The pardon excluded those convicted of terrorism, but some individuals convicted of lesser crimes, but potentially having some terror connections, were pardoned. It is unknown how the pardon will affect other individuals with known or suspected ties to terrorism.

In May, the U.S. Ambassador and the Italian Justice Minister signed a new treaty on extradition and mutual legal assistance. The treaty, when ratified by the U.S. Senate, will allow for joint investigative teams, easier asset freezing and forfeiture, and faster sharing of bank account and other financial information.

The Italian security services engaged in raids, temporary detentions, prosecutions, and expulsions of known or suspected extremists to combat Islamic extremists. The Italian government benefited from reinforced counterterrorism legislation enacted in 2005, which made it easier to hold suspects; mandated arrest for crimes involving terrorism; and facilitated the deportation of persons who may be involved in terrorist activities. More than 25 individuals were arrested nationwide as a result of counterterrorism investigations, and approximately 20 suspected terrorists or facilitators were deported. The European Court of Human Rights is reviewing the Italian government's policy of expulsions and deportations without judicial review, which could impact the government's ability to uphold a key part of its counterterrorism policy.

Italian officials carefully monitored and dismantled groups with suspected links to the Balkans and Islamic terrorist groups. In a variety of operations, Italian officials maintained that some members of Balkan-based groups in Italy traveled throughout the country and elsewhere in Europe, possibly

PX202

engaging in recruitment, support, and facilitation of terrorist activities. These individuals faced charges of membership to a terrorist organization and involvement in illegal immigration, both of which are considered a crime under the Italian Penal Code.

In February, two of the main plotters in terrorist cells that were planning attacks in Italy, including against Saint Petronio's Basilica in Bologna, were arrested in Algeria and Morocco with Italian support. The investigation and subsequent debriefing of the suspects identified seven other individuals residing in Italy linked to the plot; the seven were subsequently ordered deported. In April, as a result of a joint operation, Italian and French police detained 13 suspected Islamic militants linked to the Salafist Group for Preaching and Combat (AQIM/GSPC). Eight of the suspects were apprehended in Naples on suspicion of using or making forged documents. In July, Italian police authorities arrested four Algerians suspected of belonging to the AQIM/GSPC and of fabricating false documentation. In October, Italian police services, in collaboration with the Federal Swiss Police, arrested six Algerians that belonged to the AQIM/GSPC and were suspected of promoting, financing, and supporting terrorist acts against the Algerian government. Individuals in the group reportedly were linked to at least two terrorist attacks in Algiers conducted in 2005. The investigation also revealed that the group managed more than $1.7 million through some 50 bank and postal accounts.

With respect to financial aspects of fighting terrorism, Italy aggressively identifies and blocks financial resources to suspected terrorist individuals and groups. Italy is second in the EU only to the United Kingdom in the number of individual terrorists and terrorist organizations the country has submitted to the United Nations UN 1267 Sanctions Committee for designation.

Domestic anarchist-inspired terrorist groups presented a diminished threat as a result of Italian authorities' continued efforts to dismantle their organizations. Nevertheless, anarchist groups sent letter bombs to Italian officials and placed package bombs near military installations and media outlets. In some cases, these devices caused minor injuries. Communist-inspired revolutionary groups occasionally placed improvised explosive devices outside military installations and in one case, a defense industrial firm.

In December, Italian authorities rearrested Fabio Matteini on charges of belonging to a terrorist and subversive organization and of participating in an armed organization. Matteini, who was released from prison in 1997 after serving time for similar charges, is connected to the new Red Brigades, which killed labor advisers Marco Biagi (in 2002) and Massimo D'Antona (in 1999). Biagi and D'Antona served as advisers to the center-right and center-left governments, respectively. Matteini previously was a member of the Combatant Communist Nuclei. In December, a Court of Appeals in Bologna confirmed the life sentences of four other individuals involved in Biagi's killing.

## LATVIA

Latvia's Financial Intelligence Unit continued to maintain a terrorist financing (OFAC) database that it shared with local banks. Although Latvia had previously passed legislation to improve government oversight, in May 2005, the Department of the Treasury designated two Latvian banks as institutions of "primary money laundering concern" under Section 311 of the Patriot Act, prohibiting them from having any dealings with U.S. financial institutions. Since then, the Latvian government and regulatory agencies have worked very closely with the United States to enhance their legislative and regulatory framework. In July, Treasury cleared one bank but continued sanctions against the second.

PX202

In April, Latvian law enforcement, security police, and defense forces took part in Shamrock Key 2006, a regional counterterrorism exercise held in Lithuania, Latvia, and Estonia. The United States, Norway, and Poland also participated as NATO partners. The exercise's objective was to improve cooperation and coordination between the various NATO Allies' counterterrorism units, including synchronization of communications systems, coordination of logistical support, and cooperation on combat tactics. In November, the NATO summit in Riga brought Heads of State and Government from 26 countries to Latvia. The summit provided an impetus for significant improvements in coordination among the various Latvian security-related agencies. Annual exercises are planned to ensure continuation of this high level of coordination. Latvia actively sought vigorous cooperation with law enforcement officials from neighboring and participating countries to prevent terrorist incidents. In securing the summit, Latvia also undertook significant cooperation with U.S. agencies and the U.S. military. Latvia used the Summit to strengthen its border control and inspection system, including data sharing with EU and other partners.

Latvia contributed 35 soldiers to support the International Security Assistance Force (ISAF) in Afghanistan; in October the team's mandate was renewed for one year and is now scheduled to expire the same day that the UNSCR mission mandate expires (October 13, 2007). In Iraq, Latvia has 120 soldiers under Polish command. Parliament renewed the authority for the Iraq deployment in December for an additional year.

## LITHUANIA

In May, President Adamkus introduced a Lithuanian-Belarusian intergovernmental agreement to combat organized crime and trafficking in narcotics and psychotropic substances, terrorism, and other crimes (Decree No. 616), which is pending ratification. In June, the Parliament passed an amendment that allows for and formalizes the process by which the military can be used for counterterrorism purposes. In October, based on EU guidelines, the Lithuanian government approved a terrorist watch list of persons, groups, and organizations related to terror acts or suspected of terrorism. For EU citizens on the list, it limited their rights to own and use funds held by them in financial institutions (Decision No. 1027).

Lithuania has approximately 60 troops in Iraq, including infantry troops serving in Multinational Division South East (MND-SE) near Basra and trainers in the NATO Training Mission-Iraq (NTM-I). Lithuania also led a provincial reconstruction team in Afghanistan's remote Ghor Province. This element consists of approximately 130 Lithuanian troops and civilians responsible for maintaining a stable environment throughout the province to enable reconstruction efforts.

## MACEDONIA

Macedonia's active implementation of the Law on Export Control of Dual Use Goods and Technologies, through the establishment of an electronic system to review and issue export licenses for dual use technologies, demonstrated its commitment to preventing the sale of potentially dangerous technologies to terrorist and criminal regimes. Macedonia also passed legislation on nuclear security and terrorism, chemical weapons, and bilateral law enforcement, security, and extradition agreements.

Macedonia continued to support troop rotations to Afghanistan and Iraq. The government removed five of seven caveats on its troops deployed to both countries so Macedonian soldiers can better support ISAF and other allied military operations. The United States trained several hundred police and military personnel in counter and antiterrorism techniques, technologies, and methods.

PX202

**MALTA**

Although the Government of Malta has expressed political will, counterterrorism efforts in Malta remained in a nascent stage and are in need of development, enlargement, training, and financial assistance. Deputy Prime Minister Tonio Borg acknowledged this during his September visit to the United States.

In February, Malta's Prevention of Money Laundering Regulations was extended to include "financing of terrorism," which criminalized terrorist financing and imposed additional obligations, namely customer due diligence, record keeping, reporting, and training procedures. Like other EU countries, Malta has not yet adopted the Directive but was already in substantial compliance with the enumerated requirements. The Government of Malta made significant strides to reform and regulate the banking laws, most significantly, ending its offshore investment regime. The Ministry of Finance's Financial Intelligence and Analysis Unit continued to expand and upgrade its capabilities.

The Maltese government was concerned about the proliferation and trafficking of weapons of mass destruction (WMD) in and through its territory. A particular vulnerability is Malta's Freeport which transshipped approximately 1.2 million containers per year. Most of the containers through Free-port were heading to, or coming from, nations along the North African littoral. Through the Export Control and Border Security assistance program, the United States has for several years provided training and advanced equipment that have increased Maltese authorities' capability to monitor what passes through its ports. The Maltese have seized many shipments of stolen and counterfeit goods as a direct outcome of the U.S. assistance. Malta and the United States agreed in October on the text for a bilateral Proliferation Security Initiative Ship Boarding Agreement. After Malta and the United States sign the agreement, which is set to occur in March 2007, the Maltese Parliament must approve legislation for it to enter into force.

Technology, funding, and training of Maltese agencies contributed to improved port security and the ability to inspect goods transiting the Freeport and Malta International Airport. With Malta's geographic location between northern Africa and the European mainland, Malta could become increasingly attractive to terrorist organizations seeking entry into Europe.

**MOLDOVA**

Moldova deployed four separate contingents of servicemen (a total of 76 servicemen) to Iraq, where they specialized in demining, liaison, and convoy security. The Moldovan government continued to manage a counterterrorism strategy based on its 2003 - 2008 National Action Plan on Combating Terrorism. The SECI/GUAM National Virtual Center, aimed at combating terrorism, organized crime, and narcotics trafficking, was created on January 27. On November 13, a Counterterrorism Center within the Information and Security Service (SIS) was created and staffed by 18 employees.

The separatist-controlled Transnistria region of Moldova remained a potential area for terrorist recruitment. Moldovan law enforcement worked hard to track the whereabouts and activities of a sizeable Arab student population, as many often move in and out of Transnistria, an area where the Moldovan police and security services do not have the authority to operate. Many of these students remained in Moldova illegally, as the government lacked the resources to deport them when their visas expired. Corruption was endemic, and it was easy to obtain false travel documents. The U.S. embassy does not maintain liaison relationships or contacts with Transnistrian law enforcement and/or security service personnel. To date, Embassy has not obtained any information about known terrorist organizations or terrorists operating from or within this region.

PX202

## MONTENEGRO

Montenegro became independent on June 3, after a May 21 public referendum. The Government of Montenegro, before and after independence from the State Union of Serbia and Montenegro, has taken a serious and considered approach to combating international terrorism, including terrorism finance. Although Montenegro made considerable progress in its efforts to combat corruption and organized crime, weak border control and high levels of organized crime make Montenegro a potential harbor for organized crime and extremist groups that seek to operate in Montenegro and the Balkan region. Montenegro sits along several major smuggling routes between Southern and Western Europe.

Montenegro does not tolerate the activity of terrorist groups on its territory. The Administration for the Prevention of Money Laundering, which was established with and continues to receive assistance and training from the United States, works closely and shares information with regional and international Financial Intelligence Units (FIUs). The Montenegrin FIU also conducted local investigations of terrorism finance and initiated investigations potentially leading to future criminal prosecution in three cases this past year. Montenegro joined INTERPOL in September.

On September 9, the day before parliamentary elections, Montenegrin police raided arms caches in a suburb of Podgorica, the nation's capital, initially arresting 14 persons, including three foreign nationals, on suspicion that the group planned to carry out armed attacks on election day. The Government described the group as comprising of ethnic Albanian extremists. On December 7, 18 persons, including four fugitives and, non-exclusively, five foreign nationals, were criminally charged with planning terrorist acts, financing of terrorism, and other acts constituting organized crime. Subsequently, one foreign national fugitive was arrested in Austria upon an Interpol warrant filed by Montenegro. The State Prosecutor, in the indictment, stated that additional planning for the terrorist acts took place in Skoder, Albania. Some opposition political parties criticized the arrests, claiming the raid was aimed at suppressing legitimate political dissent. At year's end, all of the defendants were still awaiting trial. Since September 9, there were numerous unconfirmed reports of similar ethnic-Albanian extremist groups operating within Montenegro.

## NETHERLANDS, THE

The Dutch continued to respond to the global terrorist threat with leadership and energy in the areas of border and shipping security, terrorist financing, and Coalition efforts in Afghanistan. The Netherlands deployed over 1900 troops to Afghanistan as part of NATO's International Security Assistance Force (ISAF) mission and in support of Operation Enduring Freedom (OEF). The Dutch led a Provincial Reconstruction Team (PRT) in Uruzgan province, and in November assumed a six-month rotational command in Kandahar of NATO's efforts in southern Afghanistan. For 2004-2006, the Dutch pledged 75 million euros toward the Afghanistan Reconstruction Trust Fund to support the transition from humanitarian to reconstruction assistance. From December 2005 to May 2006, the Government of the Netherlands commanded OEF's Combined Task Force 150, committing a fast frigate, a submarine, and a support ship to the mission. Dutch troops ended their deployment in Iraq as part of SFIR in March 2005 following two extensions. The Netherlands deployed 14 trainers and security guards in support of the NATO Training Mission in Iraq and pledged 21 million euros for Iraqi reconstruction.

In its October quarterly terrorism threat analysis, the Dutch National Counterterrorism Coordinator (NCTb) maintained the "substantial threat" level, citing significant threats against other European countries, and Western countries in general. The NCTb also highlighted concern about continuing

72

PX202

radicalization among young Muslims, particularly through the Internet. The report cited the increasing presence of susceptible teenagers, particularly those of Dutch-Turkish descent, in local Jihad networks as evidence of continuing radicalization, noting that frustration about the position of Muslims in the Netherlands and fury about events in conflict areas appeared to nourish the feeling of "having to do something." The NCTb also highlighted the role of the Internet as a platform for radical Islamic propaganda.

In February, the Dutch government launched a national counterterrorism public information campaign, "The Netherlands against Terrorism." The campaign was designed to make the public aware of government counterterrorism actions and what individuals could do to minimize the risks of an attack. In March a special notification center for radical statements and hate mail became operational via the new cyber crime website. The Dutch hosted the first ever U.S.-Netherlands Cyber-Crime Conference in October. The conference, attended by Attorney General Gonzales and Dutch Justice Minister Hirsch Ballin, included discussions on bilateral counterterrorism investigations and combating internet radicalization.

The Dutch prosecuted two major terrorism cases. In March, the Rotterdam court ruled the Hofstad group a terrorist organization that aimed to incite hatred, violence, and intimidation. Nine of 14 defendants, including Mohammad Bouyeri, the convicted murderer of film director Theo Van Gogh, were found guilty of membership in a criminal organization "with terrorist intent." Two of the nine, Jason Walters (a dual U.S. – Dutch national) and Ismael Akhnikh, were also convicted for attempted murder and violating the Weapons and Ammunition Act for throwing a hand grenade at The Hague police officers in November 2004. They were sentenced to 15 and 13 years, respectively. Noureddin el Fatmi, also charged in the Piranha case (see below), was sentenced to five years. Bouyeri, considered the group's leader, did not receive an additional sentence in the Hofstad case because he already was serving a life term for Van Gogh's murder. This was the first case to be tried under the 2004 Terrorist Crimes Act, which made membership in a terrorist group and conspiracy to commit terrorist attacks criminal offenses.

The second major prosecution concluded in December, when Samir Azzouz and four additional defendants in the "Piranha" trial were found guilty of planning terrorist attacks on politicians and the national intelligence office. Samir Azzouz, the alleged leader of the group, was sentenced to eight years in prison.

In November, the National Crime Squad arrested five men and one woman on suspicion of terrorist recruitment, participating in a terrorist organization, and obtaining false travel documents.

Dutch officials remained committed to active cooperation with the United States in freezing the assets of known terrorist organizations. In March, the Netherlands Finance Ministry hosted an international conference on terrorist financing issues. In April, the Hofstad group and nine convicted members of the group were put on the Dutch Terrorist Sanctions List, freezing all their assets; in June the government decided, on humanitarian grounds, to ease financial sanctions on some members of the group who already served their sentences. The Netherlands sought EU designations of the Hofstad group and Hizballah as terrorist groups.

The Netherlands adopted three new counterterrorism laws that were expected to facilitate the investigation and prosecution of terrorism suspects. The Protected Witness Act permitted the use of intelligence information in criminal proceedings by establishing procedures to allow the examining judge to assess the reliability of intelligence information without exposing the identities of intelligence officers or sharing confidential intelligence information with the public. The provisions went into effect November 1. The "special investigative methods" bill expanded the use of special

PX202

investigative techniques in terror investigations by lowering the threshold for the use of surveillance, infiltration, undercover purchases, and wiretapping. This allows the police to initiate investigations at a much earlier stage in terrorist planning. The final law forbade the operation in the Netherlands of terrorist organizations on the UN or EU designations lists. (Previously, only the bank accounts of such groups were frozen.) The law also provided for action, including the confiscation and liquidation of the group's Dutch assets, to be taken against foreign organizations, including those not appearing on the UN or EU terror lists, conducting activities or pursuing objectives in the Netherlands deemed contrary to public order. These new laws complemented the 2004 Terrorist Crimes Law and were expected to facilitate the successful investigation and prosecution of terrorist suspects.

The National Police Service's Special Intervention Unit became operational in June. It integrated various special police and defense units engaged in counterterrorism activities.

The government's sectoral terror alert system, which became operational in June 2005, now includes nine economic sectors: Schiphol Airport, the Rotterdam Port, and the petrochemical industry, drinking water, railway, natural gas, electricity, nuclear, municipal and regional transport, and financial sectors. This early-warning system was designed to trigger a clear and rapid response to terrorist threats by both the public and private sectors. It links sector-specific measures to be taken to the latest threat information from the National Counterterrorism Coordinator. There are four alert levels: basic, low, moderate, and high-threat.  A total of 14 sectors are anticipated.

On October 11, the Justice Minister approved the extradition to the United States of Wasem Al Delaema, an Iraqi-born Dutch citizen. Al Delaema was charged with conspiring to attack U.S. troops in Iraq in 2003, and was the first person to be charged in U.S. courts for terrorist activities in Iraq. The Supreme Court's September ruling that Al Delaema was eligible for extradition was the first time a Dutch court approved the extradition of a Dutch citizen on terrorism-related charges. Al Delaema filed for an injunction against the Minister's extradition order; his appeal was rejected on December 19, paving the way for his extradition. In September, the Dutch Supreme Court blocked the extradition of alleged female PKK leader Nuriye Kesbir to Turkey, citing concerns over Turkey's human rights practices and insufficient guarantees against torture.

## NORWAY

Norway took steps to improve its counterterrorism capabilities but more work remains to be done. The government's efforts to address serious shortages in equipment, training, and capabilities were complicated by the widespread belief among the general public that no one would attack Norway. In October, the Ministry of Interior conducted a large-scale exercise in Oslo designed to test emergency response capabilities to a London and Madrid-type terrorist attack on transit infrastructure.

In October 2005, Norway passed an antiterrorism law that gave the police greater leeway to investigate and prosecute terror suspects. The September 2006 arrest of four individuals suspected of shooting an Oslo synagogue and planning attacks on the U.S. and Israeli embassies was the first test of this law. Some of the new investigative tools were used in the case. However, the prosecution of the case highlighted concerns that the law's definition of a conspiracy to commit a terror act was restrictive and could limit its usefulness. Reported miscommunication among various police offices and mishandling of information and suspects illustrated the need for improvement.

Alleged Ansar al-Islam leader Mullah Krekar, an Iraqi Kurd listed in December 2006 under UNSCR 1267, continued to reside in Norway but was unable to travel abroad, as his travel documents were confiscated and he remained under a government expulsion order. In the fall of 2005 the Oslo City Court

74

PX202

rejected Krekar's suit against the government's expulsion decision. His subsequent appeal was rejected one year later. Despite the failure of his appeal, Krekar remained in Norway because the government was unable to receive sufficient human rights assurances from Iraq to proceed with deportation.

## POLAND

Poland supplied about 100 troops to the International Security Assistance Force (ISAF) in Afghanistan while leading the Multinational Division Center South (MND-CS) in Iraq with 900 troops. Domestically, Poland hosted the global Proliferation Security Initiative (PSI) policy meeting in June, conducted a PSI maritime interdiction exercise in September, and cooperated with the United States in various counterterrorism training opportunities. There were no reported terrorist groups or incidents in Poland, but a growing population of Chechen migrants vulnerable to radicalization was a cause for concern.

Through the bilateral Joint Counterterrorism Working Group (JCTWG), Poland cooperated with various U.S. government agencies on synchronizing counterterrorism policy and training counterterrorism specialists. The United States trained 16 Polish Air Marshals, eight Polish officials in cargo inspection procedures, and about 100 Polish officials in topics ranging from bioterrorism to the psychology of terrorism.

Poland continued to closely monitor incoming Chechen migrants for signs of radicalization. According to the Office for the Repatriation of Foreigners, about 4,500 Chechens entered Poland in 2006. Most of them continued on to other EU destinations in search of work, however, approximately 5,500 Chechens were residing in Poland, of whom approximately 100 were known to be extremists.

## PORTUGAL

Portugal supported international efforts to combat terrorist networks and actively pursued indications of extremist group activity in Portugal. Portuguese government agencies took steps to minimize exploitation of its financial sector and to maintain the integrity of its passports and other documents.

On November 14, Portugal's Judicial Police (PJ) simultaneously executed 48 search warrants on small currency exchange operations. The effort, in cooperation with the Bank of Portugal, was intended to investigate money laundering operations with links to Lusophone Africa and South Asia that could be exploited by extremist organizations. The investigation into the "mixed Hawala" system netted equipment, documents, and over 300,000 Euros, but no arrests.  Portugal announced it would restructure the Judicial Police to create four major operational commands regarding terrorism, corruption, drug trafficking, and technological investigation.

In August, Portugal began issuing biometric passports with greater protections than previous iterations. In addition to the additional security features, the new Portuguese passport law passed July 16 centralized the production of all passports to counter the fraudulent acquisition of Portuguese documents by criminal and extremist organizations. Portugal maintained its active participation in both the Proliferation Security Initiative and the Container Security Initiative.

PX202

## ROMANIA

Approximately 1,500 Romanian troops served in Iraq and Afghanistan as part of coalition and NATO efforts to combat terrorism and to deny terrorists operational and political opportunities.  President Basescu reaffirmed his commitment to keep Romanian troops in Iraq and Afghanistan for as long as they are needed. Romania made available its airspace, ground infrastructure, and naval facilities to support U.S. and NATO forces. The Romanian frigate Regina Maria deployed from September to November with NATO counterterrorism forces in the Mediterranean Sea as part of Operation Active Endeavor.

The Romanian government strengthened its national policies as part of a strategic approach to combat terrorism. Romania included proactive language on counterterrorism in its National Security Strategy, in its National Antiterrorism Strategy, and in guidelines for preventing and combating terrorist financing activities. Romania continued to promote the Bucharest-based South East Europe Cooperation Initiative (SECI), a regional center that provides law enforcement training and intelligence sharing to prevent trans-border criminal activities, including terrorist-related activities, for the 12 member countries in South Eastern and Central Europe.

In April, Romania hosted the first meeting of counterterrorism chiefs within the framework of the Regional Conference of Interior Ministers under the Brdo Process (a regional initiative involving Interior Ministries from Central and Southern European states). In October 2005, the Government of Romania first released a list of over 250 individuals and legal entities suspected of committing or financing terrorist acts. The 21 official agencies that form Romania's National System to Prevent and Combat Terrorism routinely update this list based on information from the UN Security Council. The list was compiled by the Ministry of Public Finance, which was responsible for monitoring and blocking the movement of terrorist funds.

In October, the Romanian Parliament ratified the UN International Convention for the Suppression of Acts of Nuclear Terrorism; in November, it ratified two Council of Europe Conventions related to counterterrorism: the Convention on the Prevention of Terrorism and the Convention on Money Laundering, and the Search, Seizure, and Confiscation of Criminal Proceeds.

In June, a Romanian citizen, Ioan Les, was detained by Romanian intelligence agents near the town of Buzias in Western Romania, for allegedly planning an act of terrorism. According to Romanian authorities, the suspect was arrested in transit to Timisoara, where he planned to use a remote control device to blow up a car in the city center. The suspect told investigators that his motive was to force Romania to withdraw its troops from Iraq. Investigators linked the suspect to a Bosnia-based terrorist network. The Romanian Intelligence Service (SRI) placed Les under surveillance for several months after he allegedly made several threats via the internet to various entities, including CNN and Al-Jazeera television stations. Les was charged under a 29-day preventive arrest warrant.

Omar Hayssam, a businessman with strong connections both to the Arab world and the now-in-opposition Social Democratic Party (PSD) was arrested on terrorism-related charges in 2005 for his involvement in the abduction of three Romanian journalists and another businessman in Iraq. Although prohibited from leaving the country, Hayssam fled Romania for Syria on June 30, following his conditional April release on medical grounds. As a result of the ensuing public scandal, the General Prosecutor, the Police Information Service chief, and both Internal and External Intelligence chiefs resigned.

On November 13, four Romanian-Muslim citizens were arrested in Iasi under suspicion of supporting Middle Eastern terrorist groups. On November 14, an Iraqi citizen Shaker A. Shaker was arrested in Bacau under suspicion of terrorist-related activities. Romanian Intelligence Services had

PX202

evidence that Shaker possessed a false passport, and that his real name was in fact Mahmoud Chaker, a former Iraqi Embassy diplomat, who had been deported previously from Romania in 2003 along with 40 other Iraqi citizens for planning terrorist attacks against Israeli interests in Bucharest.

## RUSSIA

The Russian government continued to view counterterrorism as a top priority and considered cooperation with the United States in this area as one of the pillars of the bilateral relationship. Much of the terrorist activity in Russia was homegrown and linked to both the Chechen separatist movement and in some ways, to separate, but overlapping, North Caucasus-wide extremism. However, there was evidence of a foreign terrorist presence in the North Caucasus with financial and ideological ties to international terrorism. There were no high-profile terrorist incidents involving large numbers of civilian casualties, as had been the case in the four previous years.

Russian security forces carried out operations that led to the deaths of two significant terrorist leaders. In July, Russia's most wanted terrorist, Chechen separatist Shamil Basayev, was killed in the North Caucasus. Russian officials claim he was targeted by security forces but there were reports he was killed accidentally by his own explosives. In November, Abu Hafs al-Urdani, the AQ-linked, Jordanian-born commander of foreign separatist forces in Chechnya, was killed by security forces. In June Russian security forces killed Chechen separatist leader Abdul Khalim Sadulayev, whom the Russian government considered a terrorist, and who was nominal head of the Chechen separatist "government" to which Basayev belonged.

The most significant terrorist incident for Russia took place outside the borders of the Russian Federation. In June, five employees of the Russian Embassy in Baghdad were abducted and murdered, reportedly by members of the Mujahideen Shura Council, an umbrella group incorporating al-Qaida in Iraq. This was followed by a Presidential decree that ordered Russian security forces to "eliminate" those responsible and authorized the deployment of Russian security forces abroad to prevent "international terrorist activity."

The Russian government continued to take steps to improve coordination of counterterrorism activities and expand law enforcement responsibilities domestically. In February, President Putin signed a decree creating the National Counterterrorism Committee (NCC), to be headed by the Federal Security Service (FSB). The NCC was an effort to rationalize the decision-making process following the 2004 Beslan school siege, and was designed to establish a single chain of command and centralize the decision-making process at the national level, subordinating the Regional Counterterrorism Committees headed by governors. In March, the Russian legislature approved the law "On Counteracting Terrorism," which further defined the role of the NCC. The legislation expanded the concept of terrorism under Russian law, going beyond physical involvement in planning or carrying out terrorist attacks. Under the law, terrorism also included promotion of "terrorist ideas" and distributing materials or information to encourage terrorist activity or inciting individuals to commit a terrorist act.

The government provided further transparency about its counterterrorist efforts in July by releasing, for the first time, a list of 17 organizations it designated as terrorist entities. All entries to the list must be approved by the Supreme Court, and must meet the following criteria:

- Activities aimed at changing Russia's constitutional system through violence, including terrorism;

PX202

- Links to illegal armed groups and other extremist organizations operating in the North Caucasus;

- Association with, or links to, groups regarded as terrorists by the international community.

The list includes the following organizations: AQ; Supreme Military Majlisul Shura of the Caucasus Mujahedin United Forces; Ichkeria and Dagestan People's Congress; Asbat al-Ansar; Holy War (Al Jihad or Egyptian Islamic Jihad); Islamic Group (Al-Gamaa al Islamia); Moslem Brothers (Al-Ikhvan al-Muslimun); Party of Islamic Liberation (Hiz'but-Tahrir al-Islami); Lashkar-I-Taiba; Islamic Group (Jamaat-i-Islami); Taliban Movement; Islamic Party of Turkestan (former Islamic movement of Uzbekistan); Social Reform Society (Jamiyat Ikhya al-Islakh al-Ijtimai); Islamic Heritage Renaissance Society (Jamiyat Ikhya at-Turaz al-Islami); Two Holies' House (Al Kharamein); Islamic Jihad – Mujahidin Jammat; and Jund ash-Sham.

There were three known organizations operating within the Russian Federation that the United States designated terrorist entities in February 2003, under Executive Order 13224. They have not been designated as Foreign Terrorist Organizations under 8 USC Section 1189. These include:

- The Special Purpose Islamic Regiment (SPIR). The SPIR was one of three Chechen-affiliated terrorist groups that furnished personnel to carry out the seizure of the Dubrovka Theater in Moscow in October 2003. It is not clear if the SPIR was still active, nor is it clear who commanded the organization.

- Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs. The group had been led by Basayev. It used terrorism as part of an effort to secure an independent Muslim state in the North Caucasus. The group has not mounted a terrorist attack since the Beslan school attack in September 2004. The group's strength is probably no more than 50 fighters at any given time.

- Islamic International Peacekeeping Brigade (IIPB). The IIPB is a terrorist group affiliated with the Chechen separatist movement demanding a single Islamic state in the North Caucasus. Arab mujahedin still operating in Chechnya fell under the command of Abu Hafs al-Urdani, until his death in November. According to the pro-separatist website Kavkaz Center, Saudi national "Mukhanned" (full name not known) is the group's new commander. The IIPB has engaged in terrorist and guerrilla operations against Russian forces, pro-Russian Chechen forces, and Chechen non-combatants. At its peak, the group had up to 400 fighters, including as many as 100 Arabs and other foreign fighters, but almost certainly has suffered significant attrition. It operates primarily in Russia in adjacent areas of the North Caucasus, particularly in the mountainous south of Chechnya, with major logistical activities in Georgia, Azerbaijan, and Turkey. The IIPB and its Arab leaders appear to be a primary conduit for Islamic funding of the Chechen guerrillas, in part through links to AQ-related financiers on the Arabian Peninsula. The IIPB was also listed under UNSCR 1267 for its associations with AQ, and the Terrorist Exclusion List.

Noteworthy court cases involving terrorist suspects included:

- In May, Nurpashi Kulayev was found guilty of all charges for his role in the 2004 Beslan school siege and was sentenced to life in prison. He was charged with murder and terrorism.  Kulayev was the sole known survivor among the Beslan hostage takers. Kulayev claimed he did not kill anyone during the siege.

PX202

- In November, the highest court in the Russian Republic of Dagestan found Magomed Salikhov innocent of the 1999 apartment bombing that killed 64 people. Russian authorities cited that attack and a series of other bombings to justify sending troops back into Chechnya in 1999. The court had previously found Salikhov not guilty but that decision was overturned by the Federal Supreme Court, which ordered him retried.

- In December, Spanish police arrested suspected Chechen terrorist Murat Gasayev in Mislata, Valencia. Russian authorities were preparing an extradition request. Under Spanish law, Gasayev would first have to be found guilty in a Spanish court.

The United States and Russia continued to cooperate on a broad range of counterterrorism issues, including efforts to destroy, safeguard, and prevent the proliferation of WMD. The U.S.-Russian Counterterrorism Working Group (CTWG) met for its fifteenth session September 13-14 in Washington, fostering cooperative, operational links between numerous U.S. and Russian agencies. Law enforcement, intelligence, and policy cooperation have increased as a result of the work of the CTWG. At the St. Petersburg G8 Summit in July, the United States and Russia jointly announced the Global Initiative to Combat Nuclear Terrorism, and Russia and the United States invited other nations to join. The Initiative demonstrates Russia's effort to take a leadership role in establishing a partnership amongst nations to accelerate efforts to combat nuclear terrorism. Partner nations are committed to steps to combat nuclear terrorism in a variety of ways, to include safeguarding radioactive and nuclear materials, preventing nuclear smuggling, and sharing information. The first meeting of the Initiative took place in Morocco in October.

Russia was an active member of the Financial Action Task Force on Money Laundering and Terrorist Financing (FATF). Russia fulfilled its pledge to create a Eurasian FATF-style regional body (FSRB) in 2004, known as the Eurasia Group on Money Laundering (EAG), and as the group's leading force remained its chair. The EAG, whose members also include Belarus, China, Kazakhstan, Kyrgyzstan, and Tajikistan, made significant progress toward building Financial Intelligence Units (FIUs) and established the necessary legislative and regulatory frameworks in member states to help those states improve their compliance with international standards.

Russia used its position in international fora to build cooperative mechanisms and programs to counter terrorism. For example, Russia led efforts to make counterterrorism cooperation a key element in the Shanghai Cooperation Organization (SCO) and the Collective Security Treaty Organization (CSTO). Russia has also promoted counterterrorism within the framework of the Organization for Security and Cooperation in Europe, the G8, and the United Nations.

## SERBIA

Serbia was eager to cooperate with the United States on a wide range of issues including border security, information sharing, antiterrorism financing, and export control. Internally, the Serbian government consistently demonstrated a strong commitment to counterterror operations. Serbia and the United States signed an agreement on countering proliferation of weapons of mass destruction; the agreement was provisionally in force upon signature and awaited ratification by the Serbian parliament. While still largely complacent about the prospect of an attack in Serbia by international terrorists, Belgrade officials were significantly concerned about the potential for an increase of Middle Eastern terrorist transit through Serbia.

PX202

Kosovo

Kosovo's counterterrorism efforts were hampered by porous boundary lines easily crossed by individuals trafficking in people or goods. The Kosovo border police service is new and lacks basic equipment: Underpaid border and customs officials were often easily corrupted.  While NATO has roving teams patrolling the green border right up to the border and administrative boundary lines, terrorists could exploit numerous passable roads leading into Kosovo.

The United Nations Interim Administration Mission in Kosovo (UNMIK) continued to administer Kosovo pursuant to UN Security Council Resolution 1244, and to monitor suspected terrorist activity with the Provisional Institutions of Self-Government (PISG). The Provisional Institutions and UNMIK monitored NGOs suspected of funding Islamic extremist and Albanian extremist movements. Officials believed only several of the more than 400 NGOs operating in Kosovo were involved in suspicious activities, and sought to prevent extremists from using NGOs to gain a foothold in Kosovo. Consequently, municipalities authorized NGO use of public facilities for religious gatherings only if the relevant religious community consented. The Kosovo Islamic Community (KIC) reported that it evaluated about 20 applications of mostly foreign NGOs and rejected four due to reservations about their proposed programs and participants.

The UNMIK Police's Counterterrorism Task Force (CTTF) is primarily responsible for Kosovo's counterterrorism efforts, and reported that its objectives shifted in 2006 from reactive to preventive measures. It received information and analysis support from the UNMIK Central Intelligence Unit (CIU) and the UNMIK Police Intelligence Liaison Unit (ILU). In October, with UNMIK Police's support and guidance, the Kosovo Police Service established its own Counterterrorism Unit (CTU), with six officers.

While there were no new terrorism cases, UNMIK's Department of Justice (DOJ) reported that intimidation of witnesses during investigation and trial phases hampered ongoing terror prosecutions. According to UNMIK's DOJ, a weak domestic witness protection program and the absence of witness relocation agreements to places outside of Kosovo made it difficult to convince witnesses to come forward. Moreover, international officials still handled terrorism cases due to concerns that local officials could be susceptible to intimidation.

While Kosovo officials struggled to bring the perpetrators of terrorist acts to justice, domestic extremists, acting individually and in groups, continued to commit violence, sometimes directed towards local government institutions and UN facilities. Approximately 15 attacks by such groups or individuals occurred and included use of hand grenades, rocket propelled grenades, explosive devices, and shots fired. There were a few fatalities and injuries as a result of these attacks. In early December, groups of armed, masked men reportedly presenting themselves as members of the Albanian National Army (AKSH), intermittently stopped pedestrians and vehicles in western Kosovo to check their identification documents. On December 5, the masked men fired at Kosovo Police Service officers in the village of Gercine near Gjakove. AKSH's Tirana-based spokesman, Gafurr Adili, told Kosovo media that these groups were not affiliated with the AKSH.

## SLOVAKIA

Slovakia contributed a team of 57 deminers and construction engineers to the International Security Assistance Force (ISAF) in Afghanistan and 112 personnel to Operation Iraqi Freedom (OIF). In late 2006 Slovakia decided to withdraw the bulk of its forces from Iraq with effect from February 2007.

PX202

**SLOVENIA**

Slovenia participated in four training sessions for dual-use licensing as part of its ongoing coopera-tion with the United States under the Export Control and Border Security Program, as well as several Proliferation Security Initiative exercises. Slovenia continued to provide police instructors in Amman, Jordan, to train Iraqi policemen, instructors as part of the NATO training mission in Iraq, and troops as part of the International Stabilization Forces in Afghanistan.

**SPAIN**

Spain cooperated closely with the United States and worked aggressively to investigate and pros-ecute acts of terrorism, to prevent future attacks, and to disrupt terrorist acts that possibly were directed against U.S. interests.

Spain has decades of experience with terrorism involving the Basque terrorist group Basque Fatherland and Liberty (ETA). Despite the "permanent ceasefire" declared by the group in March, on December 30 the group exploded a massive car-bomb at Madrid's Barajas International Airport, killing two individuals. The government of Spanish President Jose Luis Rodriguez Zapatero announced political negotiations with the group had ended. ETA supporters continued to carry out acts of street violence and vandalism in the Basque region and Navarra.  The group was weakened by the continued arrests of senior members and logistical supporters by Spanish and French authorities.

Spain arrested 47 individuals with possible links to al-Qaida and related extremist organizations. The National Court Chief Prosecutor reported in July that Spain held a total of 145 Islamist extremist terrorist suspects that were either under prison sentence or awaiting trial. Detainees included indi-viduals arrested in 2004 for the March 11 train bombings and others for conspiring to bomb Spain's High Court. Authorities continued to hold eleven Pakistani nationals arrested in Barcelona in 2004, for allegedly providing logistical support to al-Qaida, and the prosecutor asked for sentences ranging from 22 to 32 years in jail. In April, the UK extradited Tunisian citizen Hedi Ben Youseff Boudhiba to Spain, where he was awaiting trial for membership in a Spanish terrorist cell that provided false passports and other identification to the March 11, 2004 bombers.

Spain remained both a target for international terrorist groups and an important transit point and logistical base for terrorist organizations operating in Western Europe. Spain did not serve as a safe haven for terrorists or terrorist organizations, but the large population of immigrants from North Africa, the opportunities that exist for raising funds through illicit activities, and the ease of travel to other countries in Europe, made Spain a strategic location for international terrorist groups. Spanish authorities put great effort into investigating, disrupting, and prosecuting members of such groups.

Many of the 2004 Madrid train bombing suspects had direct or indirect relationships with members of the Moroccan Islamic Combat Group (GICM), and, in 2006, several GICM members were arrested. A splinter group, known as the Moroccan Salafiya Jihadiya, was also increasingly on the radar screen of Spanish law enforcement.

The Salafist Group for Preaching and Combat (GSPC), who later in the year changed its name to al-Qaida in the Islamic Maghreb, was known to use Spain as a logistical base and transit point. Several alleged AQIM/GSPC members were arrested this year and Joan Mesquida, Director of the Police and Civil Guard, announced in November that the Spanish and French Ministries of Interior had created a "Joint Investigation Team" to investigate the financial network of the group. This was the first joint team the two countries have created to fight Islamist terrorism.

PX202

Spanish police worked to thwart terrorist facilitation networks that sought both to funnel potential extremists from Spain to Iraq, primarily through Syria, as well as bring fighters seasoned in Iraq into Spain. In November, police arrested four individuals charged with cooperating with an Islamist terrorist organization, forging official documents to support terrorist activities, and aiding extremists who tried to enter Spain after having fought in Iraq. In a separate case pending before Spanish courts, the national prosecutor will seek a prison sentence of 124 years for six alleged Islamist extremists arrested in January 2003 in Barcelona and Girona. These individuals are known in Spain as "The Detergent Command," because of their possession of large quantities of detergents that police believed were to serve as ingredients for explosive devices. In June, police arrested eleven individuals on charges of recruiting terrorists for terrorist organizations operating in Iraq.

Also in June, the Supreme Court reduced the prison sentence of Imad Eddin Barakat Yarkas, aka Abu Dahdah, from 27 years to 12 years. Barakat Yarkas, a Syrian immigrant to Spain, was detained in November 2001 on charges of providing support to AQ and of helping Mohammed Atta organize the September 11 terrorist attacks. Yarkas and 17 co-defendants were convicted in September 2005 for their roles in supporting AQ, but three codefendants were later released on appeal. Among those convicted was al-Jazeera journalist Taysir Alony, who was sentenced to seven years in prison for transporting funds from Yarkas to terrorists in Afghanistan under his cover as a journalist. Spanish authorities released Alony in October for humanitarian reasons stemming from a serious heart problem, but he remained under surveillance.

Spanish authorities continued their investigation into the March 2004 Madrid train bombings that killed 191 people and wounded hundreds of others, and the trials of 29 suspected perpetrators of the attacks were scheduled to begin in February 2007. This year, police arrested an additional 31 individuals in connection with the attacks, bringing to 110 the total number of suspects detained as part of the investigation. In November, Italian authorities extradited Egyptian national Osman El Sayed, known as "the Egyptian," to Spain in response to an international arrest warrant for his alleged role in the Madrid bombings. Later that month, Osman was sentenced in Italy to ten years in jail for international terrorist crimes.

Key arrests by Spanish security forces of suspected international terrorists included:

- January: A joint Civil Guard-SNP operation culminated in the arrest of 19 people associated with Islamist terrorism in Catalonia, Madrid, and Guipuzcoa Province (15 of them were sent to jail). Among the group arrested in Catalonia were seven Moroccans and one Spaniard who were alleged members of the GICM, and allegedly were responsible for sending the suicide bomber who struck the Italian base of Nasiriyah in southern Iraq in November 2003, killing 20 Italian soldiers.

- May: the Civil Guard arrested Issa Ben Othman in Barcelona, an alleged member of the terrorist network dismantled in the January operation. He was accused him of recruiting and sending foreign combatants to Iraq.

- November: Two individuals accused of belonging to the GICM and of having links with the 2003 Casablanca terrorist attack were arrested by Spanish police in Melilla.

PX202

- December: Spanish National Police arrested ten Spanish nationals and one Moroccan national in the North African enclave of Ceuta on charges that the men were plotting to carry out a terrorist attack. [9]

Spain continued to make progress in its decades-old campaign to eliminate the Basque Fatherland and Liberty (ETA) terrorist group, but a new phase in the struggle began in March when ETA declared a "permanent cease-fire." The government of President Jose Luis Rodriguez Zapatero agreed to begin peace talks with ETA and its outlawed political wing Batasuna if the group put an end to all violence. ETA supporters continued to engage in street violence and vandalism, and in October alleged ETA supporters stole 350 handguns from an armory in the French town of Vauvert. As of mid-December, Spanish authorities had arrested 15 individuals for membership in or association with ETA. On December 30, ETA exploded a massive car-bomb that destroyed much of the covered parking garage outside the new Terminal 4 of Madrid's Barajas International Airport and effectively broke its nine-month "permanent cease-fire." Two individuals killed in the blast became ETA's first fatalities in more than three years. The government suspended talks with ETA, and government officials subsequently said political negotiations with the group had ended. The bombing came on the heels of extensive vandalism by street gangs in various Basque cities.

Spain cooperated with French authorities in its ETA effort, with French police arresting 22 suspected members and extraditing seven of them to Spain to stand trial. Cooperation with Mexico resulted in the extradition to Spain of four additional ETA members. Spanish authorities charged 41 members of ETA's illegal political front group Batasuna, including senior Batasuna figure Arnaldo Otegi, with membership in a terrorist organization and of providing financial support to ETA. Before the fatal December 30 airport bombing, ETA had carried out 12 bombings, all of them before the March 22 cease-fire announcement, resulting in injuries and significant property damage, but no fatalities.

Spain made great strides in disrupting terrorist cells and frustrating would-be terrorist plots. Under Spanish law, however, the standards of evidence for conviction are high and this affects terrorism cases. For example, the Spanish National Court in September 2005 convicted Spanish national Hamed Abderrahman (known as the "Spanish Taliban", who was transferred to Spain from the U.S. naval base at Guantanamo in February 2004 at the request of Spanish authorities), and sentenced him to six years imprisonment for membership in a terrorist organization. The Supreme Court overturned that decision in July. In its decision, the Supreme Court excluded all evidence obtained during the more than two years that Abderrahman spent in Guantanamo, as well as communications intercepts by Spanish authorities that had also served as evidence against him. It threw out other evidence collected against Abderrahman prior to his capture in Afghanistan and determined that prosecutors had skewed Abderrahman's testimony to incriminate him. This finding had an immediate affect on the case of Lahcen Ikassrien, a Moroccan national and former Guantanamo detainee transferred to Spanish custody in July 2005. Spain's National Court, in October, acquitted Ikassrien after finding insufficient evidence that he was a member of either AQ or of the Abu Dahdah terror cell in Spain, or that he fought alongside the Taliban in Afghanistan. The Court excluded the prosecution's evidence that was obtained during his detention in Guantanamo and any information gleaned from intercepted phone calls in Spain.

---

[9]     *Among the detainees were two brothers of former Spanish national Guantanamo detainee Hamed Abderrahaman Ahmed (known in Spain as the Spanish Taliban), whose conviction on terrorism charges was overturned earlier this year by the Spanish Supreme Court. According to initial reports, the eleven men were accused of membership in the GICM or the related "Al Haraka Salafiya Jihadiya" organization. In announcing the arrests, Minister of Interior Alfredo Perez Rubalcaba said the group had not selected a specific target, but was in the initial stages of planning an attack.*

PX202

The U.S. - Spain Counterterrorism Working Group (CTWG) met in Madrid in October, and was addressed by U.S. Attorney General Gonzales, Spanish Minister of Justice Lopez Aguilar, and Spanish Attorney General Conde Pumpido. The group helped foster counterterrorism cooperation between numerous U.S. agencies and their Spanish law enforcement and judicial counterparts. The sides agreed to designate a point of contact on counterterrorism issues in the U.S. Department of Justice and in the Spanish Prosecutors' office to streamline future collaborative efforts.

Spain participated in the Container Security Initiative to scan containers bound to the United States from the port of Algeciras for hazardous and illicit materials. The Megaports initiative was inaugurated in Algeciras in June. Spain and the United States co-chaired the Financial Action Task Force (FATF) Terrorism Finance Working Group, and Spain participated in all meetings of the G8 Counterterrorism Action Group (CTAG).

## SWEDEN

In his first policy statement in October, newly elected Prime Minister Fredrik Reinfeldt called for increased international cooperation against terrorism, to include preventive measures and greater coordination of operational activities and intelligence. Authorities considered the threat of terrorist attacks in Sweden low, but monitored a number of known extremists and extremist organizations within the country. Such groups, including AQ, Ansar-Al-Islam, FARC, Hizb Al-Tahrir, Hizballah, and Islamic Jihad, provided logistical and financial support to their respective organizations abroad.

While the Government of Sweden did not provide safe haven for terrorists or terrorist organizations, terrorist organizations exploited its considerable legal protections of personal freedoms and civil liberties to maintain a presence in the country. Sweden's immigration policy, based on political asylum, attracted individuals from troubled countries, including some that sponsor terrorism.

The government augmented law enforcement funding and passed new laws to fight terrorism.  In July, a law entered into force that enabled the military to assist police in responding to terrorist incidents. The Swedish government provided an extra $10 million to strengthen the work on serious crime and to increase capabilities at the Prosecutors Office and the National Police Board.

The Stockholm District Court in June convicted three men: 22-year-old Nima Ganjin, 25-year-old Andreas Fahlen, and 19-year-old Albert Ramic; for attempting to commit a terrorist act, and conspiracy to commit a terrorist act, in connection with a December 2005 botched arson attack on a Stockholm polling center for expatriate Iraqis. Prison sentences for the three ranged from two to three years. In September an appeals court reduced the sentences of Ganjin and Fahlen to two years for Mr. Ganjin, and 15 months for Mr. Fahlen, and reversed the conviction of Mr. Ramic.

In April, authorities in Bosnia and Herzegovina confirmed the indictment of Swedish citizen Mirsad Bektasevic on charges, inter alia, of terrorism under Article 201, Paragraph 1, in conjunction with Article 29 of the Criminal Code of Bosnia and Herzegovina.  Bektasevic's formal trial opened in July and was ongoing. He has remained in Bosnian custody since his arrest in Sarajevo in 2005.

Pursuant to a U.S. arrest warrant and INTERPOL Red Notice, in December 2005, Czech authorities arrested Oussama Kassir, a Lebanese-born Swedish national, while he was in transit from Stockholm to Lebanon. Kassir is wanted in the United States on allegations that he conspired to provide material support to terrorists in the planned establishment of a terrorist training camp in Bly, Oregon. In June, a hearing was held to consider the extradition. Kassir remained in Czech custody pending continued consideration of the U.S. extradition request.

PX202

Swedish law did not provide the government independent national authority to freeze assets, unless in connection with an ongoing criminal investigation. Noteworthy cases concerning asset freezing included:

- In September, Sweden unfroze the assets of Ahmed Yusuf, one of three Swedes designated on UN and EU lists in 2002; after he was delisted from UNSCR 1267 and the EU formally de-listed him.

- In November, authorities froze assets of a grain trading company "al-Aqsa" in Malmo (southern Sweden), and arrested its head Marwan el-Ali; they subsequently released him and unfroze the assets due to lack of evidence.

- Subsequent to his listing in December 2006 under UNSCR 1267 (as well as U.S. and EU designations), Sweden froze the financial assets of, and imposed travel restrictions on AQ-linked Mohamed Moumou, a Swedish citizen of Moroccan origin.

Sweden actively contributed to EU counterterrorism efforts. Through the European Common Foreign and Security Policy (EFSP), Sweden coordinated EU counterterrorism cooperation with Morocco and Algeria. Sweden participated in EUROPOL and EUROJUST, European law enforcement institutions that coordinated member states' counterterrorism cooperation and activities. Further, the government participated in the Nordic Council of Ministers Regional Forum for Nordic Governmental Cooperation. Sweden contributed $900,000 to the Terrorism Prevention Branch of the United Nations Office on Drugs and Crime. It additionally provided $150,000 to the UN Counterterrorism Implementation Taskforce. In Asia, Sweden continued to provide funding for the Jakarta Center for Law Enforcement Cooperation, with a contribution of $150,000.

## SWITZERLAND

In 2006, the Swiss became more conscious of the presence of terrorist groups on their own soil, with the Swiss Federal Police describing Switzerland as a "jihadi field of operations" in its 2005 terrorism report. Due in part to increased pressure in neighboring EU countries, several non-al-Qaida terrorist groups, including the Tamil Tigers (LTTE), Kurdish Workers Party (PKK), and Colombian FARC, appeared to have increased their presence in Switzerland. Existing Swiss law and practice limited the government's ability to designate these as terrorist entities, but Swiss officials have expressed willingness to pursue criminal investigations of such "violent extremist" groups. Swiss officials have provided information to U.S. officials when information had a specific U.S. angle; however, law and practice continued to limit the scope of intelligence sharing and joint investigations.

The Department of Foreign Affairs (DFA) noted that in the past, Swiss officials were primarily concerned that outside radical networks might try to use the country as a logistical base to raise money or support operations elsewhere. Whereas most terrorism suspects arrested or questioned after September 11, 2001, were foreigners just transiting,  most of the ten North African suspects arrested for alleged involvement in a plot against a U.S. or Israeli commercial aircraft at Geneva or Zurich airport were immigrants who had been granted Swiss residency. The accused were believed to be members of the Salafist Group for Preaching and Combat (AQIM/GSPC).

On May 12, the Swiss Federal Police arrested seven North African terrorists in Basel and Zurich, following a lengthy investigation in Switzerland, including close cooperation with the police and legal authorities in several European countries. This operation was followed in July with the arrest of another North African terrorist in July and other arrests abroad.

PX202

In a parallel investigation, federal police arrested another AQIM/GSPC member in October following an international warrant issued by Italian authorities. Afif Mejri, also known as Lofti, is believed to be a member of a Milan cell that had raised 1.62 million Euros (SFr 2.57 million) to finance at least two AQIM/GSPC attacks on January 3, 2005, and another on March 27, 2005, in towns southwest of Algiers. Two others, Yacine Ahmed Nacer and Ali El Heit have been jailed in Italy since May 2005 for weapons trafficking for terrorist groups. Three other suspects, identified as Rabah Bouras, Lamine Ahmed Nacer and Farid Aider are fugitives and are believed to have left Europe last year. They are being sought on the more serious charge of having criminal associations with terrorism.

The Government of Switzerland estimated there were 4,000 sympathizers of the PKK/Kongra-Gel in Switzerland and approximately 100 individuals in the Kongra-Gel's central coordinating cadre, although no training camps were found in Switzerland during the last four years. Swiss police still experienced problems when tracking them, because their leaders changed jobs about every six months. Most Kongra-Gel's activities in Switzerland consisted of media relations, training management staff, and fundraising. Swiss authorities also noted that the Turkish Communist Party/Marxist-Leninists (TKP/ML) and the successor organizations of Devrimci Sol, the Revolutionary Peoples' Liberation Party/Front (DHKP-C), and the Turkish Peoples' Liberation Party/Front (THKP-C) remained active in Switzerland.

The Sri Lankan Ambassador to the UN in Geneva met with Swiss authorities on June 6, and expressed concerns about the presence of members of the separatist movement Tamil Tigers, and pointed to the EU's inclusion of the Tamil rebels on its terrorist list in May. While Norway is an official mediator in the Sri Lankan conflict, Switzerland has offered its services several times in the past. Swiss officials asserted that since September 2005, Switzerland "has implemented a very selective visa policy" for Sri Lanka, especially regarding sympathizers of Tamil rebels.

Similarly, the Colombian Ambassador raised concerns with Swiss officials over the presence of the Colombian Marxist guerrilla movement FARC in Switzerland. The Swiss press reported not only the presence of the FARC member Marcos Calarca, but also noted that the group's website was based in Switzerland.

Investigations continued against individuals suspected of supporting the 2002 Jerba and 2003 Riyadh bombings, although only three suspects remained imprisoned.

On March 29, the Federal Council agreed that authorities must be able to better supervise new technologies and in particular those related to the Internet.

Counterterrorism activities were carried out by several police units: the Federal Criminal Police's Counterterrorism Unit focused on al-Qaida-related cases and employed 21 officials -- eleven working on terrorism, nine working on terrorism financing, and a chief. Another 15 analysts worked in the Department for Analysis and Prevention (DAP) in the Federal Office for Police. There were also 70 policemen in the cantons working on counterterrorism activities.

The Federal Council extended its ban on AQ and kept frozen approximately $28 million in AQ and Taliban assets in 82 separate accounts. One recent Swiss investigation centered on Al-Taqwa Management, a financial firm based in Switzerland until it went into liquidation in December 2001. The United States accused the company of funding al-Qaida. Al-Taqwa was founded in 1988 and was run from Lugano, canton Ticino, by its Egyptian-born managing director, Youssef Nada, and his Syrian-born associate, Ali Himat. The company is on the Office of Foreign Assets Control (OFAC)'s list of organizations accused of helping to fund terrorism and is listed under UNSCR 1267. Soon after the list was published, Swiss police raided the firm's headquarters in Lugano. The company's

PX202

bank accounts, as well as those belonging to its board members, were subsequently frozen. Swiss authorities acknowledged that their investigations showed that the Al-Taqwa directors' ties to leadership could go back as far as the late 1990s.

In September, Switzerland and the United States co-sponsored the successful "Black Ice" bioterrorism coordination exercise in Montreux, hosting senior officials from numerous multilateral organizations. The Swiss also sponsored several conferences on civil infrastructure protection and terrorism finance under the auspices of NATO's Partnership for Peace.

## TURKEY

Domestic and transnational terrorist groups have targeted Turkish nationals and foreigners, including, on occasion, U.S. Government personnel, for more than 40 years. International and domestic terrorist groups that operated in Turkey included Kurdish separatist, Marxist-Leninist, radical Islamist, and pro-Chechen groups.

Most prominent among terrorist groups in Turkey is the Kurdistan Workers' Party (PKK), subject to regular name changes, currently operating as Kongra-Gel (KGK/PKK). Composed primarily of Kurds with a historically separatist agenda, the KGK/PKK operated from headquarters in part of northern Iraq and directed forces to target mainly Turkish security forces, government offices, and villagers who opposed the KGK/PKK. The Kurdistan Freedom Falcons (TAK), a group affiliated with the KGK, assumed responsibility for attacks on resort areas in southern and western Turkey, an attack on the office of a political party, and the bombing of a minibus carrying schoolchildren.

KGK/PKK attacks against Turkey increased significantly and claimed as many as 600 lives in 2006. In October, the KGK/PKK declared a unilateral cease-fire that slowed the intensity and pace of its attacks but attacks continued in response to Turkish security forces significant counterinsurgency and counterterrorism operations, especially in the southeast.

Other prominent terrorist groups included the Revolutionary People's Liberation Party/Front (DHKP/C), a militant Marxist-Leninist party with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state; and Turkish Hizballah (not affiliated with Lebanese Hizballah), an organization of Sunni Kurds with a violent history, which appeared to be providing social services and promoting Sharia in parts of the southeast.

At year's end, a criminal trial was underway for the 72 defendants allegedly involved in the four November 2003 Istanbul bombings. [The trial concluded on February 16, 2007, with 48 of the 72 receiving jail sentences. Seven of those were sentenced to life in prison; 26 were acquitted.]  The lead defendants admitted to contacts with AQ and warned of further attacks. Most of the other defendants denied responsibility for, or knowledge of, the bombings. Four of the suspects, including the brother of one of the four suicide bombers, were released pending trial in May after spending more than two and half years in prison.

As of late November, Turkish prosecutors were seeking life imprisonment for Luay Sakka, a Syrian national linked to AQ and the Zarqawi network. Sakka was connected to the funding of the November 2003 Istanbul bombings and the deaths of U.S. and Coalition Forces in Iraq, and was allegedly plotting a terrorist attack on Israeli cruise ships in Turkish ports when he was apprehended in August 2005.

PX202



*TURKEY, Istanbul:  Yusuf Polat ( C ), one of the 30 defendants charged with four massive suicide attacks in Istanbul in November 2003,  is escorted by Turkish gendarmes 24 January 2006 upon his arrival at an Istanbul courthouse.  The two sets of car bombings, the worst terrorist incidents in Turkish history, targeted two synagogues 15 November 2003, the British Consulate and the British-based HSBC bank 20 November 2003, killing 63 people, including British Consul Roger Short.  AFP Photo/Cem Turkel*

In addition to sharing intelligence information on various groups operating in Turkey, the Turkish National Police (TNP) and the National Intelligence Organization (MIT) conducted an aggressive counterterrorist campaign and detained numerous suspected terrorists in scores of raids, disrupting these groups before terrorist acts could be carried out. For example, in December, TNP counterterrorism units simultaneously raided ten addresses in Istanbul that were suspected of housing leftist militants. Twenty suspects were arrested. Turkish law defined terrorism as attacks against Turkish citizens and the Turkish state, and government left the definition unchanged when Parliament enacted a package of amendments to its antiterrorism law.

Turkey has consistently supported Coalition efforts in Afghanistan. After commanding ISAF II in 2002 and ISAF VII in 2005, in August, Turkey began a two-year joint rotational command of the International Security Assistance Force (ISAF) in Afghanistan for the Capital Regional Command along with France and Italy. Turkey also opened its first Provincial Reconstruction Team (PRT) in November in Wardak Province and pledged $100 million in humanitarian assistance for the reconstruction and operation of schools and hospitals.

Turkey has provided significant logistical support to Coalition operations in Afghanistan and Iraq, authorizing the use of Incirlik Air Base as an air-refueling hub for OEF and OIF and as a cargo hub to transport non-lethal cargo to U.S. troops in Afghanistan and Iraq. Almost 60 percent of air cargo

PX202

for U.S. troops in Iraq transits Incirlik.  Establishment of this hub allows six C-17 aircraft to transport the amount of goods it took nine to ten aircraft to move from Germany, and saves the United States almost $160 million per year.

One-third of the fuel (has been as high as two-thirds) destined for the Iraqi people and more than 25 percent of fuel for Coalition Forces transits from Turkey into Iraq via the Habur Gate border crossing. Turkey was active in reconstruction efforts, including providing electricity to Iraq. Turkish citizens continued to be killed, providing logistical support to Coalition Forces or performing reconstruction in Iraq. Turkey contributed headquarters personnel to the NATO Training Mission in Iraq (NTM-I), helped train Iraqi diplomats and political parties, and completed military leadership training in Turkey for 90 Iraqi officers as a further contribution to the NATO NTM-I.

The Financial Action Task Force (FATF) conducted a peer review of Turkey's regime against the financing of terrorism and money laundering in September and planned to publicize the report in early 2007. Pursuant to its obligations under UNSCR 1267 and subsequent resolutions, Turkish officials continued to pass UN and U.S.-designated names of terrorists to all law enforcement and intelligence agencies, as well as to financial institutions. Only UN-designated names, however, were subjected to asset freezes enforced through a Council of Ministers decree. This legal mechanism for enforcing the sanctions under UNSCR 1267 was challenged in Turkish courts by UN-designated terrorist financier Yasin al-Qadi. A lower-court ruled in July that the Council of Ministers lacked the authority to freeze assets, but in February 2007, an appeals court overturned the lower court ruling and confirmed the Council of Ministers' authority to freeze. In the meantime, al-Qadi's assets remain frozen. Separately, in October, Parliament enacted legislation to reorganize MASAK, Turkey's anti-money laundering agency, which doubled as Turkey's Financial Intelligence Unit. This law explicitly criminalized terrorism finance and provided legal protections for filers of suspicious transaction reports

## UKRAINE

Ukraine did not suffer from domestic terrorism incidents, although law enforcement authorities sometimes labeled ordinary criminal activity as terrorist acts. Still, the Ukrainian government insti-tuted legislative and regulatory changes to improve its ability to investigate and prosecute acts of terrorism. In September, the Ukrainian Parliament amended the Criminal and Criminal Proceedings Codes of Ukraine to conform to commitments resulting from Ukraine's ratification of the Council of Europe Convention on Prevention of Terrorism. The amendments to the codes introduced punish-ments for inducing people to participate in an act of terror, public calls to commit an act of terror, formation of a terrorist group/organization, and facilitating an act of terror through provision of financing, material, or arms. The Ukrainian State Financial Monitoring Agency signed bilateral agree-ments with Croatia, Canada, and China, which stipulated cooperation in the prevention of money laundering and prevention of terrorist financing. Ukrainian banks and other financial institutions were required to screen all transactions against a consolidated list of terrorists approved by the Cabinet of Ministers.

## UNITED KINGDOM

There were no successful terrorist attacks in the United Kingdom in 2006. In August, British, Paki-stani, and American officials worked together to disrupt a terror plot involving British citizens intent on detonating aircraft traveling between the United Kingdom and the United States. The British government arrested over 20 individuals suspected of being involved in that plot, many of whom were subsequently charged with criminal acts and intent to carry out acts of terrorism. Their cases remained before the courts. Some of those arrested had spent time in or had ties to Pakistan.

PX202

The British and American governments instituted new restrictions to transatlantic airline travel in response to the revealed airline plot. The United States and United Kingdom enjoyed a wide-range of bilateral information sharing on threat assessments and terror networks, and government responses to both. Cooperation in derailing the transatlantic terror plot in August was evidence of the ability of the two governments to work together, in real-time, to avert loss of life from terrorism.

The British government acknowledged the existence of some 200 known terror networks in the United Kingdom. In November, Dame Eliza Manningham-Buller, head of the domestic security service (known as MI5), made a stark announcement that there were some "1,600" individuals, "200 networks," and an estimated "30 terror plots" in the United Kingdom. The British government viewed radicalization of young people in the UK and elsewhere, regardless of whether those radicalized in the UK had ties to AQ or are "homegrown," as a growing threat to international and British security.

The government enacted new counterterrorism legislation that made the "glorification of terrorism" illegal, and expanded the government's ability to detain terror suspects before charging them. The government has a mechanism for deporting foreign terror suspects to their home countries once those countries agreed to provide assurances that the suspects' human rights will not be violated upon their return. The courts tried and convicted several prominent terror suspects involved in terror plots prior to 2006. The British government also increased its efforts at outreach to Muslim communities within the UK. It sought to support advocates of moderate interpretations of Islam and to gain support from within British Muslim communities to counter the appeal of extremist ideology and radicalization.

The United States and the UK worked closely within the UN and the FATF to deny terrorists and their supporters access to the international financial system. The United Kingdom had strong legal provisions for freezing assets related to terrorist financing, including the Terrorism (United Nations Measures) Order 2001, the al-Qaida and Taliban (United Nations Measures) Order 2001, and the Anti-terrorism Crime and Security Act 2001. In October, the British government took measures to further strengthen its terrorist financing legislation when Chancellor Gordon Brown announced that Her Majesty's Treasury, on the advice of law enforcement agencies, had agreed to use "closed source evidence" (classified materials) in asset freezing cases where there were strong operational reasons to impose a freeze but insufficient unclassified information available. He also announced that the government would seek to amend its existing domestic legislation to give "the Treasury the power to stop funds reaching anyone in the UK suspected of planning terror or engaging with terror."

Northern Ireland

Political progress in Northern Ireland, including prospects for the establishment of a devolved government and continuing cease-fires by paramilitary organizations, have created a marked decrease in terrorist incidents in Northern Ireland. In October, the Independent Monitoring Commission (IMC), which was established in 2004 by the British and Irish governments to monitor progress made by paramilitary groups in ending their violent activities, reported that evidence showed the Provisional Irish Republican Army had committed itself to following a peaceful path.

Loyalist paramilitary groups, however, were thought to be responsible for two killings in Northern Ireland from September 2005 to August 2006. The IMC was unable to place blame in three other killings, including the April murder of Sinn Fein member Denis Donaldson, who admitted publicly in December 2005 to having been a British spy.

PX202

Loyalist paramilitary Michael Stone disrupted a session of the Northern Ireland Assembly on November 24 as he tried to enter the parliament building with a viable bomb, a knife, and an imitation pistol. Afterwards, Stone, who was sentenced to over 600 years in prison for killing three mourners at a 1988 Sinn Fein funeral but released in 2000 under the terms of the 1998 Good Friday Agreement, had his license for liberty under that agreement revoked. He will now serve out the remainder of his term and faces additional charges stemming from the November 24 incident including attempted murder for targeting the leader of Sinn Fein (Gerry Adams).

## MIDDLE EAST AND NORTH AFRICA OVERVIEW

*"In Saudi Arabia, we strongly believe that international cooperation is crucial for fighting terrorism.  It also goes without saying that the will and resolve to fight terrorism must begin at home; the national will then must be extended to a universal collective resolve, for no country can afford to stay on the sidelines."*

**—Prince Saud Al-Faisal,** Foreign Minister of Saudi Arabia Address to Britain's Royal United Services Institute London; January 16, 2006

Iraq remained at the center of the War on Terror battling al-Qaida and affiliated terrorist organizations, insurgent groups fighting against Coalition Forces (CF), militias and death squads increasingly engaged in sectarian violence, and criminal organizations taking advantage of Iraq's deteriorating security situation. Terrorist organizations and insurgent groups continued to attack Coalition Forces primarily utilizing improvised explosive devices (IEDs) and vehicle-borne improvised explosive devices (VBIEDs). The U.S. Government continued with focused efforts to mitigate the threat posed by foreign fighters in Iraq, coordinating both with the interagency and with our embassy officials overseas. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region.  (See Chapter 3, State Sponsors of Terrorism.)

Israel faced a new situation when HAMAS, a designated Foreign Terrorist Organization, assumed control of the Palestinian Authority's (PA) Palestinian Legislative Council (PLC). After HAMAS' election win in January, the Israeli government declared it would not meet with PA representatives, and that it would hold HAMAS responsible for all terrorist attacks and rocket launches emanating from PA territory.

In the past year, major terrorist attacks occurred in Algeria, Iraq, Saudi Arabia, Israel, Lebanon, and Egypt. In Lebanon, in addition to the war precipitated by Hizballah against Israel in July, political violence continued throughout the year. Most notable was the assassination of Industry Minister Pierre Gemayel by a team of gunmen in the streets of a northern suburb of Beirut on November 21. This act, the latest in a series of assassinations and attempted assassinations over the last two years, seemed designed to inflame tensions and intimidate forces opposing Syrian interference in Lebanon. Algiers experienced its first terrorist attacks since 2004, including one that targeted westerners. Past attacks targeted Algerian government interests. On April 24 in Egypt, three suicide bombers detonated their explosive charges in rapid succession at three popular tourist locations in the Sinai resort town of Dahab. The bombers killed at least 24 people, including six foreigners. At least 87 were injured, among them four Americans and 25 other foreigners. In Saudi Arabia, one failed attack attempted to target a critical petroleum installation.

PX202



*EGYPT, Dahab: Egyptian investigators inspect the site where one of the three explosions took place in the tourist resort of Dahab, 25 April 2006. Three explosions killed 23 people including foreigners and wounded scores more in Egypt's Red Sea resort of Dahab. AFP Photo/Pedro Ugarte*

PX202

Almost all governments in the region cooperated with the United States in counterterrorist activities and undertook efforts to strengthen their capabilities to fight the War on Terror. These efforts included active participation in USG-sponsored antiterrorism assistance (ATA) programs and bolstering banking and legal regimes to combat terrorist financing. Many countries continued to provide some form of assistance to Coalition efforts to bring peace and stability to Iraq and Afghanistan.

The United States rescinded Libya's designation as a state sponsor of terrorism on June 30. Full diplomatic relations were resumed and Libya continued to cooperate closely with the United States and the international community on counterterrorism efforts.

Some countries made impressive strides. In Saudi Arabia, the government announced in December that it had captured 136 suspected terrorists over a three month period. In Morocco and Jordan, authorities disrupted a number of terrorist cells, some with connections to AQ and the Salafist Group for Preaching and Combat (GSPC), now known as al-Qaida of the Islamic Maghreb (AQIM). The Government of Jordan moved forward with prosecuting several terrorism-related cases, including the sentencing of seven individuals connected to the 2005 Amman hotel bombings. The Kuwaiti government sentenced several individuals who intended to travel to Iraq to join the insurgency. In Algeria, as part of the government's National Reconciliation Project, over 350 terrorists turned themselves over to authorities. The Moroccan government continued to implement internal reforms that aimed to address the socioeconomic conditions extremists exploit for recruitment.

## THE SUMMER WAR

On July 12, Hizballah terrorists entered Israel from southern Lebanon, abducted two Israeli soldiers and killed eight others. During the next 34 days, Hizballah fired over 4,000 Katyusha[10] rockets and other missiles into northern Israel, forcing the residents of Haifa, Nahariya, Tiberias, and other northern communities into bunkers. Hizballah also launched weaponized drones toward Israel and struck an Israeli naval vessel with an anti-ship missile. Israel responded by sending the Israeli Air Force (IAF) to attack rocket launchers and Hizballah infrastructure throughout southern Lebanon and in select areas north of the Litani River. The IAF also bombed Hizballah offices in southern Beirut, and roads, bridges, and power plants throughout Lebanon.  Israeli Defense Force (IDF) artillery struck Hizballah targets in southern Lebanon and paved the way for an incursion of more than a division of mechanized and infantry forces into southern Lebanon, aimed at pushing Hizballah forces north of the Litani River and laying the groundwork for a cessation of hostilities. During this period, Israel imposed an air and sea blockade on Lebanon to prevent the resupply of Hizballah by Syria and Iran. At least 110 Israeli soldiers and 43 Israeli civilians died in the conflict. The conflict also resulted in more than 1,000 Lebanese civilian deaths, and four UN observers died following an Israeli air attack.

The war ended with a UN-sponsored cessation of hostilities on August 14. Despite the cessation of hostilities and the deployment of Lebanese Armed Forces (LAF) and additional United Nations Interim Forces in Lebanon (UNIFIL) troops in the south, Lebanese militias, particularly designated

---

10    *The Katyusha multiple rocket launch system uses a ballistic (lacking a guidance system) rocket that was originally built and fielded by the Soviet Union. The launchers can deliver several rockets to an area target in a short span of time, although with low accuracy and a relatively long reload period.  The Katyusha, about 10 feet long, has a range of 10 - 20 miles.  The Qassam rocket is a home-made rocket with low accuracy and a range of 5 - 10 miles.*

PX202

Foreign Terrorist Organization Hizballah, retained significant influence over parts of the country. UN Security Council (UNSC) resolutions 1559 and 1701 required the government to take effective control of all Lebanese territory and disarm militia groups operating in Lebanese territory. Due to several factors, including internal political differences, resource shortages, and the unstable political situation following the conflict, the government was not able to disarm fully various extralegal armed groups or Hizballah. The conflict did not resolve Hizballah's claim of its right to conduct hostile operations against Israel along the Blue Line on the premise of legitimate self-defense of Lebanese territory and sovereignty. Hizballah has contended, with the support of many Lebanese, that the Shebaa Farms area of the Israeli-occupied Golan Heights is Lebanese territory.

The Israeli government and IDF report they dealt a serious blow to Hizballah, degrading its medium to long-range missile capability, destroying its infrastructure in southern Lebanon, and killing up to 700 of its fighters. By the end of the year, however, Israeli security experts suggested that Hizballah had recovered much of its manpower and equipment losses through recruitment and resupply from Syria and Iran. Hizballah nonetheless was keeping a low profile on the Israel-Palestinian border, and the provocations that preceded the July outbreak of hostilities have not resumed.

### ALGERIA

For the majority of 2006, the security situation in Algeria remained relatively unchanged, marked by stability in the major urban areas and low-level terrorist activities in the countryside. The last quarter of the year, however, witnessed four attacks in the province of Algiers, including one that targeted Westerners. These were the first attacks inside the province since 2004. Until these recent attacks,



*ALGERIA, Algiers:  Algerian security and explosives experts check the area 10 December 2006 after a bomb attack on two buses carrying staff of a US company killed one Algerian driver and injured nine other people from the US, Britain, Lebanon, Canada and Algeria in the neighborhood of Staoueli.  AFP Photo/Riad Kramdi*

PX202

terrorism in Algeria was generally not aimed at foreign entities. Instead, the country's major terrorist group, the Salafist Group for Preaching and Combat (GSPC), preferred to target Algerian government interests.

Two events helped fuel terrorism concerns in Algeria: the GSPC's September merger with al-Qaida and the conclusion of the amnesty period for Algeria's National Reconciliation project. Following al-Qaida's September 11 announcement of the GSPC's status as an AQ affiliate in North Africa, the group changed its name to al-Qaida in the Islamic Maghreb (AQIM), and subsequently made more threats against what it termed "crusading" westerners, particularly American and French citizens. On October 19, an improvised explosive device (IED) exploded outside a military barracks in an Algiers suburb, wounding six; and on October 30 two bombs killed two persons approximately 20 kilometers from downtown Algiers. On December 10, a shuttle bus carrying expatriate workers of an American oil services company was ambushed in an Algiers suburb thought to be secure because of its proximity to residences of senior government officials and a major western hotel. This attack, done with a road-side IED, killed two foreigners and wounded several others, including an American worker. The terrorists escaped. The December 10 attack against a relatively soft American target generated greater global media attention than nearly all of AQIM/GSPC past attacks against Algerian government targets. Given the success of this attack in terms of media attention, the AQIM/GSPC likely will attempt further attacks.

Even before its affiliation with AQ, the GSPC was an organization whose regional ties were expanding. AQIM/GSPC support cells have been discovered and dismantled in Spain, Italy, Morocco, and Mali; it maintains training camps in the Pan-Sahel. The AQIM/GSPC's regional scope, however, is thought to be the result of successful Algerian security service and military operations against it on Algerian soil that compelled it to operate outside Algerian territory. The Algerian services killed approximately 260 terrorists and arrested an additional 450 in 2006, compared to the combined killed and arrested figure of about 400 for 2005.

The counterterrorism successes of the Algerian services, combined with the public's continued rejection of terrorists, led the AQIM/GSPC to seek new methods to finance attacks. Algerian media reported the use of extortion in concert with 16 instances of fake roadblocks and 55 kidnappings inside Algeria. The kidnappings, sometimes in coordination with fake roadblocks, often targeted wealthy Algerians. Not all these methods were attributed solely to the AQIM/GSPC as there was also a growing crime problem in Algeria. AQIM/GSPC terrorists such as Mokhtar Belmokhtar have also taken an active role in regional smuggling to finance terrorism.

The final stages of implementation of the national reconciliation, a major policy initiative of Algerian President Abdelaziz Bouteflika, took place in 2006, and sought to bring closure to the near civil war between Algeria's secular government and Islamic terrorists in the 1990s. A cornerstone of this initiative was the six-month amnesty program from March to September 2006 for repentant imprisoned or active terrorists who had not committed bombings, massacres, or rapes. As of September, over 2,300 convicted terrorists were released and more than 350 terrorists surrendered to authorities in order to benefit from the amnesty; statistics on the recidivism of these individuals were not available. Despite a September deadline for amnesty, the government has quietly extended the amnesty grace period indefinitely. In addition, some members of the banned political party Islamic Salvation Front returned to the country from self-imposed exile as part of the amnesty.

The National Reconciliation policy was an effort to resolve divisions that had resulted during more than a decade of civil strife. The amnesty, however, paradoxically appeared to harden the resolve of the remaining terrorists. Indeed, there were reports of terrorists killing cohorts who surrendered to the authorities. During the March through September amnesty period, 199 security officials and

civilians were killed, compared to 107 during the rest of the year. Perhaps as a show of defiance and renewed determination, the AQIM/GSPC was responsible for the death of 78 security officials and civilians in October and November, immediately after the amnesty period ended. The AQIM/GSPC, thanks in part to high unemployment among Algerian youth, was partially successful in replenishing its numbers after the arrests, surrenders, and deaths of over 1,000 terrorists. Those remaining appear to be more hard-line and resistant to the government's amnesty offer.

Despite the upsurge of AQIM/GSPC activity toward the end of the year, overall, the government has greatly improved security from the situation of the late 1990s. The Algerian security services and military remained capable of handling the prolonged effort against internal terrorist threats and continued to be a reliable ally in the War on Terror.

## BAHRAIN

In 2006, the Government of Bahrain enacted important legislation to combat terrorism and its financing. In August, Bahrain enacted its first law (Law 58 of 2006) specifically criminalizing terrorism. The law, officially titled "Protecting Society from Terrorist Acts," enumerated the types of crimes considered to be terrorism and established punishments, ranging up to and including the death penalty. The law criminalized conspiracy to carry out an act of terror, although it did not specify a precise penalty of imprisonment or fine.

In August, the King signed amendments to an anti-money laundering law (Law 4 of 2001) that specifically addressed terror financing. These amendments criminalized the undeclared transfer of money across international borders for the purpose of money laundering or in support of terrorism. Anyone convicted under the law of collecting or contributing funds, or otherwise providing financial support to a group or people who practiced terrorist acts, was subject to imprisonment and/or fine. Law 54 also codified a legal basis for a disclosure system for cash couriers although the government must still enact supporting regulations.

The new law included a definition of terrorism based upon the Organization of the Islamic Conference definition. The law excludes from the definition of terrorism acts of struggle against invasion or foreign aggression, colonization, or foreign supremacy in the interest of freedom and the nation's liberty, according to the principles of international law. There are various legal interpretations about the possible application of this clause, and its impact is not yet known.

Bahrain actively monitored terrorist suspects. Domestic legal constraints, particularly prior to the promulgation of the new counterterrorism and CFT laws, at times have hamstrung its ability to detain and prosecute suspects. The legal case of four Bahrainis arrested in mid-2004 on suspicion of plotting terrorist attacks was resolved conclusively on November 20 when Bahrain's Higher Criminal Court ruled that the four accused were not guilty of any remaining charges. This step followed a June 26 ruling by the Constitutional Court that conspiracy charges filed against the suspects were unconstitutional.

In September, security services arrested eight Bahrainis on suspicion of planning possible terrorist activities. During the interrogations, several of the suspects admitted they intended to travel to Afghanistan to fight allied forces. The prosecutor general subsequently decided he did not have enough evidence to charge them under the counterterrorism law and released them on bond in late September.

PX202

Bahrain continued to host the Middle East and North Africa Financial Action Task Force (MENA FATF) secretariat. At the Bahraini government's request, the International Monetary Fund and World Bank conducted a financial sector assessment program (FSAP). The FSAP made recommendations to improve the anti-money laundering/combating the financing of terror environment in Bahrain, among other items. The Bahraini delegation briefed MENA FATF members on the FSAP during the November plenary in Abu Dhabi.

## EGYPT

Egypt was a victim of domestic terrorism in 2006. On April 24, three suicide bombers detonated explosive charges in rapid succession at three popular tourist locations in the southern Sinai resort town of Dahab. The bombers killed at least 24 people, including six foreigners. At least 87 were injured, among them four Americans and 25 other foreigners. As with the 2005 triple bombing in Sharm el-Sheikh, the attacks seemed to target the Egyptian tourism industry, not Americans or foreigners specifically.

On April 26, two suicide bombers attacked a vehicle belonging to the Multinational Force and Observers (MFO) in northern Sinai and the Egyptian police, but the bombers were the only casualties. In the first attack, a suicide bomber wearing a belt bomb threw himself on the hood of an unarmored MFO vehicle, shattering the windshield. In the second attack, several kilometers away, another man with a belt bomb rode a bicycle to an Egyptian police vehicle and blew himself up. The police vehicle was responding to the first attack on the MFO vehicle.

Following these attacks, Egyptian police conducted major security sweeps of the Sinai.   According to police, al-Tawhid wa al-Jihad ("Unity and Holy War"), an indigenous group comprised mostly of radicalized Bedouin extremists was responsible for the Sinai bombings. Although the group espouses a pro al-Qaida, Salafist ideology, there were no indications the group was specifically targeting Americans. Egyptian authorities believed they have arrested or killed most of its leadership and operational planners, but members are very likely still at large in the Sinai.

Although al-Tawhid wa al-Jihad was the only terrorist group to successfully commit attacks in Egypt this year, the Egyptian government broke up two other alleged terrorist groups before the groups could conduct operations. One group was reportedly planning attacks; the other was reportedly planning to send foreign fighters to Iraq. There was no further evidence of operational domestic or foreign terrorist groups in the country.

The Egyptian government's well-known opposition to Islamist terrorism and its effective intelligence and security services have made it less likely that terror groups will seek safe haven there. However, Egypt's rugged northern Sinai region remained a haven for smuggling arms and explosives into Gaza and a transit point for Gazan Palestinians trying to infiltrate Israel. In addition, Palestinian HAMAS officials have allegedly carried millions of U.S. dollars in cash across the Gaza-Egypt border. Criminal networks that smuggle weapons and other contraband through the Sinai into Israel and the Gaza Strip may be associated with or used by terrorist groups in the region. The apparent radicalization of some Sinai Bedouin might be linked in part to these smuggling networks, to heavy-handed Egyptian efforts to dismantle them, and to the Bedouin's long-standing distrust of the central government.

In the past three years, Egypt has tightened its terror finance regulations. Egypt maintained its strengthened security measures for airports, seaports, and the Suez Canal.

PX202

The Egyptian judicial system does not allow plea bargaining, and terrorists have historically been prosecuted to the full extent of the law. Terrorism defendants may be tried in military tribunals or emergency courts. Under the framework of the Mutual Legal Assistance Treaty, the Egyptian regime provided evidence for counterterrorism cases in the United States

Many of the Egyptian President's far-reaching counterterrorism authorities are derived from a decades-old Emergency Law that was renewed by Parliament in 2006 for two years. President Mubarak called for new counterterrorism legislation to replace the Emergency Law. Such legislation is reportedly being drafted by a governmental interagency committee, although pursuit of the legislation will likely follow passage and public approval of constitutional amendments which maintain wide latitude for government action against terrorist suspects.

## IRAN

*(See Chapter 3, State Sponsors of Terrorism.)*

## IRAQ

Iraq remained at the center of the War on Terror with the Iraqi Government and the Coalition battling al-Qaida in Iraq (AQI) and affiliated terrorist organizations, insurgent groups fighting against Coalition Forces (CF), militias and death squads increasingly engaged in sectarian violence, and criminal organizations taking advantage of Iraq's deteriorating security situation. Terrorist organizations and insurgent groups continued to attack CF primarily using Improvised Explosive Devices (IEDs) and Vehicle-Borne Improvised Explosive Devices (VBIEDs). The Iraqi government universally condemned terrorist groups and supported CF against AQI and its affiliates.

The June 7 death of AQI's leader, Abu Musab al-Zarqawi, damaged the group's leadership but did not diminish attacks against Coalition Forces and Iraqis nor did it halt overall increasing attack trends by the group. AQI's new leader is Abu Ayyub al-Masri, also known as Abu Hamza al-Muhajir. January press reports indicated that AQI teamed with several smaller Sunni Islamist groups devoted to continuing the insurgency calling themselves the Mujahideen Shura Council. By the end of the year, this group had renamed itself the Islamic State of Iraq.

AQ and affiliated groups continued attacks on Iraq's infrastructure and claimed responsibility for kidnappings and attacks against Coalition Forces.

The Government of Iraq sponsored reconciliation programs to reduce the sources of violence. The government organized conferences involving tribal and religious leaders, politicians, and civil society organizations to counter support for terrorist organizations and to promote dialogue between Iraq's ethnic and religious groups in an effort to decrease violence. Tribal leaders in Ramadi, a volatile city in Anbar province, banded together late in the year and pledged to fight against AQ instead of the coalition. While the tribal leaders' full effectiveness remained uncertain, this represented an important step.

Iraq's sectarian divide increased dramatically following the February 22 bombing of the al-Askariyah Mosque, one of the holiest sites to Shia Muslims, located in Salah ad Din province. While violence against both CF and Iraqis had increased prior to the bombing, this event exacerbated sectarian tensions and led to increased violence in Iraq's ethnically-mixed areas, especially Baghdad. Sectarian attacks, including car bombs, suicide vests, sniper fire, targeted assassinations, and

PX202

death squad murders, occurred on a close-to-daily basis with Iraqi civilians suffering the majority of causalities. Iraq's sectarian violence furthered the terrorists' goals by creating instability and weakening the government.

Neighboring countries, specifically Iran, continued to interfere in Iraq's internal affairs by allowing, condoning, or in some cases, actively smuggling weapons, people, materials, and money to terrorist, insurgent, and militia groups inside Iraq. Iranian agents and sympathizers utilized an 800-mile long, porous border with limited security to transport goods, which increasingly included Iranian-made weapons such as IEDs or their components, which proved effective in attacks against Coalition Forces.

In recent statements, Iraqi government leaders, including the Prime Minister, the President and the Foreign Minister, have called on neighboring countries to stop interfering in Iraq's internal affairs and to stop supporting elements actively fighting against Iraq's elected government. Syria's Foreign Minister traveled to Baghdad and agreed to cooperate more closely on border security in an effort to reduce the number of foreign fighters entering Iraq. Senior Iraqi officials, including Iraqi President Talabani, traveled to Iran throughout the year encouraging the Iranian government to support Iraq's political process and to stop material support of terrorist groups and militias.

To demonstrate that the Iraqi government does not wish to allow Iraq to become a safe haven for terrorist organizations, Prime Minister al-Maliki appointed the Minister of State for National Security, Shirwan al-Waeli, as the Iraq coordinator for issues involving the Kurdistan Workers Party (Kongra-Gel/PKK), a designated Foreign Terrorist Organization. Tension between Turkey and the Iraqi government increased as Turkish leaders expressed increasing frustration at what they viewed as Iraq's inaction against the PKK.

Although Iraq is a proven ally in the War on Terror, Iraq's developing security and armed forces will require further training and resources before they can effectively address the terrorist groups already operating within their borders. Iraq's intelligence services continued to improve in both competency and confidence, but they also will require additional support before they will be able to adequately identify and respond to internal and external terrorist threats. The international community's support for investment and reconstruction are critical components needed to ensure that the Government of Iraq's plans to reduce violence, improve services, and increase economic opportunities are successful.

## ISRAEL, THE WEST BANK, AND GAZA

Israel faced a new situation when HAMAS, a designated Foreign Terrorist Organization, assumed control of the Palestinian Authority's (PA) Palestinian Legislative Council (PLC). After HAMAS' electoral victory in January, the Israeli government declared it would not meet with PA representatives, initiated a diplomatic campaign to secure international isolation of the HAMAS-led PA government, and withheld the disbursement of hundreds of millions of dollars of value-added tax and customs revenues collected by Israel on behalf of the PA. Following the formation of a new HAMAS-led government in March, the Israeli government declared it would hold HAMAS responsible for all terrorist attacks and rocket launches emanating from PA territory. IDF officials were instructed to suspend all contact with Palestinian security forces in the Gaza Strip. Israeli security experts increasingly expressed concern that terrorist know-how and capabilities would be transferred from the Gaza Strip to the West Bank.

PX202

Throughout the year, Israel grappled with the problem of Qassam rocket launches from the Gaza Strip. On numerous occasions, rockets struck Israeli communities in the western Negev desert, including Sderot, or landed near or in the city of Ashkelon. Evidence suggested that Palestinian terrorists were able, on occasion, to improve the range of the Qassams. On at least three occasions, longer-range Katyusha rockets were launched from the Gaza Strip. To address the problem of rocket launches from populated areas, the IDF modified its rules of engagement to permit its forces to fire on targets a few hundred meters from Palestinian homes and police positions. During an IDF incursion into the northern Gaza Strip in November (Operation Autumn Cloud), an errant IDF artillery strike destroyed an apartment complex, and killed 18 Palestinian civilians and wounded over 50. A HAMAS spokesman called on all Palestinian factions to renew attacks, including suicide bombings, inside Israeli territory. Beginning in late November, however, HAMAS was the primary group observing a cessation of rocket fire from Gaza into green-line Israel. Although other groups have disregarded the cease-fire, HAMAS has upheld it, according to Israeli security experts.

Israel also grappled with a growing concern that terrorists, weapons, and funds were being smuggled between Egypt and the Gaza Strip through the Rafah crossing -- manned by the PA Border Crossing Authority, international observers, and Egyptian border guards – and a series of tunnels under the 12 km Philadelphi Corridor (PC) separating Gaza from Egypt. Israeli security experts voiced concern that Palestinian militants were exiting the Gaza Strip via Rafah, and then infiltrating Israel across the Egypt-Israel border. After HAMAS staged a June 25 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the abduction of Corporal Gilad Shalit, Israel took steps that severely limited the operation of the Rafah crossing. The IDF also carried out operations to locate tunnels under the PC, destroying at least 17 during the year.

Early in 2006, Israeli security officials said Israel was not targeting HAMAS because it forbade its members to participate in Qassam rocket launches. The Israelis maintained, however, that HAMAS activists were providing assistance to militants from other terrorist groups launching Qassams. HAMAS called Palestinian Islamic Jihad's (PIJ) April 17 suicide bombing attack in Tel Aviv a legitimate act of resistance. PIJ launched Qassam rockets into Israel, carried out the January 19 and April 17 suicide bombings at the old central bus station in Tel Aviv (which killed ten Israeli civilians and an American citizen, and injured 98 Israeli civilians), participated in a foiled February attack against the Erez crossing between Israel and the Gaza Strip, and attempted to carry out a number of other suicide bombings. Israeli security sources said PIJ made significant efforts to carry out terror attacks in Israel prior to the March 28 Knesset elections. The IDF believed PIJ was behind the launch of a Katyusha rocket from the Gaza Strip into Israel during Knesset elections.

Israeli security officials also maintained that various Fatah-affiliated groups carried out Qassam launches, particularly the Fatah-linked al-Aqsa Martyrs Brigade (AAMB) and the Abu Rish Brigades. Using stolen bulldozers, AAMB demolished part of the border wall between Gaza and Egypt on January 4, allowing hundreds of Palestinians to surge through the wall and enter Egypt. AAMB also claimed that it participated in two failed attempts in February to attack the Erez crossing between Israel and the Gaza Strip. AAMB claimed, on the Hizballah-operated Al-Manar TV station in Lebanon that it was responsible for the March 30 suicide car bombing at the entrance to a West Bank settlement that killed four Israeli civilians. On April 17, AAMB issued a statement threatening to target Zionists outside Palestine until Israel released its prisoners.

Lebanese Hizballah continued to provide support to select Palestinian groups to augment their capacity to conduct attacks against Israel. Hizballah also continued to call for the destruction of Israel, and directly launched a number of attacks from Lebanon, including a May 28 attack against Israel and the July 12 attack (see "The Summer War", earlier in this chapter).

PX202

Israeli security services maintained that Palestinian terrorists attempted numerous times to perpe-trate attacks in Israel, but were thwarted. Palestinians in the Gaza Strip attempted to infiltrate Israel by breaching the security fence around the Gaza Strip, and PIJ members were stopped en route to suicide bombings in Israeli territory. Israeli security officials claim they thwarted numerous attempts by Popular Resistance Committees (PRC) operatives and other Palestinian militants to detonate explosives at the Karni crossing between Israel and the Gaza Strip.

According to claims by HAMAS, AAMB, PIJ, PFLP, and the PRC, a number of terrorist attacks and Qassam launches were carried out by two or more organizations acting together. AAMB, PRC and PIJ claimed to have cooperated in a foiled February 9 attempt to attack the Erez crossing between Israel and the Gaza Strip. In February, the IDF and ISA shut down a Fatah-Tanzim infrastructure in Bethlehem that was receiving instructions and professional and financial assistance from PRC terrorists in the Gaza Strip.

Israeli security sources expressed concern that AQ and other external Sunni extremists were attempting to infiltrate the West Bank and Gaza Strip. On March 21, an Israeli military court in the West Bank charged two Palestinians with conspiracy to cause death, active membership in AQ, illegal assembly, and other charges. According to the charges, the two men created an al-Qaida cell in the West Bank city of Nablus, were recruiting to form other AQ cells in the West Bank, were preparing to carry out large-scale terrorist attacks in Israel, and were receiving funds and instructions from al-Qaida in Jordan. One of the two men had also been a member of HAMAS and AAMB.

In response to continuing threat information, Israeli security forces launched frequent arrest and detention raids throughout the West Bank and the Gaza Strip, conducted targeted killings of suspected Palestinian terrorists, imposed strict and widespread closures and curfews in Palestinian areas, conducted aerial attacks on buildings affiliated with designated Foreign Terrorist Organiza-tions in the Gaza Strip, and continued the construction of an extensive security fence in the West Bank. Israeli security forces arrested and held without trial or charges HAMAS and other Palestinian lawmakers and PA ministers from the West Bank.  In the wake of the June 25 kidnapping by HAMAS of an IDF corporal posted outside the Gaza Strip, IDF troops arrested 64 HAMAS ministers and members of parliament. On August 5, the IDF arrested the speaker of the PA parliament.

On March 14, the IDF carried out an operation to seize Palestinian terrorists held in a prison in the West Bank city of Jericho within minutes after international monitors left the prison. The IDF took into custody five PFLP members, including four held responsible for the 2001 murder of an Israeli government minister, a prisoner responsible for the foiled "Karine A" weapons smuggling attempt, and over 100 other prisoners (most of whom were soon released). Israel's Attorney General said the prisoners believed responsible for the Israeli minister's murder would stand trial.

In December 2005, the IDF declared a 16 square kilometer zone in the northern Gaza Strip off-limits, warning the PA and general public that anyone in the zone could be targeted. The area remained off-limits in 2006. The IDF carried out ground and naval artillery and aerial strikes against wanted terror suspects and terrorists attempting to launch Qassam rockets into Israel, access roads to Qassam rocket launch sites, terrorist training camps, and weapons manufacturing and storage facilities. The IDF also conducted air strikes against the offices and official establishments of the PA in the Gaza Strip, including the office of PA Prime Minister Haniyeh, the PA ministries of interior, foreign affairs, and finance; and the offices of HAMAS' security force located in the Jabalya refugee camp.

Israeli security forces carried out several operations to shut down terrorist finance networks and seize terrorist funds. In the port city of Ashdod, Israeli Customs authorities seized containers of goods worth millions of dollars that they claimed were to be sold as part of a money laundering

101

PX202

and transfer operation aimed at providing funds to HAMAS and PIJ. Another container from China destined for the Gaza Strip was confiscated because it allegedly contained combat support equipment. On numerous occasions, Israeli security forces raided the West Bank offices of HAMAS' "Dawaa" organization, charging that the offices were providing financial support to families of suicide bombers and imprisoned terrorists under the guise of charity. Israeli security forces also raided foreign exchange bureaus in the West Bank, confiscating millions of counterfeit shekels that Israeli security sources suspected originated in Iran, were transferred by HAMAS, PIJ, and Hizballah offices in Syria and Lebanon, and were earmarked for terrorist acts.

Israeli security experts cited occasions when HAMAS-affiliated PA officials smuggled millions of dollars into the Gaza Strip from Egypt. In June, PA Foreign Minister Zahar carried 20 million Euros in his suitcases into the Gaza Strip from Egypt. On October 22, the PA Interior Minister carried $2 million into the Gaza Strip in his suitcases. On November 28, the PA Foreign Minister crossed into Gaza through Rafah with $20 million. In an effort to stop another such effort, Israel closed the Rafah crossing on December 14, to prevent PA Prime Minister Haniyeh from entering the Gaza Strip from Egypt carrying $35 million. Haniyeh was eventually allowed to enter Gaza after he agreed to deposit the money in an Egyptian bank.

## JORDAN

The Government of Jordan retained its keen interest in combating Takfiri[11]-inspired extremism, and has actively supported forums for tolerance and religious education during the last year. Polls indicate, however, that only one-half of Jordanians considered AQ a terrorist organization, but many Jordanians viewed U.S. operations in Iraq as terrorist operations. King Abdullah continued to be an outspoken critic of terrorism and Islamic extremism -- condemning as a "criminal cowardly attack" the September 4 shooting of a British tourist in downtown Amman. The King also continued to promote a tolerant and moderate brand of Islam. The Jordanian government publicly condemned terrorist acts throughout the world, practiced strict security measures, and passed new anti-terror legislation. Jordanian security forces disrupted several terrorist plots during the year, while Jordan's State Security Court (SSC), which has purview over terrorism-related cases, maintained a heavy caseload.

In March, Jordanian and Arab intellectuals participated in a conference titled "Terrorism: The Phenomenon and Mechanisms to Combat It." Hosted by Public Security Director Lieutenant General Mohammad Eitan and Interpol Secretary General Ronald Nobel, the conference highlighted the threats from terrorism and the need to understand and fight its origins. In April, Prince Ghazi bin Mohammad inaugurated the 17th annual Fiqh Academy Conference -- a three-day conference on Islamic doctrine. Prince Ghazi delivered a speech on behalf of King Abdullah calling on Muslims "to work honestly and seriously to eradicate terrorism and expose misguided Takfiri thought." Also in April, the King signed the Amman Declaration, which calls for more dialogue, cooperation, and understanding between Western and Muslim civilizations and stressing that ties must be built on mutual respect rather than conflict and rivalry. King Abdullah told reporters during a subsequent TV interview, "[w]e believe fighting terrorism does not take place through employing direct security measures alone, but through a comprehensive strategy to strengthen the culture of dialogue and renounce the culture of violence."

---

11      Takfiri is a an Arabic word applied to Muslims who assert that other self-professed Muslims are not true followers of Islam. Some takfiri groups are willing to kill other Muslims whom they regard as insufficiently Muslim.

PX202

The General Intelligence Directorate and Public Security Directorate actively defended Jordan throughout the year. In February, Jordan's security forces disrupted an al-Qaida-linked cell plotting to attack Queen Alia International Airport. In June, the State Security Court indicted seven Iraqi, Libyan, and Saudi suspects involved in the airport plot for conspiracy to carry out terrorist attacks. In mid-April, the Government of Jordan announced it had discovered a cache of weapons, including rockets, C-4 explosives, and small arms, in northern Jordan. The government said that several militants associated with the cache were arrested while planning attacks in Jordan with instructions from HAMAS leaders in Syria. In early November, the State Security Court indicted three of the HAMAS-affiliated defendants for plotting attacks in Jordan. Jordanian security forces quickly apprehended Nabil Ahmed Issa al-Jaaourah, a Jordanian citizen, after he shot and killed a British tourist and injured five tourists from the Netherlands, Australia, and New Zealand, and a Jordanian tourist police officer, while shouting "God is great" at Amman's Roman Amphitheater in early September.

Jordan's lower house of Parliament ratified a bill on the prevention and punishment of terrorism in late August; the bill became law in early November following a royal decree. Highlights of the bill include: authority for the government to freeze the assets of persons suspected of terrorist conspiracy, place them under surveillance, and prevent them from leaving Jordan; a provision that would limit investigative detention to 30 days; and a definition of terrorism. The approved bill defined terrorism as "every intentional action committed by any means that leads to killing anyone or causing him physical harm or inflicting damages to public or private property...if the intention of that action was to disturb public order and endanger public safety and security or impede the implementation of the law or the constitution."

The Government of Jordan moved forward on several high-profile al-Qaida-related terrorism cases:

- In February, the State Security Court sentenced nine men to hang for the 2004 plot to carry out a chemical/vehicle-borne explosive attack against the U.S. embassy and Government of Jordan targets.

- On March 11, Jordanian authorities executed Libyan national Yasser Saad bin Suway for the October 2002 assassination of USAID officer Lawrence Foley.

- In September, the State Security Court sentenced seven terrorist plotters to hang, including would-be suicide bomber Sajidah al-Rishawi, for the November 2005 Amman Hotel Bombings. The King must review and approve the death warrant before the execution can take place.

- In September, the Court sentenced Omar Jamil Nazzal al-Khalayleh, a cousin of the late terrorist Abu Musab al-Zarqawi, to six months in prison for planning to recruit fighters in Syria to fight against U.S. and Iraqi forces in Iraq.

- On December 7, Ali Muhammad Hasan al-Sahli was sentenced to death, and Abd-al-Rahman Ismai'l and Samih al-Nubani to two years in prison, for their roles in the August 2005 rocket attack against U.S. naval vessels (USS Ashland and USS Kearsarge) visiting the port of Aqaba.

Several non-al-Qaida-related cases were also concluded:

- In the first quarter of 2006, the State Security Court sentenced Abdullah al-Mrayat and seven men from the Horani cell to prison for recruiting fighters for operations against U.S. and Iraqi government forces in Iraq;

PX202

- In March and September, the State Security Court sentenced four members of the Qteishat cell and six members of the Khattab Brigade for plotting attacks against hotels, liquor stores, tourist sites, and security officers.

- In October, the Court found eight Mansurah cell militants guilty of plotting to kill American and Iraqi trainers at the Jordan International Police Training Center; and in November, the court sentenced five men from the Khaled Mohammad cell to prison for planning attacks against Israel.

- In December, the Court sentenced three men to prison for attempting to join Iraqi insurgents.

Border security remained a top concern. The Jordanian government enforced security measures at each of its ports of entry, including thorough manual and electromagnetic searches of vehicles and persons attempting to enter Jordan through the Karama-Trebil border crossing in the West Bank. The Jordanian and Iraqi Interior Ministers met in Amman in mid-December to discuss the formation of joint committees aimed at countering terrorism and enhancing control along the 180 km Jordanian – Iraqi border.

## KUWAIT

Kuwaiti officials condemned terrorism in regional and international fora, drafted stronger money laundering and terrorist finance legislation, and implemented a government-funded moderation campaign to combat extremism. Despite these efforts, the risk of a terrorist attack in Kuwait remained high because of the Government of Kuwait's continued reluctance to confront domestic extremists and Kuwaiti supporters of terrorism active in Iraq and Afghanistan, and regional tensions, particularly sectarian violence in Iraq.

The Government of Kuwait continued to pursue prosecutions of 36 members of the "Peninsula Lions" terrorist cell involved in the January 2005 confrontations with police, 22 Kuwaiti citizens accused of "jihad in Iraq," 12 Kuwaitis involved in the 2002 Failaka Island shooting, and eight Guantanamo detainees released to Kuwaiti custody. In November, the Appeals Court upheld most of the verdicts in the "Peninsula Lions" case, including four death sentences, four prison sentences of ten years or more, two seven-year sentences, and six sentences of four years or less. The Court commuted two death sentences to life imprisonment and reduced seven other prison sentences; it also increased four sentences from seven to ten years imprisonment.

In the "Jihadists in Iraq" case, 15 defendants were sentenced to three years, three received small fines, and four were acquitted by the Appeals Court in June.  The government is still pursuing cases against 12 of the defendants. In January, the Appeals Court increased the sentences of six of the 12 defendants in the Failaka Island shooting case, and imposed heavier fines, longer probation periods, and travel restrictions. Of the eight Guantanamo detainees released to Kuwait, two remained in Kuwaiti custody awaiting trial. The other six were tried. Five were found not guilty and released; the government is appealing the verdicts. One was initially found guilty, but in an appeal, Kuwait's highest court overturned the decision and issued a not guilty verdict.

Kuwait still lacked strong legal provisions to deal effectively with those engaged in conspiracy to commit terrorist acts. Kuwaiti officials stated that insufficient and incomplete evidence prevented the conviction of, or more robust sentences for, many suspected terrorists.

PX202

In August, Kuwaiti police apprehended Hamid Nawaf al-Harbi, a suspect in the "Peninsula Lions" case who was sentenced in absentia to seven years in prison. Mohsen al-Fadhli, a known Kuwaiti terrorist believed to be in the country, remains at large. In December, the U.S. Treasury Department designated Kuwaiti extremist cleric Hamid al-Ali and terrorist facilitators Mubarak Bathali and Jabir Jalahmah as terrorist supporters. Kuwait continued to pursue upgrades to its border security, and worked closely with Iraq and other countries to secure the Iraqi border area. Kuwait also significantly increased security at oil installations after AQ threatened to attack oil facilities in the Gulf.

The Kuwaiti government continued to strengthen its legal regime for combating money laundering and terrorist financing, but problems persisted, particularly with enforcement. Although money laundering was a criminal offense, terrorist financing was not specifically prohibited. Currency smuggling into Kuwait was illegal, but cash reporting requirements were not uniformly enforced and there were no currency reporting requirements for individuals leaving the country. Members of the Kuwait National Committee for Anti-Money Laundering and Combating Terrorist Financing represented a wide range of government ministries and domestic financial institutions, but vague delineations of the roles and responsibilities continued to hinder their overall effectiveness. Kuwait was also an active member of the Middle East and North Africa Financial Action Task Force and had a Financial Intelligence Unit in accordance with current international standards, although it was not well-organized nor an independent body.

The Ministry of Social Affairs and Labor took steps to increase the monitoring and regulation of the domestic fundraising activities of Kuwait-based Islamic charities, but the Kuwaiti government was less effective in monitoring the operations of Kuwaiti charities abroad. The government needed to accelerate its efforts to pass counterterrorism legislation, strengthen charity oversight, empower its FIU, monitor cash couriers, and fully conform to international standards and conventions on terrorist financing.

Toward the end of the year, Kuwait's Ministry of Awqaf and Islamic Affairs opened its World Moderation Center, a special agency responsible for implementing an initiative launched in 2005 to combat extremism and spread moderation among Muslims through education, training, international dialogue, and research.

## LEBANON

Political violence continued throughout the year.  Most notable was the assassination of Industry Minister Pierre Gemayel by a team of gunmen in the streets of a northern suburb of Beirut on November 21. This act, the latest in a series of assassinations and attempted assassinations over the last two years, seemed designed to inflame tensions and intimidate forces opposing Syrian interference in Lebanon. An assassination attempt on Internal Security Forces (ISF) Colonel Samir Shehade took place on September 5. Colonel Shehade was injured by the explosion of a roadside bomb which went off as his car passed by the village of Rmaileh, near the southern port city of Sidon. Lebanese officials suspected that the attempt on his life was in retaliation for his role in the investigation into former Prime Minister Rafiq Hariri's murder.

Between October and November, several attacks targeted ISF barracks in different areas in Beirut. On October 8 and November 1, Energa grenade-type shells were fired at al-Helou ISF barracks, causing damage to the ISF dormitory. On October 10, the Barbar el-Khazzen ISF barracks were also the target of an Energa shell that caused no casualties. The Tareek el-Jedideh ISF barracks were

PX202

targeted on November 5. In what may have been a related incident, on October 15, two Energa shells exploded in downtown Beirut, injuring five and causing damage to the Credit Libanais Bank building.

Since October 2004, there have been at least 18 bombings and assassination attempts that resulted in more than 32 deaths, including that of former Prime Minister Rafiq Hariri on February 14, 2005. Other attacks have targeted Lebanese journalists and politicians critical of Syrian interference in Lebanon, including Telecom Minister Marwan Hamadeh, MP Gebran Tueni, journalist May Chidiac, Deputy Prime Minister and Defense Minister Elias Murr, and journalist Samir Kassir.  Each of these attacks remained unsolved. The UN International Independent Investigation Commission (UNIIIC) has been investigating the Hariri assassination and other possibly related crimes, pursuant to UNSC Resolution 1644. The Lebanese government also continued to investigate the acts of political violence.

The government of Prime Minister Fouad Siniora has taken some gradual steps to prevent terrorist activities. In accordance with UNSC Resolution 1701, the Lebanese Armed Forces (LAF)  strengthened its border presence and increased patrols in the south, with assistance from UNIFIL. The LAF deployed 15,000 troops in the south, establishing itself in this region for the first time in 30 years. Also, the ISF created a special unit to combat terrorism, and established branches of this unit to preempt terrorist activity in northern and central Lebanon.

Even with these steps, there are many concerns about Lebanon's ability to combat terrorism. Hizballah still remains the most prominent terrorist group in Lebanon. It has strong influence among Lebanon's Shia community, which comprises about one-third of Lebanon's population. The Lebanese government still recognizes Hizballah as a legitimate "resistance group" and political party. Hizballah maintains offices in Beirut and elsewhere in the country, has official liaison officers to the security services, is represented by elected deputies in parliament, and until recently had one minister in the cabinet.

The unstable political situation in Lebanon also contributed to enabling suspected foreign terrorist organizations, such as AQ and Fatah-Islam, to infiltrate Lebanon and set up operational cells within the Palestinian refugee camps. Some of these groups, such as AQ affiliate Asbat al-Ansar, have been able to find safe haven within the camps to support their actions.

Although Syria withdrew its military forces from Lebanon in April 2005, it still maintained a covert intelligence presence. The Lebanese government accused Syria of continuing to support and facilitate arms smuggling to Hizballah and Palestinian terrorist groups. Even with the post-conflict LAF troop deployments, the Government of Lebanon did not exercise full control over areas in the Hizballah-dominated south, the southern suburbs of Beirut, parts of the Biqa Valley, and inside the Palestinian-controlled refugee camps or Palestinian paramilitary bases. This lack of control provided opportunity for terrorist groups to operate relatively freely in some of these locations. During the national dialogue held in March that aimed to generate consensus among the country's major parliamentary groups, Lebanese leaders agreed to disarm the Palestinian factions located outside the 12 Palestinian refugee camps by September. The intended disarming of the Palestinian factions was derailed by the Summer War and the subsequent unsettled internal political situation.

At the end of 2006, the Lebanese government had not fully complied with UNSC Resolution 1559, which calls for respect for the sovereignty and political independence of Lebanon, the end of foreign interference in Lebanon, and the disarming and disbanding of all Lebanese and non-Lebanese militias. While Lebanon was committed to fulfilling UNSC Resolution 1559, its political leaders main-

106

PX202

tained that implementation of Hizballah's disarmament should be accomplished through a national dialogue rather than force. Lebanon's 12 Palestinian refugee camps, safe havens for several armed Palestinian factions and numbers of Sunni extremists, remained no-go zones for the LAF.

Lebanese authorities maintained that the amnesty for Lebanese individuals involved in acts of violence during the civil war prevented the government from prosecuting terrorist cases of concern to the United States. These cases included individuals involved in the 1985 hijacking of TWA Flight 847, during which a U.S. Navy diver was murdered, and the abduction, torture, and murder of U.S. hostages in Lebanon from 1984 to 1991. U.S. courts brought indictments against Lebanese Hizballah operatives responsible for a number of those crimes. Despite evidence to the contrary, some Lebanese government officials have insisted that Imad Mughniyah[12], wanted in connection with the TWA 847 hijacking and other terrorist acts, and placed on the FBI's list of most-wanted terrorists in 2001, was no longer in Lebanon. Mohammad Ali Hamadi, who spent 18 years in a German prison for his role in the TWA hijacking, was released in December 2005 and was believed to be in Lebanon. The United States continued its efforts to bring him to trial before a U.S. court and formally requested his extradition.

With regard to terrorism finance, Lebanese officials played an active leadership role in the Middle East and North Africa Financial Action Task Force (MENA/FATF). The Central Bank of Lebanon's Special Investigation Commission (SIC), an independent legal entity with judicial status that is empowered to investigate suspicious financial transactions, investigated 123 cases involving allegations of money laundering and terrorist financing activities. On two occasions, the SIC was unable to designate or freeze the assets of two groups affiliated with Hizballah, on the ground that the groups were affiliated with a political party participating in the Lebanese government, and thus, a decision to freeze their assets would have been a political, rather than a legal, decision.

## LIBYA

On May 15 the United States announced its intention to restore full diplomatic relations with Libya and to rescind Libya's designation as a state sponsor of terrorism. The United States formally rescinded Libya's designation as a state sponsor of terrorism on June 30. Libya continued to cooperate closely with the United States and the international community on counterterrorism efforts.

Since pledging to renounce terrorism in 2003, Libya has endeavored to show its commitment to the War on Terror. Libya cooperated with the United States to combat the Libyan Islamic Fighting Group (LIFG), an AQ affiliate dedicated to the overthrow of the Qadhafi regime. Libya also worked with the United States to curtail terrorist activities of al-Qaida in the Islamic Maghreb  (AQIM), an Algeria-based al-Qaida associate formerly known as the Salafist Group for Preaching and Combat (GSPC).

A number of U.S. court cases seeking compensation from Libya for its past support for terrorism remained unresolved.

## MOROCCO

The Moroccan government continued with internal reforms that aimed to address the socio-economic conditions extremists exploit for recruitment. The National Initiative for Human Development (INDH), launched by King Mohammed VI in 2005, is designed to combat poverty, generate employment, and improve infrastructure. INDH projects have focused on rural areas.  Morocco's Ministry of Religious Endowments and Islamic Affairs (MOIA) continued reforms begun in 2004 to

---

12        Late in 2006, Mughniya was indicted by the Argentine government in connection with the AMIA bombing in 1994.

**PX202**

counter extremist ideology and promote religious tolerance and moderation. Thirty Imams were dismissed in an effort to eliminate extremist ideology in the mosques, and the Ministry supervised revisions to the country's religious curriculum, broke with precedent by appointing 50 women to serve as Islamic spiritual guides in mosques across the country, and installed a closed circuit television network that broadcast moderate religious lectures and sermons to 2,000 mosques daily.

Moroccan efforts to combat terrorism were overhauled and upgraded following coordinated suicide bombings in Casablanca in May 2003 that left 45 persons dead. In the investigation that followed, approximately 3,000 persons suspected of connections to the network were detained, some of whom remain imprisoned. The Moroccan government continued to aggressively investigate and detain terrorist suspects. Minister of Interior Chakib Ben Moussa announced in late November that 300 terrorist suspects had been detained during the year.

Several terrorist cells were identified and disrupted. In March, members of the "Ben Hadi Cell," allegedly tied to (AQIM/GSPC) were arrested. In July, 56 alleged members of the "Mehdi Support Group," led by Hassan al-Khatab, an extremist first jailed after the 2003 Casablanca bombings, were arrested. In November, 13 alleged members of another group were arrested. All three terror cells had identified targets, procured explosives, and initiated planning for attacks against both domestic and foreign interests in Morocco.

Morocco continued with steps to counter terrorism finance and to strengthen controls against money laundering. At the end of 2006, the Parliament was in the final stages of preparing new anti-money laundering legislation that will provide a comprehensive legal basis for the monitoring, investigation, and prosecution of illegal financial activities.

## OMAN

Oman remained proactive in developing counterterrorism programs and strategies to ensure that it does not become a terrorist safe haven. Oman has worked extensively with neighboring countries to delineate border regions to help prevent the ability of terrorists to move freely throughout the Arabian Peninsula. These efforts resulted in a December agreement between Oman and Saudi Arabia to establish a formal Port of Entry along Oman's western border to better control border transit operations between the two countries.

Although Oman does not have a significant money laundering problem, its government launched the "Oman Program for Anti-Money Laundering" (OPFAM) in August. The purpose of this initiative was to promote greater cohesion among Omani policy-makers, regulators, law enforcement agencies, and financial institutions. Through OPFAM the Omani government hopes to promote information exchanges among relevant actors, standardize indicators to report suspicious transactions, and develop common guidelines to address anti-money laundering challenges.

The Omani government has expressed concern about the increasing number of illegal immigrants attempting to enter Oman. Oman's long coastline and porous borders offered significant challenges as they remained vulnerable to illegal transit by immigrant workers, smugglers, terrorists, and individuals involved in the traffic and sale of illegal drugs. No known terrorists were apprehended during immigration enforcement operations, but Omani officials were aware of the possibility of such individuals using human smuggling organizations to enter Oman. To date, illegal immigrants used Oman primarily as a transit point to other destinations in the Arabian Peninsula, particularly the United Arab Emirates. The majority of illegal immigrants apprehended were Pakistani, Afghani, and, to a much lesser extent, Iranian nationals who were smuggled across the Gulf of Oman.

PX202

The Omani government has been aggressive in obtaining training and equipment through the U.S. military to support efforts to control its land and maritime borders. This included the purchase of night vision equipment, an upgraded communication system used by the Royal Omani Police (ROP) and Coast Guard units, open-water patrol boats for the Coast Guard with advance radar systems, and ground surveillance radar systems to assist in border interdiction efforts. The Royal Omani Police, Sultan's Special Force, and the Royal Omani Police Coast Guard participated in U.S. Antiterrorism Assistance Programs.

## QATAR

The Qatari government's 2004 Combating Terrorism Law defined terrorism and terrorist acts, provided measures against terrorist financing or fundraising activities, gave the government the authority to take action against terrorist activities, and listed specific punishments, including the death penalty, for terrorist crimes.

The Qatar Authority for Charitable Works monitored all domestic and international charitable activities and approved international fund transfers by charities. The Authority had primary responsibility for monitoring overseas charitable, development, and humanitarian projects; and reported annually to Qatari government ministries on their status.

Cooperation with U.S. authorities on counterterrorism finance was strong. Qatar's Financial Information Unit resided in the Qatar Central Bank. Local banks worked with the Central Bank and the FIU on counterterrorism finance and anti-money laundering issues, and bank officials attended U.S.-sponsored conferences.

There has not been a terrorist attack in Qatar since the March 19, 2005, suicide car bomb attack at an amateur theater playhouse, which killed a British citizen. Cooperation with U.S. authorities improved during the course of the investigation of this unresolved case.

## SAUDI ARABIA

The Government of Saudi Arabia continued to experience a mix of successes and setbacks in its efforts to combat terrorism. Government security forces conducted successful operations against terrorist cells, capturing or killing large numbers of wanted terrorist suspects, as well as members of their support networks. The government has made some progress in other aspects of its counterterrorism effort, such as financing and education, but it still has significant ground to cover to address these issues.

Saudi efforts suffered setbacks with prison breaks and an attack that led to the discovery of extensive support networks in the Kingdom. Prison escapes occurred in March at the al-Kharj prison and in July from al-Malaz jail in Riyadh. On February 24, a Saudi-based AQ cell conducted a suicide attack utilizing vehicle-borne improvised explosive devices on Saudi Aramco's Abqaiq oil stabilization and processing facility near Dammam, which resulted in the death of two security guards and several of the bombers.

Saudi security forces achieved several successes, both in response to these attacks and independently of them. Saudi security forces killed or captured all of the members of the Abqaiq cell and all but three of the Maraz prison escapees. On August 21, five wanted terrorists surrendered in response to government assurances in the media that they would receive mitigated sentences. In December, the government announced the capture during the previous three months of 136 suspected terrorists who were involved in terrorist support networks in the Kingdom.

PX202

The Saudi government initiated several programs to support its counterterrorism efforts and bolster its campaign against extremists. King Abdullah created a special security court, the Court of the Divergent, to prosecute terrorist suspects. Interior Minister Prince Nayif gave public assurances that the Court would not be a military tribunal, but would conform to existing judicial practices and law. Additionally, the government began planning a border security system, including fences and sensors, to prevent infiltration of terrorists or terrorist funding into the kingdom. In December, the Gulf Cooperation Council (GCC) summit reiterated its calls to criminalize terrorism, and called for a comprehensive effort against terrorism to include intellectual, social, and educational efforts.

The Saudi government moved to monitor and enforce its anti-money laundering and terrorist finance laws, regulations, and guidelines. However, it still had not established a High Commission for Charities. As in many countries in the Middle East, there was still an over-reliance on suspicious transaction reporting to generate money laundering investigations. Saudi Arabia's unwillingness to publicly disseminate statistics regarding money laundering prosecutions impeded the evaluation and design of enhancements to the judicial aspects of its anti-money laundering system. The Saudi government did not subject Saudi international charities to the same government oversight as domestic charities. In August, the UN 1267 Sanctions Committee designated the International Islamic Relief Organization's (IIRO) branches in Indonesia and the Philippines, and the Kingdom's Eastern Province Branch Director, Abdulhamid Al-Mujil.

In late 2005, the government enacted stricter regulations on the cross-border movement of money and precious metals. Money and gold in excess of $16,000 must be declared upon entry and exit from the country. While the regulations were effective immediately, Customs has not issued new cash declaration forms, and therefore has not yet been able to enforce the current regulation.

In the cultural arena, official visits by a number of U.S. officials, including Ambassador-at-Large for International Religious Freedom John Hanford, highlighted the government's efforts to remove references in textbooks that called for violence against non-Muslims and Muslims of different sects. The government also initiated the National Campaign to Counter Terrorism, which included publications, lectures, and workshops intended to educate school-age girls and boys about the evils of terrorism. To promote tolerance, the government began revising curricula and teaching methods, screening and reevaluating existing teachers, improving selection of future teachers, and better monitoring of teachers.

The government continued to require religious leaders to attend courses designed to eradicate extremist ideology in the mosques and monitor mosque sermons to promote tolerance and eliminate extremism. Several religious leaders were fired or subjected to punitive actions for failure to abide by government instructions to avoid provocative speeches against non-Muslims and non-Sunni Muslims. In previous years in some mosques, a second preacher would appear after the main preacher during the Friday prayer and speak provocatively against Jews, Americans, or non-orthodox Muslims. This practice is less prevalent now, due in large part to the government's efforts to combat extremism in the mosques.

The Saudi government remained engaged in its efforts to root out terrorists and their support networks in the Kingdom, but continued to face difficulties in combating the appeal of AQ ideology. Despite significant efforts and successes in the counterterrorism realm, Saudi security forces continued to discover new terrorist networks in the Kingdom. The Saudi government will need to further address the social and religious underpinnings that sustain the Saudi form of Islamic extremism.

PX202

**SYRIA**

*(See Chapter 3, State Sponsors of Terrorism.)*

**UNITED ARAB EMIRATES (UAE)**

The Government of the United Arab Emirates (UAE) repeatedly condemned terrorist acts in Iraq, Egypt, and elsewhere in the region throughout the year. In order to prevent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided prescribed guidelines for all Friday sermons, and required all 1,500 mosques that delivered sermons to record them each Friday to ensure that imams adhered to the guidelines. The UAE undertook several border security measures to deter terrorists from reaching UAE soil.

The UAE was generally cooperative in counterterrorism and law enforcement efforts, although cooperation on law enforcement matters was hampered by the lack of a mutual legal assistance treaty (MLAT) between the UAE and the United States. In February, the UAE passed a cyber-crimes law criminalizing the use of the internet for terrorist groups to "promote their ideologies and finance their activities." In June, the UAE established a National Security Council charged with formulating and implementing a national strategic plan.

The Container Security Initiative (CSI), which became operational at the ports of Port Rashid and Jebel Ali in the Emirate of Dubai in 2005, had five U.S. Customs officers co-located with the Dubai Customs Intelligence Unit at Port Rashid. On average, CSI reviewed approximately 250 bills of lading each week, resulting in 15-20 non-intrusive inspections of U.S.-bound containers; examinations were conducted jointly with Dubai Customs officers. In addition, Dubai Customs made requests for most, if not all, containers that originated in Iran to be designated for inspection.

The U.S./UAE Joint Terrorist Finance Coordinating Committee met three times during the year, directly resulting in affirmative changes to the UAE's anti-money laundering laws. The UAE Central Bank provided training programs to financial institutions on money laundering and terrorist financing. The Central Bank initiated memoranda of understanding with regional financial intelligence units, and performed anti-money laundering training both locally and regionally. The Central Bank investigated financial transactions and froze accounts in response to internal investigations. Nine prosecutions for money laundering were in process at year's end. The Central Bank has registered 201 hawala dealers to date.

**YEMEN**

The Republic of Yemen took action against al-Qaida and local extremists, arresting several individuals suspected of having AQ ties, and prosecuting the perpetrators of previous terrorist acts. Yemen also experienced several setbacks to its counterterrorism efforts with the February 3 escape of 23 suspected AQ supporters and the September 15 terrorist attacks on two oil facilities.

On September 15, two coordinated attacks on oil facilities in eastern Yemen resulted in the deaths of all four attackers and one Yemeni security official. A group calling itself al-Qaida in Yemen claimed responsibility. One day after the attack, security forces arrested four individuals on suspicion of links to the attack and for planning attacks in Sanaa on Yemeni government and Canadian Nexen oil company facilities. The investigations into the oil facility and Sanaa attacks continued but no charges were filed.

PX202

On February 3, 23 suspected AQ supporters escaped from a maximum security prison in Sanaa. Among the escapees were individuals convicted of participating in the 2000 USS Cole and 2002 M/V Limburg attacks, including the alleged organizer of the Cole attack, Jamal Badawi. On October 1, the U.S.-trained Central Security Force/ Counterterrorism Unit killed two of the most dangerous escapees, Foaz al-Rabi'i and Mohammed al-Dhailami. Rabi'i was sentenced to death, in absentia, in 2004 for his role in the M/V Limburg attack. Rabi'i and Dhailami were alleged to have organized the September oil facility attacks. In total, eight escapees surrendered and security forces killed three.

Yemeni security forces continued to arrest and try suspected members of AQ and other terrorist groups throughout the year. On May 3, a security court convicted Mohammed Hamdi al-Ahdal, alleged to be AQ's number two in Yemen, of financing terrorist groups associated with AQ. Al-Ahdal was sentenced to 37 months in prison, much of which was credited as time served while awaiting trial.

On July 8, the Special Penal Court (SPC) acquitted 19 individuals charged with conspiring to attack U.S. and Yemeni interests. The defendants admitted to traveling to Iraq to "conduct jihad," but the judge ruled that jihad was not illegal under Yemeni law. Also in July, the SPC acquitted 23 other individuals on conspiracy charges relating to traveling to Iraq to attack U.S. forces and found 21 of the defendants guilty on fraudulent document charges. Both cases are currently under appeal. In March, the Sanaa Appellate Court upheld the acquittal of four Iraqis charged with plotting to attack the U.S. and British Embassies in 2003.

In August, the Sanaa Appellate Court returned the case of two individuals accused of plotting to assassinate the U.S. Ambassador in 2004 to a lower court, claiming the judge did not follow correct sentencing procedures. Hizam al-Mass and Khalid al-Halilah were sentenced on March 5 to five years in prison.

Yemen used its Islamic Dialogue Committee, headed by a leading judge, to continue its dialogue with detainees arrested for connections to terrorist groups and extremist elements. The government released detainees it considered rehabilitated after they pledged to uphold the Yemeni constitution and laws, the rights of non-Muslims, and the inviolability of foreign interests. No comprehensive program existed to monitor recidivism rates. An undisclosed number of released detainees from previous years reportedly have traveled to Iraq to participate in attacks against Coalition Forces.

The government's capacity for stemming terrorism financing remained limited. In 2004, the UN 1267 Sanctions Committee designated prominent Yemeni Sheikh Abd al-Majid al-Zindani for his association with AQ. The Yemeni government took no action to bar his travel or freeze his assets in compliance with its UN obligations. Throughout the year, President Saleh voiced public support for Zindani and his Al-Iman University.

PX202

# SOUTH AND CENTRAL ASIA OVERVIEW

> "We must look beyond Afghanistan to the sources of terrorism. We must destroy terrorist sanctuaries beyond Afghanistan, dismantle the elaborate networks in the region that recruit, indoctrinate, train, finance, arm, and deploy terrorists. We must ensure that political currents and entities in the region are not allowed to use extremism as an instrument of policy."
>
> —**Hamid Karzai,** President of the Islamic Republic of Afghanistan
> Statement, 61st UN General Assembly New York;
> September 20, 2006

Terrorism remained a problem in the region, directly and indirectly threatening American interests and lives. To varying degrees, U.S. cooperation with regional partners on counterterrorism issues continued to increase, but much is left to be accomplished.

Despite considerable progress in Afghanistan, the Taliban-led insurgency remained strong and resilient, particularly in the Pashtun south and east. Although the insurgency absorbed heavy combat losses, its ability to recruit foot soldiers from its core base of rural Pashtuns remains undiminished.

Pakistan executed effective counterterrorism cooperation and captured or killed many terrorists. In August, close cooperation between Pakistani, British, and American law enforcement agencies exposed the London-Heathrow bomb plot, leading to the arrest in Pakistan of Rashid Rauf and other conspirators believed to be connected to the case. However, the United States remained concerned that the Federally Administered Tribal Areas (FATA) of Pakistan are a safe haven for al-Qaida, the Taliban, and other militants.

Terrorists staged numerous attacks in India, including a series of commuter train bomb attacks in Mumbai which killed over 200 people and injured more than 700. Despite challenges associated with its law enforcement and judicial systems, India achieved major successes this year, including numerous arrests and the confiscation of explosives and firearms. Neighboring Bangladesh continued to arrest extremists, but the deteriorating political situation in Bangladesh may increase the opportunity for terrorists to find refuge or transit.

In Nepal and Sri Lanka, terrorism carried out by the Maoists and the Liberation Tigers of Tamil Eelam (LTTE) posed a severe challenge to those governments. On an encouraging note, in November, the Maoists signed a peace agreement with the Government of Nepal that provided, under certain disarmament conditions, that the Maoists could be admitted into an interim government. In Sri Lanka, the LTTE continued attacks including targeted assassinations against political and military opponents.

A sustained commitment to counterterrorism by Central Asian states resulted in relatively few terrorist attacks. Yet terrorism and the underlying conditions and porous borders it exploits still pose a significant threat to the region. In May, terrorists attacked border posts in Tajikistan and Kyrgyzstan but were subsequently killed and captured by joint operations in the Ferghana Valley. With U.S. support, Central Asian states have undertaken to improve the capabilities of their border forces and build new border posts to impede terrorist movements and interdict drug smuggling, some of which financed terrorism in the region. The sheer length of the border and local corruption remained

113

PX202

obstacles in Central Asia's efforts to control its borders. More widely, popular grievances over governance and poor economic growth enhance conditions terrorists and other extremists could exploit to recruit and operate in the region.

Central Asia's most notorious terrorists are the Islamic Movement of Uzbekistan (IMU) and a splinter group, the Islamic Jihad Union (IJU ). However, radical extremist groups such as Hizbut-Tahrir (HT) may also present a danger to the region. HT, an extremist political movement advocating the establishment of a borderless, theocratic Islamic state throughout the entire Muslim world, has followers in Kyrgyzstan, Kazakhstan, Tajikistan, Uzbekistan, Germany, the United Kingdom, Turkey, and the Middle East. The United States has no evidence that HT has committed any acts of international terrorism, but the group's radical anti-American and anti-Semitic ideology is sympathetic to acts of violence against the United States and its allies. HT has publicly called on Muslims to travel to Iraq and Afghanistan to fight Coalition Forces.

## AFGHANISTAN

Afghanistan continued its progress toward building a stable and democratic government, despite a strong Taliban offensive and an increase in suicide bombings and attacks on soft targets throughout the country. Programs designed to combat the Taliban and other lawlessness were the principal focus of the Afghan government and international community.

At year's end, the Program for Strengthening Peace and Reconciliation (PTS), which worked to reconcile Taliban and Hizb-i-Islami Gulbuddin (HIG) members, had eleven regional offices, and over 2,500 former Taliban fighters and other insurgents had left the battlefield and joined the program. Plans were underway to strengthen and expand PTS, provided sufficient funding was available. The Disarmament, Demobilization, and Reintegration (DDR) program processed more than 63,000 former combatants in 2005, and 380 in 2006, as the program successfully wound down in June. The Disbandment of Illegal Armed Groups (DIAG) began work in June 2005 vetting parliamentary candidates to ensure they had no ties to illegal armed groups (IAGs). The DIAG disqualified a number of candidates, using the program more as an effort to push compliance rather than to punish individuals for past and present actions. The program's second phase began in early 2006, and undertook a province-by-province effort to identify and remove government officials with links to IAGS and disband the most notorious IAGs. Progress has been slow because of a lack of government enforcement of mandatory compliance and the unwillingness of many to disarm given the security situation.

Coalition Forces, in particular the U.S.-led Combined Joint Task Force-76, conducted a series of sub-campaigns during 2006. These actions utilized effective counterinsurgency means and methods, including the simultaneous use of kinetic (air and ground forces) and non-kinetic means to counter terrorism, extremism, and anti-government forces. This regional strategy, focusing on the south and east, destroyed many anti-government forces and attempted to restore the flow of reconstruction and development. Coalition Forces killed over 2,000 anti-government forces and provided hundreds of millions of dollars in reconstruction and development aid.

Increasingly, the rapidly professionalizing Afghan National Army (ANA), with more than 31,000 personnel trained and equipped, and to a lesser extent the Afghan National Police (ANP), with 61,500 trained and equipped, have taken the lead in counterterrorism operations and cooperated closely with the U.S. Afghan security forces have arrested presumed terrorists, disrupted several IED cells, and prevented many bombings, particularly in Kabul.

PX202

Despite this progress, the Taliban-led insurgency remained a capable and resilient threat to stability, particularly in the Pashtun south and east. Although the insurgency absorbed heavy combat losses, its funding and ability to recruit foot soldiers from its core base of rural Pashtuns remained undiminished. This was due in part to aggressive Taliban propaganda. Taliban information operations have grown increasingly sophisticated. Seemingly reliable streams of Taliban financing from various sources, including collusion with narcotraffickers responsible for 92 percent of the world's opium supply, as well as safe haven in the FATA across the border in Pakistan, have allowed the insurgency to strengthen its military and technical capabilities.

Afghanistan saw an increasing number of violent incidents during 2006. More than 1,400 civilians were killed in terrorist attacks during the year. The use of IEDs and suicide bombings in Afghanistan increased fourfold. Militants launched approximately 130 suicide attacks this year. Insurgents targeted provincial governors, NGOs, women's affairs officials, and ministry buildings and officials during the year. Insurgents increased their use of IEDs and suicide attacks against Coalition Forces, NATO/ISAF, Afghan National Security Forces, and Government of Afghanistan targets, while maintaining a steady level of direct and indirect fire attacks against these same forces.

Overall attacks against non-combatants (government officials, civilians, religious figures, teachers, and students) appeared to increase, and international NGOs, UN workers, and recipients of NGO assistance were attacked on approximately 57 occasions. Thirty-one NGO staff members were killed compared to 33 in 2005 and 23 in 2004. Insurgents targeted Provisional Reconstruction Teams and construction crews in a possible effort to hamper reconstruction and drive the international assistance community out of Afghanistan.

## BANGLADESH

Bangladesh continued to arrest, prosecute, and convict top leaders and activists of Jamaatul Mujahedin Bangladesh (JMB), the banned Islamic extremist group responsible for a wave of bombings and suicide attacks in late 2005. In response to the attacks, the government's Rapid Action Battalion, a paramilitary organization, emerged as Bangladesh's lead counterterrorism unit responsible for the arrests of significant numbers of JMB leaders and activists. Although JMB remnants have threatened violence if the death sentences of JMB leaders under appeal are carried out, there was no JMB-linked violence in 2006. In September, authorities arrested four members of another banned terrorist organization, Harakat ul-Jihad-I-Islami/Bangladesh (HUJI-B), two of whom confessed involvement with the 2004 grenade attack that severely injured the British High Commissioner, the 2005 assassination of opposition Awami League elder statesman Shah Kibria, and three attacks on two other Awami League leaders.

The Government of Bangladesh stated that it intended to close permanently the local office of the radical Kuwait-based Revival of Islamic Heritage Society, but has yet to do so. The Central Bank of Bangladesh fined Islami Bank for violating anti-money laundering laws in connection with possible financing of JMB activities. Islami Bank has a number of board members who are associated with the Jamaat Islami Party, a member of the ruling coalition.

India continued to allege that the United Liberation Front of Assam (ULFA) and other anti-India insurgency groups operated from Bangladesh with the concurrence of senior Bangladeshi government officials. The Government of Bangladesh strongly denied these allegations.  Nonetheless, the arrest in India of two Pakistanis linked to the Mumbai train bombings who allegedly entered India

PX202



*INDIA, Mumbai:  Indian forensic experts collect samples from a damaged coach at the site of a bomb blast, at Kandivli in Mumbai, 12 July 2006.  The death toll from a wave of coordinated blasts on commuter trains in India's financial capital of Mumbai has risen to 174 with 485 people injured, police said.  AFP Photo/Prakash Singh*

from Bangladesh underscored how porous the Indo-Bangladeshi border is. The absence of counter-terrorism cooperation between India and Bangladesh fueled mutual allegations that each country facilitated terrorism inside the borders of the other.

U.S. and Bangladeshi law enforcement agencies cooperated well on several cases related to domestic and international terrorism. With U.S. technical assistance, Bangladesh drafted an improved anti-money laundering law, and put into operation basic elements of a Financial Intelligence Unit. Bangladesh also continued cooperation with the United States to strengthen control of its borders and land, sea, and air ports of entry.

## INDIA

As in previous years, terrorists staged hundreds of attacks on people and property in India. The most prominent terrorist groups were violent extremists operating in Jammu and Kashmir; Maoists operating in the "Naxalite belt" in eastern, southern and central India; and ethno-linguistic nationalists in India's northeastern states. The federal and state governments tried various strategies to address some of these grievances within the context of Indian democracy, but the government was firm: groups must cease violence before negotiations can begin, and the government will not entertain territorial concessions.

India alleged, based on numerous arrests and several major attacks, that UN designated Foreign Terrorist Organizations (FTOs) began a campaign in the Indian heartland to gain support from India's minority Muslim population for terrorist attacks. The Indian government blamed two prominent Pakistani-based FTOs, Lashkar-e-Taiba (LT) and Jaish-e-Mohammad (JEM), for several attacks in major Indian cities.

PX202

On July 11, terrorists set off seven blasts on packed commuter trains in Mumbai, killing at least 209 people and injuring more than 700. On March 7, terrorists set off three blasts in the holy city of Varanassi, killing 21 and injuring 62 people. On September 9, terrorists set off a series of blasts outside a mosque in the western Indian city of Malegon that killed 38 people and wounded more than 50. Police claimed the Malegon attack was conducted by Islamic extremists hoping to incite further anger between the Hindu and Muslim communities.

On October 27, Karnataka state police in Mysore arrested two suspected terrorists who allegedly belonged to the terrorist group Al-Badr. Police believed the suspects were inserted as an advance team to establish a base in southern India from which they would facilitate terrorist attacks on economic and government targets, especially in nearby Bangalore, a high-tech hub.

In addition, terrorist groups continued their attacks in Jammu and Kashmir against Indian and Kashmiri politicians, civilians in public areas, and security forces. Hundreds of non-combatants were killed, most of whom were Kashmiri Muslims. Indian experts asserted that the July 11 attack that killed eight tourists and injured 43 in Srinagar was designed to inhibit growth in the tourism industry and to hamper increasing Kashmiri enthusiasm for normalization of ties with New Delhi and between Indian and Pakistani controlled Kashmir. Unfortunately, Kashmir continued to be a dangerous area as an American citizen was injured in a grenade attack in Srinagar in June. Indian officials said that terrorist infiltration into Jammu and Kashmir increased in 2006, although they also pointed to an overall decline in violence and infiltration since 2000.

Naxalite (a Maoist agrarian peasant movement) terrorism, which covered a broad region of eastern, central, and southern India, grew in sophistication and lethality. Naxalites launched several high-level attacks, raising the insurgency's profile, and expanded the rural territory under their control. On July 17, at least 25 people were killed, 80 injured, and approximately 250 people were missing following an attack by some 800 armed Naxalites in the Dantewada district of Chhattisgarh.

The United Liberation Front of Assam (ULFA), an ethnic separatist group, conducted multiple terrorist attacks against civilians and security forces in the Northeastern Indian state of Assam resulting in numerous deaths and injuries. In one of the more violent series of attacks attributed to ULFA, on November 5 several bombs exploded in a crowded market and at an oil refinery in Assam's capital city Guwahati, killing 12 people and injuring a few dozen.

In Manipur, a Northeast Indian state affected by over 20 insurgent groups, two American citizens were seriously injured on August 16 in a grenade attack on a Hindu temple in the capital, Imphal. Four people died, including two children, and 34 were injured. An ethnic Meitei separatist group, Kanglei Yawol Kanna Lup (KYKL), was suspected to have been the perpetrator.

Indian security agencies and the police in Tamil Nadu remained active to prevent infiltration into the state by members of the Liberation Tigers of Tamil Eelam (LTTE) who were engaged in violent conflict with the army in neighboring Sri Lanka.

U.S. Government and military cooperation with India on counterterrorism continued to expand. In October, a company of U.S. Marines traveled to India for a counterterrorism exercise with the Indian army. In September, the Indian Army sent a company to Hawaii to train with U.S. Army Pacific forces. In August, the Indian Army sent two experts to observe a military exercise in Hawaii.

The U.S.-India Counterterrorism Joint Working Group (CTJWG) has met eight times since its creation in 2000. India also participated in CTJWGs with 15 other countries, and in multilateral CTJWGs with the EU and BIMSTEC (an organization promoting economic cooperation among Bangladesh, India, Myanmar, Sri Lanka, Thailand, Bhutan, and Nepal).

PX202

The Indian government supported ongoing U.S. investigations in cases involving American citizens that were victims of terrorism. On April 26, in part due to U.S. evidence, a special court in Kolkata convicted seven men for the January 2002 attack on the American Center in Kolkata that left five Indian police officers dead and over 20 injured.

India's counterterrorism efforts were hampered by its outdated and overburdened law enforcement and legal systems. The Indian court system was slow, laborious, and prone to corruption; terrorism trials can take years to complete. An independent Indian think tank determined that the thousands of civilians killed by terrorism in Jammu and Kashmir from 1988 to 2002 received justice in only 13 convictions through December 2002; most of the convictions were for illegal border crossing or possession of weapons or explosives. Many of India's local police forces were poorly staffed, trained, and equipped to combat terrorism effectively. Despite these challenges, India scored major successes this year, including numerous arrests and the seizure of explosives and firearms during operations against Lashkar-e-Taiba and other terrorist groups.

## KAZAKHSTAN

Kazakhstan continued to aggressively combat terrorism and extremism locally and strengthened its cooperation and timeliness in sharing information with the United States. There was little movement, however, on counterterrorism legislation. The draft law on money laundering that the government has worked on since 2005 remained stalled in Parliament.

In January, authorities arrested a number of individuals from two extremist cells in Almaty on terrorism charges. Eight of those arrested remain in prison with trials ongoing. In November, authorities arrested eleven people from a terrorist group in Stepnogorsk and confiscated arms, explosives, and extremist printed materials. According to press reports, members of the terrorist group were planning hostage sieges, lethal attacks on state employees, and several explosions. In December, three Kazakhstani nationals were returned to Kazakhstan from the Guantanamo Bay detention facility.

Kazakhstan continued to face a growing problem with the Islamic extremist group Hizb'ut Tahrir (HT). HT remained outlawed as an "extremist" organization through the Law on Extremism and continued to be the only group so designated under this law.

In November, the Government of Kazakhstan added the East Turkistan Liberation Organization and Aum Shinrikyo to the national list of banned terrorist organizations, accusing these groups of using terrorist means in an attempt to achieve an independent state in Central Asia and in China, respectively. The list of banned groups also included al-Qaida, the East Turkistan Islamic Party, the Kurdish People's Congress, Asbat al-Ansar, the Muslim Brotherhood, the Taliban, the Boz Gurd, Jamaat of Central Asian Mujahadins, Lashkar-e-Tayyiba, the Social Reform Society, the Islamic Movement of Uzbekistan, and its splinter group, the Islamic Jihad Union.

In July, Kazakhstan became an initial partner nation in the Global Initiative to Combat Nuclear Terrorism. Kazakhstan was one of the first countries to endorse and participate in the Global Initiative after its inception.

Kazakhstan, along with China, Kyrgyzstan, Russia, Tajikistan, and Uzbekistan, is a member of the Shanghai Cooperation Organization, which established a Regional Antiterrorism Center in Tashkent. Kazakhstan is also a member of the CIS Collective Security Treaty Organization and the Eurasia Group, a regional anti-money laundering organization modeled on the Financial Action Task Force,

PX202

which has as its objective the integration of Kazakhstan, Belarus, China, Kyrgyzstan, Tajikistan, Russia, and Uzbekistan into the global system of anti-money laundering and combating the financing of terrorism.

## KYRGYZSTAN

The Republic of Kyrgyzstan took new political, legislative, and law enforcement steps to disrupt terrorism. Since 2001, Kyrgyzstan has hosted the Operation Enduring Freedom Coalition airbase at Manas International Airport near Bishkek. In October, Kyrgyzstan adopted an antiterrorism law that authorized an antiterrorism center to coordinate state agencies and facilitate international cooperation. In November, President Bakiyev signed a comprehensive law on "Counteracting Terrorist Financing and Legalization (Money Laundering) of Proceeds from Crime." The law authorized the establishment of a Financial Intelligence Unit (FIU), and

obligates financial institutions to report any suspicious activity and bank transactions that exceed the threshold amount of $25,000.

Kyrgyzstan's military and internal forces worked to improve their counterterrorism capabilities and to expand cooperation with regional partners. Kyrgyzstan is a member of the Shanghai Cooperation Organization (SCO) and the Central Asian Cooperation Organization (CACO), which established lists of banned terrorist groups in an effort to streamline cooperation.

On May 12, an attack on Tajik and Kyrgyz border posts in the southern Batken region left six Kyrgyz servicemen and civilians dead. Kyrgyz authorities blamed the attack on Islamic militants crossing from Tajikistan. In response to a request from the Kyrgyz government following the attack, the United States provided $280,000 in radio and communication equipment to the Kyrgyz Border Guards in December to help improve their operational effectiveness in the mountainous border regions. In addition, the United States is funding $5 million in infrastructure improvements for the Kyrgyz Border service in the southern regions.

During the summer, Kyrgyz security services conducted operations in southern Kyrgyzstan against alleged terrorists from banned groups such as Hizb ut-Tahrir and the Islamic Movement of Uzbekistan (IMU). A July 14 raid killed five suspected IMU militants near Jalalabad. In September, a raid on the home of the alleged leader of the Islamic Movement of Turkestan, Rasul Akhunov, resulted in his death; authorities later claimed that Akhunov died of a heart attack.

Hizbut-Tahrir (HT) has been banned in Kyrgyzstan since 2003. Local specialists estimate that there are more than 5,000 HT members in Kyrgyzstan, located primarily among Kyrgyzstan's ethnic Uzbek population in the south but with growing support in the north as well. Kyrgyz authorities continued to report seizures of HT leaflets and small arms.

## NEPAL

Through April 2006, Nepal's primary counterterrorism focus remained the Maoist insurgency but the focus shifted dramatically after Nepal's political parties, the Maoists, and civil society led a popular uprising against the King. King Gyanendra was compelled to restore parliament and cede his authoritarian powers to a government run by an alliance of the seven main political parties. The Maoists declared a unilateral cease-fire on April 27. The government followed suit on May 3, formally lifting its designation of the Maoists as a terrorist organization. Months of negotiations resulted in a

PX202

comprehensive peace agreement on November 21 that formally ended the insurgency. The agreement also provided that the Maoists would be admitted into an interim government once Maoist combatants were in camps and relinquished their weapons under UN monitoring.

From January to November, Maoist rebels were responsible for the deaths of 165 security personnel and 46 civilians. During the same time period, the government killed 182 suspected Maoist militants. Nepal's National Human Rights Commission (NHRC) reported that murders by Maoists lessened after the cease-fire in April, but still totaled 28 from May until November. Security force killings of Maoist insurgents were also significantly lower after the cease-fire, totaling nine during the same period.

Despite the cease-fire, Maoist rebels continued to conduct abductions, extortion, and violence. In the Kathmandu Valley, Maoists took advantage of their dramatically increased presence and the government's reluctance to upset the peace process to expand their use of extortion and efforts to undermine trade unions and student groups affiliated with the political parties. They also continued forced recruitment of schoolchildren, with thousands targeted after the signing of the initial November 8 peace accord. On September 20, and again on December 19, the Maoists declared nationwide transportation strikes. Both events were accompanied by the stoning of vehicles, and each lasted only for the declared period, demonstrating Maoist command and control.

This year also saw the beginning of a disturbing new trend with the activation of the separatist Maoist-splinter terrorist group called the Janatantrik Terai Mukti Morcha (JTMM), which aimed to bring about the secession of the southern Terai plains from the rest of Nepal. This group was responsible for the assassination of a Nepali Member of Parliament in September.

"Imperialist" United States and "expansionist" India were the targets of considerable Maoist venom, especially in the period leading up to the April uprising. A trip by Maoist Supremo Prachanda to New Delhi on November 18, however, seemed to mark the culmination of a shift in the Maoist view of Nepal's large neighbor to the south. At the end of the year, the United States was the only country to maintain its designation of the Maoist insurgency as a terrorist organization. Several countries, including India, were waiting for the Maoist entry into government to authorize open contacts at all levels.

The United States provided substantial antiterrorism assistance and training to Nepal's security forces, including courses on crisis management and critical incident management.

## PAKISTAN

The Government of Pakistan is a frontline partner in the War on Terror. Nevertheless, Pakistan remains a major source of Islamic extremism and a safe haven for some top terrorist leaders. Credible reports estimated that as many as 900 Pakistanis lost their lives in more than 650 terror attacks in 2006, with another 1,500 people seriously injured. Pakistan has experienced attacks from international terror networks such as AQ and its supporters, as well as violence stemming from Sunni-Shia sectarian strife and militant sub-nationalists. Attacks occurred with greatest frequency in the regions bordering Afghanistan: Balochistan, the North West Frontier Province (NWFP), and the adjacent Federally Administered Tribal Areas (FATA).

PX202



*PAKISTAN, Karachi: Pakistani NGO workers shout slogans against the suicide attack on an army training camp during a demonstration in Karachi, 12 November 2006.  Protesters condemned the suicide attack which killed 42 soldiers at an army base in northwest Pakistan 08 November 2006.  AFP Photo/Rizwan Tabassum*

Al-Qaida's continued calls for the overthrow of President Musharraf remained a threat to Pakistan, despite the government's efforts to eliminate AQ elements. Pakistan continued to pursue AQ and its allies aggressively through nationwide police action and military operations in the FATA. Despite having approximately 80,000 troops in the FATA, including Army and Frontier Corps (FC) units, the Government of Pakistan has been unable to exert control over the area.

Pakistan Army and FC units have targeted and raided AQ and other militant safe havens in the FATA. In November, a suicide bomber killed 43 Army recruits and injured more than 40 others at a Pakistani military training facility in Dargai, NWFP, in retaliation for raids on AQ installations.

Operations throughout the year against both AQ and Taliban command and control capabilities helped disrupt support for the anti-Coalition insurgency in Afghanistan and anti-militant activity in Pakistan. In the early part of the year, recognizing that military operations alone would not restore security and stability to the FATA, President Musharraf directed governmental agencies to devise a comprehensive strategy to accelerate economic and social development, strengthen political administration and enhance security in the region. By year's end, the FATA Sustainable Development Plan was undergoing a final review before being presented to the Pakistani public and international community.

Pakistani security services cooperated with the United States and other nations to attack terrorism both within Pakistan and abroad. Hundreds of suspected AQ operatives have been killed or captured by Pakistani authorities since September 2001. Close cooperation between Pakistani, British and American law enforcement agencies exposed the August London-Heathrow bomb plot, leading

PX202

to the arrest in Pakistan of Rashid Rauf and other alleged conspirators connected to the case. Pakistani authorities arrested two suspects in the March bombing of the U.S. Consulate in Karachi, which killed American diplomat David Foy and two others and injured more than 50 bystanders.

Pakistan's leaders took steps to prevent support to the Kashmiri militancy and denounced acts of terrorism in India, including bombings in Varanasi in March and Mumbai in July. Meeting in September on the margins of the Non-Aligned Movement Summit in Havana, President Musharraf and Indian Prime Minister Manmohan Singh agreed to establish an Anti-Terrorism Mechanism to coordinate bilateral exchange of information on terrorist threats.

Armed conflict between the national government and militant Baloch nationalists escalated, culminating in the August 26 death of Nawab Akbar Khan Bugti[13] during a raid by security forces on his mountain hideout. The "Balochistan Liberation Army" (BLA) claimed responsibility for dozens of terror attacks on government offices and economic infrastructure in the province, as well as in neighboring Sindh and Punjab. The government declared the BLA a terrorist organization in April. In addition to violence related to the militant Baloch nationalists, a series of bomb attacks in the provincial capital of Quetta followed police actions against suspected Taliban fighters in the last quarter of the year.

Sectarian violence, a scourge in Pakistan for more than two decades, claimed hundreds of lives, although the total number of sectarian terror attacks continued to decline for the second year in a row. A suicide bomber killed over two dozen and injured approximately 50 people participating in a February 9 Shia religious procession in Hangu, NWFP. On April 11, at least 57 people were killed in a bombing of a gathering of Sunni (Barelvi) religious leaders in Nishtar Park, Karachi. Although media reports blamed intra-Sunni Muslim sectarian rivalry, the results of the government's investigation have not been made public.

President Musharraf remained a forceful advocate for his vision of "enlightened moderation," calling on Pakistanis to reject extremism and terrorist violence. The government's crackdown on banned organizations, hate material, and incitement by religious leaders continued unevenly. Madrassa registration, foreign student enrollment in madrassas, and financial disclosure requirements remained a source of friction between government and religious leaders.

Although Pakistan continued to work with the UNSCR 1267 Committee to freeze the assets of individuals and groups identified as terrorist entities linked to AQ and the Taliban, several UN-sanctioned entities continued to operate. An anti-money laundering bill introduced into the National Assembly in September 2005 remained under consideration in 2006. Adoption of anti-money laundering legislation consistent with international standards would significantly broaden Pakistan's ability to cooperate internationally on counterterrorism finance issues. Pakistani customs officials continued to enhance controls to interdict bulk cash couriers at key ports of entry to prevent unregulated cross-border cash flows, which are a potential source of terrorism funding.

Pakistan's courts, including the Anti-Terrorism Court (ATC), presided over several high-profile terror-related cases. Prosecuting terrorism cases presented considerable challenges for the government, which obtained convictions in some cases but suffered reversals in others. On May 22, the Rawalpindi ATC sentenced four men to death and ordered life imprisonment for three others for their part in a July 2004 plan to assassinate Prime Minister Shaukat Aziz. On May 30, a Multan ATC judge sentenced Lashkar-e-Jhangvi activist Qari Omar Hayat to death on 16 counts of murder for a

---

13   Nawab Akbar Khan Bugti was rebel leader of the Balochistan nationalist movement and played a major role in Pakistani politics for decades.

PX202

1999 attack on a Shia prayer gathering. On November 23, the Sindh High Court reversed the convictions of nine Harkat-ul Mujahideen members for killing three during the May 2004 bombing of the honorary Macedonian Consulate in Karachi.

The United States and Pakistan engaged in a broad range of counterterrorism cooperative efforts including border security and criminal investigations, as well as several long-term training projects. A Joint Working Group (JWG) on Counterterrorism and Law Enforcement, established in 2002, convened in Washington, DC in April to assess ongoing efforts and discuss enhanced cooperation.

## SRI LANKA

The 2002 cease-fire between the Sri Lankan government and the Liberation Tigers of Tamil Eelam (LTTE), a designated Foreign Terrorist Organization, continued to erode amidst numerous violations and escalating military engagement between the LTTE and government security forces. The Sri Lankan Army remained deployed across the country to fight the insurgency. The paramilitary Special Task Force (STF) police were deployed both in the east and in strategic locations in the west.

The LTTE conducted a campaign of targeted assassinations against political and military opponents. This included the April assassination attempt of Sri Lanka Army Commander General Sarath Fonseka and the assassination of the Army Third-in-Command; the August 12 assassination of the Government of Sri Lanka's Secretariat for the Coordination of the Peace Process, Deputy Director Keteshwaran Loganathan; and the December 1 suicide bomber's attempt on the life of Defense Secretary Gothabaya Rajapaksa, the President's brother. The Karuna faction, a dissident faction of the LTTE, conducted its own assassination campaign against the LTTE and pro-LTTE civilians in the east.

Following the assassination of Foreign Minister Kadirgamar in August 2005, the government enacted emergency regulations giving arrest power to members of the armed forces, who were required to turn suspects over to the police within 24 hours. Individuals arrested under the emergency regulations may be detained for up to one year. Under these regulations, 148 persons were arrested; most have already been released. A revised Prevention of Terrorism Act (PTA), enacted in December, strengthened these powers.

The LTTE financed itself with contributions from the Tamil Diaspora in North America, Europe, and Australia, and by imposing local "taxes" on businesses operating in the areas of Sri Lanka under its control. Using this money, LTTE weapons were purchased on the international black market or captured from the Sri Lankan Army. Many LTTE innovations, such as explosive belts, vests, and bras, using female suicide bombers, and waterborne suicide attacks against ships, have been copied by other terrorist groups.

In general, the LTTE did not target U.S. citizens or assets, limiting attacks to Sri Lankan security forces, political figures, civilians, and businesses. However, two suicide bomb attacks on VIP motorcades in Colombo occurred within half a mile of the U.S. embassy on roads frequently traveled by Embassy employees.

Sri Lankan cooperation with the FBI has resulted in arrests of persons charged with material support to terrorist groups. The Sri Lankan government cooperated with U.S. efforts to track terrorist financing, although no assets were identified. The United States also provided training for relevant Sri Lankan government agencies and the banking sector. The government cooperated with the United States to implement both the Container Security Initiative and the Megaports program at the port of Colombo.

PX202

## TAJIKISTAN

Sharing a 1,400-kilometer border with Afghanistan, Tajikistan offered its limited resources to assist the United States with Operation Enduring Freedom almost unconditionally. Following the deployment of U.S. troops to Afghanistan, Tajikistan allowed its territory and air space to be used for counterterrorist actions. The Tajik government's main impediment to counterterrorism performance remained its lack of resources. The fact that Tajikistan remained the poorest of all the former Soviet republics, and the ninth poorest country in the world in per capita GDP, puts these funding issues into context.

Tajikistan is not known to harbor terrorist groups, but extremists have transited Tajikistan to and from Afghanistan and Pakistan through the porous 1,400 kilometer Tajik-Afghan border. The United States spent over $5.8 million in 2006 to train and equip the Tajik Border Guards, improve border fortifications, and related capacity-building assistance. These measures will help stem the flow of potential terrorists attempting to cross the border and allow Tajikistan to better monitor its own borders.

Tajikistan prohibited extremist-oriented activities and closely monitored terrorist groups like the Islamic Movement of Uzbekistan (IMU) and extremist groups like Hizbut-Tahrir (HT). The Government of Tajikistan believed HT was active in the Ferghana Valley. The Tajik legal system convicted 32 alleged HT members (19 men and 13 women) in 2006. Analysts believed that the IMU also operated in Tajikistan. Recent press reports indicated that Tajik authorities arrested 30 suspect IMU members in Tajikistan; figures were not available regarding how many of them have been convicted. Tajik authorities arrested five additional alleged IMU members in Isfara. During a search of their house, police claimed that they found 80 kilograms of ammoniac nitrate and four kilograms of aluminum powder.

In May, a small group of armed bandits attacked Tajik and Kyrgyz border posts. The fighters seized several weapons, including 17 Kalashnikov assault rifles, a PK light machine-gun, and 3,000 rounds of ammunition. The date of the attack coincided with the one-year anniversary of the Andijan uprising in Uzbekistan leading authorities to suspect that the IMU was responsible for these attacks. Kyrgyz security services killed four militants during the attack and arrested one other. Tajik authorities later convicted seven IMU members for their participation in the attacks.

Tajikistan participated in the counterterrorist activities of the Shanghai Cooperation Organization (SCO), the Commonwealth Security Treaty Organization (CSTO), and the CIS Counterterrorist Center.

## TURKMENISTAN

While the Government of Turkmenistan strictly controlled access into and passage through Turkmenistan at official border crossings and along main roads, clandestine passage could not be eliminated because of the extended border through mountainous and desert terrain, as well as the small size and uneven quality of Turkmenistan's border guard, customs service, and law enforcement agencies. Turkmenistan government officials exert stringent security control over the country. The Government of Turkmenistan strictly controlled religious expression, and radical or extremist forms of Islam were not tolerated. The military-style counterterrorism unit with hostage rescue and explosives threat management capability, inaugurated in 2005, and the Department for the Prevention of Terrorism and Organized Crime in the Ministry of Internal Affairs, were used largely to investigate and harass real or perceived opposition to the regime, relatives of those implicated in the 2002 coup attempt, religious groups, and non-governmental organizations. The Government of Turkmenistan

PX202

supported humanitarian assistance related to the War on Terror and Operation Enduring Freedom in Afghanistan. The government entered the names of individuals and organizations on terrorist financing lists into its banking system.

## UZBEKISTAN

There remained a clear potential for Islamic extremism and acts of international terrorism in Uzbekistan. Supporters of terrorist groups such as al-Qaida, the Islamic Movement of Uzbekistan (IMU), the Islamic Jihad Union (IJU), and the East Turkistan Islamic Movement (ETIM), were active in the region. Members of these groups expressed anti-U.S. sentiments and have attacked U.S. interests in the past, including a 2004 suicide bombing at the U.S. embassy in Tashkent, which was clamed by the Islamic Jihad Group (IJU), now the IJU. U.S. Government personnel and facilities continued to operate at a heightened state of alert.

The Government of Uzbekistan did not provide safe haven for terrorists or terrorist organizations. However, the country's poor economic climate and repressive government policies created conditions in which large portions of the population were increasingly susceptible to extremist ideologies. Uzbekistan's porous borders, particularly in the Ferghana Valley, allowed for people and illicit goods to move in and out of the country with relative freedom. The government responded to these threats with even more repressive actions against regime opponents and those it deemed to be religious extremists. However, it failed to address the conditions terrorists might exploit to gain popular support and recruits for their cause.

Although Uzbekistan was among the first states to support U.S. efforts in the War on Terror, the Government of Uzbekistan ended virtually all counterterrorism cooperation with the United States in mid-2005. In November 2005, the United States fully vacated, at Uzbekistan's request, the Karshi-Khanabad airbase. Authorization for U.S. aircraft to overfly Uzbekistani territory ended in January 2006, although an agreement was signed in November allowing Department of Defense-contracted civilian aircraft to overfly Uzbekistan on a fee-per-flight basis.

Tashkent hosted the Shanghai Cooperation Organization's (SCO) Regional Antiterrorism Center Secretariat (RATS), which claimed to have begun to focus on operational activities such as developing a coordinated list of terrorist groups and facilitating joint counterterrorism exercises among SCO member states. In the past, the government participated in UNODC and OSCE programs aimed at ensuring that it enacted appropriate terrorism legislation. However, Uzbekistani participation in these programs has virtually ended, and the government has made little progress in this regard.

PX202

# WESTERN HEMISPHERE OVERVIEW

*"It is true that, somewhere in some community, we will find the apostles of terror – people who use the symbols of culture or faith to justify crimes of violence. They hate open, diverse, and democratic societies like ours because they want the exact opposite, a society that is closed, homogeneous, and dogmatic. But they and their vision will be rejected – rejected by men and women of generosity and goodwill in all communities, and rejected most strongly by those men and women in the very community they claim to represent…"*

**—Stephen Harper,** Prime Minister of Canada Address to the World Urban Forum Vancouver, Canada; June 19, 2006

Terrorism in the Western Hemisphere was primarily perpetrated by Foreign Terrorist Organizations based in Colombia and by the remnants of radical leftist Andean groups. With the exception of the United States and Canada, where some prosecutions of suspected terrorists were underway, there were no known operational cells of Islamic terrorists in the hemisphere, although pockets of ideological supporters and facilitators in South America and the Caribbean lent financial, logistical, and moral support to terrorist groups in the Middle East.

The Secretary of State certified Venezuela as "not fully cooperating" with U.S. antiterrorism efforts. The designation, included in Section 40A of the Arms Export Control Act, was based on a review of Venezuela's overall efforts to fight terrorism. The certification became active October 1 and will remain in effect until the end of the fiscal year, when it may be renewed by a determination by the Secretary of State. Cuba remained a State Sponsor of Terrorism.

On October 25, the Argentine special prosecutors who investigated the July 18, 1994, terrorist bombing of the Argentine-Israeli Mutual Association (AMIA) building that killed 85 and injured over 200 people, issued an 801-page indictment charging eight Iranian government officials and one member of Hizballah with the attack. On November 9, Judge Canicoba-Corral ratified the indictments and maintained charges against former Iranian Ambassador Soleimanpour. The judge issued arrest warrants, and on November 15, the Argentine government transmitted a request to INTERPOL for new Red Notices[14] for the nine suspects. The year ended with action in INTERPOL pending.

The threat of a major terrorist attack remained low for most countries in the hemisphere. Overall, governments took modest steps to improve their counterterrorism (CT) capabilities and tighten border security, but corruption, weak government institutions, ineffective or lack of interagency cooperation, weak or non-existent legislation, and reluctance to allocate sufficient resources limited progress. Some countries, like Panama, Mexico, and El Salvador, made serious prevention and preparedness efforts. Others lacked urgency and resolve to address deficiencies in their counterterrorism posture. Caribbean and Central American nations, recognizing their attractiveness and vulner-

---

14    *An Interpol Red Notice is not an international arrest warrant. The persons concerned are wanted by national jurisdictions. Interpol's role is to assist the national police forces in identifying or locating those persons with a view to their arrest and extradition. Interpol red notices allow the warrant to be circulated worldwide with the request that the wanted person be arrested with a view to extradition.*

PX202

ability to attack or transit by terrorists, took steps to improve their border controls and to secure key infrastructure, especially air and maritime ports. Most countries began to look seriously at possible connections between transnational criminals and terrorist organizations.

The United States enjoyed solid cooperation on terror-related matters from most hemispheric partners, especially at the operational level. The United States maintained excellent intelligence, law enforcement, and legal assistance relations with most countries. The hemisphere boasts the OAS' Inter-American Committee against Terrorism, the only permanent regional multilateral organization focused exclusively on counterterrorism.

Mexico and Canada were key partners in the War on Terror and for U.S. homeland security. Cooperation with them was broad and deep, involving all levels of government and virtually all agencies, in several initiatives. Mexico represented primarily a terrorist transit threat, and the Mexican government worked with the United States to enhance aviation, border, maritime, and transportation security, to secure critical infrastructure, and to combat terrorism financing. In the first case of its kind in Canada, law enforcement officials in June arrested 18 individuals, all Canadian citizens or residents, who were allegedly planning terror attacks on Canadian soil.  The group was arrested with bomb building materials and was attempting to buy an additional three tons of ammonium nitrate and detonators.

The United States remained fully committed to assisting the government and people of Colombia in their efforts to defeat Colombian-based Foreign Terrorist Organizations. President Alvaro Uribe continued vigorous law enforcement, intelligence, military, and economic measures against the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United Self-Defense Forces of Colombia (AUC).  The Colombian government also increased its efforts with neighboring countries to thwart terrorist expansion, investigate terrorist activities inside and outside Colombia, seize assets, and bring terrorists to justice.

Colombia's neighbors had varied reactions to the threat from Colombian based terrorists. While none condemned the terrorists or outlawed membership in such groups in their countries, for the most part, they responded positively to Colombian requests to arrest specific fugitives. Brazil and Peru improved cross-border cooperation with Colombia (often based on local, rather than national, arrangements), but their security forces remained under formal or informal orders to avoid military confrontations with encroaching foreign terrorists. Forces in those countries pursued renascent domestic terrorist groups aggressively. It remained unclear to what extent the Government of Venezuela provided material support to Colombian terrorists. However, weapons and ammunition -- some from official Venezuelan stocks and facilities -- have turned up in the hands of Colombian terrorist organizations. The Venezuelan government did not systematically police the 1,400-mile Venezuelan-Colombian border to prevent the movement of groups of armed men or interdict arms flows to narcoterrorists.

Argentina hosted a meeting of the 3+1 Security Group (Argentina, Brazil, Paraguay, and the United States) in December. Delegates highlighted the importance of early warnings among States and the immediate exchange of information in order to prevent and combat illegal activities, and to deny refuge to those who finance, plan or commit acts of terrorism. In November, Brazil inaugurated a new Regional Intelligence Center, in Foz do Iguacu, dedicated to coordinating intelligence activities of the police forces of Argentina, Brazil, and Paraguay, and invited Argentina and Paraguay to send official representatives to the center.

PX202

## OAS INTER-AMERICAN COMMITTEE AGAINST TERRORISM (CICTE)

CICTE delivered more than $5 million in counterterrorism capacity-building assistance in the region. CICTE provided training to nearly 500 port and airport security officials from 29 member states to help meet the requirements of the International Maritime Organization's International Ship and Port Facility Security (ISPS) code, and the International Civil Aviation Organization's (ICAO) new air security standards. CICTE advised 15 member state governments on how to meet the requirements of UNSC Resolution 1373, the 13 international conventions and protocols relating to terrorism, and the Inter-American Convention against Terrorism (IACAT), which complements and expands on international conventions and protocols. CICTE also organized its sixth annual regular session in Bogotá, Colombia.

## TRI-BORDER AREA  (ARGENTINA, BRAZIL, AND PARAGUAY)

The governments of the Tri-Border Area (TBA) have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early 1990s, they established a mechanism to address these illicit activities. In 2002, at their invitation, the United States joined Argentina, Brazil, and Paraguay in what became the "3+1 Group on Tri-Border Area Security" to improve the capabilities of the three TBA states to address cross-border crime and thwart money laundering and potential terrorist fundraising activities. The United States remained concerned that Hizballah and HAMAS were raising funds in the TBA by participating in illicit activities and soliciting donations from extremists within the sizable Muslim communities in the region and elsewhere in the territories of Argentina, Brazil, and Paraguay, although there was no corroborated information that these or other Islamic extremist groups had an operational presence in the area.

## ARGENTINA

Argentina cooperated well with the United States at the operational level, and began to address legal and institutional weaknesses that have hindered its counterterrorism efforts. The Argentine government amended its money laundering legislation to strengthen and reorganize its Financial Intelligence Unit (FIU), and created a new national Coordination Unit in the Ministry of Justice and Human Rights to oversee and manage the government's money laundering and terrorism finance efforts. The Attorney General's Office and the Central Bank both established special investigative units to handle money laundering and terrorism finance cases. In order to comply with a Financial Action Task Force (FATF) mandate, on December 20, President Kirchner approved a draft antiterrorism and counterterrorism finance law and sent it to Congress for review. If passed, the draft law would criminalize both terrorist acts and the financing of terrorism, and would provide the legal foundation for the FIU, Central Bank, and other law enforcement bodies to investigate and prosecute such crimes. The Argentine government and Central Bank have committed to freeze assets of terrorist groups identified by the United Nations if detected in Argentine financial institutions. Implementation will determine whether Argentine law enforcement institutions, including the Central Bank and FIU, aggressively apply the newly strengthened legal and administrative measures available to them.

Since President Bush's visit during the November 2005 Summit of the Americas, there were no reported incidents similar to the 20 small-scale bombings, attempted bombings, or acts of arson noted in Country Reports on Terrorism 2005. American businesses received e-mail threats and bomb threats, and were at times the focus of protests and demonstrations, but actual reporting and confirmation of these types of incidents declined.

PX202



*ARGENTINA, Buenos Aires:  A minute's silence in commemoration of the 12th anniversary of the terrorist bombing against the Argentine-Israeli Mutual Association (AMIA) which killed 85 and injured over 200 people, in Buenos Aires, 18 July 2006.  AFP Photo/Juan Mabromata*

Hizballah and Iran remained the chief suspects for the July 18,1994 terrorist bombing of the Argentine-Israeli Mutual Association (AMIA) that killed 85 and injured over 200 people. On October 25, AMIA special prosecutors issued an 801-page indictment charging eight Iranian government officials and one member of Hizballah with the attack.[15] On November 9, Judge Canicoba-Corral ratified the indictments and maintained charges against former Iranian Ambassador Soleimanpour. The judge issued arrest warrants and on November 15, the Argentine government transmitted a request to INTERPOL for new Red Notices for the nine suspects. The year ended with action in INTERPOL pending.

## BOLIVIA

Bolivia's counterterrorism efforts were hindered by inadequate resources, corruption, and a weak legal framework. The Bolivian government's ineffective anti-money laundering regime failed to comply with international norms.

---

[15]     The completion of the Special Prosecutors' investigation is the latest and, perhaps, the most important and promising development in the saga of a mismanaged and overly politicized 12-year investigation into the AMIA bombing.  The attack destroyed the seven-story structure, killed 85 people and injured more than 300 Argentine citizens.  In many ways, it was Argentina's September 11, and remains one of four major attacks by international terrorist groups in this hemisphere – the others being the Israeli Embassy bombing in Buenos Aires in 1992, the World Trade Center bombing in 1993, and the 9/11 attacks.

PX202

In April, the Bolivian government released Francisco "Pacho" Cortez, a member of the National Liberation Army (ELN), who was arrested in Bolivia after the statute of limitations on his case expired. Bolivian authorities arrested Aida Ochoa, a suspected member of the Tupac Amaru Revolutionary Movement (MRTA), in October 2005, but then released her in early 2006. After a four month delay, the Government of Bolivia issued an arrest warrant, as requested by the Peruvians, for Ochoa, who by that time was a fugitive. In a separate case in late May, Bolivia's Vice-Minister of the Interior directly intervened to arrange the release of Paraguayan Free Fatherland Party (PPL) member Angel Acosta, after he was arrested on an Interpol warrant for his involvement in the kidnapping and murder of Cecilia Cubas, claiming the warrant was invalid.

Peruvian terrorist organizations appear to be extending their influence to Bolivia. The Bolivian district attorney prosecuting a gang leader allegedly responsible for the murders of three foreign tourists in Bolivia said the gang had received training from Sendero Luminoso (Shining Path), a designated Foreign Terrorist Organization from Peru. Additionally, a December press article highlighted a Peruvian intelligence report claiming that the Tupac Amaru Revolutionary Movement (MRTA) was rebuilding its capabilities in Bolivia and was receiving aid from supporters in La Paz and Cochabamba.

## BRAZIL

The Government of Brazil vigorously condemned international terrorism, but did not provide the necessary political and material support to strengthen domestic counterterrorism institutions.  A government commission proposed a new national interagency counterterrorism structure, but the government did not present legislation to implement it.

Brazil chose not to establish a terrorist-designation regime that would make support for and membership in terrorist organizations a crime. Moreover, the Government of Brazil considers Hizballah a legitimate political party. Brazilian law prohibits the extradition of native-born Brazilian citizens and imposes tight constraints on the extradition of naturalized citizens and foreigners, which complicates foreign governments' efforts to bring terrorist fugitives to justice.  In August 2005, the Brazilian Federal Police arrested Revolutionary Armed Forces of Colombia (FARC) "spokesman" Francisco Antonio Cadena Collazos under an international warrant.  In August 2006, the Government of Brazil granted him political asylum and denied Colombia's extradition request.

Brazil continued to improve aspects of its counterterrorism capabilities, such as more effectively using its financial intelligence unit (COAF) to monitor and prevent possible funding for terrorist groups. With assistance and training from the United States, COAF upgraded its database and data collection mechanisms. The government also invested in border and law enforcement infrastructure with a view toward gradually controlling the flow of legal and illegal goods through the Tri-Border Area. The United States continued to work with Brazil in several bilateral, multilateral, and international fora, including CICTE and the 3+1 group.

## CANADA

The United States and Canada collaborated extensively on a broad array of initiatives, exercises, and joint operations that spanned virtually all agencies and every level of government. Canada added the Liberation Tigers of Tamil Eelam (LTTE) to its list of terrorist organizations, preemptively arrested 18 Canadian citizens in June for suspected terrorist activity, and sought to amend the country's terrorist financing act to strengthen its information sharing and reporting provisions.

PX202

In the first case of its kind in Canada, law enforcement officials in June arrested 18 individuals, all Canadian citizens or residents, who were planning terror attacks on Canadian soil.  Individual members of the Toronto-based group (the Toronto 18) were under investigation since August 2005. Two group members had been previously arrested by Canadian authorities on charges of bringing weapons from the United States to Canada and were already in custody.  Two other individuals traveled from the United States to Canada in March 2005 to meet with the group's leader, and were subsequently arrested in the United States where they were awaiting trial. The group was arrested with bomb building materials and was attempting to buy an additional three tons of ammonium nitrate and detonators. The group's targets reportedly included the Parliament Building and Peace Tower in Ottawa, and the CN Tower and Stock Exchange in Toronto.  Reactions by Canadians were measured but sober, and sparked a national discussion on multiculturalism, immigration, and the necessary balance between protective security and respecting civil liberties.

The Toronto 18 were charged under Canada's Antiterrorism Act, which was enacted in December 2001 to provide law enforcement with new tools for the War on Terror. In October, the Supreme Court of Canada struck down one piece of the Act that required the specification of motive in proving terrorist offenses. Two other provisions that allow for preventive arrest and permit judges to compel testimony, are subject to mandatory Parliamentary review and renewal and were under consideration at year's end.

U.S.-Canadian counterterrorism cooperation rested on a number of established forums, including the terrorism sub-group of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group. In September, the latter brought together counterterrorism officials from over a dozen agencies on both sides of the border to coordinate policy on bioterrorism, information sharing, and joint counterterrorism training.

In Afghanistan, Canada stood firm in fighting the resurgent Taliban in Kandahar province, where it led Regional Command South and provided a battalion-sized battle group and a Provincial Reconstruction Team for stabilization and development efforts.

Canada also helped key countries address terrorism and terrorism financing with new training programs. For example, Canada provided 18 trainers to the Iraqi police training program in Amman and had four senior advisors attached to the U.S. Security Coordinator for the West Bank and Gaza. In other supportive efforts, its Counterterrorism Capacity Building Program became a fully operational mechanism for providing Canadian expertise to other countries in border security, transportation security, and antiterrorism legislation drafting.

The United States and Canada continued to work on mechanisms to accommodate Canadian concerns about information sharing in the wake of the Arar affair, in which a Canadian-Syrian citizen and terror suspect was removed from New York to Syria in 2002. A Canadian government commission said in September that there was no evidence of Arar's involvement in terrorism or any Canadian government participation in the U.S. decision to detain and remove Arar. This has made certain aspects of information sharing more challenging, although it was noteworthy that the commission also recommended that "the Royal Canadian Mounted Police (RCMP) should maintain its policy of sharing information obtained in the course of national security with other agencies and police departments, both domestic and foreign...in accordance with clearly established policies." The commission also recognized that it did not have access to all the information on Arar available to the United States.

PX202

The Canadian government introduced legislation before Parliament to amend the Proceeds of Crime and Terrorist Financing Act to make Canada's anti-money laundering and anti-terrorist financing regime consistent with new Financial Action Task Force (FATF) standards. It would allow Canada to enter into Memorandums of Understanding (MOUs) with international and third country law enforcement organizations to strengthen information sharing and to create penalties to improve compliance with the act.

In May, the Canadian government announced $56 million in additional funding over the next two years for the Financial Transactions And Reports Analysis Centre of Canada (FINTRAC), the RCMP, and the Department of Justice, to increase their capability to combat terrorist financing and money laundering. Additionally, Toronto was selected as the permanent headquarters of the Egmont Group, a worldwide organization of financial intelligence units including FINTRAC. For the first time ever, Canada assumed the presidency of FATF, the international body that develops and promotes policies to combat terrorist financing and money laundering.

In April, the government announced that it was listing the Liberation Tigers of Eelam (LTTE) as a terrorist group, pursuant to the Criminal Code, making it illegal for any person to provide support, facilitate, or participate in the activities of the listed group, including providing financial support. The move brought the total number of listed entities in Canada to 40. The large Tamil community in Toronto has traditionally been a key source of funding for the LTTE. The RCMP assisted the FBI in an investigation that led to the arrest on August 19 of seven Canadians, three in New York and four in Canada, involved in trying to buy weapons for the LTTE.

## CHILE

Chilean law enforcement actively cooperated in international terrorism investigations and cooperated with the United States to monitor and combat terrorist financing. Law enforcement officials monitored possible extremist links between Chile's Iquique Free Trade Zone and the Tri-Border Area; trade links between these two areas are increasing. Chile's National Intelligence Agency remained an analytical body, relying on law enforcement and investigative agencies for collection and operations.

Chile hosted an Interpol working group meeting on terrorism in Central and South America in October to discuss the activities of individuals related to radical fundamentalist movements in the region. The meeting was attended by members of both the law enforcement agencies and the intelligence communities from Chile, the United States, Peru, Bolivia, Colombia, and Argentina.

Thirty-eight members of Chile's law enforcement agencies participated in money-tracing and document-tracking techniques training, and several investigators and lawyers took part in a cyber-crime seminar. The United States worked closely with Chilean counterparts to combat money laundering and terrorist financing. Senior analysts from Chile's armed forces, academia, and non-governmental organizations participated in a counterterrorism seminar with an OAS counterterrorism expert. The seminar highlighted the role of illegal financing, corruption, and drug trafficking in enabling terrorists to carry out attacks.

Grupo de Operaciones Especializados (GOPE), a 300-person unit of the Carabinero police force, served as the nation's primary counterterrorist reaction force.  The force is well-trained and participates each year in Exercise Fuerzas Comando, a SOCOM-sponsored special operations seminar designed to refine the tactics, techniques, and procedures used by Special Operations counterterrorism forces.

PX202



*COLOMBIA, Bogota:  A soldier searches the shoulder bag of a man inside a bus in Bogota 06 August, 2006, as part of the security operations on the eve of President Alvaro Uribe's second term inauguration.  Car bombings have rocked a number of Colombian cities in what authorities have called a wave of attacks by the rebel Revolutionary Armed Forces of Colombia (FARC), ahead of the second-term inauguration of Uribe.  AFP Photo/Martin Bernetti*

## COLOMBIA

The Government of Colombia, facing a domestic terrorist threat, continued vigorous law enforce-ment, intelligence, military, and economic measures against three designated Foreign Terrorist Organizations: the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United Self-Defense Forces of Colombia (AUC). Colombia increased its efforts with neighboring countries to thwart terrorist expansion, investigate terrorist activities inside and outside Colombia, seize assets, and bring terrorists to justice. The U.S.-Colombia extradition relationship remained the most successful in the world. The Colombian government cooperated fully with U.S. efforts to recover three U.S. citizens kidnapped by the FARC in February 2003, and remained open to third-party proposals for a hostage-prisoner exchange, but at year's end talks had not progressed.

Colombian based terrorist groups were weakened as a result of aggressive actions by the military and police, but these groups continued to murder, kidnap, and terrorize Colombians from all walks of life. The Uribe administration maintained its focus on defeating and demobilizing Colombia's terrorist groups through its "democratic security" policy. In the course of an increased tempo of offensive military, intelligence, and police operations, combined with efforts to demobilize combatants, the security services captured or killed numerous terrorists and mid-level commanders, debriefed terrorist group deserters for detailed information on their terrorist cells, and reduced the amount of territory where terrorists can freely operate. The government increased offensive operations against the FARC and ELN along the Venezuelan and Ecuadorian borders, and restarted anti-drug fumigation operations along the Ecuadorian border. Overall, aerial spraying in 2006 covered 425,000 acres of illegal drug crops (coca and opium poppies).

PX202

Colombia continued its close cooperation with the United States to block terrorists' assets, and financial institutions continued to close narcotrafficking and terrorism-related accounts on government order. In December, the Colombian Congress passed a law that, upon final presidential approval, will make terrorist financing an autonomous crime. Where financial institutions previously cooperated with authorities in specific cases of terrorist finance, the new law will require them to screen all new clients, and to file suspicious transaction reports (STRs) with the country's financial intelligence unit when they suspect terrorist finance activities.

Colombia emerged as a regional leader for improving counterterrorism capabilities and for strengthening political will to combat terrorism in the region, and intends to expand its leadership role in counterterrorism training in the region. Building on U.S. Antiterrorism Assistance (ATA), Colombia provided training to regional neighbors on anti-kidnapping, VIP protection, and cyber-investigation, and took over the Chair of the Organization of American States' Inter-American Committee against Terrorism (CICTE). The government continued to seek enhanced regional CT cooperation to target terrorist safe havens in vulnerable border areas.

The threat of extradition to the United States is a strong weapon against the FARC, the ELN, and ex-AUC leaders. In 2006, Colombia extradited 102 criminals to the United States, the vast majority of whom were Colombian nationals. Trials for extradited FARC leader Ricardo Palmera "Simon Trinidad" and financier Omaira Rojas Cabrera "Sonia" on terrorism and drug related charges were scheduled when the year ended. The Uribe administration suspended two more extraditions of alleged AUC members, bringing the total to five, who were cooperating with the peace process, but the United States continued to seek their extraditions. However, the Colombian government denied a request from two other AUC leaders to suspend their extradition based on their demobilization; the extraditions are proceeding.

The FARC continued tactical-level terrorist and narcotrafficking activities, despite the ongoing military campaign against it, and launched several bombings against military targets in urban areas, including Bogotá. The FARC also targeted numerous rural outposts, infrastructure targets, and political adversaries in dozens of attacks, and continued kidnappings across Colombia. A sample of the FARC's daily criminal activity included:

- In February, the FARC killed eight town councilmen in Rivera, Huila;

- In April, Liliana Gaviria, sister of former-President Cesar Gaviria, was killed by the FARC;

- In October, the FARC launched car bomb attacks in Bogotá, Villavicencio, and Fusagasuga,

- In November, the FARC attacked rural National Police post in Tierradientro, killing 17 police officers;

- In December, the FARC ambushed the military in Ocana, North Santander, killing 17 soldiers; and

- In December, the FARC killed 15 soldiers near La Julia (Meta).

Three Irish Republican Army (IRA) members who were awaiting final sentencing for training the FARC on IRA bomb tactics fled Colombian parole and resurfaced in Ireland in August 2005. They were detained and questioned by the Irish national police and released without charge. The Colombian government requested their extradition. Ireland does not have an extradition treaty with Colombia; the case remained under review and the three fugitives at large.

PX202

The Government of Colombia and the ELN conducted several rounds of peace talks, but no agreements were reached. The ELN remained in the field, but with limited resources, a dwindling membership, and reduced offensive capability. The ELN and FARC clashed over territory in north-eastern Colombia regularly, which further weakened the ELN.

AUC blocs continued to demobilize under the Justice and Peace Law, which offers judicial benefits and reduced prison sentences for qualifying demobilizing terrorists. The law requires all participants to confess fully their crimes as members of a terrorist group and to return all illicit profits. More than 32,000 AUC members have demobilized, and the government is attempting to reintegrate them into society through a newly created high commissioner for reintegration. At year's end, the Colombian Prosecutor's office began taking sworn confessions from ex-members of the AUC as part of the Justice and Peace process. Some AUC renegades continued to engage in criminal activities after demobilization, but the AUC as a formal organization largely ceased to function.

## CUBA

*(See Chapter 3, State Sponsors of Terrorism.)*

## ECUADOR

Ecuador's greatest counterterrorism and security challenge was the presence of Colombian Foreign Terrorist Organizations, frequently linked with narcotics trafficking organizations, along its northern border. Members of the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) were widely present on the Colombian side of the border and regularly entered Ecuadorian territory (generally as unarmed civilians) for rest and resupply. Training camps for these groups were discovered on the Ecuadorian side of the border.

In response, the Government of Ecuador continued troop shifts to the northern border region, and publicly affirmed the need to maintain effective presence and control of the border. This position was taken in the Ministry of Defense White Paper and in the Foreign Ministry's forward-looking foreign policy White Paper, referred to as PLANEX 2006 -2020.

Greater troop presence and more frequent patrolling led to the discovery and dismantling of over 30 clandestine FARC camps in northern Ecuador. The Ecuadorian National Police continued efforts to strengthen border crossing security and worked with the military to deepen national security cooperation to combat illegal armed groups. Ecuador strengthened its dialogue with Colombia on sensitive cross-border issues and initiated bilateral development planning. Ecuador worked closely with the United States and other donors to promote lawful economic activity and development in the north. In May, the Ecuadorian Congress ratified the Inter-American Convention Against Terrorism.

Ecuadorian police suspected several small Ecuadorian groups of domestic subversion and involvement in terrorism. Of greatest concern was the estimated 200-member Popular Combatants Group (GCP), a faction of the Marxist-Leninist Communist Party of Ecuador. Its members are mainly students and are trained in the use of firearms and low-yield pamphlet bombs, which they deployed in major cities without casualties. Also of concern were the Political Military Organization (OPM) and Alfarista Liberation Army (ELA), which were reputed to have ties with and support from Colombian narcoterrorists.

PX202

## EL SALVADOR

El Salvador, the only Western Hemisphere country with troops serving alongside U.S. forces in Iraq, continued its support for the Coalition by dispatching an eighth contingent of troops to Iraq in December, and President Tony Saca publicly expressed his intention to deploy a ninth unit.

In September, the Legislative Assembly passed new counterterrorism legislation, which President Saca quickly signed into law. The law featured new sentencing requirements for certain terrorist-related crimes, but fell short of international recommendations on terrorist finance. Rather than distinguishing terrorism from regular crime by defining it as politically-motivated violence, the new legislation lists some 27 types of acts as terrorism[16], punishable by a maximum sentence of 86 1/2 years in prison in the case of aggravating circumstances and, in a controversial provision, the law provides for 25-30 years in prison for armed occupation of public buildings (a tactic favored by some militant groups affiliated with the opposition FMLN party). The FMLN legislators, many of whom are former guerrilla insurgents, voted unanimously against the legislation, charging that its measures would restrain their right of free association. A group of different organizations is planning constitutional challenges and threatened to take the case to the Inter-American Court of Human Rights if necessary.

The Civilian National Police (PNC) is a professional force that is well-regarded by Salvadorans and international observers. The PNC coordinated its work with the Immigration Service, the Office of the Attorney General (FGR), and the National Intelligence Service (OIE). The new CA-4 agreement, implemented among El Salvador, Guatemala, Honduras, and Nicaragua, allowed for the inspection-free movement of citizens among these countries, and reduced overall inspection at land crossings. While important for improving overall integration and trade among the four member nations, the system has raised concerns that it could facilitate easier international movement of terrorists.

## GUATEMALA

Guatemala continued to strengthen its anti-money laundering and terrorism finance regime since its 2004 removal from the Financial Action Task Force list of Non-Cooperative Countries. The Financial Intelligence Unit is an active partner of U.S. and multilateral efforts to track terrorism finance and reduce financial sector vulnerabilities. With U.S. assistance, Guatemala formed an interagency money laundering task force with representation from the Financial Intelligence Unit, the Guatemalan tax authority, and the Public Ministry (prosecutors office). There was no credible evidence of terrorism financing in Guatemala, and the Guatemalan government, along with private financial sector actors, actively cooperated in looking for such funds.

An organized crime bill passed by the Guatemalan Congress on July 19 provided the Guatemalan government with the tools to investigate criminal activities including those related to terrorism, but is not yet operational. The Guatemalan military's deployment of a western border task force at the beginning of the year continued the government's initial efforts to secure control of its borders with Mexico that began with the deployment of a northern border task force in September 2005.

---

16    *The 27 acts include: murder or grave injury of public officials, diplomats, or other international figures; kidnapping; terror-*
      *ist attacks against aircraft or maritime vessels; crimes against port and maritime security; participation in terrorist finance*
      *(though lacking internationally-accepted language on cash couriers and wire transfers); tampering with chemicals and*
      *medicines; inciting acts of terror; publicly defending or supporting acts of terror; membership in terrorist organizations; use*
      *of WMD; and acts of cyber-terrorism.*

PX202

Severe resource constraints of both technology and manpower, corruption, and an ineffective criminal justice system hindered efforts against transnational crime threats such as drug trafficking and alien smuggling, especially through remote areas of the country. Guatemala's northern and western borders with Mexico lacked effective coverage by police or military personnel, and controls at its southern and eastern borders with El Salvador have been relaxed as part of the Central American integration process. Nevertheless, Guatemalan civil aviation and port authorities provided strong cooperation to U.S. requests for assistance in investigating potential terrorism leads. Deployment of the military-led border task forces provided a new governmental presence in the previously lawless northwest and western border regions. The Guatemalan government worked to enhance overall maritime and aviation security and counterterrorism capabilities to remain in compliance with rising international standards.

## MEXICO

Mexico demonstrated a strong commitment to work with the United States to preempt terrorist activity and entry through our shared border. There were no known international terrorists residing or operating in Mexico, and no terrorist incidents have occurred on or originated from its territory. Mexico represented primarily a terrorist transit threat, and our bilateral efforts focused squarely on minimizing that threat.

Counterterrorism cooperation steadily increased through the end of the Fox administration.  President Calderon entered office on December 1, committed to prioritizing national security.  U.S. law enforcement agencies enjoyed particularly strong relationships with the Center for National Security Investigations (CISEN), the Attorney General's Office (PGR), and the National Migration Institute (INM). Mexico worked with the United States to enhance aviation, border, maritime, and transportation security, secure critical infrastructure, and combat terrorism financing.

The Mexican government further professionalized federal law enforcement institutions, restructured and strengthened the institutions directly responsible for fighting organized crime, and developed tools under the framework of the Security and Prosperity Partnership (SPP) to better address national security threats.

The March 2005 launch of the SPP, which consists of ten security-related goals within its Security Pillar, institutionalized mechanisms for information exchange across agencies and levels of our respective governments. While a solid foundation has been built, we are working towards further cooperation and information sharing.

Mexico continued to make steady progress on border security projects focused on counterterrorism and alien smuggling. Mexico acknowledged and responded thoughtfully to U.S. reports concerning terrorist transit and the smuggling of aliens who may raise terrorism concerns. Cooperation between the United States and Mexico was especially positive in alien smuggling initiatives along Mexico's northern and southern borders. Initiatives included exchanges of information on and screening of individuals suspected of cooperation with terrorist organizations as well as smugglers whose activities presented terrorist concerns. This cooperation led to the deployment of the Operation Against Smugglers Initiative on Safety and Security (OASISS) system, which allowed Mexican and U.S. law enforcement officials to share real-time information regarding ongoing alien smuggling investigations in a systemized fashion.  OASISS enhanced the ability to prosecute alien smugglers and human traffickers on both sides of the border and to avoid situations where smugglers responsible for life-threatening behavior (even deaths) on one side of the border could evade

PX202

justice by escaping to the other side. The U.S. Government would like to see more cooperative efforts to identify smuggling organizations operating along Mexico's southern border that may raise terrorism concerns.

An ongoing issue of strategic concern was the continued exploitation of smuggling channels traversing the U.S.-Mexico border and the lack of enforcement along the southern Mexican border with Guatemala and Belize. The southern border, in particular, could be vulnerable to the movement of terrorists. In the wake of increasing narcotics-related border violence, bilateral cooperation on border security issues has increased.

The Mexican government coordinated with the United States on information sharing of air passenger data. The United States was also planning to support Mexico's plans to develop a national center for migratory alerts, which would coordinate information drawn from various other agencies to alert officials of possible suspect entries into Mexico.

Mexico and the United States began negotiations on programs designed to deter terrorists from using Mexico's seaports to ship illicit materials, detect nuclear or radioactive materials if shipped via sea cargo, and interdict harmful material before it could be used against the United States or U.S. allies. The cooperative effort will include installation of specialized equipment to screen cargo containers for nuclear or other radioactive materials.

Despite excellent U.S.-Mexico cooperation, money laundering remained a significant problem. The United States and the new Mexican government are discussing the dedication of greater resources to combating it. The underlying legal framework remained inadequate, and the establishment of a specific Mexican penal charge against money laundering connected to terrorism is needed. Both chambers of the Mexican legislature have passed legislation outlawing terrorist financing and associated money laundering; the two bills must still be consolidated in conference. The Mexican government notably deployed a task force to the Mexico City airport that included elements from the Agencia Federal de Investigacion (Federal Investigative Agency), Mexican Customs, and prosecuting attorneys from the PGR's anti-money laundering criminal prosecution section.

The Mexican Armed Forces continued to expand its counterterrorism capabilities. The Secretariat of the Navy improved maritime air surveillance by returning to service two of three E-2C Hawkeye command and control aircraft and acquiring more MI-17 helicopters. This capability related directly to efforts to secure key national strategic facilities, including those related to oil production in the Bay of Campeche. It remains difficult to accurately assess Mexican Army counterterrorism capabilities because the U.S. and Mexican Armed Forces had limited interoperability in counterterrorism.

The U.S.-Mexico Border Security and Public Safety Working Group, formed in March, has become another important tool for bilateral cooperation, establishing protocols between both governments to respond cooperatively at a local level to critical incidents and emergencies along the border. It remains in the pilot stage. The United States was able to further develop its border security relationship with the Government of Mexico through training programs, which focused on using non-intrusive inspection equipment, detecting weapons of mass destruction, and identifying fraudulent documents.

## NICARAGUA

The most pressing counterterrorism issue for the United States concerning Nicaragua was the stalled destruction of Nicaragua's stocks of man-portable air defense systems (MANPADS). While the Nicaraguan executive branch under outgoing President Enrique Bolanos, as well as the armed

PX202

forces, recognized the danger of these weapons falling into the hands of terrorists and cooper-ated with the United States, the opposition-controlled legislature refused to allow the MANPADS destruction program to move forward. The Nicaraguan legislature also failed to act on a comprehen-sive counterterrorism law that would create a national counterterrorism operations unit and address deficiencies in existing criminal and money laundering statutes. The latter, coupled with both the lack of a Financial Intelligence Unit, and a Prosecutor General who refused to prosecute money laundering cases brought to him by the existing cash-starved Commission on Financial Analysis, amounted to an ineffective anti-money laundering and terror financing regime. Nicaragua's court system was politicized and mired in corruption that reached right up to the Nicaraguan Supreme Court. Nicaragua's immigration system suffered from corrupt practices and could be exploited by terrorist groups.

## PANAMA

The Panama Canal remains Panama's most important economic asset. Any act of terrorism that could close off the Canal would severely impact the economies of Panama, the United States, and other countries that rely heavily on the Canal for commerce. The government undertook a review of the structure of its Public Forces and conducted exercises to ensure its ability to protect the Canal and residents of Panama against a possible terrorist act.

Panama's highly developed commercial transport sector and shared border with Colombia makes it a transshipment point for arms, drugs, and smuggling of illegal aliens. Panama's Public Forces (PPF) closely monitored FARC activities in the Darien Province on the Colombian border. In January, the FARC kidnapped two Spanish citizens near the town of Jaque in the Darien. The group held and later released the two individuals. This incident indicated that the FARC continued to have a presence and activity in the Darien[17]. Panama created a dedicated border patrol force for both the Colombian and Costa Rican borders. The Border Protection Force was a separate service with its own command and headquarters under direction of the Panamanian National Police (PNP).

Panama provided enhanced force protection for U.S. military vessels, including submarines, during "high value transits" (HVT) of the Canal; U.S. officials praised Panama's level of support and secu-rity. The Ministry of Government and Justice (MOGJ) used classroom training, table-top exercises, and field visits to improve coordination among the PPF agencies. Panama was also the sponsor and host of the annual PANAMAX exercise, a multinational civil and military forces training exercise tailored to the defense of the Panama Canal. The exercise replicated real world threats to the Canal in order to develop appropriate responses and guarantee safe passage through the waterway. Fifteen nations, including the United States, participated.

The Ministry of Government and Justice, the U.S. Department of Homeland Security and the Department of Justice worked together on joint counterterrorist initiatives, including the malafide traveler interdiction operation at Tocumen Airport, Operation Firewall. Panama worked closely with DHS to finalize the Declaration of Principles for Panama's Container Security Initiative.

On October 30-31, Panama hosted a multilateral conference for Inter-American Committee Against Terrorism (CICTE) members from the United States, Panama, Colombia, and Brazil to discuss strate-gies and preventative measures to protect critical infrastructure from potential terrorist activities. The conference included expert presentations on topics such as telecommunications, cyber secu-rity, and international port security. The October meetings were held in preparation for the upcoming CICTE General Assembly scheduled to take place in late February 2007.

---

17      Panama's remote border region with Colombia, the Darien Province, served in the past as a rest and regrouping point for the FARC.

PX202

Panama is an international offshore banking center. While the government has taken extensive measures to combat money laundering, the banking system and the Canal Free Zone continue to serve as vehicles for illicit finance. Panama's Foreign Ministry, Council for Public Security and National Defense, Financial Analysis Unit, and the Superintendent of Banks were fully cooperative in reviewing terrorism finance lists. The Panamanian legislature passed legislation that toughened laws on money laundering.

## PARAGUAY

Although Paraguay was generally cooperative in counterterrorism and law enforcement efforts, its judicial system remained severely hampered by a lack of strong anti-money laundering and counterterrorism legislation. Such legislation is essential for Paraguay to meet its counterterrorism obligations under UN Security Council Resolutions and, equally important, acquire the tools it needs to effectively obstruct and prosecute money laundering and terrorist financing occurring in the Tri-Border Area, particularly Ciudad del Este.

Paraguay did not exercise effective immigration or customs controls at its borders. Efforts to address illicit activity occurring in the Tri-Border Area were uneven due to a lack of resources and, more principally, corruption within customs, the police, and the judicial sector. In October, a Legal Reform Commission introduced to Congress a Penal Code Reform bill that included provisions to update Paraguay's money laundering law. The Legal Reform Commission was also working on a Procedural Code Reform bill that would include provisions on money laundering and terrorism. Separately, Congress must pass another bill that would give Paraguay's Financial Intelligence Unit (FIU), the Secretariat for the Prevention of Money Laundering (SEPRELAD), the autonomy it would need to function effectively. Without this law, in June 2007 SEPRELAD could be suspended  from the Egmont Group, the international group that facilitates information exchange among the Financial Intelligence Units of its 100 members. Despite expanded cooperation with other government entities and significant assistance from the United States over recent years, SEPRELAD has yet to demonstrate the ability to monitor and detect money laundering. Absent effective money laundering and terrorist financing legislation, it remained difficult for Paraguay to prosecute terrorist financiers or seize their assets.

Without effective counterterrorism legislation, Paraguay has successfully prosecuted suspected terrorist financiers under tax evasion or other statutes. The tax evasion case against Kassem Hijazi, a suspected Hizballah money launderer connected to 113 businesses and 46 individuals, remains ongoing. This case was set to go to trial pending Hijazi's latest appeal to the Supreme Court. Suspected terrorist fundraiser Hatim Ahmad Barakat was convicted of document fraud and was sentenced to six years in jail in June. Paraguayan authorities continued to seek the arrest of fugitive Hassan Ali Barakat (Ahmad Barakat's cousin), for conspiracy, piracy, and contempt of court.

Twelve of the 15 individuals charged with the 2004-5 kidnapping and murder of Cecilia Cubas, daughter of former President Raul Cubas, were convicted in November. Their sentences ranged from 10 to 35 years. Several of the defendants were tied to the leftist Free Fatherland Party (PPL) which, in turn, has allegedly received support from the Revolutionary Armed Forces of Colombia (FARC) and other foreign governments. The PPL supports armed struggle as a means to overthrow the Paraguayan elected government. Several co-conspirators remained at large. Six escaped to Argentina, one of whom subsequently fled to Bolivia after the others were captured, and were awaiting the possibility of extradition. Two escaped to Bolivia and extradition was pending.[18] An additional nine individuals remained at large and were under investigation.

---

[18]  The two that escaped to Bolivia initially received refugee status in Bolivia but the Supreme Court overturned that decision in August. They remained at large.

PX202

The United States assisted Paraguay with training for judges, prosecutors, and police in investigating, preventing and prosecuting individuals involved in money laundering, bulk cash smuggling, and terrorism, including terrorism financing. Paraguay qualified for participation in the Millennium Challenge Account (MCA) Threshold Program and received a $35 million dollar grant to develop and strengthen institutions. Paraguay is a member of the Financial Action Task Force of South America Against Money Laundering (GAFISUD), which has been critical of Paraguay for its failure to adopt strong money laundering legislation. A delegation from the UN Security Council's Counterterrorism Committee visited Paraguay in June urging it to move expeditiously to adopt counterterrorism legislation that would meet its international obligations.

## PERU

Peru's top counterterrorism concern was preventing the reemergence of the militant Maoist Sendero Luminoso (SL or Shining Path), a designated Foreign Terrorist Organization that convulsed the country in the 1980s and1990s at a cost of more than 69,000 lives. SL members continued to engage in narcotrafficking and killed eight civilians and five counternarcotics police officers. SL members also intimidated voters during the election year, but it suffered significant setbacks in 2006 when SL founder and leader Abimael Guzman was sentenced to life in prison, SL's number two military leader Hector Aponte Sinarahua "Clay" was killed, and a boat capsized in the Ene River drowning some 40 members.

Although previous Peruvian administrations nearly eliminated SL in the 1990s, the organization, now entwined with narcotics trafficking, reemerged and remained a threat. Now estimated to include hundreds of armed combatants, Sendero Luminoso conducted 92 terrorist acts in remote areas. While the new SL is shorter on revolutionary zeal than its predecessor, reports suggested it was attempting to rebuild support in the university system, where it exercised considerable influence in the 1980s. Meanwhile, the drug trade provided SL with a greater source of funding to conduct operations, to improve relations with local communities in remote areas, and to gain recruits. Lack of government presence in these areas and deterioration in Peruvian security capabilities complicated efforts to counter or disrupt SL activity.

Since SL remnants operated in coca growing regions and relied on narcotrafficking income, the Peruvian National Police (PNP) in these regions and U.S.-Peruvian counternarcotics operations were on alert for possible attacks based on SL threats. SL presence and activity near Aucayacu in Huanuco limited voluntary eradication and alternative development projects, as SL members reportedly owned and operated coca fields in this area.

SL killed five Peruvian Police officers and two employees of the government-regulated licit coca company (ENACO) in an ambush attack on December 16 in the Apurimac and Ene River Valley (VRAE) of Ayacucho. The ENACO staff, protected by the PNP officers, was tasked to confiscate illegal coca and cocaine precursor chemicals. The Armed Forces reported three soldiers wounded by SL. Two sustained injuries in May and July when their base came under SL fire, and the other soldier was wounded when his convoy was ambushed by SL guerillas.

In rural areas of the Huallaga Valley and the Apurimac and Ene River Valley, SL called for the boycott of April presidential elections and stepped up its recruitment before the elections. Five murders were linked to SL either as voter intimidation during the presidential elections or as revenge for the police operation resulting in the death of SL military leader Hector Aponte Sinarahua "Clay". In March, three people were tortured and mutilated for allegedly providing information to the PNP that led to the police operation against Clay. Their bodies were found with anti-election/pro-revolution

PX202

notes attached. In March, three residents of Leoncio Prado, Huanuco were murdered; one body was found with a note stating that other informants would also be murdered. SL declared that the killings would continue until Clay's death was avenged. In August, SL murdered a fifth civilian from Tocache, San Martin for working as an informant in Clay's case. SL's propaganda and intimidation activities peaked around the first round of the presidential elections and were less pronounced for the subsequent runoff and regional/municipal elections.

From January through June, then-President Toledo undertook a counterterrorism campaign (the Huallaga Police Front) in response to the deadly attacks on police in 2005. This strategy remained in effect. Alan Garcia's government announced a new counterterrorism strategy in November. Under Garcia's strategy, 2,000 troops and 19 antiterrorism bases in the Apurimac and Ene River Valley operated under a central command. The plan also called for new health, education, and infrastructure investment in these isolated communities where the state lacked presence. The government also sought to improve interagency cooperation and strengthen prosecutors. Police units specializing in counterterrorism and counternarcotics conducted joint operations with the Peruvian Army. President Garcia proposed a law in November that called for the death penalty for those convicted of acts of terrorism, but Congress has yet to take action.

President Garcia and former President Toledo repeatedly reauthorized a 60-day state of emergency in parts of Peru's five departments where SL operates, suspended some civil liberties and gave the armed forces authority to maintain public order.

The Tupac Amaru Revolutionary Movement (MRTA) has not conducted a significant terrorist attack since the December 1996 hostage taking at the Japanese Ambassador's residence in Lima. However, there were indications that ex-MRTA members were trying to reconstitute an organizational structure. These MRTA activists were infiltrating far left civil society organizations. For example, the MRTA participated in a conference with left-wing fringe parties in Chile in an attempt to rejuvenate their organization. Police also found MRTA propaganda distributed during the election season.

Authorities arrested 155 suspected SL members and nine Tupac Amaru Revolutionary Movement (MRTA) members. On February 19, the PNP killed Clay, military leader and number two in the Huallaga branch of the SL. The PNP also arrested Mansueto Ausencio "Mansho" and Juan Chujutalli "Pablito", two top political-military operatives in November. Reportedly the result of a boat accident, almost 40 SL members, a third of the force in the region, drowned in the Ene River.

Government records indicated that 145 former SL members were released from jail in November after completing their sentences. Some of these members rejoined political movements but there was no evidence that they have engaged in violent acts.

The Government of Peru aggressively prosecuted terrorist suspects, led by special counterterrorism prosecutors. A special terrorism court was in the process of retrying the remaining SL and MRTA members whose convictions were overturned by Peru's Constitutional Tribunal in 2003. Following a trial that lasted over a year, Abimael Guzman was convicted and sentenced to life in prison on October 13 for acts of terrorism and for founding and leading SL.  Elena Iparraguirre, his partner and co-conspirator, was also sentenced to life in prison.  Oscar Ramirez Durand 'Feliciano', former leader of SL was sentenced to 24 years prison in June for acts of terrorism. Guzman and his accomplices will continue to face other judicial processes.

PX202

The Revolutionary Armed Forces of Colombia (FARC) used remote areas along the Colombian/Peruvian border for rest and to make arms purchases. According to the Peruvian police, the FARC has forced indigenous groups in remote jungle areas to cultivate coca crops.  The outgoing Loreto Regional President made headlines in November when he claimed the FARC operated in the region and had begun to recruit locals to fight in Colombia. Peru, Colombia, and Brazil are party to a 2004 border security agreement to cooperate against terrorism and arms trafficking.

## SURINAME

Suriname's lead agency for counterterrorism, the Central Information and Security Agency (CIVD); and the Ministry of Justice and Police (MOJP) have a police Anti-Terrorist Team (ATE) and a 28 person "capture team" for use in the interior. Suriname has not yet signed the UN Convention for the Suppression of the Financing of Terrorism and does not have laws or regulations that would enable the authorities to freeze and seize funds and assets related to terrorist financing, but does have legislation to allow authorities to freeze assets of those suspected of money laundering.

Suriname began issuing CARICOM-compliant machine-readable passports in 2004, yet there are still numerous valid old passports in circulation, which can easily be tampered with in order to assume a false identity to travel across borders. An unknown number of blank old-style passports remained unaccounted for. The United States provided watch lists of known terrorists to Suriname police, but if any terrorists were present, the likelihood of apprehending them is low because of the lack of border and immigration control by police and officials, and because Suriname has no system for registering and monitoring visitors. According to police sources, the FARC conducted arms-for-drugs operations with criminal organizations in Suriname.

## TRINIDAD AND TOBAGO

In October, Trinidad and Tobago signed a U.S.-CARICOM Memorandum of Intent for the creation of an Advance Passenger Information System (APIS) in preparation for the 2007 Cricket World Cup, and the Parliament passed implementing legislation for the system. The Opposition United National Congress Party failed in its attempt to challenge the constitutionality of the 2005 Antiterrorism Act, and Imam Yasin Abu Bakr became the first person to be prosecuted under the Act. Law enforcement officials participated in U.S. Antiterrorism Assistance programs, and in December, the Trinidad and Tobago government hosted a seminar on "Tourism and Recreational Security", sponsored by the OAS' Inter-American Committee against Terrorism (CICTE).

## VENEZUELA

In reviewing Venezuela's overall level of cooperation in U.S. efforts to fight terrorism, the Secretary of State certified Venezuela as "not fully cooperating" with U.S. antiterrorism efforts. In light of Venezuela's actions, the United States imposed an arms ban effective August 17.  The Secretary's designation became a matter of law October 1, and will remain in effect until the end of the fiscal year, when it may be renewed by a determination by the Secretary of State[19].

---

19      *Venezuela is the only nation certified as "not fully cooperating" that is not a state sponsor of terrorism. Sanctions ended all commercial arms sales and retransfers to Venezuela.*

PX202

President Hugo Chavez persisted in public criticism of U.S. counterterrorism efforts, deepened Venezuelan relationships with Iran and Cuba, and was unwilling to prevent Venezuelan territory from being used as a safe haven by the FARC and ELN, effectively flouting UN Security Council Resolutions 1373 and 1540, which form part of the legal basis of international counterterrorism efforts.

Chavez' ideological sympathy for the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) limited Venezuelan cooperation with Colombia in combating terrorism. FARC and ELN units often crossed into Venezuelan territory to rest and regroup with relative impunity. Splinter groups of the FARC and another designated Foreign Terrorist Organization, the United Self- Defense Forces of Colombia (AUC), operated in various parts of Venezuela and were involved in narcotrafficking.

It remained unclear to what extent the Venezuelan government provided material support to Colombian terrorists. However, limited amounts of weapons and ammunition -- some from official Venezuelan stocks and facilities -- have turned up in the hands of Colombian terrorist organizations. The Venezuelan government did not systematically police the 1,400-mile Venezuelan-Colombian border to prevent the movement of groups of armed terrorists or to interdict arms or the flow of narcotics.

An individual claiming to be a member of an Islamic extremist group in Venezuela placed two pipe bombs outside the American Embassy in Caracas on October 23. Venezuelan police safely disposed of the two pipe bombs and immediately made one arrest. The investigation by Venezuelan authorities resulted in the additional arrest of the alleged ideological leader of the group. At year's end, both suspects remained in jail and prosecutors were pressing terrorism charges against them.

Responding to a complaint filed by two deported ETA terrorists in the Interamerican Human Rights Commission in June, Venezuelan officials negotiated and signed an "amicable settlement" to facilitate the naturalization of Basques who came to Venezuela as political refugees in the 1980s as a result of a bilateral agreement between the governments of Spain and Venezuela. After media reports revealed that ETA terrorists would obtain substantial benefits from the settlement, Venezuela repudiated the terms of the agreement in December.

Venezuelan citizenship, identity, and travel documents remained easy to obtain, making Venezuela a potentially attractive way-station for terrorists. International authorities remained suspicious of the integrity of Venezuelan documents and their issuance process.

PX202

# CHAPTER 3.
## STATE SPONSORS OF TERRORISM

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. Most worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) and other destabilizing technologies that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

As a result of the historic decisions taken by Libya's leadership in 2003 to renounce terrorism and to abandon its WMD programs, the United States rescinded Libya's designation as a state sponsors of terrorism on June 30. Since pledging to renounce terrorism in 2003, Libya has cooperated closely with the United States and the international community on counterterrorism efforts.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

Venezuela was certified by the Secretary of State as "not fully cooperating" with U.S. counterterrorism efforts. The designation, included in Section 40A of the Arms Export Control Act, was based on a review of Venezuela's overall efforts to fight terrorism. Effective October 1, the decision imposed sanctions on all commercial arms sales and transfers. It remains in effect until September 30, 2007, when it may be renewed by a determination by the Secretary. (Venezuela is the only nation certified as "not fully cooperating" that is not a state sponsor of terrorism.)

## STATE SPONSOR: IMPLICATIONS

Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   • Requiring the United States to oppose loans by the World Bank and other international financial institutions;

   • Lifting diplomatic immunity to allow families of terrorist victims to file civil lawsuits in U.S. courts;

145

PX202

- Denying companies and individuals tax credits for income earned in terrorist-listed countries;

- Denial of duty-free treatment of goods exported to the United States;

- Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and

- Prohibition of Defense Department contracts above $100,000 with companies controlled by terrorist-list states.

## CUBA

Cuba continued to publicly oppose the U.S.- led Coalition prosecuting the War on Terror. To U.S. knowledge, Cuba did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank. No new counterterrorism laws were enacted, nor were any executive orders or regulations issued in this regard. To date, the Cuban government had not undertaken any counterterrorism efforts in international and regional fora or taken action against any designated Foreign Terrorist Organizations. The Government of Cuba provided safe haven to members of ETA, FARC, and the ELN, and maintained close relationships with other state sponsors of terrorism such as Iran. The Cuba-Iran Joint Commission met in Havana in January.

The Cuban government continued to permit U.S. fugitives to live legally in Cuba and is unlikely to satisfy U.S. extradition requests for terrorists harbored in the country. The United States periodically requested that the government return wanted fugitives[1], and Cuba continued to be non-responsive. The Cuban regime publicly demanded the return to Cuba of five of its agents convicted of espionage in the United States. The five were variously accused of being foreign intelligence agents and infiltrating U.S. military facilities, but the Cuban government continued to refer to these individuals as heroes in the fight against terrorism. One was accused of conspiracy to murder for his role in the Cuban Air Force's shooting down of two small civilian planes. Cuba has stated, however, that it will no longer provide safe haven to new U.S. fugitives who may enter Cuba.[2]

Although Cuba did not extradite suspected terrorists during the year, the government demanded that the United States surrender Luis Posada Carriles, whom it accused of plotting to kill Castro and bombing a Cubana Airlines plane in 1976, which resulted in more than 70 deaths. Posada Carriles remained in U.S. custody. Cuba also asked the United States to return three Cuban-Americans implicated in the same cases.

---

1    U.S. fugitives range from convicted murderers, two of whom killed police officers, to numerous hijackers. Most of those fugitives entered Cuba in the 1970s. In previous years, the Government of Cuba responded to requests to extradite U.S. fugitives by stating that approval would be contingent upon the U.S. returning wanted Cuban criminals.

2    During September, a U.S. fugitive sequestered his son, stole a plane at a local airport in the Florida Keys, and landed illegally in Varadero, east of Havana. American Interests Section efforts resulted in a visit to the male individual and his son in Varadero. After several meetings between the aforementioned USINT Offices and Cuban government officials, the son was returned in October to his mother in Mexico, who had legal custody. Simultaneously, the father was returned to the United States via charter flight to Miami, where he is being prosecuted. The stolen private plane was later returned to the United States. This was the first instance in which the Cuban government permitted the return of a fugitive from U.S. justice.

PX202

# IRAN

Iran remained the most active state sponsor of terrorism. Its Islamic Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) were directly involved in the planning and support of terrorist acts and continued to exhort a variety of groups, especially Palestinian groups with leadership cadres in Syria and Lebanese Hizballah, to use terrorism in pursuit of their goals.

Iran maintained a high-profile role in encouraging anti-Israeli terrorist activity, rhetorically, operationally, and financially. Supreme Leader Khamenei and President Ahmadi-Nejad praised Palestinian terrorist operations, and Iran provided Lebanese Hizballah and Palestinian terrorist groups – notably HAMAS, Palestinian Islamic Jihad, the al-Aqsa Martyrs Brigades, and the Popular Front for the Liberation of Palestine-General Command – with extensive funding, training, and weapons.

Iran continued to play a destabilizing role in Iraq, which appeared to be inconsistent with its stated objectives regarding stability in Iraq. Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology.  These individuals then passed on this training to additional militants in Iraq.

Iran remained unwilling to bring to justice senior AQ members it detained in 2003, and it has refused to publicly identify these senior members in its custody. Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al-Qaida members who fled to Iran following the fall of the Taliban regime in Afghanistan.

# NORTH KOREA

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. The DPRK continued to harbor four Japanese Red Army members who participated in a jet hijacking in 1970. The Japanese government continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities; five such abductees have been repatriated to Japan since 2002. In the February 13, 2007 Initial Actions Agreement, the United States agreed to "begin the process of removing the designation of the DPRK as a state-sponsor of terrorism."

# SUDAN

The Sudanese government was a strong partner in the War on Terror and aggressively pursued terrorist operations directly involving threats to U.S. interests and personnel in Sudan. In recent months, Usama Bin Laden and other senior al-Qaida leaders have called for the expansion of AQ's presence in Sudan in response to possible deployment of UN peacekeepers in Darfur. This has led to speculation that some individuals with varying degrees of association with AQ have taken steps to establish an operational network in Darfur, but there were no indications that AQ affiliated extremists were active there.

PX202

With the exception of HAMAS, the Sudanese government did not openly support the presence of extremist elements in Sudan. The Sudanese government took steps to limit the activities of these organizations. For example, Sudanese officials welcomed HAMAS members as representatives of the Palestinian Authority (PA), but limited their activities to fundraising. The Sudanese government also worked to disrupt foreign fighters from using Sudan as a logistics base and transit point for Jihadists going to Iraq. There was some evidence to suggest that individuals who were active participants in the Iraqi insurgency have returned to Sudan and were in a position to use their expertise to conduct attacks within Sudan or to pass on their knowledge.

The Lords Resistance Army (LRA) continued to be a threat to Uganda, the Democratic Republic of the Congo (DRC), and Southern Sudan. The Government of Southern Sudan worked to mediate peace between the LRA and the Government of Uganda and sought to curb LRA raids, but achieved little tangible progress. Although LRA attacks declined significantly, renewed violence remains a threat. Formal negotiations commenced in Juba in July 2006. The LRA continued to stall the talks, however, most recently with demands for a change of venue and a halt to all Ugandan People's Defense Forces activity in southern Sudan. Both parties signed a Cessation of Hostilities agreement in August 2006 identifying areas where the LRA could assemble for the negotiations without fear of being attacked by the Ugandan People's Defense Forces.

## SYRIA

The Syrian government continued to provide political and material support to Hizballah and political support to Palestinian terrorist groups. Palestinian Islamic Jihad (PIJ), HAMAS, the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, base their external leadership in Damascus. The Syrian government insisted that the Damascus-based groups undertake only political and informational activities, but Palestinian groups with leaders in Syria have claimed responsibility for anti-Israeli terrorist acts.

Syria's public support for the Palestinian groups varied, depending on its national interests and international pressure. In April, visiting PA Foreign Minister Zahar (HAMAS) met with Damascus-based Palestinian leaders and attended a rally at the Palestinian Yarmouk refugee camp alongside HAMAS Political Bureau Chief Khalid Mish'al and representatives of other terrorist groups and Hizballah. In July, Mish'al held a highly publicized press conference under tight security at a Damascus hotel, expressing gratitude for Syria's unconditional support to the Palestinian cause.

The Government of Syria has not been implicated directly in an act of terrorism since 1986, although preliminary findings of a UN investigation into the February 2005 assassination of former Lebanese Prime Minister Rafik Hariri indicated a strong likelihood of official Syrian involvement. That investigation remains in process.

On September 12, four Syrian nationals with alleged Islamist ties used grenades, guns, and a small truck bomb to launch an attack against the U.S. embassy in Damascus. All four of the assailants were killed as was a Syrian security officer who responded to the attack. In the incident's aftermath, the Syrian government enhanced security for the embassy and American personnel in Syria, although it declined to provide the embassy with the findings of its internal investigation into the attack. Damascus repeatedly assured the United States that it will take every possible measure to protect U.S. citizens and facilities in Syria, but at the same time has not taken the measures considered necessary by the United States.

PX202

In 2004-2005, Syria upgraded physical security conditions on the border and began to give closer scrutiny to military-age Arab males entering Syria. (Visas are still not required for citizens of Arab countries.) It also highlighted the repatriation of more than 1,200 foreign extremists and the arrest of more than 4,000 Syrians trying to go to Iraq to fight. In November, Syria's foreign minister announced the resumption of diplomatic relations with Iraq after a 25-year rupture, and, a month later, the Syrian and Iraqi Ministers of Interior signed a five-year memorandum of understanding to boost, among other things, joint efforts to control the borders and combat terrorism.

As in recent years, Damascus highlighted in Syrian government-controlled press, information about clashes on Syrian territory with terrorist groups, particularly with the Jund a-Sham group. Sepa-rately, in November, security agents on the Syrian side of the border with Lebanon engaged in a gun battle with a Syrian Islamic militant from the Tawhid and Jihad group. The militant, who was trying to use fake documents to cross into Lebanon, subsequently blew himself up with a hand grenade.

PX202

# CHAPTER 4.
## THE GLOBAL CHALLENGE OF WMD TERRORISM

The nexus of weapons of mass destruction (WMD) and terrorism poses one of the gravest potential risks to the national security of the United States and its global partners. A successful major WMD terrorist attack could result in hundreds of thousands of casualties and produce far-reaching economic and political consequences that would affect all members of the international community. This chapter outlines:

- The key elements of the United States' National Strategy for Combating WMD Terrorism;

- The various types of materials terrorists may use in a WMD attack;

- The potential that resources of a state could be directed or diverted to facilitate WMD terrorism;

- The emerging WMD terrorism threat presented by non-state facilitators; and

- Transformational U.S. partnerships to combat this growing global risk.

The U.S. Government places the highest priority on working with a broad range of international partners, international organizations and national governments, as well as local governments and private sector organizations, to develop effective partnerships to meet the global challenge of WMD terrorism.

## DIPLOMATIC STRATEGIC PRIORITIES FOR COMBATING WMD TERRORISM

U.S. diplomatic priorities for combating WMD terrorism build on the comprehensive approach set forth in the U.S. National Strategy for Combating WMD Terrorism. Specifically, our strategic approach hinges on the six objectives outlined in the National Strategy. We work across all objectives simultaneously to maximize our ability to eliminate the threat.

- Determine terrorists' intentions, capabilities, and plans to develop or acquire WMD. We need to understand and assess the credibility of threat reporting and provide technical assessments of terrorists' WMD capabilities.

- Deny terrorists access to the materials, expertise, and other enabling capabilities required to develop WMD. We seek to deny our enemies access to WMD-related materials (with a particular focus on weapons-usable fissile materials), methods of transport, sources of funds, and other capabilities that facilitate the execution of a WMD attack. In addition to building upon existing initiatives to secure materials, we are developing innovative approaches that blend classic counterproliferation, nonproliferation, and counterterrorism efforts.

- Deter terrorists from employing WMD. A new deterrence calculus combines the need to deter terrorists, facilitators, and supporters from contemplating a WMD attack and, failing that, to dissuade them from actually conducting an attack. Traditional threats may not work because terrorists generally show a wanton disregard for the lives of innocents and, in some cases, for their own lives. We require a range of deterrence strategies that are

PX202

tailored to the various WMD threats and the individual actors who facilitate or enable those threats. We will employ diplomatic strategies that seek to address extremism and diffuse volatile conditions to discourage populations from considering WMD an appropriate tool to address perceived injustices.

- Detect and disrupt terrorists' attempted movement of WMD-related materials, weapons, and personnel. We will seek to expand our global capability for detecting illicit materials, weapons, and personnel transiting abroad or heading for the United States or U.S. interests overseas. We will use our global partnerships, international agreements, and ongoing border security and interdiction efforts. We also will continue to work with countries to enact and enforce strict penalties for WMD trafficking and other suspect WMD-related activities.

- Prevent and respond to a WMD-related terrorist attack. Once the possibility of a WMD attack against the United States has been detected, we will seek to contain, interdict, and eliminate the threat. We will continue to develop requisite capabilities to eliminate the possibility of a WMD operation and to prevent a possible follow-on attack. We will prepare ourselves for possible WMD incidents by developing capabilities to manage the range of consequences that may result from such an attack against the United States or our interests around the world.

- Define the nature and source of a terrorist-employed WMD device. Should a WMD terrorist attack occur, the rapid identification of the source and perpetrator of an attack would enable our response efforts and may be critical in disrupting follow-on attacks. We will maintain and improve our capability to determine responsibility for the intended or actual use of WMD via accurate attribution - the rapid fusion of technical forensic data with intelligence and law enforcement information.

As we move forward in the implementation of our diplomatic strategic priorities for combating WMD terrorism, we will take special care to work closely with the full range of foreign partners to prioritize and to tailor our capacity-building approaches to the regional and local conditions we face across the world.

## THE MATERIAL THREATS

There are four generally accepted categories of weapons of mass destruction that terrorists may seek to acquire and use in a WMD terrorist attack: nuclear, radiological, biological, and chemical.

### NUCLEAR

Some terrorist organizations, such as AQ, have openly stated their desire to acquire and use nuclear weapons. The diffusion of scientific and technical information regarding the assembly of nuclear weapons, some of which is now available on the Internet, has increased the risk that a terrorist organization in possession of sufficient fissile material could develop its own nuclear weapon. The complete production of a nuclear weapon strongly depends on the terrorist group's access to fissile material and scientific expertise. Terrorists may, however, seek to link up with a variety of facilitators to develop their own nuclear capability. These facilitators include black market proliferators or transnational criminal networks that may seek to profit from the sale of nuclear material, a weaponized device, or technical knowledge gathered from nuclear experts involved in a national nuclear program.

PX202

## RADIOLOGICAL

Some terrorists seek to acquire radiological materials for use in a radiological dispersal device (RDD) or "dirty bomb." Most radiological materials lack sufficient strength to present a public health risk, but public panic and the economic disruption caused by a radiological dispersal device would be significant. Radiological materials are used widely across the medical industry including medical isotopes and sources used in some X-ray machines; and in the oil industry they are used in well-logging devices and other measuring instruments. Its widespread use makes radiological material significantly easier to procure than fissile nuclear material.

## BIOLOGICAL

Biological weapons, another deadly threat, consist of pathogens that are deliberately dispersed through food, air, water, or living organisms. If properly produced and released, biological weapons can kill on a massive scale, even spreading across oceans to distant continents and population centers.

Like other WMD, developing a biological weapons capability represents scientific and operational challenges. The quality of a biological weapon greatly determines its ability to harm people. It requires scientific expertise to assemble a biological weapon or develop and disperse a suitable pathogen such as the one used in the 2001 anthrax attacks in the United States.  Some terrorist organizations, however, remain interested in developing a bioweapons capability.

Among present-day terrorist organizations, AQ is believed to have made the greatest effort to acquire and develop biological weapons. U.S. forces discovered a partially built biological weapon laboratory near Kandahar after expelling the Taliban from Afghanistan. Although it was not conclusive that AQ succeeded in obtaining a biological weapon, the discovery demonstrated a concerted effort to acquire a biological weapons capability.

## CHEMICAL

Chemical weapons represent another highly dangerous potential tool in the hands of terrorists. Effectively dispersed and in sufficient dosages, chemical weapons could injure tens of thousands. Not since the 1995 sarin attack conducted by Aum Shinrikyo in the Tokyo subway system has an attack been conducted with a sophisticated chemical device. Since then, only materials with legitimate dual uses, such as pesticides, poisons, and industrial chemicals, have been used. The growth and sophistication of the worldwide chemical industry, including the development of complex synthetic and dual-use materials, may make the task of preventing and protecting against this threat more difficult. Preventing chemical terrorism is particularly challenging as terrorists can, with relative ease, use commercial industrial toxins, pesticides, and other commonly available chemical agents as low-cost alternatives to conventional attacks – though likely with limited effects rather than mass casualties.

### DUAL-USE MATERIALS, EQUIPMENT, RESEARCH AND TECHNOLOGY OF CONCERN

Reducing the risk of terrorist acquisition of, access to, and use of dual-use materials, equipment, research, and technology of concern also remains a critical challenge. Terrorists have shown an interest in developing improvised devices leveraging such capabilities, and the diffusion of information on the Internet regarding dual-use research of concern has compounded this challenge. Recent

PX202

attacks in Iraq involving improvised devices containing chlorine, a dual-use chemical used in water treatment facilities, offer a notable example. Effective partnerships with private sector organizations – industry, academia, and the scientific research community – as well as with local governments will play an important role in mitigating the risk of dual-use capabilities falling into the wrong hands.

## STATE SPONSORSHIP OF TERRORISM: A KEY CONCERN

A state that directs WMD resources to terrorists, or one from which enabling resources are clandestinely diverted, may pose a potentially grave WMD terrorism threat. Although terrorist organizations will continue to seek a WMD capability independent of state programs, the sophisticated WMD knowledge and resources of a state could enable a terrorist capability. State sponsors of terrorism and all nations that fail to live up to their international counterterrorism and nonproliferation obligations deserve greater scrutiny as potential facilitators of WMD terrorism.

## NON-STATE FACILITATORS: AN EMERGING THREAT

State sponsors of terrorism represent just one facet of the overall risk of WMD terrorism. Non-state facilitators have emerged as a growing WMD proliferation threat in recent years. In 2003, the United States and its international partners succeeded in interdicting a shipment of WMD-related material destined for Libya's then active nuclear weapons program. As facts emerged regarding this shipment and its origin, the U.S. Government gained insight into an emerging WMD terrorism risk. Pakistani nuclear scientist A.Q. Khan had developed a transnational nuclear proliferation network reaching from Southeast Asia to Europe, and was making available sensitive technology and WMD-related materials to nations willing to pay.

The dismantling of the A.Q. Khan network revealed an uncomfortable truth about globalization. The very trends driving globalization – improved communications and transportation links – can enable development of extended proliferation networks that may facilitate the terrorist acquisition of WMD. Globalization requires that partner nations work together closely to prevent, detect, and disrupt linkages that may develop between terrorists and facilitators such as A.Q. Khan.

## TRANSFORMATIONAL PARTNERSHIPS TO COMBAT WMD TERRORISM

Since September 11, 2001, the international community has taken significant strides in responding to the threat of WMD terrorism. States are working together bilaterally and multilaterally to address these threats and protect their populations. The United States has taken concrete measures to build a layered defense against the WMD terrorism threat. In 2003, the U.S. Government announced the first National Strategy to Combat Weapons of Mass Destruction. Through a variety of multinational initiatives such as the Global Partnership against the Spread of Weapons of Mass Destruction, the Global Threat Reduction Initiative, and the Proliferation Security Initiative, and most recently, through the Global Initiative to Combat Nuclear Terrorism, the United States has taken a leadership role in reducing the threat of WMD in the hands of non-state actors and terrorists.

## THE PROLIFERATION SECURITY INITIATIVE

Announced by President Bush in 2003, the Proliferation Security Initiative (PSI) deserves special mention as a particularly well received and effective international initiative. The PSI is a global effort that aims to stop the trafficking of WMD, their delivery systems, and related materials to and from states and non-state actors of proliferation concern worldwide. States that wish to join the PSI are

PX202

asked to endorse a Statement of Interdiction Principles that identifies specific measures participants intend to undertake for the interdiction of WMD and related materials. PSI participants also conduct exercises to improve their operational capabilities to conduct interdictions, and meet periodically to develop new operational concepts and share information. PSI has led to a number of important interdictions over the last two years and is an important tool in the overall U.S. strategy to combat WMD terrorism.

## THE GLOBAL INITIATIVE TO COMBAT NUCLEAR TERRORISM

Presidents Bush and Putin announced the Global Initiative to Combat Nuclear Terrorism on July 15, 2006 to expand and accelerate the development of partnership capacity against one of the most serious threats to international security. Although PSI has marshaled resources to support interdiction, the Global Initiative focuses on strengthening the other defensive layers necessary to prevent, protect against, and respond comprehensively to the nuclear terrorist threat.

Australia, Canada, China, France, Germany, Italy, Japan, Kazakhstan, Morocco, Russia, the United Kingdom, and the United States agreed to and endorsed a Statement of Principles and Terms of Reference for the Initiative in a meeting in Rabat, Morocco on October 30-31. The International Atomic Energy Agency (IAEA) attended as an observer. By agreeing to the Statement of Principles, partner nations committed themselves to:

- Develop, if necessary, and improve accounting, control, and physical protection systems for nuclear and other radioactive materials and substances;

- Enhance security of civilian nuclear facilities;

- Improve the ability to detect nuclear and other radioactive materials and substances in order to prevent illicit trafficking in such materials and substances, to include cooperation in the research and development of national detection capabilities that would be interoperable;

- Improve capabilities of participants to search for, confiscate, and establish safe control over unlawfully held nuclear or other radioactive materials and substances or devices using them;

- Prevent the provision of safe haven to terrorists and financial or economic resources to terrorists seeking to acquire or use nuclear and other radioactive materials and substances;

- Ensure adequate respective national legal and regulatory frameworks sufficient to provide for the implementation of appropriate criminal and, if applicable, civil liability for terrorists and those who facilitate acts of nuclear terrorism;

- Improve capabilities of participants for response, mitigation, and investigation, in cases of terrorist attacks involving the use of nuclear and other radioactive materials and substances, including the development of technical means to identify nuclear and other radioactive materials and substances that are, or may be, involved in the incident; and

- Promote information sharing pertaining to the suppression of acts of nuclear terrorism and their facilitation, taking appropriate measures consistent with their national law and international obligations to protect the confidentiality of any information which they exchange in confidence.

PX202

**ADDITIONAL U.S. EFFORTS SUPPORTING A GLOBAL LAYERED DEFENSE**

The United States has also worked with partner nations through the United Nations and the IAEA to reduce the threat of WMD in the hands of terrorists. In the past few years, the UN Security Council has passed two important resolutions related to the prevention of terrorism and the proliferation of WMD. In 2001, the Security Council adopted Resolution 1373, which requires all UN member states to refrain from providing any support, active or passive, to terrorists, and to work together to limit terrorist movement and safe haven. In 2004, the Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery. The United States remains committed to full implementation of both UN Security Council Resolutions 1373 and 1540 and stands ready to support our partners in this area.

In 2005, the UN General Assembly adopted the Convention on the Suppression of Acts of Nuclear Terrorism (Nuclear Terrorism Convention). The United States was one of the first signatories. There are now over 100 signatories to this Convention, and the United States is taking steps to prepare for ratification. The adoption of the Nuclear Terrorism Convention, and the recent adoption of the Amendment to the Convention on the Physical Protection of Nuclear Material and the Protocol to the Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, both U.S. initiatives, underscore the importance that many countries are now placing on cooperating to reduce the risk of WMD terrorism.

## CONCLUSION

The potential threat of terrorists acquiring and using WMD poses one of the greatest security challenges facing the United States and our international partners today. During the past year, the U.S. Government has built on a range of activities and launched new efforts to prevent, protect against, and respond to the threat or use of WMD. Together with partner nations and international organizations, the United States will continue to take the initiative to reduce the global risk of WMD terrorism.

PX202

# CHAPTER 5.
## TERRORIST SAFE HAVENS (7120 REPORT)
*(Update of Information Originally Reported Under Section 7120(b) of the Intelligence Reform and Terrorist Prevention Act)*

Section 2656f(b) requires that this report include "an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act." Section 7120(b) includes certain reporting requirements relating to terrorist "sanctuaries" in addition to other reporting requirements. [We have integrated the terrorist sanctuary reporting required under Section 7120(b) in the present chapter. Because the term "sanctuary" is commonly associated with places of worship, we have, for greater clarity and for consistency with the terminology used elsewhere in Country Reports on Terrorism, referred instead here to terrorist "safe havens." We interpret terrorist "safe haven" to have the same meaning as terrorist "sanctuary" for purposes of Section 7120(b).

**The 7120 report includes:**

1. Terrorist Safe Havens:  Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
2. Support for Pakistan
3. Collaboration with Saudi Arabia
4. Struggle of Ideas in the Islamic World
5. Outreach through the Broadcast Media
6. Visas for Participants in United States Programs
7. Basic Education in Muslim Countries
8. Economic Reform

### 5.1. TERRORIST SAFE HAVENS

Terrorist safe havens are defined in this report as ungoverned, under-governed, or ill-governed areas of a country and non-physical areas where terrorists that constitute a threat to U.S. national security interests are able to organize, plan, raise funds, communicate, recruit, train, and operate in relative security because of inadequate governance capacity, political will, or both. Physical safe havens provide security for terrorist leaders, allowing them to plan acts of terrorism around the world. Global communications and financial systems, especially those created by electronic infrastructure such as the internet, global media, and unregulated economic activity, further allow terrorists to carry out activities, particularly the dissemination of propaganda and misinformation, without the need for a physical safe haven. These "virtual" havens are highly mobile, difficult to track, and difficult to control, and are not based in any particular state. This part of the report, however, will not address virtual safe havens, focusing instead on physical safe havens.

PX202

## AFRICA

**Somalia:** A small number of al-Qaida operatives found safe haven in East Africa, particularly Somalia, where they continued to pose a serious threat to American and allied interests in the region. Although these elements were severely disrupted at year's end as a result of Ethiopian and Somali Transitional Federal Government military actions, AQ continued to operate in Somalia and elsewhere in East Africa. Somalia remains a concern given the country's long unguarded coastline, porous borders, continued political instability, and proximity to the Arabian Peninsula all of which provide opportunities for terrorist transit and/or safe haven. AQ remains likely to make common cause with Somali extremists.

**The Trans-Sahara:** The Algeria based Salafist Group for Preaching and Combat (AQIM/GSPC) officially merged with al-Qaida in September, and subsequently changed its name to al-Qaida in the Islamic Maghreb (AQIM). The AQIM/GSPC continues to operate in the Trans-Sahara region, crossing difficult-to-patrol borders between Mali, Mauritania, Niger, Algeria, and Chad to recruit extremists within the region for training and terrorist operations in the Trans-Sahara, and possibly for operations outside the region. Its new alliance with Al-Qaida potentially has given it access to more resources and training.

Northern Mali served as a potential safe haven for terrorists, traffickers, and smugglers because the region's remoteness and harsh desert climate discouraged effective assertion of central government control. The al-Qaida-aligned AQIM/GSPC maintained a small-scale presence using sparsely populated areas in northern Mali as a safe haven, although the group does not maintain permanent facilities and is constantly on the move. Since a brief exchange of gunfire in April 2004, during which four Malian armed forces personnel were wounded, there have been no confrontations between the Malian military and the AQIM/GSPC. In September and October, a group of Malian Tuareg rebels, known as the Alliance for Democracy and Change (ADC), engaged in two fire-fights with the AQIM/GSPC in northern Mali. The Malian government has announced no official position on the violence between the ADC and AQIM/GSPC, nor did it attempt to confront AQIM/GSPC elements in the North or prevent their use of Malian territory in 2006.

The Government of Mauritania aggressively pursued AQIM/GSPC members on its territory, and several AQIM/GSPC members who attempted to infiltrate the country were arrested. In contrast with 2005, there were no terrorist attacks on Mauritanian soil. However, fighting between the AQIM/GSPC and Tuareg rebels in Northern Mali occasionally threatened the border region.

## EAST ASIA AND PACIFIC

**The Sulu/Sulawesi Seas Littoral:** Southeast Asia includes a safe haven area composed of the Sulawesi Sea and Sulu Archipelago, which sit astride the maritime boundary between Indonesia, Malaysia, and the Philippines. The geography of the thousands of islands in the region makes them very difficult for authorities to monitor. The range of non-terrorist activities, both licit and illicit, that are occurring in this maritime area pose another challenge to identifying and countering the terrorist threat. Although Indonesia, Malaysia, and the Philippines have improved their efforts to control their shared maritime boundaries, the area remained difficult to control. Surveillance is partial at best, and traditional smuggling and piracy groups provided an effective cover for terrorist activities in the area, such as movement of personnel, equipment, and funds. This area represents a safe haven for the AQ-linked Jemaah Islamiya (JI) organization and the Philippine Abu Sayyaf Group (ASG).

PX202

In 2006, Malaysian authorities arrested several members of a JI support cell in Sabah,  Malaysia, who were facilitating JI activities across the tri-border area. In December, the Malaysian Defense Minister/Deputy Prime Minister and his Indonesian counterpart announced an initiative to enhance bilateral police cooperation along the land border on Borneo.

- **The Southern Philippines.**  The Abu Sayyaf Group (ASG), responsible for multiple bomb- ings and kidnappings throughout the southern Philippines in recent years, remained active, although weakened. Several key operatives, including ASG leader Khadaffy Janjalani and his lieutenant Abu Solaiman, were killed during a counterterrorism offensive by the Armed Forces of the Philippines. JI and ASG operatives continued to enjoy safe haven in the Southern Philippines, but sustained, effective counterterrorist field operations by the Phil- ippine military forces on key islands of the Sulu archipelago have had a marked impact on the terrorists' freedom of action.  Development programs, civil-military affairs projects such as infrastructure construction, medical and dental clinics, and other measures have undermined public sympathy for terrorist groups and boosted popular support for the government.

- **Indonesia.**  Although Indonesia has made significant progress in weakening the JI terrorist organization, JI continues to operate in Indonesia, a geographically  widespread archipelago country with porous borders and CT resource constraints. Key JI operational planner Noordin Mat Top remains on the run, although aggressively pursued by Indonesian CT authorities.

# NEAR EAST ASIA

**Iraq:** Iraq is not currently a terrorist safe haven, but terrorists, including Sunni groups like al-Qaida in Iraq (AQI), Ansar al-Islam (AI), and Ansar al-Sunna (AS), as well as Shia extremists and other groups, view Iraq as a potential safe haven and are attempting to make it a reality.

The June 7 death of AQI leader, Abu Musab al-Zarqawi, damaged the group's leadership but did not diminish attacks against Coalition Forces, Iraqi civilians and infrastructure nor did it halt overall increasing attack trends by the group and other affiliated groups. Senior Iraqi officials, including Iraqi President Talabani, traveled to Iran throughout the year encouraging the Iranian government to support Iraq's political process and to stop material support of terrorist groups and militias. Although efforts by the Iraqi government, the United States, Coalition partners, and the international commu- nity are helping to thwart the terrorists' ambitions, the battle is not over. Prospects for increasing stability in Iraq over the next year will depend on: the extent to which the Iraqi government and political leaders can establish effective national institutions that transcend sectarian or ethnic inter- ests and, within this context, the willingness of the security forces to pursue extremist elements of all kinds; the extent to which extremists, most notably AQI, can be defeated in their attempt to foment inter-sectarian struggle between Shia and Sunnis; and the extent to which Iraq's neighbors, especially Iran and Syria, can be persuaded to stop the flow of militants and munitions across their borders.

- **Northern Iraq.** The Kongra-Gel/PKK maintains an active presence in northern Iraq, from which it coordinates attacks in the predominantly ethnic Kurdish areas of southeastern Turkey and provides logistical support to forces that launch attacks into Turkey, primarily against Turkish security forces, local Turkish officials, and villagers who oppose the orga- nization. In an effort to demonstrate further that the Iraqi government would not allow

PX202

Iraq to become a safe haven for terrorist organizations, Prime Minister Nuri al-Maliki appointed the Minister of State for National Security, Shirwan al-Waeli, as the Iraq coordinator for PKK issues.

**Lebanon:** In accordance with UNSC Resolution 1701, the Lebanese Armed Forces (LAF) strengthened its border presence and deployed 15,000 troops to patrols in the south, establishing itself in this region for the first time in 30 years. The LAF was assisted by UNIFIL, authorized to deploy up to 15,000 international peacekeepers south of the Litani River. Also, the Internal Security Force created a special unit to combat terrorism and established branches of this unit to preempt terrorist activity in northern and central Lebanon. Despite these steps, Lebanon remains a safe haven for terrorist activities. Hizballah remains the most prominent and powerful terrorist group in Lebanon, with a strong influence among Lebanon's large Shia community. Hizballah maintains offices in Beirut and elsewhere in the country, has official liaison officers to the security services, is represented by elected deputies in parliament, and has two ministers in the cabinet (although they have suspended their participation in the government). Hizballah is still recognized by the Lebanese government as a legitimate "resistance group" and political party.

The unstable political situation in Lebanon also contributed to enabling foreign Sunni extremists with links to AQ to infiltrate Lebanon and to set up cells, including within the Palestinian refugee camps. Palestinian extremist groups also have exploited the absence of Lebanese government authority within the 12 refugee camps, which have become terrorist safe havens and LAF no-go zones. We believe that some of these groups, such as AQ-associated Asbat al-Ansar, and Fatah al-Islam, have used the safe haven within the camps to train for terrorist attacks in Lebanon proper.

See Chapter 3, State Sponsors of Terrorism, for discussions on Iran and Syria, which provide safe haven to Hizballah and Palestinian terrorist groups, and are used as safe havens by al-Qaida-linked operatives and groups.

**Yemen:**  AQ's operational structure in Yemen has been weakened and dispersed, but concerns remain about the organization's attempts to reconstitute operational cells there. Yemen continues to increase its maritime security capabilities, but land border security along the extensive frontier with Saudi Arabia remains a problem, despite increased Yemeni-Saudi cooperation on bilateral security issues.

# SOUTHWEST ASIA

**Afghan-Pakistan Border:** Historically, Islamabad and Kabul have not exerted comprehensive control over the mountainous and sparsely populated Afghan-Pakistan border – the famed "Durand Line." Fiercely independent Pashtun and Baluch tribes straddle the border, which is routinely crossed by militants and extremists.

**Pakistan:** The Federally Administered Tribal Areas (FATA) of Pakistan have become a safe haven for AQ terrorists and Afghan insurgents since the fall of the Taliban in December 2001. Islamist Deobandi groups and many local tribesmen in the FATA continue to resist the government's efforts to improve governance and administrative control at the expense of longstanding local autonomy. Despite Pakistan's efforts to eliminate threats and establish effective governance in the FATA, these tribal areas continued to be terrorist safe havens and sources of instability for Pakistan and its neighbors. The government maintains approximately 80,000 troops, including Army and Frontier Corps (FC) units, along the Afghanistan border. The U.S. plans to help modernize and increase the capacity of the Frontier Corps so they can become a more effective force. The Pakistani government expects to close four Afghan refugee camps—in which terrorists and violent extremists often hide — this

**PX202**

year. Pakistan Army and FC units have targeted and raided AQ and other militant safe havens in the FATA. The failure of the tribal leaders in the FATA to fulfill their promises to the government under the terms of the North Waziristan agreement signed in September, failed to stem insurgent infiltration into Afghanistan.

In order to increase the central government's writ in the FATA, the Government of Pakistan is implementing a comprehensive approach with three prongs: political, security, and developmental. For the political prong, Pakistan seeks to bolster effective governance by empowering local officials. For the security prong, Pakistan's objective is to increase the capacity and efficacy of local security forces. For the developmental prong, the Government of Pakistan has designed a comprehensive sustainable development plan for the region. The plan concentrates on four sectors (basic human services, natural resources, communication/ infrastructure, and economic development) and, if fully implemented, would cost $2 billion. The plan was developed with the extensive grassroots participation of all stakeholders and will provide essential economic and livelihood opportunities while upgrading and expanding social services to a population at risk for recruitment by extremist and terrorist organizations.

- **Afghanistan:** The Afghan government, in concert with ISAF/NATO forces and the international community, continues efforts to build security on the Afghan side of the border. The border areas remain contested , however, with ongoing insurgent and terrorist attacks, to include al-Qaida activity. Taliban terrorist attacks, alongside with those of associated extremist movements such as Hizb-e-Islami Gulbuddin (HIG) and the Haqqani network, continued throughout Afghanistan. Taliban-sponsored insurgency, terrorism, and related narcotics cultivation remained particularly prevalent in the South and East of the country.

## WESTERN HEMISPHERE

**Colombia Border Region:** This region includes the borders between Colombia on one side, and Venezuela, Ecuador, Peru, Panama, and Brazil on the other. Rough terrain, dense forest cover, low population densities, and lack of government authority and presence in this area create an area of safe haven for insurgent and terrorist groups, including especially the Revolutionary Armed Forces of Colombia (FARC). Brazil, Ecuador, Peru, and Panama have adopted an tacit policy mix of containment and non-confrontation with Colombian narcoterrorist groups, with, however, some confrontations occurring.  Much of this depends on local decisions and relations. The FARC uses remote areas in Colombia's border regions to rest and regroup, procure supplies, and stage and train for terrorist attacks. In addition, the FARC and another designated terrorist organization, the National Liberation Army (ELN) regard Venezuelan territory near the border as a safe haven and often use the area for cross-border incursions.  Splinter groups of the FARC and breakaway members of another designated terrorist organization, the United Self-Defense Forces of Colombia (AUC), operate in various parts of Venezuela and are involved in drug trafficking.

**The Tri-Border Area (Argentina, Brazil, and Paraguay):** The United States remains concerned that Hizballah and HAMAS are using the Tri-Border area as a safe haven in which to raise funds by participating in illicit activities and soliciting donations from extremists within the sizable Muslim communities in the region and elsewhere in Argentina, Brazil, and Paraguay. Although there was no corroborated information that these or other Islamic extremist groups used the region for military-type training, or planning of terrorist operations, suspected supporters of Islamic terrorist groups, including Hizballah, take advantage of loosely regulated territory and proximity to Muslim communities in Ciudad del Este, Paraguay, and Foz do Iguacu, Brazil, to engage in illegal activity and illicit

PX202

fundraising. The governments of the TBA have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early 1990s, the governments established a mechanism to address these illicit activities.

## STRATEGIES, TACTICS, TOOLS FOR DISRUPTING OR ELIMINATING SAFE HAVENS

Corruption, poverty, a lack of civic institutions and social services, politically repressive governments, inadequate or unjust law enforcement and legal systems are conditions terrorists exploit for recruitment, operational planning or physical safe haven. Efforts to build partner capacity and encourage states to cooperate more effectively at the local and regional level are key to denying terrorists safe haven. U.S. Ambassadors, as the President's personal representatives abroad, have a unique responsibility to bring all elements of national power to bear against the terrorist enemy. They lead interagency Country Teams that develop strategies to help host nations understand the threat and to strengthen their political will and capacity to counter it.

Defeating the terrorist enemy requires a comprehensive effort executed locally, nationally, regionally and globally. Working with partner nations, we must eliminate terrorist leadership, but incarcerating or killing terrorists will not achieve an end to terrorism. We must simultaneously eliminate terrorist safe havens, tailoring regional strategies to disaggregate terrorist networks, breaking terrorist financial, travel, communications and intelligence links. Finally, and most challenging, we must address the underlying conditions that terrorists exploit. These include geo-political issues, lack of economic opportunity and political participation, ethnic conflict, ungoverned space, or political injustice.

**Regional Strategic Initiative:** Building on this understanding, we have worked to develop the Regional Strategic Initiative (RSI), an effort to develop flexible regional networks of interconnected Country Teams. The State Department's Office of the Coordinator for Counterterrorism (S/CT) is working with ambassadors and interagency representatives in key terrorist theaters of operation to assess the threat and devise collaborative strategies, action plans, and policy recommendations.

The RSI is a key tool in promoting cooperation between our partners in the War on Terror – for example with Malaysia, Indonesia and the Philippines as they confront terrorist transit across the Sulawesi Sea; or among Mauritania, Algeria, Morocco, Niger, Chad, and Mali, to counter a GSPC/AQIM enemy recruiting and hiding in the desert that sits astride national borders.  Terrorists are highly adaptable; defeating them requires both centralized coordination and field authority. Resources and responses must be applied in a rapid, flexible, and focused manner. The RSI helps achieve this coordinated approach.

As of December 2006, RSI strategy groups were in place for Southeast Asia, Iraq and its neighbors, the Eastern Mediterranean, the Western Mediterranean, and the Horn of Africa.  These groups are chaired by Ambassadors, with interagency representatives participating. RSI programs focus on developing a common understanding of the strategic situation in a region. Using this shared perspective, networked Country Teams then identify opportunities for collaboration and pool resources not only to eliminate terrorism safe havens, but also to address the conditions that terrorists exploit for recruitment.

Terrorists operate without regard to national boundaries. To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships and increasingly operate in a regional context. Denying safe haven plays a major role in undermining terrorists' capacity to

PX202

operate effectively and forms a key element of U.S. counterterrorism strategy as well as the cornerstone of UN Security Council Resolution 1373, adopted in September 2001. UNSCR 1373 specifically targets terrorists' ability to move across international borders and find safe haven, to solicit and move funds, and to acquire weapons. It also calls on UN member states to enact laws criminalizing terrorist activity and support to enact such laws.

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

Since the terrorist attacks of September 11, 2001, the United States has acted to block funding of terrorists and their supporters and to promote international cooperation against them. On September 23, 2001, the President signed E.O. 13224, giving the United States a powerful tool to impede terrorist funding. This executive order provides a means to disrupt the financial support network for terrorists and terrorist organizations by authorizing the U.S. government to designate and block assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism. In addition, because of the pervasiveness and expansiveness of the financial base of foreign terrorists, the order authorizes the U.S. government to block the assets of individuals and entities that provide support, offer assistance to, or otherwise associate with designated terrorists and terrorist organizations. The order also covers their subsidiaries, front organizations, agents, and associates.

The Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, continues to designate Foreign Terrorist Organizations (FTOs) pursuant to Section 219 of the Immigration and Nationality Act, as amended. These designations play a critical role in the U.S. fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business. Among the consequences of such a designation, it is unlawful for U.S. citizens or any persons subject to the jurisdiction of the U.S. to provide funds or material support to a designated FTO. U.S. financial institutions are also required to freeze the funds of designated FTOs.

Executive Order and Foreign Terrorist Organization designations support U.S. efforts to curb the financing of terrorism and encourage other nations to do the same. They internationally stigmatize and isolate designated terrorist entities and individuals. They also deter donations or contributions to, and economic transactions with, named entities and individuals. In addition, they heighten public awareness and knowledge of terrorist organizations and signal to other governments U.S. concerns about named entities and individuals.

International cooperation remains fundamental to our common endeavors for the simple reason that most of the funds used to support terrorism are located outside the jurisdiction of the United States. International cooperation is essential to initiatives in fields ranging from intelligence and law enforcement coordination to targeted financial sanctions to norms and standards of financial regulation.

United Nations Security Council Resolution 1267 and successor resolutions require member states to impose financial and other sanctions on listed groups and individuals associated with Usama bin Ladin, the Taliban, or al-Qaida. In 2006, UNSCR 1735 was adopted, clarifying procedures for both listing and delisting terrorist groups and entities under 1267 in an effort to increase transparency. UNSCR 1735, also encourages member states and the 1267 Committee to update the Taliban section of the 1267 consolidated sanctions list, both by submitting additional names for inclusion on the Consolidate List of individuals and entities associated with the Taliban, especially those responsible for the recent upsurge of Taliban violence in Afghanistan, as well as considering petitions to

162

PX202

remove listed members and/or associates no longer associated with the Taliban. In December 2006, the United States and France co-sponsored UNSCR 1730 in response to a call for improving proce-dures for delisting individuals and entities from the 1267 Committee's Consolidated List.

**In 2006, the United States and other UN members designated a number of individuals and entities:**

- On February 8, the United States designated five individuals and four entities for their role in financing the Libya Islamic Fight Group (LIFG), an AQ affiliate known for engaging in terrorist activity in Libyan and cooperating with AQ worldwide. Abd Al-Rahman Al-Faqih, Ghuma Abd'rabbah, Abdulbaqi Mohammed Khaled, Tahir Nasuf, and Mohammed Benham-medi were designated pursuant to E.O.13224 as were the four entities Sara Properties Ltd., Meadowbrook Investments Ltd., Sanabel Relief Agency Ltd., and Ozlam Properties, Ltd. On February 7, the UN 1267 Sanctions Committee added these individuals and enti-ties and entities to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qaida.

- On March 23, the United States designated Al-Manar, a satellite owned or controlled by the Iran-funded Hizballah terrorist network. Also designated were Al-Nour Radio and the Lebanese Media group, the parent company to both Al-Manar and Al-Nour.

- On April 13, the United States designated four top leaders of the al-Qaida-linked Southeast Asian terrorist organization Jemaah Islamiya (JI) pursuant to E.O. 13224: Abdullah Anshori, Abu Bakar Ba'asyir, Gun Gun Rusman Gunawan, and Taufik Rifki.

- On July 20, the United States designated Abu Sufian Al Salambai Muhammed Ahmed Abd Al-Razziq for high level ties to and support for the al-Qaida network pursuant to E.O.13224.

- On August 4, the United States designated the Indonesian and Philippine branches of the Saudi-based International Islamic Relief Organization (IIRO) for facilitating fundraising for al-Qaida and affiliated terrorist groups pursuant to E.O. 13224. The Executive Director of the Eastern Province Branch of IIRO in Saudi Arabia, Abd Al Hamid Sulaiman Al-Mujil, was also designated for using his position to bankroll the al-Qaida network in Southeast Asia. On August 4, the UN 1267 Sanctions Committee added Abd Al Hamid Sulaiman Al-Mujil and the Philippine branch of the IIRO to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qaida.

- On August 30, the Islamic Resistance Support Organization (IRSO), a key Hizballah fund-raising organization, was designated under E.O.13224.

- On September 7, the United States designated two financial companies and one individual that provided financial support to the Iran funded Hizballah terrorist network. Bayt al-Mal and the Yousser Company as well as Husayn al-Shami, the head of Bayt al-Mal and a senior Hizballah leader, were designated under E.O.13224.

- On December 6, the United States designated nine individuals and two entities located in the triple frontier of Argentina, Brazil and Paraguay that provided financial and logistical support to Hizballah. Muhammad Yusuf Abdallah, Hamzi Ahmad Barakat, Hatim Ahmad Barakat, Muhammad Fayez Barakat, Muhammad Tarabain Chamas, Saleh Mahmud Fayad, Sobhi Mahmud Fayad, Ali Muhammad Kazan, and Farouk Omairi, and two businesses, Casa Hamze and Galeria Page; were designated under E.O. 13224.

PX202

- On December 7, the United States designated five individuals under E.O.13224 for providing financial support to al-Qaida and other terrorist organizations as well as facilitating terrorist activity. Mullah Krekar, Hamed Al Ali, Jaber Al Jalamah, Mubarak Al Btahali, and Mohamed Moumou were designated. On December 7, the UN 1267 Sanctions Committee approved the request that Mohamed Moumou and Mullah Krekar be added to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qaida.

- December 12, Mohammed Al-Ghabra, a British citizen who provided material and logistical support to al-Qaida and other terrorist organizations, was added to the UN 1267 Sanctions Committee list. On December 19, the United States designated Mohammed Al-Ghabra under E.O. 13224.



*PHILIPPINES, Manila: An exhibitor prepares "Rewards for Justice" posters of wanted Filipino terrorist belonging to the Abu Sayyaf group and the two Indonesians from Jemaah Islamiyah at the counterterrorism forum in Manila 27 September 2006. AFP Photo/Joel Nito*

PX202

- As of December 31, 2006, the United States has designated a total of 469 individuals and entities as terrorists, their financiers, or facilitators, since 2001. The global community has frozen more than $153 million in terrorist-related assets.

## BRINGING TERRORISTS TO JUSTICE

The Rewards for Justice (RFJ) Program continues to be one of America's most valuable assets in the War on Terror. Through RFJ, the Secretary of State may offer rewards for information that prevents or successfully resolves an act of international terrorism against the United States. Rewards of up to $25 million have been authorized for information leading to the capture of Usama bin Laden and other key al-Qaida leaders. Since its inception in 1984, RFJ has paid more than $62 million to over 40 people who provided credible information. In 2006, rewards totaling $1.1 million were approved for the successful resolution of terrorist cases in Afghanistan and the Philippines. In January, the Department of State paid a reward of $500,000 to an individual who assisted U.S. authorities in resolving a terrorist case involving al-Qaida operative Habis Abdulla al-Saoub.

In January and May, two public rewards ceremonies were jointly sponsored by the U.S. Embassy in Manila and the Government of the Philippines. In January, the Department paid a reward of $100,000 to an individual who helped the Government of the Philippines bring to justice Abu Sayyaf Group member Toting Craft Hanno. In May, the Department paid rewards of $250,000 each to two persons who supported Filipino authorities in their efforts to bring Rajah Solaiman Movement leader Ahmad Santos to justice.

New initiatives included adding five new reward offers at $1 million each for key al-Qaida leaders. In June, Abu Ayyub al-Masri was added to the RFJ program upon the death of Abu Musab al-Zarqawi, the former leader of al-Qaida in Iraq. In addition, the Secretary approved a reward of up to $1 million for the American-born al-Qaida terrorist Adam Gadahn. In October, the Bureau of Diplomatic Security and the FBI conducted a joint press conference announcing the RFJ reward offer and the indictment of Gadahn on charges of treason.

## BILATERAL AND MULTILATERAL EFFORTS TO IDENTIFY AND ADDRESS TERRORIST SAFE HAVENS

Throughout the year, the United States worked closely with multilateral partners in numerous counterterrorist financing efforts, including the Counterterrorism Committee of the United Nations, the Egmont Group of Financial Intelligence Units, the Financial Action Task Force (FATF), the G8's Counterterrorism Assistance Group (CTAG), and international financial institutions. In addition, the United States continued its regular dialogue on terrorism finance with the European Union. Since its launch in September 2004, the dialogue has served as the framework for ongoing exchanges to promote information sharing and cooperation on FATF and on technical assistance issues.

European nations are active participants in a variety of multilateral organizations that contributed to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF), the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). The United States and its partners worked through these organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and institutionalize the War on Terror globally. The World Bank and International Monetary Fund also have pledged to provide countries with training to increase their capacity to combat money laundering and terrorist financing.

PX202

**The United Nations.** The United Nations continued to devote energy to the fight against terrorism. The Security Council adopted four resolutions related to terrorism:

- Resolution 1673, adopted in April, reauthorized and improved the mandate of the 1540 committee, which deals with nonproliferation and preventing terrorist access to WMD.

- Resolution 1686, adopted in June, extended the mandate of the International Independent Investigation Commission and supported its intention to extend further technical assistance to the Lebanese authorities regarding their investigations in terrorist attacks in Lebanon since October 1, 2004.

- Resolution 1699, adopted in August, endorsed and encouraged increased cooperation between the UN and INTERPOL to help facilitate the implementation of sanctions, including counterterrorism sanctions.

- Resolution 1735, adopted in December, strengthened the current sanctions regime against the Taliban, Usama bin Laden, and al-Qaida.

The Counter-Terrorism Committee (CTC) was established by Security Council Resolution 1373 after September 11, 2001, with the goal of enhancing the ability of UN member states to combat terrorism. The Counter-Terrorism Committee's Executive Directorate (CTED), established by Resolution 1535 in 2004, became fully operational in December 2005. CTED's mandate is to enhance the Committee's ability to monitor the implementation of Resolution 1373 and to continue its capacity-building work by facilitating technical assistance to member states and promoting closer cooperation and coordination with international, regional, and sub-regional organizations. It also conducts visits in member states to assess the implementation of Resolution 1373. CTED visited ten states in 2006, and the CTC has approved another 17 visits for the future. Resolution 1624 (2005), concerning incitement to terrorism and denial of safe havens, also directs the CTC, among other things, to include implementation of Resolution 1624 (2005) in its dialogue with states. CTED is doing so in its visits to member states.

The 1267 Sanctions Committee, also established by the Security Council, maintains a list of individuals and entities associated with al-Qaida, the Taliban, and/or Usama bin Ladin who are subject to international sanctions -- assets freeze, travel ban, and arms embargo -- that member states are obligated to implement. The Committee entered into an agreement to exchange information with Interpol with the goal of better enforcing the sanctions.

In 2006, the UN General Assembly took several important steps to counterterrorism. The General Assembly negotiated and adopted three terrorism-related resolutions, 61/40, 61/86, and 61/161, and continued work on the negotiation of a Comprehensive Convention on International Terrorism. The General Assembly concluded the International Convention for the Suppression of Acts of Nuclear Terrorism in 2005, and, by July 2006, 106 states had signed this important new instrument. In September 2006, the United Nations General Assembly adopted the United Nations Global Counter-Terrorism Strategy.

Then-UN Secretary General, Kofi Annan continued to use his office to focus the international community on terrorism. He took steps to institutionalize the Counterterrorism Implementation Task Force, which brings together 23 United Nations system entities that address different aspects of terrorism. He also established a focal point within the Secretariat to help coordinate a civil society campaign to counterterrorism and suggested the creation of an informal group of UN technical assistance providers, donors and recipients to exchange information and coordinate efforts.

166

PX202

UN Secretariat staff of the Terrorism Prevention Branch in Vienna, Austria, continued to help countries build the legal framework necessary to become party to and implement the international counterterrorism conventions and protocols.

UN Specialized Agencies are also involved in the work of fighting terrorism. For example, the International Civil Aviation Organization adopted passport security standards, and the International Maritime Organization engaged in security-related activities designed to make it harder for terrorists to operate in the commercial shipping arena. In February, a new protocol to the 1988 Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation and a new protocol to the 1988 Protocol for the Suppression of Unlawful Acts against Fixed Platforms on the Continental Shelf opened for signature. The International Atomic Energy Agency (IAEA) launched a nuclear security action plan to combat the threat of terrorism involving nuclear and other radioactive materials. The IAEA also promoted more rigorous standards for securing radioactive sources and released the first international export control framework for radioactive sources. In February, under a global security initiative, an IAEA-supported operation safely conditioned, packaged, and shipped radioactive neutron sources from three African countries to the United States for ultimate disposition. In April, the IAEA supported the removal of potentially weapon-usable highly enriched uranium from a civilian research reactor in Uzbekistan. In July, two potentially dangerous radioactive devices were successfully secured in the Republic of Georgia. In December, the IAEA supported the return to Russia of over 200 kg of highly enriched uranium from a research reactor in Germany.

## G8 COUNTERTERRORISM ACTIONS

The Group of Eight (G8), the United States, Canada, France, Germany, Italy, Japan, Russia, and the United Kingdom, has been instrumental in developing cutting-edge counterterrorism standards and practices. These included enhanced travel document security standards, as well as strengthened controls over exports and stockpile security to mitigate the threat to airports from illicit acquisition of shoulder-fired anti-aircraft missiles (man portable air defense systems, or MANPADS).

G8 counterterrorism initiatives often have an impact well beyond the borders of G8 member states since the group actively seeks to promulgate the standards and practices it develops to international standard-setting organizations. In 2006, the G8 completed the Secure and Facilitated International Travel Initiative (SAFTI) and produced two counterterrorism-related documents for the St. Petersburg Summit.

Since 2004, G8 leaders have expressed their commitment to defending against bioterrorism. Through the work of the Bioterrorism Experts Group (BTEX), G8 efforts to counter bioterrorism include strengthening national and international biosurveillance capabilities, increasing protection of the global food supply, and improving bioterrorism response and mitigation capabilities.

Securing Critical Energy Infrastructure. At the July 2006 St. Petersburg Summit, President Bush and the other leaders of the G8 announced a plan of action to secure global critical energy infrastructures, including:

- Defining and ranking vulnerabilities of critical energy infrastructure sites;

- Assessing emerging and potential risks of terrorists attacks; and

- Developing best practices for effective security across all energy sectors.

PX202

**Counterterrorism Action Group (CTAG):** At the June 2003 Evian Summit, G8 leaders adopted a plan to build political will and capacity to combat terrorism globally, and established the Counterterrorism Action Group (CTAG) to implement this plan. CTAG supports the UN Counter-Terrorism Committee's efforts to monitor and promote implementation of UNSCR 1373 by developing an active forum for donors to coordinate counterterrorism cooperation with, and assistance to, third countries. CTAG promotes counterterrorism by prioritizing needs, and targeting and coordinating assistance to expand counterterrorism capacity in recipient countries. CTAG also encourages all countries to meet their obligations under UNSCR 1373 and, for states party to them, the 13 international counterterrorism conventions and protocols.

Under the leadership of the rotating G8 presidency, CTAG meets three times per year with the active participation of G8 member states, the European Commission, the UN Counterterrorism Committee, and other countries and organizations. Coordination meetings hosted by the local embassy of the G8 presidency were also held among CTAG members' diplomatic missions in recipient countries.

**In 2006, CTAG coordinated diplomatic, donor cooperation, and donor assistance efforts, including:**

- Cooperated with the UN Counterterrorism Committee Executive Directorate (CTED) during country visits by contributing significantly to the preparation of the visits, meeting with CTED during those visits, and monitoring the implementation by visited countries of the CTC's recommendations;

- Facilitated universal adherence to the 13 international counterterrorism conventions and protocols by encouraging more than a dozen countries to approve unratified instruments;

- Focused counterterrorism donor assistance on needs in the Asia-Pacific Economic Cooperation (APEC) region, especially port and maritime security gaps, in concert with APEC's Counterterrorism Task Force;

- Coordinated donor assistance to help countries in the Asia and South America assess and improve airport security; and

- Promoted and assisting implementation of travel security and facilitation standards and practices being developed by the G8 under its Secure and Facilitated International Travel Initiative (SAFTI).

**Financial Action Task Force (FATF):** Under the Department of Treasury's leadership, the United States played a strong role in developing new initiatives within FATF to meet evolving anti-money laundering and counterterrorism finance threats. The United States became a co-chair, with Italy, of the newly created International Cooperation Review Group to examine AML/CTF systemic threats and participated in major FATF studies (e.g., Trade-Based Money Laundering) and FATF mutual evaluations.

**European Union (EU):** The United States and the European Union's Judicial Cooperation Unit (Eurojust) agreed to improve cooperation and information exchange among investigators and prosecutors, posting a U.S. Liaison Prosecutor at Eurojust. We continue to make progress toward ratification and entry into force of the U.S. - EU Extradition and Mutual Legal Assistance Agreements between the United States and EU member states. Expert level discussions have begun on mutual recognition of the EU Authorized Economic Operator provisions and the U.S. Customs -Trade Partnership Against Terrorism. We have begun a pilot project to the Container Security Initiative

PX202

for feeder ports, to increase security of goods transiting our ports, and continue to work jointly to refine our risk assessments. A pilot in Southampton under the U.S. Secure Freight Initiative should improve detection and response capabilities for high-risk container traffic.

In October, the United States and the EU concluded an interim agreement on the processing of passenger name record data. We are studying the comparability of our airport assessment programs and will continue to refine international airport security measures, as in our successful joint effort to establish a common standard for liquids in carry-on baggage.

The United States and the EU continued to improve procedures for information sharing and for proactively implementing FATF Special Recommendations, including enforcing cash declaration regulations for travelers and getting private sector financial institutions to improve implementation of asset freeze measures. We continue to exchange information and best practices in expert-level discussions. In 2006, conferences on terrorism finance and money laundering issues were held with sanctions implementers, analysts, and prosecutors and investigators. We are working on a public outreach statement on fairness and transparency in the implementation of sanctions regimes.

**Organization for Security and Cooperation in Europe (OSCE):**  The United States worked with the OSCE to establish and implement best counterterrorism practices and help build the capacity of OSCE members. OSCE members committed themselves to becoming parties to the 13 UN terrorism conventions and protocols, to work together to modernize travel documents and shipping container security, to prevent and suppress the financing of terrorist organizations, and to implement UNSC Resolution 1540 to counter WMD (related materials and the means of delivery) proliferation. The OSCE also held two regional workshops on ICAO's minimum security standards for handling and issuance of passports, sponsored visits by ICAO and other experts to provide technical advice to requesting countries on new travel document security features, and increased OSCE countries' cooperation with Interpol in reporting lost or stolen passports. The OSCE, in conjunction with the UNODC, held its second experts workshop in 2006 on promoting legal cooperation in criminal matters as related to terrorism, which covered such issues as extradition and mutual legal assistance. The OSCE also held a conference on countering the use of the Internet for terrorist purposes.

**North Atlantic Treaty Organization (NATO):** The North Atlantic Treaty Organization (NATO) plays a key role in combating terrorism at the regional level in Europe. First and foremost, NATO is contributing to the War on Terror by leading security and stability operations in Afghanistan and continuing Operation Active Endeavor (OAE), a naval operation that aims to combat terrorism by monitoring maritime traffic in the Mediterranean. The Alliance is also engaged in a far-reaching transformation of its forces and capabilities to better deter and defend against 21st Century threats, including terrorism, and is working closely with partner countries and organizations to ensure interoperability of forces and broad cooperation.

**Trans-Sahara Counterterrorism Partnership (TSCTP):**  The Trans-Sahara Counterterrorism Partnership (TSCTP) is a multi-faceted, multi-year strategy aimed at defeating terrorist organizations by strengthening regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security forces, promoting democratic governance, discrediting terrorist ideology, and reinforcing bilateral military ties with the United States. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the region, and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) in combating terrorism. See Chapter 2, Country Reports, Africa, for further information on the TSCTP.

PX202

**The African Union:** The African Union (AU) has several counterterrorism legal instruments, including a Convention on Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention, and a 2004 Plan of Action. See Chapter 2, Country Reports, Africa, for further information on the AU.

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF):** The United States works closely with the ten-member Association of Southeast Asian Nations (ASEAN), comprising Brunei, Burma, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand, and Vietnam to enhance counterterrorism cooperation. In July 2006, Secretary of State Rice and her ASEAN counterparts signed the "Framework Document for the Plan of Action to Implement the ASEAN-U.S. Enhanced Partnership." The Plan of Action identifies a range of measures to strengthen cooperation on maritime security, law enforcement, border security, information sharing, suppressing illicit money transfers and terrorist financial flows, curbing the abuse of NGOs and charities, as well as on other transnational crime issues. The United States actively participates in counterterrorism-related activities of the 26-member ASEAN Regional Forum (ARF), including the annual meetings on counterterrorism and transnational crime. The United States has continued efforts to increase maritime security cooperation by co-chairing with Singapore an ARF confidence-building measure in 2005 focused on preventing and countering terrorist attacks and other unlawful acts. This event built on earlier efforts to strengthen agreement on the key elements of maritime security among participants. Subsequent events, hosted by India and Japan respectively, have focused on expanding cooperation in capacity building for maritime security. In July of 2005, ARF Foreign Ministers adopted the "Statement on Information Sharing and Intelligence Exchange and Document Integrity and Security in Enhancing Cooperation to Combat Terrorism and other Transnational Crimes" in which ministers committed to improve cooperation among participants in these areas.

**Asia Pacific Economic Cooperation (APEC):** The 21 member economies of APEC (Australia, Brunei, Canada, Chile, China, Hong Kong, Indonesia, Japan, Republic of Korea, Malaysia, Mexico, New Zealand, Papua New Guinea, Peru, Philippines, Russia, Singapore, Chinese Taipei, Thailand, the United States, and Vietnam) are committed to creating a safe environment for the movement of goods, services, and people throughout the region. The APEC Counterterrorism Task Force (CTTF) was established in 2003 to coordinate implementation of Leaders' and Ministers' statements on counterterrorism and non-proliferation. The United States works within APEC to dismantle transnational terrorist groups and to eliminate the severe and growing danger posed by proliferation of weapons of mass destruction and their means of delivery.

In 2006, with Australian and Chilean co-sponsorship, the United States introduced the first bioterrorism/biodefense initiative in APEC to protect the food supply from deliberate contamination. The United States co-hosted an experts-level workshop in Bangkok in November to share experiences and develop best practices. APEC is also committed to bolstering regional maritime and port security, and to strengthening international non-proliferation regimes. In 2005, APEC members adopted the Framework for Secure Trade and provided capacity building to seven economies to assist with implementation of the International Ship and Port Facility Security code. APEC export control systems were strengthened through capacity building initiatives, such as the 2005 Export Control Conference for APEC Economies. APEC also ensured the safe handling of radioactive sources through an agreement to implement the International Atomic Energy Agency (IAEA) Code of Conduct and Import/Export Guidelines for Radioactive Sources by the end of 2006. Airport Security was further enhanced through APEC members' agreement to undertake Man Portable Air Defense Systems (MANPADS) Vulnerability Assessments at international airports based on ICAO or similar international guidelines. APEC enhanced travel security through improvements in travel document

security standards and the launch of a pilot project to share lost and stolen passport data between Australia, New Zealand, and the United States.  APEC also continues to combat terrorist financing in APEC economies through efforts to strengthen financial intelligence units.

**OAS Inter-American Committee against Terrorism (CICTE):**  CICTE delivered more than $5 million in counterterrorism capacity-building assistance in the region. CICTE provided training to nearly 500 port and airport security officials from 29 member states to help meet the requirements of the International Maritime Organization's International Ship and Port Facility Security (ISPS) code, and the International Civil Aviation Organization's (ICAO) new air security standards. CICTE advised 15 member state governments on how to meet the requirements of UNSCR 1373, the 13 international conventions and protocols relating to terrorism, and the Inter-American Convention against Terrorism (IACAT), which complements and expands on international conventions and protocols. CICTE also organized its sixth annual regular session in Bogota, Colombia.

**Three Plus One Group on Tri-Border Area Security (3+1):**  Argentina hosted a meeting of the 3+1 Group (Argentina, Brazil, Paraguay, and the United States) in December.  Delegates highlighted the importance of early warnings among States and the immediate exchange of information to prevent and combat illegal activities, and to deny refuge to those who finance, plan, or commit acts of terrorism. In November, Brazil inaugurated a new Regional Intelligence Center, in Foz do Iguacu, dedicated to coordinating intelligence activities of the police forces of Argentina, Brazil, and Paraguay, and invited Argentina and Paraguay to send official representatives to help staff the center.

## LONG-TERM GOALS AND PROGRAMS/ACTIONS DESIGNED TO REDUCE CONDITIONS THAT ALLOW TERRORIST SAFE HAVENS TO FORM

**The Middle East Partnership Initiative:** As President Bush noted, when an "entire region sees the promise of freedom in its midst, the terrorist ideology will become more and more irrelevant, until that day when it is viewed with contempt or ignored altogether."  Conversely, systems characterized by an absence of political choice, transparent governance, economic opportunities, and personal freedoms can become incubators for extremism, hate, and violence.

To this end, in 2006, the State Department's Middle East Partnership Initiative (MEPI) continued to provide tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from campaign schools to civic education to an Arab businesswomen's network. Despite a difficult political environment in the region throughout the year, reformers continued to provide reasons to believe that positive change is possible for the people of the Middle East. Examples of MEPI's work with reformers include the following:

**Political**

- MEPI-supported local and regional election monitors in Yemen reported a process with an absence of the violence of previous electoral contests in the country and with an opposition candidate garnering over 20 percent of the vote against the incumbent leader, a rarity in the region. Technical support also was provided to all parties contesting provincial and municipal elections on the same day;

- MEPI-supported domestic monitors in Bahrain observed the most competitive elections in the kingdom's history with a turnout of more than 70 percent and without the opposition boycotts that undermined the last round of elections.;

PX202

- Provided technical assistance to women candidates and voter awareness campaigns in Kuwait's first parliamentary elections through universal suffrage as Kuwait joined Oman, Bahrain, Qatar, and the UAE in enfranchising women in electoral processes;

- Continued to provide technical assistance to parties and candidates across the region in anticipation of new rounds of municipal and parliamentary elections in 2007;

- Strengthened the role of civil society in the democratic process by facilitating dialogue among activists, NGOs, and their respective governments within the framework of the G8's Broader Middle East and North Africa Initiative and by awarding direct grants to numerous civil society organizations across the region to advance the Freedom Agenda;

- Trained journalists in free and independent media techniques to support greater transparency and accountability in their countries.

**Economic**

- Provided technical and other assistance in support of successfully completed free trade agreements with Bahrain and Oman;

- Expanded trade capacity of Arab countries with training and technical assistance; a number of Gulf countries are drafting new labor laws and updating new customs codes and agricultural import/export standards;

- Provided entrepreneurial training for more than 300 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 35 alumni going on to start or expand businesses. At least 500 new jobs have been created following their participation in MEPI programs;

- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations;

- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters; and

- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman, update commercial codes to meet international standards in Bahrain and Oman, and provide continuing education programs for the judiciary.

**Education**

- Provided English language study to more than 4,500 underserved youth from 13 countries in the Middle East through a micro-scholarship program, bringing the total number of students reached with MEPI support to more than 12,000;

- Empowered young, highly motivated Arab men and women with leadership, problem-solving, and entrepreneurial skills through intensive five-week institutes. More than 200 students have participated, and most have started their own civic projects back home;

PX202

- Supported a regional civic-education network that promotes youth civic awareness and involvement. Examples of resulting youth-led projects included starting after-school classes for poor students and improving health services at local hospitals. The program is being widely accepted and adopted; for example, education officials committed to adopting Project Citizen in all schools in Marrakesh, Morocco; and

- Promoted critical thinking and independent reading with an initiative to provide more than 80 titles of high-quality American children's books to more than 3,000 schools in three Middle Eastern countries.

**Women's Empowerment**

- Strengthened the technology, business and advocacy skills of women across six Gulf nations;

- Established the first U.S.-Middle East Partnership for Breast Cancer Awareness and Research, which activated women across the region in private-public partnerships, civic engagement, and networking;

- Established business network hubs in six countries, focusing on training, professional development, and information sharing on laws, business opportunities, skills, and the global economy; and

- Focused on women's rights, particularly family law, in three Gulf states and Morocco.

**Antiterrorism Assistance Program (ATA):** The Antiterrorism Assistance Program (ATA) provides partner countries with the training, equipment, and technology needed to increase their capabilities to find and arrest terrorists, and to build the kind of cooperation and interactivity between law enforcement officers that has a lasting impact.

At the operational level, ATA alumni have led the investigation of a number of recent terrorist attacks. In Indonesia, a special unit trained and equipped by DS/ATA tracked SE Asia's most wanted terrorist, Dr. Azahari. The suspect refused to give himself up and was killed along with another accomplice. Azahari and his accomplice were responsible for the Bali bombing in 2002, the J.W. Marriott attack in 2003, and the bombing of the Australian Embassy in 2004. The ATA program has also been crucial in helping local initiatives take root. In Tanzania, ATA assistance mapped out the foundation for the establishment of a counterterrorism center and the implementation of an innovative mechanism to regularly communicate with Kenyan counterparts. In Colombia, ATA financed a training facility in Sibate, which has become an international training hub for officials across the Hemisphere.

ATA sponsored 289 courses and technical consultations and trained approximately 4,816 participants from 77 countries in 2006. In its two-decade long existence, ATA has trained more than 57,116 students from 151 countries, providing programs tailored to the needs of each partner nation and to local conditions. Such training included crisis management and response, cyber terrorism, dignitary protection, bomb detection, airport security, border control, kidnap intervention and hostage negotiation and rescue, response to incidents involving weapons of mass destruction, countering terrorist finance, and interdiction of terrorist organizations.  All courses emphasized law enforcement under the rule of law and respect for human rights.

PX202

**Terrorist Interdiction Program (TIP):** The Terrorist Interdiction Program (TIP) assisted priority countries at risk of terrorist activity to enhance their border security capabilities. TIP provided participating countries with a computerized watch listing system to identify suspect travelers at air, land, or sea ports of entry. TIP further promotes expanded cooperation and close liaison with host governments in the areas of rule of law, anticorruption, and law enforcement. Since 2001, the State Department has provided TIP assistance to more than 20 countries, assistance that was instrumental in impeding terrorist travel. Hundreds of individuals traveling on stolen passports in Pakistan, as well as wanted criminals, narcotics smugglers, and human traffickers have been identified and intercepted worldwide. The Terrorist Interdiction Program complements other counterterrorism-related U.S. Government efforts to enhance aviation, border, cyber, maritime, and transportation security.

**Counterterrorist Finance Training:** In response to the development of new international standards against the growing threat of illicit cash couriers and bulk cash smuggling, the State Department worked with its interagency partners to develop a training course on interdicting bulk cash smuggling. This course provided operational training to foreign customs officers, investigators, and other officials on the detection, interdiction, analysis, investigation, and seizure of illicit cross-border cash used to facilitate terrorism and criminal activities. The training, conducted in three Middle Eastern countries, emphasized the need to investigate the source, destination, and organization behind cash smuggling, and stressed FATF requirements on reporting of outbound/inbound currency and working with Financial Intelligence Units. Based on the vulnerabilities uncovered during this training, one country moved aggressively to implement new laws and regulations. Due to high demand, the State Department is planning to increase the number of courses offered and to provide this training to countries in other geographical regions.

**Increasing Economic Development:** Development is central to the President's National Security Strategy. Expanding the circle of prosperity is critical to our national security. Poverty, weak institutions, and corruption can turn nations of great potential into recruiting grounds for terrorists. Well-conceived targeted aid is a potential leveraging instrument that can help countries implement sound economic policies, helping to improve the conditions that terrorists exploit.

The Millennium Challenge Account,  established by Congress in 2004 based on President Bush's concept, represents a new model for achieving transformational development by providing assistance to those countries that rule justly, invest in their people and encourage economic freedom. The prospect of an MCA Compact provides a powerful incentive for the poorest countries to reform. Good governance and sound policies, not foreign aid, are the keys to economic development. U.S. private sector flows to the developing world, including trade and investment ($450.2 billion in 2004), dwarf our foreign aid ($19.7 billion). Unutilized capital in developing countries, owing to weak policies and poor property rights, is estimated to be as high as $9 trillion.

Debt relief for the poorest is another element of our development strategy. Our long-standing support for the Heavily Indebted Poor Countries (HIPC) initiative, as well as for the Multilateral Debt Relief Initiative (MDRI) introduced in 2006, promotes debt sustainability, reduces the likelihood of debt distress and enables the poorest countries to devote additional resources to reducing poverty and promoting economic growth. Our aggressive multilateral and bilateral trade agenda to open agricultural and non-agricultural markets and liberalize financial services, transportation, telecommunications, and government procurement all support development.

The U.S. Agency for International Development (USAID), carries out foreign assistance programs that support key U.S. foreign policy interests and have a positive public diplomacy impact for many people in the developing world. USAID's humanitarian aid programs and its activities in the areas

PX202

of economic growth, agriculture, trade, health, democracy, and conflict prevention help reduce the risk of countries becoming breeding grounds for terrorism. In Afghanistan, USAID is helping to build a safe, stable society that meets the needs of its people and eliminates an environment in which terrorist groups have flourished. USAID has been on the front lines of support to tsunami-affected countries, garnering goodwill toward the United States among people in the hardest-hit areas. Our rapid humanitarian assistance and generous reconstruction pledge in response to the devastating South Asian earthquake helped Pakistan in its hour of need, tangibly changing hearts and minds about the U.S. role in this predominately Muslim country.

## INTERNATIONAL CONVENTIONS AND PROTOCOLS

**1. CONVENTION ON OFFENCES AND CERTAIN OTHER ACTS COMMITTED ON BOARD AIRCRAFT**
Signed in Tokyo on September 14, 1963.
Convention entered into force on December 4, 1969.
Status: 180 Parties

**2. CONVENTION FOR THE SUPPRESSION OF UNLAWFUL SEIZURE OF AIRCRAFT**
Signed in The Hague on December 16, 1970.
Convention entered into force on October 14, 1971.
Status: 181 Parties

**3. CONVENTION FOR THE SUPPRESSION OF UNLAWFUL ACTS AGAINST THE SAFETY OF CIVIL AVIATION**
Signed in Montreal on September 23, 1971.
Convention entered into force on January 26, 1973.
Status: 183 Parties

**4. CONVENTION ON THE PREVENTION AND PUNISHMENT OF CRIMES AGAINST INTERNATIONALLY PROTECTED PERSONS, INCLUDING DIPLOMATIC AGENTS**
Adopted in New York on December 14, 1973.
Convention entered into force on February 20, 1977.
Status: 159 Parties

**5. INTERNATIONAL CONVENTION AGAINST THE TAKING OF HOSTAGES**
Adopted in New York on December 17, 1979.
Convention entered into force on June 3, 1983.
Status: 153 Parties

**6. CONVENTION ON THE PHYSICAL PROTECTION OF NUCLEAR MATERIAL**
Signed in Vienna on October 26, 1979.
Convention entered into force on February 8, 1987.
Status: 116 Parties

PX202

**7. PROTOCOL FOR THE SUPPRESSION OF UNLAWFUL ACTS OF VIOLENCE AT AIRPORTS SERVING INTERNATIONAL CIVIL AVIATION, SUPPLEMENTARY TO THE CONVENTION FOR THE SUPPRESSION OF UNLAWFUL ACTS AGAINST THE SAFETY OF CIVIL AVIATION**

Done in Montreal on September 23, 1971.
Signed in Montreal on February 24, 1988.
Protocol entered into force on August 6, 1989.
Status: 156 Parties

**8. CONVENTION FOR THE SUPPRESSION OF UNLAWFUL ACTS AGAINST THE SAFETY OF MARITIME NAVIGATION**

Done in Rome on March 10, 1988.
Convention entered into force on March 1, 1992.
Status: 134 Parties

**9. PROTOCOL FOR THE SUPPRESSION OF UNLAWFUL ACTS AGAINST THE SAFETY OF FIXED PLATFORMS LOCATED ON THE CONTINENTAL SHELF**

Done in Rome on March 10, 1988.
Protocol entered into force on March 1, 1992.
Status: 123 Parties

**10. CONVENTION ON THE MARKING OF PLASTIC EXPLOSIVES FOR THE PURPOSE OF DETECTION**

Done in Montreal on March 1, 1991.
Convention entered into force on June 21, 1998.
Status: 123 Parties

**11. INTERNATIONAL CONVENTION FOR THE SUPPRESSION OF TERRORIST BOMBINGS**

Adopted in New York on December 15, 1997.
Convention entered into force on May 23, 2001.
Status: 145 Parties

**12. INTERNATIONAL CONVENTION FOR THE SUPPRESSION OF THE FINANCING OF TERRORISM**

Adopted in New York on December 9, 1999.
Convention entered into force on April 10, 2002.
Status: 150 Parties

**13. INTERNATIONAL CONVENTION FOR THE SUPPRESSION OF ACTS OF NUCLEAR TERRORISM**

Adopted in New York on April 13, 2005.
Not yet entered into force (open for signatures from September 14, 2005 until December 31, 2006). Status: 100 signatories, no ratifications

PX202

| Country/Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Afghanistan | 15/04/1977 | 29/08/1979 | 26/09/1984 | 24/09/2003 | 24/09/2003 | 12/09/2003 | 23/09/2003 | 23/09/2003 | 01/10/2003 | 24/09/2003 | 24/09/2003 | | |
| Albania | 01/12/1997 | 21/10/1997 | 21/10/1997 | 22/01/2002 | 22/01/2002 | 05/03/2002 | 29/04/2002 | 19/06/2002 | 19/06/2002 | 20/10/2004 | 22/01/2002 | 10/04/2002 | |
| Algeria | 12/10/1995 | 06/10/1995 | 06/10/1995 | 07/11/2000 | 18/12/1996 | 30/04/2003 | 05/11/1995 | 11/02/1998 | N/A | 14/11/1996 | 08/11/2001 | 08/11/2001 | |
| Andorra | 17/05/2006 | 23/09/2004 | 22/05/2006 | 23/09/2004 | 23/09/2004 | | 22/05/2006 | | N/A | 17/05/2006 | 23/09/2004 | | |
| Angola | 24/02/1998 | 12/03/1998 | 12/03/1998 | | | 27/06/2006 | | | | | | | |
| Antigua and Barbuda | 19/07/1985 | 22/07/1985 | 22/07/1985 | 19/07/1993 | 06/08/1986 | 04/08/1993 | 11/03/2002 | 17/08/1993 | 26/11/2003 | 08/03/1999 | 25/09/2003 | 22/08/2005 | |
| Argentina | 23/07/1971 | 11/09/1972 | 26/11/1973 | 18/03/1982 | 18/09/1991 | 06/04/1989 | 12/02/1992 | 08/06/2005 | 08/06/2005 | 22/07/2005 | 16/03/2004 | 16/03/2004 | |
| Armenia | 23/01/2003 | 10/09/2002 | 10/09/2002 | 18/05/1994 | 16/03/2004 | 24/08/1993 | 10/09/2002 | | | | 16/03/2004 | 16/03/2004 | |
| Australia | 22/06/1973 | 09/11/1972 | 12/07/1973 | 20/06/1977 | 21/05/1990 | 22/09/1987 | 23/10/1990 | 19/02/1993 | 19/02/1993 | | 09/08/2002 | 26/09/2002 | |
| Austria | 07/02/1974 | 11/02/1974 | 11/02/1974 | 03/08/1977 | 22/08/1986 | 22/12/1988 | 28/12/1989 | 28/12/1989 | 12/09/2002 | 31/05/1999 | 06/09/2000 | 15/04/2002 | 14/09/2006 |
| Azerbaijan | 05/02/2004 | 03/03/2000 | 15/03/2000 | 02/04/2001 | 29/02/2000 | 19/01/2004 | 23/03/2000 | 26/01/2004 | 26/01/2004 | 04/07/2000 | 02/04/2001 | 26/10/2001 | |
| Bahamas | 12/06/1975 | 13/08/1976 | 27/12/1984 | 22/07/1986 | 04/06/1981 | 25/10/2005 | 25/10/2005 | 01/11/2005 | | | | | |
| Bahrain | 09/02/1984 | 20/02/1984 | 20/02/1984 | | 16/09/2005 | 12/02/1996 | 21/10/2005 | 21/10/2005 | 30/01/1996 | 21/09/2004 | 21/09/2004 | | |
| Bangladesh | 25/07/1978 | 28/06/1978 | 28/06/1978 | 16/09/2005 | 20/05/2005 | 11/05/2005 | 27/06/2005 | | 09/06/2005 | 16/08/2005 | 20/05/2005 | 26/08/2005 | |
| Barbados | 04/04/1973 | 02/04/1973 | 06/08/1976 | 26/10/1979 | 09/03/1981 | 12/09/2002 | 06/05/1994 | 06/05/1994 | 06/05/1994 | 18/09/2002 | 18/09/2002 | 18/09/2002 | |
| Belarus | 03/02/1988 | 30/12/1971 | 31/01/1973 | 05/02/1976 | 01/07/1987 | 09/09/1993 | 01/05/1989 | 04/12/2002 | 04/12/2002 | 06/02/2002 | 06/02/2002 | 06/10/2004 | |
| Belgium | 06/08/1970 | 24/08/1973 | 13/08/1976 | 13/06/1976 | 16/04/1999 | 06/09/1991 | 20/04/1999 | 11/04/2005 | 11/04/2005 | 20/05/2005 | 17/05/2004 | 17/05/2004 | |
| Belize | 19/05/1998 | 10/06/1998 | 10/06/1998 | 14/11/2001 | 14/11/2001 | 10/06/1988 | 14/11/2001 | 01/12/2003 | 01/12/2003 | | | | |
| Benin | 30/03/2004 | 13/03/1972 | 19/04/2004 | 31/07/2003 | 31/07/2003 | 19/04/2004 | 31/08/2006 | N/A | 30/03/2004 | 31/07/2003 | 30/08/2004 | | |
| Bhutan | 25/01/1989 | 28/12/1988 | 28/12/1988 | 16/01/1989 | 31/08/1981 | 26/08/2005 | 28/08/2005 | 22/03/2004 | | | | | |
| Bolivia | 05/07/1979 | 18/07/1979 | 18/07/1979 | 18/07/1979 | 07/01/2002 | 24/01/2002 | 01/02/2002 | 13/02/2002 | 13/02/2002 | 07/02/2002 | 22/01/2002 | 07/01/2002 | |
| Bosnia and Herzegovina | 07/03/1995 | 15/08/1994 | 15/08/1994 | 01/09/1993 | 30/06/1998 | 30/06/1998 | 15/08/1994 | 28/07/2003 | 28/07/2003 | 03/05/2004 | 11/08/2003 | 10/06/2003 | |
| Botswana | 16/01/1979 | 28/12/1978 | 28/12/1978 | 25/10/2000 | 08/09/2000 | 19/09/2000 | 30/10/2000 | 14/09/2000 | 14/09/2000 | 19/09/2000 | 08/09/2000 | 08/09/2000 | |
| Brazil | 14/01/1970 | 14/01/1972 | 24/07/1972 | 07/06/1999 | 08/03/2000 | 17/10/1985 | 09/05/1997 | 25/10/2005 | 25/10/2005 | 04/10/2001 | 23/08/2002 | 16/09/2005 | |
| Brunei Darussalam | 23/05/1986 | 16/04/1986 | 16/04/1986 | 13/11/1997 | 18/10/1988 | 20/12/2000 | 04/12/2003 | 04/12/2003 | 14/03/2002 | 04/12/2002 | | | |
| Bulgaria | 28/09/1989 | 19/05/1971 | 28/03/1973 | 18/07/1974 | 10/03/1988 | 10/04/1984 | 26/03/1991 | 08/07/1999 | 08/07/1999 | 08/09/1999 | 12/02/2002 | 15/04/2002 | 17/03/2006 |
| Burkina Faso | 06/06/1969 | 19/10/1987 | 19/10/1987 | 01/10/2003 | 01/10/2003 | 13/01/2004 | 08/12/1998 | 15/01/2004 | 14/01/2004 | 07/07/2004 | 01/10/2003 | 01/10/2003 | |
| Burundi | 14/07/1971 | 11/02/1999 | 17/12/1980 | 01/10/2003 | | | | | | | | | |
| Cambodia | 22/10/1996 | 08/11/1996 | 08/11/1996 | 27/07/2006 | 27/07/2006 | 04/08/2006 | 08/11/1996 | 18/08/2006 | 31/07/2006 | 12/12/2005 | | | |
| Cameroon | 24/03/1988 | 14/04/1988 | 11/07/1973 | 08/06/1992 | 09/03/1988 | 29/06/2004 | 13/03/2003 | 03/06/1998 | 21/03/2005 | 06/02/2006 | | | |

PX202

| Country/ Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 07/11/1969 | 20/06/1972 | 19/06/1972 | 04/08/1976 | 04/12/1985 | 21/03/1986 | 02/08/1993 | 18/06/1993 | 18/06/1993 | 29/11/1996 | 03/04/2002 | 19/02/2002 | |
| Cape Verde | 04/10/1989 | 20/10/1977 | 20/10/1977 | 10/09/2002 | 10/09/2002 | 12/09/2002 | 03/01/2003 | 03/01/2003 | 04/11/2002 | 10/05/2002 | 10/05/2002 | | |
| Central African Rep | 11/06/1991 | 01/07/1991 | 01/07/1991 | 01/07/1991 | | | | | | | | | |
| Chad | 30/06/1970 | 12/07/1972 | 12/07/1972 | 01/11/2006 | | | | | | | | | |
| Chile | 24/01/1974 | 02/02/1972 | 28/02/1974 | 21/01/1977 | 12/11/1981 | 27/04/1994 | 15/08/1989 | 22/04/1994 | 22/04/1994 | 02/08/2000 | 10/11/2001 | 10/11/2001 | |
| China | 14/11/1978 | 10/09/1980 | 10/09/1980 | 05/08/1987 | 26/01/1993 | 10/01/1989 | 05/03/1999 | 20/08/1991 | 20/08/1991 | 13/11/2001 | 19/04/2006 | | |
| Colombia | 06/07/1973 | 03/07/1973 | 04/12/1974 | 16/01/1996 | 14/04/2005 | 28/03/2003 | 14/01/2004 | 14/09/2004 | 14/09/2004 | | | | |
| Comoros | 23/05/1991 | 01/08/1991 | 01/08/1991 | 25/09/2003 | 25/09/2003 | 25/09/2003 | 25/09/2003 | | | | | | |
| Congo | 13/11/1978 | 24/11/1989 | 19/03/1987 | | | | | | | | | | |
| Congo (Democratic Republic of) | 20/07/1977 | 06/07/1977 | 06/07/1977 | 25/07/1977 | 21/09/2004 | 28/10/2005 | | | | | | | |
| Cook Islands | 12/04/2005 | 14/04/2005 | 14/04/2005 | 14/04/2005 | 04/03/2004 | | | | | | | | |
| Costa Rica | 24/10/1972 | 09/07/1971 | 21/09/1973 | 02/11/1977 | 24/01/2003 | 02/05/2003 | 22/04/2003 | 25/03/2003 | 25/03/2003 | 12/07/2005 | 20/09/2001 | 24/01/2003 | |
| Côte d'Ivoire | 03/06/1970 | 09/01/1973 | 09/01/1973 | 13/03/2002 | 22/08/1989 | 13/03/2002 | 13/03/2002 | | | | | | |
| Croatia | 05/10/1993 | 08/06/1993 | 08/06/1993 | 12/10/1992 | 23/09/2003 | 29/09/1992 | 08/06/1993 | 18/08/2005 | 18/08/2005 | 24/02/2005 | 02/06/2005 | 01/12/2003 | 11/09/2006 |
| Cuba | 12/02/2001 | 27/11/2001 | 31/10/2001 | 10/06/1998 | 15/11/2001 | 26/09/1997 | 31/10/2001 | 20/11/2001 | 20/11/2001 | 30/11/2001 | 15/11/2001 | 15/11/2001 | |
| Cyprus | 31/05/1972 | 05/07/1972 | 27/07/1973 | 24/12/1975 | 13/09/1991 | 23/07/1998 | 23/04/2002 | 02/02/2000 | 02/02/2000 | 20/08/2002 | 24/01/2001 | 30/11/2001 | |
| Czech Republic | 25/03/1993 | 14/11/1994 | 14/11/1994 | 22/02/1993 | 22/02/1993 | 24/03/1993 | 25/03/1993 | 10/12/2004 | 10/12/2004 | 25/03/1993 | 06/09/2000 | 27/12/2005 | 25/07/2006 |
| Denmark | 17/01/1967 | 17/10/1972 | 17/07/1973 | 01/07/1975 | 11/08/1987 | 06/09/1991 | 23/11/1989 | 25/08/1995 | 25/08/1995 | 05/10/1998 | 31/08/2001 | 27/08/2002 | |
| Djibouti | 10/06/1992 | 24/11/1992 | 24/11/1992 | 01/06/2004 | 01/06/2004 | 22/06/2004 | 11/06/2004 | 09/06/2004 | 09/06/2004 | 11/06/2004 | 01/06/2004 | 13/03/2006 | |
| Dominica | 26/07/2005 | 26/07/2005 | 24/09/2004 | 09/09/1986 | 08/11/2004 | 26/07/2005 | 31/08/2001 | 12/10/2004 | 24/09/2004 | 24/09/2004 | 07/06/2004 | | |
| Dominican Republic | 03/12/1970 | 22/06/1978 | 28/11/1973 | 08/07/1977 | | | | | | | | | |
| Ecuador | 03/12/1969 | 14/06/1971 | 12/01/1977 | 12/03/1975 | 02/05/1988 | 17/01/1996 | 04/03/2004 | 10/03/2003 | 10/03/2003 | 15/12/1995 | 09/12/2003 | | |
| Egypt | 12/02/1975 | 28/02/1975 | 20/05/1975 | 25/06/1986 | 02/10/1981 | 25/07/2000 | 08/01/1993 | 08/01/1993 | 19/07/1993 | 09/08/2005 | 01/03/2005 | | |
| El Salvador | 13/02/1980 | 16/01/1973 | 25/09/1979 | 08/08/1980 | 12/02/1981 | 15/12/2006 | 08/04/1998 | 07/12/2000 | 07/12/2000 | 18/02/2000 | 15/05/2003 | 15/05/2003 | N/A |
| Equatorial Guinea | 27/02/1991 | 02/01/1991 | 02/01/1991 | 07/02/2003 | 07/02/2003 | 24/11/2003 | 14/01/2004 | 15/01/2004 | 15/01/2004 | 07/02/2003 | 07/02/2003 | | |
| Eritrea | 07/12/1994 | | | | | | | | | | | | |
| Estonia | 31/12/1993 | 22/12/1993 | 22/12/1993 | 21/10/1991 | 08/03/2002 | 09/05/1994 | 22/12/1993 | 15/02/2002 | 28/01/2004 | 05/03/1996 | 10/04/2002 | 22/05/2002 | |
| Ethiopia | 27/03/1979 | 26/03/1979 | 26/03/1979 | 16/04/2003 | 16/04/2003 | 15/12/1989 | 16/04/2003 | | | | | 22/06/2003 | |
| Fiji | 31/01/1972 | 27/07/1972 | 05/03/1973 | 21/09/1992 | 16/04/2003 | 15/12/1989 | | | | | | | |
| Finland | 02/04/1971 | 15/12/1971 | 13/07/1973 | 31/10/1978 | 14/04/1983 | 22/09/1989 | 03/04/1998 | 12/11/1998 | 28/04/2000 | 05/12/2001 | 28/05/2002 | 28/06/2002 | |

PX202

| Country/Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| France | 11/09/1970 | 18/09/1972 | 30/06/1976 | 26/08/2003 | 09/06/2000 | 06/09/1991 | 06/09/1989 | 02/12/1991 | 02/12/1991 | 21/05/1997 | 19/08/1999 | 07/01/2002 | |
| Gabon | 14/01/1970 | 14/07/1971 | 29/06/1976 | 14/10/1981 | 19/04/2005 | 13/08/2003 | 10/03/2005 | 10/03/2005 | | | | | |
| Gambia | 04/01/1979 | 28/11/1978 | 28/11/1978 | 16/06/2000 | 01/11/1991 | 20/06/2000 | | | | | | | |
| Georgia | 16/06/1994 | 20/04/1994 | 20/04/1994 | 18/02/2004 | 18/02/2004 | 07/09/2006 | 15/02/1999 | 11/08/2006 | N/A | 25/04/2002 | 18/02/2004 | 27/09/2002 | |
| Germany | 16/12/1969 | 11/10/1974 | 03/02/1978 | 25/01/1977 | 15/12/1980 | 06/09/1991 | 25/04/1994 | 06/11/1990 | 06/11/1990 | 17/12/1998 | 23/04/2003 | 17/06/2004 | |
| Ghana | 02/01/1974 | 12/12/1973 | 12/12/1973 | 25/04/1975 | 10/11/1987 | 16/10/2002 | 15/07/1997 | 01/11/2002 | 01/11/2002 | 22/04/1998 | 06/09/2002 | 06/09/2002 | |
| Greece | 31/05/1971 | 20/09/1973 | 15/01/1974 | 03/07/1984 | 18/06/1987 | 06/09/1991 | 25/04/1991 | 11/06/1993 | 11/06/1993 | 30/10/1995 | 27/05/2003 | 16/04/2004 | |
| Grenada | 28/08/1978 | 10/08/1978 | 10/08/1978 | 13/12/2001 | 10/12/1990 | 09/01/2002 | 15/01/2002 | 29/01/2002 | 09/01/2002 | 15/01/2002 | 13/12/2001 | 13/12/2001 | |
| Guatemala | 17/11/1970 | 16/05/1979 | 19/10/1978 | 18/01/1983 | 11/03/1983 | 23/04/1985 | 11/10/1994 | 29/01/2002 | 12/02/2002 | 12/02/2002 | 13/12/2001 | 13/12/2001 | |
| Guinea | 18/01/1994 | 02/05/1984 | 02/05/1984 | 22/12/2004 | 22/12/2004 | 29/11/2005 | 01/10/1998 | 01/02/2005 | 01/02/2005 | 23/01/2004 | 07/09/2000 | 14/07/2003 | |
| Guinea-Bissau | 20/08/1976 | 20/08/1976 | | | | | | | | | | | |
| Guyana | 20/12/1972 | 21/12/1972 | 21/12/1972 | 19/06/2002 | 30/01/2003 | 30/01/2003 | | | | | | | |
| Haiti | 26/04/1984 | 09/05/1984 | 09/05/1984 | 25/08/1980 | 17/05/1989 | | | | | | | | |
| Holy See | | | | | | | | | | | | | |
| Honduras | 08/04/1987 | 13/04/1987 | 13/04/1987 | 29/01/2003 | 01/06/1981 | 28/01/2004 | 20/01/2004 | 17/05/2005 | 17/05/2005 | 18/02/2004 | 25/03/2003 | 25/03/2003 | |
| Hungary | 03/12/1970 | 13/08/1971 | 27/12/1972 | 26/03/1975 | 02/09/1987 | 04/05/1984 | 07/09/1988 | 09/11/1989 | 09/11/1989 | 11/01/1994 | 13/11/2001 | 14/10/2002 | |
| Iceland | 16/03/1970 | 29/06/1973 | 29/06/1973 | 02/08/1977 | 06/07/1981 | 18/06/2002 | 09/05/1990 | 28/05/2002 | 28/05/2002 | 24/05/2002 | 15/04/2002 | 15/04/2002 | |
| India | 22/07/1975 | 12/11/1982 | 12/11/1982 | 11/04/1978 | 07/09/1994 | 12/03/2002 | 22/03/1995 | 15/10/1999 | 15/10/1999 | 16/11/1999 | 22/09/1999 | 22/04/2003 | |
| Indonesia | 07/09/1976 | 27/08/1976 | 27/08/1976 | 05/11/1986 | 29/06/2006 | 29/06/2006 | | | | | | | 01/12/2006 |
| Iran (Islamic Republic of) | 28/06/1976 | 25/01/1972 | 10/07/1973 | 12/07/1978 | 20/11/2006 | 14/02/2002 | | | | | | | |
| Iraq | 15/05/1974 | 03/12/1971 | 10/09/1974 | 28/02/1978 | 31/01/1990 | | | | | | | | |
| Ireland | 14/11/1975 | 24/11/1975 | 12/10/1976 | 30/06/2005 | 30/06/2005 | 06/09/1991 | 26/07/1991 | 10/09/2004 | 10/09/2004 | 15/07/2004 | 30/06/2005 | 30/06/2005 | |
| Israel | 19/09/1969 | 16/08/1971 | 30/06/1972 | 31/07/1980 | N/A | 22/01/2002 | 02/04/1993 | 10/02/2003 | 10/02/2003 | | | | |
| Italy | 18/10/1968 | 19/02/1974 | 19/02/1974 | 30/08/1985 | 20/03/1986 | 06/09/1991 | 13/03/1990 | 26/01/1990 | 26/01/1990 | 26/09/2002 | 16/04/2003 | 27/03/2003 | |
| Jamaica | 16/09/1983 | 15/09/1983 | 15/09/1983 | 21/09/1978 | 09/08/2005 | 16/08/2005 | 18/08/2005 | 17/08/2005 | 19/08/2005 | 18/08/2005 | 09/08/2005 | 16/09/2005 | |
| Japan | 26/05/1970 | 19/04/1971 | 12/06/1974 | 08/06/1987 | 08/06/1987 | 28/10/1988 | 24/04/1998 | 24/04/1998 | 24/04/1998 | 26/09/1997 | 16/11/2001 | 11/06/2002 | |
| Jordan | 03/05/1973 | 18/11/1971 | 13/02/1973 | 18/12/1984 | 19/02/1986 | 18/09/1992 | 02/07/2004 | 23/05/1996 | 23/05/1996 | 28/08/2003 | 16/11/2001 | 11/06/2002 | |
| Kazakhstan | 18/05/1995 | 04/04/1995 | 04/04/1995 | 21/02/1996 | 21/02/1996 | 02/09/2005 | 02/07/2004 | 24/11/2003 | 24/11/2003 | 18/05/1995 | 06/11/2002 | 24/02/2003 | |
| Kenya | 22/06/1970 | 11/01/1977 | 11/01/1977 | 16/11/2001 | 08/12/1981 | 11/02/2002 | 05/07/1995 | 21/01/2002 | 21/01/2002 | 22/10/2002 | 16/11/2001 | 27/06/2003 | |
| Kiribati | 15/09/2005 | 15/09/2005 | 17/11/2005 | 15/09/2005 | 15/09/2005 | 15/09/2005 | | | | | | | 13/04/2006 |
| Korea (Democratic Republic of) | 09/05/1983 | 28/04/1983 | 13/08/1980 | 01/12/1982 | 12/11/2001 | 19/07/1995 | | | | | | | |

PX202

| Country/ Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Korea (Republic of) | 19/02/1971 | 18/01/1973 | 02/08/1973 | 25/05/1983 | 04/05/1983 | 07/04/1982 | 27/06/1990 | 14/05/2003 | 10/06/2003 | 02/01/2002 | 17/02/2004 | 17/02/2004 | |
| Kuwait | 27/11/1979 | 25/05/1979 | 23/11/1979 | 01/03/1989 | 06/02/1989 | 23/04/2004 | 08/03/1989 | 30/06/2003 | 30/06/2003 | 18/03/1996 | 19/04/2004 | | |
| Kyrgyzstan | 28/02/2000 | 25/02/2000 | 25/02/2000 | 02/10/2003 | 02/10/2003 | 28/02/2000 | 14/07/2000 | 01/05/2001 | 02/10/2003 | | | | |
| Lao People's Democratic | 23/10/1972 | 06/04/1989 | 06/04/1989 | 22/08/2002 | 22/08/2002 | 07/10/2020 | 22/08/2002 | | | | | | |
| Latvia | 10/06/1997 | 23/10/1998 | 13/04/1997 | 14/04/1992 | 14/11/2002 | 06/11/2002 | 13/04/1997 | 04/12/2002 | 04/12/2002 | 17/08/1999 | 25/11/2002 | 14/11/2002 | 25/07/2006 |
| Lebanon | 11/06/1974 | 10/08/1973 | 23/12/1977 | 03/06/1997 | 04/12/1997 | 16/12/1997 | 27/05/1996 | 16/12/1994 | 16/12/1994 | 26/11/1997 | 13/11/2006 | | |
| Lesotho | 28/04/1972 | 27/07/1978 | 27/07/1978 | 05/11/1980 | 12/11/2001 | 12/11/2001 | | | | | | 20/02/2003 | |
| Liberia | 10/03/2003 | 01/02/1982 | 01/02/1982 | 30/09/1975 | 05/03/2003 | 10/03/2003 | 05/10/1995 | 05/10/1995 | 05/03/2003 | 05/03/2003 | | 09/07/2002 | |
| Libyan Arab Jamahiriya | 21/06/1972 | 04/10/1978 | 19/02/1974 | 25/09/2000 | 25/09/1998 | 18/10/2000 | 26/07/1996 | 08/08/2002 | 08/08/2002 | 10/10/2002 | 22/09/2000 | 09/07/2002 | 19/07/2006 |
| Liechtenstein | 26/02/2002 | 23/02/2001 | 23/02/2001 | 28/11/1994 | 28/11/1994 | 25/11/1986 | 26/02/2001 | 08/11/2002 | 08/11/2002 | 04/12/2002 | 26/11/2002 | 09/07/2003 | |
| Lithuania | 27/11/1996 | 04/12/1996 | 04/12/1996 | 23/10/2002 | 02/01/2001 | 07/12/1993 | 04/12/1996 | 30/07/2003 | 30/01/2003 | 21/11/1996 | 17/03/2004 | 20/02/2003 | |
| Luxembourg | 21/09/1972 | 22/11/1978 | 18/05/1982 | 10/05/2006 | 29/04/1991 | 06/09/1991 | 14/11/2003 | 06/11/2006 | 06/02/2004 | 05/11/2003 | | | |
| Macedonia (FYROM) | 30/08/1994 | 07/01/1998 | 04/01/1995 | 12/03/1998 | 12/03/1998 | 20/09/1996 | 04/01/1995 | 21/09/1998 | 30/08/2004 | 30/08/2004 | | 24/09/2003 | |
| Madagascar | 02/12/1969 | 18/11/1986 | 18/11/1986 | 24/09/2003 | 24/09/2003 | 28/10/2003 | 30/03/1998 | 15/09/2006 | N/A | 23/12/2003 | 24/09/2003 | | |
| Malawi | 28/12/1972 | 21/12/1972 | 21/12/1972 | 14/03/1977 | 17/03/1986 | 11/08/2003 | 11/08/2003 | | | | | | |
| Malaysia | 05/03/1985 | 04/05/1985 | 04/05/1985 | 24/09/2003 | 08/09/2003 | 24/09/2003 | | | | | | | |
| Maldives | 28/09/1987 | 01/09/1987 | 01/09/1987 | 21/08/1990 | 20/05/1991 | 22/03/1999 | 07/09/2000 | 20/04/2004 | N/A | | | | |
| Mali | 31/05/1971 | 29/09/1971 | 24/08/1972 | 12/04/2002 | 08/02/1990 | 07/05/2002 | 31/10/1990 | 29/04/2002 | 29/04/2002 | 28/09/2000 | 28/03/2002 | 28/03/2002 | |
| Malta | 28/06/1991 | 14/06/1991 | 14/06/1991 | 11/11/2001 | 11/11/2001 | 16/10/2003 | 14/06/1991 | 20/11/2001 | 20/11/2001 | 15/11/1994 | 11/11/2001 | 11/11/2001 | |
| Marshall Islands | 15/05/1989 | 31/05/1989 | 31/05/1989 | 27/01/2003 | 27/01/2003 | 07/02/2003 | 30/05/1989 | 29/11/1994 | 16/10/1995 | 06/02/2003 | 27/01/2003 | 27/01/2003 | |
| Mauritania | 30/06/1977 | 01/11/1978 | 01/11/1978 | 09/02/1998 | 13/03/1998 | 08/07/2003 | 30/04/2003 | 30/04/2003 | N/A | | | | |
| Mauritius | 05/04/1983 | 25/04/1983 | 25/04/1983 | 24/09/2003 | 17/10/1980 | 17/08/1989 | 03/08/2004 | 03/08/2004 | 24/01/2003 | 14/12/2004 | | | |
| Mexico | 18/03/1969 | 19/07/1972 | 12/09/1974 | 22/04/1980 | 28/04/1987 | 04/04/1988 | 11/10/1990 | 13/05/1994 | 13/05/1994 | 09/04/1992 | 20/01/2003 | 20/01/2003 | 27/06/2006 |
| Micronesia (Federated States of) | 19/03/2003 | 06/07/2004 | 06/07/2004 | 19/03/2003 | 10/02/2003 | 23/09/2002 | 23/09/2002 | | | | | | |
| Moldova (Republic of) | 20/06/1997 | 21/05/1997 | 21/05/1997 | 08/09/1997 | 10/10/2002 | 07/05/1998 | 20/06/1997 | 11/10/2005 | 11/10/2005 | 01/12/1997 | 10/10/2002 | 10/10/2002 | |
| Monaco | 02/06/1983 | 03/06/1983 | 03/06/1983 | 27/11/2002 | 16/10/2001 | 09/08/1996 | 22/12/1993 | 25/01/2002 | 25/01/2002 | 14/05/1998 | 06/09/2001 | 10/11/2001 | |
| Mongolia | 24/07/1990 | 08/10/1971 | 14/09/1972 | 08/08/1975 | 09/06/1992 | 28/05/1986 | 22/09/1999 | 22/11/2005 | 22/11/2005 | 22/09/1999 | 07/09/2000 | 25/02/2004 | 06/10/2006 |
| Montenegro | 23/10/2006 | 23/10/2006 | N/A | 23/10/2006 | 23/10/2006 | 23/09/2006 | | | | 19/08/2002 | | | |
| Morocco | 21/10/1975 | 24/10/1975 | 24/10/1975 | 09/01/2002 | 23/08/2002 | 15/02/2002 | 08/01/2002 | 08/01/2002 | 26/05/1989 | | | | |

PX202

| Country/ Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mozambique** | 06/01/2003 | 16/01/2003 | 16/01/2003 | 14/01/2003 | 14/01/2003 | 03/03/2003 | 16/01/2003 | 08/01/2003 | 08/01/2003 | 15/03/2006 | 14/01/2003 | 14/01/2003 | |
| **Myanmar** | 23/05/1996 | 22/05/1996 | 22/05/1996 | 04/06/2004 | 04/06/2004 | 22/05/1996 | 19/03/2003 | 19/09/2003 | 01/09/2004 | 12/11/2001 | 16/08/2006 | | |
| **Namibia** | 19/12/2005 | 04/11/2005 | 04/11/2005 | 02/10/2002 | 04/11/2005 | 10/07/2004 | 07/09/2005 | | | | | | |
| **Nauru** | 17/05/1984 | 17/05/1984 | 17/05/1984 | 02/08/2005 | 02/08/2005 | 12/08/2005 | 19/09/2005 | 11/08/2005 | 11/08/2005 | 03/04/2006 | 02/08/2005 | 24/05/2005 | |
| **Nepal** | 15/01/1979 | 11/01/1979 | 11/01/1979 | 09/03/1990 | 09/03/1990 | 06/09/1991 | | | | | | | |
| **Netherlands** | 14/11/1969 | 27/08/1973 | 27/08/1973 | 06/12/1988 | 06/12/1988 | 06/09/1991 | 11/07/1995 | 05/03/1992 | 05/03/1992 | 04/05/1998 | 07/02/2002 | 07/02/2002 | |
| **New Zealand** | 12/02/1974 | 12/02/1974 | 12/02/1974 | 12/11/1985 | 12/11/1985 | 19/12/2003 | 02/08/1999 | 10/06/1999 | 10/06/1999 | 19/12/2003 | 04/11/2002 | 04/11/2002 | |
| **Nicaragua** | 24/08/1973 | 06/11/1973 | 06/11/1973 | 10/03/1975 | 24/09/2003 | 25/04/2002 | 25/04/2002 | 10/01/2006 | 17/01/2003 | 14/11/2002 | | 04/11/2002 | |
| **Niger** | 27/06/1969 | 15/10/1971 | 01/09/1972 | 17/06/1985 | 26/10/2004 | 19/08/2004 | 30/08/2006 | 26/10/2004 | 30/09/2004 | 14/11/2002 | | 09/01/2003 | |
| **Nigeria** | 07/04/1970 | 03/07/1973 | 03/07/1973 | 25/03/2003 | 24/02/2004 | 10/05/2002 | 16/06/2003 | | | | | | |
| **Niue** | | | | | | | | | | | | | |
| **Norway** | 17/01/1967 | 23/08/1971 | 01/08/1973 | 28/04/1980 | 02/07/1981 | 15/08/1985 | 29/05/1990 | 18/04/1991 | 18/04/1991 | 09/07/1992 | 20/09/1999 | 15/07/2002 | |
| **Oman** | 09/02/1977 | 02/02/1977 | 02/02/1977 | 22/03/1988 | 22/07/1988 | 11/06/2003 | 27/11/1992 | 24/09/1990 | 24/09/1990 | 13/11/2001 | N/A | 04/11/2002 | |
| **Pakistan** | 11/09/1973 | 28/11/1973 | 24/01/1974 | 29/03/1976 | 08/09/2000 | 12/09/2000 | 26/09/2000 | 20/09/2000 | 20/09/2000 | 13/08/2002 | | | |
| **Palau** | 12/10/1995 | 03/08/1995 | 03/08/1995 | 14/11/2001 | 14/11/2001 | 12/10/1995 | 04/12/2001 | 04/12/2001 | 30/11/2001 | 14/11/2001 | 14/11/2001 | | |
| **Panama** | 16/11/1970 | 10/03/1972 | 24/04/1972 | 17/06/1980 | 19/08/1982 | 01/04/1999 | 10/04/1996 | 03/07/2002 | 03/07/2002 | 12/04/1996 | 05/03/1999 | 03/07/2002 | |
| **Papua New Guinea** | 15/12/1975 | 15/12/1975 | 15/12/1975 | 30/09/2003 | 30/09/2003 | 11/07/2002 | 30/09/2003 | 30/09/2003 | 30/09/2003 | | | | |
| **Paraguay** | 09/08/1971 | 04/02/1972 | 05/03/1974 | 24/11/1975 | 06/02/1985 | 06/02/1985 | 23/07/2002 | 12/11/2004 | 12/11/2004 | 15/10/2004 | 22/09/2004 | 30/11/2004 | |
| **Peru** | 12/05/1978 | 28/04/1978 | 28/04/1978 | 25/04/1978 | 06/07/2001 | 11/01/1995 | 07/06/1989 | 19/07/2001 | 19/07/2001 | 07/02/1996 | 10/11/2001 | 10/11/2001 | |
| **Philippines** | 26/11/1965 | 26/03/1973 | 26/03/1973 | 26/11/1976 | 14/10/1980 | 22/09/1981 | 17/12/2003 | 06/01/2004 | 06/01/2004 | 17/12/2003 | 07/01/2004 | 07/01/2004 | |
| **Poland** | 19/03/1971 | 21/03/1972 | 28/01/1975 | 14/12/1982 | 25/05/2000 | 05/10/1983 | 12/08/2004 | 25/06/1991 | 25/06/1991 | 26/09/2006 | 03/02/2004 | 26/09/2003 | |
| **Portugal** | 25/11/1964 | 27/11/1972 | 15/01/1973 | 11/09/1995 | 06/07/1984 | 06/09/1991 | 18/12/2001 | 05/01/1996 | 05/01/1996 | 09/10/2002 | 10/11/2001 | 18/10/2002 | |
| **Qatar** | 06/08/1981 | 26/08/1981 | 26/08/1981 | 03/03/1997 | 03/02/2004 | 07/06/1991 | 18/09/2003 | 18/09/2003 | 09/11/1998 | 09/10/2002 | 10/11/2001 | | |
| **Romania** | 15/02/1974 | 10/07/1972 | 15/08/1975 | 15/08/1978 | 17/05/1990 | 23/11/1993 | 03/09/1998 | 02/06/1993 | 02/06/1993 | 21/09/1998 | 29/07/2004 | 09/01/2003 | |
| **Russian Federation** | 03/02/1988 | 24/09/1971 | 19/02/1973 | 15/01/1976 | 11/06/1987 | 25/05/1983 | 31/03/1989 | 04/05/2001 | 04/05/2001 | 08/05/2001 | 27/11/2002 | | |
| **Rwanda** | 17/05/1971 | 03/11/1987 | 03/11/1987 | 29/11/1977 | 13/05/2002 | 16/05/2002 | 13/05/2002 | 13/05/2002 | | | | | |
| **Saint Kitts and Nevis** | 17/01/1991 | 17/01/2002 | 09/05/2002 | 16/11/2001 | 16/11/2001 | | | | | | | | |
| **Saint Lucia** | 31/10/1983 | 08/11/1983 | 08/11/1983 | 11/06/1990 | 20/05/2004 | 20/05/2004 | | | | | | | |
| **Saint Vincent & Grenadines** | 18/11/1991 | 29/11/1991 | 29/11/1991 | 12/09/2000 | 12/09/2000 | 29/11/1991 | 09/10/2001 | 09/10/2001 | 15/09/2005 | 28/03/2002 | | | |
| **Samoa** | 09/07/1998 | 09/07/1998 | 09/07/1998 | 09/07/1998 | 18/05/2004 | 09/07/1998 | 27/09/2002 | | | | | | |
| **San Marino** | 12/03/2002 | 12/03/2002 | | | | | | | | | | | |

PX202

| Country/Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sao Tome and Principe | 04/05/2006 | 08/05/2006 | 08/05/2006 | 12/04/2006 | 23/08/2006 | 08/05/2006 | 05/05/2006 | N/A | 12/04/2006 | 12/04/2006 | | | |
| Saudi Arabia | 21/11/1969 | 14/06/1974 | 14/06/1974 | 01/03/2004 | 08/01/1991 | 21/02/1989 | 02/02/2006 | 02/02/2006 | 11/07/1996 | | | | |
| Senegal | 09/03/1972 | 03/02/1978 | 03/02/1978 | 07/04/2006 | 10/03/1987 | 03/11/2003 | 24/03/2003 | 09/08/2004 | 09/08/2004 | 11/02/2004 | 27/10/2003 | 24/09/2004 | |
| Serbia | 06/09/2001 | 23/07/2001 | 23/07/2001 | 12/03/2001 | 12/03/2001 | 06/09/2001 | 11/05/2004 | 02/03/2005 | 22/06/2006 | 31/07/2003 | 10/10/2002 | 26/09/2006 | |
| Seychelles | 04/01/1979 | 29/12/1978 | 29/12/1978 | 29/05/1980 | 12/11/2003 | 13/08/2003 | 21/05/2004 | 24/01/1989 | 24/01/1989 | 14/08/2003 | 22/08/2003 | 30/03/2004 | 09/01/2006 |
| Sierra Leone | 09/11/1970 | 13/11/1974 | 20/09/1979 | 26/09/2003 | 26/09/2003 | 26/09/2003 | 26/09/2003 | | | | | | |
| Singapore | 01/03/1971 | 12/04/1978 | 12/04/1978 | 22/11/1996 | 03/02/2004 | 20/01/2003 | 30/12/2002 | | | | | | |
| Slovakia | 20/03/1995 | 13/12/1995 | 06/03/1995 | 28/05/1993 | 28/05/1993 | 10/02/1993 | 20/03/1995 | 08/12/2000 | 08/12/2000 | 20/03/1995 | 08/12/2000 | 13/09/2002 | 23/03/2006 |
| Slovenia | 18/12/1992 | 27/05/1992 | 27/05/1992 | 06/07/1992 | 06/07/1992 | 07/07/1992 | 27/05/1992 | 18/07/2003 | 18/07/2003 | 05/06/2000 | 25/09/2003 | 23/09/2004 | |
| Solomon Islands | 23/03/1982 | 13/04/1982 | | | | | | | | | | | |
| Somalia | | | | | | | | | | | | | |
| South Africa | 26/05/1972 | 30/05/1972 | 30/05/1972 | 23/09/2003 | 23/09/2003 | 21/09/1998 | 08/07/2005 | 08/07/2005 | 01/12/1999 | 01/05/2003 | 01/05/2003 | | |
| Spain | 01/10/1969 | 30/10/1972 | 30/10/1972 | 08/08/1985 | 26/03/1984 | 06/09/1991 | 08/05/1991 | 07/07/1989 | 07/07/1989 | 31/05/1994 | 30/04/1999 | 09/04/2002 | |
| Sri Lanka | 30/05/1978 | 30/05/1978 | 30/05/1978 | 27/02/1991 | 08/09/2000 | 11/02/1997 | 04/09/2000 | 11/10/2001 | 23/03/1999 | 08/09/2000 | | | |
| Sudan | 25/05/2000 | 18/01/1979 | 18/01/1979 | 15/06/1979 | 19/06/1990 | 18/05/2000 | 15/05/2000 | 22/05/2000 | 22/05/2000 | 25/05/2000 | 08/09/2000 | 05/05/2003 | |
| Suriname | 10/09/1979 | 27/10/1978 | 27/10/1978 | 05/11/1981 | 27/03/2003 | 27/03/2003 | | | | | | | |
| Swaziland | 15/11/1999 | 27/12/1999 | 27/12/1999 | 04/04/2003 | 04/04/2003 | 17/04/2003 | 17/04/2003 | 17/04/2003 | 13/05/2003 | 04/04/2003 | 04/04/2003 | | |
| Sweden | 17/01/1967 | 07/07/1971 | 10/07/1973 | 01/07/1975 | 15/01/1981 | 01/08/1980 | 26/07/1990 | 13/09/1990 | 13/09/1990 | 06/09/2001 | 06/06/2002 | | |
| Switzerland | 21/12/1970 | 14/09/1971 | 17/01/1978 | 05/03/1985 | 05/03/1985 | 09/01/1987 | 09/10/1990 | 12/03/1993 | 12/03/1993 | 03/04/1995 | 23/09/2003 | 23/09/2003 | |
| Syrian Arab Republic | 31/07/1980 | 10/07/1980 | 10/07/1980 | 25/04/1988 | 18/07/2002 | 24/03/2003 | 24/03/2003 | 29/09/2004 | 24/04/2005 | | | | |
| Tajikistan | 20/03/1996 | 29/02/1996 | 29/02/1996 | 19/10/2001 | 06/05/2002 | 11/07/1996 | 29/02/1996 | 12/08/2005 | 12/08/2005 | 18/07/2006 | 29/07/2002 | 16/07/2004 | |
| Thailand | 06/03/1972 | 16/05/1978 | 16/05/1978 | 14/05/1996 | 25/01/2006 | 29/08/2004 | | | | | | | |
| Timor-Leste | | | | | | | | | | | | | |
| Togo | 26/07/1971 | 09/02/1979 | 09/02/1979 | 30/12/1980 | 25/07/1986 | 07/06/2006 | 09/02/1990 | 10/03/2003 | 10/03/2003 | 22/07/2003 | 10/03/2003 | 10/03/2003 | |
| Tonga | 13/02/2002 | 21/02/1977 | 21/02/1977 | 09/12/2002 | 09/12/2002 | 24/01/2003 | 10/12/2002 | 06/12/2002 | 06/12/2002 | 10/12/2002 | 09/12/2002 | 09/12/2002 | |
| Trinidad and Tobago | 09/02/1972 | 31/01/1972 | 09/02/1972 | 15/06/1979 | 01/04/1981 | 25/04/2001 | 03/04/2001 | 27/07/1989 | 27/07/1989 | 03/04/2001 | 02/04/2001 | | |
| Tunisia | 25/02/1975 | 16/11/1981 | 16/11/1981 | 21/01/1977 | 18/06/1997 | 08/04/1993 | 07/06/1994 | 06/03/1998 | 06/03/1998 | 28/05/1997 | 22/04/2005 | 10/06/2003 | |
| Turkey | 17/12/1975 | 17/04/1973 | 23/12/1975 | 11/06/1981 | 15/08/1989 | 27/02/1985 | 07/07/1989 | 06/03/1998 | 06/03/1998 | 14/12/1994 | 30/05/2002 | 28/06/2002 | |
| Turkmenistan | 30/06/1999 | 25/05/1999 | 25/05/1999 | 25/06/1999 | 25/07/1999 | 07/01/2005 | 25/05/1999 | 08/06/1999 | 08/06/1999 | 14/01/2005 | 25/06/1999 | 07/01/2005 | 22/09/2005 |
| Tuvalu | 02/12/2005 | | | | | | | | | | | | |
| Uganda | 25/06/1982 | 27/03/1972 | 19/07/1982 | 05/11/2003 | 05/11/2003 | 10/12/2003 | 17/03/1994 | 11/11/2003 | 02/07/2004 | 05/11/2003 | 05/11/2003 | | |

PX202

| Country/ Instrument | 1 Aircraft Conv. | 2 Unlawful Seizure Conv. | 3 Civil Aviation Conv. | 4 Diplo Agents Conv. | 5 Hostage Taking Conv. | 6 Nuclear Mat. Conv. | 7 Airport Protection Protocol | 8 Maritime Conv. | 9 Fixed Platforms Protocol | 10 Plastic Explosive Conv. | 11 Terrorist Bombings Conv. | 12 Terrorist Financing Conv. | 13 Nuclear Terrorism Conv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ukraine | 29/02/1988 | 21/02/1972 | 26/01/1973 | 20/01/1976 | 19/06/1987 | 06/07/1993 | 03/01/1990 | 21/04/1994 | 21/04/1994 | 18/03/1999 | 26/03/2002 | 06/12/2002 | |
| United Arab Emirates | 16/04/1981 | 10/04/1981 | 10/04/1981 | 25/02/2003 | 24/09/2003 | 16/10/2003 | 09/03/1989 | 15/09/2005 | 15/09/2005 | 21/12/1992 | 23/09/2005 | 23/09/2005 | |
| United Kingdom | 29/11/1968 | 22/12/1971 | 25/10/1973 | 02/05/1979 | 22/12/1982 | 06/09/1991 | 15/11/1990 | 03/05/1991 | 03/05/1991 | 28/04/1997 | 07/03/2001 | 07/03/2001 | |
| United Republic of Tanzania | 12/08/1983 | 09/08/1983 | 09/08/1983 | 22/01/2003 | 24/05/2006 | 09/03/2004 | 11/05/2005 | 11/02/2003 | 22/01/2003 | 22/01/2003 | | | |
| United States of America | 05/09/1969 | 14/09/1971 | 01/11/1972 | 26/10/1976 | 07/12/1984 | 13/12/1982 | 19/10/1994 | 06/12/1994 | 06/12/1994 | 09/04/1997 | 26/06/2002 | 26/06/2002 | |
| Uruguay | 26/01/1977 | 12/01/1977 | 12/01/1977 | 13/06/1978 | 04/03/2003 | 24/10/2003 | 03/12/1998 | 10/08/2001 | 10/08/2001 | 14/06/2001 | 10/11/2001 | 08/01/2004 | |
| Uzbekistan | 31/07/1995 | 07/02/1994 | 07/02/1994 | 19/01/1998 | 19/01/1998 | 09/02/1998 | 07/02/1994 | 25/09/2000 | 25/09/2000 | 09/06/1999 | 30/11/1998 | 09/07/2001 | |
| Vanuatu | 31/01/1989 | 22/02/1989 | 06/11/1989 | 09/11/2005 | 18/02/1999 | 18/02/1999 | 25/01/2006 | 31/10/2005 | | | | | |
| Venezuela | 04/02/1983 | 07/07/1983 | 21/11/1983 | 19/04/2005 | 13/12/1988 | 23/09/2003 | 23/09/2003 | 25/09/2002 | 25/09/2002 | | | | |
| Viet Nam | 10/10/1979 | 17/09/1979 | 17/09/1979 | 02/05/2002 | 25/08/1999 | 12/07/2002 | 12/07/2002 | | | | | | |
| Yemen | 26/04/1986 | 29/09/1986 | 29/09/1986 | 09/02/1987 | 14/07/2000 | 05/01/2007 | 30/06/2000 | 30/06/2000 | 23/04/2001 | | | | |
| Zambia | 14/09/1971 | 03/03/1987 | 03/03/1987 | 31/05/1995 | | | | | | | | | |

183

PX202

# 5.2. SUPPORT FOR PAKISTAN

The 9/11 Commission recommended that the United States "make the difficult long-term commitment to the future of Pakistan" and "support Pakistan's government in its struggle against extremists with a comprehensive effort that extends from military aid to support for better education, so long as Pakistan's leaders remain willing to make difficult choices of their own."

## COMPOSITION AND LEVELS OF ASSISTANCE, INCLUDING SECURITY AND OTHER ASSISTANCE

The USG commitment to a long-term relationship with Pakistan is highlighted by President Bush's pledge to Pakistani President Musharraf to seek from Congress $3 billion in Economic Support Funds (ESF) and Foreign Military Financing (FMF) for Pakistan during the five-year period from FY-2005 through FY-2009. In addition to Economic Support Funds and Foreign Military Financing, the United States Government is also providing other forms of assistance to Pakistan, including funding for Child Survival and Health (CSH), Development Assistance (DA), International Military Education and Training (IMET), International Narcotics and Law Enforcement (INCLE), Anti-Terrorism Assistance (NADR-ATA), Export Control and Border Security (NADR-EXBS), Small Arms and Light Weapons (NADR-SALW), Terrorism Interdiction Programs (NADR-TIP), Food for Peace (P.L. 480 Title I & II), and Emergency Refugee and Migration Assistance (ERMA). The chart below offers a comparison of levels:

**ASSISTANCE TO PAKISTAN**
($ in millions)

| Account | FY-2005 (Includes Supplemental) | FY-2006 | FY-2006 Supplemental | FY-2007 Request | FY-2008 Request |
|---|---|---|---|---|---|
| CSH | 21.000 | 22.757 | 5.300 | 21.700 | 39.800 |
| DA | 29.000 | 26.990 | 10.500 | 29.000 | 18.000 |
| ESF | 297.600 | 296.595 | 40.500 | 350.000 | 382.900 |
| FMF | 298.800 | 297.000 | - | 300.000 | 300.000 |
| IMET | 1.885 | 2.037 | - | 2.075 | 2.000 |
| INCLE | 32.150 | 34.97 | - | 25.500 | 32.000 |
| NADR-ATA | 6.051 | 6.885 | - | 8.590 | 8.000 |
| NADR-CTF | - | - | - | 0.100 | 0.400 |
| NADR-EXBS | 1.000 | 0.700 | - | 0.600 | 0.500 |
| NADR-SALW | | | | | 0.500 |
| NADR-TIP | 0.900 | 1.000 | - | 1.000 | 0.900 |
| P.L. 480 Title I & II | - | 17.675 | - | TBD | TBD |
| ERMA | - | 0 | - | - | - |
| IDFA | - | - | 70.000 | - | - |
| TOTAL | 688.386 | 706.609 | 126.300 | 738.565 | 785.000 |

PX202

Approximately $706.6 million in U.S. assistance was provided to Pakistan from monies appropriated for Fiscal Year 2006. In addition, the Administration received a supplemental Fiscal Year 2006 appropriation from Congress for $126.3 million for Pakistan to meet relief needs from the devastating October 8, 2005, earthquake. The Administration requested $738.565 million in assistance for Pakistan for Fiscal Year 2007 and is requesting $785 million for Fiscal Year 2008.

The mix of U.S. assistance for Pakistan reflects the diverse ways that the U.S. Government is cooperating with Pakistan in pursuit of critical U.S. policy goals. These include prosecuting the War on Terror; countering nuclear proliferation; building a stable and democratic Afghanistan; ensuring peace and stability in South Asia through the continuation of the India-Pakistan reconciliation process; supporting Pakistan's efforts to become a modern, prosperous, democratic state; and assisting it in recovering from the October 8, 2005, earthquake.

U.S. Foreign Military Financing (FMF) funding for Pakistan is designed to enhance Pakistan's capabilities in the War on Terror; help it to better control its borders; meet its legitimate defense needs; and make Pakistan more secure so that it can more readily take the steps necessary to build a durable peace with all its neighbors—thus fostering security and stability throughout the South Asia region. FMF is being used by Pakistan to purchase helicopters, aircraft, weapons systems, munitions, and other equipment, which, inter alia, has enabled Pakistan's armed forces to operate effectively against foreign terrorists and militants in the rugged border areas along the Pakistan-Afghanistan border. The Pakistani military is continuing major military operations along that border, which to date have resulted in the capture or death of several hundred foreign terrorists and militants, at the expense of the lives of several hundred Pakistani servicemen.

International Military Education and Training (IMET) assistance for Pakistan complements Foreign Military Financing by providing training to Pakistani officers with the aim of promoting military-to-military cooperation, increased professionalism, and enhanced military interoperability between Pakistan and the United States. IMET also assists Pakistan in developing expertise and systems to more effectively manage its defense establishment; builds technical skills for better operation and maintenance of U.S.-origin equipment; and promotes military subordination to democratic civilian rule and respect for human rights. For Fiscal Year 2008, the Administration's International Military Education and Training request is $2.0 million, a slight decrease over the $2.075 million requested for Fiscal Year 2007.

### MEASURES TO ENSURE THAT ASSISTANCE HAS THE GREATEST LONG-TERM POSITIVE IMPACT ON THE WELFARE OF PAKISTANI PEOPLE AND THEIR ABILITY TO COOPERATE AGAINST TERROR

Economic Support Funds, Development Assistance, and Child Survival and Health assistance is being used to improve the lives of ordinary Pakistanis; lay the groundwork for the country's sustained economic growth; and strengthen social, political, and economic institutions, thus alleviating the conditions that breed extremism while demonstrating that the U.S. interest in Pakistan extends beyond the War on Terror to concern for the Pakistani people as a whole.  Economic Support Funds reduced Pakistan's bilateral debt to the United States by $1 billion in Fiscal Year 2003 and a further $460 million in Fiscal Year 2004. This debt reduction, together with prior comprehensive donor debt rescheduling, enabled Pakistan to reduce its total sovereign debt from 89 percent of gross domestic product in 2000 to 64 percent of gross domestic product in 2004, laying the groundwork for the implementation of economic reforms designed to stabilize its macroeconomic environment, boost economic growth, and reduce poverty.

PX202

During Fiscal Year 2007, $200 million in Economic Support Funds are being provided to the Government of Pakistan as budget support to enable the country to carry out further economic and social reforms, expand its poverty alleviation programs, and reform and expand access to public education and health care. Pakistan's use of this money is guided by the Shared Objectives agreed to with the U.S. Government.

A total of approximately $61 million in Fiscal Year 2007 Economic Support Funds and Development Assistance funds ($69 million in Fiscal Year 06) were requested to implement education reform programs in Pakistan and support the Government of Pakistan's education sector reform initiative. Pakistan's literacy rate greatly hampers its ability to develop and expand its economic base. Literacy averages 49 percent nationwide, and in Pakistan's remote tribal areas can be as low as 0.5% for women. The dearth of good public schools results in thousands of youth attending private madrassas, schools teaching only religious subjects, some of which also inculcate a radical, jihadist ideology. To tackle these problems, U.S. Government-funded education programs in Pakistan are aimed at improving the quality of education in Pakistani primary and secondary schools, especially in Baluchistan and Sindh provinces; improving early childhood education; training teachers; increasing parental and community involvement in schools, ensuring that teachers have adequate classroom materials; and promoting the development of a new generation of Pakistani leaders by providing scholarships for disadvantaged students to obtain a higher education. Adult and youth literacy education programs are targeting out-of-school youth and illiterate adult populations, with a focus on women and girls. In addition, student exchanges play a large part in our education efforts, with Pakistan's Fulbright program being the largest in the world.

Democratization is a key focus of U.S. Government assistance toward Pakistan. One of the fundamental tools for combating terrorism over the long-term is democracy. The programs include several mutually reinforcing components: legislative training to increase the effectiveness, transparency, and accountability of Pakistan's provincial and national parliaments; political party strengthening focused on identifying and training young reformers – tomorrow's political leadership; support for increased women's political participation; civil society development designed to increase the capacity of indigenous nongovernmental organizations to serve as policy watchdogs and promote human rights; and independent media training for journalists.

Pakistan trails its South Asian neighbors in almost all key health areas:  maternal and infant mortality; safe, affordable family planning; and control of infectious diseases. Fiscal Year 2007 Child Survival and Health funds will be used to increase availability of maternal and child health services, especially in rural areas; to improve healthcare at the provincial and district level through better resource management; to help maintain Pakistan's low human immunodeficiency virus prevalence rate by increasing awareness; to control other infectious diseases; and to improve water and sanitation.

Throughout 2007, Economic Support Funds, Development Assistance, and Child Survival and Health will support reconstruction efforts to rebuild, furnish, and supply health and education sector infrastructure and human resource capacities; to re-establish the livelihoods of earthquake victims; to relocate displaced victims; and to train skilled and unskilled individuals in vocational training, agriculture and livestock development, asset formation, enterprise development, micro-credit, and market restoration.

The Administration is requesting $382.9 million in Economic Support Funds and $39.8 million in Child Survival and Health for Pakistan for Fiscal Year 2008, a combined increase of $51 million from its Fiscal Year 2007 request. This increase is designed to complement Musharraf's Federally Administered Tribal Areas Sustainable Development Plan to improve governance, provide security,

PX202

and encourage economic development of the border area between Afghanistan and Pakistan. These funds will also help meet earthquake reconstruction needs, with a focus on rebuilding education, economic, social and health care infrastructure, including human capital, in the earthquake zone. The Administration is requesting for Fiscal Year 2008 $18 million in Development Assistance and $39.8 million in Child Survival and Health funds, a decline from the $29 requested for Development Assistance and an increase from the $21.7 requested for Child Survival and Health in Fiscal Year 2007.

International Narcotics and Law Enforcement funds for Pakistan continue to strengthen border security and enable law enforcement access to remote areas along the Pak-Afghan border – thus enhancing the country's capability to interdict traffickers in narcotics, arms, persons, and contraband, as well as terrorists. International Narcotics and Law Enforcement funds are used to reform, strengthen, and improve cooperation among Pakistan's law enforcement agencies, all of which play an important role in the War on Terror. International Narcotics and Law Enforcement funds support a counternarcotics Air Wing based in Quetta, Baluchistan, operated by Pakistan's Interior Ministry, which includes fixed-wing surveillance aircraft and Huey II helicopters. International Narcotics and Law Enforcement funds are used to procure vehicles and communications, surveillance, and related equipment for border control and counter-narcotics activities. Border security roads that facilitate law enforcement access to inaccessible parts of Pakistan's Federally Administered Tribal Areas are also funded by International Narcotics and Law Enforcement, as are an Automated Fingerprint Identification System and National Criminal Database, and training and equipment to expand law enforcement investigative skills and forensic capacities. In tackling poppy cultivation, International Narcotics and Law Enforcement funds also support crop control, alternative livelihood, and demand reduction programs.

Nonproliferation, Anti-terrorism, Demining, and Related Programs/Export Control and Related Border Security assistance strengthens Pakistan's export control system and thus prevents weapons of mass destruction and related technology transfers that raise proliferation concerns.  Nonproliferation, Anti-terrorism, Demining, and Related Programs/Export Control and Related Border Security funds are used for nonproliferation export control training addressing legal/regulatory reform, export licensing systems, and customs enforcement; for general inspection and weapons of mass destruction detection training for border control personnel; and for procuring specialized radiation/chemical-detection equipment. The Administration's $500,000 Fiscal Year 2008 request in Nonproliferation, Anti-terrorism, Demining, and Related Programs/Export Control and Related Border Security assistance represents a slight decrease from the $600,000 requested for Fiscal Year 2007.

Nonproliferation, Anti-terrorism, Demining, and Related Programs/Anti-terrorism Assistance funding for Pakistan enhances the capabilities of elite national police units responsible for counterterrorism investigations and tactical operations. Nonproliferation, Anti-terrorism, Demining, and Related Programs/Anti-terrorism Assistance trained the Special Investigation Group and crisis response teams that were integral in making arrests after the December 2003 assassination attempts on President Musharraf and the May 2004 car bombs near the U.S Consulate in Karachi. The Administration's Fiscal Year 2008 request of $8 million for Nonproliferation, Anti-terrorism, Demining, and Related Programs/Anti-terrorism Assistance represents a decrease from the $8.59 million requested in Fiscal Year 2007.

Nonproliferation, Anti-terrorism, Demining, and Related Programs/Terrorism Interdiction Programs funding for Pakistan is being used to support the Personal Identification Secure Comparison Evaluation System automated border control system, including to sustain ongoing program operations and to expand coverage to additional Pakistani ports-of-entry. The Administration is requesting $900,000

PX202

in Nonproliferation, Anti-terrorism, Demining, and Related Programs/Terrorism Interdiction Programs funds for Pakistan for Fiscal Year 2008, a slight decrease from the $1 million requested for Fiscal Year 2007.

The Administration is requesting $400,000 in Nonproliferation, Anti-terrorism, Demining, and Related Programs/Counter-Terrorism Finance funds for Fiscal Year 2008, an increase from the $100,000 requested in Fiscal Year 2007, to support assignment of a resident legal advisor to U.S. Embassy Islamabad. The legal advisor will assist the Pakistani government in establishing the counter-terrorist finance infrastructure needed to prevent money flows to terrorist groups.

### MEASURES TO ALLEVIATE DIFFICULTIES, MISUNDERSTANDINGS, AND COMPLICATIONS IN U.S.-PAKISTANI RELATIONS

The United States and Pakistan engage in extensive consultations to ensure that U.S. foreign assistance has the greatest long-term benefit for Pakistanis and also enhances the country's ability to cooperate in the global War on Terror. This is exemplified by the annual consultations that result in mutually-agreed Shared Objectives for the Government of Pakistan's use of $200 million in Economic Support Funds in direct budget support. The United States also participates in the annual Pakistan Development Forum, which brings together the Government of Pakistan and bilateral and multilateral donors to discuss Pakistan's development priorities and assistance needs. The United States holds regular consultations with major donors, including the European Union, Japan, and World Bank, to ensure that assistance to Pakistan is effectively coordinated and that its impact is maximized.

U.S. public diplomacy programs in Pakistan play a critical role in improving mutual understanding; garnering Pakistani support for United States policies; supporting Pakistani reforms; and laying the foundation for a stable, productive, long-term U.S.-Pakistan relationship. U.S. public diplomacy efforts include: people-to-people exchanges to bring Pakistani students, journalists, academics, politicians, and other opinion leaders to the U.S. for academic programs and study tours; placement of articles and opinion pieces in the Pakistani media and interaction with Pakistani journalists to explain U.S. policies; and public speeches and appearances by the U.S. Ambassador to Pakistan, other U.S. mission staff, and American exchange visitors.

## 5.3.  COLLABORATION WITH SAUDI ARABIA

### STEPS TO INSTITUTIONALIZE AND MAKE MORE TRANSPARENT GOVERNMENT-TO-GOVERNMENT RELATIONS

The U.S.-Saudi Strategic Dialogue, inaugurated in November 2005 by Secretary Rice and Foreign Minister Saud al-Faisal and reporting to President Bush and King Abdullah, continues to be the highest level institutionalized forum for coordinating U.S. and Saudi interests. The Strategic Dialogue consists of six working groups focusing on human development, economy, energy, consular affairs, military cooperation, and counterterrorism. These Strategic Dialogue working groups meet periodically to address issues ranging from reform to human rights to visas to child custody cases to security cooperation. Ministerial-level meetings, dealing with bilateral issues of strategic importance, are held as part of the Strategic Dialogue.

PX202

## INTELLIGENCE AND SECURITY COOPERATION IN THE FIGHT AGAINST ISLAMIC TERRORISM

The United States and Saudi Arabia have an ongoing and robust dialogue on a full range of counterterrorism issues, including regular high-level discussions and close working-level collaboration. Saudi cooperation in this area is significant, and U.S. law enforcement and intelligence agencies have benefited and continue to benefit greatly from Saudi information and intelligence on individuals and organizations. U.S. law enforcement agencies have provided counterterrorism training to Saudi security services in both Saudi Arabia and in the United States. We hope to continue to build upon past cooperation and training through additional CT initiatives.

In 2006, Saudi Arabia improved its capabilities to disrupt terrorist organizations and operations and attempted to preempt the resurgence of al-Qaida and any potential attacks. Since May 2003, the Saudi government has killed or captured al-Qaida's operational Saudi-based senior leadership, as well as almost all of the network's key operatives and many of the Kingdom's most wanted individuals. Saudi security forces killed or captured within four months all of the members of the al-Qaida cell that conducted the February 2006 attack on Aramco's Abqaiq facility. On August 21, five wanted terrorists surrendered in response to government assurances in the media that they would receive mitigated sentences. The Saudi government continues to arrest individuals associated with terrorism, including nascent operational cells and members of facilitation networks for terrorist groups in Iraq and South Asia, including al-Qaida.

In November 2006, the Saudi government announced that security forces had captured 136 known or suspected terrorists or those who supported terrorist networks during the previous three months, continuing a trend in which hundreds of terrorist suspects have been killed or captured since 2003. However, the United States continues to urge Saudi Arabia to take action against additional key terrorist financiers and facilitators in the Kingdom. The U.S. and Saudi Arabian cooperation on designations in the UN 1267 Committee has also been good. The Saudi Arabian Monetary Authority circulates to all financial institutions under its supervision the names of suspected terrorists and terrorist organizations on the UNSCR 1267 Sanctions Committee's consolidated list.

## SAUDI CONTRIBUTION TO STABILITY IN THE MIDDLE EAST AND ISLAMIC WORLD, INCLUDING THE MIDDLE EAST PEACE PROCESS, BY ELIMINATING SUPPORT FOR EXTREMIST GROUPS

Saudi Arabia was one of the first countries to condemn the September 11 attacks and provided key logistical support to U.S. forces in Afghanistan. Saudi Arabia has been an important partner in the War on Terror, particularly since the onset of the al-Qaida-sponsored terror campaign inside the Kingdom in 2003. Saudi Arabia also has strengthened its border controls and security and, in particular, its border with Iraq. These efforts have hampered the flow of terrorists and weapons across the border.

The United States and Saudi Arabia have worked closely to combat extremist groups and tendencies in Saudi Arabia. The government continued its wide-ranging re-education and training program that requires all government-sponsored religious leaders to attend courses designed to eliminate extremist ideology from mosques. Those who fail to abide by government directives have been fired or reassigned. Several religious leaders were fired or subjected to punitive action for failure to abide by government instructions to avoid provocative speeches against non-Muslims and non-Sunni Muslims. In previous years in some mosques, a second preacher would appear after the main preacher during the Friday prayer and speak provocatively against Americans, Jews, or non-orthodox Muslims. This practice is less prevalent now, due in large part to the government's efforts to combat extremism in the mosques.

PX202

In the cultural arena, official visits by a number of U.S. officials, including Ambassador-at-Large for International Religious Freedom John Hanford, highlighted the government's efforts to remove references in textbooks that promote hatred towards non-Muslims and Muslims of different sects. Senior Saudi officials have acknowledged the need to combat extremism by addressing comprehensive education reform.  In November 2006, the King Abdul Aziz Center for National Dialogue held the Sixth National Dialogue Forum in Al-Jawf called "Education:  Reality and Promises." The Dialogue produced a "road map" for educational reform, including revision of textbooks, curricula, and teaching methods to promote tolerance. The government also initiated the National Campaign to Counter Terrorism, which includes publications, lectures, and workshops intended to educate school-age girls and boys about the evils of terrorism.  Additionally, The Ministry of Education recently issued a new regulation that allows only Ministry-approved summer camps to operate.

## POLITICAL AND ECONOMIC REFORM IN SAUDI ARABIA AND THROUGHOUT THE ISLAMIC WORLD

Since 2005, Saudi Arabia has taken incremental steps toward political reform through holding municipal city council elections and allowing women to both vote in and compete for seats in chamber of commerce elections and the Saudi Engineer's Council. The United States welcomed the municipal elections as an opportunity to increase citizen participation in government and to increase government accountability. However, in the future the United States hopes to see the inclusion of women in the municipal elections, further expansion of citizen participation in politics, and the development of independent political and civil society institutions.

In 2006, there was also greater involvement in government activities by the Majlis Al-Shura (the Consultative Council) and the 178 municipal councils. Despite increased public and media discourse about human rights, the overall human rights environment remained poor.

The United States sponsors a variety of initiatives focused on increasing freedom and opportunity for Saudi citizens, including the Middle East Partnership Initiative (MEPI), support to the Middle East Democracy Assistance Dialogue and the Broader Middle East and North Africa (BMENA) Civil Society Dialogue, and a broad variety of public diplomacy educational, exchange, and outreach programs of the State Department's Bureaus of Educational and Cultural Affairs and International Information Programs. With MEPI support, Junior Achievement International--a program to educate youth on the benefits of free enterprise, business, and economics--will focus on opening a new chapter in Saudi Arabia this summer. MEPI also is supporting the creation of a women's business hub in the kingdom to expand the participation and variety of economic opportunities for women.

Higher oil prices bolstered the Saudi economy in 2006, resulting in a budget surplus of roughly $71 billion. In addition to reducing the national debt, Saudi Arabia is re-investing much of the surplus revenue in ambitious social development and massive infrastructure projects. The government also has supported investments to diversify the economy away from petroleum and the petrochemical industry. Saudi Arabia's accession to the World Trade Organization in December 2005 strengthened the Kingdom's ability to attract foreign investment.

## WAYS TO PROMOTE GREATER TOLERANCE AND RESPECT FOR CULTURAL AND RELIGIOUS DIVERSITY IN SAUDI ARABIA AND THROUGHOUT THE ISLAMIC WORLD

In November 2006, the Secretary of State designated Saudi Arabia a "Country of Particular Concern" pursuant to the International Religious Freedom Act. This is an important element of our bilateral dialogue with the Saudi government. The United States is working to promote religious and cultural diversity in Saudi Arabia and counter the spread of extremist ideology through high-level

PX202

engagement and through exchange programs aimed at reaching key population groups. We also support efforts to promote moderation and tolerance, such as King Abdullah's National Dialogue initiative.

On April 25, 2005, following the visit of then-Crown Prince Abdullah to Crawford, Texas, the United States and Saudi Arabia issued a joint declaration noting that "future relations must rest on a foundation of broad cooperation. We must work to expand dialogue, understanding, and interactions between our citizens." The declaration noted that such cooperation would include programs designed to:

- Increase the number of young Saudi students traveling and studying in the U.S.;

- Increase military exchange programs so that more Saudi officers visit the U.S. for military training and education; and

- Increase the number of Americans traveling to work and study in Saudi Arabia.

In 2005, Saudi Arabia initiated a scholarship program to increase the number of young Saudi men and women pursuing undergraduate and graduate studies in the United States. By 2006, more than 15,000 Saudis were studying in the United States on government scholarships.

### WAYS TO ASSIST SAUDI ARABIA IN REVERSING THE IMPACT OF FINANCIAL, MORAL, INTELLECTUAL, OR OTHER SUPPORT TO EXTREMIST GROUPS IN SAUDI ARABIA AND OTHER COUNTRIES, AND TO PREVENT THIS SUPPORT FROM CONTINUING IN THE FUTURE

The United States and Saudi Arabia work closely together to combat terrorism in Saudi Arabia and abroad. This includes collaboration on countering terrorist financing. The United States and Saudi Arabia have established a Joint Task Force on Terrorism Finance (JTFTF) that has strived to improve cooperation on combating terrorist financing. However, the Saudis still have not established a High Commission for Charities to oversee all charities in Saudi Arabia. Although the Saudis have increased oversight and monitoring of domestic charities, the government does not subject the foreign activities of Saudi-based international charities to the same level of scrutiny. Additionally, although the Saudis announced plans to establish the Commission for Relief and Charitable Works Abroad to oversee the activities of Saudi charities overseas, this body is not yet functioning.

The United States and Saudi Arabia have worked together to jointly designate entities to the UN 1267 Committee, and the Saudis have submitted over 20 names. To combat terrorist financing, Saudi Arabia has instituted new anti-money laundering and counterterrorism finance laws and regulations, including removing charity boxes from mosques, restricting the amount of cash that can be carried into or out of the Kingdom, and establishing a Financial Investigations Unit (FIU) in the Ministry of Interior to investigate money-laundering cases. However, the Customs authorities have not yet implemented the new regulations governing the movement of cash across Saudi Arabia's border.

PX202

## 5.4.  THE STRUGGLE OF IDEAS IN THE ISLAMIC WORLD

Public diplomacy is essential to a successful foreign policy and to America's national security. The United States recognizes that the global and generational challenge of countering terrorism is, at its heart, a contest of ideas and values, and that America is more secure when people around the world share the same hopes and freedoms.

### GOALS FOR WINNING THE STRUGGLE OF IDEAS

The State Department's public diplomacy work is guided by three strategic imperatives. First and foremost, it continues to offer a positive vision of hope and opportunity rooted in the enduring U.S. commitment to freedom. It promotes the fundamental and universal rights of free speech and assembly, the freedom to worship, the rule of law, and rights for women and minorities. It strives to isolate and marginalize violent extremists and undermine their efforts to exploit religion to rationalize their acts of terror. Finally, it fosters a sense of common interests and common values between Americans and people around the world.

### TOOLS TO ACCOMPLISH SUCH GOALS

The United States advances these strategic objectives by vigorously engaging foreign publics to explain and advocate American policies. Reaching foreign audiences with core policy messages on democracy, tolerance, and the universal values of liberty, justice, and respect are at the center of U.S. efforts to counter extremist rhetoric and disinformation coming from hostile groups.

The United States is promoting increased exchanges, which exemplify the transformative power of American global engagement. The significance of people-to-people exchanges has never been more clear or compelling. The 9/11 Commission Report recognizes the essential contribution exchanges make to national security. The National Intelligence Reform Act of 2004 reaffirms the importance of America's commitment to exchanges.

The United States is expanding educational opportunities as the path to hope and opportunity. English language programs not only provide crucial skills but also open a window to information about the United States, its people, and its values. Americans must also better educate themselves about the world; the President's National Strategic Languages Initiative will encourage more American students to study critical languages such as Chinese and Arabic.

Responding to and quickly debunking misinformation, conspiracy theories, and urban legends is crucial for success in the war of ideas. The State Department maintains a public "Identifying Misinformation" website, in English and Arabic, devoted to countering false stories that appear in extremist and other web sources. The site focuses on disinformation likely to end up in the mainstream media. Embassies have used information from this site to counter disinformation in extremist print publications in Pakistan and other countries. One article, "A Trio of Disinformers," was the subject of a 1,100-word front-page article in an issue of the influential pan-Arab newspaper al-Sharq al-Awsat. "Identifying Misinformation" is featured on the usinfo.state.gov website, and is listed first of 17.6 million sites in a Google search for the term "misinformation." At least 49 websites have direct links to it.

PX202



*SRI LANKA, Colombo:  A Sri Lanka demonstrator carries a placard showing Al-Qaeda chief Osama bin Laden during a demonstration in Colombo 21 July 2006. AFP Photo/Sanka Vidanagama*

PX202

The Internet, radio, television, and video products remain powerful tools for bringing America's foreign policy message to worldwide audiences. The State Department produces a wide array of print and electronic materials describing for foreign audiences, in their own languages, the need to counter those who have committed or wish to commit terrorist acts, as well as the achievements made in that struggle.

The State Department's premier web page to explain U.S. counterterrorism policy is "Response to Terrorism," created more than seven years ago and featured on usinfo.state.gov. The site is listed third out of 241 million sites in a Google search for the terms "terrorism U.S." At least 133 websites link directly to it.

In addition to featuring articles, texts, and transcripts from key policymakers, this site provides valuable links to the Electronic Journals series, the National Strategy for Combating Terrorism, the designated Foreign Terrorist Organization list, and the State Department's Country Reports on Terrorism. "Response to Terrorism" is located on the Internet at: http://usinfo.state.gov/is/ international_security/terrorism.html.

Support for and understanding of the United States go hand-in-hand with strengthening and empowering the voices most credible to speak out in favor of tolerance and rule of law to counter the violent extremists' message of hate and terror. One of public diplomacy's greatest assets is the American people. Empowerment of individuals and groups--from all walks of life--is a key aspect of the Department's public diplomacy efforts.

As we actively prosecute the struggle of ideas, we need to recognize that this will require a long-term effort spanning years and generations. For that reason, we are placing increased emphasis on programs directed at younger audiences, including undergraduate and, in select cases, high school students.

The U.S. Government's assistance programs, administered through USAID, the Middle East Partnership Initiative, the Millennium Challenge Corporation, and other U.S. entities, advance U.S. interests in this area directly through programs to increase access to education, improve health care and empower people to build better lives. Civic engagement is an important component. Assistance programs to strengthen and professionalize independent media and civic society contribute to opening the "marketplace of ideas," as well as support development and reform across the board.

Through the $66 million in FY 2006 supplemental funds for civil society development, broadcasting, and exchange efforts related to Iran, we have dramatically increased our ability to speak directly to the Iranian people and Diaspora. This supports efforts to clarify U.S. policy objectives to the Iranian people and to increase pressure on the Iranian regime to suspend its funding of extremist activities abroad.

## BENCHMARKS FOR MEASURING SUCCESS AND LINKING RESOURCES TO ACCOMPLISHMENTS

In 2004, State established the Public Diplomacy Evaluation Office (PDEO). Its mandate is to evaluate all major public diplomacy and exchange programs individually as well as provide an overall strategic framework for public diplomacy assessment.

The PDEO has researched other government public diplomacy evaluation and measurement tools and it is considered one of the most advanced in terms of measuring outcomes of public diplomacy. Organizations as diverse as the Peace Corps, Department of Defense, the British Council, the World Bank, and non-profits in Italy, Japan, and the Netherlands have all consulted with the PDEO on how to measure public diplomacy activities.

PX202

The measures used by the PDEO are based upon recognized social and behavioral science methodologies and include measuring changes in audience attitudes (knowledge, skills, perceptions, and understanding), behavior, and condition. Examples include:

- Improved or increased understanding of the United States, its policies and values;

- Initiated or implemented "positive" change within an individual's organization—positive referring to changes that support U.S. ideals and values;

- Institutional partnerships and linkages and on-going collaboration; and

- Changes in editorial content in major media.

## PARTICIPATION IN INTERNATIONAL INSTITUTIONS FOR THE PROMOTION OF DEMOCRACY AND ECONOMIC DIVERSIFICATION

The United States is a leading participant in many international organizations, such as the United Nations and NATO, that are important to the struggle of ideas and the War on Terror. We also play a leading role in other initiatives, such as the Forum for the Future and the Community of Democracies, which stimulate cooperation with other nations to advance the agenda of freedom. For the first time since its creation in 2000, the Community of Democracies, in response to U.S. recommendations, created regional dialogues which brought together governmental and non-governmental organization representatives from each region, including the Middle East, to discuss the particular challenges and solutions unique to their area.  We will continue to seek opportunities to build on the momentum coming out of the April ministerial, particularly in support of the Forum for the Future and the Broader Middle East and North Africa (BMENA) processes.

## U.S. ASSISTANCE SUFFICIENT TO CONVINCE ALLIES AND PEOPLE IN THE ISLAMIC WORLD THAT THE UNITED STATES IS COMMITTED TO WINNING THIS STRUGGLE

U.S. assistance programs are intended to improve economic conditions and opportunities in developing countries around the world, thereby serving the U.S. national interest in a more prosperous and secure international community. Our assistance can have the additional impact of demonstrating our commitment to help poorer countries or countries in special need, as we saw after the tsunami of 2004, and the Pakistan earthquake of 2005. There is, however, no set amount of money or time that we could identify as being sufficient to win the struggle of ideas.

PX202

## 5.5. OUTREACH THROUGH BROADCAST MEDIA

*This section is provided by the Broadcasting Board of Governors (BBG).*

### BROADCASTING BOARD OF GOVERNORS INITIATIVES: OUTREACH TO FOREIGN MUSLIM AUDIENCES

The Broadcasting Board of Governors (BBG) continues to build its capacity to broadcast to Muslim populations in the Middle East and other parts of the world. In the past four years, the establishment of the Middle East Broadcasting Networks (MBN) illustrates the urgency and gravity of the broadcast priorities associated with the nation's War on Terror. Radio Sawa and Alhurra television's 24/7 Arabic broadcasts reach audiences in 22 countries in the Middle East as well as throughout Europe.

In 2006, the BBG made further progress in implementing its broadcast strategy across the broad geographical and cultural landscape of the Middle East and beyond. A dramatic increase in the Persian language television programming of the Voice of America has been a singular accomplishment, providing four hours of original television news and information each day to the people of Iran. A 12-hour stream of programming is expected to be on line by April 2007. At the same time, Radio Free Europe/Radio Liberty strengthened its 24/7 Persian broadcasts via Radio Farda by adding 30 minutes of additional daily news programming, as well as  creating a more substantive, interactive website that enhances our ability to communicate directly with the Iranian people.

Through the combined skills of broadcasters at MBN, VOA, RFE/RL, and Radio Free Asia, the BBG is securing a public diplomacy strategy that mirrors U.S. national security priorities and focuses on nations that may suffer from, or contribute to, the scourge of terrorism. The implementation of this strategy focuses on building BBG's reach and impact within the Islamic world; facilitating citizen discourse; engaging the world in conversation about America; enhancing program delivery; helping audiences understand the principles of democratic societies; and employing modern communication techniques. The rigorous use of research, more frequent program review and oversight, and more compelling broadcast formats that will resonate in competitive, but critical, international markets remain crucial to this strategy. But underlying these techniques, the journalistic product and integrity remain the same.  BBG broadcasters provide accurate, objective, and comprehensive news and information.

As BBG resources have shifted from areas of the world where the local media are increasingly free and robust to the Middle East and Southwest Asia, the BBG has created a new broadcast entity, MBN, and refocused the broadcasts of others. RFE/RL is now a major broadcaster to Iran, Iraq and Afghanistan. RFE/RL reaches audiences in the Muslim countries of Uzbekistan, Kazakhstan, Turkmenistan, Kyrgyzstan, Tajikistan, and Azerbaijan as well as the majority Muslim populations of Tatarstan, Bashkortostan, and the North Caucasus. VOA has similarly reduced its broadcasts to Europe, increasing its focus on Iran, Afghanistan, Indonesia, Pakistan, and other critical nations.

During the past year, BBG's broadcasters harnessed their broad journalistic resources to fully report on issues such as the Israeli-Hezbollah conflict in Lebanon, to provide a program perspective that is often lacking in media outlets abroad. BBG correspondents in the Unites States and around the world contribute to coverage available in 58 languages. Live, simultaneous interpretation of Presidential speeches, such as the State of the Union, and of Congressional hearings enables Muslim audiences to hear the President's message, as well as the Democratic response._

PX202

## ARABIC BROADCASTING

To effectively communicate with the predominantly young audiences in the Middle East, the BBG created a new concept in international broadcasting – Radio Sawa – a 24/7 network of stations specifically designed to reach the large segment of the Arabic-speaking population under the age of 35. Radio Sawa went on the air in March 2002, quickly attracting and sustaining a loyal audience throughout the Middle East, as new transmission sites were added throughout the region. In 2007, Radio Sawa continues to broadcast accurate, authoritative, comprehensive, and timely news about the Middle East, the U.nited States, and the world.  In addition to 325 newscasts per week, Radio Sawa offers discussion and informational programs such as the popular "Sawa Chat" interactive feature and the "Free Zone," a weekly review and discussion of democracy and freedom as they relate specifically to the Middle East.  Feature programs encourage discussion of key social and political issues in a manner very different from indigenous Arab media.

Radio Sawa broadcasts on FM in Morocco (Rabat, Casablanca, Tangier, Meknes, Marrakesh, Agadir and Fes), Jordan (Amman and Ajlun), the Palestinian Territories (Ramallah and Jenin), Kuwait (Kuwait City), Bahrain (Manama), Qatar (Doha), U.A.E. (Abu Dhabi and Dubai), Iraq (Baghdad, Nasiriya, Basra, Mosul, Kirkuk, Sulimaniya and Erbil), Lebanon (Beirut, North Lebanon, South Lebanon and Bekaa Valley), and Djibouti.  Radio Sawa broadcasts on medium wave to Egypt, Yemen, Saudi Arabia, and Sudan. However, Radio Sawa recently received permission from Sudan to expand its reach in that country and broadcast Radio Sawa on FM transmitters throughout Sudan. By broadcasting on FM, Radio Sawa increases the number of listeners who can receive objective news and information about Sudan, the Middle East, and the world.

Building on the success of Radio Sawa, the BBG launched Alhurra Television on February 14, 2004, covering 22 countries in the Middle East via the same satellites used by major indigenous Arabic channels. In the three years Alhurra has been broadcasting 24/7, the channel has provided in-depth coverage of historic events, such as elections throughout the Middle East including Iraq, the Palestinian Territories, Egypt, U.A.E., Kuwait, Bahrain, and Israel. Alhurra has been a consistent leader reporting on and analyzing new democratic trends in the Middle East. Through objective and accurate reporting, Alhurra has been an example of a free press to the region and has become a trusted source of news for its estimated 20 million weekly viewers. In 2006, Alhurra expanded its live and breaking news coverage to provide viewers with the latest news and information as it is happening.

Alhurra also gives its audience insights into life in America and the American system of government. During the U.S. electoral campaign in 2004 and the midterm elections in 2006, Alhurra provided daily in-depth coverage of the candidates and the issues that impacted the U.S. elections. Broad coverage of the U.S. elections provided an opportunity to showcase the political institutions of the United States. Alhurra also dramatically increased its live news coverage of events and speeches by President Bush, Secretary of State Rice, and members of Congress. Additionally, Alhurra has reporters that cover the White House, Congress, State Department and the Pentagon. Alhurra s current affairs programs also highlight the U.S. Inside Washington takes viewers behind the scenes of the political process in Washington with guests such as Supreme Court Justice Antonin Scalia, former Secretary of State Alexander Haig, and Representatives Howard Berman, Ileana Ros-Lehtinen, Tom Lantos, and Peter Hoekstra. The network also produced a documentary series on American culture and values, and Americans, which proved to be a popular program with audiences and the Arabic press.

PX202

Alhurra is also producing programs to provide a forum for discussion on sensitive issues such as human rights and the rights of women. Current affairs programs like Alhurra's Equality continue to be unique in the region's media, due to the limitations imposed by the countries that finance regional television networks. Hosted by Saudi journalist Nadine Al-Bdair, the program discusses the rights of women and tackles subjects such as young girls being forced into marriage, the right of women to drive and the rights of women in Islam. There has been incredible feedback on this program and others, some praising the courageousness of this program and others condemning Alhurra for discussing these topics. In 2006, Alhurra also launched Eye on Democracy focusing on democratic efforts throughout the Middle East and human rights abuses in the region.

Throughout its three-year history, Alhurra has provided a forum for discussion of important topics by a wide variety of experts including the all-important voices of moderation. Alhurra's talk shows, roundtables, and documentaries have routinely tackled vital topics that are taboo on many other stations in the region, including the struggle for human rights, the position of women in Arab society, religious freedom, freedom of the press, and freedom of expression.

Radio Sawa and Alhurra Television continue to grow in popularity and credibility and now reach a total unduplicated audience of 35 million adults 15 and older according to international research firms such as ACNielsen and Ipsos. The surveys show that, despite high levels of anti-American sentiment throughout the region, both Alhurra and Radio Sawa are regarded as credible sources of news and information by their audiences.

## IRAQ

Alhurra Iraq, a special television stream containing more concentrated news and information to and about Iraq, began broadcasting in April 2004. Through satellite and terrestrial broadcasting in Iraq, Alhurra has gained a foothold in one of the most competitive TV marketplaces in the world. Alhurra's goal is to help its viewers make educated and informed decisions about political, social, and economic events affecting their lives. To this end, during the historic elections in Iraq, Alhurra produced and broadcast the first televised electoral debate in Iraq's history, featuring six candidates representing the major political parties. This historic debate brought about a candid discussion among the candidates and provided a forum for the viewers to be able to compare and contrast each of the parties' candidates.

RFE/RL's Radio Free Iraq continues to provide the Iraqi people with breaking news and in-depth coverage of developments in Iraq and the Middle East. RFI appeals to a wide spectrum of listeners in Iraq, covering the most significant political issues in the country through its extensive network of stringers reporting through its Baghdad bureau. During 2006, the editors in Prague continued to develop thematic programming focused on democracy-building, and an enhanced website has shown strong growth topping more than 170,000 page views in December. A December 2005 survey showed listening rates for RFI at a weekly level of 21.6 percent.

Radio Free Iraq provided extensive coverage of President Bush's trip to the Middle East in November 2006, and aired a special broadcast on President Bush's talks in Jordan with Iraqi Prime Minister Nuri Kamal al-Maliki. The program included reports from RFI correspondents in Amman on the President's joint press conference with al-Maliki, with lengthy excerpts of statements by the two leaders, analysis and reactions within Iraq.

Throughout December, RFI devoted substantial airtime to the report of the Iraq Study Group. Coverage focused on the report's content, analysis by experts, and local and international reactions to its findings. RFI presented the positions of Iraqi national and regional leaders, and statements

PX202

by leaders in the United States, Britain, Israel, Jordan, Syria, and Egypt. RFI correspondents interviewed political analysts, commentators and advisers to politicians in Baghdad, Damascus, Tel Aviv, Washington, Arbil, and Kut, airing a range of views and responses.

Weekly programs such as "Human Rights in Iraq" provided a forum for extensive coverage of the trial of Saddam Hussein, in addition to the daily coverage of the trial when it was in session.  On November 5, RFI broke into regular programming to bring a live report with the verdict, followed by a special half-hour program of live reactions from five Iraqi cities--Baghdad, Tikrit, Mosul, Amara, and Basra--and statements from President Bush and Iraqi government officials.  The same format was used the day of the execution.

## ARABIC IN EUROPE

In August 2006, Alhurra Europe was launched to bring together the best programs of Alhurra and Alhurra-Iraq to the Arabic-speaking population in Europe. Alhurra Europe can be seen on the Hotbird satellite system that reaches all of Europe.

## KURDISH

Broadcasting four hours of daily radio programming, VOA's Kurdish Service remains highly popular. According to a 2006 survey conducted by InterMedia Research, VOA's Kurdish Service scored a 31 percent audience share among the Kurds of Iraq. The survey stated: "In fact, no radio station ranks higher in terms of reliability," and added: "VOA occupies a unique position among Iraqi Kurds as it is the only major international broadcaster offering programs in the Kurdish language." VOA Kurdish focuses on the Iraqi scene through a network of stringers, with special programs and call-in shows devoted to combating extremism inside the country and the surrounding region. Special coverage highlighted the debate among Kurds on the role of Islam in the regional and national constitutions of Iraq. In interviews with VOA Kurdish, moderate Kurdish-speaking clerics tried to calm the passions raised by the Pope's comments on Islam. The Iranian regime's nuclear ambitions and its support for extremist groups in Iraq and in the Middle East received particular coverage in the form of interviews and panel discussions.

## IRAN

Broadcasting to Iran remains a key BBG priority.  Pursuant to increased funding, VOA Persian television to Iran essentially doubled its broadcast hours over 2005 levels by June 2006, and expanded fourfold by October 2006. This programming has been met in Iran with open arms.

VOA's current television lineup includes: NewsTalk, a discussion program with a panel of experts who examine the day's headlines; News and Views, VOA Persian's flagship program featuring live news coverage of the latest headlines from Iran and the world; Roundtable, a call-in and discussion program on politics and current affairs; and Late Edition, a daily nightly wrap-up of the day's news, which is targeted to a younger audience. Programming on human rights, democratic governance, freedom of speech, the rights of women and ethnic minorities, the issue of nuclear energy vs. nuclear weapon development, and news and analysis are constant features of our programming.

This year, Persian television featured an impressive array of prominent guests including Under Secretary of State Nicholas Burns; Principal Deputy Assistant Secretary for Near Eastern Affairs James Jeffrey; Nobel Peace Prize laureate Shirin Ebadi; journalist Akbar Gandji, recently released from jail; Holocaust survivor Elie Wiesel; and many U.S. senators and representatives. VOA TV has

PX202

also covered Senate and House hearings on Iran. In the near future, the Service will launch a series on 28 years after the Islamic Revolution in Iran and the impact it has had on that country and the region.

Other program examples include: an interview with Ted Koppel about his documentary, "Iran – the Most Dangerous Nation," which explored the generation gap in Iran between aging clerics and the 70 percent of the population below the age of 30; an interview with former CIA Director James Woolsey at the American Foreign Policy Council conference, "Understanding the Iranian Threat"; coverage of testimony by General John Abizaid, Senior Advisor to the Secretary of State and Coordinator for Iraq David Satterfield, and CIA Director Michael Hayden before the Senate Armed Services Committee; live broadcast, with simultaneous translation into Persian, of President Bush's January 11 address to the nation about increasing the number of troops in Iraq; commentaries from Iraqi government officials welcoming President Bush's new strategy for their country; U.N. Secretary-General Ban Ki-Moon's statement that the UN backs any genuine efforts to improve security for Iraqis and to stabilize the country; and commentaries from Capitol Hill on the President's new Iraq strategy.

VOA devotes significant effort to hard-hitting topics on the role of religion in society, including Iranian regime's use or abuse of Islam to solidify its control of power, as well as to justify the oppression of women and limit free speech, free association and freedom of religion. These stories generate massive email response and other feedback from Iran, as well as from Persian-speaking populations in Kuwait, the UAE, Qatar, Saudi Arabia, Iraq, Turkey, Syria, and Lebanon.

In 2006, Radio Farda, a joint service of RFE/RL and VOA, continued to broadcast to Iran 24 hours a day, with a goal of providing Iran's predominantly young population news and information. As Radio Farda has matured, and as funding has supported the addition of larger blocks of news and information, it has done so in its tradition as a "surrogate" broadcaster, presenting news about the country to which it broadcasts. Current broadcasts include over eight hours of news and information programming daily, with popular Persian and western music drawing in the younger audience. Radio Farda finds direct sources of information from within Iran in spite of the challenging environment for journalism.

Radio Farda reaches significant audiences in Iran, in spite of Iran's consistent jamming. Listening remained stable at 13.5 percent -- the highest weekly reach rate of any international broadcaster, and more than double that of BBC's Persian service. Among its key target group, youth aged 18-29, Farda's weekly reach was 28.7 percent. Utilizing new resources provided by the U.S. Congress, Radio Farda has augmented its website to expand breadth of content -- more stories to read, more images to view, and more opportunities to comment on news and information. December 2006 was the first full month of operations for the revamped Farda site, which showed a million-page increase in usage over the previous month.

The Internet will become increasingly important in the lives of Iranians seeking objective news and information about Iran and the world. Radio Farda's new site also brings a new level of interactivity to Radio Farda. This includes the "Most Popular and Most Emailed Stories" and "Farda Club" – for moderated discussions and blogs, providing immediate feedback from users to Radio Farda and other users. During the first 30 minutes that the site was live, about 500 visitors viewed a story on a protest at the Amir Kabir University.

Farda also provided thorough news coverage and analysis of the December 15, 2006, Assembly of Experts and municipal elections held throughout Iran, widely considered a setback for conservative forces aligned with President Mahmoud Ahmadinejad. In addition to pre-election analysis and hour-by-hour coverage of the voting from correspondents in all provinces on Election Day, Radio Farda broadcast comments from both Iranian party leaders and international experts on Iran.

Radio Farda provides Iranians with both breaking news and updates on social and political movements and unrest in their country, including such issues as the strikes by Iranian workers. Farda aired comments from student leaders, who proclaimed their solidarity with striking workers, as well as an exclusive eyewitness account from an Iranian trade union official of the surprise arrest of union leader Mansour Osanlou in Tehran. Radio Farda has provided ongoing coverage of ethnic unrest among the Azeri and Kurdish population of Iran.

In its human rights reporting, Radio Farda covered government attacks against women, including the Tehran police dispersing a gathering to mark International Women's Day by beating the assembled women. On December 11, 2006, within minutes of receiving word that students at Tehran's Amir Kabir University were heckling President Ahmadinejad during a speech he was giving, Radio Farda reported the news to its listeners around the country.

## PAKISTAN

Since VOA introduced a new, youth-oriented, 12/7 radio station called Radio Aap ki Dunyaa (Your World) in 2004, the station has continued to attract a growing number of listeners with its contemporary format that includes news, information, roundtable discussions, call-in shows, interviews, features, and music. Research indicates that Radio Aap ki Dunyaa's audience has doubled since its debut. The programs target Pakistani listeners between the ages of 15 and 39 – which account for some 60 million of Pakistan's 150 million residents – as well as millions more potential listeners in India, the Gulf, and the Diaspora. To increase Radio Aap ki Dunyaa's reach, VOA introduced a bilingual web page that offers live audio streaming of news and entertainment programming.

Stories of interest to VOA's Muslim audience are a central part of the Urdu Service's programming on radio, the Web, and television. The Service provided detailed coverage of the 2006 U.S. mid-term elections, with a particular focus on the perspectives of American Muslims, both Republican and Democratic. VOA followed the campaign and successful election of Congressman Keith Ellison (D-MN), the first Muslim member of Congress. The Urdu Service also covered the observations by American Muslims of Raman, the month of fasting, with daily television features, including special packages on iftar (breaking of the fast) at the White House, and on the participation of Karen Hughes, Under Secretary of State for Public Diplomacy, in Washington-area celebrations of Eid, the last day of Ramadan and the most important holy day in Islam. A five-part interfaith discussion underscored freedom of religion in the United States.

**VOA's Urdu Service** entered the television market in November 2005 with a 30-minute program, "Beyond the Headlines," a news magazine featuring current affairs, discussions of issues behind the news, and feature stories illustrating shared values between Pakistanis and Americans. The show airs every weekday during prime time on GEO, Pakistan's most widely watched satellite TV channel. The program includes in-depth reports from VOA's Islamabad bureau on Pakistani politics and cultural issues; hard-hitting interviews with newsmakers, policy experts, diplomats and journalists; and stories examining the similarities between life in Pakistan and the United States, including Pakistani-American life and its contribution to both cultures.  "Beyond the Headlines" newsmaker

PX202

interviews have generated widespread coverage in the Pakistani press.  According to GEO-TV's market research, "Beyond the Headlines" is the most widely watched program in Pakistan during the 7:30 to 8:00 p.m. local time slot.

## AFGHANISTAN

Since 9/11, the BBG increased radio broadcasting to Afghanistan pursuant to the Radio Free Afghanistan Act. Together RFE/RL and VOA provide a 24-hour daily radio service  in the Dari and Pashto languages that has a vast audience reach in Afghanistan. In addition, VOA provides a one hour daily program of branded TV news and cultural features to state-owned Kabul TV.

An InterMedia survey in September 2006 found RFE/RL's Radio Free Afghanistan to have the highest weekly reach of any communications medium in Afghanistan, including domestic radio and TV, at 58.0 percent. Afghanistan is the only country in the RFE/RL broadcast region where a U.S. government-funded broadcaster is the dominant media.

With its wide audience and high level of public trust, Radio Free Afghanistan is a key media outlet in Afghanistan for both U.S. and Afghan officials. For example, during the last year, Radio Free Afghanistan covered President Bush's March 1 visit to Afghanistan, the surprise first stop his tour of South Asia.  Radio Free Afghanistan provided a simultaneous translation of his joint press conference with President Karzai after their meeting at the presidential palace in Kabul.  On June 28, U.S. Secretary of State Rice's exclusive interview to Radio Free Afghanistan during her visit to Kabul assured the Afghan people that "the American people are committed to Afghanistan's future..."

The Service provides reports from Washington, Prague, and Kabul, exclusive interviews and round-tables, and ongoing coverage of the efforts by Coalition Forces to subdue the insurgency.  During June, Radio Free Afghanistan reporters in the Kandahar and Helmand provinces went out with Afghan and Coalition Forces in southern Afghanistan to report on the launch of the second phase of Operation Mountain Thrust, the largest counterinsurgency operation in the country since the Taliban regime was toppled in 2001.

An example of Radio Free Afghanistan's thought-provoking programming was its comprehensive coverage of the apostasy case of Abdul Rahman, from his arrest in mid-March for his conversion to Christianity, to his release March 28 and request for asylum in Italy.  Correspondents in Kabul interviewed Ministry of Justice and Afghan Supreme Court officials about the charges and the specific laws on apostasy. Radio Free Afghanistan aired statements from Afghan judicial officials, reactions from ordinary Afghans, and from leaders around the world including President Bush and Pope Benedict XVI. Radio Free Afghanistan's weekly live call-in show March 30 was dedicated to the Rahman case, inviting listeners to exchange views on religious tolerance.

Human rights programming provides interviews with senior U.S. officials, and features Afghan citizens struggling with everyday issues, such as an interview with 14-year-old Zohra Amiri, a student who was criticized for attending a music academy for women sponsored by the United Nations and the European Union because of prohibitions under Islamic law for women to play music. On October 12, Radio Free Afghanistan for the first time broadcast a call-in show conducted in three languages: Dari, Pashto, and English, featuring Mark Laity, the senior spokesman for NATO/ISAF in Afghanistan, as a guest in the Kabul bureau.

VOA shares the 24 hour radio broadcast clock with RFE/RL, providing up to the minute news and information to large Afghan audiences. In addition, VOA has also launched new television and radio programming to engage broad Afghan audiences and to focus on the Pashto-speaking people in the

Afghanistan-Pakistan border region. In September, VOA launched "TV Ashna", a Saturday through Thursday 60-minute TV news program (30 minutes each in Dari and Pashto) broadcast directly to viewers nationwide via satellite and its affiliate Radio and TV Afghanistan (RTA). This coverage now complements VOA's 12 hours of extensive radio programming to the country. TV and Radio Ashna feature regular segments on American Muslims and Civil Rights, Islam in America, and Islam and Democracy through the segment's interviews and daily live call-in programs.

Ashna provided extensive coverage of the first Muslim Member of Congress being sworn into office, using the Koran that belonged to Thomas Jefferson. Highlights of Ashna's information programming in 2006 included:

- An exclusive interview with General Richard Myers, former General Chief of Staff, in which he said NATO and Coalition Forces will respond to any attack across the border of Pakistan only when they are under attack;

- An interview with General David Richards, Commander of ISAF forces in Afghanistan in Kabul, who said that NATO and Afghan forces are preparing themselves for anticipated Spring attacks by the Taliban, and described efforts by NATO and the PRT (Provincial Reconstruction Team) to help the Afghan people rebuild their country;

- A profile of Zinedine Zidane, the world champion soccer star for the French national team, and his return to Algeria for the first time in 20 years to be honored by President Boutef-lika; and

- Interviews with both the Imam and Chairman of the Mustafa Center in Virginia, and the president of the Afghan Academy in Virginia, regarding the freedom of practicing Islam in America.

## THE PAKISTAN/AFGHANISTAN BORDER REGION

In August, VOA introduced Radio Deewa (Light), a new broadcast stream aimed at the 40 million Pashto-speaking people living in the Afghanistan-Pakistan border region. This three hour daily program offers local, regional, and international news as well as features on Islam in America, including interviews with prominent Muslim leaders. VOA Pashto Deewa Radio features a daily segment called "Islam in America," and recently had live reports from Eid Celebrations by Muslims in America. Additionally, Deewa Radio focuses on the Islamic world through its daily call-in shows.

Deewa has interviewed dozens of Muslims of South Asian origin residing in America and has aired profiles of Islamic Centers and Mosques in its programming (i.e., the Islamic Center in Washington DC, the Mustafa Masjid in Virginia, and the Mustafa Mosque in New York). During the month of Ramadan, Deewa aired daily interviews with Muslims in America, from Washington, D.C., New York, the Carolinas and Texas. These interviews tackle the topic of freedom of religion in America, the observance of fasting, and attendance at area mosques for late night prayers and ceremonies.

Last month Radio Deewa had four call-in shows during Eid celebrations in America and its reporters reported live from area mosques on Eid Prayers. The Service also regularly interviews American Pashtuns, both men and women of every walk of life, to talk about their experiences of practicing their religion and culture in the United States. A call-in show on "Islamic Mysticism" featured a prominent mystic scholar, Tahir Bukhari, from the Northwest Frontier Province of Pakistan responding to questions posed by more than a dozen callers from Pakistan, Afghanistan and the Diaspora.

PX202

The Service regularly interviews the Pakistani Foreign Ministry spokesperson, Afghan officials, and Pakistani federal and state cabinet ministers and religious and tribal leaders on political and social issues.

## TURKEY

In recognition of media listening habits in Turkey, VOA's Turkish Service is moving to devote more of its existing resources to TV and the Internet. In 2006, VOA Turkish expanded its TV affiliation in Turkey by launching two weekly live broadcasts on TGRT News TV network, a 24-hour nationwide news network with a weekly audience share of over 30 percent of Turkey's estimated 25 million regular viewers. A 15-minute wrap of the latest developments in news and current affairs, VOA-TGRT Live is broadcast at 9:00 p.m. local time in Turkey on Tuesdays and Fridays. In addition, VOA Turkish Service produces a weekly 30-minute news and magazine program that is aired on TGRT News network 9:30 p.m. local time on Sundays. Managers of TGRT News TV are pleased with this cooperation and have indicated that they would like to increase the VOA-TGRT Live broadcasts to five days per week.

VOA Turkish radio broadcasts include two news shows (Mon-Fri) on NTV-FM, Turkey's largest FM news network. Discussions are underway with another Turkish network, TGRT-FM, to carry the 30-minute evening radio show. VOA has also been working to attract more users to the VOA Turkish website. The average number of monthly visitors to the VOA Turkish site has tripled this year to almost 65,000/month. VOA Turkish is also one of the first VOA languages to offer text versions of top news stories for use on web-enabled handheld devices such as cell phones and PDAs (Personal Digital Assistants). This service was launched in June 2006.

VOA Turkish Service summarized the U.S. State Department's 2006 Annual Report on International Religious Freedom and reported on the reactions from Turkish officials and experts. In an exclusive interview to VOA in July 2006, Turkish Foreign Minister Abdullah Gul responded to questions about issues of religious tolerance in Turkey and shared his views on the so-called "clash of civilizations." The Service aired original radio and TV reports on how U.S. Muslims celebrated the month of Ramadan and other Muslim holidays last year.  In a series of reports and interviews during Pope Benedict's highly sensationalized visit to Turkey in November 2006, Turkish Service focused on issues related to "the current lack of dialogue between Christianity and Islam." Those interviewed included Andrew Duff, member of British Parliament and Joost Lagendijk, Dutch member of the European Parliament and co-chairman of the EU-Turkey Joint Parliamentary Committee.

## INDONESIA

VOA expanded its reach to Indonesia's more than 200 million Muslims in 2006 by launching six news and information programs for Indonesia's top three TV networks. VOA also peppered the TV market with a dozen or more special series on subjects ranging from illegal arms sales by Indonesians to the diverse faces of Islam in America and how Americans celebrate the fasting month of Ramadan. VOA is now seen on five national TV networks and 16 regional TV stations. In late 2006, VOA conducted a five-week promotional campaign on Indonesian TV. The one-minute "VOA World News Quiz" spots aired several times a day on the top four national stations and attracted over 450,000 text and email quiz entries. Additionally, more than 200 radio stations now carry one or more of VOA's program offerings, including the youth-oriented "VOA Direct Connection" and "VOA Headline News." This year also saw greater VOA outreach to Indonesian youth. Three times a day

**PX202**

the popular youth station, Prambors, airs "VOA Minute", a rapid-fire segment of breaking news and information of interest to youth.  As a result of this growth in TV and radio, 7.9 million Indonesians now tune in to VOA regularly, making VOA the number one international broadcaster in Indonesia.

With more and more Indonesians jumping into digital communications, VOA has begun providing a range of information services including a dynamic webpage, a weekly electronic newsletter and daily email news bulletins direct to cell phones.

Finally, VOA's presence on the ground inside Indonesia solidified and grew in 2006, with its Jakarta news bureau becoming a valuable resource for coordinating VOA's local TV and radio news coverage and for developing new programs, especially for television.

## UZBEKISTAN AND CENTRAL ASIA

VOA Uzbek reaches Muslim audiences in Uzbekistan, the most populous Muslim country in Central Asia, with a total population of 27 million. VOA broadcasts are carried on short wave, medium wave from Tajikistan, and two FM frequencies in Osh and Jalalabad, Kyrgyzstan. Both reach a key area of Uzbekistan, the Ferghana Valley, a hotbed of Islamic fundamentalism. VOA's daily 30-minute broadcasts feature high profile interviews with various U.S. and international sources discussing critical issues, such as the War on Terror and the future of U.S. relations with Uzbekistan. Interviews with Members of the U.S. Congress and key policymakers, bring U.S. policy and debate alive for listeners. Pegged to the State Department's annual report on religious freedom, VOA Uzbek aired two series on Islam in Central Asia and women's rights. When Uzbek-speaking Muslims living in the United States observed their religious holidays, VOA Uzbek covered their stories as examples of tolerance in the American way of life. On television, VOA continues to produce a weekly 30-minute feature magazine called Exploring America, which is being placed on a TV satellite network reaching Uzbek-speakers in Afghanistan and the rest of Central Asia, and on two local stations in the Uzbek-speaking area of Osh, home to Uzbek and Kyrgyz Muslims.

RFE/RL's programming to Uzbekistan, Turkmenistan, Tajikistan, Kyrgyzstan and Kazakhstan continued despite various forms of harassment and even repression against its correspondents and editors. In Turkmenistan, an RFE/RL correspondent died while in prison. The recent death of President Saparmurat Niyazov of Turkmenistan may provide an opportunity for RFE/RL to register its in-country correspondents, and eventually open its first bureau in the country if there is a political realignment in Turkmenistan. In Uzbekistan, RFE/RL's bureau remains closed by Uzbek government order. The service continues to provide news coverage and democracy promotion under harsh conditions reminiscent of the Soviet era. In Kyrgyzstan, RFE/RL has been able to work with Kyrgyz National Television (KTR) to produce and air local television news programming.

## AZERBAIJAN

According to a March 2006 InterMedia national survey in Azerbaijan, VOA Azerbaijani had emerged as the leading international broadcaster in Azerbaijan with an audience share of 34 percent. In addition to TV and radio offerings, VOA Azerbaijani maintains two web sites, one in Farsi to reach the large Azeri-speaking minority in Iran (estimated at 15 million).  Azerbaijani Foreign Minister Elmar Mammadyarov was interviewed exclusively for TV by the VOA Azerbaijani Service in September 2006. Among other issues, he commented on "tensions between Muslims and followers of other faiths throughout the world." In November 2006, when an article published in an Azerbaijani newspaper was seen as denigrating Islam, leading Muslim clerics in neighboring Iran issued a religious order calling for the killing of its author. VOA's Azerbaijani Service interviewed several religious

205

PX202

experts as well as men and women on the street both in Azerbaijan and Iran to get their reactions. This issue, and the U.S. State Department's Annual Report on Religious Freedom, were discussed in two separate live radio call-in shows produced by VOA's Azerbaijani Service.

RFE/RL's Azerbaijan service drew a 7.6 percent audience on radio only in 2006 maintaining its status as the lead international radio broadcaster in the country. RFE/RL lived through the same setbacks in local delivery of programming as VOA during the past year. Programming remains a mix of news-casts and democracy programming on political issues and civil society such as: human rights, media rights, minorities, judicial rights, religion and elections. Social issues of health care, pensions, public welfare, unemployment and drugs are increasingly a component of the programming. The service, working in concert with RFE/RL's Armenian Service, provided comprehensive coverage of intensi-fied negotiations over a settlement to the longstanding dispute over Nagorno-Karabakh including on-the-scene coverage of summits in Rambouillet, France in February, and Brussels, Belgium in November.

## AFRICA

VOA reaches a large percentage of the almost 250 million Muslims in Sub-Saharan Africa. One in every five Muslims in the world lives in Africa, and one-third of Sub-Saharan Africa's population is Muslim. VOA Hausa reaches 51 percent of the Hausa-speaking Muslim population in Nigeria (about 20 million), and about 65 percent of the Muslim population in Niger.

VOA's broadcasts serve an important role in easing tensions and presenting the facts about local, international, and U.S.-based news stories. For example, when Danish cartoons depicting Muhammed generated protests throughout the Muslim world, including many countries in Africa, VOA was able to provide needed perspective to the story. The Africa Division covered this major story from every angle, while giving special attention to the African reaction. In Nigeria, the northern city of Maiduguri was the scene of rioting. Muslims attacked Christians and burned churches and shops owned by Christians. The services contacted Muslim, Christian and civic leaders as well as politicians, journalists and ordinary people in Africa, in the United States and in other parts of the world to ensure that listeners could evaluate the situation fairly.

**Northern Nigeria.**  A VOA Africa Division program targeting Hausa speaking Muslims in northern Nigeria, "Political Crossfire" (Tsaka Mai Wuya), has been praised by ordinary listeners and many Muslim political leaders. In this lively program with listener participation, politicians representing different points of view discuss the hottest political issues of the day. In a ceremony in late June of 2006, many citizens, leading media outlets, leaders of several political parties, and the Nigerian Vice-President participated in a ceremony where a national Nigerian NGO with 2.5 million members, Friends of Nigeria, presented an award to "Political Crossfire," the first award of its kind. The leader of Friends of Nigeria called VOA Hausa "a watchdog of democracy in Nigeria."

**Amharic.**  On December 28, 2006, the Horn of Africa Service added an additional half-hour morning radio news program in Amharic to cover the crisis in the predominantly Muslim country of Somalia. The program, whose centerpiece is an integrated newscast with correspondent reports and actuali-ties, is broadcast on shortwave in the target area Monday through Friday. The program is heard in the region at 6:00 a.m. local time, with a repeat at 7:00 a.m. local time.  The new program supple-ments the regular evening programs in Amharic, Afan Oromo and Tigrigna, which also give exten-sive coverage to Somalia-related news. VOA Amharic attracts an audience of 18 percent of the adult population of Ethiopia on a weekly basis.

PX202

**New VOA Somali Broadcast.** VOA is scheduled to begin a new half-hour, seven day a week Somali broadcast on Monday, February 12. The new program will be heard at 7:00 PM local time and again at 8:00 PM on shortwave, medium wave, and on FM through local affiliates. The program will follow fast changing news developments in Somalia and the sub-region; it will also include interviews with Horn newsmakers, U.S. policymakers and experts, interviews with the Somali Diaspora, analysis and cultural features and music. The re-launched VOA Somali-language programming to the Horn of Africa will aim to reach millions of Somali speakers in predominantly Muslim Somalia, Djibouti and in the greater Horn of Africa and will target listeners, ages 17 to 35.

## BANGLADESH

Bangladesh, with a population of over 140 million, has one of the largest Muslim populations in the world. VOA Bangla TV & Radio produced features regarding Muslim youth, Islamic Centers, Eid festivals and Ramadan. Interviews were aired with Nobel Peace Prize Winner Dr. Muhammad Yunus, Assistant Secretary of State for South Asia Richard Boucher, Congressman Joseph Crowley (D) from New York, U.S. Ambassador in Bangladesh Patricia Butenis, Bangladesh Foreign Minister Morshed Khan, Home Minister Lutfuzzaman Babar, and Bangladesh Ambassador in Washington Shamsher M. Choudhury.

India. With Muslims numbering over 145 million, India has the second largest Muslim population, after Indonesia. VOA Hindi TV and radio programming reaches them. Whether it is a discussion about the Iraq war, the situation in Afghanistan, the nuclear ambitions of Iran, the recent India-Pakistan peace initiatives, the situation in Kashmir, or the Bombay Blats of 7/11, the Hindi Service covers issues of interest to the Muslim world. In 2006, VOA Hindi offered exclusive TV interviews with U.S. UnderSecretary of State R. Nicholas Burns, Assistant Secretary of State for South and Central Asian Affairs Richard Boucher, dozens of U.S. senators and representatives, and Muslim leaders, scholars, and experts regarding India's relations with Iran, Pakistan, and the United States.

Bosnia and Herzegovina. VOA broadcasts to Bosnia and Herzegovina include programming targeted to the 49 percent of the population that are Bosnian Muslims. Bosnian Service has a 15-minute daily live radio show; a half hour daily live television show (news and current affairs); a 4-minute daily satellite television feed; and a variety of short programs aired by the best rated Bosnian television station, BHT1. Programs are also aired by 15 television and 15 radio affiliate stations throughout Bosnia, and are available via satellite.

The Service has been at the forefront of promoting reconciliation between the three ethnic groups in Bosnia, still widely divided, even twelve years after the signing of the Dayton Agreement, which ended the war. VOA's news and current affairs programs are tailored to address concerns of the Muslim population in Bosnia, providing exclusive interviews with religious leaders in Bosnia. Interviews such as those with the Grand Mufti of Bosnia Mustafa Ceric; Catholic Cardinal Vinko Puljic; Orthodox Metropolitan Nikolai Dabrobosanski; and Bosnian Jewish Community leader Jacob Finci, were aimed toward promoting inter-religious dialogue, and healing the wounds of war.

The Service continues to address the problem of terrorism, beginning with the allegations of a serious threat posed by foreign Islamic militants in Bosnia after the Bosnian war was over. Interviews with Ilan Berman of the American Foreign Policy Council; Juan Zarate, Deputy Assistant to the President and Deputy National Security Advisor for Combating Terrorism; Bosnian Americans Bajram ef. Mulic and Senad Agic; and Lorenzo Vidino with the Investigative Project have focused

PX202

on the problem of terrorism in Europe. Recently Grand Mufti Ceric gave an exclusive interview to VOA Bosnian on his initiative for a new Islamic Declaration which would condemn Wahabism and its violent influence on Bosnian Muslim Community.

## CHINA

Radio Free Asia provides service to Muslim audiences through its Uigher language service launched in December 1998. It is the only international radio service providing impartial news and information to the Uighur Muslim population in Western China in the Uigher language. The Xinjiang Uigher Autonomous Region (XUAR) comprises roughly one-sixth of China's territory and an estimated 10 million Uigher speakers. Like Tibetans, the Turkic Uighers have faced extreme repression from the Chinese government since the People's Republic took control of their home territory. In recent years, Beijing has stepped up their control over Uighers, using the War on Terror to justify harsh crackdowns on religious practice and political and social dissent.

Consistent with RFA's mandate, the Uigher service acts as a substitute for indigenous media reporting on local events in the region. The service, broadcasting two hours daily seven days a week, breaks many stories that go unreported by China's state-run media or foreign news organizations including programs on Sino-Central Asia, Sino-Russia, Sino-America relationship, democratic development in Central Asia, Uigher history, culture, literature, language, arts, human rights, corruption in the communist leadership system, the environment, AIDS and other health issues, as well as Internet control in China.

RFA provides a forum for a variety of opinions and voices from within the XUAR. Programming includes: breaking news, analysis, in-depth reporting, interviews, commentary, a hotline call-in show, weekly news review, and feature stories. A listener call-in hotline airs five days per week, allowing callers a platform to discuss current events in the region.

RFA's Uigher service Web site, launched in September 2004, provides continuously updated news in all three writing systems used to convey the Uigher language – Arabic, Latin, and Cyrillic. RFA's site is the only non-Chinese Uigher news Web site and the only Unicode Uigher news Web site. The site streams the daily RFA broadcast in Uigher and offers ongoing coverage of events in the XUAR in text, image and video. The archived audio files can be retrieved on a special page or downloaded via podcast. RSS feeds are also available, making it possible for people to automatically update their news readers or Web pages with RFA news content.

RFA continues to be confronted with unrelenting jamming of broadcasts and blocking of its Web site. Research conducted between June 2005 and August 2006 shows that fear is the main tool used to prevent Uigher people from accessing RFA, whether on air or online. RFA's confronts Chinese censorship by broadcasting on multiple short-wave frequencies and by regularly e-mailing instructions on accessing the banned www.rfa.org through proxy Web servers. Despite Chinese censorship and the dangers involved, research indicates that Uigher listeners and Web users consider RFA a lifeline in a hostile media environment – a station offering unique content worth taking risks to access.

## TRANSMISSION

Since September 11, 2001, the BBG has transformed its transmission capabilities, continuing its move from a shortwave environment to one that uses AM, FM, satellite, and Internet capabilities to reach its audience. By bolstering transmission capabilities to the Muslim world, BBG has improved

PX202

opportunities to deliver news and information clearly, reliably, and effectively. New transmission capabilities have been added, and assets reallocated from regions of lesser geopolitical importance and from technologies of declining effectiveness.

The BBG has worked to ensure that we deliver programming to in the media that are most effective in reaching local populations. Recent transmission enhancements include: the delivery of Persian television broadcasts to Iran through two satellites; transmission of Alhurra Europe on a new satellite channel widely viewable throughout Europe; the launch of two additional Alhurra TV transmitters in Iraq (Mosul and Al Hillah) bringing to four the total number of BBG-funded TV transmitters in that country; the construction of a new medium wave antenna in Tajikistan that is increasing the strength of VOA's Aap ki Dunyaa radio programs to Pakistan. In addition, a number of new FM transmitters became operational in 2006. Subsequent to an agreement with Sudan, we hope to establish FM radio transmitting stations in Khartoum and up to 11 other locations in Sudan.

The BBG is currently supporting the construction of three high power medium wave radio transmitters that should come on the air in the next year: one for Pashtun programming in Afghanistan, one for Radio Farda programs to Iran, and one for Aap ki Dunyaa programs to Pakistan. VOA's launch of www.vaomobile.com provides an innovative service that offers news content on a mobile phone or Internet-enabled handheld device in ten languages including English, Persian, Turkish, and Indonesian.

U.S. international broadcasting must meet and serve U.S. national security priorities, and must also meet the needs and technological capabilities of the audiences and regions to which we broadcast.

## PRESENTING THE U.S. POINT OF VIEW THROUGH INDIGENOUS BROADCAST MEDIA

At the Department of State, the Bureau of Public Affairs, Office of Broadcast Services uses television and video products as strategic tools for bringing America's foreign policy message to Middle East and worldwide audiences. A state-of-the-art digital broadcast television facility enables the Department to deliver messages instantly, using the same technology as professional broadcast television networks. Public Affairs facilitates live and taped interviews with the Secretary of State and other State Department principals to all the major Arab networks such as Middle East Broadcasting Corporation (MBC), Al Arabiya, Al Iraqiya, Abu Dhabi TV, Dubai Television, Arab Radio and Television Network (ART), Al Hurra, Kuwait TV, Egyptian TV (ETV), and Lebanese Broadcasting Corporation (LBC). This investment in people and technology was developed to give senior U.S. government officials an opportunity to engage and inform the widest audiences possible about our foreign policy and public diplomacy objectives.

Furthermore, to specifically enhance the capacity of the U.S. Embassy in Iraq, the Department of State recently opened a television studio inside the U.S. Embassy in Baghdad. This fully functioning studio allows top U.S. officials to conduct live interviews via satellite with national and international media on a range of topics related to the current situation and future of Iraq as well as America's role in the greater Middle East.

The Department of State Near East Asia Public Affairs and Public Diplomacy Directorate's Arab/Regional Media Outreach Program has achieved tremendous success in directly engaging Middle East media and broadcast services. Since its creation, it has recorded an ever-increasing number of interviews with Arab and regional media outlets – during 2006, 820 interviews with 1200 Arab and regional journalists/media outlets occurred, with a record 486 conducted primarily in Arabic. Networks aired many of the interviews repeatedly and the broadcasts were often picked up by other outlets or wire services.

This capacity was further enhanced by the creation of Regional Public Diplomacy Hubs in London, Brussels and Dubai, key media markets where the full-time job of spokesmen is to advocate U.S. policies on regional media, especially television.

A Rapid Response Unit (RRU) was created within the Bureau of Public Affairs to monitor and translate major world media in real-time, produce an early morning daily report on stories driving news around the world, and to craft language to explain the U.S. position on these issues. It is distributed daily worldwide, to U.S. cabinet and sub-cabinet officials, U.S. ambassadors, public affairs officers, regional combatant commanders, and others across the U.S. Government.

The Department of State directly engages foreign audiences on the Internet through the Digital Outreach Team. The Team directly engages in discussions of policy issues and related developments on websites, primarily in the Arabic language. Openly representing the Department, but using informal language, the Team seeks to ensure that the U.S. perspective is heard in cyberspace, providing a counterpoint to extremist ideological arguments and misinformation. Other interagency public diplomacy efforts targeted at countering extremist use of the internet are coordinated through the interagency Public Diplomacy Working Group, chaired by the Bureau of International Information Programs.

In the absence of a U.S. embassy, the Bureau of International Information Programs manages a Persian-language website directing policy and general information into Iran. The website supports active engagement via web chats, web casts and listservs to connect  U.S. policymakers and subject-matter experts and Iranian citizens.

Another tool used to enhance communications not just within the Middle East, but with the entire world, is the use of "Echo Chamber" Messages. These messages have given U.S. ambassadors and other U.S. Government officials clear, common-sense guidance that enables them to better advocate U.S. policy on major news stories and policy issues.  Additionally, these messages are provided to the Voice of America Policy Office for use in crafting editorials reflecting the views of the U.S. Government.

The Strategic Speakers Initiative (SSI) identifies, recruits, and programs prominent U.S. experts to engage foreign opinion leaders on key strategic themes such as democracy/rule of law, terrorism/ security, energy/environment and trade/development. Such speakers can be deployed rapidly to focus IIP resources where the need is greatest to address the most crucial U.S. policy priorities. Strategic Speaker participants are often part of a bigger public diplomacy package that includes webchats, DVCs and other outreach. This program represents collaboration throughout the State Department.

### MAJOR THEMES OF BIASED OR FALSE MEDIA COVERAGE OF THE UNITED STATES IN FOREIGN COUNTRIES AND THE ACTIONS TAKEN TO ADDRESS THIS TYPE OF MEDIA COVERAGE.

The Department of State is taking a leading role to counter misinformation and falsehoods about the United States and its policies or intentions. For example, recent false themes about the United States in foreign media included that the United States has devised an "American Koran," and it is pressing Muslims to adopt it, and that depleted uranium, which the United States uses in its anti-tank ammunition, has caused a massive upsurge in cancers and birth defects. Actions the Department of State has taken to address these false allegations include:

PX202

- Launching a Department of State webpage entitled "Identifying Misinformation," appearing in English and Arabic, provides truthful information and analysis to the public to debunk these false allegations. (English-language website url: http://usinfo.state.gov/media/misinformation..html

- Instructing Public Affairs Officers at our Embassies around the world to use this information on the website to counter false stories in the local media.

- Creating the position of Counter-Misinformation Officer in the Bureau of International Information Programs (IIP) to respond to Embassy requests regarding false stories about the United States.

**Potential incentives for and costs associated with encouraging United States broadcasters to dub or subtitle into Arabic and other relevant languages their news and public affairs programs broadcast in the Muslim world in order to present those programs to a much broader Muslim audience than is currently reached.**

The single greatest incentive for U.S. broadcasters to dub or subtitle their news and public affairs programs would be evidence that there is adequate demand for the programming among the targeted foreign publics. The Office of the Under Secretary for Public Diplomacy and Public Affairs is working with the Bureau of Public Affairs and other elements within the Department to explore avenues to demonstrate that a potentially profitable market exists for this programming. These offices will continue to do such work, and if data emerges that indicates that this translation makes sense from a business standpoint, will present the data to broadcasters in an effort to encourage this activity.

**Any recommendations the President may have for additional funding and legislation necessary to achieve the objectives of the strategy?**

The President's budget and legislative requests for FY-2008, and supplemental request for FY-2007, include a number of authorities that would aid the strategic objectives of U.S. international broadcasting. The pending supplemental contains a request for $10 million for the Middle East Broadcasting Networks. As part of the Administration's strategy to counter violent extremism, Alhurra television would launch a signature three-hour daily program to provide additional information about American policies, people, institutions, and perspectives to its audiences across 22 countries in the Middle East. The three-hour daily program capitalizes on Alhurra's unique perspective in a growing market of over 200 channels, and would provide a format and information mix unavailable in the region today. The programming would focus on the news of the day, discuss compelling social issues, broadcast investigative reporting and a spectrum of information not presented in the region's media.

The Administration's budget and legislative requests for FY-2008 would provide ongoing support for this new Alhurra programming effort, increase Alhurra's newscast capability to 24 hours a day (expanding from the current 16 hour capability), and allow Radio Sawa to grow as a news source in the region. The FY-2008 budget also continues VOA's program initiative Somalia, begun in 2007, and maintains program strength in Iran, Afghanistan, and Pakistan. Further, our pending legislative request to the Congress to permanently adopt the BBG's pilot program for personal services contracting (PSC) authority – up to a ceiling of 200 PSCs at any given time – would assure the agency the flexibility to quickly meet staffing needs to respond to broadcast requirements.

PX202

## 5.6 VISAS FOR PARTICIPANTS IN U.S. PROGRAMS

According to the State Department's Bureau of Consular Affairs, current visa processing guidelines are sufficient to meet any requirements for the issuance of appropriate visas to individuals from predominantly Muslim nations to participate in any new exchange program, as envisioned by the Intelligence Reform and Terrorism Protection Act of 2004.

The Bureau of Consular Affairs' policy is to expedite all student and exchange visitor applications, with the goal of giving every student and exchange visitor applicant the opportunity to meet their program start date in the United States. This policy is in place at every embassy and consulate worldwide. In countries with a significant waiting period for a visa appointment due to high demand, this policy reduces the wait time for students and exchange visitors from weeks to mere days. In all cases requiring a separate security clearance, the average processing time is now about 25 days. Processing they can take longer, however, and applicants should allow additional time. Security clearances can be expedited when circumstances so warrant.

The most important factor in expediting visa applications is for the applicants, in conjunction with their program sponsors, to initiate their visa applications well in advance of their planned travel. Most problems in the visa process can be resolved given sufficient time. New exchange programs should be planned far enough in advance to allow the necessary time for visa processing. Candidates should be advised to obtain passports immediately; visit embassy websites for instructions on applying for U.S. visas; and ensure that they follow the instructions concerning required documents and procedures they must complete, as well as how to complete an EVAF and how to arrange an appointment as soon as all required documents are available to them.

The Bureau of Consular Affairs is prepared to work with the Bureau of Educational and Cultural Affairs, or any other government and/or private sector implementing agency to facilitate the timely issuance of visas to exchange visitors.

## 5.7 BASIC EDUCATION IN MUSLIM COUNTRIES

The Department of State, the U.S. Agency for International Development (USAID), and other United States agencies continue to support an increased focus on education in predominantly Muslim countries and those with significant Muslim populations. The ongoing U.S. approach stresses mobilizing public and private resources as partners to improve access, quality and the relevance of education, with a specific emphasis on developing civic-mindedness in young people. In many Muslim-majority countries, such as Afghanistan and Yemen, the challenge is to increase country capacity to provide universal access to primary education and literacy. Countries face increasing enrollments and low education quality in the classroom while struggling with limited budgets.

In the Middle East, USAID and the Department of State's Middle East Partnership Initiative (MEPI) are responding to these needs by promoting quality education through improved policy, teacher training, education finance/governance, and community participation. These U.S. efforts complement investments of partner countries and other donors. MEPI funding for projects in basic education totals $34.5 million (FY-2002-06).

PX202

In 2006, USAID/Asia Near East Bureau's total education assistance for the region was approximately $365 million, of which $336 million was targeted in predominantly Muslim countries -- Afghanistan, Bangladesh, Egypt, Indonesia, Jordan, Lebanon, Morocco, Pakistan, Philippines (Mindanao), West Bank/Gaza, and Yemen. Out of the $336 million total, approximately $237 million goes toward basic education programs.

In 2006, USAID/Africa Bureau's total education assistance for the region was approximately $185.4 million in DA Basic Education (includes the Africa Education Initiative, Fast Track Initiative and School Fees), of which $36.6 million benefits Muslim populations in Chad, Djibouti, Ethiopia, Kenya, Mali, Mauritania, Niger, Nigeria, Senegal, Somalia, Tanzania, and Uganda.

USAID/Europe and Eurasia (E&E) Bureau implements a regional program for primary and secondary education in the Muslim-majority countries of Tajikistan, Kyrgyzstan, and Turkmenistan. The program is approximately $3.5 million per year, of which $0.58 million was FY-2006 funding.

## THE U.S. STRATEGY TO MEET CHALLENGES IN EDUCATION

To promote transformational diplomacy and development, the Department of State and USAID have articulated a common Foreign Assistance Framework. In the "Investing in People" objective of this framework, education is a major element with basic education as an important sub-element. This strategy is applied to programs worldwide, including Muslim countries.

## BASIC EDUCATION

USAID has an Agency-wide Basic Education Strategy that targets underserved populations and promotes free universal basic education. The goal is to help learners gain the general skills and knowledge needed to function effectively in life. Basic education programs focus on three areas:

- Increasing Access: Targeting groups that have been marginalized in the education system such as minority, rural, out-of-school youth, girls, and young adults, and those who have been impacted by conflict or disaster, thus helping ensure equitable access to education.

- Improving Quality: Improving the quality of education is pivotal for ensuring attendance and learning outcomes of basic education. Increasing attention is placed on curriculum reform and measuring learning outcomes.

- Improving Relevance: Education programs that develop human capacities and livelihood skills, and aim to link learning with skill development and employment opportunities, particularly in areas with high youth unemployment.

In designing and implementing basic education programs throughout the world, USAID works closely with host-country governments (national and local), non-governmental organizations, communities, and the private sector to maximize program impact and sustainability.

## WORKING WITH THE INTERNATIONAL COMMUNITY

The U.S. Government continues to be an active member of several international bodies and activities to achieve universal basic education, including the International Working Group on Education, which originally proposed the "Education for All" (EFA) initiative begun in the late 1980s.

PX202

## COORDINATION OF THE INTERNATIONAL EFFORT

USAID provides technical guidance to the EFA effort through the UNESCO-aligned International Institute for Educational Planning. The U.S. Director of Foreign Assistance represents the U.S. at the annual High Level Group meeting for "Education for All," and the USAID Office of Education participates in the annual EFA Working Group meeting. In 2004, USAID served as the G-8 co-chair of the global EFA Fast Track Initiative (FTI) focused on universal primary education; the Agency has participated in all FTI meetings since its inception in 2000.

In engaging the G-8 and Muslim country governments for Broader Middle East and North Africa (BMENA) initiatives, USAID collaborates closely with the State Department and key cooperating United States agencies, especially on literacy. At the Sea Island Summit, the G-8 launched the Broader Middle East and North Africa (BMENA) Literacy Initiative aimed at halving illiteracy rates in the region by 2015. This initiative launched a series of Literacy Working Group and Education Ministerial Dialogues in the BMENA region. Education Ministers from the BMENA region and the G-8 met in Jordan in May 2005 and in Egypt in May 2006, and confirmed their commitment to the process of cooperation under the umbrella of the Forum for the Future launched in Rabat in December 2004. Following the Egypt Ministerial, USAID took over as G-8 co-chair of the BMENA Literacy Task Force with Egypt as regional co-chair. USAID continues to collaborate closely with the State Department and the U.S. Department of Education on literacy reform. As part of the U.S. contribution to this international effort, USAID is supporting literacy assessments in the region and has developed the BMENA 'Literacy Hub' database of global best practices in promoting literacy. The 'Literacy Hub' will be transferred to the BMENA region by March 2008.

## LEVERAGING OTHER DONORS

Of all bilateral aid to the education sector in 2003-2004, the United States with France, Germany, Japan and the United Kingdom contributed 72 percent of the total, according to the EFA Global Monitoring Report for 2007." For basic education, over two-thirds were contributed by Canada, Japan, the Netherlands, the United Kingdom, and the United States." Both the United States and the United Kingdom have the greatest focus on basic education, with over 80 percent of their resources focused on that level.

USAID coordinates closely with multilateral (e.g. World Bank and the Asian Development Bank) and other bilateral donors in each country often extending the reach of USAID programs. In Indonesia, for example, the Australian bilateral aid agency, AusAID, used USAID pilot education program as the basis for its new basic education project, using USAID's methodology for supporting local government management of education and for promoting active learning in classrooms. Collaboration with AusAID, as well as other donors such as UNICEF, continues during implementation in the form of jointly-prepared training materials and activities in communities to avoid duplication as well as combined approaches in working with local and national officials. This coordinated approach has extended donor program coverage in Indonesia in the education sector.

In Tajikistan, USAID-developed training modules on interactive learning and teaching methods and teacher trainers support the Government of Tajikistan's implementation of the "Education for All" Fast Track Initiative, leveraging funds of approximately $1.6 million. The USAID basic education project also complements World Bank and Asia Development Bank (ADB) projects in the area of education finance, curriculum revision, teacher training, and strengthening capacity of teacher training institutes. In Kyrgyzstan, USAID-supported independent testing organization won a World

PX202

Bank tender to implement student assessments; USAID-developed teacher standards are used in revision of the teacher incentive system; and the basic education project collaborates with the ADB project by providing training for textbook authors.

## LEVERAGING CONTRIBUTIONS FROM THE PRIVATE SECTOR AND CIVIL SOCIETY ORGANIZATIONS

The U.S. Government uses its official development assistance to leverage other resources for education by developing alliances or partnerships with the private sector and non-governmental organizations (NGOs), including civil society organizations. USAID's Global Development Alliances (GDAs), also known as public-private partnerships, are tailored to country-specific needs and the private sector partners' interests. Between the years 2000-2006, USAID received on average a greater than a three-to-one match for education alliances in the Asia Near East region. Below are several examples of ongoing and new country-specific partnerships in the region:

In Western and Central Mindanao, as well as the Autonomous Region of Muslim Mindanao in the Philippines, there are currently six GDA partnerships to increase educational opportunities for children by ensuring access to quality education; to improve the capacity of teachers, and raise math, science and English skills among elementary school beneficiaries; to increase employment opportunities and engage young leaders; and, to provide business and skills training for out-of-school youth; and, to provide opportunity for school drop-outs and out-of-school youths to rejoin formal schooling through an accreditation and equivalency mechanism.  With approximately $12 million in USAID funding, an additional $42.7 million was leveraged (more than a one-to-three leverage) from private businesses, local NGOs, foundations, and national government agencies.

In Indonesia, public private partnerships are being used to expand the reach of USAID activities and to respond in natural disaster situations. A partnership with BP is helping improve education quality in Papua, one of the most under-served and isolated areas of Indonesia. An alliance with ConocoPhillips is helping restore education services in communities affected by the May 2006 earthquake that struck Yogyakarta and Central Java.

In Morocco and Jordan, a USAID information technology partnership with CISCO, UNIFEM, and the Governments of Morocco and Jordan has introduced CISCO Certified Network Associate and job-readiness training to eleven Moroccan institutions (900 students, 49 percent women) and to over 600 students (all women) in Jordan. In both countries, there is a focus on job skills and placement for women. In Morocco, 900 students, more than 50 percent of whom are women, have benefited (or are still benefiting) from the CISCO Certificate programs combined with job-preparedness training. Fifty percent of the first student cohort who completed the program found jobs within six months after graduation.

USAID's Office of Middle East Affairs recently finalized a new GDA that will engage and support emerging youth leaders in five Middle Eastern countries Egypt, Jordan, Lebanon, West Bank Gaza and Yemen. Partnering with the Ford Foundation, Save the Children International will create a youth development toolkit and link emerging young leaders to a network of youth development workers and institutions that assist young people build leadership capacity and exercise positive, moderate leadership behaviors within a community development context.

In cooperation with the Middle East Partnership Initiative (MEPI), Scholastic Inc., is providing millions of Arabic-language classroom libraries to thousands of schools in the Middle East and North Africa Scholastic's substantive contribution allows MEPI to leverage its $12 million investment in this critical-thinking and independent reading skills development program. In another example,

215

PX202

MEPI's partnership with the CISCO Learning Institute, is developing on-line English language curricular materials to complement the efforts of the private sector-based World Economic Forum (WEF) – sponsored Jordan Education Initiative.

## USG COORDINATION TO REDUCE DUPLICATION AND WASTE

The Department of State and USAID work closely together implementing their Foreign Assistance Framework, which includes education. Through this framework and a joint Operational Plan process, State, and USAID coordinate to reduce duplication of effort and/or waste.

USAID collaborates actively with the Department of State/Middle East Partnership Initiative (MEPI) to promote education in Muslim countries within the Near East region, with a focus on civic education. The MEPI education pillar supports education systems that enable all people, especially girls, to acquire the knowledge and skills necessary to compete in today's economy, participate actively and effectively in the civic arena, and improve the quality of their lives and that of their families. MEPI and USAID coordinate to minimize any potential duplication of efforts and investments. A modest number of MEPI-funded education programs, notably the support for the Arab Civitas network, are implemented in conjunction with USAID. Other examples of collaboration include: support for a women's literacy in Morocco; development of e-learning modules for civics in Jordan; and, in Yemen, pending funds availability, the design and implementation of an Internet communication and collaborative learning network for 20 high schools. (This program will end March 31, 2007; there is no additional funding for it.) MEPI is also providing funding for an Arabic version of the Global Learning Portal, a project under the auspices of the Broader Middle East and North Africa (BMENA) initiative; the Portal will provide new means for professional collaboration and benefit educators and idea leaders across the Arab world.

## TRAINING AND EXCHANGE PROGRAMS.

Bridging both basic and higher education, USAID, State Department Bureau of Education and Cultural Affairs (ECA) and MEPI coordinate in the area of providing training and exchanges for students from Muslim-majority countries to the United States. In addition to the educational value of these kinds of interventions, participants are exposed to American values, culture, and democratic institutions. Many of these programs directly benefit basic education. In Egypt, 100 scholarships will be awarded to enhance the Ministry's technical college instructor capacity through "Train-the-Trainer" teacher preparation programs, of which 25 will be financed by the current ECA community college scholarship program. In Pakistan, secondary school educators will attend a five-week program in the United States, focusing on mathematics, science, and classroom technology.

For younger students, there are some programs such as State Department's English Microscholarship Access Program, which provides English classes for deserving high school students from non-elite sectors in countries with significant Muslim populations. The program, funded by MEPI in the Middle East and North Africa region, delivers language instruction in a civic education context, and helps students compete for future job and educational opportunities. It also prepares them to be considered for a U.S. exchange program. During FY-2006, U.S. embassies selected schools in 45 countries to enroll approximately 10,000 students in the program. In addition to teaching English, the program provides an American classroom experience using U.S. materials and emphasizes active learning.

PX202

The State Department's Youth Exchange and Study Program (YES) and Future Leaders Exchange Program (FLEX) bring high school students from Muslim countries to live with American host families and attend American public high schools for an academic year. The FLEX students also receive special training in civics and work as volunteers. Similarly, MEPI's Student Leaders/Study of the United States Institutes provide young people with intensive training in civic engagement and leadership skills in both U.S. and regionally-based settings.

The State Department's "Leaders in Education Program" is specifically designed to bring K-12 educators and administrators from all regions of the world, including Muslim countries, to the United States to visit schools, meet with teachers, administrators, and representatives of Parent Teacher Associations and other community organizations. The Teaching Excellence and Achievement Program (TEA) provides secondary school teachers from Eurasia, South Asia, and Southeast Asia with unique opportunities to enhance their teaching skills and increase their knowledge about the United States. The participants participate in a professional teacher development program in the United States. The six-week program also includes a three-week internship at a secondary school where participants actively engage with American teachers and students. Also, the TEA program provides follow-on grants to the international teachers to purchase essential materials for their schools, to offer follow-on training for other teachers, and to conduct other activities that will build on the exchange visits.

USAID's Training Future Leaders initiative highlights the importance of U.S.- trained scholars and their unique role in developing their nations upon returning home. USAID is carrying out an analytical study on prior USG investments. This research will inform future program design and provide a "best practices" framework for long-term training programs. Currently, field research is being done in Yemen, Egypt, Nepal, and Indonesia. This program complements ongoing efforts carried out by State/ECA and MEPI.

## FUNDS NEEDED TO ACHIEVE UNIVERSAL BASIC EDUCATION

UNESCO estimates that $5.6 billion are needed per year to achieve "Education for All" by 2015. Globally UNESCO estimated that 103 million children were out of school in 2002/2003. For the countries in the Muslim world, this figure is estimated to be around 45 million. Estimating that it costs roughly $50 per year per child to complete basic education (6 years of schooling), it would cost $2.2 billion per year in Muslim countries as a whole to achieve universal basic education.

## EFFORTS TO ENCOURAGE DEVELOPMENT AND IMPLEMENTATION OF A NATIONAL EDUCATION PLAN

In countries with predominantly Muslim populations, the effectiveness of basic education systems is at the crux of their development future and potential to moderate the influence of low growth, joblessness, lagging social services and despair. The United States encourages countries to develop and implement national education plans by offering assistance to support education reform developments and program funding once reforms have moved into the implementation phase. The United States has influenced national education plans and reform by way of pilot programs that model best practices in education. These positive experiences galvanize support for broader change and can impact the education system beyond the pilots programs' localities. Model programs also potentially have an impact outside of targeted interventions. In Indonesia, USAID helped the provincial govern-

PX202

ment of Aceh with its new long-term education strategy, developed after decades of conflict and the 2004 tsunami. This strategic plan was recently endorsed by the Government of Indonesia's Ministry of National Education.

In December 2006, the USAID basic education project in Central Asia organized a regional conference on school governance which gathered over 60 representatives from ministries of education and finance, local authorities, schools, and national and international organizations from Kyrgyzstan, Tajikistan, Turkmenistan, and Uzbekistan. The participants reviewed policy guidelines on community participation in education decision making developed by the USAID project, discussed relevant national and international legal frameworks and recommended changes which will help the decision makers in the region to increase community involvement in school activities and provide input to education reform.

### CLOSING THE DIGITAL DIVIDE AND EXPANDING VOCATIONAL/BUSINESS SKILLS

To "close the digital divide" and expand vocational/business skills, USAID, State, and other agencies implement public-private partnerships, information technology in the classroom, school-to-work and workforce training programs, improved quality of basic and secondary education programs, scholarships and exchanges. A few programs are highlighted below.

—USAID/ANE Bureau Education and Employment Alliance promotes private sector participation in Egypt, Morocco, Pakistan, India, Indonesia, and the Philippines to enhance skills and improve education and employment opportunities among over 1 million underserved youth. In addition to local partners (profit and non-profit), corporate partners include Chevron/Unocal, GE, Ink Media, Lucent, Microsoft, Nike, and Oracle.

—The State Department's Global Connections and Exchange Program seeks to promote mutual understanding and civic education in countries with significant Muslim populations by bringing together more than 1,000 schools from 16 countries for online collaborative projects that focus on professional development, media literacy, and civic education. Teachers also develop skills needed to participate in collaborative activities with U.S. schools, and teachers and students are offered opportunities to travel to their partner schools as a way to strengthen mutual understanding and solidify virtual relationships through face-to-face meetings.

—The USAID Internet Access Training Program (IATP), administered by the International Research and Exchanges Board (IREX) since 1995, provides free internet access and training in 11 countries throughout Central Asia, the Caucasus, and Western Eurasia. From major cities to small communities, IATP encourages information sharing, network building, and collaboration among U.S. Government exchange alumni and other targeted audiences. IATP staff train alumni and other targeted audiences in the effective use of the Internet and sponsor the development of local language web sites. The centers also conduct training in basic civics, entrepreneurship, and English.

—USAID and the Intel Corporation signed Memorandum of Understanding in December 2006 to broaden access and usage of information and communications technologies (ICT) in developing communities around the world. This alliance envisions collaboration and partnership in the following areas: enabling "last mile" internet connectivity and locally relevant applications; supporting ICT usage and deployment by small and medium-sized enterprises to enhance economic development; and increasing the use of ICTs to support education and health. Intel prior experience in the education sector includes software development and teacher training programs for K-12.

PX202

## COUNTRIES ELIGIBLE FOR ASSISTANCE

USAID has education programs in Muslim-majority countries and countries with large Muslim populations, which potentially overlap those which might be targeted by the President under an International Youth Opportunity Fund [section 7114(b)]. Below is a list, though not exhaustive, of programs in the Asia Near East, Africa, Europe, and Eurasia regions.

The Asia Near East region contains several Muslim-majority countries with significant education needs. Basic education program highlights include:

In Afghanistan, because many children and youth lost years of formal schooling, students need to catch up to their appropriate grade level. USAID created an accelerated learning program, compressing two years of study into a single year through innovative teaching techniques. This program has trained around 10,500 teachers and enrolled nearly 170,000 students. More than half the students are girls. In addition, USAID has printed and distributed nationwide 48.5 million textbooks for grades 1-12. Since 2002, USAID in conjunction with the Ministry of Education has built or refurbished 622 schools, mostly in remote areas.

In Bangladesh, Sesame Street Bangladesh, known locally as Sisimpur, is USAID's most recognized activity in the country. The program began airing in April 2005 and is the first show of its kind in Bangladesh. The half-hour television programs provide access to literacy, numeracy, and critical thinking skills for almost half of the estimated nine million three to six-year-olds in Bangladesh. This prepares them for learning success and helps to combat traditionally low achievement and high drop out rates in the lower primary grades. Secondly, USAID supports the Early Learning for School Success Program (SUCCEED) operation of 1,800 preschools which prepare preschool-aged children for school by improving reading and mat skills and expanding access to primary schools. A further aim of the program is to increase children's confidence and to reduce high dropout rates by enriching early learning opportunities prior to formal education. The program has established 1,800 preschools across the country (600 are based in schools and 1,200 are based in homes) and trained over 1,800 preschool teachers in new interactive methodologies.

USAID/Egypt supports the Government of Egypt in sustaining improvements in learning outcomes in grades K-12. The program focuses on improving teaching and learning, increasing equitable access to education, and strengthening management and governance in seven governorates. Activities include in-service teacher training, school libraries, information technology, and some school construction in remote and densely populated areas. To date, USAID has also provided 5 million books to over 5,000 Egyptian primary schools. Over 39,000 students now have access to computer technology. USAID has built 70 new girls schools serving almost 40,000 students.  USAID supported the development of the Egyptian Sesame Street, which helps over 85 percent of all children under age eight acquire early literacy and numeracy skills.

USAID works in Indonesia, the world's largest Muslim country. The USAID program there works with over 100 districts (25 percent of the nation), providing training and technical assistance to school officials, communities and local governments on education management and finance. This Presidential initiative also includes in-service teacher training, mentoring, and teacher resource centers to improve the quality of classroom instruction. Over 245,000 junior secondary students and out-of-school youth are learning employment-related life skills while working toward school completion or its equivalency. USAID is supporting the creation of an Indonesian Sesame Street, which will debut in 2007. Through direct assistance and dissemination of best practices, education programs are expected to reach 9,000 public and private schools, 2.5 million students, 90,000 educators and one million out-of-school youth by 2010.

PX202

In July 2003, the Government of Jordan launched a five-year, $380 million program, developed with USAID assistance, Education Reform for the Knowledge Economy (ERfKE) initiative. This initiative is one of the most ambitious education reform programs in the Arab region to date; its goal is to re-orient education policy, restructure education programs and practices, improve physical learning environments, and promote learning readiness through improved and more accessible early child-hood education. USAID, in coordination with Jordan and eight other donor nations and multi-lateral organizations, will provide $80 million during this strategy period to support reform efforts through ERfKE. USAID's efforts under this initiative (1) assist the Government of Jordan's early child care initiative, creating 100 public kindergartens, field-test curriculum, and develop an accreditation system; (2) develop school-to-work programs and an IT curriculum stream for high school students; (3) connect 100 'Discovery' schools to broadband and test e-learning modules for all subject; (4) expand youth and life skills programs to secondary schools in new underserved areas in Jordan; and, (5) construct up to 28 new schools and rehabilitate another 100 schools to create the appro-priate learning environment that supports the reform efforts and accommodates the recent influx of refugees from the region.

In Pakistan, USAID supports the Government of Pakistan's education reform strategy by: (1) strengthening education policy and planning; (2) improving the skills and performance of teachers and administrators; (3) increasing youth and adult literacy; (4) expanding public-private partnerships; and (5) providing school improvement grants and involving parents and communities in public schools. Over 9,000 parent-teacher associations received school improvement grants helping communities to build over 3,000 new classrooms, reconstruct over 1,000 more classrooms, build over 1,200 toilets, and repair another 1,000. In addition, in the Federally Administered Tribal Areas, USAID is constructing and furnishing 65 primary, middle, and high schools. USAID is building or restoring water and sanitation facilities at 190 girls' schools. Scholarships have been awarded to 57 women from this area to attend a one-year, pre-service teacher education program.

In the Philippines (Mindanao), USAID education programs aim at improving education quality and access, and providing livelihood skills training for out-of-school youth. USAID and the U.S. Peace Corps jointly help improve instruction in English, science, and math by training over 21,000 elemen-tary and secondary school teachers, as well as mobilizing over 300 Parent-Teacher Community Associations. Computer and internet education has also been introduced.

The Asia Near East region also contains countries with significant Muslim populations though not in the majority, such as India (second largest Muslim population in the world).

USAID/India's pilot program introduces the formal curriculum in eleven Islamic religious schools (madrassas), complementing the Indian Government's efforts to modernize madrassa education. The program reaches over 2,500 out-of-school youth and working children, particularly adolescent girls. A state government has decided to scale-up this model with its own resources, benefiting over 90,000 children in 1,200 madrassas by September 2008.

The sub-Saharan Africa region contains a number of important Muslim and Muslim majority countries, in which support to basic education activities and improved learning opportunities for in-school and out-of-school youth figure prominently. While USAID has been working with predominately Muslim countries and communities in the education sector in Africa from the 1960s, since the events of 9/11, the Bureau for Africa's Office of Sustainable Development (AFR/SD) has re-evaluated the role of education and taken a more strategic approach to address the concerns of a post-9/11 society. USAID partners with Muslim communities to ensure that children in these

PX202

communities are receiving the best and broadest education possible and that USAID is working collaboratively to create an enabling socio-economic environment that will ultimately lead to greater global peace, security and understanding.

In support of President Bush's $100 million East Africa Counter Terrorism Initiative (EACTI), AFR/SD initiated programs in East Africa in 2003 that provide basic education opportunities in marginalized Muslim communities. The targeted countries include Kenya, Uganda, Tanzania, and Ethiopia. Eritrea had been part of the original list, but eliminated during the USAID/Eritrea closeout. A summary of these programs include:

- USAID/Ethiopia implements various activities in Muslim-dominated areas particularly in Somali, Afar, and Oromia regions. The activities include: support to pre-service and in-service teacher training to improve the quality of primary education; provision of capacity building training for Parent Teacher Associations (PTAs) and community members to increase parent and community involvement in school management; building the capacity of education officers to improve the planning and management of the education system; and establishment and expansion of alternative basic education centers to provide non-formal primary education to children, especially girls, and adult literacy classes for illiterate Muslim men and women.

- USAID/Kenya's basic education program, Education for Marginalized Children in Kenya (EMACK), is concentrated in the North Eastern and Coast Provinces. Both Provinces have predominantly Muslim populations and the lowest education statistics in the country.  This education portfolio began in 2004 with supplemental funding specifically targeted at Muslim communities. At the end of two years the project has had a tremendous impact on enrollment and retention. Over 100,000 children have been reached in the Coast Province. Approximately 250 Early Childhood Development Centers have been supported; over 2,000 teachers were trained in child-centered teaching methods. To date, the School Infra-structure Program has successfully built 107 classroom, three dining halls, eight dormito-ries, and supplied 2,000 desks along with 300 bunk-beds with mattresses.

- USAID/Tanzania's program focuses on strengthening primary performance in general and secondary math and sciences over the next five years. USAID will focus basic education activities for under-served children (especially girls in Muslim and pastoral areas). The United States' basic education initiative will provide training and materials to teachers and students, allowing thousands of Tanzanian students to receive textbooks written in Kiswa-hili and allowing girls to receive scholarships. United States resources will enable two programs to lay the groundwork over the next five years to: increase the number of girls receiving preschool, primary, and secondary education; improve primary and secondary skills in math and science; and provide specialized training for teachers in math, science, English, and the needs of children with disabilities.

USAID works with Muslim and pastoralist populations in geographic areas where there is little or no donor support. USAID/Tanzania will continue enhancing service delivery in Zanzibar, while adding two pilot districts (Lindi Urban and Mtwara Urban) on the southern Tanzanian mainland. Over 36,000 secondary, 64,000 primary, and 7,000 pre-primary school students will benefit from U.S. support targeting education delivery systems at local, district, and regional levels. In addition, an innovative radio instruction activity will focus on pre-primary and primary-level education. The radio instruction activity will establish 100 informal learning centers, as well as pilot radio instruction in 40 primary-school classrooms in Zanzibar. In addition, isolated communities in pastoralist areas will establish

PX202

70 Community Learning Centers providing equitable access to education for 14,000 children by FY-2008. Children will benefit from quality basic education in Kiswahili, English, math, social studies, science, and life skills

- USAID/Uganda supports Madrassa Early Childhood Development (ECD), which targets poor communities and builds on existing informal early child education at selected community mosques. Through the Madrassa Resource Centre communities are supported to establish and manage their own pre-schools by using intense community participation in pre-primary education. The education activities follow a unique structure that was exclusively designed for Madrassa for use in the Ugandan context. The project seeks to provide access to high quality, culturally relevant and affordable early childhood education and development in order to increase the chances of children from underprivileged communities to access and succeed in later formal education. To date the project has achieved the following: 15 community schools have been mobilized and are participating in the program; 13 community schools are being supported under post graduation continuous support to ensure the long-term sustainability of the pre-schools; 1,207 children are currently enrolled in the new schools and other schools supported by the ECD activity; 282 Schools Management Committee members received training on how to manage their schools; 120 ECD teachers have been trained in ECD  methodologies; and 1,810 parents have been mobilized to send their children to the community schools.

**IN SUPPORT OF THE TRANS-SAHARA COUNTER-TERRORISM PARTNERSHIP (TSCTP):**

- USAID/Mali's basic education program focuses on supporting moderate Islamic schools (madrassas) and improving the quality of primary education for Mali's predominantly Muslim population. The program reinforces the Ministry of Education's management capacity; provides school-based and radio-based teacher training; develops interactive radio instruction for students; promotes adult literacy, and mobilizes communities to better manage and advocate for their local primary schools. In the three northern regions of the country, USAID provides scholarships for over 6,000 disadvantaged girls each year.

- USAID/Senegal's program aims at improving basic education in Koranic schools currently benefits approximately 4,800 vulnerable children living and studying in these schools. The pilot activity, funded with TSCTP ESF funds, was launched in late 2005.  It supports improvements in the living, health, nutrition, and learning conditions of children in Koranic schools. It accomplishes this through the provision of hot meals; basic learning materials such as pens, books, and notebooks; and first aid kits. The program also provides training to teachers in how to effectively teach languages, math, life skills, and health education. Vocational training is also offered in the areas of carpentry, sewing, masonry, and tannery. Over the past few months, the leaders of these schools have become increasingly receptive to incorporating secular education in their curriculum and in promoting better nutrition and hygiene among their students.

- AFRD/SD's efforts through the President's Africa Education Initiative (AEI) in Niger, Chad, and Mauritania complement the TSCTP's efforts to counter extremism and terrorism. In these countries, USAID has used the AEI's Ambassador Girls' Scholarship Program to improve access to quality education for girls and to engage parents and communities in the north of Mali and throughout Niger, Chad, and Mauritania.

PX202

While not part of EACTI or TSCTP, other countries have benefited from USAID's Bureau for Africa's efforts to reach out to Muslim populations, including Somalia, Sudan, and Djibouti in the Horn of Africa and Nigeria in the West.

- IUSAID/East Africa has been supporting education programs in Somalia since 1994. The current education program uses radio to deliver high-quality, interactive instructional programs to marginalized children. The radio programs are currently being broadcast throughout Somalia, including in Mogadishu. The instructional radio program will target out-of-school youth and Koranic schools in Muslim communities.

- USAID/Sudan efforts are focused on the Three Areas and southern Sudan and engaging in national development. USAID continues to implement programs to enhance inter-religious peace-building through improving education access. Formal and non-formal programs focus on primary and girls' education, teacher training and institutional development - targeting out-of-school youth, women girls, returnees, and other vulnerable groups. The U.S. Government is expediting the provision of primary education and adult literacy through radio-based instruction to provide a quality standard of learning both for students and teachers. Conflict resolution, recovery, and prevention are integrated to support the peace process.

- USAID/Djibouti. Since 2003, USAID has supported Djibouti's education reform program, to (a) increase access through school rehabilitation, renovating/building water and sanitation facilities, and the provision of textbooks, equipment and kits; (b) improve quality through teacher training, development of teachers' and school principals' guides, provision of English Language teaching and teacher training for secondary and university levels, and construction and equipment of pedagogic resources centers, as well as improving supervision; and (c) improve community participation and increase girls' education through the provision of scholarships to 1,000 girls and non-formal education programs for out-of-school youth, especially girls. USAID collaborates with the U.S. Embassy and the Combined Joint Task Force/ Horn of Africa.

- USAID/Nigeria began support to the education sector in 1999. The first three-year program focused on increasing teachers' instructional skills in English literacy and numeracy; used interactive radio instruction; increased community/PTA involvement in schools' management; increased child-focused classroom instructional methods; and increased local and state government skills in school-based data collection and use (this aspect evolved into the current GON National EMIS model). Some 25 percent of participating schools were Islamiyyah, the balance were public. The current program integrates health and education activities, focusing on increasing teachers' instructional skills in English literacy and numeracy; uses interactive radio instruction; increases community/PTA involvement in schools' management; and deals with school health and nutrition issues.

In Europe and Eurasia the dissolution of the Soviet Union, followed by creation of new independent countries in place of the former Soviet republics, and the drastic deterioration of the economic situation during the 1990s, forced many of the new governments to drastically reduce the country's share of the Gross Domestic Product (GDP) allocated for the education sector. The economic downturn and the challenges of restructuring the economy and the education sector have been particularly severe in Tajikistan, which suffered from a five-year civil war (1992-97).

PX202

In 2003, to support the efforts of the Central Asian countries to reform the education sectors, USAID has implemented a regional education project in Tajikistan, Kyrgyzstan, Uzbekistan, and Turkmenistan. Although regional in implementation, the project allows for and takes into account the specific needs of each country and aims to utilize windows of opportunity as they arise. The Basic Education Strengthening Program (PEAKS) focuses on five major aspects of the education system: (1) in-service teacher training; (2) classroom-level learning materials and textbook development; (3) parent and community involvement in education decision making; (4) management and technical capacity at all levels of the education system; and (5) rehabilitation of school infrastructure. The program is implemented in close collaboration with the respective Ministries of Education, Ministry of Finance, teacher training institutes and other pedagogical and research institutions. USAID also facilitates donor-host country dialogue and to the extent possible collaborates with other donors to ensure complementary design and delivery of education activities.

## USAID/E&E EDUCATION PROGRAM IMPACT IN FOUR MUSLIM MAJORITY CENTRAL ASIAN COUNTRIES (2002 – 2006)

| TYPE OF PROGRAM | MAJOR PROGRAM COMPONENTS | REGIONAL IMPACT (approximate numbers) |
|---|---|---|
| Increase Access to Education Opportunities | •School and classroom construction and rehabilitation | •Rehabilitated 113 schools (Kyrgyzstan, Tajikistan, Uzbekistan) |
| | •School finance | •Piloted new school finance mechanism based on per capita funding formula to improve efficiency.  Results include more efficient student/teacher ratios in pilot areas. (Kyrgyzstan, Tajikistan, Uzbekistan) |
| Increase the Quality of Education | •Teacher training | •8,142 primary and secondary school teachers trained in interactive, student-centered methods with mentoring and other follow-up support  (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan) |
| | •Community and parental involvement | •174 school community committees strengthened to support school quality improvements (Kyrgyzstan, Tajikistan, Uzbekistan,) |
| | •Model school program | •300 "Model Schools" model best practices in the use of new teaching methods, management practices and community involvement.  (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan) |

## KYRGYZSTAN

After the Tulip Revolution, the country continues to hang in a tenuous balance.  Strengthening the ability of the education sector to deliver quality education relevant to the needs of market-based democracy will facilitate the democratic transition and economic performance and competitiveness. USAID provides teacher training and resource development for 11 pilot schools, which in turn will serve as teacher training centers for 84 cluster schools.  The professional Development Schools

PX202

(PDS) have been recognized by the Government of Kyrgyzstan as the alternative teacher training providers, a significant accomplishment in a country with a highly centralized educational system that does not readily look to alternative service providers. The Government of Kyrgyzstan also pays a salary for a PDS coordinator. From the inception of the project, 90,268 students benefited from this program and 12,062 teachers received training. In addition, USAID funds the Kyrgyz National Scholarship Test, which helps to fight corruption by enabling high school graduates to receive merit-based scholarships for higher education.

## TAJIKISTAN

Keeping momentum towards democratic reform in Tajikistan is critical, and a strong education system is an important tool to support that goal. While the basic education project initially focused on primary grades, deemed to be in the most urgent need of support, in 2005, additional resources allowed the project to expand the spectrum of interventions to cover grades 5-11 and introduce the Reading, Writing, and Critical Thinking Program. From the inception of the project, 53,105 students benefited from this program and 481 teachers received training.

In addition to the regionally implemented PEAKS project, USAID is also supporting a basic education project through the Aga Khan Foundation (AKF). This project works in remote, mountainous areas where teachers seldom have access to professional development activities. As a result of teacher training improvements, teachers report increased attendance, return to school of students who stopped attending, and new motivation to study among the students. From its inception, the USAID-AKF project has benefited 5,000 students and trained 1,057 teachers.

## UZBEKISTAN

Although USAID was forced to halt project activities in 2006 due to the deteriorating political situation, the overall project achievements to date may be noted here. Since its inception, the basic education project has benefited 102,412 students and trained 676 teachers. The success of the project is also evidenced by the fact that many of the Uzbek trainers continue to support the regional project activities in Kyrgyzstan and Tajikistan.

## TURKMENISTAN

Turkmenistan has taken the disturbing step of essentially eliminating upper secondary education by reducing the length of study to nine years instead of the standard ten years (under the Soviet system). In addition, the shift to the almost total reliance on the late President Niyazov's books (Rukhnama) as the primary curriculum which emphasizes loyalty to the president and his spiritual teachings, resulted in devastating deterioration of education quality and relevance and created a vast knowledge vacuum which will affect many generations to come. Young people under the age of 15 make up nearly 35 percent of the population in Turkmenistan – the second largest percentage of youth in the Europe and Eurasia region. As a result of the President Niyazov's education reforms, upper secondary enrollments have fallen from 67 percent to 27 percent since 1991. This means that approximately one in four students between ages of 15 and 18 are enrolled in school.

Besides a small-scale UNICEF initiative in primary and secondary education, USAID has been the only other donor involved in education. Although the Government of Turkmenistan has not formally endorsed the program, it has allowed interested schools to work with the USAID-funded project.

PX202

Assistance-to-date has focused on teacher training in interactive teaching and learning methods. Up to now, 57,335 students have benefited from the project and 533 teachers received training. In FY-2006, USAID did not fund the basic education project.

The change of leadership following the recent death of President Niyazov may create opportunities for broader engagement. President Berdimuhammedov announced that Turkmenistan will embark on reform to align the education system with international standards. If implemented, this may provide an opportunity for U.S. involvement in basic education reform.

# 8. ECONOMIC REFORM

High unemployment and underemployment, often a result of slow economic growth, are among the most critical issues in predominantly Muslim countries. U.S. assistance programs attempt to address this issue with reforms to improve the investment climate. Such reforms could include business registration, dispute settlement, financial sector and agricultural reforms, combined with education, job training, and health programs.

The United States strategy of Total Economic Engagement pursues economic reform, rule of law, and global economic integration worldwide, including countries with predominantly Muslim populations. Total Economic Engagement includes:

- Regular bilateral discussions on these topics with host government officials, with both U.S. Embassy officials and officials from a wide range of U.S. agencies participating in these talks;

- Formal structured dialogues, high-level Economic Dialogues, and Trade and Investment Framework Agreement (TIFA) Councils;

- U.S. bilateral and multilateral assistance programs for economic reform, trade capacity building, and rule of law are managed chiefly through USAID, the Millennium Challenge Corporation, and the State Department's Middle East Partnership Initiative. Programs are often complemented with technical assistance provided by specialized U.S. agencies and offices;

- Working through our membership in such international organizations as the International Monetary Fund (IMF), World Bank (WB), World Trade Organization (WTO), and OECD (MEAN-OECD Investment); we coordinate bilateral policies and assistance strategies with these organizations and other bilateral donors to advance reform goals; and

- Working with non-governmental organizations (NGOs), such as Transparency International, and U.S. and foreign business associations, such as American Chambers of Commerce and Business Councils, to advance reform issues of mutual concern.

### INTEGRATING PREDOMINANTLY MUSLIM COUNTRIES INTO THE GLOBAL TRADING SYSTEM

There are a number of USG-funded programs to promote predominantly Muslim countries' integration into the global trading system and promotion of regional trade and rule of law.

The following table lists USG funding for trade and capacity building programs. USAID/Asia and Near East Bureau currently funds 86 percent of these programs in these countries.

PX202

| USG FUNDING FOR TRADE AND CAPACITY BUILDING | |
|---|---|
| **Country** | **USG FY-2006 Funding** |
| Afghanistan | $59,337,037 |
| Bangladesh | $879,412 |
| Egypt | $29,678,973 |
| Indonesia | $13,873,877 |
| Iraq | $9,482,830 |
| Jordan | $10,960,695 |
| Lebanon | $50,000 |
| Morocco | $10,867,389 |
| Pakistan | $3,929,000 |
| West Bank/Gaza | $0 |
| Yemen | $448,824 |
| TOTAL TCB Funding | $139,508,037 |

## WTO AWARENESS AND ACCESSION

FY-2006 USAID programs with components dealing with WTO awareness and accession are being implemented in Afghanistan ($11,000,000), Egypt ($7,500,000), Iraq ($5,029,501), and Yemen ($100,000):

- USAID/Afghanistan's Strengthening Private Sector through Capacity Building goal is to establish sound economic governance within the economic ministries and agencies of the Government of Afghanistan. Activities include customs operations and administration and other related reforms supporting progress toward WTO accession.

- USAID/Egypt's Assistance for Customs and Trade Facilitation Project targets all aspects of trade capacity building, including trade policy, trade facilitation, inspections, import and export procedures, trade agreements, and WTO awareness.

- USAID/Iraq's Trade Policy and Market Access Support - Iraq. Key objectives include assisting with the Government of Iraq's accession to the World Trade Organization, supporting trade policy reform, and training and capacity building on trade-related matters.

- USAID/Yemen's Agricultural Support Project supports both Yemen's capacity to increase its exports of traditional and non-traditional commodities, and Yemen's WTO accession.

PX202

## USAID GLOBAL EXPORT PROMOTION PROGRAMS

USAID global export promotion programs in FY-2006 included Afghanistan/Pakistan ($493,000), Bangladesh ($630,000), Egypt (the $7,500,000 mentioned previously and $4,000,000), Jordan ($1,000,000), Morocco ($3,587,706 and $5,600,000), Pakistan ($2,500,000 and $240,000), and Yemen ($73,000):

- A U.S. Interagency Working Group supporting the Presidential Initiative for Reconstruction Opportunity Zones (ROZs) sponsored a study on the most feasible locations and products to be included in ROZs to be located in Afghanistan and adjacent border areas of Pakistan. Goods produced in the ROZs could enter the U.S. market duty free. The study was funded and implemented by USAID/Afghanistan, USAID/Pakistan, and USAID/ANE.

- In Bangladesh, the Shrimp Quality Support Project focuses on improving the quality and quantity of shrimp exports by Bangladesh in socially and environmentally acceptable ways by transferring appropriate applied research to farmers.

- USAID/Egypt's Assistance for Customs and Trade Facilitation Project (mentioned previously).

- USAID/Egypt's Information Communication Technology works to establish the legal and regulatory framework necessary to strengthen e-commerce and information and communication technology; these investments are designed to support business development, trade, and investment.

- USAID/Jordan supports the Business Development Center – Jordan, which provides assistance to firms in Jordan to help them adapt to the integration of Jordan into the global economy, and enhances their ability to export to international markets.

- USAID's Morocco Fast Track Trade is designed to help Moroccan companies identify U.S. business partners and provide advice on marketing, packaging, and exporting to the United States. The Project prepares export-ready Moroccan small and medium enterprises to use the U.S. - Morocco Free Trade Agreement to their best advantage.

- USAID's Morocco New Business Opportunities supports the U.S. - Morocco Free Trade Agreement by providing technical assistance, training, and business contacts to Moroccan manufacturing enterprises to enable them to successfully export to the United States.

- The Pakistan Initiative for Strategic Development and Competitiveness provides technical assistance and training to increase the competitiveness of Pakistani small and medium sized enterprises. This USAID/Pakistan project works with a number of sectors, including gems, jewelry, dairy, marble, horticulture, and furniture, to improve their capacity to market and export their product. In addition, USAID's Embroidery Value Chain in Pakistan project is linking rural female embroiderers to agents, who in turn sell their product to urban and rural export markets.

## CUSTOMS REFORMS

Customs reforms are supported by USAID FY-06 programs in Afghanistan ($11,000,000), Egypt ($7,500,000, mentioned previously), Iraq ($1,453,334), and Jordan ($6,437,695):

PX202

- Afghanistan's Customs Reform Program is imbedded in USAID's Strengthening Private Sector through Capacity Building Project, which is designed to establish sound economic governance in economic ministries and agencies, including the Ministry of Finance and Customs Service.  Customs generated some $150 million in Afghan fiscal year 2004-5, surpassing the IMF revenue generation goal.

- Customs Reform for Trade Improvements - Iraq is a USAID project to assist the government of Iraq to develop the necessary customs reforms to rebuild the economic infrastructure in Iraq. A modern customs service is essential for revenue collection and international trade management.

- Jordan's Customs Reform Program is embedded in USAID's Achievement of Market Friendly Initiatives and Results (AMIR), which supports private sector development and trade capacity building.

## USAID AFRICA BUREAU PROGRAMS

Programs managed within the USAID Africa Bureau include Sub-Saharan integration into the global trading system, the driving forces of which are the African Growth and Opportunity Act (AGOA) and the Presidential Initiative - African Global Competitiveness Initiative (AGCI). The African Global Competitiveness Initiative promotes export competitiveness and growth of African enterprises to expand trade with the United States under the African Growth and Opportunity Act, other international trading partners, and within Africa.  Program efforts are focused on helping countries build a sound enabling environment including policies, laws and regulations governing business and trade; improving infrastructure to facilitate trade; strengthening financial services to small and medium-sized enterprises and other businesses; and developing the energy sector to meet the needs of growing African economies.

## USAID EUROPE AND EURASIA BUREAU PROGRAMS.

### ALBANIA

USAID's objective in Albania is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID/Albania's programs worked with the government to improve the business climate for private sector growth and investment and to improve private sector competitiveness to meet international export requirements. The Albanian Center for International Trade, founded in 2003, currently assists the Government of Albania to improve the quality of its trade policies. The Enterprise Development and Export Market Services Project, scheduled to run through September 2008, promotes the competitiveness of small and medium Albanian enterprises in domestic and foreign markets, and accelerates the entry of Albanian exports into global markets.

### AZERBAIJAN

Azerbaijan's program emphasizes economic growth and reform, with a focus on developing the non-oil sectors of the economy. In 2006, USAID worked to develop a well-functioning private sector to increase job creation and regional economic development.

PX202

## BOSNIA AND HERZEGOVINA

The program in Bosnia and Herzegovina (BiH) supports progress towards full integration into the EU. USAID/BiH worked to integrate the energy sector into the regional European framework and supported the development and implementation of a coherent direct taxation system that is regionally competitive. USAID's competitiveness projects promote trade and investment in agribusiness, wood processing, and tourism by improving the competitiveness of the firms, industries, and training firms to meet EU standards.

## CENTRAL ASIA REGION

The Trade Facilitation and Investment (TFI) Project has been operating in Kazakhstan and the Kyrgyz Republic since 2001 and in Tajikistan and Uzbekistan since 2002. The project seeks to improve the trade and investment environment for small and medium-sized enterprises through the reduction of investment constraints, trade facilitation, and accession to and active participation in the WTO (Kyrgyz Republic joined in 1998).

Building on USAID's TFI Project, the U.S. Central Asia Trade Facilitation Initiative works to foster greater regional trade through reduced transaction costs for businesses by harmonizing, strengthening, and streamlining customs functions.

The Business Environment Improvement Project (BEI) was launched for Kazakhstan, the Kyrgyz Republic and Tajikistan in October. This program supports the streamlining of legal and regulatory processes and facilitates multi-party engagement to improve the business, trade, and legal environment.

The Central Asia Infrastructure Integration Initiative, under the Regional Electricity Market Assistance Project (REMAP) helps to establish a transparent and competitive regional electricity market to increase regional electricity trade, stimulate economic growth, and provide market-based solutions for regional disputes related to hydro facilities and reservoirs.

## KAZAKHSTAN

USAID's Trade Facilitation and Investment (TFI) Project operates five offices in Kazakhstan and was directly involved in the drafting of Kazakhstan's Customs Code, bringing the country into greater compliance with WTO principles and agreements. TFI is also financing the training of front-line customs officers in the identification and seizure of pirated goods which will help Kazakhstan meet the standards of the Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS) and achieve removal from the Special 301 Watch List, both of which will help Kazakhstan's accession process to the WTO. The Kazakhstan Small Business Development Project, funded in October 2006, aims to promote development of small business, resulting in an increase of sales domestically and regionally.

## KOSOVO

USAID's objective in Kosovo is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID's goal is to help Kosovo make the transition from international administration to self-governance in an effective and peaceful manner. USAID provides training and expert counsel to ensure Kosovars quickly build capacity in the fiscal and economic policy sectors, private enterprise development, and energy management. One such

PX202

program is the Cluster and Business Support Project, assisting businesses in the construction materials, livestock, and fruit and vegetables sectors by promoting productivity, trade and investment, identifying trade, marketing and import-substitution opportunities and providing training to meet European Union standards.

Kyrgyz Republic. USAID's Trade Facilitation and Investment Project provides support to the WTO Department within the Kyrgyz Ministry of Economic Development and Industry & Trade (MEDIT) to increase its technical capacity in the legal and regulatory process. The Kyrgyz Agri-Enterprise Development Program works closely with the USAID Ferghana Valley Agribusiness Initiative, and provides development assistance to private agricultural-input suppliers that share the Ferghana Valley with Uzbekistan and Tajikistan.

Tajikistan.  USAID's Trade Facilitation and Investment Project works directly with the Tajik government to prepare it to meet its WTO commitments by revising and updating the Legislative Action Plan to bring trade-related legislation into conformity with the provisions of WTO Agreements. Patent, copyright, trademark, and geographic indication legislation are revised to reach conformity with the provisions of the Trade-Related Aspects of the Intellectual Property Rights (TRIPS) Agreement. USAID's programs support small and medium enterprise development, customs reform, and the creation of agricultural value chains. Fiscal reform projects focus on reducing regional disparities by increasing the effectiveness of local tax administration and increasing the capacity of local governments to develop and execute budgets.

Turkmenistan. USAID works to foster trade advisory services and implement International Financial Reporting Standards in Turkmenistan. In FY-06, USAID implemented its Agricultural Improvement Project to improve competitiveness and increase the rural incomes of farmers through the production of quality goods for domestic and international markets.

Uzbekistan. In FY-06 USAID assisted Uzbekistan in its WTO accession process supporting the drafting of new legislation and amending the existing legislation required, and worked to implement the reforms required for liberalizing Uzbekistan's trade regime and increasing its participation in the global economy.

## STABILITY PACT FOR SOUTHEASTERN EUROPE

The Stability Pact for Southeastern Europe (SP) has several relevant programs related to global trade that affect parts of the region with significant Muslim populations, including Albania, Bosnia and Herzegovina, and Kosovo. In December, under Stability Pact leadership, the countries of Southeastern Europe signed the amended and enlarged Central European Free Trade Agreement (CEFTA), which brings the region the benefits of freer trade, improve the climate for investment, and bolster stability by increasing economic cooperation. The SP's Trade Working Group has encouraged the negotiation, ratification and implementation of a network of bilateral free trade agreements among the members of the Stability Pact and supports negotiation of a single regional trade agreement aimed at harmonizing the bilateral trade agreements to encompass all SP members. The U.S. supports this process by providing technical assistance to lower non-tariff barriers within the region, consistent with WTO principles.

The SP has also helped develop a common energy market between the European Union and Southeastern Europe. On October 25, Albania, Bosnia-Herzegovina, and UNMIK/Kosovo (among other Southeastern European parties) signed the Energy Community Treaty in Athens. This treaty will

PX202

establish a common regulatory framework for trade in electricity and gas and facilitate financing and investment by both official donors and private investors in the rehabilitation of existing infrastructure and construction of new infrastructure.

Under Stability Pact auspices, the OECD Investment Compact for Southeastern Europe aims to improve the region's investment conditions, by setting out commitments for policy reform, which countries need to implement in order to create a robust and sustainable market economy and to encourage increasing local and foreign direct investment. Albania and Bosnia and Herzegovina (among other Southeastern Europe nations) are signatories.

## POSSIBLE ACTIONS TO PROMOTE INTRAREGIONAL TRADE AND RULE OF LAW IN THE REGION

Supporting intraregional trade and rule of law is a key aspect of U.S. policy in the Middle East and around the world.

## INTRAREGIONAL TRADE

- The President's vision of a Middle East Free Trade Area (MEFTA) by 2013, linking countries in the region with each other and the U.S, is the centerpiece of our effort to promote intra-regional trade. Our strategy for attaining MEFTA includes:

- Negotiating Free Trade Agreements (FTAs) with countries ready for that step. The U.S. has concluded FTAs with Israel, Jordan, Morocco, Bahrain, and Oman;

- Working with additional countries through the TIFA process to advance readiness for FTA negotiations; and

- Assisting reform-minded Middle East countries that are not yet in the WTO accession process.

- The Middle East Partnership Initiative (MEPI), MCC, and USAID Missions in the Middle East, provide support for the MEFTA initiative through a variety of programs in trade capacity building. MEPI and USAID Missions in the Middle East are supporting the WTO accession efforts of Iraq, Yemen, and Lebanon. U.S. assistance programs assist FTA partners Jordan, Morocco, Bahrain, and Oman to implement their FTAs with the United States.

- USAID/Jordan's Achievement of Market Friendly Initiatives and Results (AMIR), supports implementation of the FTA between the United States and Jordan. It offers support to Jordan as it liberalizes its economy and works to meet the requirements of regional and global trade opportunities. USAID/Morocco assists the government and private sector to successfully respond to the challenges and opportunities that the FTA with the United States will bring.

## THE RULE OF LAW

- USAID/Egypt's Administration of Justice Support II project promotes the rule of law by reforming and modernizing the commercial court system and improving the access to quality legal services. FY-2006 funding is $5,000,000.

PX202

- USAID/Morocco's Commercial Court Judges Training in Trademark Opposition Process promotes mandatory continuing education for judges and lawyers, including trademark opposition. This builds on the work of a previous USAID project on modernization of commercial laws and of the judiciary. The project will also cooperate with USAID funded training provided the U.S. Patent and Trademark Office regarding implementation of the system for both judges and customs officials.

## THE MILLENNIUM CHALLENGE CORPORATION (MCC)

In addition, the Millennium Challenge Corporation (MCC) provides assistance for transformational development in countries that perform well on 16 independent, transparent policy indicators in the areas of ruling justly, investing in people, and economic freedom. Besides the financial support provided by MCC programs, MCC creates an incentive for candidate countries to adopt legal, policy, regulatory, and institutional reforms related to the MCC selection criteria. Such reforms will contribute to countries' efforts to reduce poverty and increase economic growth.

## SUMMARY OF MCC ACTIVITIES IN PREDOMINANTLY MUSLIM COUNTRIES:

### COMPACT-ELIGIBLE COUNTRIES

Based on their good performance on the 16 policy indicators mentioned above, Compact-Eligible countries are invited to apply for substantial grants from MCC for programs that they design and implement through a "Compact."

### MALI

Mali signed a five-year, $460.8 million Compact with MCC in November. Its Compact aims to reduce rural poverty and help achieve national food security through a sustainable increase in the economic performance of the agricultural sector. The Compact also intends to spur economic growth and reduce poverty by increasing the competitiveness of light industry and increasing the value-added of exports and tourism. The Compact's objectives will be met through investments aimed to increase farmers' incomes, enhance agricultural supply chains, reduce transport costs and create a platform for industrial production. The Compact focuses on key infrastructure investments that capitalize on two of Mali's major assets, the Bamako-Senou International Airport, gateway for regional and international trade, and the Niger River, a source of water for irrigated agriculture.

### BURKINA FASO

Burkina Faso submitted a Compact proposal to MCC in October. It aims to promote economic growth in the rural sector by fostering land tenure security; investing in irrigation and watershed management infrastructure for agricultural purposes; constructing national roads, feeder roads, and market infrastructure; and improving existing agro-industrial supply chains.

PX202

## JORDAN

In November, MCC's Board of Directors selected Jordan as eligible to apply for Compact funding. Jordan is currently preparing a proposal for submission to MCC.

## MOROCCO

Morocco submitted its Compact proposal to MCC in August. The proposal focuses on relieving constraints to growth in the agriculture, fishing, artisan, and small enterprise finance sectors.

Threshold Programs are designed to assist countries that have demonstrated significant commitment to improving their performance on MCC selection criteria, but do not yet pass more than half the indicators in each of the three selection categories of ruling justly, investing in people, and encouraging economic freedom. A Threshold Program provides financial assistance to help improve a low score on at least one of MCC's policy indicators.

## ALBANIA

Reducing corruption is the primary focus of the $13.8 million Albanian program.  Albania is receiving assistance from MCC to fund three programs designed to reform tax administration, public procurement and business administration. The program anticipates reducing the extensive red tape and below-board payments needed to start a business while increasing the national tax base.

## BURKINA FASO

The $12.9 million program is a pilot program that seeks to improve performance on girls' primary education completion rates. Specific interventions include the construction of 132 "girl-friendly" schools, teacher training, providing take-home dry rations to girls who maintain a 90 percent school attendance rate, and providing literacy training for mothers.  Burkina Faso is now eligible for Compact assistance.

## INDONESIA

The $55 million program with Indonesia seeks to immunize at least 80 percent of children under the age of one for diphtheria, tetanus, and pertussis and 90 percent of all children for measles. The Threshold Program also has a component aimed at curbing public corruption by reforming the judiciary.

## JORDAN

The $25 million Jordanian program aims to strengthen democratic institutions by supporting Jordan's efforts to broaden public participation in the political and electoral process, increasing government transparency and accountability, and enhancing the efficiency and effectiveness of customs administration. The Threshold Program is a part of Jordan's reform efforts focused on improvements in public administration, civil liberties, infrastructure, and the economy. Jordan has now become eligible for Compact assistance.

## KYRGYZ REPUBLIC

PX202

Selected as eligible for the Threshold Program in FY-2006 and reselected in FY-2007, the Kyrgyz Republic has requested MCC funding to improve performance on MCC indicators in the Ruling Justly category. The Kyrgyz Republic submitted a Threshold Country Plan to MCC, which is currently under review.

## YEMEN

In February 2007, the Republic of Yemen was reinstated into the Threshold Program. The MCC Board of Directors found that the Yemeni government worked aggressively and demonstrably to address the country's performance on the MCC selection criteria. Yemen may now apply for a Threshold Program agreement.

## THE MIDDLE EAST PARTNERSHIP INITIATIVE (MEPI)

In 2006, the State Department's Middle East Partnership Initiative (MEPI) provided tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from trade technical assistance to commercial code reform to a network for Arab businesswomen.

## EXAMPLES OF MEPI'S WORK WITH REFORMERS INCLUDE THE FOLLOWING:

- Provided technical and other assistance in support of successfully completed free trade agreements with the Bahrain and Oman.

- Expanded trade capacity of Arab countries with training and technical assistance; a number of Gulf countries are drafting new customs codes and updating agricultural import/export standards.

- Provided entrepreneurial training for more than 300 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 35 alumni going on to start or expand businesses. At least 500 new jobs have been created following their participation in MEPI programs.

- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations.

- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters.

- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman, update commercial codes to meet international standards in Bahrain and Oman, and provide continuing education programs for the judiciary.

- Established business network hubs in six countries, focusing on training, professional development, and information sharing on laws, business opportunities, skills, and the global economy.

PX202

# CHAPTER 6.
## FOREIGN TERRORIST ORGANIZATIONS

Foreign Terrorist Organization (FTO) aliases cited are consistent with and drawn from the Specially Designated Nationals list maintained by the Department of Treasury. The full list can be found at the following website: www.treasury.gov/offices/enforcement/ofac/sdn/sdnlist.txt.

**Abu Nidal Organization (ANO)**

**Abu Sayyaf Group (ASG)**

**Al-Aqsa Martyrs Brigade**

**Ansar al-Sunna (AS)**

**Armed Islamic Group (GIA)**

**Asbat al-Ansar**

**Aum Shinrikyo (Aum)**

**Basque Fatherland and Liberty (ETA)**

**Communist Party of Philippines/New People's Army (CPP/NPA)**

**Continuity Irish Republican Army (CIRA)**

**Gama'a al-Islamiyya (IG)**

**HAMAS**

**Harakat ul-Mujahedin (HUM)**

**Hizballah**

**Islamic Jihad Union (IJU)**

**Islamic Movement of Uzbekistan (IMU)**

**Jaish-e-Mohammed (JEM)**

**Jemaah Islamiya Organization (JI)**

**Al-Jihad (AJ)**

**Kahane Chai (Kach)**

**Kongra-Gel (KGK/PKK)**

**Lashkar e-Tayyiba (LT)**

**Lashkar i Jhangvi (LJ)**

**Liberation Tigers of Tamil Eelam (LTTE)**

**Libyan Islamic Fighting Group (LIFG)**

**Moroccan Islamic Combatant Group (GICM)**

**Mujahedin-e Khalq Organization (MEK)**

**National Liberation Army (ELN)**

PX202

**Palestine Liberation Front (PLF)**

**Palestinian Islamic Jihad (PIJ)**

**Popular Front for the Liberation of Palestine (PFLP)**

**Popular Front for the Liberation of Palestine-General Command (PFLP-GC)**

**Al-Qaida (AQ)**

**Al-Qaida in Iraq (AQI)**

**Al-Qaida in the Islamic Maghreb (AQIM) [Formerly Salafist Group for Call and Combat (GSPC)]**

**Real IRA (RIRA)**

**Revolutionary Armed Forces of Colombia (FARC)**

**Revolutionary Nuclei (RN)**

**Revolutionary Organization 17 November (17N)**

**Revolutionary People's Liberation Party/Front (DHKP/C)**

**Shining Path (SL)**

**United Self-Defense Forces of Colombia (AUC)**

*\* Listed on the UN 1267 Committee List.*

*º Listed on the Terrorist Exclusion List.*

*^ Designated under Executive Order 13224.*

## ABU NIDAL ORGANIZATION (ANO)

a.k.a. Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

### DESCRIPTION

The ANO international terrorist organization was founded by Sabri al-Banna (a.k.a. Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974. The group's previous known structure consisted of various functional committees, including political, military, and financial. In August 2002, Abu Nidal died in Baghdad; the new leadership of the organization remains unclear.

### ACTIVITIES

The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons; however, the group has not staged a major attack against Western targets since the late 1980s. Major attacks included the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988. The ANO is suspected of  assassinating PLO deputy chief Abu Iyad and PLO security Chief Abu Hul in Tunis in 1991. The ANO was responsible for the December 1985 simultaneous Rome and Vienna airport attacks in which 12 people died, including five American citizens.

PX202

**STRENGTH**

Current strength and operational status are unknown.

**LOCATION/AREA OF OPERATION**

Although former and possibly current ANO associates may be in Iraq and Lebanon, the group is largely considered inactive.

**EXTERNAL AID**

The ANO received considerable support, including safe haven, training, logistical assistance, and funding from Iraq, Libya, and Syria (until 1987). The ANO's current access to resources is unclear, but it is likely severely impacted by the decline in state support.

## ABU SAYYAF GROUP (ASG)*

a.k.a. Al Harakat al Islamiyya

**DESCRIPTION**

The ASG is a violent Muslim terrorist group operating in the southern Philippines. Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamic teachings. The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998. His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group. In September 2006, Janjalani was killed in a gun battle with the Armed Forces of the Philippines. Radullah Sahiron is assumed to be the new ASG leader.

**ACTIVITIES**

The ASG engages in kidnappings for ransom, bombings, beheadings, assassinations, and extortion. The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago, areas in the southern Philippines heavily populated by Muslims, but the ASG primarily has used terror for financial profit. Recent bombings may herald a return to a more radical, politicized agenda, at least among certain factions. In August 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that has disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadafy Janjalani in September 2006.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995. In April 2000, an ASG faction kidnapped 21 persons, including ten Western tourists, from a resort in Malaysia. In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines. Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered. A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham and Filipina Deborah Yap were killed. U.S. and Philippine authorities blame the ASG for exploding a bomb near a Philippine military base in Zamboanga in

PX202

October 2002 that killed a U.S. serviceman. In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132. In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila. The ASG also claimed responsibility for the 2005 Valentine's Day bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150.

## STRENGTH

ASG is estimated to have 200 to 500 members.

## LOCATION/AREA OF OPERATION

The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi. The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila. In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao. The ASG was expelled from Mindanao proper by the Moro Islamic Liberation Front (MILF) in mid-2005. The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there.

## EXTERNAL AID

The ASG is funded through acts of ransom and extortion, and receives funding from both regional terrorist groups such as Jemaah Islamiya (JI), which is based mainly in Indonesia, and Middle Eastern Islamic extremists.

# AL-AQSA MARTYRS BRIGADE (AL-AQSA)

a.k.a. al-Aqsa Martyrs Battalion; Fatah Tanzim

## DESCRIPTION

The al-Aqsa Martyrs Brigades consists of localized cells of Palestinian militants loyal to the secular-nationalist Fatah movement. Al-Aqsa emerged at the outset of the 2000 Palestinian al-Aqsa Intifadah, splitting from the Fatah party to attack Israeli military targets and settlers with the aim of driving Israel from the West Bank and Gaza Strip and establishing a Palestinian state. Al-Aqsa has no central leadership; the cells operate with autonomy, although they remained ideologically loyal to Palestinian Authority (PA) President and Fatah party head Yassir Arafat until his death in 2004.

## ACTIVITIES

Al-Aqsa initially focused on small arms attacks against Israeli military personnel and settlers in the West Bank. In 2002, the group began to conduct suicide bombings against Israeli civilians. After a March 2002 bombing, the U.S. State Department designated Al-Aqsa a foreign terrorist organization.

PX202

Al-Aqsa suspended most anti-Israel attacks as part of the broader unilateral Palestinian ceasefire agreement during 2004 but resumed them following HAMAS's electoral victory in January 2006. Al-Aqsa members have continued anti-Israeli as well as intra-Palestinian violence and contribute to the overall chaotic security environment inside the Palestinian territories. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed some dual U.S.-Israel citizens.

## STRENGTH

Current strength is unknown.

## LOCATION/AREA OF OPERATION

Al-Aqsa operates mainly in the West Bank but has conducted attacks inside Israel and the Gaza Strip. The group has members in refugee camps in southern Lebanon and overseas, although it has not demonstrated transnational capability.

## EXTERNAL AID

Iran has exploited Al-Aqsa's lack of leadership and funds by  providing aid and exerting influence over the organization.

# ANSAR AL-SUNNA (AS) *

a.k.a. Ansar al-Islam; Ansar Al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar Al-Sunna; Jund Al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

## DESCRIPTION

Ansar al-Sunna (AS) is a Salafi terrorist group whose goals include expelling the U.S.- led Coalition from Iraq and establishing an independent Islamic Iraqi state. This amorphous group has changed its name several times over the years and was last known as Ansar al-Islam. AS announced its creation in 2003 by posting a statement to the Internet calling all extremists in Iraq to unite under the new name. The bid to become a jihadist umbrella organization failed, but the name AS stuck. AS has ties to the al-Qaida central leadership and al-Qaida in Iraq (AQI); it has a competitive relationship with AQI, and did not join the AQI-dominated "Islamic State of Iraq." Some members of AS trained in al-Qaida camps in Afghanistan, and the group provided safe haven to al-Qaida fighters before Operation Iraqi Freedom (OIF). Since OIF, AS has become the second-most prominent group engaged in anti-Coalition attacks in Iraq behind AQI and has maintained a strong propaganda campaign.

## ACTIVITIES

AS continues to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures. AS has claimed responsibility for many high profile attacks, including the simultaneous suicide bombings of the Patriotic Union

PX202

of Kurdistan and Kurdistan Democratic Party offices in Irbil in February 2004, the bombing of the U.S. military dining facility in Mosul in December 2004, and numerous kidnappings, executions, and assassinations.

## STRENGTH

Precise numbers are unknown, but AS is the second largest Sunni jihadist group in Iraq, behind AQI.

## LOCATION/AREA OF OPERATION

Primarily central, western, and northern Iraq.

## EXTERNAL AID

AS receives assistance from a loose network of associates in Europe and the Middle East.

# ARMED ISLAMIC GROUP (GIA) *

a.k.a. Al-Jama'ah al-Islamiyah al-Musallah; Groupement Islamique Arme

## DESCRIPTION

An Islamic extremist group, the GIA aims to overthrow the Algerian regime and replace it with a fundamentalist Islamic state. The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Islamic opposition party.

## ACTIVITIES

The GIA has engaged in attacks against civilians and government workers. The GIA began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians, thus alienating itself from the Algerian populace in the process. Since announcing its campaign against foreigners living in Algeria in 1992, the GIA killed more than 100 expatriate men and women, mostly Europeans, in the country. Many of the GIA's members have joined other Islamist groups or have been killed or captured by the Algerian government. The government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces. The GIA's most recent significant attacks occurred in August 2001.

## STRENGTH

Precise numbers are unknown, but probably fewer than 100.

## LOCATION/AREA OF OPERATION

Algeria, the Sahel, and Europe.

PX202

## EXTERNAL AID

The GIA has members in Europe that provide funding but mostly the group engages in criminal activity to finance activities and raise funds.

# ASBAT AL-ANSAR

a.k.a. League of the Followers; Partisans' League

## DESCRIPTION

Asbat al-Ansar, the League of the Followers or Partisans' League, is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to Usama bin Ladin's al-Qaida organization and other Sunni extremist groups. Asbat is well positioned to play an important role should al-Qaida attempt to expand further its terrorist operations to Lebanon. The group follows an extremist interpretation of Islam that justifies violence against civilian targets to achieve political ends. Some of the group's goals include overthrowing the Lebanese government and thwarting perceived anti-Islamic and pro-Western influences in the country.

## ACTIVITIES

Asbat al-Ansar maintains close ties with the al-Qaida network, and had a "front-line" command post relatively close to Israel's border in the Ain al-Hilwah (Palestinian) refugee camp.  In early to mid-March, Lebanese authorities arrested several members of the group. Some were Palestinians, some were Lebanese. Members of this group were believed by some to have been responsible for a Katyusha rocket attack on the Galilee (Israel) in December 2005. On April 3, 2006, a video was posted to an Islamic website claiming that five members of Asbat al-Ansar were killed fighting in Iraq; the date of death was not provided. Asbat al-Ansar members have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations.

Since it first emerged in the early 1990s, Asbat al-Ansar has carried out multiple terrorist attacks in Lebanon; in the mid-1990s the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000. Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di a.k.a. Abu Muhjin, remains at large despite being sentenced to death in absentia for the 1994 murder of a Muslim cleric. In September 2004, operatives with links to the group were believed to be involved in a planned terrorist operation targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices. In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for plotting to assassinate then U.S. Ambassador to Lebanon David Satterfield in 2000. Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of al-Qaida at the 'Ayn al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements.

## STRENGTH

The group commands about 300 fighters in Lebanon.

PX202

## LOCATION/AREA OF OPERATION

The group's primary base of operations is the 'Ayn al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

## EXTERNAL AID

Probably receives money through international Sunni extremist networks.

# AUM SHINRIKYO (AUM)

a.k.a. A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

## DESCRIPTION

Shoko Asahara established Aum in 1987, and the cult received legal status as a religious entity in 1989. At first, Aum aimed to take over Japan and then the world, but over time it began to emphasize the imminence of the end of the world. Asahara predicted 1996, and 1999 to 2003, as likely dates and said that the United States would initiate Armageddon by starting World War III with Japan. The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995. In 1997, however, a government panel decided not to invoke the Operations Control Law against the group that would have outlawed it. A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns that Aum might launch future terrorist attacks. Under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph in January 2000 and tried to distance itself from the violent and apocalyptic teachings of its founder. In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara. A growing divide between members supporting Joyu and those who remain loyal to Asahara is splitting the cult into factions. In 2006, Joyu officially split from Aleph over recognizing Shoko Asahara as the sole authority.

## ACTIVITIES

In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 persons and causing up to 6,000 to seek medical treatment. Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500. The group's attempts to conduct attacks using biological agents were unsuccessful. Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him in to death for his role in the 1995 attacks. In September 2006, Asahara lost his final appeal against the death penalty.

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry. In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

PX202

## STRENGTH

Aum's current membership in Japan is estimated to be about 1,650 persons.  At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.

## LOCATION/AREA OF OPERATION

Aum's principal membership is located in Japan, while a residual branch comprising about 300 followers lives in Russia.

## EXTERNAL AID

None.

# BASQUE FATHERLAND AND LIBERTY (ETA)

a.k.a. Askatasuna; Batasuna; Ekin; Epanastatiki Pirines; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; Popular Revolutionary Struggle; XAKI

## DESCRIPTION

ETA was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava, as well as the autonomous region of Navarra and the southwestern French territories of Labourd, Basse-Navarre, and Soule. Spain and the European Union both have listed ETA as a terrorist organization, and in 2002 the Spanish parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group. In 2004, Spain and France formed a joint counterterrorism and judicial unit to combat ETA and Islamic terrorist groups. During 2005 and 2006, police in both countries together arrested around 100 individuals associated with ETA, dismantled several of the group's cells, and dealt a significant blow to its operational capability. Spanish and French prisons are estimated to hold a total of more than 500 ETA members. In March 2006, ETA announced that it would implement a "permanent" cease-fire. On December 30, ETA exploded a massive car-bomb that destroyed much of the covered parking garage outside the new Terminal 4 of Madrid's Barajas International Airport and effectively broke its nine-month "permanent cease-fire." Two individuals killed in the blast became ETA's first fatalities in more than three years. The Government of Spain suspended talks with ETA, and government officials subsequently said political negotiations with the group had ended.

## ACTIVITIES

ETA primarily conducts bombings and assassinations; targets are typically Spanish government officials, security and military forces, politicians, and judicial figures, but the group also has targeted journalists and tourist areas. The group is responsible for killing more than 800 and injuring thousands more since it began its lethal attacks in the late 1960s. Security service scrutiny and a public outcry after the Islamic extremist train bombings in Madrid in March 2004, have limited ETA's capability and willingness to inflict casualties. ETA conducted no fatal attacks in 2005, but did mount more than 30 low-level bombings, most preceded by a warning call, that caused minor injuries and property damage. In February 2005, ETA detonated a car bomb in Madrid at a conven-

PX202

tion center where Spanish King Juan Carlos and then Mexican President Vicente Fox were scheduled to appear, wounding more than 20 people. In June 2005, ETA launched grenades at the airport that serves the city of Zaragoza, shutting down the airport but causing no damage or injuries. ETA also detonated an explosive device at a stadium constructed as part of Madrid's bid to host the 2012 Olympic Games; there were no injuries in that attack. Just days before its March 2006 cease-fire announcement, ETA claimed responsibility for a spate of roadside blasts in northern Spain that caused no injuries. Its late 2006 attack at Madrid's airport is the group's first fatal attack since March 2003. ETA finances its activities primarily through bribery and extortion.

## STRENGTH

Not precisely known, but believed to number in the low hundreds.

## LOCATION/AREA OF OPERATION

Operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but also has attacked Spanish and French interests elsewhere.

## EXTERNAL AID

Has received training at various times in the past in Libya, Lebanon, and Nicaragua. Some ETA members allegedly fled to Cuba and Mexico, while others reside in South America. ETA members have operated and been arrested in other European countries, including Belgium, the Netherlands, and Germany.

# COMMUNIST PARTY OF PHILIPPINES/NEW PEOPLE'S ARMY (CPP/NPA)

a.k.a. Communist Party of the Philippines; CPP; New People's Army; NPA

## DESCRIPTION

The military wing of the Communist Party of the Philippines (CPP), the NPA is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare. Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from the Netherlands, where he lives in self-imposed exile. Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen. Although primarily a rural-based guerrilla group, the NPA has an active urban infrastructure to support its terrorist activities and at times uses city-based assassination squads.

## ACTIVITIES

The NPA primarily targets Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes." The NPA extorts politicians running for office in NPA-influenced areas, charging them for "campaign permits." The group opposes any U.S. military presence in the Philippines and in the past has attacked U.S. military inter-

PX202

ests; it killed several U.S. service personnel before the U.S. base closures in 1992. The NPA claimed responsibility for the assassination of two congressmen, from Quezon in May 2001 and Cagayan in June 2001, among other killings. Periodic peace talks with the Philippine government stalled after these incidents.  In December 2005, the NPA publicly expressed its intent to target U.S. personnel if they were discovered in NPA operating areas.

## STRENGTH

Estimated at less than 9,000, a number significantly lower than its peak strength of approximately 25,000 in the 1980s.

## LOCATION/AREA OF OPERATIONS

Operates in rural Luzon, Visayas, and parts of northern and eastern Mindanao. Has cells in Manila and other metropolitan centers.

## EXTERNAL AID

Unknown.

# CONTINUITY IRISH REPUBLICAN ARMY (CIRA)

a.k.a. Continuity Army Council; Continuity IRA; Republican Sinn Fein

## DESCRIPTION

CIRA is a terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland. CIRA's aliases, Continuity Army Council and Republican Sinn Fein, are included in its FTO designation. CIRA cooperates with the larger Real IRA (RIRA).

## ACTIVITIES

CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups. CIRA did not join the Provisional IRA in the September 2005 decommissioning and remains capable of effective, if sporadic, terrorist attacks. In late 2006 CIRA members issued a list of up to 20 individuals they were targeting for paramilitary attacks, several of whom were wounded in subsequent shootings.

## STRENGTH

Membership is small, with possibly fewer than 50 hard-core activists. Police counterterrorist operations have reduced the group's strength, but CIRA continues to recruit, train, and plan operations.

PX202

**LOCATION/AREA OF OPERATION**

Northern Ireland and the Irish Republic. Does not have an established presence in Great Britain.

**EXTERNAL AID**

Suspected of receiving funds and arms from sympathizers in the United States. May have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

## GAMA'A AL-ISLAMIYYA (IG)

a.k.a. Al-Gama'at; Egyptian al-Gama'at al-Islamiyya; Islamic Gama'at (IG); Islamic Group

**DESCRIPTION**

The IG, Egypt's largest militant group, has been active since the late 1970s and is a loosely orga-nized network, whose primary goal is to overthrow the Egyptian government and replace it with an Islamic state. It has an external wing with supporters in several countries. The group's issuance of a cease-fire in 1997 led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations. The IG issued another ceasefire in March 1999, but its spiritual leader, Shaykh Umar Abd al-Rahman, sentenced to life in prison in January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000. IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists, four Egyp-tians, and wounded dozens more. In February 1998, a senior member signed Usama bin Ladin's fatwa calling for attacks against the United States.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that would cause mass casualties. Taha Musa disappeared several months thereafter, and there is no information as to his current whereabouts. In March 2002, members of the group's historic leadership in Egypt declared use of violence misguided and renounced its future use, prompting denunciations by much of the leadership abroad. The Egyptian government continues to release IG members from prison; approximately 900 were released in 2003, and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members. Ayman al-Zawahiri announced in August 2006 that IG had merged with al-Qaida, but the group quickly denied this claim.

**ACTIVITIES**

IG conducted armed attacks against Egyptian security and other government officials, Coptic Chris-tians, and Egyptian opponents of Islamic extremism before the 1997 cease-fire; after the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack. IG claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia.

PX202

## STRENGTH

Unknown. At its peak IG probably commanded several thousand hard-core members and a like number of sympathizers. The 1999 cease-fire, security crackdowns following the 1997 attack in Luxor, and post-September 11 security efforts, have probably resulted in a substantial decrease in the group's numbers.

## LOCATION/AREA OF OPERATION

IG Operates mainly in the Al-Minya, Asyut, Qina, and Sohaj Governorates of southern Egypt. It also appears to have support in Cairo, Alexandria, and other urban locations, particularly among unem-ployed graduates and students. The IG has an external presence, including in the United Kingdom, Afghanistan, Yemen, and in various locations in Europe.

## EXTERNAL AID

Unknown. Usama Bin Ladin and Afghan militant groups support the organization. IG also may obtain some funding through various Islamic non-governmental organizations.

# THE ISLAMIC RESISTANCE MOVEMENT (HAMAS)

a.k.a. Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Students of Ayyash; Students of the Engineer; Yahya Ayyash Units

## DESCRIPTION

HAMAS, which includes military and political wings, was formed at the onset of the first Palestinian uprising or Intifadah in late 1987, as an outgrowth of the Palestinian branch of the Muslim Brother-hood. The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, including suicide bombings against civilian targets inside Israel. Social-political elements engage in "Dawa" or ministry activities, which include running charities and schools, fund-raising and political activities. A Shura council based in Damascus, Syria, sets overall policy. Since winning Palestinian Authority (PA) elections in 2006, HAMAS has taken control of significant PA ministries, including the Ministry of Interior. HAMAS formed an expanded, overt militia called the Executive Force, subordi-nate to the Ministry.

## ACTIVITIES

Prior to 2005, HAMAS conducted numerous anti-Israeli attacks including suicide bombings, rocket attacks, IED attacks, and shootings. The group curtailed terrorist attacks in February 2005 after agreeing to a temporary period of calm brokered by the PA, and ceased most violence after winning control of the PA legislature and cabinet in 2006. After HAMAS staged a June 25 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the abduction of Corporal Gilad Shalit, Israel took steps that severely limited the operation of the Rafah crossing. HAMAS maintained and expanded its military capabilities during this time. HAMAS has not directly targeted U.S. interests, although the group makes little or no effort to avoid targets frequented by foreigners.

PX202

## STRENGTH

HAMAS probably has several hundred members in its armed wing, the al-Qassam Brigades, along with its reported 6,000-man Executive Force and tens of thousands of supporters and sympathizers.

## LOCATION/AREA OF OPERATION

HAMAS has an operational presence in every major city within the Palestinian territories and has focused its anti-Israeli attacks on targets in those territories and Israel. The group retains a cadre of leaders and facilitators that conduct diplomatic, fundraising, and arms smuggling activities in Lebanon, Syria, and other states.

## EXTERNAL AID

Receives some funding, weapons and training from Iran. Also receives donations from Palestinian expatriates around the world and private benefactors in Arab states. Some fundraising and propaganda activity takes place in Western Europe and North America.

# HARAKAT UL-MUJAHEDIN (HUM) *

a.k.a. Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Ansar; Harakat ul-Mujahideen; HUA; Jamiat ul-Ansar (JUA)

## DESCRIPTION

HUM, an Islamic militant group based in Pakistan, is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir. Reportedly under pressure from the Government of Pakistan, HUM's long time leader Fazlur Rehman Khalil stepped down and, in January 2005, was replaced by Dr. Badr Munir as the head of HUM. Khalil has been linked to Usama bin Ladin, and his signature was found on Bin Ladin's fatwa in February 1998 calling for attacks on U.S. and Western interests. HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001. Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December. In 2003, HUM began using the name Jamiat ul-Ansar (JUA). Pakistan banned JUA in November 2003.

## ACTIVITIES

HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir. It is linked to the Kashmiri militant group al-Faran that kidnapped five Western tourists in Kashmir in July 1995; one was killed in August, and the other four reportedly were killed in December of the same year. HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar who was imprisoned by India in 1994 and founded Jaish-e-Mohammed (JEM) after his release. Ahmed Omar Sheik also was released in 1999, and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

PX202

## STRENGTH

HUM has several hundred armed supporters located in Azad Kashmir, Pakistan, and India's southern Kashmir and Doda regions and in the Kashmir valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets. In 2000, HUM lost a significant share of its membership in defections to the JEM.

## LOCATION/AREA OF OPERATION

Based in Muzaffarabad, Rawalpindi, and several other towns in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan. HUM trains its militants in Afghanistan and Pakistan.

## EXTERNAL AID

Collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf and Islamic states. HUM's financial collection methods also include soliciting donations in magazine ads and pamphlets. The sources and amount of HUM's military funding are unknown. Its overt fundraising in Pakistan has been constrained since the government clampdown there on extremist groups and the freezing of terrorist assets.

# HIZBALLAH

(Common alternate spellings: Hezbollah, Hizbullah, Hizb`allah) a.k.a. Party of God; Islamic Jihad

## DESCRIPTION

Formed in 1982 in response to the Israeli invasion of Lebanon, this Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini. The group follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei. Hizballah is closely allied with Iran and often acts at its behest, but it also can and does act independently. Although Hizballah does not share the Syrian regime's secular orientation, the group has been a strong ally in helping Syria advance its political objectives in the region. The Majlis al-Shura, or Consultative Council, is the group's highest governing body and has been led by Secretary General Hasan Nasrallah since 1992.

Hizballah remains the most technically capable terrorist group in the world. It has strong influence in Lebanon's Shia community, which comprises about one-third of Lebanon's population. The Lebanese government still recognizes Hizballah as a legitimate "resistance group" and political party. Hizballah maintains offices in Beirut and elsewhere in the country, has official liaison officers to the security services, claims 14 elected officials in the 128-seat Lebanese National Assembly and was represented in the Cabinet for the first time, by the Minister of Water and Electricity Mohammed Fneish, until his resignation, along with other Shia ministers on November 11, 2006. Hizballah has largely withdrawn its military presence from southern Lebanon in accordance with UNSCR 1701, although likely maintains weapons caches in southern Lebanon and justifies its continued arms status by claiming to act in defense of Lebanon against acts of Israeli aggression, such as regular

PX202

Israeli overflights of Lebanese airspace. Hizballah alleges that Israel has not withdrawn completely from Lebanese territory because, in Hizballah's view, the Shebaa Farms and other areas belong to Lebanon. Hizballah supports a variety of violent anti-Western groups, including Palestinian terrorist organizations. This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

## ACTIVITIES

In 2006, Hizballah launched a number of attacks on Israel, including the May 28 and July 12 attack, which resulted in the capture and kidnapping of two Israeli soldiers. (See Chapter 2, Country Reports.) Hizballah continued to call for the destruction of Israel and provided support to select Palestinian groups to augment their capacity to conduct attacks against Israel. Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles. Hizballah is known to have been involved in numerous anti-U.S. and anti-Israeli terrorist attacks, and prior to September 11, 2001, was responsible for more American deaths than any other terrorist group; its terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy annex in Beirut in 1984. Four members of Hizballah, Imad Mughniyah, Hasan Izz-al-Din, Mohammed Hamadei, and Ali Atwa, are on the FBI's list of most wanted terrorists for the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah also has been implicated in the attacks on the Israeli Embassy in Argentina in 1992 and the Argentine-Israeli Mutual Association (AMIA) in Buenos Aires in 1994.[1] The U.S. Government has indicted a member of Lebanese Hizballah for his participation in the June 1996 truck bomb attack of the U.S. Air Force dormitory at Khobar Towers in Saudi Arabia. In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

## STRENGTH

Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

## LOCATION/AREA OF OPERATION

Operates in the southern suburbs of Beirut, the Beka'a Valley, and southern Lebanon. Has established cells in Europe, Africa, South America, North America, and Asia.

## EXTERNAL AID

Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid, from Iran, and diplomatic, political, and logistical support from Syria. Hizballah also receives funding from religious donations, and profits from legal and illegal businesses.

---

[1]     On October 25, 2006, the Argentine AMIA special prosecutors issued an indictment charging eight Iranian government officials and one member of Hizballah with the attack.

PX202

## ISLAMIC JIHAD UNION (IJU) *

a.k.a. Al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jama'at al-Jihad; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mujahedin; The Kazakh Jama'at; The Libyan Society

### DESCRIPTION

The IJU is an extremist organization which splintered from the Islamic Movement of Uzbekistan. They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law.

### ACTIVITIES

The IJU issued a statement in May 2004 fully supporting the armed attacks on Uzbek police and military personnel in Andijon, Uzbekistan, and called for the overthrow of the Uzbekistani regime. The group first conducted attacks in March-April 2004 targeting a popular bazaar and police at several roadway checkpoints. These attacks killed approximately 47 people, including 33 terrorists, some of whom were suicide bombers. The IJU's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan. These attacks marked the first use of suicide bombers in Central Asia. In July 2004, the group struck again with near-simultaneous suicide bombings of the U.S. and Israeli Embassies and the Uzbekistani Prosecutor General's office in Tashkent. The IJU again claimed responsibility via an Islamic website and stated that martyrdom operations by the group would continue. The statement also indicated that the attacks were done in support of IJU's Palestinian, Iraqi, and Afghan brothers in the global insurgency. The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March-April attacks.

### STRENGTH

Unknown.

### LOCATION/AREA OF OPERATION

Militants are scattered throughout Central Asia and probably parts of South Asia.

### EXTERNAL AID

Unknown.

## ISLAMIC MOVEMENT OF UZBEKISTAN (IMU) *

### DESCRIPTION

PX202

The IMU is a group of Islamic militants from Uzbekistan and other Central Asian states. The IMU's goal is to overthrow Uzbekistani President Islam Karimov and establishing an Islamic state in Uzbekistan. The IMU is affiliated with al-Qaida and, under the leadership of Tohir Yoldashev, has embraced Usama bin Ladin's ideology.

## ACTIVITIES

Since Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan. Although it is difficult to differentiate between IMU and Islamic Jihad Union members, Pakistani security forces continue to arrest probable IMU operatives in the Federally Administered Tribal Areas (FATA).

The IMU was active in terrorist operations in Central Asia. Tajikistan arrested several IMU members in 2005. In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist. In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan. The IMU was also responsible for explosions in Bishkek in December 2002 and Osh in May 2003 that killed eight people. The IMU primarily targeted Uzbekistani interests before October 2001, and is believed to have been responsible for several explosions in Tashkent in February 1999. IMU militants took foreigners hostage in Kyrgyzstan for two consecutive years: in August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage, and in August 2000, they took four U.S. mountain climbers hostage.

## STRENGTH

Approximately 500 members.

## LOCATION/AREA OF OPERATION

IMU militants are scattered throughout South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, Kazakhstan, and Uzbekistan.

## EXTERNAL AID

The IMU receives support from a large Uzbek diaspora, Islamic extremist groups and patrons in the Middle East, Central Asia, and South Asia.

# JAISH-E-MOHAMMED (JEM) *

a.k.a. Army of Mohammed; Jaish-i-Mohammed; Khudamul Islam; Khuddam-ul-Islam; Kuddam e Islami; Mohammed's Army; Tehrik ul-Furqaan

## DESCRIPTION

Jaish-e-Mohammed is an Islamic extremist group based in Pakistan founded by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India in early 2000. The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States. It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F). Pakistan outlawed JEM in 2002. By 2003, JEM had splintered into Khuddam ul-Islam

253

PX202

(KUI),headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004 after being detained for suspected involvement in the December 2003 assassination attempts against President Pervez Musharraf. Pakistan banned KUI and JUF in November 2003.

## ACTIVITIES

Jaish-e-Mohammed continues to operate openly in parts of Pakistan despite President Musharraf's 2002 ban on its activities. The group is well-funded, and is said to have tens of thousands of followers who support attacks against Indian targets, the Pakistani government, and sectarian minorities. Since Masood Azhar's 2000 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the area. JEM continues to claim responsibility for several suicide car bombings in Kashmir, including a suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar in October 2001 that killed more than 30. The Indian government has publicly implicated the JEM, along with Lashkar e-Tayyiba, for the December 2001 attack on the Indian Parliament that killed nine and injured 18. Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans. In December 2003, Pakistan implicated elements of JEM in the two assassination attempts against President Musharraf. In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl. In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.

## STRENGTH

JEM has at least several hundred armed supporters, including a large cadre of former HUM members, located in Pakistan, in India's southern Kashmir and Doda regions, and in the Kashmir Valley.  Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

## LOCATION/AREA OF OPERATION

Pakistan and Kashmir. Until autumn 2001, JEM maintained training camps in Afghanistan.

## EXTERNAL AID

Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami (HUJI) and the Harakat ul-Mujahedin (HUM). In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods. In addition, JEM collects funds through donation requests in magazines and pamphlets, and al-Qaida is suspected of providing funding.

PX202

# JEMAAH ISLAMIYA (JI) *

## DESCRIPTION

The Southeast Asia-based Jemaah Islamiya (JI) is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines. More than 300 JI operatives, including operations chief Hambali, have been captured since 2002. Several are no longer incarcerated, however, including JI emir Abu Bakar Bashir who was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings. The death of top JI bombmaker Azahari bin Husin in November 2005, and further arrests of several close associates of senior JI operative Noordin Mat Top in 2006 likely disrupted JI's anti-Western attacks that occurred annually from 2002-2005.

## ACTIVITIES

The group's most recent high-profile attack occurred in Bali on October 1, 2005 and left 26 persons dead. Other major JI attacks include the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003 bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing. The 2002 Bali attack, which killed more than 200, remains one of the deadliest terrorist attacks since 9/11. In December 2001, Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies and British and Australian diplomatic buildings in Singapore. JI is also responsible for the coordinated bombings of numerous Christian churches in Indonesia in December 2000 and was involved in the bombings of several targets in Manila the same month.

## STRENGTH

Exact numbers currently are unknown. Estimates of total JI members vary from the hundreds to one thousand.

## LOCATION/AREA OF OPERATION

JI is based in Indonesia and believed to have cells in Indonesia, Malaysia, and the Philippines.

## EXTERNAL AID

Investigations indicate that JI is fully capable of its own fundraising, although it also receives financial, ideological, and logistical support from Middle Eastern contacts, and non-governmental organizations.

# AL-JIHAD (AJ)

Egyptian Islamic Jihad (EIJ); Egyptian al-Jihad; New Jihad; The Jihad Group

## DESCRIPTION

This Egyptian Islamic extremist group merged with Usama Bin Ladin's al-Qaida organization in 2001. Usama Bin Ladin's deputy, Ayman al-Zawahiri, was the former head of AJ. Active since the 1970s, AJ's primary goal has been the overthrow of the Egyptian government and the establishment of an

255

PX202

Islamic state. The group's targets, historically, have been high-level Egyptian government officials as well as U.S. and Israeli interests in Egypt and abroad. Regular Egyptian crackdowns on extremists have greatly reduced AJ capabilities in Egypt.

## ACTIVITIES

The original AJ was responsible for the 1981 assassination of Egyptian President Anwar Sadat. It claimed responsibility for the attempted assassinations in 1993 of Interior Minister Hassan al-Alfi and Prime Minister Atef Sedky. AJ has not conducted an attack inside Egypt since 1993 and has never successfully targeted foreign tourists there. The group was responsible for the Egyptian Embassy bombing in Islamabad in 1995 and a disrupted plot against the U.S. Embassy in Albania in 1998.

## STRENGTH

Believed to have several hundred hard-core members inside and outside of Egypt.

## LOCATION/AREA OF OPERATION

Most AJ members today are outside Egypt in countries such as Afghanistan, Pakistan, Lebanon, the United Kingdom, and Yemen. AJ activities have been centered outside Egypt for several years under the auspices of al-Qaida.

## EXTERNAL AID

Since 1998 AJ has received most of its funding from al-Qaida; these close ties culminated in the eventual merger of the groups in June 2001. Some funding may come from various Islamic non-governmental organizations, cover businesses, and criminal acts.

# KAHANE CHAI  (KACH)

a.k.a. American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Gomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

## DESCRIPTION

Kach's stated goal is to restore the biblical state of Israel.  Kach was founded by radical Israeli-American rabbi Meir Kahane. Its offshoot Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States. Both Kach and Kahane Chai were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law. This designation followed the groups' statements in support of Dr. Baruch

PX202

Goldstein's attack in February 1994 on the Ibrahimi Mosque (Goldstein was affiliated with Kach) and their verbal attacks on the Israeli government. Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank.

## ACTIVITIES

Kach has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. Kach is suspected of involvement in a number of low-level attacks since the start of the al-Aqsa intifada in 2000.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

## EXTERNAL AID

Receives support from sympathizers in the United States and Europe.

## KONGRA-GEL (KGK/PKK)

(Despite name changes, the group is still most commonly referred to as the PKK; for the purposes of this report we refer to the group as Kongra-Gel/PKK or KGK/PKK.)  a.k.a. Kurdish Freedom Hawks (TAK); Kurdistan Workers' Party (PKK); Freedom and Democracy Congress of Kurdistan (KADEK); Halu Mesru Savunma Kuvveti (HSK); Kurdistan Freedom and Democracy Congress; Kurdistan People's Congress (KHK); Partiya Karkeran Kurdistan; People's Congress of Kurdistan; The People's Defense Force.

## DESCRIPTION

The KGK/PKK was founded by Abdullah Ocalan in 1974 as a Marxist-Leninist separatist organization. The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984. The KGK/PKK aspired to establish an independent Kurdish state in southeastern Turkey, but in recent years has spoken more often about cultural or linguistic rights. In the early 1990s, the KGK/PKK moved beyond rural-based insurgent activities to include urban terrorism.  In the 1990s south-eastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons. Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues. Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group. The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years. Striking over the border from bases within Iraq the KGK/PKK engaged in terrorist attacks in eastern and western Turkey.

PX202

## ACTIVITIES

Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey. The group conducted attacks on Turkish diplomatic and commercial facilities in West European cities in 1993 and again in spring 1995. In an attempt to damage Turkey's tourist industry, the KGK/PKK bombed tourist sites and hotels and kidnapped foreign tourists in the early-to-mid-1990s. Turkish authorities have confirmed or suspect that the group is responsible for dozens of bombings since 2004 in western Turkey, particularly in Istanbul and increasingly in resort areas on the western coast where foreign tourists, among others, have been killed. There have also been dozens of military clashes between Turkish security forces and KGK/PKK militants.

## STRENGTH

Approximately 4,000 to 5,000; 3,000 to 3,500 are currently located in northern Iraq.

## LOCATION/AREA OF OPERATION

Operates primarily in Turkey, Iraq, Europe, and the Middle East.

## EXTERNAL AID

Kongra-Gel/PKK has historically received safe haven and modest aid from Syria, Iraq, and Iran. Since 1999, Syria and Iran have cooperated with Turkey against the PKK, in a limited fashion. The KGK/PKK funds raise in Europe.

## LASHKAR E-TAYYIBA (LT) *

a.k.a. Al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Jamaat ud-Dawa and Al Monsooreen; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis;  Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir

## DESCRIPTION

LT began as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad (MDI), which was formed in the mid-1980s. MDI changed its name to Jamaat ul-Dawa (JUD) in 2001, probably in an effort to avoid Pakistan government restrictions. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed and is one of the three largest and best-trained groups fighting in Kashmir against India. The Pakistani government banned the group and froze its assets in January 2002. Elements of LT and Jaish-e-Muhammad combined with other groups to mount attacks as "The Save Kashmir Movement."

## ACTIVITIES

LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993. LT claimed responsibility for numerous attacks in 2001, including an attack in January on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an attack in April against Indian border secu-

258

rity forces that left at least four dead. The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building, although concrete evidence is lacking. LT is also suspected of involvement in May 2002 attack on an Indian Army base in Kaluchak that left 36 dead. India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack. Senior al-Qaida lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of al-Qaida members in Pakistan. Government of India officials hold LT responsible for the July 11, 2006 train attack in Mumbai.

## STRENGTH

LT has several thousand members in Azad Kashmir, Pakistan, in the southern Jammu and Kashmir and Doda regions, and in the Kashmir Valley. Almost all LT members are Pakistanis from madrassas across Pakistan or Afghan veterans of the Afghan wars.The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

## LOCATION/AREA OF OPERATION

Based in Muridke (near Lahore) and Muzaffarabad.

## EXTERNAL AID

Collects donations from the Pakistani expatriate communities in the Middle East and United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people. LT also maintains a website under the name Jamaat ud-Daawa through which it solicits funds and provides information on the group's activities. The precise amount of LT funding is unknown.

# LASHKAR I JHANGVI (LJ) *

a.k.a. Lashkar e Jhangvi; Lashkari-i-Jhangvi

## DESCRIPTION

Lashkar i Jhangvi (LJ) is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan. LJ focuses primarily on anti-Shia attacks and was banned by Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence. Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties. After the collapse of the Taliban, LJ members became active in aiding other terrorists with safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi. In January 2003, the United States added LJ to the list of designated Foreign Terrorist Organizations.

## ACTIVITIES

LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan. In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province. Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl. Media reports linked LJ to attacks on Christian targets in Pakistan,

259

PX202

including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed against the group. Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shiite mosque in Quetta, Pakistan. Authorities also implicated LJ in several sectarian incidents in 2004, including the May and June bombings of two Shiite mosques in Karachi that killed more than 40 people. In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the April bombing outside the U.S. Consulate in Karachi that killed one U.S. official; investigations are ongoing. In late 2006, Pakistani security agencies arrested eight suspects allegedly involved in the October blast at the Ayub Park in Rawalpindi and in planting anti-tank rockets at several locations in Islamabad. The Pakistani Interior Minister claimed these suspects have links to LJ and al-Qaida.

## STRENGTH

Probably fewer than 100.

## LOCATION/AREA OF OPERATION

LJ is active primarily in Punjab and Karachi. Some members travel between Pakistan and Afghanistan.

## EXTERNAL AID

Unknown.

# LIBERATION TIGERS OF TAMIL EELAM (LTTE)

a.k.a. Ellalan Force; The Tamil Tigers

## DESCRIPTION

Founded in 1976, LTTE is the most powerful Tamil secessionist group in Sri Lanka. LTTE wants to establish an independent Tamil state in the island's north and east. It began its insurgency against the Sri Lankan government in 1983 and has relied on a guerrilla strategy that includes the use of terrorist tactics. LTTE nominally has observed a cease-fire agreement with the Sri Lankan government since 2002. The United States designated LTTE as a Foreign Terrorist Organization in October 1997.

## ACTIVITIES

LTTE has integrated a battlefield insurgent strategy with a terrorist program that targets key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers. It also has conducted a sustained campaign targeting rival Tamil groups and figures, and assassinated the head of government of two countries: Prime Minister Rajiv Gandhi of India in 1991 and President Premadasa of Sri Lanka in 1993. LTTE is most notorious for the Black Tigers, its cadre of suicide bombers. Political assassinations and bombings were commonplace tactics prior to the cease-fire and have increased again since mid-2005. Fighting between LTTE and the Sri Lanka government escalated in 2006.

PX202

## STRENGTH

Exact strength is unknown, but LTTE is estimated to have 8,000 to 10,000 armed combatants in Sri Lanka, with a core of 3,000 to 6,000 trained fighters. LTTE also has a significant overseas support structure for fundraising, weapons procurement, and propaganda activities.

## LOCATION/AREA OF OPERATIONS

Headquartered in northern Sri Lanka, LTTE controls portions of the northern and eastern coastal areas of Sri Lanka, where it has set up a comprehensive administrative structure, but also has conducted operations throughout the island. LTTE leader Velupillai Prabhakaran has established an extensive network of checkpoints and informants to keep track of any outsiders who enter the group's area of control.

## EXTERNAL AID

LTTE's overt organizations support Tamil separatism by lobbying foreign governments and the United Nations. LTTE also uses its international contacts and the large Tamil Diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies.

# LIBYAN ISLAMIC FIGHTING GROUP (LIFG) *

## DESCRIPTION

The Libyan Islamic Fighting Group (LIFG) emerged in the early 1990s among Libyans who had fought Soviet forces in Afghanistan and the Qadhafi regime in Libya. The LIFG declared Libyan President Muammar Qadhafi un-Islamic and pledged to overthrow him. Some members maintain a strictly anti-Qadhafi focus and organize against Libyan government interests, but others, such as Abu al-Faraj al-Libi, who was arrested in Pakistan in 2005, are aligned with Usama bin Ladin and believed to be part of al-Qaida's leadership structure or active in the international terrorist network. The United States designated the LIFG a Foreign Terrorist Organization in December 2004.

## ACTIVITIES

Libyans associated with the LIFG are part of the broader international terrorist movement. Spanish media in August 2005 linked Ziyad Hashem, an alleged member of the LIFG's media committee, as well as the imprisoned amir Abdullah al-Sadeq, with the Tunisian Islamist Serhane Ben Abdelmajid Fakhet, the suspected ringleader in the 2004 Madrid attacks. The LIFG is one of the groups believed to have planned the Casablanca suicide bombings in May 2003.  The LIFG continues to target Libyan interests, and attempted to assassinate Qadhafi a total of four times; the last attempt was in 1998. The LIFG engaged Libyan security forces in armed clashes during the 1990s.

## STRENGTH

Probably has several hundred active members or supporters.

PX202

## LOCATION/AREA OF OPERATION

Since the late 1990s many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the United Kingdom. It is likely that LIFG maintains a clandestine presence in Libya.

## EXTERNAL AID

Unknown. The LIFG has used Islamic charitable organizations as cover for raising and transferring money and documents.

# MOROCCAN ISLAMIC COMBATANT GROUP (GICM) *

a.k.a. Groupe Islamique Combattant Marocain

## DESCRIPTION

The Moroccan Islamic Combatant Group (GICM) is a clandestine transnational terrorist group currently centered in the Moroccan diaspora communities of Western Europe. Its goals include establishing an Islamic state in Morocco and supporting al-Qaida's war against the West by assisting in the assimilation of al-Qaida operatives into Moroccan and then European society. The group appears to have emerged in the 1990s and is comprised of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war. GICM members interact with other North African extremists, particularly in Europe. In November 2002, the United States designated the GICM for asset freeze under EO 13224 following the group's submission to the UNSCR 1267 Sanctions Committee. The United States designated GICM as a Foreign Terrorist Organization on October 11, 2005.

## ACTIVITIES

The GICM carried out its first attack in Casablanca, Morocco on May 16, 2003, and GICM members were responsible for the Madrid attack. Moroccans associated with the GICM are part of the broader international terrorist movement; GICM members have been implicated in the recruitment network of individuals for Iraq, and at least one GICM member has carried out a suicide attack against Coalition Forces in Iraq.

## STRENGTH

Much of the GICM's leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. Alleged leader Mohamed al-Guerbouzi has been convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remains free in exile in the United Kingdom.

## LOCATION/AREA OF OPERATION

Morocco, Western Europe, Afghanistan, and Canada.

PX202

## EXTERNAL AID

The GICM is involved heavily in narcotics trafficking in North Africa and Europe to fund their operations. Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks. The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan jihadist Jamal Ahmidan.

# MUJAHEDIN-E KHALQ ORGANIZATION (MEK)

a.k.a. MKO; Mujahedin-e Khalq; Muslim Iranian Students' Society; National Council of Resistance; National Council of Resistance (NCR); Organization of the People's Holy Warriors of Iran; The National Liberation Army of Iran (NLA); The People's Mujahedin Organization of Iran (PMOI); National Council of Resistance of Iran (NCRI); Sazeman-e Mujahedin-e Khalq-e Iran

## DESCRIPTION

The MEK advocates the violent overthrow of the Iranian regime and was responsible for the assassination of several U.S. military personnel and civilians in the 1970's. MEK leadership and members across the world maintain the capacity and will to commit terrorist acts in Europe, the Middle East, the United State, Canada, and beyond.

The MEK emerged in the 1960s as one of the more violent political movements opposed to the Pahlavi dynasty and its close relationship with the United States. MEK ideology has gone through several iterations and blends elements of Marxism, Islam, and feminism. Following its participation in the 1979 Islamic Revolution, the group rapidly fell out of favor with the Iranian people. The new Iranian government under Supreme Leader Khomeini systematically arrested and targeted many MEK members, causing most MEK leadership to flee to Europe. In 1986, MEK leaders and operatives were evicted from France and provided a safe haven in Iraq by Saddam Hussein. The group has planned and executed terrorist operations against the Iranian regime for nearly three decades from its European and Iraqi bases of operations. Additionally, it has expanded its fundraising base, further developed its paramilitary skills, and aggressively worked to expand its European ranks. In addition to its terrorist credentials, the MEK has also displayed cult-like characteristics. Upon entry into the group, new members are indoctrinated in MEK ideology and revisionist Iranian history. Members are also required to undertake a vow of "eternal divorce" and participate in weekly "ideological cleansings." Additionally, children are reportedly separated from parents at a young age. MEK leader Maryam Rajavi has established a "cult of personality." She claims to emulate the Prophet Muhammad and is viewed by members as the "Iranian President in exile."

## ACTIVITIES

The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives and has been supported by reprehensible regimes, including that of Saddam Hussein. During the 1970s, the MEK assassinated several U.S. military personnel and U.S. civilians working on defense projects in Tehran and supported the violent takeover in 1979 of the U.S. Embassy in Tehran. Despite U.S. efforts, MEK members have never been brought to justice for the group's role in these illegal acts.

PX202

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group. The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister  Mohammad-Javad Bahonar. These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown which forced MEK leaders to flee to France. For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters. Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training. Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s. In 1991, the group reportedly assisted in the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime; press reports cite MEK leader Maryam Rajavi encouraging MEK members to "take the Kurds under your tanks." In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas. In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq. The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran. One of those attacks included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President. In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border. Also in 2001, the FBI arrested seven Iranians in the United States who funneled $400,000 to an MEK-affiliated organization in the UAE which used the funds to purchase weapons. Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and voluntarily surrendered their heavy-arms to Coalition control. Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq, under the supervision of Coalition Forces.

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks. Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation. French authorities eventually released Rajavi. Although currently in hiding, Rajavi has made appearances via video-satellite to "motivate" MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003, which supported planning and executing future terrorist attacks. In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of Saddam Hussein handing over suitcases of money to known MEK leaders, and video of MEK operatives receiving training from the Iraqi military.

PX202

## STRENGTH

Estimates place MEK's worldwide membership in the several thousands, with large pockets in Paris and other major European capitals. In Iraq, roughly 3,400 MEK members are gathered under Coalition supervision at Camp Ashraf, the MEK's main compound north of Baghdad, where they have been designated as "protected persons" under Article 27 of the Fourth Geneva Convention. This status does not affect the group's members outside of Camp Ashraf or the MEK's designation as a Foreign Terrorist Organization. As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks; armored personnel carriers; and heavy artillery. A significant number of MEK personnel have voluntarily left Ashraf, and an additional several hundred MEK defectors have been voluntarily repatriated to Iran. Many MEK leaders and operatives, however, remain at large, and the number of at-large MEK operatives who received weapons and bomb-making instruction from Saddam Hussein's regime remains a source of significant concern.

## LOCATION/AREA OF OPERATION

In the 1980s, the MEK's leaders were forced by Iranian security forces to flee to France. Following France's recognition of the Iranian regime in 1986, the group's leadership was forced out of France and took up residence in Iraq. The MEK maintains its main headquarters in Paris and has concentrations of members across Europe, in addition to the large concentration of MEK located at Camp Ashraf in Iraq. The MEK's global support structure remains in place with associates and supporters scattered throughout Europe and North America. Operations target Iranian regime elements across the globe, including in Europe and Iran. MEK's political arm, the NCRI, has a global support network with active lobbying and propaganda efforts in major Western capitals. NCRI also has a well-developed media communications strategy.

## EXTERNAL AID

Before Operation Iraqi Freedom began in 2003; the MEK received all of its military assistance and most of its financial support from Saddam Hussein. The fall of Saddam's regime has led MEK to increasingly rely on front organizations to solicit contributions from expatriate Iranian communities.

# NATIONAL LIBERATION ARMY (ELN)

a.k.a. Ejercito de Liberacion Nacional

## DESCRIPTION

The ELN is a Colombian Marxist insurgent group formed in 1965 by urban intellectuals inspired by Fidel Castro and Che Guevara. It is primarily rural-based, although it possesses several urban units. In December 2005, the ELN began preliminary talks with the Colombian government in Cuba, but had not yet agreed to begin a formal peace process.

## ACTIVITIES

ELN conducts kidnapping, hijacking, bombing, and extortion. It has minimal conventional military capability. The group conducts kidnappings for ransom, often targeting foreign employees of large corporations, especially in the petroleum industry. ELN derives some revenue from taxation of the

265

PX202

illegal narcotics industry, and its involvement may be increasing. It assaults energy infrastructure and has inflicted major damage on pipelines and the electrical distribution network but has lost much of its capacity to carry out attacks in the past few years.

## STRENGTH

Approximately 3,000 armed combatants and an unknown number of active supporters.

## LOCATION/AREA OF OPERATION

Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, and Venezuelan border regions.

## EXTERNAL AID

Cuba provides some medical care and political consultation.

# PALESTINE LIBERATION FRONT (PLF)

a.k.a. PLF-Abu Abbas Faction

## DESCRIPTION

In the late 1970s the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and later split into pro-PLO, pro-Syrian, and pro-Libyan factions. The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

## ACTIVITIES

Abbas's group was responsible for the 1985 attack on the Italian cruise ship Achille Lauro and the murder of U.S. citizen Leon Klinghoffer. In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s. In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq. Current leadership and membership of the relatively small PLF appears to be based in Lebanon and the Palestinian territories.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Based in Iraq from 1990 until 2003, the group currently is based in Lebanon.

## EXTERNAL AID

Unknown.

PX202

# PALESTINE ISLAMIC JIHAD (PIJ)

a.k.a. Islamic Jihad of Palestine; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Al-Quds Brigades

## DESCRIPTION

Formed by militant Palestinians in the Gaza Strip during the 1970s, Palestine Islamic Jihad (PIJ) is committed to the creation of an Islamic state in all of historic Palestine and the destruction of Israel through attacks against Israeli military and civilian targets.

## ACTIVITIES

PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets. In 2006, the group conducted two suicide bombings and launched numerous homemade rockets from the Gaza Strip into neighboring Israeli towns. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in PIJ mounted attacks, the group has not directly targeted U.S. interests.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Primarily Israel, the West Bank, and the Gaza Strip. The group's central leadership resides in Syria. Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

## EXTERNAL AID

Receives financial assistance primarily from Iran.  Syria provides the group with safe haven.

# POPULAR FRONT FOR THE LIBERATION OF PALESTINE (PFLP)

## DESCRIPTION

Formerly a part of the PLO, the Marxist-Leninist PFLP was founded by George Habash when it broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.

## ACTIVITIES

The PFLP has stepped up its operational activity since the start of the current intifada, highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001, to avenge Israel's killing of the PFLP Secretary General earlier that year. In March 2006, the PFLP's current Secretary

PX202

General, Ahmed Sa'adat, who had been imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and is now awaiting trial.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Syria, Lebanon, Israel, the West Bank, and the Gaza Strip.

## EXTERNAL AID

Receives safe haven and some logistical assistance from Syria.

# POPULAR FRONT FOR THE LIBERATION OF PALESTINE–GENERAL COMMAND (PFLP-GC)

## DESCRIPTION

The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on fighting and less on politics. Originally, the group was violently opposed to the Arafat-led PLO.  Ahmad Jibril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding.  The PFLP-GC is closely tied to both Syria and Iran.

## ACTIVITIES

The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on guerrilla operations in southern Lebanon, training members of other Palestinian terrorist groups, and weapons smuggling. The PFLP-GC maintains an armed presence in several refugee camps and military bases throughout Lebanon.

## STRENGTH

Several hundred.

## LOCATION/AREA OF OPERATION

Headquartered in Damascus with bases in Lebanon.

## EXTERNAL AID

Receives logistical and military support from Syria and financial support from Iran.

PX202

# AL-QAIDA*  (AQ)

a.k.a. International Front for Fighting Jews and Crusaders; Islamic Army; Islamic Army for the Liberation of Holy Sites; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; The World Islamic Front for Jihad Against Jews and Crusaders; Usama bin Ladin Network; Usama bin Ladin Organization; Qaidat al-Jihad

## DESCRIPTION

Al-Qaida was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union. The group helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. Al-Qaida's goal is uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries. Its ultimate goal is the establishment of a pan-Islamic caliphate throughout the world. Al-Qaida leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad Against the Jews and Crusaders" saying it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere. Al-Qaida merged with al-Jihad (Egyptian Islamic Jihad) in June 2001, renaming itself "Qaidat al-Jihad."

## ACTIVITIES

Even as al-Qaida's top leaders continue to plot and direct terror attacks worldwide, terrorists affiliated with al-Qaida but not necessarily controlled by bin Ladin have increasingly carried out high-profile attacks. Over the past four years, al-Qaida, its affiliates, and those inspired by the group were also involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices.

In 2006, al-Qaida and affiliated organizations continued major efforts to attack the West and its interests.  For example, in mid-August, U.K. and U.S. authorities foiled a plot to blow up as many as ten aircraft.  Al-Qaida may have been complicit in the plot but the group has made no public statement claiming its involvement.  Additionally, al-Qaida in the Arabian Peninsula claimed responsibility for the  February 24, 2006, attack on the Abqaiq petroleum processing facility, the largest such facility in the world, in Saudi Arabia. The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qaida in September 2006, subsequently changed its name to al-Qaida in the Islamic Maghreb (AQIM), and attacked a U.S. contractor bus in December 2006 in greater Algiers, marking its first attack against a U.S. entity.

Bin Ladin's deputy Ayman al-Zawahiri claimed responsibility on behalf of al-Qaida for multiple attacks in 2005 against the London public transportation system. The extent of senior leadership involvement in planning the July 2005 attacks is unclear, however, some suspects in the attacks included homegrown United Kingdom-based extremists who were inspired by al-Qaida.

In 2003 and 2004, Saudi-based al-Qaida operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia. Al-Qaida may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people. Pakistani President Musharraf blames al-Qaida for two attempts on his life in December 2003.

PX202

In October 2002, al-Qaida directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four. The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya, which killed 15. Al-Qaida probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

On September 11, 2001, 19 al-Qaida members hijacked and crashed four U.S. commercial jets -- two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and a fourth into a field in Shanksville, Pennsylvania -- leaving nearly 3,000 individuals dead or missing. In October 2000, al-Qaida conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39. Al-Qaida also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam killing at least 301 individuals and injuring more than 5,000 others. Al-Qaida and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.

## STRENGTH

Al-Qaida's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11. The arrests and deaths of mid-level and senior al-Qaida operatives have disrupted some communication, financial, and facilitation nodes and disrupted some terrorist plots. Additionally, supporters and associates worldwide who are inspired by the group's ideology may be operating without direction from al-Qaida's central leadership; it is impossible to estimate their numbers. Al-Qaida also serves as a focal point of inspiration for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahedin, Ansar al-Sunnah, the Taliban, Jemaah Islamiya, and the Libyan Islamic Fighting Group.

## LOCATION/AREA OF OPERATION

Al-Qaida's worldwide networks are augmented by ties to local Sunni extremists. The group was based in Afghanistan until Coalition Forces removed the Taliban from power in late 2001. While the largest concentration of senior al-Qaida members now reside in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia who continue working to carry out future attacks against U.S. and Western interests.

## EXTERNAL AID

Al-Qaida primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause. Some funds are diverted from Islamic charitable organizations. Additionally, parts of the organization raise funds through criminal activities; for example, al-Qaida in Iraq raises funds through hostage-taking for ransom, and members in Europe have engaged in credit card fraud. U.S. and international efforts to block al-Qaida funding have hampered the group's ability to raise money.

PX202

# AL-QAIDA IN IRAQ (AQI) *

a.k.a. Al-Qaida Group of Jihad in Iraq; Al-Qaida Group of Jihad in the Land of the Two Rivers; Al-Qaida in Mesopotamia; Al-Qaida in the Land of the Two Rivers; Al-Qaida of Jihad in Iraq; Al-Qaida of Jihad Organization in the Land of The Two Rivers; Al-Qaida of the Jihad in the Land of the Two Rivers; Al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qaidat al Jihad/Bilad al Raafidaini; Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers

## DESCRIPTION

In an attempt to unify Sunni jihadists in Iraq, in January 2006, al-Qaida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni jihadist groups in Iraq. AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qaida's goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks.

On June 7, 2006, AQI leader Abu Mus'ab al-Zarqawi was killed in a U.S. airstrike. Following his death, the MSC announced Abu Hamza al-Muhajir, also known at Abu Ayyub al-Masri, as Zarqawi's successor. Abu Ayyub promptly issued a statement pledging to continue what Zarqawi had started, and AQI has continued its strategy of targeting Coalition Forces and Shi'a civilians in an attempt to foment sectarian strife. Although Coalition and Iraqi security force operations also have cost AQI dozens of lieutenants and high-ranking network members, overall violence in Iraq is at a higher level than it was while Zarqawi was alive.

## ACTIVITIES

In August 2003, Zarqawi's group carried out a major terrorist attack in Iraq when it bombed the Jordanian Embassy in Baghdad, followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq (SCIRI). The group kept up its attack pace throughout 2003, striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross. Zarqawi's group conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad. The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market. It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 8, 2004), Jack Armstrong (September 20, 2004), and Jack Hensley (September 21, 2004). AQI was likely involved in other hostage incidents as well. In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the

PX202

coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24. The group also continued assassinations against Shia leaders and-Shia militia–Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December. In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships. Prior to 2005, AQI planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002. In October 2006, AQI declared the ISI would become a platform from which AQI would launch jihad throughout the world. Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force. AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006.

### STRENGTH

Precise numbers are unknown, but AQI is the largest terrorist group in Iraq.

### LOCATION/AREA OF OPERATION

AQI's operations are predominately Iraq-based, but the group maintains an extensive logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe.

### EXTERNAL AID

AQI probably receives funds from donors in the Middle East and Europe, local sympathizers in Iraq, a variety of businesses and criminal activities, and other international extremists throughout the world. In many cases, AQI's donors are probably motivated by support for terrorism rather than affili-ation with any specific terrorist group.

## AL-QAIDA IN THE ISLAMIC MAGHREB (AQIM) [FORMERLY SALAFIST GROUP FOR PREACHING AND COMBAT (GSPC)]

a.k.a. Le Groupe Salafiste pour la Predication et le Combat; Salafist Group for Call and Combat

### DESCRIPTION

The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qaida in September 2006, and subsequently changed its name to al-Qaida in the Islamic Maghreb (AQIM). GSPC members  abandoned the Armed Islamic Group (GIA) over disagreements about leadership and tactics, but retained the mission of  overthrowing the Algerian Government and installing an Islamic regime. AQIM/GSPC is the most effective and largest armed group inside Algeria. In contrast to the GIA, it has pledged to avoid civilian attacks inside Algeria.

PX202

## ACTIVITIES

AQIM/GSPC attacked a U.S. contractor bus in December 2006 in greater Algiers. In Zawahiri's September 11 speech announcing the GSPC's merger with al-Qaida, Zawahiri called on it to be "a bone in the throat of the American and French crusaders" and to sow fear "in the heart of the traitors and apostate sons of France."  AQIM/GSPC continues to conduct operations aimed at government and military targets, primarily in rural areas, although civilians are sometimes killed. AQIM/GSPC executed simultaneous attacks on October 30 on two police stations just east of Algiers, killing three civilians, wounding 14 police officers, and causing substantial damage to both facilities. In 2005, the GSPC claimed responsibility for an attack on a remote Mauritanian military outpost, killing 15, while indicating a shift in its strategy toward a more global war beyond Algerian borders.

Police in France, Italy and Spain arrested several Algerians suspected of providing support to AQIM/GSPC, and French officials announced that the AQIM/GSPC had issued an Internet call-to-action against France, declaring France "public enemy number one." The Government of Algeria scored major counterterrorism successes against AQIM/GSPC in 2004, killing AQIM/GSPC leader Nabil Sahraoui and separately taking custody of Abderazak al-Para, who led a AQIM/GSPC faction that held 32 European tourists hostage in 2003.

## STRENGTH

Several hundred fighters with an unknown number of facilitators outside Algeria.

## LOCATION/AREA OF OPERATION

Algeria, the Sahel, Canada, and Western Europe.

## EXTERNAL AID

Algerian expatriates and AQIM/GSPC members abroad, many residing in Western Europe, provide financial and logistical support. AQIM/GSPC members also engage in criminal activity.

# REAL IRA (RIRA)

a.k.a. 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Irish Republican Army; Real Oglaigh Na Heireann

## DESCRIPTION

Like the Continuity IRA, RIRA did not participate in the September 2005 weapons decommissioning. RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland. RIRA also seeks to disrupt the Northern Ireland peace process. The 32 County Sovereignty Movement opposed Sinn Fein's adoption in September 1997 of the Mitchell principles of democracy and non-violence; it also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland. Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, RIRA has pledged additional violence and continues to conduct attacks.

PX202

## ACTIVITIES

Many RIRA members are former Provisional Irish Republican Army members who left that organization after it renewed its cease-fire in 1997. These members brought a wealth of experience in terrorist tactics and bomb-making to RIRA. Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities. RIRA's most recent fatal attack was in August 2002 at a London army base, killing a construction worker. The organization wants to improve its intelligence-gathering ability, engineering capacity, and access to weaponry; it also trains members in the use of guns and explosives. RIRA continues to attract new members, and its senior members are committed to launching attacks on security forces. Three suspected RIRA members that engaged in cigarette smuggling were arrested in Spain in 2006.

## STRENGTH

The number of activists may have fallen to less than 100. The organization may receive limited support from IRA hardliners and Republican sympathizers dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process. Approximately 40 RIRA members are in Irish jails.

## LOCATION/AREA OF OPERATION

Northern Ireland, Great Britain, and the Irish Republic.

## EXTERNAL AID

Suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers. RIRA also is reported to have purchased sophisticated weapons from the Balkans.

# REVOLUTIONARY ARMED FORCES OF COLOMBIA (FARC)

a.k.a. Fuerzas Armadas Revolucionarias de Colombia

## DESCRIPTION

The FARC is Latin America's oldest, largest, most capable, and best-equipped insurgency.  It began in the early sixties as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology, although it only nominally fights in support of Marxist goals today. The FARC is governed by a general secretariat led by long-time leader Manuel Marulanda (a.k.a. "Tirofijo") and six others, including senior military commander Jorge Briceno (a.k.a. "Mono Jojoy"). The FARC is organized along military lines and includes some specialized urban fighting units. A Colombian military offensive targeting FARC fighters in their former safe haven in southern Colombia has experienced some success, with several FARC mid-level leaders killed or captured. France, Spain, and Switzerland formed an international commission in November 2005 to aid the Colombian government and the FARC with humanitarian exchange negotiations, which are currently stalled.

PX202

## ACTIVITIES

FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets. In February 2003, when a U.S. plane crashed in a FARC-held area, the FARC murdered a U.S. citizen and a Colombian; it continues to hold hostage the three other U.S. citizens that were on the plane. Foreign citizens often are targets of abductions that FARC carries out in pursuit of ransom and political leverage. The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.

## STRENGTH

Approximately 15,000 combatants and several thousand more supporters, mostly in rural areas.

## LOCATION/AREA OF OPERATION

Primarily in Colombia with some activities such as extortion, kidnapping, weapons sourcing, logistics, and R&R in neighboring countries.

## EXTERNAL AID

Cuba and Venezuela provide some medical care, safe haven, and political consultation. The FARC often uses the Colombia/Venezuela and Colombia/Ecuador border areas for cross-border incursions and Venezuelan and Ecuadorian territory as a safe haven, although the degree of government acquiescence is not clear and seems to vary.

# REVOLUTIONARY NUCLEI (RN)

a.k.a. Revolutionary Cells

## DESCRIPTION

Revolutionary Nuclei (RN) emerged from a broad range of anti-establishment and anti-U.S./NATO/EU leftist groups active in Greece between 1995 and 1998. The group is believed to be the successor to or offshoot of Greece's most prolific terrorist group, Revolutionary People's Struggle (ELA), which has not claimed an attack since January 1995. Indeed, RN appeared to fill the void left by ELA, particularly as lesser groups faded from the scene. RN's few communiqués show strong similarities in rhetoric, tone, and theme to ELA proclamations. RN has not claimed an attack since November 2000, nor has it announced its disbandment.

## ACTIVITIES

Since it began operations in January 1995, the group has claimed responsibility for some two dozen arson attacks and low-level bombings against a range of U.S., Greek, and other European targets in Greece. In its most infamous and lethal attack to date, the group claimed responsibility for a bomb it detonated at the Intercontinental Hotel in April 1999 that resulted in the death of a Greek woman and injury of a Greek man. RN's modus operandi includes warning calls of impending attacks, attacks targeting property instead of individuals, use of rudimentary timing devices, and strikes

PX202

during the late evening to early morning hours. RN may have been responsible for two attacks in July 2003 against a U.S. insurance company and a local bank in Athens. RN's last confirmed attacks against U.S. interests in Greece came in November 2000, with two separate bombings against the Athens offices of Citigroup and the studio of a Greek-American sculptor. Greek targets have included judicial and other government office buildings, private vehicles, and the offices of Greek firms involved in NATO-related defense contracts in Greece. Similarly, the group has attacked European interests in Athens.

## STRENGTH

Group membership is believed to be small, probably drawing from the Greek militant leftist or anarchist milieu.

## LOCATION/AREA OF OPERATION

Primary area of operation is in the Athens, Greece metropolitan area.

## EXTERNAL AID

Unknown but believed to be self-sustaining

.

# REVOLUTIONARY ORGANIZATION 17 NOVEMBER (17N)

a.k.a. Epanastatiki Organosi 17 Noemvri; 17 November

## DESCRIPTION

17 November (17N) is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that protested the ruling military junta. 17N is an anti-Greek establishment, anti-United States, anti-Turkey, and anti-NATO group that seeks the ouster of U.S. bases from Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

## ACTIVITIES

Initial attacks were assassinations of senior U.S. officials and Greek public figures. Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975. The group began using bombings in the 1980s. In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece, and added improvised rocket attacks to its methods. The group supported itself largely through bank robberies. A failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, coupled with robust detective work, led to the arrest of 19 members, the first 17N operatives ever arrested, including a key leader of the organization. In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms. Four other alleged members were acquitted for lack of evidence. In December 2005, against the backdrop of a sympathetic press, a group appeals trial opened for the 15 convicted members and two of the previously acquitted members. The appeals trial essentially represents a new trial for the convicts because new evidence and facts can be introduced under Greek law. Moreover, convicted

PX202

17N terrorist Nikos Papanastasiou was released from prison in July 2006 on medical grounds. Papanastasiou was the third convicted 17N terrorist to be granted early release from prison for health reasons, following Konstantinos Telios and Pavlos Serifis in 2005.

## STRENGTH

Unknown but presumed to be small.

## LOCATION/AREA OF OPERATION

Athens, Greece.

## EXTERNAL AID

Unknown.

# REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT (DHKP/C)

a.k.a. Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

## DESCRIPTION

This group originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth). It was renamed in 1994 after factional infighting. "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations. The group espouses a Marxist-Leninist ideology and is vehemently anti-U.S., anti-NATO, and anti-Turkish establishment. Its goals are the establishment of a socialist state and the abolition of F-type prisons, which contain one- to three-man prison cells. DHKP/C finances its activities chiefly through donations and extortion.

## ACTIVITIES

Since the late 1980s, the group has targeted primarily current and retired Turkish security and military officials. It began a new campaign against foreign interests in 1990, which included attacks against U.S. military and diplomatic personnel and facilities. To protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities. In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others. DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September. Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity; attacks against U.S. targets beginning in 2003 probably came in response to Operation Iraqi Freedom. Operations and arrests against the group have weakened its capabilities.

PX202

## STRENGTH

Probably several dozen terrorist operatives inside Turkey, with a large support network throughout Europe.

## LOCATION/AREA OF OPERATION

Turkey, primarily Istanbul, Ankara, Izmir, and Adana. Raises funds in Europe.

## EXTERNAL AID

Widely believed to have training facilities or offices in Lebanon and Syria.

# SHINING PATH (SL)

a.k.a. Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); Ejercito Popular de Liberacion (People's Liberation Army); Partido Comunista del Peru (Communist Party of Peru); Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru)

## DESCRIPTION

Former university professor Abimael Guzman formed SL in Peru in the late 1960s, and his teachings created the foundation of SL's militant Maoist doctrine. In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere. Approximately 35,000 persons have died since Shining Path took up arms in 1980. The Peruvian government made dramatic gains against SL during the 1990s, but recent SL attacks against Peruvian counternarcotics police and kidnappings of counternarcotics NGO workers underscore the continuing threat SL poses, as well as the group's increasing ties to narcotrafficking. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments. In response to SL's bloody attacks in late 2005, Peruvian authorities have stepped up counterterrorism efforts against the group. More recently, SL members have attempted to influence the local populace through indoctrination versus violence.

## ACTIVITIES

SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations. Its increased drug ties have raised operating revenue.

## STRENGTH

Unknown but estimated to be some 300 armed militants.

## LOCATION/AREA OF OPERATION

Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

PX202

**EXTERNAL AID**

None.

## UNITED SELF-DEFENSE FORCES OF COLOMBIA (AUC)

a.k.a. Autodefensas Unidas de Colombia

### DESCRIPTION

The AUC, commonly referred to as the paramilitaries, is an umbrella group formed in April 1997 to organize loosely affiliated illegal paramilitary groups that emerged to retaliate against leftist guerillas fighting the Colombian government and the landed establishment. The AUC increasingly discarded its counter-guerilla activities, electing instead to involve itself in the illegal drug trade. Recently, as the result of a large demobilization process, most of the AUC's centralized military structure has been dismantled, all the top paramilitary chiefs have stepped down, and the majority of the chiefs are being held in a maximum security facility. More than 31,000 paramilitary members demobilized bloc by bloc from 2003 to 2006. Colombia now faces criminal gangs formed by demobilized paramilitaries and other individuals, as well as a few paramilitary groups that refused to disarm. Unlike the AUC, the new criminal groups make little claim to fighting guerillas and are more clearly criminal enterprises focused primarily on drug trafficking, other lucrative illicit activity, and controlling local politics. They are not part of the AUC.

### ACTIVITIES

Paramilitary operations vary from assassinating suspected insurgent supporters to engaging guerrilla combat units. As much as 70 percent of the paramilitary operational costs are financed with drug-related earnings, with the rest coming from "donations" from sponsors. These groups generally avoid actions against U.S. personnel or interests. Paramilitary operations are reduced as a result of the demobilization of all AUC groups, although some individuals appear to be violating the commitments they made when they demobilized. Colombia's homicide rate is at its lowest level in 18 years, in part because of the cease-fire agreement and demobilization. Other violence indicators such as kidnapping and terror attacks have also decreased significantly.

### STRENGTH

The Colombian government has stated that the AUC no longer exists. An estimated 3,000 former members have re-engaged in criminal activities.

### LOCATION/AREAS OF OPERATION

Paramilitary forces were strongest in northwest Colombia in Antioquia, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

### EXTERNAL AID

None.

279

PX202

# OTHER GROUPS OF CONCERN

The following groups of concern have not been designated as Foreign Terrorist Organizations under 8 USC Section 1189, although many have been designated under other U.S. government counter-terrorism authorities.

**Al-Badhr Mujahedin (al-Badr)**

**Al-Ittihad al-Islami (AIAI)**

**Alex Boncayao Brigade (ABB)**

**Anti-Imperialist Territorial Nuclei (NTA)**

**Cambodian Freedom Fighters (CFF)**

**Communist Party of India (Maoist)**

**Communist Party of Nepal (Maoist)/United People's Front (CPN/M)**

**Democratic Forces for the Liberation of Rwanda (FDLR)**

**East Turkistan Islamic Movement (ETIM)**

**First of October Antifascist Resistance Group (GRAPO)**

**Harakat ul-Jihad-I-Islami (HUJI)**

**Harakat ul-Jihad-I-Islami/Bangladesh (HUJI-B)**

**Hizb-I Islami Gulbuddin (HIG)**

**Hizbul-Mujahedin (HM)**

**Irish National Liberation Army (INLA)**

**Irish Republican Army (IRA)**

**Islamic Army of Aden (IAA)**

**Islamic Great East Raiders–Front (IBDA-C)**

**Islamic International Peacekeeping Brigade (IIPB)**

**Jamaatul-Mujahedin Bangladesh (JMB)**

**Jamiat ul-Mujahedin (JUM)**

**Japanese Red Army (JRA)**

**Kumpulan Mujahedin Malaysia (KMM)**

**Lord's Resistance Army (LRA)**

**Loyalist Volunteer Force (LVF)**

**Movement for the Emancipation of the Niger Delta (MEND)**

**New Red Brigades/Communist Combatant Party (BR/PCC)**

**People Against Gangsterism and Drugs (PAGAD)**

PX202

**Rajah Solaiman Movement (RSM)**

**Red Hand Defenders (RHD)**

**Revolutionary Proletarian Initiative Nuclei (NIPR)**

**Revolutionary Struggle (RS)**

**Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs (RSRSBCM)**

**Sipah-I-Sahaba/Pakistan (SSP)**

**Special Purpose Islamic Regiment (SPIR)**

**Al-Tawhid w'al Jihad (TWJ)**

**Tenrik Mifaz-E-Shariah Mohammadi (TNSM)**

**Tunisian Combatant Group (TCG)**

**Tupac Amaru Revolutionary Movement (MRTA)**

**Turkish Hizballah**

**Ulster Defense Association/Ulster Freedom Fighters (UDA/UFF)**

**Ulster Volunteer Force (UVF)**

**United Liberation Front of Assam (ULFA)**

*\* Listed on the UN 1267 Committee List.*

*º Listed on the Terrorist Exclusion List.*

*^ Designated under Executive Order 13224.*

# AL-BADHR MUJAHEDIN (AL-BADR)

## DESCRIPTION

The al-Badhr Mujahedin split from Hizbul-Mujahedin (HM) in 1998. It traces its origins to 1971, when a group named al-Badr attacked Bengalis in East Pakistan. The group later operated as part of Gulbuddin Hekmatyar's Hizb-I Islami (HIG) in Afghanistan and, from 1990, as a unit of HM in Kashmir. The group was relatively inactive until 2000. Since then, it has increasingly claimed responsibility for attacks against Indian military targets. Since the late 1990s, al-Badhr leader Bakht Zamin repeatedly has expressed his support for Usama bin Ladin and the Taliban, and in 2002 declared jihad against U.S. forces in Afghanistan.

## ACTIVITIES

The organization has conducted a number of operations against Indian military targets in Jammu and Kashmir. Since late 2001, al-Badr members have reportedly targeted Coalition Forces in Afghanistan.

PX202

**STRENGTH**

Perhaps several hundred.

**LOCATION/AREA OF OPERATION**

Jammu and Kashmir, Pakistan, and Afghanistan.

**EXTERNAL AID**

Unknown.

# AL-ITTIHAD AL-ISLAMI (AIAI) *^0

**DESCRIPTION**

AIAI, a Somali extremist group that was formed in the 1980s and reached its peak in the early 1990s, failed to obtain its objective of establishing a Salafist emirate in Somalia and steadily declined following the downfall of the Siad Barre regime in 1991 and Somalia's subsequent collapse into anarchy. AIAI was not internally cohesive, lacked central leadership, and suffered divisions between factions. AIAI was militarily defeated by Ethiopian forces in 1997. In recent years, the existence of a coherent entity operating as AIAI has become difficult to prove. After the downfall of the Somali Council of Islamic Courts in late 2006, AIAI has re-emerged. Former elements of AIAI continue to pursue a variety of agendas ranging from social services and education to insurgency activities in the Ogaden region of eastern Ethiopia. Some sheikhs formerly associated with AIAI espouse a fundamentalist version of Islam, with particular emphasis on a strict adherence to Sharia (Islamic law), a view often at odds with Somalis' emphasis on clan identity. A small group of former AIAI members embrace global jihad and support al-Qaida members in East Africa. 1267 al-Qaida/Taliban/ Usama bin Laden Sanctions Committee has listed AIAI for its associations with al-Qaida.

**ACTIVITIES**

Individuals formerly associated with AIAI may have been responsible for several kidnappings and murders of relief workers in Somalia and Somaliland since 2003 and in the late 1990s. Prior to its destruction in 1997, factions of AIAI also may have been responsible for a series of bomb attacks in public places in Addis Ababa in 1996 and 1997. Most AIAI factions in recent years have concentrated on broadening their religious base, renewed an emphasis on building businesses, and undertaken "hearts and minds" actions, such as sponsoring orphanages and schools and providing security that uses an Islamic legal structure in the areas where it is active.

**STRENGTH**

The actual membership strength is unknown.

**LOCATION/AREA OF OPERATION**

Primarily in Somalia, with a presence in the Ogaden region of Ethiopia, Kenya, and possibly Djibouti.

PX202

**EXTERNAL AID**

Receives funds from Middle East financiers and Somali diaspora communities in Europe, North America, and the Arabian Peninsula.

## ALEX BONCAYAO BRIGADE (ABB)

**DESCRIPTION**

The ABB, the breakaway urban hit squad of the Communist Party of the Philippines/New People's Army, was formed in the mid-1980s. The ABB was added to the Terrorist Exclusion List in December 2001.

**ACTIVITIES**

Responsible for more than 100 murders, including the murder in 1989 of U.S. Army Col. James Rowe in the Philippines. In March 1997, the group announced it had formed an alliance with another armed group, the Revolutionary Proletarian Army (RPA). In March 2000, the group claimed credit for a rifle grenade attack against the Department of Energy building in Manila and strafed Shell Oil offices in the central Philippines to protest rising oil prices. The group has not been active/conducted attacks in recent years.

**STRENGTH**

Unknown, but believed to number below 500.

**LOCATION/AREA OF OPERATION**

The largest RPA/ABB groups are on the Philippine islands of Luzon, Negros, and the Visayas.

**EXTERNAL AID**

Unknown.

## ANTI-IMPERIALIST TERRITORIAL NUCLEI FOR THE CONSTRUCTION OF THE COMMUNIST COMBATANT PARTY (NTA-PCC)

a.k.a. Anti-Imperialist Territorial Units

**DESCRIPTION**

The NTA-PCC is a clandestine leftist extremist group that first appeared in Italy's Friuli region in 1995. It adopted the class struggle ideology of the Red Brigades of the 1970s and 1980s, and a similar logo--an encircled five-point star--for its declarations. It seeks the formation of an "anti-impe-rialist fighting front" with other Italian leftist terrorist groups, including Revolutionary Proletarian Initiative Nuclei and the New Red Brigades. The group opposes what it perceives as U.S. and NATO

PX202

imperialism, and condemns Italy's foreign and labor policies. In a leaflet dated January 2002, NTA-PCC identified experts in four Italian government sectors--federalism, privatizations, justice reform, and jobs and pensions--as potential targets.

## ACTIVITIES

To date, NTA-PCC has conducted attacks only against property. During the NATO intervention in Kosovo in 1999, NTA-PCC members threw gasoline bombs at the Venice and Rome headquarters of the then-ruling party, Democrats of the Left. NTA-PCC claimed responsibility for a bomb attack in September 2000 against the Central European Initiative office in Trieste and a bomb attack in August 2001 against the Venice Tribunal building. In January 2002, police thwarted an attempt by four NTA-PCC members to enter the Rivolto military air base. In 2003, NTA-PCC claimed responsibility for the arson attacks against three vehicles belonging to U.S. troops serving at the Ederle and Aviano bases in Italy. There has been no reported activity by the group since the arrest in January 2004 of NTA-PCC's founder and leader.

## STRENGTH

Accounts vary from one to approximately 20 members.

## LOCATION/AREA OF OPERATION

Primarily northeastern Italy and U.S. military installations in northern Italy.

## EXTERNAL AID

None evident.

# CAMBODIAN FREEDOM FIGHTERS (CFF)

a.k.a. Cholana; Kangtoap Serei Cheat; Kampouchea

## DESCRIPTION

The Cambodian Freedom Fighters (CFF) emerged in November 1998 in the wake of political violence that saw many influential Cambodian leaders flee and the Cambodian People's Party assume power. With an avowed aim of overthrowing the government, the U.S.-based group is led by a Cambodian-American, a former member of the opposition Sam Rainsy Party. The CFF's membership reportedly includes Cambodian-Americans based in Thailand and the United States, and former soldiers from the Khmer Rouge, Royal Cambodian Armed Forces, and various political factions.

## ACTIVITIES

Alleged CFF leader Chhun Yasith was arrested in June in the United States on charges of conspiracy to kill in a foreign country, conspiracy to damage or destroy property in a foreign country, and engaging in a military expedition against a nation with which the United States is at peace. If convicted, Yasith faces life imprisonment without parole for each of the charges. Meanwhile, a

PX202

Cambodian court in October dropped charges against five alleged CFF members arrested in April 2004 in connection with a bombing at a ferry, which slightly injured three persons. In 2003, the Cambodian government arrested seven CFF members who were reportedly planning an unspecified terrorist attack in southwestern Cambodia. Cambodian courts in February and March 2002 prosecuted 38 CFF members suspected of staging an attack in Cambodia in 2000. The courts convicted 19 members, including one U.S. citizen, of "terrorism" and/or "membership in an armed group," and sentenced them to terms of five years to life imprisonment. A Cambodian court later judged that the three-year sentences of six other members were too light and decided in December 2005 to extend them to 6 to 10 years. The group had claimed responsibility for an attack in late November 2000 on several government installations that killed at least eight persons and wounded more than a dozen. In April 1999, five CFF members also were arrested for plotting to blow up a fuel depot outside Phnom Penh with anti-tank weapons.

## STRENGTH

Exact strength is unknown, but totals probably never have exceeded 100 armed fighters.

## LOCATION/AREA OF OPERATION

Northeastern Cambodia near the Thai border, and the United States.

## EXTERNAL AID

U.S.-based leadership collects funds from the Cambodian-American community.

# COMMUNIST PARTY OF INDIA (MAOIST) ^0

a.k.a. Maoist Communist Center of India (MCCI) and People's War (PW)

## DESCRIPTION

The Indian groups known as the Maoist Communist Center of India and People's War (a.k.a. People's War Group) joined in September 2004 to form the Communist Party of India (Maoist), or CPI (Maoist). The MCCI was originally formed in the early 1970s, while People's War (PW) was founded in 1975. Both groups are referred to as Naxalites, after the West Bengal village where a revolutionary radical Left movement originated in 1967. The new organization continues to employ violence to achieve its goals of peasant revolution, abolition of class hierarchies, and expansion of Maoist-controlled "liberated zones," eventually leading to the creation of an independent "Maoist" state. The CPI (Maoist) reportedly has a significant cadre of women. Important leaders include Ganapati (the PW leader from Andhra Pradesh), Pramod Mishra, Uma Shankar, and P.N.G. (alias Nathuni Mistry, arrested by Jharkhand police in 2002).

## ACTIVITIES

Prior to its consolidation with the PW, the MCCI ran a virtual parallel government in remote areas, where it collected a "tax" from villagers and, in turn, provided infrastructure improvements such as building hospitals, schools, and irrigation projects. It ran a parallel court system wherein allegedly corrupt block development officials and landlords — frequent MCCI targets — were punished

285

PX202

by amputation and even death. People's War conducted a low-intensity insurgency that included attempted political assassination, theft of weapons from police stations, kidnapping police officers, assaulting civilians, extorting money from construction firms, and vandalizing the property of multi-national corporations. Together the two groups were reportedly responsible for the deaths of up to 170 civilians and police a year. The group conducted two major attacks in 2005. In June, some 500 members attacked a village in Uttar Pradesh, killing several local policemen, destroying buildings, and seizing weapons. In November, an estimated 300 members attacked a prison in Bihar, killing two people, freeing more than 300 inmates, and abducting 30 landowners belonging to a group opposed to the Naxalites.

## STRENGTH

Although difficult to assess with any accuracy, media reports and local authorities suggest the CPI's (Maoist) membership may be as high as 31,000, including both hard-core militants and dedicated sympathizers.

## LOCATION/AREA OF OPERATION

The CPI (Maoist), which is believed to be enlarging the scope of its influence, operates in the Indian states of Andhra Pradesh, Orissa, Jharkhand, Bihar, Chhattisgarh, and parts of West Bengal. It also has a presence on the Bihar-Nepal border.

## EXTERNAL AID

The CPI (Maoist) has loose links to other Maoist groups in the region, including the Communist Party of Nepal (Maoist), but does not appear dependent on outside sources of support. The MCCI was a founding member of the Coordination Committee of Maoist Parties and Organizations of South Asia (CCOMPOSA).

# COMMUNIST PARTY OF NEPAL (MAOIST) (CPN/M)

## DESCRIPTION

The Communist Party of Nepal (Maoist) insurgency grew out of the radicalization and fragmentation of left-wing parties following Nepal's transition to democracy in 1990. The United People's Front, a coalition of left-wing parties, participated in the elections of 1991, but the Maoist wing failed to win the required minimum number of votes, leading to its exclusion from voter lists in the elections of 1994 and prompting the group to launch the insurgency in 1996. The CPN/M's ultimate objective is the overthrow of the Nepalese government and the establishment of a Maoist state. On October 31, 2003, the United States designated Nepal's Maoists under E.O. 13224 for terrorist activity.

## ACTIVITIES

The Maoists have used traditional guerrilla warfare tactics and engage in murder, torture, arson, sabotage, extortion, child conscription, kidnapping, bombings, and assassinations to intimidate and coerce the populace. In 2002, Maoists claimed responsibility for assassinating two Nepalese U.S. Embassy guards, citing anti-Maoist spying, and in a press statement threatened foreign embas-

PX202

sies, including the U.S. Mission, to deter foreign support for the Nepalese government. Maoists are suspected in the September 2004 bombing at the American Cultural Center in Kathmandu. The attack, which caused no injuries and only minor damage, marked the first time the Maoists had damaged U.S. Government property. The Maoists entered into peace talks with the government in 2001 and 2003, but negotiations failed after a few months. In 2005, the group announced a unilateral cease-fire in September, and entered into an alliance with the seven-party alliance of opposition political parties in November.

## STRENGTH

Approximately several thousand full-time members.

## LOCATION/AREA OF OPERATION

Operations are conducted throughout Nepal. Press reports indicate some Nepalese Maoist leaders reside in India.

## EXTERNAL AID

None.

# DEMOCRATIC FORCES FOR THE LIBERATION OF RWANDA (FDLR)

a.k.a. Army for the Liberation of Rwanda (ALIR);  a.k.a. FAR/Interahamwe

## DESCRIPTION

In 2001, the Democratic Forces for the Liberation of Rwanda (FDLR) supplanted the Army for the Liberation of Rwanda (ALIR), the armed branch of the Party for the Liberation of Rwanda (PALIR). ALIR was formed from the merger of the Armed Forces of Rwanda (FAR), the army of the ethnic Hutu-dominated Rwandan regime that orchestrated the genocide of over 500,000 Tutsis and regime opponents in 1994, and Interahamwe, the civilian militia force that carried out much of the killing. This occurred after the two groups were forced from Rwanda into the Democratic Republic of the Congo (DRC, then Zaire) that year. Though directly tied to those who organized and carried out the genocide, identified ALIR/FDLR leaders are not thought to have played a role in the killing. They have worked to build bridges to other opponents of the Kigali regime, including ethnic Tutsis.

## ACTIVITIES

ALIR sought to topple Rwanda's Tutsi-dominated government, reinstitute Hutu domination, and, possibly, complete the genocide. In 1996, a message--allegedly from the ALIR--threatened to kill the U.S. Ambassador to Rwanda and other U.S. citizens. In 1999, ALIR guerrillas critical of U.S.-UK support for the Rwandan regime kidnapped and killed eight foreign tourists, including two U.S. citizens, in a game park on the DRC-Uganda border. Three suspects in the attack are in U.S. custody awaiting trial. In the 1998-2002 Congolese war, the ALIR/FDLR was allied with Kinshasa against the Rwandan invaders. ALIR/FDLR's political wing mainly has sought to topple the Kigali regime via an alliance with Tutsi regime opponents. It established the ADRN Igihango alliance in 2002, but this has not resonated politically in Rwanda. In March 2005, FDLR representatives announced a willingness

PX202

to cease military actions and return to Rwanda. FDLR denounced the genocide, committed to a political struggle rather than a military one, and indicated it would voluntarily demobilize and repatriate. No large-scale FDLR repatriation to Rwanda has occurred, however, owing to FDLR concerns about security and the "political space" it would be allowed in Rwanda.

## STRENGTH

Exact strength is unknown, but an estimated 8,000 to 10,000 FDLR guerrillas operate in the eastern DRC close to the Rwandan border. In 2003, the United Nations, with Rwandan assistance, repatriated close to 1,500 FDLR combatants from the DRC. A senior FDLR military commander returned to Rwanda in November 2003 and has been working with Kigali to encourage the return of his comrades.

## LOCATION/AREA OF OPERATION

Mostly in the eastern Democratic Republic of the Congo.

## EXTERNAL AID

The Government of the Democratic Republic of the Congo provided training, arms, and supplies to ALIR forces to combat Rwandan armed forces that invaded the DRC in 1998. Kinshasa halted that support in 2002, though allegations persist of continued support from several local Congolese warlords and militias, including the Mai Mai.

# EAST TURKISTAN ISLAMIC MOVEMENT (ETIM) *^0

## DESCRIPTION

The East Turkistan Islamic Movement (ETIM) is a small Islamic extremist group linked to al-Qaida and the international jihadist movement. It is the most militant of the ethnic Uighur separatist groups pursuing an independent "Eastern Turkistan," an area that would include Turkey, Kazakhstan, Kyrgyzstan, Uzbekistan, Pakistan, Afghanistan, and Western China's Xinjiang Uighur Autonomous Region. On September 12, 2002, the group was designated under E.O. 13224 for its terrorist activity. ETIM is also listed by the UN 1267 al-Qaida/Taliban/Usama bin Laden Sanctions Committee for its associations with al-Qaida.

## ACTIVITIES

ETIM militants fought alongside al-Qaida and Taliban forces in Afghanistan during Operation Enduring Freedom. In October 2003, Pakistani soldiers killed ETIM leader Hassan Makhsum during raids on al-Qaida–associated compounds in western Pakistan. U.S. and Chinese government information suggests that ETIM is responsible for various terrorist acts inside and outside China. In May 2002, two ETIM members were deported to China from Kyrgyzstan for plotting to attack the U.S. Embassy in Kyrgyzstan as well as other U.S. interests abroad.

PX202

## STRENGTH

Unknown. Only a small minority of ethnic Uighurs supports the Xinjiang independence movement or the formation of an independent Eastern Turkistan.

## LOCATION/AREA OF OPERATION

Afghanistan, China, Kyrgyzstan, and Pakistan.

## EXTERNAL AID

ETIM has received training and financial assistance from al-Qaida.

# FIRST OF OCTOBER ANTIFASCIST RESISTANCE GROUP (GRAPO); GRUPO DE RESISTENCIA ANTI-FASCISTA PRIMERO DE OCTUBRE

## DESCRIPTION

GRAPO was formed in 1975 as the armed wing of the illegal Communist Party of Spain during the Franco era. It advocates the overthrow of the Spanish government and its replacement with a Marxist-Leninist regime. GRAPO is vehemently anti-American, seeks the removal of all U.S. military forces from Spanish territory, and has conducted and attempted several attacks against U.S. targets since 1977. The group issued a communiqué following the September 11, 2001, attacks in the United States, expressing its satisfaction that "symbols of imperialist power" were decimated and affirming that "the war" has only just begun. Spanish authorities believed they had nearly eradicated GRAPO, but a joint Spanish, French, and Italian police operation in October 2005 that resulted in the arrest of two GRAPO members led observers to speculate that the group may be reconstituting itself. GRAPO in a November 2006 internal publication announced that it was trying to find new members and resources but admitted it was having difficulty reorganizing because of sporadic arrests that continued well into 2006. The group was designated under E.O. 13224 in December 2001.

## ACTIVITIES

GRAPO suffered setbacks in 2004, with several members and sympathizers arrested and sentences upheld or handed down in the appellate case for GRAPO militants arrested in Paris in 2000. Press reports indicate that as of mid-2006, about 30 people connected with the terrorist group were in prison. The group's operations traditionally have been designed to cause material damage and gain publicity rather than inflict casualties, but the terrorists have conducted lethal bombings and close-range assassinations; GRAPO has killed more than 90 persons and injured more than 200 since its formation. GRAPO claimed responsibility for the murder in Zaragoza on 6 February 2006 of a Spanish businesswoman. Members of the group also have been charged with engaging in extortion and for carrying out a series of bank robberies in recent years.

PX202

## STRENGTH

Fewer than two-dozen activists remain. Police have made periodic large-scale arrests of GRAPO members, crippling the organization and forcing it into lengthy rebuilding periods. In 2002, Spanish and French authorities arrested 22 suspected members, including some of the group's reconstituted leadership. More members have been arrested in the past three years.

## LOCATION/AREA OF OPERATION

Spain.

## EXTERNAL AID

None.

## HARAKAT UL-JIHAD-I-ISLAMI (HUJI) [o]

a.k.a Movement of Islamic Holy War

## DESCRIPTION

HUJI, a Sunni extremist group that follows the Deobandi tradition of Islam, was founded in 1980 in Afghanistan to fight in the jihad against the Soviets. It also is affiliated with the Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F) of the extremist religious party Jamiat Ulema-i-Islam (JUI). The group, led by Qari Saifullah Akhtar and chief commander Amin Rabbani, is made up primarily of Pakistanis and foreign Islamists who are fighting for the liberation of Jammu and Kashmir and its accession to Pakistan.

## ACTIVITIES

The group has conducted a number of operations against Indian military targets in Jammu and Kashmir. It is linked to the Kashmiri militant group al-Faran that kidnapped five Western tourists in Jammu and Kashmir in July 1995; one was killed in August 1995, and the other four reportedly were killed in December of the same year.

## STRENGTH

Exact numbers are unknown, but there may be several hundred members in Kashmir.

## LOCATION/AREA OF OPERATION

Pakistan and Kashmir. Trained members in Afghanistan until fall of 2001.

## EXTERNAL AID

Specific sources of external aid are unknown.

PX202

# HARAKAT-UL-JIHAD-I-ISLAMI/BANGLADESH (HUJI-B)

## DESCRIPTION

The goal of HUJI-B is to establish Islamic rule in Bangladesh. Bangladeshi veterans of the war against the Soviets in Afghanistan are the group's core membership. HUJI-B has connections to the Pakistani militant groups Harakat ul-Jihad-I-Islami (HUJI) and Harakat ul-Mujahedin (HUM), which advocate similar objectives in Pakistan and Jammu and Kashmir. The leaders of HUJI-B and HUM both signed the February 1998 fatwa sponsored by Usama bin Ladin that declared American civilians to be legitimate targets for attack.

## ACTIVITIES

HUJI-B was accused of stabbing a senior Bangladeshi journalist in November 2000 for making a documentary on the plight of Hindus in Bangladesh. HUJI-B and its detained leader, Mufti Hannan, are suspected in the assassination attempt in July 2000 of Bangladeshi Prime Minister Sheikh Hasina.

## STRENGTH

Unknown. Some estimates of HUJI-B cadre strength suggest several thousand members.

## LOCATION/AREA OF OPERATION

The group operates in Bangladesh.

## EXTERNAL AID

HUJI-B funding comes from a variety of sources. Several international Islamic NGOs, including the South African-based Servants of Suffering Humanity, may have funneled money to Bangladeshi militant groups, including HUJI-B. HUJI-B also can draw funding from militant madrassa leaders and teachers in Bangladesh.

# HIZB-I ISLAMI GULBUDDIN (HIG)

## DESCRIPTION

Gulbuddin Hikmatyar founded Hizb-I Islami Gulbuddin (HIG) as a faction of the Hizb-I Islami party in 1977, and it was one of the major mujahedin groups in the jihad against the Soviet occupation of Afghanistan. Hikmatyar has long-established links with Usama bin Ladin. In the early 1990s, Hikmatyar ran several terrorist training camps in Afghanistan and was a pioneer in sending mercenary fighters to other Islamic conflicts. Hikmatyar offered to shelter bin Ladin after the latter fled Sudan in 1996 and has consistently offered public support for him since the 9/11 attacks. Hikmatyar has issued regular statements on the need for Afghans to reject the international community's presence in their country. In 2005, he responded to protests against Danish cartoons of the prophet Mohammad with a new call for the expulsion of international troops from Afghanistan.

PX202

## ACTIVITIES

HIG has staged small attacks in its attempt to force the international community to withdraw from Afghanistan, overthrow the Afghan government, and establish an Islamic state. U.S. troops have encountered regular violence in Konar, the area of Afghanistan in which HIG is most active, which has occasionally led to U.S. casualties, and it is likely that HIG is responsible for at least some of this violence.

## STRENGTH

Unknown, but possibly could have hundreds of veteran fighters on which to call.

## LOCATION/ AREA OF OPERATION

Eastern Afghanistan, particularly Konar and Nurestan Provinces, and adjacent areas of Pakistan's tribal areas.

## EXTERNAL AID

Unknown.

# HIZBUL-MUJAHEDIN (HM)

## DESCRIPTION

Hizbul-Mujahedin (HM) is the largest Kashmiri militant group, and was founded in 1989. It officially supports the liberation of Jammu and Kashmir and its accession to Pakistan, although some members favor independence. The group is the militant wing of Pakistan's largest Islamic political party, the Jamaat-i-Islami, and targets Indian security forces and politicians in Jammu and Kashmir. It reportedly operated in Afghanistan in the mid-1990s and trained with the Afghan Hizb-I Islami Gulbuddin (HIG) in Afghanistan until the Taliban takeover. The group, led by Syed Salahuddin, is composed primarily of ethnic Kashmiris.

## ACTIVITIES

HM has conducted a number of operations against Indian military targets in Jammu and Kashmir. The group also occasionally strikes at civilian targets, but has not engaged in terrorist acts outside India. HM claimed responsibility for numerous attacks within Kashmir in 2006.

## STRENGTH

Exact numbers are unknown, but estimates range from several hundred to possibly as many as 1,000 members.

## LOCATION/AREA OF OPERATION

Jammu, Kashmir, and Pakistan.

PX202

**EXTERNAL AID**

Specific sources of external aid are unknown.

# IRISH NATIONAL LIBERATION ARMY (INLA)

## DESCRIPTION

The INLA is a terrorist group formed in 1975 as the military wing of the Irish Republican Socialist Party (IRSP), which split from the Official IRA (OIRA) because of OIRA's cease-fire in 1972. The group's primary aim is to end British rule in Northern Ireland, force British troops out of the province, and unite Ireland's 32 counties into a Marxist-Leninist revolutionary state. It is responsible for some of the most notorious killings of "The Troubles," including the bombing of a Ballykelly pub that killed 17 people in 1982. Bloody internal feuding has repeatedly torn the INLA. The INLA announced a cease-fire in August 1998 but continues to carry out occasional attacks and punishment beatings.

## ACTIVITIES

The INLA has been active in Belfast and the border areas of Northern Ireland, where it has conducted bombings, assassinations, kidnappings, hijackings, extortion, and robberies. It is also involved in drug trafficking. On occasion, it has provided advance warning to police of its attacks. Targets include the British military, Northern Ireland security forces, and Loyalist paramilitary groups. The INLA did not join the IRA's September 2005 weapons decommissioning, but continues to observe a cease-fire because, in the words of its leadership in 2003, a return to armed struggle is "not a viable option at this time." However, the group continues to recruit members and was responsible for a 2005 arson attack against the home of a local official.

## STRENGTH

Unclear, but probably fewer than 50 hardcore activists. Police counterterrorist operations and internal feuding have reduced the group's strength and capabilities.

## LOCATION/AREA OF OPERATION

Northern Ireland and the Irish Republic. Does not have a significant established presence on the UK mainland.

## EXTERNAL AID

Suspected in the past of receiving funds and arms from sympathizers in the United States.

# IRISH REPUBLICAN ARMY (IRA)

a.k.a. Provisional Irish Republican Army (PIRA); the Provos

PX202

## DESCRIPTION

Formed in 1969 as the clandestine armed wing of the political movement Sinn Fein, the IRA is devoted both to removing British forces from Northern Ireland and to unifying Ireland. The IRA conducted attacks until its cease-fire in 1997 and agreed to disarm as part of the 1998 Belfast Agreement, which established the basis for peace in Northern Ireland. Dissension within the IRA over support for the Northern Ireland peace process resulted in the formation of two more radical splinter groups: Continuity IRA (CIRA) in 1995, and the Real IRA (RIRA) in 1997. The IRA, sometimes referred to as the PIRA to distinguish it from RIRA and CIRA, is organized into small, tightly-knit cells under the leadership of the Army Council.

## ACTIVITIES

Traditional IRA activities have included bombings, assassinations, kidnappings, punishment beatings, extortion, smuggling, and robberies. Before the cease-fire in 1997, the group had conducted bombing campaigns on various targets in Northern Ireland and Great Britain, including senior British government officials, civilians, police, and British military targets. In August 2002, three suspected IRA members were arrested in Colombia on charges of helping the Revolutionary Armed Forces of Colombia (FARC) improve its explosives capabilities; the men subsequently escaped from prison and appeared in Ireland in 2005. Irish police have questioned the men but have filed no charges. Colombia has requested their extradition, which is unlikely, since Ireland has no extradition treaty with Colombia.

In July 2005, a spokesperson for the IRA made a statement calling for an end to all forms of IRA illegal activity. This statement was confirmed in September 2005 by the Independent International Commission on Decommissioning's announcement that the IRA had met its commitments to put all arms beyond use. The Independent Monitoring Commission (IMC) also reported that since the September decommissioning the IRA has shown no evidence of training and recruiting terrorists or an intent to return to violence. There have been indications of IRA members using violence in 2006; however, the IMC reports that these incidents were not sanctioned by IRA leadership. The IRA has yet to abandon its extensive criminal activities, which reportedly provide the IRA and the political party Sinn Fein with millions of dollars each year.

## STRENGTH

Several hundred members and several thousand sympathizers, despite the defection of some members to RIRA and CIRA.

## LOCAL/AREA OF OPERATION

Northern Ireland, Irish Republic, Great Britain, and Europe.

## EXTERNAL AID

In the past, the IRA has received aid from a variety of groups and countries, and considerable training and arms from Libya and the PLO. It is suspected of receiving funds, arms, and other terrorist-related materiel from sympathizers in the United States. In addition to the apparent contact with the FARC, similarities in operations suggest the IRA has links to the ETA.

294

PX202

# ISLAMIC ARMY OF ADEN (IAA) *⁰^

a.k.a. Aden-Abyan Islamic Army (AAIA)

## DESCRIPTION

The Islamic Army of Aden (IAA) emerged publicly in mid-1998 when the group released a series of communiqués that expressed support for Usama bin Ladin and called for the overthrow of the Yemeni government and for operations against U.S. and other Western interests in Yemen. IAA was first designated under E.O. 13224 in September 2001.

## ACTIVITIES

The IAA, a group with established connections to al-Qaida and whose membership includes veteran fighters from the Soviet-Afghan war, in the past has engaged in small-scale operations such as bombings, kidnappings, and small arms attacks to further its agenda. In June 2003, the group reportedly was behind an attack against a medical convoy in the Abyan Governorate. Yemeni authorities responded with a raid on a suspected IAA facility that killed several individuals and captured others, including Khalid al-Nabi al-Yazidi, the group's leader. The IAA's previous involvement in terrorist attacks includes the throwing of a grenade into the British Embassy compound in Sanaa in October 2000. In 2001, Yemeni authorities found an IAA member and three associates responsible for that attack. In December 1998, the group kidnapped 16 British, American, and Australian tourists near Mudiyah in southern Yemen. The group's involvement in a 2003 attack against the medical convoy and reports that its leader was released from prison in October 2003 suggest that the IAA, or at least elements of the group, may remain active. However, Yemeni officials previously have claimed that IAA is operationally defunct, and the group has not claimed any attacks since 2003.

## STRENGTH

Not known.

## LOCATION/AREA OF OPERATION

Operates in the southern governorates of Yemen, primarily Aden and Abyan.

## EXTERNAL AID

Not known.

# ISLAMIC GREAT EASTERN RAIDERS–FRONT (IBDA-C)

## DESCRIPTION

The Islamic Great Eastern Raiders–Front (IBDA-C) is a Sunni Salafist group that supports Islamic rule in Turkey, is sympathetic to al-Qaida, and believes that Turkey's present secular leadership is "illegal." It has been known to cooperate with various opposition elements in Turkey in attempts to destabilize the country's political structure. The group supports the establishment of a "pure

295

PX202

Islamic" state to replace the present "corrupt" Turkish regime that is cooperating with the West. Its primary goal is the establishment of the Federative Islamic State, a goal backed by armed terrorist attacks primarily against civilian targets. It has been active since the mid-1970s.

## ACTIVITIES

IBDA-C has engaged in activities that minimize personal risk, such as bombings, throwing Molotov cocktails, and sabotage. The group has announced its actions and targets in publications to its members, who are free to launch independent attacks. IBDA-C typically has attacked civilian targets, including churches, charities, minority-affiliated targets, television transmitters, newspapers, pro-secular journalists, Ataturk statues, taverns, banks, clubs, and tobacco shops. One of IBDA-C's more renowned attacks was the killing of 37 people in a firebomb attack in July 1993 on a hotel in Sivas. In May 2004, Turkish police indicted seven members of the group for the assassination of retired Colonel Ihsan Guven, including the alleged leader of the "Dost" (Friend) sect, and his wife. Turkish police believe that IBDA-C has also claimed responsibility for attacks carried out by other groups in order to elevate its image.  Turkish government crackdowns continued into 2006. In a May operation, the government arrested 18 members.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Turkey.

## EXTERNAL AID

Unknown.

## ISLAMIC INTERNATIONAL PEACEKEEPING BRIGADE (IIPB) *^0

### DESCRIPTION

The IIPB is a terrorist group affiliated with the Chechen separatist movement demanding a single Islamic state in the North Caucasus. In 1998 Chechen extremist leader Shamil Basayev established the IIPB, consisting of Chechens, Arabs, and other foreign fighters, which he led with Saudi-born mujahedin leader Ibn al-Khattab until the latter's death in March 2002. In July 2006, Basayev himself was killed by Russian forces. The IIPB was one of three groups affiliated with Chechen guerrillas that seized Moscow's Dubrovka Theater and took more than 700 hostages in October 2002. While this group has not been identified by the mujahedin media as conducting attacks since its designation three years ago, those Arab mujahedin still operating in Chechnya now fall under the command of Abu Hafs al-Urduni, who assumed the IIPB leadership in April 2004 after the death of Khattab's successor, Abu al-Walid. IIPB was designated under E.O. 13224 in February 2003 and listed by the UN al-Qaida/Taliban Sanctions Committee for its associations with al-Qaida.

PX202

## ACTIVITIES

The IIPB has engaged in terrorist and guerilla operations against Russian forces, pro-Russian Chechen forces, and Chechen non-combatants.

## STRENGTH

At its peak, up to 400 fighters, including as many as 100 Arabs and other foreign fighters, but almost certainly has suffered significant attrition.

## LOCATION/AREA OF OPERATION

Primarily in Russia and adjacent areas of the North Caucasus, particularly in the mountainous south of Chechnya, with major logistical activities in Georgia, Azerbaijan, and Turkey.

## EXTERNAL AID

The IIPB and its Arab leaders appear to be a primary conduit for Islamic funding of the Chechen guerrillas, in part through links to al-Qaida-related financiers on the Arabian Peninsula.

# JAMAATUL-MUJAHEDIN BANGLADESH (JMB)

## DESCRIPTION

JMB is a Bangladeshi Islamic extremist group dedicated to the use of violence to achieve its objective of a state based on Islamic law. JMB, which emerged in the late 1990s, has been associated with several bombings during the past several years. The Bangladeshi government banned the group in February 2005.

## ACTIVITIES

On August 17, 2005, JMB claimed responsibility for nearly 500 simultaneous explosions throughout Bangladesh. Subsequent bombings, possibly involving suicide bombers, targeted judges, police, government offices, traditional folk festivals and cultural groups, and local non-governmental organizations. The Bangladeshi government has captured several of the group's most important leaders.

## STRENGTH

Estimates range as high as 11,000.

## LOCATION/AREA OF OPERATION

Bangladesh.

## EXTERNAL AID

JMB probably also receives some support from persons of Bangladeshi origin living in Europe and the Middle East.

PX202

## JAMIAT UL-MUJAHEDIN (JUM) [0]

### DESCRIPTION

The JUM is a small pro-Pakistan militant group formed in Jammu and Kashmir in 1990 that seeks to unite Jammu and Kashmir with Pakistan. Followers are mostly Kashmiris, but the group includes some Pakistanis.

### ACTIVITIES

Has conducted a number of operations against Indian military and political targets in Jammu and Kashmir, including two grenade attacks in 2004.

### STRENGTH

Unknown.

### LOCATION/AREA OF OPERATION

Jammu, Kashmir, and Pakistan.

### EXTERNAL AID

Unknown.

## JAPANESE RED ARMY (JRA) [0]

a.k.a. Anti-Imperialist International Brigade (AIIB)

### DESCRIPTION

The JRA is an international terrorist group formed around 1970 after breaking away from the Japanese Communist League--Red Army Faction. The JRA's historical goal has been to overthrow the Japanese government and monarchy and to help foment world revolution. The JRA's leader, Fusako Shigenobu, claimed that the forefront of the battle against international imperialism was in Palestine, and in the early 1970s she led her small group to the Middle East. After her arrest in November 2000, Shigenobu announced she intended to pursue her goals using a legitimate political party rather than revolutionary violence, and the group apparently disbanded in April 2001.

### ACTIVITIES

During the 1970s, the JRA carried out a series of attacks around the world, including the 1972 massacre at Lod Airport in Israel, two Japanese airliner hijackings, an attempted takeover of the U.S. Embassy in Kuala Lumpur, and the 1974 seizure of the French Embassy in The Hague, in which the ambassador was among the hostages. During the late 1980s, the JRA began to single out American targets and used car bombs and rockets in attempted attacks on U.S. Embassies in Jakarta, Rome, and Madrid. In April 1988, JRA operative Yu Kikumura was arrested with explosives

PX202

on the New Jersey Turnpike, apparently planning an attack to coincide with the bombing of a USO club in Naples, a suspected JRA operation that killed five, including a U.S. servicewoman. Kikimura was convicted of the charges and is serving a lengthy prison sentence in the United States. JRA operative Tsutomu Shirosaki, captured in 1996, is also jailed in the United States. In 2000, Lebanon deported four members it arrested in 1997 to Japan, but granted a fifth operative, Kozo Okamoto, political asylum. Longtime leader Shigenobu was arrested in November 2000 and faced charges of terrorism and passport fraud. In February 2006, Shingenobu was sentenced to 20 years in prison for coordinating the 1974 French embassy siege. Four JRA members remain in North Korea following their involvement in an airline hijacking in 1970; five of their family members returned to Japan in 2004.

## STRENGTH

At its peak, the group claimed to have 30 to 40 members.

## LOCATION/AREA OF OPERATION

Possibly in Asia.

## EXTERNAL AID

Unknown.

# KUMPULAN MUJAHEDIN MALAYSIA (KMM)

a.k.a. Kumpulan Militan Malaysia

## DESCRIPTION

Kumpulan Mujahedin Malaysia (KMM) favors the overthrow of the Malaysian government and the creation of an Islamic state comprising Malaysia, Indonesia, and the southern Philippines (and Southern Thailand). Malaysian authorities believe an extremist wing of the KMM has engaged in terrorist acts and has close ties to the regional terrorist organization Jemaah Islamiya (JI). Key JI leaders, including the group's spiritual head, Abu Bakar Bashir, and JI operational leader Hambali, reportedly had great influence over KMM members. The Government of Singapore asserts that a Singaporean JI member assisted the KMM in buying a boat to support jihad activities in Indonesia.

## ACTIVITIES

Malaysia continues to hold a number of KMM members under the Internal Security Act for activities deemed threatening to Malaysia's national security, including planning to wage jihad, possession of weaponry, bombings, robberies, the murder of a former state assembly member, and planning attacks on foreigners, including U.S. citizens. A number of those detained also are believed to be members of Jemaah Islamiya. Several of the arrested KMM militants reportedly have undergone military training in Afghanistan, and some fought with the Afghan mujahedin during the war against the former Soviet Union. Some members allegedly have ties to Islamic extremist organizations in Indonesia and the Philippines. One alleged KMM member was sentenced to 10 years in prison for unlawful possession of firearms, explosives, and ammunition; eight other alleged members in detention since 2001 were later released in July and November 2004; three others were freed in

PX202

November 2005. In March 2004, alleged KMM leader Nik Adli Nik Abdul Aziz and other suspected KMM members went on a hunger strike as part of an unsuccessful bid for freedom, but the Malaysian court in September 2004 rejected their applications for a writ of habeas corpus. In September 2005, detention orders for Aziz and eight other alleged KMM members were extended for another two years. The Malaysian government is confident that the arrests of KMM leaders have crippled the organization and rendered it incapable of engaging in militant activities. In May 2004, Malaysian officials denied Thailand's charge that the KMM was involved in the Muslim separatist movement in southern Thailand.

## STRENGTH

KMM's current membership is unknown.

## LOCATION/AREA OF OPERATION

The KMM is reported to have networks in the Malaysian states of Perak, Johor, Kedah, Selangor, Terengganu, and Kelantan. They also operate in Kuala Lumpur. The KMM has ties to radical Indonesian Islamic groups.

## EXTERNAL AID

Largely unknown, probably self-financing.

# LORD'S RESISTANCE ARMY (LRA)*^0

## DESCRIPTION

The LRA, founded in 1987, succeeded the ethnic Acholi-dominated Holy Spirit Movement and other insurgent groups. LRA leader Joseph Kony has called for the overthrow of the Ugandan government and its replacement with a regime run on the basis of the Ten Commandments. More frequently, however, he has spoken of the liberation and honor of the Acholi people, whom he sees as oppressed by the "foreign" government of Ugandan President Museveni. Kony is the LRA's undisputed leader. He claims to have supernatural powers and to receive messages from spirits, which he uses to formulate the LRA's strategy.

## ACTIVITIES

Since the early 1990s, the LRA has kidnapped some 20,000 Ugandan children, mostly ethnic Acholi, to replenish its ranks. Kony despises Acholi elders for having given up the fight against Museveni and relies on abducted children who can be brutally indoctrinated to fight for the LRA. The LRA kidnaps children and adult civilians to become soldiers, porters, and "wives" for LRA leaders. The LRA prefers to attack camps for internally displaced persons and other civilian targets, avoiding direct engagement with the Ugandan military. The LRA stepped up its activities from 2002 to 2004 after the Ugandan army, with the Sudanese government's permission, attacked LRA positions inside Sudan. By late 2003, the number of internally displaced persons had doubled to 1.4 million, and the LRA had pushed deep into non-Acholi areas where it had never previously operated. During 2004, a combination of military pressure, offers of amnesty, and several rounds of negotiation markedly

PX202

degraded LRA capabilities due to death, desertion, and defection of senior commanders. In October 2005, the International Criminal Court (ICC) issued arrest warrants for Kony and four other top LRA leaders. Since February 2006, the Government of Southern Sudan has been holding peace talks between the LRA and the Ugandan government.

## STRENGTH

Estimated at 500 to 700 fighters.

## LOCATION/AREA OF OPERATION

Northern Uganda, southern Sudan, and northeast Democratic Republic of the Congo.

## EXTERNAL AID

Although the LRA has been supported by the Government of Sudan in the past, the Sudanese now appear to be cooperating with the Government of Uganda in a campaign to eliminate LRA sanctuaries in Sudan.

# LOYALIST VOLUNTEER FORCE (LVF)

## DESCRIPTION

An extreme Loyalist group formed in 1996 as a faction of the Ulster Volunteer Force (UVF), the LVF did not emerge publicly until 1997. It is composed largely of UVF hardliners who have sought to prevent a political settlement with Irish nationalists in Northern Ireland by attacking Catholic politicians, civilians, and Protestant politicians who endorse the Northern Ireland peace process. LVF occasionally uses the Red Hand Defenders as a cover name for its actions but has also called for the group's disbandment. In October 2001, the British government ruled the LVF had broken the ceasefire it declared in 1998 after linking the group to the murder of a journalist. According to the Independent International Commission on Decommissioning, the LVF decommissioned a small amount of weapons in December 1998, but it has not repeated this gesture. The LVF was designated under E.O. 13224 in December 2001.

## ACTIVITIES

The group conducts bombings, kidnappings, and close-quarter shooting attacks. It finances its activities with drug money and other criminal activities. LVF attacks have been particularly vicious; the group has murdered numerous Catholic civilians with no political or paramilitary affiliations, including an 18-year-old Catholic girl in July 1997 because she had a Protestant boyfriend. LVF terrorists also have conducted successful attacks against Irish targets in Irish border towns. From 2000 to August 2005, the LVF engaged in a violent feud with other Loyalists, which left several men dead. In October 2005, the group said that it would stand down its "military units," but the Independent Monitoring Commission has no evidence of the LVF disbanding.

## STRENGTH

Small, perhaps dozens of active members.

PX202

**LOCATION/AREA OF OPERATION**

Northern Ireland and Ireland.

**EXTERNAL AID**

None.

## NEW RED BRIGADES/COMMUNIST COMBATANT PARTY (BR/PCC) [o]

a.k.a. Brigate Rosse/Partito Comunista Combattente

### DESCRIPTION

This Marxist-Leninist group is a successor to the Red Brigades, active in the 1970s and 1980s. In addition to ideology, both groups share the same symbol, a five-pointed star inside a circle. The group is opposed to Italy's foreign and labor policies and to NATO.

### ACTIVITIES

In 2003, Italian authorities captured at least seven members of the BR/PCC, dealing the terrorist group a severe blow to its operational effectiveness, and the group continued to suffer setbacks in 2005 and 2006, with its leadership in prison, key suspects convicted and sentenced, and additional arrests made. In June 2005, a Rome court sentenced five BR/PCC members to life in prison for the 2002 assassination of Labor Ministry external adviser Marco Biagi. One month later, three of the five also were found guilty of the assassination of Labor Ministry external adviser Massimo D'Antona in 1999, again incurring a life sentence. An additional nine BR/PCC suspects were sentenced to between four and nine years, and some convicted members provided valuable information to Italian authorities, leading to additional arrests. In December 2005, an Italian judge refused to pardon Adriano Sofri, leader of Continuous Struggle (Lotta Continua), a precursor movement to the Red Brigades, whose life sentence was suspended for health reasons. Italian authorities in early December 2006 arrested Fabio Matteini, suspected of trying to recruit new members in an effort to revive the group. The BR/PCC in recent years has financed its activities in part through armed robberies.

### STRENGTH

Fewer than 20.

### LOCATION/AREA OF OPERATION

Italy.

### EXTERNAL AID

Has obtained weapons from abroad.

PX202

# PEOPLE AGAINST GANGSTERISM AND DRUGS (PAGAD)

a.k.a. Muslims Against Global Oppression; Muslims Against Illegitimate Leaders

## DESCRIPTION

People Against Gangsterism and Drugs (PAGAD) and its ally Qibla (an Islamic fundamentalist group that favors political Islam and takes an anti-U.S. and anti-Israel stance), view the South African government as a threat to Islamic values. The two groups work to promote a greater political voice for South African Muslims. PAGAD has used front names such as Muslims Against Global Oppression and Muslims Against Illegitimate Leaders when launching anti-Western protests and campaigns.

## ACTIVITIES

PAGAD formed in November 1995 as a vigilante group in reaction to crime in some neighborhoods of Cape Town. In September 1996, a change in the group's leadership resulted in a change in the group's goal, and it began to support violent jihad to establish an Islamic state. Between 1996 and 2000, PAGAD conducted a total of 189 bomb attacks, including nine bombings in the western Cape that caused serious injuries. PAGAD's targets included South African authorities, moderate Muslims, synagogues, gay nightclubs, tourist attractions, and Western-associated restaurants. PAGAD is believed to have masterminded the bombing on August 1998 of the Cape Town Planet Hollywood and the 2000 attack on a New York Bagel restaurant in Cape Town. Since 2001, PAGAD's violent activities have been severely curtailed by law enforcement and prosecutorial efforts against leading members of the organization. Qibla leadership has organized demonstrations against visiting U.S. dignitaries and other protests, but the extent of PAGAD's involvement is uncertain.

## STRENGTH

Early estimates were several hundred members. Current operational strength is unknown, but probably vastly diminished.

## LOCATION/AREA OF OPERATION

Operates mainly in the Cape Town area.

## EXTERNAL AID

May have ties to international Islamic extremists.

PX202

# RAJAH SOLAIMAN MOVEMENT (RSM)

## DESCRIPTION

The RSM is a Philippines-based Islamic extremist group comprising Christian converts to Islam, many of whom had embraced extremist Islamic ideology while working in the Middle East. RSM promotes the use of violence and terrorism against Philippine Christians and Westerners with the aim of turning the Philippines into an Islamic state. The group is named after Rajah Solaiman, the last indigenous Muslim ruler of Manila before Spanish rule began in the 16th century.

## ACTIVITIES

The RSM has assisted with the terrorist plots of the Abu Sayyaf Group (ASG) in Manila and other areas in the northern Philippines. It was involved in ASG's bombing of SuperFerry 14 in February 2004, and the February 2005 Valentine's Day bombings, according to Philippine security officials. In 2005 the RSM suffered several major setbacks when in March, Philippine security forces seized more than 1,300 pounds of explosives from an RSM safe house in metropolitan Manila, and in October, Philippine intelligence agents arrested RSM leader Ahmad Santos in Zamboanga City and charged him with plotting to bomb high profile targets, including the U.S. Embassy in Manila. Two months later, Philippine security forces arrested another RSM leader in Zamboanga City. Philippine officials subsequently claimed that debriefing captives helped them thwart an alleged RSM plot to conduct attacks in Manila during the Christmas 2005 holiday season. In late 2006, another RSM leader, Feliciano de los Reyes was arrested.

## STRENGTH

The exact number of members in the RSM is unknown, but the group likely has fewer than 50 members.

## LOCATION/AREA OF OPERATION

The RSM operates throughout the Philippines and maintains a significant presence in metropolitan Manila. Some RSM operatives trained alongside members of the Abu Sayyaf Group and other militants in the southern Philippines.

## EXTERNAL AID

The Abu Sayyaf Group and Jemaah Islamiya have provided training, funds, and operational assistance to the RSM. Some Middle East-based non-governmental organizations and other sympathizers also may provide funds to the RSM.

PX202

# RED HAND DEFENDERS (RHD)

## DESCRIPTION

The RHD is a terrorist group formed in 1998 and composed largely of Protestant hardliners from Loyalist groups observing a cease-fire. RHD seeks to prevent a political settlement with Irish nationalists by attacking Catholic civilian interests in Northern Ireland. In January 2002, the group announced all staff at Catholic schools in Belfast and Catholic postal workers were legitimate targets. Despite calls in February 2002 by the Ulster Defense Association (UDA), Ulster Freedom Fighters (UFF), and Loyalist Volunteer Force (LVF) to announce its disbandment, RHD continued to make threats and issue claims of responsibility. RHD is a cover name often used by elements of the banned UDA and LVF. RHD was designated under E.O. 13224 in December 2001.

## ACTIVITIES

In early 2003, the RHD claimed responsibility for killing two UDA members as a result of what is described as Loyalist internecine warfare. It also claimed responsibility for a bomb that was left in the offices of Republican Sinn Fein in West Belfast, although the device was defused and no one was injured. In recent years, the group has carried out numerous pipe bombings and arson attacks against "soft" civilian targets such as homes, churches, and private businesses. In January 2002, the group bombed the home of a prison official in North Belfast. Twice in 2002 the group claimed responsibility for attacks--the murder of a Catholic postman and a Catholic teenager--that were later claimed by the UDA-UFF, further blurring distinctions between the groups. In 2001, RHD claimed responsibility for killing five persons.

## STRENGTH

Up to 20 members, some of whom have experience in terrorist tactics and bombmaking. Police arrested one member in June 2001 for making a hoax bomb threat.

## LOCATION/AREA OF OPERATION

Northern Ireland.

## EXTERNAL AID

None.

# REVOLUTIONARY PROLETARIAN INITIATIVE NUCLEI (NIPR)

## DESCRIPTION

The NIPR is a clandestine leftist extremist group that appeared in Rome in 2000. It adopted the logo of the Red Brigades of the 1970s and 1980s, an encircled five point star, for its declarations. NIPR opposes Italy's foreign and labor policies. The group has targeted property interests rather than personnel in its attacks.

PX202

## ACTIVITIES

The NIPR has not claimed responsibility for any attacks since an April 2001 bomb attack on a building housing a U.S.-Italian relations association and an international affairs institute in Rome's historic center. The NIPR claimed to have carried out a bombing in May 2000 in Rome at an oversight committee facility for implementation of the law on strikes in public services.

## STRENGTH

Fewer than 20 members.

## LOCATION/AREA OF OPERATION

Mainly in Rome, Milan, Lazio, and Tuscany.

## EXTERNAL AID

None evident.

# REVOLUTIONARY STRUGGLE (RS)

## DESCRIPTION

RS is a radical leftist group that is anti-Greek establishment and ideologically aligns itself with the Revolutionary Organization 17 November.

## ACTIVITIES

RS is widely regarded as the most dangerous indigenous Greek terrorist group still active and has been linked to attacks against Americans. RS first became known when the group conducted a bombing in 2003 against the courthouse where trials of alleged 17 November members were occurring. In 2004, the group detonated four improvised explosive devices at a police station in Athens. These two attacks were notable for their apparent attempts to target and kill first responders, the first time a Greek terrorist group had used this tactic. RS claimed responsibility for a large explosion in December 2005 in Constitution Square in the center of Athens, apparently targeting the Ministry of National Economy, injuring three and badly damaging the facade of a post office and other buildings. The group claimed responsibility for a bomb explosion in May 2006, near the residence of former Minister of Public Order Giorgos Voulgarakis. The remotely detonated bomb was placed next to a school along the minister's usual route to work and exploded just minutes before he was due to pass. The explosion wrecked several cars but caused no injuries.  RS also claimed responsibility for a rocket-propelled-grenade (RPG) attack against the U.S. Embassy on January 12, 2007. The attack occurred early in the morning when few Embassy personnel were working and there were no injuries, but the RPG damaged a room at the front of the Embassy.

## STRENGTH

Likely less than 50 members.

PX202

**LOCATION/AREA OF OPERATION**

Athens, Greece.

**EXTERNAL AID**

Unknown.

## RIYADUS-SALIKHIN RECONNAISSANCE AND SABOTAGE BATTALION OF CHECHEN MARTYRS (RSRSBCM) *0^

**DESCRIPTION**

Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs (RSRSBCM), led by Chechen extremist Shamil Basayev, uses terrorism as part of an effort to secure an independent Muslim state in the North Caucasus. Basayev claimed the group was responsible for the Beslan school hostage crisis of September 2004, which culminated in the deaths of about 330 people; simultaneous suicide bombings aboard two Russian civilian airliners in August 2004; and a third suicide bombing outside a Moscow subway that same month. The group has not mounted a terrorist attack since the Beslan operation. The RSRSBCM, whose name translates into English as "Requirements for Getting into Paradise," was not known to Western observers before October 2002, when it participated in the seizure of the Dubrovka Theater in Moscow. The group was designated under E.O. 13224 in February 2003. The group's viability is in question since its leader Shamil Basayev was killed by Russian forces in July 2006.

**ACTIVITIES**

RSRSBCM has primarily engaged in terrorist and guerilla operations against Russian forces, pro-Russian Chechen forces, and Russian and Chechen non-combatants.

**STRENGTH**

Probably no more than 50 fighters at any given time.

**LOCATION/AREA OF OPERATION**

Primarily Russia.

**EXTERNAL AID**

May receive some external assistance from foreign mujahedin.

307

PX202

## SIPAH-I-SAHABA/PAKISTAN (SSP)

a.k.a. Millat-I-Islami Pakistan

### DESCRIPTION

The Sipah-I-Sahaba/Pakistan (SSP) is a Sunni sectarian group that follows the Deobandi school. Violently anti-Shia, the SSP emerged in central Punjab in the mid-1980s as a response to the Iranian revolution. Pakistani President Musharraf banned the SSP in January 2002. In August 2002, the SSP renamed itself Millat-i-Islami Pakistan, and Musharraf re-banned the group in November 2003. The SSP also has operated as a political party, winning seats in Pakistan's National Assembly.

### ACTIVITIES

The group's activities range from organizing political rallies calling for Shia to be declared non-Muslims to assassinating prominent Shia leaders. The group was responsible for attacks on Shia worshippers in May 2004, when at least 50 people were killed.

### STRENGTH

The SSP may have approximately 3,000 to 6,000 trained activists who carry out various kinds of sectarian activities.

### LOCATION/AREA OF OPERATION

The SSP has influence in all four provinces of Pakistan. It is considered to be one of the most powerful sectarian groups in the country.

### EXTERNAL AID

The SSP reportedly receives significant funding from Saudi Arabia and wealthy private donors in Pakistan. Funds also are acquired from other sources, including other Sunni extremist groups, madrassas, and contributions by political groups.

## SPECIAL PURPOSE ISLAMIC REGIMENT (SPIR) *0^

### DESCRIPTION

The SPIR is one of three Chechen-affiliated terrorist groups that furnished personnel to carry out the seizure of the Dubrovka Theater in Moscow in October 2002. The SPIR has had at least seven commanders since it was founded in the late 1990s. Movsar Barayev, who led and was killed during the theater standoff, was the first publicly identified leader. The group continues to conduct guerrilla operations in Chechnya under its current leader, Amir Aslan, whose true identity is not known. SPIR was designated under E.O. 13224 in February 2003. In 2006, SPIR continued to target official Russian targets and Chechen elements it believe to be sympathetic to Russia.

PX202

## ACTIVITIES

SPIR has primarily engaged in guerrilla operations against Russian forces. Has also been involved in various hostage and ransom operations, including the execution of ethnic Chechens who have cooperated with Russian authorities.

## STRENGTH

Probably no more than 100 fighters at any given time.

## LOCATION/AREA OF OPERATION

Primarily Russia.

## EXTERNAL AID

May receive some external assistance from foreign mujahedin.

# AL-TAWHID W'AL JIHAD  (TWJ)

a.k.a. Tawhid Islamic Brigades; al-Tawhid Wa al-Jihad; Monotheism and Jihad Organization

## DESCRIPTION

The TWJ is an Egypt-based Islamic extremist group motivated by Cairo's harsh treatment of the Bedouin community and difficult economic conditions in the Sinai. This group is comprised of radicalized Sinai Bedouin, criminals, and smugglers who use their knowledge of the rugged Sinai terrain and their compartmented cell structure to attack Western and Israeli tourist targets.

## ACTIVITIES

The TWJ has conducted bombings and suicide attacks, such as attacks at Taba in October 2004, Sharm ash Shaykh in July 2005, Dhahab in April 2006, and against the Multinational Force and Observers (MFO) in August 2005 and April 2006.

## STRENGTH

Unknown.  Egyptian security services have killed or captured many high-ranking TWJ members during the past two years.

## LOCATION/AREA OF OPERATION

Sinai, Gaza.

## EXTERNAL AID

Unknown.

PX202

# TUNISIAN COMBATANT GROUP (TCG)* ⁰^

a.k.a. Jama'a Combattante Tunisienne

## DESCRIPTION

The Tunisian Combatant Group (TCG), also known as the Jama'a Combattante Tunisienne, seeks to establish an Islamic regime in Tunisia and has targeted U.S. and Western interests. The group is an offshoot of the banned Tunisian Islamist movement, an-Nahda. Founded around 2000 by Tarek Maaroufi and Saifallah Ben Hassine, the TCG has drawn members from the Tunisian diaspora in Europe and elsewhere. It has lost some of its leadership, but may still exist, particularly in Western Europe. Belgian authorities arrested Maaroufi in late 2001 and sentenced him to six years in prison in 2003 for his role in the assassination of anti-Taliban commander Ahmed Shah Massoud two days before 9/11. The TCG was designated under E.O. 13224 in October 2002. Historically, the group has been associated with al-Qaida as well. Members also have ties to other North African extremist groups. The TCG was designated for sanctions under UNSCR 1333 in December 2000.

## ACTIVITIES

Tunisians associated with the TCG are part of the support network of the broader international terrorist movement. According to European press reports, TCG members or affiliates in the past have engaged in trafficking falsified documents and recruiting for terror training camps in Afghanistan. Some TCG associates were suspected of planning an attack against the United States, Algerian, and Tunisian diplomatic missions in Rome in April 2001. Some members reportedly maintain ties to the Algerian Salafist Group for Preaching and Combat.

## STRENGTH

Unknown.

## LOCATION/AREA OF OPERATION

Western Europe and Afghanistan.

## EXTERNAL AID

Unknown.

# TUPAC AMARU REVOLUTIONARY MOVEMENT (MRTA)

## DESCRIPTION

MRTA is a traditional Marxist-Leninist revolutionary movement formed in 1983 from remnants of the Movement of the Revolutionary Left, a Peruvian insurgent group active in the 1960s. It aims to establish a Marxist regime and to rid Peru of all imperialist elements, primarily U.S. and Japanese

PX202

influence. Peru's counterterrorist program has diminished the group's ability to conduct terrorist attacks, and the MRTA has suffered from infighting, the imprisonment or deaths of senior leaders, and the loss of leftist support.

## ACTIVITIES

MRTA previously conducted bombings, kidnappings, ambushes, and assassinations, but recent activity has fallen drastically. In December 1996, 14 MRTA members occupied the Japanese Ambassador's residence in Lima and held 72 hostages for more than four months. Peruvian forces stormed the residence in April 1997, rescuing all but one of the remaining hostages and killing all 14 group members, including the remaining leaders. The group has not conducted a significant terrorist operation since and appears more focused on obtaining the release of imprisoned MRTA members, although there are reports of low-level rebuilding efforts.

## STRENGTH

Believed to be no more than 100 members, consisting largely of young fighters who lack leadership skills and experience.

## LOCATION/AREA OF OPERATION

Peru, with supporters throughout Latin America and Western Europe. Many exiled members live in Bolivia.

## EXTERNAL AID

None.

# TEHRIK NEFAZ-I-SHARIAT MUHAMMAD (TNSM)

## DESCRIPTION

Maulawi Sufi Muhammed (now imprisoned) established TNSM in May 1989 in the former Malakand District of the Northwest Frontier Province (NWFP) of Pakistan with the goal of instituting strict Islamic law in the region because they believe the government failed to institute Sharia law in the NWFP. The group held massive rallies in 1994 and effectively shut down the Malakand District. The uprising ended after the Pakistani government agreed to implement Sharia law in the Malakand District. Islamabad banned the group in 2002 in response to TNSM's deployment of fighters to Afghanistan to fight with the Taliban. Since Sufi Muhammad's arrest in early 2002, the leadership of the group has been in flux. Both Maulawi Faqir Muhammad and Maulawi Fazlullah—Sufi Muhammad's son-in-law—have been mentioned as possible leaders of the group. Faqir Muhammad in November 2006 publicly pledged to continue the jihad in Afghanistan under Taliban leader Mullah Omar.

PX202

## ACTIVITIES

TNSM is a party to 2006 peace negotiations with Pakistan. Prior to the peace negotiations, the Pakistani government released nine prisoners associated with TNSM, to include Faqir Muhammad's brother and two senior clerics. On October 28, 2006, TNSM staged an anti-U.S. rally and vowed to continue to support the Taliban but agreed not to shelter foreigners. On October 30, 2006, a madrassa suspected of hosting a terrorist training camp was destroyed in a counterterrorism operation and Pakistani forces killed Maulana Liaqat, the madrassa's director and deputy for the group. At a protest rally following the operation, Faqir Muhammad declared he would continue to wage jihad, but he renewed his pledge to abide by the peace accords and not attack the Pakistani government. Faqir also denied reports that al-Qaida deputy leader Ayman al-Zawahiri was present at the madrassa. Press reports alleged TNSM was responsible for a suicide bombing on November 8 that killed 35 soldiers in Dargai, Pakistan, although the group did not claim responsibility. Pakistan security agencies have reopened investigations on members following this attack. Newspaper announcements requested certain members to appear in court and face charges filed against them under anti-terrorism laws.

## STRENGTH

Exact numbers are unknown; however, TNSM has recruited very high numbers of fighters in the past (in the thousands) and has also held demonstrations attended by several thousand people.

## LOCATION/AREA OF OPERATION

Eastern Afghanistan, Northern Pakistan – particularly Bajaur Agency and Malakand District.

## EXTERNAL AID

TNSM was founded to pursue the implementation of Sharia in the NWFP and stongly supports the Taliban. The group has also been linked to al-Qaida, especially through Faqir Muhammad who has stated that he would welcome Ayman al-Zawahiri and Usama Bin Ladin if they were to come to his area.

# TURKISH HIZBALLAH

## DESCRIPTION

Turkish Hizballah is a Kurdish Sunni Islamic terrorist organization that arose in the early 1980s in response to the Kurdistan Workers' Party (PKK)'s secularist approach of establishing an independent Kurdistan. Turkish Hizballah spent its first 10 years fighting the PKK, accusing the group of atrocities against Muslims in southeastern Turkey, where Turkish Hizballah seeks to establish an independent Islamic state.

## ACTIVITIES

Beginning in the mid-1990s, Turkish Hizballah, which is unrelated to Lebanese Hizballah, expanded its target base and modus operandi from killing PKK militants to conducting low-level bombings against liquor stores, bordellos, and other establishments the organization considered "anti-Islamic."

PX202

In January 2000, Turkish security forces killed Huseyin Velioglu, the leader of Turkish Hizballah, in a shootout at a safe house in Istanbul. The incident sparked a year-long series of counterterrorist operations against the group that resulted in the detention of some 2,000 individuals; authorities arrested several hundred of them on criminal charges. At the same time, police recovered nearly 70 bodies of Turkish and Kurdish businessmen and journalists whom Turkish Hizballah had tortured and brutally murdered during the mid-to-late 1990s. The group began targeting official Turkish interests in January 2001, when its operatives assassinated the Diyarbakir police chief in the group's most sophisticated operation to date. Turkish Hizballah has not conducted a major operation since 2001, and probably is focusing at present on recruitment, fundraising, and reorganization.

## STRENGTH

Possibly a few hundred members and several thousand supporters.

## LOCATION/AREA OF OPERATION

Primarily the Diyarbakir region of southeastern Turkey.

## EXTERNAL AID

It is widely believed that Turkey's security apparatus originally backed Turkish Hizballah to help the Turkish government combat the PKK. Alternative views are that the Turkish government ignored Turkish Hizballah activities because its primary targets were PKK members and supporters, or that the government simply had to prioritize scarce resources and was unable to wage war on both groups simultaneously. Allegations of collusion have never been laid to rest, and the Government of Turkey continues to issue denials. Turkish Hizballah also is suspected of having ties with Iran, although there is not sufficient evidence to establish a link.

# ULSTER DEFENSE ASSOCIATION/ULSTER FREEDOM FIGHTERS (UDA/UFF)

## DESCRIPTION

The Ulster Defense Association (UDA), the largest Loyalist paramilitary group in Northern Ireland, was formed in 1971 as an umbrella organization for Loyalist paramilitary groups such as the Ulster Freedom Fighters (UFF). Today, the UFF constitutes almost the entire UDA membership. The UDA/UFF declared a series of cease-fires between 1994 and 1998. In September 2001, the UDA/UFF's Inner Council withdrew its support for Northern Ireland's Good Friday Agreement. The following month, after a series of murders, bombings, and street violence, the British government ruled the UDA/UFF's cease-fire defunct. The dissolution of the organization's political wing, the Ulster Democratic Party, soon followed. In January 2002, however, the UDA created the Ulster Political Research Group to serve in a similar capacity. In October 2006, a splinter group of the UDA, calling itself Beyond Conflict, publicly announced its mission to assist former UDA members to disengage from the conflict and develop dialogue with local neighborhoods. Designated under E.O. 13224 in December 2001.

## ACTIVITIES

The UDA/UFF has evolved into a criminal organization deeply involved in drug trafficking and other moneymaking criminal activities through six largely independent "brigades." It also has been involved in murder, shootings, arson, assaults, and exiling. According to the Independent Monitoring Commission (IMC), "the UDA has the capacity to launch serious, if crude, attacks." Some UDA activities of a sectarian nature directed at the Catholic community are aimed at so-called "soft" targets, and often have taken place at the interface between the Protestant and Catholic communities, especially in Belfast.

## STRENGTH

Estimates vary from 2,000 to 5,000 members, with several hundred active in paramilitary operations.

## LOCATION/AREA OF OPERATION

Northern Ireland.

## EXTERNAL AID

Probably obtains weapons from abroad.

## ULSTER VOLUNTEER FORCE (UVF)

### DESCRIPTION

The UVF is a Loyalist terrorist group formed in 1966 to oppose liberal reforms in Northern Ireland that members feared would lead to unification of Ireland. The group adopted the name of an earlier organization formed in 1912 to combat Home Rule for Ireland. The UVF's goal is to maintain Northern Ireland's status as part of the United Kingdom; to that end, it has killed some 550 persons since 1966. The UVF and its offshoots have been responsible for some of the most vicious attacks of "The Troubles", including horrific sectarian killings like those perpetrated in the 1970s by the UVF-affiliated "Shankill Butchers." In October 1994, the Combined Loyalist Military Command, which included the UVF, declared a cease-fire, and the UVF's political wing, the Progressive Unionist Party, has played an active role in the peace process. Despite the cease-fire, the organization has been involved in a series of bloody feuds with other Loyalist paramilitary organizations, although the UVF is considering a stand-down similar to that of the Irish Republican Army. The Red Hand Defenders is linked to the UVF.

### ACTIVITIES

The UVF has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies. UVF members have been linked to recent racial attacks on minorities; however, the UVF leadership reportedly did not authorize these assaults. On occasion, it has provided advance warning to police of its attacks. Targets include nationalist civilians, Republican paramilitary groups, and, on occasion, rival Loyalist

PX202

paramilitary groups. The UVF is a relatively disciplined organization with a centralized command. The Independent Monitoring Commission has said that UVF members were responsible for the attempted murder in 2006 of Mark Haddock, a former UVF member turned police informant, and main suspect in the 1997 murder of Raymond McCord.  Additionally, UVF members are suspected of murdering one individual and attempting to murder another, but the IMC assesses these actions were not sanctioned by UVF leadership.

## STRENGTH

Unclear, but probably several hundred supporters, with a smaller number of hard-core activists. Police counterterrorist operations and internal feuding have reduced the group's strength and capabilities.

## LOCATION/AREA OF OPERATION

Northern Ireland. Some support on the UK mainland.

## EXTERNAL AID

Suspected in the past of receiving funds and arms from sympathizers overseas.

# UNITED LIBERATION FRONT OF ASSAM (ULFA)

## DESCRIPTION

Northeast India's most prominent insurgent group, ULFA, an ethnic secessionist organization in the Indian state of Assam, which borders Bangladesh and Bhutan, was founded in 1979 at Rang Ghar, during anti-foreigner agitation organized by the state's powerful students' union. The group's objective is an independent Assam. ULFA enjoyed widespread support in upper Assam in its initial years, especially from 1985 to 1992. ULFA's kidnappings, killings, and extortion led New Delhi to ban the group and start a military offensive against it in 1990, which forced it to go underground. ULFA began to lose popularity in the late 1990s after it increasingly targeted civilians, including a prominent NGO activist. It lost further support for its anti-Indian stand during the 1999 Kargil conflict. In recent years, the group has been in decline, losing popular support and suffering from aggressive counterinsurgency operations by Indian security forces. The Royal Bhutan Army's attack on ULFA camps in Bhutan in 2003, and the suspension of operations by Bodo tribal insurgent groups in Assam, also contributed to the group's decline. Despite the ban on the group, New Delhi held official talks with ULFA's representative Peace Consultative Group in October 2005, which apparently have had little effect on dampening ULFA's operations against business and government targets in 2006.

## ACTIVITIES

ULFA trains, finances, and equips its cadres for a "liberation struggle", while extortion helps finance military training and weapons purchases. ULFA conducts hit-and-run operations on security forces in Assam, selective assassinations, and explosions in public places. During the 1980s and 1990s, ULFA undertook a series of abductions and murders, particularly of businessmen. In 2000, ULFA

PX202

assassinated an Assam state minister. In 2003, ULFA killed more than 60 "outsiders" in Assam, mainly residents of the bordering state of Bihar. Some important ULFA functionaries surrendered in Assam, but incidents of violence continue, although of a lesser magnitude than in the past. In 2004, ULFA started targeting civilians and killed some 14 people in August that year.

## STRENGTH

ULFA's earlier strength of more than 3,000 dropped following the December 2003 attack on its camps in Bhutan. Total cadre strength now is estimated at several hundred, plus supporters providing safe houses and logistical and intelligence assistance.

## LOCATION/AREA OF OPERATION

ULFA is active in the state of Assam, and members transit and periodically conduct operations in parts of the neighboring states of Arunachal Pradesh, Meghalaya, and Nagaland. All ULFA camps in Bhutan are reportedly demolished.

## EXTERNAL AID

ULFA reportedly procures and trades in arms with other Northeast Indian groups.

*\* Listed on the UN 1267 Committee List.*

*ᴼ Listed on the Terrorist Exclusion List.*

*^ Designated under Executive Order 13224.*

316

PX202

# CHAPTER 7.
## LEGISLATIVE REQUIREMENTS AND KEY TERMS

**Country Reports on Terrorism 2006** is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act. Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

### EXCERPTS AND SUMMARY OF KEY STATUTORY TERMS

**Section 2656f(a) of Title 22 of the United States Code states as follows:**

(a) The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing –

    (1)  (A) detailed assessments with respect to each foreign country –

            (i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;

            (ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and

            (iii) which the Secretary determines should be the subject of such report; and

        (B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;

    (2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;

    (3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on—

PX202

(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and

(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and

(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).

**Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:**

(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;

(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and

(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

**The "7120 Report."** Section 2656f(b) requires the Department of State, to the extent feasible, to provide Congress an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act of 2004 (also known as the Intelligence Reform and Terrorist Prevention Act of 2004). The 7120 Report forms a part of the annual Country Reports on Terrorism but was provided under separate cover in 2004 and 2005. In Country Reports on Terrorism 2006, we have integrated the terrorist sanctuary reporting required under Sections 2656f(a)(1)(B) and (b)(2), with the information required under Section 7120(b).

**Interpretation and Application of Key Terms.** For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC. 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC. 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the U.S. government on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

PX202

**Statistical Information.** Pursuant to 22 USC § 2656f(b), this report must contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This requirement is satisfied through the inclusion of a statistcal annex to the report that sets out statistical information provided by the National Counterterrorism Center (NCTC). The statistical annex includes a discussion of the methodology employed by NCTC in compiling the relevant data.

This report does not contain statistical information specifically concerning combatants. The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets. Further, it would not be practicable to provide such statistics, as the government does not maintain – and would have great difficulty maintaining – statistics that distinguish between incidents against combatants by terrorist groups and by others, including insurgents, in Iraq and Afghanistan.

**Contextual Reporting.** Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists. Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations. It is terrorist groups--and their actions--that are the focus of this report.

Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw. This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence. Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily international terrorism and therefore are not subject to the statutory reporting requirement.

PX202

PX202



# National Counterterrorism Center

**Annex of Statistical Information**

April 13, 2007



PX202

## FOREWORD:

Consistent with its statutory mission to serve as the U.S. Government's knowledge bank on international terrorism, the National Counterterrorism Center (NCTC) is providing the Department of State with required statistical information to assist in the satisfaction of its reporting requirements under Section 2656f of title 22 of the U.S. Code.  The statistical information included in this Annex to the 2006 Country Reports on Terrorism is drawn from the data NCTC maintains on the www.nctc.gov website.

Section 2656f(b) of Title 22 of the U.S. Code requires the State Department to include in its annual report on terrorism "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year."  While NCTC keeps statistics on the annual number of incidents of "terrorism," its ability to track the specific groups responsible for each incident involving killings, kidnappings, and injuries is significantly limited by the availability of reliable open source information, particularly for events involving small numbers of casualties.  Moreover, specific details about victims, damage, perpetrators, and other incident elements are frequently not fully reported in open source information.

- The statistical material in this report, therefore, is drawn from the incidents of "terrorism" that occurred in 2006 as reported in open sources information, which is the most comprehensive body of information available to NCTC for compiling data that it can provide to satisfy the above-referenced statistical requirements.

In deriving its figures for incidents of terrorism, NCTC in 2005 adopted the definition of "terrorism" that appears in the 22 U.S.C. § 2656f(d)(2), i.e., "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

- Through 2004 NCTC compiled statistical data on the basis of a more limited methodology tied to the definition of "international terrorism," which is also contained in 22 U.S.C. § 2656f.

- Because of the change in methodology, 2006 data is only comparable to 2005 data compiled by NCTC, the highlights of which are contained in the 2005 Country Reports on Terrorism.

- Subject to changes in reporting statutes, NCTC anticipates that future statistics provided by it will continue to be tied to the broader definition of "terrorism."

To record and update incident records NCTC has continued to post information in the repository for the U.S. Government's database on terrorist incidents, the Worldwide Incidents Tracking System (WITS) that was unveiled in 2005.  A data management system with a more comprehensive dataset than those used in previous years, WITS is accessible on the NCTC website at www.nctc.gov for the public to have an open and transparent view of the NCTC data.   NCTC will insure that the data posted to the website is updated as often as necessary by regularly posting information about new or prior incidents.

PX202

## CONSIDERATIONS FOR INTERPRETING THE DATA

NCTC cautions against placing too much emphasis on any single set of incident data to gauge success or failure against the forces of terrorism.  Furthermore, NCTC does not believe that a simple comparison of the total number of incidents from year to year provides a meaningful measure.

- Tallying incident data necessarily involves relying exclusively on frequently incomplete and ambiguous information—information for these statistics is not derived from federal government collection programs created or operated specifically to obtain incidents data. The quality, accuracy, and volume of incident open source reporting can vary greatly from country to country.  As a result, determining whether an incident meets the NCTC criteria for a terrorist incident is often difficult and highly subjective. This is particularly true if the incident does not involve mass casualties because little information is typically available on these incidents that usually are not subject to heavy media coverage. Furthermore, in the parts of the world where there is little press coverage and little non-governmental organization presence, terrorist incidents go unreported.

- Incident tallies exclusively do not provide a complete picture of the magnitude or seriousness of the terrorism challenge confronting a country or region.  For example, that 50 percent of the incidents in the NCTC database involve no loss of life would be only one factor for assessing the danger of terrorism globally.  Moreover, different factors weigh more heavily than others in assessing the dangers posed by terrorism.  For example, an attack that kills 100 civilians is likely to be considered more alarming than an attack that damages a pipeline but harms no one; however, each attack is simply tallied as one incident.

- Counting protocols matter and inevitably require judgment calls that may have an impact on results.  For example, NCTC protocols dictate that events identified as simultaneous and coordinated would be recorded as one incident, as would be attacks that subsequently targeted first-responders.  For instance, on the morning of August 17, 2005, there were approximately 450 small bomb attacks in Bangladesh, and because they were coordinated according to a central plan, NCTC counted them as a single incident.  Other valid counting protocols would register these attacks as 450 separate attacks.

- Analyzing incident data from year-to-year to identify trends and notable deviations in the data is problematic, and not meaningful in most cases.  The availability, quality, and depth of open source reporting vary making it hard to isolate whether a rise or fall of a particular data element from one year to the next is due to an increase or decrease of this open source reporting or whether actual events are behind the change in the data.

Despite these limitations, tracking and analyzing incidents can help us understand some important characteristics about terrorism, including the geographic distribution of incidents and information about the perpetrators, their victims, and other details about an attack.  Year-to-year changes in the gross number of incidents across the globe, however, may tell us little about the international community's effectiveness either for preventing these incidents, or for reducing the capacity of terrorists to advance their agenda through violence against the innocent.

PX202

## METHODOLOGY UTILIZED TO COMPILE NCTC'S DATABASE OF TERRORIST INCIDENTS

For compiling 2005 results, NCTC, working with a panel of terrorism experts, adopted a revised methodology for counting terrorist incidents, basing it on the broader statutory definition of "terrorism" rather than that of "international terrorism,"[1] on which the NCTC based its incident counting in previous years.   For 2006, we continued using this broader definition of "terrorism" and overall this broader definition and improvements in cataloging have resulted in a larger, more comprehensive set of incident data, all of which can now be found on NCTC's website, www.nctc. gov.

The data provided on the website is based on the statutory definition set forth in the Developing Statistical Information section to this Annex.  Accordingly, the incidents NCTC has catalogued in the database are those that, based on available open source information, meet the criteria for "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."   Determination of what constitutes an incident of terrorism, however, is sometimes based on incomplete information and may be open to interpretation.  The perpetrator's specific motivation, whether political or otherwise, is not always clear, nor is the perpetrator's identity always evident.  Moreover, additional information may become available over time, affecting the accuracy of initial judgments about incidents. Users of this database should therefore recognize that expert opinions may differ on whether a particular incident constitutes terrorism or some other form of political violence.

NCTC has made every effort to limit the degree of subjectivity involved in the judgments.  In the interests of transparency NCTC has adopted counting rules that require that terrorists must have initiated and executed the attack for it to be included in the database; foiled attacks, as well as hoaxes, are not included in the database.  Spontaneous (i.e. non-premeditated) hate crimes without intent to cause mass casualties are excluded to the greatest extent practicable.

## WHAT IS A "NONCOMBATANT"?

Under the statutory definition of terrorism that NCTC uses to compile its database, the victim must be a "noncombatant."  However, that term is left open to interpretation by the statute.  For the purposes of the WITS database, the term "combatant" was interpreted to mean military, para-military, militia, and police under military command and control, in specific areas or regions where war zones or war-like settings exist.  Further distinctions were drawn depending on the particular country involved and the role played by the military and police, e.g., where national security forces are indistinguishable from police and/or military forces.  Noncombatants therefore included civilians and civilian police and military assets outside of war zones and war-like settings.  Diplomatic assets, including personnel, embassies, consulates, and other facilities, were also considered noncombatant targets.

Although only acts of violence against noncombatant targets were counted as terrorism incidents for purposes of the WITS database, if those incidents also resulted in the death of combatant victims, all victims (combatant and noncombatant) were tallied.   In an incident where combatants were the target of the event, non-combatants who were incidentally harmed were designated

---

1   Users who wish to determine the number of incidents of "international terrorism" (i.e., incidents that involve the territory or citizens of two or more countries) will find these incidents included in the WITS database.

PX202

"collateral" and the incident excluded from the posted data set.  For example, if terrorists attacked a military base in Iraq and wounded one civilian bystander, that victim would be deemed collateral, and the incident would not be counted.

In the cases of Iraq and Afghanistan, it is particularly difficult to gather comprehensive information about all incidents and to distinguish terrorism from the numerous other forms of violence, including crime and sectarian violence, in light of imperfect information.  The distinction between terrorism and insurgency in Iraq is especially challenging, as Iraqis participate in the al-Qaida in Iraq and other terrorists network as well as in tribal and sectarian violence.  Therefore, some combatants may be included as victims in some incidents when their presence was incidental to an attack intended for noncombatants.  We note, however, that because of the difficulty in gathering data on Iraq and Afghanistan, the dataset does not provide a comprehensive account of all incidents of terrorism in these two countries.

## WHAT IS "POLITICALLY MOTIVATED VIOLENCE"?

The statutory definition also requires the attack to be "politically motivated."  NCTC has adopted a series of counting rules to assist in the data compilation.   Any life threatening attack or kidnap-ping by any "Foreign Terrorist Organization" or group appearing on the list of "Other Organizations of Concern" is deemed politically motivated.  Similarly, any serious attack by any organization or individual against a Government/Diplomatic official or a Government/Diplomatic building is deemed politically motivated and is therefore considered terrorism.  On the other hand, any attack that is primarily criminal or economic in nature or is an instance of mob violence is considered not to be "politically motivated."  Similarly, any terrorist organization actions that are primarily intended to enable future terrorist attacks (robbing a bank or selling narcotics for the purpose of raising money, for example) are not considered terrorism.

In between these relatively clear-cut cases, there is a degree of subjectivity.  In general, NCTC counting rules consider that attacks by unknown perpetrators against either unknown victims or infrastructure are not demonstrably political and therefore are not terrorism.  However, there are exceptions to this general rule:  if such an attack occurs in areas in which there is significant insur-gency, unrest, or political instability, the attack may be considered terrorism; or if the attack occurs in a region free of such political violence, but involves something more than a shooting (for instance, improvised explosive device, beheading, etc.), the attack may, depending on the circumstances, be considered terrorism.  Finally, if low level attacks against noncombatant targets begin to suggest the existence of a chronic problem, the attacks may be considered terrorism.

PX202

## INCIDENTS OF TERRORISM WORLDWIDE[2]*

|  | 2005 | 2006 |
|---|---|---|
| Incidents of terrorism worldwide | 11,153 | 14,338 |
| Incidents resulting in death, injury, or kidnapping of at least one individual | 8,028 | 11,170 |
| Incidents resulting in death of at least one individual | 5,135 | 7,332 |
| Incidents resulting in the death of zero individuals | 6,018 | 7,007 |
| Incidents resulting in the death of only one individual | 2,881 | 4,091 |
| Incidents resulting in the death of at least 10 individuals | 228 | 291 |
| Incidents resulting in the injury of at least one individual | 3,838 | 5,718 |
| Incidents resulting in the kidnapping of at least one individual | 1,152 | 1,334 |
| Individuals worldwide killed, injured or kidnapped as a result of incidents of terrorism | 74,217 | 74,543 |
| Individuals worldwide killed as a result of incidents of terrorism | 14,618 | 20,498 |
| Individuals worldwide injured as a result of incidents of terrorism | 24,761 | 38,191 |
| Individuals worldwide kidnapped as a result of incidents of terrorism | 34,838 | 15,854 |

Incidents of Terrorism in Iraq and Afghanistan*

|  | 2005 | 2006 |
|---|---|---|
| Incidents of terrorism in Iraq | 3,468 | 6,630 |
| Incidents in Iraq resulting in death, injury, or kidnapping of at least one individual | 2,834 | 6,026 |
| Individuals in Iraq killed, injured, or kidnapped as a result of incidents of terrorism | 20,685 | 38,813 |
| Incidents of terrorism in Afghanistan | 491 | 749 |
| Incidents in Afghanistan resulting in death, injury, or kidnapping of at least one individual | 366 | 555 |
| Individuals in Afghanistan killed, injured, or kidnapped as a result of incidents of terrorism | 1,540 | 2,943 |

---

2      *In all cases limited to incidents targeting noncombatants.  The 2005 numbers were updated since last year's publication.  Updates are available on the Worldwide Incidents Tracking System at <www.nctc.gov>

**PX202**

**NCTC OBSERVATIONS RELATED TO TERRORIST INCIDENTS STATISTICAL MATERIAL**

Approximately 14,000 terrorist attacks occurred in various countries during 2006, resulting in over 20,000 deaths.  Compared to 2005, attacks rose by 3,000, a 25 percent increase in 2006 while deaths rose by 5,800, a 40 percent increase.  As was the case last year, by far the largest number of reported terrorist incidents and deaths occurred in the Near East and South Asia.  These two regions also were the locations for 90 percent of all the 290 high casualty attacks that killed 10 or more people—only a total of five high casualty attacks occurred in Europe-Eurasia, East Asia-Pacific, and the Western Hemisphere.

- Of the 14,000 reported attacks, 45 percent—about 6600—of them occurred in Iraq where approximately 13,000 fatalities—65 percent of the worldwide total—were reported for 2006.

- Violence against non-combatants in eastern and sub-Saharan Africa, particularly related to attacks associated with turmoil in or near Sudan and Nigeria, rose 65 percent in 2006, rising to 420 from the approximately 253 attacks reported for 2005.

- The 749 attacks in Afghanistan during 2006 are over 50 percent more than the 491 attacks reported for 2005 as fighting intensified during the past year.

- The number of reported incidents in 2006 fell for Europe and Eurasia by 15 percent from 2005, for South Asia by 10 percent, and for the Western Hemisphere by 5 percent.  No high casualty attacks occurred in Western Europe, and only two occurred in Southeast Asia, in the southern Philippines.  There were no high casualty attacks and 95 percent fewer victims of terror in 2006 in Indonesia that was attributable, at least in part, to enhanced Indonesian security measures.

The number injured during terrorist incidents rose substantially in 2006, as compared with 2005, by 54 percent, with most of the rise stemming from a doubling of the reported number of injuries in Iraq since 2005.  Although kidnappings in Iraq during 2006 rose sharply by 300 percent, kidnappings overall declined by more than 50 percent in 2006 due to a large drop of approximately 22,000 kidnappings in Nepal where peace discussions during the year apparently curtailed hostage taking.

**ATTACKERS**

The perpetrators of over 9,000 terrorist attacks in 2006 could not be determined from open source information.  Of the remaining incidents, as many as 290 various subnational groups—many of them well-known foreign terrorist organizations—or clandestine agents were connected to an attack in various ways, including as a claimant, as the accused, and as the confirmed perpetrator.  In most instances, open source reporting contains little confirmed or corroborating information that identifies the organizations or individuals responsible for a terrorist attack.  In many reports, attackers are alleged to be tied to local or well-known terrorist groups but there is little subsequent reporting that verifies these connections.  Moreover, pinpointing attackers becomes even more difficult as extremist groups splinter or merge with others, make false claims, or deny allegations.

PX202

- According to open source reports, Sunni extremists, more than any other subnational group, claimed they conducted the largest number of incidents with the highest casualty totals.

- Sunni extremists in various countries carried out about the same number of high fatality attacks in 2006 but with deadlier results, and were involved in more kidnappings than these extremists reportedly carried out in 2005.

Although no terrorist attack occurred last year that approached the sophistication of planning and preparations that were characteristic of the 9/11 attacks, open source reporting alleges that al-Qaida leaders played an important role in steering the airline hijacking plot in the United Kingdom that was disrupted in August. Reporting points to a steadfast al-Qaida that is planning attacks in northwest Pakistan, and was able to expand its propaganda campaign in 2006 to invigorate supporters, win converts, and gain recruits while its al-Qaida in Iraq associates and other linked groups carried out several successful attacks.

- Al-Qaida in the Arabian Peninsula conducted the first-ever terrorist attack against a Saudi Arabia oil facility at the major oil processing plant at Abqaiq on 24 February 2006. Security forces, suffering a few casualties, prevented the attackers from damaging processing capabilities.

- According to open sources, al-Qaida senior leadership approved the merger with the Salafist Group for Preaching and Combat (GSPC), which conducted its first attack against a US target at La Trappe, Algeria on 10 December. The GSPC remotely detonated a bomb that struck a bus and wounded one of the US passengers who worked for a US company, and subsequently the attackers used small arms to fire bullets at the bus, killing or wounding 9 non-US civilians.

## TYPES OF ATTACKS

As was the case in 2005, in 2006 most attacks were perpetrated by terrorists applying conventional fighting methods that included using bombs and weapons, such as small arms. However, technology continues to empower terrorist and effective methods of attack continue to be developed by them to offset countermeasures. Terrorists continued their practice of coordinated attacks that included secondary attacks on first responders at attack sites, and they uniquely configured weapons and other materials to create improvised explosive devices.

- While bombing incidents increased by 30 percent from those in 2005, the death tolls in these incidents during 2006 rose by 39 percent and injuries by 45 percent. The use of suicide bombing attacks overall fell 12 percent, most notably in the use of suicide car bombers. However, suicide bombers operating outside of vehicles increased by 25 percent, and the ability of these attackers to penetrate large concentrations of people and then detonate their explosives probably accounted for the increase in lethality of bombings in 2006.

- A new CBRN terrorist attack method in Iraq emerged in 2006. According to an Iraqi Interior Ministry explosive expert, a large vehicle-borne IED (VBIED) attack that included chemicals in Sadr City on 23 November signaled a dangerous strategic shift in tactics for 2007 that features the use of chemical weapons.

328

PX202

## VICTIMS AND TARGETS OF ATTACKS

As was the case in 2005, Muslims again bore a substantial share of being the victims of terrorist attacks in 2006.

- Approximately 58,000 individuals worldwide were either killed or injured by terrorist attacks in 2006.  Based upon a combination of reporting and demographic analysis of the countries involved, well over 50 percent of the victims were Muslims, and most were victims of attacks in Iraq.

Open source reporting identifies approximately 70 percent of the 58,000 killed or injured victims of terror as simply civilians, and therefore actual tallies of significant types of victims cannot be specifically determined. However, the reporting does yield some insights about the demographics of these victims.

- Government officials such as leaders, police, department personnel, paramilitary personnel such as guards, were reported 20 percent more often, rising from approximately 9,500 in 2005 to just over 11,200 in 2006. More specifically, police victims were reported more often, their total rising more than 20 percent, from over 6,500 in 2005 to over 8,200 in 2006.

- More killings of educators were reported in 2006; 148 deaths were highlighted in 2006 reporting as compared to 96 last year.  Reporting of student victims increased over 320 percent to over 430 either killed or injured in attacks, and reports of teachers as victims also increased by over 45 percent reaching 214 either killed or injured in attacks.

- Children were also reported more often as victims in 2006, up by more than 80 percent, with over 1,800 children either killed or injured in terrorist attacks.

- More attacks involving journalists were reported, an increased of 5 percent, yet in those attacks more journalist deaths and injuries were reported in 2006, an increase of 20 percent.

In addition to the human toll, 19,500 facilities were struck or were the target during terrorist attacks last year.  For both 2005 and 2006, the most common types of properties damaged or destroyed during an incident were vehicles and residences, which were hit in about 27 and 12 percent of the incidents in each year, respectively.   The percentage of incidents that included other types of property damage or destruction, such as those associated with energy, transportation, education, government, and other enterprises, remain unchanged at single digit levels with a few notable exceptions.

- Approximately 350 Mosques were targeted or struck during an attack in 2006, in most cases by Islamic extremists, representing over a three-fold increase from 2005.  The attack against the Shia Golden Dome Mosque in Iraq, attributed to al-Qaida in Iraq, triggered a watershed of escalating sectarian violence in Iraq.

- Fewer incidents involved civil aircraft and airports, resulting in less damage to either one in 2006.

- Electoral polling stations saw over an 80 percent drop in attacks by terrorists in 2006.

PX202

## AN ACADEMIC'S PERSPECTIVE OF STATISTICAL DATA

*"In this short note, which was invited by NCTC, I highlight some of the challenges encountered in producing credible data on terrorist incidents. The WITS database strikes me as a particularly useful resource to use to evaluate trends in terrorist activity, to infer patterns in terrorists' methods in order to take the best possible precautions, and to test hypotheses concerning the causes of terrorism. With these applications in mind, there are three areas in which the WITS data deserve partic-ular attention: Definition, measurement and significance.  The definition is missing two important pieces, whether or not an attack is international or domestic, and political violence 'usually intended to influence an audience.'  Measurement of the error rate in the WITS data is important to understand.  Statistical techniques used by other government statistical agencies could be adopted to measure the rate of error, comprehensiveness, and consistency of the WITS data. These measures will facilitate use of the WITS data by researchers and highlight areas where the data are weak. Providing measures of significance of events (e.g., a terrorist Richter scale running from 1 to 5) and coder confidence would be particularly useful.  The collection and provision of data like the WITS is a quintessential public good, and NCTC is the most appropriate government agency to collect such data."*

**—Alan B. Krueger** Princeton University
April 11, 2007

*The full letter of Dr. Krueger is available in the 2006 NCTC Report on Terrorist Incidents, available via the Internet at www.nctc.gov.*

PX202

## TERRORISM DEATHS, INJURIES, KIDNAPPINGS OF PRIVATE U.S. CITIZENS, 2006*

Provided by the Bureau of Consular Affairs, U.S. Department of State

The term "Private U.S. Citizen" refers to any U.S. citizen not acting in an official capacity on behalf of the U.S. Government; therefore these figures do not include, for example, U.S. military personnel killed or injured in a terrorism-related incident while on active duty or employees of the Department of State and other federal agencies. Members of U.S. Government employees' households are considered private U.S. citizens.

Although every effort was made to include all terrorism-related deaths and injuries involving private U.S. citizens, the figures below reflect only those cases reported to, or known by, the U.S. Department of State, and may not reflect actual numbers of injured, which may not always be reported depending on their severity. As NCTC also notes, in the cases of Iraq and Afghanistan, it is particularly difficult to gather comprehensive information about all incidents and to distinguish terrorism from the numerous other forms of violence.

| | |
|---|---|
| U.S. citizens worldwide killed as a result of incidents of terrorism: | 28 |
| U.S. citizens worldwide injured as a result of incidents of terrorism: | 27 |
| U.S. citizens worldwide kidnapped as a result of incidents of terrorism: | 12 |

*In all cases limited to incidents targeting noncombatants.

## TERRORISM DEATHS OF PRIVATE U.S. CITIZENS IN 2006 (BY COUNTRY)

**AFGHANISTAN:**

| Date of Death | Number | Location |
|---|---|---|
| May 18, 2006 | 1 | Islam Qal, Herat, Afghanistan |
| December 6, 2006 | 2 | Kandahar, Afghanistan |

**IRAQ:**

| Date of Death | Number | Location |
|---|---|---|
| January 6, 2006 | 1 | Nasiriyah, Iraq |
| January 16, 2006 | 1 | Baghdad, Iraq |
| January 18, 2006 | 2 | Basrah, Iraq |
| February 11, 2006 | 1 | Baghdad, Iraq |
| March 9, 2006 | 1 | Baghdad, Iraq |
| March 14, 2006 | 1 | Tal Afar, Iraq |

331

PX202

**IRAQ CONTINUED:**

| Date of Death | Number | Location |
| --- | --- | --- |
| March 20, 2006 | 1 | Baghdad, Iraq |
| May 3, 2006 | 1 | Tallil, Iraq |
| May 7, 2006 | 1 | Balad-Tahwilla, Iraq |
| May 8, 2006 | 1 | Near Rustamiyah, Iraq |
| August 17, 2006 | 1 | North of Tallil, Iraq |
| August 18, 2006 | 1 | Baghdad, Iraq |
| August 28, 2006 | 1 | Baji, Iraq |
| September 17, 2006 | 1 | Hawijah, Iraq |
| September 22, 2006 | 1 | Basrah, Iraq |
| October 4, 2006 | 1 | Baghdad, Iraq |
| October 11, 2006 | 1 | Tikrit, Iraq |
| October 22, 2006 | 1 | Baghdad, Iraq |
| November 2, 2006 | 1 | Baghdad, Iraq |
| November 13, 2006 | 1 | Baghdad, Iraq |
| December 21, 2006 | 1 | Baghdad, Iraq |

**ISRAEL, GAZA, AND THE WEST BANK:**

| Date of Death | Number | Location |
| --- | --- | --- |
| May 14, 2006 | 1 | Tel Aviv, Israel |

**PAKISTAN:**

| Date of Death | Number | Location |
| --- | --- | --- |
| March 2, 2006 | 1 | Karachi, Pakistan |

**THAILAND:**

| Date of Death | Number | Location |
| --- | --- | --- |
| September 16, 2006 | 1 | Hat Yai, Thailand |

PX202

# TERRORISM INJURIES OF PRIVATE U.S. CITIZENS IN 2006 (BY COUNTRY)

**AFGHANISTAN:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| April 7, 2006 | 2 | Lashkargar Province, Afghanistan |
| May 18, 2006 | 2 | Islam Qal, Herat, Afghanistan |

**ALGERIA:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| December 10, 2006 | 1 | Algiers, Algeria |

**EGYPT:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| April 24, 2006 | 5 | Dahab, Sinai, Egypt |

**INDIA:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| July 11, 2006 | 1 | Srinagar, India |
| August 16, 2006 | 5 | Imphal, India |

**IRAQ:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| January 18, 2006 | 1 | Basra, Iraq |
| January 29, 2006 | 1 | Taji, Iraq |
| May 18, 2006 | 2 | Herat, Iraq |
| May 29, 2006 | 1 | Baghdad, Iraq |
| October 24, 2006 | 1 | Keokuk, Iraq |
| December 21, 2006 | 1 | Baghdad, Iraq |

PX202

**ISRAEL, GAZA, AND THE WEST BANK:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| April 17, 2006 | 1 | Tel Aviv, Israel |
| October 11, 2006 | 1 | Nobles, the West Bank |

**RUSSIA:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| January 11, 2006 | 1 | Moscow, Russia |

**THAILAND:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| September 16, 2006 | 1 | Hat Yai, Thailand |

## TERRORISM KIDNAPPINGS OF PRIVATE U.S. CITIZENS IN 2006 (BY COUNTRY)

**AFGHANISTAN:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| March 30, 2006^ | 1 | Near Gresham, Afghanistan |

**IRAQ:**

| Date of Incident | Number | Location |
| --- | --- | --- |
| March 30, 2006^ | 1 | Baghdad, Iraq |
| July 9, 2006^ | 1 | Baghdad, Iraq |
| August 5, 2006^ | 1 | Baghdad, Iraq |
| November 16, 2006 | 4 | Aswan, Iraq |

PX202

**ISRAEL, GAZA, AND THE WEST BANK:**

| Date of Incident | Number | Location |
|---|---|---|
| June 10, 2006^ | 1 | Nobles, the West Bank |
| August 27, 2006^ | 1 | Gaza City, Gaza |

**NIGERIA:**

| Date of Incident | Number | Location |
|---|---|---|
| January 30, 2006^ | 1 | Offshore the Niger Delta, Nigeria |
| August 23, 2006^ | 1 | Port Harcourt, Nigeria |

*^Date rescued/released.*

335

PX202

PX202

PX203

# Country Reports on Terrorism 2007

**April 2008**

United States Department of State Publication
Office of the Coordinator for Counterterrorism
Released April 2008

PX203

*Country Reports on Terrorism 2007* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the ―Act‖), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

# COUNTRY REPORTS ON TERRORISM 2007

# Table of Contents

**Chapter 1.  Strategic Assessment**

**Chapter 2.  Country Reports**

> **Africa Overview**
> > Trans-Sahara Counterterrorism Partnership
> > The African Union
> > Angola
> > Botswana
> > Burkina Faso
> > Burundi
> > Comoros
> > Cote D'Ivoire
> > Djibouti
> > Eritrea
> > Ethiopia
> > Kenya
> > Liberia
> > Madagascar
> > Mali
> > Mauritania
> > Nigeria
> > Rwanda
> > Senegal
> > Somalia
> > South Africa
> > Tanzania
> > Uganda
> > Zambia
> > Zimbabwe

> **East Asia and Pacific Overview**
> > Australia
> > Burma
> > Cambodia
> > China
> > > o   Hong Kong

PX203

o   Macau
Indonesia
Japan
Republic of Korea
Laos
Malaysia
Mongolia
New Zealand
Philippines
Singapore
Taiwan
Thailand

**Europe Overview**
Albania
Armenia
Austria
Azerbaijan
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Kosovo
Latvia
Lithuania
Macedonia
Malta
Moldova
The Netherlands
Norway
Poland
Portugal
Romania

PX203

Russia
Serbia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Turkey
Ukraine
United Kingdom
- Northern Ireland

**Middle East and North Africa Overview**
Algeria
Bahrain
Egypt
Iraq
Israel, West Bank, and Gaza
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**South and Central Asia Overview**
Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyzstan
Nepal
Pakistan
Sri Lanka
Tajikistan
Turkmenistan
Uzbekistan

**Western Hemisphere Overview**
Tri-Border Area
Argentina

PX203

Belize
Bolivia
Brazil
Canada
Chile
Colombia
Dominican Republic
Ecuador
El Salvador
Guatemala
Honduras
Mexico
Nicaragua
Panama
Paraguay
Peru
Suriname
Trinidad and Tobago
Uruguay
Venezuela

## Chapter 3.  State Sponsors of Terrorism Overview

Cuba
Iran
North Korea
Sudan
Syria

## Chapter 4. The Global Challenge of  WMD Terrorism

## Chapter 5. Terrorist Safe Havens (7120 Report)

1.  Terrorist Safe Havens/Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
    1a. International Conventions and Protocols Matrix
2.  Support for Pakistan
3.  Collaboration with Saudi Arabia
4.  Struggle of Ideas in the Islamic World
5.  Outreach through Foreign Broadcast Media
6.  Visas for Participants in United States Programs
7.  Basic Education in Muslim Countries
8.  Economic Reform

## Chapter 6.  Terrorist Organizations

Abu Nidal Organization (ANO)
Abu Sayyaf Group
Al-Aqsa Martyrs Brigade

5

PX203

Ansar al-Sunnah
Armed Islamic Group (GIA)
Asbat al-Ansar
Aum Shinrikyo
Basque Fatherland and Liberty (ETA)
Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
HAMAS
Harakat ul-Mujahadin (HUM)
Hizballah
Islamic Jihad Group (IJG)
Islamic Movement of Uzbekistan (IMU)
Jaish-e-Mohammed (JEM)
Jemaah Islamiya Organization (JI)
Al-Jihad
Kahane Chai (Kach)
Kongra-Gel (formerly PKK)/People's Defense Force Lashkar e-Tayyiba
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Libyan Islamic Fighting Group (LIFG)
Moroccan Islamic Combatant Group (GICM)
Mujahadin-e Khalq Organization (MEK)
National Liberation Army (ELN)
Palestine Liberation Front (PLF)
Palestinian Islamic Jihad (PIJ)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qaʻida
Al-Qaʻida in Iraq
Al-Qaʻida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Nuclei (RN)
Revolutionary Organization 17 November (17N)
Revolutionary People's Liberation Party/Front (DHKP/C)
Shining Path (SL)
United Self-Defense Forces of Colombia (AUC)

**Chapter 7. Legislative Requirements and Key Terms**

**NCTC Statistical Annex**

**Supplement on Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens**

PX203

# Chapter 1
# Strategic Assessment

This chapter highlights terrorism trends and ongoing issues in 2007 to provide a framework for detailed discussion in later chapters.

| TRENDS IN 2007 |
|---|

**AL-QA'IDA AND ASSOCIATED TRENDS:**  Al-Qa'ida (AQ) and associated networks remained the greatest terrorist threat to the United States and its partners in 2007. It has reconstituted some of its pre-9/11 operational capabilities through the exploitation of Pakistan's Federally Administered Tribal Areas (FATA), replacement of captured or killed operational lieutenants, and the restoration of some central control by its top leadership, in particular Ayman al-Zawahiri. Although Usama bin Ladin remained the group's ideological figurehead, Zawahiri has emerged as AQ's strategic and operational planner.

AQ and its affiliates seek to exploit local grievances for their own local and global purposes. They pursue their own goals, often at large personal cost to the local population. These networks are adaptive, quickly evolving new methods in response to countermeasures. AQ utilizes terrorism, as well as subversion, propaganda, and open warfare; it seeks weapons of mass destruction in order to inflict the maximum possible damage on anyone who stands in its way, including other Muslims and/or elders, women, and children.

Despite the efforts of both Afghan and Pakistani security forces, instability, coupled with the Islamabad brokered ceasefire agreement in effect for the first half of 2007 along the Pakistan-Afghanistan frontier, appeared to have provided AQ leadership greater mobility and ability to conduct training and operational planning, particularly that targeting Western Europe and the United States. Numerous senior AQ operatives have been captured or killed, but AQ leaders continued to plot attacks and to cultivate stronger operational connections that radiated outward from Pakistan to affiliates throughout the Middle East, North Africa, and Europe.

2007 was marked by the affiliation of regional insurgent groups with AQ, notably the growing threat in North Africa posed by the Algerian Salafist Group for Preaching and Combat's (GSPC) September 2006 merger with AQ, which resulted in GSPC renaming itself al-Qa'ida in the Islamic Maghreb (AQIM). AQIM is still primarily focused on the Algerian government, but its target set is broader than it was prior to the merger. For example, AQIM claimed responsibility for the near-simultaneous December 11 bombings of the Algerian Constitutional Council and the United Nations headquarters in Algeria; building upon previous attacks on foreign vehicles and AQIM statements, the attack on the UN underlined that AQIM now considers foreign interests to be attractive targets. In April, AQIM launched suicide attacks for the first time and vowed to use them as a primary tactic against their enemies. In 2007, AQIM carried out eight suicide attacks that resulted in large numbers of government and civilian casualties. The suicide bombers used by AQIM are typically recruited from easily exploitable groups, such as teenagers in the July 11 and September 8 attacks, or the elderly and terminally ill, as in the December 11 UN attack. The Libyan Islamic Fighting Group's (LIFG) November 2007 merger with AQ, on the other hand,

PX203

has yielded few successful attacks to date, reflecting the depleted capabilities of LIFG within Libya. *(See Chapter 6, Terrorist Organizations, for further information on AQIM and LIFG.)*

At the same time, the alliance of convenience and mutual exploitation between al-Qa'ida in Iraq (AQI) and many Sunni populations there has deteriorated. The Baghdad Security Plan, initiated in February, along with assistance from primarily Sunni tribal and local groups has succeeded in reducing violence to late 2005 levels, has disrupted and diminished AQI infrastructure, and has driven some surviving AQI fighters from Baghdad and Al Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. While AQI remained a threat, new initiatives to cooperate with tribal and local leaders in Iraq have led to Sunni tribes' and local citizens' rejection of AQI and its extremist ideology. The continued growth and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar, Diyala Provinces, and elsewhere have turned against the terrorist group and were cooperating with the Iraqi government and Coalition Forces to defeat AQI.

The late 2006 Ethiopian invasion of Somalia and subsequent deployment of AU forces there have kept AQ East Africa leadership, and elements of the Council of Islamic Courts that harbored them, on the run. Intense militancy against the Ethiopian and Transitional Federal Government (TFG) forces continued, reinforcing the early 2007 call to action by AQ through Ayman al-Zawahiri. In an Internet video released in January 2007, al-Zawahiri urged all mujahedin, specifically those in the Maghreb, to extend support to Somali Muslims in a holy war against the occupying Ethiopian forces.

Throughout 2007, AQ increased propaganda efforts seeking to inspire support in Muslim populations, undermine Western confidence, and enhance the perception of a powerful worldwide movement. Terrorists consider information operations a principal part of their effort. Use of the Internet for propaganda, recruiting, fundraising and, increasingly, training, has made the Internet a ―virtual safe haven.‖ International intervention in Iraq continued to be exploited by AQ as a rallying cry for radicalization and terrorist activity, as were other conflicts such as Afghanistan and Sudan. The international community has yet to muster a coordinated and effectively resourced program to counter extremist propaganda.

2007 witnessed the continuation of the transition from expeditionary to guerilla terrorism highlighted in *Country Reports on Terrorism 2006*. Through intermediaries, web-based propaganda, exploitation of local grievances, and subversion of immigrant and expatriate populations, terrorists inspired local cells to carry out attacks which they then exploit for propaganda purposes. We have seen a substantial increase in the number of self-identified groups with links (communications, training, and financial) to AQ leadership in Pakistan. These ―guerilla‖ terrorist groups harbor ambitions of a spectacular attack, including acquisition and use of Weapons of Mass Destruction.

**TALIBAN and other insurgent groups and criminal gangs**:  Afghanistan remained threatened by Taliban and other insurgent groups and criminal gangs, some of whom were linked to AQ and terrorist sponsors outside the country. Taliban insurgents murdered local leaders and attacked Pakistani government outposts in the Federally Administered Tribal Areas (FATA) of Pakistan. The Government of Pakistan's long term three-pronged (security, economic and political) FATA

8

PX203

Strategy was designed to eliminate Taliban and AQ safe havens along the Pakistan-Afghanistan frontier.

The Government of Afghanistan continued to strengthen its national institutions and polls indicated the majority of Afghans believed they were better off than they were under the Taliban. The international community's assistance to the Afghan government to build counterinsurgency capabilities, ensure legitimate and effective governance, and counter the surge in narcotics cultivation is essential to the effort to defeat the Taliban and other insurgent groups and criminal gangs.

**STATE SPONSORS OF TERRORISM**:  State sponsorship of terrorism continued to undermine efforts to eliminate terrorism. Iran remained the most significant state sponsor of terrorism. A critically important element of Iranian national security strategy is its ability to conduct terrorist operations abroad. Iranian leaders believe this capability helps safeguard the regime by deterring United States or Israeli attacks, distracting and weakening the United States, enhancing Iran's regional influence through intimidation, and helping to drive the United States from the Middle East. Hizballah, a designated Foreign Terrorist Organization, is key to Iran's terrorism strategy. Iran also continued to threaten its neighbors and destabilize Iraq by providing weapons, training, and funding to select Iraqi Shia militants. These proxy groups perpetrate violence and cause American casualties in Iraq. Hizballah, supported by Iran and Syria, continued to undermine the elected Government of Lebanon and remained a serious security threat. Foreign terrorists continued to transit Syria en route to and from Iraq; a report to Congress stated that nearly 90 percent of all foreign fighters entering Iraq are transiting from Syria. In addition, the Government of Iran has recently begun an effort to expand commercial and diplomatic ties throughout the Western Hemisphere. Iran has, in the past, used diplomatic missions to support the activities of Hizballah operatives.

**OTHER TERRORIST GROUPS**:  The ongoing political stalemate in Lebanon has contributed to enabling suspected foreign extremist militants to set up operational cells within the Palestinian refugee camps, such as Fatah al Islam (FAI) in Nahr el-Barid. While the Lebanese Armed Forces defeated FAI militants after a three-month battle (May 20 – September 2), some of its members remained at large while other Palestinian militant groups continued to capitalize on the lack of government control within the camps. Some of these groups, such as the al-Qa'ida-associated Asbat al-Ansar and Jund al-Sham, were able to find a safe haven within the camps, most notably in the Ain el-Hilwah camp.

Terrorist activity emanating from the the Palestinian territories also remained a key destabilizing factor and a cause for concern.

In Colombia, the FARC exemplified another trend: growing links between terrorist and other criminal activity. The FARC, which continued to hold hundreds of hostages, including three American citizens captive for more than four years, raised more than an estimated $60 million per year from narcotics trafficking. Terrorist activities and support for terrorist infrastructure are funded by contributions from individuals, false charities and front organizations, but also increasingly through other illicit activities such as trafficking in persons, smuggling, and

PX203

narcotrafficking. We also have seen increasing evidence of trafficking in persons network facilitators being employed to facilitate terrorist movement, particularly into Iraq.

## DEFEATING AN AGILE TERRORIST ENEMY

Responding to terrorist groups that have many of the characteristics of a global insurgency – propaganda campaigns, grass roots support, and political and territorial ambitions, though ill-defined, requires a comprehensive response. Successful methods include a focus on protecting and securing the population; and politically and physically marginalizing the insurgents, winning the support and cooperation of at-risk populations by targeted political and development measures, and conducting precise intelligence-led special operations to eliminate critical enemy elements with minimal collateral damage.

There were significant achievements in this area this year against terrorist leadership targets, notably the capture or killing of key terrorist leaders in Pakistan, Ethiopia, Iraq, and the Philippines. These efforts buy us time to carry out the most important elements of a comprehensive counterterrorist strategy: disrupting terrorist operations, including their communications, propaganda and subversion efforts; planning and fundraising; and eliminating the conditions that terrorists exploit. We must seek to build trusted networks of governments, multilateral institutions, business organizations, and private citizens and organizations that work collaboratively to defeat the threat from violent extremism.

Working with allies and partners across the world, we have created a less permissive operating environment for terrorists, keeping leaders on the move or in hiding, and degrading their ability to plan and mount attacks. Canada, Australia, the United Kingdom, Germany, Spain, Jordan, the Philippines, Pakistan, Afghanistan, Iraq, and many other partners played major roles in this success. Dozens of countries have passed new counterterrorism legislation or strengthened pre-existing laws that provide their law enforcement and judicial authorities with new tools to bring terrorists to justice. The United States has expanded the number of foreign partners for the sharing of terrorist screening information, which is a concrete tool for disrupting and tracking travel of known and suspected terrorists. Saudi Arabia has implemented an effective model rehabilitation program for returning jihadis to turn them against violent extremism and to reintegrate them as peaceful citizens.

Through the Regional Strategic Initiative, the State Department and other United States agencies are working with Ambassadors overseas in key terrorist theaters of operation to assess the threat and devise collaborative strategies, action plans, and policy recommendations. We have made progress in organizing regional responses to terrorists who operate in ungoverned spaces or across national borders. This initiative has produced better intra-governmental coordination among United States government agencies, greater cooperation with and between regional partners, and improved strategic planning and prioritization, allowing us to use all tools of statecraft to establish long-term measures to marginalize terrorists. (*See Chapter 5, Terrorist Safe Havens (7120 Report) for further information on the Regional Strategic Initiative and on the tools we are using to address the conditions that terrorists exploit.*)  2007 witnessed improvement in capacity and cooperation on such key issues as de-radicalization, border

PX203

controls, document security, interdiction of cash couriers, and biometrics and other travel data sharing. (*See Chapter 2, Country Reports, for further details on counterterrorism efforts taken by individual countries*).

Radicalization of immigrant populations, youth and alienated minorities in Europe, the Middle East, and Africa continued. But it became increasingly clear that radicalization to violent extremism does not occur by accident, or because such populations are innately prone to extremism. Rather, we saw increasing evidence of terrorists and extremists manipulating the grievances of alienated youth or immigrant populations, and then cynically exploiting those grievances to subvert legitimate authority and create unrest. We also note a "self-radicalization" process of youths reaching out to extremists in order to become involved in the broader AQ fight.

Such efforts to manipulate grievances represent a "conveyor belt" through which terrorists seek to convert alienated or aggrieved populations, by stages, to increasingly radicalized and extremist viewpoints, turning them into sympathizers, supporters, and ultimately, in some cases, members of terrorist networks. In some regions, this includes efforts by AQ and other terrorists to exploit insurgency and communal conflict as radicalization and recruitment tools, especially using the Internet to convey their message.

Counter-radicalization is a key policy priority for the United States, particularly in Europe, given the potential of Europe-based violent extremism to threaten the United States and its key interests directly. The leaders of AQ and its affiliates are extremely interested in recruiting terrorists from and deploying terrorists to Europe, people familiar with Western cultures who can travel freely. Countering such efforts demands that we treat immigrant and youth populations not as a source of threat to be defended against, but as a target of enemy subversion to be protected and supported. It requires community leaders to take responsibility for the actions of members within their communities and to act to counteract extremist propaganda and subversion, and also requires bilateral, regional, and multilateral cooperation.

Because the enemy is a non-state actor that thrives among disaffected populations, private sector efforts are as important as government activity. We have yet to fully harness the power of the private sector, which offers enormous potential, such as economic might and fast and flexible responses to market and security conditions. We need to find better ways to deploy this strength against terrorists. The private sector, of course, has a vested interest in partnering against violent extremists to secure its existing and future investments/economic opportunities. In addition, grassroots and community groups can play an important role in supporting immigrant and youth populations as described above, strengthening their resistance to extremist approaches. Citizen diplomacy, cultural activity, person-to-person contact, economic cooperation and development, and the application of media and academic resources are key components of our response to the threat.

The key success factor in confronting violent extremism is the commitment by governments to work with each other, with the international community, with private sector organizations, and with their citizens and immigrant populations. Local communities are also a vital part of countering radicalization strategies.

PX203

Where governments cooperate, build trusted networks, seek active, informed support from their people, provide responsive, effective, and legitimate governance, and engage closely with the international community, the threat from terrorism has been significantly reduced. Where governments have lacked commitment in working with their neighbors and engaging the support of their citizens, terrorism and the instability and conflict that terrorists exploit, have remained key sources of threat.

This chapter sets the scene for the detailed analysis that follows. Significant achievements in border security, information sharing, transportation security, financial controls, and the killing or capture of numerous terrorist leaders have reduced the threat. But the threat remains, and state sponsorship, improved terrorist propaganda capabilities, the pursuit of weapons of mass destruction by some terrorist groups as well as by state sponsors of terrorism, and terrorist exploitation of grievances represent ongoing challenges.

PX203

## Chapter 2
## Country Reports on Terrorism

| AFRICA OVERVIEW |
| --- |

―Emergent threats, such as terrorism, climate change, and illegal exploitation of natural resources, equally demand vigilance and decisive action. The good news is that the African Union and its member nations are resolved to take the initiative tackling these problems, and are in fact making progress."

–John Agyekum Kufuor, President of Ghana
Statement, 62nd UN General Assembly; New York
September 25, 2007

Al-Qa'ida (AQ) operatives in East Africa and al-Shabaab militants in Somalia continued to pose the most serious threat to American and allied interests in the region. The late 2006 defeat of the Council of Islamic Courts (CIC) as a governing force in Mogadishu by Ethiopian and Transitional Federal Government (TFG) forces, and the ensuing insurgency that engulfed Mogadishu and parts of south central Somalia for the remainder of the year continued to make Somalia a permissive operating environment and a potential safe haven for both Somali and foreign terrorists already in the region. Somalia remains a concern, as its unsecured borders and continued political instability provide opportunities for terrorist transit and/or organization. AQ is likely to keep making common cause with cells of Somali extremists in an attempt to disrupt international peacemaking efforts in Somalia.

There were few significant international terrorist incidents in Africa, but civil conflict, ethnic violence, and activity amongst domestic terrorist groups continued in a number of countries. The Salafist Group for Preaching and Combat (GSPC) officially merged with AQ in September 2006 and subsequently, in early 2007, changed its name to al-Qa'ida in the Islamic Maghreb (AQIM). This event signaled the importance of a comprehensive and coordinated approach to the threats posed in the region. The huge swath of largely open territory in the Sahel provides AQIM with an important base for smuggling, logistics, recruiting, and training fighters. AQIM focused its major attacks on Algeria, but continued to operate in the Sahel region, crossing difficult-to-patrol borders between Mali, Mauritania, Niger, Algeria, and Chad to recruit extremists within the region for training and terrorist operations in the Trans-Sahara and, possibly, for operations outside the region.

Hizballah continued to engage in fundraising activities in Africa, particularly in West Africa, but did not engage in any terrorist attacks within the region.

Many African governments improved their cooperation and strengthened their counterterrorism efforts. Both the African Union (AU) and African regional organizations continued initiatives to improve counterterrorism cooperation and information sharing.

PX203

**Trans-Sahara Counterterrorism Partnership (TSCTP)**

The Trans-Sahara Counterterrorism Partnership (TSCTP) is a multi-faceted, multi-year strategy to combat violent extremism and defeat terrorist organizations by strengthening individual-country and regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security and intelligence organizations, promoting democratic governance, and discrediting terrorist ideology. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the trans-Sahara, and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) .

TSCTP was developed as a follow-on to the Pan-Sahel Initiative, which focused solely on the Sahel. Ongoing concern that extremists continued to seek to create safe havens and support networks in the Maghreb and Sahel, as well as recognition that AQ and others were seeking to impose radical ideologies on traditionally moderate Muslim populations in the region highlighted the urgency of creating an integrated approach to addressing current threats and preventing conditions that could foster persistent threats in the future.

TSCTP's main elements include:

- Continued specialized Antiterrorism Assistance Training (ATA), Terrorist Interdiction Program (TIP), and Counterterrorism Finance (CTF) activities in the trans-Sahara region and possible regional expansion of those programs;

- Public diplomacy programs that expand outreach efforts in the trans-Sahara region and seek to develop regional programming embracing this vast and diverse region. Emphasis is on preserving the traditional tolerance and moderation displayed in most African Muslim communities and countering the development of extremism, particularly in youth and rural populations;

- Democratic governance programs that strive, in particular, to provide adequate levels of USG support for democratic and economic development in the Sahel, strengthening those states to withstand internal threats; and,

- Military programs intended to expand military-to-military cooperation, to ensure adequate resources are available to train, advise, and assist regional forces, and to establish institutions promoting better regional cooperation, communication, and intelligence sharing.

**The African Union**

The African Union (AU) has several counterterrorism legal instruments including a Convention on the Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention and a 2004 Plan of Action. The Addis Ababa-based AU Commission provided guidance to its 53

PX203

member states and coordinated limited technical assistance to cover member states' counterterrorism capability gaps.

The Algiers-based *African Center for Study and Research in Terrorism* (ACSRT) was approved and inaugurated in October 2004 to serve as a think tank, an information collection and dissemination center, and a regional training center. The AU is working with member states to eliminate redundancies between the ACSRT and the Committee on Intelligence and Security Services in Africa (CISSA), which was first established at the AU Summit in Abuja, Nigeria, in January 2005. The Department of State and the National Defense University's Africa Center for Strategic Studies (ACSS) have collaborated with the AU to run counterterrorism workshops.

In 2005, with Danish funding, the AU hired a consultant to draft a counterterrorism Model Law to serve as a template to assist member states in drafting language to implement counterterrorism commitments. In December 2006, an AU-sponsored group of experts drafted counterterrorism language, which was in the process of being legislated. The group of experts decided to retain options for both broad and specific laws and determined that new legislation was needed to combat money laundering and other financial crimes.

Some AU member states maintained that Africa's colonial legacy made it difficult to accept a definition of terrorism that excluded an exception for ―freedom fighters." Nonetheless, the AU is on record strongly condemning acts of terrorism.

Although the AU Commission had the strong political will to act as an effective counterterrorism partner, AU staffing remained below requisite levels; consequently, capacity remained relatively weak. The AU created a counterterrorism unit at its Addis Ababa headquarters to coordinate and promote member state counterterrorism efforts more effectively. The AU welcomed technical and financial assistance from international partners/donors to bolster both AU headquarters and ACSRT activities approved by member states.

**Angola**

Angola's borders remained porous and vulnerable to movements of small arms, diamonds, and other sources of terrorist financing. Angola's high rate of dollar cash flow makes its financial system an attractive site for money laundering. The Government of Angola's capacity to detect financial crimes is limited, although it did make several high-profile arrests of dollar counterfeiters in 2007. Angola has not signed the UN International Convention for the Suppression of the Financing of Terrorism. The government's limited law enforcement resources were directed towards border control and stemming the flow of illegal immigrants into the country, which increased exponentially since the 2002 peace treaty ending Angola's protracted civil war. Lack of infrastructure, corruption, and insufficient capacity continued to hinder Angola's border control and law enforcement capabilities.

**Botswana**

The Botswana government was cooperative in international counterterrorism efforts. The Botswana government established the National Counter Terrorism Committee to address

15

PX203

terrorism issues and weapons of mass destruction. In December, President Festus Mogae signed a law creating a new intelligence agency responsible for domestic and foreign intelligence gathering. The Botswana Defense Force designated a squadron as its counterterrorist unit and sent several officers to IMET-sponsored counterterrorism training.

Terrorists may use Botswana as a transit point due to its porous borders as evidenced by a 2006 report of organized smuggling of immigrants from Bangladesh and Pakistan, and the number of illegal Zimbabwean immigrants living in Botswana. Individuals suspected of providing financial support to terrorist groups may have business interests in Botswana companies.

The Bank of Botswana lists suspected terrorist assets and keeps all banking institutions in the country informed by circulating an updated list of suspicious accounts. Although there is no Financial Intelligence Unit, the Directorate on Corruption and Economic Crimes had a unit that investigated suspicious transactions.

**Burkina Faso**

Burkina Faso continued to lack the resources necessary to protect its borders and to monitor movement of terrorists. There was no formal method for tracking movement into and out of the country at border checkpoints, or at either of the country's two commercial airports. Burkina Faso was not a safe haven for any terrorist groups, but had the potential of becoming a safe haven owing to its close proximity to several countries where terrorist groups operate and because its borders are porous, especially in the sparsely populated north.

Despite its lack of resources, Burkina Faso was serious about fighting terrorism, cooperated with the United States where possible, and participated in training, seminars, and exercises, such as the regional Flintlock Exercises held in Mali this past year. The government participated in regional efforts at combating terrorism with the Economic Community of West African States (ECOWAS), the African Union (AU), and other international organizations, such as INTERPOL (it participated in an Interpol General Assembly meeting that was held in November). In 2007, Burkina Faso submitted a request to the USG to train their existing, approximately 150-person antiterrorism unit under the President's Security Force.

**Burundi**

Burundi's counterterrorism efforts were hindered by domestic ethnic tension, the unsteadiness of a transitional period after a decade plus of civil war, a lack of mature governmental institutions, considerable corruption, and porous borders that enabled various rebel groups in Tanzania and Eastern Congo to freely enter Burundi. Due to Burundi's small size and overtly Christian identity, it is likely that any radical Muslim influence would be quickly noted and reported to both Burundian government institutions and the international diplomatic community. The Burundi National Police's financial crimes unit was severely crippled by both a lack of resources and trained investigators, resulting in little or no oversight of Burundi's financial community by law enforcement officials, which could be exploited by terrorists for financing terrorism. Transnational criminals, for example, laundered illegal drug money through Burundian front companies.

16

PX203

**Comoros**

International terrorism concerns in Comoros focused on Comorian national Fazul Abdullah Mohammed (a.k.a. Harun Fazul), who is suspected of involvement in the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam. His whereabouts were unknown, but he was believed to have maintained contacts in the Comoros. The Comorian government's security forces had limited resources and training in counterterrorism and maritime security, so the country remained vulnerable to terrorist transit. Comorian police and security forces participated in USG antiterrorism assistance programs and cooperated with the Rewards for Justice Program.

President Sambi, a devout Muslim democratically elected in May 2006, reconfirmed Comoros' rejection of terrorism and, with Comoros' religious leaders, publicly rejected Islamist extremism. In September, military and port officials participated in a USG-hosted Maritime Security Conference in Mombasa, Kenya. President Sambi has sought close partnership with the United States to develop Comoros and to create opportunities for the country's youth. In April, Foreign Minister Jaffar hosted a joint committee to improve bilateral relations, which included counterterrorism cooperation.

The Government of the Union of the Comoros did not provide safe haven to terrorist organizations on the islands of Grande Comore and Moheli. Colonel Mohamed Bacar, former island president of Anjouan and current illegitimate leader, runs his island for personal profit outside the authority of the Union. Among Bacar's illicit activities were licensing for shell banks. The extent of his dealings and contacts with criminal or terrorist networks in the Indian Ocean Region was unknown.

**Cote d'Ivoire**

Cote d'Ivoire has been in the throes of a political-military crisis since 2002, leaving the country politically and, until recently, geographically divided.[1] Despite this instability, violence associated with the country's crisis has not been linked with any international terrorist organizations, and there was little evidence to indicate a threat of terrorist attacks. While some Lebanese private communities living in Cote d'Ivoire were known to be active in donating personal income to Hizballah, it is unlikely that the Government of Cote d'Ivoire supported or subsidized it, although it was likely that it was aware of this.

**Djibouti**

Djibouti hosted the only military base in Sub-Saharan Africa for United States and Coalition Forces and was one of the most forward-leaning Arab League members supporting ongoing efforts against terrorism. President Ismail Omar Guelleh and many top leaders in Djibouti repeatedly expressed their country's full and unqualified support for the War on Terror.

United States security personnel continued to work closely with Djiboutian counterparts to monitor intelligence and follow up on prospective terrorism-related leads. Although the

---

[1] A March 2007 political agreement has made significant inroads towards peace.

PX203

government's capabilities were limited, Djiboutian counterparts were very proactive, and were highly receptive and responsive to United States requests for cooperation. The Djiboutian National Security Services took extraordinary measures with its limited resources to ensure the safety and security of American citizens, the U.S. embassy, and the U.S. military base at Camp Lemonier.

## Eritrea

The Government of Eritrea was not an active partner on counterterrorism programs. The government linked broader cooperation in USG counterterrorism programs to the unresolved border dispute with Ethiopia, publicly stating that cooperation will occur only after the final demarcation of the border. During the March kidnapping of British diplomats in Ethiopia by an ethnic Afari rebel group, the Eritrean government played a role in securing their release.

Sheikh Hassan Dahir Aweys, designated under both UN Security Council Resolution 1267 and Executive Order 13224, was publicly reported as being in Asmara as recently as November.

## Ethiopia

The Government of Ethiopia, after conducting a counter offensive in late 2006 in response to threats against its security and in support of the internationally recognized Transitional Federal Government of Somalia, battled insurgents and extremists that were formerly affiliated with the Council of Islamic Courts, including the AQ-affiliated al-Shabaab militia. Ethiopian forces provided critical support in the stand up of the African Union Mission in Somalia (AMISOM) peacekeeping force which was also targeted by extremist elements. In addition, Ethiopian forces countered Somali-based extremists who attempted to conduct attacks inside Ethiopia.

Ethiopia's location within the Horn of Africa made it vulnerable to money laundering activities perpetrated by transnational criminal organizations, terrorists and narcotics traffickers. As the economy continued to grow and become more liberalized, federal police investigation sources reported expectations that bank fraud, electronic/computer crimes, and laundering activities would continue to rise. On November 6, the National Bank of Ethiopia (NBE) and the United States Department of the Treasury signed the terms of reference and work plan for a technical assistance package to strengthen Ethiopia's anti-money laundering and counterterrorist financing regimes. The assistance will aid the NBE in establishing a financial intelligence unit and provide training to Ethiopia's government-owned and private banks.

Ethiopia's National Intelligence and Security Service (NISS), with broad authority for intelligence, border security, and criminal investigation; was responsible for overall counterterrorism management. Federal and local police counterterrorism capabilities were primarily focused on being able to respond to terrorist incidents. Draft counterterrorism legislation was submitted to Parliament in late 2006, but there was no legislative action in 2007.

Ethiopia was an active participant in AU counterterrorism efforts, served as a focal point for the AU's Center for Study and Research on Terrorism, and participated in meetings of the Committee of Intelligence and Security Services of Africa.

PX203

**Kenya**

Following the late 2006 Ethiopian action to remove the radical Council of Islamic Courts (CIC) in Somalia, Kenyan Ministry of Defense efforts largely prevented the flight of violent extremists across the Somalia-Kenya border. The Kenyan military drastically increased its numbers on the Somalia border, and worked closely with police elements in the region to block CIC forces and associated individuals from infiltrating Kenyan territory. Kenyan security forces apprehended several suspected extremist leaders during these operations. However, human rights organizations criticized the Kenyan government for closing the border and claimed that large numbers of refugees fleeing the fighting were forcibly returned to Somalia. At the same time, the Kenyan government suspended all flights to and from Somalia except for humanitarian aid flights and flights to the Transitional Federal Government's (TFG) seat in Baidoa. The Kenyan government ended the suspension in August, but continued to require all flights from Somalia to first stop at Wajir Airport for immigration, customs, and security processing before proceeding to their final destinations in Kenya.

The Government of Kenya did not knowingly provide safe haven for terrorists or terrorist organizations. However, Kenya's borders remained porous and vulnerable to movement of potential terrorists as well as small arms and other contraband. Supporters of AQ and other extremist groups were active in the East Africa region. As a result of the continuing conflict in Somalia, many members of these organizations have sought to relocate elsewhere in the region and some were believed to have traveled to Kenya.

Kenya continued to lack the counterterrorism legislation necessary to comply with the UN conventions it has signed. In addition, it was difficult to detain terror suspects and prosecute them effectively under existing laws. The issue of counterterrorism legislation remained highly controversial in Kenya with elements of the press, the human rights community, and Muslim leadership criticizing proposed legislation as anti-Muslim and giving the government too much power to potentially abuse human rights. The Kenyan government wrote a revised draft of the defeated 2003 "Suppression of Terrorism Bill" in 2006, but the new bill was sharply criticized and subsequently did not pass. Progress also stalled on legislation for combating money laundering and terrorist financing. The ―Proceeds of Crime and Money Laundering Bill" was submitted in March but the Parliament did not debate it.

Political and bureaucratic resistance remained to the formation of an interagency Kenyan Joint Terrorism Task Force (JTTF). Senior Kenyan officials sharply criticized the U.S. Public Announcement regarding the possibility of a terrorist threat to the Cross-Country World Championships in Mombasa in March, seeing this as an unfriendly act and a threat to the country's vital tourism industry.

**Liberia**

Despite limited resources, inadequately trained personnel, and a weak judicial system – products of 14 years of civil war – the Government of Liberia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism. Through rule of law

19

PX203

and security sector reform assistance programs, the United States supported a number of initiatives that addressed Liberia's vulnerabilities, which included porous borders, rampant identification document fraud, lax immigration controls, wide-scale corruption, and underpaid law enforcement, security, and customs personnel.

There have never been any acts of transnational terrorism in Liberia. Of concern, however, were reports that hundreds of Middle Eastern businessmen purchased legitimately issued but fraudulently obtained Liberian diplomatic passports from Ministry of Foreign Affairs (MFA) officials. These documents would permit free movement between the Middle East and West Africa. The government took steps to stop this Charles Taylor-era practice by requiring that diplomatic passports be issued only by the Ministry of Foreign Affairs in Monrovia. New restrictions on who qualified for Liberian diplomatic or official passports were being implemented by the new head of the Foreign Ministry's passport office.

Since 2003, there has been resurgence in the number of visits to Liberia by foreign Islamic proselytizing groups, overwhelmingly Sunni organizations from Pakistan, Egypt, and South Africa. However, Liberian security services reported that none of these groups publicly espoused militant or anti-American messages. Liberia's indigenous, war-weary, and predominantly Sunni Muslim community, which represented at least 20 percent of the country's population, has demonstrated no interest in militant strains of Islam to date. That said, outstanding land disputes negatively affecting large numbers of Muslim land owners in Nimba and other counties could fan ethnic and religious tensions with the predominantly Christian central government. As in other West African states, reports surfaced that Lebanese businessmen in Liberia provided financial support and engaged in fundraising activities for Hizballah. There were no other terrorist groups known to be operating within Liberia.

**Madagascar**

International terrorism was a concern in Madagascar because of the island nation's inadequately monitored 3,000 mile coastline. Limited equipment, personnel, and training for border control increased the risks of penetration. Following the International Maritime Conference in 2006, hosted by the Ministry of Defense and the U.S. Embassy, Madagascar military and port officials participated in a similar event in Mombassa in September. Malagasy police, military, intelligence, and security forces have not had much training in counterterrorism and maritime surveillance. Despite limited resources, government officials were willing to cooperate with the United States; international maritime conferences and the Rewards for Justice Program were two examples of cooperative ventures. At the main port in Tamatave, which handled 80 percent of maritime traffic and more than 90 percent of container traffic, access control and overall security improved substantially. The U.S. Coast Guard Port Security Liaison removed Tamatave Port from its Port Security Advisory for Madagascar, with an acknowledgement that the Port met minimum standards under the International Ship and Port Facility Security (ISPS) Code.

**Mali**

Inadequate resources continued to hamper the Malian government's ability to control its long and porous borders, thus limiting the effectiveness of military patrols and border control measures.

20

PX203

Mali is currently more threatened by tribal insurgencies than by terrorist threats, but cooperated with United States counterterrorism efforts, and remained one of the largest recipients in the sub-region of military training and assistance through the Trans-Sahara Counterterrorism Partnership and other United States assistance programs. Northern Mali served as a potential safe haven for terrorists, traffickers, and smugglers due to the region's remoteness, harsh desert climate, and size. AQIM maintained a regular, small-scale presence, moving essentially without hindrance in the northern part of Malian territory, although it did not maintain any permanent facilities and was constantly on the move. There were no confrontations between the Malian military and the AQIM this year.

**Mauritania**

The December 2007 murder of four French tourists and the attack on a military checkpoint were both low-level attacks, but highlighted the fact that AQIM was active in the country despite the newly elected government's significantly increased level of cooperation with the United States on counterterrorism. The Mauritanian Government actively pursued the perpetrators of the December attacks. The government embarked on an ambitious political agenda to build national unity.

In June, 24 of 25 individuals accused of ties to AQIM were acquitted, and the remaining defendant sentenced in absentia to two years in prison. On July 31, the court acquitted 14 of 19 persons accused of complicity in the 2005 AQIM attack on a Mauritanian military base, for lack of evidence. The remaining five defendants received sentences from two to five years. In late October, the government arrested five other individuals for suspected ties to AQIM. Three of the five were released with the remaining two currently awaiting trial on terrorism and explosives charges.

The Government of Mauritania continued working to prevent terrorist organizations, notably AQIM, from using its territory. These efforts remained constrained, however, by limited resources and training, and by the inherent challenges of controlling the sparsely-populated and porous regions bordering Algeria and Mali. The government continued to identify and respond to AQIM cells operating in country. Western Missions warned their citizens of AQIM efforts to target westerners in Mauritania, particularly those involved in the petroleum industry.

The new government established a new counterterrorism force which, despite USG assistance, was not fully functional at year's end. The Mauritanian Army Camel Corps, responsible for patrolling the eastern border regions of the country, participated in USG antiterrorism training and the Mauritanian military participated in USG-sponsored regional counterterrorism exercises.

**Nigeria**

The apprehensions and trials of extremists by the Nigerian government seemed to indicate not just recognition of potential threats to itself and its citizens, but a responsiveness and willingness to act to protect American interests, including facilities and personnel. These arrests also suggested some degree of cooperation and facilitation among extremist groups in the Sahel, which were made possible by porous borders with minimal controls, and the logistical

PX203

difficulties inherent in patrolling the Sahara desert. Since 2005, the Nigerian Taliban (which has no connection to the Taliban of Afghanistan) has been suspected of having connections to AQIM in Mali and AQ affiliates. To date, no conclusive links have been definitively proven, although bin Ladin went on record in 2003 saying that Nigeria was fertile ground for action.

In December 2006, Mohammed Yusuf, a Maiduguri-based imam and alleged "Nigerian Taliban" leader was charged with five counts of illegally receiving foreign currency. His trial was still ongoing at the end of 2007.

Also in December 2006, Mohammed Ashafa of Kano was charged with receiving funds in 2004 from two AQ operatives based in Lahore, Pakistan to "identify and carry out terrorist attacks" on American residences in Nigeria. Deported from Pakistan for alleged ties to AQ, and said to have undergone terrorist training in Mauritania, Ashafa was charged in a Nigerian court with recruiting 21 fighters who were sent to Camp Agwan in Niger for terrorist training with AQIM. Ashafa also stood accused of being a courier for AQ from 2003 to 2004, who passed coded messages from Pakistan to Nigerian Taliban members on how to carry out terrorist activities against American interests in Nigeria. In addition, Nigerian authorities alleged that Ashafa's home was used as an AQ safe house, and that he rendered logistical and intelligence support to AQ operatives.

On January 16, 2007, Mohammed Bello Ilyas Damagun, a Nigerian cleric described by prosecutors as a primary sponsor of the Nigerian Taliban, was arraigned on three counts of terrorism. Damagun was accused of receiving the sum of 300,000 USD from Sudanese extremists or an AQ affiliate in Sudan "with the intent that said money shall be used in the execution of acts of terrorism." He also allegedly sent three young men to train with AQIM in Mauritania. The final count in Damagun's indictment was for aiding terrorist activities in Nigeria. This trial was ongoing with the defendant out on bail. These trials were still in progress due to a combination of procedural appeals, lengthy adjournments, and the additional time necessary to translate the proceedings from English to Hausa and back.

There was an attack in April that was likely perpetrated by the Nigerian Taliban, however this was not proven. On April 17, a police station in Panshekera, a small village outside Kano city, was attacked by militants subsequently described by the media as the "Nigerian Taliban," though the exact identities of the militants and their ideological affiliations (if any) remain unknown. While reports are conflicting, it was widely believed that the attackers were targeting the state and its uniformed security.

On July 27, the Government of Nigeria introduced e-passports containing a data chip, which will allow for easier passport authentication and fraudulent documentation detection. Besides enhanced security, the system will provide the country's first electronic database of biometric information.

The U.S. Embassy issued a warden message to American citizens on September 7, advising that American and other Western interests in Lagos and Abuja, both official and commercial, were at risk for terrorist attack. In an October 31 press report about the arrest of two men in Kano, "a

PX203

senior officer" of the Nigerian State Security Service said that the men detained were the individuals whose activities had prompted the U.S. warden message.

On November 12, Nigerian law enforcement announced the arrests in Kano, Kaduna, and Yobe states of at least 10 suspected terrorists with alleged ties to AQIM, which included the two men from the October 31 report. On November 22, five of these individuals were charged with conspiracy and planning to commit a terrorist act. Two were also charged with attempted murder. The defendants were denied bail and the case was adjourned. The others were allegedly in custody, undergoing interrogation. Local news reports described a collaborative effort between Nigerian and American intelligence services.

The Sultan of Sokoto, the supreme Muslim authority in the country, has stated "There is no AQ cell of Taliban in Nigeria." The Sultan received information from a longstanding network of traditional local and regional leaders (emirs), and maintained that it would be extremely difficult for terrorist groups to operate without detection by this network. Nonetheless, poverty and unemployment, especially acute in the Muslim-majority north, helped create a climate potentially conducive to the radicalization of marginalized individuals.

In September 2005, a draft antiterrorism bill was approved by the Nigerian cabinet and sent to the National Assembly. The bill provided for sentences of up to 35 years for those convicted of a terrorist offense. Membership in a banned organization carried lighter jail sentences that could be replaced by a fine of up to 50,000 naira (400 USD). The bill was withdrawn, however, the day of its second reading in the Senate due to opposition from northern Senators who argued that the motivation for such a bill was anti-Muslim sentiment.

**Rwanda**

The Government of Rwanda combated terrorist financing and reinforced border control measures to identify potential terrorists and to prevent entry of armed groups operating in the Democratic Republic of Congo (DRC). Rwanda had an intergovernmental counterterrorism committee and a counterterrorism reaction team in the police intelligence unit. Rwandan police and marines conducted anti-narcotrafficking patrols on Lake Kivu. Central Bank and Ministry of Finance officials provided outstanding cooperation on terrorist financing issues. While the Government of Rwanda had not yet fully developed its laws and regulations in accordance with international conventions and protocols concerning terrorism, it had the authority under local law to identify, freeze, and seize terrorist-related financial assets. Rwanda participated in regional initiatives on international counterterrorism cooperation, including the East African Standby Brigade. In November, Rwanda hosted a meeting of the Committee of Intelligence and Security Services of Africa, which brought intelligence and security officials together to address security challenges faced by members of the African Union through information sharing and strategic intelligence coordination. Also in November, Rwanda hosted a six-week training course for East African police commanders in cooperation with the United Kingdom.

Besides reinforcing border security, the Government of Rwanda developed terrorism response strategies. The Rwandan national tourist office hired a consultant to develop a communications policy to alert embassies should their citizens be harmed in Rwanda's national parks, and to

PX203

increase disaster preparedness. The national Civil Aviation Authority worked to develop a crisis plan to address terrorist attacks and/or other disasters, and installed more cameras at Kigali International Airport to increase surveillance capability.

**Senegal**

The Government of Senegal cooperated with the United States to identify terrorist groups operating in Senegalese territory. More work remained to be done, however, to develop first responder services, to facilitate the quick sharing of information between agencies, and to control porous borders where police and security services are undermanned and ill-equipped to prevent illicit crossborder trafficking. The Government of Senegal affirmed its commitment to United States government-assisted efforts to augment its border security.

Senegal continued to enhance its ability to combat terrorism, prosecute terror suspects, and respond to emergencies. Despite advances, however, Senegal lacked specific counterterrorism Legislation, and current laws made it difficult to prosecute terror suspects. As participants in the Trans-Saharan Counterterrorism Partnership, more than 318 Senegalese government officials participated in ATA programs. Senegalese military officials attended a counterterrorism seminar in Rabat and attended the Chiefs of Defense and Directors of Military Intelligence conferences. The Defense International Institute of Legal Studies, the Department of Justice, the Department of the Treasury's Office of Technical Assistance, and the UN Office on Drugs and Crime (UNODC) gave separate seminars on the legal aspects of fighting terrorism.

Senegal did not provide safe haven for terrorists or terrorist organizations. However, five Mauritanians, two of whom claimed to be members of al-Qa'ida, were allegedly involved in the December 24 murder of four French tourists in Mauritania; the five traveled through Senegal before being captured in a hotel in Guinea-Bissau by Bissau-Guinean police, aided by French authorities. The Mauritanians were able to cross four Senegalese borders without being stopped by Senegalese authorities. This event demonstrated Senegal's porous borders and its lack of capacity to identify and combat terrorist threats and the need for further training.

**Somalia**

Somalia's fragile central government, protracted state of violent instability, long unguarded coastline, porous borders, and proximity to the Arabian Peninsula made the country an attractive location for international terrorists seeking a transit or launching point for conducting operations in Somalia or elsewhere. Despite the late 2006 defeat of the Council of Islamic Courts (CIC) in Mogadishu by Ethiopian and Transitional Federal Government (TFG) forces, the ensuing low-level conflict that engulfed Mogadishu and parts of south central Somalia for the remainder of the year continued to make Somalia a permissive operating environment and safe haven for both Somali and foreign terrorists. The extremist al-Shabaab (The Youth), the militant "shock troops" of the CIC whose radicalism and violent means led to the CIC's undoing, initially dispersed and fled south along the Kenyan border. Al-Shabaab, some of whom are affiliated with AQ, consists of radicalized young men, between 20 and 30 years of age. A few of its senior leaders are believed to have trained and fought with AQ in Afghanistan. Al-Shabaab extremists participated in attacks against Ethiopian and TFG security forces. Al-Shabaab and other extremists were also

PX203

behind suicide bombings, the use of landmines, remote controlled roadside bombs, and targeted assassinations against Ethiopian and TFG security forces, other government officials, journalists, and civil society leaders. The African Union Peace Support Mission (AMISOM), which deployed in March to secure the air and sea ports and presidential compound, lost six soldiers to extremist attacks during the year.

Among the foreign AQ operatives believed to have enjoyed protection by the former CIC and al-Shabaab leadership were individuals wanted for the 1998 embassy bombings in Kenya and Tanzania and a 2002 hotel bombing in Kenya, including Fazul Abdallah Mohammed (aka Harun Fazul), and Saleh Ali Saleh Nabhan. At the end of the year, Ethiopian and TFG forces remained nominally in control of Mogadishu and southern and central Somalia, though institutions of government remained weak and ineffective. Regional efforts to bring about national reconciliation and establish peace and stability in Somalia are ongoing. The capability of the TFG and other Somali local and regional authorities to carry out counterterrorism activities was limited.

**South Africa**

South Africa supported efforts to counter international terrorism and shared financial, law enforcement, and limited intelligence information with the United States. The South African government adopted broad counterterrorism legislation under the title ―Protection of Constitutional Democracy against Terrorist and Related Activities Bill‖ in 2004.

It was unclear to what extent foreign terrorist groups were present in South Africa. Some analysts held the view that AQ or other extremist groups had a presence within South Africa‗s generally moderate Muslim community. In January, the Department of the Treasury designated South African nationals Farhad and Junaid Dockrat as AQ financiers and facilitators, subjecting them to United States sanctions.

Border security challenges and document fraud negatively affected the government‗s efforts to pursue counterterrorism initiatives. South African documents often included good security measures, but because of corruption within the immigration services, thousands of South African identity cards, passports, and work/residence permits were fraudulently issued.

**Sudan**
*See Chapter 5, State Sponsors of Terrorism*.

**Tanzania**

Tanzania took significant steps to establish a National Counterterrorism Center to build its capacity to prevent and respond to terrorist attacks, and worked closely with the United States to disrupt terrorist networks. Tanzania law enforcement cooperated with the United States to exchange evidence and testimony on cases related to the 1998 bombing of the U.S. Embassy in Dar Es Salaam.

PX203

Tanzania continued its participation in several multi-year programs to strengthen its law enforcement and military capacity, improve aviation and border security, and combat money laundering and terrorist financing. The Ministry of Finance and the Bank of Tanzania showed ongoing willingness to combat terrorist financing. In December 2006, the Tanzanian Parliament passed the Anti-Money Laundering (AML) Bill, ending a legislative process that began in 2002 with support from the United States. The AML Bill created a Financial Intelligence Unit (FIU) and bolstered Tanzania's ability to combat financial crime, including counterterrorist financing.

With the Millennium Challenge Account Threshold Program, the United States supported Tanzania as it equipped and staffed the FIU. Tanzanian law enforcement and security forces attempted to identify and monitor terrorist activities and deny use of Tanzanian territory as a safe haven for terrorists. The government was aware that terrorists could use its territory for transit purposes and did not provide any kind of material assistance to terrorists or terrorist groups.

**Uganda**

Porous borders in a region rife with insecurity have left Uganda vulnerable to terrorist activity. In response, the Government of Uganda stepped up efforts to track, capture, and hold suspected terror suspects. Uganda also worked with the United States to push forward on peace and security initiatives in the Great Lakes Region. While the Ugandan government was a strong advocate for crossborder solutions to persistent problems, resource limitations and corruption hampered more effective measures. In March, the Ugandan military's counterterrorism units engaged some 100 Allied Defense Force (ADF) rebels, killing 60-80 and capturing 10-20. The Ugandan government engaged the Democratic Republic of Congo on the ADF through various regional mechanisms.

**Zambia**

Zambia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism. In June, Zambia endorsed the U.S. Global Initiative to Combat Nuclear Terrorism. In July, the government submitted an Antiterrorism Bill to Parliament. The Bill criminalized acts of terrorism, including terrorist training and incitement; and granted the government significant authority to investigate, prevent, and prosecute acts of terrorism. Inadequate resources and training impeded Zambia's law enforcement agencies' counterterrorism capabilities. Zambia's borders are long and porous, and its ports of entry are vulnerable transit points for human trafficking and international crime.

Zambia made no progress in ratifying the counterterrorism conventions listed in UNSC 1373. In November, Zambia participated in an African regional workshop on implementing UNSC 1540. Despite offers of assistance from the United States, the Zambian government does not have an internationally-compliant antimoney laundering or counterterrorist financing regime. The Cabinet is reviewing a national antimoney laundering policy and draft antimoney laundering and asset forfeiture bills.

**Zimbabwe**

26

PX203

Despite the Government of Zimbabwe's self-imposed isolation on most diplomatic issues, local intelligence and criminal investigative agencies were responsive to our counterterrorism needs. Government agencies routinely provided assistance by conducting investigative inquiries, traces, and border checks of individuals thought to be threats to USG facilities or personnel.

During the year, the government attempted to strengthen its ability to prevent and suppress terrorism and money laundering activities. On August 3, Parliament passed the Suppression of Foreign and International Terrorism Bill, which provided a maximum punishment of life in prison for engaging in or recruiting for foreign or international terrorist activities. It also contained penalties for harboring, concealing, or failing to report foreign or international terrorists. An enactment date for the Bill had not been set by the end of 2007.

The Reserve Bank of Zimbabwe installed a new IT system that provided enhanced capability to detect, analyze, and disseminate information on suspicious financial transactions. Working with law enforcement and other government agencies, the Reserve Bank maintained export/import desks at ports of entry and conducted audits of mining entities to detect and prevent illegal mineral smuggling and money laundering activities. An increase in suspicious transaction reports and prosecutions of financial crime cases was attributed to these efforts.

The Government of Zimbabwe entered into talks with several other countries in the region to sign MOUs, similar to the MOU signed with South Africa last year, to combat money laundering and the financing of terrorism.

## EAST ASIA AND PACIFIC OVERVIEW

"We fight terrorism. It threatens our sovereign, democratic, compassionate, and decent way of life. Therefore, in the fight against lawless violence, we must uphold these values. It is never right and always wrong to fight terror with terror."

–Gloria Macapagal-Arroyo, President of the Philippines
July 23, 2007

The Jemaah Islamiya regional terrorist network (JI) remained a serious threat to Western and regional interests, particularly in Indonesia and the Southern Philippines, although its capabilities were degraded in large part as a result of regional counterterrorism successes in 2005-2007. The Government of Indonesia continued to create a legal and law enforcement environment conducive to fighting terrorism, and the Indonesian National Police scored major successes in breaking up terrorist cells linked to Jemaah Islamiya (JI) and other violent Islamic extremist organizations. In January, DNA analysis conducted by the FBI confirmed the death of Abu Sayyaf Group's (ASG) nominal leader, Khaddafy Janjalani, at the hands of the Armed Forces of the Philippines. Philippine forces also killed ASG spokesperson Abu Solaiman, while Indonesian

PX203

police broke up JI cells in Sulawesi and Central Java. These actions represented major blows to JI and the ASG, but did not eliminate the overall threat to United States interests in the region. JI bombers Dulmatin and Patek remained on the run, probably on Jolo Island. Other terrorists remained at large, such as key JI operative Noordin Mohammad Top, in Indonesia.

Geography made effective border control problematic for archipelagic states like Indonesia and the Philippines. Monitoring remote locations among the thousands of islands in the Sulawesi Sea and Sulu Archipelago that span the boundaries between Indonesia, Malaysia, and the Philippines was extremely difficult, which made this tri-border area accessible for such terrorist activities as movement of personnel, equipment, and funds. This made building regional capacity a priority goal, in addition to bilateral cooperation and national capacity-building. Institutes like the United States-Thailand International Law Enforcement Academy (ILEA) in Bangkok, the Australian-Indonesian Jakarta Center for Law Enforcement Cooperation (JCLEC), and the Southeast Asia Regional Center for Counterterrorism (SEARCCT) in Malaysia, sought to expand their activities to provide effective counterterrorism training to law enforcement officers throughout the region. Multilateral fora, including the UN Security Council's Counterterrorism Committee (UNCTC), the G8's Roma-Lyon Group and Counterterrorism Action Group (CTAG), the Asia-Pacific Economic Cooperation (APEC) forum, the Association of Southeast Asian Nations (ASEAN), which adopted a new ASEAN Convention on Counterterrorism pending ratification, and the ASEAN Regional Forum (ARF), also promoted regional counterterrorism cooperation.

Australia maintained its position as a regional leader in the fight against terrorism and worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of bilateral and regional initiatives, in fora such as APEC, the ASEAN ARF, and the Pacific Island Forum (PIF).

China increased its efforts to build its domestic counterterrorism capabilities to improve security for the 2008 Beijing Olympics. In 2007, Beijing expressed concern that terrorists operated on Chinese territory and asserted that some members of the Uighur minority in Xinjiang Province posed a threat to China's domestic stability.

Japan strengthened its own security by contributing to counterterrorism capacity-building among Asian countries. Japan used Official Development Assistance (ODA) grants to expand counterterrorism capacity in Southeast Asia. The Ministry of Foreign Affairs Economic Cooperation Bureau increased funding for the annual Cooperation on Counterterrorism and Security Enhancement grant aid program. This FY-2007 65 million USD program included projects aimed at bolstering piracy prevention, increasing maritime and port security, and preventing weapons proliferation.

Traditionally focused on potential terrorism from the Democratic People's Republic of Korea (DPRK or North Korea), the South Korean government broadened its attention to acts of terror beyond the Korean Peninsula, and continued its active participation in regional training and capacity-building programs.

Counterterrorism cooperation with the Government of Thailand remained strong. Thai and USG officials were concerned that transnational terror groups could establish links with southern Thailand-based separatist groups. However, there were no indications that transnational terrorist

28

PX203

groups were directly involved in the violence in the south, and there was no evidence of direct operational links between southern Thai separatist groups and regional terror networks.

**Australia**

Australia maintained its position as a regional leader in the fight against terrorism. In June, Australia hosted the Trilateral Counterterrorism Consultations in Sydney and pushed for concrete measures to broaden the relationship between the Trilateral partners (Australia, Japan, and the United States) and regional stakeholders. Australia hosted a subregional ministerial conference on counterterrorism and the Asia-Pacific seminar on combating nuclear terrorism, and proposed that the partners develop and implement a special policy and operational "Combating Bioterrorism" workshop for Southeast Asian nations. The proposed workshop would strengthen local capacity to combat bioterrorism and improve the overall counterterrorism infrastructure in Southeast Asia by ensuring early detection of and effective response to bioterrorism.

The Jakarta Center for Law Enforcement Cooperation (JCLEC), continued to reap benefits for Australia and its regional partners. At the Counterterrorism Trilateral in Sydney, the partners proposed that JCLEC be expanded and serve as a platform for more diverse training. There were over 100 courses of training in place at JCLEC. Australia also continued its commitment to the designation of terrorist organizations; it has designated a total of 19 terrorist organizations under its domestic criminal code.

The Australian Federal Police (AFP) received further funding to expand its investigative and specialist training, currently delivered to regional law enforcement partners through facilities like JCLEC. Funding was targeted toward:
- conducting offshore exercises and training with regional partners,
- increasing the number of counterterrorism advisers working in AFP's international liaison officer network,
- introducing to high priority locations a custom-built Case Management and Information System developed for use in overseas jurisdictions, and
- enhancing specialist forensic and technical training for law enforcement agencies in the region.

In 2007, 350 officers of the AFP's International Deployment Group (IDG) were deployed overseas, many in counterterrorism technical assistance and operational/liaison roles. The AFP Operational Response Group was designed to respond on short notice to emerging law and order issues and to conduct stabilization operations to head off lawless situations that terrorists could exploit. Australia continued to provide legal drafting assistance to regional states, including the South Pacific islands, seeking to adopt international conventions and protocols against terrorism, and to bring domestic laws into conformity with these conventions.

The Australian Transaction Reports Analysis Centre (AUSTRAC), which monitors financial transactions, serves as the national AML/CTF regulator with supervisory, monitoring, and enforcement functions over a diverse range of industry sectors. A new set of regulatory reforms, introduced in draft legislation made public in August,  included new regulations regarding real estate, precious gems and stones; and specified legal, accounting, and trust services. Australia

PX203

continued to seek and fund additional staff and technical capabilities, and established identity security strike teams to investigate and prosecute people and syndicates involved in manufacturing false identities.

In May, Australia (with New Zealand, Indonesia, and the Philippines) cosponsored the Third Asia-Pacific Interfaith Dialogue, held in New Zealand. The Dialogue, involving religious and community leaders from 15 South East Asia and Pacific countries, aims to foster mutual respect, understanding, and tolerance, and to isolate religious extremism.

Australia is a partner with both the United States in exchanging information on known and suspected terrorists using the Terrorist Screening Center as the operational hub for encounter management; and with the United States in APEC's Regional Movement Alert System (RMAS). Both programs enhance our joint ability to disrupt travel by known and suspected terrorists.

In Afghanistan, Australia continued its support of a Dutch-led provincial reconstruction team. By year's end, there were 960 and 970 Australian troops in Iraq and Afghanistan, respectively.

## Burma

Bilateral relations between Burma and the United States remained strained. The government defined almost all anti-regime activities as "acts of terrorism" and made little distinction between peaceful political dissent and violent attacks by insurgents or criminals. The Burmese government was quick to characterize dissident groups as aligned with terrorist organizations and used this as justification to scrutinize and disrupt their activities. In the past several years, bombs have exploded in Rangoon and other parts of Burma. In most incidents, the Government of Burma claimed the incidents were a subversive act, "committed by a group of insurgent destructive elements who wanted to disturb and destroy stability of the state." Authorities did not make public any evidence of a genuine investigation or identify the specific perpetrator(s). Requests by the U.S. Embassy to view either the scenes or remaining fragments of the explosive devices were consistently denied.

## Cambodia

Cambodia's political leadership demonstrated a strong commitment to take aggressive legal action against terrorists. However, Cambodia's ability to investigate potential terrorist activities was limited by a lack of training and resources. The government passed a counterterrorism law and a law to combat terrorist financing, and comprehensive domestic legislation has been promulgated and implemented. To date, the Cambodian government has fully cooperated with United States counterterrorism efforts on many levels, despite its limited resources.

Conditions in Cambodia, such as porous borders, endemic corruption, massive poverty, high unemployment, a poor education system, and disaffected elements within the Cham Muslim population, which makes up approximately five percent of the population, could make the country vulnerable to terrorists and terrorist influence. Although the Cham were not generally politically active, the Cambodian government feared that Cham areas might provide safe haven to terrorists. For example, Hambali, the Indonesian national and key member of Jemaah Islamiya

PX203

accused of involvement in the 2002 Bali nightclub bombings, took refuge in a Muslim school in Kandal Province in 2002-2003.

One violent group among the many peaceful and law-abiding Kampuchea Khmer Krom groups attempted to blow up the Vietnam-Cambodia Friendship memorial using three improvised explosive devices in July, providing evidence that terrorist groups were capable of conducting domestic attacks in Cambodia. Although no one was injured, the Cambodian government thoroughly investigated this case, and eventually arrested and jailed the responsible individuals.

Cambodia's National Counterterrorism Committee (NCTC), a policy level decision making body established by the government in 2005 and chaired by the prime minister, continued to develop its resources. In December, several NCTC officials traveled to the United States for USG consultations.

In July, Cambodia's Senate approved a Counterterrorism Law after it was passed by Cambodia's National Assembly on June 26. On July 20, following the Senate's approval, the King enacted the law, which addressed aircraft safety, maritime navigation safety, the protection of nuclear materials, the financing and provision of material support to terrorism, and other important issues affecting national security and safety. It also implemented measures to enhance international cooperation regarding terrorism offenses.

In June, the Cambodian government enacted the Law on Anti-Money Laundering and Combating the Financing of Terrorism. The government was also working on decrees and sub-decrees to bring these counterterrorism laws fully into effect. In addition, the National Bank of Cambodia (NBC) circulated nationwide the UN Security Council lists of individuals and entities involved in global terrorism. The NBC officially instructed all financial and banking institutions operating in Cambodia to scrutinize and freeze assets of these persons and entities.

The Australian and Cambodian governments jointly sponsored a Maritime Security seminar in November to train Cambodian military, police, and other officials. At this seminar, Prime Minister Hun Sen stated that Cambodia's maritime security is a priority in fighting against drug trafficking, human trafficking, terrorism, crossborder crimes, and piracy. He added that cooperation with international partners to combat terrorism and crossborder criminals had improved. As part of ongoing cooperation on counterterrorism capacity-building, training was conducted with elements of the U.S. military in conjunction with the USS Essex ship visit to Cambodia.

In June, the Royal Government of Cambodia designated three government focal points to work on the multilateral Global Initiative to Combat Nuclear Terrorism, co-chaired by the United States and the Russian Federation. The government strictly controlled the use of weapons, explosive devices, chemical substances, and radioactive materials.

With U.S. assistance, the Government of Cambodia installed computerized border control systems at Phnom Penh and Siem Reap airports, and at the land border crossing of Poipet and Koh Kong. There are 20 land border checkpoints. During a November International Ship and Port Facility Security Code (ISPS Code) assessment visit by the U.S. Coast Guard, various Port

PX203

security officials expressed a need for additional USG-funded training, tactical equipment, and technical materials in order to continue improving security standards. The Cambodian government also cooperated fully with U.S. requests to monitor terrorists and terrorist entities listed as supporters of terrorist financing.

The Cambodian government cooperated with a number of other governments on counterterrorism issues. The FBI conducted a "Major Case Management" course in Cambodia which reviewed Cambodia's new Criminal Procedures Law, instructed best practices in evaluating evidence, and increased the government's investigative capacity. Counterterrorism training was also provided by Singapore, Australia, Russia, Thailand, and Vietnam.

The Germans, as G8 President, convened a local CTAG (the G8's Counterterrorism Action Group) meeting December 13, to exchange views on the nature of the terrorist threat in Cambodia and the region; to share information about assistance programs in Cambodia building capacity and countering terrorist threats; to discuss the question of whether the UN Office of Drugs and Crime (UNODC) "menu of services" included any activities of interest to donors; to hear a readout of the Australian-sponsored maritime security seminar; and to exchange information on the National Counterterrorism Committee.

**China**

In the lead up to the 2008 Olympics, China continued to boost counterterrorism cooperation with the United States and other nations. China participated in the UN Security Council's Fifth Special Meeting of the Counterterrorism Committee held in Nairobi, Kenya, and attended a United Nations, Organization of Islamic Conference (OIC), and Islamic Educational, Scientific, and Cultural Organization Antiterrorism conference held in Tunis, Tunisia. China, a founding member of the Shanghai Cooperation Organization (SCO), has made counterterrorism one of the group's main objectives. In August, troops from the six SCO member states conducted an "antiterrorist operation" joint military exercise in Russia. In December, Chinese and Indian troops conducted joint antiterrorism training in Kunming, China.

China selected Yangshan Deepwater Port in Shanghai as the pilot port for the Megaports Initiative, designed to detect and interdict illicit nuclear and radiological materials that could be smuggled in United States-bound cargo.

In February, at the second meeting of the Global Initiative to Combat Nuclear Terrorism in Ankara, China offered to host a workshop on radiation emergency response. Fifteen countries attended this workshop, which was hosted by the Chinese Ministry of Foreign Affairs in Beijing in December. China continued its participation in the Container Security Initiative with United States Customs and Border Protection inspectors stationed at the ports of Shanghai and Shenzhen.

China's new Anti-Money Laundering Law took effect January 1. The law expanded the criminalization of money laundering-related offenses and broadened the scope of existing anti-money laundering regulations to hold a greater range of financial institutions accountable for recording customer information and reporting suspicious transactions. It also firmly established

PX203

the People's Bank of China (PBOC) as the lead agency for all anti-money laundering activities in China. The Ministry of Public Security (MPS) Anti-Money Laundering Division and Anti-Terrorism Bureau are responsible for criminal investigations.

China's cash-based economy and robust crossborder trade contributed to a high volume of difficult-to-track cash transactions. While mechanisms were in place for tracking financial transactions in the formal banking sector, the large size of the informal economy, prevalence of counterfeit identity documents, and vast numbers of underground banks presented major obstacles to law enforcement authorities. According to International Monetary Fund (IMF) statistics, money laundering in China may account for as much as $24 billion dollars per year.

Terrorist financing is a criminal offense in China, and the government had the authority to identify, freeze, and seize terrorist financial assets, but laws defining terrorist financing were not yet consistent with international standards, according to reporting by the Financial Action Task Force. China's Financial Intelligence Unit (FIU), housed by PBOC, worked closely with the Financial Crimes Enforcement Network (FINCEN) in the United States to develop its capabilities. In addition to its domestic collection and analysis activities, the FIU exchanged information with foreign FIUs on a case-by-case basis, but coordination in this area could be enhanced through membership in the Egmont Group, an umbrella body that coordinates the activities of over 100 FIUs worldwide. China applied for membership in the Egmont Group, but domestic political concerns about Taiwan's participation in the organization have reportedly hampered membership discussions.

China expanded its role in international efforts to combat terrorist finance and money laundering by becoming a full member of the Financial Action Task Force (FATF) in June. Since 2004, China has also been a member of the Eurasian Group (EAG), a FATF-style regional grouping that includes China, Russia, and several Central Asian countries.

Human rights organizations have accused China of using counterterrorism as a pretext to suppress Uighurs, a predominantly Muslim ethnic group composed of the majority of the population of the Xinjiang Uighur Autonomous Region (XUAR) of western China. In January, Chinese authorities raided an alleged terrorist camp affiliated with the East Turkestan Islamic Movement (ETIM) in the XUAR, killing 18 and arresting 17.

According to police reports, Chinese police seized hand grenades, unassembled explosives, detonators, and the equivalent of $38,705 dollars in cash. Six of the 17 arrested were sentenced in November: three were sentenced to death, two received suspended death sentences, and another was given life imprisonment. In August 2006, upon Chinese request, Uzbekistan extradited a Canadian citizen of Uighur ethnicity to China where he was convicted for alleged involvement in East Turkistan terrorist activities. In November 2006, China gave Canada assurances that he would not be executed for his alleged crimes, and in September 2007, China denied the appeal of his life imprisonment sentence; at year's end he remained in prison.

Formally established in 2002, the FBI Legal Attaché Office in Beijing bolstered United States-China cooperation on counterterrorism investigations. China provided substantive intelligence in

PX203

some counterterrorism cases, but more work remained to be done in terms of the depth and overall responsiveness to United States requests.

In 2006, Chinese Air Marshals completed their first mission to the United States, and in July 2007, United States Air Marshals made inaugural trips to Shanghai and Guangzhou. The CAAC sent the Commander of the Air Marshals to attend an International In-Flight Security Officer Conference held in Miami in September. In October, the Administrator of the Transportation Security Administration (TSA) made the first high-level TSA visit to Beijing to discuss future formal collaboration on security matters in both the aviation and mass transit sectors.

Although not publicly attributing any particular incident to terrorism, Chinese authorities asserted that terrorists, primarily based in Xinjiang, continued to operate clandestinely on Chinese territory. The Chinese government increased the number of deployed security personnel in response to perceived terrorist activities in Xinjiang.

Hong Kong

Hong Kong's position as a major transit point for cargo, finances, and people and its open trade and financial regime made it a potential site for money laundering and terrorist financing activities. The high level of cooperation and the successful implementation of the Container Security Initiative (CSI) by Hong Kong Customs officials received continued praise from visiting USG delegations, which described it as a model for CSI implementation. In cooperation with Hong Kong Customs and one of Hong Kong's port terminal operators, the United States began implementation of a the Strategic Freight Initiative (SFI) pilot project to screen 100 percent of U.S.-bound containers using non-invasive inspection techniques to scan for nuclear and radiological materials.

Hong Kong law enforcement agencies provided full support and cooperation to their overseas counterparts in tracing financial transactions suspected of being linked to terrorist activities.

Hong Kong actively participated in various anti-money laundering and counterterrorist financing initiatives, including the Financial Action Task Force (FATF) and the Asia/Pacific Group (APG) on Money Laundering. Hong Kong's Joint Financial Intelligence Unit (JFIU), operated by Hong Kong Police and the Customs and Excises Department, is a member of the Egmont Group. Hong Kong completed a mutual evaluation by the FATF and APG in November; the results of this review will be announced in mid-2008.

Macau

The Macau Special Administrative Region is a member of the Asia Pacific Group (APG) and completed a mutual evaluation of its Anti-Money Laundering Regime in 2007. APG examiners reviewed Macau government regulations, suspicious transaction reporting; bank record-keeping and reporting requirements; and also interviewed frontline staff, senior management, and money laundering compliance officers. The APG report, published in September, made a series of recommendations including making the FIO a permanent body, establishing disclosure or

34

**PX203**

declaration systems for crossborder transport of currency, and tighter due-diligence requirements for casinos.

The Government of Macau continued to exchange information with the Hong Kong Special Administrative Region and counterparts in mainland China. Additionally, Macau continued to cooperate internationally in counterterrorism efforts, through INTERPOL and other security-focused organizations within the Asia Pacific Region. Macau was considering information sharing mechanisms that would allow it to join the Egmont Group.

## Indonesia

Indonesia experienced its second consecutive year of no major terrorist incidents. Radical groups in Indonesia had their ability to carry out attacks further diminished as a result of the Indonesian government's counterterrorism efforts. The Indonesian National Police (INP) scored major successes in breaking up terrorist cells linked to Jemaah Islamiya (JI) and other violent Islamic extremist organizations. While JI cells in Java and Central Sulawesi were weakened, JI and its radical associates remained a security threat to both Western and domestic targets. The Attorney General's Office made some strides toward conducting more efficient and effective counterterrorism prosecutions despite weaknesses in Indonesia's counterterrorism law. The Government of Indonesia continued to create a legal and law enforcement environment conducive to fighting terrorism within its borders, and numerous terrorists were convicted of crimes.  One measure of the successful efforts to curb terrorism was the return of tourists to the country.  In 2007, the number of tourists to Indonesia increased 14 percent; Bali, where tourists have been the target of terrorist attacks, experienced a 32 percent increase in tourism.

In January, the INP conducted two raids against a radical stronghold in Poso, Central Sulawesi. The second raid used 500 security force personnel against a large group of terrorists and their supporters, who were armed with small arms and Improvised Explosive Devices (IEDs). The raids ended with 18 dead, 18 injured, and 28 captured. Subsequent operations netted five more suspects. While the Poso operation was criticized as "heavy-handed" by some members of the local community, it calmed the previously tense situation in Central Sulawesi. There were no reprisal attacks following the raids. In March, information gained from the Poso suspects helped the INP initiate a series of raids in Central and East Java which resulted in the arrest of several members of the so-called "military wing" of JI and several cell leaders and the seizure of a large cache of explosives in East Java. In June, INP's Special Detachment 88 (SD-88) in Central Java, arrested several key JI terrorist operatives, including alleged JI Emir Ustad Syahroni (aka Zarkasih) and senior JI operative Abu Dujana (aka Ainul Bahri). As the JI Emir, Afghanistan-veteran Zarkasih, a former JI leader, is thought to be senior to Dujana in the JI hierarchy. Dujana, also an Afghanistan-veteran, was part of JI's central command and was involved in several JI attacks in recent years.

The arrests in January, March, and June removed several key JI leaders. To create sympathy for these radical groups and to discredit the INP (especially SD-88), lawsuits were brought against the INP by Abu Dujana's wife and by JI cofounder and spiritual leader, Abu Bakar Ba'asyir. The two lawsuits did not create the expected groundswell of public attention and were eventually thrown out of court.

PX203

The newly formed USG-funded Attorney General's Task Force on Terrorism and Transnational Crime took the leading role in handling prosecutions of terrorists. The Task Force won convictions against: Hasanuddin, a JI leader in Poso; four men who participated in the 2005 schoolgirl beheadings; and three others who were involved in the 2005 Tentena market bombings. The Attorney General also won convictions against 17 Poso Christians who had murdered two Muslims in revenge killings in September 2006. The Task Force is currently prosecuting a dozen members of JI's military unit who were arrested in the March and June raids, including Dujana and Zarkasih.

Other Indonesian legal institutions took a hard line against terrorists. In September, the Supreme Court rejected the final appeals of three men on death row for carrying out the 2002 Bali bombings. The Court also upheld the life sentence imposed on JI trainer/recruiter Subur Sugiyarto. In October, the Ministry of Law and Human Rights announced that convicted terrorists would no longer be given automatic sentence remissions at major holidays. The new policy came too late to prevent the early release of some 20 convicted terrorists in 2007, but most of these were minor figures.

The Indonesian government made genuine efforts to develop an effective anti-money laundering system for investigations and prosecutions. Indonesian police froze terrorist financial assets uncovered during investigations. However, the government's implementation of the UNSCR 1267 sanctions was hampered by poor interagency coordination and by continued lack of human and technical capacity within both the government and financial institutions. It remains to be seen whether or not the Government of Indonesia has the political will to do what is necessary to implement UNSCR 1267.

USAID is promoting capacity-building through its Financial Crimes Prevention Project, a multi-year program to provide technical advisors and support to Indonesia's effort to develop an effective and credible regime against money laundering and terrorism finance. Other donors are also providing assistance to the Financial Crimes Transaction and Analysis Center (PPATK). The unit receives Suspicious Transaction Reports (STRs) and Cash Transaction Reports. PPATK has dramatically increased the number of STRs from 10 per month in 2002 to 483 per month in 2007 and these reports have led to 32 successful prosecutions to date. While only one of these had a terrorist component, strengthened financial oversight will assist the Indonesian government in tracking potential terrorist financial transactions.

The Indonesian National Police (INP) continued a program to "de-radicalize" convicted terrorists. The program identified individuals who may be open to more moderate teachings and INP officials work with them while they are in prison. The program focuses on providing spiritual support to the men and modest financial support to their families. By providing this support, the police attempt to gain the trust of the men and receive valuable information about terrorist networks. The program aims to reduce terrorist recruitment inside prisons.

While Indonesia's counterterrorism efforts have been impressive, more could be done in some areas. Despite the successes in Sulawesi and Central Java, JI networks and "sleeper" cells may remain intact  and have the capacity to go operational with little warning. Moreover, Malaysian

PX203

JI operative and recruiter Noordin Mohammed Top, who is suspected of involvement in every anti-Western terrorist attack in Indonesia since 2002,  remains at large.

**Japan**

Domestically, Japan bolstered its defenses against terrorism by improving crisis management and first responder capabilities and took steps to strengthen border security. In 2007, 98 percent of local governments adopted plans to better protect the public from terrorist attacks. Japan held local drills simulating terrorist attacks to boost response capabilities. In January, Japan made it mandatory for both ship and air carriers to provide manifest information prior to the arrival of the conveyance.

In November, immigration officials began to collect and electronically store finger prints and facial imagery from foreigners under the revised Immigration and Refugee Control Act. The Ministry of Justice Immigration Bureau continued testing that began in 2004 on a biometric fingerprint and facial recognition system at Narita and Kansai airports with the aim of identifying people trying to enter Japan on fake passports.

Japan used Official Development Assistance (ODA) grants to expand counterterrorism capacity in Southeast Asia. The Ministry of Foreign Affairs (MOFA) Economic Cooperation Bureau increased funding for the annual Cooperation on Counterterrorism and Security Enhancement grant aid program. This FY-2007 65 million USD program included projects aimed at bolstering piracy prevention, increasing maritime and port security, and preventing weapons proliferation.

Japan made valuable contributions to building counterterrorism capacity among Asian countries. In May, Japan hosted a two-day Asia-Europe Meeting (ASEM) conference aimed at battling terrorism in Asia, Europe, and beyond. Participants shared threat assessments and discussed ways to increase counterterrorism capacity-building. Japan provided assistance to the G8 Counterterrorism Action Group (CTAG) and maintained momentum on improving port security via the G8 adopted Secure and Facilitated International Travel Initiative (SAFTI). Japanese experts participated in G8 bioterrorism workshops on forensic epidemiology and decontamination. In March, Japan hosted a seminar in which  several Southeast Asian countries, as well as the United States and Australia, participated to promote accession and ratification of international counterterrorism treaties. In September, Japan hosted the ASEAN-Japan Counterterrorism Dialogue. In October, Japan became a partner nation in the U.S. Global Initiative to Combat Nuclear Terrorism.

Japan increased efforts to combat terrorist financing. On April 1, 2007, the Japanese government promulgated a new anti-money laundering law, the Law for Prevention of Transfer of Criminal Proceeds, which expanded the scope of businesses and professions under the previous law's jurisdiction, and moved the financial intelligence unit from the Financial Regulatory Agency to the National Police Agency (NPA) in accordance with FATF recommendations. Furthermore, the Foreign Exchange and Foreign Trade Law's January revision now requires Japanese financial institutions  to confirm the identity of customers sending 100,000 yen ($900) or more overseas. The Financial Services Agency announced a similar change for domestic remittances; in an

PX203

amendment to the Customer Identification by Financial Institutions rule, financial institutions are now required to identify the originators of wire transfers over 100,000 yen.

In June, Japan implemented revised infectious disease legislation aimed at tightening control of harmful pathogens that could be used for terrorism. In July, the Japanese government held a seminar on the prevention and crisis management of bioterrorism to strengthen mechanisms to combat CBRN (chemical, biological, radiological, nuclear) terrorism in the Asia Pacific. Participants included ASEAN countries, China, Korea, and the Southeast Asia Regional Centre for Counterterrorism (SEARCCT). In August, Japan ratified the International Convention for the Suppression of Acts of Nuclear Terrorism.

Japan continued to reach beyond the region in its fight against terrorism; its trilateral counterterrorism cooperation with the United States and Australia remained strong. In June, Japan participated in a counterterrorism trilateral meeting in Australia to better synchronize regional activities.

Japan Air Self-Defense Forces, based in Kuwait, continued to provide airlift operations in support of Iraq. In July, the Cabinet approved a one-year extension of the deployment. During January thru October, the Maritime Self-Defense Forces provided approximately 5.7 million gallons of fuel to U.S. and allied naval vessels engaged in Operation Enduring Freedom (but ended refueling operations in the Indian Ocean in November).

Bilaterally, Japan was a responsive counterterrorism partner. In January, Japan and the United States initiated a pilot Immigration Advisory Program (IAP) at Narita Airport to identify high risk travelers before they board flights destined for the United States. The IAP pilot has been extended until July 2008; negotiations were underway to convert the pilot IAP into a longterm program.

Japan and the United States continued to improve the preparedness and interoperability of U.S. and Japanese armed forces and civilian entities to respond to and sustain operations during a CBRN attack. The bilateral CBRN Defense Working Group (CDWG), established under the U.S.-Japan Security Consultative Committee (SCC), held plenary meetings, conducted seminars on decontamination and medical response and engaged in table top exercises in the United States and Japan. Representatives from the Ministries of Defense and Foreign Affairs, the Japanese Self Defense Forces, Cabinet Secretariat, the NPA, the Fire and Disaster Management Agency, and the Nuclear Safety Commission, and other government agencies, participated in the CDWG.

The NPA and the Public Security Intelligence Agency (PSIA) continued to monitor the activities of Aum Shinrikyo, renamed Aleph. In May, Fumihiro Joyu, a former spokesman and Aum leader, along with approximately 200 Aleph members, split and formed a new organization called Hikari No Wa (Ring of Light). PSIA and NPA continued to monitor both groups and inspected their facilities in 2007. The Tokyo High Court, in June, upheld the death sentence for Seiichi Endo for his involvement in the Matsumoto and Tokyo sarin attacks. In July, the Tokyo Court upheld the death sentence for former senior Aum member Tomomasa Nakagawa for his role in 11 crimes, including the 1995 Tokyo subway sarin gas attack. In August, the Supreme Court upheld the death sentence for Masato Yokoyama for his involvement in the 1995 attack;

PX203

he is not eligible for future appeals. The Supreme Court, in October, upheld the death sentence for Aum Shinrikyo member Satoru Hashimoto, who carried out the 1994 sarin gas attack in Matsumoto. In November, the Supreme Court upheld the death sentence for Satoru Hashimoto, for his involvement in the 1994 attack.

In April, police arrested suspected former Japan Red Army member Yu Kikumura upon reentry to Japan following deportation from the United States; Kikumura was deported after his release from U.S. prison for serving time for transporting home made bombs. In May, the Tokyo High Court upheld the life in prison sentence for Haruo Wako, for his role in both the 1974 seizure of the French Embassy in The Hague and the 1975 seizure of the U.S. Embassy in Kuala Lumpur. The Tokyo District Court sentenced Jun Nishikawa to life in prison for his role in the 1974 seizure of the French Embassy in The Hague and the 1977 hijacking of a Japan Airlines plane.

**Korea, North**
*See Chapter 5, State Sponsors of Terrorism*.

**Korea, South**

The Republic of Korea (ROK) demonstrated excellent law enforcement and intelligence capabilities, and provided terrorism-related training to law enforcement officials from various developing countries. Traditionally focused on potential terrorism from the Democratic People's Republic of Korea (DPRK or North Korea), the South Korean government broadened its attention to acts of terror beyond the Korean Peninsula. South Korean citizens were victims of terrorism in Afghanistan, Nigeria, and Somalia. Seoul supported U.S. goals in Afghanistan and maintained the third-largest foreign troop contingent in Iraq through most of 2007. Additionally, Seoul leads a Coalition Provincial Reconstruction Team in Irbil Province. The South Korean government remained a valued international partner in the fight against terror financing and money laundering.

In recognition of its regional efforts to combat terrorism, the Republic of Korea held the position of Chair Economy of the Asia-Pacific Economic Cooperation (APEC) Counterterrorism Task Force (CTTF) in 2007. The South Korean Ambassador for International Counterterrorism Cooperation presided over three CTTF meetings. The ASEAN Regional Forum's (ARF) 4th Seminar of Cyber Terrorism was held in October in Busan, Korea. The seminar, cohosted by the Ministry of Foreign Affairs and Trade (MOFAT) and the National Cyber Security Center, welcomed 90 officials and experts from 24 ARF participating countries. The South Korean government also held bilateral consultations with Mexico, Germany, and France.

South Korean immigration and law enforcement agencies had an excellent record of tracking suspicious individuals entering their territory and reacting quickly to thwart potential terrorist acts. The government is on schedule to begin issuing e-passports that will further protect the identity of lawful travelers and prevent terrorists from using counterfeit passports. In November, the National Assembly passed Anti-Terrorist Financing legislation to further curb money laundering by terrorist organizations in and through the country.

PX203

Seoul continued its active participation in regional training and capacity-building programs. The South Korean government hosted representatives from Vietnam and other Southeast Asian countries for training in crime prevention, criminal justice, counterterrorism, forensic science, prevention of money laundering, narcotics law enforcement, and antipiracy and terrorism management.

## Laos

Since 2002, the Government of Laos has consistently denounced international terrorism and expressed a willingness to cooperate with the international community on counterterrorism, but has taken little proactive action to combat terrorism. In addition to a lack of resources, Lao officials at many levels believed that Laos, a small and neutral country, would not be targeted or exploited by international terrorists.

Laos did not have a separate counterterrorism law, but recent amendments to the criminal code sought to strengthen counterterrorism sanctions. Laos' border security was weak. Border officials could not effectively control access to the country even at its most sophisticated border checkpoints. Illegal border crossing along the Mekong River into the surrounding countries of Burma, Thailand, and Cambodia could be accomplished easily and without detection. Border delineation remained poor in more remote sections of the country, especially along the land borders with Vietnam and China; it is likely that unmonitored border crossings by locals occurred on a daily basis. Since 9/11, Lao authorities have strengthened airport security, and airport security forces participated in U.S. supported security seminars in an effort to raise their standards, but security procedures at land immigration points remained lax compared with most other countries in the region. In addition, official Lao identity documents, including passports and ID cards, were easy to obtain.

When requested, the Bank of Laos has vetted government and commercial bank holdings for possible terrorist assets, as identified by U.S.-provided lists of terrorist organizations and individuals, and issued freeze orders for assets of organizations and individuals named on these lists. However, the Bank has yet to require the freezing of assets of individuals and entities included on the UN 1267 Sanctions Committee consolidated list. In accordance with its obligations under UNSCR 1373, the Bank of Lao issued freeze orders for assets of organizations and individuals named in lists provided by the United States. Lao authorities issued orders limiting the amount of cash that could be withdrawn from local banks or carried into or out of the country and strengthened reporting requirements of state and privately owned commercial banks. Banking regulation remained extremely weak, however, and the banking system was vulnerable to money laundering and other illegal transactions. Cooperation between USG officials and the Bank of Laos remained cordial and cooperative.

## Malaysia

New provisions to Malaysia's Penal Code and Criminal Procedures Code came into effect in March. They included clearer definitions of terrorism and related crimes and penalties including the death penalty or life in prison for terrorist-related crimes. The police forces in Malaysia continued to conduct all counterterrorist investigations and operations.

PX203

Malaysian police fall under the authority of the Ministry of Internal Security, headed by Prime Minister Abdullah Badawi. To date, no suspected terrorists were brought to trial under either the new or previous legal provisions. At year's end, 29 terrorist suspects linked to Jemaah Islamiya and 17 linked to Darul Islam Sabah were held in detention under the country's Internal Security Act (ISA), where they undergo a program of rehabilitation. Two-year ISA sentences can be renewed if the Malaysian government determines that a detainee remains a threat to national security. On average, the Malaysian government has held suspected terrorists and suspected terrorist supporters in ISA detention for two to six years.

Amendments to the Anti-Money Laundering and Anti-Terrorism Financing Act, the Subordinate Courts Act, and the Courts of Judicature Act also came into effect in March. These provisions provide for the forfeiture of terrorist-related assets, allow for the prosecution of those who materially support terrorists, and expanded surveillance of suspects. The Financial Action Task Force/Asia Pacific Group on Money Laundering (FATF/APG) conducted a Mutual Evaluation of Malaysia in February. While otherwise in compliance, FATF found ineffective enforcement of Malaysian laws on the import and export of cash. The Malaysian government responded by setting up an interagency task force to issue recommendations to bring Malaysia into compliance with international standards.

The Malaysian government engaged with its neighbors on issues related to counterterrorism and transnational crime. It continued to operate the Southeast Asian Regional Center for Counterterrorism (SEARCCT), which conducts training for Malaysian officials and to a lesser extent for officials from countries in the region.

Malaysian mediators continued to work in the southern Philippines to help end the conflict between the Philippines government and the separatist Moro Islamic Liberation Front (MILF). With the "Eyes in the Sky" program, Malaysian military forces worked with Singapore and Indonesia to provide enhanced security to the Strait of Malacca, the world's busiest shipping lane.

Malaysia's Financial Intelligence Unit (FIU) signed memoranda of understanding on the sharing of financial intelligence with the FIUs of the United States, the United Kingdom, Japan, the Republic of Korea, Sweden, and the Republic of Chile. Malaysia's FIU provided training and evaluation assistance throughout the region. In late June, Malaysia's accession to the UN Convention for the Suppression of the Financing of Terrorism came into force.

**Mongolia**

There were no known terrorist groups operating in Mongolia and no known bases of support. Nonetheless, Mongolian government officials cited more than 6,000 kilometers of porous borders, easy entry for foreign travelers, and poverty as conditions that terrorists could exploit, and moved to increase awareness of terrorism and to consider new laws. In August, Mongolia's Border Force, State Specialized Inspection Agency, Customs Authority and other agencies worked with a visiting —Second Line of Defense" team from the U.S. Department of Energy to improve systems for detecting the movement of nuclear and radiological materials that could be

PX203

used as weapons of mass destruction. The Mongolian police, the Ministry of Justice, and the General Intelligence Agency's counterterrorism branch also cooperated with the United States. As a result of resource and technical limitations, counterterrorism law enforcement capacities remained modest. Mongolia deployed an eighth rotation of 100 Mongolian soldiers to Iraq in October in support of Operation Iraqi Freedom, as well as a seventh rotation of 21 Mongolian soldiers to Afghanistan to train the Afghan National Army.

**New Zealand**

In November, New Zealand passed a further amendment to the Terrorism Suppression Act 2002. The main amendments created a generic offense for committing a terrorist act; streamlined the process for designating terrorists (UN terrorist list entities are now automatically designated as terrorists under New Zealand law) and created two new offenses involving nuclear material. To date, New Zealand has designated more than 480 UN listed terrorist entities. The FIU processed over 4,090 Suspicious Transaction Reports (STRs) and referred 615 of these to various law enforcement agencies and units for investigations[2]. Over the same twelve month period, the FIU received five Suspicious Property Reports pursuant to the Suppression of Terrorism Act 2002, none of which were found to have connections to terrorist entities or associated individuals.

New Zealand's counterterrorism efforts were reinforced by its engagement in interfaith and inter-cultural initiatives aimed at countering radicalization and terrorist recruitment. With Australia, Indonesia, and the Philippines, New Zealand co-sponsored the Asia-Pacific Regional Interfaith Dialogue. The Dialogue involved religious and community leaders from 15 countries from South East Asia and the Pacific, and aimed to foster tolerance, reinforce moderate religious views, and isolate religious extremism. In May, New Zealand hosted the third Dialogue at Waitangi, New Zealand. New Zealand also supports the UN-led Alliance of Civilizations (AOC) initiative, which has developed a framework for practical action to bridge differences and improve relations between faiths, societies and cultures, particularly between Islam and the West. New Zealand convened a Symposium in May to focus regional attention on the AOC Report's recommendations in the four "fields of action": education, youth, media, and migration.

New Zealand is a partner with both the United States in exchanging information on known and suspected terrorists using the Terrorist Screening Center as the operational hub for encounter management,  and with the United States in APEC's Regional Movement Alert System (RMAS). Both of these programs enhance our joint ability to disrupt travel by known and suspected terrorists.

On October 15, New Zealand police arrested 17 people and seized a number of weapons, including semiautomatic weapons and petrol bombs, during a series of raids throughout the country and referred evidence against 12 of the 17 people for additional possible prosecution under the Terrorism Suppression Act (TSA), the first time the Act has been evoked since it

---

[2] Under the Financial Transaction Reporting Act 1996, financial institutions (note: which includes banks, money exchanges and casinos) are required to report transactions suspected of being linked to money laundering or proceeds of crime enforcement to the New Zealand Police Financial Intelligence Unit based at Police National Headquarters in Wellington.

PX203

became law in 2002. Solicitor-General Dr. David declined TSA prosecution; 16 still faced charges.

Also in mid-October, amendments to the TSA legislation were before Parliament. The Terrorism Suppression Amendment Bill corrected inconsistencies in the TSA with New Zealand's obligations under the Charter of the United Nations and the United Nations Security Council resolutions on terrorism. It contained proposals on the designation of UN-listed terrorist entities, the High Court extension of designations for those entities, the freezing of terrorists' assets, the terrorist financing offenses, the offenses of committing a terrorist act and participating in a terrorist group. The Bill also introduced new offenses involving nuclear material.

New Zealand closed the security risk immigration case against an asylum seeker, Ahmed Zaoui, after five years of blocking his claim for refugee status on the grounds that he represented a threat to national security (he has convictions in Belgium and France for links to terror groups). On September 13, the Security Intelligence Service (SIS) determined that Zaoui was no longer a security risk and removed the security risk certificate it placed upon him.

New Zealand remained active in Operation Enduring Freedom in Afghanistan, working with coalition partners in undertaking Maritime Security Operations. New Zealand commands the Provincial Reconstruction Team (PRT) in Afghanistan's Bamiyan Province, as part of NATO's International Security Assistance Force (ISAF).

New Zealand continued to provide assistance to Pacific Islands Forum member countries to help them submit reports pursuant to UN Security Council Resolutions 1267, 1373, and 1540. Assistance was provided to five Pacific Island Countries (PICs) to date, and of these, four have submitted completed reports to the UN. New Zealand convened and chaired the annual Pacific Islands Forum Working Group on Counterterrorism (WGCT) which provided an opportunity for Pacific Island countries to receive up-to-date information on the international counterterrorism regime and to coordinate technical assistance projects to assist their compliance with UN Security Council reporting obligations. The last WGCT meeting was held in Nadi in June, preceding the annual Forum Regional Security Committee meeting.

New Zealand promoted counterterrorism capacity-building and a range of regional security initiatives through the Asia Security Fund. The Fund supported projects implemented by a range of partners, including regional counterterrorism centers such as the Jakarta Centre for Law Enforcement Cooperation in Indonesia and the South East Asia Regional Centre for Counter Terrorism in Malaysia.

**Philippines**

The Philippines continued to face numerous threats from terrorism. Operating within the country were the Abu Sayyaf Group (ASG), Communist Party of the Philippines/New Peoples Army (CPP/NPA), and Jemaah Islamiya (JI), all of whom are designated as Foreign Terrorist Organizations (FTOs) by the United States. In addition, the Alex Boncayao Brigade (ABB) and the Pentagon Gang are on the U.S. Terrorist Exclusion List.

PX203

Philippines military and law enforcement conducted intensive civil-military and internal security operations  to eliminate terrorist safe havens in the Sulu Archipelago and central Mindanao. This year they captured and arrested 38 ASG members and killed 127. The ASG's release in October of an Internet video soliciting funds is an indication of the group's financial constraints. Courts sentenced 14 members of the ASG to life imprisonment for their role in the May 2001 Dos Palmas kidnapping of 20 persons, including three Americans. President Arroyo signed landmark antiterrorism legislation to improve the Philippine government's ability to investigate and prosecute terrorism crimes.

The Government of the Philippines includes the following among its numerous successes against terrorists this year:

- On January 13, Philippine law enforcement authorities arrested Kule Mamagong in North Cotabato for his involvement in three bombings that left six dead and 36 injured.

- On March 11, Philippine military officials captured ASG member Abu Usman for his role in a January 2001 kidnapping in Lantawan, Basilan.

- On March 16, Philippine security forces on Basilan captured ASG member Merang Abate for his involvement in several kidnappings.

- In late March, the Philippine police arrested Pentagon Gang members, Alimona Cali and Beru Mendoza, for their role in a 1997 kidnapping of five civilians.

- On May 9, the Philippine police arrested Taya Kulat for his involvement in a bombing in Tacurong City.

- On May 11, Philippine security forces raided an ASG safe house on Simunul Island, Tawi Tawi, and arrested four children of fugitive JI bomber, Dulmatin, and deported them to Indonesia.

- In September, Philippine security officials arrested eight ASG members on Palawan Island and in Zamboanga.

- On November 12, Philippine security officials arrested Demaatol Guialal in Sultan Kudarat for his involvement in two bombings that left six dead and over 20 injured.

- On December 6, 14 ASG members were sentenced to life imprisonment for the May 2001 Dos Palmas kidnapping of 20 people, including three Americans.

- On December 10, Philippine authorities arrested ASG member Abdel Kamala in Zamboanga City for his role in the 2001 Dos Palmas kidnapping and June 2001 attack on Lamitan, Basilan.

- On January 6, the Philippine military killed five ASG terrorists and one suspected JI operative near the southern island of Tawi-Tawi.

PX203

- On January 7, the Philippine military killed ASG bomb expert, Binang Sali, in a firefight on Jolo.

- On January 16, Philippine military forces killed ASG spokesman Jainal Sali a.k.a. Abu Solaiman during an armed encounter on Jolo.

- On August 18, the Philippine military killed ASG members, Furuji and Umair Indama, who were involved in the 2001 beheading of U.S. citizen Guillermo Sobero, an October 2002 bombing that killed a U.S. serviceman, and the July 10 beheadings of 10 Philippine Marines on Basilan.

- In the aftermath of a November 13 bombing at Congress that left five dead and nine injured, Philippine law enforcement authorities killed ASG member, Abu Jandal, during a raid of a safe house in Manila.

- On December 15, Philippine security forces killed ASG member Mubin Sakandal in Tawi-Tawi.

USG and Philippine authorities also effectively used rewards programs to target terrorist groups. The U.S. Department of State paid $5 million in June through its Rewards for Justice Program to informants who provided information that led to the killings of ASG leaders Khadaffy Janjalani and Jainal Sali a.k.a Abu Solaiman. The U.S. Department of Defense, meanwhile, rewarded informants whose information led to the capture of: Khair Malvan Mundos (April), Mohammad Yusuf Karim, April), Redendo Dellosa (April), Mariano Lomarda April), Abubakar Delos Reyes (April), Binang Andang Sali (April), Jundam Jamalul ( April), Ismin Sahiron June), Alnaser Parad, June), and Itting and Omar Sailani (November). In total, the United States paid out $10,302,500 for information leading to the arrest or killing of 13 ASG members.

The passage of the Human Security Act (HSA) was a major step forward in the modernization of Philippine law enforcement tools for use against terrorists. It permits wiretapping of members of judicially designated terrorist organizations and financial investigations of individuals connected to terrorist organizations. Tight restrictions in the law, however, have prevented it from being used in actual cases.

Limited financial resources, inadequate salaries, corruption, low morale, limited cooperation between police and prosecutors, and other problems in law enforcement have hampered bringing terrorists to justice. In December, U.S prosecutors and FBI agents provided training to 34 representatives of the Philippine Anti-Terrorism Council. The training was directed at assisting the Philippines in HSA implementation, and focused on ways to use electronic surveillance authority and procedures to obtain judicial designation of organizations as terrorist under the HSA.

The Anti-Money Laundering Council (AMLC), operating under the Philippine Anti-Money Laundering Act of 2001 (AMLA), as amended in 2003, investigated and prosecuted money laundering and took the lead in implementing the asset freeze measures called for by the UN

PX203

Security Council 1267 Sanctions Committee. The AMLA was used as the legislative basis for financial actions against AQ and the Taliban. Under the law, however, the AMLC could not take direct action against suspected terrorists or those supporting terrorism; instead it had to apply for a court order to inquire into bank accounts and direct the freezing of assets and transactions.

The American Embassy received excellent cooperation from Philippine law enforcement officials in obtaining access to terrorist detainees and witnesses for FBI interviews, and access to criminal, immigration, financial, and biographic records via the mechanisms established in the U.S.-Philippine Mutual Legal Assistance Treaty. The Philippine Security Engagement Board was the primary mechanism for planning and coordination of nontraditional security issues, including counterterrorism and maritime security. This watershed agreement served as the foundation for the "Kapit Bisig" (Arm-In-Arm) counterterrorism framework that focused on civil affairs, capability upgrades, and support for AFP operations.

The United States helped the Philippines establish interagency intelligence fusion centers to support maritime interdictions against transnational criminal/terrorist organizations and a "Coast Watch" system in Mindanao. The Maritime Drug Enforcement Center is located at the Philippines Drug Enforcement Agency Headquarters in Quezon City. Three satellite centers, called Maritime Information Coordination Centers, are located at the headquarters of the Philippine Naval Forces-Western Mindanao in Zamboanga del Sur (southwestern Mindanao), the Coast Guard Station in General Santos City (southcentral Mindanao), and at Poro Point, San Fernando, La Union (northwestern Luzon). The United States also provided equipment valued at $120,000 to establish a bomb data center on Mindanao.

The Philippine Department of Foreign Affairs began issuing digitized, machine-readable passports in June. While the Philippines cooperated with USG requests for prosecuting persons who had tampered with or altered travel documents, the prosecutions carried low-level penalties. In addition, law enforcement officials were reluctant to investigate or charge vendors or users of false documents when the Philippine government was not the issuing authority.

**Singapore**

Singapore continued its bilateral and multilateral intelligence and law enforcement cooperation to investigate terrorist groups with a focus on Jemaah Islamiya (JI). In June, Singapore announced that it had detained, under the Internal Security Act (ISA), a "self-radicalized" (i.e., through the Internet) Muslim attorney who had traveled abroad in an effort to join an extremist group and fight alongside the Taliban. Also in June, Singapore announced the detention of four suspected JI members who had fled Singapore in 2001 following the arrest of other JI members by the Internal Security Department (ISD).

As of November, Singapore held in detention 32 people with links to terrorist groups. Detainees included members of JI who had plotted to carry out attacks in Singapore in the past and members of the Moro Islamic Liberation Front (MILF). Under detention orders, the detainees were required to undergo a program of religious counseling with a group of volunteer religious counselors. Singapore enlisted the support of religious teachers and scholars to study JI's

46

PX203

ideology, to develop teachings to counter the group's spread within Singapore's Muslim community, and to provide counseling to detainees.

Singapore adopted revised regulations and guidelines for banks, other financial institutions, and non-financial businesses and professions that for the first time prescribed measures in accordance with Financial Action Task Force (FATF) recommendations for countering the financing of terrorism (CFT.) The government moved to implement regulations to require inbound and outbound travelers to report cash and cash-equivalent instruments of greater than $20,700 (S$30,000). In October, Parliament approved the Terrorism (Suppression of Bombings) Act, which gives effect to the International Convention for the Suppression of Terrorist Bombings.

In March, Singapore's Ministry of Home Affairs and the U.S. Department of Homeland Security signed a Science and Technology Agreement to provide a framework to expand cooperation and carry out collaborative projects to enhance border security. After endorsing the Secure Freight Initiative (SFI) in December 2006, Singapore agreed in 2007 to participate in the Phase I deployment of SFI to improve the scanning of maritime container cargo, which will leverage Singapore's participation in the Container Security Initiative (CSI) and the Megaports Initiative.

Singaporean officials took strong measures to enhance maritime security in nearby waters, especially the Strait of Malacca, which included countering terrorist threats, piracy, and other criminal attacks. The three littoral states (Indonesia, Malaysia, and Singapore) continued their surface naval and air patrols in and over the Strait of Malacca. In March, Singapore broke ground on construction of the Changi Command and Control Centre, which will enhance Singapore's maritime security capabilities by co-locating the interagency Singapore Maritime Security Centre, the Information Fusion Centre, and the Multinational Operations and Exercises Centre.

In September, Singapore hosted the third and final International Maritime Organization (IMO)-sponsored meeting on ―The Straits of Malacca and Singapore: Enhancing Safety, Security and Environmental Protection.‖ Delegates from the three littoral states and 35 other countries and 16 international observer organizations and NGOs attended the conference. The Regional Cooperation Agreement on Combating Piracy and Armed Robbery against Ships in Asia (ReCAAP) Information Sharing Centre (ISC) continued its operations, connecting 14 governments in Asia to enhance piracy-related information sharing. The Republic of Singapore Navy and Police Coast Guard worked closely on measures to secure the Singapore Strait and port from a maritime terrorist attack.

Singapore actively participated in counterterrorism efforts through various international fora, including the ASEAN Regional Forum (ARF), and continued to take part in the Proliferation Security Initiative (PSI), including the ―Pacific Shield 07‖ exercise hosted by Japan. The Singaporean authorities regularly conducted emergency exercise drills to prepare for a potential terrorist attack in the country, bringing together relevant government agencies and civil society organizations.

**Taiwan**

47

Taiwan is not a member of the United Nations and, therefore, is not subject to UNSC Resolutions and cannot join UN conventions and protocols related to terrorist financing. Nonetheless, Taiwan sought to implement, to the maximum extent possible, all UN resolutions relating to combating terrorism and terrorist finance issues. Taiwan continued to provide rapid and thorough responses on terrorism financing issues to the American Institute in Taiwan (AIT). In 2006, Taiwan's Executive Yuan submitted an "Antiterrorist Action Law" to the Legislative Yuan. This bill would empower the Financial Supervisory Commission to seize assets of entities involved in terrorist activities, and employ a package of trade, travel, and financial sanctions against North Korea in response to UNSCR 1718. These items were under review at year's end.

The cabinet-level Counterterrorism Office (CTO) conducted several large-scale training exercises. In December, the CTO conducted its most recent exercise in Kaohsiung in preparation for the 2009 World Games. While the primary focus of this exercise was counterterrorism, it also included crisis management, disaster preparedness, and island-wide civilian military mobilization. Taiwan is currently engaged in seeking ways to harden and protect its critical infrastructure, in order to maintain continuity of operations and government in the event of an attack or a disaster.

**Thailand**

Counterterrorism cooperation with the Government of Thailand remained strong despite the September 2006 coup and preoccupation of the interim government with domestic political issues. Thai security forces continued to cooperate with the United States and other countries to deny safe haven for terrorists within their territory. No major incidents of international terrorism occurred in Thailand this year, though insurgency-related violence in Thailand's southern provinces of Pattani, Narathiwat, Yala, and Songkhla continued unabated, with acts of violence occurring daily.

The December 31, 2006 bomb attacks in Bangkok, which killed three Thai and injured dozens, including six foreign tourists, remained unsolved. Thai officials contended the bombing was related to domestic political issues. The locations targeted in the attacks were not specifically identified with foreign interests or tourists. On October 1, 2007, a bomb exploded outside Army headquarters in Bangkok. Two bomb disposal personnel were wounded. No suspects have been apprehended and Thai officials contended that this attack, like the December 31 bombings, was related to domestic issues.

Thailand's biggest domestic security challenge remained the ongoing separatist movement in the far southern provinces of Narathiwat, Yala, Pattani, and Songkhla. This region, bordering Malaysia, has experienced episodic, separatist-related violence for decades among the predominantly ethnic Malay-Muslim population. Since January 2004, violence increased dramatically and continued on a near daily basis. Suspected separatist militants carried out assassinations, beheadings, and coordinated bombings using improvised explosive devices.

A particularly brutal series of attacks commenced on March 14 in Yala province when suspected insurgents ambushed a civilian passenger van and executed the eight Buddhist passengers on board. Subsequently, on March 15, a mosque and a tea shop frequented by Muslims were

PX203

attacked with grenades by unknown assailants. Thai press reports and security forces attribute nearly all the attacks in the south to militant separatists, but human rights watchers believe attacks are committed by both Buddhist and Muslim groups.

Interim Prime Minister Surayud's efforts at conciliation have had only a limited impact, and attacks continued to occur regularly. In June, Thai security forces adopted a more aggressive approach to dealing with the militants. Security forces began large scale operations to arrest and detain anyone suspected of having links to the insurgency. In late October, General Anupong Paochinda, the newly appointed commander-in-chief of the Royal Thai Army, reorganized security forces operating in the South to ensure better coordination of security operations.

Legal mechanisms to counter the insurgency lagged behind security efforts. Government prosecutors struggled to develop cases that could stand up in court and relied chiefly on confessions in order to bring prosecutions. Police forensics and ballistics work often failed to produce evidence that led to arrests following separatist attacks. Because of the difficulties in bringing cases to court, security forces engaging in operations to arrest militants relied instead on their powers under martial law and the 2005 Emergency Decree to detain suspects without trial.

Prosecutors have had some success in bringing cases to court, however. On July 2, after an investigation into bombing incidents, security forces arrested seven suspected bomb makers at an Islamic boarding school. This case remained in the court system; the prosecution is based on the confession of the suspects. In November, police were able to arrest six suspects after a series of bombings in Yala province, based on forensic investigations.

Thai authorities believe the Barisan Revolusi Nasional Coordinate (BRN-C) is behind most of the violence in the south. The operational arm of this group is the Ruanda Kumpulan Kecil (RKK). Other militant groups active in southern Thailand include the Pattani United Liberation Organization (PULO), and the Pattani Islamic Mujahideen Movement (GMIP). Because of the transnational nature of the ethnic Malay-Muslim community in southern Thailand, all the separatist groups active in the South may have connections throughout maritime Southeast Asia. Some of these groups may share elements of ideology and general rejection of Western influence held by international Islamic terrorists, but by all indications they remained primarily focused on seeking autonomy for the far southern provinces and historical grievances against the Thai state.

Thailand's southern border with Malaysia remained an issue of concern because of the difficulty both Thailand and Malaysia have had in controlling it. In the past, former Prime Minister Thaksin alleged militants were traveling across the border to training camps in Kalantan, and interim Prime Minister Surayud claimed militants in southern Thailand funded their activities through business operations in Malaysia – an allegation that Malaysia strenuously denied.

Relations between Thailand and Malaysia improved after a series of meetings between Surayud and Malaysian Prime Minister Abdullah Badawi in January and February, in which the two leaders agreed to a series of measures to tighten security along the border. These measures included resolving issues of recognizing dual nationality, sharing information, and initiating joint patrols between Thai and Malaysian security forces.

PX203

Thai security forces cooperated with the United States and with other countries to deny safe haven to terrorists within their territory. In the past, Thailand has served as a transit point for regional terrorists, as evidenced by the 2003 capture in central Thailand of Nurjaman Riduan bin Isomuddin (a.k.a. Hambali), JI's operations chief and the architect behind the 2002 Bali bombings. Thai and USG officials were concerned that transnational terror groups could establish links with southern Thailand-based separatist groups. However, there were no indications that transnational terrorist groups were directly involved in the violence in the south, and there was no evidence of direct operational links between southern Thai separatist groups and regional terror networks.

There was no evidence that foreign governments provided financial, military, or diplomatic support for militant separatist operations in the South of Thailand. However, PULO reportedly operated openly in Syria, and a number of self-declared separatist leaders received asylum in Europe or were believed to be hiding in Malaysia.

Thai police and security officials participated in USG training programs, and the U.S. and Thai militaries conducted a number of joint exercises that supported counterterrorism. Thailand is a co-sponsor of the International Law Enforcement Academy (ILEA) in Bangkok. It continued to run training modules for Thai security officials and police that included post-blast and crime scene investigation courses.

Under the auspices of the Container Security Initiative (CSI) and the Megaports Initiative, Thailand participated in a range of port security programs, including programs to ensure that Thailand has proper controls on the export of munitions, dual use goods, and related technologies.

The Thai Anti-Money Laundering Office (AMLO) acted as the center for interdicting terrorist finance. On October 28, The Ministry of Finance issued new regulations governing cross border cash carrying, bringing the Thai government into line with the Financial Action Task Force Special Recommendation on Terrorist Financing. UN 1267 resolutions were quickly implemented by Thai banks under instructions from AMLO. Thailand engaged with the G8 Counterterrorism Action Group on increasing penalties for document fraud, an ongoing problem in Thailand.

Thailand participated actively in international counterterrorism efforts through Asia Pacific Economic Cooperation (APEC), the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum (ARF), and other fora, and in January became a signatory to the ASEAN Convention on Counterterrorism. Thailand has not endorsed the Proliferation Security Initiative (PSI).

PX203

## EUROPE OVERVIEW

"Since the attacks of July 7, 2005, communities in Britain and across the world have come together in a common front against terrorism and against the propaganda that fuels it. And this requires not just the security measures I have outlined but that we work with all communities and all countries through debate, discussion, dialogue, and education as we tackle at root the evils that risk driving people, particularly vulnerable young people, into the hands of violent extremists."

–Gordon Brown, Prime Minister of the United Kingdom,
July 5, 2007

European countries continued to improve their capabilities to counter the terrorist threat, foiled several significant terrorist plots, and continued to prosecute and jail terrorist suspects. European governments were increasingly concerned about radicalization among their populations and sought greater understanding of the process of "radicalization" and how to prevent it. Several governments increased outreach to Muslim communities living within their countries and made attempts to gain support from within those communities to counter the appeal of extremist ideology.

European nations continued to work in close partnership with the United States against a terrorist threat characterized by both external and, increasingly, internal components. The contributions of European countries in sharing intelligence, arresting members of terrorist cells, and interdicting terrorist financing and logistics were vital elements in the War on Terror.

At the June 2004 U.S.-EU Summit, the sides agreed on a Declaration on Combating Terrorism that renewed the transatlantic commitment to develop measures to maximize capacities to detect, investigate, and prosecute terrorists; prevent terrorist attacks; prevent access by terrorists to financial and other economic resources; enhance information sharing and cooperation among law enforcement agencies; and to improve the effectiveness of border information systems. These commitments were reaffirmed at the 2007 Summit, and work continued on implementation.

European nations were active participants in a variety of multilateral organizations that contribute to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF), the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). During its G8 Presidency, Germany placed a particular emphasis on supporting UN counterterrorism activities and topics such as terrorist use of the Internet, protecting critical energy infrastructure, and countering radicalization and recruitment to terrorism. The United States worked with its international partners through multilateral organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and help counter terrorism globally. OSCE members committed themselves to becoming parties to the 13

51

PX203

international terrorism conventions and protocols, to work together to modernize travel documents and shipping container security, to prevent and suppress the financing of terrorist organizations, and to implement UNSC Resolution 1540 to counter WMD (related materials and the means of delivery) proliferation. *(See Chapter 5, Terrorist Safe Havens (7120 Report) for further information on the G8, NATO, FATF, and OSCE, and on the tools we are using to address the conditions that terrorists exploit.)*

Terrorist activity and the presence of terrorist support networks in Europe remained a source of concern. Efforts to combat the threat in Europe were sometimes slowed by legal protections that made it difficult to take firm judicial action against suspected terrorists, asylum laws that afforded loopholes, the absence of adequate legislation, or standards of evidence that limited the use of classified information in holding terrorist suspects. Terrorists also sought to take advantage of the ease of travel among Schengen countries. At times, some European states have not been able to prosecute successfully or hold some of the suspected terrorists brought before their courts – a product, in part, of insufficient measures to use intelligence information in judicial proceedings. The EU as a whole remained reluctant to take steps to block the assets of charities associated with HAMAS and Hizballah.

Cooperation with and among European law enforcement agencies remained vital for counterterrorism successes. France and Spain continued to cooperate effectively against Basque Fatherland and Liberty (ETA). Germany led Europe in maintaining action against the militant Kurdish separatist group Kongra Gel/Kurdistan Workers' Party (KGK/PKK), which raised funds, often through illicit activity, to fund violence in Turkey, but coordination problems across borders in Europe blunted some successful arrests. Portuguese authorities worked with security services of several other European countries to arrest and extradite to Italy a person suspected of associating with and recruiting for an international terrorist organization. Eight other suspects were also arrested during similar operations across Europe. The Swiss Parliament ratified the U.S.-Swiss Operative Working Agreement, which entered into force in December.

No major terrorist attacks took place in Europe in 2007, but several plots were disrupted that could have resulted in a serious loss of life. In June, terrorists attempted attacks in London and, a day later, terrorists drove a burning car into Glasgow airport. A total of seven individuals, including the two suspected perpetrators in Glasgow, were arrested in connection with the attacks. In Germany, a major terrorist plot was disrupted in September with the arrests of two ethnic Germans and a Turkish citizen resident in Germany. The plotters, who German officials said were connected to the Islamic Jihad Group (IJG), had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb attacks. Also in September, Danish police in Copenhagen arrested eight alleged militant Islamists with al-Qa'ida (AQ) links on suspicion that they were preparing explosives for use in a terrorist attack. Earlier in the year, Revolutionary Struggle claimed responsibility for a rocket propelled grenade (RPG) attack against the U.S. Embassy in Athens; no one was hurt.

Judicial proceedings in countries across Europe resulted in the convictions of terrorist suspects. In Belgium, hearings began in the case of Bilal Soughir and five other men suspected of having recruited and trained terrorists for suicide attacks in Iraq. In Bosnia, three persons were convicted on terrorism charges in that country's first state-level terrorism trial, and in February, a Danish

PX203

court convicted four men charged with planning a terrorist attack—the country's first trial under 2002 counterterrorism legislation. Members of the Moroccan Islamic Combatant Group (GICM) were convicted in France for providing material support to a terrorist organization in connection with the 2003 terrorist bombings in Casablanca. In May, the Athens Court of Appeals in Greece issued consolidated sentences in the November 17 (N17) appeals trial. Of the 219 counts remaining, convictions were sustained on 218. The six members of the operational core of N17 received a total of 44 life sentences. In October, Spain's National Court returned guilty verdicts on 21 of 29 individuals suspected of involvement in the 2003 Madrid train bombings that killed 191 people and wounded hundreds of others, and handed down sentences ranging from three years to almost 43,000 years in prison (although the maximum time they can serve under Spanish law is 40 years).

## Albania

Albania pledged to increase its contribution of troops to both Afghanistan and Iraq, maintained frozen bank accounts related to money laundering and terrorism financing, and aggressively worked with the United States and other countries to combat terrorism. Albania made progress in identifying vulnerabilities at land and sea borders, but the government and police forces continued to face substantial challenges to enforce fully border security and combat organized crime and corruption.

In December, Hamzeh Abu Rayyan, the administrator for UNSCR 1267 Committee-designated terrorist financier Yassin Al-Kadi, was charged with hiding funds used to finance terror. This marked the first criminal terror finance-related case charged in Albania. A civil suit filed by al-Kadi to release his assets from seizure was originally dismissed for technical reasons but was refiled in July.

Although no new groups' assets were frozen this year under Albania's Terrorism Financing Freeze (TFF) law enacted in 2004, as of October, the Ministry of Finance claimed that it maintained asset freezes against six individuals and fourteen foundations and companies on the UNSCR 1267 list. Despite this progress, the effectiveness of the government's counterterrorist financing effort was undermined by a lack of data-processing infrastructure and an inadequate capability to track and manage cases properly.

## Armenia

Armenia's counterterrorism contribution included its continued commitment to overflight and landing rights of U.S. military aircraft, additional security support to U.S. facilities in Armenia during times of terrorist alert, and the renewed deployment of peacekeeping forces in Iraq. In addition, Armenia joined the Global Initiative to Combat Nuclear Terrorism, and expressed interest in joining the Convention for Suppression of Acts of Nuclear Terrorism.

In September, a delegation of inspectors from the UN Counterterrorism Committee Executive Directorate visited Armenia to ascertain its progress in complying with UNSCR 1372, and found that 12 of the 13 legal counterterrorism instruments had already been implemented or were soon

PX203

to be implemented. And in July, the Armenian government succeeded in adapting the EU export control list of "dual-use" commodities to its own national control list.

The Financial Monitoring Center (FMC), a U.S.-supported financial intelligence unit within the Central Bank of Armenia (CBA), continued to make investigative strides against money-laundering. During the first nine months of the year, the FMC received twenty-four suspicious transaction reports (STRs), compared to twenty-three STRs during the same period in 2006, and six STRs in 2005. Under its current mandate, the CBA can freeze temporarily financial assets while referring the STRs to the competent authorities for further investigation. However, it must rely on private financial institutions to self-monitor and lacked an integrated IT system to store information on financial entities or individuals of concern. At the end of the year, no cases involving terrorist financing were uncovered or prosecuted. The FMC received Egmont Group membership this year.

Armenia improved border security by maintaining an automated Border Management Information System (BMIS) that documented and stored the names of travelers at nearly all official points of entry, and contained criminal and terrorist watchlists as updated by the Republic of Armenia Police (RAP) and National Security Service (NSS). While Armenia has no bilateral agreement with the United States governing the sharing of information on travelers, the NSS and RAP shared information with the U.S. Embassy when they discovered fraudulent U.S. visas or other documents of interest to the United States

Armenia's warming relations with neighboring Iran continued, with Armenia hosting official visits by Iranian President Ahmadinejad (October) and Iranian Defense Minister Najjar (November). In addition to fostering closer diplomatic ties, these visits served to solidify previous bilateral commitments to develop joint energy and transportation projects. This closer cooperation has made Armenia more reluctant to criticize publicly objectionable Iranian conduct or join other UN member states in advocating for sanctions on the Iranian regime.

Although Armenia continued to strengthen its counterterrorism capabilities and enhanced its counterterrorism cooperation with the United States and other international security organizations, its geographic location, porous borders, and loose visa regime still provided ample opportunities for traffickers of illicit materials, persons, and finances. Furthermore, endemic governmental corruption, a significant organized crime presence, and a large shadow economy made the country potentially vulnerable to money laundering and terrorist financing schemes.

**Austria**

Austria experienced two concrete, Internet-based terror threats from second generation Muslim immigrants who were subsequently arrested. A national "integration platform" launched in the autumn sought to mobilize both the Austrian government and society to promote social and economic integration, prevent the isolation of ethnic and religious groups, and stop radicalization.

PX203

Austria made modest contributions to stability in Afghanistan and Iraq, with its contribution of three liaison officers at the International Security Assistance Force (ISAF) headquarters in Kabul, after having completed two larger in-and-out missions in Afghanistan since 2002.

However, Austria failed to coordinate fully law enforcement activities with other states against the militant Kurdish separatist group, Kongra Gel/Kurdistan Workers' Party (KGK/PKK), an EU- and U.S.-designated terrorist group. For example, in mid-year, Austria initially detained and quickly released KGK/PKK operative Riza Altun and allowed him to board a plane for northern Iraq, despite the fact that he had fake documents and faced charges in France and an extradition request from Turkey. In November, Austria failed to detain Remzi Kartal, a KGK/PKK leader known to be traveling to Austria who was wanted by INTERPOL.

Austria's legal framework to combat terrorism includes legislation making the planning of intended terrorist acts a criminal offense, but the 2005 terrorism law is untested. Austria also has policies in place to combat terrorism financing and money laundering.

**Azerbaijan**

Over the past five years, the Government of Azerbaijan has aggressively apprehended and prosecuted members of suspected terrorist groups. It has closed organizations that were suspected of supporting terrorist groups and arrested at least 39 persons from three separate terrorist-associated groups, on terrorism-related charges.

Azerbaijan has granted blanket overflight clearance, engaged in information sharing and law-enforcement cooperation, and has approved numerous landings and refueling operations at its civilian airport in support of U.S. military operations in Afghanistan. Since August 2003, Azerbaijan has supported peacekeeping operations in Iraq with an infantry company of approximately 150 soldiers stationed at the Haditha Dam. A platoon of Azerbaijani soldiers has worked with the Turkish peacekeeping contingent in Afghanistan since November 2002.

While Azerbaijan has taken steps to combat terrorist financing and identify possible terrorist-related funding by distributing lists of suspected terrorist groups and individuals to local banks, comprehensive legislation to counter terrorist financing has not yet passed parliament. In December 2006, an inter-ministerial experts group responsible for drafting anti-money laundering and counterterrorist finance legislation through the President's office provided its most recent draft to the U.S. Department of Justice and the Council of Europe; the Department of Justice provided comments on the law and discussed it with Azerbaijani government officials. The government has not yet presented the draft law to parliament, nor has it taken steps to create a Financial Intelligence Unit. In anticipation of future adoption of this law, the USG has trained prosecutors, investigators, and judges on implementing anti-money laundering and anti-terrorist financing law enforcement techniques.

In February, Azerbaijani authorities arrested a group of 15 Azerbaijani citizens in Baku who called themselves the Northern Mahdi Army. The group was charged with having ties to Iran's Islamic Revolutionary Guards Corps (IRGC). In October, the group went before a closed trial on charges of cooperation with a foreign intelligence service, high treason, possession of illegal

PX203

weapons and robbery. According to the Azerbaijani Ministry of National Security (MNS), the group was organized to establish a state ruled by Sharia (Islamic) law. According to published reports, the MNS said that one of the group members had met an IRGC officer in Qom, Iran, and was offered money to fight against the United States, Israel, and other Western countries. According to published reports, the group received training in Iran and Azerbaijan.

During security sweeps in late October and early November, a group of twelve Azerbaijanis, reportedly led by an ethnic Arab named Abu Jafar, were arrested in Sumgayit, Azerbaijan on terrorism-related charges. A large quantity of arms and ammunition, a map of Sumgayit, and other equipment were confiscated from members of the group. Criminal cases are pending.

Separately, in November, 11 Azerbaijani citizens were arrested over a number of days in connection with a late October threat against the U.S. Embassy in Baku, which resulted in the embassy working at limited staffing for two days. The group consisted of Azerbaijani citizens led by a renegade radicalized Azerbaijani army officer, Kamran Asadov, who left his unit without permission, taking four assault rifles, a machine gun, 20 grenades, and a large amount of cartridges on October 24. The fugitives from the group robbed a Lukoil gas station in Baku on October 30. According to press reports, members of the groups told the MNS that they planned to attack the U.S. Embassy. All the weapons and known members of the group have been seized and criminal charges are pending.

**Belgium**

Belgium continued to strengthen its response to the threat of terrorism, fashioning new institutions in its security services, improving internal coordination among antiterrorism offices, promulgating new laws to deal with terrorism and money laundering more aggressively, and strengthening agencies that confront terrorist financing.

In 2006, under Belgium's 2003 antiterrorism law, members of the Revolutionary People's Liberation Party/Front (DHKP/C), a far left militant Turkish group, were convicted for membership in a terror organization and for providing material support to a terrorist group. The Belgian Court of Appeals upheld the DHKP/C convictions and imposed stiffer sentences in November 2006. In April 2007, Belgium's Supreme Court cited technical grounds in quashing the Court of Appeals ruling; at year's end the case was being retried in the Antwerp Appellate Court.

On October 15, hearings began in the case of Bilal Soughir and five other men suspected of recruiting and training terrorists for suicide attacks in Iraq, including Muriel Degauque, a Belgian national who, in 2005, blew herself up in a failed bomb attack in Iraq. Federal authorities planned ongoing reviews of court rulings to gauge what acts and groups could be prosecuted successfully under the 2003 legislation and what types of sentences could be imposed.

Recently-enacted legislation that loosened restrictions on police surveillance of alleged extremists and clarified procedures for authorizing searches, wiretaps, and use of informants also facilitated action against suspected terrorists. Belgian authorities continued to strengthen their

PX203

internal capabilities to combat terrorism and made its Coordinating Body for Threat Analysis (OCAM/CODA) more fully operational.[3] OCAM aims to facilitate the exchange of information among all governmental counterterrorism bodies and make a common threat analysis on the basis of such information exchanges. The new agency operated under the joint authority of the Justice and Interior Ministers and included representatives from the external and internal services, the Federal Police, Customs, and the Ministries of Transport, Finance, and Foreign Affairs.

Belgium also granted authorities the ability to create a national list of terrorist entities, separate from UN and EU lists, to be coordinated by OCAM, and to include financiers and suspected financiers of terrorism. This information will allow Belgian authorities to develop and apply a national capacity to freeze assets (in addition to UN- and EU-mandated asset freezes that Belgium already implements). In addition, Belgian cooperation on security programs such as the Container Security Initiative (CSI), Megaports, and export controls has been generally excellent.

Belgian emergency action plans have been reviewed and updated to prepare for and respond to potential attacks, including bioterrorism. On a local level, authorities have instituted drills of rapid alert systems, and reviewed critical infrastructure support and civil protection and medical assistance procedures.  Federal and local authorities have participated in a EUCOM WMD Consequence Management exercise, furthering U.S.-Belgian cooperation in this area. Police and private sector working groups have been formed to target terrorists, the financing of terrorism, and terrorist use of the Internet.

Belgium made a significant military contribution to the International Security Assistance Force (ISAF) in Afghanistan, where it maintains a ground presence of about 400 troops, mainly at Kabul airport, with some personnel at the Provisional Reconstruction Team (PRT) in Konduz. Belgium contributed approximately $33 million euros toward Afghan reconstruction and promised to boost its support for reconstruction and development, totaling approximately 45 million euros, to be disbursed over the next four years. Assistance to Iraq included expanded participation in the Jordan International Police Training Center in Amman (which subsequently closed in September), training for Iraqi diplomats and magistrates in Belgium, and training for Iraqi servicemen in Abu Dhabi, in cooperation with Germany.

Belgian authorities remained concerned about potential terror activities involving groups from Algeria and North Africa, and have investigated groups such as the Moroccan Islamic Combatant Group (GICM), the DHKP/C, a far right group with links to neo-Nazi groups, and a cell suspected of training members for attacks in Iraq. The KGK/PKK is a known presence, with television production studios in Brussels. The KGK/PKK continued to exploit Belgium to raise illicit financing for violence in Turkey and its camps in northern Iraq.

Belgium continued to take action in response to EU and UN Security Council actions to freeze suspected terrorist assets and to study steps to improve its ability to combat and control terrorist financing. Based upon a mutual evaluation review by the Financial Action Task Force (FATF) in June 2005, Belgium was working to implement FATF's recommendations.

---

[3]By law, it became operational on December 1, 2006, but the start up was delayed while budget and personnel issues were worked out.

PX203

**Bosnia and Herzegovina**

Despite increased ethnic polarization and disputes among Bosnian political leaders that hindered the functioning of state government for most of the year, Bosnia and Herzegovina's law enforcement organizations cooperated with the United States on international counterterrorism issues. Bosnia remained a weak, decentralized state and ethnically-based political confrontations continued to undermine national government. As a result of weak interagency communication, competing security structures, and political interference in law enforcement, Bosnia is vulnerable to exploitation as a potential staging ground for terrorist operations in Europe. The dysfunctional Bosnian state government and efforts by Republika Srpska officials to undermine state-level institutions contributed to a slowdown, and in some cases, setbacks in efforts to improve operational capabilities to combat terrorism and terrorism finance.

The State Investigation and Protection Agency (SIPA) is the Bosnia agency with primary responsibility for counterterrorism operations. The position of SIPA Director was unfilled for most of the year and the agency's readiness and capabilities suffered as a result. In addition, the head of the Ministry of Security, parent organization to SIPA, politicized the Ministry's terrorism threat analysis and counterterrorism operations. Although Bosnian capabilities and potential for independent action were degraded over the year, Bosnian authorities were generally effective and responsive to U.S. counterterrorism cooperation requests.

The Citizenship Review Commission (CRC), formed to review the status of foreign mujahedin fighters and others who obtained Bosnian citizenship during and after the 1992-95 war, completed its review of approximately 1200 cases. The CRC withdrew citizenship from 612 individuals it deemed to have obtained Bosnian citizenship unlawfully.

On January 10, the Bosnian State Court handed down a fifteen and a half year prison sentence for Mirsad Bektasevic, a lead defendant in the country's first state-level terrorism trial.  Two co-defendants received thirteen and a half, and eight year sentences, respectively. The three defendants were arrested in October 2005, on terrorism charges, and two others were charged with illegal possession of explosives. Lead defendants Mirsad Bektasevic (a Swedish citizen) and Abdulkadir Cesur were linked to terrorist networks elsewhere in Europe. In June 2007, a State Court appellate panel upheld the convictions but substantially reduced the sentences.

The Bosnian organization Aktivna Islamska Omladina (Active Islamic Youth, or AIO) spread extremist and anti-American rhetoric through its weekly print and online publication *SAFF Magazine*. AIO was founded in Zenica in 1995 by individuals with ties to the so-called "El Mujahid Brigade," a wartime unit comprised mainly of foreign extremists. AIO conducts youth outreach in Bosnia and maintains a presence in Western Europe.

Bosnia and Herzegovina continued its deployments in support of MNF-I. In September, the sixth rotation of the Armed Forces' 36-member Explosive Ordnance Disposal Unit deployed to Iraq. The Armed Forces also undertook specialized training that would allow for further deployments to either Iraq or to support Operation Enduring Freedom.

PX203

**Bulgaria**

Bulgaria's Financial Intelligence Agency (FIA) remained vigilant against terrorist financing and cooperated with the United States on identifying and investigating terrorist assets. The FIA regularly distributed lists of individuals and organizations linked to terrorism to all banks in Bulgaria, the Ministry of Interior, Customs, and the Border Police. The FIA was active in efforts against all mandated UNSCR-designated terrorists and terrorist organizations, and cooperated on USG-designated individuals and organizations. The FIA advised the banking sector to use the Department of Treasury's Office of Foreign Assets Control (OFAC) website as a reliable information resource for individuals and organizations associated with terrorism. The FIA provided feedback, including information on the response level of Bulgaria's banks, to the U.S. Treasury Department's Financial Crimes Enforcement Network (FINCEN).

In 2006, the Bulgarian Parliament passed amendments that further strengthened the FIA's investigative powers, enabling it to obtain bank information without a court order or a Suspicious Transaction Report (STR). In late 2007, as part of legislation creating the new State Agency for National Security (DANS), the FIA was transferred from the Finance Ministry to DANS. The legislation lacked clarity on the independent and investigatory powers of the FIA, potentially complicating its Egmont compliance and undermining its ability to execute its mission and uphold its international commitments. Aware of the issue, Bulgarian officials were considering additional legislative and regulatory measures at year's end.

In December, the Bulgarian parliament adopted the State Agency for National Security Act, under which DANS will consist of four chief directorates:  Internal Security, Counterintelligence, Technical Operations, and Economic and Financial Security. It will split off the current National Security Service from the Interior Ministry, Military Counterintelligence from the Defense Ministry, and the Financial Intelligence Agency from the Finance Ministry. These services will be incorporated into DANS. The new agency will exercise control over the stay of foreigners in Bulgaria, which was previously handled by the National Security Service.

Bulgaria signed and ratified the Council of Europe's new Convention on the Prevention of Terrorism in 2006, which entered into force on June 1, 2007. Bulgaria's religious leaders, including leaders of the nation's Muslim community, spoke out strongly against terrorism.

The Bulgarian government continued its high level of cooperation with the United States in preventing acts of terrorism against U.S. citizens in Bulgaria and elsewhere. This included sharing information on potential terrorist threats and a heightened level of protection for USG facilities. Bulgaria's Defense Ministry, Interior Ministry, Nuclear Regulatory Agency, Ports Authorities, and Civil Protection Agency participated in a multinational field exercise and command post exercise led by the Department of Defense's Defense Threat Reduction Agency (DTRA) and the FBI on handling a terrorist attack scenario involving WMD.

Bulgaria has contributed approximately 150 troops to Operation Iraqi Freedom and 400 troops to the International Security Assistance Force (ISAF) in Afghanistan.

**Croatia**

59

PX203

The Croatian government increased its contribution to the International Security Assistance Force (ISAF) in Afghanistan from 150 to 200 soldiers who served in military police, medical support, force security, and liaison and training roles. In addition, Croatia maintained a small civilian and police team deployment to the German-led Provincial Reconstruction Team in Feyzabad. Croatia's long land and sea borders presented a monitoring and enforcement challenge and guided continued efforts to improve its border integrity and its export control regime.

## Cyprus

Cyprus took a clear stand against international terrorism and supported United States counterterrorism efforts. The Government of Cyprus continued to allow blanket overflight and landing rights to U.S. military aircraft supporting operations in Iraq and Afghanistan. Cyprus was responsive to international efforts to block and freeze terrorist assets, implemented the Financial Action Task Force's (FATF) recommendations, and conformed to EU counterterrorism directives.

Cyprus's legal framework for investigating and prosecuting terrorist-related activity remained relatively weak. The United States and the Republic of Cyprus cooperated closely on terrorist finance and money laundering issues. The Cypriot Anti-Money Laundering Authority (MOKAS) implemented new UNSCR 1267 Committee decisions immediately and informally tracked names listed under U.S. Executive Orders.

In the area administered by Turkish Cypriots, issues of status and recognition inevitably restricted the ability of authorities to cooperate on counterterrorism. Turkish Cypriots cannot sign treaties, UN conventions, or other international agreements, for example. Moreover, the Turkish Cypriot-administered area lacked the legal and institutional framework necessary to combat money laundering and terrorist financing effectively. Within these limitations, Turkish Cypriots cooperated in pursuing specific counterterrorism objectives. They shuttered the First Merchant Bank after receiving evidence of illicit financial activity there and conducted a successful criminal investigation into the bank's activities, bringing together law enforcement, financial crimes investigators, and ―central bankers" to revoke First Merchant's operating license and seize its assets.

Kurdish-origin communities exist on both sides of the island. The KGK/PKK has a presence in Cyprus, although its activities generally were limited to fundraising and transit en route to third countries; authorities believed there was little risk the group would conduct operations there. Cyprus maintained that it was fulfilling all responsibilities with respect to the EU designation of the KGK/PKK as a terrorist organization.

A large volume of container traffic moves through ports in the government-controlled area, making Cyprus an attractive and convenient venue for terrorist organizations seeking transshipment points for weapons and other items of concern. While Cypriot agencies responsible for nonproliferation assess only a small risk of illicit materials moving through transit cargo, the United States continued to push for increased maritime cooperation. The

PX203

American Embassy organized and executed training programs to assist Cyprus to create a stronger export control regime and to pursue more proactive nonproliferation enforcement.

While the Turkish Cypriot community took some steps to prevent terrorist financing within its banking institutions, authorities lacked the legal and institutional framework to meet minimum international standards with regard to combating money laundering and terrorist finance. The "TRNC Central Bank" regularly asked financial institutions to search for assets linked to individuals or entities whom the United States and/or the UNSCR 1267 Committee has designated as terrorists. However, the north lacked modern audit control technology, relying instead on antiquated paper-based systems. Consequently, the Turkish Cypriot community's financial sector is vulnerable to abuse by criminals and terrorists. Authorities in the north are aware of the problem and "parliament" recently passed anti-money laundering legislation. Authorities are now looking to the international community for assistance with training and organizing a Financial Crimes Unit that would significantly improve their ability to combat illicit financial activity.

**Czech Republic**

Whether protecting the Prague headquarters of Radio Free Europe/Radio Liberty and other facilities, providing critical military assistance in Iraq and Afghanistan, or cooperating in criminal investigations, the Czech Republic remained a steadfast U.S. ally in the War on Terror.

The Czech Republic contributed significant numbers of troops to Coalition efforts in Iraq and Afghanistan. In Afghanistan, the Czech government is establishing a Provincial Reconstruction Team in Logar Province, and has decided to nearly double the size of its military force there, to over 400 soldiers. In Iraq, it maintained approximately 100 personnel, but will withdraw all but 20 by June 2008.

Pursuant to a U.S. request, Czech authorities extradited Oussama Kassir to the United States on September 25. Kassir, a Lebanese-born Swedish national, was alleged to have conspired to provide material support to terrorists through the planned operation of a terrorist training camp in Oregon. Kassir had requested political asylum, which the Czech government denied.

**Denmark**

Denmark completed implementation of two counterterrorism legislation packages that were passed by Parliament in 2006. These new measures criminalized the recruitment of persons to terrorism and the training of others to assist in committing terrorist acts, including financing terrorism. These new counterterrorism measures enhanced the Danish government's ability to investigate and prevent terrorism and other serious crimes. In March, Parliament passed additional legislation that prohibited private persons from purchasing fertilizer with ammonium nitrate levels of more than 28 percent, which could be used for improvised explosive devices. Denmark worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force (FATF), and in international nonproliferation groups, such as PSI and the Global Initiative to Combat Nuclear Terrorism. We note however, that Roj-TV, a KGK/PKK affiliated media outlet, continued to operate in Denmark.

PX203

During the year, Danish law enforcement authorities arrested a number of individuals suspected of involvement in terrorism. Prominent new actions and arrests included:

- On September 4, Danish police arrested eight alleged militant Islamists in Copenhagen with al-Qa'ida (AQ) links on suspicion that they were preparing explosives for use in a terror attack. Police raided 11 homes in the greater Copenhagen area during the sweep. Six of the men were released from custody, while two await trial and face possible life in prison, if convicted.

- On November 11, Danish police arrested a foreign-born resident in Copenhagen on charges of urging terror groups abroad to kidnap Danish nationals. The 22-year-old suspect had links to two men arrested on terrorism charges in Copenhagen on September 4 (see above). Danish officials stated that the man arrested in the Nørrebro district of Copenhagen had apparently hoped that by kidnapping Danish citizens abroad, pressure could be exerted on Danish authorities to release the two suspects. The man remained in police custody awaiting trial.

Key judicial proceedings involving Islamic terrorism related crimes included:

- In January, the State Prosecutor's office dropped charges against a group of Danish imams who traveled to the Middle East in 2005, due to lack of evidence that they broke any laws in their alleged efforts to convince Muslims to protest against the publication of the Mohammed cartoons. The decision to drop the charges cleared the group of any responsibility for attacks on Danish embassies in Syria and Lebanon at the start of 2006.

- In February, a Danish court convicted four men charged with planning a terrorist attack, which marked the country's first trial under 2002 counterterrorism legislation. The men, all Muslims born in Denmark, were arrested in 2005 in the Copenhagen suburb of Glostrup, on charges of attempting to conduct terrorist acts in cooperation with two men arrested in Bosnia. On February 15th, 2007, however, a panel of judges overturned the verdict for three of the suspects due to insufficient evidence. The guilty verdict for the fourth suspect, 17-year-old Abdul Basit Abu-Lifa, was upheld. Abu-Lifa was sentenced to seven years' imprisonment, which was upheld by a Danish Supreme Court decision in October. In July, the public prosecutor in Copenhagen decided to proceed with a re-trial for one of the three suspects whose conviction had been overruled by the judges.

- On March 28, Copenhagen City Court acquitted two leading members of the Danish branch of the Al-Aqsa Foundation of charges of supporting terrorism. The men were indicted in 2003 for funneling money collected in Denmark, ostensibly for humanitarian purposes, to terrorist-related groups abroad. Danish authorities seized approximately $89,406 in funds from the organization. The court ruled that the evidence against the group's president and treasurer was insufficient to establish a connection between the funds collected by Al-Aqsa in Denmark and HAMAS.

PX203

- On April 11, Copenhagen City Court convicted Said Mansour of inciting terrorism and sentenced him to three years and six months in prison. Mansour, a Danish citizen originally from Morocco, was arrested in September 2005 by Danish police for making and distributing DVDs and videos throughout Europe that showed beheadings and killings and called for a violent jihad against the Western world. The case marked the first conviction under 2002 counterterrorism legislation prohibiting the promotion of terrorism on Danish soil. Mansour previously served a 90-day sentence from December 2004 on weapons possession charges.

- On November 23, the Danish High Court convicted three men under national counterterrorism legislation for planning terrorist acts. Two foreign-born residents received 11-year prison sentences, while a Danish convert to Islam received a four-year sentence. A fourth defendant was acquitted after the presiding judge refused to consider a lesser charge. The men were among nine individuals arrested in September 2006, in Vollsmose, a suburb of Denmark's third-largest city, Odense, on suspicion of planning a terrorist attack. Prosecutors charged four of the nine with plotting acts of terrorism after finding laboratory equipment, chemicals, and explosives in their possession.

- On December 20, a Copenhagen municipal court acquitted seven people accused of supporting terrorism by transferring a portion of the proceeds of the sale of T-shirts to the Popular Front for the Liberation of Palestine (PFLP) and the Revolutionary Armed Forces of Colombia (FARC), both of which are EU- and U.S.-listed terrorist groups. Two of the three presiding judges in the case ruled that, while there was evidence to show that the FARC and the PFLP had carried out criminal actions, it was not possible to determine whether they were terrorist groups. The dissenting judge stated that the FARC did constitute a terrorist organization. The accused included five employees of "Fighters+Lovers", the clothing company that made the T-shirts, a man who owned the server that hosted its website, and a hot dog vendor who posted an advertisement for the shirts. Danish police shut down the company in February 2006, a month after it began selling T-shirts with PFLP and FARC logos, and confiscated all intended donations to the two groups. Prosecutors appealed the ruling in late December.

- Danish authorities concluded their terror-finance case against Patrick MacManus, the spokesman of the Danish NGO, "Oprør" (Revolt), and await a ruling by the Danish High Court. MacManus was indicted in October 2005 for violating Danish counterterrorism legislation by transferring approximately $17,000 to the FARC and the PFLP. In 2005, MacManus informed local media that the group's actions were a means to challenge Denmark's counterterrorism laws.

Denmark withdrew nearly all of its 450 troops from southern Iraq at the end of 2007. The Danish government increased its contribution to Afghanistan, raising its forces to more than 750 as part of the International Security Assistance Force (ISAF). Most of these are engaged in challenging Helmand Province in Southern Afghanistan.

**Estonia**

PX203

As a member of the International Security Assistance Force (ISAF) in Afghanistan, Estonia contributed 120 soldiers to the UK-led Provincial Reconstruction Team in Helmand Province. The Estonian contribution consisted of an infantry company, an explosive ordnance disposal team, the national support element, a cross-service team, a human intelligence team, a close protection team, and staff officers to various headquarters in Kabul and Kandahar. Estonia also sent 37 soldiers to participate in combat operations in Iraq.

On December 21, Estonia joined the EU Schengen Area for land and sea border controls, making it one of the easternmost border checkpoints of the EU. This means that EU and non-EU citizens alike who cross Estonia's borders will be entering common European space, and will not face further border controls when traveling to any other Schengen country. In December 2007, Estonia signed an arrangement for the exchange of terrorist screening information pursuant to Homeland Security Presidential Directive #6.

**Finland**

Finland continued its support of the War on Terror, as evidenced by the approximately 100 Finnish troops deployed in Afghanistan in support of ongoing NATO/ISAF operations. Government officials and the general population focused on economic, social, and development aid projects aimed at addressing the conditions that terrorists exploit. Finland maintained its annual contribution of approximately $15 million in development assistance to Afghanistan, and announced new law enforcement, humanitarian, and counternarcotics assistance initiatives.

Finnish and American officials shared counterterrorism information effectively, including a wide range of information on threat assessments, terrorist networks, and government responses to both. Following its EU Presidency in the second half of 2006, when it made counterterrorism and combating terrorist financing top priorities, the Finnish government continued to participate actively in ongoing EU efforts to remove institutional barriers to counterterrorism cooperation.

Finland pressed for EU cooperation with the U.S and the international community on counterterrorism issues. The Government of Finland maintained legislative and regulatory mechanisms to keep close watch over potential terrorist cells or financial support operations and to interdict their activities within the country. Finland effectively implemented new regulations requiring ships to submit security-related information prior to entry into port. In cases when another government presented a legal request for action or when an individual or organization was suspected of having committed an offense within Finland's borders, Finland implemented regulations that allowed it to freeze assets without prior UN or EU action.

Finland engaged in significant efforts to mitigate the social and economic factors that might lead members of the country's extremely small (less than 2 percent) population of foreign-born residents to adopt extremist ideologies. It carried out programs to help Muslim and other immigrants find jobs and integrate into Finnish society, and it encouraged religious and ethnic tolerance through a variety of legislation, government-funded social programs, and ombudsmen's offices.

**France**

PX203

France dismantled terror networks on its territory and successfully convicted or extradited a number of high profile terrorists and their supporters. French authorities detained people with connections to a number of different terrorist groups, including Islamic terrorists, Corsican nationalists, Basque Fatherland and Liberty (ETA) members, 17 members of the Liberation Tigers of Tamil Eelam (LTTE), and 16 Kurds with links to the Kongra-Gel/Kurdistan Worker's Party (KGK/PKK). The French government undertook several counterterrorism operations during the year against Islamic terrorism targets in coordination with other countries including the UK, Germany, Italy, Spain, Belgium, and Portugal. France's efforts to avoid homegrown radicalization and extremism increased in 2007, and included administrative and judicial action against people who incite violence or hatred, and social and economic initiatives to prevent the susceptibility of at-risk populations. Increasing Islamic radicalization in the prison system continued to worry French officials.

Several public announcements by al-Qaʻida (AQ) reiterated that France and French interests remain key targets of al-Qaʻida in the Islamic Maghreb (AQIM). In December, French police arrested a group of eight people in Paris suspected of providing material support to AQIM. In September, AQIM injured two Frenchmen in an attack in Algeria, and in December, it killed four French tourists in Mauritania. In February, AQ members were also suspected of killing four French nationals in Saudi Arabia.

In February, counterterrorism police detained 16 Kurds suspected of links to the KGK/PKK; all were charged with various crimes including extortion, money laundering, and terrorism financing; and were suspected of providing financial support to the KGK/PKK to fund terrorist attacks in Turkey. Riza Altun, who has been wanted in Turkey for many years on terrorism charges, was among those arrested. After being released on bail, he fled France for Austria and was allowed to depart Austria for northern Iraq. Altun is still wanted in France and is being prosecuted in absentia.

In April, authorities arrested 17 people suspected of extorting funds from the Tamil community in France, and illegally transferring the money to Sri Lanka for use by the Liberation Tigers of Tamil Eelam (LTTE). Unofficial reports noted that the LTTE raises as much as six million euros per year in France.

The French government increased its efforts to obtain the release of French-Colombian hostage Ingrid Betancourt (detained since 2002), and other hostages held by the Revolutionary Armed Forces of Colombia (FARC). Both President Sarkozy and Foreign Minister Kouchner engaged Colombian President Uribe and Venezuelan President Chavez to work towards Betancourt's release. In November, Colombian authorities seized FARC materials that provided proof of life of Betancourt for the first time since 2003.

France's most recent counterterrorism legislation was adopted January 23, 2006. Preliminary detention for terrorism suspects in France is six days. The state may thereafter place suspects in pre-trial detention for up to four years when the evidence is compelling or when the suspect presents an imminent threat. In conjunction with local government, the national government increased video surveillance in major cities. French law also allowed for freezing of assets, video

PX203

and telephone surveillance, monitoring of public transport records, and broad powers of official access to connection data held by Internet cafes and to various personal data records. The sentence for a convicted terrorist is up to 30 years for leading or organizing an attack, and from ten to twenty years for assisting a terrorist organization or operation. French nationality may be revoked, leading to eventual expulsion from French territory if the terrorist became a citizen through naturalization within the preceding 15 years.

France continued its active engagement with the UN Security Council (UNSC) Counterterrorism Committee (CTC), the G8's Counterterrorism Action Group (CTAG), the UNSCR 1267 Sanctions Committee (for the Taliban and AQ), and the European Council's Antiterrorism Strategy action plan. France is an original member of the Global Initiative to Combat Nuclear Terrorism and continued to participate actively. France remained a member and contributor to both the Proliferation and Container Security Initiatives.

In March, French Justice Minister Pascal Clement inaugurated an international justice network on terrorism. The network brought together justice officials from nine different countries[4] whose legal systems have centralized terrorism-related cases. The concept was to create a dialogue among nations' experts about how to use the judicial system to counter terrorism.

On the military front, France contributed three additional Operational Mentoring and Liaison Teams (OMLTs) to Afghanistan and transferred six Mirage fighter jets to Kandahar. France continued its participation in Coalition Task Force (CTF) 150, a multinational naval force that patrolled the Red Sea and Gulf of Yemen to interdict the movement of suspected terrorists between Afghanistan, the Arabian Peninsula and the Horn of Africa. It has twice commanded the Task Force. France maintained its overall contributions to both the International Security Assistance Force (ISAF) in Afghanistan and Operational Iraqi Freedom (OIF), with approximately 1,200 and 750 troops, respectively.

Following the assassinations of two Spanish police in southern France in December, French and Spanish officials announced the creation of permanent joint police units to combat Basque Fatherland and Liberty (ETA). The assassinations marked the first killings by ETA in France since 1976. A number of arrests of Basque Fatherland and Liberty (ETA) suspects were made throughout the year, several of whom were extradited to Spain. Police also arrested 13 people with ties to ETA in September in connection with the June 2006 attack against the Hotel Ostape in the French Basque region.

France continued to develop competencies and capabilities of TRACFIN, the Ministry of Finance's terrorism financing coordination and investigation unit. Within the European Union, France played an active role in the Clearinghouse, the EU process for designation of terrorist organizations. France did not designate HAMAS-affiliated charities, such as the French based Comite de Bienfaisance et Secours aux Palestiniens (Committee for the Well-Being and Assistance to Palestinians), arguing that this institution had no proven links to terrorism. France also opposed EU designation of Lebanese Hizballah as a terrorist organization, although it

---

[4] The nine member countries are: France, U.S., UK, Netherlands, Germany, Indonesia, Morocco, Belgium, and Spain.

PX203

supported Hizballah's eventual disarmament, maintaining that disarmament would result in Hizballah's gradual integration into Lebanese politics.

Attacks on the French island of Corsica decreased in 2007, totaling 180. The government had a widespread police presence in the region and arrested dozens of people throughout the year in connection with various attacks. No deaths were reported and only a handful of minor injuries resulted from the attacks. The December conviction of Corsican extremist Yvan Colonna (convicted of the 1998 assassination of the highest ranking national government representative in Corsica), however fueled a rise in attacks at the end of 2007.

Key judicial proceedings involving Islamic terrorism related crimes included:

- The French government continued its policy of expelling non-French citizens engaged in terrorist activities or speech that promoted hate or incited violence. Among those ordered expelled from France were as many as 18 foreign imams who preached values determined to incite hate or violence.

- In April, France expelled Rachid Benmessahel to Algeria, and permanently banned him from entering France. Benmessahel was a French citizen who was sentenced in March 2005 on terrorism-related charges. His nationality was revoked in accordance with French law.

- In May police arrested Kamel Bouchentouf, a French citizen collaborating via the Internet with AQIM. Bouchentouf confessed to planning attacks against multiple targets including the American Embassy in Luxembourg.

- On December 19, five of six French former Guantanamo detainees expelled to France in 2004 and 2005 were convicted on terrorism related charges and sentenced to several years in prison. The judge ordered the majority of their sentences suspended, however, reducing jail time to time already served based on their incarceration in France upon return from Guantanamo. One detainee, Achhab Kanouni, was acquitted of all charges.

- On June 19, Djamel Beghal, convicted in 2003 for planning a terrorist attack against the U.S. Embassy in Paris, was ordered by an Expulsion Commission to be expelled from France upon the completion of his prison term. Beghal was sentenced to ten years prison in 2003, but is eligible for ―parole" as early as mid-2008. Beghal had his French nationality revoked by French courts in 2005. He is an Algerian national and, under the current order, would be sent back to Algeria once released.

- On June 20, eight members of the Moroccan Islamic Combatant Group (GICM) were convicted in France for providing material support to a terrorist organization in connection with the May 16, 2003 terrorist bombings in Casablanca. Mustapha Baouchi, sentenced to ten years, was considered the leader of the French cell and the key link to the group.

PX203

- In March, French citizen Willie Brigitte was sentenced to nine years in prison for planning a 2003 terrorist attack against a nuclear plant in Australia and for ties to Islamic radicals. Brigitte was held in pre-trial detention in Paris since his expulsion from Australia in 2003.

**Georgia**

The Georgian government improved border security operations and worked to eliminate corruption at border checkpoints, focusing its efforts on stopping the smuggling of contraband, including money, illegal drugs, and all types of weapons (chemical, nuclear and biological) that could support terrorism. There were significant improvements in infrastructure at the major border crossing checkpoints: new facilities were opened at Sadakhlo, an important land border crossing between Georgia and Armenia, which greatly enhanced controls at that port of entry. The Georgian Coast Guard installed a new coastal radar station at Chakvi, improving that facility's ability to guard Georgia's coastline. The U.S.-funded Georgia Border Security and Law Enforcement program facilitated an expansion of Georgia's Passport Identification Registration System to a total of 15 land border, railroad, and airport ports of entry. The land border between Russia and Georgia proper remained closed throughout the year. Border crossings into Russia from the separatist regions of Abkhazia and South Ossetia operated, but were not under the control of the Government of Georgia. This situation allowed for the unrestricted and unidentified flow of people, goods, and other items from Russia into these regions.

Georgia contributed over 2,000 troops to counterterrorism efforts in Iraq and became a contributing nation to the International Security Assistance Force (ISAF) in Afghanistan.

In January, the Georgian government sentenced a Russian citizen from North Ossetia to eight years in prison for a 2006 attempt to sell 100 grams of weapons-grade highly enriched uranium to Georgian undercover agents. In June, radiation sensors at the Red Bridge border crossing detected a load of contaminated metal originating in Azerbaijan, indicating those sensors were operational.

In the Pankisi Gorge in northeastern Georgia, the U.S.-funded Georgia Train and Equip Program (2002-2004) assisted Georgia in regaining control of the area by raising the combat effectiveness of the Georgian armed forces. According to the latest official reports, there were 1300 Chechen refugees in the Pankisi Gorge, down from 7000 in 1999. Anatoly Zabrodin, head of the Border Protection Department of the Russian Federal Security Service, noted publicly that there were no attempts by militants to infiltrate Russia from Georgia in 2007.

**Germany**

Germany participated in counterterrorism military operations overseas, provided leadership in multilateral settings, and fought terrorism within its borders. Although no terrorist attacks took place in Germany, a major terrorist plot was disrupted on September 4. The three individuals arrested in the plot included two ethnic Germans and a Turkish citizen resident in Germany. The group had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb

PX203

attacks. German officials said that the suspects were connected to the designated Foreign Terrorist Organization, the Islamic Jihad Group (IJG).

Concerned about the threat from radicalization, the government reached out to at-risk communities, in particular youth, through programs designed to foster integration, including German language classes, after school sports, etc. The government also made efforts to work with Muslim organizations to encourage and motivate opinion leaders within the Muslim community to counter extremist messages. The Ministry of Interior continued the Islam Conference that it began in 2006. The conference is made up of several working groups that meet on a regular basis, one of which discussed issues related to radicalization.

Germany was the third largest troop contributor to the International Security Assistance Force (ISAF) in Afghanistan, with more than 3,000 troops deployed. Germany led the ISAF Provincial Reconstruction Teams (PRT) in Kunduz and Feyzabad, provided a forward support base in Mazar-e-Sharif, and commanded ISAF's northern region, which encompassed nine provinces and five PRTs. Germany was the top European contributor to the EU police training mission in Afghanistan, EUPOL; and made available 100 Special Forces to operate in Afghanistan under Operation Enduring Freedom (OEF). The German Navy participated in OEF off the Horn of Africa and Operation Active Endeavour in the Mediterranean Sea. Germany's contribution to these naval operations included fast patrol boats that sought to prevent the movement of terrorists and weapons of mass destruction.

Germany was especially active in multilateral fora to promote counterterrorism cooperation; Germany held the EU Presidency during the first half of the year and the G8 Presidency for all of 2007. In January, German Federal Interior Minister Wolfgang Schaeuble pushed for EU-wide adoption of the main provisions of the Pruem Treaty, an agreement signed in 2005 by seven European states that provides for greater cross-border law enforcement and judicial cooperation. Germany also used its EU Presidency to establish the "Check the Web" initiative that allows EU member states to submit and retrieve information from a central Europol-managed facility on Internet sites used by terrorist and extremist groups for radicalization, recruitment, and training purposes. As EU President, Germany took the initiative to hold EU troika meetings with Pakistan and Indonesia to expand EU counterterrorism cooperation with these two nations.

During its G8 Presidency, Germany placed a particular emphasis on supporting UN counterterrorism activities and topics such as terrorist use of the Internet, protecting critical energy infrastructure, and countering radicalization and recruitment to terrorism. These priorities were reflected in the G8 Heiligendamm Summit Statement on Counterterrorism and the Report on the G8 Support to the UN Counterterrorism Efforts. Germany's chairmanship of the G8 Roma-Lyon Anti-Crime and Counterterrorism Subgroup saw a record number of project proposals being addressed and new initiatives being agreed upon to tackle issues such as bulk cash smuggling used to finance terrorism.

In September, Germany's Foreign Office co-organized an international seminar in Berlin with key negotiating parties to discuss outstanding issues related to the UN Comprehensive Convention on International Terrorism and ways that the negotiations might be advanced. The Germans remained steadfast advocates of the UNSCR 1267 sanctions regime and played an

PX203

active role in suggesting the development of mechanisms to ensure due process in the regime. The United States works actively and cooperatively with the Germans on UN Security Council 1267 Committee listing and de-listing issues.

The German government implemented legislation and established new facilities to strengthen its ability to fight terrorism. On January 11, an extension of the 2002 Terrorism Prevention Law came into effect which extended for another five years the counterterrorism provisions contained in the 2002 law. The legislation also better defined the role of intelligence services in counterterrorism activities and broadened and simplified the ability of German security agencies to obtain travel, financial, and telephone data. In January, a Joint Internet Center was established in Berlin to monitor Islamic terrorist and extremist websites that are used for radicalization, recruitment, and training purposes. The center was staffed by representatives from domestic and foreign intelligence offices, law enforcement agencies, and the office of the public prosecutor. On March 30, a unified terrorism database was established and came into operation which combines information on members and supporters of terrorist and violence-prone groups from nearly 40 federal and state law enforcement and intelligence agencies.

During the year, German law enforcement authorities arrested a number of individuals suspected of involvement in terrorism. Prominent new actions and arrests included:

- The September 4 arrests of three individuals suspected of planning large-scale terrorist attacks. The suspects are alleged to have attended terrorism training camps in Pakistan.

- The August 14 arrest of German-Turkish citizen Tolga Duerbin who was deported from Pakistan to Germany by Pakistani security forces following his arrest there. Duerbin is alleged to have attended a terrorist training camp in Pakistan. After nearly four months incarceration, Duerbin was released on December 10 following a plea agreement.

German courts began trials or reached verdicts in some notable counterterrorism cases:

- In December, the trial of Youssef Mohammad El-Hajdib began at the Dusseldorf Higher Regional Court. Lebanese national El-Hajdib is charged with attempted murder and attempting to cause an explosion by placing bombs hidden in suitcases on commuter trains in Cologne in July 2006.

- On December 5, the Dusseldorf Higher Regional Court convicted Syrian national Ibrahim Mohamed Khalil and two Palestinian defendants (brothers Yasser Abu Shaweesh and Ismail Abu Shaweesh) of membership in and/or support of AQ, insurance fraud, and attempted procurement of enriched uranium for a "dirty bomb." The defendants received prison sentences of seven, six, and three and one half years, respectively.

- In September, the trial of Ibrahim Rashid started at the Celle Higher Regional Court. This was Germany's first trial in which the defendant's actions were carried out solely on the Internet. Rashid was charged with 28 counts of having promoted membership in, and support of, al-Qa'ida.

PX203

- The Bavarian Supreme Court sentenced two individuals to prison for supporting a foreign terrorist organization (Ansar al-Islam) and violating Germany's foreign trade law (for transferring money to Ansar al-Islam members in Iraq). Dieman Abdulkadir Izzat was sentenced on June 25 to three years and three months in prison and Farhad Kanabi Ahmad was sentenced on July 9 to five years and six months in prison. Izzat was also found guilty of fraud for having illegally obtained payments from the Nuremberg welfare office.

- In July, the trial of suspected AQ supporter Redouane El-Habhab began. El-Habhab, a dual German-Moroccan national, is accused of supporting al-Qa'ida, violating the German Foreign Trade Law, and assisting in the founding of a terrorist organization abroad.

- On January 8, the Hamburg Regional Court convicted Mounir el-Motassadeq of membership in a terrorist organization and of 246 counts of accessory to murder in connection with the September 11, 2001 terrorist attacks. The court sentenced Motassadeq to a 15-year prison sentence, which is the maximum sentence that can be imposed under the German Penal Code for this crime. Motassadeq's lawyers appealed the sentence, but on May 11, the German Federal High Court in Karlsruhe rejected the appeal.

- The trial of three Iraqi alleged members of Ansar al-Islam, Ata Abdoulaziz Rashid, Rafik Mohamad Yousef, and Mazen al-Hussein, continued. German prosecutors have charged the three, who have been in detention since December 2004, with a plot to assassinate former Iraqi Prime Minister Allawi during his visit to Berlin. Prosecutors also charged them with financial crimes and membership in, financing, and recruiting for a foreign terrorist organization. The trial started in 2006.

German–U.S. bilateral counterterrorism cooperation is strong. Germany participated in several USG programs to combat terrorism, including the Customs and Border Protection's Container Security Initiative in the ports of Hamburg and Bremerhaven. The Transportation Security Administration's presence in Frankfurt, together with U.S. and German air marshals, formed key parts of bilateral efforts to provide air transport security for the seven German airports with flights to the United States.

**Greece**

With improved counterterrorism infrastructure in place following the 2004 summer Olympic Games in Athens, Greece continued to fight international and domestic terrorism. There was concern that Greece, because of its long coast line and proximity to the Middle East, could be used as a transit route for terrorists traveling to Europe and the United States. Greek authorities cooperated with U.S. officials to address the problem. Cooperative efforts included information sharing, training of Greek security and customs officials, training of judicial personnel, and improving border and cargo-container security through such programs as the Container Security Initiative (CSI). Greece was also an active participant in the Proliferation Security Initiative (PSI). A bilateral PSI ship boarding agreement was under consideration at year's end. Greece

PX203

sustained its participation in the International Security Assistance Force (ISAF) in Afghanistan by providing engineers and ISAF Headquarters personnel totaling about 130 troops. Greek forces were limited to operating in the Kabul region. Greece has also offered to provide an embedded Operational Mentoring and Liaison Team to train the Afghan Army.

From the mid-1970s until earlier this decade, the domestic Marxist terrorist group November 17 (N17) targeted Greek officials, as well as officials from NATO countries residing in Greece. During that period, five employees of the U.S. Embassy were murdered by N17, which was responsible for 23 killings altogether. Many of the N17 terrorists were apprehended by Greek authorities in 2002 and tried for their crimes. In 2003, Greek courts handed down multiple life sentences to key N17 members. A group appeals trial for the N17 convicts and two previously acquitted individuals opened in December 2005. The appeals trial essentially represented a new trial for the convicts, since the Greek judicial system allows new facts and evidence to be introduced in the appeals phase. The appeals trial lasted far longer than the original trial, in part due to the defense team's tactics and the court's decisions allowing defendants great leeway to make statements and interrupt witnesses.

On May 14, the Athens Court of Appeals issued consolidated sentences in the N17 appeals trial. There were 226 counts of major felonies (murder, attempted murder, attacks with explosives) in the original trial, resulting in convictions on 224 counts. The appeal proceedings involved de novo review of 225 counts (the public prosecutor appealed one acquittal on behalf of the United States). During the appeal proceedings, six counts became time-barred under Greek law. Of the 219 counts remaining, convictions were sustained on 218. The six members of the operational core of N17 received a total of 44 life sentences. Seven members received various prison terms. Six of those originally charged were either acquitted or prosecutions were time-barred under Greek law.

During the original N17 trial, a new domestic terrorism group calling itself Revolutionary Struggle (RS) emerged. RS is a radical leftist group, which aligned itself with the ideology of N17 and may have incorporated some previous members of N17. RS was believed responsible for nine violent terrorist attacks since 2003, including the 2004 murder of a Greek guard outside the British Defense Attaché's residence. In 2006, RS claimed responsibility for triggering a remote-controlled explosive device placed along the vehicle route of the Greek Minister of Culture (formerly the Greek Minister of Public Order). The Minister was not injured in the attack. RS claimed responsibility for the rocket propelled grenade attack against the U.S. Embassy on January 12, 2007. The attack took place before normal working hours and no Embassy personnel were injured. The Hellenic National Police and the Embassy continued to work together on the investigation. No arrests were made.

Throughout the year, self-styled ―anarchists" attacked banks, police stations, and other "imperialist-capitalist targets" with tools such as firebombs and Molotov cocktails. Since these attacks usually occurred at night, few persons were seriously injured and there were no deaths. Several U.S. businesses were targeted. Police officials pursued a more proactive approach to deterring these violent attacks and arrested perpetrators. No damage to the Embassy or injuries to personnel were noted in the last several years.

PX203

## Hungary

Hungary made a long-term commitment to continue its leadership of a Provincial Reconstruction Team in Afghanistan and proceeded with plans to increase its deployments there to more than 200. The Hungarian government continued to implement fully domestic legislation to ensure compliance with EU norms regarding financial transactions and money laundering. Cooperation on border security issues remained excellent in both the bilateral and regional context. Hungary assumed responsibility for its part of the EU's Schengen border in December. Its preparations for this responsibility, including the merger of the Border Guards into the National Police, should further enhance its ability to monitor the border for individuals and items of concern.

## Iceland

The Government of Iceland worked to strengthen domestic border security and counterterrorism capabilities and increased links with neighboring states and in international bodies. The government signed bilateral security agreements in April with Norway and Denmark pledging to increase regional counterterrorism cooperation. The Icelandic Coast Guard (ICG) continued its capacity-building efforts with contracts for the purchase of new air and sea assets and was a founding member of the North Atlantic Coast Guard Forum in October.

In August and September, Iceland hosted two NATO exercises, each involving a counterterrorism component: NORTHERN VIKING 2007 featured separate air defense and ground-based counterterrorism elements; NORTHERN CHALLENGE 2007 was an ICG-hosted event focusing on Explosive Ordnance Disposal and counterterrorism scenarios.

The United States and Iceland held the first post-Naval Air Station Keflovik (NASKEF) round of high level security dialogue talks in June. Iceland-U.S. counterterrorism cooperation increased through the establishment of a formal linkage between the ICG and the U.S. Coast Guard (USCG) First District in Boston. In April, Iceland hosted a USCG International Ship and Port Security (ISPS) Program assessment visit.

The Icelandic government supported multilateral counterterrorism efforts. In May, Iceland joined the Global Initiative to Combat Nuclear Terrorism. Support for the NATO mission in Afghanistan remained strong. While Iceland withdrew its Mobile Liaison and Observation Team from a NATO Provincial Reconstruction Team in May, it continued its deployment at Kabul International Airport and supported NATO/ISAF operations through funding for airlift and other means.

In July, the FATF released an assessment of Iceland's anti-money laundering and terrorist financing regime.

## Ireland

Strong counterterrorism measures implemented in previous years were sustained and relations between USG and Irish law enforcement officials continued to be positive. The Irish government permitted the transit of U.S. military personnel and materiel though Irish airspace and airports for

PX203

deployment to theaters in Iraq, the broader Middle East, and elsewhere. Ireland has continued a modest troop commitment to the International Security Assistance Force (ISAF) in Afghanistan.

In July, the European Commission criticized Ireland for failing to implement properly the European Arrest Warrant, which enables EU states to ask other member states to arrest and surrender criminal suspects and is a useful instrument for fighting terrorism. The European Commission alleged that Ireland often takes more than the specified 90 days to execute the warrants.

**Italy**

Italy aggressively investigated and prosecuted terrorism suspects, dismantled terrorist-related cells within its borders and maintained high-level professional cooperation with its international partners. In December 2007, Italy and the United States signed an Aide Memoire for the exchange of terrorist screening information. Italy's law enforcement and judicial authorities continued counterterrorism efforts with several noteworthy cases during the reporting period. In June, authorities issued arrest warrants in Milan for nine Tunisian nationals, including Ben Khemais Essid Sami, for recruiting militants for training in Afghanistan and providing logistical and financial support for a Milan-based Salafist terror cell from 1997 to 2001. In July, police arrested three Moroccan nationals in Perugia on terrorism charges, the culmination of a two-year investigation. The individuals, who included the Imam of the local mosque, were in possession of terrorist training items and chemicals used in explosives making.

In October, police arrested Iraqi national Saber Fadhil Hussein on charges of leading a cell that sought to procure ultra light aircraft and anti-tank rockets from Italian and other sources for use in attacks against coalition forces in Iraq. Also in October, a Milan court resentenced Mohammed Daki, a Moroccan immigrant accused in 2003 of recruiting suicide bombers for Iraq, to four years imprisonment in absentia.[5] Maher Bouyahia and Ali Ben Saffi Toumi, both Tunisian, were sentenced in the same ruling to six years imprisonment, overturning a January 2005 decision by a Milan judge that acquitted Daki and the others on the grounds that they were "guerilla fighters" and not terrorists.

In October, a Spanish court acquitted Rabei Osman Sayed Ahmed, an Egyptian national currently serving an eight-year prison term in Milan, of involvement in the Madrid train bombings. This verdict did not affect his sentence in Italy, where he was found guilty in 2006 of subversive association with international terrorism for having recruited suicide bombers in Italy for Iraq. In November, as part of an international sweep involving British, French, and Portuguese authorities, police arrested 11 suspects (primarily Tunisians and Algerians) across Northern Italy and charged them with having been members of a Milan-based cell that recruited and sent suicide bombers to Iraq and Afghanistan. In December, a Milan court convicted Egyptian-born Imam Abu Imad and ten others of promoting jihad and recruiting potential suicide bombers. The members of the group received sentences ranging from two to ten years.

---

[5] He had been expelled to Morocco in 2005 under the so-called Pisanu decree allowing the Interior Ministry to expel terror suspects.

PX203

Domestic anarchist-inspired and extreme-left terrorist groups presented a continued (albeit small-scale) threat despite Italian authorities' continued efforts to dismantle their organizations. In February, in a string of simultaneous raids across northern Italy, police arrested 15 people suspected of membership in the operational wing of the Red Brigades. Police found arms caches during searches and determined that the cells were planning attacks on leading political figures, including former Prime Minister Berlusconi.

Italian authorities have stated publicly that many radical Islamist groups in Italy were inspired by or connected to al-Qaʻida in the Islamic Maghreb (AQIM) and other terrorist groups, and used Italy as a logistical and financial base. KGK/PKK affiliated organizations maintained a presence in Italy and were thought to have links with affiliated charitable organizations that maintained Italian branches. Italy worked closely with the United States on money laundering matters and information sharing.

Italy aggressively identified and blocked financial resources destined for suspected terrorist individuals and groups. Italy was one of the most active countries in the world with regard to the number of individuals and organizations submitted for designation to the UNSCR 1267 Sanctions Committee against al-Qaʻida (AQ) and the Taliban (73 individuals and 15 organizations). Since 2001, Italian authorities have frozen Euro 500,000 (ca. 720,000 USD) in assets belonging to individuals or entities in Italy suspected of financing terror activities. Italy worked closely with the United States on money laundering matters and information sharing. As an active member of the Financial Action Task Force (FATF) and the Egmont Group, Italy cooperated actively with other foreign governments.

As a non-permanent member of the UN Security Council, Italy played an active role in the UNSC Counterterrorism Committee and in UNSCR 1267 Committee deliberations and was a strong proponent of multilateral cooperation in countering terrorism. Italy was also a leading financial contributor to the UN Office on Drugs and Crime (UNODC) Counterterrorism Prevention Branch.

Italy was an important partner in the Proliferation Security Initiative (PSI) and the Container Security Initiative (CSI), and was an initial partner nation of the Global Initiative to Combat Nuclear Terrorism. On December 4, The United States and Italy concluded initial negotiations on an HSPD-6 data sharing agreement and signed an Aide Memoire on data sharing.

Italy was a vital participant in NATO's Active Endeavour naval mission against terrorism in the Mediterranean, and contributed to the International Security Assistance Force (ISAF) in Afghanistan, where it held Regional Command-West and rotating command of the Kabul Region, and in Iraq, where it played a lead role in the NATO Training Mission. Italy contributed training personnel to various regional counterterrorism training centers such as the South East Asia Regional Centre on Counterterrorism (SEARCCT) in Malaysia, the Joint Centre on Law Enforcement Cooperation (JCLEC) in Indonesia, and the African Union's Anti-Terrorism Centre in Algeria.

**Kosovo**

75

PX203

The United Nations Mission in Kosovo (UNMIK) continued to monitor suspected terrorist activity with the Provisional Institutions of Self-Government (PISG). Officials believed that a few of the more than 400 NGOs operating in Kosovo were involved in suspicious activities, and sought to prevent extremists from using NGOs to gain a foothold in Kosovo. Consequently, municipalities authorized NGO use of public facilities for religious gatherings only if the relevant religious community consented.

The Kosovo Police Service (KPS) and UNMIK Police Counterterrorism Units (CTUs) were primarily responsible for Kosovo's counterterrorism efforts, but were small and lacked resources. They received information and analysis support from the UNMIK Central Intelligence Unit (CIU) and the UNMIK Police Intelligence Liaison Unit (ILU), but also relied on the KPS CTU's intelligence, surveillance, and investigations units. The KPS established its CTU in October 2006 and incorporated it into UNMIK Police's CTU in January 2007. Consequently, it focused on building up its unit, training and equipping its officers, and collecting information on potential terrorist threats. UNMIK Police CTU monitored, mentored, and advised their KPS CTU counterparts, and exercised executive authority over them.

Porous boundary lines that were easily crossed by individuals trafficking in people, weapons, and narcotics hampered Kosovo's counterterrorism efforts. The Kosovo border police service lacked basic equipment, and only had a mandate to patrol the green border (areas that lack official, manned border, or administrative boundary line gates) from two to three kilometers beyond the actual border and boundary lines. NATO-KFOR roving teams patrolled the green border right up to the actual border and administrative boundary lines, but numerous passable roads and trails that lead to Kosovo lack border or boundary gates. Moreover, poorly paid border and customs officials were susceptible to corruption.

Witness intimidation was also an obstacle to combating terrorism in Kosovo. UNMIK's Department of Justice reported that it created a Witness Protection Task Force to address this issue. The Task Force reportedly worked on constructing a new safe house in Kosovo, encouraged the use of video conferencing equipment now in place in Kosovo's district courts, and increased efforts to secure relocation agreements with other jurisdictions.

According to the UNMIK Department of Justice (DOJ), there were three terrorism-related convictions, and seven terrorism cases underway with local judges and prosecutors. International prosecutors and the Kosovo Special Prosecutor's Office (KSPO) also initiated four terrorism-related investigations and filed two indictments, which were pending confirmation at year's end. One of the indictments was related to Albanian National Army (AKSH) activity, and one of the investigations involved the Front for Albanian National Unification (FBKSH), the AKSH's political wing.

The AKSH, which UNMIK designated as a terrorist organization in 2003, continued to intimidate Kosovo citizens. In June, its Tirana-based spokesman, Gafurr Adili, told Kosovo media that AKSH members in several Kosovo towns had distributed leaflets threatening violence if the Serbian paramilitary group Tsar Lazar Guard ventured into Kosovo for the annual June 28th commemoration of the 1389 Battle of Kosovo. Kosovo Liberation Army (KLA) war veteran leader Abdyl Mushkolaj also made similar threats, adding to concerns over the commemoration.

PX203

As a result, the Special Representative of the UN Secretary General (SRSG) issued an executive decision prohibiting the Tsar Lazar Guard or any paramilitary group from carrying out activities in Kosovo. The commemoration passed without incident.

In an October interview on Radio Television Kosovo (RTK), heavily armed, masked individuals in black uniforms bearing the AKSH insignia appeared from an undisclosed location described as an AKSH training facility near the administrative boundary line with Serbia. One of them told viewers the ―boys of former wars‖ wanted to show they were ready to counter the threat of Serbian paramilitaries. Adili later claimed that the people RTK featured were AKSH and that they were ―filling a void‖ created by KFOR‘s alleged abandonment of several villages near Serbia proper in the municipalities of Podujevo and Kamenica. AKSH had long claimed to operate only in areas outside of KFOR or Kosovo Protection Corps control, and was reportedly also active in southern Serbia and western Macedonia.

**Latvia**

Latvia's Financial Intelligence Unit continued to maintain a terrorist financing database that it shared with local banks. Since the May 2005 U.S. Treasury designation of two Latvian banks as institutions of "primary money laundering concern" under Section 311 of the Patriot Act, Latvian government and regulatory agencies have worked very closely with the United States to enhance their legislative and regulatory framework. There have been no further sanctions on Latvian banks. In 2006, Treasury lifted the proposed sanction against one bank. In the case of the second bank, the issue is specific to the bank and its ownership structure, and does not reflect Latvian regulatory efforts.

On May 15-16, the counterterrorism exercise "Seajack" was conducted within the NATO international search and rescue exercise "Bold Mercy". Seajack was organized by the Coast Guard Service of the Latvian Naval Force together with the Counterterrorism Center of the Security Police. On October 25, a national exercise was conducted at the International Airport Riga, organized by the Security Police and International Airport Riga in cooperation with the Counterterrorism Unit OMEGA and other Latvian governmental agencies.

Latvia contributed 98 soldiers to support the International Security Assistance Force (ISAF) in Afghanistan. In October, the team‘s mandate was renewed for one year and is now scheduled to expire the same day that the UNSCR mission mandate expires (October 23, 2008). In Iraq, Latvia had two officers under Polish command. In December, the Latvian Parliament renewed the authority for Iraq deployment until December 31, 2008.

**Lithuania**

President Adamkus introduced a Lithuanian-Belarusian intergovernmental agreement to combat organized crime and trafficking in narcotics and psychotropic substances, terrorism, and other crimes (Decree No. 616), which came into force in February. In May, Lithuania ratified the International Convention on the Fight Against Nuclear Terrorism. The Lithuanian military was an active participant in multinational operations against terrorist and insurgent elements. At year‘s end, Lithuania had approximately 50 troops in Iraq, including an infantry platoon serving

PX203

in Multinational Division Center (MND-C) near Al Kut and trainers in the NATO Training Mission-Iraq (NTM-I). In Afghanistan, Lithuania led a provincial reconstruction team in remote Ghor Province. This element consisted of approximately 150 Lithuanian troops and civilians responsible for maintaining a stable environment throughout the province to enable reconstruction efforts. An additional 50 Lithuanian Special Forces troops operated under NATO's International Security Assistance Force (ISAF) in Southern Afghanistan.

## Macedonia

Macedonia passed legislation on nuclear security and terrorism, chemical weapons, and entered into bilateral law enforcement, security, and extradition agreements. Macedonia supported troop rotations to Afghanistan and Iraq. The government trained several hundred police and military personnel in counterterrorism techniques, technologies, and methods. The commitment of Macedonia in Iraq was increased by an additional platoon.

Macedonia provided adequate security on potential terrorist weapons with annual inventories and worked to improve security on its weapons facilities. With USG assistance, the Macedonian government destroyed 156 shoulder-fired surface-to-air missiles (SA-7's), an important counterterrorism achievement. The Macedonian Ministry of Defense provided support to the Ministry of Interior for actions against domestic and regional terrorist groups.

The Government of Macedonia continued its close coordination with the United States on counterterrorism matters, which included intelligence sharing on potential terrorist groups operating in or transiting the country. The government also cooperated with its regional and European Union partners, and worked closely with INTERPOL and other international law enforcement agencies. Macedonia's efforts were hampered by the porous nature of the Kosovo border.

## Malta

The Government of Malta continued to freeze assets of organizations on the consolidated list promulgated by the UNSCR 1267 Committee. Since its accession to the EU in 2004, Malta has actively participated in the EU Clearing House and cooperates with other Member States and third states to prevent and suppress terrorist acts, including the preparation and financing of any acts of terrorism, denying safe havens to terrorists, and exchanging information in order to prevent the commission of terrorist acts.

Some of the most significant Maltese contributions to international counterterrorism efforts were in support of U.S. military operations, including approval of requests for overflight and emergency landing for all military aircraft including those with hazardous material, use of the Malta Shipyards for repairs of U.S. Navy ships, and full security support for visiting U.S. Navy ships. Malta also demonstrated a commitment to interdiction operations and compliance with international requests.

While the Government of Malta was responsive to requests for action in support of the War on Terror, a lack of financial resources, dedicated training, and specialist staff sometimes hampered

PX203

their efforts. Malta made significant progress in the area of customs inspection and border security procedures, however. Improvements included establishment of both the authority for Maltese Customs to inspect goods transiting the container port (Malta Freeport) and the necessary procedures to prevent the transshipment of WMD material through the Freeport. Maltese police and intelligence service officials have provided timely assistance to the Embassy's requests for investigation of potential suspects or groups within or transiting Malta as well as other terrorism related intelligence.

The United States affirmed its commitment to developing Malta's counterterrorism efforts by committing a 2005 earmark of $2,976,000 in the International Narcotics and Law Enforcement Affairs (INL) budget toward the purchase of a helicopter to enhance Malta's ability to control its borders and deter terrorists. Final acquisition will require the Government of Malta to more than match the U.S. contribution.

The Maltese criminal code included specific provisions on terrorism. The law addressed "acts of terror" and "terrorism" and enumerated actions that constitute the offense. Malta criminalized terrorist financing. Recently, Malta's Prevention of Money Laundering Act was expanded to include provisions on the "funding of terrorism." In addition, the Act broadened the money laundering mission of Malta's Financial Intelligence Unit (FIU) and gave it the authority to focus on terrorism funding. In February 2006, the Prevention of Money Laundering Regulations was extended to include ―financing of terrorism,‖ which criminalized terrorist financing and imposed additional obligations, namely customer due diligence, record keeping, reporting, and training procedures.

With Malta's entry into the EU in 2004, and its geographic location between northern Africa and the European mainland, Malta could become increasingly attractive to terrorist organizations seeking entry into Europe. The Government of Malta has become increasingly concerned about migrant discontent and the possibility of radicalization within the detention centers. Maltese government officials received training last summer from the EU on recognizing the signs of radicalization, and from the FBI on the radicalization process, indicators, and infiltration.

**Moldova**

Moldovan support for counterterrorism included deploying servicemen to Iraq for humanitarian demining operations. In June, Moldova deployed its fifth contingent to Iraq. Returning in December, the contingent consisted of eleven personnel. To date, 87 Moldovan servicemen have served in Iraq. The Moldovan Ministry of Defense (MOD) also deployed two liaison officers to CENTCOM headquarters. One officer is Moldova's Senior Representative to CENTCOM while the other officer is attached to CENTCOM's Coalition Planning Group.

In October, in an effort to establish communication and response protocols and to evaluate the capabilities of the Moldovan national SWAT team, Embassy Chisinau and the Ministry of Internal Affairs (MIA) conducted a day-long, joint counterterrorism training exercise at the Quality Schools International (QSI) campus in Chisinau. This exercise simulated a terrorist attack against the school and a corresponding hostage situation. Approximately 25 U.S. Embassy

PX203

children attend QSI and participated in this drill. The MIA performed well and new emergency assistance protocols were established between the Embassy and the Government of Moldova.

Moldova continued to work on implementation of obligations under UNSCR 1373 (and E.O. 13224, the Terrorism Finance Executive Order) and provisions related to terrorist financing. The Moldovan government continued to manage a counterterrorism strategy based on its 2003-2008 National Action Plan on Combating Terrorism.

The separatist-controlled Transnistria region of Moldova remained a potential area of concern. Moldovan law enforcement worked hard to track the whereabouts and activities of individuals moving in and out of Transnistria, an area where Moldovan police and security services do not have the authority to operate. Many of these individuals were foreign students who remained in Moldova illegally, as the government lacked the resources to deport them when their visas expired. Corruption was endemic, and it was easy to obtain false travel documents. The U.S. Embassy does not maintain liaison relationships or contacts with Transnistrian law enforcement and/or security service personnel. To date, the United States has not obtained any information about known terrorist organizations or terrorists operating from or within this region.

The following counterterrorism laws and "governmental decisions" were enacted:

- November 14: Information and Security Service of the Government of Moldova, Decree no. 75 constituting the publication/identification of known or wanted international terrorists and terrorist organizations (designation of foreign terrorist subjects and organizations);

- September 3: Government Decision no. 990 constituting the approval of the Cooperative Agreement between the Governments of Georgia, Ukraine, Azerbaijan, and Moldova in combating terrorism, organized crime, and other severe crimes;

- July 26: Law (190-XVI) on Preventing and Combating Money Laundering and Terrorism Financing;

- June 5: Government Decision no. 632 constituting the approval of the National Strategy and Action Plan for preventing and combating money laundering and terrorism financing; and

- April 6: Government Decision no. 372 constituting the approval of the Memorandum of Cooperation between the Center for Combating Economic Crimes and Corruption and the Government of Georgia's Financial Monitoring Service in combating money laundering and terrorism financing.

Law enforcement and intelligence officials had the authority to intercept wire, oral, and electronic communications, with the investigator required to obtain prosecutorial concurrence and authorization from a judge. A specific section in the Prosecutor General's Office would handle any terrorism-related case. The primary investigative body in counterterrorism cases is the Information and Security Service (SIS), Moldova's intelligence service. In 2006, SIS was

PX203

given the governmental lead to establish and manage a special Counterterrorism Center. Substantial assistance from the American Embassy's law enforcement assistance programs aid Moldovan efforts to impede the ability of terrorists and other citizens without proper immigration documents to cross national borders. The programs also facilitated automation at ports of entry to ensure greater security of passports and travel documents.[6]

**The Netherlands**

The Dutch responded to the global terrorist threat with leadership and energy in the areas of border and transportation security, terrorist financing, bilateral counterterrorism cooperation, and Coalition efforts in Afghanistan. The Netherlands deployed over 1700 troops to Afghanistan as part of the International Security Assistance Force (ISAF). The Dutch led a Provincial Reconstruction Team (PRT) in Uruzgan province, headed the rotational command in Kandahar of NATO's efforts in southern Afghanistan for six months (ending in May), and provided in extremis support for Iraq. The Netherlands deployed as many as 14 trainers and security guards in support of the NATO Training Mission in Iraq, and pledged approximately 40 million USD for Iraqi reconstruction.

In an April quarterly terrorism threat analysis, the Dutch National Counterterrorism Coordinator (NCTb) lowered the threat level from "substantial," where it had been since the government began producing the quarterly assessments in 2005, to "limited." The second lowest of the four levels, "limited" means that the identified threat from individuals or networks is relatively slight, but cannot be ruled out entirely. In the October threat assessment, the NCTb cited events in Denmark and Germany, and concern about continuing internationalization of the violent jihad in Afghanistan as the rationale for maintaining the level at "limited." It also noted a significant drop in the number of reports about possible Islamic radicalization among the Dutch population, citing growing resistance among the Muslim population to terrorist actions.

Nevertheless, the assessment warned about growing support for Salafism. According to an October report by the AIVD intelligence service, the Netherlands had approximately 20,000 to 30,000 Muslims who are susceptible to extremist ideology. As concern over possible radicalization mounted, the government launched efforts meant to foster integration and to combat the appeal of violent extremists, including teaching imams the Dutch language and culture. In 2007, the Dutch government devoted millions of euros and reorganized some offices in order to take on these issues in a more concerted way.

In November, the Justice Ministry launched a new phase in the "Netherlands against Terrorism" campaign that began in 2006, with a particular focus on the prevention of radicalization. In November, the Interior Ministry's National Advisory Center for Vital Infrastructure Protection (NAVI) was opened. The government's terror alert system, initiated in June 2005, now includes 14 economic sectors: the financial sector, seaports, airports, drinking water, railway, natural gas,

---

[6] Embassy's EXBS program closed permanently in September 2006. However, the current INL Law Enforcement Capacity Development Project provides technical assistance in the areas of border security and money laundering/terrorism financing. This project directly complements the law enforcement and security goals of Moldova's EU Action Plan and National Strategy.

PX203

oil, electricity, nuclear, chemical, municipal and regional transport, hotels, public events, and tunnels and flood defense systems. This early-warning system was designed to trigger a clear and rapid response to terrorist threats by both the public and private sectors. It linked sector-specific measures to be taken in response to the latest threat information from the National Counterterrorism Coordinator. In June, the Port Security Act came into force, expanding the definition of a "port" to include all works and facilities in the port area, including both seagoing and inland commercial maritime transportation-related facilities. In October, a biannual national disaster exercise, known as "Voyager," was held in and around the port of Rotterdam.

There were three major terrorism-related cases this year. In the Hofstad group appeal case, the public prosecutor's office sought 18-year prison sentences for both Jason Walters (a dual U.S. - Dutch national) and Ismael Aknikh, who were sentenced to 15 and 13 years imprisonment, respectively, for attempted murder and weapons violations in the trial court's March 2006 verdict. The prosecution argued that the two had acted with terrorist intent when they threw a hand grenade at police officers in The Hague in November 2004. The prosecution further argued that all Hofstad Group members acted with terrorist intent in sowing hatred and threatening politicians. The trial court ruled, in March 2006, that the Hofstad Group was a criminal organization "with terrorist intent," and found nine of the 14 defendants guilty of membership in a criminal and terrorist organization, but that there was insufficient evidence to convict the individual defendants of acting with "terrorist intent" in committing the criminal offences with which they were charged.

After two previous acquittals, the Amsterdam appeals court sentenced Samir Azzouz to four years imprisonment for having prepared terrorist attacks on government buildings in 2004. Azzouz was currently serving an eight-year sentence in the separate "Piranha" terrorism case. In October, the Rotterdam district court acquitted five of the six suspects arrested in November 2006 on suspicion of terrorist recruitment, participating in a terrorist organization, and obtaining false travel documents. The court ruled that there was insufficient evidence that the defendants had "ideologically prepared" each other or other persons to fight in Afghanistan or Iraq to convict them on terrorist recruitment charges. One female defendant in the case was sentenced to one month imprisonment for distributing subversive documents.

Dutch officials remained committed to active cooperation with the United States in designating known terrorist organizations, and interdicting and freezing their assets, and supported the continued exchange of information on financial transactions. The Dutch government worked with the United States to emphasize the importance of balancing security, the effectiveness of the financial system, and data protection concerns in the debate over SWIFT, an international messaging service for cross-border money transfers that provided information to track terrorist financing.

In October, the Cabinet approved a bill to make participation and cooperation in a terrorist training camp a serious punishable offence, even if the training takes place outside the Netherlands; the offense would carry a maximum prison sentence of eight years. The bill, currently before the Council of State for review prior to submission to Parliament, would implement Article 7 of the Council of Europe Convention on the Prevention of Terrorism. In March, the lower house of Parliament approved the Bill on Administrative National Security

PX203

Measures, which would allow the Interior Minister to issue restraining orders to prohibit a terrorist suspect's physical proximity to specific locations or persons. At year's end the bill was awaiting action by the upper house of Parliament.

The port of Rotterdam completed the installation of 31 radiological portal monitors at container facilities. The radiological monitoring program was initiated in 2004 as a pilot project under the U.S. Department of Energy's Megaport/Second Line of Defense Initiative. In October, a new mobile container scanner became operational in the port of Rotterdam. The scanner has a processing capacity of 20 containers per hour, or 175,000 per year.

During bilateral law enforcement consultations in October, the United States and the Netherlands agreed to continue operational cooperation on counterterrorism, including the exchange of information on terrorism-related investigations. In October, three Dutch government officials observed the U.S. Top Officials (TOPOFF 4) national crisis management exercises.

In January, Wasem al Delaema, an Iraqi-born Dutch citizen was extradited to the United States for trial on charges of conspiring to attack U.S. troops in Iraq in 2003. Al Dalaema was the first Dutch citizen extradited on charges of terrorism, and the first person to be indicted in the United States for terrorist activities in Iraq.

**Norway**

Norwegian authorities considered the threat of terrorist attacks in Norway low and the widespread belief among the general public was that no one would attack Norway. However, the continued presence of Mullah Krekar in Norway and preparations for the upcoming trial of Arfan Bhatti highlighted gaps in Norway's existing legal system that the government was moving to address.

Alleged Ansar al-Islam leader Mullah Krekar, an Iraqi Kurd listed in December 2006 under UNSCR 1267, lost his final appeal of the government's expulsion order in Norway's Supreme Court this fall. Despite this ruling, Krekar will remain in Norway for the foreseeable future as the government still is unable to receive sufficient human rights assurances from Iraq to proceed with deportation. This situation brought to light the limited tools the police have to detain individuals deemed a danger to society. The government introduced legislation that would allow stricter controls over movements of suspected terrorists, including possible house arrest. Budget shortfalls limited the ability of the police to monitor dangerous individuals' activities, but to the extent possible, the police have put a high priority on counterterrorism activities.

Arfan Bhatti, a Pakistani Norwegian, remained the only individual in custody after the September 2006 arrest of four individuals suspected of shooting at an Oslo synagogue and planning attacks on the U.S. and Israeli embassies. In the summer, the government presented a revised version of the 2002 terror law designed to improve the law and bring it in line with international obligations. Questions were raised, however, whether the new law will be too restrictive in its definition of a terrorist act and of what constitutes aiding and abetting or financing terrorism.

PX203

Norway has contributed more than 500 troops to International Security Assistance Force (ISAF) efforts in Afghanistan.

**Poland**

Poland supported international counterterrorist efforts with vigorous participation in foreign missions. About 1,000 Polish troops served the International Security Assistance Force (ISAF) in Afghanistan. In Iraq, Poland commanded the MND-CS, headquartered in Ad Diwaniyah, provided approximately 900 troops engaged in active patrolling, and trained and advised Iraq's 8th Army Division.

Through participation in initiatives such as the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism, Poland was actively engaged in many international fora combating terrorist threats. Poland's December integration into the Schengen zone also served as another strong argument for close collaboration with European neighbors on counterterrorism.

The bilateral Counterterrorism Working Group (CTWG), formed in 2005 to further U.S.-Polish collaboration on counterterrorism by synchronizing counterterrorism policy and training counterterrorism specialists, held its most recent meeting in March. We agreed to collaborate on identifying ideal candidates for training under the Combating Terrorism Fellowship Program (CTFP).[7] Under the Combating Terrorism Fellowship Program (CTFP), Embassy Warsaw provided Poland with $430,000 for special operations officer training, regional seminars, and terrorism focused programs.

The Government of Poland continued to recognize that terrorist threats can emanate from two sources: traditional migrant groups entering Poland from the east, such as Chechen refugees who may become radicalized, but also from western neighbors who have previously experienced threats or attacks stemming from radical Islamic groups. Groups with ties to organized crime also constituted a significant concern as a result of their experience with money laundering and access to fake documentation and weapons.

**Portugal**

Portugal supported international efforts to combat terrorist networks and actively pursued indications of extremist group activity in Portugal. Portuguese government agencies took steps to minimize exploitation of its financial sector by implementing European Community directives against money-laundering and illicit transfer of funds.

On November 6, Portugal's Judicial Police (PJ) arrested Algerian Samir Boussaha on charges of associating with, and recruiting for, an international terrorist organization. Eight other suspects were also arrested during similar operations across Europe. The Judicial Police coordinated its efforts closely with Italian officials and extradited Boussaha to Italy within one week of his arrest.

---

[7] Until that time, we had difficulty obtaining candidates at the working level with appropriate English proficiency. As a direct result of our agreement, a State Secretary at the Ministry of Interior gave this effort priority and soon after filled five slots in the CTFP with fully qualified candidates.

PX203

In another international case, Portuguese and Spanish law enforcement officers seized a car with 130 kilograms of explosives on June 22, which had been rented by members of the Basque terrorist group, ETA. The car was reportedly rented in Lisbon, and driven to Spain for a couple of days. On the way back into Portugal with the explosives, the driver saw a police outpost near the Spanish town of Ayamonte and abandoned the vehicle, fleeing with assistance on the highway towards Seville. Portugal's border with Spain runs over 1,200 kilometers, and Portugal was studied as a possible staging location for ETA since 2003, according to press accounts.

In September, Portuguese officials announced plans to establish a Secretary General for Internal Security, to facilitate communication between the Judicial Police (FBI-equivalent), Public Security Police (national uniformed police), and a National Republican Guard (paramilitary police force).

Portugal supported International Security Assistance Force (ISAF) efforts in Afghanistan with more than 150 troops.

**Romania**

Romania provided a full range of public and diplomatic support to counterterrorism efforts. Approximately 500 Romanian troops are serving in Iraq and 500 in Afghanistan as part of coalition and NATO Alliance efforts. In April, the Supreme Council for National Defense confirmed Romania's commitment of troops deployed in Iraq and Afghanistan through 2008. Romania has made its airspace, ground infrastructure, and naval facilities available to U.S. and NATO forces.

The Romanian government has established internal mechanisms to combat terrorism, including the development of a –National Anti-Terrorism Strategy" and guidelines to prevent the use of Romanian financial institutions, including its banking system, for the purpose of financing terrorist-related activities.

Bucharest is the headquarters for the Southeast European Cooperation Initiative (SECI), a regional center that provided law enforcement training and intelligence sharing on transborder criminal activities, including terrorist-related activities, for the 12 member countries in South Eastern and Central Europe.

- In March, the Romanian Parliament ratified the Accord (originally signed in Bucharest in 2006) between the Indonesian and Romanian governments in the field of prevention and combating transnational organized criminality, terrorism, and other crimes.

- In April, the Government of Romania formally subscribed to the Statement of Principles for the Global Initiative to Combat Nuclear Terrorism.

- In August, the Chief of the Romanian Military Prosecutors, Dan Voinea, finalized the penal file regarding the 1981 terrorist attack against the Radio Free Europe Romanian service in Munich. Many Romanian journalists working at Romania Libera station were

PX203

injured from the bombing, and sought civil damages in the penal file. The principal defendant in this case, the infamous Carlos ―The Jackal", remained imprisoned in France.

- In October, terrorist suspects Tariq Mousa al Ghazi and Luis Felipe Moreno were handed over to the Drug Enforcement Administration by Romanian authorities. They were arrested in Bucharest in June, after attempting to sell weapons to U.S. undercover informers, and were extradited following the issuance of an international arrest warrant.

- Also in October, the Romanian Parliament's Chamber of Deputies adopted a draft law regarding cooperation in combating terrorism and organized crime, which ratified the Accord between the Romanian Government and the Bosnia and Herzegovina Council of Ministers, signed in Bucharest in June. The Chamber forwarded the document to the Senate for approval.

**Russia**

The Russian government continued to view counterterrorism as a top priority, and considered cooperation with the United States a pillar of bilateral relations. The scope of the Russian government's authority continued to grow, resulting in a greater number of terrorist acts being foiled and the continued weakening of formerly powerful terrorist groups. The majority of terrorist attacks continued to occur in the North Caucasus, where the pacification of much of Chechnya has correlated with an increase in terrorism in Dagestan and Ingushetia. Russia did not offer safe haven to terrorists, but there was evidence of a foreign terrorist presence in the North Caucasus with international financial and ideological ties. As in 2006, there were no high-profile terrorist incidents in Russia involving a large number of civilian casualties.

According to Minister of Interior Rashid Nurgaliyev, there were 38 terrorist attacks in Russia in the first nine months of the year, compared to 561 terrorist acts committed in 2003.

Major terrorist acts included the following incidents:

- On August 13, a Moscow-St. Petersburg train was derailed in the Novgorod region, injuring sixty. Three members of the St. Petersburg League of Anarchists were arrested.

- On October 31, a suicide bomber blew up a bus in the Samara region, killing eight and wounding fifty, although Russian officials had not determined by the end of the year if the incident was terrorism or organized crime-related. They were investigating a Caucasus trail, Russian ultranationalists, and Chechen-based organized crime.

- On November 22, five people were killed and thirteen injured in a bomb explosion on a passenger bus in Stavropol; on December 9 another bus was blown up in the same region, killing two and injuring thirteen. Law enforcement agencies suspected the same terrorist group carried out both incidents.

- In May, the Federal Security Service (FSB) announced that it thwarted a terrorist attack planned for the Russia-EU summit in Samara.

PX203

- Other security incidents, such as a vehicle-borne improvised explosive device (VBIED) that exploded near the Krasnopresnenskaya Metro, and a VBIED that was located and disarmed just prior to the May 9 Victory Day celebrations, both in the Moscow area, may have been terrorist acts.

In Chechnya, from 2005-2007, mass attacks on civilians diminished in favor of increased targeted attacks on policemen, local interior ministry officials, and departments responsible for fighting the insurgency, although an increasing number of attacks failed or were prevented by Russian and Chechen special services. In January, more than 500 militants surrendered to authorities as part of an amnesty following the 2006 death of Shamil Basayev, the militant Islamist leader of the Chechen separatist movement. The incidence of violent acts increased in Dagestan and Ingushetia, but it was often difficult to characterize whether they were the result of terrorism, political violence, or criminal activities. In September, Rappani Khalilov (the ―Emir" for Dagestan), whom the Russians had described as a terrorist, was killed by Russian forces. The FSB stated that special attention will be paid to the prevention of terrorist attacks in the North Caucasus.

The 1998 federal law ―On Fighting Terrorism" and the 2006 federal law ―On Countering Terrorism" remained the main counterterrorism legal authorities. The National Antiterrorism Committee, organized in 2006, was the main government body coordinating the Russian government's response to the terrorist threat.

The United States and Russian Counterterrorism Coordinators met in November to advance cooperation within the context of the United States-Russia Counterterrorism Working Group. Cooperation continued on a broad range of counterterrorism issues, including efforts to destroy, safeguard, and prevent the proliferation of weapons of mass destruction. Russian law enforcement agencies also cooperated closely with U.S. agencies. Past participation led to the release of a hostage victim and the conviction of a U.S.-based subject attempting to purchase shoulder-to-air missiles.

Regulating and investigating terrorist websites was a major concern with numerous requests to the United States for assistance from both the FSB and the Cybercrime Directorate.

At the St. Petersburg G8 Summit in July 2006, the United States and Russia jointly announced the Global Initiative to Combat Nuclear Terrorism and invited other nations to join. The Initiative demonstrated Russia's effort to take a leadership role in establishing a partnership among nations to accelerate efforts to combat nuclear terrorism. It includes 66 partner nations committed to combating nuclear terrorism in a variety of ways, including safeguarding radioactive and nuclear materials, preventing nuclear smuggling, and sharing information. The third meeting of the Initiative took place in Kazakhstan in June. (*See Chapter 4, The Global Challenge of Nuclear Terrorism, for further information on the Global Initiative to Combat Nuclear Terrorism*.)

Russia increased its commitment to fighting terrorism in Afghanistan. Through the Collective Security Treaty Organization (CSTO), Russia committed financial and technical resources and

PX203

also supported the OSCE's initiative to develop projects aimed at strengthening security along Tajikistan's border with Afghanistan.

In September, Russia hosted the Sixth International Meeting of the Heads of special services, security agencies, and law-enforcement organizations, which FBI, CIA, DOE, and NCTC attended. Russia participated in the OSCE Public-Private Partnership Counterterrorism Conference, which focused on partnerships between state authorities, civil society, and the business community in combating terrorism. Russia has also expanded counterterrorism activities into newer regional groups. The scenario for the August 9-17 Shanghai Cooperation Organization (SCO) ―Peace Mission 2007" exercise in Chelyabinsk involved combating a terrorist takeover of a village. Under the scenario, approximately 6,500 troops from all six SCO countries, but primarily Russia and China, worked together to defeat terrorists and free hostages. The SCO also signed an agreement with the CSTO on the joint fight against terrorism.

Russia is a member of the Financial Action Task Force on Money Laundering and Terrorist Financing (FATF). It is also a leading member, chair, and primary funding source of the FATF-style body known as The Eurasian Group on Money Laundering (EAG). EAG members include Russia, China, Belarus, Kazakhstan, Kyrgyzstan, Uzbekistan, and Tajikistan. Russia, through EAG, provided technical assistance and funding towards establishing legislative and regulatory frameworks.

**Serbia**

Serbia cooperated with the United States on a wide range of terrorism issues, including border security, information sharing, terrorist financing, and export controls.

In December, the Government of Serbia agreed to join the Global Initiative to Combat Nuclear Terrorism. Serbia, however, has not yet ratified the bilateral Weapons of Mass Destruction Agreement, which it signed in 2006. Failure of the Serbian Parliament to ratify the agreement prohibited the duty free import and donation of equipment that could be used to counter terrorism.

Serbia's law enforcement and security agencies, particularly the Customs Administration, Criminal Police, Security Information Agency, and Border Police, continued bilateral counterterrorism cooperation. Serbia had two police organizations that operated as counterterrorism tactical response units, the Special Antiterrorist Unit (SAJ) and the Counterterrorist Unit (PTJ). The Serbian government also began developing a third Counterterrorist force, an investigative unit within the Ministry of Interior's Criminal Investigation Directorate.

The U.S. International Criminal Investigative Assistance Training Program's Organized Crime Advisor, in conjunction with Serbia's new Counterterrorist force, conducted an antiterrorism workshop in Serbia in November. The workshop covered trends in international terrorism, the formation of a Joint Terrorist Task Force, investigative techniques, vulnerability assessments, crime scene management, case studies, and practical exercise problems.

PX203

In March, police raided a mountain cave near the town of Novi Pazar in the Sandzak region of Serbia. Large quantities of plastic explosives, ammunition, face masks, military uniforms, bombs, and other supplies were found at the site, which authorities believed was a training camp for Muslim fighters. Police found terrorist propaganda materials, military survival manuals, and maps. In April, during a search of another suspected terrorist hideout, Serbian police killed Ismail Prentic, the suspected leader of the local terror group. In total, police took 15 suspects into custody in connection with this operation.

**Slovakia**

In March, Slovakia hosted a Counterterrorism Fellowship Program seminar that was a follow-on to a 2005 seminar. Participants from law enforcement, judicial, military, and foreign affairs agencies in ten Central and East European countries participated.

Although Slovakia withdrew its last two officers from Operation Iraqi Freedom (OIF), the Minister of Defense and Prime Minister said publicly that this was part of a larger plan to focus efforts on three larger missions, including the International Security Assistance Force (ISAF) in Afghanistan. In December, the Slovak Parliament approved a plan to send 56 additional soldiers to Afghanistan, nearly doubling Slovakia's contribution to the NATO mission, albeit with caveats on their deployment. Domestically, Slovakia's Ministry of Defense took the lead in developing a cross-agency Counterterrorism Training Facility in Lest, which is also used by both the Ministries of Interior and Finance.

Slovakia officially acceded to Europe's border-free Schengen zone on December 21. Although not directly involved in Slovakia's preparation for Schengen, the United States provided assistance to Slovakia's efforts to secure its borders against terrorist threats.

In December, Slovak police arrested three men near the border with Ukraine, who were attempting to sell 400 grams of what was later evaluated as not being highly enriched uranium. Slovak police announced that they had worked cooperatively with Hungarian counterparts for a number of months in advance of the arrests, and had both the sellers and potential buyers under surveillance.

A suspected terrorist, Mustapha Labsi, has been held in Slovak custody since May. In November, the Bratislava Regional Court approved a Slovak Government request to extradite him to Algeria where he was convicted in absentia to life in prison, but the verdict was on hold pending an appeal to the Supreme Court. Slovakia's Justice Minister said that he personally will take the final decision on extradition in light of stated concerns that Labsi could be subject to torture in Algeria.

**Slovenia**

Slovenia participated in three Internal Control Program training sessions, which concluded the Export Control and Border Security Program in Slovenia. It also hosted a regional Proliferation Security Initiative exercise, and continued to provide instructors as part of the NATO training

PX203

mission in Iraq. Slovenia also contributed 65 troops to International Security Assistance Force (ISAF) efforts in Afghanistan.

## Spain

The Government of Spain and its citizens were concerned that their country has been and remained a principal target of Islamic extremism and acts of international terrorism. Al-Qa'ida (AQ) leaders Usama bin Ladin and Ayman al-Zawahiri routinely called for the recapture of the former Muslim-controlled region in Spain they still call "al-Andalus." Almost four years have passed since the March 11, 2004, Madrid train bombings without another successful Islamic extremist terrorist attack on Spanish soil, but the Spanish government remained on a heightened state of alert. Spain cooperated closely with the United States to investigate and prosecute acts of terrorism and to prevent future attacks, and worked hard to disrupt terrorist acts that possibly were directed against U.S. interests. Spain was the first EU country to sign an arrangement for the exchange of screening information on known and suspected terrorists.

Spain remained an important transit point and logistical base for terrorist organizations operating in Western Europe. Its geographic location, large population of immigrants from North Africa, and the ease of travel to other countries in Europe, made Spain a strategic crossroads for international terrorist groups and an important staging point for North African extremists heading to Iraq to join the insurgency. The Spanish government feared that experienced terrorists may soon make their way back to Spain in a reverse terrorist pipeline. Spanish media reported in July that the Iraqi terrorist group Ansar al-Islam had established a recruiting cell in Catalonia to route would-be suicide bombers from Spain to Iraq.

Spain aggressively targeted terrorist recruiters and facilitators and arrested 47 suspected terrorists in 2007, according to the Ministry of Interior. The National Court Chief Prosecutor reported that as of November, Spain held a total of 139 terrorist suspects, either under a prison sentence or awaiting trial. Many of these individuals were believed to be supporters of terrorist groups such as AQ, al-Qa'ida in the Islamic Maghreb (AQIM), and the Moroccan Islamic Combat Group (GICM).

For much of the year, Spain was focused on the trial of 29 individuals suspected of involvement in the Madrid train bombings that killed 191 people and wounded hundreds of others. On October 31, Spain's National Court returned guilty verdicts on 21 individuals and handed down sentences ranging from three years to almost 43,000 years in prison. Under Spanish law, the maximum jail term an individual can serve for terrorist crimes is 40 years. Only three of the individuals were convicted of complicity in the Madrid attacks; the rest were convicted for belonging to a terrorist organization, cooperating with a terrorist organization, trafficking in explosives, and/or document forgery. The Spanish government, including its law enforcement and intelligence services, government ministries, and national prosecutors and judges, came together to carry out an in-depth and comprehensive investigation, prosecution, and trial on an issue of supreme national security and political importance. The Spanish government was able to energize and bring together its interagency community in a focused and highly-effective manner. The entire process was carried out in an open, transparent, and public way, despite the emotional

PX203

circumstances of the attacks and the heightened political tensions and controversies surrounding its aftermath.

Since the 1960s, Spain has battled the Basque terrorist group Basque Fatherland and Liberty (ETA). The Spanish government began 2007 sifting through the rubble of a parking garage at Madrid's Barajas Airport that was destroyed by an ETA bomb on December 30, 2006, killing two individuals and effectively ending a "permanent ceasefire" the group had declared the previous March. ETA officially ended the ceasefire on June 6, 2007, and threatened to reopen its activities "on all fronts in defense of the Basque homeland." Good police work allowed Spanish security forces to thwart a number of potentially large attacks, but ETA was able to carry out a series of smaller strikes. On October 9, an off-duty police officer was the victim of an ETA attack when a bomb attached to his vehicle exploded at mid-day in a residential section of Bilbao. The officer survived with severe burns, and two bystanders were injured in the attack. This act was noteworthy because ETA had previously taken pains to avoid innocent victims when directing attacks against governmental targets. On December 1, alleged ETA gunmen shot and killed two Spanish Civil Guard officers in southwest France, the first such assassinations since December 2002. Spain has collaborated successfully with the Governments of France and Portugal to further squeeze ETA from all sides and limit its room to maneuver. As of early December, security services had arrested 122 alleged ETA members (76 in Spain, 40 in France, six in other countries).

In February, the Spanish National Court sentenced five individuals to 13 years in jail for belonging to a terrorist organization believed to have been planning a 2006 attack against a military base in southern Spain. These individuals are known in Spain as "The Detergent Command," due to their possession of large quantities of detergents that police believed were to serve as ingredients for explosive devices.

Spain participated in the Megaports and Container Security Initiatives, and worked hard to deny terrorists access to Spanish financial institutions. Spain maintained a robust law enforcement and intelligence posture against terrorist finance. In July, Spanish police arrested two Syrian nationals on money laundering and terrorism finance charges. Spain and the United States co-chaired the OECD's Financial Action Task Force on Money Laundering and Terrorist Financing. Spain was a member of the G8's Counterterrorism Action Group and provided technical assistance to other countries to help build their institutions to counter terrorist finance. Spain and France collaborated on a project to establish a Financial Intelligence Unit in Morocco.

Spain contributed more than 700 troops to the International Security Assistance Force (ISAF) in Afghanistan.

**Sweden**

The Government of Sweden placed a high priority on increasing international cooperation against terrorism. Swedish authorities considered the threat of terrorist attacks inside Sweden to be low, but they monitored a number of known terrorists and terrorist organizations within their borders, including al-Qa'ida (AQ), Ansar al-Islam/Sunna, the Revolutionary Armed Forces of Colombia (FARC), Hizb Al-Tahrir, Hizballah, Islamic Jihad, and the Kongra-Gel/Kurdistan

PX203

Worker's Party (KGK/PKK). They provided logistical and financial support to their respective organizations abroad.

In August, the Swedish artist Lars Vilks published a picture of the prophet Muhammed depicted as a dog in the local Swedish newspaper *Nerikes Allehanda*, as part of an article on freedom of speech. Several Muslim organizations condemned the picture. Al-Qaʻida in Iraq (AQI) offered a bounty to encourage the assassination of Mr. Vilks and his editor for having published the drawings. Following this incident, a group claiming to be supporters of AQ published a video on an Islamic website attacking Sweden and Swedish companies.

In January, the government participated in the NATO-led operation Active Endeavour focusing on maritime antiterrorism measures such as boarding procedures and smuggled weapons searches. Building upon a 2006 initiative to better prepare the military to assist law enforcement in responding to terrorist incidents in 2007, the police began training military pilots and marine commanders on providing such assistance.

The Government of Sweden did not provide safe haven to terrorists or terrorist organizations. Terrorist organizations, however, exploited Sweden's considerable legal protections of personal freedoms and civil liberties to maintain a presence in the country. Sweden's political asylum policy attracted individuals from areas of conflict. Although these numbers have not been verified, authorities on the subject have estimated there are approximately 1,500 members and supporters and 100 persons with ties to terrorist organizations in Sweden.

According to Swedish terrorism experts, members of terrorist groups, such as Ansar al-Islam, Ansar al-Sunna, and Hizballah, earned money in Sweden to finance terrorist activities in other countries. The Swedish government shut down the al-Aqsa Foundation in Malmo when it was suspected of facilitating such activity for Hizballah.

Swedish law does not provide the government independent national authority to freeze or seize assets, unless in connection with an ongoing criminal investigation. However, once the EU takes action, the government can and does freeze assets of entities and persons listed on the UN 1267 Sanctions Committee list. This procedure is managed through the Sanctions Act (1995). Sweden can also take action against entities designated by the EU clearinghouse process, although Sweden has not yet proposed individuals or entities for inclusion on such lists.

Sweden implemented UN Security Council Resolutions 1267 and 1373 sanctions against AQ and the Taliban. Without a designation by the UN or EU however, Swedish authorities only have the right to seize assets once a criminal investigation has been initiated. Efforts to create a national authority and address existing shortcomings are underway.

Sweden played an active role in UN and EU deliberations to develop legal instruments for the listing and de-listing of terrorist organizations and an appeals process after the freezing of financial assets.

Sweden's ties to terrorism cases included:

PX203

- In January, three Swedes, accused of participating in Somali Islamist militia activity targeting Ethiopian troops, were apprehended in Kenya and taken to a prison in Addis Ababa. They were later released and returned to Sweden.

- In April, authorities in Bosnia and Herzegovina sentenced 19 year-old, Bosnian-born Swedish citizen Mirsad Bektasevic to 15 years in prison on charges, inter alia, of conspiracy to commit terrorist acts against western targets.

- In September, the 41-year old Lebanese-born Swedish citizen Oussama Kassir, arrested in the Czech Republic in 2005 pursuant to a U.S. arrest warrant and INTERPOL Red Notice, was extradited to the United States. He was accused of conspiracy to provide material support to terrorists in connection with the planned establishment of an Islamist terrorist training camp in Bly, Oregon.

- Ahmed Essafri, a Moroccan-born Swedish citizen, was arrested in Morocco in December 2006 for allegedly having ties to the Moroccan Combatant Group and for participating in a recruitment network for foreign jihadis in Iraq. In September 2007, he was tried in Morocco on terrorism related charges.

- In 2005, the Swedish Court of Appeal found Ali Berzengi and Ferman Abdullah, Iraqi citizens with Swedish residency permits, guilty of financially supporting Ansar al-Sunna terrorist actions in Irbil, Iraq. They remained in custody awaiting a government decision on deportation.

Through the European Common Foreign and Security Policy (EFSP), Sweden contributed to capacity-building projects in Morocco, Algeria, and Indonesia. Sweden participated in EUROPOL and EUROJUST, European law enforcement institutions that coordinated member states' counterterrorism cooperation and activities. Additionally, it participated in the Nordic Council of Ministers Regional Forum for Nordic Governmental Cooperation.

Sweden drafted a development cooperation policy that identified ways that assistance could contribute to strengthening the recipient state's ability to prevent terrorism. Sweden contributed $575,000 to the Terrorism Prevention Branch of the UN Office on Drugs and Crime, $160,000 to the UN Counterterrorism Implementation Taskforce, and $150,000 to two intergovernmental organizations concentrating on counterterrorism capacity-building programs in Africa. Sweden also contributed $150,000 to legal counterterrorism education efforts at the Jakarta Center for Law Enforcement Cooperation and initiated a dialogue with Pakistan on the possibility of providing greater training to Pakistani officials on terrorism financing methods.

Sweden has contributed 350 troops to the International Security Assistance Force (ISAF) in Afghanistan.

## Switzerland

The United States worked closely with the Government of Switzerland, the Swiss Bankers' Association, the financial community, and cantonal law enforcement authorities. Senior U.S.

PX203

Treasury officials met frequently with Swiss officials throughout the year. Swiss security services continued to monitor activities of terrorist groups with a presence in Switzerland and coordinated with appropriate USG officials, although the scope of the coordination was limited. Swiss law severely restricts the level of information-sharing possible on banking issues.

The Swiss Parliament ratified the United States-Swiss Operative Working Agreement, which entered into force on December 1 and should facilitate more bilateral law enforcement and intelligence cooperation. The Swiss Department of Foreign Affairs also agreed to co-sponsor a second Bioterrorism Workshop (Black Ice II), with the State Department.

The Swiss have grown more conscious of the presence of terrorist groups on Swiss soil. Authorities tightened measures to curb terrorist use of telecommunications and banking services. The Swiss Federal Police (FEDPOL) once again described Switzerland as a ―Jihadi field of operations.‖ The Federal Council, Switzerland's Cabinet, extended its ban on al-Qaʻida (AQ) and kept frozen approximately $28 million in AQ and Taliban assets in 82 separate accounts. This total amount of frozen assets is among the highest of any nation. During the past year, Swiss banks reported eight terrorist-related money laundering transactions, down from 20 reports a year ago.

On June 15 the Federal Council modified Switzerland‛s money laundering legislation to bring it into compliance with the recommendations of the FATF. All financial institutions, not just banks, now are required to report suspicious transactions. Also on June 15, the Federal Council decided to transfer the Special Tasks Service (STS) of the Federal Department of the Environment, Transport, Energy, and Communications (DETEC) to the Federal Department of Justice and Police (FDJP). The STS serves as an intermediary between the criminal prosecution authorities and telecommunication service providers when it comes to the monitoring of correspondence by post and telecommunications. The surveillance measures must first be authorized by a judge. Telecom companies usually submit the required data to the STS, which forwards them to the criminal prosecution authorities for analysis. The STS does not undertake any surveillance nor does it have access to the monitoring results.

Swiss companies are slowly increasing the pressure on the Swiss government to allow them to participate in the Customs Trade Partnership Against Terrorism (C-TPAT) initiative, but Swiss legal barriers preventing Swiss firms from being active participants remained in place. Article 271, paragraph 1 of the Swiss Penal Code forbids foreign government agencies, such as the U.S. Department of Homeland Security, from validating or contacting Swiss companies that export. Strict Swiss privacy laws also make initiatives such as C-TPAT difficult to implement.

Due in part to increased antiterrorism activities in neighboring EU countries, several terrorist organizations, including the Liberation Tigers of Tamil Eelam (LTTE), Kongra-Gel/Kurdistan Worker‛s Party (KGK/PKK), and the Revolutionary Armed Forces of Colombia (FARC), have a presence in Switzerland. Existing Swiss law and practice prevent the government from listing these entities as terrorist organizations.

PX203

Switzerland has already ratified the Council of Europe's Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime, and is a party to the UN International Convention for the Suppression of the Financing of Terrorism.

The new ―Pass 06" Swiss passport features electronically-stored data. The passport was introduced in September 2006 and provides greater reliability in identifying a person and is more tamper-resistant.

The Swiss government, recognizing the potential for terrorists to grow links in Switzerland, organized a meeting on November 26 between representatives of more than thirty Swiss-based Muslim organizations and the Federal Office of Police (FEDPOL) to address global issues related to internal security. Participants presented their views on internal security and stressed that it was important for them and condemned all forms of violence.

The Federal Council also took legislative steps to improve the nation's national security posture. On June 15, the Federal Council revised legislation enabling authorities to monitor terrorist suspects, spies and those involved with the proliferation of weapons of mass destruction via telephone tapping, mail screening, video cameras, and bugs. The new measures must be approved by the Federal Administrative Court, the Justice Ministry, and the Defense Ministry.

In September, Justice Ministers from Germany, Austria, Liechtenstein, and Switzerland created a working group to fight terrorism. The ministers also discussed the German-Austrian Pruem agreement on transborder exchange of DNA information, fingerprints, and data storage. Switzerland's Federal Office of Police is evaluating the conditions under which Switzerland could participate. The Swiss Justice Minister reemphasized that Switzerland was no haven for terrorists, and that Swiss bank secrecy provided no room for criminal money.

On July 12, 2006, then Swiss Justice Minister Christoph Blocher and then U.S. Attorney General Alberto Gonzales signed a formal revision of the 2002 ―Operative Working Agreement (OWA)". The new OWA was approved by parliament in June and entered into force on December 1, 2007. It will permit the exchange of law enforcement officials to create joint teams of investigators, though with restrictions on the use of information gathered by investigators. The new OWA extended the scope of the original, which was set up to regulate judicial cooperation in the wake of the 2001 terrorist attacks in the United States It provided the legal basis for joint investigations on terrorism and terrorism financing. These would only be set up once criminal proceedings had been launched in both countries and handed to a prosecutor. Unlike the initial OWA, cooperation was no longer limited to investigations related to AQ and the September 11 attacks, but extended to all terrorist groups linked to AQ. There has not yet been a formal investigation initiated under the scope of the OWA.

**Turkey**

Domestic and transnational terrorist groups have targeted Turkish nationals and foreigners, including, on occasion, USG personnel, in Turkey, for more than 40 years. Terrorist groups that operated in Turkey included Kurdish separatist, Marxist-Leninist, radical Islamist, and pro-Chechen groups. Terrorism in Turkey is defined in the Anti-Terror Law #3713 (TMK, 1991).

"Terrorist" activities are composed primarily of crimes outlined in the Penal Code committed within the context of terrorist group activities, which target the structure of the state, changing or destroying the principles of the state, and aiming to create panic and terror in society. Thus, Turkish law defines terrorism as attacks against Turkish citizens and the Turkish state, and hampers Turkey's ability to interdict those who would target non-combatants globally.

Most prominent among terrorist groups in Turkey is the Kongra-Gel/Kurdistan Worker's Party (KGK/PKK). Composed primarily of Kurds with a separatist agenda, the KGK/PKK operated from bases in northern Iraq and directed its forces to target mainly Turkish security forces. In 2005 and 2006, KGK/PKK violence claimed hundreds of Turkish lives. This persisted in 2007, when the KGK/PKK continued its terrorist tactics. The Kurdistan Freedom Falcons (TAK), a group designated under E.O. 13224, is affiliated with the KGK/PKK and has claimed responsibility for a series of deadly attacks on Turkish and foreign citizens in Turkish cities in recent years. KGK/PKK and TAK-linked individuals were discovered in late May in Istanbul, Adana, Konya, and Mardin with explosive materials designed to carry out suicide attacks. On May 25, the KGK/PKK claimed responsibility for the bombing of a cargo train in Bingol Province.

In the midst of weeks of violence, during which KGK/PKK attacks claimed scores of killed or wounded Turkish soldiers and citizens, the Turkish parliament on October 17 overwhelmingly passed a motion authorizing cross-border military operations against KGK/PKK targets in northern Iraq. Turkish forces carried out extensive operations along the Turkey-Iraq border in the latter part of the year. On November 5th, President Bush committed to provide Turkey "real-time, actionable intelligence" to counter the KGK/PKK in northern Iraq.

Other prominent terrorist groups in Turkey included the Revolutionary People's Liberation Party/Front (DHKP/C), a militant Marxist-Leninist group with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state; and Turkish Hizballah (not affiliated with Lebanese Hizballah), an organization of Sunni Kurds with a violent history. The Great Eastern Islamic Raiders Front (IBDA-C) is a decentralized Islamic revivalist group that was particularly active in the 1990s; it claimed ties with AQ.

A criminal trial for the 74 defendants allegedly involved in the four November 2003 Istanbul bombings concluded on February 16, with 48 of the 74 receiving jail sentences. Seven of those, including Syrian financier and operative Luay Sakka, were sentenced to life in prison; 26 were acquitted. The lead defendants admitted to contacts with AQ and warned of further attacks. Most of the other defendants denied responsibility for, or knowledge of, the bombings.

In January, the courts jailed seven Ansar al-Islam members for their role in the foiled 2004 assassination plot against President Bush, who was attending the Istanbul NATO summit. In June, the 13-year trial of Turkish Hizballah suspects for the murders of 24 people from 1992 to 1994 concluded with the acquittal of one and conviction and sentence of life imprisonment for ten. A local leader of the legal, Democratic Society Party (DTP) was jailed in April for aiding and abetting the KGK/PKK.

PX203

The Turkish National Police (TNP) and the National Intelligence Organization (MIT) conducted an aggressive counterterrorist campaign and detained numerous suspected terrorists in a number of raids, at least temporarily disrupting these groups before terrorist acts could be carried out, although prosecutions did not always follow the arrests. For example:

- In January, a multi-city crackdown netted 47 suspected terrorists associated with AQ;

- In March, 48 suspected Islamic terrorists were arrested in Konya;

- In June, a concentrated effort in Bursa resulted in 23 arrests;

- In November, in response to a German request, authorities arrested a German citizen in Konya allegedly involved in a disrupted terrorist plot.

Turkey has consistently supported Coalition efforts in Afghanistan. After commanding International Security Assistance Force (ISAF) II in 2002 and ISAF VII in 2005, Turkey led the joint rotational command of the ISAF in Afghanistan for the Capital Regional Command from April to December. Turkey was fielding a civilian Provincial Reconstruction Team (PRT) in Wardak Province and pledged $100 million in humanitarian assistance for the reconstruction and operation of schools and hospitals.

Turkey has provided significant logistical support to Coalition operations in Afghanistan and Iraq, authorizing the use of Incirlik Air Base as an air-refueling hub for OEF and OIF and as a cargo hub to transport non-lethal cargo to U.S. troops in Afghanistan and Iraq. Almost 60 percent of air cargo for U.S. troops in Iraq transits Incirlik. Establishment of this hub allows six C-17 aircraft to transport the amount of goods it took nine to ten aircraft to move from Germany, and saves the United States almost $160 million per year. Between one third and two thirds of the fuel destined for the Iraqi people and more than 25 percent of fuel for Coalition Forces transits from Turkey into Iraq via the Habur Gate border crossing. Turkey was active in reconstruction efforts, including providing electricity to Iraq. Turkey contributed headquarters personnel to the NATO Training Mission in Iraq (NTM-I), helped train Iraqi diplomats and political parties, and completed military leadership training in Turkey for 90 Iraqi officers as a further contribution to the NATO NTM-I.

In October 2006, a new law went into place giving MASAK, Turkey's Financial Crimes Investigation Board, sole responsibility for financial investigation of money laundering and financing of terrorism (ML/FT). In its February peer review report, the Financial Action Task Force (FATF) evaluated Turkish standards to combat ML/FT. Among its major findings were that although the new legislation has been in place only a short time, the number of convictions for money laundering was relatively low; confiscation measures have not yet produced substantial results; and the number of suspicious transaction reports was also relatively low.

Pursuant to its obligations under UNSCR 1267 and subsequent resolutions, Turkish officials continued to circulate UN and U.S.-designated names of terrorists to all law enforcement and intelligence agencies, and to financial institutions. Only UN-listed names, however, were subjected to asset freezes enforced through a Council of Ministers decree. This legal mechanism

PX203

for enforcing sanctions under UNSCR 1267 was challenged in Turkish courts by UN-designated terrorist financier Yasin al-Kadi. A lower-court reversed the ruling, but the appeals court upheld the Council's authority to freeze. In the meantime, al-Kadi's assets remained frozen.

## Ukraine

Ukraine did not suffer from domestic terrorism incidents, although law enforcement authorities sometimes labeled ordinary criminal activity as terrorist acts. The Ukrainian government instituted legislative and regulatory changes to improve its ability to investigate and prosecute acts of terrorism. On May 24, the Ukrainian Parliament amended the Criminal and Criminal Proceedings Codes of Ukraine to conform to commitments resulting from Ukraine's ratification of the International Convention for the Suppression of Acts of Nuclear Terrorism. The new law implemented criminal sanctions for actions in support of nuclear terrorism. On January 31, the Ukrainian Cabinet of Ministers approved an action plan for countering terrorism financing. The Ukrainian State Financial Monitoring Agency continued to pass information to the Security Service of Ukraine (SBU) to investigate whether organizations possibly engaged in terrorism financing activity were active in Ukraine, but the SBU found no evidence of such activity in Ukraine. From June 25-26, the SBU and the NATO Special Committee hosted a joint seminar on "organized crime and financing terrorism" in Odessa that brought together experts from 13 nations and NATO International Staff. Ukraine has made contributions to efforts in both Iraq and Afghanistan.

## United Kingdom

On June 29, three days after Prime Minister Gordon Brown took office, terrorists attempted attacks in London and, a day later, terrorists drove a vehicle into Glasgow airport, which caught fire. The terrorist plots were disrupted by the British police, the British public, and, in the London attempt, the failure of the explosive material to detonate. The first attempts took place in London, where the terrorists had left two cars filled with explosive materials outside popular nightclubs. A paramedic became suspicious of the contents of one of the vehicles, (the other had already been towed for parking illegally), which led to discovery of the plot. Neither vehicle detonated. The following day, two terror suspects, believed to have fled from London, attempted to drive a vehicle into an entrance of Glasgow airport. The vehicle caught fire and did limited damage to the building. One of the suspects did not survive the fire and a passer-by, who worked at the airport, apprehended the other suspect as he exited the burning vehicle.

A total of seven individuals were arrested in connection with the June attempted attacks. Among them were an Iraqi and other nationals from the Middle East, several of whom worked in the UK in health professions. These attempted attacks followed the pattern of a spike in attempted terror activity in the summer, beginning in 2005 with the July 7 and July 21 London subway and bus attacks (in which 52 civilians died) and the foiled transatlantic airline plot disrupted in August 2006, though there were no AQ core-inspired plots in 2007. Of the seven individuals arrested in connection with the June attempted attacks, one died, three were released without being charged, and three are awaiting trial.

PX203

Seventeen individuals were arrested and charged with various aspects of the airline plot disrupted in August 2006. This plot involved preparations for the detonation of explosives on aircraft traveling between the UK and the United States. One individual has been convicted, charges against one individual were dropped, and 15 are awaiting trial.

As to the attacks of July 7, 2005, four individuals have been arrested and are awaiting trial (four suicide bombers died). Regarding the failed attacks of July 21, 2005, on July 9 four of the would-be suicide bombers were found guilty of conspiracy to commit murder and received life sentences. One defendant was acquitted. An additional 16 suspects were arrested for aiding and abetting; two have been convicted and fourteen await trial.

In November, the head of the domestic Security Service told the press that the number of individuals residing in the UK whose support for terrorism posed a direct threat to national security and public safety was at least 2,000. This figure represented an increase of 400 individuals from 2006, an increase attributable to both the government's greater coverage of terrorist networks and the steady flow of recruits to the extremist cause. Deeply concerned about growing extremism, HMG sought through the ―Prevent‖ portion of its Counterterrorism Strategy to prevent the radicalization of vulnerable populations by exerting influence on both extremists and their audiences, addressing structural problems that cause radicalization, and disrupting extremists‘ ability to gain access that means of communications such as websites, blogsites, and other forms of new media. HMG also made efforts to stimulate self-regulation from the mosques and imams.

The domestic Security Service official noted that over the course of the last five years, attack planning had derived from AQ leadership in Pakistan, often using young British citizens to mount the attacks. In 2007, the government‘s assessment of the threat against the UK never fell below ―severe,‖ which is defined as ―an attack is highly likely.‖ The threat level was raised briefly in June and early July, around the time of the London/Glasgow incidents, to ―critical,‖ defined as ―an attack is expected imminently.‖

After the attempted attacks of June, which were carried out by resident foreigners working in the UK health field, the British government pledged to review how it vets foreign-born personnel working in the National Health Service (the main, state-run health care employer in the UK). In December, the British government announced it had allocated $14 million to secure and dispose of used radiological and other materials from British hospitals (that could be used as ingredients for a radiological weapon or ―dirty bomb‖).

The British government reorganized its governmental structures to better address terrorism. Changes included creation of an office of security and counterterrorism to coordinate all intra-governmental counterterrorism efforts, and the establishment of a research, intelligence, and communication unit (RICU) to lead British efforts to develop coherent messaging for domestic and international audiences on terrorist issues. The number of people working on counterterrorism was increased in both the Home Office and the domestic Security Service. The government increased its efforts to engage local communities through the establishment of a new ministerial position. In addition, the government announced its intention to meld the immigration and border control agencies into a single agency, a move meant to increase the government‘s

PX203

ability to track movements of individuals entering and exiting the country. In November, the government said it would improve physical security for key infrastructure, including major train and air transportation hubs. The government announced it will increase education campaigns to teach private sector businesses how to improve their security.

Individuals were prosecuted under UK terror legislation on charges of ―incitement to terrorism.‖ On November 8, a Muslim woman, known as the ―Lyrical Terrorist,‖ was convicted under the Terrorism Act in the UK. The woman, arrested in October 2006, had a ―library‖ of material useful to terrorists in her apartment. She was found guilty of possessing records likely to be used for terrorism, but not guilty of the more serious charge of possessing an article for a terrorist purpose. On December 6, she was given a nine-month suspended sentence, ordered to do 100 hours of unpaid work within the community, and will remain under supervision for 18 months. The government‘s prosecution on the grounds of ―incitement to terrorism‖ were contested by some Muslim community organizations as amounting to ―conviction for thought.‖

The UK provided assistance to U.S. extradition requests for three individuals charged with attacks of terrorism in the United States or against U.S. citizens. Khalid Al Fawwaz, Adel Mohammed Aboul Almagid Abdul Bary, and Ibrahim Hussein Abdelhidi Eidarous are wanted for alleged involvement in the bombing of American Embassies in East Africa. Two of the three await decisions by the Home Secretary as to whether to extradite them to the United States. They remained in custody. The Home Secretary declined to extradite one individual on humanitarian, medical-related grounds. Also in UK custody, where the Home Secretary is considering his extradition to the United States, is Mustafa Kamel Mustafa, aka Abu Hamza, who was found extraditable in November. The Home Secretary subsequently concurred with this decision. Abu Hamza has been found guilty in the UK of offenses relating to incitement to commit terrorist acts, has been sentenced to seven years, and is wanted in the United States on a variety of charges including conspiring to take hostages in Yemen in 1998. In May, the UK extradited Syed Hashmi to the United States; Hashmi is wanted for conspiring to provide and providing material support to terrorist activities in Afghanistan.

The United States and the UK worked closely within the UN and the FATF to deny terrorists, and their supporters, access to the international financial system. The UK had strong legal provisions in place for freezing assets related to terrorist financing, including the Terrorism Act 2000, the Anti-Terrorism Crime and Security Act 2001, the Proceeds of Crime Act 2002, the Terrorism (United Nations Measures) Order 2006, and to further restrict the flow of funds to anyone HM Treasury designates as involved in terrorism, the AQ and Taliban (United Nations Measures) Order 2006. The Brown government is currently proposing language in an upcoming Counterterrorism bill to authorize forfeiture of assets by anyone involved in any aspect of support for terrorism. Current law only allows forfeiture for those convicted of terrorist financing.

The UK has an arrangement with the United States for the exchange of screening information on known and suspected terrorists, pursuant to Homeland Security Presidential Directive #6.

The UK has consistently supported the International Security Assistance Force (ISAF) in Afghanistan, and is currently the second largest troop contributor. The UK increased its

PX203

contributions to more than 7,500 troops. The UK has also contributed approximately 4,000 troops to efforts in Iraq.

<u>Northern Ireland</u>

In October of 2006, representatives of Sinn Fein, the political wing of the IRA, and the Democratic Unionist Party (DUP) announced their support for the Ireland/UK-brokered ―St. Andrews Agreement,‖ which was implemented in the spring. The St. Andrews Agreement restored power to the Northern Ireland Assembly (NIA) and envisioned a power-sharing arrangement between the unionists and republicans.

Elections for the Assembly were held in March. On May 8th, the Democratic Unionist Party's Ian Paisley assumed office as First Minister, and Martin McGuiness of Sinn Fein became the Deputy First Minister. Two key decisions underpinned the restoration of the NIA. First, at a party conference in January, Sinn Fein agreed to endorse policing. Next, the DUP contested the election in March, signaling that it would agree to share power with Sinn Fein. The Independent Monitoring Commission (IMC), a four-person body established by the Irish and British governments in 2004, regularly releases reports on paramilitary activity in Northern Ireland and the Republic of Ireland. The most recent publication, the Sixteenth IMC report released in September, praised the British government's ―amazing progress‖ on its dismantling of Northern Ireland's military structure.

British commitments were on schedule: all security watchtowers have been dismantled, and all soldiers assigned to counterterrorism duties were removed from Northern Ireland. Special counterterrorism legislation was gradually being rescinded. The IMC Commissioners expressed concern over the still-armed loyalist Ulster Defense Association's (UDA) lack of progress towards a strictly political existence and debated how long the UDA should be given to make the transition from paramilitary activity. The IMC Commissioners also stated that the IRA ―has abandoned terrorism and violence and does not pose any form of threat relevant to security normalization.‖ They also found that loyalist paramilitaries did not present a ―terrorist type threat to the security forces,‖ and were not likely to be a threat in the future. Republican dissidents did not have the resources to mount a major sustained violent effort. Nevertheless, dissident Republicans admitted responsibility for shooting two police officers in November, and were still considered a threat by security services.

PX203

## MIDDLE EAST AND NORTH AFRICA OVERVIEW

—Terrorism kills civilians, journalists, actors, thinkers, and professionals; it attacks universities, marketplaces, and libraries; it blows up mosques and churches and destroys the infrastructure of State institutions. We consider terrorism an extension of the fallen dictatorship, whether it may vary in its outside form or by the gangs that carry it out. Terrorism aims at aborting the political process, and igniting sectarian dissension as a prelude to hijack Iraq back into the era of tyranny, oppression, and backwardness."

–Mr. Nuri Kamal Al-Maliki, Prime Minister of Iraq
Statement, 62nd UN General Assembly, New York;
September 26, 2007

Iraq remained at the center of the War on Terror battling al-Qa'ida in Iraq (AQI) and affiliated terrorist organizations, insurgent groups fighting against Coalition Forces (CF), militias and death squads engaged in sectarian as well as intra-communal violence, and criminal organizations. The Iraqi government, in coordination with the Coalition, made significant progress in combating AQI and affiliated terrorist organizations. There was a notable reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IED) attacks in the last quarter of the year. Terrorist organizations and insurgent groups continued their attacks on Coalition and Iraqi security forces using IEDs, vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers. The Iraqi government continued to emphasize national reconciliation and made progress in passing key pieces of reconciliation-related legislation. There were practical steps taken that helped to advance reconciliation at the provincial and local level. The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region. (*See Chapter 3, State Sponsors of Terrorism*.)

While the number and lethality of individual terrorist attacks in Israel declined in comparison to 2006, Israel nevertheless continued to suffer from terrorist threats emanating from the West Bank and Gaza, and was particularly vulnerable to rocket and mortar attacks launched against Israeli targets from inside Gaza. While there was an overall decrease in the number of successfully perpetrated terrorist attacks in comparison to previous years, Israeli security officials maintained that the decrease was not for lack of terrorists' efforts, but because the security services were able to keep terrorist planners and operators off balance and foil acts before they were carried out. Throughout the year, Israel's security services publicly reported several foiled attempts.

In Lebanon, a campaign of domestic political violence continued. Most notable were the June 13, September 19, and December 12 car bombing assassinations of MP Walid Eido, MP Antoine Ghanem, and General Francois Hajj, respectively. Both MPs were part of the pro-government March 14 coalition. Several political allies of the two MPs charged that the Syrian government

PX203

was responsible for the assassinations, which Syria strongly denied. These acts, the latest in a series of assassinations and attempted assassinations over the last three years, seemed designed to intimidate the pro-government forces and eliminate, through the process of killing MPs, their numerical majority in parliament.

There were several high profile attacks in Algiers, including the April 11 bombing of the Prime Minister's office and the December 11 near simultaneous bombing of the Constitutional Council and the UN headquarters in Algeria. These attacks underlined the substantial shifts in strategy made by al-Qa'ida in the Islamic Maghreb (AQIM) towards mass-casualty attacks employing suicide tactics and targeting Western interests. AQIM claimed responsibility for both attacks and touted them as major successes. In the latter case, AQIM inaccurately equated breaching the security in the heretofore highly protected Hydra neighborhood of Algiers with breaching the Green Zone in Baghdad.

Saudi Arabia suffered two high-profile terrorist incidents: the shooting of four French citizens and the violent murder of a high-ranking Saudi colonel. Saudi security forces managed to capture or kill most of the assailants involved in the two incidents and successive government roundups resulted in hundreds of arrests that likely disrupted terrorist cells planning to carry out attacks in the Kingdom.

A series of suicide bombing attacks shattered the relative lull in terrorist violence that had prevailed in Morocco since the 2003 Casablanca bombings. The attacks underscored that Morocco's greatest terrorist threat stems from numerous small —grassroots" Salafi Jihadist groups. The main external terrorism threat to Morocco was AQIM and its demonstrated willingness to train inexperienced Moroccan extremists. Morocco adopted a comprehensive counterterrorism strategy that emphasized vigilant security measures, counter-radicalization policies, and strong international cooperation. In the wake of the December AQIM double bombing in Algiers, King Mohamed VI summed up Moroccan cognizance of the AQIM threat in a condolence message, stating that —Algeria's security is linked to the security of the region."

On July 2 in Yemen, Abdu Mohamad Sad Ahmad Reheqa drove a suicide vehicle-borne improvised explosive device (SVBIED) into a group of western tourists in Marib, killing himself and ten others. Three days later, U.S.-trained Yemeni security forces killed the suspected leader of the SVBIED bombing Ahmed Basyouni Dwedar, an Egyptian wanted in Egypt. On August 8 and 13, Yemeni security forces raided two houses, arresting 17 and killing four AQ-affiliated suspects while suffering one casualty.

Most governments in the region cooperated with the United States in counterterrorist activities and undertook efforts to strengthen their capabilities to fight the War on Terror. These efforts included participation in USG-sponsored antiterrorism assistance (ATA) programs and taking steps to bolster banking and legal regimes to combat terrorist financing. Many countries continued to provide some form of assistance to Coalition efforts to bring peace and stability to Iraq and Afghanistan.

**Algeria**

PX203

The security situation in Algeria was marked by several high profile terrorist attacks throughout the country, an evolution of terror tactics and ongoing low-level terrorist activities in the countryside. Beginning in April, several high profile attacks were staged throughout Algeria, including the December 11 near simultaneous bombing of the Constitutional Council and the UN headquarters in Algiers. This attack against a Western hard target underlined the substantial shift in strategy by al-Qaʻida in the Islamic Maghreb (AQIM), who claimed responsibility for the attack and touted it as a major success. Previously, AQIM's predecessor, the Salafist Group for Preaching and Combat (GSPC), had preferred to target Algerian government interests and had been more averse to suicide attacks and civilian casualties. Although Algerian government interests remained the primary focus of AQIM, this attack confirmed that foreigners were included as targets.

Two events helped fuel terrorism concerns in Algeria: the September 2006 merger of elements of the GSPC with AQ to form AQIM, and the conclusion of the amnesty period for Algeria's Charter for Peace and National Reconciliation in August 2006. National Reconciliation remained an open wound for much of the Algerian population, which is divided over amnesty and re-integration on the one hand and a more aggressive, unforgiving approach to terrorism on the other. Although the Charter has officially expired, its terms may still be applied on a case by case basis at the exclusive discretion of the Presidency.

Following the AQ September 11, 2006, announcement of affiliation, AQIM began to make more threats against what it termed "crusading" westerners, particularly American and French citizens, although Russians have been targeted as well. Even before its affiliation with AQ, the GSPC was an organization whose regional ties were expanding. AQIM support cells have been discovered and dismantled in Spain, Italy, Morocco, Mauritania, and Mali, and it maintained training camps in northern Mali.

The year was punctuated with over half a dozen high profile terrorist attacks that included:

- On February 13, AQIM claimed responsibility for car bombings in the provinces of Tizi Ouzou and Boumerdes that claimed six lives and injured many.

- On April 11, AQIM conducted its trademark attack against multiple targets in the city of Algiers. The terrorists targeted government offices and a police station with suicide car bombs.

- On September 6, the first suicide vest attack targeted Algerian president Abdelaziz Bouteflika in Batna, 200 miles east of Algiers.

- On September 8, a suicide bomber attacked the coast guard barracks in Dellys.

- In December, a roadside bomb attack again targeted a Russian company bus west of Algiers.

- The December 11 double suicide bombing of the Algerian Constitutional Council building and UN Headquarters in Algiers.

PX203

The most alarming trend was the evolution of tactics to include the use of suicide bombers to conduct attacks in Algeria. We have witnessed a shift in Algeria to tactics that have been successfully employed by insurgents and terrorists in Iraq and Afghanistan. The use of suicide car bombs, suicide vests, and improvised explosive devices (IEDs) by Algerian terrorists indicated a greater level of cooperation and training by AQIM. Of greater concern was the degree that AQIM consistently changed its profile throughout the year. For example, the August 8 suicide bomber was a 15-year-old boy, the youngest suicide bomber in the history of Algeria. Meanwhile the suicide bomber who struck UN Headquarters on December 11 was a 64-year-old man, in the advanced stages of cancer, potentially the oldest. The proliferation of tactics used in Iraq has had a profound effect on the level of organization and sophistication employed by the terrorists in Algeria. The main sources of funding for AQIM remained kidnapping for ransom, muggings, and the narcotics trade in Southern Algeria/Northern Mali. Individual cells in Europe also provided support through small scale funding.

Algerian security services expressed a concern about AQIM using propaganda based on the call to fight in Iraq as a hook to recruit young people, many of whom never made it to Iraq but were redirected towards joining local groups. In previous years, the AQIM propaganda videos originating in Algeria were of amateur quality and poorly produced. This has changed dramatically. It was evident that AQIM has placed a greater emphasis on improving the quality of the videos, and that these videos and communiqués were orchestrated to attract Algerian youth to the AQIM ―cause.‖ Several videos posted on the Internet, such as the series ―Shadows of the Sword‖ and ―Apostate Hell,‖ showed operations conducted against Algerian military and security targets that included preparations for the attacks and pre-briefings with the commanders that led the attacks. The ability to conduct an attack and claim responsibility via communiqué within hours demonstrated the importance AQIM placed in transmitting their message in an attempt to win the media war.

It was estimated that the Algerian security services killed and arrested upwards of 1100 terrorists, compared to the estimated combined killed and arrested figure of about 650 for 2006. Notable successes were the surrender of GSPC founder Hassan Hattab in late September and the September 6 killing of AQIM central zone emir Zohair Harek. On September 10, Harek's deputy Fateh Bouderbala was arrested, effectively removing the top leadership of the central zone. The counterterrorism successes of the Algerian services, combined with the public's continued rejection of terrorists, have possibly influenced AQIM's shift in tactics to the use of suicide bombers. AQIM was believed to have resorted to suicide attacks as a result of its operational weakness, and to demonstrate its AQ link by adopting the organization's trademark modus operandi. Suicide attacks were cheap and attracted media attention. The head of the Algerian External Intelligence Service confirmed that AQIM's membership was becoming more international. However, the service also noted that the recruitment of foreigners had been limited thus far as a result of the joint efforts of neighboring states.

AQIM, thanks in part to high unemployment among Algerian youth, was partially successful in replenishing its numbers after the arrests, surrenders, and deaths of over 1,000 terrorists. Those remaining appeared to be more hard-line and resistant to the government's amnesty offer. Despite the upsurge of AQIM activity toward the end of the year, overall, the government had greatly

PX203

improved security from the situation of the late 1990s. That said, the Algerian military and security forces were often perceived as slow to adapt to AQIM's changing tactics and have shown a resistance to accepting that they now face a better organized international threat in the form of AQIM. The Algerian security services and military remained capable of handling a prolonged effort against internal terrorist threats and were a reliable counterterrorism partner.

## Bahrain

The Government of Bahrain actively monitored terrorist suspects, but domestic legal constraints at times hampered its ability to detain and prosecute suspects. Using the new 2006 counterterrorism law[8], security forces monitored the travels and activities of a Bahraini citizen and arrested him on August 8. His arrest and the subsequent investigation led to the arrest of a number of other men. Prosecutors charged each with membership in a terrorist organization, undergoing terrorist training, facilitating the travel of others abroad to receive terrorist training, and financing terrorism. Their trial began on October 23 and had not concluded at year's end.

Bahrain continued to host the Middle East and North Africa Financial Action Task Force (MENA FATF) secretariat. The MENA FATF concluded Bahrain's mutual evaluation in November 2006 and published it in early 2007.

## Egypt

There were no successful terrorist attacks in Egypt, due mainly to the vigilance and effectiveness of Egypt's security services. The Egyptian government's active opposition to terrorism, and effective intelligence and security services, made Egypt an unattractive locale for terror groups. Nonetheless, Egypt's northern Sinai region remained a haven for smuggling weapons, explosives, funds, and people between Egypt, Gaza, and Israel. Criminal networks that smuggle weapons and other contraband through the Sinai into Israel and Gaza may be associated with or used by terrorist groups in the region. The apparent radicalization of some Sinai Bedouin may be linked in part to these smuggling networks and to the Bedouin's long-standing complaints of discriminatory and heavy-handed treatment by the central government.

In the past four years, Egypt has tightened its terror finance regulations in keeping with relevant UN Security Council Resolutions. Egypt passed anti-money laundering legislation in 2002, established a financial intelligence unit in 2003, and ratified the International Convention for the Suppression of the Financing of Terrorism. The Government of Egypt kept open, regular lines of communication with U.S. officials concerning terrorist finance information. Egypt maintained its

---

[8] The 2006 counterterrorism law was the first of its kind in Bahrain to specifically criminalize terrorism. It enumerated the types of crimes considered to be terrorism and established punishments, ranging up to and including the death penalty. The law also criminalized conspiracy to carry out an act of terrorism and outlawed membership in proscribed groups, including al-Qa'ida. Bahrain enacted amendments to an existing anti-money laundering law in 2006 that criminalized the undeclared transfer of money across international borders for the purpose of money laundering or in support of terrorism. Anyone convicted under the amended law of collecting or contributing funds, or otherwise providing financial support to a group or people who undertook terrorist acts, was subject to imprisonment and/or fine. The amendments also codified a legal basis for a disclosure system for cash couriers. The implementing regulations have not yet been enacted, however.

**PX203**

strengthened airport security measures and security for the Suez Canal, and continued to institute more stringent port security measures.

The Egyptian judicial system does not allow plea bargaining, and terrorists have historically been prosecuted to the full extent of the law. Terrorism defendants may be tried in military tribunals or emergency courts.

Many of the Egyptian president's far-reaching powers in the realm of counterterrorism come from a decades-old Emergency Law, which was renewed by Parliament for two years in 2006. President Mubarak has pledged to lift the Emergency Law by June 2008 and has called for new antiterrorism legislation to replace the Emergency Law, noting that Egypt should follow the example of other countries that have recently passed comprehensive laws to combat terrorism. Such legislation was being drafted by a governmental interagency committee at year's end.

The United States hosted the third session of the United States-Egypt Counterterrorism Joint Working Group.

The imprisoned former leader of Egyptian Islamic Jihad, Sayid Imam al-Sharif, issued a detailed "revision" of his previous ideology of violent jihad. His revised approach to jihad did not amount to a rejection of the concept, but an attempt to establish "rules of engagement" for conducting jihad, while also offering non-violent alternatives. He also denounced AQ's agenda and verbally attacked AQ's leaders Usama bin Ladin and Ayman al-Zawahiri.

**Iran**

*See Chapter 3, State Sponsors of Terrorism*.

**Iraq**

The Iraqi government, with support from Coalition Forces, made significant progress in combating al-Qa'ida in Iraq (AQI) and affiliated terrorist organizations. There was a significant reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IED) attacks in the last five months of the year.

Terrorist organizations and insurgent groups continued their attacks on Coalition and Iraqi security forces using IEDs, including vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers. The Iraqi government continued to emphasize national reconciliation and passed key pieces of reconciliation-related legislation. However, there was greater success taking practical steps that helped to advance reconciliation at the provincial and local level.

Coalition and Iraqi forces made their gains against AQI and like-minded extremists with much help from the grass-root engagement of Sunni and Shia tribal leaders and Concerned Local Citizens (CLC)/Sons of Iraq (SOI) groups. The Iraqi government took greater steps on both the bilateral and multilateral fronts to try to harness regional and international support against the common threat from AQI and like-minded extremists.

PX203

An improved security environment has resulted from the combined factors of Coalition troop surge and sustained presence, the declared ceasefire by Muqtada al-Sadr's Jaysh al-Mahdi militia in August, improved Iraqi Security Forces proficiency, and increasing popular support for the actions of Iraqi Forces against AQI and other extremist groups. CLC and SOI groups provided Coalition and Iraqi forces with valuable information that helped disrupt terrorist operations and expose large weapons caches. Tribal awakening movements, similar to the Anbar Awakening that emerged in western Iraq in 2006, gained momentum as both Sunni and Shia sheikhs formed alliances with the coalition against AQI and extremist groups. Ethno-sectarian related violence declined but remained a concern as Shia extremists and criminal organizations became an increasing threat to stability.

Iraqi and Coalition Forces forced AQI cells from their strongholds in western Iraq and the Baghdad area. With their bases of operations disrupted and with members detained or killed, AQI and like-minded extremist elements were forced into the eastern and northern parts of Iraq to look for more advantageous and secure operating areas. AQI has shifted its tactics from primarily Shia targets to focusing its attacks against Iraqi security forces, CLC groups, and tribal awakening movement members. Despite the improved security environment, AQI still possessed the means to launch high-profile attacks against Iraqi civilians and infrastructure.

Iraqi government officials continued to strongly condemn terrorists. On September 28, Iraq and Turkey concluded a counterterrorism agreement between its interior ministers to increase cooperation in countering the militant Kurdish separatist group, Kongra Gel/Kurdistan Workers' Party (KGK/PKK). Following an October 7 attack by the KGK/PKK that killed 13 Turkish soldiers in Southern Turkey, Prime Minister Maliki publicly stated that the KGK/PKK was a terrorist organization and would not be tolerated in Iraq. Kurdistan Regional Government (KRG) officials in northern Iraq also took concrete actions against the KGK/PKK presence there by closing off re-supply routes via additional checkpoints, increasing airport screening for KGK/PKK members, and directing the closure of KGK/PKK-affiliated offices.

The government's national reconciliation programs made incremental progress. The Iraqi Council of Representatives passed a unified pension law important to reconciliation efforts, and local working level reconciliation initiatives also successfully brought Sunni and Shia groups together to promote a message of unity. In October, Anbar and Karbala provincial government officials and tribal sheikhs met three times in two weeks to foster improved Sunni-Shia reconciliation.

Terrorism committed by illegal armed groups receiving weapons and training from Iran continued to endanger the security and stability of Iraq. Foreign terrorists from Saudi Arabia, North Africa, and other Middle Eastern countries continued to flow into Iraq, predominantly through Syria.

The Iraqi government increased its bilateral and multilateral efforts to garner regional and international support against the common threat from AQI and like-minded extremists. The Expanded Neighbors Process has emerged as a forum in which Iraq and its neighbors can address the political and security challenges facing Iraq. The first Expanded Neighbors of Iraq

PX203

Ministerial was convened in Sharm el Sheikh on May 4. At the ministerial, participants unanimously endorsed the creation of  three working groups, including one on border security, which held its first meeting in Damascus later in the year. At the second Expanded Neighbors of Iraq Ministerial, hosted by Turkey on November 3, participants, including high-level representatives from all of Iraq's neighbors, issued a final communiqué that condemned all acts of terrorism in all its forms in Iraq. In August, Prime Minister Nuri al-Maliki met with Syrian President Bashar al-Asad and other top Syrian government officials to discuss improving bilateral cooperation on both the counterterrorism and border security fronts. Other senior Iraqi government officials also visited Syria in an effort to foster bilateral counterterrorism and border security cooperation.

Iraq remained a committed partner in counterterrorism efforts. The Iraqi security forces continued to build tactical and operational momentum and assumed responsibility for security in nine of Iraq's 18 provinces. Continued Coalition and other international support will be critical for the Iraqi government to continue building its capacity to fight terrorist organizations. Iraq's intelligence services continued to improve in both competency and confidence but will also require ongoing support before they will be able to adequately identify and respond to internal and external terrorist threats. The international community's support for investment and reconstruction are critically needed to ensure the success of the Government of Iraq's plans to reduce violence, improve services, and increase economic opportunities.

**Israel, the West Bank, and Gaza**

Israeli civilians were killed in six separate terrorist attacks during the year, the lowest number since the first Intifada broke out. While the lethality of individual terrorist attacks declined in comparison to 2006, Israel nevertheless continued to suffer from terrorist threats emanating from the West Bank and Gaza. Israeli security sources continued to express concern that AQ and other external Sunni extremists might infiltrate the West Bank and Gaza, especially after Palestinian gunmen claiming affiliation with AQ blew up a vacant resort in Gaza in January. Claims of actual AQ presence in the West Bank and Gaza have not been substantiated.

Israel responded to the terrorist threat as it has in recent years, with targeted operations directed at terrorist leaders and weapons experts, Israel Defense Forces (IDF) incursions into the West Bank and Gaza to conduct roundup operations, and other efforts designed to increase pressure on Palestinian terrorist organizations and their supporters. The Israeli security services also imposed strict and widespread closures and curfews in Palestinian areas, and continued constructing an extensive security barrier in the West Bank and Jerusalem that Israeli officials believe has played an important role in making terrorist attacks more difficult to undertake.

Perceiving the need to restore deterrence vis-à-vis Lebanese Hizballah and its backers in Syria and Iran, the IDF conducted extensive military exercises in northern Israel and the Golan Heights. Diplomatically, Israel continued to make the case at the UN, in its bilateral relations, and through public diplomacy that it faced threats from Hizballah, which was re-arming with Syrian and Iranian help, and from Palestinian terrorist groups receiving financial support from Iran. Israel contended that Egypt did not do enough to stop the smuggling of arms and explosives from the Sinai into Gaza through tunnels under the Gaza-Sinai border. In October, the Army

PX203

Corps of Engineers conducted a study of the situation, and Egypt agreed to utilize $23 million of its Foreign Military Funding budget this year to purchase anti-tunneling equipment. Egypt has also agreed to discuss coordination and constructive ways to address this problem with the United States, Israel, and the Palestinian Authority.

While rocket fire against Israeli civilian targets from Gaza by HAMAS and other terrorist organizations continued during the year, HAMAS did not otherwise take responsibility for terrorist attacks pursuant to a unilateral conditional cease-fire it announced in 2005. HAMAS likely aided other terrorist organizations in Gaza, including Palestinian Islamic Jihad (PIJ), the al-Aqsa Martyrs' Brigades (AAMB), and the Popular Resistance Committees (PRC), particularly after HAMAS seized power and expelled the legitimate Palestinian Authority government from Gaza in June.

Terrorist attacks that resulted in injuries and the Israeli responses included:

- On January 29, in the resort city of Eilat, a suicide bomber blew himself up in a bakery. Three Palestinian groups, PIJ, AAMB, and an unknown group calling itself "The Army of the Faithful", claimed responsibility for the attack.

- On February 25, the body of an Israeli settler was found in the Gush Etzion settlement bloc in the West Bank. The Israeli National Police said that he had been stabbed to death in a terrorist attack. No group claimed responsibility for the attack. Two young Palestinian men were subsequently arrested in a joint IDF-Israel Security Agency (ISA or Shin Bet) operation, and reportedly admitted to carrying out the attack based on religious grounds.

- On May 21 and 28, two Israeli civilians were killed when Qassam rockets launched from Gaza landed near them in the border community of Sderot.

- On November 19, an Israeli civilian was killed in a shooting incident near the West Bank settlement of Kedumim. The AAMB took responsibility for the attack. Two suspects were arrested the following day in a joint IDF-ISA operation. Palestinian security forces arrested a third suspect, who reportedly served previously in the Palestinian National Security Forces.

These incidents reflected an overall decrease in the number of successfully perpetrated terrorist attacks in comparison to previous years. Israeli security officials maintained that the decrease was not for lack of terrorists' efforts, but because the security services were able to keep terrorist planners and operators off balance. Throughout the year, Israel's security services publicly reported several foiled attempts.

Three nearly successful attempts, in particular, could have had disastrous consequences if they had been carried through to completion. The first attempt occurred on February 20 and involved a PIJ militant who carried an explosive backpack onto an Israeli bus in Tel Aviv. After failing to detonate the backpack, the man fled the scene. The man, his PIJ accomplices, and the backpack were subsequently found by the Israeli security services. The PIJ commander who ordered the

110

PX203

failed attempt was killed by IDF forces the following day in the West Bank. The second involved a truck bomb in Tel Aviv in March. For unknown reasons, the driver did not detonate the truck. The operation was discovered by the Shin Bet and suspected operators were subsequently detained. Press reports cite Shin Bet sources as alleging that HAMAS was behind the foiled attack. HAMAS never responded to the allegations. The third attack involved an explosive belt discovered in an apartment in Tel Aviv on September 22. According to Israeli security sources, the belt was intended to be used in an attack on the Yom Kippur holiday, to be carried out by a suicide bomber who had been arrested three days earlier in a joint IDF-ISA operation in the West Bank. A joint HAMAS-Popular Front for the Liberation of Palestine (PFLP) cell in the West Bank reportedly planned the attack.

On the law enforcement front, in March, a Tel Aviv court sentenced three Israelis to 13 years in jail for assisting a Palestinian who killed five Israeli civilians and wounded 30 in the July 2005 suicide bombing of a shopping mall in Netanya. Another Israeli was sentenced to seven years imprisonment in May for transporting a Palestinian suicide bomber to a Tel Aviv cafe, where the bomber carried out his attack in 2002, killing an Israeli civilian and wounding 28 others.

Despite the fact that Palestinian terrorists were relatively unsuccessful in carrying out suicide bombings and other attacks within Israel, they were nevertheless able to harass Israel throughout the year with mortar attacks against the Israeli-manned crossings between Gaza and Israel, and with Qassam rocket launches from Gaza towards Israeli communities abutting Gaza, the majority of which were targeted at the town of Sderot in the southern Negev desert. The Israeli Foreign Ministry claimed that from mid-June through mid-December, 428 Qassam rockets and 590 mortar shells were fired from Gaza towards Israeli civilians and soldiers. On October 7, militants fired a 122 mm Grad missile into Israel. It struck the town of Netivot, 15 kilometers inside Israel. PIJ, HAMAS, the AAMB, and the PRC claimed responsibility for the rocket and mortar attacks. On the eve of the November 27 Annapolis Conference, attended by the United States, Israel, the Palestinians, and representatives of other Middle Eastern countries, the PRC announced that it would begin "Operation Autumn Storm" and launch hundreds of rockets towards Sderot and western Negev communities during and after the conference. This threat was not carried out.

The Israeli security services assessed that the use of rockets and mortars reflected recognition by the groups launching them that their best chances for success were through asymmetrical warfare. The reliance on rockets also reflected technological advancements that allowed the groups to manufacture the rockets cheaply, stockpile them, and launch them greater distances. Prior to HAMAS' takeover of Gaza in June, Israeli security experts also assessed that rocket attacks were being carried out in order to draw Israel into Gaza, and force PA President Abbas' Fatah party to cooperate with HAMAS. Mortars were used mainly against Israeli targets within or on the very edge of the Gaza, to include crossings, which had the effect of closing the crossings to the detriment of Gaza's residents.

During the first half of the year, Israel undertook small-scale military operations against suspected launch teams and sites in Gaza. After HAMAS' June seizure of control in Gaza, the IDF sought to prevent launches by carrying out aerial attacks against vehicles it had identified as carrying rockets en route to launch sites in Gaza. The Israeli government also authorized targeted operations against terrorist leaders and operatives and the expansion of a buffer zone within Gaza

PX203

wherein the IDF could carry out counterterrorist operations. Throughout the year, the IDF struck at areas used for launch sites in northern Gaza to deter launches. Israeli Air Force (IAF) helicopters also deliberately struck HAMAS military headquarters and other HAMAS installations in response to Qassam rocket attacks that HAMAS claimed it carried out.

Press reports also highlighted numerous attempts by Palestinians to kidnap Israeli citizens or high-value targets of interest, including foreign diplomats and journalists. In January, a French diplomat and his two bodyguards were kidnapped by AAMB gunmen in the West Bank. On March 12, BBC reporter Alan Johnston was abducted in Gaza by gunmen belonging to a Palestinian group calling itself "The Army of Islam" and was held for 114 days until his release on July 4. While in captivity, an AQ-affiliated Palestinian organization calling itself "The Palestinian Jihad and Tawheed Brigades" claimed that it executed Johnston, and blamed the Palestinian Authority and the British government for his death. Two videos were also released that showed Johnston dressed in an explosive vest, and threatened his death unless Palestinian prisoners in the UK and Jordan were released. HAMAS brokered his release in an apparent bid to demonstrate its control over Gaza.

Deterring the Threat from Hizballah and Syria

Israel's security establishment remained concerned about the terrorist threat posed to Israel in the north by Hizballah and its Iranian and Syrian backers. Israeli security officials said that Hizballah continued to provide support to select Palestinian groups to augment their capacity to conduct attacks against Israel. Israeli politicians and security officials pointed to Hizballah's efforts to rebuild and re-arm after the previous summer's war as evidence that Hizballah remained a threat to Israel. Throughout the rest of the year, Israeli officials claimed publicly that Hizballah had completely replenished its ranks, possessed even more short and medium-range rockets than it had before the 2006 war, had moved arms back into southern Lebanon, and was providing training to HAMAS operatives from Gaza.

During the summer, Israeli officials and media outlets also filled Israel's airwaves with dire predictions of a summer war between Israel and Syria that was likely to be started by a kidnapping or terrorist operation in the vicinity of the Golan Heights. With a view to deterring such a provocation, the IDF carried out large-scale, comprehensive military exercises for several weeks in the Golan Heights, in clear view of UN Disengagement Observer Force observers, the Syrian military, and Hizballah. While some observers feared that the exercises themselves might lead to a misunderstanding and a subsequent conflict, Israel's northern border remained comparatively quiet.

Increasing Pressure on HAMAS and Raising the Tunnel Problem

Israel continued to face the problem of terrorists in Gaza receiving funds and supplies through cross-border smuggling either through the Egypt-Gaza border, or under the border via tunnels, or by sea. In June, Israeli Prime Minister Olmert publicly stated that the smuggling problem had become so serious that the international community should consider deploying a multinational force between Gaza and the Sinai Peninsula. HAMAS said it would treat such a force as an occupying power.

PX203

Israeli security sources claimed in August that arms smuggling into Gaza had reached a peak since HAMAS' June takeover of Gaza. Specifically, officials said that since June, 40 tons of explosives, as well as large quantities of ammunition and over 150 RPG launchers had been smuggled into Gaza from Egypt. Israeli security sources also alleged that HAMAS had smuggled hundreds of terrorists from Gaza to Iran for advanced training across the Gaza-Sinai border and through tunnels underneath. They claimed that HAMAS was amassing an arsenal of sophisticated anti-tank missiles and long-range rockets of the type used by Hizballah in the Summer 2006 Israel-Hizballah conflict.

Israel responded to the ongoing tunnel problem by taking unilateral military action to root out and destroy the tunnels, and by increasing diplomatic pressure on Egypt to enhance security on its side of the Egypt-Gaza and Egypt-Israel border. Throughout the year, small IDF units, backed by helicopters and armored combat vehicles, entered southern Gaza on missions to search for terrorist suspects and tunnels. By the end of the year, more than 40 tunnels had been discovered and destroyed.

At the same time, the Israeli government increased pressure on the Egyptian government to encourage it to address the problem of smuggling through tunnels and the Rafah crossing. On December 26, Israeli Defense Minister Barak met with Egyptian President Mubarak and his aides about the arms smuggling problem and the flow of Palestinians between Gaza and Sinai.

<u>West Bank and Gaza</u>

The Palestinian Authority's (PA) counterterrorism efforts improved in 2007, with a new PA Cabinet under PM Salam Fayyad undertaking serious efforts to fight incitement and terror in the second half of the year. Nevertheless, additional efforts will be required to dismantle terrorist groups and infrastructure in the West Bank and Gaza. In the first half of the year, PA counterterrorism efforts and USG assistance to support these efforts were greatly complicated by HAMAS' control of the PA government and by the creation of rival security forces in Gaza. In June, HAMAS militants captured PA offices and security bases in a violent takeover of Gaza. Subsequently, President Mahmud Abbas dismissed HAMAS Prime Minister Ismayil Haniyah and his cabinet. A new cabinet, appointed and led by PM Salam Fayyad, and USG security assistance to PA security forces in the West Bank, created new opportunities for PA action against terrorism.

The primary PA security forces (PASF) are the National Security Forces (NSF), police, Preventive Security Organization (PSO), Presidential Guard (PG), General Intelligence (GI, or Mukhabarat), and civil defense. While the GI, PG, and NSF are subordinate to the President, under Palestinian law all are under the jurisdiction of the Interior Minister. In Gaza, HAMAS has established separate police, coastal patrol, border guard, and ―Executive Force" organizations under the former HAMAS Prime Minister's control. HAMAS military-wing members were often integrated into their ranks. Militias such as the HAMAS and PIJ military wings, the al-Aqsa Martyrs Brigade, and clan-based armed groups (especially in Gaza) also exercised significant control and carried out vigilante justice in areas where PASF were not present or were ineffective at delivering basic law enforcement.

PX203

There were no terrorist attacks against American citizens in the West Bank or Gaza during the reporting period. The PA made no progress in apprehending, prosecuting, or bringing to justice the perpetrators of the October 2003 attack on a U.S. Embassy convoy in Gaza that killed three USG contractors and critically injured a fourth.

While cooperation between the PA and Government of Israel security services improved in the second half of the year, local counterterrorism coordination remained weak. The PA protected and returned several Israelis, including IDF soldiers, who had entered Palestinian cities, including Jenin and Bethlehem.

In the West Bank, the PASF were hindered by a lack of resources and trained personnel, and an unclear chain of command and guidance. PASF officials frequently raised concerns about operational difficulties imposed by the Israeli government on PASF movement. Efforts to arrest and prosecute terrorists were also impeded by a disorganized legal system, a weak security apparatus, and inadequate prison infrastructure.

President Abbas and PM Fayyad put their weight behind a security program that included disarming fugitive militants and eventually dismantling armed groups. PM Fayyad has condemned violence against Israelis in harsh terms and has taken rapid action against those involved in attacks. Since becoming Prime Minister, Fayyad has condemned every attack against Israelis as contrary to Palestinian interests and commitments and has ordered immediate action, including planned prosecutions against the perpetrators.

The Fayyad-led PA government instituted stricter controls on media outlets and religious figures to reduce incitement. The Fayyad government's political platform was the first to omit language concerning ―the right of resistance,‖ and he and the PA government have actively criticized violence and terror as contrary to Palestinian interests.

The Palestinian Monetary Authority (PMA) continued building a Financial Follow-Up Unit (FFU) and developing capacity to track and deter financial transactions used to fund terrorist activity. The new PA Cabinet, formed in July, improved efforts to counter terrorist financing, and the Finance Ministry worked effectively with the Justice Ministry, Attorney General, and (as appropriate), with the Interior and Waqf Ministries to shut down illegal NGOs and charities. The PMA drafted an Anti-Money Laundering Law that was enacted as law by Presidential decree in November.

**Jordan**

In its public statements, new legislation, security measures, and court cases, the Government of Jordan continued to place a high priority on its fight against extremism and terrorism. Those efforts coincided with an apparent shift in public opinion against extremism as reflected in poll results. The 2007 Pew Research Center Global Attitudes survey indicated a marked turn against support for terrorism among Jordanians. Only a fifth of respondents expressed any confidence in Usama bin Ladin (down from 56 percent four years ago), and fewer than a quarter viewed suicide bombing as justified (down from 43 percent in 2002, and from 57 percent in 2005). A

PX203

common view among commentators was that antipathy toward extremism increased since terrorists killed 60 Jordanians in attacks on three hotels in Amman in 2005. According to the Pew data, while worries about terrorism fell in many countries since 2002, in Jordan concerns were up nearly threefold, from 15 percent to 42 percent.

King Abdullah used international fora, national addresses, and media interviews to denounce extremists and promote a tolerant, moderate brand of Islam. Speaking before the opening session of the new parliament in December, for example, the King promised to combat extremist Islam and ―stand up to anybody who tries to abduct our religion or to monopolize fatwas for political reasons, for the purpose of using religion as a tool to subdue others for the sake of special or suspicious agenda.‖

Parliament passed new anti-money laundering legislation that began to address a key law enforcement deficiency in what is otherwise a strong counterterrorism environment. The new law, which went into effect in July, created an Anti-Money Laundering Unit (AMLU) that is the central receiving point for all suspicious transaction reports related to money laundering. Although the law did not specify terrorism and terrorism financing as a predicate offense for money laundering, the AMLU believes it will be able to resolve these ambiguities through the issuance of regulations and Central Bank of Jordan instructions to obligated entities. This approach has not yet been tested in the courts.

Jordan‘s security forces remained vigilant against terror threats. For example, the General Intelligence Directorate in February arrested members of al-Qa‘ida in Iraq (AQI) who were attempting to infiltrate from Syria. Another member was killed in an armed confrontation in Irbid in January. Additionally, Jordan‘s State Security Court (SSC), a special tribunal for terrorism and other cases that had both civilian and military judges and attorneys, maintained a heavy caseload. Examples of SSC actions included:

- In November, it ratified a prior ruling against two men who were convicted of plotting to launch an attack on Israel via the Jordanian border.

- In September, 16 people were convicted and given prison terms ranging from 20 months to five years for recruiting people to fight Americans in Iraq and carry out suicide attacks. Five of them, including Fatah al-Islam leader Shaker al-Absi, were tried in absentia.

- In August, five men were sentenced to prison terms ranging from 20 months to five years after being convicted of plotting acts that undermine Jordan‘s relations with another country and subjecting the country to hostile acts.

- In July, two men were given prison sentences for plotting to kill Americans in Jordan ―to avenge U.S. policies toward Muslims.‖

- In April, sentences were handed to six men who plotted AQ-linked terrorist attacks at Queen Alia International Airport and hotels in Aqaba and the Dead Sea.

PX203

The SSC continued to review the cases in the trial of the defendants accused of plotting to assassinate President Bush during his November 2006 visit to Jordan. The three Zarqa residents, Nidal Momani, Sattam Zawahra, and Tharwat Daraz, stand accused of conspiracy to carry out terrorist attacks with flammable substances in Jordan, and of possession of illegal weapons and explosive substances for illicit purposes.

Additionally, in January, the Court of Cassation upheld the death sentence imposed on would-be suicide bomber Sajida Rishawi, who, in 2006 was convicted of plotting terrorist attacks against three hotels in Amman; she was the first woman to receive the death penalty in a terror-related trial in Jordan.

## Kuwait

In 2007, the Government of Kuwait did not enact stronger antiterrorism and money laundering legislation, and it continued to have difficulty prosecuting terrorists and terrorism financiers and facilitators. The risk of a terrorist attack in Kuwait remained high because of U.S. forces in the country, regional tensions, and the Kuwaiti government's reluctance to confront domestic extremists. Kuwait lacked legal provisions to deal with conspiracies to commit terrorist acts, a problem complicated by domestic politics. In the past, the Kuwaiti government took action against non-Kuwaiti residents involved in terror facilitation but was reluctant to take action against key local Sunni extremists unless there was a perception of clear and direct danger to Kuwaiti or U.S. interests. The Kuwaiti government was reluctant to support the designation of its nationals as terrorists or terrorism supporters under UNSCR 1267.

In April, the Kuwaiti government froze all financial accounts of terrorism financier Mubarak Al-Bathali and forbade him to open any further accounts in Kuwait. In July, Kuwaiti authorities arrested Jabir Al-Jalahmah for his role in facilitating the travel of jihadists to Iraq, but a Kuwaiti court later released him on bail.[9]  The Kuwaiti government had not prepared a case against Al-Jalahmah. Mohsen al-Fadhli, a U.S.-designated Kuwaiti terrorist, was believed to be in Jordan and remained at large. The Court of Cassation, Kuwait's highest court, ruled in March 2005 that it did not have jurisdiction over al-Fadhli's alleged financing of the terrorist attack on the USS Cole in October 2000.

The Kuwaiti government continued the prosecutions of the 36 members of the ―Peninsula Lions" terrorist cell involved in January 2005 confrontations with police. In May, the Court of First Instance overturned the convictions of three defendants. In June, the Court of Cassation commuted the death sentences of four defendants to life sentences (equal to 25 years of imprisonment under Kuwaiti law). The Court of Cassation is reviewing the verdicts of the remaining 32 defendants in the Peninsula Lions case.

---

[9] In December 2006, the U.S. Department of the Treasury designated three Kuwaiti nationals as terrorist supporters within the U.S.: extremist cleric Hamid Abdallah Al-Ali, and terrorism facilitators Mubarak Al-Bathali and Jabir Al-Jalahmah. In December 2005, a Kuwaiti court acquitted Hamid Al-Ali for his role in inciting the Peninsula Lions attack of January 2005.

PX203

In 2002, twelve armed Kuwaitis attacked two U.S. service members outside a military base near Failaka Island. The Appeals Court acquitted five of the twelve defendants. In February 2007, the Court of Cassation reduced the fines of two of these defendants from 700,000 USD to 7,000 USD. Separately, in 2005, the Criminal Court convicted 18 Kuwaitis in absentia to three years in prison for recruiting jihadists to fight in Iraq. In October, the Appeals Court attempted to review the cases of seven of these individuals, but was unsuccessful since they remained at large.

In April and May, Kuwaiti courts upheld the not guilty verdicts of seven former Guantanamo detainees on terror-related charges. The Kuwaiti government had been appealing decisions previously rendered by lower Kuwaiti courts.

Nevertheless, Kuwait was an effective and reliable partner in providing security for U.S. military installations and convoys in Kuwait. In 2006, Kuwaiti police arrested three bidoons (stateless residents) for planning to attack U.S. military personnel. The Criminal Court convicted the bidoons in January 2007, and sentenced them each to ten years in prison, to be followed by deportation. The Court of Appeals was scheduled to review their case on December 31. Kuwait's reluctance to address the social and economic conditions of its bidoon residents has resulted in this segment of the population becoming vulnerable to radical ideologies and terrorist recruiters.

In response to AQ threats to attack oil facilities in the Gulf, Kuwait took some steps to improve security at its petroleum installations and export terminals. In March, a multi-agency U.S. Critical Energy Infrastructure Protection team visited and provided the Kuwaiti government with a number of recommendations to improve its energy infrastructure security. Kuwait responded by taking initial steps to enhance physical security at several locations.

The Kuwaiti government's legal regime for combating money laundering and terrorist financing lacked sufficient enforcement mechanisms, thus hindering its effectiveness. The Kuwaiti government implemented no cash reporting requirements for individuals leaving the country, and this was a significant vulnerability. While money laundering was a criminal offense, terrorist financing was not specifically prohibited. Kuwait had established an Anti-Money Laundering/Combating Terrorist Financing Committee (AML/CTF), with representation from a wide range of government ministries and domestic financial institutions. Kuwait was also an active member of the Middle East and North Africa Financial Action Task Force (MENA FATF). Although Kuwait had a Financial Intelligence Unit (FIU), it did not exercise independent authority in accordance with current international standards.

The Ministry of Social Affairs and Labor (MOSAL) took some steps to strengthen its domestic monitoring regime of Kuwait-based Islamic charities, but was less effective in monitoring the activities of these charities outside Kuwait. The Kuwaiti government needs to accelerate its efforts to pass counterterrorism legislation, strengthen charity oversight, empower its FIU, monitor cash couriers, and fully conform to international standards and conventions on terrorist financing.

In 2005, Kuwait's Ministry of Awqaf (religious endowments) and Islamic Affairs launched an initiative to spread moderation and to combat extremism within the Muslim community. The Ministry's World Moderation Center (WMC), tasked with implementing this program, offers a

PX203

45-day moderation course, which over 700 imams have completed thus far. The Center also began offering this course to high school Islamic studies teachers.

The moderation campaign has had some difficulty reaching the broader public, prompting the government to launch an awareness campaign on its behalf. The World Moderation Center sponsored international moderation conferences in London and Washington, D.C., and established a moderation center in Manchester, England.

**Lebanon**

Political violence continued throughout 2007. Most notable were the June 13, September 19, and December 12 car bombing assassinations of MP Walid Eido, MP Antoine Ghanem, and General Francois al-Hajj, respectively. The two MPs were part of the pro-government March 14 coalition, and several political allies of the two MPs charged that the Syrian government was responsible for the assassinations, which Syria strongly denied. These acts, the latest in a series of assassinations and attempted assassinations over the last three years, seemed designed to intimidate the pro-government forces and eliminate, through the process of killing MPs, their numerical majority in parliament.

On May 20, a conflict involving the Lebanese Armed Forces (LAF) and militant Islamic fundamentalist group Fatah al-Islam (FAI) erupted in Nahr el-Barid, a Palestinian refugee camp in the north. After a three-month battle, the Lebanese Army took control of the camp on September 2. The death toll was 168 LAF soldiers and an estimated 42 civilians. While the LAF were able to defeat FAI militants and secure the Nahr el-Barid camp, the Government of Lebanon still lacked control of the other eleven refugee camps in the country.

The assassinations of the MPs and the battle against FAI were followed by a December 12 car bombing that killed LAF Brigadier General Francois al-Hajj in the Christian town of Baabda, east of Beirut. General al-Hajj had been in charge of operations when Lebanon's army fought Islamic militants from Fatah al-Islam in Nahr el-Barid refugee camp. No one publicly claimed responsibility for the bombing, though potential suspects include FAI and its sympathizers.

On June 24, six soldiers in the Spanish contingent of the UN Interim Force in Lebanon (UNIFIL) were killed, and another two injured, when two improvised explosive devices (IEDs) exploded near their vehicle in southern Lebanon. While no organization claimed credit for the attack, it was widely viewed as an effort by those who oppose UNIFIL's efforts to prevent attacks against Israel launched from southern Lebanon.

During the last three years, there have been at least 12 assassinations and assassination attempts that resulted in more than 49 deaths, including that of former Prime Minister Rafiq Hariri. Other attacks targeted Lebanese journalists and politicians critical of Syrian interference in Lebanon. All of these attacks remained unsolved. The UN International Independent Investigation Commission (UNIIIC) continued its investigation of the Hariri assassination and its assistance to Lebanon in the Lebanese investigation of the other assassinations.

PX203

By confronting and defeating FAI in the Nahr el-Barid camp, the government of Prime Minister Fouad Siniora and the LAF took a strong incremental step in combating and preventing terrorist activities. The battle against FAI marked the first time in 40 years that the LAF fought a major conflict as a single entity, and it was the first time the army entered a Palestinian refugee camp to eliminate an Islamic militant terrorist group and reestablish order and security. Also, the LAF continued to strengthen its border presence and increased patrols in the south, with assistance from UNIFIL. Even with the conflict in north Lebanon, the LAF was able to maintain its deployment commitments in the south.

While the Lebanese government has made progress, there were still concerns about its ability to combat terrorism. The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah retains its strong influence among Lebanon's Shia community, which comprises about one-third of Lebanon's population. Hizballah maintained offices in Beirut and elsewhere in Lebanon.

The ongoing political stalemate over both the election of a president and the failure of Parliament to meet has contributed to enabling militant foreign Islamic extremists affiliated with or sympathetic to al-Qaʻida (AQ) to infiltrate Lebanon, and to set up operational cells. Palestinian militant groups continued to capitalize on the lack of government control within the camps. Some of these groups, such as AQ-affiliated Asbat al-Ansar and Jund al-Sham, have been able to find safe haven within the camps to support their actions, most notably in the Ain el-Hilwah camp.

Although Syria withdrew its military forces from Lebanon in April 2005, it still maintains a covert intelligence presence. The Lebanese government has accused Syria of continuing to support and facilitate arms smuggling to Hizballah and Palestinian terrorist groups. Even with the continued LAF troop deployments, the Government of Lebanon still did not exercise full control over areas in the Hizballah-dominated south, the southern suburbs of Beirut, parts of the Bekaa Valley, and inside eleven Palestinian-controlled refugee camps. This lack of control provided opportunities for terrorist groups to operate relatively freely in some of these locations.

At the end of the year, the Lebanese government had not fully implemented provisions of UNSCR 1559, which called for respect for the sovereignty and political independence of Lebanon, the end of foreign interference in Lebanon, and the disarming and disbanding of all Lebanese and non-Lebanese militias. While the Lebanese government was committed to fulfilling the provisions of UNSCR 1559, it maintained that implementation of Hizballah's disarmament should be accomplished through "national dialogue" rather than force.

Lebanese authorities maintained that the amnesty for Lebanese individuals involved in acts of violence during the civil war prevented the government from prosecuting terrorist cases of concern to the United States. These cases included individuals involved in the 1985 hijacking of TWA Flight 847, during which a U.S. Navy diver was murdered, and the abduction, torture, and murder of U.S. hostages in Lebanon from 1984 to 1991. U.S. courts issued indictments against Lebanese Hizballah operatives responsible for a number of those crimes. Mohammad Ali Hamadi, who spent 18 years in a German prison for his role in the TWA hijacking, was released

PX203

in December 2005 and was believed to be in Lebanon. The United States continued its efforts to bring him to trial before a U.S. court and formally requested his extradition.

With regard to terrorism finance, Lebanese officials played an active leadership role in the Middle East and North Africa Financial Action Task Force (MENA/FATF). The Central Bank of Lebanon's Special Investigation Commission (SIC), an independent legal entity with judicial status that is empowered to investigate suspicious financial transactions, investigated 209 cases involving allegations of money laundering and terrorist financing activities. On two occasions, the SIC was unable to designate or freeze the assets of two groups affiliated with Hizballah, because the groups were affiliated with a political party participating in the Lebanese government, and thus, a decision to freeze their assets would have been a political, rather than a legal decision.

**Libya**

Since the United States rescinded Libya's designation as a state sponsor of terrorism in June 2006, Libya has continued to cooperate closely with the United States and the international community on counterterrorism efforts. Since renouncing terrorism in 2003, Libya has endeavored to show its commitment to the War on Terror.

On November 3, Egyptian cleric and AQ leader Ayman al-Zawahiri announced a merger between AQ and the Libyan Islamic Fighting Group (LIFG). In an audiotape, al-Zawahiri urged AQ fighters to topple the government of Libya, describing Libyan leader Muammar Qadhafi as an "enemy of Islam" and criticizing Qadhafi's 2003 decision to renounce WMD and terrorism. According to press accounts, LIFG maintained a limited presence in eastern Libya and has facilitated the transfer of foreign fighters to join insurgents fighting U.S.-led forces in Iraq.

A number of U.S. court cases seeking compensation from Libya for its past support for terrorism remained unresolved. Libyan officials are engaging with the courts and, at USG urging, are continuing settlement talks with the claimants, including the families of the victims of the 1988 bombing of Pam Am flight 103 in Lockerbie, Scotland, and the 1986 bombing of the La Belle nightclub in Berlin.

**Morocco**

A series of suicide bombing attacks shattered the relative lull in terrorist violence that had prevailed in Morocco since the 2003 Casablanca bombings. The attacks underscored that Morocco's greatest terrorist threat stems from numerous small ―grassroots" Salafi Jihadist groups. The main external terrorism threat to Morocco was al-Qa'ida in the Islamic Maghreb (AQIM) and its demonstrated willingness to train inexperienced Moroccan extremists. Morocco adopted a comprehensive counterterrorism strategy that emphasized vigilant security measures, counter-radicalization policies, and strong international cooperation.

This year's violence was centered in the city of Casablanca, Morocco's commercial capital, but the last attack occurred in the city of Meknes.

PX203

- On March 11, an individual blew himself up in an Internet café.

- On April 10, three suicide bombers, cornered by police as a result of an investigation of the March bombing, blew themselves up to avoid capture, with a fourth being killed by the police.

- On April 14, two suicide bombers blew themselves up near the U.S. Consulate and the private American Language Center, respectively. Other than the attackers themselves, one person was wounded.

- In August, a fourth suicide bombing incident took place in Meknes when an individual unsuccessfully attacked a tourist bus with a crude improvised explosive device (IED), blowing his arm off but injuring no one else seriously.

Characteristics of the attacks supported previous analysis that Morocco's greatest terrorist threat stems from the existence of numerous small –grassroots" terrorist groups in Morocco willing to commit violent acts against the state, foreigners, and innocent civilians. However, these separate followings in Morocco remained small, separate, and disorganized groups without territorial safe haven. These attacks, which appeared to have been, at best, poorly coordinated events, contrasted sharply with the 2006 terrorist incidents, which had more elaborate plots, albeit thwarted by Moroccan authorities.

Morocco has several external terrorist threats, including AQIM, al-Qa'ida (AQ), and extremist veterans returning from Iraq.[10] The main threat from AQIM remained the knowledge transfer of AQIM operational capabilities to Morocco's committed, but relatively inexperienced, Salafi adherents. There were credible reports of Moroccans going to northern Mali and Algeria and returning to Morocco after training with AQIM. In the wake of the December AQIM double bombing in Algiers, King Mohamed VI summed up Moroccan cognizance of the AQIM threat in a condolence message, stating that –Algeria's security is linked to the security of the region."

AQ's information operations may have inspired the 2003 and 2007 bombings in Casablanca. AQ number two Ayman al-Zawahiri publicly threatened Moroccan and Western interests, and in December 2006 and November 2007, implicitly called for attacks on the two Spanish enclaves of Ceuta and Melilla, which, for many Moroccans, represent humiliating colonial legacies. In so doing, AQ demonstrated its ability to mix local grievances into its propaganda to increase its effectiveness.

Morocco's comprehensive counterterrorism strategy not only emphasized identifying and neutralizing existing terrorist threats through traditional law enforcement and security measures, but also engaged in preventative measures to discourage terrorist recruitment through political reform and policy measures. King Mohamed VI led this effort by unambiguously condemning

---

[10] While overall numbers of Moroccans fighting in Iraq are difficult to estimate, some press reporting puts the number at several hundred.  The precedent in the 1990s of Jihadists returning to North Africa after the conflict in Afghanistan also underscores this potential threat.

PX203

terrorism and those who espouse or conduct terrorism; he recently called terrorism something alien to Islam and contrary to religion and law."

In September, Morocco held free and fair elections of its lower house of parliament. Turnout for the election was lower than many expected (approximately 37 percent of registered voters) and the parliament's institutional capacity remained limited. The parliament, however, has been a productive forum for moderate Islamists to air their views, in part offering a counterweight to extremist rhetoric.

The Moroccan government continued to implement internal reforms aimed at ameliorating socio-economic factors that terrorists exploit for recruitment and ideological purposes. The National Initiative for Human Development, launched by King Mohamed VI in 2005, is a $1.2 billion program designed to generate employment, combat poverty, and improve infrastructure, with a special focus on rural areas.

Morocco's Ministry of Religious Endowments and Islamic Affairs (MOIA) continued the reforms launched in 2004 to counter extremist ideology and promote religious moderation and tolerance. MOIA supervised revisions to the country's religious curriculum, broke with precedent by appointing 50 women as spiritual guides at mosques across the country, and installed a closed circuit television network that broadcast moderate religious sermons to 2,000 mosques per day.

Rabat continued to target aggressively and dismantle terrorist cells by enhancing policing techniques, coordinating and focusing the security services, and expanding and bolstering regional counterterrorism partnerships.

The Government of Morocco aggressively continued to pursue terrorism-related cases. Police investigations into the March 11 suicide bombings led police subsequently to capture Saad Houssaini, an individual linked to the 2003 Casablanca bombings who confessed to helping make the explosives for the March attacks.Police were also able to disrupt an attack in Casablanca a month later.  The police tracked down the four men involved in the April 10 bombing as a result of an investigation of the March bombing and a tip they had received from an undisclosed source, according to press reports. The Government of Morocco also disrupted numerous cells dedicated to sending Jihadi fighters to Iraq, including one based in the northern Moroccan city of Tetouan. The Tetouan cell appeared to be both a nascent domestic terror cell and a feeding point into the Iraq foreign fighter pipeline.

The Government of Morocco emphasized adherence to human rights standards and increased law enforcement transparency as part of its counterterrorism program. The government provided non-governmental organizations with unprecedented access to prisons where individuals convicted of terrorism-related crimes were being held. Counterterrorism investigations and arrests appeared to be better targeted and legal proceedings more transparent throughout the year. The government also demonstrated unprecedented frankness in presenting candid assessments of the terrorism threat and its response to the public. Government appeals for public support with counterterrorism investigations, in this regard, also appeared successful. Subsequent to the

PX203

March suicide bombing attacks, police were able to locate and raid a makeshift bomb making facility in Casablanca linked to the bombers after receiving tip-offs from local residents.

In May, Morocco implemented a comprehensive anti-money laundering bill that provided the legal basis for the monitoring, investigation, and prosecution of illegal financial activities. The law also called for the establishment of a centralized Financial Intelligence Unit. Both U.S. and EU assistance provided Moroccan police, customs, central bank, and government financial officials with training to recognize money laundering methodologies. Morocco had an effective system for disseminating U.S. and UN Security Council Resolution terrorist freeze lists to its financial sector and legal authorities. Morocco provided timely reports requested by the UNSC Sanctions Committee and, as a result, was able to freeze some terrorist-related accounts.

Transparent Moroccan court proceedings against detained terrorism suspects ended with prosecutorial successes. In March, Moroccan courts convicted eight individuals for plotting to conduct terrorist attacks in France, Italy, and Morocco. One of the defendants, believed to have ties to AQIM, received the maximum penalty of 15 years. The case of over 50 individuals linked to the Ansar al-Mahdi cell continued to move forward despite several delays. The judicial proceedings for six individuals allegedly linked to the 2007 Casablanca bombings began in May.

Another key to Morocco's counterterrorism success has been its emphasis on international counterterrorism cooperation. The United States and Morocco have built a valuable relationship based on cooperation and an ongoing exchange of information. Moroccan authorities continued to disrupt plots to attack Moroccan, U.S., and other Western-affiliated targets, and aggressively investigated numerous individuals associated with international terrorist groups. Morocco forged solid cooperative relationships with European partners such as Spain and France, and continued to work to increase existing counterterrorism relationships with its North African neighbors.

**Oman**

Oman remained proactive in its implementation of counterterrorism strategies and its cooperation with neighboring countries to prevent terrorists from moving freely throughout the Arabian Peninsula. The Omani government promoted religious moderation and tolerance in an effort to prevent the spread of extremist ideology. A new comprehensive antiterrorism law was promulgated in January, which established the National Committee for Combating Terrorism and strengthened the country's legal proscriptions against all forms of terrorist acts, including the furnishing of assistance to terrorists.

Oman is not a major financial center and did not have a significant money laundering problem. Nevertheless, it has adopted controls designed to prevent the use of its financial system to fund terrorist or other illicit activities. Following the launch of the ―Oman Program for Anti-Money Laundering" (OPFAM) in 2006, the government sponsored two workshops to enhance the prevention, detection, investigation, and prosecution of money laundering. The Omani government continued to encourage information exchanges among relevant actors, standardize indicators to report suspicious transactions, and develop common guidelines to address the threat of money laundering.

PX203

Oman's long coastline and relatively porous borders offered significant security challenges as they remained vulnerable to illegal transit by migrant workers, smugglers, terrorists, and individuals involved in the traffic and sale of illegal drugs. The government was concerned by the steady flow of illegal immigrants throughout the year attempting to enter Oman, often in transit to other destinations in the Arabian Peninsula, particularly the United Arab Emirates. The majority of the illegal immigrants apprehended were from Pakistan and Afghanistan. An increasing amount of Somalis illegally attempted to cross the border into Oman from Yemen. No known terrorists were found during immigration enforcement operations.

The Omani government has been aggressive in seeking training and equipment through the U.S. military to support its efforts to control its land and maritime borders. United States military assistance, including the sale of night vision equipment and the provision of training on maritime interdiction operations, was used to bolster coastal patrol efforts, modernize Oman's coastal surveillance system, and made Oman's remote inland borders with Yemen, Saudi Arabia, and the UAE less porous and easier to observe.

**Qatar**

Qatari security services maintained tight control over immigration and effective monitoring of possible extremist events. While counterterrorism cooperation remained positive, the United States continued to strive for increased cooperation with the Qatari government on information sharing and political engagement.

There has not been a terrorist attack in Qatar since the March 19, 2005, suicide vehicle-borne improvised explosive device (SVBIED) attack at an amateur theater playhouse that killed a British citizen. Cooperation with U.S. law enforcement authorities continued to improve during and after the course of the investigation of this case. Press reports indicated that up to 19 people of various nationalities, including one Qatari, were apprehended during the ensuing investigation. There were no reports of criminal prosecution in the case; however, many of the third country nationals who were apprehended were deported subsequent to the investigation.

The Qatar Authority for Charitable Activities is responsible for overseeing all domestic and international charitable activities, including approving international fund transfers by charities and monitoring overseas charitable, development, and humanitarian projects. The Authority reports annually to Qatari government ministries on their status.

Cooperation with U.S. authorities on counterterrorism finance continued to develop. Qatar's Financial Information Unit resides in the Qatar Central Bank. Local banks worked with the Central Bank and the FIU on counterterrorism finance and anti-money laundering issues, and bank officials attended U.S.-sponsored conferences.

As of December 2007, Qatar was the only country in the Gulf with an Attorney General (AG) independent of the Ministry of Interior or Ministry of Justice, and equivalent to a ministerial level position. The AG independently controlled and oversaw public prosecutions and appointed attorneys within the Public Prosecutors Office. The AG's office was created in 2002 and maintains a National Security Office responsible for prosecutions under the 2004 Combating

PX203

Terrorism Law. Prior to the creation of a separate AG office, the majority of public prosecutors were senior police officers, not trained lawyers.

Qatar was the only Gulf country with a public prosecutor exchange program with the U.S. Department of Justice. In November, six Qatari attorneys from the Public Prosecutors' office attended a two-week exchange; one week was spent studying financial crimes at the Public Prosecutors Training Academy Federal Advocacy Center at the University of South Carolina School of Law, and the second week was devoted to shadowing U.S. federal attorneys in Boston and New Hampshire.

As of mid-December, Qatar and the United States were discussing a non-binding memorandum of understanding (MoU) regarding judicial assistance and cooperation between the two nations. The MoU would allow both nations to strengthen judicial cooperation and to exchange evidence and information for use in prosecutions.

The USG has provided law enforcement and counterterrorism training under various programs, including the State Department's Antiterrorism Assistance (ATA) program. The exchanges and training have had a positive effect in maintaining a good relationship with Qatari law enforcement agencies and increasing their ability to deter, disrupt, and defeat terrorist activity in Qatar. Operationally, however, this capability has yet to be fully tried, tested, or proven.

**Saudi Arabia**

The Government of Saudi Arabia continued to confront terrorism and extremist ideologies, though with varying degrees of success. The country suffered two high-profile terrorist incidents: the shooting of four French citizens and the violent murder of a high-ranking Saudi colonel. Saudi security forces managed to capture or kill most of the assailants involved in the two incidents and successive government roundups resulted in hundreds of arrests that likely disrupted terrorist cells planning to carry out attacks in the Kingdom. The Saudi government continued its efforts to disrupt terror-related financial flows. Cooperation with the United States resulted in the arrests of 16 Saudi-based terrorism financiers and the successful implementation of new Saudi Customs cash courier regulations. The United States continued to urge Saudi Arabia to establish a Charities Commission to oversee all private charitable activities.

In February, a group of armed men attacked nine French nationals traveling near the city of Medina. Four of the victims were killed, including one teenager. By June, security forces had captured or killed all individuals suspected of being involved in the attack. In mid-April, a police colonel serving in Al-Qasim was found decapitated at his family rest house in Al-Qusaiah. The murder was widely believed to have been carried out by terrorists. Security forces later detained 30 people in connection to the murder. This was not the first time that terrorists attacked and killed a member of the security forces. In June 2005, terrorists murdered a lieutenant colonel in Mecca just outside his home.

The Saudi security forces continued efforts to make Saudi Arabia inhospitable for terrorists and their supporters. The security forces arrested 380 individuals suspected of involvement in terrorism during operations conducted throughout 2007. The announcements were widely

PX203

reported in the press and may have bolstered a perception among the public that terrorism remained a threat but that the government continued to combat terrorism within the Kingdom actively. According to the Ministry of the Interior, these attacks neutralized several terror cells and prevented several planned attacks, including an imminent attack on an unnamed Saudi oil installation. Some of those arrested had allegedly received flight training abroad, while others planned to mount attacks against Saudi oil facilities or to murder public officials. Some of those arrested were planning to travel to Iraq or Afghanistan as foreign fighters.

To address the enduring concern over foreign fighters returning to Saudi Arabia from Iraq or Afghanistan, the Saudi government continued plans to construct a border security system. During the first half of the year, Saudi border guards seized large amounts of weapons and explosives from smugglers transiting the Saudi-Iraqi border and the Saudi-Yemeni border. They also apprehended a large number of individuals attempting to enter the Kingdom illegally and, through their investigations, located caches of weapons and explosives at undisclosed locations in the desert.

Saudi Arabia increased its efforts to disrupt terror-related financing in the Kingdom. In the past year, the Saudi government arrested more than thirty individuals suspected of financing terrorism. However, in the case of ten individuals arrested in February, some activists protested against the arrests and testified to the legitimate reform efforts of some of these individuals. Despite these steps, the United States continued to urge the Government of Saudi Arabia to pursue and prosecute terrorist financiers more vigorously. The Saudi Government took action against suspected terrorism financiers by freezing their accounts and confiscating their assets. Saudi Arabia continued to comply with obligations under the UNSCR 1267 Sanctions regime, which included freezing assets of and enforcing a travel ban on three Saudi nationals designated in October.

New cash courier regulations in Saudi Arabia were put in place to curb illegitimate cross-border cash flows. Travelers transiting all 17 Saudi ports of entry were now required to declare cash, jewels, and precious metals with a value in excess of 16,000 USD. In the weeks preceding Ramadan, the Ministry of Interior reiterated Saudi law prohibiting the placement of donation collection boxes in department stores, shopping centers, pharmacies, mosques, and hospitals. The Saudi government had still not established its National Committee for Relief and Charity Work Abroad (Charities Commission). As a stop-gap, the Saudi government decreed that no local charities could send funds abroad until the Charities Commission was established.

Over the past year, Sheikh Abdul Aziz Bin Muhammad Al-Asheikh, the Grand Mufti of Saudi Arabia, made statements undermining financial support for terrorism. During the Muslim holy month of Ramadan, the Grand Mufti delivered a sermon in which he cautioned young Saudis against traveling abroad under the pretext of jihad – a vague reference to joining the insurgency in Iraq. In the same speech, he urged Saudi citizens not to finance terrorism and be mindful of how their charitable contributions are distributed. In late November, the Grand Mufti declared that "deviant groups" guilty of corrupting society should be subject to severe punishment in accordance with Islamic law. Several Saudi Islamic scholars and officials including Dr. Saleh bin-Humaid, the Imam of the Grand Mosque in Mecca, voiced support for the Grand Mufti's words. While not a member of the Saudi government, the Grand Mufti is the most senior

126

PX203

religious scholar in Saudi Arabia and his moral authority plays an influential role in shaping public opinion in the Kingdom.

On a more basic level, the Ministry of Islamic Affairs launched an extensive media campaign to educate young Saudis on the ―correct" teachings of Islam in order to prevent them from becoming drawn to extremist doctrines. The campaign included messages incorporated into Friday sermons at mosques, distribution of literature and tapes, and publication of articles on the Internet. As a part of the campaign, the government published a book in October entitled, "Guarding Against Terrorism." The government also recently began to issue identification cards to imams and religious leaders to curb instances of unauthorized persons delivering Friday sermons.

The Kingdom took several steps toward prosecuting its growing prison population of terror suspects. Senior Saudi officials, including the Minister of Interior, Minister of Justice, and Supreme Judicial Council Chairman all publicly supported aggressive legal action against terrorists but it remained unclear exactly how many detainees have faced formal charges in Saudi courts and how many were awaiting trial at year's end. During an address to the Shura Council on July 1, the Interior Minister stated that of some 9,000 suspected militants detained since 2003, 3,106 were still in detention.

The Saudi government also moved to reform its judicial system, including establishing a new state security court to try terrorism cases and expanding rehabilitation programs for terror-related prisoners. On October 1, King Abdullah issued a royal decree approving the restructuring of the judiciary to improve governance and efficiency of the Saudi court system. In addition, Saudi officials have announced the establishment of specialized state security courts to try terrorism cases. The Grand Mufti's October fatwa against supporting jihad abroad also added gravitas to pending legal actions against terror financiers and facilitators. The Grand Mufti and Supreme Judicial Council Chairman have urged the courts to follow a strict interpretation of Islamic law, including sentencing unrepentant terrorists to death. However, they continued to offer incentives for good behavior and said that terrorists who surrender themselves to the authorities and repent will be given special consideration in accordance with Islamic law.

Saudi officials acknowledged that the long-term solution must include an effective rehabilitation program to undermine detainees' adherence to extremist ideology. Accordingly, the government continued its extensive prisoner rehabilitation program aimed at addressing the social context within which individuals are recruited by terrorist groups. Officials involved with the rehabilitation program told the press that since the establishment of detainee counseling programs in 2004, the Interior Ministry had held more than 5,000 sessions to counsel more than 3,200 detainees and successfully rehabilitated and released more than 1,000 prisoners. Likewise, Saudi prisoners repatriated to Saudi Arabia from Guantanamo Bay underwent a similar rehabilitation program before reintegration into Saudi society.

**Syria**

*See Chapter 3, State Sponsors of Terrorism*.

PX203

**Tunisia**

Tunisian law enforcement organizations carefully monitored the activities of Tunisian extremists, both in Tunisia and abroad, which challenged the ability of terrorists to organize internally. In December 2006 and January 2007, government forces disrupted a terrorist cell that allegedly targeted domestic and foreign (including U.S. and UK) interests in Tunisia. Six of those involved allegedly entered Tunisia from Algeria, where they received training and support. Tunisian security forces killed 12 members of the group, reportedly called Assad Ibn Fourat's Army, and captured 15 others. In December 2007, 30 individuals allegedly associated with the cell were convicted by the Tunis Court of First Instance of various terrorism-related charges. Lawyers have appealed the sentences, which ranged from death to five years imprisonment.

The Tunisian government actively prevented the formation of terrorist groups inside Tunisia, including prohibiting the formation of religious-based political parties and groups that it believed would pose a terrorist threat. Hundreds of other suspected terrorists were reportedly detained, charged, and/or convicted under Tunisia's 2003 Terrorism Law and other relevant legislation.

Tunisian extremists were also involved in terrorist activities abroad, including in Algeria, Italy, Iraq, and Lebanon. Domestically, the government worked to improve security procedures at borders and airports. In April, 12 Tunisians were convicted of planning to travel to Algeria to join al-Qa'ida in the Islamic Maghreb (AQIM). A number of Tunisians suspected of involvement in terrorist incidents abroad were also repatriated and subsequently charged with or convicted of terrorist activities.

In November, Tunisia hosted an international conference on terrorism organized by the Islamic International Educational, Cultural, and Scientific Organization (ISESCO). The concluding statement of the conference, which was attended by over 100 international officials and opened by UN Secretary General Ban Ki-Moon and Tunisian President Ben Ali, stressed the role of education and economic development in defeating terrorism. During the year, Tunisia also hosted several meetings of Ministry of Interior officials from Arab League members, including ministers and chiefs of counterterrorism units, to review regional counterterrorism efforts and cooperation.

**United Arab Emirates**

The Government of the United Arab Emirates (UAE) repeatedly condemned terrorist acts in Iraq, Lebanon, and elsewhere in the region. In order to prevent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided prescribed guidelines for all Friday sermons, and required all 1,500 mosques that delivered sermons to record them each Friday to ensure that imams adhered to the guidelines.

The Container Security Initiative (CSI), which became operational at the ports of Port Rashid and Jebel Ali in the Emirate of Dubai in 2005, had five U.S. Customs officers co-located with the Dubai Customs Intelligence Unit at Port Rashid. On average, CSI reviewed approximately 250 bills of landing each week, resulting in 15-20 non-intrusive inspections of U.S.-bound containers; examinations were conducted jointly with Dubai Customs officers. In addition, Dubai

PX203

Customs made requests that most, if not all containers that originated in Iran be designated for inspection.

Although generally cooperative in counterterrorism, cooperation on law enforcement matters was hampered by the lack of a mutual legal assistance treaty (MLAT) between the United Arab Emirates and the United States. The UAE has a cyber-crime law criminalizing the use of the Internet for terrorist groups to "promote their ideologies and finance their activities." The UAE has established a National Security Council charged with formulating and implementing a national strategic plan.

The UAE continued its efforts to combat terror financing, but challenges remain. The United States-UAE Joint Terrorist Finance Coordinating Committee met three times during the year, directly resulting in affirmative changes to the UAE's anti-money laundering laws. The UAE Central Bank provided training programs to financial institutions on money laundering and terrorist financing. However, the Central Bank remained resistant to implementing operations targeting passengers suspected of Bulk Cash Smuggling arriving from terrorist source countries. The Central Bank initiated memoranda of understanding with regional financial intelligence units, and performed anti-money laundering training both locally and regionally. The Central Bank investigated financial transactions and froze accounts in response to internal investigations. Nine prosecutions for money laundering were in process at year's end. In December, the Department of Justice provided training for prosecutors on Bulk Cash Smuggling in Dubai.

**Yemen**

Yemen's 2007 counterterrorism record was mixed. The Republic of Yemen took action against al-Qa'ida (AQ) and local extremists, arresting and killing several individuals suspected of having AQ ties, and prosecuted the perpetrators of previous terrorist acts. However, significant setbacks included the June 22 announcement that Abu Basir Nasir al-Wahishi was the new head of al-Qa'ida in Yemen (AQY), and the July 2 terrorist attack in Marib that killed ten people. Despite United States pressure, Yemen continued to implement a surrender program with lenient requirements for terrorists it could not apprehend, which often led to their relatively lax incarceration. Yemen also released all returned Guantanamo detainees after short periods of assessment and rehabilitation, into a government monitoring program that lacked strict monitoring measures. U.S.S. Cole bomber Jamal al-Badawi's continued incarceration remained uncertain at the end of 2007.

On July 2, Abdu Mohamad Sad Ahmad Reheqa drove a suicide vehicle-borne improvised explosive device (SVBIED) into a group of western tourists in Marib, killing him and several others. AQY claimed responsibility. Three days later, U.S.-trained Yemeni security forces killed the suspected leader of the SVBIED bombing, Ahmed Basyouni Dwedar, an Egyptian wanted in Egypt for his ties to the Muslim Brotherhood. On August 8 and 13, Yemeni security forces raided two houses, arresting 17 and killing four AQ-affiliated suspects while suffering one casualty.

On June 22, AQ affiliate and February 2006 prison escapee Abu Basir Nasir al-Wahishi announced he was the new head of AQY, replacing Abdul Ali al-Harithi, who was killed in

PX203

2002. On August 23, the Yemeni Ministry of Interior instituted a gun ban in major cities throughout Yemen based on a 1992 gun control law. Security forces continued to report increasing numbers of weapons seized.

Despite Yemen's history of terrorist activity and repeated offers of assistance from the USG, Yemen lacked a comprehensive counterterrorism law. Current law as applied to counterterrorism was weak. In October, the government established a working group on drafting a comprehensive counterterrorism law. The Yemeni justice system was also ineffective. The courts did not set dates for the trials of suspects involved in the two September 2006 AQY-orchestrated attacks on oil facilities in eastern Yemen. In August 2006, the Sanaa Appellate Court returned to a lower court the case of two individuals accused of plotting in 2004 to assassinate the U.S. Ambassador, claiming the judge did not follow correct sentencing procedures. Consequently, the March 2006 convictions to five years in prison for Hizam al-Mass and Khalid al-Halilah were under appeal at year's end.

Yemeni security forces continued to arrest and try suspected members of AQ and other terrorist groups throughout the year. On November 12, a Yemeni court sentenced December 2006 U.S. Embassy shooter Saleh Alawi al-Ammari to five years in prison. On November 6, the government sentenced 23 suspected AQ affiliated individuals to between two and 15 years in prison.

Although the government lacked laws to criminalize or prevent foreign fighters going to Iraq, it applied available lesser laws to thwart foreign fighter activity. At year's end twenty-one individuals awaited the appeal of their July 2006 Special Penal Court conviction on fraudulent document charges relating to traveling to Iraq to attack U.S. forces. On August 22, a Yemeni court sentenced 19 individuals charged with conspiring to travel to Iraq to attack U.S. and Yemeni interests to 40 months in prison for falsifying documents, possession of arms and aiding AQ suspects.

On August 8, the courts sentenced two Yemenis to one year in prison for their part in the February 2006 escape from a maximum security prison of 23 suspected AQ supporters. Much of this sentence will be time served. The escapees included individuals convicted of participating in the 2000 U.S.S. Cole and 2002 M/V Limburg attacks. On January 15, the Yemeni security forces killed prison escapee Yasir Hamayqani in southern Yemen. In total, ten escapees returned to Yemeni custody and security forces killed six. The government could not account for seven of the escapees at year's end.

In May 2006, a security court convicted Mohammed Hamdi al-Ahdal, allegedly AQ's number two in Yemen, to 37 months in prison for financing terrorist groups associated with AQ.

The government had a surrender program for wanted terrorists that it believed it could not apprehend. The program provided lenient requirements for completion of convictions to those who surrendered. Most notably on October 15, mastermind of the U.S.S. Cole bombing and February 2006 prison escapee Jamal al-Badawi surrendered to Yemeni authorities. He was released to house arrest on October 17, under the terms of this program. Following substantial

PX203

USG pressure, he was back in jail by October 29. The Yemeni constitution precludes extradition of Yemeni citizens.

Yemen used its Islamic Dialogue Committee, headed by a leading judge who was also the Minister of Religious Guidance and Endowments, to continue its dialogue with detainees arrested for connections to terrorist groups. The government released detainees it considered rehabilitated after they pledged to uphold the Yemeni constitution and laws, the rights of non-Muslims, and the inviolability of foreign interests. The government also released all 12 returned Guantanamo detainees, lacking sufficient evidence for convictions after short periods of assessment and rehabilitation. The government monitoring program of released detainees was loose. The government considers this program to have a very high success rate, but this has not been independently corroborated.

The Government of Yemen's capacity for stemming terrorism financing remained limited. On November 6, the government presented a terrorism financing bill to parliament for approval, where it remained at year's end. On August 6, the UN agreed to a study at the behest of the Yemeni government to rescind the 2004 UN 1267 sanctions against Abdulmajeed al-Zindani, who was associated with promoting and supporting AQ. Yemen continued to take no action to bar his travel or freeze his assets in compliance with its UN obligations. Throughout the year, President Saleh continued to voice public support for al-Zindani and his Al-Iman University.

## SOUTH AND CENTRAL ASIA OVERVIEW

> May I emphasize, ladies and gentlemen, that we were the prime victim of terrorism and terrorism was never, nor is it today, a homegrown phenomenon in Afghanistan. Therefore, this threat can only be overcome if addressed appropriately across its regional international dimensions.…Recognizing that constructive regional cooperation is vital to a successful counterterrorism strategy, we proposed the holding of Joint Peace Jirgas between Pakistan and Afghanistan, and we were pleased for the support that this initiative has received from our friends in the international community."
>
> –Hamid Karzai, President of the Islamic Republic of Afghanistan
> Statement, 62nd UN General Assembly, New York;
> September 25, 2007

Terrorism remained a serious problem in the region, directly and indirectly threatening American interests and lives. Increasingly, South and Central Asian terrorists expanded their operations and networks across the region and beyond. To varying degrees, U.S. cooperation with regional partners on counterterrorism issues continued to increase, but much is left to be accomplished.

PX203

Despite progress in Afghanistan, the Taliban-led insurgency remained strong and resilient in the South and East. Although the insurgency absorbed heavy combat and leadership losses, its ability to recruit foot soldiers from its core base of rural Pashtuns remained undiminished.

Pakistan continued to suffer from rising militancy and extremism. The United States remained concerned that the Federally Administered Tribal Areas (FATA) of Pakistan were being used as a safe haven for AQ terrorists, Afghan insurgents, and other extremists.

Terrorists staged numerous attacks in India and continued to foment terrorist ideology. India continued to rank among the world's most terror-afflicted countries. Terrorists, separatists, and extremists took more than 2,300 lives this year. Although clearly committed to combating violent extremism, the Indian government's counterterrorism efforts were hampered by its outdated and overburdened law enforcement and legal systems.

Neighboring Bangladesh continued to arrest extremists, but porous borders and internal political strife threatened the progress made against violent extremists. Although the Caretaker Government made a concerted effort to crack down on corruption and address the root causes of violent extremism within its borders, mistrust between Bangladesh and India stymied potential counterterrorism cooperation between the two countries.

In Sri Lanka, both the Liberation Tigers of Tamil Eelam (LTTE) and the government engaged in numerous violations of the 2002 Ceasefire Agreement that left more than 5,000 people dead since hostilities started again in 2006. The LTTE reverted to targeting civilians in bus bombings and claymore mine attacks, while the government used anti-LTTE paramilitaries to terrorize citizens suspected of having ties to the Tigers. Both the LTTE and armed groups allied to the government engaged in wide-spread human rights abuses including extra-judicial killings, abductions, and extortion.

The Communist Party of Nepal (Maoists) briefly entered into a coalition with the government in the spring, withdrew from the coalition in September, and rejoined the government in December. The Maoists continued to engage in violence, extortion, and abductions, and tensions remained high throughout the year. Various separatist groups fought with the government as well as with each other as crime, abductions, and general lawlessness were evident throughout Nepal.

A sustained commitment to counterterrorism by Central Asian states resulted in relatively few terrorist attacks. With U.S. support, Central Asian states have undertaken to improve the capabilities of their border forces and build new border posts to impede terrorist movements and interdict drug smuggling, some of which financed terrorism in the region. The sheer length of the border and local corruption remained obstacles in Central Asia's efforts to control its borders, however. More widely, popular grievances over governance and poor economic growth enhanced the conditions that terrorists and other extremists could exploit to recruit and operate in some parts of the region, such as the Ferghana valley.

Central Asia's most significant terrorist organizations include the Islamic Movement of Uzbekistan (IMU) and a splinter group, the Islamic Jihad Group (IJG). However, radical extremist groups such as Hizbut-Tahrir (HT) foment an anti-Semitic, anti-Western ideology that

PX203

may indirectly generate support for terrorism. HT, an extremist political movement advocating the establishment of a borderless, theocratic Islamic state throughout the entire Muslim world, has followers in Kyrgyzstan, Kazakhstan, Tajikistan, Uzbekistan, and elsewhere. The United States has no evidence that HT has committed any acts of international terrorism, but the group's radical anti-American and anti-Semitic ideology is sympathetic to acts of violence against the United States and its allies. HT has publicly called on Muslims to travel to Iraq and Afghanistan to fight Coalition Forces.

## Afghanistan

Afghanistan struggled to build a stable, democratic, and tolerant government in the face of vicious attacks by the Taliban and related groups on Coalition Forces, civilians, international NGOs, and other soft targets, most notably through suicide bombings. Supported by the international community, the Afghan government has made suppression of terrorism and establishment of effective law-enforcement mechanisms a high priority. The Afghan government reached out to neighboring Pakistan through a Joint Peace Jirga to find ways to root out economic and social factors contributing to terrorism. Reconciliation of low- and mid-level insurgents remained a high priority, and the Program for Strengthening Peace and Reconciliation (PTS) has brought in over 5,000 Taliban and other insurgents who have wearied from the violence and lack of opportunity offered by extremism. The Government of Afghanistan was exploring additional efforts to strengthen and expand PTS reconciliation efforts.

The Disbandment of Illegal Armed Groups (DIAG) program, the follow-on to the earlier Disarmament, Demobilization, and Reintegration (DDR) program, has disbanded 161 illegal armed groups and collected almost 36,000 weapons in 62 districts since its inception in March 2005. In April 2007, in an effort to achieve greater local government support, DIAG began offering development assistance to qualifying districts. DIAG operations expanded, intensifying efforts to build political will at the provincial and local levels to target the more threatening illegal armed groups.

In 2006, the Combined Joint Task Force (then CJTF-76), which had led the Coalition Forces' campaigns against terrorism, turned this responsibility over to the International Security Assistance Force (ISAF). The ISAF used a combination of effective counterinsurgency means and methods, including synchronized use of combat (air and ground forces) and non-combat means (building civil governance and aiding reconstruction and development) to fight terrorism, extremism, and attempts to undermine the constitutionally constituted government. The careful targeting of insurgent leaders and insurgent centers, and proactive operations against them, were aimed at eliminating terrorists and facilitating the flow of reconstruction and development. The increasingly professional and effective Afghan National Army (ANA), and to a lesser extent, the Afghan National Police (ANP), more often took the lead in counterterrorism operations and cooperated closely with the United States.  In December, the ANA combined with UK and U.S. forces to retake the Taliban-held town of Musa Qala in southern Helmand Province.

New integrated civilian-military counterinsurgency approaches in the east, particularly Nangarhar, have begun to yield successes. Despite progress, the Taliban-led insurgency remained a capable, determined, and resilient threat to stability and to the expansion of

133

PX203

government authority, particularly in the Pashtun south and east. The insurgency continued to suffer heavy combat losses, including senior leaders, but its ability to obtain AQ support and recruit soldiers from its core base of rural Pashtuns remained undiminished. Taliban information operations were increasingly aggressive and sophisticated.

Streams of Taliban financing from across the border in Pakistan, along with funds gained from narcotics trafficking and kidnapping, have allowed the insurgency to strengthen its military and technical capabilities. At a Joint Peace Jirga held in August, Pakistani President Musharraf acknowledged that support to the Afghanistan insurgency was being provided from within Pakistani territory.

The Taliban continued to target police, police recruits, government ministers, parliamentarians, civil servants, and civilians, including urban crowds, in numerous violent incidents. Having increased the use of improvised explosive devices, suicide bombings became both more numerous and more costly in terms of innocent lives lost. According to media reports of UN-compiled figures, terrorists launched approximately 140 suicide bombing attacks this year, inflicting large numbers of civilian casualties.

Terrorists, often supported by criminal gangs, have also increasingly turned to kidnapping foreigners, most notably the July abduction of South Korean missionary aid workers. This kidnapping was an attempt to extort ransom as well as to make a political point; the Taliban killed two hostages before releasing the remaining 21 after talks with the Afghan and South Korean governments.

Insurgents also targeted international NGOs, UN workers, and recipients of NGO assistance. They attacked teachers, pupils (especially girls), and schools. They also threatened and often brutally killed those who worked for religious tolerance, including ex-insurgents, tribal leaders, and moderate imams, mullahs, and religious scholars. The Taliban coupled threats and attacks against NGOs with continued targeting of Provincial Reconstruction Teams, de-mining teams, and construction crews on road and other infrastructure projects.

**Bangladesh**

Bangladesh continued to arrest dozens of alleged members of Jamaatul Mujahedin Bangladesh (JMB), the banned Islamic extremist group responsible for a wave of bombings and suicide attacks in late 2005, and recovered bomb-making materials and weapons from their hideouts. The arrests, combined with the execution in March of six senior JMB leaders, appeared to have depleted the membership of the organization. Although there was speculation that JMB remnants might try to reorganize to launch a new wave of attacks, no such terror campaign unfolded.

On May 1, three small bombs went off at railroad stations in the major cities of Dhaka, Chittagong, and Sylhet. Authorities found a message signed by "Zadid al-Qa'ida" at each of the sites threatening non-governmental agencies if they did not leave Bangladesh within ten days. The deadline passed without incident and it remained unclear who was responsible for the attacks.

PX203

Neighboring India continued to allege that the United Liberation Front of Assam (ULFA) and other anti-India insurgency groups operated from Bangladesh with the knowledge of senior Bangladeshi government officials. India also blamed the terrorist group Harakat ul-Jihadi-Islami-Bangladesh (HUJI-B) for bomb attacks in the city of Hyderabad in May and August. Bangladesh strongly denied these allegations. The absence of counterterrorism cooperation between India and Bangladesh fueled mutual allegations that each country facilitated terrorism inside the borders of the other.

Bangladesh's caretaker government pledged to pass a series of amendments that would strengthen Bangladesh's Anti-Money Laundering Act and a draft Anti-Terrorism Act, but failed to do so by the end of the year. The legislation would help Bangladesh enter Egmont, the international body of Financial Intelligence Units that plays a critical role in fighting terror financing.

The caretaker government took a strong stance against corruption and arrested many leading politicians and businessmen on graft charges. The United States launched a $20 million, five-year anti-corruption program in Bangladesh to further transparency and good governance efforts, necessary foundations for counterterrorism activity.

U.S. and Bangladeshi law enforcement agencies cooperated well on several cases related to domestic and international terrorism. The United States continued to fund Antiterrorism Assistance programs for Bangladeshi security forces. Bangladesh also continued cooperation with the United States to strengthen control of its borders and land, sea, and air ports of entry.

**India**

India continued to rank among the world's most terror-afflicted countries. The conflict in Jammu and Kashmir, attacks by extreme leftist Naxalites and Maoists in eastern and central India, assaults by ethno-linguistic nationalists in the northeastern states, and terrorist strikes nationwide by Islamic extremists took more than 2,300 lives this year. The Indian government's counterterrorism efforts remained hampered by outdated and overburdened law enforcement and legal systems. The Indian court system was slow, laborious, and prone to corruption; terrorism trials can take years to complete. Many of India's local police forces were poorly staffed, lacked training, and were ill-equipped to combat terrorism effectively.

The Indian government accused Islamic extremists for the following terrorist attacks:
- The February 19 attack on the Friendship Train service between New Delhi and Lahore, Pakistan that killed dozens;
- The May 18 bomb blast at the Mecca Masjid (Mosque) in Hyderabad that killed eleven;
- The August 25 nearly simultaneous explosions on at an amusement park and a market in Hyderabad that killed dozens;
- The October 11 blast at a Sufi mosque in Ajmer, Rajasthan, that killed three;
- The October 14 explosion in a cinema in Ludhiana, Punjab, that killed seven; and
- The November 23 three simultaneous explosions on in judicial complexes in Lucknow, Varanasi, and Faizabad (all in Uttar Pradesh) that killed 13.

PX203

These attacks, which killed and injured both Muslims and Hindus, were probably conducted by extremists hoping to incite anger between the Hindu and Muslim communities. Indian officials claim that the perpetrators of these attacks have links to groups based in Pakistan and Bangladesh, particularly Lashkar-e-Tayyiba, Jaish-e-Mohammad, and Harkat-ul-Jihad Islami, among others.

These groups also have links to terrorist activity in Jammu and Kashmir. The number of civilians killed were approximately half of that in the previous year. In May, the Indian government acknowledged that the level of infiltration across the Line of Control had fallen, but noted that insurgents had in some case shifted routes to enter India through Bangladesh and Nepal. Attacks in Kashmir continued. For example, on October 11, two civilians and five soldiers were killed by an improvised explosive device (IED), and on July 29, six people were killed when a bomb exploded on a tourist bus.

The Government of India is very concerned with the threat from leftist extremist (Maoist or agrarian Naxalite) groups to India's internal stability and democratic culture. Leftist extremist groups were very active in wide areas of impoverished rural eastern and central India, and also operated in parts of southern India. Hundreds of people were killed in conflicts between the government and various leftist extremist groups, such as the Naxalites and the Communist Party of India; Maoists (CPI-Maoists) and the government; and between the groups themselves. There were at least 971 Naxalite attacks in the first seven months of the year, approximately equal to that of the entire previous year. Leftist extremists were highly active across a wide swath of India, including the states of Jharkhand, Chattisgarh, Andhra Pradesh, Bihar, Uttarakhand, and West Bengal. They were also active in some areas of Orissa, Maharashtra, and Karnataka. Extremists have targeted elected officials: On March 4, CPI-Maoists shot a Member of Parliament from Jharkhand and five others during a soccer game, and on August 25, leftist extremists killed the son of a former Chief Minister of Andhra Pradesh during a cultural performance in the city of Hyderabad. Ethnic-linguistic separatist groups were responsible for numerous attacks in Northeastern India, particularly in the states of Assam, Nagaland, Manipur, Tripura, and Meghalaya.

Several proscribed terrorist groups operated in the northeast, including the United Liberation Front of Assam (ULFA) and the People's Liberation Army. At least 850 died in conflicts between dozens of insurgent groups and security forces, and in conflicts between the groups.

Lack of security, remoteness, and inhospitable terrain combined to prevent the government from providing security and other basic services in many of the areas in which the leftist extremists and the northeastern separatist groups operated. Both types of groups increased the level of sophistication of attacks this year by using satellite phones and sophisticated IEDs. In some districts, they took control of a large proportion of the territory, making it impossible for government service providers to enter the area. Infighting, particularly among groups in the northeast, may have slowed the increase in the attacks, but poverty and isolation combined to make the rural, mountainous, and forested areas of India vulnerable to both the Maoists and those who claimed to be fighting for liberation in the northeast.

PX203

The United States-India Counterterrorism Joint Working Group (CTJWG) has met nine times since its creation in 2000, most recently on November 28. India participated in CTJWGs with 15 other countries, and in multilateral CTJWGs with the EU and with the Bay of Bengal Initiative for Multisectoral Technical and Economic Cooperation, an organization that promotes economic cooperation among Bangladesh, India, Myanmar, Sri Lanka, Thailand, Bhutan, and Nepal. In October, the Indian government held the second round of consultations with Pakistan under the bilateral counterterrorism joint mechanism, and hosted a ministerial level meeting of the South Asia Association for Regional Cooperation on Counterterrorism.

**Kazakhstan**

Kazakhstan continued to aggressively combat terrorism and extremism locally and strengthened its cooperation and timeliness in sharing information with the United States. There was little movement, however, on counterterrorism legislation, and the long-delayed draft law on money laundering remained stalled in Parliament. In June, Kazakhstan hosted over 50 partners for the third meeting of the Global Initiative to Combat Nuclear Terrorism.

In April, authorities began Kazakhstan's first ever trial concerning the financing of terrorism. According to press reports, the trial involved two leaders of the banned East Turkistan Islamic Party and an unnamed organization in Central Asia. In April, authorities arrested approximately 20 people in Shymkent and other cities, accusing the individuals of organizing terrorist acts against Special Services' employees. In July, a trial began in the case of ten members of a radical Islamic Wahabi group suspected of organizing terrorist acts in and around Astana and Almaty. Also in July, an Almaty court sentenced ten individuals from the terrorist group Jamaat Muhadjir, who were detained in 2006, on allegations of planning a series of terrorist attacks. Nine of the individuals were sentenced to prison terms ranging from three to twenty-five years. According to press reports, there is one Kazakhstani national being detained in the Guantanamo Bay detention facility.

The Islamic extremist group Hizbut Tahrir (HT) remained the only group designated and outlawed as an "extremist" organization under the Law on Extremism. There were several instances of arrests of individuals associated with HT, as well as the confiscation of printed materials and electronic media. In August, a closed trial began against 30 members of HT arrested in December 2006 on accusations of activities in support of a banned extremist organization, the stirring of national and religious enmity, and establishing an organized criminal group. The list of fourteen banned terrorist organizations was unchanged from 2006.[11]

Kazakhstan, with China, Kyrgyzstan, Russia, Tajikistan, and Uzbekistan, is a member of the Shanghai Cooperation Organization (SCO), which established a Regional Antiterrorism Center

---

[11] The list of Kazakstan's fourteen banned terrorist organizations included al-Qa'ida, the East Turkistan Islamic Party, the East Turkistan Liberation Organization, the Kongra Gel/Kurdistan Workers' Party, Asbat al-Ansar, the Muslim Brotherhood, the Taliban, Aum Shinrikyo, the Boz Gurd, Jamaat of Central Asian Mujahadins, Lashkar-e-Tayyiba, the Social Reform Society, the Islamic Movement of Uzbekistan, and its splinter group, the Islamic Jihad Group.

PX203

in Tashkent. Kazakhstan is also a member of the CIS Collective Security Treaty Organization and the Eurasia Group, a regional anti-money laundering organization modeled on the Financial Action Task Force, with the objective of integrating Kazakhstan, Belarus, China, Kyrgyzstan, Tajikistan, Russia, and Uzbekistan into the global system of anti-money laundering and combating the financing of terrorism.

## Kyrgyzstan

The Kyrgyz Republic took political, legislative, and law enforcement steps to disrupt and deter terrorism. Since 2001, Kyrgyzstan has hosted the Operation Enduring Freedom Coalition airbase at Manas International Airport near Bishkek. In October 2006, Kyrgyzstan adopted an antiterrorism law that provided for establishment of an antiterrorism center to coordinate the activities of state agencies and facilitate international cooperation. In November 2006, President Bakiyev signed a comprehensive law on ―Counteracting Terrorist Financing and Legalization (Money Laundering) of Proceeds from Crime." The law obligates financial institutions to report any suspicious activity and bank transactions that exceed the threshold of $25,000. The law also established a Financial Intelligence Service, an administrative body charged with collecting and analyzing information related to financial transactions, developing systems to prevent and detect suspicious transactions, and submitting cases to the prosecutor's office for further action.

Kyrgyzstan's military and internal forces worked to improve their counterterrorism capabilities and to expand cooperation with regional partners. Kyrgyzstan is a member of the Shanghai Cooperation Organization and the Cooperative Security Treaty Organization (CSTO), which established lists of banned terrorist groups in an effort to streamline cooperation. With U.S. assistance, the Kyrgyz National Guard opened a counterterrorism training facility. Also in December, the Ministry of Defense opened a U.S.-funded facility to house a non-commissioned officers academy.

## Nepal

While Nepal experienced no significant acts of international terrorism, several incidents of domestic terrorism and politically-motivated violence occurred in urban areas and in the Terai. In 2007, the Communist Party of Nepal (Maoists), a designated organization on the Terrorism Exclusion List (TEL), became part of the interim government. Despite ending their ten-year insurgency by signing the Comprehensive Peace Agreement in November 2006, and entering into the interim government in April 2007, the Maoists, the only U.S.-designated terrorist organization in Nepal, continued to engage in violence, extortion, and abductions. The Maoists withdrew their ministers from the interim government between September and December, but left their members in place in the interim Parliament. The government failed to hold the Maoists accountable for violating the peace process, and law enforcement efforts against terrorist activity were minimal. The Maoist People's Liberation Army (PLA) ostensibly settled into UN-monitored cantonments but at times attempted to circumvent the disarmament and combatant verification process. The Maoist-affiliated Young Communist League, which included former PLA members, grew increasingly prominent during the year, carrying on the Maoist militia's tactics of abuse, abduction, assassination, intimidation, and extortion in cities and villages.

PX203

Ethnic tensions increased in the southern Terai plains. From mid-January to early March, as Madhesis (Terai inhabitants culturally and linguistically close to India) protested against the failure of the interim constitution and the interim government to address their concerns, an occasionally-violent popular uprising, the Madhesi Andolan, left many dead. Over a dozen extremist groups in pursuit of independence or autonomy and some criminal elements followed the Maoist lead of "negotiation" via armed struggle. Competing factions of Madhesis clashed with each other, with the Maoists, with hill-origin Nepalis, and with police, instigating numerous strikes, demonstrations, and Indo-Nepal border road closures. The most violent of these groups were factions of the Janatantrik Terai Mukti Morcha (People's Terai Liberation Front), which had broken with the Maoist-affiliated Madhesi Mukti Morcha (Madhesi Liberation Front) insurgency in 2004 in order to bring about the secession of the Terai from the rest of Nepal. The Janatantrik Terai Mukti Morcha factions became increasingly more violent through 2007, despite splitting into five factions by the end of the year. The Maoists exacerbated bloodshed in the Terai in a scramble to regain influence it had lost in the region. On March 21, confrontation between Maoists and Madhesis at a rally in Gaur resulted in the massacre of over 25 people, most of them Maoists. The Government of Nepal largely ignored the conflict in the Terai.

Anti-money laundering legislation remained stalled in Parliament, although the government responded favorably to U.S. requests to be prepared to freeze the assets of individuals and entities involved in the financing of terrorism when or if such assets were discovered. The United States provided substantial antiterrorism assistance and training to Nepal's security forces, including courses on crisis management, post-blast investigations, and terrorist crime scene investigations.

**Pakistan**

International terror organizations, including al-Qa'ida (AQ) and its supporters, operated and carried out attacks in Pakistan. Violence stemming from Sunni-Shia sectarian strife and militant sub-nationalists also claimed civilian lives. Attacks occurred with greatest frequency in the regions bordering Afghanistan: Balochistan, the Northwest Frontier Province (NWFP), and the adjacent Federally Administered Tribal Areas (FATA), but militant attacks continued to grow and target urban centers including Karachi, Islamabad, and Rawalpindi.

The trend and sophistication of suicide bombings grew in Pakistan this year. The December 27 assassination of former Prime Minister Benazir Bhutto, in a suicide bombing after a political rally in Rawalpindi, was the most prominent suicide attack. Between 2002 and 2006, the Department recorded approximately 22 suicide attacks in the country, whereas in 2007 there were over 45 such attacks. These suicide attacks often resulted in large numbers of casualties, and several occurred in Islamabad and Rawalpindi. A number of these attacks targeted well-protected government targets and made use of coordinated and complex operations, such as the November 24 and September 4 suicide attacks in Rawalpindi. On October 18, the most deadly suicide attack in Pakistan's history took place against Bhutto's homecoming procession in Karachi, killing over 130, and injuring hundreds more. In separate suicide attacks in Peshawar and Charsadda, extremists targeted Federal Minister for Political Affairs Amir Muqam in November, and former Interior Minister Aftab Sherpao in December and April; neither were killed, although there were civilian casualties.

PX203

Extremists led by Baitullah Mehsud and other AQ-related extremists re-exerted their hold in areas of South Waziristan and captured over 200 government soldiers, who were later released after a local peace deal collapsed. Earlier this year, extremists took over the Lal Masjid (Red Mosque) in Islamabad for a number of months until they were ousted in July during a military operation. Extremists have also gained footholds in the settled areas bordering the FATA, including Swat, Tank, and DI Khan. The Taliban broke a peace agreement between the government and local leaders associated with the Taliban, which contributed to the increase in attacks. Maulana Hasan Jan, a prominent Islamic teacher who preached against the practice of suicide bombings, was assassinated in September. Taliban-linked extremists have closed barber shops and CD and music stores that were alleged to be anti-Islamic, through a series of bombings and threats in the NWFP. A number of girls' schools have closed due to similar threats. Pakistani security forces continued to fight militant leader Maulana Fazlullah in Swat, a settled area in NWFP, after his group tried to implement Sharia law there and displaced court and law enforcement authorities. As of early December, Pakistan's military was conducting enhanced operations against Fazlullah, although Islamabad will likely continue to face challenges to its ability to enforce its writ of law there.

The government's crackdown on banned organizations, hate material, and incitement by religious leaders continued unevenly. Madrassa registration, foreign student enrollment in madrassas, and financial disclosure requirements remained a source of friction between government and religious leaders.

AQ's continued public calls for the overthrow of President Musharraf remained a threat to Pakistan, despite government efforts to eliminate AQ elements. Pakistan continued to pursue AQ and its allies through nationwide police action and military operations in the FATA and elsewhere. Despite having approximately 80,000 to 100,000 troops in the FATA, including Army and Frontier Corps (FC) units, the Government of Pakistan's authority in the area continued to be challenged. While military operations caused disruptions in militant activities, there were no reports of the government capturing or killing any senior AQ leaders. Over 1,000 Pakistani military personnel have been killed since 2001 while carrying out counterterrorist operations.

Pakistani security services cooperated with the United States and other nations to fight terrorism within Pakistan and abroad. Hundreds of suspected AQ operatives have been killed or captured by Pakistani authorities since September 2001. Close cooperation between Pakistani, British, and American law enforcement agencies exposed the August 2006 London-Heathrow bomb plot, leading to the arrest in Pakistan of Rashid Rauf and other alleged conspirators connected to the case. On December 15, 2007, Rashid Rauf escaped from police custody in Rawalpindi and remained at large. Two of the police officers guarding him were arrested and questioned.

Pakistan's leaders took steps to prevent support to the Kashmiri militancy, and the number of violent attacks in Kashmir was down by approximately 50 percent from 2006, according to public statements made by the Indian Defense Minister. Meetings in September 2006 led to the March establishment of the Anti-Terrorism Mechanism to coordinate Pakistan-India exchange of information on terrorist threats.

PX203

Pakistan-based Lashkar-e-Tayyiba (LT) and other Kashmir-focused groups continued regional attack planning. In 2007, Kashmir-focused groups continued to support attacks in Afghanistan, and operatives trained by the groups continued to feature in AQ transnational attack planning.

Armed conflict between the government and militant Baloch nationalists continued. Pakistani press reported that the government killed the leader of the Balochistan Liberation Army (BLA), Nawabzada Balach Marri, in November, although the details remained unclear. The BLA and its sympathizers responded with violent protests and terrorist attacks against the government leaving more than 12 dead. (Pakistan declared the BLA a terrorist organization in April 2006.)

Sectarian violence claimed hundreds of lives this year and increased since 2006, according to data from the Institute for Conflict Management. In November, more than 100 people were killed in Sunni-Shia fighting in Parachinar. In April, approximately 80 people were killed in Kurram (in the FATA), when sectarian fighting broke out after a religious procession was attacked.

In 2006, President Musharraf and governmental agencies developed the FATA Sustainable Development Program (SDP) to accelerate economic and social development and strengthen political administration and security in the region. The government created a FATA Development Authority and filled all of its executive positions in November 2006. Pakistan allocated 120 million USD in its FY-2007 budget for FATA development programming, with the bulk going to education and infrastructure projects. While capacity remained a serious challenge, the government continued to build schools, enhance security, and provide training and education.

Although Pakistan continued to work with the UNSCR 1267 Committee to freeze the assets of individuals and groups identified as terrorist entities linked to AQ and the Taliban, several UN-sanctioned entities continued to operate in Pakistan. In September, the long-awaited anti-money-laundering (AML) ordinance was adopted by presidential decree. Unfortunately, parts of the ordinance did not meet international norms and Financial Action Task Force (FATF) recommendations, particularly in the areas of designated offense categories and the statutory definition of money laundering. The AML ordinance formally established a Financial Management Unit (FMU) to independently monitor suspicious transactions.

The State Bank of Pakistan required all informal money changers (or hawaladars) to register as authorized foreign exchange dealers and meet minimum capital requirements, although enforcement was uneven. The regulation had limited success in consolidating the national foreign exchange regime, subjecting it to more stringent regulation and accounting standards. Despite government efforts, unlicensed hawalas still operated illegally in parts of the country (particularly Peshawar and Karachi). The informal and secretive nature of the unlicensed hawalas made it difficult for regulators to effectively combat their operations. Most illicit funds were transacted through these unlicensed operators.

Pakistan arrested or detained several high-profile terrorist suspects, but faced significant challenges in prosecuting such cases. The government freed 28 militants in November, three of whom were convicted on terrorism charges, in exchange for the release of 213 Pakistani soldiers held by militant commander Baitullah Mehsud. In August, the government released Muhammad

PX203

Naem Noor Khan without formally charging him, even though the government claimed at the time of his arrest in July 2004 that he was a top AQ operative.

The United States and Pakistan engaged in a broad range of counterterrorism cooperative efforts including border security and criminal investigations, as well as several long-term training projects. Pakistan is the third largest recipient of U.S. military and economic assistance. (*See Chapter 5, Terrorist Safe Havens [7120 Report] for further information on U.S. Assistance for Pakistan.*)

## Sri Lanka

Approximately 5,000 people were killed and many thousands more displaced as the conflict escalated between the Sri Lankan government and the Liberation Tigers of Tamil Eelam (LTTE), a designated Foreign Terrorist Organization. The Sri Lankan government took effective control of the Eastern Province in midyear, but the LTTE continued to control much of the north and carried out attacks throughout the country. The Sri Lankan Army remained deployed across the country in all areas it controlled to fight the insurgency. The Special Task Force (STF) police were deployed both in the east and in strategic locations in the west. Although a Ceasefire Agreement was nominally in effect, the level of violence rose to that associated with the period prior to the signing of the agreement in 2002.

The LTTE and government forces engaged in retaliatory attacks throughout the year. On November 28, an LTTE suicide bomber attempted to assassinate Minister for Social Services and Welfare Douglas Devananda. (This was at least the 11th attempt on the Tamil leader's life.) On the same day, a parcel bomb killed at least 19 in a shopping area in southern Colombo. The likely perpetrator was the LTTE, although there is some public speculation that this may have been a criminal, rather than LTTE, attack. Other major LTTE attacks included attacks on the Anuradhapura Air Base (October); the first-ever LTTE attacks by air of Katunayake Airport and a gas storage facility in Colombo (March), the Palaly Air Force Base in Jaffna (April), and parcel bombings of two intercity buses in southern Sri Lanka (January). Many of these attacks appeared to have been reprisals for offensive actions taken, or at least alleged to have been carried out, by the Government of Sri Lanka, such as attacks on busses and villages and the air raid on November 2 that killed LTTE political chief S.P. Tamilchelvan.

A breakaway group from the LTTE, the Karuna Faction, was also responsible for extrajudicial killings and attacks against the LTTE and its alleged civilian supporters in eastern Sri Lanka. Its former leader, Karuna Amman, was arrested in London on charges of immigration fraud in November. A rival leader, Pillayan, has since consolidated control of the Karuna faction and displaced cadres loyal to Karuna.

The government took control of Sri Lanka's eastern province by July, but was unable to move forward on elections, devolution of power, and economic development programs because of instability and the fragility of the national governing coalition. The LTTE maintained control of much of the north and retained the capacity to mount attacks throughout the country. In late November and December, government forces increased activity against targets in the north.

PX203

The LTTE continued to finance itself with contributions from the Tamil Diaspora in North America, Europe, and Australia, by imposing local "taxes" on businesses operating in the areas of Sri Lanka under its control, and reportedly by extortion operations in government-controlled areas. The LTTE also used Tamil charitable organizations as fronts for its fundraising. In November, the USG designated under Executive Order 13224 and froze the U.S.-held assets of the Tamils Rehabilitation Organization, a charity associated with the LTTE. The LTTE previously used such funds for weapons purchases on the international black market and also captured arms from Sri Lankan security forces. The Sri Lankan Navy sunk three LTTE supply ships in September and another in October.

Human rights groups and other observers have accused all parties to the conflict with carrying out abductions and extrajudicial killings. The LTTE and the Karuna faction were charged with forced conscription and child recruitment. In general, the LTTE did not intentionally target U.S. citizens or assets, limiting attacks to Sri Lankan security forces, political figures, civilians, and businesses. However, attacks occurred within the vicinity of the U.S. embassy and personnel; the U.S. Ambassador was traveling in a helicopter that came under mortar fire in February. The LTTE subsequently apologized for the incident.

Sri Lankan cooperation with the FBI resulted in arrests of persons charged with material support to terrorist groups. The U.S. provided training for relevant Sri Lankan government agencies and the banking sector. The Government of Sri Lanka cooperated with the United States to implement both the Container Security Initiative and the Megaports program at the port of Colombo.

**Tajikistan**

As the poorest of the former Soviet countries, the Tajik government's main impediment to counterterrorism remained its lack of resources. The government, particularly the Border Guards, lacked appropriate technical equipment, personnel, and training to effectively interdict illegal border crossings and to detect and analyze hazardous substances. As a result, Tajikistan could serve as a transit country for extremists and terrorists traveling to and from Afghanistan and Pakistan. The United States and other donors assisted the government of Tajikistan to secure its 1400 kilometer porous border with Afghanistan.

Assistance included a $5 million U.S. Department of Defense (DOD) radio program to improve Border Guard communications capability. DOD held four Joint Combined Exchange Training (JCET) sessions with Tajikistani security forces to improve their capacity to conduct counterterrorism operations. The U.S. Embassy administered training which included chemical weapons response and weapons of mass destruction (WMD) detection training. These programs will help Tajikistan stop potential terrorists who may attempt to cross the Tajikistani border, and will enable Tajikistan to better control its borders.

Tajikistan endorsed the joint U.S.-Russia co-chaired Global Initiative to Combat Nuclear Terrorism. In November, it hosted a regional conference to discuss with its neighbors more effective cooperation to counter WMD proliferation. The Tajikistani government also participated in regional security alliances, including the Shanghai Cooperation Organization.

PX203

Since September 11, 2001, the Government of Tajikistan has allowed its airspace to be used for counterterrorist actions in support of Operation Enduring Freedom (OEF). Tajikistan prohibited extremist-oriented activities and closely monitored groups it listed as terrorist organizations, such as the Islamic Movement of Uzbekistan (IMU) and Hizbut-Tahrir (HT). The Government of Tajikistan believed that HT, in particular, was active in the northern part of the country. Analysts believed that supporters of terrorist groups such as al-Qa'ida and the IMU were active in the region this year.

The Government of Tajikistan did not provide safe haven for terrorists or terrorist organizations. However, the country's poor economic climate and repressive government policies to restrict Islamic religious practice provided conditions that religious extremists could exploit. Events occurred in Tajikistan that may have been terrorism-related. A small bomb exploded outside the Supreme Court on June 17, causing no injuries or serious damage, and another bomb detonated at a conference hall on November 14, killing one person. These incidents remained under investigation at year's end.

Under the guise of fighting extremism, the Government of Tajikistan has taken increased measures against opposition parties in the country, particularly the Islamic Renaissance Party of Tajikistan (IRPT), the only legal Muslim opposition party in Central Asia.

## Turkmenistan

Turkmenistan's longtime president, Saparmyrat Niyazov, died in late December 2006, and it remained too early in the presidency of Gurbanguly Berdimuhamedov to assess any change in the government's counterterrorism policy. The Government of Turkmenistan, while generally supportive of counterterrorism initiatives, increasingly was viewing counterterrorism through a domestic security lens and was receptive to international counterterrorism initiatives as they related to the country's effort to prevent terrorist activity on its own soil. The government cooperated with a variety of international organizations and partner countries in conducting counterterrorism training events for government personnel, including, for example, canine bomb detection training and professional seminars on terrorism and security studies.

While the government continued to strictly control access into and passage through Turkmenistan at official border crossings and along main roads, clandestine passage was still possible due to long and porous borders that stretch across mountain and desert terrain, as well as the small size and uneven quality of Turkmenistan's border guard and customs services. Turkmenistan's law enforcement and security agencies exert stringent security control over all aspects of society making it unlikely that Turkmenistan could easily be used as a terrorist refuge. The Government of Turkmenistan strictly controlled religious expression, and radical or extremist forms of Islam were not tolerated.

The government maintained a military-style counterterrorism unit with hostage rescue and explosives threat management capability, as well as a Department for the Prevention of Terrorism and Organized Crime in the Ministry of Internal Affairs. The Government of Turkmenistan continued to support humanitarian assistance related to the War on Terror and

PX203

Operation Enduring Freedom in Afghanistan. The government entered the names of individuals and organizations on terrorist financing lists into its banking system.

## Uzbekistan

The Government of Uzbekistan did not provide safe haven for terrorists or terrorist organizations and continued to work aggressively to combat terrorist groups and other suspected Islamic radicals. Nevertheless, widespread poverty and the government's repressive security policies created conditions that religious extremists could exploit. In the past, Uzbekistan's porous borders, particularly in the Ferghana Valley, allowed for people and illicit goods to move in and out of the country with relative freedom. The government responded to these threats with impressive tightening of border controls, especially in the Ferghana Valley and increased its cooperation with Kyrgyzstan. It did not, however, systematically address the conditions terrorists might exploit to gain popular support and recruits for their cause.

Supporters of terrorist groups such as the Islamic Jihad Group (IJG), the Islamic Movement of Uzbekistan (IMU), the IMU-affiliated East Turkistan Islamic Movement (ETIM), and other al-Qa'ida (AQ)-affiliated groups were active in the region, and terrorist groups in the region continued to target both the Government of Uzbekistan and western interests. Members of these groups expressed anti-U.S. sentiments and some have attacked U.S. interests in the past, including a 2004 suicide bombing at the U.S. Embassy in Tashkent conducted by the IJG. USG personnel and facilities continued to operate at a heightened state of alert.

In contrast with 2005, when the Government of Uzbekistan ended virtually all counterterrorism cooperation with the United States, there were a few modest steps in resuming cooperation. In November, the government of Uzbekistan extended for another year a protocol giving over-flight rights to commercial aircraft contracted by the Department of Defense, and permitted several over-flights of such aircraft in 2007.

Tashkent hosts the Shanghai Cooperation Organization's (SCO) Regional Antiterrorist Structure (RATS), which said it had both facilitated combined counterterrorism exercises among SCO member states and begun work on developing a coordinated terrorist database. Uzbekistan is also a member of the Russian-led Collective Security Treaty Organization (CSTO), which said it held counterterrorism exercises and made progress in coordinating counterterrorism efforts. Nonetheless, the Government of Uzbekistan did not participate fully in the SCO or CSTO exercises. The government increased its participation in counterterrorism-themed UN Office of Drugs and Crime (UNODC) programs, and took part in two out of three regional terrorism prevention activities organized by UNODC.

PX203

## WESTERN HEMISPHERE OVERVIEW

―With persistence and transparency, Colombia will overcome terrorism, which is financed by illicit drugs…To fight them (terrorists), we deepen democracy instead of restricting it, protect liberties instead of suppressing them, stimulate dissent instead of silencing it. Our fight against terrorism is observed by national and international critics, who can be in the country and say what they please without any restriction. Our democratic practice gives us the political authority to say that those who take up arms, financed by illicit drugs, are not insurgents against oppression but terrorists against liberty."

–Mr. Alvaro Uribe Velez, President of Colombia
Statement, 62nd UN General Assembly, New York;
September 27, 2007

Regionally based Foreign Terrorist Organizations (FTOs) in Colombia, and remnants of radical leftist Andean groups were the primary perpetrators of terrorist acts in the Western Hemisphere. With the exception of the United States and Canada, where some prosecutions of suspected terrorists were underway, there were no known operational cells of Islamic terrorists in the hemisphere, although pockets of ideological sympathizers in South America and the Caribbean lent financial and moral support to terrorist groups in the Middle East.

In May 2007, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Rampant corruption with the Venezuelan government and military, ideological ties with the FARC, and lax counternarcotics policies have fueled a permissive operating environment for drug traffickers and an increase in drug trafficking to Europe, Africa, and the United States.  Cuba remained a state sponsor of terrorism.

On November 9, 2006, an Argentine judge issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah for their alleged role in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured over 150 people. On March 13, 2007, INTERPOL's Executive Committee unanimously decided to issue international ―wanted" notices ("Red Notices") for five of the Iranians (including the former Minister of Intelligence and Security, Ali Fallahijan, and the commanders of the Islamic Revolutionary Guard Corps and the Qods force) and the one Lebanese national (Imad Mugniyah, recently deceased). The Government of Iran appealed that decision. On November 7, INTERPOL's General Assembly voted (78 for, 14 against, 26 abstentions) to uphold the Executive Committee's March 13 decision and the ―Red Notices" were issued.

PX203

The threat of a transnational terrorist attack remained low for most countries in the hemisphere. Overall, governments took modest steps to improve their counterterrorism capabilities and tighten border security, but corruption, weak government institutions, ineffective or lack of interagency cooperation, weak or non-existent legislation, and reluctance to allocate sufficient resources limited progress. Some countries, like Argentina, Panama, Paraguay, Mexico, and El Salvador, made serious prevention and preparedness efforts. Others lacked urgency and resolve to address deficiencies in their counterterrorism posture. Caribbean and Central American nations, recognizing their vulnerability to attack or transit by terrorists, took steps to improve their border controls and to secure key infrastructure, especially air and maritime ports. The CARICOM nations have an on-going relationship with U.S. Customs and Border Protection (CBP) for the review of passengers traveling in the region which enables the United States to screen passengers against the terrorist screening database and review them for other suspected travel patterns. Most countries began to look seriously at possible connections between transnational criminal organizations and terrorist organizations. Colombia maintained and strengthened its ―democratic security‖ strategy, directly confronting the convergence of threats from terrorism, newly emerging criminal groups, narcotics trafficking organizations, and the Revolutionary Armed Forces of Colombia (FARC). The Colombian government was increasingly successful in attacking mid-level FARC commanders engaged in narcotics trafficking and terrorist activities. The September 3 and October 25 deaths of commanders Tomas Medina Caracas ―El Negro Acacio,‖ and Gustavo Rueda Diaz, ―Martin Caballero,‖ respectively, represented serious blows.

In May, the U.S. Federal Bureau of Investigation uncovered a plot by two Guyanese, one Trinidadian, and one U.S. citizen to destroy a fuel pipeline at New York's JFK airport. The Government of Trinidad and Tobago cooperated in the effort to locate and detain those involved in the plot. Of the four suspects, three were arrested in Trinidad, where they remained in custody awaiting a judicial decision on their extradition to the United States The fourth suspect remained in detention in the United States.

The United States enjoyed solid cooperation on terror-related matters from most hemispheric partners, especially at the operational level, and maintained excellent intelligence, law enforcement, and legal assistance relations with most countries. The hemisphere boasts the OAS Inter-American Committee Against Terrorism, which is the only permanent regional multilateral organization focused exclusively on counterterrorism.

Mexico and Canada were key partners in the War on Terror and U.S. homeland security. Cooperation with them was broad and deep, involving all levels of government and virtually all agencies, in several initiatives. Recognizing the threat from terrorist transit, the Mexican government worked with the United States to enhance aviation, border, maritime, and transportation security, to secure critical infrastructure, and to combat terrorism financing. United States- Canadian counterterrorism cooperation took place in a number of established forums, including the terrorism subgroup of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group (BCG). The BCG brings together USG and Canadian counterterrorism officials from over a dozen agencies, on an annual basis, to coordinate policy on bioterrorism, information sharing, and joint counterterrorism training. Both Canada and Mexico have arrangements with the United States for the exchange of

PX203

terrorist screening information, pursuant to Homeland Security Presidential Directive (HSPD) No. 6.

The United States remained fully committed to supporting the Government of Colombia in its efforts to defeat Colombian-based Foreign Terrorist Organizations. President Alvaro Uribe continued vigorous law enforcement, intelligence, military, and economic measures against the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United Self-Defense Forces of Colombia (AUC) who have not demobilized or who have gravitated to newly-formed criminal groups. The Colombian government also increased its efforts with neighboring countries to thwart terrorist expansion, investigate terrorist activities inside and outside Colombia, seize assets, secure hostage release, and bring terrorists to justice. Colombia provided antiterrorism training to nations in the region.

Colombia's neighbors had varied reactions to the threat from Colombian based terrorists. While none condemned the terrorists or designated the groups for domestic purposes, they responded for the most part, positively to Colombian requests to arrest specific fugitives. Brazil and Peru improved cross-border cooperation with Colombia, which was often instituted at the local rather than national level. Ecuador demonstrated a willingness to militarily confront encroaching foreign narcoterrorists, while security forces in Brazil and Peru generally sought to avoid military confrontations with them. Forces in Peru pursued reemerging domestic terrorist groups aggressively. It remained unclear to what extent the Government of Venezuela provided support to Colombian terrorists. However, weapons and ammunition, some from official Venezuelan stocks and facilities, have turned up in the hands of Colombian terrorist organizations. Neither the Venezuelan nor Colombian governments systematically policed the 1400-mile Venezuelan-Colombian border to prevent the movement of groups of armed men or to interdict arms flows to narcoterrorists.

**Tri-Border Area**
(Argentina, Brazil, and Paraguay)

The Governments of the Tri-Border Area (TBA), Argentina, Brazil, and Paraguay, have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early 1990s, they established a mechanism to address these illicit activities. In 2002, at their invitation, the United States joined them in what became the "3+1 Group on Tri-Border Area Security" to improve the capabilities of the three to address cross-border crime and thwart money laundering and potential terrorist financing activities. The United States remained concerned that Hizballah and HAMAS sympathizers were raising funds in the TBA by participating in illicit activities and soliciting donations from sympathizers within the sizable Muslim communities in the region. There was no corroborated information, however, that these or other Islamic extremist groups had an operational presence in the TBA.

**Argentina**

Argentina cooperated well with the United States at the operational level, and addressed many of the legal and institutional weaknesses that previously hindered its counterterrorism efforts. In

148

PX203

2006 and 2007, the National Coordination Unit in the Ministry of Justice and Human Rights became fully functional, managing the government's anti-money laundering and counterterrorism finance efforts and representing Argentina to the Financial Action Task Force (FATF) and the Financial Action Task Force of South America (GAFISUD). The Attorney General's special investigative unit set up to handle money laundering and terrorism finance cases began operations this year. The Central Bank's specialized anti-money laundering and counterterrorism finance examination program was awaiting final authorization and was not operational at year's end. The Argentine government and Central Bank remained committed to freezing assets of terrorist groups identified by the United Nations if they were detected in Argentine financial institutions.

A noteworthy event was the Argentine Congress' passage in June of legislation penalizing the financing of terrorism ("Illegal Terrorist Associations and Terrorism Financing"), which brought Argentina into greater compliance with FATF standards. The law, which entered into effect in mid-July, amended the Penal Code (Law No. 25.246 "Cover-Up and Laundering of Assets Act") to criminalize acts of terror, terrorism financing, and money laundering for the purpose of financing terrorism. The new law provided a legal foundation for the financial intelligence unit (FIU), Central Bank, and other regulatory and law enforcement bodies to investigate and prosecute such crimes. Argentina joined Chile, Colombia, and Uruguay as the only countries in South America to have laws against financing terrorism. On September 11, the Argentine President signed into force the National Anti-Money Laundering and Counterterrorism Finance Agenda. The Agenda will serve as a road map to implement the existing money laundering and terrorism finance laws and regulations. The Agenda's 20 objectives focus on closing legal/regulatory loopholes and improving interagency cooperation. The next challenge is for Argentine law enforcement and regulatory institutions, including the Central Bank and FIU, to implement the National Agenda and aggressively enforce the newly strengthened and expanded legal, regulatory, and administrative measures available to them to combat financial crimes.

On November 9, 2006, an Argentine judge issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah, that were indicted in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured over 150 people. On March 13, 2007, the INTERPOL Executive Committee decided unanimously to issue international —wanted" notices ("Red Notices") for five of the Iranians (including the former Minister of Intelligence and Security, Ali Fallahijan, and the commanders of the Islamic Revolutionary Guard Corps and the Qods force) and the one Lebanese national (Imad Mugniyah, recently deceased). The Government of Iran appealed the Executive Committee's decision and requested that the INTERPOL General Assembly decide the matter. On November 7, the INTERPOL General Assembly voted (78 for, 14 against, 26 abstentions) to uphold the Executive Committee's March 13 decision and the Red Notices were issued.

**Belize**

The Government of Belize cooperated with the United States by sharing information and providing assistance to the extent that its limited resources allowed. The U.S. Embassy enjoyed a close and cooperative relationship with counterparts in the police force, particularly the Special Branch, immigration, customs, and prison officials. The Government of Belize cooperated with

PX203

U.S. law enforcement agencies to capture AQ associate Earnest James Umaama and return him to Washington State. The Belize Defense Force (880 total personnel) established a Counterterrorism Platoon to perform operations within Belize and its territorial waters.

**Bolivia**

With political instability, a weak and fluctuating legal framework, increasing coca cultivation, and the opening of diplomatic relations with Iran, Bolivia showed new potential as a possible site for terrorist activity. Supporters and actors from the National Liberation Army (ELN), the Revolutionary Armed Forces of Columbia (FARC), the Tupac Amaru Revolutionary Movement (MRTA), the Paraguayan Free Fatherland Party (PPL), and the Shining Path were thought to be present in Bolivia.

In December, following 16 months of deliberations within a Constituent Assembly, President Morales' Movement to Socialism (MAS) party approved a new draft constitution with little input from the political opposition. The government's actions divided the country with five out of nine departmental governors calling the new constitution illegal and illegitimate. Opposition departments (states) may hold autonomy votes in May and June. Bolivia's uncertain political and economic climate, and an increase in coca production, could lead to increased trafficking of illicit goods and money across Bolivia's borders.

In September, the Bolivian government announced the opening of diplomatic and commercial relations with Iran. The September 27 agreement pledged $1.1 billion in Iranian assistance to Bolivia over five years. In addition, Bolivia received continued medical and intelligence support from Cuba, with which it has had a close relationship since 2006. The Bolivian government's ineffective anti-money laundering regime failed to comply with international norms. In July, the Egmont Group suspended Bolivia's membership when it did not criminalize the financing of terrorism.

In October, the Peruvian government requested the extradition of Walter Chavez, a close advisor to the Bolivian government. In 1990, Chavez was arrested in Peru for alleged illegal activities and involvement with the MRTA, and was released on bail and disappeared before turning up in Bolivia in 1992. The Bolivian government vowed to defend and protect Chavez, arguing that he was a political refugee protected by international agreements.

**Brazil**

Elements of the Brazilian government continued counterterrorism cooperation, which included investigating potential terrorism financing, document forgery networks, and other illicit activity. Operationally, elements of the Brazilian government responsible for combating terrorism, such as the Federal Police, Customs, and the Brazilian Intelligence Agency, diligently worked with their U.S. counterparts to pursue investigative leads provided by U.S. intelligence, law enforcement, and financial agencies regarding terrorist suspects.

Brazil was increasingly capable of monitoring domestic financial operations and effectively utilized its financial intelligence unit, the Financial Activities Oversight Council (COAF), to

PX203

identify possible funding sources for terrorist groups. COAF carried out name checks for persons and entities on the UNSCR 1267 Committee's Consolidated List, but has not found any assets, accounts, or property in the names of persons or entities on the lists. COAF partnered with Customs to create a database called the Electronic Declaration of Cash Carriage (EDPV), which will assist in monitoring individuals who transfer funds abroad. Although the system is a prototype and is still being tested, Brazilian law enforcement officials were encouraged by initial results. The government recognized the connection between cash couriers and terrorism, and took the necessary steps to receive guidance from the Financial Action of South American (GAFISUD) and the Financial Action Task Force (FATF). At year's end, there was a bill before the Minister of Justice for approval that would increase training and the budget to counter illicit cash/drug smuggling regimes in Brazil.

Two key counterterrorism-related legislative initiatives continued to languish. Neither the antiterrorism nor the anti-money laundering bills, which have been pending since 2005, were introduced in Congress. If passed, the bills would criminalize terrorism and associated activities, and facilitate greater law enforcement access to financial and banking records during investigations, criminalize illicit enrichment, allow administrative freezing of assets, and facilitate prosecutions of money laundering cases by amending the legal definition of money laundering and making it an autonomous offense.

Brazil and the United States agreed to expand the Container Security Initiative (CSI) in Santos. The USG provided a variety of training courses in Brazil in combating money laundering, airport interdiction, container security, and maritime security. Brazilian authorities received seminars and courses on security and worked closely with U.S. law enforcement agencies to prepare for the 2007 Pan American Games.

The Government of Brazil continued to invest in border and law enforcement infrastructure with a view to gradually controlling the flow of goods, both legal and illegal, through the Tri-Border Area (TBA), the proceeds of which could be diverted to support terror groups. Tougher controls at the Brazilian Customs inspection station at the Friendship Bridge in the TBA enabled the government to crack down on contraband crossing the bridge, though law enforcement officials expected that traffickers would respond to the tougher controls by trying to move their goods clandestinely across the border elsewhere via boat. In 2007, a Joint Intelligence Center was built in the TBA in an effort to combat transborder criminal organizations with its neighbors.

**Canada**

The United States and Canada collaborated extensively on a broad array of counterterrorism initiatives that spanned virtually all agencies and every level of government. Canada continued stabilization and reconstruction operations in the Kandahar province of Afghanistan and led G8 efforts to improve border security to cut the flow of insurgents and terrorists into Afghanistan from Pakistan. The Canadian government submitted additional counterterrorism legislation and revised security certificate legislation to Parliament to strengthen the country's legal tools to combat terrorism. Through its Counterterrorism Capacity-building Program, Canada continued to implement a major effort to assist in training and technical assistance to partner nations in

PX203

terrorism financing, legislation, and border management. This year marked the tenth anniversary of the exchange of terrorist screening information between the United States and Canada.

In June 2006, Canadian law enforcement officials charged 18 individuals, all Canadian citizens or residents, with planning terror attacks in Canada. Among them, fourteen adults continued to face charges, three youths have had charges against them stayed or dropped, and a fourth youth was released on bail. Four of the fourteen adults charged were released on bail, subject to conditions. Only six of the fourteen faced the most serious charges of planning to storm Parliament Hill and take politicians hostage, and to bomb targets such as a Canadian Forces base and government offices in Toronto and Ottawa. The rest of the group faced lesser charges, including participation in alleged terrorist training and charges related to terrorist financing. This case, and that of Momin Khawaja, who was accused of conspiring with a British AQ cell in a thwarted plot to bomb targets in London in 2004, will be the first cases tried under Canada's 2001 Anti-Terrorism Act.

In October 2007, the Government of Canada introduced two important pieces of legislation, both of which were under debate in Parliament. One bill proposed to amend provisions of the Immigration and Refugee Protection Act to allow for continued application of ―security certificates,‖ which have been in use for several decades as a way to detain, pending deportation, foreign nationals deemed to be a security threat. In February, the Canadian Supreme Court ruled that the government's use of secret evidence in certificate proceedings and procedures for detention review were unconstitutional and gave the government until February 23, 2008 to amend the Act. The proposed legislation would provide for cleared ―special advocates‖ to challenge the evidence on behalf of the accused and for an initial judicial review of detainees in the first 48 hours of arrest and at six-month intervals. Six individuals are still subject to security certificates; five of whom were released from detention on conditions and one who is in custody. The bill remained in the House of Commons upon its adjournment on December 13.

The second key bill is part of a mandatory review of the Anti-Terrorism Act. Two provisions of the Act – investigative hearings that would permit police to apply for an order requiring a witness to appear before a judge and answer questions; and preventive arrest, whereby peace officers may bring an individual before a judge in the early stages of terrorist activity to disrupt a potential terrorist attack – were subject to sunset clauses and lapsed in February. The Canadian government was committed to reinstating these provisions as part of its overall counterterrorism strategy and introduced the measures after an earlier motion to extend them was defeated in the House of Commons in February. In October, the government reintroduced the legislation first in the Senate, where it remained as of its adjournment in December.

In an effort to improve emergency management in the event of a disaster (such as a major terrorist attack), the Canadian parliament passed a bill in June that clarified responsibilities and lines of authority during an emergency. The bill also included a special provision ―that the Minister may develop joint emergency management plans with the relevant USG authorities and, in accordance with those plans, coordinate Canada's response to emergencies in the United States and provide assistance in response to those emergencies.‖

PX203

United States-Canadian counterterrorism cooperation took place in a number of established forums, including the terrorism sub-group of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group (BCG). The BCG brings together U.S. and Canadian counterterrorism officials from over a dozen agencies, on an annual basis, to coordinate policy on bioterrorism, to share information, and for joint counterterrorism training. The United States and Canada continued to work on mechanisms to accommodate Canadian concerns about information sharing in the wake of a 2002 case in which a Canadian-Syrian citizen and terror suspect was removed from New York to Syria, where he claimed to have been tortured and subsequently received formal compensation from the Government of Canada.

In Afghanistan, Canada stood firm in fighting the insurgency in Kandahar province, where it provided a 2500-person battle group to ISAF Regional Command South and a Provincial Reconstruction Team for stabilization and development efforts. Canada also was leading a major initiative to improve cross border coordination between Afghan and Pakistani authorities, police, and military, and to enhance the capacities of the units that work to secure the border from insurgent and terrorist crossings. In October, Canada led two border assessment missions and held a Joint Border Management Workshop with Afghan and Pakistani experts in Dubai. To date, Canada has suffered 73 soldiers and one diplomat killed in Afghanistan, the highest proportion of casualties to troops deployed for any NATO member.

Canada also helped key countries address terrorism and terrorism financing with its Counterterrorism Capacity-building Program, a $15 million a year program to provide training, advice, and technical assistance to counterpart agencies. Through this program, Canada provided assistance to several countries in the Caribbean to draft new counterterrorism legislation, intelligence training for border officials on the Afghan-Pakistani border, and financial intelligence training to officials in India. Through its Cross Cultural Roundtable and Muslim Outreach program, Canada has been actively seeking to engage its citizens in a dialogue on a broad range of national security issues, including terrorism. The Muslim Communities Working Group in the Department of Foreign Affairs and International Trade is also engaged in efforts abroad to enhance Canada's relationships with the countries of the Muslim world, focusing on the promotion of democratic governance, pluralism, and human rights. In November, the Department of Foreign Affairs and International Trade led an effort to compare approaches and lessons learned among international partners on outreach to Muslim communities.

The Government of Canada extended its Chemical, Biological, Radiological, and Nuclear (CBRN) Research and Technology Initiative (CRTI), which aimed to bring people and knowledge from the Canadian and U.S. scientific, technology, intelligence, responder, and policy communities together in an integrated fashion to pursue new technologies and approaches to counterterrorism. Canada also worked with the United States under the 1995 Canada/U.S. Counterterrorism Research and Development Agreement to manage a robust joint program on counterterrorism research and development.

In late 2006, the Canadian government passed legislation that amended the Proceeds of Crime and Terrorist Financing Act to make Canada's anti-money laundering and anti-terrorist financing regime consistent with new Financial Action Task Force (FATF) standards. It allowed Canada to

153

PX203

enter into Memorandums of Understanding with international and third country law enforcement organizations to strengthen information sharing and to create penalties to improve compliance with the act. The bill also created a registration regime for money service businesses, expanding the number of reporting actions required to implement compliance, to include dealers in precious metals and stones and the real estate industry, and created an administrative and monetary penalties regime that could better enforce compliance.

## Chile

Chilean law enforcement actively cooperated in international terrorism investigations and with the United States to monitor and combat terrorist financing. Law Enforcement officials monitored possible links between extremists in Chile's Iquique Free Trade Zone and those in the Tri-Border Area, as trade links between these two areas are increasing. Chile's National Intelligence Agency remained mostly an analytical body, relying on law enforcement and investigative agencies for the vast majority of collection and operations.

Chile endorsed both the Proliferation Security Initiative (March) and the Global Initiative to Combat Nuclear Terrorism (May). In June, representatives from Chile's Foreign Relations Ministry and the two national police forces (the uniformed Carabiñeros and the Investigative Police) attended the FBI-sponsored Global Initiative to Combat Nuclear Terrorism Law Enforcement Conference in Miami. Chile was an active member of APEC's Counterterrorism Task Force.

Chileans requested FBI support on two domestic terrorism cases. Coordinadora Arauco Melleca (CAM), is a violent Mapuche Indian group in southern Chile that has burnt fields and attacked police while fighting for land it claims belongs to it. CAM appeared to have begun organizing itself more like a guerilla group; attacks late in the year demonstrated increased planning and a more professional use of weapons and tactics. Walter Wendelin, a representative of the Spain-based Basque Fatherland and Liberty (ETA) political branch, traveled to Chile to meet with CAM members. Chilean police were monitoring for possible contacts between Mapuche groups and armed political movements in Latin America.

Grupo de Operaciones Policiales Especiales (GOPE), a 300-person unit of the Carabiñeros police force, served as the nation's primary counterterrorist reaction force. The force was well-trained and participates annually in Exercise Fuerzas Comando, a U.S. Special Operations Command South (SOCSOUTH)-sponsored special operations seminar designed to refine the tactics, techniques, and procedures used by Special Operations counterterrorism forces. A GOPE commander attended a conference in Paraguay this year on "Combating Radical Ideology," sponsored by the Counterterrorism Fellowship Program (CTFP).

## Colombia

The Government of Colombia, facing domestic terrorist threats, continued vigorous law enforcement, intelligence, military, and economic measures against three designated Foreign Terrorist Organizations within Colombia: the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United

PX203

Self-Defense Forces of Colombia (AUC). Colombia increased its counterterrorism efforts in the region to counter terrorist groups' operations, investigate terrorist activities inside and outside Colombia, seize assets, and bring terrorists to justice.

Colombia continued to expand its role as regional leader in counterterrorism, and provided some training to numerous countries. Leveraging experience gained from U.S. training, Colombia reached out to countries across the region to create AMERIPOL (a regional police cooperation institution similar to INTERPOL), which will allow more efficient coordination on counterterrorism and law enforcement issues in the region. The Colombian government continued to seek enhanced regional counterterrorism cooperation to target terrorist safe havens in vulnerable border areas, and provided counterterrorism training to officials from partner countries across the region. Colombia and Mexico significantly increased joint training and operations against narco-terrorist organizations operating in both countries.

The United States-Colombia extradition relationship remained the most successful such effort in the world. The Colombian government cooperated fully with U.S. efforts to recover U.S. citizen kidnapping victims, including three kidnapped by the FARC in February 2003 – Thomas Howes, Keith Stansell, and Marc Gonsalves – and remained open to third-party proposals for a hostage-prisoner exchange.

In November, President Alvaro Uribe agreed to a request of Venezuelan President Hugo Chavez and Colombian Senator Piedad Cordoba, to act as intermediaries for a possible "humanitarian exchange" of FARC-held hostages for FARC prisoners in Colombian jails. The Colombian government-sanctioned effort ended in November after Chavez and Cordoba repeatedly failed to adhere to Colombia's guidelines. Nevertheless, Chavez continued his efforts to gain the release of hostages including a failed effort at year's end involving the promised release of three Colombian hostages (Clara Rojas, her son Emmanuel, and Consuelo Gonzales de Perdomo) to an international delegation that included former-Argentine President Nestor Kirchner. The Government of Colombia revealed that the FARC had turned over Emmanuel to a sympathizer, who had in turn placed the child in Colombian social services. Confusion over Emmanuel's whereabouts coupled with FARC allegations that the Colombian military was operating in the area led the FARC to temporarily call off the release. The FARC, under intense public pressure, eventually turned over Rojas and Gonzales to President Chavez.

In December, the Colombian government intercepted three FARC operatives with video tapes showing twelve hostages, including Howes, Stansell, and Gonsalves, and former Colombian presidential candidate Ingrid Betancourt, who holds dual Colombian-French citizenship. French President Nicolas Sarkozy remained active in renewed efforts for the hostages' release, calling on leaders across the region to take up the cause.

In December, President Uribe announced a proposal to establish an "encounter zone" to negotiate an exchange that would be mediated by the Catholic Church. Though previous mediation attempts by the Church were unsuccessful, and the Colombian government had attempted a similar proposal in 2005, international pressure to free the hostages further increased. At year's end, the FARC has not responded President Uribe's offer.

155

PX203

The Uribe Administration maintained its focus on defeating and demobilizing Colombia's terrorist groups through its "democratic security" policy, which combined military, intelligence, police operations, efforts to demobilize combatants, and the provision of public services in rural areas. Colombian security forces captured or killed a number of mid-level FARC leaders, debriefed terrorist group deserters for detailed information on their terrorist cells, and reduced the amount of territory where terrorists could freely operate. The September 3 and October 25 deaths of commanders Tomas Medina Caracas —El Negro Acacio," and Gustavo Rueda Diaz, —Martin Caballero," respectively, represented serious blows to the FARC. Medina was a key figure in overseeing the FARC's drug trafficking and weapons procurement activities. Rueda led FARC fronts in the Caribbean coast, and was responsible for the 2003 kidnapping of current Foreign Minister Fernando Araujo, who escaped FARC custody during a military assault on his captors and was recovered in January 2007.

Colombia continued its close cooperation with the United States to block terrorists' assets. Financial institutions closed drug trafficking and terrorism-related accounts on Colombian government orders. Aerial and manual eradication of illicit drugs in Colombia, key to targeting terrorist group finances, covered about 220,000 hectares of illegal drug crops, thus depriving terrorist groups of potentially huge profits. At the same time, the Treasury Department through the Office of Foreign Assets Control pursued and blocked the assets of narcotics traffickers and terrorists it had placed on its Specially Designated Nationals List.

Colombia implemented a new law that defined and criminalized direct and indirect financing of terrorism for both national and international terrorist groups, in accordance with recommendations of both the Financial Action Task Force of South America (GAFISUD) and the Egmont Group. The new law authorized Colombia's Financial Intelligence Unit (UIAF) to freeze terrorists' assets immediately after their designation. Banks were held responsible for their client base and must immediately inform UIAF of any accounts held by newly designated terrorists. Banks also had to screen new clients against current lists of designated terrorists before they would be allowed to provide prospective clients with services. (Previously, banks were not legally required to comply with these regulations, although many had done so on a voluntary basis.)

The threat of extradition to the United States remained a strong weapon against drug traffickers and terrorists. Colombia extradited 164 defendants to the United States for prosecution, the vast majority Colombian nationals, surpassing its previous record. At the end of the year, the Uribe administration had extradited 581 individuals to the United States. Ex-FARC senior member Anayibe Rojas Valderrama, —Sonia," was sentenced in July to more than 16 years in prison for drug trafficking. AUC members Davinson Gomez Ocampo and Hector Rodriguez Acevedo were convicted of drug trafficking and providing material support to a terrorist organization, respectively. The Uribe administration suspended six extraditions of alleged-AUC members, who continued cooperating with the paramilitary peace process under the Colombian Justice and Peace Law. The United States continued to seek their extraditions.

Despite the ongoing military campaign against it, the FARC continued tactical-level terrorist, kidnapping for profit and narcotrafficking activities, and launched several bombings against military and civilian targets in urban areas. It also targeted numerous rural outposts,

PX203

infrastructure targets, and political adversaries in dozens of attacks. Examples of the FARC's 2007 terrorist activity included the following:

- In January, six people, including a child, were killed in a bomb attack in Buenaventura;

- In March, a bomb attack killed six people and injured over ten in Buenaventura;

- In March, a car bomb attack attempted but failed to assassinate Neiva Mayor Cielo Gonzalez.

- In April, a bomb detonated in front of the Cali police headquarters, killed one person, injured more than thirty, and destroyed the building.

- In June, eleven department legislators from Valle del Cauca held hostage since 2003 were murdered while in FARC custody;

- In October, a grenade attack at a campaign headquarters in Puerto Asís killed two people and injured six others.

- In December, the FARC again attempted but failed to assassinate Neiva Mayor Cielo Gonzalez in a rocket attack.

The Colombian government continued to seek the extradition of three Irish Republican Army (IRA) members, who were first acquitted and then sentenced after the prosecution appealed, to 17 years in prison for training the FARC on bomb tactics. The three fled Colombia while on bail and resurfaced in Ireland in August 2005. Colombia's extradition request remained under review before the Irish courts and the three fugitives remained at large.

The Government of Colombia and the ELN continued peace talks, but no agreements were reached. The ELN remained in the field, but with ever-limited resources, a dwindling membership, and reduced offensive capability. The ELN and FARC clashed over territory in northeastern Colombia, which further weakened the ELN.

Demobilized AUC members continued to be processed and investigated under the Justice and Peace Law, which offered judicial benefits and reduced prison sentences for qualifying demobilizing terrorists.[12] The law requires all participants to confess fully their crimes as members of a terrorist group and to return all illicit profits. More than 32,000 rank-in-file AUC members who did not commit serious crimes have demobilized, and many were receiving benefits through the government's reintegration program, including psychosocial attention, education, healthcare, and career development opportunities. Over 80,000 victims have

---

[12] Since 2002, more than 31,000 rank-in-file AUC members demobilized under the Justice and Peace Law, which offered judicial benefits and reduced prison sentences for qualifying demobilizing terrorists. As part of the Justice and Peace Law (JPL) process, the Colombian Prosecutor's office is taking what will be hundreds of sworn confessions from ex-AUC members, that have revealed the location of the graves of almost 1,200 paramilitary victims and provided information on 3,600 of the AUC's crimes.

PX203

registered under the JPL, and the Colombian government was working on measures to provide reparations. Some AUC renegades continued to engage in criminal activities after demobilization, mostly in drug trafficking, but the AUC as a formal organization remained inactive.

**Cuba**
*See Chapter 5, State Sponsors of Terrorism.*

**Dominican Republic**

The Dominican Armed Forces have a counterterrorism unit, but were unable to conduct complex special operations-type missions to counter terror. Despite good intentions, the Dominican government displayed a persistent inability to control its air, land, and sea borders. While many seaports and airports were considered permeable, three facilities, Caucedo, Haina, and La Romana, were certified by the International Maritime Organization as being compliant with the International Ship and Port Facility Security Code. In September, a new border control unit, the Cuerpo Especializado Fronterizo (CESFRONT), was deployed along the border with Haiti. Despite start-up problems, there was increased optimism that the unit will become increasingly productive in controlling the border with time, experience, and proper funding.

The United States has provided assistance in both training and equipment. A particularly large donation was four interceptor ―go fast" boats from U.S. SOUTHCOM under the ―Enduring Friendship" program. These boats will be used to intercept vessels carrying arms, narcotics, and individuals who were attempting to transit the territorial waters of the Dominican Republic. Another significant donation was the provision of biometric equipment to the Dominican government.

**Ecuador**

Ecuador's greatest counterterrorism and security challenge remained the presence of Colombian narcoterrorists on its Northern Border. In order to evade Colombian military operations, the Revolutionary Armed Forces of Colombia (FARC) regularly used Ecuadorian territory for rest, recuperation, resupply, and training, thereby involving significant numbers of Ecuadorians in direct or indirect ways. The Government of Ecuador faced challenges in patrolling a porous 400-mile border, and the lack of adequate licit employment opportunities for Ecuadorians in the region have made the area vulnerable to narcoterrorist influence. Ecuadorian officials along the border believed the FARC's economic impact allowed it to buy silence and compliance.

Ecuador's response to this threat historically has been uneven, but it has improved of late. The government shifted troops to the border region, continued efforts to improve military-to-military information sharing with Colombia, and launched a domestic Northern Border development agenda in concert with international donors to spur economic development in the area. The Correa Administration, while maintaining the country's traditional neutrality with respect to the Colombian conflict, has firmly opposed armed encroachments of any kind across its borders. It has publicly expressed its desire to eliminate FARC presence within Ecuadorian territory.

PX203

Despite some notable successes in this effort, insufficient resources and the challenging border region terrain have made it difficult to thwart cross-border incursions.

Despite constraints on their resources and limited capabilities, Ecuador's security forces conducted effective operations against FARC training and logistical resupply camps along the Northern Border. The Ecuadorian military significantly increased the number of operations along Ecuador's Northern border, especially at the end of the year. The Ecuadorian military destroyed FARC training, rest, and resupply camps; and confiscated weapons, communications equipment, explosives, explosives manufacturing equipment, and other support equipment. These operations also netted valuable information on FARC activities and infrastructure in and outside of Ecuador. Ecuadorian forces discovered and destroyed three cocaine producing laboratories and eradicated coca plants in at least two locations.

Ecuadorian police suspected several small and relatively minor Ecuadorian groups of domestic subversion and involvement in terrorism. A handful of other radical groups, including a radical self-proclaimed vestigial faction of the Alfaro Vive Carajo organization, were reputed to have ties with and support from Colombian narcoterrorists. As recently as June, Ecuadorian security forces conducted operations against this faction of the Alfaro Vive Carajo organization in an attempt to minimize their capacity to conduct subversive, disruptive, or terrorist activities.

The Ecuadorian legislature passed a landmark anti-money laundering law in 2005, criminalizing the laundering of illicit funds from any source, penalizing the undeclared entry of more than 10,000 USD in cash, and establishing a Financial Intelligence Unit (FIU) under the Superintendent of Banks. There was one major case in process as of December 2007.

Ecuador's judicial institutions remained weak, susceptible to corruption, and heavily backlogged with pending cases. While the military and police have made numerous arrests, the judicial system had a poor record of achieving convictions. The Government of Ecuador established a Ministry of Justice on November 15 to reform the penal code and improve the prison system.

**El Salvador**

El Salvador, the only Western Hemisphere country with troops serving alongside U.S. forces in Iraq, continued its support for the Coalition by dispatching a ninth contingent of troops to Iraq and approving a tenth rotation that will arrive in Iraq in early 2008. El Salvador also hosted a U.S. Department of Defense ―Forward Operating Location" (FOL) at Comalapa International Airport, and a USG-funded International Law Enforcement Academy (ILEA).

The Government of El Salvador cooperated closely with the United States on counterterrorism efforts and took active steps to protect U.S. interests and citizens. The CA-4 agreement, recently implemented among El Salvador, Guatemala, Honduras, and Nicaragua, allowed for the inspection-free movement of citizens among these countries, and reduced overall inspection at land crossings. The agreement has raised concerns, however, that its implementation could possibly facilitate easier international movement of terrorists.

PX203

The National Civilian Police was well regarded by U.S. and international observers alike, and coordinated its work with the Immigration Service, the Office of the Attorney General, and the Office of State Intelligence.

In July, the Government of El Salvador used the 2006 terrorism statute[13] to file charges against several individuals who had taken part in a violent demonstration protesting the visit of Salvadoran President Tony Saca to the town of Suchitoto. This in turn led to numerous Salvadoran and U.S.-based non-governmental organizations alleging that the government was using the statute to suppress political opposition, and was guilty of backsliding on human rights. Given the violent nature of the demonstrations, in which several protestors blocked roads, set fire to debris, threw stones at the Presidential motorcade, and allegedly fired shots at a police helicopter, the government's decision to prosecute the protestors under the statute served to further blur the distinction between full-blown acts of terrorism and violent political protest subject to ordinary criminal sanction.

**Guatemala**

Guatemala continued to strengthen its anti-money laundering and terrorist financing regime since its 2004 removal from the Financial Action Task Force list of Non-Cooperative Countries. With U.S. assistance, Guatemala formed an interagency money laundering task force with representation from the Financial Intelligence Unit, the Guatemalan tax authority, and the Public Ministry (prosecutor's office). There was no credible evidence of terrorist financing in Guatemala.

In May/June, in cooperation with the U.S. Department of Defense, Guatemala inaugurated its first military counterterrorist unit. The Guatemalan Counterterrorist unit, primarily tasked with counterterrorism operations, also had counternarcotics operations and border enforcement capabilities.

Severe resource constraints, corruption, and an ineffective criminal justice system hampered efforts against transnational crime threats such as drug trafficking and alien smuggling, especially in remote areas of the country. Guatemala's northern and western borders with Mexico lacked effective coverage by police or military personnel, and controls of its southern and eastern borders with El Salvador have been relaxed as part of the Central American integration process. Nevertheless, Guatemalan civil aviation and port authorities provided strong cooperation to U.S. requests for assistance in investigating potential terrorism leads. The Guatemalan government was working to enhance overall maritime, aviation security, and counterterrorism capabilities to remain in compliance with rising international standards.

---

[13] The Salvadoran Legislative Assembly passed a new counterterrorism law in September 2006, which featured new sentencing requirements for certain terrorist-related crimes, but failed to distinguish terrorism from regular crime. Rather than define terrorism as politically motivated violence, the new legislation listed some 27 specific acts that would constitute terrorism. The various acts are punishable by a maximum sentence of 86 1/2 years in prison (in the case of aggravating circumstances). One of the more controversial provisions of the law provided for 25-30 years in prison for armed occupation of public buildings, a tactic favored by some militant groups affiliated with the opposition FMLN party.

PX203

## Honduras

Honduran cooperation with the United States on counterterrorism finance issues remained strong. The Honduran Banking and Insurance Commission, through instruction from the Ministry of Foreign Affairs, promptly sent freeze orders to the entire regulated financial sector every time the United States amended Executive Order lists. Financial entities, particularly the commercial banks, promptly undertook the requested searches for accounts by terrorist entities. No terrorist-related funds have been found to date in the Honduran financial system. The Honduran Congress was considering a change to the criminal code that would criminalize terrorist financing. While terrorism is a crime, terrorist financing is not listed as a separate crime.

There was a trend in Honduras towards closer regional intelligence cooperation with neighboring countries; this cooperation was aimed principally at organized crime, but it could potentially protect the country from terrorist threats. In September, the Honduran government announced the adoption of a National Security Strategy, which included counterterrorism as an objective, and stressed regional and international cooperation.

The United States assisted the Honduran Armed Forces (HOAF) with its counterterrorism efforts by providing training and equipment. With U.S. assistance, the Honduran Armed Forces created a Joint Task Force.

There was no indication of illegal immigration networks being used by terrorist groups. Over the past five years, however, smuggling rings were detected moving people from East Africa, the Middle East, and Southwest Asia to or through Honduras. There was an increase in the number of boats arriving on the north coast with people from all over the world seeking to enter the United States illegally via Guatemala and Mexico. Nationals of countries without Honduran visa requirements were involved in schemes to transit Honduras, often with the United States and Europe as their final destination. The Honduran government's ability to combat transnational crime was limited by sparsely populated and isolated jungle regions, limited resources, corruption, and poor control of the north coast and eastern border.

## Mexico

Since entering office in December 2006, President Calderón's Administration has demonstrated an unprecedented commitment to improve national security, which included taking a leadership role to improve the region's response to the threat posed by transnational crime. Moreover, the Mexican government has resolved to strengthen law enforcement and counterterrorism cooperation with the United States. The already strong relationships existing between U.S. and Mexican law enforcement agencies improved further. Mexico worked with the United States to secure critical infrastructure, combat terrorism financing, and enhance aviation, border, maritime, and transportation security.

Although the July and September attacks on oil and gas pipelines by a guerrilla group called the Popular Revolutionary Army (EPR) raised the specter of domestic terrorism, Mexico primarily represented a terrorist transit threat and our bilateral efforts focused squarely on minimizing that threat. The Mexican government made steady progress on counterterrorism and alien smuggling

PX203

in 2007. It restructured and strengthened the institutions directly responsible for fighting organized crime, and developed tools under the framework of the Security and Prosperity Partnership (SPP) to address national security threats more effectively.

Information sharing on counterterrorism issues in the first year of the Calderón Administration was strong. We will continue working with Mexico to improve existing information sharing initiatives. In particular, we will continue to support digitalization of the government's information-gathering procedures to build a database of usable biometric information and to strengthen our ability to analyze accurately the information provided by Mexico. In 2007, Mexico signed an arrangement pursuant to Homeland Security Presidential Directive (HSPD) No. 6, with the United States, for the exchange of terrorist screening information.

The continued exploitation of smuggling channels traversing the U.S.-Mexico border and the lack of enforcement along Mexico's border with Guatemala remained strategic concerns. The Government of Mexico acknowledged and responded thoughtfully to U.S. concerns regarding terrorist transit and the smuggling of aliens who may raise terrorism concerns. Mexico passed a federal law against human trafficking, which will aid in pursuing criminal proceedings against traffickers and smugglers. In a recent case, Mexican authorities provided substantial support to U.S. Immigration and Customs Enforcement in arresting a third country national wanted in the United States for alien smuggling.

One setback in United States-Mexico counterterrorism cooperation was a change in detention procedures. In 2005 and 2006, Mexico's Immigration Service (INM) maintained a policy of housing all detained aliens who may raise terrorism concerns in their detention facility near Mexico City. In March 2007, however, the INM began releasing such detainees from their point of arrest, thus hindering information sharing and the USG's ability to track the movement of these aliens.

Nevertheless, cooperation between Mexico and the United States was strong overall, especially in investigating individuals suspected of cooperation with alien smugglers. A particularly effective mechanism was the Operation Against Smugglers Initiative on Safety and Security (OASISS), which allowed Mexican and U.S. law enforcement officials to share real-time information regarding ongoing alien smuggling investigations on a regular basis. OASISS, which is operational in the United States in all four states along the southwest border, and in most of Mexico's northern Border States, enhanced the ability of both governments to prosecute alien smugglers and human traffickers who otherwise might elude justice. The program provided a model for bilateral information sharing in a variety of law enforcement and security areas. An essential next step will be to expand OASISS to all of Mexico's northern border states. At the same time, the United States will need to continue to support Mexican efforts to identify smuggling organizations operating along Mexico's southern border that may raise terrorist concerns.

The U.S.-Mexico Border Security and Public Safety Working Group, formed in March 2006, became another important tool for bilateral cooperation; it established protocols between both governments to respond cooperatively at a local level to critical incidents and emergencies along the border. The success of the pilot sites led to the expansion and formalization of the program.

PX203

These protocols are now in place along the entire U.S.-Mexico border. The United States was able to develop further its border security relationship with the Mexican government under President Calderón, through training programs, which focused on using non-intrusive inspection equipment, detecting weapons of mass destruction, and identifying fraudulent documents.

Mexico coordinated with the United States on the information sharing of air passenger data and the use of its Integrated System for Migratory Operations (SIOM). In addition, the United States and Mexican governments agreed to share, on a case by case basis, biometric data for comparison to the Integrated Automated Fingerprint Identification System (IAFIS).

In mid-2006, Mexico and the United States began negotiations on programs designed to deter terrorists from using Mexico's seaports to ship illicit materials, detect nuclear or radioactive materials if shipped via sea cargo, and to interdict harmful material before it could be used against the United States or one of our allies. The cooperative effort will include installation of specialized equipment to screen cargo containers for nuclear or other radioactive materials. If anything were detected, the equipment would alert Mexican port officials of the need to further examine the cargo and take appropriate action.

In the area of money laundering, the United States developed strong working relationships with the Financial Intelligence Unit of the Attorney General's Office (PGR), and its companion unit in the Mexican Treasury (Hacienda), to combat money laundering, terrorist financing, and narcotics trafficking.

On June 28, President Calderón signed legislation into law outlawing terrorist financing and associated money laundering. The new law established international terrorism and terror financing as serious criminal offenses, as called for in UN resolution 1373, and provided for up to 40-year prison sentences. The measure also incorporated several non-finance related provisions, including jail sentences for individuals who cover up the identities of terrorists and for those who recruit people to commit terrorist acts. The law was a significant step forward in suppressing those who plan, facilitate, finance, or commit terrorist acts, although it lacked some important provisions, such as assets forfeiture measures.

The Mexican Navy and Army continued to expand counterterrorism capabilities. The Mexican Navy improved control over ports of entry by deploying a newly constituted infantry force. The Navy was also looking to expand its still incomplete control over Mexico's vast maritime zone by better integrating radar, patrol craft, sea going vessels, air platforms, and land based platforms. If undertaken, such enhancements to Mexico's maritime air surveillance will allow the Navy to protect more effectively key national strategic facilities, including those related to oil production in the Bay of Campeche.

It remained difficult to assess the Mexican Army's counterterrorism capabilities due to the institution's closed nature. There have been improvements in U.S.-Mexico military-to-military cooperation in the past year, but the United States and Mexican armed forces had limited counterterrorism interoperability.

**Nicaragua**

PX203

In January, Daniel Ortega was inaugurated as the elected President of Nicaragua. Ortega reestablished formal diplomatic ties with Iran, which now has a resident, accredited Ambassador in the capital, and aggressively sought to expand relations with Cuba and Venezuela. In November, the government relaxed visa requirements for all travelers from Iran, permitting visa-free entry.  As a member of the Central American Four (CA4), with Guatemala, Honduras, and El Salvador, Nicaragua shared common immigration and customs policies with its CA4 partners. The Nicaraguan government's recent decision to grant visa-free entry for Iranians created consternation among the other CA4 members.

Nicaragua is the only Central American nation without a Financial Intelligence Unit. A counterterrorism bill, first proposed in 2004, remained moribund in the National Assembly. The new Penal Code, however, included language that specifically penalized terrorism financing and used an international definition of money laundering. The judicial system remained a vulnerability that could be exploited by international terrorist groups, because it was highly politicized, corrupt, and prone to manipulation by political elites and organized crime.

President Ortega has made several public statements supporting Iran's pursuit of nuclear weapons, including his September address to the UN General Assembly in New York. Ortega's statements questioned the authority of the UN, NATO, and other international actors to prevent any nation (namely Iran) from its ―right‖ to develop nuclear weapons.

**Panama**

The Panama Canal remained Panama's most important economic asset. An act of terrorism that would close off the Canal would severely affect the economies of Panama, the United States, and other countries that rely heavily on the Canal for commerce. The Panamanian government continued to review the structure of its Public Forces and conducted exercises to ensure its ability to protect the Canal and residents of Panama against a possible terrorist act.

Panama's highly developed commercial transport sector and shared border with Colombia made it a transshipment point for arms, drugs, and smuggling of illegal aliens. The Revolutionary Armed Forces of Colombia (FARC) continued to be active in Panama's Darien Province and although they committed no significant terrorist acts, Panama's Public Forces (PPF) closely monitored its activities. Panama created a dedicated border patrol force for both the Colombian and Costa Rican borders, and took the first steps toward creating a stand-alone border protection force with its own command and headquarters under direction of the Panamanian National Police (PNP).

Panama provided enhanced force protection for U.S. military vessels, including submarines, during "high value transits" of the Canal; U.S. officials praised Panama's level of support and security. The Ministry of Government and Justice used classroom training, tabletop exercises, and field visits to improve coordination among the PPF agencies. Panama was the sponsor and host of the annual PANAMAX exercise, a multinational civil and military forces training exercise tailored to the defense of the Panama Canal. The exercise replicated real world threats to the Canal in order to develop appropriate responses and guarantee safe passage through the

PX203

waterway. Seventeen nations, including the United States, participated. On the margins of PANAMAX, Panama, for the first time, hosted a tabletop exercise specifically designed to examine its ability to address asymmetric threats.

Panama worked closely with the U.S. Department of Homeland Security to sign a Container Security Initiative agreement and to launch its activities, beginning with two operational scanners at two ports. Panamanian Public Force Counterterrorism units continued to benefit from the second year of SOUTHCOM-funded training provided by Navy Special Warfare South personnel.

In February, Panama hosted the General Assembly of the Inter-American Committee Against Terrorism (CICTE) multilateral conference. Subsequently, Panama headed this committee, whose work focused primarily on infrastructure security.

Panama is an international offshore banking center. While the government has taken extensive measures to combat money laundering in the banking system, the Colon Free Trade Zone served as a vehicle for illicit finance. Panama's Foreign Ministry, Council for Public Security and National Defense, Financial Analysis Unit, and the Superintendent of Banks were fully cooperative in reviewing terrorism finance lists.

## Paraguay

Paraguay was very cooperative in counterterrorism and law enforcement efforts, but its judicial system was hampered by a lack of strong anti-money laundering and counterterrorism legislation. On December 20, Paraguay's Congress passed improved anti-money laundering legislation as part of a major overhaul of the penal code; this statute will improve Paraguay's ability to effectively obstruct and prosecute money laundering and terrorist financing, particularly in Ciudad del Este. Counterterrorism legislation, introduced but not passed, will be critical to keep Paraguay current with its international obligations. The Congress Legal Reform Commission was also working on a criminal procedural code reform bill that would facilitate prosecution of money laundering and terrorism and modernize Paraguay's criminal justice system.

Paraguay did not exercise effective immigration or customs controls at its borders. Efforts to address illicit activity occurring in the Tri-Border Area were uneven due to a lack of resources and, more principally, corruption within customs, the police, and the judicial sector. Despite expanded cooperation with other government entities and significant USG assistance over the past several years, Paraguay's Secretariat for the Prevention of Money Laundering (SEPRELAD) did not demonstrate the ability to monitor and detect money laundering in the first half of the year. However, with a change in leadership in August, SEPRELAD made significant progress. In November it secured approval of important insurance and credit union regulations, and paid a portion of its past dues to the Financial Action Task Force of Latin America (GAFISUD), preserving its membership in that organization. Paraguay still lacked terrorist finance legislation, however, and without it, the Egmont Group, which facilitates information exchange among Financial Intelligence Units, will likely suspend Paraguay.

PX203

Despite pending constitutional appeals, the tax evasion case against Kassem Hijazi, a suspected Hizballah money launderer connected to 113 businesses, is at the trial stage. In a judicially suspect move, Hijazi's case was separated from related charges against forty-three defendants. The court excluded key evidence and summarily absolved all forty-three defendants in August. An appellate court reduced the 2006 sentence of suspected terrorist fundraiser Hatim Ahmad Barakat from six to three years.

The United States assisted Paraguay with training for judges, prosecutors, and police in bulk cash smuggling, document fraud, terrorist financing; and investigating, preventing, and prosecuting individuals involved in money laundering. Under the Millennium Challenge Account Threshold Program[14], the U.S. assisted Paraguay with training for judges, prosecutors, and police in investigation techniques that are critical to money laundering and terrorist finance cases. In December, Paraguay was invited to submit a proposal for a second phase Threshold program.

**Peru**

Peru's topmost counterterrorism concern remained preventing the reemergence of Sendero Luminoso (SL or Shining Path), a designated Foreign Terrorist Organization that devastated the country in the 1980s and 1990s. In 2007, SL remnants engaged in narcotrafficking and killed 11 police officers, 20 civilians, and one member of the military. SL in the Upper Huallaga River Valley (UHV) suffered significant setbacks with the arrests of several of their key members. Meanwhile, the SL organization in the Apurimac and Ene River Valley (VRAE) retained its control over the area.

Although the Peruvian government nearly eliminated SL in the 1990s, the organization, now entwined with narcotics trafficking, reemerged and remained a threat. Estimated to include up to several hundred armed combatants, SL conducted 80 terrorist acts in remote coca-growing areas this year. The reemergent SL is shorter on revolutionary zeal than it was in the past, but reports suggested it was attempting to rebuild support in the university system, where it exercised considerable influence in the 1980s. Meanwhile, involvement in drug production and trafficking provided SL with substantial funding to conduct operations, improve relations with local communities in remote areas, and to recruit new members. While the government made significant progress against SL in the UHV, insufficient government presence and ineffective security capabilities in the more remote VRAE allowed the SL to operate practically unhindered.

For example, on June 14, a SL ambush near Tocache in the UHV resulted in the deaths of a local anti-drug prosecutor and the three police officers protecting him. Two other police officers were seriously injured in the attack. On December 24, an estimated 20 heavily armed persons attacked a PNP patrol, killing two officers and wounding one near the town of Huanta in the Ayacucho region. Over 70 anti-personnel mines caused one death and 22 injuries, mostly to eradication workers in illegal coca plantations in the San Martin region. Authorities suspected SL remnants in the UHV were responsible.

---

[14] Paraguay qualified in 2006 for participation in the $35 million Millennium Challenge Account Threshold Program to address corruption problems of impunity and economic informality.

PX203

The "Huallaga Police Front" counterterrorism campaign in the UHV, initiated by then-President Toledo in 2006, was largely inactive. Implementation of the Garcia government's "Plan VRAE," which called for 2,000 troops and 19 counterterrorism bases operated under a central command, was slow because of the lack of an operational security plan. Plans for new health, education, and infrastructure investment in isolated communities where the state lacks presence were implemented spottily, if at all. The government's efforts to strengthen prosecutorial capacity and to improve interagency cooperation, especially in intelligence, were marginally successful. Police units specializing in counterterrorism and counternarcotics conducted some joint operations with the Peruvian Army in the Upper Huallaga Valley. There was no movement on President Garcia's 2006 proposal calling for the death penalty for those convicted of acts of terrorism.

President Garcia repeatedly reauthorized a 60-day state of emergency in parts of Peru's five departments where SL operated, which suspended some civil liberties and gave the armed forces additional authority to maintain public order.

In August, two Huallaga Front (PNP/Peruvian Army) operations captured 28 SL suspects, including two believed to be bodyguards of UHV SL Committee head ―Artemio". Also apprehended were a number of suspected participants in the June ambush near Tocache that killed a prosecutor and three police.

During a November 27 PNP operation, Epifanio Espiritu Acosta, known as "Comrade JL," third in the UHV organization and leader of its forces on the western side of the Huallaga River, was killed. Eight suspects were captured including the organization's ideological chief, "Comrade Julian," as well as the head of personal security for the group's leader. UHV-SL leader "Comrade Artemio," is a top priority target of continuing PNP security operations.

Media and other sources continued to report that former SL members released from prison were rejoining leftist civic groups and political movements, and perhaps recruiting new members into the organization. SL founder and leader Abimael Guzman and key accomplices remained in prison facing charges stemming from crimes committed during the 1980s and 1990s.

The Revolutionary Armed Forces of Colombia (FARC) continued to use remote areas along the Colombian/Peruvian border for rest and to make arms purchases. There were reports that the FARC was funding coca cultivation and cocaine production among the Peruvian population in border areas.

**Suriname**

Suriname's lead agency for counterterrorism was the Central Intelligence and Security Agency (CIVD). The Ministry of Justice and Police (MOJP) had a police Anti-Terrorist Unit (ATU) and a 70-person ―Arrest Team" (A-Team). At the end of the year, the Council of Ministers approved a new counterterrorism law that defined terrorism as a crime, and provided a framework for more effectively combating terrorism and the financing of terrorism. This legislation should bring Surinamese law in line with various international treaties dealing with terrorism and could help pave the way for Surinamese membership in the Egmont Group. The draft law will be presented

PX203

to the State Council and the President for their approval, after which it will be presented to the National Assembly. A criminal procedure law is expected to be approved by the Council of Ministers, which will provide the implementing legislation for the new counterterrorism law, as well as special investigative tools to assist law enforcement authorities in detecting and investigating terrorist activities.

Suriname began issuing Caribbean Community (CARICOM)-compliant machine-readable passports in 2004, yet there were still numerous valid old passports in circulation, which could easily be tampered with in order to assume a false identity to travel across borders. An unknown number of blank old-style passports remained unaccounted for. The United States provided watch lists of known terrorists to Surinamese police, but if any terrorists were present, the likelihood of apprehending them would be low because of the lack of border and immigration control by police and other Surinamese government officials, and because Suriname has no system for registering and monitoring visitors. According to police sources, the Revolutionary Armed Forces of Colombia (FARC) has conducted arms-for-drugs operations with criminal organizations in Suriname. In December, the Minister of Justice and Police told the media that his Ministry had received information that international criminal organizations were planning attacks in Suriname. According to the Minister, there were arrests over a two-week period late in the year, and investigations had pointed to involvement of the FARC and unspecified African crime organizations. As of late December, no further information was available on those allegations and no attacks had occurred.

**Trinidad and Tobago**

In May, the U.S. Federal Bureau of Investigation (FBI) uncovered a plot by two Guyanese, one Trinidadian, and one U.S. citizen to destroy a fuel pipeline at New York's JFK airport. The Government of Trinidad and Tobago supported the FBI effort to locate and detain those involved in the plot. Of the four suspects, three were arrested in Trinidad, where they remained in custody awaiting a judicial decision on their extradition to the United States

Imam Yasin Abu Bakr of Jamaat al Muslimeen (JAM) became the first person to be prosecuted under the 2005 Anti-Terrorism Act after delivering a seditious sermon in late 2005. Abu Bakr has a loyal following that was consumed with issues related to Trinidad and Tobago. His rhetoric has yet to become an international threat. His current trial continued to be delayed based on claims that Bakr would not receive a fair trial because of the publicity that still surrounded the JAM's 1990 attempted coup.

In February, Trinidad and Tobago implemented the Advance Passenger Information System (APIS) in preparation for the 2007 Cricket World Cup. Under the system, regional and international aircraft and vessels must submit Advance Passenger Information prior to arrival in and upon departure from any of the ten Member States. The system utilized a number of watch lists, including INTERPOL's Stolen and Lost Travel Documents (SLTD) database, to check every passenger arriving in the region or traveling throughout the region by air or by sea.

Recognizing Trinidad and Tobago's role as the United States' largest supplier of liquefied natural gas and as guarantor of energy security in the Caribbean region, the U.S. Department of Energy and the U.S. Department of Homeland Security provided the government with technical

PX203

assistance to conduct a vulnerability assessment of critical infrastructure in its energy sector under the umbrella of the Inter-American Committee against Terrorism (OAS/CICTE). In October and December, following preparatory meetings between officials of these agencies and participants in Trinidad and Tobago's public/private Energy Sector Security Initiative, a team of USG experts carried out an assessment and prepared a report for the government with recommendations on how best to improve and prioritize critical infrastructure protection efforts.

**Uruguay**

The level of cooperation and intelligence sharing on counterterrorism related issues greatly improved in 2007, especially at the working level where officers in law enforcement and security services recognized the importance of conducting proactive investigations, sharing intelligence with the United States, and working cooperatively with its regional partners. The Government of Uruguay generally cooperated with the United States and international institutions on counterterrorism efforts, but has not devoted great resources to the effort. Uruguayan banking and law enforcement agencies professed to search for financial assets, individuals, and groups with links to terrorism, but discovered neither terrorist assets in Uruguayan financial institutions nor terrorist operatives in Uruguay.

While Uruguay supported the fight against international terrorism in principle, it has been hesitant for many years to permit joint military training on its soil. Part of the reluctance to engage in robust security cooperation can be explained by the painful experiences endured during a thirteen-year period of military dictatorship when security forces ruthlessly conducted a campaign against violent insurgents. Instead, the Government of Uruguay focused its participation on efforts to promote global security through collective action within multinational organizations such as the UN and OAS.

Uruguay provided the greatest number of UN peacekeepers, in per capita terms, of any UN member state. Although these efforts are not specifically focused on counterterrorism, Uruguay believed that using its diplomatic and military resources to fight global instability served to address the conditions that terrorists exploit, such as political, economic, and social instability.

Uruguay is a member of the MERCOSUR Permanent Working Group on Terrorism, together with Argentina, Brazil, Chile, Paraguay, and Bolivia. The group facilitated cooperation and information sharing among countries combating terrorism. The focus was expanding from the Tri-border region of Argentina, Paraguay, and Brazil, to include the Uruguayan-Brazilian border, although with limited tangible results. Uruguay was also active in a range of international counterterrorism efforts, particularly in the Rio Group and the OAS.

**Venezuela**

In May 2007, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended (the "Act"). Pursuant to this certification, defense articles and services may not be sold or licensed for export to Venezuela from October 1, 2007 to September 30, 2008.  This certification will lapse unless it is renewed by the Secretary of State by May 15, 2008.

PX203

President Hugo Chavez persisted in his public criticism of U.S. counterterrorism efforts and deepened Venezuelan relationships with state sponsors of terrorism Iran and Cuba. Chavez's ideological sympathy for the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), along with high levels of corruption among Venezuelan officials, limited Venezuelan cooperation with Colombia in combating terrorism. FARC and ELN units regularly crossed into Venezuelan territory to rest and regroup.

It remained unclear to what extent the Venezuelan government provided support to Colombian terrorist organizations. However, limited amounts of weapons and ammunition, some from official Venezuelan stocks and facilities, have turned up in the hands of Colombian terrorist organizations. The Venezuelan government did not systematically police the 1,400-mile Venezuelan-Colombian border to prevent the movement of groups of armed terrorists or to interdict arms or the flow of narcotics.

In another case, the trial began on February 22 for two self-proclaimed Islamic extremists that were arrested in October 2006 for placing a pair of pipe bombs outside the American Embassy in Caracas. At year's end, the Venezuelan government continued to prosecute both persons, and they remained in police custody.
.
In March, Iran and Venezuela began weekly Iran Airlines flights connecting Tehran and Damascus with Caracas. Passengers on these flights were not subject to immigration and customs controls at Simon Bolivar International Airport. On June 1, one of the JFK Airport bombing subjects, Abdul Kadir, was arrested at the airport in Port of Spain, Trinidad, on board a flight destined for Caracas, Venezuela. He had an onward ticket to Tehran. Venezuelan citizenship, identity, and travel documents remained easy to obtain, making Venezuela a potentially attractive way station for terrorists. International authorities remained suspicious of the integrity of Venezuelan documents and their issuance process.

PX203

# Chapter 3
## State Sponsors of Terrorism

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have greater difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. More worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

## STATE SPONSOR: IMPLICATIONS

Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   - Requiring the United States to oppose loans by the World Bank and other international financial institutions;
   - Exception from the jurisdictional immunity in U.S. courts of state sponsor countries, and all former state sponsor countries (with the exception of Iraq), with respect to claims for money damages for personal injury or death caused by certain acts of terrorism, torture, or extrajudicial killing, or the provision of material support or resources for such acts;
   - Denying companies and individuals tax credits for income earned in terrorist-list countries;
   - Denial of duty-free treatment of goods exported to the United States;
   - Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
   - Prohibition of Defense Department contracts above $100,000 with companies in which a state sponsor government owns or controls a significant interest.

PX203

## CUBA

The Government of Cuba remained opposed to U.S. counterterrorism policy, and actively and publicly condemned many associated U.S. policies and actions. To U.S. knowledge, the Cuban government did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 Against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank. No new counterterrorism laws were enacted, nor were any executive orders or regulations issued in this regard. The Government of Cuba provided safe haven to members of ETA, the FARC, and the ELN.  It maintained close relationships with other state sponsors of terrorism such as Iran and Syria.

The Cuban government continued to permit more than 70 U.S. fugitives to live legally in Cuba and refused almost all U.S. requests for their return. These U.S. fugitives include convicted murderers (two of them killed police officers) as well as numerous hijackers, most of whom entered Cuba in the 1970s. The government returned one American citizen fugitive when that person sailed his boat into Cuban waters and it was determined that he was wanted on fraud charges in the state of Utah. The Cuban government stated in 2006 that it would no longer provide safe haven to new U.S. fugitives entering Cuba.

The Cuban government did not extradite suspected terrorists during the year.

## IRAN

Iran remained the most active state sponsor of terrorism. Elements of its Islamic Revolutionary Guard Corps (IRGC) were directly involved in the planning and support of terrorist acts throughout the region and continued to support a variety of groups in their use of terrorism to advance their common regional goals. Iran provides aid to Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan.

Iran remains a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups, such as HAMAS and Hizballah, and its efforts to undercut the democratic process in Lebanon, where it seeks to build Iran's and Hizballah's influence to the detriment of other Lebanese communities.

Iran is a principal supporter of groups that are implacably opposed to the Middle East Peace Process, and continues to maintain a high-profile role in encouraging anti-Israel terrorist activity – rhetorically, operationally, and financially. Supreme Leader Khamenei and President Ahmadinejad praised Palestinian terrorist operations, and Iran provided Lebanese Hizballah and Palestinian terrorist groups, notably HAMAS, Palestinian Islamic Jihad, the al-Aqsa Martyrs Brigades, and the Popular Front for the Liberation of Palestine-General Command, with extensive funding, training, and weapons.

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups

PX203

that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hizballah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a ―train-the-trainer‖ program. In addition, the Qods Force and Hizballah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hizballah operative in Iraq in 2007.

Iran‗s IRGC-Qods Force continued to provide weapons and financial aid to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since 2006, Iran has arranged a number of shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives, possibly including man-portable air defense systems (MANPADs), to the Taliban.

Iran remained unwilling to bring to justice senior al-Qa‗ida (AQ) members it has detained, and has refused to publicly identify those senior members in its custody. Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some AQ members who fled to Iran following the fall of the Taliban regime in Afghanistan.

## NORTH KOREA

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. The DPRK continued to harbor four Japanese Red Army members who participated in a jet hijacking in 1970. The Japanese government continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities; five such abductees have been repatriated to Japan since 2002. As part of the Six-Party Talks process, the United States reaffirmed its intent to fulfill its commitments regarding the removal of the designation of the DPRK as a state sponsor of terrorism in parallel with the DPRK‗s actions on denuclearization and in accordance with criteria set forth in U.S. law.

## SUDAN

During the past year, the Sudanese government continued to cooperate in the War on Terror, pursuing terrorist operations directly involving threats to U.S. interests and personnel in Sudan. While the U.S.-Sudanese counterterrorism relationship remained solid, hard-line Sudanese officials continued to express resentment and distrust over actions by the USG and questioned the benefits of continued cooperation. Their assessment reflected disappointment that Sudan‗s

PX203

counterterrorism cooperation has not warranted rescission of its designation as a state sponsor of terrorism.

AQ-inspired terrorist elements, elements of Palestinian Islamic Jihad (PIJ), HAMAS, and the Lord's Resistance Army (LRA), remained in Sudan. In light of the ongoing hybrid United Nations-African Union deployment to Darfur, various terrorist threats against these forces emerged, and AQ leadership has called for jihad against UN forces in Darfur. Further, Sudanese authorities uncovered and largely dismantled a large-scale terrorist organization targeting western interests in Khartoum in summer and fall of the year. The terrorist threat level remained high in Khartoum and Darfur, and potentially other parts of Sudan.

With the exception of HAMAS, the Sudanese government does not appear to openly support the presence of terrorist groups in Sudan. The Sudanese government has taken steps to limit the activities of these organizations. As an example, Sudanese officials have welcomed HAMAS members as representatives of the Palestinian Authority (PA), but have limited their activities to fundraising. The Sudanese government has also worked hard to disrupt foreign fighters from using Sudan as a logistics base and transit point for extremists going to Iraq.

The LRA, led by Joseph Kony, continued to operate from its base in the Democratic Republic of the Congo (DRC) and threatened the tri-border area (DRC, Sudan, and Uganda). The Government of Southern Sudan worked to mediate peace between the LRA and neighboring countries and has vowed to eliminate the presence of the LRA as an organization in Southern Sudan. The Sudanese People's Liberation Army made some progress in containing LRA activity. Negotiations between the LRA and the Ugandan People's Defense Forces (UPDF) continued, with occasional interruptions in Juba under the mediation of the Government of Southern Sudan.

## SYRIA

Since Syria's 1979 designation as a state sponsor of terrorism, it has continued to provide political support to Palestinian terrorist groups. Syria has also continued to provide political and material support to Hizballah since that group's creation. HAMAS, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, all have offices in Damascus and operate within Syria's borders. The Syrian government insisted that the Damascus-based groups are confined to political and informational activities, but Palestinian groups with leaders in Syria have claimed responsibility for anti-Israeli terrorist attacks.

As in 2006, President Bashar al-Asad expressed public support for Palestinian terrorist groups. HAMAS Politburo head Khalid Mishal and his deputies continued to reside in Syria, and the Syrian government provided security escorts for their motorcades. Additionally, Mishal led Friday prayers at various mosques throughout Syria and gave several public speeches expressing gratitude for Syria's support.

The regime in Damascus continued to undermine Lebanon's sovereignty and security through its proxies. Although Syrian officials publicly condemned some acts of international terrorism,

174

PX203

including bombing attacks that killed Lebanese government officials, it made a distinction between what it considered to be legitimate armed resistance by Palestinians in the occupied territories.

The Syrian government has not been implicated directly in an act of terrorism since 1986, although an ongoing UN investigation into the February 2005 assassination of former Lebanese Prime Minister Rafiq Hariri continued to examine Syrian involvement. The Syrian regime, Hizballah, and pro-Syrian opposition elements in Lebanon have attempted to stymie international efforts to bring to justice those responsible for the Hariri assassination, as well as efforts to disarm militia groups that constitute a challenge to Lebanese security and sovereignty.

Separately, four Syrian members of Fatah al-Islam were arrested in connection with the February 13 Ain Alaq bus bombings in Lebanon. In March, Syrian Interior Minister, Major General Bassam Abdul Majeed, spoke publicly on the matter and rejected suggestions that the Syrian regime was involved in the attack. Syrian-linked groups were involved in several attacks outside of the country in 2007, including a rocket-propelled grenade attack in Lebanon. Lebanese authorities also blame Syria for complicity in a September improvised explosive device (IED) attack that killed a member of the Lebanese parliament.

Syria continued to strengthen its ties with Iran, another state sponsor of terrorism.  Iranian President Ahmadinejad, accompanied by the Iranian Defense Minister and the Iranian Army Chief of Staff, met with Syrian President al-Asad and other senior Syrian officials in July. During this visit, Ahmadinejad also met with Palestinian terrorist groups, including two separate meetings with the leaders of HAMAS and PIJ and a collective meeting with leaders of PFLP, PFLP-GC, Democratic Front for the Liberation of Palestine (DFLP), and Fatah al-Intifada. Additionally, local media reported that Hizballah leader Nasrallah met with Ahmadinejad at the Iranian Embassy in Damascus. Syria and Iran worked successfully to rearm Hizballah after the July-August 2006 conflict between Hizballah and Israel.

Although the Syrian government suspended intelligence cooperation with the United States and several foreign governments in 2004, Damascus has taken some action against AQ-linked groups and individuals in 2007. Additionally, the Syrian government worked to increase security cooperation with Iraq. In July, Syria hosted a meeting of technical border security experts representing Iraq's neighbors, the United States, and other countries. Syria also participated in two ministerial-level Iraq Neighbors' Conferences in May and November, in Sharm el-Sheikh, Egypt, and Istanbul, respectively. In August, Syria hosted Iraqi Prime Minister Maliki and signed several security-related agreements. According to U.S. and Iraqi officials, 2007 witnessed a marked reduction in the flow of foreign terrorists transiting through Syria into Iraq.

Despite acknowledged reductions in foreign fighter flows, the scope of the problem remained large. According to the December "Measuring Stability and Security in Iraq" report to Congress, nearly 90 percent of all foreign terrorists known to be in Iraq had used Syria as an entry point. The Syrian government could do more to stop known terror networks and foreign fighter facilitators from operating within its borders. Separately, the Syrian government has cracked down on pro-Kongra-Gel/Kurdistan Worker's Party (KGK/PKK) sympathizers in northeastern

PX203

Syria, and President al-Asad expressed his public support of Turkish military action against KGK/PKK militants operating in southern Turkey and northern Iraq.

The Syrian government refused to implement mandatory visa requirements for citizens of Arab countries.

Syria remained a source of concern regarding terrorist financing. The Commercial Bank of Syria remained subject to U.S. sanctions. Industry experts reported that 70 percent of all business transactions were conducted in cash and only eight percent of all Syrians used formal banking services.

PX203

## Chapter 4
## The Global Challenge of WMD Terrorism

| INTRODUCTION |
| --- |

The nexus of weapons of mass destruction (WMD) and terrorism poses one of the gravest potential risks to the national security of the United States and its global partners. A successful major WMD terrorist attack could result in mass casualty events and produce far-reaching economic and political consequences that would affect all members of the international community. This chapter outlines:

- The key elements of the United States' National Strategy for Combating WMD Terrorism;

- The various types of materials terrorists may use in a WMD attack;

- The potential that resources of a state could be directed or diverted to facilitate WMD terrorism;

- The emerging WMD terrorism threat presented by non-state facilitators; and

- Transformational U.S. partnerships to combat this growing global risk.

The United States places the highest priority on working with a broad range of national governments, international organizations, local governments, and private sector organizations, to develop effective partnerships to confront the global challenge of WMD terrorism.

| DIPLOMATIC AND STRATEGIC PRIORITIES FOR COMBATING WMD TERRORISM |
| --- |

U.S. diplomatic priorities for combating WMD terrorism build on the comprehensive approach set forth in the U.S. National Strategy for Combating WMD Terrorism. Specifically, our strategic approach hinges on the six objectives outlined in the National Strategy. We work across all objectives simultaneously to maximize our ability to eliminate the threat.

- **Determine terrorists' intentions, capabilities, and plans to develop or acquire WMD.** We need to understand and assess the credibility of threat reporting and provide technical assessments of terrorists' WMD capabilities.

- **Deny terrorists access to the materials, expertise, and other enabling capabilities required to develop WMD,** with a particular focus on weapons-usable fissile materials, dangerous pathogens, and poisonous chemicals; as well as methods of transport, sources of funds, and other capabilities that facilitate the execution of a WMD attack. In addition to building upon existing initiatives to secure materials, we are developing innovative

PX203

approaches that blend classic counterproliferation, nonproliferation, and counterterrorism efforts.

- **Deter terrorists from employing WMD.** A new deterrence calculus combines the need to deter terrorists, facilitators, and supporters from contemplating a WMD attack and, failing that, would need to dissuade them from actually conducting an attack. Traditional threats may not work because terrorists generally show a wanton disregard for the lives of innocents and, in some cases, for their own lives. We require a range of deterrence strategies that are tailored to the various WMD threats and the individual actors who facilitate or enable those threats. We will employ diplomatic strategies that seek to address extremism and defuse volatile conditions to discourage consideration of WMD as an appropriate tool to address perceived injustices.

- **Detect and disrupt terrorists' attempted movement of WMD-related materials, weapons, and personnel.** We will seek to expand our global capability for detecting illicit materials, weapons, and personnel transiting abroad. We will use our global partnerships, international agreements, and ongoing border security and interdiction efforts. We also will continue to work with countries to enact and enforce strict penalties for WMD trafficking and other suspect WMD-related activities.

- **Prevent and respond to a WMD-related terrorist attack.** Once the possibility of a WMD attack has been detected, we will seek to contain, interdict, and eliminate the threat. We will continue to develop requisite capabilities to eliminate the possibility of a WMD operation and to prevent a possible follow-on attack. We will prepare ourselves for possible WMD incidents by developing capabilities to manage the range of consequences that may result from such an attack.

- **Define the nature and source of a terrorist-employed WMD device.** Should a WMD terrorist attack occur, the rapid identification of the source and perpetrator of an attack would facilitate our response efforts and may be critical in disrupting follow-on attacks. We will maintain and improve our capability to determine responsibility for the intended or actual use of WMD via accurate attribution, using the rapid fusion of technical forensic data with intelligence and law enforcement information.

As we move forward in the implementation of our diplomatic strategic priorities for combating WMD terrorism, we will take special care to work closely with the full range of foreign partners to prioritize and to tailor our capacity-building approaches to the regional and local conditions we face across the world.

## THE MATERIAL THREATS

There are four generally accepted categories of weapons of mass destruction that terrorists may seek to acquire and use in a WMD terrorist attack: nuclear, radiological, biological, and chemical.

**Nuclear**

PX203

Some terrorist organizations, such as al-Qaʻida (AQ), have openly stated their desire to acquire and use nuclear weapons. The diffusion of scientific and technical information regarding the assembly of nuclear weapons, some of which is now available on the Internet, has increased the risk that a terrorist organization in possession of sufficient fissile material could develop its own crude nuclear weapon. The complete production of a nuclear weapon strongly depends on the terrorist group's access to fissile material and scientific expertise. Terrorists may, however, seek to link up with a variety of facilitators to develop their own nuclear capability. These facilitators include black market proliferators or transnational criminal networks that may seek to profit from the sale of nuclear material, a weaponized device, or technical knowledge gathered from nuclear experts involved in a national nuclear program.

**Radiological**

Some terrorists seek to acquire radioactive materials for use in a radiological dispersal device (RDD) or "dirty bomb." Most radioactive materials lack sufficient strength to present a significant public health risk once dispersed, and the materials posing the greatest hazard would require terrorists to have the expertise to handle them without getting radiation sickness and possibly dying or being detected. Public panic and economic disruption caused by setting off a radiological dispersal device, however, could be substantial, even if a weak radioactive source is used. Radioactive materials are used widely in industrial, medical, and research applications and include devices used for power supply in remote locations, cancer therapy, food and blood irradiation, and radiography. Their widespread use in nearly every country makes radioactive materials much more accessible than fissile material.

**Biological**

Bioterrorism, another deadly threat, is the deliberate dispersal of pathogens through food, air, water, or living organisms to cause disease and, potentially more devastating, trigger alarm in a population. If properly produced and released, biological agents can kill on a massive scale and, if terrorists use a pathogen that can be transmitted from person to person, the disease can quickly spread across oceans and continents through air travel before authorities realize their nations have been attacked.

Developing a bioterrorism capability presents some scientific and operational challenges. However, the required scientific capabilities are not beyond the expertise of motivated biologists with basic university-level training. And, unlike other types of WMD, the materials required to produce a weapon are widely available – some are even found in nature. Even a badly-designed weapon resulting in limited health impact can cause significant uncertainty. Even though a small-scale bioterrorism attack, such as the 2001 anthrax attacks in the United States, can produce a relatively small number of cases of the disease, the costs of decontamination, medical treatment for the ―worried well,‖ decreased commercial activity, social distress, and lost productivity can be considerable. The terrorists can often meet their objective of creating disruption and fear without large numbers of casualties.

PX203

Among present-day terrorist organizations, AQ is believed to have made the greatest effort to acquire and develop a bioterrorism program. U.S. forces discovered a partially built biological weapons laboratory near Kandahar after expelling the Taliban from Afghanistan. Although it was not conclusive that AQ succeeded in obtaining a biological weapon, the discovery demonstrated a concerted effort to acquire a biological weapons capability.

**Chemical**

Chemical weapons represent another highly dangerous potential tool in the hands of terrorists. Effectively dispersed and in sufficient dosages, chemical agents could cause mass casualties as demonstrated by the use of chemical weapons during World War I. Today's terrorist threat ranges from the potential acquisition and use of militarized chemical weapons and delivery systems, to the production and use of improvised chemical agents and dissemination systems like the 1995 attack conducted by Aum Shinrikyo in the Tokyo subway system.  Perpetrators of that attack employed an improvised nerve agent (sarin) with plastic bottles taped together, and the pointed end of an umbrella to puncture the containers, which caused mixing and dissemination of the materials. More recently, terrorists have concentrated on acquiring and employing chemical materials with dual uses, such as pesticides, poisons, and industrial chemicals, in their operations (*see below*). The growth and sophistication of the worldwide chemical industry, including the development of complex synthetic and dual-use materials, may make the task of preventing and protecting against this threat more difficult. Preventing chemical terrorism is particularly challenging as terrorists can, with relative ease, use commercial industrial toxins, pesticides, and other commonly available chemical agents and materials as low-cost alternatives to militarized weapons and delivery systems, though likely with more limited effects.

**Dual-Use Materials, Equipment, Research, and Technologies of Concern**

Reducing the risk of terrorist acquisition of, access to, and use of dual-use materials, equipment, research, and technologies also remains a critical challenge. Terrorists have shown an interest in developing improvised devices leveraging such capabilities, and the diffusion of information on the Internet regarding dual-use research has compounded this challenge. Recent attacks in Iraq involving improvised devices containing chlorine, a dual-use chemical used in water treatment facilities, offer a notable example. Effective partnerships with private sector organizations, industry, academia, and the scientific research community, as well as with local governments, will play an important role in mitigating the risk of dual-use capabilities falling into the wrong hands.

## STATE SPONSORSHIP OF TERRORISM: A KEY CONCERN

A state that directs WMD resources to terrorists, or one from which enabling resources are clandestinely diverted, may pose a potentially grave WMD terrorism threat. Although terrorist organizations will continue to seek a WMD capability independent of state programs, the sophisticated WMD knowledge and resources of a state could enable a terrorist capability. State sponsors of terrorism and all nations that fail to live up to their international counterterrorism and nonproliferation obligations deserve greater scrutiny as potential facilitators of WMD terrorism.

PX203

## NON-STATE FACILITATORS: AN EMERGING THREAT

State sponsors of terrorism represent just one facet of the overall risk of WMD terrorism. Non-state facilitators have emerged as a growing WMD proliferation threat in recent years, and could eventually provide terrorists with conduits to materials and expertise that are particularly hard to acquire. In 2003, the United States and its international partners succeeded in interdicting a shipment of WMD-related material destined for Libya's then-active nuclear weapons program. As facts emerged regarding this shipment and its origin, the United States gained insight into an emerging WMD terrorism risk. Pakistani nuclear scientist A.Q. Khan had developed a transnational nuclear proliferation network reaching from Southeast Asia to Europe, and was making available sensitive technology and WMD-related materials to nations willing to pay.

The dismantling of the A.Q. Khan network revealed an uncomfortable truth about globalization. The very trends driving globalization, improved communications and transportation links, can enable development of extended proliferation networks that may facilitate terrorist acquisition of WMD. Globalization requires that partner nations work together closely to prevent, detect, and disrupt linkages that may develop between terrorists and facilitators such as A.Q. Khan.

## TRANSFORMATIONAL PARTNERSHIPS TO COMBAT WMD TERRORISM

Since September 11, 2001, the international community has made significant strides in responding to the threat of WMD terrorism. States are working together bilaterally and multilaterally to address these threats and protect their populations. The United States has taken concrete measures to build a layered defense against the WMD terrorism threat. In 2003, the United States announced the first National Strategy to Combat Weapons of Mass Destruction. Through a variety of multinational initiatives such as the Global Partnership against the Spread of Weapons of Mass Destruction, the Global Threat Reduction Initiative, the Proliferation Security Initiative, and the Global Initiative to Combat Nuclear Terrorism, the United States has taken a leadership role in reducing the threat of WMD in the hands of non-state actors and terrorists.

**The Proliferation Security Initiative.**  Announced by President Bush in 2003, the Proliferation Security Initiative (PSI) deserves special mention as a particularly well received and effective international initiative. The PSI is a global effort that aims to stop the trafficking of WMD, WMD delivery systems, and related materials to and from states and non-state actors of proliferation concern worldwide. States that wish to join the PSI are asked to endorse its Statement of Interdiction Principles, which identifies specific measures participants intend to undertake for the interdiction of WMD and related materials. As of December 31, 2007, 86 states have endorsed the statement. PSI participants also conduct exercises to improve their operational capabilities to conduct interdictions and meet periodically to share information and develop new operational concepts. The PSI has led to a number of important interdictions over the last five years and is an important tool in the overall U.S. strategy to combat WMD terrorism.

**The Global Initiative to Combat Nuclear Terrorism.**  President Bush and Russian Federation President Putin announced the Global Initiative to Combat Nuclear Terrorism on July 15, 2006, to expand and accelerate the development of partnership capacity against one of the most serious

PX203

threats to international security. The Global Initiative offers a comprehensive approach to strengthening all defensive layers necessary to prevent, protect against, and respond comprehensively to the nuclear terrorist threat.

By agreeing to the Global Initiative's Statement of Principles, partner nations commit themselves to:

- Develop, if necessary, and improve accounting, control, and physical protection systems for nuclear and other radioactive materials and substances;

- Enhance security of civilian nuclear facilities;

- Improve the ability to detect nuclear and other radioactive materials and substances in order to prevent illicit trafficking in such materials and substances, to include cooperation in the research and development of national detection capabilities that would be interoperable;

- Improve capabilities of participants to search for, confiscate, and establish safe control over unlawfully held nuclear or other radioactive materials and substances or devices using them;

- Prevent the provision of safe haven and financial or economic resources to terrorists seeking to acquire or use nuclear and other radioactive materials and substances;

- Ensure respective national legal and regulatory frameworks, which are sufficient to provide for the implementation of appropriate criminal and, if applicable, civil liability for terrorists and those who facilitate acts of nuclear terrorism;

- Improve capabilities of participants for response, mitigation, and investigation in cases of terrorist attacks involving the use of nuclear and other radioactive materials and substances, including the development of technical means to identify nuclear and other radioactive materials and substances that are, or may be, involved in the incident; and

- Promote information sharing pertaining to the suppression of acts of nuclear terrorism and their facilitation, taking appropriate measures consistent with their national laws and international obligations to protect the confidentiality of any information which they exchange in confidence.

In the beginning of 2007, the partnership consisted of 13 nations; by December 31, the partnership had grown to 66 partner nations representing all regions of the world. The IAEA and the EU also participated as observers. Partner nations created a Plan of Work, committing themselves to host or co-sponsor events in furtherance of the goals in the Statement of Principles. In 2007, seven countries conducted nine Plan of Work activities implementing all eight of the Principles. The Global Initiative also engaged the private sector and local governments, both of which have an important role to play in preventing, protecting against, and responding to acts of nuclear terrorism.

PX203

**The Global Threat Reduction Initiative (GTRI).**  The goal of GTRI, announced by the United States on May 26, 2004, in Vienna, Austria, is to identify, secure, remove, or facilitate the disposition, as quickly and expeditiously as possible, of vulnerable nuclear and radioactive materials and equipment around the world that pose a potential threat to the international community. International partners are key participants in this initiative, and GTRI has undertaken cooperative activities in over 90 countries. In particular, GTRI seeks to facilitate globally the reduction or elimination of the use of highly enriched uranium in civilian nuclear applications and to remove or protect other vulnerable nuclear and radiological materials at civilian sites worldwide. Specific activities include the conversion of reactors used for research, testing, and medical-isotope production from the use of highly enriched uranium (HEU) fuel to low enriched (LEU); repatriation of fresh and spent HEU fuel to its country of origin (the United States or Russian Federation); enhancing the physical protection at sites utilizing such materials; and removal of unwanted radiological sources and other nuclear materials not otherwise covered by the fuel-return programs.

**Additional U.S. Efforts Supporting a Global Layered Defense.**  The United States has also worked with partner nations through the UN and the IAEA to reduce the threat of WMD in the hands of terrorists. The UN Security Council has passed two important resolutions related to the prevention of terrorism and the proliferation of WMD. In 2001, the Security Council adopted Resolution 1373, which requires all UN member states to refrain from providing any support, active or passive, to terrorists, and to work together to limit terrorist movement and safe haven. In 2004, the Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery. The United States remains committed to full implementation of both UN Security Council Resolutions 1373 and 1540.

The Convention on the Suppression of Acts of Nuclear Terrorism (Nuclear Terrorism Convention) entered into force on July 7, 2007. The USG submitted the Nuclear Terrorism Convention to the Senate for advice and consent to ratification in 2007, along with three other multilateral counterterrorism instruments: the Amendment to the Convention on the Physical Protection of Nuclear Material, the Protocol of 2005 to the Convention on the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, and the Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf. Collectively, these treaties will enhance international cooperation with regard to the prevention of WMD terrorism and proliferation of WMD, as well as the investigation and prosecution of such acts.

**Conclusion.**  The potential threat of terrorists acquiring and using WMD poses one of the greatest security challenges facing the United States and our international partners today. During the past year, the USG has built on a range of activities and launched new efforts to prevent, protect against, and respond to the threat or use of WMD. Together with partner nations and international organizations, the United States will continue to take the initiative to reduce the global risk of WMD terrorism.

PX203

# Chapter 5
# Terrorist Safe Havens (7120 Report)

**Update of Information Originally Reported Under Section 7120(b) of the Intelligence Reform and Terrorist Prevention Act of 2004**

Title 22 of the United States Code, Section 2656f(b), requires that this report include "an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act" (also known as the Intelligence Reform and Terrorist Prevention Act of 2004, or ─IRTPA"). Section 7120(b) of IRTPA includes certain reporting requirements relating to terrorist "sanctuaries," which are included in the present chapter. Since the term "sanctuary" is commonly associated with places of worship, we have, for greater clarity and for consistency with the terminology used elsewhere in *Country Reports on Terrorism*, referred instead here to terrorist "safe havens." We interpret terrorist "safe haven" to have the same meaning as terrorist "sanctuary" for the purposes of Section 7120(b).

The 7120 report includes:
1. Terrorist Safe Havens: Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
2. Support for Pakistan
3. Collaboration with Saudi Arabia
4. Struggle of Ideas in the Islamic World
5. Outreach through the Broadcast Media
6. Visas for Participants in USG Programs
7. Basic Education in Muslim Countries
8. Economic Reform

## 5.1. Terrorist Safe Havens

Terrorist safe havens are defined in this report as ungoverned, under-governed, or ill-governed areas of a country and non-physical areas where terrorists that constitute a threat to U.S. national security interests are able to organize, plan, raise funds, communicate, recruit, train, and operate in relative security because of inadequate governance capacity, political will, or both. Physical safe havens provide security for terrorist leaders, allowing them to plan acts of terrorism around the world.

Global communications and financial systems, especially those created by electronic infrastructure such as the Internet, global media, and unregulated economic activity, further allow terrorists to carry out activities, particularly the dissemination of propaganda and misinformation, without the need for a physical safe haven. These "virtual" havens are highly mobile, difficult to track, and difficult to control, and are not based in any particular state. This part of the report, however, will not address virtual safe havens, focusing instead on physical safe havens.

**AFRICA**

PX203

**Somalia.**  A small number of al-Qaʻida (AQ) operatives remain in East Africa, particularly Somalia, where they pose a serious threat to U.S. and allied interests in the region. Although these elements have been severely disrupted as a result of Ethiopian and Somali Transitional Federal Government military actions, AQ continues to operate in Somalia and elsewhere in East Africa. Somalia remains a concern given the country's long, unguarded coastline, porous borders, continued political instability, and proximity to the Arabian Peninsula, all of which provide opportunities for terrorist transit and/or safe haven. AQ remains likely to make common cause with Somali extremists.

**The Trans-Sahara.** Remote areas of the Sahel and Maghreb regions in Africa serve as terrorist safe havens because of little government control in sparsely populated regions. The threat to U.S. interests from Islamic extremists increased in 2007 as a result of AQ merging with two Islamic extremist organizations that operate in the region: al-Qaʻida in the Islamic Maghreb (AQIM), based in Algeria; and the Libyan Islamic Fighting Group (LIFG), although LIFGʻs November 2007 merger with AQ has yielded few successful attacks to date, reflecting the depleted capabilities of LIFG within Libya.

AQIM has used the Sahel to train Islamic militants in small arms, use of explosives, and guerilla tactics for the last several years. Training appears to take place on the move or in makeshift facilities in remote areas outside government control. While LIFG members have trained in AQIM-run and other camps, the goal of their preparations has been to join anti-Coalition fighting in Iraq. AQIM taps into already existing smuggling networks in the region to obtain weapons, explosives, and supplies to support its operations.

## EAST ASIA AND PACIFIC

**The Sulu/Sulawesi Seas Littoral.**  Southeast Asia includes a safe haven area composed of the Sulawesi Sea and Sulu Archipelago, which sit astride the maritime boundary between Indonesia, Malaysia, and the Philippines. The geography of the thousands of islands in the region made the area difficult for authorities to monitor. Worker migration, tourism, trade, and other non-terrorist activities, both licit and illicit, that occur in this maritime region pose another challenge to identifying and countering the terrorist threat. Although Indonesia, Malaysia, and the Philippines have improved their efforts to control their shared maritime boundaries, this expanse remains difficult to control. Surveillance is partial at best, and traditional smuggling and piracy groups provided an effective cover for terrorist activities, such as movement of personnel, equipment, and funds. The Sulu/Sulawesi Seas Littoral represents a safe haven for the AQ-linked Jemaah Islamiya (JI) organization and the Philippine Abu Sayyaf Group (ASG).

**The Southern Philippines**.  The southern Philippines, specifically the Sulu archipelago and Mindanao, serve as terrorist safe havens. The governmentʻs control in this area is weak due to rugged terrain, weak rule of law, poverty, and local Muslim minority resentment of central governmental policies. In addition to Jemaah Islamiya (JI) and the Abu Sayyaf Group (ASG), the area hosts several terrorist and insurgent groups including the Communist Party of the Philippines/New Peopleʻs Army and the Rajah Solaiman Movement.

PX203

JI and the ASG pose a threat to U.S. interests, including the U.S. military forces supporting the Philippine Armed Forces that are conducting counterinsurgency operations in Jolo Island. JI maintains a presence in the southern Philippines where it conducts attack planning, but its capabilities in the region have decreased since 2006. It conducts training in some areas of Mindinao controlled by the Moro Islamic Liberation Front (MILF), though MILF's peace talks with the government may reduce ties (and therefore support capabilities) between the groups.

**Indonesia**.  Jemaah Islamiya (JI) poses the principal threat to U.S. and other Western interests in Indonesia. In 2007, the Indonesian government improved its counterterrorist capabilities and scored several successes against the group, such as the June arrest of the former acting JI emir Muhammad Naim (aka Zarkasih) and the former JI military commander Abu Dujana. JI's leadership operates largely in west and central Java where the group recruits, funds, trains, and plans operations, which in the past have included attacks on Western targets.

## THE MIDDLE EAST AND NORTH AFRICA

**Iraq.**  Iraq is not currently a terrorist safe haven, but terrorists, including Sunni groups like al-Qa'ida in Iraq (AQI), Ansar al-Islam (AI), and Ansar al-Sunna (AS), as well as Shia extremists and other groups, view Iraq as a potential safe haven and are attempting to make it a reality. The Iraqi government, in coordination with the Coalition, made significant progress in combating AQI and affiliated terrorist organizations in 2007.

The substantial degradation of AQI stems from a number of factors. The alliance of convenience and mutual exploitation between AQI and many Sunni populations has deteriorated. The Baghdad Security Plan, initiated in February, along with assistance from primarily Sunni tribal and local groups, has succeeded in reducing violence to late 2005 levels, has disrupted and diminished AQI infrastructure, and has driven some surviving AQI fighters from Baghdad and Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. While AQI remained a threat, new initiatives to cooperate with tribal and local leaders in Iraq have led to Sunni tribes' and local citizens' rejection of AQI and its extremist ideology. The continued growth, professionalism, and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar and Diyala Provinces, and elsewhere have turned against AQI and were cooperating with the Iraqi government and Coalition Forces to defeat it. The Coalition troop surge and its sustained presence and tactics, and the reduction in violence following the declared ceasefire by Muqtada al-Sadr's Jaysh al-Mahdi militia in August, also increased popular support for the actions of Coalition and Iraqi Forces against AQI and other terrorist groups.

AQI, although substantially degraded in 2007, retains some infrastructure that allows the group to use these areas for staging operations.

**Northern Iraq.** The Kongra Gel/Kurdistan Worker's Party (KGK/PKK) maintained an active presence in northern Iraq, from which it coordinated attacks in the predominantly ethnic Kurdish areas of southeastern Turkey and provided logistical support to forces that launched attacks into Turkey, primarily against Turkish security forces, local Turkish officials, and villagers who opposed the organization. On October 17, the Turkish Parliament

PX203

overwhelmingly passed a motion authorizing cross-border military operations against KGK/PKK encampments in northern Iraq. Turkish forces carried out extensive operations along the Turkey-Iraq border in the latter part of the year. The United States continued to work with Turkey and Iraq to counter the common threat from the KGK/PKK.

**Lebanon.** Hizballah remained the most prominent and powerful terrorist group in Lebanon, with a strong influence among Lebanon's large Shia community. The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah retains its strong influence among Lebanon's Shia community, which comprises at least one third of Lebanon's population. Hizballah maintained offices in Beirut and elsewhere in the country, and was represented by elected deputies in parliament.

An increasing number of AQ-associated Sunni extremists are also operating within the country. AQ likely views Lebanon as an opportunity to expand its jihad into the Levant, especially after the 2006 conflict between Israel and Hizballah. The organization uses the refugee camps as staging grounds for recruitment, training, planning, and facilitating transit of foreign fighters to and from Iraq. On May 20, a conflict involving the Lebanese Armed Forces (LAF) and militant Islamic fundamentalist group Fatah al-Islam (FAI) erupted in Nahr el-Barid, a Palestinian refugee camp in the north. After a three-month battle, the Lebanese Army took control of the camp on September 2. The death toll was 168 LAF soldiers and an estimated 42 civilians. While the LAF were able to defeat FAI militants and secure the Nahr el-Barid camp, local Palestinian authorities still retained control of the other eleven refugee camps in the country.

*See Chapter 3, State Sponsors of Terrorism,* for information on Iran and Syria, which provided safe haven to Hizballah and Palestinian terrorist groups, and were used as safe havens by AQ-linked operatives and groups.

**Yemen**. Yemen experienced several setbacks to its counterterrorism efforts with the June 22 announcement that Abu Basir Nasir al-Wahishi was the new head of al-Qa'ida in Yemen (AQY), the July 2 terrorist attack which killed ten people, and the uncertainty of U.S.S. Cole bomber Jamal al-Badawi's continued incarceration. At the end of 2007, the Government of Yemen could not account for seven of the 23 AQ members that escaped from a prison in Sanaa in February 2006. AQY carried out several attacks against tourism targets, most notably the January and July 2007 attacks against foreign visitors to the Queen of Sheba Temple in Ma_rib and the country's oil infrastructure. Yemen continued to increase its maritime security capabilities, but land border security along the extensive frontier with Saudi Arabia remained a problem, despite increased Yemeni-Saudi cooperation on bilateral security issues.

## SOUTHWEST ASIA

**Afghan-Pakistan Border.** Despite the efforts of both Afghan and Pakistani security forces, instability along the Pakistan-Afghanistan frontier appeared to have provided al-Qa'ida (AQ) leadership greater mobility and ability to conduct training and operational planning, particularly that targeting Western Europe and the United States. Numerous senior AQ operatives have been

PX203

captured or killed, but AQ leaders continue to plot attacks and to cultivate stronger operational connections that radiate outward from Pakistan to affiliates throughout the Middle East, North Africa, and Europe.

**Pakistan.**  Portions of the Federally Administered Tribal Areas (FATA) and the North-West Frontier Province (NWFP) of Pakistan have become a safe haven for AQ terrorists, Afghan insurgents, and other extremists. AQ uses the FATA to launch attacks in Afghanistan, plan operations worldwide, train, recruit, and provide propaganda. Other extremists, including Taliban and Kashmir-focused organizations such as Hizb-e-Islami Gulbuddin or Hizb-e-Islami Khalis, use the area for safe haven and share short term goals of eliminating Coalition presence in Afghanistan. They exploit the local sympathetic populations to recruit, train, and conduct cross-border raids and bombings in Afghanistan. Islamist Deobandi groups and many local tribesmen in the FATA continue to resist the government's efforts to improve governance and administrative control at the expense of longstanding local autonomy.

Extremists led by Taliban commander Baitullah Mehsud and other AQ-related extremists re-exerted their hold in areas of South Waziristan and captured over 200 government soldiers, who were later released after a local peace deal collapsed. Extremists have also gained footholds in the settled areas bordering the FATA, including Swat, Tank, and DI Khan. Pakistani security forces continue to fight militant leader Maulana Fazlullah in Swat, a settled area in NWFP. As of December, Pakistan's military was conducting increased operations in Swat. The Government of Pakistan maintains approximately 120,000 troops, including Army and Frontier Corps (FC) units, along the Afghanistan border. The United States plans to help modernize and increase the capacity of the FC so they can become a more effective force.

In order to increase the central government's writ in the FATA, the Government of Pakistan is implementing a comprehensive approach with three prongs: political, security, and development. For the political prong, the government seeks to bolster effective governance by empowering local officials. For the security prong, Pakistan's objective is to increase the capacity and efficacy of local security forces. For the development prong, the Government of Pakistan has designed a comprehensive sustainable development plan for the region. The plan concentrates on four sectors – basic human services, natural resources, communication/ infrastructure, and economic development – and, if fully implemented, would cost $2 billion. The plan was developed with the extensive grassroots participation of all stakeholders to provide essential economic and livelihood opportunities while upgrading and expanding social services to a population at risk for recruitment by terrorist organizations.

**Afghanistan.** The Afghan government, in concert with ISAF/NATO forces and the international community, continued efforts to bring and build security on the Afghan side of the border. The border areas remained contested, however, with ongoing insurgent and terrorist attacks, including AQ activity. Attacks by the Taliban and other insurgent groups and criminal networks, along with those of extremist movements such as Hizb-e-Islami Gulbuddin (HIG) and the Haqqani network, continued throughout Afghanistan. Criminal networks and narcotics cultivation remained particularly prevalent in the south and east of the country, constituting a source of funding for the insurgency in Afghanistan. In 2007, AQ expanded its Afghanistan-based leadership cadre and its support to militants inside the country, providing funding, training,

PX203

and personnel to facilitate terrorist and insurgent operations. Anti-Coalition organizations such as HIG continued to operate in coordination with AQ, Taliban, and other insurgent groups, primarily in the east.

## WESTERN HEMISPHERE

**Colombia Border Region**.  The regions adjacent to Colombia's borders with Venezuela, Ecuador, Peru, Panama, and Brazil include rough terrain and dense forest cover. These conditions, coupled with low population densities and weak government presence, create areas of safe haven for insurgent and terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC). Brazil, Ecuador, Peru, and Panama have often adopted a tacit policy mix of containment and non-confrontation with Colombian narcoterrorist groups, although some confrontations do occur. Much depends on local decisions and cross-border relations. The FARC used areas in neighboring countries near Colombia's border to rest and regroup, procure supplies, and stage and train for terrorist attacks. These areas appeared to be more prevalent in Venezuela and Ecuador, less so in Brazil and Peru. In addition, the FARC and another designated terrorist organization, the National Liberation Army (ELN), regard Venezuelan territory near the border as a safe haven and often used the area for cross-border incursions.

**Venezuela**. Rampant corruption within the Venezuelan government and military, ideological ties with the FARC, and lax counternarcotics policies have fueled a permissive operating environment for drug traffickers and an increase in drug trafficking to Europe, Africa, and the United States. The United States is closely monitoring this situation.

**The Tri-Border Area (TBA) (Argentina, Brazil, and Paraguay)**.  Although no corroborated information shows that Hizballah, HAMAS, or other Islamic extremist groups used the TBA for military-type training or planning of terrorist operations, the United States remains concerned that these groups use the TBA as a safe haven to raise funds. Suspected supporters of Islamic terrorist groups, including Hizballah, take advantage of loosely regulated territory and the proximity of Ciudad del Este, Paraguay and Foz do Iguaçu, Brazil to participate in a wide range of illicit activities and to solicit donations from within the sizable Muslim communities in the region and elsewhere in Argentina, Brazil, and Paraguay. The governments of the TBA have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early years of this decade, the governments of Argentina, Brazil, and Paraguay invited the United States to participate in the Three Plus One Group on TBA Security to address these illicit activities.

## Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens

Corruption, poverty, a lack of civic institutions and social services, politically repressive governments, and inadequate or unjust law enforcement and legal systems are conditions terrorists exploit for recruitment, operational planning, or physical safe haven. Efforts to build partner capacity and encourage states to cooperate more effectively at the local and regional level are key to denying terrorists safe haven. U.S. Ambassadors, as the President's personal representatives abroad, are in charge of U.S. relations with host nations, with a unique

189

PX203

responsibility to bring all elements of national power to bear against the terrorist enemy. They lead interagency country teams that develop strategies to help host nations understand the threat and to strengthen their political will and capacity to counter it.

Defeating the terrorist enemy requires a comprehensive effort executed locally, nationally, regionally, and globally. Working with partner nations, we must eliminate terrorist leadership, but incarcerating or killing terrorists will not achieve an end to terrorism. We must simultaneously eliminate terrorist safe havens, tailoring regional strategies to disaggregate terrorist networks and break terrorist financial, travel, communications, and intelligence links. Finally, and most challenging, we must address the underlying conditions that terrorists exploit at the national and local levels to induce alienated or aggrieved populations to become sympathizers, supporters, and ultimately members of terrorist networks. We can marginalize violent extremists by addressing people's needs and grievances, by giving people a stake in their own political future, and by providing alternatives to what terrorists offer.

Economic development offers at-risk populations a better choice. Terrorists exploit despair and hopelessness to win recruits. Systems characterized by an absence of political choice, economic opportunities, and personal freedom can become unwitting incubators of extremism. Economically disadvantaged people are vulnerable to recruitment by extremists and by criminal ―quick-fix‖ livelihoods, such as the poppy production that finances terrorism in Afghanistan.

Combating corruption and fostering good governance in host governments is indispensable to our efforts to strengthen host government law enforcement and oversight of terrorist financing, and the effectiveness of our other training programs, such as those that help border guards interdict dangerous goods and people.

Terrorists exploit weakness, most notably sectarian violence, to create greater instability and to piggyback onto the conflict for propaganda purposes. Fostering reconciliation and strengthening community mechanisms is vital to eliminating terrorism.

This is a long-term challenge. Over time, our global and regional cooperative efforts will reduce terrorists' capacity to harm us and our partners, while local security and development assistance will build our partners' capacity. We must continue to enlist the support and cooperation of a growing network of partners. If we are to be successful, we must all work together toward our common goal in a strategic and coordinated manner.

## REGIONAL STRATEGIC INITIATIVE

Building on this understanding, we have worked to develop the Regional Strategic Initiative (RSI), an effort to develop flexible regional networks. The State Department's Office of the Coordinator for Counterterrorism (S/CT) is working with ambassadors and interagency representatives in key terrorist theaters of operation to collectively assess the threat, pool resources, and devise collaborative strategies, action plans, and policy recommendations.

PX203

The RSI is a key tool in promoting cooperation between our partners in the War on Terror – for example, with Malaysia, Indonesia, and the Philippines as they confront terrorist transit across the Sulawesi Sea; or among Mauritania, Algeria, Morocco, Niger, Chad, and Mali, to counter al-Qa'ida in the Islamic Maghreb (AQIM), as it recruits and hides in the desert that sits astride national borders. Terrorists are highly adaptable; defeating them requires both centralized coordination and field authority. Resources and responses must be applied in a rapid, flexible, and focused manner. The RSI helps achieve this coordinated approach.

RSI strategy groups are in place for South East Asia, Iraq and its neighbors, the Eastern Mediterranean, the Western Mediterranean, East Africa, the Trans-Sahara, South Asia, and Latin America. These groups are chaired by Ambassadors, with interagency representatives participating. RSI programs focus on developing a common understanding of the strategic situation in a region. Using this shared perspective, networked country teams then identify opportunities for collaboration and pool resources not only to eliminate terrorism safe havens, but also to address the conditions that terrorists exploit for recruitment.

Terrorists operate without regard to national boundaries. To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships and increasingly operate in a regional context. Denying safe haven plays a major role in undermining terrorists' capacity to operate effectively and forms a key element of U.S. counterterrorism strategy.

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

Since the terrorist attacks of September 11, 2001, the United States has acted to block funding of terrorists and their supporters, and to promote international cooperation against them. On September 23, 2001, the President signed E.O. 13224, giving the United States a powerful tool to impede terrorist funding. This Executive Order (EO) provides a means to disrupt the financial support network for terrorists and terrorist organizations by authorizing the USG to designate and block assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism. In addition, because of the pervasiveness and expansiveness of the financial base of foreign terrorists, the order authorizes the USG to block the assets of individuals and entities that provide support, offer assistance to, or otherwise associate with designated terrorists and terrorist organizations. The order also covers their subsidiaries, front organizations, agents, and associates.

The Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, also has the authority to designate groups as Foreign Terrorist Organizations (FTOs) pursuant to Section 219 of the Immigration and Nationality Act, as amended. These designations play a critical role in U.S. counterterrorism efforts and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business. As a consequence of such a designation, it is unlawful for U.S. citizens or any persons subject to the jurisdiction of the United States to provide material support or resources to a designated FTO. U.S. financial institutions are also required to freeze the funds of designated FTOs.

PX203

EO and FTO designations support U.S. efforts to curb the financing of terrorism and encourage other nations to do the same. They internationally stigmatize and isolate designated terrorist entities and individuals. They also deter donations or contributions to, and economic transactions with, named entities and individuals. In addition, they heighten public awareness and knowledge of terrorist organizations, and signal U.S. concerns about named entities and individuals to other governments.

**In 2007, the United States designated a number of individuals and entities:**

- On January 26, the United States designated two South African individuals, Farhad Ahmed Dockrat and Junaid Ismail Dockrat, and a related entity for financing and facilitating al-Qaʻida, pursuant to Executive Order 13224.
    - Farhad Dockrat both finances and facilitates al-Qaʻida. In one example, Dockrat in 2001 provided over 400,000 South African Rand (approximately $62,900) to the Taliban ambassador to Pakistan to be forwarded to al-Akhtar Trust, an Afghanistan-based fundraiser for al-Qaʻida.
    - Al-Akhtar Trust was previously designated by the United States under E.O. 13224 for its support to al-Qaʻida. Al-Akhtar Trust is also on the United Nations Security Council 1267 Committee's list of sanctioned individuals and entities designated for providing support to al Qaʻida, Usama bin Ladin and the Taliban.
    - Junaid Dockrat is an al-Qaʻida financier, recruiter, and facilitator. Junaid Dockrat in 2004 worked via phone and email with al-Qaʻida operations chief Hamza Rabi'a (now deceased) to coordinate the travel of South Africans to Pakistan in order for them to train with al Qaʻida. He is also responsible for raising $120,000 that Rabi'a received in the spring of 2004.

- On February 20, the United States designated Jihad al-Bina under Executive Order 13224 for its support to Hizballah. Jihad al-Bina is a Lebanon-based construction company formed and operated by Hizballah. Jihad al-Bina receives direct funding from Iran, is run by Hizballah members, and is overseen by Hizballah's Shura Council, at the head of which sits Hizballah Secretary General Hassan Nasrallah.

- On June 15, the United States designated `Ali Sulayman Mas'ud `Abd al-Sayyid, Sa'id Yusif Ali Abu Azizah, and Nur al-Din al-Dibiski under Executive Order 13224. `Abd al-Sayyid is one of al-Qaʻida's early members and is reportedly a member of the al-Qaʻida military committee. `Abd al-Sayyid was assigned by al-Qaʻida's leadership to deliver messages to al-Qaʻida members in Libya that contained instructions for terrorist plots in Libya. `Abd al-Sayyid was also tasked by LIFG to enter Libya secretly, and was involved in arming an al-Qaʻida group in Libya. Sa'id Yusif Ali Abu Azizah is a member of and recruiter for al-Qaʻida, and was responsible for al-Qaʻida's publications and mass media operations. Azizah was identified as a member of al-Qaʻida in Canada in 2003, and became the leader of the LIFG in Canada in 2004. Nur al-Din al-Dibiski traveled to Afghanistan in the early 1990s, where he joined al-Qaʻida and received military training in al-Qaʻida's camps. Dibiski is believed to be a senior member of the LIFG and a member of that terrorist group's military committee.

PX203

- On July 24, the United States designated the Iran-based Martyrs Foundation, including its U.S. branch, the Goodwill Charitable Organization (GCO), and the finance firm al-Qard al-Hassan (AQAH) under Executive Order 13224 for their support to Hizballah. Two individuals, Qasem Aliq and Ahmad al-Shami, were also designated for the role they play in Hizballah's support network. The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, HAMAS, and the Palestinian Islamic Jihad (PIJ). The designation included:

  o The Goodwill Charitable Organization (GCO), a fundraising office in Dearborn, Michigan, established by the Martyrs Foundation. GCO is a Hizballah front organization that reports directly to the leadership of the Martyrs Foundation in Lebanon.
  o The finance firm al-Qard al-Hassan (AQAH), which has been used by Hizballah as a cover to manage its financial activity. After the summer 2006 conflict, Hizballah transferred a portion of its financial activity to AQAH, giving Hizballah access to the international banking system.
  o Qasem Aliq, a Hizballah official who was previously the director for the Martyrs Foundation branch in Lebanon, and is responsible for overseeing Martyrs Foundation's operation. He worked closely with senior Hizballah officials.
  o Ahmad al-Shami, who has worked for the Martyrs Foundation in Lebanon and has been in frequent contact with GCO. Money raised by GCO was sent to al-Shami in Lebanon to be distributed to the Martyrs Foundation. Hizballah leadership placed al-Shami in his position at the Martyrs Foundation in Lebanon.

- On August 7, the United States designated the al-Salah Society and its director Ahmad al-Kurd under Executive Order 13224 for their support to HAMAS. Al-Salah is one of the largest and best-funded HAMAS charitable organizations in the Palestinian territories.

  o The al-Salah Society supported HAMAS-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support HAMAS' activities. It also financed commercial stores, kindergartens, and the purchase of land for HAMAS.
  o The al-Salah Society was included on a list of suspected HAMAS and Palestinian Islamic Jihad-affiliated NGOs whose accounts were frozen by the Palestinian Authority as of late August 2003. After freezing the bank accounts, PA officials confirmed that the al-Salah Society was a front for HAMAS.
  o Ahmad al-Kurd, Director of the al-Salah Society, is a recognized high-ranking HAMAS leader in Gaza.

- On August 13, the United States designated Fatah al-Islam under Executive Order 13224. Fatah al-Islam, an offshoot of the Syria-backed secular Palestinian terrorist group Fatah al-Intifada, was led by Shakir al-Absi, a well-known Palestinian-Jordanian militant who was sentenced to death in absentia in Jordan for his involvement in the 2002 murder of U.S. diplomat Laurence Foley. Fatah al-Islam initiated the hostilities in the Nahr al-Barid Palestinian refugee camp near Tripoli, Lebanon with an unprovoked attack on Lebanese

193

PX203

security forces in May, and used civilian refugees as human shields during the fighting. Over 130 Lebanese Armed Forces soldiers and civilians lost their lives in the conflict at Nahr al-Barid.

- On October 10, the United States designated Abdul Rahim al-Talhi, Muhammad `Abdallah Salih Sughayr, and Fahd Muhammad `Abd al-`Aziz al-Khashiban under Executive Order 13224 for providing support to the Abu Sayyaf Group (ASG), an al-Qa'ida-affiliated terrorist group responsible for multiple bombings, kidnappings, and other terrorist attacks in Southeast Asia. These three men have served as significant sources of financial and other support to individuals and entities in Southeast Asia previously named as Specially Designated Global Terrorists (SDGTs) and listed pursuant to UNSCR 1267.

- On October 25, the United States designated the IRGC-Qods Force (IRGC-QF) under Executive Order 13224 for its support to terrorist organizations. The Qods Force is a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), that provides material support to the Taliban, Lebanese Hizballah, HAMAS, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

  o The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged some shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and possibly man-portable defense systems to the Taliban.
  o The Qods Force has a long history of supporting Hizballah, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701. Through Qods Force material support to the Taliban, Iran is seeking to inflict casualties on U.S. and NATO forces. In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shia militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

- On October 25, the United States designated Bank Saderat, its branches, and subsidiaries under Executive Order 13224 for their support to terrorist organizations. Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups HAMAS, PFLP-GC, and Palestinian Islamic Jihad. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars to support the activities of HAMAS. As of early 2005, HAMAS had substantial assets

PX203

deposited in Bank Saderat, and in 2007, Bank Saderat has transferred several million dollars to HAMAS.

- On November 15, the United States designated the Tamils Rehabilitation Organization (TRO) under Executive Order 13224 for its support to the Liberation Tigers of Tamil Eelam (LTTE). The TRO is a charitable organization that acts as a front to facilitate fundraising and procurement for the LTTE through a network of individual representatives. In the United States, TRO has raised funds on behalf of LTTE and facilitated LTTE procurement operations in the United States. Operations included the purchase of munitions, equipment, communication devices, and other technology for the LTTE. TRO's efforts worldwide have reportedly allowed the LTTE to use humanitarian aid that it collected from the international community after the December 2004 Indian Ocean tsunami to launch new campaigns to strengthen LTTE military capacity.

- On December 4, the United States designated Abdelmalek Droukel, of al-Qa'ida in the Islamic Maghreb (AQIM), under Executive Order 13224. Droukel reportedly supervised the April 2007 AQIM bombings of the Algerian Prime Minister's office and police facilities in Algiers. In a May 2007 video announcement, Droukel publicly called on regional AQIM commanders to seek recruits and select targets for suicide bombings.

- On December 6, the United States designated Fawzi Mutlaq al-Rawi, the leader of the Iraqi wing of the Syrian Baath Party, under Executive Order 13224, for providing financial and material support to al-Qa'ida in Iraq (AQI). In November 2005, al-Rawi facilitated the provision of $300,000 to members of AQI, and provided AQI with vehicle-borne improvised explosive devices, rifles, and suicide bombers at the request of a senior AQI leader. As of March 2005, al-Rawi was present at regular meetings to plan funding for Muhammad Yunis Ahmad's network in Iraq. Muhammad Yunis Ahmad has provided guidance, financial support, and coordination for insurgent attacks throughout Iraq. Al-Rawi also ran a charity organization which was a front for funding the network.

**UN Security Council Resolution 1267**

United Nations Security Council Resolution 1267 (1999) and successor resolutions require member states to impose financial and other sanctions on listed groups and individuals associated with Usama bin Ladin, the Taliban, or al-Qa'ida. The 1267 Sanctions Committee, also established by the Security Council, maintains a list of individuals and entities associated with al-Qa'ida, the Taliban, and/or Usama bin Ladin who are subject to the international sanctions, assets freeze, travel ban, and arms embargo that member states are obligated to implement. On July 29, 2005, the UN Security Council requested, through the adoption of Resolution 1617, that the UN Secretary General take the necessary steps to increase cooperation between the UN and INTERPOL in order to provide the Committee (established pursuant to Resolution 1267) with better tools to fulfill its mandate more effectively.

**In 2007, the United States and the UN Security Council 1267 Committee designated the following individuals and entities:**

PX203

- On June 8, the UN 1267 Sanctions Committee added `Ali Sulayman Mas'ud `Abd al-Sayyid, Sa'id Yusif Ali Abu Azizah, and Nur al-Din al-Dibiski to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. `Abd al-Sayyid is one of al-Qa'ida's early members and is reportedly a member of the al-Qa'ida military committee. _Abd al-Sayyid was assigned by al-Qa'ida's leadership to deliver messages to al-Qa'ida members in Libya that contained instructions for terrorist plots in Libya. `Abd al-Sayyid was also tasked by LIFG to enter Libya secretly, and was involved in arming an al-Qa'ida group in Libya. Sa'id Yusif Ali Abu Azizah is a member of and recruiter for al-Qa'ida, and was responsible for al-Qa'ida's publications and mass media operations. Azizah was identified as a member of al-Qa'ida in Canada in 2003, and became the leader of the LIFG in Canada in 2004. Nur al-Din al-Dibiski traveled to Afghanistan in the early 1990s, where he joined al-Qa'ida and received military training in al-Qa'ida's camps. Dibiski is believed to be a senior member of the LIFG and a member of that terrorist group's military committee.

- On August 27, the UN 1267 Sanctions Committee added Abdelmalek Droukdel, the leader or emir of al-Qa'ida in the Lands of the Islamic Maghreb (AQIM), to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. Droukel reportedly supervised the April 2007 AQIM bombings of the Algerian Prime Minister's office and police facilities in Algiers. In a May 2007 video announcement, Droukel publicly called on regional AQIM commanders to seek recruits and select targets for suicide bombings.

- On September 13, the UN 1267 Sanctions Committee added Sirajuddin Jallaloudine Haqqani to its list of individuals or entities associate with Usama bin Ladin, the Taliban, or al-Qa'ida. Haqqani is a Taliban Deputy Commander who since 2004 has been a major operational commander in the southern and eastern regions of Afghanistan.

- On October 9, the UN 1267 Sanctions Committee added three individuals based in Saudi Arabia to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. Abdul Rahim al-Talhi, Muhammad `Abdallah Salih Sughayr, and Fahd Muhammad `Abd al-`Aziz al-Khashiban were listed for providing support to the Abu Sayyaf Group (ASG), an al-Qa'ida-affiliated terrorist group responsible for multiple bombings, kidnappings and other terrorist attacks in Southeast Asia. These three men have served as significant sources of financial and other support to individuals and entities in Southeast Asia previously named as SDGTs and listed pursuant to United Nations Security Council Resolution (UNSCR) 1267 and successor resolutions.

**DE-LISTING OF INDIVIDUALS AND/OR ENTITIES UNDER UNSCR 1267**

Pursuant to the UN 1267 Committee guidelines, any individual(s), groups, undertakings, and/or entities on the Consolidated List may submit a petition for de-listing. The petitioner must provide justification for the de-listing request, offer relevant information, and request support for the de-listing. The Committee, in determining whether to remove names from the Consolidated List, may consider, among other things: whether the individual or entity was placed on the Consolidated List due to a mistake of identity, or whether the individual or entity no longer

PX203

meets the criteria set out in relevant resolutions. In evaluating whether an individual or entity no longer meets the criteria, the Committee may consider, among other things, whether the individual is deceased, or whether it has been affirmatively shown that the individual or entity has severed all association, as defined in paragraph 2 of Resolution 1617 (2005), with al-Qaʻida, Usama bin Ladin, the Taliban, and their supporters, including all individuals and entities on the Consolidated List.

**In 2007, the United States and the UN 1267 Committee de-listed the following individuals and entities:**

- On August 1, Momtaz Bank was de-listed as an entity from the 1267 Consolidated List.
- On September 17, Lokman Amin Mohammed (Hama Karim) was de-listed from the 1267 Consolidated List.
- On November 14, Ahmed Irdis Nasreddin was de-listed as an individual (and 12 entities associated with him were delisted as entities) from the consolidated list (al-Qaʻida section) of the UN 1267 Committee.


| BRINGING TERRORISTS TO JUSTICE: REWARDS FOR JUSTICE |
| --- |

Rewards for Justice (RFJ) is a valuable asset in the War on Terror. Through the RFJ program, the Secretary of State offers and pays rewards for information that prevents or successfully resolves an act of international terrorism against United States persons or property. Reward offers of up to $25 million have been authorized for information leading to the capture of Usama bin Ladin and other key terrorist leaders. Since its inception in 1984, RFJ has paid more than $77 million to over 50 people who provided credible information. In 2007, the United States gave out rewards totaling $15 million for the successful resolution of terrorist cases in the Philippines and the United States. This was the second highest payout year in the history of the RFJ program.

In June, U.S. Ambassador Kristie A. Kinney presided over a public reward ceremony jointly sponsored by the U.S. Embassy in Manila and the Government of the Philippines. The reward payment of $10 million to multiple sources was the largest Rewards for Justice payment in the Philippines since the program was launched in the country in 2002. The sources provided information that contributed to successful military operations against Khadaffy Janjalani and Abu Solaiman, leaders of the Abu Sayyaf Group, who were responsible for the kidnappings and deaths of American and Filipino citizens. Janjalani was killed during a battle with the Armed Forces of the Philippines (AFP) in October 2006, while Abu Solaiman was killed in similar circumstances by the AFP in January 2007.

In October, RFJ gave $5 million to an individual who was instrumental in bringing Zacarias Moussaoui, the so-called "20th hijacker" of the September 11, 2001 terrorist attack, to justice.

In 2007, new initiatives included adding six terrorists to the RFJ Most Wanted List and one new incident-based reward offer. In January, RFJ added three new terrorists with reward offers of up to $5 million to its list: Mohammad Ali Hamadei, a member of Lebanese Hizballah, who participated in the 1985 hijacking of TWA 847 and the murder of U.S. Navy diver Robert

PX203

Stetham; Ramadan Shallah, the Secretary-General and founding member of the Palestinian Islamic Jihad; and Mohammed Qari Zafar, a terrorist operative wanted for questioning in connection with the March 2006 attack against the Consulate in Karachi, which led to the death of U.S. Foreign Service Officer David Foy. In March, Zulkifli bin Hir (a.k.a. Marwan), a leader in Jemaah Islamiya (JI) in the Philippines, was added to the RFJ list with a reward offer of up to $5 million. In April, the Secretary of State approved a reward offer of up to $1 million for information regarding the January 2007 terrorist attack against the U.S. Embassy in Athens. Finally, in July, RFJ added JI leaders Noordin Top and Zulkarnaen to the list.

All of these reward offerings are listed in greater detail on the www.rewardsforjustice.net website, which was redesigned in July 2007.

---

| **MULTILATERAL EFFORTS TO COMBAT TERRORISM** |
| --- |

International cooperation remains essential to initiatives in fields ranging from intelligence and law enforcement coordination, to targeted financial sanctions, to norms and standards of financial regulation, because most funds used to support terrorism are located outside the jurisdiction of the United States.

Throughout the year, the United States worked closely with multilateral partners in numerous counterterrorist financing efforts, including the Counterterrorism Committee of the United Nations, the Egmont Group of Financial Intelligence Units, the Financial Action Task Force (FATF), the G8's Counterterrorism Assistance Group (CTAG), and international financial institutions. In addition, the United States continued its regular dialogue on terrorism finance with the European Union. Since its launch in September 2004, the dialogue has served as the framework for ongoing exchanges to promote information sharing and cooperation on the Financial Action Task Force (FATF), and on technical assistance issues.

European nations are active participants in a variety of multilateral organizations that contributed to counterterrorist efforts, including the G8, NATO, the FATF, MONEYVAL, the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). The United States and its partners worked through these organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and to institutionalize the War on Terror globally. The World Bank and International Monetary Fund have pledged to provide countries with training to increase their capacity to combat money laundering and terrorist financing.

**The United Nations (UN)**.  The Counter-Terrorism Committee (CTC) was established by Security Council Resolution 1373 after September 11, 2001, with the goal of enhancing the ability of UN member states to combat terrorism. The Counter-Terrorism Committee's Executive Directorate (CTED), established by Resolution 1535 in 2004, became fully operational in December 2005. CTED's mandate is to enhance the Committee's ability to monitor the implementation of Resolution 1373 and to advance capacity-building work by facilitating technical assistance to member states and promoting closer cooperation and coordination with

PX203

international, regional, and sub-regional organizations. It also conducts visits to member states to assess the implementation of Resolution 1373. CTED visited seven states in 2007 (Bosnia-Herzegovina, Bangladesh, Turkey, Georgia, Armenia, Nigeria, and Vietnam).

In 2007, UN Security Council Resolution 1787 (December 10), extended the mandate of the Counter-Terrorism Committee Executive Directorate (the Executive Directorate) until March 31, 2008. The resolution requested that the Executive Director of the Executive Directorate recommend appropriate changes and recommendations to the organization of CTED.

The Counterterrorism Implementation Task Force (CTITF) brought together 24 UN entities across the UN system, which work under mandates from the General Assembly, the Security Council, and various specialized agencies, funds, and programs to implement the historic Global Counterterrorism Strategy agreed to by all 192 member countries in September 2006. In 2007, the Task Force developed a program of work and established working groups to carry forward a first set of initiatives to implement the Strategy.

UN Specialized Agencies are also involved in the work of fighting terrorism. For example, the International Civil Aviation Organization (ICAO) adopted passport security standards, and the UN Office on Drugs and Crime's (UNODC's) Terrorism Prevention Branch continued to provide assistance to countries in the legal and related aspects of counterterrorism. This included an emphasis on building the legal framework necessary to become party to and implement the international counterterrorism conventions and protocols. The Terrorism Prevention Branch also focused on strengthening the capacity of the national criminal justice systems to apply the provisions of these instruments in compliance with the principles of rule of law, providing substantive input on counterterrorism issues to intergovernmental bodies.

The International Atomic Energy Agency (IAEA) continued to implement its Nuclear Security Plan (2006-2009) for combating the threat of terrorism involving nuclear and other radioactive material. IAEA promoted States' ratification and implementation of international instruments relating to nuclear security, including the Amendment to the Convention on the Physical Protection of Nuclear Material and the International Convention for the Suppression of Acts of Nuclear Terrorism, the latter of which entered into force in July. The IAEA Nuclear Security Series is a framework of guidance documents designed to help states establish a coherent nuclear security infrastructure.

In 2007:
  ⇒ The IAEA published Engineering Safety Aspects of the Protection of Nuclear Power Plants against Sabotage (NSS-4) and Identification of Sealed Radioactive Sources and Devices (NSS-5). It also brought other documents close to publication.
  ⇒ The IAEA continued to prioritize nuclear security training and support the development of mechanisms for nuclear security education.
  ⇒ More than 950 participants from 87 countries took part in IAEA nuclear security training in a total of 69 events.
  ⇒ In April, the IAEA inaugurated a Nuclear Security Support Centre (NSSC) in Islamabad, Pakistan.

PX203

⇒ The IAEA also procured equipment for the establishment of an NSSC in Ghana, and conducted initial discussions with Brazilian and Malaysian authorities on establishing NSSCs in those States.

⇒ In May, the IAEA transmitted a set of Practical Arrangements for enhancing cooperation between NAUSS and the Agency to Saudi Arabia's Naif Arab University for Security Services.

The IAEA continued to assist States in the removal and repatriation of vulnerable radioactive sources. In 2007:

⇒ The IAEA facilitated the repatriation of 127 such sources from Brazil to the United States.

⇒ In Nigeria, IAEA coordinated the recovery, conditioning, and repatriation two high-activity, disused sources, and also assisted Nigeria in the removal to secure storage of one very large disused source, one disused teletherapy source, and one disused brachytherapy machine.

⇒ To aid in the recovery, handling, and conditioning of spent high activity radioactive sources (SHARS), the IAEA developed a mobile hot cell enabling SHARS to be conditioned and readied for long-term storage.

⇒ In March, the pilot operation of the SHARS mobile hot cell was successfully carried out.

⇒ In November, the IAEA convened the International Conference on Illicit Nuclear Trafficking: Collective Experience and the Way Forward, hosted by the UK. The Conference reviewed global experience in combating illicit trafficking and suggested a range of actions through which international efforts in this area, including those under the Agency's auspices, could be strengthened.

⇒ Also during the year, participation in the IAEA Illicit Trafficking Database (ITDB) program expanded to 99 States. As of December 31, ITDB Participating States had reported or otherwise confirmed in total 1,340 incidents to the ITDB.

The IAEA continued, upon request, to assist States in developing and implementing measures to prevent incidents of nuclear terrorism at major public events. Drawing on ITDB reporting, the Agency provided information support and advice in the areas of detection, interdiction, and response. In addition, training courses, workshops, and exercises were conducted and detection equipment purchased and supplied. In 2007, the Agency conducted, in support of Brazilian authorities, a successful project to ensure the nuclear security of the Pan American Games in Rio de Janeiro, and began the implementation of a project for nuclear security at the 2008 Olympic Games, to be held in Beijing, China.

ITDB also continued to expand its membership, which now includes nearly 100 countries. The ITDB is a voluntary program whereby states confirm incidents of illicit trafficking or other unauthorized activities involving nuclear and radioactive material. The ITDB collects authoritative information on illicit trafficking events and helps participating states better understand illicit trafficking events and trends. Additionally, the ITDB is an authoritative database for tracking nuclear and radioactive materials that have fallen outside of legitimate control and that could be used in potential actions of terrorism.

PX203

**Group of Eight (G8) Counterterrorism Actions.** The Group of Eight (G8), composed of Canada, France, Germany, Italy, Japan, Russia, the United Kingdom, and the United States, continued to develop and promote effective counterterrorism standards and best practices throughout 2007. Germany hosted the 2007 annual G8 Summit in Heiligendamm where leaders committed to take action on a range of counterterrorism issues, including countering cash smuggling used to finance terrorism and violent extremism by identifying key transshipment and courier routes; maximizing effective information exchange; enhancing law enforcement investigations; facilitating enforcement of cash declaration and disclosure standards; and offering training and capacity-building to partners. G8 Leaders welcomed the completion of 28 projects to improve transportation security and the completed efforts to protect critical energy infrastructure and sharing best practices of effective security responses. G8 Leaders committed to counter terrorism in the Afghanistan and Pakistan border regions and to work against terrorist radicalization and recruitment. In May, G8 Justice and Home Affairs Ministers met in Munich to increase judicial cooperation and joint efforts to combat international terrorism, including tackling terrorist misuse of the Internet, and sharing knowledge and experiences regarding the processes of some countries' residents becoming radical and violent, known as ―homegrown" terrorism.

**Counterterrorism Action Group (CTAG).** At the June 2003 Evian Summit, G8 leaders adopted a plan to build political will and capacity to combat terrorism globally, and established the Counterterrorism Action Group (CTAG) to implement this plan. CTAG supports the UN Counter-Terrorism Committee's efforts to monitor and promote implementation of UNSCR 1373 by developing an active forum for donors to coordinate counterterrorism cooperation with, and assistance to, third countries. It promotes counterterrorism by prioritizing needs and targeting and coordinating assistance to expand counterterrorism capacity in recipient countries; and encourages all countries to meet their obligations under UNSCR 1373 and, for states party to them, the 13 international counterterrorism conventions and protocols.

Under the leadership of the rotating G8 presidency, CTAG meets two times per year with the active participation of G8 member states, the European Commission, and other donor countries and organizations. Coordination meetings hosted by the local embassy of the G8 presidency were also held among CTAG members' diplomatic missions in recipient countries.

**Financial Action Task Force (FATF)**. Under the Department of Treasury's leadership, the United States played a strong role in developing new initiatives within FATF to meet evolving anti-money laundering and counterterrorism finance threats. The United States became a co-chair, with Italy, of the newly created International Cooperation Review Group to examine AML/CTF systemic threats and participated in major FATF studies (e.g., Trade-Based Money Laundering) and FATF mutual evaluations.

**European Union (EU).** In September, the European Union appointed Council Secretariat Justice and Home Affairs Director Gilles de Kerchove as the new EU Counterterrorism Coordinator. Since then, he has participated in various meetings with U.S. counterterrorism officials. The United States and the EU's Judicial Cooperation Unit (Eurojust) have improved cooperation and information exchange among investigators and prosecutors. A U.S. Intermittent Liaison Prosecutor, resident in Brussels, currently liaises with Eurojust. Progress was made

towards ratification and entry into force of the U.S.-EU Extradition and Mutual Legal Assistance Agreements. Expert level discussions have begun and the U.S. and EU are working to establish a roadmap toward mutual recognition of the EU Authorized Economic Operator provisions and the U.S. Customs-Trade Partnership Against Terrorism, which are based on a risk management approach to cargo security. In August, we began a Container Security Initiative pilot project for feeder ports. We began a Secure Freight Initiative pilot project in Southampton, UK, which should provide data that will be useful in determining how best to implement 100 percent scanning of maritime cargo containers.

The United States and the EU continued to:
⇒ improve procedures for information sharing and for proactively implementing FATF Special Recommendations, including enforcing cash declaration regulations for travelers and working with private sector financial institutions to improve implementation of asset freeze measures;
⇒ exchange information and best practices in expert-level discussions;
⇒ Hold semi-annual senior-level meetings and practitioner workshops between the United States and EU on terrorism finance issues; and
⇒ In 2007, the United States and the EU completed a public outreach statement on fairness and transparency in the implementation of sanctions regimes.

**Organization for Security and Cooperation in Europe (OSCE).** The United States worked with the OSCE through its Anti-Terrorism Unit to encourage cooperation and to address existing gaps in the capabilities and legal framework of the OSCE's 56 participating states. In June, the OSCE organized a high-level political conference, a joint initiative of the United States and the Russian Federation, on Public-Private Partnerships (PPPs). The conference highlighted the fact that effective solutions to fighting terrorism required integrated approaches that harness the expertise of all sections of society by bringing them together in close public-private sector cooperation. Over 320 participants from 58 OSCE countries and Partners for Cooperation discussed ways to best draw upon the capacity of businesses and civil society to help governments fight terrorism.

The OSCE also continued its considerable efforts to provide technical capacity-building assistance to help participating states detect and prevent the use of fraudulent and counterfeit travel documents, to make it more difficult for terrorists and other criminals to forge or counterfeit them, and to encourage the reporting of lost and stolen travel documents to INTERPOL. Given the difficulties of mutual legal assistance cooperation in fighting terrorism, the OSCE, in cooperation with the United Nations Office on Drugs and Crime (UNODC), held a follow-up experts workshop in February which highlighted issues of extradition and promoted the use of UNODC's mutual legal assistance software. The OSCE also held a sub-regional event in Turkey, which gave participants more in-depth mutual legal assistance instruction. In addition, the OSCE also held events on victims of terrorism, incitement, and terrorist use of the Internet. The OSCE Madrid Ministerial issued a statement supporting the UN's Global Counterterrorism Strategy, called upon OSCE participating states to join the Global Initiative to Combat Nuclear Terrorism, and tasked the OSCE's Forum for Security Cooperation to produce a Best Practices Guide as a tool to help OSCE members implement UN Security Council Resolution 1540.

PX203

**North Atlantic Treaty Organization (NATO).**  First and foremost, NATO contributes to the War on Terror by leading International Security Assistance Force stability operations against radical insurgents in Afghanistan. NATO also conducts Operation Active Endeavor (OAE), a naval mission that aims to combat terrorism by monitoring Mediterranean maritime traffic. The Alliance is also engaged in a far-reaching transformation of its forces and capabilities to better deter and defend against 21st Century threats, including terrorism, and is working closely with partner countries and organizations to ensure interoperability of forces, enhance security, and broaden cooperation. NATO adopted its Military Concept against Terrorism in 2002, fielded a Chemical Biological Radiological and Nuclear (CBRN) defense battalion in 2004, and established a special Terrorist Threat Intelligence Unit. Efforts are underway to enhance Allied resilience against the potential disruption of critical infrastructure (energy, cyber) systems. Through NATO's Defense Against Terrorism (DAT) program, the Alliance is developing 11 cutting-edge technologies to protect troops and civilians against terrorist attacks.

NATO contributes to non-proliferation through the efforts of the Weapons of Mass Destruction Center, the Senior Political Committee, and the Senior Political-Military Group on Proliferation (which organizes the annual Seminar on Proliferation Issues, NATO's largest outreach event). NATO has opened a dialogue with the United Nation's 1540 Committee and is developing a framework for further cooperation. NATO's 26 Allies and 23 Euro-Atlantic Partnership Council Partners have all submitted initial reports as called for by UN Security Council Resolution 1540. NATO also supported a Defense Against Biological Terrorism regional workshop in Bucharest in Fall 2007.

**Trans-Sahara Counterterrorism Partnership (TSCTP).**  The TSCTP is a multi-faceted, multi-year strategy aimed at defeating terrorist organizations by strengthening regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security forces, promoting democratic governance, discrediting terrorist ideology, and reinforcing bilateral military ties with the United States. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the region, and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) in combating terrorism. (*See Chapter 2, Country Reports, Africa, for further information on the TSCTP.*)

**The African Union (AU).** The AU has several counterterrorism legal instruments, including a Convention on Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention, and a 2004 Plan of Action. *(See Chapter 2, Country Reports, Africa, for further information on the AU.)*

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF).** In January 2007, the Heads of State of the ten-member Association of Southeast Asian Nations (ASEAN), comprising Brunei, Burma, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand, and Vietnam, signed a new convention on counterterrorism cooperation. The new ASEAN treaty recognizes the importance of having a global legal framework to combat terrorism, as established by the universal conventions on terrorism, and further recognizes that terrorism offenses such as hijacking, hostage-taking, or bombing are not political offenses, and

PX203

terrorists cannot hide behind political justifications to evade justice. Under the new Convention, ASEAN members agree to cooperate to prevent terrorist attacks, the financing of terrorism, and terrorist movement across national borders. They will also cooperate to enhance intelligence exchanges, promote public participation in counterterrorism efforts and strengthen preparedness for dealing with chemical, biological, and nuclear terrorism.

The United States actively participates in counterterrorism-related activities of the 26-member ASEAN Regional Forum (ARF), including the annual meetings on counterterrorism and transnational crime. The United States has continued efforts to increase maritime security cooperation. In January 2007, ARF held a maritime security desktop exercise in Singapore. ARF continues to hold various capacity-building activities in counterterrorism and transnational crime.

**Asia Pacific Economic Cooperation (APEC).**  The 21 member economies of APEC (Australia, Brunei, Canada, Chile, China, Hong Kong, Indonesia, Japan, Republic of Korea, Malaysia, Mexico, New Zealand, Papua New Guinea, Peru, Philippines, Russia, Singapore, Chinese Taipei, Thailand, the United States, and Vietnam), are committed to creating a safe environment for the movement of goods, services, and people throughout the region. The APEC Counterterrorism Task Force (CTTF) was established in 2003 to coordinate implementation of Leaders' and Ministers' statements on counterterrorism and non-proliferation. The United States works within APEC to dismantle transnational terrorist groups and to eliminate the severe and growing danger posed by proliferation of weapons of mass destruction and their means of delivery.
In 2007, the United States continued its capacity-building work to counter biological and chemical terrorism. The second expert-level food defense workshop was held in Vietnam and built upon the success of the first workshop held in Bangkok in 2006. The USG-led bioterrorism initiative resulted in the first ever, APEC Food Defense Principles on prevention, preparedness, response, recovery, and effective communication. These principles will make an important contribution to international counterterrorism efforts to protect the food supply from deliberate contamination.

**OAS Inter-American Committee against Terrorism (CICTE).**  On March 1, 2007, at the CICTE Ministerial in Panama City, CICTE released the Declaration of Panama on the Protection of Critical Infrastructure in the Hemisphere in the Face of Terrorism, which acknowledged that terrorism is a threat to critical infrastructure and committed OAS members to take all necessary actions, in accordance with their domestic law and relevant international agreements, to prevent, mitigate, and deter potential terrorist threats to critical infrastructure, through the development and implementation of national measures and the strengthening of regional and international cooperation. In addition, CICTE delivered more than $5 million in counterterrorism capacity-building assistance in the region. During 2007, the Secretariat conducted 61 training courses and technical assistance missions, benefiting some 2,692 participants in the Hemisphere; this included training of nearly 500 port and airport security officials from 29 member states to help meet the requirements of the International Maritime Organization's International Ship and Port Facility Security (ISPS) code, and the International Civil Aviation Organization's (ICAO) new air security standards.

PX203

In addition, the Secretariat continued to solidify its position as a central point for facilitating international cooperation against terrorism. Following adoption of CICTE's aforementioned ―Declaration of Panama on Protection of Critical Infrastructure in the Hemisphere" the Secretariat helped facilitate two instances of horizontal cooperation between the United States and OAS Member States: a vulnerability assessment of the energy sector in Trinidad and Tobago, and technical assistance on the first steps in identifying and protecting critical infrastructures in Paraguay. CICTE also provided security training to the Caribbean nations hosting the Cricket World Cup.

CICTE continued to advise its 34 member state governments on how to meet the requirements of UNSCR 1373, the 13 international conventions and protocols relating to terrorism, and the Inter-American Convention against Terrorism (IACAT), which complements and expands on international conventions and protocols. CICTE also organized its sixth annual regular session in Bogota, Colombia.

**Tri-Border Area (Argentina, Brazil, and Paraguay)**

The governments of Argentina, Brazil, and Paraguay have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through the region where their territories meet, known as the Tri-Border Area (TBA). In the 1990s, they established the ―Tripartite Commission of the Triple Frontier" to address these illicit activities. In 2002, at their invitation, the United States joined what became the ―3+1 Group on Tri-Border Area Security," a regional mechanism focusing on practical steps to help the TBA states address cross-border crime through enhanced law enforcement and intelligence sharing and strengthened financial and border controls. The United States remains concerned that Hizballah and HAMAS are raising funds in the TBA by participating in illicit activities and soliciting donations from extremists within the sizable Muslim communities in the region and elsewhere in the territories of Argentina, Brazil, and Paraguay. However, there was no corroborated information that these or other Islamic extremist groups had an operational presence in the area.

---

### LONG-TERM GOALS AND PROGRAMS/ACTIONS DESIGNED TO REDUCE CONDITIONS THAT ALLOW TERRORIST SAFE HAVENS TO FORM

---

The **Antiterrorism Assistance Program (ATA)** provides partner countries with the training, equipment, and technology needed to increase their capabilities to find and arrest terrorists, and builds the kind of cooperation and interactivity between law enforcement officers that has a lasting impact. In 2007, ATA sponsored 266 training activities and technical consultations and trained over 4500 participants from 64 countries. In its two-decade long existence, ATA has trained more than 5850 students from 151 countries, providing programs tailored to the needs of each partner nation and to local conditions. Training included: crisis management and response, cyber terrorism, dignitary protection, bomb detection, airport security, border control, response to incidents involving weapons of mass destruction, countering terrorist finance, interdiction of terrorist organizations, and kidnap intervention and hostage negotiation and rescue. All courses emphasized law enforcement under the rule of law and respect for human rights.

PX203

Examples of ATA training include the following:

⇒ **Palestinian Authority**: A $5-million program to administer technical and leadership training, and operational support equipment, to build a professional VIP Protective Unit for the Palestinian Authority. With initial efforts focused on the Presidential Guards from the West Bank, 15 courses were offered in less than five months that trained 320 participants in VIP Protection, Surveillance Detection, and Vital Installation Security.

⇒ **Liberia**: With a $5-million budget, the State Department initiated training and provided equipment for the Special Security Service (SSS), the protective security detail of Liberia's President Ellen Johnson Sirleaf. Nine courses were offered and extensive support equipment was provided, building upon an existing DS/ATA program that has supported contracted mentors embedded in the SSS since early 2007. During this period, the local police called upon SSS personnel to assist with a hostage situation at the home of a former Liberian Minister. Three officers responded, safely extricated the hostages from the home, and shot the perpetrator as he fired on them while trying to escape.

⇒ **Colombia**: For the past several years, ATA has conducted numerous classes of antiterrorism instruction at a cutting-edge training facility known as Sibate, which has helped Columbia's anti-kidnapping units (known by their Spanish acronym GAULA) to reduce kidnappings in Colombia by 83 percent since 2002. None of the ATA-trained GAULAs have lost a hostage during rescue operations. Furthermore, Colombia is taking over responsibility for running the programs itself; the transition is expected to be complete by 2009, with Colombia funding the entire tactical portion of training. In 2007, the Colombian police hosted the head of the Serious Crime Unit from the Montevideo, Uruguay Police Department to explore the possibility of training his anti-kidnapping and counterterrorism units at that location. Training of the Brazilian Federal Police has already occurred.

⇒ **Afghanistan**: ATA programs worked to organize, train, equip, and mentor the protective detail and supporting tactical elements of the now regionally renowned Presidential Protective Service (PPS) responsible for the safety of President Karzai. As a result of the high degree of professionalism that it has achieved, the PPS began escorting President Karzai on overseas state visits without American mentor support.

⇒ **The Caribbean**: ATA training enabled officials from five Caribbean countries to develop strategies to manage security for the 2007 Cricket World Cup.

⇒ **Thailand**: A Royal Thai Police (RTP) tactical team conducted a successful raid in which they recovered unharmed a kidnapped American citizen and arrested eight suspects. The RTP Lieutenant Colonel who led the operation, the lead investigator, and four members of the tactical entry team had completed ATA training in Crisis Response Team, Hostage Negotiation, Officer Survival/High-Threat Incident, and the Police Role in Crisis Management.

PX203

⇒ **Pakistan**: The Federal Special Investigations Group's (SIG's) forensics laboratory used leads gleaned from a cell phone SIM card retrieved by Quetta Criminal Investigative Division personnel who had attended an ATA Post-Blast Investigation course. More than 33 messages were retrieved that outlined 14 bomb threats. Numerous suspects were identified, and two bombs were later seized. ATA had designed and funded the SIG's forensics laboratory and trained the staff.

⇒ **Persian Gulf**: In order to facilitate participation in the ATA program by the energy-rich nations of the Persian Gulf that would not otherwise be eligible for foreign assistance, ATA initiated the strategic Partner Nation Pre-Payment Program. Under this program, the State Department first obtains the required legal —determination" from the Office of Foreign Assistance authorizing a foreign nation's participation in the program; then determines the antiterrorism training needs of the Partner Nation; and enters into a Memorandum of Understanding (MOU) to provide training subsequent to receipt of their advance payment. Initial training deliveries are currently under negotiation with two Persian Gulf nations for the Preventing Attacks on Soft Targets course.

The **Terrorist Interdiction Program (TIP)** assisted priority countries at risk of terrorist activity to enhance their border security capabilities. TIP provided participating countries with a computerized watch listing system to identify suspect travelers at air, land, or sea ports of entry. TIP further promotes expanded cooperation and close liaison with host governments in the areas of rule of law, anticorruption, and law enforcement. Since 2001, the State Department has provided TIP assistance to more than 20 countries, assistance that was instrumental in impeding terrorist travel. High-priority countries participating in the program include Iraq, Pakistan, Afghanistan, Yemen, and Kenya. Hundreds of individuals traveling on stolen passports in Pakistan, as well as wanted criminals, narcotics smugglers, and human traffickers have been identified and intercepted worldwide. The TIP complements other counterterrorism-related U.S. efforts to enhance aviation, border, cyber, maritime, and transportation security.

**Counterterrorist Finance Training (CTFT)**.  The State Department chaired the interagency Terrorist Finance Working Group (TFWG), which meets biweekly to develop and coordinate USG CTF capacity-building efforts, and worked to expand its counterterrorism financing (CTF) capacity-building efforts in key partner nations. Under the auspices of the TFWG we have worked with the Department of Homeland Security (DHS) and our interagency partners to expand our bulk cash smuggling training programs, and thus provided regional or bilateral Bulk Cash Smuggling training to 45 countries. In addition, the CTF capacity-building program includes training and technical assistance in the legal, financial regulatory, financial intelligence, financial investigation, and judicial/prosecutorial fields. In 2007, CTF programs included the posting of five Resident Legal Advisors, the development of a Regional Operational Cash Courier program, Prosecutorial and Designation Workshops, Financial Intelligence Unit (FIU) Development, and terrorist financing analytical training for law enforcement authorities.

**Increasing Economic Development**.  Poverty, unemployment, weak institutions, and corruption can turn nations of great potential into recruiting grounds for terrorists. Development is central to the President's National Security Strategy and long-term U.S. economic growth. Well-conceived, targeted aid is a potential leveraging instrument that can help countries implement sound economic policies and improve the conditions that terrorists might otherwise exploit.

PX203

The Millennium Challenge Account (MCA), established by Congress in 2004, represents a new model for achieving transformational development by providing assistance to those countries that rule justly, invest in their people and encourage economic freedom. The prospect of an MCA Compact provides a powerful incentive for the poorest countries to reform. U.S. private sector flows to the developing world, including trade and investment ($685.4 billion in 2004), dwarf our foreign aid ($23.5 billion). Unutilized capital in developing countries, owing to weak policies and poor property rights, is estimated to be as high as $9 trillion.

Debt relief for the poorest is another element of our development strategy. Our long-standing support for the Heavily Indebted Poor Countries (HIPC) initiative, as well as for the Multilateral Debt Relief Initiative (MDRI) introduced in 2006, promotes debt sustainability, reduces the likelihood of debt distress and enables the poorest countries to devote additional resources to reducing poverty and promoting economic growth. Our aggressive multilateral and bilateral trade agenda to open agricultural and non-agricultural markets and liberalize financial services, transportation, telecommunications, and government procurement all support development.

USAID's humanitarian aid programs and its activities in the areas of economic growth, agriculture, trade, health, democracy, and conflict prevention help reduce the risk of countries becoming breeding grounds for terrorism. In Afghanistan, USAID is helping to build a safe, stable society that meets the needs of its people and eliminates an environment in which terrorist groups have flourished. USAID has been on the front lines of support to tsunami-affected countries, garnering goodwill toward the United States among people in the hardest-hit areas.

**The Middle East Partnership Initiative (MEPI)** Despite some setbacks to the freedom agenda, including attempts by authoritarian governments to limit basic rights for citizens, 2007 developments in the Middle East and North Africa region demonstrated that calls for greater political, economic, and educational opportunities; and women's empowerment are clear, indigenous, and growing.

In 2007, to support and amplify local demands for reform, MEPI provided tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from campaign schools to civic education to an Arab businesswomen's network. Examples of MEPI's work with reformers include the following:

**Political**
- MEPI supported programs to increase participation in the 2007 Majlis Al Shura elections in Oman, and in Parliamentary elections in Jordan, Algeria, and Morocco. While there is still more progress that needs to be made to truly make these electoral processes free and fair, it is significant nonetheless that elections are becoming institutionalized and that electorates expect a level of transparency and competition;
- Through training, technical assistance, and networking, MEPI supported programs that addressed media reform and the backsliding situation of press freedoms in Egypt, Morocco, Tunisia, and the Palestinian Territories; and

PX203

- Strengthened the role of civil society in the democratic process by supporting regional networks of grassroots activists that are advancing tangible reform initiatives in the areas of freedom of expression, women's political participation, and the legal environment for NGOs. Awarded direct grants to numerous Arab civil society organizations across the region to advance the Freedom Agenda. MEPI also supported dialogue between these civil society leaders and their respective governments within the framework of the G8's BMENA Initiative.

**Economic**
- Provided technical and other assistance in support of successfully completed free trade agreements with Bahrain and Oman; Trade and Investment agreements with Kuwait, Qatar, Tunisia, and Egypt; and, WTO accession support for Yemen, Algeria, and Lebanon;
- Expanded trade capacity of Arab countries with training and technical assistance; and assisted a number of Gulf and North African countries with revisions to their labor, intellectual property codes, customs codes, and agricultural import/export standards;
- Expanded efforts to strengthen indigenous labor and business organizations;
- Provided entrepreneurial training for more than 400 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 50 alumni going on to start or expand businesses. At least 1,000 new jobs have been created following their participation in MEPI programs;
- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations;
- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters; and
- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman; update commercial codes to meet international standards in Bahrain, Qatar, and Oman; and provide continuing education programs for the judiciary.

**Education**
- Empowered more than 300 young, highly motivated Arab men and women with leadership, problem-solving, and entrepreneurial skills through intensive five-week training institutes; most have started their own civic projects in their countries;
- Supported a regional civic-education network that promotes youth civic awareness and involvement. Examples of resulting youth-led projects included starting after-school classes for underprivileged students and improving health services at local hospitals. The program is being widely accepted and adopted; for example, education officials committed to adopting Project Citizen in all schools in Marrakesh, Morocco;
- Promoted critical thinking and independent reading with an initiative to provide over 8.2 million high-quality Arabic-language American children's books to more than 6,770 primary schools in more than 40,620 classrooms in four Middle Eastern countries; and
- Provided English language study to more than 4,500 underserved youth from 13 countries in the Middle East through a micro-scholarship program, bringing the total number of students reached with MEPI support to more than 12,000.

PX203

**Women**

- Strengthened the technology, business, and advocacy skills of women throughout the region, including the Gulf;
- Established the first U.S.-Middle East Partnership for Breast Cancer Awareness and Research, which enabled women across the region to join together in private-public partnerships, civic engagement, and networking;
- Created business network hubs in nine countries, focusing on training, professional development, and information sharing on laws, business opportunities, skills, and the global economy; and
- Supported legal reform and family law initiatives in the region that improve gender equality and economic rights for women.

PX203

## INTERNATIONAL CONVENTIONS AND PROTOCOLS

**1. Convention on Offences and Certain Other Acts Committed On Board Aircraft**
Signed in Tokyo on September 14, 1963.
Convention entered into force on December 4, 1969.
Status: 183 Parties

**2. Convention for the Suppression of Unlawful Seizure of Aircraft**
Signed in The Hague on December 16, 1970.
Convention entered into force on October 14, 1971.
Status: 182 Parties

**3. Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation**
Signed in Montreal on September 23, 1971.
Convention entered into force on January 26, 1973.
Status: 185 Parties

**4. Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents**
Adopted in New York on December 14, 1973.
Convention entered into force on February 20, 1977.
Status: 166 Parties

**5. International Convention Against the Taking of Hostages**
Adopted in New York on December 17, 1979.
Convention entered into force on June 3, 1983.
Status: 164 Parties

**6. Convention on the Physical Protection of Nuclear Material**
Signed in Vienna on October 26, 1979.
Convention entered into force on February 8, 1987.
Status: 130 Parties

**7. Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, Supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation**
Signed in Montreal on February 24, 1988.
Protocol entered into force on August 6, 1989.
Status: 161 Parties

**8. Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation**
Done in Rome on March 10, 1988.
Convention entered into force on March 1, 1992.
Status: 147 Parties

PX203

**9.  Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf**
Done in Rome on March 10, 1988.
Protocol entered into force on March 1, 1992.
Status: 136 Parties

**10. Convention on the Marking of Plastic Explosives for the Purpose of Detection**
Done in Montreal on March 1, 1991.
Convention entered into force on June 21, 1998.
Status: 137 Parties

**11.  International Convention for the Suppression of Terrorist Bombings**
Adopted in New York on December 15, 1997.
Convention entered into force on May 23, 2001.
Status: 153 Parties

**12.  International Convention for the Suppression of the Financing of Terrorism**
Adopted in New York on December 9, 1999.
Convention entered into force on April 10, 2002.
Status: 160 Parties

**13.  International Convention for the Suppression of Acts of Nuclear Terrorism**
Adopted in New York on April 13, 2005.
Convention entered into force on July 7, 2007.
Status: 115 Parties

**14.  2005 Amendment to the Convention on the Physical Protection of Nuclear Material**
Not yet entered into force
Status: 13 States have deposited instruments of ratification, acceptance or approval with the depositary.

**15. Protocol of 2005 to the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation**
Not yet entered into force
Status: Two States have deposited instruments of ratification, acceptance or approval with the depositary.

**16. Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf**
Not yet entered into force
Status: No States have deposited instruments of ratification, acceptance or approval with the depositary.

PX203

## 5.2. Support for Pakistan

The 9/11 Commission recommended the United States "make the difficult long-term commitment to the future of Pakistan" and "support Pakistan's government in its struggle against extremists with a comprehensive effort that extends from military aid to support for better education, so long as Pakistan's leaders remain willing to make difficult choices of their own."

| Composition and Levels of Assistance, Including Security and Other Assistance |

The United States commitment to a long-term relationship with Pakistan is highlighted by President Bush's pledge to Pakistani President Musharraf to seek from Congress $3 billion in Economic Support Funds (ESF) and Foreign Military Financing (FMF) for Pakistan during the five-year period from FY-2005 through FY-2009. Since 2002, U.S. assistance to Pakistan, including Coalition Support Funds (CSF), totals $9.92 billion. Approximately $1.24 billion in U.S. assistance, also including CSF, was provided to Pakistan from monies appropriated for FY-2007. The Administration requested $845 million in assistance for Pakistan for FY-2008 and is requesting $785 million for FY-2009, neither of which includes CSF.

In addition to Economic Support Funds and Foreign Military Financing, the United States is also providing other forms of assistance to Pakistan, including funding for Child Survival and Health (CSH), Development Assistance (DA), International Military Education and Training (IMET), International Narcotics and Law Enforcement (INCLE), Antiterrorism Assistance (NADR-ATA), Export Control and Border Security (NADR¬EXBS), Small Arms and Light Weapons (NADR-SALW), Terrorism Interdiction Programs (NADR-TIP), Food for Peace (P.L. 480 Title I & II), Emergency Refugee and Migration Assistance (ERMA), and International Disaster and Famine Assistance (IDFA). The chart below offers a comparison of selected types of assistance and does not include CSF.

| Account | FY-2006 | FY-2006 Supplemental | FY-2007 | FY-2007 Supplemental | FY-2008 Request | FY-2008 Supplemental | FY-2009 Request |
|---|---|---|---|---|---|---|---|
| CSH | 22,800 | 5,300 | 22,400 | | 39,800 | | 33,800 |
| DA | 27,000 | 10,500 | 95,300 | | 18,000 | | 18,000 |
| ESF | 296,600 | 40,500 | 283,700 | 110,000 | 382,900 | 60,000 | 388,900 |
| FMF | 297,000 | | 297,000 | | 300,000 | | 300,000 |
| IMET | 2,000 | | 2,000 | | 2,000 | | 2,000 |
| INCLE | 37,620 | | 21,350 | | 32,000 | | 32,000 |
| NADR | 8,600 | | 10,000 | | 10,300 | | 10,300 |
| P.L 480 TITLE I & II | 17,700 | | | | TBD | | TBD |
| ERMA | | | | | | | |
| IDFA | | 70,000 | | | | | |
| TOTAL | 709,320 | 126,300 | 731,750 | 110,000 | 785,000 | 60,000 | 785,000 |

PX203

The mix of U.S. assistance for Pakistan reflects the diverse ways the United States is cooperating with Pakistan in pursuit of critical USG policy goals. These include prosecuting the War on Terror; countering nuclear proliferation; building a stable and democratic Afghanistan; ensuring peace and stability in South Asia through the continuation of the India-Pakistan reconciliation process; supporting Pakistan's efforts to become a modern, prosperous, democratic state; and assisting it in reconstruction efforts from the October 8, 2005 earthquake.

U.S. Foreign Military Financing (FMF) funding for Pakistan is designed to enhance Pakistan's capabilities in the War on Terror; help it to better control its borders; meet its legitimate defense needs; and make Pakistan more secure so that it can more readily take the steps necessary to build a durable peace with all its neighbors-thus fostering security and stability throughout the South Asia region. FMF is being used by Pakistan to purchase helicopters, aircraft, weapons systems, munitions, and other equipment, which, inter alia, have enabled Pakistan's armed forces to operate against foreign terrorists and militants in the rugged border areas along the Pakistan-Afghanistan border. The Pakistani military is continuing military operations along that border. Since 2001, over 1,000 Pakistani military personnel have been killed carrying out operations in support of the War on Terror.

International Military Education and Training (IMET) assistance for Pakistan complements FMF by exposing Pakistani officers to U.S. doctrine, systems, and American culture, promoting military-to-military cooperation, increased professionalism, and enhanced military interoperability between Pakistan and the United States. IMET also assists Pakistan in developing expertise and systems to more effectively manage its defense establishment; builds technical skills for better operation and maintenance of U.S.-origin equipment; and promotes military subordination to democratic civilian rule and respect for human rights. For FY-2008, the Administration's International Military Education and Training request is just under $2.0 million, with post seeking sizable increases in the future to bridge the gap created during sanction years when no Pakistani military officials attended training in the United States

## Measures to Ensure that Assistance Has the Greatest Long-Term Positive Impact on the Welfare of Pakistani People and Their Ability to Cooperate Against Terror

Economic Support Funds, Development Assistance, and Child Survival and Health assistance are being used to improve the lives of ordinary Pakistanis; lay the groundwork for the country's sustained economic growth; and strengthen social, political, and economic institutions, thus alleviating the conditions that breed extremism while demonstrating that the United States interest in Pakistan extends beyond the War on Terror to concern for the Pakistani people as a whole.

Approximately $60 million in FY-2008 Economic Support Funds and Development Assistance funds will be allocated to implement education reform programs in Pakistan and support the Government of Pakistan's initiative to improve the teaching and learning process in public schools. Pakistan's low literacy rate greatly hampers its ability to develop and expand its economic base. Literacy averages 54 percent nationwide, and in Pakistan's remote tribal areas

PX203

can be as low as 0.5 percent for women. The dearth of good public schools results in thousands of youth attending madrassas, schools that teach mainly religious subjects, some of which promote a radical, violent ideology. To tackle these problems, USG-funded education programs in Pakistan are aimed at improving the quality of education in Pakistani primary and secondary schools, especially in Baluchistan, Sindh, and the Federally Administered Tribal Areas (FATA); improving early childhood education; training teachers; increasing parental and community involvement in schools; ensuring teachers have adequate classroom materials; improving access to schools and promoting the development of a new generation of Pakistani leaders by providing scholarships for disadvantaged students to obtain a higher education. Adult and youth literacy education programs are targeting out-of-school youth and illiterate adult populations, with a focus on women and girls. In addition, student exchanges play a large part in our education efforts, with Pakistan's Fulbright program being the largest in the world.

Democratization is a key focus of USG assistance toward Pakistan. One of the fundamental tools for combating terrorism over the long-term is democracy. The programs include several mutually reinforcing components: legislative training to increase the effectiveness, transparency, and accountability of Pakistan's provincial and national parliaments; political party strengthening focused on identifying and training young reformers - tomorrow's political leadership; support for increased women's political participation; independent media training for journalists; and civil society development designed to increase the capacity of indigenous nongovernmental organizations to serve as policy watchdogs and promote human rights. In preparation for the 2008 elections, several USAID-funded non-governmental organizations are conducting security assessments in sensitive areas to ensure the safety of observers, monitors, and polling stations.

Pakistan trails its South Asian neighbors in almost all key health areas: maternal and infant mortality; safe affordable family planning; and control of infectious diseases. FY-2008 Child Survival and Health funds will be used to increase availability of maternal and child health services, especially in rural areas; to ensure that families who want to space births can access high quality family planning services; to help maintain Pakistan's low human immunodeficiency virus prevalence rate by increasing awareness; to eradicate polio, to support continued progress in TB diagnosis and treatment; and to increase communities' access to clean drinking water and their practice of adequate hygiene behaviors.

The United States supports Pakistan's economic growth. New programs are being developed to create jobs and increase incomes. Current programs providing microfinance and small business lending in rural and peri-urban areas will continue to enable enterprise development and smooth income streams for the poor. Programs improving the competitiveness of small and medium enterprises are assisting the growth of Pakistani exports and generating frequent, positive coverage in the local press, helping to improve the image of USG assistance.

Earthquake Reconstruction efforts will enter their third year in FY-2008, and will continue to rebuild, furnish, and supply health and education sector infrastructure and human resource capacities; to re-establish the livelihoods of earthquake victims; to resettle displaced victims; and to train skilled and unskilled individuals in vocational training, agriculture, and livestock development, asset formation, enterprise development, micro-credit, and market restoration.

215

PX203

The FY-2008 budget request for Economic Support Funds, Child Survival and Health, and Development Assistance (DA) is $500 million, which is $10 million less than the FY-2007 actual budget. Part of the FY-2008 request is $60 million in ESF funds from the Global War on Terror Supplemental. This will help fund the government's Federally Administered Tribal Areas Sustainable Development Plan to improve governance and encourage economic development of the border area between Afghanistan and Pakistan.

International Narcotics and Law Enforcement funds for Pakistan continue to strengthen border security and enable law enforcement access to remote areas along the Pak-Afghan border - thus enhancing the country's capability to interdict traffickers in narcotics, arms, persons, and contraband, as well as terrorists. International Narcotics and Law Enforcement funds are used to reform, strengthen, and improve cooperation among Pakistan's law enforcement agencies, all of which play an important role in the War on Terror. International Narcotics and Law Enforcement funds support a counternarcotics Air Wing based in Quetta, Baluchistan, operated by Pakistan's Interior Ministry. The Wing includes C-208 Caravan fixed-wing surveillance aircraft and UH-2 Huey II helicopters.

International Narcotics and Law Enforcement funds are also used to procure vehicles and communications, surveillance, and related equipment for border control and counter-narcotics activities; fund infrastructure projects to enhance roads in inaccessible parts of FATA; fund an Automated Fingerprint Identification System and National Criminal Database; and for training and equipment to expand law enforcement investigative skills and forensic capacities. In tackling poppy cultivation, International Narcotics and Law Enforcement funds support crop control, alternative livelihood, and demand reduction programs.

Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security assistance strengthens Pakistan's export control system and thus prevents weapons of mass destruction and related technology transfers that raise proliferation concerns. Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security funds are used for nonproliferation export control training addressing legal/regulatory reform, export licensing systems, customs enforcement, general inspection, weapons of mass destruction detection training for border control personnel, and procuring specialized radiation/chemical detection equipment. The Administration's $500,000 FY-2008 request in Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security assistance represents a slight decrease from the FY-2007 $600,000 request.

Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance funding for Pakistan enhances the capabilities of elite national police units responsible for counterterrorism investigations and tactical operations. Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance trained the Special Investigation Group and crisis response teams that were integral in making arrests after the December 2003 assassination attempts on President Musharraf and the May 2004 car bombs near the U.S Consulate in Karachi. The Administration's FY-2008 request of $8 million for Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance represents a decrease from the FY-2007 $8.59 million request.

PX203

Nonproliferation, Antiterrorism, Demining, and Related Programs/Terrorism Interdiction Programs funding for Pakistan is being used to support the Personal Identification Secure Comparison Evaluation System automated border control system, including to sustain ongoing program operations and to expand coverage to additional Pakistani ports-of-entry. The Administration is requesting $900,000 in Nonproliferation, Antiterrorism, Demining, and Related Programs/Terrorism Interdiction Programs funds for Pakistan for FY-2008, a slight decrease from the $1 million requested for FY-2007.

## Measures to Alleviate Difficulties, Misunderstandings, and Complications in United States-Pakistani Relations

The United States and Pakistan engage in extensive consultations to ensure U.S. foreign assistance has the greatest long-term benefit for Pakistanis and also enhances the country's ability to cooperate in the War on Terror. This is exemplified by the annual consultations that result in mutually-agreed Shared Objectives for the Government of Pakistan's use of $200 million in Economic Support Funds in direct budget support. The United States participates in the annual Pakistan Development Forum, which brings together the Government of Pakistan and bilateral and multilateral donors to discuss Pakistan's development priorities and assistance needs. The United States holds regular consultations with major donors including Great Britain, the European Union, Japan, the Asian Development Bank, and the World Bank, to ensure that assistance to Pakistan is effectively coordinated for maximum impact.

The USAID Federally Administered Tribal Areas (FATA) Development Program supports the Government of Pakistan's FATA Sustainable Development Plan. The USAID program is focused on improving health, education, access to and availability of jobs, and capacity-building of FATA institutions. In education, USAID is improving access and quality of education for students by building and furnishing 65 primary, middle, and high schools; awarding scholarships to 37 women from this area to attend a one-year, pre-service teacher education program; and building or restoring water and sanitation facilities at 190 girls' primary schools and 90 villages. In health, USAID is improving the quality of drinking water, training health practitioners, providing polio vaccines, and immunizing children. To date, the United States has conducted 32 polio eradication campaigns in the FATA. USAID is promoting competitiveness initiatives to support both the marble and granite, and gems and jewelry sectors of the local economy, as well as provide jobs, training opportunities, and access to micro loans. Finally, the program is building the capacity of the FATA Secretariat and other Government of Pakistan institutions to improve their ability to deliver services to the people of the FATA and to ensure the sustainability of USAID's development efforts in the region.

## USAID GLOBAL EXPORT PROMOTION PROGRAMS

The Pakistan Initiative for Strategic Development and Competitiveness (PISDAC) project aims at increasing the competitiveness of Pakistani small- and medium-sized enterprises. Sectors currently covered under the project are gems, jewelry, dairy, horticulture, surgical supplies,

PX203

furniture, and marble granite. The project has focused on several prominent Pakistani industries and formed six strategic working groups composed of business people from the industries that develop sector-specific strategies. FY-2007 funding for PISDAC was $2.0 million.

USAID supports the Government of Pakistan's education reform strategy by: (1) strengthening education policy and planning; (2) improving the skills and performance of teachers and administrators; (3) increasing youth and adult literacy; (4) expanding public-private partnerships; and (5) providing school improvement grants and involving parents and communities in public schools.

## 5.3. Collaboration with Saudi Arabia

| Steps to Institutionalize and Make More Transparent Government-to-Government Relations |
| :---: |

The United States-Saudi Strategic Dialogue, inaugurated in November 2005 by Secretary Rice and Foreign Minister Saud al-Faisal, and reporting to President Bush and King Abdullah, remains the highest level institutionalized forum for coordinating U.S. and Saudi interests. The Strategic Dialogue consists of six working groups focusing on human development, economy, energy, consular affairs, military cooperation, and counterterrorism. These Strategic Dialogue working groups meet periodically to address issues such as making government more accountable and participatory, human rights, visas, child custody cases, and security cooperation. Ministerial-level meetings, dealing with bilateral issues of strategic importance, are held as part of the Strategic Dialogue.

| Intelligence and Security Cooperation in the Fight against Islamic Terrorism |
| :---: |

The United States and Saudi Arabia have an ongoing dialogue on a full range of counterterrorism issues, which include regular high-level discussions and close working-level collaboration. Saudi cooperation in this area is significant, and U.S. law enforcement and intelligence agencies have benefited and continue to benefit from Saudi information and intelligence on individuals and organizations. U.S. law enforcement agencies have provided counterterrorism training to Saudi security services in both Saudi Arabia and in the United States.

Since May 2003, the Saudi government has killed or captured al-Qaʻidaʻs (AQʻs) operational Saudi-based senior leadership, as well as most of the networkʻs key operatives and many of the Kingdomʻs most wanted individuals. This effort has disrupted AQʻs efforts to prosecute its terrorist campaign against the government. During 2007, Saudi security forces continued to target terrorists and their supporters, and the Saudi government announced the arrest of more than 400 terrorists and their supporters, including terrorist financiers and those advocating extremist ideology over the Internet. Saudi officials claimed these arrests disrupted major attacks that were planned against Saudi government and economic targets. During an address to the Shura Council on July 1, Interior Minister Prince Nayif bin Abdulaziz Al Saud, stated that more than 9,000 suspected terrorists and their supporters have been arrested since 2003 and more than 3,100 remained in custody.

PX203

Recognizing that financiers of terrorism are key actors that allow terrorist groups to operate, the Saudi government continued to target such individuals and announced the arrest of more than 30 terrorist financiers in 2007. The United States continued to urge Saudi Arabia to take action against additional key terrorist financiers and facilitators in the Kingdom. While the government has not yet made operational a National Committee to oversee overseas charitable contributions, the government has prohibited Saudi charities from sending funds abroad until the Committee is established. Saudi Arabia took action against suspected terrorist financiers by freezing their accounts and confiscating their assets. In October, the Saudi government froze assets and accounts belonging to three Saudis who were designated by the 1267 committee, and also imposed the required travel ban on these individuals.

Grand Mufti Sheikh Abdulaziz al-Sheikh, Saudi Arabia's preeminent religious figure, made strong statements warning Saudis to be cautious when making charitable contributions, and the government continued to closely monitor charitable giving by Saudis. The government also implemented new customs regulations that restrict the free flow of money, precious metals, and gems across its borders.

## Saudi Contributions to Stability in the Middle East and Islamic World, Including the Middle East Peace Process, by Eliminating Support for Extremist Groups

Saudi Arabia has strengthened its border controls and security and, in particular, its border with Iraq to address travel by Saudis to Iraq to join terrorist groups fighting against Coalition Forces and the travel of non-Saudis through Saudi Arabia. The government announced a project to secure its border with Iraq as part of its larger border modernization program. The project will increase physical barriers and electronic surveillance of the northern border. In the interim, the Ministry of the Interior has deployed additional forces to the border area and has been successful in interdicting illicit movement of persons and equipment across the Saudi-Iraq border. The Saudi government announced the arrest of several hundred individuals who were planning to travel to Iraq or were actually en route, and increased its security cooperation with the Government of Iraq.

Senior Saudi leaders, including King Abdullah and Interior Minister Nayif, made strong statements against Saudis traveling to Iraq to join terrorist groups. On October 1, Grand Mufti Abdulaziz al-Sheikh issued a religious edict urging Saudi youth not to travel to Iraq to join terrorist organizations. This edict was repeated by other senior Saudi religious leaders as well.

The Saudi government continued its aggressive campaign to undercut the extremist ideologies that underpin support for terrorism and terrorist groups. Its publicity campaign includes using print media ads, billboards, text messages, and the Internet to oppose extremist thought. The government continues to monitor speeches and writings of religious leaders closely to ensure they do not advocate extremism and to conduct re-education training for religious leaders. Those who violate government decrees and regulations are fired or reassigned. In an effort to prevent unauthorized preaching, the Saudi government has recently taken steps to issue identification cards to imams authorized to speak in mosques. The government has stepped up its efforts to de-legitimize the extremist ideologies that glorify terrorism and undercut the so-called Islamic

PX203

underpinnings of these beliefs. Senior Saudi leaders have made strong statements criticizing the extremist ideology espoused by many terrorists as evil and "un-Islamic".

The government also operates a counter-radicalization/de-radicalization program designed to re-educate those arrested for supporting extremism or terrorism, including Saudis formerly held at the Guantanamo Bay detention facility. The program is designed to reintegrate individuals into society and includes educational, social, and religious components to undermine extremist messages and foster a more tolerant attitude. The program builds on family and tribal relations to reinforce the message and speed the reintegration process. Those who complete the program and show evidence of having been rehabilitated are eligible for consideration for release from custody, though not before they have served any prison sentence for their previous crimes. Employment, coupled with tribal and family re-integration, including marriage, in some cases, are important components of the post-release program, as are monitoring and follow-up by both extended families and the Saudi government. More than 1,000 Saudis have completed the program and the Saudi government states that the recidivism rate is very low. The USG is following the progress of this program closely, both to understand the program and monitor rates of recidivism, and will not hesitate to raise any concerns with the Saudi government.

The USG continued to urge the Saudis to make progress on revising their textbooks to remove hateful and intolerant references and to reform its educational system. Senior Saudi officials have acknowledged the need to combat extremism by addressing comprehensive education reform. In November 2006, the King Abdul Aziz Center for National Dialogue held the Sixth National Dialogue Forum in Al-Jawf called "Education: Reality and Promises." The Dialogue produced a "road map" for educational reform that included revision of textbooks, curricula, and teaching methods to promote tolerance. The government continued its National Campaign to Counter Terrorism, which includes publications, lectures, and workshops intended to educate school-age girls and boys about the evils of terrorism. Additionally, the Ministry of Education recently issued a new regulation that allows only Ministry-approved summer camps to operate.

## Political and Economic Reform in Saudi Arabia and Throughout the Islamic World

King Abdullah continued to pursue an incremental reform policy that aims to achieve a more tolerant society. Saudi Arabia is a conservative country and some societal elements are wary of this policy. The undercurrent against reform remains strong, albeit muted, and the government continued to move slowly in easing many social restrictions. The United States has encouraged the Government of Saudi Arabia to make legal, economic, political, and social reforms, with progress in such areas as local governance, economic reform, and religious and social freedoms.

The Saudi government has taken some steps to devolve power. In 2007, King Abdullah granted increased authority to the Majlis al-Shura, the Consultative Council, which can now offer some oversight on government actions and has the authority not only to review laws proposed by the Council of Ministers but to propose laws. King Abdullah also established a Succession Council that will guide the selection of future Crown Princes, a move to institutionalize the process more formally. The United States will continue to urge the Government of Saudi Arabia to promote political participation, increased transparency, and accountability in government.

PX203

Recognizing the need to better prepare Saudis for the challenges of the 21st century and to address some of the root causes of extremism, King Abdullah has directed a major overhaul of the Saudi education system. Saudi Arabia is now in the second year of a six-year $2.4 billion program to reform its educational system, which includes incorporating an updated and modernized curriculum, updated teacher training, and new textbooks. The government is expanding the number of colleges and universities and is examining possibilities for partial privatization of primary and secondary schools.

While Saudi Arabia continues to have a society strictly segregated by gender, women's rights and opportunities have increased. Saudi women are joining the workforce in larger numbers and there have been efforts to rein in the Mutawwa'in (religious police) and apply official sanctions for extremist acts. Recent government initiatives to allow women to stay alone at hotels and comments about granting women the right to drive have generated a strong backlash among religious conservatives, but demonstrate the King's commitment to moving forward slowly on women's rights. In October, the King announced a sweeping judicial reform including specialized criminal, commercial, labor, and family courts, which has the potential to modernize and improve the Saudi judicial system.

The United States sponsors a variety of initiatives focused on increasing freedom and opportunity for Saudi citizens. These include the Middle East Partnership Initiative (MEPI), support to the Middle East Democracy Assistance Dialogue, the Broader Middle East and North Africa (BMENA) Civil Society Dialogue, and a variety of public diplomacy educational, exchange, and outreach programs of the State Department's Bureaus of Educational and Cultural Affairs and International Information Programs. With MEPI support, Junior Achievement International, a program to educate youth on the benefits of free enterprise, business, and economics will focus on opening a new chapter in Saudi Arabia this summer. MEPI is supporting the creation of a women's business hub in the Kingdom to expand economic opportunities for women.

Higher oil prices bolstered the Saudi economy in 2007, resulting in a budget surplus of roughly $47.6 billion. In addition to reducing the national debt, Saudi Arabia is re-investing much of the surplus revenue in social development and large infrastructure projects and also has supported investments to diversify the economy away from petroleum and the petrochemical industry. The Kingdom announced plans to establish six Economic Cities to provide regional anchors to spur economic diversification and to move into greater value-added manufacturing. The King Abdullah Economic City in Rabigh will be the site for the King Abdullah University of Science and Technology, Saudi Arabia's flagship effort to establish a world-class university.

> **Ways to Promote Greater Tolerance and Respect for Cultural and Religious Diversity in Saudi Arabia and Throughout the Islamic World**

In November 2007, the Secretary of State re-designated Saudi Arabia a "Country of Particular Concern" pursuant to the International Religious Freedom Act. This is an important element of our bilateral dialogue with the Saudi government. The United States is working to promote religious and cultural tolerance in Saudi Arabia and to counter the spread of extremist ideology

221

PX203

through high-level engagement and exchange programs aimed at reaching key population groups. In 2007, 25 Saudis traveled to the United States on International Visitor programs designed for religious leaders in an effort to expose Saudis to American ideas of religious tolerance and civil society.

On April 25, 2005, following the visit of then-Crown Prince Abdullah to Crawford, Texas, the United States and Saudi Arabia issued a joint declaration noting that ―future relations must rest on a foundation of broad cooperation. We must work to expand dialogue, understanding, and interactions between our citizens." The declaration noted that such cooperation would include programs designed to:

– Increase the number of young Saudi students traveling and studying in the United States;
– Increase military exchange programs so that more Saudi officers visit the United States for
   military training and education; and
– Increase the number of Americans traveling to work and study in Saudi Arabia.

In 2005, Saudi Arabia initiated a scholarship program to increase the number of young Saudi men and women pursuing undergraduate and graduate studies in the United States. By 2007, more than 15,000 Saudis were studying in the United States on Saudi government scholarships.

> **Ways to Assist Saudi Arabia in Reversing the Impact of Financial, Moral, Intellectual, or Other Support to Extremist Groups in Saudi Arabia and Other Countries, and to Prevent this Support from Continuing in the Future**

The United States and Saudi Arabia worked closely together to combat terrorism in Saudi Arabia and abroad. The United States continued to urge the Saudi government to more vigorously pursue and prosecute terrorist financiers, and offered training to the Government of Saudi Arabia to help increase its capacity to detect and disrupt terrorist financing efforts.

While the Saudis have not yet made operational a High Commission for Charities to oversee all charities in Saudi Arabia, the government has imposed a ban on domestic charities sending money overseas except through this Commission. All international charitable work is carried out through the Saudi government agencies such as the Saudi Fund for Development or the Red Crescent Society.

The United States and Saudi Arabia have worked together to designate individuals and entities jointly to the UNSC 1267 Committee. More needs to be done in terms of reducing the flow of money and foreign fighters to Iraq. To combat terrorist financing, Saudi Arabia has instituted new anti-money laundering and counterterrorism finance laws and regulations including removing charity boxes from mosques, restricting the amount of cash that can be carried into or out of the Kingdom, and establishing a Financial Investigations Unit (FIU) in the Ministry of Interior to investigate money-laundering cases and to consolidate all counterterrorism financing operations, both analysis and investigations.

PX203

## 5.4. The Struggle of Ideas in the Islamic World

Public diplomacy is essential to a successful foreign policy and to America's national security. The United States recognizes that the global and generational challenge of countering terrorism is, at its heart, a contest of ideas and values. America is more secure when people around the world share the same hopes and freedoms.

| Goals for Winning the Struggle of Ideas |
|---|

The State Department's public diplomacy work is guided by three strategic imperatives. First and foremost, it offers a positive vision of hope and opportunity rooted in the enduring U.S. commitment to freedom. It promotes the fundamental and universal rights of free speech and assembly, the freedom to worship, the rule of law, and rights for women and minorities. It strives to isolate and marginalize violent extremists and undermine their efforts to exploit religion to rationalize their acts of terror. Finally, it fosters a sense of common interests and common values between Americans and people around the world.

| Tools to Accomplish Such Goals |
|---|

The United States advances these strategic objectives by vigorously engaging foreign publics to explain and advocate American policies. Reaching foreign audiences with core policy messages on democracy, tolerance, and the universal values of liberty, justice, and respect are at the center of U.S. efforts to counter extremist rhetoric and disinformation coming from hostile groups.

The United States is promoting increased exchanges, which exemplify the transformative power of American global engagement. The significance of people-to-people exchanges has never been more clear or compelling. The 9/11 Commission Report recognized the essential contribution exchanges make to national security. The National Intelligence Reform Act of 2004 reaffirmed the importance of America's commitment to exchanges.

The United States is expanding educational opportunities as the path to hope and opportunity. English language programs not only provide crucial skills but also open a window to information about the United States, its people, and its values. Americans must also better educate themselves about the world. The President's National Security Language Initiative will encourage more American students to study critical languages such as Chinese, Russian, Hindi, Persian, and Arabic.

Responding to and quickly debunking misinformation, conspiracy theories, and urban legends is crucial for success in the war of ideas. That is a key objective of the State Department's Digital Outreach Team, whose members post comments on well-trafficked Arabic, Persian, and Urdu language blogsites. Additionally, State maintains a public "Identifying Misinformation" website in both English and Arabic, which is devoted to countering false stories that appear in extremist and other web sources. The site focuses on disinformation likely to end up in the mainstream media. Embassies have used information from this site to counter disinformation in extremist print publications in Pakistan and other countries. One article, "A Trio of Disinformers," was the subject of a 1,100-word front-page article in an issue of the influential pan-Arab newspaper *al-*

PX203

*Sharq al-Awsat.* "Identifying Misinformation" is featured on the usinfo.state.gov website and is listed first of 17.6 million sites in a Google search for the term "misinformation." At least 49 websites have direct links to "Identifying Misinformation".

The Internet, radio, television, and video products remain powerful tools for bringing America's foreign policy message to worldwide audiences. The State Department produces a wide array of print and electronic materials describing for foreign audiences, in their own languages, the need to counter those who have committed or wish to commit terrorist acts, as well as achievements made in this area.

The State Department's premier web page to explain U.S. counterterrorism policy is "Response to Terrorism," created more than seven years ago and featured on usinfo.state.gov. The site is listed third out of 241 million sites in a Google search for the terms "terrorism U.S." At least 133 websites link directly to it. In addition to featuring articles, texts, and transcripts from key policymakers, this site provides valuable links to the Electronic Journals series, the National Strategy for Combating Terrorism, the designated Foreign Terrorist Organization list, and the State Department's Country Reports on Terrorism. "Response to Terrorism" is located on the Internet at: http://usinfo.state.gov/is/international_security/terrorism.html.

Support for and understanding of the United States go hand-in-hand with strengthening and empowering the voices most credible to speak out in favor of tolerance and rule of law to counter the violent extremists' message of hate and terror. One of public diplomacy's greatest assets is the American people. Empowerment of individuals and groups, from all walks of life, is a key aspect of the Department's public diplomacy efforts.

As we actively prosecute the struggle of ideas, we need to recognize that this will require a long-term effort spanning years and generations. For that reason, we are placing increased emphasis on programs directed at younger audiences, including undergraduate and, in select cases, high school students.

The USG's assistance programs, administered through USAID, the Middle East Partnership Initiative, the Millennium Challenge Corporation, and other U.S. entities, advance U.S. interests in this area directly through programs to increase access to education, improve health care, and empower people to build better lives. Civic engagement is an important component. Assistance programs to strengthen and professionalize independent media and civic society contribute to opening the "marketplace of ideas," as well as support development and reform across the board.

The United States appropriated $66 million in FY-2006 supplemental funds and almost $60 million in FY-2008 funds for civil society development, broadcasting, and exchange efforts related to Iran, allowing us to dramatically increase our ability to speak directly to the Iranian people. This funding supports efforts to clarify U.S. policy objectives to the Iranian people.

**Benchmarks for Measuring Success and Linking Resources to Accomplishments**

PX203

In 2004, State established the Public Diplomacy Evaluation Office (PDEO). Its mandate is to evaluate all major public diplomacy and exchange programs individually as well as provide an overall strategic framework for public diplomacy assessment.

Organizations as diverse as the Peace Corps, Department of Defense, the British Council, the World Bank, and non-profits in Italy, Japan, and the Netherlands have all consulted with the PDEO on how to measure public diplomacy activities.

The measures used by the PDEO are based upon recognized social and behavioral science methodologies and include measuring changes in audience attitudes (knowledge, skills, perceptions, and understanding), behavior, and condition. Examples include:

- Improved or increased understanding of the United States, its policies and values;
- Initiated or implemented "positive" change within an individual's organization (positive referring to changes that support U.S. ideals and values);
- Institutional partnerships and linkages and on-going collaboration; and
- Changes in editorial content in major media.

## Participation in International Institutions for the Promotion of Democracy and Economic Diversification

The United States is a leading participant in many international organizations, such as the United Nations and NATO. We also play a leading role in other initiatives, such as the Forum for the Future and the Community of Democracies, which stimulate cooperation with other nations to advance the agenda of freedom. For the first time since its creation in 2000 and in response to USG recommendations, the Community of Democracies created regional dialogues which brought together governmental and non-governmental organization representatives from each region to discuss the particular challenges and solutions unique to their area. We will continue to seek opportunities to build on the momentum coming out of the April ministerial, particularly in support of the Forum for the Future and the Broader Middle East and North Africa (BMENA) processes.

## U.S. Assistance Sufficient to Convince Allies and People in the Islamic World that the United States is Committed to Winning this Struggle

USG assistance programs are intended to improve economic conditions and opportunities in developing countries around the world, thereby serving the United States national interest in a more prosperous and secure international community. Our assistance can have the additional impact of demonstrating our commitment to help poorer countries or countries in special need, as we saw after the tsunami of 2004 and the Pakistan earthquake of 2005. There is, however, no set amount of money or time that we could identify as being sufficient to win the struggle of ideas.

PX203

## 5.5. Outreach through Broadcast Media
**This section is provided by the Broadcasting Board of Governors (BBG).**

**Broadcasting Board of Governors Initiatives: Outreach to Foreign Muslim Audiences**

**Overview.** The Broadcasting Board of Governors (BBG) promotes freedom and democracy and seeks to enhance understanding through the broadcast of accurate, objective news and information about America and the world to foreign audiences. Since September 11, this mission has become more critical in the Muslim world and BBG programming has expanded accordingly. The result of BBG efforts, detailed below, has been to boost audiences in Muslim majority countries from under 15 million five years ago to over 60 million weekly today.

Four of the five broadcast entities under the supervision of the Board – the Voice of America, the Middle East Broadcasting Networks, Radio Free Europe/Radio Liberty, and Radio Free Asia – provide programming for Muslim audiences. From 24-hour broadcasting to large Muslim populations in the Middle East and South Asia, to programs heard by smaller Muslim audiences in Thailand, Russia, and Russian-speaking Central Asia, BBG programs are serving Muslim audiences and U.S. foreign policy goals.

In the past five years, a number of new or expanded broadcasts reflect the continued urgency of the broadcast priorities associated with U.S. counterterrorism efforts. For example, the programs of the Middle East Broadcasting Networks (*Radio Sawa* and *Al Hurra* television) are broadcast 24 hours a day in Arabic and reach audiences in 22 countries in the Middle East and Europe. In 2007, the agency charted a dramatic expansion of VOA's *Persian News Network* from the previous year, boosting production of original Persian language programming from two to six hours daily, with broadcasting into Iran 24 hours per day, up from only eight hours daily in 2006. ―Radio Farda," a joint VOA and RFE/RL effort that also broadcasts 24/7, rounds out the Persian broadcast strategy by targeting a younger Iranian audience with a mix of music and information programs. Today, the BBG's Arabic and Persian broadcasts are available 24/7 and reach audiences in the broadcast media they prefer – radio, television, and the Internet.

To reflect the nation's critical foreign policy priorities since September 11, 2001, BBG resources have also shifted from areas of the world where the local media are increasingly free and strong to the Middle East and Central and South Asia. VOA has similarly reduced its broadcasts to Europe, increasing its focus on Iran, Afghanistan, Indonesia, Pakistan, and other critical nations. Eighteen of RFE/RL's broadcast languages, almost two-thirds of the total, are directed to countries or regions where the majority populations are Muslim. RFE/RL now broadcasts to Iran, Iraq, Afghanistan, Azerbaijan, Bosnia, Kazakhstan, Kyrgyzstan, Tajikistan, Turkmenistan, and Uzbekistan; the majority Muslim populations of Kosovo; and Tatarstan, Bashkortostan, and the North Caucasus in the Russian Federation.

The BBG's research indicates that these new programs resonate with audiences and are drawing listeners and viewers, even in environments where listening or seeking access to satellite broadcasts may be illegal. In Iraq, Al Hurra Television's audience has equaled that of Al Jazeera and competes increasingly well with Al Iraqia, Al Sharqiya, Al Arabiya, and MBC. Telephone surveys conducted in Iran indicate that the BBG's Persian language programming reaches 25

226

PX203

percent of Iranians on a weekly basis. Research indicates that these new programs have gained respect and trust since their relatively recent inception.

Programming in other key areas of the Muslim world continues to provide relevant news and information to populations who otherwise might not have access to unbiased reporting on key USG policy statements and reporting on local or international news. VOA's Urdu language service has expanded its broadcasts to Pakistan, and Pashto language broadcasts target the Waziristan region. Both VOA and RFE/RL provide blanket news and information coverage to Afghanistan in the Dari and Pashto languages. Listener rates are up to 69 percent weekly.

New technologies aid the transmission of programming to key audiences, and comprehensive Internet sites are vital to each language service. The Internet offers an exciting transmission opportunity to countries such as Iran, where the BBG's traditional broadcast technologies are jammed or blocked. Through the use of proxy sites and daily emails of news summaries, VOA Persian and Radio Farda bypass the Iranian government's censorship tools. Radio Farda has enhanced its website to improve the flow of information to viewers and to increase opportunities for interactivity.

Where Internet access is unfettered, BBG broadcasters are using the web to access audiences that increasingly use the Internet as their information lifeline. VOA's central English-language Internet site, VOANews.com, routinely carries news reports and special coverage of events relevant to Muslim viewers. For example, the site offered a special report entitled ―Exploring Ramadan," which examined ways that Muslims around the world celebrate Islam's holiest month, as well as news reports and features from VOA correspondents around the world, audio and video reports focusing on Muslims in America, links to President Bush's Ramadan greeting, and special reports relevant to Muslims in Nigeria, Iraq, Pakistan, Somalia, and Sudan.

The agency's broadcast strategy focuses on building program reach and impact within the Islamic world with thematic content, which includes facilitating citizen discourse, engaging the world in conversations about America, and helping audiences understand the principles of democratic societies. Technical aspects emphasize enhanced program delivery and employ modern communication techniques. The rigorous use of research about audience and broadcast environments, more frequent program review and oversight, and more compelling broadcast formats that will resonate in competitive but critical international markets remain crucial to this strategy. Underlying these techniques, the journalistic product and integrity remain the same. BBG broadcasters provide accurate, objective, and comprehensive news and information as mandated under the U.S. International Broadcasting Act. Through the combined skills of its broadcasters, the BBG is securing a public diplomacy strategy that mirrors U.S. national security priorities and focuses on nations that may suffer from, or contribute to, the growth of terrorism.

During the past year, the agency's extensive journalistic resources reported on issues such as the Annapolis Peace Conference and the upcoming U.S. elections to provide a program perspective that is often lacking in media outlets abroad. BBG correspondents in the United States and around the world contribute to coverage available in 60 languages. Live, simultaneous interpretation of Congressional hearings and of Presidential speeches, such as the State of the

227

PX203

Union, allow Muslim audiences to hear both the President's message and the opposing party's response.

**Arabic Broadcasting.** To effectively communicate with the large, predominantly young audiences in the Middle East, the BBG launched Radio Sawa, a 24/7 network of stations specifically designed to reach the large segment of the Arabic-speaking population under the age of 35. Radio Sawa went on the air in March 2002, quickly attracting and sustaining a loyal audience throughout the Middle East as new transmission sites were added throughout the region. In 2007, Radio Sawa continued to broadcast accurate, authoritative, comprehensive, and timely news about the Middle East, the United States, and the world. In addition to 325 newscasts per week, Radio Sawa offers discussion and informational programs such as the popular "Sawa Chat" interactive feature and the "Free Zone," a weekly review and discussion of democracy and freedom as they relate specifically to the Middle East. Feature programs encouraged discussion of key social and political issues in a manner very different from indigenous Arab media.

Radio Sawa broadcasts on FM in Morocco (Rabat, Casablanca, Tangier, Meknes, Marrakesh, Agadir, and Fes), Jordan (Amman and Ajlun), the Palestinian Territories (Ramallah and Jenin), Kuwait (Kuwait City), Bahrain (Manama), Qatar (Doha), U.A.E. (Abu Dhabi and Dubai), Iraq (Baghdad, Nasiriya, Basra, Mosul, Kirkuk, Sulimaniya, Amara, Najaf, Samawa, and Erbil), Lebanon (Beirut, North Lebanon, South Lebanon, and Bekaa Valley), and Djibouti.

Radio Sawa expanded its FM coverage in 2007 by adding its first FM transmitter in Khartoum, and plans to further expand its FM coverage throughout Sudan. Radio Sawa broadcasts on medium wave to Egypt, Yemen, Saudi Arabia, and throughout Sudan.

Building on the success of Radio Sawa, the BBG launched Al Hurra Television on February 14, 2004, covering 22 countries in the Middle East via the same satellites used by major indigenous Arabic channels. In the four years Al Hurra has been broadcasting 24/7, it has provided in-depth coverage of historic events, such as the elections in Morocco and the renewed efforts to begin the Middle East peace process. Al Hurra was a consistent leader analyzing and reporting on democratic trends in the Middle East. Through objective and accurate reporting, Al Hurra has been an example of a free press to the region and has become a trusted source of news for its estimated 20 million weekly viewers.

Al Hurra also gives its audience insights into life in America and the American system of government. During both the United States midterm elections in 2006 and the road to the 2008 presidential elections, Al Hurra has provided daily coverage of the candidates and the issues that impact United States elections. Broad election coverage provided an opportunity to showcase the political institutions of the United States.

Al Hurra carried extensive live news coverage of events and speeches by President Bush, Secretary of State Rice, and members of Congress. Additionally, Al Hurra has reporters that cover the White House, Congress, State Department, and the Pentagon. Al Hurra's current affairs programs, such as *Inside Washington,* take viewers behind the scenes of the political process in Washington with guests such as Supreme Court Justice Antonin Scalia, and Representatives

PX203

Howard Berman, Ileana Ros-Lehtinen, and Peter Hoekstra. The network also included a series of reports within its newscasts examining Islam in America.

Al Hurra produces programs to provide a forum for discussion on sensitive issues such as women's rights and human rights. Current affairs programs, such as *Equality,* are unique in the region's media. Hosted by Saudi journalist Nadine Al-Bdair, the program addresses women's rights and tackles subjects such as young girls being forced into marriage. There has been positive feedback on this program and others, praising the programs' courageousness, while others condemn Al Hurra for raising these topics.

In 2007, Al Hurra launched a new program bringing together four women to discuss social and political issues that are largely regarded as taboo in the region. Each of the hosts brings a different perspective when they address issues such as sexual harassment, women in prison, discrimination of women, the psychological impact on women who marry at an early age, and domestic violence against women. Al Hurra also broadcasts *Eye on Democracy*, which focuses on democratic efforts throughout the Middle East.

Throughout its four-year history, Al Hurra has provided a forum for discussion of important topics by a wide variety of experts including the all-important voices of moderation. Al Hurra's talk shows, roundtables, and documentaries have routinely tackled vital topics that are taboo on many other stations in the region, including the struggle for human rights, the position of women in Arab society, religious freedom, freedom of the press, and freedom of expression.

Radio Sawa and Al Hurra Television now reach a total audience of 35 million adults 15 and older, according to international research firms such as ACNielsen and Ipsos. The surveys show that despite high levels of anti-American sentiment throughout the region, both Al Hurra and Radio Sawa are regarded as credible sources of news and information by their audiences.

## IRAQ

**Al Hurra Iraq**, a special television stream containing more concentrated news and information to and about Iraq, began broadcasting in April 2004. Through satellite and terrestrial broadcasting in Iraq, Al Hurra has gained a foothold in one of the most competitive TV marketplaces in the world. Al Hurra's goal is to help its viewers make educated and informed decisions about political, social, and economic events affecting their lives. During the historic elections in Iraq, Al Hurra produced and broadcast the first televised electoral debate in Iraq's history, featuring six candidates representing the major political parties. This historic debate brought about a candid discussion among the candidates and provided a forum for viewers to compare the various candidates.

RFE/RL's **Radio Free Iraq** (RFI) continues to provide the Iraqi people with breaking news and in-depth coverage of developments in Iraq and the Middle East. Because RFI is a surrogate broadcaster, the Iraqi people see it as ―their radio‖ but with the reliability and reputation of a top-notch western operation. RFI appeals to a wide spectrum of listeners in Iraq by covering the most significant political issues in the country, including daily coverage of the activities of the Iraqi Cabinet and Parliament. RFI's extensive network of freelance reporters, based in the Baghdad

PX203

bureau, risk their lives to bring objective news to their compatriots. Two Radio Free Iraq correspondents, Khamail Khalaf and Nazar Abdulwahid Al-Radhi, were slain; a third, Jumana Al-Obaidi, was kidnapped and held for nearly two weeks before being released (her driver was shot and killed during the kidnapping). A September survey showed listening rates for RFI at a weekly level of 16.6 percent and revealed widespread appreciation of RFI's distinctly Iraqi sound.

This past year, Radio Free Iraq focused on subjects such as the campaign by Iraqi and coalition forces to make the city of Baghdad more secure, the mortar attack on the joint press conference by Iraqi Prime Minister Nuri al-Maliki and UN Secretary General Ban Ki-moon in Baghdad, and the December 16 Turkish military raid on KGK/PKK targets in Northern Iraq. RFI also broadcast interviews with a host of high-profile figures, including U.S. Ambassador Ryan Crocker, Iraqi National Security Advisor Muwaffaq al-Rubay'i, and Speaker of the Iraqi Parliament, Mahmoud al-Mashadani.

In June, RFE/RL analysts Daniel Kimmage and Kathleen Ridolfo released *Iraqi Insurgent Media: The War of Images and Ideas*, a 78-page report that provided an in-depth analysis of the media efforts of Sunni insurgents who are responsible for the majority of U.S. combat deaths in Iraq. On June 12, Kimmage testified before an open hearing of the Senate Select Committee on Intelligence on the findings of the report.

**Arabic in Europe.** Since August 2006, Al Hurra Europe has brought the best programs of Al Hurra and Al Hurra-Iraq to the Arabic-speaking population in Europe. Al Hurra Europe can be seen on the Hotbird satellite system that reaches all of Europe.

**Kurdish.** Broadcasting four hours of daily radio programming, VOA's Kurdish Service remains highly popular among Kurds in Iraq, Iran, Turkey, and Syria. According to surveys conducted by InterMedia Research, VOA occupies a unique position among Iraqi Kurds. It is the only major international broadcaster offering programs in the Kurdish language. VOA Kurdish focuses on the Iraqi scene through a network of stringers, with special programs and call-in shows devoted to combating extremism inside the country and the surrounding region. Special coverage highlighted the debate among Kurds on the role of Islam in the regional and national constitutions of Iraq. Some of the topics discussed in special programming by VOA Kurdish during the last year included the observance of Muslim holidays in the United States, Muslim students in U.S. colleges, and the role of religion in U.S. politics.

**Iran.** As noted above, broadcasting to Iran remains a key BBG priority. In 2007, VOA's Persian Service, once part of VOA's West and South Asia Division, became a separate unit and changed its name to the ―Persian News Network‖ (PNN) to reflect this priority.

PNN's seven-hour program block opens with *Today in Washington*, a brief look at the latest news developments in Washington, as well as the content of PNN's upcoming programs. Other original programming includes:

PX203

- *Today's Woman*, PNN's newest program made its debut on September 27. The one-hour program features influential women from around the world discussing such topics as social issues, medical themes, human rights, the law, sports, and business.

- *News and Views*, PNN's flagship news program, is now two hours in length, and features live interviews and news coverage of the latest headlines from Washington, DC, Iran, and across the globe.

- *Roundtable with You* is a talk show with expert guests who discuss current events, politics, popular culture, and global health. Viewers and listeners from Iran and around the world participate in the show via phone calls and e-mails.

- *Late Edition* begins with a close look at the day's top story. This program is targeted to a younger demographic and features segments on Iran's student movement, health, technology, sports, entertainment, and culture.

- *NewsTalk* is a new journalists' roundtable discussion program that features an examination of the day's top stories and an in-depth look at issues relating to Iran.

This year, Persian television featured an impressive array of prominent guests including former Under Secretary of State Nicholas Burns, Assistant to the President and Deputy National Security Advisor James Jeffrey, U.S. Ambassador to the UN Zalmay Khalilizad, Nobel Peace Prize laureate Shirin Ebadi, several U.S. senators and representatives, and Christine Levinson, wife of ex-FBI agent Robert Levinson, who has been missing in Iran since March 2007.

Other programs included annual live coverage of the President's State of the Union address with simultaneous Farsi translation and post speech analysis, live coverage of the opening of the UN General Assembly in September, Iranian President Mahmoud Ahmadinejad's speech at the UN coupled with a special live hour of analysis and coverage, President Bush's June visit to the Islamic Center of Washington in commemoration of its 50th anniversary, live coverage from President Bush's May trip to Latin America, live coverage of an IAEA meeting in Vienna on Iran's nuclear program, and coverage of Commander of the Multinational Forces-Iraq, General David Petraeus and U.S. Ambassador to Iraq Ryan Crocker during their September testimony to Congress. VOA's Persian News Network has also covered Senate and House hearings on Iran and Iraq.

VOA devotes significant effort to hard-hitting topics on the role of religion in society, including the Iranian regime's abuse of Islam to solidify its control of power, to justify the oppression of women, and to limit free speech, free association, and freedom of religion. These stories generated considerable email response and other feedback from Iran, and from Persian-speaking populations in Kuwait, the UAE, Qatar, Saudi Arabia, Iraq, Turkey, Syria, Lebanon, Europe, and the United States.

**Radio Farda,** a joint service of RFE/RL and VOA, continued to broadcast to Iran 24 hours a day in 2007. As Radio Farda has matured, and as funding has supported the addition of larger blocks of news and information, it has done so in its tradition as a "surrogate" broadcaster, presenting

PX203

news about the country to which it broadcasts. Current broadcasts include over eight hours of news and information programming daily. Popular Persian and western music draws in the younger audience. Radio Farda finds direct sources of information within Iran in spite of the challenging environment for journalism.

The people of Iran turned to Radio Farda and its website for round-the-clock breaking news on stories of global interest, such as the ongoing standoff over Iran's nuclear program, the seizure and release of several British sailors, President Mahmoud Ahmadinejad's trip to New York, the arrest of three Iranian-Americans visiting Iran and court proceedings against a fourth who worked as a Radio Farda reporter. Their stories included the arrest of a prominent union leader and several women's rights activists; riots sparked by the imposition of gasoline rationing in May 2007; and the mistreatment of Azeri, Kurdish, Ahvazi Arab, and other ethnic minority populations of Iran. To enhance its coverage, Radio Farda has doubled the length of its main evening newscast to one hour and launched a revamped, news-oriented website.

Radio Farda reaches significant audiences in Iran, in spite of the government's consistent jamming. According to the last InterMedia survey conducted in November 2006, Radio Farda's weekly reach measured 10.3 percent – the highest weekly reach rate of any international radio broadcaster, and more than double that of the BBC's Persian service. Among a key target group, youth under 30, Farda's weekly reach was 14.8 percent.

Utilizing new resources provided by the Congress, Radio Farda augmented its website to expand its content, providing more stories to read, more images to view, and more opportunities to comment on news and information. It now receives over five million page views each month, despite the Iranian government's efforts to block it. Radio Farda's website is highly interactive, with features such as "Most Popular and Most Emailed Stories" and "Farda Club" for moderated discussions and blogsites.

**Afghanistan.** After September 11, 2001, the BBG increased radio broadcasting to Afghanistan pursuant to the Radio Free Afghanistan Act, signed into law in March 2002. Together, RFE/RL and VOA provide a 24-hour daily radio stream in the Dari and Pashto languages that has a vast audience reach in Afghanistan.

**VOA's _Radio Ashna (Friend)_** continued to build on its reputation as a source of accurate and credible news for listeners in Afghanistan. The seamless daily 12-hour program includes daily call-in shows and in-country reporting from approximately 30 stringers. Program topics include reconstruction, security, continuing violence, disarmament, international counterterrorism efforts, drug trafficking, and human rights.

VOA continues to rank as one of the top three international broadcasters in Afghanistan. The most recent survey shows that VOA's one-hour daily _TV Ashna_ program in Dari and Pashto has become widely popular. The viewership rate increased from 9 percent in 2006 to 20 percent in 2007.

**_VOA's TV Ashna_** has taken advantage of Washington's large Islamic community to produce a number of original reports for Afghanistan and other Services in the South Asian Division. For

PX203

example, the program followed Rep. Keith Ellison, the first Muslim-American member of Congress, taking the oath of office using a Koran owned by Thomas Jefferson, and his activities during his first year in the House of Representatives. It also covered the opening of a new Islamic Center in Prince William County in Virginia, and obtained interviews with Governor Tim Kaine, Senators John Warner and Jim Webb, and Representative Tom Davis, who attended the center's ribbon cutting. Viewers were taken inside an Islamic Academy in Virginia to view how education and Muslim tradition coexist in the United States. Other coverage included an exclusive interview with President Karzai of Afghanistan.

**RFE/RL's Radio Free Afghanistan** has a weekly reach of 64.3 percent in the country, according to preliminary data from an August InterMedia survey. Afghanistan is the only country in the RFE/RL broadcast region where a USG-funded broadcaster is the dominant media outlet.

Radio Free Afghanistan delivers breaking news, in-depth reporting, and analysis to the people of Afghanistan on the struggles their young democracy faces, including a resurgent Taliban. With its dual-language programming and its tone of moderation, Radio Free Afghanistan works to promote national unity and religious tolerance. In January, a would-be suicide bomber credited a Radio Free Afghanistan series on suicide bombings with changing his mind about carrying out his deadly mission.

Reports from Washington, Prague, and Kabul, exclusive interviews and roundtables, and ongoing coverage of the efforts by Coalition Forces to subdue the insurgency made up the program offerings. In 2007, Radio Free Afghanistan celebrated its fifth anniversary. Throughout the year it provided its listeners with coverage of important stories such as the Taliban's execution of journalist Adjmal Naqshbandi, the accidental killing of 25 civilians by NATO air strikes in June, the Taliban's seizure of 23 Korean hostages and the negotiated release of the 21 who survived, the death of former Afghan king Mohammad Zahir Shah, the lives of Afghan expatriates living in Saudi Arabia, the massive bomb attack that took place in Baghlan province on November 6, the assassination of Pakistani politician Benazir Bhutto, and the recapture by NATO and Afghan forces of the Taliban stronghold of Musa Qala in southern Afghanistan. In addition, Radio Free Afghanistan uses the hundreds of letters it receives from listeners to find stories that deserve attention and to spur the government to act on them.

**Pakistan**. The Pakistani government's ―state of emergency‖ crackdown on private media on November 3, 2007 darkened two VOA television affiliates in the country, foremost among them the privately-owned cable news operation GEO TV, which had carried VOA's 30-minute news and information Urdu-language, *Beyond the Headlines*. In response, VOA immediately stepped up its radio news and information programming in Urdu by shifting its TV staff to expand live daily radio news programming from five to 12.5 hours. Domestic TV stations currently face restrictions on the use of foreign broadcast material. However, VOA is aggressively working to regain access to the Pakistani TV Market with affiliates GEO and Aaj.

In covering the crisis, and U.S. and world reaction, the Urdu Service engaged its network of stringers in Islamabad, Peshawar, Quetta, Karachi, and Lahore, and interviewed government officials and Pakistani opposition figures, such as former Prime Ministers Nawaz Sharif and

PX203

Benazir Bhutto. The Service also provided timely, in-depth coverage of Benazir Bhutto's assassination, with stringers in Rawalpindi and Islamabad providing live coverage of events. One stringer in Islamabad was among a group of journalists who spoke with Benazir Bhutto just hours before her assassination, between her meeting with Afghan President Hamid Karzai and her final campaign rally.

Since VOA introduced its youth-oriented, 12/7 radio station called *Radio Aap ki Dunyaa* (Your World) in 2004, the station has continued to attract a growing number of listeners with its contemporary format that includes news, information, roundtable discussions, call-in shows, interviews, features, and music. The programs target Pakistani listeners between the ages of 15 and 39, which account for some 60 million of Pakistan's 150 million residents, as well as millions more potential listeners in India, the Gulf, and the Diaspora. To increase Radio Aap ki Dunyaa's reach, VOA introduced a bilingual web page that offers live audio streaming of news and entertainment programming.

**The Pakistan/Afghanistan Border Region.** VOA's *Deewa Radio* broadcasts reports, interviews, and call-in shows on events and issues about political Islam in and outside of the United States, Pakistan, and Afghanistan to Muslim audiences in Pakistan and Afghanistan. Scholars and leaders of religious parties in Pakistan participate in call-in shows to answer questions from listeners on their role in the local political scene.

Deewa Radio presented American views to people living in the target broadcast region. After the assassination of Pakistan's opposition leader Benazir Bhutto and the worsening political crisis, the Service obtained reactions from former U.S. ambassador to Pakistan Wendy Chamberlin, CSIS Director of South Asia Programs Teresita Schaffer, UNHR representative Hina Jilani, U.S.-based Pakistani analyst Michael Shank, and other prominent analysts.

Through interviews with religious and secular leaders, the station addressed critical issues such as terrorism, suicide attacks, religious extremism, the madrassa and its syllabus, the role of women in society, and the political future of the region. Noted personalities interviewed by Deewa included former Prime Ministers Benazir Bhutto and Nawaz Sharif, Imran Khan (leader of Tehrik Insaf party), Asfandyar wali Khan (Pashtun nationalist), Mehmood Khan Achakzai (nationalist leader), Farooq Laghari (former Pakistan president), sitting and former federal ministers Aftab Sherpao, Iftikhar Gilani, Mohammad Ali Durrani, Amir Muqam Khan, Saif Ali Khan, and Saleem Saifullah; as well as a number of provincial ministers in NWFP and Balochistan province.

**India.** With a Muslim population numbering close to 150 million, India has the second largest Muslim population after Indonesia. VOA's Hindi Service reaches this audience, with discussions about events in Pakistan and Kashmir, the recent India-Pakistan peace initiatives, Iran's nuclear ambitions, developments in Afghanistan, and the Iraq war. Hindi also offered exclusive TV interviews with USG senior officials, dozens of U.S. senators and representatives, the late Benazir Bhutto, and Muslim-American leaders and scholars. Topics addressed included developments in the region and India's relations with Iran, Pakistan, and the United States.

PX203

**Bangladesh.** Bangladesh has one of the largest Muslim populations in the world. During the past year, VOA Bangla Radio and Television produced numerous features on Muslim youth, including a piece on Hasan Askari, a 20-year old Muslim student from Bangladesh who was honored by the Governor of New York for saving a Jewish youth from a beating during the holiday season in December. VOA Bangla also produced features on Islamic centers in the United States, Ramadan observances, and Eid festivals. Following the assassination of Benazir Bhutto, Bangla Service interviewed diplomats, scholars, and political analysts in the United States and abroad.

**Turkish.** As part of the special coverage of the general election in Turkey, VOA's Turkish Service focused on the role of Islam in Turkish politics under the strictly secular Turkish constitution. Coverage included interviews with U.S. and Turkish officials, members of the U.S Congress, and other experts. VOA Turkish provided extensive coverage in radio and television programs and on the VOA Turkish website on the role of religion in U.S. society.

This year, VOA Turkish also expanded its TV affiliation in Turkey by launching daily live reports for TGRT News TV network, broadcast via web cam. TGRT News, a 24-hour nationwide news network with a weekly audience share of over 30 percent of Turkey's estimated 25 million regular viewers, carries twice-weekly a live, 15-minute news and current affairs program and a weekly 30-minute news and magazine program produced by the VOA Turkish Service. At the request of TGRT, VOA has produced a number of live or pre-recorded special programs on developments in U.S.-Turkish relations and on the U.S. image in the world.

**Indonesia.** This year, the Indonesian Service produced nearly nine hours of original radio programming per day for over 200 affiliates throughout Indonesia. A new program called *Executive Lounge* is a daily 30-minute prime-time radio program for Indonesia's growing numbers of young professionals, and is aired on a new affiliate network, the Trijaya Radio Network. The new lifestyle program *Pop Notes* is a weekly 60-minute culture program for JakTV (Jakarta) and other regional TV stations. Warung VOA (Café VOA), a weekly 30-minute talk show, airs on JTV (East Java). The Service also developed four new regular short feature segments for Indonesian national TV stations. VOA Indonesian TV programming can now be seen regularly on five of the 11 national stations. In addition, the VOA Indonesian Service produced six special series and special events programs, including reports on the Virginia Tech shootings that claimed one Indonesian victim, reports on illegal arms exports, Indonesian immigrants in the United States, and U.S.-Indonesian military relations, as well as special serial programming for Indonesian Independence Day and Ramadan. The Service continued to develop its website, and sent out both a daily email with headline news and a weekly email-newsletter. VOA Headlines are also available for text message transmission to mobile phones.

**Uzbekistan.** VOA's daily 30-minute radio broadcasts are carried on short wave, medium wave from Tajikistan, and two FM frequencies in Osh and Jalalabad, Kyrgyzstan. The Service's *Exploring America*, is a weekly half-hour TV show placed on a satellite network targeting Uzbek-speakers in Afghanistan and all of Central Asia. Two local stations in the Uzbek-speaking areas of Kyrgyzstan carry it live. All broadcasts reach the Ferghana Valley. VOA Uzbek features interviews with various U.S. and international sources discussing critical issues, such as the War on Terror, religious extremism, and U.S.-Uzbek relations. Interviews with Members of Congress

PX203

and key officials provide a unique perspective of U.S. policymaking. The Service also features reporting on Muslim life in the United States and serves as a window into religious tolerance and understanding in America.

RFE/RL's programming to Uzbekistan, Turkmenistan, Tajikistan, Kyrgyzstan, and Kazakhstan continued despite various forms of harassment and even repression against its correspondents and editors. A former correspondent for, and frequent contributor to, the Uzbek Service was murdered in Kyrgyzstan in October 2007. RFE/RL's Tashkent Bureau remained closed by Uzbek government order, but the Uzbek Service continued to provide news coverage and democracy promotion under harsh conditions reminiscent of the Soviet era. In Kyrgyzstan, RFE/RL was able to work with Kyrgyz National Television (KTR) to produce and air local television news.

**Azerbaijan.**  VOA's Azerbaijani Service provides extensive coverage on Muslims in America. In addition, the Service produces special programs on the occasion of Muslim holidays, featuring messages of congratulation by the President of the United States, administration officials, and Congressional leaders. Since the beginning of 2007, the Azerbaijani broadcasts of VOA and RFE/RL reached radio audiences in and around Baku, the capital, via a local 24/7 dedicated FM frequency. VOA has added two daily five-minute newscasts to its ongoing, daily 30-minute radio program. This programming also reached the Azerbaijani speaking audience in Iran via short wave frequencies. The Service also produces a 15-minute TV news program, which is rebroadcast by Azerbaijan TV network six days per week. VOA Azerbaijani maintains two websites, one in Persian-Arabic script to reach the large Azeri-speaking minority in Iran (estimated at more than 15 million). This year, the Service started to send out daily VOA newsletters in Latin and Arabic-Persian scripts to a number of subscribers via the Internet.

Following changes in rebroadcast partnerships, the weekly listenership of RFE/RL's Azerbaijani Service declined to 4.9 percent from 7.7 percent in 2006.  In 2007, however, the RFE/RL Service and VOA Azerbaijani secured re-broadcasting on a new FM frequency in Baku. Programming remains a mix of newscasts and democracy-related programming on political issues and civil society such as human rights, media rights, minorities, judicial rights, religion, and elections. Social issues of health care, pensions, public welfare, unemployment, and drugs increasingly became programming themes.

**Nigeria.**  VOA reaches a large percentage of the almost 250 million Muslims in Sub-Saharan Africa. One in every five Muslims in the world lives in Africa, and roughly one-third of Sub-Saharan Africa's population is Muslim. VOA's biggest audience is in Nigeria, with a weekly audience of more than 21 million adults tuning in to its Hausa or English-to-Africa broadcasts – up from 19 million in 2006. Among the primarily Muslim Hausa-speaking population of Nigeria, over 43 percent listen to VOA at least once a week.

In April, VOA's Central News, Hausa, and English-to-Africa provided on-the-ground coverage of the Nigerian presidential, gubernatorial, national and state assembly elections. VOA Hausa and English-to-Africa broadcasts included live hookups with VOA's three reporting centers in Nigeria, discussions with reporters and stringers on the scene, and interviews with leading political and election officials. VOA's Hausa reporter secured an exclusive interview with the winner of the controversial presidential election, Umaru Musa Yar'Adua, of the ruling People's

PX203

Democratic Party, and with opposition candidates. Prior to the elections, VOA Hausa organized two town hall meetings, featuring live panel discussions with politicians, government officials, and leaders of civil society in Kano and in Abuja. Using staff correspondents and 14 stringers throughout Nigeria, Hausa and English-to-Africa Services covered the aftermath of the elections, including violence and complaints of vote rigging.

**Somalia and the Horn of Africa**. VOA established its Somali Service on February 12, 2007, with an on-air promise to listeners that they would hear the voices of Somalis from all political persuasions and walks of life. What started as a 30-minute broadcast expanded to 60 minutes in July and to two hours in early December. One hour is also repeated for VOA's FM Horn Afrik affiliate in Mogadishu. Through its shortwave and medium wave transmissions and its network of 12 affiliate FM stations, the Somali Service reaches a large Muslim population in this critical region. VOA's Somali program is available through rebroadcast by some of the most widely listened-to FM stations in Somalia and the region, including HornAfrik, the network of stations run by Radio Daljir, the SBC in Puntland, and a VOA-leased FM station in Djibouti. HornAfrik's satellite service also broadcasts VOA Somali programs to the Diaspora throughout Europe. Somali websites worldwide provide links to the VOA Somali Service website.

The expanded VOA Somali broadcast has allowed for more interaction with listeners, more in-depth discussion segments, and more regular features on such topics as reconciliation, democratic ideals, development, health, youth, women's issues, American life, and Somali culture. After his recent appointment, Transitional Federal Government Prime Minister Nur Hassan Hussein gave his first broadcast interview to the VOA Somali Service. The Service has also conducted interviews with transitional government President Abdulahi Yusuf and opposition figures such as Islamic Courts leader Sheikh Sharif Sheikh Ahmed.

VOA's Amharic Service also covers news developments in Somalia as well as in Ethiopia and the sub-region. The service offers interviews with Horn of Africa newsmakers and U.S. policymakers and experts, as well as interviews with members of the Somali Diaspora, analysis, cultural features, and music.

**Bosnia and Herzegovina.** VOA broadcasts to Bosnia and Herzegovina include programming targeted to the 49 percent of the population that are Bosnian Muslims. VOA's Bosnian Service has a 15-minute daily live radio show; a half hour daily live television show (news and current affairs); and a variety of short programs aired by the best rated Bosnian television station, BHT1.

In October 2006, VOA Bosnian launched its interactive program segment in partnership with BHT1, Bosnia and Herzegovina's public broadcaster. The segment airs each Sunday during BHT1's primetime news program. Topics range from official Washington policy on Bosnian issues to medicine and technology reports. The Sarajevo-based BHT1 network is internationally funded and is the only station that reaches audiences in both the Bosnian-Croat Federation and Republika Srpska. Programs are also aired by 15 television and 15 radio affiliate stations throughout Bosnia, and are available via satellite.

The Service has worked to promote reconciliation between the three ethnic groups in Bosnia. VOA's news and current affairs programs are tailored to address concerns of the Muslim

PX203

population in Bosnia, and provide exclusive interviews with Bosnian political and religious leaders.

RFE/RL's South Slavic and Albanian Languages Service continued to fulfill a unique role in the Balkans with its regional programming. With bureaus in Sarajevo and Pristina, the Service reached Muslim listeners in Kosovo and in Bosnia and Herzegovina with programs that stressed the bonds among the peoples of the former Yugoslavia. The Service broadcasts two popular thirty-minute television programs in Bosnia, *TV Liberty* and *Open Parliament*.

**China**. Radio Free Asia (RFA) provides service to Muslim audiences through its Uighur language service launched in December 1998. It is the only international radio service providing impartial news and information in the Uighur language to the potential audience of more than 16 million Uighur Muslims in Western China and Central Eurasia. The Xinjiang Uighur Autonomous Region (XUAR) alone comprises roughly one-sixth of China's territory and is estimated to have more than 10 million Uighur speakers.

Consistent with RFA's mandate, the Uighur service acts as a substitute for indigenous media reporting on local events in the region. The service broadcasts two hours daily, seven days a week, often breaking stories that go unreported by China's state-run media or foreign news organizations. RFA provides a forum for a variety of opinions and voices from within the XUAR with its programs, that include breaking news, analysis, interviews, commentary, a hotline call-in show, a weekly news review, and feature stories.

The Uighur Service news and stories feature important interviews with various U.S. and international sources, including officials, scholars, scientists, artists, historians, educators, and human rights activists, as well as Chinese and Uighur dissidents from all over the world. Programs address pressing issues like China's relationship with Central Asian countries, democratic development in Central Asia, Uighur history, literature, the arts, human rights, religious freedom, labor issues, official corruption, the environment, Internet control in China, and AIDS and other health issues. Additionally, RFA brings U.S. policy, debate, and Congressional resolutions on China to its listeners via interviews with members of Congress and other policymakers.

RFA's Uighur service website, launched in September 2004, provides continuously updated news in all three writing systems used to convey the Uighur language, Arabic, Latin, and Cyrillic. RFA's site is the only non-Chinese Uighur news website and the only Unicode Uighur news website. The site streams the daily RFA broadcast in Uighur and offers ongoing coverage of events in the XUAR in text, image, and video. The archived audio files can be retrieved on a special page or downloaded via podcast. RSS feeds are also available, making it possible for people to automatically update their news readers or web pages with RFA news content.

RFA continues to be confronted with unrelenting jamming of broadcasts and blocking of its website. RFA confronts Chinese censorship by broadcasting on multiple short-wave frequencies and by regularly e-mailing instructions on accessing the banned www.rfa.org through proxy web servers. Despite Chinese censorship and the dangers involved, research indicates that Uighur

PX203

listeners and web users consider RFA a lifeline in a controlled media environment – a station offering unique content worth taking risks to access.

**Transmission.** Since September 11, 2001, the Broadcasting Board of Governors (BBG) has modernized its transmission capabilities, continuing its move from a predominantly shortwave environment to one that uses AM, FM, satellite, and Internet capabilities to reach its audience. By bolstering transmission capabilities to the Muslim world, BBG has improved opportunities to deliver news and information clearly, reliably, and effectively. New transmission capabilities have been added, and assets reallocated from regions of lesser geopolitical importance and from technologies of declining effectiveness.

The BBG has worked to ensure that programming is delivered in the media that are most effective in reaching local populations. In the past year, transmission facilities in Ismaning, Germany and Delano, California were closed to shift available resources to more effective delivery media. Asiasat 3 replaced Asiasat 2 to deliver BBG TV and radio programs to large audiences throughout Asia on this more popular satellite service. An emergency back-up power system was installed at the IBB Djibouti transmitting facility to overcome erratic local electricity supply problems and to ensure more reliable delivery of BBG medium wave programs to audiences in Sudan and Somalia. A new high power leased medium wave transmitting service from the UAE significantly improved VOA radio transmissions to Pakistan. Higher capacity, more flexible, and cost-effective fiber optic circuits replaced satellite channels between the Far East and Washington. These circuits will facilitate video newsgathering in Asia. In the past year, new BBG FM transmitters came on the air in Ethiopia, Iraq, Lebanon, Sudan, and the West Bank/Gaza.

The BBG is currently supporting the construction of a number of additional FM transmitters in various locations and two high power medium wave radio transmitters that should come on the air in the coming year: one for Pashto programming in Afghanistan and one for Radio Farda programs to Iran. On the Internet, the recently launched VOA *Daily Download* provides a short, lively video feature of current information targeted toward a youthful audience. The use of webchats, blogsites, and other attractive Internet applications have also been expanded as the Internet becomes an increasingly viable information medium in both open and closed societies.

### Presenting the United States Point of View through Indigenous Broadcast Media

At the Department of State, the Bureau of Public Affairs, Office of Broadcast Services uses television and video products as strategic tools for bringing America's foreign policy message to Middle East and worldwide audiences. A state-of-the-art digital broadcast television facility enables the Department to deliver messages instantly, using the same technology as commercial broadcast television networks. Public Affairs facilitates live and taped interviews with the Secretary of State and other State Department principals to all the major Arab networks such as Middle East Broadcasting Corporation (MBC), Al Arabiya, Al Iraqiya, Abu Dhabi TV, Dubai Television, Arab Radio and Television Network (ART), Al Hurra, Kuwait TV, Egyptian TV (ETV), and the Lebanese Broadcasting Corporation (LBC). This investment in people and

PX203

technology was developed to give senior USG officials an opportunity to engage and inform the largest audiences possible about our foreign policy and public diplomacy objectives.

To enhance the capacity of the U.S. Embassy in Iraq, the Department of State operates a television studio inside the Embassy. This fully-functioning studio allows senior USG officials to conduct live interviews via satellite with national and international media on a range of topics related to the current situation and future of Iraq, as well as America's role in the broader Middle East.

The Bureau of Near Eastern Affairs, Press & Public Diplomacy Office, through its Arab and Regional Media Unit, has significantly expanded the Department's outreach to Arab and regional media outlets (i.e. print, broadcast, and web) through a strategy of proactive engagement. Since its creation, it has recorded an ever-increasing number of interviews with Arab and regional media outlets. In 2007, the Arab and Regional Media Unit, together with NEA posts, gave over 1,200 interviews to Arabic, Farsi, and Hebrew language media. Many of the broadcasts aired multiple times and were picked up by other regional media outlets and wire services. The Arab and Regional Media Unit has also inaugurated weekly web chats in an effort to utilize new media and reach Arab and regional audiences directly. The new Arabic language web chats allow Arab audiences to interact directly with USG policy makers on topics such as, ―What is a Provincial Reconstruction Team (PRT)," ―Muslims and Political Participation in the United States," and ―Solving the Western Sahara Dilemma."

This capacity was further enhanced by the Office of the Under Secretary for Public Diplomacy and Public Affairs' creation of Regional Media Hubs in London, Brussels, and Dubai. In these key media markets, spokesmen advocate U.S. policies and actively encourage and facilitate a growing number of USG officials to appear on important Arabic, European, and other international media. For example, between November 2006 and November 2007, the Dubai Hub Director participated in 242 on-air interviews, talk shows, and panel discussions (more than 230 of them in Arabic) with Arab broadcast media, including Al Jazeera, Al Arabiya, MBC 1, LBC, Al Hurra, Sharqiyya, Nile TV, BBC Arabic, Radio Sawa, Sawt al Arab, and a number of smaller local and regional stations. The construction of a new broadcast studio at the Brussels Hub, combined with the existing studio used by the London Hub, enables Hub spokesmen and visiting USG officials to quickly reach media and audiences around the world. The London Hub also produces a weekday morning report on the pan-Arab media for readers throughout the USG, matched by the Brussels' Hub morning report on key European media.

A Rapid Response Unit (RRU) monitors and translates major world media in real-time, produces an early morning daily report on stories driving news around the world, and provides language to explain the U.S. position on these issues. It is distributed daily worldwide, to U.S. cabinet and sub-cabinet officials, U.S. ambassadors, public affairs officers, regional combatant commanders, and others across the USG.

**Presenting the U.S. Point of View through Internet-based Media**

The Department of State directly engages participants in online discussion forums on the Internet through the Digital Outreach Team. The Team participates in discussions of policy issues and

240

PX203

related developments on websites in Arabic, Persian, and Urdu. Openly representing the State Department, but using the more informal language of the discussion forums, the Team seeks to ensure that the U.S. perspective is heard in cyberspace, providing a counterpoint to extremist ideological arguments and misinformation. Other public diplomacy efforts of the Department of State and other agencies targeted at countering extremist use of the Internet are coordinated through the interagency Counterterrorism Communication Center, chaired by the Bureau of International Information Programs.

The Department has expanded its web presence via the State.gov website and the America.gov website in English, Arabic, Russian, Persian, French, and Spanish. The introduction of multimedia interactive products such as ads, videos, podcasts, web chats, blogging, and other interactive elements widen audience participation. Country-specific websites run by our Embassies overseas provide a wide range of information and advocate U.S. policies to foreign audiences.

In the absence of a U.S. embassy in Iran, the Bureau of International Information Programs manages a Persian-language website directing policy and general information into Iran. The website supports active engagement via web chats, webcasts, and listservs to connect U.S. policymakers and subject-matter experts with Iranian citizens. IIP's Arabic-language website provides information about U.S. policies, society, and values directly to audiences in the Middle East.

**Presenting the U.S. Point of View through U.S. Missions in the Field**

The Strategic Speakers Initiative (SSI) identifies, recruits, and programs prominent U.S. experts to engage foreign opinion leaders on key strategic themes such as democracy and rule of law, terrorism and security, energy, the environment, and trade and development. A subset of this program is the Citizen Dialogue Program, in which Muslim-American citizens share their personal stories with fellow Muslim cohorts in strategically important countries, many of whom are not aware of the strength and diversity of Muslim life in America. Such speakers can be deployed rapidly to focus IIP resources where the need is greatest to address the most crucial U.S. policy priorities. Strategic Speaker participants are often part of a bigger public diplomacy package that includes web chats, DVCs, and other outreach.

IIP's INFOCENTRAL website provides guidance and background information on U.S. policy priorities to U.S. embassies and military commands worldwide.

**Major Themes of Biased or False Media Coverage of the United States in Foreign Countries and Actions Taken to Address this Type of Media Coverage.**

The Department of State is taking a leading role to counter misinformation and falsehoods about the United States and its policies or intentions. The Department of State's actions to address these false allegations include:

- The Department of State's webpage entitled "Identifying Misinformation," which appears in English and Arabic, provides truthful information and analysis to the public to debunk

241

PX203

false allegations about the September 11 attacks, Iraq, and other issues. (English-language website url: http://usinfo.state.gov/media/misinformation.html.)

- The Department has instructed Public Affairs Officers at our embassies around the world to use information on the website to counter false stories in the local media, or to contact the Department's Counter-Misinformation Officer, who can rapidly provide research and guidance.

**Potential incentives for and costs associated with encouraging U.S. broadcasters to dub or subtitle into Arabic and other relevant languages their news and public affairs programs broadcast in the Muslim world in order to present those programs to a much broader Muslim audience than is currently reached.**

The single greatest incentive for U.S. broadcasters to dub or subtitle their news and public affairs programs would be evidence that there is adequate demand for the programming among the targeted foreign publics. The Office of the Under Secretary for Public Diplomacy and Public Affairs is working with the Bureau of Public Affairs and other elements within the Department to explore avenues to demonstrate that a potentially profitable market exists for this programming. If data emerges that indicates that this translation makes sense from a business standpoint, we will present this data to broadcasters in an effort to encourage this activity.

**Any recommendations the President may have for additional funding and legislation necessary to achieve the objectives of the strategy?**

The President's budget request for FY-2009, the FY-2008 appropriation, and the FY-2007 and supplemental request include a number of initiatives that would aid the strategic objectives of U.S. international broadcasting. The FY-2007 supplemental contained $10 million for the Middle East Broadcasting Networks. As part of the Administration's strategy to counter violent extremism, Al Hurra television is launching a signature three-hour daily program to provide additional information about American policies, people, institutions, and perspectives to its audiences across 22 countries in the Middle East. This program capitalizes on Al Hurra's unique perspective in a growing market of over 200 channels, and would provide a format and information mix unavailable in the region today. Programming would focus on the news of the day, compelling social issues, investigative reporting, and a range of information not presented in the region's media.

The FY-2008 appropriation and FY-2009 request provides ongoing support for this new Al Hurra programming effort, increases Al Hurra's newscast capability to 24 hours a day (expanding from the current 16 hour capability), and allows Radio Sawa to grow as a news source in the region. The FY-2008 budget also continues VOA's Somalia program initiative, and maintains program strength in Iran, Afghanistan, and Pakistan. The FY-2009 Administration budget request includes proposals to continue VOA Somali three-hour daily broadcasts and to launch a ―RFE/RL Azerbaijani to Iran‖ program. Further, our pending legislative request to the Congress to permanently adopt the BBG's pilot program for personal services contracting (PSC) authority, up to a ceiling of 200 PSCs at any given time, would assure the agency the flexibility to meet staffing needs to respond quickly to broadcast requirements.

PX203

## 5.6. Visas for Participants in U.S. Programs

According to the State Department's Bureau of Consular Affairs, current visa processing guidelines are sufficient to meet any requirements for the issuance of appropriate visas to individuals from predominantly Muslim nations to participate in any new exchange program, as envisioned by the Intelligence Reform and Terrorism Protection Act of 2004.

The Bureau of Consular Affairs' policy is to expedite all student and exchange visitor applications, with the goal of giving every student and exchange visitor applicant the opportunity to meet their program start date in the United States. This policy is in place at every embassy and consulate worldwide. In countries with a significant waiting period for a visa appointment due to high demand, this policy reduces the wait time for students and exchange visitors from weeks to mere days. In all cases requiring a separate security clearance, the average processing time is now about 25 days. Processing can take longer, however, and applicants should allow additional time. Security clearances can be expedited when circumstances so warrant.

The most important factor in expediting visa applications is for the applicants, in conjunction with their program sponsors, to initiate their visa applications well in advance of their planned travel. Most problems in the visa process can be resolved given sufficient time. New exchange programs should be planned far enough in advance to allow the necessary time for visa processing. Candidates should be advised to obtain passports immediately, visit embassy websites for instructions on applying for U.S. visas, and ensure they follow instructions concerning required documents and procedures, as well as for information on how to complete an Electronic Visa Application Form (EVAF) and how to arrange an appointment.

## 5.7. Basic Education in Muslim Countries

The Department of State, USAID, and other U.S. agencies continued to support an increased focus on education in predominantly Muslim countries and those with significant Muslim populations. The United States' approach stresses mobilizing public and private resources as partners to improve access, quality, and the relevance of education, with a specific emphasis on developing civic-mindedness in young people. In many Muslim-majority countries, such as Afghanistan and Yemen, the challenge was to increase country capacity to provide universal access to primary education and literacy. Countries faced increasing enrollments and low education quality in the classroom while struggling with limited budgets.

In the Middle East, USAID and the Department of State's Middle East Partnership Initiative (MEPI) promoted quality education through improved policy, teacher training, education, finance/governance, and community participation. These U.S. efforts complemented investments of partner countries and other donors. Between FY-2002 and FY-2007, MEPI funding for projects in basic education totaled approximately $90 million.

**The U.S. Strategy to Meet Challenges in Education**

PX203

To promote transformational diplomacy and development, the Department of State and USAID have articulated a common Foreign Assistance Framework. In the framework's "Investing in People" objective, education is a major element with basic education as an important sub-element. This strategy is applied to programs worldwide, including Muslim countries.

**Basic Education:**  USAID has an agency-wide *Basic Education Strategy* that targets underserved populations and promotes free universal basic education. The goal is to help learners gain the general skills and knowledge needed to function effectively in life. Basic education programs focus on three areas, which also provide the strategic goals for the Middle East Partnership Initiative's (MEPI) education programming in the Middle East and North Africa:

- **Increasing Access:**  Targeting groups that have been marginalized in the education system such as minority, rural, out-of-school youth, girls, and young adults, and those who have been impacted by conflict or disaster, thus helping ensure equitable access to education.
- **Improving Quality:**  Improving the quality of education is pivotal for ensuring attendance and learning outcomes of basic education. Increasing attention is placed on curriculum reform and measuring learning outcomes.
- **Improving Relevance:**  Education programs develop human capacities and livelihood skills, and aim to link learning with skill development and employment opportunities, particularly in areas with high youth unemployment.

In designing and implementing basic education programs throughout the world, USAID works closely with host-country governments (national and local), non-governmental organizations, communities, and the private sector to maximize program impact and sustainability.

**Working with the International Community.**  The United States continued to be an active member of several international bodies and activities to achieve universal basic education, including the International Working Group on Education, which originally proposed the "Education for All" (EFA) initiative begun in the late 1980s.

**Coordination of the International Effort.**  USAID provides technical guidance to the EFA effort through the UNESCO-aligned International Institute for Educational Planning. The U.S. Director of Foreign Assistance represents the United States at the annual EFA high level group meeting.  The USAID Office of Education participates in the annual EFA working group meeting. USAID has participated in all Fast Track Initiative (FTI) meetings since its inception in 2000.

In engaging the G8 and Muslim country governments for Broader Middle East and North Africa (BMENA) initiatives, USAID collaborates closely with the State Department and key cooperating U.S. agencies, especially on literacy. At the June 2004 G8 Sea Island Summit, the G8 launched the BMENA Literacy Initiative aimed at halving illiteracy rates in the region by 2015. This initiative launched a series of Literacy Working Group and Education Ministerial Dialogues in the BMENA region. Education Ministers from the BMENA region and the G8 met in Jordan in May 2005 and in Egypt in May 2006, and confirmed their commitment to the process of cooperation under the umbrella of the Forum for the Future launched in Rabat in

244

PX203

December 2004. Following the Egypt Ministerial, USAID took over as G8 co-chair of the BMENA Literacy Task Force with Egypt as regional co-chair. As part of the USG contribution to this international effort, USAID is supporting literacy assessments in the region and has developed the BMENA ‚Literacy Hub' database of global best practices in promoting literacy.

**Leveraging Other Donors.**  USAID coordinates closely with multilateral donors (e.g., the World Bank (WB) and the Asian Development Bank (ADB)) and other bilateral donors in each country, often extending the reach of USAID programs. In Indonesia, the Australian bilateral aid agency, AusAID, used USAID pilot education program as the basis for its new basic education project. Collaboration with AusAID, as well as other donors such as UNICEF, continued during implementation in the form of jointly-prepared training materials and activities in communities to avoid duplication as well as to combine approaches in working with local and national officials. This coordinated approach has extended donor program coverage in Indonesia in the education sector.

In Tajikistan, training modules on interactive learning and teaching methods and teacher trainers support the Government of Tajikistan's implementation of the EFA FTI, leveraging funds of approximately $1.6 million. The USAID basic education project also complements WB and ADB projects in the area of education finance, curriculum revision, teacher training, and strengthening capacity of teacher training institutes. In Kyrgyzstan, a USAID-supported independent testing organization won a WB tender to implement student assessments. USAID-developed teacher standards are used in revision of the teacher incentive system. The basic education project collaborates with the ADB project by providing training for textbook authors.

**Leveraging Contributions from the Private Sector and Civil Society Organizations.**  The USG uses its Official Development Assistance (ODA) to leverage other resources for education by developing alliances or partnerships with the private sector and NGOs, including civil society organizations. USAID's Global Development Alliances (GDAs), also known as public-private partnerships, are tailored to country-specific needs and the private sector partners' interests. Below are several examples of ongoing and new country-specific partnerships in the region:

- **Western and Central Mindanao, and the Autonomous Region of Muslim Mindanao in the Philippines.** There are currently six GDA partnerships, with the goals of: increasing educational opportunities for children by ensuring access to quality education; improving the capacity of teachers; raising math, science, and English skills among elementary school beneficiaries; increasing employment opportunities and engaging young leaders; providing business and skills training for out-of-school youth; and providing opportunity for school drop-outs and out-of-school youths to rejoin formal schooling through an accreditation and equivalency mechanism. With approximately $12 million in USAID funding, an additional $42.7 million was leveraged (more than a one-to-three leverage) from private businesses, local NGOs, foundations, and national government agencies.

- **Indonesia.** Public-private partnerships are being used to expand the reach of USAID activities and to respond in natural disaster situations. A partnership with BP is helping improve education quality in Papua, one of the most underserved and isolated areas of

245

PX203

Indonesia. An alliance with ConocoPhillips is helping restore education services in communities affected by the May 2006 earthquake that struck Yogyakarta and Central Java.

- **Morocco and Jordan**. USAID information technology partnerships with Cisco Systems, Inc., UNIFEM, and the Governments of Morocco and Jordan have introduced Cisco Certified Network Associate and job-readiness training to eleven Moroccan institutions (900 students, 49 percent women) and to over 600 students (all women) in Jordan. In both countries, there is a focus on job skills and placement for women. In Morocco, 900 students, more than 50 percent of whom are women, have benefited (or are still benefiting) from the Cisco Certificate programs and job-preparedness training. Fifty percent of the first group of students who completed the program found jobs within six months after graduation.

USAID's Office of Middle East Affairs recently finalized a new GDA that will engage and support emerging youth leaders in Egypt, Jordan, Lebanon, Yemen, and West Bank/Gaza. Save the Children International, in partnership with the Ford Foundation, will create a youth development tool kit and link emerging young leaders to a network of youth development workers and institutions that assist young people to build leadership capacity and exercise positive, moderate leadership behaviors within a community development context.

In cooperation with the Department of State's Middle East Partnership Initiative (MEPI), Scholastic Inc. is providing 8.2 million Arabic-language classroom libraries to more than 40,620 classrooms in more than 6,770 primary schools in the Middle East and North Africa. Scholastic's substantive contribution allows MEPI to leverage its $12 million investment in this critical-thinking and independent reading skills development program. In another example, MEPI's partnership with the CISCO Learning Institute developed on-line English language curricular materials to complement the efforts of the private sector-based World Economic Forum (WEF)-sponsored Jordan Education Initiative.

**USG Coordination to Reduce Duplication and Waste.**  The Department of State and USAID work closely together implementing their Foreign Assistance Framework, which includes education. Through this framework and a joint Operational Plan process, the Department of State and USAID coordinate to reduce duplication of effort and/or waste.

USAID collaborates actively with the Department of State's MEPI to promote education in Muslim countries within the Near East region, with a focus on civic education. The MEPI education pillar supports education systems that enable all people, especially girls, to acquire the knowledge and skills necessary to compete in today's economy, participate actively and effectively in the civic arena, and improve the quality of their lives and that of their families. MEPI and USAID coordinate to minimize any potential duplication of efforts and investments. A modest number of MEPI-funded education programs, notably the support for the Arab Civitas network, are implemented in conjunction with USAID. MEPI is also providing funding for an Arabic version of the Global Learning Portal, a project under the auspices of the BMENA initiative.  The Portal will provide new avenues of professional collaboration and benefit educators and idea leaders across the Arab world.

PX203

**Training and Exchange Programs.** Bridging both basic and higher education, USAID and the State Department coordinate in the area of providing training and exchanges for students from Muslim-majority countries to the United States. In addition to the educational value of these kinds of interventions, participants are exposed to American values, culture, and democratic institutions. Many of these programs directly benefit basic education. In Egypt, 100 scholarships will be awarded to enhance the Education Ministry's technical college instructor capacity through "Train-the-Trainer" teacher preparation programs. In Pakistan, secondary school educators will attend a five-week program in the United States, focusing on mathematics, science, and classroom technology.

**Scholarship Programs.** The Middle East Partnership Initiative (MEPI) has launched two new pilot scholarship programs, the basic-education based ―MEPI Scholarship Program,‖ and the higher-education based ―Tomorrow's Leaders‖ program, using $9 million in FY-2006 funds. The MEPI Scholarship Program is providing disadvantaged youth with the opportunity to receive a democratic based education (grades 7–12) at American-sponsored schools abroad. The program was launched in Oman, Egypt, Morocco, and Jordan, for the September 2007 school year and was enthusiastically received by teachers, parents, students, and the communities. With an additional $2.7 million in FY-2007 funds, the program has grown to include more students at the initial pilot schools and has expanded to include the affiliate school in Lebanon. The ―Tomorrow's Leaders‖ scholarship recipients will be selected from among the underserved around the Middle East and North Africa, and the scholarship will provide them with a four-year academic and internship/study-abroad opportunity with specialized curricula to develop their civic engagement, entrepreneurial, and leadership skills.

USAID's **Training Future Leaders** initiative highlights the importance of U.S.-trained scholars and their unique role in developing their nations upon returning home. A USAID analytical study on prior USG investments will inform future program design and provide a "best practices" framework for long-term training programs. Currently, field research is being done in Yemen, Egypt, Nepal, and Indonesia. This program complements ongoing efforts carried out by the Department of State's Bureau of Educational and Cultural Affairs and MEPI.

**Funds Needed to Achieve Universal Basic Education.** UNESCO estimates that $5.6 billion is needed per year to achieve EFA by 2015. Globally, UNESCO estimated that 103 million children were out of school in 2002/2003. For the countries in the Muslim world, this figure is estimated to be around 45 million. Estimating that it costs roughly $50 per year per child to complete basic education (six years of schooling), it would cost $2.2 billion per year in Muslim countries as a whole to achieve universal basic education.

**Efforts to Encourage Development and Implementation of a National Education Plan.** In countries with predominantly Muslim populations, the effectiveness of basic education systems is at the crux of their development and of their potential to moderate the negative influence of low growth, joblessness, lagging social services, and despair. The USG encourages countries to develop and implement national education plans by offering assistance to support education, reform developments, and program funding once reforms have moved into the implementation phase. The United States has influenced national education plans and reform by

PX203

way of pilot programs that model best practices in education. These positive experiences galvanize support for broader change and can impact the education system beyond the pilot programs' localities. Model programs also potentially have an impact outside of targeted interventions. In Indonesia, for example, USAID helped the provincial government of Aceh with its new long-term education strategy, developed after decades of conflict and the 2004 tsunami. This strategic plan was recently endorsed by the Government of Indonesia's Ministry of National Education.

**Fulbright-Hays Programs.**  Under authority of the Mutual Educational and Cultural Exchange Act of 1961 (Fulbright-Hays Act), the State Department's Bureau of Educational and Cultural Affairs conducts a variety of programs designed to increase mutual understanding, promote international cooperation, and foster friendly and peaceful relations between the United States and other countries in the world.

Among the programs relevant to this report are the following:

The **English Access Microscholarship Program (Access)** provides English classes for deserving high school students from non-elite sectors in countries with significant Muslim populations and other key student audiences. Students receive language instruction in a civic education context and become more competitive for future job and educational opportunities. Access also prepares them to be considered for other U.S. exchange programs.

Through its **Youth Exchange and Study Program (YES)** and **Future Leaders Exchange Program (FLEX)**, the State Department brings high school students to live with American host families and attend American high schools for one academic year. Participants in the YES Program are from countries with significant Muslim populations, while FLEX students are from Eurasia. Both the YES and FLEX students perform community service while in the United States, and have the opportunity to take part in a number of enhancement activities designed to heighten their awareness of civic responsibility and leadership.

Under **Youth Leadership Programs,** high school students and educators from all regions of the world come to the United States for two to four-week programs that focus on specific themes related to science, cultural heritage, leadership development, civic education, conflict management, and community activism.

The **Teaching Excellence and Achievement Program** (TEA) provides secondary school teachers from Eurasia, South Asia, and Southeast Asia with unique opportunities to enhance their teaching skills and increase their knowledge about the United States. The participants attend a six-week professional teacher development program in the United States, which includes a three-week internship at a secondary school where participants actively engage with American teachers and students. Also, the TEA program provides follow-on grants to the international teachers to purchase essential materials for their schools, to offer follow-on training for other teachers, and to conduct other activities that will build on the exchange visits.

The State Department's **International Leaders in Education Program** is a semester-long program for secondary teachers that includes university coursework, intensive training in

PX203

teaching methodologies, leadership development, and use of computers as tools for teaching. The program includes an eight-week internship at U.S. secondary schools to engage participants in the American classroom experience. The program currently serves Algeria, Bangladesh, India, Indonesia, Jordan, Lebanon, Malaysia, Morocco, Tunisia, and Yemen.

The State Department's **Global Connections and Exchange Program** seeks to promote mutual understanding and civic education in countries with significant Muslim populations by bringing together more than 1,000 schools from 16 countries for online collaborative projects that focus on professional development, media literacy, and civic education. Teachers also develop skills needed to participate in collaborative activities with U.S. schools, and teachers and students are offered opportunities to travel to their partner schools as a way to strengthen mutual understanding and solidify virtual relationships through face-to-face meetings.

Since 2005, MEPI has worked in partnership with Ministries of Education in Yemen and Algeria to help them refine and implement their National Education Plans. Efforts in Yemen focused on developing a workable strategy by which to incorporate information technology into Yemen's broader education goals.

**Closing the Digital Divide and Expanding Vocational/Business Skills**

To "close the digital divide" and expand vocational/business skills, USAID, the Department of State, and other agencies implement public-private partnerships, information technology in the classroom, school-to-work and workforce training programs, improved quality of basic and secondary education programs, scholarships, and exchanges. A few programs are highlighted below.

- The **Education and Employment Alliance** promotes private sector participation in Egypt, Morocco, Pakistan, India, Indonesia, and the Philippines to enhance skills and improve education and employment opportunities among over one million underserved youth. In addition to local profit and non-profit partners, corporate partners include Chevron/Unocal, GE, Ink Media, Lucent, Microsoft, Nike, and Oracle.

- **The Middle East Partnership Initiative (MEPI)** is partnering with the Education for Employment Foundation (EFE) and with businesses, universities, and private organizations to create four highly scalable and replicable youth education and employment programs that offer real employment to 80 percent of all graduates. The programs are as follows: in Egypt, both a ―Mini MBA" accounting training and a textile management and workplace for success training program; in Morocco, sales force training; in Jordan, vocational scholarships and workplace for success training; and in Yemen, IT training. EFE will also create an affiliate foundation in Yemen that will partner with business, universities, and civil society leaders that are dedicated to youth education and employment to develop employer-driven education and training linked to jobs. This initiative also supports broader education goals articulated under BMENA.

- **MEPI's** Partnership Schools Program in Algeria launched a pilot e-Math initiative to develop and implement a web-based math curriculum for primary school students. In the

PX203

first year of implementation, students in the pilot province of Ghardaia improved their success rates on end-of-year exams by an average of 20 percent. MEPI's **E-Enabled Civics** project in Jordan leverages the efforts underway through the Jordan Education Initiative and has developed new, on-line, interactive civics material to support the revised civics curriculum for grades 7-12.

- The USAID **Internet Access Training Program** (IATP), administered by the International Research and Exchanges Board (IREX) since 1995, provides free Internet access and training in 11 countries throughout Central Asia, the Caucasus, and Western Eurasia. From major cities to small communities, IATP encourages information sharing, network building, and collaboration among USG exchange alumni and other targeted audiences. IATP staff train alumni and other targeted audiences in the effective use of the Internet and sponsor the development of local language websites. The centers also conduct training in basic civics, entrepreneurship, and English.

- **USAID and the Intel Corporation** signed a Memorandum of Understanding in December 2006 to broaden access and usage of information and communications technologies (ICT) in developing communities around the world. This alliance envisions collaboration and partnership in the following areas: enabling "last mile" Internet connectivity and locally relevant applications; supporting ICT usage and deployment by small and medium-sized enterprises to enhance economic development opportunities; and increasing the use of ICTs to support education and health. Intel's prior experience in the education sector includes software development and teacher training programs for K-12.

**Countries Eligible for Assistance.**  USAID education programs in Muslim-majority countries and countries with large Muslim populations potentially overlap with and reinforce those which might be targeted by the USG's International Youth Opportunity Fund [Section 7114(b)]. Below is a list, though not exhaustive, of programs in the Asia Near East, Africa, Europe, and Eurasia regions.

- **The Asia Near East region** contains several Muslim-majority countries with significant education needs. Basic education program highlights include:

  o **Afghanistan.** Students need to catch up to their appropriate grade level because many children and youth lost years of formal schooling. USAID created an accelerated learning program, compressing two years of study into a single year through innovative teaching techniques. This program has trained around 10,500 teachers and enrolled nearly 170,000 students. More than half the students are girls. In addition, USAID has printed and distributed nationwide 48.5 million textbooks for grades 1-12. Since 2002, USAID in conjunction with the Ministry of Education has built or refurbished 622 schools, mostly in remote areas.

  o In **Bangladesh**, Sesame Street Bangladesh, known locally as Sisimpur, is USAID's most recognized activity in the country. The program began airing in April 2005 and is the first show of its kind in Bangladesh. The half-hour television programs provide access to literacy, numeracy, and critical thinking

PX203

skills for almost half of the estimated nine million three to six-year-olds in Bangladesh. This prepares them for learning success and helps to combat traditionally low achievement and high drop out rates in the lower primary grades. USAID also supports the Early Learning for School Success Program (SUCCEED) operation of 1,800 preschools which prepare preschool-aged children for school by improving reading and math skills and expanding access to primary schools. A further aim of the program is to increase children's confidence and to reduce high dropout rates by enriching early learning opportunities prior to formal education. The program has established 1,800 preschools across the country (600 are based in schools and 1,200 are based in homes) and trained over 1,800 preschool teachers in new interactive methodologies.

o   USAID/Egypt supports the Government of **Egypt** in sustaining improvements in learning outcomes in grades K-12. The program focuses on improving teaching and learning, increasing equitable access to education, and strengthening management and governance in seven governorates. Activities include in-service teacher training, school libraries, information technology, and some school construction in remote and densely populated areas. To date, USAID has also provided 5 million books to over 5,000 Egyptian primary schools. Over 39,000 students now have access to computer technology. USAID has built 70 new girls schools serving almost 40,000 students. USAID supported the development of the Egyptian Sesame Street, which helps over 85 percent of all children under age eight acquire early literacy and numeracy skills.

o   The program in **Indonesia,** the world's largest Muslim country, works with over 100 districts (25 percent of the nation), providing training and technical assistance to school officials, communities, and local governments on education management and finance. This Presidential initiative also includes in-service teacher training, mentoring, and teacher resource centers to improve the quality of classroom instruction. Over 245,000 junior secondary students and out-of-school youth are learning employment-related life skills while working toward school completion or its equivalency. USAID supports an Indonesian version of *Sesame Street,* which went on the air in 2007. Through direct assistance and dissemination of best practices, education programs are expected to reach 9,000 public and private schools, 2.5 million students, 90,000 educators, and one million out-of-school youth by 2010.

o   In July 2003, the Government of **Jordan** launched a five-year, $380 million program, developed with USAID assistance, Education Reform for the Knowledge Economy (ERfKE) initiative. This initiative is one of the most ambitious education reform programs in the Arab region to date; its goal is to re-orient education policy, restructure education programs and practices, improve physical learning environments, and promote learning readiness through improved and more accessible early childhood education. USAID, in coordination with Jordan and eight other donor nations and multilateral organizations, will provide $80 million during this strategy period to support reform efforts through

PX203

ERfKE. USAID's efforts under this initiative:  assist the Government of Jordan's early child care initiative, creating 100 public kindergartens, field-test curriculum, and develop an accreditation system; develop school-to-work programs and an IT curriculum stream for high school students; connect 100 _Discovery' schools to broadband and test e-learning modules for all subject; expand youth and life skills programs to secondary schools in new underserved areas in Jordan; and, construct up to 28 new schools and rehabilitate another 100 schools to create the appropriate learning environment that supports the reform efforts and accommodates the recent influx of refugees from the region.

o  In **Pakistan**, USAID supports the government's education reform strategy by: strengthening education policy and planning; improving the skills and performance of teachers and administrators; increasing youth and adult literacy; expanding public-private partnerships; and, providing school improvement grants and involving parents and communities in public schools. Over 9,000 parent-teacher associations received school improvement grants helping communities to build over 3,000 new classrooms, reconstruct over 1,000 more classrooms, build over 1,200 toilets, and repair another 1,000. In addition, in the Federally Administered Tribal Areas (FATA), USAID is constructing and furnishing 65 primary, middle, and high schools. USAID is building or restoring water and sanitation facilities at 190 girls' schools. Scholarships have been awarded to 57 women from this area to attend a one-year, pre-service teacher education program.

South Asia also contains countries with significant Muslim populations though not in the majority, such as India with the second largest Muslim population in the world.

o  **USAID/India**'s pilot program introduces the formal curriculum in eleven Islamic religious schools (madrassas), complementing the Indian government's efforts to modernize madrassa education. The program reaches over 2,500 out-of-school youth and working children, particularly adolescent girls. A state government has decided to scale-up this model with its own resources, benefiting over 90,000 children in 1,200 madrassas by September 2008.

o  In the **Philippines (Mindanao)**, education programs aim at improving education quality and access, and providing livelihood skills training for out-of-school youth. USAID and the U.S. Peace Corps jointly help improve instruction in English, science, and math by training over 21,000 elementary and secondary school teachers, as well as mobilizing over 300 Parent-Teacher Community Associations. Computer and Internet education was also introduced.

o  **The sub-Saharan Africa region** includes a number of important Muslim and Muslim majority countries, in which support for basic education activities and improved learning opportunities for in-school and out-of-school youth figure prominently. While USAID has been working with predominately Muslim countries and communities in the education sector in Africa from the 1960s, since

PX203

the events of 9/11, the Africa Bureau's Office of Sustainable Development (AFR/SD) has re-evaluated the role of education and taken a more strategic approach to address the concerns of a post-9/11 society. USAID partners with Muslim communities to ensure that children in these communities are receiving the best and broadest education possible and that USAID is working collaboratively to create an enabling socio-economic environment that will ultimately lead to greater global peace, security, and understanding.

In support of President Bush's $100 million **East Africa Counterterrorism Initiative (EACTI)**, USAID initiated programs in East Africa in 2003 that provided basic education opportunities in marginalized Muslim communities. The targeted countries included Kenya, Uganda, Tanzania, and Ethiopia. Eritrea had been part of the original list, but was eliminated when USAID/Eritrea ended its operations. A summary of these programs include:

- o **USAID/Ethiopia** implements various activities in Muslim-dominated areas particularly in Somali, Afar, and Oromia regions. The activities include support to pre-service and in-service teacher training to improve the quality of primary education; provision of capacity-building training for Parent Teacher Associations (PTAs) and community members to increase parent and community involvement in school management; building the capacity of education officers to improve the planning and management of the education system; and establishment and expansion of alternative basic education centers to provide non-formal primary education to children, especially girls, and adult literacy classes for illiterate Muslim men and women.

- o **USAID/Kenya's** basic education program, Education for Marginalized Children in Kenya (EMACK), is concentrated in the North Eastern and Coast Provinces. Both Provinces have predominantly Muslim populations and the lowest education statistics in the country. This education portfolio began in 2004 with supplemental funding specifically targeted at Muslim communities. At the end of two years the project has had a tremendous impact on enrollment and retention. Over 100,000 children have been reached in the Coast Province. Approximately 250 Early Childhood Development Centers have been supported; over 2,000 teachers were trained in child-centered teaching methods. To date, the School Infrastructure Program has successfully built 107 classrooms, three dining halls, eight dormitories, and supplied 2,000 desks and 300 bunk-beds with mattresses.

- o **USAID/Tanzania's** program focuses on strengthening primary school performance in general and secondary school performance in math and sciences over the next five years. USAID will focus basic education activities for under-served children (especially girls in Muslim and pastoral areas). The U.S. basic education initiative will provide training and materials to teachers and students, allowing thousands of Tanzanian students to receive textbooks written in Kiswahili and allowing girls to receive scholarships. U.S. resources will enable two programs to lay the groundwork over the next five years to: increase the number of girls receiving preschool, primary, and secondary education; improve

PX203

primary and secondary skills in math and science; and provide specialized training for teachers in math, science, English, and the needs of children with disabilities. USAID works with Muslim and pastoralist populations in geographic areas where there is little or no donor support.

USAID/Tanzania will continue enhancing service delivery in Zanzibar, while adding two pilot districts (Lindi Urban and Mtwara Urban) on the southern Tanzanian mainland. Over 36,000 secondary, 64,000 primary, and 7,000 pre-primary school students will benefit from U.S. support targeting education delivery systems at local, district, and regional levels. In addition, an innovative radio instruction activity will focus on pre-primary and primary-level education. The radio instruction activity will establish 100 informal learning centers, and pilot radio instruction in 40 primary-school classrooms in Zanzibar. In addition, isolated communities in pastoralist areas will establish 70 Community Learning Centers providing equitable access to education for 14,000 children by FY-2008. Children will benefit from quality basic education in Kiswahili, English, math, social studies, science, and life skills.

o **USAID/Uganda** supports Madrassa Early Childhood Development (ECD), which targets poor communities and builds on existing informal early child education at selected community mosques. Through the Madrassa Resource Centre, communities are supported to establish and manage their own pre-schools by using intense community participation in pre-primary education. The education activities follow a unique structure that was exclusively designed for Madrassas in the Ugandan context. The project seeks to provide access to high quality, culturally relevant, and affordable early childhood education in order to increase the chances children from underprivileged communities will access and succeed in later formal education. To date, the project has achieved the following: 15 community schools have been mobilized and are participating in the program; 13 community schools are being supported post graduation to ensure the long-term sustainability of the pre-schools; 1,207 children are currently enrolled in the new schools and other schools supported by the ECD activity; 282 Schools Management Committee members received training on how to manage their schools; 120 ECD teachers have been trained in ECD methodologies; and 1,810 parents have been mobilized to send their children to the community schools.

In support of the **Trans-Sahara Counterterrorism Partnership (TSCTP)**:

o **USAID/Mali's** basic education program focuses on supporting moderate madrassas and improving the quality of primary education for Mali's predominantly Muslim population. The program reinforces the Ministry of Education's management capacity; provides school-based and radio-based teacher training; develops interactive radio instruction for students; promotes adult literacy; and mobilizes communities to better manage and advocate for their local primary schools. In the three northern regions of the country, USAID provides scholarships for over 6,000 disadvantaged girls each year.

PX203

- o **USAID/Senegal's** program aims at improving basic education in Koranic schools and currently benefits approximately 4,800 vulnerable children living and studying in these schools. The pilot activity, funded by TSCTP, was launched in late 2005. It supports improvements in the living, health, nutrition, and learning conditions of children in Koranic schools. It accomplishes this through the provision of:  hot meals; basic learning materials such as pens, books, and notebooks; and first aid kits. The program also provides training to teachers on how to effectively teach languages, math, life skills, and health education. Vocational training is also offered in the areas of carpentry, sewing, masonry, and tannery. Over the past few months, the leaders of these schools have become increasingly receptive to incorporating secular education in their curriculum and in promoting better nutrition and hygiene among their students.

- o USAID's efforts through the President's Africa Education Initiative (AEI) in **Niger, Chad, and Mauritania** complement the TSCTP's efforts to counter extremism and terrorism. In these countries, USAID has used the AEI's Ambassador Girls' Scholarship Program to improve access to quality education for girls and to engage parents and communities in the north of Mali and throughout Niger, Chad, and Mauritania.

While not part of EACTI or TSCTP, other countries have benefited from USAID's Africa Bureau's efforts to reach out to Muslim populations, including Somalia, Sudan, and Djibouti in the Horn of Africa and Nigeria in the West.

- **USAID/East Africa** has been supporting education programs in Somalia since 1994. The current education program uses radio to deliver high-quality, interactive instructional programs to marginalized children. The radio programs are currently being broadcast throughout Somalia, including in Mogadishu. The instructional radio program will target out-of-school youth and Koranic schools in Muslim communities.

- **USAID/Sudan** efforts are focused on the Three Areas and southern Sudan and engaging in national development. USAID continues to implement programs to enhance inter-religious peace-building through improving education access. Formal and non-formal programs focus on primary and girls' education, teacher training and institutional development, targeting out-of-school youth, women, girls, returnees, and other vulnerable groups. The USG is expediting the provision of primary education and adult literacy through radio-based instruction to provide a quality standard of learning both for students and teachers. Conflict resolution, recovery, and prevention are integrated to support the peace process.

- **USAID/Djibouti.** Since 2003, USAID has supported Djibouti's education reform program, to:  increase access through school rehabilitation, renovating/building water and sanitation facilities, and the provision of textbooks, equipment and kits; improve quality through teacher training, development of teachers' and school principals' guides, provision of English Language teaching and teacher training for secondary and university

PX203

levels, and construction and equipment of pedagogic resources centers, as well as improving supervision; and, improve community participation and increase girls' education through the provision of scholarships to 1,000 girls and non-formal education programs for out-of-school youth, especially girls. USAID collaborates with the U.S. Embassy and the Combined Joint Task Force/ Horn of Africa.

- **USAID/Nigeria** began support to the education sector in 1999. The first three-year program: focused on increasing teachers' instructional skills in English literacy and numeracy; used interactive radio instruction; increased community/PTA involvement in schools' management; increased child-focused classroom instructional methods; and increased local and state government skills in school-based data collection and use (this aspect evolved into the current Government of Nigeria's National model). Some 25 percent of participating schools were Islamic, the balance were public. The current program integrates health and education activities, focusing on increasing teachers' instructional skills in English literacy and numeracy. The use of interactive radio instruction increases community/PTA involvement in school management and addresses school health and nutrition issues.

In **Europe and Eurasia** the dissolution of the Soviet Union, followed by the creation of new independent countries in place of the former Soviet republics, and the drastic deterioration of the economic situation during the 1990s, forced many of the new governments to reduce drastically the country's share of the Gross Domestic Product (GDP) allocated to the education sector. The economic downturn and the challenges of restructuring the economy and the education sector have been particularly severe in Tajikistan, which suffered from a five-year civil war (1992-97).

In 2003, to support the efforts of the Central Asian countries to reform the education sectors, USAID has implemented a regional education project in Tajikistan, Kyrgyzstan, Uzbekistan, and Turkmenistan. Although regional in implementation, the project takes into account the specific needs of each country and aims to utilize windows of opportunity as they arise. The **Basic Education Strengthening Program (PEAKS)** focuses on five major aspects of the education system: in-service teacher training; classroom-level learning materials and textbook development; parent and community involvement in education decision making; management and technical capacity at all levels of the education system; and, rehabilitation of school infrastructure. The program is implemented in close collaboration with the respective Ministries of Education, Ministry of Finance, teacher training institutes, and other pedagogical and research institutions. USAID also facilitates donor-host country dialogue and collaborates with other donors to ensure complementary design and delivery of education activities.

**USAID/E&E EDUCATION PROGRAM IMPACT IN FOUR MUSLIM MAJORITY CENTRAL ASIAN COUNTRIES (2002 - 2006)**

| TYPE OF PROGRAM | MAJOR PROGRAM COMPONENTS | REGIONAL IMPACT (approximate numbers) |
|---|---|---|
| **Increase Access to Education Opportunities** | • School and classroom construction and rehabilitation | • Rehabilitated 113 schools (Kyrgyzstan, Tajikistan, Uzbekistan) |

PX203

| | • School finance | • Piloted new school finance mechanism based on per capita funding formula to improve efficiency. Results include more efficient student/teacher ratios in pilot areas (Kyrgyzstan, Tajikistan, Uzbekistan). |
|---|---|---|
| **Increase the Quality of Education** | • Teacher training | • 8,142 primary and secondary school teachers trained in interactive, student-centered methods with mentoring and other follow-up support (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan). |
| | • Community and parental involvement | • 174 school community committees strengthened to support school quality improvements (Kyrgyzstan, Tajikistan, Uzbekistan). |
| | • Model school program | • 300 "Model Schools" model best practices in the use of new teaching methods, management practices and community involvement (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan). |

**Kyrgyzstan.**  Strengthening the ability of the education sector to deliver quality education relevant to the needs of market-based democracy will facilitate Kyrgyzstan's democratic transition and economic performance and competitiveness. USAID provides teacher training and resource development for 11 pilot schools, which in turn will serve as teacher training centers for 84 cluster schools. The Professional Development Schools (PDS) have been recognized by the Government of Kyrgyzstan as the alternate teacher training providers, a significant accomplishment in a country with a highly centralized educational system that does not readily look to alternate service providers. The Government of Kyrgyzstan pays a salary for a PDS coordinator. From the inception of the project, 90,268 students have benefited from this program and 12,062 teachers have received training. In addition, USAID funds the Kyrgyz National Scholarship Test, which helps to fight corruption by enabling high school graduates to receive merit-based scholarships for higher education.

**Tajikistan.**  Keeping momentum towards democratic reform in Tajikistan is critical, and a strong education system is an important tool to support that goal. While the basic education project initially focused on primary grades that were considered in most urgent need of support, additional resources allowed the project to expand to cover grades 5-11 and to introduce the

PX203

Reading, Writing, and Critical Thinking Program. From the inception of the project, 53,105 students benefited from this program and 481 teachers received training.

In addition to the regionally implemented PEAKS project, USAID is also supporting a basic education project through the Aga Khan Foundation (AKF). This project works in remote, mountainous areas where teachers seldom have access to professional development activities. As a result of teacher training improvements, teachers report increased attendance, return to school of students who stopped attending, and new motivation to study among the students. From its inception, the USAID-AKF project has benefited 5,000 students and trained 1,057 teachers.

**Turkmenistan.**  Turkmenistan has taken the disturbing step of essentially eliminating upper secondary education by reducing the length of study to nine years instead of the standard ten years (under the Soviet system). In addition, the shift to the almost total reliance on the late President Niyazov's books (Rukhnama) as the primary curriculum, which emphasizes loyalty to the president and his spiritual teachings, has resulted in devastating deterioration of education quality and relevance and created a vast knowledge vacuum which will affect many generations to come. Young people under the age of 15 make up nearly 35 percent of the population in Turkmenistan - the second largest percentage of youth in the Europe and Eurasia region. As a result of the President Niyazov's education reforms, upper secondary enrollments have fallen from 67 % to 27 % since 1991. This means that approximately one in four students aged 15 to 18 is enrolled in school.

Besides a small-scale UNICEF initiative in primary and secondary education, USAID has been the only other donor involved in education. Although the Government of Turkmenistan has not formally endorsed the program, it has allowed interested schools to work with the USAID-funded project. Assistance-to-date has focused on teacher training in interactive teaching and learning methods. Up to now, 57,335 students have benefited from the project and 533 teachers received training.

The change of leadership following the death in 2006 of President Niyazov may create opportunities for broader engagement. President Berdimuhammedov announced that Turkmenistan will embark on reform to align the education system with international standards. If implemented, this may provide an opportunity for U.S. involvement in basic education reform.

## 5.8. Economic Reform

High unemployment and underemployment, often a result of slow economic growth, are among the most critical issues in predominantly Muslim countries. U.S. assistance programs attempt to address this issue with reforms to improve the investment climate. Such reforms could include business registration, dispute settlement, financial sector and agricultural reforms, combined with education, job training, and health programs.

PX203

The U.S. strategy of Total Economic Engagement pursues economic reform, rule of law, and global economic integration, including countries with predominantly Muslim populations. Total Economic Engagement includes:

- Regular bilateral discussions on these topics with host government officials, with both U.S. Embassy officials and officials from a wide range of U.S. agencies participating;
- Formal structured dialogues, high-level Economic Dialogues, and Trade and Investment Framework Agreement (TIFA) Councils;
- U.S. bilateral and multilateral assistance programs for economic reform, trade capacity-building, and rule of law managed chiefly through USAID, the Millennium Challenge Corporation (MCC), and the State Department's Middle East Partnership Initiative (MEPI). Programs are often complemented with technical assistance provided by specialized U.S. agencies and offices;
- Coordinated multilateral policies and assistance strategies to advance reform goals by working with such international organizations as the (IMF, WB, World Trade Organization (WTO), and OECD (MENA-OECD Investment), and other multilateral donors; and
- Working with NGOs, such as Transparency International, and U.S. and foreign business associations, such as American Chambers of Commerce and Business Councils, to advance reform issues of mutual concern.

**Integrating Predominantly Muslim Countries into the Global Trading System**
There are a number of USG-funded programs to promote predominantly Muslim countries' integration into the global trading system and promotion of regional trade and rule of law. The following table lists USG funding for trade and capacity-building programs. USAID/Asia and Near East Bureau currently funds 77 percent of these programs in these countries.

| USG Funding for Trade and Capacity-building | |
|---|---|
| **Country** | **USG FY-2007 Funding** |
| Afghanistan | $27,689,169 |
| Bangladesh | $775,088 |
| Egypt | $17,557,096 |
| Indonesia | $19,714,237 |
| Iraq | $2,896,080 |
| Jordan | $17,742,245 |
| Lebanon | $2,895,500 |
| Morocco | $8,626,500 |
| Pakistan | $7,406,217 |
| West Bank/Gaza | $0 |
| Yemen | $480,000 |
| **TOTAL TCB Funding** | **$105,782,132** |

259

PX203

**WTO Awareness and Accession.** FY-2007 USAID programs with components dealing with WTO awareness and accession are being implemented in Afghanistan ($9,000,000), Indonesia ($7,073,927), and Iraq ($2,222,830):

- **Afghanistan.** The Strengthening Private Sector through Capacity-building Project is designed to establish sound economic governance within the economic ministries and agencies of the Government of Afghanistan. Activities include customs operations and administration and other related reforms supporting progress toward WTO accession.

- **Indonesia.** The Trade Assistance Project focuses on legal support, economic research, public outreach, organizational development, information technology, and WTO awareness and agreements. The objective is to improve the Ministry of Trade's capacity to analyze and implement trade reforms that will lead to increased exports and a more attractive investment climate.

- **Iraq.** The Trade Policy and Market Access Support Project provides technical assistance to the Government of Iraq on legal, procedural, and practical matters pertaining to Iraq's bid to join the WTO. This includes technical assistance in completing key accession-relation documentation, in particular ACC4 (agriculture), ACC8 (sanitary and phytosanitary, technical barriers to trade), and ACC9 (intellectual property), and modifications and updates as WTO-related regulatory reforms progress.

**USAID Global Export Promotion Programs.** USAID global export promotion programs in FY-2007 include Afghanistan ($5,500,000), Bangladesh ($575,088), Indonesia ($3,131, 110), and Pakistan ($3,343,000):

- **Afghanistan.** The Small Medium Enterprise Development Project supports the development of the Afghan private sector by addressing non-governmental barriers to enterprise development. Key activities include strengthening business associations through support of trade fairs, trade missions, and participation of leading small and medium enterprises and associations.
- **Bangladesh.** The Shrimp Quality Support Project focuses on improving the quality and quantity of shrimp exports by Bangladesh in socially and environmentally acceptable ways by transferring appropriate applied research to farmers.
- **Indonesia.** The Enterprise and Agribusiness Development Activity supports the competitiveness of labor-intensive manufacturing industries, including footwear, furniture, auto parts, garments, home accessories, and information and communications technology. Competitiveness is strengthened by strengthening industry value chains, developing new industry-based standards to improve product quality and access to markets, and improving business skills, such as export readiness.
- **Pakistan.** The Initiative for Strategic Development and Competitiveness provides technical assistance and training to increase the competitiveness of Pakistani small and medium-sized enterprises. The project works with a number of sectors, including gems, jewelry, dairy, marble, horticulture, and furniture to improve their capacity to market and export their products. The project has formed six strategic working groups to develop

PX203

sector-specific strategies aimed at upgrading production and improving marketing and trade.

**Customs Reforms.** Customs reforms are supported by USAID FY-2007 programs in Egypt ($5,000,000), Afghanistan ($9,000,000, previously mentioned), and Indonesia ($7,073,927, previously mentioned).

**USAID Africa Bureau Programs.** Programs managed within the USAID Africa Bureau include Sub-Saharan integration into the global trading system, the driving forces of which are the African Growth and Opportunity Act (AGOA) and the President's Initiative - African Global Competitiveness Initiative (AGCI). Program efforts are focused on helping countries build a sound enabling environment including policies, laws, and regulations governing business and trade; improving infrastructure to facilitate trade; strengthening financial services to small and medium-sized enterprises and other businesses; and developing the energy sector to meet the needs of growing African economies.

**USAID Europe and Eurasia Bureau Programs.**

**Albania**. The objective in Albania is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID/Albania's programs worked with the government to improve the business climate for private sector growth and investment, and to improve private sector competitiveness to meet international export requirements. The Albanian Center for International Trade, founded in 2003, assists the Government of Albania to improve the quality of its trade policies. The Enterprise Development and Export Market Services Project, scheduled to run through September 2008, promotes the competitiveness of small and medium Albanian enterprises in domestic and foreign markets, and accelerates the entry of Albanian exports into global markets.

**Azerbaijan.** Azerbaijan's program emphasizes economic growth and reform, with a focus on developing the non-oil sectors of the economy.

**Bosnia and Herzegovina (BiH).** The program in BiH supports progress towards full integration into the EU. USAID/BiH worked to integrate the energy sector into the regional European framework and supported the development and implementation of a coherent direct taxation system that is regionally competitive. USAID's competitiveness projects promote trade and investment in agribusiness, wood processing, and tourism by improving the competitiveness of the firms, industries, and training firms to meet EU standards.

**Central Asia Region.** The Trade Facilitation and Investment (TFI) Project has been operating in Kazakhstan and the Kyrgyz Republic since 2001 and in Tajikistan and Uzbekistan since 2002. The project seeks to improve the trade and investment environment for small and medium-sized enterprises through the reduction of investment constraints, trade facilitation, and accession to and active participation in the WTO (Kyrgyz Republic joined in 1998).

PX203

Building on USAID's TFI Project, the **U.S. Central Asia Trade Facilitation Initiative** works to foster greater regional trade through reduced transaction costs for businesses by harmonizing, strengthening, and streamlining customs functions.

The Business Environment Improvement Project (BEI) was launched for Kazakhstan, the Kyrgyz Republic, and Tajikistan in October 2006. This program supports the streamlining of legal and regulatory processes, and facilitates multi-party engagement to improve the business, trade, and legal environment.

The Central Asia Infrastructure Integration Initiative, under the Regional Electricity Market Assistance Project (REMAP), helps to establish a transparent and competitive regional electricity market to increase regional electricity trade, stimulate economic growth, and provide market-based solutions for regional disputes related to hydro facilities and reservoirs.

**Kazakhstan.**  The TFI Project operates five offices in Kazakhstan and was directly involved in the drafting of Kazakhstan's Customs Code, bringing the country into greater compliance with WTO principles and agreements. TFI is also financing the training of front-line customs officers in the identification and seizure of pirated goods to help Kazakhstan meet the standards of the Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS) and achieve removal from the Special 301 Watch List, both of which will help Kazakhstan's accession process to the WTO. The Kazakhstan Small Business Development Project, funded in October 2006, aims to promote development of small business, resulting in an increase of sales domestically and regionally.

**Kosovo.**  The objective in Kosovo is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID's goal is to help Kosovo make the transition from international administration to self-governance in an effective and peaceful manner. USAID provides training and expert counsel to ensure Kosovars quickly build capacity in the fiscal and economic policy sectors, private enterprise development, and energy management. One such program is the Cluster and Business Support Project, assisting businesses in the construction materials, livestock, and fruit and vegetables sectors by promoting productivity, trade and investment, identifying trade, marketing, and import-substitution opportunities; and providing training to meet EU standards.

**Kyrgyz Republic**. The TFI Project provides support to the WTO Department within the Kyrgyz Ministry of Economic Development and Industry & Trade (MEDIT), to increase its technical capacity in the legal and regulatory process. The Kyrgyz Agri-Enterprise Development Program works closely with the USAID Ferghana Valley Agribusiness Initiative, and provides development assistance to private agricultural-input suppliers that share the Ferghana Valley with Uzbekistan and Tajikistan.

**Tajikistan**. The TFI Project works directly with the Tajik government to prepare it to meet its WTO commitments by revising and updating the Legislative Action Plan to bring trade-related legislation into conformity with the provisions of WTO Agreements. Patent, copyright, trademark, and geographic indication legislation are revised to reach conformity with the provisions of the TRIPS Agreement. USAID's programs support small and medium enterprise

PX203

development, customs reform, and the creation of agricultural value chains. Fiscal reform projects focus on reducing regional disparities by increasing the effectiveness of local tax administration and increasing the capacity of local governments to develop and execute budgets.

**Turkmenistan**.  USAID works to foster trade advisory services and implement International Financial Reporting Standards in Turkmenistan.

**Stability Pact for Southeastern Europe (SP).**  The SP has several relevant programs related to global trade that affect parts of the region with significant Muslim populations, including Albania, BiH, and Kosovo. The SP's Trade Working Group has encouraged the negotiation, ratification, and implementation of a network of bilateral free trade agreements among the members of the SP and supports negotiation of a single regional trade agreement aimed at harmonizing the bilateral trade agreements to encompass all SP members. The United States supports this process by providing technical assistance to lower non-tariff barriers within the region, consistent with WTO principles.

Under SP auspices, the OECD Investment Compact for Southeastern Europe aims to improve the region's investment conditions, by setting out commitments for policy reform and to encourage increasing local and foreign direct investment. Albania and BiH (among other Southeastern Europe nations) are signatories.

**Possible Actions to Promote Intraregional Trade and Rule of Law in the Region**
Supporting intraregional trade and rule of law is a key aspect of U.S. policy in the Middle East and around the world.

**Intraregional Trade**

- The President's vision of a Middle East Free Trade Area (MEFTA) by 2013, linking countries in the region with each other and the United States, is the centerpiece of our effort to promote intraregional trade. Our strategy for attaining MEFTA includes:
  - Negotiating Free Trade Agreements (FTAs) with countries ready for that step. The United States has concluded FTAs with Israel, Jordan, Morocco, Bahrain, and Oman;
  - Working with additional countries through the TIFA process to advance readiness for FTA negotiations; and
  - Assisting reform-minded Middle East countries that are not yet in the WTO accession process.

- The MEPI, MCC, and USAID Missions in the Middle East, provide support for the MEFTA initiative through a variety of programs in trade capacity-building. MEPI and USAID missions in the Middle East are supporting the WTO accession efforts of Iraq, Yemen, and Lebanon. USG assistance programs assist FTA partners Jordan, Morocco, Bahrain, and Oman with free trade implementation with the United States.

- USAID/Jordan's Business Development Center supports implementation of the FTA between the United States and Jordan, and assists small and medium-sized firms to

PX203

modernize and improve their competitiveness so they can move into higher value sectors and take advantage of FTA export opportunities. FY-2007 funding is $840,220.

- USAID/Morocco's New Business Opportunities (NBO) Program helps export-oriented Moroccan firms to take advantage of new opportunities for entry and expansion into the United States created by the Morocco-U.S. Free Trade Agreement. NBO includes business development services that help exporting firms to identify new market opportunities, and then work to improve their marketing and promotion to turn these opportunities into exports to the United States. FY-2007 funding is $3,343,000.

## The Rule of Law

- **The Middle East Partnership Initiative (MEPI)** will continue to support rule of law activities aimed at strengthening the capacity of regional governments to enact and implement commercial laws conducive to promoting economic growth. By working with legislators, judges, lawyers, and business persons, improvements in the commercial legal and regulatory environment focused on international best practices should lead to increased investment and employment across the region.
- **Egypt.** USAID's Administration of Justice Support II project promotes the rule of law by reforming and modernizing the commercial court system and improving the access to quality legal services.  FY-2007 funding is $3,700,000.
- **Indonesia.** USAID's Financial Crime Prevention Project (FCPP) is designed to strengthen Indonesia's ability to combat financial crimes. FCPP provides technical assistance to the FIU (PPATK), Supreme Audit Commission, Attorney General's Office, Corruption Eradication Commission, and Ministry of Finance-Inspector General Office. FCPP's work aids Indonesia's own efforts to build a more modern legal and institutional framework to detect and prosecute corruption and financial crimes. FY-2007 funding is $254,132.

**The Millennium Challenge Corporation (MCC).**  The MCC provides assistance for transformational development in countries that perform well on 17 independent, transparent policy indicators in the areas of ruling justly, investing in people, and economic freedom. Besides the financial support provided by MCC programs, MCC selection criteria creates an incentive for candidate countries to adopt related legal, policy, regulatory, and institutional reforms related to the MCC selection criteria. Such reforms will contribute to countries' efforts to reduce poverty and increase economic growth.

**Summary of MCC Activities in Predominantly Muslim Countries:**

**Compact-Eligible Countries.**  Based on their good performance on the 17 policy indicators mentioned above, Compact-Eligible countries are invited to apply for substantial grants from MCC for programs that they design and implement through a "Compact."

**Mali.**  Mali signed a five-year, $460.8 million Compact with MCC in November 2006 which entered into force in September 2007. It aims to reduce rural poverty and help achieve national food security through a sustainable increase in the economic performance of the agricultural

PX203

sector, and to spur economic growth and reduce poverty by increasing the competitiveness of light industry and increasing the value-added of exports and tourism. These objectives will be met through investments that increase farmers' productivity, enhance agricultural supply chains, reduce transport costs, and create a platform for industry. The Compact focuses on improved infrastructure at the Bamako Airport, a key gateway for trade, and along the Niger River for irrigated agriculture.

**Burkina Faso.** Burkina Faso submitted an initial Compact proposal to MCC in October 2006. It aims to promote economic growth in the rural sector by fostering land tenure security; investing in irrigation and watershed management infrastructure for agricultural purposes; constructing national roads, feeder roads, and market infrastructure; and improving existing agro-industrial supply chains. While MCC continues due diligence, it granted the government $9.43 million in pre-Compact assistance in December 2007 to cover preparatory work and fees.

**Morocco.** Morocco signed a five-year, $697.5 million Compact with MCC on August 31, 2007. The Compact focuses on relieving constraints to growth in the agriculture, fishing, artisan, and small enterprise finance sectors. Entry into force is pending.

**Threshold Programs** are designed to assist countries that have demonstrated significant commitment to improving their performance on MCC selection criteria, but do not yet pass more than half the indicators in each of the three selection categories of ruling justly, investing in people, and encouraging economic freedom. A Threshold Program provides financial assistance to help improve a low score on at least one of MCC's policy indicators.

**Albania.** Reducing corruption is the primary focus of the $13.8 million Albanian program that began in April 2006. Albania is receiving assistance from MCC to fund three programs designed to reform tax administration, public procurement, and business administration. The program anticipates reducing the extensive red tape and below-board payments needed to start a business while increasing the national tax base.

**Burkina Faso.** The $12.9 million program, signed in July 2005, is a pilot program that seeks to improve performance on girls' primary education completion rates. Specific interventions include the construction of 132 "girl-friendly" schools, teacher training, providing take-home dry rations to girls who maintain a 90 percent school attendance rate, and providing literacy training for mothers. Burkina Faso is also eligible for Compact assistance.

**Indonesia**. The $55 million program with Indonesia, begun in November 2006, seeks to immunize at least 80 percent of children under the age of one for diphtheria, tetanus, and pertussis, and 90 percent of all children for measles. The Threshold Program also has a component aimed at curbing public corruption by reforming the judiciary and strengthening government institutions that fight corruption.

**Jordan.** The $25 million Jordanian program, signed in October 2006, aims to strengthen democratic institutions by supporting Jordan's efforts to broaden public participation in the political and electoral process, increasing government transparency and accountability, and enhancing the efficiency and effectiveness of customs administration. The Threshold Program is

PX203

a part of Jordan's reform efforts focused on improvements in public administration, civil liberties, infrastructure, and the economy.

**Kyrgyz Republic.** The Kyrgyz Republic $16 million Threshold Program was approved in August 2007 to help the Kyrgyz government fight corruption and improve the rule of law through judicial, criminal justice, and law enforcement reforms. As of December 2007, the implementing agreement (SOAG) was pending signature.

**Yemen.** In February, the Republic of Yemen was reinstated into the Threshold Program based on the Yemeni government's efforts to address the country's performance on the MCC selection criteria. On September 12, the MCC Board approved a $20.6 million grant to Yemen to help it fight corruption and improve rule of law, political rights, and fiscal policy. However, signing of a Threshold agreement, originally scheduled for October 31, has been indefinitely deferred pending MCC review of Yemen's status.

**The Middle East Partnership Initiative (MEPI).** In 2007, MEPI provided tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from trade technical assistance to commercial code reform to a network for Arab businesswomen.

**Examples of MEPI's work with reformers include the following:**
- Provided technical and other assistance in support of successfully completed free trade agreements with Bahrain and Oman; Trade and Investment agreements with Kuwait, Qatar, Tunisia, and Egypt; and supported WTO accession for Yemen, Algeria, and Lebanon;
- Expanded trade capacity of Arab countries with training and technical assistance, including assisting a number of Gulf and North African countries with revising their labor codes, and updating intellectual property codes, customs codes, and agricultural import/export standards;
- Expanded efforts to strengthen indigenous labor and business organizations;
- Provided entrepreneurial training for more than 400 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 50 alumni going on to start or expand businesses. These entrepreneurs created at least 1,000 new jobs following their participation in MEPI programs;
- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations;
- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters; and
- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman, update commercial codes to meet international standards in Bahrain, Qatar, and Oman, and provide continuing education programs for the judiciary.

PX203

# Chapter 6
# Terrorist Organizations

Foreign Terrorist Organization (FTO) aliases cited are consistent with and drawn from the Specially Designated Nationals list maintained by the Department of Treasury. The full list can be found at the following website:
http://www.treasury.gov/offices/enforcement/ofac/sdn/sdnlist.txt.

On October 15, 1999, pursuant to UNSCR 1267, the ‑al‑Qaʻida and Taliban Sanctions Committee" was established. The 1267 sanctions regime has been modified and strengthened by subsequent resolutions so that the sanctions now cover individuals and entities associated with al-Qaʻida, Usama bin Ladin, and the Taliban. The targeted individuals and entities are placed on the Consolidated List. The full list can be found at the following website:
http://www.un.org/sc/committees/1267/consolist.shtml.

## USG Designated Foreign Terrorist Organizations

**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group**
**Al-Aqsa Martyrs Brigade**
**Ansar al-Sunnah**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Mujahadin (HUM)**
**Hizballah**
**Islamic Jihad Group (IJG)**
**Islamic Movement of Uzbekistan (IMU)**
**Jaish-e-Mohammed (JEM)**
**Jemaah Islamiya Organization (JI)**
**Al-Jihad**
**Kahane Chai (Kach)**
**Kongra-Gel (formerly Kurdistan Worker's Party (PKK))**
**Lashkar e-Tayyiba**
**Lashkar i Jhangvi (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**
**Mujahadin-e Khalq Organization (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front (PLF)**

PX203

Palestinian Islamic Jihad (PIJ)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qa'ida
Al-Qa'ida in Iraq
Al-Qa'ida in the Islamic Maghreb (AQIM) [Formerly Salafist Group for Call and Combat (GSPC)]
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Nuclei (RN)
Revolutionary Organization 17 November (17N)
Revolutionary People's Liberation Party/Front (DHKP/C)
Shining Path (SL)
United Self-Defense Forces of Colombia (AUC)

---

## Abu Nidal Organization (ANO)

a.k.a. Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:** The Abu Nidal Organization (ANO), an international terrorist organization, was founded by Sabri al-Banna (a.k.a. Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974. The group's previous known structure consisted of various functional committees, including political, military, and financial. In August 2002, Abu Nidal died in Baghdad, probably at the hands of Iraqi security officials; the new leadership of the organization remains unclear.

**Activities:** The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons. The group has not staged a major attack against Western targets since the late 1980s. Major attacks included the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988. The ANO is suspected of assassinating PLO deputy chief Abu Iyad and PLO security Chief Abu Hul in Tunis in 1991. The ANO conducted no attacks in 2007.

**Strength:** Current strength is unknown.

**Location/Area of Operation:** The group is largely considered inactive, although former and possibly current ANO associates might be in Iraq and Lebanon.

**External Aid:** The ANO's current access to resources is unclear, but it is likely that the decline in state support has had a severe impact on its capabilities.

## Abu Sayyaf Group

a.k.a. Al Harakat al Islamiyya

PX203

**Description:** The Abu Sayyaf Group (ASG) is an Islamic terrorist group operating in the southern Philippines. Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamic teachings. The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998. His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group. In September 2006, Janjalani was killed in a gun battle with the Armed Forces of the Philippines. Radullah Sahiron is assumed to be the new ASG leader.

**Activities:** The ASG engages in kidnappings for ransom, bombings, beheadings, assassinations, and extortion. The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago, areas in the southern Philippines heavily populated by Muslims, but the ASG primarily has used terror for financial profit. Recent bombings may herald a return to a more radical, politicized agenda, at least among certain factions. In August 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadaffy Janjalani in September 2006 and his deputy, Abu Solaiman in January 2007. In July 2007, the ASG, and Moro Islamic Liberation Front (MILF) engaged a force of Philippine marines on Basilan Island, killing fourteen, of which ten were beheaded.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995. In April 2000, an ASG faction kidnapped 21 persons, including ten Western tourists, from a resort in Malaysia. In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines. Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered. A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham and Filipina Deborah Yap were killed.

U.S. and Philippine authorities blamed the ASG for a bomb near a Philippine military base in Zamboanga in October 2002 that killed a U.S. serviceman. In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132. In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila. The ASG also claimed responsibility for the 2005 Valentine's Day bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150. In November 2007, a motorcycle bomb exploded outside the Philippines Congress, killing a congressman and three staff members. While there was no definitive claim of responsibility, three suspected ASG members were arrested during a subsequent raid on a safe house.

**Strength**: ASG is estimated to have 200 to 500 members.

**Location/Area of Operation:** The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi. The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila. In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao. The ASG was expelled from Mindanao proper by the Moro Islamic Liberation Front in mid-2005. The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there.

PX203

**External Aid:** The ASG is funded through acts of ransom and extortion, and receives funding from both regional terrorist groups such as Jemaah Islamiya (JI), which is based mainly in Indonesia, and from Middle Eastern Islamic extremists. In October, the ASG appealed for funds and recruits on YouTube by featuring a video of the Janjalani brothers before they were killed.

## Al-Aqsa Martyrs Brigade
a.k.a. al-Aqsa Martyrs Battalion

**Description:** The al-Aqsa Martyrs Brigade consists of loose cells of Palestinian militants loyal to, but not under the direct control of the secular-nationalist Fatah movement. Al-Aqsa emerged at the outset of the 2000 Palestinian al-Aqsa intifada as a militant offshoot of the Fatah party to attack Israeli military targets and settlers with the aim of driving Israel from the West Bank and Gaza and establishing a Palestinian state. Al-Aqsa has no central leadership; the cells operate with autonomy, although they remained ideologically loyal to Palestinian Authority (PA) President and Fatah party head Yassir Arafat until his death in November 2004.

**Activities:** Al-Aqsa initially focused on small arms attacks against Israeli military personnel and settlers in the West Bank. In 2002, however, the group began to conduct suicide bombings against Israeli civilians. Al-Aqsa suspended most anti-Israel attacks as part of the broader unilateral Palestinian ceasefire agreement during 2004 but resumed them following HAMAS's victory in January 2006 Palestinian Legislative Council elections. Al-Aqsa members continued the anti-Israeli and intra-Palestinian violence that contributes to the overall chaotic security environment in the Palestinian territories. In 2007, the majority of al-Aqsa attacks were rocket and mortar attacks into southern Israel from HAMAS-ruled Gaza. Israel agreed to extend a conditional pardon to 178 West Bank al-Aqsa members, but did not expand the program to the rest of the organization. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed some dual U.S.-Israeli citizens.

**Strength:** Current strength is unknown, but most likely numbers a few hundred.

**Location/Area of Operation:** Al-Aqsa operates mainly in the West Bank but has conducted attacks inside Israel and Gaza. The group also has members in Palestinian refugee camps in southern Lebanon.

**External Aid:** Iran has exploited al-Aqsa's lack of resources and formal leadership by providing funds and other aid, mostly through Hizballah facilitators.

## Ansar al-Islam
a.k.a. Ansar al-Sunna; Ansar Al-Sunnah Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar Al-Sunnah; Jund Al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

PX203

**Description:** Ansar al-Sunnah (AS) is a Salafi terrorist group whose goals include expelling the U.S.-led Coalition from Iraq and establishing an independent Iraqi state based on Sharia law.  In 2003, AS announced its creation by posting a statement on the Internet calling all extremists in Iraq to unite under the new name. The bid to become an extremist umbrella organization failed, but the name AS remained in use until November, when it changed its name back to Ansar al-Islam (AI). AI has ties to the al-Qaʿida (AQ) central leadership and to al-Qaʿida in Iraq (AQI), although it has a competitive relationship with AQI, and did not join the AQI-dominated "Islamic State of Iraq." Some members of AI trained in AQ camps in Afghanistan, and the group provided safe haven to affiliated terrorists before Operation Iraqi Freedom (OIF). Since OIF, AI has become the second-most prominent group engaged in anti-Coalition attacks in Iraq behind AQI and has maintained a strong propaganda campaign. Despite AI's ties to AQ, the group does not seem to be interested in attacking targets outside Iraq.

**Activities:** AI continued to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures. AI has claimed responsibility for many high profile attacks, including the execution-style killing of nearly two dozen Yazidi civilians in Mosul in reprisal for the stoning death of a Muslim convert in April, the car-bombing of a police convoy in Kirkuk in July, the suicide bombing of Kurdistan Democratic Party offices in Khursbat in October, and numerous kidnappings, executions, and assassinations.

**Strength:** Precise numbers are unknown. AI is one of the largest Sunni terrorist groups in Iraq.

**Location/Area of Operation:** Primarily central, western, and northern Iraq.

**External Aid:** AI receives assistance from a loose network of associates in Europe and the Middle East.


## Armed Islamic Group (GIA)

a.k.a. Al-Jama'ah al-Islamiyah al-Musallah, Groupement Islamique Arme

**Description:** The Armed Islamic Group (GIA) aims to overthrow the Algerian regime and replace it with a state governed by Sharia law. The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Algerian Islamic opposition party.

**Activities:** The GIA engaged in attacks against civilians and government workers. The group began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians, alienating itself from the Algerian populace. Since announcing its campaign against foreigners living in Algeria in 1992, the GIA killed more than 100 expatriate men and women, mostly Europeans, in the country. Many of the GIA's members joined other Islamist groups or have been killed or captured by the Algerian government. The government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces. The GIA's most recent significant attacks occurred in August 2001. After the arrest of the GIA's last known emir and

PX203

subsequent counterterrorism operations, the Algerian government declared that the GIA network was almost entirely broken up. The last terror attack attributed to the GIA occurred in 2006.

**Strength:** Precise numbers are unknown, but the group continues to decline and probably numbers fewer than 40. The last known emir was Nourredine Boudiafi, who was arrested by Algerian authorities in November 2005.

**Location/Area of Operation:** Algeria, the Sahel, and Europe.

**External Aid:** GIA members in Europe provide funding, but most funding comes from the group members' criminal activity.

## Asbat al-Ansar

**Description:** Asbat al-Ansar is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to the al-Qa'ida (AQ) organization and other Sunni extremist groups. The group follows an extremist interpretation of Islam that justifies violence against civilian targets to achieve political ends. Some of the group's goals include thwarting perceived anti-Islamic and pro-Western influences in the country.

**Activities:** Asbat al-Ansar maintains close ties with the AQ network, with its base of operations in the Ain al-Hilwah Palestinian refugee camp near Sidon. Lebanese authorities detained a cell of al-Qa'ida in Iraq (AQI) extremists in June in the Bekaa Valley that had trained with Asbat al-Ansar and was possibly planning terrorist attacks throughout Lebanon against United Nations Interim Forces in Lebanon (UNIFIL) or other Western targets. Asbat al-Ansar has recently been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in Ain al-Hilwah. Various extremist web forums criticized Asbat al-Ansar for its failure to support fellow Sunni extremist group Fatah al-Islam (FAI) during the Lebanese Armed Forces campaign in summer 2007 that forced FAI out of Nahr al-Barid refugee camp in northern Lebanon, and severely damaged the group.

Members of Asbat al-Ansar were believed responsible for a Katyusha rocket attack on the Galilee region of Israel in December 2005. Asbat al-Ansar operatives have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations. Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of al-Qa'ida at the 'Ayn al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements. In 2007, Asbat al-Ansar remained focused on supporting jihad in Iraq and planning attacks against UNIFIL, Lebanese security forces, and U.S. and Western interests. Asbat al-Ansar-associated elements were implicated in the June 17 Katyusha rocket attack against northern Israel.

Asbat al-Ansar first emerged in the early 1990s. In the mid-1990s the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000. Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di, a.k.a. Abu Muhjin, remains at large despite being sentenced to death in

PX203

absentia for the 1994 murder of a Muslim cleric. In September 2004, operatives with links to the group were allegedly involved in planning terrorist operations targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices. In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for plotting to assassinate then U.S. Ambassador to Lebanon, David Satterfield, in 2000.

**Strength:** The group commands between 100 and 300 fighters in Lebanon. Its named leader is Ahmed Abd al-Karim al-Saadi.

**Location/Area of Operation:** The group's primary base of operations is the Ayn al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**External Aid:** It is likely the group receives money through international Sunni extremist networks.


# Aum Shinrikyo

a.k.a. A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:** Shoko Asahara established Aum Shinrikyo (Aum) in 1987, and the cult received legal status as a religious entity in 1989. Initially, Aum aimed to take over Japan and then the world, but over time it began to emphasize the imminence of the end of the world. Asahara predicted 1996, and 1999 to 2003, as likely dates and said that the United States would initiate Armageddon by starting World War III with Japan. The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995. In 1997, however, a government panel decided not to invoke the Operations Control Law to outlaw the group. A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns Aum might launch future terrorist attacks. Under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph in January 2000 and tried to distance itself from the violent and apocalyptic teachings of its founder. In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara. A growing divide between members supporting Joyu and Asahara emerged. In 2007, Joyu officially split and in May, established a splinter group called Hikari No Wa. Hikari No Wa is translated as ‚Circle of Light‘ or ‚Ring of Light.‘  Japanese authorities continued to monitor both Aum (now called Aleph) and Hikari No Wa.

**Activities:** In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 persons and causing up to 6,000 to seek medical treatment. Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500. Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him to death for his role in the 1995 attacks. In September 2006, Asahara lost his final appeal against the death penalty.

273

PX203

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry. In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

**Strength:** Aum's current membership in Japan is estimated to be about 1,500 persons, according to a study by the Japanese government issued in December. At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.

**Location/Area of Operation:** Aum's principal membership is located in Japan, while a residual branch of about 300 followers live in Russia.

**External Aid:** None.

## Basque Fatherland and Liberty (ETA)

a.k.a. Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; XAKI

**Description:** Basque Fatherland and Liberty (ETA) was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava, the autonomous region of Navarra, and the southwestern French territories of Labourd, Basse-Navarre, and Soule. Spain and the EU both have listed ETA as a terrorist organization; in 2002 the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group. In 2004, Spain and France formed a joint counterterrorism and judicial unit to combat ETA and Islamic terrorist groups. During 2005 and 2006, police in both countries together arrested around 100 individuals associated with ETA, dismantled several of the group's cells, and dealt a significant blow to its operational capability. Spanish and French prisons are estimated to hold a total of more than 500 ETA members. In March 2006, days after claiming responsibility for a spate of roadside blasts in northern Spain that caused no injuries, ETA announced that it would implement a "permanent" cease-fire. However, on December 30, 2006, ETA exploded a massive car-bomb that destroyed much of the covered parking garage outside the new Terminal 4 of Madrid's Barajas International Airport. Two individuals killed in the blast became ETA's first fatalities in more than three years. The Spanish Government suspended talks with ETA, and government officials later said political negotiations with the group had ended.

**Activities:** Since the beginning of 2007, the group has been suspected of conducting numerous arson and incendiary attacks against government, financial, and civilian targets using various youth organizations as a proxy. ETA claimed several bombings: one in late July, on a road targeting the Tour de France that caused no damage; a car bombing in late August targeting a police station that wounded two police officers and damaged the building; a bombing in early September on a road that caused no damage; an attempted car-bombing on a Defense Ministry building in early September that failed due to a technical fault; and a bombing in late September

274

at another police station that damaged the building but caused no injuries. ETA was also suspected of a car bombing in early October that wounded the bodyguard of a local government official, although the group has not yet claimed responsibility.

ETA formally renounced its ―permanent" cease-fire in June, and in early September threatened a wave of attacks throughout Spain. Following indications in mid-2007 that the group may have expanded into Portugal its logistical operations, such as renting vehicles, Madrid and Lisbon agreed, in October, to intensify their cooperation against ETA by establishing a joint antiterrorism team based in Lisbon. In December, ETA murdered two Civil Guard officials in southern France, the first ETA killings in France since 1976. Several days later, the group threatened to open a new front in France against Spanish authorities. Also in December, Spanish and French authorities agreed to create a permanent joint police investigation team to fight ETA.

ETA primarily conducts bombings and assassinations; targets are typically Spanish government officials, security and military forces, politicians, and judicial figures, but the group also has targeted journalists and tourist areas. The group is responsible for killing more than 800 and injuring thousands more since it began its lethal attacks in the late 1960s. Security service scrutiny and a public outcry after the Islamic extremist train bombings in Madrid in March 2004, have limited ETA's capability and willingness to inflict casualties. In February 2005, ETA detonated a car bomb in Madrid at a convention center where Spanish King Juan Carlos and then Mexican President Vicente Fox were scheduled to appear, wounding more than 20 people. ETA also detonated an explosive device at a stadium constructed as part of Madrid's bid to host the 2012 Olympic Games; there were no injuries in that attack. ETA‗s late 2006 attack at Madrid's airport is the group's first fatal attack since March 2003.

**Strength:** According to Spanish security forces quoted in the press in mid-2007, ETA has about 100 active members; this number was reduced in 2007 as a result of the number of arrested by Spanish and French authorities.

**Location/Area of Operation:** ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but also has attacked Spanish and French interests elsewhere.

**External Aid:** ETA finances its activities primarily through bribery and extortion of Basque businesses. It has received training at various times in the past in Libya, Lebanon, and Nicaragua. Some ETA members allegedly fled to Cuba and Mexico, while others reside in South America. ETA members have operated and been arrested in other European countries, including France, Belgium, the Netherlands, the UK, Germany, and Portugal.

## Communist Party of Philippines/New People's Army (CPP/NPA)

a.k.a. Communist Party of the Philippines; CPP; New People's Army; NPA

**Description:** The military wing of the Communist Party of the Philippines (CPP), the New People‗s Army (NPA), is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare. Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from

PX203

the Netherlands, where he lives in self-imposed exile. Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen. Although primarily a rural-based guerrilla group, the NPA has an active urban infrastructure to support its terrorist activities and at times uses city-based assassination squads.

In September, Sison was briefly arrested in the Netherlands but was released on a judge's order a few days later. In November, the Armed Forces of the Philippines announced the capture of Elizabeth Principe, a suspected member of the Central Committee of the Communist Party of the Philippines.

**Activities:** The NPA primarily targets Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes." The NPA charges politicians running for office in NPA-influenced areas for "campaign permits." The group opposes any U.S. military presence in the Philippines and has attacked U.S. military interests; it killed several U.S. service personnel before the U.S. base closures in 1992. The NPA claimed responsibility for the assassination of two congressmen, one from Quezon in May 2001 and one from Cagayan in June 2001, among other killings. Periodic peace talks with the Philippine government stalled after these incidents. In December 2005, the NPA publicly expressed its intent to target U.S. personnel if they were discovered in NPA operating areas.

**Strength**: Estimated at less than 9,000, a number significantly lower than its peak strength of approximately 25,000 in the 1980s.

**Location/Area of Operations:** Operates in rural Luzon, Visayas, and parts of northern and eastern Mindanao. There are cells in Manila and other metropolitan centers.

**External Aid:** Unknown.


# Continuity Irish Republican Army (CIRA)

a.k.a. Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:** The Continuity Irish Republican Army (CIRA) is a splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland. CIRA cooperates with the larger Real IRA (RIRA).

**Activities:** CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups. CIRA did not join the Provisional IRA in its September 2005 decommissioning and remained capable of effective, if sporadic, terrorist attacks. In late 2006, CIRA members issued a list of up to 20 individuals they were targeting for paramilitary attacks, several of whom were wounded in

PX203

subsequent shootings. In early 2006, the Independent Monitoring Commission reported that two splinter organizations, Óglaigh na hÉireann and Saoirse na hÉireann, were formed due to internal disputes within CIRA. In mid-October 2006, CIRA claimed the firebomb attacks of B&Q home-supply stores. CIRA activity has largely decreased from previous levels seen in 2005 and by 2007, the group had become increasingly active in criminal activity. In April, following the discovery of an improvised mortar adjacent to the railway line in Lurgan, three CIRA members were arrested and charged with conspiracy to murder, possession of explosives with intent to endanger life, and possession of articles for use in terrorism.

**Strength:** Membership is small, with possibly fewer than 50 hard-core activists. Police counterterrorist operations have reduced the group's strength.

**Location/Area of Operation:** Northern Ireland and the Irish Republic. CIRA does not have an established presence in Great Britain.

**External Aid:** Suspected of receiving funds and arms from sympathizers in the United States. CIRA may have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

## Gama'a al-Islamiyya (IG)

a.k.a. Al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI, Islamic Gama'at, IG; Islamic Group

**Description:** Gama'a al-Islamiyya (IG), Egypt's largest militant group, has been active since the late 1970s, but is now a loosely organized network. The external wing, composed of mainly exiled members in several countries, maintains its primary goal is to overthrow the Egyptian government and replace it with an Islamic state. The IG announced a cease-fire in 1997 that led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations. The IG announced another ceasefire in March 1999, but its spiritual leader, Shaykh Umar Abd al-Rahman, sentenced to life in prison in January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000. IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists and four Egyptians, and wounded dozens more. In February 1998, a senior member signed Usama bin Ladin's fatwa calling for attacks against the United States.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that cause mass casualties. Musa disappeared several months afterward, and we have no information about his whereabouts. In March 2002, members of the group's historic leadership in Egypt declared the use of violence misguided and renounced its future use, prompting denunciations by much of the leadership abroad. The Egyptian government continued to release IG members from prison; approximately 900 were released in 2003, and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members. In August 2006, Ayman al-Zawahiri announced that IG had merged with al-Qa'ida, but the group's Egypt-based leadership quickly denied this claim.

PX203

**Activities:** Before the 1997 cease-fire, IG conducted armed attacks against Egyptian security and other government officials, Coptic Christians, and Egyptian opponents of Islamic extremism. After the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack. IG claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia. IG was dormant in 2007.

**Strength:** Unknown. At its peak IG probably commanded several thousand hardcore members and a like number of supporters. Security crackdowns following the 1997 attack in Luxor, the 1999 cease-fire, and post-September 11 security measures have probably resulted in a substantial decrease in the group's membership and extremist activities.

**Location/Area of Operation:** IG operates mainly in the Al-Minya, Asyut, Qina, and Sohaj Governorates of southern Egypt. It also appears to have support in Cairo, Alexandria, and other urban locations, particularly among unemployed graduates and students. The IG maintains an external presence in Afghanistan, Yemen, the United Kingdom, and other locations in Europe.

**External Aid:**. Al-Qa'ida and Afghan militant groups support the organization. IG also may obtain some funding through various Islamic non-governmental organizations.

## The Islamic Resistance Movement (HAMAS)

a.k.a. Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units ; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions; Izz al-Din al Qassam Forces

**Description:** HAMAS, which includes military and political wings, was formed at the onset of the first Palestinian uprising or Intifada in late 1987, as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, including suicide bombings against civilian targets inside Israel. HAMAS also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fund-raising, and political activities. A Shura council based in Damascus, Syria, sets overall policy. After winning Palestinian Legislative Council elections in January 2006, HAMAS took control of significant Palestinian Authority (PA) ministries, including the Ministry of Interior. HAMAS subsequently formed an expanded, overt militia called the Executive Force, subordinate to the Ministry. This force and other HAMAS cadres took control of Gaza in a military-style coup in June 2007, forcing Fatah forces to either leave Gaza or go underground there.

**Activities:** Prior to 2005, HAMAS conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised explosive device (IED) attacks, and shootings. HAMAS, however, has not directly targeted U.S. interests, although the group makes little or no effort to avoid soft targets frequented by foreigners. The group curtailed terrorist attacks in February 2005, after agreeing to a temporary period of calm brokered by the PA, and ceased most violence after winning control of the PA legislature and cabinet in January 2006. After HAMAS staged a June 2006 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the

PX203

abduction of Corporal Gilad Shalit, Israel took steps that severely limited the operation of the Rafah crossing. HAMAS maintained and expanded its military capabilities in 2007. In June 2007, HAMAS took control of Gaza from the PA and Fatah in a military-style coup, leading to an international boycott and closure of Gaza borders. HAMAS has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, tightening security, and conducting limited operations against Israeli military forces.

HAMAS fired rockets from Gaza into Israel in 2007 but focused more mortar on attacks targeting Israeli incursions. Additionally, other terrorist groups in Gaza fired rockets into Israel, most, presumably, with HAMAS support or acquiescence. HAMAS internal security efforts have centered on confronting threats to the group's hold on power, including arrest operations against Fatah. In June 2007, HAMAS took control of Gaza, leading to a drawn-out struggle between HAMAS and supporters of Fatah. The majority of HAMAS activity in Gaza is directed at solidifying their control over Gaza and weakening Fatah through kidnappings, torture, and the use of the ―Executive Force" as a de-facto security apparatus. The continued international boycott and perceived efforts to destroy HAMAS have increased anti-U.S. sentiment on the Palestinian street, a development that could lead cells affiliated with HAMAS to launch attacks, including suicide bombings, without the sanction of HAMAS' senior leadership.

**Strength:** HAMAS probably has several hundred operatives in its armed wing, the al-Qassam Brigades, along with its reported 9,000-man Executive Force and tens of thousands of supporters and sympathizers.

**Location/Area of Operation:** HAMAS has an operational presence in every major city in the Palestinian territories and currently focuses its anti-Israeli attacks on targets in the West Bank and within Israel. HAMAS could potentially activate operations in Lebanon or resume terrorist operations in Israel. The group retains a cadre of leaders and facilitators that conducts diplomatic, fundraising, and arms smuggling activities in Lebanon, Syria, and other states. HAMAS is also increasing its presence in the Palestinian refugee camps in Lebanon, probably with the goal of eclipsing Fatah's long-time dominance of the camps.

**External Aid:** HAMAS receives some funding, weapons, and training from Iran. In addition, fundraising takes place in the Gulf countries, but the group also receives donations from Palestinian expatriates around the world and private benefactors in Arab states. Some fundraising and propaganda activity takes place in Western Europe and North America.

## Harakat ul-Mujahadin (HUM)

a.k.a. Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Ansar; Harakat ul-Mujahideen; HUA; Jamiat ul-Ansar

**Description:** Harakat ul-Mujahadin (HUM), an Islamic militant group based in Pakistan, is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir. Reportedly under pressure from the Government of Pakistan, HUM's long time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir as the head of HUM in January 2005. Khalil has been linked to Usama bin Ladin, and his signature was found on Bin Ladin's fatwa in February 1998, calling for attacks on U.S.

PX203

and Western interests. HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001. Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December. In 2003, HUM began using the name Jamiat ul-Ansar (JUA). Pakistan banned JUA in November 2003.

**Activities:** HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir. It is linked to the Kashmiri militant group al-Faran that kidnapped five Western tourists in Kashmir in July 1995; one was killed in August, and the other four reportedly were killed in December of the same year. HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release. Ahmed Omar Sheik also was released in 1999, and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

**Strength:** HUM has several hundred armed supporters located in Azad Kashmir, Pakistan, India's southern Kashmir and Doda regions, and in the Kashmir valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets. In 2000, HUM lost a significant share of its membership in defections to the JEM.

**Location/Area of Operation:** Based in Muzaffarabad, Rawalpindi, and several other towns in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan. HUM trains its militants in Afghanistan and Pakistan.

**External Aid:** HUM collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf and Islamic states. HUM's financial collection methods include soliciting donations in magazine ads and pamphlets. The sources and amount of HUM's military funding are unknown. Its overt fundraising in Pakistan has been constrained since the government clampdown on extremist groups and the freezing of terrorist assets.


# Hizballah

a.k.a. Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar alla; Followers of the Prophet Muhammed

**Description:** Formed in 1982, in response to the Israeli invasion of Lebanon, this Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini. The group generally follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei. Hizballah is closely allied with Iran and often acts at its behest, though it also acts independently. Although Hizballah does not share the Syrian regime's secular orientation, the group has helped Syria advance its political objectives in the region. The Majlis al-Shura, or Consultative Council, is the group's highest governing body and has been led by Secretary General Hasan Nasrallah since 1992.

PX203

Hizballah remains the most technically capable terrorist group in the world. It has strong influence in Lebanon's Shia community, which comprises about one-third of Lebanon's population. The Lebanese government and the majority of the Arab world, still recognize Hizballah as a legitimate "resistance group" and political party. Hizballah claimed 14 elected officials in the 128-seat Lebanese National Assembly and was represented in the Cabinet for the first time, by the Minister of Water and Electricity Mohammed Fneish, until his resignation, along with other Shia ministers and Hizballah members of Parliament on November 11, 2006.

Hizballah has reduced its overt military presence in southern Lebanon in accordance with UNSCR 1701, although it likely maintains weapons caches in southern Lebanon. It justifies its continued armed status by claiming to act in defense of Lebanon against acts of Israeli aggression. Hizballah alleges that Israel has not withdrawn completely from Lebanese territory because, in its view, the Shebaa Farms and other areas belong to Lebanon. Hizballah provides support to several Palestinian terrorist organizations that reject peace between Israel and its neighbors. This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

**Activities:** Hizballah is known to have been involved in numerous anti-U.S. and anti-Israeli terrorist attacks and prior to September 11, 2001, was responsible for more American deaths than any other terrorist group. In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting the conflict with Israel that lasted into August. Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily armored vehicles, which it developed in southern Lebanon in the late 1990s. A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants.

Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983, and the U.S. Embassy annex in Beirut in 1984, and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and the Argentine-Israeli Mutual Association (AMIA) in Buenos Aires in 1994. In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

**Strength:** Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

**Location/Area of Operation:** Operates in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon. Has established support cells in Europe, Africa, South America, North America, and Asia.

**External Aid:** Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran, and diplomatic, political, and logistical support from Syria.

PX203

Hizballah also receives funding from private donations, and profits from legal and illegal businesses.

## Islamic Jihad Group (IJG)

a.k.a. Al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jama'at al-Jihad; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahadin; The Kazakh Jama'at; The Libyan Society

**Description:** The Islamic Jihad Group (IJG) is an extremist organization that splintered from the Islamic Movement of Uzbekistan (IMU). They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law. They adhere to an anti-Western global agenda.

**Activities:** In September, German authorities disrupted an IJG plot by detaining three IJG operatives involved in the operation. Two of the three had attended IJG run terrorist training camps in Pakistan and maintained communications with their Pakistani contacts after returning to Germany. The operatives had acquired large amounts of hydrogen peroxide and an explosives precursor that they stockpiled in a garage in southern Germany. The group had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb attacks. The IJG subsequently claimed responsibility for the foiled attacks.

The IJG issued a statement in May 2005, fully supporting the armed attacks on Uzbek police and military personnel in Andijon, Uzbekistan, and called for the overthrow of the regime in Uzbekistan. The group first conducted attacks in March-April 2004 targeting police at several roadway checkpoints and a popular bazaar. These attacks killed approximately 47 people, including 33 terrorists, some of whom were suicide bombers. The IJG's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan. These attacks marked the first use of suicide bombers in Central Asia.

In July 2004, the group carried out near-simultaneous suicide bombings in Tashkent of the U.S. and Israeli Embassies, and the Uzbekistani Prosecutor General's office. The IJG again claimed responsibility via an Islamic website and stated that martyrdom operations by the group would continue. The statement also indicated that the attacks were done in support of IJG's Palestinian, Iraqi, and Afghan brothers in the global insurgency. The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March-April attacks.

**Strength:** Unknown.

**Location/Area of Operation:** IJG members are scattered throughout Central Asia, South Asia, and Europe.

**External Aid:** Unknown.

## Islamic Movement of Uzbekistan (IMU)

PX203

**Description:** The Islamic Movement of Uzbekistan (IMU) is a group of Islamic militants from Uzbekistan and other Central Asian states. The IMU's goal is to overthrow Uzbekistani President Islam Karimov and to establish an Islamic state in Uzbekistan. The IMU is affiliated with al-Qa'ida (AQ) and under the leadership of Tohir Yoldashev, has embraced Usama bin Ladin's anti-Western global terrorist ideology.

**Activities:** Since Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan. The IMU also was active in terrorist operations in Central Asia. Government authorities in Tajikistan arrested several IMU members in 2005. In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist. In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan. The IMU was also responsible for explosions in Bishkek in December 2002, and Osh in May 2003, that killed eight people. The IMU primarily targeted Uzbekistani interests before October 2001, and is believed to have been responsible for several explosions in Tashkent in February 1999. In August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage, and in August 2000, they took four U.S. mountain climbers hostage.

**Strength:** Approximately 500 members.

**Location/Area of Operation:** IMU militants are located in South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, Kazakhstan, and Uzbekistan.

**External Aid:** The IMU receives support from a large Uzbek Diaspora, Islamic extremist groups, and patrons in the Middle East, Central Asia, and South Asia.

## Jaish-e-Mohammed (JEM)

a.k.a. Army of Mohammed; Jaish-i-Mohammed; Khudamul Islam; Khuddam-ul-Islam; Kuddam e Islami; Mohammed's Army; Tehrik ul-Furqaan

**Description:** Jaish-e-Mohammed (JEM) is an Islamic extremist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India. The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States. It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F). Pakistan outlawed JEM in 2002. By 2003, JEM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004.  Pakistan banned KUI and JUF in November 2003.

**Activities:** JEM continued to operate openly in parts of Pakistan despite President Musharraf's 2002 ban on its activities. The group was well-funded, and was said to have tens of thousands of followers who supported attacks against Indian targets, the Pakistani government, and sectarian minorities. Since Masood Azhar's 2000 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the area.

PX203

JEM continued to claim responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people. The Indian government has publicly implicated the JEM, along with Lashkar e-Tayyiba (LT), for the December 2001 attack on the Indian Parliament that killed nine and injured 18. Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans. In December 2003, Pakistan implicated elements of JEM in the two assassination attempts against President Musharraf. In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl. In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.

**Strength**: JEM has at least several hundred armed supporters, including a large cadre of former HUM members, located in Pakistan, in India's southern Kashmir and Doda regions, and in the Kashmir Valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

**Location/Area of Operation:** Pakistan and Kashmir. Prior to autumn 2001, JEM maintained training camps in Afghanistan.

**External Aid:** Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami (HUJI-B) and the Harakat ul-Mujahadin (HUM). In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods. In addition, JEM collects funds through donation requests in magazines and pamphlets, and allegedly from AQ.

# Jemaah Islamiya (JI)

**Description:** Southeast Asia-based Jemaah Islamiya (JI) is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines. More than 300 JI operatives, including operations chief Hambali, have been captured since 2002, although many are free after serving short sentences, including former JI emir Abu Bakar Bashir. Abu Bakar was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings. Indonesia's Supreme Court later that year acquitted him of the charges. The death of top JI bomb maker Azahari bin Husin in November 2005, the arrests of several close associates of senior JI operative Noordin Mat Top in 2006, and the 2007 arrests of former acting JI emir Muhammad Naim (a.k.a. Zarkasih), JI military commander Abu Dujana, and several of their associates, coupled with additional efforts by the Government of Indonesia, likely disrupted JI's anti-Western attacks that had occurred annually from 2002-2005.

.
**Activities:** The group's most recent high-profile attack occurred in Bali on October 1, 2005, which left 26 persons dead, including the three suicide bombers. Other major JI attacks include the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003

PX203

bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing. The 2002 Bali attack, which killed more than 200, was one of the deadliest terrorist attacks since 9/11. In December 2001, Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies, and British and Australian diplomatic buildings in Singapore. In December 2000, JI coordinated bombings of numerous Christian churches in Indonesia and was involved in the bombings of several targets in Manila. In February 2004, JI facilitated attacks in Manila, Davao, and General Santos City. In 2007, the group staged an improvised explosive device (IED) attack in Sultan Kudarat that killed two civilians and injured thirty others. JI associates in the Philippines provide operational support and training for indigenous Philippine Muslim violent extremists.

**Strength:** Exact numbers currently are unknown. Estimates of total JI members vary from the hundreds to one thousand.

**Location/Area of Operation:** JI is based in Indonesia and is believed to have cells in Indonesia, Malaysia, and the Philippines.

**External Aid:** Investigations indicate that JI is fully capable of its own fundraising, although it also receives financial, ideological, and logistical support from Middle Eastern contacts and non-governmental organizations.


## Al-Jihad

Egyptian Islamic Jihad; Egyptian al-Jihad; New Jihad; Jihad Group

**Description**: In 2001, this Egyptian Islamic extremist group merged with al-Qa'ida (AQ). Usama bin Ladin's deputy, Ayman al-Zawahiri, was the former head of Al-Jihad (AJ). Active since the 1970s, AJ's primary goal has been the overthrow of the Egyptian government and the establishment of an Islamic state. The group's targets, historically, have been high-level Egyptian government officials as well as U.S. and Israeli interests in Egypt and abroad. Regular Egyptian crackdowns on extremists and Cairo's deradicalization measures aimed at imprisoned AJ members have greatly reduced AJ's capabilities in Egypt.

**Activities:** The original AJ was responsible for the 1981 assassination of Egyptian President Anwar Sadat. It claimed responsibility for the attempted assassinations in 1993 of Interior Minister Hassan al-Alfi and Prime Minister Atef Sedky. AJ has not conducted an attack inside Egypt since 1993 and has never successfully targeted foreign tourists there. The group was responsible for the Egyptian Embassy bombing in Islamabad in 1995, and a disrupted plot against the U.S. Embassy in Albania in 1998. AJ was dormant in 2007.

**Strength:** Believed to have several hundred hard-core members inside and outside Egypt.

**Location/Area of Operation:**  Most AJ members today are outside Egypt in countries such as Afghanistan, Pakistan, Lebanon, the United Kingdom, and Yemen. AJ activities have been centered outside Egypt for several years under the auspices of AQ.

PX203

**External Aid:** Since 1998, AJ has received most of its funding from AQ; these close ties culminated in the eventual merger of the groups in June 2001. Some funding may come from various Islamic non-governmental organizations, cover businesses, and criminal acts.

## Kahane Chai (Kach)

a.k.a. American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description**: Kahane Chai's (Kach) stated goal was to restore the biblical state of Israel. The group disbanded in 2005. Kach was founded by radical Israeli-American rabbi Meir Kahane. Its offshoot, Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States. Both Kach and Kahane Chai were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law. This designation followed the groups' statements in support of Dr. Baruch Goldstein's attack in February 1994 on the Ibrahimi Mosque and their verbal attacks on the Israeli government. Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank. The group has attempted to gain seats in the Israeli Knesset over the past several decades, but has won only one seat, in 1984.

**Activities:** Kach has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. Kach is suspected of involvement in a number of low-level attacks since the start of the al-Aqsa Intifada in 2000.

**Strength:** Unknown.

**Location/Area of Operation:** Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

**External Aid:** Receives support from sympathizers in the United States and Europe.

## Kongra-Gel

Kurdistan Workers' Party (PKK); Freedom and Democracy Congress of Kurdistan (KADEK); Halu Mesru Savunma Kuvveti (HSK); Kurdistan Freedom and Democracy Congress; Kurdistan People's Congress (KHK); Partiya Karkeran Kurdistan; People's Congress of Kurdistan; The People's Defense Force

PX203

(**Note**: Despite name changes, the group is still most commonly referred to as the PKK; for the purposes of this report we use the name Kongra-Gel/Kurdistan Workers Party or KGK/PKK.)

**Description:** The Kongra-Gel/Kurdistan Worker's Party was founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization. The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984. The KGK/PKK aspired to establish an independent Kurdish state in southeastern Turkey, but in recent years has spoken more often about autonomy within a Turkish state that guaranteed Kurdish cultural and linguistic rights.

In the early 1990s, the KGK/PKK moved beyond rural-based insurgent activities to include urban terrorism. In the 1990s, southeastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons. Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues. Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group. The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years. Striking over the border from bases within Iraq the KGK/PKK engaged in terrorist attacks in eastern and western Turkey.

**Activities:** Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey. KGK/PKK's reputed military-wing, the People's Defense Force (HPG), has been responsible mainly for attacks against military and paramilitary targets in the southeastern area of Turkey. The group conducted attacks on Turkish diplomatic and commercial facilities in West European cities in 1993 and again in spring 1995.

In an attempt to damage Turkey's tourist industry, the KGK/PKK bombed tourist sites and hotels and kidnapped foreign tourists in the early-to-mid-1990s. KGK/PKK-initiated attacks rose from just five in 2000 to more than 70 in 2007. Last year was the most violent year for Turkish security forces since the 1990s, with more than 140 deaths attributed to counterterrorism related operations in eastern Turkey.

**Strength:** Approximately 4,000 to 5,000; 3,000 to 3,500 are currently located in northern Iraq.

**Location/Area of Operation:** Operates primarily in Turkey, Iraq, Europe, and the Middle East.

**External Aid:** In the past, KGK/PKK has received safe haven and modest aid from Syria, Iraq, and Iran. Since 1999, Syria and Iran have cooperated in a limited fashion with Turkey against the KGK/PKK. The group maintains a large extortion, fundraising, and propaganda network in Europe.


## Lashkar e-Tayyiba (LT)

a.k.a. Al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir

287

PX203

**Description:** Lashkar e-Tayyiba (LT) is one of the largest and most proficient of the Kashmiri-focused militant groups. LT formed in the late 1980s or early 1990s as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad (MDI), a Pakistan-based Islamic fundamentalist mission organization and charity founded to oppose the Soviet presence in Afghanistan. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad combined with other groups to mount attacks as "The Save Kashmir Movement. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad (JEM) combined with other groups to mount attacks as "The Save Kashmir Movement." The Pakistani government banned the group and froze its assets in January 2002. LT and its leader, Hafiz Muhammad Saeed, continue to spread ideology advocating terrorism, as well as virulent rhetoric condemning the United States, India, Israel, and other perceived enemies.

**Activities:** LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993, as well as several high profile attacks inside India itself. LT claimed responsibility for numerous attacks in 2001, including an attack in January on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an attack in April against Indian border security forces that left at least four dead. The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building, although concrete evidence is lacking. LT is also suspected of involvement in May 2002 attack on an Indian Army base in Kaluchak that left 36 dead. India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack. Senior al-Qaʻida (AQ) lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of AQ members in Pakistan. Indian governmental officials hold LT responsible for the July 11, 2006 train attack in Mumbai and several attacks since then in Hyderabad.

**Strength:** The actual size of the group is unknown but LT has several thousand members in Azad Kashmir, Pakistan, in the southern Jammu and Kashmir and Doda regions, and in the Kashmir Valley. Most LT members are Pakistanis from madrassas across Pakistan or Afghan and/or veterans of the Afghan wars, though the group is alleged to augment its strength through collaboration with terrorist groups comprised of non-Pakistanis. The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

**Location/Area of Operation:** Based in Muridke (near Lahore) and Muzaffarabad, Pakistan; maintains a number of facilities, including training camps, schools, and medical clinics.

**External Aid:** Collects donations from the Pakistani expatriate communities in the Middle East and the United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people. LT coordinates its charitable activities through its front organization Jamaat ud-Daawa (JUD), which spearheaded humanitarian relief to the victims of the October 2005 earthquake in Kashmir. The precise amount of LT funding is unknown.

PX203

## Lashkar i Jhangvi (LJ)

**Description:** Lashkar i Jhangvi (LJ) is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan. LJ focuses primarily on anti-Shia attacks and was banned by Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence. Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties. After the collapse of the Taliban, LJ members became active in aiding other terrorists with safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.

**Activities:** LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan. In January, the Interior Ministry ordered the arrest of three LJ militants suspected of being involved in a suicide bombing at a Shia religious procession in Peshawar that killed 15 people. In February, police arrested 20 LJ militants who were wanted for various terrorism attacks in the Punjab and Sindh provinces. In June, Sindh authorities issued a statement attributing the April 2006 Mishtar Parking bombing in Karachi to a militant with ties to LJ. The government claimed that the group was involved in the April 2006 assassination attempt and the July 2006 assassination of Allama Turabi, an influential Shia leader. In October, Afghan security forces claimed to have arrested four Pakistani suicide bombers in Kandahar who asserted that they belonged to LJ.

In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the March bombing outside the U.S. Consulate in Karachi that killed one U.S. official. Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl. Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed. Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shia mosque in Quetta, Pakistan. Authorities also implicated LJ in several sectarian incidents in 2004, including the May and June bombings of two Shia mosques in Karachi that killed more than 40 people. In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province.

**Strength:** Probably fewer than 100.

**Location/Area of Operation:** LJ is active primarily in Punjab and Karachi. Some members travel between Pakistan and Afghanistan.

**External Aid:** Unknown.

## Liberation Tigers of Tamil Eelam (LTTE)
a.k.a. Ellalan Force; Tamil Tigers

**Description:** Founded in 1976, the Liberation Tigers of Tamil Eelam (LTTE) is a powerful Tamil secessionist group in Sri Lanka. The LTTE wants to establish an independent Tamil state

PX203

in the island's north and east. Since the beginning of its insurgency against the Sri Lankan government in 1983, it has evolved its capability from terrorist and guerilla tactics to conventional warfare. Although the LTTE nominally committed to a 2002 cease-fire agreement with the Sri Lankan government, it continued terrorist attacks against government leaders and dissident Tamils.

**Activities:** LTTE has integrated a battlefield insurgent strategy with a terrorist program that targets key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers. It has conducted a sustained campaign targeting rival Tamil groups and figures, and assassinated Prime Minister Rajiv Gandhi of India in 1991, and President Ranasinghe Premadasa of Sri Lanka in 1993. Although most notorious for its cadre of suicide bombers, the Black Tigers, the organization also features an amphibious force, the Sea Tigers; and a nascent air wing, the Air Tigers. Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2007. Political assassinations and bombings were commonplace tactics prior to the cease-fire and have increased again since mid-2005. After a period of targeting Sri Lankan military and official personnel throughout 2007, the LTTE appears to have recently resumed its targeting of civilians.

**Strength:** Exact strength is unknown, but LTTE is estimated to have 8,000 to 10,000 armed combatants in Sri Lanka, with an elite cadre of 5,000 to 7,000. LTTE also has a significant overseas support structure for fundraising, weapons procurement, and propaganda activities.

**Location/Area of Operations:** LTTE controls portions of the northern areas of Sri Lanka, where it has set up a de facto administrative structure, but over the past year, the LTTE has lost control of its eastern bases to the Sri Lankan military. LTTE also has conducted operations throughout the island and has established an extensive network of checkpoints and informants to keep track of any outsiders who enter the group's area of control.

**External Aid:** The LTTE uses its international contacts and the large Tamil Diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies. The group employs charities as fronts to collect and divert funds for their activities. In May 2007, Australian police arrested two individuals with ties to LTTE. The two were also accused of collecting money for tsunami relief and sending the funds to the LTTE in Sri Lanka instead. In November, the United States designated the Tamils Rehabilitation Organization (TRO) — a charitable organization with offices in seventeen countries worldwide —as an LTTE front organization that facilitates fundraising and procurement for the group.

## Libyan Islamic Fighting Group (LIFG)

**Description:** In the early 1990s, the Libyan Islamic Fighting Group (LIFG) emerged from the group of Libyans who had fought Soviet forces in Afghanistan and the Qadhafi regime in Libya. The LIFG declared Libyan President Muammar Qadhafi un-Islamic and pledged to overthrow him. In the years following, some members maintained a strictly anti-Qadhafi focus and targeted Libyan government interests. Others, such as Abu al-Faraj al-Libi, who in 2005 was arrested in Pakistan, aligned with Usama bin Ladin and are believed to be part of the al-Qa'ida (AQ)

PX203

leadership structure or active in the international terrorist network. On November 3, 2007, senior AQ leaders announced that LIFG had officially joined AQ.

**Activities:** Libyans associated with the LIFG are part of the broader international terrorist movement. The LIFG is one of the groups believed to have planned the Casablanca suicide bombings in May 2003. Spanish media in August 2005 linked Ziyad Hashem, an alleged member of the LIFG's media committee, as well as the imprisoned amir Abdallah al-Sadeq, with Tunisian Islamist Serhane Ben Abdelmajid Fakhet, the suspected ringleader in the 2004 Madrid attacks. The LIFG continued to target Libyan interests, and attempted to assassinate Qadhafi four times; the last attempt was in 1998. The LIFG engaged Libyan security forces in armed clashes during the 1990s. However, the LIFG has been largely operationally inactive in Libya since the late 1990s when members fled predominately to Europe and the Middle East because of tightened Libyan security measures. To date, the November 3 merger with AQ has not resulted in a significant increase in LIFG activities within Libya.

**Strength:** The LIFG probably has several hundred active members or supporters, mostly in the Middle East or Europe.

**Location/Area of Operation:** Since the late 1990s, many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the UK. It is likely that LIFG maintained a limited presence in eastern Libya.

**External Aid:** Unknown. The LIFG has used Islamic charitable organizations as cover for fundraising and transferring money and documents; it may have also financed operations with criminal activity.


## Moroccan Islamic Combatant Group (GICM)
a.k.a. Groupe Islamique Combattant Marocain

**Description: :** The Moroccan Islamic Combatant Group (GICM) has disintegrated, and it is likely that the few remaining former members no longer operate on behalf of any single group. Much of the leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. There is no indication that new leaders have emerged or additional members have been recruited to fill the ranks of arrested cell members, although individual extremists still pose a threat.

The Moroccan Islamic Combatant Group (GICM) was a clandestine transnational terrorist group centered in the Moroccan Diaspora communities of Western Europe. Its goals included establishing an Islamic state in Morocco and supporting al-Qa'ida's (AQ 's) war against the West by assisting in the assimilation of AQ operatives into Moroccan and European society. The group emerged in the 1990s and was comprised of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war. GICM members interact with other North African extremists, particularly in Europe.

**Activities:** GICM members were among those responsible for the 2004 Madrid bombing, and Moroccans associated with the GICM are part of the broader international terrorist movement.

PX203

GICM members were implicated in the recruitment network of individuals for Iraq, and at least one GICM member carried out a suicide attack against Coalition Forces in Iraq. GICM individuals are believed to have been involved in the 2003 Casablanca attacks.

**Strength:** Much of the GICM's leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. Alleged leader Mohamed al-Guerbouzi was convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remained free in exile in the UK.

**Location/Area of Operation:** Morocco, Western Europe, Afghanistan, and Canada.

**External Aid:** The GICM was involved in narcotics trafficking in North Africa and Europe to fund its operations. Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks. The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan terrorist Jamal Ahmidan.


## Mujahadin-e Khalq Organization (MEK)

a.k.a. MKO; Mujahadin-e Khalq (Iranian government name for group); Muslim Iranian Students' Society; National Council of Resistance (NCR); Organization of the People's Holy Warriors of Iran; The National Liberation Army of Iran (NLA); The People's Mujahadin Organization of Iran (PMOI); National Council of Resistance of Iran (NCRI); Sazeman-e Mujahadin-e Khalq-e Iran

**Description:** The Mujahadin-e Khalq Organization (MEK) advocates the violent overthrow of the Iranian regime and was responsible for the assassination of several U.S. military personnel and civilians in the 1970s. The MEK's armed wing is known as the National Liberation Army of Iran (NLA). In December 2006, the European Court of Justice ruled to overturn the designation of the MEK as a terrorist organization but was not supported by the Council of the European Union (EU).

The MEK emerged in the 1960s as one of the more violent political movements opposed to the Pahlavi dynasty and its close relationship with the United States. MEK ideology has gone through several iterations and blends elements of Marxism, Islam, and feminism. The group has planned and executed terrorist operations against the Iranian regime for nearly three decades from its European and Iraqi bases of operations. Additionally, it has expanded its fundraising base, further developed its paramilitary skills, and aggressively worked to expand its European ranks. In addition to its terrorist credentials, the MEK has also displayed cult-like characteristics.

Upon entry into the group, new members are indoctrinated in MEK ideology and revisionist Iranian history. Members are also required to undertake a vow of "eternal divorce" and participate in weekly "ideological cleansings." Additionally, children are reportedly separated from parents at a young age. MEK leader Maryam Rajavi has established a "cult of personality." She claims to emulate the Prophet Muhammad and is viewed by members as the "Iranian President in exile."

PX203

**Activities:** The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives and has been supported by reprehensible regimes, including that of Saddam Hussein. During the 1970s, the MEK assassinated several U.S. military personnel and U.S. civilians working on defense projects in Tehran and supported the violent takeover in 1979 of the U.S. Embassy in Tehran.

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group. The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar. These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown which forced MEK leaders to flee to France. For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters. Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training. Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s. In 1991, the group reportedly assisted the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime. In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas. In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq. The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran. One attack included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President. In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border. Also in 2001, the FBI arrested seven Iranians in the United States who funneled $400,000 to an MEK-affiliated organization in the UAE, which used the funds to purchase weapons. Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and voluntarily surrendered their heavy-arms to Coalition control. Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq, under the protection of Coalition Forces.

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks. Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation. French authorities eventually released Rajavi. Although currently in hiding, Rajavi

PX203

has made ―motivational‖ appearances via video-satellite to MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003. In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of Saddam Hussein handing over suitcases of money to known MEK leaders, and video of MEK operatives receiving training from the Iraqi military.

**Strength:** Estimates place MEK's worldwide membership at between 5,000 and 10,000 members, with large pockets in Paris and other major European capitals. In Iraq, roughly 3,400 MEK members are gathered under Coalition protection at Camp Ashraf, the MEK's main compound north of Baghdad, where they have been treated as "protected persons" consistent with provisions of the Fourth Geneva Convention. This status does not affect the group's members outside of Camp Ashraf or the MEK's designation as a Foreign Terrorist Organization.

As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks, armored personnel carriers, and heavy artillery. A significant number of MEK personnel have voluntarily left Ashraf, and an additional several hundred individuals have renounced ties to the MEK and been voluntarily repatriated to Iran.

**Location/Area of Operation:** The MEK maintains its main headquarters in Paris and has concentrations of members across Europe, in addition to the large concentration of MEK located at Camp Ashraf in Iraq. The MEK's global support structure remains in place, with associates and supporters scattered throughout Europe and North America. Operations target Iranian regime elements across the globe, including in Europe and Iran. MEK's political arm, the National Council of Resistance of Iran (NCRI), has a global support network with active lobbying and propaganda efforts in major Western capitals. NCRI also has a well-developed media communications strategy.

**External Aid:** Before Operation Iraqi Freedom began in 2003, the MEK received all of its military assistance and most of its financial support from Saddam Hussein. The fall of Saddam's regime has led MEK increasingly to rely on front organizations to solicit contributions from expatriate Iranian communities.


## National Liberation Army (ELN)

a.k.a. Ejercito de Liberacion Nacional

**Description:** The National Liberation Army (ELN) is a Colombian Marxist-Leninist terrorist group formed in 1964 by urban intellectuals inspired by Fidel Castro and Che Guevara. It is primarily rural-based, although it possesses several urban units. Peace talks between the ELN and the Colombian government began in Cuba in December 2005 and continued as recently as August 2007. To date, Bogota and the ELN have yet to agree on a formal framework for peace negotiations.

PX203

**Activities**: The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities. It has minimal conventional military capabilities. The group conducts kidnappings for ransom, often targeting foreign employees of large corporations, especially in the petroleum industry. In August, ELN leadership discussed the possibility of ending kidnapping as a means of financing insurgent operations as a government-proposed precondition for formal peace talks. However, the organization has yet to renounce kidnapping. ELN derives some revenue from taxation of the illegal narcotics industry, and its involvement may be increasing. It attacks energy infrastructure and has inflicted major damage on oil and natural gas pipelines and the electrical distribution network, but has lost much of its capacity to carry out these types of attacks in recent years.

**Strength:** Approximately 3,000 armed combatants and an unknown number of active supporters.

**Location/Area of Operation:** Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, and Venezuelan border regions.

**External Aid:** Cuba provides some medical care and political consultation.


## Palestine Liberation Front (PLF)
a.k.a. PLF-Abu Abbas; Palestine Liberation Front – Abu Abbas Faction

**Description:** In the late 1970s the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and later split into pro-PLO, pro-Syrian, and pro-Libyan factions. The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:** Abbas's group was responsible for the 1985 attack on the Italian cruise ship *Achille Lauro* and the murder of U.S. citizen Leon Klinghoffer. In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s. In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq. Current leadership and membership of the relatively small PLF appears to be based in Lebanon and the Palestinian territories. The PLF took part in the 2006 Palestinian parliamentarian elections but did not win a seat.

**Strength:** Estimates have placed membership between 50 and 500.

**Location/Area of Operation:** Based in Iraq from 1990 until 2003. The group currently is based in Lebanon and Syria.

**External Aid:** Unknown.


## Palestine Islamic Jihad (PIJ)
a.k.a. Palestine Islamic Jihad-Shaqaqi Faction; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic

295

PX203

Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya Al-Quds; Al-Awdah Brigades

**Description:** Formed by militant Palestinians in Gaza during the 1970s, Palestine Islamic Jihad (PIJ) is committed to both the creation of an Islamic state in all of historic Palestine, including present day Israel, and the destruction of Israel through attacks against Israeli military and civilian targets.

**Activities:** PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets. In 2006, the group conducted two suicide bombings and launched numerous homemade rockets from Gaza into neighboring Israeli towns. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in PIJ mounted attacks, the group has not directly targeted U.S. interests. All but one of PIJ's attacks in 2007 consisted of rocket attacks aimed at southern Israeli cities.

**Strength:** Unknown.

**Location/Area of Operation:** Primarily Israel, the West Bank, and Gaza. The group's senior leadership resides in Syria. Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**External Aid:** Receives financial assistance and training primarily from Iran. Syria provides the group with safe haven.


## Popular Front for the Liberation of Palestine (PFLP)

a.k.a. Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles

**Description:** The Popular Front for the Liberation of Palestine (PFLP), a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens. A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:** The PFLP stepped up its operational activity during the al-Aqsa intifada. This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year. In March 2006, the PFLP's current Secretary General, Ahmed Sa'adat, who had been imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and is now awaiting trial. The PFLP-GC is suspected in several rocket attacks against Israel in 2007.

PX203

**Strength:** Unknown.

**Location/Area of Operation:** Syria, Lebanon, Israel, the West Bank, and Gaza.

**External Aid:** Receives safe haven and some logistical assistance from Syria.


## Popular Front for the Liberation of Palestine-General Command (PFLP-GC)

**Description:** The Popular Front for the Liberation of Palestine-General Command (PFLP-GC) split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics. Originally, the group was violently opposed to the Arafat-led PLO. Ahmad Jibril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding. The PFLP-GC is closely tied to both Syria and Iran.

**Activities:** The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and weapons smuggling. The PFLP-GC maintains an armed presence in several Palestinian refugee camps and its own military bases in Lebanon. The PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel in 2007.

**Strength:** Several hundred to several thousand.

**Location/Area of Operation:** Headquartered in Damascus with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.

**External Aid:** Receives logistical and military support from Syria and financial support from Iran.


## Al Qaʻida

a.k.a. al Qaeda; International Front for Fighting Jews and Crusaders; Islamic Army; Islamic Army for the Liberation of Holy Sites; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; The World Islamic Front for Jihad Against Jews and Crusaders; Usama bin Ladin Network; Usama bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:** Al-Qaʻida (AQ) was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union. The group helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. AQ's near-term goal is uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries. Its ultimate goal is the

PX203

establishment of a pan-Islamic caliphate throughout the world. AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders" saying it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere. AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.

**Activities:** Even as AQ's top leaders continue to plot and direct terror attacks worldwide, terrorists affiliated with but not necessarily controlled by AQ have increasingly carried out high-profile attacks. AQ, its affiliates, and those inspired by the group were involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices.

AQ has reconstituted some of its pre-9/11 operational capabilities through the reestablishment of a safe haven in the Federally Administered Tribal Areas (FATA) of Pakistan, replacement of captured or killed operational lieutenants, and the restoration of some central control by its top leadership, in particular Ayman al-Zawahiri. Although bin Ladin remains the group's ideological figurehead, Zawahiri has emerged as AQ's strategic and operational planner.

AQ is assessed to be the top terrorist threat to the United States and is developing stronger operational relationships with affiliates in the Middle East, North Africa, and Europe. It is through these "franchises" that AQ has conducted its recent attacks. AQ remains committed to attacking the United States and focuses its planning on targets that would produce mass casualties, dramatic visual destruction, and economic dislocation. In a 1999 interview with the press, bin Ladin's response to a question about chemical and nuclear weapons was, "Acquiring weapons for the defense of Muslims is a religious duty."

The Government of Pakistan accused AQ, along with the Taliban, of being responsible for the October suicide bombing attempt against former Pakistani Prime Minister Benazir Bhutto that killed at least 144 people in Karachi, Pakistan. On December 27, the Government of Pakistan stated that Baitullah Mahsud, a leading Pakistani Taliban commander with close ties to AQ, was responsible for the assassination of Benazir Bhutto.

In 2006, AQ and affiliated organizations continued major efforts to attack the West and its interests. For example, in mid-August, UK and U.S. authorities foiled a plot to blow up several aircraft. AQ may have been complicit in the plot but the group has made no public statement claiming its involvement. Additionally, al-Qa'ida in the Arabian Peninsula claimed responsibility for the February 24, 2006 attack on the Abqaiq petroleum processing facility, the largest such facility in the world, in Saudi Arabia. The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida in September 2006, subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM), and attacked a U.S. contractor bus in December 2006 in greater Algiers, marking its first attack against a U.S. entity. On December 11, 2007, AQIM conducted a near-simultaneous double suicide bombing that hit both the Algerian Court building and a UN office building. The Libyan Islamic Fighting Group (LIFG) also officially merged with AQ in November 2007, although no significant LIFG activities have occurred since the merger.

Bin Ladin's deputy Ayman al-Zawahiri claimed responsibility on behalf of AQ for multiple attacks on July 7, 2005 against the London public transportation system. The extent of senior

PX203

leadership involvement in planning the July 2005 attacks was unclear. Some suspects in the attacks included homegrown United Kingdom-based extremists who were ―inspired" by AQ. In 2003 and 2004, Saudi-based AQ operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia. AQ may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people. Pakistani President Musharraf blames AQ for two attempts on his life in December 2003.

In October 2002, AQ directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four. The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya that killed 15. AQ probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and a fourth into a field in Shanksville, Pennsylvania – leaving nearly 3,000 individuals dead or missing. In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39. AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam killing at least 301 individuals and injuring more than 5,000 others. AQ and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.

**Strength:** AQ's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11, but several thousand members and associates comprise the AQ-associated movement. The arrests and deaths of mid-level and senior AQ operatives have disrupted some communication, financial, and facilitation nodes and disrupted some terrorist plots. Additionally, supporters and associates worldwide who are ―inspired" by the group's ideology may be operating without direction from AQ central leadership; it is impossible to estimate their numbers. AQ also serves as a focal point of ―inspiration" for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahidin, Ansar al-Sunnah, the Taliban, and Jemaah Islamiya.

**Location/Area of Operation:** AQ worldwide networks are augmented by ties to local Sunni extremists. The group was based in Afghanistan until Coalition Forces removed the Taliban from power in late 2001. While the largest concentration of senior AQ members now resides in Pakistan's Federally Administered Tribal Areas, the network incorporates members of al-Qaʻida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia who are working to carry out future attacks against U.S. and Western interests.

**External Aid:** Al-Qaʻida primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause. Some funds are diverted from Islamic charitable organizations. In addition, parts of the organization raise funds through criminal activities; for example, al-Qaʻida in Iraq raises funds through

PX203

hostage-taking for ransom, and members in Europe have engaged in credit card fraud. U.S. and international efforts to block al-Qa'ida funding have hampered the group's ability to raise money.

## Al-Qa'ida in Iraq

a.k.a. al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; Al-Qa'ida of Jihad Organization in the Land of The Two Rivers; Al-Qa'ida of the Jihad in the Land of the Two Rivers; Al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network

**Description:** In January 2006, in an attempt to unify Sunni extremists in Iraq, al-Qa'ida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni terrorist groups in Iraq. AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qa'ida's goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks. Although Iraqis compose 90 percent of the group's membership, it is probable that the majority of AQI's leadership is foreign-born. In an attempt to give AQI a more Iraqi persona, the Islamic State of Iraq umbrella organization was created and headed by ―Abu Omar al-Baghdadi."

Abu Ayyub al-Masri, Zarqawi's successor, issued a statement pledging to continue what Zarqawi began, and AQI has continued its strategy of targeting Coalition Forces, Iraqi government groups, and Shia civilians to provoke sectarian violence and undermine perceptions that the Iraqi central government can defend them.

AQI has claimed joint attacks with both Ansar Al-Sunnah (AS) and the Islamic Army in Iraq (IAI); however, ideological differences have prevented these groups from merging. More recently, IAI and the 1920 Revolution Brigades cooperated with Coalition Forces in targeting AQI. *(See Chapter 2, Country Reports, Middle East and North Africa, for further information on U.S. efforts to counter AQI.)*

**Activities:** High-profile attacks in 2007 included the suicide car-bombing attack of a mosque in Al Habbaniyah in February, the multiple suicide bombing attack of Shia pilgrims in Al Hillah in March, several chlorine gas canister bombings from January through June, an orchestrated bridge bombing campaign throughout Iraq aimed at isolating Baghdad Shia population concentrations and disrupting ground transportation from January through October, the suicide truck bombing of a market in Tall _Afar in March, the suicide truck bombings of a market and Patriotic Union of Kurdistan (PUK) party offices in Amurli and Kirkuk in July, and the single deadliest attack of the Iraq war, the multiple suicide truck bombings of two Yazidi villages near Sinjar in August.

300

PX203

In August 2003, Zarqawi's group carried out major terrorist attacks in Iraq when it bombed the Jordanian Embassy in Baghdad, which was followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq (SCIRI). The group kept up its attack pace throughout 2003, striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross. Zarqawi's group conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad. The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market. It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004). AQI was likely involved in other hostage incidents as well. In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24. The group also continued assassinations against Shia leaders and members of the Shia militia groups Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December. In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships. Prior to 2005, Zarqawi planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002. In October 2006, AQI declared the ISI would become a platform from which AQI would launch terrorist attacks throughout the world. Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force. AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006 but decreased significantly in 2007. AQI was implicated in the February 2006 Samarra' al-Askari Mosque bombing that precipitated the escalation in sectarian violence.

AQI senior leaders in Iraq may have had advance knowledge of terrorist attacks in Iraq that incorporated chlorine into vehicle-borne improvised explosive devices (VBIEDs). However, the use of chlorine in suicide attacks probably represents an opportunistic evolution of conventional VBIED attacks.

**Strength:** Membership is estimated at 5,000 to 10,000, making it the largest Sunni extremist group in Iraq. AQI perpetrates the majority of suicide and mass casualty bombings in Iraq with foreign operatives constituting the majority of these bombers. The selection of civilian targets, particularly in Baghdad, generates widespread media coverage.

PX203

**Location/Area of Operation:** AQI's operations are predominately Iraq-based, but it has perpetrated attacks in Jordan. The group maintains an extensive logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe. In Iraq, AQI currently conducts the majority of its operations in Ninawa, Diyala, Salah ad Din, and Baghdad provinces and to a lesser extent Al Anbar.

**External Aid**: AQI probably receives funds from donors in the Middle East and Europe, local sympathizers in Iraq, from a variety of businesses and criminal activities, and other international extremists throughout the world. In many cases, AQI's donors are probably motivated to support terrorism rather than an attachment to any specific terrorist group.

## Al-Qa'ida in the Islamic Maghreb (AQIM)

a.k.a.  Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya; Le Groupe Salafiste pour la Predication et le Combat; Salafist Group for Call and Combat; Salafist Group for Preaching and Combat

**Description:** The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida (AQ) in September 2006 and subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM). The GSPC formed in 1998 when its members left the Armed Islamic Group (GIA) over disagreements about leadership, tactics, and indiscriminant targeting of Algerian civilians. In contrast to the GIA, it has pledged to avoid attacks on civilians inside Algeria, but civilians have died in numerous GSCP/AQIM attacks. The GSPC retained GIA's mission of overthrowing the Algerian government and installing an Islamic regime. AQIM is the most effective and largest armed group inside Algeria. AQIM and AQ have used the merger extensively in their propaganda.

**Activities**:  On April 11, 2007, AQIM for the first time employed suicide tactics. The attacks on that date, near-simultaneous bombings of multiple targets inside Algiers including the office of Algeria's prime minister, claimed more than 30 lives. Shortly thereafter, AQIM vowed to continue to use suicide tactics, and the organization carried out five further suicide attacks in Algeria during 2007. On December 11, AQIM carried out two near-simultaneous suicide vehicle-borne improvised explosive device (VBIED) attacks that struck two UN offices and the headquarters of Algeria's Constitutional Council, killing 41 people, (including 17 UN employees), and wounding at least 170 others. AQIM had previously attacked vehicles belonging to foreign corporations several times during the year, beginning in December 2006 with an attack in Algiers on a bus belonging to a U.S.-Algeria joint venture and carrying several expatriate workers.

Outside Algeria, in December 2007, multiple AQIM-linked attacks in Mauritania were the first terrorist incidents since 2005, when the GSPC had claimed responsibility for an attack on a remote Mauritanian military outpost that killed 15; this appeared to indicate an AQIM shift towards a more regional terrorist campaign. Also during 2007, police in France, Italy, and Spain arrested several individuals from Algeria and other Maghreb countries suspected of providing support to AQIM. French officials announced that AQIM had issued an Internet call-to-action against France, declaring France "public enemy number one."

PX203

**Strength:** AQIM has several hundred fighters operating in Algeria and the Sahel. Abdelmalek Droukdel, a.k.a. Abu Mus'ab Abd al-Wadoud is the leader of the group.

**Location/Area of Operation:** Algeria and the Sahel, with affiliates and logistics/fundraisers in Western Europe.

**External Aid:** Algerian expatriates and AQIM members abroad, many residing in Western Europe, provide financial and logistical support. AQIM members also engage in criminal activity to finance their operations.

## Real IRA (RIRA)

a.k.a. 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Irish Republican Army; Real Oglaigh Na Heireann

**Description:** Like the Continuity IRA, the Real IRA (RIRA) did not participate in the September 2005 weapons decommissioning. RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland. RIRA also seeks to disrupt the Northern Ireland peace process. The 32 County Sovereignty Movement opposed Sinn Fein's September 1997 adoption of the Mitchell principles of democracy and non-violence; it also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland. Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, RIRA pledged additional violence and continued to conduct attacks.

**Activities:** Many RIRA members are former Provisional Irish Republican Army members who left that organization after it renewed its cease-fire in 1997. These members brought a wealth of experience in terrorist tactics and bomb-making to RIRA. Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities. RIRA's most recent fatal attack was in August 2002 at a London army base, killing a construction worker. The organization seeks to improve its intelligence-gathering ability, engineering capacity, and access to weaponry; it also trains members in the use of guns and explosives. RIRA continues to attract new members, and its senior members are committed to launching attacks on security forces. Three suspected RIRA members that engaged in cigarette smuggling were arrested in Spain in 2006. From 2006 to November 2007, terrorist activity in the form of successful and attempted attacks by RIRA slightly decreased. Notably, between August and November 2006, throughout Northern Ireland, RIRA targeted B&Q home-supply stores and other retail businesses in successful and attempted firebombings, although a handful of these attacks were also claimed by the Continuity Irish Republican Army (CIRA). In November 2007, RIRA claimed two armed attacks that wounded two Police Service of Northern Ireland (PSNI) officers.

**Strength:** According to the Irish government, RIRA has approximately 100 active members. The organization may receive limited support from IRA hardliners and Republican sympathizers

303

PX203

dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process. Approximately 40 RIRA members are in Irish jails.

**Location/Area of Operation:** Northern Ireland, Great Britain, and the Irish Republic.

**External Aid:** RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers. RIRA also is reported to have purchased weapons from the Balkans.


## Revolutionary Armed Forces of Colombia (FARC)
a.k.a. Fuerzas Armadas Revolucionarias de Colombia

**Description:** The Revolutionary Armed Forces of Colombia (FARC) is Latin America's oldest, largest, most capable, and best-equipped insurgency. It began in the early sixties as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology, although it only nominally fights in support of Marxist goals today. The FARC is governed by a general secretariat led by co-founder Antonio Marin (a.k.a. Manuel Marulanda or "Tirofijo") and six others, including senior military commander Victor Suarez (a.k.a. Jorge Briceno or "Mono Jojoy"). The FARC is organized along military lines and includes some specialized urban fighting units. A Colombian military offensive targeting FARC fighters in southern Colombia has experienced some success, with a number of FARC mid-level leaders killed or captured. Colombian military operations in September and October resulted in the deaths of Thomas Median Caracas (a.k.a. ―Negro Acacio") and Gustavo Rueda (a.k.a. ―Martin Caberllero"), two senior FARC military commanders, respectively.

**Activities**: The FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets. In February 2003, when a U.S. plane crashed in a FARC-held area, the FARC murdered a U.S. citizen and a Colombian; it continues to hold hostage the three other U.S. citizens that were on the plane. In late 2007, the Colombian government granted Venezuelan President Hugo Chavez permission to negotiate with the FARC to secure the release of the three U.S. citizens and 42 other so-called ―political" hostages, some held as long as a decade. Colombia ended Chavez' role after he repeatedly ignored Colombian positions, however, the FARC did release two hostages. Foreign citizens were often targets of abductions that the FARC carried out to obtain ransom and political leverage. The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.

**Strength:** Approximately 9,000 to 12,000 combatants and several thousand more supporters.

**Location/Area of Operation:** Primarily in Colombia with some activities such as extortion, kidnapping, weapons sourcing, and logistics in neighboring countries.

**External Aid:** Cuba provided some medical care, safe haven, and political consultation. Venezuela supplied some lethal aid to the FARC, although this may be a result of individual

PX203

corruption rather than official policy; available information is not conclusive. The FARC often used the Colombia/Venezuela and Colombia/Ecuador border areas for incursions into Colombia and also used Venezuelan and Ecuadorian territory for safe haven, although the degree of government acquiescence was not clear and may vary depending on cross-border relations.

## Revolutionary Nuclei

a.k.a. Revolutionary Cells; ELA; Epanastatiki Pirines; Epanastatikos Laikos Agonas; June 78; Liberation Struggle; Organization of Revolutionary Internationalist Solidarity; Popular Revolutionary Struggle; Revolutionary People's Struggle; Revolutionary Popular Struggle

**Description:** Revolutionary Nuclei (RN) emerged from a broad range of anti-establishment and anti-U.S./NATO/EU leftist groups active in Greece between 1995 and 1998. The group is believed to be the successor to or offshoot of Greece's most prolific terrorist group, Revolutionary People's Struggle (ELA), which has not claimed an attack since January 1995. Indeed, RN appeared to fill the void left by ELA, particularly as lesser groups faded from the scene. RN's few communiqués show strong similarities in rhetoric, tone, and theme to ELA proclamations.

**Activities:** Since it began operations in January 1995, the group has claimed responsibility for some two dozen arson attacks and low-level bombings against a range of U.S., Greek, and other European targets in Greece. In its most infamous and lethal attack to date, the group claimed responsibility for a bomb it detonated at the Intercontinental Hotel in April 1999 that resulted in the death of a Greek woman and injury of a Greek man. RN's modus operandi includes warning calls of impending attacks, attacks targeting property instead of individuals, use of rudimentary timing devices, and strikes during the late evening to early morning hours. RN may have been responsible for two attacks in July 2003 against a U.S. insurance company and a local bank in Athens. RN's last confirmed attacks against U.S. interests in Greece came in November 2000, with two separate bombings against the Athens offices of Citigroup and the studio of a Greek-American sculptor. Greek targets have included judicial and other government office buildings, private vehicles, and the offices of Greek firms involved in NATO-related defense contracts in Greece. Similarly, the group has attacked European interests in Athens.

**Strength:** Group membership is believed to be small, probably drawing from the Greek militant leftist or anarchist milieu.

**Location/Area of Operation:** Primary area of operation is the Athens metropolitan area.

**External Aid:** Unknown but believed to be self-sustaining.

## Revolutionary Organization 17 November

a.k.a. Epanastatiki Organosi 17 Noemvri; 17 November

**Description:** Revolutionary Organization 17 November (17N) is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that

305

PX203

protested the ruling military junta. 17N is an anti-Greek, anti-U.S., anti-Turkey, and anti-NATO group that seeks the ouster of U.S. bases from Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

**Activities:** Initial attacks were assassinations of senior U.S. officials and Greek public figures. Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975. The group began using bombings in the 1980s. In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece, and added improvised rocket attacks to its methods. The group supported itself largely through bank robberies. A failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, coupled with robust detective work, led to the arrest of 19 members, the first 17N operatives ever arrested, including a key leader of the organization. In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms. Four other alleged members were acquitted for lack of evidence. In December 2005, against the backdrop of a sympathetic press, a group appeals trial opened for the 15 convicted members and two of the previously acquitted members. The appeals trial essentially represents a new trial for the convicts because new evidence and facts can be introduced under Greek law. At the conclusion of the appeals trial in May 2007, 13 of the 17 members of 17N were found guilty of terrorism. Two members already released from prison for medical reasons in July 2006 and 2005 were cleared of their charges since the crimes they were suspected of committing were outside of the Greek twenty-year statute of limitations. Two others were also acquitted due to doubts surrounding the charges against them. The last suspected attack by 17N occurred in May 2004, at a courthouse in Larissa, Greece, wounding one civilian and causing minor damage to the facility. Although no group claimed responsibility for the attack, authorities believed 17N was responsible.

**Strength:** Unknown but presumed to be small.

**Location/Area of Operation:** Athens, Greece.

**External Aid:** Unknown.


## Revolutionary People's Liberation Party/Front (DHKP/C)

a.k.a. Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:** The Revolutionary People's Liberation Party/Front (DHKP/C) originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth). It was renamed in 1994, after factional infighting. "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations. The group espouses a Marxist-Leninist ideology and is vehemently anti-U.S., anti-NATO, and anti-Turkish establishment. Its goals are the establishment of a socialist state and the abolition of F-type prisons, which contain one to three-man prison cells. DHKP/C finances its activities chiefly through donations and extortion.

**Activities:** Since the late 1980s, the group has targeted primarily current and retired Turkish security and military officials. It began a new campaign against foreign interests in 1990, which

PX203

included attacks against U.S. military and diplomatic personnel and facilities. To protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities. In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others; the perpetrators fled to Belgium, where legal cases continue. DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September. Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity. Attacks against U.S. targets beginning in 2003 probably came in response to Operation Iraqi Freedom.

Operations and arrests against the group have weakened its capabilities. In late June 2004, the group was suspected of a bus bombing at Istanbul University, which killed four civilians and 21 other people. In July 2005, in Ankara, police intercepted and killed a suicide bomber who attempted to attack the Ministry of Justice. In June 2006, in Istanbul, the group fired upon and killed a police officer; four members of the group were arrested the next month for the attack.

In January 2007, authorities raided DHKP/C safe-houses in Duinbergen, Belgium, and in Istanbul, Turkey, resulting in the confiscation of weapons, bomb-making material, documents, and propaganda material, and in the arrest of several members of DHKP/C. In the spring of 2007, the Belgian Supreme Court overturned, on procedural grounds, the conviction of several DHKP/C operatives, including the DHKP/C spokesman in Belgium, Bahar Kimyougur, and key figure Musa Asoglu, who had been convicted of membership in a terrorist organization, arms possession, and using forged documents.

**Strength:** Probably several dozen terrorist operatives inside Turkey, with a large support network throughout Europe.

**Location/Area of Operation:** Turkey, primarily Istanbul, Ankara, Izmir, and Adana.

**External Aid:** Widely believed to have training facilities or offices in Lebanon and Syria. DHKP/C raises funds in Europe.


## Shining Path (SL)

a.k.a. Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:** Former university professor Abimael Guzman formed the Shining Path (SL) in Peru in the late 1960s, and his teachings created the foundation of SL's militant Maoist doctrine. In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere. The Peruvian government made dramatic gains against SL during the 1990s, but recent SL attacks against Peruvian counternarcotics police underscore that SL continues to be a threat. In

PX203

response to SL's bloody attacks in late 2005, Peruvian authorities stepped up counterterrorism efforts against the group. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments. More recently, SL members have attempted to influence the local populace through indoctrination versus violence.

**Activities:** In the past, SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations. Remnants of SL now focus on drug-trafficking activities to obtain funds to carry out attacks.

**Strength:** Unknown but estimated to be between 200 and 300 armed militants.

**Location/Area of Operation:** Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

**External Aid:** None.

## United Self-Defense Forces of Colombia (AUC)

a.k.a. Autodefensas Unidas de Colombia

**Description:** The United Self-Defense Forces of Colombia (AUC), commonly referred to as the paramilitaries, was an umbrella group formed in April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged to retaliate against leftist guerillas fighting the Colombian government and the landed establishment. The AUC increasingly discarded its counterguerilla activities, electing instead to involve itself in the illegal drug trade. By 2007, as the result of a large demobilization process, most of the AUC's centralized military structure had been dismantled, and all of the top paramilitary chiefs had stepped down with the majority being held in a maximum security facility. More than 31,000 paramilitary members and support personnel demobilized bloc by bloc from 2003 to 2006. Colombia now faces criminal gangs formed by demobilized paramilitaries and other individuals, and one minor paramilitary group that refused to disarm. Unlike the AUC, the new criminal groups make little claim to fighting insurgents and are more clearly criminal enterprises focused primarily on drug trafficking, other lucrative illicit activities, and influencing local politics to facilitate their criminal ventures. These new criminal groups are not a reconstituted AUC, but they recruit heavily from the pool of former AUC members. A large part of their leadership appears to be former mid-level paramilitary commanders who did not participate in demobilization.

**Activities:** Paramilitary operations varied from assassinating suspected insurgent supporters to engaging insurgent combat units. As much as 70 percent of the paramilitary operational costs were financed with drug-related earnings, with the rest coming from "donations" from sponsors and government corruption. These groups generally avoided actions against U.S. personnel or interests. Traditional paramilitary operations are largely nonexistent as a result of the demobilization of all AUC groups, although some individuals are violating their demobilization commitments by continued participation in criminal activities.

PX203

**Strength:** The Colombian government has determined that the AUC no longer exists. The Colombian government and Organization of American States estimate that 22 new criminal groups have emerged in the wake of AUC demobilization. According to Colombian government figures, approximately 10 to 15 percent of the 3,000 to 4,000 members of these groups are former members of paramilitary groups, including the AUC.

**Location/Areas of Operation:** Paramilitary forces were strongest in northwest Colombia in Antioquia, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

**External Aid:** None.

PX203

Chapter 7
Legislative Requirements and Key Terms

***Country Reports on Terrorism 2007*** is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act. Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

Excerpts and Summary of Key Statutory Terms

Section 2656f(a) of Title 22 of the United States Code states as follows:

(a) … The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing –

*(1) (A) detailed assessments with respect to each foreign country –*

*(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;*

*(ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and*

*(iii) which the Secretary determines should be the subject of such report; and*

*(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;*

*(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;*

*(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on-*

310

PX203

*(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and*

*(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and*

*(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).*

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;
(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and
(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

**The "7120 Report."** Title 22 USC Section 2656f(b) requires the Department of State, to the extent feasible, to provide to Congress an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act of 2004 (also known as the Intelligence Reform and Terrorist Prevention Act of 2004 or "IRTPA"). The "7120 Report" forms a part of the annual *Country Reports on Terrorism*, and the terrorist sanctuary reporting required under Sections 22 USC 2656f(a)(1)(B) and (b)(2) is integrated with the information required under Section 7120(b)(1) of IRTPA.

**Interpretation and Application of Key Terms.** For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC. 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the USG on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

PX203

**Statistical Information.** Pursuant to 22 USC § 2656f(b), this report must contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This requirement is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Counterterrorism Center (NCTC). The statistical annex includes a discussion of the methodology employed by NCTC in compiling the relevant data.

This report does not contain statistical information specifically concerning combatants. The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets. Further, it would not be practicable to provide such statistics, as the government does not maintain - and would have great difficulty maintaining - statistics that distinguish between incidents against combatants by terrorist groups and by others, including insurgents, in Iraq and Afghanistan.

**Contextual Reporting.** Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists. Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations. It is terrorist groups, and their actions, that are the focus of this report. Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw. This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence. Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily –international terrorism" and therefore are not subject to the statutory reporting requirement.

PX203

# PX205

# Country Reports on Terrorism 2009

**August 2010**

United States Department of State Publication
Office of the Coordinator for Counterterrorism
Released August 2010

PX205

*Country Reports on Terrorism 2009* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

<div align="center">

**COUNTRY REPORTS ON TERRORISM 2009**

**Table of Contents**

</div>

**Foreword**

**Chapter 1.   Strategic Assessment**

**Chapter 2.  Country Reports**

    **Africa Overview**
        Trans-Sahara Counterterrorism Partnership
        The African Union
        Angola
        Botswana
        Burkina Faso
        Burundi
        Cape Verde
        Comoros
        Democratic Republic of the Congo
        Cote D'Ivoire
        Djibouti
        Equatorial Guinea
        Eritrea
        Ethiopia
        Gabon
        Ghana
        Kenya
        Liberia
        Madagascar
        Mali
        Mauritania
        Niger
        Nigeria

PX205

Rwanda
Sao Tome and Principe
Senegal
Somalia
South Africa
Tanzania
Uganda
Zambia
Zimbabwe

**East Asia and Pacific Overview**
Australia
Burma
Cambodia
China
o   Hong Kong
o   Macau
Indonesia
Japan
Republic of Korea (South Korea)
Democratic People's Republic of Korea (North Korea)
Laos
Malaysia
Micronesia, Federated States of
Mongolia
New Zealand
Palau
Philippines
Singapore
Taiwan
Thailand

**Europe Overview**
Albania
Armenia
Austria
Azerbaijan
Belgium

PX205

Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Kosovo
Latvia
Lithuania
Macedonia
Malta
Moldova
Montenegro
The Netherlands
Norway
Poland
Portugal
Romania
Russia
Serbia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Turkey
Ukraine
United Kingdom

PX205

    o  Northern Ireland

**Middle East and North Africa Overview**
    Algeria
    Bahrain
    Egypt
    Iraq
    Israel, West Bank, and Gaza
    Jordan
    Kuwait
    Lebanon
    Libya
    Morocco
    Oman
    Qatar
    Saudi Arabia
    Tunisia
    United Arab Emirates
    Yemen

**South and Central Asia Overview**
    Afghanistan
    Bangladesh
    India
    Kazakhstan
    Kyrgyzstan
    Nepal
    Pakistan
    Sri Lanka
    Tajikistan
    Turkmenistan
    Uzbekistan

**Western Hemisphere Overview**
    Tri-Border Area
    Argentina
    Belize
    Bolivia

PX205

Brazil
Canada
Chile
Colombia
Dominican Republic
Ecuador
El Salvador
Guatemala
Haiti
Honduras
Jamaica
Mexico
Nicaragua
Panama
Paraguay
Peru
Suriname
Trinidad and Tobago
Uruguay
Venezuela

**Chapter 3.  State Sponsors of Terrorism Overview**
Cuba
Iran
Sudan
Syria

**Chapter 4. The Global Challenge of  WMD Terrorism**

**Chapter 5. Terrorist Safe Havens**
Terrorist Safe Havens
Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
International Conventions and Protocols Matrix

**Chapter 6.  Terrorist Organizations**
**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group (ASG)**
**Al-Aqsa Martyrs Brigade (AAMB)**

PX205

**Al-Shabaab (AS)**
**Ansar al-Islam**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo (AUM)**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)**
**Harakat ul-Mujahideen (HUM)**
**Hizballah**
**Islamic Jihad Union (IJU)**
**Islamic Movement of Uzbekistan  (IMU)**
**Jaish-e-Mohammed  (JEM)**
**Jemaah Islamiya (JI)**
**Kahane Chai**
**Kata'ib Hizballah (KH)**
**Kurdistan Workers' Party (PKK)**
**Lashkar e-Tayyiba (LT)**
**Lashkar i Jhangvi  (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**
**Mujahadin-e Khalq Organization  (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front – Abu Abbas Faction (PLF)**
**Palestinian Islamic Jihad – Shaqaqi Faction  (PIJ)**
**Popular Front for the Liberation of Palestine  (PFLP)**
**Popular Front for the Liberation of Palestine-General Command  (PFLP-GC)**
**Al-Qa'ida (AQ)**
**Al-Qa'ida in Iraq (AQI)**
**Al-Qa'ida in the Islamic Maghreb (AQIM)**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Organization 17 November  (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Revolutionary Struggle (RS)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia  (AUC)**

# Chapter 7. Legislative Requirements and Key Terms

PX205

**NCTC Statistical Annex**

**Supplement on Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens**

PX205

## Foreword

The Department of State's *Country Reports on Terrorism 2009* covers events from January 1 to December 31, 2009. This publication, which fulfills a Congressional requirement, aims to enhance our collective understanding of the international terrorist threat. The report also serves as a reference tool to inform policymakers, the general public, and our foreign partners about our efforts, progress, and challenges in the campaign against international terrorism.

The first chapter provides a strategic overview of the terrorist threat to the United States and U.S. interests abroad, as well as a description of the setbacks and advancements of al-Qa'ida and its affiliated groups. The report also includes country-by-country discussions of foreign government counterterrorism cooperation as well as chapters on WMD terrorism, state sponsors of terrorism, terrorist safe havens, and designated Foreign Terrorist Organizations.

Transnational terrorism remains the foremost security threat the United States faces, and the Obama administration has been working to strengthen the nation's counterterrorism strategy. An effective counterterrorism policy must go beyond the law enforcement, intelligence, and military efforts that thwart those who seek to harm the United States and its citizens. Under the President's leadership, the administration is formulating policies that seek to shape and constrain the environments where terrorists operate. Central to this approach is taking steps to undermine the appeal of al-Qa'ida's world view and to isolate violent extremists. Our actions are guided by a recognition of the phenomenon of radicalization and the need to prevent more people from committing themselves to violence. In every country where extremism has taken root, three questions guide our approach: Are our actions going to result in the creation of more terrorists? What can we do to shrink the potential pool of recruits? And what is necessary to minimize the near term as well as the long term threat to the United States?

As part of this effort, the administration is looking to address the "upstream" factors of radicalization. We are working to confront the political, social, and economic conditions that our enemies exploit to win over recruits and funders. We are also working to expand our foreign assistance to nations and communities where violent extremism has made inroads, such as Pakistan and Yemen.

As the six regional overviews in Chapter 2 show, each region possesses unique terrorist threats and radicalization dynamics. Therefore, the State Department and other U.S. agencies are working on Regional Strategic Initiatives with our embassies to devise tailored and collaborative strategies to match the particular radicalization profiles of affected communities. One-size-fits-all programs have limited appeal, while regional and trans-regional strategies have a better chance of succeeding and enduring.

Additionally, our counterterrorism strategy involves building a genuinely multilateral approach to this global threat. The United States has been working hard to reinvigorate alliances and strengthen existing partnerships; this is especially true in the arena of counterterrorism. Through consistent diplomatic engagement, we are seeking to boost the political will and strengthen the resolve of leaders around the world to confront terrorist threats. That will is essential for our

PX205

long-term capacity building efforts.  Ultimately, our success will hinge on strengthening the ability of others around the world to deal with terrorism in their countries and regions.

--Daniel Benjamin
Coordinator of Counterterrorism

# Chapter 1
# Strategic Overview

In 2009, al-Qa'ida's core in Pakistan remained the most formidable terrorist organization targeting the U.S. homeland.  It has proven to be an adaptable and resilient terrorist group whose desire to attack the United States and U.S. interests abroad remains strong.  The U.S. intelligence community assessed that al-Qa'ida was actively engaged in operational plotting against the United States and continued recruiting, training, and deploying operatives, including individuals from Western Europe and North America.  Moreover, al-Qa'ida continued to try to expand its operational capabilities by partnering with other terrorist groups, with varying degrees of success.

Nevertheless, al-Qa'ida suffered several significant setbacks in 2009.  The group remained under pressure in Pakistan due to Pakistani military operations aimed at eliminating militant strongholds in the Federally Administered Tribal Areas (FATA).  Although al-Qa'ida has collaborated with the Taliban insurgency against the Pakistani government by providing technical know-how and disseminating propaganda, the group continued to suffer leadership losses.  As a result, al-Qa'ida found it tougher to raise money, train recruits, and plan attacks outside of the region.  In addition to these operational setbacks, al-Qa'ida continued to fail in its efforts to carry out the attacks that would shake governments in the Muslim world.

Finally, al-Qa'ida's core continued to suffer from popular Muslim disaffection due to recent and past indiscriminate targeting of Muslims by its operatives and allies in Algeria, Iraq, Saudi Arabia, Pakistan, Indonesia, and elsewhere.  Consequently, the number of conservative clerics and former militants speaking out against the organization increased.  Al-Qa'ida spokesmen responded ineffectively to this criticism by arguing that the organization does not target Muslims, demonstrating both their concern about its resonance and their inability to counter such criticism effectively.

Yet despite these setbacks, the al-Qa'ida threat was more dispersed than in recent years, which partially offset the losses suffered by al-Qa'ida's core.  The attempted December 25th bombing of a U.S. commercial airliner demonstrated that at least one al-Qa'ida affiliate has developed not just the desire but also the capability to launch a strike against the United States.  Al-Qa'ida in the Arabian Peninsula[1] has already shown itself to be a formidable threat to Yemen's internal

---

[1] On January 19, 2010, the Secretary of State designated al-Qa'ida in the Arabian Peninsula (AQAP) as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended (INA).  The Secretary also designated AQAP and its two top leaders Nasir al-Wahishi and Said al-Shihri under E.O. 13224. AQAP is a Yemen-based terrorist organization that has claimed responsibility for numerous terrorist acts against

PX205

security, with attacks on the Yemeni security services, as well as a threat to Saudi Arabia, with an August 2009 attempted assassination against the head of counterterrorism in Saudi Arabia, Prince Mohammed bin Nayif.  The attempted December 25 bombing provided a further reminder that un- or under-governed spaces can serve as an incubator for extremism and underscored that we cannot expect al-Qa'ida affiliates to be focused solely on the near enemy – the governments in their own countries and regions – or American facilities in their immediate surroundings.

Al-Qai'da's other most active affiliates were in Africa.  In the sparsely populated Sahel, operatives from al-Qa'ida in the Islamic Maghreb kidnapped foreigners, sometimes working with individual local tribesmen and nomads.  Its operations along under-governed borders posed challenges to coordinated state responses.  In Somalia, al-Qa'ida's allies in al-Shabaab controlled significant tracts of territory and several al-Shabaab leaders have publically proclaimed loyalty to al-Qaida.

Despite their failure at broad mobilization, another respect in which al-Qa'ida and violent Sunni radicals continued to succeed was in persuading people to adopt their cause, even in the United States.  Five Americans from Virginia were arrested in Pakistan on suspicion of terrorist ties. Some Americans have traveled to Somalia for one reason or another and ultimately joined al-Shabaab.  Najibullah Zazi, a U.S. lawful permanent resident and airport shuttle driver, trained in Pakistan and now faces charges in federal court for allegedly planning to set off several bombs in the United States.  An American citizen, David Headley, has pleaded guilty in a U.S. court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 160 people – including six Americans – and to crimes relating to a separate plot to bomb the Danish newspaper *Jyllands-Posten*.  And there is also the case of  Nidal Hasan  who is facing charges for the Fort Hood attack that killed 13 people and wounded 30 others on November 5, 2009.

The Lashkar e-Tayyiba connection has added a further dimension to the terrorist threat landscape since its activities have made clear its deepening commitment to undertake bold, mass-casualty operations against American and other Western targets.  Since the 2008 Mumbai attack, analysts have deepening concern that it could evolve into a genuine global threat.  Headley and others indicate the diversity, mobility, and versatility of self-selecting recruits whom organizations can pick to meet strategic goals.  Organizations may set these goals, but their training resources and recruits are increasingly modular and interchangeable.

Not only have there been more cases of Americans becoming operatives for foreign terrorist organizations, we have also seen U.S. citizens rise in prominence as proponents of violent extremism.  The most notable is al-Qa'ida in the Arabian Peninsula's Anwar al-Aulaqi, who has become an influential voice of Islamist radicalism among English-speaking extremists.  The

---

Saudi, Korean, Yemeni, and U.S. targets since its inception in January 2009.  Such instances include a March 2009 suicide bombing against South Korean tourists in Yemen, the August 2009 attempt to assassinate Saudi Prince Muhammad bin Nayif, and the December 25, 2009 failed attack on a Northwest Airlines flight from Amsterdam to Detroit, Michigan.

PX205

alleged Ft. Hood attacker Nidal Hasan sought him out for guidance, and the December 25 bomber, Umar Farouk Abdulmutallab, visited him at least twice in Yemen.  Also popular among English-speaking extremists is Omar Hammami from Alabama, now one of the chief propagandists for al-Shabaab.

Compounding the threat of terrorist organizations is the active or tacit support of states.  Iran has long been the foremost state sponsor of terrorism, supporting Hizballah, HAMAS, and other rejectionist Palestinian groups as proxies for their own interests in the Arab world.  Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf, jeopardized the tenuous peace in southern Lebanon, and undermined the growth of democracy.  Syria also provided political and material support to Hizballah in Lebanon and allowed Iran to resupply this organization with weapons, and provided safe-haven as well as political and other support to a number of designated Palestinian terrorist groups, including  HAMAS, Palestinian Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

Looking ahead, there is ample reason to be concerned about demographic and technological trends in countries where terrorism is already endemic.  The youth population throughout South Asia and the Middle East is rapidly expanding, bringing the prospect of increasing numbers of at risk young people.  Europe may continue to be a fertile recruitment ground for extremists if sizable numbers of recent immigrants and, in particular, second- and third-generation Muslims continue to experience integration problems and feel alienated by governments' domestic and foreign policies.  These prospects underscore the need to look beyond the immediate – and genuinely pressing – challenges of tactical counterterrorism toward the longer term developments shaping the threat environment of the future.

As for technological trends, terrorist groups and their sympathizers have expressed interest in using cyber means to target the United States.  They have not been successful to date.  Terrorists have used cyber means to transfer funds, but international action has made significant progress towards addressing this illicit activity.  Most major terrorist groups have propaganda websites and forums.  Al-Qa'ida continued its efforts to encourage key regional affiliates and jihadist networks to pursue a global agenda, using both the Internet as a means to distribute propaganda and telecommunications infrastructure to plan attacks and coordinate movements.  Going forward, this will be an area of continued focus for the United States.

PX205

# CHAPTER 2
# COUNTRY REPORTS

## AFRICA OVERVIEW

> "To succeed in the quest for Somali peace…we must take a more comprehensive approach in tackling the extremists, which includes encouraging the Transitional Federal Government to more aggressively pursue its commitment to a much more inclusive political process to bring into the government all forces which eschew violence."
>
> –Raila Odinga, Prime Minister Of The Republic Of Kenya
> 64th Session of the United Nations General Assembly
> September 25, 2009

Al-Shabaab's leadership was supportive of al-Qa'ida (AQ), and both groups continued to present a serious terrorist threat to American and allied interests throughout the Horn of Africa.  Due to ongoing fighting between designated Foreign Terrorist Organization al-Shabaab, Hizbul Islam, other armed factions and militias and Somalia's Transitional Federal Government (TFG), Somalia remained highly unstable, and a permissive environment for terrorist transit and training.  Foreign fighters, a small number of AQ operatives, and likeminded indigenous Islamic extremists continued to pose a threat to regional security.  Fazul Abdullah Mohammed, aka Harun Fazul, one of several AQ leaders charged with carrying out the 1998 bombings of the U.S. embassies in Kenya and Tanzania, most likely remained in the region.  Senior al-Qa'ida in East Africa leader Saleh Ali Saleh Nabhan was killed in al-Shabaab controlled territory in mid-September.

In the Trans-Sahara, al-Qa'ida in the Islamic Maghreb (AQIM) expanded its reach in the Sahel, conducting kidnappings of Spanish, French, German, and Italian citizens in Mauritania, Niger, and Mali.  In June, AQIM murdered a British citizen in northern Mali and an American citizen in Mauritania, and assassinated a Malian military official.  A small Malian military response to the assassination was subsequently defeated.  In August, AQIM launched an unsuccessful suicide bomb attack in the vicinity of the French embassy in Mauritania.

The Financial Action Task Force (FATF), as the international standard-setting body to address threats of money laundering, terrorist financing, and other related crimes, has established a network of countries around the world.  These FATF-Style Regional Bodies (FSRBs) have the potential to serve both as a disciplinarian and as a resource.  In sub-Saharan Africa, there are two such bodies recognized by the FATF: the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) and the Intergovernmental Action Group against Money Laundering and Terrorist Financing (GIABA).  Like FATF and the other FSRBs, they conducted mutual evaluations, worked on various framework and implementation issues, and provided training for their members.  Despite the existence and activities of these groups, Africa remained the single region in the world without FSRB coverage over wide swaths of its countries.  FATF has

Page | 13

PX205

attempted to organize an RSRB in Central Africa, where the majority of unsubscribed countries are located.

**The Trans-Sahara Counterterrorism Partnership (TSCTP)**

The Trans-Sahara Counterterrorism Partnership (TSCTP) is a multi-faceted, multi-year strategy designed to combat violent extremism, and contain and marginalize terrorist organizations by strengthening individual-country and regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security and intelligence organizations, promoting democratic governance, and discrediting terrorist ideology. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria, Senegal, and Burkina Faso); to confront the challenge posed by terrorist organizations in the trans-Sahara; and to facilitate cooperation between those countries and U.S. partners in the Maghreb (Morocco, Algeria, and Tunisia).

The TSCTP was developed as a follow-on to the Pan-Sahel Initiative, which focused solely on the Sahel. Ongoing concern that extremists continued to seek safe havens and support networks in the Maghreb and Sahel – as well as recognition that al-Qa'ida and others were seeking to impose radical ideologies on traditionally moderate Muslim populations in the region – highlighted the urgency of creating an integrated approach to addressing current threats and preventing conditions that could foster persistent threats in the future.

TSCTP has been successful in slowly building capacity and cooperation despite political setbacks over the years caused by coup d'etats, ethnic rebellions, and extra-constitutional actions that have interrupted progress and work with select countries of the partnership.

TSCTP's main elements include:

- Continued specialized Antiterrorism Assistance Training, Terrorist Interdiction Program, and Counterterrorist Finance activities in the Trans-Sahara region, and possible regional expansion of those programs as well as other law enforcement-capacity building efforts;

- Public diplomacy programs that expand outreach efforts in the Trans-Sahara region and seek to develop regional programming embracing the vast and diverse region. Emphasis is on preserving the traditional tolerance and moderation displayed in most African Muslim communities and countering the development of extremism, particularly in youth and rural populations;

- Democratic governance programs that strive to provide adequate levels of U.S. government support for democratic and economic development in the Sahel, strengthening those states to withstand internal threats;

- Military programs intended to expand military-to-military cooperation, ensure adequate resources are available to train, advise, and assist regional forces; and establish

PX205

institutions promoting better regional cooperation, communication, and intelligence sharing.

**The African Union**

The African Union (AU) has several counterterrorism legal instruments, including a 1999 Convention on the Prevention and Combating of Terrorism, a 2002 Protocol to the Convention, and a 2004 Plan of Action.  The Addis Ababa-based AU Commission provided guidance to the 53 member states and coordinated limited technical assistance to cover member states' counterterrorism capability gaps.

The AU worked with member states to eliminate redundancies between the Algiers-based African Center for Study and Research in Terrorism (ACSRT) and the Committee on Intelligence and Security Services in Africa, which was first established at the AU Summit in Abuja, Nigeria, in January 2005.

The Department of State and the Department of Defense's African Center for Strategic Studies have collaborated with the AU to run counterterrorism workshops for African civilian and military officials.  These workshops, as well as regional counterterrorism seminars, examined the nature of terrorism threats on the continent, the capacity of countries to counter terrorism, and their needs for technical assistance to strengthen that capacity.

Some AU member states maintained that Africa's colonial legacy made it difficult to accept a definition of terrorism that excluded an exception for "freedom fighters."  Nonetheless, the AU is on record strongly condemning acts of terrorism.  On several occasions, AU Commission Chairperson Jean Ping publicly condemned acts of terrorism, including:

- On February 16 after two deadly bombs in Algeria;
- On February 23 after a deadly blast in Cairo;
- On September 18 following a terrorist attack on the Force Headquarters of the AU Mission in Somalia (AMISOM) in Mogadishu; and
- On December 4 after a suicide bomb killed more than 50 people, including three Somali government ministers, at a graduation ceremony for medical students in Mogadishu. AMISOM maintained several thousand Ugandan and Burundian troops in Mogadishu to protect the Somali Transitional Federal Government.

On July 3, at the AU's 13th Ordinary Session of the Assembly in Libya, AU heads of state adopted a decision to combat the payment of ransom to terrorist groups.

Although the AU Commission had the strong political will to act as an effective counterterrorism partner, AU staffing remained below requisite levels.  Consequently, capacity remained relatively weak.  The AU created a counterterrorism unit at its Addis Ababa headquarters to coordinate and promote member state counterterrorism efforts more effectively. The AU welcomed technical and financial assistance from international partners and donors to

Page | 15

PX205

bolster both AU headquarters and ACSRT activities approved by member states.

**Angola**

Angola's borders remained porous and vulnerable to movements of small arms, diamonds, and other possible sources of terrorist financing. That said, there is no evidence of a terrorist presence in Angola. Angola's high rate of U.S. dollar cash flow made its financial system an attractive site for money laundering, and the government's capacity to detect financial crimes remained limited. On December 14, however, the government agreed to allow for the placement of an advisor from the U.S. Treasury Department in the Angolan Ministry of Finance and Central Bank. This advisor will help Angola promote transparency in its financial system. Corruption, lack of infrastructure, and insufficient capacity continued to hinder Angola's border control and law enforcement capacities. The government's limited law enforcement resources were directed towards border control and stemming the flow of illegal immigrants into the country. In May, the U.S. Treasury Department designated Kassim Tajideen, an important financial contributor to Hizballah with extensive business interests in Angola, as a Specially Designated Global Terrorist under Executive Order 13224.

**Botswana**

Botswana has a National Counterterrorism Committee to address issues pertaining to terrorism and weapons of mass destruction. Botswana established its first intelligence agency in 2008, with responsibility for both domestic and foreign intelligence gathering. In April, Botswana's Parliament passed legislation to create a Financial Intelligence Unit (FIU), which will harmonize Botswana's anti-money laundering and counterterrorist financing regime. While the legislation for this has been enacted, the FIU was not yet established at year's end. Until the FIU is functioning, the Directorate on Corruption and Economic Crimes has a dedicated unit that will continue investigating suspicious transactions. One goal of this legislation is to decrease the likelihood that terrorist financing could move through Botswana's financial institutions. Terrorist financing is not criminalized as a specific offense in Botswana. However, acts of terrorism and related offenses, such as aiding and abetting, can be prosecuted under the Penal Code and under the Arms and Ammunitions Act.

**Burkina Faso**

Despite its lack of resources, Burkina Faso was serious about countering terrorism. The government cooperated with the United States in its counterterrorism efforts where possible, and participated in training, seminars, and exercises, such as the regional Flintlock exercise held in Spain and Mali, and familiarization events offered by U.S. Africa Command and Special Operations Command Europe. In December 2008, Burkina Faso was accepted as a member of the Trans-Sahara Counterterrorism Partnership and is now eligible for various programs aimed at improving the nation's capacity to combat terrorism. Outside of U.S. cooperation, the government participated in regional efforts at combating terrorism, including with the Economic Community of West African States, the African Union, and other international organizations.

PX205

There is no formal method for tracking movement into and out of the country at border checkpoints, or at either of the country's two commercial airports.

**Burundi**

The United States has provided training and assistance to Burundi, and its recent contribution of troops to the African Union Mission in Somalia, brought threats from the Somalia-based terrorist group al-Shabaab.  Aware of its limited counterterrorism capabilities, Burundi has asked the international community for assistance and expertise in countering terrorism.

**Cape Verde**

Cape Verdean authorities continued to prosecute a case against Jean-Charles Mendes Da Silva, a French citizen and alleged member of the Algerian terrorist organization, the Armed Islamic Group.[2]  On March 10, 2007, Cape Verdean police arrested Da Silva on an Interpol warrant and unrelated forgery and weapons charges.  A Cape Verdean court convicted him of those crimes, as well as of certain criminal offenses related to his activities in France, but prosecutors declined to seek a conviction under Cape Verde's counterterrorism laws.  Moreover, Cape Verde refused the French government's request to extradite Da Silva, because he had claimed and obtained Cape Verdean citizenship prior to his arrest.[3]  At year's end Da Silva was awaiting sentencing.

With respect to counterterrorism legislation, Cape Verdean law specifically criminalizes terrorist activity, including the provision of material assistance to terrorists.  The code of criminal procedure gives police wide authority to perform wiretaps and warrantless searches in cases of suspected terrorism.  Additionally, in November Cape Verde's two major political parties informally agreed to amend the Cape Verdean constitution in order to allow nighttime searches and seizures in such circumstances.

Cape Verdean law enforcement has taken special measures to prevent terrorists from entering the country.  Immigration authorities check names of visitors against a database of actual and suspected terrorists, which includes data furnished by the U.S. government.  Cape Verde was in the process of obtaining access to certain data from the FBI's Integrated Automated Fingerprint Identification System, and also participated in the Economic Community Of West African States Warning and Response Network, an information sharing program addressing security issues.

**Comoros**

---

[2] In 2000, Da Silva escaped from a French prison where he had been incarcerated for participating in a Paris-area bombing.  According to media reports, the French Directorate-General for External Security believes Da Silva contacted terrorist organizations throughout North Africa after his escape and then sought refuge in Cape Verde, where he attempted to establish a terrorist cell.

[3] The Cape Verdean constitution forbids extradition of its citizens, and some speculate that Da Silva claimed citizenship when he arrived in Cape Verde specifically to obtain this protection.

PX205

Comoran security forces had limited resources and training in counterterrorism and maritime security, and remained vulnerable to terrorist transit. However, Comoran authorities welcomed the visit of a U.S. Coast Guard International Port Security team in November, and Comoran police and security forces participated in U.S. counterterrorism assistance programs and cooperated with the Rewards for Justice Program. International terrorism concerns in Comoros focused on Comoran national Fazul Abdullah Mohammed (a.k.a. Harun Fazul), who is suspected of involvement in the 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam.

President Sambi, democratically elected in 2006, reconfirmed Comoros' rejection of terrorism and, with Comoran religious leaders, publicly rejected religious extremism.

**Democratic Republic of Congo**

The Democratic Republic of the Congo (DRC) was cooperative on counterterrorism issues when resources were provided. The Government of the DRC focused its limited fiscal, military, and diplomatic resources on trying to maintain a hard-fought, tenuous peace. The fragile internal security situation was aggravated by foreign-based armed rebel groups operating with relative impunity in contested areas of the country. The DRC's lack of capacity to secure its borders, monitor large tracts of sparsely populated and remote territory, and unfamiliarity with the issue of global terrorism could make it vulnerable as a staging ground for transnational criminal or terrorist groups; however, such activities would be hindered by the lack of transportation and telecommunications infrastructure, as well as a generally non-violent domestic population. The Congolese national intelligence apparatus similarly lacked an ability to identify and disrupt any potential domestic terrorist threats.

**Cote D'Ivoire**

On August 6, Ivoirian authorities detained Imam Abd al Menhem Qubaysi, a Hizballah spiritual leader and U.S. designated terrorist financier, at the airport upon his arrival on a commercial flight from Lebanon. Qubaysi, who lived in Cote d'Ivoire for a number of years, was denied entry at immigration and returned to Lebanon on the same flight.

The Ivoirian Ministry of Interior, in cooperation with the United States, uses the Personal Identification Secure Comparison and Evaluation System (PISCES) to enhance border security at its major airport and seaport. The Financial Intelligence Unit (FIU), which was formed in 2008, received additional legal authority when Ordinance 637 on terrorism financing became law on November 12, 2009. The law extends FIU activities to the receipt, analysis, and dissemination of information on transactions suspected of being terrorism-related.

**Djibouti**

Djibouti was one of the most forward-leaning Arab League members supporting ongoing counterterrorism efforts. President Ismail Omar Guelleh and other top leaders in Djibouti repeatedly expressed their country's full and unqualified support for the international counterterrorism efforts. Although the government's counterterrorism capabilities were limited,

PX205

Djiboutian counterparts were proactive, and were highly receptive and responsive to U.S. requests for counterterrorism cooperation.  The Djiboutian National Security Services and law enforcement agencies took extraordinary measures with their limited resources to ensure the safety and security of American citizens, the U.S. Embassy, and the U.S. military base at Camp Lemonnier.  Limited resources continued to hamper the government's ability to comprehensively control its porous borders, especially with Somaliland.  Nevertheless, the government continued to support overall enhanced border security, notably by inviting the International Organization for Migration to set up an office in Djibouti, and by issuing machine-readable travel documents.  More broadly, the government also played a constructive role in hosting regional initiatives addressing peace and security in the Horn of Africa.

**Eritrea**

In May 2009, the Department of State again certified Eritrea as a country that is "not cooperating fully" with U.S. antiterrorism efforts.  The lack of Eritrean cooperation has constrained the ability of the United States and international partners to counter terrorist groups in the Horn of Africa and Somalia, particularly with respect to al-Shabaab leaders linked to al-Qa'ida.  In late 2009, the UN Security Council created a sanctions regime on Eritrea that includes a territorial arms embargo and an asset freeze, travel ban, and arms embargo for those individuals and entities listed by the UN Somalia Sanctions Committee.

The Government of Eritrea has provided safe haven to political officials aligned with the now obsolete Alliance for the Re-Liberation of Somalia (ARS), including U.S. designated terrorist Sheikh Hassan Dahir Aweys, who resided in Asmara until May but is now in southern Somalia leading a faction of Hizbul Islam.

**Ethiopia**

The Ethiopian government remained concerned about terrorist-related activities in neighboring Somalia.  The Ethiopian military's January 2009 withdrawal from Somalia reduced the rationale long used by Somalia-based extremists as grounds for targeting Ethiopia.  By bolstering defensive forces along the Ethio-Somali border, the Ethiopians further reinforced defensive mechanisms to stem potential infiltration of extremists into Ethiopia.  Ethiopia is a member state and was in the rotating chair of the Inter-Governmental Authority on Development (IGAD), and also participated actively in IGAD's Capacity Building Program Against Terrorism (ICPAT) to bolster the counterterrorism capacity of IGAD member states.

Ethiopia's National Intelligence and Security Service (NISS), with broad authority for intelligence, border security, and criminal investigation was responsible for overall counterterrorism management.  The Ethiopian Federal Police (EFP) worked in conjunction with NISS on counterterrorism.  Key among Ethiopia's counterterrorism objectives is combating terrorist groups like al-Shabaab and the United Western Somali Liberation Front.

Ethiopia has requested U.S. assistance to craft legislation and provide other technical assistance to establish a regime to combat terrorist financing, and is more focused on seeking prosecution of

PX205

counterterrorism suspects since the new Antiterrorism Law was passed in July.  Ethiopia was an active participant in African Union (AU) counterterrorism efforts, participating in the AU's Center for Study and Research on Terrorism, and in meetings of the Committee of Intelligence and Security Services of Africa (CISSA).

The United States continued to support Ethiopia's counterterrorism capabilities.  Antiterrorism Assistance Training participants included front line supervisors engaged in land border management at ports of entry and senior police leaders studying their role in combating terrorism on the strategic, regional, and national levels.  Students were taught to analyze terrorist activities including financing, confidential source handling, development and information management sharing.  This year's goal was to address the ability to disseminate information across agencies and countries, and to concentrate on the large issue of stabilizing the Horn of Africa by countering terrorism on a multilateral front.

Ethiopia's location within the Horn of Africa made it vulnerable to money laundering activities perpetrated by transnational criminal organizations, terrorists, and narcotics traffickers. On November 19, parliament passed anti-money laundering/combating the financing of terrorism (AML/CFT) legislation that had been supported through technical advice from the U.S. Department of Treasury.  This legislation formally created Ethiopia's first financial intelligence unit called the Financial Information Center.  This new Center is charged with implementing this new legislation.

**Gabon**

Despite its lack of resources, Gabon cooperated with the United States in its efforts to combat terrorism, where possible, and participated in numerous training programs, seminars, and exercises offered by U.S. Africa Command (AFRICOM).  Gabon lacked the resources necessary to protect its borders adequately and to monitor the movement of potential terrorists, especially along its unpatrolled land borders.  Airfields in Gabon are unsecured and generally in need of significant security infrastructure improvements.  The Government of Gabon made significant strides in improving its maritime security and restricting illegal access to the country via the Gulf of Guinea.  Gabon has taken steps to upgrade security at its port facilities in Owendo, Port Mole, and Port Gentil.

**Ghana**

In 2008, Ghana enacted the Counterterrorism Act, which called for implementation of a national identification card.  The cards will contain biometric data such as fingerprints and photos, but the national identification card has not yet been introduced.  Forms of identification with biometrics were not in widespread use, although the Ghanaian driver's license is issued with a fingerprint as part of the individual's application.  Most citizens use their voter registration card and a passport for identification.  In 2009, Ghanaian passports issued were machine readable but lacked biometric features.

PX205

Ghana passed an anti-money laundering law in 2008 that provided for the establishment of a Financial Intelligence Unit (FIU).  At the end of 2009, the FIU was not yet operational. However, six potential FIU members, including the Chief Executive Officer, were identified and sent to the United States for training.

U.S. Africa Command provided technical and training assistance to the Ghanaian Navy for the three "Defender" class patrol boats they received in 2008 and the additional four boats delivered in December. The patrol boats are intended to improve maritime interdiction capacity and to address Ghana's limited ability to patrol its porous borders.

The Governments of Ghana and Togo signed an agreement in October to cooperate on crime and security problems such as human trafficking, small weapons trafficking, money laundering, and counterterrorism.  The agreement is part of a larger strategy to accelerate regional integration and the free movement of persons, goods, and services; and to intensify trade and economic relations within the sub-region.

**Kenya**

Cross-border kidnappings and arms smuggling, reports of extremist recruiting within refugee camps and Kenyan cities, increased allegations of terrorist plotting, and public threats by al-Shabaab leaders led to a heightened recognition among government officials, the diplomatic community, and civil society that Kenya remained vulnerable to terrorist attacks.  Whereas Kenyans have traditionally perceived terrorism as primarily a 'foreign' problem, during the past year an increasing number of Kenyan citizens and government officials came to recognize that their own country and society were threatened by violent extremists.

Kenya did demonstrate increased political will to prevent infiltration into the country and apprehend suspected terrorists, although porous borders make that task extremely difficult.  The government took some steps to increase security along the long Kenya/Somalia border and to track down extremists operating inside the country.

Al-Shabaab's continued dominance of most of southern Somalia provided a permissive environment for a small number of al-Qa'ida operatives to conduct training and terrorist planning with sympathetic Islamic extremists, to include foreign fighters.  Although the Kenya-Somalia border officially remained closed, large numbers of Somali refugees continued to flee to refugee camps in Kenya in order to escape the fighting and drought.  Armed militants crossed the porous border into Kenya to obtain supplies, funding, medical care, and recruits.  There was a disturbing increase in incidents of armed Somalis crossing the border to kidnap foreigners inside Kenya.  In February, two Italian nuns who had been kidnapped from the Kenyan border town of El Wak in late 2008 were released.  In July, gunmen claiming to belong to al-Shabaab kidnapped three foreign aid workers, including one American, inside Kenya and took them back to Somalia. The militants released the hostages in October.  In mid-December, armed Somalis attempted to kidnap an Italian nun working in the northeastern town of Wajir but were driven off by Kenyan police.

Page | 21

PX205

Despite increased concern over security and Kenya's strong counterterrorism partnership with the U.S. government, the lack of counterterrorism and anti-money laundering legislation during most of 2009 hindered Kenya's efforts to combat violent extremism.  Existing laws did not permit police to detain terrorist suspects and prosecute them effectively.  The government did not submit a revised version of counterterrorism legislation that was defeated in 2006.  The Kenyan anti-money laundering bill was passed by parliament and signed into law at the end of the year.

The United States continued to enjoy close and productive ties with the Kenyan Armed Forces.  During the year the United States provided training and equipment to the Kenya Navy for coastal security and maritime domain awareness.  Equipment grants included six coastal radar sites and three Defender class patrol boats, plus training and spare parts for existing equipment.  The United States also assisted the Kenyan Army to train and equip two Infantry Battalions and one Ranger Strike Force company tasked with providing border security.

Kenyan law enforcement agencies also worked with the United States and other allies to increase their counterterrorism abilities.  Security along Kenya's land and maritime borders remained a primary focus of these efforts.  The Kenyan Maritime Police Unit (MPU) and other agencies not only received equipment and training for coastal security from the State Department's Antiterrorism Assistance (ATA) program, but also demonstrated an increasing degree of self-sufficiency.  During the latest iterations of ATA's 11-week Comprehensive Maritime Security Training program, previous graduates of the course served as associate instructors.  ATA-trained Kenyan personnel also developed and presented a basic two-week maritime operations course to professionals from multiple security agencies at the Kenya Wildlife Service (KWS) Marine Camp in Malindi.  In December, the U.S. Ambassador formally donated three patrol boats for use by the MPU and Administrative Police (AP) coastal security forces.  Other ATA courses provided training in border control management, fraudulent travel documents, protecting digital infrastructure, and internet investigations.  ATA also provided digital forensic equipment and training to the Kenyan Police Service (KPS).

The U.S. Department of Justice, through the offices of the Resident Legal Advisor and Senior Law Enforcement Advisor, conducted a number of training activities aimed at building the capacity of police and prosecutors.  Courses included trial advocacy, witness protection, trafficking in persons, forensic and digital evidence, cyber crimes, and piracy.  In December, Kenya and 10 other regional countries participated in a U.S. Department of Justice-sponsored regional conference on combating criminal organizations, including terrorist organizations.  Conference topics included terrorist financing, cooperation between intelligence and law enforcement agencies, electronic evidence gathering, and legal regimes.  The FBI also provided training and equipment to the KPS, the AP, and the KWS.  Training activities included crime scene investigation and terrorist finance, and money laundering.  Equipment grants included fingerprint kits and gyro-stabilized binoculars for use in air surveillance operations.

In July and August, the Department of Homeland Security's Customs and Border Protection (CBP) provided specialized training and equipment to the newly established AP border patrol unit and the KWS.  In September, ATA funded a study tour for AP and KWS personnel to

PX205

observe CBP operations along the Mexican-American border and to meet with State Department and Department of Homeland Security officials in Washington, DC.

**Liberia**

Despite limited resources, inadequately trained personnel, and a weak judicial system – products of 14 years of civil war – the Government of Liberia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism.  Through rule of law and security sector reform assistance programs, the United States supported a number of initiatives that addressed Liberia's vulnerabilities, which included porous borders, rampant identification document fraud, lax immigration controls, wide-scale corruption, and underpaid law enforcement, security, and customs personnel.

The Government of Liberia took steps to improve security at the Freeport of Monrovia, and the U.S. Coast Guard certified the port compliant under the International Port Security Program. The Transportation Security Administration worked with the Liberia Civil Aviation Authority to improve security at Roberts International Airport in order to make it compliant under the International Civil Aviation Organization (ICAO).  However, at year's end, RIA remained ICAO non-compliant.

**Madagascar**

Despite several steps taken in 2008 to counter terrorism, progress stalled in 2009 due to a political crisis that weakened government operations.  Following an unconstitutional change of government in March, the United States had limited engagement with the de facto authorities, who did demonstrate a willingness to cooperate in law enforcement matters, however.  The government budget suffered due to a suspension of foreign aid programs, negatively affecting public investment throughout the island.

To combat terrorist threats, the government previously created the Central Counterterrorism Service within the Ministry of Interior to work with INTERPOL and to provide information within the framework of regional and international cooperation.  It also created a special counterterrorism branch within the Central Intelligence Service.  These entities continued to function during the year, but did not fulfill their full roles.

The Financial Intelligence Unit (SAMIFIN) launched in June 2008 to combat money laundering, including terrorist finance, remained nominally operational, but its work was seriously limited by budget constraints.

Although the Malagasy government took steps to create a coast guard to improve maritime security and border control in 2008, no further progress was made in 2009, and the coast guard was not yet operational.  Parliament was disbanded after the March coup, so no action was taken on a draft 2008 bill that would have implemented the provisions of several universal counterterrorism instruments, including UN Security Council Resolution 1373.

PX205

Political unrest and limited resources severely constrained Madagascar's ability to confront a potential terrorist threat.  The Malagasy authorities lacked the capacity to effectively monitor suspect organizations, control suspicious financial transactions, identify terrorist suspects, and control the movement of people and goods across its borders.

**Mali**

In contrast to 2008, 2009 saw increased terrorist activity on Malian soil, although at the end of the year it was unclear if this increased activity was indicative of a long-term change in the terrorist environment in Mali.

- On May 31, al-Qa'ida in the Islamic Maghreb (AQIM) executed a British citizen, Edwin Dyer, who had been kidnapped in Niger on January 22 and held in northern Mali along with several other western hostages.

- On June 10, AQIM elements assassinated Malian State Security officer Colonel Lamana Ould Bou at his residence in Timbuktu.

- On November 29, three Spanish aid workers were kidnapped by AQIM in Mauritania, but were brought to northern Mali, where they were still being held at year's end.

- On December 18, AQIM kidnapped two Italians in Mauritania, but brought them to northern Mali, where they were still being held at year's end.

Although the Malian government was aware that northern Mali was being used by AQIM as a safe haven, Mali's long, porous borders and a general lack of resources have hindered the country's ability to combat AQIM effectively.

Although the kidnapping of westerners is a continuation of AQIM's tactics of prior years, the execution of Edwin Dyer, the kidnapping of Pierre Camatte on Malian soil, and the attacks against Colonel Ould Bou and the Malian army represented a significant departure from AQIM's prior tactics in northern Mali.

Following the assassination of Colonel Ould Bou, the Malians launched a military operation in northern Mali targeting AQIM.  The Malian military effort included extended patrols through areas where AQIM was thought to be present, and resulted in engagements on June 15 and in July.  The beginning of the rainy season led to a lull in military action.

Mali continued to address terrorist financing issues.  Mali's National Section for the Processing of Financial Information, which began operations in May 2008, received eight reports of suspicious financial activities during the year, although ongoing investigations have not yet revealed any links to terrorist financing or terrorist activity.

Mali has expressed a willingness to increase regional cooperation against AQIM and terrorism generally.  Mali is a Trans-Sahara Counterterrorism Partnership country.  Mali also works with

PX205

other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania. Malian President Amadou Toumani Toure has long called for a regional Heads of State Summit to be held in Bamako to discuss coordination of counterterrorism efforts, including improved border monitoring and security.  On August 12 in Algeria, Mali participated in a meeting with military chiefs of staff from Algeria, Mauritania, and Niger to draft a counterterrorism strategy for the Sahara.

Mali is an engaged and active member of the Trans-Sahara Counterterrorism Partnership.  It is also an active participant in U.S. programs including bilateral, joint combined exchange and regional military training, and the Antiterrorism Assistance Training program.

**Mauritania**

Al-Qa'ida in the Islamic Maghreb (AQIM) represented the primary terrorist threat to Mauritania. After two attacks in late December 2007 and two others in 2008, including the February attack against the Israeli embassy and the September attack in Tourine that cost the lives of 11 soldiers and their civilian guide, AQIM significantly increased its level of activity and severity of attacks.

- On June 23, American citizen Christopher Leggett was murdered by two gunmen upon arriving at his workplace in Nouakchott.  AQIM claimed responsibility for the murder, stating Leggett was targeted for Christian proselytizing activities.

- On August 8, a suicide bomber affiliated with AQIM detonated his explosive belt next to the French Embassy compound in Nouakchott.  There were no fatalities other than the attacker. This marks the first suicide bomber attack in Mauritania's history.

- On November 29, three Spanish aid workers traveling in a caravan from Nouadhibou to Nouakchott were kidnapped by gunmen in an attack claimed by AQIM.

- On December 18, AQIM kidnapped two Italians in Mauritania near the border with Mali who were believed to be held in Northern Mali at year's end.

The lawless eastern and northern regions of Mauritania were a haven for smugglers and terrorists. The porous borders with Algeria, Mali, and Western Sahara posed ongoing challenges for the ill-equipped and poorly funded Mauritanian security services.  In the case of the Leggett murder and the suicide bomber attack, terrorists entered Mauritania from outside the country with the sole intention of carrying out operations.  Through the year, there were specific threats against U.S. interests and citizens in Mauritania.

The August 6, 2008 coup d'etat against democratically elected President Sidi Ould Cheikh Abdallahi resulted in the suspension of all U.S. government non-humanitarian assistance, including most military cooperation and counterterrorism training to the junta-led government. Constitutional order was restored eleven months after the coup following Abdallahi's resignation and the naming of a transitional government of national unity that led the country to presidential

Page | 25

PX205

elections on July 18, won by Mohamed Ould Abdel Aziz and recognized by the international community.  The United States re-initiated its cooperation with the newly formed Mauritanian government in September.  Programs focusing on counterterrorism included the Counterterrorism Fellowship Program training of military counterterrorism units under the Joint Combined Exercise Training Program, and an Anti-Terrorism Assistance border security program.  Prior to the coup, the United States provided counterterrorism training to two Mauritanian units and plans to continue strengthening its military capacity.

In response to the increased terrorist threat in Mauritania, the government strengthened roadblocks and road security.  In November, authorities announced the creation of a new Road Security Agency in charge of monitoring terrorist activity and all forms of trafficking on Mauritanian roads.

The government has consistently exhibited a willingness to cooperate with the United States to prevent and deter future acts of terrorism.  Mauritanian authorities have been highly responsive to U.S. requests for security support, both for routine operations as well as special events, despite security forces' somewhat limited means.

The Mauritanian government has also displayed a willingness to both investigate and apprehend individuals involved in acts of terrorism against U.S. citizens or interests, as shown by the arrest of the entire terrorist cell responsible for planning and executing the Leggett murder.  Two members of the cell were apprehended on July 17 and the remaining members were taken into custody days later.

As of December 31, the Mauritanian government held in custody approximately 66 terrorist suspects.  Roughly thirteen of them have already been prosecuted and sentenced.  In July, the Nouakchott court sentenced Abdel Jelil Ould Biye and Teyeb Ould Saleck, two terrorists who participated in the 2005 Lemgheity attack, to eight and seven years respectively.  In November, the Government of Senegal extradited to Mauritania three Mauritanians allegedly implicated in the August 8 suicide bomber attack against the French Embassy.

Mauritania is a Trans-Sahara Counterterrorism Partnership country and also works with other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania.  In order to improve regional coordination in the fight against terrorism, Mauritania participated in an August 12 meeting in Tamanrasset, Algeria with military chiefs of staff from Algeria, Mali, and Niger to draft a counterterrorism strategy for the Sahara.  According to the agreement, Mauritania will deploy 4,000 soldiers to secure its borders with Mali and Algeria.  Mauritania has strong bilateral military and counterterrorism cooperation with France.

**Niger**

The Nigerien government's counterterrorism program has improved to include the use of updated terrorist watch lists, more consistent border patrols, and regular monitoring of mosques believed to espouse extremist views.  Border crossings were not automated and relied on

PX205

handwritten ledgers to record entry and exit.  The government has been receptive to Western and regional counterterrorism training and is a Trans-Sahara Counterterrorism Partnership country. Niger also works with other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania.

Al-Qa'ida in the Islamic Maghreb (AQIM) demonstrated a greater interest in Niger in 2009, with attempts to extend its influence into Nigerien territory from the largely ungoverned region bordering Mali and Algeria.  The porous borders and ungoverned spaces provide terrorist groups such as AQIM a potential environment for recruiting, people and contraband smuggling, undetected transit, and logistical facilitation.  Niger's severe resource constraints stemming from its status as one of the poorest countries in the world, and the ongoing political crisis, hampered the Nigerien government's ability to prevent AQIM intrusion.

On December 14, 2008, AQIM-affiliated persons kidnapped and held hostage UN Special Envoy, Robert Fowler, his colleague, Louis Guay, and a local Nigerien driver.  They were seized by AQIM within 40 kilometers of Niamey, taken across the Mali border and held hostage in the Sahara desert for 130 days before being released.  On January 22, 2009, along the Mali/Niger border, AQIM-affiliated persons kidnapped four European tourists near the Niger/Mali border and held them hostage in the Sahara desert.  Three of the European hostages were released months later, but one British hostage was killed.

In October, an AQIM-linked Mauritanian was captured in Niamey following his involvement in terrorist related activities outside Niger.

On November 14, AQIM associates armed with AK-47 assault rifles attempted to kidnap five U.S. Embassy personnel from a hotel in Tahoua.  The failed operation was believed to have been sanctioned by AQIM leaders.  The perpetrators of this attempted kidnapping have yet to be captured.

Although the rise of violent extremist organizations in northern Nigeria has yet to directly impact southern Niger, a very real threat exists.  Northern Nigeria and southern Niger share a common Hausa ethnicity, numerous economic and cultural links, and a long, porous border.  Immediately following the July 2009 Nigerien break-up of the Boko Haram[4] group, Nigerien ties to the group were revealed when dozens of Boko Haram members were deported from Nigeria to their home cities in southern Niger.

**Nigeria**

In 2009, the Government of Nigeria continued efforts to improve coordination, communication, and cooperation between the executive and legislative branches on counterterrorism matters. Progress on counterterrorism legislation in the National Assembly slowed, however, due to

---

[4] Boko Haram is Hausa for "education is sin."  The sinful or forbidden "education" is commonly understood to mean western education.

PX205

reconciliation and consolidation issues between two rival terrorism bills and general legislative lethargy.  The National Focal Point on Terrorism, an interagency task force formed in February 2007 composed of the State Security Service (SSS), the Nigerian Customs Service, the Ministries of Foreign Affairs (MFA) and Immigration, and other relevant authorities, has been on an extended hiatus since the transfer of its SSS and MFA coordinators.  Nigeria is a Trans-Sahara Counterterrorism Partnership country.

Subsequently, on July 26, around 70 Islamic militants from a group calling itself "Boko Haram", and which some refer to as the "Nigerian Taliban", attacked an Izala mosque and police station in the Dutsen Tanshi section of Bauchi town with firearms and hand grenades.  The attacks resulted in at least 55 deaths and up to 200 arrests.  The following day, Boko Haram carried out near-simultaneous attacks against police headquarters in Maiduguri, Borno State, and police stations in Potsikum, Yobe State; and Wudil, Kano State; provoking police and military sweeps in several states thought to harbor Boko Haram members and sympathizers.  Running clashes between security forces and militants reportedly resulted in around 700 deaths, including innocent bystanders.  The situation is reminiscent of the largely rural, anti-establishment, and radical movement known as Maitatsine which caused riots in Kano State in December 1980, in which over 4,000 people reportedly died.

The Nigerian military captured Maiduguri-based Boko Haram spiritual leader Mohammed Yusuf alive after a siege of his compound, and turned him over to Maiduguri police, whose colleagues had been killed by the group.  A local policeman summarily executed Yusuf in front of the station in full view of onlookers, after parading him before television cameras.  On August 17, al-Qa'ida in the Islamic Maghreb (AQIM) issued a "Statement of Consolation, Advice, and Condolences to our Brothers and Family in Nigeria."

Legislators merged a "private member" Senate bill based on the Commonwealth Secretariat's Model Legislative Provisions on Measures to Combat Terrorism, which passed its second reading on September 17, 2008, with an executive bill sponsored by the presidency.  The hybrid legislation, which resembles more the later executive bill, currently awaits a third and final reading in the Senate, before the President may sign it into law.  In an October 12, 2009 letter, Nigerian President Yar'Adua asked the National Assembly to pass the legislation to combat terrorism and kidnapping.  The bill stipulates a maximum jail term of only five years for those convicted of terrorism.

On December 25, Umar Farouk Abdulmutallab, who was associated with al-Qa'ida in the Arabian Peninsula, attempted to set off an explosive aboard a U.S.-flagged air carrier landing in Detroit, Michigan.  Abdulmutallab's flight originated in Nigeria and he changed planes in Amsterdam enroute to the United States.  The attack was unsuccessful and Abdulmutallab was charged by a U.S. court with offenses related to the attack.

The Nigerian government continued to operate USG-funded body scanners in all four international airports to detect explosives and drugs on passengers, with numerous successful interdictions of contraband, mainly drugs.  Despite repeated USG requests since 2007, the Nigerian government has yet to sign a memorandum of understanding sanctioning the use of

Page | 28

PX205

U.S. (and Nigerian) Federal Air Marshals on direct flights between Nigeria and the United States.  A Transportation Security Administration assessment team visited Nigeria from July 13-17 in conjunction with Delta Airlines' commencement of service from Abuja to New York.

The Nigerian government welcomes and actively participates in U.S. government-sponsored counterterrorism training and capacity building programs.  Progress continued on establishment of an additional Regional Maritime Awareness Capability (RMAC) radar station on the eastern coast to complement one already operational in Lagos.  The U.S. military assisted the Government of Nigeria with standing up a specialized counterterrorism unit within the Nigerian military.  The American Embassy's Office of Security Cooperation (OSC) conducted three Trans-Sahara Security Symposia in support of the Trans-Sahara Counterterrorism Partnership, addressing human development issues that may contribute to the spread of extremism and instability.  In addition, OSC sponsored the attendance of nine participants from various agencies at the Trans-Sahara Security Symposium at the Kofi Annan Peacekeeping Center in Accra, Ghana from December 14-18.

Nigerians participated in Antiterrorism Assistance (ATA) courses on: Terrorism Crime Scene Investigation, Airport Security Management, VIP Protection, VIP Protection Management, Fraudulent Documents, and Maritime Interdiction of Terrorism.

**Rwanda**

The Rwandan government worked to improve border control measures and prepared to create a financial investigations unit, in accordance with anti-money laundering/counterterrorist financing legislation adopted in 2008.  In November, Rwanda's parliament ratified the African Union protocol on the prevention and combating of terrorism.  In August, a U.S. Coast Guard team trained Rwandan security forces at Lake Kivu, bordering the Democratic Republic of the Congo (DRC), on maritime patrolling and law enforcement techniques.  During the year, Rwandan law enforcement officers participated in U.S.-sponsored training courses on criminal investigation techniques and small arms identification.

**Sao Tome and Principe**

Sao Tome and Principe has a lengthy coastline that remained porous and vulnerable to terrorist activities, smuggling, human trafficking, and other illegal activities.  While there have been no reports of terrorist activity, the country's capacity to monitor and disrupt terrorist threats was limited due to lack of resources, lack of adequate equipment and infrastructure, and insufficient administrative and financial capacity.

Despite the lack of resources and capabilities, Sao Tome and Principe cooperated with the United States and other partners in its efforts to counter terrorism.  Working with the United States, Sao Tome and Principe trained and equipped local security forces in counterterrorism and maritime security to build institutional capacity and knowledge.  The government created regulatory and management bodies in an effort to improve control of its border.  The Sao Tomean immigration service terminated or refused visas of individuals suspected of money

PX205

laundering, created a Maritime and Port Security Institute, funded the establishment of a Financial Intelligence Unit at the Central Bank, and supported the establishment of a radar and tracking systems program with the Sao Tomean Coast Guard.

**Senegal**

The Government of Senegal cooperated with the United States to identify terrorist groups operating in Senegalese territory. Senegal lacked specific counterterrorism legislation and current laws made it difficult to prosecute terrorist suspects. More work remained to be done to develop first responder services, to facilitate the quick sharing of information between agencies, and to control porous borders where police and security services were undermanned and ill-equipped to prevent illicit cross-border trafficking. The Government of Senegal continued to welcome U.S.-assisted efforts to augment its border security. Although al-Qa'ida in the Islamic Maghreb did not launch attacks or secure safe haven in Senegal, it continued to be active in the neighboring countries of Mauritania and Mali and attempted to set up transit points and facilitation networks in Senegal. Senegal is a Trans-Sahara Counterterrorism Partnership country.

Senegal participated in regional efforts to combat terrorist finance. One of the first Financial Intelligence Units (FIUs) in the sub-region, Senegal's FIU, known as CENTIF, has been active in sponsoring and holding implementation and awareness workshops on anti-money laundering/terrorist finance issues for its own stakeholders as well as for counterparts from around the sub-region. Senegal is a member of the Intergovernmental Anti-Money Laundering Group in Africa.

**Somalia**

The fragile hold on power of Somalia's Transitional Federal Government (TFG), a protracted state of violent instability, long unguarded coasts, porous borders, and proximity to the Arabian Peninsula, made Somalia an attractive location for international terrorists seeking a transit or launching point for operations there or elsewhere. Despite continuing peace efforts by the TFG and other moderate forces not formally aligned with the TFG, the terrorist and insurgent groups al-Shabaab and Hizbul Islam continued to exercise control over much of southern Somalia. The TFG and peacekeepers of the African Union Mission in Somalia (AMISOM) were confined to parts of Mogadishu. Foreign fighters were involved in al-Shabaab's fight against rival militias and the TFG. Several foreign extremists were involved in terrorist attacks in Somalia, including suicide bombings.

In January, the last Ethiopian troops withdrew from Somalia. On January 31, Somalia's newly expanded parliament, meeting in Djibouti under UN auspices, elected the former leader of the Islamic Courts Union, Sheikh Sharif Sheikh Ahmed, as president of Somalia. The move came just days after the Djibouti wing of the Alliance for the Re-Liberation of Somalia entered into a power-sharing deal with the TFG. Over the next several months Sharif announced the imposition of moderate sharia law in Somalia and made other efforts to reach out to the opposition, but al-Shabaab and other radical groups rejected these moves. Armed Islamist group

Page | 30

PX205

attacks in May through July left the TFG isolated in Mogadishu and reliant on AMISOM for protection. The capability of the TFG and other Somali local and regional authorities to carry out counterterrorism activities was extremely limited.

Al-Shabaab's leadership has connections with al-Qa'ida (AQ); several senior al-Shabaab leaders have publicly proclaimed loyalty to al-Qa'ida. Al-Shabaab consists of a disparate grouping of armed clan militias, many of whom do not adhere to the ideology that is held by the group's leaders. These leaders have founded and support a number of training camps in southern Somalia for young national and international recruits to al-Shabaab. In these camps, AQ-affiliated foreign fighters often lead the training and indoctrination of the recruits. Al-Shabaab and other extremists conducted suicide attacks, remote-controlled roadside bombings, kidnappings, and assassinations of government officials, journalists, humanitarian workers, and civil society leaders throughout Somalia. Al-Shabaab threatened UN and other foreign aid agencies and their staff.

On September 14, AQ senior leader and al-Shabaab trainer Saleh Ali Saleh Nabhan was killed in al-Shabaab controlled territory in southern Somalia. Nabhan was an associate of Fazul Abdullah Mohammed, aka Harun Fazul, one of several al-Qa'ida leaders charged with carrying out the 1998 bombings of the U.S. embassies in Kenya and Tanzania. In November, Fazul was reportedly named Nabhan's successor as AQ leader in Somalia.

Although AQ and al-Shabaab are not formally merged, they produce mutually supportive rhetoric. In March, AQ released a video entitled "Fight on, Champions of Somalia" in which Usama bin Ladin urged al-Shabaab to overthrow the TFG. On September 21, al-Shabaab proclaimed its allegiance to Usama bin Ladin in a video entitled "At Your Service, Osama." The 48-minute film was posted on Islamist Internet forums while al-Shabaab fighters distributed DVD copies and organized public screenings in Mogadishu.

During the year there were numerous high profile terrorist attacks inside Somalia. Some of these operations were conducted by al-Shabaab, others by insurgent or criminal groups:

- On February 22, a double suicide bombing on an AMISOM base killed 11 soldiers and wounded 15 others.

- On March 26, a roadside bomb injured Somalia's interior minister Sheik Abdulkadir Ali Omar and killed his secretary in Mogadishu.

- On April 19, gunmen kidnapped two foreigners working for Medecins Sans Frontieres (MSF) in Huddur, Bakool region. They were released ten days later. Shortly thereafter, MSF announced that deteriorating security was forcing it to close the Huddur health center and four others in Somalia.

- On May 17, four foreign fighters and 13 other al-Shabaab members reportedly died in Mogadishu when the vehicle bomb they were constructing detonated prematurely.

Page | 31

PX205

- On May 24, an al-Shabaab suicide bomber killed six policemen and a civilian at a police headquarters in Mogadishu.

- On June 18, an al-Shabaab suicide bomber killed 35 people in Beledweyne, including TFG Security Minister Omar Hashi Aden.

- On July 10, al-Shabaab militants in the city of Baidoa publicly beheaded seven people accused of being Christians or spies for the TFG.

- On July 14, al-Shabaab kidnapped two French security advisors from their hotel in Mogadishu.  One escaped and the second was still being held at year's end.

- On July 17, armed men possibly linked to al-Shabaab kidnapped three foreign aid workers, including one American citizen in Mandera, Kenya, and took them across the border into Somalia.  All were released in October.

- On July 21, the UN announced it had suspended humanitarian operations in Baidoa after al-Shabaab fighter's looted equipment and vehicles from the UN compound there and at the UN office in Wajid.

- On September 17, two al-Shabaab suicide bombers in stolen UN vehicles killed 21 people in an attack on an AMISOM base in Mogadishu.  The dead included the deputy AMISOM commander and 16 other peacekeepers.

- On November 1, a remote-controlled bomb killed five Somaliland military officers, including a division commander.

- On November 2, gunmen attempted to hijack a Daallo Airlines flight from Bosasso, Puntland, to Djibouti.  Other passengers overpowered the hijackers and the plane returned to Bosasso.

- On November 12, gunmen shot to death Puntland judge Sheikh Mohamed Abdi Aware, who had recently jailed four al-Shabaab members.

- On December 3, a suspected al-Shabaab suicide bomber disguised as a woman killed at least 23 people, including three government ministers, at a graduation ceremony for a university in Mogadishu.  Al-Shabaab denied responsibility for the attack.

- On December 13, Puntland Vice President Col Shire survived a bomb attack on his motorcade 30KM south of Bosasso, Puntland.

- On December 14, a roadside bomb killed three policemen on patrol in Bosasso.

PX205

- In mid-December, al-Shabaab militants reportedly killed more than ten people who were praying at the grave of a famous Sufi sheikh in Lower Shabelle region.

Western and regional nations worked to assist Somalia through training and support for TFG security forces. On November 17, EU Ministers of Foreign Affairs and European Defense meeting in Brussels approved the concept of a European initiative to train the Somali security forces.

AMISOM continued to secure the air and sea ports and presidential compound in Mogadishu. In November, AMISOM announced a total of 80 of its soldiers had died since deploying to the country in 2007. Uganda had 37 troops killed and Burundi 43, mainly in suicide attacks and roadside bombings.

**South Africa**

South Africa supported efforts to counter international terrorism and shared financial, law enforcement, and limited intelligence information with the United States. In advance of the 2010 World Cup, there has been closer cooperation between South African and U.S. law enforcement and intelligence agencies concerning recent terrorist threats against U.S. facilities in South Africa. South Africa's direct international air links and its permeable land borders made it vulnerable to illegal immigration, trafficking, and international organized crime. Recognizing these vulnerabilities, the Government of South Africa dramatically increased international cooperation on measures to prevent terrorist attacks; it also markedly increased training in anticipation of the 2010 World Cup.

Uneven border security and document fraud continued to hinder the government's ability to pursue counterterrorism initiatives. Due to a lack of institutional capacity and corruption within the Department of Home Affairs, bona fide South African identity cards, passports, and work/residence permits were sometimes fraudulently issued to unqualified persons and sometimes denied to qualified individuals. Under the leadership of new Minister Dlamini-Zuma, the Department of Home Affairs continued work on a turnaround strategy. Department of Home Affairs initiatives included a counter-corruption strategy and a campaign aimed at accelerating documentation of all bona fide South Africans. The South African government began implementing plans to provide more reliable border security. In preparation for the 2010 World Cup, the government announced that the South African National Defense Force (SANDF) would relieve the South African Police Service (SAPS) and assume responsibility for patrolling major stretches of South Africa's land border.

The South African Revenue Service (SARS) has a Customs and Border Protection (CBP) Container Security Initiative team located in Durban that works with SARS to screen containers entering and leaving the port for contraband, currency, nuclear materials, and other WMD. SARS is a member of the World Customs Organization and has worked closely with the Department of Homeland Security Customs and Border Protection to develop the SARS, Customs Border Control Unit (CBCU), which is modeled after the CBP, Antiterrorism

PX205

Contraband Enforcement Team (ATCET), and a dedicated corps of law enforcement officers focused on WMD issues.

South Africa cooperated with the United States in exchanging information related to terrorist financing.  The two nations have mutual legal assistance and extradition treaties.  In early 2009, the Financial Action Task Force (FATF) completed a review of South Africa's compliance with FATF standards for anti-money laundering and combating the financing of terrorism.  The review was generally positive, and noted that the Financial Intelligence Center was functioning effectively.  The FATF noted, however, that South Africa could do a better job of regulating trusts, monitoring financial institutions compliance with AML legislation, and enhancing the disclosure of cross-border transfers of cash.  South Africa remains the only FATF member in Africa and has one of the three Egmont-member Financial Intelligence Units in the region.  It is also a member of Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG), a regional organization of financial intelligence units, and as such, has served as a resource for other ESAAMLG members.  Due in part to strict banking requirements and the cash-driven nature of the South African economy, South Africans sometimes use alternative remittance systems that bypass the formal financial sector.

**Tanzania**

Tanzania remained vulnerable to international terrorism.  Al-Qa'ida elements responsible for the 1998 U.S. Embassy bombing remained active throughout East Africa.  During the year, Tanzanian law enforcement and security forces made efforts to identify and monitor terrorist activities and deny use of Tanzanian territory as a safe haven.  U.S.-Tanzanian cooperation has led to new training initiatives designed to strengthen Tanzania's border control and internal security capacity.  Tanzania's National Counterterrorism Center continued its participation in several multi-year programs to strengthen its law enforcement and military capacity, improve aviation and border security, and combat money laundering and terrorist financing.  The Financial Intelligence Unit (FIU), established in 2007 with the passage of the Anti-Money Laundering Act, is responsible for receiving, analyzing, and disseminating suspicious transaction reports and other information regarding potential money laundering or terrorist financing.  With only three technical staff, however, the FIU has limited resources to investigate potential money laundering or terrorist financing activities.  In an effort to build Tanzania's capacity to combat money laundering and terrorist financing, the U.S. Internal Revenue Service held a seminar on anti-money laundering and financial investigative techniques in November.

**Uganda**

Uganda remained vulnerable to international terrorism, with members of al-Qa'ida using Uganda as a transit point.  Al-Qa'ida and the Somali-based al-Shabaab posed the most significant terrorist threats to Uganda.  Uganda took tangible steps to track, capture, and hold individuals with suspected links to terrorist organizations.  While in transit, al-Qa'ida members were believed to have procured government documents illegally and engaged in recruitment activities.  In response, the Government of Uganda increased efforts to track, capture, and hold individuals with suspected links to terrorist organizations.  Uganda's Joint Anti-Terrorism Taskforce

PX205

(JATT), composed of military, police, and intelligence entities, led Uganda's counterterrorism response.

In September, November, and December, the Ugandan government raised alert levels and increased security at government installations, popular shopping centers, hotels, and other soft targets due to threats from al-Qa'ida and al-Shabaab. Al-Shabaab identified Uganda as a potential target in retaliation for Uganda's participation in the African Union peacekeeping mission in Somalia.

The Ugandan military continued to track, in coordination with the Democratic Republic of Congo (DRC), Sudan, and the Central African Republic (CAR), remnants of the Lord's Resistance Army (LRA). The LRA has not carried out an attack in Uganda since mid-2006, but was responsible for killing, raping, and kidnapping hundreds of persons in southern Sudan, the DRC, and CAR. During the year, 255 LRA combatants surrendered to the government and were granted amnesty under the country's Amnesty Act of 2000.

The U.S. Antiterrorism Assistance Program (ATA) conducted an assessment of the Ugandan government's counterterrorism capabilities in June. While the Ugandan government was a strong advocate for cross-border solutions to persistent security concerns in the Great Lakes Region, resource limitations and corruption hampered more effective counterterrorism measures. The need to amend the 2002 Anti-terrorism Act, enact comprehensive anti-money laundering legislation pending before Parliament, and improve coordination and information sharing between security services remained at year's end.

**Zambia**

In 2007, the Zambian Government passed a counterterrorism bill, which criminalized acts of terrorism, including terrorist training, incitement, and financing, and granted the government significant authority to investigate, prevent, and prosecute acts of terrorism. Inadequate resources and training impeded Zambia's law enforcement agencies' counterterrorism capabilities, however. Zambia's long and porous borders continued to pose a challenge in terms of the monitoring and control of illegal immigrants attempting to enter the country. Its points of entry remained vulnerable to human trafficking and international crime. Instability in Zimbabwe, Somalia, and Congo resulted in an increase in migrants during 2009. With U.S. assistance, Zambia has sent a number of law enforcement officers to the International Law Enforcement Academy in Botswana to learn and understand better methods to challenge illegal border crossing.

The Zambian government does not have an internationally-compliant anti-money laundering or counterterrorist financing regime, but the Zambian government has announced its intentions to create a Financial Intelligence Unit (FIU) within the Bank of Zambia that meets international standards.

**Zimbabwe**

PX205

Zimbabwean government agencies routinely provided assistance by conducting investigative inquiries, traces, and border checks of individuals thought to be threats to U.S. government facilities or personnel. Zimbabwe's continued economic decline, however, has had a detrimental impact on local law enforcement and national security elements responsible for implementing and coordinating counterterrorism efforts. The Suppression of Foreign and International Terrorism Bill, enacted in August 2007 to combat terrorism and mercenary activities in Zimbabwe, was redirected to suppress opponents of Zimbabwe's political leaders and policies. Although generally cooperative, Zimbabwean law enforcement officials have been reluctant to take or recommend actions that would be seen as pro-American. This has undermined efforts to foster greater cooperation.

## East Asia and Pacific Overview

> **"The challenge of terrorism demands the broadest possible coalition of nations to put an end to it — not only through sheer force of arms but mainly through a dialogue of faiths, cultures and civilizations that will put the merchants of hate out of business."**
>
> **--N. Hassan Wirajuda, Foreign Minister of the Republic of Indonesia, Statement to the 64[th] Session of the UN General Assembly September 29, 2009**

By 2009, Asia's combination of multilateral cooperation, capacity building, popular support, and political will had resulted in significant progress in countering terrorism and in developing the institutions necessary to deprive violent extremists of exploitable grievances. Despite that on July 17, suicide bombers affiliated with the remnants of the terrorist organization Jemaah Islamiya (JI) struck two hotels in downtown Jakarta within five minutes, killing nine and injuring sixty more, ending a four year period without a major terrorist attack in Indonesia. The attack was a reminder of the difficulty in eradicating the use of terrorism by those who are committed to violence. The Indonesian government's counterterrorism efforts led to the arrests of 14 key operatives and the deaths of nine, including Noordin Muhammad Top, the Malaysian leader of a splinter JI group based in Indonesia. Top was number one on Indonesia's most wanted list for several years and believed to have overseen the 2003 Jakarta J. W. Marriott bombing, the 2004 bombing of the Australian Embassy, the 2005 Bali bombings, and the 2009 Jakarta bombings.

Similarly, in 2009 the international community worked with the Philippines to find a peaceful resolution to the long-running insurgency in the Southern Philippines. The insurgency contributed to the conditions of conflict and instability that provided both physical and ideological space to groups of violent extremists, including JI fugitives and Abu Sayyaf Group members. Philippines security forces continued to make headway against extremist groups, killing 45 and arresting 18 individuals in the first half of the year.

The United States continued to work in partnership with countries in the region through diplomacy, bilateral security cooperation, multilateral organizations, and capacity building to

PX205

support counterterrorism efforts.  The United States and China held bilateral counterterrorism consultations in September, and the annual Trilateral Strategic Dialogue Counterterrorism Consultations with the U.S., Australia, and Japan, were held in Tokyo in December.  Also in December, South Korea hosted the Counterproliferation Working Group plenary, a U.S.-South Korea forum to discuss ways to build cooperative capacity to deter Chemical, Biological, Radiological and Nuclear (CBRN) attacks and manage consequences of a CBRN event.  The same month, South Korea hosted the second round of bilateral counterterrorism consultations.

Australia maintained its position as a regional leader in the fight against terrorism and worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of bilateral and regional initiatives in fora such as Asian Pacific Economic Cooperation, the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum, and the Pacific Island Forum. Japan also continued to assist counterterrorism capacity building in developing countries through seminars, workshops, and training.

**Australia**

Australia continued to play a leadership role in the fight against international terrorism through multilateral and bilateral fora, including the annual Trilateral Security Dialogue with Japan and the United States, and the Lombok Treaty with Indonesia that enhanced bilateral counterterrorism cooperation.

The Australian Security Intelligence Organization (ASIO) assessed that terrorism remained a serious and immediate threat to Australia; that extremist organizations in the Middle East, South Asia, and East Africa were the primary sources of inspiration and capabilities for extremists in Australia; and that the number of Islamist extremists willing to use violence in the country was very small and did not change substantially between July 2008 and June 2009.  The most serious terrorism case was the arrest of five men, some with alleged links to the Somali terrorist group al-Shabaab, for allegedly planning a suicide attack on an Australian military base.  The Australian National Counterterrorism Committee (NCTC) alert level remained at medium.

On August 12, the government announced proposed reforms to counterterrorism legislation, including expanding the definition of a "terrorist act" in the Criminal Code to include psychological, as well as physical harm; extending the expiration period of regulations proscribing a terrorist organization from two to three years; extending parliamentary oversight of the Australian Federal Police (AFP); and providing further limits on the period a suspect can be held without charge.

The government directed intelligence agencies – including the Australian Transaction and Reports Analysis Centre, which monitors financial transactions – to increase monitoring of small transactions sent abroad.

Eighteen groups were included on Australia's Listing of Terrorist Organizations.  In 2009, 10 groups were re-listed, including the Kurdistan Workers Party, Lashkar e-Tayyiba, Palestinian

PX205

Islamic Jihad, and the Islamic Movement of Uzbekistan.  On August 21, al-Shabaab was listed as a terrorist organization.

Several other terrorism-related arrests or convictions occurred in 2009:

- In February, seven men from Melbourne were sentenced to jail terms, ranging from four and a half to 15 years, for their involvement in planning terrorist activities.  They were arrested in November 2005, during concerted actions on suspected terrorist groups in Melbourne and Sydney.  An eighth, who trained in Afghanistan, was sentenced to five years in September.

- In October, five Sydney men, arrested as part of a series of raids in 2005, were found guilty of plotting terrorist attacks.  Sentencing hearings began in December 2009.  Soon after, it was revealed that four other men involved in the plot had pled guilty and had been sentenced to jail terms.  Two of them were eventually freed in exchange for cooperation with authorities.

- In September, a Lebanese-born Sydney man, Bilal Khazal, was sentenced to 12 years in jail for posting a terrorism handbook titled "Provisions on the Rules of Jihad" on the Internet.  In December 2003, Khazal and his brother were sentenced in absentia by a Lebanese military tribunal for financing an Islamist extremist group, which bombed U.S. businesses.

Australia assisted Indonesia in the investigation of the July hotel bombings in Jakarta.

Australian multilateral engagement continued in forums such as the United Nations, Association of Southeast Asian Nations (ASEAN), ASEAN Regional Forum, Asia Pacific Economic Cooperation, Pacific Island Forum, and G8 Counterterrorism Action Group, as well as in the Global Initiative to Combat Nuclear Terrorism.  Australia has counterterrorism memoranda of understanding with Indonesia, the Philippines, Malaysia, Cambodia, Thailand, Brunei, Fiji, Papua New Guinea, East Timor, India, Pakistan, Afghanistan, Turkey, and Bangladesh. Australia continued to provide legal drafting assistance to regional states seeking to adopt international conventions and protocols against terrorism, and to bring their law codes into conformity with these conventions.  Australia continued to lead efforts within the Civil International Civil Aviation Organization to update two counterterrorism conventions on civil aviation.

In October, Australia participated in the Fifth Regional Interfaith Dialogue in Perth, Australia, sponsored by Australia, Indonesia, New Zealand, and the Philippines.  It aimed to promote peace and understanding through interfaith links.  Within Australia, the government funded projects encouraging tolerance of religious diversity, particularly focusing on strengthening goodwill between Muslims and non-Muslims.

Australia and the United States exchanged information using APEC's Regional Movement Alert System.

PX205

The Australian Defense Force boosted its contribution in Afghanistan to approximately 1550 personnel.

**Burma**

The Government of Burma defined almost all anti-regime activities as "acts of terrorism," making little distinction between peaceful political dissent and violent attacks by insurgents or criminals.  The government characterized dissident groups as aligned with terrorist organizations and has used this as justification to scrutinize and disrupt dissident activities.  In December 2009, bombs exploded in Rangoon and other parts of Burma.  The government attributed the bombings to subversives or insurgents intent on disturbing the stability of the state.  Authorities have not made public any evidence of a genuine investigation nor have they identified the specific perpetrator(s).  Requests by the U.S. Embassy to view either specific bomb scenes or remaining fragments of explosive devices were consistently denied.

 In October, a Government of Burma liaison informed U.S. officials that its Special Branch police had arrested three members of an anti-Burma group that was planning to set off explosives in Rangoon, including targeting the U.S. Embassy.  The Burmese liaison advised that the arrested persons were not members of a terrorist organization as defined by the U.S. government.  This was a departure from past practice, in which, as noted, the Government of Burma defined all groups allegedly engaged in bombings as terrorists.

**Cambodia**

Cambodia's political leadership demonstrated a strong commitment to legal action against terrorists and the Government of Cambodia remained committed to strengthening its counterterrorism capability through training and international cooperation.

In Cambodia, terrorists could attempt to exploit various local conditions – including endemic corruption, poverty, high unemployment, a poor education system, porous borders, and disaffection within the Cham Muslim population, which makes up approximately five percent of the population – to gain recruits, resources, and lines of operation.  Although the Cham are not generally politically active, the Cambodian government is aware that foreign terrorists might use Cham areas as safe havens.  For example, Hambali, a senior Jemaah Islamiya operative accused of involvement in the 2002 Bali nightclub bombings, took refuge in a Muslim school in Cambodia in 2002-2003.

With U.S. assistance, Cambodian authorities monitored computerized border control systems at Phnom Penh and Siem Reap airports, and at the land border crossings of Poipet and Koh Kong.  International ports employed the use of this computerized system, as well as E-passport for Cambodian nationals and VISPEC, which was provided, installed, and trained to Cambodia's immigration police by the United Kingdom.  Although biometric systems were not available in Cambodia, various officials received biometrics training from Singapore.  U.S. officials also provided training to Cambodian authorities on financial investigation, methods for countering

Page | 39

PX205

money laundering and terrorist financing, hostage release negotiations, and terrorist incident management.

In 2009, 70 Cambodian government officials participated in 17 separate Cambodia-based training and workshop sessions hosted by the Australian, German, Russian, and U.S. Embassies. Twenty officials participated in 15 separate overseas training and workshop sessions in the United States, Malaysia, Japan, Australia, Vietnam, Philippines, India, and Thailand, which covered a range of topics, including security, counterterrorism, and investigation of fraudulent documents.

In November, a counterterrorism exercise on Southeast Asian-Japan Maritime Security was conducted in Preah Sihanouk Province under the auspices of Australia, the United States, and the secretariat of the National Counterterrorism Committee.

The Cambodian government continued to make progress in strengthening its counterterrorist finance regime.  The Financial Intelligence Unit (FIU), which operated within the framework of the National Bank of Cambodia, conducted on-site examinations of banks and financial institutions and signed Memorandums of Agreements on information exchanges concerning money laundering and terrorist financing with the Bank Nagara Malaysia FIU, the FIU of the Central Bank of Sri Lanka, and the Anti Money-Laundering Department of the Bangladesh Bank on information exchange concerning money laundering and terrorist financing.

**China**

China continued its counterterrorism cooperation with the United States and other nations throughout the year.  In September, the United States and China held bilateral counterterrorism talks in Washington, DC.  In June, China and Singapore conducted joint counterterrorism exercises in Guilin.  Then in July, China held a joint Sino-Russian counterterrorism exercise in Jilin Province.  Finally, in November, representatives from the Shanghai Cooperation Organization attended an international counterterrorism conference in Kyrgyzstan.  Additionally, the implementation of the Yangshan Deep Water Megaports project was resumed on July 2.

China's anti-money laundering and counter-financing of terrorism (AML/CTF) system was significantly strengthened during 2009, although several key deficiencies have yet to be addressed.  In July, at the U.S.-China Strategic and Economic Dialogue held in Washington, DC, the United States and China agreed to strengthen their cooperation on AML/CTF, including counterfeiting.  In August, the Securities Association of China provided AML/CTF guidelines to securities firms in China, in an effort to cut off possible sources of funding to terrorists.  In November, the Supreme People's Court released a judicial interpretation that further expands application of the law to specific non-banking/financial institutions and more widely covers terrorist financing activities.

Terrorist financing is a criminal offense in China.  However, the government has yet to develop an asset freezing and confiscation regime that meets international standards or that adequately implements UN Security Council Resolutions 1267 and 1373, according to the Financial Action

Page | 40

PX205

Task Force (FATF).  In addition, China's cross-border declaration and disclosure system needs strengthening to better prevent terrorist financing activity.  China's Financial Intelligence Unit (FIU), housed within the People's Bank of China, worked closely with the Financial Crimes Enforcement Network in the United States to develop its capabilities.  In addition to its domestic collection and analysis activities, the FIU exchanged information with foreign FIUs.

China expanded its role in international efforts to combat terrorist finance and money laundering by becoming a full member of the FATF in June 2007.  Since 2004, China has also been a member of the Eurasian Group (EAG), a FATF-style regional body that includes China, Russia, and most Central Asian countries.  In December, China hosted the EAG's bi-annual plenary, providing China an opportunity to enhance its leadership role in AML/CFT issues.  Coordination in countering terrorist finance could be further enhanced through China's membership in the Egmont Group, an umbrella body that coordinates the activities of over 100 FIUs worldwide.  Though China has applied for membership in the Egmont Group, political concerns about Taiwan's participation in the organization have hampered membership discussions.

The East Turkistan Islamic Party (ETIP), also known as the East Turkistan Islamic Movement (ETIM), was added to the UN Security Council al-Qa'ida and Taliban Sanctions Committee's Consolidated List of individuals and entities associated with al-Qa'ida or the Taliban in 2002.  In April 2009, the Sanctions Committee added ETIP leader Abdul Haq to the Consolidated List.

Human rights organizations have accused China of using counterterrorism as a pretext to suppress Uighurs, a predominantly Muslim ethnic group that makes up a large percentage of the population within the Xinjiang Uighur Autonomous Region of western China.  After widespread rioting in urban areas of Xinjiang in July and September, police moved in and arrested more than 200 people according to official estimates, at least 26 of whom have been sentenced to death.  The Chinese government claimed that the riots were orchestrated from abroad and therefore terrorist attacks on China.

Formally established in 2002, the FBI Legal Attaché's Office in Beijing bolsters U.S.-China cooperation on counterterrorism investigations.  In 2009, FBI Counterterrorism Division personnel participated in a round table discussion on terrorism issues with the China Institute of Contemporary International Relations.  FBI personnel also provided a general overview to Ministry of Public Security Terrorism Department personnel on counterterrorism investigations.

Hong Kong

Hong Kong's position as a major transit point for cargo, international finance, and people, coupled with its open trade and financial regime, make it a potential site for money laundering and terrorist financing activities.  Hong Kong is a close partner with the United States in the fight against terrorism.  The Hong Kong government successfully participated in the Secure Freight Initiative pilot project through its conclusion on April 30.  The Container Security Initiative in Hong Kong remained effective, and cooperation with Hong Kong customs officials received continued praise from visiting U.S. government delegations.

PX205

Hong Kong law enforcement agencies provided full support and cooperation to their overseas counterparts in tracing financial transactions suspected of links to terrorist activities, and participated in U.S. government-sponsored training on financial crimes and strategic commodity identification, among other topics.

In October, Hong Kong's police, fire, health, and other government services held emergency response drills simulating chemical, biological, radiological, and nuclear attacks. During the Hong Kong-hosted East Asia Games in December, Hong Kong deployed its newly established police Counter Terrorist Readiness Unit (CTRU). In addition to providing a counterterrorist deterrent presence, the CTRU assisted police districts with counterterrorism strategy implementation and provided tactical and professional support to existing specialist units, such as the Special Duties Unit and its VIP Protection Unit.

Hong Kong actively participated in various anti-money laundering and counterterrorist financing initiatives, including the Financial Action Task Force (FATF) and the Asia/Pacific Group (APG) on Money Laundering. Hong Kong is a member of the Egmont Group of Financial Intelligence Units, reporting through its Joint Financial Intelligence Unit operated by the Hong Kong Police and the Customs and Excise Department.

In response to recommendations stemming from the 2007 FATF and APG mutual evaluation of Hong Kong, authorities are drafting legislation to increase supervision of money changers and remittance agents; create statutory requirements for customer due diligence and record-keeping in the banking, securities, and insurance sectors; and establish civil penalties for these infractions. Legislation to establish government oversight for non-financial professions and to create a cross-border currency reporting mechanism is needed to address additional FATF recommendations.

Macau

Macau's position as a major international gambling center makes it a potential site for money laundering and terrorist financing activities. Macau's financial regulatory authorities directed banks and other financial institutions to search continuously for terrorist financing networks and accounts using lists of individuals and entities designated by the United States under relevant authorities, as well as the UN 1267 Sanctions Committee's consolidated list of individuals and entities associated with al-Qa'ida, the Taliban, and Usama bin Ladin.

Macau is a member of the Asia/Pacific Group (APG) on Money Laundering. In response to recommendations of the APG evaluation, Macau authorities have taken steps to improve compliance with suspicious transactions reporting requirements in banks, casinos, and professional associations, but the threshold reporting limits remain well above international norms. Macau does not have reporting requirements for cross-border currency movements.

In May, Macau joined the Egmont Group of Financial Intelligence Units through its Financial Intelligence Office (FIO), an independent government unit under Macau's Secretary for Economy and Finance. The FIO played an essential role in Macau's Anti-Money Laundering

PX205

(AML) regime by collecting and analyzing suspicious transactions, providing AML assistance to local authorities, raising the public's AML awareness, and sharing information with overseas counterparts.

In September, the Macau Monetary Authority (AMCM) strengthened its AML guidelines for financial institutions, money changers, and remittance agents by mandating enhanced customer due diligence measures and the compulsory employment of AMCM-approved AML compliance officers.

Macau cooperated internationally in counterterrorism efforts through INTERPOL and other security-focused organizations within the Asia Pacific Region. Macau's law enforcement and customs agencies participated in U.S. government-sponsored training in bulk cash smuggling detection, weapons of mass destruction proliferation awareness workshops, and complex financial investigation techniques.

**Indonesia**

The Government of Indonesia reacted decisively to the July 17, 2009 bombings of the Jakarta Ritz Carlton and J.W. Marriott hotels, which killed nine people, including the two bombers, and injured more than 50 in the first attacks in Indonesia in almost four years.

The Indonesian government's counterterrorism efforts led to the arrests of 14 operatives and the deaths of nine, including Noordin Muhammad Top, the Malaysian leader of a splinter Jemaah Islamiya (JI) group based in Indonesia. Top was number one on Indonesia's most wanted list for several years and is believed to have overseen the 2003 Jakarta J. W. Marriott bombing, the 2004 bombing of the Australian Embassy, and the 2005 Bali bombings.

The Marriott suicide bomber entered a private dining room where a breakfast meeting of prominent business community representatives, primarily expatriates, was being held. The bomber set off an improvised explosive device (IED) that killed six people. Approximately five minutes later, a second bomber set off an IED in the Ritz Carlton restaurant, killing himself and two others. An undetonated bomb was later discovered in a J.W. Marriott guest room where one of the bombers stayed during the two days before the attacks.

The level of planning for the attacks, including the planting of a JI operative in the hotels and floral shops for at least two years prior to the bombings, indicated that Top's network had grown in sophistication. As the investigation developed, it became apparent the network was larger in number and geographical reach than previously thought. The ages of the Marriott bomber and other operatives indicate Top and his associates successfully recruited youths with no previous criminal records. Family links between operatives, including by marriage, were evident throughout the network.

Regarding terrorism legislation, the Parliamentary Commission on Security and Defense proposed revisions to the 2003 Terrorism Law. By the end of 2009, Parliament had not yet begun to review the revisions. It was not clear when they would begin to do so.

Page | 43

PX205

One proposed revision to the law would allow a suspect to be detained for two years without trial should his/her activities be deemed an endangerment to Indonesia's security. Under the current law, the Indonesian police must formally name a subject as a terrorism defendant within seven days after arrest and can then detain them for up to four months without charges.

Another proposed revision to the law would allow the police to crack down on individuals and groups that glorify terrorism and openly preach hatred against those of a different faith. This particular law would target radical clerics who support radical jihad, or war, in their religious lectures.

An additional proposed revision to the law would create a Counterterrorism Coordination Agency composed of governmental and social components, including representatives of most of the Ministries, the Attorney General's Office, the National Police, the State Intelligence Agency, and the Armed Forces.

The Coordinating Minister for Political, Legal, and Social Affairs would head the body and answer directly to the President. The agency would coordinate counterterrorism policy and activities, and serve as a central crisis center in the event of a terrorist attack. It has not yet been determined whether the agency would have operational capacities. Elements of the agency would also coordinate with the Religious, Education, and Information Affairs Ministries to implement counter- and de-radicalization programs.

A final proposed revision to the law would allow the Indonesian military (TNI) and the State Intelligence Agency (BIN) to work more closely with the police, directed by the Counterterrorism Coordination Agency, to counter terrorist acts.

Regarding developments in terrorist financing legislation, the Indonesian government made substantial efforts to draft effective terrorist financing legislation that meets FATF standards and creates an effective mechanism to freeze terrorist assets pursuant to UNSCRs 1267 and 1373.

An Indonesian interagency team headed by PPATK, the Indonesian Financial Intelligence Unit, drafted new terrorist financing legislation. This draft law addresses criticisms raised in the Asia Pacific Group on Money Laundering 2008 evaluation of Indonesia, which noted significant deficiencies in Indonesia's statutory and regulatory framework to combat money laundering and terrorist financing.

The draft legislation is a significant improvement over previous terrorist financing legislation, as it creates a mechanism to trace, freeze, seize, and confiscate terrorist assets pursuant to UNSCRs 1267 and 1373, and clarified and broadened the definition of support to a terrorist organization. The draft legislation does not specifically address the use of non-profit organizations (NPOs) and non-governmental organizations to finance terrorism, a sensitive topic. Although PPATK interlocutors assert the draft legislation will apply to non-profits, it is unclear whether there would be political will to apply the legislation to non-profits. The Government of Indonesia initiated a review of its domestic NPO sector in July 2009, as requested by the APG. The review

PX205

is a key part of the government's effort to improve regulation and oversight of the NPO sector. To date, there has been only one successful terrorist financing prosecution in Indonesia, a function of poorly drafted legislation and a lack of training for police and prosecutors.

The Victim and Witness Protection Agency LPSK is in the process of developing procedures to assist victims of crime, including terrorist activities, and to shelter witnesses from criminals including terrorist organizations.

The Indonesian government continued programs to counter violent extremism, but concrete, systemic information as to the effectiveness of the programs was not available.  The National Police and the Ministry for Political, Legal, and Security Affairs offered counter-violence programs to youth across the country, including sports events, television programs, and traditional puppet shows (a popular cultural practice in Indonesia).

The Indonesian National Police continued its prisoner assistance program to de-radicalize convicted terrorists, primarily with the assistance of two former terrorists, Ali Imron and Nasir Abas, who were convicted for their participation in the 2002 Bali bombings.  The program identified individuals who might be open to more moderate teachings and focused on providing spiritual support to the men and modest financial support to their families.

The United States and Indonesia continued to enjoy excellent cooperation on issues related to international terrorism.  The Indonesian government has worked closely with the United States on terrorism cases and indicated its interest in ongoing assistance and cooperation.  The Attorney General's Office of Terrorism and Transnational Crime Task Force, which the United States helps support, has successfully convicted more than 60 Indonesian terrorists to date, including more than 40 JI members.  Although there is no mutual legal assistance treaty in place, there is considerable sharing of information between Indonesia and the United States, and mechanisms exist for the formal transfer of evidence, with the first two mutual legal assistance requests being executed between Indonesia and the United States in 2009.

**Japan**

Japan bolstered border security and enhanced national counterterrorism measures in coordination with the United States.  Japanese immigration officials continued to strengthen their capability to identify suspicious travelers upon entry into Japan's international airports through fingerprinting and facial image technology.  Since the introduction of the Biometric Immigration Control System in November 2007 until October 31, 2009, officials denied entry to 1,465 foreign nationals who attempted to enter Japan using forged or altered passports or re-enter after being previously deported from Japan.  Japan's Immigration Bureau, National Police Agency (NPA), and the Ministry of Land, Infrastructure, Tourism, and Travel coordinated with Department of Homeland Security (DHS) on preventing terrorists and other high-risk travelers from boarding commercial aircraft bound for the United States.  Japanese officials see the program as a valuable tool to secure travel between Japan and the United States and as an effective way to share information and prevent suspected terrorists and improperly documented air passengers from boarding U.S.-bound flights.  During December 2009, DHS and the Japan Immigration Bureau

Page | 45

PX205

agreed to begin negotiations on an Immigration Mutual Assistance Agreement that would facilitate immigration cooperation between Japan and the United States.

Japan also took steps to strengthen port and shipping security.  Under DHS' Container Security Initiative, Japanese authorities worked with U.S. officials to review ship manifests and to screen suspicious containers bound for the United States.  In March, Japan installed radiation portal monitors and began screening containers for the presence of radiological material under the pilot Megaports Initiative Program.  In June, Japan and the United States signed a Mutual Recognition Arrangement in Brussels, aligning security standards in both countries' trade partnership programs.  Japan also continued collaboration with the United States on science and technology for homeland security through the U.S.-Japan Framework Initiative for a Safe and Secure Society.

The NPA and the Public Security Intelligence Agency (PSIA) continued to monitor the activities of Aum Shinrikyo, renamed Aleph, and splinter group Hikari no Wa, or "Circle of Light."  In January, PSIA successfully filed a request to maintain surveillance of Aleph and Hikari no Wa for an additional three years.  PSIA has monitored Aum since 2000 under the Organization Control Law, a measure that allows the Agency to conduct on-site facility inspection and to obtain quarterly operational reports from the cult.

Japan reached beyond its borders to fight terrorism as well.  Japan is the second largest contributor to Iraq reconstruction with US$ 1.7 billion in grants, US$ 3.5 billion in concessionary loans, and US$ 6.9 billion in debt relief.  Japan remained an active partner in Operation Enduring Freedom (OEF) and a key international contributor to Afghan stabilization and reconstruction.  Japan has pledged more than US$ 2 billion in reconstruction aid since 2002 and continued construction on the 114 kilometer stretch of the southern ring road between Kandahar and Herat.  In November, Japan announced a new five-year, US$ 5 billion assistance package that included, among other items, continued funding of Afghan National Police salaries, job training initiatives, and employment programs for former upper-echelon insurgents.  The Japan Maritime Self Defense Force continued to conduct refueling operations in support of OEF in the Indian Ocean.  In April, Tokyo pledged US$ 1 billion for a wide-range of assistance to Pakistan over the next two years.

In December, Japan hosted the fifth annual U.S.-Japan-Australia Trilateral Strategic Dialogue (TSD) Counterterrorism Consultations, as part of the broader TSD, which aimed to coordinate regional activities.  Japanese officials chaired a specialist working group on border security and counter-radicalization and took part in discussions on law enforcement capacity building and on ways to prevent chemical, biological, radiological, and nuclear attacks.  The TSD Consultations followed a TSD Counter-radicalization Workshop Japan hosted in July.

Japan continued to assist counterterrorism capacity building in neighboring countries through dialogue, seminars, workshops, and training.  In July, Japanese officials took part in the third Japan-South Korea Counterterrorism Consultations.  In August, Japan co-chaired the Fourth Japan-ASEAN Counterterrorism Dialogue in Vietnam.  In December, Japanese officials took part in the first Japan-Singapore Counterterrorism Dialogue.  The Japanese Counterterrorism

PX205

Ambassador reaffirmed the necessity of enhancing capacity building assistance to developing countries, strengthening counter-radicalization efforts, and promoting secure trade in the APEC region. In March, Japan hosted the Seminar on Promotion of Accession to International Counterterrorism Conventions and Protocols for the sixth consecutive year. Tokyo promoted information sharing and provided implementation guidance to participants including Fiji, Papua New Guinea, and several members of the Association of Southeast Asian Nations, among others.

Japan supported regional projects, such as counterterrorism research in Malaysia and terrorist rehabilitation programs in Indonesia, through the Japan-ASEAN Integrated Fund. Over the past few years, Japan has invited roughly 60 teachers from 17 Indonesian provinces and 43 madrassas for the purpose of fostering "cultural understanding" and opening inter-faith dialogue. Japan has expanded the pool of visitors to include Yemen and the Philippines.

Japan assisted third-country law enforcement personnel by dispatching experts and accepting trainees. The Japanese Coast Guard (JCG), for example, provided capacity building services and training seminars to authorities from states that border the Straits of Malacca. Since 2002, Japan has provided training to Coast Guard counterparts from the Philippines and has offered technical assistance to support local police in Indonesia by, in part, introducing the Japanese police box, or koban[5] system.

Japan contributed to counterterrorism capacity building through membership in multilateral fora. In July, Japan joined G8 counterparts in calls to bolster the role of the United Nations; improve information sharing; strengthen the security of land, sea, and air transportation; and support the G8 Counterterrorism Action Group.

Japan undertook measures to combat terrorist financing. Japan cooperated on freezing assets of individuals and entities listed under UN Security Council resolutions to help stem the flow of terrorist financing to al-Qa'ida and the Taliban. Japan expanded the scope of business practices and professions under the Law for Prevention of Transfer of Criminal Proceeds, which requires specified business operators, including financial institutions, to conduct customer identification and submit suspicious transaction reports. Under the Foreign Exchange and Foreign Trade Law, Japanese financial institutions must confirm the identity of customers sending 100,000 yen or more overseas. For domestic remittances, financial institutions must identify originators of wire transfers over 100,000 yen (US$ 1,000). Japan's Banking Law also levies administrative sanctions on financial institutions that fail to comply with anti-money laundering and counterterrorist financing measures. In addition, the Financial Services Agency and the NPA's Financial Intelligence Unit inspect financial institutions for compliance with counterterrorist financing laws and regulations.

---

[5] Koban are often located near stations and busy entertainment areas and are supposed to act as a community policing center: a deterrent to criminal activity as well as providing a rapid response post in the case of actual wrongdoing. Each koban is usually staffed by a group of 4 police - 3 officers under the command of a sergeant working on 3 shifts of 8 hours under the control of the city or ward police station.

PX205

In June, the Japanese Diet passed the Payment Services Act, which addresses October 2008 Financial Action Task Force (FATF) Mutual Evaluation recommendations pertaining to customer due diligence and money transfer services.  The evaluation had noted several deficiencies, including the low number of money laundering prosecutions, the absence of an established mechanism for freezing terrorist assets that covered domestic funds, and the absence of a requirement for financial institutions to establish and maintain procedures, policies, and internal controls to prevent illicit finance.  Japan's Financial Services Agency must still adopt implementing rules.  The Diet also amended Customs Act secondary legislation, which addressed in part the FATF recommendation pertaining to cross-border currency declaration and disclosure.

**Republic of Korea**

The Republic of Korea (South Korea) demonstrated excellent law enforcement and intelligence capabilities to combat terrorism.  South Korean immigration and law enforcement agencies had a strong record of tracking suspicious individuals entering their territory and reacting quickly to thwart potential terrorist acts.  Seoul also reviewed and strengthened its emergency response plan and, in accordance with UNSCR 1267 and 1373, further tightened its legislative framework and administrative procedures to combat terrorist financing.  For example, the Prohibition of Financing for Offenses of Public Intimidation Act took effect in December 2008 and was intended to implement the UN Convention for the Suppression of the Financing of Terrorism, to which the South Korea has been a party since 2004.  Under the Act, funds for public intimidation offenses are identified as "any funds or assets collected, provided, delivered, or kept for use in any of the following acts committed with the intention to intimidate the public or to interfere with the exercise of rights of a national, local, or foreign government."  An amendment expanding the government's ability to confiscate funds related to terrorism was enacted in March, enabling the government to confiscate not only the direct proceeds of terrorism, but also funds and assets derived from those proceeds.  In October, South Korea became a full member of FATF.  The accession to FATF will allow Korea, an observer since 2006, to actively participate in the process of setting and revising global Anti-Money Laundering and Counterterrorismm Financing Terrorism (AML/CTF) standards and increase international cooperation.

South Korea supported U.S. counterterrorism goals in Afghanistan by announcing the establishment of a Provincial Reconstruction Team.  In addition, South Korea worked closely with other foreign partners and played a constructive role in improving regional counterterrorism capabilities.  South Korea continued to participate in the counterterrorism activities of the Asia-Pacific Economic Cooperation forum, the ASEAN Regional Forum, and the Asia-Europe Meeting.  The Korea Overseas International Cooperation Agency hosted counterterrorism training and capacity-building programs for regional partners in forensic science, prevention of money laundering, and cyber security.

In March, the Counterterrorism Committee Executive Directorate of the United Nations visited South Korea to monitor its efforts to combat terrorism in accordance with UNSCR 1373.  The team found that Korea had made good progress with respect to AML/CFT laws and mechanisms

to criminalize terrorist financing and freeze funds and assets.  In October, the Korea Institute for Defense Analyses hosted the ninth Biannual Symposium of the Council for Asian Terrorism Research, with the theme "Korean Peninsula WMD Threats: Regional and Global Implications." In November, South Korea hosted the second APEC Cybersecurity Seminar on "Protection of Cyberspace from Terrorist Attacks and Use," which brought 13 countries together to discuss recent cyber attacks and ways to deal with the challenges of cyber terrorism.  In December, the Ambassador for International Counterterrorism Cooperation hosted the second round of South Korea-U.S. bilateral counterterrorism consultations, attended on the U.S. side by the Deputy Coordinator for Regional Affairs of the Office of the Coordinator for Counterterrorism.  Korea also held bilateral counterterrorism meetings with Indonesia, Japan, France, and Germany during the year.

The South Korean government has recently been concerned over the growing number of South Korean citizens abroad who have been victims of terrorist attacks.  In March, four South Korean tourists were killed and five were wounded in a suicide bombing in Yemen, for which al-Qa'ida later claimed responsibility.  In June, another South Korean civilian working for a medical NGO in Yemen was kidnapped and killed.  Although the Yemeni government did not find a conclusive connection to an established terrorist group in that incident, the South Korean government was put on alert and is now exploring various possibilities to prevent future attacks on its citizens.

**North Korea (DPRK)**

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987.  On October 11, 2008, the United States removed the designation of the DPRK as a state sponsor of terrorism in accordance with criteria set forth in U.S. law, including a certification that the government of the DPRK had not provided any support for international terrorism during the preceding six-month period and the provision by the DPRK of assurances that it will not support acts of international terrorism in the future.

In May, the United States re-certified North Korea as "not cooperating fully" with U.S. counterterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Pursuant to this certification, defense articles and services may not be sold or licensed for export to North Korea from October 1, 2009 to September 30, 2010.  This certification will lapse unless it is renewed by the Secretary of State by May 15, 2010.

Four Japanese Red Army (JRA) members who participated in a jet hijacking in 1970 continued to live in the DPRK.  On June 13, 2008, the government of Japan announced that the DPRK had agreed to cooperate in handing over the remaining members of the JRA involved in the hijacking.  However, the DPRK has not yet fulfilled this commitment.

The Japanese government continued to seek a full accounting of the fate of 12 Japanese nationals believed to have been abducted by DPRK state entities in the 1970s and 1980s.  The DPRK admitted to abducting eight of these individuals, but claimed that they have since died; the DPRK has denied having abducted the other four individuals.  On August 12, 2008, Japan and

PX205

the DPRK agreed on steps towards the eventual resolution to this issue. However, the DPRK has not yet fulfilled its commitment to reopen its investigations into the abductions. Since 2002, five other abductees have been repatriated to Japan.

**Laos**

Since 2002, the Government of Laos has consistently denounced international terrorism and expressed a willingness to cooperate with the international community on counterterrorism. While domestic opposition elements have in the past employed terrorist tactics, such as ambushing civilian buses in 2003 and bombing civilian targets in 2004, Lao officials at many levels saw international terrorism as an issue of only marginal relevance to Laos. They believed that Laos, as a small and neutral country, would not be targeted or exploited by international terrorists.

Laos does not have a separate counterterrorism law, but the Lao judicial system allows for the prosecution of acts of terrorism as crimes under the Lao criminal code, and Lao officials have amended the criminal code to strengthen counterterrorism sanctions. Laos' border security was weak; border officials could not effectively control access to the country at any of the country's border checkpoints. Crossing the border along the Mekong River into Burma, Thailand, and Cambodia could be accomplished easily and without detection. Border delineation remained poor in more remote sections of the country, especially along its land borders with Vietnam and China. It was likely that unmonitored border crossings by locals occurred on a daily basis. Since September 11, 2001, Lao authorities have strengthened airport security, and airport security forces have participated in U.S.-supported security seminars to raise their standards, but security procedures at land immigration points remained lax compared with those of most other countries in the region. In addition, official Lao identity documents, including passports and ID cards, were easy to obtain.

Lao authorities have issued orders limiting the amount of cash that could be withdrawn from local banks or carried into or out of the country and strengthened reporting requirements of state and privately owned commercial banks. Banking regulation remained extremely weak, however, and the banking system was vulnerable to money laundering and other illegal transactions.

**Malaysia**

The police forces in Malaysia, which fall under the authority of the Home Ministry, continued to conduct all counterterrorism investigations and operations in the country. In 2009, the Prime Minister's Office created a new office, the Special Task Force (Operations/Counterterrorism), within the Royal Malaysian Police (RMP) to handle counterterrorism-related investigations, a function previously conducted by the RMP Special Branch. By year's end, Malaysia had not initiated prosecution of any terrorist suspects using legislation amended in 2007 in order to accede to the UN International Convention for the Suppression of the Financing of Terrorism, but continued to rely on the Internal Security Act (ISA) to detain terrorist suspects. Under the ISA, the authorities can detain suspects without trial for up to two years, a period the Home Minister can extend in two-year increments.

PX205

At year's end, five terrorist suspects linked to Jemaah Islamiya (JI) were held in ISA detention. This included one well-known JI operative, Mas Selamat bin Kastari, whom the Malaysian authorities detained in April. Kastari had been on the run in Malaysia after escaping from prison in Singapore in February 2008. The Malaysian government has held suspected terrorists and suspected terrorist supporters in ISA detention from one to six years. While imprisoned, these terrorist suspects receive de-radicalization training from Malaysian authorities, and are only released after the government believes they are no longer a threat to society. The authorities continued to monitor terrorist suspects after their release, and imposed restrictions on their activities and their travel. Because of growing domestic and international pressure, the Malaysian government has become more cautious about employing the ISA to detain persons it suspects of terrorist activities, and has been slowly reducing the number of those detained under the ISA. In 2009, the authorities released 39 ISA detainees, 29 of whom were alleged members of terrorist organizations JI or Darul Islam.

The Malaysian government allows travelers from many nations to enter the country without visas, to promote trade and tourism. Persons from most Islamic countries can enter Malaysia without visas, although immigration authorities do scrutinize these travelers and screen for known terrorists. Malaysian authorities will detain terrorist suspects if they become aware of their presence in the country, and have actively cooperated with other countries to deport these suspects.

The Malaysian government engaged with its neighbors, both bilaterally and in international fora such as the Association of Southeast Asian Nations, on issues related to counterterrorism and transnational crime. It continued to operate the Southeast Asian Regional Center for Counterterrorism. The Center has served to facilitate the training of Malaysian front-line officials, but has done less to identify forward-looking or regional counterterrorism priorities. The organization largely depends on initiatives from donor countries, including the U.S., Japan, Australia, and Canada, to sponsor its training program.

Malaysian mediators continued to work in the southern Philippines to help end the conflict between the Government of Philippines and the separatist Moro Islamic Liberation Front (MILF). Malaysia played an active role in mediating negotiations between the two sides. A Malaysian official served as a mediator between the Government of Philippines and the MILF, and Kuala Lumpur played host to meetings between the two sides as well as to the International Contact Group – a group of four countries, seen by both parties as neutral, which lend their weight to the negotiations. Malaysia, along with Singapore, Indonesia, and Thailand, conducts the "Eyes in the Sky" program designed to provide enhanced security to the Strait of Malacca, the world's busiest shipping lane. Malaysian authorities also cooperate with their Thai counterparts along the border to prevent insurgents from Southern Thailand from using Malaysia as a safe haven.

Malaysia's central bank has signed memoranda of understanding on the sharing of financial intelligence with the Financial Intelligence Units (FIUs) of many countries in the region. Malaysia is an active member of the Asia/Pacific Group Donor & Provider Group for Technical

PX205

Assistance and has worked with the World Bank, International Monetary Fund, Asian Development Bank, United Nation Counterterrorism Committee Executive Directorate, and the United Nations Office on Drugs and Crime.  Malaysia is working with the United States to help develop an effective FIU in Afghanistan.

**Micronesia, Federated States of**

The Micronesian Criminal Code contains no counterterrorism statutes.  Should the government ever prosecute someone for terrorist activity it would undoubtedly invoke its laws against murder, attempted murder, and destruction of property.  The country's statutes do not outlaw terrorist financing.  Law enforcement efforts against terrorism, limited as they are given the region's lack of capacity, fell within the purview of the Transnational Crime Unit (TCU).  Reliant on American funding and Australian supervision since its opening in April 2008, the TCU brought officers from other Pacific island nations to Palikir, the Micronesian capital, to share information on such issues as narcotics, human trafficking, and terrorism.  The TCU also exchanged information with the FBI and the Australian Federal Police, making it the recipient of relevant terrorist-related intelligence.

**Mongolia**

Although there were no known terrorist groups operating in Mongolia and no known bases of support, Mongolian government officials cited more than 6,000 kilometers of porous borders and easy entry for foreign travelers as conditions that terrorists could exploit, and moved to increase awareness of terrorism and to consider new laws.  Throughout the year, eight senior personnel attended counterterrorism-related training at the Asian Pacific Center for Security Studies in Honolulu and at the Marshall Center in Germany.

The Mongolian police, the Ministry of Justice, and the General Intelligence Agency's counterterrorism branch cooperated with their U.S. counterparts on counterterrorism issues. As a result of resource and technical limitations, however, Mongolian counterterrorism law enforcement capacities remained modest.

Mongolia continued to contribute to international counterterrorism efforts.  In support of Operation Enduring Freedom, the 130 member Mongolian Expeditionary Task Force and 23-strong Mongolian Technical Training and Maintenance Team arrived in Afghanistan in November.  They will provide fixed site security at Camp Eggers in Kabul and artillery training and maintenance at Camp Phoenix.  In addition to supporting Operation Enduring Freedom, Mongolia also supported the NATO-led International Security Assistance Force.  On November 28, the Mongolian Armed Forces deployed an additional platoon of approximately 40 soldiers to support the German contingent in northern Afghanistan.  This brings the total number of Mongolians deployed to Afghanistan to almost 200.

**New Zealand**

PX205

The Government of New Zealand took a leadership role in the Asia-Pacific region in multilateral counterterrorism organization.  New Zealand worked closely with other Pacific Island Countries (PIC) to help them to build their capacity in all areas of counterterrorism and nonproliferation activity.  Finally, New Zealand expressed its strong desire to work cooperatively with the United States on the bilateral, regional, and global levels to fight terrorism and achieve mutual nonproliferation objectives.

New Zealand places considerable importance on its compliance with international counterterrorism instruments.  New Zealand uses the UN Global Counter-Terrorism Strategy as a key reference point and the government of New Zealand is working to ratify the remaining four of 16 international counterterrorism instruments to which New Zealand is not yet party - two of which concern maritime terrorism and two of which pertain to nuclear terrorism.

New Zealand designations of terrorist entities listed by the 1267 Committee occur automatically, by operation of law.  The Terrorism Suppression Act 2002 as amended provides that all individuals and groups designated by the Security Council under Resolution 1267 are automatically designated domestically in New Zealand.  New Zealand has yet to designate any individuals or entities pursuant to UN Security resolution 1373 that do not appear on the 1267 Committee list.

Under the Financial Transaction Reporting Act 1996, financial institutions are required to report transactions suspected of being linked to money laundering or proceeds of crime enforcement to the New Zealand Police Financial Intelligence Unit (FIU) based at Police National Headquarters in Wellington.  In 2009, the FIU processed 4963 Suspicious Transaction Reports and referred 976 of these to various law enforcement agencies and units for investigations.  Over the same period, the FIU filed one Suspicious Property Reports pursuant to the 2002 Terrorism Suppression Act.

New Zealand remained active in Operation Enduring Freedom in Afghanistan.  In September, New Zealand deployed 71 Special Air Service (SAS) troops to Afghanistan.  This was the first of three six-month rotations scheduled to take place between 2009 and 2011.  In addition to the deployment of troops, New Zealand continued to lead the Provincial Reconstruction Team in Bamyan and had some 140 New Zealand Defense Force (NZDF) personnel deployed there.  NZDF also maintained personnel with the UN Assistance Mission in Jalabad, ISAF headquarters in Kabul, army training with the UK in Kabul and, until recently when it closed, two surgeons with the Canadian medical centre in Kandahar.  Three New Zealand Police officers (NZP) were also deployed to Bamyan, under the auspices of the European Union Police Mission to train and mentor Afghan National Police (ANP).  The focus of NZP's work in Afghanistan was on strengthening the capacity of the ANP.  While the focus was on Bamyan Province, two of the three staff worked primarily at the U.S.-funded Regional Training Centre, located within the Bamyan Provincial Reconstruction Team compound, which trained staff for several provinces.

New Zealand development assistance to Afghanistan totaled US$ 6.7 million in 2009.  It was delivered in Bamyan primarily through partners including the UN Food and Agricultural Organization, Aga Khan Foundation, and Bamyan University.  Supporting delivery of health and

education was a key part of New Zealand's development assistance program, which had a particular focus on women and children.

New Zealand assists Pacific Island Countries' (PIC) understanding of, and compliance with, the international counterterrorism agenda. Strong focus is given to legislative and operational capacity-building projects many of which are funded through the Pacific Security Fund. In 2009:

- New Zealand supported the running of a United Nations Workshop on Implementing Security Council Resolution 1540 for Pacific Island Countries in April in Port-Vila, Vanuatu.

- New Zealand provided funding for the Asia-Pacific Group on Money Laundering's technical assistance and training program with Pacific island countries.

- New Zealand and a representative from the Pacific Island Secretariat chaired the 2009 Pacific Islands Forum Working Group on Counterterrorism. Funding for the event was provided by New Zealand drawing on the Pacific Security Fund.

New Zealand also promotes counterterrorism capacity building and a range of regional security initiatives in Southeast Asia through the Asia Security Fund. Key projects over the last year included:

- A number of training programs for law enforcement officials in the region, including training in terrorism scene investigation for counterparts in Vietnam; a month-long study visit on investigating violent crime for police officers from Aceh; and a one-week workshop on international peacekeeping for police officers from Singapore and the Philippines, based at the New Zealand Police College.

- Continued support for the Indonesian National Police's community policing program, including providing country-wide "train the trainers" courses, a community policing study tour to New Zealand for key police officials, and support for the drafting of a community policing handbook.

- The provision of surveillance equipment to Special Detachment 88, the counterterrorism unit within the Indonesian National Police.

**Palau**

Palau worked closely with the United States on counterterrorism. Local law enforcement officers from the Ministry of Justice, Ministry of Public Infrastructure, Industries and Commerce, and the Division of Customs continued to receive training on counterterrorism from U.S. counterparts. In addition, the Federal Aviation Administration and the Transportation Security Administration regularly inspected airport facilities and trained airport officials on security procedures.

PX205

Responding to UN Security Council Resolution 1373, the national congress passed a Foreign Evidence Act, a Money Laundering and Proceeds of Crime Act, a Mutual Assistance in Criminal Matters Act, and an Extradition and Transfer Act in 2001. These laws are intended to regulate the banking system, criminalize money laundering, and provide a legal basis for international law enforcement cooperation. A Financial Intelligence Unit was established to detect money laundering and other financial crimes.

**Philippines**

Terrorist groups active in the Philippines included the Abu Sayyaf Group (ASG), Jemaah Islamiya (JI), the New People's Army (NPA), and the Rajah Solaiman Movement (RSM). Philippine security forces continued to make progress against terrorist groups. The Armed Forces of the Philippines (AFP) reported that it killed 10 ASG members and 165 NPA members in 2009. The Philippine National Police (PNP) claimed that its personnel killed 14 NPA members in 2009. Those apprehended included an RSM cofounder and two bomb makers in Mindanao. U.S. intelligence, reconnaissance, and surveillance continued to support AFP operations against terrorist elements in the southern Philippines. Additionally, U.S. Department of Justice criminal investigation, police development, and counterterrorism programs trained approximately 1,600 police, supported professional development efforts of the Philippines National Police at 12 sites throughout the country, and provided opportunities for cooperation between law enforcement officials of the Philippines, Malaysia, and Indonesia.

Data on terrorist incidents is limited and incomplete; many kidnappings or other acts of violence that indiscriminately target innocent people go unsolved, and some shootings and bombings occur in the course of criminal activity unrelated to terrorism. The Philippines estimated that the NPA began 2009 with 5,240 members, and the ASG began the year 400-strong. These organizations' memberships fell to an estimated 4,700 and 390, respectively, by the end of the year. Kidnappings, associated with both criminal and terrorist groups, continued during the year in Mindanao and the Sulu Archipelago. On January 15, ASG members kidnapped three International Committee of the Red Cross workers in Jolo, Sulu. All either escaped or were released. The ASG reportedly abducted numerous other individuals, including an Irish priest.

While the NPA continued to disrupt public security and business operations with intermittent attacks on communication and transportation infrastructure throughout the Philippines, it continued to decline in personnel and effectiveness. However, the NPA remained steadfast in its refusal to accept President Arroyo's broad amnesty overtures, turning down offers to negotiate unless its U.S. and international designations as a terrorist organization were rescinded. RSM maintained close links to ASG and JI, and was alleged to have participated in several attacks in the Philippines.

During the year the long-running separatist insurgency in Mindanao boiled over in violence, resulting in thousands of internally displaced persons. Subsequently the government and the insurgents agreed to renew negotiations and the violence waned. Late in the year an election-related violent episode involving two rival Mindanao clans resulted in the massacre of over fifty

Page | 55

PX205

civilians, including a number of journalists.  While not the activities of international terrorism, these developments are indicative of the instability and conflict in the southern Philippines that complicated the government's efforts during 2009 to combat the terrorist groups harboring there.

The U.S. strategy of offering development opportunities in areas at risk for terrorist recruitment continued to isolate the remaining ASG and JI terrorists in the southern Philippines.  Philippine military and law enforcement agencies conducted intensive civil-military and internal security operations to eliminate terrorist safe havens in the Sulu Archipelago and central Mindanao.

In the past year, the AFP conducted several key operations that disrupted the ASG and limited its ability to conduct organized attacks.  In accordance with Philippine government priorities, the U.S. Joint Special Operations Task Force-Philippines (JSOTF-P) provided advice and assistance, including training, intelligence, surveillance, and reconnaissance.  Terrorist groups in the region are also being countered by a robust AFP Information Operations and Civil Military Operations capability that has been bolstered by the JSOTF-P's Subject Matter Exchanges and training.

Law enforcement authorities continued to make little use of the 2007 Human Security Act, which provided additional counterterrorism tools for law enforcement because of key limitations in its application, including stiff fines levied on law enforcement personnel in cases where the suspect is later acquitted or the case dismissed.  The Act also provided for the establishment of an Antiterrorism Council to implement counterterrorism efforts in the country and ensure interagency cooperation.  According to experts, the newly established Council was not yet fully effective.

The United States continued to receive excellent cooperation from Philippine law enforcement officials in obtaining access to terrorist suspects and witnesses for FBI interviews, and access to criminal, immigration, financial, and biographic records via the mechanisms established in the U.S.-Philippine Mutual Legal Assistance Treaty.  The U.S. Embassy continued to achieve significant progress in supporting the counterterrorism efforts of the Philippine government, including well-coordinated Embassy programs aimed at strengthening security forces and promoting peace and development in Mindanao.  The FBI provided host-nation law enforcement and government authorities with vital information for counterterrorism purposes, including investigation of the financing of terrorism.  This proactive partnership with the Philippine government has yielded solid results in combating terrorist elements.  Two prominent Filipino fugitives indicted by the FBI were deported to the Philippines by Malaysia and Indonesia.  The Filipino fugitive from Malaysia was extradited by the Philippines to the United States.  The other Filipino fugitive from Indonesia arrived in the Philippines and was undergoing judicial proceedings for extradition to the United States.

The FBI continued to provide host-nation law enforcement and government authorities with vital information for counterterrorism purposes, including investigation of the financing of terrorism.  The FBI conducted numerous judicial custodial interviews of counterterrorism subjects and leaders of the JI, ASG, RSM, as well as rogue members of the MILF.  All counterterrorism subjects were advised of their international United States Department of Justice advice of rights and afforded host nation Philippine legal counsel representation when requested.  Statements

Page | 56

PX205

were obtained and put on record for inclusion into FBI counterterrorism case files and investigations as appropriate.

The Antiterrorism Assistance (ATA) Program sustained its focus on Mindanao, where the terrorist threat and associated problems were most acute.  The program continued to provide training in a wide range of counterterrorism skills, including investigating terrorist incidents, vital infrastructure security, critical incident management, surveillance detection, and investigation and seizure of digital evidence.  ATA established the first Philippine National Police Cyber Forensic Unit, in Mindanao.  ATA also initiated an Antiterrorism Curriculum Development Project for the Philippine National Police Academy to assist in the development of a comprehensive antiterrorism curriculum.  In addition to enhanced capacity building efforts, ATA is fostering and enhancing interregional cooperation between the Philippine National Police and law enforcement agencies from Indonesia and Malaysia.

The U.S. Department of Justice/International Criminal Investigative Training Assistance Program (DOJ/ICITAP) trained 1,601 police personnel, including training PNP personnel in basic police operations and investigation techniques in Sulu Province.  DOJ/ICITAP also continued with implementation of the Maritime Police Project, which will equip maritime police in Palawan Province with special patrol boats to monitor the western Sulu Sea bordering Malaysia.

The FBI organized the visit of five senior Philippine police and prosecutors, along with 10 others from Malaysia and Indonesia, to key locations in the United States through the SE Asia Counterterrorism Regional Strategic Initiative.  The FBI sponsored seminars focused on counterterrorism issues, current procedures, and the development of future mutually enhancing law enforcement and judicial cooperation.

Other programs included the U.S. Department of Homeland Security Immigration and Customs Enforcement (DHS/ICE) development of the Philippine Biometrics Initiative (PBI), whereby fingerprints, photographs, and other information on suspected terrorists were collected and provided to the appropriate Philippine authorities.  The Philippine National Police is now the primary recipient of the Biometric Data Collection Kits and collector of the biometric data.  The intent of the PBI is to collect biometric information on individuals incarcerated in the Philippines who are associated with known suspected terrorist (KST) groups and to make this information available to U.S. authorities.

The government initially established its anti-money laundering/counterterrorist finance regime by passing the Anti-Money Laundering Act (AMLA) of 2001.  The AMLA established the Anti-Money Laundering Council (AMLC) as the country's financial intelligence unit (FIU).  The Council is composed of the Governor of the Central Bank, the Commissioner of Insurance Commission, and the Chairman of the Securities and Exchange Commission.  By law, the AMLC is an independent agency responsible for receiving, maintaining, analyzing, evaluating covered and suspicious transactions and investigating reports for possible criminal activity.  AMLC's role goes beyond traditional FIU responsibilities and includes the investigation and assisting the Office of the Solicitor General in the handling of civil forfeiture cases.

PX205

In 2009, the Philippines' Anti-Money Laundering Council (AMLC) received 82 official requests for counterterrorism action, many concerning groups on the UNSC Resolution 1267 Sanction Committee's consolidated list. In nearly all cases, the AMLC's investigations responding to such requests showed no record of the entities concerned conducting financial transactions in the Philippines.

The Philippines is a member of the Asia/Pacific Group on Money Laundering (APG). The APG conducted a comprehensive peer review of the Philippines AML/CFT regime in September 2008 and subsequently provided 45 pages of recommendations for improvement. The Philippine legislature is now considering an amendment to the AMLA to address these issues.

**Singapore**

Singapore continued its strong bilateral and multilateral counterterrorism intelligence and law enforcement cooperation. Since December 2001, more than 50 persons with links to terrorist groups were detained under Singapore's Internal Security Act (ISA) for involvement in terrorist-related activities. At year's end, Singapore held in detention 17 persons with links to terrorist groups. Detainees included members of Jemaah Islamiya (JI) who had plotted to carry out attacks in Singapore in the past and members of the Moro Islamic Liberation Front (MILF).

Under detention orders, the detainees were required to undergo a program of counseling with a group of volunteer counselors. Singapore enlisted the support of religious teachers and scholars to study JI's ideology, to develop teachings to counter the group's spread within Singapore's Muslim community, and to provide counseling to detainees , which would continue after their release. As of December, a total of 47 persons remained under Restriction Orders (RO). Detainees released on ROs were monitored by the Singapore authorities and required to report to authorities on a regular basis. Singapore authorities determined that all 47 persons released on ROs had cooperated in investigations and responded positively to counseling. Among those *having received counseling*, there are no reported cases of recidivism to date.

In April, Mas Selamat Kastari, the Singapore leader of JI, was recaptured by Malaysian authorities in Johor, Malaysia. Kastari had been a fugitive since his escape from detention in Singapore in February 2008. Kastari remains in Malaysian custody. In June, Indonesian authorities captured two Singaporean JI fugitives, Husaini Ismail and Samad Subari. Husaini was one of five Singaporean JI members involved in a failed 2002 plot to hijack a commercial airliner and crash it into Singapore's Changi International Airport. All five JI members involved in the plot are now in custody, with two in Singapore, one in Malaysia and two in Indonesia.

When Singapore held its annual counterterrorism exercise, Northstar VII, in July, the exercise simulated a series of coordinated, simultaneous Mumbai-style terrorist attacks on hotels and infrastructure in multiple locations. More than 2,000 personnel from 15 civilian and military organizations participated in the exercise, including the Special Operations Task Force, the Ministry of Defense, the Singapore Police Force, the Singapore Civil Defense Force, the Maritime and Port Authority, and the Ministry of Transportation.

PX205

Singapore hosted the Proliferation Security Initiative Exercise Deep Sabre II in October. Approximately 2,000 personnel from 21 countries participated, representing military, diplomatic, legal, customs, immigration, police, and civil defense agencies. The exercise demonstrated Singapore's multi-layered, multi-agency commitment to deny terrorists the ability to move people or materials in Singapore. Authorities made extensive use of advanced biometrics to verify the identity of all individuals arriving into Singapore.

The Republic of Singapore Navy participated in the annual bilateral exercise "Cooperation Afloat Readiness and Training" with the U.S. Navy and U.S. Coast Guard, and also the multilateral "South East Asia Cooperation Against Terrorism" drill. Singapore also conducted its own internal, annual exercise "APEX," which tested the government's multi-agency response to a maritime terrorism incident.

Singapore contributed to the international community's efforts in Afghanistan, including military personnel supporting a weapons locating radar unit, a medical team, and an engineering team. Singapore was also involved in training Afghan civilians in various capacities, including health care, civil aviation, and water/waste management.

**Taiwan**

Taiwan is not a member of the United Nations and, therefore, is not subject to UNSC Resolutions and cannot join UN counterterrorism conventions and protocols. Nonetheless, Taiwan sought to implement, to the maximum extent possible, all UN resolutions related to combating terrorism and terrorist finance issues. Taiwan continued to provide rapid and thorough responses on terrorist financing issues to the American Institute in Taiwan (AIT). The "Antiterrorist Action Law" proposed in 2006 by Taiwan's Executive Yuan, is still awaiting action by the Legislative Yuan. Taiwan revised its Money Laundering Control Act in 2009 to extend the law's coverage to the financing of crimes that intimidate the public or threaten "the government, a foreign government or institution, or international organization."

The Taiwan Office of Homeland Security (OHS) coordinated several large-scale training exercises among law enforcement and security agencies. Taiwan sought ways to harden and protect its critical infrastructure, in order to maintain continuity of operations and government in the event of an attack or disaster. OHS also coordinated counterterrorism exercises with Taiwan law enforcement and security agencies prior to the "2009 Kaohsiung World Games" and the "2009 Taipei Deaf Olympics."

**Thailand**

Counterterrorism cooperation with Thailand remained strong despite internal political conflict. While officials have long expressed concern that transnational terrorist groups could establish links with southern Thailand-based separatist groups, there have been no indications that transnational terrorist groups are directly involved in the violence in the south, and there is no

PX205

evidence of direct operational links between southern Thai insurgent groups and regional terrorist networks.

The ethno-nationalist separatist insurgency in Thailand's southernmost provinces of Songkhla, Pattani, Narathiwat, and Yala continued in 2009.  Some 4,000 people have been killed in the conflict since the violence escalated in 2004 with a campaign of assassinations, beheadings, and coordinated bombings using improvised explosive devices (IEDs).  Levels of violence rose in 2009 after a decrease in 2008, with larger explosive devices employed.  Thai press reports and security forces attributed nearly all the attacks in the south to insurgents; it is unclear, however, how much of the violence was attributable to crime and other political or business disputes.  It was reasonably clear that there were overlaps between the groups conducting criminal activities and those who were manufacturing IEDs.

A range of Thai government agencies, including the Ministries of Interior and of Social Development and Human Security, and the Thai military and police academies continued to organize outreach programs to ethnic Malay-Muslims to counter radicalization and violent extremism.

The porous nature of Thailand's southern border with Malaysia remained an issue of concern.  In April, Thai Supreme Commander Songkitti Jaggabatara and Malaysian defense forces chief Haji Zainal agreed to closer intelligence sharing to improve border security.  At the same time, cross-border law enforcement cooperation based on long association between Thai and Malaysian police officers was surprisingly good, even though it was conducted in a very low-tech manner.  In a December meeting, Malaysian Prime Minister Najib Razak and Thai Prime Minister Abhisit Vejjajiva agreed to improve security in the border area by linking the Smart Card system of Thailand to MyKad system of Malaysia to prevent border residents from holding dual citizenship.  In early 2009, Thailand began conducting joint sea and air patrols of the Malacca Strait with Indonesia, Malaysia, and Singapore in a program that includes "Eyes in the Sky" and intelligence exchange programs.

Legal mechanisms to counter the southern Thai insurgency lagged behind security efforts, but showed signs of improvement.  Government prosecutors still struggled to develop cases that could stand up in court, relying chiefly on confessions as evidence.  Through a U.S. Embassy initiative, the Thai judiciary was soliciting consultations with judges from the U.S., Northern Ireland, and the Middle East, seeking to distill the experiences of judges working in areas of religious and ethnic conflict into new approaches to Thailand's Muslim population.

Police forensics and ballistics work often failed to produce viable evidence leading to convictions following separatist attacks.  There was an 80 percent acquittal rate in insurgency-related indictments in the south, chiefly due to poor evidence.  While this may have spoken to the integrity of the judiciary, it also spoke to the low capacity of police and prosecutors.  The security environment in the three insurgency-affected provinces in the south has resulted in some innovative police work, including specialized task forces and twice-weekly reviews of the character and quality of evidence in each ongoing terrorism-related case — something the Thai police would do well to emulate nationwide.  Because of the difficulties in bringing cases to

PX205

court, security forces engaging in operations to arrest militants relied on powers under martial law and the 2005 Emergency Decree to detain suspects, who can be held for a total of 37 days without being charged with a crime.  There were various legal means available to extend that period.

Thai security forces cooperated with the United States and with other countries to deny safe haven to terrorists.  In the past, Thailand has served as a transit point for regional terrorists, as evidenced by the 2003 capture in central Thailand of Nurjaman Riduan bin Isomuddin (a.k.a. Hambali), JI's operations chief, and the architect behind the 2002 Bali bombings.  Thai police, security officials, and court system personnel participated in a series of U.S. training programs sponsored through the Antiterrorism Assistance Program, the Force Protection Detachment (the criminal justice sector capacity-building programs for police, prosecutors, and judiciary mounted by the Transnational Crime Affairs Section), and the International Law Enforcement Academy (ILEA) in Bangkok.  Training modules included courses on post-blast investigations, interrogation and interview techniques, forensic science, law enforcement response to terrorism, community policing, humane crowd control, training in SWAT tactics, and the Antiterrorism Executive Forum.  The United States and Thai militaries cooperated in a series of training events and exchanges designed to build counterterrorism capacity.

The Thai Anti-Money Laundering Office (AMLO) is Thailand's official Financial Intelligence Unit.  Thailand has been a member of the Financial Action Task Force's Egmont Group since June 2001.  AMLO, the Bank of Thailand, and the Securities and Exchange Commission are empowered to supervise and examine financial institutions for compliance with anti-money laundering/counterterrorist financial laws and regulations.  Capacity-building for this office and the Ministry of Justice's Department of Special Investigations continued, with training in cyber-crime.

Ministry of Finance regulations governing cross border cash carrying are in line with the Financial Action Task Force Special Recommendation on Terrorist Financing.  The Bank of Thailand has issued instructions to financial institutions to comply with FATF recommendations on Anti-Money Laundering and Combating the Financing of Terrorism.

The Thai government continued to cooperate on the extradition case involving international arms trafficker Victor Bout, who is under federal indictment in New York for conspiring to kill U.S. nationals and officers; acquire and use anti-aircraft missiles; and provide material support to the Revolutionary Armed Forces of Colombia, a designated foreign terrorist organization.  Bout was arrested in Bangkok in March 2008, and formal extradition proceedings took place in the Thai Criminal Court from June 2008 until May 2009.  In August, the Criminal Court denied the extradition request based primarily on its conclusion that the U.S. indictment charged "political" rather than criminal offenses.  The Thai government has appealed this decision.  Bout remained in custody at a maximum-security prison in Bangkok.

Thailand participated actively in international counterterrorism efforts through the Asia Pacific Economic Cooperation, the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum, and other multilateral fora.

Page | 61

PX205

**Vietnam**

The Government of Vietnam, the Ministry of Public Security, and the Counterterrorism Department, assessed that there is no general terrorist threat against Vietnam from indigenous groups and individuals or from abroad. Vietnamese police and security officials participated in a series of U.S. training programs sponsored by the State Department, Drug Enforcement Administration, and the International Law Enforcement Academy in Bangkok.

## EUROPE OVERVIEW

> **"Because this is a fight for hearts and minds against violent extremism and those ideologies that would pervert the true Islamic faith, we have both stepped up our work with our allies to expose the damage that this extreme and violent ideologies do and to support those working across all faiths to uphold the common ground of dignity tolerance and respect for all."**
>
> **--Gordon Brown, Prime Minister, United Kingdom**
> **Speech to the House of Commons, November 30, 2009**

European countries continued to enhance their abilities to combat the threat from terrorism by strengthening counterterrorism legislation, improving multilateral cooperation, and prosecuting and jailing terrorist suspects. Several significant terrorist plots were foiled in 2009, as governments continued to focus both on foiling specific attacks and on understanding and countering the process of radicalization. Toward that end, European governments continued their efforts at outreach to domestic Muslim communities and made attempts to gain support from those communities to counter the appeal of violent extremist ideology. France trained police to recognize signs of incipient radicalization, Germany continued engagement through its German Islam Conference, the Netherlands Justice Ministry continued to focus on radicalization, and the United Kingdom continued to implement numerous counter-radicalization programs.

European nations worked in close partnership with the United States against a terrorist threat characterized by both external and, increasingly, internal components. The abortive attempt on December 25 to blow up a trans-Atlantic flight resulted in even greater cooperation between U.S. security agencies and European ones, especially those of the United Kingdom and the Netherlands. More broadly, the contributions of European countries in sharing intelligence, arresting members of terrorist cells, and interdicting terrorist financing and logistics remained vital elements in the global effort to combat terrorism. The United States and European Union continued to cooperate closely on counterterrorism, although differences over standards for protection of data complicated efforts to agree on the sharing of bank data collected by the Society for Worldwide Interbank Financial Telecommunication (SWIFT). In October 2009, the United States and EU exchanged instruments of ratification on the US-EU mutual legal assistance and extradition agreements.

PX205

European nations were active participants in a variety of multilateral organizations that contributed to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF) and the Council of Europe's FATF-style regional body, the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and Financing of Terrorism (MONEYVAL), the Global Initiative to Combat Nuclear Terrorism, the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO).  **(**See Chapter 5*, Terrorist Safe Havens (7120 Report)* for further information on the G8, NATO, FATF, OSCE, and ICAO.)

Terrorist activity and the presence of terrorist support networks in Europe remained a source of serious concern.  Judicial proceedings in countries across Europe resulted in the successful convictions of several terrorist suspects.  For example, Spanish courts convicted all 11 suspects linked to an alleged plot in Barcelona, and in April, the trial began in Germany of the Sauerland Islamic Jihad Union (IJU) cell connected to plotting against U.S. bases.  French authorities detained and prosecuted suspects tied to terrorist organizations ranging from Islamist groups to Corsican Nationalists to Basque Fatherland and Liberty (ETA), to the Liberation Tigers of Tamil Ealam (LTTE), and the Kurdistan Workers' Party (PKK).  However, efforts to combat the threat in Europe were sometimes slowed by legal protections that made it difficult to take firm judicial action against suspected terrorists, asylum laws that afforded loopholes, the absence of adequate legislation, or standards of evidence that limited the use of classified information in holding terrorist suspects.  Terrorists also sought to take advantage of the ease of travel among Schengen countries.  At times, some European states have not been able to prosecute successfully or hold some of the suspected terrorists brought before their courts – a product, in part, of insufficient measures to use intelligence information in judicial proceedings.  The EU as a whole remained reluctant to take steps to block the assets of charities associated with HAMAS and Hizballah.

Cooperation with and among European law enforcement agencies remained vital for counterterrorism successes.  U.S.- Danish cooperation helped foil an October plot to attack a Danish newspaper; Franco-Spanish cooperative efforts against ETA led to a series of arrests of senior ETA political and military leaders.  European countries continued to maintain pressure on the PKK, which raised funds, often through illicit activity, to fund violence in Turkey.

No major terrorist attacks took place in Western Europe in 2009, although ETA bombings, the attempted December 25 airline attack, an abortive suicide bombing in Milan, and arrests in countries across the continent brought home the scope of the challenge facing European governments and security forces – as did the public statement by the head of Britain's MI5 that some 2000 terrorism suspects are under constant surveillance in the UK.  Greece bore the brunt of a reinvigoration of domestic terrorism, with many attacks claimed by radical leftist-anarchist terrorist groups.  Swedes were arrested for suspicion of terrorism in the border area between the Northwest Frontier Province and the Punjab in Pakistan.  Italy arrested suspects linked to a terrorist network broken up in 2008 in France and Belgium, and persons connected to the November 2008 attacks in Mumbai, India who were also implicated in plots against Denmark and Italy.  The level of threat in Western Europe remained high, particularly in the Netherlands, Denmark, Germany, France, the United Kingdom, and Belgium.  The lead-up to the September elections in Germany saw a drumbeat of threats from persons linked to the IJU and the Islamic

Page | 63

PX205

Movement of Uzbekistan, with German-speakers repeatedly warning that the country would be attacked if its Afghanistan policy did not change; fortunately, nothing came of the threats. Nonetheless, German authorities expressed concern over their estimate that roughly 185 individuals have undergone paramilitary training over the past ten years at Islamist extremist training centers located primarily in the border regions of Afghanistan and Pakistan.

**Albania**

Albania pledged to increase its contribution of troops to Afghanistan, froze bank accounts related to money laundering and terrorist financing, and aggressively worked with the United States and other countries to combat terrorism. Albania made progress in identifying vulnerabilities at land and sea borders, but the government and police forces continued to face challenges to enforce border security fully and to combat organized crime and corruption.

On January 14, 2008, the criminal trial began against Hamzeh Abu Rayyan, the suspected administrator for UNSCR 1267 Committee-designated terrorist financier Yassin al-Kadi, who is charged with hiding funds used to finance terrorism. This marked the first-ever criminal terrorist finance-related trial in Albania. The trial continued throughout 2009. A civil suit filed by al-Kadi to release his assets from seizure was dismissed and refiled several times. It was later reviewed by higher courts on matters of jurisdiction and statute of limitations. After being dismissed in June, it was filed again and is now pending trial in Tirana District Court. In addition, al-Kadi's company, Loxhall, filed a lawsuit in April. It aimed to annul the Council of Ministers' decision, as well as the two orders of the Ministry of Finance related to the administration of seized terrorism assets. This lawsuit was rejected in October, and is now pending appeal.

On October 12, a local imam, Artan Kristo, was arrested in Durrës. Kristo, also known as Muhamed Abdullah, was accused of "publicly inciting and propagating terrorist acts" for allegedly calling for jihad in the AlbSelafi.net online forum. Previously, Kristo was named as a suspect in the murder of the Secretary General of the Albanian Muslim Community, Salih Tivari, in January of 2003. The Durrës court decided to detain Kristo pending trial.

As of October, the Ministry of Finance stated it maintained asset freezes against six individuals and 14 foundations and companies on the UNSCR 1267 list. No new assets were frozen this year under Albania's Terrorist Financing Freeze law. Despite this, the effectiveness of the government's counterterrorist financing effort was undermined by a lack of data-processing infrastructure and an inadequate capability to track and manage cases properly.

**Armenia**

Armenia's counterterrorism partnership with the United States included granting blanket over-flight clearance and ad hoc landing rights to U.S. military aircraft, deployment of a peacekeeping contingent to Iraq, and participation in bilateral assistance programs that strengthened the government's capacity to monitor illicit financial flows and confront trafficking in hazardous substances. Widespread corruption, however, continued to hamper full implementation and

Page | 64

PX205

enforcement of laws that would improve Armenia's counterterrorism posture and response capability.

In December, the Armenian parliament approved Ministry of Defense plans to send a 35-45 troop contingent to Kunduz, Afghanistan. Armenian troops are expected to protect the Kunduz airport runway and other facilities near the airport.

In recent years, Armenia has achieved measured progress in implementing border security and combating trafficking in persons, drugs, and WMD materials. This progress has included the installation of radiation portal alarms at all land ports of entry and its main airport, and the use of sensors for increased monitoring of Armenia's mountainous border with Georgia. Additionally, the Armenian Border Guard Service now has full connectivity of its automated Border Management Information System with all points of entry, which should reduce the possibility of passport and visa fraud.

In 2008, Armenia revised its law on combating money laundering and terrorist financing. The revision significantly expanded the range of reporting entities required to report suspicious transactions to the Financial Monitoring Center (FMC), a specialized intelligence unit within the Central Bank that is responsible for combating money laundering and terrorist financing. In 2009, as a result of the work of the FMC, Armenia recorded its first successful money laundering prosecution.

**Austria**

According to Austria's counterterrorism agency, the Bureau for the Protection of the Constitution and Counterterrorism (BVT), there was a growing number of radicalized individuals among second- and third-generation Muslim immigrants and among converts to Islam.

Austria has a fairly comprehensive counterterrorism and anti-money laundering legislative framework in place. In December, the government introduced a bill that would make it a crime to attend terrorist training camps abroad or to receive terrorism training on the Internet.

In August, Austria's Supreme Court upheld a prison sentence for a young couple jailed for terrorist threats conveyed through the Internet in late 2007. In a related development, a Canadian court ruled in October 2009 that a Moroccan national, who had maintained close contact with the Austrian couple, was guilty of having planned bomb attacks against OPEC, UN sites, and German facilities in Austria and Germany in 2007.

There are believed to be 4,000 sympathizers of the PKK in Austria. Some Turks in Austria supported Turkish extremist Metin Kaplan, who advocates replacement of the Turkish state by an Islamic regime and who has been linked to violent criminal acts.

Austria closely followed EU policies to counter terrorist financing and actively participated in the EU Clearinghouse mechanism, which designates terrorist financiers under UNSCR 1373. Austria fulfilled its obligations to freeze assets, pursuant to UNSC resolutions and EU

Page | 65

PX205

Clearinghouse designations, but did not initiate any freezing actions independently.  Parliament passed two relevant laws in 2009.  The Administrative Assistance Implementing Act provides a new basis for handling foreign authorities' assistance requests for exchange of tax information.  Austrian authorities will provide information in tax proceedings, including data formerly blocked by bank secrecy regulations.  The Law on Payment Services integrates European Council Directive 2007/64/EC on payment services into domestic law and establishes a license requirement for money transmitters, which previously was regulated under the Banking Act for relevant businesses.  The FATF's 2009 Mutual Evaluation Report, which includes FATF assessment of Austria's anti-money laundering and counterterrorist financing (AML/CTF) regime, acknowledged that Austria has established a comprehensive AML/CTF system, but raises questions about its effective implementation.  In reaction, the Austrian government announced additional legal changes to bring its AML/CFT standards fully in compliance with the FATF's 40+9 recommendations.

The BVT continued to monitor a handful of mosques in Vienna suspected of preaching radicalism.  Likewise, it continued to follow the activities of the Egyptian Islamic Jihad movement, certain radicalized converts to Islam, and suspected Afghan and Chechen extremists entering Austria as asylum seekers.

Austria has about 23,000 Chechen refugees.  According to counterterrorism experts, a small Vienna-based Chechen group serves as the European arm of the Chechen separatist movement headed by Dokku Umarov.  The Vienna-based group is suspected of extorting money from the Chechen exile community in Austria.

In late 2008, domestic and international media reported a possible link between Austria and the terrorists responsible for the November 2008 attacks in Mumbai.  As reported by the Indian newspaper "Indian Express" in 2008, one of the SIM cards used by one of the terrorists had been issued by a Vienna-based telecommunications company.  An Austrian newspaper subsequently claimed the terrorists had communicated via a Voice-Over-Internet Server in Vienna.

As a non-permanent member of the UN Security Council, Austria chaired the al-Qa'ida and Taliban Sanctions Committee 1267.  In this capacity, Austria sought "to place particular focus on observance of rule of law and human rights with terrorism suspects."[6]

Vienna is the seat of the United Nations Office for Drugs and Crime (UNODC), and of the related Terrorism Prevention Branch (TPB).  In 2009, Austria contributed US$ 825,000 to the UNODC.  In October, together with a handful of other nations, Austria held a two-day counterterrorism networking workshop in Vienna, gathering representatives from 100 nations and 40 international organizations and UN units.  In Afghanistan, Austria supported criminal law

---

[6]  (See briefing by Austrian committee chairman Thomas Mayr-Harting to UN Security Council November 13. (http://www.un.org/sc/committees/1267/latest.shtml).

PX205

and criminal justice capacity building programs.  Austria worked with the UNODC and the EU to establish more effective border control checkpoints along the Afghan-Iranian border.

Austria continued its participation in the Salzburg Forum, a regular meeting platform of interior ministers from Austria, the Czech Republic, Slovakia, Poland, Hungary, Italy, Romania, and Bulgaria designed to fight terrorism and organized crime in the region.  Similarly, the Austrian government worked throughout the year to promote and expand the Pruem Treaty, under which the seven EU signatory states share information from their police databases.  The treaty, which involves the exchange of DNA, fingerprint, and vehicle data, was designed, in part, to identify terrorism suspects.

**Azerbaijan**

Azerbaijan actively opposed terrorist organizations seeking to move people, money, and material through the Caucasus.  The country stepped up efforts and has had some success in reducing the presence of terrorist facilitators and hampering their activities.  At the end of 2009, Azerbaijan demonstrated an increasing level of seriousness and urgency in taking steps to combat terrorist financing, and is proceeding with efforts to implement its law on anti-money laundering and counterterrorist financing (AML/CTF) and to establish a Financial Investigative Unit (FIU).  The Central Bank, which houses the FIU, prepared an action plan in October to bring Azerbaijan's AML/FIU into conformity with the standards of the United Nations, the Financial Action Task Force (FATF), and other international organizations and conventions, and submitted the plan to MONEYVAL, the FATF-Style Regional Body (FSRB) hosted by the Council of Europe.  That institution, in turn, reviewed Azerbaijan's proposals in December and agreed to withdraw its advisory (on non-compliance) on Azerbaijan.  The FIU has requested technical assistance from the U.S. government to improve the legal framework in the AML/CTF area, establish information systems, build capacity for AML/CTF stakeholders, and develop a mid-term strategy plan for the FIU.  Azerbaijan continued to identify possible terrorism-related funding by distributing lists of suspected terrorist groups and individuals to local banks.

Azerbaijan has granted blanket overflight clearance, engaged in information sharing and law-enforcement cooperation, and has approved numerous landings and refueling operations at Baku's civilian airport in support of U.S. and International Security Assistance Force (ISAF) military operations in Afghanistan.  Azerbaijan maintained 90 soldiers in Afghanistan and cooperated with ISAF in medical and social services and civilian capacity-building.

In 2007, the Ministry of National Security (MNS) arrested 15 Azerbaijani citizens who were members of the "Mahdi Army Group," an extremist organization the government linked to the Iranian Revolutionary Guard Corps.  On June 18, 2009, the Military Court of Grave Crimes sentenced Lieutenant Kamran Asadov and 20 accomplices to prison terms from two to 15 years for their participation in an abortive plot to attack the United States and British embassies in Baku in late 2007.  Asadov and his co-conspirators stole weapons and ammunition from the army base where he was posted and committed an armed robbery at a Lukoil gas station.

PX205

On October 4, a Baku court sentenced two Lebanese nationals, Ali Muhammad Karaki and Ali Hussein Najmeddin, to 15 years each, and sentenced four Azerbaijani accomplices to terms of two to 14 years. The court found that the group was planning attacks on the Israeli Embassy. The investigation revealed that Karaki and Hussein were linked to Hizballah and others in Iran.

In two separate trials in October, the Court of Grave Crimes sentenced 15 Azerbaijani nationals to prison terms ranging from six months to 30 months for participating in illegally armed groups in Pakistan and Afghanistan. In the 11 cases where the accused received six months sentences, they were released, having already served that much time since their arrests. Depending on the individual combinations of charges proffered, each of the 15 defendants had been in jeopardy of a sentence of up to five or seven years.

On November 4, a Baku court sentenced 26 people – 23 Azerbaijanis, two Turkish nationals and a Russian national – to prison terms from two to 15 years for the August 17, 2008 attack on Baku's main Sunni mosque, known as Abu Bakr. The grenade attack killed three people and wounded eight others. The mosque has not reopened since the attack. The Azerbaijani government linked the Abu Bakr Mosque attackers to the "Forest Brothers" organization of the North Caucasus, whose leader Ilgar Mollachiyev was killed in Dagestan in September 2008.

**Belgium**

Belgian authorities are concerned with potential terrorist activities by domestic extremists, Islamic extremists, anarchists, and militant animal rights groups. International groups of concern to Belgium included extremists from al-Qa'ida and the Democratic People's Party of Kurdistan (DHKP/C). The Kurdistan Workers' Party (PKK) is a known presence in Belgium and has television production studios in Denderleeuw. A fine levied on the studio several years ago did not impact the production facility significantly.

The inter-ministerial College of Security and Intelligence meets regularly and makes reports and recommendations to the Belgian government. The College is chaired by the Prime Minister's Security Advisor. The Coordinating Body for Threat Analysis (OCAM/OCAD) develops common threat analyses that are discussed in the College. The College includes representatives from OCAM/OCAD, the State Security Service, the Federal Police, Customs, and the Ministries of Transport, Finance, Interior, Justice, and Foreign Affairs.

Belgian authorities have the ability to create a national list of terrorist entities, separate from UN and EU lists and coordinated by OCAM, including financiers and suspected financiers of terrorism. This information allowed Belgian authorities to develop and apply a national capacity to freeze assets, in addition to UN- and EU-mandated asset freezes that Belgium already implements. Belgium cooperated with the United States on security programs such as the Container Security Initiative, Megaports, and export controls.

Prosecutors continued to investigate the case of five suspected terrorists arrested in December 2008. Another nine persons taken into custody at the same time were released shortly thereafter due to lack of evidence. Belgium ratified the U.S.-EU Multilateral Legal Assistance and

Extradition Agreements in July 2009. Belgium's prosecutors are cooperating with the United States in the extradition of Nizar Trabelsi, who was convicted of plotting to attack American soldiers at Kleine Brogel Air Base in Belgium.

Belgium's troop commitment to NATO ISAF operations in Afghanistan increased from about 250 troops in 2008 to nearly 540 in 2009. Belgians provided security for Kabul airport, operated and maintained six F-16s in Kandahar, ran an Operational Mentoring and Liaison Team in Kunduz, and participated in a German-run Provincial Reconstruction Team (PRT).

**Bosnia and Herzegovina**

Despite ethnic polarization, corruption, and disputes among Bosnian political leaders that hindered the functioning of state government, Bosnia and Herzegovina's law enforcement organizations cooperated with the United States on international counterterrorism issues. Bosnia remained a weak, decentralized state with poor interagency communication and competing security structures. Efforts by Republika Srpska officials to undermine state-level institutions slowed efforts to improve operational capabilities to combat terrorism and terrorist financing. These factors resulted in Bosnia being vulnerable to exploitation as a potential staging ground for terrorist operations in Europe.

The State Investigation and Protection Agency is the state-level Bosnian law enforcement agency with primary responsibility for counterterrorism operations. SIPA's capacity is limited, but it improved its cooperation with the entity-level police forces in the Federation and Republika Srpska on terrorism issues. In an effort to more effectively investigate and prosecute terrorism cases, the State Prosecutor's Office transferred responsibility for these cases to the Special Department for Organized Crime, which received technical assistance from the United States and other members of the international community. Politicization of the terrorism issue in Bosnia, including terrorism threat analysis, was less of a problem than in the past. The state-level intelligence service provided excellent cooperation, and Bosnian authorities were generally responsive to U.S. counterterrorism cooperation requests.

Some former members of the mujahideen brigade, whose citizenship was revoked by the Citizenship Review Commission, have pursued appeals of these decisions that remained unresolved. In the case of Abu Hamza al-Suri (Imad al-Husayn), the appeals process has lasted more than one year. The state-level Constitutional Court returned several portions of Hamza's appeal to the State Court, and the court had not adjudicated this case at year's end.

In July, Swedish citizen Misrad Bektasevic, who was convicted on terrorism charges in Bosnia in 2005, was transferred from Bosnia to Sweden, where he will serve the remainder of his prison sentence. Bektasevic was arrested by Bosnian Security Police in Sarajevo, when he was found in an apartment with explosives, weapons, and suicide bomb belts in 2005. A video with masked persons threatening to attack forces in Iraq and Afghanistan was found and a voice analysis proved that Bektasevic was one of the individuals in the video. In 2007, he was sentenced to eight years and four months imprisonment for terrorism-related crimes.

PX205

In November, four individuals with alleged ties to extremists, led by Rijad Rustempasic, were arrested for terrorism and weapons trafficking. One of the suspects wanted in this case remained at large at the end of 2009.

Bosnia has deployed 10 officers to augment Alliance military staffs operating under NATO's International Security and Assistance Force (ISAF) in Afghanistan.

**Bulgaria**

During 2009, 29 Bulgarians attended U.S. government-sponsored counterterrorism training courses within the context of the Combating Terrorism Fellowship Program, administered by the Embassy's Office of Defense Cooperation. This training had courses in intelligence, security, operations, legal processes, and civilian-military cooperation. In July, 15 analysts from the Defense Information Service received a two-day seminar on terrorist network analysis and terrorist finance.

Bulgaria participated in the International Security Assistance Force in Afghanistan with approximately 470 service members. At U.S. request, Bulgaria added its first Operational Mentor and Liaison Team in February and agreed to add a second. On a yearly basis since 2004, Bulgaria has deployed a frigate in support of the Mediterranean Operation Active Endeavor (OAE). OAE's mission is to conduct maritime operations in the OAE area of operations to demonstrate NATO's resolve to help deter, defend, disrupt, and protect against terrorist activity.

In November, the new center-right government achieved a major success with the passage of two bills designed to overhaul the structure and operation of the Ministry of Interior and the agency responsible for counterterrorism, the State Agency for National Security (DANS). The two pieces of legislation eliminate duplication of effort and unclear responsibilities, making it easier for them to cooperate and share information. The DANS amendments explicitly restored the powers of the Financial Intelligence Directorate (FID) to conduct on-site inspections of banks and other financial institutions, and collect "bank secret" information for money laundering and terrorist financing cases. The FID remained vigilant against terrorist financing and continued to cooperate with the U.S. government on identifying and investigating terrorist assets. The FID reliably distributed lists of individuals and organizations linked to terrorism to all of the banks in Bulgaria, the Ministry of Interior, Customs, and the Border Police. The FID has been responsive to all mandated UNSCR-designated terrorist organizations, and has also been supportive and cooperative on U.S. government designated individuals and organizations. The FID has advised the banking sector to use the Department of Treasury Office of Foreign Assets Control OFAC website as a reliable information resource for individuals and organizations associated with terrorism. The FID continued to provide feedback, including information on the response level of Bulgaria's banks, to the U.S. Treasury Department's Financial Crimes Enforcement Network, as well as to the U.S. Embassy.

**Croatia**

PX205

In 2009, Croatia started the drafting process for an action plan to implement its national strategy for the prevention and suppression of terrorism.  Croatia expanded its extensive counterterrorism legal framework by passing the Anti-Money Laundering and Terrorist Financing Act, which entered into force in January.

In 2009, Croatia chaired the UN Security Council's Counter-Terrorism Committee (CTC).  Croatia supported U.S. efforts in the 1267 Committee.  Croatia also advocated providing further financial support to the Counterterrorism Implementation Task Force.  The Croatian Interagency Working Group on Suppression of Terrorism amended its mandate adding UNSCR 1624 to the UNSC Resolutions it was already charged with implementing, such as UNSCRs 1267, 1373, and 1566.

Croatia is currently issuing biometric passports.  In addition, Croatia signed a number of agreements in 2009 with the United States that strengthened information sharing and cooperation between U.S. and Croatian immigration, law enforcement, and security agencies.  Croatia also worked with the State Department's Export Control and Border Security program to improve security along its 750 mile border with Serbia, Montenegro, and Bosnia, as well as to monitor the country's 6,000 miles of coastline.

The multinational Special Forces military exercise "Jackal Stone 09" held in September in Croatia had approximately 1,500 participants from 10 countries, including the United States, and developed the capabilities of the participants in countering terrorism.

During 2009, Croatia chaired the Council of Europe's Committee of Counterterrorism Experts (CODEXTER).  Following up on a Croatian initiative to develop cross-regional cooperation in counterterrorism, the Council, Spain, and the Organization of American States organized a Conference on Cyber Security in Spain in April.  Under CODEXTER's umbrella, Croatia kept an updated self-assessing Country Profile that summarized Croatia's counterterrorism activities.

Croatia worked closely with the OSCE's Action against Terrorism Unit.  This resulted in a joint Croatian-OSCE workshop addressing cyber-security issues such as terrorist use of the Internet, held in Zagreb in November.  More than 140 national representatives, as well as 20 internationally recognized experts from academia, business, and government, participated in this event.

As part of international efforts to counter violent extremists, Croatia participated in the International Security Assistance Force (ISAF) in Afghanistan, contributing approximately 300 troops.  Croatia joined NATO in April and began contributing to the Alliance's counterterrorism efforts.

**Cyprus**

Cyprus continued to stand as an ally of the United States in its counterterrorism efforts.  The government was responsive to efforts to block and freeze terrorist assets, implemented Financial Action Task Force (FATF) recommendations, and conformed to European Union

Page | 71

PX205

counterterrorism directives. Cyprus continued to allow blanket overflight and landing rights to U.S. military aircraft supporting operations in Iraq and Afghanistan. In January, Cypriot authorities detained the Cypriot-flagged MV Monchegorsk. The vessel, chartered by the Islamic Republic of Iran Shipping Lines, contained Iranian-origin weapons components allegedly headed for Hizballah that were confiscated by Cypriot customs officials after the Government of Cyprus determined the shipment was in violation of United Nations Security Council resolutions.

Cyprus's legal framework for investigating and prosecuting terrorist-related activity remained relatively weak. The United States and Cyprus cooperated closely on terrorist financing and money laundering issues. The Cypriot Anti-Money Laundering Authority implemented new UNSCR 1267 listings immediately and informally tracked suspect names listed under U.S. executive orders. The Cypriot government maintained a "Prevention and Suppression of Money-Laundering Activities Law" that contained provisions on tracing and confiscating assets.

Since 1974, the southern part of Cyprus has been under the control of the government of the Republic of Cyprus; the northern part, administered by Turkish Cypriots, proclaimed itself the "Turkish Republic of Northern Cyprus (TRNC)" in 1983. The United States does not recognize the "TRNC," nor does any country other than Turkey. This de facto division has precluded counterterrorism cooperation between the two communities' law enforcement authorities, and between Cyprus and Turkey. The largely porous, lightly-patrolled "green line" separating the two sides is routinely exploited for trafficking people, narcotics, and other illicit goods, and is vulnerable to penetration by terrorist groups. Since 2007, regular ferry service between Latakia, Syria, and Famagusta, in the area administered by Turkish Cypriots, has facilitated increased illegal migration into Cyprus and the wider EU. The opening in 2009 of a new route between Famagusta and Lebanon could further facilitate such migration.

In the Turkish Cypriot-administered area, issues of status and recognition inevitably restricted the ability of authorities to cooperate on counterterrorism. Turkish Cypriots cannot sign treaties, UN conventions, or other international agreements, and lack the legal and institutional framework necessary to combat money-laundering and terrorist financing effectively. Within these limitations, Turkish Cypriots cooperated in pursuing specific counterterrorism objectives. In 2008, pressure from the international community culminated in the Turkish Cypriot-administered area being included as a jurisdiction susceptible to money-laundering by FATF, the global anti-money laundering (AML) and anti-terrorism financing body. This designation galvanized Turkish Cypriot authorities and bankers, who quickly passed updated AML "laws" bringing offshore banks under the authority of the Central Bank. A financial investigation unit-equivalent was created and began operations.

The Kurdistan Workers' Party (PKK) has a presence in Cyprus. Its activities generally were fundraising and transit en route to third countries. Authorities on both sides believed there was little risk the group would conduct operations on the island. Cyprus maintained it was fulfilling all responsibilities with respect to the EU designation of the PKK as a terrorist organization.

**Czech Republic**

Page | 72

PX205

The Czech Ministry of Interior's office with primary responsibility for counterterrorism analysis, the National Contact Point for Terrorism (NCPT), concluded that there was no acute risk of a terrorist incident, but assessed that the overall security situation in the Czech Republic was unpredictable.  The NCPT is the Ministry of Interior's lead office for collecting and analyzing law enforcement data related to terrorism.  A relatively new organization, the NCPT continued to recruit and train needed personnel, and to establish reporting protocols within the Czech National Police to ensure effective and timely dissemination of information.  The NCPT determined that the country's membership in NATO and the EU, and its military presence in Afghanistan, made it a potential target for an attack.  Czech law enforcement officials also remained vigilant for signs that the country was being used as a logistical or staging base for potential terrorist attacks within Europe.

The NCPT perceived an emerging risk in a possible connection between increasingly violent right-wing extremism and terrorism.  In October, a group of 10 individuals was arrested by the Czech National Police on suspicion of preparing to conduct a terrorist attack, possibly directed against an infrastructure facility such as a power plant.  These individuals were members of the illegal right-wing extremist organization White Justice, which declared itself to be a militant neo-Nazi group.  Evidence indicated that members of the group were conducting military training camps to teach small-unit military tactics.  There were no other arrests related to terrorism in 2009.

The Czech government's overall efforts against terrorism are established in its "National Counterterrorism Action Plan for 2007-2009".  This strategic document set goals in four areas: improving communication and coordination between intelligence and law enforcement agencies; protecting the public and critical infrastructure; preventing the isolation and radicalization of immigrant communities; and conducting foreign policy to counter international terrorism.  In October, after receiving the Ministry of Interior's evaluation of the effectiveness of the 2007-2009 Plan, the Czech National Security Council tasked the Ministry of Interior to prepare a new plan for the period 2010-2011.

The Ministry of Finance's Financial Analysis Unit and the Customs Service cooperated with the NCPT to combat terrorist financing.  The NCPT has a public website with an anonymous Internet hotline.

The Czech Republic actively participated in the counterterrorism and nonproliferation efforts of multilateral bodies such as NATO, the EU, and the UN.  The country's bilateral cooperation with the United States was also close.  The NCPT characterized the level and quality of cooperation it received from U.S. agencies and law enforcement offices as exceptionally good and very successful.

The Czech parliament approved an ongoing deployment of up to nearly 540 military personnel in Afghanistan.  The Czech Ministry of Defense also slightly increased the size of its Provincial Reconstruction Team of civilian experts in Afghanistan's Logar Province.

**Denmark**

PX205

The Center for Terror Analysis of the Danish Security and Intelligence Service (PET) assessed that there is a general terrorist threat against Denmark, both from groups and individuals in Denmark as well as a threat against Danes and Danish interests abroad. The threat came primarily from networks, groups, and individuals who adhered to various forms of militant Islamist ideology, including al-Qa'ida-related groups and networks.

While there were no terrorist attacks in Denmark in 2009, a plot to attack the Danish newspaper *Jyllands-Posten* was disrupted through a cooperative effort of Danish and American authorities.

Denmark worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force, and in international nonproliferation groups, such as the Proliferation Security Initiative (PSI) and the Global Initiative to Combat Nuclear Terrorism. Denmark cooperated closely with EU partners and institutions within the field of counter-radicalization. Roj-TV, a Kurdistan Workers' Party (PKK)-affiliated media outlet, continued to operate in Denmark.

On October 3, the FBI arrested in Chicago U.S. citizen David Headley, formerly known as Daood Gilani. Headley was charged with planning terrorist attacks in Denmark, most notably against the headquarters of *Jyllands-Posten*, the Danish newspaper whose 2005 publication of cartoons of the Prophet Mohammed outraged many Muslims around the world. The joint investigation leading to Headley's arrest was conducted by the PET and the Federal Bureau of Investigation, with support from U.S. Immigration and Customs Enforcement. Headley was also charged with planning the 2008 Mumbai terrorist attacks. Headley, has since pleaded guilty in a U.S. court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 170 people – including six Americans – as well as to crimes relating to a separate plot to bomb *Jyllands-Posten*.

On June 11, the Danish parliament voted to maintain its troop level of up to 750 in Afghanistan until 2012. Danish troops served as part of the International Security Assistance Force. Most of these were engaged in Helmand Province in southern Afghanistan.

**Estonia**

Estonia actively enforced all EU laws regarding counterterrorism and cooperated fully with the United States in law enforcement matters. Estonian passports issued since May 2007, including "gray" passports issued to stateless residents of Estonia, have the latest in biometric security features, including an embedded computer chip containing biometric information.

Participation in the International Security Assistance Force (ISAF) operation in Afghanistan was Estonia's highest priority international mission. Estonia contributed an additional motorized infantry company in 2009, for a total of two companies plus staff officers and support elements, which equaled more than 280 soldiers. One unit formed part of a U.K.-led provincial reconstruction team in Helmand Province, and the additional company, also in Helmand, operated side-by-side with U.S. Marines providing election security. Although the second

PX205

company was withdrawn, Estonia still had approximately 155 troops in Afghanistan at the end of 2009.  Estonia participated in the European Police Mission to Afghanistan with two police officers and a political advisor.  It was projected to give a total of 1.3 million Euros in assistance for the period 2009-2011, which includes funding for the fight against narcotics; the Afghanistan Population and Housing Census project; and for human capital and infrastructure development of Helmand province's health care network, such as training of nurses, mid-wives, and other health professionals.  While no longer participating in combat operations in Iraq, Estonia continued to support the NATO Training Mission in Iraq with a staff officer.

On March 11, Estonia amended the Penal Code to criminalize the financing and support of acts of terrorism or actions leading to the perpetration of an act of terrorism, punishable by up to 10 years imprisonment or the liquidation of any entity used in such efforts.  The MLTFPA also harmonized Estonian law with EU standards and brought Estonia's money laundering regime into total compliance with Financial Action Task Force recommendations.

On October 12, the Government of Estonia began operating U.S. Department of Energy-funded radiation monitors at Luhamaa, on its southeastern border with Russia.  The Estonian Border Guard was in the process of constructing helicopter landing pads at entry control points at Narva, in the east, and Varska, in the southeast, with U.S. Department of Defense Counternarcotics and Terrorism funds.

**Finland**

Information sharing between Finnish and U.S. authorities regarding terrorism-connected cases was an effective tool for both countries.  Relevant Finnish agencies monitored potential threats closely and kept their international partners apprised of threats with connections outside the borders of Finland.

In a rare publicized case in November, a Finnish citizen was deported from Sweden to Finland because of suspected links to a terrorist organization.  Media reports confirmed by the government indicated that this individual was closely monitored by the Security Police (SUPO) after his return from Sweden.

Finland took additional steps to verify the identity of those seeking to enter the country and anticipated a further surge in immigration through family reunification.  The Government of Finland continued to exert significant efforts to assimilate newcomers into society and to avoid conditions that would lead to radicalization of minority groups.  These measures included social benefits, Finnish language training, and ombudsmen's offices to advocate on behalf of immigrants.

One new measure that Finland was considering to prevent the infiltration of terrorists or their facilitators into the country was the permanent stationing of SUPO officers at Finnish embassies abroad.  If approved, this would be the first foreign deployment of dedicated counterterrorism personnel.  The director of SUPO has publicly stated that these officers would be focused on "stop(ping) potential terrorists in the country of departure."  The government has made a request

PX205

to parliament for US$ 2.3 million to fund the 15-20 personnel who would be involved in the effort.

Finland continued its contributions towards building counterterrorism capacity with overseas partners.  It made donations, under its G8 Global Partnership pledge, of approximately US$ 14 to 21 million for the period 2004-2014, including about US$ 350,000 as part of the Nuclear Smuggling Outreach Initiative to provide equipment to the Kyrgyz Republic needed to prevent the smuggling of nuclear materials that might be sought by terrorist groups.  Finland also began a police-prosecutor training program in Afghanistan to facilitate investigation and prosecution of serious crimes there, including those related to terrorism, and it continued to be the third-largest contributor of trainers to the EUPOL training program for Afghan police.  On January 22, the government reached a decision to temporarily increase the strength of Finnish military crisis management personnel by approximately 50 soldiers from the current ceiling of 145, all expected to be deployed by the beginning of 2011.  Finland also aimed to allocate a larger proportion of its development cooperation funding to the northern provinces of Afghanistan, and to deepen its participation in the EU police mission in northern Afghanistan.

**France**

In 2009, France found itself grappling with an Islamist threat that reflected the nation's changing demographics.  Several public announcements by al-Qa'ida (AQ) and other groups reiterated that French interests remained key targets of al-Qa'ida in the Islamic Maghreb (AQIM).  In response to President Sarkozy's June comments calling for the banning of the burka in France, AQIM spelled out their intentions to attack France stating, "We will do everything in our power to avenge our sisters' and our daughters' honor, by striking France and its interests, wherever they may be."

Traditionally, local Corsican separatists, Basque Fatherland and Liberty (ETA) members, and ultra-left anarchist factions have been responsible for the majority of attacks and arrests classified as terrorism in France.  The number and violence of ETA and Corsican attacks in France have continued their downward trend, however.  In 2009, the French intelligence services recognized an elevated threat from an "international European network of radical Islamists with a strong presence in France."  In response to that threat, the French Ministry of interior created the National Police Intervention Force (FIPN) on December 1.  The FIPN brings together the Special Weapons and Tactics (SWAT) elements of multiple French Police units to form a 500-man SWAT team.  France remained on high alert and recognized that it is a target of AQIM and of other extremist groups in France and abroad.

France and Spain's concerted efforts against ETA operatives and leadership highlighted the benefits of close regional cooperation and demonstrated the effectiveness of the French counterterrorism program:

- On January 5, court proceedings began in Paris for the April 2002 suicide bombing of a Djerba Synagogue.  The attack killed 14 German and two French nationals.  Khalid

Page | 76

PX205

Sheikh Mohammed is a co-defendant, accused of being responsible for all AQ external operations during that time frame.

- In April, French President Sarkozy announced that France and Spain would set up a joint security committee to fight terrorism and drug trafficking. The group, which is an expansion of existing police cooperation targeted at ETA, created a joint general staff headquarters on security to lead the fight against terrorism.

- On August 19, shortly after the creation of the joint staff, French police arrested three top members of the military arm of ETA: Alberto Machain, Aitzol Etxaburu, and Andono Sarasola. Additionally, police found weapons and bombmaking materials.

- On October 11, French police in Montpellier arrested the deputy commander of ETA's military wing, Lurgi Mendinueta and another senior ETA member, Jones Larretxea.

- On October 19, French police arrested ETA's political chief, Aitor Lizan Aguilar, as well as ten other ETA members.

Although no terrorist attacks took place on French soil during 2009, French interests were targeted and attacked abroad:

- On July 14, two French security service personnel, reportedly in Somalia to train government forces in counterterrorism operations, were kidnapped and held by two separate groups–Hezb al-Islam and al-Shabaab. On August 26, the hostage held by Hezb al-Islam was freed, although the circumstances of his release or escape remained unclear. Initial reports suggested he killed his kidnappers and escaped. Later reports intimated that a ransom had been paid to Hezb al-Islam and the hostage was freed.

- On August 18, AQIM claimed responsibility for the August 8 suicide bombing at the French Embassy in Mauritania that injured three people.

- On October 9, a suspected AQ operative was arrested with his brother in Paris. The operative had been working on projects for a nuclear-research facility near Geneva. French intelligence investigators said the physicist, a man of Algerian origin, was working on analysis projects at a "very high level" related to the Large Hadron Collider at the European Organization for Nuclear Research, or CERN. Officials said the suspect had been in contact with people linked to AQIM about potential targets for terrorism in France, and he had expressed a desire to carry out such attacks but had "not committed material preparatory acts." The interior minister determined that the brothers were enough of a threat to be arrested, ending the French government's 18-month-long surveillance of them.

PX205

- On November 26, a French citizen was kidnapped in Northern Mali. On December 8, AQIM claimed responsibility for the kidnapping.[7]

French authorities detained and prosecuted a number of people with ties to various terrorist organizations, including Islamist terrorists (18 convictions), Corsican Nationalists (19 convictions), Basque Fatherland and Liberty (ETA) members (28 convictions), the Liberation Tigers of Tamil Ealam (LTTE) (22 convictions), and Kurds with links to the Kurdistan Workers' Party (PKK) (16 convictions). It should be noted that the number of arrests of ultra-left anarchists dropped from 17 in 2008 to zero in 2009. Additionally, the number of Corsican Nationalists convicted dropped from 46 in 2008 to 19 in 2009. The number of LTTE members arrested, however, jumped from two in 2008 to 22 in 2009, which may be linked to the military crackdown in Sri Lanka during this same period.

The French government undertook several counterterrorism operations with other countries, including the United Kingdom, Belgium, Germany, Italy, Spain, and Portugal. In addition to undertaking operations to arrest and prosecute terrorists, France continued programs to address radicalization and extremism through the use of social and economic incentives. Of particular note, the French government went to great efforts to train police personnel to be aware of the signs of radicalization. The French government is very concerned about Islamist radicalization in the French prison system. In 2008, the governments of France, Austria, and Germany jointly commissioned a study to identify key indicators of radicalization in the prison system and offered suggestions on how to prevent or minimize radicalization within the penal system. In 2009, the document was provided to all 27 members of the European Union and was requested by, and provided to nine non-EU states. Within the EU, France hosted a conference on November 13 to help other EU-countries understand the benefits of a counterterrorism coordination center.

Preliminary detention for suspected terrorists in France is six days. The state may thereafter place suspects under pre-trial detention for up to four years when the evidence is compelling or when the suspect is considered to present an imminent threat. In conjunction with local government, the national government continued to increase video surveillance in major cities. French law allows for seizing of assets, video and telephone surveillance, monitoring of public transport records, and provides other broad powers for official access to connection data held by internet cafes and to various personal data. Notably, French nationality may be revoked, leading to expulsion from French territory, if the person in question was naturalized in the preceding 15 years.

France is actively engaged with the UN Security Council Counterterrorism Committee, the G8's Counterterrorism Action Group, the UNSCR 1267 Committee and the European Council's Antiterrorism Strategy action plan. France is an original member of the Global Initiative to Combat Nuclear Terrorism and continued to participate actively. France remained a member of,

---

[7] The French intelligence services were aware of a rise in the kidnapping of French citizens, yet remained hesitant about classifying them as terrorist activity (as opposed to criminal) until a specific group had claimed responsibility and they could investigate the circumstances leading up to the kidnapping.

PX205

and contributor to, both the Proliferation and Container Security Initiatives.  France continued to upgrade passports to the biometric standard.  On May 15 and December 1, in support of U.S. efforts to close the Guantanamo Bay facility, France accepted two former detainees and resettled them in France.

On the military front, France currently has more than 3,000 troops participating in operations in Afghanistan.  The French commitment included ground troops and air assets.

**Georgia**

Georgia continued to support U.S. efforts in the fight against terrorism, increasing its role by providing a battalion of Georgian soldiers, approximately 750 troops, to be trained by the United States in preparation for a deployment as part of the International Security Assistance Force (ISAF) in Afghanistan.  This is in addition to 173 Georgian troops already serving as part of ISAF with the French and one service member serving with Turkish forces.  Additionally, Georgia has granted blanket flight clearance for all U.S. military aircraft engaged in operations in Afghanistan and Iraq.

Russian claims of Georgian support for Chechen terrorists and harboring of such individuals in the Pankisi Gorge were unsubstantiated, and the Georgian government has made transparent efforts to prove this to the international community.

Border security operations and anti-corruption efforts at border checkpoints remained high priorities for the Georgian government, with its continued focus on countering the smuggling of contraband such as laundered money, drugs, and weaponry that could support terrorism.  Significant improvements to infrastructure at border crossing points and employment of the Department of Energy's Second Line of Defense Program to detect radiation continued. The new border crossing facility at Kazbegi/Larsi between Georgia and Russia was finished in September 2009, although due to the state of relations between Georgia and Russia, the border remained closed at the end of 2009.

Additionally, seven remote border posts were completed in 2009, enhancing the security of the Georgian- Azerbaijani border and further limiting illegal crossings.  The fifth and final radar station on the Black Sea coast was also completed, which will enhance Georgian capabilities to secure its maritime border and interdict potential smugglers and counter any terrorist threats from this direction.  The Georgian Border Police's capabilities significantly improved, including its ability to monitor, patrol, and interdict criminals along the green borders.  This was accomplished by the development of additional enforcement tools such as new communications equipment.

The situation in the separatist regions of Abkhazia and South Ossetia remained largely unchanged, and the Georgian government does not control its international borders located between these regions and Russia.  This lack of control allowed for unrestricted and unidentified flow of people, goods, and other potentially dangerous items from Russia into Abkhazia and South Ossetia.  The administrative boundary lines between Georgia and the conflict zones were

PX205

furthered militarized in 2009 when Russia tasked its Federal Security Service (FSB) border guards to take over control from de facto authorities in both territories.  Movement over these boundary lines was strictly controlled, although formal customs checks, security inspections, or other counterterrorism procedures did not exist.

**Germany**

German security officials estimated that roughly 185 individuals – both German nationals and permanent residents – have undergone paramilitary training over the past ten years at Islamist extremist training centers located primarily in the border regions of Afghanistan and Pakistan. Approximately 90 of these individuals have returned to Germany and 15 of them were in custody in 2009.  Germany investigated, arrested, and prosecuted numerous terrorism suspects and disrupted terrorist-related groups within its borders with connections to international Islamist, Kurdish nationalist, and Marxist-Leninist terrorist organizations.  Two new legislative packages entered into force that strengthened Germany's counterterrorism legal framework and provided security officials with new powers of investigation.

Throughout the year, a number of Islamist-inspired terrorist organizations, including the Islamic Jihad Union (IJU), al-Qa'ida (AQ), and the Islamic Movement of Uzbekistan, released videos featuring German speakers who threatened terrorist attacks in Germany or against German interests abroad.  Bin Ladin and Zawahiri also issued statements threatening Germany prior to the German federal elections in September.  In a number of instances, the identities of the individuals appearing in the videos were known and included German-Moroccan dual citizens Bekkay Harrach, Mounir Chouka, and Yassin Chouka.

During the summer, the frequency of the extremist video and audio messages increased.  The messages threatened Germany with attacks if the government did not withdraw its military forces from Afghanistan in what security officials interpreted as an attempt to influence the September 27 national elections.  The threats led German police to take heightened security measures at airports, railway stations, and other public sites.  On November 13, the Stuttgart district court sentenced an ethnic Turkish man to six months in jail for breach of the peace after he posted one of the extremist videos featuring Bekkay Harrach on *YouTube*.

On January 1, new legislation went into effect that broadened the powers of the Federal Office of Criminal Investigation (BKA) in counterterrorism investigations.  The law provided the BKA with preventative investigatory powers, that is authority to carry out actions based either on a suspicion that individuals are planning a crime or potentially involved in criminal activity, and gave it lead responsibility in terrorism investigations in which the threat extends across multiple federal states, in which state-level competence is unclear, or in which state officials request federal assistance.

On August 4, a second legislative package entered into force that made significant amendments to the German Criminal Code and criminalized a range of terrorism-related preparatory actions such as participating in terrorist training or acquiring weapons and bombs with the intent to commit attacks that endanger the German state.  The amendments also outlawed the distribution

and acquisition of bomb making and similar instruction materials if the intent is to motivate individuals to commit violent crimes.  Establishing contact with a terrorist group with the intent of receiving training to commit attacks is also outlawed.

A high-profile trial of the four individuals belonging to the IJU cell arrested in Sauerland in 2007 began on April 22.  The defendants were charged with membership in a foreign terrorist organization, preparation of a serious criminal offense involving explosives, and other violations. The defendants gave comprehensive testimony that included descriptions of their training at terrorist camps in North Waziristan, Pakistan.  The trial had not concluded by year's end.

German courts also began trials or reached verdicts in other notable counterterrorism cases:

- On October 13, the Frankfurt Higher Regional Court sentenced Omid Shirkani, a German citizen, to two years and nine months in prison, and co-defendant Huseyin Ozgun, a Turkish citizen, to one year and two months in prison on charges of supporting a foreign terrorist organization and violating the Foreign Trade Act.  The two participated in terrorism training in Pakistan and supported the IJU with financing and paramilitary equipment.

- On July 13, the Koblenz Higher Regional Court sentenced Aleem Nasir, a German citizen, to eight years imprisonment for membership in a foreign terrorist organization (AQ) and multiple counts of violating the Foreign Trade Act.  Nasir recruited personnel and provided money and military equipment to AQ.

- In July, the Dusseldorf Higher Regional Court found Hüseyin Acar, a leading member of the Kurdistan Workers' Party (PKK), guilty of being the ring-leader of a criminal organization and of coordinating PKK actions in Germany.  The Court sentenced Acar to three years and nine months in prison.

- On August 12, the Frankfurt Higher Regional Court found a Turkish citizen, guilty of membership in a terrorist organization and multiple cases of arson, sentencing him to four years imprisonment.  The individual was a PKK leader in southern Germany between 1993 and 1994 and ordered multiple arson attacks on Turkish targets in Germany in which one person died.

- On April 8, the Frankfurt Higher Regional Court upheld the 2008 sentencing of Muzaffer Ayata, a Turkish citizen, to three years and six months in prison on charges of being a leader of a criminal organization (PKK).

- On September 14, the Koblenz Higher Regional Court began the trial of Sermet Ilgen, a German citizen, and Ömer Özdemir, a Turkish citizen, who are charged with membership in a foreign terrorist organization and violations of the Foreign Trade Act.  The two were accused of having participated in terrorist training at camps in Pakistan and to have provided al-Qa'ida with funding and equipment.

PX205

- On January 15, the Dusseldorf Higher Regional Court began the trial of five individuals suspected of membership in the Revolutionary People's Liberation Party–Front (DHKP-C), a left-wing terrorist organization that seeks to overthrow the Turkish government and replace it with a Marxist-Leninist regime.

During the year, German law enforcement authorities arrested a number of individuals suspected of involvement in terrorism.  Prominent new actions and arrests included:

- The BKA arrested Adnan Vatandas, who is suspected of supporting AQ by distributing Internet propaganda and instructions on bomb-making.

- On December 9, prosecutors in Dusseldorf filed charges against a Turkish woman for membership in a terrorist organization (DHKP-C).

- On December 15, police arrested a German citizen of Turkish descent, on suspicion of attempted arson, membership in a terrorist organization (DHKP-C) and conspiracy to commit homicide.  He is alleged to have participated in the fire bombings of two Turkish banks in Germany in 1995.

Germany remained a strong advocate of the UNSCR 1267 al-Qa'ida/Taliban financial sanctions regime and proposed a number of individuals to the committee for designation.

Implementation discussions continued regarding a bilateral U.S.-German agreement to strengthen fingerprint and DNA information sharing to combat terrorism and serious crime.  The U.S. Embassy's Law Enforcement Working Group continued its ongoing engagement with state-level law enforcement contacts by organizing four security conferences throughout Germany that included terrorist themes.

The Department of Homeland Security (DHS) and the Federal Ministry of Interior continued their strategic dialogue and held a Deputies-chaired conference in June to strengthen cooperation across a range of counterterrorism-related issues.  Germany participated in the DHS Customs and Border Protection's Container Security Initiative in the ports of Hamburg and Bremerhaven and supported DHS Customs and Border Protection's Immigration Advisory Program operating at the Frankfurt Airport.  The DHS Transportation Security Administration's presence in Frankfurt, together with U.S. and German air marshals, formed key parts of bilateral efforts to provide air transport security for the seven German airports with flights to the United States.

**Greece**

Domestic terrorism increased significantly in Greece in 2009, following large-scale rioting in December 2008.  In 2009 there were more than 430 security incidents – defined to include incendiary and explosive attacks, as well as attacks involving small arms, grenades, and other infantry-style weaponry – far more than have been recorded in each of the previous 20 years.  Local extremists increasingly targeted businesses and Greek law enforcement, and there was an increasing use of infantry-style weaponry in terrorist attacks.

PX205

The leftist domestic terrorist group Revolutionary Struggle claimed responsibility for shooting police officers and bombing financial targets, including U.S.-affiliated banks and the Athens Stock Exchange, which was targeted in an ammonium nitrate car bomb attack on September 2. A previously unknown group, Sect of Revolutionaries, emerged during the year to claim responsibility for attacks on police and other targets, including the only such lethal attack during the year: the June 17 murder of a police officer on protective detail outside the apartment building of a government witness in Athens.  On October 27, unknown assailants attacked the Aghia Paraskevi police station in suburban Athens with AK-47s, seriously wounding six officers and a civilian.  Two groups, the Guerilla Group of Terrorists and the Conspiracy of Fire Nuclei (SPF), jointly claimed responsibility for the December 27 bombing of the National Insurance Company building in Athens.

The appeals of eight convicted members of the November 17 terrorist organization went before the Supreme Court in October.  Prosecutors urged the court to sustain the convictions, but recommended consideration of reduced sentences for two of the convicts.  On December 3, an appeals court threw out the convictions of three members of the People's Revolutionary Struggle terrorist organization who had initially been sentenced in 2004 to 25 years each for the 1994 murder of a police officer, 48 attempted murders by bombing, and 42 bomb attacks and attempted bombings, though they had been released for health reasons and on other grounds pending appeal in separate decisions in 2005 and 2006.

Throughout the year, self-styled anarchists attacked banks, police stations, the homes and offices of politicians, and other "imperialist-capitalist" targets with tools such as firebombs and Molotov cocktails.  Since these attacks usually occurred outside normal business hours, few persons were seriously injured and there were no deaths.  Several U.S. businesses were targeted.  On January 10 , a rock-throwing group of pro-Palestinian demonstrators caused some physical damage to the U.S. Embassy during a protest against the Israeli operation in Gaza.

Greece is increasingly an EU entry point for illegal immigrants coming from the Middle East and South Asia and there was concern that it could be used as a transit route for terrorists travelling to Europe and the United States.  The number of illegal immigrants entering Greece, especially through the Aegean Sea, increased dramatically in 2008 and 2009, with more than 100,000 illegal immigrants, nearly half of whom originated from North Africa, the Middle East, and South Asia, arrested each year.  Greek authorities participated in the Container Security Initiative and cooperated with U.S. officials on information sharing, as well as the training of Greek security and customs officials, and judicial personnel.  Greece sustained its participation in the International Security Assistance Force in Afghanistan by providing engineers and other support officers.

**Hungary**

Hungary remained a consistent and reliable counterterrorism partner.  In addition to the continued leadership of a Provincial Reconstruction Team, Hungary sent 28 troops to Afghanistan as part of a new joint Operational, Mentoring, and Liaison team (OMLT).  The

PX205

OMLT, which is commanded by a Hungarian Lieutenant Colonel, includes an equal number of troops from the Ohio National Guard. Additionally, Hungary deployed 40 troops to provide security during the national elections, as well as committing a Special Forces contingent, which operated with U.S. forces. At year's end, Hungary had a total of 324 troops serving in Afghanistan. In response to President Obama's calls for further allied support, Prime Minister Bajnai pledged in December 2009 to add a further 200 soldiers to the Hungarian contingent.

In September, the Prime Minister announced that Hungary would accept one detainee from the Guantanamo detention facility. This decision was controversial, but won cross-party support. In late November, the detainee was transferred to Hungary.

In a series of operations, Hungary arrested 19 of the approximately 20-member Hungarian Arrows National Liberation Army, a far-right extremist group suspected of committing or conspiring to commit terrorist acts. The remaining individual is still at large. Although Hungary's legal code does not provide for the designation of domestic terrorist organizations, Hungarian authorities nonetheless carefully monitored potential extremist groups and closely cooperated with U.S. law enforcement and other agencies.

As a Schengen zone country, Hungary continued to manage its border responsibilities, including the increased entry of foreigners seeking asylum.

**Iceland**

The Government of Iceland stated in its most recent terrorist threat assessment, conducted by the National Police Commissioner in 2008, that the likelihood of terrorist activities occurring in Iceland is low. In the same assessment, however, the government concluded that the potential consequences of such activities were severe enough to merit a high level of vigilance. The government, therefore, continued its efforts to strengthen domestic border security and counterterrorism capabilities during the year. Notably, the Government of Iceland passed legislation in December that clarified the legal definition of terrorism and strengthened penalties against money launderers.

The National Police Commissioner has primary responsibility for counterterrorism efforts in the country. The Viking Squad, Iceland's counterterrorism unit, is considered the first line of defense in Iceland's efforts against terrorism. The paramilitary unit is comprised of approximately 40-50 members who are trained in active counterterrorism response by U.S. and other European police and military counterterrorism units. The National Security Unit, which also falls under the jurisdiction of the National Police Commissioner, gathers intelligence, drafts threat assessments, and exchanges information with foreign counterparts with the aim to prevent or reduce the likelihood of terrorism.

The Icelandic Coast Guard (ICG) is responsible for Iceland's coastal defense and monitors the ocean around Iceland, both within and outside of territorial waters. The ICG served as the Chair of the North Atlantic Coast Guard Forum in 2009 and hosted the organization's annual conference in September. Also in September, the ICG hosted Northern Challenge 2009, a

NATO-supported exercise focusing on explosive ordnance disposal and counterterrorism scenarios.  The explosive ordinance team was called upon in December when a Lufthansa flight heading to Detroit made an emergency landing in Iceland after the aircraft was found to be carrying luggage for a passenger who had not boarded the plane.  The explosive ordinance team found nothing suspicious and the flight was released in short order.  The EOD team has served in international peacekeeping missions in Iraq and Afghanistan.

The Icelandic government supported multilateral counterterrorism efforts.  Iceland continued its deployment of personnel at Kabul International Airport and International Security Assistance Force (ISAF) Headquarters in Afghanistan in support of NATO operations.

**Ireland**

In 2009, increasing levels of Real Irish Republican Army (RIRA) and Continuity Irish Republican Army (CIRA) violence in Northern Ireland were traced back to elements in Ireland with the assumed objective of undercutting the formation of an integrated Police Service of Northern Ireland.  Counterterrorism measures implemented in previous years were sustained and relations between the U.S. government and Irish law enforcement officials were increasingly positive.  Over the past year, there has been increasing levels of cooperation with Irish authorities to deny Islamist extremists the opportunity to use Ireland as a base for facilitation of terrorist activity in Iraq, Afghanistan, and elsewhere.  Irish law enforcement authorities were focused on enhancing their coverage of what is assessed to be a small, ideologically dedicated group of Islamist radicals.

On October 10, the Irish National Liberation Army (INLA), an IRA splinter group responsible for some of the most notorious attacks of the Northern Ireland conflict, renounced armed struggle and agreed to disarm.  Although INLA remained opposed to the British presence, officials from their political wing stated that the renunciation of violence was based on political calculations.

In 2009, Ireland enacted the Criminal Justice (Surveillance) Act 2009, which provided a statutory framework for evidence obtained by means of covert surveillance to be used in criminal trials.

In 2009, Ireland resettled two former Guantanamo detainees.  Ireland continued a modest troop commitment to the International Security Assistance Force in Afghanistan.  It also worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force, the Proliferation Security Initiative (PSI), and the Global Initiative to Combat Nuclear Terrorism.

**Italy**

Italy continued to aggressively investigate and prosecute terrorism suspects, dismantle terrorist-related cells within its borders, and maintain high-level professional cooperation with its international partners.  Italy was one of the largest troop contributors to the NATO mission in

PX205

Afghanistan and justified its commitment to "prevent it from becoming a launching pad for terrorists," according to the Italian Minister of Defense.  Italy immediately called for the EU to provide increased counterterrorism assistance to Yemen after the failed December 25 bombing attempt of Northwest Flight 253.

During the last two months of 2009, two detainees from Guantanamo and one from Afghanistan were transferred to Italy for prosecution in terrorism proceedings pending in Milan.  The transfers were made pursuant to a memorandum of understanding finalized between U.S. Attorney General Eric Holder and Italian Justice Minister Angelino Alfano in September.

Italy's law enforcement and judicial authorities had several noteworthy cases in 2009:

- In April, Italian prosecutors began investigating a group of North Africans and others in Venice on charges of international terrorism.  One was a former imam in the southern city of Caserta who reportedly controlled a network providing lodging, money, and false identity papers to migrants traveling to other European countries.

- In May, judicial authorities issued arrest warrants for Bassam Ayachi and Raphael Marcel Frederic Gendron, French citizens, on charges of international terrorism for promoting, managing, and funding an Islamic organization connected to the al-Qa'ida (AQ) network, and for recruiting terrorists locally and through the Internet for potential attacks in France, the UK, Iraq, and Afghanistan.  Both were already detained in Bari under 2008 charges of encouraging illegal migration.  They were reportedly connected to a dozen other international terrorists arrested in December 2008 in France and Belgium. Ayachi, of Syrian origin, was a former imam in Belgium.  Gendron, a Muslim convert, was co-founder of the Belgium Islamic Center, Assabyle.  In July, a judge sentenced Ayachi and Gendron to 54 months in prison.

- In June, Tunisian citizen Houcine Tarkhani was arrested in Sicily.  His arrest had been sought since 2006 for his participation in the planning of a terrorist attack against the Church of San Petronio in Bologna, which contains a depiction of the Prophet Mohammed, and the Milan subway system.  Italian authorities expelled seven others in 2006 for the same incident.  The group had connections to Algeria, Morocco, Syria, France, Spain, and Denmark.

- In October, Libyan citizen Mohamed Game unsuccessfully attempted a suicide attack against an army barracks in Milan.  The explosive device partially malfunctioned, wounding him and a guard who tried to stop him.  Game and two alleged accomplices, Egyptian Mohmoud Abdelaziz Kol, and Libyan Mohamaed Imbaeya Israfel, were arrested for the incident.  Game reportedly had developed targeting profiles of Prime Minister Berlusconi and other senior Italian officials.  Interior Minister Maroni reported that Game and his accomplices were self-radicalized over the Internet by al-Qa'ida propaganda and had no connections to other terrorist cells.

Page | 86

PX205

- In November, Mohammad Yaqub Janjua and his son Aamer Yaqub, of Pakistan, were arrested in Brescia in a joint operation with the FBI and Indian intelligence services in connection with the November 2008 terrorist attacks in Mumbai.  The two owned a money transfer agency in Brescia used to activate Voice Over Internet Protocol accounts online and to manage Hawala operations that transferred more than US$ 550,000 to Pakistan from 2006 to 2008.  Italian authorities claimed the arrests confirmed the existence of a network in the northern Italian region of Lombardy that provided logistical support to international terrorism.

- Also in November, Italian Tax Police arrested six Algerian citizens on charges of producing false identity documents.  Eleven others were arrested in Spain, Austria, Switzerland, France, and the United Kingdom in the same operation.  According to Interior Minister Maroni, the group was also collecting funds for terrorist activities outside Italy.

Follow-ups to judicial proceedings initiated in 2008 included:

- In May, a Milan judge dismissed all terrorism charges against Maher Bouyahia and 19 others arrested in May 2008 for alleged drug trafficking and terrorism offenses.  Prosecutors continued to pursue drug charges against the group.

- In October, a trial began in Bologna against five alleged terrorists arrested in August 2008 on charges of international terrorism.  The cell allegedly sent tens of thousands of dollars to Bosnian groups linked to terrorist organizations in Iraq and Afghanistan to support suicide attacks.

- In October, a trial began in Milan against four Moroccan citizens on terrorism charges for their plans to attack targets in and around Milan.

Domestic anarchist-inspired and extreme-left terrorist groups continued to present a moderate threat despite Italian authorities' efforts to dismantle their organizations.

- In October, Red Brigade terrorist Massimo Papini was arrested near Salerno in connection with the 2003 killing by the Red Brigades in Bologna of Labor Ministry adviser Marco Biagi.

- Also in October, the Revolutionary Brigades for a Combatant Communism threatened the lives of Prime Minister Berlusconi and other senior officials in a letter to a daily newspaper.

- In December, a small explosive detonated in the underground walkways of Milan's private Bocconi University.

- Also in December, a letter bomb was sent to a government migrant and expulsion center near Gorizia.  Italy's major anarchist group, the Informal Federation of Anarchists, claimed responsibility for both incidents.

The Italian government continued to make use of reinforced counterterrorism legislation enacted in 2005, which facilitated the detention of suspects, mandated arrest for crimes involving terrorism, and expedited procedures for expelling persons who may be involved in terrorist activities.

In March, the European Court of Human Rights prevented the expulsion of eight Tunisians for association with terrorist organizations, ruling that it would violate Article 3 of the European Convention on Human Rights, which prohibits torture and inhumane or degrading treatment even in cases of serious threat to the community.  Despite the ruling, Italy expelled a number of individuals suspected of having ties to AQ, al-Qa'ida in the Islamic Maghreb, and Ansar al-Islam.

With respect to the financial aspects of fighting terrorism, Italy aggressively identified and blocked financial resources destined for suspected terrorist individuals and groups.  The Italian government worked closely with the United States on anti-money laundering and information sharing, and cooperated with other foreign governments as an active member of the Financial Action Task Force and the Egmont Group.  Italy also participated actively in the UNSCR 1267 process, both as a sponsor and as a co-sponsor nation.

As president and host of the 2009 G8 Summit, Italy played a leading role in the Roma-Lyon Group and the Counterterrorism Action Group, within which Italy led an initiative to enhance counterterrorism security measures in airports in the western Balkans.  Italy effectively used its role as G8 host to promote counterterrorism cooperation.

Italy was an important partner in the Proliferation Security Initiative and the Container Security Initiative.  In 2009, Italy appointed the Italian Customs Service to team with the U.S. Department of Energy to implement the Megaports program in Italy.

Italy participated in NATO's Active Endeavour naval mission against terrorism in the Mediterranean, and contributed to international military missions in Afghanistan, where it held Regional Command-West and offered an additional 1,000 troops and pledged 200 Carabinieri police trainers at the president's request.  In Iraq, Italy played a lead role in the NATO Training Mission, among others.

Italy contributed training personnel to various regional counterterrorism training centers, such as the South East Asia Regional Centre on Counterterrorism in Malaysia, the Joint Centre on Law Enforcement Cooperation in Indonesia, and the African Union's Antiterrorism Centre in Algeria.

**Kosovo**

PX205

In 2009, there were no direct acts of terrorism in Kosovo, although Islamist extremists were involved in domestic and international terrorism plots and extremists continued to maintain links to organized crime.  The Kosovo government and the European Rule of Law Mission (EULEX) monitored suspected terrorist activity throughout the year.  The recently-established Kosovo Intelligence Agency (AKI) and EULEX suspected that some of the many Islamic non-governmental organizations (NGOs) operating in Kosovo were involved in suspicious activities, particularly in laundering money for future terrorist acts in the Middle East.  The government sought to prevent extremists from using NGOs to gain a foothold in Kosovo.

The Kosovo Police (KP) and EULEX Police Counterterrorism Units (CTUs) were primarily responsible for Kosovo's counterterrorism efforts.  The KP's CTU continued to suffer from a lack of resources, training, and expertise.  On July 22, the KP CTU became fully independent, with EULEX acting only in a monitoring, mentoring, and advising role.[8]  The KP CTU focused on preventing terrorist attacks and training and equipping its officers.

Porous borders that were easily crossed by individuals trafficking in people, weapons, and narcotics hampered Kosovo's counterterrorism efforts.  The Kosovo Border Patrol (KBP) and KFOR (NATO Kosovo Force) jointly patrolled the "Green Border" perimeter, the area where there are no official manned borders or border gates.  The KBP and KFOR patrols along the "Green Border" were conducted with their cross national counterparts along the Macedonian, Montenegrin, and Albanian borders.  Poorly paid border and customs officials were susceptible to bribery and corruption.

Still, the Ministry of Internal Affairs has made modest progress improving border security.  Kosovo passports have a wide range of security features; including rainbow printing, optically variable ink, and UV light reflection.

The Kosovo Special Prosecutor's Office (KSPO), which was established in September 2006, conducted all governmental terrorism investigations in 2009.  The KSPO reported that it had one case with terrorism charges in the trial phase and was pursuing an additional 10 active cases.  Five cases, including holdovers from prior years, were inactive at year's end.  On March 13, the Kosovo Supreme Court, consisting of a combined panel of three international and two local judges, overturned Florim Ejupi's June 2008 conviction on terrorism-related charges and acquitted him of all charges, citing a lack of evidence.  Ejupi had been sentenced to 40 years imprisonment for the 2001 "Nis Express" bus bombing case near Podujeve/Podujevo that killed 11 Kosovo Serbs and injured 40 others.

The Government of Kosovo cooperated closely with the United States on combating terrorism.  On September 23, it deported Betim Kaziu, a U.S. citizen, to the United States.  On September 24, the Eastern District of New York charged Kaziu with conspiracy to commit murder in a foreign country and conspiracy to provide material support to terrorists.  According to the

---

[8] Prior to that, EULEX's Police Executive Department (PED) exercised direct supervision over its KP counterparts. The KP and EULEX received information and analytical support from the Office of Criminal Intelligence, a division within EULEX's PED and the KP Department of Criminal Analysis.

Page | 89

PX205

indictment and other documents filed by the government, Kaziu traveled to Pakistan to obtain training for violent activities and then attempted to join al-Shabaab, a designated Foreign Terrorist Organization that operates in Somalia.  In addition, Kaziu attempted to travel to Afghanistan, Iraq, and the Balkans to fight against U.S. armed forces.  Ultimately, Kaziu traveled to Kosovo, where he was arrested by Kosovo law enforcement authorities in late August.

On July 27, FBI agents in North Carolina arrested Hysen Sherifi, along with six other men preparing for acts of terrorism.  Sherifi, a 24-year-old Kosovo native, was a legal U.S. resident living in North Carolina.  Sherifi was charged with multiple counts of conspiracy.  As part of the conspiracy, the indictment alleges Sherifi traveled to Kosovo in July 2008 to engage in violent extremist activities, then returned in April to raise support for the mujahedin.  Sherifi and the others were arrested before they could carry out any terrorist acts.

**Latvia**

In May, the Cabinet of Ministers approved an action plan for responding to terrorist threats and attacks on people or objects in Latvia's territory.  In September, Latvia established a working group to develop an action plan for terrorist or pirate attacks against Latvian ships anywhere in the world.  The Transportation Ministry is currently developing legislation to control hazardous cargo and is developing an action plan to respond to emergency situations related to hazardous cargo.  Latvia regularly participates in the European Union's Terrorism Working Group.

In October, the Counterterrorism Center of the Latvian Security Police and the Riga International Airport organized a counterterrorism exercise that simulated a plane hijacking and hostage situation.  Representatives from the Security Police, Riga International Airport, Civil Aviation Agency, State Border Guards, State Police, State Fire and Rescue Service, Center of Emergency and Disaster Medicine, and the Prosecutor General's Office participated.

As of December, Latvia was contributing 170 soldiers to support the International Security Assistance Force in Afghanistan, including an Operational Mentoring and Liaison Team.  Latvia's Financial Intelligence Unit maintained a terrorist financing database that it shared with local banks.

**Lithuania**

The Lithuanian military was an active participant in multinational operations against terrorist and insurgent elements.  In Iraq, Lithuania maintained four trainers serving in the NATO Training Mission-Iraq.  In Afghanistan, Lithuania led a Provincial Reconstruction Team in Ghor Province that is responsible for maintaining a stable environment throughout the province and coordinating reconstruction efforts.  Lithuania contributed approximately 215 personnel to NATO's International Security Assistance Force.

**Macedonia**

The Government of Macedonia continued its close counterterrorism coordination with the United States, which included intelligence sharing on potential terrorist groups operating in or transiting the country.  The government also cooperated with its regional and European Union partners, and worked closely with INTERPOL and other international law enforcement agencies.

Macedonia provided adequate security for weapons generally sought by terrorists with annual inventories and worked to improve security on its weapons facilities.  The Macedonian Ministry of Defense provided intelligence and other support to the Ministry of Interior for actions against domestic and regional terrorist groups.

The Ministry of Defense provided troop contributions to the International Security Assistance Force in Afghanistan.  In 2009, the Macedonian troop contribution reached the level of 240.

The Macedonian government trained several hundred police and military personnel in counterterrorism techniques, technologies, and methods in 2009.  Macedonia cooperated closely on preventing terrorist financing and money laundering through close coordination with the U.S. Embassy and in partnership with the banking sector.

**Malta**

The Maltese government continued to freeze the assets of those entities on the UN 1267 consolidated list.  Malta actively participated in the EU Clearing House and cooperated with other Member States and third states to defeat terrorist activities and, by extension, to prevent financing acts of terrorism, to deny safe havens to terrorists, and to exchange information to stop the commission of terrorist acts.  The Maltese government has historically supported sharing information with the United States on matters related to terrorism, and has demonstrated a commitment to interdiction operations and compliance with international requests.

The Maltese criminal code includes several specific provisions on terrorism.  The law addresses "acts of terror" and "terrorism" and enumerates the actions constituting the offense.  Malta criminalized terrorist financing through the Prevention of Money Laundering Act, which was expanded to include provisions for the funding of terrorism.  Additionally, the act expanded the powers of the Maltese Financial Intelligence Unit to include terrorist financing.  Since 2006, the Prevention of Money Laundering Regulations have been extended to financing terrorism and include controls that require proper record keeping, specific reporting requirements, and relevant training on the subject of terrorist financing.

**Moldova**

Moldova continued to work on implementation of its UN obligations related to terrorist financing.  The Government of Moldova welcomed information regarding terrorist financing from the U.S. government and other bodies, and actively applied such information in its monitoring efforts through its Center for Combating Economic Crimes and Corruption.

PX205

A specific section in the Prosecutor General's Office handles terrorism-related cases.  The primary investigative body in counterterrorism cases is the Information and Security Service, Moldova's intelligence service.  In 2006, SIS was given the governmental lead to establish and manage a special counterterrorism center.  In 2009, staffing and funding were minimal, as were its activities.  The U.S. Embassy's law enforcement assistance programs aid Moldovan efforts to impede the ability of terrorists and other citizens without proper documents to cross national borders.  The programs also facilitated automation at ports of entry to ensure greater security of passports and travel documents.

The separatist-controlled Transnistria region of Moldova remained a potential area of concern.  Moldovan law enforcement worked hard to track the whereabouts and activities of individuals moving in and out of Transnistria, an area where central government police and security services were not able to operate.  Some of the individuals moving in and out of Transnistria were foreign students who remained in Moldova illegally, as the government lacked the resources to deport them when their visas expired.  Corruption was endemic, and it was easy to obtain false travel documents in both Transnistria and Moldova.

**Montenegro**

The Ministry of Interior, through the Police Directorate and the Agency for National Security, is primarily responsible for counterterrorism operations.  In 2009, the Ministry of Interior continued work on a National Counterterrorism Strategy to foster better counterterrorism cooperation among its different institutions.

Seventeen individuals, including four Americans, were convicted and sentenced to prison in 2008 for an intended terrorist act referred to as the "Eagles Flight" case.[9]  The individuals had appealed their conviction, and, in 2009, the appellate court dismissed their appeals, indicating that each was to serve the original sentence.  During 2009, five of the individuals, including two U.S. citizens, completed their sentences, and were released from prison.

Montenegrin legislation on terrorism has been harmonized with EU standards and UN conventions.[10]  In 2007, Parliament passed the Law on the Prevention of Money Laundering and Terrorist Financing.  The FIU also publishes an international list of terrorists and terrorist organizations established pursuant to UN resolution 1267.  In 2009, the FIU produced instructions for risk analysis for the Prevention of Money Laundering and Terrorist Financing.

---

[9] In September 2006, 17 ethnic Albanians, four of whom are U.S. citizens, were arrested and charged with planning terrorist acts to incite an ethnic Albanian rebellion.  After a lengthy trial, in August 2008, the Higher Court in Podgorica convicted the defendants of plotting to disturb the constitutional order and security of Montenegro.  Sentences ranged from three months to six years and six months in prison.

[10] Criminal acts of terrorism are defined by Montenegrin Criminal Code Article 365, which states that "anyone who, with the intention of endangering the constitutional order and security of Montenegro causes an explosion or fire or undertakes other dangerous measures or kidnaps a person or commits another act of violence or threatens to undertake some dangerous action or to use nuclear, chemical, biological or other dangerous substance and whereby may cause fear or feelings of insecurity among citizens shall be punished by imprisonment for a term of three to fifteen years."

PX205

These instructions set out risk factors which determine the level of risk of individual clients, groups, and business relations.

Montenegro contributed to international efforts supporting the government of Afghanistan, and prepared to deploy a military unit to Afghanistan.  In July, the Parliament of Montenegro approved a plan to send 31 military personnel to join the NATO-led International Security Assistance Force mission in Afghanistan.  This deployment is Montenegro's first participation in a NATO-led peacekeeping mission.  Montenegrin troops operated within ISAF's Regional Command North.

Montenegrin police forces, including the "Special Anti-Terrorism Unit," (SAJ), have received international and U.S. training and equipment.  Besides the SAJ, the Special Police Unit is also training and equipping a high-threat arrest team that can be used to augment the SAJ during larger counterterrorism operations.  For example, the George Marshall European Center for Security Studies trained government officials, police, and military officers through two programs in 2009: the Combating Terrorism Language Program and the Terrorism and Security Studies Program.  Also, the Department of Justice ICITAP program provided training for the police organized crime unit, which is also responsible for conducting terrorism investigations.  Despite significant training and equipment from outside donors, implementation of the laws is weak, corruption and porous borders remain issues, and Montenegrin law enforcement and security agencies will require additional assistance to attain international standards.

**The Netherlands**

The Netherlands continued its response to the global terrorist threat with leadership and energy in the areas of border and transportation security, terrorist financing, bilateral counterterrorism cooperation, and Coalition efforts in Afghanistan.  The Netherlands had 1,800 troops deployed in Afghanistan as part of the International Security Assistance Force.  The Dutch led a Provincial Reconstruction team in Uruzgan province, commanded NATO's efforts in southern Afghanistan through November, and contributed approximately US$ 95 million in development aid for Afghanistan.  The Netherlands maintained five trainers supporting the NATO Training Mission in Iraq, rotated officials for the EU rule of law mission in Iraq, and dedicated naval resources to the counter-piracy efforts off the coast of Somalia.

In its December 2009 quarterly terrorism threat analysis, the Dutch National Counterterrorism Coordinator (NCTb) lowered the national threat level to "limited" from "substantial," meaning chances of an attack in the Netherlands or against Dutch interests were relatively small but could not be ruled out entirely (The Netherlands has four threat levels: minimum, limited, substantial and critical).  The NCTb attributed the reduced threat level to the fact that the Netherlands was less in the picture of international terrorist organizations as a specific "preferred target."  The NCTb also noted that al-Qa'ida's (AQ) power to strike in Europe was less than a year ago.  The NCTb believed that the threat of an attack against Dutch interests abroad was greater in countries and regions where groups affiliated with AQ were more active than in the Netherlands itself.  According to the NCTb, the growth of domestic extremist networks seems to have decreased in

PX205

recent years as a result of increased resistance to extremists within Muslim communities in the Netherlands.

The NCTb also cited a report by the General Intelligence and Security Service (AIVD) showing that the growth of the Salafist movement in the Netherlands was stagnating, partly as a result of increased resistance by Muslims in the Netherlands to the anti-integration message of Salafist centers.  Another factor that appeared to play a role was that, in the eyes of believers, some preachers are not sufficiently applying the doctrines they teach in their personal lives.  According to the NCTb, the puritanical lifestyle, which demands considerable personal sacrifices and the limited scope for independent thinking, causes orthodox Muslims to leave the movement.
The Justice Ministry's "Netherlands against Terrorism" campaign continued in 2009, with a particular focus on prevention of radicalization.  A study commissioned by the City of Amsterdam concluded in October that the two-day training sessions given to professionals on how to recognize and handle radicalization were effective.  The government's terrorism alert system, which became operational in June 2005, now includes fourteen economic sectors: the financial sector, seaports, airports, drinking water, railway, natural gas, oil, electricity, nuclear, chemical, municipal and regional transport, hotels, public events, and tunnels and flood defense systems.

In November, the Foreign Minister announced plans to establish an international counterterrorism institute in The Hague.  The institute is to focus on ways to prevent terrorism; strengthen and supplement international legal architecture for countering terrorism; and the relationship between counterterrorism policy, human rights, the rule of law, and international humanitarian law.  The institute is to become an independent hub in the international counterterrorism network that includes academics, policy makers, and law enforcers from Europe, the United States, Asia, and the Middle East.  It will also be engaged in prevention research, training, and will organize international symposia.

One major terrorism-related appeal case was still pending a Supreme Court ruling at year's end.  In February 2008, the public prosecutor's office in The Hague appealed the verdict by the appeals court of The Hague that acquitted the seven members of the Hofstad terrorist group of participating in a criminal and terrorist organization.

In November, the appeals court in The Hague sentenced two former associates of convicted terrorist Samir Azzouz to an unconditional prison sentence of 104 and 74 days, respectively, which is equal to the time they served in pre-trial detention.

In September, the national prosecutor's office released four men from The Hague who were arrested in Kenya in July on suspicion of preparing a terrorist attack.  The four suspects allegedly were travelling in a rented truck to an al-Shabaab terrorist training camp in Somalia.  According to the prosecutor's office, there was insufficient evidence to detain them any longer.  However, the four – two Dutch nationals of Moroccan origin, one of Somali origin, and a Moroccan national with a Dutch residence permit – remained suspects and the police investigation continued.

PX205

In November, the Dutch police, at the request of U.S. law enforcement authorities, arrested Somali terrorist suspect Mahamud Said Omar in a center for asylum seekers.  Omar, a Somali citizen granted permanent U.S. resident status in 1994, is suspected of financing weapons for terrorists and helping young men travel from Minneapolis to Somalia to train with and fight for al-Shabaab.  U.S. authorities have requested Omar's extradition.

On December 25, Nigerian national Umar Farouk Abdulmutallab unsuccessfully attempted to detonate an explosive device on a Northwest Airlines flight from Schiphol Airport in Amsterdam to Detroit.  His attempt was foiled by an alert Dutch passenger, and he, the aircraft crew, and other passengers quickly subdued the suspect.  Abdulmutallab arrived at Schiphol from Lagos where, after spending roughly an hour in the transfer area, he was subjected to the standard U.S. government-required security screening for U.S.-bound flights.  Al-Qa'ida in the Arabian Peninsula later claimed responsibility for the failed attempt.

Dutch officials remained committed to active cooperation with the United States in designating known terrorist organizations and interdicting and freezing their assets, and supported the continued exchange of information on financial transactions.  The Dutch government worked with the United States to emphasize the importance of balancing security and the effectiveness of the financial system.  In July, the Netherlands assumed Presidency of the Financial Action Task Force for a one-year period.

In July, following the recommendations of a committee that investigated ways to improve the cohesion of Dutch counterterrorism legislation, the government decided to initiate an external investigation into the cohesion, legitimacy, effectiveness, and operational practicality of Dutch counterterrorism laws and regulations.  The committee concluded that many counterterrorism laws passed in recent years overlap and might even be in conflict with fundamental human rights.  The committee noted a general lack of guidelines for coordinating government action in the event of terrorist incidents and concluded that cooperation between departments was the vulnerable point.  In line with the committee's recommendations, Justice Minister Hirsch Ballin requested the Upper House of Parliament defer action on the Bill on Administrative National Security Measures, which would have allowed the Interior Minister to issue restraining orders to prohibit a terrorist suspect's physical proximity to specific locations or persons.

In June, a bill became effective making participation and cooperation in a terrorist training camp a serious punishable offense, even if the training takes place outside the Netherlands.

The Netherlands continued its strong commitment to effective cooperation with the United States on border security issues.  In April, Justice Minister Hirsch Ballin and U.S. authorities performed the opening of the new FLUX (Fast Low Risk Universal Crossing) system at JFK airport enabling registered travelers between Amsterdam and a number of U.S. airports to go straight through U.S. immigration controls using iris scanners. FLUX was an initiative of the Dutch Justice Ministry and the Department of Homeland Security.

In December, the FBI hosted the Netherlands Police Agency (KLPD) for the second counterterrorism "Experts Meeting" in Washington, D.C.  During the meeting, experts from the

Page | 95

PX205

FBI and KLPD presented topics of mutual interest and concern to both the United States and the Netherlands.  The meeting was the result of recommendations from the 2007 "Agreed Steps" meeting.  The first "Experts Meeting" was hosted by the KLPD in the Netherlands in November 2008.

**Norway**

Norwegian authorities considered the threat of terrorist attacks in Norway low and the widespread belief among the general public was that Norway was not in danger of attack.  In December 2008, the parliament revised its counterterrorism laws in order to be able to ratify the Council of Europe Convention on the Prevention of Terrorism.  These revisions allowed incitement, recruiting, and training for terrorist acts to become punishable offenses independent of whether an attack is actually carried out.  They also require specific "intent" to commit an act that causes terrorism, whereas the prior standard had been "willfulness" to commit the act.  As of December 2009, the government still had not yet ratified the Convention, but was expected to do so shortly.

In October, the Norwegian Attorney General indicted Abdirahman Abdi Osman, a Norwegian citizen of Somali ancestry, for collecting in excess of US$ 35,000 for al-Shabaab.  Osman was charged with knowingly collecting money for a terrorist organization, knowingly contributing funds to a terrorist organization, and violating a UN Security Council resolution incorporated into Norwegian law that forbids the financing of arms deliveries to Somalia.  Osman is not in custody and retains his passport.  Osman is the only one of the six persons, three in Norway and three in Sweden, initially arrested in this matter who face charges.

In February, the jury in an appeals court affirmed a lower court's 2008 conviction of Arfan Bhatti for attempted murder and aggravated vandalism, and affirmed the sentence of eight years imprisonment.  In 2008, Bhatti had been acquitted of terrorism in connection with a plot to attack the United States and Israeli embassies; the vandalism charge was for the 2006 shooting of an automatic weapon at the Oslo synagogue.  In June, the Supreme Court threw out the conviction for attempted murder on the grounds that the requirement of intent was not correctly decided by the appeals court.  Bhatti was released from prison in June, and Norwegian authorities returned his passport.  In November, the appeals court announced that Bhatti's re-trial for attempted murder was delayed until May 2010.

Mullah Krekar (aka Najmuddin Faraj Ahmad), the founder of Ansar al-Islam, an organization on both the U.S. list of designated Foreign Terrorist Organizations and the UN list of entities linked to terrorist activities, resides in Norway.  He has been arrested on several occasions by Norwegian law enforcement, but they have been unable to collect sufficient evidence to convict him.  Norway has frozen his assets, restricted his movement to some degree, and ordered his deportation to Iraq.  As of December 2009, the Norwegian government stated that it had not yet received sufficient human rights assurances from the Iraqi government that would allow it to carry out the deportation order pending against him.

PX205

Norway contributed more than 500 troops to International Security Assistance Force efforts in Afghanistan.

**Poland**

The Polish Ministry of Internal Affairs and Administration assessed the terrorist threat level in Poland as low.  However, the Polish government devoted significant resources to counterterrorism activities to ensure that the threat did not increase.

Poland continued to support international counterterrorism efforts through its participation in the International Security Assistance Force (ISAF) in Afghanistan.  At the end of 2009, Polish ISAF troops represented the seventh-largest national contingent.  Additionally, Poland deployed about 17 soldiers as part of the NATO Training Mission in Iraq.

Through participation in initiatives including the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism, Poland remained an active participant in various international undertakings to combat terrorist threats.  Two years after integration into the Schengen zone, Poland maintained a close and growing collaboration with its European neighbors on counterterrorism.

The bilateral Counterterrorism Working Group (CTWG), formed in 2004 to further U.S.-Polish collaboration on counterterrorism by synchronizing counterterrorism policy and training counterterrorism specialists, continued to hold regular meetings.  The CTWG identified specific areas of mutual interest, including critical infrastructure and terrorist financing, and developed further plans for training and cooperation.

**Portugal**

Portugal worked proactively with other nations to combat terrorism and disrupt funding for terrorist groups.  Because Portugal does not have any indigenous terrorist groups, the legal system and law enforcement focus is on preventing international groups from establishing operations on its soil.

Portuguese and American officials shared counterterrorism information effectively, including information on threat assessments and terrorist operative activities.  In cooperation with other European Union partners, the Portuguese government continued to participate actively in ongoing EU efforts to remove institutional barriers to cooperation on counterterrorism.

In September 2008, the Government of Portugal created a new Secretary General for Internal Security, a move designated to facilitate communication between the Judicial Police, Public Security Police, and the National Republican Guard.  As a result, the distinct law enforcement agencies were able to share information about terrorism investigations more effectively.

In August 2009, Portugal accepted two Guantanamo detainees for resettlement.

PX205

Portugal contributed approximately 145 Portuguese troops that were deployed in Afghanistan in support of ongoing International Security Assistance Force and NATO operations, including a C-130 transport aircraft with a supporting crew of 42 personnel on a three-month mission to support Afghan elections in August.

**Romania**

The Romanian Intelligence Service (SRI) assessed that the terrorism threat in Romania was low, both in Romania and to Romanians and Romanian interests abroad. Romania also began implementation of the "National Anti-Terrorism Strategy," which proved an effective mechanism for preventing the use of Romanian financial institutions, including the national banking system, for the purpose of financing terrorist-related activities. The Romanian Supreme Council for National Defense (CSAT) viewed terrorism as a high priority and ensured political and material support for the National System for Preventing and Countering Terrorism (NSPCT), in particular by assigning the SRI as the national authority for counterterrorism and the technical coordinator of the NSPCT.

Romania continued to provide a wide array of public, military, and diplomatic support to global counterterrorism efforts. On July 1, Romanian President Traian Basescu declared that Romania's mission in Iraq was completed; from January through June, Romania was the third largest troop contributor in Iraq, by invitation of the Government of Iraq. Approximately five Romanian soldiers remained in Iraq after July 1, as part of the NATO training mission. As of December, approximately 1,050 Romanian troops were serving as part of coalition and NATO Alliance efforts in Afghanistan, primarily in the Zabul and Kandahar regions. Romania also continued to make airspace, ground infrastructure, and naval facilities available to U.S. and NATO forces.

**Russia**

On November 27, an explosion derailed the Moscow to St. Petersburg express train. As investigators combed the site of the attack for clues the following day, a second explosion occurred injuring the chief of the Investigative Committee. Chechen separatists were the primary suspects in these incidents, which killed 26 and wounded 90. It was the deadliest such incident in Russia outside the North Caucasus since 2004.

Attacks continued in the North Caucasus, where ongoing regional violence has been most significant in Chechnya, Dagestan, and Ingushetia. According to the U.S. Center for Strategic and International Studies, there were 16 suicide bombings in Chechnya alone in 2009, compared to four in 2008. According to President Medevdev's Political Representative for the Southern Federal District, almost 800 terrorist acts occurred in the North Caucasus in 2009, an increase of 30 percent compared to 2008. However, many attacks were often difficult to differentiate from criminal acts motivated by greed or revenge. The Federal Security Service (FSB) claimed to have prevented 80 terrorist attacks and killed more than 500 militants in 2009.

PX205

Throughout the North Caucasus, groups have, for the most part, moved away from mass attacks on civilians in favor of targeted attacks on police, local interior ministry officials, and departments responsible for combating the insurgency.  On June 5, a sniper killed the Dagestan Interior Ministry chief and on June 22, Ingush President Yevkurov was injured by a suicide bomber.  In August, an attack on an Ingush police station killed 20 and wounded 90.

The 1998 federal law "On Fighting Terrorism" and the 2006 federal law "On Countering Terrorism" remained the main counterterrorism legal authorities.  On January 11, President Medvedev signed amendments to the law "On Countering Terrorism" that abrogated jury trial for espionage and terrorism cases, although the law is now under review by the Constitutional Court.  In April, Russia lifted an almost 10-year counterterrorism regime in Chechnya, in which counterterrorist operations were under the direct authority of the FSB, that had severely restricted civil liberties.  When the regime was lifted, the local MVD under President Ramzan Kadyrov took over responsibility for counterterrorist operations.  In July, the Ministry of Justice drafted a law on compensation for civilian victims of counterterrorism operations.  The National Antiterrorism Committee, organized in 2006, is the main government body coordinating the Russian government's response to the terrorist threat.  Interagency efforts to combat terrorism through anti-narcotics enforcement remained a challenge, particularly the use of financial intelligence to interrupt narcotics sales that provided revenue to terrorists.

Russia is a member of the Financial Action Task Force on Money Laundering and Terrorist Financing (FATF).  It is also a leading member, chair, and primary funding source of a similar body known as the Eurasian Group on combating money laundering and financing of terrorism (EAG)[11].  Russia, through the EAG, provides technical assistance and funding towards improving legislative and regulatory frameworks and operational capabilities.

The United States and Russian Counterterrorism Coordinators met in November to advance cooperation within the context of the United States-Russia Counterterrorism Working Group.  They agreed to work together in the multilateral arena to strengthen international counterterrorism norms and increase capacity building; focus on Afghanistan with particular regard to counterterrorism/terrorist finance issues; strengthen UNSCR 1267 sanctions; counter the ideological dimension of violent extremism; and work on improving the bilateral exchange of transportation security issues.  Cooperation continued on a broad range of counterterrorism issues.  U.S. and Russian law enforcement agencies shared substantive, concrete terrorism intelligence.

At the St. Petersburg G8 Summit in July 2006, the United States and Russia jointly announced the Global Initiative to Combat Nuclear Terrorism and invited other nations to join.  The Initiative demonstrated Russia's effort to take a leadership role to combat nuclear terrorism.  It now includes 75 partner nations that cooperate in a variety of ways, including safeguarding radioactive and nuclear materials, preventing nuclear smuggling, and sharing information.  In July, President Medvedev joined President Obama in a Joint Statement, which pledged enhanced

---

[11] The EAG members are Russia, China, Belarus, Kazakhstan, Kyrgyzstan, Uzbekistan, and Tajikistan.

PX205

efforts to prevent WMD terrorism through international cooperation, citing the fifth plenary meeting of the Initiative in the Netherlands in June.

In June, Russia hosted the Eighth International Meeting of the Heads of Special Services, Security Agencies, and Law-Enforcement Organizations, which the FBI, CIA, DOE, and NCTC attended. The 2009 agenda included discussion of terrorist use of the Internet, efforts to counter radicalization, the development of an international counterterrorism database, and the prevention of WMD terrorism through UNSCR 1540 and other instruments.

Russia continued to work with regional groups to address terrorism, including the EU, NATO (through the NATO-Russia Council), the Shanghai Cooperation Organization, and the OSCE.

Pursuant to an Agreement signed by Presidents Obama and Medvedev at their July Summit in Moscow, Russia now permits flights in route to Afghanistan carrying lethal materiel to support the ISAF to transit its airspace.

**Serbia**

Serbia's law enforcement and security agencies, particularly the Customs Administration, Criminal Police, Border Police, Security Information Agency, and other security services continued to improve intra-governmental cooperation. Serbia has two police organizations that operated as counterterrorism tactical response units, the Special Antiterrorist Unit and the Counterterrorist Unit. The Criminal Investigative Unit for Counterterrorist Investigation within the Interior Ministry's Criminal Investigation Directorate conducts terrorism-related investigations.

The Parliament passed new legislation that will aid in countering terrorism. Parliament passed on March 19, and amended on September 3, the Law on the Prevention of Money Laundering and the Financing of Terrorism, which is compliant with international standards. The law applies all provisions of the previous Anti-Money Laundering Law to terrorist financing and expands the entities required to collect information and file currency transaction reports. It requires reporting of transactions suspected to be terrorist financing and creates mechanisms for freezing, seizing, and confiscating suspected terrorist assets. On December 11, the Parliament passed a law specifying that non-biometric passports would not be valid after December 31, 2010. On October 26, the Parliament passed the National Security Strategy and National Defense Strategy. The strategies define terrorism and note that separatism and religious extremism are security risks.

On July 5, the trial of Islamist extremists charged with conspiracy to commit terrorism, illegal possession of firearms, and attempted murder concluded. The Belgrade District Court's Special Department for Organized Crime convicted 12 individuals and acquitted two others. Authorities found evidence that the group was planning attacks on infrastructure in the city of Novi Pazar, on a local religious leader, and on several sites in Belgrade, including the U.S. Embassy. In a follow-up trial on September 8, an additional four individuals were convicted of planning attacks on police in Novi Pazar and storing large quantities of weapons and ammunition.

PX205

Bilateral cooperation continued to improve, and the United States provided counterterrorism training and assistance to the Serbian government.  In February, the Department of Justice International Criminal Investigative Assistance Training Program (ICITAP) conducted a counterterrorism workshop for Serbian police officers.  The workshop covered trends in international terrorism, the formation of a joint terrorist task force, investigative techniques, vulnerability assessments, crime scene management, case studies, and practical exercise problems.  In May, ICITAP conducted an informant development course for Serbian counterterrorism and organized crime investigators.  Also in May, ICITAP held an anti-corruption workshop bringing together for the first time Serbian and Montenegrin police and prosecutors to discuss terrorism and corruption.  In September, ICITAP and the FBI's Hostage Rescue Team provided joint training to a SAJ-sponsored counterterrorism regional training initiative.  This training involved specialized counterterrorism units from Serbia, Slovenia, Bosnia, Croatia, Romania, Greece, Bulgaria, and Montenegro.

**Slovakia**

The police unit responsible for investigating criminal offenses related to terrorism is the Counterterrorism Unit (CTU) of the Bureau for Combating Organized Crime.  The CTU develops Slovakia's counterterrorism strategy, conducts criminal investigations, and makes arrests of suspected terrorists or extremists within Slovakia's borders.  Slovakia's most recent strategy, approved in October 2007, focuses on developing the legislative and institutional framework to combat terrorism, as well as strengthening coordination, collaboration, and exchange of information among key institutional actors.  The Financial Intelligence Unit (FIU) of the Bureau for Combating Organized Crime and the Slovak Information Service (SIS) provides support to CTU's counterterrorism mission.  On December 16, President Ivan Gasparovic signed a law making the financing of terrorism a punishable criminal offense in Slovakia.  According to the amended Penal Code, financing terrorism can be punished by 20 to 25 years imprisonment.

One suspected terrorist, Mustapha Labsi, has been held in Slovak custody since May 2007.  In January 2008, the Supreme Court confirmed that he could be extradited to Algeria, where he was convicted in absentia to life in prison.  In June, the Constitutional Court ruled that the Supreme Court must verify that Labsi will not face torture upon extradition.  On October 28, the Regional Court in Bratislava decided again not to grant asylum to Labsi due to the serious threat he could pose to the security of Slovakia.  On December 19, Labsi left a refugee detention center and fled to Austria, where he was apprehended by police.   Labsi had not been returned to Slovakia at year's end.

Slovakia cooperated closely with a range of international partners in numerous fora.  Slovak police participated in the Police Working Group on Terrorism, a consortium of 30 countries, including EU member states, Norway, Switzerland, Iceland, and Croatia. The SIS is engaged in the Club de Berne, which facilitates exchange of police and intelligence information on terrorism.  Both CTU and SIS take a part in the EU's Joint Situation Center.

PX205

In August, Slovakia hosted a conference on "Legal Aspects of Combating Terrorism and handling extremism" under the auspices of the U.S. Office of Defense Cooperation – U.S. Embassy.  A result of the conference was the creation of a forum for discussion between nine countries, the SIS, and the ministries of Defense, Interior, Justice, and Foreign Affairs.

In 2009, Slovakia increased its presence in Afghanistan from 51 soldiers to 319.  This includes a substantial contingent in Uruzgan province, a very active operational area, as well as in Kandahar.

**Slovenia**

Slovenia is generally assessed as a low-threat country for terrorism and terrorist activity.  The National Security Council, chaired by the president and including the defense, interior, justice, foreign affairs, and finance ministers, is the main body for counterterrorism policy.  In the case of a terrorist incident, the NSC's secretariat, led by the prime minister's national security advisor, would lead the inter-ministerial working group tasked with a response, with subgroups focusing on specific threats.  In 2005, the MOI and Slovene Police developed a response plan for a terrorist attack using weapons of mass destruction.  Slovenia's national policy also has plans in place to assess threat levels and specific guidelines on measures police officers are to take based on the corresponding threat level.  According to the MOI, Slovenia's counterterrorism plans follow EU security standards.

The Government of Slovenia actively participated in multilateral terrorism efforts, including the Global Initiative to Combat Nuclear Terrorism.  The U.S. Office for Defense Cooperation facilitated counterterrorism training for officials from various Slovene ministries, which included regional conferences and Marshall Center seminars.  In fall 2009, Slovenia's Ministry of Defense announced that it would host a regional counterterrorism conference in March 2010.  Slovenia contributed 81 troops to the International Security Assistance Force in Afghanistan, including 15 sent specifically for security during the August 2009 presidential elections.

**Spain**

During 2009, Spain continued to confront and suffer from both radical Islamist terrorism and domestic Basque terrorists.  Spain maintained close cooperation with the United States to investigate and prosecute acts of terrorism, prevent future attacks, and worked hard to disrupt terrorist acts that might be directed against U.S. interests.

The Government of Spain and its citizens recognized that their country remained a principal target of Islamist terrorist groups who routinely called for "recapture" of the Iberian Peninsula, "liberation" of Spain's North African enclaves in Ceuta and Melilla, and for the Spanish military's withdrawal from multilateral forces in Afghanistan and Lebanon.  In October, al-Qa'ida in the Islamic Maghreb's (AQIM) decision to name its propaganda unit, "al Andalus", reinforced the Government of Spain's concern that Spain remains a priority target for AQIM.  In late November, AQIM kidnapped three Spanish aid workers in Mauritania as a convoy from their Barcelona-based non-governmental organization traveled through West Africa to deliver

PX205

humanitarian assistance.  At year's end, two of the three were still being held; one had been released.

Spain's geographical location and large immigrant population from North Africa and South Asia, combined with the ease of travel to other European countries, made it a strategic crossroads for international terrorist groups.  Spain remained an important transit, fundraising, and logistical base for terrorist organizations operating in Western Europe.  Spain continued to aggressively target terrorist recruiters and facilitators.  The Ministry of Interior arrested 14 suspected Islamist terrorists.

In order to implement the Council of Europe's Convention on the Prevention of Terrorism, Spain's Council of Ministers in November approved legislative reforms in the nation's counterterrorism laws.  These reforms criminalized such offenses as inciting terrorism as well as recruiting, training, indoctrinating, or financing terrorists. The proposal requires parliamentary approval to become a binding law.

Meanwhile, the Spanish judiciary remained active in combating Islamist terrorism.  In January 2008, authorities arrested members of an alleged terrorist cell for plotting to attack Barcelona's transportation system.  In December 2009, the National Court convicted all 11 defendants, primarily Pakistanis, for membership in a terrorist organization, with sentences ranging from 8.5 to 14.5 years.  In November 2009, a Spanish judge indicted seven additional persons for their alleged roles in the 2004 Madrid train bombings.

On the domestic front, 2009 marked the 50th anniversary of the founding of the terrorist group Basque Fatherland and Liberty (ETA), whose aim is to create an independent Basque state.  The group marked its anniversary with a series of high profile and deadly bombings.  ETA claimed its first victim of the year weeks earlier when it used a car bomb on June 19 to assassinate a national police officer in the Basque Region.  On July 29, ETA detonated an explosive-laden van outside a Civil Guard barracks in Burgos.  The blast injured more than 60 Civil Guards, spouses, and children.  The following day, ETA killed two Civil Guards in Mallorca with a car bomb.

2009 was also noteworthy for the change of administration in the Basque regional government. The Socialist Party, under Patxi Lopez's regional leadership, assumed power as the first non-Basque nationalist government to administer the Basque Country since the restoration of democracy in Spain nearly 30 years ago.  Lopez's administration implemented a more unequivocal counterterrorism policy to confront ETA.

Building on strong results in 2008, Spain intensified its cooperation with the French government and continued to put considerable pressure on ETA.  Joint operations with France resulted in, among other successes, the detention of ETA's suspected military leader and its alleged political chief, who also reportedly served as the group's communications chief.  Each of these arrests – as well as numerous others – occurred in France with the participation of Spanish security forces. As of mid-December, security services had arrested 124 alleged ETA members or associates, including 31 in France.  Joint operations also resulted in the seizure throughout August of more than a dozen arms caches.  The European Court of Human Rights in June upheld Spain's 2003

ban on the political party Batasuna for its ties to ETA.

Spain participated in the Megaports and Container Security Initiatives, and worked hard to deny terrorists access to Spanish financial institutions.  The Spanish government maintained a robust law enforcement and intelligence posture against terrorist financing.  Spain was a member of the G8 Counterterrorism Action Group and provided technical assistance to other countries to help build their institutions to counter terrorist financing.  Spain is a longtime member of the intergovernmental Financial Action Task Force and its efforts to combat money laundering were considered comprehensive and effective.

During a visit to Washington in June, Spain's Interior Minister and U.S. Attorney General Eric Holder signed an Agreement on Preventing and Combating Serious Crime that allows for the exchange of fingerprints and other data on known terrorists and criminals while protecting individual privacy.  The Interior Minister also signed a Letter of Intent with Homeland Security Secretary Janet Napolitano to expand bilateral science and technology cooperation in order to enhance security and combat transnational threats.

In support of the International Security Assistance Force (ISAF) in Afghanistan, Spain increased its contingent of more than 750 troops to roughly 1,000.  President Zapatero voiced support for President Obama's strategy for increasing overall ISAF troop levels further.

**Sweden**

The Swedish Security Service (SAPO), which has responsibility for counterterrorism, distinguished between attack and activity threats in its terrorism assessment.  Attack threats, which included plans to carry out attacks in Sweden and/or against Swedish interests abroad, remained low.  SAPO noted, however, an increased activity threat from individuals who were planning, supporting, or financing terrorist attacks in areas of conflict.  A number of individuals with connections to radical and violent networks, primarily al-Qa'ida (AQ) and al-Shabaab, continued to depart Sweden for training camps in Afghanistan, Pakistan, Somalia, and Iraq.  According to estimates, the number of persons who seek ideological education, weapons training, or other activity in training camps abroad is likely to increase, and these individuals have the potential to speed up radicalization in Sweden.  SAPO is responsible for trying to prevent such trips, but existing legislation leaves few possibilities to stop determined individuals from leaving Sweden.  SAPO, therefore, continued to work to identify individuals planning to travel to training camps and held dialogues with them to try to prevent their travel, and it also spoke with persons who were suspected of returning from such travel.  At least 20 Swedes were estimated to be active in camps around the world.  Somalia continued to be the destination that attracted most individuals, and SAPO confirmed that it was aware of a hand-full of casualties involving ethnic Somali Swedish citizens fighting in East Africa.

In July, Xasaan Xussen, a spiritual leader for the Somali terrorist organization al-Shabaab, spoke at a conference in the Bellevue Mosque in Gothenburg.  Xuseen's visit was controversial because of a widespread concern that he came to Sweden to recruit young people and collect money for al-Shabaab.  On July 15, the Somali Minister of Justice Abdirahman Janaqoo visited

Sweden to discuss how to prevent young Somali-Swedes from traveling to Somalia and fight against the government.  Together with two Somali parliamentarians, Minister Janaqoo met with representatives from the Swedish government to discuss radicalization of Somali-Swedes.  In November, the media reported that a Swedish-Somali youth leader had used a youth center in one of Stockholm's suburbs as a base for al-Shabaab recruitment.

Swedish authorities monitored individuals with connections to AQ, al-Shabaab, Ansar al-Islam, the Revolutionary Armed Forces of Colombia, Hizb Al-Tahrir, Hizballah, Islamic Jihad, and the Kurdistan Workers' Party (PKK).  According to Swedish terrorism experts, members of terrorist groups, such as Ansar al-Islam, and Hizballah, used funds earned in Sweden to finance terrorist activities elsewhere.  The al-Aqsa Foundation in Malmo was shut down in 2007 when it was suspected of financing HAMAS.  Its chairman, Khaled al-Yousef, went on trial for terrorist financing and violating international sanctions, though he was acquitted in November after the case had been reviewed in two different courts.

Swedish law does not provide the government with independent national authority to freeze or seize assets, unless in connection with an ongoing criminal investigation.  However, once the EU takes action, the government can and does freeze assets of entities and persons listed on the UN 1267 Sanctions Committee list.  This procedure is managed through the Sanctions Act (1995).  On October 26, the Swedish branch of the Somali bank network Al-Barakaat was delisted from the UN's sanctions list.  The Swedish branch of the organization was first designated in 2001 and about US$ 142,857 of frozen assets will now become accessible.  Sweden can also take action against entities designated by the EU clearinghouse process, although Sweden has not yet proposed individuals or entities for inclusion on such lists.

On March 15, a new law on money laundering and terrorist finance came into effect that covers a broader range of entities and requires companies to have better knowledge about customer transactions.  Suspicious transactions have to be reported to the Financial Police for further investigation.  A special unit at the Financial Supervisory Authority, which supervises and monitors companies operating on the financial market, has been established to oversee implementation of the new legislation.

In late 2008, the Swedish Parliament approved the new EU directive on counterterrorism, which was intended to harmonize the EU Member States' domestic laws and to criminalize public exhortation to terrorist crimes, recruitment and training for terrorism purposes, including actions performed over the Internet.  In order for Sweden to comply with the directive, changes in the current legislation and a new law have been drafted.  On December 21, the government introduced its proposed bill for action by the Parliament for voting.

Between July 2008 and June 2009, Sweden applied its Special Alien's Control Act once.  The act was established in 1991 to prevent presumptive terrorists from entering or residing in Sweden but also permits for control of individuals, who due to asylum reasons still have to be granted a stay in Sweden.  In this particular case, the government decided to deport the person from Sweden.

PX205

While there were no convictions for terrorism in Sweden during the reporting period, the following cases should be mentioned:

- In April, a 32 year-old Swedish citizen of Somali origin was arrested in the United Kingdom, where he currently faces allegations for terrorist financing in Somalia.

- In July, Swedish citizen Misrad Bektasevic, who was convicted on terrorism charges in Bosnia in 2005, was transferred from Bosnia to Sweden, where he will serve the remainder of his prison sentence. Bektasevic was arrested by Bosnian Security Police in Sarajevo, when he was found in an apartment with explosives, weapons, and suicide bomb belts in 2005. A video with masked persons threatening to attack forces in Iraq and Afghanistan was found and a voice analysis proved that Bektasevic was one of the individuals in the video. In 2007, he was sentenced to eight years and four months imprisonment for terrorism-related crimes.

During Sweden's EU Presidency in the latter half of the year, Sweden arranged a conference on prison radicalization and prevention; a seminar on enabling local police officers to detect and prevent radicalization; chaired the Working Party meeting on Terrorism and Terrorist Financing between the EU and the United States; and led EU efforts for negotiating the interim Terrorist Financing Tracking Program Agreement between the EU and the United States. Sweden also drafted and negotiated the EU's new five-year program within Justice and Home Affairs, which involves counterterrorism and law enforcement cooperation. Sweden continued to contribute to counterterrorism capacity-building projects in third countries.

In November, the Swedish Parliament voted to extend the mandate for its troop contribution to the International Security Assistance Force in Afghanistan for another 12 months. Troop numbers are expected to remain at 500 and Sweden will continue its engagement in northern Afghanistan.

**Switzerland**

The United States worked closely with the Swiss government, the Swiss Bankers' Association, the Swiss Interagency Counterterrorism Task Force, and cantonal law enforcement authorities on counterterrorism issues. Swiss security services continued to monitor activities of terrorist groups with a presence in Switzerland and to coordinate with appropriate U.S. government officials, though the scope of the coordination is limited. Swiss law severely restricts the level of information-sharing possible on banking issues.

On February 1, the Government of Switzerland implemented a bill incorporating recommendations of the Financial Action Task Force (FATF). The legislation extended the scope of the federal law concerning the fight against money laundering in the financial sector to the fight against terrorist financing.

In 2008, the Government of Switzerland extended for the second time its ban against al-Qa'ida (AQ) and its associate organizations for three years. The ban includes not only all activities by

PX205

the organization itself, but also all activities in support of the organization.  Approximately US$ 17 million in AQ and Taliban assets in 25 separate bank accounts remained frozen.

The Swiss government maintained a list of individuals and organizations connected with international terrorism or terrorist financing, in accordance with UN lists.  On October 13, Switzerland and other countries co-sponsored a UN workshop in Vienna to improve domestic and global efforts to prevent terrorism.  National representatives from more than 100 UN Member States, as well as counterterrorism experts from regional and international organizations took part in this two-day event.  They also exchanged information on national experiences, challenges, and lessons learned in order to more effectively link national and global counterterrorism efforts.

Swiss authorities have thus far blocked about 48 accounts totaling approximately US$ 20.6 million from individuals or companies linked to individuals or entities listed pursuant to relevant UN resolutions.  The Swiss Attorney General also separately froze 21 accounts representing about approximately US$ 20.5 million on the grounds that they were related to terrorist financing.

Counterterrorism activities were carried out by several police units: The Federal Criminal Police's Counterterrorism Division focused on AQ-related cases and employed approximately 20 investigators within two operational units.  Of the 130 employees who worked in the Department for Analysis and Prevention in the Federal Office for Police, approximately 12 concentrated on counterterrorism matters, in addition to the roughly 85 cantonal officers focusing on counterterrorism activities.

The Swiss government does not compile lists of prohibited organizations.  The sole recent exception has been AQ, which is banned on the basis of UN Security Council decisions.  However, terrorism and membership in a terrorist organization are illegal and subject to criminal penalties.[12]  Due in part to increased counterterrorism activities in neighboring EU countries, several terrorist organizations, including the Liberation Tigers of Tamil Eelam, the Kurdistan Workers' Party, and the Revolutionary Armed Forces of Colombia, had a presence in Switzerland.  Switzerland does not extradite persons based solely on their membership in a terrorist organization.

In May, the Swiss government announced it would take part in an IMF project aimed at providing technical assistance for developing countries in the global fight against money laundering and terrorist financing.

---

[12] Article 260 of the Swiss penal code defines a terrorist as someone who takes part in an organization that keeps its structure and membership secret and that has the purpose of committing violent crimes or of enriching itself by criminal means. Anyone who supports such an organization or participates in its criminal activities can be punished with up to five years in prison.  The penal code also provides for punishment of those who commit criminal acts outside of Switzerland if their organization conducts its criminal activities partly within Swiss boundaries or plans to do so.

Page | 107

PX205

On September 7-8, the United States and Swiss governments co-hosted an International Bioterrorism Response Coordination Exercise (called "Black ICE II") in Montreux.  This two-day exercise was an opportunity for officials from numerous international and regional organizations and national governments to examine the critical cooperation and coordination issues that would be necessary to respond to an international bioterrorism attack.  Black ICE II built on the lessons learned through the original Black ICE I exercise, also held in Montreux, in September 2006.

**Turkey**

Domestic and transnational terrorist groups have targeted Turkish nationals and foreigners in Turkey, including, on occasion, U.S. government personnel, for more than 40 years.  Terrorist groups that have operated in Turkey have included Kurdish groups, al-Qa'ida (AQ), Marxist-Leninist, and pro-Chechen groups.  The past year may have been a watershed year for Turkey in countering the Kurdistan Workers' Party (PKK).

Turkish terrorism law defines terrorism as attacks against Turkish citizens and the Turkish state. This definition may hamper Turkey's ability to interdict, arrest, and prosecute those who plan and facilitate terrorist acts to be committed outside of Turkey, or acts to be committed against non-Turks within Turkey.  Nonetheless, Turkish cooperation with the United States against terrorism is strong.

Most prominent among terrorist groups in Turkey is the PKK.  Composed primarily of Kurds with a nationalist agenda, the PKK operated from bases in northern Iraq and directed its forces to target mainly Turkish security forces.  In 2006, 2007, and 2008, PKK violence claimed hundreds of Turkish lives.  PKK activity was lower in 2009, but was still a constant throughout the year.

In 2009, the Turkish government and the Turkish General Staff agreed that military action against the PKK would not be sufficient to eliminate it as a terrorist threat.  The government began an initiative, now known as the National Unity Project, to address the social and economic inequalities in Turkish society that purportedly fuel Kurdish dissent and PKK recruitment. Concrete steps within the scope of the Project were clearly devised to drain the PKK's support, by, for example, liberalizing laws governing the use of the Kurdish language in broadcasting, education, and state buildings; reducing the application of counterterrorism laws to non-violent crimes; and providing legal incentives to bring members of the PKK who have not engaged in violence back into civil society.

A court case against an alleged terrorist organization known as Ergenekon continued throughout the year.  Investigations into Ergenekon, a group allegedly composed of former military officials, bureaucrats, politicians, journalists, and underworld figures, began in 2007, and led to arrests beginning in the summer of 2008.  In 2009, the focus of the case gradually shifted away from terrorism aspects, such as investigating and prosecuting suspects for illegally stockpiling arms and attempting assassinations of prominent minority leaders, to alleged coup-plotting by senior military staff.  The responsible court may issue an interim decision on whether Ergenekon and its

PX205

alleged members should be tried under counterterrorism laws or whether Ergenekon would be better classified as an organized crime ring and tried under laws against organized crime.

Terrorists associated with al-Qa'ida, the Islamic Jihad Union, and other Sunni extremist groups continued to have a logistical and operational presence in Turkey and used Turkey as a transit country.  Newspapers reported several raids on alleged AQ cells.

Other prominent terrorist groups in Turkey included the Revolutionary People's Liberation Party/Front (DHKP-C), a militant Marxist-Leninist group with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state.  Newspapers reported several operations against the group throughout the year.  A DHKP-C suicide bomber failed in her April 29 attempt to assassinate former Justice Minister Hikmet Sami Turk.  The Marxist-Leninist Communist Party took responsibility for bomb attacks against a police station in Gaziantep in April.  On April 27, police raided a Revolutionary Headquarters cell in Istanbul, in an operation that resulted in the deaths of one suspected terrorist and one policeman.  The Turkish Workers' and Peasants' Liberation Army, though largely inactive, is still considered a potential threat by the Turkish government.

Turkey has consistently supported Coalition efforts in Afghanistan.  Turkey has more than 1,700 troops in Afghanistan, including four military training teams in Kabul and a civilian Provincial Reconstruction Team in Wardak Province.  In November, Turkey re-assumed command of Regional Command Capital (the new name given to the former Kabul Multinational Brigade) for the International Security Assistance Force in Afghanistan.  Turkey has undertaken training of Afghan military and police officials, politicians, and bureaucrats in Turkey.  It has pledged a total of US$ 200 million to reconstruction efforts in Afghanistan.  Turkey has provided significant logistical support to Coalition operations in Afghanistan and Iraq, authorizing the use of Incirlik Air Base as an air-refueling hub for Operation Enduring Freedom and Operation Iraqi Freedom, and as a cargo hub to transport non-lethal cargo to U.S. troops in Afghanistan and Iraq.

Almost 60 percent of air cargo for U.S. operations in Afghanistan and Iraq between 2005 and 2009 transited the Incirlik cargo hub.  Establishment of this hub allows six C-17 aircraft to transport the amount of goods it took nine to ten aircraft to move from Germany, and saves the United States almost US$ 160 million per year.  More than 16 percent of the fuel for Coalition and U.S. Forces transited from Turkey into Iraq via the Habur Gate border crossing in 2009.  Turkey was active in reconstruction efforts in Iraq, including providing electricity.  Turkey contributed headquarters personnel to the NATO Training Mission in Iraq (NTM-I) and completed military leadership training in Turkey for 89 Iraqi officers as a further contribution to the NATO NTM-I.

Pursuant to its obligations under UNSCR 1267 and subsequent resolutions, Turkish officials continued to circulate UN-designated names of terrorists to all law enforcement and intelligence agencies, and to financial institutions.  Turkish officials also circulated U.S.-designated names, although only UN-listed names were subjected to asset freezes enforced through a Council of Ministers decree.  This legal mechanism for enforcing sanctions under UNSCR 1267 was challenged in Turkish courts by UN-designated terrorist financier Yasin al-Kadi, whose assets

PX205

had been frozen by the state.  Following a series of legal actions, the decree freezing his assets has been successfully challenged but was still in effect pending appeal.

**Ukraine**

There were no terrorist incidents in Ukraine in 2009, but the Ministry of Interior (MOI) claimed to have disrupted a domestic plot still in the planning stages.  The MOI detained five men accused of plotting to assassinate the leader of the Crimean Tatar Mejlis (the unofficial Muslim Crimean Tatar community representative body).  The men, some of whom are Crimean Tatars, claimed they are members of Egypt-based Al-Takfir wa al-Hijrah and had acquired weapons and explosives in preparation for the assassination attempt.  The men are charged with illegal possession of weapons and explosives.  The extent of the group's links to outside terrorist organizations remains unclear.

In December, President Yushchenko vetoed significant amendments to Ukraine's law on money-laundering and terrorist financing.  The law would have expanded the scope of current financial monitoring and would have been a demonstrable step toward bringing Ukraine's money-laundering and terrorist finance laws into compliance with international norms.

The Ukrainian government continues to contribute to the stabilization efforts in Afghanistan, with ten soldiers serving in Chaghcharan province under Lithuanian leadership.  On December 12, the Ukrainian National Security and Defense Council announced that the government plans to triple the size of its deployment to Afghanistan in 2010.

**United Kingdom**

In March, the UK government released its updated counterterrorism strategy, CONTEST TWO, which contains sections covering the risks of chemical, biological, radiological, and nuclear attacks, and highlights the threat from small terrorist groups.  Published by the Home Office but based on broad intergovernmental input, CONTEST TWO is more detailed than its previous iterations in 2003 and 2006.  The update focused more on isolating extremist voices who advocate violence and on encouraging moderate voices who advocate community cohesion.  Then-Home Secretary Jacqui Smith characterized the strategy as extremely broad-ranging, including proposals to tackle radicalization, support mainstream Muslim voices, prepare for attacks, and garner support from Islamic communities for investigations.  Government ministers have indicated that 60,000 workers, including shop assistants and hotel employees, were being trained to respond to terrorist attacks as part of the new strategy.  Since 2003, the number of police in the UK working counterterrorism issues has risen from 1,700 to 3,000.

Parliament's Intelligence and Security Committee published in May a review of intelligence concerning the London terrorist attacks of July 7, 2005.  The report cleared the police and security services of any blame for failing to track those responsible for the bombings.  The report noted that the UK's intelligence agencies and police had implemented operational changes and received increased resources from the government since the attacks, concluding that the government's ability to detect a similar plot in the future had been improved.

PX205

In July, the Joint Terrorism Analysis Center (JTAC) lowered the UK's terrorism threat level from Severe to Substantial. In announcing the change, the Home Secretary stressed that the overall terrorist threat had not dissipated and that the public should remain vigilant.

Since 2005, the UK has been able to ban foreigners who promote hatred, terrorist violence, or serious criminal activity from entering the country. In October, the government implemented more stringent rules for determining who could enter the UK.

Important counterterrorism legislation enacted in the UK in 2009 included:

- In January, the UK government announced new legislation that requires travelers by sea and air between Ireland and the UK to show a passport for the first time to prevent terrorists, criminals, and illegal immigrants from exploiting less stringent border controls between the UK and Ireland. (Ireland announced similar requirements for those arriving from the UK.)

- In March, the House of Commons renewed for another year the "control orders" program for terrorists. The program, which can impose up to 16-hour-a-day house arrest and other restrictions on terrorist suspects who cannot otherwise be brought to trial or deported back to their home countries, was part of the Prevention of Terrorism Act of 2005, enacted after the terrorist bombings on London's transport systems. The provision for control orders must be renewed every 12 months under the Act.

Prominent terrorism-related arrests included:

- In April, in counterterrorism raids in northwest England termed Operation Pathway, police and security services arrested 12 suspects on suspicion of planning terrorist attacks in Manchester and other locations. Some of those arrested were Pakistani nationals who were released without charges and transferred to the UK Border Agency for deportation. The remaining suspects were also released without charge.[13]

- In November, officers from the North West Counterterrorism Unit of the Greater Manchester Police arrested four men at addresses in Manchester and Bolton and a man at Heathrow airport in London in a coordinated operation under the Terrorism Act. A police spokesman said that three properties in Manchester and one in Bolton were searched. Media reported that police sources said that there was no imminent danger to the Greater Manchester area but that the arrests were related to an alleged overseas threat.

---

[13] The UK's independent reviewer of counterterrorism legislation, Lord Carlisle, undertook a review of Operation Pathway and the manner in which police and security services pursued it. Carlile's report concluded that the police had no realistic alternative to arresting at least some of the suspects in the interest of public safety; that the arrests were made on the basis of the intelligence assessment; and that the need for early intervention based only on intelligence may result is some people being arrested and held in detention while the investigation continues, evidence is collected, and charges are considered. Carlile's report made a number of recommendations to the police and the Crown Prosecution Service to improve operational performance and procedure.

In the judicial arena, several high-profile terrorism cases were decided in 2009, including:

- In April, a jury found Waheed Ali, Sadeer Saleem, and Mohammed Shakil not guilty of conspiring to cause explosions in the July 7, 2005 attacks on London transport that killed 52 passengers and four suicide bombers.  Ali and Shakil were found guilty of the lesser charge of plotting to travel to a terrorist training camp in Pakistan, after being arrested at Manchester Airport in 2007.  The two men were sentenced to seven years in prison, and are expected to serve 16 months after having already spent two years in Belmarsh high-security prison.  Sadeer Saleem was acquitted of all charges.

- Also in April, a Scottish court heard the appeal of Mohammed Atif Siddique, who was found guilty in 2007 of breaches of the Terrorism Act for possession of material connected with the commission, preparation, or instigation of a terrorist act.  By year's end, the case was still in appeal.

- On August 19, Scottish Cabinet Secretary for Justice Kenny MacAskill released Abdelbasset al-Megrahi, a Libyan national convicted by Scottish courts for his role in the 1988 bombing of Pan Am flight 103 over Lockerbie, Scotland, on compassionate grounds over his failing health due to prostate cancer.  MacAskill considered two legal questions on the case:  whether to transfer Megrahi to Libya as part of the UK-Libya Prisoner Transfer Agreement (PTA), or to release him on compassionate grounds given Megrahi's terminal illness.  MacAskill rejected Megrahi's request for transfer under the PTA, citing the clear understanding of the U.S. Government and families that Megrahi's sentence would be served in Scotland and he would not be transferred to Libya.  He instead released Megrahi on a clause and practice in Scottish criminal law that allows for prisoners to be released on compassionate grounds, typically if medical experts determine that the prisoner has three months or less to live.  At the end of 2009, Megrahi remained alive and free in Libya beyond the three months he was expected to live.

- Seven men were convicted in connection with the 2006 plot to blow up transatlantic flights with bombs disguised as soft drinks.  Abdulla Ahmed Ali, Tanvir Hussain, and Assad Sarwar were arrested in 2006 and convicted in a June 2008 trial of conspiracy to murder using home-made explosives; the jury, however, failed to determine whether the suspects' plans extended to detonating devices on airplanes.  During a September retrial, a second jury found that a terrorist plot targeting airplanes had existed and convicted the three men.  They were sentenced to life in prison with a minimum mandatory time to be served of between 32 and 40 years in prison.  A fourth man, Umar Islam, was found guilty in September of conspiracy to murder and sentenced to life in prison with a minimum of 22 years.  In December, Adam Khatib, Nabeel Hussain, and Mohammed Uddin were also convicted in connection with the plot.  Khatib was sentenced to life in prison and should serve a minimum of 18 years.

- In September, the Home Secretary lifted a control order on a Libyan-British terrorist suspect known as "AF," who had reportedly been linked to the Libyan Islamic Fighting

Page | 112

PX205

Group, after a legal battle raised concern among government officials that secret evidence might be revealed about the case if the control order was pursued.  Also in September, the Home Secretary lifted the control order of a second terrorist suspect, an Iraqi-Kurd known as "AE", rather than disclose secret evidence against him.  The moves by the Home Secretary came after a June Law Lords judgment that ruled that individuals subject to government control orders must be given sufficient disclosure about the case against them in order to advise their lawyers to prepare a defense.

The UK is the second largest contributor to NATO's International Security Assistance Force in Afghanistan, with more than 9,500 troops.

Northern Ireland

There was an escalation of terrorist activity in Northern Ireland, with more than 130 explosives, weapons, or ammunition finds attributed to dissident republican elements in the first half of the year.  In January, police discovered a 300-lb car bomb prior to its detonation at Castlewellan, County Down.  The bomb was placed in a car on Dublin Road, a mile from a primary school.  Real IRA splinter group Oglaigh na hEireann (OnH) claimed responsibility for the home-made explosives, which they said were intended for detonation at Ballykinler Army Base.

On March 7, British Army soldiers Mark Quinsey and Patrick Azimkar were shot dead by gunmen outside Masserene Army Barracks in Antrim.  Within 48 hours of that attack, Police Service of Northern Ireland constable Stephen Carroll was murdered in his vehicle in Craigavon as he supported a police response to a domestic violence call.  The Continuity IRA claimed responsibility for both attacks.  Throughout March, bomb disposal experts were called to 79 alerts, 28 of which were found to be viable devices.

In April, a 37-year-old man was shot in both legs in Rosemount Gardens in Londonderry in what appeared to be a paramilitary-style punishment shooting.  Also in April, four masked men shot a 26-year-old man in the thigh, knee, and ankle in a similar attack at a house in Londonderry's Creggan Heights.  In May, components for a bomb containing approximately 100-lb of explosives were found by police near Roslea, County Fermanagh.  In August, suspected dissident republican terrorists wearing balaclava masks set up an illegal roadblock in the south Armagh village of Meigh.

In June, some loyalist paramilitary groups decommissioned weapons.  General John de Chastelain, head of the Independent International Commission on Decommissioning and a number of independent witnesses, observed an act of decommissioning by the Ulster Volunteer Force.  A series of bombs were discovered in separate incidents in September, including a 600-lb bomb found near the south Armagh village of Forkhill.  Additionally, a dissident group also shot and injured a man in the Ballmagroarty area of Londonderry.

In November, the latest report of the International Monitoring Commission said that the dissident threat was at its highest in six years.  At least two paramilitary-style shootings occurred:  a 23-year-old man was shot in the legs in the Creggan area of Londonderry; a 27-year-old from

PX205

Brandywell was also shot in the legs.  The Continuity IRA claimed responsibility for shooting a man in the leg in west Belfast.  Four men were arrested in relation to an attempted gun attack on a police constable in the village of Garrison in County Fermanagh.  Dissident republicans were blamed for the attempted bombing of the Northern Ireland Policing Board headquarters in Belfast where a 400-lb bomb was discovered after it failed to detonate properly.

## MIDDLE EAST AND NORTH AFRICA OVERVIEW

> **"Terrorism is the enemy of all of us, and fighting it is a joint responsibility."**
>
> **- King Abdullah II, of the Hashemite Kingdom of Jordan**
> **May 16, 2009**

Most governments in the region cooperated with the United States in counterterrorism activities and undertook efforts to strengthen their counterterrorism capabilities.  These efforts included participating in U.S.-sponsored Antiterrorism Assistance (ATA) programs and taking steps to bolster banking and legal regimes to combat terrorist financing. Many countries continued to provide some form of assistance to Coalition efforts to bring peace and stability to Iraq and Afghanistan.

The Iraqi government made significant strides in mitigating the threat posed by Sunni militant organizations, including al-Qa'ida in Iraq (AQI), though AQI maintained some capability to conduct large-scale attacks across the country.  There was a sharp reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IEDs) attacks in the last quarter of the year.  National reconciliation remained the focus of the Iraqi government.  The United States continued its focused efforts to reduce the threat posed by foreign fighters in Iraq.  Iran and Syria, both state sponsors of terrorism, continued to play destabilizing roles in the region. [See Chapter 3, *State Sponsors of Terrorism.*]

Israel completed Operation Cast Lead in January, which aimed to eliminate rocket and mortar stockpiles in Gaza.  While Israel remained vulnerable to rocket and mortar attacks launched from inside Gaza, it continued to be largely successful in confronting the threat posed by suicide bombers and rockets from the Palestinian territories.  The Israeli government also began some security withdrawals from portions of the West Bank as security improved in those areas, allowing for some ceding of control to the Palestinian Authority.

In Lebanon, the Lebanese government was able to strengthen its presence across the country, including stronger monitoring in and around Palestinian refugee camps.  Though Lebanon's border with Syria remained a problem related to arms smuggling, the Lebanese government stated its commitment to strengthen border security.  Sporadic rocket fire from southern Lebanon

PX205

into Israel did occur throughout the year, with select Sunni militant groups responsible for most of the attacks.  The U.S. government remained concerned with Hizballah's stated intent to retaliate for the 2008 killing of Hizballah official Imad Mughniyeh.  Hizballah continued its acquisition of smuggled arms, primarily via Iran and Syria, in violation of UN resolution 1701.

While Algeria experienced a marked decrease in high profile terrorist incidents, al-Qa'ida in the Islamic Maghreb (AQIM) continued to stage numerous attacks in suburban and rural areas, mostly targeting government installations.  AQIM also remained focused on kidnapping and ransom-taking as a primary tactic.  AQIM kidnapped three Spanish hostages in November in Mauritania, two Italian hostages in December in Mauritania, and one French hostage in December in Mali.

After the failed December 25 attempt on NWA Flight #253, in which Umar Farouk Abdulmutallab, who had trained in Yemen with al-Qa'ida in the Arabian Peninsula (AQAP), attempted to detonate explosives over the continental United States, the international community intensified its focus on Yemen's security situation, which continued to deteriorate in 2009.  The Yemeni government's response to the terrorist threat  improved dramatically in December, exemplified by the heightened pace of counterterrorism operations.  Still, the government's focus on other internal security challenges, including the "Sixth War" of the Houthi rebellion in the northern Sa'ada governorate, which began in August and had not ceased by year's end, often diverted it from broader counterterrorism activities.

While Saudi Arabia's efforts to address its internal terrorist threat remained strong and effective, it was affected by continued instability in Yemen and the involvement of some Saudi citizens in terrorist activity and training in Yemen.  The Saudi government continued to confront extremist ideology through government-funded education programs, official pronouncements from prominent clerics, and government-organized rehabilitation programs.

**Algeria**

The security situation in Algeria was marked by a decrease in the number of high-profile terrorist attacks throughout the country, although low-level terrorist activities continued in non-urban areas.  The Salafist Group for Preaching and Combat (GSPC), which formally merged with al-Qa'ida (AQ) in 2006 and now calls itself al-Qa'ida in the Islamic Maghreb (AQIM), previously focused on targeting Algerian government interests and had been more averse to suicide attacks and civilian casualties.  Some senior members of AQIM are former GIA insurgents.  Although Algerian government interests remained the primary focus of AQIM, the group was forced to resort to kidnappings for ransom and expanded operations against westerners in the Sahel region.  Algerian government counterterrorism operations, which included an increased security presence and the dismantling of support and recruitment networks, restrained AQIM's capacity to conduct high-profile attacks, particularly in major Algerian cities.

There were no suicide bombings after March.  The month of Ramadan, typically a period of frequent attacks, was quiet.  Nevertheless, AQIM carried out lethal operations, using ambushes

Page | 115

PX205

and roadside bombs against government and civilian targets, particularly in the Kabylie region east of Algiers, and increased its terrorist activities along the Algerian-Malian border.

The year was punctuated by several terrorist attacks:

- On March 9, two people were killed when an AQIM suicide bomber attacked a communal guard post in Tadmait, 70km east of Algiers.

- On June 17, AQIM killed 18 officers in an attack against a police vehicle escorting a group of Chinese workers to a site near Bordj Bou Arreridj, east of Algiers.

- On August 4, terrorists injured 25 people, including four police officers, using a vehicle borne IED at a police station in Tizi Ouzou, east of Algiers.

- On October 22, terrorists killed seven and wounded three Algerian security guards working for a Canadian water project.

Roadside bombs and ambushes persist despite the efforts of the security forces. The combination of a population weary of civilian casualties from over a decade of Islamic terrorist violence and the growing availability and use of cell phones has made the terrorists more vulnerable to detection and targeting by the police. The majority of attacks occurred in rural and suburban areas. Terrorists have been very careful to establish remote bases, communicate sparingly, and carry out meticulously-planned attacks. AQIM does not have significant popular support and is not assessed as strong enough to bring down the Algerian government. When security forces are in the countryside, approaching terrorists often stand out and are intercepted before they can successfully complete their attacks.

Following massive suicide attacks in 2007, AQIM has issued directives to avoid civilian deaths, and operations have been concentrated more on military, police, and foreign national targets. AQIM is likely seeking to disrupt business and commercial activity and probably uses such attacks to discourage foreign investment. The overall civilian death toll from terrorist attacks has declined in recent years. During the civil war that began in 1992 and had largely subsided by 2000, Algerian Islamic terrorists killed on average more than 10,000 people a year, with the majority being civilians.

In the past, Algerian security services have expressed concern about AQIM using propaganda based on the call to fight in Iraq as a hook to recruit young people, many of whom never made it to Iraq but were redirected towards joining local groups. In previous years, AQIM propaganda videos originating in Algeria were of amateur quality and poorly produced. This began to change dramatically in 2008. It was evident that AQIM placed a greater emphasis on improving the quality of the videos, and these videos and communiqués were orchestrated to attract Algerian youth to the AQIM "cause." Several videos posted on the Internet, such as the series *Shadows of the Sword* and *Apostate Hell*, showed operations conducted against Algerian military and security targets that included preparations for the attacks and pre-briefings with the commanders that led the attacks. The ability to conduct an attack and claim responsibility via

PX205

communiqué within hours demonstrated the importance AQIM placed in transmitting its message in an attempt to win the media war.

Criminal activities, such as holdups of motorists at roadblocks on remote roads (often disguised to look like security forces roadblocks), armed robbery, and the kidnapping of Algerian citizens remained critical to funding operations of the cash-strapped AQIM units located in northern Algeria.  Besides relying heavily on kidnapping for ransom in Algeria and the Sahel, AQIM financed itself with extortion and smuggling in southern Algeria/northern Mali.

The counterterrorism successes of the Algerian services, combined with the public rejection of terrorism, appears to have reduced AQIM's overall effectiveness during the past two years.  In August, the Algerian government hosted a meeting of the military chiefs of staff from Mali, Libya, Mauritania, and Niger to develop a regional counterterrorism strategy and establish a regional command center in the southern city of Tamanrasset.  Algeria led efforts in international fora to condemn payment of ransom to terrorists.  During 2008, the Government of Algeria instituted a program to hire 100,000 new police and gendarme officers, reinforce the borders, augment security at airports, and increase the overall security presence in major cities.  The initiative was effective in reducing the impact of terrorist incidents and also demonstrated the Government of Algeria's determination to fight terrorism.

Partly because of high unemployment among Algerian youth, AQIM has had some success replenishing its numbers after the arrest or death of an estimated 1,300 terrorists.  Those remaining appeared to be more hard-line and resistant to the government's amnesty offer.  Despite continued AQIM attacks, the overall security situation remained greatly improved from the situation of the late 1990s.  That said, the Algerian military and security forces must continuously adapt to AQIM's changing tactics and accept that an organization that had primarily been a local threat now has a reach that extends to the surrounding region and has international ties.  Algerian security and military forces remained capable of handling a prolonged effort against internal terrorist threats.

**Bahrain**

The Government of Bahrain monitored suspected international terrorist facilitators in Bahrain and worked closely and cooperatively with international partners throughout the year.  Bahraini law enforcement succeeded in jailing a man suspected of providing financial support of terrorism.  The government also foiled an alleged attack plot that was in the early stages of planning.

Adel Saleh, a Bahraini citizen arrested in June 2008, was convicted February 4, 2009 on charges of maintaining links to al-Qa'ida (AQ) and financing terrorism.  According to testimony offered during his trial, Saleh traveled to Iran three times to deliver approximately US$ 70,000 to AQ operatives. He received a one-year sentence with credit for time served since his arrest.  Prosecutors appealed, seeking a longer sentence, but the appeal process ended when Saleh, along with 177 other prisoners and detainees, was pardoned by King Hamad bin Isa Al Khalifa on April 11.  Two other defendants in the same case who were tried in absentia were convicted on

Page | 117

PX205

similar charges and sentenced to five years' imprisonment.  They were not pardoned.

Security forces monitored the activities of two Bahraini citizens and arrested them on April 26.
During the arrest, the authorities discovered automatic weapons, ammunition, a pistol, hunting
knives, and a sword, along with evidence indicating the accused were in the early stages of
planning an attack against U.S. naval interests.  Prosecutors charged the men, one of whom was
an employee of the Ministry of Interior Customs Directorate, with joining an international
terrorist organization, plotting attacks in Bahrain and elsewhere in the Gulf, and various weapons
charges.  Their trial began on June 30 and continued through the end of the year.

On December 16, Bahrain deployed a company of Special Security Forces to southern
Afghanistan in support of Coalition operations in Helmand province.

Bahrain continued its cooperation with U.S. authorities on counterterrorist finance.  Its Financial
Information Unit (FIU) resides in the Central Bank of Bahrain (CBB).  The CBB, FIU, and local
banks worked cooperatively on counterterrorist finance and anti-money laundering issues.  The
government worked with the U.S. Department of the Treasury to host a conference on the
regulation of Islamic charities.  Bahrain also hosted the Middle East and North Africa Financial
Action Task Force secretariat, and has cooperated actively with the Global Initiative to Combat
Nuclear Terrorism since formally endorsing the initiative in March 2008.

**Egypt**

The Egyptian government's active opposition to terrorism, and its effective intelligence and
security services, made Egypt an unattractive locale for terrorist groups, however Egypt's
northern Sinai region was a base for the smuggling of arms and explosives into Gaza, and a
transit point for Gazan Palestinians.  Palestinian officials from HAMAS have also carried large
amounts of cash across the border.  The smuggling of humans, weapons, and other contraband
through the Sinai into Israel and the Gaza Strip has created criminal networks that may be
associated with terrorist groups in the region.  In April, Egypt announced it had discovered a 49-
member Hizballah cell in Egypt that was supplying weapons to Gaza, and in July, government
prosecutors said that 26 members of the cell had been detained and transferred to a State Security
Court for trial.

In February, a bomb exploded in the popular Khan El Khalil market place, killing a young
French tourist and wounding a number of other foreign tourists.  In May, Egyptian authorities
announced the arrest of seven suspects but later ordered their release.  On May 10, a bomb
exploded in a car parked near the Cathedral of the Virgin Mary in Cairo's Zeitoun neighborhood.
There were no injuries, minimal property damage, and no claims of responsibility.

In the past six years, Egypt has tightened its terrorist finance regulations in keeping with relevant
UN Security Council Resolutions.  In 2008, Egypt strengthened its anti-money laundering
legislation by specifically adding terrorism financing to the list of punishable crimes.  Egypt
regularly informed its own financial institutions of any individuals or entities that are designated
by any of the UN sanctions committees.

PX205

Egypt maintained strengthened security measures in the Suez Canal and continued to institute more stringent port security.

The Egyptian judicial system does not allow plea bargaining, and terrorists have historically been prosecuted to the full extent of the law.  Terrorism defendants may be tried in military tribunals or emergency courts.  In terms of evidence for counterterrorism cases in the United States., Egypt's judicial system cooperated within the framework of the Mutual Legal Assistance Treaty.

Many of the Egyptian president's far-reaching counterterrorism powers come from the country's Emergency Law, which has been in force since 1981 and was renewed by Parliament for two years in June 2008.  President Mubarak has pledged to lift the Emergency Law and has called for new counterterrorism legislation to replace the Emergency Law, noting that Egypt should follow the example of other countries that have recently passed comprehensive laws to combat terrorism.  Such legislation reportedly has been drafted but not submitted or approved by Egypt's Parliament.

**Iraq**

Iraq remained a committed partner in counterterrorism efforts.  As a result of the U.S.-Iraq Security Agreement, Iraqi security forces assumed primary responsibility for the security and stability of Iraq, with support from Multi-National Forces-Iraq.  Together, U.S. and Iraqi security forces continued to make progress in combating al-Qa'ida in Iraq (AQI) and affiliated Sunni terrorist organizations, as well as Shiite militia elements engaged in terrorism.  A significant reduction in the number of security incidents throughout much of Iraq, beginning in the last half of 2007, continued through 2009, with a steady downward trend in numbers of civilian casualties, enemy attacks, and improvised explosive device (IED) attacks.

Still, terrorist organizations and insurgent groups continued their attacks on Iraqi security forces, civilians, and government officials using IEDs, including vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers.  Although a scattering of small scale attacks continued to hamper the country's progress toward broad-based security, terrorist elements focused their efforts on high-profile and deadly attacks in Baghdad, as demonstrated by attacks on August 19, October 25, and December 8.  The three sets of attacks targeted Iraqi government buildings with simultaneous, multiple suicide and/or remote-detonated VBIEDs in Baghdad.  While AQI claimed responsibility for the violence, some Iraqi government officials publicly blamed Syrian-based individuals with alleged ties to the former Baath Party.

U.S. forces conducted full spectrum operations with the Iraqi forces to defeat the evolving threats employed by AQI.  Their efforts to defeat AQI cells, in addition to an increasingly violence-weary Iraqi public, forced AQI elements to consolidate in Ninewa and Diyala provinces.  Despite being limited to smaller bases of operation within Iraq, AQI retained networks in and around Baghdad and in eastern Anbar.  In Ninewa, U.S. and Iraqi security forces focused efforts against AQI and other Sunni extremists through operations targeting warranted individuals and judicial detentions of senior leaders, and targeted the terrorists' operational support systems. AQI, whose

PX205

apparent goal in 2009 was to discredit the Iraqi government and erode its security and governance capabilities, targeted primarily the Iraqi security forces, government infrastructure, Sons of Iraq (SOI) groups, and tribal awakening movement members.  Despite the improved security environment, AQI, fueled in part by former detainees, still possessed the capacity to launch high-profile attacks against Iraqi civilians and infrastructure.

In addition to reducing the strength of AQI and Sunni extremists, Iraq made progress in containing other terrorist groups with differing motives, such as Jaysh Rijal al-Tariqah al-Naqshabandiyah (a Sunni nationalist insurgent group with links to the former Baath Party that advocates the removal of occupation forces from Iraq) and Kata'ib Hizballah (a Shia militant group with ideological ties to the militant wing of Hizballah).

The flow of foreign terrorists from North Africa and other Middle Eastern countries greatly diminished, although they continued to enter Iraq, predominantly through Syria.  AQI and its Sunni extremist partners mainly used Iraqi nationals, including some females, as suicide bombers.  Terrorist groups receiving weapons and training from Iran continued to endanger the security and stability of Iraq; however, incidents of such violence were lower than in previous years.  Many of the groups receiving ideological and logistical support from Iran were based in Shia communities in central and southern Iraq.

Iraq, Turkey, and the United States continued their formal trilateral security dialogue as one element of ongoing cooperative efforts to counter the Kurdistan Workers' Party (PKK).  Iraqi leaders, including those from the Kurdistan Regional Government, continued to publicly state that the PKK was a terrorist organization and would not be allowed a safe haven in Iraq.  The trilateral discussions and other efforts continued through the end of the year, with a ministerial in late December.

The Iraqi government increased its efforts to garner regional and international support against terrorism.  The Expanded Neighbors Process continued to provide a forum for Iraq and its neighbors to address Iraq's political and security challenges in a regional context.  In October, the Iraqi government sent representatives to Egypt to participate in the sixth Neighbors Process working group on border security, in which the group sought ways to enhance and integrate border security systems in preparation for Iraq's 2010 parliamentary elections.  Iraq also became a more active voice at the UN in 2009.

The Iraqi government pressed senior Iranian leaders to end support for lethal aid to Iraqi militias, and the Iraqi army carried out operations against extremists trained and equipped by Iran in Basra, Baghdad, and other areas.  Although attacks by militants have sharply decreased, concerns remain that Iranian-supported Shia groups may be stockpiling weapons to influence the elections or the subsequent government formation.  Shia militant groups' ties to Iran remained a diplomatic and security challenge and a threat to Iraq's long-term stability.  National unity efforts to involve Iraqi Shia groups with Iranian ties, such as Asaib ahl al Haq (League of Righteousness) in the political process, decreased Shia-linked violence.

PX205

The Iraqi government faced internal and external pressure to relocate the Mujahadeen-e Khalq (MEK) organization, a U.S. designated foreign terrorist organization, from the group's current location in eastern Iraq. The Iraqi government committed to act with respect for human rights in any efforts to relocate the group, and UN and international observers monitored the situation.

The Iraqi government attributed security gains to Iraqi security force capability and proficiency, as well as to increasing popular support for Iraqi government actions against AQI and other extremist groups. SOI and other groups provided U.S. and Iraqi forces with valuable information that helped disrupt terrorist operations and exposed large weapons caches. The SOI began integration into Iraqi security forces in 2008, and many more transitioned to non-security ministries throughout 2009. Sunni tribal awakening movements continued alliances with U.S. forces against AQI and extremist groups. AQI targeting of Christian and other minority churches, schools, and institutions indicated that AQI pursued strategies that required the least resources and yielded the highest payoff in the media and minds of Iraq's citizens. Despite this, ethno-sectarian violence continued to decline.

On June 30, U.S. combat troops pulled out of cities, villages, and localities, in accordance with the U.S.-Iraq Security Agreement[14], and after that conducted all kinetic operations in partnership with Iraqi security forces. The focus of U.S. operations moved from urban to rural areas where international support will remain critical for the Iraqi government to build its capacity to fight terrorist organizations. All U.S. military operations are conducted with the agreement of and in partnership with Iraqi authorities.

Iraq's intelligence services continued to improve in both competency and confidence but will require ongoing support and legislative authority before they will be able to adequately identify and respond to internal and external terrorist threats.

**Israel, West Bank, and Gaza**

Four Israeli citizens were killed in three separate terrorist attacks during the year, down from 13 attacks with 27 Israeli casualties in 2008. Rocket and mortar fire emanating from the Gaza Strip was the predominant form of attack. In response to an escalation of such attacks in 2008, Israeli forces conducted Operation Cast Lead from December 2008 to January 2009 to root out terrorist organizations' stockpiles of rockets and mortars in Gaza. The IAF launched airstrikes on HAMAS security installations, personnel, and other facilities, as well as rocket and mortar launch teams. On January 3, Israeli forces launched a ground invasion. Hostilities between Israeli forces and HAMAS militants continued through January 18, and the Israeli withdrawal of troops was completed on January 21. Israeli officials believed Operation Cast Lead helped achieve a level of deterrence, as rocket and mortar attacks from Gaza dropped precipitously following the conflict. Since January 2009, HAMAS has actively enforced a unilateral cease-fire with Israel, stopping rocket attacks, arresting militants firing on Israel, and negotiating agreements with the other factions to prevent violence. However, Israeli officials believed that

---

[14] The Security Agreement is the legal basis for continued security cooperation to help Iraq build its capacity to fight terrorist organizations and establish formal mechanisms for joint security operations.

PX205

Gaza-based terrorist organizations have used this relatively quiet period to rearm and reorganize in preparation for future conflict.  There were no incidents of Palestinian suicide bombing.

In addition to Operation Cast Lead, Israel responded to terrorist threats with targeted operations directed at terrorist leaders, infrastructure, and activities such as rocket launching activities such as indirect fire into Israel.  The Israel Defense Force (IDF), the Israel Security Agency (Shin Bet), and Palestinian Authority Security Services continued to conduct roundups and other military operations in the West Bank designed to increase pressure on terrorist organizations and their supporters.  Construction of an extensive security barrier in the West Bank and Jerusalem continued in some areas.  Israeli officials believed the security barrier has played an important role in making terrorist attacks more difficult to undertake.  In some areas in the West Bank, such as Jenin and around Nablus, Israeli authorities eased curfews and reduced incursions to mitigate effects on the local population while maintaining a strong counterterrorism presence.  Overall, Israeli security services reduced movement restrictions in the West Bank.

Given the drop in rocket/mortar fire and the absence of suicide bombing attacks, Israel security forces focused on a new trend in terrorist attacks that they dubbed "the lone terrorist."  They defined "lone terrorist" incidents as those carried out by individuals typically lacking criminal records who have not previously communicated with or received support from terrorist organizations.  The motivations behind these types of attacks varied from personal to political.  These individuals were harder to identify and deter prior to committing attacks.

Terrorist attacks that resulted in injuries and Israeli responses included:

- On March 5, a Palestinian driving a bulldozer rammed into a police car and a bus in Jerusalem, injuring two Israeli police officers.  Israeli police and a taxi driver shot and killed the assailant.

- On March 15, two police officers were killed in a shooting attack near Massua in the northern Jordan Valley.  No suspects were identified in the attack.  The "Imad Mughniyeh Group" claimed responsibility.

- On April 2, a Palestinian with an axe killed a 13-year old Israeli and seriously wounded a seven-year-old Israeli in the West Bank settlement of Bat Ayin.  The assailant was later arrested.  Islamic Jihad and the Martyrs of Imad Mughniyeh both claimed responsibility for the attack.

- On April 17, a Palestinian man infiltrated the Beit Hagai settlement and injured a member of the settlement's emergency squad with a knife.  The infiltrator was shot and killed by another member of the emergency squad.

- On May 9, a 56-year old taxi driver was kidnapped and strangled to death by three Palestinians near Gan Yavne.  The assailants were arrested and claimed they committed the murder as vengeance for the death of an Islamic Jihad operative killed by the IDF in 2007.

PX205

- On December 24, Rabbi Meir Avshalom Chai was killed in a drive-by shooting while driving his own vehicle near the town of Nablus. The next day, the General Security Service and the IDF killed three terrorists reportedly responsible for Chai's death. The three individuals were previously held on terrorism charges in Israeli prisons.

Throughout the year Israel's security services were able to keep terrorist planners and operators off balance and reported multiple foiled attempts:

- On March 21, a 40-kilogram explosive device concealed in the trunk of a car parked outside a shopping mall in Haifa was activated but failed to detonate. Israel police defused the bomb; the previously unknown Galilee Free Brigades claimed responsibility.

- On June 16, 10 terrorists from Gaza staged a failed assault at the Karni crossing. At least four terrorists and several horses loaded with explosives were killed in the ensuing firefight with the IDF. Video footage released by the Jund Ansar Allah ("Soldiers Loyal to Allah") cell following the attack detailed preparations for the attack.

- On November 26, IDF reservists ordered an individual approaching the Israeli border from Egypt near Eilat to stop. The individual fled the scene after dropping his bag containing a 15 kilogram explosive device.

- On December 9, Israel border guards arrested a Palestinian attempting to carry six pipe bombs through the Qalandiya checkpoint leading into Jerusalem from the West Bank.

- On December 24, Israeli police located and safely disarmed nine pipe bombs hidden near a bus station at the Ginaton Junction of Routes 443 and 40.

Israel security services assessed that the use of rockets and mortars reflected recognition by Palestinian terrorist groups that such indirect fire attacks stood the best chances of success, especially in light of the stringent physical security measures that limited the movement of potential suicide bombers into Green Line Israel.

Israel's security establishment remained concerned about the terrorist threat posed in the north by Hizballah and its Iranian and Syrian backers. Israeli security officials argued that Iran, primarily through the efforts of the Iranian Revolutionary Guard Corps (IRGC), has established a sophisticated arms smuggling network from Iran through Syria to Hizballah in Lebanon. Israeli security officials said Hizballah continued to provide support to select Palestinian groups to augment their capacity to conduct attacks against Israel.

Israeli politicians and security officials pointed to Hizballah's efforts to rebuild and re-arm following the 2006 conflict against the group as evidence that it remained a threat to Israel; these officials estimated that Hizballah possessed an arsenal of over 40,000 short- and medium-range rockets. Israeli Prime Minister Netanyahu said on several occasions that Israel will hold the government of Lebanon accountable for any attack on Israel from Lebanon.

PX205

Israeli officials continued to claim that Hizballah has moved arms south of the Litani River in violation of UN resolution 1701 and pointed to several incidents to support this assertion:

- On July 14, between 1,000 and 1,550 kilograms of explosives detonated in the Shiite village of Khirbit Salim.  Hizballah blocked United Nations Interim Force in Lebanon (UNIFIL) access to the scene, preventing further inspection.

- On September 11, Palestinian terrorists claimed responsibility for firing two Katyusha rockets from southern Lebanon into northern Israel near Nahariya.

- On October 27, a Katyusha rocket was fired into northern Israel near Kirya Shmona.  IDF forces responded by firing artillery shells at the source of the rocket attack.

Despite these few security incidents, Israel's northern border remained relatively quiet during the course of the year.  The IDF continued a robust exercise schedule and military presence in the Golan Heights.  In April, Israeli media outlets reported that Egyptian security services foiled a Hizballah cell's plot to carry out terrorist attacks against Israeli tourists in Sinai.

HAMAS and Hizballah continued to finance their terrorist activities against Israel primarily through state sponsors of terrorism Iran and Syria, and fundraising networks in the Arabian Peninsula, Europe, the Middle East, the United States, and to a lesser extent, elsewhere.  Israel has adopted strong measures to prevent the financing of terrorism through its financial sector.  Regulation and enforcement of Israel's domestic financial industry is equivalent in scope and effect to other highly industrialized and developed nations.  In 2009, several changes strengthened Israel's anti-money laundering and combating of terrorism financing (AML/CT) legislation, and significantly increased the number of reported seizures related to financial crime by the Israeli National Police (INP).

The smuggling of commodities, arms, explosives, and funds in support of HAMAS through tunnels between the Gaza Strip and Egypt, and Hizballah along smuggling routes in Lebanon, continued to prove problematic.  Israeli officials asserted that Egypt took steps to prevent arms smuggling from the Sinai into Gaza, but can do much more in terms of arresting, prosecuting, and incarcerating smugglers, destroying tunnel infrastructure, and providing socio-economic alternatives for Bedouin involved in smuggling activities.

The IAF carried out regular air strikes against smuggling tunnels along the Philadelphi Corridor.  On November 4, the Israel Naval Forces detained the M/V Francop and seized the largest illicit arms shipment in Israeli history.  According to Israeli officials, the M/V Francop left Bandar-Abbas, Iran, bound for Latakia, Syria.

A high-profile case raised awareness regarding settler violence and acts of terrorism.  On October 7, Israeli security services arrested American-born settler Yaacov "Jack" Teitel in connection with a number of crimes and terrorist attacks over the past 12 years.  Teitel was arrested for posting anti-homosexual flyers, and later confessed to a number of crimes, including

PX205

the murder of two Palestinians in 1997.  He also claimed responsibility for several attempted bombings, including sending a parcel bomb to a Messianic Jewish family in Ariel in which a 15-year old Israeli-American boy was injured, and placing a pipe-bomb that injured Israel Prize laureate and peace activist Professor Zeev Sternhell in September 2008.

While Israeli officials praised the Israeli security services' arrest and investigation of Teitel, Israeli media outlets questioned whether the security services were sufficiently motivated or resourced to conduct investigations into settler violence.  Israel security services believed Teitel acted alone, and not as part of a larger settler terrorist organization.

Prime Minister Benjamin Netanyahu's November 25 decision to temporarily freeze settlement construction in the West Bank has the potential to incite further incidents of settler violence and terrorism.  On December 11, a mosque in the West Bank village of Yasuf was set afire, apparently in response to the moratorium.  Settlers repeatedly clashed with IDF and border security forces following Netanyahu's decision.  Israeli media reports on a leaked IDF plan to put down settler violence and enforce the settlement freeze further increased tensions.

The Israel Security Agency and INP cooperated with U.S. law enforcement agencies on cases involving U.S. citizens killed in terrorist attacks.  On December 7, the Israeli Parliament (Knesset) passed a controversial biometrics bill.  The law seeks to create a biometric database containing fingerprints and facial scans; corresponding biometric chips will be installed in Israeli identification cards and passports.  The law will not officially go into effect until the Ministry of Interior signs implementation regulations.  Once the law goes into effect, Israeli citizens can volunteer to participate in the program for a two-year trial period.  Israel will reassess the law following the trial period to determine if the law will be extended.

Israeli security services spent more time, attention, and resources focused on cyberterrorism. IDF leadership stressed the importance of creating a "cyber command" to combat cyber threats. Israel security officials highlighted new trends in terrorist activity on the Internet beyond collecting information posted by Israelis.  These included direct and concrete appeals and proposals to Israeli citizens, especially those active in social networks, to become involved in terrorist activity or pass along classified information in exchange for payment.  Concerns over such activity included divulging classified information, as well as luring Israeli citizens abroad with the promise of payment so that terrorist organizations could abduct them.  Security officials called on Israeli citizens to be alert to suspicious internet or telephone appeals by unfamiliar persons.

West Bank and Gaza

The Palestinian Authority (PA) continued its counterterrorism efforts in 2009, with an emphasis on controlling the activities of terrorist organizations, particularly HAMAS, in the West Bank. The PA remained unable to undertake counterterrorism efforts in the HAMAS-controlled Gaza Strip.

PX205

The number of rocket and mortar attacks into Israel from the Gaza Strip dropped from 2,048 in 2008 to 566 in 2009, although HAMAS and other armed groups in Gaza continued to smuggle weapons, cash, and other contraband into the Gaza Strip through an extensive network of tunnels from Egypt.  Since the end of Operation Cast Lead, HAMAS has actively enforced a unilateral cease-fire with Israel, stopping rocket attacks, arresting militants firing on Israel, and negotiating agreements with the other factions to prevent violence.

HAMAS continued to consolidate its control over the Gaza Strip in 2009, eliminating or marginalizing potential rivals.  The Gaza Strip remained a base of operations for terrorist organizations besides HAMAS, such as Palestinian Islamic Jihad (PIJ); Salafi splinter groups, and clan-based criminal groups that engaged in or facilitated terrorist attacks.

HAMAS, PIJ, and the Popular Front for the Liberation of Palestine – General Command (PFLP-GC) remained present in the West Bank, although the improved capacity of PA security forces degraded those organizations' ability to carry out attacks inside or from the West Bank.  No suicide bombings took place inside or originated from either the Gaza Strip or the West Bank in 2009.  In May and June, PA security forces took direct action against HAMAS cells in the West Bank city of Qalqilya, resulting in the deaths of five militants and the arrest of a sixth.  At the end of 2009, the PA held approximately 240 suspected terrorists in custody in the West Bank.

The primary PA security forces in the West Bank were the Civil Police, the National Security Forces (NSF), the Preventive Security Organization (PSO), the General Intelligence Service (GI or Mukhabarat), the Presidential Guard (PG), and the Civil Defense.  They numbered approximately 27,500 in total.  PA security services are under the Interior Minister's operational control and follow the Prime Minister's guidance.  Israeli authorities, among others, identified the improved capacity and performance of PA security forces as a leading contributor to the improved security environment of the West Bank.

In the Gaza Strip, HAMAS relied on its internal intelligence, police, coastal patrol, border guard, and military-wing "Executive Force" bodies, numbering at least 15,000 in total.  In August, HAMAS security forces took direct action against the Salafi splinter group, Jund Ansar Allah, at a mosque in Rafah.  A total of 24 were killed and the group was decimated.

Terrorist organizations, particularly HAMAS and PIJ, continued to receive substantial foreign funding and support from foreign terrorist organizations and state sponsors of terrorism, particularly Iran.

There were no terrorist attacks against American citizens in the West Bank or Gaza in 2009.  No apparent progress was made in apprehending, prosecuting, or bringing to justice the perpetrators of the October 2003 attack on a U.S. Embassy convoy in Gaza that killed three U.S. government contractors and critically injured a fourth.

Security cooperation between the PA and the Israeli government was close and productive, although there were continued Israeli military incursions in Palestinian population centers in the West Bank, which the PA strongly criticized.  PA officials stressed the importance of close

PX205

security cooperation with the Israeli government, but criticized what they considered slow and only partial Israeli recognition of the PA's improved security performance. For their part, Israeli officials, while noting the achievements of PA security forces against HAMAS in the West Bank, questioned the PA's willingness to deploy them against Fatah-affiliated militants. PA officials rejected this criticism.

The United States continued to assist the PA's counterterrorism efforts through capacity building of PA security forces. As of the end of the year, four NSF battalions had been trained and equipped under the auspices of the U.S. Security Coordinator (USSC). USSC-run training of NSF battalions took place at the International Police Training Center in Jordan.

Limitations on PA counterterrorism efforts in the West Bank included restrictions on the equipment, movement, and activities of PA security forces in areas of the West Bank for which the Israeli government retained responsibility for security. PA officials argued that Israeli incursions into Palestinian population centers in the West Bank eroded PA security forces' credibility. The limited capacity of the PA's civilian justice system also hampered PA counterterrorism efforts. The PA continued to lack modern forensic capability. Ongoing low-level violence between Israeli settlers and Palestinians in the West Bank tested the limited mandates of PA security forces.

PA President Mahmoud Abbas and Prime Minister Salam Fayyad repeatedly condemned terrorist tactics and stated the necessity of a solution to the Palestinian-Israeli conflict based on a political process and peaceful negotiations. They continued to support a security program involving disarmament of fugitive militants, arresting members of terrorist organizations, and gradually dismantling armed groups. PA efforts to end incitement to violence continued, using official monitoring of sermons given in West Bank mosques. There were no such efforts against incitement in the Gaza Strip, where the de facto HAMAS authorities continued to support incitement in public statements.

The PA continued its efforts against terrorism financing in the West Bank and Gaza by increasing its capacity to detect, analyze, and interdict suspicious financial activity. The Palestinian Monetary Authority (PMA) continued to build the analytical capability of its Financial Intelligence Unit.

The PMA maintained a staff of roughly 80 in the Gaza Strip to conduct on-site bank examinations, including audits of bank compliance with the PA's 2007 Anti-Money Laundering (AML) decree. The PMA also licensed 90 percent of money service businesses in the West Bank and 45 percent in the Gaza Strip, under a new regulatory framework requiring moneychangers to comply with the AML law and conduct international transfers only through local banks rather than by phone or "hawala." The PA Attorney General and Civil Police both formed specialized units that supported enforcement of the AML law, although limited technical expertise was a constraint. The PA Interior and Waqf Ministries also continued to monitor the charitable sector for signs of abuse by terrorist organizations.

**Jordan**

PX205

Through both its public statements and its actions, the Jordanian Government demonstrated a solid commitment to countering terrorist groups and extremist ideologies. The Jordanian government continued its political and material support for the Palestinian Authority (PA) and for PA President Mahmoud Abbas. King Abdullah II routinely expresses backing for the peace process and for a negotiated settlement of the Israel-Palestine dispute. Jordan has facilitated the regional peace process by training five battalion-sized elements of the Palestine Security Forces at the Jordan International Police Training Center (JIPTC) outside of Amman, including two such training rotations in 2009. These Palestinian forces have since deployed throughout the West Bank, where their motivation and professionalism have earned praise from the different regional parties.

In late 2008, Jordan discontinued a short-lived and abortive attempt to engage HAMAS, which had begun a few months earlier. Although the government's relationship with HAMAS is cool, the organization continued to garner some popular support, particularly in the aftermath of the Israeli-conducted Operation Cast Lead from December 2008 to January 2009. Numerous street demonstrations took place throughout Jordan in protest of the Israeli operation. Although the King permitted HAMAS leader Khaled Meshal into the country briefly in the fall of 2009 to attend the funeral of Meshal's father, Jordanian security remained vigilant against any effort to establish cells or use Jordanian territory as a base of operations against Israel.

Jordan placed a strong emphasis upon countering violent extremism, fighting radicalization, and strengthening interfaith coexistence and dialogue. Building upon the foundations of the 2005 Amman Message, Jordanian officials, including King Abdullah II, strongly condemned extremist violence and the ideology that promotes it. The Royal Aal-al Bayt Institute for Islamic Thought under the leadership of Prince Ghazi bin-Talal continued its sponsorship of the "Common Word" series of ecumenical and interfaith conferences and lectures in the United States, the United Kingdom, and elsewhere. The "Common Word" program began as a response to the controversy caused by Pope Benedict XVI's 2006 address in Regensburg. In May 2009, Jordan hosted a successful papal visit. Jordanian government officials and media routinely reinforce the importance of interfaith dialogue and tolerance.

At the same time the government undertook concrete measures to address the threat of extremist ideology in the country. Recognizing the key role that incarceration has played in the radicalization of many terrorists (including the Jordanian-born Abu Musab al-Zarqawi), Jordanian authorities continued their 2008 program of theological engagement of suspected takfiris and other radical inmates. This program employs carefully selected and vetted religious scholars and jurists to introduce or reinforce more balanced and moderate views, based upon established Islamic jurisprudence and teachings. In the summer of 2009, Jordanian correctional authorities introduced a classification system for prisoners that allowed authorities to more readily identify and segregate adherents of violent extremist ideologies.

Jordan's security forces continued programs to prevent terrorist attacks in the country and to deny terrorists the use of its territory to launch attacks against its neighbors. For example, the first phase of the Joint Border Security Program (JBSP) was completed in September, including

Page | 128

PX205

the installation of a suite of monitoring and communications equipment along a 50km stretch of Jordan's border with Syria. This border area has historically presented the highest risk of illicit infiltration and smuggling across Jordan's border and it accounted for the greatest number of interdictions by Jordanian law enforcement. The completion of this portion of the JSBP program significantly enhanced Jordan's detection capabilities and allows Jordan to respond to incidents more quickly.

In August, Jordan, with U.S. government support, hosted a conference establishing the Regional Biometric Partnership Initiative, bringing together law enforcement, security, and forensic experts from twelve Middle Eastern countries. Jordan presented a tailored biometric software package and proposed the creation of a regional biometric database for known and suspected terrorists in the region to allow the efficient sharing of data between governments. The proposal won an endorsement in principal from other participants and could potentially do much to thwart terrorist travel. Jordan welcomed U.S. training and assistance designed to strengthen security at its ports of entry.

Jordan's security services remained intensely engaged against domestic terrorist threats. As a result of their vigilance, several planned attacks were disrupted prior to execution. The State Security Court (SSC) has primary jurisdiction for terrorism cases and it maintained a substantial caseload during the year. For example:

- In March, three Jordanians were convicted and sentenced to 22 years each for plotting a suicide car bombing against a Roman Catholic Church in Marka. The plotters had originally wanted to strike police facilities but shifted their focus to a Christian target after their surveillances revealed the difficulty of attacking the police.

- In April, four men were arrested and charged with plotting attacks in Israel in retaliation for the Israeli incursion into Gaza. The men were reportedly in possession of firearms at the time of their apprehension. The alleged leader of the cell, Usama Abu Kabir, had been released from U.S. custody at Guantanamo Bay in November 2007.

- In April, the SSC sentenced three men to five years' imprisonment for plotting and preparing attacks against Israeli targets on behalf of HAMAS. Potential targets included the Israeli Embassy in Amman and border posts in Jordan Valley.

- In October, the SSC imposed sentences of 15 to 20 years each on twelve Jordanian al-Qa'ida (AQ) sympathizers for attempting to attack a Christian church in the northern city of Irbid, as well as a Christian cemetery in the same city. This group was also reportedly affiliated with an individual who fired upon a visiting Lebanese Christian choir in Amman in 2008.

In November, the Court of Cassation reduced the sentence of Muamar Yusef al-Jaghbir to 15 years for his role in the 2002 assassination of USAID Officer Thomas Foley. Al Jaghbir was convicted of playing a secondary role in the killing, and had been previously convicted and

Page | 129

PX205

sentenced to death in July in the SSC, but the Court of Cassation reviewed the case and reduced the sentence on appeal. He was also credited with the six years al-Jaghbir had already served in U.S. or Jordanian custody following his 2003 apprehension in Iraq. This ruling, however, is unlikely to result in al-Jaghbir's release in the future: he is also awaiting execution for his role in the August 2003 car bombing of the Jordanian Embassy in Baghdad that killed at least 14 people.

Despite the government's determination to battle radicalization, however, extremist messages still found a receptive audience with a small but significant proportion of the total population. According to polling data compiled by the Pew Research Center Global Attitudes survey for 2009, the percentage of Jordanians expressing "confidence" in Usama bin Ladin crept upwards to 28 percent in 2009 from 19 percent in 2008. According to WorldPublicOpinion.org (affiliated with the University of Maryland) roughly 27% of Jordanians stated that they had "positive" feelings toward bin Ladin, and another 27% expressed mixed feelings toward him.

Although there were no successful AQ attacks in Jordan itself in 2009, a Jordanian national, Hammam al-Balawi, carried out a December 30 suicide attack in Khost, Afghanistan, that killed seven U.S. government employees, as well as one member of the Jordanian security forces.

Jordan's financial sector remained vulnerable to money-laundering and terrorist finance. Jordan has an Anti-Money Laundering (AML) law and in 2008, the Jordanian Securities Commission Board of Commissioners issued AML regulations for securities activities, a positive step toward defining obligated entities falling under the regulatory purview of the Commission.

Furthermore, Jordan began steps to implement a cross-border currency declaration form. Despite these measures, however, a Middle East North Africa Financial Action Task Force (MENAFATF) review identified deficiencies in 14 of 16 core and key FATF recommendations for combating money laundering and terrorist financing.

**Kuwait**

The Government of Kuwait made measured progress in combating terrorism. Despite a lack of legal provisions that deal specifically with terrorism, the government increased its efforts to counter terrorism, notably in the arrests and prosecutions of key terrorists and terrorism facilitators throughout the year. Buttressing these actions were increased denunciations of terrorism by senior Kuwaiti officials. In the past, the Kuwaiti government was more likely to take action against non-Kuwaiti residents involved in terrorist facilitation, but in 2009 it took steps against key local Sunni extremists perceived to pose a clear and direct danger to Kuwaiti or U.S. interests.

Kuwait was an effective and reliable partner in providing security for U.S. military installations and convoys, but the risk of a terrorist attack in Kuwait remained high. In July, Kuwaiti security officials arrested and charged six men with planning attacks on the U.S. military base Camp Arifjan, as well as Kuwait State Security headquarters.

PX205

In July, the Government of Kuwait opened the al-Salam Center, a treatment facility modeled after the Kingdom of Saudi Arabia's rehabilitation center, to rehabilitate extremists including Kuwaitis repatriated from Guantanamo Bay Detention Center.  The facility is located in a secured area within Kuwait's Central Prison and is governed by a board of government officials, medical experts, and a religious scholar.  Al-Salam Center received its first residents from Guantanamo in October and December.

The Kuwaiti Armed Forces, National Guard, and Ministry of Interior, along with counterparts from the United States, UAE, Bahrain, and Jordan, conducted a number of exercises aimed at responding to terrorist attacks.  In January 2009, Kuwaiti National Guardsmen participated jointly with U.S. Embassy officials and a Marine Expeditionary Unit in a large-scale simulated defense of the Embassy chancery and compound against a terrorist attack and subsequent treatment and evacuation of the wounded.

Although the Kuwaiti government lacked comprehensive legislation that criminalizes terrorist financing, Kuwait has made progress over the past year in its efforts to prosecute financial crimes.  An amended law designed to bring Kuwait's anti-money laundering/terrorist finance regime in compliance with FATF requirements was passed to parliament in December 2009.  Kuwait's Financial Intelligence Unit, which is under the direct supervision of the Bank of Kuwait, is not part of the Egmont Group.

The Ministry of Social Affairs and Labor (MoSAL) and the Ministry of Foreign Affairs (MFA) continued their monitoring and supervision of charities, including the ban on cash donations except during Ramadan.  MoSAL reported a continued decline in the number of violations during their 2009 Ramadan audit.  MFA and MoSAL officials also conducted site visits and audits of selected foreign projects funded by Kuwaiti charities.

Significant terrorism-related arrests and prosecutions took place during the year, notably, the July sentencing of a Kuwaiti citizen to seven years imprisonment on a combination of charges of holding weapons, carrying a false passport, and inciting hostile acts against a foreign country.  A local imam also received a seven-year sentence in December for facilitating hostile acts against a foreign country.  On December 21, the Criminal Court began the trial of the six Kuwaitis accused of planning attacks against U.S. military base Camp Arifjan and Kuwait State Security headquarters.  There have also been convictions using existing criminal statutes to successfully prosecute two individuals, in January and August respectively, for "inciting youth to jihad" and facilitating terrorism in Iraq, and for "supporting and funding terrorist activities."  The courts suspended, in both cases, sentences of three years imprisonment upon payments by the defendants of US$ 3,540.

In October and November, two of the remaining four Kuwaiti Guantanamo Bay Detention Facility detainees were repatriated to Kuwait.  On November 23, one of the two was acquitted by Kuwait's Attorney General on all terrorism-related charges.

In October, the Kuwaiti Ministry of Interior submitted 17 security proposals to the government's four-year Action Plan, among which are the following counterterrorism initiatives:

Page | 131

PX205

- Border Security (US$ 602,000,000): Securing borders to deter illegal entry of foreigners into the country, to prevent smuggling, and to monitor and survey restricted areas.

- Terrorism (US$ 13,000,000): Counterterrorism and counter-radicalization project to secure the "internal front" against terrorism, achieve stability, and protect the Kuwaiti society against extremist messages.

- CCTV (US$ 475,000): CCTV network to secure vital installations, highways, land and marine borders, islands, and populous locations.

- Port Security (US$ 138,000,000): Securing air, sea, and land ports.

**Lebanon**

While the threat of terrorist activity kept Lebanese security agencies on high alert throughout the year, 2009 was characterized by increased governmental efforts to disrupt suspected terrorist cells before they could act. The Lebanese Armed Forces (LAF), in particular, were credited with capturing wanted terrorist fugitives and containing sectarian violence.

Several designated terrorist organizations remained active in Lebanon. HAMAS, The Popular Front for the Liberation of Palestine (PFLP), the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), Fatah al-Islam (FAI), al-Qa'ida (AQ), Jund al-Sham, the Ziyad al-Jarrah Battalions, and several other splinter groups all operated within Lebanon's borders. Hizballah, which is a legal entity and a major political party, is represented in Lebanon's cabinet and parliament.

In 2009, terrorist violence and counterterrorist activity included the following incidents:

- On five separate occasions, January 8 and 14, February 21, September 11, and October 27, Katyusha rockets were fired from southern Lebanon into Israel. No casualties were reported from any of the incidents. The AQ-inspired Ziyad al-Jarrah battalions claimed responsibility for several of the attacks.

- On March 24, the Internal Security Forces (ISF) defused an explosive device near the home of former Lebanese President Amin Gemayel and arrested a Syrian, Youssef Mohammad al-Mohammed, who remains imprisoned.

- On June 17, the Lebanese Army thwarted an attempt to drive a vehicle-borne improvised explosive device into the Ain al-Hilweh refugee camp in Sidon. Hasan Merhi, a FAI member was arrested in connection with the incident.

- In July, the Lebanese Army arrested Syrian citizen Mounjed al-Fahham at Beirut

PX205

International Airport.  Investigations revealed that al-Fahham intended to smuggle out of Lebanon FAI spiritual leader Oussama Chehabi, known as Abou Zahra; FAI leader Abdel Rahman Awad; and Abdel Ghani Jawhar, wanted for 2008 attacks against LAF soldiers in Tripoli.

- On August 19, an LAF intelligence unit arrested Lebanese citizen Wissam Tahbish, reported to be a key member of Jund al-Sham.  Tahbish was the primary suspect in the 1999 assassination of four Lebanese judges in Sidon.

- On September 17, a Lebanese military court convicted five Palestinians of armed attacks, including a January 2008 bombing aimed at United Nations Interim Force in Lebanon (UNIFIL) peacekeepers.  The one member in custody was sentenced to three years of hard labor while four fugitive members, convicted in absentia, were given life sentences.

The June 7 parliamentary elections, an event widely considered vulnerable to politically motivated violence, passed peacefully under the watch of international observers and a fully deployed LAF.  In these elections, the March 14 coalition led by Sunni leader Saad Hariri, defeated the March 8 opposition allied with Syria and Iran.  After six months of negotiations between the majority and opposition, Saad Hariri brokered agreement over the cabinet and was named prime minister.  He formed a national unity government, which included Hizballah.  The new government obtained a vote of confidence on December 10.

Incoming PM Hariri announced that strengthening the Lebanese Armed Forces (LAF) and the Internal Security Forces (ISF) would be a hallmark of his administration.  General Jean Kahwagi, LAF commander since 2008, publicly listed counterterrorism, internal security, and suppression of sectarian violence as his top priorities.  The U.S. government had an active security assistance program with the LAF and the ISF that included both training and equipment.

LAF commanders stressed that it has strengthened its surveillance capabilities over the 12 Palestinian camps and four Syrian-backed Palestinian military bases within its borders. Nevertheless, a porous border with Syria, weak internal camp security, and LAF reluctance to enter the Palestinian refugee camps all contributed to fears of another confrontation with an armed group, similar to the 2007 Nahr al-Barid conflict.  The most widely predicted venue for such a clash is in Lebanon's most populous refugee camp, Ain al-Hilweh, near the southern city of Sidon.  The camp is well known for HAMAS-Fatah violence and as a suspected safe haven for fugitive FAI terrorists.

UN Security Council Resolution (UNSCR) 1559 called for respecting the sovereignty and political independence of Lebanon, the end of foreign interference in Lebanon, and the disarming and disbanding of all Lebanese and non-Lebanese militias.  While the Lebanese government was committed to fulfilling the provisions of UNSCR 1559, it maintained that Hizballah's disarmament should be accomplished through a National Dialogue, rather than by force. The new government's ministerial statement – similar to the policy statements of the last two governments – acknowledged the right of the Lebanese "resistance" (interpreted by many as

PX205

referring to Hizballah's militia), along with the army, to recover occupied territory and confront external aggression.

The dismantling of four Palestinian military bases controlled by Syrian-backed groups remained a concern for the LAF.  The Qousaya Base, which straddles the border with Syria and allows easy access for fugitives and smugglers, was of particular concern.  Activity in these bases reportedly remained quiet in 2009, although without political support to dismantle them, the LAF can do little more than monitor ththe camps.  However, Lebanon's political leaders had previously agreed at the 2006 National Dialogue to disarm Palestinian groups outside of the country's refugee camps.  The new ministerial statement also called for the elimination of Palestinian weapons outside the refugee camps and obliged the government to provide security for Palestinian refugees.

Security along the Syria-Lebanon border remained problematic.  The Government of Lebanon still does not exercise control over parts of the border.  Over the course of the year, conflicting reports surfaced of weapons smuggling from Syria and Iran to Hizballah and other militant groups in Lebanon.  Reports from UNIFIL and the LAF said there was no conclusive evidence of arms smuggling to Hizballah in the UNIFIL area of operations south of the Litani River.  UNIFIL and the LAF described a suspected Hizballah arms cache that exploded in July in the southern village of Khirbet Selim as containing weapons that pre-dated the 2006 war and the establishment of UNSCR 1701.  Nevertheless, Hizballah officials publically stated that the organization is now more heavily armed than it was before the 2006 war with Israel.

In June, then-Prime Minister Fouad Siniora announced the government's intention to improve border security.  In July, an LAF-headed team produced a comprehensive border security management plan, for which the UN Special Coordinator on Lebanon (UNSCOL) is coordinating further technical evaluation with donor assistance.  The Lebanese security agencies lacked strong interagency cooperation, so progress on implementing the integrated border management plan moved slowly.  Some gains were achieved on port security through better radiological screening of incoming shipping containers, and upgraded customs inspection stations on the eastern border improved border inspections.

On March 1, the Special Tribunal for Lebanon was officially opened in The Hague.  The investigation into the assassination of former Prime Minister Rafik Hariri and others continued.

Lebanon has not yet become party to two important international counterterrorism conventions.  The International Convention on the Suppression of Terrorist Bombing was before the Parliament, but was sent back to the parliamentary Foreign Affairs Committee for further study.  The International Convention for the Suppression of the Financing of Terrorism was not submitted by the Foreign Ministry for cabinet approval due to reservations by the Finance Ministry.

Lebanon hosted the 2009 Middle East and North Africa Financial Action Task Force (MENA-FATF) and played a leadership role in the U.S.-MENA Private Sector Dialogue.  Lebanon's financial intelligence unit is the Special Investigation Commission (SIC), an independent legal

PX205

entity empowered to investigate suspicious financial transactions, lift banking secrecy, and freeze assets. In 2009, it investigated 116 cases involving allegations of money laundering, terrorism, and terrorist financing activities. The SIC referred requests for designation or asset freezes regarding Hizballah and affiliated groups to the Ministry of Foreign Affairs, but the Lebanese government does not require banks to freeze these assets because it does not consider Hizballah a terrorist organization.

Lebanese authorities maintained that the amnesty for Lebanese individuals involved in acts of violence during the 1975-90 civil wars prevented the government from prosecuting terrorist cases of concern to the United States. These cases included the bombings of the U.S. Embassy in Beirut in 1983 and 1984 and the abduction, torture, and murder of U.S. hostages in Lebanon from 1984 to 1991. Mohammad Ali Hamadi, convicted in a West German court in 1987 of air piracy, murder, and possession of explosives for his part in the 1985 TWA Flight 847 hijacking, spent 18 years in a German prison before he was paroled in December 2005 and was believed to be in Lebanon. He remains under criminal indictment in the United States for his role in the hijacking, and the United States has previously sought his extradition from Lebanon.

**Libya**

The United States rescinded Libya's designation as a state sponsor of terrorism in June 2006. Libya renounced terrorism and weapons of mass destruction in 2003 and has continued to cooperate with the United States and the international community to combat terrorism and terrorist financing.

On July 20, Malian President Amadou Toumani Toure confirmed to the Malian press that Libya, Algeria, and Mali planned to coordinate military and intelligence efforts to fight security threats linked to al-Qa'ida in the Islamic Maghreb (AQIM) in the Trans-Sahara region.

In November 2007, al-Qa'ida (AQ) leader Ayman al-Zawahiri announced a merger between AQ and the Libyan Islamic Fighting Group (LIFG). In an audiotape, al-Zawahiri urged AQ fighters to topple the Government of Libya, describing Muammar al-Qadhafi as an "enemy of Islam" and criticizing the 2003 decision to renounce WMD and terrorism.

In late September, six leading members of the Libyan Islamic Fighting Group, being held in the Abu Salim prison, issued a document renouncing violence and claiming to adhere to a more sound Islamic theology than that of AQ and other jihadist organizations. The 417-page, Arabic-language document, entitled "Revisionist Studies of the Concepts of Jihad, Verification, and Judgment of People," was the product of a two-year reconciliation project between the Government of Libya and the LIFG, facilitated by the Qadhafi Development Foundation. The authors state that "The lack of religious knowledge, whether it was a result of an absence of 'ulama' (religious scholars) or the neglect of people in receiving it and attaining it, or due to the absence of its sources, is the biggest cause of errors and religious violations."

In the text, the authors directly challenged AQ, addressing the recantation to "anyone who we might have once had organizational or brotherly ties with." The document gave detailed

Page | 135

PX205

interpretations of the "ethics and morals to jihad," which included the rejection of violence as a means to change political situations in Muslim majority countries whose leader is a Muslim and condemned "the killing of women, children, the elderly, monks/priests, wage earners, messengers, merchants and the like."  It claimed that "the reduction of jihad to fighting with the sword is an error and shortcoming."  According to press and government sources, at least 144 former LIFG members and 60 members of other jihadist groups have been released from prison after completing this rehabilitation effort.

**Morocco**

Morocco pursued a comprehensive counterterrorism approach that emphasized vigilant security measures, including international cooperation and innovation in the area of counter-radicalization policies.  Evidence gained from Moroccan authorities' disruption of certain groups, and the common characteristics of those groups, supported previous analysis that Morocco's threat of terrorist attack continued to stem largely from the existence of numerous small "grassroots" extremist cells.  These groups, sometimes referred to collectively as adherents of Moroccan Salafia Jihadia ideology, remained isolated from one another, small in size (less than 50 individuals each), and tactically limited.  Their international connections were also limited.  The Government of Morocco's counterterrorism efforts have effectively reduced the threat, but the existence of these groups points to the need for continued vigilance.

Although AQIM has been unable to mount a successful terrorist attack in Morocco to date, Moroccan authorities remained concerned about the inspiration and knowledge transfer that AQIM may have provided to Moroccan extremists.  AQIM repeatedly tried to incite Moroccans to commit violence against their government through internet propaganda.  The Moroccan government remained concerned about numbers of veteran Moroccan jihadists returning from Iraq to conduct terrorist attacks at home.  A further cause for concern is Moroccans who were radicalized during their stays in Western Europe, much like those who were involved in the 2004 Madrid train bombings.

The Moroccan government pursued a comprehensive counterterrorism approach that, building on popular rejection of terrorism, emphasized neutralizing existing terrorist cells through traditional intelligence work and preemptive security measures.  Morocco aggressively targeted and dismantled terrorist cells within the Kingdom by leveraging intelligence collection, police work, and collaboration with regional and other international partners.  These efforts resulted in the disruption of several terrorist groups:

- In February, Moroccan police arrested Abdelkebir Barka at the Mohammed V International Airport upon his return from Syria.  He was charged with forming a terrorist cell.

- In May, the Moroccan police arrested eight alleged members of the terrorist group "Jamaat al Mouslimoun al Joudoud."

PX205

- In June, Moroccan authorities arrested five members of a suspected terrorist cell operating in Morocco and Spain.

- In late June, the security services arrested eight individuals on charges of forming a terrorist group, bringing charges that included drug trafficking and corruption. The leader of the group was Abou Yassine, a former Salafia Jihadia prisoner who had been sentenced previously to two years in jail for his involvement in the "Ansar al-Mahdi" terrorist group. The cell operated between Morocco and Spain, according to press reports.

- In September, security services arrested 24 members of an alleged terrorist network linked to AQ that recruited volunteers for suicide bombings in Iraq, according to the Ministry of Interior. The Interior Ministry stated that the network had coordinated with terrorists in Sweden, Belgium, Iraq, and Syria and had also sought recruits to fight in Afghanistan and Somalia. Those arrested also intended to carry out terrorist acts in Morocco, according to the Ministry.

In addition to traditional security measures, Morocco's King Mohammed VI has promoted significant efforts to reduce extremism and dissuade individuals from becoming radicalized. Each Ramadan, for example, the King hosts a series of religious lectures, inviting Muslim speakers from around the world to promote moderate and peaceful religious viewpoints. In his Throne Day speech in July, the King highlighted the moderate and tolerant nature of the Sunni Malekite rite, which he emphasized, forms an integral part of Moroccan identity. After the 2003 Casablanca bombings, Morocco increasingly focused on strengthening the Ministry of Endowments and Islamic Affairs (MOIA). Under the MOIA, the pioneering experiment, begun in 2007, of training and using women as spiritual guides continued. Morocco also formed a Council of Ulema for Europe to train and send Moroccan imams and women spiritual guides to counter extremist messages in Moroccan expatriate communities in Europe.

During the year, the Moroccan Government continued to implement internal reforms aimed at ameliorating the socio-economic factors that terrorists exploit. The National Initiative for Human Development, launched by the King in 2005, is a US$1.2 billion program designed to generate employment, combat poverty, and improve infrastructure, with a special focus on rural areas.

The Government of Morocco made public commitments that the struggle against terrorism would not be used to deprive individuals of their rights and emphasized as part of its approach adherence to human rights standards and increased law enforcement transparency. Moroccan laws were effective in leading to numerous convictions and the upholding of convictions of multiple terrorism-related cases:

- In January, a Moroccan criminal court sentenced Abdelmajid Zerghout to five years in prison for forming a terrorist group. Zerghout had been an imam in Italy before he was extradited to Morocco for his alleged involvement in the terrorist attacks of May 16, 2003 in Casablanca.

Page | 137

PX205

- In February, a Moroccan counterterrorism court condemned Saad al-Husseini, the key plotter of the Casablanca attacks, to 15 years in prison.  His five accomplices received between three and eight years.  Then, in June, a Moroccan increased the jail terms of al-Husseini and his accomplices, who were sentenced for "undermining the national security of the State" and forming a terrorist group, to 20 and 10 years, respectively.

- In March, a Moroccan court condemned Hassan Haski to 10 years in prison for his involvement in the 2003 terrorist attack in Casablanca.

- In September, 38 people suspected of belonging to a network that recruited Moroccans to fight in Iraq and Algeria appeared before a counterterrorist court.  Police said the suspects intended to join terrorist groups in desert camps run by AQIM before proceeding to Iraq.

As part of its comprehensive approach in combating terrorism, Morocco also addressed terrorist financing.  Although Morocco is not a regional financial center, its financial sector is integrated into international markets.  Money laundering is a concern due to the narcotics trade, vast informal sector, trafficking in persons, and large level of remittances from Moroccans living abroad.  The extent of the money laundering problem in the country is unknown, but conditions exist for it to occur on a significant scale.  In recent years, Morocco has taken a series of steps to address the problem, most notably with the enactment of a terrorist finance (CFT) law in May 2003; with a comprehensive anti-money laundering (AML) law in April 2007; and with the establishment of a Financial Intelligence Unit (FIU) in April 2009.  These actions have provided the legal basis for the monitoring, investigation, and prosecution of illegal financial activities.  The new laws allow for the freezing of suspicious accounts and permit the prosecution of terrorist finance-related crimes.  U.S. and EU programs are providing Moroccan police, customs, central bank, and government financial officials with training to recognize money laundering methods.  The FIU and its member organizations met with the U.S. Department of the Treasury and the Department of Homeland Security in early October to discuss possible U.S. technical assistance to develop the AML/CFT regime.  A formal request from the FIU and the Central Bank followed in November.  Morocco had a relatively effective system through the newly established FIU for disseminating U.S. government and UN Security Council terrorist freeze lists to its financial sector and legal authorities.  Morocco froze some terrorist-related accounts.

Another key to Morocco's counterterrorism efforts was its emphasis on international cooperation.  Moroccan authorities continued to disrupt plots to attack Moroccan, U.S., and other Western-affiliated targets, and aggressively investigated numerous individuals associated with international terrorist groups, often in collaboration with international partners.  Morocco and the United States worked together extensively on counterterrorism efforts at the tactical level. In the past years, Morocco has accepted prisoners formerly detained at Guantanamo Bay and prosecuted them under Moroccan law.  In May, a Moroccan criminal court reduced the sentence of former Guantanamo Bay detainee Mohammed Benmoujane from 10 to two years.

Morocco also forged solid cooperative relationships with European and African partners by sharing information and conducting joint operations.  Morocco is considered a Mediterranean

PX205

Dialogue partner of the North Atlantic Treaty Organization and also cooperated with regional partners on a bilateral basis.  In March, Spanish police arrested a Moroccan on an international warrant issued by Morocco on suspicion of belonging to a terrorist group that had planned attacks on official and tourist targets in Morocco.  Morocco also worked closely with African partners such as Mauritania and Senegal.  The government used army and Ministry of Interior paramilitary forces to secure its borders as best it could but faced resource constraints and both a lengthy border and lengthy coastline.

**Oman**

Oman continued to be proactive in implementing counterterrorism strategies and cooperating with neighboring countries to prevent terrorists from entering or moving freely throughout the Arabian Peninsula.    The Omani government opposed the spread of extremist ideology by promoting religious moderation and tolerance.  To better coordinate efforts to prevent terrorist-related activities, the government continued development of a national terrorism operations and analysis center. In some cases, the country was resistant to sharing of specific information or its activities in this field with bilateral partners. Oman is not a major financial center and did not have a significant money laundering problem.

In this regard, an Omani businessman, Ali Abdul Aziz al-Hooti, was arrested, tried, and sentenced to life imprisonment in Oman for helping to fund Lashkar-e-Tayyiba, as well as helping plan terrorist attacks in Oman.  At the same time, al-Hooti's Indian-born accomplice, Sarfraz Nawaz, was returned to India where he is also serving a life term.

Oman's long coastline and relatively porous borders remained vulnerable to illegal transit by migrant workers, smugglers, terrorists and drug traffickers.  The government was concerned about the steady flow of illegal immigrants attempting to transit Oman to other destinations in the Arabian Peninsula, particularly the United Arab Emirates.  The majority of the illegal immigrants apprehended were from Pakistan and Afghanistan.  Somalis continued to attempt to cross the border illegally into Oman from Yemen.

The Omani government actively sought training and equipment from the United States and other countries and relevant commercial entities, to support its efforts to control its land and maritime borders.  It continued conceptual development of joint operations centers to be staffed and equipped by relevant ministries.  Oman used United States security assistance to enhance nighttime operational capabilities on its maritime and land borders.

**Qatar**

While Qatar and the United States cooperated on some counterterrorism issues, the United States continued to strive for increased cooperation – and particularly information sharing – with the Qatari government.  There has not been a terrorist attack in Qatar since the March 19, 2005 suicide vehicle-borne improvised explosive device attack at an amateur theater playhouse that killed a British citizen. Cooperation with U.S. law enforcement authorities continued to improve during and after the investigation of this case.  Press reports indicated that up to 19 people of

Page | 139

PX205

various nationalities, including one Qatari, were apprehended during the ensuing investigation. There were no reports of criminal prosecution in the case; however, many of the third country nationals who were apprehended were deported subsequent to the investigation.

The Qatar Authority for Charitable Activities was responsible for overseeing all domestic and international charitable activities, including approving international fund transfers by charities and monitoring overseas charitable, development, and humanitarian projects. The Authority reports annually to Qatari government ministries on their oversight and humanitarian activities.

Cooperation with U.S. authorities on counterterrorist finance continued to develop. Qatar's Financial Information Unit (FIU) resides in the Qatar Central Bank. Local banks worked with the Central Bank and the FIU on counterterrorist finance and anti-money laundering issues.

Qatar was one of two countries in the Gulf with an attorney general independent of the Ministry of Interior or Ministry of Justice and equivalent to a ministerial level position. The Attorney General independently controlled and oversaw public prosecutions and appointed attorneys within the Public Prosecutors Office.

The United States provided law enforcement and counterterrorism training under various programs. Exchanges and training have had helped sustain a good relationship with Qatari law enforcement agencies and improved their counterterrorism capabilities.

**Saudi Arabia**

The Saudi government continued to build its counterterrorism capacity and strengthened efforts to counter extremist ideology. Over the course of the year, Saudi authorities arrested numerous suspected al-Qa'ida (AQ) militants, uncovered several AQ arms caches, continued to develop its new facilities security force, implemented improved border security measures, and tightened laws aimed at combating terrorist financing. In addition, prominent officials and religious leaders publicly criticized extremist ideology. Although Saudi Arabia's capacity to deal with internal threats remained strong, continued instability in Yemen gave al-Qa'ida in the Arabia Peninsula (AQAP) a base to continue targeting Saudi Arabia.

The country suffered a high profile attack on August 27 – the first since 2005 – when the Deputy Minister of the Interior for Security Affairs, Prince Mohammed bin Nayif, survived an assassination attempt. The prince, who spearheads the Kingdom's counterterrorism operations, invited AQAP member Abdullah al-Asiri to his palace to personally accept his surrender. As a show of good faith, Prince Mohammed asked that al-Asiri be excluded from the usual security screening. Approximately 40 minutes after his arrival at the palace, al-Asiri detonated explosives hidden on his person. The prince suffered minor injuries and the would-be assassin was killed in the explosion. There were no other casualties. Following the attack, Second Deputy Prime Minister and Minister of Interior Prince Nayif bin Abdulaziz and other officials publicly re-affirmed the Kingdom's commitment to its counterterrorism strategy.

PX205

Saudi authorities focused public attention on a list of key extremists located outside the Kingdom and made several terrorism-related arrests.  On February 2, the Saudi Ministry of Interior (MOI) issued a list of the 85 most wanted suspects located outside of the Kingdom, 83 Saudi nationals and two Yemenis, including AQAP senior leaders and others tied to AQ across the Middle East and South Asia.  On August 19, the MOI announced the arrests of 44 AQ suspects throughout the country and the discovery of large weapon caches.  On October 13, police shot and killed two Saudis with links to AQ at a checkpoint in Jizan.  The men entered the country disguised in women's clothing and, according to police reports, the vehicle was loaded with weapons and explosives.  A third man in the car was also arrested.  On November 1, the MOI announced the discovery of another large weapons cache that was located using the information they obtained from interviews with the AQ-linked suspects arrested in August.

Saudi citizens were also arrested on terrorism charges in neighboring Yemen.  In February, Yemeni police arrested seven Saudi citizens with AQ links on suspicion of planning attacks against Saudi Arabia.  Also in February, Saudi citizen Mohammed al-Harbi, a former Guantanamo detainee and terrorist rehabilitation program graduate who later appeared in AQAP propaganda videos, surrendered to Yemeni authorities and was returned to Saudi Arabia.

Trials continued for more than 900 militants arrested from 2000-2008 on charges of terrorism. In July, the Ministry of Justice announced that 270 of these suspects were convicted, with sentences ranging from a few months incarceration to death.[15]

The Saudi government focused on combating extremist ideology as a key part of its counterterrorism strategy.  The Ministry of Islamic Affairs (MoIA) continued its extensive media campaign to educate young Saudis on teachings of Islam in order to prevent them from becoming drawn to extremist doctrines.  The campaign included messages incorporated into Friday sermons at mosques, distribution of literature and tapes, and postings on the Internet.  In 2007, the Kingdom issued identification cards to imams and religious leaders to curb instances of unauthorized persons delivering Friday sermons.  In 2009, the government continued to monitor these licensed imams and identify instances of "illegal sermons."  On March 25, the MoIA announced that in the past five years they have dismissed 3,200 clerics for preaching intolerance.

Prominent Saudi officials and religious leaders also spoke out against extremism.  For example:

- In a Friday sermon in Riyadh following the MoI's announcement of 44 AQ related arrests in August, the Grand Mufti strongly attacked the "deviant group" responsible for past extremist operations in the Kingdom and expressed surprise that highly-educated individuals would join such a network.

---

[15] The convicted suspects are in custody and serving jail terms, but U.S. Embassy Riyadh was not aware of any executions carried out.

- In opening remarks delivered on behalf of King Abdullah at the Muslim World League conference held in Jeddah in November, Mecca Governor Prince Khaled al-Faisal urged Muslim scholars to "stand firm in the face of extremist ideology to prevent it from corrupting Muslim youth."

- In September, Prince Khalid bin Sultan, Assistant Minister of Defense, told the media that there would be no compromise with extremist groups who work under the pretext of following religious principles. He also stated that extremism surrounded Saudi Arabia, and required Saudis to be on maximum alert.

Saudi Arabia continued to operate a government-run rehabilitation center for extremists. Since its inception, the program has worked to reintegrate between 200 and 300 extremists, including former Guantanamo detainees, into Saudi society. In January, two of the program's graduates, Said Ali al-Shihri and Muhammad al-Harbi, appeared in a propaganda video announcing the formation of AQAP in Yemen. Both men were former Guantanamo detainees. Al-Harbi later surrendered to Yemeni authorities and was remanded to Saudi Arabia. The MoI estimates recidivism rates for former Guantanamo detainees to be 25% and for all other program participants to be less than 10%.

In addition to its rehabilitation effort, the MoI continued a program of counter-radicalization within the prison system aimed at exposing the violence that extremist ideology entails. The MoI worked with specialists, clerics, and teachers to stop extremist groups from being able to find recruits in the prison system. Since its inception, 3,200 detainees have participated in 5,000 counter-radicalization meetings.

The Government of Saudi Arabia continued to take measures to strengthen its physical borders and improve its security screening processes. The Ministry of the Interior worked to increase the overall safety and security of its land, sea, and air borders by upgrading infrastructure and tightening procedures. The MOI also instituted biometric screening at airports.

Saudi Arabia continued to make progress in combating money laundering and terrorist finance. Banks must report suspicious transactions to the Financial Investigations Unit (FIU), which is part of the Ministry of Interior, and provide the Saudi Arabia Monetary Agency's Department of Banking Inspection and the Anti-Money Laundering Unit with a copy of the report. In May, the FIU was accepted into the Egmont Group, an international group of financial intelligence units, which should improve its ability to cooperate and share information with FIUs around the world.

Also in May, the Saudi Arabian Monetary Agency hosted the sixth annual Gulf–European Symposium on Combating Terrorism Financing. Several government bodies, including the Ministries of Social Affairs, Interior, Islamic Affairs, and the central bank continued to advise Saudis to be cautious when selecting charity groups to which they contribute. The government has also banned cash contributions to charities, required charities to seek Ministry of Interior permission before opening a bank account, and required that charities' bank accounts be in the name of the organization. Terrorist finance facilitators were among those convicted of supporting terrorism in June. Although Saudi Arabia took important steps to address hawala

Page | 142

PX205

remittances, further vigilance is required.  The United States urged the Government of Saudi Arabia to pursue and prosecute terrorist financiers vigorously.

**Tunisia**

The Government of Tunisia placed a high priority on combating extremism and terrorism.  In addition to using security and law enforcement measures, the Tunisian government also used social and economic programs, including health care and public education, to ameliorate the conditions that terrorists exploit for recruitment and propaganda purposes.  The government prohibits the formation of religious-based political parties and groups it believes could pose a terrorist threat.  Tunisia does not have a rehabilitation or reintegration program.  The Tunisian government puts a high priority on controlling the border regions.

On July 30, the Chamber of Advisors amended the 2003 anti-terrorism law to harmonize national legislation with UN resolutions related to terrorism financing and money laundering.  The amendments included measures to establish databases on terrorist financial transactions; protect the identities of magistrates, judicial police officers and civil servants involved in terrorism and money laundering cases; freeze funds belonging to people accused of terrorist activities; and extend from two to five days the period allowed for a public prosecutor to issue his judgment on investigations carried out by the Financial Analysis Commission.  The new legislation made a clear distinction between terrorism and resistance, with specific reference to the Palestinians.

The Government of Tunisia enforced the 2003 anti-terrorism law.  However, the government's application of the law was criticized by Tunisian and international organizations who maintained that too many individuals undergo extended pre-trial detention and face unfair trials that rely on weak evidence.  In response to a claim by Tunisian lawyers that 2000 people had been sentenced under the anti-terrorism law, the Minister of Justice stated on May 27 that 300 persons were being detained on terrorism charges.

On July 2, a private Tunisian lawyer announced in the press that the government was charging two military officers along with seven civilians for plotting to attack U.S. military personnel in country.  On July 14, Tunisian media reported that prosecutors dropped the charges against the two officers, citing lack of evidence.

Among the cases in which sentences were publicly announced:

- On March 26, the court in Grombalia, Nabeul sentenced a man to three years in prison for joining a terrorist movement.  He had been previously arrested in December 2006 and released 18 days later.

- May 14, a woman was sentenced to six years in prison for belonging to a terrorist organization, incitement to join terrorist organizations, funding terrorism, and traveling outside the country without official documents.

- May 20, a military court sentenced one person to three years in prison on terrorism-

PX205

related charges.

- In June, the Tunisian Appeals Court sentenced 22 individuals to three to eight years in prison for belonging to a terrorist organization, obtaining supplies and equipment for the organization, and for calling for acts of terrorism.  One of the 22 individuals convicted was a non-commissioned military officer.

- On July 6, 19 individuals suspected of belonging to the Pan-Islamist "Party of Liberation", were given sentences ranging from 11-14 months in prison for belonging to a foreign terrorist organization.

- On August 2, a Tunisian was forcibly repatriated from Italy to Tunisia after completing a six year sentence for belonging to a terrorist organization.  He was arrested upon his arrival in Tunisia and then released on bail August 10.  The police informed him that he could not leave his house or receive visitors without their permission.

- On October 1, the Tunis court sentenced six individuals to one year in prison for holding an unauthorized meeting, and one person to ten years for belonging to a terrorist organization and inciting terrorist acts.

- On October 17, nine men were given sentences ranging from three to six years in prison on terrorist related charges.

**United Arab Emirates**

While there were no terrorist attacks in the UAE in 2009, seven Emiratis were charged with promoting and funding terrorism.  A U.S. citizen was convicted of supporting a foreign terrorist organization and subsequently deported to Lebanon, his country of birth.

The Government of the United Arab Emirates (UAE) repeatedly condemned terrorist acts in Iraq, Lebanon, Pakistan, and elsewhere in the region.  In order to prevent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided guidelines for all Friday sermons and monitored compliance.  The UAE worked to keep its education system free of radical influences and emphasized social tolerance and moderation.

The Container Security Initiative (CSI), which became operational at Port Rashid and Jebel Ali Port in the Emirate of Dubai in 2005, reviewed approximately 250 bills of lading each week, resulting in about 20 non-intrusive inspections of U.S.-bound containers.  Examinations were conducted jointly with Dubai Customs officers, who shared information on transshipments from high risk areas, including those originating in Iran.

The UAE has a cyber-crime law criminalizing the use of the Internet by terrorist groups to "promote their ideologies and finance their activities."  The UAE has established a National Security Council charged with formulating and implementing a national strategic plan.

PX205

Cooperation on law enforcement matters was hampered by the lack of a mutual legal assistance treaty between the United Arab Emirates and the United States.

The UAE continued efforts to strengthen its institutional capabilities to combat terrorist financing, but challenges remained.  The Central Bank initiated memoranda of understanding with regional FIUs, and performed anti-money laundering training both locally and regionally. The 2008 MENA-FATF (Middle East North Africa Financial Action Task Force) Mutual Evaluation Report for the UAE made a recommendation to amend the federal anti-money laundering law and increase dedicated resources available to the Central Bank's Financial Intelligence Unit (FIU).  Although the UAE took important steps to address hawala remittances, further vigilance is required, as hawalas are easily used for money laundering.

The UAE Central Bank provided training programs to financial institutions on money laundering and terrorist financing.  The United States and the UAE worked together to strengthen efforts to combat Bulk Cash Smuggling (BCS), in particular from countries at higher risk of illicit finance activity.  Immigration and Customs Enforcement provided Dubai Customs with BCS training for airport interdiction of contraband currency.  The Department of Justice also provided BCS training for prosecutors in Dubai.

**Yemen**

The security situation in Yemen continued to deteriorate during 2009.  Al-Qa'ida in Yemen (AQY) announced its merger with al-Qa'ida (AQ) elements in Saudi Arabia in January 2009, creating al-Qa'ida in the Arabian Peninsula (AQAP).  This strategy of consolidation received significant publicity and demonstrated AQ's reinvigorated recruitment efforts and commitment to expand operations throughout the Peninsula.  However, the creation of AQAP coincided with fewer attacks within Yemen.  This was due in part to Yemeni security forces' disruptions of the group, but also may have reflected the desire of AQAP's leadership to reduce its attacks within Yemen and use the country – and particularly those regions that were largely outside government control -- as a safe haven for planning future attacks.

The government's response to the terrorist threat was intermittent, and its ability to pursue and prosecute suspected terrorists remained weak throughout most of the year.  Draft counterterrorism legislation stalled in Parliament.  The government's response, however, improved dramatically in December, exemplified by the heightened pace of counterterrorism operations.  Still, the government's focus on other internal security challenges, including the "Sixth War" of the Houthi rebellion in the northern Sa'ada governorate, which began in August and had not ceased by year's end, often diverted it from broader counterterrorism activities.

On December 25, Nigerian citizen Umar Farouk Abdulmutallab attempted to blow himself up while on a flight into Detroit.  Abdulmutallab admitted to having been trained by AQAP in Yemen.

There were three terrorist attacks against foreign interests:

PX205

- On March 15, four South Korean tourists were killed in a suicide bomb attack in the city of Shibam in Hadramaut province.

- On March 18, a motorcade carrying South Korean government officials was attacked by a suicide bomber on the road to Sana'a International Airport.

- In June, nine foreigners were kidnapped in Sa'ada, resulting in three confirmed deaths. The remaining six were still missing at year's end.

There were a number of terrorist attacks against Yemeni interests, particularly Yemeni security and military targets. Terrorist elements, either explicitly aligned with AQAP or related actors, attacked Yemeni targets of opportunity in Ma'rib and Hadramaut in June, July, October, and November; among these incidents was the assassination of three high-level security officials. AQAP showed signs of financial strain, and Yemeni authorities suspected them to have conducted the sophisticated robbery of a Yemeni bank truck in Aden on August 17 that resulted in the theft of US$ 500,000.

While attacks inside Yemen decreased from 2008, AQAP launched an attempt on Saudi counterterrorism chief Prince Mohammed bin Nayif's life in Riyadh on August 27. A known AQAP member, Abdullah al-Asiri, claimed he was seeking a royal pardon during Ramadan and gained access to bin Nayif. Al-Asiri detonated a bomb, killing himself but failing to inflict serious injury on the prince. The suicide bomber was thought to have crossed into Saudi Arabia via the northern Yemeni border.

Despite these security challenges, there were counterterrorism successes in 2009, including:

- On January 19, the Counterterrorism Unit (CTU) conducted a raid on an AQ cell in Sana'a, which resulted in the death of two suspects, and the capture of another suspect and a weapons cache, including machine guns, mortars, and rocket-propelled grenades.

- In March, Abdullah Abdul-Rahman Mohammed al-Harbi, a Saudi AQAP member, was arrested in Ta'iz and later returned to Saudi Arabia. Also in Yemen, Naif Duhais Yahya al-Harbi, another Saudi national AQAP member, surrendered and Hasan Hessian bin Alwan, a Saudi AQAP financier, was arrested in June.

- On December 17, strikes were conducted on two significant AQAP sites. Similar strikes followed on December 24. In the wake of these operations, Yemeni officials affirmed that they will continue to pursue AQAP operatives.

Throughout most of the year, prosecuting terrorists remained extremely difficult for Yemeni courts, largely because current law, as applied to counterterrorism and the financing of terrorism, remained weak. Counterterrorism legislation sent to a Parliamentary committee for review in 2008 remained there at year's end. The absence of effective counterterrorism legislation that criminalized the activities of those engaged in planning and facilitating acts of terrorism, both in Yemen and abroad, contributed to Yemen's appeal as a safe haven and potential base of

PX205

operations for terrorists.  For this reason, the government was forced to apply other available laws, including fraudulent document charges or "membership in an armed gang" charges to thwart foreign fighters going to Iraq and Afghanistan.  Those who commit acts of terrorism in Yemen can face punishment for murder or assault under the criminal system, but terrorism itself is not a defined crime, and therefore not illegal.  On December 29, however, the Parliament passed long-stalled counterterrorist finance and anti-money laundering legislation that gave the government new powers to investigate and prosecute terrorist financial networks operating inside the country.  Legal, political, and logistical hurdles remained a hindrance to an effective detention and rehabilitation program for Guantanamo returnees.  The government lacked a secure facility to house Guantanamo returnees, a plan for rehabilitating the returnees, or the legal framework to hold returnees for more than a short amount of time.  The government's monitoring program of released Guantanamo returnees remained largely ineffective.

As Saudi security forces have clamped down on terrorism, and foreign fighters have returned from Afghanistan and Pakistan, Yemen's porous borders have allowed many terrorists to seek to base operations within Yemen.  The government lacked a strong security apparatus outside major cities and its Counterterrorism Unit and Yemen Special Operations Force, the state's two premier counterterrorism entities, required additional training and funding in order to effectively target terrorist elements.  The Department of State provided training and equipment to Yemen's security forces in the Ministry of Interior, including the Yemeni Coast Guard and the Central Security Forces Counterterrorism Units (CTU).  The United States also supported regional and multilateral efforts to help Yemen stop the flow of funding to terrorism, including regional training of Yemeni officials from the Central Bank, Ministry of Finance, and Financial Intelligence Unit.


## SOUTH AND CENTRAL ASIA OVERVIEW

> **"Our struggle against terrorism must be fought not just on the battlefield, but in education, in health, in jobs, in trade, and above all for the hearts and minds of our people."**
>
> **--Asif Ali Zardari, President of Pakistan**
> **September 24, 2009**

Already plagued by terrorism, South Asia experienced more violence in 2009 as terrorists expanded their operations and networks across the region and beyond.  In response, the United States worked to increase counterterrorism cooperation with its partners in South Asia.  Progress was limited because of combination of political unrest in the region, weak governments, and competing factions within various South Asian governments.

In Afghanistan, the Taliban-led insurgency remained resilient in the south and east and expanded its presence into the north and west.  Although the insurgency absorbed heavy combat and leadership losses, its ability to recruit foot soldiers from its core base of rural Pashtuns remained undiminished. Al-Qa'ida (AQ) provided some facilitation, training, and funding while maintaining its safe haven in Pakistan.

PX205

Pakistan continued to suffer from rising militancy and extremism. The Federally Administered Tribal Areas (FATA), Baluchistan, the North West Frontier Province, southern Punjab, and other parts of Pakistan continued to be used as safe havens for AQ terrorists, Afghan insurgents, and other terrorist groups.

India was the focus of numerous attacks from both externally and internally based terrorist organizations. Although clearly committed to combating terrorism, the Indian government's counterterrorism efforts remained hampered by its outdated and overburdened law enforcement and legal systems. In the wake of the Mumbai terrorist attacks of 2008, India's Parliament has introduced bills to restructure its counterterrorism laws and established a National Investigative Agency to create a national-level capability to investigate and prosecute acts of terrorism.

In Bangladesh, the Awami League, which won a landslide electoral victory in 2008, acted on its pledge to focus serious attention on Bangladesh's counterterrorism needs. This resulted in the arrest of several high-profile terrorism-related figures in Bangladesh, including some from Lashkar-e-Tayyiba (LT). The Bangladeshi government has also championed the creation of a South Asia counterterrorism task force that countries could use to work together regionally to stamp out the rise of violent extremism.

In spite of losing the war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected of surviving largely intact. The Sri Lankan government was criticized for using former LTTE paramilitary organizations that relied on abduction, extra-judicial killings and other illegal tactics to combat the LTTE and their suspected sympathizers. As the military recaptured the remainder of the LTTE-held territory, the LTTE reverted increasingly to more asymmetrical tactics, including suicide bombers and other terrorist attacks, some of which caused serious civilian casualties.

In April, 2008, the Communist Party of Nepal (Maoists) won the national Constituent Assembly election and formed a Government under Maoist Prime Minister Pushpa Kamal Dahal. Following Dahal's May 2009 resignation, the Maoists continued in political opposition and remained a U.S.-designated terrorist entity under the Terrorism Exclusion List and Executive Order 13224.

Other significant terrorist organizations in Central Asia include the Islamic Movement of Uzbekistan (IMU) and a splinter group now known as the Islamic Jihad Union (IJU). Extremist groups such as Hizb ut-Tahrir (HT) foment an anti-Semitic, anti-Western ideology that may indirectly generate support for terrorism. HT, a political movement that advocates the establishment of a borderless, theocratic Islamic state throughout the entire Muslim world, has followers in Kyrgyzstan, Kazakhstan, Tajikistan, Uzbekistan, and elsewhere. The United States has no evidence that HT has committed any acts of terrorism, but the group is sympathetic to acts of violence against the United States and its allies. HT has publicly called on Muslims to travel to Iraq and Afghanistan to fight Coalition Forces.

**Afghanistan**

PX205

During a year in which it conducted a presidential election, Afghanistan continued to confront the challenges of building a stable, democratic government in the face of a sophisticated, multi-faceted insurgency that primarily relied on asymmetric tactics. The insurgency targeted coalition forces, the United Nations Assistance Mission to Afghanistan (UNAMA), international non-governmental organizations (NGOs), foreign diplomatic missions, Afghan government officials and security forces, and Afghan civilians.

Separate but intertwined and affiliated extremist organizations led by Mullah Omar (Taliban), Sirajuddin Haqqani (Haqqani Network), and Gulbuddin Hekmatyar (Hezb-e-Islami Gulbuddin - HIG) increased their use of improvised explosive devices (IEDs) and coordinated attacks using multiple suicide bombers, resulting in an increase from 2008 in overall casualties. The Taliban, in particular, stepped up the pace of its attacks and simultaneously increased its shadow government presence throughout the country. Al-Qa'ida (AQ) and the Taliban senior leadership maintained an operational relationship, but AQ's direct influence in Afghanistan has diminished over the past year due to effective counterterrorism operations.

With support from the international civilian and military community, the Government of the Islamic Republic of Afghanistan worked to build and strengthen its national security forces and establish effective law-enforcement mechanisms and improved governance to increase stability and counter Taliban presence and influence.

The International Security Assistance Force (ISAF) led the coalition forces' counterinsurgency campaign, using a combination of counterinsurgency means and methods, including synchronized use of combat (air and ground forces) and non-combat means (building civil governance and aiding reconstruction and development in conjunction with UNAMA) to fight extremism. Over the summer, General Stanley A. McChrystal issued a tactical directive which sought to reduce civilian casualties caused by military actions. A UN report on the protection of civilians in Afghanistan showed a 14 percent increase in civilian deaths compared to 2008, but credited ISAF with a 28 percent reduction in civilian deaths from pro-government forces.

The Commander, U.S. Central Command, maintained command and control of U.S. forces operating in Afghanistan. United States forces targeted insurgent leaders, facilitators, improvised explosive device (IED) networks, the narcotics-insurgent nexus, and insurgent training and logistics centers with the objective of eliminating terrorists and facilitating reconstruction and development. The Afghan National Army (ANA), and to a lesser extent, the Afghan National Police (ANP), continued to lead in the majority of counterterrorism operations, in close cooperation with coalition forces. The Afghan National Security Force (ANSF) continued to work in close partnership with ISAF to develop the capability necessary to assume the lead in security across Afghanistan and take a greater role in planning and execution operations. Partly in response to their growing inability to prevail against coalition and ANSF forces in conventional encounters, insurgents increasingly resorted to asymmetrical tactics to intimidate ordinary Afghans. These tactics included increasingly sophisticated IEDs placed along key travel arteries, assassination attempts against Afghan government officials, and the use

Page | 149

PX205

of suicide bombers and direct fire attacks in population centers where Afghan civilians are used as shields.

Integrated civilian-military counterinsurgency approaches in the eastern part of the country have continued to yield some successes. Nonetheless, the anti-government insurgency remained a capable, determined, and resilient threat to stability and to the expansion of government authority, particularly in the south and east. The insurgency continued to suffer heavy combat losses, including among senior leaders, but its ability to recruit soldiers remained undiminished. Taliban information operations were aggressive and sophisticated, including, for example, Mullah Omar's injunctions on the Taliban website for Taliban fighters to avoid harming civilians and monitor local communities regarding their satisfaction with Taliban shadow government officials' performance.

Despite increased efforts by the international community against funding flows, streams of Taliban financing from abroad, along with funds gained from narcotics trafficking and kidnapping, criminal enterprises, and taxing the local population, have allowed the insurgency to strengthen its military and technical capabilities. Narcotics trafficking in particular remained an important financing mechanism of terrorist/insurgent operations.

In addition to targeting Afghan and coalition military forces, insurgents and criminals attacked Afghan government officials and civil servants, Afghan police and army forces and recruits, humanitarian actors, and civilians. Foreign civilians, including diplomats, were deliberately targeted. Two high-profile terrorist attacks against foreign diplomats in Kabul City this year included the October 8 suicide car bombing of the Indian Embassy that killed at least 17 and the October 28 attack on a UNAMA guesthouse that killed five UN employees and three other Afghans. The Taliban claimed responsibility for both attacks.

Throughout the year, insurgents targeted NGOs, Afghan journalists, government workers, UN workers, and recipients of NGO assistance. They targeted teachers, pupils (especially girls), and schools. Attacks on girls schools in the east and south increased. Taliban militants were suspected in late April and early May of using an unidentified gas to sicken girls and teachers at two schools in the town of Charikar in Parwan Province and one school in Mahmud Raqi, a small town north of Kabul. Insurgents coupled threats and attacks against NGOs with continued targeting of Provincial Reconstruction Teams (PRTs), de-mining teams, construction crews working on roads and other infrastructure projects. Additionally, insurgents continued to kidnap foreigners and Afghans. While insurgents conducted most abductions for ransom, presumably as a means of raising money to support their operations, they have also sought to use victims to negotiate with Afghanistan's government and the international community.

Taliban militants made a concentrated effort to thwart the August 20 Presidential and Provincial elections by intimidating voters and attacking election officials. There were more than 1,000 insurgent attacks in August, approximately 20% of which occurred on Election Day. Although there were few resulting casualties, voter turnout was notably lower than for the 2004 election, and, in some areas in the south and east, turnout was effectively shut down altogether as a result of Taliban intimidation.

Page | 150

PX205

**Bangladesh**

Immediately after taking office in January 2009, the Awami League-led government began a crackdown on domestic and transnational terrorist groups.  As a result, Bangladesh and India improved their counterterrorism cooperation during the year, which led to the arrest of several senior members of the United Liberation Front of Assam (ULFA), an anti-India insurgency group.  In November, Bangladesh arrested several extremists alleged to have ties to Lashkar-e Tayyiba (LT), the organization believed responsible for the November 2008 Mumbai attack, Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B), and other extremist groups.  The arrests were evidence of the government's efforts to deny transnational terrorists safe haven and targeting opportunities in Bangladesh.

Jamaatul Mujahedin Bangladesh (JMB), the banned domestic Islamist extremist group responsible for a wave of bombings and suicide attacks in late 2005, remained a threat.  During the first three months of 2009, authorities arrested several suspected JMB members and uncovered weapons caches that included grenades and chemicals that could be used to make explosives.

In February, the Awami League-led government adopted into law the Money Laundering Prevention Act (MLPA) and the Antiterrorism Act (ATA).  These laws formalized ordinances passed in 2008 under the caretaker government.  Although not fully compliant with international standards, the MLPA addressed many flaws in the 2002 money laundering law and antiterrorist financing into the Bangladeshi legal system for the first time.  The laws facilitated international cooperation and established a financial intelligence unit (FIU) at the Bangladesh Bank.  The new laws are part of the effort to enable Bangladesh to enter the Egmont Group, the international body of FIUs that plays a critical role in fighting terrorist financing.

U.S. and Bangladeshi law enforcement agencies cooperated well on several cases related to domestic and international terrorism.  Bangladesh worked with the United States to further strengthen control of its borders and land, sea, and air ports of entry.

**India**

India remained one of the countries most afflicted by terrorism with over 1,000 deaths attributed to terrorist attacks in 2009, primarily in Kashmir, the Northeast, and the Maoist affected "Red Corridor."[16] India continued to face persistent and significant external threats from groups including LT, Jaish-e-Mohammad, and Harakat-ul-Jihad-i-Islami-Bangladesh. Although there were no large-scale assaults similar to the November 26, 2008 attacks in Mumbai, senior

---

[16] According to Home Minister Chidambaram, groups affiliated with the Communist Party of India (Maoist) had pockets of influence in 20 states, but were primarily active in 223 out of India's 545 Parliamentary districts across eight states known as the "Red Corridor", comprised of West Bengal, Bihar, Chhattisgarh, Jharkhand, Orissa, Andhra Pradesh, Maharashtra, and Karnataka.

PX205

government officials warned that India remained at risk on the basis of the volume of credible threats the government continued to receive.  Terrorist attacks included:

- On January 1, the United Liberation Front of Assam (ULFA) detonated several bombs in Guwahati, Assam, killing five people and injuring 50.

- On February 1, Maoists/Naxalites killed and mutilated the bodies of 15 police officers in Maharashtra's eastern district of Gadchiroli, looting guns and ammunition.

- On October 7, Maoists/Naxalites beheaded Police Inspector Francis Induwar near Ranchi, Jharkhand, after the Indian Government refused to respond to a demand for the release of three jailed Maoist/Naxalite leaders.

- On October 8, Maoists/Naxalites ambushed a police patrol in Maharashtra killing 17 police.

- On December 2, Maoists/Naxalites in West Bengal beheaded school teacher Satya Kinkar Hansda following his earlier abduction.

Indian authorities made several terrorism-related arrests:

- On May 3, state police arrested approximately 20 sympathizers of the Liberation Tigers of Tamil Ealam (LTTE) for attacking an army camp in Coimbatore, Tamil Nadu.

- On June 4, police arrested Lashkar-e-Tayyiba (LT) operative Mohammad Omar Madini in New Delhi.

- On August 7, police arrested two suspected Hizb-ul-Mujahideen terrorists in New Delhi ahead of Independence Day celebrations.

The state of Jammu and Kashmir, historically victim to the largest number of foreign terrorist attacks, saw casualties decline significantly from previous years.  The Ministry of Home Affairs (MHA) reported that 71 civilians and 52 members of the security forces were killed in terrorist-related violence in the state through November.  Home Minister P. Chidambaram reported to Parliament in December that 700 foreign insurgents were active in the state, down from 800 earlier in the year.

Indian Prime Minister Manmohan Singh told Parliament that Maoists/Naxalites insurgent groups represented the most significant threat to domestic security.  Maoists/Naxalites conducted numerous attacks against police and local government officials and bombed railways, killing civilians and disrupting services.  No American citizens were victims of Maoist/Naxalite-related terrorism during the year.  Foreign companies were reportedly targeted for extortion.  In June, the central government banned Maoist/Naxalite groups under the Unlawful Activities Prevention Act of 1967.  Chief Ministers from the most affected states agreed to cooperate with the MHA to

PX205

launch joint operations against the Maoists/Naxalites along inter-state borders.  MHA established counter-insurgency schools for police officials in Assam, Bihar, Chhattisgarh, Orissa, and Jharkhand.  The central government deployed additional security forces in Chhattisgarh and Orissa, and announced plans to deploy to eight additional states.

Ethno-nationalist insurgent groups remained active, particularly in the Northeast.  The ULFA, a domestic terrorist group banned by India in 1990, continued a campaign of bombings in Assam state resulting in 27 fatalities this year.  On December 2, security forces arrested ULFA Chairman Arabinda Rajkhowa near the Bangladesh border.  The Assam state government offered talks and free passage to ULFA leaders in a bid to make peace with the group.  Home Minister Chidambaram reported to Parliament that the central government would agree to hold talks with the ULFA, if the group "abjured violence."

Parliamentary elections in April and May returned the ruling Congress Party-led coalition government to power despite criticism that security and intelligence lapses failed to prevent the 26/11 attacks.  The new government instituted several reforms designed to augment its existing security structures and to develop new capabilities.  The MHA instituted regular meetings to improve communication among security agencies at the central and state levels, and it assigned senior officers to review counterterrorism and counter-Maoist/Naxalite operations.  The government implemented tighter immigration controls, and, in some areas.  It also implemented more effective border management through fencing and flood lighting and undertook a coastal security project that began issuing identity cards to villagers in some coastal areas.  The MHA instituted a mega-city police training program and, in coordination with the Ministry of Defense (MOD), established assistance programs to train state police.  The MHA increased resources for the National Security Guard (NSG), India's first responder paramilitary force, and established NSG hubs in Chennai, Kolkata, Hyderabad, and Mumbai.  It also reorganized the Multi-Agency Centers (MACs), which are tasked with collecting real-time intelligence and coordinating among agencies and began establishing subsidiary MACs in state capitals.  The new National Investigation Agency created in the wake of the Mumbai attacks registered several cases in 2009.  The trial of Ajmal Kasab, the alleged lone surviving gunman involved in the Mumbai attack, continued in Mumbai.

Amendments to the Prevention of Money Laundering Act (PMLA) came into force in June, furthering India's ability to combat the financing of terrorism.  Indian officials participated in the South Asian Regional Conference for Countering Terrorist Financing in the Charitable Sector in April.  The Asia/Pacific Group and the Financial Action Task Force (FATF) conducted a joint mutual evaluation in December to evaluate India's compliance with global anti-money laundering and counterterrorist finance standards in the context of India's candidacy for FATF membership.  In December, India's Narcotics Control Bureau arrested Naresh Kumar Jain, allegedly a significant underground banker, as part of an operation to close a global network of illegal money transfers.

In the wake of the Mumbai attack, the government increased its bilateral and multilateral cooperation with foreign governments on counterterrorism.  Senior Indian government officials, including the Home Minister, visited the United States to advance bilateral counterterrorism

PX205

cooperation, culminating in the conclusion of the U.S.-India Counterterrorism Cooperation Initiative during Prime Minister Singh's official state visit in November.

**Kazakhstan**

Kazakhstan continued to aggressively combat terrorism.  Kazakhstan's Ministry of Interior announced on January 10 that Ministry of Interior troops have new responsibilities related to the fight against terrorism under a new military doctrine, and the Ministry held a counterterrorism exercise in January.  In August the National Security Committee (KNB), and the Ministries of the Interior, Defense, and Emergency Situations held counterterrorism exercises at the international trade port in Aktau.[17]  On August 28, Kazakhstan's President Nursultan Nazarbayev signed two new laws to counter terrorist funding and money laundering.

Kazakhstan's cooperation with the United States included its hosting of a September 29-October 1 Legislative Drafting Expert Workshop on Counterterrorism.  During the seminar, Kazakhstani legal experts from both houses of the country's Parliament, the General Prosecutor's office, and the Customs Control Committee reviewed Kazakhstan's counterterrorism legislation, based on advice from U.S. and United Nations Office on Drugs and Crime (UNODC) experts.  During FBI Director Robert Mueller's November 17 visit to Astana, the Prosecutor-General's Office and the FBI signed a memorandum of understanding, stating that the parties intend to cooperate in the fight against organized crime and money laundering.  Mueller also met with then-KNB Chairman Amangeldy Shabdarbayev, who agreed to intensify cooperation in the fight against terrorism and extremism.  Kazakhstani government agencies have typically provided limited information on domestic terrorism cases and generally do not provide contextual information on cases reported by the press.

Kazakhstan has continued to detain and prosecute suspected terrorists. The press reported a number of cases in which individuals were detained or sentenced for suspected acts of terrorism, including the following:

- On September 22, local press reported that the Astana City police detained a 23-year-old Uzbek citizen.  After an investigation determined he was wanted by Uzbek law-enforcement agencies on suspicion of carrying out terrorist activities, the police arrested him, pending an extradition decision.

- On September 24, national media published an article stating that an Aktobe Province court sentenced six local people to 12-17 years in prison for terrorism.  According to the press, the group intended to punish foreign investors and announce a jihad against infidels.  The six alleged terrorists reportedly planned to blow up oil company facilities in the region and possessed arms and explosives.

---

[17] Aktau is Kazakhstan's largest port on the Caspian Sea and an important shipping site in the transportation of oil from Kazakhstan to Azerbaijan and Russia.

PX205

To prevent radicalization and support other domestic counterterrorism initiatives, Kazakhstan actively promoted intercultural and religious dialogues.  Most notably, Kazakhstan hosted the third triennial Congress of World and Traditional Religions in Astana July 1-2, and it has stressed multi-confessional concord as a key element of a proposed "doctrine of national unity." During the October 26 opening session of the Kazakhstan People's Assembly (KPA), Nazarbayev also suggested the creation of a doctrine on national unity.  Nazarbayev suggested that the doctrine focus on the shared priorities of Kazakhstan and the KPA and particularly emphasized multi-confessional concord.

Kazakhstan also continued to strengthen its engagement in international counterterrorism activities.  On February 11, the Government of Kazakhstan ratified a 2007 Shanghai Cooperation Organization (SCO) agreement to actively advance cooperation in the fight against terrorism and extremism.  The Collective Security Treaty Organization (CSTO) held a counterterrorism drill in Aktau in October, with participation from various Kazakhstani security forces.

**Kyrgyzstan**

In 2009, the Government of Kyrgyzstan took political and law enforcement steps to disrupt and deter terrorism. Since 2001, Kyrgyzstan has actively supported U.S. counterterrorism efforts and Operation Enduring Freedom in Afghanistan.

The Government of Kyrgyzstan, with the financial support from the U.S. and other international organizations, continued efforts to improve border security throughout the country and particularly in the southern Batken region.  These efforts included the construction of more modern border facilities, a program to create central communications between the dispersed border checkpoints and government agencies, the installation of radiation detection equipment at select crossings, and the establishment of a tracking system to monitor the transport of certain dual-use equipment throughout the country.

Kyrgyzstan's military and internal forces worked to improve their counterterrorism capabilities and to expand cooperation with regional partners.  Kyrgyzstan continued to be an active member of the Shanghai Cooperation Organization and the Cooperative Security Treaty Organization (CSTO). With U.S. assistance, the Kyrgyz armed forces continue to improve their facilities and tactical capabilities.  U.S. financial support has resulted in the training of dozens of Kyrgyz military and law enforcement personnel, and the establishment of more modern defense installations.

Kyrgyzstan's under-regulated borders, especially in the Batken region, remain highly problematic.  Kyrgyz law enforcement still lacks the equipment, personnel, and funding to effectively detect and deter terrorists or terrorist operations in the southern regions of the country.  In 2009, however, Kyrgyz law enforcement agencies conducted multiple raids in southern Kyrgyzstan against terrorist groups.

Supporters of the terrorist groups Islamic Jihad Union (IJU) and Islamic Movement of Uzbekistan (IMU) are believed to maintain a presence in Kyrgyzstan.  Hizb ut-Tahrir (HT), an

PX205

extremist group banned in Kyrgyzstan, remained active, especially in the south.  In addition to law enforcement initiatives, the government, in particular the State Agency for Religious Affairs, was actively conducting outreach efforts to diminish support for extremist groups and reverse the growing trend toward religious extremism.

**Nepal**

While Nepal experienced no significant acts of international terrorism, several incidents of politically-motivated violence occurred in the country.  Maoist -affiliated Young Communist League (YCL) criminal activity continued, including intimidation and extortion.  In response to the YCL violence, other political parties condoned the use of violence by their youth wings.  Unrest in the southern Terai plains remained high with the proliferation of numerous armed groups and an inadequate police presence.  More than 100 armed groups are estimated to be operating in the Terai, some in pursuit of independence or autonomy, most composed of opportunistic criminal elements.  Competing factions clashed with each other, with the Maoists, with hill-origin Nepalese, and with police, instigating numerous strikes, demonstrations, and Indo-Nepal border road closures.  A Special Security Plan (SSP) was put in place in July to curb violence and end the culture of impunity.  Despite this program, police still do not have an active presence in many parts of the Terai.

Nepal experienced several acts of religiously-motivated violence, most prominently the bombing of a Catholic Church in May.  The attack was conducted by the Nepalese Defense Army (NDA), a Hindu extremist group that was responsible for shooting a Catholic priest and bombing a mosque in 2008.  The leader of this group has since been arrested and their activities appear to have ceased.

There were no indications that Nepal was a safe haven for international terrorists.  Given Nepal's continued instability, however, there is a possibility that members of extremist groups could transit Nepal, especially into India.  The large ungoverned space along the Nepal/Indian border exacerbates this vulnerability, as do security shortfalls at Tribhuvan Airport, Nepal's international airport.  In June, Lashkar-e Tayyiba (LT) member Muhammad Omar Madni traveled through Nepal enroute to New Delhi.

Nepal is not a regional financial center and there were no indications that the country was used as an international money laundering center.  There were no prosecutions or arrests for money laundering in 2009.  However, YCL illicit financial activities, including smuggling, extortion, and protection demands, increased in 2009.

The United States sponsored the attendance of Nepalese security force officers at various international counterterrorism events.

**Pakistan**

Foreign terrorist organizations, including al-Qa'ida (AQ) and its affiliates, continued to operate and carry out attacks in Pakistan.  Violence stemming from Sunni-Shia sectarian strife and ethnic

PX205

tensions, limited to certain geographical areas, claimed civilian lives.  Similar to last year, attacks occurred with greatest frequency in the regions bordering Afghanistan, including Baluchistan, the Federally Administered Tribal Areas (FATA), and the North-West Frontier Province (NWFP).  Attacks targeting the country's major urban centers, including Lahore, Islamabad, Peshawar, Karachi, and Rawalpindi, continued to increase.

The coordination, sophistication, and frequency of suicide bombings continued to climb in 2009.  (See the NCTC Annex of Statistic Information or www.nctc.gov for precise figures).  These suicide attacks often resulted in large numbers of casualties, with about 50 percent of them occurring in Islamabad, Lahore, Peshawar, and Rawalpindi.  The terrorists launched complex attacks and chose high-value targets, coordinating their attacks with greater precision.  Additionally, there were several audacious and deadly attacks on key security forces targets in retaliation for Pakistani military operations in Swat and throughout the Federally Administered Tribal Areas:

- On October 10, terrorists attacked the Pakistan Army's General Headquarters in Rawalpindi.

- On October 15, terrorists targeted three different security forces locations in Lahore simultaneously with assault rifles, hand-grenades, and suicide vests.  Approximately 20 persons, mostly police personnel, were killed in these well-coordinated attacks.

- On December 4, militants attacked a mosque in Rawalpindi with assault rifles, hand-grenades, and suicide jackets.  Forty people, mostly members of the military and their families, were killed and more than 80 were injured.

- Other high profile suicide bombings targeted the only four-star hotel in Peshawar, the offices of the Inter-Services Intelligence Directorate (ISI) in Peshawar and Lahore, the office of the World Food Program (WFP), and the International Islamic University in Islamabad.

- On February 2, ethnic Baluch separatists were involved in the kidnapping of UNHCR official and American national John Solecki, who was released by his captors on April 4.

- On February 11, an ANP member of the NWFP provincial assembly, Alamzeb Khan, was killed in a remote-control bomb attack in Peshawar.  Seven others were injured in the attack.

- On March 3, militants attacked a bus transporting the visiting Sri Lanka cricket team and its accompanying police detail in Lahore.  At least seven police officers were killed and several cricketers were injured.

PX205

- On March 11, there was an unsuccessful suicide attempt against senior ANP leader and senior minister in NWFP government, Bashir Bilour.  Two suicide bombers and four other persons were killed in the attack.  (Bilour was also attacked in 2008.)

- Another ANP member of the NWFP assembly, Dr. Shamsher Ali Khan, was killed and 11 others, including his two brothers, were injured in a suicide bomb blast in his native Swat.  Khan's house was blown up by militants in May.

- Dozens of ANP activists across NWFP were also assassinated by terrorists.

Besides targeting security forces, government institutions and elected representatives, terrorists systematically targeted perceived adversaries, such as aid workers, religious scholars, journalists, diplomats, senior military officers, and educational institutions.

- On July 16, a Pakistani UNHCR official was killed along with his driver at the Katcha Garhi camp in a kidnapping attempt.

- On September 2, there was an attempt to assassinate the Federal Minister for Religious Affairs, Hamid Saeed Kazmi, in Islamabad.  He was injured in the attack, while his driver was killed and two guards were injured.

- On June 12, an important moderate religious scholar, Dr. Sarfaraz Naeemi, was assassinated in a suicide attack.  Five others were killed and seven injured in that bomb blast.

- On August 24, an Afghan journalist, Janullah Hashimzada, was killed in Jamrud Tehsil of Khyber Agency.

- The fate of Afghan and Iranian diplomats who were kidnapped from Peshawar last year remained unresolved this year, while another Pakistani working at the Iranian Consulate in Peshawar was shot and killed by terrorists on November 12.

- Terrorists also continued targeting schools --especially ones for girls -- in NWFP and FATA.  Approximately 100 schools were attacked with explosives or rockets this year.

While the terrorists continued their violence against the population in Pakistan, the government made significant gains, clearing several areas of their control after the insurgents failed to honor an agreement with the government.  On February 16, the NWFP government signed a peace agreement with Tehrik-i-Nifaz-i-Shariat-i-Mohammadi (TNSM) led by an elderly cleric, Sufi Mohammad, in the hope of restoring the writ of government in Malakand Division, including the districts of Buner, Dir Lower, Dir Upper, Malakand, Shangla, and Swat.  While the government of NWFP acceded to all the demands of the TNSM, the latter refused to lay down its weapons. In a widely watched speech on April 19, Mohammad announced his disregard for the political system of Pakistan and asked government-appointed judges to leave Malakand Division.  This

PX205

proved to be a turning point, provoking a full-scale military operation across Malakand Division, code-named "Raah-i-Raast" (the way of the truth).  Hundreds of terrorists were killed, injured, and arrested in the operation, which also resulted in the country's most extensive internal displacement crisis.  The military operation succeeded, and life has gradually returned to normal in Malakand Division.

Another major blow to the terrorists in Pakistan was the August 4 death of the leader of Tehrik-i-Taliban Pakistan (TTP), Baitullah Mehsud.  The top three leaders of the TTP, Hakimullah Mehsud, Wali-ur-Rehman Mehsud, and Qari Hussain, jockeyed for power after his death.  Hakimullah Mehsud, a nephew of Baitullah Mehsud was eventually made the consensus leader and TTP increased its attacks.  This prompted the military to intensify operations against the TTP, finally culminating in a full-scale ground offensive in South Waziristan code-named "Raah-i-Nijaat" (the way of riddance) in mid-October.  As of December 7, the Pakistan army had cleared major towns and highways of the terrorists.  The local population, however, still remained internally displaced and many extremist organizations have not been dislodged.  At year's end, Pakistan's paramilitary Frontier Corps (FC) was engaged in fighting against a banned terrorist organization, Lashkar-i-Islam (LI), in the Bara subdivision of Khyber Agency, while the Pakistan Air Force and Army Aviation was striking the TTP in Orakzai Agency with aerial bombardment in advance of a possible ground assault.  The Government of Pakistan claimed to have made gains against the TTP and its affiliates in the tribal agencies of Bajaur and Mohmand, where there were frequent clashes, including airstrikes, against the terrorists.

Sectarian violence claimed over 200 lives in 2009, and several high-casualty bomb blasts targeted Shia.

- On February 5, 30 people were killed and 20 injured in a bomb blast near a Shia mosque in D.G. Khan in the Punjab.

- On April 5, there was a suicide bomb blast at a Shia mosque in Chakwal in which 24 people were killed and 140 injured.

- On December 28, a suicide bombing attack in Karachi during a Muharram procession killed at least 93 people, injured at least 75 others, triggering riots and arson.

- There was also an increase in ethnic violence in Baluchistan, especially the killing of Punjabi settlers in Quetta.

The November 2008 terrorist attacks in Mumbai, India were attributed to the Pakistan-based militant group Lashkar-e-Tayyiba (LT).  LT was a designated terrorist organization before the Mumbai attacks, as was its humanitarian front, the Jamaat ud-Dawa (JUD), which the Government of Pakistan banned after the attack.  The United Nations Sanctions Committee agreed to list the group and several individuals associated with it.  In response to allegations of involvement by LT in the Mumbai attacks, Pakistani officials cracked down on an LT camp in Muzzafarabad and arrested or detained more than 50 LT or JUD leaders in Punjab and elsewhere

Page | 159

PX205

in Pakistan, but it subsequently released many of them.  LT remained a serious threat to Western interests.

Pakistani officials pledged to prosecute all individuals in Pakistan found to be involved in the Mumbai attacks and offered to share intelligence regarding the attacks with the Government of India.  At year's end, however, peace talks between Pakistan and India remained frozen amid Indian allegations that Pakistan was not doing enough to bring the terrorists to justice.

Unlicensed informal hawalas (money changers) still operated illegally in parts of Pakistan.  The informal and secretive nature of the unlicensed hawalas made it difficult for regulators to effectively combat their operations.  Most illicit funds were moved through unlicensed operators, including through bulk cash smuggling.

**Sri Lanka**

The Sri Lankan government effectively dismantled much of the Liberation Tigers of Tamil Eelam (LTTE), after cornering remaining LTTE fighters and several hundred thousand civilians in the northeast of the island.  Though the government declared victory on May 18, in completing this military campaign, both sides suffered heavy losses.  Earlier in the year, the LTTE carried out a number of attacks, including suicide bombings and an air raid on Colombo, but no further attacks occurred following the end of the war.  On a number of occasions after May, the government announced the capture of suspected LTTE forces, often stating that those captured were intending to carry out violent attacks.  Military and Sri Lankan Police Service personnel discovered large caches of weapons, ammunition, and military grade explosives that had been abandoned and left uncontrolled throughout the country.  These items have been uncovered by government military forces, usually in the northern region most recently under LTTE control.  The Sri Lankan Army remained deployed across the country once the war was over.  Special Task Force (STF) police were deployed in the east, north, and in strategic locations in the west.

In 2009, there were over 40 attacks attributed to the LTTE, including:

- On January 2, a suicide bomber killed two people and injured 32 in an attack at the Air Force Admin Base less than two miles from the US Embassy in Colombo.

- On February 9, a female suicide bomber killed 30 people and injured 64 in an attack at a Mullaithivu IDP Rescue Center.

- On March 10, a suicide bomber killed 14 and injured 46 people after he blew himself up in a mosque in Matara during a religious procession.

- On April 20, a suicide bomber killed 17 people who were among thousands of Tamils fleeing the LTTE and who were seeking refuge with Sri Lankan military forces in Mullaithivu.

PX205

In spite of losing the war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected to have survived largely intact.  However, the international network likely suffered a serious blow by the August arrest in Southeast Asia and rendition to Sri Lanka of Selvarajah Patmanathan (aka KP), the LTTE's principle financier and arms supplier. This network continued to collect contributions from the Tamil diaspora in North America, Europe, and Australia, where there were reports that some of these contributions were coerced by locally-based LTTE sympathizers.  The LTTE also used Tamil charitable organizations as fronts for fundraising.

The Government of Sri Lanka cooperated with the United States to implement both the Container Security Initiative and the Megaports program at the port of Colombo.

**Tajikistan**

Tajikistan's security forces confronted members of terrorist groups in the east-central district of Tavildara in spring and summer 2009.  Government forces killed several suspected members of the terrorist group Islamic Movement of Uzbekistan (IMU), while other terrorists fled the area as a result of government counterterrorism operations from May to August.  The terrorists had infiltrated Tajikistan from Afghanistan and, reportedly, from Russia.  Tajikistani security forces also fought extremists near the capitol of Dushanbe and in northern Tajikistan, as well as on the Tajikistan-Kyrgyzstan border.

While security forces were able to defeat the incursion in Tavildara, they continued to suffer from lack of resources.  Border Guards and other services lacked appropriate technical equipment, transportation, personnel, and training to interdict illegal border crossings, detect and analyze hazardous substances effectively and respond quickly to incursions.  Pervasive corruption and low wages also undermined the motivation of security force members to interdict smugglers.

Tajikistan's 1,300 kilometer long border with Afghanistan is lightly guarded.  Much of it runs through remote and difficult terrain, which allows smugglers, extremists, and terrorists to travel to and from Afghanistan.  To address the transshipment of illicit goods and people across Tajikistan's borders, the United States and other donors assisted the Government of Tajikistan's efforts to secure its border with Afghanistan.  The United States provided communication support to the Border Guards, built a commercial customs facility at the Nizhny Pyanj Bridge, and provided technical and scanning equipment at this location.  The U.S. Department of Defense sponsored two Counter Narcoterrorism Training (formerly Joint Combined Exchange Training) events with Tajikistani security forces to improve their capacity to conduct counterterrorism operations.  The U.S. Department of State's International Narcotics and Law Enforcement Bureau (INL) provided Tajikistan's State Committee for National Security with a Counter Narcotics/Counterterrorism Analytical Center which included space refurbishment, computer hardware, analytical software, and training.  It also refurbished three Border Guard Service outposts on the border with Afghanistan.

Tajikistan hosted Exercise Regional Cooperation 10, sponsored by the U.S. Department of

PX205

Defense. This exercise focused on regional responses to terrorism and strengthening cooperation among Central Asian countries.  The Tajikistani government participated in regional security alliances, including the Shanghai Cooperation Organization and the Collective Security Treaty Organization.

Tajikistan prohibited activities by groups it considered extremist, including the Tablighi Jamaat. It closely monitored groups it listed as terrorist organizations, including the IMU and Hizb ut-Tahrir (HT).

**Turkmenistan**

Since the September 2008 violence in Ashgabat's Khitrovka neighborhood, the Turkmenistan government has not reported any other terrorist incidents.  The government maintains a military-style counterterrorism unit that is reported to have hostage rescue and explosives threat management capabilities.  There is also a Department for the Prevention of Terrorism and Organized Crime in the Ministry of Internal Affairs.  In May, the Turkmenistan government passed an Anti-Money Laundering and Counterterrorism Financing Law, which went into effect in August.  This law is understood to have aimed at creating a new state agency to collect information and uncover suspicious transactions.  Although Turkmenistan's law enforcement and security agencies exerted stringent control over society, Turkmenistan's border guards, customs services, and law enforcement were small in size and uneven in quality.  While the government strictly controlled official border crossings and along main roads, clandestine passage was still possible due to long and porous borders that stretch across mountain and desert terrain.  The United States worked with Turkmenistan's authorities to improve the quality of border checkpoints.  In October, a new checkpoint at Farap on the border with Uzbekistan was opened.

**Uzbekistan**

The Government of Uzbekistan maintained tight control over internal security.  No large scale terrorist attacks were carried out on Uzbekistan's territory in 2009, although several assassinations and other incidents were believed to be linked to extremist groups.  Terrorist groups that originated in Uzbekistan, including the Islamic Movement of Uzbekistan (IMU) and the Islamic Jihad Union (IJU), were active in other countries, including Afghanistan and Pakistan.

On May 26, an armed group attacked a police outpost in Andijan province, near Uzbekistan's border with Kyrgyzstan.  At the same time, at least two suicide bombings took place in the city of Andijan.  The IJU claimed responsibility for the attacks.

On July 16, the deputy director of Tashkent's largest madrassa was murdered in front of his home.  On July 31, three men attacked and stabbed the principal imam of Tashkent in front of his home, but the imam survived.

PX205

Although terrorist financing does not appear to be a significant problem in Uzbekistan, a large and robust black market functions outside the confines of the official financial system. The unofficial, unmonitored cash-based market created an opportunity for small-scale terrorist money laundering. In April 2009, the Government of Uzbekistan responded to international concerns and passed legislation to reestablish an anti-money laundering regime that had been suspended by Presidential decree. The new legislation falls short of international standards in some areas, but represented a step forward in Uzbekistan's commitment to combat financial crimes.

Uzbekistan cooperated with foreign governments on general security issues, including border control. Uzbekistan hosted the Central Asian Border Security Initiative (CABSI) meeting in October 2009, for the purpose of facilitating border security cooperation within the region. Tashkent was the seat of the six-nation Shanghai Cooperation Organization's Regional Anti-Terrorism Structure.

## WESTERN HEMISPHERE OVERVIEW

"Terrorism cannot be ignored in the name of good international relations. On the contrary, multilateralism and diplomacy must lead to collaborative actions among States to overcome this drama and its accomplices like trafficking in arms, illicit drugs, money, asset laundering, and terrorist havens, among others."

--Alvaro Uribe Velez, President of the Republic of Colombia
Statement to the 64th Session of the UN General Assembly
September 23, 2009

Terrorist attacks within the Western Hemisphere in 2009 were committed primarily by two U.S.-designated Foreign Terrorist Organizations in Colombia – the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) – and other radical leftist Andean groups elsewhere. The threat of a transnational terrorist attack remained low for most countries in the Western Hemisphere. While the United States and Canada pursued prosecutions against suspected terrorists, there were no known operational cells of either al-Qa'ida- or Hizbollah-related groups in the hemisphere. Ideological sympathizers in South America and the Caribbean, however, continued to provide financial and moral support to these and other terrorist groups in the Middle East and South Asia.

Overall, regional governments took modest steps to improve their counterterrorism capabilities and tighten border security, but corruption, weak government institutions, insufficient interagency cooperation, weak or non-existent legislation, and reluctance to allocate necessary resources limited progress. Countries like Argentina, Colombia, and Mexico undertook serious prevention and preparedness efforts. Others lacked urgency and resolve to address counterterrorism deficiencies. Most countries began to look seriously at possible connections between transnational criminal organizations and terrorist organizations.

PX205

In May 2009, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Cuba continued to be listed as a state sponsor of terrorism.

Colombia continued vigorous military, law enforcement, intelligence, and economic measures through its "Democratic Security" strategy and especially the "National Consolidation Plan" to defeat and demobilize Colombia's terrorist groups, including the FARC and the ELN. The FARC continued to carry out asymmetrical attacks on soft targets and carried out several high profile operations, including the kidnapping and execution of the governor of Caqueta. While the number of demobilizations, captures, and kills of FARC members in 2009 were all below 2008 levels, Colombian security forces did capture or kill a number of mid-level FARC leaders, debriefed deserters for information, and continued to reduce the amount of territory where terrorists could freely operate. The military and police also destroyed major caches of weapons and supplies, and reduced the group's financial resources through counternarcotics and other security operations.

Mexico and Canada were key counterterrorism partners. Cooperation with them was broad and deep, involving all levels of government and virtually all agencies. The Mexican government remained a committed partner in its battle against organized crime and in efforts against terrorist threats. Counterterrorism cooperation between the United States and Canada occurred in a number of established fora, including the terrorism subgroup of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group on Counterterrorism (BCG). The BCG brings together U.S. and Canadian counterterrorism officials from over a dozen agencies to coordinate policy on bioterrorism, information sharing, and joint counterterrorism training on an annual basis.

The political will of Caribbean nations to combat terrorism remained strong, despite limited resources and capabilities. Primary counterterrorism objectives for the Caribbean included: preventing terrorists or terrorist organizations from entering or transiting the Caribbean en route to other countries, particularly the United States; increasing countries' awareness of the potential threat from terrorists or terrorist organizations; preventing terrorists or terrorist organizations from operating or developing safe havens in the Caribbean; and increasing countries' capabilities to prevent terrorists from attacking targets of opportunity.

The United States enjoyed solid cooperation on terrorism-related matters from most hemispheric partners, especially at the operational level, and maintained excellent intelligence, law enforcement, and legal assistance relations with most countries. An important regional focus for this cooperation was the Organization of American States' Inter-American Committee Against Terrorism, which is the only permanent regional multilateral organization focused exclusively on counterterrorism.

**Tri-Border Area**

The Governments of Argentina, Brazil, and Paraguay have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of

PX205

contraband goods in the border region where the three countries meet.  In the early 1990s, they established a mechanism to address these illicit activities.  In 2002, at the invitation of the three countries, the United States joined them in what became the "3+1 Group on Tri-Border Area Security" to improve the capabilities of the three to address cross-border crime and thwart money laundering and terrorist financing activities.

The United States remained concerned that Hizballah and HAMAS sympathizers were raising funds in the Tri-Border Area by participating in illicit activities and soliciting donations from sympathizers in the sizable Middle Eastern communities in the region. There was no corroborated information, however, that these or other Islamic extremist groups had an operational presence in the region.

**Argentina**

During 2009, Argentina continued to focus on the challenges of policing its remote northern and northeastern borders – including the tri-border area where Argentina, Brazil, and Paraguay meet – against threats including drug and human trafficking, contraband smuggling, and other international crime.

Argentina and the United States cooperated well in analyzing possible terrorist threat information.  Argentine security forces received U.S. government training in terrorism investigations, special operations related to terrorist incidents and threats, and in explosive and drug-sniffing dog handling and dog training.  In addition, Argentina hosted U.S. government-financed regional training on the role of police commanders in responding to terrorist threats.  Argentina takes seriously its responsibility to protect its nuclear technology and materials; it has begun to provide training to other countries on best practices against illicit trade in nuclear materials.

The National Coordination Unit in the Ministry of Justice and Human Rights manages the government's anti-money laundering and counterterrorist finance efforts, and represents Argentina at the Financial Action Task Force, the Financial Action Task Force of South America, and the Group of Experts of the Inter-American Commission for the Control of the Abuse of Drugs (CICAD) of the Organization of American States' CICAD Group of Experts.

The Attorney General's special prosecution unit, set up to handle money laundering and cases, began operations in 2007.  That same year, the Argentine Congress criminalized terrorist financing with the enactment of Law 26.268, "Illegal Terrorist Associations and Terrorism Financing."  This statute amended the Penal Code and anti-money laundering law to criminalize terrorist financing and established it as a predicate offense for money laundering.  To date, Argentina has not filed any charges under the law.  In 2008, the Argentine Central Bank's Superintendent of Banks began specific anti-money laundering and counterterrorist finance inspections of financial entities and exchange houses.  The Argentine government and Central Bank remained committed to freezing assets of terrorist groups identified by the United Nations in Argentine financial institutions.

Page | 165

PX205

An Argentine judge in 2006 issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah, who were indicted in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured more than 150 people.  Despite Iranian objections, the INTERPOL General Assembly voted in November 2007 to uphold the Executive Committee's decision and the Red Notices on six were issued.  At the 2009 UN General Assembly, President Cristina Fernández de Kirchner called on Iran to surrender the suspects to face charges in Argentina.  In June, an Argentine judge requested the capture of a Colombian citizen, Samuel Salman El Reda, after the AMIA Special Prosecutor identified him as having helped coordinate the 1994 attack.  El Reda had been named previously as a suspect and was presumed to no longer be in Argentina.

**Belize**

In 2009, the Government of Belize began receiving funding through the Merida Initiative.  While counterterrorism is not Merida's primary objective, Merida's work in Belize continued to improve Belize's border security.  Belize participated in an assessment of its northern and western borders by a team from U.S. Customs and Border Protection.  This assessment included training on how to identify suspicious vehicles and individuals, and on the use of contraband detection kits.  The United States gave Belize eight of these kits in 2009.

Belize's borders are extremely porous and there is a significant corruption problem among Immigration and Customs officers, particularly on the western and northern borders.  It remained easy to change identity by purchasing stolen passports.  Laws governing name changes were extremely lax.  The country is sparsely populated and has limited human and technological resources to monitor individuals and groups residing in or transiting through its borders.

The Belize Defense Force (1025 total personnel) has operated a Counterterrorism Platoon for three years to perform operations within Belize and its territorial waters.

**Bolivia**

The Government of Bolivia cooperated only minimally on counterterrorism.  It did not share its counterterrorism information with the U.S. government and we have no information that the Government of Bolivia has active counterterrorism measures.  The U.S. government has funds available to provide training opportunities to Bolivian counterterrorism forces, but as is the case with other training opportunities offered by the United States, the Government of Bolivia refused to send anyone on such programs.  The Financial Action Task Force has identified Bolivia as a jurisdiction with structural deficiencies in its anti-money laundering/countering terrorist finance (AML/CFT) regime and has agreed with the Government of Bolivia on an action plan to address these deficiencies.

Bolivia continued to expand its relationship with Iran, a state sponsor of terrorism.  On November 24, Iranian President Ahmadinejad visited Bolivia as part of a five-nation Latin America tour.

PX205

On April 16, a Bolivian National Police SWAT team raided a hotel in the eastern city of Santa Cruz, engaging in a firefight and killing three individuals from Hungary, Ireland, and Romania allegedly connected with a previously-discovered arms cache. Two others, a Hungarian and a Bolivian, were arrested. The Bolivian government alleged that police disrupted a terrorist cell bent on dividing the country, and thwarted a possible presidential assassination attempt. Some opposition members suggested that the incident was staged for political purposes or otherwise manipulated by authorities.

Various individuals affiliated with terrorist groups were reportedly present in Bolivia. There were reports that relatively small numbers of individuals associated with the Revolutionary Armed Forces of Colombia were present. Movimiento Revolucionario Tupac Amaru members were also believed to be present, as were members of the Shining Path.

**Brazil**

The Government of Brazil's counterterrorism strategy consisted of deterring terrorists from using Brazilian territory to facilitate attacks or raise funds, along with monitoring and suppressing transnational criminal activities that could support terrorist actions. It accomplished this through actions between its law enforcement entities and through cooperation with the United States and other partners in the region. For example, Brazilian authorities worked with other concerned nations to combat the significant and largely unchecked document fraud problem in the country. During the year, multiple regional and international joint operations with U.S. authorities successfully disrupted a number of document vendors and facilitators, as well as related human-trafficking infrastructures.

The Brazilian government investigated potential terrorist financing, document forgery networks, and other illicit activity. Elements of the Brazilian government responsible for combating terrorism, such as the Federal Police, Customs, and the Brazilian Intelligence Agency, worked effectively with their U.S. counterparts and pursued investigative leads provided by U.S. and other intelligence services, law enforcement, and financial agencies regarding terrorist suspects. In July, the head of the Brazilian Federal Police intelligence division stated on the record during a Brazilian Chamber of Deputies hearing, that an individual arrested in April was in fact linked to al-Qa'ida.

Brazil's intelligence and law enforcement services were concerned that terrorists could exploit Brazilian territory to support and facilitate terrorist attacks, whether domestically or abroad, and have focused their efforts in Sao Paulo and on border areas with Argentina, Colombia, Paraguay, Peru, and Venezuela.

Brazil's intelligence and law enforcement forces also worked with regional and international partners. Brazil was actively involved in both Mercosur's Permanent Working Group on Terrorism (with Argentina, Brazil, Chile, Paraguay, and Bolivia) and its sub-working group on financial issues, which covers terrorist financing and money laundering issues.

PX205

Bilaterally, the U.S. government provided a variety of training courses throughout Brazil in counterterrorism, combating money laundering, detection of travel document fraud, container security, and international organized crime. The United States hosted a Major Crimes Conference that successfully brought together Brazil and neighboring countries' federal and state law enforcement communities, as well as judges and prosecutors, to share best practices and receive practical training.

President Luiz Inacio Lula da Silva has been critical of the FARC's use of violence and publicly called on the group to end its violence against the Colombian government.

Brazil monitored domestic financial operations and effectively used its financial intelligence unit, the Financial Activities Oversight Council (COAF), to identify possible funding sources for terrorist groups. Through COAF, Brazil has carried out name checks for persons and entities on the UNSCR 1267 and 1373 terrorist finance lists, but it has so far not found any assets, accounts, or property in the names of persons or entities on the UN lists.

The Brazilian government is achieving visible results from recent investments in border and law enforcement infrastructure that were carried out to control the flow of goods through the Tri-Border Area (TBA) of Brazil, Argentina, and Paraguay, the proceeds of which could be diverted to support terrorist groups. The inspection station at the Friendship Bridge in the TBA, which was completed by the Brazilian customs agency (Receita Federal) in 2007, reduced the smuggling of drugs, weapons, and contraband goods along the border with Paraguay. According to Receita Federal, from January to July 2009, the agency seized more than US$ 400 million in contraband goods, including drugs, weapons, and munitions, an increase of eight percent from 2007. The Federal Police had special maritime police units in Foz de Iguacu and Guaira that patrolled the maritime border areas.

Brazil's overall commitment to combating terrorism and the illicit activities that could be exploited to facilitate terrorism was undermined by the government's failure to strengthen its legal counterterrorism framework significantly. While Brazilian law criminalizes terrorist financing when connected to a money laundering offense, it does not criminalize terrorist financing itself as an independent crime. Although the 2005 National Strategy against Money Laundering (ENCLA) created a working group charged with drafting legislation to criminalize terrorism and terrorist financing, the draft legislation was never forwarded from the executive branch to the Brazilian Congress. At year's end, a long-delayed anti-money laundering bill was pending before the Brazilian Congress.

**Canada**

Canada was under a general threat from international and domestic terrorists, according to the country's Integrated Threat Assessment Centre's (ITAC) most recent "Biannual Update on the Threat from Terrorists and Extremists," published November 10. ITAC emphasized that al-Qa'ida (AQ) "has specifically identified Canada as a target on several occasions," while also noting that "homegrown Islamist extremists remain a threat to Canada." Single and multi-issue

PX205

domestic extremists "maintain the intent and capability to carry out attacks against property in Canada," according to ITAC.

International terrorists did not attack Canada in 2009.  However, Canadian officials continued to investigate a "series of bombings [of gas pipelines] in British Columbia for possible connections to environmental extremism," according to ITAC.  Two bombing attacks in July in British Columbia were the fifth and sixth attacks against energy infrastructure there since October 2008.

In June, the government introduced two new bills in Parliament (C-46 and C-47) that would strengthen law enforcement powers and that have specific counterterrorism implications. Collectively known as the "Investigative Powers for the 21st Century Act," the bills would amend the Criminal Code and the Mutual Legal Assistance in Criminal Matters Act.  C-46 would give police new powers to obtain Internet and wireless telephone transmission data.  C-47 would require telecommunications service providers to retain a law enforcement intercept capability for all new technology they deploy.  In March, the government re-introduced bill C-19, which would amend the Anti-Terrorism Bill to restore lapsed powers to hold investigative hearings as well as a form of preventive arrest whereby police may bring an individual before a judge in the early stages of terrorist activity to disrupt a potential terrorist attack, authorities that lapsed in February 2008 but which Parliament did not succeed in renewing before its dissolution in September 2008.

On October 6, Canada's Federal Court released its written decision authorizing warrants permitting the Canadian Security Intelligence Service to track terrorism suspects electronically overseas.  The decision significantly expanded the electronic surveillance powers of Canadian law enforcement and security agencies to monitor suspected "homegrown" extremists. Previously, the Federal Court had argued it lacked jurisdiction to issue warrants for activities taking place outside Canada's borders.

On December 13, then-Public Safety Minister Peter Van Loan announced that Canada was reviewing its national security certificate program following a series of court decisions that struck down certificates or ordered the government to provide more information in open court to defendants.  In use since 1978, the security certificate system allows the government to detain non-citizens whom the government deems inadmissible to Canada under security-related provisions of the Immigration and Refugee Protection Act, pending deportation.  On October 15 and December 17, the Federal Court of Canada revoked certificates, respectively, against Moroccan-born Adil Charkaoui and Syrian-born Hassan Almrei, which reduced the number of active certificates in suspected terrorist cases to three.

Canada worked closely with the United States and the UN and other multilateral counterterrorism efforts - including the G8's Roma-Lyon Group and Counterterrorism Action Group - and in international nonproliferation groups, such as the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism.  Canada and the United States cooperated bilaterally through the Cross Border Crime Forum sub-group on counterterrorism and the Bilateral Consultative Group on Counterterrorism.

PX205

On numerous occasions, Canadian and U.S. officials discussed how to enhance intelligence and information sharing related to counterterrorism and law enforcement efforts. Despite Canada's strict privacy laws, Canadian Security Intelligence Service Director Richard Fadden argued publicly in October that information sharing is "vitally important to the protection of Canada."

On April 21, al-Qa'ida in the Islamic Maghreb (AQIM) released two Canadian diplomats working for the UN whom the group had kidnapped in December 2008.

On June 4, a Federal Court judge ordered the Canadian government to bring Abousfian Abdelrazik back to Canada from Khartoum, Sudan, where he had been since 2003. Abdelrazik – whom the United States designated in 2006 as a terrorism supporter posing a significant risk to national security and who is also included on the UN Security Council's al-Qa'ida and Taliban Sanctions Committee's watchlist – returned to Canada on June 24. The Canadian government had refused to issue a passport to Abdelrazik until the issuance of the court order, citing "national security" grounds. The court ruled that the government's actions violated Adbdelrazik's freedom of mobility under the Charter of Rights and Freedoms and the government did not appeal the court's decision.

On December 9, freelance journalist Amanda Lindhout, whom a criminal group in Mogadishu, Somalia had kidnapped along with an Australian colleague in August 2008, returned to Canada. An Australian businessman claimed publicly that he had paid US$ 600,000 to secure the pair's release on November 25.

Canadian prosecutors won a series of guilty pleas and convictions in terrorism cases. Most of them related to the disrupted 2006 "Toronto 18" plot, which involved a conspiracy to bomb Parliament Hill, Royal Canadian Mounted Police headquarters, and nuclear power plants.

- On March 12, an Ottawa judge sentenced convicted terrorist Momin Khawaja to ten and one-half years in prison for financing and facilitating terrorism and two criminal code offenses related to building a remote-control device to trigger bombs. Police had arrested Khawaja in 2004, accusing him of conspiring with a British AQ cell in a thwarted London bomb plot in that same year. He is eligible for parole in 2014.

- Saad Khalid, a 23-year-old Toronto-area man, pled guilty on May 4 to one charge of intending to cause an explosion as part of the 2006 "Toronto 18" terrorism plot. On September 3, an Ontario judge imposed a 14-year sentence with seven years credit for time served, making him eligible for parole in 2011. Crown prosecutors originally asked for 18 to 20 years and on September 30 appealed the sentence, which was still pending at year's end.

- On May 22, Nishanthan Yogakrishnan, who was a minor when police arrested him, received a two and a half year prison sentence and three years of probation for his part in the "Toronto 18" plot. In light of time served, the judge released Yogakrishnan the day of the sentencing. He was the first person convicted under Canada's terrorism laws.

PX205

- On September 22, another "Toronto 18" plotter, Ali Mohamed Dirie, pled guilty to one count of participating in the activities of a terrorist group. Crown prosecutors and defense counsel agreed on a seven-year sentence. On October 2, a judge granted Dirie five years of credit for his pre-trial confinement.

- On September 28, Saad Gaya, 21, pled guilty to trying to cause an explosion for a terrorist group as part of the "Toronto 18" plot. Gaya faced a maximum 10 years in prison;

- On October 1, a Federal court judge in Quebec found Moroccan-born Said Namouh guilty of four terrorism charges, all related to disrupted plots to attack targets in Germany and Austria. At the November 13 sentencing hearing, the prosecution asked for a minimum of 10 years in custody before parole eligibility.

- On October 8, Zakaria Amara, whom prosecutors had described as one of the "Toronto 18" "ringleaders," pled guilty to two counts: knowingly participating in a terrorist group and intending to cause an explosion for the benefit of a terrorist group. As of December, the judge had yet to set Amara's sentencing date.

- On November 25, an Ontario court sentenced Justain Dillon to one year in jail for anonymously telephoning Toronto Police with threats to blow up a New Jersey shopping mall in November 2006. Dillon pled guilty to causing a hoax regarding terrorist activity following his April 2008 arrest.

Canadian political leaders in both the ruling Conservative Party and the official Opposition Liberal Party remained firm in their March 2008 decision to withdraw Canadian combat forces from Afghanistan by the end of 2011. Canada has maintained its military presence with a 2,800-person battle group in Kandahar province as part of the International Security Assistance Force's Regional Command South. Canada continued to provide a Provincial Reconstruction Team for stabilization and development efforts and maintained its role in brokering improved Afghan and Pakistani police and military cooperation to enhance their mutual capacities to secure the border from insurgent and terrorist crossings. At year's end, Canada had suffered the deaths of 139 soldiers, one diplomat, and two aid workers in Afghanistan. It had suffered the highest proportion of casualties-to-troops deployed of any NATO member in country.

**Chile**

Chilean law enforcement agencies investigated a series of small bomb attacks in Santiago. Officials believed that small groups of anarchists were responsible for more than 60 attacks since 2004, which have targeted government buildings, banks, and health clubs. The bombs were small and crudely built. Most of the attacks took place late at night and did not appear to be designed to kill people. On January 17, the government appointed a special prosecutor to investigate the attacks. On November 3, a small bomb exploded outside a Marriott hotel in the Las Condes neighborhood, injuring one person. A group called the Movimiento Dinamitero

Efrain Plaza Olmedo claimed responsibility for the bomb, but no arrests were made in this attack.

Chilean law enforcement agencies confronted sporadic low-level violence related to indigenous land disputes in the Araucania region. The Coordinadora Arauco Malleco (CAM), a group seeking recovery of former Mapuche indigenous lands, sometimes through radical means, claimed responsibility for an October 20 attack in which seven trucks were seized and burned. Several members of the CAM subsequently renounced their citizenship and declared war on the Chilean state. Police arrested approximately 30 CAM members during the year and some were charged under Chile's counterterrorism law. Critics challenged the use of the counterterrorism law, which was established by the Pinochet government and restricts the rights of alleged criminals.

Chilean officials continued to monitor the northern part of the country, particularly Iquique, for illicit activities, including terrorist financing and money laundering.

Chile participated in several U.S. training courses related to counterterrorism. Chilean law enforcement officials attended FBI training courses on post-blast investigations and fingerprint collections. Chile's national police, the Carabineros continued to participate in the FBI's South American Fingerprint Exchange initiative, a biometric exchange program wherein foreign governments provided and exchanged biometric information with the United States on violent criminal offenders. Four Chilean officials attended a U.S.-sponsored counterterrorism assistance course in Buenos Aires.

Chile's counterterrorist reaction force is the Grupo de Operaciones Policiales Especiales (GOPE), a 300-person unit of the Carabineros. The GOPE participates annually in Exercise Fuerzas Comando, a U.S. Special Operations Command South-sponsored special operations seminar designed to refine the tactics, techniques, and procedures used by counterterrorism forces. Chile's National Intelligence Agency is a strategic, analytical organization that advises the Government of Chile on a variety of threats, including terrorism.

**Colombia**

The Government of Colombia maintained its focus on defeating and demobilizing Colombia's terrorist groups through the government's "National Consolidation Plan," which combines military, intelligence, and police operations including counternarcotics, with efforts to demobilize combatants, and the provision of public services and alternative development programs in rural areas that have historically seen high levels of narcotics trafficking and violence. Efforts primarily targeted the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), along with operations against remaining elements of the demobilized United Self-Defense Forces of Colombia (AUC) – those few who never demobilized and those who rearmed – and newly emerging criminal organizations (BACRIM or bandas criminals in Spanish).

PX205

Colombia increased its international counterterrorism cooperation and training efforts. The threat of extradition to the United States remained a strong weapon against drug traffickers and terrorists. At year's end, Colombia extradited 186 defendants to the United States in 2009 for prosecution; most were Colombian nationals.

Colombia continued to expand its role as a regional leader in counterterrorism and provided training to several other countries, including on combating terrorist financing. The Colombian government sought enhanced regional counterterrorism cooperation to target terrorist safe havens in vulnerable border areas. Colombia and Mexico significantly increased joint training and operations against drug trafficking organizations operating in both countries.

The Colombian military's momentum against the FARC slowed somewhat in 2009. Unlike in 2008, the Colombian military did not kill or capture any of the FARC's Secretariat members. Fewer FARC members deserted in 2009 (2,058 as of December 10) than in 2008 (3,027).

However, Colombian security forces captured or killed a number of mid-level FARC leaders, continued to debrief deserters from the group for detailed information on their respective units, and reduced the amount of territory where terrorists could operate freely. The Colombian military and police also destroyed caches of weapons and supplies, and reduced the group's financial resources through counternarcotics and other security operations.

Despite the ongoing campaign against the FARC, the group continued a campaign of terrorist attacks, extortion, and kidnappings. The FARC continued narcotrafficking activities, bombed several military and civilian targets in urban areas, and targeted numerous rural outposts, police stations, infrastructure targets, and local political leaders in dozens of attacks.

- On January 14, the FARC attacked a police station in Narino using gas cylinders filled with explosives, killing four children and one adult.

- On January 27, the FARC bombed a Blockbuster video store in the heart of Bogota, killing two people.

- On February 4, the FARC killed 17 civilians in Barbacoas, Narino.

- On May 5, the FARC detonated a bomb in Valledupar, Cesar, near a police station, killing two and injuring 10 civilians.

- On May 20, the FARC bombed two electrical towers in Arauca, causing a blackout in three cities. Some 100,000 people were affected.

- On May 29, the FARC ambushed a Colombian army battalion in La Guajira, approximately two kilometers from the Venezuelan border, killing eight Colombian soldiers.

Page | 173

PX205

- On July 19, the FARC attacked a police station in Corinto, Cauca, killing two officers and injuring fifteen civilians.

- On August 25, a FARC bomb in San Vicente del Caguan, Meta, killed two and wounded 19 civilians in the middle of a crowded marketplace.

- On September 17, the FARC attacked a police checkpoint near the Buenaventura port in Valle del Cauca, injuring one civilian and two police officers.

- On November 20, the FARC stopped and burned a passenger bus in Barbacoas, Narino, killing four adults and two children.

- On December 21, the FARC kidnapped and subsequently killed the governor of Colombia's southern department of Caqueta.

The FARC continued a campaign of intimidation and violence against local leaders and communities. The Colombian Council Members' Federation reported that as of November 2009, 12 council members had been murdered, two had been kidnapped, and thousands had received threats. The FARC was also blamed for an August 19 attack that destroyed a U.S.-funded justice center in Cauca department. USAID had invested US$ 150,000 in the new justice house, which was designed to provide basic legal and social services to the community. In an August communiqué released in Narino department, the FARC announced it would treat all projects developed under Colombia's National Consolidation Plan (PNC) as legitimate military targets.

The ELN remained active with approximately 2,000 fighters but with diminished resources and reduced offensive capability. Still, the ELN continued to inflict casualties on the Colombian military through use of land mines and occasional attacks. It continued to fund its operations through narcotics trafficking. The ELN and FARC clashed over territory in northeastern and southern Colombia, although they cooperated in other areas. The ELN continued kidnapping and extortion.

The FARC and ELN in December issued a joint decree claiming the two groups planned to unite to fight the Colombian government. The communiqué claimed leaders of the two groups had met and forged an agreement to focus on cooperating to defeat the government and end U.S. influence in Colombia. Colombian Armed Forces Commander Freddy Padilla dismissed the announcement, pointing out that the two groups' longstanding ideological differences and ongoing confrontations over drug trafficking made such an alliance unlikely to succeed. Previous efforts to unify the two groups have failed.

The AUC formally remained inactive as the Colombian government continued to process and investigate demobilized AUC members under the Justice and Peace Law (JPL), which offers judicial benefits and reduced prison sentences for qualified demobilizing terrorists. The law requires all participants to confess fully to their crimes as members of a terrorist group and to return all illicit profits. More than 32,000 rank-and-file ex-AUC members who did not commit serious crimes have demobilized, and many were receiving benefits through the government's

PX205

reintegration program, including psychosocial attention, education, healthcare, and career development opportunities. More than 280,000 victims have registered under the JPL through December 2009, although Colombian government efforts to create measures to provide reparations to victims have not been as effective as hoped. Some former paramilitaries continued to engage in criminal activities after demobilization, mostly in drug trafficking.

Colombia kept up its close cooperation with the United States to block terrorists' assets. Financial institutions closed drug trafficking and terrorism-related accounts on Colombian government orders or in response to designation by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC). Aerial and manual eradication of illicit drugs in Colombia, which is key to targeting terrorist group finances, destroyed about 153,000 hectares of illegal drug crops as of December 7, thus depriving terrorist groups of potentially huge profits. OFAC carried out several designation actions against the financial assets and networks of narcotics traffickers and narcoterrorists. The FARC was first designated a Foreign Terrorist Organization in 1997 and OFAC has frozen assets of the FARC or its members when identified, pursuant to Executive Order 12978 and the Foreign Narcotics Kingpin Designation Act. The OFAC sanctions investigations targeted networks of money exchange businesses in Colombia that laundered narcotics proceeds for the FARC. In 2006, a Washington, D.C. grand jury indicted 50 leaders of the FARC on charges of importing more than US$25 billion worth of cocaine into the United States and other countries. The United States continued to support Colombia in its efforts to decrease the number of kidnappings and to support cyber security related investigations and forensics units.

On October 30, the United States and Colombian governments signed the Defense Cooperation Agreement (DCA). The DCA will facilitate effective bilateral cooperation on security matters in Colombia, including narcotics production and trafficking, terrorism, illicit smuggling of all types, and humanitarian and natural disasters. The DCA facilitates U.S. access for these purposes to three Colombian air force bases, located at Palanquero, Apiay, and Malambo. The agreement also permits access to two naval bases and two army installations, and other Colombian military facilities if mutually agreed. All these military installations are, and will remain, under Colombian control. Command and control, administration, and security will continue to be handled by the Colombian armed forces. All activities conducted at or from these Colombian bases by the United States will take place only with the express prior approval of the Colombian government. The presence of U.S. personnel at these facilities would be on an as needed, and as mutually agreed upon, basis.

**Dominican Republic**

The Dominican Republic continued to lack the ability to fully control its air, land, and sea borders but is making progress to do so. The Dominican Republic cooperated with U.S. law enforcement agencies under the Sovereign Skies agreement and negotiated a MOU for US$ 10 million to upgrade helicopters and train pilots for counternarcotics operations. In addition, in December 2009, the Dominicans received the first two Brazilian Super Tucano aircraft out of an order of eight that will be used to control its airspace. In another positive step, the Dominican Republic continued to work with the United States to create a nation-wide biometric database

PX205

base that incorporates and provides timely data from Dominican military, law enforcement, and judicial databases. Biometric equipment was maintained at the headquarters of the Dominican National Police and 16 other key locations, with another 20 sets to be installed. Positive steps were taken last year by the Dominican Republic to strengthen its legal regime and capabilities to combat terrorism.

The National Congress passed the General Counterterrorism Act, thereby creating the legislative framework that defines the behaviors that constitute acts of terrorism and other related acts.

Since the Dominican Republic is a strategic point for international trade and tourism, measures were implemented by the government in coordination with the United States to reinforce customs controls to prevent terrorist organizations from acquiring weapons, weapons delivery systems, and the technologies to manufacture them from persons and institutions located in the country.

The Dominican Republic, in coordination with the United States and other international agencies, organized and/or participated in efforts to strengthen training and international cooperation to combat terrorism. The Dominican Republic hosted a ministerial conference in February that engaged various entities of the UN Office on Drugs and Crime (UNODC) in dealing with issues related to illicit drugs, organized crime, and terrorism. This conference concluded with the adoption of the Political Declaration on Combating Illicit Drug Trafficking, Organized Crime and Other Serious Crimes in the Caribbean. The Office of the Attorney General for the Dominican Republic sponsored Specialized Training in the Prevention and Fight against Terrorism and Terrorist Financing. In November, law enforcement and high-level officials from the Dominican Republic took part in an UNODC Terrorism workshop in the Bahamas and examined trends and discussed the legal framework and mechanisms of international cooperation in the fight against terrorism. In March, the Dominican Republic's counterterrorism unit known as Secretaria de Las Fuerzas Armadas Commando Especial Contra Terrorismo was trained as part of U.S. Southern Command, Special Operations Command-South's Exercise Fused Response. Fused Response provided real world scenarios that tested the commandos' ability to perform counterterrorism type missions. In September, the Dominican Republic participated in a U.S.-sponsored military training exercise, PANAMAX. This particular exercise was designed by U.S. Southern Command to address teamwork and to strengthen the Country's ability to operate jointly against terrorism. As a means to improve border security, members of the specialized Border Security Force were trained by members of the U.S. Border Patrol.

While many land border, ports, and airline hubs remained permeable, the United States assisted the Dominican Republic on various initiatives to improve security, such as the Container Security Initiative. Port Caucedo was identified as a Megaport and its certification was part of the Customs Trade Partnership Against Terrorism Initiative.

**Ecuador**

PX205

Ecuador's greatest counterterrorism and security challenge remained the presence of Colombian narcotics, criminal, and terrorist groups in the extremely difficult terrain along the porous 450-mile border with Colombia. The lack of adequate employment opportunities for Ecuadorians and Colombian refugees also made the area vulnerable to narco-terrorist influence and created a contraband economy. To evade Colombian military operations, these groups, principally the Revolutionary Armed Forces of Colombia (FARC), regularly used Ecuadorian territory for recuperation, medical aid, weapons and explosives procurement, and coca processing. These activities involved Ecuadorian and Colombian refugees in northern Ecuador in direct or indirect ways. Some Ecuadorian officials along the border believed that the FARC's economic impact allowed it to buy silence and compliance among resident communities in the border area.

Ecuador responded to this threat, although it still faced resource constraints and limited capabilities. The Correa Administration, while still maintaining that the Colombian conflict was mainly Colombia's problem, stated that it opposed armed encroachments across its borders. Tensions between Ecuador and Colombia rose following the March 2008 Colombian bombing of a FARC camp in Ecuador, which killed the FARC's number two in command, Raul Reyes, plus 24 Colombians and one Ecuadorian associated with the FARC. However, in September, the two countries embarked on a rapprochement and, in November, assigned charges d'affaires. Although Ecuador-Colombia security mechanisms have been reactivated, the reestablishment of full diplomatic ties would be important to making further progress in disrupting and dismantling FARC-associated narcotics traffickers' operations in the region.

Ecuador's security forces continued their operations against FARC training and logistical resupply camps along the northern border. The Ecuadorian military continued to increase the number of troops in the north. The Ecuadorian government also increased its emphasis on protection of national sovereignty against illegal armed incursions and improved efforts to counter the perception that Ecuador was not shouldering its burden in fighting drug traffickers along its northern border.

While Ecuadorian security forces increased their presence, the pace of their operations remained roughly the same. The Ecuadorian military reported that it conducted four counternarcotics operations at the brigade level, 219 battalion-level operations, and 159 patrols that led to the destruction of nine cocaine laboratories, 253 FARC base camps, houses and resupply facilities; the eradication of one hectare of coca; and the confiscation of weapons, communications equipment, and other support equipment.

The Ecuadorian military's operations netted information on FARC activities and infrastructure both inside and outside of Ecuador, and resulted in the detention of more than 75 narcotics traffickers, the killing of three FARC members, and the wounding of seven others during the year. However, insufficient resources, corruption among members of the military and police, the challenging border region terrain, and a tense bilateral relationship with Colombia since the March 2008 raid made it difficult to thwart cross-border incursions.

Domestic terrorist groups present in Ecuador, although operationally inactive in the last few years, included the Popular Combatants Group, the Revolutionary Militia of the People, the

PX205

Marxist-Leninist Party of Ecuador, and the Alfarista Liberation Army.

The Ecuadorian government sought to strengthen controls over money laundering through the Financial Intelligence Unit (FIU), which it established under a 2005 Money Laundering Law. The FIU made some improvements in cooperating with the Anti-Narcotics Police Directorate, the Superintendent of Banks, the courts, and the private banker association to identify suspicious transactions and develop information for the prosecution of cases.  An important emphasis of the FIU was to monitor casinos for money laundering activities.  The National Police also set up an anti-money laundering unit to carry out investigations into financial crimes.

Ecuador has not criminalized terrorist financing, and the Financial Action Task Force and Financial Action Task Force of South America have encouraged the Ecuadorian government to adopt appropriate counterterrorism financing legislation and regulations.  Ecuador is not yet a member of the Egmont Group of Financial Intelligence units, as terrorist finance legislation is a requirement for Egmont membership.

Ecuador's judicial institutions remained weak, susceptible to corruption, and heavily backlogged with pending cases.  While the military and police made numerous arrests, the judicial system had a poor record of achieving convictions.

Ecuadorian immigration officials allowed almost all travelers to enter the country for 90 days without a visa, including travelers from countries of concern for terrorism, drug smuggling, and illegal immigration.  Ecuador's 2008 constitutional declaration of the rights of all to migrate eliminated the concept of illegal immigration in the country, and combined with the visa-free policy, removed effective screening to entry to the western hemisphere for travelers of all nationalities.  Consequently, official Ecuadorian immigration statistics showed dramatic increases – four-fold or higher – from 2007 to 2009 in the number of entries by travelers from state sponsors of terrorism.  Other U.S. government agencies have reported recently on active smuggling rings in Ecuador that focus on moving aliens who may raise terrorism concerns at ports of entry to the United States and Canada.

**El Salvador**

El Salvador hosts the U.S. government-funded International Law Enforcement Academy, which provided instruction on counterterrorism, transnational crime, alien trafficking, money laundering, and other topics of counterterrorism interest.  El Salvador also worked within the regional Central American Integration System to promote effective regional responses to transnational crime and other public security threats.

The Government of El Salvador was vigilant in its efforts to ensure that Salvadoran territory was not used for recruitment, training, or terrorist financing.

The principal Salvadoran counterterrorism entity, the National Civilian Police, worked in close cooperation with the Salvadoran Immigration Service, the Office of the Attorney General, and the Office of State Intelligence, and was well regarded by U.S. counterparts.  A 2006 statute

PX205

established strict criminal liability for engaging in terrorism, while other statutes outlawed money laundering and terrorist financing.

**Guatemala**

U.S. assistance supported Guatemala's anti-money laundering, anti-corruption, and border security efforts and Guatemala cooperated with the United States in investigating potential terrorism leads. The U.S. Department of Defense continued to train the Guatemalan military's counterterrorist unit. In addition to threats posed by transnational narcotics organizations, Guatemala was a major alien smuggling route from Central and South America, which made it a potential transit point for terrorists seeking to gain access to the United States. Corruption, an ineffective criminal justice system, and a lack of resources have limited Guatemala's ability to combat transnational crime, especially in remote parts of the country. Guatemala's borders are porous and lack adequate coverage by police or military personnel.

**Haiti**

The Financial Investigative Unit, within the Haitian National Police; and the Financial Intelligence Unit, within the Ministry of Justice, cooperated with the United States in anti-money laundering initiatives to improve the ability to detect funds acquired through criminal activity, including funds that could be acquired through terrorist networks. The Haitian government drafted counterterrorism legislation in 2008 but it was not enacted by Parliament in 2009. In addition, the country has accepted the terms of the International Convention for the Suppression of the Financing of Terrorism, but has not formally signed the Convention.

**Honduras**

The Honduran government continued to implement steps in accordance with its 2007 National Security Strategy, which included counterterrorism as an objective, and stressed regional and international cooperation. For example, in November, the Honduran Armed Forces (HOAF) and the Honduran National Police (HNP) took steps towards the creation of a Joint Interagency Task Force. This joint task force should improve inter-agency intelligence cooperation and should decrease illicit trafficking and minimize terrorist threats within the country.

Organized crime and illicit trafficking organizations and networks were strong and potentially ripe for exploitation by terrorists intent on entering and attacking the United States. While there was no conclusive evidence that terrorist groups worked with illicit trafficking organizations, the United States continued to assist the HOAF and HNP with their counterterrorism efforts in order to prevent terrorist groups from exploiting illicit trafficking networks. The Honduran military lacked sufficient resources, and the police and judiciary were spread thin, poorly trained, and susceptible to threats and corruption. In the first half of the year, before a coup d'etat took place, the United States continued to provide the HOAF and HNP with training, equipment, and base construction, which dramatically improved their ability to interdict illicit trafficking and protect the country against terrorist threats. In response to the June 28 coup, however, the U.S. government suspended all counterterrorism training pending restoration of the democratic,

Page | 179

PX205

constitutional order.

There were no known instances of terrorist organizations using Honduras's financial system to deposit or launder funds.  Prior to the coup, Honduran cooperation with the United States on combating terrorist financing was strong.  The Honduran Banking and Insurance Commission, instructed by the Ministry of Foreign Affairs, promptly sent freeze orders to the entire regulated financial sector every time the United States amended Executive Order lists.  Financial entities, particularly the commercial banks, undertook the requested searches for accounts by terrorist entities.  There were no amendments to the Executive Order lists after the coup that required notification of the Honduran government.

There was no indication of terrorist groups using illegal immigration networks.  Over the past five years, however, smuggling rings have been detected moving people from East Africa (in particular Somalia in 2009), the Middle East, and Southwest Asia to Honduras or through its territory.  Nationals of countries without Honduran visa requirements, especially Ecuador and Colombia, were involved in schemes to transit Honduras, often with the United States and Europe as their final destination.  Foreign nationals have successfully obtained valid Honduran identity cards and passports under their own or false identities.

**Jamaica**

The United States and Jamaica cooperated on a variety of counterterrorism-related areas, including the Container Security Initiative; the provision of equipment and training to the Jamaica Defense Force and Constabulary Force; and law enforcement intelligence sharing.  In 2007, following his imprisonment in the United Kingdom for inciting murder and for fomenting terrorism and racial hatred, British authorities deported the radical Jamaican-born cleric Sheik Abdullah El-Faisal back to Jamaica.  Jamaican and U.S. authorities remained concerned about El-Faisal's plans, intentions, and influence.  At year's end, El-Faisal was detained in Kenya pending deportation to Jamaica.  Kenyan officials arrested El-Faisal for violating his visa terms by preaching in Kenyan mosques.

Jamaica's entry/exit computer system, controlled by the Passport, Immigration, and Citizenship Agency, had no more storage capacity and thus could only recall two years of entry/exit records; an inability to track inbound and outbound persons beyond those two years remained a vulnerability.  Jamaican Customs' ability to target inbound/outbound/ transiting containers was limited to a paper-based system. All paper files that document entry and exit prior to 2004 were lost in a warehouse fire.

**Mexico**

The Mexican government remained highly committed to the fight against organized crime and remained vigilant against domestic and international terrorist threats.  No known international terrorist organizations had an operational presence in Mexico and no terrorist incidents targeting U.S. interests and personnel occurred on or originated from Mexican territory.  Mexico

PX205

continued to confront well-armed, organized crime elements in several regions of the country and traditional hot spots for narcotics trafficking saw record levels of violence.

Although incidents of domestic terrorism did not increase over the past year, Mexico received threats from a previously active group and witnessed the emergence of a new element. El Ejercito Popular Revolucionario (EPR) dissolved talks with the government in April and threatened to reemploy violent measures to force a response to its demands for a government investigation into the disappearance of two of its members. In 2009, no acts of terrorism were attributed to the EPR. From May to August, the Animal Liberation Front claimed responsibility for attacking banks and commercial sites throughout Mexico City, using propane tank bombs. Three bombs were discovered unexploded, while another three caused property damage but no casualties.

Levels of organized crime and narcotics-related violence rose significantly in places along the U.S. border and in marijuana cultivation regions. Cartels increasingly used military-style terrorist tactics to attack security forces. There was no evidence of ties between Mexican organized crime syndicates and domestic or international terrorist groups. The violence attributed to organized crime groups on the border, however, continued to strain Mexico's law enforcement capacities, creating potential vulnerabilities that terrorists seeking access to the United States could exploit.

There was no indication that terrorist organizations used Mexico as a conduit for illicit activities. Nevertheless, Mexico's nascent capacity to counter money laundering suggested a potential vulnerability. The Mexican Attorney General's Organized Crime Division's money laundering unit investigated and prosecuted money laundering crimes in Mexico with mixed results. The majority of its investigations were linked to organized crime and drug proceeds. In order to combat the illegal movement of funds, Mexican financial institutions followed international standards advocated by the Financial Action Task Force Recommendations. These institutions also terminated the accounts of individuals and entities identified on international country lists such as the Office of Foreign Asset Control Specially Designated National and Blocked Persons List. Furthermore, Mexican financial institutions follow the Law of Credit Institutions, as ordered by the Mexican Treasury and supervised by the National Bank and Securities Commission. This law requires banks to consult international and country lists of individuals involved in terrorism or other illicit activities and submit a "suspicious activities report" within 24 hours to the Mexican Department of Treasury's Financial Intelligence Unit on the activities of any individual on that list.

Mexico stepped up efforts to improve interagency coordination as part of its campaign to combat crime and prevent terrorism. It has created a national database designed to promote greater information exchange and overall interoperability across Mexico's disparate police entities. Tactical Intelligence Operations Units brought together all federal agencies in a state to coordinate intelligence and operations. The United States directly supported programs to help both the Secretariat for Public Security and the Attorney General's Office train federal investigators and facilitate greater operational coordination and effectiveness.

PX205

The United States and Mexico worked together to address a number of challenges in connection with Mexico's southern and northern borders.  The United States deployed two teams to Mexico's southern border to conduct assessments.  Its border with Guatemala and Belize remained very porous and could serve as a potential terrorist transit point.  The United States worked with Mexico to address resource requirements and offered some best practices applied at other ports of entry.  The two countries agreed to coordinate actions at the northern border ports of entry in order to obstruct the flow of illegal arms and currency.  The United States supported the establishment of the Mexico Targeting Center, modeled after the CBP National Targeting Center-Cargo, which should strengthen Mexico's ability to target suspicious or illicit cargo.  The Advance Passenger Information System (APIS) supported targeting efforts, increased information sharing, and enhanced intelligence capabilities in connection with efforts to identify aliens who may raise terrorism concerns at ports of entry.  The United States and Mexico also commenced the Joint Security Program for Travelers, a pilot program that promotes exchanges of immigration officials as part of an effort to streamline the APIS referral process and seeks to identify and track suspected terrorists, fugitives, or smugglers.

In June 2008, President Calderon signed into law a number of security and justice reforms.  The security reforms granted police greater investigative authorities and facilitated the ability of law enforcement officials to seize the assets of individuals implicated in criminal activity.  The justice reforms effected constitutional changes that provide for a presumption of innocence in criminal and civil prosecutions and allow for evidence-based trials promoting greater transparency and more confidence in the judicial system.  Although these measures were primarily aimed at organized crime groups, the legislation also supports investigations against domestic or international terrorists.  The government has eight years to implement the justice reform legislation. At year's end implementation had been slow and uneven.

The United States and Mexico worked closely to implement a strong Anti-Terrorism Assistance (ATA) program; ATA programs provided training for 300 Mexican security officials in 18 courses on matters ranging from VIP protection to digital security and forensics.

**Nicaragua**

Nicaragua made no substantive progress towards establishing a Financial Intelligence Unit or passing the counterterrorism bill first proposed in 2004.  Nicaragua's judiciary remained highly politicized, corrupt, and prone to manipulation by political elites and organized crime and therefore remained a vulnerability that could be exploited by international terrorist groups. President Daniel Ortega's 2007 decision to grant Iranian and Libyan nationals visa-free entry into Nicaragua remained in effect.

President Ortega maintained close relations with the Revolutionary Armed Forces of Colombia (FARC).  He also continued to provide safe haven to Doris Torres Bohórquez and Martha Perez Gutiérrez, two suspected FARC associates and survivors of the March 2008 Colombian military operation against the FARC.  Both were granted asylum in Nicaragua and welcomed by President Ortega as survivors of "state-sponsored terrorism by Colombia."  On October 12, Nicaragua refused Ecuador's request to extradite Torres and Perez on the grounds that doing so

Page | 182

PX205

would violate their human rights.  Senior FARC official Nubia Calderon de Trujillo continued to have humanitarian asylum in Nicaragua.[18]

There was no new information in the case of Alberto Bermudez (aka Rene Alberto Gutierrez Pastran, or "Cojo"), the FARC emissary granted a false Nicaraguan identity by Nicaragua's Supreme Electoral Council (CSE).  However, in December, local media reported that the CSE provided official Nicaraguan identity documents for false identities to several suspected drug traffickers, including Amauri Paul (alias Alberto Ruiz Cano), a Colombian criminal who was involved in an attack against Nicaraguan counter-narcotics forces that killed two Nicaraguan Navy personnel.

No known terrorist groups operated openly in Nicaragua; however, both the FARC and the ETA (Basque Fatherland and Liberty) have retired or inactive members residing in Nicaragua.

 During 2009, the U.S. Embassy had increasing difficulty obtaining information from or access to civilian officials of the government.  In one instance, the government failed to comply with a routine evidence transfer request related to an arms-for-drugs case involving the FARC.  Despite this, there were several U.S.-Nicaragua military-to-military counterterrorism-related exchanges during the year.

**Panama**

The presence of the Revolutionary Armed Forces of Colombia (FARC) in Panama's remote Darien Region and potential actions against the Panama Canal remained the main terrorist concerns in Panama.  The Government of Panama continued to work with the United States in both areas.

A small, stable number of FARC 57th front members operated in Panama's Darien Province, using the area as a safe haven and drug trafficking base.  Darien's dense jungle, sparse population, and lack of significant infrastructure have historically limited the government's presence.  As the FARC's drug trafficking in the Darien province increasingly moved inland, new transit routes and logistical supply lines required greater interaction with the local populace, who were often coerced or paid to help.  The FARC 57th front was involved in the April 2008 kidnapping of a U.S.-Cuban citizen near Panama City who was held until his release in February 2009.  Subsequently, in April, several members of the FARC's 57th front were charged in New York with conspiring to take a U.S. citizen hostage.  The Government of Panama also turned over several FARC members to the United States for prosecution in 2009.

The United States and Panama continued to plan for incidents that could potentially shut down transit through the Panama Canal, one of the most strategically and economically important structures in the world.  Panama co-hosted the annual PANAMAX exercise, a multinational

---

[18] In 2008, the U.S. Department of Treasury's Office of Foreign Asset Control designated Calderon de Trujillo, along with seven other FARC international representatives, as significant narco-traffickers under the Kingpin Act. During 2009, Calderon, Torres, and Perez did not appear publicly in Nicaragua.

PX205

security training exercise tailored to the defense of the canal.  The exercise replicated real world threats, and included specific exercises designed to counter terrorist attacks.  Considered the largest operational and foreign military exercise of its kind, the event included 30 ships, a dozen aircraft, and 4,500 personnel from 20 nations.  In addition, Panama continued to provide force protection for U.S. military vessels, including submarines, during "high value transits" of the canal.

Panama's Ministry of Government and Justice utilized classroom training, tabletop exercises, and field visits to improve overall counterterrorism coordination among the Panamanian National Police (PPF) agencies.  Additionally, several PPF counterterrorism units benefited from the fourth year of counterterrorism training funded by the U.S. Southern Command and provided by U.S. Navy Special Warfare South personnel.

Panama is an important regional financial center and has had one of the fastest growing economies in the Western Hemisphere over the past 15 years.  However, the factors that have contributed to Panama's economic growth and sophistication in the banking and commercial sectors – the large number of offshore banks and shell companies, the presence of the world's second-largest free trade zone, the growth in ports and maritime industries, and the use of the U.S. dollar as the official currency – also provide the infrastructure for significant money laundering activity.  While Panama took extensive measures to combat money laundering in the banking system, the Colon Free Trade Zone's (CFTZ) significant revenue turnover and cash-intensive transactions left the area vulnerable to money laundering and terrorist financing.[19]  In 2009, the CFTZ Authority developed and prepared to launch two projects designed to increase transparency and accountability in the zone: an automated transactions system to replace a manual system that limited effective reporting and analysis; and a compulsory money laundering/terrorist financing on-line training module, required for all companies operating in the zone.  The Government of Panama was fully cooperative in reviewing terrorist finance lists.

Panama continued to participate in the Container Security Initiative (CSI) at three ports: Balboa, Manzanillo, and the Evergreen Colon Container Terminal, which was installed in 2009.  Additionally, the Department of Energy's Megaports Radiation Portals, which specifically scan for nuclear and other radioactive materials, became functional at the ports of Manzanillo and Balboa, and construction was nearly completed at the ports of Colon and Cristobel.

**Paraguay**

Although Paraguay was generally cooperative on counterterrorism and law enforcement efforts, a politicized judicial system, corrupt police force, and the absence of counterterrorist financing legislation continued to hamper the country's counterterrorism efforts.  The Paraguayan People's

---

[19] Articles 287-291 of the Terrorism Financing Act No. 14 of May 2007, which entered into force in 2008 by amending Panama's Criminal Code, set forth provisions for combating terrorism.  The act classified terrorism and terrorist financing as independent offenses, with terrorist financing included as a predicate offense to money laundering.  Subsequently, in April of 2008 Executive Decree No. 52, referred to as the "New Banking Law," stated that banks and other supervised entities are obliged to establish policies, procedures, and controls on the prevention of money laundering, terrorist finance, and related crimes.

PX205

Army (EPP), a small, leftist guerilla group seeking to destabilize the Paraguayan government, kidnapped rancher Fidel Zavala on October 15 in Concepcion Department.  When two police officers discovered Zavala's vehicle the following day, a car bomb exploded, critically injuring both officers.  In April, unidentified individuals placed an improvised explosive device (IED) at the Supreme Court building.  Although the device exploded in the building's courtyard,  no injuries occurred.  After that incident, anonymous callers reported dozens of bomb threats throughout Asuncion.  In some cases, police located mock IEDs made to look real.  Some of the devices contained trace levels of explosives, others did not.  No further explosions or injuries took place.

On July 2, the Paraguayan Congress passed a law that granted the rank of Minister to the Secretariat for the Prevention of Money-Laundering (SEPRELAD) director, who now reports directly to President Fernando Lugo.  The new law extends the range of financial institutions under SEPRELAD's surveillance and provides the tools to investigate institutions suspected of financing terrorism.  In August, the Egmont Group lifted sanctions against Paraguay following the new SEPRELAD bill.  Separately, on July 20, Paraguay implemented amendments to its current anti-money laundering regulations as part of a revised penal code.  A draft counterterrorist finance bill and a draft criminal procedure code were pending in Congress at year's end.

Paraguay did not exercise effective immigration or customs controls at its porous borders.  Efforts to address illicit activity occurring in the Tri-border Area with Argentina and Brazil were uneven due to a lack of resources and, more principally, corruption within customs, the police, the public ministry, and the judicial sector.

Phase I of the Millennium Challenge Corporation's Threshold Program, largely focused on anti-corruption, enabled Paraguay to issue updated national identity documents and passports beginning on September 21.  While the new documents exceeded the standards established by the International Civil Aviation Organization, and included fingerprints, machine readable text, and other anti-counterfeiting security measures; fraud involving purchase of the new documents continued.  Phase II of the Threshold Program includes assistance to both Paraguayan customs and the National Police.  Other U.S. government assistance included FBI training on money-laundering and terrorist financing in September for 35 members of the public ministry, judiciary, SEPRELAD, police, military, and customs.

**Peru**

Peru's primary counterterrorism concern remained fighting remnants of Sendero Luminoso (Shining Path or SL), a designated Foreign Terrorist Organization that wreaked havoc on the country in the 1980s and 1990s at a cost of more than 69,000 lives.  SL elements in the Upper Huallaga River Valley (UHV) sought to regroup and replenish their ranks following significant setbacks in 2007 and 2008.  Separately, the rival SL organization in the Apurimac and Ene River Valley (VRAE) maintained its influence in that area.  Both factions continued to engage in drug trafficking, and in 2009 carried out more than 100 terrorist acts that killed at least three police officers and 26 civilians.

PX205

Although Peru nearly eliminated SL in the 1990s, the organization, now entwined with narcotics trafficking, remained a threat.  The two SL organizations combined are believed to have several hundred armed members.  While SL possessed less revolutionary zeal than in the past, analysts believed that leaders continued to use Maoist philosophy to justify their illicit activities.  Involvement in drug production and trafficking provided SL with funding to conduct operations, improve relations with local communities in remote areas, and to recruit new members.  While SL in the UHV worked to recuperate from losses suffered in 2007 and 2008, insufficient government presence in the more remote VRAE allowed the organization there to continue operating.

- On August 1, about 40 SL terrorists attacked a police station in San Jose de Secce, outside the VRAE in the highlands of Ayacucho, killing three police officers and two civilians.  Official reports indicated a highly coordinated attack with explosives and military grade weaponry.

- On September 2, SL forces downed a Peruvian air force MI-17 helicopter near the town of Sinaycocha in Junin department, killing the pilot, co-pilot, and one crewman.

The Army's 2008 offensive in the Vizcatan region, called "Operation Excellence 777," continued haltingly with the military maintaining a number of small provisional bases established in the area.  Confrontations generally consisted of SL members attacking Peruvian patrols or incoming supply helicopters, but in several cases the SL attacked a military base.  Several of the significant attacks perpetrated by the VRAE faction occurred in highland areas outside of the VRAE.  Some analysts believed the attacks marked SL's attempts at expansion, while others said they were strictly aimed at protecting the group's stronghold in the VRAE and controlling drug routes.

Implementation of the government's Plan VRAE, which called for 2,000 troops and 19 counterterrorism bases under a central command, was still evolving.  In August, the Garcia administration named Fernan Valer as the civilian head of Plan VRAE.  Plans for new health, education, and infrastructure investment in these isolated communities were not fully implemented, but authorities made some improvements to roadways and rural electrification.

Government efforts to improve interagency cooperation, especially in intelligence, and to strengthen prosecutorial capacity were somewhat successful.  Police units specializing in counterterrorism and counternarcotics conducted some joint operations with the Peruvian Army in the UHV where police captured one high-ranking SL terrorist.

President Garcia continued reauthorizing a 60-day state of emergency in parts of four departments where SL operated, suspending some civil liberties, and giving the armed forces additional authority to maintain public order.  There was no movement on President Garcia's 2006 proposal calling for the death penalty for those convicted of acts of terrorism, but, in October, Congress passed a law removing parole and other benefits for convicted terrorists.

PX205

SL founder and leader Abimael Guzman and key accomplices remained in prison serving life sentences on charges stemming from crimes committed during the 1980s and 1990s.  In September, Guzman's attorney published a book of Guzman's handwritten manuscripts as compiled by Guzman's common-law wife, Elena Iparraguirre, who is also incarcerated for terrorism charges.

The Revolutionary Armed Forces of Colombia (FARC) continued to use remote areas along the Colombian-Peruvian border to regroup and make arms purchases.  Experts believed the FARC continued to fund coca cultivation and cocaine production among the Peruvian population in border areas.

The Tupac Amaru Revolutionary Movement (MRTA) has not conducted terrorist activities since the 1996 hostage taking at the Japanese Ambassador's residence in Lima.  Efforts to reconstitute an organizational structure were not in evidence in 2009, though former MRTA members established a political party called the Free Fatherland Party and sought alliances with other political parties.

**Suriname**

Suriname's lead agency for counterterrorism is the Central Intelligence and Security Agency. The Ministry of Justice and Police has a police Counterterrorist Unit and a 50-person "Arrest Team."  At the end of 2007, the Council of Ministers approved a new draft counterterrorism law that defined terrorism as a crime, and provided a framework for more effectively combating terrorism and the financing of terrorism.  This draft legislation was approved by the State Council and the President in 2008, and was presented to the National Assembly for discussion. As of 2009, the legislation has not been passed.  However, if the legislation is passed, it should bring Surinamese law in line with various international treaties dealing with terrorism and could help pave the way for Surinamese membership in the Egmont Group.  A draft criminal procedure law was approved by the Council of Ministers in February 2008, which provides the implementing legislation for the new counterterrorism law, as well as special investigative tools to assist law enforcement authorities in detecting and investigating terrorist activities.

In an effort to enhance its border security capabilities, as well as hamper potential terrorist transit, Suriname began issuing Caribbean Community-compliant machine-readable passports in 2004.  The United States provided watch lists of known terrorists to Surinamese police, but if any terrorists were present, the likelihood of apprehending them would be low because of the lack of border and immigration control, and because Suriname has no digitized system for registering and monitoring visitors.  According to police sources, the Revolutionary Armed Forces of Colombia (FARC) has conducted arms-for-drugs operations with criminal organizations in Suriname.

**Trinidad and Tobago**

In September, Trinidad and Tobago acceded to the International Convention for the Suppression of the Financing of Terrorism.  In a statement, the Ministry of Foreign Affairs said accession

PX205

obligated the country to take measures to criminalize the funding of terrorist activities and to identify, detect, seize, or freeze funds used or allocated for terrorist purposes. The government further stated that it was obligated under the convention to prosecute or extradite individuals suspected of unlawful involvement in the financing of terrorism and to cooperate with other states that are parties in the investigation.

In October, Trinidad and Tobago enacted two pieces of legislation and a set of rules that strengthened the government's ability to combat, deter, and prosecute organized criminal activity, money laundering, and terrorist financing. The laws and regulations established a financial intelligence unit, provided greater authority for the government to pursue the proceeds of crime, and enhanced banking regulations to detect suspicious transactions.

Also in October, the United States provided a report to Trinidad and Tobago that assessed vulnerabilities and recommended improvements to the country's infrastructure critical to liquefied natural gas (LNG) exports. Trinidad and Tobago remained the largest supplier of LNG to the United States, and the assessment was conducted in 2008 by U.S. government experts under the umbrella of the Inter-American Committee Against Terrorism of the Organization of American States. Canada also collaborated in the report, which was referred to the Office of Disaster Preparedness Management for action.

Trinidad and Tobago purchased three 90-meter offshore patrol vessels for delivery over the coming few years. These vessels, along with the expected delivery of helicopters and other patrol vessels, should improve the country's border security and its capacity to engage in regional security efforts.

Trinidad and Tobago hosted two major international events in its capital Port of Spain, each of which included dozens of world leaders and government ministers. The Summit of the Americas was held in April and involved more than 30 leaders of countries from the Western Hemisphere. The Commonwealth Heads of Government Meeting was held in November with more than 50 national leaders. The Government of Trinidad and Tobago cooperated with security and counterterrorism units from a variety of nations and regional organizations to provide security for the events, which occurred without incident.

**Uruguay**

Uruguay was a willing partner of the United States in counterterrorism efforts and improved its ability to fight international crime through legislation, better protection of its borders, and military training. The Government of Uruguay focused its efforts to promote global security through collective action within multinational organizations such as the U.N. and Organization of American States (OAS). Uruguay is a member of the MERCOSUR Permanent Working Group on terrorism, together with Argentina, Brazil, Chile, Paraguay, and Bolivia. The group facilitates cooperation and information sharing. Uruguay has also been active in a range of international counterterrorism efforts, particularly in the Rio Group and the OAS.

PX205

A new money laundering law passed in 2009 further defined money laundering, including as it relates to terrorist financing.

Uruguay's level of cooperation and intelligence sharing on counterterrorism-related issues improved. The political leadership in the Ministries of Defense and Interior increasingly saw terrorism as a significant issue for Uruguay, and working level officers in law enforcement and security services recognized the importance of conducting pro-active investigations and intelligence sharing with the U.S. government and other Latin American countries.

**Venezuela**

In May, the United States re-certified Venezuela as "not cooperating fully" with U.S. counterterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Pursuant to this certification, defense articles and services may not be sold or licensed for export to Venezuela from October 1, 2009 to September 30, 2010. This certification will lapse unless it is renewed by the Secretary of State by May 15, 2010.

President Hugo Chavez persisted in his public criticism of U.S. counterterrorism efforts. In October, he called the United States "the first state sponsor of terrorism" and has repeatedly referred to the United States as a "terrorist nation." Since Colombia and the United States signed a Defense Cooperation Agreement, Venezuela's cooperation with the United States on counterterrorism has been reduced to an absolute minimum. President Chavez continued to strengthen Venezuela's relationship with state sponsor of terrorism Iran. Iran and Venezuela continued weekly Iran Airlines flights connecting Tehran and Damascus with Caracas.

It remained unclear to what extent the Venezuelan government provided support to Colombian groups such as the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN). The FARC and ELN reportedly regularly crossed into Venezuelan territory to rest and regroup as well as to extort protection money and kidnap Venezuelans to finance their operations. Colombia on various occasions has accused the Venezuelan Government of harboring and aiding top FARC leaders in Venezuelan territory.

Some weapons and ammunition from official Venezuelan stocks and facilities have turned up in the hands of these groups. In July, Colombia announced that it had recovered five Swedish AT-4 anti-tank missiles from the FARC that were originally sold to Venezuela. Chavez called the Colombian report "a dirty lie." When Sweden confirmed the 1988 sale of the weapons, Venezuela then claimed the weapons had been stolen by the FARC from a Venezuelan base in 1995. When local journalists showed 1995 news reports that said the rival ELN had carried out the attack, the government claimed the ELN had sold the weapons to their rivals.

In mid-December, local newspapers cited the report of the Ecuadorian "Transparency and Truth Commission on the Angostura Case" that claimed that FARC Secretariat member Iván Márquez has offices in Caracas, where he directs the agenda of the FARC-linked organization, the Continental Bolivarian Coordinator.

Page | 189

PX205

On December 4, President Chavez promoted Hugo Carvajal Barrios and Henry de Jesus Rangel Silva to the rank of Venezuelan Major General, a three-star equivalent.  Both Carvajal and Rangel had been designated Drug Kingpins by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) in 2008 for materially assisting the narcotics trafficking activities of the FARC.  Carvajal remained in his position as head of the Directorate of Military Intelligence.  Rangel Silva was named Commander of the Guayana Strategic Military Region in August.

There was some limited counterterrorism cooperation between Colombia and Venezuela, however.  On April 23, Zulia State police arrested Yainer Esneider Acosta Peña, alleged to be the second in command of the FARC 45th Front.  Local authorities transferred Acosta to the Colombian border where he was handed over to face charges of rebellion and terrorism.

Venezuela served as a safe haven for at least one alleged terrorist from a non-Colombian group. On August 5, the Venezuelan Supreme Court denied Spain's extradition request of suspected ETA member Ignacio Echevarria Landazabal.  In April 2008, Echevarria was arrested in Valencia, Venezuela, based on an INTERPOL warrant and was subsequently released.

Self-proclaimed Islamic extremists José Miguel Rojas Espinoza and Teodoro Rafael Darnott remained in prison after being sentenced to 10 years each in 2008 for placing a pair of pipe bombs outside the American Embassy in 2006.

Venezuelan citizenship, identity, and travel documents remained easy to obtain through fraudulent means; thereby making these documents a potentially viable way for terrorists to travel internationally.  International authorities remained suspicious of the integrity of the Venezuelan document issuance process.

PX205

## Chapter 3
## State Sponsors of Terrorism

State sponsors of terrorism provide critical support to many non-state terrorist groups.  Without state sponsors, these groups would have greater difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations.  The United States will continue to insist that these countries end the support they give to terrorist groups.

**State Sponsor: Implications**

The designation of countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism carries with it four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2.  Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3.  Prohibitions on economic assistance.

4.  Imposition of miscellaneous financial and other restrictions, including:

- Requiring the United States to oppose loans by the World Bank and other international financial institutions;
- Exception from the jurisdictional immunity in U.S. courts of state sponsor countries, and all former state sponsor countries (with the exception of Iraq), with respect to claims for money damages for personal injury or death caused by certain acts of terrorism, torture, or extrajudicial killing, or the provision of material support or resources for such acts;
- Denial to companies and individuals tax credits for income earned in terrorist-list countries;
- Denial of duty-free treatment of goods exported to the United States;
- Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
- Prohibition of Defense Department contracts above US$ 100,000 with companies in which a state sponsor government owns or controls a significant interest.

## Designated State Sponsors of Terrorism

### CUBA

The Cuban government and official media publicly condemned acts of terrorism by al-Qa'ida and affiliates, while at the same time remaining critical of the U.S. approach to combating international terrorism.  Although Cuba no longer supports armed struggle in Latin America and

PX205

other parts of the world, the Government of Cuba continued to provide physical safe haven and ideological support to members of three terrorist organizations that are designated as Foreign Terrorist Organizations by the United States.

The Government of Cuba has long assisted members of the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army of Colombia (ELN), and Spain's Basque Homeland and Freedom Organization (ETA), some having arrived in Cuba in connection with peace negotiations with the governments of Colombia and Spain.  There was no evidence of direct financial support for terrorist organizations by Cuba in 2009, though it continued to provide safe haven to members of the FARC, ELN, and ETA, providing them with living, logistical, and medical support.

Cuba cooperated with the United States on a limited number of law enforcement matters. However, the Cuban government continued to permit U.S. fugitives to live legally in Cuba. These U.S. fugitives include convicted murderers as well as numerous hijackers.  Cuba permitted one such fugitive, hijacker Luis Armando Peña Soltren, to voluntarily depart Cuba; Peña Soltren was arrested upon his arrival in the United States in October.

Cuba's Immigration Department refurbished the passenger inspection area at Jose Marti International Airport and provided new software and biometric readers to its Border Guards.

**IRAN**

Iran remained the most active state sponsor of terrorism.  Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf and undermined the growth of democracy.

Iran remained the principal supporter of groups that are implacably opposed to the Middle East Peace Process. The Qods Force, the external operations branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad.   Iran provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).  Iran has provided hundreds of millions of dollars in support to Lebanese Hizballah and has trained thousands of Hizballah fighters at camps in Iran.  Since the end of the 2006 Israeli-Hizballah conflict, Iran has assisted Hizballah in rearming, in violation of UN Security Council Resolution 1701.

Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons.  Since at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives.

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups

PX205

that targeted U.S. and Iraqi forces.  The Qods Force continued to supply Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces, as well as civilians.  Iran was responsible for the increased lethality of some attacks on U.S. forces by providing militants with the capability to assemble explosively formed penetrators that were designed to defeat armored vehicles.  The Qods Force, in concert with Lebanese Hizballah, provided training outside of Iraq and advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members it continued to detain, and refused to publicly identify those senior members in its custody.  Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for trial; it is reportedly holding Usama bin Ladin's family members under house arrest.

Senior IRGC, IRGC Qods Force, and Iranian government officials were indicted by the Government of Argentina for their alleged roles in the 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA); according to the Argentine State Prosecutor's report, the attack was initially proposed by the Qods Force.  In 2007, INTERPOL issued a "red notice" for six individuals wanted in connection to the bombing.  One of the individuals, Ahmad Vahidi, was named as Iran's Defense Minister in August 2009.

**SUDAN**

The Sudanese government continued to pursue counterterrorism operations directly involving threats to U.S. interests and personnel in Sudan.  Sudanese officials have indicated that they view their continued cooperation with the U.S. government as important and recognize the potential benefits of U.S. training and information-sharing.  While the bilateral counterterrorism relationship remains solid, hard-line Sudanese officials continued to express resentment and distrust over actions by the United States and questioned the benefits of continued counterterrorism cooperation.  Their assessment reflected disappointment that Sudan's cooperation has not resulted in its removal from the list of State Sponsors of Terrorism.  Despite this, there was no indication that the Sudanese government will curtail its current level of counterterrorism cooperation despite bumps in the overall bilateral relationship.

Al-Qa'ida-inspired terrorist elements as well as elements of the Palestinian Islamic Jihad, and HAMAS, remained in Sudan in 2009.  In the early hours of January 1, 2008, attackers in Khartoum sympathetic to al-Qa'ida, calling themselves al-Qa'ida in the Land Between the Two Niles, shot and fatally wounded two U.S. Embassy staff members -- one American and one Sudanese employee, both of whom worked for the U.S. Agency for International Development. Sudanese authorities cooperated closely with agencies of the U.S. government in the investigation.  The five alleged conspirators were arrested in February 2008 and put on trial for murder on August 31, 2008.  On June 24, 2009 four men were sentenced to death by hanging for the killings.  A fifth man received a two-year prison term for providing the weapons used in the attack.  At least three other men allegedly involved in planning the attack were detained but have

PX205

not been charged.

With the exception of HAMAS, whose members the Sudanese government considers "freedom fighters," the government does not openly support the presence of extremist elements in this country.  For example, Sudanese officials have welcomed HAMAS members as representatives of the Palestinian Authority, but have limited their activities to fundraising.  The Sudanese government has also worked hard to disrupt foreign fighters from using Sudan as a logistics base and transit point for terrorists going to Iraq.  However, gaps remain in the Sudanese government's knowledge of these individuals and its ability to identify and capture them.  There was some evidence to suggest that individuals who were active participants in the Iraqi insurgency have returned to Sudan and are in a position to use their expertise to conduct attacks within Sudan or to pass on their knowledge to local Sudanese extremists.  There was also evidence that Sudanese extremists participated in terrorist activities in Somalia.

The Lord's Resistance Army (LRA) led by Joseph Kony continued to operate in southern Sudan. Following Kony's repeated failure to sign a draft of the Final Peace Agreement, on December 14, 2008, the Ugandan People's Defense Force (UPDF), with cooperation from the Government of Southern Sudan and the Democratic Republic of Congo (DRC), launched Operation Lighting Thunder, attacking LRA bases along the border of Southern Sudan and the DRC.  This operation destroyed the main LRA base camp and forcing LRA members to relocate elsewhere in the DRC, Southern Sudan, and the Central African Republic.  The UPDF started withdrawing from the operation in mid-March, handing control over operations in DRC to the Armed Forces of the DRC.  The operation was declared a success and was said to have significantly weakened the LRA's command structure.  However, the official objectives -- to make Kony sign the Final Peace Agreement, or to destroy the LRA -- were only partially achieved, and it is unclear how much the LRA's central command has been hurt.  Few senior LRA figures were captured and Kony's whereabouts were unknown at year's end.  The UPDF continued to pursue the LRA in Central African Republic, and in southern Sudan, it received assistance from the Sudan Peoples Liberation Army.  There was no reliable information to corroborate long-standing allegations that the Government of Sudan was supporting the LRA in 2009.

**SYRIA**

Syria is a signatory to nine of the 13 international conventions and protocols relating to terrorism.  While Syrian officials have publicly condemned international terrorism, they continue to insist there is a distinction between terrorist attacks and attacks undertaken by "national liberation movements" engaged in legitimate armed resistance, including Palestinian groups, Lebanese Hizballah, and members of the Iraqi opposition.  The United States does not agree with this characterization and has designated a number of these groups as Foreign Terrorist Organizations.  During the reporting period, the United States raised concerns about Syria's support of these groups directly with the Syrian government.

Designated in 1979 as a State Sponsor of Terrorism, Syria continued to provide safe-haven as well as political and other support to a number of designated Palestinian terrorist groups, including  HAMAS, Palestinian Islamic Jihad (PIJ), and the Popular Front for the Liberation of

PX205

Palestine-General Command (PFLP-GC). Several of these terrorist groups have claimed responsibility for terrorist acts in the past, but none over the past year.  The operational leadership of many of these groups is headquartered or sheltered in Damascus, including Khaled Meshaal of HAMAS, Ramadan Shallah of PIJ, and Ahmed Jibril of PFLP-GC.  The Syrian government provided Meshaal with security escorts for his motorcades and allowed him to travel freely around Damascus, attending numerous public events such as national day celebrations for Arab states.  Though the Syrian government claimed periodically that it used its influence to restrain the activities of Palestinian groups, it allowed conferences organized by HAMAS to take place over the course of the year.  In addition, the Syrian government has made no attempt to restrict the operation, travel, or movement of these groups' leaders or members.  Syria allows terrorist groups resident in its territory to receive and ship goods, including weapons, in and out of the country.

Additionally, the Syrian government provided diplomatic, political and material support to Hizballah in Lebanon and allowed Iran to supply this organization with weapons.  Weapons flow from Iran through Syria, and directly from Syria, to Hizballah despite UN Security Council resolution 1701 of 2006, which imposes an arms embargo on Lebanon except with the consent of the Lebanese government.  Indeed, Hizballah claims to have a larger arsenal today than it did in 2006.  Underscoring links between the Syrian government and Hizballah, Israeli naval commandos intercepted a large cache of arms on November 3 on its way from Iran to Hizballah by way of the Syrian port of Latakia.  The arms shipment, which was found amidst civilian cargo on the Antiguan-flagged ship MV Francop, weighed over 500 tons.  While the Syrian government denied involvement in the shipment, Israeli officials stressed that the incident illustrates Syria's continued efforts to fight a proxy war with Israel through terrorist groups like Hizballah  The last attack across the internationally-recognized Israeli line of withdrawal (a.k.a. the Blue Line) occurred in 2006.  In the same year, a terrorist attack on the U.S. Embassy in Damascus was defeated by Syrian security forces.

Syria has maintained its ties with its strategic ally, and fellow state sponsor of terrorism, Iran.  In August, President al-Asad visited Tehran.  On December 3, the Syrian president met the Iranian National Security Advisor Said Jalili in Damascus.  On December 8, Iranian Defense Minister Ahmed Vahidi began a three-day visit to Syria, where he met with political and military leaders. Vahidi and his Syrian counterpart announced a Syrian-Iranian defense cooperation agreement on December 11.  Frequent working-level visits between Iranian and Syrian officials took place regularly throughout 2009.  Syria also allowed leaders of HAMAS and other Palestinian groups to visit Tehran.  Al-Asad continued to be a staunch defender of Iran's policies, including Iran's nuclear ambitions.

The number of foreign fighters from extremist groups, including those affiliated with Al Qaeda in Iraq (AQI), transiting through Syrian territory into Iraq has decreased significantly from its peak flows in 2005-2007.  The existence of foreign fighter facilitation networks in Syria, however, remains troubling.  Bombings in Iraq in 2009 underscore the threat these networks continue to pose, but the United States recognizes Syrian efforts to decrease foreign fighter travel into Iraqi during the reporting period.  In 2009, Syria increased border monitoring activities, instituted tighter screening practices on military-age Arab males entering its borders, and agreed

Page | 195

PX205

to participate with the U.S. and Iraqi governments in a trilateral border security assessment of the Syrian side of the Syrian-Iraqi border.  Although preparatory meetings were held, the actual border assessment did not occur after the Iraqi government withdrew its support in August 2009. The Syrians have indicated a willingness to establish a border security mechanism if future Iraqi governments are supportive.

While Syria has long provided sanctuary and political support for certain former Iraqi regime elements (FRE), Damascus denied supporting terrorist attacks and urged Baghdad to include the FRE in the Iraqi political process.  In 2008, the United States designated several Iraqis and Iraqi-owned entities residing in Syria under Executive Order 13438 for providing financial, material, and technical support for acts of violence that threatened the peace and stability of Iraq, including Mish'an Al-Jaburi and his satellite television channel al-Rai.  Iraqi government officials criticized al-Rai for serving as a "platform for terrorists."  Additionally, the United States designated one Syria-based individual in 2007 under E.O. 13224 for providing financial and material support to AQI and six others under E.O. 13315 as FRE or family members of FRE, some of whom had provided financial assistance to the Iraqi insurgency.

Syria's financial sector remains vulnerable to terrorist financing.  An estimated 70 percent of all business transactions are conducted in cash and as many as 80 percent of all Syrians do not use formal banking services.  Despite Syrian legislation requiring money-changers to be licensed by the end of 2007, many continued to operate illegally in Syria's vast black market, which is believed to be as large as Syria's formal economy.  Regional "hawala" networks remained intertwined with smuggling and trade-based money laundering – facilitated by corrupt customs and immigration officials – raising significant concerns that the Syrian government and business elites could be complicit in terrorist financing schemes.

PX205

# Chapter 4
# The Global Challenge of WMD Terrorism

**Introduction**

The nexus of weapons of mass destruction (WMD) and terrorism poses one of the gravest threats to the national security of the United States and its global partners.  A successful major WMD terrorist attack could result in mass casualties and produce far-reaching economic and political consequences.  This chapter outlines:

- The key elements of the United States' National Strategy for Combating WMD Terrorism;
- The various types of materials terrorists may use in a WMD attack;
- The potential that the resources of a state could be directed or diverted to facilitate WMD terrorism;
- The emerging WMD terrorism threat presented by non-state facilitators
- Moving toward a world without nuclear weapons, and
- Transformational U.S. partnerships to combat this growing global risk.

The United States places the highest priority on working with a broad range of local governments, federal entities, domestic emergency responders, international organizations, foreign governments, and private sector organizations to develop effective partnerships to confront the global challenge of WMD terrorism.

**Diplomatic and Strategic Priorities for Combating WMD Terrorism**

U.S. diplomatic priorities for combating WMD terrorism build on the comprehensive approach set forth in the National Strategy for Combating Terrorism (**http://www.globalsecurity.org/security/library/policy/national/nsct_sep2006.pdf**).  Specifically, the U.S. strategic approach hinges on the six objectives outlined in the National Strategy.  The USG works across all objectives simultaneously to maximize its ability to eliminate the threat.

- Determine terrorists' intentions, capabilities, and plans to develop or acquire WMD.  Understand and assess the credibility of threat reporting and provide technical assessments of terrorists' WMD capabilities.

- Deny terrorists access to the materials, expertise, and other enabling capabilities required to develop WMD, with a particular focus on weapons-usable fissile materials, dangerous pathogens, and poisonous chemicals.  Denial efforts extend to the methods of transport, sources of funds, and other capabilities that could facilitate the execution of a WMD attack.  In addition to building upon existing initiatives to secure materials, develop innovative approaches that blend classic counterproliferation, nonproliferation, and counterterrorism efforts.

Page | 197

PX205

- Deter terrorists from employing WMD.  A new deterrence calculus seeks to deter terrorists, facilitators, and supporters from contemplating a WMD attack and, failing that, to dissuade them from actually conducting an attack.  Traditional deterrence by punishment may not work because terrorists generally show a wanton disregard for the lives of innocents and, in some cases, for their own lives.  Accordingly, develop a range of deterrence strategies that are tailored to the various WMD threats and the individual actors who facilitate or enable those threats.  Employ diplomatic strategies that seek to address extremism and defuse volatile conditions in order to discourage consideration of WMD as a tool to address real or perceived injustices.

- Detect and disrupt terrorists' attempted movement of WMD-related materials, weapons, and personnel.  Expand our global capability for detecting illicit materials, weapons, and personnel transiting abroad.  Utilize global partnerships, international agreements, and ongoing border security and interdiction efforts to promote detection capabilities.  Continue to work with countries to enact and enforce strict penalties for WMD trafficking and other suspect WMD-related activities.

- Prevent a WMD-related terrorist attack and develop a response capability.  Once the possibility of a WMD attack has been detected, work to contain, interdict, and eliminate the threat.  Continue to develop requisite capabilities to eliminate the possibility of a WMD operation and to prevent a possible follow-on attack.  Prepare ourselves for possible WMD incidents by developing capabilities to manage the range of consequences that may result from such an attack.

- Define the nature and source of a terrorist-employed WMD device.  Should a WMD terrorist attack occur, the rapid identification of the source and perpetrator of an attack would facilitate response efforts and may be critical in disrupting follow-on attacks.  Work to maintain and improve our capability to determine responsibility for the intended or actual use of WMD via accurate attribution, using the rapid fusion of technical forensic data with intelligence and law enforcement information.

In January 2009, the Commission on the Prevention of WMD Proliferation and Terrorism released a report card on the U.S. government's response to its December 2008 recommendations.  This report highlighted several key observations including the high likelihood that a WMD would be involved in a terrorist attack within the next five years.  The Commission concluded that the United States, and the world, must act quickly to slow the proliferation of WMD technologies and information to avoid such an act.

As the implementation of diplomatic strategic priorities for combating WMD terrorism move forward, special care must be taken to work closely with the full range of foreign partners to prioritize and tailor capacity-building approaches to the differing regional and local conditions that exist worldwide.

**THE MATERIAL THREATS**

PX205

Four categories of weapons of mass destruction (WMD) that terrorists may seek to acquire and use in a WMD terrorist attack are chemical, biological, radiological, and nuclear (CBRN).

**Chemical**

Chemical weapons represent a potentially dangerous tool in the hands of terrorists. Effectively dispersed and in sufficient dosages, chemical agents could cause mass casualties, as was demonstrated by the use of chemical weapons during World War I and the Iran-Iraq War (1980-1988). Today's chemical terrorism threat ranges from the potential acquisition and use of chemical warfare agents and military delivery systems, to the production and use of toxic industrial chemicals, such as industrial chlorine containers included in IED attacks in Iraq, or improvised dissemination systems, such as those used in the 1995 attack conducted by Aum Shinrikyo in the Tokyo subway system. Perpetrators of that attack used sharpened umbrellas to puncture plastic bags filled with the nerve agent sarin causing the sarin to spill out and evaporate – killing twelve and injuring thousands. Terrorists also have sought to acquire and use commercially-available materials, such as poisons and toxic industrial chemicals. The growth and sophistication of the worldwide chemical industry, including the development of complex synthetic and dual-use materials, may make the task of preventing and protecting against this threat more difficult. Preventing chemical terrorism is particularly challenging as terrorists can use toxic industrial chemicals and other commonly available chemical agents and materials as low-cost alternatives to traditional chemical weapons and delivery systems, though likely with more limited effects.

**Biological**

Bioterrorism, another deadly threat, is the deliberate dispersal of pathogens through food, air, water, or living organisms to cause disease. The 2009 Commission on the Prevention of WMD Proliferation and Terrorism concluded that it is more likely that terrorists would be able to acquire and use biological agents than nuclear weapons due to the difficulty in controlling the proliferation of biotechnologies and biological agent information. If properly produced and released, biological agents can kill on a massive scale and, if terrorists use a pathogen that can be transmitted from person to person, the disease could quickly spread through commercial air travel across oceans and continents before authorities realize their nations have been attacked.

Developing a bioterrorism capability presents some scientific and operational challenges. However, the necessary technical capabilities are not beyond the expertise of motivated scientists with university-level training. Unlike most other types of CBRN threats, the materials required to produce a biological weapon are available in laboratories worldwide, and many threat agents could be isolated from nature, though doing so may pose a challenge. International laboratories are often not safeguarded and secured up to preferred U.S. standards, making access to dual-use equipment and potentially dangerous pathogens possibly more accessible. Even the use of a badly-designed weapon that resulted in only a limited health impact could cause significant disruption. A small-scale bioterrorism attack such as the 2001 anthrax attacks in the United States, which resulted in five Americans killed and an additional 17 individuals infected, had a

Page | 199

PX205

substantial economic impact with the costs of decontamination, medical treatment for those exposed, decreased commercial activity, social distress, and lost productivity.  The terrorists can often meet their objective of creating disruption and fear without causing large numbers of casualties.

Among present-day terrorist organizations that pose a threat to the United States, al-Qa'ida (AQ) is believed to have made the greatest effort to acquire and develop a bioterrorism program.  The United States discovered a partially built biological laboratory near Kandahar after expelling the Taliban from Afghanistan.  Although it was not conclusive that AQ succeeded in producing a biological weapon, the discovery demonstrated a concerted effort to acquire a biological attack capability.

**Radiological**

Some terrorists seek to acquire radioactive materials for use in a radiological dispersal device (RDD) or "dirty bomb."  Radioactive materials are used widely in industrial, medical, and research applications and include devices used for power supply in remote locations, cancer therapy, food and blood irradiation, and radiography.  Their widespread use in nearly every country makes these materials much more accessible than the fissile materials required for nuclear weapons.  Most radioactive materials lack sufficient strength to present a significant public health risk once dispersed, while the materials posing the greatest hazard would require terrorists to have the expertise to handle them without exposure to incapacitating doses of radiation or detection during transit across international borders.  Public panic and economic disruption caused by setting off an explosive radiological dispersal device, however, could be substantial, even if a weak radioactive source is used.

**Nuclear**

Some terrorist organizations, such as al-Qa'ida, have stated their desire to acquire nuclear weapons.  The diffusion of scientific and technical information regarding the assembly of nuclear weapons, some of which is now available on the Internet, has increased the risk that a terrorist organization in possession of sufficient fissile material could develop its own crude nuclear weapon.  The complete production of a nuclear weapon strongly depends on the terrorist group's access to special nuclear materials as well as engineering and scientific expertise.  Certainly with recent nuclear proliferants including irresponsible countries, such as North Korea, the number of potential sources of an unsecured nuclear weapon or materials is challenging world-wide efforts to control and account for nuclear materials.  Terrorists may, however, seek to link up with a variety of facilitators to develop their own nuclear capability.  These facilitators include black market proliferators or transnational criminal networks that may seek to profit from the sale of nuclear material, a weaponized device, or technical knowledge gathered from nuclear experts currently or formerly involved in a national nuclear program.

**Dual-Use Materials, Equipment, Research, and Technologies of Concern**

Reducing the risk of terrorist acquisition of, access to, and use of dual-use materials, equipment,

PX205

research, and technologies remains a critical challenge.  Terrorists have shown an interest in taking advantage of the availability of such material when developing improvised devices. Attacks in Iraq in 2006 and 2007 involving chlorine cylinders, a dual-use chemical used in water treatment facilities, offered a notable example.  This challenge has only been compounded by the diffusion of dual-use information on the Internet and in academic venues.

The United States maintains dual-use export controls based on its multilateral commitments in the export control regimes, and it also maintains unilateral controls on a wide range of dual-use items predominantly for antiterrorism reasons.  Effective partnerships with private sector organizations, industry, academia, and the scientific research community, as well as with local governments, will play an important role in mitigating the risk of dual-use capabilities falling into the wrong hands.  Using alternative materials in technologies is one way to curtail the threat around the world.  For example, recent technological developments allow the use of low enriched uranium as a substitute for highly enriched uranium for production of the medical isotope molybdenum-99.

In this era of globalization, control of exports cannot occur only at national borders, but also must be a concern for the knowledge sharing at U.S. research universities, laboratories, and industry.  The reduced domestic pool of qualified scientists and engineers has driven many U.S. companies, universities and laboratories to recruit foreign nationals in order to remain competitive.  The increased presence of talented foreign science and engineering staff and students carries the risk of WMD technology transfers by way of "deemed exports."  (A deemed export is the release of information pertaining to the design and manufacturing of dual-use technology or source code to a foreign national within the confines of the United States borders.) In accordance with the Export Administration Regulations, several USG departments and agencies support a national effort to better control foreign access to sensitive dual-use technologies to prevent unauthorized transfers.

**STATE SPONSORSHIP OF TERRORISM: A KEY CONCERN**

A state that directs WMD resources to terrorists, or one from which enabling resources are clandestinely diverted, poses a grave WMD terrorism threat.  Although terrorist organizations will continue to seek a WMD capability independent of state programs, the sophisticated WMD knowledge and resources of a state could enable a terrorist capability.  State sponsors of terrorism and all nations that fail to live up to their international counterterrorism and nonproliferation obligations deserve continued scrutiny as potential facilitators of WMD terrorism.

**NON-STATE FACILITATORS: AN EMERGING THREAT**

State sponsors of terrorism with WMD programs represent just one facet of the overall risk of WMD terrorism.  The non-governmental entities they use to facilitate their WMD programs have emerged as a growing proliferation threat in recent years that could eventually provide terrorists with access to materials and expertise that are particularly hard to acquire.  In 2003, the United States and its international partners succeeded in interdicting a shipment of WMD-related

Page | 201

PX205

material destined for Libya's then-active nuclear weapons program. The facts surrounding this shipment indicated a transnational nuclear proliferation network reaching from East Asia to Europe, developed by Pakistani nuclear scientist A.Q. Khan. This network was making available sensitive technology and WMD-related materials to nations willing to pay. There is a risk that such non-state facilitators and their networks could provide their services to terrorist groups.

The dismantling of the A.Q. Khan network revealed an uncomfortable truth about globalization. The very trends driving globalization, improved communications and transportation links, can enable the development of extended proliferation networks that may facilitate terrorist acquisition of WMD. Globalization requires that partner nations work together closely to prevent, detect, and disrupt linkages that may develop between terrorists and facilitators such as A.Q. Khan.

## ADDRESSING THE INTERNATIONAL NUCLEAR THREAT

On April 5, in Prague, President Obama presented an ambitious three-part strategy to address the international nuclear threat: 1) proposing measures to reduce and eventually eliminate existing nuclear arsenals; 2) strengthening the Non-Proliferation Treaty (NPT) and halting proliferation of nuclear weapons to additional states; and 3) preventing terrorists from acquiring nuclear weapons or materials. He also announced an international effort to secure vulnerable nuclear materials within four years, break up black markets, detect and intercept materials in transit, and use financial tools to disrupt illicit trade in nuclear materials.

At the L'Aquila G-8 Summit on July 8, the President formally announced his plan to host a Global Nuclear Security Summit in March 2010. The Summit would allow discussion on the nature of the threat and develop steps that can be taken together to secure vulnerable materials, combat nuclear smuggling and deter, detect, and disrupt attempts at nuclear terrorism. The planned outcome of the Summit would be a communiqué pledging efforts to attain the highest levels of nuclear security, which is essential for international security as well as the development and expansion of peaceful nuclear energy worldwide.

At the United Nations on September 24, President Obama presided over the UN Security Council (UNSC) meeting which unanimously cosponsored and adopted UNSC Resolution (UNSCR) 1887. UNSCR 1887 conveyed the Security Council's grave concern about the nuclear proliferation threat and the need for concerted international action to prevent it. It demonstrated agreement on a broad range of actions to address nuclear proliferation, disarmament and the threat of nuclear terrorism. UNSCR 1887 listed fourteen steps that the Security Council will pursue in reducing the nuclear proliferation and terrorism threat and further buttresses UNSCR 1540 in helping prevent WMD proliferation.

## PARTNERSHIPS TO COMBAT WMD TERRORISM

Since September 11, 2001, the international community has made significant strides in responding to the threat of WMD terrorism. States are working together bilaterally and multilaterally to address these threats and protect their populations. The United States has taken

PX205

concrete measures to build a layered defense against the WMD terrorism threat.  In 2003, the United States announced the first National Strategy to Combat Weapons of Mass Destruction. Through a variety of multinational initiatives such as the Global Threat Reduction Initiative, the Proliferation Security Initiative (PSI), and the Global Initiative to Combat Nuclear Terrorism, (GICNT), the United States has taken a leadership role in reducing the threat of WMD reaching the hands of non-state actors and terrorists.  On July 8, 2009, the G8 endorsed President Obama's three-part strategy to address the international nuclear threat by 1) proposing measures to reduce and eventually eliminate existing nuclear arsenals; 2) strengthening the Non-Proliferation Treaty and halting proliferation of nuclear weapons to additional states; and 3) preventing terrorists from acquiring nuclear weapons or materials.

**The Proliferation Security Initiative:**  Announced in 2003, the Proliferation Security Initiative deserves special mention as a particularly effective international initiative.  The PSI is a global effort that aims to stop the trafficking of WMD, its delivery systems, and related materials to and from states and non-state actors of proliferation concern worldwide.  The PSI relies on voluntary actions by states, using existing national and international legal authorities, to put an end to WMD-related trafficking.  PSI partners take steps to strengthen those legal authorities as necessary.  States that wish to participate in the PSI are asked to endorse its Statement of Interdiction Principles, which identifies specific measures participants commit to undertake for the interdiction of WMD and related materials.  As of December 31, 2009, 95 states have endorsed the Statement.  PSI participants conduct approximately four exercises per year to improve their operational capabilities to conduct interdictions and meet periodically to share information and develop new operational concepts.  The PSI has led to a number of important interdictions over the last six years and is an important tool in the overall U.S. strategy to combat WMD proliferation to state and non-state actors.

**The Global Initiative to Combat Nuclear Terrorism (GICNT):**  The Global Initiative to Combat Nuclear Terrorism (GICNT), which is co-chaired by the United States and Russia, is a cross-cutting strategic framework of 77 partners and four observers who are determined to strengthen individual and global capacity to prevent, detect, and respond to a nuclear terrorist event.  These partners have endorsed a set of core nuclear security principles encompassing the full spectrum of deterrence, prevention, detection, and response objectives.  Partners utilize multilateral activities and exercises to share best practices and lessons learned in order to strengthen individual and collective capacity to combat nuclear terrorism.  To date, partners have conducted 34 multilateral activities and five senior-level meetings in support of these nuclear security goals.  Through these activities, partners have improved international understanding in emerging detection technologies, emergency response and preparedness practices, and anti-smuggling assistance programs.  The Initiative is open to nations that share in its common goals and are committed to combating nuclear terrorism on a determined and systematic basis.

**The Global Threat Reduction Initiative (GTRI)**:  The goal of GTRI, announced by the United States on May 26, 2004, in Vienna, Austria, is to identify, secure, remove, or facilitate the disposition, as quickly and expeditiously as possible, of vulnerable nuclear and radioactive materials and equipment around the world that pose a potential threat to the international community.  One hundred international partners are key participants in this initiative, and GTRI

PX205

has undertaken cooperative activities in 100 countries.  In particular, GTRI seeks to facilitate globally the reduction or elimination of the use of highly enriched uranium in civilian nuclear applications and to remove or protect other vulnerable nuclear and radiological materials at civilian sites worldwide.  Specific activities include the conversion of reactors used for research, testing, and medical-isotope production from the use of highly enriched uranium (HEU) fuel to low enriched uranium (LEU); repatriation of fresh and spent HEU fuel to its country of origin (the United States or Russian Federation); enhancement of physical protection at sites utilizing such materials; and removal of unwanted radiological sources and other nuclear materials not otherwise covered by the fuel-return programs.

The **Export Control and Related Border Security Program (EXBS)** is the U.S. government's premier initiative to assist other countries in improving their strategic trade control systems.  EXBS seeks to prevent the proliferation of weapons of mass destruction and irresponsible transfers of advanced conventional weapons by helping to build effective national export control systems in countries that possess, produce, or supply strategic items as well as in countries through which such items are most likely to transit.  EXBS provides extensive training on export control legislation, licensing, enforcement, government-industry outreach, and interagency cooperation, as well as providing inspection and detection equipment.  EXBS country programs complement DHS/CBP's Container Security Initiative, DOE's Second Line of Defense Program, and the Megaports Initiative, and improve partner countries' capabilities to fulfill their commitments as part of the Proliferation Security Initiative, the Global Initiative to Combat Nuclear Terrorism, and UNSCR 1540[20] EXBS currently has 21 Program Advisors stationed globally and is active in over 60 countries.  The EXBS program's comprehensive approach, flexibility, responsiveness, and interagency approach makes it a unique resource for addressing critical aspects of the United States' nonproliferation objectives.

**Second Line of Defense (SLD):**  Under its Second Line of Defense (SLD) Program, the Department of Energy's National Nuclear Security Administration (DOE/NNSA) cooperates with partner countries to provide radiation detection systems and associated training to enhance host nation capabilities to deter, detect, and interdict illicit trafficking of special nuclear and other radiological materials across international borders.  The SLD Program complements first line of defense threat reduction efforts, which ensure that protections are in place to lock down and protect material at the source in civilian and military facilities.  The second line of defense thus serves as a key component in a layered defense system, seeking to detect trafficking in material that may have been removed from these facilities as it is moved across international borders and through the maritime shipping network.  The SLD Program includes two components: the Core Program and the Megaports Initiative. The Core Program focuses on providing equipment to land border crossings, feeder seaports, and international airports.  This work originally began in Russia and has since expanded to include former Soviet states, the Caucasus, Eastern Europe, and other key areas.  Mobile detection equipment is also provided to selected countries for use at land borders and internal checkpoints.  The Megaports Initiative began in 2003 and provides equipment to scan cargo containers as they move through the global

---

[20] In 2004, the UN Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery.

PX205

maritime shipping network.  In identifying ports of interest for engagement under the Megaports Initiative, DOE/NNSA considers a number of factors, including volume of containers and regional terrorist threat.  To date, DOE/NNSA has completed deployments at over 230 sites around the world.

**Global Threat Reduction (GTR)**: GTR programs aim to prevent proliferators and terrorists, anywhere in the world, from acquiring WMD expertise, materials and technology.  GTR is actively engaged in a variety of countries including Pakistan and Afghanistan.  GTR programs have expanded to meet these emerging WMD proliferation threats worldwide and focus on promoting biological, chemical, and nuclear security in those countries where there is a high risk of WMD terrorism or proliferation.  The programs also engage and redirect former weapons scientists in the former Soviet Union, Iraq, and Libya.  By engaging biological, chemical, and nuclear scientists, and helping them to secure dangerous pathogens, improve chemical security, and adopt nuclear safety best practices, GTR seeks to keep WMD and dual-use materials, technology and expertise away from proliferators and terrorists.  GTR outreach has helped at-risk facilities deter attempted thefts of dangerous pathogens, and engaged WMD scientists worldwide, among other nonproliferation successes.

**National Strategy for Countering Biological Threats:**  In November 2009, President Obama approved a new national strategy which aimed to provide greater policy cohesion and coordination for U.S. efforts to prevent the acquisition and use of biological weapons.  The strategy aimed to build international capacity to detect and contain outbreaks of infectious disease regardless of cause; reinforce norms against the misuse of the life sciences; and pursue a coordinated suite of actions to identify, influence, inhibit, or interdict those pursuing a biological weapons capability.

**U.S. Efforts to Counter the Threat of a "Dirty Bomb":**  Since the terrorist attacks of 2001, the United States has played a central role in raising international attention and establishing systems of control for radioactive material that could be used in a radiological dispersal device, or "dirty bomb."  The United States was instrumental in the development of the first international export control framework for radioactive sources.  The IAEA *Guidance for the Import and Export of Radioactive Sources* was released in 2005 with strong G-8 backing.  Within the United States, export control measures consistent with the Guidance were incorporated into the 2005 Energy Policy Act and into new rules issued by the Nuclear Regulatory Commission.  The United States also took a lead role in revising the international standard for the control of radioactive materials, the IAEA *Code of Conduct on the Safety and Security of Radioactive Sources*, to better account for security concerns and in building international recognition and observance of this benchmark.  To date, 97 countries have made a political commitment to the IAEA Director General to follow the non-legally binding Code and it has been endorsed by leaders at G-8, U.S.-EU, APEC, and OSCE summits.  The United States provides substantial bilateral assistance, primarily through the NNSA Global Threat Reduction Initiative, and support for the IAEA to secure vulnerable radioactive materials, provide training, detect materials at border crossings, and improve regulatory infrastructures around the world.

PX205

**Additional U.S. Efforts Supporting a Global Layered Defense:**  The United States has also worked with partner nations through the UN and the IAEA to reduce the threat of WMD use by terrorists.  The UN Security Council has passed three important resolutions related to the prevention of terrorism and the proliferation of WMD.  In 2001, the Security Council adopted Resolution 1373, which requires all UN member states to refrain from providing any support, active or passive, to terrorists, and to work together to limit terrorist movement and safe haven.  In 2004, the Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery.  In 2009, the Security Council adopted Resolution 1887, committing all UN member states to work toward a world without nuclear weapons and endorsing a broad framework of actions to reduce global nuclear dangers.  The United States remains committed to full implementation of both UN Security Council Resolutions 1373, 1540, and 1887.

The Convention on the Suppression of Acts of Nuclear Terrorism (Nuclear Terrorism Convention) entered into force on July 7, 2007.  On September 25, 2008, the Senate passed resolutions of advice and consent to ratification of the Nuclear Terrorism Convention to the Senate, the Amendment to the Convention on the Physical Protection of Nuclear Material, the Protocol of 2005 to the Convention on the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, and the Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf.  Collectively, these treaties will enhance international cooperation with regard to the prevention of WMD terrorism and proliferation of WMD, as well as the investigation and prosecution of such acts.

**Conclusion:**  As the President stated in his Prague speech, nuclear terrorism is the most immediate and extreme threat to global security.  We should not wait for an act of nuclear terrorism before working together to collectively improve our nuclear security culture, share our best practices, and raise our standards for nuclear security.  During the past year, the USG has built on a range of activities and launched new efforts to prevent, protect against, and respond to the threat or use of WMD.  Together with partner nations and international organizations, the United States will continue to take the initiative to reduce the global risk of WMD terrorism.

For FY 2009, the following countries are Global Initiative Current Partner Nations:

| | | |
|---|---|---|
| 1. Afghanistan | 26. Hungary | 51. Panama |
| 2. Albania | 27. Iceland | 52. Poland |
| 3. Armenia | 28. India | 53. Portugal |
| 4. Australia | 29. Ireland | 54. Republic of Korea |
| 5. Austria | 30. Israel | 55. Republic of Macedonia |
| 6. Bahrain | 31. Italy | 56. Romania |
| 7. Belgium | 32. Japan | 57. Russian Federation |
| 8. Bosnia | 33. Jordan | 58. Saudi Arabia |
| 9. Bulgaria | 34. Kazakhstan | 59. Serbia |
| 10. Cambodia | 35. Kyrgyz Republic | 60. Seychelles |
| 11. Canada | 36. Latvia | 61. Slovakia |
| 12. Cape Verde | 37. Libya | 62. Slovenia |
| 13. Chile | 38. Lithuania | 63. Spain |
| 14. China | 39. Luxembourg | 64. Sri Lanka |
| 15. Cote d'Ivoire | 40. Madagascar | 65. Sweden |
| 16. Croatia | 41. Malta | 66. Switzerland |

PX205

17. Cyprus
18. Czech Republic
19. Denmark
20. Estonia
21. Finland
22. France
23. Georgia
24. Germany
25. Greece

42. Mauritius
43. Montenegro
44. Morocco
45. Nepal
46. Netherlands
47. New Zealand
48. Norway
49. Pakistan
50. Palau

67. Tajikistan
68. Turkey
69. Turkmenistan
70. Ukraine
71. United Arab Emirates
72. United Kingdom
73. United States
74. Uzbekistan
75. Zambia
76. Belarus
77. Mexico
78. IAEA (Observer)
79. INTERPOL (Observer)
80. European Union (Observer)
81. UNODC (Observer)

PX205

**Chapter 5: Terrorist Safe Havens and Tactics and Tools for Disrupting or Eliminating Safe Havens**

**Terrorist Safe Havens**

Terrorists operate without regard to national boundaries.  To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships.  Denying safe haven is essential for undermining terrorists' capacity to operate effectively and is a central goal of U.S. counterterrorism strategy.

Terrorist safe havens are defined in this report as ungoverned, under-governed, or ill-governed areas of a country and non-physical areas where terrorists that constitute a threat to U.S. national security interests are able to organize, plan, raise funds, communicate, recruit, train, and operate in relative security because of inadequate governance capacity, political will, or both.  Physical safe havens provide security for terrorist leaders, allowing them to plan acts of terrorism around the world.

Global communications and financial systems, especially those created by electronic infrastructure such as the internet, global media, and unregulated economic activity, further allow terrorists to carry out activities, particularly the dissemination of propaganda and misinformation, without the need for a physical safe haven.  These "virtual" havens are difficult to track, difficult to control, and are not based in any particular state.  This part of the report, however, will not address virtual safe havens, and will focus instead on physical safe havens.

**AFRICA**

**Somalia.**  A small number of al-Qa'ida (AQ) operatives remained in East Africa, particularly Somalia, where they posed a serious threat to U.S. and allied interests in the region.  These elements were disrupted in late 2006 and early 2007 as a result of Ethiopian military actions and again by the death of AQ operative Saleh Nabhan in September 2009.   Somalia remained a concern given the country's long, unguarded coastline, porous borders, continued political instability, and proximity to the Arabian Peninsula, all of which provide opportunities for terrorist transit and/or safe haven and increased the regional threat level.  AQ remains likely to make common cause with Somali extremists, most notably al-Shabaab.  Al-Shabaab has expanded its area of control during its protracted insurgency against the Transitional Federal Government and particularly since the withdrawal of Ethiopian forces in early 2009.  The group controlled most of southern Somalia at year's end.

**The Trans-Sahara.**  The primary terrorist threat in this region was al-Qa'ida in the Islamic Maghreb (AQIM).  AQIM was based primarily in northeastern Algeria but factions also operated from a safe haven in northern Mali, from which they transited areas of the Maghreb and Sahel, especially Mali, Niger, and Mauritania.  AQIM continued to conduct small scale ambushes and attacks on Algerian security forces in northeastern Algeria, but in 2009 the group was not able to conduct the "spectacular" attacks that were more common a few years ago such as their bombing of the UN and Algerian government buildings.  AQIM factions in northern Mali used the safe

Page | 208

PX205

haven to conduct kidnappings for ransom and murder of Western hostages and to conduct limited attacks on Malian and Mauritanian security personnel. AQIM derived financial support from the ransoms it collected, which were used to sustain the organization and plan further terrorist operations. AQIM routinely demanded the release of their operatives in custody in the region and elsewhere as a condition of release of hostages. Regional governments sought to take steps to counter AQIM operations, but there was a need for foreign assistance in the form of law enforcement and military capacity building in order to do so.

## EAST ASIA AND PACIFIC

**The Sulu/Sulawesi Seas Littoral.** In Southeast Asia, the terrorist organizations Jemaah Islamiya (JI) and Abu Sayyaf Group (ASG) have sought safe haven in the vicinity of the Sulawesi Sea and the Sulu Archipelago, which encompasses the maritime boundaries of Indonesia, Malaysia, and the Philippines. The area's thousands of islands make it a difficult region for authorities to monitor, while a range of licit and illicit activities that occur there – worker migration, tourism, and trade, for example – pose another challenge to identifying and countering the terrorist threat. Although Indonesia, Malaysia, and the Philippines have improved their efforts to control their shared maritime boundaries, the expanse nevertheless remains difficult to control. Surveillance is improved but remains partial at best, and traditional smuggling and piracy groups have provided an effective cover for terrorist activities, such as movement of personnel, equipment, and funds.

**The Southern Philippines.** Terrorist operatives have sought safe haven in areas of the southern Philippines, specifically in the Sulu archipelago and Mindanao. Philippine government control and the rule of law in this area is weak due to rugged terrain, poverty, and local Muslim minority resentment of central governmental policies. In addition to Jemaah Islamiya (JI) fugitives and Abu Sayyaf Group (ASG) terrorists, the New People's Army and Rajah Solaiman Movement also operated in the southern Philippines.

## THE MIDDLE EAST

**Iraq.** Iraq was not a terrorist safe haven in 2009, but terrorists, including Sunni groups like al-Qa'ida in Iraq (AQI), and Ansar al-Islam (AI), as well as Shia extremists and other groups, viewed Iraq as a potential safe haven. Together, U. S. and Iraqi security forces continued to make progress against these groups. The significant reduction in the number of security incidents in Iraq that began in the last half of 2007 continued through 2009, with a steady downward trend in numbers of civilian casualties, enemy attacks, and improvised explosive device (IED) attacks.

AQI, although still dangerous, experienced the defection of members, lost key mobilization areas, suffered disruption of support infrastructure and funding, and was forced to change targeting priorities. A number of factors have contributed to the substantial degradation of AQI. The alliance of convenience and mutual exploitation between AQI and many Sunni populations has deteriorated. The Baghdad Security Plan, initiated in February 2007, along with assistance from primarily Sunni tribal and local groups, has succeeded in reducing violence to late 2005

PX205

levels and disrupted and diminished AQI infrastructure, driving some surviving AQI fighters from Baghdad and Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. New initiatives with tribal and local leaders in Iraq have led Sunni tribes and local citizens to reject AQI and its extremist ideology.  The continued growth, professionalism, and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar and Diyala Provinces, and elsewhere have turned against AQI and were cooperating with the Iraqi government and Coalition Forces to defeat it.

**Northern Iraq.**  The Kurdistan Workers' Party (PKK) maintained an active presence in northern Iraq, from which it coordinated attacks into Turkey, primarily against Turkish security forces, local officials and villagers who opposed the organization.  In October, the Turkish Parliament overwhelmingly voted to extend the authorization for cross-border military operations against PKK encampments in northern Iraq.  Iraq, Turkey, and the United States continued their formal trilateral security dialogue as one element of ongoing cooperative efforts to counter the PKK. Iraqi leaders, including those from the Kurdistan Regional Government, continued to publicly state that the PKK was a terrorist organization that would not be tolerated in Iraq.  Turkish and Iraqi leaders signed a counterterrorism agreement in October.

**Lebanon.**  Hizballah remained the most prominent and powerful terrorist group in Lebanon, with deep roots among Lebanon's large Shia community,, which comprises at least one third of Lebanon's population.  The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah maintained offices in Beirut and military-style bases elsewhere in the country and was represented by elected deputies in parliament.  (See **Chapter 3,** *State Sponsors of Terrorism, for* information on Iran and Syria, which provided safe haven to Hizballah and Palestinian terrorist groups and were used as safe havens by AQ-linked operatives and groups.)

AQ associated extremists also operated within the country, though their presence was small compared to that of Palestinian groups operating in Palestinian refugee camps who were not aligned with AQ.  The camps are officially controlled by the Lebanese government.  While the Lebanese Armed Forces do not have a day-to-day presence in the camps, they have at times conducted operations in the camps to combat terrorist threats.

**Yemen**.  The security situation in Yemen continued to deteriorate.  As Saudi security forces have clamped down on terrorism and foreign fighters have returned from Afghanistan and Pakistan, Yemen's porous borders have allowed many terrorists to seek safe haven within Yemen.  Al-Qa'ida in Yemen (AQY) announced its merger with al-Qa'ida (AQ) elements in Saudi Arabia in January 2009, creating al-Qa'ida in the Arabian Peninsula (AQAP).  The creation of AQAP coincided with fewer attacks within Yemen, possibly due to the desire of its leadership to use Yemen as a safe haven for planning of future attacks and recruitment because the central government lacks a strong presence in much of the country.

The absence of effective counterterrorism legislation contributed to Yemen's appeal as a safe haven and potential base of operations for terrorists.  The Yemeni government's response to the terrorist threat was intermittent, and its ability to pursue and prosecute suspected terrorists

remained weak for most of the year due to a number of shortcomings, including the stalling of draft counterterrorism in Parliament.  The government's response improved dramatically in December with security forces taking strong action against a number of terrorist cells.  Even with this turn of events, the government was often distracted by the "Sixth War" of the Houthi rebellion in the Sa'ada governorate in the north of the country and  political unrest in southern Yemen.

## SOUTH ASIA

**Afghanistan**.  The Government of Afghanistan, in concert with the International Security Assistance Force and the international community, continued its efforts to eliminate terrorist safe havens and build security, particularly in the country's south and east where the main Taliban-based insurgents threatened stability.  Many insurgent groups, including Taliban elements, the Haqqani Network, Hezb-e-Islami Gulbuddin, al-Qa'ida (AQ), and Lashkar-e-Tayyiba, continued to use territory across the border in Pakistan as a base from which to plot and launch attacks within Afghanistan and beyond.  Narcotics trafficking, poppy cultivation, and criminal networks were particularly prevalent, constituting a significant source of funding for the insurgency as well as fueling corruption within Afghanistan.  AQ leadership in Pakistan maintained its support to militants conducting attacks in Afghanistan and provided funding, training, and personnel to facilitate terrorist and insurgent operations.  Anti-Coalition organizations continued to operate in coordination with AQ, Taliban, and other insurgent groups, primarily in the east.

**Pakistan.**  Despite increased efforts by Pakistani security forces, al-Qa'ida (AQ) terrorists, Afghan militants, foreign insurgents, and Pakistani militants continued to find safe haven in portions of Pakistan's Federally Administered Tribal Areas (FATA), North-West Frontier Province (NWFP), and Baluchistan.  AQ and other groups such as the Haqqani Network used the FATA to launch attacks in Afghanistan, plan operations worldwide, train, recruit, and disseminate propaganda.  The Pakistani Taliban (under the umbrella moniker Tehrik-e-Taliban or TTP) also used the FATA to plan attacks against the civilian and military targets across Pakistan.  Outside the FATA, the Quetta-based Afghan Taliban and separate insurgent organizations such as Hizb-e-Islami Gulbuddin used the areas in Baluchistan and the NWFP for safe haven.  Islamist Deobandi groups and many local tribesmen in the FATA and the NWFP continued to resist the government's efforts to improve governance and administrative control.  Despite the August death of the Pakistani Taliban's leader Baitullah Mehsud and Pakistani military operations throughout the FATA and NWFP, the Pakistani Taliban, AQ, and other extremist groups remained dangerous foes to Pakistan and the international community.

Despite international condemnation for its November 2008 attacks in Mumbai, Lashkar-e-Tayyiba (LT) continued to plan regional operations from within Pakistan.  LT is an extremely capable terrorist organization with a sophisticated regional network.  It continued to view American interests as legitimate targets.  While the Government of Pakistan has banned LT, it needs to take further action against this group and its front organizations, which find safe haven within Pakistan.

Page | 211

PX205

**WESTERN HEMISPHERE**

Colombia's borders with Venezuela, Ecuador, Peru, Panama, and Brazil include rough terrain and dense forest cover.  These conditions, coupled with low population densities and historically weak government presence, create potential safe havens for insurgent and terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC).  The FARC, retreating in the face of Colombian military pressures, thus operated with relative ease along the fringes of Colombia's borders, and also uses areas in neighboring countries along the border to rest and regroup, procure supplies, and stage and train for terrorist attacks with varying degrees of success.  The FARC elements in these border regions often engaged the local population in direct and indirect ways, including recruitment and logistical assistance.  This appeared to be less so in Brazil and Peru where potential safe havens were addressed by stronger government responses.  Ecuador and Panama have responded with a mix of containment and non-confrontation with Colombian narco-terrorist groups, although some confrontations do occur depending on local decisions and cross-border relations

**Venezuela**.  Corruption within the Venezuelan government and military, ideological ties with the FARC, and weak international counternarcotics cooperation have fueled a permissive operating environment for narco-traffickers.  Other than some limited activities, such as the bombing of remote dirt airstrips on the border, there is little evidence that the government of Venezuela is moving to improve this situation in the near future.  The FARC, as well as Colombia's second largest rebel group, the National Liberation Army (ELN), regularly used Venezuelan territory to rest and regroup, engage in narcotics trafficking, as well as to extort protection money and kidnap Venezuelans to finance their operations.

**The Tri-Border Area (Argentina, Brazil, and Paraguay).**  No corroborated information showed that Hizballah, HAMAS, or other Islamic extremist groups used the Tri-Border Area (TBA) for military-type training or planning of terrorist operations, but the United States remained concerned that these groups use the region as a safe haven to raise funds.  Suspected supporters of Islamic terrorist groups, including Hizballah, take advantage of loosely regulated territory and the proximity of Ciudad del Este, Paraguay and Foz do Iguaçu, Brazil to participate in a wide range of illicit activities and to solicit donations from within the sizable Muslim communities in the region.  The Argentine, Brazilian, and Paraguayan governments have long been concerned with arms and drugs smuggling, document fraud, money laundering, trafficking in persons, and the manufacture and movement of contraband goods through the TBA.  Concerns about the region moved the three governments to invite the United States to participate in the Three Plus One Group on Tri-Border Area Security, which focuses on practical steps to strengthen financial and border controls and enhance law enforcement and intelligence sharing.  Brazil, Argentina, and Paraguay have made notable strides in launching initiatives to strengthen law enforcement institutions and cooperation, including developing financial intelligence units, broadening border security cooperation, augmenting information sharing among prosecutors responsible for counterterrorism cases, and establishing trade transparency units.

## 5.1.a. International Conventions and Protocols Matrix

## 5.1.b. STRATEGIES, TACTICS, AND TOOLS FOR DISRUPTING OR ELIMINATING SAFE HAVENS

**The Regional Strategic Initiative.** Terrorists operate without regard to national boundaries. To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships and to increasingly operate in a regional context. Denying safe haven plays a major role in undermining terrorists' capacity to operate effectively and forms a key element of U.S. counterterrorism strategy. For this reason, the State Department's Office of the Coordinator for Counterterrorism (S/CT) has developed the Regional Strategic Initiative (RSI) in key terrorist theaters of operation to collectively assess the threat, pool resources, and devise collaborative strategies, action plans, and policy recommendations. To implement these strategies, U.S. Ambassadors lead interagency Country Teams that recommend initiatives using all instruments of U.S. statecraft to help host nations understand the threat, and strengthen their political will and capacity to counter it. The RSI promotes cooperation between our counterterrorism partners; for example, between Malaysia, Indonesia, and the Philippines as they confront terrorist transit across the Sulawesi Sea; or among Mauritania, Algeria, Morocco, Niger, Chad, and Mali, to counter al-Qa'ida in the Islamic Maghreb (AQIM). Terrorists are highly adaptable and agile adversaries. Defeating them requires both centralized coordination and field authority. Resources and responses must be applied in a rapid, flexible, and focused manner. The RSI helps achieve this coordinated approach. In 2009, RSI groups were in place for South East Asia, Iraq and its neighbors, the Eastern Mediterranean, the Western Mediterranean, East Africa, the Trans-Sahara, South Asia, and Latin America.

### COUNTERING TERRORISM ON THE ECONOMIC FRONT

Since the terrorist attacks of September 11, 2001, the United States has acted to block funding of terrorists and their supporters, and to promote international cooperation against them. On September 23, 2001, President George W. Bush signed E.O. 13224, giving the United States a powerful tool to impede terrorist funding. This Executive Order (EO) provides a means to disrupt the financial support networks for terrorists and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism. The EO prohibits transactions between U.S. persons and designated individuals and entities. In addition, because of the breadth of the financial base of foreign terrorists, the order authorizes the U.S. government to block the assets of individuals and entities that provide support, offer assistance to, or otherwise associate with designated terrorists and terrorist organizations. The order also covers their subsidiaries, front organizations, agents, and associates.

The Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, has the authority to designate groups as Foreign Terrorist Organizations (FTOs), pursuant to Section 219 of the Immigration and Nationality Act, as amended. These designations play a critical role in U.S. counterterrorism efforts and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business. As a consequence of such a designation, it is unlawful for U.S. citizens or any persons subject to the

PX205

jurisdiction of the United States to provide material support or resources to a designated FTO. U.S. financial institutions are also required to freeze the funds of designated FTOs.

In 2009, the following designations were made under E.O. 13224:

- On January 6, the United States designated the Waad Project for providing support to Hizballah, a designated Foreign Terrorist Organization. The Waad Project was formed in 2007 and provides construction support for Hizballah in Beirut and Lebanon. Hizballah has used the Waad Project to rebuild its command headquarters in Beirut's southern suburbs, which was destroyed in the 2006 summer conflict with Israel. The Waad Project has built Hizballah's underground weapons storage facilities and parts of the group's military infrastructure in Lebanon. Additionally, the Waad Project's website has provided telephone numbers for those wishing to donate aid to Hizballah, Jihad al-Bina, and the Hizballah-controlled Martyrs Association.

- On February 4, the United States designated the Free Life Party of Kurdistan (PJAK) for supporting the Kurdistan Workers Party (PKK), a designated Foreign Terrorist Organization that has been involved in the targeting of the Turkish government for more than 20 years. PJAK was created in 2004 as a splinter group of the PKK to appeal to Iranian Kurds. Operating in the border region between Iraq and Iran, PJAK is controlled by the leadership of the PKK and receives orders and personnel from the main organization.

- On February 11, the United States designated the Tamil Foundation for supporting the Liberation Tigers of Tamil Eelam (LTTE), a designated Foreign Terrorist Organization. The LTTE sought an independent state in northeastern Sri Lanka. The LTTE employed conventional, guerrilla, and terrorist tactics in a civil war that led to the deaths of an estimated 80,000-100,000 people. Working with the Tamils Rehabilitation Organization, another front organization for the LTTE designated by the United States under E.O. 13224 in 2007, the Tamil Foundation has collected funds for the LTTE though fundraising activities by acting as a charitable organization.

- On April 20, the United States designated Abdul Haq for holding leadership positions in the Eastern Turkistan Islamic Movement (ETIM), a China-based group with links to Usama bin Ladin and the al-Qa'ida (AQ) network. In 2003, Haq became the top commander and leader of ETIM and has raised funds, recruited members, and otherwise contributed to the development of the organization. Since late 2007, Abdul Haq has sent operatives to the Middle East to raise funds and buy explosive materials for terrorist attacks against Chinese targets outside China. In early January 2008, Abdul Haq directed ETIM's military chief to attack cities in China, particularly focusing on the eight cities hosting the 2008 Olympic Games.

- On May 14, the United States designated Sa'ad Uwayyid 'Ubayd Mu'jil al-Shammari, also known as Abu Khalaf. Al-Shammari is a senior leader of al-Qa'ida in Iraq's Syria-

Page | 214

PX205

based facilitation network and is in charge of money, weapons, terrorist fighters, and other resources that flow through Syria to al-Qa'ida in Iraq. Heavily involved in the travel of foreign fighters, al-Shammari is also involved in the recruitment of suicide bombers and other operatives.

- On June 24, the United States designated Iraq-based Kata'ib Hizballah. Kata'ib Hizballah is an Iraqi extremist group active in and around the Baghdad area that has been responsible for numerous terrorist attacks since 2007. Kata'ib Hizballah has conducted numerous rocket propelled grenade and mortar attacks against U.S. bases and assets and routinely attacks U.S., Coalition, and Government of Iraq patrols in Baghdad. One such attack took place in November 2008, when a rocket attack killed two UN workers in the International Zone in Baghdad. In addition, Kata'ib Hizballah has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

- On July 1, the United States designated Fazeel-A-Tul Shaykh Abu Mohammed Ameen al-Peshawari, Nasir Javaid, Mohammed Yahya Mujahid, and Arif Qasmani for providing support to al-Qa'ida (AQ) and Lashkar-e Tayyiba (LT). Lashkar-e Tayyiba, a designated Foreign Terrorist Organization, is a Pakistan-based terrorist group with links to Usama bin Ladin and the AQ network.

  o Ameed al-Peshawari is the leader of the Ganj Madrassah in Peshawar, Pakistan. He provides assistance, funding, and recruits to the AQ network. He also provides funding, explosive suicide vests, and other resources to the Taliban. In order to continue his material and personnel contributions, al-Peshawari has begun a campaign to support AQ and Taliban militants in Pakistan and raises money for fighters in Afghanistan.

  o Nasir Javaid is a LT official involved in operations and in mid-2001, assumed command of an LT training center in Pakistan.

  o Mohammed Yahya Mujahid is the head of LT's media department and has served as a media spokesman since at least mid-2001. In that capacity, Mujahid has issued statements to the press on behalf of the organization on numerous occasions, including after the December 2001 LT attacks on the Indian Parliament, and following the November 2008 attacks in Mumbai.

  o Arif Qasmani is the chief coordinator of LT's dealings with other organizations and has provided significant support for LT terrorist operations. Qasmani has worked with LT to facilitate terrorist attacks, including the July 2006 train bombing in Mumbai and the February 2007 Samjota Express bombing in Panipat, India. Not only has Qasmani conducted fundraising activities on behalf of LT he has also provided financial and other support to AQ; facilitated the return of foreign fighters to their respective countries; and assisted in the movement of leaders in and out of Afghanistan.

Page | 215

PX205

- On July 31, the United States designated Revolutionary Struggle.  Revolutionary Struggle is a Greek terrorist organization responsible for numerous terrorist acts against Greek, U.S., and other targets since 2003, including the 2007 attack on the U.S. Embassy in Athens.  Revolutionary Struggle has also claimed responsibility for a May 2006 bomb blast meant to assassinate the Minister of Culture and former Minister of Public Order Georgos Voulgarakis, and for the March 9, 2009 detonation of a bomb outside a Citibank branch in Athens.

- On October 15, the United States designated Bekkay Harrach.  In early 2007, Harrach left Germany for the Afghan-Pakistani border region in order to join with an al-Qa'ida (AQ) training camp.  Harrach provides AQ with narration for media releases targeting German speakers.  In or before January 2009, Harrach provided the German narration for a video entitled "Das Rettungspaket für Deutschland" (The rescue package for Germany), in which Harrach stated that German troops serving under a Security Council mandate in Afghanistan should expect to be attacked by AQ and the Taliban.  In another German-language Internet release distributed via the AQ media office in February 2009, Harrach called for a complete overthrow of the constitutional democratic order in Germany.

**REWARDS FOR JUSTICE**:  The Rewards for Justice Program(RFJ), managed by the Bureau of Diplomatic Security, is one of the U.S. government's most valuable tools for collecting critical information on terrorist leaders and others who seek to harm U.S. interests.  Through the RFJ program, the Secretary of State offers and pays rewards for information that prevents or successfully resolves an act of international terrorism against U.S. persons or property.  Reward offers of up to US$ 25 million have been authorized for information leading to the capture of Usama bin Ladin and other key terrorist leaders.  Since its inception in 1984, RFJ has paid over US$ 82 million to more than 50 people who provided credible information.  In 2009, the Rewards for Justice website carried information in 27 languages.

Also in 2009, the RFJ program added the following five individuals to its *Wanted for Terrorism* list:

- Husayn Muhammed al-Umari, who is believed to be responsible for multiple bombings, including the 1982 bombing of Pan American World Airways flight 830, with a reward offer of up to US$ five million; and

- Wadoud Muhammad Hafiz al-Turki, Muhammad Ahmed al-Munawar, Muhammad Abdullah Khalil Hussain ar-Rahayyal, and Jamal Saeed Abdul Rahim, who were all charged for their roles in the hijacking of Pan American World Airways flight 73 in 1986 on the ground in Karachi, Pakistan, with reward offers of up to US$ five million each.

All of these reward offerings are listed in greater detail on www.rewardsforjustice.net.

**MULTILATERAL EFFORTS TO COUNTER TERRORISM**

PX205

International cooperation remained essential to effectively track funding, freeze assets, disrupt planning, and prevent future attacks, as well as to investigate, capture, and prosecute terrorists. Consequently, the United States worked hard to reinvigorate alliances around the world and deepen its engagement in multilateral fora concerned with counterterrorism at the United Nations and its specialized agencies, and at regional organizations worldwide.  The net effect of this work has included increasing the pool of donors for capacity building; strengthening international resolve against terrorism; and also strengthening global norms so that countries jointly do a better job to build security.

Throughout the year, for example, the United States worked closely with partners in many multilateral fora to combat and prevent the financing of terrorism, including the UN Security Council's Counter-Terrorism Committee (CTC)  and the al-Qa'ida and Taliban Sanctions Committee; the UN's Counterterrorism Implementation Task Force; the Egmont Group of Financial Intelligence Units; the Financial Action Task Force (FATF) and FATF-style regional bodies; the Group of Eight's (G8) Counterterrorism Action Group (CTAG); and various international financial institutions.  In addition, the United States continued its regular dialogue on terrorist financing with the European Union (EU).  Since its launch in September 2004, the dialogue has served as a framework for exchanges to promote information sharing and cooperation on joint issues of concern and on technical assistance issues.

The United States and its partners worked through these organizations to establish and promote best practices, build the counterterrorism and law enforcement capabilities of "weak but willing" states, and to institutionalize global counterterrorism norms and standards.  The World Bank and International Monetary Fund have pledged to provide countries with training to increase their capacity to combat money laundering and terrorist financing.

**The United Nations (UN)**.  Sustained and strategic engagement at the UN on counterterrorism issues is a priority for the United States for a number of reasons.  In most parts of the world, it is easier to convince a country to take action if one can point to a UN resolution or treaty calling for such action, rather than relying exclusively on bilateral or informal group pressure.  In addition, the UN has unique expertise it can bring to bear in a range of counterterrorism capacity building fields, which can supplement U.S.-led initiatives.  Working through UN agencies and programs can offer the United States the platform to help build counterterrorism coalitions and to overcome the stigma attached to bilateral relations between the United States and certain states.  Such an approach may not only be more cost-effective, as existing expertise and programs can be leveraged, but also be viewed as more politically acceptable in the recipient country and thus more likely to be implemented.  With these comparative advantages in mind, the United States engaged with a wide range of UN actors on counterterrorism in 2009, including the three counterterrorism related committees of the Security Council: the Counter-Terrorism Committee; the 1267 Committee; and the 1540 Committee.

**The Counter-Terrorism Committee (CTC)** was established by Security Council Resolution (UNSCR) 1373 after September 11, 2001, with the goal of monitoring global efforts to implement the ability of UN member states to combat terrorism.   The work of the CTC is supported by the Counter-Terrorism Executive Directorate (CTED), a staff body of some 20

Page | 217

PX205

counterterrorism experts.  Among other things, CTED seeks to facilitate the delivery of capacity building and other technical assistance to member states, and to promote closer cooperation and coordination with international, regional, and sub-regional organizations.  It also conducts visits to member states to assess the implementation of Resolution 1373.  In 2009, CTED visited eight states: Australia, Azerbaijan, Bahrain, Ghana, Libya, New Zealand, Oman, and Uzbekistan.  It also organized a number of practical capacity building workshops in 2009, including one for South Asian prosecutors and police (in Bangladesh) and for Pakistani parliamentarians focusing on a draft anti-money laundering law.  In September 2009, the committee initiated a series of thematic discussions of all major areas of implementation of resolution 1373 (2001), including issues related to border security, arms trafficking, law enforcement, and best practices in the implementation of Resolution 1624 (2005).

**The United Nations Security Council 1267 Committee**.  The Security Council imposed sanctions against the Taliban in November 1999 for its support of Usama bin Ladin.  The sanctions - a travel ban, arms embargo, and assets freeze - have been modified and strengthened by subsequent resolutions, including 1333 (2000), 1390 (2002), 1455 (2003), 1526 (2004), 1617 (2005), 1735 (2006), 1822 (2008), and 1904 (2009), so that the sanctions measures now apply to individuals and entities associated with al-Qa'ida, Usama bin Ladin, and/or the Taliban wherever located.  On December 19, 2009, the UN Security Council adopted Resolution 1904, which further strengthens procedures to enhance fairness and transparency in the committee's listing and delisting processes.  The resolution also calls on the 192 U.N. member states to provide as much information as possible when proposing a new entry for the 1267 Consolidated List, and requires the committee to approve narrative summaries of reason for listing simultaneous to approving names for sanctions.

To ensure that current listings remain appropriate, the sanctions committee is implementing pursuant to UNSCR 1822 a review of all 488 individuals and entities on the list at the time of the adoption of that resolution (June 30, 2008), which mandated the committee complete this review by June 30, 2010.  Resolution 1904 further calls for the committee to conduct subsequent reviews every three years, and to commence special annual reviews with an eye to removing people who have died or cannot be adequately identified from the list.  The resolution also requested the Secretary-General, in close consultation with the committee, appoint an ombudsperson to assist the committee in its review of petitions received by or on behalf of individuals and entities seeking removal from the Consolidated List.

The United Nations Security Council 1540 Committee on non-proliferation was established after the adoption of Resolution 1540 "that all States shall refrain from providing any form of support to non-State actors that attempt to develop, acquire, manufacture, possess, transport, transfer or use nuclear, chemical, or biological weapons and their means of delivery."  The United States co-sponsored UN Security Council Resolution 1810, which extended the work of the 1540 Committee for three years until April 2011.

The Counterterrorism Implementation Task Force, which now includes 24 UN entities across the UN system and Interpol, was established by the Secretary-General in 2005 to improve the coordination and cooperation among the different entities involved in countering terrorism.  It

Page | 218

PX205

played a key role in the formulation of the Secretary-General's April 2006 report, which served as the basis for the UN Global Counterterrorism Strategy, which was agreed to by all UN member states in September 2006. Since the strategy's adoption, the Task Force has become the focal point for UN efforts to support implementation of the global framework, which includes four pillars: 1) measures to address the conditions conducive to the spread of terrorism; 2) measures to prevent and combat terrorism; 3) measures to build states' capacity to prevent and combat terrorism; and 4) measures to ensure respect for human rights for all and the rule of law as the fundamental basis of the fight against terrorism.

In December 2009, the United States voted in favor of a General Assembly resolution that provided the Task Force with the necessary UN regular budget funding to support the creation of seven positions in the UN Secretariat to support the group's work. Until this point, the Task Force's work was funded exclusively by voluntary contributions from individual UN member states, including the United States.

The members of the Task Force comprise those UN offices and specialized agencies whose ongoing work contributes to global counterterrorism efforts.

 In 2009, the International Civil Aviation Organization (ICAO) instituted procedures on the control and screening of liquids in passenger carry-on baggage and providing specifications for the manufacture of tamper-evident duty free bags. In cooperation with member state authorities and industry, it helped create a harmonized, international list of items prohibited from aircraft. ICAO also continued the second cycle of its Universal Security Audit Program's security assessments of airports around the globe.

The UN Office on Drugs and Crime's (UNODC's) Terrorism Prevention Branch and Global Programme Against Money Laundering continued to provide assistance to countries in the legal and related aspects of counterterrorism. UNODC's mandate in the area of counterterrorism is specifically focused on building the legal framework necessary for member states to become party to and implement the international counterterrorism conventions and protocols. The Terrorism Prevention Branch also focused on strengthening the capacity of the national criminal justice systems to apply the provisions of these instruments in compliance with the principles of rule of law.

International organized crime networks and members can provide support to terrorist organizations and facilitate their activities. The UN Convention on Transnational Organized Crime (UNTOC) is the main international instrument to counter international organized crime. The UNODC supports member states' implementation of the UNTOC and its Protocols, specifically the Protocol on Human Smuggling, and thereby contributed to the global efforts to counter terrorism through the provision of technical assistance and training, and by strengthening countries' legal systems and law enforcement and border control capabilities. Building the capacity of countries to control their borders is critical for reducing terrorist mobility.

The International Atomic Energy Agency (IAEA) continued to implement its Nuclear Security Plan (2006-2009) for combating the threat of terrorism involving nuclear and other radioactive

PX205

material.  IAEA promoted its member states' ratification and implementation of international instruments relating to nuclear security, including the Amendment to the Convention on the Physical Protection of Nuclear Material, and the non-binding IAEA Code of Conduct on the Safety and Security of Radioactive Sources.  The IAEA Nuclear Security Series is a framework of guidance documents designed to help states establish a coherent nuclear security infrastructure.

The United States has been working in the IAEA to enhance security over vulnerable nuclear and other radioactive materials within the IAEA's 144 member states to reduce the risk that such materials could be used in a terrorist event.

**Group of Eight (G8) Counterterrorism Actions.**  The G8, composed of Canada, France, Germany, Italy, Japan, Russia, the United Kingdom, and the United States, continued to develop and promote effective counterterrorism standards and best practices throughout the year.

Italy, who held the G8 presidency, hosted the 2009 annual G8 Summit in L'Aquila where G8 Leaders committed to take action on a range of counterterrorism issues, including:

- strengthening cooperation among the G8 and UN on capacity building for countries requiring assistance to meet international counterterrorism commitments; countering bulk cash smuggling, and the exploitation of charities that finance terrorism;
- countering violent extremism;
- continuing to develop measures to counter and prevent radicalization leading to violence;
- reinforcing efforts to tackle chemical, biological, radiological, and nuclear terrorism;
- protecting against attacks on energy infrastructure and transportation systems; and
- preventing abuse of information/communication technology.

G8 Leaders condemned all terrorist acts as criminal and unjustifiable, particularly the tactics of suicide bombings, the recruitment of the young or disadvantaged to carry out such bombings, and hostage taking.

**Counterterrorism Action Group (CTAG).**  At the June 2003 Evian Summit, G8 Leaders adopted a plan to build political will and capacity to combat terrorism globally, and established the Counterterrorism Action Group (CTAG) to implement this plan.  CTAG supports the UN Counter-Terrorism Committee's efforts to monitor and promote implementation of UNSCR 1373 by developing an active forum for donors to coordinate counterterrorism cooperation with, and assistance to, third countries.  It promotes counterterrorism by prioritizing needs and targeting and coordinating assistance to expand counterterrorism capacity in recipient countries; and encourages all countries to meet their obligations under UNSCR 1373 and, for states party to them, the 13 international counterterrorism conventions and protocols.

Under the leadership of the rotating G8 presidency, CTAG meets two times per year with the active participation of G8 member states, the European Commission, and other donor countries and organizations.  Coordination meetings hosted by the local embassy of the G8 presidency are also held among CTAG members' diplomatic missions in recipient countries, and in

PX205

coordination with the UN Counterterrorism Executive Directorate's (CTED) country visits. Italy, as G8 president, convened several CTAG meetings in New York and chaired 18 local CTAG meetings.  In November 2009, Italy launched discussions on the reform and revitalization of CTAG.

**Financial Action Task Force (FATF) and FATF-Style Regional Bodies (FSRBs)**.  The United States continued to play a strong role in developing new initiatives within FATF, and within FATF-Style Regional Bodies, to meet evolving anti-money laundering and counterterrorism financing threats.  In 2009, the United States delegation continued its contributions to the Plenary on issues of policy as well as to the Working Groups on issues of implementation.  The United States continued its co-chair role, with Italy, on the International Cooperation Review Group to address jurisdictional anti-money laundering/counterterrorism financing (AML/CTF) systemic deficiencies and threats.  The United States also participated in major FATF work comprising examination, negotiation, and implementation of Special Special Recommendation IX (SRIX) on cash couriers for supranational entities.  This included spearheading a best practices paper for SRIX implementation, examination of proliferation finance, and ongoing discussion of making the FATF follow-up process more effective, including the processes of the FATF-style regional bodies in the FATF network.  In 2009, additional work contributed by the United States included evaluation of selected recommendations and criteria, outreach to the private sector, public-private partnerships, development of guidance for non-financial businesses and professions, and participating in FATF mutual evaluations and Expert Review Groups.  The United States has been focusing FATF's attention on trade-based money laundering and terrorist financing, and in 2009 worked with the FATF on a typologies project on the exploitation of free trade zones in money laundering and terrorist financing.  Throughout 2009, the United States promoted a Law Enforcement Working Group to better address AML/CFT issues specific to law enforcement, and was an active participant in projects on confiscation and corruption.  The United States played a similar and equally active role in the FATF-Style Regional Bodies (FSRBs), supporting FSRB-executed training and other workshops and providing technical assistance not only to members, but to the Secretariats themselves.  Additionally, the United States took part in Contact Groups, mutual evaluations, and Expert Review Groups, and provided advice with an eye to increasing the capacity and transparency of the Secretariats.

**European Union (EU).**  The United States and the European Union (EU) cooperated closely on combating terrorism.  In October 2009, the U.S. Attorney General, Secretary of Homeland Security, and EU Justice and Homes Affairs Ministers adopted a joint statement committing both sides to enhancing policy and operational cooperation in the areas of justice freedom and security.  U.S. and EU leaders at the November 2009 Summit highlighted the Ministerial statement and other efforts to deepen counterterrorism cooperation.  The EU Counterterrorism Coordinator, Gilles de Kerchove, coordinated the counterterrorism work of the Council of the European Union, composed of representatives from all 27 EU Member States.  De Kerchove participated in regular dialogues with U.S. counterterrorism officials.

The United States and EU have deepened cooperation in the area of domestic security, including reciprocally participating in each others' domestic response exercises.  The United States

PX205

recently participated in the European Council's review of its emergency and crisis coordination arrangements. The United States and EU continued to collaborate on techniques for preventing terrorist travel. U.S. experts have met with EU counterparts on a number of occasions to exchange lessons learned on the development of passenger prescreening systems, including the use of Passenger Name Records.

In September 2008, the European Court of Justice held that EU implementation of asset freezes required by the UN sanctions regime against al-Qa'ida, the Taliban, and their associates, violated procedural and property rights enshrined in European Community law. The Court annulled the Regulation (insofar as it applied to the two plaintiffs), but gave the EU three months to revise it to rectify these defects. There are several other similar challenges to the EU's implementation of counterterrorism sanctions pending before the European Court of Justice. EU officials continued to remedy issues raised in the September 2008 and other rulings, while preserving a strong counterterrorism effort that complies with UN obligations. In December 2009, the EU passed a new counterterrorism sanctions regulation, codifying many of the procedural changes that have been incorporated in response to evolving European jurisprudence.

EU Justice and Home Affairs Ministers approved a change to the existing EU Framework Decision on Terrorism. Among other changes, the Ministers added incitement and terrorist training as criminal offences under the EU legal framework. The United States and the EU's Judicial Cooperation Unit (Eurojust) have improved cooperation and information exchange among investigators and prosecutors. Pursuant to the U.S.-Eurojust Cooperative Agreement, a U.S. National Liaison Prosecutor, resident in Brussels, assists with operational cases that include several EU member states and assists in mutual legal assistance or extradition issues involving member states. The United States and the EU completed ratification of the U.S.-EU Extradition and Mutual Legal Assistance Agreements.

The United States and EU have established a roadmap toward mutual recognition between the EU Authorized Economic Operator provisions and the U.S. Customs-Trade Partnership Against Terrorism, which are based on a risk management approach to cargo security. A Secure Freight Initiative pilot project in Southampton, UK was concluded in 2008 and provided valuable lessons that will assist in determining how best to execute the 9/11 Implementation Act's requirement for 100 percent scanning of maritime cargo containers.

The United States and EU organized an experts seminar in December 2008 on enhancing the control of explosives. The forum focused on two high-priority shared challenges: improvised liquid or "home-made" explosives and response issues. Discussions are underway to expand existing transatlantic cooperation on research and development to include security research. Responding to the terrorist use of explosives as a threat to aviation security, the European Commission, Directorate General for Transportation and Energy, recommended the restrictions on liquid and gels in carry-on luggage remain in effect beyond the current April 2010 deadline to allow for development and deployment of suitable detection technologies.

In October 2009, the United States and the EU concluded work on a common set of data privacy principles uniting their approaches to protecting personal data while processing and exchanging

Page | 222

PX205

information, and agreed to move ahead with negotiation of a binding international agreement. The November 2009 U.S.-EU Summit welcomed the completion of this effort and agreement to move forward on a binding international agreement as a solid basis for our law enforcement authorities to enhance cooperation, while ensuring full protection for U.S. citizens.  Despite this progress, EU concerns about privacy protection in the United States continue to present an operational and political obstacle to further collaboration in the area of information sharing.

The United States and the EU continued to cooperate on combating terrorist financing, including:

- Improving implementation of Financial Action Task Force Special Recommendation III on developing effective, targeted sanctions regimes;
- Improving procedures for information sharing and for working with private sector financial institutions to strengthen the implementation of asset freezing measures;
- Discussing current terrorist financing risks, including terrorist abuse of the charitable sector and new payment methods (FATF SR III);
- Exchanging information and best practices in expert-level discussions; and
- Holding regular senior-level meetings and practitioner workshops between the United States and EU on counterterrorist financing issues.

**Organization for Security and Cooperation in Europe (OSCE).**  The United States worked with the OSCE through its Action against Terrorism Unit (ATU) to encourage cooperation among OSCE participating states on counterterrorism-related issues by facilitating events and activities, including capacity-building assistance programs, training, and contingency-preparedness workshops.  A comprehensive report by the Secretary General released in April highlighted the main areas of the OSCE's work on counterterrorism and emphasized its multidimensional aspects, including democracy and human rights concerns and media freedom. The OSCE hosted a major conference in September on terrorist financing, bringing together financial and counterterrorism experts from across Eurasia to discuss areas for further collaboration.  In October, a workshop, supported by Russia, highlighted the critical connection between a free and responsible media and efforts to counter terrorism, emphasizing the importance of information sharing and partnership between government and media.  At a regional workshop in Malta in December, the OSCE continued its efforts to provide technical capacity-building assistance to help participating states detect and prevent the use of counterfeit travel documents.

The OSCE Athens Ministerial in December approved several decisions to support counterterrorism efforts: urging a more consolidated approach to transnational threats; outlining specific steps to support OSCE participating state implementation of UN legal counterterrorism instruments; and encouraging OSCE participating state adoption of the ICAO Public Key Directory to support greater travel document security.  The evolving European security dialogue known as the Corfu Process includes a transnational threats component under which counterterrorism work remains prominent.

**North Atlantic Treaty Organization (NATO).**  NATO leads International Security Assistance Force stability operations against insurgents in Afghanistan.  NATO also conducts Operation

PX205

Active Endeavor, a naval mission that aims to counter terrorism by monitoring Mediterranean maritime traffic.  The Alliance is engaged in a far-reaching transformation of its forces and capabilities to better deter and defend against 21st century threats, including terrorism, and is working closely with partner countries and organizations to ensure interoperability of forces, thus enhancing security and broadening cooperation.

NATO adopted its Military Concept against Terrorism in 2002; fielded a Chemical Biological Radiological and Nuclear defense battalion in 2004; and established a special Terrorist Threat Intelligence Unit.  Efforts were underway to enhance Allied protection against the potential attempts to disrupt critical infrastructure (energy, cyber) systems.  Through NATO's Defense Against Terrorism program, the Alliance is developing 10 cutting-edge technologies to protect troops and civilians against terrorist attacks.

In April 2009, at the NATO Summit in Strasbourg-Kehl, NATO leaders condemned all terrorist acts as unjustifiable and criminal, and deplored tactics such as suicide bombing and hostage taking; the recruitment of the young and disadvantaged to conduct terrorist activities; and terrorist abuse of freedoms inherent to democratic societies.  Allies also committed to intensify efforts to deny terrorists access to weapons of mass destruction and their means of delivery. NATO's 28 Allies and 22 Euro-Atlantic Partnership Council Partners have all submitted initial reports as called for by UN Security Council Resolution 1540.  NATO is also examining ways to help strengthen NATO Allies' and Partners' implementation of  UNSCR 1540 commitments.

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF).** In January 2007, the Heads of State of the 10-member ASEAN, comprising Brunei, Burma, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand, and Vietnam, signed a new convention on counterterrorism cooperation.  The new ASEAN treaty recognized the importance of having a global legal framework to combat terrorism, as established by the universal conventions on terrorism.  The treaty further recognized that terrorism offenses such as hijacking, hostage-taking, and bombing are not political offenses, and terrorists cannot hide behind political justifications to evade justice.

Under the new convention, ASEAN members agreed to cooperate to prevent terrorist attacks, terrorist financing, and terrorist movement across national borders.  They also agreed to cooperate to enhance intelligence exchanges, promote public participation in counterterrorism efforts, and strengthen preparedness for dealing with chemical, biological, and nuclear terrorism.

The United States worked closely with ASEAN to enhance counterterrorism cooperation.  The United States  actively participated in counterterrorism-related activities of the 27-member ASEAN Regional Forum (ARF), including the annual meetings on counterterrorism and transnational crime.  The United States has played a significant role in ARF's Counterterrorism and Transnational Crime (CTTC) area of engagement.  The United States developed the CTTC Work Plan, which is a comprehensive and coordinated strategy that focuses ARF efforts on three priority areas: biological terrorism, cybersecurity and cyberterrorism, and narcotics trafficking. The United States is also committed to working with ARF partners on transnational maritime security.

PX205

**Asia Pacific Economic Cooperation (APEC).**  The 21 member economies of APEC (Australia, Brunei, Canada, Chile, China, Hong Kong, Indonesia, Japan, Republic of Korea, Malaysia, Mexico, New Zealand, Papua New Guinea, Peru, Philippines, Russia, Singapore, Chinese Taipei, Thailand, the United States, and Vietnam), are committed to creating a safe environment for the movement of goods, services, and people throughout the region.  Since 2001, APEC has worked to secure the region's economic, trade, investment, and financial systems from attack and/or abuse by terrorists.  The APEC Counterterrorism Task Force was established in 2003 to coordinate implementation of leaders' and ministers' statements on counterterrorism and non-proliferation, promote information sharing, and develop counterterrorism capacity in the region. APEC also leverages its relationship with the private sector to promote public-private partnerships in counterterrorism and secure trade.

In 2009, APEC leaders' recognized the importance of building capacity to counter terrorism and welcomed APEC's work in areas such as trade security, aviation security, protection of energy infrastructure, countering terrorism financing, fighting cyberterrorism, protecting the food supply against terrorist contamination, and emergency preparedness.  The United States also led capacity-building work to counter biological and chemical terrorism, completing a joint pilot project with Peru to implement the APEC Food Defense Principles.  The United States promoted APEC efforts to counter terrorist financing and to help member economies implement the Financial Action Task Force Special Recommendations on Terrorist Financing.  Lastly, the United States actively supported APEC initiatives to strengthen aviation, land, and maritime security, and support trade recovery following an attack.

**OAS Inter-American Committee against Terrorism (CICTE).**  CICTE operates as the counterterrorism policy body for the hemisphere, with its experts representing and advising the 34 member state governments on how to meet the requirements of the international conventions and protocols relating to terrorism, UN Security Council Resolutions (especially 1373, 1267, and 1540), and the Inter-American Convention against Terrorism (IACAT).

At the Ninth Regular Session of CICTE in March 2009 in Washington DC, the member states adopted the Declaration of Strengthening Border Controls and International Cooperation in the Fight Against Terrorism.  The declaration acknowledged that terrorism constitutes a grave threat to the lives, well-being, and fundamental freedoms of all people; threatens international peace and security; it undermines the values and principles underlying the inter-American system, democratic institutions, and the freedoms enshrined in and promoted by the Charter of the OAS, the Inter-American Democratic Charter, and other international instruments.  The CICTE Ministers also reaffirmed:

- the commitments and conclusions adopted in the Declaration of Panama on the Protection of Critical Infrastructure in the Hemisphere in the Face of Terrorism,
- the declarations adopted at the six previous regular sessions of CICTE,
- the importance of the United Nations Global Counterterrorism Strategy, and the relevance of the implementation of these in the fight against terrorism; and

PX205

- the importance of the efforts of the Financial Action Task Force and its commitment to implement and promote internationally its 40 Recommendations on Money Laundering and Nine Special Recommendations on Terrorism Financing.

In 2009, the Secretariat received more than US$ 3.9 million in voluntary contributions from member states.  It conducted 71 activities, training courses and technical assistance missions, which  benefited more than 2,800 participants through nine programs in five areas: border control, critical infrastructure protection, counterterrorism legislative assistance and terrorist financing, crisis management of emerging terrorist threats, and international cooperation and partnerships.  Key achievements included the development of new methodologies — workshops on best practices and crisis management exercises — and the expansion of international partnerships.

## LONG-TERM PROGRAMS/ACTIONS DESIGNED TO REDUCE CONDITIONS THAT ALLOW TERRORIST SAFE HAVENS TO FORM

**The Antiterrorism Assistance Program (ATA)** provides partner nations with the training, equipment, and technology needed to increase their capabilities to find and arrest terrorists.  ATA training builds the kind of cooperation and interactivity between law enforcement officers that has a lasting impact.  During fiscal year 2009, the State Department delivered more than 412 training activities and technical consultations, and trained more than 5,900 participants from 75 countries.  Over the course of its 25-year existence, ATA has trained more than 66,800 students from 159 countries, providing programs tailored to the needs of each partner nation.

**ATA training subjects include**:
- Airport security
- Cyberterrorism
- Bomb detection
- Dignitary protection
- Border control
- Fraudulent document recognition
- Countering terrorist financing
- Interdiction of terrorist organizations
- Crisis management and response
- Kidnap intervention
- Crisis response teams
- Hostage negotiation and rescue
- Response to incidents involving weapons of mass destruction
- Critical antiterrorism skills at the tactical, operational, and strategic levels.

All courses emphasized advanced law enforcement techniques under the rule of law.  Successful ATA programs include:

**Afghanistan**:  ATA's success with the training of the Presidential Protective Service

PX205

(PPS), responsible for the safety of President Hamid Karzai, has lead to a request from Afghanistan to implement training for Detachment 10 (D-10).  D-10 is responsible for the protection of VIPs outside of the scope of the PPS.  ATA will begin teaching VIP techniques to D-10 in FY10.

In 2009, a notable example of a recent PPS program success was when President Karzai requested that a rescue team be sent to his brother-in-law's residence to rescue the brother-in-law and his family.  An ATA trained and equipped counter-assault team (CAT) arrived at the site and observed an individual dressed in an Afghan National Police uniform on the rooftop.  This individual was firing his weapon and the CAT team assumed he was firing at insurgents.  Once the individual noticed the CAT team, he threw a grenade at them and began firing at the CAT team.  A CAT team member  engaged the target and  the motorcade was repositioned in order to better protect Karzai's family, as they were moved to the motorcade and transported to a safe location.  No members of Karzai's family or the CAT team were injured.

**Colombia**:  The acting director of the Colombian Anti-Kidnapping School and the director of the Colombian National Police training facility acknowledged the support provided by DS/T/ATA in the establishment of the school.  Both directors attributed much of the 90 percent reduction in kidnappings since 2003 to ATA training conducted at the Sibate training facility.  The knowledge and techniques, as well as equipment donated, by the ATA Program were recognized as crucial elements in the Colombian government's successful campaign against kidnapping and extortion.

**Indonesia**:  The ATA trained and equipped tactical units of Detachment 88 (Det 88), which have arrested and participated in the adjudication of more than 400 terrorist suspects.  Det 88 units participated in a combined raid on a suspected terrorist safe house in Solo, Central Java.  During the raid, Noordin M. Top, the most-wanted Jemaah Islamiya (JI) terrorist who had eluded capture for nine years, was killed.  Top is considered the mastermind behind the July 17, 2009, hotel bombings of the J.W. Marriott and Ritz-Carlton Hotels in Jakarta, and for a string of other deadly attacks in Indonesia.  Additional JI extremists were also arrested and 200 kilograms of explosives material was confiscated during the raid.

**Mexico:**  Due to the increasing amount of violence against high-level Mexican government officials, ATA has provided a continuing series of VIP Protection courses in Mexico for the Office of the Attorney General, the Secretariat of Public Security, and other high-level Mexican officials.  In 2009, ATA began increasing assistance to the Government of Mexico by hiring a Resident Program Manager who will oversee all aspects of the Mexico ATA program.

**Pakistan**:  On September 12, ATA-trained Pakistani police officers from the Anti-Terrorist Squad (ATS) of the Peshawar Police were on routine patrol in a North West Frontier Province semi-tribal area.  The officers stopped a pickup truck with four men and two women.  Both women were wearing burkas but were observed to be wearing men's shoes.  The ATS officers became suspicious and ordered the women to remove their burkas.  Upon removing their burkas, the ATS officers found two police officers from the ATS Peshawar, who had been kidnapped by the Dara Adam Khel Taliban.  The ATS officers arrested the four suspects in the vehicle, who

Page | 227

PX205

were attempting to transport the abducted police officers from the tribal area to a semi-tribal area.

**Philippines**:  Members of an ATA-trained Philippine National Police Explosive Ordinance Disposal Unit (EOD) responded to a report of abandoned hand grenades next to a children's playground in Central Mindanao, Philippines.  The EOD unit discovered three unexploded fragmentation hand grenades lying in a grassy area near the playground.  After the area was made safe, the ATA-trained EOD technician conducted a controlled destruction of the unexploded grenades using prescribed explosive/disposal materials.

**Terrorist Interdiction Program/Personal Identification Secure Comparison and Evaluation System Program (TIP/PISCES).**   TIP/PISCES FY2009 funding of US$ 10,000,000 sustained, upgraded, and expanded TIP/PISCES system capabilities in the following 17 countries: Afghanistan, Cambodia, Cote D'Ivoire, Djibouti, Ethiopia, Ghana, Iraq, Kenya, Kosovo, Macedonia, Malta, Pakistan, Tanzania, Thailand, Uganda, Yemen and Zambia.  The program helped countries at risk of terrorist activity enhance their border security capabilities by providing a computerized watch-listing system and training that enable host nations to identify suspect travelers.  U.S. agreements for providing this equipment and training included provisions for sharing information gathered at borders and other international entry points.  TIP/PISCES processes an estimated 150,000 travelers every day.

In FY2009:

- In Iraq, two new sites were set up at Mosul and Najaf International Airports.
- In Pakistan, the number of sites equipped with the TIP/PISCES immigration system increased by four to 24 (13 international airports, five land borders, four seaports, and two rail stations).
- In Yemen, 24 sites are currently equipped with the TIP/PISCES immigration system with another four sites planned (three airports and a seaport).
- In Kosovo and Macedonia, TIP/PISCES expanded rapidly and by September 30, 2009, these countries had 10 and 21 sites respectively.

**Counterterrorist Finance Training (CTFT).**  The Deputy Coordinator for Programs of the Department of the State Department's Office of the Coordinator for Counterterrorism and the Deputy Assistant Secretary for Crime in the State Department's Bureau of International Narcotics and Law Enforcement Affairs co-chair the interagency Terrorist Finance Working Group (TFWG).  TFWG meets biweekly or on an ad-hoc basis to develop, coordinate, and review U.S. government global Counterterrorist Finance (CTF) capacity-building initiatives intended to deter, disrupt, and interdict the flow of funds to terrorist organizations and their allies in criminal syndicates.

TFWG has established CTF capacity building programs in countries in each of the Department's six regional bureaus, but the primary focus has been on countries where the illicit finance threat is highest.  Accordingly, in coordination with the interagency Illicit Finance Task Force (IFTF), which is led by the Department of Treasury under the guidance of the Special Representative for

Page | 228

PX205

Afghanistan and Pakistan, CTF programs are being expanded in Afghanistan and Pakistan. Both countries currently lack the legal, regulatory, and institutional capacity to deal effectively with the growing threat of terrorist and other illicit financing being used to fund al-Qa'ida, the Taliban, and Lashkar e-Tayyiba. TFWG and IFTF's Capacity-Building Working Group (CBWG) have also sought to partner with Gulf countries to further expand training and technical assistance in the legal, financial regulatory, financial intelligence, financial investigation, prosecutorial, judicial, and asset forfeiture fields. The goal is to deny terrorists access to funding from donors and facilitators in the Gulf and restrict their use of the formal and informal financial systems of the region.

The roles and responsibilities of the five Department of Justice Resident Legal Advisors (RLAs) were expanded with bilateral and regional responsibilities. The RLAs have conducted training workshops, assisted with the drafting of laws and regulations, and conducted outreach to parliamentarians.

TFWG has worked closely with the Department of Homeland Security and interagency partners to expand bulk cash smuggling training programs. This included conducting a highly successful Regional Operational Cash Courier Training program in South East Asia and bulk cash smuggling training in a variety of countries, including Nigeria and Iraq.

## Countering Violent Extremism

To counter violent extremism, the U.S. government is developing a better understanding of the dynamics of the communities in which violent extremism has taken root. Every at-risk community possesses unique "upstream" political, economic, and social factors that can contribute to the radicalization process. For this reason, one-size-fits-all programs have limited appeal. Instead, programs must be tailored to fit the characteristics of the audience. "Micro-strategies" customized for specific communities, and even neighborhoods, have a better chance of succeeding and enduring.

The State Department is working to address the local drivers of radicalization that can lead large numbers of young people to be vulnerable to al-Qaida's ideology. We are also working both to undermine the al-Qaida narrative and to address the political, economic, and social conditions that al-Qaida and other violent extremists exploit in their drive to recruit. The State Department recognizes that violent extremism can flourish where there is marginalization, alienation, and perceived – or real – relative deprivation. In recognition of this, the Office of the Coordinator for Counterterrorism has staffed a unit to focus on local communities most prone to radicalization.

In many cases, Muslims have more credibility than the U.S. government in addressing these issues in their own communities. They are the ones best placed to convey effective counter-narratives capable of discrediting violent extremism in a way that makes sense to their local community, and only they have the credibility to counter the religious claims made by violent extremists. The U.S. government is working to identify reliable partners and amplify those credible Muslim voices. The United States can help empower these local actors through

Page | 229

PX205

programmatic assistance, funding, or by simply providing them with space – physical or electronic – to challenge violent extremist views.  Non-traditional actors such as NGOs, religious leaders, foundations, and private businesses are some of the most capable and credible partners in local communities.  Therefore, the U.S. government is boosting its outreach efforts to engage with such organizations.  The U.S. government and partner nations are also seeking to develop greater understanding of the linkages between diaspora communities and countries of ancestry. Through familial and business networks, events that affect one community have an impact in the other.

The State Department's Office of the Coordinator for Counterterrorism implements a number of innovative CVE programs.  The Ambassadors Fund for Counterterrorism marries law enforcement and public diplomacy approaches.  It supports projects proposed by Embassies that enhance the ability of local law enforcement personnel to deter terrorism, by applying the tools of soft power and supporting USG efforts to counter violent extremist ideology and recruitment. Up to US$ 100,000 is provided in micro-grants to embassies for projects. In FY2009, 17 projects were funded, including projects in Iraq, Afghanistan, Cambodia, the Philippines, Bosnia and Herzegovina, and Peru.

The International Information Programs Bureau in the Undersecretary's Office of Public Affairs and Public Diplomacy has enhanced and expanded its innovative Digital Outreach Team.  This team of native Arabic, Persian, and Urdu speakers actively engaged on highly-trafficked mainstream news sites and Internet discussion forums in those languages.  Identifying themselves as representing the State Department, they directly counter online arguments that defend goals and tactics of violent extremists, in particular al-Qa'ida and the Taliban.  They have found that in many if not most cases, their interlocutors even welcome the opportunity to engage with official U.S. representatives.  These discussions have generated thousands of hits at a time on popular websites such as *al-Jazeera Talk*.  In the last three years, the team has posted more than 6,000 online messages, including YouTube videos on U.S. foreign policy, religious freedom in America, and U.S. cooperation with Muslim communities around the world, which generated more than 500,000 hits.

In 2009, the Special Representative to Muslim Communities met with civil society leaders at the grassroots level in 11 countries in every region of the globe.  Focusing particularly on young people, she is working to create partnerships with civil society and seeking out those who are pushing back against violent extremism to amplify their voices and connect them to other like-minded thinkers who can inspire positive change.  Because reaching young people requires operating in the spaces that young people choose to occupy, the State Department is increasingly using online and mobile technology to empower credible Muslim voices who can provide an alternative, positive counter-narrative to the negative voices of extremism young people face online.

**The Middle East Partnership Initiative**

The Middle East Partnership Initiative (MEPI), which is located within the Department of State's Bureau of Near Eastern Affairs, seeks to build a vibrant partnership between the United States

PX205

and citizens of the Middle East to support the development of more prosperous, successful, participatory, pluralistic societies at peace within themselves and with their neighbors.  MEPI projects mainly support civil society, the private sector, and academic institutions in their efforts to enhance citizens' economic, social, and political empowerment; expand opportunities for women and youth; and help communities participate together with governments in shaping their own futures.  MEPI assists indigenous efforts to expand political participation, strengthen the rule of law, empower women and youth, expand educational opportunities, and foster entrepreneurship and economic reform throughout the Middle East and North Africa.   Through its Washington headquarters and Regional Offices in Abu Dhabi and Tunis, MEPI has contributed over US$ 530 million to more than 600 projects in 17 countries and territories since its establishment in 2002.

One third of the Middle East's population is under the age of 15 years.  Integrating this vast youth cohort into society as productive adults is a key challenge for regional stability, as well as regional prosperity.  Without education, employment and civic engagement that enable youth to become articulate, engaged, and productive members of society, the region will continue to be marked by limited economic prospects, high unemployment, illiteracy, and even less innovation and capital investment, with more youth potentially falling prey to the appeal of extremist rhetoric.  MEPI works to target this youth population through programming across a range of issue-areas, from English literacy to volunteerism programs, from vocational training to support for entrepreneurship.

MEPI is not a counterterrorism program, but a program dedicated to building effective partnerships with the citizens of the Middle East on behalf of a better future.  Its work to support local agents of change in the Middle East and North Africa helps contribute to improvements in social cohesion, economic development, civil discourse, and responsive governance.  These, in turn, help to address some of the underlying conditions that have been associated with violent extremism.

**Giving People a Voice In Their Future**

- MEPI supported programs to develop inclusive and representative political parties and more transparent electoral systems.
- Through training and technical assistance, MEPI supported independent media outlets and efforts to advance freedom of the press.
- Through hundreds of small grants to indigenous organizations, MEPI helped local civil society expand their impact, enhance their internal capacity, and improve their networking.
- MEPI projects helped local citizens advocate for laws and practices to protect basic rights and fundamental freedoms, including freedom of expression and association.
- By supporting the G8's BMENA Initiative and the participation of civil society from across the region in the Forum for the Future and associated BMENA activities, MEPI provided rare opportunities to reformers and activists to dialogue directly with government officials in multilateral settings.

Page | 231

PX205

- 2009 saw the continuation of MEPI assistance to legislatures.  Many countries held or planned for elections, including Algeria, Kuwait, Morocco, Lebanon, and Tunisia.  In Kuwait, the four female Members of Parliament, elected in May 2009, were all alumni of MEPI programs, and are now active and outspoken parliamentarians.
- A poll released by the Jordan Center for Strategic Studies, a MEPI local grant recipient, revealed public dissatisfaction with parliamentary performance, lending weight to the dissolution of Parliament and creating expectations for the newly formed government.
- In Yemen, a MEPI local grant provides a cadre of Yemeni women political leaders with assistance and training to establish and lead a parliamentary watchdog effort, including lobbying parliament and implementing public awareness and advocacy campaigns.

**Developing Economic Opportunity**

- MEPI provided technical and other assistance in support of both
- free trade agreements with Bahrain, Jordan, Morocco, and Oman; and WTO accession for Yemen, Algeria, and Lebanon.
- MEPI expanded the trade capacity of Arab countries with training and technical assistance; and assisted a number of Gulf and North African countries with revisions to their labor, intellectual property, and customs regulations and to their agricultural import/export standards.
- MEPI expanded efforts to strengthen indigenous labor and business organizations.  For example, the Private Sector Job Creation project trained 480 youth and 15 trainers.  More than 400 youth obtained employment as a result of their participation.
- MEPI created mechanisms to extend credit and other financial services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations.
- MEPI's Women in Technology (WIT) project trained more than 6,000 low-income women, 565 trainers and partner organization staff.  More than 250 WIT participants obtained internships or employment and 45 women started their own businesses after completing training.
- MEPI also expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at various law schools.  The MEPI-funded Commercial Law Development Program, implemented by the Department of Commerce, helped Saudi Arabian judges become better equipped at adjudicating transactions that directly impact the ability of the private sector to operate.  In a historic first, Saudi Arabian judges traveled to the United States for two weeks of judicial consultations.

**Increasing Opportunities For Youth**

- The Higher Education for Development (HED) project funds partnerships that improve quality of instruction and enhance universities' capacities.  HED has funded a number of partnerships between US- and MENA-based universities since 2008.

PX205

- Through the support of a MEPI local grant, the Palestinian non-governmental organization Basma Society for Culture and Arts is involving young people from UNRWA schools in theatrical productions designed to teach dialogue and forgiveness.
- Similarly, The Maccabim Association, an Israeli non-governmental organization, received a MEPI local grant to provide Arab children in a disadvantaged neighborhood with after-school soccer and academic assistance to improve their social and conflict resolution skills.
- With MEPI support, Embassy Doha sponsored a Youth Film Makers' Workshop. Approximately 75 Qatari men and women attended the final juried event, which was covered by Al Jazeera and local media.  The movie that won the Best Film category was a hard-hitting piece on the travails of foreign laborers in Qatar.  One of the films produced by a young filmmaker has been selected for the Al Jazeera Documentary Film Festival and a film festival in Beirut later this year.
- In Yemen, young leaders are learning the values and concepts of effective democratic leadership and civic engagement under a MEPI local grant.  The Democracy School project facilitates political empowerment for young leaders and demonstrates the potential for youth to help Yemen's fledgling democracy meet the local challenges Yemenis face.

**Empowering Women**

- MEPI supports a robust Business Women's Network across the region and strengthens the technology, business, and advocacy skills of women and supports aspiring entrepreneurs.
- MEPI established the first U.S.-Middle East Partnership for Breast Cancer Awareness and Research, which enabled women across the region to join together in private-public partnerships, civic engagement, and networking.  To date, the project has directly trained and engaged more than 2,500 community advocates, resulting in outreach to more than 25,000 community beneficiaries.
- Through its Women in Law program, MEPI created a regional network of more than 400 young Middle East women legal professionals.  The network fosters an exchange of expertise and information, provides professional development training and mentoring, and helps women secure equal rights under the law.
- MEPI also developed projects that encourage greater women's participation in politics through training and mentoring female electoral candidates, strengthening women's civil society membership, and providing leadership training to women.
- MEPI funded country-wide campaign training in Morocco for nearly 4,000 women candidates in preparation for June 2009's municipal elections.  Women candidates won 12.3 percent of the seats, marking a dramatic increase from the 0.5 percent of seats they held previously.
- In Jerusalem and the West Bank, MEPI supports several programs with direct impact on villages in the area.  For example, a community leadership empowerment program funds computer labs in women and youth centers, provides equipment for community halls, and promotes leadership and problem-solving skills in community participants.

PX205

PX205

## Chapter 6
## Terrorist Organizations

**Foreign Terrorist Organizations**

Foreign Terrorist Organizations (FTOs) are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA).  FTO designations play a critical role in the fight against terrorism and are an effective means of curtailing support for terrorist activities.

**Identification**

The Department of State continually monitors the activities of terrorist groups around the world in order to identify potential targets for designation.  When reviewing potential targets, the Department considers terrorist attacks that a group has carried out, whether the group has engaged in planning and preparations for possible future acts of terrorism, or whether it retains the capability and intent to carry out such acts.

**Designation**

Once a target is identified, a detailed "administrative record" is prepared.  This record demonstrates that the criteria for designation have been legally satisfied.  If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to designate an organization, Congress is notified of the Secretary's intent and given seven days to review the designation, as required by the INA.  Upon the expiration of the seven-day waiting period, and in the absence of Congressional action to block the designation, notice of the designation is published in the *Federal Register*, at which point the designation becomes law.  An organization designated as an FTO may seek judicial review of the designation in the U. S. Court of Appeals for the District of Columbia Circuit no later than 30 days after the designation is published in the *Federal Register*.

The Intelligence Reform and Terrorism Prevention Act of 2004 provides that a designated FTO may file a petition for revocation two years after its designation date  or two years after the determination date of its most recent petition for revocation.  In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation have sufficiently changed as to warrant revocation.  If no such petition has been filed within a five-year period, the Secretary of State is required to review the designation to determine whether revocation would be appropriate.  In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed, or that the national security of the United States warrants a revocation.  Revocations made by the Secretary of State must undergo the same administrative review and Congressional processes as that of designations.  A designation may also be revoked by an Act of Congress.

PX205

**Legal Criteria for Designation under Section 219 of the INA as amended**

1. It must be a *foreign organization.*

2. The organization must *engage in terrorist activity*, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)), or *terrorism*, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)), *or retain the capability and intent to engage in terrorist activity or terrorism.*

3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

---

**U.S. Government Designated Foreign Terrorist Organizations**

**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group (ASG)**
**Al-Aqsa Martyrs Brigade (AAMB)**
**Al-Shabaab (AS)**
**Ansar al-Islam**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo (AUM)**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)**
**Harakat ul-Mujahideen (HUM)**
**Hizballah**
**Islamic Jihad Union (IJU)**
**Islamic Movement of Uzbekistan  (IMU)**
**Jaish-e-Mohammed  (JEM)**
**Jemaah Islamiya (JI)**
**Kahane Chai**
**Kata'ib Hizballah (KH)**
**Kurdistan Workers' Party (PKK)**
**Lashkar e-Tayyiba (LT)**
**Lashkar i Jhangvi  (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**

PX205

**Mujahadin-e Khalq Organization  (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front – Abu Abbas Faction (PLF)**
**Palestinian Islamic Jihad – Shaqaqi Faction  (PIJ)**
**Popular Front for the Liberation of Palestine  (PFLP)**
**Popular Front for the Liberation of Palestine-General Command  (PFLP-GC)**
**Al-Qa'ida (AQ)**
**Al-Qa'ida in Iraq (AQI)**
**Al-Qa'ida in the Islamic Maghreb (AQIM)**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Organization 17 November  (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Revolutionary Struggle (RS)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia  (AUC)**

---

| **ABU NIDAL ORGANIZATION** |
| --- |

aka ANO; Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:**  The Abu Nidal Organization (ANO) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ANO was founded by Sabri al-Banna (aka Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974.  The group's previous known structure consisted of various functional committees, including political, military, and financial.  In August 2002, Abu Nidal died in Baghdad, probably at the hands of Iraqi security officials.  Present leadership of the organization remains unclear.  ANO advocates the elimination of Israel and has sought to derail diplomatic relations efforts in support of the Middle East peace process.

**Activities:**  The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons.  The group has not staged a major attack against Western targets since the late 1980s.  Major attacks included those on the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988.  The ANO is suspected of assassinating PLO Deputy Chief Abu Iyad and PLO Security Chief Abu Hul in Tunis in 1991.  In 2008, a Jordanian official reported the apprehension of an ANO member who planned to carry out attacks in Jordan.  The ANO did not successfully carry out attacks in 2009.

**Strength:** Current strength is unknown.

**Location/Area of Operation:** The group is largely considered dormant operationally, although former and possibly current ANO associates might be present in Iraq and Lebanon.

Page | 237

**PX205**

**External Aid:** The ANO's current access to resources is unclear, but it is likely that the decline in support previously provided by Libya, Syria and Iran has had a severe impact on its capabilities.

---

**ABU SAYYAF GROUP**

a.k.a. al Harakat al Islamiyya

**Description:**  The Abu Sayyaf Group (ASG) was designated as a Foreign Terrorist Organization on October 8, 1997, operating in the southern Philippines.  Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamist teachings.  The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998.  His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group.  In September 2006, Khadaffy Janjalani was killed in a gun battle with the Armed Forces of the Philippines.  Radullah Sahiron is assumed to be the ASG leader.

**Activities:**  The ASG engaged in kidnappings for ransom, bombings, beheadings, assassinations, and extortion.  The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago – areas in the southern Philippines heavily populated by Muslims.  In 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadaffy Janjalani in September 2006 and his deputy, Abu Solaiman in January 2007.  In July 2007, the ASG, and Moro Islamic Liberation Front (MILF) engaged a force of Philippine military forces on Basilan Island, killing 14, 10 of whom were beheaded.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995.  In April 2000, an ASG faction kidnapped 21 people, including ten Western tourists, from a resort in Malaysia.  In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines.  Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered.  A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham, also a U.S. national, and Filipina Deborah Yap were killed.

U.S. and Philippine authorities blamed the ASG for a bomb near a Philippine military base in Zamboanga in October 2002 that killed a U.S. serviceman.  In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132.  In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila.  The ASG also claimed responsibility for the February 14, 2005 bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150.  In November 2007, a motorcycle bomb exploded outside the Congress of the Philippines, killing a congressman and

PX205

three staff members.  While there was no definitive claim of responsibility, three suspected ASG members were arrested during a subsequent raid on a safe house and tried for their respective roles in the bombing.  During 2009, the ASG staged multiple kidnappings, beheadings, and assassinations, including the January kidnappings of three Red Cross workers in the southern Philippines who were later released.

**Strength**:  ASG is estimated to have approximately 200 to 500 members.

**Location/Area of Operation:**  The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi.  The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila.  The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there.  In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao.  The ASG was expelled from Mindanao proper by the MILF in mid-2005.

**External Aid:**  The ASG is funded through acts of ransom and extortion, and may receive funding from external sources such as remittances from overseas Filipino workers and possibly Middle East-based extremists.  In October 2007, the ASG appealed for funds and recruits on *YouTube* by featuring a video of the Janjalani brothers before they were killed.

## AL-AQSA MARTYRS BRIGADE

aka al-Aqsa Martyrs Battalion

**Description:**  The al-Aqsa Martyrs Brigade was designated as a Foreign Terrorist Organization on March 27, 2002.  The al-Aqsa Martyrs Brigade comprises an unknown number of small cells of Fatah-affiliated activists that emerged at the outset of the second Palestinian uprising, or al-Aqsa Intifada, in September 2000.  Al-Aqsa's goal is to drive the Israeli military and West Bank settlers from the West Bank and establish a Palestinian state loyal to the secular nationalist Fatah.

**Activities:**  Al-Aqsa employed primarily small-arms attacks against Israeli military personnel and settlers as the intifada spread in 2000, but by 2002 they turned increasingly to suicide bombings against Israeli civilians inside Israel.  In January 2002, the group claimed responsibility for the first female suicide bombing inside Israel.  Many al-Aqsa cells suspended anti-Israeli attacks as part of the broader unilateral Palestinian cease-fire agreement during 2005, though others did not, highlighting the group's absence of central leadership or control.  After the June 2007 HAMAS takeover of the Gaza Strip, al-Aqsa Martyrs cells in Gaza stepped up rocket and mortar attacks against Israel.  However, the group's attacks have largely diminished since the end of Israeli Operation CAST LEAD in January 2009 due to HAMAS' efforts to strictly enforce a ceasefire.  West Bank Al Aqsa Martyrs Brigade members participated in 2007 and 2008 in an Israeli-Palestinian Authority amnesty program in which the fugitives promised to cease anti-Israeli violence and surrender their weapons.  The program remained fragile and threatened to lose credibility with participants due to slow bureaucratic processes and escalating

Page | 239

PX205

Israeli incursions in the West Bank targeting al-Aqsa members – the most recent of these occurred in December 2009 in reaction to a fatal shooting of an Israeli settler in the West Bank. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed dual U.S.-Israeli citizens.

**Strength:** Current strength is unknown, but most likely numbers a few hundred.

**Location/Area of Operation:** Most of al-Aqsa's operational activity is in the Gaza Strip but the group also planed and conducted attacks inside Israel and the West Bank. The group also has members in Palestinian refugee camps in Lebanon.

**External Aid:** Iran has exploited al-Aqsa's lack of resources and formal leadership by providing funds and guidance, mostly through Hizballah facilitators.

---

## AL-SHABAAB

aka The Harakat Shabaab al-Mujahidin; al-Shabab; Shabaab; the Youth; Mujahidin al-Shabaab Movement; Mujahideen Youth Movement; Mujahidin Youth Movement

**Description:** Al-Shabaab was designated as a Foreign Terrorist Organization on March 18, 2008. Al-Shabaab is the militant wing of the former Somali Islamic Courts Council that took over most of southern Somalia in the second half of 2006. In December 2006 and January 2007, Somali government and Ethiopian forces routed the Islamic Court militias in a two-week war. Since the end of 2006, al-Shabaab and disparate clan militias led a violent insurgency, using guerrilla warfare and terrorist tactics against the Ethiopian presence in Somalia and the Transitional Federal Government of Somalia, and the African Union Mission in Somalia (AMISOM) peacekeepers. Rank and file militia fighters from multiple clans that are aligned with al-Shabaab are predominantly interested in indigenous issues and have not shown a strong affinity for global jihad. However, al-Shabaab's core leadership is ideologically aligned with al-Qa'ida (AQ) and has made statements praising Usama bin Ladin and linking the Somali jihad movement to AQ's wider agenda and strategy. In September 2009, al-Shabaab's emir released a video titled "We Are at Your Command, Usama," in which he pledged the group's allegiance to Usama bin Ladin and AQ. Senior al-Shabaab leaders have also benefited from the training program that was created in southern Somalia by now deceased East African AQ operative Saleh Nabhan.

**Activities:** Al-Shabaab has used intimidation and violence to undermine the Somali government, forcibly recruit new fighters, and regularly kill activists working to bring about peace through political dialogue and reconciliation. The group has claimed responsibility for several high profile bombings and shootings throughout Somalia targeting Ethiopian and African Union troops and Somali government officials and allies. It has been responsible for the assassination of numerous civil society figures, government officials, and journalists. Al-Shabaab fighters or those who have claimed allegiance to the group have also conducted violent attacks and targeted assassinations against international aid workers and nongovernmental aid

PX205

organizations.  During 2009, al-Shabaab carried out multiple attacks, including a February double suicide car bomb attack against an African Union Mission in Somalia military base in Mogadishu that killed 11 soldiers; a May suicide bombing that killed six policemen and a civilian at a police headquarters in Mogadishu; and a September attack where two al-Shabaab suicide bombers in stolen UN vehicles killed 21 people at an African Union base in Mogadishu.  In December, an al-Shabaab attack against a medical school graduation ceremony killed 23, including three members of the Transitional Federal Government.

Foreign AQ operatives operated in Somalia under al-Shabaab's protection.  These included Fazul Abdullah Mohammed (aka Harun Fazul) and Saleh Ali Saleh Nabhan, wanted for the 1998 embassy bombings in Kenya and Tanzania and a 2002 hotel bombing in Kenya.  On September 14, Saleh Nabhan was killed while he was traveling in a convoy of armed vehicles.

**Location/Area of Operation:**  The majority of Ethiopian troops left Somalia in late January 2008 and the subsequent security vacuum in parts of central and southern Somalia has led divergent factions to oppose al-Shabaab and its extremist ideology.  However, hardcore al-Shabaab fighters and allied militias conducted brazen attacks in Mogadishu and outlying environs, primarily in lower-Somalia.  In May, al-Shabaab launched a major offensive in Mogadishu, gaining control over parts of the capital.  Al-Shabaab also gained control over the southern port city of Kismayo in late 2009.  Al-Shabaab's victories can also be tied to their ability to play upon clan fissures and the military weakness of the Somali Government.

**Strength:**  Precise numbers are unknown.  Some of al-Shabaab's senior leaders are affiliated with AQ operatives, and it is believed that some al-Shabaab members have previously trained and fought with AQ in Afghanistan.

**External Aid:**  Because al-Shabaab is a multi-clan entity, it received significant donations from the global Somali diaspora; however, the donations were not all specifically intended to support terrorism.  Rather, the money is also meant to support family members.  Al-Shabaab leaders and many rank and file fighters have successfully garnered significant amounts of money from port revenues and through criminal enterprises.

---

## ANSAR AL-ISLAM

aka Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:**  Ansar al-Islam (AI) is a Salafist terrorist group whose goals include expelling the U.S.-led Coalition from Iraq and establishing an independent Iraqi state based on Sharia law.  It was designated as a Foreign Terrorist Organization on March 22, 2004.   AI was established in 2001 in Iraqi Kurdistan with the merger of two Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan.  In a probable effort to appeal to the broader Sunni jihad and expand its support base, AI changed its name to Ansar al-Sunna in 2003, in a bid to unite

Page | 241

PX205

Iraq-based extremists under the new name.  In December 2007, it changed its name back to Ansar al-Islam.  AI has ties to al-Qa'ida central leadership and to al-Qa'ida in Iraq (AQI).  Since Operation Iraqi Freedom, AI has become one of the most prominent groups engaged in anti-Coalition attacks in Iraq behind AQI, and has maintained a strong propaganda campaign.

**Activities:**  AI continued to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures, including high profile attacks on U.S. and Coalition forces, as well as Iraqi private citizens in 2008 and 2009.  AI has also conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians.  One of the more notable attacks was a March 2008 bombing at the Palace Hotel in As Sulamaniyah that killed two people.

**Strength:**  Precise numbers are unknown.  AI is one of the largest Sunni terrorist groups in Iraq.

**Location/Area of Operation:**  Primarily northern Iraq but maintained a presence in western and central Iraq.

**External Aid:**  AI received assistance from a loose network of associates in Europe and the Middle East.  AI has also been linked to AQ and Iran.

## ARMED ISLAMIC GROUP

aka GIA; al-Jama'ah al-Islamiyah al-Musallah; Groupement Islamique Arme

**Description:**  The Armed Islamic Group was designated as a Foreign Terrorist Organization on October 8, 1997.  The GIA aims to overthrow the Algerian regime and replace it with a state governed by Sharia law.  The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Algerian Islamic opposition party.

**Activities:**  The GIA has engaged in attacks against civilians and government workers.  The group began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians.  Since announcing its campaign against foreigners living in Algeria in 1992, the GIA has killed more than 100 expatriate men and women, mostly Europeans.  Almost all of the GIA's members have now joined other Islamist groups or have been killed or captured by the Algerian government.  The Algerian government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces, and the GIA has not conducted attacks since that time.  Some senior members of AQIM are former GIA insurgents.

**Strength:**  Almost all former GIA members have accepted amnesty or joined other terrorist groups; precise numbers are unknown.

**Location/Area of Operation:**  Algeria

PX205

**External Aid:** Unknown.

| ASBAT AL-ANSAR |
|---|

aka Asbat al-Ansar; Band of Helpers; Band of Partisans; League of Partisans; League of the Followers; God's Partisan's; Gathering of Supporters; Partisan's League; AAA; Esbat al-Ansar; Isbat al-Ansar; Osbat al-Ansar; Usbat al-Ansar; Usbat ul-Ansar

**Description:** Asbat al-Ansar was designated as a Foreign Terrorist Organization on March 27, 2002. Asbat al-Ansar is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to al-Qa'ida (AQ) and other Sunni extremist groups. Some of the group's goals include thwarting perceived anti-Islamic and pro-Western influences in the country.

**Activities:** Asbat al-Ansar first emerged in the early 1990s. In the mid-1990s, the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000. Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di, a.k.a. Abu Muhjin, remains at large despite being sentenced to death in absentia for the 1994 murder of a Muslim cleric. In September 2004, operatives with links to the group were allegedly involved in planning terrorist operations in Lebanon targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices. In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for his 2000 plot to assassinate then-U.S. Ambassador to Lebanon, David Satterfield.

Members of Asbat al-Ansar were believed responsible for a Katyusha rocket attack on the Galilee region of Israel in December 2005. Asbat al-Ansar operatives have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations. Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of AQ at the Ain al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements. In 2007, Asbat al-Ansar remained focused on supporting extremists in Iraq and planning attacks against UNIFIL, Lebanese security forces, and U.S. and Western interests. Asbat al-Ansar-associated elements were implicated in the June 17, 2007 Katyusha rocket attack against northern Israel.

Asbat al-Ansar maintained ties with the AQ network. Asbat al-Ansar has recently been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in Ain al-Hilwah. Various extremist web forums criticized Asbat al-Ansar for its failure to support fellow Sunni extremist group Fatah al-Islam (FAI) during the Lebanese Armed Forces campaign in summer 2007. That campaign forced FAI out of Nahr al-Barid refugee camp in northern Lebanon, and severely damaged the group.

PX205

**Strength:**  The group commands between 100 and 300 fighters in Lebanon.  Its nominal leader is Ahmad Abd al-Karim al-Sa'di.

**Location/Area of Operation:**  The group's primary base of operations is the Ain al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**External Aid:**  It is likely that the group receives money through international Sunni extremist networks.

## AUM SHINRIKYO

aka A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:**  Aum Shinrikyo (Aum) was designated as a Foreign Terrorist Organization on October 8, 1997.  Shoko Asahara established Aum in 1987, and the cult received legal status as a religious entity in 1989.  Initially, Aum aimed to take over Japan and then the world, but over time it began to emphasize the coming of the end of the world.  Asahara predicted in the late 1990s that the United States would initiate Armageddon by starting World War III with Japan.  The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995.  In 1997, however, a government panel decided not to invoke the Operations Control Law to outlaw the group.  A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns that Aum might launch future terrorist attacks.  In January 2000, under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph and tried to distance itself from the violent and apocalyptic teachings of its founder.  In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara.  A growing divide between members supporting Joyu and Asahara emerged.  In 2007, Joyu officially left the group and in May established a splinter group called Hikari No Wa, which is translated as 'Circle of Light' or 'Ring of Light.'  Japanese authorities continued to monitor both Aum (now called Aleph) and Hikari No Wa.

**Activities:**  In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 people and causing up to 6,000 to seek medical treatment.  Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500.  Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him to death for his role in the 1995 attacks.  In September 2006, Asahara lost his final appeal against the death penalty and the Japanese Supreme Court upheld the decision in October 2007.  The Supreme Court on December 10 upheld a high court decision that sentenced former AUM Shinrikyo cult member Yoshihiro Inoue to death for playing a key role in the deadly 1995 attack.  This would bring the number of AUM members on death row to nine for their crimes related to the sarin gas attack.

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry. In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

Although Aum has not conducted a terrorist attack since 1995, concerns remain regarding their continued adherence to the violent teachings of founder Asahara that led them to perpetrate the 1995 sarin gas attack.

**Strength:** According to a study by the Japanese government issued in December 2008, current Aum Shinrikyo/Aleph membership in Japan is approximately 1,500, with another 200 in Russia. According to this study, Aum maintained 30 facilities in 15 Prefectures in Japan and continued to possess a few facilities in Russia. At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia. The group gets money from member contributions.

**Location/Area of Operation:** Aum's principal membership is located in Japan, while a residual branch of about 200 followers live in Russia.

**External Aid:** None.

---

## BASQUE FATHERLAND AND LIBERTY

aka ETA, Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; Epanastatiki Pirines; Popular Revolutionary Struggle; K.A.S.; XAKI

**Description:** Basque Fatherland and Liberty (ETA) was designated as a Foreign Terrorist Organization on October 8, 1997. ETA was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava; the autonomous region of Navarra; and the southwestern French territories of Labourd, Basse-Navarre, and Soule. Spain and the EU have listed ETA as a terrorist organization. In 2002, the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group. The European Court of Human Rights in June 2009 upheld the ban on Batasuna. In September 2008, Spanish courts also banned two other Basque independence parties with reported links to Batasuna. Spanish and French prisons together are estimated to hold a total of more than 750 ETA members.

**Activities:** ETA primarily has conducted bombings and assassinations. Targets typically have included Spanish government officials, security and military forces, politicians, and judicial figures, but the group also targeted journalists and tourist areas. The group is responsible for

Page | 245

PX205

killing more than 800 and injuring thousands since it formally began a campaign of violence in 1968.

In March 2006, days after claiming responsibility for a spate of roadside blasts in northern Spain that caused no injuries, ETA announced that it would implement a "permanent" ceasefire. On December 30, 2006, however, ETA exploded a massive car bomb that destroyed much of the covered parking garage outside the Terminal Four of Madrid's Barajas International Airport. The two individuals killed in the blast became ETA's first fatalities in more than three years. The Spanish government suspended talks with ETA, and government officials later said political negotiations with the group had ended. ETA formally renounced its "permanent" cease-fire in June 2007 and three months later threatened a wave of attacks throughout Spain.

In March 2008, just days before the national election in Spain, ETA fatally shot a former city councilman within the Basque Autonomous Community outside his home in northern Spain. In May 2008, a car bomb exploded outside a Civil Guard barracks in Legutiano, killing one policeman and wounding four others. In July 2008, ETA was responsible for five bomb explosions in northern Spain, including four at popular seaside resorts. In September 2008, an ETA car bomb killed an army officer and injured several other people in the northern town of Santona. In October 2008, ETA members conducted a car bomb attack at a university in Pamplona that injured more than one dozen people. The group also claimed responsibility for the December 2008 killing of a leading Basque businessman, for failing to pay extortion money to ETA and for his construction company's involvement in the building of high-speed train links in the Basque Country, which ETA opposed.

In 2009, ETA continued to carry out attacks resulting in extensive damage and casualties. A police chief and two police officers were killed in car bomb explosions claimed by ETA in June and July. Also in July, ETA conducted a car bomb attack outside a Civil Guard barracks that resulted in the injury of 64 people, including 32 officers, 12 children, and 20 other civilians.

Between 2007 and 2009, more than 365 ETA members were arrested. In 2008, Spanish and French authorities apprehended ETA's top three leaders, beginning in May with the arrest of Francisco Javier Lopez Pena (a.k.a. Thierry). In November 2008, French police arrested Garikoitz Aspiazu (a.k.a. Txeroki), who was suspected of ordering the December 2006 car bombing at the Madrid airport. One month later, French police captured his alleged replacement, Aitzol Iriondo Yarza (a.k.a. Gurbitz). In April 2009, ETA's military leader, Jurdan Martitegi, was also arrested in France. In August 2009, French security seized 13 ETA arms caches containing more than 800 kilos of explosives, 15 complete limpet bombs, several weapons, and thousands of rounds of ammunition. In October, Spanish and French authorities arrested the leader of ETA's political wing, which since the arrest of Thierry has held less clout than the military wing.

**Strength**: ETA's exact strength is unknown, but estimates put membership at approximately 300.

Page | 246

PX205

**Location/Area of Operation:**  ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but has attacked Spanish and French interests elsewhere.  Most recently, ETA has sought to establish operational cells in Portugal.

**External Aid:**  ETA financed its activities primarily through bribery and extortion of Basque businesses.  It has received training at various times in the past in Libya, Lebanon, and Nicaragua.  Some ETA members allegedly fled to Cuba and Mexico, while others resided in South America.  ETA members have operated and been arrested in the past in other European countries, including France, Belgium, the Netherlands, the UK, Germany, and Portugal.

## COMMUNIST PARTY OF PHILIPPINES/NEW PEOPLE'S ARMY

aka CPP/NPA; Communist Party of the Philippines; the CPP; New People's Army; the NPA

**Description:**  The Communist Party of the Philippines/New People's Army (CPP/NPA) was designated as a Foreign Terrorist Organization on August 9, 2002.  The military wing of the Communist Party of the Philippines (CPP), the New People's Army (NPA), is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare.  Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from the Netherlands, where he lives in self-imposed exile.  Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen.  Although primarily a rural-based guerrilla group, the NPA had an active urban infrastructure to support its terrorist activities and, at times, used city-based assassination squads.

**Activities:**  The CPP/NPA primarily targeted Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes."  The CPP/NPA charged politicians running for office in CPP/NPA-influenced areas for "campaign permits."  Despite its focus on Philippine governmental targets, the CPP/NPA has a history of attacking U.S. interests in the Philippines.  In 1987, CPP/NPA conducted direct action against U.S. personnel and facilities when three American soldiers were killed in four separate attacks in Angeles City.  In 1989, CPP/NPA issued a press statement taking credit for the ambush and murder of Colonel Rowe, chief of the Ground Forces Division of the Joint U.S.-Military Advisory Group.

For many years the CPP/NPA carried out killings, raids, acts of extortion, and other forms of violence.  In 2009, CPP/NPA's attacks continued unabated.  On January 11, 2009, CPP/NPA claimed responsibility for an attack that wounded the governor of Masbate.  According to the Philippines government, in 2009 the NPA killed 132 soldiers and 55 civilians and committee 360 violent incidents, such as acts of harassment, bombing, and arson.  In multiple 2009 public statements, CPP/NPA declared its intention to target western entities, particularly U.S. military forces conducting joint operations with the Philippine military.

Page | 247

PX205

**Strength**:  The Philippines government estimated that there were around 5,000 CPP/NPA members at the end of 2009.

**Location/Area of Operations:**  The CPP/NPA operated in rural Luzon, Visayas, and parts of northern and eastern Mindanao.  There were cells in Manila and other metropolitan centers.

**External Aid:**  Unknown.

## CONTINUITY IRISH REPUBLICAN ARMY

aka Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:**  The Continuity Irish Republican Army (CIRA) was designated as a Foreign Terrorist Organization on July 13, 2004.  CIRA is a terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland.  CIRA cooperates with the larger Real IRA (RIRA).

**Activities**:  CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies.  On occasion, it provided advance warning to police of its attacks.  Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups.  CIRA did not join the Provisional IRA in the September 2005 decommissioning and remained capable of effective, if sporadic, terrorist attacks.  In early 2006, the Independent Monitoring Commission reported that two splinter organizations, Óglaigh na hÉireann and Saoirse na hÉireann, were formed as a result of internal disputes within CIRA.  Around the same time, CIRA claimed the firebomb attacks of B&Q home-supply stores, although RIRA also claimed such attacks.  CIRA activity largely decreased from previous levels seen in 2005.

By 2007, the group had become increasingly active in criminal activity in Northern Ireland and Ireland.  In April 2007, following the discovery of an improvised mortar adjacent to the railway line in Lurgan, three CIRA members were arrested and charged with conspiracy to murder, possession of explosives with intent to endanger life, and possession of articles for use in terrorism.  The Independent Monitoring Commission , which was established to oversee the peace process, assessed that CIRA was responsible for the June bombing of a police patrol car and an August 2008 attempted rocket attack in Lisnaskea.  In November 2008, CIRA publicly threatened to murder any Belfast Catholic community workers found to be cooperating with the police.  In March 2009, the CIRA claimed responsibility for the murder of a Police Service of Northern Ireland constable in Craigavon County, Northern Ireland.

**Strength:**  Membership is small, with possibly fewer than 50 hard-core activists.  Police counterterrorist operations have reduced the group's strength.

PX205

**Location/Area of Operation:**  Northern Ireland and the Irish Republic.  CIRA does not have an established presence in Great Britain.

**External Aid**:  Suspected of receiving funds and arms from sympathizers in the United States.  CIRA may have acquired arms and materiel from the Balkans, in cooperation with the RIRA.

| GAMA'A AL-ISLAMIYYA |
|---|

aka al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI; Islamic Gama'at; IG; Islamic Group,

**Description:**  Gama'a al-Islamiyya (IG) was designated as a Foreign Terrorist Organization on October 8, 1997.  IG, once Egypt's largest militant groups, was active in the late 1970s, but is now a loosely organized network.  The majority of its Egypt-based members have renounced terrorism, although some located overseas have begun to work with or have joined al-Qa'ida (AQ).  The external wing, composed of mainly exiled members in several countries, maintained that its primary goal was to replace the Egyptian government with an Islamic state.

IG announced a cease-fire in 1997 that led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations.  IG announced another ceasefire in March 1999 that the majority of its leaders have held to through the end of 2009, but its spiritual leader, Sheik Umar Abd al-Rahman, sentenced to life in prison in January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000.  IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists and four Egyptians, and wounded dozens more.  In February 1998, a senior member signed Usama bin Ladin's fatwa call for attacks against the United States but may not have been acting as part of the IG.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that cause mass casualties.  Musa disappeared several months afterward and the United States has no information about his whereabouts.  In March 2002, members of the group's historic leadership in Egypt declared the use of violence misguided and renounced its future use, prompting denunciations from much of the leadership abroad.  The Egyptian government continued to release IG members from prison as part of its rehabilitation program; approximately 900 were released in 2003 and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members.  In August 2006, Ayman al-Zawahiri announced that IG had merged with AQ, but the group's Egypt-based leadership quickly denied this claim which ran counter to their reconciliation efforts.  Supporters of Sheikh Abd al-Rahman still remain a possible threat to U.S. interests as both 'Abd al-Rahman and his supporters have previously called for reprisal attacks in case of his death in prison.

**Activities:**  Before the 1997 cease-fire, IG conducted armed attacks against Egyptian security and other government officials and Coptic Christians.  After the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack.  IG

Page | 249

PX205

claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia.  IG was dormant in 2009.

**Strength:**  At its peak, IG probably commanded several thousand hardcore members and a similar number of supporters.  Security crackdowns following the 1997 attack in Luxor, the 1999 cease-fire, and post-September 11 security measures and defections to AQ have probably resulted in a substantial decrease in what is left of an organized group.

**Location/Area of Operation:**  The IG maintained an external presence in Afghanistan, Yemen, Iran, the United Kingdom, Germany, Austria, and France.  IG terrorist presence in Egypt was minimal due to the reconciliation efforts of former local members.

**External Aid:** AQ and Afghan militant groups provide support to members of the organization to carry out support on behalf of AQ but not in conjunction with the IG.  IG also may have obtained some funding through various Islamic non-governmental organizations.

---

| HAMAS |
| --- |

aka the Islamic Resistance Movement; Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Izz al-Din al Qassam Forces; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions

**Description:**  HAMAS was designated as a Foreign Terrorist Organization on October 8, 1997.  HAMAS possesses military and political wings, and was formed in late 1987 at the onset of the first Palestinian uprising, or Intifada, as an outgrowth of the Palestinian branch of the Muslim Brotherhood.  The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, previously including suicide bombings against civilian targets inside Israel.  HAMAS also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fund-raising, and political activities.  A Shura council based in Damascus, Syria, sets overall policy.  After winning Palestinian Legislative Council elections in January 2006, HAMAS seized control of significant Palestinian Authority (PA) ministries in Gaza, including the Ministry of Interior.  HAMAS subsequently formed an expanded, overt militia called the Executive Force, subordinate to the Interior Ministry.  This force and other HAMAS cadres took control of Gaza in a military-style coup in June 2007, forcing Fatah forces to either leave Gaza or go underground.

**Activities:**  Prior to 2005, HAMAS conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised-explosive device attacks, and shootings.  HAMAS has not directly targeted U.S. interests, though the group makes little or no effort to avoid soft targets frequented by foreigners.  The group curtailed terrorist attacks in February 2005 after agreeing to a temporary period of calm brokered by the PA and ceased most violence after winning control of the PA legislature and cabinet in January 2006.  After HAMAS staged a June 2006 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the abduction of Corporal Gilad

Page | 250

PX205

Shalit, Israel took steps that severely limited the operation of the Rafah crossing.  In June 2007, HAMAS took control of Gaza from the PA and Fatah, leading to an international boycott and closure of Gaza borders.  HAMAS has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, tightening security, and conducting limited operations against Israeli military forces.

HAMAS fired rockets from Gaza into Israel in 2008 but focused more on mortar attacks targeting Israeli incursions. Additionally, other terrorist groups in Gaza fired rockets into Israel, most, presumably, with HAMAS support or acquiescence.  In June 2008, HAMAS agreed to a six-month cease-fire with Israel and temporarily halted all rocket attacks emanating from the Gaza Strip by arresting Palestinian militants and violators of the agreement.  HAMAS claimed responsibility for killing nine civilians, wounding 12 children and 80 other civilians in an attack at the residence of Fatah's Gaza City Secretary in the Gaza Strip in August 2008.  HAMAS also claimed responsibility for driving a vehicle into a crowd in Jerusalem, wounding 19 soldiers and civilians in September 2008.  HAMAS fought a 23-day war with Israel from late December 2008 to January 2009, in an unsuccessful effort to break an international blockade on the Gaza Strip and force the openings of the international crossings.  Since Israel's declaration of a unilateral ceasefire on January 18, 2009, HAMAS has largely enforced the calm, focusing on rebuilding its weapons caches, smuggling tunnels, and other military infrastructure in the Gaza Strip.

**Strength:**  HAMAS probably has several thousand operatives with varying degrees of skills in its armed wing, the al-Qassam Brigades, along with its reported 9,000-person HAMAS-led Palestinian Interior Ministry paramilitary group known as the "Executive Force."

**Location/Area of Operation:**  HAMAS has an operational presence in every major city in the Palestinian territories and currently focuses its anti-Israeli attacks on targets in the West Bank and within Israel.  HAMAS could potentially activate operations in Lebanon or resume terrorist operations in Israel.  The group retains a cadre of leaders and facilitators that conducts diplomatic, fundraising, and arms-smuggling activities in Lebanon, Syria, and other states.  HAMAS is also increasing its presence in the Palestinian refugee camps in Lebanon, probably with the mid-term goal of eclipsing Fatah's long-time dominance of the camps and long-term goal of seizing control of the Palestinian Liberation Organization.

**External Aid:**  HAMAS receives some funding, weapons, and training from Iran.  In addition, fundraising takes place in the Persian Gulf countries, but the group also receives donations from Palestinian expatriates around the world.  Some fundraising and propaganda activity takes place in Western Europe and North America.  Syria provides safe haven for its leadership.

| HARAKAT UL-JIHAD-I-ISLAMI/BANGLADESH |
|---|

aka Harakat ul Jihad e Islami Bangladesh; Harkatul Jihad al Islam; Harkatul Jihad; Harakat ul Jihad al Islami; Harkat ul Jihad al Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad Islami Bangladesh; Islami Dawat-e-Kafela; IDEK

PX205

**Description:** Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) was designated as a Foreign Terrorist Organization on March 5, 2008. HUJI-B was formed in April 1992 by a group of former Bangladeshi Afghan veterans to establish Islamic rule in Bangladesh. The group was banned by Bangladeshi authorities in October 2005. In May 2008, HUJI-B members formed a political off-shoot of HUJI-B called the Islamic Democratic Party (IDP) in an effort to advance HUJI-B goals through Bangladeshi politics. In November, government authorities rejected the IDP's application for registering as a party that could participate in national elections. HUJI-B has connections to the Pakistani militant groups Harakat ul-Jihad-Islami (HUJI) and Harakat ul-Mujahedin (HUM), as well as Lashkar e-Tayyiba (LT), which advocate similar objectives in Pakistan, Jammu, and Kashmir. The leaders of HUJI-B signed the February 1998 fatwa sponsored by Usama bin Ladin that declared American civilians legitimate targets for attack.

**Activities:** HUJI-B may be responsible for numerous terrorist attacks in India, including an October 2008 attack in a shopping area in Agartala, Tripura that killed three and wounded more than 100 people. The Agartala attack may have been conducted jointly with a local Indian separatist group. HUJI-B has trained and fielded operatives in Burma to fight on behalf of the Rohingya, an Islamic minority group. HUJI-B and its detained leader, Mufti Hannan, are also suspected in a 2000 assassination attempt on Bangladeshi Prime Minister Sheikh Hasina. Three HUJI-B members were convicted in December 2008 for the May 2004 grenade attack that wounded the British High Commissioner in Sylhet, Bangladesh. Bangladeshi courts issued warrants in December 2008 for the arrest of eight HUJI-B members for the bombing at a festival in April 2001 that killed 10 and injured scores of people. In May 2008, Indian police arrested HUJI-B militant Mohammad Iqbal, a.k.a. Abdur Rehman, who was charged with plotting attacks in Delhi, India.

**Strength:** HUJI-B leaders claim that up to 400 of its members are Afghan war veterans, but its total membership is unknown.

**Location/Area of Operation:** The group operates primarily in Bangladesh, India, and Burma. HUJI-B has a network of madrassas and conducts trainings in Bangladesh. HUJI-B members are also known train in Pakistan alongside Kashmir-focused groups such as LT, Jaish-e-Mohammed (JEM), HUJI, and HUM.

**External Aid:** HUJI-B funding comes from a variety of sources. Several international Islamic NGOs such as the South African-based Servants of Suffering Humanity may have funneled money to HUJI-B and other Bangladeshi militant groups. HUJI-B also can draw funding from local militant madrassa leaders and teachers.

## HARAKAT UL-MUJAHIDEEN

aka HUM; Harakat ul-Ansar; HUA; Jamiat ul-Ansar; Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Mujahidin;

PX205

**Description:**  Harakat ul-Mujahideen (HUM) was designated as a Foreign Terrorist Organization on October 8, 1997.  HUM, an Islamic militant group based in Pakistan, is aligned politically with the political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir.  Reportedly under pressure from the Government of Pakistan, HUM's long-time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir as the head of HUM in January 2005.  Khalil has been linked to Usama bin Ladin, and his signature was found on Bin Ladin's February 1998 fatwa calling for attacks on U.S. and Western interests.  HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001.  Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December of the same year.  In 2003, HUM began using the name Jamiat ul-Ansar (JUA).  Pakistan banned JUA in November 2003.

**Activities:**  HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir.  It is linked to the Kashmiri militant group al-Faran, which kidnapped five Western tourists in Kashmir in July 1995; the five reportedly were killed later that year.  HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release.  Ahmed Omar Sheik also was released in 1999 and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

HUM is still actively planning and carrying out operations against Indian security and civilian targets in Kashmir.  In 2005, such attacks resulted in the deaths of 15 people.  In November 2007, two Indian soldiers were killed in Kashmir while engaged in a firefight with a group of HUM militants.  Indian police and army forces have engaged with HUM militants in the Kashmir region, killing a number of the organization's leadership in April, October, and December 2008.  In February 2009, Lalchand Kishen Advani, leader of the Indian opposition Bharatiya Janata Party, received a death threat that was attributed to HUM.

**Strength:**  HUM has several hundred armed supporters located in Azad Kashmir, Pakistan; India's southern Kashmir and Doda regions; and in the Kashmir valley.  Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war.  HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets.  After 2000, a significant portion of HUM's membership defected to JEM.

**Location/Area of Operation:**  Based in Muzaffarabad, Rawalpindi, and several other cities in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan.  HUM trains its militants in Afghanistan and Pakistan.

**External Aid:**  HUM collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf states.  HUM's financial collection methods include soliciting donations in magazine ads and pamphlets.  The sources and amount of HUM's military funding are unknown.  Its overt fundraising in Pakistan has been constrained since the government clampdown on extremist groups and the freezing of terrorist assets.

PX205

| HIZBALLAH |
|---|

aka the Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar Allah; Followers of the Prophet Muhammed

**Description:**  Hizballah was designated as a Foreign Terrorist Organization on October 8, 1997. Formed in 1982, in response to the Israeli invasion of Lebanon, the Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini.  The group generally follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei.  Hizballah is closely allied with Iran and often acts at its behest, though it also acts independently.  Although Hizballah does not share the Syrian regime's secular orientation, the group has helped Syria advance its political objectives in the region.  Hizballah remains the most technically-capable terrorist group in the world.  It has strong influence in Lebanon's Shia community.  The Lebanese government and the majority of the Arab world still recognize Hizballah as a legitimate "resistance group" and political party.

Hizballah provides support to several Palestinian terrorist organizations, as well as a number of local Christian and Muslim militias in Lebanon.  This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

**Activities:**  Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s.  Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and on the Argentine-Israeli Mutual Association in Buenos Aires in 1994.  In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily-armored vehicles.  A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants.  In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting a conflict with Israel that lasted into August.  Since the February 2008 killing in Damascus of Imad Mughniyah, the Hizballah terrorist and military chief suspected of involvement in many attacks, senior Hizballah officials have repeatedly made public statements blaming Israel for the killing and vowing retaliation.  In a two-week period in May 2008, Hizballah's armed takeover of West Beirut resulted in more than 60 deaths.  In November 2009, the Israeli navy seized a ship carrying an estimated 400-500 tons of weapons originating in Iran and bound for Hizballah, via Syria.

PX205

**Strength:** Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

**Location/Area of Operation:** Operates in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon. Receives support from Lebanese Shia communities in Europe, Africa, South America, North America, and Asia. Support from these communities is primarily financial, although Hizballah can expect to receive logistic support if needed.

**External Aid:** Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran. Hizballah receives diplomatic, political, logistical, and material support from Syria. Hizballah also receives funding from private donations and profits from legal and illegal businesses.

---

## ISLAMIC JIHAD UNION

aka Islomiy Jihod Ittihodi; formerly known as Islamic Jihad Group; al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahedin; The Kazakh Jama'at; The Libyan Society

**Description:** The Islamic Jihad Union (IJU) was designated as a Foreign Terrorist Organization on June 17, 2005. The IJU is a Sunni extremist organization that splintered from the Islamic Movement of Uzbekistan. They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law.

**Activities:** The IJU primarily operated against Coalition forces in Afghanistan but continued to plan and carry out attacks in Central Asia. The group first conducted attacks in March and April 2004, targeting police at several roadway checkpoints and a popular bazaar. These attacks killed approximately 47 people, including 33 IJU members, some of whom were suicide bombers. The IJU's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan. These attacks marked the first use of suicide bombers in Central Asia. In July 2004, the group carried out near-simultaneous suicide bombings in Tashkent of the Uzbek Prosecutor General's office and the U.S. and Israeli Embassies. The IJU again claimed responsibility via a radical Islamic website and stated that martyrdom operations by the group would continue. The statement also indicated that the attacks were done in support of IJU's Palestinian, Iraqi, and Afghan "brothers" in the global insurgency. The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March and April attacks.

The IJU issued a statement in May 2005, fully supporting the armed attacks on Uzbek police and military personnel in Andijan, Uzbekistan, and called for the overthrow of the regime in Uzbekistan. In September 2007, German authorities disrupted an IJU plot by detaining three IJU operatives. Two of the three had attended IJU-run terrorist training camps in Pakistan and maintained communications with their Pakistani contacts after returning to Germany. The

Page | 255

PX205

operatives had acquired large amounts of hydrogen peroxide and an explosives precursor that they stockpiled in a garage in southern Germany for possible use in multiple car bomb attacks. The IJU subsequently claimed responsibility for the foiled attacks. The IJU claimed responsibility for attacks targeting Coalition forces in Afghanistan in 2008, including a March suicide attack against a U.S. military post. IJU claimed responsibility for two May 2009 attacks in Uzbekistan. The attacks, an armed assault on the police and National Security Service in the border town of Xonobod and a suicide bombing in nearby Andijon, killed a police officer and injured several people.

**Strength:** Unknown.

**Location/Area of Operation:** IJU members are scattered throughout Central Asia, South Asia, and Europe.

**External Aid:** Unknown.

## ISLAMIC MOVEMENT OF UZBEKISTAN

aka IMU

**Description:** The Islamic Movement of Uzbekistan (IMU) was designated as a Foreign Terrorist Organization on September 25, 2000. The IMU is a group of Islamic extremists from Uzbekistan, other Central Asian states, and Europe, whose goal is to overthrow the Uzbek regime and to establish an Islamic state. The IMU has a relationship with the Taliban and al-Qa'ida.

**Activities:** The IMU primarily targeted Uzbek interests before October 2001 and is believed to have been responsible for several explosions in Tashkent in February 1999. In August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage. In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan. In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist.

Since the beginning of Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan, and has also been active in terrorist operations in Central Asia. In late 2009, NATO forces reported an increase in IMU-affiliated foreign fighters in Afghanistan. There are conflicting reports regarding the possible demise of Tahir Yuldashev during an August 2009 airstrike in Pakistan. Government authorities in Russia arrested three suspected IMU-affiliated extremists in November 2009.

**Strength:** Approximately 500-600 members.

PX205

**Location/Area of Operation:**  IMU militants are located in South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, Kazakhstan, and Uzbekistan.

**External Aid:**  The IMU receives support from a large Uzbek diaspora, terrorist organizations, and patrons in the Middle East, Central Asia, and South Asia.

## JAISH-E-MOHAMMED

aka the Army of Mohammed; Mohammed's Army; Tehrik ul-Furqaan; Khuddam-ul-Islam; Khudamul Islam; Kuddam e Islami; Jaish-i-Mohammed

**Description:**  Jaish-e-Mohammed (JEM) was designated as a Foreign Terrorist Organization on December 26, 2001.  JEM is a terrorist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India.  The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States.  It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F).  Pakistan outlawed JEM in 2002.  By 2003, JEM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004.  Pakistan banned KUI and JUF in November 2003.

**Activities:**  Operating under the umbrella of Tehrik-i-Taliban Pakistan (TTP), JEM continued to operate openly in parts of Pakistan despite then-President Musharraf's 2002 ban on its activities.  The group was well-funded and supported attacks against Indian targets, the Pakistani government, sectarian minorities, and Coalition forces in Afghanistan.  Since Masood Azhar's 1999 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the region.

JEM claimed responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people.  The Indian government has publicly implicated JEM, along with Lashkar e-Tayyiba, for the December 2001 attack on the Indian Parliament that killed nine and injured 18.  Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans.  In December 2003, Pakistan implicated JEM members in the two assassination attempts against President Musharraf.  In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl.  In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.  Indian police and JEM extremists continued to engage in firefights throughout 2008 and 2009.  In August 2009, JEM was believed to have fired upon three police officers in two separate incidents, killing one.

PX205

**Strength**:  JEM has at least several hundred armed supporters – including a large cadre of former HUM members – located in Pakistan, India's southern Kashmir and Doda regions, and in the Kashmir Valley.  Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war.  The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

**Location/Area of Operation:**  Pakistan, Afghanistan, and Kashmir.

**External Aid:**  Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami and the Harakat ul-Mujahadin.  In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods.  In addition, JEM collects funds through donation requests in magazines and pamphlets, and allegedly from al-Qa'ida.

---

## JEMAAH ISLAMIYA

aka Jemaa Islamiyah; Jema'a Islamiyah; Jemaa Islamiyya; Jema'a Islamiyya; Jemaa Islamiyyah; Jema'a Islamiyyah; Jemaah Islamiah; Jemaah Islamiyah; Jema'ah Islamiyah; Jemaah Islamiyyah; Jema'ah Islamiyyah; JI

**Description:**  Jemaah Islamiya (JI) was designated as a Foreign Terrorist Organization on October 23, 2002.  Southeast Asia-based JI is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines.  More than 400 JI operatives, including operations chief Hambali, have been captured since 2002, although many of these were subsequently released after serving short sentences, including former JI emir Abu Bakar Bashir.  Abu Bakar was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings.  Indonesia's Supreme Court later that year acquitted him of the charges.  The death of top JI bomb maker Azahari bin Husin in 2005 and a series of high-profile arrests between 2005 and 2008, in combination with additional efforts by the Government of Indonesia, likely reduced JI's capabilities.  But the July 2009 Jakarta hotel bombings demonstrated that JI remained willing and capable of carrying out deadly operations.

Since 2006, many high profile JI operatives have been either captured or killed.  These include the 2006 arrests of several close associates of senior JI operative Noordin Mohammad Top; the 2007 arrests of former acting JI emir Muhammad Naim (a.k.a. Zarkasih) and JI military commander Abu Dujana; the 2008 arrests of two senior JI operatives in Malaysia; the mid-2008 arrest of a JI-linked cell in Sumatra; and the September 2009 death of Noordin Mohammad Top in a police raid.

**Activities:**  In December 2000, JI coordinated bombings of numerous Christian churches in Indonesia and was involved in the bombings of several targets in Manila.  In December 2001, Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies, and British

PX205

and Australian diplomatic buildings in Singapore.  Other significant JI attacks included the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003 bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing, which killed more than 200.  In February 2004, JI facilitated attacks in Manila, Davao, and General Santos City.  JI operatives in the Philippines provide some operational support and training for indigenous Philippine Muslim insurgents.  JI's October 2005 suicide bombing in Bali left 26 dead, including the three suicide bombers.

A JI faction led by Noordin Mohammad Top conducted the group's most recent high-profile attack on July 17, 2009 at the J.W. Marriott and Ritz-Carlton hotels in Jakarta when two suicide bombers detonated explosive devices.  The attack killed seven and injured more than 50, including seven Americans.

**Strength:**  Estimates of total JI members vary from 500 to several thousand.

**Location/Area of Operation:**  JI is based in Indonesia and is believed to have elements in Malaysia and the Philippines.

**External Aid:**  Investigations indicate that JI is fully capable of its own fundraising through membership donations and criminal and business activities, although it also has received financial, ideological, and logistical support from Middle Eastern contacts and non-governmental organizations.

---

## KAHANE CHAI

aka American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description**:  Kach – the precursor to Kahane Chai – was founded by radical Israeli-American Rabbi Meir Kahane with the goal of restoring Greater Israel, which is generally used to refer to Israel, the West Bank, and Gaza Strip.  Its offshoot, Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States.  Both organizations were designated as Foreign Terrorist Organizations on October 8, 1997 after they were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law.  This designation followed the groups' statements in support of Baruch Goldstein's February 1994 attack on the Ibrahimi Mosque and their verbal attacks on the

Page | 259

PX205

Israeli government.  Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank.  The group has attempted to gain seats in the Israeli Knesset over the past several decades, but has won only one seat, in 1984.

**Activities:**  Kahane Chai has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. The group is suspected of involvement in a number of low-level attacks since the start of the First Palestinian Intifada in 2000.  Since 2003, Kahane Chai activists have called for the execution of former Israeli Prime Minister Ariel Sharon and physically intimidated other Israeli and Palestinian government officials who favored the dismantlement of Israeli settlements. Israeli authorities in May 2005 arrested Kahane Chai and other right-wing extremists planning attacks on the Temple Mount using a model aircraft, according to Israeli news services.  In August 2005, an Israeli Army deserter, affiliated with Kahane Chai, opened fire on a bus in the Israeli city of Shfaram, killing four Israeli Arabs and injuring 12.  In June 2006, an Israeli court charged an American born Israeli immigrant and Kahane Chai member with illegally importing and possessing weapons, ammunition, and additional equipment from the United States.  The indictment stated the immigrant intended to use the arms against Arabs for "ideological reasons." In an August 24, 2007 interview with Kuwaiti TV, a leading Kahane Chai member admitted that Kahane Chai had military equipment and weapons and had engaged in military training.

**Strength:**  Kahane Chai's core membership is believed to be fewer than 100.  The group's membership and support networks are overwhelmingly composed of Israeli citizens, most of whom live in West Bank settlements.  Kahane Chai has engaged in terrorist acts in various locations, including the Temple Mount, Hebron, and Shfaram.

**Location/Area of Operation:**  Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

**External Aid:**  Receives support from sympathizers in the United States and Europe.

---

## KATA'IB HIZBALLAH

aka Hizballah Brigades; Hizballah Brigades In Iraq; Hizballah Brigades-Iraq; Kata'ib Hezbollah; Khata'ib Hezbollah; Khata'ib Hizballah; Khattab Hezballah; Hizballah Brigades-Iraq Of The Islamic Resistance In Iraq; Islamic Resistance In Iraq; Kata'ib Hizballah Fi Al-Iraq; Katibat Abu Fathel Al A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah

**Description:**  Kata'ib Hizballah (KH) was designated as a Foreign Terrorist Organization on July 2, 2009.  Formed in 2006, KH is a radical Shia Islamist group with an anti-Western outlook and jihadist ideology that has conducted attacks against Iraqi, U.S., and Coalition targets in Iraq. KH has ideological ties to Lebanese Hizballah and may have received support from that group. KH gained notoriety in 2007 with attacks on U.S. and Coalition forces designed to undermine the establishment of a democratic, viable Iraqi state.  KH has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket

PX205

propelled grenade attacks, and sniper operations.  In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

**Activities:**  KH is responsible for numerous attacks on U.S. forces and Coalition forces, as well as Government of Iraq military, police, politicians, and civilians.  The group is particularly notable for its extensive use of media operations and propaganda by filming and releasing videos of attacks.

KH was particularly active in summer 2008, recording and distributing video footage of its attacks against U.S. and Coalition soldiers.  Using the alias "Hizballah Brigades in Iraq," KH filmed attacks on U.S. Stryker vehicles, Abram tanks, and Bradley armored personnel carriers.  In August 2008, in addition to these attacks, KH filmed seven separate attacks on U.S. and Coalition vehicles.  These recorded attacks carried on into September 2008, with KH targeting U.S. bases, U.S. and Coalition vehicles, and private contractors affiliated with Coalition forces.

KH's activity carried over into 2009 on a number of fronts.  For example, in March 2009, the group continued to record and distribute its attacks by utilizing an Iraqi video hosting website to promote its operational films.  In May 2009, KH displayed videos of its attacks, ranging in date from 2006 to 2008, showcasing operations against U.S. forces in and around Baghdad; and in July 2009 the group highlighted its use of rocket propelled grenades in more operational video footage.

**Strength:**  Membership is estimated at approximately 400 individuals.

**Location/Area of Operation:**  KH's operations are predominately Iraq-based.  KH currently conducts the majority of its operations in Baghdad but has been active in other areas of Iraq, including Kurdish areas such as Mosul.

**External Aid:**  KH is suspected of receiving support from Iran through links with Lebanese Hizballah.

---

| KURDISTAN WORKERS' PARTY |
|---|

aka the Kurdistan Freedom and Democracy Congress; the Freedom and Democracy Congress of Kurdistan; KADEK; Partiya Karkeran Kurdistan; the People's Defense Force; Halu Mesru Savunma Kuvveti; Kurdistan People's Congress; People's Congress of Kurdistan; KONGRA-GEL

**Description:**  The Kurdistan Workers' Party (PKK) or Kongra-Gel (KGK) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PKK was founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization.  The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984.  The PKK aspires to establish an independent Kurdish state in southeastern Turkey, but in recent years has spoken more often about autonomy within a Turkish state that guarantees Kurdish cultural and linguistic rights.

PX205

In the early 1990s, the PKK moved beyond rural-based insurgent activities to include urban terrorism.  In the 1990s, southeastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons.  Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues.  Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group.  The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years.  Striking over the border from bases within Iraq, the PKK has engaged in terrorist attacks in eastern and western Turkey.  The Turkish government in November 2009 announced a reform initiative aimed at giving Kurds more democratic rights in Turkey, in large part to establish a political resolution to the ongoing PKK insurgency.

**Activities:**  Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey.  The PKK's reputed military wing, the People's Defense Force, has been responsible mainly for attacks against military and paramilitary targets in the southeastern area of Turkey.  The PKK's reported urban terrorist arm, the Kurdistan Freedom Hawks (TAK), has attacked primarily tourist areas in Western Turkey, and in late February 2008, announced a new wave of terrorist actions against Turkey.  The PKK did not claim credit for any attacks in 2009.

In an attempt to damage Turkey's tourist industry, the PKK has bombed tourist sites and hotels and kidnapped foreign tourists.  In July 2008, PKK operatives kidnapped three German tourists on Mount Ararat in eastern Turkey in retaliation for Germany's tough stance against the group.  In October 2008, PKK militants killed 15 Turkish soldiers at the Aktutun outpost on the Turkish-Iraqi border, and five days later the group killed several police officers and wounded 19 in an attack in the southeastern province of Diyarbakir.  In 2006, 2007, and 2008, PKK violence killed or injured hundreds of Turks.  PKK activity was lower in 2009, but was still a constant throughout the year.  Despite Ankara's recent democratic initiative, PKK militants killed seven Turkish soldiers near Tokat in north-central Turkey in December 2009.

**Strength:**  Approximately 4,000 to 5,000, of which 3,000 to 3,500 are located in northern Iraq.

**Location/Area of Operation:**  Operates primarily in Turkey, Iraq, Europe, and the Middle East.

**External Aid:**  In the past,  the PKK received safe haven and modest aid from Syria, Iraq, and Iran.  Syria ended support for the group in 1999 and since then has cooperated with Turkey against the PKK.  Since 1999, Iran has also cooperated in a limited fashion with Turkey against the PKK.  In 2008, Turkey and Iraq began cooperating to fight the PKK.  The PKK continues to receive substantial financial support from the large Kurdish diaspora in Europe and from criminal activity there.

| LASHKAR E-TAYYIBA |
| --- |

**PX205**

aka al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir; Jamaat-ud-Dawa, JUD; Jama'at al-Dawa; Jamaat ud-Daawa; Jamaat ul-Dawah; Jamaat-ul-Dawa; Jama'at-i-Dawat; Jamaiat-ud-Dawa; Jama'at-ud-Da'awah; Jama'at-ud-Da'awa; Jamaati-ud-Dawa; Idara Khidmat-e-Khalq

**Description:**  Lashkar e-Tayyiba (LT) was designated as a Foreign Terrorist Organization on December 26, 2001.  The group was responsible for the November 2008 Mumbai attacks.  LT is one of the largest and most proficient of the traditionally Kashmiri-focused militant groups.  LT formed in the late 1980s or early 1990s as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad, a Pakistan-based Islamic fundamentalist mission organization and charity founded to oppose the Soviet presence in Afghanistan.  LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed.  Shortly after LT was designated as an FTO, Saeed changed the name to Jamaat-ud-Dawa (JUD) and began humanitarian projects to avoid restrictions.  LT disseminates its message through JUD's media outlets.  Elements of LT and Jaish-e-Muhammad (JEM) combined with other groups to mount attacks as "The Save Kashmir Movement."  The Pakistani government banned the group and froze its assets in January 2002.  LT and its leader, Hafiz Muhammad Saeed, continued to spread ideology advocating terrorism, as well as virulent rhetoric condemning the United States, India, Israel, and other perceived enemies.

**Activities:**  LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993, as well as several high profile attacks inside India.  LT claimed responsibility for numerous attacks in 2001, including a January attack on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an April attack against Indian border security forces that left at least four dead.  The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building.  LT is also suspected of involvement in the May 2002 attack on an Indian Army base in Kaluchak that left 36 dead.  India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack.  Senior al-Qa'ida (AQ) lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of AQ members in Pakistan.  Indian governmental officials hold LT responsible for the July 2006 train attack in Mumbai and several attacks since then in Hyderabad.

LT was behind the November 2008 attacks in Mumbai against luxury hotels, a Jewish center, a prominent train station, and a popular café that killed at least 183, including 22 foreigners, and injured more than 300.  India has charged 38 people in the case, including the lone surviving suspected terrorist who was captured at the scene.  While most of those charged are at large and thought to be in Pakistan, the suspected terrorist remains in Indian custody and is awaiting trial.  In 2009, the FBI charged Pakistani-American businessman David Headley (born Daood Sayed Gilani) with plotting attacks against the employees of a Copenhagen, Denmark newspaper that published cartoons of the Prophet Muhammad in 2005.  Headley, has pleaded guilty in a U.S.

Page | 263

PX205

court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 170 people – including six Americans – as well as to crimes relating to a separate plot to bomb the Danish newspaper *Jyllands-Posten*.

**Strength:**  The actual size of the group is unknown, but LT has several thousand members in Azad Kashmir, Pakistan; in the southern Jammu, Kashmir, and Doda regions; and in the Kashmir Valley.  Most LT members are Pakistanis or Afghans and/or veterans of the Afghan wars, though the group is alleged to augment its strength through collaboration with terrorist groups comprised of non-Pakistanis.  The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

**Location/Area of Operation:**  Based in Muridke (near Lahore) and Muzaffarabad, Pakistan; maintains a number of facilities, including training camps, schools, and medical clinics.  It has a strong operational network through South Asia.

**External Aid:**  The precise amount of LT funding is unknown.  LT collects donations from the Pakistani expatriate communities in the Middle East and the United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people.  LT coordinates its charitable activities through its front organization JUD and Falah-i-Insaniat Foundation, which spearheaded humanitarian relief to the victims of the October 2005 earthquake in Kashmir.

## LASHKAR I JHANGVI

**Description:**  Lashkar I Jhangvi (LJ) was designated as a Foreign Terrorist Organization on January 30, 2003.  LJ is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan.  LJ focuses primarily on anti-Shia attacks and was banned by then Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence.  Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties.  After the collapse of the Taliban, LJ members became active in aiding other terrorists, providing safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.

**Activities:**  LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan.  In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province.  Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl.  Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed.  Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shia mosque in Quetta, Pakistan.  Authorities also implicated LJ in several sectarian incidents in 2004, including the May and June bombings of two Shia mosques in Karachi that killed more than 40 people.

Page | 264

PX205

In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the March bombing outside the U.S. Consulate in Karachi that killed one U.S. official.  The Government of Pakistan claimed that the group was involved in the July 2006 assassination of Allama Turabi, an influential Shia leader.  In June 2008, Sindh authorities issued a statement attributing the April 2006 Mishtar Parking bombing in Karachi to a militant with ties to LJ.  In January 2008, the Interior Ministry ordered the arrest of three LJ militants suspected of being involved in a suicide bombing at a Shia religious procession in Peshawar that killed 15 people.  In February 2008, police arrested 20 LJ militants wanted for various terrorism attacks in the Punjab and Sindh provinces.  In October 2008, Afghan security forces claimed to have arrested four Pakistani suicide bombers in Kandahar who asserted that they belonged to LJ.

The group was active in 2009.  In January, Hussain Ali Yousafi, chairman of the Hazara Democratic Party, was shot dead by LJ in the southwestern city of Quetta.  Similarly, LJ claimed responsibility for a November attack on the vehicle of Shahid Nizam Durrani, Deputy Inspector General (Operations) of Quetta; one passerby was killed and six others injured.

**Strength:**  Probably fewer than 100.

**Location/Area of Operation:**  LJ is active primarily in Punjab and Karachi.  Some members travel between Pakistan and Afghanistan.

**External Aid:**  Unknown.

## LIBERATION TIGERS OF TAMIL EELAM

aka Ellalan Force; Tamil Tigers

**Description:**  The Liberation Tigers of Tamil Eelam (LTTE) was designated as a Foreign Terrorist Organization on October 8, 1997.  Founded in 1976, the LTTE became a powerful Tamil secessionist group in Sri Lanka.  The LTTE wants to establish an independent Tamil state in the island's north and east.  Since the beginning of its insurgency against the Sri Lankan government in 1983, it evolved its capability from terrorist and guerilla tactics to conventional warfare.  Although the LTTE nominally committed to a 2002 cease-fire agreement with the Sri Lankan government, it continued terrorist attacks against government leaders and dissident Tamils.  In spite of losing the 2009 war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected of surviving largely intact.  However, the international network likely suffered a serious blow by the arrest in southeast Asia and rendition to Sri Lanka of Selvarajah Patmanathan (aka KP), the LTTE's principle financier and arms supplier.  This network continued to collect contributions from the Tamil diaspora in North America, Europe, and Australia, where there were reports that some of these contributions were coerced by locally-based LTTE sympathizers.  The LTTE also used Tamil charitable organizations as fronts for its fundraising.  The Sri Lankan Navy sunk a number of LTTE supply ships during the war, and confiscated at least one such ship, the Princess Chrisanta, after the end

Page | 265

PX205

of the war.

**Activities:**  LTTE integrated a battlefield insurgent strategy with a terrorist program that targeted key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers.  It has conducted a sustained campaign targeting rival Tamil groups, and assassinated Prime Minister Rajiv Gandhi of India in 1991 and President Ranasinghe Premadasa of Sri Lanka in 1993.  Although most notorious for its cadre of suicide bombers, the Black Tigers, the organization included an amphibious force, the Sea Tigers, and a nascent air wing, the Air Tigers.  Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2008.  The LTTE was blamed for a claymore mine on a crowded bus near Colombo on June 6, 2008, killing 22 civilians and wounding more than 50 others.  Political assassinations and bombings were commonplace tactics prior to the 2002 cease-fire and have increased again since mid-2005.  Most LTTE attacks targeted Sri Lankan military and official personnel but, as illustrated by the June 2008 bombing, the LTTE appeared to continue to target civilians.  In 2009, there were more than 40 attacks attributed to the LTTE, including: a February suicide bombing that killed 30 people and injured 64 in an attack at a Mullaithivu IDP Rescue Center; a February air raid in Colombo that killed three people and injured 45 after an LTTE plane, reportedly engaging in kamikaze-style tactics indicating a suicide attack, was hit by anti-aircraft gunfire and crashed into the Inland revenue Building; and a suicide bombing in March that killed 14 and injured 46 people during a religious procession at a mosque in Matara.  In early 2009, Sri Lankan forces re-captured the LTTE's key strongholds and killed LTTE's second in command.  As a result, the Sri Lankan government declared military victory over LTTE in May 2009.

**Strength:**  Exact strength is unknown.

**Location/Area of Operations:**  Sri Lanka

**External Aid:**  The LTTE uses its international contacts and the large Tamil diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies.  The group employs charities as fronts to collect and divert funds for their activities.

---

## LIBYAN ISLAMIC FIGHTING GROUP

aka LIFG

**Description:**  The Libyan Islamic Fighting Group (LIFG) was designated as a Foreign Terrorist Organization on December 17, 2004.  In the early 1990s, the LIFG emerged from the group of Libyans who had fought Soviet forces in Afghanistan and pledged to overthrow Libyan  Leader Muammar al-Qadhafi.  In the years following, some members maintained a strictly anti-Qadhafi focus and targeted Libyan government interests.  Others, such as Abu al-Faraj al-Libi, who in 2005 was arrested in Pakistan, aligned with Usama bin Ladin, and are believed to be part of the al-Qa'ida (AQ) leadership structure or active in the international terrorist network.  On November 3, 2007, AQ leader Ayman al-Zawahiri announced a formal merger between AQ and

PX205

LIFG.  However on July 3, 2009, LIFG members in the United Kingdom released a statement formally disavowing any association with AQ.  In September 2009, six imprisoned LIFG members issued a 417-page document that renounced violence and claimed to adhere to more sound Islamic theology than that of AQ.  More than 100 LIFG members pledged to adhere to this revised doctrine and have been pardoned and released from prison in Libya as of September 2009.

**Activities:**  LIFG has been largely inactive operationally in Libya since the late 1990s when members fled predominately to Europe and the Middle East because of tightened Libyan security measures.  To date, the November 3, 2007 merger with AQ, which many LIFG members in Europe and Libya did not recognize, has not resulted in a significant increase in LIFG activities within Libya.  LIFG engaged Libyan security forces in armed clashes during the 1990s and attempted to assassinate Qadhafi four times.  On July 3, 2009, the LIFG released a statement that the group would cease terrorist activities in Libya.  Although LIFG has not claimed responsibility for terrorist acts in recent years, in February 2006, the U.S. Treasury Department accused five suspected LIFG members residing in the UK of financing terrorism by providing false documents and financial assistance through front companies. The five were placed on the UN's al-Qa'ida and Taliban Sanctions Committee's consolidated terrorist list.

**Strength:**  Unknown.

**Location/Area of Operation:**  Since the late 1990s, many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the UK.

**External Aid:**  The LIFG has used Islamic charitable organizations as cover for fundraising and transferring money and documents.  LIFG also finances operations with criminal activity.

## MOROCCAN ISLAMIC COMBATANT GROUP

aka Groupe Islamique Combattant Marocain (GICM)

**Description:**  The Moroccan Islamic Combatant Group (GICM) was designated as a Foreign Terrorist Organization on October 11, 2005.  The GICM is a clandestine transnational terrorist group centered in the Moroccan diaspora communities of Western Europe.  Its goals include establishing an Islamic state in Morocco and supporting al-Qa'ida's (AQ) war against the West by assisting in the assimilation of AQ operatives into Moroccan and European society.  The group emerged in the 1990s and is composed of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war.  GICM members interact with other North African extremists, particularly in Europe.

**Activities:**  GICM members are believed to be among those responsible for the 2004 Madrid bombing.  GICM members were also implicated in the recruitment network for Iraq, and at least one GICM member carried out a suicide attack against Coalition Forces in Iraq.  GICM

PX205

individuals are believed to have been involved in the 2003 Casablanca attacks. However, the group has largely been moribund since these attacks.

**Strength:**  Much of the GICM's leadership in Morocco and Europe has been killed, imprisoned, or are awaiting trial. Alleged leader Mohamed al-Guerbouzi was convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remains free in exile in the UK. Current strength of GICM is unknown

**Location/Area of Operation:**  Morocco, Western Europe, and Afghanistan.

**External Aid:**  The GICM has been involved in narcotics trafficking in North Africa and Europe to fund its operations. Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks. The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan terrorist Jamal Ahmidan.

## MUJAHADIN-E KHALQ ORGANIZATION

aka MEK; MKO; Mujahadin-e Khalq (Iranian government name for group); Muslim Iranian Students' Society; National Council of Resistance; NCR; Organization of the People's Holy Warriors of Iran; the National Liberation Army of Iran; NLA; People's Mujahadin Organization of Iran; PMOI; National Council of Resistance of Iran; NCRI; Sazeman-e Mujahadin-e Khalq-e Iran

**Description:**  The MEK was originally designated as a Foreign Terrorist Organization on October 8, 1997. The MEK is a Marxist-Islamic Organization that seeks the overthrow of the Iranian regime through its military wing, the National Liberation Army (NLA), and its political front, the National Council of Resistance of Iran (NCRI).

The MEK was founded in 1963 by a group of college-educated Iranian Marxists who opposed the country's pro-western ruler, Shah Mohammad Reza Pahlavi. The group participated in the 1979 Islamic Revolution that replaced the Shah with a Shiite Islamist regime led by Ayatollah Khomeini. However, the MEK's ideology – a blend of Marxism, feminism, and Islamism – was at odds with the post-revolutionary government and its original leadership was soon executed by the Khomeini regime. In 1981, the group was driven from its bases on the Iran-Iraq border and resettled in Paris, where it began supporting Iraq in its eight year war against Khomeini's Iran. In 1986, after France recognized the Iranian regime, the MEK moved its headquarters to Iraq, which facilitated its terrorist activities in Iran. Since 2003, roughly 3,400 MEK members have been encamped at Camp Ashraf in Iraq.

**Activities:**  The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives. During the 1970s, the MEK staged terrorist attacks inside Iran and killed several U.S. military personnel and civilians working on defense projects in Tehran. In 1972, the MEK set off bombs in Tehran at the U.S. Information Service office, a U.S. diplomatic facility staffed by internationally protected persons, the Iran-American Society, and

PX205

the offices of several U.S. companies to protest the visit of President Nixon to Iran.  In 1973, the MEK assassinated the deputy chief of the U.S. Military Mission in Tehran and bombed several businesses, including Shell Oil.  In 1974, the MEK set off bombs in Tehran at the offices of U.S. companies to protest the visit of then U.S. Secretary of State Kissinger.  In 1975, the MEK assassinated two U.S. military officers who were members of the U.S. Military Assistance Advisory Group in Tehran.  In 1976, the MEK assassinated two U.S. citizens who were employees of Rockwell International in Tehran. In 1979, the group claimed responsibility for the murder of an American Texaco executive.

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group.  The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar.  These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown that forced MEK leaders to flee to France.  For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters.  Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training.  Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s.  In 1991, the group reportedly assisted the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime.  In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas.  In June 1998, the MEK was implicated in a series of bombing and mortar attacks in Iran that killed at least 15 and injured several others.  In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq.  The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran.  One attack included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President.  In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border.  Also in 2001, the FBI arrested seven Iranians in the United States who funneled US$ 400,000 to an MEK-affiliated organization in the UAE, which used the funds to purchase weapons.  Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and surrendered their heavy-arms to Coalition control.  Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq.

Page | 269

PX205

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks.  Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation.  French authorities eventually released Rajavi.  Although currently in hiding, Rajavi has made "motivational" appearances via video-satellite to MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003.  In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of both Saddam Hussein handing over suitcases of money to known MEK leaders, and of MEK operatives receiving training from the Iraqi military.

**Strength:**  Estimates place MEK's worldwide membership at between 5,000 and 10,000 members, with large pockets in Paris and other major European capitals.  In Iraq, roughly 3,400 MEK members are gathered at Camp Ashraf, the MEK's main compound north of Baghdad.  As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks, armored personnel carriers, and heavy artillery.  Between 2003 and 2006, a significant number of MEK personnel voluntarily left Ashraf, and an additional several hundred individuals renounced ties to the MEK and been voluntarily repatriated to Iran.

**Location/Area of Operation:**  The MEK's global support structure remains in place, with associates and supporters scattered throughout Europe and North America.  Operations target Iranian government elements across the globe, including in Europe and Iran.  The MEK's political arm, the National Council of Resistance of Iran, has a global support network with active lobbying and propaganda efforts in major Western capitals.  NCRI also has a well-developed media communications strategy.

**External Aid:**  Before Operation Iraqi Freedom began in 2003, the MEK received all of its military assistance and most of its financial support from Saddam Hussein.  The fall of Saddam Hussein's regime has led the MEK increasingly to rely on front organizations to solicit contributions from expatriate Iranian communities.

## NATIONAL LIBERATION ARMY

aka ELN, Ejercito de Liberacion Nacional

**Description:**  The National Liberation Army (ELN) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ELN is a Colombian Marxist-Leninist group formed in 1964 by intellectuals inspired by Fidel Castro and Che Guevara.  It is primarily rural-based, although it also has several urban units.  Peace talks between the ELN and the Colombian government began in Cuba in December 2005 and continued as recently as August 2007.  To

Page | 270

PX205

date, Colombia and the ELN have yet to agree on a formal framework for peace negotiations and talks stalled in early 2008, although sporadic efforts have been made to revive them.

**Activities**:  The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities.  Historically, the ELN has been one of the biggest users of anti-personnel mines in Colombia.  The ELN continues to attempt high profile attacks, but these have fallen off.  For example, in 2003, ELN murdered two mayors from the State of Cauca, Colombia.  In July 2004, ELN kidnapped a Catholic Archbishop while he was traveling in eastern Colombia.  In 2005, after the ELN removed 54 landmines it had placed in Bolivar province, the group promptly replaced them with 50 new ones.  In August 2006, the ELN was believed to be responsible for the kidnapping of three China National Petroleum Corporation contractors in the Colombian state of Choco near the Panamanian border.  In February 2008, ELN rebels kidnapped a Radio Delfin journalist near Dibuya.  In 2009, the ELN remained active but with diminished resources and reduced offensive capability.  Still, the ELN continued to inflict casualties on the Colombian military through use of land mines and occasional attacks.  It continued to fund its operations through narcotics trafficking, kidnapping, and extortion.

**Strength:**  Approximately 2,000 armed combatants and an unknown number of active supporters.

**Location/Area of Operation:**  Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, as well as the border regions with Venezuela.

**External Aid:**  Cuba provides some medical care and political consultation.  Nevertheless, Cuba has encouraged the Colombian government and the ELN to reach an agreement.

## PALESTINE LIBERATION FRONT- ABU ABBAS FACTION

aka PLF; PLF-Abu Abbas; Palestine Liberation Front

**Description:**  The Palestinian Liberation Front – Abu Abbas Faction (PLF) was designated as a Foreign Terrorist Organization on October 8, 1997.  In the late 1970s, the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and then later split into pro-PLO, pro-Syrian, and pro-Libyan factions.  The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:**  Abbas's group was responsible for the 1985 attack on the Italian cruise ship Achille Lauro and the murder of U.S. citizen Leon Klinghoffer.  In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s.  In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq.  The PLF took part in the 2006 Palestinian parliamentarian elections but did not win a seat.  In 2008, as part of a prisoner exchange between Israel and Hizballah, Samir Kantar, a PLF member, and purportedly the longest serving Arab prisoner in Israeli custody, was released from an Israeli prison.  After going approximately 16

PX205

years without claiming responsibility for an attack, PLF claimed responsibility for two attacks against Israeli targets on March 14, 2008, according to media reports.  One attack was against an Israeli military bus in Huwarah, Israel, and the other involved a PLF "brigade" firing at an Israeli settler south of the Hebron Mountain, seriously wounding him.  On March 28, 2008, shortly after the attacks, a PLF Central Committee member reaffirmed PLF's commitment to using "all possible means to restore" its previous glory and to adhering to its role in the Palestinian "struggle" and "resistance," through its military.

**Strength:**  Estimates have placed membership between 50 and 500.

**Location/Area of Operation:**  Based in Iraq from 1990 until 2003.  Current PLF leadership and membership appears to be based in Lebanon and the Palestinian territories.

**External Aid:** Unknown.

## PALESTINE ISLAMIC JIHAD - SHAQAQI FACTION

aka PIJ; Palestine Islamic Jihad; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya Al-Quds; Al-Awdah Brigades

**Description:**  Palestine Islamic Jihad (PIJ) was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed by militant Palestinians in Gaza during the 1970s, PIJ is committed to both the the destruction of Israel through attacks against Israeli military and civilian targets and the creation of an Islamic state in all of historic Palestine, including present day Israel.

**Activities:**  PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets.  The PIJ continued to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories.  Although U.S. citizens have died in PIJ attacks, the group has not directly targeted U.S. interests.  PIJ attacks in 2008 and 2009 were primarily rocket attacks aimed at southern Israeli cities.  In March 2008, two IDF soldiers died as a result of an explosive device detonated near their jeep while patrolling the security fence in the central Gaza Strip, near Kissufim.  HAMAS and PIJ claimed responsibility for the attack.  In April 2008 alone, PIJ fired 216 rockets and mortar shells at Israeli towns.  In 2009, the number of PIJ attacks decreased, but rocket attacks on Israeli towns continued as the PIJ claimed that it had launched 12 rockets in January, one in February and another in September.  Attacks against the Israeli military continued as PIJ teamed up with the Popular Front for the Liberation of Palestine (PFLP) and the al-Aqsa Martyrs Brigade to attack military jeeps with explosives on at least two occasions in May and June.

**Strength:**  PIJ currently has less than 1000 members.

PX205

**Location/Area of Operation:**  Primarily Israel, the West Bank, and Gaza.  The group's senior leadership resides in Syria.  Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**External Aid:**  Receives financial assistance and training primarily from Iran.  Syria provides the group with safe haven.

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE

aka PFLP; Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles; Martyr Abu-Ali Mustafa Battalion

**Description:**  The Popular Front for the Liberation of Palestine (PFLP) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PFLP, a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967.  The PFLP views the Palestinian struggle as a broader non-religious revolution against Western imperialism.  The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.  A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:**  The PFLP stepped up its operational activity during the Second Intifada.  This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year.  In March 2006, the PFLP's current Secretary General, Ahmed Sa'adat, then imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and sentenced to 30 years in prison by an Israeli military court in December 2008.  The PFLP was involved in several rocket attacks, launched primarily from the Gaza Strip, against Israel in 2008 and 2009.  PFLP also claimed responsibility for numerous attacks on Israeli forces in the Gaza Strip, including sniper attacks at border crossings and a December 2009 ambush of Israeli soldiers in central Gaza.

**Strength:**  Unknown.

**Location/Area of Operation:**  Syria, Lebanon, Israel, the West Bank, and Gaza.

**External Aid:**  Receives safe haven from Syria.

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE - GENERAL COMMAND

aka PFLP-GC

PX205

**Description:**  The Popular Front for the Liberation of Palestine - General Command (PFLP-GC) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics.  Originally, the group was violently opposed to the Arafat-led PLO.  Ahmad Jibril, a former captain in the Syrian Army whose son, Jihad, was killed by a car bomb in May 2002, has led the PFLP-GC since its founding.  The PFLP-GC is closely tied to both Syria and Iran.

**Activities:**  The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s.  The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders.  The group's primary focus is now on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and smuggling weapons.  The PFLP-GC maintained an armed presence in several Palestinian refugee camps and at its own military bases in Lebanon and along the Lebanon-Syria border.  The PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel in 2008.  In May 2008, the PFLP-GC claimed responsibility for a rocket attack on a shopping center in Ashkelon that wounded at least ten people.  A health clinic took the brunt of the attack.

**Strength:**  Several hundred to several thousand.

**Location/Area of Operation:**  Headquartered in Damascus, with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.

**External Aid:**  Receives logistical and military support from Syria and financial support from Iran.

---

## AL-QA'IDA

Variant spelling of al-Qa'ida, including al Qaeda; translation "The Base"; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; the Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Ladin Network; the Usama Bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:**  Al-Qa'ida (AQ) was designated as a Foreign Terrorist Organization on October 8, 1999.  AQ was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union.  The group helped finance, recruit, transport, and train Sunni Islamist extremists for the Afghan resistance.  AQ's strategic objectives include uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries.  Its ultimate goal is the establishment of a pan-Islamic caliphate throughout the world.  AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders," saying

PX205

it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere.  AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.

**Activities:** Even as AQ's top leaders continued to plot and direct terrorist attacks worldwide, terrorists affiliated with, but not necessarily controlled by AQ, have increasingly carried out high-profile attacks.  AQ, its affiliates, and those inspired by the group were involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, and South Asia including suicide bombings and vehicle-borne improvised explosive devices in Iraq, Afghanistan, and Pakistan.

AQ is the most significant terrorist threat to the United States and is developing stronger operational relationships with affiliates in the Middle East, North Africa, and Europe.  AQ remained committed to attacking the United States and focused its planning on targets that would produce mass casualties, dramatic visual destruction, and economic dislocation.

AQ and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.  AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam, killing up to 300 individuals and injuring more than 5,000.  In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC; and a fourth into a field in Shanksville, Pennsylvania – leaving over 3,000 individuals dead or missing.

In October 2002, AQ directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four.  The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya that killed 15.  AQ probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

In 2003 and 2004, Saudi-based AQ operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia.  AQ may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people.  Former Pakistani President Musharraf blamed AQ for two attempts on his life in December 2003.  Bin Ladin's deputy al-Zawahiri claimed responsibility on behalf of AQ for the July 7, 2005 attacks against the London public transportation system.  The extent of senior leadership involvement in planning the July 2005 attacks was unclear.

The Government of Pakistan accused AQ, along with the Pakistani Taliban, of being responsible for the October 2007 suicide bombing attempt against former Pakistani Prime Minister Benazir Bhutto that killed at least 144 people in Karachi, Pakistan.  On December 27, 2007, the

PX205

Government of Pakistan stated that Baitullah Mehsud, a now-deceased Pakistani Taliban leader with close ties to AQ, was responsible for Bhutto's assassination.

In January 2008, militants attacked a convoy of Belgian tourists in Hadhramout, Yemen, killing two Belgian women and two Yemeni drivers.  AQ claimed responsibility for the attack.  In June 2008, a suicide car bomber attacked the Danish Embassy in Islamabad, killing six people, including a Danish citizen.  The blast was so powerful that it damaged windowpanes of buildings in a four kilometer radius and left a three-foot crater at impact.  In a press interview, an AQ commander in Afghanistan claimed responsibility for the attack, on behalf of AQ.

In January 2009, Bryant Neal Vinas – a U.S. citizen who traveled to Pakistan, allegedly trained in explosives at AQ camps, and was eventually captured in Pakistan and extradited to the United States – was charged with providing material support to a terrorist organization and conspiracy to commit murder.  Vinas later admitted his role in helping AQ plan an attack against the Long Island Rail Road in New York and confessed to having fired missiles at a U.S. base in Afghanistan.

In September 2009, Najibullah Zazi, an Afghan immigrant and naturalized U.S. citizen, was charged with conspiracy to use weapons of mass destruction as part of an AQ plot to attack the New York subway system.  Zazi later admitted to contacts with AQ senior leadership, which suggests they took an interest in his plans.  U.S. officials have described the alleged bombing plot as one of the most serious terrorism threats to the United States since the 9/11 attacks.

**Strength:**  AQ's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11.  The arrests and deaths of mid-level and senior AQ operatives have disrupted some communication, financial, and facilitation nodes and some terrorist plots.  Additionally, supporters and associates worldwide who are "inspired" by the group's ideology may be operating without direction from AQ central leadership; it is impossible to estimate their numbers.  AQ serves as a focal point of "inspiration" for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahadin, the Taliban, and Jemaah Islamiya.  Pakistani Taliban, separate from the Taliban in Afghanistan, also appear to have strengthened their ties to AQ.

**Location/Area of Operation:**  AQ worldwide networks are augmented by ties to local Sunni extremists.  The group was based in Afghanistan until Coalition Forces removed the Taliban from power in late 2001.  While the largest concentration of senior AQ members now resides in Pakistan's Federally Administered Tribal Areas, the network incorporates members of al-Qa'ida in Iraq (AQI), Yemen, Algeria, and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia.

**External Aid:**  AQ primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause.  Some funds are diverted from Islamic charitable organizations.  In addition, parts of the organization raise funds through criminal activities; for example, AQI raises funds through hostage-taking for ransom,

Page | 276

PX205

and members in Europe have engaged in credit card fraud.  U.S. and international efforts to block AQ funding have hampered the group's ability to raise money.

| AL-QA'IDA IN IRAQ |
| --- |

aka al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; al-Qa'ida of Jihad Organization in the Land of The Two Rivers; al-Qa'ida of the Jihad in the Land of the Two Rivers; al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network

**Description:**  Al-Qa'ida in Iraq was designated a Foreign Terrorist Organization on December 17, 2004.  In the 1990s, Abu Mus'ab al-Zarqawi, a Jordanian-born militant, organized a terrorist group called al-Tawhid wal-Jihad as an opposition  to the presence of U.S. and Western military forces in the Islamic world and also the West's support for and the existence of Israel.  He traveled to Iraq during Operation Iraqi Freedom and led his group against U.S. and Coalition forces  there until his death in June 2006.  In late 2004 he joined al-Qaeda and pledged allegiance to Usama bin Laden. After this al-Tawhid wal-Jihad became known as al-Qaeda in Iraq (AQI), and al-Zarqawi was given the Al-Qaeda title, "Emir of al-Qa'ida in the Country of Two Rivers."

In January 2006, in an attempt to unify Sunni extremists in Iraq, al-Qa'ida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni terrorist groups in Iraq.  AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qa'ida's (AQ's) goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks.  Although Iraqis comprise at least 90 percent of the group's membership, a disproportionate percentage of AQI's senior leadership is foreign-born.  In an attempt to give AQI a more Iraqi persona, the AQI-led ISI was created with Iraqi-national Abu Umar al-Baghdadi named its leader.

Abu Ayyub al-Masri, Zarqawi's successor, issued a statement pledging to continue what Zarqawi began, and AQI has continued its strategy of targeting Coalition Forces, Iraqi government groups, anti-AQI Sunni tribal and security elements, and Shia civilians to provoke violence and undermine perceptions that the Iraqi central government can effectively govern.  AQI has claimed joint attacks with both Ansar al-Islam (AI) and the Islamic Army in Iraq (IAI); however, ideological differences have prevented these groups from merging.  More recently, IAI and the 1920 Revolution Brigades cooperated with Coalition Forces in targeting AQI.

PX205

**Activities:**  AQI's predecessor group, led by al-Zarqawi, was established in 2003 and swiftly gained prominence,  striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross.  In August 2003, AQI carried out major terrorist attacks in Iraq when it bombed the Jordanian Embassy in Baghdad, which was followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq.

AQI conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad.  The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market.  It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004).  AQI was likely involved in other hostage incidents as well.  In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24.  The group also continued assassinations against Shia leaders and members of the Shia militia groups Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against three hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December.  In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships.  Prior to 2005, AQI planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002.  AQI was implicated in the February 2006 Samarra' al-Askari Mosque bombing that precipitated the escalation in sectarian violence. In October 2006, AQI declared the ISI would become a platform from which AQI would launch terrorist attacks throughout the world.  Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force.  AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006 but decreased significantly starting in late 2007.

High-profile attacks in 2007 included the suicide car-bombing attack of a mosque in Al Habbaniyah in February; the multiple suicide bombing attack of Shia pilgrims in Al Hillah in March; several chlorine gas canister bombings from January through June; the suicide truck bombing of a market in Tall 'Afar in March; the suicide truck bombings of a market and Patriotic Union of Kurdistan (PUK) party offices in Amurli and Kirkuk in July; and the multiple suicide truck bombings of two Yazidi villages near Sinjar in August – the single deadliest attack of the Iraq war.

PX205

Although a series of setbacks since late 2007 have diminished its strength, AQI remained the largest violent extremist group in Iraq. It is still capable of high profile attacks that negatively affect public perceptions of stability in Iraq. The group garnered significant media attention in 2009 with a series of high-profile bombings focused on Government of Iraq targets such as ministry buildings and police stations. Three of the biggest attacks, in April, October, and December, killed more than 380 people and injured approximately 1,500. The attacks were designed to highlight the Iraqi government's inability to provide security in Baghdad. Prime Minister Maliki condemned the bombings as a "cowardly" attempt to "cause chaos and hinder the election" taking place at the time. This focus on fewer, better-planned attacks is evidence of the group's shift in strategy and designed to counter its waning influence in 2008 by focusing on the Shia-led Iraqi Government in an effort to heighten sectarian tensions.

**Strength:** Membership is estimated at 1,000-2,000, making it the largest, most potent Sunni extremist group in Iraq. AQI perpetrates the majority of suicide and mass casualty bombings in Iraq, using foreign and Iraqi operatives. The selection of civilian targets, particularly in large urban areas, generates widespread media coverage, but garners public backlash against the group.

**Location/Area of Operation:** AQI's operations are predominately Iraq-based, but it has perpetrated attacks in Jordan. The group maintains a logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe. In Iraq, AQI currently conducts the majority of its operations in Ninawa, Diyala, Salah ad Din, and Baghdad provinces and is re-establishing its capabilities in Al Anbar.

**External Aid**: AQI probably receives most of its funding from a variety of businesses and criminal activities within Iraq, although it likely also receives some funds and other international extremists.

## AL-QA'IDA IN THE ISLAMIC MAGHREB

aka AQIM; formerly known as Group for Call and Combat; GSPC; Le Groupe Salafiste Pour La Predication Et Le Combat; Salafist Group for Preaching and Combat

**Description**: The Salafist Group for Call and Combat (GSPC) was designated as a Foreign Terrorist Organization on March 27, 2002. The GSPC officially merged with al-Qa'ida (AQ) in September 2006 and subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM) in January 2007.

Despite its affiliation, AQIM remains largely a regionally-focused terrorist group. It has adopted a more anti-Western rhetoric and ideology and has aspirations of overthrowing "apostate" African regimes and creating an Islamic Caliphate. AQIM numbers under a thousand fighters and is significantly constrained by its poor finances and lack of broad general appeal to Sufi Muslims in the region. Some senior members of AQIM are former GIA insurgents.

PX205

**Activities**:  AQIM has not been able to conduct spectacular attacks in over two years since it bombed the UN building and Algerian government buildings in 2007.  AQIM continued to conduct small scale attacks and ambushes in northeastern Algeria against Algerian security forces and regularly used improvised explosive devices there.  AQIM in northeastern Algeria was under significant pressure by Algerian security forces.  AQIM's goals of expanding into Morocco, Tunisia, Libya, and Europe have failed thus far.

AQIM factions in the northern Sahel (northern Mali, Niger and Mauritania) conduct kidnap for ransom operations and can conduct small scale attacks and ambushes on security forces there. The target for kidnap for ransom is usually Western citizens from governments or third parties that have established a pattern of making concessions in the form of payment of money or release of operatives in custody.  Last year, one citizen from the United States and the United Kingdom were murdered in Mauritania and Mali respectively.

**Strength:**  AQIM has under a thousand  fighters operating in Algeria with a smaller number in the Sahel.  Abdelmalek Droukdel, aka Abu Mus'ab Abd al-Wadoud, is the leader of the group.

**Location/Area of Operation:**  Northeastern Algeria (the Kabylie region) and northern Mali, Niger, and Mauritania.  AQIM aspires to expand into Europe but its efforts to do so thus far have failed.

**External Aid:**  Algerian expatriates and AQIM members abroad, many residing in Western Europe, provide some limited financial and logistical support.  AQIM members also engage in hostage-taking for ransom and criminal activity to finance their operations.

---

## REAL IRA

aka RIRA; Real Irish Republican Army; 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Oglaigh Na Heireann

**Description:**  The Real IRA (RIRA) was designated as a Foreign Terrorist Organization on May 16, 2001.  The RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland.  The RIRA also seeks to disrupt the Northern Ireland peace process and did not participate in the September 2005 weapons decommissioning.  The 32 County Sovereignty Movement opposed Sinn Fein's adoption in September 1997 of the Mitchell principles of democracy and non-violence.  It also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland.  Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, the RIRA has pledged additional violence and continued to conduct attacks.

PX205

**Activities:**  Many RIRA members are former Provisional Irish Republican Army members who left the organization after that group renewed its cease-fire in 1997.  These members brought a wealth of experience in terrorist tactics and bomb-making to the RIRA.  Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities.  The RIRA's attack in August 2002 at a London army base killed a construction worker.  The RIRA continued to attract new members, and its senior members were committed to launching attacks on security forces.  In November 2007, the RIRA claimed two armed attacks that wounded two Police Service of Northern Ireland (PSNI) officers that same month.  The RIRA claimed responsibility for a May 2008 improvised explosive device that injured a PSNI officer in Belfast and the firebombing of two stores.  The Independent Monitoring Commission, which was established to oversee the peace process, assesses that RIRA members were likely responsible for the majority of the shootings and assaults that occurred in Northern Ireland in 2008.  In November 2008, Lithuania arrested a RIRA member for attempting to arrange a shipment of weapons to Northern Ireland.  In March 2009, the group claimed responsibility for an attack that killed two British soldiers outside a British Army barracks in County Antrim, Northern Ireland.

**Strength:**  According to the Irish government, the RIRA has approximately 100 active members.  The organization may receive limited support from IRA hardliners and Republican sympathizers who are dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process.  Approximately 40 RIRA members are in Irish jails.

**Location/Area of Operation:**  Northern Ireland, Great Britain, and the Irish Republic.

**External Aid**:  The RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers.  The RIRA also is reported to have purchased sophisticated weapons from the Balkans and also occasionally collaborates with its sister organization, the Continuity Irish Republican Army.

## REVOLUTIONARY ARMED FORCES OF COLOMBIA

aka FARC; Fuerzas Armadas Revolucionarias de Colombia

**Description:**  The Revolutionary Armed Forces of Colombia (FARC) was designated as a Foreign Terrorist Organization on October 8, 1997.  The FARC is Latin America's oldest, largest, most capable, and best-equipped terrorist organization, and remains so in spite of recent losses at the hands of the Colombian government.  It began in the early 1960s as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology.  Today, it only nominally fights in support of Marxist goals.  The FARC is responsible for large numbers of ransom kidnappings in Colombia and in some years have held more than 700 hostages.  In 2008, the FARC experienced several significant setbacks.  A continuing Colombian military offensive targeting key FARC units and leaders succeeded in capturing or killing a number of FARC senior and mid-level commanders.

Page | 281

**PX205**

**Activities**:  The FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets.  The FARC has also used landmines extensively.  Foreign citizens are often targets of abductions that the FARC carried out to obtain ransom and political leverage.  The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.  Over the years, the FARC has perpetrated a large number of high profile terrorist acts, including the 1999 murder of three U.S. missionaries working in Colombia, which resulted in a U.S. indictment of the FARC in 2002.   In 2001, the FARC kidnapped and killed a former Colombian minister of culture.  In 2002, the group kidnapped presidential candidate, Ingrid Betancourt and hijacked a domestic commercial flight, kidnapping a Colombian senator on board.  In 2004, the group kidnapped eight Colombian tourists at a spa in San Rafael, Antioquia Department, the mayors of Toribio, Cauca Department and Ricaurte, Narino Department.  In January 2005, authorities attributed to the FARC the murder of the governor of the indigenous reserve of La Ciria in Cauca Department, and the FARC accepted responsibility for the kidnapping and death of the governor of the Kuambi Yalasbi indigenous reserve in Narino Department and a mayor in Quindio Department.

During 2005, the FARC also targeted politicians, assassinating a congressional representative from Caldas Department and four town councilors in Caqueta Department.  In August 2005, a suspected FARC member shot and killed a parish priest in Tolima Department.  A taped conversation of a FARC deserter indicated that a FARC commander ordered the killing.  In 2007, the FARC assassinated eleven state assemblymen and executed a well-known mayor near the Pacific coast.  Also, in 2007, the FARC murdered two town councilmen and another person in Caqueta.  In July 2008, the Colombian military made a dramatic rescue of 15 high-value FARC hostages including three U.S. Department of Defense contractors and former Colombian presidential candidate Ingrid Betancourt.

Significant FARC attacks in 2009 included a May bombing near a police station in Valledupar, Cesar that killed two and injured 10 civilians; an August bombing in the middle of a crowded marketplace in San Vicente del Caguan, Meta that killed two and wounded 19 civilians; and a November incident in which the FARC stopped and burned a passenger bus in Barbacoas, Narino, killing four adults and two children.  On November 11, FARC fighters killed nine Colombian soldiers during an offensive in a southwestern region of Colombia.  In late December, the FARC kidnapped and killed the Governor of Caqueta.  He was the first governor to be kidnapped since President Uribe took office in 2002.

**Strength:**  Approximately 9,000 to 12,000 combatants, with several thousand more supporters.

**Location/Area of Operation:**  Primarily in Colombia with some activities, such as extortion, kidnapping, weapons sourcing, and logistics in neighboring countries.

**External Aid:**  Venezuela provided some logistical, financial, and lethal aid to the FARC.  Cuba provided some medical care, safe haven, and political consultation.  The FARC often used the Colombia/Venezuela, Colombia/Panama, and Colombia/Ecuador border areas for incursions into Colombia and also used Venezuelan and Ecuadorian territory for safe haven, although the degree

PX205

of government acquiescence was not always clear.  In 2008, based on captured computer documents, the Colombian government accused the Venezuelan government of funding and providing weapons to the FARC.

## REVOLUTIONARY ORGANIZATION 17 NOVEMBER

aka Epanastatiki Organosi 17 Noemvri; 17 November

**Description:**  The Revolutionary Organization 17 November (17N) was designated as a Foreign Terrorist Organization on October 8, 1997.  17N is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that protested the ruling military junta.  17N is opposed to the Greek government, the United States, Turkey, and NATO and seeks the end of the U.S. military presence in Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

**Activities:**  Initial attacks consisted of assassinations of senior U.S. officials and Greek public figures.  Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975.  The group began using bombings in the 1980s.  In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece; the group also added improvised rocket attacks to its methods.  The group supported itself largely through bank robberies.  After a failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, excellent detective work led to the arrest of 19 members.  These were the first 17N operatives ever arrested and among them was  a key leader of the organization.  In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms while four other alleged members were acquitted for lack of evidence.  In May 2007, two of the 15 convicted members were acquitted on appeal due to doubts surrounding the charges against them.  The convictions of the other 13 were upheld.

**Strength:**  Unknown but presumed to be small.

**Location/Area of Operation:**  Athens, Greece.

**External Aid:**  Unknown.

## REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT

aka DHKP/C; Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:**  The Revolutionary People's Liberation Party/Front (DHKP/C) was designated as a Foreign Terrorist Organization on October 8, 1997.  The DHKP/C originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth).  It was

PX205

renamed in 1994, after factional infighting. "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations. The group espouses a Marxist-Leninist ideology and vehemently opposes the U.S., NATO, and Turkish establishment. Its goals are the establishment of a socialist state and the abolition of harsh "F-type" Turkish prisons. DHKP/C finances its activities chiefly through donations and extortion.

**Activities:** Since the late 1980s, the group has primarily targeted current and retired Turkish security and military officials. It began a new campaign against foreign interests in 1990, which included attacks against U.S. military and diplomatic personnel and facilities. In order to protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities. In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others. The perpetrators fled to Belgium, where legal cases continue. DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September. Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity. Attacks against U.S. targets beginning in 2003 were probably a response to Operation Iraqi Freedom.

Operations and arrests against the group have weakened its capabilities. In late June 2004, the group was suspected of a bus bombing at Istanbul University, which killed four civilians and 21 other people. In July 2005, in Ankara, police intercepted and killed a suicide bomber who attempted to attack the Ministry of Justice. In June 2006, the group killed a police officer in Istanbul; four members of the group were arrested the next month for the attack. In June 2007, a plot to assassinate Turkish Defense Minister Vecdi Gonul by detonating an improvised explosive device as his car passed under a bridge near Izmir was only foiled when security officials noticed DHKP/C militants attaching the explosives to the bridge.

The DHKP/C was dealt a major ideological blow when Dursun Karatas, leader of the group, died in August 2008 in the Netherlands. Throughout 2008, several DHKP/C members were arrested in Turkey and Europe, and several stood trial for previous terrorist activity. In early March, Turkish authorities arrested three DHKP/C members preparing bombings. German authorities in late July indicted a DHKP/C senior leader, and in November, German authorities arrested several individuals suspected of serving as high-ranking DHKP/C functionaries. In addition, Belgian authorities reviewed the acquittal of several DHKP/C members and began retrials to reach final judgment. After the loss of their leader, the DHKP/C used 2009 to reorganize and was reportedly competing with the Kurdistan Workers Party for influence in Turkey and Europe. In April, a female DHKP/C member conducted an unsuccessful suicide bomb attack against former Justice Minister Hikmet Turk during a visit to Bilkent University when the device failed to detonate. She then fired a gun at him but was blocked by Turk's bodyguards. In December, a 29-year-old case against 1,243 accused members of the organization came to a close in Turkey, resulting in the handing down of 39 life sentences.

**Strength:** Probably several dozen terrorist operatives inside Turkey, with a limited support network throughout Europe.

Page | 284

PX205

**Location/Area of Operation:** Turkey, primarily in Istanbul, Ankara, Izmir, and Adana.

**External Aid:** Widely believed to have training facilities or offices in Lebanon and Syria. DHKP/C raises funds in Europe.

---

## REVOLUTIONARY STRUGGLE

aka RS; Epanastatikos Aghonas; EA

**Description**:  Revolutionary Struggle (RS) was designated as a Foreign Terrorist Organization on May 18, 2009.  RS is a radical leftist group with a Marxist ideology that has conducted attacks against both Greek and U.S. targets in Greece.  RS emerged in 2003 following the arrests of members of the Greek leftist groups 17 November and Revolutionary People's Struggle.

**Activities**:  RS first gained notoriety when it claimed responsibility for the September 5, 2003, bombings at the Athens Courthouse during the trials of 17 November members who were later convicted.  In March 2004, RS claimed responsibility for placing an improvised explosive device (IED) outside of a Citibank office in Athens.  In June 2005, RS claimed responsibility for IEDs detonated in front of the Ministry of Labor and Social Welfare.  In December 2005, RS claimed responsibility for an IED attack in Syntagma Square, outside the Ministry of Economy in central Athens.  RS also claimed responsibility for a  failed May 2006 IED attack against then Greek Minister of Public Order George Voulgarakis.

RS claimed responsibility for the January 12, 2007 attack on the U.S. Embassy in Athens.  A rocket propelled grenade struck the front of the Embassy, damaging the facility but causing no injuries.  In 2009, RS increased the number and sophistication of its attacks on police, financial institutions, and other targets.  RS successfully bombed a Citibank branch in Athens in March 2009, but failed in its vehicle-borne IED attack in February 2009 against the Citibank headquarters building in Athens.  In September, RS claimed responsibility for a car bomb attack on the Athens Stock Exchange, which caused widespread damage and injured a passerby.

**Strength**:  Unknown but presumed to be small.

**Location/Area of Operation**:  Athens, Greece.

**External Aid**:  Unknown.

---

## SHINING PATH

aka SL; Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose

PX205

Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:** Shining Path (SL) was designated as a Foreign Terrorist Organization on October 8, 1997.  Former university professor Abimael Guzman formed SL in Peru in the late 1960s; his teachings created the foundation of SL's militant Maoist doctrine.  SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments.  In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere.  The Peruvian government made dramatic gains against SL during the 1990s, capturing Guzman in 1992 and killing a large number of militants.  More recently, SL members have attempted to influence the local populace through indoctrination.  SL responded to the government's stepped up counterterrorism efforts with a series of bloody counterattacks in late 2008 and throughout 2009.

**Activities:**  In the past, SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations.  However, in the past five years, SL activities have included intimidation of U.S.-sponsored nongovernmental organizations involved in counternarcotics efforts, the ambushing of counternarcotics helicopters, and attacks against Peruvian police perpetrated in conjunction with narcotics traffickers.  For example, in 2005, SL targeted the U.S.-Peruvian counternarcotics program by ambushing and murdering three highway police officers, attacking three counter narcotics helicopters, and killing three police officers with an electronically-detonated explosive device.  Also in 2005, SL kidnapped 10 Peruvian employees of a USAID economic development contractor in the Huallaga valley region.  SL released all of the hostages but reportedly threatened to kill them if they returned to the area.

In 2008, SL killed at least 34 people and conducted over 64 attacks in remote coca growing areas. In one of its most devastating attacks, on October 10, 2008, Peru's military command said a bomb killed 12 soldiers and seven civilians in the country's southeastern mountains.  In April 2009, SL fired rocket propelled grenades at the helicopter carrying the chief of the Peruvian armed forces and several other high-ranking officers.  The helicopter was on its way to the town of Sanabamba, where SL killed 14 soldiers in ambushes earlier that month.  In early September 2009, SL shot down an MI-17 helicopter operated by Peru's Air Force in the country's main coca-growing region, killing three members of the military and wounding five.

**Strength:** Unknown but estimated to be between 300 and 500 armed militants.

**Location/Area of Operation:**  Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

**External Aid:**  None.

---

| **UNITED SELF-DEFENSE FORCES OF COLOMBIA** |
| --- |

aka AUC; Autodefensas Unidas de Colombia

PX205

**Description:** The United Self-Defense Forces of Colombia (AUC) was designated as a Foreign Terrorist Organization on September 10, 2001.  The AUC, commonly referred to as the paramilitaries, was formed in April 1997.  AUC was designed to serve as an umbrella group for loosely affiliated, illegal paramilitary groups retaliating against leftist guerillas, which in turn were fighting the Colombian government and the landed establishment.  However, as the Colombian government increasingly confronted Foreign Terrorist Organizations including the AUC, the group's counter-guerilla activities decreased.  After a large-scale demobilization process, most of the AUC's centralized military structure had been dismantled, and all of the top paramilitary chiefs had stepped down.  Despite AUC's overall demobilization, the group's Cacique Pipinta Front refused to demobilize.  The Cacique Pipinta Front was described as being engaged in a struggle with the FARC for political and territorial control of the western Colombian  region of Caldas, and is still considered a risk to the political stability of the Embera Chami region of Colombia.  According to the Office of the Colombian Ombudsman, the Cacique Pipinta Front has coordinated criminal gangs and hired guns to seize land, accumulate capital, and maintain a hold on power in Caldas and Embera Chami.

**Activities:**  The AUC has carried out political killings and kidnappings of, among others, human rights workers, journalists, teachers, and trade unionists.  As much as 70 percent of the AUC's paramilitary operational costs were financed with drug-related earnings.  Some former members of the AUC never demobilized or are recidivists, and these elements have continued to engage heavily in criminal activities.

**Strength:**  Unknown.

**Location/Areas of Operation:**  Paramilitary forces were strongest in northwest Colombia in Antioquia, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

**External Aid:**  None.

PX205

**Chapter 7**
**Legislative Requirements and Key Terms**

***Country Reports on Terrorism 2009*** is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act. Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

Excerpts and Summary of Key Statutory Terms

Section 2656f(a) of Title 22 of the United States Code states as follows:
(a) … The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing -

*(1) (A) detailed assessments with respect to each foreign country -*

*(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;*

*(ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and*

*(iii) which the Secretary determines should be the subject of such report; and*

*(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;*

*(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;*

*(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on-*

*(A) the extent to which the government of the foreign country is cooperating with the United*

Page | 288

PX205

*States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and*

*(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and*

*(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).*

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;

(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and

(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

**Interpretation and Application of Key Terms.** For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC. 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the U.S. government on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

**Statistical Information.** Pursuant to 22 USC § 2656f(b), this report must contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This requirement is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Counterterrorism Center (NCTC). The statistical annex includes a discussion of the methodology employed by

Page | 289

PX205

NCTC in compiling the relevant data. This report does not contain statistical information specifically concerning combatants. The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets. Further, it would not be practicable to provide such statistics, as the government does not maintain - and would have great difficulty maintaining - statistics that distinguish between incidents against combatants by terrorist groups and by others, including insurgents, in Iraq and Afghanistan.

**Contextual Reporting.** Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists. Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations. It is terrorist groups--and their actions--that are the focus of this report.

Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw. This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence.

Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily "international terrorism" and therefore are not subject to the statutory reporting requirement.

PX205

**National Counterterrorism Center: Annex of Statistical Information**

Information Cut Off Date: March 19, 2010

**Developing Statistical Information**

Consistent with its statutory mission to serve as the United States government's knowledge bank on international terrorism, the National Counterterrorism Center (NCTC) is providing the Department of State with required statistical information to assist in the satisfaction of its reporting requirements under Section 2656f of title 22 of the US Code (USC).

This statute requires the State Department to include in its annual report on terrorism "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." While NCTC keeps statistics on the annual number of incidents of "terrorism," its ability to track the specific groups responsible for each incident involving killings, kidnappings, and injuries is significantly limited by the availability of reliable open source information, particularly for events involving small numbers of casualties. Moreover, specific details about victims, damage, perpetrators, and other incident elements are frequently not fully reported in open source information.

- The statistical material in this report, therefore, is drawn from the incidents of "terrorism" that occurred in 2009 as reported in open source information, which is the most comprehensive body of information available to NCTC for compiling data that it can provide to satisfy the above-referenced statistical requirements.

This Annex is provided for statistical purposes only. The statistical information contained in the Annex is based on factual reports from a variety of open sources that may be of varying credibility. Any assessments regarding the nature of the incidents or the factual circumstances thereof are offered only as part of the analytic work product of the National Counterterrorism Center. Nothing in this report should be construed as a determination that individuals associated with the underlying incidents are guilty of terrorism or any other criminal offense. As with all entries in the Worldwide Incident Tracking System, the statistical information will be modified, as necessary and appropriate, when and if the underlying incidents are finally adjudicated.

In deriving its figures for incidents of terrorism, NCTC in 2005 adopted the definition of "terrorism" that appears in the 22 USC § 2656f(d)(2), i.e., "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

PX205

NCTC posts information in the repository for the US government's database on terror attacks, the Worldwide Incidents Tracking System (WITS). WITS is accessible on the NCTC website at www.nctc.gov for the public to have an open and transparent view of the NCTC data. A detailed description of the methodology and counting rules is also available on the website, as is a geospatial tool to allow mapping of the data. NCTC will ensure that the data posted to the website is updated as often as necessary by regularly posting information about new or prior attacks.

Tracking and analyzing terrorist incidents can help us understand some important characteristics about terrorism, including the geographic distribution of attacks and information about the perpetrators, their victims, and other details. Year-to-year changes in the gross number of attacks across the globe, however, may tell us little about the international community's effectiveness either for preventing these incidents, or for reducing the capacity of terrorists to advance their agenda through violence against the innocent.

| Incidents of Terrorism Worldwide* | | | | | |
|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 |
| Attacks worldwide | 11,023 | 14,443 | 14,435 | 11,725 | 10,999 |
| Attacks resulting in at least 1 death, injury, or kidnapping | 7,963 | 11,278 | 11,097 | 8.411 | 7,875 |
| Attacks resulting in the death of at least 1 individual | 5,083 | 7,412 | 7,235 | 5,045 | 4,764 |
| Attacks resulting in the death of 0 individuals | 5,940 | 7,031 | 7,200 | 6,680 | 6,235 |
| Attacks resulting in the death of only 1 individual | 2,853 | 4,127 | 3,984 | 2,870 | 2,694 |
| Attacks resulting in the death of at least 10 individuals | 226 | 295 | 353 | 234 | 234 |
| Attacks resulting in the injury of at least 1 individual | 3,805 | 5,774 | 6,243 | 4,869 | 4,536 |
| Attacks resulting in the kidnapping of at least 1 individual | 1,156 | 1,343 | 1,156 | 961 | 877 |
| People killed, injured or kidnapped as a result of terrorism | 74,327 | 74,616 | 71,856 | 54,653 | 58,142 |

PX205

| People worldwide killed as a result of terrorism | 14,482 | 20,515 | 22,736 | 15,727 | 14,971 |
| People worldwide injured as a result of terrorism | 24,795 | 38,314 | 44,139 | 34,057 | 34,057 |
| People worldwide kidnapped as a result of terrorism | 35,050 | 15,787 | 4,981 | 4,869 | 4,869 |

### Incidents of Terrorism in Iraq and Afghanistan*

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Terrorist attacks in Iraq | 3,438 | 6,631 | 6,210 | 3,256 | 2,458 |
| Attacks resulting in at least 1 death, injury, or kidnapping | 2,648 | 5,910 | 5,507 | 2,878 | 2,167 |
| People killed, injured, or kidnapped as a result of terrorism | 20,629 | 38,878 | 44,012 | 19,077 | 16,869 |
| Terrorist attacks in Afghanistan | 494 | 962 | 1,124 | 1,222 | 2,126 |
| Attacks resulting in at least 1 death, injury, or kidnapping | 357 | 667 | 898 | 982 | 1,480 |
| People killed, injured, or kidnapped as a result of terrorism | 1,557 | 3,532 | 4,657 | 5,430 | 7,584 |

**NCTC Observations Related to Terrorist Incidents Statistical Material**

Approximately 11,000 terrorist attacks occurred in 83 countries during 2009, resulting in over 58,000 victims, including nearly 15,000 fatalities. Attacks decreased by about six percent in 2009 and deaths by about 5 percent. This marks the second consecutive year for declines for both attacks and fatalities. Unlike the preceding four years where the Near East witnessed the largest number of attacks, the largest number of reported terrorist attacks in 2009 occurred in South Asia, which also had, for the second consecutive year, the greatest number of fatalities. Together, South Asia and the Near East were the locations for almost 2/3rds of the 234 high-casualty attacks (those that killed 10 or more people) in 2009.

PX205

- Of the 10,999 reported attacks, about 4,850, or 44 percent, occurred in South Asia these attacks accounted for approximately 6,270 fatalities, or 42 percent of the worldwide total in 2009. Attacks in Afghanistan nearly doubled from 2008 and increased in Pakistan for the third consecutive year.
- Another 30 percent of the attacks occurred in the Near East with attacks in Iraq accounting for three-fourths of these incidents. Compared with 2008, attacks in Iraq declined by nearly one-quarter, continuing an ongoing decline since August of 2007. Since 2005, Iraq continues to be the single country with the most attacks and fatalities due to terrorism.
- Almost 700 of the 850 reported attacks in Africa were associated with turmoil in the Somalia and the Democratic Republic of the Congo. Compared with 2008, attacks in Africa rose by 140 (19 percent) and fatalities increased by over 250 (eight percent).
- The number of reported attacks in 2009 increased in the Western Hemisphere by about 27 percent, mostly attributable to increases in Colombia; in East Asia and the Pacific the number of reported attacks declined by 16 percent, mostly attributable to declines in the Philippines.

## Attackers

Sunni extremists were identified with about one-half of all attacks in 2009. Almost 90 groups were associated with these attacks. According to open source reports, the Taliban, more than any other group, claimed credit for the largest number of attacks and the most fatalities. Al-Shabaab was the second deadliest group, followed by al-Qa'ida in Iraq as the third deadliest group.

Largest Sunni extremist attacks

- On October 25, 2009, al-Qa'ida in Iraq killed155 people including 24 children, and wounded 720 in a double suicide VBIED attack in Baghdad, Iraq
- On December 8, 2009, al-Qa'ida in Iraq killed 127 people including 12 students, and wounded 513 others in multiple suicide VBIED attack in Baghdad, Iraq
- On October 28, 2009, Sunni extremists killed 117 people, and injured 200 others in a VBIED attack in Peshawar, North-West Frontier, Pakistan
- On August 19, 2009, al-Qa'ida in Iraq killed 101 people, and wounded 1,200 others in a coordinated SVBIED and VBIED attack in Baghdad, Iraq.
- On May 10, 2009, Sunni extremists killed 88 people and wounded 245 others including several journalists in mortar attacks in Mogadishu, Banaadir, Somalia

Other notable Sunni extremist attacks

PX205

- On February 9, 2009, the Taliban killed 15 including 11 children, and wounded 15 others in a mortar attack on a school in Darra Adam Khel, North-West Frontier, Pakistan
- On August 27, 2009, al-Qa'ida in the Arabian Peninsula slightly wounded the Saudi minister of the interior for security affairs in a suicide bombing in Jiddah, Makkah, Saudi Arabia
- On November 27, 2009, Caucasus Emirate killed 39 people and wounded 95 others in an IED attack against a passenger train near Bologoye, Tverskaya Oblast', Russia
- On December 25, 2009 Omar Farouk Abdulmutallab injured 1 person when he allegedly detonated an IED that malfunctioned on a flight over Detroit, Michigan, United States

Of the remaining incidents, as many as 150 groups were identified as perpetrators. The largest non-Sunni attacks include the following:

- On January 17, 2009, the Lord's Resistance Army killed approximately 400 people in assault and incendiary attacks near Tora, Orientale, Democratic Republic of the Congo
- On May 9, 2009, the Forces for the Liberation of Rwanda (FDLR) killed 86 people including 25 children, and wounded 24 others including 1 child in an assault and armed attack in Nord-Kivu, Democratic Republic of the Congo
- On November 23, 2009, Ampatuan clan members killed 66 people including 34 journalists in armed attack in Ampatuan, Maguindanao, Philippines and Datu Abdullah Sangki, Maguindanao, Philippines

### Types of Attacks

Most attacks in 2009 were perpetrated by terrorists applying conventional methods such as armed attacks, bombings, and kidnappings. Drawing on the lessons learned from the Mumbai attack in 2008, Sunni extremist elements used suicidal militia style attacks in numerous large scale attacks in 2009. Terrorists continued their practice of coordinated attacks that included secondary attacks on first responders at attack sites; they also continued to reconfigure weapons and other materials to create improvised explosive devices, and used women and children to evade security counter-measures.

- Suicide attacks declined from 405 in 2008 to 299 in 2009. This was largely due to declining violence in Iraq. A total of 13 countries experienced suicide attacks in 2009. The country with highest number of suicide bombings was Afghanistan with 99, followed by Pakistan with 84, and Iraq with 82.
- Attacks in Iraq, Afghanistan and Pakistan accounted for about 60 percent of all terrorist attacks.

Page | 295

PX205

- Al-Qa'ida in Iraq used dual suicide bombers to target the residence of an anti-terrorism police official and first responders and on-lookers, killing 12 police officers, 24 civilians, and wounding 83 civilians and children.
- Attacks by female suicide bombers declined significantly from 2008, accounting for only seven of the 299 total suicide attacks. Three of these attacks occurred in Iraq, two in Sri Lanka, and two in Russia.
- In Thailand, Muslim separatists used a woman and child to park VBIEDs in an effort to avoid suspicion and security procedures.

## Victims and Targets of Attacks

As has been the case since 2005, substantial numbers of victims of terrorist attacks in 2009 were Muslim.

- Almost 58,000 individuals worldwide were either killed or injured by terrorist attacks in 2009. Based upon a combination of reporting and demographic analysis of the countries involved, well over 50 percent of the victims were Muslims, and most were victims of Sunni extremist attacks.

Open source reporting largely identifies victims as civilians – approximately two-thirds of almost 48,000 killed or injured. As such, the fidelity of victim types is difficult to obtain, but the fragmented reporting on it does yield some insights about the demographics of these victims.

- Police officers are a favored terrorist target, accounting for 14 percent of the total killed and wounded in 2009.
- Government officials, employees and contractors killed and wounded from terrorist attacks doubled from 2008 and accounted for five percent of the total victims.
- The press experienced its single worst day in history on November 23rd in a terrorist massacre in the Philippines that killed 34 members of the media, the largest number of reporters ever killed in a single incident.

### *An Academic's Perspective on Open Source Event Data*

The Worldwide Incidents Tracking System (WITS) data provided in the National Counterterrorism Center's Report on Terrorism is the triumph of empirical analysis over primal fear of terrorism and impulses to react rashly. The NCTC mission statement, which emphasizes analysis and information sharing, paves the way for such an approach to thinking about terrorism and developing effective counterterrorism strategy. Terrorism is difficult to analyze for several

Page | 296

PX205

reasons. The broad variety of types of terrorism, the tendency for terrorists to operate outside of predictable patterns, and the unknown relationship between cases reported in the open source arena and actual terrorist incidents, stand as barriers to a full understanding of the phenomena. News reporter Lincoln Steffens's account of creating the impression of a crime wave in New York in the early 20th century just by changing his reporting practices is a cautionary tale against the temptation to put too much faith in the reliability of open source data. Despite these limitations, the NCTC data set provides vital starting points to overcome the barriers that can impede useful empirical analysis toward the prevention of terrorism. Our thinking about terrorism can be organized by establishing the causal drivers behind the lethality and frequency of terrorist incidents, with help from coherent models like the routine activities theory and games theory. Thoughtful analysis of the best data available is no panacea, but enlightened approaches to counterterrorism can substantially reduce the risk of lapses in our ongoing attempts to prevent terrorism.

—**Brian Forst**, American University

March 12, 2010

The full letter of Dr. Brian Forst is available in the *2009 NCTC Report on Terrorism*, available via the Internet at www.nctc.gov.


**\*** Incidents are limited to attacks against non-combatant targets. 2005 to 2008 numbers were updated since last year's publication on the Worldwide Incidents Tracking System at www.nctc.gov.

Page | 297

PX205

Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens, 2009

*Provided by the Bureau of Consular Affairs, U.S. Department of State*

The term "Private U.S. Citizen" refers to any U.S. citizen not acting in an official capacity on behalf of the U.S. Government; therefore these figures do not include, for example, U.S. military personnel killed or injured in a terrorism-related incident while on active duty or employees of the Department of State and other federal agencies. Members of U.S. Government employees' households are considered private U.S. citizens.

Although every effort was made to include all terrorism-related deaths and injuries involving private U.S. citizens, the figures below reflect only those cases reported to, or known by, the U.S. Department of State, and may not reflect actual numbers of injured, which may not always be reported depending on their severity. As NCTC also notes, in the cases of Iraq and Afghanistan, it is particularly difficult to gather comprehensive information about all incidents and to distinguish terrorism from the numerous other forms of violence. The deaths, injuries, and kidnappings to U.S. citizens in this report occurred outside the United States. US based casualties can be found in the *NCTC Report on Terrorism*.

**U.S. citizens worldwide killed as a result of incidents of terrorism: 9**
**U.S. citizens worldwide injured as a result of incidents of terrorism: 14**
**U.S. citizens worldwide kidnapped as a result of incidents of terrorism: 4**

## TERRORISM DEATHS OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)

| Country | Date of Death | Number | Location |
|---------|---------------|--------|----------|
| Afghanistan | August, 13, 2009 | 1 | Kabul, Afghanistan |
| | August 15, 2009 | 3 | Kabul, Afghanistan |
| | August 16, 2009 | 1 | Kabul, Afghanistan |
| | October 28, 2009 | 1 | Kabul, Afghanistan |
| Iraq | May 22, 2009 | 1 | Baghdad, Iraq |
| Mauritania | June 23, 2009 | 1 | Nouakchott, Mauritania |
| Somalia | December 3, 2009 | 1 | Mogadishu, Somalia |

## TERRORISM INJURIES OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)

PX205

| Country | Date of Injury | Number | Location |
|---------|----------------|--------|----------|
| Indonesia | July 17, 2009 | 8 | Jakarta, Indonesia |
| Iraq | October 25, 2009 | 4 | Baghdad, Iraq |
| Pakistan | October 7, 2009 | 1 | Islamabad, Pakistan |
| Somalia | September 17, 2009 | 1 | Mogadishu, Somalia |

**TERRORISM KIDNAPPINGS OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)**

| Country | Date of Kidnapping | Number | Location / Date Released or Rescued |
|---------|--------------------|--------|-------------------------------------|
| Columbia | February 6, 2009 | 1 | Cali, Colombia – April 2009 |
|  | May 25, 2009 | 1 | Bogota, Colombia - May 28, 2009 |
| Kenya | July 17, 2009 | 1 | Luuq, Somalia – October 3, 2009 |
| Pakistan | February 2, 2009 | 1 | Quetta, Pakistan – April 4, 2009 |

PX205

PX209

# Country Reports on Terrorism 2014

# June 2015

United States Department of State Publication
Bureau of Counterterrorism
Released June 2015

Country Reports on Terrorism 2014 is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

PX209

# COUNTRY REPORTS ON TERRORISM 2014

## Table of Contents

**Chapter 1.  Strategic Assessment**

**Chapter 2.  Country Reports**

### Africa
Overview
Trans-Sahara Counterterrorism Partnership
The Partnership for East African Regional Counterterrorism
Burkina Faso
Burundi
Cameroon
Chad
Djibouti
Eritrea
Ethiopia
Kenya
Mali
Mauritania
Niger
Nigeria
Senegal
Somalia
South Africa
Tanzania
Uganda

### East Asia and Pacific
Overview
China (Hong Kong and Macau)
Indonesia
Democratic People's Republic of Korea
Republic of Korea
Malaysia
Philippines
Singapore
Thailand

### Europe
Overview
Albania
Austria
Azerbaijan
Belgium
Bosnia and Herzegovina

PX209

Bulgaria
Cyprus
Denmark
France
Georgia
Germany
Greece
Ireland
Italy
Kosovo
Macedonia
The Netherlands
Norway
Russia
Serbia
Spain
Sweden
Turkey
United Kingdom

**Middle East and North Africa**
Overview
Algeria
Bahrain
Egypt
Iraq
Israel, the West Bank and Gaza, and Jerusalem
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**South and Central Asia**
Overview
Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyzstan
Maldives
Nepal
Pakistan
Sri Lanka
Tajikistan

3

PX209

Turkmenistan
Uzbekistan

**Western Hemisphere**
Overview
Argentina
Brazil
Canada
Colombia
Mexico
Panama
Paraguay
Peru
Venezuela

## Chapter 3.  State Sponsors of Terrorism
Cuba
Iran
Sudan
Syria

## Chapter 4.  The Global Challenge of Chemical, Biological, Radiological, or Nuclear (CBRN) Terrorism

## Chapter 5.  Terrorist Safe Havens (Update to 7120 Report)
Terrorist Safe Havens
Countering Terrorism on the Economic Front
Multilateral Efforts to Counter Terrorism; International Conventions and Protocols
Long-Term Programs and Initiatives Designed to Counter Terrorist Safe Havens
-Countering Violent Extremism
-Capacity Building
-Regional Strategic Initiative
Support for Pakistan
Counterterrorism Coordination with Saudi Arabia
Broadcasting Board of Governors Initiatives: Outreach to Foreign Muslim Audiences

## Chapter 6.  Terrorist Organizations
Abdallah Azzam Brigades (AAB)
Abu Nidal Organization (ANO)
Abu Sayyaf Group (ASG)
Al-Aqsa Martyrs Brigade (AAMB)
Ansar al-Dine (AAD)
Ansar al-Islam (AAI)
Ansar al-Shari'a in Benghazi (AAS-B)
Ansar al-Shari'a in Darnah (AAS-D)
Ansar al-Shari'a in Tunisia (AAS-T)
Ansar Bayt al-Maqdis (ABM)
Army of Islam (AOI)
Asbat al-Ansar (AAA)
Aum Shinrikyo (AUM)

4

PX209

Basque Fatherland and Liberty (ETA)
Boko Haram (BH)
Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
Hamas
Haqqani Network (HQN)
Harakat ul-Jihad-i-Islami (HUJI)
Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
Harakat ul-Mujahideen (HUM)
Hizballah
Indian Mujahedeen (IM)
Islamic Jihad Union (IJU)
Islamic Movement of Uzbekistan (IMU)
Islamic State in Iraq and the Levant (ISIL)
Jama'atu Ansarul Muslimina Fi Biladis-Sudan (Ansaru)
Jaish-e-Mohammed (JEM)
Jemaah Ansharut Tauhid (JAT)
Jemaah Islamiya (JI)
Jundallah
Kahane Chai
Kata'ib Hizballah (KH)
Kurdistan Workers' Party (PKK)
Lashkar e-Tayyiba
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Libyan Islamic Fighting Group (LIFG)
Mujahidin Shura Council in the Environs of Jerusalem (MSC)
Al-Mulathamun Battalion (AMB)
National Liberation Army (ELN)
Palestine Islamic Jihad – Shaqaqi Faction (PIJ)
Palestine Liberation Front – Abu Abbas Faction (PLF)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Nusrah Front (ANF)
Al-Qa'ida (AQ)
Al-Qa'ida in the Arabian Peninsula (AQAP)
Al-Qa'ida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Organization 17 November (17N)
Revolutionary People's Liberation Party/Front (DHKP/C)
Revolutionary Struggle (RS)
Al-Shabaab (AS)
Shining Path (SL)
Tehrik-e Taliban Pakistan (TTP)

## Chapter 7.  Legislative Requirements and Key Terms

PX209

**Annexes:**

National Consortium for the Study of Terrorism and Responses to Terrorism: Annex of Statistical Information

Terrorism Deaths, Injuries, and Kidnappings of Private U.S. Citizens Overseas in 2014

PX209

# CHAPTER 1
## STRATEGIC ASSESSMENT

Major trends in global terrorism in 2014 included the Islamic State in Iraq and the Levant's (ISIL's) unprecedented seizure of territory in Iraq and Syria, the continued flow of foreign terrorist fighters worldwide to join ISIL, and the rise of lone offender violent extremists in the West.  Despite the fragmentation of al-Qa'ida and its affiliates, weak or failed governance continued to provide an enabling environment for the emergence of extremist radicalism and violence, notably in Yemen, Syria, Libya, Nigeria, and Iraq.  Continuing a trend noted in last year's report, terrorist groups employed more aggressive tactics in their attacks.  In ISIL's case, this included brutal repression of communities under its control and the use of ruthless methods of violence such as beheadings and crucifixions intended to terrify opponents.  Boko Haram – operating in the Lake Chad Basin region of northern Nigeria, northern Cameroon, and southeast Niger – shared with ISIL a penchant for the use of brutal tactics, which included stonings, indiscriminate mass casualty attacks, and kidnapping children for enslavement.  ISIL targeted religious minorities such as Christians and Yazidis in particular, but also Shia Muslims and Sunni tribesmen who defied its rule.  The 2014 calendar year also witnessed a powerful regional and international mobilization to counter ISIL that halted the group's initial advances in Iraq.  The adoption of UN Security Council Resolution 2178 in September constituted a significant step forward in international efforts to cooperate in preventing the flow of foreign terrorist fighters to and from conflict zones.

\* \* \* \* \*

The ongoing civil war in Syria was a significant factor in driving worldwide terrorism events in 2014.  The rate of foreign terrorist fighter travel to Syria – totaling more than 16,000 foreign terrorist fighters from more than 90 countries as of late December – exceeded the rate of foreign terrorist fighters who traveled to Afghanistan and Pakistan, Iraq, Yemen, or Somalia at any point in the last 20 years.  Many of the foreign terrorist fighters joined ISIL, which, through intimidation and exploitation of political grievances, a weak security environment in Iraq, and the conflict in Syria, secured sufficient support to conduct complex military operations in an effort to seize contiguous territory in western Iraq and eastern Syria for a self-declared Islamic caliphate.  ISIL routinely and indiscriminately targeted defenseless civilians, including religious pilgrims, while engaging in violent repression of local inhabitants.

ISIL showed a particular capability in the use of media and online products to address a wide spectrum of potential audiences:  local Sunni Arab populations, potential recruits, and governments of coalition members and other populations around the world, including English-speaking audiences.  ISIL has been adroit at using the most popular social and new media platforms (YouTube, Facebook, and Twitter) to disseminate its messages broadly, with near-instantaneous reposting and the generation of follow-on links and translations into additional languages following ISIL's initial publication of online propaganda.  Content included brutal images, such as hostage beheadings and boasts of slave markets of Yazidi girls and women.  In 2014, ISIL expanded its messaging tactics to include content that purported to show an idealized version of life under its rule and progress in building the institutions of an orderly state.  ISIL's use of social and new media also facilitated its efforts to attract new recruits to the battlefields in

7

PX209

Syria and Iraq, as ISIL facilitators answered in real time would-be members' questions about how to travel to join the group. Individuals drawn to the conflict in Syria and Iraq were diverse in their socioeconomic and geographic backgrounds, highlighting the need for comprehensive counter-messaging and early engagement with a variety of communities to dissuade vulnerable individuals from traveling to join the conflict.

In 2014, ISIL began to foster relationships with potential affiliates beyond Iraq and Syria. Ansar al-Shari'a in Darnah pledged allegiance to ISIL in October 2014, and Ansar Bayt al-Maqdis, operating primarily out of Egypt's Sinai Peninsula, officially declared allegiance to ISIL in November. Questions remained, however, about the meaning of such affiliates – whether representative of a command relationship, commonality of strategic goals, or merely opportunistic relationships.

The prominence of the threat once posed by core al-Qa'ida (AQ) diminished in 2014, largely as a result of continued leadership losses suffered by the AQ core in Pakistan and Afghanistan. AQ leadership also appeared to lose momentum as the self-styled leader of a global movement in the face of ISIL's rapid expansion and proclamation of a Caliphate.

Though AQ central leadership was weakened, the organization continued to serve as a focal point of "inspiration" for a worldwide network of affiliated groups, including al-Qa'ida in the Arabian Peninsula – a long-standing threat to Yemen, the region, and the United States; al-Qa'ida in the Islamic Maghreb; al-Nusrah Front; and al-Shabaab. Other violent Sunni Islamist extremist groups associated with AQ included the Islamic Jihad Union, Lashkar i Jhangvi, Harakat ul-Mujahadin, and Jemaah Islamiya. Tehrik-e Taliban Pakistan, the Afghan Taliban, and the Haqqani Network, which operated in Pakistan and Afghanistan, also have ties to AQ. Additionally, supporters and associates worldwide "inspired" by the group's ideology may have operated without direction from AQ central leadership, making it difficult to estimate their numbers.

Adherents of ISIL and AQ conducted terrorist attacks in the West in 2014 in so-called "lone offender attacks" including Quebec and Ottawa , Canada (October 20 and October 22, respectively) and Sydney, Australia (December 15-16). In many cases it was difficult to assess whether attacks were directed or inspired by ISIL or by al-Qa'ida and its affiliates. These attacks may presage a new era in which centralized leadership of a terrorist organization matters less; group identity is more fluid; and violent extremist narratives focus on a wider range of alleged grievances and enemies with which lone actors may identify and seek to carry out self-directed attacks. Enhanced border security measures among Western states that have increased the difficulty for known or suspected terrorists to travel internationally likely encouraged groups like AQ and ISIL to inspire and rely on lone actors already resident in the West to carry out attacks and thereby realize their goal of terrorizing Western populations.

ISIL and AQ were far from the only serious threat that confronted the United States and its allies. Iran continued to sponsor terrorist groups around the world, principally through its Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). These groups included Lebanese Hizballah, several Iraqi Shia militant groups, Hamas, and Palestine Islamic Jihad. Iran, Hizballah, and other Shia militia continued to provide support to the Asad regime, dramatically

PX209

bolstering its capabilities, prolonging the civil war in Syria, and worsening the human rights and refugee crisis there. Iran supplied quantities of arms to Syria and continued to send arms to Syria through Iraqi airspace in violation of UN Security Council Resolutions. Finally, Iran used Iraqi Shia militants and high profile appearances by Qods Force officials on the front lines of Iraq to claim credit for military successes against ISIL and to belittle coalition airstrikes and U.S. contributions to the Government of Iraq's ongoing fight against ISIL.

ISIL and AQ affiliates, including al-Nusrah Front, continued to use kidnapping for ransom operations and other criminal activities to raise funds for operational purposes. Much of ISIL's funding, unlike that of AQ and AQ-type organizations, did not come from external donations but was internally gathered in Iraq and Syria. ISIL earned up to several million dollars per month through its various extortion networks and criminal activity in the territory where it operated, including through oil smuggling. Some progress was made in 2014 in constraining ISIL's ability to earn money from the sale of smuggled oil as a result of anti-ISIL Coalition airstrikes that were conducted on ISIL-operated oil refineries.

* * * * *

President Obama has repeatedly stressed that the fight against terrorism is not one the United States can or should pursue alone. We have been working to shift our counterterrorism strategy to more effectively partner with countries where terrorist networks seek a foothold. Accordingly, we have built an effective Global Coalition to Counter ISIL; more than sixty partners are contributing to this multifaceted effort to stop ISIL's advances on the ground, combat the flow of foreign fighters, disrupt ISIL's financial resources, counteract ISIL's messaging, and undermine its appeal.

The shared foreign terrorist fighter threat has prompted even closer cooperation among U.S. federal agencies and our international partners, particularly in Europe. In September, President Obama chaired a UN Security Council (UNSC) session on the foreign terrorist fighter threat, and the UNSC subsequently adopted Resolution 2178. We have seen increased international focus on this problem and the development of more effective counterterrorism laws overseas, as well as enhanced border security efforts and a greater willingness to share threat information among partner nations.

Partners in North Africa and Asia also took steps in 2014 to strengthen their counterterrorism capabilities through new laws and the development of other means to identify, interdict, and prosecute foreign terrorist fighters and those who support them. Egypt, Jordan, Saudi Arabia, Qatar, Turkey, and the United Arab Emirates have all enacted legislation or regulations in 2014 to address the foreign terrorist fighter issue.

In West Africa, the countries of Cameroon, Chad, and Niger mobilized forces in 2014 to help Nigeria contain the growing threat posed by Boko Haram. With the authorization of the African Union (AU), these countries announced the launch of a new Multinational Joint Task Force to coordinate operations against Boko Haram. In Somalia, AU troops from Burundi, Djibouti, Ethiopia, Kenya, and Uganda continued to push al-Shabaab from towns, thus supporting the people and government of Somalia's efforts to build security and stability.

PX209

While countries worldwide worked to enact legislation and developed and implemented programs to address violent extremism, we remain concerned about counterproductive actions some governments have taken in the name of addressing terrorism – actions such as political repression and human rights violations, including extrajudicial killings, which could heighten political grievances and exacerbate the terrorist threat.  These actions could become conditions that terrorists themselves exploit for recruitment – for example, banning political parties or suppressing freedom of speech by imprisoning bloggers and journalists.  Multilateral and regional institutions can provide the appropriate framework to address these challenges.

PX209

# CHAPTER 2
# COUNTRY REPORTS ON TERRORISM

## AFRICA

Africa experienced significant levels of terrorist activity in 2014.  In East Africa, the Somalia-based terrorist group al-Shabaab remained the primary terrorist threat despite a series of significant setbacks.  African Union Mission in Somalia (AMISOM) forces were able to supplant al-Shabaab control of several urban areas inside Somalia in 2014, forcing al-Shabaab out of lucrative port cities and further into the countryside.  In addition to the group's declining revenues, al-Shabaab lost three critical members of its leadership circle to airstrikes – the group's leader, the head of intelligence, and the chief of external operations and planning.  The loss of territory, revenue, and leadership hampered al-Shabaab's operational capabilities for a time, but the organization regrouped in new safe havens to continue planning and launching attacks and suicide bombings in Somalia, Kenya, and Djibouti.  In Somalia, al-Shabaab conducted a complex assault against the Mogadishu International Airport on December 25, killing three contractors – one American, one Kenyan, and one Ugandan - and eight Ugandan AMISOM soldiers.  Djibouti suffered its first bombing in May when two suicide operatives detonated their explosive devices at a French restaurant in the capital.  One Turkish citizen was killed along with the two suicide bombers.  Al-Shabaab launched mass-casualty attacks in several Kenyan towns and villages along the porous border with Somalia that resulted in over 200 deaths, Kenya's deadliest year against al-Shabaab to date.  While still focused on striking targets outside Somalia, particularly within countries contributing troops to AMISOM, al-Shabaab attempted to delegitimize the Federal Government of Somalia through assassinations, suicide bombings, and other asymmetric attacks within the country.

The United States continued to support counterterrorism capacity building throughout the Horn of Africa, including bolstering of AMISOM's operational efficacy, contributing to the development and professionalization of Somalia's security sector, and improving regional critical incident response capabilities.  In the wake of the 2013 Westgate mall attack in Nairobi, various East African countries increased their efforts to detect, deter, disrupt, investigate, and prosecute terrorist incidents.  In October, Kenyan Defense Forces interdicted a vehicle with five suspected al-Shabaab operatives, several suicide vests, and other explosive materiel at the Moyale border crossing between Kenya and Ethiopia.  Border security initiatives remained high on the list of national security and counterterrorism priorities in East Africa.

In West Africa, conflict in Nigeria continued throughout the northeast, with Boko Haram and related actors committing hundreds of attacks, resulting in over 5,000 casualties in 2014.  This violence spilled over into neighboring Cameroon, Chad, and Niger.  The kidnapping of 276 female students from a secondary school in Chibok, Borno State, brought global attention to the conflict and highlighted Boko Haram's deliberate targeting of non-combatants, including children.

France's Operation BARKHANE, an operation focused on countering terrorists operating in the Sahel, continued and was supported by important contributions of the UN peacekeeping mission

11

PX209

in Mali to bolster and restore that country's stability.  Peace accord discussions, hosted by Algeria, continued through year's end in northern Mali.

## TRANS-SAHARA COUNTERTERRORISM PARTNERSHIP

Established in 2005, the Trans-Sahara Counterterrorism Partnership (TSCTP) is a U.S.-funded and implemented, multi-faceted, multi-year effort designed to build the capacity and cooperation of military, law enforcement, and civilian actors across North and West Africa to counter terrorism.  Areas of support include:

(1) enabling and enhancing the capacity of North and West African militaries to conduct counterterrorism operations;
(2) integrating the ability of North and West African militaries, and other supporting partners, to operate regionally and collaboratively on counterterrorism efforts;
(3) enhancing border security capacity to monitor, restrain, and interdict terrorist movements;
(4) strengthening the rule of law, including access to justice, and law enforcement's ability to detect, disrupt, respond to, investigate, and prosecute terrorist activity;
(5) monitoring and countering the financing of terrorism (such as that related to kidnapping for ransom); and
(6) reducing the limited sympathy and support among communities for violent extremism.

TSCTP partners include Algeria, Burkina Faso, Cameroon (joined in 2014), Chad, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, and Tunisia.

TSCTP has built capacity and cooperation despite setbacks caused by a restive political climate, violent extremism, ethnic rebellions, and extra-constitutional actions that have interrupted work and progress with select partner countries.  Prosecutorial capacity to adjudicate terrorism cases has been improved in Niger through training for prosecutors.

Regional cooperation, a strategic objective of U.S. assistance programming in this region, has increased substantially in West Africa among most of the partners of TSCTP.  Countries bordering Nigeria agreed to form a Multinational Joint Task Force to combat Boko Haram in late 2014, and Nigeria's neighbors remained actively engaged in countering Boko Haram throughout the region.  The TSCTP partners are joined in this effort by the AU and by Benin, who is not a TSCTP partner.

## PARTNERSHIP FOR REGIONAL EAST AFRICA COUNTERTERRORISM

First established in 2009, the Partnership for Regional East Africa Counterterrorism (PREACT), is a U.S.-funded and implemented multi-year, multi-faceted program designed to build the capacity and cooperation of military, law enforcement, and civilian actors across East Africa to counter terrorism.  It uses law enforcement, military, and development resources to achieve its strategic objectives, including:

(1) reducing the operational capacity of terrorist networks;
(2) developing a rule of law framework for countering terrorism in partner nations;

PX209

(3) enhancing border security;
(4) countering the financing of terrorism; and
(5) reducing the appeal of radicalization and recruitment to violent extremism.

Active PREACT partners include Burundi, Djibouti, Ethiopia, Kenya, Somalia, Tanzania, and Uganda.  Comoros, Rwanda, Seychelles, South Sudan, and Sudan are also members of PREACT.

In 2014, the U.S. government, through PREACT, continued to build the capacity and resilience of East African governments to contain the spread of, and ultimately counter the threat posed by, al-Qa'ida, al-Shabaab, and other terrorist organizations.  PREACT complements the U.S. government's dedicated efforts, including support for AMISOM, to promote stability and governance in Somalia and the greater East African region.  Joint training exercises for Kenyan, Tanzanian, and Ugandan first responders and law enforcement professionals have supported efforts to enhance regional coordination and cooperation, protect shared borders, and respond to terrorist incidents.  Similarly, training for Ugandan and Kenyan prosecutors has supported efforts to improve prosecutorial capacity to adjudicate terrorism cases.

## BURKINA FASO

**Overview:**  Burkina Faso showed an increase in its overall willingness to expand its involvement in regional counterterrorism and stability operations, enabled by approximately US $10 million that has been provided to its security forces through Africa Contingency Operations Training & Assistance, the Trans-Sahara Counterterrorism Partnership, and National Defense Authorization Act Section 1206 funding initiatives.

**Legislation, Law Enforcement, and Border Security:**  Burkina Faso's Terrorism Suppression Law of 2009, modeled after French law, criminalizes a wide range of terrorist-related activities, and imposes criminal punishment of up to life in prison.

Several officials, including Burkina Faso's Director General of Internal Security, expressed concern that Burkina Faso's security forces lacked interagency coordination and incident command structure, and asked for assistance in this area.  During a 2014 assessment of host country needs and capabilities, the U.S. Department of State determined that incident command structure is one of the most pressing needs of Burkinabe security forces.  Further complicating this issue is the problem of overlapping areas of jurisdiction faced by the police and gendarmerie – which has led to confusion over which force would have primary responsibility in the event of a terrorist incident.

Burkinabe security forces actively have sought and received training from the United States on key areas requiring technical assistance.  In 2014, Burkinabe law enforcement and judicial officials received training on cross-border security, criminal justice procedures, and prosecution of terrorists through the Global Counterterrorism Forum and the International Institute for Justice and the Rule of Law.  The Department of State's Antiterrorism Assistance program provided trainings and equipment related to managing terrorist incidents, forensic examination of terrorist

13

PX209

crime scenes, and post-blast investigation.  Burkina Faso adopted the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System (PISCES) in 2013 in an effort to secure borders and identify fraudulent travel documents.  Burkina Faso has the capability to conduct biographic screening at multiple land and air ports of entry.

Burkina Faso's Counterterrorism Strategy, *Mission de Securitization du Nord*, strives to eliminate the possibility of terrorist activities along its northern border.

**Countering the Financing of Terrorism:**  Burkina Faso is a member of the Inter-Governmental Action Group Against Money Laundering in West Africa, a Financial Action Task Force (FATF)-style body that is part of the Economic Community of West African State (ECOWAS). Burkinabe law enforcement has the will to improve its ability to counter terrorist financing, but lacks resources and experience.  In recent years, the Burkinabe government put in place a Financial Intelligence Unit (FIU) under the Ministry of Economy and Finance.  This unit is a task force composed of magistrates, police, gendarmerie, and financial experts.  The FIU continued to work on developing database connectivity with regional neighbors and other international parties, such as the United States.  There are some laws in place that help the unit carry out its mission, such as a requirement for local banks to report large deposits.  Other laws and customs, however, complicate their mandate.  For example, Burkina Faso is a cash society, making money difficult to track.  Also, an agreement between West African countries for the free movement of people and goods allows individuals from those countries uninhibited entry to and exit from Burkina Faso with any amount of money.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Burkina Faso was active in regional organizations and international bodies, including the UN, AU, ECOWAS, and the GCTF.  Burkina Faso is a member of the G-5 Sahel group that was created in February 2014 to enable regional collaboration.

## BURUNDI

**Overview:**  Burundi demonstrated its continued commitment to addressing international terrorism in 2014, and contributed six battalions to the AU Mission in Somalia (AMISOM).  A counterterrorism unit, formed in 2010, consists of elements of the police, military, and the Burundi National Intelligence Service.  In the aftermath of the September 2013 al-Shabaab attack in Nairobi, the Burundian National Police (BNP) conducted several counterterrorism operations throughout the country in an attempt to disrupt and dismantle potential terrorist operations. However, the BNP was hampered by a lack of training, resources, and infrastructure.  In addition, the BNP focused counterterrorism efforts on the Muslim community and foreigners in Burundi, rather than basing its actions on operational intelligence.  This reflects the BNP's belief that these groups pose the greatest terrorist threat to Burundi.

PX209

**Legislation, Law Enforcement, and Border Security:**  Burundi has provisions in its penal code defining forms of terrorism.  Sentences for acts of terrorism range from 10 to 20 years in prison to life imprisonment if the act results in the death of a person.  Burundi continued its participation in the Department of State's Antiterrorism Assistance (ATA) program and the International Law Enforcement Academy.  Through ATA, BNP officers received counterterrorism training to bolster their leadership and management skills, build investigative capacity, and identify fraudulent documents.

Burundi's land and water borders are porous, and therefore pose significant border security challenges.  Burundi does not use biometric screening capabilities such as fingerprinting or retinal scans.  Burundi screens travel documents, however, at official border crossings.

Deterrents to more effective law enforcement and border security included corruption, resource constraints, limited judicial capacity, lack of training, and porous borders lacking security.

**Countering the Financing of Terrorism:**  Burundi is not a member of a Financial Action Task Force-style regional body but is an observer of ESAAMLG, the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force-style regional body.  While the government has created counterterrorist financing laws, it has yet to commit funding, provide training, or implement policies.  Very few people in the country have access to the formal banking sector.  The anti-money laundering/counterterrorist finance regime in Burundi does not include regulatory requirements for or supervision of money/value transfer services, precious metal and jewelry dealers, real estate agents, exchange houses or new payment methods.  Each local commercial bank operation is recorded within the bank's system and the banks exchange information with their foreign correspondent banks through their compliance officers.  However, banks are not asked to share this information with the Burundi government's Financial Intelligence Unit.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Burundi is a member of the Partnership for Regional East Africa Counterterrorism (PREACT), and through PREACT received funding for military and law enforcement counterterrorism training.  Burundi cooperated with neighboring countries to exchange information on suspected terrorists.  Burundi has also contributed battalions to AMISOM to stabilize the situation in Somalia**.**

**Countering Radicalization to Violence and Violent Extremism:**  The Burundian government does not have any formal programs to counter violent extremism.  However, several international organizations fund vocational training and economic development programs designed to provide positive alternatives for populations vulnerable to radicalization and recruitment into terrorist organizations.

## CAMEROON

**Overview:**  Cameroon became a member of the Trans-Sahara Counterterrorism Partnership (TSCTP) in 2014.  Countering terrorist threats remained a top security priority for the

PX209

Government of Cameroon, and the government worked with the U.S. government to improve the capacity of its security forces. Boko Haram took advantage of weaknesses in Cameroon's border security to conduct a number of terrorist attacks in the country's Far North and East Regions in 2014, including targeted killings and kidnappings of Cameroonians and foreigners. Cameroon responded to the attacks with an increased security presence in these regions.

In 2014, the United States provided a number of training programs on terrorism and security to help Cameroon address the Boko Haram threat in the Far North. In addition to bolstering the operational capacity of its security forces, Cameroon's prospects for preventing terrorism also depends on the ability of the government to address humanitarian concerns in its northern regions as well as socio-economic and political challenges—such as widespread youth unemployment, poor transportation infrastructure, inadequate public service delivery, endemic corruption, and political marginalization.

**2014 Terrorist Incidents:** In 2014, Boko Haram was responsible for targeted killings of Cameroonians in Mayo-Sava, Mayo-Tsanaga, Mayo-Danay, and the Logone and Chari Divisions of the Far North Region – including the villages of Kolofata, Fotokol, Waza, Amchide, and other localities at the border with Nigeria. Terrorist incidents in 2014 included:

- On June 30 in Mayo Sava Division of the Far North Region, Boko Haram killed the village chief of Magdeme, who they suspected was collaborating with security forces.
- On May 16, Boko Haram kidnapped 10 Chinese engineers in the Far North Region of Cameroon, where they were working on a road construction project. The assailants attacked the engineers' camp in Waza, and took the hostages to Nigeria before eventually releasing them in October.
- On July 6, a group of 10 men on motorcycles stormed the Lamida of Limani in the Mayo-Sava division and kidnapped two teenagers, both students at the local high school.
- On July 27, Boko Haram launched a cross-border attack on Kolofata and kidnapped over a dozen people, including the Lamido (traditional ruler) of Kolofata and the wife of Cameroon's Vice-Prime Minister, Amadou Ali. The assailants took the hostages to Nigeria before releasing them, along with the Chinese nationals, in October.
- Between October and December, Boko Haram targeted civilians and military patrols in different areas of the Far North Region using vehicle-borne improvised explosive devices, stationary improvised explosive devices, and mines.

**Legislation, Law Enforcement, and Border Security:** Certain provisions of the 1965 Penal Code were used to prosecute acts of terrorism. These include sanctions for efforts to undermine state authority, threats to public and individual safety, destruction of property, threats to the safety of civil aviation and maritime navigation, hostage taking, and the use of firearms and explosive substances.

Prior to 2014, Cameroonian law did not explicitly criminalize terrorism. However, in December, the National Assembly adopted legislation specifically addressing terrorism. The Law for the Fight Against Terrorism confers the death penalty for those found guilty of carrying out, abetting, or sponsoring acts of terrorism, including any activity likely to incite revolt in the population or disturb the normal functioning of state institutions. The bill was controversial, and

16

PX209

members of the political opposition claimed that the definition of terrorism was too broad and could be used as a tool for political repression.

Faced with the security challenges at its borders with Nigeria and the Central African Republic, the Cameroonian government increased coordination and information sharing among law enforcement, military, and intelligence entities, including the General Delegation for External Research, the National Army, the Rapid Intervention Unit (BIR), and the National Gendarmerie.  During the year, Cameroon received U.S. capacity building training to improve its counterterrorism and law enforcement efforts, including programs on the civil–military response to terrorism and the legal aspects of defense.  These measures supported Cameroon's improvements in the detection of and responses to terrorist attacks, although further efforts are needed for the country to be able to more effectively deter terrorist incidents.

In 2014, Cameroon continued to issue regional biometric passports aimed at providing enhanced security for residents of the Economic and Monetary Community of Central African States zone.  In response to terrorist incidents, Cameroon reinforced its border security by establishing more control posts and deploying additional military units, including the BIR, to the Far North Region of the country.  The government also stepped up screening efforts at ports of entry and highways, using terrorist screening watchlists as well as biographic and biometric technology in some cases.  However, the capacity of security forces to patrol and control all land and maritime borders remained limited due to inadequate staffing and resources, leading to some uncontrolled border crossings.

Cameroonian military and police units proactively confronted and disrupted the activities of suspected Boko Haram members.  Several large arrests were made.  According to reports, the police arrested 104 Boko Haram members, including 84 minors and 20 adults, operating in a madrassa in the Mayo-Danay Division of the Far North.  The adults were allegedly teaching their students how to become messengers, combatants, and suicide bombers for Boko Haram.

**Countering the Financing of Terrorism:**  Cameroon is a member of the Central African Action Group Against Money Laundering (GABAC) which holds Financial Action Task Force (FATF) observer status and is seeking to become a FATF-style regional body.  Through its membership in GABAC, Cameroon has adopted a legislative architecture to implement anti-money laundering and financial supervision actions.  It established a financial intelligence unit, the National Financial Investigation Agency, which processes suspicious transaction reports and initiates investigations.  There were no prosecutions or convictions for money laundering during the year.  Under the newly adopted legislation, any person convicted of financing or using financial proceeds from terrorist activities would be sentenced to death.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Cameroon actively participates in AU peacekeeping operations, and its military schools train soldiers and gendarmes from neighboring countries.  Cameroon has pledged forces as part of the Multinational Joint Task Force to fight Boko Haram with neighboring countries.

PX209

**Countering Radicalization to Violence and Violent Extremism:**  Cameroonian authorities have taken a series of measures to counter violent extremism, including forming partnerships with local, traditional, and religious leaders to monitor preaching in mosques.  The Government of Cameroon partnered with faith-based organizations such as the Council of Imams and Religious Dignitaries of Cameroon (CIDIMUC) to educate citizens on the dangers of radicalization and violent extremism, promote religious tolerance, and present religion as a factor for peace.  This objective was furthered through targeted messaging in mosques, special prayer sessions, press releases, and through roundtable discussions and conferences bringing together people from various religious backgrounds.  One of CIDIMUC's strategies has been to work for improving the living conditions of imams.

## CHAD

**Overview:**  The Government of Chad considered countering violent extremist threats a priority at the highest level, with a particular focus on countering potential terrorist threats from across the Sahel region.  Chad's counterterrorism strategy focused on promoting regional stability and securing its borders.  Chad provided combat forces to the Multinational Joint Task Force (MNJTF) that also included Benin, Cameroon, Nigeria, and Niger, and took an active role in leading that coalition and fighting violent extremists in Nigeria and neighboring states.  This follows Chad's important contribution to the French intervention in northern Mali, Operation SABRE; and its contribution to the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA).

**Legislation, Law Enforcement, and Border Security:**  Chadian criminal law does not explicitly criminalize terrorism.  However, certain general provisions of the Penal Code (1967) have been used to prosecute acts of terrorism.  In addition, in 2014, the Minister of Justice and Human Rights began certain reforms, including drafting a revised Penal Code that eliminates the death penalty and criminalizes terrorism, piracy, and pedophilia.

While Chadian law enforcement units displayed basic command and control capacity, some Chadian units had limited investigation, crisis response, and border security capacity.  Specialized law enforcement units possessed some necessary equipment and better tactics.  Essentially all 22 police brigades performed counterterrorism functions, however interagency cooperation and information sharing was rarely practiced.  Law enforcement units had a mixed record of accountability and respect for human rights.

Frequently, the head of the police and security are replaced suddenly and without explanation.  In addition, law enforcement and security chiefs are sometimes appointed for political reasons rather than merit and therefore are limited in their capability of identifying the type of training, skills, and equipment needed.

In 2014, the Government of Chad increased border-crossing screenings to prevent infiltration by members of Boko Haram and Central African militias and transit of illegal arms, drugs, weapons, and other contraband into the country.  Border patrol was provided by a combination of border security officials, gendarmes, police, and military.  Border officials, particularly police

PX209

at the Ngueli bridge border crossing between N'Djamena and Kousseri in Cameroon, took security measures that included: eliminating taxi and motorcycle traffic; searching cars, trucks, and pedestrians at points of entry to screen for weapons, drugs, explosives, and other contraband; and continuing the use of the Personal Identification Secure Comparison and Evaluation System (PISCES) biometric screening system, that was adopted in 2013.  Chad has the capability to conduct biographic screening at multiple land and air ports of entry.

Chadian security forces executed several cordon and search operations in the Lake Chad region in 2014, extending south to the capital, in an effort to prevent spillover from ongoing security operations on the opposite side of Lake Chad undertaken by the Nigerian government directed against Boko Haram.  In May, Chadian customs officials intercepted two containers of arms and ammunition allegedly destined for Central African Republic (CAR).  In June, the Minister of Territorial Administration announced the arrest of two suspects and the seizure of 12 rocket propelled grenade, 43 machine guns, 80 anti-tank rockets, 33 rockets, and over 11,000 rounds of ammunition as a result of increased patrols in the capital of N'Djamena.

Chad continued its participation in the Department of State's Antiterrorism Assistance (ATA) program.  In 2014, ATA provided training on Quality Control in Civil Aviation Security and Interviewing Terrorist Suspects, and provided two boats to assist the Chadian River Police Brigade.

**Countering the Financing of Terrorism:**  Chad is a member of the Action Group against Money Laundering in Central Africa (GABAC), an observer to the Financial Action Task Force (FATF), with the same mandate and status as a FATF-style regional body.  GABAC worked directly with Chad's Financial Intelligence Unit, the National Financial Investigative Agency (ANIF).  In 2014, ANIF joined the Egmont Group of Financial Intelligence Units.

Chad's underdeveloped financial sector is primarily cash-based and lacked sufficient capacity to enforce banking regulations.  ANIF faces serious resource constraints, and financial intelligence reporting and analysis is limited.  Additionally, law enforcement and customs officials require training in financial crimes enforcement.  Several banks reported suspicious transactions, but the practice was not universal.  The government also lacks sophisticated equipment to monitor transactions and does not track money transactions through wire transfer services (i.e. Western Union), *hawala* remittance systems, or SMS mobile money transfers.

In August 2014, ANIF held a two-day seminar for financial institutions to increase awareness of their obligations in the fight against terrorist financing, including suspicious transaction reporting.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  In 2014, Chad participated in the Lake Chad Basin Commission's effort to establish the MNJTF, and deployed a contingent of 700 troops along Chad's Lake Chad border to prevent infiltration by Boko Haram.  It has also cooperated actively

PX209

with Cameroon in operations to counter the threat of Boko Haram in its border regions, and continued to work with Sudan on the joint border commission the two countries had established in 2012 to better control Chad's eastern border.  It also began talks with Niger and Libya to form a tripartite border commission.

In January, Chad assumed one of the rotating seats on the UN Security Council.  Chad participated in MINUSMA, providing 1,400 troops to combat violent extremists.  Chad is a member of the Global Counterterrorism Forum and participated in the Sahel Region Capacity Building Working Group in March in Dakar, Senegal.  Chad is a member of the Trans-Sahara Counterterrorism Partnership (TSCTP), the Lake Chad Basin Commission, and the AU.

The G-5 Sahel was created in February 2014 to enable region-wide collaboration on the Sahel-Sahara region's political and security situation, and Chad participated in the five G-5 Sahel meetings held among the five member countries: Mauritania, Niger, Burkina Faso, Chad, and Mali, as well as representatives of the AU, UN, the Economic Community of West African States, the EU, and the Organization of Islamic Cooperation.

In a July 2014 visit to Chad, France's president Francois Holland launched Operation BARKHANE, a successor to Operations SERVAL and EPERVIER formerly based in Mali and Chad.  In August, France deployed 1,300 troops to Chad as a base of operations for its regional initiative to fight terrorism in the Sahel.

In 2014, Chad served as a base of operations for U.S. air surveillance in search of the Nigerian Chibok schoolgirls kidnapped on April 14-15.

**Countering Radicalization to Violence and Violent Extremism:**  As a participant in the TSCTP, Chad participated in targeted projects to counter violent extremism.  Activities included building the capacity of national civil society organizations; engagement of community and youth empowerment; promotion of interfaith dialogue and religious tolerance; and media and outreach work.  President Idriss Déby Itno (Déby) instructed the High Council for Islamic Affairs to monitor religious activities closely in mosques to counter violent extremism.

President Déby encouraged religious tolerance through public statements and urged religious leaders to promote peaceful cohabitation among religious groups.  During the celebration of Eid al-Fitr, he urged each religious group to advocate for harmony among all Chadians.  Leaders from the country's principal religious organizations, including the secretary of Evangelical Mission for Harmony and the vice-president of the Episcopal Conference publicly stated they supported President Déby's public statements advocating religious tolerance.

The Regional Forum on Interfaith Dialogue, composed of representatives of evangelical churches, the Catholic Church, and the Islamic community, met three times in 2014 to promote religious tolerance and counter prejudice.  On January 25, President Déby presided over the group's fifth annual National Day of Peace, Peaceful Cohabitation, and National Concord, which consisted of prayer and pardon for people of all faiths and aimed to promote tolerance and eliminate verbal and physical violence.

PX209

On August 20, Muslim, Catholic, and Protestant leaders launched a project to teach values of religious tolerance and peaceful coexistence for refugees and Chadian returnees from CAR.

## DJIBOUTI

**Overview:**  Djibouti remained an active and supportive counterterrorism partner in 2014. Djibouti hosts Camp Lemonnier, which serves as headquarters to the U.S. Africa Command's Combined Joint Task Force-Horn of Africa.  Djibouti's efforts to counter terrorism focused on increased training for Djibouti's military through the Africa Contingency Operations Training and Assistance program, and deploying soldiers to the African Union Mission in Somalia (AMISOM) campaign.

**2014 Terrorist Incidents:**  On May 24, two suicide bombers attacked the La Chaumière restaurant in a popular area in downtown Djibouti City.  A female suicide bomber entered the restaurant and detonated a suicide vest in the midst of three tables situated in the bar. Immediately following this initial blast, a male attacker threw a grenade onto the patio and then detonated his suicide vest.  One Turkish citizen was killed and more than 20 others were injured, some severely.  Al-Shabaab claimed responsibility for the attack and stated that it targeted Djibouti because the country hosts foreign militaries and contributes troops to AMISOM.

**Legislation, Law Enforcement, and Border Security:**  Djibouti has a legal framework for prosecuting terrorism-related crimes and tries terrorists in criminal courts using its penal code. Counterterrorism remained a high priority for all Djiboutian law enforcement entities in 2014, due to Djibouti's geographic location, porous borders, and the May al-Shabaab attack. Djiboutian officials arrested and detained individuals connected to the terrorist attack.  At year's end, no dates were set for their prosecution.

Djibouti's law enforcement organizations consist of the Djiboutian National Police (DNP), the Djiboutian National Gendarmerie, and the Djiboutian Coast Guard.  In 2014, all three organizations received equipment and training through the Department of State's Antiterrorism Assistance (ATA) program, as well as the International Law Enforcement Academy (ILEA) in Gaborone.  ATA assistance focused primarily on counterterrorism instruction covering post-blast investigations, crisis response, and tactical operations.  Djibouti's law enforcement organizations routinely interacted with U.S. government personnel, and the DNP, Gendarmes, and Djiboutian Coast Guard frequently sought U.S. input to identify potential terrorist suspects.

Generally, Djibouti's law enforcement organizations have personnel and units that have received training in complex investigations and crisis response.  The majority of law enforcement units, however, lacked operational experience responding to terrorist incidents or significant crises. Specialized law enforcement units possessed some necessary equipment yet lacked sustainment training to maintain the skills they have been taught through ATA and ILEA.

Djibouti's most visible counterterrorism efforts were checkpoints and cordon-and-search operations within the capital city.  There was also an increased emphasis at border control points to screen for potential security threats, which included the prohibition of any vehicle entering Djibouti from Somalia after the May 24 bombing.  The Government of Djibouti requested and

PX209

received assistance from the U.S. government to conduct a post-blast investigation. The Government of Djibouti also enhanced protection of soft targets, including hotels and grocery stores, but it is unclear to what extent this level of increased protection will be sustainable.

Djibouti adopted the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System in 2003 in an effort to secure borders and identify fraudulent travel documents. Djibouti has the capability to conduct biographic screening at multiple land, sea, and air ports of entry. Djibouti has regularly issued passports to non-citizen Somalis with close personal or business relationships to the Djiboutian government, as well as to residents of Somalia with no legal claim to Djiboutian citizenship.

While the airport and seaport are important entry points, the vast majority of travelers cross into Djibouti by land at one of three land border points, one of which is the Loyada border crossing at the Somali border. The DNP has control over border checkpoints and the Djiboutian Armed Forces has responsibility for patrolling the border. Djiboutian law enforcement personnel acknowledged the difficulty of securing their land borders as well as the coast. Officials at the DNP-manned checkpoints remained susceptible to bribes.

**Countering the Financing of Terrorism:** Djibouti's request for observer status at the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body, was pending at year's end. The Central Bank of Djibouti houses a Fraud Investigation Unit (FIU). Given its very limited financial and human resources, the FIU is unable to perform its core functions and instead focuses on banking supervision. The FIU has made no referrals of cases to law enforcement involving suspected terrorist financing.

Djibouti's Central Bank places the responsibility for staying updated on sanctions lists with the financial institutions themselves. Many of the financial institutions operating in Djibouti have software packages that include links to the lists of designated terrorists or terrorist entities from the UN, the U.S. Department of the Treasury's Office of Foreign Assets Control, and the EU. The Djiboutian Central Bank monitors compliance with these lists through routine supervision and audits of the financial institutions.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Djibouti is a member of the AU, is headquarters to the Intergovernmental Authority on Development, and has deployed troops to AMISOM. In February, Djibouti hosted the Second Gulf of Aden Counterterrorism Forum, a regional meeting that brought together counterterrorism officials from Djibouti, Somalia, and Yemen to examine shared challenges and discuss best practices. Djibouti is a member of the Partnership for Regional East Africa Counterterrorism.

**Countering Radicalization to Violence and Violent Extremism:** Most of the Government of Djibouti's strategic communication efforts focused on countering radicalization of the youth population. Members of Parliament and representatives from the Ministry of Islamic Affairs

PX209

held monthly meetings in Djibouti's low-income neighborhoods.  The Ministry of Youth and Sports organized sports leagues to engage youth in positive activities.  In addition, the Government of Djibouti, via the Ministry of Islamic Affairs, increased its legal authority over all Islamic matters and institutions to counter the potential for radicalization to violence in mosques.

## ERITREA

**Overview:**  In 2014, the Government of Eritrea continued to claim that it sought to be a partner in the war on terrorism.  Eritrean officials in Asmara, at the UN, and at the AU, issued statements and told Embassy staff that Eritrea wanted to move out of a long period of regional isolation and animosity.  Eritrean officials engaged in shuttle diplomacy with nations in sub-Saharan Africa and the Arabian Peninsula to discuss regional stability, counterterrorism cooperation, and regional initiatives to counter transnational challenges, especially migration and human trafficking.  The UN Somalia and Eritrea Monitoring Group (SEMG) continued to accuse Eritrea of sponsoring regional armed groups.  The Eritrean government denied the accusations and continued to levy charges that Ethiopia supported groups committed to the violent overthrow of the Eritrean regime.  Eritrea's poor relations with Ethiopia, Djibouti, the United States, and the SEMG limited opportunities for cooperation or counterterrorism dialogue.

In May, the United States re-certified Eritrea as "not cooperating fully" with U.S. counterterrorism efforts under Section 40A of the Arms Export and Control Act, as amended.  In considering this annual determination, the Department of State reviewed Eritrea's overall level of cooperation with U.S. efforts to combat terrorism, taking into account U.S. counterterrorism objectives and a realistic assessment of Eritrean capabilities.

The Government of Eritrea has been under UNSC sanctions since December 2009 as a result of past evidence of support for terrorism and regional destabilization.  UNSCR 1907 (2009) imposed an arms embargo on Eritrea and a travel ban and asset freeze on some military and political leaders, calling on the nation to "cease arming, training, and equipping armed groups and their members, including al-Shabaab, that aim to destabilize the region."  The SEMG's October report found no evidence that Eritrea is supporting al-Shabaab or opposition groups in South Sudan.

Lack of transparency on how governing structures function means that we do not have a clear picture of the methods the Eritrean government uses to track terrorists or maintain safeguards for its citizens.  For a number of years, members of the police have refused to meet with security officials from western nations to discuss policy matters, although the U.S. government had informal contact with law enforcement counterparts in 2014.

The Government of Eritrea remained prone to labeling any persons who advocate change or political reform, or who appear to oppose the Eritrean President, as terrorists.

**Legislation, Law Enforcement, and Border Security:**  Articles 259-264, 269-270, and 282 of the Eritrean Penal Code, grandfathered into present-day law from 1957, criminalize terrorist methods; measures of intimidation or terrorism; acts of conspiracy carried out by  organized armed bands; offenses that make use of arms, means, or support from foreign organizations; use

PX209

of bombs, dynamite, explosives, or other terrorist methods constituting a public danger; genocide; and war crimes against the civilian population.  Other sections of Eritrean law could also be used to prosecute terrorism, including acts related to offenses against public safety; offenses against property; offenses against the state; offenses against the national interest; offenses against international interests; attacks on the independence of the state; impairment of the defensive power of the state; high treason; economic treason; collaboration; and provocation and preparation.

Entities including the Eritrean Defense Forces, National Security Agency (NSA), Police, Immigration and Customs authorities all potentially have counterterrorism responsibilities. There are special units of the NSA that monitor fundamentalism or extremism.  Chain of command may work effectively within some security and law-enforcement elements, but there are rivalries and responsibilities that overlap between and among the various forces.  Whether information sharing occurs depends on personal relationships between and among given unit commanders.  Many soldiers, police officers and immigration and customs agents are young national service recruits or assignees, performing their jobs without adequate training.

The Government of Eritrea, justifying its behavior based on alleged threats from Ethiopia, continued to reject the need to prioritize adherence to international human rights standards, and instead based many of its law enforcement decisions and practices on statutes resembling martial law.

The Eritrean government closely monitors passenger manifests for any flights coming into Asmara, and scrutinizes travel documents of visitors, but does not collect biometric data.  Government officials lack training and technology to recognize fraudulent documents. The Government of Eritrea does not share information gathered at ports of entry with the United States.

**Countering the Financing of Terrorism:**  Eritrea is not a member of a Financial Action Task Force-style regional body.  This gap prevents any overall assessment of the risks the country faces in regards to terrorist financing.  Eritrea's general lack of transparency on banking, financial, and economic matters makes the gathering of definitive information difficult.  On September 8, the Government of Eritrea issued Proclamation No. 175/2014 on "Anti-Money Laundering and Combating Financing of Terrorism," which criminalized terrorist financing.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Eritrea is a member of the AU, and would like to reactivate its membership in the Intergovernmental Authority (IGAD); however, Eritrea's return to IGAD is opposed by both Ethiopia and Djibouti, both of whom have had military conflicts and have unresolved border disputes  with Eritrea.

**ETHIOPIA**

PX209

**Overview:**  Following al-Shabaab's failed October 2013 bombing attempt in Addis Ababa, Ethiopian security intensified counterterrorism efforts in 2014.  Although Ethiopia suffered no terrorist attacks during the year, the persistent risks posed by al-Shabaab dominated the Ethiopian government's security posture.  This threat contributed to the Ethiopia National Defense Force (ENDF) joining the African Union Mission in Somalia (AMISOM) at the beginning of the year.  The integration of Ethiopia's forces into AMISOM was a milestone in the multinational effort against international terrorists, since ENDF counterterrorism operations in Somalia have been instrumental in preventing al-Shabaab's dispersion into Ethiopia.

**Legislation, Law Enforcement, and Border Security:**  The Government of Ethiopia continued to use the Antiterrorism Proclamation (ATP), implemented in 2009, to prosecute crimes associated with terrorist activity.  The government also used the ATP to suppress criticism, and continued to prosecute and convict journalists and opposition political figures under the proclamation, including the high-profile "Zone 9" case against six bloggers and three journalists.

The National Intelligence and Security Service (NISS) – with broad authority for intelligence, border security, and criminal investigation – is responsible for overall counterterrorism management in coordination with the ENDF and the Ethiopian Federal Police (EFP).  In 2014, the ENDF, EFP, NISS, and regional special police successfully blocked al-Shabaab attacks on Addis Ababa and other major towns in Ethiopia.  NISS has the mandate to facilitate interagency and international coordination, although rivalries and overlapping authorities between NISS and ENDF hinder information sharing and overall counterterrorism strategy, including coordination with the United States.  In 2014, the Ethiopian government received training and equipment through the U.S.-funded Regional Strategic Initiative, the International Law Enforcement Academy, and the Antiterrorism Assistance program.

Border security is a persistent concern for the Government of Ethiopia, and the government worked to mitigate uneven border controls by expanding the presence and reach of military forces in border regions with Somalia and by joining AMISOM.  Ethiopia adopted the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System in 2003 in an effort to secure borders and identify fraudulent travel documents.  Ethiopia has the capability to conduct biographic screening at multiple land and air ports of entry.  Ethiopia's vulnerable borders include the frequently transited southern and eastern borders with Kenya and Somalia, especially in Dolo Odo – a town located in southeast Ethiopia on the border with Somalia – and Moyale, located on the Kenyan border.

Regional police in the Somali region captured two accomplices of the al-Shabaab suicide bombers responsible for the May 24 attack in Djibouti.

**Countering the Financing of Terrorism:**  Ethiopia is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force (FATF)-style regional body.  The FATF removed Ethiopia from its monitoring process due to the overall improvement in the legal and regulatory framework and addressing its action plan.  In 2014, Ethiopia passed regulations for freezing terrorists' assets.

PX209

In 2014, the Ethiopia took part in the Cross Border Financial Investigation Training, but the lack of capacity and experience within law enforcement remained an impediment to effective responses. Additionally, Ethiopia's poor record-keeping system in general, and lack of centralized law enforcement records in particular, hindered the ability to identify and investigate trends in money laundering and terrorism financing.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** The Government of Ethiopia participated in AU-led counterterrorism efforts as part of the AMISOM forces in Somalia. Ethiopia is a member of the Intergovernmental Authority on Development, and participates in its counterterrorism programs and trainings. The Ethiopian government also supported counterterrorism efforts in Somalia with the Somali National Army and other regional security groups in Somaliland, Puntland, and southern Somalia.

**Countering Radicalization to Violence and Violent Extremism:** The Government of Ethiopia remained concerned about violent extremism and looks to engage in local mediation and conflict mitigation strategies to defuse ethnic or religious tensions, especially in the Oromia and Somali regions. The Government of Ethiopia's continued restrictions on activities of civil society and NGOs imposed by the Charities and Societies Proclamation hinders the expansion of robust NGO activity, including countering violent extremism programming targeting at-risk youth and engaging communities and credible leaders.

## KENYA

**Overview:** Kenya is a member of the Partnership for Regional East Africa Counterterrorism and a strong partner of the United States in the fight against terrorism. Kenya faced a continuing terrorist threat from al-Shabaab, against which Kenya Defense Forces engaged in military operations in Somalia since 2011. Despite some successes, including the discovery of a large unexploded vehicle-born improvised explosive device in Mombasa, Kenya continued to face serious domestic security challenges, growing radicalization and violent extremism within its own borders, and a spike in al-Shabaab attacks in 2014. While no single incident drew the level of international attention garnered by the 2013 attack on Nairobi's Westgate Shopping Mall, more than two dozen terrorist incidents occurred throughout Kenya in 2014, resulting in more than 200 dead and many more injured – making 2014 the deadliest of the past four years. There were allegations of violations of human rights by Kenya's police against civilians during counterterrorism operations, including allegations of extra-judicial killings. There were also reports that highlighted a public perception of a bias against members of the Somali community.

Kenyan officials cooperated closely with the United States and other partner nations on counterterrorism issues – including investigating and prosecuting terrorism cases – and pledged deeper cooperation. Kenya is one of six countries participating in the President's Security Governance Initiative (SGI) announced at the U.S.-Africa Leaders' Summit. SGI focuses on the management, oversight, and accountability of the security sector at the institutional level.

PX209

The Kenyan government focused increased attention on preventing the flow of foreign fighters, including Kenyan nationals, to join al-Shabaab in Somalia, as well as on Kenyan national foreign fighters returning from abroad.

**2014 Terrorist Incidents:**  Of the two dozen terrorist attacks in Kenya in 2014, al-Shabaab publicly claimed responsibility for three major attacks.

- On June 15, armed attacks in the village of Mpeketoni in Lamu County left at least 48 people dead.
- On November 22, a bus hijacking in November in Mandera County in Northeast left 28 people dead.
- On December 2, an armed attack in December at a quarry also in Mandera County left 36 workers dead.  While Kenya had seen deadly attacks in these counties near the Somali border before, the brutality of the Mandera County attacks in which non-Muslims – including women – were singled out for killing, was especially troubling and prompted some non-Muslims, particularly civil servants and teachers, to flee the areas.

Other notable deadly incidents included multiple explosions in March in Nairobi's Eastleigh neighborhood that left seven dead; bombings in May targeting buses and a hotel in Mombasa and Nairobi that left seven dead; bombings in May in Nairobi's Gikomba Market that left 12 dead; and a series of additional attacks in June and July in Lamu County and coastal Tana River County that left at least an additional 45 people dead.

The discovery in March of a powerful and sophisticated but unexploded vehicle-borne improvised explosive device (VBIED) in an impounded car at a Mombasa police station was also significant.

**Legislation, Law Enforcement, and Border Security:**  Kenya's 2012 Prevention of Terrorism Act, 2011 Proceeds of Crime and Anti-Money Laundering Act, and 2010 Prevention of Organized Crime Act together provide a strong legal framework under which to prosecute acts of terrorism.  In December, President Uhuru Kenyatta signed into law the Security Laws (Amendment) Act 2014, a set of provisions that altered 20 existing laws in an effort to further strengthen further Kenya's legislative framework to fight terrorism.  Positive steps included the criminalization of the receipt of terrorist training, creation of a coordinated border control agency, strengthening the National Counter-Terrorism Centre, and a relaxation of evidentiary standards to allow greater use of electronic evidence and recorded testimony.  Other provisions, including those that affected freedom of speech and the rights of the accused and refugees, sparked controversy and garnered criticism that they violated constitutionally-guaranteed civil liberties and contravened Kenya's international obligations.  In December, a Kenyan High Court judge suspended implementation of eight provisions of the Act and formed a three-judge panel to fully examine the Act's constitutionality.  [In January 2015, the High Court temporarily suspended the implementation of eight provisions of the Act, determining that the provisions in question raised human rights concerns.  In February, the High Court struck down the eight provisions on the grounds of unconstitutionality.]

27

PX209

During the year, the Kenyan judiciary demonstrated independence and competence, but remained hampered by a lack of key procedures to allow effective use of plea agreements, cooperation agreements, electronic evidence, and other undercover investigative tools.

In line with the security sector reorganization outlined in the 2013 Kenyan Constitution, the Government of Kenya divided counterterrorism functions among the three branches of the National Police Service – the Kenya Police (including the investigative Anti-Terrorism Police Unit and the paramilitary General Services Unit), the Directorate of Criminal Investigation, and the Administration Police – as well as non-police agencies such as the National Intelligence Service and elements of the Kenya Defense Forces. Operational effectiveness was impeded by poor interagency coordination among and within police, intelligence, and military forces; limited resources; insufficient training; endemic corruption; and an unclear command and control of, and politicization of, some terrorist incidents. In an effort to reverse this trend and improve operational effectiveness, the government made significant leadership changes.

Kenyan security and justice sector officials participated in a range of U.S. government-sponsored capacity-building programs funded and implemented by the U.S. Departments of State, DHS, DOJ, and DoD, in a range of areas including crisis response, investigations, and prosecutions. Notable among these was the Department of State's Antiterrorism Assistance program's East Africa Joint Operations exercise, a month-long crisis response training series – hosted in Kenya for Kenyan, Ugandan, and Tanzanian law enforcement personnel and first responders – that culminated in a large-scale simulation of a terrorist incident.

Border security remained a challenge for Kenya due to the country's vast, sparsely populated border regions and porous borders, as well as corruption. Kenyan officials emphasized the importance and challenges of border security in their initial discussions with U.S. counterparts in the context of the Security Governance Initiative. A lack of capacity on border security and inadequate systems of national identification hampered law enforcement's ability to identify and detain potential terrorists.

However, terrorist screening watch lists, biographic and biometric screening, and other measures were largely in place at major Kenyan ports of entry. Kenya continued its partnership with the United States to strengthen Personal Identification Secure Comparison and Evaluation System border controls at major ports of entry, adding new ports of entry and upgrading systems nationwide.

The Kenyan government focused increased attention on preventing the flow of foreign fighters, including Kenyan nationals attempting to join al-Shabaab in Somalia, as well as Kenyan national foreign fighters returning from abroad.

Kenyan security services detected and deterred a number of terrorist plots during 2014, and responded to about two dozen significant terrorist incidents. Kenyan law enforcement, in large-scale security operations in April and May called "Usalama Watch," rounded up thousands of potential suspects, primarily in the Nairobi and Mombasa areas. However, the operations were widely criticized as fraught with abuse, corruption, and violations of civil liberties – including in a report of Kenya's own civilian oversight body, the Independent Policing Oversight Authority.

28

PX209

Allegations of abuses, extra-judicial killings, and arbitrary detentions by Kenyan security services persisted in 2014. A July report by Kenya's civilian oversight body, the Independent Policing Oversight Authority. indicated that 332 Somalis had been deported to Mogadishu and outlined a range of violations by police of constitutional guarantees, including detention of suspects without arraignment before a court past the constitutional limit of 24 hours; extortion; and overcrowding in detention facilities. The report also included a set of time-bound recommendations, to which the government had not responded to by year's end.

The Independent Policing Oversight Authority made progress in fulfilling its mandate by investigating multiple cases of police misconduct and referring these to the Office of the Director of Public Prosecutions, two of which had already moved to the prosecution stage by year's end.

At the end of 2014, several major terrorism cases remained ongoing, including the trial of accomplices in the Westgate Shopping Mall attack and the case of the unexploded Mombasa VBIED.

Kenyan law enforcement agencies worked with regional organizations and the broader international community, including the United States, to increase its counterterrorism capacity and to secure land, sea, and air borders.

**Countering the Financing of Terrorism:** Kenya is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force (FATF)-style regional body. Kenya made progress in implementing its anti-money laundering/countering the financing of terrorism regime, and was removed from the FATF's continuing monitoring process in 2014 due to achieving the goals of its work plan. On December 16, the NGO Coordination Board de-registered 510 organizations for failure to provide required financial reporting and indicated it would deregister an additional 15 for suspected links to terrorist financing. The list of 510 was public and many of those groups were reinstated after filing the necessary paperwork. The list of 15 groups with suspected ties to terrorism has not been made public.

Kenya's Financial Reporting Center also continued to make progress in becoming fully operational, and continued to build its capacity to monitor the formal financial system and expand the number of reporting entities that it served. It remained hampered by a lack of essential resources, however, including an electronic reporting system for suspicious transactions. The Central Bank of Kenya took steps to encourage more people to use the formal financial sector to increase financial integrity by ensuring regulatory oversight.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Kenya is a member of the AU, the Inter-Governmental Authority on Development, the Community of Eastern and Southern Africa, and the East African Community. Kenya's primary contribution to regional counterterrorism efforts was its significant troop contribution to AMISOM since 2012. In 2014, Kenya hosted a head-of-

PX209

state level meeting of the AU's Peace and Security Council focused on counterterrorism, as well as regional meetings of East African Community intelligence and police chiefs.  In addition, Kenya hosted numerous trainings and the aforementioned crisis response exercise involving law enforcement professionals from neighboring countries to build counterterrorism capacities and increase regional cooperation.

**Countering Radicalization to Violence and Violent Extremism:**  The Government of Kenya took some steps to increase engagement with civil society on issues of countering violent extremism, including participation by government officials along with religious and civil society leaders in the First National Conference on Security and Countering Violent Extremism in January, at which a Violent Extremism Advocacy and Accountability Charter was developed and adopted.  The Kenyan government also developed, but had not implemented by year's end, a comprehensive National Counter-Radicalization Strategy.  Senior leaders made some overtures to communities at risk of violent extremism, but also used divisive and inflammatory rhetoric, especially in the wake of terrorist incidents that further increased tensions.  "Usalama Watch" and other heavy-handed security operations risked further alienating communities at risk of violent extremism.  Some Kenyan civil society organizations actively worked to address the drivers of radicalization and violent extremism in Kenya, often with assistance from the United States and other international partners, without significant government involvement.

## MALI

**Overview:** The Government of Mali remained a willing U.S. counterterrorism partner, despite serious challenges, which included renewed fighting and insecurity in some northern regions, and a protracted peace process that hampered the return of government services and security to the north.  The government's counterterrorism efforts remained focused on violent extremist elements who continued to play a destabilizing role in Mali's largely ungoverned northern regions.  Despite continued security efforts and successes in expelling violent extremists in some parts of the vast northern region, violent extremist groups remained active, exploiting the lack of effective control of swathes of territory by governmental forces, northern armed groups, and troop drawdowns linked to the reconfiguration of French military operations.  The government's ability to effectively disrupt terrorist activities was hampered by the Malian army's defeat in May at the hands of northern armed rebel groups in Kidal.

Mali relies heavily on the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA) and French forces to provide a measure of stability and security to the northern regions.  MINUSMA significantly expanded its northern presence in 2014, including in Kidal, and it continued to work with the Malian government and armed groups to facilitate the redeployment of Malian administrators and security forces to the north.

The United States resumed initial security assistance cooperation with Mali in 2014, with an emphasis on institution building, civilian control, and respect for human rights.  To help strengthen Malian counterterrorism crisis response capacity, the Department of State's Antiterrorism Assistance program offered an initial crisis management seminar for senior Malian officials involved in planning responses to terrorist incidents.

PX209

The French military's 18-month mission in Mali, Operation SERVAL, was replaced in July by an integrated counterterrorism force for the Sahel region entitled Operation BARKHANE. In cooperation with Malian forces, BARKHANE launched numerous operations to degrade remaining violent extremist elements operating in northern Mali, including al-Qa'ida in the Islamic Maghreb (AQIM), al-Murabitoun (AMB), the Movement for Unity and Jihad in West Africa (MUJAO), and Ansar al-Dine (AAD). Other key counterterrorist efforts included a September French and Malian joint military operation in response to increased improvised explosive device (IED) attacks. On December 10, Malian and French forces eliminated 10 members of AMB, including Ahmed el Tilemsi, a senior leader of AMB and founding member of MUJAO.

Mali is one of six countries participating in the President's Security Governance Initiative (SGI) announced at the U.S.-Africa Leaders' Summit. SGI focuses on the management, oversight, and accountability of the security sector at the institutional level.

**2014 Terrorist Incidents:** AQIM, MUJAO, AMB, and AAD continued to conduct terrorist attacks in 2014; IEDs were used with higher frequency and success compared to 2013, and regularly targeted MINUSMA, French, and Malian forces. Detonated IEDs alone resulted in over 100 injuries to these forces and the deaths of 19 MINUSMA personnel in 2014, a stark increase from the four peacekeeper deaths in 2013. Violent extremists also used rocket or mortar fire, landmines, and suicide bombings. Incidents linked to terrorism included:

- Between May 27 and September 15, a total of 27 IED, landmine, and rocket or mortar attacks targeted MINUSMA premises and personnel (15 IED or mine incidents and 12 rocket or mortar fire incidents). This included a June 11 suicide vehicle-borne improvised explosive device attack in Aguelhok that killed four peacekeepers and injured six, along with four Malian Defense and Security Forces elements.
- On September 2, four UN peacekeepers from Chad were killed when their truck was blown up by a landmine near Kidal.
- On September 18, five UN peacekeepers from Chad were killed when their truck drove over a mine in the Kidal region.
- On October 3, nine UN peacekeeping troops from Niger were killed in an ambush in the Gao region of Mali.
- On November 25, an IED targeted a governmental convoy carrying the Minister of Rural Development, killing two Malian soldiers and injuring nine.

**Legislation, Law Enforcement, and Border Security:** Mali's criminal justice system continued to implement the new penal code of 2013, intended to help counter terrorism and transnational organized crime. In an effort to prioritize and strengthen criminal justice institutions with a responsibility for terrorism-related activities, Malian authorities began staffing the specialized counterterrorism unit's judicial component (composed of police, investigators, and judges). The Malian Ministry of Justice and Police Agencies began to work directly with the U.S. government to promote efficient practices and conduct appropriate rule of law training. Around 25 members of the Malian police and Gendarme also participated in a U.S. Africa Command-funded Crime Scene Investigation Course focused on the collection and storage of evidence.

PX209

The Malian Armed Forces and Air Force under the Ministry of Defense remained the primary entities responsible for securing Mali against terrorist threats. The General Directorate of State Security under the Ministry of Security has the authority to investigate and detain persons for terrorism offenses. Law enforcement and military units did not coordinate on counterterrorism missions, inhibiting their capacity to detect, deter, and respond to terrorist incidents. Law enforcement units displayed insufficient command, lacked resources and control capacity, and had a poor record of accountability and respect for human rights. In order to improve its counterterrorism crisis response capacity, the U.S. Department of State's Antiterrorism Assistance program offered an initial crisis management seminar for senior Malian officials involved in planning responses to terrorist incidents.

The Ministry of Internal Security and Civilian Protection's interagency working group to reform the security sector in Mali, conceived in 2013, had yet to move beyond the discussion phase; MINUSMA worked with the Malian government in 2014 to move this from discussion to action. Mali also lacked a national counterterrorism strategy.

Although Mali has basic border security enforcement mechanisms, law enforcement units lacked capacity, training, and mobility assets to effectively secure Mali's porous borders. In May, Mali began using the U.S.-funded Personal Identification Secure Comparison and Evaluation System at its international airport for passenger screening and biometric collection. The gendarmerie – which reports to both the Ministry of Defense and the Ministry of Interior – and the national border police – under the Ministry of Interior – continued to provide paramilitary support to prevent and deter criminal activity at borders. Customs officials under the Ministry of Economy and Finance continued to monitor the flow of goods and enforce customs laws at borders and ports of entry. Access to the Interpol list is restricted to senior authorities and is made available to investigators upon request.

Customs officials have travel forms to collect biographical information from travelers at airports and manifests for information on goods transiting borders. When conducting investigations, customs officials and border police increasingly compare the biographic data on forms against presented travel documents or manifests against goods possessed. However, the exit and entry stamps used by border officials are inconsistent in size and shape due to poor training and resources, undermining efforts to authenticate travel documents. Additionally, illegal reproduction of these stamps is easy.

In May 2012, Mali introduced an updated machine-readable passport linked to the Economic Community of West African States (ECOWAS). The new passport contains several security additions, including micro printing, ultraviolet features, and a full-color digital photo. However, Malian diplomatic and official passports have still not been updated. Unfortunately, many of the relatively sophisticated anti-fraud characteristics of the new Malian passport are rendered moot by the relative ease with which imposters can obtain fraudulent documents, such as birth and marriage certificates.

While the Prosecutor's office estimates 200 arrests since 2013 for crimes in connection with terrorism and rebellion against the state, data on number of terrorism-related arrests made in

PX209

calendar year 2014 was not available at year's end.  Mali did not prosecute any terrorism cases in 2014.  As in 2013, resource constraints, a lack of training in investigative techniques, and inexperience with trying terrorism cases continue to plague a weak judicial system.  Although no longer in the immediate post-coup environment of 2013, the government remained primarily focused on achieving a peace agreement with northern armed groups.

Mali is very cooperative in working with the United States to prevent acts of terrorism against U.S. citizens in the country.  In March, the Malian government extradited Alhassane Ould Mohamed – also known as Cheibani – to the United States to face charges for the murder of one U.S. diplomat and the attempted murder of another U.S. diplomat in Niger in 2000.  Cheibani, who had been providing support to AMB, was captured by French forces in late 2013.  Efforts also began in 2014 on a Special Program for Embassy Augmentation and Response program with the Malian National Guard, aimed at developing the country's capacity to effectively respond and coordinate with the United States to prevent and respond to terrorist attacks directed at U.S. citizens in Mali.

**Countering the Financing of Terrorism:**  Mali is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force (FATF)-style regional body.  In May 2013, the National Assembly passed a law amending the Penal Code and the Penal Procedures Code and created a judicial unit focused on the fight against terrorism and trans-border crime.  A prosecutor in charge of this "anti-terrorist" judicial unit was appointed in July 2014.  In November, the prosecutor formed an investigative team composed of judges and gendarmerie, rendering the court operational.  The court has the authority to implement Article 30 related to financial terrorism, including a mechanism to freeze assets administratively.

The Malian government freezes and confiscates terrorist assets without delay.  The asset seizure must first be authorized by a judge in the new judicial unit targeting terrorism and trans-border crimes. Assets can be frozen indefinitely during the investigation period.  However, coordination between investigative agencies is poor, thus not all suspected cases make it to court.

Because the majority of transactions in Mali are cash-based, it is difficult to monitor and regulate money/value transfer and other remittance services given resource constraints.  Additionally, non-financial businesses and professions are not subject to customer due diligence requirements.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  During 2014, Mali continued its cooperation with regional and international partners both militarily and politically, and remained active in bodies including ECOWAS, the UN, and the AU.  Mali is also a member of the Trans-Sahara Counterterrorism Partnership and participated in the Global Counterterrorism Forum.

The Malian military participated in multinational counterterrorism operations in 2014, including Operation BAOBAB in cooperation with Operation BARKHANE, and the Mauritanian military. The AU created a follow-up and support group for the political and security situation in Mali and

PX209

has held six meetings in Mali with international partners on enhancing international cooperation to bring political stability and security in Mali.  President Keita participated in the inaugural "G-5 of the Sahel" summit in Nouakchott in December to discuss security and terrorist concerns with fellow heads of state from the Sahel.

**Countering Radicalization to Violence and Violent Extremism:**  While Mali has no official strategy in place to counter violent extremism (CVE), the Malian government has developed a National Reconciliation Policy that considers the need to delegitimize extremist ideologies and the promotion of social cohesion between communities.  CVE considerations are also integrated into Mali's "Program for Accelerated Development in the Northern Regions," as well as a draft decentralization policy.  The Ministry of Religious Affairs, by working with the High Islamic Council and other religious associations to promote moderate Islam and maintain a secular state, is developing a coherent approach to address rising radicalization in Mali.  Conversely, efforts to prevent increased radicalism and recruitment by violent extremist groups have been hindered by the absence of the Malian government in much of the north.

Mali volunteered to serve as an initial pilot country for the Global Community Engagement and Resilience Fund, a public-private funding mechanism designed to support local, community-based projects to strengthen resilience against violent extremism.

## MAURITANIA

**Overview:**  The Mauritanian government continued to oppose terrorism actively and effectively, building on an approach that hinges on improving the capacity of security forces and securing the country's borders.  As in years past, the Mauritanian authorities cooperated with the United States on counterterrorism efforts and seized opportunities to participate in U.S.-sponsored training on counterterrorism tactics and techniques.  Al-Qa'ida in the Islamic Maghreb (AQIM) remained the leading terrorist threat to Mauritania in 2014, although it has not conducted a successful attack in Mauritania in several years.

**Legislation, Law Enforcement, and Border Security:**  Mauritania's national counterterrorism laws define terrorism as a criminal act, describe court procedure in terrorism cases, and proscribe punishment for convicted terrorists.  The Mauritanian government continued to send prosecutors and investigative magistrates to terrorism prosecution training organized by the United States and other international partners.

Mauritania's National Gendarmerie – a paramilitary police agency – and its National Security Directorate – which falls under the Ministry of Interior – are the primary law enforcement units performing counterterrorism functions.  Cooperation and information sharing between the two organizations occurred sporadically.

Throughout the year, security forces personnel participated in eight courses funded by the Department of State's Antiterrorism Assistance program, which conferred expertise in relevant tactical and technical skills related to border security and investigative capacity building, with a particular emphasis on regional cooperation.

PX209

Border security remained a priority of the Mauritanian government, yet remained difficult due to a lack of capacity and different formations of security forces bearing responsibility for the various sections of the country's long land borders.  Mauritania's border forces employed biometric screening capabilities at some, but not all, ports of entry.  Information sharing efforts within the government and with other countries remained nascent.

Mauritanian authorities continued to arrest terrorist suspects during the reporting period.  In contrast to years past, no terrorism prosecutions took place in 2014.  Terrorism-related arrests in 2014 included:

- On October 1, the Mauritanian authorities apprehended Haiba Ould Zouein, an alleged leader in AQIM, in Vassala, a village located along the border with Mali.  At year's end, Ould Zouein remained in pre-trial confinement.
- On October 12, Mauritanian security forces arrested four men in Zouérate – a city in the country's northwest – who had allegedly declared their allegiance to and sought to recruit fighters for the Islamic State in Iraq and the Levant (ISIL).  The authorities released one of the detainees after two days and charged the remaining three with attempting to provide material support to a terrorist group.  At year's end, they remained in pre-trial confinement.
- On November 5, Mauritanian security forces captured Ali Ould Soueilim in F'derik, a town in the country's far northwest.  Suspected of collaboration with unspecified terrorist groups, Ould Soueilim was in custody and awaiting trial at year's end, after more than six years in hiding.

In addition, on November 17, the Supreme Court of Mauritania upheld the prison or death sentences of five appellants convicted of terrorism-related offenses.  Among the petitioners was El Khadim Ould Semmane, who is reputed to be the former leader of the Mauritanian branch of AQIM.

**Countering the Financing of Terrorism:**  Mauritania is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body, and maintains observer status within the Intergovernmental Action Group against Money Laundering in West Africa.  On February 10, Mauritanian officials from the Ministry of Justice and the Central Bank's financial intelligence unit met in Nouakchott with counterparts from the United States to outline the broad strokes of a legal framework to combat terrorist financing and money laundering.

Although legislation regulating alternative remittances exists, the Mauritanian government neither has the resources to monitor sizable flows of funds through the informal *hawala* money transfer system, nor considers doing so a priority.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

PX209

**Regional and International Cooperation:**  Mauritania was an active member of the UN, the AU, and the Sahel G-5 – a regional cooperation partnership organized in February.  On December 19, Mauritania hosted the first meeting of the presidents of the five member states of the Sahel G-5: Mauritania, Mali, Niger, Burkina Faso, and Chad.  All signatories pledged to cooperate to combat urgent cross-border security threats – namely, terrorism and organized crime.  Mauritania is also a member of the Trans-Sahara Counterterrorism Partnership.

On March 26 and 27, Mauritanian officials participated in a two-day Global Counterterrorism Forum (GCTF) workshop on border security, co-sponsored by the U.S. and Senegalese governments, in Dakar.  On April 22 and August 4, Mauritania co-hosted meetings of the GCTF's capacity building coordination group in Nouakchott.

In early May, Mauritania's Ministry of Justice and the UN Development Program co-hosted a two-day capacity building workshop on investigation and prosecution of criminal organizations, including terrorist groups.  Over 60 Mauritanian prosecutors, investigative magistrates, police investigators, and customs officials participated in the seminar, which featured presentations on investigative techniques and coordination practices outlined in the GCTF's Rabat Memorandum.

**Countering Radicalization to Violence and Violent Extremism:**  The Malian government continued to manage programs designed to counter violent extremism and to offer alternatives to "at-risk" individuals.  For example, in 2014 the Ministry of Islamic Affairs and Traditional Education trained over 300 former *mahadra* (Qur'anic school) students in vocational subjects at three education centers in Nouakchott, Atar, and Kaedi.  Officials from Ministry of Interior and Decentralization introduced this program, and other aspects of the national strategy to combat terrorism and violent extremism, during public workshops that took place in regional capitals throughout the summer and fall.  The government also continued to collaborate with independent Islamic religious organizations to promote non-violence, sponsoring radio and television programming on the themes of temperance in Islam, and paying monthly salaries of US $170 to 200 moderate imams who fulfilled stringent selection criteria.

## NIGER

**Overview:**  In 2014, the threat of terrorist activity by Boko Haram in the area near Niger's southern border with Nigeria increased substantially.  While most Boko Haram-related violence occurred outside Niger, a few isolated incidents occurred on the Nigerien side of the border, and suspected Boko Haram members were arrested there.  Additionally, hundreds of Nigerian soldiers and tens of thousands displaced persons fleeing from Boko Haram crossed into Niger – adding to tensions in Niger's region of Diffa.  The Government of Niger deployed additional military and law enforcement resources to this area.

Suspected members of al-Qa'ida in the Islamic Maghreb (AQIM) and other terrorist organizations continued to transit through the vast northern part of Niger in the areas bordering Mali, Algeria, Libya, and Chad.  Weapons and contraband were believed to move through these areas, some of which were interdicted by the Nigerien military.  The terrorist group Movement for Oneness and Jihad in West Africa (MUJAO) claimed responsibility for one attack against

PX209

government personnel in Niger.  During 2014, with foreign assistance, the Nigerien military continued to increase its capability to patrol, collect information, and interdict in the north.

Niger remained an outspoken opponent of terrorism in the region, continued to cooperate with international partners – including the United States, and received substantial international counterterrorism assistance.  Niger is one of six countries participating in the President's Security Governance Initiative (SGI) announced at the U.S.-Africa Leaders' Summit.  SGI focuses on the management, oversight, and accountability of the security sector at the institutional level.

Nigerien officials took credit for mediating the release of several Europeans held hostage by AQIM who were released in 2014, allegedly after payments were made.

**2014 Terrorist Incidents:**  Attacks included:

- On May 2, the president of the local Chamber of Commerce in the Diffa region was killed at his home by suspected Boko Haram sympathizers.  Reports indicated that the victim was targeted and killed because he was believed to be an informant working for the Government of Niger.  No arrests were made in connection with this murder.
- On May 20, in the village of Chetimawongo in the Diffa region, the village chief and a shopkeeper were murdered by having their throats slit by suspected Boko Haram militants.  It was believed that the village chief and the shopkeeper were targeted because they were suspected of providing information on Boko Haram to Nigerien security services.  No arrests were made in connection with this incident.
- On October 30, three simultaneous attacks – using small arms and rocket-propelled grenades (RPGs) – targeting Nigerien personnel and institutions were carried out in the Tillabery region.  While no group claimed credit for these attacks, there were reports that the attackers had ties to MUJAO.  The first attack targeted a mixed patrol of Nigerien National Police, National Guard, and gendarme personnel who were camped near the Niger/Mali border near the village of Zaroumdaray.  The second attack targeted a gendarme post located at a Malian refugee camp near the village of Mangaize.  The third attack, and subsequent prison break, occurred at a prison protected by the National Guard located in the town of Ouallam.  These attacks resulted in at least nine Nigerien security service personnel being killed, several more being wounded, the theft of multiple weapons and ammunition, the destruction of one vehicle, and the escape of over 60 prisoners.  Many of the prisoners were recaptured or returned of their own accord, but the ones connected to the attackers were still at large at year's end.
- On November 19, MUJAO violent extremists attacked a gendarme post near the village of Bani Bangou in Tillabery region using small arms and RPGs.  Although the gendarmes were able to repel the attack, one gendarme was killed and three others were wounded.  The assailants managed to take a vehicle, several small arms, and ammunition from the gendarme post as they fled.  A local telecommunications operation was destroyed in the attack, presumably in an attempt to prevent the gendarmes from contacting other security services for reinforcements.

PX209

**Legislation, Law Enforcement, and Border Security:**  Niger's legislation criminalizes acts of terrorism consistent with the international instruments on terrorism.  Recent amendments to the code of criminal procedure created a specialized counterterrorism jurisdiction and authorized more robust investigative techniques.  In 2014, Niger's interagency counterterrorism investigative cell, the Central Service for the Fight against Terrorism (SCLCT), was expanded to include a separate operational cell in the regional capital of Diffa.

The law enforcement and security services of Niger were actively engaged in detecting, deterring, and preventing acts of terrorism in Nigerien territory.  However, a lack of sufficient manpower, funding, and necessary equipment made this more difficult.  Counterterrorism investigations in Niger are primarily the responsibility of the SCLCT, which is made up of representatives from Niger's three primary law enforcement organizations:  the National Police, the National Guard, and the gendarmerie.  Information sharing occurred among the law enforcement agencies of SCLCT, and prosecutors at the Judicial Counterterrorism Center were consulted during investigations.

Niger's long borders and vast swaths of harsh terrain make border security a challenge, specifically in the north along the borders with Mali, Algeria, and Libya.  These borders are very difficult to secure and patrol, and are often exploited by smugglers.  Niger attempted to improve its border security by increasing the number of border control facilities and requesting assistance from partners to construct and equip facilities.  Niger continued to use rudimentary terrorism watchlists that it shares with the security services and at border checkpoints, although the lists were not frequently updated.  The ability to conduct biographic and/or biometric screening remained limited to Niamey's international airport.  Niger's air surveillance capability increased – Niger has the ability to collect advance passenger name records and is able to use these records in counterterrorism efforts.  Information sharing within the Nigerien government is adequate but sometimes slow between services due to stove piping or a lack of communications equipment.

Resource constraints across the spectrum of basic needs – such as electricity, radios, reliable vehicles, computers, and other technology – and personnel, including resource constraints within the Ministries of Justice and Interior, made it difficult for the Government of Niger to carry out strong law enforcement and border security.  Additionally, effective whole-of-government coordination in the fight against terrorism continued to present challenges, and capacity remained lacking in areas such as proactive investigations and non-confession-based prosecutions.

Throughout 2014, SCLCT arrested terrorist suspects on charges that included planning acts of terrorism, association with a terrorist organization, recruitment, and terrorist financing.  Several proactive operations were conducted in the Diffa and Zinder regions, resulting in multiple arrests. At year's end, approximately 100 terrorism suspects were detained in Niger awaiting trial.  Most of the cases were under investigation by investigating judges.

Niger continued to receive counterterrorism assistance from a variety of international partners, including the United States.  The EU supported a 50-person team (EUCAP-Sahel) in Niger to build capacity in fighting terrorism and other organized crime.  A number of other international partners provided security sector assistance in Niger, including France and the UN.  Niger

PX209

continued to permit French forces to be based in Niamey as well as in other locations to conduct operations such as ground and air surveillance. The U.S. government, provided terrorism assistance to Nigerien law enforcement – primarily through the Department of State's Antiterrorism Assistance program and a Resident Legal Advisor from the DOJ.

**Countering the Financing of Terrorism:** Niger is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body. Niger's porous borders and historical trafficking routes make it easy for terrorists to transfer large sums of cash. At year's end, suspected AQIM and Boko Haram members were awaiting trial on charges of terrorist financing. In 2014, Niger's financial intelligence unit, CENTIF, continued to increase its activities. For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Niger supported the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA) by contributing a battalion of infantry. Additionally, Niger worked with Mali, Algeria, and Mauritania at the General Staff Joint Operations Committee in Tamanrasset, Algeria. Niger participates in a judicial cooperation organization, the Sahel Judicial Platform, with other countries in the region.

Niger increased its efforts to improve joint patrols and operations with Algeria. Niger also conducted joint patrols with Nigeria and Chad, and increased cooperation with Lake Chad Basin Commission member countries to fight against Boko Haram.

Nigerien officials continued to participate actively in regional programs organized by the Global Counterterrorism Forum (GCTF) Sahel and Rule of Law Working Groups, although Niger is not a GCTF member.

Nigerien officials hosted and attended multiple international meetings concerning international efforts to combat the threat of Boko Haram. In August, the U.S.-African Leaders Summit in Washington included Niger as one of the six initial countries participating in the Security Governance Initiative. On October 7, the Lake Chad Basin Commission summit took place in Niamey; partner countries Benin, Chad, Nigeria, Niger, and Cameroon all pledged to field a Multinational Joint Task Force to counter Boko Haram.

**Countering Radicalization to Violence and Violent Extremism:** Niger's strategy to counter violent extremism includes the Sahel-Sahara Development and Security Strategy (SDSS), which aims to improve security through access to economic opportunities and employment, especially for youth; access to basic social services; capacity for good governance at the community and local authority level; and reintegration of forced returnees from Libya, Ivory Coast, Nigeria, and Algeria. The SDSS launched three years ago, but at year's end remained not fully funded; and therefore, results were limited.

Niger's SDSS, supported by USAID's Peace through Development II program, helped reduce the risk of instability and increase resiliency to violent extremism through such activities strengthening moderate, non-extremist voices through radio, social media, and civic education;

PX209

and working with religious leaders who promote religious tolerance and peaceful resolution of conflict.

The Resilient Voices program, supported by the U.S. government, uses credible Nigerien voices to promote peace, tolerance, and respect for Nigerien identity.

In 2014, the Nigerien Ministry of Justice created a new position of Director of Reinsertion and Rehabilitation within its prison administration. While some very basic vocational training programs in prisons exist, there were no programs yet that focused specifically on rehabilitation and reintegration of violent extremist prisoners into mainstream society in 2014.

## NIGERIA

**Overview:** The terrorist group Boko Haram carried out kidnappings, killings, bombings, and attacks on civilian and military targets in northern Nigeria, resulting in nearly 5,000 deaths, many injuries, tens of thousands of displaced civilians, and significant destruction of property in 2014. The states in which attacks occurred most frequently were Adamawa, Borno, and Yobe states. Attacks were launched also in Bauchi, Gombe, Kano, Niger, Plateau, Taraba states, and the Federal Capital Territory (FCT). While Boko Haram did not claim responsibility for known attacks in the south of the country, it is widely believed the group was responsible for the early December prison break in Ekiti state, and a June bomb attack on the Apapa oil depot in Lagos State. In May, the Nigerian government renewed a state of emergency in the northeastern states of Adamawa, Borno, and Yobe. The state of emergency expired in November and was not renewed at year's end. Despite the increased military presence in the region, Boko Haram continued to attack schools and take over large and small towns and villages in Borno (including Bama and Gwoza), Adamawa (including Madagali and Michika), and Gombe states, as well as Buni Yadi and Gujba in Yobe.

In April, Boko Haram invaded a secondary school in Chibok in Borno state, where they kidnapped more than 275 young female students who were taking examinations – the group's largest mass kidnapping to date. Throughout the year, suspected Boko Haram members killed Nigerian government and security officials and civilians, including both Christians and Muslims.

The state of emergency provided the Nigerian government additional authorities to prosecute a military campaign against Boko Haram, including sweeping powers to search and arrest without warrants. The 7th Army Division, headquartered in Maiduguri, the capital of Borno state, remained in charge of the operations within Borno, while the 3rd Division became more active in Adamawa state following the significant upswing in activity there. Despite an increased security budget from the National Assembly and the wide arrest authority, the military was unable to repel Boko Haram's attacks on and control over several key towns in the Northeast. On more than one occasion, Boko Haram attackers forced the Nigerian military to retreat across the border into Cameroon.

The Nigerian government's efforts to address grievances among Northern populations, which include high unemployment and a dearth of basic services, made little progress. Some state governments in the North attempted to increase education and employment opportunities, with

PX209

little support from the federal government.  The United States called on the Nigerian government to employ a more comprehensive strategy to address Boko Haram that combines security efforts with political and development efforts to reduce Boko Haram's appeal, address legitimate concerns of the people of northern Nigeria, and protect the rights of all of Nigeria's citizens.

In April 2014, to assist with Nigeria's investigation and recovery efforts of the 275 girls kidnapped by Boko Haram in Chibok, Borno State, the United States deployed an Interdisciplinary Assistance Team composed of personnel from DOD, USAID, the State Department, and the Federal Bureau of Investigation (FBI).  The establishment of the Joint Coordination Fusion Cell (JCFC) and the Joint Coordination Planning Cell in May modestly improved coordination between the U.S. military and the Nigerian military and interagency coordination between the Nigerian security forces.  However, such coordination was not seen between upper levels of the Nigerian military in the JCFC and commanders in the field.

Nigeria is one of six countries participating in the President's Security Governance Initiative (SGI) announced at the U.S.-Africa Leaders' Summit.  SGI focuses on the management, oversight, and accountability of the security sector at the institutional level.

**2014 Terrorist Incidents:**  In 2014, Boko Haram expanded its attacks primarily in 10 northern states.  The number of attacks by female suicide bombers increased in 2014.  Notable terrorist incidents committed by Boko Haram included:

- On January 14, 31 people were killed and 50 others injured when an improvised explosive device (IED) detonated in a crowded area near the main market in Maiduguri, Borno state.
- On February 16, a group of 100 armed persons believed to be Boko Haram rounded up and shot men in the village of Izghe in Borno state.  A total of 107 persons were killed in the attack, which was labeled the "Izghe Massacre."
- On February 25, 59 boys were killed in their dormitories at the Federal Government College of Buni Yadi in Yobe state.  The female students were allowed to escape.  Although no group formally claimed responsibility, Boko Haram is suspected to have carried out the attack.
- On March 14, Boko Haram attacked Giwa Barracks in Maiduguri, Borno state, where suspected Boko Haram members were detained.  Approximately 600 prisoners were freed in the attack, which was filmed in a video released by the group.
- On April 14, Boko Haram attacked a girls' secondary school in Chibok, in Borno state, and, according to the Nigerian police, abducted 276 girls.  Of these, 57 students escaped while being transported to a remote camp.  Boko Haram leader Abubakar Shekau stated in a video that the girls were considered "spoils of war" and would become brides of Boko Haram members.
- Also on April 14, two devices placed in vehicles were detonated in a motor park in Nyanya, a suburb of Abuja, in the FCT.  The blasts killed approximately 100 persons with more than 200 injured.
- On May 20, two explosions at a busy market area in Jos, Plateau state, killed 118 people, according to officials.

PX209

- On June 2, Boko Haram attacked the Local Government Area (LGA) of Gwoza in Borno State and killed more than 200 residents of three communities.
- On July 2, 56 people were killed when a car bomb exploded in a busy market area of Maiduguri.
- On July 4, approximately 200 members of Boko Haram attacked the Damboa LGA in Borno state, destroying the divisional police headquarters, markets, homes, and vehicles. The attackers used IEDs, rocket propelled grenades, and anti-aircraft weapons to attack the Nigerian Army's 7th Division. Officials stated that 12 soldiers, three police officers, and four civilians were killed.
- On July 28, a female suicide bomber in Kano killed three people and injured seven others.
- On July 30, a female suicide bomber killed two students at Kano State Polytechnic in Kano.
- On August 6, Boko Haram fighters captured the town of Gwoza in Borno, killed up to 100 people, and burned down the divisional police headquarters, the LGA secretariat, and other public buildings.
- On September 6, Boko Haram took control of the town of Gulak in Adamawa state and killed nearly 40 residents.
- On September 9, Boko Haram attacked the town of Hong in Adamawa and killed more than 100 residents, according to police.
- On October 30, Boko Haram took control of Mubi in Adamawa after Nigerian soldiers fled the town in anticipation of the raid. Officials stated several residents were killed, but no casualty figures were released.
- On November 10, a suicide bomber dressed as a student detonated a bomb at a boys' school in Potiskum, Yobe state. Police believed Boko Haram carried out the attack, which left 47 people dead, including the suicide bomber, and 79 persons wounded.
- On November 25, two female suicide bombers killed at least 30 people in a crowded Maiduguri market in Borno. The first bomber set off her explosives and killed several persons; when others gathered around the scene, the second bomber blew herself up, killing about 30.
- On November 28, three bombs were detonated in an armed raid on the Central Mosque and other locations in Kano. More than 100 people were killed and over 120 injured. Several others were killed when police opened fire to disperse the crowd.
- On December 10, at least four people were killed and seven injured in a double attack by two young female suicide bombers near a market in Kano. Boko Haram militants are suspected of being behind the attacks.
- On December 13, more than 175 women and children were kidnapped and 35 people were killed by Boko Haram militants in the village of Gumsuri, Borno state.
- On December 25, a suicide bomber rammed into a military checkpoint in Bajoga, Gombe state, but failed to detonate his IED. The bomber was apprehended by police while trying to escape.

**Legislation, Law Enforcement, and Border Security:** In April, President Goodluck Jonathan directed the Nigerian National Security Advisor to coordinate and promulgate the National Counterterrorism Strategy (NACTEST), which was made public in November. In 2012, the Terrorism (Prevention) Act was revised, and in February 2013 the revisions were enacted into

PX209

law.  The law appointed the National Security Advisor as the coordinator for all counterterrorism intelligence activities and the attorney general as the lead official for enforcement.

The Nigerian government's criminal justice institutions were not significantly strengthened in 2014, although several donor countries, including the UK, worked closely with the Ministry of Justice to assist in prioritizing how to investigate and prosecute suspected terrorism cases.

Several Nigerian government agencies performed counterterrorism functions, including the Department of State Security (DSS), the Nigeria Police Force (NPF), and the Ministry of Justice.  The Nigerian military had primary responsibility for combating terrorism in northeastern Nigeria.  While the counterterrorism activities of these agencies and ministry were ostensibly coordinated by the Office of the National Security Advisor (ONSA), the level of interagency cooperation and information sharing was limited.

The Nigerian government participated in U.S. counterterrorism capacity building through the Department of State's Antiterrorism Assistance (ATA) program, including the training of more than 120 NPF members in the detection and handling of IEDs.  This increased the NPF's awareness and capacity to protect and preserve evidence from the crime scene of a suspected terrorist act.  Through the ATA program, Nigerian police, customs officials, and immigration officers also participated in interagency rural border patrol training to build the law enforcement sector's ability to utilize effectively all agencies in tackling rural border security challenges.  The Nigerian government worked with the U.S. FBI to investigate specific terrorism matters.

The Government of Nigeria instituted the collection of biometric data for passport applications of all Nigerian citizens and upgraded the Nigerian machine-readable passports.  Screening at the ports of entry of major airports in Nigeria, including Abuja, Port Harcourt, and Kano, improved, with passenger name records being collected in advance for commercial flights.  Border security at rural and extended land borders with Benin, Cameroon, Niger, and Chad was vulnerable to exploitation by Boko Haram.

Among the problems that deterred or hindered more effective law enforcement and border security by the Nigerian government were a lack of coordination and cooperation between Nigerian security agencies; a lack of biometrics collection systems and the requisite data bases; corruption; misallocation of resources; the slow pace of the judicial system, including a lack of a timely arraignment of suspected terrorist detainees; and lack of sufficient training for prosecutors and judges to understand and carry out the Terrorism (Prevention) Act of 2011 (as amended).

Significant law enforcement actions against terrorists and terrorist groups in 2014 included:

- Aminu Ogwuche, the alleged planner of the April 14 Nyanya motor park bombing, was arrested in Sudan and extradited to Nigeria.  He has been in custody since his extradition, and on November 10 requested bail in the Federal High Court.  A bail hearing was rescheduled for November 24, when the Federal High Court reportedly ruled against the two count indictment against Ogwuche.  The NPF, through its Interpol office, was involved in the extradition of Ogwuche but DSS is the investigating and prosecuting agency.  Ogwuche remained in DSS custody at year's end.

PX209

- The case against Nigerians Abdullahi Mustapha Berende and Saidi Adewumi, charged under Section 5(1) and 8 of the Terrorism Prevention Act 2013 with recruiting terrorists, remained pending. A six-count charge by the Nigerian government stated the subjects traveled to Iran and rendered support to a terrorist group via provision of materials and terrorism training on use of firearms and other weapons. The two were said to have collected the sum of US $23,350 from the terrorist group in order to source and train terrorist-minded Nigerians fluent in English.

**Countering the Financing of Terrorism:** Nigeria is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body. The Nigerian government froze and confiscated terrorist assets as designated by U.S. Executive Orders and by UN Security Council Resolutions; however, delays – up to a few weeks in duration – sometimes occurred. While there was political will to freeze assets, bureaucratic processes occasionally caused delays of up to four weeks before authorities blocked these assets. This is a risk because of the possibility that those whose assets may be frozen will have time to transfer them to other jurisdictions. For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Throughout 2014, Nigeria participated in ministerial-level international meetings to address insecurity in northeast Nigeria – first held in Paris in May, then London in June, and lastly in Abuja in September. The effort was concentrated on ensuring a coordinated response to the threat Boko Haram presents to the region. While dialogue between Cameroon, Niger, Chad, Benin, and Nigeria focused on strengthening regional cooperation, the countries took only minimal steps in 2014 to increase cooperation or interoperability of their security forces. In August, the Regional Intelligence Fusion Unit was stood up in Abuja to increase intelligence sharing between the countries' external services. Talks remained ongoing through the Lake Chad Basin Commission to enhance the existing multinational task force to coordinate military action along the border regions. Nigeria is also a member of the Trans-Sahara Counterterrorism Partnership (TSCTP).

In 2014, the Nigerian government participated in or hosted several multilateral efforts. In January, Nigeria and the United States co-hosted in Abuja a Global Counterterrorism Forum (GCTF) Sahel Working Group on the Criminal Justice Sector and Rule of Law. In November in Abuja, the United States and Nigeria co-hosted the GCTF workshop on Prison Security Issues and Implementation of the Rome Memorandum. Nigeria was an active participant in other GCTF events in the region.

Nigeria, primarily through its ONSA, took a lead role in continuing a multilateral dialogue among regional countries – including through GCTF and TSCTP activities – on how to better coordinate regional efforts to confront networks of terrorist groups that span international borders. The Nigerian government has not invested significant resources or time enlisting regional organizations such as the Economic Organization of West African States and Economic Community of Central African States to assist with the Boko Haram problem, instead preferring to engage in direct, unilateral military action.

PX209

**Countering Radicalization to Violence and Violent Extremism:**  In March, the ONSA officially announced a program to counter violent extremism, including educational and employment opportunities and de-radicalization of former Boko Haram members, as well as detained terrorist members.

In 2014, several projects were funded by the TSCTP, including:

- A program to protect the human rights and security of *almajiri* children in northern Nigeria.  The program works closely with Kano state government authorities to respond to the challenges facing street children in Kano who are vulnerable to recruitment by violent extremist groups.
- A program to reinforce "Peacebuilding and Conflict Transformation" efforts that will carry out training with youth, women, traditional leaders, and religious leaders on conflict transformation skills; and will organize media campaigns to promote conflict transformation strategies in four northern states – Kaduna, Nasarawa, Benue, and Taraba.
- A program to develop "Youth Leadership and Civic Engagement in Northern Nigeria through English Language Training," focusing on at-risk youth in the Kano-Kaduna corridor.

## SENEGAL

**Overview:**  The Government of Senegal continued to take a firm stance against terrorism by strengthening its internal policies and continuing its support to multilateral peacekeeping missions such as the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA).  Although Senegal did not have any terrorist incidents in 2014, regional trends – such as the rise of Boko Haram in Nigeria and instability in Mali – caused President Macky Sall to label terrorism as the biggest challenge to development in Africa.

The government worked closely with U.S. military and law enforcement officials to strengthen its counterterrorism capabilities.  The risk of violent extremism and terrorist activity in Senegal remained elevated from transnational threats due to Senegal's support of MINUSMA.  While there was less terrorist activity within Senegal than in some other parts of the Sahel, the Senegalese government remained concerned that terrorists were crossing its porous borders to escape fighting in neighboring countries.

**Legislation, Law Enforcement, and Border Security:**  Since 2007, the criminal code has included criminal offenses for terrorist acts as defined in the Organization of African Unity Convention on the Prevention and Combating of Terrorism.  Article 279 of the criminal code, allows the state to prosecute an individual or group that "intentionally undertakes an act to disturb public order, or the normal functioning of national and international institutions, through intimidation or terror."  The maximum penalty is life in prison.

In October, the chief of the Directorate of Territorial Surveillance, Senegal's domestic intelligence agency, announced that Senegal will develop a department dedicated to fighting terrorism and will create new counterterrorism laws in the criminal code.

PX209

Senegal's gendarmerie, national police, and judicial police have insufficient capacity and resources to detect, deter, and prevent acts of terrorism.  Senegal worked to improve its law enforcement capacity by participating in multilateral efforts, such as the Global Counterterrorism Forum (GCTF), and AU and Economic Community Of West African States (ECOWAS) programs.  Senegal also continued participating in U.S. government counterterrorism capacity building programs, such as the Department of State's Antiterrorism Assistance program, which focused on strengthening regional border security and enhancing counterterrorism investigative capacity.  Senegal also received significant funding and training from the French government.

Senegalese officials identified a lack of border resources and regional cooperation as major security vulnerabilities.  On October 21, the United States notified the Senegalese government that the port of Dakar no longer met U.S. Coast Guard security standards.

The United States continued to provide border security training to Senegalese personnel, including an official visit in July by a Senegalese delegation to the United States to learn about best practices recommended by the U.S. Coast Guard.  DHS hosted international interdiction training in McAllen, Texas, in addition to providing tours of land, sea, and air borders for the Senegalese Director General of Customs and Deputy Commander of Gendarmes.

Senegal participated in France's Action Plan Against Terrorism (PACT), a US $900,000 French capacity building project for local police and gendarmes involved in countering terrorist threats and for magistrates who hear terrorism-related cases.

Significant law enforcement actions against terrorists or terrorist groups in 2014 included the arrest of El Hadji Malick Mbengue in Dakar by security forces.  Mbengue was arrested for his alleged links to terrorists in Algeria planning to carry out attacks on American and French interests in Senegal.

Corruption and lack of infrastructure remained obstacles to more effective Senegalese law enforcement and border security, as well as a chronic lack of equipment, insufficient training, and the inability of authorities to maintain their current stock.  Additionally, there was a lack of interagency cooperation and coordination across several of the government entities that deal with terrorism.

**Countering the Financing of Terrorism:**  Senegal is a member of the Inter-Governmental Action Group against Money Laundering in West Africa (GIABA), a Financial Action Task Force-style (FATF) regional body.  At the regional level, Senegal implements the anti-money laundering/counterterrorist financing framework used by member states of the West African Economic and Monetary Union (WAEMU).  Among WAEMU countries, Senegal was the first to have the new framework in place.  The Regional Council for Public Savings and Financial Markets is the body responsible for the control of WAEMU financial markets.  Article 279-3 of the Senegalese criminal code also allows for the prosecution of sponsors of terrorism.  The text stipulates that individuals who "directly or indirectly finance a terrorist enterprise by giving, gathering or managing funds, valuables or goods or by providing advice" are subject to prosecution.  The maximum penalty is life in prison.  For further information on money

PX209

laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Senegal is a member of the UN, AU, ECOWAS, the Organization of Islamic Cooperation, and the Trans-Sahara Counterterrorism Partnership. The government also participated in the Global Counterterrorism Forum's Sahel Regional Capacity Building Working Group, and hosted the Second Cross-Border Workshop in Dakar from March 26-27. Additionally, Senegal's military remained committed to MINUSMA and increased its troop contribution from 200 to 800 during 2014.

**Countering Radicalization to Violence and Violent Extremism:** Strong cultural and religious traditions make Senegalese society resistant to extremist ideologies. Islam in Senegal is organized around several influential brotherhoods, which are generally tolerant and do not preach violent extremist ideology. These brotherhoods are also fairly resistant to external influences. In addition, the government continued its outreach to the brotherhoods to build partnerships and offer support in resisting violent extremist messaging and recruitment.

---

## SOMALIA

**Overview:** In 2014, Somalia made significant progress in its counterterrorism efforts. The terrorist group al-Shabaab lost control of large sections of rural areas in south-central Somalia, including the key port city of Barawe and other key towns along the main supply route in the Juba, Shabelle, Bay, and Bakol regions as a result of the successful AMISOM-led Operation Indian Ocean. In October, the Puntland Security Forces led an offensive against the al-Shabaab stronghold in northern Somalia's Golis Mountains, which further degraded al-Shabaab's operational capability. Separate U.S. military strikes that killed then-leader Mokhtar Abu Zubeyr, also known as Ahmed Abdi "Godane," and Tahlil, the head of intelligence and security, left al-Shabaab in a leadership crisis. Nevertheless, al-Shabaab continued to conduct a broad spectrum of asymmetrical attacks throughout Somalia. These attacks included harder targets in Mogadishu, such as the Mogadishu International Airport, Villa Somalia Presidential Compound, and the Parliament, as well as an increasingly greater number of assassinations of government and security officials. The ability of the federal, local, and regional authorities to prevent and preempt al-Shabaab terrorist attacks remained limited. Somalia remained a safe haven for a number of international terrorists, who continued to plan and mount operations within Somalia and in neighboring countries, particularly in Kenya.

Minister for Foreign Affairs Abdirahman Beileh represented Somalia at the first ministerial–level plenary for the Global Coalition to Counter the Islamic state in Iraq and the Levant (ISIL) in Brussels on December 3, 2014, where he reaffirmed Somalia's commitment to work together under a common, multi-faceted, and long-term strategy to degrade and defeat ISIL.

**2014 Terrorist Incidents:** In 2014, al-Shabaab conducted suicide attacks, remote-controlled roadside bombings, and assassinations of government, security officials, and civil society leaders throughout Somalia. Al-Shabaab executed attacks in Mogadishu in a targeted campaign against Somali security forces and other government officials, and targeted government and foreign

PX209

structures, convoys, and popular gathering places for government officials, the Somali diaspora, and foreigners.  Notable incidents in 2014 included:

- On January 1, al-Shabaab targeted the Jazeera hotel in Mogadishu using suicide vehicle-borne improvised explosive devices (SVBIED) in a staggered assault.  After the first SVBIED detonated at the hotel frequented by Somali government officials and foreigners, a second VBIED exploded shortly after first responders arrived at the scene to tend to the injured.  According to Somali officials, at least 20 people were killed and another 30 were wounded.

- On February 13, an al-Shabaab SVBIED hit a UN convoy outside the main gate of Mogadishu International Airport.  The attack killed multiple bystanders but no UN employees, according to National Intelligence and Security Agency (NISA) officials.

- On February 21, al-Shabaab militants launched a complex attack against the Presidential Compound, known as Villa Somalia, using a Vehicle-Born Improvised Explosive Device (VBIED) and a team of attackers, some armed with AK-47s and suicide vests.  All militants were killed and at least five security officials died, according to the Office of the President.

- On May 24, al-Shabaab militants launched a complex attack against the Somali Parliament compound in Mogadishu using a suicide driver with a VBIED and a team of about seven attackers armed with AK-47s.  Two members of Parliament reportedly sustained injuries when the militants detonated the VBIED at the main gate.  Security forces reportedly killed all the militants during the attack.  Casualties included around 12 security officials from AMISOM, NISA, the Somali National Army (SNA), and Somali National Police (SNP).  In addition, some 24 security officials and civilians sustained injuries according to NISA officials.

- On August 4, al-Shabaab used suicide vests to attack and kill the Bosasso City Police Commissioner and about three bystanders in Bosasso City, Puntland, according to Puntland Security Services.

- On August 31, al-Shabaab militants attacked the NISA Godka Jilicow Detention Facility in central Mogadishu.  The attackers reportedly employed a VBIED at the front gate of the facility followed by a ground assault using small weapons and grenades.  NISA officers reportedly killed all the attackers, preventing them from breaching the interior of the facility.

- On October 12, al-Shabaab launched VBIED attacks against a cafe and restaurant frequented by Somali government officials in Mogadishu.  According to a senior police official, a VBIED detonated at the Aroma Café may have been triggered by remote control, killing 11 people and wounding eight others.

- On October 15, attackers killed up to five people and injured several others at the Panorama Restaurant near the Somali National Theater using a VBIED.

- On November 8, al-Shabaab fighters attacked Interim Juba Administration (IJA) Security Forces (IJASF) at Koday, Lower Juba Region.  Al-Shabaab militants retook control of Koday, which had fallen to pro-government forces during AMISOM operations October 25 to 27, inflicting heavy casualties, according to IJA officials.

- On November 16, al-Shabaab targeted Villa Somalia with mortar shells, resulting in no reported casualties or damage.

- On December 3, an al-Shabaab suicide bomber detonated a VBIED within 200 meters of the main gate of the Mogadishu International Airport, according to NISA officials.
- On December 25, al-Shabaab operatives launched an attack using small weapons and Improvised Explosive Devices inside the Mogadishu International Airport compound, killing up to eight AMISOM soldiers and an American citizen contractor, a Ugandan citizen contractor, and a Kenyan citizen contractor, according to NISA officials. This attack involved the first one inside the airport compound since September 2009.

**Legislation, Law Enforcement, and Border Security:**  The Federal Government of Somalia continued its efforts to improve security in Mogadishu.  Somalia lacks counterterrorism laws, and possesses limited investigative and enforcement capacity to prosecute terrorists, terrorism financiers, and supporters effectively.  Somalia currently follows an outdated penal code, last updated in 1963.  Ministries responsible for drafting and submitting legislation to Parliament lack the capacity to draft comprehensive counterterrorism laws.  Due to lack of civil judiciary capacity, the Somali government tried all terrorism cases in the military court system.  Puntland also lacked regional counterterrorism legislation and tried all terrorism cases using its state military court.  On March 21, the Puntland military court convicted 36 people accused of links to al-Shabaab.  The court sentenced several individuals to life imprisonment, while others received the death penalty.  On April 30, Puntland executed 13 al-Shabaab members and supporters whom the court convicted in March.

Somali law enforcement needs significant training assistance for basic investigation skills, cordon and search operations, and effective coordination with the judiciary.  Through participation in the Department of State's Antiterrorism Assistance program, the Somali National Police (SNP) received training and equipment to help build professional capacity to respond to critical incidents and coordinate with national and international law enforcement partners.  Somalia lacked the capacity, transparency, and technical expertise to operate an effective judicial and law enforcement system, which, in turn, hinders the ability of the government to develop rule of law, prosecute criminals, and provide justice to the Somali population.  NISA is the lead counterterrorism organization providing rapid-reaction response forces to respond to terrorist attacks in Mogadishu.  Interagency cooperation and information sharing remained weak, and almost all Somali law enforcement actions against terrorists and terrorist groups were reactive in nature.

Somalia has porous borders.  Most countries do not recognize Somali identity documents, leaving Somalia with little to no travel document security.  Somalia currently does not have a central or shared terrorist screening watchlist, nor does it have biographic and biometric screening capabilities at ports of entry.  Minimal cooperation occurred between the federal and regional governments to investigate suspected terrorists, kidnappings, and other incidents of terrorism committed inside and outside of Somalia.  The U.S. Federal Bureau of Investigation (FBI) sent an investigative team to Mogadishu following the December 25 al-Shabaab attack inside the Mogadishu International Airport.  FBI investigators continued to work with a team of AMISOM and NISA investigators, providing technical expertise and investigative assistance related to the attack.

PX209

**Countering the Financing of Terrorism:**  In 2014, Somalia applied to become an observer to the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force-style regional body, with the country officially becoming an observer of the MENAFATF in late December 2014.  No laws criminalize terrorist financing.  During the year, the Central Bank drafted a comprehensive anti-money laundering/counterterrorist finance (AML/CFT) law with the help of the World Bank.  At year's end, the Central Bank sought assistance to translate the law to send to Parliament.

In 2014, government entities lacked the capacity to track, seize, or freeze illegal assets.  The Somali *hawalas*, most of which operated abroad, employed self-imposed, minimum, international standards to continue operating in countries with comprehensive AML/CFT laws.  In May, Merchant's Bank, the largest U.S. bank servicing the Somali remittance sector, announced that it would close all Somalia-based accounts.  In August, however, after a careful review of Dahabshiil (the largest money transfer operator in Somalia), Merchant's Bank announced that it would resume services to Somali money transfer operators.

Somalia does not have a commercial banking sector, and the Central Bank lacks the capacity to supervise or regulate the *hawala* (money service businesses) sector.  Somalia does not have laws or procedures requiring the collection of data for money transfers or suspicious transaction reports.  The supervisory and examining section of the Somali Central Bank attempted to develop procedures to oversee the policies governing the establishment of commercial banks in the country.  The section suffered from limited staffing and lacked additional funding to pay the salaries of its staff.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Somalia is a member of the AU, Intergovernmental Authority on Development, League of Arab States, and Organization of Islamic Cooperation, and the Partnership for Regional East Africa Counterterrorism.  The Somali government expressed greater interest in increasing intelligence sharing and conducting joint operations against al-Shabaab with its Horn of Africa neighbors.

**Countering Radicalization to Violence and Violent Extremism:**  The Somali government continued to build its capacity to deliver public messaging, to include Radio Mogadishu and state-owned television stations, which countered al-Shabaab's messaging.  The government continued to air the Islamic Lecture Series (ILS) on radio stations in the Somali cities of Beledweyne, Dhusamared, and Abudwaq.  The ILS employs an hour-long, call-in radio talk show format designed to undercut al-Shabaab's efforts to acquire religious support for its violent extremist ideology.  The Minister of Information strongly advocated for forward-leaning strategies to inform the Somali people of al-Shabaab's violent extremist messages and ideology.

**SOUTH AFRICA**

PX209

**Overview:**  In 2014, the South African government increased its limited counterterrorism cooperation with U.S. law enforcement agencies.  Nevertheless, South Africa's State Security Agency (SSA) remained reluctant to engage with U.S. counterparts on counterterrorism issues.  SSA's Foreign Branch (SSA/FB) is the sole contact for counterterrorism-related coordination, and it determines which other entities within SSA or other parts of the government will be involved.  In the wake of the Westgate Mall attack in Kenya, South African police have indicated interest in advancing their preparedness for similar incidents.

**Legislation, Law Enforcement, and Border Security:**  The South African Police Service (SAPS) Crime Intelligence Division, the Directorate for Priority Crime Investigation, and South African State Security Agency are tasked with detecting, deterring, and preventing acts of terrorism within South Africa.  The SAPS have a Special Task Force specifically trained and proficient in counterterrorism, counterinsurgency, and hostage rescue.  The National Prosecuting Authority (NPA) prosecutes cases of terrorism.  All entities possess the knowledge, resources, intelligence capabilities, and techniques to effectively implement South Africa's counterterrorism legislation.

In May, South Africa amended the Immigration Act aiming to "reduce the country's vulnerability to the security threats of the modern world."  The new immigration laws include the requirement that visa applications must be done in person in order to collect biometric data, fingerprints, and a photograph.  In recent years, South Africa introduced new passports with additional security features in line with international standards.

Measures in place to counter terrorism include advanced technology x-ray machines at some airport ports of entry.

**Countering the Financing of Terrorism:**  South Africa is a member of the Financial Action Task Force (FATF) and the Eastern and Southern Africa Anti-Money Laundering Group, a FATF-style regional body.  Its financial intelligence unit is the Financial Intelligence Centre (FIC), which is a member of the Egmont Group of Financial Intelligence Units.  Those required to report to the FIC include banks, financial institutions, car dealers, attorneys, gold dealers, gambling establishments, real estate agents, foreign exchange dealers, securities traders, money lenders (to include those who lend against shares, e.g., brokers), entities selling travelers' checks, and Johannesburg stock exchange-registered individuals and companies.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  South Africa participated in the Global Counterterrorism Forum.

## TANZANIA

**Overview:**  Tanzania has not experienced a large-scale terrorist act conclusively linked to an international terrorist organization since the U.S. Embassy bombing in July 1998.  Smaller instances of alleged domestic terrorism, however, continued to concern government

PX209

officials.  Several bombings targeting religious leaders or institutions occurred in 2014, although at year's end officials were still investigating whether the perpetrators were members of an organized terrorist group.  Police, working with various security elements – including Tanzania's interagency National Counterterrorism Center (NCTC), the Immigration Services Department (ISD), and the Tanzania Intelligence and Security Service (TISS) – made several arrests of alleged terrorists in 2014, and officials were prosecuting these cases at year's end.  NCTC reported concerns over escalating radicalism and inadequate border security.

**2014 Terrorist Incidents:**  Tanzanian authorities reported two incidents:

- On April 13, 15 people were injured when a homemade bomb exploded at the crowded Arusha Night Park bar, where customers were watching an English Premier League match on television.  Arusha is a popular destination for Western tourists in northern Tanzania, although this bar is generally only frequented by local residents.  Police arrested the perpetrators and said that the assailants were members of a small group dedicated to the imposition of sharia law in Tanzania who wanted to attack Christians and westerners.  Court cases against the perpetrators were continuing at year's end.
- On September 6, two Tanzanian policemen were killed and another two were injured when assailants raided a police station in Bukombe district, Geita region.  Police arrested suspects and said they were members of a small group dedicated to the introduction of sharia law in Tanzania who wanted to raid the police station to steal weapons to use in future attacks against Christians.

**Legislation, Law Enforcement, and Border Security:**  Tanzania's legal counterterrorism framework is governed by the 2002 Prevention of Terrorism Act.  The implementing regulations for the Act were published in 2012.  In January 2014, a further amendment to the Act was implemented that strengthened Tanzania's ability to respond to terrorist financing challenges, particularly with regards to UN Security Council Resolutions (UNSCRs) 1267 and 1373.

Tanzania continued its interagency coordination efforts in 2014, mainly through NCTC, but it had not used advanced investigative forensic techniques and streamlined prosecutions to detect, investigate, and fully prosecute suspected terrorists.  NCTC is an interagency unit composed of officers from the intelligence, police, defense, immigration, and prison sectors who worked collectively on counterterrorism issues.  The organization continued to lack specialized equipment, especially for border security, and NCTC officers lacked advanced training on intelligence analysis and crime scene investigation.  When terrorist incidents occur, the police generally lead the investigation – although officials from the ISD and TISS also participate.  Once the investigation is completed, the case goes to the Director of Public Prosecutions before being brought to court.

Border security in Tanzania remained a challenge for a variety of reasons, including problems of corruption and vast, porous borders.  All major airports and border crossings screened for weapons, drugs, explosives, and other contraband; and continued the use of the Personal Identification Secure Comparison and Evaluation System border management system.  NCTC and the ISD generally worked together to ensure that all border posts had updated terrorist

PX209

watchlists, although smaller border posts often have to check passports against paper copies of the list.

Significant law enforcement actions related to terrorist activity included:

- In May, police arrested 16 people suspected of participating in various terrorist incidents in Tanzania over the last several years.  Eight of the suspects were suspected of recruiting young people for terrorist activity.  Seven others were suspected to be involved in several bombing incidents in Arusha while another, Jaffar Hassan Mondo, was arrested for attempting to apply for a Tanzanian passport using false names.  All suspects were charged with various offenses including murder and attempted murder.
- On July 17, 17 suspects appeared before Kisutu Resident Magistrate's Court in Dar es-Salaam to face terrorism charges, 16 of whom were charged with conspiracy and recruitment of people to commit terrorist acts throughout Tanzania between January 2013 and June 2014.  One suspect, Jihad Swalehe, was charged separately with seeking financial support to facilitate terrorist attacks; conspiracy, promotion, and facilitation of the commission of terrorist acts; and the use of Facebook to coordinate attacks between March 21, 2013 and June 2, 2014.  The prosecution said Swalehe communicated with individuals through Facebook, seeking material, financial, and technical support to plant explosives in undisclosed locations in Kenya.
- On July 21, in Arusha, police searched the house of and arrested Yusufu Hussein Ally, also known as Huta, and his wife Sumaiya Juma, for possession of seven Russian-made bombs and a German grenade.  Ally was investigated by police in connection with several terrorist attacks in Arusha.
- On October 6, police arrested Yahaya Hassan Omari Hella – also known as "Sensei" – who police say admitted to being the leader behind several terrorist attacks in Arusha, Zanzibar, Mwanza, and Dar es Salaam over the past two years.  He died on October 19, en route to the hospital after being shot by the police while allegedly attempting to escape from custody.
- Police in Somalia notified the NCTC in 2014 that three teenage boys from Zanzibar were arrested after attempting to join the al-Shabaab terrorist group.  At year's end, the court case remained ongoing in Somalia.

Through the Department of State's Antiterrorism Assistance program, Tanzanian law enforcement officials received technical training in the areas of strengthening border security capacity, enhancing investigative capacity, and building response capacity to a critical incident.

**Countering the Financing of Terrorism:**  Tanzania is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force (FATF)-style regional body.  In June, the FATF noted Tanzania's significant progress in improving anti-money laundering and countering the financing of terrorism (AML/CFT) efforts, as well as improving its legal and regulatory framework in this regard.  As a result, FATF removed Tanzania from a list of countries subject to a monitoring process due to AML/CFT deficiencies.  In 2014, Tanzania became a member of the Egmont Group of Financial Intelligence Units.  Tanzania's Financial Intelligence Unit received 65 suspicious transaction reports related to money laundering in 2014, a slight decrease from the 68 received in 2013.

PX209

In January, Tanzania passed implementing regulations which assign specific responsibilities to various government entities in order to implement UNSCRs 1267 and 1373.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Tanzania is a member of the AU, the Southern African Development Community, and the East African Community, all of which implement counterterrorism initiatives.  In addition, Tanzania participated in counterterrorism training programs sponsored by the Intergovernmental Authority on Development – even though Tanzania is not a full member.  The NCTC continued to coordinate with partner organizations although the East African Police Chiefs' Organization and the Southern African Police Chief's Organization.  Police officials also continued to work closely with Interpol.  Tanzania is a member of the Partnership for Regional East Africa Counterterrorism and participates in the Global Counterterrorism Forum.  Tanzania has especially close relationships with police and counterterrorism officials in Kenya and Uganda, although these were hindered at times from a lack of effective mechanisms to share information electronically.

**Countering Radicalization to Violence and Violent Extremism:**  The current focal point of NCTC's counter-radicalization strategy is its community policing program.  Through this initiative, which has been active in many perceived counterterrorism hot spots for several years, officials aim to build better relationships within key communities and are better able to detect threats tied to radicalization.

## UGANDA

**Overview:**  In 2014, the Government of Uganda was a strong advocate of cross-border solutions to security issues, effectively supported U.S. counterterrorism efforts, and showed continued and strong political will to apprehend suspected terrorists and disrupt terrorist activity in Uganda.  Terrorist groups such as al-Shabaab, however, continued to put consistent pressure on Uganda's security apparatus primarily due to Uganda contributing troops to the African Union Mission in Somalia (AMISOM).  Uganda's ability to respond to such threats remained inconsistent, given its resource and capacity limitations, porous borders, and corruption at all levels of government.

**Legislation, Law Enforcement, and Border Security:**  Uganda continued to use the Anti-Terrorism Act (2002) as its main legal framework for deterring, disrupting, and prosecuting terrorist activity and incidents in Uganda.  The Uganda Police Force (UPF) Counterterrorism Directorate is the lead Ugandan law enforcement entity charged with investigating, disrupting, and responding to terrorist incidents.  While Ugandan law enforcement officers assigned to this directorate are highly motivated, the UPF overall was limited in its capacity to detect, deter, and respond to terrorist incidents due to the lack of manpower, resources, basic skills, and competencies.  In addition, police officers are particularly susceptible to corruption.  Moreover, the bulk of the counterterrorism police and other law enforcement elements are centrally located in the capital, which limits the effectiveness of law enforcement in the border regions and all

54

PX209

areas outside Kampala.  The UPF still lacks the technological resources needed to conduct comprehensive terrorism investigations in the most effective manner.  Following the Westgate terrorist attack in Nairobi in 2013, the UPF has held regular interagency meetings to ensure coordination among its security agencies.

The United States continued to provide significant counterterrorism assistance to the UPF, specifically through the Department of State's Antiterrorism Assistance program, which builds capacity in the areas of counterterrorism investigations, crisis response, and border security.

Border security remained a persistent concern for the Ugandan government, which continued to work to expand enforcement and monitoring capacity.  Uganda continued to employ biometric security measures at airports.

On September 13, Uganda demonstrated its ability to disrupt an imminent terrorist threat when Ugandan security services conducted an extremely complex and large operation to disrupt an al-Shabaab terrorist cell that was in the final planning stages of an imminent attack on unknown targets in Kampala.  Approximately 16 suspects were arrested on September 13, and five more were arrested on September 15 and 16.  After initial investigations, 10 suspected terrorists remained detained at the end of 2014.  Security agencies continued to pursue leads throughout the region to garner additional evidence.  As of the end of 2014, no trial dates had been announced.

In October, the Constitutional Court ruled on a legal challenge over the jurisdiction, extradition, and treatment of the 12 individuals arrested for orchestrating the July 2010 al-Shabaab bombings following the World Cup, upholding Uganda's detention of the suspects.  One of the victims of those attacks was an American citizen.

The UPF cooperated with the United States on several terrorism-related cases.  The U.S. Federal Bureau of Investigation maintained strong relationships with the UPF.

The United States and UPF continued to try to operationalize a 2013 Memorandum of Cooperation to modernize its criminal records management system to replace the outdated system currently used to identify criminal and terrorist suspects.  In addition, while the U.S. government provided the UPF substantial counterterrorism training, the UPF lacked training in tactical operations, incident command, cybersecurity, handling of suspects, and crime scene management.

**Countering the Financing of Terrorism:**  Uganda is a member of the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG), a Financial Action Task Force (FATF)-style regional body.  In February 2014, Uganda made a high-level political commitment to work with the FATF and ESAAMLG to address its strategic AML/CFT deficiencies.  In October, the FATF noted that Uganda had taken positive actions by establishing its financial intelligence unit and issuing guidance to reporting entities.

In 2014, Uganda made some progress on implementing the Anti-Money Laundering Act (AMLA), which passed in 2013, including the appointment in August of an interim executive

PX209

director of the Financial Intelligence Agency (FIA), which under the AMLA would be responsible for monitoring and regulating remittance services and wire transfer data.  The FIA was not fully established at year's end, however.  Once the board of the FIA is fully constituted, the agency will receive reports from financial institutions on suspicious financial activity.  The Bank of Uganda asks local banks to report suspicious transactions, but there is no clear implementation mechanism for enforcement or investigation of potentially suspicious activity.  The Criminal Investigations Department (CID) of the UPF maintained responsibility for investigating financial crimes.  However, the CID remained understaffed and poorly-trained, with only limited ability to investigate and prosecute money laundering violations.  The AMLA also does not capture Uganda's large mobile money sector within its regulatory framework.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Uganda is a strong force for regional stability, security coordination, and counterterrorism efforts, and is an active member of the AU, the Inter-Governmental Authority on Development, the East African Community (EAC), the Partnership for Regional East Africa Counterterrorism (PREACT), and the International Conference on the Great Lakes Region, and as such is a strong force for regional stability, security coordination, and counterterrorism efforts.  Uganda contributed troops to AMISOM to counter al-Shabaab, and continued to pursue the Lord's Resistance Army (LRA) in coordination with the DRC, South Sudan, and the Central African Republic.  In January, UPF and the Somali National Police Force signed a memorandum of understanding to enhance cooperation between the two forces to include training, equipment, and intelligence sharing.  Additionally, as a member of the EAC, Uganda signed a regional counterterrorism strategy with other member nations in April that provides for greater counterterrorism cooperation.

**Countering Radicalization to Violence and Violent Extremism:**  Ugandan authorities have shown some interest in partnering with the U.S. government and Ugandan Muslim leaders to conduct more systematic and targeted outreach within the expatriate Somali community in Uganda, particularly since Somali youth living as refugees are often targeted for recruitment by al-Shabaab.

# EAST ASIA AND PACIFIC

In 2014, countries in the East Asia and Pacific continued to weaken the ability of terrorist groups to operate in the region and constrained the activities of large terrorist organizations.  Governments became increasingly concerned about the growing threat of the Islamic state in Iraq and the Levant (ISIL), which became a major impetus for further counterterrorism efforts in Indonesia and Malaysia, as citizens from both countries travelled abroad to fight with ISIL.  The emergence in July of a recruitment video calling for Indonesians to join ISIL further mobilized efforts of the Indonesian government, civil society, and religious groups to counter the ISIL threat.  Indonesian government officials banned support for ISIL, and then-President Yudhoyono outlined a series of measures to counter ISIL.  Malaysia also demonstrated its political will at the highest levels of government to confront the threat of ISIL and other terrorist groups.

PX209

The Philippine government's Comprehensive Agreement on the Bangsamoro with the Moro Islamic Liberation Front – creating a new Bangsamoro autonomous government in Mindanao – was signed in March. However, violent clashes with fighters from terrorist groups and splinter groups erupted periodically in central Mindanao, indicating that a lasting peace settlement remains a challenge.

Indonesia and Australia continued their co-chairmanship of the Global Counterterrorism Forum's Detention and Reintegration Working Group (DRWG), which grew out of the former Southeast Asia Working Group. The inaugural DRWG meeting was held in August in Indonesia.

Australia maintained its position as a regional leader in the fight against terrorism, and worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of bilateral and regional initiatives in organizations such as ASEAN, the ASEAN Regional Forum, and the Pacific Island Forum. In mid-December 2014, a lone-offender ISIL sympathizer held 17 hostages in a Sydney café; three were killed, including the gunman, and four were wounded.

The Japanese government continued to participate in international counterterrorism efforts at multilateral, regional, and bilateral levels. Japan made progress with, but at year's end still had not ratified, the Palermo Convention on countering terrorist financing.

## CHINA (HONG KONG AND MACAU)

**Overview:** China's attention to counterterrorism is increasing, both domestically and abroad. China experienced several terrorist and other violent incidents in 2014. As a result, China tightened its security in the Xinjiang Uighur Autonomous Region (XUAR) to prevent additional domestic acts of terrorism, including by implementing stricter government controls on religious expression and practice. The main focus of China's counterterrorism efforts is the East Turkistan Islamic Movement (ETIM), a terrorist organization that China alleges maintains influence in Xinjiang. China tightened its security clampdown in the XUAR, characterizing it as an effort to prevent additional domestic acts of terrorism.

The Chinese government has claimed that Chinese citizens operated with the Islamic State in Iraq and the Levant (ISIL) in the Middle East, and has taken action to prevent its citizens from traveling to Syria and Iraq.

Counterterrorism cooperation activities between the United States and China remained limited, though the two countries continued to discuss ways to enhance cooperation. These included efforts aimed at stemming the transnational flow of foreign terrorist fighters, countering terrorist funding networks, increasing information sharing on terrorist threats, and assisting the Government of Iraq in its rebuilding efforts.

China held 12 bilateral dialogues on counterterrorism in 2014, including one with the United States in July. China remained engaged on counterterrorism in the Asia-Pacific region and Central Asia, conducting bilateral and multilateral joint exercises.

PX209

China has criticized the U.S. response to some domestic incidents of violence that China characterized as terrorism, alleging that U.S. expressions of concern over the treatment of China's ethnic minorities and the U.S. failure to label all such incidents as terrorism represented a double standard. China frequently refers to Uighur activists abroad – including those in the United States – as complicit in supporting "terrorist" activity, but has not provided credible evidence to support those claims.

**2014 Terrorist Incidents:**  The lack of information provided by China about alleged terrorist incidents in China made it difficult in some instances to verify details of those and other violent incidents.  In many of the domestic incidents that China labeled as terrorism, China alleged that ETIM influenced or directed the violence through its online propaganda.  China also generally prevented foreign journalists and international observers from independently verifying official media accounts, which are often the only source of reporting violent incidents in its territory.

Among the violent incidents in China over the year, the U.S. government identified sufficient evidence to consider the following incidents terrorist attacks:

- On March 1, 33 people were killed (including four perpetrators of the attack) and 141 injured when eight knife-wielding men and women attacked passengers at a railway station in the city of Kunming.
- On April 30, an explosion at Urumqi South Train Station in Xinjiang killed three people, including two attackers.  Chinese officials attributed this attack to ETIM.
- On May 22, four men attacked a crowded market in Urumqi with a car bomb, killing themselves and 39 others, while wounding more than 90 other individuals.

**Legislation, Law Enforcement, and Border Security:**  In October, China's National People's Congress reviewed draft legislation for the country's first counterterrorism law.  The draft included proposals to establish a counterterrorism intelligence center aimed at improving international cooperation and better coordinating information sharing across the government, military, armed police, and law enforcement authorities.  The draft legislation also stipulated measures on tightening internet security management, inspection of dangerous materials, prevention of terrorist financing, and border controls.  Some aspects of the draft CT law, including its broad definition of terrorism and trade-related requirements for foreign telecoms and internet service providers have elicited human rights and business concerns from many foreign observers.  At the end of 2014, the CT law had not been passed.

Over the year, there was an increase in the number of stories in Chinese media of operations targeting alleged terrorists.  Following the March 1 knife attack in Kunming, China's leaders arrested and tried hundreds of people in Xinjiang.  However, because of the Chinese government's tight control of information, it remained difficult to determine whether particular raids, detentions, arrests, or judicial punishments targeted individuals who were seeking political goals, voicing local grievances, or orchestrating criminal or terrorist acts.  For example, according to state media, 37 civilians and 59 individuals labeled as terrorists were killed after a July 28 incident in front of a police station and government offices in Kashgar Prefecture's Shache (Yarkand) County.  While the police arrested 215 people in connection with the incident and sentenced a dozen individuals to death for their alleged involvement in the attack, some

PX209

residents reported that the incident stemmed from local protests against the detention of women and girls who had refused to remove their headscarves.  According to state media, law enforcement authorities in XUAR eliminated what they considered to be 115 terrorist cells in 2014.  These reports claimed that about 40 percent of the 115 terrorist cells were found through clues authorities obtained during intensive interrogation of detained suspects.

In May, a mass trial was held at a sports stadium in Xinjiang where three people were sentenced to death and another 53 received lengthy jail terms after being convicted of terrorism charges.  Three individuals accused of organizing the October 2013 Tiananmen car crash were executed in August 2014 on terrorism charges.  In 2014, Chinese authorities sentenced ethnic activists to imprisonment on terrorism-related charges, exhibiting what appeared to be a failure to distinguish between peaceful dissent and violent extremism.

Hotan's city government mobilized over 30,000 volunteers in massive terrorist searches following violence in late July.  The Xinjiang government offered substantial cash rewards to the public for providing information that led to the arrest of terrorists.

China continued to stress the importance of counterterrorism cooperation with the United States, but Chinese law enforcement agencies generally remained reluctant to conduct joint investigations or share specific threat information with U.S. law enforcement partners.  Despite several requests to Chinese law enforcement officials for more detailed background information on Chinese media-reported arrests and operations, U.S. law enforcement agencies received little new information.  Overall, China's counterterrorism cooperation with the United States remained limited.

**Countering the Financing of Terrorism:**  China is a member of the Financial Action Task Force (FATF), as well as the Asia/Pacific Group on Money Laundering and the Eurasian Group on Combating Money Laundering and Terrorist Financing, both of which are FATF-style regional bodies.  The Chinese government has strengthened its preventive measures to counter terrorist financing, with an emphasis on requiring financial institutions to collect and maintain beneficial ownership information, and making Suspicious Transaction Reports more comprehensive.  Additional issues remain to be addressed, including guidance for designated non-financial businesses and professions; delisting and unfreezing procedures; and defining the rights of bona fide third parties in seizure/confiscation actions.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  China continued collaboration on UNSC counterterrorism issues and voted for UNSCRs 2170 and 2178.  China is a founding member of the Global Counterterrorism Forum (GCTF), and in November hosted in Beijing the GCTF Symposium on "Strengthening International Cooperation to Prevent and Counter Terrorists' Use of the Internet."

China cooperated with other nations on counterterrorism efforts through military exercises and assistance.  In August, China, Russia, Kazakhstan, Kyrgyzstan, and Tajikistan held a

PX209

counterterrorism exercise (Peace Mission 2014) within the framework of the Shanghai Cooperation Organization.  In October, China and Indonesia held a bilateral counterterrorism exercise.  Following the 2013 inaugural joint exercise, China and India held a counterterrorism exercise in November 2014.  Also in November, China and Russia carried out a regularly scheduled China-Russia bilateral exercise.  China also held separate dialogues and consultations with the AU and 12 countries, including Afghanistan, the United States, the UK, France, Turkey, the Republic of Korea, and Uzbekistan.

**Countering Radicalization to Violence and Violent Extremism:**  While China does not have an official strategy or program in place to counter violent extremism, the government implemented a number of programs aimed at countering radicalization and violent extremism, concentrating much of its efforts in Xinjiang.  Local counterterrorism working groups have been established at the county, municipal, and provincial levels across China to coordinate "stability maintenance," the law enforcement, ethnic and religious affairs, and a propaganda campaign countering the so-called "Three Evils" of terrorism, separatism, and religious extremism. Xinjiang government officials required imams to take political education classes as a means of persuading them to discourage extremism and condemn violence.  In Xinjiang, authorities placed restrictions on private religious practices, and closely monitored Uighurs returning from madrassas overseas.  In March, the Xinjiang government announced a crackdown on videos and audio recordings that the government defined as promoting terrorism, religious extremism, and separatism.  According to the notice, it was forbidden to disseminate such materials on the internet, on social media, and on online marketplaces.

Chinese public security authorities released a strategic communications brochure in July in an attempt to educate the public about how to respond to various forms of violent attack.  Copies of the brochure, called the "Citizens Anti-Terror Handbook," were handed out in Xinjiang, as well as in other major cities throughout China.  The pamphlet advises people to look out for "terrorist suspects" who dress or act suspiciously.  Similarly, in December, Xinjiang police issued a list of 75 "specific signs" that might indicate someone is a religious extremist, which included wearing Islamic veils in public, reading religious books, and abstaining from alcohol.

Many Chinese government policies may exacerbate ethnic tension in Xinjiang and contribute to increased radicalism and violent extremism.  In China, official government accounts of terrorism focus almost exclusively on Xinjiang-related violence.  For further information, we refer you to the State Department's *2014 Report on International Religious Freedom* at: http://www.state.gov/j/drl/rls/irf/religiousfreedom/index.htm.

Hong Kong

Hong Kong continued its effective security and law enforcement partnership with the United States through the Hong Kong Customs and Excise Department's successful joint operation of the Container Security Initiative; through participation in U.S. government-sponsored training in related topics; and through engagement with U.S. counterterrorism agencies.

Counterterrorism remained an operational priority for the Hong Kong Police Force, as demonstrated by existing policies on prevention, protection, and preparedness.  The Police

PX209

Security Wing coordinates potential terrorist threat information with relevant counterterrorism units.  The Police Counterterrorism Response Unit provides a strong deterrent presence, assisting police districts with counterterrorism strategy implementation, and complementing the tactical and professional support of existing police specialist units – such as the Explosive Ordnance Disposal Bureau, Special Duties Unit, and VIP Protection Unit.  Hong Kong's strategic trade regime buttresses U.S. efforts to restrict commodities, software, and technology to terrorist organizations or individuals.  Hong Kong law enforcement officers attended U.S. government-sponsored capacity building training at the International Law Enforcement Academy on advanced post-blast investigations, personnel and facility security, law enforcement techniques to combat terrorism, and financial investigations.

Hong Kong is a member of the Financial Action Task Force (FATF), the Asia/Pacific Group (APG) on Money Laundering, a FATF-style regional body, and the Egmont Group of Financial Intelligence Units.  Terrorist financing is a criminal offense in Hong Kong, and financial institutions are required to continuously search for terrorist financing networks and screen accounts using designations lists provided by the United States under relevant authorities, as well as the UN 1267/1989 (al-Qa'ida) and1988 (Taliban) Sanctions Committees' lists.  Filing suspicious transactions reports irrespective of transaction amounts is obligatory, but Hong Kong does not require mandatory reporting requirements for cross-border currency movements.

Macau

Macau's counterterrorism cooperation with the United States included information exchange as well as regular capacity building through participation in U.S. government-sponsored training.  The Police Intervention Tactical Unit (UTIP), which falls under the Macau Public Security Police Force, is responsible for protecting important installations and dignitaries, and for conducting high-risk missions, such as deactivation of IEDs.  UTIP's Special Operations Group's mission is counterterrorism operations.  Macau law enforcement officers attended U.S. government-sponsored capacity building training at the International Law Enforcement Academy on personnel and facility security, financial and crime scene investigations, combating terrorism, computer investigations, and evidence protection.

Macau is a member of the Asia/Pacific Group (APG) on Money Laundering, a Financial Action Task Force (FATF)-style regional body, and the Egmont Group of Financial Intelligence Units.  Terrorist financing is a criminal offense in Macau, and banks and other financial institutions are required to continuously search for terrorist financing networks and screen accounts using designations lists provided by the United States under relevant authorities, as well as the UN 1267/1989 (al-Qa'ida) and 1988 (Taliban) Sanctions Committees' lists.  Filing suspicious transactions reports (STRs) irrespective of transaction amounts is obligatory, but Macau does not currently require mandatory reporting requirements for cross-border currency movements.

Macau cooperated internationally on counterterrorism efforts through Interpol and other security-focused organizations, including through FATF and APG.  On December 15, Macau's Financial Intelligence Unit signed a memorandum of understanding with the U.S. Financial Crimes Enforcement Network that allows the two jurisdictions to exchange information on STRs.

PX209

**INDONESIA**

**Overview:** With more than 17,000 islands, Indonesia is the world's largest archipelagic nation. As a result, securing land and sea borders remains an ongoing challenge. Although Indonesia does not provide a safe haven for terrorists, terrorists meet and train in the isolated area near Poso, Central Sulawesi.

In 2014, Indonesia expanded international counterterrorism cooperation, including with the United States. Indonesia sustained pressure on terrorists and their networks, particularly those operating within its borders, but continued to face challenges trying to stem the flow of Indonesians traveling abroad to engage in terrorism. The Islamic State in Iraq and the Levant (ISIL) became a major impetus for further counterterrorism efforts. The emergence in July of a recruitment video calling for Indonesians to join ISIL focused the attention of the government and civil society and religious groups on countering the ISIL threat. Indonesian government officials have estimated that up to 300 Indonesians may have traveled to the Middle East since 2012 to engage in terrorist activities.

**2014 Terrorist Incidents:** The Eastern Indonesia Mujahedin (MIT) claimed responsibility for the September 18 murder of M. Fadli in Poso, Central Sulawesi. MIT is a Poso-based terrorist group led by Abu Wardah, also known as Santoso, one of Indonesia's most wanted terrorists.

Fatal shootings of police officers on March 28, June 2, and August 16 in the Bima region of West Nusa Tenggara province were handled as acts of terrorism. The targeting of police and security forces by terrorists is a trend that has emerged since 2009.

**Legislation, Law Enforcement, and Border Security:** Indonesia follows a strong rule-of-law-based counterterrorism approach. After investigation by police, terrorist suspects' dossiers are sent to the Task Force on Counterterrorism and Transnational Crimes, which is part of the Attorney General's Office, for prosecution. Relevant legislation includes the Law on Combating Criminal Acts of Terrorism (15/2003), the 1951 Emergency Law, and Indonesia's Criminal Code.

Counterterrorism efforts are police-led, with Detachment 88 – the elite counterterrorism unit of the police – leading operations and investigations. Counterterrorism units from the Indonesian military may be called upon to support domestic counterterrorism operations and responses on an as-needed basis. Law enforcement units are increasingly able to detect, and in some cases prevent, attacks before they are carried out.

Law enforcement personnel participated in a range of training and professional development activities, including through the Department of State's Antiterrorism Assistance program, with training focused on building sustainable police capacity in tactical crisis response and investigative skills.

In August, government officials banned support for ISIL. However, this ban is a proclamation and does not have the force of law. Officials are considering measures to revise Indonesia's legislative framework to make it more effective. Authorities made at least 10 arrests of alleged

PX209

ISIL supporters.  The Ministry of Communications and Information blocked 20 ISIL-related websites.  To complement these actions, officials recognized the need for a counter-messaging campaign; these efforts were nascent at year's end.  Many of Indonesia's countermeasures against ISIL also addressed the broader threat posed by foreign terrorist fighters, whether affiliated with ISIL or other violent extremist groups operating in the Middle East.

In September, then-President Yudhoyono outlined a series of measures to counter ISIL.  To prevent the travel of potential foreign fighters, Yudhoyono called for increased scrutiny of passport and visa issuances.  The government held a series of coordination meetings with foreign officials, including from transit and destination countries.  Yudhoyono announced that Indonesian citizens abroad and foreigners within Indonesia would be monitored more closely.  He said the surveillance of terrorist prisoners would be tightened and called for heightened vigilance throughout Indonesia, especially in areas vulnerable to or with a history of violent extremism.  In December, authorities in Malaysia arrested and later deported seven Indonesian citizens, accompanied by five children, who were planning travel to Syria to join ISIL.

Indonesia's efforts dovetailed with obligations outlined in UN Security Council Resolutions (UNSCRs) 2170 and 2178.  For example, Indonesia condemned ISIL and sought to prevent the movements of terrorists, including through enhanced controls related to the issuance of identity papers.  Indonesia implemented several of the Global Counterterrorism Forum's (GCTF's) good practices for a more effective response against foreign terrorist fighters.

Immigration officials at major ports of entry, especially larger international air and seaports, have access to biographic and biometric domestic-only databases.  Military and police personnel are often posted at major ports of entry to ensure security.  Police maintain a watchlist of suspected terrorists, but there are not always clear lines of coordination among stakeholder agencies.  Indonesia shares information through Interpol, but does not regularly screen through Interpol at immigration checkpoints.  Information sharing with countries in the region is often on an ad hoc basis, and there is no centralized database or platform for the sharing of information with countries in the region or internationally.

As of early November, there were 274 terrorist prisoners held in approximately 26 prisons throughout Indonesia, overseen by the Directorate General of Corrections, under the Ministry of Law and Human Rights.  Some of Indonesia's most hardened terrorists and ideologues are incarcerated in several prisons on the island of Nusakambangan, off the southern coast of Java.  Authorities remained concerned about the potential recidivism of released terrorist prisoners.  As an example, Muhammad Sibgotulloh was detained in Malaysia in early December, suspected of attempting to travel to join ISIL, and was returned to Indonesia two weeks later.  Sibgotulloh had previously served a three-year jail term based on support lent to Umar Patek, one of the principal makers of a bomb used in the 2002 Bali terrorist attacks.

Police conducted periodic raids against suspected terrorists, with a particular focus on Poso, Central Sulawesi.  By mid-November, law enforcement officials had arrested 44 suspects on terrorism charges, including 10 ISIL-related arrests.  During a raid on New Year's Eve in Ciputat, near Jakarta, police killed six alleged terrorists.  At least one of the suspects was

PX209

reportedly planning travel to Syria.  Evidence seized indicated the group was responsible for a series of bank robberies – used to fund terrorism – and the April 2013 bombing of a Buddhist temple in Jakarta.  On September 13, police in Central Sulawesi arrested seven people, including four Uighurs from China's Xinjiang Province, for alleged links to MIT.  On September 20, law enforcement authorities arrested five suspects with ties to terrorism in connection with the series of shootings in the Bima region of West Nusa Tenggara province; one suspect was killed.

In January, judges at the South Jakarta District Court sentenced four men to prison terms ranging from six to seven-and-a-half years for their roles in a failed plan to bomb the Burmese Embassy in Jakarta in May 2013.  On March 3, Haris Fauzi was sentenced to nine years in jail for his involvement in a failed plot to assassinate the vice mayor of Makassar, South Sulawesi, in 2012.  Fauzi is associated with a terrorist group affiliated with Abu Roban, and had participated in terrorist training camps in the Poso area.

Despite these domestic convictions, Indonesian law lacks the provisions to criminalize and prosecute acts of, and support for, terrorism committed abroad.  Frequent personnel rotation at various agencies – including the police, Attorney General's Office, and judiciary – represents a challenge to building long-term institutional expertise.  Prosecutors sometimes use other laws and criminal statutes not specific to terrorism to prosecute and convict terrorists.  As a result, these individuals are not counted or tracked through the justice system as convicted terrorists, creating a potential loophole in disengagement and de-radicalization efforts.

**Countering the Financing of Terrorism:**  Indonesia is a member of the Asia/Pacific Group on Money Laundering, a regional Financial Action Task Force (FATF)-style body, and the Egmont Group of Financial Intelligence Units.  In 2013, Indonesia's House of Representatives passed Law 9 of 2013, "the Bill on Prevention and Eradication of Crimes of Financing of Terrorism" (TF Law) and the legislation became effective in March 2013.  Fifteen defendants have been prosecuted under this law since its passage.  According to the UNSC and the FATF, Indonesia has not yet fully implemented UNSCRs 1267 and 1373.  By November 26, Indonesia had issued orders to freeze the assets of all 1267/1989 (al-Qa'ida) sanctioned individuals and entities.  Indonesia is working on a joint regulation to ensure that its freezing process is "without delay," in accordance with UNSCRs 1267, 1988, and 1373.  The FATF continued to include Indonesia on its Public Statement list, noting that Indonesia needs to address certain deficiencies in the TF law regarding identifying and freezing terrorist assets.

The passage of the TF Law was an important step forward and Indonesia has filed cases under this new legislation; while the law could have stronger conspiracy and preparatory act provisions, it does allow for investigation and prosecution of TF offenses.  However, the law does not meet international standards because the mechanism to freeze terrorist assets as applied to UNSCRs 1267, 1988, and 1373, does not "freeze without delay."  The TF law requires steps to be taken by the Ministry of Foreign Affairs, the police, and the court system, among others, before terrorist assets can be frozen and/or confiscated, thus impeding the ability to freeze "without delay."  Indonesia is working to address this issue.

Indonesia does not oblige non-profit organizations to file suspicious transaction reports or regulate and monitor them to prevent misuse and terrorist financing.  Although non-profit

PX209

organizations such as religious and charitable organizations are licensed and required to file suspicious transaction reports, the TF Law does not require monitoring or the regulation of such organizations to prevent misuse, including terrorist financing.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Indonesia participates in counterterrorism efforts through several international, multilateral, and regional fora including: the UN, the Global Counterterrorism Forum (GCTF), ASEAN, APEC, and others.  Indonesia expanded regional and international cooperation, especially in response to the foreign terrorist fighter issue.  Indonesia participated in a range of GCTF workshops where participants shared best practices and lessons learned, thereby supporting the capacity building efforts of other countries.  In August, with co-chair Australia, Indonesia launched the GCTF's new Working Group on Detention and Reintegration.  Indonesia remained active in the ASEAN Regional Forum (ARF) Inter-Sessional Meetings on Counter-Terrorism and Transnational Crime (CTTC).  Indonesia completed a second year as the Chair of the Counter-Terrorism Task Force of APEC.  Under Indonesian leadership, the task force was upgraded to a working group.  Indonesian efforts drove the creation of a five-year plan focused on the security of supply chains, travel, finance, and infrastructure.  In September, Indonesia co-sponsored UNSCR 2178 on foreign terrorist fighters.

**Countering Radicalization to Violence and Violent Extremism:**  Indonesian officials recognized the importance of addressing radicalization to violence and countering violent extremism (CVE).  CVE programs are included in counterterrorism efforts, but because of limited resources and the vast amount of territory of the Indonesian archipelago, CVE efforts are not yet comprehensive.  Government efforts are augmented by contributions from various civil society organizations that are active in CVE efforts.  Some of the groups offered positive alternatives – such as sports, film-making, camps, and rallies – for populations vulnerable to violent extremism, especially youth.

Indonesia's National Counterterrorism Agency (BNPT) supported a school outreach program that included former terrorists, survivors of terrorist attacks, law enforcement personnel, and religious leaders.  The BNPT continued to use the Terrorism Prevention Coordination Forum (FKPT), a program located in more than 20 of Indonesia's provinces, as a platform for broader outreach.  Forum participants are usually civic and religious leaders who coordinate activities with the communities on CVE-related programming.  The FKPT network also conducts programs designed to maximize the positive influence of families and community members regarding the reintegration of former terrorist prisoners.  Over time, officials aim to establish a Forum in each of Indonesia's 34 provinces.  BNPT planned to continue a program that invites religious leaders from the Middle East to meet terrorist prisoners in Indonesia, with the aim to foster a more moderate and peaceful mindset among convicted terrorists.

A de-radicalization blueprint for terrorist prisoners issued by the BNPT in late 2013 has yet to be fully implemented.  Counterterrorism officials, in coordination with the Directorate General of Corrections and other relevant law enforcement agencies, have planned to open a de-

PX209

radicalization center in Sentul, south of Jakarta.  There is ongoing debate about how to handle the most hardcore ideologues, but the evolving consensus is to confine these prisoners in one of Indonesia's maximum security detention centers.

## DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA

**Overview:**  The Democratic People's Republic of Korea (DPRK) is not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987.  In October 2008, the United States rescinded the designation of the DPRK as a state sponsor of terrorism in accordance with criteria set forth in U.S. law, including a certification that the DPRK had not provided any support for international terrorism during the preceding six-month period and the provision by the DPRK of assurances that it would not support acts of international terrorism in the future.

Four Japanese Red Army members who participated in a 1970 jet hijacking continued to live in the DPRK.  The Japanese government continued to seek a full accounting of the fate of 12 Japanese nationals believed to have been abducted by DPRK state entities in the 1970s and 1980s.  In May 2014, the DPRK agreed to re-open its investigation into the abductions, but as of the end of 2014 had not yet provided the results of this investigation to Japan.

**Legislation, Law Enforcement, and Border Security:**  In May, the United States recertified North Korea as a country "not cooperating fully" with U.S. counterterrorism efforts pursuant to Section 40A of the Arms Export and Control Act, as amended.  In making this annual determination, the Department of State reviewed the DPRK's overall level of cooperation with U.S. efforts to combat terrorism, taking into account U.S. counterterrorism objectives with the DPRK and a realistic assessment of DPRK capabilities.

**Countering the Financing of Terrorism:**  The DPRK is not a member of the Financial Action Task Force (FATF).  In July 2014, it was admitted as an observer, but not a full member, of the Asia/Pacific Group (APG) on Money Laundering, a FATF-style regional body.  Nevertheless, the DPRK failed to demonstrate meaningful progress in strengthening its anti-money laundering/countering the financing of terrorism (AML/CFT) infrastructure.  While encouraging the DPRK's continued engagement with FATF and APG, FATF highlighted continuing concerns about North Korea's "failure to address the significant deficiencies in its [AML/CFT] regime and the serious threat this poses to the integrity of the international financial system."  At each of its plenary meetings throughout the year, the FATF renewed its call on members to "protect their financial sectors from money laundering and financing of terrorism risks emanating from the DPRK."  For further information on money laundering and financial crimes, see the *International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

## REPUBLIC OF KOREA

**Overview:**  The Republic of Korea has strong counterterrorism capabilities and enjoys robust cooperation with the United States and the international community.  In 2014, the Republic of

PX209

Korea did not face any major domestic terrorist threats; however, South Korean citizens serving as tourists and missionaries have in prior years been victims of terrorist attacks in the Middle East and East Africa.  Domestically, agencies with counterterrorism responsibilities continued to closely monitor and cooperate with the United States on the prevention of cyberattacks and the mitigation of threats posed by foreign residents with potential ties to terrorist groups.  South Korean and U.S. law enforcement agencies have worked closely on information sharing through the Homeland Security Presidential Directive 6 (HSPD-6) and the Preventing and Combating Serious Crime (PCSC) agreement, and have held joint investigations on known and suspected terrorists.  In October, the Republic of Korea conducted a bilateral counterterrorism consultation with the People's Republic of China.

**Legislation, Law Enforcement, and Border Security:**  The National Assembly failed to pass a comprehensive counterterrorism law, first proposed in 2001.  As a result, South Korean legal authorities have no legal framework to proactively and consistently investigate individuals with material or ideological ties to terrorism.  Therefore, South Korean authorities use criminal statutes for suspected terrorism cases.

The Republic of Korea derives its authority to perform counterterrorist activities from Presidential Directive 309, last revised in 2013.  In spring 2014, National Assembly members submitted for deliberation several bills regarding cyberterrorism and compensation for victims of terrorist acts, including medical and recovery assistance.  At year's end, the bills were with the National Assembly Intelligence Committee.

In the lead-up to the 2014 Asian Games, a group of international police prevented sixteen foreign nationals from entering the country due to terrorism suspicions.

**Countering the Financing of Terrorism:**  The Republic of Korea is a member of the Financial Action Task Force (FATF), the Asia/Pacific Group on Money Laundering, a FATF-style regional body, and the Egmont Group of Financial Intelligence Units.  In May, a law was revised to stipulate that the Republic of Korea implement all international treaties and resolutions related to countering the financing of terrorism (CFT) in accordance with UN Security Council Resolutions (UNSCRs) 1267, 1988, and 1373.  The Korea Financial Intelligence Unit, established by the Ministry of Finance and Economy, works with law enforcement agencies to monitor suspicious transactions and develop CFT policy.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  The Republic of Korea continued to strengthen bilateral and multilateral counterterrorism efforts in 2014.  The Republic of Korea is a member of the UN, APEC, ASEAN+3, East Asia Summit, Asia-Europe Meeting, Asia Cooperation Dialogue, Forum for East Asia-Latin America Cooperation, the OECD, the G-20, and the Conference on Interaction and Confidence-Building Measures in Asia.  South Korea is also a partner country of OSCE and NATO.  The Republic of Korea remains actively engaged in global efforts to counter the flow of foreign terrorist fighters, and participated in the October implementation meeting on UNSCR 2178 on foreign terrorist fighters.

PX209

## MALAYSIA

**Overview:**  Both domestically and on the international stage, Malaysia's counterterrorism efforts in 2014 largely focused on mitigating the threat of the Islamic State in Iraq and the Levant (ISIL) and foreign terrorist fighters.  Prime Minister Najib submitted to Parliament a White Paper on the threat of ISIL in November, which emphasized the risk of Malaysian foreign terrorist fighters returning home to destabilize the country.  Malaysian authorities arrested approximately 50 suspected ISIL supporters in 2014.  When he presented the White Paper to Parliament, the Prime Minister said that authorities had identified 39 Malaysians fighting with various militant groups in Syria and Iraq, 17 of whom were fighting with ISIL.  The Prime Minister also announced that five Malaysian foreign fighters had returned home from Syria and Iraq, three of whom had been arrested, with police monitoring the other two.

President Obama's April visit to Malaysia resulted in the elevation of the bilateral relationship to a Comprehensive Partnership, which included efforts to strengthen security and law enforcement cooperation such as maritime and border security.  With the positive developments from the summit, U.S. cooperation with Malaysia on counterterrorism and other transnational security issues continued to improve.  The United States and Malaysia signed an Immigration Memorandum of Understanding in October, and a Customs Mutual Assistance Agreement in December – both of which further strengthen bilateral security cooperation.

Malaysia is not considered a terrorist safe haven, but some violent extremists have been known to operate and hide in isolated littoral areas of the Sulu/Sulawesi Seas between Malaysia, Indonesia, and the Philippines.

**2014 Terrorist Incidents:**  Militants allegedly from the Philippines and linked to the Abu Sayyaf Group conducted four cross-border kidnapping for ransom operations in eastern Sabah, Malaysia.  In April, a Chinese tourist and a Philippine hotel employee were kidnapped by armed men from a diving resort off the coast of Semporna.  In May, a Chinese manager of a fish farm was kidnapped from an island near Lahad Datu; and in June, a Philippine and a Malaysian national were kidnapped from another fish farm in Kunak.  In July, at a diving resort on Mabul Island, armed men killed a Royal Malaysian Police (RMP) officer and kidnapped another officer, who remained in captivity at year's end.

**Legislation, Law Enforcement, and Border Security:**  The Security Offenses (Special Measures) Act (SOSMA), and chapters VI (Offenses Against the State) and VIa (Offenses Relating to Terrorism) of Malaysia's penal code were the primary legal tools for terrorism cases.

In January, the RMP restructured the former Special Task Force (Operations/Counterterrorism) into a new Special Branch/Counterterrorism Unit, which now has the lead role in counterterrorism efforts.  Malaysian authorities made efforts to improve interagency cooperation and information sharing, including participation in regional meetings, Global Counterterrorism Forum (GCTF) regional workshops, and training conducted through Malaysia's Southeast Asia Regional Centre for Counter-Terrorism (SEARCCT), which is part of Malaysia's Ministry of Foreign Affairs.

PX209

In January, Malaysian authorities released from detention the remaining six individuals who had been held under the Internal Security Act (ISA), which was repealed in 2012 with the introduction of SOSMA.  The six included three Malaysians, two Indonesians, and a Philippine citizen detained under the ISA in November 2011 for alleged membership in Darul Islam Sabah, which is linked to Jemaah Islamiya (JI).

In November, Indonesian authorities released from prison JI bomb-maker Taufik Abdul Halim, a Malaysian citizen who spent the past 12 years in jail for attempting to bomb a Jakarta shopping mall in 2001.  Malaysian police monitored Taufik after his release, as he is the brother-in-law of wanted terrorist Zulkifli Abdul Khir, also known as Marwan.

In December, Malaysian authorities arrested and subsequently deported to Indonesia three men and four women intending to join ISIL in Syria.  The seven Indonesians were traveling with five children.

As of year's end, the trial of al-Qa'ida operative Yazid Sufaat, who was arrested in 2013 for recruiting Malaysians to fight in Syria, had not yet begun.  Sufaat was charged with inciting or promoting the commission of terrorist acts under Section 130G(a) of Malaysia's penal code.  One accomplice, Muhammad Hilmi Hasim, remained in custody awaiting trial under for aiding and abetting the commission of terrorist acts.  Sufaat's other accomplice, Halimah Hussein, remained at large at year's end.

The SOSMA trial of 30 suspects – 27 Philippine nationals and three Malaysians – involved in the February 2013 Lahad Datu incursion began in January and was ongoing at year's end.  The suspects were on trial for harboring terrorists, membership of a terrorist group, recruiting terrorists, and waging war against the king.

Iranian citizen, and suspected member of the Iran's Revolutionary Guard Corps, Masoud Sedaghatzadeh, arrested in Malaysia in February 2012 after failed attempted bombings in Bangkok, remained in Malaysian custody.  A Malaysian court had ordered Sedaghatzadeh's extradition to Thailand in 2012, but his appeal remained pending at year's end.

Malaysia has a no-fly list, but passengers are compared to that list by the immigration officer at the port of entry and the decision to deny entry is made at the airport.  Malaysia does not regularly screen at immigration checkpoints through Interpol.

In July, in response to the continued threat of kidnapping for ransom and other transnational threats, the Malaysian government enacted a maritime curfew along the eastern coast of Sabah.  The government extended the curfew multiple times and at year's end it was still in effect.  The government also announced in July that an additional 330 police officers and 350 army personnel would be deployed to eastern Sabah to strengthen the border.

Of the approximately 50 suspected ISIL supporters Malaysian authorities arrested (not including non-Malaysian citizens who were deported), prosecutors filed charges in 22 cases.  The charges

PX209

included incitement, abetment, and soliciting or giving support to a terrorist organization.  At least two of the individuals were charged with illegal firearms possession.

Malaysian police also arrested – and subsequently deported – 13 alleged supporters of the Liberation Tigers of Tamil Eelam (LTTE) and a Somali member of al-Shabaab.  Several of the deported LTTE suspects had allegedly planned attacks against U.S. and Israeli diplomatic facilities in India.  In July, the Malaysian Home Minister said that, since 2009, Malaysia had deported 67 foreigners suspected of being involved in militant activities in Malaysia and overseas.

Malaysia demonstrated its political will at the highest levels of government to confront the threat of ISIL and other terrorist groups.  Malaysia's existing legal system is capable of disrupting terrorist plots before they are carried out, and before fighters travel to foreign conflicts.  Malaysia has laws against conspiracy, attempt, incitement, solicitation, aiding, abetting, and promoting terrorist acts, and most of the same inchoate offenses that are prosecutable in the United States.  However, as authorities were unable to file charges in roughly half of the terrorism-related arrests, a significant challenge is Malaysia's need to strengthen proactive cooperation between police and prosecutors from the outset of an investigation.

Malaysia continued to participate in the Department of State's Antiterrorism Assistance program, with programs focused on strengthening law enforcement capacity to secure Malaysia's borders from terrorist transit.

The U.S. Department of State's Export Controls and Related Border Security (EXBS) Program conducted capacity building activities for customs, police, immigration, coast guard, and strategic trade officials.  EXBS also strengthened international and regional coordination of maritime security efforts.  Malaysia participated in the Container Security and Megaports Initiatives, as well as the UN Office and Drugs and Crime Container Control Program.

In October, the U.S. government conducted a three-day workshop for over 60 Malaysian police and prosecutors designed to promote greater cooperation in the proactive investigation and prosecution of terrorism cases.

**Countering the Financing of Terrorism:**  Malaysia became an official observer country of the Financial Action Task Force (FATF) in October, and has expressed interest in becoming a full member.  In November, a FATF team conducted an assessment of Malaysia.  Malaysia is a member of the Asia/Pacific Group on Money Laundering, a FATF-style regional body.

Malaysia has a well-developed anti-money laundering/countering the financing of terrorism (AML/CFT) framework, and a capable Financial Intelligence and Enforcement Unit within Bank Negara Malaysia, the central bank of Malaysia.  Nevertheless, the ISIL White Paper noted that Malaysia was at risk of becoming a terrorist finance hub, suggesting that existing laws should be strengthened.

PX209

In August, Parliament passed an amendment to the 2001 Anti-Money Laundering, Anti-Terrorist Financing Act, which broadened the government's investigation and enforcement authority, in line with FATF standards.  The amendment came into effect on September 1.

Law enforcement and customs officials are responsible for examining trade-based money laundering and invoice manipulation, and their relationship to underground finance and informal remittance systems.  Malaysia took strong steps in 2014 to counter and reduce unauthorized money services businesses – including a series of raids in November.

In response to FATF's 2012 revised international standards, Malaysia's National Coordinating Committee for Countering Money Laundering assessed money laundering and terrorist financing threats facing the country.  The review was completed in 2014, and Malaysia is implementing new measures to mitigate the risks identified, including intensifying joint law enforcement investigation efforts, forming dedicated AML/CFT law enforcement units, and strengthening Malaysia's AML/CFT framework.

Malaysia does not oblige non-profit organizations (NPOs) themselves to file suspicious transaction reports, but they are required to file annual financial statements that are scrutinized by the Registrar of Societies (ROS), which may file such reports.  Law enforcement works with the ROS and other charity regulators to prevent misuse and terrorist financing in the NPO sector, especially in vulnerable areas like religious or charitable NPOs.  ROS also conducts an annual conference for its members on the risks of terrorist financing.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm

**Regional and International Cooperation:**  Malaysia actively participated in UN, ASEAN, and other regional and international forums.  As part of the ASEAN Regional Forum (ARF) 2014-2015 Work Plan for Counterterrorism and Transnational Crime, Malaysia is one of the lead countries for two key priority areas: 1) cybersecurity and terrorists' use of the internet, and 2) counter-radicalization.  In March, Malaysia hosted an ARF workshop on cyber-confidence building measures.

The SEARCCT hosted 17 training events in 2014, including seminars on crisis management, transportation security, and chemical/biological/radiological/nuclear response training.  The U.S. government supported three SEARCCT events in 2014, including programs on countering the financing of terrorism and countering violent extremism.  Malaysian officials participated in several GCTF events, including workshops on strengthening the judiciary, detention and reintegration of terrorist prisoners, and foreign terrorist fighters.

A team from the U.S. Department of State's Rewards for Justice Program visited Kuala Lumpur in November to consult with Malaysian officials on establishing a similar program.

In 2014, Malaysia continued to facilitate peace talks between the Philippine government and the Moro Islamic Liberation Front.  Malaysia's mediation efforts helped lead to the Philippine

PX209

government and the Moro Islamic Liberation Front signing the Comprehensive Agreement on the Bangsamoro in May.

Malaysia considers ISIL a terrorist organization and was a co-sponsor of UNSCR 2178.  In addition to robust law enforcement activity, Malaysia hosted several regional capacity building efforts to strengthen anti-ISIL efforts in Southeast Asia.

**Countering Radicalization to Violence and Violent Extremism:**  In October, Malaysia's Islamic Development Authority (JAKIM), which oversees the majority of the country's mosques and Islamic scholars, issued a *fatwa* against ISIL that labeled the organization illegal under Islamic law and declared that followers that died fighting with ISIL were not "martyrs."  JAKIM promoted anti-ISIL messaging through its Friday sermons and sought to educate Malaysia's Muslims on the peaceful meaning of jihad.

SEARCCT conducted several regional programs on countering violent extremism and the dynamics of youth and terrorism.  These programs included a January workshop on promoting community-oriented policing to counter violent extremism, and a November program that brought together government officials, civil society leaders, journalists, and representatives of the private sector to develop effective strategies to counter violent extremist narratives online.

The Global Movement of Moderates (GMM), a Malaysian-based organization founded by Prime Minister Najib, conducted several countering violent extremism programs, including a public forum on youth and terrorism.  In September, GMM formed a task force in partnership with the Malaysian Islamic Youth Movement focused on countering violent extremist ideologies.

## PHILIPPINES

**Overview:**  Counterterrorism cooperation between the Philippines and the United States continued to improve in 2014.  Terrorist groups, including the Abu Sayyaf Group (ASG), Jemaah Islamiya (JI), and the Communist People's Party/New People's Army (CPP/NPA), were unable to conduct major attacks compared to previous years due to continuous pressure from Philippine counterterrorism and law enforcement efforts.  Terrorist groups' acts included criminal activities designed to generate revenue for self-sustainment, such as kidnapping for ransom, extortion, and bombings for hire.  Although Philippines counterterrorism efforts sustained pressure on terrorist organizations, members of these groups were suspected to have carried out attacks against government, public, and private facilities, primarily in the central and western areas of Mindanao; others were linked to extortion operations in other parts of the country.  In addition, terrorist and rebel groups in the southern Philippines retained the capability and intent to conduct bomb-making training, small-scale shootings, and ambushes.

The Government of the Philippines made progress in implementing its 2011–2016 Internal Peace and Security Plan that calls for the transition of internal security functions from the Armed Forces of the Philippines (AFP) to the Philippine National Police (PNP).  The increasing role and capability of the police in maintaining internal security in conflict-affected areas will permit the AFP to shift its focus to enhance the country's maritime security and territorial defense capabilities.  To date, however, this transition continued to be slow and ineffective.  Continued

PX209

violent extremist activity, as well as counterterrorism capability gaps between the AFP and PNP, slowed this transition and forced the AFP to continue playing the lead counterterrorism role in the Philippines.

The Philippine government's Comprehensive Agreement on the Bangsamoro (CAB) with the Moro Islamic Liberation Front (MILF) creating a new Bangsamoro autonomous government in Mindanao, if successful, paves the way for a peaceful solution to the 40-year-old conflict in Mindanao.  The Philippine government hopes to reduce tensions in the South and the political attraction of violent extremist groups by providing greater political and economic autonomy for the predominately Muslim-majority areas of Mindanao.  As a result, some of the groups who traditionally were committed to Moro secessionism now either back the peace deal or have splintered into less coherent groups like the Bangsamoro Islamic Freedom Fighters (BIFF).

After the March signing ceremony of the CAB, however, violent clashes with the BIFF continued in central Mindanao, indicating that violent spoilers to a lasting peace remain.  At the same time, continued heavy military and police presence in Mindanao and other regions of the country, including active ongoing operations against terrorist groups, including the ASG, JI, the NPA, and other violent extremist groups with ties to terrorists like the BIFF, resulted in displacement and disruption of civilian activities, and in some instances provided impetus for recruiting or fundraising efforts by local terrorist group members.

The Philippine government submitted to Congress draft legislation known as the "Bangsamoro Basic Law" in 2014 to establish a new autonomous government entity in the Southern Philippines, as stipulated by the CAB.  However, with several splinter groups – including rogue elements of the MILF, the BIFF, and others – claiming they will not be bound by the law and are unwilling to forsake violence, a number of small-scale terrorist attacks occurred.

The Government of the Philippines recognizes the potential threat posed by radicalized Philippine citizens supporting the Islamic State in Iraq and the Levant (ISIL) and the risk of ISIL elements traveling to the Philippines to promote violent extremism in the country or seek safe haven.  Members of numerous groups – including ASG and BIFF – pledged allegiance to ISIL in 2014.  The Government of the Philippines has condemned the actions of ISIL and other extremist groups in the Middle East, describing their use of violence as a "crime against humanity."  The President's Anti-Terrorism Council (ATC) convened an ad hoc interagency technical working group on persons of interest in conflict areas in July.  The working group meets regularly every two to three weeks, and actions taken by this group include tightening passport issuance, increasing Bureau of Immigration screening at major departure points, and dedicating increased resources to monitoring online ISIL-related activity.

**2014 Terrorist Incidents:**  There were dozens of small arms and improvised explosive device (IED) attacks, kidnappings for ransom, and extortion efforts by suspected members of terrorist groups in the Philippines in 2014.  High-profile incidents included:

- On January 29, an eight-year-old girl and a pregnant woman were injured when a powerful explosion ripped through the public ferry terminal in the town of Datu Piang.

73

PX209

The PNP said the bombing was an apparent attack by the BIFF to divert the attention of security authorities involved in an operation to arrest senior group leaders.

- On March 2, 16 individuals, including 11 soldiers and five civilians, were hurt in a landmine explosion that hit a convoy of ambulances in Bansalan, Davao del Sur.  The landmine was allegedly planted by NPA guerrillas operating in the area.  The convoy was transporting several soldiers reportedly injured in an earlier encounter with the NPA to a local hospital when the landmine detonated and damaged the passing ambulances.
- On May 21, policemen foiled an attempt by as many as 100 NPA communist rebels to take over the town hall of President Roxas city in Cotabato, killing three guerrillas and forcing the rest to retreat.  The police chief of President Roxas was wounded in the firefight.
- On May 22, suspected members of the ASG group demanded US $670,194 in exchange for the release of a Chinese businesswoman and her daughter, kidnapped by at least 10 armed men in early May in Isabela City, Basilan.
- On December 9, five people were killed and 42 wounded in an explosion aboard a bus in Bukidnon, Mindanao.  Authorities filed charges against Garnet Lintang, a commander of the BIFF operating in Central Mindanao.

**Legislation, Law Enforcement, and Border Security:**  The 2007 Human Security Act (HSA) is the principal counterterrorism legislation of the Philippines.  The law defines terrorism and provides methods for law enforcement to conduct investigations of terrorist suspects.  Many aspects of the law have not been used due to a number of strict procedural requirements in the law, however, including notification to subjects of surveillance before activities can begin and damages of approximately US $12,000 for every day of detention if an individual accused of terrorism is ultimately acquitted.

President Aquino has prioritized the adoption of amendments to the HSA in three main areas: revise the definition of terrorism to conform to international standards; ease the strict monetary penalties and prison terms against law enforcement officials involved in cases where individuals are wrongly accused and later acquitted; and remove barriers to support investigations.  The ATC Project Management Center, in coordination with the Anti-Money Laundering Council (AMLC) Secretariat and the Presidential Legislative Liaison Office, ensured the final version of the HSA was fully in line with the Terrorism Financing Prevention Act and other Anti-Money Laundering Act and Philippine government initiatives prior to submission to the House of Representatives.

Units with a specialized counterterrorism focus, including the National Bureau of Investigation (NBI) and the PNP Special Action Force (SAF), have limited investigations, crisis response, and border security capacity.  Multiple agencies have jurisdiction over counterterrorism efforts, creating confusion and inefficiency in leading investigations and in response to terrorism incidents.  Roles and responsibilities between law enforcement and military units that have a counterterrorism mission are often not well delineated.  Law enforcement units display moderate command and control capacity.  Specialized law enforcement units possess some necessary equipment, but have many unfulfilled needs.  Law enforcement units have a mixed record of accountability and respect for human rights.  The ATC provides guidance to agencies responsible

PX209

for enforcing terrorism laws, but its capacity and authority to ensure cooperation and coordination between agencies is limited.

The PNP maintains legal responsibility for ensuring peace and security throughout the county, including arresting terrorists and conducting terrorism investigations.  In some of the conflict-affected areas, the PNP has relied upon the AFP to conduct counterterrorism operations.  The PNP SAF is the national operational support unit for law enforcement counterterrorism efforts.  The Department of State's Antiterrorism Assistance (ATA) program in the Philippines assisted the PNP's SAF, Anti-Kidnapping Group, Anti-Cybercrime Group, and Explosive Ordnance Disposal/K9 units by providing counterterrorism-related training and equipment.  This assistance strengthened the PNP's capacity to respond to terrorism-related incidents.  In 2014, the ATA program in the Philippines conducted 33 courses with 658 participants, on training platforms both within the Philippines and internationally.

In 2014, the Philippines continued to improve the security of its passports.  Three million machine-readable passports remained in circulation at year's end.  In August 2009, the Philippines started to produce "e-passports" containing a biometric chip.  Six million Philippine passports in circulation are e-passports, accounting for 65 percent of all valid passports, according to the Philippine Passport Office.  At the main international airport in Manila, the Philippines participated in the Interpol Border Management Program.

The first phase of the Automated Fingerprint Identification System (AFIS) was completed in 2014, which included the build-out of the physical AFIS facility at NBI headquarters, and the digitization of 850,000 fingerprint records.

In the area of transportation and port security, the Philippines has committed to align its priorities with the Transportation Security Administration (TSA) and the U.S. Coast Guard (USCG) to increase security capabilities at its airports, seaports, and bus terminals.  The TSA and USCG have committed a significant amount of technical assistance to the Philippine Office for Transportation Security (OTS).  In 2014, TSA conducted a counterterrorism bus exercise with APEC, the U.S. Department of State, and OTS to outline best practices and introduce a risk identification tool for implementation.  Additionally, TSA and OTS conducted joint aviation security assessments/inspections at Manila International Airport and Clark International Airport to align policies with international standards, and increase the capacity of OTS oversight personnel.  USCG conducted a joint table top exercise at several Philippine seaports, and sponsored a Philippine delegation to observe port security procedures in Seattle, Washington.

In 2014, the United States continued to work with the Government of the Philippines to monitor and investigate groups engaged in or supporting terrorist activities in the Philippines.  The government launched numerous operations, particularly in the Southern Philippines, to arrest and disrupt organizations like the ASG, JI, BIFF and NPA.  There were a number of ongoing operations against and prosecutions of terrorist suspects that included:

- On January 27, "Operation Darkhorse" was supposed to end after two days.  The campaign was extended until February 1 to allow government forces to seize more BIFF facilities, leading to the capture of four BIFF camps and a makeshift explosive factory in

PX209

Maguindanao.  The weeklong offensive left 52 BIFF members and one AFP soldier dead, while injuring 49 BIFF members and 20 AFP soldiers.  Eight civilians were also hurt and more than 35,000 were displaced during the operations.

- On April 14, two suspected members of a kidnapping syndicate were killed while six others, including an alleged member of the MILF and a police officer, were captured following a raid and exchange of fire in Zamboanga.  The raid was executing an arrest warrant for 12 suspects, but four of them escaped during the shootout.

- On April 29, clashes between government forces and ASG members over control of a jungle training camp in Sulu resulted in 26 casualties, including one AFP Marine.  After 10 hours, government forces successfully drove the ASG members from the camp in Sitio Kanjimao, Barangay Buhanginan, Patikul town.

- On June 11, terrorist financier and high-ranking ASG member Khair Mundos was arrested by Philippine authorities in Manila near the Ninoy Aquino International Airport.  Mundos was on trial at year's end, facing local bombing related charges.

- On June 17, security forces captured two ASG militants in Zamboanga City, including one who was allegedly involved in the 2011 kidnappings of an American teenage boy and his mother, as well as a separate kidnapping of an Australian man in 2011.  Philippine Police and Army troops captured Jimmy Nurilla and Bakrin Haris in a raid on their hideout in Sangali village.  Nurilla was suspected of being involved in a number of kidnappings, including that of American Kevin Lunsmann, who was 14 when he escaped from his Abu Sayyaf captors in 2011 after five months in captivity in Basilan.

- On June 22, four suspected members of ASG were arrested in separate police and military operations.  The four included a suspect in the kidnapping of six Jehovah's Witnesses in 2002, two of whom were beheaded.

- On July 7, during an operation in Isabela City, Basilan, police intelligence and combat forces captured an ASG suspect linked to the mass abduction of teachers, students, and a Catholic priest 14 years ago.  The captured suspect was identified as Salih Ali, also known as Abu Ali, who had a standing warrant for arrest for nine counts of kidnapping.

- On July 11, Philippine authorities in Cebu arrested Australian citizen Musa Cerantonio, a popular pro-ISIL ideologue active on social media, for suspicion he was radicalizing Philippine citizens to join the group.  Cerantonio was deported back to Australia.

- On July 14, a court decision was promulgated in a 2003 vehicle-borne improved explosive device attack at the Awang Airport in Cotobato organized by the MILF and JI which resulted in the death of a Philippine Army Sergeant.  Five defendants were convicted of murder and attempted murder.

- On October 7, authorities arrested Ricardo Ayeras, Andrescio Valdez, and Ricky Macapagal in Manila on suspicion of plotting to attack the U.S. Embassy in Manila.  One of the three suspects, Ayeras, was implicated in the 2003 Maguindanao airport bombing.

- On October 20, troops seized several suspected ASG camps in Patikul, Sulu.  The Philippine military kept up the pressure on ASG following the 2013 kidnapping and subsequent release of two German hostages, in which the ASG is suspected to have received a ransom of more than US $5 million.

In 2014, substantive hearings in the prosecution of three defendants – accused of kidnapping two U.S. nationals in Mindanao in 2011 – commenced in Zamboanga.  Additionally, substantive

PX209

hearings continued in 2014 in Cebu in the prosecution of four defendants accused of murdering two U.S. soldiers and one Philippine Marine in an IED attack in Kagay, Jolo, in September 2009.

In 2014, the Philippines continued coordinating with U.S. law enforcement authorities, especially regarding U.S. fugitives and suspected terrorists.  In particular, Philippine authorities provided assistance in the U.S. investigation of the kidnapping of two U.S. nationals in Mindanao in 2011.  In December 2014, four Philippine nationals were indicted in the United States on conspiracy, hostage-taking, and weapons charges stemming from this kidnapping.

An under-resourced and understaffed law enforcement and judicial system, coupled with widespread official corruption, resulted in limited domestic investigations, unexecuted arrest warrants, few prosecutions, and lengthy trials of cases.  Philippine investigators and prosecutors lacked necessary tools to build strong cases, including a lack of clear processes for requesting judicially-authorized interception of terrorist communications, entering into plea bargains with key witnesses, and seizing assets of those suspected in benefiting from terrorism.

The Philippines received counterterrorism assistance from Australia, the UK, Canada, and Japan. This work focuses generally on capacity building on investigation, case management, intelligence, and special operations training with the PNP and the AFP.

**Countering the Financing of Terrorism:**  The Philippines is a member of the Asia/Pacific Group (APG) on Money Laundering, a Financial Action Task Force-style regional body and the Egmont Group.  In recent years, the Philippines significantly improved its financial regulatory regime and remains focused on effective implementation of international standards.

The U.S. government supported the Anti-Terrorism Council (ATC), the Anti-Money Laundering Council (AMLC), the PNP's Directorate of Intelligence, Anti-Kidnapping Group, and the SAF in successfully forming a Joint Terrorist Financing Investigation Group (JTFIG) in 2014.  The JTFIG acts as an "intelligence fusion center" to complement the other intelligence groups tasked with investigating terrorism and terrorist financing.  The JTFIG expanded to include the NBI and PNP Criminal Investigation and Detection Group.

The AMLC has been able to identify, freeze, and obtain forfeiture judgments and writs of execution for bank deposits and real estate assets linked to the International Islamic Relief Organization and the Rajah Sulaiman Movement – both U.S.-designated terrorist groups under E.O. 13224 – with a total estimated value of US $237,000.

Under UN Security Council Resolution 2170, the AMLC has frozen the assets of six members of ISIL and al-Nusrah Front.  Under Section 8 of the Terrorist Financing Prevention and Suppression Act, all transactions with the named individuals designated by AMLC are prohibited.  The AMLC freezes assets of those listed at the 1267/1989 (al-Qa'ida) and 1988 Taliban sanctions committees through AMLC Resolution TF-01.

Non-profit organizations are not covered institutions under the Anti-Money Laundering Act. There is no single authority for entities in the non-profit sector, making monitoring and coordination of regulatory bodies difficult.

PX209

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes:* http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Philippine government representatives participated in several regional events in 2014:

- In May, the UN Office on Drugs and Crime (UNODC) sponsored a workshop in Tagaytay City focused on Combating the Financing of Terrorism.
- In October, the Philippines supported the ASEAN Defense Ministers' Meeting Plus (ADMM-Plus) and ADMM-Plus Experts' Working Group on Counterterrorism.
- In November, a pioneering project called "Training on Collaborative Intelligence, Investigation, and Prosecution of Terrorism-Related Cases" was implemented with the UNODC to encourage close collaboration among these sectors to ensure successful prosecution of terrorism cases.

**Countering Radicalization to Violence and Violent Extremism:** The Philippine government continued its counter-radicalization program, Payapa at Masaganang Pamayanan or PAMANA (Resilient Communities in Conflict Affected Communities). During the year, the Philippines worked with the Global Counterterrorism Forum to apply the Rome Memorandum on Good Practices for Rehabilitation and Reintegration of Violent Extremist Offenders. Government offices, including the President's Law Enforcement and Security Integration Office and the Philippine Center for Transnational Crime, led interagency collaboration on countering violent extremism through counter-radicalization and de-radicalization initiatives.

Training on rehabilitation and reintegration of violent extremist offenders, funded by the U.S. Department of State and implemented by the International Centre for Counter-Terrorism – The Hague, was provided to 24 experts in the Philippines from different agencies and the private sector.

The Philippine government also continues to support a counter-radicalization program in the Bureau of Jail Management and Penology facilities housing ASG or other terrorist suspects pending trial.

---

## SINGAPORE

**Overview:** In 2014, Singapore and the United States expanded counterterrorism cooperation, including increased information sharing on known and suspected terrorists. U.S. agencies welcomed the closer engagement and continued to see the potential for more strategic and productive agency-to-agency relationships. In November, Singapore announced it would contribute to the Global Coalition to Counter the Islamic State in Iraq and the Levant, declaring that contribution an integral part of its ongoing efforts to combat terrorism, and pledged staff and midair refueling assets to the Coalition. Singapore seeks to actively prevent foreign terrorist fighters from traveling to Syria and Iraq, and has detained Singaporean residents attempting to do so. The government and Muslim community organizations, such as the Islamic Religious

PX209

Council of Singapore and the Religious Rehabilitation Group, actively promoted tolerance and provided a counter-narrative to violent extremists.

**Legislation, Law Enforcement, and Border Security:**  Singapore uses its Internal Security Act (ISA) to arrest and detain suspected terrorists without trial.  The ISA authorizes the Minister for Home Affairs (MHA), with the consent of the president, to order detention without judicial review if it is determined that a person poses a threat to national security.  The initial detention may be for up to two years, and the MHA may renew the detention for an unlimited number of additional periods up to two years at a time with the president's consent.  Singapore's existing legal framework, in conjunction with the ISA, provides the government the necessary tools to support the investigation and prosecution of terrorism offenses.  Law enforcement agencies displayed coordination, command, and control in responding to threat information affecting Singapore's security.

**Countering the Financing of Terrorism:**  Singapore is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering, a FATF-style regional body. In 2014, Singapore tightened currency reporting requirements, lowering the threshold for currency declarations when bringing in or taking cash out of the country from US $22,200 to US $14,800.  The Monetary Authority of Singapore also commenced consultations in 2014 on revised regulations to strengthen the anti-money laundering/countering the financing of terrorism framework for financial institutions to bring it in line with the FATF's revised recommendations of February 2012.  Singapore's robust financial regulatory framework makes terrorist financing illegal and the government, in cooperation with the financial services industry, remains vigilant against this threat.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Singapore is an active participant in counterterrorism cooperation efforts in ASEAN, the ASEAN Regional Forum, and APEC; has supported UN Security Council Resolutions condemning terrorist activities – including co-sponsoring UNSCR 2178; and announced at the 2014 East Asia Summit that it will host a regional conference on countering violent extremism.  Singapore participates in regional exercises, which occasionally have counterterrorism components.

**Countering Radicalization to Violence and Violent Extremism:**  Singapore's efforts to prevent youth radicalization focus on education and outreach efforts.  The government also encourages interreligious and interethnic dialogue through Interracial and Religious Confidence Circles, community forums that bring leaders from Singapore's religious and ethnic communities together to discuss issues of concern, and build trust.  The government has highlighted opportunities for constructive engagement for those concerned with the conflict in Syria and Iraq, such as promoting legitimate charities working to ease suffering in conflict zones.

Singapore's Islamic Religious Council of Singapore, the Islamic authority in charge of Muslim affairs in the country, maintains a Facebook presence and holds outreach and education events to counter terrorist propaganda and recruitment efforts.

PX209

Singapore's Religious Rehabilitation Group, a volunteer organization, has had success in counseling detainees held under the ISA.  The comprehensive program includes religious and psychological counseling, and involves the detainee's family and community.

## THAILAND

**Overview:**  Thailand's counterterrorism cooperation continued to be productive, although domestic political challenges remained the government's key security priority.  In late 2014, Thai security officials expressed moderate concern about the threat to Thailand from the Islamic State in Iraq and the Levant (ISIL), particularly given the reported travel of fighters from neighboring Southeast Asian nations to the Middle East.  There was no confirmed evidence of Thais joining ISIL, however, and no direct evidence of operational linkages between ethno-nationalist Malay Muslim insurgent groups in southern Thailand and ISIL or other international terrorist networks.

While Thai officials have long expressed concern that transnational terrorist groups could establish links with southern Thailand-based separatist groups, there have been no indications that transnational terrorist groups were directly involved in the violence in the south, and there was no evidence of direct operational links between southern Thai insurgent groups and regional terrorist networks.

**Legislation, Law Enforcement, and Border Security:**  Thailand incorporated terrorism offenses into its penal code in 2003, but most terrorism prosecutions fail to prove the necessary element of specific intent and therefore result in deportation or conviction on less serious offenses.

Law enforcement units demonstrate some capacity to detect, deter, and respond to terrorist incidents.  Multiple entities – including the Royal Thai Police, Department of Special Investigations, and elements of the Thai military – have law enforcement responsibilities in counterterrorism cases.  Semiannual reshuffles of senior ranks of government and security officials, and shifts directed by the post-coup government, hampered continuity in leadership.  Interagency cooperation and coordination is sporadic, information sharing is limited, and the delineation of duties between law enforcement and military units with counterterrorism responsibilities is unclear.  Law enforcement officials with counterterrorism responsibilities receive U.S. training, including through the Bangkok-based joint U.S.-Thai International Law Enforcement Academy.  Additionally, the U.S. Department of State provides Antiterrorism Assistance training programs designed to enhance Royal Thai Police capacity to counter terrorism.

Land borders are relatively porous.  In June 2012, the Thai government removed the Personal Identification Secure Comparison and Evaluation System (PISCES) from eight major points of entry and installed a locally developed program.  At year's end, PISCES remained in place at Bangkok's Suvarnabhumi Airport, which handles the majority of arrivals, but its continued implementation remained unclear.  All passengers originating in Thailand traveling to or overflying the United States will continue to be vetted through the Secure Flight Program.

PX209

Thailand has an active market in fraudulent documents.  Local law enforcement pursues fraud cases concerning official documents such as passports, birth certificates, and national identification; however, it does not prioritize investigating non-official documents such as financial records, school transcripts, and employment letters.  Thailand has initiated investigations into multiple passport fraud rings, but has not yet conducted any prosecutions.  Information sharing within the Thai government and with neighboring countries appeared limited.

In April, two dual Lebanese nationals suspected of being associated with Hizballah were detained in Bangkok and subsequently deported.  Police stated they received intelligence that the pair plotted to attack an area in the capital popular with Israeli tourists.  Separately, a Hizballah operative – who was storing 10,000 pounds of urea-based fertilizer and 10 gallons of liquid ammonium nitrate in a commercial building about 20 miles south of Bangkok when he was detained in January 2012 – was released and deported to Sweden in September 2014 after serving two years and eight months in prison.

**Countering the Financing of Terrorism:**  Thailand belongs to the Asia/Pacific Group on Money Laundering, a Financial Action Task Force-style regional body.  Thailand's Counter Terrorist Financing Act (CFT), together with subordinate laws, came into effect in early 2013.  The Anti-Money Laundering Office (AMLO) is in the process of revising the CFT Act in order to quicken the designation process and to make updates to the Anti-Money Laundering Act.

In 2014, two unlicensed money changers were shut down and charged by the Bank of Thailand, which is revising its regulations to tighten control of similar financial activities.  While AMLO did not identify and freeze terrorist assets of sanctioned individuals and organizations in 2014 in accordance with relevant UN Security Council Resolutions including 1267, 1988, and 1373, it froze US $581 in assets of one person designated on Thailand's domestic list as an individual engaged in terrorist financing activities.  The case was being scrutinized by AMLO's litigation division at year's end.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Thailand participated in international counterterrorism efforts, including through APEC, ASEAN, and the ASEAN Regional Forum.

**Countering Radicalization to Violence and Violent Extremism:**  Following the May 2014 coup, the Internal Security Operations Command continued to organize outreach programs to ethnic Malay-Muslims to counter radicalization and violent extremism.  Ongoing shortcomings of the justice system, however, contributed to support for the ethno-nationalist insurgency in Thailand's southernmost provinces.  NGOs also reached out to communities in the southern provinces to provide services, identify the underlying causes of the area's violence, and provide outlets for peaceful political expression.

## EUROPE

PX209

While Europe continued to face terrorist threats from a variety of sources in 2014, a primary area of concern in many countries was the emergence of the threat posed by foreign terrorist fighters participating in the conflict in Syria and Iraq in the ranks of such groups as al-Nusrah Front and the Islamic State in Iraq and the Levant (ISIL).  Significant numbers of foreign terrorist fighters came from countries such as France and Belgium in Western Europe, while, on a per capita basis, certain western Balkan countries such as Albania, Kosovo, and Bosnia and Herzegovina also figured as significant foreign terrorist fighter source countries.  At the same time, violent extremist groups espousing left-wing and nationalist ideologies continued to operate in Europe, such as the Revolutionary People's Liberation Party/Front (DHKP/C) in Turkey.

Returning foreign terrorist fighters were deemed responsible for terrorist attacks in a number of countries, including Belgium, where in May, a French citizen killed four people at a Jewish museum in Brussels.  In March, three persons, including a police officer and a gendarme, were killed in an incident involving three young men who were believed to be foreign terrorist fighters returning to Europe from Syria.  Terrorist incidents attributed to other groups were reported in a number of countries, including attacks in Chechnya in the North Caucasus region of the Russian Federation in October and December, attributed to the Caucasus Emirate, and in Turkey in October, attributed to the Kurdistan Workers' Party.

By virtue of its location, the international transport hubs on its territory, and its long border with Syria and Iraq, Turkey remained the main transit route for foreign terrorist fighters.  In 2014, Turkey increased cooperation with source countries to develop an extensive banned-from-entry list of known or suspected terrorists and introduced tougher traveler screening procedures, making it more difficult for foreign terrorist fighters to cross its borders.  Turkey's border security challenges, however, continued to be aggravated by its failure to impose visa requirements for certain major foreign terrorist fighter source countries such as Libya.

To counter the foreign terrorist fighter threat, European countries strengthened existing legislation and, where necessary, introduced new legislation aimed at criminalizing participation in terrorist elements in foreign conflicts, in keeping with commitments made under UN Security Council Resolution 2178; however, some European countries are struggling to successfully prosecute cases under the new laws.  Countries such as France and Albania adopted such legislation, for example.  In the Western Balkans, major law enforcement actions have been conducted resulting in arrests of persons allegedly returning from or intending to travel to Syria and Iraq, or facilitating and supporting such travel.  Concern about foreign terrorist fighters was also an important factor in efforts to improve border security and improve the effectiveness of traveler screening and information-sharing among law enforcement bodies.  The European Council, for example, urged the adoption of an EU Passenger Name Record system and a number of Schengen Area countries called for improvements in border security and information sharing measures under the Schengen Information System.

Individual countries implemented strategies to counter terrorism and address the foreign terrorist fighter threat, such as Norway's National Action Plan, the Netherlands' Comprehensive Program to Combat Jihadism, and Denmark's Countering Violent Extremism Action Plan.  Many strengthened programs to counter the messaging of violent extremism, stop radicalization to

PX209

violence, and thwart the recruitment efforts of ISIL and similar groups. Community groups and religious leaders played a key part in these efforts.

While taking strong action against terrorist threats internally and in the region, European countries also made important contributions to countering terrorism worldwide. Approximately 40 European countries, plus the European Union, joined the Global Coalition to Counter ISIL and participated actively in its efforts. The important efforts of France in West Africa, Spain in North Africa and the Sahel, and Denmark in Afghanistan, are representative of the counterterrorism contributions of individual European countries elsewhere in the world.

## ALBANIA

**Overview:** Albania continued to be a strong supporter of counterterrorism efforts in 2014 and joined the Global Coalition to Counter the Islamic State in Iraq and the Levant. In August and December, Albania donated a sizeable amount of weapons and ammunition for Peshmerga forces in northern Iraq. Albania is a source country of foreign terrorist fighters going to Syria and Iraq.

**Legislation, Law Enforcement, and Border Security:** Albania criminalizes terrorist acts; financing of terrorism; collection, transfer and concealment of funds that finance terrorism; conducting transactions with persons in the UN list; recruiting and training people to commit terrorist actions; incitement of terrorist actions; and establishing, leading, and participating in terrorist organizations.

In 2014, Parliament added three statutes to Albania's Criminal Code aimed primarily at strengthening the government's ability to address the problem of Albanian nationals who travel to fight in the conflict in Syria. The changes made it illegal to (1) participate in; (2) organize the participation of; or (3) call for participation in military action in a foreign country. Specifically, these statutes punish participation in "military or paramilitary organizations in an armed conflict taking place in the territory of a foreign country," unless a person is a citizen of the foreign country, a member of the armed forces of one of the parties in the conflict, or a member of an official military mission of another country or an international military organization. The statutes also cover recruiting, training, equipping, or providing funds or other material support for people participating in these military actions. Those people guilty under these statutes are subject to maximum penalties of between three years (calling for participation) and 15 years (organizing the participation) in prison. These laws came into effect on September 3.

While Albanian law enforcement actively detects and deters illicit activities related to drugs and smuggling, it has not taken an equally aggressive approach to countering potential terrorist threats. With concern about terrorism increasing in connection with foreign terrorist fighters, however, the Albanian State Police announced plans in October 2014 to expand substantially its counterterrorism unit. A significant effort will likely be needed to equip and train the unit sufficiently to achieve the necessary level of capacity to counter terrorism effectively.

Albania does not have the capacity to collect biometric data other than that contained on biometric identity cards and passports presented at border crossing points. The Department of Justice's International Criminal Investigative Training Assistance Program (ICITAP), funded by

PX209

the Department of State, provided a new information technology module to the Albanian government which gives it the capacity to incorporate online fingerprint identification functions, and is in the process of providing fingerprint scanning equipment to equip all 26 border crossing points. The border control module will allow Albanians to collect entry and exit information of international travelers.

The Customs agency has improved its performance at ports of entry and has strengthened its relationship with the Border Police.

In March, Albanian State Police acted against an alleged Syria fighter recruitment ring, resulting in the arrest of nine people for "Inciting Acts of Terrorism." Two of the arrestees were imams at mosques on the outskirts of Tirana that allegedly promote violent extremism. As of December 31, 2014, the investigation was ongoing.

Corruption, combined with a poorly functioning judicial system, continued to hinder Albania's law enforcement efforts.

**Countering the Financing of Terrorism:** The Albanian financial intelligence unit (FIU) is a member of the Egmont Group. Albania is also a member of the Council of Europe Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body.

Albania has adopted measures against persons and organizations listed by the UN as financers of terrorism, and it has established a preventive anti-money laundering/combating the financing of terrorism (AML/CFT) system that includes extended due diligence and the obligation to file suspicious transaction reports and currency transaction reports.

The FATF currently lists Albania on its list of High Risk and Non-Cooperative Jurisdictions. Since June 2012, Albania has been working with FATF and MONEYVAL to address the identified weaknesses in AML/CFT. In 2013, Albania adopted a new law against financing terrorism to comply with the FATF and MONEYVAL Recommendations and has focused on its implementation in 2014, resulting in the confiscation of approximately 10 million euros (approximately US $11,189,000), a large increase from the 213,000 euros (approximately US $241,712) confiscated in 2013.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Albania is a member of the UN, OSCE, NATO, and the Organization of Islamic Cooperation. The Albanian government participated in the Foreign Terrorist Fighters roundtable for Balkan countries hosted by the State Department on the margins of the UNGA.

**Countering Radicalization to Violence and Violent Extremism:** The Government of Albania provides financial support to the Albanian Islamic Community (AIC), the official administrative

PX209

body of the Albanian Sunni Muslim community, and actively engages it to discuss radicalization to violence and terrorist recruitment.

## AUSTRIA

**Overview:**  Austria was vigilant in its counterterrorism efforts and U.S.-Austrian law enforcement cooperation was generally strong.  Austria's Office for State Protection and Counterterrorism (BVT), the key counterterrorism agency within the Ministry of the Interior, reported that, while no specific climate for fostering terrorist attacks existed within Austria, radicalization within violent Islamist extremist groups increased.  The country's traditional, broad perception that Austria is safe from terrorist attacks was challenged by a significant rise in the number of foreign terrorist fighters from Austria headed to Syria and Iraq.  The BVT charged or monitored those returning from Syria, as well as other potentially violent radicalized individuals among second- and third-generation Muslim immigrants.  Continued concerns over data privacy protection, amplified by public debate about suspected NSA locations and activities in Austria, slowed the implementation of counterterrorism legislation and agreements in some cases.

Austria is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL) and has taken a whole-of-government approach to implement UN Security Council Resolutions 2170 and 2178 as well as Global Counterterrorism Forum (GCTF) good practices on foreign terrorist fighters.  Throughout 2014, the Ministries of Interior, Justice, and Foreign Affairs have increased enforcement and engagement to counter incitement of terrorist acts motivated by extremism and combat the problem of foreign terrorist fighters, with law enforcement agencies focusing on intelligence gathering and investigations and Integration officials (within the Ministry of Foreign Affairs) focusing on public outreach and engagement to prevent radicalization to violence.

The BVT estimated the number of Austrians fighting in Syria and Iraq at approximately 160, predominantly of Chechen, Turkish, and Balkan origin.  Twenty-five are suspected to have been killed in Syria, while an estimated 60 have returned to Austria.  Formal criminal investigations have been launched against 117.  In December, a prosecutor submitted the first terrorism court case in Austria specifically against an ISIL sympathizer accused of membership in ISIL and of financial support to Syrian fighters.

**Legislation, Law Enforcement, and Border Security:**  Austria has a broad legal framework to combat terrorism.  Relevant statutes criminalize training in terrorist camps abroad and allow wiretapping of individual suspects or small groups with the permission of an independent judge or ombudsman.  Plans for structural reform of Austria's CT-agency BVT were being discussed by the end of 2014.

The Austrian Parliament passed additional counterterrorism legislation in December (effective January 1, 2015) to enhance existing counterterrorism laws.  The counterterrorism legislation amends existing law on the use of symbols and prohibits the use and distribution of symbols attributable to ISIL, al-Qa'ida, and any organization linked to these groups.  Limited exemptions

PX209

from these restrictions apply to media coverage, films, theater, and exhibits, provided that they do not serve to propagate the ideology of a terrorist organization.

As part of the same legislative package, an amendment to the border control law allows border authorities to confirm that minors have received parental permission to leave Austria when there is a suspicion that the minors are traveling to participate in fighting activities abroad.  Border authorities are empowered to deny departure to a minor and withhold his or her passport until an investigation is complete.  An amendment to the Austrian citizenship law allows authorities to withdraw citizenship from an Austrians who voluntarily and actively participates in fighting in an armed conflict if the individual holds a second citizenship.

Law enforcement officials have increased surveillance and arrests, with the most significant being the November 28 arrests of 12 suspects in a nation-wide series of raids involving 900 police officers in raids against 40 locations in various Austrian cities.  The key suspect, Vienna-based ISIL sympathizer Mirsad Omerovic, alias Ebu Tejma, is being held in pre-trial detention.  In December, the BVT also created an office for tracking and reporting radical content on the internet.  The BVT then passes this information on to social media providers, such as Google or Facebook, with an official government request to delete the content.

In reaction to the challenge of foreign terrorist fighters during 2014, law enforcement agencies called for expanded police powers to monitor foreign terrorist fighter suspects more effectively.  Under current law, police must delete all data collected on a violent extremist suspect after nine months if it cannot be proven that the monitored suspect committed any violations.  This data would not be available in the event that police reopen an investigation.  Austria's Ministers for Interior and Justice have pressed for amended legislation to extend data retention provisions.

Border security forces make effective use of security measures including biographic and biometric screening capabilities at ports of entry and information sharing internally and with other EU countries.  Border security officials at ports of entry have discretion when determining those documents and passengers subject to screening on arrival.

Austrian law enforcement routinely cooperated in investigative areas with U.S. law enforcement, from the informal sharing of preliminary investigative information to joint, multilateral investigative projects and enforcement operations.

**Countering the Financing of Terrorism:**  Austria is an active member of the Financial Action Task Force (FATF) and has developed comprehensive anti-money laundering/combating the financing of terrorism (AML/CFT) legislation, including the enactment of a new Sanctions Act; undertaken reforms of the financial intelligence unit operational procedures and supervisory framework; developed and published secondary legislation (regulations), thematic and sectorial guidelines, and explanatory notes.  Austria is also a member of the Egmont Group, a global association of financial intelligence units.

The Austrian Parliament approved the bilateral agreement with the United States on the Foreign Account Tax Compliance Act (FATCA) in October, and pertinent formalities for the law to become effective were concluded by the end of 2014.  Under the agreement, Austrian banks will

PX209

require U.S. citizens resident in Austria to waive bank secrecy and allow the exchange of account information with the United States.

Non-profit organizations are not required to file suspicious transaction reports as part of their license to operate or as a matter of law.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Austria is a member of various regional security platforms, including the OSCE, the Salzburg Forum, and the Central European Initiative, which it chaired in 2014. Austria regularly leads law enforcement training programs with Salzburg Forum countries and the Balkan states.

**Countering Radicalization to Violence and Violent Extremism:** Austria continued efforts to counter violent extremism, largely in response to the foreign terrorist fighter phenomenon as detailed above. In addition, the Austrian government undertook or continued several other initiatives. The Integration Office within the Foreign Ministry, in cooperation with the Islamic faith community, released a flyer addressing misinterpretation of the Quran by violent extremists.

The Ministry of Foreign Affairs, in cooperation with the Islamic Faith Community undertook an information campaign in mosques, Islamic organizations, and community centers that includes education outreach to the majority population to differentiate between Islam and what Austria describes as jihadism, or violent extremism. In November, the Austrian government opened a counseling center and a de-radicalization hotline, aimed at friends and family members of potential violent extremists

The Austrian government is in the process of revising the existing 1912 Law on Islam, updating the rights and responsibilities of the Islamic communities. The law would further formalize Islam's place within Austria and contain provisions related to religious education, pastoral care in hospitals and prisons, afford some recognition of Islamic holidays, and formalize some Islamic traditions.

## AZERBAIJAN

**Overview:** Azerbaijan maintained its strong counterterrorism cooperation with the United States and actively opposed terrorist organizations seeking to move people, money, and material through the Caucasus. The country remained focused on its counterterrorism efforts, to include prosecuting numerous individuals under statutes related to terrorism, confiscating sizeable quantities of illegal arms and munitions, and seeking to arrest foreign terrorist fighters returning to Azerbaijan from conflicts abroad. Azerbaijan also amended its law on terrorism to stiffen penalties for involvement in foreign mercenary activity.

PX209

Azerbaijan indicated its willingness to counter the Islamic State in Iraq and the Levant (ISIL) by continuing to share information and working to disrupt the flow of foreign terrorist fighters to Iraq and Syria and of illicit funding to support violent extremist groups there. Influential figures, including the heads of the Caucasus Muslim Board and the State Committee for Work with Religious Associations, undertook efforts to counter ISIL ideology publicly.

**Legislation, Law Enforcement, and Border Security:** Azerbaijan continued to use counterterrorism legislation, first adopted in 1999, that governs the investigation and prosecution of individuals who have committed or plan to commit terrorist acts. The Ministry of National Security is primarily responsible for combating terrorism, although the Ministry of Internal Affairs also plays a role as the country's primary law enforcement entity. Both ministries effectively demonstrated the ability to detect and deter terrorist activities, as well as prosecute foreign terrorist fighters returning to Azerbaijan. Azerbaijani law enforcement officers participated in the Department of State's Antiterrorism Assistance program and received technical training in counterterrorism skills.

Authorities demonstrated a capability to effectively use watch lists and biographic/biometric information at ports of entry. Information sharing within the host government and with other countries was strong. Collection of advance passenger name records on commercial flights was possible.

Authorities also amended the law on terrorism in April 2014, increasing penalties for fighting as a mercenary or recruiting or sponsoring mercenaries, specifically designed to counter Azerbaijani citizens' involvement in groups such as ISIL.

Significant law enforcement actions related to counterterrorism included:

- On June 20, the Ministry of National Security announced that it had detained 18 violent extremists in Baku's Badamdar neighborhood. Authorities stated the individuals were becoming radicalized and showing indications of carrying out violent activity and potentially travelling to Syria.
- On September 23, the Ministry of National Security announced that it had arrested 26 individuals who had fought as foreign terrorist fighters outside Azerbaijan, many as ISIL-affiliated terrorists in Syria and Iraq.
- On December 1, authorities carried out a counterterrorism operation following an attack on a Baku mosque, one of the perpetrators of which was alleged to have fought with a Kurdish militia against ISIL in Syria.

**Countering the Financing of Terrorism:** Azerbaijan is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body. Azerbaijan has increased its professionalism in anti-money laundering/countering the financing of terrorism (AML/CFT) since 2009, when it adopted AML/CFT legislation. This legislation created a financial intelligence unit, the Financial Monitoring Service (FMS), and imposed the necessary obligations on financial institutions to conduct customer due diligence and report suspicious

PX209

transactions to the FMS.  Institutions from outside the formal financial sector that conduct monetary operations, however, are often not required to report, which presents vulnerabilities.

In order to bring Azerbaijan's legislative framework into conformity with international standards, including those of the UN, the EU, and the FATF, Azerbaijan continued to implement MONEYVAL recommendations to address AML/CFT issues.  The U.S. government has been one of the FMS' leading partners since its formation, currently working through Treasury and the FDIC to provide technical assistance and training to the Prosecutor General's Office and others to improve enforcement capabilities.  USAID also previously supported these efforts.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Azerbaijan remained an active member of the OSCE, the Organization of Islamic Cooperation, and other regional organizations.  Azerbaijan also continued to work with NATO on counterterrorism initiatives.  Additionally, Azerbaijan took part in working group meetings of Caspian Sea littoral states to coordinate law enforcement efforts aimed at combating terrorism as well as smuggling, narcotics trafficking, and organized crime.

**Countering Radicalization to Violence and Violent Extremism:**  In response to reports of growing Sunni Salafi movements, as well as evidence of numerous Azerbaijani citizens fighting in Syria and Iraq, Azerbaijani officials made attempts to counter domestic radicalization to violence and violent extremism.  Specifically, authorities sought to bring mosques under greater control by installing cameras inside, replacing Salafi clerics with moderate leaders, forbidding Salafis from taking leadership roles in mosques, banning books promoting extremist views, and increasing control over public television.  These methods sometimes failed to distinguish between persons who incited violence and persons who rejected violence but sympathized with some of the philosophical goals of various political movements.  Additionally, government leaders regularly spoke out against radicalism, and frequently pledged to combat the political influence of radical groups and to undermine such groups' ability to obtain financial support.

## BELGIUM

**Overview:**  Belgian authorities maintained an effective counterterrorism apparatus that was overseen by the Ministries of Interior and Justice in 2014.  They continued to investigate, arrest, and prosecute terrorism suspects and worked closely with U.S. authorities on counterterrorism matters.  The Belgian government has formed a task force focused on countering radicalization to violence and developed a national strategy to address the issue.

The new coalition government, which assumed power in October, announced a number of new measures aimed at disrupting the significant number of Belgian foreign terrorist fighters who have traveled to Syria and Iraq.  These include strengthening and enforcing legislation that would prohibit traveling abroad to participate in armed groups, and stripping dual nationals of their Belgian citizenship if they are convicted of these or other terrorism crimes.  Belgian

PX209

officials announced stricter enforcement of regulations that allow them to prohibit passport issuance of or revocation of passports to disrupt the travel of suspected foreign terrorist fighters.

As one of the leading countries of origin for foreign terrorist fighters in Europe, Belgium has focused efforts on identifying, disrupting, and decreasing the flow of foreign terrorist fighters. According to Belgian government statistics, of the estimated 358 foreign terrorist fighters of Belgian origin, approximately 47 have been killed and 87 have returned to Belgium. Both the Ministry of the Interior and the Coordination Unit for Threat Analysis (OCAM) continued their implementation of new strategies to address the foreign terrorist fighter problem in 2014. A December 2013 study by the International Centre for the Study of Radicalization estimated that Belgium has the highest per capita number of Syrian foreign terrorist fighters of any European country.

Belgium is an active member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL), conducting air strikes and sending support personnel to the campaign against ISIL in Iraq. On December 18, the Council of Ministers approved the extension of the mission through June 30, 2015, as well as the deployment of up to 50 military trainers to Iraq in 2015. The number of personnel and length of the training mission will be determined based on a Ministry of Defense needs assessment.

**2014 Terrorist Incidents:** On May 24, a shooter killed four individuals at the Brussels Jewish Museum. Mehdi Nemmouche, a French-Algerian dual national arrested by French authorities a few days later near Marseilles, is the key suspect in the shooting. He was extradited to Belgium on July 30 and was in prison awaiting trial at year's end. In early December, the French police arrested five additional individuals in Marseilles for their alleged participation in helping prepare for the Brussels Jewish Museum attack. Nemmouche reportedly fought in Syria with ISIL from December 2012 through March 2014.

**Legislation, Law Enforcement, and Border Security:** The Belgian government continued to make use of counterterrorism legislation that was reinforced in 2003 to provide authorities with enhanced powers to investigate and prosecute terrorist suspects. On October 13, the Belgian government took the final step to implement the Prevent and Combating Serious Crime (PCSC) Agreement with the United States by publishing a royal decree in the country's official register.

Following the May 25 general elections, a new federal government was sworn in on October 11. The government's coalition agreement proposed a number of measures to be taken in the fight against violent extremism. The new ministers were in the process of drafting legislation at year's end.

Belgian law enforcement units can capably detect, deter, and respond to terrorist incidents. The primary actors in this apparatus are the Belgian Federal police and its counterterrorism division, the Civilian and Military Intelligence Services, Office of the Federal Prosecutor, and the Crisis Unit. The Inter-Ministerial Coordination Unit for Threat Analysis plays a coordinating role, particularly with regard to foreign terrorist fighters.

PX209

Belgium worked closely with other Schengen zone states and Turkey to improve efforts to share information and interdict prospective foreign terrorist fighters traveling to Syria, including increasing border checks aimed at disrupting and decreasing the flow of the fighters.  All new Belgian passports contain biometric data.  Belgium has advocated for more systematic screening by partners at Schengen borders; of the approximately 20,000 asylum applications filed in Belgium in 2014, 94 percent were made at local offices in Belgium rather than at ports of entry into the country.  Belgian officials have expressed concern that 80 percent of the approximately 10,000 unsuccessful asylum applicants simply disappear rather than accepting assistance to return to their country of origin.

Significant law enforcement and judicial actions related to counterterrorism included:

- On September 29, the trial began in Belgium's largest terrorism trial ever, against the "Sharia4Belgium" organization founder Fouad Belkacem (aka Abu Imran) and 45 other organization members, some in absentia, on various terrorism-related charges.  A verdict had not been issued at year's end.
- On October 14, a Brussels Court handed down sentences to Rachid Benomari, Mohamed Said, and Mustapha Bouyahbaren for their participation in al-Shabaab activities in Somalia in 2011 and 2012.  Benomari was sentenced to 18 years in prison, Said received a five-year sentence, and Bouyahbaren received a five-year suspended sentence.  The three have appealed the ruling.
- On May 21, a Brussels Court sentenced 19 terrorist suspects for their active or passive participation in al-Shabaab activities in Somalia.
- On December 17, the Hof van Cassatie (Supreme Court) partially overturned the January 2014 appellate court ruling against the so-called Hamdaoui cell, also known as the "Sint-Jans Square Gang."  Hassan Hamadoui and other members of his cell were accused of participating in extremist chat rooms, of plotting possible terrorist attacks in Belgium, and of traveling to fight in Chechnya; all received prison sentences ranging from five to eight years.  Hamdaoui's appeal was rejected by the Hof van Cassatie and his 12-year sentence affirmed, but seven of his accomplices were granted a new trial because the prosecution failed to translate evidence and other documents into Flemish, as required by court procedures.

**Countering the Financing of Terrorism:**  Belgium is a member of the Financial Action Task Force (FATF) as well as the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a FATF-style regional body.  Belgium's financial intelligence unit, the Cellule de Traitement des Informations Financieres (CTIF), is tasked with tracking and investigating reports of financial crimes, including money laundering and terrorist financing, and has broad authorities under Belgian legislation to conduct inquiries and refer criminal cases to federal prosecutors.  Belgium is also a member of the Egmont Group, a global association of financial intelligence units.  According to the 2013 CTIF annual report (the most recent report), of the 1,168 financial crimes cases that CTIF referred to prosecutors, only 25 (2.14 percent) were connected to possible terrorist and/or proliferation financing, a slight increase from the previous year (1.32 percent).

PX209

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Belgium continues to be a leader in regional cooperation and information exchanges, and the agreement among the parties in the new coalition government specifically refers to the importance of sharing information as a component in combating violent extremism.  Belgium participates in EU, NATO, OSCE, and Council of Europe counterterrorism efforts, and is a member of the advisory board of the UN Counterterrorism Center.  In December 2013, former Belgian Interior Minister Joelle Milquet hosted a ministerial meeting of her counterparts from EU member states affected by the foreign terrorist fighter problem.  EU officials and representatives of the United States worked to develop additional areas of cooperation in border controls, radicalization prevention, and information sharing.  In May 2014, Belgium hosted a follow-up meeting that was expanded to include officials from Turkey, Jordan, Morocco, and Tunisia.

As an EU member state, Belgium has contributed trainers and capacity building expertise to EU counterterrorism assistance programs in Sahel countries, including the Collège Sahélien de Sécurité; and the Belgian Federal Police have provided training to counterparts in the Maghreb.

Belgium is not a member of the Global Counterterrorism Forum (GCTF) but has participated in GCTF workshops.  Belgium is implementing UN Security Council Resolutions 2170 and 2178 to mitigate the threat posed by foreign terrorist fighters and to restrict terrorist financing.

**Countering Radicalization to Violence and Violent Extremism:**  Countering violent extremism (CVE) remains a high priority for the Belgian government.  The government has identified unemployment, alienation, and discontentment as potential drivers of radicalization to violence in some communities.

Belgian government support for projects such as the city pair program between Columbus, Ohio and Vilvoorde is designed to facilitate positive community engagement between the government, police force, and the Muslim community.  The city pair program allowed for community leaders to exchange best practices in countering violent extremism and improving integration, thus providing unprecedented access to the municipal services and local minority community of Vilvoorde.  Based on this exchange, Vilvoorde officials hope to create law enforcement and community advisory groups, similar to the DHS Civil Rights and Civil Liberties/FBI roundtable for the Somali community; to begin diversity training for law enforcement; to develop online counter-narratives to ISIL propaganda; to establish teacher and student exchanges that focus on cross-cultural education and sensitivity training; to design positive media campaigns for Muslims; and to found a Citizens Academy for the Belgian police force, modeled after U.S. programs.

OCAM's "Plan R" (Action Plan Against Radicalization) promotes a series of measures designed to address radicalization to violence in Belgium, including the exchange of best practices between agencies and regions, the refusal of visas to extremist preachers, the increased financial screening of Belgian extremists, the watchlisting of foreign terrorist fighters, and the facilitation

PX209

of contact between social services and the families of foreign terrorist fighters and returnees.  OCAM has also worked to develop better cooperation with the prison system, and now has plans for a prison de-radicalization program based on community policing models.

Among the components of the government's strategy on preventing radicalization to violence is an effort to counter extremist messaging on the internet. The Ministry of Interior is working to increase cooperation with the internet industry in Belgium, working with the big five internet providers to suppress violent extremist content.

The government counter-radicalization strategy includes an interagency effort to support local government actors who work with returnees from Syria and Iraq to monitor their reintegration into society and provide them with guidance and support.  The new government has suggested it may link the receipt of social services for returnees and their families to mandatory participation in de-radicalization programs.

## BOSNIA AND HERZEGOVINA

**Overview:**  Bosnia and Herzegovina (BiH) remained a cooperative counterterrorism partner and continued to make slow progress in increasing its counterterrorism capacity in 2014.  BiH law enforcement agencies generally keep close track of foreign terrorist fighter suspects in BiH and have carried out operations against them, although internal cooperation needs to improve.  BiH's Joint Terrorism Task Force, tasked with improving coordination between BiH's many security and police agencies to better counter potential terrorist threats, has faltered significantly over the last year.  Islamist extremist ideology and regional nationalist extremist groups both remain potential sources of violent extremism in BiH.

BiH has seen a significant number of its citizens travel to Syria and Iraq over the last year.  In August, the BiH government began to consider a proposal to donate ammunition to the Government of Iraq to assist in its counter-Islamic State in Iraq and the Levant (ISIL) efforts.  In November 2014, BiH joined the Global Coalition to Counter ISIL and in December sent its Foreign Minister to Brussels to participate in the U.S.-led coalition ministerial.

**Legislation, Law Enforcement, and Border Security:**  BiH does not have a comprehensive counterterrorism legal framework, but in July, Parliament enacted the first "foreign terrorist fighter" law in the Balkans region in an effort to discourage BiH citizens from participating in foreign paramilitary groups.  The bill, which does not address BiH citizens who serve in the armed forces of internationally-recognized countries, criminalizes organizing, managing, training, equipping, or recruiting individuals or groups of people to fight abroad, and joining paramilitary groups and imposes both imprisonment and monetary fines.

Much of BiH's coordination and cooperation issues are caused by overlapping law enforcement jurisdictions.  The problem is also the result of personal, political, and institutional rivalries that exist among most police agencies as well as with the BiH Prosecutor's Office and BiH Court.  Many of these rivalries are deeply ingrained and difficult to overcome.

PX209

In October and November, BiH authorities arrested a combined total of 27 suspects in two separate actions under "Operation Damascus," which targeted BiH citizens who went to fight in Syria and Iraq as well as those who supported them or aided them in their efforts.

On September 4, Bosnian authorities, in cooperation with Italian authorities, arrested in BiH Bilal Bosnic, a Cremona preacher, and another 15 activists, seizing large quantities of weapons. Bosnic was accused of having recruited and funded foreign terrorist fighters sent to Syria and Iraq.

On terrorism-related prosecutions, in October, the BiH Appeals Court ordered a new trial for Haris Causevic, who was convicted in 2013 of a terrorist act and sentenced to 45 years in prison for the June 2010 bombing of a police station in Bugojno, which killed one police officer and injured six others. The Appeals Court agreed with the defense that the first panel had prevented it from calling additional witnesses and ordered a new trial. The case will not be re-tried in whole, but only the parts where the defense can call these witnesses. This is the second time since 2013 that a court has overturned a terrorism case on appeal.

To track entries into BiH, the BiH Border Police (BP) use a computerized database and software system to support immigration and passenger information collection. The system links all 55 border crossings and all four airport locations (Sarajevo, Tuzla, Mostar, and Banja Luka) via the State Police Information Network, a network developed and donated by the Department of Justice's International Criminal Investigative Training Assistance Program (ICITAP), funded by the U.S. Department of State. Both the BP and the Foreigners Affairs Service (FAS) field offices are connected to this system. It provides the BP and FAS with immediate access to other supporting databases (including Interpol) to run appropriate checks and cross-checks. All law enforcement agencies in BiH have the capability to add data into this system, and any derogatory information will come up as a "hit" when a subject's passport or BiH identification card is passed through the scanner at the point of entry. The BP has both legal authority and physical facilities at border crossings to detain individuals for up to 24 hours while they consult with SIPA and the BiH Prosecutor's Office regarding next steps regarding questionable individuals.

Through the Department of State's Antiterrorism Assistance program, Bosnian law enforcement received training in instructor development, critical incident management, and management of antiterrorism curricula.

Separately, ICITAP is working with the FAS to provide a biometrics system that will permit it to better monitor individuals entering and leaving BiH. This system is compatible with EU systems, and BiH has now met the requirements to share biometrics data with the EU. ICITAP is also helping to upgrade the existing Emergency Operation Center at the BiH Ministry of Security. In the event of a terrorist attack, these centers would be able to work together to ensure that required resources are made available anywhere in BiH. ICITAP, with Department of State funding, is also assisting with the construction of mobile command posts which can respond to the scene of any disaster and coordinate responses.

**Countering the Financing of Terrorism:** BiH belongs to the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism

PX209

(MONEYVAL), a Financial Action Task Force (FATF)-style regional body, which in 2014 expressed concerns that BiH needed to improve its laws to better deter and detect money laundering and terrorist financing.  BiH is also a member of the Egmont Group, a global association of financial intelligence units.

The new law on Prevention of Money Laundering and Terrorism Financing created a financial investigation department within the government that is empowered to forward information and data to appropriate authorities concerning money laundering and funding of terrorist organizations.   The bylaws and amendments to Criminal Code had not been implemented as of the end of 2014.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  BiH's criminal code and related legal framework are generally harmonized with UN and EU counterterrorism standards. In September, BiH voted to support UN Security Council Resolution 2178, which requires countries to take certain steps to address the foreign fighter threat.  The Bosnian government participated in the Foreign Terrorist Fighters roundtable for Balkan countries hosted by the State Department on the margins of the UNGA.

BiH law enforcement agencies regularly interact with their U.S. and European counterparts on counterterrorism investigations. Interpol has a Sarajevo branch office that enjoys good cooperation with all law enforcement agencies throughout the country, all which have direct access to its databases.  Regional cooperation at the professional law enforcement level with Croatia and Serbia improved in 2014.

**Countering Radicalization to Violence and Violent Extremism:**  The main religious communities in BiH (Islamic, Orthodox, Catholic, and Jewish) continued to work together through the Interreligious Council to promote tolerance and confront acts of bigotry or extremism directed at any of the communities.  Among public figures, the leader of the Islamic Community in BiH, Reis Kavazovic, continued to speak out against "misinterpretations of Islam" that lead to extremist violence, and the Bosniak Member of BiH's Tri-Presidency, acting in his capacity as a political party leader, issued a statement in October that was sharply critical of ISIL and condemned those who support it.  In academia, a noted professor from the faculty of Islamic Sciences at the Center for Advanced Studies in Sarajevo published a piece in Bosnia's leading daily newspaper in November, condemning the ISIL terrorist organization.

## BULGARIA

**Overview:**  Continued migration of asylum seekers from Syria to Bulgaria as well as increasing evidence of the transit of foreign terrorist fighters through Bulgaria raised the country's counterterrorism profile in 2014.  In response, the Government of Bulgaria has worked to enhance its prevention and enforcement tools, including new foreign terrorist fighter legislation

PX209

and the development of a National Counter Terrorism Center.  Bulgaria is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).

The Prosecution Service promised indictments in early 2014 against defendants in the 2012 airport bus bombing case in Burgas, but they had not been issued by year's end.

U.S. agencies maintain a regular exchange of counterterrorism information with various entities within the Bulgarian government and assisted it to detect and react to terrorist threats within Bulgaria.

The Ministry of Interior and State Agency for National Security have responded strongly to evidence of possible domestic support for ISIL.  In November, police arrested a group of Muslim men from Roma communities in the Pazardjik area for inciting war and anti-democratic activities.  The men are followers of a controversial imam who posted pictures online of himself and some of his followers wearing clothing and holding a banner imprinted with the ISIL logo.

The Ministry of Foreign Affairs has designated a Counterterrorism Coordinator, who is a key point of contact for Post on issues like foreign terrorist fighters.

**Legislation, Law Enforcement, and Border Security:**  Bulgaria prosecutes suspected terrorists under several general provisions of the Penal Code but lacks a comprehensive counterterrorism legal framework.  In 2014, the Minister of Justice introduced a new Penal Code which included updated counterterrorism statutes.  The draft was not passed before the government fell and parliament was dissolved.  With the arrival of a new government in November, the future of reforms to the code is unclear.

Law enforcement cooperation between U.S. agencies and their Bulgarian counterparts has historically been strong.  However, the previous government reshuffled and reorganized key police units, and the resulting reassignment of personnel and imposition of new rules slowed joint casework.  The new administration has promised to reverse many of the changes.

The Interior Ministry has operational units responsible for deterring, detecting, and responding to incidents, including the Specialized Unit for Combating Terrorism (SOBT), Security Police, and Special Police Forces.  Specialized law enforcement units are properly equipped and supported with relevant training but lack resources in regional areas where the terrorism threat appears strongest.

The influx of asylum seekers in 2014, primarily from Syria, put significant strain on law enforcement.  The Interior Ministry reassigned scores of local police to the border area to assist the besieged border police.  The result has been increased deterrence against illegal border crossings but significantly less capacity for other law enforcement issues.

The establishment of the National Counterterrorism Training Center (NCTC) in 2014 provides the first inter-ministerial standing task force to develop law enforcement sensitive watch lists, coordinate between law enforcement and security services on counterterrorism checks and incidents, and build a common operating picture of the threats to national leadership facing

PX209

Bulgaria.  Officials at the center will have the ability to receive and provide information to border guards, customs officials, counterterrorism officials, intelligence officers, and the police.  The center has also served as a taskforce center when coordinating inter-ministerial counterterrorism operations.  Through Regional Strategic Initiative-funded Antiterrorism Assistance program support in counterterrorism skills and other initiatives, the Department of State provided technical training to NCTC staff and worked with them to develop a national counterterrorism strategy.

**Countering the Financing of Terrorism:**  Bulgaria belongs to the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL).  Bulgaria is also a member of the Egmont Group, a global association of financial intelligence units.  The Financial Intelligence Directorate of the State Agency for National Security (FID-SANS) has primary responsibility for anti-money laundering measures for all reporting entities.  The Bulgarian National Bank (BNB) also has a Special Supervision Directorate to investigate banks for compliance with money laundering and terrorist financing requirements.  Although reporting by non-bank institutions, such as gaming entities, investment intermediaries, notaries, non-profit organizations (NPOs), and leasing companies has increased, it remained low.  FID's resources remained limited, particularly with respect to performing onsite inspections in non-banking institutions.  Publicly available information on persons who own, control, or direct the activities of NPOs was not consistently maintained.  In 2014, the government did not identify, freeze, seize, or forfeit any terrorism-related assets.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Bulgaria is a member of and active contributor to counterterrorism initiatives at the UN, EU, Council of Europe, OSCE, Organization for the Black Sea Economic Cooperation, and NATO.  Law enforcement officials benefit from joint investigations and training opportunities with international partners.  Bulgaria's aforementioned participation in GCTF activities is an example of this contribution.

**Countering Radicalization to Violence and Violent Extremism:**  The Grand Mufti of Bulgaria issued a statement and, along with the National Council of Religious Communities in Bulgaria, adopted a decree condemning ISIL and its violent activities.  The Grand Mufti has been a voice of tolerance and moderation but he has complained that the Government of Bulgaria is not a strong enough partner in this effort.

## CYPRUS

**Overview:**  The Government of the Republic of Cyprus collaborated closely with the United States, the EU, and other countries – bilaterally and multilaterally – in international counterterrorism efforts in 2014.  In March, the Cypriot Supreme Court rejected the appeal against the Criminal Court's 2013 conviction of Hossam Yaacoub Taleb, a Lebanese Hizballah operative, for conducting surveillance activities on Israeli targets in Cyprus.

PX209

Cyprus' counterterrorism partnership with the United States included regular, routine protection for transiting U.S. military personnel, aircraft, and naval vessels throughout 2014; and participation in the Department of State's Antiterrorism Assistance and Regional Strategic Initiative programs, which strengthened the government's capacity to counter terrorism.

Since 1974, Cyprus has been divided de facto into the Republic of Cyprus government-controlled area, composed of the southern two-thirds of the island, and a northern third, administered by the Turkish Cypriots. The Republic of Cyprus government does not exercise effective control over the area administered by the Turkish Cypriots.  In 1983, the Turkish Cypriots declared the northern part an independent "Turkish Republic of Northern Cyprus (TRNC)."  The United States does not recognize the "TRNC," nor does any country other than Turkey.  The UN Peacekeeping Force in Cyprus patrols the buffer zone separating the two sides, but people, narcotics, and other illicit goods routinely cross uncontrolled.

Turkish Cypriots lacked the legal and institutional framework necessary to counter money laundering and the financing of terrorism effectively. Within these limitations, however, Turkish Cypriots cooperated in pursuing specific counterterrorism objectives.

Cyprus is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).  In October, the government approved French civil aviation authorities' request to access Paphos airbase to support humanitarian operations in Iraq.  The government began an interagency review of its legal framework for addressing foreign terrorist fighters, including a review of its 2010 counterterrorism law to begin to implement UN Security Council Resolution 2178.  Cyprus police have conducted a seminar on the foreign terrorist fighters issue.  In September 2014, the police investigated five people for possible facilitation of travel to conflict areas abroad, but nothing suspicious was revealed.

**Legislation, Law Enforcement, and Border Security:**  The Cypriot government has not yet tried a case under the 2010 National Law on Combating Terrorism, but has used the criminal code to prosecute terrorism-related offenses; for example, the prosecution pursued criminal charges against Yaacoub for his surveillance activities of Israeli tourist targets in Cyprus.  In March 2014, the Cypriot Supreme Court upheld the Yaacoub convictions for participation in a criminal organization, participation and acceptance in committing a crime, and money laundering.  In November 2014 Yaacoub, a Swedish national of Lebanese origin, completed his criminal sentence and was escorted to Sweden.  Cypriot law enforcement continued to develop the capacity to detect, deter, and respond to terrorist incidents, under the coordination of the National Counterterrorism Coordinator with a specialized antiterrorist squad in the Cyprus National Police's (CNP's) Emergency Response Unit.

In 2014, the Council of Ministers approved a new National Counterterrorism Strategy for the Republic of Cyprus, based on the four pillars of the corresponding EU strategy:  "Prevent, Pursue, Protect, and Respond."  Cyprus began participating in the newly-established Europol Data Fusion Center to help identify potential terrorist threats, strengthened security measures at borders and crossing points, and advocated adoption of an EU Directive on Passenger Name Records.  U.S. training programs and analytic exchanges strengthened the capacity of Cypriot law enforcement to detect surveillance and prevent attacks on airports, bus, and rail systems.

PX209

CNP continued a screening watchlist mechanism. On the CNP's Counterterrorism Office watchlist, among others, are all persons subject to travel bans and asset freezing sanctions by UNSCRs and EU decisions concerning terrorism. In cooperation with FRONTEX Eurosur Program, the CNP has also conducted training programs concerning false and falsified document detection, border security processing techniques, and recognition of foreign terrorist fighters at sea and airports.

**Countering the Financing of Terrorism:** Cyprus is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force-style regional body. Cyprus' financial intelligence unit (FIU), the Unit for Combating Money Laundering (MOKAS), is a member of the Egmont Group.

The Republic of Cyprus government implemented new UNSCR 1267/1989 (Al-Qa'ida) and 1988 (Taliban) sanctions listings and informally tracked suspect names listed under U.S. Executive Orders (EO), including EO 13224. In June, the Council of Ministers proposed new legislation criminalizing and establishing penalties for circumvention of UN or EU sanctions, including terrorist financing. The proposal, which was pending before the House of Representatives at year's end, aims to criminalize infringements of UNSCRs and relevant sanctions adopted by the EU, as well as impose effective, proportionate, and dissuasive penalties.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** In addition to hosting and participating in OSCE counterterrorism programs, Cyprus participated in counterterrorism initiatives of the UN and the Global Initiative to Combat Nuclear Terrorism. The Ministry of Foreign Affairs attended meetings of the Working Group on the External Aspects of Terrorism of the Council of the EU, an ad hoc working group on Lebanese Hizballah's military wing, and a regional conference on foreign terrorist fighters.

**Countering Radicalization to Violence and Violent Extremism:** Cyprus continued to participate in the EU Commission's Radicalization Awareness Network meetings, with particular focus on the health, police, and prison sectors. The government exchanges best practices with partners on addressing terrorists' internet recruitment efforts. The Police's Counterterrorism Office conducted training of first line police officers and prison employees about radicalization to violence.

# DENMARK

**Overview:** The Kingdom of Denmark (Denmark, Greenland and the Faroe Islands) has devoted significant assets to counterterrorism programs, as well as to initiatives to counter violent extremism in Denmark and abroad. Denmark continued to cooperate closely with the United States, the UN, and the EU on specific counterterrorism initiatives, such as the Global

PX209

Counterterrorism Forum (GCTF).  Denmark remained a prominent target for global terrorist groups, including al-Qa'ida, due in part to the crisis that began in 2005 when the Danish newspaper *Jyllands-Posten* published political cartoons depicting the Prophet Muhammad with a bomb, and because of Denmark's ongoing counterterrorism efforts, including involvement in the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).  No large-scale terrorist attacks occurred within Denmark in 2014.

The Danish Security and Intelligence Service (PET) estimated that at least 110 Danish citizens and residents have voluntarily left Denmark to fight in Syria and Iraq, a significant number of whom have likely fought on behalf of ISIL.  Danish security services have focused on addressing the issue of foreign terrorist fighters and monitoring the individuals who have returned; there is concern that Danish fighters could return to Denmark with terrorist training and seek to radicalize others.

Denmark has contributed air strikes, military personnel, and trainers to the Global Coalition to Counter ISIL.

Denmark introduced a national countering violent extremism (CVE) action plan in September 2014 and has already allocated approximately $10 million to CVE efforts.

**Legislation, Law Enforcement, and Border Security:**  Denmark continued to use its terrorism legislation from 2006, which allows greater information sharing between Denmark's two intelligence services, the Danish Security and Intelligence Service (PET) and the Danish Defense Intelligence Service (DDIS).   The legislation also permits official surveillance and wiretapping of terrorist suspects with a valid warrant and sufficient evidentiary proof.

In addition to the Danish National Police, the two Danish agencies most involved in countering terrorist threats in Denmark are PET and DDIS.  Danish security and law enforcement organizations have adequate information sharing, thanks to the Danish government's Center for Terror Analysis (CTA), which was established to share information between PET, DDIS, the Ministry of Foreign Affairs and the Danish Emergency Management Agency.

Denmark continued to support border security via travel document checks for non-Schengen Area travel; has biographic and biometric screening capabilities at ports of entry; shares information within its own government and with other countries as appropriate.  Security forces patrol and control Denmark's land and maritime borders.  Additionally, Denmark has a very competent Customs and Tax Authority (SKAT).  As a member of the Schengen Agreement, Denmark has open borders with its EU neighbors and there are no passport controls at the land borders or in the airport terminals servicing most Schengen Visa area flights.

Counterterrorism-related law enforcement actions include:

- In October, Moroccan-born Danish citizen Sam (formerly Said) Mansour, commonly known as ''the Bookseller from Bronshoj'' was charged with promoting terrorist propaganda.  Mansour was convicted and on December 4, sentenced to four years in prison.  Mansour had previously been sentenced, in April 2007, to three-and-a-half years

PX209

in prison for producing and distributing graphic videos encouraging participation in violent extremism.

- On October 22, 11 Danish citizens of Kurdish origin were found not guilty of financing terrorism. Their trial began in September 2013. The men, aged 29-73 years, were accused of having collected approximately $23 million for the Kurdistan Workers' Party (PKK), which is designated as a terrorist organization in Denmark. The defendants had allegedly channeled money to the PKK through the Kurdish-language broadcast station Roj TV. The defendants were acquitted on the grounds that prosecutors could not prove that the defendants knew that the money raised for the television station went to the PKK. The prosecutor has appealed the court ruling.
- On December 18, Danish police arrested a 21-year-old Danish citizen in the Copenhagen suburb of Allerød and charged him with violating criminal code paragraph 136,1, "inciting terrorism." The defendant is accused of posting a link on his Facebook page to a video of an ISIL spokesperson in Syria. In the video, the spokesperson calls for the killing of citizens from countries taking part in the Global Coalition to Counter ISIL. The defendant had just returned from Lebanon, where he had been arrested earlier at the Syrian border inside a vehicle filled with weapons and explosives.
- Also on December 18, a 26-year-old Danish citizen was charged in absentia for violating paragraph 136/2, "explicitly expressing support for terrorism." In late June, the individual had posted on Facebook a number of pictures from the central square of the Syrian city of Raqqa which showed the accused posing next to several severed heads posted on a nearby fence, as well as photos of beheaded bodies filled with bullet holes. The accused was not present in Denmark when charged, and was presumed to still be in Syria.

**Countering the Financing of Terrorism:**  Denmark is a member of the Financial Action Task Force), cooperates closely with other Nordic financial intelligence units (FIUs), and is a member of the Egmont Group, a global association of FIUs. Danish authorities can freeze assets within hours or days with a valid court order, however the confiscation process requires a full trial which may take months to years, depending on appeals.

In 2014, Denmark assisted Ethiopia in its efforts to combat terrorist finance, supporting a 17-month intensive capacity building and technical assistance program focused on institutional development within the Ethiopian Financial Intelligence Center (FIC) and the Ministry of Justice (MoJ). The project has utilized expertise of the Danish State Prosecutor for Serious Economic and International Crime. As part of this Danish-supported program and an internally developed action plan, Ethiopia has undertaken considerable efforts to enhance its counterterrorist finance legislative framework and has demonstrated significant political commitment to addressing strategic deficiencies.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  The Danish government is committed to close cooperation with international organizations, particularly within the UN framework and through

PX209

the EU, to ensure that it has both the capacity and the support needed to counter terrorism. Denmark actively participates in the UN, GCTF, EU, the Council of Europe, the OSCE, NATO, Interpol, Europol, the Middle Europe Conference, the Bern Club, and the EU Counterterrorism Group.

Denmark continued to be a close ally in counterterrorism capacity building in Afghanistan, contributing up to 750 troops in 2014, together with police, diplomats, and technical assistants. Afghanistan is also the single largest recipient of Danish foreign aid, receiving nearly US $30 million of non-military aid in addition to significant coalition military support.  Afghanistan is currently the centerpiece of Danish efforts to develop an integrated approach where all relevant actors – such as the UN, NATO, individual nations and NGOs – coordinate efforts to systematically strengthen political, development, and security-related efforts.

The stabilization program for the Sahel region, launched by the Danish government in 2013, continued to contribute to international efforts towards preventing the Sahel from becoming a terrorist safe haven.

On April 18-19, the Governments of Burkina Faso and Denmark hosted a GCTF-affiliated workshop focusing on countering violent extremism in West Africa and the Sahel.  The workshop aimed at improving understanding of the sources and drivers of violent extremism in the region and discussed concrete ways of addressing the issue.

In June, Burkinabé Minister for Territorial Administration and Security and the Deputy Permanent Representative of Denmark to the UN opened the UN Global Counter Terrorism Strategy meeting where Denmark and Burkina Faso focused on countering violent extremism in the Sahel and West Africa, and forging stronger collaborative international efforts in the region.

**Countering Radicalization to Violence and Violent Extremism:**  In September, the Ministry of Justice and the Ministry of Children, Gender Equality, Integration, and Social Affairs presented an Action Plan to prevent radicalization and violent extremism.  This plan details 12 specific areas for improving CVE efforts domestically.  The plan calls for strengthening local officials' actions by expanding the legal authority to use social services for persons aged 18 to 25.  (Note:  the authority previously existed only for minors below the age of 18.)  This change is expected to improve cooperation between social workers, local law enforcement, schools, and national counterterrorism experts (PET and DDIS).  The Action Plan also funds additional training for recognizing signs of radicalization to violence.  Other parts of the Action Plan include monitoring of online extremist content; improving prevention methods by providing mentors, and encouraging youth to attend youth dialogues; and establishing a new exit center to help those at risk of radicalization.  The third group of efforts includes the creation of a new Nordic Ministerial Network to coordinate CVE efforts across the region and pursue specific engagement with developing countries via Denmark's Peace and Stabilization Fund, a part of Denmark's foreign aid.  The new CVE Action Plan also calls for mobilizing civil society by increased dialogue with PET, creating a new national hotline for parents and caregivers to report concerns, and providing training for civil society on how to recognize radicalization and react appropriately.  Denmark's CVE Action Plan now includes funding for law enforcement to provide strategic communication and counter narratives online in addition to continuing offline

PX209

efforts.  The exit program frequently uses individuals who can debunk the glorification of terrorism and the mystique of becoming a foreign terrorist fighter, as well as support for civil society groups includes training for an NGO that promotes stories of victims of terrorism.

Denmark has law enforcement resources dedicated to monitoring of internet-based violent extremist messaging.  Under the 2014 national CVE action plan, Denmark will coordinate at a national level prior work with counter-narratives, including voicing stories from victims and families affected by violence and from former foreign terrorist fighters.  Denmark provides training and resources to civil society groups seeking to present alternative narratives.

The exit program was initially designed to allow members of criminal gangs find a way out of the gang and back into lawful society; it has since been adapted successfully for use with extremists as well.  The program provides a case manager, job training and placement, housing assistance, and other social services as needed to transition gang members or extremists back into productive members of society.  In addition, the prison system provides a number of educational and vocational resources to all criminals.

## FRANCE

**Overview:**  France was an excellent counterterrorism partner in the face of the mounting challenge of foreign terrorist fighters.  French government agencies worked with their U.S. counterparts for the exchange and evaluation of terrorist-related information and partnered in fostering closer regional and international cooperation.  France's security apparatus and legislation afford broad powers to security services to prevent terrorist attacks.  France experienced five particularly serious attacks from December 2014 to January 2015, the most serious being the January 7 to 9 attacks on the *Charlie Hebdo* satirical magazine and the Hyper Cacher (Jewish kosher grocery).

The Government of France was concerned about the possibility of attacks against its interests in France and worldwide, and has taken steps to counter the potential threat posed by its nationals traveling abroad to engage in terrorist activity.  The return of French nationals who joined groups fighting in the civil war in Syria is a major and increasing threat.  On December 17, the Interior Minister estimated there were 1,200 French citizens or French residents linked to fighting among violent extremist groups in Syria, with approximately 390 in the theater; approximately 60 have been killed in combat.  France's main counterterrorism apparatus is its Direction Générale de la Sécurité Intérieure (DGSI), which replaced the Direction Centrale du Renseignement Intérieur on May 12, 2014 and is tasked with counter-espionage, counterterrorism, and the surveillance of potential threats on French territory, along with economic protection issues including organized crime and corporate espionage.

France is a member of the Global Coalition to Counter the Islamist State of Iraq and the Levant (ISIL), was instrumental in passing UN Security Council resolutions 2170 and 2178, participates fully in multilateral counterterrorism fora, and has taken decisive domestic action to restrict terrorist financing and to limit the flow of foreign terrorist fighters.  France has also conducted air strikes and contributed military personnel and trainers in Iraq.

PX209

**Legislation, Law Enforcement, and Border Security:**  France has a system of non-jury courts for terrorism trials and a broad definition of what is considered a terrorist offence – the so-called "association of wrongdoers" offence – which allows it to cast a wide net and imprison a broad range of suspects.  Under French law, foreigners can be deported if they are believed to pose a serious threat to public order.

A November 13, 2014 law took steps to counter the threat of foreign terrorist fighters via three key objectives: to prevent people from leaving the territory when there are reasons to believe that they intend to engage in illicit terrorist activities abroad; to counter online propaganda by blocking websites advocating terrorism (the law calls for blocking to be carried out under judicial supervision, to avoid infringement on the freedom of speech); and to criminalize individual preparation of acts of terrorism.  This legislation builds on 2012 counterterrorism legislation that allows authorities to prosecute French citizens who return to France after  committing an act of terrorism abroad, or after training in terrorist camps (notably in the Afghanistan-Pakistan region) with the intention of returning to France to commit terrorist attacks.  Some groups raised data privacy concerns about both the 2014 legislation and earlier expansions of French government domestic surveillance powers.

France has two national police forces: the General Directorate of National Police (DGPN) and the Directorate General of the National Gendarmerie (DGGN), both subordinate to the Ministry of Interior.  (The DGGN is part of the Defense Ministry but the Interior Ministry manages its policing functions.)  The DGPN is responsible for civil law enforcement and criminal investigations in cities and large towns and is staffed with approximately 150,000 personnel.  The DGSI combines law enforcement capabilities with domestic intelligence gathering.

France works diligently to maintain strong border security and implements national and EU border security legislation.

The following high profile arrests or law enforcement actions related to counterterrorism took place in 2014:

- On February 17, a police investigation into people linked to the "Cannes-Torcy" terrorist cell revealed 900 grams of explosives as well as weapons in an apartment in Mandelieu-le-Napoule, near Cannes.
- In February, the French courts cancelled the deportation order against Ali Belhadad, an Algerian national with a French residency permit, so he would be tried in France.  Police said Belhadad was connected to a violent extremist group linked to Mohammed Merah, the man who killed seven in south-central France in March 2012.
- Also in February, police arrested two men – a French citizen, and a Spanish citizen – affiliated with a leftist anarchist group, for Molotov cocktail attacks in Tarbes and Pau (southeastern France) in 2013.  French citizen Damien Camelio, 31, was later sentenced to two years imprisonment for his role in attacking a church, a prison, and a military installation.
- On May 30, police in Marseille arrested Mehdi Nemmouche, a 29-year-old French citizen of Algerian origin; he was extradited to Belgium and charged with killing four at the

PX209

Jewish Museum in Brussels on May 24; Nemmouche is allegedly a former Syria foreign terrorist fighter.

- Police made the first arrests under France's new foreign terrorist fighter legislation in late November, arresting two for selling ISIL flags and other terrorist propaganda online.
- On December 21, a 20-year-old French citizen of African origin – a recent convert to Islam – was shot dead after entering a police station in Tours and slashing three police officers with a foot-long knife.  The attack closely followed two other street attacks by mentally disturbed assailants and raised alarms throughout France.
- Throughout the year, police arrested dozens of people, including minors, throughout France, for being foreign terrorist fighters in Syria or Iraq, for recruiting others to fight, or for promulgating violent extremist propaganda online.  Most were focused on Syria and Iraq, although there have been reports of French fighters elsewhere.  Interior Minister Bernard Cazenueve said in December that "the dismantlement of jihadist networks is an absolute priority for the police" and said, as of December 17, 2014, there were 103 judicial cases against violent extremists concerning 505 suspects.

**Countering the Financing of Terrorism:**  France is a member of the Financial Action Task Force (FATF).  France belongs to, or is an observer in the following FATF-related bodies: Cooperating and Supporting Nation to the Caribbean Financial Action Task Force, Observer to the Financial Action Task Force of Latin America, Observer to the Asia/Pacific Group on Money Laundering, Observer to the Eurasian Group on Combating Money Laundering and Financing of Terrorism, and Observer to the Middle East and North Africa Financial Task Force.  France is a member of the Egmont Group and member of the Anti-Money Laundering Liaison Committee of the Franc Zone.

In mid-January 2014, the French Treasury froze the assets of "Perle d'Espoir" (Pearl of Hope), a nonprofit association registered in 2012.  On November 18, the French arrested two employees, President Yasmine Znaidi and Naibl Ourfelli, charging them with terrorist financing and conspiracy.

The French financial intelligence unit "Tracfin" said that regular "1901 Law" non-profit organizations (NPOs) are not obliged to file suspicious transactions reports.  NPOs are not regulated or monitored by Tracfin.  According to the French monetary and financial code, only monetary and financial professions, government administrative structures, and related NPOs are regulated and monitored.

For further information on money laundering and financial crimes, we refer you to the *2013 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  France is a founding member of the Global Counterterrorism Forum.  Sworn in in 2013, France's Jean Paul Laborde remained the Executive Director of the UN Counterterrorism Committee (CTC).  France played a strong role on the UNSCR 1267/1989 and 1988 Sanctions Committees.  In regional organizations, France participated in the drafting of the European Council's Counterterrorism Strategy action plan, and helped create and implement NATO's new Strategic Concept and the Lisbon Summit

PX209

Declaration, both of which include major counterterrorism measures for member states.  Through the OSCE, France engaged in new measures to counter transnational threats, including terrorism.

The Government of France undertook joint counterterrorism operations with countries including the UK, Belgium, Germany, Italy, and Spain.  France also played an active role in efforts to support counterterrorism capacity building in other countries both bilaterally and within the EU.

**Countering Radicalization to Violence and Violent Extremism:**  France has an overall strategy to counter terrorism that includes countering violent extremism.  France considers its integration programs for all French citizens and residents a major tool in countering radicalization and violent extremism.  Many of these programs target disenfranchised communities and new immigrants.

The Ministry of Education works to instill "universal values" in all French pupils, regardless of ethnic origin or country of birth.  Ministry regulations mandate that all French public schools teach civic education, and that all students attend school until age 16.  The government also offers adult vocational training for older immigrants and minorities who have never attended French schools.  The Interior Ministry plays a significant role in countering radicalization to violence by increased police presence in disenfranchised areas, neighborhoods, and regions with high criminality and juvenile delinquency rates.

The Ministry of Justice implements rehabilitation and reintegration programs for former criminals.  According to the Ministry of Justice, as of December 1, there were 185 Muslim chaplains employed by the French penitentiary system.

According to the Interior Ministry, a toll-free hotline implemented in spring 2014 for families of radicalized citizens has received some 625 "pertinent" notifications and prevented between 70 and 80 French citizens from departing to fight in Syria.

## GEORGIA

**Overview:**  In 2014, Georgia continued its robust engagement with the United States across a range of counterterrorism-related issues and remained a strong U.S. counterterrorism partner.  However, there are continuing concerns about Georgia as a transit and source country for international terrorism.  Media reported that, as of December, between 50 and 100 Georgian nationals from the Muslim-majority regions of Adjara and the Pankisi Gorge were fighting in Syria and Iraq for either al-Qa'ida affiliates or the Islamic State in Iraq and the Levant (ISIL), including senior ISIL commander Tarkhan Batirashvili (aka Omar al-Shishani).  Given Georgia's geographic location, violent Islamist extremists continued to transit through the country between the Russian Federation's North Caucasus and Syria and Iraq.

Georgian Prime Minister Irakli Garibashvili and former Foreign Minister Maia Panjikidze publicly committed to provide humanitarian support as part of Georgia's contribution to and membership of the Global Coalition to Counter ISIL.  Following the passage of UN Security Council Resolution 2178, the Georgian government initiated changes to its criminal code related

PX209

to foreign terrorist fighters and modified regulations to strengthen document security along the border with Turkey.  Georgian and Turkish nationals are allowed to cross the border in both directions using identification cards that lack the security features of passports, thus increasing the likelihood that fraudulent documents could be used at the critical Turkish-Georgian border checkpoint on the route to Syria through Turkey.

**Legislation, Law Enforcement, and Border Security:**  Georgia continued to enhance its counterterrorism legislation in 2014.  In April, the Georgian government amended the Criminal Code to criminalize participation in international terrorism, recruitment for membership in a terrorist organization, and failing to hinder a terrorist incident.  The Georgian government amended other terrorism-related articles in the Criminal Code in July to bring them into line with international best practices and make them more precise for use in criminal prosecutions.  In November, Georgia updated its legislation on surveillance to provide for additional oversight of the Ministry of Internal Affairs, which is primarily responsible for counterterrorism and for conducting surveillance within the country.  As of December, the Georgian government was preparing additional amendments to the Criminal Code and other relevant legislation related to foreign terrorist fighters to fully implement UN Security Council Resolution 2178.  The country would benefit from additional legislation to allow for the creation of a means to identify and sanction individuals who are not included on UN sanctions list and to improve the Georgian government's ability to prosecute terrorism cases.

Counterterrorism units within Georgia's Ministry of Internal Affairs have the lead in investigating terrorism-related incidents, and in December, the Georgian government established a new interagency mechanism that would operate as a joint task force to conduct a major counterterrorism operation, if needed.  Overall, the Georgian government is largely capable of detecting, deterring, and responding to terrorism incidents.  However, several ministries and offices share counterterrorism responsibilities, creating challenges to cooperation and information sharing.  Nonetheless, the Georgian government took steps toward improving interagency coordination.  The government set up a counterterrorism working group within the country's State Security and Crisis Management Council to promote regular communication among relevant agencies and a crisis management unit within the same Council that would coordinate the government's response in the event of a major terrorist incident.

Georgia continued efforts to strengthen its overall border security, in part due to its goal to attain visa-free travel to the EU.  However, Tbilisi's lack of control over its Russian-occupied territories of South Ossetia and Abkhazia, harsh terrain, and a continuing tense relationship with Moscow limited the country's ability to secure its northern border.  In 2014, Georgia took steps to strengthen document security by imposing stricter conditions on issuing a second passport and, since late July, issuing biometric passports.  Georgian law enforcement used UN sanctions lists as terrorist watchlists and advance passenger name records on commercial flights at ports of entry, to help detect potential terrorist movement.  More comprehensive biometric and biographic screening at ports of entry would enhance this capability, however.  With significant U.S. support, the Georgian Coast Guard is now better equipped to patrol the country's maritime borders, with the exception of Russian-occupied Abkhazia's coastline, and the Georgian government continued to improve its ability to detect and interdict WMD.  Georgia shares cross-border terrorism-related information with its southern neighbors – Turkey, Armenia, and

PX209

Azerbaijan – through police attaches and working-level interaction at border crossings.  Chains of supervision at the border hamper official cross-border communication, however, as border guards and patrol police at border checkpoints must check with Tbilisi before sharing information with senior law enforcement in neighboring countries.

**Countering the Financing of Terrorism:**  Georgia is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body.  Georgia's amendments to terrorist financing legislation – to address shortcomings highlighted in MONEYVAL's 2012 evaluation – came into force in January, and in March, the Georgian government adopted a strategy and action plan for combating money laundering and terrorist financing to further improve regulations and build capacity.  In response to recommendations from MONEYVAL and the FATF, the government established the Interagency Commission on Implementation of UNSC Resolutions to coordinate the government's immediate compliance with UN Security Council Resolutions 1267 and 1373.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Georgia is actively engaged on counterterrorism issues at the international, regional, and bilateral levels, and participates in regional organizations such as the Council of Europe Convention on the Suppression of Terrorism and its amending protocol, the Organization of Black Sea Economic Cooperation, and the GUAM (Georgia, Ukraine, Azerbaijan, and Moldova) Organization for Democracy and Economic Development.  The Council of Europe Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime and on the Financing of Terrorism (Warsaw Convention) came into force in Georgia in May.  As of December, Georgia had concluded bilateral law enforcement and counterterrorism treaties with 23 countries.  In 2014, Georgian law enforcement officials participated in counterterrorism-related training and capacity-building exercises with the Governments of Turkey, the UK, Israel, and Slovakia, as well as with the George Marshall Center in Germany, the OSCE, and the UN.

**Countering Radicalization to Violence and Violent Extremism:**  In 2014, Georgia increased its nascent efforts to prevent radicalization in vulnerable populations, but more focus – particularly in the areas of economic development, community policing, prison reform, and outreach to Muslim communities – would strengthen the government's ability to identify and provide alternatives to at-risk individuals.  In order to increase the integration of Muslim youth into Georgian society, the Georgian government now allows students to pass exams in languages other than Georgian, and the government attempts to better advertise educational opportunities and scholarships to vulnerable populations.  The Muslim-majority Adjara region already enjoys significant autonomy, and legislation passed in February gives more autonomy to municipalities and villages, including in the Muslim-majority Pankisi Gorge.

**GERMANY**

108

PX209

**Overview:**  The threat from violent extremism increased in 2014 in connection with the threat posed by domestic radical groups as well as foreign terrorist fighters.  Germany investigated, arrested, and prosecuted a sharply increased number of terrorist suspects and disrupted terrorist-related groups within its borders, many of whom were connected to al-Qa'ida (AQ), the Islamic State in Iraq and the Levant (ISIL), other violent Islamist extremists, Kurdish nationalist, and neo-Nazi terrorist organizations.  Security officials estimated over 550 residents in Germany have departed the country to participate in the conflicts in Syria and Iraq, the majority of which joined violent Islamist extremist groups in the fighting there.  A third of these may have already returned to Germany.  German officials actively investigated these returnees for any terrorist threat resulting from their experience abroad and possible desire to continue to support violent extremist causes.  Bilateral counterterrorism cooperation with the United States remained excellent.

Germany is a member of the Global Coalition to Counter ISIL and has provided arms, material support, and training to Kurdish security forces.  The German government has committed support for further counter-ISIL training efforts in Iraq.  Germany voiced its support for UNSCRs 2170 and 2178 and is currently preparing legislative amendments to specifically criminalize terrorist finance and foreign terrorist fighter travel, although German law already criminalizes both the provision of financial or material support for terrorist groups or acts as well as attendance at terrorist training camps.  Germany is a founding member of the Global Counterterrorism Forum (GCTF) and supported the GCTF good practices on foreign terrorist fighters.  Domestically, the German government has increased enforcement efforts to prevent, interdict, and counter foreign terrorist fighter travel and has voiced support for strengthening EU and Schengen measures to do so.  In September, the Ministry of Interior issued a ban against actions in support of ISIL, making it explicitly illegal to join, recruit, provide material support for, propagandize for, or display the symbols of ISIL.  German security officials actively made use of existing provisions allowing them to seize passports of those deemed to pose a security risk and began preparatory work on other measures to block travel, such as limitations on national identification cards.  In November, the Bundestag (parliament) approved a 2015 budget that included increased spending on law enforcement and domestic intelligence efforts to counter the foreign terrorist fighter threat.

**Legislation, Law Enforcement, and Border Security:**  The German government continued to apply its comprehensive counterterrorism legislation, which criminalizes membership in or support for domestic and foreign terrorist associations.  The Criminal Code also makes a range of terrorism-related preparatory actions illegal, such as participating in terrorist training or acquiring weapons or explosives with the intent to commit attacks that endanger the German state.

German border management data systems, equipment, and infrastructure are highly developed. Data on suspected terrorists is shared between federal and state law enforcement agencies.  The German passport and other identity documents incorporate strong security features.  Germany does not collect entry/exit data. Collection and retention of Advance Passenger Information (API) is limited and Passenger Name Record (PNR) analysis is not used.  Germany supports an EU-wide PNR directive and entry/exit systems rather than systems managed by individual member states.

PX209

Counterterrorism arrests, prosecutions, and trials:

ISIL-related:

- Throughout the year, German police, prosecutors, and courts took various actions against ISIL members, supporters, or returned foreign terrorist fighters. At year's end, the Federal Minister of Justice said authorities were carrying out approximately 300 investigations or prosecutions nationwide related to ISIL membership or support
- In March, as part of a nationwide series of raids, police arrested German citizen Fatih Kharaman in Berlin, Turkish citizen Fatih I. in Frankfurt, and German-Polish dual national Karolina R. in Bonn. The three were indicted for providing financial or propaganda support to ISIL, and Kharaman and Fatih I. were also charged with ISIL membership and terrorist training during travel to Syria. In September, prosecutors indicted Kharaman for membership in Junud al-Sham, which fights alongside ISIL and other violent extremist groups. Also in September, the Federal Prosecutor General added additional terrorist finance charges against Karolina R. and also indicted Ahmed-Sadiq M. and Jennifer Vincenza M. for membership in and financial support to ISIL.
- In June, the German Federal Police arrested a French citizen returning from Syria and subsequently extradited him to France on terrorism charges. The man arrived in Berlin by plane from Turkey and was detained upon arrival. He was suspected of having traveled to Syria to join ISIL forces, where he was wounded participating in combat.
- In October, the Federal Prosecutor General indicted German citizen Harun P. for membership in the foreign terrorist group Junud al-Sham, as well as for murder and conspiracy to commit murder. P. traveled to Syria in September 2013 where he received paramilitary training and participated in a February 2014 attack on the central state prison in Aleppo that left two soldiers and five inmates dead. Prosecutors also charged him with attempting to incite the group to murder a teenaged German girl in Syria. Czech Police arrested him at the Prague Airport in April and later extradited him to Germany.
- In October and November, police and prosecutors carried out a series of investigations and raids resulting in the arrest of multiple alleged members or supporters of ISIL. Police in North Rhine-Westphalia arrested Tunisian citizen Kamel Ben Yahia S., Russian citizen Yusup G, Moroccan-German citizen Mounir R., and Lebanese citizen Kassem El R. for providing financial, material, and recruitment support to ISIL.
- In November, police including special counterterrorism units, arrested a German citizen suspected of being a returned ISIL fighter in Wolfsburg.
- In November, a court in Stuttgart opened the trial of Lebanese citizens Ismail Issa and Ezzeddine Issa and German citizen Mohammed Sobhan Ayubi on charges of support for terrorism. Ismail Issa is also charged with membership in a foreign terrorist organization (ISIL). Police arrested Ismail Issa and Ayubi in November 2013 while they were transporting night vision equipment, medication, tools, and binoculars intended for ISIL. Ezzeddine Issa (Ismail's brother) and Ayubi allegedly assisted him with financing, procurement, and transport. The trial was ongoing at year's end.
- In December, a court in Frankfurt convicted Kreshnik Berisha of membership in a foreign terrorist organization (ISIL) and sentenced him to three years and nine months in prison. Berisha was arrested upon his return to Germany in December 2013, after having left for

110

PX209

Syria in July of the same year.  This was the first trial involving a returned foreign terrorist fighter from Syria to be concluded.

Other significant cases included:

- In November, a court in Düsseldorf convicted four members of an AQ terrorist cell, ending a trial that began in July 2012.  The court found three defendants (Moroccan citizen Abdeladim El Kebir, German-Moroccan citizen Jamil Sedikki, and German-Iranian citizen Amid Chaabi) guilty of membership in a foreign terrorist group and sentenced them to terms of nine years, seven years and five-and-a-half years in prison, respectively. The court found German citizen Halil Simsek guilty of support for terrorism and fraud and sentenced him to four-and-a-half years.  The charges stemmed from El Kebir's travel to a terrorist training camp in the Afghanistan-Pakistan border region and subsequent recruitment of his co-defendants for the preparation and execution of one or more bombing attacks in Germany.  The United States provided evidentiary support and expert testimony in the case.  The defendants filed an appeal in federal court, which was pending at year's end.
- In January, a Frankfurt court sentenced Emrah Erdogan to seven years in prison for membership in terrorist organizations (AQ and al-Shabaab) and incitement of robbery.
- In February, a court in Hamburg convicted German-Afghan dual national Sulaiman Sadiki of membership in the foreign terrorist organization the Islamist Movement of Uzbekistan (IMU) and sentenced him to three years in prison.  Sadiki attended an IMU/AQ terror camp in the Afghanistan-Pakistan border region in 2009 and assisted with logistical tasks including weapons transport, as well as with the production of an IMU propaganda film.  Sadiki fled before the trial's conclusion but Bulgarian authorities arrested and subsequently extradited him to Germany.
- In March, a court in Düsseldorf sentenced Josef Dweik to two-and-a-half years in prison for membership in the foreign terrorist organization the German Taliban Mujahedin, which he joined in the Afghan-Pakistan border region in 2010, intending to participate in the armed conflict in Afghanistan.  The Federal Prosecutor General's Office indicted Dweik on terrorism charges in September 2013.
- In May, a court in Düsseldorf sentenced 29-year old Lebanese-German dual citizen Ahmed Krekshi to three-and-a-half years in prison for support of the foreign terrorist organization IMU.  Krekshi transferred over US $4,700 to the IMU and contributed to propaganda efforts, as well as gathering intelligence on Germany.
- In August, a Düsseldorf court convicted Turkish citizen Özkan Güzel and sentenced him to 26 months in prison for membership in the Turkish foreign terrorist organization the Revolutionary People's Liberation Party/Front (DHKP/C).  The court found that Güzel had been involved with the DHKP-C since 1998 and that he was raising funds meant to support armed conflict.
- In August, the Federal Criminal Police arrested Turkish citizen Mehmet D. on suspicion of membership in the foreign terrorist organization the Kurdistan Workers' Party (PKK).  Federal prosecutors accused him of directing PKK activities (including fundraising and overseeing financial management) in northern and central Germany under the code name "Kahraman" since January 2013.

PX209

- In September, the Federal Criminal Investigative Police (BKA) arrested three German citizens (Steven N., Abdullah W., and Abdulsalam W.) on suspicion of membership in terrorist group al-Shabaab.  The three were arrested upon arrival in Frankfurt on a flight from Kenya and were reportedly considering travel to Syria to join violent extremist groups there.  The following day, authorities in Kenya arrested two additional German citizens who were also thought to be members of al-Shabaab.
- In September, the Düsseldorf Higher Regional Court opened the trial of German citizen Marco René Gäbel, German citizen Tayfun Sevim, German-Turkish dual citizen Koray Nicholas Durmaz, and Albanian citizen Enea Buzo on terrorism-related charges.  Authorities charged that the four formed a terrorist group and attempted to murder the leader of a far-right-wing political party in March 2013.  Additionally, Gäbel is charged with attempted mass murder in a failed attempt to bomb the Bonn train station in December 2012, which potentially carries a life sentence.  The trial was ongoing at year's end.

**Countering the Financing of Terrorism:**  Germany is a member of the Financial Action Task Force (FATF), and an observer to the Eurasian Group on Combating Money Laundering and Terrorist Financing, the Asia/Pacific Group on Money Laundering, and the Financial Action Task Force of Latin America against Money Laundering, all of which are FATF-style regional bodies.  Germany's financial intelligence unit is a member of the Egmont Group.  In June, based on improvements reflected in its most recent FATF Mutual Evaluation Follow-up Report, FATF removed Germany from the Follow-Up process.  German agencies filed 19,095 suspicious transaction reports in 2013 (the latest figures available), a 33% increase over the prior year.  Agencies designated 208 of them for suspected terrorist financing, a significant decrease as a share of reports.  Germany remained a strong advocate of the UNSCR 1267/1989 (Al-Qaida) and 1988 (Taliban) sanctions regimes.

Police and prosecutors began investigations and trials in a number of terrorist financing cases related to ISIL during the year, as noted above.  None of these had reached a conclusion by year's end.

In April, the Federal Ministry of the Interior banned a Hizballah-affiliated charity, the Lebanese Orphan Children Project (Waisenkinderprojekt Libanon) and seized nearly US $80,000 in assets.  The group is suspected of transferring over US $4 million to Hizballah's Al-Shahid Foundation since 2007.  In June, a court issued a temporary injunction against parts of the ban after the organization filed a legal challenge, but left the assets frozen; a final ruling was still pending at year's end.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Germany is a founding member of the Global Counterterrorism Forum and continued to participate in various multilateral counterterrorism initiatives.  German cooperation with regional and international organizations on counterterrorism includes the UN and UN Security Council, EU, OECD, OSCE, NATO, Council

PX209

of Europe, G-7, the Global Initiative to Combat Nuclear Terrorism, and Interpol.  Within the GCTF, Germany is a founding supporter of the International Institute for Justice and the Rule of Law, and the Institute's Executive Director is a seconded German official.  Germany also supports GCTF capacity building projects.  Germany has advocated strongly within the EU for improved counterterrorism and border security efforts.

**Countering Radicalization to Violence and Violent Extremism:**  Germany has numerous programs to counter violent extremism at the state and federal levels.  The Federal and State Ministries of Interior have formed a working group to ensure coordination and more effective support for efforts to analyze and counter the appeal of violent extremism, which meets regularly to compile and disseminate information and best practices.

The Federal Ministry of the Interior continued its counter-radicalization assistance center for concerned parents and friends of violent extremists; the center was established in January 2012 and has expanded to include a nationwide telephone hotline with clients referred to a region-specific advising partner.  The hotline has received over 1,200 calls since its establishment.  In September, the government folded the work of its HATIF (the Arabic word for telephone) program into the counter-radicalization assistance center, which has also taken on HATIF's mission of assisting violent extremists who wish to exit the scene with reintegration.

In North-Rhine Westphalia, Germany's most populous state with 17 million residents, state authorities continued and expanded the work of the "Pathfinder" initiative to work with communities to engage individuals believed to be susceptible to radicalization to violence.  In some cities, NGOs or community organizations implement the programs, while in others, city government offices do so.  In addition, North-Rhine Westphalia continued other programs to improve civic education and to provide opportunities for at-risk youth.  In Berlin, the Violence Prevention Network runs a training program that serves ideologically motivated perpetrators both during and after detention.

In June, the state of Hesse opened a state-wide "Violence Prevention Network" supported by a counseling center in Frankfurt.  The center's mission is to advise at-risk youth and their friends, families, teachers, and classmates.  Other states have announced similar plans or begun funding the work of NGOs involved in CVE and de-radicalization efforts, including Hamburg, Lower Saxony, Bavaria, and Baden-Württemberg.

## GREECE

**Overview:**  In 2014, Greece continued to experience intermittent small-scale terrorist attacks such as targeted package bombs or improvised explosive device detonation by domestic anarchist groups.  Generally, these attacks did not appear aimed at inflicting bodily harm but rather sought to make a political statement.  Overall, Greek government cooperation with the United States on counterterrorism remained strong.

Senior Greek government leaders have emphasized that counterterrorism is one of their top priorities.  The MFA has strongly condemned the actions of the Islamic State in Iraq and the Levant (ISIL) and called on the international community to join the Global Coalition to Counter

PX209

ISIL, of which Greece is a member.  Greece has pledged to provide ammunition to Kurdish Peshmerga forces fighting ISIL.  In 2014, Greece also established a special legislative committee which began reviewing and updating its existing legal framework on terrorism to ensure authorities have the right tools in place to take action against foreign terrorist fighters.

**2014 Terrorist Incidents:**  Greece's two largest cities, Athens and Thessaloniki, experienced frequent, relatively small-scale anarchist attacks that used inexpensive and unsophisticated incendiary devices against the properties of political figures, party offices, private bank ATMs, ministries and tax offices, and privately-owned vehicles.  Terrorist attacks included:

- On April 26, Revolutionary Struggle claimed responsibility for an April 10 car bomb attack targeting the offices of the IMF and Greek Central Bank.
- Conspiracy of Fire Nuclei claimed responsibility for sending a parcel bomb containing over one pound of explosives to a police station in Central Greece on April 29.  This device malfunctioned and did not detonate.
- On December 12, an unknown group fired approximately 50 rounds of ammunition at the Israeli Embassy in Athens.  This was similar to the attack that targeted the German Ambassador's residence December 30, 2013.  The attackers remained at large at year's end.

**Legislation, Law Enforcement, and Border Security:**  Article 187A of the Greek Penal Code codifies the terrorism statute.  In addition, Article 28(1) of the Greek Constitution subjects Greek citizens to applicable international laws, to include those related to terrorism.  Article 28 (2) and (3) subjects Greek citizens to applicable EU Laws, including the EU law against terrorism.  As noted above, Greece is presently reviewing and updating its existing legal framework on terrorism to ensure authorities have the right tools in place to take action against foreign terrorist fighters.  The Police Directorate for Countering Special Violent Crimes (DAEEV) is responsible for counterterrorism in Greece.  DAEEV is proactive and attracts highly motivated and educated young police officers.  This unit has demonstrated a high capacity to collect information, but it lacks capacity to use the volume of data it collects and to share it with other services within the Greek police and Coast Guard.

Greece has a weak document system for birth certificates and Greek ID cards, which compromise the integrity of the Greek passports.  The national ID card is extremely vulnerable to alteration and photo substitution, and it has not incorporated any new security features such as digitized photo and biometrics.  The government is working actively to address this vulnerability.

Christodoulos Xiros, key leader and hit-man for the terrorist organization 17 November, disappeared in January while on furlough from prison.  [Note: The Greek police arrested Xiros in early 2015.]

Nikolaos Maziotis, a lead member of the terrorist organization Revolutionary Struggle, who was convicted in absentia for his participation in this terrorist organization by an Athens appeals court in 2013, was re-captured by police in July 2014.  Hellenic Police also arrested Andonis Stamboulos for membership in a terrorist organization, as he was a known associate of Maziotis.

PX209

At the time of his arrest Stamboulos was carrying plans for an imminent attack on the headquarters of the ruling party and a list of potential high-profile targets.

On October 1, Greek police discovered two locations in Athens and Thessaloniki serving as hideouts for Conspiracy of Fire Nuclei. The trial of 19 suspected members of the group, which began in 2011 and was repeatedly postponed due to work stoppages by judges and judicial postponements, re-commenced on December 4.

In 2014, the Hellenic Police DAEEV directorate arrested at least seven suspected members of the DHKP/C to include the February 10 arrest of senior leader Hussein Tekin.

The porous nature of Greece's borders remained a concern. While Greek border authorities have had success in stemming the flow of illegal migration at the land border with Turkey, their ability to control large-scale illegal migration via sea borders is limited. Recent regional upheavals have intensified illegal migration to and through Greece via the Greek Aegean islands. In September, the antiterrorism assistance program (ATA) provided analytic methodology and threat analysis training to Hellenic Police, while the Hellenic Police and Coast Guard hosted a three-day regional seminar with participants from Albania, Bulgaria, Cyprus, Italy, Malta, Morocco, Romania, Spain and the United States. The seminar "Developing Border Protection Management Strategies to Counter Illicit Migration, Trafficking and Terrorist Migration" enhanced the capabilities of law enforcement, Coast Guard, and border control agencies across the Mediterranean.

**Countering the Financing of Terrorism:** Greece is a member of the Financial Action Task Force and the Egmont Group, a global association of financial intelligence units. The Foreign Ministry's Sanctions Monitoring Unit is tasked with ensuring that Greece meets its commitments to enforce international sanctions, including terrorism-related sanctions. The Financial Intelligence Unit (FIU), which is essentially an autonomous institution, although nominally under the oversight of the Ministry of Finance, received 5,526 suspicious transaction reports through October 31, 2014.

Non-profit organizations are not obliged to file suspicious transaction reports. However, all banks – through which these organizations conduct transactions – are legally obliged to report suspicious transactions of any kind, regardless of the type of entity (for- or not-for profit), and the government may directly monitor such entities if necessary.

For further information on money laundering and financial crimes, see the annual *International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Greece engaged constructively on counterterrorism initiatives in international fora and regularly participated in regional information exchange and seminars through such bodies as the UN, the EU, the OSCE, the Southeast European Law Enforcement Center for Combating Trans-Border Crime, and the Organization of Black Sea Economic Cooperation.

PX209

## IRELAND

**Overview:**  The United States and Ireland worked closely in bilateral and regional counterterrorism, law enforcement, and information sharing efforts.  Garda Síochána (the local and national police service of Ireland, referred to as Garda in this report) has comprehensive law enforcement, immigration, investigative, intelligence, and counterterrorism responsibilities.

In 2014, there were incidents carried out in Ireland by dissident republican groups (sometimes referred to as criminal terrorist groups by the Irish Department of Justice).  Some violent actions committed in neighboring Northern Ireland by members of dissident groups were traced back to support provided by persons living in Ireland.  Attacks were directed at Northern Ireland's law enforcement personnel and security structures to disrupt ongoing post-peace process community rehabilitation efforts.  Irish authorities worked to address these legacy issues stemming from "The Troubles," and were actively involved in dealing with transnational terrorism issues.  The targets for other attacks by dissident republican groups in Ireland have been other republican factions, and the incidents often involve criminal activity.  Major Garda successes in disrupting the activities of such groups and infighting between dissident factions seem to have weakened threat capabilities.

Ireland is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant.

**2014 Terrorist Incidents:**  There were no significant terrorist attacks in 2014.  As of the end of November, however, there were 127 bomb squad mobilizations for possible improvised explosive devices (IEDs) in 2014, 43 of which resulted in the discovery of viable IEDs that were subsequently disarmed by Ireland's Army bomb disposal teams.  The list below details terrorism-related incidents reported in the public domain.

- In February, forensic tests on seven bombs sent to army recruitment centers in Great Britain showed that all of them had been mailed over a three-day period from Ireland.  The bombs were all defused without incident.  Irish authorities said that the parcels were sent as part of a new campaign being carried out by a group called the New IRA alliance.
- On May 10, police discovered a 66-pound bomb in the trunk of a car parked in a Dublin hotel.  Garda said that the bomb was intended for use against security forces in Northern Ireland.  A 55-year-old man was subsequently charged with the possession of explosives in relation to the bomb, and membership in the IRA.
- On May 25, five men were arrested when Garda found an explosive device (a beer keg with components for an IED) in their car.  Garda said that the device was being transported to Northern Ireland by dissident republicans for an attack on security forces.  Three of the five men were charged.
- On November 16, during a Garda operation targeting dissident republican groups, officers seized firearms and uncovered a suspected bomb-making operation.  An army bomb disposal unit was called in to carry out a controlled explosion on bomb-making equipment found in one house.  Two men suspected of having links to dissident republican groups were arrested.

116

PX209

**Legislation, Law Enforcement, and Border Security:**  In 2014, the Dáil (Irish Lower House) voted to renew the Offenses Against the State (Amendment) Act, which was first introduced following an IRA bombing in Omagh in 1998 that killed 29 people.  The amendment allows for the drawing of inferences in certain circumstances in prosecutions and created offenses such as directing an unlawful organization, a category which includes the IRA.  The law also extends the maximum detention time without being formally charged to 72 hours.

Ireland also introduced the Criminal (Terrorist Offenses) (Amendment) Act 2014 which would create three new terrorism offenses.  The bill transposes into Irish law an EU Council Framework Decision on counterterrorism.  When enacted, the offenses would be: public provocation to commit a terrorist offense, recruitment for terrorism, and training for terrorism.  The new offenses would carry sentences of up to 10 years imprisonment upon conviction.

Law enforcement units have effectively demonstrated their capacity to detect, deter, and respond to terrorist incidents.  The Garda Special Branch provides specialized law enforcement capability and has primary responsibility for counterterrorism response, with the military performing specific functions when requested by the civil authorities.

Ireland works closely with the UK on border security, including the sharing of biographic and biometric information.  Ireland has been active in highlighting the need for the sharing of passenger name records (PNR) on flights in the EU.

Significant law enforcement action against terrorists or terrorists groups in 2014 included:

- On February 7, a Garda operation disrupted a major fundraising plan by dissident republicans involving the printing of counterfeit currency.  The Garda seized fake notes worth US $24,000 along with two industrial sized printing presses, a cutting machine used to produce single notes, and computers programmed to impose graphics on the bills.  Three men were charged in connection with the investigation.
- On February 18, the Garda arrested two Irish Defense Forces personnel in connection with dissident activity and the discovery of a pipe bomb.  The soldiers allegedly had links to a dissident republican group in Northern Ireland.  One solider was subsequently charged, and one was released.
- The Garda seized up to 20 million euros (US $24,019,300) in counterfeit 50 euro notes along with printing and computer equipment in April.  A man with reported connections to dissident republicans was arrested.

**Countering the Financing of Terrorism:**  Ireland is a member of the Financial Action Task Force (FATF) and the Egmont Group, a global association of financial intelligence units.  The Criminal Justice (Money Laundering and Terrorist Financing) Bill of 2010 enacted the EU's third money-laundering directive into Irish law, giving effect to several of the FATF Recommendations.  In 2014, the Criminal Justice Act 2013 which amended the Criminal Justice (Money Laundering and Terrorist Financing) Act 2010 by providing for the cessation of mobile communications services where necessary for the aversion of terrorist threats went into effect.

PX209

A June 2013 FATF review found that Ireland relies exclusively on the EU listing system in relation to UN Security Council Resolution 1373 and that there is still no mechanism in Ireland for the immediate freezing of funds of EU "internal" or "domestic" terrorists that fall outside this EU list.  However, Irish Criminal Justice legislation does provide a legal basis for immediate asset freezing if such crimes are suspected.

Law enforcement authorities monitor non-profit organizations for purposes of monitoring breaches of criminal law, but Ireland has yet to fully implement the Charities Act of 2009, which regulates the activities of charities and non-profit organizations in Ireland.

For further information on money laundering and financial crimes, see the annual *International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Ireland works closely with the UK in securing the Common Travel Area (CTA).  The introduction of the British Irish visa required the sharing of biometric and other information.  The net result was a more integrated system for checking travelers.  Ireland participated in an ad hoc grouping of ministers from nine EU countries that met to discuss issues related to stopping the flow of foreign terrorist fighters.

In addition to counterterrorism capacity building overseas, Ireland also cooperated on counterterrorism efforts with Northern Ireland.  The Irish Defense Forces provide a robust explosive ordnance disposal capability to the civil authorities, routinely deploying to investigate and disarm ordnance around the country.  The 2 Brigade, which is responsible for the Dublin area and a significant portion of the territory along the border with Northern Ireland, has responded to 79 reports of explosive devices in 2014 through November.

**Countering Radicalization to Violence and Violent Extremism:**  The Government of Ireland's efforts to counter radicalization to violence focused on integrating minority groups into Irish society.  These measures included providing social benefits, language training, health care, and the proactive advocacy work of an Ombudsman's office in the affairs of immigrants.  Through the Garda Racial, Intercultural, and Diversity Office, police officers are provided special training to assist with at-risk populations.

The primary strategy used by the Irish government is the Ethnic Liaison Officer program of the Garda.  These officers liaise with representatives of the various minority communities in an area, and establish communication links with each of these communities.  They support integration by involving members of ethnic minority communities in Garda and community social events.

## ITALY

**Overview:**  Italy investigated and prosecuted terrorist suspects, dismantled suspected terrorist-related cells within its borders, and maintained a high level of professional cooperation with the United States and international partners.  Terrorist and criminal activity by domestic anarchists and other violent extremists also remained a threat.  Italy is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL), conducting air strikes in Iraq,

PX209

contributing military support, trainers, and humanitarian assistance to the crises in Iraq and Syria, engagement with foreign leaders – including Middle East partners – in support of the coalition, and enhanced efforts to identify, decrease, and disrupt the flow of foreign terrorist fighters.  Italy is implementing UN Security Council Resolutions (UNSCRs) 2170 and 2178 to mitigate the threat posed by foreign terrorist fighters and to restrict terrorist financing.  Italy promoted Europol as a venue for EU-level coordination of law enforcement and intelligence cooperation across national borders.  Italian law enforcement's primary focus has been on preventing returning foreign terrorist fighters from using Italy to create bases for international operations and recruitment.  As a founding member of the Global Counterterrorism Fund (GCTF), and consistent with its implementation of UNSCRs 2170 and 2178, Italy has endorsed the GCTF Memorandum on Good Practices for a More Effective Response to the Foreign Terrorist Fighter Phenomenon.  On December 11-12, 2014, it hosted in Rome a joint GCTF-UN Interregional Crime and Justice Research Institute (UNICRI) workshop on challenges and lessons learned in reintegrating returning foreign terrorist fighters.

**2014 Terrorist Incidents:**  Representative incidents included:

- On January 13, a Democratic Party Senator, Stefano Esposito, who was in favor of the construction of a controversial high speed railway Turin-Lyon, discovered three rudimentary explosive devices (Molotov cocktails) and a threatening note outside of his residence in Turin.
- On January 24, a small bomb exploded outside the office of a foundation linked to the French Embassy to the Holy See in Rome, damaging three cars and some windows.  The incident occurred on the same day of the meeting between the French President and the Pope in Rome.
- On June 10, an anarchist group was considered responsible for an attack against an office of the Democratic Party in Florence that resulted in limited damages to the façade of the building.
- On July 1, an explosive device detonated outside the office of the right-wing association Casa Pound in Bologna, and another small bomb was found unexploded outside of the office of the PD, also in Bologna.
- On December 21, a bottle of flammable liquid exploded near the Rome-Florence high-speed train line, damaging electrical cables and causing train traffic to halt.  A second bottle did not explode.  The attack is being attributed to a violent anti-high-speed train group known as NO TAV.  The attack follows two similar incidents using rudimentary explosive devices on high speed train lines on December 2 and December 18.

**Legislation, Law Enforcement, and Border Security:**  The Italian government continued to make use of reinforced counterterrorism legislation enacted in 2005 that facilitates detention of suspects, mandates arrest for crimes involving terrorism, and expedites procedures for expelling persons suspected of terrorist activities.  At year's end, the Government of Italy was drafting new legislation that would criminalize the travel of persons and export of materiel in support of armed conflict; Italy currently only criminalizes the recruitment of combatants.

Italy's long history of countering both organized crime and violent ideological movements has given it a strong legacy in fighting internal threats to security, and authorities are leveraging

PX209

those capabilities to counter terrorist recruitment, radicalization to violence, and networking. The Police, the ROS *Carabinieri* (gendarmerie), *Guardia di Finanza,* other specialized law enforcement agencies, and the intelligence services coordinated their counterterrorism efforts and met regularly. Italian judges have the authority to swiftly expel non-citizens for "seriously disturbing public order, endangering national security, or religious discrimination."

The Italian Civil Aviation Authority (CAA) continued to implement a Memorandum of Cooperation with the United States, allowing the Transportation Security Administration (TSA) to conduct aviation security assessments at three Italian commercial airports. Italy demonstrated its capability to quickly enhance measures to counter threats against civil aviation; in 2014, Italy worked with the TSA to increase measures at major commercial airports to counter the threat of various types of improvised explosive devices. In 2014, Italy received a record number – over 150,000 – of refugees, asylum-seekers and economic migrants crossing the Mediterranean from Libya, presenting serious challenges to the capacity of Italian border security officials to comprehensively screen all incoming migrants. For most of the year, Italy continued an anti-smuggling and search and rescue operation, called *Mare Nostrum;* the operation has formally wound down in favor of a multination EU FRONTEX border security operation called *Triton*. Senior Italian officials have indicated publicly they do not believe the Mediterranean exodus has been used by terrorists to penetrate Italy. The government has not reported any returning foreign terrorist fighters among these arrivals, but Italian authorities and the Italian public remained sensitive to this risk and were especially concerned about an increasingly unsecure Libya. EU data privacy concerns limit the sharing of biometric data with the United States.

Significant law enforcement actions related to counterterrorism included:

- On March 14, a Turin court sentenced two NO TAV (anti high-speed train) activists, Davide Forgione and Paolo Rossi, to two years and two months in prison. They had been arrested in August 2013 in a car containing materials meant to be used to make explosive devices.
- On April 2, police arrested 24 persons, including a former parliamentarian, accused of planning violent actions to claim the independence of the Veneto region.
- On May 30, Claudio Alberto, a NO TAV militant, was convicted and sentenced to four months' imprisonment for intimidation against a worker outside of a high speed railroad construction site; Alberto and three other NO TAV members were sentenced to three years and six months in jail, but the court rejected the charges of terrorism over the objection of the government, resulting in the milder verdict. Other NO TAV activists were arrested in July 2014, accused of violence against a public officer, public damages, and the use of rudimentary explosive devices in Milan, Turin, and Lecce.
- On June 18, a Rome judge sentenced two Informal Anarchist Federation (IAF) affiliates, Gianula Iacovacci and Antonio Antonacci, to six years, and to three years and eight months, respectively for 13 violent attacks against the offices of multinational corporations, banks, and a landfill in the province of Rome.
- On July 11, a Genoa Court of Appeals upheld the 2013 conviction of Alfredo Cospito and Nicola Gai to 10 and nine years, respectively, in prison for a 2012 kneecapping attack

PX209

against Roberto Adinolfi, Chief Executive Officer of the Ansaldo nuclear engineering company.  The IAF had claimed responsibility for the incident.

- On August 27, authorities announced that they had been conducting an investigation on five persons suspected of being close to violent Islamist extremist groups. Some of them might have recruited foreign terrorist fighters willing to fight in Syria and Iraq.
- On October 14, the prefecture of Naples expelled a French citizen who repeatedly expressed approval for violent Islamist extremist movements.
- On November 11, police arrested a Tunisian man suspected of having established an Ansar al-Shari'a cell.  During a random inspection of a car, the man tried to fire a bullet at police officers and escape.  Investigators found an original ISIL flag in the caravan where alleged cell members lived.  Another Tunisian member of the same group, suspected of drug trafficking, disappeared after the arrest of his associate.
- On December 22, 14 people were arrested and 31 placed under investigation in L'Aquila (Abruzzo) accused of domestic terrorism.  The suspects allegedly belonged to a far-right movement ideologically inspired by the former Italian, neo-fascist "New Order" movement.  The suspects were accused of incitement of terrorism, subversion of democracy, conspiracy, discrimination, and of racial, ethnic, and religious violence directed at state objectives.  The charges documented repeated attempts by the group to procure weapons through robbery or from abroad.

**Countering the Financing of Terrorism:**  Italy is a member of the Financial Action Task Force (FATF) and the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a FATF-style regional body (FSRB); it has observer status with the Eurasian Group on Combating Money Laundering and Financing of Terrorism, an FSRB.  Italy cooperated with foreign governments, including the United States, as an active member of the FATF and the Egmont Group.  Italy also participated in the UNSCR 1267/1989 and 1988 designation process both as a sponsoring and co-sponsoring nation.  Italy is co-chair of the ISIL Counter Finance Group (ICFG).

The Italian judiciary and financial police (*Guardia di Finanza*) continued to identify and freeze the assets of sanctioned individuals and organizations and to prosecute terrorist financing cases.  In addition, Italy carried out several counterterrorism operations and prevented international money transfers to terrorist groups.  Judicial and law enforcement efforts to counter terrorist financing included monitoring financial transactions such as financial services companies specializing in wire transfers, bank transfers, pre-paid electronic cards, payments on fraudulent invoices, and cash-in-transit.  Cash-in-transit to countries involved in terrorist activity has decreased slightly.

Italy does not require that non-profit organizations send suspicious transaction reports.  Reporting entities are, however, required to consider the specific money laundering and terrorist financing risks when entering in a relationship or carrying out transactions that involve non-profit organizations.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

PX209

**Regional and International Cooperation:**  Italy is a founding member of the Global Counterterrorism Forum (GCTF) and actively participates in its work.  In its capacity as EU President, Italy hosted a December 11-12 GCTF Expert Workshop on Reintegrating Returning Foreign Terrorist Fighters:  Challenges and Lessons Learned.  Italy also supported counterterrorism efforts through the G-7 Roma-Lyon Group, the OSCE, NATO, the UN, and the EU.  The Italian government and law enforcement, in particular the *Carabinieri,* engaged actively in international law enforcement and military capacity building programs.

**Countering Radicalization to Violence and Violent Extremism:**  Italy has a long history of countering organized crime and radical ideological movements.  Italy's countering violent extremism toolkit includes an anti-radicalization program in its prison system.  The Ministry of Justice's Prison Police continued financing counter-radicalization programs to train 120 agents working in the four prisons where persons convicted of terrorism were incarcerated.  Prison Police worked with Italy's largest Muslim confederation to assist in de-radicalization efforts within the prisons.  Outside of prison, Italy's diverse immigrant community and well-pronounced regional distinctions made it difficult for terrorist recruiters to employ broad-based or counter-state narratives.  To the extent domestic recruitment of violent Islamist extremists occurs, it appears largely concentrated in the more industrialized North, although there were unconfirmed media reports of alleged foreign terrorist fighters emerging from Rome and Naples.

## KOSOVO

**Overview:**  The threat of violent Islamist extremism has been slowly growing in Kosovo since its 1999 conflict, assisted in part by funding from foreign organizations that preach extremist ideologies.  Approximately 150 to 200 foreign terrorist fighters from Kosovo have traveled to Syria and Iraq to fight for the Islamic State in Iraq and the Levant (ISIL) or al-Nusrah Front, of which approximately 20 have been killed.  Violent extremist groups actively use social media to spread propaganda and recruit followers.  To date, no terrorist incidents have taken place inside Kosovo.  An online posting of a video showing a Kosovo foreign terrorist fighter beheading a youth in Syria in the summer contributed to the Government of Kosovo's decision to launch its first large-scale counterterrorism operation.  The Government of Kosovo has thus far focused its counterterrorism efforts on law enforcement.  Kosovar security officials began initial efforts in this year to reach out to non-security ministries, independent media, NGOs, and religious organizations to enlist their support on preventing radicalization of young people and reintegrating foreign terrorist fighters.  A six-month delay in forming a new government following June elections slowed such efforts, however.  The new government immediately reapproved previous draft legislation prohibiting citizens from fighting in foreign conflicts.

The Government of Kosovo welcomed cooperation with the United States on counterterrorism issues.  The United States has mentored and assisted law enforcement and judicial institutions on active counterterrorism cases.  The United States has provided counterterrorism training opportunities through the Export Control and Related Border Security program, the International Criminal Investigative Training Assistance Program, Overseas Prosecutorial Development and Training program, and the Office of Defense Cooperation.

PX209

Because the security and political situation in northern Kosovo continues to limit the government's ability to exercise its authority in that region, the NATO Kosovo Force (KFOR) and EU Rule of Law Mission (EULEX) work with the Kosovo Police (KP) to maintain a safe and secure environment and strengthen the rule of law, including at the borders.  Kosovo's ability to exercise its authority in the north has improved since the signing of the 2013 Brussels Agreement to normalize relations with Serbia, but the two countries have yet to fully implement the agreement.  Although Kosovo and neighboring Serbia do not usually cooperate on counterterrorism issues, the governments have had an Integrated Border Management (IBM) plan in place since 2013 and have participated in joint U.S. government-sponsored training.

Kosovo is a member of the Global Coalition to Counter ISIL and has taken steps to support the various lines of effort within the limits of its capabilities.  It has primarily focused on stemming the flow of foreign terrorist fighters, tracking and restricting financing for terrorist groups, and providing humanitarian assistance to refugees from Syria.  In 2014, Kosovo authorities arrested around 70 individuals suspected of terrorism, around 40 of whom were returned foreign terrorist fighters.  The Financial Intelligence Unit (FIU) is tracking the finances of individuals and NGOs suspected of connections to terrorism.  The Government of Kosovo is beginning to discuss ways to counter ISIL-related propaganda, but has taken no concrete steps.  Kosovo is not a member of the UN and not an official party to UNSC Resolutions 2170 and 2178, however the Government of Kosovo has pledged to implement these resolutions unilaterally.

**Legislation, Law Enforcement, and Border Security:**  Kosovo's legislative framework is sufficient to prosecute individuals suspected of committing or supporting terrorist activities, but prosecutors lack experience in trying such cases.  Kosovo officials recognized the need to improve interagency cooperation.

Kosovo has a comprehensive legal framework that covers all criminal aspects related to terrorism. The Criminal Code of Kosovo follows the UN model on counterterrorism criminal legislation and criminalizes all forms of terrorism, including commission, assistance, facilitation, recruitment, training, and incitement to commit terrorism.  It also criminalizes concealment or failure to report terrorists or terrorist groups, organization and participation in terrorist groups, and preparation of terrorist offenses against the constitutional order and the security of the state of Kosovo.  It defines a terrorist group as a structured group of more than two persons, established over a period of time and acting in concert to commit terrorism.  In addition, the Criminal Procedure Code provides authorities with all the necessary powers to investigate and prosecute such cases, including the possibility to use covert measures such as wiretapping, undercover agents, disclosure of financial data, and interception of computer communications.  It further gives authorities flexibility to investigate criminal activity during the planning stage in order to prevent crimes and terrorist acts.  The Procedural Code also allows Kosovo courts to admit evidence from other countries, thus allowing prosecution of international terrorism in Kosovo.  This framework provides the relevant authorities with the tools necessary to fight all forms of terrorism.

Kosovo authorities drafted legislation in 2014 that would criminalize participation in or support for a military group that operates outside of Kosovo.

PX209

Kosovo's law enforcement authorities demonstrated some capacity to detect prospective foreign terrorist fighters and prevent them from joining the conflicts in Syria and Iraq. Authorities are inexperienced in dealing with terrorism cases, however, and communications and information sharing remained a challenge for law enforcement. The Ministry of Internal Affairs revised its counterterrorism strategy. The Kosovo Police Directorate against Terrorism undertakes counterterrorism investigative functions, and has experienced resource constraints that interfere with its ability to track suspected individuals. Prosecutions of terrorism cases are handled by the Special Prosecution Office (SPRK), which is composed of local and international prosecutors. The law provides the SPRK with exclusive jurisdiction over terrorism cases. Prosecutors' lack of experience in dealing with terrorism-related cases complicates efforts to prosecute. The United States is mentoring law enforcement and prosecutors on terrorism-related cases. Representatives from Kosovo attended training activities and conferences on counterterrorism-related topics sponsored by the EU and the United States.

Kosovo has issued biometric travel and identity documents since 2013. All major border crossing points, including Pristina International Airport, are equipped with computerized fraudulent/altered document identification equipment, for which a database is updated regularly with information from other countries. The electronic Border Management System does not interface with Interpol, however, and does not always function properly. The KBP and Directorate against Terrorism also use biometric equipment to enroll suspicious foreigners entering or applying for benefits in Kosovo and locals who may be affiliated with terrorism. Although the Law on Border Control obliges airlines to submit Airline Passenger Name Recognition lists to Kosovo, KBP has had technical difficulties using the information. KBP is working with the Civilian Aviation Authority to resolve this problem. KBP applies specific profiling techniques to identify persons attempting to travel to Syria and Iraq to join ISIL. In 2014, the KBP identified and blocked at least 12 such persons from leaving Kosovo and turned them over to the Directorate against Terrorism. Finally, with U.S. assistance, KBP is revising its curricula used to train border officers to focus more on early identification of persons affiliated with terrorism. Kosovo is not a member of the UN, Interpol or Europol; the UN Mission in Kosovo and EULEX serve as Kosovo's intermediaries with these organizations, slowing down cooperation and preventing Kosovo from having access to their screening databases.

The Government of Kosovo mounted its largest counterterrorism operation to date in summer 2014 when it arrested 59 individuals suspected of terrorist activity. Investigations were ongoing, with no indictments filed; many of these suspects remained under house arrest at year's end. The prosecution and the police were working together to collect evidence to indict these individuals. Kosovo authorities were working with EULEX to prosecute six other individuals arrested in June in connection with a separate case; all six suspects remained in detention at year's end. Six terrorism suspects arrested in a November sting operation also remained in detention while authorities investigated the case.

Kosovo showed increasing political will during the year to address threats related to terrorism, and the state possesses the legal framework to do so. However, national institutions -- including investigative and prosecutorial elements -- have limited capacity, resources, and experience to handle terrorism cases effectively. The United States will continue to provide training and

124

PX209

mentoring assistance to build the capacity of these institutions overall and specifically as it relates to counterterrorism cases.

**Countering the Financing of Terrorism:**  The Kosovo financial intelligence unit is not a member of the Financial Action Task Force or any similar regional body.  Kosovo has a Law on the Prevention of Money Laundering and Terrorist Financing, which allows it to comply with international anti-money laundering (AML) and counterterrorist finance (CFT) standards.  This law also established enforcement mechanisms for the examination of reporting entities and narrowly defines terrorist financing.  However, Kosovo is not a member of a Financial Action Task Force-styled regional body, and lacks an appropriate registration and monitoring system to track NGOs that receive funding from suspicious entities.

Kosovo adopted additional legislation and regulations exclusively pertaining to Terrorist Finance.  In January, authorities adopted the Strategy on Prevention and Combating Informal Economy, Money Laundering, Terrorist Financing, and other Financial Crimes.  Other legislation, amendments, and directives are pending on AML, CFT, and its indicators.

Kosovo has not consistently frozen and confiscated assets without delay.  Kosovo has at least one case in which €499,000 (US $595,550) was frozen per a court decision.  The case is in its initial stages, and the prosecutor may only freeze bank accounts for 72 hours, during which time the pretrial judge is obliged to approve or reject the freezing order.  Under a judge's temporary order, assets may be frozen for 30 days, but owners may dispute asset freezes.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  The OSCE has provided training to Kosovo law enforcement on terrorism-related topics.  Kosovo's membership in many regional and international organizations has been blocked because a number of countries do not recognize its independence, which impedes cooperation on many issues, including counterterrorism.  Further, due to Serbia's opposition and Bosnia and Herzegovina's non-recognition, Kosovo faces difficulties in participating in regional counterterrorism initiatives.

Kosovo has undertaken several efforts in support of counterterrorism capacity building and cooperation with other states.  On December 5-6, Kosovo hosted a regional conference on "Challenges in the Combat against Organized Crime and Terrorism and Cooperation in South-Eastern Europe," with support from the United States.  Chief State Prosecutors from Macedonia, Albania, Montenegro, Croatia, and Slovenia participated.  The conference served as a forum to promote and increase regional cooperation in the fight against terrorism.  The Kosovar government participated in the Foreign Terrorist Fighters roundtable for Balkan countries hosted by the State Department on the margins of the UNGA.

**MACEDONIA**

PX209

**Overview:**  Counterterrorism efforts in Macedonia include the passing of a law criminalizing fighting for, aiding, or abetting foreign terrorist groups.  Dozens of Macedonian citizens have traveled to Syria and Iraq as foreign terrorist fighters in recent years, although there are indications that the foreign terrorist fighter law passed in September 2014 may be having some deterrent effect.

Macedonia is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant.  Macedonia's Minister of Foreign Affairs confirmed that UN Security Council Resolution 2178 has been provided to all relevant government ministries for implementation.  Completed or ongoing actions that further the resolution's objectives include the passage of Macedonia's revised foreign terrorist fighter law, the government's hosting of a conference for European law enforcement and intelligence officials to discuss addressing the foreign terrorist fighters threat, the creation of an interagency foreign terrorist fighters-focused body, and the development of a counterterrorism action plan.

**2014 Terrorist Incidents:**  There were no major terrorist incidents in Macedonia.  A government building housing the Prime Minister's office was damaged in the middle of the night on October 28 by unknown perpetrators.  Although no one was injured, two rounds, possibly rocket-propelled grenades, were fired at the empty and closed building.  According to a letter published in local media, a group calling itself the "National Liberation Army" (NLA) claimed responsibility for the attack.  Some analysts dismissed the letter as not credible because it was released almost one week after the attack and did not make any demands.  A letter, allegedly from the same group, also claimed NLA responsibility for two minor explosions outside police stations in Tetovo and Kumanovo on December 9.

**Legislation, Law Enforcement, and Border Security:**  Macedonia's criminal code, criminal procedure code, and law on prevention of money laundering and terrorist finance contain comprehensive counterterrorism provisions.  Domestic and international acts of terror are proscribed, and in September, the country's counterterrorism law was modified to include a provision criminalizing participating in a conflict outside Macedonia's borders as a foreign terrorist fighter.

The U.S. government is engaged in numerous efforts to strengthen criminal justice institutions and promote the rule of law.  These include a number of Department of State-funded assistance projects that focus on the Ministry of the Interior (MOI) Public Security Bureau, as well as justice sector projects that support the implementation of the recently adopted Criminal Procedure Code.

Macedonia's security sector is well equipped and disposed to deal effectively with terrorism within its borders.  Primary responsibility for detecting and investigating terrorism falls to the Administration for Security and Counterintelligence within the MOI.  Interdiction and arrest capabilities lie primarily with the Special Units, namely the Rapid Deployment Unit and the Special Task Unit, also within the MOI.  The "Alpha" units of the Skopje Police Department (also MOI) respond to kinetic activity within Skopje (approximately half of Macedonia's citizens live in Skopje); however, this unit is also deployed outside of Skopje.  Since all of these entities are within the MOI, there are generally no problems in coordination among them.

PX209

**Countering the Financing of Terrorism:**  Macedonia is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force-style regional body, and has completed its fourth evaluation.  Macedonia is also a member of the Egmont Group, a global association of financial intelligence units.

Macedonia is not an offshore financial center, and the Law on Banks does not allow the existence of shell banks in Macedonia.  Banks do not allow opening of anonymous bank accounts and bearer shares are not permitted.

With the latest changes to the anti-money laundering/combating the financing of terrorism law from September 2014, non-profit organizations were taken off the list of obliged reporting entities.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Macedonia is an enthusiastic counterterrorism partner both regionally and internationally, although Greece's unwillingness to recognize Macedonia's name sometimes limits Macedonia's ability to fully participate in multilateral fora.  Foreign Minister Poposki participated in the Foreign Terrorist Fighters roundtable for Balkan countries hosted by the State Department on the margins of the UNGA.  In October, Macedonia hosted a regional conference for European law enforcement and intelligence officials to discuss counterterrorism and foreign terrorist fighter issues.

**Countering Radicalization to Violence and Violent Extremism:**  The Macedonian government is developing a formal strategy to counter violent extremism (CVE) and has appointed a national CVE coordinator.  There have been no significant efforts by the Macedonian government to create strategic communication or counter narratives, and there are no existing programs to rehabilitate and reintegrate terrorists into mainstream society.

## THE NETHERLANDS

**Overview:**  The Netherlands continued to respond effectively to the global terrorist threat in the areas of border and transportation security, counterterrorist financing, countering violent extremism, and bilateral and international counterterrorism cooperation.  Cooperation with U.S. law enforcement remained excellent.  In its March 2013 quarterly terrorism threat assessment, the Dutch National Coordinator for Counterterrorism and Security (NCTV) raised the national threat level from "limited" to "substantial," the second highest rank, indicating the chance of a terrorist attack is considered realistic.  The main factor for elevating the threat level was the uptick in the number of Dutch nationals travelling to conflict areas, especially Syria, as foreign terrorist fighters.  The Brussels shooting in May, and Islamic State in Iraq and the Levant (ISIL) beheadings in late summer, combined with some pro-ISIL demonstrations in the Netherlands, propelled the threat of ISIL-based extremism to the top of the political agenda.  In response, the

PX209

Dutch government released a *Comprehensive Action Program to Combat Jihadism* in August that included both existing and proposed measures to halt the flow of foreign terrorist fighters to Syria and elsewhere.  The plan focused on risk reduction, travel intervention, disruption of recruiters, countering radicalization, addressing the use of social media, and information exchange and cooperation.  Some new measures require a legislative change; others can be achieved through a change in policy or enforcement.  Resilience by the Dutch population to terrorism and violent extremism remained high.

The Netherlands is implementing UN Security Council Resolutions (UNSCRs) 2170 and 2178.  The Dutch government prevents outbound foreign terrorist fighters from leaving the country, when possible, through punitive and administrative measures (e.g., revoking passports or halting social welfare benefits).  The government pursued criminal cases against prospective and returned foreign terrorist fighters and against foreign terrorist fighter recruiters.  The government's strategy to counter ISIL propaganda has a domestic focus:  supporting opposing voices in the affected communities and suggesting to internet providers that they compare content of sites to their terms of use (Notice and Take Action).  The *Comprehensive Action Program to Combat Jihadism* expresses plans to survey and propagate a list of online violent extremist websites to raise awareness with communities, parents, and professionals.

On September 24, the government announced its membership of the Global Coalition to Counter ISIL.  The Netherlands is represented in Combined Forces Command CENTCOM, which coordinates the mission.  The Netherlands has conducted air strikes and contributed military personnel and trainers in Iraq.

**Legislation, Law Enforcement, and Border Security:**  The Netherlands continued to use counterterrorism legislation and legislation that supplements the criminal code to address terrorism.  On September 4, the government submitted draft legislation to Parliament regarding the revocation of Dutch citizenship for dual citizens after a conviction for preparing to commit a terrorist act.  On December 18, the Ministry of Security and Justice began the consultation process on draft legislation to revoke citizenship, without a court ruling, of dual national foreign terrorist fighters who have joined a designated terrorist organization.

The Netherlands' law enforcement institutions effectively demonstrated their capacity to detect, deter, and respond to terrorist threats.  The reorganization of the police into one National Police structure that began in January 2013 continued in 2014 and is scheduled to be completed in 2016.  This multi-year, country-wide reorganization effort is expected to improve police's operational capacity and effectiveness.  The Central Criminal Investigations Service of the National Police focuses on counterterrorism.

The Netherlands continued to strengthen its border security.  Dutch ports of entry have biographic and biometric screening capabilities.  The government coordinates and shares information related to foreign terrorist fighters with Interpol and Europol.  The Netherlands makes efforts to prevent potential foreign terrorist fighters from traveling to the region; as of December 2014 it had revoked 53 passports of potential foreign terrorist fighters.

PX209

The Netherlands remained strongly committed to effective cooperation with the United States on border security. The Port of Rotterdam was the first European port to participate in the Container Security Initiative (CSI); in 2014 the two governments held discussions to have CSI go from a WMD-focused initiative to incorporate all threats.

Significant law enforcement actions related to counterterrorism included:

- On May 15, authorities arrested a returned foreign terrorist fighter who allegedly planned to commit armed robbery to fund foreign terrorist fighters in Syria. His case was awaiting trial at year's end.
- On June 13, the prosecutor's office appealed a 2011 verdict on five members of the Dutch chapter of the Liberation Tigers of Tamil Eelam (LTTE) to seek higher sentences. They are charged with membership of a terrorist organization and raising funds (often through coercion) for the LTTE. In 2011, they had been sentenced to between two and six years in prison. The case was awaiting further proceedings at year's end.
- On June 24, authorities arrested one suspect on charges of incitement, recruitment, and forming a criminal organization with terrorist intent. The case was in investigative proceedings at year's end.
- On August 6, Belgian police arrested two Dutch people at the Brussels Airport on charges of membership of a terrorist group, illegal weapons possession in a terrorist context, and financing terrorism. Dutch police officers are cooperating with the Belgian police on the case.
- On August 27-28, authorities arrested two suspects on charges of incitement, recruitment, and forming criminal organization with terrorist intent. The case is connected to the June 24 arrest and was under investigative proceedings at year's end.
- On October 15, authorities arrested a man on suspicion of planning ISIL-inspired terrorist acts against local Amsterdam police officers.
- On November 25, authorities arrested three suspects on suspicion of preparing to commit terrorist acts in Syria. Three other individuals are considered suspects but were not arrested.
- On December 1, a district court sentenced a returned Dutch foreign terrorist fighter to three years in prison for preparing to commit murder with terrorist intent. This was the first trial of a returned foreign terrorist fighter from Syria and implemented the Dutch prosecution's strategy to charge individuals with preparation for (extraterritorial) crimes when there is insufficient evidence the crime was committed.
- Also on December 1, a district court acquitted a woman from charges of recruiting four girls and two men to travel to Syria. The court argued that traveling to Syria in order to marry a foreign terrorist fighter does not constitute participating in the violent conflict; therefore recruiting young girls to marry foreign terrorist fighters is not recruiting for the violent conflict. The court also ruled that because the two men were the husband and former husband of the woman, and already radicalized, her encouraging them to go to Syria did not constitute recruitment. The prosecutor's office announced plans to appeal.

**Countering the Financing of Terrorism:** The Netherlands has been a member of the Financial Action Task Force (FATF) since 1990 and is one of the Cooperating and Supporting Nations of

PX209

the Caribbean Financial Action Task Force, a FATF-style regional body.  In its February 2014 report, FATF recognized that the Netherlands had made significant progress in addressing the deficiencies from the 2011 evaluation and should subsequently be removed from the follow-up process.  The European Commission sets many rules for countering terrorist finance in directives that EU member states then implement via national legislation.  The Netherlands cooperated with the United States in designating terrorist organizations and individuals as well as interdicting and freezing assets.  Dutch authorities monitor financial transactions.  Assets of persons on terrorist watch lists are frozen.

Assets are frozen immediately when an individual or entity receives a UN designation.  The Netherlands also use EU listings and its own national designations.  The list of individuals or entities is made public, but information on the amount of assets frozen or seized is not.  As of December 2014, the assets of 18 individuals and three organizations were frozen.  In May, Dutch authorities arrested a former Syrian fighter for attempting to commit crimes to raise funds for Syrian extremists.

Non-profit organizations may choose to apply to a private entity for a "seal of approval" certification for their financial transactions.  Law enforcement can access this entity's data based on court order.  The FATF concluded that the requirements that have to be met in order to obtain this "seal of approval" are stringent.  These requirements include knowing donors and beneficiaries and having safeguards to make sure directors and employees do not have a conflict of interests.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  The Netherlands sought bilateral, multilateral, and international opportunities for exchanging information and experiences on security, counterterrorism, and foreign terrorist fighter issues.  The Netherlands is a founding member of the Global Counterterrorism Forum (GCTF) and, in 2013, the Netherlands and Morocco proposed a Foreign Terrorist Fighters Initiative under the auspices of the GCTF.  Several meetings organized in 2014, held in The Hague, Marrakech, and Abu Dhabi, led to the "The Hague-Marrakech Memorandum on Good Practices for a More Effective Response to the Foreign Terrorist Fighter Phenomenon" adopted on September 23 at the GCTF ministerial meeting.  During this ministerial, the Netherlands and Morocco recommended a new working group on foreign terrorist fighters be established under the GCTF.  This new working group, co-chaired by the Netherlands and Morocco, was inaugurated at a plenary meeting in Marrakech on December 15-16.  The Dutch participated in an informal EU core group of 11 member states that focused on foreign terrorist fighters.

The Dutch have taken a lead role in the EU to establish protocols to combat terrorist finance and provide funds to the IMF for assistance to countries that lack the resources to implement these measures expeditiously.  The Dutch cooperated with EU and OSCE counterterrorism efforts and contributed to the counterterrorism work of the UN Office on Drugs and Crime. The Netherlands

PX209

hosted the 2014 Nuclear Security Summit and continued to chair the Global Initiative to Combat Nuclear Terrorism's Nuclear Detection Working Group.

The Netherlands continued to finance a wide variety of counterterrorism capacity building projects such as the organization Free Press Unlimited in its project "Radio Life Link Somalia" and the Center on Global Counterterrorism Cooperation on its program on rule of law and criminal justice capacity and cooperation in North Africa.  The government also supported the International Centre for Migration Policy Development and programs related to terrorism and countering terrorist finance carried out by the UN Counter-Terrorism Committee Executive Directorate.  The Dutch government provided assistance to the International Center of Excellence for Countering Violent Extremism in Abu Dhabi and is a founding member of the International Institute for Justice and the Rule of Law in Malta.

The Dutch government continued to work with the International Centre for Counterterrorism (ICCT) – an independent think tank on counterterrorism issues, established in The Hague in 2010 with Dutch government encouragement.  The ICCT is implementing programs related to the collection and use of evidence collected by the military in the criminal prosecution of terrorist cases, the role victims can play in counter-radicalization, and rule of law capacity building projects in the criminal justice sector.

**Countering Radicalization to Violence and Violent Extremism:**  CVE is integrated into the Dutch government's approach to terrorism.  The government's strategy on CVE is the August 2014 *Comprehensive Action Program to Combat Jihadism,* which contains eight existing and proposed measures specifically focused on detecting radicalization and preventing new people from becoming foreign terrorist fighters.  These include increased cooperation with Muslim communities, strengthening existing networks of local and national key figures, providing support to concerned citizens, supporting education institutions, setting up expert centers on social tensions and radicalization, directing actions at high-risk areas, mobilizing societal opposition and enhancing resilience against radicalization and tensions, and stimulating social debate about the values of democracy such as rule of law.

Local governments are responsible for countering radicalization to local governments with support such as tools and training provided by the NCTV.  Many major cities are investing heavily in training local professionals.  However, following the 2013 surge of foreign terrorist fighters to Syria and Iraq (as of December 22, 2014 Dutch officials reported there were 168 known foreign terrorist fighters from the Netherlands), the NCTV and the General Intelligence and Security Service increased support to local authorities and partners.  This support includes identifying high-priority areas that are of interest to, or might host, radicalized individuals.  The NCTV also invests in information systems that combine reports and red flags from different sources in order to assess potential threats by violent extremists.

The *Comprehensive Action Program* addresses combating pro-violent extremist content on social media and the internet.  The government tracks extremist content and uses administrative measures to stop the online spread of terrorist propaganda.  Website hosting companies were requested to check the content of hosted websites against their user policies (Notice and Take Down).

PX209

Programs are created and tailored by local governments around individuals of concern and focus on identification, investigation, and prosecution.  Targets of the program include those who are becoming radicalized, those who want to go to Syria and Iraq, recruiters, and foreign terrorist fighter returnees.  Partners involved may include, but are not limited to:  the municipal government, police, the public prosecutor's office, youth care, and child protection services.  Interventions on radicalizing individuals remain case-specific and vary in intensity and design.  Several local governments have joined forces with a non-profit organization that coordinates interagency, individualized programs for at-risk or radicalized individuals.  After returning to the Netherlands, foreign terrorist fighters undergo a threat assessment by the government.  Some returnees are prosecuted.  The Netherlands also rehabilitates and reintegrates returned foreign terrorist fighters into mainstream society.

## NORWAY

**Overview:**  Norway's internal security service continued to assess that violent Islamist extremism remains the primary threat to the security of Norway.  A small but outspoken group of violent Islamist extremists continued to be active in Oslo, although they were not responsible for any attacks.  In 2014, a number of prominent cases raised concern about Norwegians radicalizing at home and traveling abroad to participate in terrorist activities.  According to media reports, the Police Security Service (PST) publicly stated that more than 70 Norwegian residents had traveled to Syria and Iraq to fight in the conflict there.

In July, the government went on high terror alert upon receiving various streams of intelligence indicating that returning foreign terrorist fighters to Europe representing the Islamic State in Iraq and the Levant (ISIL) were planning an attack, possibly in Norway.  On November 5, the PST raised the terror alert for the next 12 months, saying that a terrorist attack in Norway by violent extremists was "likely."

Norway is a member of the Global Coalition to Counter ISIL and the government co-sponsored UN Security Council Resolution (UNSCR) 2178 on foreign terrorist fighters.  In October, the government announced it would send 120 trainers to participate in two capacity building missions for Iraqi security forces.  Norway provided approximately US $200 million in 2014 to address the humanitarian crises in Iraq and Syria.  Although not a member, Norway is active in the Global Counterterrorism Forum (GCTF) and participated in the December 9 Hedayah/GCTF Countering Violent Extremism Communications Expo in Abu Dhabi.

**Legislation, Law Enforcement, and Border Security:**  Terrorism is a criminal offense in Norway.  Current laws criminalize conducting or planning to conduct a terrorist attack; receiving terrorism-related training; or providing material support to a terrorist organization with money, materials, recruitment, fighting, and related crimes.  Maximum prison sentences are 30 years for serious terrorism offenses.

The PST is responsible for domestic security, including counterterrorism activities.  A joint analysis cell with participants from the PST and the Norwegian Intelligence Service (NIS), the external security service, became fully operational in 2014.  Both the PST and the NIS have

132

PX209

placed significant resources in identifying, tracking, and taking action against Norwegian citizens who wish to travel to and from Syria and Iraq to engage in fighting.  The PST and NIS maintain an evolving list of those who have traveled to Syria and Iraq, those who have returned, and those who have expressed an interest in traveling to the two countries.

Norwegian immigration authorities continue to use biometric equipment for fingerprinting arrivals from outside the Schengen area.  Immigration to Norway is facilitated and regulated by the Norwegian Directorate of Immigration, which processes all applications for asylum, visas, family immigration, work and study permits, citizenship, permanent residence, and travel documents.

Norway faces some legal and technical barriers to stemming the flow of foreign terrorist fighters.  The largest legal barrier faced by Norwegian authorities related to the foreign terrorist fighter issue is that Norway cannot revoke or permanently hold a citizen's passport for expressing support for a terrorist group (or expressing an interest to travel to Syria and Iraq), nor return an asylum-seeker who expresses support for a terrorist group to an area with ongoing conflict, such as Syria or Iraq.

Since enacting the 2013 counterterrorism laws, the Norwegian authorities have filed criminal charges against approximately five Norwegian individuals, which would not have been possible prior to the adoption of the new laws.

**Countering the Financing of Terrorism:**  Norway is a member of the Financial Action Task Force (FATF) and a member of the Egmont Group, a global association of financial intelligence units.  The Government of Norway has largely adopted and incorporated FATF standards and recommendations.  In response to UNSCR 2178, the government established an interagency group to combat money laundering and terrorist finance, which includes representatives from the Ministries of Justice, Finance, and Foreign Affairs.

Non-profit organizations are subject to strict accounting and regulatory requirements and the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime is charged with monitoring and the periodic testing of these requirements.

While the government does not physically distribute lists, all relevant financial institutions are required to be updated and compliant with new lists, and they feed new lists directly into their own computer systems.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Norway is active in multilateral fora in counterterrorism efforts.  Norway co-sponsored UNSCR 2178 on foreign terrorist fighters, and continued its support to the UN Counter-Terrorism Implementation Task Force (CTITF).  Norway remains a member of the EU's Radicalization Awareness Network, an umbrella network of practitioners and local actors involved in countering violent extremism that

PX209

is designed to enable the members to share and discuss best practices in spotting and addressing radicalization and recruitment leading to acts of terrorism. Norway has been an active participant in the GCTF and took part in the Horn of Africa Working Group meeting in Nairobi in March, as well as the Detention and Reintegration Working Group meeting in Bali in August. Through the GCTF, Norway has implemented several new projects in the area of counterterrorism and countering violent extremism (CVE).

Together with Turkey, Norway is supporting the development of a Countering Violent Extremism Action Plan for the Horn of Africa. Norway has provided US $150,000 to the African Center for the Study and Research on Terrorism, located in Algiers, for the project to strengthen controls over the cross-border movement of terrorists in spaces between official border posts. Norway continues to implement its agreement with the University of Pretoria's Institute for Strategic Studies to build counterterrorism capacity in the police and judiciary systems of African countries, totaling US $1.1 million from 2013 to 2015. Norway also provided US $80,300 to a joint project led by the UN's Counter-Terrorism Executive Directorate and the Global Center on Cooperative Security to promote regional counterterrorism cooperation in South Asia.

**Countering Radicalization to Violence and Violent Extremism:** In June, the Norwegian government published its national Action Plan against Radicalization and Violent Extremism, which is a whole-of-government approach to CVE. Priorities include strengthening research on CVE, improving national and local cooperation on counter-radicalization efforts, helping to promote reintegration of former violent extremists, and preventing online recruitment and radicalization. The Prime Minister has encouraged municipal governments to implement CVE efforts at the local level. Several municipalities around Oslo fjord, which PST assess is the most vulnerable to radicalization to violence, have increased their CVE efforts, including passing CVE action plans and increasing budgets for CVE and counter-radicalization activities.

## RUSSIA

**Overview:** The Russian government continued to make Russia's counterterrorism efforts a priority during 2014. This was especially true in light of the incident-free February 2014 Sochi Winter Olympic Games, organized in proximity to areas of the North Caucasus where ongoing violence and violent extremist activity had occurred, resulting in heightened concern over potential terrorist activity targeting the Games.

Russia was willing to work with the United States and multilaterally on counterterrorism issues, but challenges remained. While some bilateral counterterrorism joint activities were suspended in the wake of Russia's purported annexation of Crimea, mechanisms for communication and cooperation remained, including in multilateral bodies. The Government of Russia continued to cooperate with the FBI's investigation of the Boston Marathon bombing.

Terrorist attacks related to problems in the North Caucasus continued to occur in Russia. Separatists and violent Islamist extremists calling for a pan-Islamic Caliphate within the North Caucasus constituted the main terrorist threats. Domestic violent Islamist extremists committed two terrorist attacks in Chechnya, in the North Caucasus, in the second half of the year – the first

PX209

such major attacks in the region in a decade.  The emergence and strengthening of the Islamic State in Iraq and the Levant (ISIL) in Syria and Iraq in 2014 prompted some expressions of official Russian concern about ISIL's potential to influence domestic insurgent groups.

On December 29, Russia's Supreme Court issued a ruling recognizing ISIL as a terrorist organization and banned its domestic activity.  With the ruling, participation in ISIL activities became a criminal offense under Russian legislation.  In addition, Russia also took measures to address the issue of foreign terrorist fighters, which included law enforcement and judicial actions that resulted in the conviction of at least four Russian citizens, all of whom were sentenced to prison terms.  Additional arrests were made but comprehensive information on foreign fighter cases was not publicly available.

**2014 Terrorist Incidents:**  The Russian Federal Security Service (FSB) reported that there were 78 "terrorist crimes" committed in Russia, but it prevented 59 "terrorist crimes" and eight "terrorist attacks" from January to December 2014.  In 2014, the majority of terrorist attacks in Russia targeted law enforcement and security services using suicide bombing devices and improvised explosive devices placed in vehicles.  Especially in the regions of Dagestan, Chechnya, and Kabardino-Balkaria, the attacks were targeted and, in most cases, resulted in the death or injury of one or two persons.

- On October 5, a suicide bomber killed five police officers and himself, and injured 12 persons in Grozny, the capital of Chechnya in the North Caucasus.  This was the first suicide attack in Chechnya in 10 years.  The Interior Ministry branch in Chechnya reported a suicide bomber detonated his explosives outside the concert hall where Grozny City Day celebrations were due to begin.  The attack occurred on Chechen leader Ramzan Kadyrov's birthday.  News agencies reported that local police working a metal detector outside the concert venue became suspicious of the behavior of a young man in the crowd and as they approached him, he detonated the explosives.  Authorities identified the culprit as 19-year-old Russian citizen Apti Mudarov.
- On December 4, a second attack occurred in Grozny.  In the early morning, three cars carrying militants allegedly affiliated with the terrorist group Caucasus Emirate infiltrated the capital and clashed with police after reportedly attacking a police traffic stop.  The group then stormed a centrally located nine-story building, which housed local media.  The battle between militants and law enforcement lasted for at least 10 hours, according to official reports, and resulted in the deaths of all 11 militants, in addition to 14 police and one civilian.  Official reports stated 36 police were injured.  On December 5, Chechen leader Ramzan Kadyrov ordered the burning of the homes of families of militants involved in the December 4 attacks and the expulsion of the militants and their families from Chechnya.  According to first-hand accounts, as well as commentary from Amnesty International, on December 7-10, a total of seven houses of family members of known insurgents were burned to the ground in an act of collective punishment.

**Legislation, Law Enforcement, and Border Security:**  Russia has a comprehensive counterterrorism legal framework that includes the provisions of the Criminal Code and various federal laws to include, "On Countering Terrorism," "On Money Laundering and Terrorist

PX209

Financing," "On Countering Extremist Activity," "On Security on Transport," and "On Security in the Fuel and Energy Complex."

In 2014, Russia passed several amendments to its counterterrorism legislation that increased the penalties for, and broadened the definition of, terrorist-related crimes.  The Criminal Code, Code of Criminal Procedure, Administrative Code, and the Federal Law on the Federal Security Service were amended to include:

- Article 60.3, which makes generating or disseminating terrorist propaganda an aggravating circumstance in criminal proceedings;
- Article 64, which prevents judges from sentencing terrorists to terms less than those prescribed elsewhere in legislation, to include excluding the possibility of parole;
- Articles 83 and 78, which remove the statute limitations for terrorism and supporters of terrorist activity; and
- Various amendments that increase the maximum term of imprisonment to 35 years when a count of terrorism is added to other crimes.

In addition, Russia added two new components to Article 205.1 of the Russian Criminal Code on "Aiding and Abetting Terrorist Activity."  These additions criminalize across several counterterrorism laws the act of organizing terrorist financing, leading an act of terrorism, and leading an organization that conducts "terrorist crimes."

An amendment to the Administrative Code introduced administrative liability for legal entities that collect funds or provide financial services in the preparation, organization, or commission of an act of terrorism.  The penalty ranges from 10 million to 60 million rubles (approximately US $166,000 to US $1 million as of December 31, 2014).  In addition, Russia amended the Federal Law "On the Federal Security Service" to authorize designated FSB officers to demand an individual's identification, and conduct searches of persons, clothing, and personal belongings and vehicles.

The Russian government continued to use its "anti-extremism" legislation to prosecute peaceful individuals and organizations, including the political opposition, independent media, and certain religious minorities.  Despite having counterterrorism as its ostensible primary purpose, the law criminalizes a broad spectrum of activities, including incitement to "religious discord" and "assistance to extremism," and does not precisely define what is meant by "extremism."  The law includes no stipulation that threats of violence or acts of violence must accompany incitement to religious discord, for example.

The threat of prosecution under Russia's "anti-extremism" legislation has an intimidating effect that results in restriction of freedom of speech and religious freedom under the guise of countering terrorism.

The FSB remains the primary agency responsible for counterterrorism activities within Russia.  To a lesser extent, the Ministry of Interior (MVD) also has a role in counterterrorism matters.

PX209

The FSB International Cooperation Directorate, through a joint relationship with the National Antiterrorism Committee (NAC), has developed the "International Counterterrorism Database" (Russian acronym: MBD), which holds both an unclassified and a restricted section.  The MBD is a repository of terrorism events, subjects, organizations, and methods to which international intelligence and law enforcement agencies can contribute.  The FSB promotes this as the only international database that adheres to UNSCR 2178.

Russia issues International Civil Aviation Organization/EU (ICAO/EU) compliant passports with enhanced security features, such as holographic images on the hard plastic biographic data page.  Russian citizens have the option of receiving a five- or 10-year version.  Although ICAO/EU compliant passports were introduced in 2010, the previous style of passport (containing a photograph laminated to a bio-data page) continues to be issued and remains in widespread use.  The older document has fewer and less sophisticated security features.  Recently, the Russian government moved to further strengthen security features, passing a bill that mandated the inclusion of fingerprint data in Russian citizens' foreign travel passports.

Border guards are responsible for air, land, and sea arrivals, although with over 12,000 miles of land border and over 23,000 miles of coastline, the extent to which they are able to patrol all land and maritime crossings is unclear.  Border crossings, particularly on the frontiers between Russia and some former Soviet republics, may not be registered.  Border guards have the capability of collecting biometrics at ports of entry, and while they currently do not do so regularly, on December 10 a Presidential Executive Order went into effect requiring biometrics collection for visas issued at Russian embassies in the UK, Denmark, Burma, and Namibia, in addition to requiring passenger fingerprint scanning at Moscow's Vnukovo airport (one of three international airports in Moscow).  This initial collection was reportedly a pilot program for an envisioned worldwide rollout, but federal legislation has yet to authorize or fund this program.

Standard operating procedures for the sharing of information within Russia's government exist, but it is unclear how often these procedures are followed.  A traveler to Russia must receive a visa from the Ministry of Foreign Affairs (via an Embassy or Consulate abroad), be permitted entry by the FSB (through the Border Guard Service), and then be registered with the Federal Migration Service (until 2012 a part of the Ministry of Internal Affairs, but now an autonomous organization).

Law enforcement actions/prosecutions in 2014 reportedly included:

- On April 9, a court in the Rostov Region convicted five members of the criminal organization "Vilayat Galgaiche," with sentences ranging from 14 years to life under Articles No. 205 (Act of Terrorism), No. 209 (Banditry), No. 210 (Creation of a Criminal Group/Organization and Participation Therein), No. 222 (Illegal Acquisition, Transfer, Sale, Storage, Transportation, or Bearing of Firearms, Components, Ammunition, Explosives, and Explosive Devices), No. 223 (Illegal Manufacture of Weapons), and No. 317 (Encroachment on the Life of an Officer of a Law Enforcement Agency).
- On May 17, a court in the Dagestan Republic convicted seven members of the "Yuzhnaya" (Southern) terrorist organization of terrorism and participation in an illegal armed group.  The seven men's sentences ranged from two to fifteen years.

PX209

- On October 19, during an ensuing investigation and raid, the Ministry of Interior confirmed that law enforcement officers killed Aslan Aliskhanov, a 33-year-old Russian citizen implicated in organizing an attack, as he resisted arrest. Aliskhanov purportedly was a member of an illegal armed group and was on Russia's wanted list for participation in alleged militant activity.
- On December 5, a court in Volgograd convicted four Russian citizens of involvement in the 2013 double suicide bombings in Volgograd, which killed 34 and injured over 40 persons. Alautdin Dadayev and Ibragim Mamedov each were sentenced to 19 years in a maximum security prison on charges of terrorism and participation in an illegal armed group. Two other men, Magomed Batirov and Tagir Batirov, each were sentenced to three years and 10 months for aiding an illegal armed group.
- On December 17, Russian authorities announced that they arrested Khasan Zakayev last August, who authorities believe helped organize the October 2002 terrorist attack/hostage crisis at a Moscow theatre, local media reported. He was charged with "preparation for a terrorist attack," among other related crimes.
- Also on December 17, the General Prosecutor's Office approved the indictment of two Russians for allegedly preparing a terrorist attack in Moscow. Yulay Davletbayev and Robert Amerkhanov, both residents of Bashkortostan, were arrested in May 2014 and charged with preparing to commit a terrorist act, among other related crimes.
- On December 23, the Supreme Court in Kabardino-Balkaria (North Caucasus) convicted 57 persons of participating in an armed rebellion on October 13, 2005 in Nalchik, with the goal of creating an Islamic caliphate. As a result of the rebellion, 35 law enforcement and military personnel were killed, along with 15 civilians. One hundred thirty one officials and 92 civilians suffered injuries. All 57 were convicted under the Criminal Code for participation in an "armed rebellion, terrorism, attempt on the life of a law enforcement agency, aggravated murder, and attempted theft of a weapon," according to media reports. Five of the defendants were sentenced to life imprisonment in a special regime colony. The remaining 52 were sentenced from four years and 10 months to 23 years in prison. Human rights groups alleged there is significant evidence that authorities had tortured at least 12 of the defendants in custody. For further information, we refer you to the State Department's *Country Reports on Human Rights Practices*: http://drl.j.state.sbu/reports/HRRWord.

Russian media reported that federal and local security organs continued their counterterrorism operations in the North Caucasus. These operations, although occurring throughout the region, were mostly focused in Dagestan, Chechnya, and Kabardino-Balkaria. Operations included roadblocks, raids of public venues such as cafes, and larger-scale military-style operations, especially in rural areas. On March 18, Caucasus Emirate confirmed the death of its top leader Doku Umarov. The FSB later claimed that Umarov was killed in a combat operation, but the precise date was not established. The initial claim of Umarov's death was made by Chechen leader Ramzan Kadyrov in December 2013.

In 2014, the Russian government sentenced to prison at least four known individuals for fighting with militants against the Syrian government. Those known to have been convicted by the end of 2014 were sentenced to between two and four years in prison:

PX209

- Said Mazhayev, two years;
- Shamil Nurmagomedov, four years;
- Murat Nagoyev, four years; and
- Rustam Kerimov, three years, followed by a year of "restricted freedom" on traveling and running for political office.

Despite the tensions in the overall bilateral relationship with the United States, the FSB continued to cooperate on the Boston Marathon bombing case. Russia continued to disseminate threat information and responded to requests for information on counterterrorism matters, although its responses were often not substantive or timely. U.S.-Russian cooperation in the realm of security support during the 2014 Sochi Games, within certain limits, was effective.

While there were no known legal constraints to effective host government law enforcement and border security related to counterterrorism, attempts at judicial reforms have had little success due to a lack of political will and institutionalized corruption within law enforcement entities. Ethnic or clan ties in certain regions can make policing and prosecutions difficult. Important cases are often moved to Moscow or other regions to ensure a judge is not influenced by a clan.

**Countering the Financing of Terrorism:** Russia is a member of the Financial Action Task Force (FATF) and belongs to two FATF-style regional bodies: the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), and the Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG), in which it is a leading member and primary funding source. Through the EAG, Russia provides technical assistance and other resources towards improving legislative and regulatory frameworks and operational capabilities.

Russian banks must report suspicious transactions to the Federal Financial Monitoring Service (Rosfinmonitoring), a financial intelligence unit and member of the Egmont Group whose head reports directly to the President of Russia. Rosfinmonitoring receives reports from all non-profit organizations. The Central Bank can access these transaction reports after requesting them from Rosfinmonitoring.

In 2014, Russia enacted additional changes to Anti-Money Laundering/Combating the Financing of Terrorism (AML/CFT) legislation assuring tighter control over possible money-laundering and terrorist financing activity in the non-commercial sector in Russia. The government established a lower reporting threshold (RUB 100,000 – approximately US $1,700 as of December 2014) for Russian NGOs that receive money and in-kind assistance from abroad.

The most current data on investigations and convictions of terrorist financing is from 2013. In that year, the Russian government investigated 10 cases of terrorist financing, and one case resulted in a conviction. In addition, it suspended two transactions and froze US $18,610 from entities on the national terrorist list. The total number of measures taken in 2013 was below the five year average. In the period 2008 – 2013 there were 80 total investigations and 21 convictions. In the same period, the government suspended 32 transactions totaling US $106,172.

PX209

The law requires the freezing of assets without delay, but no later than one working day.  In 2013, two transactions were suspended and US $18,610 was frozen due to National Terrorist List concerns.

Non-profit organizations have mandatory reporting requirements on transactions of cash and other property from foreign states, international and foreign organizations, foreign citizens and stateless persons, if the value of such transaction is equal or greater than RUB 100,000 (approximately US $1,700 as of December 2014).   Russia does not use a risk-based approach towards its regulation of the sector and this and other regulations are also used to tarnish the reputations of organizations with no connection to terrorism or extremism, fixing them with the label of "foreign agent."

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Russia continued to work in regional and multilateral groups to address terrorism.  Russia participated in Global Counterterrorism Forum activities, as well as in a meeting of experts from the Anti-Terrorism Centers of the OSCE.  The Russian government supported UN Security Council Resolutions 2170 and 2178.

## SERBIA

**Overview:**  The Government of Serbia continued its efforts to counter international terrorism in 2014.  Serbia's law enforcement and security agencies, the Ministry of Interior (MUP)'s Directorate of Police and the Security Information Agency (BIA) in particular, continued bilateral counterterrorism cooperation with the United States.  Serbia's two main police organizations, the Special Anti-Terrorist Unit and the Counter-Terrorist Unit, operated as counterterrorism tactical response units.  Serbian and U.S. government officials collaborated against potential terrorist threats.  Harmonization of law enforcement protocols with EU standards remained a priority for the Serbian government.

Serbia is a member of the Global Coalition to Counter the Islamic State in Iraq and the Levant. As part of Serbia's efforts to develop a national counterterrorism center, the government sent a working-level delegation to the United States in December to speak with experts at DOJ, the FBI, the NCTC, and other agencies.  The Serbian delegation included members of the MUP's counterterrorism department, BIA, the Office of the Prosecutor for Organized Crime, the Chief Prosecutor's Office, and advisers to the Minister of the Interior.  The visit provided best practices to the delegation on tracking, analyzing, and acting upon information about known or suspected terrorists.  The Serbian delegation witnessed examples of successful interagency cooperation and how domestic counterterrorism efforts are incorporated into regional and global counterterrorism efforts.

**Legislation, Law Enforcement, and Border Security:**  The Serbian government improved its legislative capabilities with regard to counterterrorism and foreign terrorist fighter issues.  In

PX209

October, the Serbian Parliament ratified a foreign terrorist fighter bill – as an amendment to the criminal code – prohibiting Serbian citizens' participation in foreign armed conflicts, or supporting fighters or organizations participating in armed conflicts abroad.  Serbian authorities initiated their first case related to Serbian citizens traveling to fight in Syria.  The Organized Crime Prosecutor's Office indicted five individuals for conspiring to commit acts of terrorism, recruitment and training, and terrorist financing.  The government has not yet ratified its National Counterterrorism Plan, which would establish the framework for future changes in legislation and authorizations for law enforcement in the case of terrorism and foreign fighter issues.

Serbia demonstrates some capabilities but does not have a strategic, interagency approach to handling terrorism-related matters.  Serbia lacks non-criminal border control measures, such as the seizure of passports and travel bans, which could be used in cases in which security measures would be justified but prosecution would not be possible or desirable.  Friction exists between law enforcement and prosecution elements, as well as between agencies competing for primacy on counterterrorism activities.  Overlapping authorities and the lack of an overall coordination and cooperation plan further complicated efforts.  Cooperation is most intense between the MUP Directorate of Police and the BIA, with sporadic friction over competencies and information sharing.

Transnational terrorism concerns within Serbia were similar to those in other Western Balkan states, which are located on an historic transit route between the Middle East and Western Europe.  Serbia is also a source country of foreign terrorist fighters going to Syria and Iraq, particularly from its Sandzak and Presevo regions.  Serbian authorities are sensitive to, and vigilant against, any efforts by foreign terrorists to establish a presence in, or transit through, the country.  To this end, the Serbian government continued to cooperate with neighboring countries to improve border security and information sharing.  The U.S. government's Export Control and Related Border Security (EXBS) program provided training courses to multiple entities within the government to address border security.  However, long sections of Serbia's borders are porous, especially those shared with Kosovo and Bosnia and Herzegovina.  Serbia's ability to monitor and screen travelers remained limited.

**Countering the Financing of Terrorism:**  Serbia is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL) and has observer status in the Eurasian Group on Combating Money Laundering and Terrorist Financing, both Financial Action Task Force-style regional bodies.  Serbia is a member of the Egmont Group, a global association of financial intelligence units.

Serbia has yet to adopt a proposed bill allowing for the seizure of terrorist assets.

Serbia implemented UN Security Council Resolutions 1267 and 1373, but does not have a list of designated terrorist organizations and individuals that would include, among others, persons and entities listed by the UN.

Serbian authorities have an ability to seize and forfeit terrorist assets pursuant to asset forfeiture mechanisms.  Serbian authorities still lack an asset freezing mechanism.  The proposed Law on Freezing of Terrorist Assets awaits adoption by the Parliament.

PX209

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Serbia is engaged in limited regional and international cooperation on counterterrorism issues.  Elements of the Serbian government, such as MUP and BIA, cooperate with Interpol and Europol on counterterrorism activities, including watchlists.  The Serbian armed forces participated in multinational training exercises, some of which involved aspects that could be applied to counterterrorism activities; however, the majority of these training events and exercises were not directly focused on addressing terrorism.  While Serbia is a member of the NATO Partnership for Peace program, Serbia is not involved in specific counterterrorism efforts through NATO, the UN, or the OSCE.  Regarding regional border security, Serbia's level of cooperation is strongest with Bulgaria, Hungary, and Romania; cooperation with Croatia, Montenegro, and Bosnia and Herzegovina is less developed.  Because of the political sensitivity in Serbia towards Kosovo's political status, cooperation on border security is least developed between Serbia and Kosovo.  The Serbian government participated in the Foreign Terrorist Fighters roundtable for Balkan countries hosted by the State Department on the margins of the UNGA.

## SPAIN

**Overview:**  Spain was an active partner with the United States in efforts to track and disrupt transnational terrorism.  Spain deepened its cooperation with Algeria, Mali, and Mauritania to combat and contain the threat posed by al-Qa'ida (AQ), its affiliates, and like-minded groups.  The domestic terrorist group Basque Fatherland and Liberty (ETA) has not launched any attacks since it announced a "definitive cessation of armed activity" in October 2011, although the group had not formally disbanded or given up its weapons arsenal by the end of 2014.

Spain has been an active member and an outspoken supporter of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL) since its inception.  Spain is in the process of deploying a 300-strong military training mission to Iraq and will stand up and lead the Besmayah training center south of Baghdad.

Spain is actively working to improve its legal framework to more effectively counter the movement of foreign terrorist fighters from Spain to conflict zones, better pursue suspected terrorists without clear affiliation to a known criminal organization, and curtail terrorist preparatory activities online.  In terms of terrorist prosecution, Spain already boasts a mature legal framework as a result of its long fight against ETA.

**Legislation, Law Enforcement, and Border Security:**  The Spanish Criminal Code specifically punishes any act of collaboration with the activities or purposes of a terrorist organization.  Spain's counterterrorism capabilities, coordinated by the national Center for Counter-Terrorism and Organized Crime Intelligence (CITCO), have proven effective.  The National Police and Civil Guard share responsibility for counterterrorism and cooperate well with the United States,

PX209

with strong information sharing and joint threat assessments.  On December 5, 2013, Spain approved a national cyber security strategy to safeguard its critical information systems, and created the Cyber Defense Committee to coordinate its cyber-security across the various government departments.

Spain continued to focus on improved security and the detection of false documents at its borders.  Spain participated in the U.S. Immigration Advisory Program, which maintains staff at Madrid-Barajas International Airport.  The program allows for coordination between Customs and Border Protection and Immigration and Customs Enforcement officials, airline security personnel, and police regarding high-risk passengers traveling to the United States.  Spain finished implementation of an automated system to read EU passports with biometric data and explosive trace detection equipment was also deployed at Spain's five largest airports at passenger checkpoints.  Spain continued to use a network of radar stations, known as the Integrated External Surveillance System, along its maritime borders.  In September 2012, the Civil Guard began integrating Europol information in its fight against terrorism and organized crime.  Previously, only the Spanish National Police had access to the Europol data.

The Spanish and Moroccan National Police participated in five joint operations against networks of foreign terrorist fighter recruiters and volunteers in March, June, August, September, and December.  The raids led to 47 arrests, primarily in Morocco and the Spanish enclaves of Ceuta and Melilla in North Africa, but also included apprehension of suspects in Barcelona and Madrid.  Spanish and French law enforcement agencies and intelligence services carried out a joint operation in July that led to the arrest of two French terrorists in Melilla.

A number of ETA members were arrested in 2014, both in Spain and abroad.  Juan Jesus Narvaez Goñi and Itziar Alberdi Uranga were arrested in Mexico in February.  Maria Jesus Elorza Zubizarreta was arrested as she disembarked form a flight from Venezuela to Madrid in June.  Tomas Elorriaga Kunze was arrested in a joint operation by German and Spanish police in November.

**Countering the Financing of Terrorism:**  Spain is a member of the Financial Action Task Force (FATF) and the Egmont Group, a global association of financial intelligence units.  Spain was reviewed under the new round of FATF evaluations and found to have "a strong system to combat money laundering and terrorist financing, with up-to-date laws and regulations and sound institutions for combating these threats."  The evaluation also recommended improvements "such as the implementation of targeted financial sanctions to allow the freezing of terrorism-related assets."  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Since 2004, Spain has been part of the informal working group on jihadism known as the 5 + 5.  The group brings together defense ministers or their designees from five European countries (Spain, Portugal, France, Italy, and Malta) and five Maghreb countries (Mauritania, Morocco, Algeria, Tunisia, and Libya).  Its mission is to exchange information and discuss the operational implications of the threat from violent Islamist extremists in the European theater, including that posed by returning foreign terrorist fighters.

PX209

Four of the group's members—Spain, Morocco, Algeria, and Portugal—held Seaborder 2014, a joint maritime exercise, in September.  The full group met in December in Granada and expanded its mission to include cyber-terrorism/cyber-recruiting.

Spain's participation in the G-4 with Portugal, France, and Morocco also has an operational objective.  The four countries freely exchange tactics and intelligence on counternarcotics, counterterrorism, and organized crime/illegal immigration.  Spain continued its work with the Global Initiative to Combat Nuclear Terrorism and invited France and Morocco to participate in two nuclear attack simulations, one held in Spain and one in Portugal.

Spain cites the lingering effects of its economic crisis as an impediment to further regional and international counterterrorism cooperation. All efforts are made to not reduce operational capacity, according to the Ministry of the Interior, but resource constraints reduce Spain's ability to take part in international training exercises.  Spain believes the EU should supplement the country in terms of counterterrorism and border issues especially given the uniqueness of Spain's North African enclaves forming the southern border of the EU.

**Countering Radicalization to Violence and Violent Extremism:**  Spain is working toward final approval of a new national strategy for countering radicalization to violence that will establish a national group managed by the National Counterterrorism Coordination Center that liaises with local, multi-sectorial CVE groups.  Spain is an active member of the Global Counterterrorism Forum, and participated in the May 14-15 First Expert Meeting on Foreign Terrorist Fighters in Marrakech, and the Second Expert Meeting in Abu Dhabi on June 16-17.  In Abu Dhabi, Spain and the United States together presented case studies on strengthening community resilience against radicalization and the related foreign terrorist fighters threats.  The Spanish have also established a new mechanism to channel financial contributions from foreign countries to support Muslim communities in Spain, and Spain's Prison System architecture has been modified to prevent radicalization to violence.

## SWEDEN

**Overview:**  The United States and Sweden maintained good cooperation on counterterrorism and law enforcement issues in 2014.  U.S. agencies worked with their Swedish counterparts for the exchange and evaluation of terrorist-related information.  Sweden is also active within the EU, UN, and Council of Europe on countering violent extremism and the recruitment of foreign terrorist fighters.

The Swedish government continued to highlight that terrorism can be motivated by right-wing, left-wing, or religious convictions.  The Swedish Security Service (SÄPO) noted that the greatest terrorist threat in Sweden comes from violent Islamist extremists.  The Swedish Security Service also expressed concern over the growing number of foreign terrorist fighters from Sweden traveling to Syria and Iraq to receive training and provide support to the Islamic State in Iraq and the Levant (ISIL), as well as the possibility that returning foreign terrorist fighters could seek to commit terrorist attacks in Sweden or elsewhere.

PX209

The Swedish government appointed its first ever National Coordinator for Safeguarding Democracy from Violent Extremism. The Swedish government has described its approach to countering violent extremism as attempting to address underlying factors behind radicalization. The government seeks to "depolarize" Swedish society as a necessary step to counter violent extremism, with the idea that people who do not feel welcome and integrated in Swedish society might turn away from it, thereby turning to violent extremism.

The National Threat Advisory level in Sweden remained "elevated" (increased from level two to three on a scale of five levels) after first being raised in October 2010. Since then, Swedish law enforcement has disrupted several planned attacks.

Sweden is a member of the Global Coalition to Counter ISIL, and has made generous humanitarian contributions to ISIL-impacted populations in Iraq. Sweden is a significant donor of humanitarian assistance for ISIL-impacted populations, and in 2014 contributed US $43 million and US $29.4 million in humanitarian assistance to Syria and Iraq, respectively. SÄPO is concerned with rapidly increasing numbers of foreign terrorist fighters who have left Sweden to join violent extremist groups in Syria and claimed that at least 110 individuals have traveled, with estimates of those who have traveled reaching as high as 350. Some of these travelers have been killed, but others have returned to Sweden. SÄPO views the returnees with specific concern as they could potentially plan an attack in Sweden, or could radicalize and recruit others for travel. SÄPO reported to Swedish press that it is conducting several "pre-investigations" related to individuals who have returned from conflict areas with fighting experience.

Foreign terrorist fighters in Sweden are recruited mainly through word of mouth by friends or family, as well as online. Foreign terrorist fighters traveling to Syria and Iraq from Sweden are most often young men of immigrant background, but not of Syrian descent. There is anecdotal evidence of women travelling to Syria as well, although their role upon arrival in Syria is less clear, with some appearing to travel to become wives to fighters or provide other logistical support to ISIL.

The Kurdistan Workers' Party continued to carry out significant support activities such as soldier recruitment and financing in Sweden in 2014.

The Swedish Civil Contingencies Agency continuously reaches out to various agencies and communities to develop awareness of the foreign terrorist fighter threat, and the Counterterrorism Cooperative Council consisting of 13 government agencies coordinates Sweden's interagency counterterrorism cooperation. The National Center for Terrorism Threat Assessment produces long- and short-term strategic assessments of the terrorist threat against Sweden and Swedish interests. SÄPO monitors returned foreign terrorist fighters to evaluate their condition.

**Legislation, Law Enforcement, and Border Security:** Sweden's legislation criminalizes incitement of terrorist acts, recruitment to terrorist organizations, and providing of terrorism training. While five people have been convicted under these laws, only two convictions have remained standing following appeals. In all other prosecutions, courts have deemed the evidence

PX209

presented in many trials inadequate to prove that those prosecuted would actually carry out their terrorist plots, had they not been intercepted.

Swedish law enforcement prepared for a reorganization in 2015 to unite the country's current 21 separate country police departments into one national agency with seven regions; this reorganization aims to streamline police work through clearer guidance and centralization of law enforcement efforts.

Sweden amended its Act on Criminal Responsibility for Public Provocation, Recruitment, and Training concerning Terrorist Offences and other Particularly Serious Crimes (2010:299) in July 2014, to include the ratification of the international Convention for the Suppression of Acts of Nuclear Terrorism of 13 April 2005. Sweden is also undertaking an internal investigation into how to implement the various provisions of UN Security Council Resolution 2178, including the possibility of criminalizing the act of training with terrorist organization or waging war campaigns on behalf of terrorist organizations.

Sweden has a specialized division at the Prosecution Authority that deals with all terrorism-related cases. SÄPO has the main responsibility to counter terrorism in Sweden. There is timely sharing of terrorism-related information and prosecutors are consulted at early stages of investigations and work in coordination with counterparts in other components of law enforcement. Law enforcement units have a record of accountability and respect for human rights.

SÄPO works in concert with the border police and the Migration Board in countering terrorism, and is the sole agency with jurisdiction over counterterrorism investigations. SÄPO chairs the National Centre for Terrorist Threat Assessment (NCT); a permanent working group within the Swedish Counter-Terrorism Cooperation Council. The NCT is staffed by personnel from the National Defense Radio Establishment (FRA), the Military Intelligence and Security Directorate (MUST), and SÄPO. SÄPO also convenes the National Counter-Terrorism Cooperation Council (NTC, which works to increase Sweden's ability to counter terrorism.) The Counter-Terrorism Cooperation Council consists of: the Armed Forces; the Civil Contingencies Agency; the Coast Guard; Customs; the Defense Research Agency; the Economic Crime Authority; the Migration Board; the National Bureau of Investigation; the National Defense Radio Establishment; the Prison and Probation Service; the Prosecution Authority; the Radiation Safety Authority; the Security Service; and the Transport Agency. This Council facilitates sharing of information across different Swedish agencies on counterterrorism issues.

Swedish citizen Johan Gustafsson, who was kidnapped by al-Qa'ida in the Islamic Maghreb (AQIM) when visiting Mali in November 2011, remained in AQIM's detention at the end of 2014. Gustafsson was last seen in an AQIM-released photograph from August.

There was significant law enforcement cooperation in the investigation and prosecution of international terrorism. Swedish law enforcement officials work closely with U.S. counterparts and cooperation has directly supported several investigations/cases.

PX209

**Countering the Financing of Terrorism:** Sweden is a member of the Financial Action Task Force (FATF). Sweden provided its latest Mutual Evaluation Report to the FATF in October 2012. The only new passage of legislation pertaining to Terrorist Financing in 2014 was the addition of an allowance to halt a transaction for two days for suspected terrorist financing, as well as an adjustment to increased rights for confiscation of assets.

The Finance Inspection agency (in concert with many other agencies) released a report on Financing of Terrorism under the FATF mandate in March. The report raised the issues of money flows both to and from Sweden, but commented that the flows are of "small scale and of legal origin" while noting Sweden's vulnerability to many forms of terrorist financing. The report spoke of a knowledge deficit in many agencies about counterterrorist finance, noting this leads to a limited number of reported suspected terrorist financing activities. The economic crime unit and the tax authority are not required to look for terrorist financing when investigating financial crimes.

In November, the Finance Inspection launched a major investigation into Sweden's largest banks and their handling of money laundering and terrorist financing.

For further information on money laundering and financial crimes, see *the 2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Sweden is a member of the EU, and also participated in an ad hoc group of the EU and several member states to focus on foreign terrorist fighter issues. Sweden participates in the EU's Schengen cooperation and uses the Schengen Information System II for information sharing, port of entry screening, lost and stolen passport information and watch listing. Under the auspices of the PNR agreement between the EU and the United States, Sweden collects and shares PNR information from commercial flights.

Sweden co-sponsored UNSCR 2178 and supports the UN's counterterrorism efforts. During the fall of 2014, Sweden was an active partner in formulating the EU's counterterrorism/foreign terrorist fighter strategy for Iraq and Syria. Sweden also participated in the Global Counterterrorism Forum's workshop on Counterterrorism and Foreign Terrorist Fighters in Marrakech in December 2014.

Sweden continued to contribute to counterterrorism capacity building projects through its development aid work carried out by the Swedish International Development Agency, and also via funding to the UN Office on Drugs and Crime-Terrorism Prevention Branch and the OSCE. Sweden also supported the EU's work with capacity building projects in prioritized countries and regions such as Pakistan, Yemen, the Horn of Africa, the Maghreb, and the Sahel. Sweden provided trainers to the EU Training Mission in Mali (MINUSMA). Sweden is a large donor to the UN's Counter-Terrorism International Task Force (CTITF), with special focus on the CTITF workgroup that works on strengthening human rights in counterterrorism work.

**Countering Radicalization to Violence and Violent Extremism:** In a response to a report by the Defense College on how to counter violent extremism (CVE), the Swedish government

147

PX209

appointed former Social Democratic Party (SDP) leader Mona Sahlin as its national CVE coordinator in July 2014.  The Swedish government has tasked the coordinator to improve collaboration among agencies, local authorities, and organizations at the national, regional, and local level regarding efforts to prevent and counter violent extremism.

The Swedish government is investigating how to enhance existing legislation to mitigate the risks posed by foreign terrorist fighters.

On the more general topic of youth and radicalization, the Swedish Media Council has conducted a study of how the internet and social media are used to promote anti-democratic messages that encourage the use of violence for an ideological cause aimed at young people.  According to the study, preventive work should include efforts to equip young people with the tools necessary to challenge anti-democratic and violent messages targeting them from the internet, social media, their peers, and adults.  Critical media training provided by schools for young people is an important measure to prevent violent extremism in Sweden.  The Swedish Media Council has also developed an online training course for teachers.

Some municipalities strived to cultivate trusted relations with relevant community actors, to empower those best-placed to affect change, and to develop effective reintegration programs for returning foreign terrorist fighters.  Such efforts were not coordinated at the national level, however.

## TURKEY

**Overview:**  Largely because of the ongoing conflict in Syria, Turkey has voiced increasing concern about terrorist groups near its border, including Islamic State in Iraq and the Levant (ISIL), al-Nusrah Front, and other al-Qa'ida (AQ)-affiliated groups.  Throughout 2014, Turkey served as a source and transit country for foreign terrorist fighters wishing to join these and other groups in Syria.  The Government of Turkey intensified efforts to interdict the travel of suspected foreign terrorist fighters through Turkey to and from Syria and Iraq.  These efforts include the development and implementation of a "banned from entry list," as well as the deployment of "Risk Analysis Units" to detect suspected foreign terrorist fighters at airports, land border crossings, and border cities.  Cooperation with other source countries increased during the year in response to the foreign terrorist fighter threat, with both Turkey and source countries seeking to improve information sharing in particular.  Turkey is an active member of the Global Coalition to Counter ISIL.

Prominent among terrorist groups in Turkey is the Kurdistan Workers' Party (PKK).  Following three decades of conflict with the PKK, in late 2012 the Government of Turkey and PKK leader Abdullah Ocalan began talks for a peace process.  The talks continued in 2014.  The PKK called for a ceasefire in March of 2013, which both sides largely observed, apart from ongoing small-scale PKK attacks.

In 2014, Turkey continued to face significant internal terrorist threats and took strong action in response.  Activity by the Revolutionary People's Liberation Party/Front (DHKP/C), a terrorist

PX209

Marxist-Leninist group with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state, threatened the security of both U.S. and Turkish interests.

Another terrorist group in Turkey is Turkish (Kurdish) Hizballah (unrelated to the similarly-named Hizballah that operates in Lebanon).  The Government of Turkey also considers the Turkish Workers' and Peasants' Liberation Army (TKP-ML-TIKKO), and the Marxist-Leninist Communist Party (MLKP), although largely inactive, to be threats.  Because of their association with the PKK, the Turkish government considers the Syria-based Democratic Union Party (PYD) and its military wing (People's Protection Units – YPG) to be terrorist organizations.  The appearance of Hamas leader Meshaal at a congress of the ruling Justice and Development Party (AKP) in December drew attention to the Turkish government's relations with this group, which is designated as a Foreign Terrorist Organization by the United States.

Turkey is a long-standing counterterrorism partner of the United States.  It co-chairs the Global Counterterrorism Forum (GCTF) with the United States.   It received U.S. assistance to address the terrorist threat posed by the PKK in 2014.  Although ongoing peace talks mitigated violence between the PKK and Turkish government forces, isolated incidents continued.

**2014 Terrorist Incidents:**  Noteworthy attacks included:

- On March 30, three individuals identified as members of ISIL killed a policeman, a Gendarmerie non-commissioned officer, and a truck driver at a checkpoint near Nigde.  Five soldiers were also wounded.  The assailants were subsequently captured and remained in custody at year's end.
- During the week of October 6, at least 40 civilians were killed during two days of protests and associated violence.  According to Human Rights First, security forces killed 15 persons during clashes between various Kurdish groups, including PKK supporters and Huda-Par (a political party with links to Turkish Hizballah).
- On October 25, masked gunmen shot dead three Turkish soldiers in the Kurdish-majority southeast of the country.  The attack was attributed to the PKK.
- On October 29, a Turkish military officer wearing civilian clothes died after being shot in the head by two PKK militants while walking in a bazaar. On December 17, a 17-year-old boy was shot dead during armed clashes between police and assailants in mainly Kurdish southeast Turkey; one police officer was wounded.

**Legislation, Law Enforcement, and Border Security:**  Counterterrorism law enforcement efforts in Turkey remained focused on the domestic threat posed by several terrorist groups, including the PKK.  Turkey's methodology and legislation are geared towards confronting this internal threat.  Efforts to counter international terrorism are hampered by legislation that defines terrorism narrowly as a crime targeting the Turkish state or Turkish citizens.  This definition of terrorism can be an impediment to operational and legal cooperation against global terrorist networks.  No significant counterterrorism-related legislation was enacted during the year.

Due to amendments made in 2013, Turkey's counterterrorism legislation conforms more closely to EU freedom of expression standards, has a narrower definition of terrorist propaganda, and criminalizes propagation of the declarations of an illegal organization only if the content

PX209

legitimizes or encourages acts of violence, threats or force. Nevertheless, the legislation remains broad-reaching and is still being broadly applied. In 2014, Turkish authorities continued to use it to detain and prosecute thousands of politicians, reporters, and activists.

While Turkey's law enforcement capacity is generally advanced, criminal procedure secrecy rules continued to prevent Turkish National Police (TNP) authorities from sharing investigative information once a prosecutor is assigned to the case, which occurs almost immediately.

The Government of Turkey compiles a "banned from entry list" with a view to prevent travel into Turkey by individuals identified by foreign governments and internal security units as potential foreign terrorist fighters. Although the Turkish government does not have an automated Advanced Passenger Information/Passenger Name Record (API/PNR) system, it has approached the Department of Homeland Security for technical assistance in developing its own automated system. Risk Analysis Units were established at 11 major international and domestic airports, land border crossings, and border cities in an effort to identify and interdict potential foreign terrorist fighters. Border forces have increased their ability to patrol and interdict persons and contraband from crossing the border.

The TNP has highly developed counterterrorism capabilities in a number of areas and is planning to expand its law enforcement training for other countries in the region.

**Countering the Financing of Terrorism:** Turkey is a member of the Financial Action Task Force (FATF) and an observer of the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a FATF-style regional group. In October, the FATF cited improvements in Turkey's counterterrorist finance (CFT) regime and approved Turkey's exit from the targeted follow-up process of the third round of mutual evaluations. No terrorist finance cases were prosecuted.

While the Government of Turkey has issued freezing orders without delay (three to five days), it remains unknown whether any assets have actually been frozen. Freezing orders are published in the official Gazette. The nonprofit sector is not audited on a regular basis for CFT vulnerabilities and does not receive adequate anti-money laundering/CFT outreach or guidance from the Turkish government. The General Director of Foundations issues licenses for charitable foundations and oversees them, but there are a limited number of auditors to cover the more than 70,000 institutions.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Turkey is an active member of the UN, NATO, and the Committee of Experts on Terrorism. Turkey is a founding member of the GCTF and is co-chair with the United States; as co-chair, Turkey provides extensive secretariat support. Turkey also participated in OSCE expert meetings on the Prevention of Violent Extremism and Radicalization that Lead to Terrorism organized by the OSCE/Office of Democratic Institutions and Human Rights and the OSCE Secretariat.

PX209

The Government of Turkey is considering effective means to implement UN Security Council Resolutions 2170 and 2178.  As GCTF co-chair, it is developing policies in line with the framework of The Hague – Marrakech Memorandum on Good Practices for a More Effective Response to the "Foreign Terrorist Fighters" Phenomenon.

Turkey increased its cooperation with European countries regarding the activities of members of the DHKP/C.  It also worked with countries from Europe, North Africa, and the Middle East to interdict the travel of potential foreign terrorist fighters planning to travel through Turkey to Syria.

In 2014, the TNP offered counterterrorism-related training programs at its Antiterrorism Academy that are designed primarily for law enforcement officers from Central Asian countries.

**Countering Radicalization to Violence and Violent Extremism:**  The Turkish government has two significant programs to counter radicalization to violence and violent extremism.  The first, administered by the TNP, is a broad-based outreach program to affected communities, similar to anti-gang activities in the United States.  Police work to reach vulnerable populations (before terrorists do) to alter the prevailing group dynamics and to prevent recruitment.  Police use social science research to undertake social projects, activities with parents, and in-service training for officers and teachers.  Programs prepare trainers, psychologists, coaches, and religious leaders to intervene to undermine violent extremist messages and to prevent recruitment.

The second program, administered by the Turkish government's Religious Affairs Office (Diyanet), works to undercut violent extremist messaging.  In Turkey, all Sunni imams are employees of the Diyanet.  In support of its message of traditional religious values, more than 140,000 Diyanet religious officials throughout Turkey conducted individualized outreach to their congregations.  The Diyanet similarly worked with religious associations among the Turkish diaspora to provide them with access to instruction and to assist them in establishing umbrella organizations.  The Diyanet supported in-service training for religious officials and lay-workers via a network of 20 centers throughout Turkey.

## UNITED KINGDOM

**Overview:**  In 2014, the United Kingdom (UK) continued to play a leading role in countering international terrorism.  On August 29, the UK raised its terrorist threat level from "substantial" to "severe," indicating a terrorist attack is "highly likely," due to the threat from Western foreign terrorist fighters in Syria and Iraq returning to the UK and potentially targeting the aviation sector.  The UK had not raised its threat level to severe since the failed aviation attack in the United States in December 2009.  Domestically, the UK government continued to implement its updated counterterrorism strategy, CONTEST, which was released in 2011 and updated in 2013.  The threat from radicalized fighters returning to the UK from Syria and Iraq resulted in a significant shift of counterterrorism resources and became the UK's number one counterterrorism priority.  However, the UK remained concerned about threats from al-Qa'ida in the Arabian Peninsula, Yemen, Libya, East Africa, as well as from home-grown violent extremists.

PX209

Northern Ireland continued to face a terrorist threat from a small minority of violent dissident republican groups who oppose the peace process. Police and prison officers remained their principal targets.  Police Service of Northern Ireland (PSNI) senior officials reported that a number of attacks involved weaponry of growing sophistication with tactics similar to those used in Iraq and Afghanistan.  Although tactically proficient, the dissidents lacked strategic acumen.  The two principal loyalist paramilitary organizations, the Ulster Defense Association (UDA) and the Ulster Volunteer Force (UVF) continued to exist.  Tensions and in-fighting within both the UDA and UVF also persisted and remained a cause for concern.

The UK is an active member of the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).  From the start of the U.S.-led air campaign in Iraq, the UK has contributed by providing surveillance and reconnaissance support, conducting airstrikes, and delivering humanitarian assistance and munitions.  The UK has eight Tornado aircraft based in Akrotiri for use against ISIL.  The UK government made clear that UK troops would not have a combat role on the ground although British trainers have deployed to Iraq to help build Iraqi security force capacity.  UK government agencies and NGOs have increased efforts to counter ISIL messaging under the auspices of its Prevent program of community outreach.

**2014 Terrorist Incidents:**  While terrorist groups were active throughout the UK, the majority of attacks occurred in Northern Ireland, with the notable exception of the parcel bombs sent to armed forces recruitment centers in England in February.  Dissident republican groups, the Real IRA (RIRA), Continuity IRA (CIRA), and Óglaigh na hÉireann (ONH), remained actively opposed to the peace settlement in Northern Ireland.  As of October, the UK's Northern Ireland Office recorded 18 national security attacks in Northern Ireland.

- In February, the IRA claimed responsibility for parcel bombs sent to armed forces recruitment centers in England.  Four suspected explosive devices were discovered at Army careers offices in Oxford, Brighton, Canterbury, and the Queensmere shopping center in Slough.  Packages were sent to Aldershot, Hampshire, and another two armed forces careers offices in Reading, Berkshire; and Chatham, Kent.  Downing Street said the small but potentially viable devices "bore the hallmarks of Northern Ireland-related terrorism."
- On October 7, dissident republicans threw a 60-centimeter long pipe bomb at a police patrol vehicle.  Although the device did not detonate, the Police Service of Northern Ireland (PSNI) labelled it "advanced" and "sophisticated."
- On October 14, dissidents placed a pressure-activated device in the garden of an unoccupied home in Derry/Londonderry.  Police arrived at the site after receiving a phone call, after which army experts disarmed a "complex and sophisticated device designed to maim and kill."
- On November 2, a horizontal mortar, fired by command wire, hit a police vehicle in Derry/Londonderry and damaged one of the rear doors before it bounced into a garden where it exploded.  Police suspect that dissident republicans were responsible for the attack.

PX209

- On November 16, suspected dissident republicans used a home-made rocket launcher to attack a police Land Rover in North Belfast. It struck the vehicle and caused some damage, but no one was injured.

**Legislation, Law Enforcement, and Border Security:** UK laws allow the government to investigate and prosecute terrorists using a variety of tools. In July, the UK enacted the Antisocial Behavior Crime and Policing Act 2014, which amended the port and border security powers in Schedule 7 of the Terrorism Act 2000. The new code of practice increased the protection of individual freedoms during counterterrorism-related border stops. In November, Parliament began review of the Serious Crime Bill, on track to be enacted in 2015. The bill includes a provision which would make extra-territorial terrorist acts prosecutable in the UK.

The UK has a highly capable network of agencies involved in counterterrorism efforts. The Metropolitan (Met) police lead the UK's national counterterrorism law enforcement effort. The Met police work closely with local police, MI5, and other agencies in terrorism investigation, prevention, and prosecution. Using a regional policing model, the Kent Police, UK Border Force, and various counterterrorism units across the UK prioritized Syrian foreign terrorist fighters/returnees as part of their investigative remit. For example, the Kent Police and the UK Border Force played a central role in identifying and disrupting the foreign fighter flow across the UK border crossing at Dover Port.

The relationship between U.S. Department of Justice personnel assigned to the Embassy and the Metropolitan Police Extradition Unit is robust and has led to seamless information sharing and resource allocation. For example, on September 4, the UK ordered Haroon Aswat, a UK-based individual, to be extradited to the United States to face terrorism charges. Aswat faces charges of conspiring to provide and providing material support to al-Qa'ida and for attempting to establish a terrorist training camp in the United States.

UK experts estimate at least 500 Britons joined the conflict in Syria and Iraq and around 27 have allegedly died in those countries. According to the Met, about 50 people per week are referred to de-radicalization programs. Police prevention is at its highest since the aftermath of the July 7, 2005 attack on London's transport system. Police made over 200 terrorism-related arrests in 2014, a significant increase, as a result of conducting high numbers of counterterrorism investigations. Police charged at least 16 people for terrorism-related offenses after returning from Syria and Iraq.

2014 law enforcement actions in Great Britain included:

- On February 25, police arrested a former Guantanamo detainee, Moazzam Begg, on suspicion of Syria-related terrorism offences. Begg was one of four arrested in Birmingham in addition to a man aged 36 from Shirley, Solihull; and a 44-year-old woman and her son, aged 20, from Sparkhill, Birmingham.
- On September 25, British police arrested nine men in London on suspicion of encouraging terrorism and being members of banned organizations. One of the men identified is Anjem Choudary, one of the most high-profile radical Muslim preachers in Britain. Choudary, 47, was previously the head of Islamist group al-Muhajiroun or

PX209

Islam4UK, which was banned in 2010.  Choudary is well-known for organizing demonstrations against Western military action in the Middle East and for publicly expressing support for the September 11 attacks on the United States and the July 7 bombings in London.

- On October 14, 2014, counterterrorism police arrested six people in raids across southern England following other detentions in London and the English Midlands.  Two men, ages 23 and 26; and two women, ages 23 and 29; were arrested on charges related to suspected terrorism, while a 57-year-old man and a 48-year-old woman were detained on suspicion of failing to disclose information about terrorism.  The 57-year-old man was also held on suspicion of "engaging in conduct in preparation of terrorist acts and arranging availability of money and property for use in terrorism."

- On October 22, counterterrorism police arrested a 32-year-old man and a 25-year-old woman in two separate probes linked to violent extremism in Syria.  The man was arrested on suspicion of having visited a terrorist training camp.

- On November 7, authorities arrested four men for suspected terrorism.  Police rounded up the men, ages 19 to 27, from four different southern England locations.  Armed police, rarely deployed in the UK, took part in three of the arrests, though no shots were fired.  The force's Terrorism Command, working with the regional South East Counter Terrorism Unit and Britain's intelligence agency MI5, made the arrests as "part of an ongoing investigation into Islamist-related terrorism."

- On November 26, two British brothers were sent to prison for conspiring to attend a terrorist training camp in Syria, becoming the first Britons jailed after returning from the war-torn country.  Hamza and Mohommod Nawaz, from London, were arrested in September 2013 after arriving in England by ferry from France.  Police say they were carrying AK-47 ammunition brought home as a trophy as well as photos and videos from their time in Syria.  The brothers pleaded guilty, and 23-year-old Hamza Nawaz was sentenced to three years in prison.  His 31-year-old brother, described as the instigator of the plan, received four-and-a-half years.

In Northern Ireland, the Crime Operations Department is responsible for conducting terrorism investigations and works closely with MI5 and Gardai (Ireland's police force) on a range of issues.  PSNI senior officials reported that cooperation was "better than ever."  As a direct result of their efforts, there were major disruptions, arrests, and convictions, as well as seizures of arms and improvised explosive device components that impeded violent dissident republican activity.  Between October 1, 2013 and September 30, 2014 police seized 26.1 kilograms of explosives, almost three times the amount seized in the previous year.  In an operation between October 8 and October 11, 2014, the PSNI Serious Crime Branch recovered 500kg of fertilizer, packs of homemade explosives, timer units, detonators, fuses, and six pipe bombs from a farmhouse in Kinawley, County Fermanagh.

2014 law enforcement actions in Northern Ireland included:

- On November 8, in Derry/Londonderry, Eamon Bradley was charged with two extra territorial offenses: possessing explosives with intent to harm and receiving weapons and explosives training in Syria.  In October, Bradley was arrested upon his return from Syria, following media reports that he had been fighting in the civil war there.  Bradley

PX209

spent two months attending a camp run by the Army of Islam group, learning to use various guns, mortars, and explosives.

- On November 10, PSNI, with the aid of MI5, raided a house in Newry and arrested 12 men, aged between 36 and 75.  Six of the men were charged with directing terrorism and membership of a proscribed organization, conspiracy to possess explosives with intent to endanger life, conspiracy to possess firearms and ammunition with intent to endanger life, and preparation for acts of terrorism.  One man was charged with directing terrorism and membership of a proscribed organization.  Five other men were released pending a report to the Public Prosecution Service.  The operation was part of a wider investigation that began in March into the Continuity IRA.  Police reported they were acting on MI5 intelligence that the Continuity IRA's top officials were meeting at the property to plot a major terrorist attack.  Among those arrested was Patrick Joseph 'Mooch' Blair, who had previously been accused of building the 1998 Omagh bomb.

**Countering the Financing of Terrorism:**  The UK is an active member of the Financial Action Task Force (FATF), and has observer or cooperating status in five regional FATF bodies: Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL); Eastern and Southern Africa 'Anti-Money' Laundering Group; Caribbean Financial Action Task Force; Asia Pacific Group on Money Laundering; and the Middle East and North Africa Financial Action Task Force.  Amendments to Schedule Four of the Terrorism Act 2000 came into force on December 3, 2014.  These amendments were made by the Crime (International Cooperation) Act 2003 and implement the Freezing Order measure in relation to terrorism offences.  These amendments require a UK court to consider executing an overseas (EU) asset-freezing request within a prescribed period.  Additionally, two important pieces of legislation relating to terror finance – the Protection of Charities Bill and the CTS Bill – progressed through Parliament in 2014.  The Charities Bill, which would enable the Charities Commission to more effectively counter terrorist financing in the non-profit sector was undergoing Parliamentary pre-legislative scrutiny at year's end.  The CTS Bill includes a provision to prevent kidnap and ransom insurance payments made to terrorists.

The UK prosecutes those involved in the financing of terrorism.  Since 2001, 48 individuals have been charged under sections 15-19 of the Terrorism Act 2000 ('fundraising'); of these, 17 individuals were convicted.  In the first half of 2014, one individual was convicted on charges of funding terrorism.  Additionally, individuals suspected of funding terrorism were convicted of related offenses (fraud, money laundering, etc.), including at least one in 2014.  The UK electronically distributes a consolidated list of all UK-designated terrorists and terrorist entities (to include UN targets, EU targets, and UK domestic targets under TAFA) to 15,000 financial institution subscribers, mainly in the UK and its overseas territories.

The UK actively met its obligations to restrict terrorist financing, including funding to extremist groups operating in Syria and Iraq, under UN Security Council Resolutions (UNSCRs) 2170 and 2178.  In the second half of 2014, the UK placed asset freezes on six ISIL-affiliated individuals: Hassan Nur, Nasser Muthana, Aseel Muthana, Ruhul Amin, Reyaad Khan and Abdul Rahman Benhammedi.  The UK Charities Commission also worked to counter terrorist financing.  Of the regulator's 85 open compliance cases as of October, 37 are Syria-related investigations.

PX209

The UK seizes assets in accordance with UNSCRs 1267, 1988, and 1373.  Asset freezes under UN obligations are made as soon as corresponding EU regulations come into force.  If aware of assets held in the UK, the government proactively notifies financial institutions to compensate for any delay in legal effect of the UN decision.  For domestic asset freezes under UNSCR 1373, action is taken immediately.  As of June 2014, the UK held approximately US $275,400 in frozen assets:  US $163,600 under the Terrorist Asset-Freezing Act 2010, US $17,800 under the EU terrorist asset freezing regime, and US $94,000 under UNSCRs 1267 and 1988.  Her Majesty's Treasury licenses funds to individuals subject to asset freezes for daily living expenses and legal costs; therefore the amount frozen reduces over time.

Her Majesty's Revenue and Customs (HMRC) regulates money transfer and remittance services.  HMRC requires remitters to understand to whom they are sending money, and collects originator and recipient information.  UK charities have a duty to report suspicious activities under section 19 of the Terrorism Act 2000; it is an offense to fail to report where there is a suspicion of terrorist finance.  Such reports are filed directly with the police or with the National Crime Agency, and the Charities Commission (UK regulator) is informed.  Charities with an annual income of US $40,500 per year are obliged to file serious incident reports (SIDs) of fraud, theft, or other criminal behavior to include support for proscribed organizations or individuals.  Charities with annual income under US $40,500 per year "should" report such incidents, but failure to do so does not result in a criminal offense.

Charities are not a regulated sector for the purposes of SIDs, but a charity can file a SID directly with the UK regulator if it chooses to do so.  From April 2013 through March 2014, UK charities filed 32 SIDs with the Charities Commission.  Additionally, auditors and accountants of charitable organizations have a statutory whistleblowing requirement to report suspicious activities.  From April 2013 through March 2014, auditors and accountants filed 85 such reports, of which only four related to suspected terrorism finance.  Lastly, UK financial institutions file Suspicious Activity Reports with the National Crime Agency related to the financial accounts and transactions of UK non-profit organizations, a portion of which may be related to suspicion of terrorist finance.

**Regional and International Cooperation:**  The UK is a founding member of the Global Counterterrorism Forum and co-chairs its Countering Violent Extremism Working Group.  The UK cooperates with other nations and international organizations on counterterrorism, including the UN and UN Security Council, EU, NATO, Council of Europe, G-7, the Global Initiative to Combat Nuclear Terrorism, and Interpol.  In January, the UK supported an UNSCR to counter kidnapping for ransom.

**Countering Radicalization to Violence and Violent Extremism:**  The UK has been following its Prevent strategy to counter radicalization since 2007.  The Department of Communities and Local Government are responsible for integration work, designed to ensure that Muslim communities received all the government services to which they were entitled and that immigrants were given assistance to integrate into British society.  The Home Office focuses on countering the ideology of violent extremism, including the identification of at-risk youth and their referral to counseling programs.  The revised strategy calls for a much more focused effort to target those most at risk of radicalization.  Finally, organizations that hold "extremist views,"

PX209

even those that are non-violent, are not eligible to receive government funding or participate in Prevent programs.

The CTS Bill introduced in November includes measures to strengthen existing de-radicalization programs, including Channel, a voluntary counter-radicalization program targeted at people, usually youth, who have been identified as at risk of radicalization. The new bill will mandate all local government authorities to participate in the program. An additional provision obliges named organizations – such as universities, schools, prisons, probation providers, and local government councils – have a "duty to prevent" extremism/radical speakers. The Home Office will provide institutions with guidance, such as requiring universities to create policies to prevent extremist speakers, and prisons to provide evidence they are dealing with violent extremist prisoners.

## THE MIDDLE EAST AND NORTH AFRICA

The Near East region remained a primary theater for terrorist activity in 2014, with the Islamic State in Iraq and the Levant (ISIL) exploiting and exacerbating the ongoing conflict in Syria and instability in Iraq to seize contiguous territory in western Iraq and eastern Syria for a self-declared Islamic caliphate. Al-Qa'ida (AQ) and its affiliates continued to seek and take advantage of opportunities to conduct operations amidst this fragile political and security climate, including in Yemen, Syria, and North Africa.

In Libya, civil conflict, the proliferation of armed groups, and the breakdown of government functions provided space and safe haven for terrorist groups. Libya's non-existent security institutions, coupled with ready access to loose weapons and porous borders provided violent extremists with significant opportunities to act and plan operations. There were indications that ISIL affiliates were active in Libya in 2014.

Expanding ISIL presence and operational activity in both Iraq and Syria further challenged the stability of both states. Iraqi security forces, including the Kurdish Peshmerga, in conjunction with Iranian-backed Shia militias, demonstrated some ability to confront this challenge. Global Coalition to Counter ISIL airstrikes stopped ISIL's initial advance in Iraq, degraded its leadership, and targeted the group's energy infrastructure. Aggressive pushes by ISIL into central and northern Iraq, as well as central and northern Syria, however, significantly challenged the capabilities of local partners to check ISIL advances. Syria was also a key theater for AQ regional activity, with al-Nusrah Front's presence and activities threatening the Syrian opposition, Syrian civilians, and other states in the region. While Shia militias have declared opposition to the return of U.S. troops to Iraq and have threatened attacks, they refrained from launching strikes against U.S. personnel in 2014.

Al-Qa'ida in the Islamic Maghreb (AQIM) has also taken advantage of the instability in the region, particularly in Libya and Mali. In 2014, AQIM and its affiliates staged separate large-scale attacks against Algerian and Tunisian security forces near the terrorist group's stronghold in the Chaambi Mountain region that straddles the two countries in April and July respectively. In addition, AQIM increased its coordination with Ansar al-Shari'a in Tunisia, partly as a result of the safe haven both groups found in an increasingly chaotic Libya. Kidnapping for ransom

PX209

operations continued to yield significant sums for AQIM, and it conducted attacks against security services across the Trans-Sahara region.

The Government of Yemen continued its fight against al-Qa'ida in the Arabian Peninsula (AQAP), although struggled in this effort in the latter half of the year due to political instability brought on by the armed Houthi movement, who forcefully took control of the government in the fourth quarter of the year.  AQAP continued to exhibit its capability by targeting government installations and Yemeni security and intelligence officials, and increasing attacks against and clashes with the Houthis.  AQAP used its social media presence and online *Inspire* magazine to encourage lone offender attacks and released instructions for a non-metallic explosive device designed to bypass airport security barriers.  President Hadi and other government officials continued to support U.S. counterterrorism efforts in Yemen, and encouraged greater cooperation between U.S. and Yemeni counterterrorism forces.  This report solely focuses on 2014 and does not address the dynamics that have unfolded in Yemen in 2015.

The Egyptian government continued to confront terrorist groups Ansar Bayt Al-Maqdis (ABM) and Ajnad Misr, which conducted numerous deadly attacks on government and military targets in the Sinai Peninsula, Cairo, and the western desert; and increasing insecurity along Egypt's extensive border with Libya.

Israel's tenuous ceasefire with Hamas broke down in July 2014, culminating with the July-August Gaza conflict between Israel and militant groups in Gaza.  Thriving smuggling activity through tunnels along the Gaza-Sinai border region was ultimately severely restricted by persistent counterterrorism activity by Egyptian forces in the Sinai who subsequently created a kilometer-wide buffer zone along the Gaza border.

In 2014, Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), its Ministry of Intelligence and Security, and Tehran's ally Hizballah, which remained a significant threat to the stability of Lebanon and the broader region.  [See Chapter 3, State Sponsors on Terrorism, for more information about Iranian activities.]

## ALGERIA

**Overview:**  Algeria remained a key partner in global counterterrorism efforts.  Its military forces and multiple law enforcement, intelligence, and security services with clearly delineated responsibilities addressed counterterrorism; these include the various branches of the Joint Staff, the National Gendarmerie (GN), the Border Guards, and the Department of Intelligence and Security (DRS), all operating under the Ministry of National Defense (MND), as well as the national police, or General Directorate of National Security, under the Ministry of Interior.  The Government of Algeria continued an aggressive campaign to eliminate all terrorist activity, and it sustained policing efforts to thwart terrorist activity in the capital and other major urban centers.  Military forces and security services, primarily the GN, operating under the MND, conducted regular search operations for terrorists in the mountainous Kabylie area, east of Algiers, and in the expansive desert regions in the southeast.

PX209

Within Algeria, al-Qa'ida in the Islamic Maghreb (AQIM) and al-Murabitoun, led by Mokhtar Belmokhtar, remained active terrorist threats. AQIM's leader, Abdelmalik Droukdel, and Belmokhtar, both Algerian nationals, remained a threat and were at-large in the region at year's end. These groups aspired to attack Algerian security services, local government targets, and Western interests. AQIM continued attacks using improvised explosive devices (IEDs), bombings, false roadblocks, kidnappings, and ambushes. The terrorist group Jund al-Khilafa fi Ard al-Jazayer (JAK, Soldiers of the Caliphate in Algeria), emerged in 2014 following a split from AQIM, and swore allegiance to the Islamic State in Iraq and the Levant (ISIL).

There is a high threat of kidnapping, primarily in the mountainous areas east of Algiers and in the expansive desert regions near Algeria's southern border. The Algerian government maintained – and advocated that others should also maintain – a strict "no concessions" policy with regard to terrorist groups holding its citizens hostage.

Rising regional political and security instability contributed to the terrorist threat to Algeria. Violent extremist groups and criminal networks in the Sahel attempted to operate around Algeria's nearly 4,000 miles of borders. The threat of retaliatory attacks in response to international military intervention in Mali since 2013, weapons smuggled out of Libya or Tunisia, and human and narcotics trafficking were key external threats and made regional coordination on border security a necessity. The Algerian government frequently cited links between terrorist activity, organized crime, and narco-traffickers in the Maghreb and Sahel.

Algerian government officials and Muslim religious and political leaders publicly condemned ISIL and criticized acts of violence committed in the name of Islam. In September, the Algerian government underscored the potential risk from ISIL infiltration at a meeting of the High Council on Security (chaired by President Bouteflika with high-level civil, military, and security officials). To build trust and resilience among communities, the government has in place a development plan and a comprehensive national reconciliation policy. It provided social services and family outreach mechanisms to integrate at-risk youth and prevent marginalization, thus reducing the risk of travel to conflict zones for the purposes of joining terrorist activities.

**2014 Terrorist Incidents:** On April 19, terrorists attacked an Algerian military convoy in Tizi Ouzou province, killing 11 soldiers, and wounding five. AQIM claimed responsibility for the ambush. The Algerian government observed that AQIM's Ramadan offensive in 2014 was significantly reduced relative to the past decade. On September 21-24, JAK-A abducted and beheaded a French citizen, Hervé Gourdel, in the Kabylie region, east of Algiers.

**Legislation, Law Enforcement, and Border Security:** The Algerian government continued its decade-long push to increase the strength of its military and security forces and to professionalize and modernize them. Following restructuring in September 2013, a June 2014 presidential decree restored some judicial police authority to the DRS, Algeria's intelligence service. It created a new Judicial Investigation Service under the jurisdiction of both the DRS and the general prosecutor of the court of appeal's criminal division. A public decree related to DRS affairs could be considered an attempt to bring more transparency to the institution's functioning.

PX209

The Algerian government underscored that border security remained a top priority to guard against the infiltration of smugglers and terrorists from neighboring countries.  In September, President Bouteflika convened a meeting of the High Council on Security to increase border security, expand search operations to detect and disrupt terrorist activity, increase troops in southern Algeria, and strengthen coordination with neighboring countries on border security.  Measures included increased border security, among them closed military border areas, new observer posts in the east, reinforced protection of energy installations, additional permanent facilities for border control management, new aerial-based surveillance technologies, upgrades to communication systems, and additional troops deployed on the borders with Tunisia, Libya, Mali, Mauritania, and Morocco.  Algerian law enforcement and armed forces increased security cooperation with Tunisian counterparts to reduce the flow of arms.  Border security measures included new joint checkpoints and patrols along the frontiers, information sharing, and training and equipment programs.

The Government of Algeria closely monitored passenger manifests for inbound and outbound flights and scrutinized travel documents of visitors, but did not fingerprint them.  Algeria employed biometric screening systems to identify suspect travelers, undertook training, and was equipped to recognize fraudulent documents.  The Government of Algeria used Interpol channels, alerts, and fusion notices to stay informed on suspicious travelers at land, air, and maritime borders.

Algerian security forces made a number of arrests in 2014.  Official and private sector press announced trials for at least 50 suspected terrorists charged with support for or membership in a terrorist organization, kidnapping for ransom, attacks on security forces, and fake checkpoints.  Human rights organizations believed there was overuse of pretrial detention by judges and magistrates.  Media sources reported on the police's excessive use of force resulting in alleged injuries and arrests in both legal and illegal protests.  Law enforcement actions included:

- On May 5, Algerian army forces launched a counterterrorist operation near Tin-Zaouatine (Tamanrasset province), on the southern border with Mali.  The MND reported a dozen terrorists were killed.  According to a Council of Ministers communique, the nationalities of those killed were Malian, Tunisian, and Libyan.
- On August 30, the Algerian government announced that it secured the release without ransom payment of two Algerian diplomats who were kidnapped in 2012 in Mali by MUJAO.
- On November 26, the Minister of Justice confirmed that security forces had killed in October a JAK member involved in the Gourdel kidnapping.  The Justice Minister announced December 23 that security forces killed the leader of JAK, Abdelmalek Gouri, along with two other perpetrators of the Gourdel kidnapping and murder.

To enhance its capacity to deal effectively with security challenges within its borders and defend against threats to regional stability, Algerian law enforcement agencies participated in Department of State Antiterrorism Assistance (ATA) program trainings to enhance investigative and screening capacities, border security, prevent terrorist transit or operations, and build response capacity to critical incidents.  The Algerian government sent an interagency mix of officers to U.S. government-sponsored programs.  In August, the State Department delivered a

PX209

Regional Border Control Management course for security officials from Algeria, Niger, and Tunisia.  The U.S. DOJ International Criminal Investigative Training Assistance Program (ICITAP) focused on capacity-building consultations with Algeria and mentoring in forensics, border security, criminal investigation, and evidence collection at crime scenes.

**Countering the Financing of Terrorism:**  Algeria is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.   Its financial intelligence unit is also a member of the Egmont Group of Financial Intelligence Units, an informal network of financial intelligence units.

Algeria continued its work on drafting revisions to various portions of its anti-money laundering/counterterrorist finance (AML/CFT) statutory scheme, including amending the Penal Code effective February 16, 2014 to bring the definition of a terrorist act into accordance with international standards, and has made progress.  It will take time, however, to determine whether the laws enacted are being actively and evenly implemented.  Algerian authorities are working on further revisions to the penal code dealing with AML/CFT with respect to terrorist finance and freezing of terrorist assets.  The decree 13-318 of September 16, 2013 addresses how to identify, locate, and freeze the funds or property of terrorists, but needs revisions to make it compliant with international standards.

The Algerian law enforcement services collaborated with the United States on several workshops that addressed terrorist financing including workshops to dismantle complex criminal organizations and terrorist financial networks.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Algeria increased diplomatic efforts to fight terrorism in the region in 2014, while maintaining its non-interventionist military policy.  It facilitated an inclusive national dialogue for Malian groups and officials, regional partners, and hosted talks among the stakeholders to help reach political resolutions, in coordination with the UN.  Algeria also strongly supports UN efforts for a political solution in Libya.

Algeria is a founding member of the Global Counterterrorism Forum (GCTF) and co-chair of GCTF's Sahel Region Capacity Building Working Group (SWG).  In June, Algeria joined regional partners and international organizations to found the International Institute for Justice and Rule of Law (IIJ).  Algeria continued to play a leadership role in the GCTF's efforts to raise awareness among governments to prevent the payment of ransoms to terrorist organizations.  As co-chair of the GCTF's SWG, Algeria continued to champion the implementation and development of the Algiers Memorandum on Good Practices on Preventing and Denying the Benefits of Kidnapping for Ransom by Terrorists.  In October, Algeria, Canada, and the United States co-sponsored the first in a series of GCTF Kidnapping for Ransom technical workshops at the IIJ.

PX209

While Morocco and Algeria both participated in the Trans-Sahara Counterterrorism Partnership, the IIJ, and the GCTF, the level of their bilateral counterterrorism cooperation did not improve in 2014.  Algeria and Morocco's political disagreement over the Western Sahara remained an impediment to bilateral and regional counterterrorism cooperation.

When the UNSC adopted Resolution 2178 condemning foreign terrorist fighters, Algeria expressed publicly its support for the measure and commitment to the UN's Global Counterterrorism Strategy.  Algeria recalled its prior experience with returning foreign fighters from Afghanistan in the 1990s and the need to address the phenomenon comprehensively. In November, Algeria sent an interagency delegation to Brussels for the regional conference on foreign terrorist fighters that was jointly organized by the Swiss Confederation and the EU.  In December, Algerian officials participated in the GCTF Foreign Terrorist Fighters Working Group meeting in Marrakech.  Algeria also attended a December meeting of the IIJ and the UN Counter-Terrorism Committee Executive Directorate on challenges regarding evidence collection and the ability to effectively prosecute cases involving foreign terrorist fighters.

The Ministry of Religious Affairs (MRA) expanded international outreach efforts, including a cooperation agreement with the French Ministry of Interior.  France will broadcast monthly the Friday prayer from the Grand Mosque of Paris on Algerian television and will welcome in France visiting Algerian imams who profess their views of a balanced and tolerant Islam and respect for the citizen and secularism.

Algeria is home to Regional Command for Joint Counter Terrorism Operations (CEMOC's) Liaison and Fusion Center for information sharing and hosts the AU's African Centre for the Study and Research on Terrorism.  Algeria also participated in the G-5 Sahel (Mauritania, Mali, Niger, Chad and Burkina Faso) and the Nouakchott Process on the Enhancement of Security Cooperation and the Operationalization of the African Peace and Security Architecture (APSA). Algeria worked with the EU on its European Neighborhood Police initiative and the EU Strategy for Security and Development in the Sahel.

Algeria actively participated in the 5+5 Defense Initiative, which brings together five European and five North African countries to address security issues in the Western Mediterranean.  In October, it hosted a meeting on the 20th anniversary of the North Atlantic Treaty Organization (NATO)'s Mediterranean Dialogue to discuss security challenges in the region.  Algeria is a delegate for the African region on the Interpol Executive Board and in February, agreed to host the headquarters of AFRIPOL, a pan-African organization that fosters police training and cooperation in response to security threats such as terrorism, drug trafficking, and cybercrime.

**Countering Radicalization to Violence and Violent Extremism:**  The Government of Algeria underscored the value of state oversight for religious education, including the training of imams, the content of prayers, and credentialing imams in a way that promotes tolerance and sensitizes the religious leaders to the risks of using religion for political objectives.  The Algerian government appointed, trained, and paid the salaries of imams.  The penal code outlined punishments, including fines and prison sentences, for anyone other than a government-designated imam who preaches in a mosque.  The Algerian government monitored mosques for possible security-related offenses and prohibited the use of mosques as public meeting places

PX209

outside of regular prayer hours.  The Ministry of Religious Affairs (MRA) warned Algerians against foreign extremist trends (e.g. ISIL, Wahhabism) and heeding to *fatwas* (judicial rulings) that originate outside Algeria.  The Religious Affairs Minister submitted a proposal to the Presidency for the creation of an Academy of *fatwa* in Algeria to include university teachers and Ulema in different fields.  Official press noted this religious institution will have the authority to take legal action against unfounded *fatwa* promulgation and the Academy's religious scholars will inform society on the criteria for issuing fatwa.

Under the 2006 Charter for Peace and National Reconciliation, Algeria offers amnesty to former terrorists who laid down their weapons, and disavowed violence, exceptions being perpetrators of particularly egregious acts, such as rape, murder, and bombings.  The Charter works through offices located nation-wide that extend judicial assistance and social and job reintegration measures to repentant terrorists, victims of terrorism, and families of terrorists.  The President of the Judicial Unit confirmed a total of 9,000 terrorists – repentant prisoners and members of terrorist support networks – were pardoned under the Charter since its inception.

## BAHRAIN

**Overview:**  The Bahraini government continued to increase efforts to detect, neutralize, and contain terrorist threats in 2014.  Some groups' use of real and fake improvised explosive devices remained a threat to security services, resulting in the death of at least five police officers.  The Government of Bahrain also began to implement tougher counterterrorism laws that the legislature approved during the first half of the year.  Peaceful opposition groups and some international observers expressed their concern at the scope of the new laws, which they say could easily be used to hinder peaceful opposition activity as well as terrorism.  The inability of the government and political opposition to reach an agreement on political reforms threatened to fuel further domestic unrest, upon which violent opposition groups could seek to capitalize.

The Government of Bahrain has supported the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL) and on November 9 hosted an international conference on countering ISIL's financing.  The Bahraini government welcomed UN Security Council Resolutions 2170 and 2178.  Bahraini leaders have publicly condemned ISIL's activities, ideology, and recruitment, while the government has worked to detect, counter, and discourage domestic ISIL recruitment and extremist messaging.  The Ministry of Interior (MOI) has arrested and charged, or stripped the citizenship of some Bahrainis suspected of supporting ISIL, and in March it called on all Bahrainis fighting in Iraq and Syria to return to Bahrain or face prosecution.

**2014 Terrorist Incidents:**  Notable incidents included:
- On February 15, a policeman was killed and three others were injured after a homemade bomb detonated in Al-Dair.
- On March 2, a policeman was injured after a homemade bomb detonated in East Eker.
- On March 3, a homemade bomb exploded in al-Daih, killing two local policemen and one officer from the United Arab Emirates.
- On March 22, a policeman was injured after a homemade bomb detonated in Sitra.
- On July 4, a homemade bomb detonated in East Eker, killing a police officer.
- On July 27, three policemen were injured when a homemade bomb exploded in Al-Dair.

PX209

- On December 9, a homemade bomb exploded on December 9 in Dumistan, killing a policeman.
- On December 10, a civilian was killed by a homemade bomb that exploded in Karzakan.

**Legislation, Law Enforcement, and Border Security:**  Throughout 2014 Bahrain bolstered existing counterterrorism laws and criminal penalties.  Bahrain's legislature approved and the government promulgated a series of royal decrees issued during the second half of 2013 increasing penalties for terrorism-related crimes and expanding counterterrorism finance regulations.  Terrorism-related acts, a broadly-defined category, are treated as criminal cases, with prescribed penalties spelled out in the Anti-Terrorism Law of 2006 and Articles 155 and 168 of the Penal Code.  There were concerns that the government used counterterrorism laws to prosecute or harass individuals for their criticism of the government.

The MOI is the lead government agency regarding the detection and prevention of acts of terrorism and the arrest of suspects in terrorist-related acts, with the Bahrain National Security Agency providing support.  The Bahraini Coast Guard also contributed to the counterterrorism mission by monitoring and interdicting the seaborne movement of weapons and terrorists into and out of the country.  The major deterrents to more effective law enforcement and border security remained the lack of interagency coordination and limited training opportunities to develop requisite law enforcement skills.

Bahrain has participated in the Department of State's Antiterrorism Assistance (ATA) program since 1987, and assistance in 2014 focused on developing the capacity to investigate and respond to terrorists' use of explosives.  Leahy vetting challenges, however, prompted the cancellation of nearly all planned ATA courses in 2014.  The U.S. Embassy was able to assist with the delivery of an ATA K9 Train the Trainer course that graduated two trainers and eight trainees, but as a result of a general lack of training and antiquated investigative methods and technologies, the MOI Police Force's progress in areas of counterterrorism and criminal investigation has slowed.

On January 4, an MOI explosives team defused a bomb placed on a busy commercial street in central Manama.  On March 16, an MOI explosives team defused a gas cylinder bomb located in a vehicle along a busy public road in central Manama.

Notable prosecutions included:

- On April 28, a court handed down life sentences to eight individuals convicted of killing a police officer (and injuring five others) in a September 2013 bomb attack on a police patrol.
- On May 11, a court sentenced six Bahraini to life in prison for planting an explosive device that killed a civilian in 2013.
- On July 17, a court sentenced three men to prison terms ranging from five years to life for forming a terrorist cell and detonating a bomb in 2013 in Budaiya.
- On August 6, a court sentenced nine Bahrainis to up to 15 years in prison and stripped their citizenship for establishing a terrorist cell, possessing unlicensed firearms and ammunition, receiving militia training, and smuggling weapons.

PX209

- On August 13, a court sentenced fourteen individuals to a range of prison terms for their involvement in an explosion in July 2013 that killed a policeman.
- On September 29, a court sentenced nine individuals to life imprisonment and stripped their citizenship for smuggling weapons and explosives into Bahrain.
- On November 21, a court sentenced three men to 10 years in prison and stripped them of their Bahraini citizenship for their involvement in an August 2013 explosion in Eker.
- On December 30, two individuals were sentenced to death for their role in an explosion on February 14 that killed a policeman.

**Countering the Financing of Terrorism:**  Bahrain is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body, and its financial intelligence unit is a member of the Egmont Group of Financial Intelligence Units.  Bahrain is an important regional financial hub, which makes it vulnerable to the large amounts of money flowing through the Gulf region to support various terrorist and violent extremist groups.  The Bahraini government did not provide information on prosecutions.  In November, Bahrain hosted an international seminar on countering the financing of terrorism.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Bahrain worked closely and cooperatively with international partners throughout the region. Since formally endorsing the Global Initiative to Combat Nuclear Terrorism in March 2008, Bahrain has proactively worked to expand air, sea, and causeway border control points.

**Countering Radicalization to Violence and Violent Extremism:**  The Ministry of Justice and Islamic Affairs (MOJIA) heads Bahrain's efforts to counter radicalization to violence and violent extremism, in part by organizing regular workshops for clerics and speakers from both the Sunni and Shia sects.  The MOJIA also undertakes an annual review of schools' Islamic Studies curricula to evaluate interpretations of religious texts.

## EGYPT

**Overview:**  In 2014, the Egyptian government continued to confront active terrorist groups, which conducted deadly attacks on government and military targets throughout the country.  The two primary terrorist groups operating in Egypt are Ansar Bayt Al-Maqdis (ABM) and Ajnad Misr.  ABM, a Sinai-based group, swore allegiance to Islamic State in Iraq and the Levant (ISIL) on November 3.  While ABM is most active in the Sinai, it has demonstrated a capability to conduct attacks throughout Egypt, including in Cairo.  Ajnad Misr is a Cairo-based terrorist group that has claimed responsibility for a number of attacks in downtown Cairo and focuses primarily on government and security targets.

In June, former head of the Egyptian Armed Forces 'Abd al-Fattah al-Sisi was elected president, replacing an interim government that had taken over following the removal of former President Mohamed Morsi from office in July 2013.  President al-Sisi has focused intently on counterterrorism in Egypt, and he made counterterrorism issues one of the pillars of his first

PX209

speech at the UN General Assembly in September 2014.  Under President al-Sisi's authority, the Egyptian military and security forces continued to aggressively pursue counterterrorism initiatives, particularly in the Sinai.  Some political opposition groups claim that the Egyptian government's counterterrorism initiatives, while intended to target terrorist groups, have also had the effect of constraining their activities.

The Muslim Brotherhood (MB), the MB-affiliated Freedom and Justice Party (FJP), and NGOs affiliated with the MB were outlawed in 2014.  The Egyptian government designated the MB as a terrorist organization in December 2013 and the High Administrative Court dissolved the FJP on August 9, 2014.  On October 30, the government also declared illegal the National Alliance to Support Legitimacy, which is an informal political advocacy coalition led primarily by MB supporters.  These designations have enabled widespread crackdown on MB and its affiliated organizations, including mass arrests by the government and often severe sentences from the judiciary in mass trials.

Egypt joined the Global Coalition to Counter ISIL, provided it with logistical and political support, and backed its line-of-effort to "expose ISIL's true nature."  Egypt acknowledges the threat of foreign terrorist fighters traveling to fight with ISIL in Syria and returning to Egypt.  Throughout the year, authorities required citizens between the ages of 18 and 40 to obtain permission to travel to Iraq, Jordan, and Syria.  Additionally, on December 6, authorities began requiring official permission for travel to Qatar and Turkey.  The government stated that these regulations are intended to make it more difficult for citizens to join terrorist groups, such as ISIL, in Iraq and Syria.

The Egyptian Ministry of Foreign Affairs and prominent Egyptian religious leaders, such as al-Azhar Grand Imam Sheikh Ahmed al-Tayyeb and Grand Mufti of Egypt Shawki Allam, have repeatedly publicly condemned ISIL and its actions, while also making unhelpful remarks about the origins of ISIL.  In early December, as part of Egypt's contribution to counter-ISIL messaging, al-Tayyeb hosted a two-day conference with dozens of Egyptian and international religious scholars, aiming to discredit the theological basis of ISIL's use of "jihad," "caliphate," and "kufr (infidelity to Islam)," and to promote coexistence between Muslims and Christians.

**2014 Terrorist Incidents:**  Noteworthy incidents included:

- On January 24, a Vehicle-Borne Improvised Explosive Device (VBIED) detonated at the Cairo Security Directorate building in Cairo, killing five people and injuring dozens of others.  The VBIED ripped the façade off of the building, and partially destroyed the nearby Islamic Museum.  ABM issued a statement claiming responsibility for the attack.
- On January 25, assailants shot down an Egyptian military helicopter near Shaykh Zuwayd, killing all five soldiers on board.  ABM released a video on YouTube several days later showing the attack.
- On February 16, a suicide bomber detonated a suicide belt on a tourist bus in Taba, killing three South Korean tourists and the Egyptian bus driver, and wounding several others.  ABM issued a statement claiming responsibility for the attack.

PX209

- On April 2, two improvised explosive devices concealed in a tree detonated near Cairo University in Giza, killing a police brigadier general and wounding five other police officers. Ajnad Misr released a statement claiming responsibility for the attack.
- On July 14, assailants on Egyptian territory fired a salvo of rockets at Eilat, Israel; which wounded multiple Israelis. ABM publicly claimed responsibility for the attack.
- On July 19, assailants used rocket-propelled grenades (RPGs) and machine guns to attack an Egyptian military checkpoint near the al-Farafra Oasis in Egypt's Western Desert. The attack killed 22 Egyptian border guard personnel and wounded several others.
- On August 6, assailants carjacked and killed a U.S. citizen oil worker on the road to the al-Karama Petroleum Field in the Western Desert. On November 30, ABM claimed responsibility for the attack via a statement on Twitter.
- On August 18, assailants kidnapped and beheaded four civilians in Shaykh Zuwayd. ABM released a video showing the four hostages allegedly confessing to spying for Israel.
- On October 24, assailants attacked a military checkpoint near Shaykh Zuwayd in a two-phased attack involving a suicide VBIED followed by RPGs and small arms fire. The assailants killed 30 Egyptian troops and wounded dozens more. ABM released a video of the attack and claimed responsibility for it.
- On November 12, assailants hijacked an Egyptian Navy guided missile craft in Damietta. Egyptian military aircraft engaged the attackers, destroying the boat and killing the crew.

**Legislation, Law Enforcement, and Border Security:** The new Egyptian Constitution passed following a public referendum in January 2014. Article 237 specifically addresses terrorism, stating that Egypt "commits to fighting all types and forms of terrorism and tracking its sources of funding within a specific time frame…" Egypt's penal code includes an extensive counterterrorism legal framework, primarily under Part 2, Section 1, Article 86, which defines terrorism in expansive terms that include peaceful protests. Additionally, subsequent sections define a variety of offenses and penalties for those who engage in terrorist activities and provide incentives for cooperation in the investigation and prosecution of terrorist organizations. Despite having counterterrorism as its stated primary purpose, Egyptian counterterrorism legislation has had an intimidating effect on NGO operations.

The November 2014 draft of the Terrorist Entities Law also defines a "terrorist entity" in broad terms that human rights groups are concerned could be applied to civil society. However, it does give designated groups the right to appeal their designation through judicial review. The draft law also gives Egyptian authorities the power to freeze a designated group's assets and to arrest its members.

The Ministry of Interior's National Security Sector (NSS) is primarily responsible for counterterrorism functions in Egypt, but it also works with other elements of the Ministry of Interior (MOI), the Egyptian General Intelligence Service, and the Egyptian armed forces. There is adequate interagency cooperation and information sharing among the various counterterrorism elements within the Egyptian government.

Egypt continues to take actions to improve its border security measures. At border crossings and airports, Egyptian authorities check for the presence of known security features within travel

PX209

documents, such as micro-printing, UV features, and digit schemes.  They also scan and cross reference documents with criminal databases that alert them when there is derogatory information present.  Egypt maintains a terrorist watch list with a simple listing provided to Egyptian immigration officials at the ports of entry and detailed information maintained within the NSS.

Egypt's primary physical border security concerns are along the borders with Gaza and Libya.  Following a series of terrorist attacks in northern Sinai, Egypt destroyed underground tunnels that connected Gaza and Sinai and is in the process of building an up-to-five kilometer buffer zone along the border with Gaza.  Egypt also increased its military presence along the Libya border, but continues to face challenges with policing the 715 miles.

Egyptian law enforcement and security personnel achieved some limited successes in battling terrorists in its territory in 2014.  In April, Egyptian authorities arrested Thirwat Salah Shihata, one of al-Qa'ida leader Ayman al-Zawahiri's top deputies, in a Cairo suburb.  In September, the MOI killed seven ABM terrorists in Ain Sukhna, who were accused of assassinating 44 civilian, security, and armed forces personnel, including an American citizen.  On December 21, government entities raided a farm located in Husainiya Sharqiia, killing one security official and five ABM members.  In this operation, security officials confiscated weapons, explosives, and explosive materials, including a VBIED, which was later control-detonated by security forces.  Additionally, the MOI killed the alleged leader of ABM's Cairo Branch, Mohamed Rabie Mohamed Younis.

**Countering the Financing of Terrorism:**  Egypt is a member of the Middle East North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body.  On May 15, the Government of Egypt issued an amendment (Presidential Decree Law no. 36) to Law no. 80 of 2002, which modernized Egypt's Anti-Money Laundering-Countering the Financing of Terrorism (AML-CFT) Law and provided the necessary legal framework for Egypt to implement key FATF standards.  Among other improvements, the law criminalizes the willful collection and provision of funds for terrorist purposes and addresses previous deficiencies with regard to the implementation of UN Security Council Resolutions 1267 and 1373.  To reflect Egypt's increased emphasis on CFT, this law changed the name of Egypt's Financial Intelligence Unit from the Money Laundering Combating Unit to the Money Laundering and Terrorism Financing Combating Unit.  Additionally, a statute proposed in November 2014 gives the government clear legal authority to designate groups as terrorist organizations, and allows the government to freeze their assets and money.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Within the UN, Egypt participated in a Sixth Committee (Legal) session in October  that sought to draft a comprehensive convention on international terrorism.  Speaking on behalf of the Organization for Islamic Cooperation (OIC), the Egypt representative denounced terrorist atrocities, condemned attempts to link terrorism with Islam, and advocated a coordinated approach by the international community to combat terrorism.  Egypt is also an active participant in the Global Counterterrorism Forum (GCTF), co-chairing (along with the U.S.) the Criminal Justice and Rule of Law Working Group.  In June,

PX209

Egypt was re-instated into the AU, following an almost one-year suspension after the removal of former President Mohamed Morsi.  In his speech at the AU's Heads of State meeting in June, President Sisi reinforced the need for cooperation among AU members to combat terrorism.

**Countering Radicalization to Violence and Violent Extremism:**  The Ministry of Islamic Endowments (Awqaf) is legally responsible for issuing guidance to which all imams throughout Egypt are required to adhere, including weekly instructions on a provided theme that aims to prevent extremist language in sermons.  Al-Azhar University cooperated with international programs to help train imams to promote tolerance and non-violence, interfaith cooperation, and human rights.  The Ministry of Islamic Endowments is also required to license all mosques in Egypt; however, many continued to operate without licenses.  The government has the authority to appoint and monitor the imams who lead prayers in licensed mosques, and the government pays their salaries.

## IRAQ

**Overview:**  Iraq witnessed a significant surge of terrorist activity in 2014, primarily as a result of the Islamic State in Iraq and the Levant's (ISIL) seizure of large areas of the country.  The resulting security vacuum and humanitarian crisis presented new challenges to the Iraqi government and exacerbated existing ethno-sectarian grievances.  Building on military victories in Syria, in January 2014 ISIL captured the city of Fallujah in Anbar Province.  On June 7, fighting erupted between ISIL, allied groups, and the Iraqi Security Forces (ISF) in Mosul, the capital of Ninewa Province and Iraq's second largest city.  Within a week, ISIL had seized control of the city and began using its significant business, industrial, and energy resources to fund its operations.  ISIL formations moved south from Mosul through the Tigris Valley in June, seizing multiple cities and putting to flight several Iraqi Army divisions.  Outside Tikrit, ISIL terrorists captured nearly 1,700 Iraqi Air Force recruits and executed many of the captives, posting the slaughter on YouTube.  Nearby, ISIL surrounded the Bayji refinery – beginning a siege that would last five months.  On August 2, ISIL invaded the Sinjar district causing hundreds of thousands of civilians to flee, tens of thousands of whom were forced to seek refuge and became trapped on Mt. Sinjar when they were unable to reach safety ahead of ISIL's advance.  In response, President Obama ordered four initiatives to gather information and help the Iraqis counter the ISIL threat, and on August 8, U.S. airstrikes against ISIL targets began in response to the group's advance toward Erbil.  In mid-September, the United States took the lead in forming the Global Coalition to Counter ISIL, uniting over 60 countries in the effort.

After a general election on April 30, Iraq began a four-month government formation process, resulting in the August 11 selection of Haider al-Abadi as the next Iraqi prime minister.  Prime Minister Abadi assumed office on September 8, and in October, Abadi secured the appointment of a full cabinet for the first time since 2010, including Defense and Interior Ministers.  Throughout the latter part of 2014, the Iraqi government worked to implement its National Program, which includes a number of initiatives to ease ethno-sectarian tensions.  It engaged with tribes fighting against ISIL and began to recruit a force composed of Sunni tribal units that could eventually be subsumed into the proposed National Guard.  In addition, the Abadi administration reached an agreement in December with the Kurds on oil exports and revenue sharing.  Looking forward to the needs of areas liberated from ISIL control, PM Abadi called for

PX209

international assistance during the Global Coalition's first ministerial in Brussels on December 3, as well as in the January meeting of the Small Group in London.

**2014 Terrorist Incidents:**  Terrorist groups significantly increased the number of attacks throughout the country in 2014.  Most notably, ISIL's rapid acquisition of abandoned ISF military equipment in the course of fighting from January onward gave ISIL greater capabilities in line with a more conventional military force, including the reported use of tanks, artillery, and unmanned aerial drones.  According to estimates from the UN Assistance Mission for Iraq (UNAMI), acts of terrorism and violence killed more than 10,000 civilians and injured more than 17,000 in 2014.  ISIL's unsparing brutality affected many lives.  Following is an illustrative sample that highlights only a small number of the most egregious practices:

- On January 15, an improvised explosive device explosion at a funeral in Diyala province killed thirteen civilians and wounded eighteen.
- In February, ISIL militants surrounded a police encampment near a stadium construction site in the town of Tuz Khurmatu.  ISIL gathered six policemen, asked if they were Shia or Sunni, and then shot and killed the men after their prayer ritual indicated they were not Sunni.
- In June, ISIL attacked an Iraqi military base, formerly known as Camp Speicher, in Salah ad Din, killing as many as 1,700 cadets and soldiers.
- On July 27, ISIL destroyed the tombs of Sufi sheikhs in the al-Rawtha al-Muhamadiya Mosque in Muthanna District in eastern Mosul.
- On August 2-3, ISIL forces invaded Sinjar district.  Hundreds of Yezidis (predominantly men) were killed and thousands fled to Mt Sinjar or the Iraqi Kurdish Region.  In the course of the fighting and in subsequent days, an estimated 5,000 Yezidis (including approximately 4,000 women and children) were taken captive.
- On August 15, in Kocho (var. Kojo), media and eyewitnesses reported that as many as several hundred Yezidi male captives were killed.
- On August 31, ISIL executed 19 Sunnis in Saadiya for not pledging allegiance to ISIL.
- On September 3, ISIL abducted two former Iraqi Army officers and four civilians from Gheda village in Daquq area, Kirkuk.
- On October 13, approximately 33 people were killed in three attacks in Baghdad as Shia Muslims celebrated Eid al-Ghadir.
- On November 3, media reports indicated ISIL forces had massacred more than 300 members of the Abu Nimr tribe in Iraq's western province of al Anbar.
- On December 10, there were reports in Mosul that ISIL had punished a homosexual man by throwing him from a rooftop and stoning him to death.

**Legislation, Law Enforcement, and Border Security:**  In 2014, ISIL's existential threat to Iraq forced the central government to focus entirely on the campaign to defeat it.  ISIL offensives significantly degraded Iraqi Security Forces (ISF) capability, manpower, and equipment.  The Government of Iraq suffered attrition across its national security apparatus, especially in the Iraqi Army and Federal and local police, and worked with the Coalition to address training and equipping shortfalls.  In addition, Prime Minister Abadi's National Plan specifically pledged to strengthen border security and improve law enforcement, among other areas.

PX209

Iraq adopted the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System (PISCES) in an effort to secure borders and identify fraudulent travel documents.  The Government of Iraq has the capability to conduct biographic screening at multiple land and air ports of entry.  Iraq also continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, and ATA training for the Emergency Response Brigades contributed to the Global Coalition to Counter ISIL.

Before ISIL's dramatic advance into northern Iraq in June, there was already significant population displacement as a result of its attacks in Anbar.  These attacks, dating back to January, resulted in the displacement of some 474,000 people from Fallujah, Ramadi, and the surrounding areas.  ISIL's takeover of Mosul in June and its subsequent advances on the Ninewa plain resulted in massive additional displacements, of minority populations in particular, primarily into the Iraqi Kurdistan Region and the Kerbala and Najaf governorates.  The UN estimates that over 2.1 million Iraqis were displaced in 2014 alone, adding to the estimated one million Iraqis who were displaced prior to 2014.

**Countering the Financing of Terrorism:**  Since 2005, Iraq has been a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body.  Iraq held the presidency of MENAFATF from November 2013 to November 2014.  In November 2012, MENAFATF adopted Iraq's mutual evaluation to review compliance with international anti-money laundering/combating the financing of terrorism (AML/CFT) standards.  The report identified significant and serious risks, and Iraq agreed on an action plan to address its vulnerabilities.  In November 2014, the Central Bank of Iraq (CBI) provided an update to the MENAFATF Plenary.  In addition, Iraq is also reviewed three times a year under the FATF International Cooperation Review Group process, which includes a negotiated action plan with timelines to address specific identified deficiencies in its AML/CFT regime.  The international community, including the United States, provided subject matter expertise to assist Iraq and seeks to develop capacity building as the situation improves.

In 2014, ISIL derived income from a range of sources, such as oil smuggling, kidnapping for ransom, looting, extortion, illegal "taxation," antiquities theft and smuggling, and foreign donations.  Together with Global Coalition partners, the United States took a holistic approach to combating ISIL's ability to generate revenues and sustain itself, including through direct military action.  Global coalition airstrikes targeted ISIL's energy infrastructure – modular refineries, petroleum storage tanks, and crude oil collection points – and these airstrikes significantly degraded ISIL's ability to generate revenue from its control of energy assets.  Additionally, the United States used sanctions to ensure that banks, companies, and citizens across the world did not engage in financial transactions with ISIL.  Partner nations actively implemented sanctions against ISIL pursuant to the UN Security Council 1267/1989 al-Qa'ida Sanctions regime, which obligates all member states to freeze assets, ban travel, and embargo arms from al-Qa'ida-associated individuals and entities, including ISIL.  Each of the over 60 Global Coalition countries reaffirmed their commitment to countering ISIL's financing in the joint statement at the Global Coalition Ministerial in Brussels on December 3.

PX209

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/2014/index.htm.

**Regional and International Cooperation:**  As a result of ISIL's rapid territorial gains in Iraq in the first half of 2014, in September, the United States led the creation of the Global Coalition to Counter ISIL.  The Coalition focused on training, equipping, advising, and assisting the ISF, including Kurdish forces.  Along with Coalition partners, the United States stood up multiple training sites across Iraq to focus on improving ISF capabilities in command and control, intelligence, logistics, fire support, and other combat-enabling roles.  On December 3, the Secretary chaired a Global Coalition ministerial conference in Brussels, at which all partners unanimously endorsed a detailed communiqué to guide and coordinate global efforts going forward, including a commitment to five lines of effort designed to guide the ongoing action against ISIL.  These five lines of effort include: supporting military operations, capacity building, and training; disrupting the flow of foreign terrorist fighters; cutting off ISIL's access to financing and funding; addressing the humanitarian crises; and exposing ISIL's true nature (ideological de-legitimization).

**Countering Radicalization to Violence and Violent Extremism:**  On October 27 the United States participated in the conference of Global Coalition partners focused on countering ISIL's messaging and countering violent extremism.  Bahrain, Egypt, France, Iraq, Jordan, Lebanon, Oman, Qatar, Saudi Arabia, Turkey, the UK, and the UAE joined the conference.  In addition, Iraq has taken several significant steps towards diminishing the pull of ISIL's propaganda on potential recruits.  On April 10, then Minister of Higher Education Ali al-Adeeb opened a one-day conference on Countering Violent Extremism and appealed for scientific research focused identifying what motivates suicide attackers.  The conference received significant national press coverage and included several high profile speakers.

## ISRAEL, THE WEST BANK AND GAZA, AND JERUSALEM

**Overview:**  Israel was a committed counterterrorism partner in 2014.  Israel again faced terrorist threats from Hamas, the Popular Resistance Committees, Palestinian Islamic Jihad (PIJ), and other violent extremists, particularly from Gaza but also from the West Bank; from Hizballah in Lebanon and Syria; and from Ansar Bayt al-Maqdis (ABM) in Egypt's Sinai Peninsula.

Gaza-based Palestinian terrorist organizations continued rocket and mortar attacks into Israeli territory, and multiple terrorist attacks were launched along Israel's security barrier with Gaza.  Israel was hit by a record volume of rocket and mortar fire from Gaza and the Sinai in 2014, according to the Israeli government, with more than 4,660 projectiles launched, most during the July-August conflict, at Israeli territory compared to 74 launchings in 2013 and 2,557 in 2012.  Militants from Gaza also infiltrated Israeli territory using tunnels in six separate attacks and, for the first time, by a sea-borne operation.  The Government of Israel reported that it responded to these threats with operations directed at terrorist leaders; infrastructure (including tunnels, weapons production and storage facilities; command and control centers; terrorist training sites; and safe havens), and activities such as rocket and mortar launching; most notably in Operation Protective Edge (OPE) during the July 7 to August 26 Gaza conflict.  The

PX209

Government of Israel reported that during OPE it conducted over 5,240 airstrikes in Gaza and carried out a 20-day military ground operation within Gaza. According to publicly available data, the conflict led to the deaths of 2,205 Palestinians and 74 persons in Israel, among them 67 soldiers, six Israeli civilians, and one Thai civilian. The Israeli government estimated that half of those killed in Gaza were civilians and half were combatants, while the UN Office for the Coordination of Humanitarian Affairs (UNOCHA) recorded 1,483 civilian Palestinian deaths – more than two-thirds of those killed – including 521 children and 283 women.

Militants continued efforts to smuggle arms and dual-use materials through the Sinai into Gaza via tunnels. Israeli officials welcomed significant efforts by the Government of Egypt to prevent such smuggling from occurring. In March, the Israeli government interdicted a weapons shipment containing 40 M-302 rockets, 181 mortars, and hundreds of thousands of rounds of ammunition from Iran believed to be destined for militants in Gaza. Israeli officials continued to be concerned about efforts to smuggle weapons from Libya, Iran, and via Sudan into Gaza.

Israeli counterterrorism officials said Gaza militants continued to make significant quantitative and qualitative advances in capabilities, as demonstrated during the 51-day conflict in the summer, with rockets reaching as far north as 74.56 miles from Gaza, frequently targeting the Tel Aviv area, and reaching as far east as the Jerusalem mountains. However, following the conflict, Israel estimated that the Hamas and PIJ weapons arsenal decreased by 60-70% due to Israeli strikes and militant use during the operation. These groups also continued to improve their tunnel construction capabilities, reaching depths of approximately 80 feet and extending more than a mile. Israeli forces destroyed more than 30 tunnels during OPE, including 14 that crossed into Israeli territory. Hamas has also announced its interest in acquiring new capabilities, such as UAVs to launch attacks. The Government of Israel continued to hold Hamas, as the dominant organization in effective control of Gaza, responsible for attacks emanating from Gaza, and Israeli officials pointed to these attacks as proof that Hamas has not abandoned terrorism.

Since the conclusion of OPE, Iranian governmental officials have publicly stated a willingness to resume Iran's military support of Hamas, including arming Hamas in the West Bank with the same weapons as in Gaza, but it remains unclear whether efforts have resumed.

Israeli security officials and politicians remained concerned about the terrorist threat posed to Israel from Hizballah and its Iranian patron, highlighting that Iran, primarily through the efforts of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), continued to transfer arms to Hizballah. Israeli experts believe that Iran is trying to arm Hizballah with advanced weapons systems such as anti-air and anti-ship cruise missile systems, as well as continuing to transfer long-range rockets into Lebanon. Also, Israeli officials were concerned about the proliferation of conventional and non-conventional weapons from Syria to terrorist organizations. According to the Government of Israel, Hizballah has stockpiled approximately 100,000 missiles in Lebanon since the 2006 Lebanon War, some of which are capable of striking anywhere in Israel, including population centers.

Iran has admitted publicly that it armed Hizballah (in violation of UN Security Council Resolutions (UNSCRs) 1701 and 1747) with advanced long-range Iranian manufactured "Fateh"

PX209

missiles.  In late November, General Amir Ali Hajizadeh, the head of the IRGC Aerospace Division admitted that "The IRGC and Hizballah are a single apparatus jointed together" (Fars news agency, 29 November).

While Israel is not involved in Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL) efforts, it shares information to help track and stem the flow of foreign terrorist fighters through information exchanges on counterterrorism issues with numerous governments.  In support of UNSCRs 2170 and 2178, Israel regularly updates the list of foreign terrorist organizations and individuals involved in terrorism in order to better align with UNSC sanctions lists.  Additionally, in November the Israeli government approved the work of an interagency team that will examine the need and methods of requiring and collecting advance passenger information and passenger name record data from airlines operating in its territory, to achieve better safety measures and as part of Israel's implementation of UNSCR 2178.

Attacks by violent extremists – both Israelis against a joint Arab-Israeli school and Palestinian residents, property, and places of worship, and Palestinians against Israelis – in Israel, Jerusalem, and the West Bank continued.

Israeli President Reuven Rivlin spoke out against extremist violence and "price tag" attacks (property crimes and violent acts by extremist Jewish individuals and groups in retaliation for activity they deemed to be anti-settlement) on multiple occasions, as did Prime Minister Benjamin Netanyahu.

**2014 Terrorist Incidents:**  Notable terrorist attacks included:

- On January 31, Sinai-based terrorist group Ansar Bayt al-Maqdis took credit for launching two rockets on the southern resort city of Eilat.  There were no reported injuries or property damage from the attack.
- On multiple occasions in March and again in October, Hizballah allegedly planted IEDs along the Israel-Lebanon and Israel-Syria borders.  Hizballah claimed responsibility for the October attack.  A total of six soldiers were injured in IED explosions along these borders while on patrol.
- On June 22, a teenager was killed and three others were wounded when hit by an anti-tank rocket along the separation fence with Syria.
- From July 11 to August 26, a total of 18 rockets were launched from southern Lebanon towards Israel, with nine rockets hitting Israel on six occasions and injuring two civilians.
- In July and August, Gaza-based terrorist organizations and militants engaged in a 51-day conflict with Israel.  Gaza-based groups fired 4,435 rockets at Israel; Israel conducted over 5,240 airstrikes in Gaza and carried out a 20-day military ground operation within Gaza.  Additionally, Sinai-based terrorist organizations launched a total of 30 rockets from the Sinai during OPE resulting in minor injuries and property damage.  During the military operation, many international airlines suspended air service to Ben Gurion Airport for 36 hours due to safety concerns after a rocket landed in close proximity to the airport.
- On November 10, a Palestinian stabbed an IDF soldier and wounded another at the Hagana train station in Tel Aviv.  The suspect was later apprehended by the INP.

PX209

- On multiple occasions, violent extremists undertook "price tag" attacks.  (In March, the tires of 19 vehicles were slashed and acid poured on in the Arab-Israeli town of Jaljulia.  Homes in the town were sprayed with graffiti stating "Every Arab is a Criminal."  Additional cases of "price tag" attacks took place in Acre in May and in Haifa against an Arab-Israeli school in June.  An Eilat sports complex was also vandalized with "Death to Arabs" and "Lehava" (the name of an extremist anti-assimilation group) in December.

**Legislation, Law Enforcement, and Border Security:**  Israel has a robust legal framework to combat terrorism and promote international legal assistance in the investigation and prosecution of terrorists.

In September, Israel declared al-Shabaab as a terrorist organization on the basis of the U.S. designation of this organization.  This was executed according to Israel's Prohibition of Terror Financing Law (2005), which allows the Israeli Security Cabinet to declare a foreign association to be an FTO on the basis of the relevant determination by a foreign country or by the UNSC.  It is the first time that Israel has adopted a designation on the basis of a determination made by another country.  Israeli officials have stated they will similarly pursue other designations.

Over the course of 2014, the Minister of Defense approved the designation of several terror organizations as "unlawful associations."  These designations include:  Islamic Relief World Wide, Imarat Al-Aqsa wal-Muqadasat, the Abdallah Azzam Brigades (Lebanon), the Islamic State / ISIS (Iraq, Syria, and others), al-Nusrah Front (Syria), the Salafiya-Jihadiya (Network of networks), Ansar Bayt al-Maqdis (Egypt), and Muassasat Alquds Litanmiya.

On the law enforcement front, the ISA and INP continued to cooperate with U.S. law enforcement agencies on cases involving U.S. citizens killed in terrorist attacks, as well as other counterterrorism initiatives of mutual interest.

The Israeli Ministry of Interior maintains a voluntary biometric passport control system at Tel Aviv's Ben Gurion International Airport, which is available for Israeli passport holders over the age of 18.  The system facilitates both entry into and exit from Israel via an automatic kiosk for Israeli citizens who successfully pass a background check and provide a scan of the back of their hand.  Israel maintained a border fence along the length of its border with the Sinai Peninsula to stem the flow of illegal immigrants into Israel, augmented by cameras and sensors to similarly reduce the threat of terrorism.  Israel does not collect advance passenger name records on commercial flights.

In November, the Israeli government approved the work of an interagency team that will examine the need and methods of requiring and collecting API and PNR data from airlines operating in its territory, to achieve better safety measures and as part of Israel's implementation of UNSCR 2178.

Additionally, legal cases against violent extremists responsible for "price tag" attacks began making their way through the Israeli judicial system, although investigations by the Israeli

175

**PX209**

authorities in the majority of such attacks did not result in prosecutions.  Three illustrative cases are as follows:

- In February, in the first indictment for a "price tag" attack that was not a response to a settlement evacuation, three settlers were indicted for torching two vehicles and vandalizing buildings in the village of Farata.  Two of the three were sentenced to 30 months imprisonment, an additional 12-month suspended sentence if they commit a similar offense within three years of release, and 15,000 NIS (approximately US $4,000) each in compensatory damages.
- In May, two teenagers from a settlement were arrested for the June 2013 "price tag" attack in the Arab-Israeli village of Abu Gosh, vandalizing 28 vehicles and buildings with graffiti.  Both suspects remained in police custody since their arrest and were indicted in August.  They will be charged as minors for incitement, damage to property, and intent to cause damage to property.
- In December, three settlers connected to the Jewish extremist group "Lehava" were arrested and indicted for the November arson and vandalization of the bilingual Max Rayne Hand-in-Hand School in Jerusalem.  The three were charged with arson, breaking and entering, and destroying property.

**Countering the Financing of Terrorism:**  Israel is a member of the Council of Europe's Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures (Moneyval), a Financial Action Task Force (FATF)-style regional body.  The FATF decided in June 2014 to expand its membership and identified Israel as a potential candidate for FATF membership.  In September, Israel's Ministers of Justice and Finance endorsed the FATF recommendations and processes and have committed to undergo a mutual evaluation.  The second step of the process is an evaluation of the country's commitment and compliance with the FATF standards.  Timing had not been set at year's end.

The Israeli financial intelligence unit, known as the Israeli Money Laundering and Terror Finance Prohibition Authority, is a member of the Egmont Group of Financial Intelligence Units.  Israel's counterterrorist finance regime continued to be enhanced through enforcement operations and the inclusion of new groups under national terrorist finance laws.  The well-regulated Israeli banking industry worked to address suspected terrorist activity.  Israeli experts and officials raised concerns about the issue of state-sponsored funding of Hamas.  Israelis claim there are indications that money transferred from countries to Hamas is being used by the organization for terrorist activity and military buildup.  Financing of Hamas through charitable organizations remained a concern for Israeli authorities, as did the funding of Hizballah through charities and criminal organizations.

Israel regularly updates the list of foreign terrorist organizations and individuals involved in terrorism, in order to align with the UNSC sanctions lists.  The UN lists of designated terrorists or terrorist entities are registered in the formal government registry.  Every designation is published in three languages (Hebrew, Arabic, English), and in three different newspapers, as required by law.  Designations are also published on the website of the Israel Money Laundering and Terror Financing Prohibition Authority, and are also distributed by email to a mailing list of the IMPA, which includes banks, lawyers, and finance professionals.

PX209

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Israel continued its counterterrorism cooperation with a range of regional and international institutions, including the UN, the OAS, and the OSCE.  On November 10-12, the Israeli Ministry of Foreign Affairs hosted an international conference on Criminal Justice Responses to Terrorism with delegates from 28 countries and international organizations.  The conference was hosted in partnership with the Terrorism Prevention Branch of the UN Office on Drugs and Crime and the OSCE, and in consultation with the UNSC Counter Terrorism Executive Directorate.  It is the first time that such a conference was hosted by Israel.  The conference examined critical issues and challenges faced by many governments when dealing with legal frameworks in the fight against terrorism, such as maintaining the balance between human rights and security while trying to prevent acts of terrorism.  In this context, the representatives of the Israeli Ministry of Justice presented the outlines of the new Israeli national counterterrorism legislation which aims to maintain such a balance.  Other issues included in the discussions were methods of handling classified intelligence derived evidence in the court systems when dealing with cases of terrorism in a way which will not jeopardize its source; the use of universal instruments against terrorist financing; and how to insure judicial independence and the integrity of the legal process while handling terrorism cases of high public interest.

Israel continued to cooperate with numerous countries regarding efforts to thwart terrorist attacks and plots against Israelis or Israeli interests abroad.  In April, Thai police arrested two Lebanese citizens under suspicion of planning a terrorist attack against tourist targets known as a center for Israeli tourists.  In May, a French foreign terrorist fighter who had returned from fighting with ISIL opened fire at the Jewish Museum in Brussels, Belgium, killing four individuals including two Israeli citizens.  In October, a Hizballah operative was arrested in a suburb of Lima, Peru, for planning attacks on Israeli targets in Lima.

In June, Israel and the United States held an interagency counterterrorism dialogue to discuss the broad range of threats in the region and to determine areas of collaboration to address these challenges.  Additionally, during 2014 Israel conducted talks on counterterrorism issues with several countries, including Canada, France, Germany, Russia, the UK, and the EU; and engaged with Bulgaria, Georgia, Greece, India, Kenya, Nigeria, and Thailand.

West Bank, Gaza, and Jerusalem

The Palestinian Authority (PA) continued its counterterrorism efforts in the West Bank where Hamas, PIJ, and the PFLP remained present.  The PASF constrained those organizations' ability to conduct attacks.  The PA exercised varying degrees of authority over the West Bank due to the continuing Israeli military presence in the majority of the West Bank.  The IDF and ISA ("Shin Bet") arrested suspected members of terrorist organizations operating in the West Bank, including a purported Hamas cell that was planning to carry out attacks against Jerusalem's Light Rail and soccer stadium.  During searches for three Israeli teenagers abducted in the West Bank

PX209

in June and subsequent military raids and searches throughout the West Bank, Israeli security forces also announced that they uncovered Hamas networks in Jerusalem, and in the West Bank, uncovered efforts to build up military infrastructure and capacity.

Extremist Palestinians and Israeli settlers continued to conduct acts of violence in the West Bank. For the first time since 2008, Palestinians kidnapped and killed Israeli citizens in the West Bank. The UN Office of the Coordinator for Humanitarian Affairs reported 330 attacks by extremist Israeli settlers that resulted in Palestinian injuries or property damage. In Jerusalem, there was an uptick in violence relative to 2013, including two vehicular attacks against crowds of civilians. Extremist Israeli settlers abducted and murdered a Palestinian teenager in June. A Palestinian stabbed and injured an Israeli in the back in November. In May, in an apparent "price tag" attack, Israeli extremists vandalized the Vatican-owned Notre Dame Center, where they daubed "Death to Arabs and Christians and all those who hate Israel."

Despite Fatah and Hamas signing a reconciliation agreement in April, and the PA forming an interim government of technocratic ministers in June, the PA has exercised little control over Gaza, and Hamas continued to maintain control of security forces there. Hamas, PIJ, and other Gaza-based terrorist and militant groups continued to launch attacks against Israel from Gaza. In the wake of two militant attacks in North Sinai, which the Government of Egypt alleged were carried out in part by Palestinian factions, the Egyptian government closed the Rafah crossing between Egypt and Gaza and cleared a buffer zone on the Egyptian side of the border to eliminate smuggling tunnels into and out of Gaza. The Government of Egypt's actions and the Israeli military's bombings of tunnels during Operation Protective Edge hampered Hamas's and other armed groups' ability to smuggle weapons, cash, and other contraband into Gaza.

Gaza remained a base of operations for several Salafist splinter groups, such as the Mujahideen Shura Council; and clan-based terrorist groups that engaged in or facilitated terrorist attacks. In November, Palestinian violent extremists detonated explosives in front of seven homes belonging to Fatah officials and in front of a stage set-up for a Fatah rally in Gaza. There were no reports of injuries. Despite claims of responsibility from individuals purporting affiliation with ISIL, there is no definitive link confirming this.

Additional 2014 incidents in the West Bank, Gaza, and Jerusalem included:

- In January, violent extremist Israeli settlers spray painted "revenge by blood" on and set fire to a mosque in the West Bank.
- In January, ISA arrested a group of al-Qa'ida (AQ) sympathizers in East Jerusalem which was allegedly planning several attacks.
- In May, St. George Romanian Orthodox Church in Jerusalem was defaced with the expressions "Jesus is Garbage" and "King David for the Jews." On another street in Jerusalem, authorities found graffiti stating "Death to Arabs."
- In June, two Palestinians kidnapped and killed three Israeli teenagers in the West Bank. During an attempt to apprehend the suspected perpetrators, the IDF shot and killed them. An Israeli court indicted a third individual suspected of planning the attack.
- In July, three Israelis kidnapped and killed a Palestinian teenager in Jerusalem. An Israeli court indicted three individuals who confessed to carrying out the attack.

PX209

- In July, an Israeli settler drove by and fired a gun into a protest near Nablus, killing one Palestinian.
- In October, a Palestinian crashed his vehicle into a crowd of people and into a Jerusalem Light Rail train as it was passing a light rail stop, killing an American-citizen infant, a foreign national, and injuring approximately nine others, according to media.  The driver, who Israeli authorities suspected of being Hamas-affiliated, died from wounds sustained during Israeli National Police's (INP) attempt to apprehend him.
- In October, a Palestinian critically injured an Israeli-American in Jerusalem while attempting to assassinate him.  The INP shot and killed the suspected shooter, a known PIJ associate, during a raid to apprehend him.
- In October and December, violent extremists bombed the French Cultural Center in Gaza.  There were no reports of injuries in October and there was one injury in December.
- In October and November, Israeli security forces arrested five residents of Tulkarem for planning to execute a suicide bombing in the Tel Aviv area as well as several other terror attacks, such as shootings, detonating a bomb in a bus crowded with soldiers, and abducting a soldier.
- In November, two Palestinians reportedly affiliated with the PFLP entered a synagogue and attacked Israelis with guns, knives, and axes, killing five people, including three American citizens, and injuring over a dozen.  INP shot and killed the perpetrators while the attack was ongoing.
- In November, Israeli extremists vandalized and set fire to the Max Rayne Hand-in-Hand School, a bilingual center for Jewish-Arab education.  ISA arrested three suspects, who were indicted by Israeli courts in December.
- In November, a Palestinian stabbed and killed an Israeli and injured two others near the West Bank settlement of Alon Shvut.
- Israeli security agencies reportedly thwarted several additional planned terrorist attacks in the West Bank, including a Hamas plan to launch a rocket-propelled grenade at the Israeli Minister of Foreign Affairs' vehicle.  Security services also prevented Hamas plans to attack Israeli towns and settlements, and to launch an attack on a stadium in Jerusalem.
- In December, a Palestinian threw acid at an Israeli family and another Israeli, injuring six, near a checkpoint between Bethlehem and Jerusalem.  The IDF arrested the attacker.

The United States continued to assist the PA's counterterrorism efforts through programs that further strengthened the capacity of the PASF, primarily through training, equipping, and the provision of infrastructure to PA personnel in the West Bank.  U.S.-funded training of PASF primarily took place at the Jordan International Police Training Center, and the PA's Central Training Institute in Jericho.  Concurrently, the United States continued to assist the larger PA criminal justice system to conduct more thorough investigations and prosecutions of terrorist related activity, among other criminal acts, and to ensure safe incarceration of those held for trial or after conviction of such crimes.

PA President Mahmoud Abbas consistently reiterated his commitment to nonviolence and recognition of the State of Israel.  He condemned acts of violence, including the kidnapping and murder of three Israeli teenagers in the West Bank in June, and the attacks on civilians at a West Jerusalem synagogue in November in which five people died, including three American

PX209

citizens.  Abbas continued to support a security program involving disarmament of fugitive militants, arresting members of terrorist organizations, and gradually dismantling armed groups in the West Bank.  The PASF arrested members of Hamas, PIJ, and PFLP when it suspected them of involvement in terrorist or criminal acts.  For example, the PASF arrested approximately 30 suspects in November who were planning terrorist attacks primarily against Israeli settlers, per media.  The PASF spokesperson publicly announced in October that the PA trained special units and officers to monitor and track internet activity affiliated with Salafist jihadist movements and AQ.  Also in October, PA security personnel arrested 10 individuals for promoting the ideology of ISIL.

Israeli authorities, among others, continued to note improvements in the capacity and performance of PASF as a leading contributor to the improved security environment in the West Bank.  Most notable was the relative lack of organized or large-scale disturbances in the West Bank following the kidnapping and killing of a Palestinian teenager and during hostilities in Gaza during the summer.

The PA continued to lack legislation specifically tailored to counterterrorism, although existing Palestinian laws criminalize actions that constitute terrorist acts.  Presidential Decree No. 3 of 1998, titled "Enhancement of National Unity and Prohibition of Incitement," prohibits incitement to violence, illegal associations, and acts against Palestine Liberation Organization agreements with other states (an indirect reference to the Oslo Accords with Israel).  PA officials frequently enforce Presidential Decree No. 17 of 2007, which criminalizes armed militias and any assistance to such militias, as well as carrying unlicensed weapons and explosives.  Presidential Decision No. 257 of 2007 bans "all Hamas militias" and states that any affiliation therewith will be punished in accordance with the laws and regulations in effect.  The PA's parliament, the Palestinian Legislative Council, has not met since 2007, due to the Hamas-Fatah rift, and was therefore unable to pass new legislation.

The PA continued to detain terrorists in the West Bank, and the PASF and public prosecutors received training to enable better investigations of terrorism-related crimes.  Despite on-again, off-again factional reconciliation talks between Hamas and Fatah, PASF personnel continued to conduct operations against and detain Hamas elements, which Hamas officials protested.  The PA continued to develop its civilian justice institutions (e.g. judiciary, police, prosecutors) to improve both investigative and prosecutorial functions.  The United States and other donors provided material and developmental assistance to enable the PA to reduce case backlogs, improve warrant executions, and upgrade forensic services.

After 2007, the Palestinian military (security) court system processed many terrorism and security-related cases.  Following numerous objections by civil society groups, the PA decided in 2011 to prosecute all cases involving civilian suspects in the civilian court system.  In 2013, a PA committee drafted legislation to govern the military court system which, in part, confirms that its jurisdiction is limited to members of the security services.  The committee completed a revision of the draft in December 2014, which awaits submission to the Council of Ministers for consideration.

PX209

The key PA institution by mandate and law that works to prevent internal terrorist events and investigates security-related criminal conduct is the Preventive Security Organization (PSO).  During 2014, the United States expanded assistance to the PSO as well as the Security Justice Commission to help the PA move the prosecution of all civilian cases, including those involving terrorism and security-related offenses, to the exclusive jurisdiction of the civilian courts, and enhance cooperation between security service investigators and civilian prosecutors.  PA security forces have a mixed although steadily improving record of accountability and respect for human rights.  International donors, primarily the United States and the EU, continued to provide assistance to the PA to improve its capacity in this field.

Per the Oslo-era Accords, Israel controls border security in the West Bank.

The primary limitation on PA counterterrorism efforts in Gaza remained Hamas's control of the area and the resulting inability of PASF to operate there.  Limitations on PA counterterrorism efforts in the West Bank included restrictions on the movement and activities of PASF in and through areas of the West Bank for which the Israeli government retained responsibility for security under the terms of Oslo-era agreements.

While the PA continued to lack modern forensic capability, the multi-year assistance efforts that the Canadian International Development Agency started through the UN Office on Drugs and Crime in late 2012 continued.  The forensic science laboratory is nearly fully equipped and training in firearm and tool mark evidence, document examination, and drug analysis continued.  The PA already has a basic ability to examine and compare unknown prints to known prints.

PA justice and security leaders continued to participate in regional conferences and meetings to combat terrorism.  PASF personnel attended a variety of international training courses related to counterterrorism at training facilities in Jordan, Europe, and the United States.

The PA is an observer to the Middle East and North Africa Financial Action Task Force.  In part due to the patchwork of legal frameworks that the PA is subject to, terrorist financing is not specifically addressed in current law as required by international standards.  However, the PA Ministry of Justice was working on modifying the anti-money laundering (AML) law to incorporate articles that address terrorist finance.  The Palestinian Financial Follow-Up Unit (FFU), the PA's financial intelligence unit, has 12 employees and a computer system linked with all 17 banks licensed to operate in the West Bank.  Although the FFU has adequate staffing, authority, and equipment, it has been unable to realize its full operational effectiveness due, in part, to restrictions in the law.  Article 31 of AML Law No. 7 of 2007 restricts information sharing between the FFU and any law enforcement agency, with the exception of the Attorney General's Office (AGO).  Prosecutors within the AGO are the chief investigators in the PA, with all the powers of an investigative judge.

The PA has taken significant steps to ensure that official institutions in the West Bank that fall under its control do not create content that leads to incitement to violence.  According to the Palestinian Broadcasting Company's code of conduct, no programming is allowed that encourages "violence against any person or institution on the basis of race, religion, political

PX209

beliefs, or sex." In practice, this code of conduct is not always observed, with some instances of inciting taking place via official media. In July, Fatah included on one of its official Facebook pages: "Sons of Zion, this is an oath to the Lord of the Heavens: Prepare all the bags you can for your body parts." The official Palestinian news agency, WAFA, included on its site in October Fatah's call to its "fighters" and Palestinian people to "aid the Al-Aqsa Mosque and occupied Jerusalem." In November, political cartoons glorifying vehicular terrorist attacks were posted on one of the official Fatah Facebook pages.

The PA maintains control over the content of Friday sermons delivered in over 1800 West Bank mosques to ensure that they do not endorse incitement to violence. Weekly, the PA Minister of Awqaf and Religious Affairs distributes approved themes; the guidance is that no sermon can discuss politics or lead to incitement to violence. The PA's ability to enforce these guidelines varies depending upon location, and it has limited authority to control the context of sermons in Israeli-controlled Area C.

As part of a policy codified in 2003, the PA provided significant financial packages to Palestinian security prisoners released from Israeli prisons in 2014 in an effort to reintegrate them into society.

## JORDAN

**Overview:** Jordan remained a key ally and a model partner in combating terrorism and extremist ideology. Jordan's geographic location leaves it vulnerable to a variety of regional threats, while also facilitating its regional leadership in confronting them. During 2014, the emergence and rapid growth of the Islamic State in Iraq and the Levant (ISIL) and other extremist organizations in Syria and Iraq further entrenched terrorism as a top concern for Jordanian security services. Jordan actively participated in Global Coalition to Counter ISIL military efforts, and amended key counterterrorism legislation. Jordan continued to provide diplomatic and political support to the Israeli-Palestinian peace process, in addition to its support for a political resolution to conflicts in Syria and Iraq.

Jordan demonstrated regional leadership in the fight against ISIL, joined the Global Coalition from the outset, and participated fully on the diplomatic, political, financial, and military fronts. King Abdullah II, in a November address to the Jordanian parliament, declared, "the war on these terrorist organizations and their radical ideology is [Jordan's] war because we are targeted and we must defend ourselves, Islam, and the values of tolerance and moderation by fighting extremism and terrorists." The Royal Jordanian Air Force participated in Global Coalition military operations against ISIL, humanitarian operations in support of communities targeted by ISIL, and the Jordanian Armed Forces (JAF) bolstered defenses against terrorist incursions in the northern and eastern border regions.

On December 24, ISIL captured, and ultimately killed, a Jordanian pilot in Syria who was participating in counter-ISIL operations. The JAF in 2014 continued to host United States military units, as well as other Global Coalition partners, for various joint counterterrorism exercises and training on Jordanian territory. Jordan actively worked to prevent flows of foreign fighters to extremist groups in Syria and Iraq, and took steps to restrict terrorism financing.

PX209

**2014 Terrorist Incidents:**  In April, during a period of civil unrest in the southern city of Ma'an, armed civilians raked several buildings with gunfire, including an Islamic bank, a school for girls, and a local headquarters for the General Intelligence Directorate (GID).  They also reportedly used hand grenades.  Additionally, a series of low-yield improvised explosive device attacks against Interior Ministry police forces occurred at major traffic circles in the affected area.  No deaths or casualties were reported, and no suspects were arrested in connection with these incidents.

**Legislation, Law Enforcement, and Border Security:**  The State Security Court (SSC) is the primary legal apparatus for trying and convicting alleged terrorists.  The SSC oversees the prosecution of civilians charged with crimes affecting national security.  In April, the parliament passed amendments to the SSC Law, limiting the court's jurisdiction to five crimes: treason, espionage, terrorism, drug-related offenses, and currency forgery.

The parliament amended the 2006 Anti-Terrorism Law in April.  The amendments broadened the definition of terrorism to include forming a group with the intention of committing terrorist acts, harming relations with a foreign state, using the internet to facilitate terrorist acts or promote terrorist ideas, and attacks on the life or liberty of members of the royal family.  The penal code provides an even broader definition of terrorism to include acts intended to "contravene the public order."  Civil society organizations have criticized the amendments to the Anti-Terrorism Law, saying that by broadening the definition of terrorism, the law expands the SSC's jurisdiction over speech-related offenses.

Jordan has advanced capabilities to proactively detect, deter, and prevent acts of terrorism within its territory.  Comprehensive training programs, detailed planning, and recurring surveys of key facilities have enabled Jordan to engineer a coordinated national response to crises.  GID has authority to investigate acts of terrorism.  The Public Security Directorate (PSD) has authority over non-terrorism related crimes but frequently supports GID counterterrorism activities through PSD Special Branch, which includes a criminal intelligence function.  The GID also coordinates with the JAF and its intelligence branch, particular on cases involving border security, which the JAF oversees.  Prosecutors typically are not consulted until the later stages of investigations, when terrorism cases are referred to the SSC.

Jordan also remained a critical partner for the Department of State's Antiterrorism Assistance (ATA) program.  Jordan continued to host the training and development of other ATA partner nations at its various academies and training facilities.

Jordan remained committed to securing its borders and denying safe haven to terrorists.  Jordan continued to develop its border security infrastructure, largely through the Jordan Border Security Program (JBSP), which began in 2009.  JBSP consists of a sophisticated package of sensors to help improve situational awareness along the border and prevent infiltrations into Jordan or unauthorized departures.  Phase II neared completion at the end of 2014.  Jordan actively monitors airports and border crossings for potential foreign fighters.  Jordan maintains a terrorist watchlist, uses biographic and biometric screening, and actively engages in passenger information sharing.

PX209

During 2014, Jordanian authorities took legal action against numerous individuals deemed to be terrorists under local law. Jordanian authorities also arrested and began prosecuting men accused of seeking to join al-Nusrah Front and ISIL; recruiting for or otherwise supporting ISIL, especially on the internet; attempting to travel to – or return from – Syria to fight with extremist groups; and individuals affiliated with the Jordanian Muslim Brotherhood accused of providing weapons to Hamas. Legal actions included:

- Abu Qatada: The public trial of Qatada, a radical Muslim cleric who was deported from the UK in July 2013, concluded in September with an acquittal on all charges. The SSC had previously convicted Qatada in absentia for his involvement in conspiring to carry out acts of terrorism in 1998 and another foiled attempt in 2000 against Western and Israeli targets during Millennium celebrations.
- Abu Muhammad al-Maqdisi: Jordan released Maqdisi, a Salafist leader who was convicted of providing support for al-Qa'ida in 2010, in June. Jordan briefly detained Maqdisi in September, and arrested him again in October, formally charging him with "using the internet to promote and incite views of jihadi terrorist organizations."
- Beginning in August, security officials arrested over 100 ISIL supporters, many for posting pro-ISIL videos or statements on social media sites. The government began charging them before the State Security Court in October for using the internet to propagate terrorist ideology.
- Security forces regularly arrested departing or returning Jordanian foreign fighters, charging them with joining armed groups, including al-Nusrah Front or ISIL in Syria.
- In late 2014, security officials arrested several members of the Engineers Association, a group with strong ties to the Muslim Brotherhood, and charged them under the Counterterrorism Law with possessing weapons and explosives, undermining public order, and carrying out illegal activities that could expose the kingdom to hostile acts.

**Countering the Financing of Terrorism:** Jordan is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body; its financial intelligence unit has been a part of the Egmont Group of Financial Intelligence Units since 2012. The Jordanian parliament introduced proposed amendments to the 2007Anti-Money Laundering and Counterterrorist Financing Law, which would bring Jordan more in line with international standards. As of December, the legal committee had endorsed the amendments, but no vote to adopt the changes had taken place. No known prosecution of terrorist financing cases occurred in 2014. Jordan faces significant challenges in monitoring financial flows for extensive refugee camps on its territory but seems to be managing these risks well.

Although the Associations Law requires non-profit organizations to apply for Cabinet approval before receiving foreign funds, Jordan's Anti-Money Laundering Law does not oblige non-profit organizations to file suspicious transaction reports.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

PX209

**Regional and International Cooperation:**  Jordan is a founding member of the Global Counterterrorism Forum, a member of the Global Initiative to Combat Nuclear Terrorism (GICNT), and the Proliferation Security Initiative (PSI).  In 2014, Jordan was a member of the UN Security Council and also a member of the Organization of Islamic Cooperation, and the Arab League.

Jordan continued to assist Palestinian Authority law enforcement institutions through training at the Jordan International Police Training Center.  In 2014 both advanced-level and refresher courses were offered to Palestinian security services, in addition to basic-level courses.  Jordan also provided anti-terrorism training for Iraqi Security Forces at the King Abdullah Special Operations Training Center.

**Countering Radicalization to Violence and Violent Extremism:**  Jordan has sought to confront and weaken the violent ideology that underpins ISIL and other radical organizations. Jordan is examining ways to better counter radicalization in schools and mosques.  The Prime Minister announced the formation of an interagency anti-extremist task force in October.  The task force issued a wide-ranging set of recommendations to various line ministries, but it had not received authorities, resources, or staff as of the end of the year.

The Royal Aal al-Bayt Institute for Thought, under the patronage of Prince Ghazi bin Mohammad, promotes religious tolerance and coexistence.  This institute continued its sponsorship of a series of ecumenical events promoting interfaith dialogue.  Jordan hosted events geared toward rejecting terrorism and sectarianism.  King Abdullah II continued to promote his "Amman Declaration" of 2005, calling for tolerance and peace within the Islamic community, and rejecting "wanton aggression and terrorism."  The Ministry of Awqaf and Islamic Affairs conducted outreach to imams across the country, encouraging them to refute radical extremist ideology in their sermons.

Jordanian prisons have a religiously based de-radicalization program that seeks to re-engage violent extremist inmates into the non-violent mainstream of their faith.

## KUWAIT

**Overview:**  Kuwait is an important ally located in the critical Arabian Gulf region and a valued partner in promoting policies that strengthen regional security and stability.  Kuwait is a key partner in the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).

Kuwait hosted the Global Coalition to Counter ISIL's Communications Conference on October 27, attended by delegations from the Gulf Cooperation Council (GCC) member states and other partner countries.  Discussions centered on how to combat ISIL and violent extremism in the region, degrade and defeat ISIL's messaging, and confront and contest its presence in the information space.  Over the reporting period, Kuwait showed a full commitment to countering the ISIL threat through its humanitarian and logistic contributions to coalition efforts.  This included taking steps to reduce ISIL's access to financing, cracking down on suspected ISIL supporters, and providing humanitarian assistance to displaced persons primarily from Syria, but also to displaced people in Iraq.

PX209

According to media reports, Kuwait implemented new security measures to prevent possible terrorist attacks on its soil.  Deputy PM and Interior Minister Sheikh Mohammed al-Khalid Al-Sabah announced a new security team of 80 officers to counter violent extremist threats.  On December 5, media reported that state security forces had foiled a terrorist attack planned by an ISIL-affiliated terrorist cell of 12 persons, two of whom were former police officers.  The Jahra-based cell had allegedly planned to carry out a number of bombings at civilian and government sites.

**Legislation, Law Enforcement, and Border Security:**  On December 14, a draft law was introduced in parliament criminalizing terrorism and stipulating harsh punishments for it.  The legislator who introduced the bill explained that regional circumstances and terrorist threats to Kuwait necessitated a law specifically criminalizing terrorism.  Terrorist acts are currently prosecuted under general provisions of the penal code.

In 2014, Kuwait security forces arrested several suspected members and sympathizers of ISIL.  The Kuwait State Security (KSS) service reported it had received information that some of the defendants had gone to Syria and Iraq and had fought with, or contributed financially to, violent extremists.  KSS also handed over an unidentified number of Saudi nationals, suspected of ISIL links, to the Saudi authorities.  In December, media reports quoted a source within the Ministry of the Interior (MOI) as saying that approximately 10 employees were terminated when it was discovered they had travelled to either Iraq or Syria to participate in fighting.

On December 18, a criminal court jailed three Arab (non-Kuwaiti) supporters of ISIL.  The court also sentenced a Kuwaiti to 10 years in jail for urging support of the terrorist group and also for insulting Kuwait's ruler in public.  An Egyptian and a Jordanian were handed four-year sentences for helping the Kuwaiti distribute pro-ISIL leaflets.  It was the first such court ruling against supporters of ISIL.  The courts were examining several similar cases at year's end.

Law enforcement units had the capacity to detect, deter, and respond to terrorist incidents, but were often hindered by internal stove-piping.  Kuwait's primary counterterrorism organizations, the MOI and Kuwait National Guard (KNG), are well-resourced and have plentiful training opportunities.  Under the auspices of the Joint and Combined Exchange Training (JCET) program, the Embassy's Office of Military Cooperation has heavily and consistently engaged with local counterterrorism units for both training and bilateral exercises in an effort to match capabilities with resources.  Because MOI also includes the country's criminal investigative apparatus and border protection mission, it has broad latitude with respect to investigations and border security.  MOI is also generally considered to be the single point of contact for incident response; some terrorism-related matters fall under the prerogative of its semi-autonomous arm, KSS.  Law enforcement units generally have a record of accountability.

On June 29, media reported that MOI had instructed its forces at border crossings to remain on high alert in anticipation of possible attacks by ISIL militants.  The ministry instructed officers to intensify their security procedures at all borders after it received "confirmed information" that ISIL might try to enter Kuwait via land or sea ports.

PX209

**Countering the Financing of Terrorism:**  Kuwait is a member of the Middle East North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body.  It took initial steps in 2014 to implement bylaws to Law 106 of 2013, which govern the criminalization of terrorist financing – including a requirement to report suspected terrorist financing that creates the legal basis to freeze terrorist assets without delay.  In April, the Cabinet issued Ministerial Resolutions 4 and 5, mandating the establishment of a ministerial-level counterterrorism committee (CTC) and stipulating the creation of mechanisms to implement UN Security Council Resolutions 1267 and 1373, including the freezing of assets.  Kuwait froze accounts and banned travel for the five Kuwaiti individuals added to the UN al-Qa'ida Sanctions Committee list in 2014.  The Ministry of Foreign Affairs established and chaired the CTC, on which 11 governmental bodies were represented.  The CTC met regularly to execute Kuwait's Anti-Money Laundering (AML)/Counterterrorism Financing (CFT) obligations under UNSCRs and domestic regulations.

Additionally, Kuwait established the Kuwaiti Financial Intelligence Unit (KFIU) in 2013.  It named its first president in February and opened a temporary office and started to process limited types of suspicious transaction reports (STRs) in June.  By November, the KFIU was working and improving its capacity to receive and analyze STRs.  It is not publicly known if any have resulted in investigations or criminal proceedings.

In July, Kuwait re-established a working-level National Committee for Combating Money Laundering and Terrorist Financing.  Chaired by the president of the KFIU, it consists of the 11 governmental bodies represented on the CTC.

Despite progress, vulnerabilities remain in Kuwait's CFT regime.  Though Kuwait regulates donations to and spending by licensed charities, unlicensed fundraisers are able to operate on social media and raise and send funds through other unofficial channels.  The KFIU does not oversee many sectors of the economy, such as money transfer businesses, according to international standards.

The CTC currently disseminates additions to the lists via facsimile, as well as by note.  Financial institutions electronically monitor the UN lists directly.  The CTC plans to set up a website that will post both UN and domestic designations.  Financial institutions will be required by regulators to check the online list for updates on a regular basis.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  As in previous years, the Kuwaiti Armed Forces, KNG, and MOI conducted a number of exercises aimed at responding to terrorist attacks, including joint exercises with regional and international partners.  Kuwait also cooperated regionally and internationally on counterterrorism, for example, conducting joint training programs with the United States and working with governments to conduct missions and exchange information.

PX209

Kuwait held the GCC's and Arab League's rotating presidencies in 2014.  During the reporting period, Kuwaiti officials issued statements encouraging enhanced cooperation among GCC and Arab League members. Kuwait was the only GCC member not to ratify the Gulf Security Pact.

**Countering Radicalization to Violence and Violent Extremism:**  In 2014, Kuwait began issuing weekly circulars to all mosques with approved language for Friday sermons and instructions to avoid extremist or sectarian language.  It began broadcasts of "Kuwait Youth Radio," which included public service announcements promoting social cohesion and religious tolerance, and also announced formation of the Higher Commission for the Promotion of Moderation, the main goal of which was to counter violent extremist ideology through education.

Media reported that an agreement was reached in September between the MOI and the Ministry of Awqaf (Islamic endowments) and Islamic Affairs to form a joint committee to monitor Friday sermons to ensure imams were not addressing any political or sectarian issues.  Over the reporting period, the Ministry of Awqaf and Islamic Affairs referred 16 imams for investigation and deported one Egyptian imam under the Mosques Charter, which prohibits promoting sectarianism, radicalization, and incitement.

## LEBANON

**Overview:**  Lebanon's security situation deteriorated in 2014 as a result of worsening spillover from the violence in Syria and the involvement of Lebanese fighters in the conflict, including Hizballah, which had fully mobilized in support of the Asad regime, and to a lesser extent individual Lebanese who supported various anti-regime forces.  Incursions by Syria-based Sunni extremists into Lebanon in 2014 underscored both the centrality of border security to Lebanon's stability and importance of enabling the Lebanese government to exercise its full sovereignty, as mandated by UN Security Council Resolution (UNSCR) 1701.  Various branches of the Lebanese state, including the Lebanese Armed Forces (LAF), Internal Security Forces (ISF), and Central Bank continued to cooperate with international partners in countering terrorism and have scored some notable successes in the disruption of terrorist networks and combating militant forces.  U.S. programs are meant to enhance the Lebanese state's capacity to exercise sovereignty over all Lebanese territory, including its borders.

Border security and spillover from the Syrian conflict remained an immediate, pressing terrorism problem.  In retaliation for Hizballah's actions supporting the Asad regime, Sunni militant groups have carried out more than two dozen suicide attacks against Shia population centers and LAF targets from June 2013 through the end of 2014.  Although these attacks declined in the second half of 2014 due to the Lebanese security services' success at disrupting terrorist networks, Syria-based Sunni extremist groups infiltrated and sought to control Lebanese territory.  Al-Nusrah Front and the Islamic State in Iraq and Levant (ISIL) battled the LAF for control of the Lebanese border town of Arsal in August, before retreating into the nearby hills with more than 30 captured LAF and ISF personnel, four of whom were subsequently killed.  The army faced additional attacks in late October in Tripoli by al-Nusrah Front and ISIL-inspired Sunni militants, some of whom professed a desire to establish an ISIL principality in northern Lebanon.

PX209

Lebanon's security institutions, including the LAF and ISF, came under considerable pressure to end these attacks, a daunting task made all the more difficult by the country's political and sectarian divisions and its refugee crisis. Lebanon, a country of approximately four million, hosted more than 1.1 million refugees from Syria at the end of 2014. Lebanese authorities were challenged not only by the significant burden the refugees place on its financial and natural resources, infrastructure, and host communities, but also by fears of potential militant recruiting among the refugee population. Al-Nusrah Front and ISIL's use of informal refugee settlements during the Arsal attacks further hardened Lebanese attitudes towards Syrian refugees.

Despite these challenges, the Lebanese security institutions improved their capacity to detect and intercept terrorist attacks, resulting in the disruption of at least three major terrorist networks and more than a dozen high-profile arrests in 2014. Furthermore, the successful implementation of the Tripoli security plan gave the LAF complete control over the city for the first time since the early 1970s. The United States remains Lebanon's closest counterterrorism partner, and the bilateral relationship is robust and growing. The focus of U.S. assistance was to strengthen Lebanon's security institutions so they can better exert sovereign authority and maintain border security in accordance with UNSCR 1701 and counter both domestic and foreign terrorist threats.

Hizballah, with considerable support from Iran, remains the most capable and prominent terrorist group in Lebanon, enjoying popular support among Lebanese Shia and some Christians. Hizballah continued to operate as an armed militia beyond the control of the state and as a powerful political actor that can hobble or topple the government as it sees fit. The government was not able to take significant action to disarm Hizballah or eliminate its safe havens in Lebanon. Despite Lebanon's official dissociation policy regarding the Syrian conflict, Hizballah accelerated its military role in support of the Syrian regime in 2014 and has proved to be a decisive force in the Syrian regime's ability to retake major swaths of territory from Syrian opposition forces.

Hizballah's actions in Syria have exacerbated the already tenuous security situation inside Lebanon. Iran's Islamic Revolutionary Guard Corps has had a presence in Lebanon since the early 1980s and coordinates closely with Hizballah on military operations and training. Hizballah engaged in terrorist activity against Israel in violation of UNSCR 1701 on October 7, when it detonated a roadside bomb in the Shebaa Farms area south of the Blue Line, injuring two Israel Defense Forces (IDF) soldiers. It was the first time since 2006 Hizballah claimed responsibility for an attack against the IDF.

Other designated terrorist groups, including Hamas, the Popular Front for the Liberation of Palestine, the Popular Front for the Liberation of Palestine General Command, Asbat al-Ansar, Fatah al-Islam, Fatah al-Intifada, Jund al-Sham, Palestine Islamic Jihad, the Abdullah Azzam Brigades (AAB), and several other groups, continued to operate within Lebanon's borders, including within Lebanon's 12 Palestinian refugee camps. The LAF did not maintain a presence in the camps, but it conducted limited operations and patrols near the camps to counter terrorist threats, including attempts to launch rockets against Israel from southern Lebanon. The UN Interim Force in Lebanon (UNIFIL) reported that a total of 18 rockets were launched from southern Lebanon towards Israel over nine different occasions in July and August, with a total of

PX209

nine rockets hitting Israel and, in one case, injuring two Israeli civilians. UNIFIL concluded that the attacks were the work of "amateur operators" and were likely aimed at expressing solidarity with Gaza during Israel's "Protective Edge" military operation from July 8 to August 26.

Lebanon is a member of the Global Coalition to Counter ISIL. The Lebanese security forces seek to limit ISIL's threat at home, including the flow of foreign fighters both to and from Syria, by working to secure the porous, ungoverned border with Syria and conducting counterterrorism operations within Lebanon. The LAF and other security services were actively engaged in monitoring potential ISIL and al-Nusrah Front elements in Lebanon, disrupting their activities and networks, and arresting those suspected of plotting terrorist attacks. The government is expanding its efforts to counter ISIL messaging. The Lebanese government supports UNSCRs 2170 and 2178 and has increased security measures at airports and border crossings to prevent the flow of ISIL and al-Nusrah Front fighters to Syria and Iraq. The government was not in full compliance with UNSCR 2178 at year's end, however, since it has not taken significant action to prevent Hizballah from sending its fighters to Syria and Iraq.

**2014 Terrorist Incidents:** Representative terrorist incidents in Lebanon included:

- On January 2, a suicide car bombing in the Hizballah-dominated Beirut suburb of Haret Hreik killed four people and injured 77. ISIL claimed responsibility for the attack.
- On January 6, a suicide car bombing killed five people and wounded 42 others in the northeastern border town of Hermel. Al-Nusrah Front claimed responsibility for the attack.
- On January 21, a suicide car bombing just 50 meters from the January 2 suicide bombing killed four people and wounded 46 others. Al-Nusrah Front claimed responsibility for this attack.
- On February 22, a suicide bomber blew himself up at a LAF checkpoint in Hermel, killing three people, including two soldiers, and injuring more than 10 others. Al-Nusrah Front claimed responsibility for the bombing.
- On February 19, at least 19 people were killed and dozens injured after two vehicle-borne suicide bombs exploded near an Iranian cultural center in the Beirut suburb of Beir Hassan, an area closely associated with Hizballah. A Twitter account linked to the AAB claimed responsibility for the bombings.
- On March 29, three LAF soldiers were killed and four others wounded by a car bomb targeting an army checkpoint near Arsal. An obscure militant group calling itself the Free Sunnis of Baalbek claimed responsibility for the attack on its Twitter account.
- On June 20, a suicide bomber targeted an ISF checkpoint in the Bekaa area of Dahr al-Baydar, killing one ISF member and injured 32 people.
- On August 2-7, al-Nusrah Front and ISIL militants attacked LAF positions near Arsal and briefly gained control of the town, following the arrest of ISIL leader Imad Ahmed Joumaa. After several days of heavy fighting, the LAF repelled the militants, who retreated into the nearby hills with more than 30 captured LAF and ISF personnel. The clashes left 17 soldiers dead and nearly 200 wounded, along with approximately 40 civilians killed and 400 wounded.

PX209

- On August 28 and September 6, ISIL beheaded two LAF soldiers taken hostage in Arsal.  Al-Nusrah Front also killed two Lebanese servicemen hostages, a LAF soldier on September 19 and an ISF policeman on December 5.
- On October 7, Hizballah detonated a roadside bomb in the Shebaa Farms area south of the Blue Line, injuring two IDF soldiers.
- On October 26-27, Sunni militants attacked LAF positions in Tripoli following the arrest of Ahmed Salim Mikati, a local terrorist suspect with ties to ISIL, resulting in the deaths of 11 soldiers, eight civilians, and 22 terrorists.
- On December 2, armed militants killed six LAF soldiers and wounded another in an ambush near Ras Baalbek.

**Legislation, Law Enforcement, and Border Security:**  Lebanon does not have a comprehensive counterterrorism law, but several articles of Lebanon's criminal code (1943) are used to prosecute acts of terrorism.  Implementation of these articles has at times been hindered by Lebanon's complex political and confessional system, however, and also by Hizballah restricting access to attack sites that were within areas under its control.  The cabinet did not consider legislative initiatives that could potentially threaten Hizballah's operations, as the presence of Hizballah and its political allies in the government make the requisite consensus on such actions impossible.

Several agencies focused on combating terrorism, although cooperation among the services was inconsistent.  Lebanon has been a participant in the Department of State's Antiterrorism Assistance program since 2006; this assistance has focused on border security as well as on building law enforcement's investigative and leadership capabilities.  The Department of State's Bureau for International Narcotics and Law Enforcement (INL) has also provided assistance to improve the capabilities of the ISF through a multi-year program that includes construction of training facilities and establishment of a secure radio communications system; provision of vehicles, protective gear, and other types of equipment; and a wide range of training and mentoring activities.  INL also provides corrections training to bolster the ISF's limited capacity to manage its overcrowded prisons.  The ISF has worked to prevent terrorist recruitment and the direction of terrorist activities by prison inmates who, in many cases, have complete control of certain cell blocks, and access to cell phones and the internet.

INL and the FBI conducted a biometric assessment for the ISF in March and at year's end were reviewing the findings and considering potential projects with the ISF to enhance its biometric capabilities.  Lebanon did not have biometric systems in place at the official points of entry into the country.  Lebanese passports were machine readable, and the government was considering the adoption of biometric passports.  The DGS, under the Interior Ministry, controls immigration and passport services, and it uses an electronic database to collect biographic data for travelers at all points of entry.

The Lebanese security services disrupted multiple terrorist networks and made several high-profile arrests in 2014.  On February 12, the LAF arrested Naim Abbas, an AAB commander with ties to al-Nusrah Front, who was alleged to be behind the January 2 and January 21 bombings in Haret Hreik.  On June 20 and 25, Lebanese security forces raided two Beirut hotels and detained at least a dozen terrorism suspects, including foreign nationals from Pakistan,

PX209

France, and Saudi Arabia.  During the June 25 raid at the Duroy Hotel, a Saudi suicide bomber blew himself up in his room to avoid arrest.  The Lebanese Military Court issued a November 7 indictment against the suspects in the hotel arrests, stating that they planned to carry out attacks against Shia targets in Lebanon.

On December 5, the Lebanese Military Court postponed trial proceedings until June 2015 in the case against Michel Samaha, a former Lebanese Information Minister arrested on terrorism charges in 2012.  The delay came after General Ali Mamlouk, the head of the Syrian National Security Bureau, failed to report to the court in accordance with a 2013 arrest warrant.  Samaha and Mamlouk face charges of "transporting explosives from Syria to Lebanon in an attempt to assassinate Lebanese political and religious leaders."  If convicted, they face the death penalty.

The United States maintains close ties with the Lebanese security services and could expect significant investigative and legal support in any terrorism case affecting U.S. citizens or interests.  Lebanese authorities maintained that amnesty for Lebanese involved in acts of violence during the 1975-90 civil wars prevented terrorism prosecutions of concern to the United States.

The LAF partnered with several friendly nations on a bilateral basis to receive training programs that focused on strengthening its counterterrorism capabilities.

**Countering the Financing of Terrorism:**  Lebanon is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  Lebanon's Central Bank, the Banque du Liban, issued two circulars in 2014 to improve its anti-money laundering/countering the financing of terrorism (AML/CFT) regime:

- Intermediate Circular No. 371 dated September 11, amending Basic Circular No. 83 dated May 18, 2005, required banks to establish an AML/CFT Branch officer in each branch and to set up additional compliance units within individual banks.
- Special Investigation Commission (SIC) Circular No. 17 dated September 16, requested banks to report suspicious transactions electronically to the SIC.

In 2014, the ISF received one request for assistance with a terrorism case from Interpol and had begun an investigation.  The SIC, Lebanon's financial intelligence unit, is an independent legal entity empowered to investigate suspicious financial transactions and to freeze assets, and is a member of the Egmont Group of Financial Intelligence Units.  The SIC reported that it had received three cases in 2014, two from the Directorate of General Security (DGS) and one from a local bank, regarding individuals with alleged terrorism ties.  The SIC froze the individuals' financial assets (amounts undisclosed) in Lebanon's banking sector and forwarded the cases to the public prosecutor for further investigation.  Neither the SIC nor the ISF received any allegations of suspicious financial transactions that led to terrorist financing cases in 2014.

Hizballah continued to work internationally to further its agenda.  Lebanese nationals in Latin America and Africa continued to provide financial support to Hizballah, including through the laundering of criminal proceeds using Lebanese financial institutions.  Requests for designation or asset freezes regarding Hizballah and affiliated groups are sent to the Ministry of Foreign

PX209

Affairs, but the Lebanese government does not require banks to freeze these assets, because it does not consider Hizballah a terrorist organization.  However, following the U.S. Treasury designation in July of Stars Group Holding for ties to Hizballah, several Lebanese banks, of their own accord, closed the bank accounts of this group and related parties.

NGOs are required by law to submit a yearly financial statement to the government, but are not obliged to file suspicious transaction reports to prevent terrorist financing.  However, the banking sector subjects NGOs to enhanced due diligence and reports suspicious transactions to the SIC.  Monitoring the finances and management of all registered NGOs is the responsibility of the Interior Ministry, but it was inconsistent in applying these controls.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Lebanon is a member of the Organization of Islamic Cooperation and attended Global Counterterrorism Forum meetings.  Although Lebanon was a co-sponsor of UNSCR 2178 regarding foreign terrorist fighters, the government is not in full compliance since it did not take significant action to prevent Hizballah from sending its fighters to Syria.  Lebanon continued to voice its commitment to fulfilling other relevant UNSCRs, including 1559, 1680, and 1701.  The Special Tribunal for Lebanon, an international body investigating the 2005 assassination of PM Rafiq Hariri, received Lebanon's annual contribution of approximately US $37.5 million on November 5.

**Countering Radicalization to Violence and Violent Extremism:**  Several government institutions have programs that seek to counter violent extremism (CVE), but there is no overall national strategy in place.  The Interior Ministry, primarily through the ISF, has the most robust CVE programs and is partnering with the LAF and DGS to develop a social media strategy that would specifically target Sunni youth who are vulnerable to extremist recruitment.  The ISF cybersecurity chief and a representative from the Foreign Affairs Ministry attended the October 27 sub-ministerial conference on counter-ISIL strategic communications in Kuwait.

## LIBYA

**Overview:**  In 2014, Libya's democratic transition was disrupted by the outbreak of violence between armed factions affiliated with rival tribes, cities, and political actors.  The resulting collapse of government authority and fragmentation of the country's security forces greatly impeded Libya's ability to counter violent extremist groups active in its territory.   Although all sides in the conflict claimed to reject terrorism, there were signs that violent extremist groups in the region sought to take advantage of the security vacuum to expand their foothold in Libya.  Libya's porous borders, vast uncontrolled weapons stockpiles, and critically weak law enforcement institutions continued to make it a permissive environment for terrorist groups, including Ansar al-Shari'a (AAS) in Benghazi and in Darnah as well as elements of al-Qa'ida in the Islamic Maghreb (AQIM) and al-Murabitun.  In November, Darnah-based extremist groups pledged allegiance to the Islamic State in Iraq and the Levant (ISIL), although the extent of operational and tactical linkages to ISIL's leadership in Iraq and Syria was unclear.  There were

PX209

reports of infighting between ISIL and other Libyan violent extremist groups.  Libya continued to serve as a key source and transit hub for foreign fighters traveling to Syria and Iraq.

The Libyan government's inability to prevent or punish terrorist violence, including a campaign of assassinations targeting activists and security officials in Benghazi, prompted others to take action outside of the state's writ.  In May, retired General Khalifa Heftar launched "Operation Dignity" against violent extremist groups in Benghazi as well as political rivals in other parts of the country.  Following the outbreak of nation-wide violence in July, the internationally recognized government in Tobruk endorsed Heftar's campaign and took some steps to bring it under the authority of the state.  However, Heftar's role within the Libyan military was unclear and he remained a controversial actor for many Libyans.  Ansar al-Shari'a elements joined other militias in opposing Operation Dignity in the east of the country.  Fighting in Benghazi continued throughout the year, with a spike in violence late in the year.

Violent Islamist extremists remained in control of the eastern city of Darnah, which has lacked virtually any state presence since the 2011 revolution.  In 2014, violent extremist groups in Darnah reportedly employed summary executions and public floggings to enforce a strict form of sharia law, and carried out assassinations and beheadings of civil society activists, judges, and security officials.

In May, Ahmed Abu Khattalah, a senior leader within Ansar al-Shari'a-Benghazi, was captured by U.S. forces and was facing trial in the United States at year's end.  Abdal Basset Azzouz, a Libyan al-Qa'ida leader, was reportedly arrested in Turkey in December.

**2014 Terrorist incidents:**  The following list of terrorist incidents is designed to highlight major attacks believed to be perpetrated by violent extremist groups against western, diplomatic, Libyan government, and civil society targets.  It is not exhaustive and does not encompass the numerous acts of violence perpetrated by the parties to the current political conflict, who have each accused their opponents of conducting terrorist acts including kidnappings, assassinations, and attacks on civilian infrastructure such as airports and seaports.  The list of incidents in Benghazi and Darnah also should not be considered comprehensive; according to Human Rights Watch, more than 250 politically motivated killings occurred in these cities in 2014.  Frequently, there were no claims of responsibility for assassinations or other attacks.

- On January 2, two British and New Zealand nationals were murdered by unknown assailants near the coastal city of Sabratha.
- On February 24, seven Egyptian Coptic Christians were killed near Benghazi, apparently because of their faith.
- On March 2, a French engineer working in Benghazi was killed by unknown assailants.
- On March 17, a car bombing targeted a graduation ceremony for military academy cadets in Benghazi, killing 11 and injuring 20.
- On March 21 and April 17, in separate incidents, two Tunisian diplomats were abducted in Tripoli.
- On April 15, the Jordanian ambassador to Libya was kidnapped in Tripoli.  He was released in May, reportedly in exchange for the release of Mohamed Dersi, a Libyan national who was serving a life sentence in Jordan for his role in an airport bomb plot.

PX209

- On June 4, a Swiss staff member of the International Committee of the Red Cross was assassinated in Sirte.
- On June 25, civil society activist Salwa Bugaighis was murdered in Benghazi by unknown assailants.
- On August 12, Tripoli's police chief was assassinated in the capital by unknown gunmen.
- From September 18-20, fourteen people, including a cleric and two teenage activists, were assassinated by unknown gunmen in Benghazi, in an event that became known as "Black Friday."
- On November 9, a car bomb was detonated in the eastern city of Shahat near a location where Prime Minister al-Thinni was meeting with UN officials, following an earlier explosion that appeared to target al-Thinni's government offices in Beyda.
- On November 11, three Libyan youth activists were beheaded in Darnah; they had been kidnapped after posting anti-extremist comments on social media. A fourth individual, a member of the Libyan security forces, was beheaded several days later. The killings were filmed and posted on social media.
- On November 12, more than 20 people were wounded in separate car bombings in the eastern cities of Tobruk and Beyda. Both attacks, in cities that previously experienced few security incidents, appeared to target the internationally recognized government and parliament.
- On November 13, car bombs detonated near the UAE and Egyptian embassies in Tripoli. The embassies were unoccupied and no one was injured.
- On December 27, a car bomb targeted Libya's diplomatic security headquarters in Tripoli. No casualties were reported. An online outlet associated with ISIL's Libya branch claimed responsibility.
- On December 30, parliamentary offices in Tobruk were targeted in a car bombing.

**Legislation, Law Enforcement, and Border Security:** Libya lacks a comprehensive counterterrorism law, although the Libyan penal code (under Title 2, Section 1, Chapter 1, Article 170 and Title 2, Chapter 2, Article 207) criminalizes offenses prejudicial to state security, including terrorism, the promotion of terrorist acts, and the handling of money in support of such acts. In 2013, the General National Congress (GNC) adopted laws no. 27 and 53 outlining a plan to disband non-state militias and integrate them into state security forces; however, neither law has been implemented. Libya has ratified the AU's Convention on the Prevention and Combating of Terrorism, which requires states to criminalize terrorist acts under their national laws.

In March, the interim government of Prime Minister Abdullah al-Thinni released a statement, known as the Ghat Declaration, pledging government, military, and security action against terrorism and requesting international counterterrorism assistance. The statement marked a significant escalation in the government's counterterrorism rhetoric, asserting that there would be "no place for terrorism in Libya" and pledging the government to do "whatever is required to restore security and peace." It placed particular emphasis on ongoing violence in Benghazi, Darnah, and Sirte. A number of GNC members affiliated with Islamist-leaning parties, who were reportedly not consulted on the content of the declaration, opposed the characterization of the security crisis in eastern Libya as terrorism.

PX209

Even prior to the outbreak of large-scale violence in July, Libyan law enforcement personnel lacked the capacity to detect, deter, respond to, or investigate terrorist incidents. There were no reported terrorism-related prosecutions in 2014. In many parts of Libya, security and law enforcement functions are provided by armed militias rather than state institutions. National police and security forces are fragmented, inadequately trained and equipped, and lack clear reporting chains and coordination mechanisms. Dozens of security and law enforcement officials, including prosecutors and judges, have been targeted in kidnappings and assassinations, resulting in the suspension of court operations in Benghazi and Derna. There has been no police presence in Darnah since 2011. Libya's military is similarly weak, with units often breaking down along local, tribal, or factional lines. Formal security structures are often overmatched by non-state armed groups. Counterterrorism operations conducted by Libyan Special Operations Forces have so far failed to significantly reduce the level of terrorist violence, bombings, assassinations, or kidnappings in Benghazi.

The Libyan government lacks a comprehensive border management strategy and has struggled to secure the country's thousands of miles of land and maritime borders, enabling the illicit flow of goods, weapons, migrants, and foreign fighters that pose serious security challenges to the region. Libyan border security forces were generally poorly trained and underequipped, and frequently participated in illicit cross-border trade. Border security infrastructure that was damaged and looted during the 2011 revolution had not been repaired or replaced, and the recent conflict has affected border security infrastructure along Libya's border with Tunisia. Security at Libya's airports is minimal, with limited document screening and no utilization of passenger name record systems or biometric technology. Libya also lacks the resources, manpower, and training to conduct sufficient maritime patrols to interdict or dissuade illicit maritime trafficking and irregular migration. According to Italian officials, more than 50,000 migrants arrived in Italy in the first half of 2014, many from Libyan ports. Existing legislation outlining the responsibilities of various government agencies in the area of border management is vague and often contradictory, resulting in ad hoc and poorly coordinated efforts.

At the March 2014 Rome Conference, the United States and other international partners committed to help Libya address its border challenges through the coordinated provision of expertise, training, and equipment. Libya has also sought to engage its neighbors and regional partners on border security issues. In 2013, Libya signed the Rabat Declaration, which foresees expanded cooperation, training, and information exchanges with countries in the region as well as the establishment of a regional secretariat in Tripoli. Under former Prime Minister Zeidan, the Libyan government also established a Border Management Working Group (BMWG) comprised of seven ministries involved in border security, including Defense, Interior, Finance (which oversees the Customs Authority), and Transportation. Envisioned as the government's lead body for coordinating border security policy and assistance, the BMWG suffered from leadership turnover, poor internal communications, and weak capacity. Border security efforts led by the EU Border Assistance Mission to Libya (EUBAM) faced repeated delays and were largely placed on hold following the outbreak of fighting in Tripoli in July, which forced the evacuation of EUBAM staff from Libya to Tunisia and a considerable reduction in personnel.

Libya has cooperated in the investigation of terrorist attacks against U.S. citizens and interests, including the September 2012 killing of Ambassador Christopher Stevens and three other

PX209

Americans at U.S. government facilities in Benghazi.  However, Libyan support to these investigations has been limited given overall weak capacity in Libya's law enforcement institutions.  Although its political leadership has pledged to do everything possible to arrest and bring to justice the perpetrators of terrorist acts against U.S. citizens, Libyan officials publicly condemned the capture by U.S. forces of Abu Anas al-Libi and Ahmed Abu Khattalah, both of whom have been charged under U.S. terrorism laws.  In 2013, the Libyan Ministry of Justice signed a Declaration of Intent to facilitate law enforcement cooperation with the United States on investigations, including that of the 1988 Pan Am Flight 103 bombing.

**Countering the Financing of Terrorism:**  Libya is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body, and has taken steps to implement a national identification database system to improve transparency in government salary payments.  Although there is little reliable data on Libya's anti-money laundering (AML) and counterterrorist financing efforts, Libyan government and financial institutions generally lacked the ability to identify and interdict illicit financial flows.  The Libyan Central Bank has requested IMF technical and capacity building assistance in AML and other areas.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Libya has participated in the Global Counterterrorism Forum and supported counterterrorism initiatives by the Organization for Islamic Cooperation and the AU.  In 2014, Libya participated in three foreign minister-level meetings with neighboring countries, hosted respectively by Tunisia, Egypt, and Spain, aimed at addressing Libya's security challenges.  Although the Libyan interim government under Prime Ministers Ali Zeidan and Abdullah al-Thinni has expressed interest in international counterterrorism cooperation, most efforts have failed to gain traction given the challenging security and political environment.  Since 2011, the United States, UN, and a number of European countries have developed programs to help rebuild Libya's law enforcement, security, and defense institutions through technical assistance and training.  At the Libyan government's request, the United States, UK, Turkey, and Italy committed to train a General Purpose Force (GPF) to help protect government institutions and maintain law and order.  However, the GPF training program, as well as EU-led efforts to build Libyan border security capacity faced repeated delays in implementation.  A number of these programs have been on hold since the outbreak of large-scale violence in July.

**Countering Radicalization to Violence and Violent Extremism:**  The Libyan government has not adopted a comprehensive strategy for countering violent extremism.  Under the previous interim government, the Ministries of Interior, Culture, and Youth and Sports launched educational and public messaging campaigns to counter extremist ideology.  Like many other government programs, these efforts are on hold in light of the current political and security situation.  Libya has participated in the UN Interregional Crime and Justice Research Institute regional workshops on the rehabilitation of violent extremist offenders.  While many Libyan political and religious leaders condemn terrorism, others have implicitly endorsed extremist views.  In November, Omar al-Hassi, the then-nominal prime minister of the unrecognized Tripoli-based administration, called Ansar al-Shari'a a "beautiful idea" and advocated engaging

PX209

the group in dialogue. While disparate civic groups have carried out campaigns, including via social media, to speak out against extremism, the increase in online threats, kidnappings, and assassinations of activists who speak out against extremists contributes to a culture of intimidation and self-censorship.

## MOROCCO

**Overview:** Morocco has a comprehensive counterterrorism strategy that includes vigilant security measures, regional and international cooperation, and counter-radicalization policies. The government has treated counterterrorism as a top policy priority since the country experienced suicide bombing attacks in Casablanca in 2003, and that focus has been reinforced by further attacks in 2007 and 2011. Additionally, Moroccan nationals were implicated in the 2004 attacks in Madrid. In 2014, Morocco's counterterrorism efforts effectively mitigated the risk of terrorism, although the country continued to face threats, largely from numerous small, independent violent extremist cells. Those groups and individuals, referred to collectively as adherents of the so-called *Salafiyya Jihadiyya* ideology, remained isolated from one another, small in size, and limited in capabilities.

During the year, authorities reported the disruption of multiple groups with ties to international networks that included al-Qa'ida in the Islamic Maghreb (AQIM) and the Islamic State in Iraq and the Levant (ISIL). AQIM and ISIL continued efforts to recruit Moroccans for combat in other countries, and there were reports of Moroccans attempting to join AQIM, ISIL, and other violent extremists in Iraq, Libya, and Syria. The Ministry of Interior (MOI) estimated that between 1,000 and 1,500 Moroccans were fighting in the Syrian conflict, making them one of the largest foreign contingents in the conflict. The government was increasingly concerned about the potential return of veteran Moroccan foreign terrorist fighters from those conflict zones to conduct possible terrorist attacks at home, and Moroccans resident abroad becoming radicalized during their stays in Western Europe. AQIM and ISIL continued to call for attacks against the Moroccan monarchy and prominent Moroccan institutions and individuals. In July, ISIL published a video online in which it promised to bring "jihad" to install the caliphate system in Morocco, and in October, the group published a video calling for attacks against U.S. persons and interests in Morocco and the region.

Morocco is a member of the Global Coalition to Counter ISIL and has made contributions and commitments to the effort. In addition, the government was increasingly proactive in 2014 to both stem the flow of foreign terrorist fighters and to counter ISIL propaganda. In July, the MOI claimed to have arrested over 120 foreign terrorist fighters who had returned from Syria since the start of the Syrian conflict. As of December, the parliament was reviewing draft amendments to the criminal procedural codes to comply with UN Security Council Resolution (UNSCR) 2178. The amendments would criminalize support to terrorist groups, travel to fight or train in conflict areas, and recruitment of others for such acts, creating greater latitude for the government to prosecute Moroccans engaged in terrorist activity abroad. Finally, in December, Morocco co-chaired the inaugural plenary session of the Global Counterterrorism Forum (GCTF) Foreign Terrorist Fighters Working Group.

PX209

**Legislation, Law Enforcement, and Border Security:**  The government continued to enforce the 2003 counterterrorism law, which supplements the criminal code.  That law defines terrorism to include incitement to terrorism but does not penalize participation in terrorist training, communication with a terrorist group, or intimidation of foreign governments or populations.  The law also sets strict penalties for active participation in terrorism.  During the year, the 2003 counterterrorism law and the criminal code were used in several convictions in terrorism-related cases.  Morocco has been working to improve its legal system through an ongoing comprehensive reform of the justice system; for example, in November, the parliament approved a law eliminating the use of military tribunals for civilian cases.

Moroccan law enforcement units aggressively targeted and effectively dismantled terrorist cells within the country by leveraging intelligence collection, police work, and collaboration with regional and international partners.  The National Brigade of the Judiciary Police (BNPJ) – a specialized entity within the investigative arm of the national police force, the General Direction of National Security (DGSN) – is the primary law enforcement entity responsible for counterterrorism law enforcement.  It works closely with and uses intelligence from the internal security service, the General Directorate of Territorial Surveillance (DGST).  In October, the MOI launched a security initiative to improve coordination among the Royal Armed Forces, the Royal Gendarmerie, and MOI auxiliary forces to better protect the public against terrorist threats in urban areas.  The government has publicly committed itself not to use the struggle against terrorism to deprive individuals of their rights.  It has emphasized adherence to human rights standards and the increased transparency of law enforcement procedures as part of its approach.  However, in August, the UN Human Rights Council working group on arbitrary detention released a report based on a review of cases from 2009 through 2013 that claimed they had found "a pattern of torture and ill-treatment by police officers" in national security and counterterrorism cases; separately, the UN Special Rapporteur on Torture Juan Mendez had reported in 2013 that while he found evidence of torture in Moroccan detention facilities, it was "not systematic."

The DGSN is the body primarily responsible for border security, handling border inspections at established ports of entry such as Casablanca's Mohammed V Airport, where most border crossings occur.  Law enforcement officials and private carriers have worked regularly with the United States to detect and deter individuals attempting to transit illegally.  Government authorities worked directly with U.S. Customs and Border Protection's Regional Carrier Liaison Group and the DHS Homeland Security Investigations Attaché office at the U.S. Consulate in Casablanca to address watchlisted or mala fide travelers.  Government airport authorities have excellent capabilities in detecting fraudulent documents but currently lack biometric screening capabilities.

Morocco's counterterrorism efforts led to numerous disruptions of alleged terrorist cells and prosecutions of associated individuals, including these cases:

- In August, the MOI announced that a joint BNPJ-DGST operation had led to the arrest of nine individuals for recruiting volunteers for ISIL.  The network was operating out of the northern cities of Fes, Fnideq, Tetouan, and Ceuta, the Spanish enclave in Morocco, raising funds and exporting people to conflict zones.  The arrests reportedly resulted from

PX209

a joint Moroccan-Spanish investigation.  According to the Moroccan MOI, some of the recruits were planning to return to Morocco to use their training to conduct attacks against senior civilian and military officials.  Press reports indicated that by late August, the nine individuals had been charged in the Salé Court of Appeals with forming a criminal gang to prepare and carry out terrorist attacks within the framework of a collective plot to undermine public order by intimidation, violence, and terrorism; funding terrorism; and holding unauthorized public meetings.

- In October, a joint BNPJ-DGST operation in Fes led to the arrest of two individuals – a French national and a Moroccan with French nationality – who were reportedly preparing to join ISIL in Syria.  The two individuals had previously been in France supporting ISIL through the translation of propaganda and posting it online along with videos that included calls for expanding the caliphate to Morocco.
- In December, the Salé Court of Appeals sentenced seven people to three years in prison, without remission, on terrorism charges based on testimonies during the preliminary investigation that these individuals had traveled to Syria to join terrorist organizations and receive military training.

Morocco continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, which provided DGSN and the Royal Gendarmerie with training in cyber forensics, crime scene forensics, and executive leadership.  In August, Morocco and the United States signed an ATA agreement to partner in the development of CT capacity and cooperation in the Maghreb and Sahel regions.  Morocco also continued to partner with the United States to improve the police criminal investigation process through the development and implementation of chain of custody and evidence management procedures; forensic evidence collection and analysis, including DNA; and mentoring and training.  Morocco participated in Global Counterterrorism Forum (GCTF) and Department of Justice programs to improve technical investigative training for police and prosecutors.  DGSN, Moroccan Customs, and the Royal Gendarmerie were active partners and participants in DHS-sponsored training events on border security, financial investigation, and counter-proliferation topics.  Finally, government officials participated in several U.S. Federal Bureau of Investigation-led courses to improve capacity in intelligence analysis, facial recognition, and leadership and management.

**Countering the Financing of Terrorism:**  Morocco is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body.  Its Financial Intelligence Unit is a member of the Egmont Group of Financial Intelligence Units.  Morocco was removed from the FATF compliance monitoring follow-up process in 2013 and continued to make legal progress in the counterterrorist finance (CFT) domain in 2014.  In July, the parliament's chamber of representatives (lower house) voted to adopt the Council of Europe Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime and on the Financing of Terrorism, and the convention was under parliamentary review at year's end.

In March, a joint BNPJ-DGST operation arrested four individuals in the Fes region for terrorist financing and the recruitment of youth to travel to Syria to fight.  According to the MOI, the group's leader, Ahmed Zahrouni Kouis, previously detained on terrorism charges, reportedly

PX209

scammed banks and financial institutions into granting loans to front companies with forged documents.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/2014/vol2/index.htm.

**Regional and International Cooperation:**  Morocco is a founding member of the GCTF and a member of the Global Initiative to Counter Nuclear Terrorism (GICNT).  In April, Morocco hosted the Fifth GCTF Coordinating Committee meeting.  During the year, Morocco pledged contributions to the GCTF-inspired Global Community Engagement and Resilience Fund (GCERF) to address countering violent extremism goals and volunteered to serve as a pilot country.  It also was a founding member of the Malta-based International Institute for Justice and the Rule of Law launched in June.  In December, it hosted and co-chaired the inaugural plenary session of the GCTF Foreign Terrorist Fighters Working Group.

Morocco is a major non-NATO Ally and a Mediterranean Dialogue (5+5) partner in the EU's Barcelona Process; within that process, Morocco participates in the 5+5 Defense Initiative, which brings together five European and five North African countries to address security issues in the Western Mediterranean.  Morocco also participates in multilateral peacekeeping operations in Africa as well as in training exercises such as maritime-focused PHOENIX EXPRESS and the FLINTLOCK regional security operations exercise, and hosts the annual AFRICAN LION regional exercise.  These engagements have enhanced border security and improved capabilities to counter illicit traffic and terrorism.

Both Morocco and Algeria participate in 5+5, the Trans-Sahara Counterterrorism Partnership (TSCTP), and the GCTF; however, political disagreement over the status of Western Sahara remained an impediment to bilateral and regional counterterrorism cooperation in 2014.

**Countering Radicalization to Violence and Violent Extremism:**  Morocco has a comprehensive strategy for countering violent extremism (CVE) that prioritizes economic and human development goals in addition to tight control of the religious sphere and messaging.  Morocco has accelerated its rollout of education and employment initiatives for youth – the population identified as most vulnerable to radicalization and recruitment – and has expanded the legal rights and political and social empowerment of women.  To counter what the government perceives as the dangerous importation of violent Islamist extremist ideologies, Morocco has developed a national strategy to affirm and further institutionalize Morocco's widespread adherence to the Maliki-Ashari school of Sunni Islam.  In the past decade, Morocco has focused on upgrading mosques, promoting the teaching of relatively moderate Islam, and strengthening the Ministry of Endowments and Islamic Affairs (MEIA).  The MEIA has developed an educational curriculum for Morocco's nearly 50,000 imams in its version of relatively moderate Sunni Islam.  The MEIA-affiliated Mohammedan League of Ulema (*Rabita Mohammedia*) produces scholarly research on the nation's Islamic values, ensures conformity in educational curricula, and conducts outreach to youth on religious and social topics.  To counter the radicalization of Moroccans living abroad, the Moroccan Council of Ulema for Europe and the Minister Delegate for Moroccans Living Abroad also undertook similar programs to promote

PX209

religious moderation within Moroccan expatriate communities in Europe.  Throughout 2014, Morocco expanded the regional counter-radicalization efforts to train Malian imams announced in 2013 to include imams from France, Gabon, Guinea, Kenya, Libya, Nigeria, and Tunisia.

The Department of State's Bureau of International Narcotics and Law Enforcement (INL) funded a program to improve the overall management of Morocco's corrections system, which might help deter potential radicalism and the recruitment of prisoners to terrorist ideology.  USAID's Favorable Opportunities to Reinforce Self-Advancement in Today's Youth (FORSATY, which loosely translates to "my opportunity" in Arabic) project addressed youth marginalization in areas known for recruitment by extremist organizations, helping them stay in school, develop skills, and become active in the community.

## OMAN

**Overview:**  Oman is an important regional counterterrorism partner and worked actively to prevent terrorists from conducting attacks within Oman, or using its territory for safe haven or to transport terrorists, weapons, and materiel.  The Government of Oman actively sought training and equipment from U.S. government and commercial entities as well as from other countries to support its efforts to control its land and maritime borders.  Oman used U.S. security assistance to improve counterterrorism tactics, techniques, and procedures.  Omani officials engaged regularly with U.S. officials on the need to counter violent extremism and terrorism.

Oman participated in Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL) meetings and signed the September 11 Jeddah Communiqué to express support for combating the spread of ISIL's extremism.  After the Jeddah meeting, the Ministry of Foreign Affairs issued a statement noting that regional cooperation was needed to end the threat posed by ISIL as quickly as possible.  Omani officials also participated in the October Coalition Partners Communications Conference in Kuwait to develop a counter-narrative to ISIL messaging, and the December Counter-ISIL plenary meeting in Brussels.  In his remarks to the UN Security Council (UNSC) September 19, Minister Responsible for Foreign Affairs, Yusuf bin Alawi, disparaged ISIL as the "un-Islamic" state.

**Legislation, Law Enforcement, and Border Security:**  Royal Decree 8/2007 outlines specific penalties, including the death penalty and life imprisonment, for various terrorist acts, including establishment or leadership of a terrorist group, attempts to join or recruit for a terrorist group, development of an explosive or weapon, or takeover of any mode of transportation for purposes of terrorism.  Royal Decree 55/1999, ratified the Arab Convention on the Suppression of Terrorism, and Royal Decree 22/2002, ratified the Organization of Islamic Cooperation Convention on Combating International Terrorism.  Royal Decree 105/2005 ratifies the Gulf Cooperation Council (GCC) Convention to Counter Terrorism.  Oman's criminal procedure law permits those suspected of posing a threat to national security to be held for 30 days without a charge.

A widespread corruption crackdown started in 2013 continued into 2104, with guilty verdicts and lengthy prison terms – up to 23 years in prison – issued to well-placed government officials, influential business persons, and senior leadership of state-owned corporations.

PX209

Counterterrorism investigation, crisis response, and border security capabilities were limited by local capacity and a challenging operating environment due to Oman's long and remote borders with Yemen and Saudi Arabia.  There was little coordination among the many agencies with jurisdiction over counterterrorism.  Roles and responsibilities between law enforcement and the armed forces were not clearly delineated.

In 2014, the U.S. Export Control and Related Border Security engaged with the Royal Oman Police Coast Guard, the Directorate General of Customs, and the Royal Army of Oman to deliver numerous training programs designed to assist Omani personnel in enhancing interdiction capabilities at official Ports of Entry on land and at sea ports, and along land and maritime borders.

Oman participated in the U.S. Department of Energy's week-long Chemical, Biological, Nuclear, and Explosives (CBRNE) Commodity Identification Course, which included training on identifying and interdicting dual-use material that may to be used in a WMD terrorist attack.

Oman also participated in the Department of State's Antiterrorism Assistance program, which provided training on maritime border security, cyber investigations, and critical incident management for Omani security officials representing a number of government agencies.

Omani authorities made significant progress on construction of a fence along Oman's long and remote border with Yemen to deter entry into its territory.

The major deterrents to more effective law enforcement and border security are the lack of  interagency coordination and lack of training to develop requisite law enforcement skills.  Oman's border with Yemen also features extremely rugged, mountainous terrain which challenges border security efforts.

**Countering the Financing of Terrorism:**  Oman is a member of the Middle East-North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  In compliance with UN Security Council Resolution 2036 (2012), the Government of Oman banned in January the import of Somali charcoal  - a measure aimed to deny revenue from charcoal sales to the al-Shabaab terrorist group.  The Switzerland-based Basel Institute assessed Oman in September 2014 as having the lowest risk among GCC states for money laundering and terrorist financing, according to its Anti-Money Laundering Index, which ranks Oman as 29th globally with a score of 4.76 on a scale from 0 (low risk) to 10 (high risk).  *Hawala* are not permitted to operate in Oman.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/2014/vol2/index.htm.

**Regional and International Cooperation:**  Oman participates in the U.S.-Gulf Cooperation Council (GCC) Strategic Cooperation Forum.  During the September 25 forum, Oman's Minister Responsible for Foreign Affairs, Yusuf bin Alawi, joined other GCC foreign ministers in reaffirming the rejection of terrorism, violent extremism, and sectarianism in all their forms, condemning the indiscriminate targeting of civilians and the recruitment of children to carry out

PX209

attacks, and emphasized that ISIL poses a direct threat to shared peace and security. The foreign ministers agreed to follow up the Strategic Cooperation Forum discussion with concrete steps to destroy and ultimately defeat ISIL, and establish security and stability, including by cutting the group's sources of revenue, blocking travel of foreign fighters, and sharing information on ISIL activities.

**Countering Radicalization to Violence and Violent Extremism:** The Grand Mufti of Oman, Sheikh Ahmed al-Khalili, published an essay in October calling on all Muslims to reject extremism and promote tolerance, themes he again amplified in his popular and widely broadcast weekly television program.

## QATAR

**Overview:** In 2014, Qatar restructured its national counterterrorism committee to improve interagency coordination on counterterrorism efforts, including counterterrorist financing, cybersecurity, threats to civil aviation, and internal security threats. The Qatari government is concerned by the threat of foreign terrorist fighters transiting through Doha's new international airport hub to or from Syria to receive training and provide support to the Islamic State in Iraq and the Levant (ISIL) as well as the possibility that violent extremists could seek to commit terrorist acts in or from Qatar using Qatar's internet or financial systems. In 2014, the Qatari government implemented new tools to enhance monitoring and enforcement against persons using charities and the internet for terrorist purposes or in support of terrorism, including fundraising.

Qatar is a member of the Global Coalition to Counter ISIL. In addition to hosting two U.S. military installations important to Coalition efforts, Qatar has offered to host a train-and-equip program for moderate Syrian opposition forces and provided operational and logistical support for Coalition activities. Qatari aircraft have participated in Coalition airstrikes against ISIL in Syria. Qatar has contributed humanitarian aid to the effort, and sent six planes full of humanitarian assistance to Iraq in September.

U.S. agencies had an active and productive dialogue with their Qatari counterparts and worked closely for the exchange and evaluation of terrorist-related information. Qatar was generally responsive to U.S. requests and coordination efforts although limited in capacity and indigenous manpower. The United States and Qatar collaborated in fostering closer regional and international cooperation on counterterrorism, law enforcement, and rule of law activities.

Qatar has a strong legal framework to combat terrorist financing, and sought to strengthen it in 2014. Qatari officials recognized there were gaps in the law and acknowledged a critical need for improvement in implementation. Capacity to address this issue remained an obstacle during the year. As a result of information sharing and engagement on specific designated individuals, Qatari officials took enforcement steps against private financiers of terrorism and shared limited information on others with the United States.

PX209

Terrorist activity historically has been low in Qatar.  Restrictive immigration policies and security services capable of monitoring and disrupting violent extremist activities helped to mitigate the terrorist threat.

**Legislation, Law Enforcement, and Border Security:**  In addition to existing laws which prohibit terrorist activities, in 2014 the Amir approved Law Number 14, the Cybercrime Prevention Law, which criminalizes terrorism-linked cyber offenses.  The new cybercrime law clarifies that it is unlawful to establish or manage a terrorist organization on any information network (including a website) or information technology device, or to use an information network to establish contact with leaders or members of terrorist organizations, promote or finance terrorism, or instruct on methods to assist in terrorist activity.  Specifically, the law prohibits use of an "information network or information technology technique" to set up or run a website for a terrorist group or organization, facilitate communication with leaders and members of such a group or organization, promote its thoughts, secure financing thereto, or publish information relating to manufacturing explosives or incendiary devices of any device that can be used in a terrorist act.

The new cybercrime law grants law enforcement and prosecutors additional investigative tools, such as monitoring internet traffic and electronic data, to combat terrorism and terrorist finance in the information age.  Qatar can also deport individuals for violation of the cybercrime law.  A professional organization (such as a law firm), unless specifically exempted by law, must comply with court orders and investigations under the Cybercrime Law, and may not withhold information on the basis of professional confidentiality.  The law also provides mechanisms and details for Qatar to comply with requests for information made by other countries under mutual legal assistance treaties, thereby expanding enforcement capabilities outside of Qatar.

The State Security Bureau, also known as the Qatar State Security, maintains an aggressive posture toward monitoring internal extremist or terrorism-related activities.  The internal security-focused Ministry of Interior is well-positioned to respond to incidents with rapid reaction forces and trained internal security forces that routinely pursue and engage in structured counterterrorism training and exercises.  Qatar's Office of Public Prosecution is tasked with prosecuting all crimes, including any related to terrorism, and plays a significant role in terrorism investigations as the prosecutors conduct investigative interviews.

Qatar also maintains an interagency National Anti-Terrorism Committee (NATC) within the Ministry of Interior, which is composed of representatives from more than 10 government ministries and official institutions.  The NATC is tasked with formulating Qatar's counterterrorism policy, ensuring thorough and transparent interagency coordination within the government, fulfilling Qatar's obligations to combat terrorism under international conventions, and participating in international or UN conferences on terrorism.  During 2014, Qatar took steps to improve interagency coordination on terrorism-related security matters, by consolidating a restructured NATC, with a new Chairman.  As of December 31, the NATC's restructuring was ongoing, with pending law changes to formalize consolidation of interagency coordination on critical infrastructure and industrial security, cybersecurity, and counterterrorism including counterterrorism financing and border security measures.

PX209

Qatar maintains its own watchlist of suspected terrorists that it uses to screen passengers on international flights.  Qatar also conducts extensive vetting and background checks on all applicants for work visas.  The Qatari government uses biometric scans for arrivals at the Doha International Airport.  Through its state-owned airline Qatar Airways, Qatar signed an agreement in November with Interpol to check the validity of passports of travelers against the Interpol Stolen and Lost Travel Documents databases, a new initiative with only two airlines worldwide to help stem the flow of foreign fighters and enhance border security.

Overall, Qatar's security services workforce is limited in scope and bandwidth, and in most agencies, is reliant on manpower from third countries to fill rank-and-file law enforcement positions.  This limitation applies across the board with all Qatari government institutions (except for the Qatar State Security and elite units of the Ministry of Interior's internal security force) and is commensurate with the demographics of the nation.  Lack of capacity and to some extent the lack of advanced training of these non-Qataris does contribute to a lack of effectiveness in basic police operations.  However, Qatar's reliance on technology has provided state-of-the-art electronic surveillance capacity, which enhances Qatari security services' effectiveness in the detection and monitoring of terrorist suspects.

**Countering the Financing of Terrorism:**  Qatar is a member of the Middle East North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body.  Qatar's Combating Money Laundering and Terrorist Financing Law of 2010 requires Qatar's Public Prosecutor to freeze the funds of UNSC-designated terrorist organizations.  Qatar Central Bank works with financial institutions to confirm compliance of UN designations of terrorist entities and individuals, including Qatari citizens.

In September, the Amir of Qatar issued a new law regulating the work of charities oversight based on FATF standards.  Law Number 15 of 2014 established an independent Charities Commission composed of an interagency board (headed by the Minister of Labor and Social Affairs and including officials from the Ministry of Foreign Affairs, Ministry of Interior, the Central Bank, and Qatar State Security).  It amended Law Number 4 of 2010 which previously charged the Ministry of Labor and Social Affairs with the sole responsibility for regulating charities.  According to the new law, local charities must obtain authorization from the Commission prior to any dealings with foreign entities.  The Qatar Central Bank scrutinizes charities' overseas transactions to ensure compliance.

The Amir also issued Law Number 14 of 2014 in September on cybercrime prevention, which penalizes the use of the internet for unauthorized fundraising in support of terrorism.

The Qatari government in 2014 took steps to stem the flow of funds from Qatar to violent extremist groups and individuals.  Qatari authorities shut down the Madad Ahl al-Sham online fundraising campaign that was suspected of sending funds to violent extremist elements in Syria.  Qatari authorities deported a Jordanian terrorist financier resident in Doha who had been employed by a Qatari charity.  To further protect the State of Qatar from foreign terrorist financiers attempting to raise funds in Doha, the government barred the entry of multiple individuals of concern.  The government also issued directives to local charities prohibiting them from transferring funds to several overseas charities suspected of engaging in illicit activities.

PX209

In June, Qatar sent fourteen interagency officials to a U.S.-hosted anti-money laundering and countering the financing of terrorism training in Washington.  Participants discussed with U.S. interagency experts the need to tackle the use of charities and misuse of the internet for illicit finance, and the relationship with funding foreign fighters and violent extremist groups overseas.

Qatari law authorizes the NATC to designate by resolution those who finance terrorism, terrorists, and terrorist organizations, independently of lists pursuant to UNSCR 1267.  No designations were made in 2014.

Non-profit organizations are not obliged to file suspicious transaction reports, but the government has reportedly increased its regulation and monitoring of charities with the implementation of a new regulation of charities law issued in September.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Qatar is a member of the Global Counterterrorism Forum (GCTF) and actively participated in GCTF coordination activities.  Qatar participated in and was active in counterterrorism issues at the UN, the Gulf Cooperation Council, the Organization of Islamic Cooperation, and the Arab League.

**Countering Radicalization to Violence and Violent Extremism:**  Qatar hosted the March GCTF workshop on developing a plan of action for community-oriented policing as a tool for Countering Violent Extremism.  Qatar also participated in the Global Countering Violent Extremism Expo hosted by the Hedayah Center in Abu Dhabi, UAE, in December.

Qatari officials and Qatari media work together on strategic communications to counter violent extremism; the Prime Minister has a senior aide responsible for overseeing strategic communications and senior Qatari officials oversee state media and sit on the Board of Directors of the Al-Jazeera network.  An Assistant Foreign Minister attended the Global Coalition Communication Conference in Kuwait in October.  Qatari officials also participated in a Global Coalition Communications Working Group in Abu Dhabi in December.

## SAUDI ARABIA

**Overview:**  For the first time in several years, al-Qa'ida in the Arabian Peninsula (AQAP), based in Yemen, was able to conduct a successful attack on Saudi soil with a July raid on the Wudayah Border Crossing and Ministry of the Interior (MOI) General Investigation Directorate (Mabahith) office in Sharurah (near the Saudi-Yemeni border), which resulted in the death of four Saudi security officers.  AQAP continued efforts to inspire sympathizers to support, finance, or engage in conflicts outside of Saudi Arabia and encouraged individual acts of terrorism within the Kingdom.

PX209

In addition to facing the enduring threat from AQAP, Saudi counterterrorism efforts were increasingly focused on the threat posed by the Islamic State in Iraq and the Levant (ISIL), as well as Saudi citizens returning from fighting in Syria. The Saudi government continued domestic and bilateral efforts to build, augment, and refine its capacity to counter terrorism and extremist ideologies in the Kingdom while increasing participation in international counterterrorism conferences and engagements. Saudi Arabia continued to maintain a robust counterterrorism relationship with the United States and supported enhanced bilateral cooperation to ensure the safety of both U.S. and Saudi citizens within Saudi territories and abroad. Saudi Arabia stood as a member of the Global Coalition to Counter ISIL, taking military action in support of coalition efforts.

The Saudi government took a zero-tolerance stance on ISIL by condemning the organization's activities and participating in Global Coalition military action to counter the group in Syria and Iraq. Its external action against ISIL was complemented by an aggressive campaign by both official clerics and Saudi King Abdullah to discredit the group and condemn their activities as acts of terrorism. The Kingdom of Saudi Arabia welcomed UN Security Council Resolutions 2170 and 2178, expanding existing counterterrorism programs and rhetoric to address the phenomenon of foreign terrorist fighters, and leveraged terrorist finance provisions of its Law for Crimes of Terrorism and Terrorist-Financing (CT Law) to combat funding of violent extremist groups in Iraq and Syria.

**2014 Terrorist Incidents:** Several attacks on both Saudi nationals and Westerners occurred, despite Saudi efforts to detect and disrupt terrorist activity.

- On July 4, the most organized of the incidents, carried out by AQAP, targeted a Saudi border checkpoint in Sharurah near the Yemeni border, which resulted in the death of four Saudi security officers and five AQAP assailants.
- On October 14, there were two shooting events involving Western targets, including one targeting two American contractors working in Saudi Arabia who were shot at a gas station in Riyadh by a dual Saudi/U.S. national. There were indications that extremist propaganda influenced the attacker, a former employee of the victim's organization.
- On November 3, a group of gunmen killed five Saudi nationals and wounded nine others in the town of al-Dalwah in Saudi Arabia's Eastern Province. The Saudi government has alleged that the gunmen had ties to ISIL.
- On November 22, a Danish national survived being shot three times by three assailants who were arrested by Saudi authorities on December 11. Initial Saudi investigations determined that the three Saudi attackers had unspecified links to ISIL.

In all cases, the Saudi government worked closely with the United States to clarify the circumstances regarding these attacks and responded quickly to ensure proper security measures were in place to better secure U.S. installations and interests.

**Legislation, Law Enforcement, and Border Security:** In February, Saudi Arabia's robust legal counterterrorism apparatus was bolstered by the introduction of a new counterterrorism law containing 41 articles that further refined existing counterterrorism laws. Human rights activists have criticized the counterterrorism law, claiming that an overly-broad definition of terrorism

PX209

greatly inhibits freedom of expression and association.  Saudi Arabia has a specialized criminal court for handling counterterrorism cases; it was also used in 2014 to try human rights defenders.

Throughout 2014, Saudi Arabia continued its efforts to disrupt terrorist activities in the Kingdom by tracking, arresting, and prosecuting terrorist suspects.  The Saudi General Investigations Directorate, also known as the Mabahith, is responsible for conducting counterterrorism investigations in the Kingdom and, upon its discretion, will cooperate with other elements of the Saudi government to further investigations into specific cases.  Once the investigation is complete, the case is transferred to the Special Investigations and Public Prosecutions Office in the Saudi Ministry of Justice for the duration of the trial.  The Saudi government continued its programs to improve physical border security through the employment of biometric systems, aerial reconnaissance, thermal imaging, and remote unattended sensors along the border region, especially considering the deteriorating security situation with neighbors Yemen and Iraq.  Saudi Arabia's MOI hosted the 17th Annual International Conference and Exhibition for Industrial Security, Fire, and Occupational Safety and Health in Riyadh in early November, which focused on strengthening industrial security practices and coordination between the government and private sectors to protect key infrastructure from terrorist attacks.

Neighborhood police units engaged and worked directly with community members in Saudi Arabia, encouraging citizens to provide tips and information about suspected terrorist activity.  The government offered rewards for information on terrorists, and Saudi security services made several announcements throughout the year pertaining to the arrest of AQAP militants and supporters, as well as the successful disruption of a more than 70-member ISIL cell active in Saudi Arabia.

Saudi Arabia continued to cooperate with the United States to prevent acts of terrorism both through engagement in bilateral programs and through information exchange agreements with the United States.  Despite the absence of a bilateral mutual legal assistance treaty, Post's Legal Attaché office brokered and enhanced direct engagement between Department of Justice Office of International Affairs and MOI's Department of Legal Affairs and International Cooperation.  This year witnessed the first case in which Saudi Arabia produced certified bank records in response to a mutual legal assistance request.

**Countering the Financing of Terrorism:**  Saudi Arabia is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body, and its financial intelligence unit is a member of the Egmont Group of Financial Intelligence Units.  The Saudi government affirmed its commitment to combating terrorist fundraising and sought to further establish itself as a regional leader in disrupting terrorist finance efforts in the Kingdom.  It continued to provide specialized training programs for bankers, prosecutors, judges, customs officers, and other officials from government departments and agencies as part of its efforts to maintain financial programs designed to combat terror financing.  The Saudi Arabian Monetary Agency (SAMA) has standing requirements to all Saudi financial institutions to implement all the FATF Recommendations regarding money laundering and terrorist finance.  The February 2014 counterterrorism law further outlined the Saudi government's ability to combat terrorist financing.  Despite these efforts, however, foreign

PX209

charities with suspected links to terrorist groups continued to leverage social media to solicit funds from Saudi donors, a trend the Saudi government worked to combat.  In 2014, the FATF decided to enable a small expansion of membership, and the Kingdom was selected as a candidate for potential membership.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Saudi Arabia cooperated regionally and internationally on counterterrorism issues, including by participating in the Global Counterterrorism Forum.  Saudi Arabia has been a member of the Global Initiative to Combat Nuclear Terrorism and the Proliferation Security Initiative since 2008; Saudi Arabia is also a member of the Gulf Cooperation Council (GCC), which itself is a member of the FATF.  Saudi officials issued statements encouraging enhanced cooperation among GCC and Arab League states on counterterrorism issues, and the Saudi government hosted international counterterrorism conferences on subjects including countering violent extremist ideology and combating terrorist financing.  In April 2014, the Saudi government participated in the U.S.-GCC Strategic Cooperation Forum Task Force on Counterterrorism and Border Security.

**Countering Radicalization to Violence and Violent Extremism:**  As part of its strategy to counter violent extremism, the Saudi government focused on increasing public awareness campaigns and conducting outreach, counter-radicalization, and rehabilitation programs.  Some of these efforts involved seminars that refuted radical Islamic interpretation and ideology.  Public awareness campaigns aimed at reinforcing the values of the Islamic faith and educating Saudi citizens about the dangers of extremism and terrorism.  Methods used included advertisements and programs on television, in schools and mosques, and at sporting events.  The Saudi government expanded these programs to address the rising threat to youth from recruitment efforts from groups like ISIL and to dissuade its citizens from engaging as foreign fighters in Syria.

The Ministry of Interior continued to operate its flagship de-radicalization program (the Sakina Campaign for Dialogue), as well as its extensive prison rehabilitation program to reduce recidivism among former inmates.  The Saudi government also continued its ongoing program to modernize the educational curriculum, including textbooks used in religious training criticized for intolerance of other religious traditions.  The Ministry of Islamic Affairs continued to re-educate imams, prohibiting them from incitement of violence, and continued to monitor mosques and religious education.

## TUNISIA

**Overview:**  Over the past year, the Tunisian government increased its counterterrorism efforts and cooperation with the United States, with positive results.  Former Prime Minister Joma'a's government, which assumed power in January 2014, made fighting terrorism a top priority and the government took increasingly bold steps to counter terrorism and violent extremism.  The government led a sustained campaign to take tough action on terrorists and began a major effort to build the counterterrorism capabilities of its security forces.  The security forces showcased their capabilities during the parliamentary and presidential elections in the last quarter of the

PX209

year.  The elections proceeded smoothly and without any major incident, despite terrorist vows to disrupt the process.  The Tunisian security forces dismantled several terrorist cells and disrupted a number of plots before they could be executed.

Nevertheless, terrorism remained a serious challenge for Tunisia's nascent democracy.  The rise of violent extremist organizations in Tunisia since the January 2011 revolution – including Ansar al-Shari'a in Tunisia (AAS-T) and al-Qa'ida in the Islamic Maghreb (AQIM) – posed serious security challenges to a post-revolutionary government.  The government continued its efforts to reorient the focus of the security forces toward a counterterrorism mission, but these reforms need time and international support to succeed.  Tunisia continued to face challenges that included the potential for terrorist attacks, the influx of arms and violent extremists from across the Algerian and Libyan borders, and the use of improvised explosive devices (IEDs).  The disproportionate numbers of Tunisians traveling to fight in Iraq and Syria – and the potential for the return of these fighters – was another cause for concern.  Some independent sources estimate that up to 3,000 Tunisians have left their country for Syria and Iraq to join militant groups, including the Islamic State in Iraq and the Levant (ISIL).

Tunisia has been active in countering terrorist threats to Tunisia's security.  The government has put considerable efforts into stemming the flow of fighters to Syria and Iraq.  Minister of Interior Lotfi Ben Jeddou told the media in June that the Tunisian government detained "hundreds of returning foreign fighters."  His announcement is consistent with his previous statement in February, estimating 400 Tunisian fighters had returned to the country.  The government also estimates that approximately 9,000 Tunisians have been prevented from leaving Tunisia for Syria to join the conflict, although there is no independent confirmation of this number.  Existing legislation enables the Tunisian government to detain returning fighters, although it has been difficult to meet the evidentiary requirements needed to prosecute them.  A counterterrorism bill, which would modernize the legislative framework for dealing with terrorism, is currently before the legislature.  An interagency team within the Tunisian Government was reviewing the bill at year's end to prepare amendments that would bring the bill's provisions in line with UN Security Council Resolutions 2170 and 2178.

Tunisia is one of six countries participating in the President's Security Governance Initiative (SGI) announced at the U.S.-Africa Leaders' Summit.  SGI focuses on the management, oversight, and accountability of the security sector at the institutional level.

**2014 Terrorist Incidents:**  The list of incidents below highlights some of the most significant clashes between security forces and terrorist elements that occurred during the year.

- On February 16, a group of terrorists wearing military uniforms killed three members of the security forces and one civilian in an ambush at a false check point in Ouled Manaa, Jendouba.
- On April 11, approximately five soldiers and one civilian were injured in an IED explosion on Mount Chaambi.
- On May 27, the Minister of Interior Lotfi Ben Jeddou's house in Kasserine was attacked.  Approximately four policemen were killed and one was injured.  AQIM took responsibility for the attack.

PX209

- On June 30, the explosion of an IED during a sweeping operation in the mountains of Ouergha, Le Kef, caused the death of approximately four soldiers.  Officials reported a fifth soldier also died the same day after a clash with gunmen.
- On July 16, in an attack on Mount Chaambi, 15 soldiers were reportedly killed and another 22 injured in a military camp a few minutes before they were to break their fast during the month of Ramadan.
- On November 5, a group of suspected terrorists attacked a bus transporting soldiers in Neber, Kef.  Five soldiers were reportedly killed and 10 injured.
- On November 30, a National Guard member was abducted and later decapitated by violent extremists in the Mount Chaambi region.

**Legislation, Law Enforcement, and Border Security:**  The 2003 counterterrorism law remains the primary legal framework for dealing with terrorism offenses, although lesser offenses can still be charged under the penal code.  A new bill that was designed to address concerns raised by human rights groups and modernizing the legislation was before the legislature at year's end.

The Ministry of Interior and the Ministry of Defense share responsibility for detecting, deterring, and preventing acts of terrorism in Tunisia.  In particular, the Antiterrorism Brigade (BAT) and the National Guard Special Unit – elite units under the Ministry of Interior's National Police and National Guard, respectively – take the lead for counterterrorism operations outside the military exclusion zones.  The National Unit for the Investigation of Terrorist Crimes leads investigations and liaises with the judicial system to encourage successful prosecutions.  The military's role in counterterrorism has gradually increased, especially in the military exclusion zones and mountainous areas close to the Algerian border, where the Ministry of Defense has the lead in counterterrorism operations.  The government was at the last stages in December 2014 of establishing an interagency Counterterrorism Fusion Center that would act as a clearing house for information among security ministries to enable them to better communicate and coordinate their counterterrorism efforts.

Security forces were inexperienced in tackling terrorist threats and lacked appropriate equipment and training.  In the past year, the government's efforts have intensified, with successes including the seizure of weapons, arrests, and operations against armed groups throughout the country.  At the tactical level, Ministry of Interior and Ministry of Defense forces reportedly work well together, coordinating their efforts within Counterterrorism Task Forces that were established in the military exclusion zones.

Tunisia has an Automated Fingerprint Identification System (AFIS) and maintains fingerprint records for identification cards, criminal records, and latent prints.  Tunisia currently has only one AFIS system and it is not known if the records can be shared with other government agencies via automated responses.  Tunisia also maintains a DNA data base and has expressed an interest in becoming a Combined DNA Index System (CODIS) member.  Tunisia does not currently share its biometric data with any countries.  The Government has undertaken a sweeping study of its options to modernize and strengthen its border security capabilities.

Instability in Libya presents an additional challenge and continues to preoccupy Tunisian security officials and political leaders.  Border security remained a priority in 2014 and Tunisian

PX209

authorities collaborated with their Algerian counterparts to stem the flow of weapons and insurgents across their common borders and across their borders with Libya. Tunisia repeatedly expressed satisfaction with its cooperation with Algeria. Efforts to root out militants in the Mount Chaambi region and western borders with Algeria continued at year's end. While the operation has achieved some success, it has been hampered by Tunisian military's inexperience in this type of engagement.

The year saw a significant number of arrests and raids by security forces. The Government of Tunisia claimed to have arrested and detained 2,700 terrorists by the end of November 2014, double the number of arrests in all of 2013. On December 2, the government began the prosecution of 75 suspected terrorists for the killing of Anis Jelassi, the first member of the Tunisian security forces killed in a terrorist attack since the revolution.

Significant law enforcement and proactive disruptions arrests related to counterterrorism activities included:

- On February 4, the police killed Kamel Gadhgadhi, alleged murderer of politician Chokri Belaid, and six other suspected terrorists in a house raid in Raoued, a northern suburb of Tunis. Clashes between suspected terrorists and security forces lasted nearly 20 hours and resulted in the death of a National Guard member. The police and the army seized weapons, ammunition, a large quantity of explosives, and mobile phones and military uniforms.
- On February 9-10, the BAT raided a house and dismantled a terrorist cell in Cité Ennasim, Ariana, near Tunis. Four suspected terrorists were arrested, including Ahmed Melki, suspected of being involved in the assassination of politician Mohamed Brahmi.
- On March 15, Abou Ayoub, one of the leaders of AAS-T was arrested in Gabes following his illegal entry into Tunisia from Libya.
- On May 21, counterterrorist units arrested eight individuals on charges of planning terrorist attacks. They entered Tunisia from Libya, where they had been reportedly trained in the use of weapons and building bombs.
- On July 10, clashes between the police forces and AAS-T members led to the arrest of eight suspected terrorists and confiscation of cash. AAS-T sympathizers organized a protest against the operations, which turned violent, and led to the use of tear gas by the police.
- On October 9, Hafedh Ben Hassine, the brother of Seif Allah Ben Hassine, an AAS-T founder, was arrested on charges of financing Salafist groups and recruiting terrorists.
- On October 22, security forces launched an assault in Oued Ellil, Manouba and surrounded a house harboring suspected terrorists. The operations continued for two days and finally led to the death of six suspected terrorists, including five women, and a National Guard member. The police seized light weapons and grenades. Information that the security forces had collected from a terrorist suspect in the early hours of that day in the south reportedly triggered the operations.

Tunisians voted in parliamentary elections on October 26 and in two rounds of presidential elections on November 23 and December 21. Despite terrorists' vows to disrupt the electoral process, the security forces could guarantee the safety of citizens during the vote. Sporadic

PX209

violence in protest of the results occurred after the second round of the presidential elections, but it did not appear that terrorist groups had organized the protests.

The appeal of the court ruling to release the individuals who allegedly took part in the September 14, 2012 attacks on the U.S. Embassy and American Cooperative School of Tunis continued in 2014, but were continually delayed due to the suspects not showing up in court.  The Minister of Interior confirmed in October that the security forces had arrested terrorists suspected of plotting an assassination attempt targeting the U.S. Ambassador.

Tunisia continued to participate in the Department of State's Antiterrorism Assistance (ATA) program.  Tunisian Ministry of Interior officials received ATA training in the areas of tactical crisis response, counterterrorism investigations, and command and control.  Tactical units were granted specific tactical and enabling equipment.  Department of State International Narcotics and Law Enforcement programs supported leadership development, police reform, prison reform, hostage rescue, and crowd control management for the Justice and Interior ministries, and provided vehicles, body armor, computers, and other equipment to enhance internal and border security.  Leadership development included travel for Tunisian police and corrections professionals to the United States to meet U.S. law enforcement counterparts.  The Tunisian Armed Forces consider counterterrorism and border security their principal mission.  The armed forces have successfully employed U.S.-funded patrol craft, equipment, and training in border security and counterterrorism operations.

**Countering the Financing of Terrorism:**  Tunisia is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  Since Tunisia has strict currency controls, it is likely that remittance systems such as *hawala* are operating.  Trade-based money laundering is also a concern.  Throughout the region, invoice manipulation and customs fraud were often involved in the process of *hawala* financial reconciliations.  Tunisia's financial intelligence unit, the Tunisian Financial Analysis Commission, is headed by the governor of the Central Bank and includes representatives from a range of other agencies.  It has worked effectively over the last year to gather important regulatory information to improve its efforts to combat money laundering and terrorist financing.  The Tunisian penal code provides for the seizure of assets and property tied to narcotics trafficking and terrorist activities.  Tunisia freezes and confiscates assets, but the timeframe for taking action varies depending on the case.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Tunisia participates in multinational efforts to counter terrorism, such as those at the UN, the Global Counterterrorism Forum (GCTF), and the AU.  Tunisia is an active member of the Trans-Sahara Counterterrorism Partnership, a U.S. multi-year interagency regional program aimed at building the capacity of governments in the Maghreb and Sahel to confront the threats posed by violent extremists.  Tunisian authorities intensified their coordination on border security with Algerian counterparts over this past year, although cooperation with Libya diminished due to the absence of an effective Libyan central government.  Algeria's cooperation with Tunisia on counterterrorism is particularly robust: an agreement between the two countries established military-to-military communications and a

PX209

coordination committee in order to improve information sharing related to counterterrorism activities.

**Countering Radicalization to Violence and Violent Extremism:**  Tunisia is making concerted efforts to improve socioeconomic conditions in the country through economic development and education programs in order to counter radicalization and violence.  The government has also attempted to prevent the radicalization of Tunisians by minimizing their exposure to inflammatory rhetoric in the mosques.  Article Six of the Constitution, adopted in January, defines the state as "the guardian of religion" with the duty to guarantee "the neutrality of the mosques and of the places of worship from all partisan instrumentalization."  It also commits the state to "the dissemination of the values of moderation and tolerance," as well as "the prohibition of, and the fight against, appeals to excommunication and incitement to violence and hatred."  Several hundred imams, reportedly with extremist agendas, took over mosques in the months following the 2011 revolution, accusing their predecessors of collaborating with the previous regime.  The Ministry of Religious Affairs acknowledged in October 2011 that these imams controlled 400 mosques in Tunisia.  The ministry declared in December 2014 that it had regained control of all mosques throughout Tunisia, and that it had replaced all self-appointed imams with government-sanctioned imams.

## UNITED ARAB EMIRATES

**Overview:**  The Government of the United Arab Emirates (UAE) continued to build its counterterrorism capacity and strengthened its international counterterrorism cooperation.  Over the course of the year, the UAE government improved its border security measures and renewed its efforts to counter terrorist financing.  The UAE government was dedicated to providing strong support for the Global Coalition to Counter the Islamic State in Iraq and the Levant (ISIL).  The pre-clearance facility for travelers boarding direct flights to the United States at the Abu Dhabi International Airport continued to operate and expand its services.  Prominent officials and religious leaders continued to publicly criticize violent extremist ideology.

The UAE government leaders and senior Emirati officials publicly highlighted the dangers of ISIL and violent extremism, using media to counter ISIL messaging.  Apart from the United States, the UAE has conducted more air operations against ISIL than any other Coalition member.  The UAE government has openly advocated fighting violent extremism not only militarily, but holistically, including by stopping violent extremist funding, disrupting the recruitment of foreign fighters, securing borders, preventing the exploitation of the web and social media, and by contesting the use of religious centers to promote hatred and violence.  To this end, the government restricts violent extremist messaging on the internet.

**2014 Terrorist Incidents:**  On December 1, an American teacher was stabbed to death in a mall restroom by a 38 year-old Emirati woman.  The alleged perpetrator then went to the home of an American doctor and planted a primitive bomb outside his apartment.  The explosive was discovered by one of the doctor's children; the Abu Dhabi police were able to evacuate the area and defuse the device.  Authorities identified the suspect, tracked her to her home, and arrested her in less than 48 hours.  Security sources told the media that the crime committed was a

PX209

"personal terrorist act" and said the accused did not have links to terrorist organizations although she had allegedly visited violent extremist websites.

**Legislation, Law Enforcement, and Border Security:**  The UAE government passed Federal Law No. 7 of 2014 on combating terrorism offenses, which replaced Federal Law No. 1 of 2004. The new law strengthened existing legislation by criminalizing additional conduct and imposing stricter punishments, including fines and forfeitures, to deter terrorism and dissident activities.

In November, the government designated 85 groups as terrorist organizations in line with the new law.  In conjunction with the new counterterrorism law, the designation of terrorist organizations laid the groundwork for prosecuting a greater number of individuals for a broader range of activities.  However, the criteria used for designations, and procedures for organizations to appeal designations, were opaque.  The list included Muslim affinity groups in several Western countries, alongside internationally recognized terrorist organizations such as al-Qa'ida and ISIL.  The U.S. government requested additional information about the designation by the UAE of two American Muslim affinity groups, which the United States does not consider to be terrorist organizations, and which operate openly in the United States.

The State Security Directorate in Abu Dhabi and the Dubai State Security are the principal security services responsible for counterterrorism functions.  These services have demonstrated capability in investigations, crisis response, and border security, and are trained and equipped to detect, deter, and respond to terrorist incidents.  The State Security Court, a branch of the Federal Supreme Court, has developed capacity for handling security cases.

In June, the Federal Supreme Court issued sentences for seven of nine alleged members of an al-Qa'ida (AQ) cell who were arrested in April 2013.  The seven individuals were convicted on charges of running or belonging to an AQ terrorist cell; recruiting and promoting the actions of AQ (including possible terrorist attacks within the UAE); and illegally collecting money to finance a terrorist organization.  The group was reportedly recruiting and fundraising for al-Nusrah Front.

In a separate trial in December, the Federal Supreme Court convicted 11 of 15 individuals who were variously charged with joining, supporting, and collecting funds for, and transferring funds to al-Nusrah Front and Ahrar Al Sham; making unauthorized explosives; possessing unlicensed firearms; and polluting the environment through dangerous and banned materials.  This is believed to be the first case involving provisions of the new counterterrorism law, and the mixed verdict of convictions and acquittals shows discernment in the way that the laws were applied.  The sentences included incarceration, fines, forfeitures, and the closing down of a website.  Four Emirati nationals who were tried in absentia were each sentenced to life imprisonment.  The case shows the ability of the UAE government to focus its investigative resources on rooting out networks, and to use conspiracy and aiding and abetting as prosecution theories in terrorism cases.

The government continued to cooperate with the United States by hosting a preclearance facility in Abu Dhabi International Airport.  The preclearance facility expanded to cover additional

216

PX209

direct flights to the U.S. through an increase in the number of deployed Customs and Border Protection (CBP) officers.

The UAE participated in the Megaports and Container Security Initiatives (CSI). The CSI, which became operational at Port Rashid and Jebel Ali Port in the emirate of Dubai in 2005, co-locates two U.S. CBP officers with the Dubai Customs Intelligence Unit at Port Rashid. On average, CSI reviewed approximately 250 bills of lading each week, resulting in about 25 non-intrusive inspections per month of U.S.-bound containers. Examinations were conducted jointly with Dubai Customs officers, who shared information on transshipments from high risk areas, including those originating in Iran.

In 2010, Immigration and Customs Enforcement (ICE) signed two Memoranda of Cooperation (MOCs) to support the respective training academies of the UAE Ministry of Interior's (federal) Immigration Authority and the Abu Dhabi (emirate-level) Customs Authority (ADCA) and to enhance capacity building of its police and customs authorities. The aforementioned MOCs remained in effect.

A critical challenge to the effectiveness of the UAE's law enforcement, border security, and judicial systems is the country's limited human capacity. These sectors are generally reserved for Emirati citizens, who compose only 11 percent of the country's total population, making it structurally difficult to develop the country's human resources to counter the full range of terrorist activities. Despite this, the UAE government remained vigilant in its overall counterterrorism pursuits.

**Countering the Financing of Terrorism:** The UAE is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body, and chairs the Task Force's Training and Typologies Working Group. The UAE's financial intelligence unit (FIU), the Anti-Money Laundering and Suspicious Cases Unit, is a member of the Egmont Group of Financial Intelligence Units. The UAE continued efforts to strengthen its institutional capabilities to combat terrorist financing. In October, the government adopted Federal Law No. 9 of 2014, amending Law No. 2 of 2002 Regarding Combating Money Laundering. The new law is intended to address deficiencies identified in the UAE's 2008 FATF Mutual Evaluation and bring the UAE into compliance with the FATF Recommendations issued in February 2012. Notably, the amendments codified in law the obligation of all covered entities to report suspicious transactions related to terrorism financing.

The Central Bank conducted Anti-Money Laundering (AML) training both locally and regionally, and expanded its cooperation with foreign FIUs. Exploitation by illicit actors of money transmitters including licensed exchange houses, *hawalas,* and trading firms acting as money transmitters, remained significant concerns.

The UAE is a regional and global financial and transportation hub. Terrorist organizations have used the UAE to send and receive financial support. Operational capability constraints and political considerations sometimes prevented the UAE government from immediately freezing and confiscating terrorist assets absent multilateral assistance. In November, the UAE reported

217

PX209

to the MENAFATF that Federal Law No. 7 of 2014 on Terrorist Crimes addressed outstanding deficiencies related to implementation of UN Security Council Resolutions 1267 and 1373.

Both the Governor of the Central Bank and the Public Prosecutor may freeze funds based on suspicion of terrorist financing.  The Central Bank may only freeze funds for a period of seven days, during which the Public Prosecutor must be informed.  The Public Prosecutor may extend the freeze, pending investigation.  Federal Law No. 7 stipulates that the Cabinet issue a list of designated terrorist organizations or persons, and that funds and other items owned by listed organizations may be seized by the court.

The UAE requires licensing and registration of exchange houses and *hawalas*.  Federal Law No. 9 of 2014 extends due diligence, reporting, and record keeping requirements to Designated Non-Financial Businesses and Persons, such as real estate brokers, precious metals dealers, lawyers, etc.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  The UAE is a founding member of the Global Counterterrorism Forum (GCTF), and chaired the Working Group on Countering Violent Extremism with the UK.  The International Center of Excellence for Countering Violent Extremism, known as Hedayah, was formally launched in Abu Dhabi in December, 2012.  The UAE is Hedayah's permanent host, pursuant to federal Law No. 7 of 2013.  The government continued to support the center, which hosted the Global CVE Expo 2014 from December 9-11, bringing together more than 200 government officials, industry partners, technology specialists, academic experts, and civil society actors to generate new ideas and programs, and to leverage new technologies for countering violent extremist narratives.

The government cooperated with other states to build counterterrorism capacity and routinely invited participation from GCC countries at counterterrorism-related training sessions conducted by the FBI in the UAE.  In December at the 35th GCC Summit, GCC leaders announced the creation of a regional police force to be headquartered in Abu Dhabi.

**Countering Radicalization to Violence and Violent Extremism:**  To prevent violent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided guidelines for all Friday sermons and monitored mosques' compliance.  Abroad, the General Authority has since 2010 trained cohorts of Afghan imams on preaching messages of non-violence and tolerance.  During key periods of Muslim religious observance, especially the fasting month of Ramadan, the UAE government aired commercials on television warning Muslim citizens and residents to refrain from donating money at mosques, as the funds could unknowingly go to support terrorist causes.  The UAE worked to keep its education system free of violent extremist influences, and it emphasized social tolerance.  Under its cybercrime law, the UAE criminalizes the use of the internet by terrorist groups to "promote their ideologies and finance their activities."

218

PX209

## YEMEN

**Overview:**  The Government of Yemen took steps to combat al-Qa'ida in the Arabian Peninsula (AQAP) in 2014, despite significant challenges posed by elements of the former regime, heavily-armed Houthi forces, militant elements of the Hirak movement, and tribal adversaries.  Yemeni security forces undertook two offensives against AQAP – one in the governorates of Shabwah and Abyan and one in Hadramawt – which temporarily reduced AQAP-controlled territory and safe havens.  Gains in Hadramawt were hindered in the wake of advances by armed Houthi militia into Sana'a.  As of the end of 2014, major counterterrorism operations and offensives by Yemen's armed forces were indefinitely paused.

AQAP's continued use of asymmetric tactics such as ambush-style attacks and assassinations took a heavy toll on military and security forces.  AQAP also continued to conduct attacks against pro-government tribes, civilians, and international targets, such as the group's car bomb attack against the Iranian Ambassador's residence in Sana'a and AQAP's murder of two Western civilian hostages (American and South African nationals) during a December rescue attempt.  Counterterrorism efforts also suffered from the continued delay in the military and security restructuring process mandated by the 2011 Gulf Cooperation Council (GCC) Initiative and the National Dialogue Conference outcomes, which left many units plagued by divided loyalties and unreliable command structures.

The National Dialogue Conference, which convened in 2013 to lay the groundwork for a political transition, concluded in January 2014.  However, political maneuvering by elements of the former regime and other spoilers derailed the peaceful transition process.  Most notably, the militant elements of the Zaydi Shiite movement known as Ansar Allah or the Houthis, aggressively expanded from their northwestern stronghold of Sa'ada in 2014.  Events dramatically changed with the Houthi takeover of the capital Sana'a in September 2014, followed by the signing of the UN-mediated Peace and National Partnership Agreement (PNPA) which granted the Houthis significant political concessions.  Despite the PNPA's call for Houthi withdrawal from the capital and disarmament, the Houthis forcibly inserted themselves into numerous government offices and ministries and expanded further south from the capital.  The political instability resulting from the Houthi crisis diverted key resources from official Yemeni counterterrorism operations, which were at a near standstill at the end of 2014.  Additionally, Houthi expansion in governorates such as Ibb and al-Baydha, including clashes with AQAP, spurred a significant increase in AQAP attacks in these areas, heightening sectarian sentiments and causing formerly neutral or anti-AQAP Sunni tribes to side with AQAP against the Houthis to defend their historic geographic and tribal locations.

Despite these challenges, Yemen, under the leadership of President Hadi, remained a willing U.S. counterterrorism partner.  In 2014, Hadi supported U.S. counterterrorism operations in Yemen and encouraged cooperation between the U.S. military and Yemen's security forces.  This report solely focuses on 2014 and does not address the dynamics that have unfolded in Yemen in 2015.

**2014 Terrorist Incidents:**  AQAP militants carried out hundreds of attacks throughout Yemen in 2014.  Methods included suicide bombers, vehicle-borne improvised explosive devices

PX209

(VBIEDs), ambushes, kidnappings, and targeted assassinations.  The following list details only a small fraction of the incidents that occurred:

- On January 16, AQAP launched simultaneous attacks on three military installations, including a checkpoint and a military camp, near the Rada district in al-Baydha Governorate.  The coordinated assault, which included an attempted suicide bombing, killed at least six Yemeni soldiers, five militants, and wounded a number of others.
- On February 14, AQAP militants conducted a complex attack targeting the Sana'a Central Prison, facilitating the escape of 29 prisoners, including 19 AQAP operatives.  A VBIED exploded outside the gate and was followed by a gun battle between security guards and the militants.  Yemeni authorities report at least seven guards and three militants were killed in the fighting.
- On April 15, suspected AQAP militants assassinated the deputy governor of al-Baydha Governorate, Hussein Dayyan, near his home, fleeing the scene on motorcycles.
- On April 29, AQAP militants ambushed a Yemeni military convoy in Shabwah Governorate using machine guns and rocket-propelled grenades.  At least 15 Yemeni soldiers and 12 militants were killed, with more wounded.  Militants also captured a troop transport vehicle and took at least 15 Yemeni soldiers hostage.  Two of these hostages were released soon thereafter, with reports indicating that they had been "severely beaten."  On April 30, three of the remaining hostages were executed and their bodies left on the roadside, reportedly bearing signs of torture.
- On July 4, six AQAP militants attacked the Wudayah Border Crossing at the Yemen-Saudi Arabia border in Hadramawt, killing at least one Yemeni soldier and several Saudi security officers.  Several militants also died, two of them by detonating suicide bombs inside a Saudi government building after being trapped by Saudi security forces.
- On August 8, AQAP militants kidnapped 14 Yemeni soldiers traveling on a bus from Shibam, Hadramawt to Sana'a, executed them, some via beheading, in a market in Shibam, and left their bodies by a road near Sayun, Hadramawt.
- On October 9, an AQAP suicide bomber detonated his vest during a Houthi rally in Tahrir Square, Sana'a, killing at least 45 people and injuring at least 75 more.
- On November 10, AQAP militants detonated a VBIED near a Houthi-controlled building in the al-Manaseh region of al-Baydha Governorate, killing dozens.
- On December 6, AQAP militants shot and killed American journalist Luke Somers, who had been held hostage since 2013, during a joint U.S.-Yemeni rescue attempt.  A video released by AQAP on December 3 had stated that Somers would be executed by the end of the week if the United States did not meet AQAP's demands.  A South African hostage, Pierre Korkie, was also killed by AQAP during this rescue effort.
- On December 16, AQAP militants in Rada, al-Baidha detonated two VBIEDs near a Houthi checkpoint, killing at least 10 Houthis and an estimated 20 children passing by in a school bus, and wounding many more.  Possibly due to popular backlash, AQAP denied responsibility publicly for the attack.

**Legislation, Law Enforcement, and Border Security:**  Yemen does not have comprehensive counterterrorism legislation.  Cases were prosecuted under a number of sections of criminal law, most with light maximum sentences.  Draft counterterrorism legislation has been pending in the parliament since 2008.  International experts provided technical advice in 2014 on the revised

PX209

draft law introduced in September 2013.  Prior to the political instability in the capital, the current draft was under review by the three parliamentary subcommittees responsible for counterterrorism law issues (Legal and Constitutional Affairs; Security and Defense; and Codification of Sharia Law).  This law would facilitate the detention of suspects and include mandatory sentencing for a number of terrorism-related crimes.

Although Yemeni courts tried dozens of suspected terrorists in 2014, many received light sentences due to the lack of counterterrorism legislation or remained in detention while their cases were pending.  A number of government organizations were involved in countering acts of terrorism, including the National Security Bureau, the Political Security Organization, the Special Security Forces, and the Yemeni military.  However, cooperation and information-sharing between these organizations was sporadic and limited.  The takeover of security institutions towards the end of 2014 has impeded information sharing.  The weakness of the law enforcement system with respect to terrorism-related crimes discouraged law enforcement officials working these cases.  Officials also noted pervasive problems with a lack of proper case development and a failure to meet the requirements of the criminal prosecutions process.

In 2014, Yemen joined the Regional Criminal Justice Sector Reform Series, a State Department program that brings together government officials and civil society from states beginning or undergoing political transitions in Africa and the Middle East to share information, best practices, and implementation strategies on civilian security and justice sector reform.  Members include Algeria, Burkina Faso, Egypt, Libya, Mali, Mauritania, Morocco, Niger, Senegal, Tunisia, and Yemen.

Yemen participated in several U.S. civilian capacity building programs to improve counterterrorism law enforcement capacity within the Ministry of Interior (MOI).  The State Department, in partnership with the UN Development Programme, provided strategic leadership support to the MOI during the ongoing political transition, including capacity development assistance for the new Inspector General's department, courses on strategic planning and leadership for several newly established central command units, and capacity development and support for senior female police officers within the MOI.  Additional State Department programming assisted the Yemeni government in improving its capacity to respond to civil disturbances, improve criminal investigations, process and analyze physical evidence, operate and manage correctional facilities in an effective and accountable manner, and professionalize the justice sector in the area of criminal investigative and forensics.  Yemen also continued to participate in the Department of State's Antiterrorism Assistance program.  However, political instability and the integration of Houthi personnel into many government organizations limited U.S. ability to effectively engage with the MOI and other Yemeni law enforcement agencies in 2014.

Yemen adopted the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System (PISCES) in 2002 in an effort to secure borders and identify fraudulent travel documents.  Yemen has the capability to conduct biographic screening at multiple land, sea, and air ports of entry.

PX209

Yemen has more than 2,400 kilometers of coastline vulnerable to penetration by militants and maritime smuggling of weapons, materials, and goods used to finance AQAP and other terrorist activities, so the Yemen Coast Guard (YCG) plays a key function in border security.  In past years, YCG forces have played a critical role in key interdictions of weapons and other illegal materials destined for Yemen-based terrorist groups.  However, despite the strong focus the YCG places on counterterrorism efforts, Yemen's maritime borders remained extremely porous due to a lack of capacity.  In 2014, Yemen continued its participation in the Yemen Quadrilateral Border Talks, a multilateral forum that brings together officials from Yemen, Oman, Saudi Arabia, and the United States to discuss opportunities for cooperation and assistance in securing the Yemen/Oman/Saudi Arabia border region.

The Yemeni government cooperated with the United States in the ongoing investigations of several murders of U.S. citizens in Yemen, including a civilian who was targeted and killed by AQAP gunmen.  Yemen also cooperated in investigations into AQAP kidnapping for ransom activities.

The justice and law enforcement sectors in Yemen continued to face significant challenges in overcoming more than 30 years of neglect by the former President Ali Abdullah Saleh.  Law enforcement entities were frequently plagued by ineffectiveness and mistrust from civil society, and in worst cases, an unwillingness to perform their assigned task.  Corrections institutions, while suffering from severe resource constraints, lacked fundamental skills to manage and operate safe and secure facilities.  Meanwhile, Yemeni courts have become a victim of political, economic, and security instability – poor facilities, limited or poorly trained staff, forced closures, and absenteeism all exponentially increased the case backlog and therefore denied access to justice.  In many cases, suspected terrorists wait years for the conclusion of their trials.  Yemeni prison institutions are commonly targeted by violent extremist groups for the 'rescue' of terrorist inmates, which later serves as propaganda to recruit others.  Criminal justice institutions and services continued to be identified by Yemenis through the National Dialogue Conference as one of their primary concerns.

**Countering the Financing of Terrorism:**  Yemen belongs to the Middle East/North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body.  In June 2014, the FATF upgraded Yemen from its October 18, 2013 Public Statement to its list of countries with strategic deficiencies in its anti-money laundering/countering terrorist finance (AML/CFT) safeguards, in recognition of the significant steps Yemen has taken toward improving its AML/CFT regime and implementing its action plan.  The FATF planned to visit Yemen in June, but this visit was prevented due to the security situation in the country.  MENAFATF also upgraded Yemen, which is now required to submit follow-up reports every two years rather than every six months.  Despite this progress, Yemen faced many challenges implementing AML/CFT safeguards due to ongoing political and economic turmoil.

Yemen's Financial Information Unit (FIU), which operates out of the Central Bank of Yemen (CBY), received 192 suspicious transaction reports as of November 26, in comparison with 166 at this time in 2013.  These reports were on a wide range of individuals, including government officials, military commanders, Houthi figures, and AQAP elements.  The FIU requested

PX209

international assistance in developing a national strategic plan to assess the risks of AML/CFT and prioritize additional needs, such as financial analysis training. In 2014, the FIU identified a need to work more closely with the Customs Authority on the risks posed by money laundering, and expressed appreciation for an ongoing World Bank program aiming to improve networking between the CBY and other Yemeni banks and increase monitoring of banks' transactions.

In October 2014, following the September incursion of Houthi forces into Sana'a, the FIU reported that Houthis posted at the CBY briefly interfered with FIU operations despite a law guaranteeing the unit's independence. The Houthis reportedly used the FIU to target the assets of enemies decried by the Houthis as corrupt, initiating proceedings via the FIU to freeze the assets of a number of these individuals.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Yemen continued to cooperate with and be advised by the Gulf Cooperation Council (GCC), the United States, and other donor countries with respect to its military restructuring plan, in accordance with NDC outcomes. It participated in several Global Counterterrorism Forum workshops. Yemen participated in the second annual Gulf of Aden Regional Counterterrorism Forum in February to support counterterrorism capacity and partnership building in Yemen, Djibouti, and Somalia. Yemeni military, police, security, and maritime units cooperated with U.S., European and regional partners on counterterrorism and related security issues.

**Countering Radicalization to Violence and Violent Extremism:** Throughout 2014, President Hadi and other senior officials stressed the importance of countering terrorism and violent extremism by attempting to address the conditions that terrorists exploit, such as a weak economy and low levels of education. Many political leaders and groups also publicly condemned terrorism and violent attacks. The Yemeni government expressed support for a rehabilitation/reintegration program for violent extremists, similar to the Mohammed bin Naif Center for Counseling and Care in Saudi Arabia, although the effort was on hold at year's end.

## SOUTH AND CENTRAL ASIA

South Asia remained a front line in the battle against terrorism. Although al-Qa'ida's (AQ) core in Afghanistan and Pakistan has been seriously degraded, AQ's global leadership continued to operate from remote locations in the region that the group has historically exploited for safe haven. AQ's presence in the region continued to face pressure from international, Afghan, and Pakistani forces, and Pakistan's ongoing offensive in North Waziristan Agency, launched in June 2014, further degraded the group's freedom to operate. Pressure on AQ's traditional safe haven has constrained the leadership's capability to communicate effectively with affiliate groups outside of South Asia.

Afghanistan, in particular, continued to experience aggressive and coordinated attacks by the Afghan Taliban, the Haqqani Network (HQN), and other insurgent and terrorist groups. A

PX209

number of these attacks were planned and launched from safe havens in Pakistan.  Afghan National Security Forces (ANSF) provided security throughout most of Afghanistan as the transition to full Afghan leadership on security continued and U.S. and Coalition Forces (CF) continued to draw down during 2014.  The ANSF and CF, in partnership, took aggressive action against terrorist elements in Afghanistan, especially in Kabul, and in many of the eastern and northern provinces.

Pakistan continued to experience significant terrorist violence, including sectarian attacks.  The Pakistani military undertook operations against groups that conducted attacks within Pakistan such as TTP, but did not take action against other groups such as Lashkar e-Tayyiba, which continued to operate, train, rally, propagandize, and fundraise in Pakistan.  Afghan Taliban and HQN leadership continued to find safe haven in Pakistan, and although Pakistan military operations disrupted the actions of these groups, it did not directly target them.

India remained a target of terrorist attacks, including operations launched by Maoist insurgents and domestic and transnational groups.  The level of terrorist violence was substantially unchanged from 2013.  Indian authorities continued to blame Pakistan for supporting terrorists operating in Jammu and Kashmir.  On September 3, AQ announced the establishment of a new branch in the Indian subcontinent.  The Government of India deepened counterterrorism cooperation with the United States, highlighted by a September 30 Summit between President Obama and Prime Minister Modi where both sides pledged greater cooperation in countering terrorist networks and in information sharing.  Even though only a small number of Indian nationals are believed to have joined the Islamic State in Iraq and the Levant (ISIL), the Indian government closely monitored the domestic threat it and other terrorist organizations posed.

Bangladesh made counterterrorism progress in 2014, with the government demonstrating a commitment to counter both domestic and transnational terrorist groups.  No major terrorist incidents took place in 2014, and the government's counterterrorism efforts have made it more difficult for transnational terrorists to operate in or use Bangladeshi territory.

Central Asian leaders have expressed concern about the potential terrorist threat posed by the return of foreign terrorist fighters to the region in the wake of ISIL's growth in the Middle East and the drawdown of U.S. and Coalition Forces in Afghanistan.

## AFGHANISTAN

**Overview:**  Although responsibility for security in Afghanistan transitioned from U.S. and international forces to Afghan National Security Forces (ANSF) on January 1, 2015, the United States remains committed to sustained political, diplomatic, and economic engagement in Afghanistan.  U.S. forces will continue to have the capacity to conduct counterterrorism operations in Afghanistan, but the majority of these operations were being carried out in conjunction with, or solely by, Afghan units at year's end.  The United States supports Afghan efforts to professionalize and modernize their security forces.  The military component of U.S. assistance to the ANSF transitioned to the Resolute Support Mission (RSM) on January 1, 2015.  RSM primarily focuses on train, advise, and assist functions, but will retain some U.S.

PX209

counterterrorism functions as outlined in the U.S.-Afghanistan Bilateral Security Agreement (BSA).

Insider attacks and force protection challenges remained problematic throughout 2014. During the 2014 spring to fall fighting season, the Taliban sought unsuccessfully to disrupt the two rounds of national elections that occurred in April and June, and attempted to expand their territorial control in western Kandahar, northern Helmand, and Kunduz Province, among other areas. Insurgents increased attacks on government forces and installations during the three-month long stalemate that followed the elections as the two presidential candidates contested the results, placing greater pressure on the Afghan police and army as they closed out the fighting season. The Taliban and other insurgent groups focused on high-profile terrorist attacks as well as attacks on government officials, particularly in Kabul, to maintain their profile and undermine the central government.

The Government of Afghanistan takes the threat of the Islamic State in Iraq and the Levant (ISIL) seriously. There were some reports of ISIL engaging Afghan insurgent groups to obtain allegiance in exchange for resources. In the following instances of ISIL-affiliated activity, the Afghan government responded with police and intelligence services investigations:

- In September, an ISIL newspaper in Dari and Pashto was reportedly distributed in Kabul and Nangarhar provinces promoting extremist ideology.
- In late October, pro-ISIL graffiti was discovered at Kabul University, sparking fear that extremist youth groups may latch onto ISIL messaging.
- On November 15, a suspected ISIL agent who had allegedly posted pamphlets at the Blue Mosque in Herat City was detained in Herat.

ISIL ideology may resonate with fringe elements of insurgent/terrorist groups in Afghanistan, but for the most part Afghanistan-based militants were resistant to fully aligning themselves with the group. ISIL will likely continue to engage Afghan insurgent and terrorist groups. Small numbers of independent actors that are loosely-affiliated with ISIL may continue to use ISIL's name to gain public and media attention in Afghanistan.

**2014 Terrorist Incidents:** In 2014, insurgents across Afghanistan used a variety of tactics against ANSF personnel and Coalition Forces (CF). They aimed to expand their territorial influence, disrupt civil governance, and create a public perception of instability, as CF transitioned to RSM and Afghan forces fully engaged in the security of their country. Attacks followed a seasonal pattern, shifting from more guerilla military-style engagements in the spring and summer to high profile and harassing attacks during the fall and winter. In Kabul, there was a significant increase in attacks against Western and U.S. interests over the same time period in 2013.

Insurgents continued to use large vehicle-borne improvised explosive devices (VBIEDs) and complex attacks involving multiple attackers laden with suicide vests working in teams. These incidents increasingly targeted ANSF, Afghan government buildings, soft foreign civilian targets, and Western interests in Kabul, as the overall number of potential targets, particularly in the provinces, decreased due to a shrinking international military footprint. Terrorist activity

PX209

expanded from historically high level areas in the south and east of Afghanistan to include some areas further north; Kabul was an insurgent focus at the end of the year.  Helmand, Kandahar, Nangarhar, Ghazni, Herat, Kunar, and Kunduz were the most violent provinces for attacks against ANSF, CF, and civilians.

Afghanistan remained an area of armed hostilities in 2014 and a variety of insurgent groups used terrorist tactics to pursue their goals.  A sampling of high-profile incidents include:

- On January 17, three Taliban insurgents launched a complex attack on a restaurant frequented by foreigners in Kabul.  One wore a suicide vest and detonated at the restaurant's gate, allowing the other two to enter the establishment.  They killed 21 people, including 13 foreigners and high-level officials from the UN and the International Monetary Fund.  The gunmen were later killed in a standoff with the Afghan police.
- On March 20, four terrorists smuggled pistols past the heavy security of the Serena Hotel in Kabul, opening fire on foreign and Afghan guests dining for the Persian New Year.  They killed nine people, including two children, before being gunned down by the ANSF.  The Taliban claimed responsibility for the attack.
- On July 15, a VBIED detonated in a public market in Paktika Province, killing 89 civilians and wounding 42 others.  No group claimed responsibility and the Taliban issued a statement disavowing any connection with the attack.
- On August 5, in an insider attack, a lone gunman opened fire upon a high-level CF delegation visiting the Marshal Fahim National Defense University, killing U.S. Major General Harold Greene and wounding 15 others according to media accounts.  Major General Greene was the highest level U.S. military official killed by hostile action since September 11, 2001.
- On September 4, Taliban attackers detonated two significant VBIEDs outside the National Directorate of Security (NDS) Headquarters in Ghazni Province.  Following the explosion, an armed assault team engaged the compound.  In the final assessment of the attack, 14 security personnel and 19 Taliban were killed, with 154 others wounded.
- On November 9, a lone suicide bomber infiltrated Kabul Police Headquarters in an attempt to kill the Chief of Police.  Instead, the suicide vest explosion killed the Chief of Staff and wounded six others.  The Taliban later claimed responsibility for the attack.
- On November 16, a suicide bomber in southern Kabul killed three civilians, and wounded approximately 10 others, included a pro-BSA Member of Parliament.  The Parliamentary member was believed to be the target as a warning against voting to approve the agreement with the United States.
- On November 23, a suicide bomber exploded his vest in a crowd of spectators at a volleyball match in Paktika Province, leaving 45 civilians dead and 50 wounded.  No group claimed responsibility for the attack.
- On November 29, three attackers with suicide vests and automatic weapons attacked a Kabul guest house for South African NGO workers, killing three foreigners and one Afghan staff member.  One insurgent died when he detonated his vest.  The other two were killed by police during the rescue of six Afghan hostages.  The Taliban claimed responsibility for the attack.

PX209

- On December 17, a teenager entered an auditorium at the French Cultural Center in Kabul where a play was taking place and detonated his suicide vest. He killed one German man and wounded 16 others. The Taliban claimed responsibility for the attack.

**Legislation, Law Enforcement, and Border Security:** The Afghan Attorney General's Office (AGO) investigates and prosecutes violations of the laws on Crimes against the Internal and External Security of the State (1976 and 1987), the Law on Combat Against Terrorist Offences (2008), and the Law of Firearms, Ammunition, and Explosives (2005), including laws that prohibit membership in terrorist or insurgent groups as well as laws that forbid violent acts committed against the state, hostage taking, murder, and the use of explosives against military forces and state infrastructure. The Law on the Structure and Jurisdiction of the Attorney General's Office was enacted in October 2013. It codifies the structure and funding of the existing Anti-Terrorism Protection Directorate (ATPD) in the AGO and permits the investigation and prosecution of terrorist and national security cases using internationally accepted methods and evidentiary rules. The ATPD handled a total of 8,619 cases in 2014, an average of 2,500 cases per quarter on the primary and appellate levels.

In early 2014, the Justice Center in Parwan (JCIP) at Bagram Air Field began adjudicating cases of individuals detained by Afghan security forces and never held in Coalition Law of Armed Conflict (LOAC) detention. Originally established by the Supreme Court of Afghanistan to try the cases of former CF LOAC detainees and staffed with Afghan public security judges and ATPD prosecutors, the JCIP is the only counterterrorism court in Afghanistan that has, in effect, nationwide jurisdiction. Its docket regularly includes cases against those implicated in terrorist attacks on U.S. military personnel and U.S. military and civilian installations in Afghanistan. Through early December, the JCIP had adjudicated 533 primary court trials in 2014, and 1,153 appellate court trials (to include appellate trials of primary court cases that had been adjudicated in 2013). Among notable cases tried at the JCIP during 2014 were:

- Aynuddin, perpetrator of an August 2012 insider attack that killed three Marines and ultimately determined by the JCIP primary court to be a juvenile, was sentenced to seven-and-one-half years (the maximum sentence authorized under Afghan law for a juvenile convicted of any crime).
- Mohammad Nazeer, the lone surviving attacker from a September 2012 assault on Camp Bastion, was sentenced to death.

The Governments of Afghanistan and the United States investigated a variety of criminal acts, including kidnappings and conspiracies to commit terrorist acts. On several occasions, U.S. law enforcement bodies assisted the Ministry of Interior, the NDS, and other Afghan authorities to take action to disrupt and dismantle terrorist operations and prosecute terrorist suspects.

Afghanistan continued to process traveler arrivals and departures at major points of entry using the Personal Identification Secure Comparison and Evaluation System (PISCES). In addition, Afghan security forces continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, receiving training and equipment in counterterrorism-related crisis response and dignitary and infrastructure protection. ATA assistance also included an intensive instructor development component to build Afghan security force capacity to institutionalize

227

PX209

counterterrorism skill sets and regenerate training within Afghanistan's law enforcement structure.

Despite advances in capability, the ANSF faces large challenges in successfully protecting the country's land borders, particularly those with Pakistan and Iran. The ABP, which is part of the policing wing of the ANSF, has over 23,000 officers and has the lead on border security. Its leaders openly say their numbers and weaponry are insufficient to successfully execute their mission, particularly in the aforementioned border areas where they face difficult terrain, resupply, and coordination problems with the military, and a heavily-armed, determined insurgency that attacks them in force.

After decades of war and poor or fragmented governance in many rural areas, the ANSF is focused on working with international actors to rebuild its capacity. While the Afghan government has progressed substantially since 2001, complex organizational structures, weak inter-ministerial coordination, corruption, lack of full control over territory (particularly in the border regions with Pakistan), and safe havens for terrorist groups operating on its soil all remain ongoing challenges.

**Countering the Financing of Terrorism:** Afghanistan is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body. In 2014, the Afghan government took initial steps to address deficiencies in its anti-money laundering/combating the financing of terrorism (AML/CFT) regime. In June, FATF strongly warned Afghanistan to comply with the government's June 2012 commitment to implement an action plan agreed upon with FATF to address the deficiencies by October 2014, or run the risk of being placed on the list of "High-Risk and Non-Cooperative Jurisdictions" (the blacklist). The FATF action plan outlined a number of areas that the government needed to address to bring Afghanistan into compliance with international standards, including enactment of amended AML/CFT legislation. Afghanistan amended its AML and CFT laws in June. Terrorist financing is a criminal offense, and Afghanistan is now able to immediately freeze assets identified by UN Security Council Resolutions (UNSCRs) 1267 and 1373. Under the updated process, the Afghan National Security Council, following notification of a UNSCR designation, immediately notifies the AGO, which in turn identifies and freezes related assets. As of the end of 2014, FATF was assessing whether the new regulations were fully FATF-compliant.

Terrorist finance investigations in Afghanistan continued to be hampered by a weak legal and regulatory regime, coupled with a lack of capacity. The new administration under President Ashraf Ghani expressed its intent to fulfill the FATF action plan milestones.

Afghan officials indicated that because al-Qa'ida, the Taliban, and terrorist organizations from the Central Asian republics transfer their assets from person to person or through informal banking system mechanisms, it is very difficult to track, freeze, and confiscate their assets. However, on those occasions when transactions have come to the Afghan government's attention, either via the Financial Intelligence Unit (FIU) or reports from the Afghan security agencies, it has acted promptly not to just freeze but also confiscate those assets. In 2014, officials reported some asset seizures, but said it is often difficult to quantify seizures in dollar

PX209

terms because they confiscate vehicles or other equipment suspected of being used by terrorist organizations.

Money Service Providers in Afghanistan are required to register with and provide currency transaction reports to the FIU at the Central Bank.  These reports include monthly data on volumes and numbers of transactions, detailing whether transactions are inbound or outbound, foreign or domestic, and in local or foreign currency.  Supervision is weak but improving, with 2014 seeing an increase in the number of on-site inspections of money service providers.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Afghanistan consistently emphasized the need to strengthen joint cooperation to fight terrorism and violent extremism in a variety of bilateral and multilateral fora.  Notable among such meetings were the Heart of Asia/Istanbul Process, the UN Regional Center for Preventative Diplomacy for Central Asia (UNRCCA), and the Shanghai Cooperation Organization (SCO).  Afghanistan shares the lead on the Counterterrorism Confidence Building Measure (CBM) of the Istanbul Process, working closely with Turkey and the United Arab Emirates.  Under the Counterterrorism CBM framework, Afghanistan hosted an international meeting on terrorist financing in Kabul in February, and also hosted an international workshop on countering improvised explosive devices in March.

**Countering Radicalization to Violence and Violent Extremism:**  The Government of Afghanistan continued to support activities designed to prevent radicalization.  Through increased engagement with religious communities, Afghan government officials promoted religious moderation, encouraged tolerance, and condemned violence.  There are approximately 120,000 mosques in Afghanistan, of which 3,600 are registered with the Ministry of Hajj and Religious Affairs (MoHRA) and the Ministry of Education.  Registration is not compulsory, and unregistered mosques, many of which have associated madrassas, operate independent of government oversight.  Some religious leaders at these unregistered mosques promote violent extremism.  The National Ulema Council is a quasi-governmental body of religious scholars established by former President Karzai in 2002 to counter radicalization and violent extremism.  Since taking office on September 29, President Ghani has engaged actively on countering violent extremism efforts, requesting that the Ulema Council both condemn insurgent attacks and issue a call for peace in mosques throughout the country.

President Ghani and Chief Executive Officer, Dr. Abdullah Abdullah, purposefully reached out early in their tenure to civil society groups to understand the challenges they face and seek ways to address them.  In an effort to stem discontent and prevent possible radicalization, Ghani also visited a number of prisons and detention facilities to address rising inmate complaints about poor prison conditions and inequitable clemency programs.  Afghan religious leaders and government officials attended conferences at the Hedayah Center, an International Center of Excellence for Countering Violent Extremism, where they received training on tolerance programming.

PX209

President Ghani has identified the peace process as the priority of his administration, and is actively pursuing engagement with the Taliban.  The Afghanistan Peace and Reintegration Program (APRP) pays for, and provides the institutional mechanism to implement, the full range of the Afghan government's peace activities, which include the reintegration of foot soldiers in the provinces and provincial-level peace outreach, Ulema engagement on countering violent extremism, and national-level reconciliation initiatives with senior Taliban leadership.  Individual fighters who join the program make the commitment to renounce violence and sever all ties with the insurgency, and to abide by the Constitution of Afghanistan.  Many go on to become peace advocates, conducting outreach on behalf of the Afghan government through the APRP.  Since its inception, the APRP has successfully reintegrated over 9,200 former combatants across Afghanistan.

## BANGLADESH

**Overview:**  The Government of Bangladesh has demonstrated political will and firm commitment to combating domestic and transnational terrorist groups, and its counterterrorism efforts made it harder for transnational terrorists to operate in or establish safe havens in its territory.  Terrorist organizations used social media to spread their radical ideologies and solicit foreign fighters from Bangladesh.  In a September 2014 audio message, al-Qa'ida leader Ayman al-Zawahiri included Bangladesh as one of the countries in which the newly-established al-Qa'ida in the Indian Subcontinent would seek to operate.  Expatriate Bangladeshis have been arrested for attempting to recruit Bangladeshis to join the Islamic State in Iraq and the Levant (ISIL).  While Bangladesh is not part of the Global Coalition to Counter ISIL, it is taking steps to address the threat.  On September 29, police in Bangladesh arrested Samiun Rahman for allegedly recruiting militants for both ISIL and al-Nusrah Front.

**Legislation, Law Enforcement, and Border Security:**  Bangladesh's criminal justice system is in the process of fully implementing the Antiterrorism Act of 2009 (ATA) as amended in 2012 and 2013.  Although Bangladesh's ATA does not outlaw recruitment and travel in furtherance of terrorism, the broad language of the ATA provides several mechanisms by which Bangladesh can implement UN Security Council Resolution (UNSCR) 2178, which requires nations to address the foreign terrorist fighter threat.

According to media reports, government forces arrested several members of domestic terrorist groups Jamaat-ul-Mujahideen Bangladesh, Harkatul Jihad al Islami-Bangladesh, and Ansarullah Bangla Team.  Bangladesh cooperated with the United States to further strengthen control of its borders and land, sea, and air ports of entry.  Bangladesh continued to participate in the Department of State's Antiterrorism Assistance program and received counterterrorism-focused training for law enforcement officers.  Bangladesh also cooperated with the Department of Justice's efforts to provide prosecutorial skills training, and to institute community policing in targeted areas of the country.  U.S. Special Operations Command Pacific continued counterterrorism training with a number of Bangladesh security forces – including the Bangladesh Coast Guard, Bangladesh Navy Special Warfare and Diving Salvage unit, and the Bangladesh Army 1st Para Commando Battalion.

PX209

**Countering the Financing of Terrorism:**  Bangladesh is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  The Bangladesh Bank (the central bank) and its financial intelligence unit/anti-money laundering section lead the government's effort to comply with the international sanctions regime.  The Bangladesh Financial Intelligence Unit (BFIU) is a member of the Egmont Group of Financial Intelligence Units.  In 2014, Bangladesh graduated out of the FATF's grey list.

The terrorist finance provisions of the ATA outlaw the provision, receipt, and collection of money, service, and material support where "there are reasonable grounds to believe that … the same has been used or may be used for any purpose by a terrorist entity."  The Act prohibits membership and support of prohibited organizations, i.e., organizations engaged or involved in terrorist activities, including the terrorist organizations listed under UNSCRs 1267 and 1373.  The ATA includes a broad provision providing mutual legal cooperation on terrorism matters with other nations and a comprehensive forfeiture provision for assets involved in terrorism activities.  However, implementation of existing laws remains a significant issue as demonstrated by the absence of money laundering convictions.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Bangladesh is active in the full range of international fora.  Bangladesh is party to various counterterrorism protocols under the South Asian Association for Regional Cooperation and is bringing the country's counterterrorism efforts in line with the four pillars of the UN Global Counter-Terrorism Strategy.  The current government has demonstrated its strong interest in cooperating with India on counterterrorism.  It has signed memoranda of understanding with a number of countries to share evidence regarding criminal investigations, including investigations related to financial crimes and terrorist financing.

**Countering Radicalization to Violence and Violent Extremism:**  In 2014, Bangladesh became a board member and pilot country for the Global Fund for Community Engagement and Resilience, a public-private global fund to support local, grassroots efforts to counter violent extremism.  Bangladesh uses strategic communication to counter violent extremism, especially among youth.  The Ministry of Education provides oversight for madrassas and is developing a standard national curriculum that includes language, math, and science; and minimum standards of secular subjects to be taught in all primary schools, up to the eighth grade.  The Ministry of Religious Affairs and the National Committee on Militancy Resistance and Prevention work with imams and religious scholars to build public awareness against terrorism.

## INDIA

**Overview:**  According to the National Consortium for the Study of Terrorism and Responses to Terrorism at the University of Maryland, approximately 400 people were killed as a result of terrorist attacks in India in 2014.  The number of fatalities from terrorist attacks did not change significantly from the previous year, demonstrating that India remains one of the most

PX209

persistently targeted countries by insurgents and transnational and domestic terrorist groups. Included in the total number of fatalities were more than 160 deaths attributed to the Communist Party of India (Maoist) or other Maoist groups. To date, these groups have not specifically targeted U.S. or other international interests. In 2014, Indian sources continued to attribute attacks and fatalities in Jammu and Kashmir and against Indian facilities in Afghanistan, to transnational terrorist groups, such as Lashkar e-Tayyiba (LeT), which continued to operate, train, rally, propagandize, and fundraise in Pakistan.

U.S.-India counterterrorism cooperation continued to increase in 2014. Prime Minister Modi's government has stated that it intends to prioritize its response to terrorism as a serious national security threat. During the September 30 Summit meeting, President Obama and Prime Minister Modi pledged to enhance U.S.-India "law enforcement, security, and military information exchanges, and strengthen cooperation on extradition and mutual legal assistance." The President and Prime Minister stressed the need for joint and concerted efforts against networks such as al-Qa'ida, LeT, Jaish-e-Mohammed, and the Haqqani Network, and reiterated their call to bring the perpetrators of the November 2008 terrorist attacks in Mumbai to justice. The Prime Minister also joined President Obama in reaffirming "deep concern over the continued threat posed by terrorism, most recently highlighted by the dangers presented by Islamic State in Iraq and the Levant (ISIL)."

In May, four individuals from India traveled to Iraq to support ISIL. Only one of them returned to India and at year's end was in custody. In September, four students from Hyderabad attempted to travel to Iraq to support ISIL but were detained in West Bengal and returned to their places of residence. In October, Anees Ansari was detained by Mumbai police for allegedly planning ISIL-inspired attacks on westerners and western schools in Mumbai. On December 13, Mehdi Biswas, a 24-year-old office executive from Bangalore, was arrested in connection with pro-ISIL messaging on Twitter. Biswas' Twitter account had approximately 17,000 followers. India also remains deeply concerned about Indian nationals taken hostage by ISIL in Iraq.

Indian officials have emphasized the government takes threats posed by ISIL seriously, even though only a small number of Indians are believed to have been recruited into the organization. Given India's large Muslim population, potential socio-religious marginalization, and active ISIL online propaganda efforts, there remains a risk of increased ISIL recruitment of Indian nationals. On December 16, India banned ISIL under the Unlawful Activities Prevention Act.

**2014 Terrorist Incidents:** Representative incidents included:

- On April 12, two bombs planted by suspected Maoist rebels killed approximately 12 people in the eastern Indian state of Chhattisgarh while voting was underway in India's general election. The first blast targeted a bus carrying election officials in Bijapur district, killing at least seven. The second attack, which took place half-an-hour later, killed five police officers in an ambulance in the Bastar district.
- On May 11, Maoist insurgents killed seven police commandos and injured two others in a landmine blast in the Gadricholi district of Chhattisgarh state.
- On May 26, LeT carried out an attack against the Indian Consulate in Herat, Afghanistan. Security forces killed the attackers.

PX209

- On October 2, an improvised explosive device (IED) explosion killed two men, alleged to be terrorist conspirators in the process of handling the device, in the town of Burdwan in West Bengal, about 70 miles northwest of Kolkata.  Subsequent investigations by the Indian and Bangladeshi governments alleged the involvement in the blast of an interstate terrorist network believed to have been run by Jamaat-ul-Mujahideen Bangladesh (JMB).  Police arrested two females and a male from the blast site who were found destroying evidence, and seized IED components and violent extremist literature.
- On November 27, 10 people were killed when terrorists wearing army uniforms attacked an Indian army base in Kashmir.
- On December 28, an IED exploded outside a busy restaurant in Bangalore on Sunday night, killing one woman and injuring one other in the central business district of Bengaluru.

**Legislation, Law Enforcement, and Border Security:**  India continued to address terrorism-related activities through existing statutes, including the Unlawful Activities (Prevention) Act (UAPA) (1967), the SAARC Convention on Suppression of Terrorism Act (1993), and various state-level laws.  The UAPA presumes the accused to be guilty if the prosecution can produce certain incriminating evidence indicating the possession of arms or explosives or the presence of fingerprints at a crime scene, regardless of whether criminal intent is demonstrated.  State governments held persons without bail for extended periods before filing formal charges under the UAPA.  Other state-level counterterrorism laws reduce evidentiary standards for certain charges and increase police powers to detain a person and his or her associates without charges and without bail for extended periods.

Since the 2008 Mumbai terrorist attacks, India has attempted to enhance the counterterrorism capabilities of the Central Bureau of Investigation, the National Security Guard, and the National Investigation Agency.  India's efforts to counter terrorism were hampered by poor interagency coordination and information sharing, however.  In addition, local police forces, led at the state level, have limited command and control capacity and suffer from poor training and equipment.  India has launched initiatives to address some of these challenges, including through a Multi-Agency Centre for enhancing intelligence gathering and sharing.  It also plans to implement the National Intelligence Grid, a system for linking databases in different government departments and ministries for use by intelligence agencies.  The Indian government has proposed the creation of a National Counter Terrorism Centre, but state-level officials have opposed this initiative and it has not been implemented.

Indian officials participated in courses provided through the Department of State's Antiterrorism Assistance (ATA) program and through other regional capacity building programs.  In addition, the Department of Homeland Security, through the Immigration and Customs Enforcement Attaché office, and the U.S. Federal Bureau of Investigation, conducted training programs and exchanges with Indian law enforcement personnel.

**Countering the Financing of Terrorism:**  India is a member of the Financial Action Task Force (FATF) and two FATF-style regional bodies, the Eurasian Group on Combating Money Laundering and Financing of Terrorism and the Asia/Pacific Group on Money Laundering. India's Financial Intelligence Unit is also a member of the Egmont Group of Financial

PX209

Intelligence Units.  Indian officials monitor and regulate money transfers, require the collection of data for wire transfers, oblige non-profit organizations to file suspicious transaction reports, and regulate and monitor these entities to prevent misuse and terrorist financing.

In November 2012, the Government of India brought its domestic anti-money laundering/counterterrorist financing (AML/CFT) laws into alignment with international standards by passing amendments to the Prevention of Money Laundering Act.  The Indian government has yet to implement the legislation effectively, however, especially with regard to criminal convictions.  Law enforcement agencies typically open criminal investigations reactively and seldom initiate proactive analysis and long-term investigations.  While the Indian government has taken action against certain *hawala* financing activities, prosecutions have generally focused on non-financial businesses that conduct *hawala* transactions as a secondary activity.  Additionally, the government has not taken adequate steps to ensure all relevant industries are complying with AML/CFT regulations.  The reporting of suspicious transactions relating specifically to terrorist financing is increasing significantly, however, especially with respect to transactions not involving sanctions lists.

The degree of training and expertise in financial investigations involving transnational crime or terrorist-affiliated groups varies widely among the federal, state, and local levels and depends on the financial resources and individual policies of differing jurisdictions.  U.S. investigators have had limited success in coordinating the seizure of illicit proceeds with their Indian counterparts.  While intelligence and investigative information supplied by U.S. law enforcement authorities have led to numerous seizures of terrorism-related funds, a lack of follow-through on investigational leads has prevented a more comprehensive approach.

The Government of India is taking steps to increase financial inclusion through expanding access to the banking sector and issuing biometric-enabled universal identification numbers.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  India is a founding member of the Global Counterterrorism Forum (GCTF) and participated in GCTF and other UN forums on counterterrorism in 2014.  Events related to the October 2 blasts in the Burdwan district of West Bengal cast a spotlight on India's counterterrorism cooperation with its neighbors.  The blasts resulted in counterterrorism cooperation between India and Bangladesh, including visits by Indian officials to Dhaka, travel by a Bangladeshi intelligence team to West Bengal, and parallel raids along the Indo-Bangla border.  During 2014, the Indian and Bangladeshi governments continued their cooperation under their bilateral Coordinated Border Management Plan to control illegal cross-border activities and announced the strengthening of bilateral cooperation in the field of security and border management through additional cooperation agreements.  Also during 2014, India and Nepal continued cooperation along their shared border.  India is a member of the South Asian Association for Regional Cooperation.

PX209

On August 18, the Border Security Force (BSF) provided Bangladeshi counterparts a list of 66 camps located in Bangladesh used by insurgents to launch militant activities into northeast India.

**Countering Radicalization to Violence and Violent Extremism:**  India's efforts to counter radicalization and violent extremism were generally directed by state and local authorities. While there was no comprehensive national policy for countering radicalization or violent extremism, the government has implemented some initiatives to counter violent extremism such as initiatives to provide "quality and modern education" in madrassas.  In addition, the government operates programs to rehabilitate and reintegrate former militants and insurgents into mainstream society.  These programs target disaffected sectors of Indian society that have been sources of separatism and violent insurgency.

Indian government officials have raised concerns over the use of social media and the internet to recruit, radicalize, and foment inter-religious tensions.  In particular, officials expressed concern about the ability of ISIL to recruit online, following prominent incidents in which Indians were attracted to join or support the group.  On December 16, India banned ISIL under the Unlawful Activities Prevention Act, a step that may deter public declarations of support for ISIL and facilitate prosecutions of individuals who assist the group.

## KAZAKHSTAN

**Overview:**  The Government of Kazakhstan continued to express its willingness to increase counterterrorism cooperation with the United States, particularly in the areas of information sharing and law enforcement, as well as in the development of its ability to conduct special counterterrorism operations.  The Ministry of Defense has expressed interest in playing a greater role in counterterrorism operations in Kazakhstan, and has sought U.S. assistance to build its capacity.  Kazakhstan is emphasizing improving the capability of its existing counterterrorism units rather than developing new ones.

The Government of Kazakhstan views the Islamic State in Iraq and the Levant (ISIL) as a dangerous terrorist organization and publicly condemned the group.  Kazakhstani law enforcement officials have inquired about best practices to counter ISIL propaganda, and in December banned dissemination of ISIL propaganda in Kazakhstan.  The head of Kazakhstan's National Security Committee (KNB) said publicly in November that approximately 300 Kazakhstani citizens are members of ISIL, and that law enforcement officials are working to identify these individuals.

**Legislation, Law Enforcement, and Border Security:**  Kazakhstan has a comprehensive legal counterterrorism framework, which includes laws on countering extremism and terrorism, and relevant bylaws and chapters in the Criminal Code, Procedural Code, and the Law on National security.  The new Criminal Code toughens penalties for crimes the government deems to be terrorist and extremist crimes.  It also introduced a number of new offences related to terrorist/extremist crimes, such as "creation of bases for preparing mercenaries," "participation in terrorist or extremist training," and "participation in foreign conflicts."  It is illegal for Kazakhstani citizens to fight in foreign wars.

235

PX209

The Government of Kazakhstan passed amendments to its counterterrorism legislation in 2014, aiming to bring the country's laws in line with the State Program on Combating Extremism and Terrorism 2013-2017. The amendments allow for expediting cooperation and removing bureaucratic barriers among government bodies engaged in combating extremism and terrorism. The legislation permits the government to shut down any communication network used for spreading terrorism and extremism, the immediate closure of any organization after a court recognizes it as an extremist or terrorist group, and for law enforcement to preemptively issue warnings to persons or organizations engaged in activities that may lead to committing crimes involving terrorism or extremism. The new legislation also allows law enforcement to monitor people released from jail after serving sentences for crimes involving terrorism or extremism. Kazakhstani security services and law enforcement organizations may now deny foreign nationals, including missionaries, who may be involved in extremist or terrorist activities entry into the country; previously foreign nationals could only be denied entry if they had been convicted of such crimes.

Kazakhstan is rapidly increasing its counterterrorism capacity, and government officials actively pursued a program of training and professionalization that appeared to enjoy political support at the highest levels. Kazakhstan remained a partner nation in the Department of State's Antiterrorism Assistance program. The government's counterterrorism plan provides for enhanced interagency cooperation, coordination, and information sharing, but the extent to which this is actually occurring remains unknown. In the past, law enforcement bodies were criticized for killing rather than capturing members of suspected terrorist groups, but over the past several years have shown a greater tendency to arrest, detain, and question suspects. Security forces, including military and law enforcement, are undergoing a process of professionalization and reform with the goal of more effectively discharging their duties. There are four special counterterrorism detachments under the Ministry of Internal Affairs and one under the KNB.

Kazakhstan's Border Guard Service (BGS), which is part of the KNB, uses specialized passport control equipment at each passport control station, allowing officers to check for fraudulent documents. Every officer working at border crossing points must be a graduate of the BGS Academy's four-year program, where they study passport control using passport samples from many different countries. BGS officers receive regular instructions and refresher training. The BGS uses the Single Information System "Berkut" database, managed by the KNB. The United States has been unable to verify the database's contents but it is likely persons on terrorist watch lists are included. Kazakhstan's BGS officers photograph all foreign visitors arriving in Kazakhstan on international flights.

In recent years Kazakhstan has strengthened security on its southern border by adding radar systems, inspection equipment and vehicles, and specialized mobile inspection groups. Kazakhstani courts convicted 29 people for terrorist offenses in 2014. Law enforcement bodies interdicted nine terrorist plots and arrested several recruiters for attempting to persuade Kazakhstanis to join ISIL. The government registered 52 terrorism and extremism-related crimes.

**Countering the Financing of Terrorism:** Kazakhstan belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force-style

PX209

regional body.  In 2014, Kazakhstan clarified the definitions for what constitutes terrorist financing in the Criminal Code to meet international standards.  Engaging in any transfer or exchange of funds, barter, or gift giving conducted knowingly with a terrorist or terrorist group is criminal under Kazakhstani law.  Kazakhstan's unregulated financial sector is relatively small.

There was no specific requirement for NGOs to file suspicious transaction reports.  The Financial Intelligence Unit under the Ministry of Finance requires banks and other covered institutions to report suspicious financial activity by NGOs, however.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Kazakhstan participates in counterterrorism and countering violent extremism activities within the Collective Security Treaty Organization, which has established a joint task force for preventing the propagation of terrorist and extremist ideas via the internet.  The Kazakhstani Procurator General's Office cooperates with the OSCE on countering violent extremism and terrorism through joint workshops.  Kazakhstan has pledged financial support to the Afghan National Security Forces, including US $2 million in 2014, and is discussing the potential provision of other types of support to the ANSF.  Kazakhstan is a member of the Shanghai Cooperation Organization, which has a limited counterterrorism role.  Kazakhstan co-sponsored UN Security Council Resolution 2178 on preventing travel and support for foreign terrorist fighters.

**Countering Radicalization to Violence and Violent Extremism:**  Kazakhstan's counterterrorism efforts focus heavily on preventing radicalization, with particular efforts to educate and provide positive alternatives to youth through social programs and economic opportunities, but the results of these nascent programs are unclear.  Critics say Kazakhstan's anti-radicalization efforts are unnecessarily heavy-handed, and could actually encourage radicalization of members of otherwise peaceful religious groups.

Kazakhstan's Ministry of Culture and Sport conducts outreach to youth who left Kazakhstan to study abroad at religious schools suspected of indoctrinating youth in extremist ideology.  According to the ministry, 41 students returned to Kazakhstan in 2014 due to outreach efforts.  Religious experts from the Committee for Religious Affairs reach out to at-risk youth via websites such as E-Islam, which was created to increase religious literacy and to counter radical ideas.  Religious experts create groups on social networks such as Facebook and VKontakte, where they post information and answer users' questions about religious extremism.  In 2014, the Republican Rehabilitation Center was opened for prisoners convicted of terrorism or extremism, where representatives from the Spiritual Administration of Muslims of Kazakhstan regularly meet prisoners to discuss religious extremism.  The government also set up 28 regional rehabilitation centers.

**KYRGYZSTAN**

PX209

**Overview:**  There were no reported terrorist attacks in Kyrgyzstan in 2014, however, security forces arrested several individuals suspected of affiliation with terrorist organizations and terrorist activities abroad.  Security forces became more aware of increased recruitment of citizens for terrorist acts in Syria.  The State Committee for National Security (GKNB) leads the country's Counterterrorism Center, which is composed of representatives at the deputy minister level of relevant government ministries.

Government agencies reported varying numbers of Kyrgyzstanis fighting in Syria; numbers ranged from 200 to 500.  Parliament proposed legislation that would assist the Prosecutor General's office in its prosecution of recruiters and its ability to charge Kyrgyzstanis for terrorist acts committed abroad.

The government is committed to preventing terrorist attacks and reached out to international organizations and foreign governments that could provide training and technical assistance.  The country remained vulnerable to transnational threats, especially in the south where border issues with Tajikistan and Uzbekistan and weak government capacity to control borders could facilitate the establishment of terrorist safe havens.  Media reported several cases of Kyrgyzstanis being drawn by promises of work in Turkey and then recruited into or trafficked into Syria.  The government was also concerned about the potential for an influx of terrorist elements from Afghanistan.

Kyrgyzstan's anti-Islamic State in Iraq and the Levant (ISIL) efforts were limited to domestic programs to prevent the flow of fighters to Syria and the prosecution of those who return.  The Counterterrorism Center partnered with an international NGO to create community leadership groups in each region of Kyrgyzstan, led by local religious leaders trained in methods to prevent violent extremism, to deter potential fighters from traveling to Syria.  Parliament worked with the OSCE to host public hearings in the southern provinces of Osh and Jalalabad (from where most fighters originate) to increase local awareness of ISIL recruitment methods.  In November, the Counterterrorism Center agreed to a 2015 training plan developed and funded by the OSCE to increase its capacity to share information on terrorist threats between law enforcement agencies at all levels of government.

**Legislation, Law Enforcement, and Border Security:**  The GKNB remained the main government organization tasked with combating terrorism.  It investigated and arrested several individuals based on their alleged connections to terrorist organizations, including those linked to Hizb-ut-Tahrir.  The government designated Hizb-ut-Tahrir as a terrorist organization in 2003, although the group's philosophy professes nonviolence and its members committed no violent acts.  It also arrested several individuals charged with recruiting citizens to fight with ISIL.

The Prosecutor General's office reported using existing counterterrorism laws enacted in 2005 (counter-extremism) and 2006 (counterterrorism and money laundering) to charge repatriated fighters.  It explained that new legislation proposed by Parliament in 2014, if passed, will make it easier to prosecute crimes such as recruitment of fighters and participation in terrorist acts abroad.

PX209

Although the GKNB's Counterterrorism Center has demonstrated the capacity to quickly react to bomb scares or other potential terrorist threat, it lacks both specialized training and equipment. Interagency cooperation and coordination is sporadic.  For example, the Prosecutor General's office receives results of GKNB and Ministry of Interior (MVD) investigations to use in its prosecutions, but has no mechanism to ask for more details or for follow-up information after the investigation is complete.  In a meeting with U.S. officials, members of the Prosecutor General's anti-terrorism division indicated that the GKNB does not provide specific information on the origin of the evidence that it collects or how it was obtained.  Prosecutors are never consulted before the GKNB considers an investigation to be complete.

There is political will to increase capacity and obtain equipment, and all law enforcement entities demonstrate a desire for cooperation with international organizations.  Kyrgyzstan continued to participate in the Department of State's Antiterrorism Assistance program, and Kyrgyz security forces received training focused on improving law enforcement capacity to secure the country's borders from terrorist transit.  The border guards and customs service also cooperate closely with the U.S. Export Control and Related Border Security Assistance (EXBS) office.  EXBS is funding construction of additional border towers and providing renovations and enhancements to existing border towers along the southern borders of Kyrgyzstan with Uzbekistan and Tajikistan.  Following ethnic clashes in 2010 in the southern regions of Osh and Jalalabad between ethnic Kyrgyz and Uzbeks, the OSCE, through its Community Security Initiative, embedded an international police advisor with law enforcement agencies in each region of Kyrgyzstan.  Along with community policing, the advisors train local law enforcement officials on how to identify potential terrorist attacks.

The government does not maintain a terrorist screening watch list.  It also does not have biographic or biometric screening capabilities at ports of entry.  Internal information sharing needs improvement.  Information sharing with other countries happens rarely and usually only by request in the context of human trafficking or organized crime investigations.  Information sharing and cooperation with counterterrorism officials in Turkey is increasing.  The MVD reported that Turkey provides information on the travel of Kyrgyzstanis to Turkey to assist in MVD investigations.  The government does not collect advance passenger records on commercial flights.

Impediments to more effective host government law enforcement activity against terrorism include interagency rivalries, a lack of coordination between the GKNB and MVD, and budgetary constraints.  Inefficient Soviet-era bureaucratic structures, corruption, low salaries, and frequent personnel turnover hampered law enforcement efforts.  Counterterrorist units are still largely untested in real-life situations.

**Countering the Financing of Terrorism:**  Kyrgyzstan belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  Kyrgyzstan did not pursue any terrorist finance cases and did not identify or freeze any terrorist assets.  Kyrgyzstan has made substantial progress in addressing concerns of the international community on money laundering and terrorist financing, and, in July, was removed from FATF's grey list and, in November, from the EAG monitoring list.  For further information on money laundering and financial crimes, see the 2014 International

PX209

*Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  In 2014, Kyrgyzstan participated in counterterrorism activities organized by the OSCE, the Commonwealth of Independent States Antiterrorism Center, and the Collective Security Treaty Organization.

**Countering Radicalization to Violence and Violent Extremism:**  In 2014, Kyrgyzstan worked in conjunction with the OSCE and other international organizations to facilitate countering violent extremism programs.  The government, specifically the GKNB, launched a public awareness campaign in the Kyrgyz language press to discredit the efforts of ISIL recruiters.  The campaign also warned potential labor migrants to Turkey of the risk of being trafficked, not being paid for their work, and the possibility of prosecution for their actions in Syria should they return to Kyrgyzstan.

## MALDIVES

**Overview:**  Maldives, an archipelago consisting of nearly 1,200 coral islands grouped into 26 atolls with a population of just over 393,000, is strategically located in the heart of the Indian Ocean, close to international sea lanes.  Press reports in 2014 indicated up to 200 Maldivians had traveled to Syria or Iraq and at least six had been killed in action.

Since 2010, concerns about the activities of a small number of local extremists who support violence and have involvement with transnational terrorist groups have been mounting.  Young Maldivians, especially those within the penal system and otherwise marginalized members of society, are at risk of becoming radicalized and some have already joined violent extremist groups.  According to reporting in the Maldivian media, radical Maldivians have made connections to violent extremist affiliates throughout the world and a small but steady stream of Maldivians leave the country to train and fight with these groups.

**Legislation, Law Enforcement, and Border Security:**  The Maldivian Parliament (Majlis) passed a new penal code in April 2014, which, once implemented, should improve the government's ability to prosecute individuals for recruiting, financing, or otherwise supporting terrorism.  However, the government was still drafting criminal procedure codes and evidence bills needed to help enforce the new penal code at year's end.  Neither Maldivian law nor the new penal code permit restrictions on travel of would-be foreign terrorist fighters or detention of those who have been turned back on suspicion they were headed to a war zone.

Responsibility for Maldivian counterterrorism efforts is divided among the Maldivian Police Service (MPS) and National Defense Force (MNDF), the latter of which has Navy, Marines, and Coast Guard branches.  The MPS has the greatest capacity among these entities; cooperation and information sharing among the agencies is very limited.  The Maldivian government worked with the United States to install the Personal Identification Secure Comparison and Evaluation System (PISCES) at Maldives' main international airport and at Malé seaport in August 2013.

PX209

The Maldivian government arrested several people possibly associated with violent extremism in 2014, but did not arrest Maldivians who were returned to the country on suspicion they intended to fight in Syria or Iraq.  Existing law severely limits the ability of law enforcement agencies to prosecute such cases.

Maldives continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, which provided training to the MPS, Maldivian Coast Guard, prosecutors, and port and border control officers.  In 2014, ATA provided training and assistance in such fields as vital infrastructure security, maritime port and harbor security management, countering domestic and transnational terrorism, first response to terrorist incidents, interdicting terrorist activities, soft target protection, and interviewing terrorist suspects.

**Countering the Financing of Terrorism:**  Maldives is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force-style regional body.  Maldivian authorities believe funds are currently being raised in Maldives to support terrorism abroad; however, they do not have reliable information regarding the amounts involved.  While no official studies have yet been conducted, the Maldivian Central Bank believes criminal proceeds mainly come from domestic sources; a large percentage of Suspicious Transaction Reports the Central Bank receives are related to Maldivians.  The Maldives Monetary Authority reports informal money transfer networks (*hawala*) are used to transfer funds between the islands, although the extent to which these systems are employed to launder money is unclear.

The Maldivian government monitors banks, the insurance sector, money remittance institutions and finance companies, and requires the collection of data for wire transfers.  Financial institutions other than banks and intermediaries in the securities sector, however, are not subject to current anti-money laundering/countering the financing of terrorism (AML/CFT) obligations.  Insurance companies and intermediaries, finance companies, money remittance service providers, foreign exchange businesses, and credit card companies therefore operate outside the AML/CFT framework.

The Maldivian government implements UN Security Council Resolutions 1267 (1999) and its follow-on resolutions and 1373 (2001), and monitors and regulates alternative remittance services, despite the fact that they lie outside the AML/CFT framework.  The Maldivian government did not report any efforts to seize terrorist assets in 2014.

According to the Maldivian government, capacity building of relevant supervisory and regulatory authorities such as the Maldives Monetary Authority and the Capital Market Development Authority, law enforcement authorities (the Anti-Corruption Commission, Department of Immigration and Emigration, Maldives Customs Service, and MPS), and the judiciary is needed to properly counter money laundering and terrorist financing.  Government of Maldives officials attended the Department of State-sponsored "Good Giving" conference at Embassy Dhaka in December 2014 on Countering Terrorist Finance and Violent Extremism.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

PX209

**Regional and International Cooperation:**  The U.S. Special Operations Command encouraged MNDF participation as a member of the Global Special Operations Force network that collaborates on common security challenges and actively supports multilateral and regional security cooperation efforts, such as global programs that focus on de-radicalization and counterterrorism issues.  Maldives is a member of the South Asian Association for Regional Cooperation.  Maldives participated, along with India and Sri Lanka, in the network's third biannual security consultation in March 2014.  Topics discussed included security force capacity building and increasing cooperation in maritime domain awareness.  In accordance with Global Counterterrorism Forum Good Practices, the Ministry of Islamic Affairs convened a forum of Islamic scholars to examine the concept of *jihad,* with the objective of preventing Maldivian citizens from becoming foreign terrorist fighters in Syria and Iraq.

**Countering Radicalization to Violence and Violent Extremism:**  The Maldivian government continued to recognize that counter-radicalization efforts are a critical component to long-term success against violent extremism.  Since 2011, the government has sought to counter the influence of extremist ideology by actively intervening in religious life.  These interventions take the form of mandating persons wanting to serve as imams to undergo a six-month state-approved training, as well as disseminating approved sermons for Friday prayers.  The government is also in the process of building an Islamic university in the capital city of Malé that will offer courses in comparative religion in addition to Islamic studies.  The university's key objective will be to expose Maldivian students to the academic study of religion as a counterweight to extremist discourses and messaging.

## NEPAL

**Overview:**  Nepal experienced no significant acts of international terrorism in 2014, although its open border with India and weak controls at Kathmandu's Tribhuvan International Airport raised concerns that international terrorist groups could use Nepal as a transit point.

**Legislation, Law Enforcement, and Border Security:**  Nepali law criminalizes activities related to terrorism, including the financing of terrorism.  While Nepal has specialized units to respond to terrorist incidents, law enforcement units lack the capacity to effectively detect, deter, and identify terrorist suspects.  An open border with India and relatively weak airport security hamper efforts to implement effective counterterrorism policing.

Nepali police officers continued to participate in the Department of State's Antiterrorism Assistance (ATA) program.  In 2014, the ATA program funded nine training courses to improve counterterrorism capabilities within Nepali law enforcement agencies.  ATA training focused on building Nepali law enforcement capacity to secure the country's borders from potential terrorist transiting and preventing terrorists from establishing safe havens within Nepal.  Additionally, the U.S. Department of Justice International Criminal Investigative Training Assistance Program (ICITAP) trained the Nepal Police in Polygraph Examination to improve criminal investigations, including investigations of potential terrorist activities.

PX209

**Countering the Financing of Terrorism:**  Nepal belongs to the Asia Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  In 2014, Nepal enacted the appropriate implementing regulations to address key anti-money laundering/countering the financing of terrorism (AML/CFT) deficiencies, including the seizing, freezing, and confiscation of terrorist assets to comply with UN Security Council Resolutions 1267 and 1373 and other provisions established by FATF.  Nepal is no longer subject to FATF's monitoring process under its ongoing global AML/CFT compliance process.

Nepali law allows the government to freeze and confiscate terrorist assets; however, coordination among different institutions remained slow.  There were no instances of assets being frozen in 2014.  The Financial Intelligence Unit (FIU) is currently working to analyze a backlog of several hundred Suspicious Transaction Reports spanning several years, which delay investigations.

Transactions by unauthorized banks and financial institutions to transfer or receive money (such as *hundi* and *hawala*) are considered criminal money laundering offenses.  However, it is difficult for the Nepali government to investigate informal money transfer systems.

Nepal's central bank, the Nepal Rastra Bank (NRB), licenses and monitors business services that receive remittances.  Only banks can legally transfer money out of Nepal.  Money transfer services in Nepal may receive inbound remittances, but funds must be distributed to recipients through banks, which are required to collect data on the originator.

The NRB issues directives to banks and financial institutions.  In 2014, the Parliament passed a statute that obligates banks and financial institutions, as well as individuals, to view the website of the Ministry of Home Affairs and Ministry of Foreign Affairs.  The websites of the Ministries and NRB are linked to the UN website and auto-updated.

The NRB's FIU directives do not cover non-profit organizations, unless there is specific information that they are involved in money laundering and terrorist financing.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Nepal is a signatory of the South Asian Association for Regional Cooperation (SAARC) Regional Convention on Suppression of Terrorism.  Nepal reaffirmed its commitment to the Convention during the 2014 SAARC summit held in Kathmandu.

## PAKISTAN

**Overview:**  Pakistan remains a critical counterterrorism partner that is plagued with numerous violent extremist groups, many of which target Pakistani government or members of other religious sects.  Counterterrorism cooperation with Pakistan during 2014 was mixed, and Pakistan continued to deny visas for trainers focused on law enforcement and civilian counterterrorism assistance.  In 2014, Pakistan launched a military operation in North Waziristan

PX209

(later expanded to Khyber Agency) aimed at eliminating terrorist safe havens.  The government's counterterrorism efforts included providing support to the military operation and countering terrorist retaliation in urban areas.  Pakistan also confronted terrorist groups that attacked Pakistani civilians, law enforcement agencies, and military and paramilitary troops.  Tehrik-e Taliban Pakistan (TTP) claimed responsibility for a December 16 attack on an Army-run school in Peshawar, one of the country's deadliest acts of terrorism, which it termed as retaliation for the North Waziristan military operation.

In 2014, terrorists used remote-controlled improvised explosive devices (IEDs) in bicycles, motorcycles, cars, and rickshaws; suicide bombers; targeted assassinations; rocket-propelled grenades; and other combat tactics to attack schools, markets, government institutions, mosques, and other places of worship.  Lashkar e-Tayyiba (LeT) and its alias organizations continued to operate freely in Pakistan, and there were no indications that Pakistan took significant enforcement actions against the group.  Attacks by sectarian groups against minorities continued.  However, the Shia commemoration of Ashura, which was a focal point of violence in 2013, passed without major attacks or rioting.

Karachi, in particular, continued to suffer from political and ethnic violence by different groups, including militant organizations, fundamentalist religious groups, and the militant wings of political parties.  Some militant groups worked to assert control over political parties and criminal gangs operating in the city and surrounding areas of southern Sindh.  The security situation in Karachi remained a priority concern for Pakistan's leadership, which launched an operation against terrorists and criminals operating in the city.

In February, Pakistan promulgated a National Internal Security Plan (NISP) aimed at combating terrorism and addressing the drivers of violent extremism.  By December, most of the policies laid out in the NISP had not been implemented.  For example, the National Counter Terrorism Authority (NACTA), which was to be the centerpiece of the plan focused on coordinating counterterrorism efforts across the government, remained ineffectual due to lack of a budget and bureaucratic disputes over personnel and chain of command.  After the Peshawar school attack, the government formed a committee of political party, military, and intelligence representatives to produce a national plan of action against terrorism.

**2014 Terrorist Incidents:**  Representative terrorist attacks in Pakistan included:

- On January 21, a bomb attack on a bus of pilgrims killed at least 24 Hazara and injured 40 others in Mastung District, Balochistan.
- On February 13, a suicide bomber targeted a bus of police officers, killing at least 13 and injuring 58 others near Razzakabad Police Training Center in Shah Latif Town, Karachi.
- On March 3, two suicide bombers and armed terrorists killed 11 people and injured 25 at the district court in Islamabad's F-8 sector.
- On April 9, a bomb at an Islamabad vegetable market killed 24 people and injured 116.
- On May 25, a bomb attack on a security convoy in the Pandiyali tehsil of Mohmand Agency killed six security personnel and injured three others.

PX209

- On May 25, armed men attacked a check-post along the Quetta-Karachi Highway in Wadh tehsil of Khuzdar District, Balochistan, killing at least eight Balochistan law enforcement officials and injuring three others.
- On June 8, armed men attacked Karachi airport, killing 13 people.  An Army spokesman said security forces killed all 10 of the gunmen.
- On September 6, naval security thwarted a terrorist attack on Karachi Naval Dockyard. One sailor and two attackers died in a firefight, while security forces captured four attackers.  The terrorists reportedly planned to hijack a naval frigate.
- On November 2, a suicide bomber killed at least 60 people at the Wagah border crossing with India.  TTP splinter group Jamaat-ul-Ahraar claimed responsibility.
- On December 16, armed militants wearing paramilitary uniforms and suicide vests attacked an Army-run school in Peshawar, killing at least 144, mostly children.  TTP claimed responsibility for what local media termed the deadliest attack in Pakistan's history.

**Legislation, Law Enforcement, and Border Security:**  Pakistan enacted additional amendments to supplement the Anti-Terrorism Act (ATA) of 1997, and promulgated the Protection of Pakistan Act (PPA), empowering the government to counter terrorism with enhanced law-enforcement and prosecutorial powers.  The country is in various stages of implementing the National Counterterrorism Authority Act, the Fair Trial Act, amendments to the ATA, and the 2014 PPA, although some of these acts may be considered lower priorities in the upcoming year following the implementation of the 21st Amendment to the Constitution, the Pakistan Army (Amendment) Act, and the National Action Plan.  The government continued to make use of reinforced counterterrorism legislation; however, the judiciary moved slowly in processing terrorism and other criminal cases.

Pakistan promulgated new legislation in 2014 that supported the investigation and prosecution of terrorism offenses.  The PPA augmented the ATA and established a federally empowered infrastructure with special federal courts, prosecutors, police stations, and investigation teams for the enforcement of 20 specially delineated categories of offenses.  The 2014 amendments to the ATA placed additional limitations on the use of lethal force, and attempted to increase the efficiency of terrorism courts and improve court security.

Pakistan's law enforcement and national security structure needs improvement.  Although the various security agencies attempt to detect, deter, and respond to terrorist incidents, the government's institutional framework is not conducive to interagency cooperation and coordination.  There is only sporadic interagency information sharing, no comprehensive integrated database capability, and specialized law enforcement units lack the technical equipment and training needed to implement the enhanced investigative  powers provided in the 2012 Fair Trial Act.  Prosecutors have a limited or inadequate role during the investigation phases of terrorism cases.  Jurisdictional divisions among and between military and civilian security agencies continued to hamper effective investigation and prosecution of terrorism cases.  Intimidation by terrorists against witnesses, police, victims, prosecutors, defense lawyers, and judges contributed both to the slow progress of cases in Anti-Terrorism Courts, and a high acquittal rate.

PX209

Pakistan continued to work toward structural reforms on counterterrorism designed to centralize coordination and information sharing. Due to constitutional requirements on the devolution of law and order responsibilities to provincial levels, counterterrorism command and control at the national level had been ad hoc and limited until the 2012-2014 legislative changes to empower federal entities. NACTA has been incorporated into the Ministry of Interior and remains in the process of establishing its mission, staffing, and responsibilities. The Intelligence Bureau has nationwide jurisdiction as a civilian agency, is fully empowered under the PPA to coordinate with provincial and territorial counterterrorism units, and is taking more of an active role in counterterrorism. The Inter-Services Intelligence Directorate has broad intelligence powers and fulfils a de facto border security role along with tribal militias, provincial police, and the Frontier Corps. The Ministry of Interior has over 20 law enforcement-related entities under its control.

Pakistan is implementing biometric collection in national databases and screening at border land crossings with the International Border Management Security system. The National Automated Database Registration Authority maintains a national biometric database of citizens, residents, and overseas Pakistanis, and is continually subject to upgrades. The Federal Board of Revenue (FBR), Pakistan's customs and tax authority, continues to maintain currency-detection units at 12 international airports to counter bulk cash smuggling. The FBR has improved information-sharing protocols on arrests and seizures to overcome bureaucratic hurdles. Information on arrests and seizures is now sent to a central intelligence and investigations directorate, which then disseminates the information throughout the country so customs agents have current information on trends, patterns, methods of operation, entities, and individuals. Pakistan collects advance passenger name records on commercial flights. In November, Pakistan Customs launched the End Use Verification (EUV) project, which will facilitate the entry of dual-use chemicals for legitimate purposes, while also investigating and preventing the entry of chemicals intended for use in IEDs. The EUV project consists of 80 Pakistani teams that will conduct countrywide verification checks.

The military conducted significant counterterrorism operations in North Waziristan and Khyber agencies in the tribal areas, and civilian forces conducted operations in Sindh, Balochistan, Khyber Pakhtunkhwa, and Punjab. In Karachi, security forces continued an operation against organized crime and terrorist groups. Security forces intercepted large stockpiles of weapons and explosives, and discovered bomb-making facilities and sophisticated telecommunication networks. Pakistan continued to arrest terrorists and initiate prosecutions throughout 2014. However, the enhanced tools provided by the Fair Trial Act of 2012 and the NACTA law are still in the process of being implemented by the government. These laws are designed to equip intelligence agencies, law enforcement agencies, and prosecutors with the necessary legal tools to detect, disrupt, and dismantle terrorist activities and organizations. If fully activated, NACTA could facilitate increased coordination and collection of counterterrorism intelligence among security agencies and provincial police, and provide a vehicle for national policy and strategy formulation for all aspects of counterterrorism.

Anti-Terrorism Courts have limited procedures for the admission of foreign evidence. The trial of seven suspects accused in the 2008 Mumbai terrorist attack was ongoing at year's end, with prosecution witnesses recording statements before the court. Security concerns and procedural

PX209

issues resulted in a slow pace of trial proceedings.  On December 18, the court granted bail to the lead defendant, alleged Mumbai attack planner and LeT operational commander Zakiur Rehman Lakhvi.  On December 19, the government detained Lakhvi for at least four months under the Maintenance of Public Order Act.

Pakistan's cooperation with the United States on information sharing and law enforcement continues, but needs improvement with respect to kidnapped U.S. citizens.  Law enforcement cooperation continued with respect to terrorist attacks and plots against U.S. personnel, and the Embassy and Consulates General in Lahore, Karachi, and Peshawar.   Pakistani law-enforcement officials have pledged to assist in the apprehension of U.S. citizen fugitives in Pakistan.  Practical implementation of this pledge has been lacking, however.

Delays in obtaining Pakistani visas for training personnel have been an obstacle to counterterrorism assistance for security forces and prosecutors, including assistance planned through the Department of State's Antiterrorism Assistance program, most of which was redirected to other regional partners.

**Countering the Financing of Terrorism:**  Pakistan is an active member of the Asia/Pacific Group on Money Laundering (APG), a Financial Action Task Force (FATF)-style regional body.  Pakistan made a high-level political commitment to work with FATF and the APG in 2010 to address its strategic anti-money laundering/countering the financing of terrorism (AML/CFT) deficiencies.  In June, Pakistan approved and enacted amendments to the ATA to rectify deficiencies identified by the FATF in its authority for freezing terrorist assets in accordance with international standards and UN Security Council Resolution (UNSCR) 1373.  Since then, the government has had the ability to freeze and confiscate terrorist assets.  However, Pakistan had not yet implemented that legislation at year's end.

UN-designated terrorist organizations continued to skirt sanctions by reconstituting themselves under different names, often with little effort to hide their connections to previously banned groups, and the government does not prosecute CFT cases.  Although Pakistan added some named groups to its proscribed organizations list, implementation of UNSCRs 1267 and 1988 remained weak.  Pakistan issued a UNSC Enforcement Order in 2012 setting out a range of sanctions for non-compliance in the implementation of UNSCR 1267, but has not used this authority.  The FATF has determined that Pakistan needs to increase the administrative monetary penalty available or legislate for additional criminal sanctions.

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Pakistan participated in counterterrorism efforts in both regional and international forums.  As a member of the Global Counterterrorism Forum (GCTF), Pakistan attended GCTF meetings and supported GCTF initiatives.  Pakistan is a partner in the UK's Counterterrorism Prosecution Reform Initiative, and provincial governments contributed to related rule-of-law programs in Malakand and Punjab.  Pakistan participated in South Asian Association for Regional Cooperation meetings on counterterrorism; is a member of

PX209

Interpol; and participated in multilateral groups where counterterrorism cooperation was discussed, including the Shanghai Cooperation Organization (as an observer) and the D-8 Organization for Economic Cooperation.  Pakistan participated in UNSC meetings on sanctions and counterterrorism, and in a UN Counterterrorism Committee's Executive Directorate regional workshop for South Asian judges, prosecutors, and investigators in the Maldives in November.

Pakistan, Afghanistan, and the United States held high-level meetings to discuss regional security, including efforts to counter extremism and violence in the border region, and reconciliation efforts.  Pakistan also held bilateral and multilateral meetings on security cooperation and counterterrorism with other countries, including Afghanistan, China, Germany, India, Iran, Nigeria, Saudi Arabia, and the UK.

**Countering Radicalization to Violence and Violent Extremism:**  The Ministry of Information and Broadcasting and the military's Inter-Services Public Relations employed strategic communications strategies to counter radicalism and build support for counterterrorism initiatives.  However, overall policy coordination had yet to be implemented under NACTA.  Integration of reformed militants into society remains a major priority for the government; to that end, the military joined civil-society leaders to operate the Sabaoon Rehabilitation Center, a de-radicalization program that attempts to rehabilitate youth exposed to militancy through education and counseling.

## SRI LANKA

**Overview:**  The 2009 military defeat of the terrorist Liberation Tigers of Tamil Eelam (LTTE) marked the beginning of what many hoped was a new era for the country.  The Sri Lankan government maintained a strong military presence in post-conflict areas and continued to voice concern about the possible reemergence of pro-LTTE sympathizers.  Although the Sri Lankan government maintains a comprehensive counterterrorism stance, counterterrorism cooperation and training with the United States in 2014 was limited.

Sri Lankan police apprehended a small number of Maldivian nationals attempting to transit through Sri Lanka to Syria allegedly to become foreign terrorist fighters.

**Legislation, Law Enforcement, and Border Security:**  Counterterrorism legislation in Sri Lanka has historically focused on eliminating the LTTE.  In 2014, the Government of Sri Lanka continued to implement the Prevention of Terrorism Act (PTA), enacted in 1982 as a wartime measure, which gives security forces sweeping powers to search, arrest, and detain individuals.  Embassy Colombo had significant concerns regarding use of the PTA by the previous government of President Mahinda Rajapaksa to harass and detain public actors under the guise of seeking to revive the LTTE.  The new government has pledged to end the broad application of the PTA, and has also taken steps to reduce the military's role in civil society and its control of land in security zones in the north.

Although U.S. counterterrorism assistance to Sri Lanka has generally been limited, the Sri Lankan government maintained its partnership with the U.S. Departments of State, Homeland Security, Defense, and Energy on securing its maritime border.  The U.S. Coast Guard, under the

PX209

Department of State's Export Control and Related Border Security program, continued to train Sri Lankan Coast Guard and Navy personnel on border and export control matters, and the Government of Sri Lanka continued to cooperate with U.S. Customs and Border Protection through the Container Security Initiative.

Border security remained a significant issue for the Sri Lankan government.  In 2014, the International Organization for Migration trained 54 newly-recruited Sri Lankan Department of Immigration and Emigration officers in techniques to improve border surveillance and combat human trafficking.

The government continued to collaborate with the EU Immigration Department on an Advanced Passenger Information system, which transmits passenger information to Sri Lankan immigration officials upon arrival.  Collaboration with the Australian government continued on the development of a passport fingerprinting program that was originally scheduled to go online in 2014.  The data generated from these collection systems will be significant assets to the Sri Lankan government in its efforts to control and combat illegal migration.

In March 2014, the government announced it had designated 16 organizations and 422 individuals as terrorist entities and/or facilitating terrorist financing designed to help revive the LTTE.  The Sri Lankan government did not provide information regarding criteria for designation or any supporting evidence.  A team from the UN Counter-Terrorism Committee Executive Director's office, which visited Sri Lanka in October 2014, expressed concerns the designation process may not have met UN standards.

**Countering the Financing of Terrorism:**  Sri Lanka belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  While neither an important regional financial center nor a preferred center for money laundering, several factors make the country vulnerable to money laundering and terrorist finance.  These include a lack of transparent tender mechanisms in government projects, past experience with terrorism, tax evasion, and a large informal economy.  Legal remittance flows through the formal banking system have increased sharply in recent years, and will surpass US $7 billion in 2014.  Remittances originate from Sri Lanka's substantial overseas workforce, primarily in the Middle East.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Sri Lanka continued to cooperate with a number of donor countries, including the United States, to improve its land and maritime border security.  These efforts also enhanced the government's capacity to interdict potential foreign terrorist fighters attempting to transit through the country.  Sri Lanka is one of 85 partner nations in the Global Initiative to Combat Nuclear Terrorism, and in 2014 served as GICNT co-chair.

In November, representatives from Sri Lankan law enforcement and judicial personnel attended the three-day Ninth Regional Workshop for Judges, Prosecutors, and Police Officers on effectively Countering Terrorism in South Asia in the Maldives.  In December, the Sri Lankan government held the Galle Dialogue, which featured multilateral discussion by international

PX209

security force representatives on issues of regional security in South Asia, including maritime terrorism.

**Countering Radicalization to Violence and Violent Extremism:**  Sri Lanka continued to operate a rehabilitation program for former alleged LTTE combatants, although limited access by independent bodies to known rehabilitation camps precluded reliable evaluations of the government's efforts.

## TAJIKISTAN

**Overview:**  In 2014, Tajikistan continued to address weaknesses in its counterterrorism strategy.  Marginalizing violent Islamist extremist groups in Tajik society was the main focus of the Tajik government's counterterrorism policies.  Tajikistan sought to increase military and law enforcement capacity to conduct tactical operations through bilateral and multilateral assistance programs, including with the United States.  The United States, Russia, Japan, and the EU provided funding for border security programs.

The biggest change in Tajikistan's security environment has been the acknowledgment that roughly 300 Tajik citizens are allegedly fighting against government forces in Syria and Iraq, and of the threat they could pose if and when they return.  The Tajik government reported the threat of militants returning from foreign conflict zones increased in 2014, due to the drawdown of international troops in Afghanistan and the Islamic State in Iraq and the Levant's success in attracting recruits from Tajikistan's Sughd and Khatlon regions, as well as among the migrant laborer population in Russia.  Tajik government reporting indicated many Tajik militants brought their families with them to Syria.

**Legislation, Law Enforcement, and Border Security:**  The Tajik government prosecutes terrorists under the Laws on Combating Terrorism, Anti-Money Laundering, Currency Regulation, and Notary; and the Criminal Code of the Republic of Tajikistan.  Resource constraints, corruption, lack of training for law enforcement and border security officials, and general capacity issues continued to plague the Tajik government's ability to interdict possible terrorists.  Tajik law enforcement bodies lacked sufficient interagency cooperation and information sharing capabilities.

Tajikistan continued to make progress in improving border security with bilateral and multilateral assistance, although effectively policing the Tajikistan/Afghanistan border was a difficult task requiring more resources and capabilities than were available to the Tajik government.  The interagency Secretariat, established by the Tajik government in 2013, met regularly throughout the year to coordinate implementation of Tajikistan's 2010 National Border Management Strategy.  The International Organization for Migration and the OSCE worked to improve travel document security.  The OSCE also provided funding to link Tajikistan's existing passport data scanners at airports and land ports of entry to the Interpol database.   Tajikistan continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, and Tajik security forces received training related to border security practices and counterterrorism investigations.  In addition, the Border Management Program in Central Asia

PX209

and the UN Office on Drugs and Crime worked to improve border infrastructure, promote inter-agency cooperation, provide direct training, and expand training capacity in Tajikistan.

In the first 11 months of 2014, the Ministry of Internal Affairs reported opening 12 cases against individuals charged with terrorism, 181 cases against individuals charged with supporting or promoting terrorism, 109 cases against individuals supporting or promoting extremism, and 46 cases against individuals charged with extremism.  The Ministry of Internal Affairs also reported the successful prosecution of six Jamaat Ansarullah members for participating in a 2010 police station bombing.  The Ministry of Internal Affairs reported having disrupted seven planned attacks in 2014.  In July, the Ministry of Internal Affairs reported the arrest of a group which allegedly planned to bomb the Tajik Aluminum Company's refinery, as well as the city hall, prosecutor's office, and police headquarters in the nearby city of Tursunzoda.  On October 18, the Ministry of Internal Affairs told media outlets it had arrested 20 militants in the northern Spitamen region planning to attack a police station, seize weapons, and blow up the Shahriston and Istiqlol tunnels connecting Dushanbe and Khujand.

Corruption in the judicial system and misuse of counterterrorism statutes to suppress political opposition hampered the effectiveness of the government's counterterrorism efforts.

**Countering the Financing of Terrorism:**  Tajikistan is a member of the Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG), a Financial Action Task Force (FATF)-style regional body.  In May, FATF reported Tajikistan had amended portions of its legislation pertaining to money laundering and financial crimes, bringing its laws closer to compliance with international recommendations.  At its June plenary session in Moscow, the EAG removed Tajikistan from the enhanced follow-up process and placed it under regular follow-up, meaning the group saw sufficient progress in the country's amendments to its criminal code regarding anti-money laundering.  The EAG took an additional step at its November meeting to further upgrade Tajikistan's status by placing it on the common monitoring list.

Similarly, the FATF recognized Tajikistan, along with several other nations, during its October meeting in Paris "...for the significant progress made in addressing the strategic anti-money laundering/counterterrorist finance (AML/CFT) deficiencies earlier identified by the FATF…"  Due to this progress, FATF removed Tajikistan from its monitoring process, although Tajikistan will continue to work with the organization to further strengthen its AML/CFT structures.

In 2014, Tajik courts sentenced seven people on charges of money laundering and sentenced one person on charges of terrorist financing.  Law enforcement officials seized US $20,400 in a money laundering case.

There is no publicly available information with regard to length of time to freeze or any estimates of the amount of assets frozen or seized, but FATF has declared Tajikistan is in compliance with its definition of "Ability to Freeze Terrorist Assets without Delay."

PX209

For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Tajikistan is an active member of the OSCE, where it focuses on border security issues, and is also a member of the Collective Security Treaty Organization and the Shanghai Cooperation Organization (SCO).  In August, Tajikistan participated with SCO partner nations in the *Peace Mission 2014* counterterrorism-focused military exercises held in China.

**Countering Radicalization to Violence and Violent Extremism:**  Stemming violent extremism and radicalization in Tajikistan is a top priority for the Tajik government.  The Tajik government seeks primarily to control radical messaging by selectively blocking social media sites, rather than issuing a counter-narrative.  Many of the government's measures, however, have had a negative impact on religious freedoms, including prohibiting children under 18 from attending mosque or other public religious services and banning women from worshiping in mosques.  We refer you to the Department of State's *Annual Report to Congress on International Religious Freedom* (http://www.state.gov/j/drl/irf/rpt/index.htm) for further information.

## TURKMENISTAN

**Overview:**  The Government of Turkmenistan continued efforts to improve the capacity of law enforcement agencies to combat terrorism, ensure border security, and detect terrorist financing.  Turkmenistan cooperated with international organizations and participated in trainings on preventing terrorist financing and strengthening border security.  The government did not report any terrorist incidents, and authorities continued to maintain close surveillance of the population.

Although the government did not report any terrorist incidents in 2014, there were two incidents along the Turkmenistan-Afghanistan border on February 25 and May 24.  In each incident, unknown persons from Afghanistan killed three Turkmen border guards on the Turkmen side of the border.  The Government of Turkmenistan has blamed the incidents on misunderstandings over the use of common resources such as grazing land, but other reports attribute the incidents to narcotics-related activities or other criminal or insurgent activity.

**Legislation, Law Enforcement, and Border Security:**  The country's legal system as it pertains to counterterrorism centers on the 2003 counterterrorism law that defines which crimes are considered terrorist in nature.  This law is supplemented by articles 271-273 of the criminal code, which pertain to terrorist acts and terrorist financing and are used to prosecute terrorism-related offenses.

The Ministries of National Security, Internal Affairs, and Defense, and the State Border, Customs, and Migration Services perform counterterrorism functions and share information through an interagency commission.  The country's law enforcement capacity needs improvement, as law enforcement units do not proactively conduct investigations and have a poor record of accountability and respect for human rights.  Prosecutors, however, do play a

PX209

significant role in the investigation phase of a case, and specialized law enforcement units exist to conduct investigations.  These units possess specialized equipment but usually only use the equipment for official ceremonies and demonstrations as opposed to daily operations.

Turkmenistan participated in training programs sponsored by the United States and international organizations, including a program on border security organized by the OSCE, a program on strategic export control regimes organized by the UN Office on Drugs and Crime (UNODC), and U.S. government-provided training on combating transnational threats.

The State Border Service continued to operate frontier garrisons on Turkmenistan's borders with Iran and Afghanistan and managed eight radiation portal monitors along its borders provided by the Department of Energy through its Second Line of Defense program.  The monitors can be used to help detect, deter, and prevent the dissemination of explosives and radioactive materials.  The State Migration Service maintains a terrorist screening watchlist and possesses biometric screening capabilities at ports of entry.

There is significant political will in Turkmenistan to combat terrorism and ensure border security.  Corruption, however, sometimes hampered effective law enforcement.  Additionally, international cooperation with the government is often hampered by a bureaucracy that operates according to opaque rules and that frequently deems public information to be "state secrets."

**Countering the Financing of Terrorism:**  Turkmenistan is a member of the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force-style regional body.  Government officials participated in OSCE trainings on anti-money laundering (AML) and combating the financing of terrorism (CFT).  Turkmenistan continued to express interest in gaining admission to the Egmont Group of Financial Intelligence Units, and reiterated this interest at a September workshop organized by the UNODC.  The U.S. Treasury Department's Office of Technical Assistance (OTA) has a December 2011 bilateral agreement with the Ministry of Finance pertaining to AML/CFT.  However, the OTA did not provide technical assistance to Turkmenistan in 2014.  There were no reported prosecutions of terrorist financing cases during the year.  For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Turkmenistan supports regional and international efforts to fight terrorism.  Law enforcement officials participated in OSCE and UN Office of Drugs and Crime trainings on border security. Turkmenistan continued to participate in the Central Asia Regional Information and Coordination Center.

**Countering Radicalization to Violence and Violent Extremism:**  Turkmenistan's law enforcement and security agencies exercise strict control over the population.  The Turkmen government reportedly views conservative Islam with suspicion.  Since the country's independence, mosques and Muslim clergy have been state-sponsored and financed.  This level of government surveillance suggests that any violent extremist groups existing in Turkmenistan would be small, underground, and disparate.  The severe curtailment of basic freedoms, growing economic inequality, an ideological void among young people, and the perception of corruption

PX209

could cause people to be attracted to violent extremist ideologies, however.  We refer you to the Department of State's *Annual Report to Congress on International Religious Freedom* (http://www.state.gov/j/drl/irf/rpt/index.htm) for further information

## UZBEKISTAN

**Overview:**  In 2014, the Government of Uzbekistan continued to rank counterterrorism within its borders as one of its top three security priorities, together with counternarcotics and countering extremism.  There were no reported significant terrorist incidents on Uzbek soil in 2014, which the government attributes to its success in ongoing efforts to counter terrorism and extremism.  The government restricts information on internal matters, making it difficult to analyze the extent of the terrorist threat and the effectiveness of Uzbek law enforcement's efforts to combat it.

The government continued to express concern about the potential for a spillover effect of terrorism across Uzbekistan's land borders with Afghanistan and other Central Asian states, especially with the drawdown of U.S. troops in Afghanistan.  Uzbekistan's government remained confident that it can control its border with Afghanistan but was less sure about its neighbors' ability to do so and was particularly concerned with the infiltration of extremists through Uzbekistan's long borders with Tajikistan and Turkmenistan.

The government remained concerned about the recruitment of ethnic Uzbek fighters to fight in the Middle East and the threat from returning foreign terrorist fighters and possible collaboration between Central Asian extremists operating in Pakistan and Afghanistan and the Islamic State in Iraq and the Levant (ISIL).  On October 31, the Committee on Religious Affairs under the Cabinet of Ministers issued a public statement condemning ISIL as un-Islamic and urging citizens to resist its virulent propaganda.  Uzbekistan President Karimov has also spoken out publicly against ISIL.

Uzbekistani law enforcement authorities frequently use the terms "terrorism" or "extremism" interchangeably and view alleged ties to what the government considers extremist organizations as grounds for the arrest, prosecution, and convictions of many people who would not be considered terrorists outside of Uzbekistan.  "Religious extremism" is the primary justification for Uzbekistan's seemingly indiscriminate police actions against religious adherents, especially Muslims.  The security sector in Uzbekistan, under the control of the National Security Service (NSS), prioritizes regime stability over domestic freedom of expression, including political dissent, and uses law enforcement to maintain internal security at the expense of some fundamental freedoms.  The government brands some Islamic groups it broadly determines to deviate from the state-sponsored version of Islam as "extremist" and criminalizes membership in such groups, even when the groups clearly espouse non-violent ideology, such as the followers of Turkish cleric Said Nursi.

**Legislation, Law Enforcement, and Border Security:**  The government investigated and prosecuted terrorist-related acts under its Law on Combating Terrorism, which was passed in 2000 and revised in 2004.  The Law on Combating Terrorism identifies the National Security Service (NSS), the Ministry of Internal Affairs, the State Border Guards Committee (operating within the NSS command structure), the State Customs Committee, the Ministry of Defense, and

254

PX209

the Ministry of Emergency Situations as the government entities responsible for countering and responding to terrorism.  The NSS is the lead counterterrorist law enforcement agency, with primary responsibility for the coordination and supervision of interagency efforts.

Law enforcement agencies in Uzbekistan continued to arrest, prosecute, and convict an unreported number of people under extremism-related charges in 2014.  It is possible that the Uzbek security forces have neutralized legitimate threats in the course of conducting indiscriminate and broadly targeted anti-extremist or politically motivated operations.  A lack of reliable information, however, makes it difficult to differentiate between legitimate counterterrorist law enforcement actions and politically-motivated arrests aimed at religious dissidents or opponents of the government.

In 2013, the government began issuing biometric passports for travel outside of Uzbekistan.  The biometric data includes a digital photo, fingerprints, and biographical data.

Below are reported examples from 2014 in which Uzbekistan's law enforcement authorities arrested and prosecuted suspects under charges of extremism or terrorism.  As with many cases like this, it is difficult to determine if the arrests and convictions were terrorist- or extremist-related or if those charges were used to suppress expressions of political or religious beliefs.

- In March, the nongovernmental organization "Forum 18" reported that the government sentenced Tajik citizen Zuboyd Mirzorakhimov to five years imprisonment for sermons found on his mobile phone.
- On May 8, six women from the Yangiyul district of the Tashkent region were sentenced under a law prohibiting materials deemed to threaten security and order.
- Lawyers for Mirsobir Hamidkariev, who left Uzbekistan to escape accusations of association with banned religious organizations, reported to independent press that on June 9, three days before a Russian court decision granting him asylum took effect, he was kidnapped from a taxi in Moscow and forcibly returned to Uzbekistan by its security services, reportedly with the acquiescence of Russian authorities.  The government stated that Hamidkariev voluntarily turned himself in to the police on June 17, following an in absentia charge of participation in an extremist organization.  On November 18, according to Uzbekistani press reports, the Tashkent City Criminal Court sentenced Hamidkariev to eight years in prison upon conviction of organizing and participating in the banned religious extremist organization "Islom Jihochilari."  According to the government, as of December 29, his case was still with the Tashkent City Criminal Court.
- In July, the human rights organization "Ezgulik" reported that three men, Otabek Ochilov, Zafar Pulatov, and Bakhtiyor Bozorov, and three women, Lolakhon Qudratova, Nigora Ernazarova, and Aziza Mukhitdinova, were sentenced to terms ranging from nine to 15 years, for being members of the Islamic Movement of Uzbekistan (IMU).  Their cases were part of a larger trial that involved 66 suspects accused of terrorism in Kashkadaryo region.

In September 2014, the State Department Anti-Terrorism Assistance program re-launched in Uzbekistan after an eight year hiatus with two courses aimed at improving civil aviation security.

PX209

**Countering the Financing of Terrorism:**  Uzbekistan belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG), a Financial Action Task Force (FATF)-style regional body.  The Department on Fighting Tax, Currency Crimes, and Legalization of Criminal Income under the Prosecutor-General's Office is the government agency responsible for implementation of EAG agreements.  In August 2014, the U.S. Drug Enforcement Administration and the Government of Uzbekistan's Prosecutor-General's Office signed a memorandum of understanding that establishes a legal foundation for training activities, joint counternarcotic and terrorist-related financial investigations, and for the exchange of intelligence.  The government did not report any efforts to seize terrorist assets in 2014.  For further information on money laundering and financial crimes, see the 2014 International *Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Although the government prefers bilateral engagement in its security-related cooperation, it is currently a member of several regional organizations that address terrorism, including the EAG and the Shanghai Cooperation Organization (SCO), with its Regional Anti-Terrorism Structure (RATS) headquartered in Tashkent.  In November, SCO RATS member states agreed to exchange information on citizens who have participated in armed conflicts in the Middle East.  The government also continued to work with the OSCE, the EU, and the UN Office on Drugs and Crime (UNODC) on general security issues, including border control.  In 2014, within the framework of an UNODC project and funded by the Government of Norway, Uzbekistan and Tajikistan opened joint border liaison offices at two Uzbekistani-Tajik border crossings to allow for direct communication between the law enforcement agencies involved in border control.

**Countering Radicalization to Violence and Violent Extremism:**  Official government media continued to produce documentaries, news articles, and full-length books about the dangers of Islamist religious extremism and joining terrorist organizations.  The message is generally targeted to the 15 to 40 year old male demographic, which the government considers the most susceptible to recruitment by Islamic extremist groups.  In December, a monthly magazine of the government-controlled Uzbekistan Muslim Board printed an article emphasizing the un-Islamic nature of ISIL.  However, some non-governmental religious experts continued to suggest that greater freedom to circulate mainstream, non-extremist Islamic and other religious materials could be more effective in countering extremism than government-produced material.

# WESTERN HEMISPHERE

Almost all governments in the region recognized the potential threat that terrorism represents to their domestic and hemispheric interests.  At the same time there was an informed understanding that terrorist groups do not currently menace the region in the way in which they can and do in other parts of the world.  Despite a genuine recognition of the importance of exercising constant unilateral and multilateral vigilance to ensure this situation continues, corruption, weak government institutions, insufficient interagency cooperation, weak or non-existent legislation, and a lack of resources remained the primary causes for the lack of significant progress on countering terrorism in some countries in the Western Hemisphere.  Transnational criminal

PX209

organizations continued to pose for more significant threats to the region than terrorism, and most countries made efforts to investigate possible connections with terrorist organizations. The primary terrorist threats in the Western Hemisphere come from the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army, which continued to commit the majority of terrorist attacks in the region.  Peace negotiations between the FARC and the Government of Colombia continued throughout the year in Cuba.  The ability of the Shining Path to conduct coordinated attacks and its membership both continued to decline with successful Peruvian military operations.

Operational cells of either al-Qa'ida or Hizballah in the hemisphere were not confirmed, but ideological sympathizers in South America and the Caribbean continued to provide financial and moral support to those and other terrorist groups in the Middle East and South Asia.  In Peru, police arrested Muhammad Amadar, a suspected member of Hizballah, who had allegedly engaged in surveillance of Israeli and Jewish targets, and was found to have traces of explosives on his body and in his home. The investigation is ongoing. The Tri-Border areas of Argentina, Brazil, and Paraguay remained an important regional nexus of arms, narcotics, and human smuggling, counterfeiting, pirated goods, and money laundering – all potential funding sources for terrorist organizations.  The United States remained vigilant in its efforts to monitor Iran's influence in the Western Hemisphere.

The United States collaborated extensively with both Canada and Mexico to protect our shared borders through regular exchanges of intelligence and other information.

On December 17, 2014, the President announced sweeping changes to U.S. policy on Cuba, which included a review of the status of Cuba as a State Sponsor of Terrorism.

## ARGENTINA

**Overview:**  Argentina maintained capabilities for confronting terrorism at the federal level, and directed increased effort to addressing policing challenges along its remote northern and northeastern borders, which include the Tri-Border Area where Argentina, Brazil, and Paraguay meet.  Limited U.S. law enforcement and security cooperation with Argentina focused on information sharing.

**Legislation, Law Enforcement, and Border Security:**  Argentina's Antiterrorism Law of 2007, modified in 2011, serves as a supplement to the criminal code for the prosecution of terrorism cases.  The Argentine government took steps that it maintained would help determine culpability for the 1994 terrorist bombing of the Argentine-Jewish Mutual Association community center in Buenos Aires that killed 85 and injured more than 150 people.  In March, President Cristina Fernandez de Kirchner confirmed to the Argentine Congress and at the September UNGA that she would continue to seek to implement a "truth commission," agreed between Argentina and Iran in January 2013.  The proposed talks were intended to clarify Iran's alleged role in the bombing, for which several former Iranian cabinet-level officials have outstanding Interpol Red Notices.  In May, an Argentine court declared the agreement between the two governments unconstitutional.  The Argentine-Jewish community and the U.S. government expressed

257

PX209

skepticism regarding the Argentina-Iran dialogue, and indeed it has failed to advance the investigation.

**Countering the Financing of Terrorism:**  Argentina is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force of Latin America, a FATF-style regional body.  In October, the FATF found that Argentina was making sufficient progress on implementing anti-money laundering action plans and removed Argentina from the FATF's monitoring process, where it had been placed since 2011.  Argentina closed several loopholes in previous legislation; gave the Financial Intelligence Unit (UIF) the power to freeze assets; and criminalized the financing of terrorist organizations, individuals, and terrorist acts.  Argentina is a member of the Egmont Group, a global association of financial intelligence units.

Not all NGOs are required to report.  Only legal entities receiving more than US $5,700 in donations or third party support must file.  The UIF has used its counterterrorism authority mainly to pursue cases against members of the country's former military dictatorship.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Argentina participated in the OAS Inter-American Committee Against Terrorism and the Southern Common Market Special Forum on Terrorism.  Argentina, Brazil, and Paraguay coordinated law enforcement efforts in the Tri-Border Area via their Trilateral Tri-Border Area Command.

## BRAZIL

**Overview:**  The Brazilian government continued to support counterterrorism activities, which included third-country technical assistance for controlling sensitive technologies, assessing and mitigating potential terrorist threats in advance of major sporting events like the FIFA World Cup, and investigating fraudulent travel documents.  Operationally, Brazilian security forces worked with U.S. officials to pursue investigative leads provided by the United States and other intelligence services, law enforcement, and financial agencies regarding terrorist suspects.

The Brazilian Federal Police (DPF) worked closely with the U.S. government and other nations' law enforcement entities to assess and mitigate potential terrorist threats, especially leading up to and during the 2014 FIFA World Cup.  Cooperation was strong and continuous, particularly dealing with crisis management, emergency response, and planning exercises to build response capability.

**Legislation, Law Enforcement, and Border Security:**  Brazil's 1980 National Security Law is the only legislation that mentions terrorism.  Brazilian law lacks clarity on the definition of terrorist acts, which hinders prosecutions of potential terrorists.

Four pieces of terrorism legislation were under consideration in the Brazilian Congress: one would deny visas to persons and/or expel foreigners convicted or accused of a terrorist act in

PX209

another country (introduced in 2011); another would define terrorism in the Brazilian Constitution (introduced in 2013); a third would update the Brazilian penal code to include sentencing guidelines for terrorism crimes (introduced in 2012); and the fourth would define a number of crimes, among them terrorism and terrorist financing, and was intended to enter into force in advance of the FIFA 2014 World Cup (introduced in 2011).

Brazil has three law enforcement agencies with counterterrorism responsibilities, ranging from the investigation of terrorism to interdiction and response. The lead counterterrorism agency, with responsibility for investigating any terrorist-related threats or groups, is the DPF Anti-Terrorism Division, working with the DPF's Tactical Operations Command. In addition, the state-level Military Police Departments, through their respective Police Special Operations Battalions; and the state-level Civil Police Departments, through their respective Divisions of Special Operations; also work on counterterrorism issues.

All of Brazil's federal law enforcement agencies with counterterrorism responsibilities have benefitted from U.S. capacity building training. The U.S. Department of State's Antiterrorism Assistance (ATA) program delivered courses to security and law enforcement personnel, covering topics such as tactical command, vital infrastructure security, crisis incident management, digital network security, and bus and rail security – all with the goal of enhancing investigative capabilities, building border security capabilities, and supporting the Government of Brazil's efforts to prevent terrorist attacks at the 2014 World Cup and the 2016 Summer Olympics. The ATA training courses had the added benefit of bringing together disparate agencies, which enhanced Brazilian interagency communication.

The U.S. Department of State funded professional development courses for police and justice officials both in Brazil and through the International Law Enforcement Academy in San Salvador, El Salvador. In 2014, Homeland Security Investigations provided cross-border financial investigations training to help combat terrorist financing. The U.S. Federal Bureau of Investigation offered courses ranging from interview and interrogation techniques, terrorist financing and money laundering investigations, and Hostage Rescue Team technical assistance exchanges. The Transportation Security Administration (TSA) provided training to Brazil's National Civil Aviation Agency (ANAC) airport security managers and to the DPF's Bureau of Airport Security Services on airport security checkpoint optimization, explosive threat mitigation, and the implementation of an airport security testing program. The TSA also initiated an expert exchange with the DPF's canine group (SECAN) to assist in the development of its explosive detection canine program. SECAN requested that its canine program be evaluated by TSA for possible recognition of commensurability with TSA's canine program.

Brazilian authorities continued to work with other concerned nations – particularly the United States – in combating document fraud. Since 2009, multiple regional and international joint operations successfully disrupted a number of document vendors and facilitators, as well as related human-smuggling networks. Since 2008, DHS Immigration and Customs Enforcement and Customs and Border Protection (CBP) have trained Brazilian airline employees on identifying fraudulent documents. The U.S. government provides comprehensive and ongoing anti-fraud training to airline and border police units through its Investigations Program.

PX209

The U.S.-Brazil Container Security Initiative in Santos, which began in 2005, continued to operate throughout 2014.  Brazil continued to reach out to CBP's International Affairs and Field Operations Offices to learn best practices and conduct joint workshops to bolster supply chain security and port security.  Similarly, the Brazilian ANAC, DPF, and Brazilian Customs continued to work with TSA to make modifications to Brazil's National Cargo Security Program to gain TSA recognition of commensurability for cargo security procedures, training, and operations at Brazil's international airports.

Brazil shares vast international borders with 10 different countries, and many of these borders are porous – especially those with Colombia, Venezuela, Uruguay, Paraguay, and Argentina.  Travel document security is a highly specialized skill.  The Brazilian states maintain individual criminal records databases, and information sharing is unwieldy.  Biometric information is not collected from visitors.  A 2013 law requires the collection of passenger name record data, and it is being gradually implemented.  Brazil does not maintain its own terrorist watch list, although it collaborates with other nations.

In 2014, the Brazilian Army inaugurated the initial section of a border-monitoring system that integrates a combination of soldiers, cameras, sensors, and satellites.  The initial section was implemented in the state of Mato Grosso do Sul on the Paraguay border.  The system will eventually cover the entire Brazilian land border.

**Countering the Financing of Terrorism:**  Brazil is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force of Latin America, a FATF-style regional body.  Brazil prioritizes FATF recommendations and created a working group chaired by the Ministry of Justice to incorporate these recommendations into legislation and regulation.  Brazil updated its money laundering legislation in 2012, establishing stricter penalties, but it did not criminalize terrorist financing as a stand-alone criminal offense.  Brazil is a member of the Egmont Group, a global association of financial intelligence units.

Through Brazil's Financial Activities Oversight Council (COAF), which is a largely independent entity within the Finance Ministry, Brazil has carried out name checks for persons and entities on the UNSCR 1267/1989 (al-Qa'ida sanctions) and 1988 (Taliban sanction) terrorist finance lists, but it has not reported any assets, accounts, or property in the names of persons or entities on the UN lists.  The Government of Brazil has generally responded to U.S. efforts to identify and block terrorist-related funds.

COAF does not have the authority to unilaterally freeze assets without a court order.  The FATF has recommended that COAF create a standard operating procedure for freezing funds, which COAF has prioritized as a project but had not yet completed by year's end.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Brazil participates in regional counterterrorism fora, including the OAS and its Inter-American Committee Against Terrorism, the Union of South

PX209

American Nations, and the working group on terrorism and sub-working group on financial issues in the Southern Common Market.

Brazil is an active participant in the International Civil Aviation Organization's (ICAO) Working Group on Security.  Additionally, in 2014, the Director-President of ANAC held the Presidency of the Latin American Civil Aviation Commission.

The Brazilian government continued to invest in border and law enforcement infrastructure, and has undertaken initiatives with its neighboring countries to control the flow of goods – legal and illegal – through the Tri-Border Area of Brazil, Argentina, and Paraguay.

**Countering Radicalization to Violence and Violent Extremism:**  Brazil's DPF Anti-Terrorism Division was created specifically to address threats of radicalization and to counter violent extremism.

## CANADA

**Overview:**  Canada plays a vital role in international efforts to detect, disrupt, prevent, and punish acts of terrorism.  Canada and the United States maintained a close, cooperative counterterrorism partnership, working together on key bilateral homeland security programs such as the Beyond the Border initiative and the Cross Border Crime Forum.  Canadian diplomacy supported global efforts to prevent radicalization, counter violent extremism, and promote the rule of law overseas.

Canada has made significant contributions to the Global Coalition to Counter the Islamic State in Iraq and the Levant.  In addition to providing military forces to coalition air and ground operations in Iraq, Canadian law enforcement and security services are working to prevent the flow of foreign terrorist fighters to and from Iraq and Syria.  Traveling abroad to commit acts of terrorism is a violation of Canadian federal law.  Measures include denial of passport applications (or revocation of valid passports) of Canadian citizens suspected of traveling abroad (or aspiring to travel abroad) to commit acts of terrorism, and maintenance of a watchlist of individuals (both citizens and non-citizen residents) flagged for potential involvement with violent extremist organizations.

**2014 Terrorist Incidents:**  On October 20 and 22, two Canadian Forces soldiers were murdered in separate terrorist attacks that took place outside Montreal and in downtown Ottawa, respectively.  On October 20, Martin Couture-Rouleau, a Canadian national, killed one uniformed Canadian soldier with his car and injured a second in a hit-and-run ambush outside a government office in Quebec that provided services to military personnel.  Police fatally shot Couture-Rouleau following a car chase.  Authorities said that he had become radicalized and motivated by violent extremist ideology.

On October 22, Canadian national Michael Zehaf-Bibeau fatally shot one military honor guard and fired at a second guard at the National War Memorial in Ottawa before forcing entry into the federal Parliament, where he was shot and killed by security officials.  Authorities said that he had become radicalized by violent extremist ideology.

PX209

**Legislation, Law Enforcement, and Border Security:**  Canada's legal framework includes significant penalties for committing terrorist acts, conspiring to commit terrorist acts, financing terrorism, and traveling abroad to engage in terrorism.  In June, the government passed C-24, Strengthening Canadian Citizenship Act, which provided for the collection, retention, use, disclosure, and disposal of information on Canadian citizens – including disclosure for the purposes of national security, the defense of Canada, the conduct of international affairs; or verification of citizenship status or identity of any person for the purpose of administering the law of another country.  C-24, which came into effect August 1, further granted the Canadian government authority for the first time to strip Canadian citizenship from Canadian dual nationals convicted of treason, terrorism, and espionage offenses, or who served as a member of an armed force or organized armed group engaged in an armed conflict with Canada.  It also barred individuals convicted of these offenses, or who had engaged in armed conflict with Canada, from acquiring Canadian citizenship.

At year's end, the passing of C-44, Protection of Canada from Terrorists Act, was still pending in Parliament.  C-44 would amend the Canadian Security Intelligence (CSIS) Act to confirm CSIS's authority to conduct investigations abroad and obtain federal court warrants to carry out those investigations; protect the identity of CSIS human sources from disclosure; and protect the identity of CSIS employees engaging in covert activities.  The bill would expedite implementation of the citizenship revocation measures in C-24 Strengthening Canadian Citizenship Act passed in June.

On December 11, C-13, Protecting Canadians from Online Crime Act, received Royal Assent.  The bill permits a combination of new online lawful access investigative tools to intercept, track, and preserve (with judicial production orders or warrants) private electronic communications on "reasonable grounds for suspicion" of committing an offense.  The bill shields internet providers from lawsuits for voluntary disclosure of private data to law enforcement without a warrant.  The bill also amends the Mutual Legal Assistance in Criminal Matters Act to promote cooperation among specific states by establishing a system for exchanging information and evidence relating to the gathering of evidence in Canada on behalf of a foreign state for use in a criminal investigation and prosecution conducted by that state.

Canadian law enforcement and homeland security entities shared information with their U.S. and other investigative counterparts in a timely, proactive fashion.  Prosecutors worked in close cooperation with specialized law enforcement units that maintain advanced investigative techniques, crisis response capabilities, and border security capacity.  Canadian law enforcement entities, such as the Royal Canadian Mounted Police (RCMP), have clearly demarcated counterterrorism missions, as well as effective working relationships with provincial and municipal law enforcement and other elements of the Canadian Forces that have counterterrorism roles.

Canada has an extensive border security network and makes excellent use of travel document security technology, biographic and biometric screening capabilities at ports of entry, information sharing with host governments and other countries, and collection of advance passenger name record information on commercial flights.  Canada and the United States

PX209

continued their extensive border security collaboration under the auspices of the Beyond the Border initiative, as well as the Cross Border Crime Forum and other ongoing law enforcement exchanges.  Canadian security forces are very capable of effectively patrolling and controlling land and maritime borders.

Notable terrorism-related cases in 2014 included:

- One man pled guilty to avoid trial, courts found a second guilty, and acquitted a third man in a 2010 conspiracy to bomb targets in Ottawa and participate in and facilitate terrorist activity.  In September, Hiva Alizadeh received a 24-year sentence with no eligibility for parole for nine years in exchange for a guilty plea on a charge of possessing an explosive device for terrorist activity.  The government withdrew lesser charges of participating in and facilitating terrorist activity.  With credit for time in pre-trial custody, Alizadeh faced a maximum 18-year-sentence.  In July, a court found Pakistan-born Misbahuddin Ahmed guilty in the same plot of conspiring to facilitate a terrorist activity and participating in a terrorist activity, but acquitted him of possessing an explosive device.  In October, he received a 12-year prison sentence, reduced to 11 years with credit for time served in custody, with eligibility for parole after three years.  In November, authorities appealed the sentence.  The appeal remained pending as of December 2014.  In August, courts acquitted Khurram Sher on one count of conspiring to commit terrorism.
- On May 14, the Supreme Court unanimously upheld a national security certificate against Ottawa resident Mohamed Harkat, and reinstated a lower court decision that had found him guilty of being a sleeper agent of the al-Qa'ida network.  Harkat, who arrived in Canada in 1995 and was arrested in 2002, appealed the constitutionality of his certificate.  The Supreme Court had struck down the original certificate system in 2007 as unconstitutional because it did not allow defendants to know and challenge confidential evidence against them.
- On July 17, Canadian authorities handed down the country's first charge under a 2013 law that criminalizes travel for the purposes of terrorism.  Police charged Hasibullah Yusufzai, a Canadian national, in absentia for murder "in association with a terrorist group."  Yusufzai reportedly left the country in January for Syria.
- On July 25, an Ontario court sentenced Somali-born Canadian citizen Mohamed Hersi to a maximum sentence of 10 years imprisonment on one count each of attempting to participate in a terrorist activity and of counselling another person to participate in a terrorist activity.  The case was the first in which authorities laid charges of attempted terrorist activity.  Authorities had arrested Hersi in March 2011 at an airport in Toronto where authorities alleged he intended to travel to Somalia to join al-Shabaab.
- On August 11, the provincial Alberta Court of Appeal denied an appeal by Iraqi-born Canadian citizen Sayfildin Tahir Sharif (also known as Faruq Khalil Muhammad Isa) challenging his extradition to the United States, and ordered him to be extradited to face charges of complicity in terrorist bombings in Iraq that killed five American soldiers and seven civilians in 2009, and of aiding and abetting the murder of U.S. nationals abroad.  [Sharif was extradited to the United States in January 2015.]
- On November 13, the Supreme Court denied an appeal by Lebanese-born Canadian citizen Hassan Diab of his deportation order to France to face charges in the 1980

PX209

bombing of a Paris synagogue by the Popular Front for the Liberation of Palestine. Four passersby were killed, and forty others were injured in the bombing. Authorities extradited Diab on November 14.

Chiheb Esseghaier, a Tunisian national, and Raed Jaser, a Palestinian national, remained in custody awaiting trial on charges of conspiring to derail a VIA Rail passenger train between Toronto and New York City for terrorism purposes. Neither are Canadian citizens. Police charged the pair in April 2013. At year's end, courts had not set a date to try the cases.

On December 11, Canada's Supreme Court ruled that police may search a suspect's cellphone without a warrant under specific conditions that safeguard the broader constitutional right to privacy. In one case, for example, an individual was arrested after an armed robbery. His cellular phone, which was not password protected, was searched and found to contain a picture of the handgun used in the robbery and a draft text message that said "We did it."

**Countering the Financing of Terrorism:** Canada is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering. Canada is also an observer in the Council of Europe's Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures; the Caribbean Financial Action Task Force; and the Financial Action Task Force of Latin America. Canada is a member of the Egmont Group, a global association of financial intelligence units, and plays an active role in developing training to combat terrorist financing.

Canada has a rigorous detection and monitoring process in place to identify money-laundering and terrorist financing activities. FINTRAC is Canada's Financial Intelligence Unit and is responsible for detecting, preventing, and deterring money laundering and financing of terrorist activities.

In June, the Canadian government passed C-31, Economic Action Plan 2014, which amended the Proceeds of Crime (Money Laundering) and Terrorist Financing Act to enhance record keeping and registration requirements for financial institutions and intermediaries, and expand the circumstances in which FINTRAC or the Canada Border Services Agency can disclose information. C-31 also updated the review and appeal provisions related to cross-border currency reporting. C-31 came into effect on June 19.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:** Canada prioritizes collaboration with international partners to counter terrorism and regularly seeks opportunities to lead. Canada is a founding member of the Global Counterterrorism Forum (GCTF) and was also active in other fora dealing with counterterrorism, including: the OSCE, the UN, G-7, APEC, ASEAN and the ASEAN Regional Forum, Commonwealth, the International Civil Aviation Organization, the International Maritime Organization, the Global Initiative to Counter Nuclear Terrorism, and the

PX209

OAS.  Canada makes major contributions to the GCTF, including as co-chair of the Sahel Working Group.

Canada's Department of Foreign Affairs, Trade, and Development maintains a counterterrorism capacity building program, and provides training, funding, equipment, technical, and legal assistance to states to enable them to prevent and respond to a broad spectrum of terrorist activity.  Examples of Canadian counterterrorism assistance include:  border security; transportation security; legislative, regulatory, and legal policy development; human rights training; law enforcement, security, military, and intelligence training; chemical, biological, radiological, nuclear, and explosives terrorism prevention; mitigation, preparedness, response, and recovery; detecting and preventing terrorist financing; cybersecurity; and protection of critical infrastructure.

**Countering Radicalization to Violence and Violent Extremism:**  The RCMP's National Security Community Outreach program continued to promote interaction and relationship building with at-risk communities.  The Department of Public Safety's Cross-Cultural Roundtable on Security fosters dialogue on national security issues between the government and community leaders, including diaspora groups.  Both of these initiatives are part of Canada's Counterterrorism Strategy, which seeks specifically to reduce the risk of individuals succumbing to violent extremism and radicalization.  The government continued to work with non-governmental partners and concerned communities to deter violent extremism through preventative programming and community outreach.

## COLOMBIA

**Overview:**  In 2014, Colombia experienced a year of overall decreased terrorist activity according to Ministry of Defense statistics, thanks in part to successes in its military campaign against Colombia's largest terrorist organization, the Revolutionary Armed Forces of Colombia (FARC).  Although the government and the FARC reached tentative, partial agreements on land reform, political participation, and drug trafficking, no overall bilateral peace agreement had been concluded by the end of the year.  On June 10, the government announced that in January, it had begun exploratory talks with the other major terrorist organization in Colombia, the National Liberation Army (ELN), although formal peace negotiations had not started by year's end.

The Colombian government continued its military pressure against insurgents in 2014.  The number of members of Foreign Terrorist Organizations – including the FARC and ELN – and several minor guerrilla groups killed in combat in 2014 decreased to some degree, while the number of members of such organizations that were captured increased slightly.  At the same time, the total number of insurgents who demobilized in the same period rose by a small amount.  Both the FARC and ELN observed a ceasefire for the first round of the presidential elections on May 25, and the FARC again observed a ceasefire June 9 through 30 during the presidential runoff elections that confirmed President Santos' second term.  On November 17, President Santos suspended peace negotiations with the FARC after the group kidnapped Brigadier General Ruben Alzate Mora and four other hostages.  The FARC released all five

PX209

hostages by November 30, and peace talks resumed December 10.  The FARC declared an indefinite, unilateral ceasefire on December 20.

**2014 Terrorist Incidents:**  The FARC focused on low-cost, high-impact asymmetric attacks, as it did in 2013.  The most common forms of terrorist activity were the launching of mortars at police stations or the military, explosive devices placed near roads or paths, sniper attacks, roadblocks, and ambushes.  In 2014, Colombian government statistics showed a decrease in attacks from 2013.  Terrorist attacks on infrastructure – particularly on oil pipelines and energy towers, primarily by the FARC and the ELN – also decreased in 2014 compared to 2013 according to Ministry of Defense statistics.  Security forces and government buildings were the most common terrorist targets, although civilian casualties occurred throughout the year.  Attacks were most common along the Venezuelan border in the departments of Arauca, Norte de Santander, and La Guajira; in the southwestern departments of Nariño and Cauca; and in the northwestern department of Antioquia.

Among the terrorist attacks recorded in 2014, several were notable for their severity or significant press coverage:

- On March 22, the Daniel Aldana Mobile Column of the FARC admitted killing two policemen they had kidnapped and tortured on March 15 in the city of Tumaco, Nariño department.
- In the weeks following the June 10 announcement of exploratory talks with the government, the ELN launched several attacks, including the June 20 bombing of a police station in the capital city of Bogota that injured three people, and a June 29 attack on the Caño Limon-Coveñas oil pipeline in Arauca department that injured 13 people and resulted in suspended production at Occidental Petroleum Corporation's oil fields.
- On July 29, in advance of the August presidential inauguration, the ELN, in a demonstration of their ability to attack the capital city, placed five leaflet bombs in Bogota, with several exploding prior to detection.
- In the run up to the August presidential inauguration, the FARC increased terrorist attacks throughout the country.  On July 28, a FARC attack on a transmission tower in the port city of Buenaventura left 400,000 people without power.  On July 30, three soldiers died after land mines laid by FARC guerrillas detonated in Norte de Santander department.  In late July, a FARC attempt to attack a military base in the town of Miranda in Cauca department with grenades killed a four-year-old girl and wounded two others.  The FARC also blew up a road linking three southern jungle departments with the rest of the country, leaving a 10-meter-deep crater in the road.  FARC attacks in Meta department left 70 oil wells without power and approximately 16,000 people without potable water.  On July 1, thousands of barrels of oil were spilled from tanker trucks in a FARC attack on Putumayo department, causing environmental damage.
- On September 14, ELN snipers shot dead two workers sent to repair a damaged section of the Caño Limon-Coveñas pipeline that had been bombed by the group near the town of Teorama in Norte de Santander department.
- On September 16, the FARC – reportedly in alliance with the Usuga Clan criminal gang – attacked a police patrol in Tierradentro in Cordoba department, killing seven policemen and injuring five others.

266

PX209

- On November 5, FARC Sixth Front insurgents killed two indigenous leaders near the southwestern municipality of Toribío for taking down a sign honoring late FARC leader Alfonso Cano.  An indigenous court convicted and sentenced seven FARC guerillas to between 40 and 60 years in jail and 20 lashes for the murders.
- On November 16, the FARC kidnapped Brigadier General Ruben Alzate Mora and two companions near Quibdo in Choco department.  Several days earlier, the FARC kidnapped two soldiers in Arauca department.  Following the President's cessation of the peace negotiations and widespread condemnation, the FARC released all five hostages by November 30.
- On November 22, FARC guerillas launched an amphibious attack on Gorgona Island (the site of a national park) located 35 kilometers from the Colombian mainland off the Pacific coast, killing the island's police commander and injuring six police officers.

**Legislation, Law Enforcement, and Border Security:**  The legal regime governing the investigation and prosecution of terrorism cases in Colombia is governed by Section 906 of Colombia's Criminal Code, which phased in an accusatory system for the country's criminal justice system.  The purpose of Section 906 is to develop an evidence-based system of justice where cases are tried before a judge based on testimonial, physical, or documentary evidence with a "beyond a reasonable doubt" standard of proof.  Most terrorism cases are prosecuted under traditional legal statutes that are used for narcotics trafficking and organized crime, such as conspiracy and illegal possession of firearms authorized for exclusive use of the security forces.  There are some specialized statutes that the Attorney General Office's specialized Counterterrorism Unit uses, such as "rebellion" under Section 467 of Colombia's Criminal Code.  Colombia's rebellion statute criminalizes "those who, through armed conflict, seek to overthrow the Constitutionally-enacted government of Colombia."

The Attorney General Office's specialized Counterterrorism Unit has prosecutors assigned at the national level in Bogota, and in regions of conflict throughout the country.  The unit has developed a great deal of expertise in investigating and prosecuting acts of terrorism and insurgency with the Attorney General's own Technical Criminal Investigative Body, Colombia's National Police (CNP), and the country's military forces.  In 2014, the Attorney General's Office also reestablished the National Judicial Police Council – presided over by the Attorney General and including members of the CNP and other agencies with investigative authority – to develop minimum standards for investigations and forensics, and to better standardize investigative basic training.  Colombia also worked on securing international accreditation for its forensic laboratories.

The CNP has specialized counterterrorism units in the Intelligence, Anti-Kidnapping, and Judicial Police Directorates, all with advanced investigation techniques and crisis response capabilities.  Law enforcement units display clear and effective command and control within each organization.  These specialized law enforcement units are properly equipped and supported with relevant training.  Counterterrorism missions are demarcated to a limited extent between law enforcement and military units.  Colombia's contemporary military and law enforcement units have an improved record of accountability and respect for human rights.  There is room for improvement in interagency cooperation and sharing of terrorism-related information.  No single

PX209

agency has jurisdiction over all terrorism-related investigations and post-incident response, sometimes resulting in poor information sharing and cooperation.

In 2014, Colombian authorities launched the operations of several new military task forces to enhance coordination in combating terrorism. The CNP managed fusion centers to ensure all operational missions coordinate intelligence, investigations, and operations under the command of regional police commanders. Additionally, the National Police Intelligence Directorate continued to operate a 24-hour Citizen Security Center tasked with detecting, deterring, and responding to terrorist attacks, among other crimes.

Colombian border security remained an area of vulnerability. Law enforcement officers faced the challenge of working in areas with porous borders and difficult topography plagued by the presence of illegally armed groups and illicit drug cultivation and trafficking. The CNP lacked the manpower to enforce uniform policies for vehicle or passenger inspections at land border crossings. Biometric and biographic screening was conducted only at international airports. Of a total force of 180,000 officers, the CNP has only 1,500 officers assigned to Customs Enforcement (air, land, and sea ports and borders) duties. The CNP's Customs Police are granted authorities for customs enforcement by Colombia's Revenue and Customs authority and do not have authority to conduct primary inspections at air, land, or sea ports.

Improved relations with neighboring Ecuador and Venezuela have led to some increased cooperation from those countries on law enforcement issues. Colombia also continued cooperation and information sharing with the Panamanian National Border Service. The Colombian government does not use advance passenger name records.

Colombia remained a key transit point for the smuggling of third-country nationals who may raise terrorism concerns seeking to enter the United States illegally through the border with Mexico. Porous borders with Ecuador and Venezuela facilitate the movements of third-country nationals who may raise terrorism concerns through Colombia, and existing maritime narcotics smuggling routes facilitate their onward movement to Central America. Colombian Immigration lacks the personnel and enforcement authority to adequately respond to this growing threat, and the ability to repatriate citizens to their home countries via air.

In August, Colombian police arrested Duverney Ospina, a suspected FARC rebel accused of participating in the kidnapping of three U.S. citizens held hostage from 2003 to 2008 after their plane crash-landed in the jungle in Caqueta department.

In October, ex-FARC Commander Alexander Beltran Herrera was sentenced by a U.S. federal judge to 27 years in prison for hostage taking and aiding and abetting, two and a half years after Colombia extradited him to the United States for holding the three U.S. citizens hostage.

In November, FARC member Diego Alfonso Navarrete-Beltran was also extradited to the United States to face kidnapping charges of the same three U.S. citizens.

From January through October 2014, Colombia saw a 65 percent reduction in kidnappings from the same period in 2005. While kidnappings as a whole have declined in recent years,

PX209

they continued to pose a real threat, especially in rural and insurgent-influenced portions of Colombia.  Organized extortion networks inhibit economic growth and subvert the rule of law where they are active, and the alleged failure of victims to accede to extortion demands is regularly cited as the cause for terrorist attacks.  The CNP Anti-Kidnapping and Anti-Extortion Directorate have an international kidnapping unit to address kidnappings involving foreign nationals.

Law enforcement cooperation between Colombia and the United States remained strong.  Evidence sharing and joint law-enforcement operations occurred in a fluid and efficient manner, with information gathered in Colombia contributing to hundreds of prosecutions of U.S.-based criminals and organizations.  The Attorney General Office's Counterterrorism Unit reported no investigations and prosecutions of acts of terrorism against U.S. citizens during the year.

Colombia continued to participate in the U.S. Department of State's Antiterrorism Assistance program.  The program provided instruction and resources to assist Colombia in building advanced, self-sustaining CNP capabilities to secure borders from terrorist transit, to investigate terrorists and terrorist incidents, and to protect critical infrastructure.  Colombia continued to establish itself as a regional provider of counterterrorism training, particularly with regard to anti-kidnapping efforts and dignitary protection.

**Countering the Financing of Terrorism:**  Colombia is a member of the Financial Action Task Force of Latin America, a FATF-style regional body.  Colombia stands out as a regional leader in the fight against terrorist financing, and has become a key part of a regional financial intelligence unit initiative aimed at strengthening information sharing among Latin American countries.  Colombia is a member of the Egmont Group, a global association of financial intelligence units.

Asset forfeiture cases developed by the Attorney General Office's Counterterrorism Unit were referred to the Attorney General Office's National Money Laundering and Asset Forfeiture Unit.  Given the volume of case referrals from virtually all units in the Attorney General's Office, however, asset forfeiture prosecutors, who were generally very experienced, often found themselves overextended.

The Attorney General's Office used the same legal asset forfeiture tools for seizing assets in all criminal cases, including organized crime, drug trafficking, and terrorism.  The government passed a new asset forfeiture law on January 20 that established a technical legal regime to streamline the manner in which such cases are processed.  The Attorney General's Office also continued a process of restructuring that includes the creation of more specialized police units with expertise in asset forfeiture and organized crime, especially financial crime.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

PX209

**Regional and International Cooperation:**  Colombia is a founding member of the Global Counterterrorism Forum and is actively involved in the UN, OAS and its Inter-American Committee Against Terrorism, the Pacific Alliance, and the Union of South American Nations.  The CNP operates an Interpol office of approximately 70 analysts, agents, and support staff.  Colombia also led the creation of the American Police Community (Ameripol) in 2007, and helped found the Latin American and Caribbean Community of Police Intelligence in 2005, whose Technical Secretariat is based in Bogota.

Colombia is becoming a leader in providing security training and assistance to other countries in the region.  In 2014, Colombia conducted security training for over 700 non-Colombian individuals – including individuals from Central America and the Caribbean – in citizen security, crime prevention and monitoring, and military and police capacity building. Colombia also provided anti-kidnapping, anti-extortion, hostage negotiation, and cyber training to international partners in 2014.  The CNP and military continued to operate schools that train security personnel from around the region.  Colombia provided judicial training to regional judges and prosecutors in handling drug trafficking and terrorism cases, offered basic and advanced helicopter training to pilots from countries throughout Latin America, and maintained its elite *Lancero* and *Jungla* special forces courses open to students from other countries. Colombia's Congress approved and President Santos subsequently signed an information sharing agreement with NATO, which at year's end was under consideration in the Colombian Constitutional Court.

**Countering Radicalization to Violence and Violent Extremism:**  Colombia employed a robust and modern multi-agency approach to countering radicalization and violent extremism, with a focus on encouraging individual members and entire units of the FARC and ELN to demobilize and reintegrate into society.  In 2014, the number of FARC and ELN members who demobilized increased slightly over 2013.  The demobilization and reintegration programs provide medical care, psychological counseling, education benefits, technical training, and job placement assistance for demobilized combatants.  In order to receive benefits, demobilized combatants must check in monthly with program managers.  Recidivism rates were estimated at between 10 and 20 percent by the Colombian Agency for Reintegration.

The Colombian armed forces and police employed a number of fixed and mobile radio transmitters to broadcast strategic messaging to individuals considering leaving the FARC or ELN.  Such messaging was also seen in print, television, and alternative media.  The Colombian military and police employed the same media forms to counter FARC and ELN recruitment efforts.  Additionally, the Ministry of Defense organized highly publicized festivals and social events with celebrity participation to discourage the recruitment of vulnerable youth.  Moreover, with international community support, the government's Inter-Institutional Committee for the Prevention of Recruitment of Children supported numerous recruitment prevention initiatives all over the country reaching more than 500,000 children at high risk.  The Committee also worked with mayors to include prevention of recruitment activities in their development plans.

**MEXICO**

PX209

**Overview:**  The Mexican government remained vigilant against domestic and international terrorist threats in 2014.  There were no known international terrorist organizations operating in Mexico, despite several erroneous press reports to the contrary during 2014.  There was no evidence that any terrorist group has targeted U.S. citizens in Mexican territory.  The Government of Mexico passed amendments to its Federal Penal Code that strengthened the country's legal framework to address acts of terrorism, including terrorist financing.  Mexican authorities cooperated well with relevant U.S. government agencies on third-country nationals who may raise terrorism concerns.

**Legislation, Law Enforcement, and Border Security:**  On February 11, the Senate approved amendments to the Federal Penal Code, the Federal Criminal Procedure Code, the Organized Crime Law, the Federal Fiscal Code, the Asset Forfeiture Law, and Constitutional implementing legislation.  These amendments strengthened Mexico's legal framework to address acts of terrorism, terrorist financing and third-party assistance to terrorist financing, attacks against internationally protected persons, the conspiracy to commit terrorism, theft of radioactive or nuclear materials, and the sanctioning of the freezing or forfeiture of terrorist assets based on domestic and international intelligence sources.  The amendments also increase the minimum sentences for acts of terrorism from six to 40 years to a minimum of 15 to 40 years, strengthened the penalties for crimes committed using illicit resources, and created an exception to rules governing the dissemination of third-party fiscal data in order to comply with new terrorist financing laws.

These amendments also sought to more closely align Mexico's federal legislation with several of the international instruments related to countering terrorism, such as the International Convention for the Suppression of the Financing of Terrorism, the International Convention for the Suppression of Terrorist Bombings, and the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons.  On February 5, Mexico passed a national code of criminal procedure that aimed to harmonize the criminal justice systems of Mexico's 31 states and Federal District, and increase justice sector transparency, efficiency, and impartiality.

The U.S. Department of State's Export Control and Border Security program (EXBS) funded training on identification and interdiction of dual-use items and materials that included participants from Mexican law enforcement agencies (Federal Police, Customs), Defense, the Office of the Prosecutor General, Migration, Committee for Nuclear Security and Safety, and others.  EXBS also donated equipment for use at borders, airports, and major seaports to enhance Mexico's capacity and readiness to identify and interdict dual-use materials of interest.  The U.S. Department of State also provided the Government of Mexico with fixed and mobile non-intrusive inspection equipment and related detection devices for use at Mexico's points of entry, border crossings, and internal checkpoints to increase border security and capabilities to interdict the illicit movement of narcotics, currency, weapons, goods, and migrants.

Mexico continued to participate in the Department of State's Antiterrorism Assistance (ATA) program, and Mexican law enforcement received a range of ATA training in border security measures, investigative techniques, and dignitary and infrastructure protection operations.

PX209

**Countering the Financing of Terrorism:**  Mexico belongs to the Financial Action Task Force of Latin America, and the Caribbean Financial Action Task Force, both Financial Action Task Force-style regional bodies.  Mexico is a member of the Egmont Group, a global association of financial intelligence units.

In January, the Head of the Mexican financial intelligence unit publicly disseminated rules outlining its power to order financial institutions to freeze the assets of designated persons and entities, namely those involved in illicit proceeds.

In August, rules limiting what individuals and businesses could deposit in banks were changed. Previously, banks could not accept more than US $4,000 per month from an individual account holder, or more than US $14,000 from business entities operating in the U.S. border region or defined tourist areas.  The changes allow border- and tourist-area businesses to exceed the US $14,000 per month cash deposit limit provided that they: 1) have been operating for at least three years; 2) provide additional information to financial institutions justifying the need to conduct transactions in U.S. dollars cash; and 3) provide two years of financial statements and tax returns.  The limit on individual account holders remained unchanged.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Mexico continued to work with the OAS Inter-American Committee Against Terrorism (CICTE) to implement a joint counterterrorism work plan, which includes nonproliferation and WMD interdiction.  OAS/CICTE collaborated closely with the Export Control and Related Border Security Program on this initiative, and the Committee funded multiple CICTE workshops in Mexico City focused on building awareness and best practices.  In May, Mexico hosted the Global Initiative to Combat Nuclear Terrorism plenary in Mexico City.

Mexico has supported counterterrorism capacity building and cooperation with other states by hosting a first-ever Regional Advanced Commodity Identification Workshop in July.  Sponsored by the U.S. Department of Energy, the course took place at the headquarters of Mexico's customs agency and featured Mexican and Panamanian instructors, and included participants from Mexico, Costa Rica, Guatemala, and Panama.

## PANAMA

**Overview:**  In recent years, the most direct terrorism threats to Panama have been posed by the 57th Front of the Revolutionary Armed Forces of Colombia (FARC), which has long operated illegally in the Darien region of Panama.  Panama's successes at confronting the  FARC's presence with patrols and raids against FARC camps, as well as working closely with Colombia to secure its border, has all but eliminated the direct security threat posed by FARC within Panamanian territory, although lingering threats from the FARC remnants and narco-trafficking groups remain. Additionally, the Panama Canal Authority's vigilance, along with international support, contributed to the maintenance of a secure Panama Canal.

PX209

Panama's strategic location as a gateway between Central and South America, the large volume of cargo transiting the Canal and its free trade zones make the country vulnerable to illicit practices such as the diversion of strategic items to unauthorized users.  Additionally, expansion in the banking and finance sectors, the establishment of a new diamond exchange, offshore banking facilities, tax shelters, and free trade zones leave Panama vulnerable to illicit arms and narcotics trade along with other associated forms of money laundering.

Panama's Darien region remained a significant and growing pathway for human smuggling with counterterrorism implications.  In 2014, more than 7,000 migrants were stopped attempting to illegally cross into Panama.  Representatives of the Department of Homeland Security-Homeland Security Investigations and the Federal Bureau of Investigation worked with Panamanian authorities to identify smuggled aliens with potential terrorism ties.

**Legislation, Law Enforcement, and Border Security:**  Panama has not passed a comprehensive counterterrorism legal framework; however, a 2013 law modified language in the existing Penal Code to criminalize certain terrorism-related crimes for periods of time ranging from six months to six years imprisonment.

Panama continued to lack a National Control List and a Strategic Trade Control law.  Initial efforts to publish a National Control List in 2013 suffered a setback early in 2014, and a change in government removed from office many of the individuals involved in the process of pursuing the publishing of a National Control List.

The Panamanian government continued its efforts to exert sovereignty in the underserved Darien region through the use of security forces.  The government's primary security force for the Darien region is the National Border Service (SENAFRONT).  SENAFRONT's successes over previous years have degraded the capabilities of FARC to the point that they can no longer maintain a permanent militarized presence within Panamanian territory; they and smaller narco-trafficking organizations and criminal gangs from Colombia continued to cause instability within the territory.  In addition to units within SENAFRONT, the Panamanian government also maintains counterterrorism units within the National Air-Naval Service, the Panamanian National Police, and the Institutional Protection Service.

Panama received significant international praise for its 2013 actions to search and detain the North Korean-flagged merchant vessel "Chong Chon Gang" for transiting the Canal with illicit cargo.  The search of the vessel found arms and related materiel that violated UN Security Council Resolutions prohibiting transfer of such items to North Korea.  In February 2014, North Korea paid a US $693,333 fine to the Panama Canal Authority, and the ship left Panama with most of the crewmembers.  Panama initially detained all 33 members of the crew and charged the Captain, First Officer, and Political Officer of the vessel.  After reviewing the evidence, the judge assigned to the case dismissed the charges against the three officers and they were released from custody.  At year's end, the vessel's cargo remained in Panamanian custody pending the results of an appeal filed by the Public Ministry.

PX209

A key focus of counterterrorism efforts in Panama was securing the borders as well as the airports and seaports throughout the country.  Panama continued to participate in the Department of State's Antiterrorism Assistance program, which provided instruction and resources to assist Panama to build its capacity to achieve these objectives and prevent use of Panama as a terrorist safe haven.  U.S. Customs and Border Protection (CBP) continued to assist Panamanian authorities in their efforts to improve airline screening at Tocumen International Airport.  Both CBP and the U.S. Department of State's Export Control and Border Security Program (EXBS) continued to work with the Government of Panama to refine risk analysis and targeting models to identify and segment high risk travelers and cargo.  Mobile security teams continued operations throughout Tocumen International Airport, identifying and intercepting fugitives, persons associated with organized crime, and individuals known or suspected of association with terrorist networks.

EXBS's engagement with the Panamanian government increased in 2014 as a result of the opening of a regional office in the U.S. Embassy in Panama City.  EXBS coordinated and sponsored a wide array of training activities designed to develop and enhance the Government of Panama's ability to detect, identify, and interdict shipments of strategic goods, WMD and WMD precursor materials, and other items of interest.

**Countering the Financing of Terrorism:**  Panama is a member of the Financial Action Task Force of Latin America, a Financial Action Task Force (FATF)-style regional body.  As of December, Panama was also a member of the Egmont Group of Financial Intelligence Units.

Panama's anti-money laundering and countering the financing of terrorism (AML/CFT) regime is in a state of significant evolution.  In February, the IMF published an assessment report which found that Panama failed to attain an adequate level of compliance on nearly all of the FATF recommendations.  As a result, Panama was immediately placed on the FATF public statement in June.  Panama was referred to the FATF review process, which resulted in the development of an action plan designed to address Panama's AML/CFT deficiencies.  President Juan Carlos Varela's government, which took office in July, offered high-level political commitment to implement the actions required by the FATF action plan.  Panama continued working with the Inter-American Development Bank to draft new laws that adequately criminalize money laundering and terrorist financing, as well as establishing the legal framework necessary to freeze terrorist assets.  In 2014, DOJ's Office of Overseas Prosecutorial Development, Assistance, and Training (OPDAT) also began working with the Panamanian government to enhance the capacity of institutions to prosecute financial crimes involving money laundering and terrorism financing.

Panama's financial intelligence unit, the Financial Analysis Unit, bears responsibility for analyzing all suspect financial transactions.  This unit, however, has been widely considered ineffective due to the lack of resources and political intervention.  The result has been uneven enforcement of existing AML/CFT legislation.  The Colon Free Zone, a port outside of the Panama Canal that is outside of Panama's normal customs and financial regulation, remains vulnerable to exploitation for illicit financial activities due to its lax customs, trade, and transaction oversight.

PX209

The legal framework in Panama permits the freezing, seizure, and confiscation of the instruments and proceeds of criminal enterprises, including money laundering and terrorist financing; however, it does not provide for the confiscation of property of corresponding value and the application of other measures.  Panama monitors and regulates money/value transfer and other remittance services for real estate agents, exchange houses, and transfer services.

While there is no obligation for non-profit organizations to file suspicious transaction reports, the Panamanian government monitors non-profit organizations for suspicious transactions.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Panama became the first Latin American nation to join the Coalition to Counter the Islamic State in Iraq and the Levant.  Panama participates in UN and regional security initiatives such as the OAS Inter-American Committee Against Terrorism. Panama maintained a well-established border commission with Colombia, and continued to cooperate on training with partners in the region.  The Colombian Army, Navy, and the National Police provided operational training in Panama for members of the Panamanian Public Forces through the U.S.-Colombia High-Level Strategic Security Dialogue.  Panama hosted personnel from Belize, Colombia, and Costa Rica at its training facilities.  EXBS sponsored a regional WMD Commodity Identification Training course in Panama City, which included instructors from Panama and Mexico and students from Panama, Costa Rica, and Colombia.  EXBS also collaborated with U.S. Customs Border Protection to assess border security measures along the Panama-Costa Rica border region.

**Countering Radicalization to Violence and Violent Extremism:**  The United States and Panama continued to work together to create opportunities for the residents of the Darien region to deter possible efforts at local recruitment by the FARC, transnational criminal organizations, and narco-trafficking organizations.  Through the Central American Regional Security Initiative programs, local youth received vocational and technical training to better prepare them to find jobs or start their own businesses, and indigenous entrepreneurs obtained assistance with the marketing of their local crafts for sale both domestically and internationally.

The addition of a temporary Bureau of International Narcotics and Law Enforcement (INL) Air Wing (AW) program supported the presence and objectives of SENAFRONT, the Attorney General's Office, the Ministry of Health, the Ministry of Environment, the Ministry of Education, the Ministry of Government, the Ministry of Public Security, the Ministry of Social Development, the National Secretariat for Higher Education, Science, Innovation, and Technology, and the Secretariat for the Sustainable Development of the Province of the Darien and the Annex Comarcas.  The INL AW-facilitated travel allowed Panamanian officials to reaffirm for local populations, particularly local youth populations, the presence of the state in a remote region, and supported the Panamanian government's effort to ensure not just security but social development in the underserved Darien region.

**PARAGUAY**

PX209

**Overview:**  In 2014, the Government of Paraguay continued to cooperate with the United States on counterterrorism matters, and the U.S. Department of State's Antiterrorism Assistance program contributed to building Paraguay's counterterrorism law enforcement capacity. Paraguay continued to face challenges of ineffective immigration, customs, and law enforcement controls along its porous borders, particularly the Tri-Border Area (TBA) with Argentina and Brazil.  Illicit activities within the TBA remained potential funding sources for terrorist organizations, most notably Hizballah.

Since 2008, persons claiming to be part of the Paraguayan People's Army (EPP) – an internal criminal group dedicated to a socialist revolution in Paraguay – have been active in the northern departments of Concepcion and San Pedro.  The group has been involved in violence designed to intimidate the population and government.  The Government of Paraguay believes the EPP to be a small, decentralized group of 20 to 100 members.  In September, former EPP members – reportedly expelled from the group over disciplinary issues – created the Armed Peasant Association (ACA).  The ACA has similar leftist pursuits and is believed to consist of 13 members.  EPP/ACA activity consisted largely of isolated attacks occurring on remote police and army posts, or against ranchers and peasants accused of collaborating with Paraguayan security services.

**2014 Terrorist Incidents:**  The EPP conducted two high profile kidnappings, which received significant press coverage:

- In April, EPP members kidnapped a Paraguayan teenager who was released after 267 days in captivity on December 25, after his family reportedly paid a US $500,000 ransom.
- In July, EPP members kidnapped a police official who was believed to still be held by the EPP at year's end.

**Legislation, Law Enforcement, and Border Security:**  Paraguay pursued individuals suspected of terrorist crimes under laws passed in 2010 and 2011.  The Paraguayan government continued to make use of a 2013 counterterrorism law that allows for the domestic deployment of the Paraguayan military to counter internal or external threats.  Counterterrorism functions are handled by the Paraguayan National Police Secretariat for the Prevention and Investigation of Terrorism.  Military forces and police officials operated jointly in 2014 in the San Pedro, Concepcion, and Amambay departments, with limited success.

Few steps were taken to address security issues at land border crossings, particularly with respect to the large and generally unprotected borders with Argentina and Brazil.  The minimal police and military presence along these borders allowed for a largely unregulated flow of people, contraband, and money.  Paraguay's efforts to provide more effective law enforcement and border security were hampered by a lack of interagency cooperation and information sharing, as well as pervasive corruption within security, border control, and judicial institutions.

PX209

Paraguay continued to participate in the Department of State's Antiterrorism Assistance program, which provided instruction and resources to assist Paraguay to build its capacity to secure borders and ports of entry to prevent the transit of terrorists and material.

**Countering the Financing of Terrorism:**  Paraguay is a member of the Financial Action Task Force of Latin America, a Financial Action Task Force (FATF)-style regional body, and is a member of the Egmont Group, a global association of financial intelligence units.  Paraguay has both counterterrorist financing legislation and the ability to freeze and confiscate terrorist assets without delay, although there were no terrorist financing convictions or actions to freeze in 2014.

Paraguay requires the collection of data for wire transfers.  Paraguay has porous borders that have facilitated a wide variety of illicit activities, however.  There is a lack of concerted law enforcement efforts to implement their laws.  Significant quantities of money are laundered through businesses or moved in cash.  Paraguay does not monitor non-profit organizations to prevent criminal misuse or terrorist financing.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Paraguay collaborated with Brazil and Argentina in border protection initiatives, regional exchanges, and discussions on counterterrorism and law enforcement projects.  In February, Paraguay was named Vice-President of the OAS Inter-American Committee Against Terrorism.

## PERU

**Overview:**  The Shining Path (Sendero Luminoso or SL) remained a threat to Peru's internal security, although the terrorist organization was relatively quiet in 2014 in comparison to previous years.  SL's membership numbers continued to dwindle, and it consisted of one single active faction by the end of 2014.  Its area of activity and influence was confined to the special military emergency zone known as the Apurimac, Ene, and Mantaro River Valley (VRAEM), a remote and rugged region slightly larger than Switzerland which accounts for over half of the cocaine produced in Peru.  SL sustained itself through its involvement in drug production, narcotics trafficking, and by extorting "revolutionary taxes" from others involved in the drug trade.  It continued to use Maoist philosophy to justify its illegal activities.

SL was weakened as a consequence of an August 2013 operation conducted by Peruvian security forces that resulted in the deaths of two of the terrorist organization's top four commanders, Orlando Borda (Comrade Alipio) and Martin Quispe Palomino (Comrade Gabriel).  In March, the then-chief of the VRAEM Special Command, Army General Leonardo Longa, claimed that the Shining Path only had around 100 armed fighters left in the emergency zone, concentrating more on criminal activities, primarily drug-related.

According to Peruvian government statistics, the SL committed 20 terrorist acts in 2014, in comparison to 49 terrorist acts recorded in 2013 and 87 acts in 2012.  The SL's reduced activity

PX209

and relatively low profile in comparison to previous years suggests that it has struggled to reconsolidate in the wake of the deaths of Alipio and Gabriel. Over the course of the year, the terrorist organization pursued a more selective strategy of "shoot-and-run" attacks. In 2014, SL attacks resulted in the deaths of two soldiers and the wounding of six soldiers, two police officers, and seven civilians. In 2013, three soldiers were killed in the VRAEM while 19 members of the security forces lost their lives in armed confrontations with the SL in 2012.

Security forces took limited actions to counter the SL during 2014, reflecting President Humala's strategy, announced in July 2013, of gaining control of territory in the VRAEM at the lowest cost in human lives. Security forces carried out various operations that freed at least 20 women and children held against their will by SL, as well as arresting or killing several SL members in the VRAEM's Junin Region.

SL founder and leader Abimael Guzman and key accomplices remained in prison serving life sentences stemming from numerous crimes committed in the 1980s and 1990s.

On October 28 in Lima, Peruvian police arrested Muhammad Ghaleb Hamdar, a 28-year old Lebanese national, for suspected links to Hizballah. According to reports, officers at the scene found residue and traces of military grade explosives in Hamdar's apartment, as well as TNT, gunpowder, and detonators in the outdoor trash can assigned to the unit. The National Police announced that Hamdar had confessed to being a member of Hizballah but Hamdar denied this on November 13, saying through a lawyer that the confession had been coerced. In November, a court ordered that Hamdar be detained for up to 18 months in pre-trial detention while prosecutors carry out an investigation and prepare charges.

**2014 Terrorist Incidents:** Notable SL activity included:

- On February 17, a group of approximately 30 SL fighters attacked a camp that was housing workers expanding the Camisea gas pipeline in Cusco's Echarate district. The attack left one pipeline worker injured with a gunshot wound to the abdomen.
- On October 13, SL snipers opened fire on soldiers providing protection for a construction company working on a road in Ayacucho's Huanta province. One soldier was killed and four others were wounded.
- On October 28, a SL attack in the Junin province of Satipo left two soldiers wounded.
- On November 18, a SL sniper wounded a soldier in Cusco's Echarate district.

**Legislation, Law Enforcement, and Border Security:** In the past three decades, Peru has passed a variety of laws specifically designed to combat terrorism. Despite high-level political will to counter terrorism, implementation and interagency coordination remained problematic. Communication gaps between senior-level policy planners and operators on the ground persisted, compounded by the high turnover rate among senior security leaders. In general, relations between the military and the Peruvian National Police were characterized by competition and mistrust. However, cooperation between the specialized counterterrorism police and military units improved.

PX209

The government remained hampered by excessive bureaucracy, resource constraints, corruption, and a lack of training.  New recruits to the security forces were often sent to emergency zones with inadequate training and were poorly equipped to fight battles in a dense, jungle environment.  Corruption was widespread within both the judiciary and security forces.

President Humala continued reauthorizing 60-day states of emergency in the VRAEM and the Upper Huallaga Valley emergency zones, giving the armed forces and police additional authority to maintain public order.  The following civil liberties were suspended in emergency zones:  freedom from search or arrest without warrant, freedom of movement, freedom of assembly, and inviolability of citizens' homes.

Peru steadily improved its ability to detect, deter, and respond to terrorist incidents in the 22 years since police captured the SL's founder and chief ideologue, Abimael Guzman.  Improved cooperation and information sharing between specialized police and military counterterrorism units helped make possible the capture of Artemio in February 2012, and played a major role in the August 2013 military operation that resulted in the deaths of Alipio and Gabriel.

Immigration authorities collected no biometrics information from visitors.  Citizens of neighboring countries were allowed to travel to Peru by land using only national identification cards.  There was no visa requirement for citizens of most countries in Western, Central, and Eastern Europe, as well as Mexico.  Peruvian immigration used a database called "Movimiento Migratorio" at 18 points of entry to track entries and exits of travelers, but the database is only a local database that tracks outstanding warrants.

The most significant Peruvian government actions against SL this year included:

- On April 9, Peruvian police arrested 28 leaders of the Movement for Amnesty and Fundamental Rights – a front organization that advocates for the release of imprisoned SL founder Abimael Guzman.  Those arrested included two of Guzman's long-time lawyers, Afredo Crespo and Manuel Fajardo.  The 28 were charged with terrorism and terrorist financing using narcotics revenue.  On August 4, the National Anti-Terrorism Court, citing lack of evidence, ordered that the 28 be released from pre-trail detention.  Although the court ordered the detainees released, it did keep the charges intact so the trial can move forward.
- A May 16 clash between security forces and the SL in the Junin region left one SL guerilla dead and another wounded.  The rest of the column was able to escape, but soldiers recovered weapons, ammunition, and communication equipment.
- On June 17, a combined Peruvian military and police force killed three SL terrorists in the VRAEM emergency zone.  The joint patrol recovered a number of weapons, including a heavy machine gun that SL fighters reportedly stripped from a Russian-made Mi-17 helicopter they shot down in a 2009 attack that killed three soldiers.
- In August, security forces rescued six adults and three children from a work camp in the VRAEM used by SL to provide food and logistic support for its members.
- In August, police officers in the UHV arrested Oscar Silva, who is believed to have been the second-in-command to "Comrade Artemio," who was captured in February 2012.

PX209

- In September, soldiers rescued 11 people, including six children, who were being forced to work for SL in Junin's Satipo district.
- On November 2, security forces announced the arrest of Filemon Huillcayaure, considered one of the top financiers of SL in the VRAEM.

On October 28, 2014, Peruvian police arrested Muhammad Amadar, a suspected member of Hizballah, for allegedly plotting attacks on Israeli and Jewish targets.

Peru continued to participate in the Department of State's Antiterrorism Assistance program, which provided instruction and resources to assist the country in building its capacity to secure borders and ports of entry to prevent the transit of terrorist and material and to prevent the use of terrorist safe havens.

**Countering the Financing of Terrorism:**  Peru is a member of the Financial Action Task Force of Latin America, a Financial Action Task Force-style regional body.  Peru is also a member of the Egmont Group, a global association of financial intelligence units.

In 2014, the Government of Peru made progress in implementing its National Plan to combat money laundering and terrorist financing.  The most notable advancement was the Public Ministry's creation of a dedicated Specialized Office of Prosecutors on Money Laundering and Asset Forfeiture (ML/AF) in January.  The Special Office is led by the National Superior Prosecutor and Coordinator for ML/AF, a new position empowered to facilitate interagency coordination and information sharing.

Under Decree Law 25475, any form of collaboration with terrorism, including economic collaboration, is criminalized.  The Peruvian MFA registers non-profit organizations that receive international development assistance and monitors them for general misuse, but does not specifically monitor terrorist financing.

For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*: http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Countering Radicalization to Violence and Violent Extremism:**  The Government of Peru has publicly noted the importance of heavily investing in the VRAEM as a means of breaking the symbiotic relationship that has existed for years between the VRAEM's residents and SL.  Since 2007, the Peruvian government has provided approximately US $5.4 billion to districts and regions in the VRAEM.  The funds have been used to pave roads, provide basic health and education services, and establish a greater state presence.  In May, the Agriculture Ministry announced that it would invest US $586 million in the VRAEM in 2014 in alternative crops to coca – primarily cacao, coffee, and oil palms.  In December, the head of VRAEM Coordinating Office announced that the government would dedicate US $586 million on development projects in the VRAEM in 2015.

PX209

The official position of the Peruvian National Penitentiary Institute is that prison is meant to rehabilitate and reintegrate prisoners, especially terrorists. A psychological evaluation is required of incarcerated terrorists before parole can be granted.

## VENEZUELA

**Overview:** In May, for the ninth consecutive year, the U.S. Department of State determined, pursuant to section 40A of the Arms Export Control Act, that Venezuela was not cooperating fully with U.S. counterterrorism efforts. The Venezuelan government took no action against senior Venezuelan government officials who have been designated as Foreign Narcotics Kingpins by the U.S. Department of the Treasury for directly supporting the narcotics and arms trafficking activities of the Revolutionary Armed Forces of Colombia (FARC).

The International Development Bank, a subsidiary of the Development and Export Bank of Iran, continued to operate in Venezuela despite its designation in 2008 by the U.S. Treasury Department under E.O. 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and their Supporters").

There were credible reports that Venezuela maintained a permissive environment that allowed for support of activities that benefited known terrorist groups. Individuals linked to FARC, National Liberation Army, and Basque Fatherland and Liberty were present in Venezuela, as well as Hizballah supporters and sympathizers.

**Legislation, Law Enforcement, and Border Security:** The Venezuelan criminal code and additional Venezuelan laws explicitly criminalize terrorism and dictate procedures for prosecuting individuals engaged in terrorist activity. Following a wave of anti-government protests early in 2014, the Venezuelan government introduced a series of counterterrorism laws likely intended to suppress future public demonstrations.

Venezuelan military and civilian agencies perform counterterrorism functions. Within the Venezuelan armed forces, the General Directorate of Military Counterintelligence and the Command Actions Group of the National Guard have primary counterterrorism duty. The Bolivarian National Intelligence Service and the Division of Counterterrorism Investigations in the Bureau of Scientific, Penal, and Criminal Investigative Corps within the Ministry of Interior, Justice, and Peace have primary civilian counterterrorism responsibilities. The degree of interagency cooperation and information sharing among agencies is unknown due to a lack of government transparency.

Border security at ports of entry is vulnerable and susceptible to corruption. The Venezuelan government did not perform biographic and biometric screening at ports of entry or exit. There was no automated system to collect advance passenger name records on commercial flights or to cross-check flight manifests with passenger disembarkation data.

In November, the Venezuelan government charged eight individuals, including five Trinidad and Tobago nationals, with terrorism and criminal conspiracy. The Venezuelan Attorney-General reported that the men were arrested in March when Venezuelan security forces raided a Caracas

PX209

hotel and found them in possession of computers, sophisticated communications gear, and military apparel to allegedly carry out "pre-jihad training."

**Countering the Financing of Terrorism:**  Venezuela is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body; the Inter-American Drug Abuse Control Commission Anti-Money Laundering Group; and the Egmont Group of Financial Intelligence Units.  In July, the CFATF determined that Venezuela had made sufficient progress on the recommendations in Venezuela's FATF action plan to warrant moving the country from periodic review once every six months to periodic review once every two years.  CFATF determined Venezuela was "compliant," "largely compliant," or "partially compliant" with the recommendations.  CFATF noted Venezuela still needed to improve its compliance with several recommendations as well as its implementation of various anti-money laundering/counterterrorist financing (AML-CFT) laws and regulations.  Venezuela's existing AML-CFT legal and regulatory framework criminalizes the financing of terrorism.  There was no publicly available information regarding the confiscation of terrorist assets.  For further information on money laundering and financial crimes, see the *2014 International Narcotics Control Strategy Report (INCSR), Volume 2, Money Laundering and Financial Crimes*:  http://www.state.gov/j/inl/rls/nrcrpt/index.htm.

**Regional and International Cooperation:**  Venezuela participated as an official observer in ongoing peace negotiations between the Colombian government and the FARC.  Venezuelan and Colombian foreign ministers met several times throughout the year to address the reduction of smuggling of illegal goods, narcotics trafficking, and the activity of illegally armed groups.

PX209

# CHAPTER 3
# STATE SPONSORS OF TERRORISM

To designate a country as a State Sponsor of Terrorism, the Secretary of State must determine that the government of such country has repeatedly provided support for acts of international terrorism.  Once a country is designated, it remains a State Sponsor of Terrorism until the designation is rescinded in accordance with statutory criteria.  A wide range of sanctions are imposed as a result of a State Sponsor of Terrorism designation, including:

- A ban on arms-related exports and sales;
- Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism;
- Prohibitions on economic assistance; and
- Imposition of miscellaneous financial and other restrictions.

State Sponsor of Terrorism designations can be rescinded pursuant to two alternative paths.

One path requires that the President submit a report to Congress before the proposed rescission would take effect certifying that:

--There has been a fundamental change in the leadership and policies of the government of the country concerned,
--The government is not supporting acts of international terrorism, and
--The government has provided assurances that it will not support acts of international terrorism in the future.

The other path requires that the President submit a report to Congress, at least 45 days before the proposed rescission would take effect, justifying the rescission and certifying that:

--The government concerned has not provided any support for international terrorism during the preceding six-month period, and
--The government concerned has provided assurances that that it will not support acts of international terrorism in the future.

This report provides a snapshot of events during 2014 relevant to countries designated as State Sponsors of Terrorism; it does not constitute a new announcement regarding such designations.  More information on State Sponsor of Terrorism designations may be found online at http://www.state.gov/j/ct/c14151.htm.

## CUBA

Cuba was designated as a State Sponsor of Terrorism in 1982.  Though not within the timeframe covered by this report, on April 14, 2015, President Obama submitted to Congress the statutorily

PX209

required report and certifications indicating the Administration's intent to rescind Cuba's State Sponsor of Terrorism designation, including the certification that Cuba has not provided any support for international terrorism during the previous six-months; and that Cuba has provided assurances that it will not support acts of international terrorism in the future.  The required 45-day Congressional pre-notification period expired, and the Secretary of State made the final decision to rescind Cuba's designation as a State Sponsor of Terrorism, effective on May 29, 2015.

In recent years, Cuba has taken a number of steps to fully distance itself from international terrorism and has taken steps to strengthen its counterterrorism laws.  In 2013, Cuba made a commitment to work with the Financial Action Task Force to address its anti-money laundering/counterterrorism finance (AML/CFT) deficiencies.  Since that time, Cuba has made significant progress in establishing the framework necessary to meet international AML/CFT standards by, for example, adequately criminalizing money laundering and terrorist finance and establishing procedures to identify and freeze terrorist assets, among other legal and regulatory actions.

Throughout 2014, Cuba supported and hosted internationally recognized negotiations between the Revolutionary Armed Forces of Colombia (FARC) and Government of Colombia aimed at garnering a peace agreement.  Safe passage of FARC members provided in the context of these talks has been coordinated with representative of the governments of Colombia, Venezuela, Chile, and Norway, as well as the International Committee of the Red Cross.  There is no credible evidence that the Government of Cuba has provided specific material support, services, or resources, to members of the FARC, or the National Liberation Army (ELN), outside of facilitating the internationally recognized peace process between those organizations and the Government of Colombia.

The Government of Cuba does continue to allow approximately two dozen members of the Basque Fatherland and Liberty Organization (ETA) to remain in the country.  The Cuban government provided assurances that it would never permit the ETA members living in Cuba to use Cuban territory for that organization's activities against Spain or any other country.  There is no available information that the Government of Cuba allowed any of these ETA members to plan, finance, lead, or commit acts of international terrorism while residing in Cuba.

The Government of Cuba does continue to harbor fugitives wanted to stand trial or to serve sentences in the United States for committing serious violations of U.S. criminal laws, and provides some of these individuals limited support such as housing, food ration books, and medical care.  Although Cuba continues to refuse to return certain individuals that fled to Cuba in the past, it has been more cooperative with the United States in recent years.  In 2014, the Government of Cuba engaged in talks with U.S. officials in reference to some of these fugitives still residing in Cuba.

## IRAN

Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity in 2014, including support for Palestinian terrorist groups in Gaza, Lebanese Hizballah, and various

PX209

groups in Iraq and throughout the Middle East. This year, Iran increased its assistance to Iraqi Shia militias, one of which is a designated Foreign Terrorist Organization (FTO), in response to the Islamic State in Iraq and the Levant (ISIL) incursion into Iraq, and has continued to support other militia groups in the region. Iran also attempted to smuggle weapons to Palestinian terrorist groups in Gaza. While its main effort focused on supporting goals in the Middle East, particularly in Syria, Iran and its proxies also continued subtle efforts at growing influence elsewhere including in Africa, Asia, and, to a lesser extent, Latin America. Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is the regime's primary mechanism for cultivating and supporting terrorists abroad.

Iran views Syria as a crucial causeway in its weapons supply route to Lebanese Hizballah, its primary beneficiary, and as a key pillar in its "resistance" front. In 2014, Iran continued to provide arms, financing, training, and the facilitation of primarily Iraqi Shia and Afghan fighters to support the Asad regime's brutal crackdown that has resulted in the deaths of at least 191,000 people in Syria, according to August UN estimates. Iran publicly admits to sending members of the IRGC to Syria in an advisory role. There is consistent media reporting that some of these troops are IRGC-QF members and that they have taken part in direct combat operations. While Tehran has denied that IRGC-QF personnel participate in combat operations, in 2014 it acknowledged the deaths in Syria of two senior officers (Brigadier Generals Abdullah Eskandari and Jamar Dariswali). Tehran claimed they were volunteers who lost their lives while protecting holy shrines near Damascus.

Likewise in Iraq, despite its pledge to support Iraq's stabilization, Iran increased training and funding to Iraqi Shia militia groups in response to ISIL's advance into Iraq. Many of these groups, such as Kata'ib Hizballah (KH), have exacerbated sectarian tensions in Iraq and have committed serious human rights abuses against primarily Sunni civilians. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device (IED) technology and other advanced weaponry. Similar to Hizballah fighters, many of these trained Shia militants have used these skills to fight for the Asad regime in Syria or against ISIL in Iraq.

Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank. Although Hamas's ties to Tehran have been strained due to the Syrian civil war, in a November 25 speech, Supreme Leader Khamenei highlighted Iran's military support to "Palestinian brothers" in Gaza and called for the West Bank to be similarly armed. In December, Hamas Deputy Leader Moussa Abu Marzouk announced bilateral relations with Iran and Hamas were "back on track."

In March, Israeli naval forces boarded the Klos C cargo ship in the Red Sea off the coast of Sudan. On board, they found 40 M-302 rockets, 180 mortars, and approximately 400,000 rounds of ammunition hidden within crates of cement labeled "Made in Iran" and believed to be destined to militants in the region.

PX209

Since the end of the 2006 Israeli-Hizballah conflict, Iran has also assisted in rearming Lebanese Hizballah, in direct violation of UNSCR 1701.  General Amir Ali Hajizadeh, head of the IRGC Aerospace Force stated in November that "The IRGC and Hezbollah are a single apparatus jointed together," and Lebanese Hizballah Deputy Secretary General Naim Qassem boasted that Iran had provided his organization with missiles that had "pinpoint accuracy" in separate November public remarks.  Iran has provided hundreds of millions of dollars in support of Lebanese Hizballah in Lebanon and has trained thousands of its fighters at camps in Iran.  These trained fighters have used these skills in direct support of the Asad regime in Syria and, to a lesser extent, in support of operations against ISIL in Iraq.  They have also continued to carry out attacks along the Lebanese border with Israel.

Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members it continued to detain, and refused to publicly identify those senior members in its custody.  Iran previously allowed AQ facilitators to operate a core facilitation pipeline through Iran since at least 2009, enabling AQ to move funds and fighters to South Asia and Syria.

Iran remains a state of proliferation concern.  Despite multiple UNSCRs requiring Iran to suspend its sensitive nuclear proliferation activities, Iran continued to be in noncompliance with its international obligations regarding its nuclear program.  Implementation of the Joint Plan of Action (JPOA) between the P5+1 (China, France, Germany, Russia, the United Kingdom, and the United States, coordinated by the EU), and Iran began on January 20, 2014.  Iran has fulfilled the commitments that it made under the JPOA.  The parties negotiated during 2014 to pursue a Joint Comprehensive Plan of Action (JCPOA) to achieve a long-term comprehensive solution to restore confidence that Iran's nuclear program is and will remain exclusively peaceful.

## SUDAN

Sudan was designated as a State Sponsor of Terrorism in 1993 due to concerns about support to international terrorist groups.  Sudan remained a generally cooperative partner of the United States on counterterrorism.  During the past year, the Government of Sudan continued to support counterterrorism operations to counter threats to U.S. interests and personnel in Sudan.

Elements of al-Qa'ida-inspired terrorist groups remained in Sudan.  The Government of Sudan has taken steps to limit the activities of these elements and has worked to disrupt foreign fighters' use of Sudan as a logistics base and transit point for terrorists going to Syria and Iraq.  However, groups continued to operate in Sudan in 2014 and there continued to be reports of Sudanese nationals participating in terrorist organizations.

In 2014, Sudan continued to allow members of Hamas to travel, fundraise, and live in Sudan.

In June 2010, four Sudanese men sentenced to death for the January 1, 2008 killing of two U.S. Embassy staff members escaped from Khartoum's maximum security Kober prison.  That same month Sudanese authorities confirmed that they recaptured one of the four convicts and a second escapee was reported killed in Somalia in May 2011.  The recaptured murderer is being held in Kober Prison, and as of December 2014, appeals of his pending death sentence were still ongoing.  The whereabouts of the other two convicts are unknown.

PX209

In February 2013, one of five men convicted of aiding the 2010 escape attempt by the four convicted killers received a presidential commutation of his remaining sentence.  Sudanese authorities explained his release was part of a broad administrative parole affecting 200 other prisoners who had served some portion of their sentences with good behavior.  U.S. government officials protested the commutation and urged Sudanese authorities to imprison the convicted accomplice for the full 12 years of his sentence.  The individual remained free on parole at year's end.

Sudanese authorities this year released most of the 25 individuals detained in a December 2012 raid on what the Government of Sudan described as a terrorist training camp operating in Dinder National Park.  Members of the so-called "Dinder cell" were charged with terrorism and murder stemming from the deaths of several police involved in the December 2012 raid.  One trial judge from the country's terrorism court remanded several cases back to the attorney general for additional interrogations and those accused continued to be held in prison.  The remaining Dinder detainees have had sessions with Dr. Essam Ahmed al-Basher, who helps lead the Government of Sudan's "extremist rehabilitation program."

In general, the Government of Sudan appeared to oppose the financing of extremist elements.  Sudanese officials have welcomed Hamas members to Khartoum, however, and its members are permitted to conduct fundraising in Sudan.  The Central Bank of Sudan and its financial intelligence unit, renamed the Financial Information Unit in late 2014, circulated to financial institutions a list of individuals and entities that have been included on the UN 1267 sanctions committee's consolidated list, as well as the U.S. government's lists of terrorist organizations/financiers.  The financing of terrorism per UN Resolution 1373 was criminalized in Sudan pursuant to Sudan's Money Laundering Act of 2003.

The Government of Sudan continued to cooperate with the Financial Action Task Force and took steps to meet international standards in combating money laundering and terrorist financing.  In 2014, Sudan adopted a new Anti-Money Laundering and Combating Terrorism Finance Act and ratified the UN Convention Against Corruption.  Sudan's Central Bank officials did not freeze, seize and/or forfeit assets in 2014.  Sudan continued to cooperate with the United States in investigating financial crimes related to terrorism.  The Sudanese government's ability to monitor illicit finance flows is increasingly hampered by the Sudanese banking sector's difficulty finding correspondent banks to process international transactions, leading most Sudanese to instead move money in cash.

Additionally, Sudan has yet to take concrete steps to resolve the crisis in the Two Areas of Southern Kordofan and Blue Nile, to include ending aerial bombardments, allowing sufficient and sustained humanitarian access, and resuming political dialogue to resolve the conflicts.

## SYRIA

Designated in 1979 as a State Sponsor of Terrorism, the Asad regime continued its political support to a variety of terrorist groups affecting the stability of the region and beyond, even amid significant internal unrest.  The regime continued to provide political and weapons support to

287

PX209

Lebanese Hizballah and continued to allow Iran to rearm the terrorist organization.  The Asad regime's relationship with Hizballah and Iran continued to grow stronger in 2014 as the conflict in Syria continued.  President Bashar al-Asad remained a staunch defender of Iran's policies, while Iran has exhibited equally energetic support for Syrian regime efforts to defeat the Syrian opposition.  Statements supporting terrorist groups, particularly Hizballah, were often in Syrian government speeches and press statements.

The Syrian government had an important role in the growth of terrorist networks in Syria through the permissive attitude the Asad regime took towards al-Qa'ida's foreign fighter facilitation efforts during the Iraq conflict.  Syrian government awareness and encouragement for many years of violent extremists' transit through Syria to enter Iraq, for the purpose of fighting Coalition Troops, is well documented.  Syria was a key hub for foreign fighters en route to Iraq.  Those very networks were the seedbed for the violent extremist elements, including ISIL, which terrorized the Syrian and Iraqi population in 2014 and – in addition to other terrorist organizations within Syria – continued to attract thousands of foreign terrorist fighters to Syria in 2014.

As part of a broader strategy during the year, the regime still attempted to portray Syria itself as a victim of terrorism, characterizing all of its armed opponents as "terrorists."

Asad's government has continued to generate significant concern regarding the role it plays in terrorist financing.  Industry experts reported that 60 percent of all business transactions were conducted in cash and that nearly 80 percent of all Syrians did not use formal banking services.  Despite Syrian legislation that required money changers to be licensed by the end of 2007, many continued to operate illegally in Syria's vast black market, estimated to be as large as Syria's formal economy.  Regional *hawala* networks (an informal value transfer system based on the performance and honor of a large network of money brokers operating outside traditional western financial systems) remained intertwined with smuggling and trade-based money laundering, and were facilitated by notoriously corrupt customs and immigration officials.  This raised significant concerns that some members of the Syrian government and the business elite were complicit in terrorist finance schemes conducted through these institutions.

Despite the progress made through the Organization for the Prohibition of Chemical Weapon's Executive Council and UNSCR 2118 (2013) to dismantle and destroy Syria's chemical weapons program, there continued to be significant concern, given ongoing instability in Syria, that these materials could find their way to terrorist organizations.  Additionally, Syria continued to use toxic chemicals, including chlorine, as a weapon against its citizens.  Syria's behavior raises serious questions about the regime's willingness to comply with its Chemical Weapons Convention and UNSCR 2118 obligations.

PX209

# CHAPTER 4

# THE GLOBAL CHALLENGE OF CHEMICAL, BIOLOGICAL, RADIOLOGICAL, OR NUCLEAR (CBRN) TERRORISM

Preventing proliferation of chemical, biological, radiological, and nuclear (CBRN) weapons has been a top U.S. national security priority for decades. The past decade has seen a growing recognition that we must also be vigilant in preventing terrorist groups from obtaining the means and methods to develop and/or deploy CBRN weapons. Thus, our strategic counterterrorism posture is strengthened by counter- and nonproliferation programs that aim to reduce or eliminate CBRN material produced and stored by states; restrict the diversion of materials and expertise for illicit use; and prevent the trafficking of CBRN weapons and related material.

While efforts to secure CBRN material across the globe have been largely successful, the illicit trafficking of these materials persists. CBRN materials and expertise remain a terrorist threat as demonstrated by terrorists' stated intent to acquire and use these materials; the nature of injury and damage these weapons can inflict; the ease with which information on these topics now flows; and the dual-use nature of many relevant technologies and material.

A number of international partnerships have either the explicit or the implicit purpose of countering the CBRN threat from terrorists and other non-state actors. Organizations and initiatives concerned with chemical and biological weapons use international conventions and regulations to reduce or eliminate stockpiles of material, regulate the acquisition of dual-use technology, and regulate trade of specific goods. International nuclear and radiological initiatives and programs focus on promoting peaceful uses of nuclear material and technology, safeguarding materials and expertise against diversion, and countering the smuggling of radioactive and nuclear material. The United States routinely provides technical and financial assistance and training to partner nations to help strengthen their abilities to adequately protect and secure CBRN-applicable expertise, technologies, and material. U.S. participation within, and contribution to these groups, is vital to ensuring our continued safety from the CBRN threat.

**The Proliferation Security Initiative (PSI):** Launched in 2003, the PSI has increased international capability to address the challenges associated with stopping the trafficking of WMD, WMD-related components, and their means of delivery. The PSI remains an important tool in the global effort to combat CBRN material transfers to both state and non-state actors of proliferation concern. As of December 31, 2014, 104 states have endorsed the PSI Statement of Interdiction Principles, by which states commit to take specific actions, consistent with national legal authorities and relevant international law and frameworks, to support efforts to halt the trafficking of WMD and related materials.

**The Global Initiative to Combat Nuclear Terrorism (GICNT):** The GICNT, which is co-chaired by the United States and Russia, is an international partnership of 85 nations and four official observers dedicated to strengthening individual and collective capacity to prevent, detect, and respond to a nuclear terrorist event. Partners engage in multilateral activities and exercises designed to share best practices and lessons learned on a wide range of nuclear security and terrorism issues. To date, partners have conducted over 70 multilateral activities and eight

PX209

senior-level plenary meetings in support of these nuclear security goals.  In 2014, there were nine multilateral activities to promote the sharing of best practices on the topics of nuclear forensics, nuclear detection, and emergency preparedness and response.

**Nuclear Trafficking Response Group (NTRG):**  The NTRG is an interagency group focused on coordinating the U.S. government response to incidents of illicit trafficking in nuclear and radioactive materials, including radiation alarms that occur in foreign countries.  The NTRG works with foreign governments to secure smuggled nuclear material, prosecute those involved, and develop information on smuggling-related threats – including potential links between smugglers and terrorists.  The U.S. Department of State chairs the NTRG, which includes representatives from the U.S. government's nonproliferation, law enforcement, and intelligence communities.

**Counter Nuclear Smuggling Program (CNSP):**  Securing dangerous radioactive and nuclear materials in illegal circulation before they reach the hands of terrorists or other malicious actors is critical to U.S. national security and that of U.S. allies.  Using CNSP funds, the U.S. Department of State conducts outreach and programmatic activities with key governments to enhance their counter nuclear smuggling capabilities.  Bilateral "Joint Action Plan" agreements developed and implemented with 13 partner governments identify strategies to improve the partners' abilities to prevent, detect, and respond to nuclear and radiological smuggling attempts.  As part of these agreements, the United States commits to seek U.S. and foreign donor assistance to address needs outside the capacity of the partner nation.  More than US $75 million in foreign donations have enabled implementation of Joint Action Plan-identified actions.  Remaining needs may be addressed by specific CNSP-developed and -funded programs.  The U.S. Department of State uses CNSP funds to facilitate, through workshops and engagement activities, integrating law enforcement, intelligence, and technical reach-back capabilities to counter nuclear smuggling. More broadly, WMDT's CNSP programmatic support has enabled 17 partner nations to address goals that include enhancing nuclear smuggling response procedures, improving nuclear forensics capabilities, and enabling the successful prosecution of smugglers, while helping partners build cross-border and regional cooperation to counter nuclear smuggling.

**Export Control and Related Border Security (EXBS) Program:**  Through the EXBS Program, the U.S. Department of State leads the interagency effort to strengthen export control systems by helping to build effective national strategic trade control and border security systems in countries that produce or supply strategic items as well as in key transit and transshipment hubs.  EXBS works in over 65 partner countries to improve national capabilities to regulate trade in sensitive items and prevent irresponsible transfers that may contribute to proliferation; detect and interdict illicit trafficking in proliferation-sensitive items at and between ports of entry by targeting high-risk shipments; investigate and prosecute violations of strategic trade control laws and regulations; and build and sustain a community of policymakers and technical experts committed to meeting international nonproliferation obligations and implementing effective strategic trade controls.

In 2014, the EXBS Program oversaw over 260 bilateral, regional, and international activities, involving more than 80 countries to promote the adoption, implementation, and enforcement of

PX209

comprehensive strategic trade controls.  These activities improve the capability of partner countries to prevent the transfers of dual-use items and conventional weapons that contribute to proliferation, terrorism, or regional instability.  EXBS is also actively involved in efforts to combat WMD smuggling through enhanced border security, and in 2014, provided 23 countries with state-of-the-art detection, inspection, and interdiction equipment and training to enhance the ability to detect, deter, and interdict illicit smuggling of radioactive and nuclear materials, WMD components, and other weapons-related items at air, land, sea, and rail borders.

EXBS works with and complements the DoD's International Counter-Proliferation Program and Cooperative Threat Reduction Program; DHS's Container Security Initiative, the Department of Energy's International Nonproliferation Export Control Program (INECP) and the Nuclear Smuggling Detection and Deterrence (NSDD) Program (formerly the Second Line of Defense Program); and the State Department's Antiterrorism Assistance Program and International Narcotics and Law Enforcement assistance programs, as well as other international donor assistance programs.  The EXBS Program fulfills important U.S. and international commitments, helping partner countries fulfill their international obligations and commitments – including those related to UNSCR 1540 (2004) and adherence to the guidelines of multilateral export control regimes.

**Nuclear Smuggling Detection and Deterrence (NSDD):**  The U.S. Department of Energy's National Nuclear Security Administration, Nuclear Smuggling Detection and Deterrence Program (formerly known as Second Line of Defense) collaborates with partner countries to provide radiation detection systems, associated training and sustainability assistance to enhance their capacity to deter, detect, and interdict illicit trafficking of special nuclear and other radioactive materials out of regulatory control.  The NSDD Program assistance to partner countries' national nuclear detection architecture is commensurate with the regional threat and country-specific infrastructure and, accordingly, can include deployments of fixed, mobile, and hand-held radiation detection technologies at land border crossings, airports, seaports, and tactical interior locations.  NSDD coordinates its capacity building activities with other international nuclear security assistance entities such as the European Commission and the International Atomic Energy Agency.

**Global Threat Reduction (GTR):**  GTR program activities aim to prevent terrorists from acquiring CBRN expertise, materials, and technology, focusing primarily in countries where there is a high threat of CBRN proliferation or WMD terrorism.  By engaging scientists, technicians, and engineers with CBRN expertise and securing related material and infrastructure, GTR seeks to deny terrorist access to the knowledge, materials, and technologies that could be used in a CBRN attack against the U.S. homeland and assets abroad.  In 2014, GTR was actively engaged in countries and regions at high risk of proliferation and terrorism, adapting as necessary to meet emerging CBRN threats.

**Biological Weapons Convention Inter-Sessional Work Program (BWC):**  The December 2011 BWC Review Conference adopted a program of work aimed at strengthening international capacities to prevent, detect, and respond to the proliferation or use of biological weapons, whether by state or non-state actors.  In 2014, the United States continued efforts in this forum to:  acquire better information about BWC states' implementing measures, and enhance such

PX209

measures, which criminalize and help deter malicious use of biological agents; promote sustainable, effective approaches to laboratory biosecurity; raise international awareness of the need for appropriate, balanced oversight of dual-use life science research with significant potential for harm; and identify and address impediments to international coordination and response in the event of a bioterrorism attack or a significant disease outbreak of unknown origin.

PX209

# Chapter 5
# Terrorist Safe Havens (Update to 7120 Report)

Terrorist safe havens described in this report include ungoverned, under-governed, or ill-governed physical areas where terrorists are able to organize, plan, raise funds, communicate, recruit, train, transit, and operate in relative security because of inadequate governance capacity, political will, or both.

As defined by section 2656f(d) of Title 22 of the U.S. Code, the term "terrorist sanctuary" or "sanctuary" excludes the territory of a country the government of which is subject to a determination under section 2405(j)(1)(A) of the Appendix to Title 50; section 2371(a) of Title 22; or section 2780(d) of Title 22– the state sponsors of terrorism.  Accordingly, information regarding Cuba, Iran, Sudan, and Syria can be found in Chapter 3, State Sponsors of Terrorism.

| TERRORIST SAFE HAVENS |
|---|

## AFRICA

**Somalia.**  In 2014, terrorists continued to use safe havens in Somalia to organize, plan, raise funds, communicate, recruit, train, and operate due to inadequate security, justice, and governance capacity at all levels.  African Union Mission to Somalia (AMISOM) operations in southern Somalia forced al-Shabaab operatives and fighters to flee former strongholds in the port city of Barawe, Buulo Mareer, and other towns in Lower Shabelle, often in advance of troop movements into these areas.  These territorial losses limited al-Shabaab's ability to raise funds from the illicit charcoal trade based out of the port cities in Lower Shabelle.  Still, many sections of Somalia's interior, particularly in rural areas of Middle and Lower Juba, Gedo, Bay, and Bakol regions, have remained safe havens for fleeing al-Shabaab fighters since 2012.  These hard-to-reach areas provided the group both relative freedom of movement and concealment from AMISOM forces stretched thin by territorial gains.  Permissive environments in southern Somalia, many devoid of adequate and consistent security, governance, and services, allowed al-Shabaab the time and space to regroup and launch attacks against harder targets and government facilities in Mogadishu and softer targets across the border in Kenya.

In northern Somalia, Puntland Security Forces continued to conduct raids against al-Shabaab camps in the Buraha Cal Madow Mountains to force the group out of longstanding strongholds near Galgala.  These remote areas in Puntland offered al-Shabaab access to undeveloped ports located along miles of unguarded coastline abutting the Gulf of Aden, which is still frequently used by terrorists and smugglers to move weapons, materiel, and fighters back and forth from the Arabian Peninsula.  Porous borders and ungoverned spaces remained a significant challenge for the Federal Government of Somalia and AMISOM, although both remained committed to countering terrorism in collaboration with international partners, including the United States.  These efforts placed al-Shabaab in a significantly weaker financial and operational position as 2014 came to an end.  Still, al-Shabaab continued to raise funds in areas still within its control by extorting local populations and raiding livestock and other livelihood commodities.

PX209

According to independent sources and NGOs engaged in demining activities on the ground, there was little cause for concern for the presence of WMD in Somalia.

**The Trans-Sahara:** The terrorist safe haven in northern Mali has been reduced, and terrorists no longer control population centers in northern Mali, as they did in 2012. Ongoing peacekeeping operations, continued peace talks with rebel factions, and, active French and African partner counterterrorism operations have contained, degraded, disrupted, and marginalized the ability of violent extremist remnants still located there, although violent extremists, including al-Murabitoun and AQIM, continued to conduct attacks. The majority of violent extremist groups have retreated into remote areas of northern Mali or southwest Libya. Asymmetric attacks by remnant violent extremist groups are expected to take a toll on peacekeeping forces for the foreseeable future.

**Mali.** Ungoverned, under-governed, and ill-governed areas of northern Mali remain. The Malian government's knowledge of violent extremist activities, particularly in the north, is limited and hampered by the lack of physical control of these areas, resources, and intelligence capabilities. The Malian military in conjunction with the French and UN forces are working to eliminate violent extremist remnants in Mali. The government has also reestablished its political presence in the cities of Timbuktu and Gao, with some local government officials returning to their posts in 2014.

## SOUTHEAST ASIA

**The Sulu/Sulawesi Seas Littoral.** The number of islands in the Sulawesi Sea and the Sulu Archipelago make it a difficult region to secure. Cooperation by all states bordering this region remained strong with U.S. counterterrorism efforts. Although Indonesia, Malaysia, and the Philippines have improved efforts to control their shared maritime boundaries – including through U.S.-funded efforts to enhance domain awareness in the waters south and southwest of Mindanao – the expanse remained difficult to control. Surveillance improved but remained partial at best, and traditional smuggling and piracy groups have provided an effective cover for terrorist activities, including the movement of personnel, equipment, and funds.

Southeast Asia is vulnerable to exploitation by illicit traffickers and proliferators given the high volume of global trade that ships through the region as well as the existence of smuggling and proliferation networks. Weak strategic trade controls, legal and regulatory frameworks, inadequate maritime law enforcement and security capabilities, as well as emerging and re-emerging infectious disease and burgeoning bioscience capacity, make Southeast Asia an area of concern for WMD proliferation and transit. Other than Singapore and Malaysia, strategic trade control laws that include controls over dual-use and end-use or "catch-all" controls are lacking in Southeast Asia. Assisting these countries to develop strong laws that meet international standards and effective targeting and risk management systems are major goals of the Export Control and Related Border Security program over the next few years.

**The Southern Philippines.** The geographical composition of the Philippines, spread out over 7,107 islands, make it difficult for the central government to maintain a presence in all areas. Counterterrorism operations over the past 13 years, however, have been successful at isolating

PX209

the location and constraining the activities of transnational terrorists.  U.S.-Philippines counterterrorism cooperation remained strong.  Abu Sayyaf Group (ASG) members, numbering a few hundred, were known to be present in remote areas in Mindanao, especially the islands of Basilan and Sulu.  Jemaah Islamiya members, of whom there are only a small number remaining, are in a few isolated pockets of Mindanao and the Sulu and Tawi-Tawi island groups.  In these areas, local residents are either overtly supportive of the ASG or generally apathetic to its presence due to latent animosity toward the government, military, and police.

The United States began funding a law enforcement capacity building project for the Philippines through the Global Security Contingency Fund, which will increase the capacity of the Philippines to patrol its islands and coastline.  Export Control and Related Border Security program efforts in recent years have been focused largely on working with the Philippines to pass a Strategic Trade Management Act.  The emphasis on dual-use and end-use controls will help Philippine customs and other law enforcement interdict illicit items transiting and being trans-shipped through all ports in the Philippines.

The Comprehensive Agreement on Bangsamoro between the Philippine government and the Moro Islamic Liberation Front (MILF), if implemented successfully, may limit the size of safe havens within MILF-controlled areas in which terrorists could operate.  The New People's Army maintained a nearly national presence, with a focus on rural and mountainous areas.  Continued pressure from Philippine security forces made it difficult, however, for terrorists to organize, plan, raise funds, communicate, recruit, train, and operate.

## THE MIDDLE EAST

**Egypt:**  Portions of Egypt's Sinai region were a safe haven for terrorist organizations in 2014.  The Egyptian government continued its extensive security campaign focused on the North Sinai region, which was launched in September 2013 with the aim of eliminating terrorists and securing the region.  The North Sinai remained closed off to tourists, most journalists, and NGO workers, which limited independent means of verifying government-published information on the success of the military's operations.  In addition to reports in Egyptian press outlets, the Army spokesperson regularly published statements summarizing recent military operations and their results, including the number of terrorists killed, injured, or arrested, as well as the number of terrorist hideouts destroyed.  In 2014, more than 500 militants were reportedly killed and at least 2,000 terrorist hideouts, shanties, and houses were destroyed, according to the Army spokesperson and Egyptian media reports.  In addition, the military frequently seizes caches of weapons, explosives, drugs, and vehicles, and destroys tunnel openings along the border with Gaza.

Beginning in late October after coordinated attacks near El Arish that killed 30 Egyptian soldiers, the military evacuated more than 2,000 families living along the border with Gaza to create an up-to-five kilometer-wide buffer zone.  The Egyptian military suspected that the attackers arrived in Egypt from Gaza via smuggling tunnels.

Through its Export Control and Related Border Security Program, the United States is working with the Government of Egypt to enhance Egypt's border security capabilities through the

PX209

provision of land and maritime border enforcement and targeting and risk management training for Egyptian Customs, Ministry of Defense, and Ministry of Foreign Affairs officials.  In addition, since 2009, the State Department's Nonproliferation & Disarmament Fund has assisted Egypt with the provision of backscatter x-ray portal monitors, with the capability to inspect vehicular and truck traffic at fixed transportation checkpoints for WMD-related materials, conventional weapons, and other illicit items.

**Iraq.**  By late 2013 and early 2014, the Islamic State in Iraq and the Levant (ISIL) had a major presence in parts of majority Sunni Iraq, including Fallujah and Ramadi.  In the summer of 2014, ISIL carried out a large-scale offensive in Iraq that included seizing the major city of Mosul and pushing south to threaten Baghdad.  ISIL was able to support this offensive from its safe haven inside Syria, moving heavy equipment, arms, resources, and personnel across the Iraq/Syria border.  On August 8, U.S. airstrikes against ISIL targets began in response to the group's advance towards Erbil.  In mid-September, the United States took the lead in forming an international Coalition to degrade and defeat ISIL, uniting over 60 countries in the effort.  Coalition airstrikes stopped ISIL's advance by late 2014 and supported Iraqi and Kurdish clearing operations in an effort to retake territory.

Iraqi Security Forces (ISF), in parallel with Iran-backed Shia militia groups, conducted air and ground operations to root out ISIL, but faced well-trained and heavily equipped ISIL fighters.  The ISF continued to clash with ISIL by the end of 2014, but had not yet retaken Mosul and Anbar province.  Along with Coalition partners, the United States is preparing to stand up multiple training sites across Iraq to focus on improving ISF capabilities in command and control, intelligence, logistics, fire support, and other combat-enabling roles.
Due to security conditions in Iraq, the Export Control and Related Border Security (EXBS) program has had difficulty implementing outreach activities.  EXBS priorities are to continue working with the Government of Iraq to develop and implement regulations and procedures related to The Act of the Iraqi National Monitoring Authority on WMD Non-Proliferation No. 48 of 2012 (INMA Act), including for licensing and compliance, to adopt and implement a control list, and to enhance Iraq's border security capabilities related to the inspection and detection of WMD-related goods and technologies.

The United States and Iraq strengthened their bilateral partnership to prevent nuclear terrorism in September 2014 by concluding the "Joint Action Plan between the Government of the Republic of Iraq and the Government of the United States of America on Combating Nuclear and Radioactive Materials Smuggling."  The agreement expresses the intention of the two governments to work together to enhance Iraq's capabilities to prevent, detect, and respond to nuclear smuggling incidents, and ultimately to prevent terrorist groups from acquiring nuclear and radiological materials.

Stakeholders across the Government of Iraq – including INMA staff, the Ministry of Interior Civil Defense, Ministry of Science and Technology, and Ministry of Higher Education and Scientific Resources – participated in various border and WMD-related security trainings, workshops, working groups, and discussions.

PX209

**Lebanon:**  The Lebanese government does not control all regions in the country or its borders with Syria and Israel.  Hizballah controlled access to parts of the country, limiting access by Lebanon's security services, which allowed it to conduct security operations with relative impunity.  The Government of Lebanon took no action in 2014 to disarm Hizballah, to eliminate its safe havens in Lebanese territory, or to prevent the flow of Hizballah members to Syria and Iraq.  Ungoverned areas along the Lebanese-Syrian border and in Tripoli and Akkar also have served as safe havens for al-Nusrah Front, Islamic State in Iraq and the Levant, and other Sunni extremist groups in 2014.  Many of these violent extremist groups operate in mountainous, mostly uninhabited zones where the government has limited reach.  However, the government has the political will to eradicate these safe havens and has launched a sustained security campaign to rid Lebanon of these violent extremist groups.  Palestinian refugee camps were also used as safe havens by Palestinian and other armed groups to house weapons and shelter wanted criminals.

The United States works closely with the Lebanese Air Force (LAF) and Internal Security Forces to combat terrorist threats along the Syrian border by providing military equipment, weaponry, and training.  Lebanon is not a source country for WMD components.  Lebanon's proliferation risk derives from its status as both a transit and transshipment hub as well as a recipient state for arms and military equipment.  With a porous and largely un-demarcated border with Syria to the north and east, Hizballah control in sizable portions of Lebanese territory, and the ongoing smuggling of weapons to extremist militias operating in Lebanon, the current conflict in Syria has only heightened concerns for the potential flow of dual-use items and munitions to militant groups in the region.  The LAF Engineer Regiment partners with U.S. government to detect and prevent proliferation of and trafficking in WMD along the Syrian border.  Hizballah's continued ability to receive sophisticated munitions via Iran and Syria requires aggressive regular monitoring of this issue.  The Export Control and Related Border Security program (EXBS) has conducted various enforcement training and procured basic inspection/detection equipment for Lebanese officials, and will continue to work with Lebanon to strengthen border security and interdict illicit trafficking of items of proliferation concern.

**Libya:**  Libya's porous borders, fragmented security forces, and vast ungoverned territory have made it a permissive environment for terrorist groups such as Ansar al-Shari'a Benghazi, Ansar al-Shari'a Darnah, al-Qa'ida in the Islamic Maghreb, al-Murabitoun, and Islamic State in Iraq and the Levant (ISIL).   The outbreak of widespread violence in July and subsequent collapse of central government authority created further opportunities for violent extremist groups to exploit Libya's territory to plan, finance, and stage operations.  In October, Darnah-based violent extremist groups pledged allegiance to ISIL.  Terrorist training camps and facilitation networks exist throughout Libya; local tribes and minority groups frequently serve as facilitators, although this appears largely due to economic rather than ideological motivations.  Libya serves as a major source and transit country for foreign fighters en route to Syria and Iraq.  There are indications that foreign fighters are beginning to return to Libya or choosing to stay in Libya to fight there, increasing concerns that Libya has become a battlefield for extremist groups such as ISIL.

In 2013, the United States signed an agreement with the Libyan government to cooperate on destroying Libya's stockpile of legacy chemical weapons in accordance with its obligations as an

PX209

Organization for the Prohibition of Chemical Weapons (OPCW) member state.  Libya successfully completed operations for the disposal of its remaining mustard gas filled in artillery projectile and aerial bombs in January 2014.  Libya also previously completed the disposal of its remaining bulk mustard in 2013.  In addition, Libya retains a stockpile of natural uranium ore concentrate (yellowcake), stored in a former military facility near Sebha in Libya's south.  This material represents a limited risk of trafficking and proliferation due to the bulk and weight of the storage containers, and the need for extensive additional processing before the material would be suitable for weapons purposes.

**Yemen.**  In 2014, the Yemeni government pursued two military offensives aimed at eradicating al-Qa'ida in the Arabian Peninsula (AQAP) safe havens in southern and eastern Yemen, but Houthi expansion limited the government's ability to conduct counterterrorism operations in late 2014.  In April/May, the Yemeni military, in conjunction with local Popular Committees, launched an offensive against AQAP strongholds in the al-Mahfid region of the southern governorates of Shabwah and Abyan.  This offensive was generally successful, pushing AQAP forces to withdraw to the remote and ill-governed Hadramawt region.  A second offensive focusing on Hadramawt was planned for July/August, but this effort was significantly hindered by the Houthi incursion into the capital, which monopolized government focus.  Local troops and Popular Committees led a series of operations against AQAP in the Hadramawt, but with little contribution or coordination by the central government in Sana'a.  Success was more limited than the al-Mahfid offensive due to the lack of involvement from the central government, which was consumed by the growing Houthi challenge, and the logistical difficulties inherent in sustaining operations in the remote eastern governorate.  AQAP was extremely active in its efforts to counter the operations that took place, particularly in al-Qatn and Sayun in the Wadi Hadramawt valley.  This is a shift from AQAP's historical activities in Hadramawt, which previously focused on the more populated coastal area.  Houthi expansion into Sana'a diverted the government's attention and security resources in late 2014, stalling most counterterrorism efforts.

While the 2014 offensives temporarily pushed AQAP from some of its safe havens, the group maintained strongholds and freedom in movement in key ungoverned areas of southern and eastern Yemen and continued to exert influence even in the regions it no longer fully controlled.  AQAP used the political instability and growing sectarian violence of 2014 to its benefit.

Yemen's political instability continued to hinder efforts to enact or enforce strategic trade controls, leaving the country vulnerable as a transit point for WMD-related materials.

## SOUTH ASIA

**Afghanistan:**  The border region of Afghanistan and Pakistan is an under-governed area which hosts terrorist cells active in both countries.  The Government of Afghanistan has struggled to assert control over this remote terrain where the population is largely detached from national institutions.  Afghanistan generally cooperates with U.S. counterterrorism efforts.  Since President Ghani's election, he has actively pursued cross-border security cooperation with the

PX209

Government of Pakistan, including the prospect of joint operations to reduce safe havens on both sides of the border.

Several terrorist networks active in Afghanistan, such as al-Qa'ida (AQ), the Haqqani Network, and others, operate largely out of Pakistan.  AQ has some freedom of movement in Kunar and Nuristan provinces largely due to a lack of Afghan National Security Forces' capacity to control certain border territories in north and east Afghanistan.  During 2014, the Afghan government continued to counter the Afghan Taliban and Taliban-affiliated insurgent networks with AQ connections.

The potential for WMD trafficking and proliferation remained a concern in Afghanistan because of its porous borders and the presence of terrorist groups.  The U.S. government worked with the Government of Afghanistan to implement comprehensive strategic trade controls and strengthen its border security system.  The Export Control and Related Border Security (EXBS) Program contributed to strengthening Afghanistan's enforcement capacity through participation in a technical exchange conducted by the Department of Homeland Security's Customs and Border Protection agency.  To increase the Government of Afghanistan's strategic trade control capacity, EXBS sponsored training for an Afghan delegation.  Representatives from the Afghan Atomic Energy High Commission, the Ministry of Commerce, and the Ministry of Foreign Affairs attended a course at the University of Georgia, Center for International Trade Security, covering a wide variety of nonproliferation topics and allowed for regional nonproliferation dialogue.  The U.S. Border Management Task Force also worked closely with Afghan officials to prevent the proliferation of and trafficking of WMD in and through Afghanistan.

The United States continued to assist the Afghan government to build capacity needed to secure potentially dangerous biological materials and infrastructure housed at Afghan facilities, promote surveillance capabilities to detect and identify possibly catastrophic biological events, and productively engage Afghan scientists and engineers that have WMD or WMD-applicable expertise.

**Pakistan:**  Portions of Pakistan's Federally Administered Tribal Areas, Khyber Pakhtunkhwa province, and Balochistan province remained a safe haven for terrorist groups seeking to conduct domestic, regional, and global attacks.  Al-Qa'ida, the Haqqani Network (HQN), Tehrik-e Taliban Pakistan (TTP), Lashkar i Jhangvi, and other terrorist groups, as well as the Afghan Taliban, took advantage of this safe haven to plan operations in Pakistan and throughout the region.

In 2014, Pakistan launched military operations in North Waziristan Agency and Khyber Agency to eliminate terrorist safe havens, destroy terrorist infrastructure, and disrupt terrorist communication networks.  The military operations had a significant impact on TTP safe havens, but some terrorist organizations in the region continued to operate, primarily along the border with Afghanistan.  Particularly since the start of comprehensive military operations in North Waziristan displaced militants into Afghanistan, Pakistan has sought improved coordination to address cross-border threats from TTP emanating from safe havens in Afghanistan.

PX209

The United States and Pakistan regularly discussed counterterrorism and border-control efforts to interdict terrorists.  The 2013 trilateral border standard operating procedures between Pakistan, Afghanistan, and ISAF expired at the end of 2014.  Pakistan and Afghanistan continued to negotiate a replacement bilateral agreement.

The potential for WMD trafficking, proliferation, and terrorism remained a concern in Pakistan. Pakistan is a constructive and active participant in the Nuclear Security Summit process and the Global Initiative to Combat Nuclear Terrorism, and has worked to strengthen its strategic trade controls.  The Export Control and Related Border Security Program increased the Government of Pakistan's enforcement capacity by training Pakistani Customs officials on international border interdiction techniques.  Trainings were implemented by the U.S. Department of Homeland Security, the Customs and Border Protection Agency; and the U.S. Department of Energy.

## WESTERN HEMISPHERE

**Colombia.**  Rough terrain and dense forest cover, coupled with low population densities and historically weak government presence have defined Colombia's borders with Venezuela, Ecuador , Peru, and Brazil, and historically have allowed for safe havens for terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN).  The Government of Colombia has maintained pressure on these groups and has continued to conduct operations to combat the FARC's ability to conduct terrorist attacks. Coupled with ongoing peace negotiations with the FARC and two FARC temporary unilateral cease fire declarations, Colombia experienced an overall decline in the total number of terrorist incidents in 2014.  Despite these successes, illegal armed groups, primarily known as "Bandas Criminales," continued to use the porous border, remote mountain areas, and jungles to maneuver, train, cultivate and transport narcotics, operate illegal mines, "tax" the local populace, and engage in other illegal activities.  Improved relations with neighboring Ecuador and Venezuela have led to some increased cooperation from those countries on law enforcement issues.  Colombia also continued to cooperate and share information with the Panamanian National Border Service.  Additionally, Brazil began implementing its Integrated Border Monitoring System in an effort to monitor its entire border and along with continued cooperation with the Government of Colombia addressed potential safe haven areas along their shared borders.

**Venezuela.**  Venezuela's porous border with Colombia has made the country attractive to the Revolutionary Armed Forces of Colombia and the National Liberation Army, who use it to cross in and out of its territory.  Jose Ignacio De Juana Chaos, an ETA terrorist whom authorities lost track of in 2008 after he was sentenced to 3,000 years in prison in Spain for the murders of 25 people, reportedly resurfaced in Venezuela after being sighted in a Caracas shopping mall in May, according to media reports.  In June, Maduro said the Venezuelan government did not have enough information to corroborate the reports.

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

In 2014, the Department of State designated five new Foreign Terrorist Organizations (FTOs) and amended three existing designations.  In addition, the Department designated 37

PX209

organizations and individuals as Specially Designated Global Terrorists under Executive Order (E.O.) 13224 and amended three existing designations.  The Department also revoked the designations of one organization and five individuals.  The Department of the Treasury also designated organizations and individuals under E.O. 13224.  For a full list of all U.S. designations, see the Department of Treasury's Office of Foreign Assets Control website at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

**2014 Foreign Terrorism Organization/Executive Order 13224 group designations:**

- On January 10, the Department of State designated Ansar al-Shari'a in Benghazi, Ansar al-Shari'a in Darnah, and Ansar al-Shari'a in Tunisia under E.O. 13224, and as a Foreign Terrorist Organization on January 13.  (See Chapter 6, Foreign Terrorist Organizations, for further information on the three groups.)
- On April 9, the Department of State designated Ansar Bayt al-Maqdis (ABM) under E.O. 13224 and as a Foreign Terrorist Organization on April 10.  (See Chapter 6, Foreign Terrorist Organizations, for further information on ABM.)
- On May 14, the Department of State amended the E.O. 13224 designation of al-Qa'ida in Iraq (AQI) to add additional aliases, including the Islamic State in Iraq and the Levant (ISIL), and to make ISIL the organization's primary name.  On the same day, the Department of State further amended AQI/ISIL's E.O. 13224 designation to revoke the aliases associated with the al-Nusrah Front (ANF) and separately designate ANF as an independent entity under E.O. 13224.  On May 15, these amendments were made to AQI's FTO designation and ANF was designated as an FTO.  (See Chapter 6, Foreign Terrorist Organizations, for further information on ISIL and ANF.)
- On June 25, the Department of State amended the E.O. 13224 designation of Lashkar e-Tayyiba (LET) to add the following aliases: Jama'at-ud-Dawa, Al-Anfal Trust, Tehrik-e Hurmat-e-Rasool, and Tehrik-e Tahafuz Qibla Awwal; and amended the FTO designation on June 26.  (See Chapter 6, Foreign Terrorist Organizations, for further information on LET.)
- On July 15, the Department of State revoked the Foreign Terrorist Organization designation of the United Self Defense Forces of Colombia (AUC).
- On August 7, the Department of State amended the E.O. 13224 designation of Harakat ul-Mujahidin (HUM) to include the alias Ansar ul-Ummah, and amended the FTO designation on August 8.  (See Chapter 6, Foreign Terrorist Organizations, for further information on HUM.)
- On August 19, the Department of State designated the Mujahidin Shura Council in the Environs of Jerusalem (MSC) under E.O. 13224 and as a Foreign Terrorist Organization on August 20.  (See Chapter 6, Foreign Terrorist Organizations, for further information on MSC.)

**2014 Executive Order (E.O.) 13224 designations:**
- On January 7, the Department of State designated Qari Saifullah, the Taliban shadow deputy governor and an operational commander in Zabul Province, Afghanistan.  Saifullah has used Taliban fighters to conduct terrorist activities, including improvised explosive device attacks, small arms fire attacks, and rocket attacks against the Government of Afghanistan and Coalition Forces.

PX209

- On January 10, the Department of State designated Abu Khattalah, Sufian bin Qumu, and Seifallah Ben Hassine.  Before his capture in July, Khattalah was a senior leader of Ansar al-Shari'a in Benghazi and Sufian bin Qumu is the founder of Ansar al-Shari'a in Darnah.  Seifallah Ben Hassine, also known as Abu Iyadh, is the founder of Ansar al-Shari'a in Tunisia.
- On January 23, the Department of State designated Ziyad al-Nakhalah, who is the Deputy Secretary General of the Palestinian Islamic Jihad.  Ziyad has repeatedly taken credit for attacks against Israel, including PIJ's indiscriminate missile attacks into Israel in 2008, 2009, and 2011.
- On February 6, the Department of State designated Malik Ishaq.  Ishaq is a founding member and the current leader of Lashkar I Jhangvi.  In February 2013, Pakistani police arrested Ishaq in connection with attacks on January 10 and February 16, 2013 in the northwestern city of Quetta, Pakistan that killed nearly 200 Pakistani civilians.
- On June 17, the State Department designated Shawki Ali Ahmed al-Badani, who is a leader and operative for al-Qa'ida in the Arabian Peninsula (AQAP).  Al-Badani was connected to a suicide bomber who killed over 100 Yemeni soldiers in a May 2012 attack, and played a key role in a plan for a major attack in summer 2013 that led the United States to close 19 diplomatic posts across the Middle East and Africa.
- On July 15, the Department of State designated Anders Cameroon Ostensvig Dale, a Norwegian citizen who traveled to Yemen to join AQAP.  As part of AQAP, Dale has received terrorist training and was taught to make bomb-belts, improvised explosive devices (IEDs), and larger explosives used in car bombs.
- On August 18, the Department of State designated Abu Mohammed al-Adnani, who is the official spokesman for and a senior leader of the Islamic State in Iraq and the Levant (ISIL).
- On August 18, the Department of State designated Said Arif.  In 2003, Arif was prosecuted in France with 25 others as part of the "Chechen Network" accused of plotting both to blow up the Eiffel Tower and to conduct chemical attacks and attacks on malls and police stations in France.  Arif is connected to al-Qa'ida (AQ) and al-Nusrah Front (ANF).
- On September 24, the Department of State designated 10 individuals and two groups connected to foreign terrorist fighters in Syria, Iraq, and Somalia:
    - Harakat Sham al-Islam is a Moroccan-led organization operating in Syria that has carried out terrorist attacks and engaged in kidnappings against civilians with other violent extremist organizations in Syria, including ANF.
    - Jaish al-Muhajireen wal-Ansar is a Chechen-led organization based in Syria that has cooperated with other violent extremist organizations in Syria, including ANF and ISIL, to launch deadly assaults against civilian communities, and has kidnapped civilians and other foreigners in Syria.
    - Muhannad al-Najdi is a Syria-based AQ facilitator of Saudi nationality.  Prior to traveling to Syria in 2013, al-Najdi was involved in facilitation and operational planning in support of attacks in Afghanistan.  Since at least 2010, al-Najdi has also been involved in the development of IEDs for use in Afghanistan and Syria.
    - Murad Margoshvili is a Chechen leader in Syria who built a terrorist combat training base in Syria near the Turkish border for newly arrived foreign terrorist fighters.
    - Lavdrim Muhaxheri is a Kosovar Albanian foreign fighter for ISIL who operates in both Syria and Iraq.  In July 2014, Muhaxheri posted graphic photos of himself online beheading a young man.

- o Nusret Imamovic is a Bosnian terrorist leader in Syria believed to be fighting with ANF.
- o Mohammed Abdel-Halim Hemaida Saleh was arrested in Egypt in 2013 for plotting to attack Western embassies in Cairo.  As of mid-2013, Saleh had been recruiting suicide bombers to send to Syria and had been planning terrorist activities against unspecified targets in Europe.
- o Salim Benghalem is a Syria-based French violent extremist and ISIL member who has carried out executions on behalf of the group.
- o Amru al-Absi was selected in July 2014 as ISIL's provincial leader for Homs, Syria. As a principal leader of ISIL in Syria, al-Absi has been in charge of kidnappings.
- o Abdessamad Fateh, also known as Abu Hamza, is a member of a Scandinavia-based network of violent extremists linked to AQ, and has traveled to Syria.
- o Abd al-Baset Azzouz is a senior member of AQ who was sent by AQ leader Ayman al-Zawahiri to Libya in 2011 to mobilize fighters there.
- o Maalim Salman is the head of African foreign fighters for al-Shabaab.  He has trained foreign nationals who were seeking to join al-Shabaab, and has been involved in operations in Africa targeting tourists, western-oriented businesses, and churches.
- On October 21, the Department of State designated Khan Said, former deputy leader of Tehrik-e Taliban Pakistan (TTP), who has maintained his commitment to terrorist activity despite officially splitting from TTP in May.
- On October 21, the Department of State designated Ramzi Mawafi, an Egyptian national and long-time AQ member best known as the former doctor to Usama bin Laden.  Mawafi is believed to be in the Sinai Peninsula coordinating among militant groups and helping to arrange money and weapons to support violent extremist activity.
- On December 18, the Department of State designated Ajnad Misr, a splinter group of Ansar Bayt al-Maqdis, which announced its formation in January 2014.  Ajnad Misr has claimed numerous attacks on Egyptian security forces at government buildings, public spaces and universities, often injuring or killing innocent bystanders.
- On December 18, the Department of State designated Ibrahim al-Rubaysh.  Al-Rubaysh is a senior leader of AQAP and a senior advisor for AQAP operational planning, who provides the justification for its attacks.

---

## MULTILATERAL EFFORTS TO COUNTER TERRORISM

In 2014, the United States continued to work with key partners and allies to strengthen its diplomatic engagement through multilateral organizations.  Deepening and broadening the international multilateral counterterrorism frameworks and capacities enhances the role of multilateral institutions at the international, regional, and sub-regional levels to counter the threat of violent extremists and also increases the counterterrorism capacities of countries around the world.

**The Global Counterterrorism Forum (GCTF).**  Since its launch in September 2011, the GCTF has mobilized over US $300 million to support national and regional efforts to strengthen civilian institutions and counter violent extremism.  This includes support for the implementation of GCTF framework documents at both the regional and country levels.  The GCTF is working with partners around the globe to change how states – particularly those emerging from

303

PX209

authoritarian rule – respond to the challenges of terrorism and the violent extremist ideologies that underpin it.  The GCTF, with its 30 founding members (29 countries and the EU), regularly convenes counterterrorism policymakers and practitioners, as well as experts from the UN and other multilateral bodies, to identify urgent needs, devise solutions, and mobilize resources for addressing key counterterrorism challenges facing civilian institutions. With its primary focus on countering violent extremism (CVE) and strengthening criminal justice and other rule of law institutions that deal with terrorism, the GCTF aims to diminish terrorist recruitment and increase countries' capacity for dealing with terrorist threats within their borders and regions.

In the past year, the GCTF developed a number of new good practices documents that are intended to both provide practical guidance for countries as they seek to enhance their counterterrorism capacity and to bring greater strategic coherence to global counterterrorism capacity building efforts:

- *The Hague—Marrakech Memorandum on Good Practices for a More Effective Response to the "Foreign Terrorist Fighters" (FTF) Phenomenon* is intended to inform and guide governments as they develop comprehensive policies, programs, and approaches to address the foreign terrorist fighter phenomenon;
- The *Abu Dhabi Memorandum on Good Practices for Countering Violent Extremism (CVE) and Education* focuses on the ways education can be used to prevent and counter violent extremism by policymakers, teachers and educators, community-based organizations, NGOs, and families;
- *The Hague Memorandum on Good Practices for the Judiciary in Adjudicating Terrorism Offenses* articulates a set of good practices on the role of the judiciary in handling counterterrorism cases within a rule of law framework, with a particular focus on effective case and trial management; and
- The *Recommendations for Using and Protecting Intelligence Information in Rule of Law-Based, Criminal Justice Sector-Led Investigations and Prosecutions* focuses on the protection of sources and collection methods of intelligence information in terrorism cases.

In addition, the GCTF has inspired the establishment of three independent institutions that provide platforms for delivering sustainable training and resources in support of CVE and strengthening rule of law.

- Based in Abu Dhabi, **Hedayah**, the first international center of excellence on CVE, hosted a number of training and capacity building courses focusing on community policing and community engagement, CVE and education, and CVE and communications.  In December, it hosted a CVE Communications Expo that brought together approximately 200 CVE practitioners and communications professionals to develop innovative CVE communications activities.

- The **International Institute for Justice and the Rule of Law (IIJ)**, based  in Malta, was inaugurated in June as a center dedicated to providing police, prosecutors, judges, corrections officials, lawmakers, and others with the training and tools required to

304

PX209

address terrorism and related transnational criminal activity.  It will initially focus on countries in the Middle East and North, West, and East Africa, with a particular emphasis on countries in transition.  The Institute is governed by a geographically diverse group of a dozen countries and is developing and delivering a series of core courses on what it means to counter terrorism within a rule of law framework; how to use intelligence as evidence in terrorism trials while protecting human rights; the role of parliamentarians in counterterrorism; a comprehensive program to counter foreign terrorists fighters; and how to interrogate suspected terrorists while upholding their human rights.

- In September 2013, Secretary Kerry announced that a core group of government and non-governmental partners from different regions will establish the first-ever public-private global fund to support local grass-roots efforts to counter violent extremism.  In June 2014, the **Global Community Engagement and Resilience Fund (GCERF)** became fully operational in Geneva as a foundation under Swiss law, with its first Board meeting held in November.  Pilot countries include Bangladesh, Mali, Morocco, and Nigeria.  Grants will be focused on programs that strengthen resilience against violent extremism.  In addition, GCERF created an accelerated funding mechanism (AFM) that will make funds available within 90 days from receipt of program application.  The AFM is targeted towards supporting local initiatives that stem radicalization and address the violent extremist agenda of the Islamic State in Iraq and the Levant and other groups.  NGOs from the Middle East, North Africa, and the Balkans will be eligible to receive grants via this mechanism, once it is funded.

The UN is a close partner of, and participant in, the GCTF and its activities.  The GCTF serves as a mechanism for furthering the implementation of the universally-agreed UN Global Counter-Terrorism Strategy and, more broadly, to complement and reinforce existing multilateral counterterrorism efforts, starting with those of the UN.  The GCTF also partners with a wide range of regional multilateral organizations, including the Council of Europe, the OSCE, the AU, and the Inter-Governmental Authority on Development.

**The United Nations (UN).**  Sustained and strategic engagement at the UN on counterterrorism issues is a priority for the United States.  In September, President Obama presided over a UN Security Council (UNSC) session that approved UN Security Council resolution (UNSCR) 2178, a binding resolution that requires all States to "prevent and suppress the recruiting, organizing, transporting, or equipping" of foreign terrorist fighters as well as the financing of their travel and activities.  This resolution was also the first time the UNSC called for action to prevent radicalization to violence.  The UNSC also adopted other important counterterrorism UNSCRs during 2014, including UNSCR 2133 to counter terrorists benefiting directly or indirectly from ransom payments or political concessions, and to secure the safe release of hostages; UNSCR 2170 to combat the gross, systematic, and widespread abuse of human rights by Islamic State in Iraq and the Levant and al-Nusrah Front; and 2195 to further address the link between transnational organized crime and terrorism and build States' and UN capacities to address the challenge.  The United States engaged with a wide range of UN actors on counterterrorism, which included:

PX209

- **The Counter-Terrorism Committee Counter-Terrorism Executive Directorate (CTED).** The United States supported CTED efforts to analyze capacity gaps and facilitate training and other technical assistance to UN member states, including on foreign terrorist fighters. This included participating in Counter-Terrorism Committee (CTC) thematic debates on a range of issues including kidnapping for ransom; counterterrorism financing; securing borders; and investigating, prosecuting, and adjudicating terrorism cases within a rule of law framework.

- **The Counter-Terrorism Implementation Task Force (CTITF).** The United States supported CTITF efforts to improve member states' implementation of the UN Global Counterterrorism Strategy, including by serving on the Advisory Board of the UN Counter-Terrorism Centre, which delivers training and other capacity building to help address identified needs. In 2014, the United States provided funding to support a range of CTITF activities including: capacity building for Mali's security and justice sectors; a training initiative to secure open borders; capacity building for civil society in Nigeria to counter violent extremism; implementing good practices on addressing and preventing terrorist kidnapping for ransom; and supporting community engagement through human rights-led policing.

- **The UNSC 1267/1989 Committee.** The United States worked closely with the UN 1267/1989 (al-Qa'ida) Sanctions Committee and its Monitoring Team by proposing listings and de-listings, providing amendments, engaging the Committee's Ombudsperson in de-listings, and providing input to the Committee to enhance its procedures and implementation of sanctions measures. The United States also assisted the Monitoring Team with information for its research and reports. There are 231 individuals and 70 entities listed on the al-Qa'ida Sanctions List. In 2014, 23 individuals and seven entities were listed. The Committee also worked to ensure the integrity of the list by conducting regular reviews and by endeavoring to remove those individuals and entities that no longer meet the criteria for listing. In 2014, 11 individuals and three entities were de-listed, of which five individuals and three entities were de-listed following the submission of a petition through the Office of the Ombudsperson.

- **The UN Office on Drugs and Crime's Terrorism Prevention Branch (UNODC/TPB).** The Terrorism Prevention Branch (TPB), in conjunction with the UNODC's Global Program against Money Laundering, continued to provide assistance to countries seeking to ratify and implement the universal legal instruments against terrorism. In 2014, the United States supported a range of TPB programs aimed at strengthening the capacity of criminal justice officials to prevent and respond to terrorism within a rule of law framework, including in the Horn of Africa and Cameroon.

- **The UN Inter-Regional Crime Research Institute (UNICRI).** The United States has provided financial support to a UNICRI-led global effort to strengthen the capacity of countries to implement the good practices contained in the GCTF's *Rome Memorandum on Good Practices for the Rehabilitation and Reintegration of Violent Extremist Offenders*.

PX209

- **The UNSC 1540 Committee.**  The Committee monitors and facilitates efforts to implement the obligations and recommendations of UNSCR 1540, addressing the nexus of proliferation of chemical, biological, and nuclear weapons and their means of delivery and illicit activities by non-state actors, including terrorists.  A May 2014 UNSC Presidential Statement marking the tenth anniversary of the resolution urged States to implement the resolution fully by 2021.  The 1540 Committee's program of work focuses on five main areas: monitoring and national implementation; assistance; cooperation with international organizations, including the UNSC committees established pursuant to UNSCRs 1267 and 1373; transparency and media outreach; and administration and resources.  The Committee's Group of Experts also participates as part of the CTITF.

**The International Civil Aviation Organization (ICAO).**  ICAO's Universal Security Audit Program (USAP) continued to contribute directly to U.S. homeland security by ensuring that each of ICAO's 191 member states conducts regular security audits that comply to aviation security standards.  In 2014, ICAO continued to transition to the USAP-Continuous Monitoring Approach (USAP-CMA) which will enable greater focus of resources on states requiring more assistance in meeting the Standards.  ICAO has begun to pilot the process and certify auditors accordingly.  USAP conducted assistance missions to help states correct security problems revealed by surveys and audits.  ICAO, in partnership with the UN's CTED, has assisted member states in the implementation of UNSCRs on counterterrorism, including border control.  The two entities have conducted assessment visits and organized workshops focused on countering terrorism and the use of fraudulent travel documents, and promoting good practices on border control and aviation security.  Together with the UN Office on Drugs and Crime, ICAO and CTED have encouraged member states to ratify and implement international counterterrorism treaties.

**The International Atomic Energy Agency (IAEA).**  The IAEA continued to implement its Nuclear Security Plan (2010-2013) for countering the threat of terrorism involving nuclear and other radioactive material.  The United States was actively involved in IAEA efforts to enhance security for vulnerable nuclear and other radioactive materials and associated facilities, and to reduce the risk that terrorists could gain access to or use such materials or expertise.

**The International Criminal Police Organization (INTERPOL).**  INTERPOL's secure, global communications system, criminal investigative tools, analytical databases, and framework for international police cooperation have been brought to bear in a coordinated effort to identify, locate, and apprehend individuals involved in terrorist activities.  Following the example of INTERPOL Washington, the U.S. National Central Bureau, a number of member countries are now integrating INTERPOL's information-sharing resources and capabilities into their border security and law enforcement lookout systems to help monitor and interdict the international transit of foreign terrorist fighters.  In addition, and with funding and staffing from U.S. law enforcement agencies, INTERPOL's Foreign Terrorist Fighter Working Group is supporting a multinational fusion cell and analytical database containing identity particulars that can be used by law enforcement and border control authorities to help determine the terrorist threat posed by subjects located in, or attempting to enter, their respective jurisdictions.

PX209

**The Financial Action Task Force (FATF) and the FATF-Style Regional Bodies (FSRBs).**  The United States supported the FATF plenary activities on a number of combating the financing of terrorism (CFT) issues including guidance on, and vulnerabilities of, new payment methods, preventing terrorist financing abuse of the non-profit sector, and countering the financing of the Islamic State in Iraq and the Levant; and participated in the working groups on implementation and on strengthening the FATF network through the FATF-style regional bodies (FSRBs).  The United States continued to stress the importance of targeted sanctions and Recommendation 6, a provision to freeze and confiscate assets.

**African Union (AU).**  The United States supported the efforts of the AU to bolster the counterterrorism capacity of its members to implement the UN Strategy, particularly via the AU's efforts to implement GCTF framework documents.  For example, the United States provided assistance for AU-led workshops on implementing the GCTF's Algiers Memorandum on Good Practices for Preventing and Denying the Benefits of Kidnapping for Ransom to Terrorists.

**Organization for Security and Cooperation in Europe (OSCE).**  Under the leadership of the Swiss Chairman-in-Office, the OSCE addressed foreign terrorist fighter and kidnapping for ransom issues, culminating in the adoption of two timely and relevant declarations at the OSCE Basel Ministerial Council meeting in December 2014.  U.S.-funded border security training in Central Asia, particularly through the OSCE's Border Management Staff College in Dushanbe, also contributed to the capabilities of border and customs officials to counter transnational threats.  Through the OSCE's Action against Terrorism Unit, the United States supported initiatives aimed at countering violent extremism (CVE); protecting critical energy infrastructure; addressing effective criminal justice system responses to terrorism, travel document security, cyber security, and nonproliferation; and promoting the vital CVE role women can play.  In a joint effort with the GCTF, the OSCE helped develop a set of good practices for women fighting terrorism-related challenges to families, communities, and international security.  The OSCE also published a comprehensive guidebook on community-policing CVE measures.

**North Atlantic Treaty Organization (NATO).**  At the Wales NATO Summit in September, allies decided to "enhance their cooperation in exchanging information on returning foreign fighters."  To complement counter-Islamic State in Iraq and the Levant coalition efforts, NATO also committed to help Iraq build more effective security forces.  On December 31, NATO transitioned from the International Security Assistance Force (ISAF) to RESOLUTE SUPPORT Mission, a non-combat train, advise, and assist mission in Afghanistan.  In 2014, NATO adopted an Action Plan to accompany its Counterterrorism Policy Guidelines to identify initiatives to enhance the prevention of, and resilience to, acts of terrorism with a focus on improved threat awareness, adequate capabilities, and enhanced engagement with partner countries and other international actors in countering terrorism.  NATO was also exploring opportunities for enhanced cooperation with the UN's Counter-Terrorism Implementation Task Force.

**European Union (EU).**  In 2014, the EU's work with the United States included efforts to curb terrorist financing, strengthen cooperation on countering violent extremism, shut down foreign terrorist fighter networks, and build counterterrorism capacity in third countries.  Much of this

PX209

work is completed through regular senior-level and working-level consultation and collaboration including the U.S.-EU Consultation on Terrorism and the U.S.-EU Political Dialogue on Counterterrorist Financing.

**Group of Seven (G-7).**  Within the context of the G-7 Roma-Lyon Group (RLG) meetings on counterterrorism and counter-crime, the United States worked to bolster cooperation on confronting the foreign terrorist fighter phenomenon, and on addressing border security capacity gaps in North and West Africa.  The United States also sought to advance projects through the RLG's expert groups on counterterrorism, transportation security, high-tech crime, migration, criminal legal affairs, and law enforcement.

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF).**  Counterterrorism activities of the 27-member ARF countries included the annual meeting on counterterrorism and transnational crime (CTTC) and supported capacity building through ARF institutions.  The United States supported ARF efforts to address cybersecurity issues, including confidence-building measures in cyberspace, and promoted efforts that respect human rights such as freedom of expression and open access.  The United States encouraged information sharing and supported the CTTC work plan, which focused on illicit drugs; chemical, biological, radiological, and nuclear terrorism; cybersecurity; counter-radicalization; the sponsorship of a regional transnational crime information sharing center; and a workshop on migration.

**Asia-Pacific Economic Cooperation (APEC).**  In 2014, APEC continued to implement its comprehensive Consolidated Counterterrorism and Secure Trade Strategy.  The Strategy, adopted in 2011, endorsed the principles of security, efficiency, and resilience, and advocated for risk-based approaches to security challenges across its four cross-cutting areas of supply chains, travel, finance, and infrastructure.  The United States co-sponsored a workshop on Secure Infrastructure in the Asia-Pacific Region, which highlighted how APEC economies face varied challenges to building secure, efficient, and resilient infrastructure for regional commerce and transportation, and also demonstrated the importance of identifying gaps, sharing best practices, and developing a regional approach to critical infrastructure protection and resilience.  The United States also sponsored APEC capacity building workshops on canine screening in aviation security and low cost/no cost checkpoint optimization, which helped further implement the APEC Counterterrorism and Secure Trade Strategy.

**Organization of American States' Inter-American Committee against Terrorism (OAS/CICTE).**  In 2014, the CICTE Secretariat conducted 59 activities, training courses, and technical assistance missions that benefited more than 2,704 participants in five thematic areas: border control; critical infrastructure protection; counterterrorism legislative assistance and terrorist financing; strengthening strategies on emerging terrorist threats (crisis management); and international cooperation and partnerships.  The United States is a major contributor to CICTE's training programs and has provided funding and expert trainers for capacity building programs focused on maritime security, aviation security, travel document security and fraud prevention, cybersecurity, counterterrorism legislation, and efforts to counter terrorist financing.

PX209

> **INTERNATIONAL CONVENTIONS AND PROTOCOLS**
>
> A matrix of the ratification status of 18 of the international conventions and protocols related to terrorism can be found here:  https://www.unodc.org/tldb/universal_instruments_NEW.html

## LONG-TERM PROGRAMS AND INITIATIVES DESIGNED TO COUNTER TERRORIST SAFE HAVENS

**COUNTERING VIOLENT EXTREMISM (CVE).**   CVE is part of the strategic approach to counterterrorism that aims to deny terrorism new recruits by reducing sympathy and support for violent extremism.  Our CVE objectives are to (1) build resilience among communities most at risk of recruitment and radicalization to violence; (2) counter violent extremist narratives and messaging; and (3) build the capacity of partner nations and civil society to counter violent extremism.  Our counter-recruitment and counter-messaging efforts are focused on the Islamic State in Iraq and the Levant (ISIL) and al-Qa'ida (AQ), its affiliates, adherents, and like-minded groups.

Diplomatically, we meet these objectives via bilateral and multilateral dialogue, emphasizing the need for countries to address the drivers of violent extremism.  Programmatically, we meet these objectives by identifying drivers of recruitment and radicalization to violence, and ways to counter the phenomena.  We identify key nodes and locales where radicalization is taking place, and focus our programming and activities in these areas.

The State Department emphasizes supporting local CVE efforts and building local CVE capacity.  The growing international focus on CVE has allowed the United States to develop a broader range of international partners to support our efforts, including other governments, multilateral organizations, and non-governmental actors.  Through these broad-based partnerships, we have been able to develop good practices, leverage others' resources, and multiply results.

The State Department works with foreign partners and other U.S. government agencies, such as USAID and DoD to identify hotspots of radicalization and to design programming focused on those areas.  Key areas of programming include:

- **Community Engagement and Community-Oriented Policing.**  The Department of State has implemented projects that link marginalized groups in a community, such as at-risk youth or women, with responsible community leaders to build their resilience to violent extremism and improve their capacity to counter it.  These activities include: providing skills training to youth, their families, and their communities; leadership development; and promoting problem solving and conflict resolution skills.  Projects also include training law enforcement personnel in community engagement, facilitation, and relationship building; counter-messaging and narratives; and supporting law enforcement partnerships with non-law enforcement government and non-government actors.  Through increased cooperation among community leaders, law enforcement, and local

PX209

government, community-oriented policing builds community resilience to violent extremism by addressing factors of local instability, disenfranchisement, and marginalization.

- **CVE Advocacy: Women and Victims/Survivors of Terrorism.** Women can act as gatekeepers to their communities, and thus can provide a first line of defense against recruitment and radicalization to violence in their families and communities. Through CVE efforts in the East Africa and West Africa region, women are trained to recognize signs of radicalization, deploy prevention techniques, and are responsible for the local promotion of security and radicalization prevention. In partnership with local women's networks, the Department of State supports training for women civil society leaders and law enforcement personnel to devise CVE-prevention strategies and pilot activities. In addition to women, victims and survivors of terrorism, by sharing their stories, offer a resonant counter-narrative that highlights the destruction and devastation of terrorist attacks. Workshops train victims to interact with conventional and social media, create public relations campaigns that amplify their messages, and seek out platforms that help them disseminate their message most broadly to at-risk audiences.

- **CVE Counter-messaging and Counter-narratives.** The Department of State supports country-based and regional trainings for local partners to develop and disseminate their own counter-narratives and build their capacity to do this work on their own. In South and Southeast Asia, for example, CVE projects – via training and regional and national media production competitions – support youth to create and show CVE films, and provide training on designing CVE counter-messaging campaigns with a particular focus on social media.

- **Diaspora Engagement.** The Department of State supports efforts to conduct outreach and training tours among diaspora communities who may be targeted for recruitment or susceptible to radicalization to violence. Efforts involve community roundtables to raise awareness and discuss ways to prevent recruitment and radicalization. These projects are especially effective in engaging Somali diaspora communities.

- **Prison Disengagement, Rehabilitation and Reintegration.** One area of potential radicalization to violence is prisons. If improperly managed, a prison can serve as both a safe haven for violent extremism and an incubator for new recruits. Recognizing that many such inmates will eventually be reintegrated back into society, the Department of State is working – primarily through partner organizations – to strengthen the capabilities of key countries to rehabilitate and reintegrate such offenders. Such partners include the UN's Interregional Crime and Justice Research Institute (UNICRI) and the International Center for Counterterrorism, and DOJ's International Criminal Investigative Training Assistance Program. The Global Counterterrorism Forum (GCTF)'s Rome Memorandum – a series of good practices in this area – is used to shape their efforts. More than 40 countries, multilateral organizations, and leading independent experts have participated in these efforts, providing policymakers, practitioners, and experts a chance to further develop these good practices. In late 2014, the GCTF and UNICRI jointly

PX209

launched an effort that attempts to address the challenge of returning foreign terrorist fighters with a focus on the knowledge learned through prison de-radicalization efforts.

- **The Center for Strategic Counterterrorism Communications (CSCC).**  CSCC, based at the Department of State, collaborates with U.S. embassies and consulates, interagency partners, and outside experts to counter terrorist narratives and misinformation.  CSCC programs draw on a full range of intelligence information and analysis for context and feedback.  CSCC counters terrorist propaganda on social media on a daily basis, contesting space where extremists and their supporters formerly had free reign.  In 2014, CSCC produced over 13,000 postings and 645 banners and videos online.  CSCC also engaged in a variety of projects directly supporting U.S. government communicators working with overseas audiences, as well as amplifying credible CVE voices and supporting local initiatives, primarily in the Middle East and Africa.  The Information Coordination Cell, housed in the CSCC, was established in 2014 to coordinate the U.S. government's counter-Islamic State in Iraq and the Levant messaging as part of the Global Coalition strategy.

**CVE Engagement through Multilateral Institutions:**

- **Global Counterterrorism Forum (GCTF) CVE Working Group.**  The GCTF's CVE Working Group, one of five expert-driven groups, focuses on the following work streams: (a) the role institutions to counter violent extremism; (b) countering the violent extremist narrative; and c) measuring the impact of CVE programs.  During 2014, the CVE Working Group led the successful development of good practices on the role of education in CVE, which GCTF member states approved in September 2014.  The working group also supported the endorsement of an action plan on community-oriented policing and engagement, which builds on the 2013 good practices in these CVE areas.

- **Hedayah, the International CVE Center of Excellence:**  With support from GCTF members and international partners, the United Arab Emirates launched the first international CVE Center of Excellence, Hedayah, in December 2012.  As in 2013, the Department of State in 2014 continued to support Hedayah through funding for training for governmental and non-governmental CVE practitioners on such topics as community-oriented policing, education, community-based approaches and CVE communications and media.  Major Hedayah activities in 2014 included an international education and CVE workshop in May, and a December CVE Communications Expo that brought together hundreds of government, civil society, and media practitioners.

- **Global Community Engagement and Resilience Fund (GCERF):**  The objective of GCERF is to leverage public and private sector support for community-based projects aimed at addressing local drivers of radicalization by focusing on education, vocational training, civic engagement, media, youth, and women's advocacy.  Participating pilot countries include Bangladesh, Mali, Morocco, and Nigeria.  Switzerland hosts the GCERF office in Geneva.  In September, Secretary Kerry called for the establishment of a global funding window through GCERF for projects to counter ISIL recruitment and radicalization to violence.

PX209

- **USAID Approach to CVE.**  USAID's approaches to CVE run parallel to and are undertaken in coordination with Department of State CVE efforts.  Unlike traditional development programming, USAID's CVE programming addresses specific populations – particularly young men – and regions that are most at risk of radicalization and recruitment.  Robust analysis, evidence-based programming, and partnership with host national and local governments, civil society, and the private sector are critical elements of USAID's CVE approach.

  o **Empowering Youth:**  vocational and entrepreneurial skills training, civic education, sports and cultural activity, capacity building for youth associations, and leadership training to increase young men and women's participation in local decision-making.  In East Africa, for example, programming aims to promote a positive sense of identity for vulnerable youth through youth association activity, community participation, and vocational training.

  o **Increasing Mainstream Voices**: integrated radio, social media, and civic education activities, enhanced quality and credible information, and positive dialogue.  In the Sahel, for example, USAID is providing technical and financial support for local radio stations and their production of mainstream, community-based content.  Religious leaders are being engaged with training and dialogue to promote mainstream messaging, conflict prevention and resolution, and constructive community initiatives.

  o **Increasing Civil Society Capacity**:  formal and informal training, strengthened advocacy skills, citizen-led accountability initiatives and issue-based campaigns integrated with radio and social media and enhanced through civil society coalitions and networks.  For example, USAID is providing capacity building grants to civil society organizations (CSOs) in Pakistan for rehabilitation projects and community initiatives.

  o **Strengthening Local Government**:  organized and enhanced community entities and CSO capacity, greater citizen participation, particularly youth and women, and training in public administration, transparency, advocacy, and government outreach.  For example, in the Sahel, USAID is supporting the establishment of local community advisory councils composed of women, youth, religious, and other representatives to ensure local governance and activities are more responsive to community needs.

**CAPACITY BUILDING PROGRAMS.**  As the terrorist threat has evolved and grown more geographically diverse in recent years, it has become clear that our success depends in large part on the effectiveness and ability of our partners.  To succeed over the long term, we must increase the number of countries capable of and willing to take on this challenge.  Our counterterrorism capacity building programs – Antiterrorism Assistance Program, Counterterrorist Finance, Counterterrorism Engagement, the Terrorist Interdiction Program/Personal Identification Secure Comparison and Evaluation System, and transnational activities under the Regional Strategic

PX209

Initiatives – are all critically important and work on a daily basis to build capacity and improve political will.  For further information on these programs, we refer you to the Annual Report on Assistance Related to International Terrorism, Fiscal Year 2014: http://www.state.gov/j/ct/rls/other/rpt/221544.htm.

**REGIONAL STRATEGIC INITIATIVE (RSI).**  Terrorist groups often take advantage of porous borders and ungoverned areas between countries.  The U.S. Department of State's Bureau of Counterterrorism created RSI to enable flexible civilian responses to rapidly evolving threats, and to build the regional capacity, partnerships, and cooperation necessary to counter the most serious threats facing the United States.  Current RSI efforts focus on stemming the flow of foreign fighters to Syria and Iraq, countering terrorist safe havens, counter-ISIL messaging, and countering Hizballah's activities.  In 2014, RSI, supported a wide variety of projects focused on regional law enforcement cooperation and effectiveness against transnational threats.  Examples include establishing interagency counterterrorism centers for partner countries in Europe and North Africa, and associated training for center personnel; support to develop partner ability to manage sophisticated terrorism and transnational crime cases in Southeast Asia; and trainings that engaged key governments in multiple sectors (finance, security, rule of law) to ensure that al-Qa'ida in the Islamic Maghreb does not benefit from kidnapping-for-ransom.  The State Department seeks to strengthen efforts by partner governments to address and mitigate threats posed by foreign terrorist fighters, including addressing critical gaps in the partner countries to prevent, interdict, prosecute, and rehabilitate foreign terrorist fighters traveling to Iraq and Syria.  To that end, RSI supported DOJ advisors and other expert travel to key partner nations to provide critical and timely assistance in various technical areas, such as the investigation and prosecution of foreign terrorist fighter cases.

PX209

| SUPPORT FOR PAKISTAN |
|---|

In 2014, the United States continued to build a long-term partnership with Pakistan, as we believe that a stable, secure, prosperous, and democratic Pakistan is in the long-term U.S. national security interest.  To support this partnership, the United States has allocated civilian and security assistance totaling more than $9 billion since 2009.  U.S. security assistance to Pakistan is designed to build Pakistan's counterterrorism and counterinsurgency capacity.  In addition, since 2001, the Department of Defense has reimbursed over $13 billion in Coalition Support Funds for Pakistani expenditures in support of Operation Enduring Freedom.

| Account | FY 2012 Actuals | FY 2013 Actuals | FY 2014 653(a) |
|---|---|---|---|
| Total Foreign Assistance | 1,820.844 | 1,146.4 | 890.4 |
| Economic Support Fund (ESF) | 904.7 | 826.3 | 477.0 |
| Intl. Narcotics Control and Law  Enforcement (INCLE) | 75.0 | 57.4 | 57.4 |
| Nonproliferation, Antiterrorism, Demining (NADR) | 20.8 | 10.6 | 10.0 |
| Foreign Military Financing (FMF) | 295.4 | 280.2 | 280.0 |
| International Military Education and Training (IMET) | 4.9 | 5.0 | 4.9 |
| Pakistan Counterinsurgency Capability Fund  (PCCF) | 452.0 | - | - |
| Food for Peace Title II (FFP) | 68.1 | 69.9 | 61.1 |

Since the Enhanced Partnership with Pakistan Act (commonly referred to as Kerry-Lugar-Berman, or "KLB") was enacted in October 2009, and with funding made available in annual appropriations legislation, the United States has committed over US $5 billion in civilian assistance to Pakistan, in addition to over US $1 billion for humanitarian assistance in that timeframe, addressing floods and conflict.  We continue to focus on five sectors determined in consultation with the Pakistani government in 2011:  energy; economic growth including agriculture, stabilization of areas vulnerable to violent extremism; education; and health.  Emphasis on improving democracy, governance, and gender equity are integrated into programming across the five sectors.

Since the passage of this major authorization and annual appropriations legislation, U.S. assistance has added over 1,400 megawatts to Pakistan's electricity grid and helped Pakistan take steps to reform the troubled sector; funded the refurbishment or construction of nearly 1,000 kilometers of roads, enabling trade, security, and mobility; trained over 5,600 police and 1,000 prosecutors across Pakistan; provided scholarships to approximately 12,000 Pakistanis to attend Pakistani universities; and supplied better access to comprehensive family planning services to over 100,000 women.

**Energy:**  Chronic energy shortages severely limit Pakistan's economic development.  As such, energy is our top assistance priority, supporting the goal of job creation, security, and political stability in Pakistan.  We continued to fund infrastructure rehabilitation projects, especially in

PX209

clean energy, and provided technical assistance to Pakistani energy institutions, including distribution companies, to increase power generation and improve performance.

**Economic Growth:**  Through a range of programs and public-private partnerships in agriculture and other sectors of Pakistan's economy, U.S. assistance helped Pakistan create jobs and foster economic growth.  In 2014, the United States made awards for the Pakistan Private Investment Initiative, a public-private program in which U.S. capital, matched equally by private sector funding, was committed as equity to small- and medium-sized Pakistani enterprises to provide much needed liquidity.

**Stabilization:**  The United States supported Pakistan's efforts to make its territory inhospitable to violent extremists by strengthening governance and civilian law enforcement capacity and promoting socioeconomic development, particularly in areas bordering Afghanistan and other targeted locations vulnerable to violent extremism.  Our efforts included road construction, small community-based grants, police and governance training, and providing equipment to civilian law enforcement.

**Education:**  Pakistan's ability to educate its youth is critical to its economic growth and future trajectory.  U.S. education programs focused on increasing the number of students who enroll in and complete courses in primary and tertiary educational institutions; and improving the quality of that education – with a specific focus on reading – to prepare Pakistani students for the workforce.  We are also committed to building bridges between Pakistani and American students and professionals through exchange programs.

**Health:**  The provision of basic health services in Pakistan is inadequate for much of the population, particularly for rural populations.  U.S. health programs supported the Government of Pakistan's efforts to deliver healthcare, particularly in the areas of maternal and child health.  U.S. assistance was also used to support Government of Pakistan initiatives to construct health clinics and hospitals, fund the acquisition of medical materials, and provide critical family planning and reproductive health care.

**Humanitarian Assistance**:  Since October 2009, over US $1.3 billion of emergency humanitarian assistance has been provided to Pakistan in response to floods and conflict, above and beyond bilateral assistance.  During the historic 2010 floods, funding from the American people helped 10 million flood-affected citizens, who received rescue services, food, emergency shelter, cash grants, and even seeds to replant crops.

**International Narcotics Control and Law Enforcement:**  Pakistan took important steps to counter violent extremists operating in the areas bordering Afghanistan during 2014.  These steps included intensifying support to civilian law enforcement and border security agencies.  The United States directly supported Pakistan's efforts to build the capacity of its civilian law enforcement and border security agencies by providing training, equipment, infrastructure, and aviation assistance.  U.S. assistance helped build capacity in law enforcement agencies responsible for holding areas cleared by Pakistan's military, protecting local populations from militant attacks, and maintaining law and order.  Collectively, these efforts enhanced the counterinsurgency, law enforcement, and counternarcotics capacities of Pakistan's civilian law

PX209

enforcement and border security agencies.  Improved security will, in turn, facilitate economic development, which is necessary for long-term Pakistani stability and progress.

**Nonproliferation, Antiterrorism, Demining, and Related Programs (NADR):**  The United States provided assistance to strengthen Pakistan's export control system to prevent transfer of WMD and related technology.  NADR/Export Control and Related Border Security funds were used for nonproliferation export control training addressing legal/regulatory reform, export licensing systems, customs enforcement, general inspection, WMD detection training for border control personnel, and procuring specialized radiation/chemical detection equipment.  The United States also provided targeted assistance to build Pakistani law enforcement capacity to detect, deter, and respond to terrorist threats.  NADR/Global Threat Reduction Programs (GTR) provided assistance to Pakistan to prevent terrorist access to biological expertise, materials, and technology.  GTR engaged scientists to reduce bio-security threats against the United States by supporting pathogen security, safe and secure laboratory conduct, and disease detection and control.

**Foreign Military Financing (FMF):**  FMF promotes the development of Pakistan's long-term counterinsurgency (COIN) and counterterrorism capabilities to enable security and stability throughout the country, particularly in the conflict-affected areas bordering Afghanistan, and to improve Pakistan's ability to lead and/or participate in maritime security operations that support counterterrorism aims.  We continue to focus FMF towards seven core capabilities: precision strike; air mobility/combat search and rescue; battlefield communications; night operations; survivability and countering improvised explosive devices; border security; and maritime security/counter-narcotics.  To support this, the United States obligated nearly US $270 million in FMF in 2014.

**International Military Education and Training (IMET):**  Pakistan's IMET program supported professional military education for Pakistan's military leaders, emphasizing respect for the rule of law, human rights, and democratic values, including civilian control of the military.  IMET also supported effective management of Pakistan's defense establishment through training in logistics, defense acquisition, and resource management.  A significant portion of this funding supports training related to counterterrorism and counterinsurgency operations in Pakistan.  To build capacity and cooperation between our security forces, Pakistan receives the largest amount of IMET of any of our global partners, at nearly US $5 million annually.

**Pakistan Counterinsurgency Capability Fund (PCCF):**  PCCF builds the capability of Pakistan's Army, Air Force, and Frontier Corps to clear and hold terrain in contested areas throughout Khyber Pakhtunkhwa province and the Federally Administered Tribal Areas by providing targeted equipment and training for COIN/counterterrorism operations.  In FY 2013, we provided US $425 million in FY 2012 PCCF funding for execution.  FY 2012 is the final fiscal year that funding was requested for this program.

**Measures to ensure that assistance has the greatest long-term positive impact on the welfare of the Pakistani people and their ability to counter terrorism:**  Over a quarter of U.S. civilian assistance is implemented via Pakistani partners, including the Government of Pakistan

PX209

and private sector actors, when practicable.  This is done to strengthen local capacity and increase sustainability, providing the greatest possible long-term impact of U.S. assistance. Increasingly, the Administration is also implementing public-private partnerships to engage the private sector as a long-term partner in Pakistan's development.

## COUNTERTERRORISM COORDINATION WITH SAUDI ARABIA

The United States and Saudi Arabia have a strong bilateral relationship.  Multiple high-level visits in 2014 deepened this relationship at the personal and institutional level and provided senior officials from both countries the chance to discuss means of improving coordination.  In 2014, high-level visits from President Barack Obama, Secretary of State John Kerry, Secretary of Defense Chuck Hagel, Secretary of Homeland Security Jeh Johnson, and anti-ISIL Coalition Special Envoy General John Allen, among others, reaffirmed the importance of bilateral counterterrorism cooperation between the United States and Saudi Arabia.

During 2014, the Government of Saudi Arabia, working in coordination with the United States, continued to build and augment its capacity to counter terrorism and violent extremist ideologies, including al-Qaida in the Arabian Peninsula (AQAP) and the Islamic State in Iraq and the Levant (ISIL).  Saudi Arabia continued to maintain a robust counterterrorism relationship with the United States and supported enhanced bilateral cooperation to ensure the safety of U.S. and Saudi citizens in both countries, and to enhance the security of infrastructure in Saudi Arabia critical to the global economy.  Saudi Arabia continued its long-term counterterrorism strategy to track and halt the activities of terrorists and terror financiers, dismantle the presence or reconstitution of al-Qa'ida–affiliates, impede the ability of militants to operate from or within Saudi Arabia, and to implement laws against supporting terrorist groups and travel to conflict zones.  Saudi Arabia welcomed UN Security Council Resolutions 2170 and 2178, expanding existing counterterrorism programs and rhetoric to address the phenomenon of foreign terrorist fighters and leveraged terrorist finance provisions of its Law for Crimes of Terrorism and Terrorist-Financing (CT Law) to combat funding of violent extremist groups in Iraq and Syria. Saudi Arabia's robust legal counterterrorism apparatus was bolstered in 2014 by the introduction in February 2014 of a new counterterrorism law that further strengthened existing counterterrorism laws.

Saudi Arabia sought to expand economic and civic opportunities for its people.  Nearly 60 percent of the Saudi populace is under 25 years of age.  The late King Abdullah promoted an economic development agenda, and Saudi Arabia has sought to address economic sources of social discontent, such as housing scarcity and the need to create jobs for millions of Saudis.

The Ministry of Islamic Affairs continued to reeducate and regulate imams, prohibiting them from inciting violence, and continued to monitor mosques and religious education.  The King Abdulaziz Center for National Dialogue continued to promote tolerance and respect for diversity through its dialogue and awareness-raising programs.  Some religious figures not directly associated with the establishment, however, reportedly made statements that promoted intolerant views.

PX209

The United States continued to support Saudi Arabia in reforms it is undertaking by facilitating Saudi nationals studying in the United States and promoting educational exchanges; encouraging increased bilateral trade and investment, urging Saudi Arabia to take actions necessary to attract job-creating partnerships with U.S. companies; and supporting programming in such areas as judicial reform and women's entrepreneurship, as well as the Ministry of Interior's extensive prison rehabilitation program, the Mohamed bin Naif Counseling and Care Center, to reduce recidivism among former inmates charged with crimes related to terrorism.

Throughout 2014, Saudi Arabia continued its efforts to disrupt terrorist activities in its territory by tracking, arresting, and prosecuting terrorist suspects. Neighborhood police units engaged and worked directly with community members in Saudi Arabia, encouraging citizens to provide tips and information about terrorist activity. The government offered rewards for information on terrorists, and Saudi security services made several announcements throughout the year pertaining to the arrest of hundreds of AQAP and ISIL members and supporters. As a result, the Saudi Arabian government successfully disrupted a 98-member ISIL cell active in Saudi Arabia.

Throughout the year, Saudi security professionals regularly participated in joint programs and information exchange agreements around the world, including in the United States and Europe. The Saudi Arabian government has continued to provide specialized training programs for bankers, prosecutors, judges, customs officers, and other officials from government departments and agencies to combat terrorist financing. In 2008, the two governments concluded a Technical Cooperation Agreement and a year later established the joint Office of Program Management-Ministry of Interior (OPM-MOI) to implement it, institutionalizing a Saudi-funded bilateral program of technical assistance focused on the protection of critical infrastructure and the Saudi public. Through the OPM-MOI program, U.S. agencies are helping Saudi Arabia improve its ability to thwart terrorists before they act and to defend against terrorist attacks if they occur. On August 8, 2013, Saudi Arabia pledged US $100 million to the UN Counter-Terrorism Centre, which was transferred in August 2014. In April 2014, the Saudi Arabian government participated in the U.S.-Gulf Cooperation Council (GCC) Strategic Cooperation Forum Task Force on counterterrorism and border security. Saudi officials have issued statements encouraging enhanced cooperation among GCC and Arab League states on counterterrorism issues, and the Saudi Arabian government has hosted international counterterrorism conferences on combating extremist ideology and countering terrorist financing. On September 11, 2014, Saudi Arabia hosted a counterterrorism conference in Jeddah, which was attended by ministers from the GCC, Egypt, Iraq, Jordan, Lebanon, and the United States, at which all parties declared their shared commitment against terrorism and ISIL. The Saudi Arabian Ministry of Interior also hosted the 17th Annual International Conference and Exhibition for Industrial Security, Fire, and Occupational Safety, and Health in November 2014, which focused on strengthening industrial security practices and coordination between the government and private sectors to protect key infrastructure from terrorist attack.

U.S.-Saudi collaboration was not confined to bilateral issues. With political upheaval across the region throughout the year, the United States consulted closely with the Saudi government on regional stability, including in Yemen, Syria, Iraq, and Egypt. Working both bilaterally and multilaterally through the GCC and the Arab League, the Saudi government provided leadership in promoting peaceful transitions. Saudi Arabia has cooperated regionally and internationally on

PX209

counterterrorism issues as demonstrated by its participation in the Global Counterterrorism Forum.  Saudi Arabia is a member of the Global Initiative to Combat Nuclear Terrorism, the Proliferation Security Initiative (PSI), and the Middle East North Africa Financial Action Task Force.  As part of its strategy to support these transitions and promote stability throughout the region, the Saudi government increased the scope of its economic and development assistance.  On the humanitarian front, Saudi Arabia pledged a US $500 million grant to the UN for Iraq humanitarian assistance in July 2014, US $60 million in Syria humanitarian assistance at the International Pledging Conference in Kuwait, and US $104 million in humanitarian assistance to the World Food Program for refugees in Syria, Ethiopia, and in Kenya.

Saudi Arabia has been a leading partner in the international Coalition against ISIL, participating in Coalition airstrikes against ISIL in Syria, and offering to host a train and equip program for the moderate Syrian opposition.  In addition, Saudi Arabia has enacted tough criminal penalties for those traveling to fight in foreign conflicts and has enforced those penalties.  The Saudi Arabian government and religious leaders have issued many statements against ISIL which the government considers a serious threat to its national security.

## BROADCASTING BOARD OF GOVERNORS INITIATIVES:
## OUTREACH TO FOREIGN MUSLIM AUDIENCES

### This section is provided by the Broadcasting Board of Governors (BBG)

Four of the five broadcast entities under the supervision of the Broadcasting Board of Governors (BBG) provided programming for countries with large Muslim populations in 2014: the Voice of America (VOA), the Middle East Broadcasting Networks (Alhurra TV, Radio Sawa, and Afia Darfur), Radio Free Europe/Radio Liberty (RFE/RL), and Radio Free Asia.

- Eighteen of RFE/RL's broadcast languages – almost two-thirds of the total – were directed to regions with majority-Muslim populations, including Iran, Iraq, Afghanistan, Azerbaijan, Bosnia and Herzegovina, Kosovo, Kazakhstan, Kyrgyzstan, Pakistan, Tajikistan, Turkmenistan, and Uzbekistan.  Additional broadcasting regions in the Russian Federation included the majority Muslim populations of Tatarstan, Bashkortostan, and the North Caucasus.
- VOA has been particularly successful in reaching non-Arabic-speaking Muslim audiences, with strong performances in Nigeria, Indonesia, Pakistan, Afghanistan, and Tanzania, among other places.
- The Middle East Broadcasting Networks broadcast throughout the region to more than 340 million people, 93 percent of who are Muslim.
- VOA and RFE/RL provided news and information to Afghanistan and the Afghanistan-Pakistan border region in Dari and Pashto.  Together, RFE/RL and VOA reached nearly 53 percent of Afghan adults each week.
- Radio Free Asia broadcast to the more than 16 million mainly ethnic Uighur Muslims in the Xinjiang Uighur Autonomous Region of northwestern China and Central Eurasia.

The BBG used the latest communications technologies to avoid jamming of its signals and to reach audiences through digital and other communications tools, such as web chats and blogs.

320

PX209

**THE MIDDLE EAST**

**Arabic:**  Middle East Broadcasting Networks (MBN) has five bureaus/production centers in the region, in addition to its main studios in Virginia, and a network of regional correspondents. MBN broadcasts to a population that includes an estimated 317 million Muslims or about 23 percent of the world's Muslim population.  MBN takes a diverse approach to reaching the largest potential audience, using three platforms: television (Alhurra TV), radio (Radio Sawa), and digital (Alhurra.com and RadioSawa.com).  The networks provide a unique, local perspective of breaking news, current events, and balanced coverage on topics such as freedom of speech, religion, and the role of women in society and politics.  Alhurra also produces programs encouraging freedom of the press, freedom of expression, and non-violence.

Radio Sawa's network of stations, broadcasting 24/7, is designed to reach the Arabic-speaking population under the age of 35.  It broadcasts 325 newscasts per week about the Middle East, the United States, and the world.

Radio Sawa broadcasts on FM in Morocco, Jordan, the West Bank and Gaza, Kuwait, Bahrain, Libya, Qatar, the United Arab Emirates, Iraq, Lebanon, and Djibouti.  Radio Sawa broadcasts on medium wave to Egypt, Yemen, Saudi Arabia, and Sudan; and was available on the Arabsat, Nilesat, and Eutelsat satellite systems.

**Iraq:**  Every week, 36 percent of Iraqi adults – some 6.3 million people – listened to or watched one of the four BBG broadcasters serving the country: Alhurra TV, Radio Sawa, RFE/RL's Radio Free Iraq, and VOA Kurdish.  Alhurra and Radio Sawa continued to be very successful given their localized dedicated streams to Iraqi news and information.  One in three Iraqis say Alhurra is their most important source of information.  Radio Sawa is one of the top radio stations among adults.  Radio Free Iraq, with five percent weekly reach on radio and internet, and VOA Kurdish reached 3 percent of Kurdish-speaking Iraqis weekly.

**Kurdish:**  In 2014, the Kurdistan region in particular faced heavy attack from the Islamic State in Iraq and the Levant.  The VOA Kurdish Service has covered the crisis on a daily basis by conducting interviews with regional analysts and through stringer reports from the region.  The Sinjar region was a primary target when thousands of Yezidis had to flee to the Kurdistan region and women and children were taken hostage.  VOA Kurdish conducted many interviews with people on the ground.

**Persian:**  VOA's Persian Service provided relevant global and regional news relating to Iran and crucial information about U.S. policy toward Iran and the region.  VOA Persian delivered original television programming for six hours per day.  In addition, VOA and Radio Farda each produced one hour of Radio-on-TV (ROT), starting with VOA Persian's ROT Tamasha and followed by Radio Farda's ROT "Sobhane Ba Khabar."

VOA's Persian Service did exceedingly well in bringing worldwide coverage on timely issues to the people of Iran.  For example, it attracted a wide television and online audience during its coverage of the Iranian National Team during the World Cup in June.  VOA Persian also had

PX209

extensive live coverage in August of the Iranian national volleyball team's first visit to the United States.  VOA Persian was on the ground during the Iran nuclear talks between Iran and the P5+1 countries, and had live coverage of the Iran nuclear talks in November where the P5+1 countries agreed to extend the deadline to implement the commitments described in the Joint Plan of Action (JPOA) through June 30, 2015.

RFE/RL's Radio Farda broadcast newscasts at the top of each hour, followed by reports, features, interviews, and regular segments on youth, women, culture, economics, and politics.

- Radio Farda sent a correspondent to Vienna in February, May, and November to provide exclusive, around-the-clock Persian-language coverage for its audience in Iran of the nuclear talks between Iran and the P5+1 countries. Radio Farda also secured interviews with U.S. chief negotiator and Undersecretary of State Wendy Sherman, and former State Department special advisor on nonproliferation and arms control, Robert Einhorn.
- Radio Farda's comprehensive human rights monitoring is unique inside Iran.  It is listened to by prison inmates who rely on it for accurate reporting on their cases.
- Radio Farda's online community continued to grow.  Its main Facebook page has a fan base of 1,335,000.
- Radio Farda's circumvention strategies to fight internet blockage by the Iranian regime remained successful, with nearly 168 million page views logged in 2014.

## SOUTH ASIA

**Afghan**: VOA's Afghan Service covered all aspects of the conflict in Afghanistan and the border region on call-in shows as well as in reports and interviews.  In addition, the Service covered Pakistan-Afghanistan relations, which included visits of officials and dialogues and agreements between the two countries, and progress made in their joint counterterrorism efforts.

In addition, the Service provided coverage of the emergence of the Islamic State in Iraq and the Levant in the Middle East, U.S. and world efforts against the organization, its reach in the region, and reports of cells/existence of the terrorist organization in Afghanistan.

Moreover, the Service also covered an unprecedented gathering of religious scholars from across Afghanistan who convened to praise the Afghan security forces' fight against violent extremists. Maulawi Abdul Basir Haqani, a representative of the Ulema (the body of scholars who are authorities on Muslim religion and law), joined the program live from the Kabul studio and spoke in unanimity with the new government's efforts to support the Afghan military.

In the past year, the Service expanded its social media outreach by providing a platform for free expression of ideas that run counter to the violent extremist narrative.

The Service also joined forces with internationally recognized pop star/UN Goodwill Ambassador Farhad Darya in a successful campaign to encourage Afghan citizens to get out and vote in two rounds of presidential elections in the face of Taliban threats and intimidation.

PX209

**Urdu:**  VOA Urdu reporters in Washington and stringers in five major Pakistani cities were reported on terrorism-related activities as they unfolded.

**The Pakistan/Afghanistan Border Region:**  VOA Deewa broadcasts go directly to Pakistan's most terrorism-prone regions and neighboring Afghanistan, where the Taliban, al-Qa'ida, and the Haqqani Network are known to operate.

The Service regularly engages Muslim scholars, analysts from U.S.-based think tanks, and Pakistan's military and civilian leaders on violent extremism.  Deewa guests participate in discussions with question and answer sessions on violent extremist ideology.

**Bangla:**  The VOA Bangla Service continuously prepares interview-based reports, features, roundtable discussions, and call-in shows on terrorism themes.

## CENTRAL ASIA

**Kazakhstan:**  RFE/RL's Kazakh Service content was delivered via its internet website, mobile site, and social media platforms.  The web strategy attracted a younger audience to this bilingual (Kazakh and Russian) site, providing opportunities for interactivity and exploring new genres such as video reporting.  The Service's reporting on Kazakh terrorist fighters in Syria and Iraq was widely quoted in local Kazakh media and sparked many discussions on Kazakh language web forums.

**Kyrgyzstan:**  RFE/RL's Kyrgyz Service is the most trusted radio news source in Kyrgyzstan, according to an October 2014 survey conducted by the International Republican Institute, Baltic Surveys Ltd./The Gallup Organization, SIAR Research and Consulting, and USAID.   The Service's daily TV news show and weekly talk show were broadcast during prime time hours on the largest national channel, which is the news source of choice for 34 percent of the population.

**Tajikistan:**  RFE/RL's Tajik Service served as one of the most reliable sources of news and information in Tajikistan.  As early as 2013, RFE/RL's Tajik Service was covering the participation of Tajik terrorists in the Syrian conflict.  The Service reported on the personal details of Tajik youth fighting in Syria and interviews with relatives, politicians, and religious leaders.

**Uzbekistan:**  RFE/RL's Uzbek Service's weekly 30-minute TV program and daily 30-minute radio broadcast featured interviews with U.S. and international sources on topics including religious extremism, terrorism, and U.S.-Uzbekistan and U.S.-Central Asian relations.  VOA Uzbek regularly covers the Fergana valley.  The Service distributed original stories to mobile phone subscribers.  Reports were also accessible on Twitter, YouTube, and Facebook; and Russia based MoiMir, VKontakte, and Yandex.  VOA Uzbek has FM radio affiliates in Northern Afghanistan and Kyrgyzstan, and a TV affiliate in Southern Kyrgyzstan.

**Turkmenistan:**  RFE/RL's Turkmen Service provides a vital, unmatched service to its audience, despite the fact that it is not allowed to have a bureau or accredited journalists within the country.  It is the only international media company providing regular multi-media reporting

PX209

from inside the country, with original video reporting and photojournalism.  The Service provided a unique and important voice covering social issues such as homelessness, housing conditions, and travel restrictions on Turkmen citizens, while its reporting on human rights cases has brought critical attention to cases of activists and journalists imprisoned or detained.

## EAST ASIA AND PACIFIC

**China:**  VOA China's Branch delivers news, including religious and local issues affecting more than 22 million Chinese Muslims, to China via satellite television, radio, internet, social media, and mobile channels in Mandarin, Cantonese, and Tibetan.  One report in 2014 on Beijing's crackdown on Uighur culture and religion in Xinjiang entitled "Beards, Veils, and the Uighur-Han Tensions" was reposted by the Uighur American Association's website and by Uighur scholar Ilham Tohti's China-based Uighur Online.  Mr. Tohti was sentenced to life in prison for several charges and part of the state evidence used against him in the trial was his use of the above mentioned VOA three-part series of articles on his website.

**Indonesia:**  VOA's Indonesian Service's 2014 weekly audience grew to more than 33 million people or 18.9% of the adult population.  About 85% of Indonesians are Muslim making it the country with the single largest Muslim population.  VOA Indonesian TV news and information products were regularly seen on eight of Indonesia's 11 national stations, and more than 30 local and regional TV stations.  VOA Indonesian radio is heard on over 400 FM affiliates across the archipelago.  Overall, the Service produced nearly four hours of TV per week and more than eight hours daily of original radio programming throughout the year.  During the month of Ramadan in 2014, the Indonesian Service produced eight special 30-minute episodes of "Muslim di Rantau" (Muslims Abroad) for the national public broadcaster, TVRI.

**Thailand:**  VOA's Thai Service has 11 affiliate radio stations in southern Thailand.  VOA Thai broadcasts news and information eight hours and 30 minutes per week to all its affiliates; it also produces a weekly video report for placement with TV networks in Thailand.  The programs emphasize the U.S.-Thailand relationship, religious and cultural diversity, and education.

**Myanmar:**  VOA's Burmese Service closely monitored relations between the Buddhist and Muslim communities in Myanmar while reporting on events and ways to promote mutual trust, tolerance, and understanding.  VOA weekly call-in discussion programs have provided effective fora to discuss sensitive issues and stimulate further dialogue.  VOA Burmese broadcasts daily radio and television programs with a popular web site.  The VOA Burmese Bureau in Yangon also participated in local media seminars to discuss professional journalism standards and to identify and counter hate messages.

## EUROPE AND EURASIA

**The Russian Federation and Ukraine:**  VOA's Russian and Ukrainian Services regularly address terrorism-related issues and threats in the United States and other key areas of interest to the target audience.  Journalist Fatima Tlisova provided VOA Russian with enterprise reporting related to the first anniversary of the Boston bombings and the beginning of the trial of suspected Boston Marathon bomber Dzhokhar Tsarnaev.  VOA Russian's reports related to the Boston

PX209

terrorist attacks generated a significant social media response and numerous shares on social media.

RFE/RL's Russian Service provides accurate, independent, and wide-ranging news and analysis of a wide range of issues affecting its Russian audience.

**Tatarstan/Bashkortostan:**  The Tatar and Bashkir communities are the two largest Muslim communities in Russia.  RFE/RL's Tatar/Bashkir Service was the only major international media producing content in the Tatar and Bashkir languages and provided listeners with objective news and analysis on issues such as Russia's policy toward ethnic and religious minorities, centralization, corruption, the role of Islam in predominantly Muslim regions, and gender issues. The Service's webpage, the most technologically advanced state-of-the-art web source in Tatar, continued to be a virtual meeting place for people to discuss these and other issues.

**North Caucasus:**  Broadcasting in the Avar, Chechen, and Circassian languages, RFE/RL's North Caucasus Service reported the news in a region where media freedom and journalists remained under severe threat.

**Turkey:**  VOA's Turkish Service has been reporting on the Islamic State in Iraq and the Levant and global terrorism extensively.

**The Balkans:**  VOA's Balkan Services provided extensive coverage of the rise of violent extremism in the region's countries with sizeable Muslim populations – Albania, Bosnia and Herzegovina (BiH), Kosovo, and Serbia.  More than 4.7 million adults weekly consumed VOA content across broadcast and digital platforms in Albania, Kosovo, BiH, Serbia, Montenegro, and Macedonia.  VOA coverage highlighted the threats posed by international terrorist networks that recruit foreign fighters for the Islamic State in Iraq and the Levant and for al-Qa'ida and its affiliates.  Balkan media outlets cited and widely republished VOA's coverage of the September 2014 UN meeting chaired by President Obama.

RFE/RL's Balkan Service is the only inclusive source of news in a region where genuine media freedom remains elusive and many outlets reflect ethnic divisions.  Kosovo President Atifete Jahjaga spoke to the Service in August 2014 about the arrest of over 40 men accused of fighting with violent extremists in Syria and Iraq; on September 3, the Service was among the first to report on a police operation in BiH that broke up a network that recruited fighters for Syria and Iraq.  The Service interviewed the wife of one man who took his eight-year-old son with him to fight in Syria.

**Azerbaijan:**  VOA's Azerbaijani Service delivered daily TV and web programming focused on the country's political dynamics as the authorities increased pressure on political activists and civil society groups.  VOA Azerbaijani commenced cooperation with RFE/RL's regularly programmed reports and interviews targeting the large Azeri population in northern Iran, with an emphasis on the Azeri minority's demands for cultural rights, human rights, and the regime's attempts to suppress dissent and the rights of Iran's minorities.

PX209

When it was banned from FM airwaves, RFE/RL's Azerbaijani Service lost more than half of its reach in Baku.  It subsequently turned to both the internet and satellite television to reconnect with listeners.  The Service's "Korrupsiometr" web portal features the latest laws and regulations, along with Azerbaijani lawyers responding to audience questions.

On December 26, Azerbaijani authorities raided and closed RFE/RL's Baku Bureau in connection with a law on "foreign agents," subsequently questioning 26 journalists and staff members.  Limited Azerbaijani Service programming continued from Prague.

## AFRICA

**Hausa:**  VOA's Hausa Service has provided comprehensive, multimedia coverage of Boko Haram's terrorist activities in Northern Nigeria through its daily news programming, interactive call-in shows, and audio streaming and postings on its website.  The Service also launched a new, dynamic 24/7 mobile stream that enables VOA to go live at any time to cover breaking news.  In an effort to reach young audiences, VOA Hausa recently launched a new half-hour daily radio program called "Today and Tomorrow."  Throughout the year, the Service has given special attention to the efforts by Nigeria's military Special Task Forces to rout Boko Haram in Northern Nigeria, especially in Borno, Yobe, and Adamawa States.  As a result of its expansive coverage, VOA has been threatened by Boko Haram.  However, the Service increased its coverage of the violent tactics being used against Nigerian civilians, military, and government.  In May 2014, VOA Hausa sent a reporter to Northern Nigeria, who spent more than a month covering Boko Haram's terrorist attacks and the resulting devastation of towns and villages.  He was able to interview some of the Chibok girls who had been taken hostage and escaped, their mothers and teachers, as well as religious and community leaders.

**Somali:**  VOA's Somali Service airs a weekly radio program called "Islamic Affairs," which focuses on issues of interest to Muslims.  Topics include terrorism, violence, and the role of Islam in conflict resolution.  For example, a recent segment of "Islamic Affairs" included an interview with a Somali-American cartoonist known as "Average Mohamed," who focuses on violent extremism and its effects.  Another segment was devoted to the coexistence of people of different faiths, following reports in Iraq that the Islamic State in Iraq and the Levant (ISIL) was targeting Yazidis.  Throughout the year, VOA's Somali Service provided blanket coverage of violent extremist activities, including a series of radio and television reports about the recruitment of Somali-Americans in Minneapolis by terrorist groups such as ISIL and al-Shabaab.  The Service also secured an exclusive one-on-one interview with Somalia's President Hassan Sheikh Mohamud, who talked about his country's efforts to combat al-Shabaab.

**Swahili:**  VOA's Swahili Service broadcast to large Muslim populations in Tanzania and Kenya, and smaller Muslim communities in Uganda, Burundi, and the Democratic Republic of the Congo.  In 2014, the Service increased its efforts to reach the Muslim communities in Kenya's Indian Ocean coastline, where the city of Mombasa was rocked by several terrorist attacks.  To improve its coverage in the area, VOA Swahili is opening a reporting center in Mombasa and is hiring additional local reporters to provide comprehensive coverage of religious politics in Mombasa and the nearby Lamu area, which has been beset by al-Shabaab activities.  Following the raid and closure of the most popular mosque in Mombasa by the Kenyan government, VOA

PX209

Swahili aired two live call-in shows in November 2014, which received praise from the city's Muslim community for providing space and equal time to opposing sides – those who support government measures and those who oppose them.  Both sides called on the government to reopen the mosque, which occurred three days after the second call-in show.

**French to Africa:**  VOA's French to Africa Service provided extensive coverage of the conflict in Mali and its impact on the sub-region.  In 2014, VOA continued to broadcast its daily news and information program in Bambara, the most widely spoken local language, as well as a weekly newscast in Songhai, the most prevalent language in the north of the country.  The Service also reaches Muslims through "Sahel Plus," a 25-minute weekly French language program with news and features about issues of common concern in the Sahel region.  In addition, VOA French to Africa aired a weekly program called "Dialogue des Religion," which offers discussions with Muslim scholars and experts on various aspects of Islam.  Throughout the year, the Service also provided full coverage of the Boko Haram insurgency through reports and interviews with French-speaking residents in Nigeria, Cameroon, and Niger.

## ENGLISH

On September 10, VOA English joined with VOA Central News to produce a 90-minute Radio/TV/Web simulcast around President Obama's speech on the Islamic State in Iraq and the Levant (ISIL), complete with analysis and Congressional reaction.  VOA set the scene with the White House Correspondent, State Department Correspondent from Jordan, Pentagon Correspondent, and senior correspondents/analysts. Coverage included a live interview with Representative Eliot Engel (D-NY).  The Service used social media to solicit questions from around the world during the President's speech and updated the speech live as the President spoke.  Throughout the speech, the White House correspondent  tweeted quotes and other highlights.

On June 12, the English Division interviewed the Governor of Kirkuk in Iraq, Dr. Najmaldin Karim, regarding the security situation and the moving of more than 15,000 Kurdish Peshmerga fighters into Kirkuk Province to protect it against ISIL.  A number of terrorism experts were interviewed, including Katherine Zimmerman of the American Enterprise Institute.

PX209

# Chapter 6
# Foreign Terrorist Organizations

Foreign Terrorist Organizations (FTOs) are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA).  FTO designations play a critical role in the fight against terrorism and are an effective means of curtailing support for terrorist activities.

In 2014, the following FTOs were designated by the Department of State: Ansar al-Shari'a in Benghazi, Ansar al-Shari'a in Darnah, and Ansar al-Shari'a in Tunisia on January 13, Ansar Bayt al-Maqdis on April 10, and Mujahidin Shura Council in the Environs of Jerusalem on August 20.  Also in 2014, the Department of State revoked the Foreign Terrorist Organization designation of the United Self-Defense Forces of Colombia on July 15.

**Legal Criteria for Designation under Section 219 of the INA as amended:**

1. It must be a *foreign organization.*
2. The organization must *engage in terrorist activity*, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C.  § 1182(a)(3)(B)), or *terrorism*, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C.  § 2656f(d)(2)), *or retain the capability and intent to engage in terrorist activity or terrorism*.
3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

## U.S. Government Designated Foreign Terrorist Organizations

Abdallah Azzam Brigades (AAB)
Abu Nidal Organization (ANO)
Abu Sayyaf Group (ASG)
Al-Aqsa Martyrs Brigade (AAMB)
Ansar al-Dine (AAD)
Ansar al-Islam (AAI)
Ansar al-Shari'a in Benghazi (AAS-B)
Ansar al-Shari'a in Darnah (AAS-D)
Ansar al-Shari'a in Tunisia (AAS-T)
Ansar Bayt al-Maqdis (ABM)
Army of Islam (AOI)
Asbat al-Ansar (AAA)
Aum Shinrikyo (AUM)
Basque Fatherland and Liberty (ETA)
Boko Haram (BH)
Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)

PX209

Gama'a al-Islamiyya (IG)
Hamas
Haqqani Network (HQN)
Harakat ul-Jihad-i-Islami (HUJI)
Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
Harakat ul-Mujahideen (HUM)
Hizballah
Indian Mujahedeen (IM)
Islamic Jihad Union (IJU)
Islamic Movement of Uzbekistan (IMU)
Islamic State in Iraq and the Levant (ISIL)
Jama'atu Ansarul Muslimina Fi Biladis-Sudan (Ansaru)
Jaish-e-Mohammed (JEM)
Jemaah Ansharut Tauhid (JAT)
Jemaah Islamiya (JI)
Jundallah
Kahane Chai
Kata'ib Hizballah (KH)
Kurdistan Workers' Party (PKK)
Lashkar e-Tayyiba
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Libyan Islamic Fighting Group (LIFG)
Mujahidin Shura Council in the Environs of Jerusalem (MSC)
Al-Mulathamun Battalion (AMB)
National Liberation Army (ELN)
Palestine Islamic Jihad – Shaqaqi Faction (PIJ)
Palestine Liberation Front – Abu Abbas Faction (PLF)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Nusrah Front (ANF)
Al-Qa'ida (AQ)
Al-Qa'ida in the Arabian Peninsula (AQAP)
Al-Qa'ida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Organization 17 November (17N)
Revolutionary People's Liberation Party/Front (DHKP/C)
Revolutionary Struggle (RS)
Al-Shabaab (AS)
Shining Path (SL)
Tehrik-e Taliban Pakistan (TTP)

PX209

# ABDALLAH AZZAM BRIGADES

**aka** Abdullah Azzam Brigades; Ziyad al-Jarrah Battalions of the Abdallah Azzam Brigades; Yusuf al-'Uyayri Battalions of the Abdallah Azzam Brigades

**Description:**  The Abdallah Azzam Brigades (AAB) was designated as a Foreign Terrorist Organization on May 30, 2012.  AAB formally announced its establishment in a July 2009 video statement claiming responsibility for a February 2009 rocket attack against Israel.  The group is divided into two branches: the Arabian Peninsula-based Yusuf al-'Uyayri Battalions of the Abdullah Azzam Brigades, named after the now-deceased founder of al-Qa'ida in the Arabian Peninsula; and the Lebanon-based Ziyad al-Jarrah Battalions of the Abdallah Azzam Brigades, named after Ziad al Jarrah, a Lebanese citizen who was one of the planners of the September 11 attacks on the United States.

**Activities:**  AAB has relied primarily on rocket attacks against Israeli civilians, and is responsible for numerous rocket attacks fired into Israeli territory from Lebanon.  These attacks in Israel have targeted population centers, including Nahariya and Ashkelon.  In addition to rocket attacks, AAB carried out a July 2010 suicide bombing attack against the Japanese-owned oil tanker M/V M. Star in the Strait of Hormuz.

In November 2013, AAB began to target Hizballah.  It claimed responsibility for a suicide bombing outside the Iranian Embassy in Beirut, Lebanon, which killed 23 people and wounded over 140, and warned that the group would carry out more attacks unless Hizballah stops sending fighters to support Syrian government forces.

In February 2014, a twin suicide bomb attack targeting the Iranian cultural center in Beirut killed four people; AAB claimed responsibility for the attack and said that it had carried out the bombings as retaliation for Hizballah's involvement in the Syrian conflict.  AAB is also believed to have been responsible for a series of bombings in Hizballah-controlled areas around Beirut.  A June suicide bombing at a police checkpoint on the Beirut-Damascus highway targeted Lebanese General Security head Major General Abbas Ibrahim, who narrowly escaped.  Also in June, a suicide bombing in the Beirut neighborhood of Tayyouneh killed a security officer and wounded 25 people.

In July, AAB briefly turned its attention back towards Israel, firing a series of rockets into northern Israel in response to Israel's Operation Protective Edge in Gaza.

**Strength:**  Unknown

**Location/Area of Operation:**  AAB is based in Lebanon and operates in Lebanon and Syria.

**Funding and External Aid:**  Unknown

# ABU NIDAL ORGANIZATION

PX209

**aka** ANO; Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Abu Nidal Organization (ANO) was founded by Sabri al-Banna (aka Abu Nidal), after splitting from the Palestine Liberation Organization (PLO) in 1974.  In August 2002, Abu Nidal died in Baghdad. Leadership of the organization after Nadal's death remains unclear.  ANO advocates the elimination of Israel and has sought to derail diplomatic efforts in support of the Middle East peace process.

**Activities:**  The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons.  It has not staged a major attack against Western targets since the late 1980s and was expelled from its safe haven in Libya in 1999.  Major attacks included those on the Rome and Vienna airports in 1985, the 1986 attack on the Neve Shalom Synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988.  The ANO was suspected of assassinating PLO Deputy Chief Abu Iyad and PLO Security Chief Abu Hul in Tunis in 1991, and a senior Jordanian diplomat in Beirut in 1994.  In 2008, a Jordanian official reported the apprehension of an ANO member who planned to carry out attacks in Jordan.  There were no known ANO attacks in 2014.

**Strength:**  Unknown

**Location/Area of Operation:**  ANO associates are presumed present in Lebanon.

**Funding and External Aid:**  The ANO's current access to resources is unclear, but it is likely that the decline in support previously provided by Libya, Syria, and Iran has had a severe impact on its capabilities.

## ABU SAYYAF GROUP

**aka** al Harakat al Islamiyya (the Islamic Movement)

**Description:**  The Abu Sayyaf Group (ASG) was designated as a Foreign Terrorist Organization on October 8, 1997.  ASG is the most violent of the terrorist groups operating in the Philippines and claims to promote an independent Islamic state in western Mindanao and the Sulu Archipelago.  The group split from the much larger Moro Islamic Liberation Front (MILF) in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998.

**Activities:**  The ASG engages in kidnapping for ransom, bombings, ambushes of security personnel, public beheadings, assassinations, and extortion.  In April 2000, an ASG faction kidnapped 21 people, including 10 Western tourists, from a resort in Malaysia.  In May 2001, the ASG kidnapped three U.S. citizens and 17 Philippine nationals from a tourist resort in Palawan, Philippines.  Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered. A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham,

PX209

but her husband, U.S. national Martin Burnham, and Deborah Yap of the Philippines were killed. Philippine and U.S. authorities blamed the ASG for a bombing near a Philippine military base in Zamboanga in October 2002 that killed a U.S. service member.  In one of the most destructive acts of maritime violence, the ASG bombed SuperFerry 14 in Manila Bay in February 2004, killing at least 116 people.

In 2014, ASG remained active, conducting numerous attacks on civilian and government targets in the southern Philippines.  On July 28, 40 to 50 ASG militants with assault rifles opened fire on civilians traveling to celebrate the end of Ramadan, killing at least 21, including six children, and wounding 11.  At least four members of a Talipao civilian security force were killed in the attack.  In a July video, senior ASG leader Isnilon Hapilon, also an FBI most-wanted terrorist, swore allegiance to ISIL and ISIL's leader, Abu Bakr al-Baghdadi.  Philippine police conducted a number of raids and arrests of ASG members in 2014, including an ASG leader, Khair Mundos.  Mundos confessed to having arranged the transfer of funds from al-Qa'ida to ASG to be used in bombings and other criminal acts throughout the island of Mindanao.

**Strength:**  ASG is estimated to have 400 members.

**Location/Area of Operation:**  The ASG operates primarily in the Philippine provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi; and on the Zamboanga Peninsula.  The group also operates in Malaysia.

**Funding and External Aid:**  The ASG is funded through kidnapping for ransom operations and extortion, and may receive funding from external sources including remittances from supportive overseas Philippine workers and Middle East-based violent extremists.  In the past, the ASG has also received assistance from regional terrorist groups such as Jemaah Islamiya, whose operatives provided training to ASG members and helped facilitate several ASG terrorist attacks.

## AL-AQSA MARTYRS BRIGADE

**aka** al-Aqsa Martyrs Battalion

**Description:**  Designated as a Foreign Terrorist Organization on March 27, 2002, the al-Aqsa Martyrs Brigade (AAMB) is composed of an unknown number of small cells of Fatah-affiliated activists that emerged at the outset of the al-Aqsa Intifada, in September 2000.  AAMB's goal is to drive the Israeli military and West Bank settlers from the West Bank in order to establish a Palestinian state loyal to the Fatah.

**Activities:**  AAMB employed primarily small-arms attacks against Israeli military personnel and settlers as the intifada spread in 2000, but by 2002 turned increasingly to attacks against Israeli civilians inside Israel.  In January 2002, the group claimed responsibility for the first female suicide bombing inside Israel.  In 2010, AAMB launched numerous rocket attacks on communities in Israel, including the city of Sederot and areas of the Negev desert.  Again in December 2011, AAMB launched rockets aimed at communities in the Negev.  The attack caused no injuries or damage.  In November 2012, two men recruited by AAMB were arrested in connection with stabbing a student in the Israeli city of Beersheba.  That same year, AAMB

PX209

claimed that they had fired more than 500 rockets and missiles into Israel during Operation Pillar of Defense, the week-long Israeli Defense Force operation in Gaza. In February 2013, AAMB claimed responsibility for a rocket attack in southern Israel, which landed outside of the city of Ashkelon. In summer 2014, AAMB joined Hamas in fighting Israel during Operation Protective Edge, and released a recruitment video showing fighters training in November.

**Strength:** A few hundred members.

**Location/Area of Operation:** Most of AAMB's operational activity is in Gaza but the group also planned and conducted attacks inside Israel and the West Bank. The group has members in Palestinian refugee camps in Lebanon.

**Funding and External Aid:** Iran has exploited AAMB's lack of resources and formal leadership by providing funds and guidance, mostly through Hizballah facilitators.

# ANSAR AL-DINE

**aka** Ansar Dine; Ansar al-Din; Ancar Dine; Ansar ul-Din; Ansar Eddine; Defenders of the Faith

**Description:** Ansar al-Dine (AAD) was designated as a Foreign Terrorist Organization on March 22, 2013. Operating in Mali, AAD was created in late 2011 after AAD's leader, Iyad ag Ghali, failed in an attempt to take over another secular Tuareg organization. Following the March 2012 coup that toppled the Malian government, AAD was among the organizations (including al-Qa'ida in the Islamic Maghreb (AQIM) and Movement for Unity and Jihad in West Africa) to take over northern Mali, destroy UNESCO World Heritage sites, and enforce a severe interpretation of Sharia law upon the civilian population living in the areas it controlled.

Beginning in January 2013, French and allied African forces conducted operations in northern Mali to counter AAD and other violent extremist groups, eventually forcing AAD and its allies out of the population centers they had seized. AAD's leader Iyad ag Ghali, however, remained free and in August 2014, Ghali appeared in an AAD video threatening to attack France.

**Activities:** AAD has received backing from AQIM in its fight against the Government of Mali – most notably in the capture of the Malian towns of Agulhok, Tessalit, Kidal, Gao, and Timbuktu – between January and April 2012. In March 2012, Tuareg rebels, reportedly including AAD, executed 82 Malian soldiers and kidnapped 30 others in an attack against the town of Aguelhok. Before the French intervention in January 2013, Malian citizens in towns under AAD's control who did not comply with AAD's laws, reportedly faced harassment, torture, or execution.

AAD was severely weakened by the French intervention in Mali, but continued to participate in and support attacks in Mali, reportedly including bringing arms and fighters into Kidal in September 2013, in advance of an AQIM-led attack that killed at least two civilians. In December 2014, AAD took responsibility for firing at least nine rockets at the UN base in Tessalit, Mali, and is suspected to have been behind a second rocket attack on the same base a few days later.

PX209

**Strength:**  AAD has fractured and its members have been largely scattered by the French intervention in Mali.  The group's membership numbers were unknown at the end of 2014.

**Location/Area of Operation:**  Northern Mali, Southwestern Libya

**Funding and External Aid:**  AAD cooperates closely with and has received support from AQIM since its inception, and some factions of AAD are believed to maintain close ties to the group.

## ANSAR AL-ISLAM

**aka** Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:**  Designated as a Foreign Terrorist Organization on March 22, 2004, Ansar al-Islam's (AAI's) goals include expelling western interests from Iraq and establishing an independent Iraqi state based on its interpretation of Sharia law.  AAI was established in 2001 in Iraqi Kurdistan with the merger of two Kurdish violent extremist factions that traced their roots to the Islamic Movement of Kurdistan.  On May 4, 2010, Abu Abdullah al-Shafi'i, AAI's leader, was captured by U.S. forces in Baghdad and remains in prison.  On December 15, 2011, AAI announced a new leader, Abu Hashim Muhammad bin Abdul Rahman al Ibrahim.

Mullah Krekar (aka Najmuddin Faraj Ahmad), an Iraqi citizen and the founder of AAI, continued to reside in Norway on a long-term residence permit.  In March 2012, a trial court in Norway convicted Krekar of issuing threats and inciting terrorism, and sentenced him to six years in prison.  Krekar appealed, and in December 2012, an appeals court affirmed his convictions for issuing threats and intimidating witnesses, but reversed his conviction for "inciting terrorism."  The appeals court reduced his sentence to two years and 10 months in prison.

**Activities:**  AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, and U.S. and Coalition Forces.  AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians.  The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that killed 24 and wounded 147.  During August and September 2013, AAI claimed attacks against Iraqi Army security forces, as well as an attack against an individual associated with the Iraqi government.

In 2014, AAI claimed responsibility for attacks that occurred near Kirkuk, Tikrit, and Mosul, Iraq.  AAI's attacks were primarily directed at the Iraqi police and security forces, and in one instance an oil field.  AAI claims to have killed several Iraqi military members, law enforcement officials, and claims to have obtained weapons and vehicles.

**Strength:**  Although precise numbers are unknown, AAI is considered one of the largest Sunni terrorist groups in Iraq.

PX209

**Location/Area of Operation:**  Primarily northern Iraq, but also maintains a presence in western and central Iraq.

**Funding and External Aid:**  AAI receives assistance from a loose network of associates in Europe and the Middle East.

## ANSAR AL-SHARI'A IN BENGHAZI

**aka** Ansar al-Sharia in Libya; Ansar al-Shariah Brigade; Ansar al-Shari'a Brigade; Katibat Ansar al-Sharia in Benghazi; Ansar al-Shariah-Benghazi; Al-Raya Establishment for Media Production; Ansar al-Sharia; Soldiers of the Sharia; Ansar al-Shariah; Supporters of Islamic Law

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Benghazi (AAS-B) was created after the 2011 fall of the Qadhafi regime in Libya and has been involved in terrorist attacks against civilian targets, and assassinations and attempted assassinations of security officials and political actors in eastern Libya.

**Activities:**  Members of AAS-B were involved in the September 11, 2012 attacks against the U.S. Special Mission and Annex in Benghazi, Libya.  Four American citizens were killed in the attack, including Sean Smith, Glen Doherty, Tyrone Woods, and the U.S. Ambassador to Libya, J. Christopher Stevens.

In 2013 and 2014, AAS-B is believed to have cooperated with Ansar al-Shari'a in Darnah in multiple attacks and suicide bombings targeting Libyan security forces in Benghazi.

In addition to its attacks, AAS-B controls several terrorist training camps in Libya, and has trained members of other terrorist organizations, some of which operate in Syria, Iraq, and Mali. At least 12 of the 28 individuals involved in Mokhtar Belmokhtar's al-Mulathamun Battalion's January 2013 attack against the Tiguentourine gas facility near In Amenas, Algeria, were trained in AAS-B camps.

**Strength:**  Unknown

**Location/Area of Operation:**  Benghazi, Libya

**Funding and External Aid:**  AAS-B obtains funds from AQIM, charities, donations, and criminal activities.

## ANSAR AL-SHARI'A IN DARNAH

**aka** Supporters of Islamic Law; Ansar al-Sharia in Derna; Ansar al-Sharia in Libya; Ansar al-Sharia; Ansar al-Sharia Brigade in Darnah

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Darnah (AAS-D) was created after the 2011 fall of the Qadhafi regime in Libya and has been involved in terrorist attacks against civilian targets, and assassinations and attempted

PX209

assassinations of security officials and political actors in eastern Libya.  In October 2014, AAS-D publicly pledged allegiance to ISIL.

**Activities:**  Members of AAS-D were involved in the September 11, 2012 attacks against the U.S. Special Mission and Annex in Benghazi, Libya.  Four American citizens were killed in the attack, including Sean Smith, Glen Doherty, Tyrone Woods, and the U.S. Ambassador to Libya, J. Christopher Stevens.

In 2013 and 2014, AAS-D is believed to have cooperated with Ansar al-Shari'a in Benghazi in multiple attacks and suicide bombings targeting Libyan security forces in Benghazi.

In addition to its attacks, AAS-D maintains several terrorist training camps in Darnah and Jebel Akhdar, Libya, and has trained members of other terrorist organizations operating in Syria and Iraq.

**Strength:**  Unknown

**Location/Area of Operation:**  Darnah, Libya

**Funding and External Aid:**  Unknown

## ANSAR AL-SHARI'A IN TUNISIA

**aka** Al-Qayrawan Media Foundation; Supporters of Islamic Law; Ansar al-Sharia in Tunisia; Ansar al-Shari'ah; Ansar al-Shari'ah in Tunisia; Ansar al-Sharia

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Tunisia (AAS-T) was founded by Specially Designated Global Terrorist Seif Allah Ben Hassine in early 2011.  AAS-T has been implicated in attacks against Tunisian security forces, assassinations of Tunisian political figures, and attempted suicide bombings of locations that tourists frequent.  AAS-T has also been involved in recruiting youth in Tunisia for fighting in Syria.

**Activities:**  Ansar al-Shari'a in Tunisia was involved in the September 14, 2012 attack against the U.S. Embassy and American school in Tunis, which threatened the safety of over one hundred U.S. employees in the Embassy.  In February and July 2013, AAS-T members were implicated in the assassination of two Tunisian politicians, Chokri Belaid and Mohamed Brahmi. In October 2013, AAS-T attempted to carry out suicide attacks against two tourist sites in Tunisia.  The first attack took place when a bomber blew himself up outside a hotel in Sousse, Tunisia, resulting in no other fatalities.  On the same day, police prevented a suicide bombing in Monastir, Tunisia, when they arrested a would-be bomber at the Tomb of Habib Bourguiba.

Throughout 2014, Tunisian security forces continued to clash with AAS-T members.

**Strength:**  Unknown

PX209

**Location/Area of Operation:**  Tunisia and Libya

**Funding and External Aid:**  Unknown

## ANSAR BAYT AL-MAQDIS

**aka** Ansar Bayt al-Maqdis; Ansar Jerusalem; Supporters of Jerusalem; Ansar Bayt al-Maqdes; Ansar Beit al-Maqdis; Jamaat Ansar Beit al-Maqdis; Jamaat Ansar Beit al-Maqdis fi Sinaa; Supporters of the holy place

**Description:**  Designated as a Foreign Terrorist Organization on April 9, 2014, Ansar Bayt al-Maqdis (ABM) rose to prominence in 2011 following the Egyptian uprisings and is responsible for attacks on Israel and Egyptian government and security elements, and tourists in Egypt.  In November 2014, ABM officially declared allegiance to the Islamic State in Iraq and the Levant (ISIL).

**Activities:**  ABM has claimed responsibility for numerous attacks against Israeli interests, including a July 2012 attack against a Sinai pipeline exporting gas to Israel and an August 2012 rocket attack on the southern Israeli city of Eilat.  In September 2012, ABM militants attacked an Israeli border patrol, killing one soldier and injuring another.

In October 2013, ABM claimed responsibility for a suicide bombing targeting the South Sinai Security Directorate in el Tor, which killed three people and injured more than 45.  In January 2014, ABM successfully downed an Egyptian military helicopter in a missile attack, killing five soldiers on board; and also claimed responsibility for four attacks involving car bombs and hand grenades in Cairo, which left six people dead and over 70 wounded, many of them civilian bystanders.

ABM has targeted government officials, including the September 2013 attempted assassination of the Egyptian Interior Minister, and the January 2014 assassination of the head of the Interior Minister's technical office.  In February 2014, ABM claimed responsibility for the bombing of a tour bus in the Sinai Peninsula, killing the Egyptian driver and three South Korean tourists, in its first attack against foreign tourists.

In October 2014, ABM beheaded four individuals who they claimed spied for Israel.  Also in October, ABM claimed an attack on a security checkpoint that left over 26 Egyptian soldiers dead and wounded 26 others, including civilians.  ABM subsequently released a video of the attack as part of its announcement declaring allegiance to ISIL in November 2014.

**Strength:**  ABM is estimated to have several hundred fighters in the Sinai and affiliated cells in the Nile Valley.

**Location/Area of Operation:**  Even though ABM's operations are based out of the Sinai Peninsula, the group's reach extends to Cairo and the Egyptian Nile Valley, and across the border into Gaza.

PX209

**Funding and External Aid:**  Although the source of ABM's funding is largely unknown, there are indications that ABM may receive funding from external actors.

## ARMY OF ISLAM

**aka** Jaysh al-Islam; Jaish al-Islam

**Description:**  Designated as a Foreign Terrorist Organization on May 19, 2011, the Army of Islam (AOI) is a Gaza-based terrorist organization founded in late 2005 that is responsible for numerous terrorist acts against the Governments of Israel and Egypt, as well as American, British, and New Zealander citizens.  Led by Mumtaz Dughmush, AOI primarily operates in Gaza.  It subscribes to a violent extremist Salafist ideology together with the traditional model of armed Palestinian resistance.  AOI has previously worked with Hamas and is attempting to develop closer al-Qa'ida contacts.

**Activities:**  AOI's terrorist acts include a number of rocket attacks on Israel, the 2006 kidnapping of two journalists in Gaza (an American and a New Zealander), and the 2007 kidnapping of a British citizen in Gaza.  AOI is also responsible for early 2009 attacks on Egyptian civilians in Cairo and Heliopolis, Egypt, and allegedly planned the January 1, 2011 Alexandria attack on a Coptic Christian church that killed 25 and wounded 100.  On July 28, 2012, AOI released a statement that one of its members, Nidal al 'Ashi, was killed fighting in Syria and in November 2012 announced that they had carried out rocket attacks on Israel in a joint operation with the Mujahidin Shura Council in the Environs of Jerusalem, a designated foreign terrorist organization.  In August 2013, an Israeli official reported that AOI leader Dughmush was running training camps in Gaza.  In August 2014, Israeli forces reportedly intercepted and killed several AOI fighters who were reportedly planning to attack Israel.

**Strength:**  Membership is estimated in the low hundreds.

**Location/Area of Operation:**  Gaza, with attacks in Egypt and Israel.

**Funding and External Aid:**  AOI receives much of its funding from a variety of criminal activities in Gaza.

## ASBAT AL-ANSAR

**aka** Asbat al-Ansar; Band of Helpers; Band of Partisans; League of Partisans; League of the Followers; God's Partisans; Gathering of Supporters; Partisan's League; AAA; Esbat al-Ansar; Isbat al-Ansar; Osbat al-Ansar; Usbat al-Ansar; Usbat ul-Ansar

**Description:**  Designated as a Foreign Terrorist Organization on March 27, 2002, Asbat al-Ansar is a Lebanon-based violent Sunni extremist group composed primarily of Palestinians with links to al-Qa'ida (AQ) and other Sunni violent extremist groups.  Some of the group's stated goals include thwarting perceived anti-Islamic and pro-Western influences in the country, although the group remains largely confined to Lebanon's refugee camps.

PX209

**Activities:**  Asbat al-Ansar first emerged in the early 1990s.  In the mid-1990s, the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores.  The group has also plotted against foreign diplomatic targets.  In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for his 2000 plot to assassinate then-U.S. Ambassador to Lebanon, David Satterfield.  Members of the group have traveled to Iraq between 2005 and 2011 to fight Coalition Forces.  Asbat al-Ansar has been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in the Ain al-Hilwah refugee camp.  AAA did not publicly claim any attacks in 2014.

**Strength:**  The group has at least 650 members.

**Location/Area of Operation:**  The group's primary base of operations is the Ain al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**Funding and External Aid:**  It is likely that the group receives money through international Sunni extremist networks.

## AUM SHINRIKYO

**aka** A.I.C.  Comprehensive Research Institute; A.I.C.  Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:**  Aum Shinrikyo (AUM) was designated as a Foreign Terrorist Organization on October 8, 1997.  Jailed leader Shoko Asahara established AUM in 1987, and the organization received legal status in Japan as a religious entity in 1989.  The Japanese government revoked its recognition of AUM as a religious organization following AUM's deadly 1995 sarin gas attack in Tokyo.  Despite claims of renunciation of violence and Asahara's teachings, members of the group continue to adhere to the violent and apocalyptic teachings of its founder.

**Activities:**  In March 1995, AUM members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 13 people and causing up to 6,000 to seek medical treatment.  Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and injured approximately 500.  Japanese police arrested Asahara in May 1995; in February 2004, authorities sentenced him to death for his role in the 1995 attacks, but authorities have not yet carried out the sentence.  In 2010 and 2011, several death sentences for other AUM senior members were finalized or affirmed by Japanese courts.  In 2012, the final three AUM fugitives were arrested after 17 years on the run.

Since 1997, the group has split into two factions, both of which have recruited new members, engaged in commercial enterprises, and acquired property.  In July 2000, Russian authorities arrested a group of Russian AUM followers who had planned to detonate bombs in Japan as part of an operation to free Asahara from jail and smuggle him to Russia.  In August 2012, a Japan Airlines flight to the United States was turned back after receiving a bomb threat demanding the release of Asahara.

339

PX209

Although AUM has not conducted a terrorist attack since 1995, concerns remain regarding its continued adherence to the violent teachings of Asahara.

**Strength:**  As of December 2014, AUM membership in Japan was approximately 1,650 with another 160 in Russia.  AUM continues to maintain at least 32 facilities in 15 prefectures in Japan and continues to possess several facilities in Russia.  (At the time of the Tokyo subway attack in 1995, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.)

**Location/Area of Operation:**  AUM's principal membership is located in Japan; a residual branch of about 160 followers live in Russia.

**Funding and External Aid:**  Funding primarily comes from member contributions and group-run businesses.

## BASQUE FATHERLAND AND LIBERTY

**aka** ETA; Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; XAKI

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, Basque Fatherland and Liberty (ETA) was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava; the autonomous region of Navarre; and the southwestern French territories of Labourd, Lower-Navarre, and Soule.  ETA is listed as a terrorist organization by Spain and the EU.  In 2002, the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group.  In June 2009, the European Court of Human Rights upheld the ban on Batasuna.  In September 2008, Spanish courts also banned two other Basque independence parties with reported links to Batasuna.  In 2010, when Batasuna continued to try to remain engaged political activities, divisions among parts of ETA became publicly apparent.

**Activities:**  ETA primarily has conducted bombings and assassinations.  Targets typically included Spanish government officials, businessmen, politicians, judicial figures, and security and military forces; however, the group has also targeted journalists and major tourist areas.  The group is responsible for killing 829 civilians and members of the armed forces and police, and injuring thousands since it formally began a campaign of violence in 1968.

ETA has committed numerous attacks in the last four decades.  Some of the group's high profile attacks include the February 2005 ETA car bombing in Madrid that wounded more than 20 people at a convention center where Spanish King Juan Carlos and then Mexican President Vicente Fox were scheduled to appear.  In December 2006, ETA exploded a massive car bomb that destroyed much of the covered parking garage at Madrid's Barajas International Airport. ETA marked its fiftieth anniversary in 2009 with a series of high profile and deadly bombings,

PX209

including the July attack on a Civil Guard Barracks that injured more than 60 people, including children.

By October 2011, after ETA was militarily debilitated and politically isolated, the group announced a "definitive cessation of armed activity." Given that the group has made and broken several past ceasefires, Madrid rejected this announcement and demanded that ETA disarm and disband. The group has yet to disband formally or give up its weapons arsenal since this latest cessation of armed activity.

Since 2007, more than 700 ETA militants have been arrested, including 16 arrested in 2014, both in Spain and abroad. Collaboration with France, the UK, Germany, and Mexico led to successful arrests in 2014.

**Strength:** Estimates put ETA membership of those who have not been captured by authorities at fewer than 20. There are approximately 455 ETA members in prison in Spain and France, one is incarcerated in Germany, and another in Portugal.

**Location/Area of Operation:** ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but the group has attacked Spanish and French interests elsewhere.

**Funding and External Aid:** ETA is probably experiencing financial shortages given that the group announced publicly in September 2011 that it had ceased collecting "revolutionary taxes" from Basque businesses. This extortion program was a major source of ETA's income.

---

## BOKO HARAM

**aka** Nigerian Taliban; Jama'atu Ahlus-Sunnah Lidda'Awati Wal Jihad; Jama'atu Ahlis Sunna Lidda'awati wal-Jihad; People Committed to the Prophet's Teachings for Propagation and Jihad; Sunni Group for Preaching and Jihad

**Description:** Designated as a Foreign Terrorist Organization on November 14, 2013, and led by Abubakar Shekau, Boko Haram (BH) is a Nigeria-based group responsible for numerous attacks in northern and northeastern Nigeria that have killed thousands of people since its emergence in 2009. The group espouses a violent Sunni extremist ideology and at times has received assistance, including funds and training, from al Qa'ida in the Islamic Maghreb (AQIM).

**Activities:** Among its major attacks, BH was responsible for the August 26, 2011 bomb attack on the UN building in Abuja that killed at least 21 people and wounded dozens more. The group is also responsible for the January 2012 attacks in Kano, Nigeria, in which a wave of bomb attacks in the city killed more than 180 people in a single day.

Boko Haram has increasingly crossed Nigerian borders to evade pressure and conduct operations. In February 2013, Boko Haram was responsible for kidnapping seven French tourists in the Far North of Cameroon. In November 2013, Boko Haram members kidnapped a French priest in Cameroon. In December 2013, Boko Haram gunmen reportedly attacked

PX209

civilians in several areas of northern Cameroon.  Security forces from Chad and Niger also reportedly partook in skirmishes against suspected Boko Haram members along Nigeria's borders.  In 2013, the group also kidnapped eight French citizens in northern Cameroon and obtained ransom payments for their release.

Boko Haram had its deadliest year in 2014, killing approximately 5,000 Nigerian civilians.  The group also declared its own "Islamic state" in 2014 and began seizing territory from the Nigerian military throughout the northeast.  In February 2014, BH killed dozens of people in two separate attacks, one on the farming village of Izghe in Borno state and the other on the fishing village of Doron Baga on Lake Chad.  In April 2014, BH kidnapped at least 276 female students from a school in Chibok, Borno state.  On June 2, 2014, at least two hundred people, mostly Christians, were massacred by BH militants in and around Gwoza, Borno state.  On November 28, 2014, BH militants attacked the central mosque in Kano, Nigeria, killing approximately 120.  BH conducted three attacks in Abuja and one attack in Lagos in 2014.

**Strength:**  Membership is estimated to be several thousand fighters.

**Location/Area of Operation:**  Northern Nigeria, northern Cameroon, Lake Chad Basin, and southeast Niger.

**Funding and External Aid:**  BH receives the bulk of its funding from criminal activities such as kidnapping for ransom, bank robberies, and extortion.

## COMMUNIST PARTY OF PHILIPPINES/NEW PEOPLE'S ARMY

**aka** CPP/NPA; Communist Party of the Philippines; the CPP; New People's Army; the NPA

**Description:**  The Communist Party of the Philippines/New People's Army (CPP/NPA) was designated as a Foreign Terrorist Organization on August 9, 2002.  The military wing of the Communist Party of the Philippines (CPP) – the New People's Army (NPA) – is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare.  Jose Maria Sison, the Chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from the Netherlands, where he lives in self-imposed exile.  Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen.  Although primarily a rural-based guerrilla group, the NPA had an active urban infrastructure to support its terrorist activities and, at times, used city-based assassination squads.

**Activities:**  The CPP/NPA primarily targeted Philippine security forces, government officials, local infrastructure, and businesses that refused to pay extortion, or "revolutionary taxes."  The CPP/NPA charged politicians running for office in CPP/NPA-influenced areas for "campaign permits."  In addition to its focus on Philippine governmental targets, the CPP/NPA has a history of attacking U.S. interests in the Philippines.  In 1987, the CPP/NPA conducted direct actions against U.S. personnel and facilities, killing three American soldiers in four separate attacks in Angeles City.  In 1989, the CPP/NPA issued a press statement claiming responsibility for the

PX209

ambush and murder of Colonel James Nicholas Rowe, chief of the Ground Forces Division of the Joint U.S.-Military Advisory Group.

Over the past few years, the CPP/NPA has continued to carry out killings, raids, kidnappings, acts of extortion, and other forms of violence which are directed mainly against domestic and security force targets.  In May 2013, the Armed Forces of the Philippines reported that from 2011 through the first quarter of 2013, 383 people, including 158 civilians, were killed in encounters between the CPP/NPA and government forces.

On July 10, 2014, heavily armed NPA fighters attacked a municipal police station in Surigao del Norte, and held four police officers captive during the attack, wounding two of them.  At least two soldiers were killed and another wounded following a confrontation with suspected NPA rebels in Negros Occidental on July 17, 2014.  During a nominal "holiday" ceasefire with the Government of the Philippines in December 2014, NPA carried out multiple attacks, including setting fire to construction equipment and a civilian's vehicle, abducting a jail warden, and shooting and killing three military-affiliated individuals – all unarmed and in civilian clothes. The NPA continued to use explosive and improvised explosive devices to target police and security forces.

On March 22, 2014, two leaders of the CPP/NPA, Benito Tiamzon and his wife Wilma, were arrested by Armed Forces of the Philippines and the Philippine National Police in Aloguinsan, Cebu.  Abraham Delejero Villanueva, a suspected leader of the CPP/NPA, was also arrested on July 20, 2014, and on August 5, 2014, Eduardo Almores Esteban, a high-ranking official in the CPP/NPA, was arrested by the military and police in Jaro, Iloilo, Philippines.

**Strength:**  The Philippine government estimates there are 4,000 CPP/NPA members.

**Location/Area of Operation:**  Rural Luzon, Visayas, and parts of northern and eastern Mindanao.  There are also cells in Manila and other metropolitan centers.

**Funding and External Aid:**  The CPP/NPA raises funds through extortion and theft.

## CONTINUITY IRISH REPUBLICAN ARMY

**aka** Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:**  Designated as a Foreign Terrorist Organization on July 13, 2004, the Continuity Irish Republican Army (CIRA) is a terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein; it split from Sinn Fein in 1986.  "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland.  CIRA cooperates with the larger Real IRA (RIRA).  In 2012, CIRA released a statement claiming it had new leadership, after previous leadership was ousted over allegations that it was acting to the detriment of the organization.

**Activities:**  CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies.  On

PX209

occasion, it provided advance warning to police of its attacks.  Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups.  CIRA did not join the Provisional IRA in the September 2005 decommissioning, and remained capable of effective, if sporadic, terrorist attacks.

The group has remained active in the past three years.  In December 2012, a plot by CIRA to murder an Irish national serving in the British army was foiled by Irish police.  In January 2013, the group claimed responsibility for firing shots at police officers in Drumbeg, Craigavon County, Northern Ireland.  In March 2014, CIRA claimed responsibility for an attempted bomb attack on the home and vehicle of a Police Service of Northern Ireland officer.

**Strength:**  Membership is small, with possibly fewer than 50.  Police counterterrorism operations have reduced the group's strength.

**Location/Area of Operation:**  Northern Ireland and the Republic of Ireland

**Funding and External Aid:**  CIRA supported its activities through criminal activities, including smuggling.

# GAMA'A AL-ISLAMIYYA

**aka** al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI; Islamic Gama'at; IG; Islamic Group

**Description:**  Gama'a al-Islamiyya (IG) was designated as a Foreign Terrorist Organization on October 8, 1997.  Once Egypt's largest militant group, IG was formed in the 1970s.  In 2011, it formed the Construction and Development political party that competed in the 2011 parliamentary elections, winning 13 seats.  Egypt-based members of IG released from prison prior to the 2011 revolution have renounced terrorism, although some members located overseas have worked with or joined al-Qa'ida (AQ).  Hundreds of members, who may not have renounced violence, were released from prison in 2011.  The external wing, composed of mainly exiled members in several countries, maintained that its primary goal was to replace the Egyptian government with an Islamic state.  IG's "spiritual" leader, the "blind Sheikh," Omar Abd al-Rahman, is serving a life sentence in a U.S. prison for his involvement in the 1993 World Trade Center bombing.  Supporters of Abd al-Rahman have called for reprisal attacks in the event of his death in prison.

**Activities:**  In the 1990s, IG conducted armed attacks against Egyptian security, other government officials, and Coptic Christians.  IG claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia.  The group also launched attacks on tourists in Egypt, most notably the 1997 Luxor attack.  In 1999, part of the group publicly renounced violence.  IG has not committed a known terrorist attack in recent years.

**Strength:**  At its peak, IG likely commanded several thousand core members and a similar number of supporters.  Security crackdowns following the 1997 attack in Luxor and the 1999

PX209

ceasefire, along with post-September 11 security measures and defections to AQ, have probably resulted in a substantial decrease in what is left of an organized group.

**Location/Area of Operation:**  The IG is believed to have maintained a presence in Afghanistan, Yemen, Iran, the UK, Germany, and France.

**Funding and External Aid:**  Unknown

## HAMAS

**aka** the Islamic Resistance Movement; Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Izz al-Din al Qassam Forces; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions

**Description:**  Hamas was designated as a Foreign Terrorist Organization on October 8, 1997. Hamas possesses military and political wings, and came into being in late 1987 at the onset of the first Palestinian uprising, or Intifada, as an outgrowth of the Palestinian branch of the Muslim Brotherhood.  The armed element, called the Izz al-Din al-Qassam Brigades, has conducted anti-Israeli attacks, including suicide bombings against civilian targets inside Israel.  Hamas also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fundraising, and political activities.  After winning Palestinian Legislative Council elections in January 2006, Hamas gained control of significant Palestinian Authority (PA) ministries in Gaza, including the Ministry of Interior.  Hamas retains control of Gaza.

**Activities:**  Prior to 2005, Hamas conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised explosive device attacks, and shootings.  Hamas has not directly targeted U.S. interests, although U.S. citizens have died and been injured in the group's attacks against Israeli targets.  In June 2007, after Hamas took control of Gaza from the PA and Fatah, the Gaza borders were closed and Hamas increased its use of tunnels to smuggle weapons into Gaza, using the Sinai and maritime routes.  Hamas has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, building its weapons caches, tightening security, and conducting limited operations against Israeli military forces.

Hamas fought a 23-day war with Israel from late December 2008 to January 2009.  From November 14-21, 2012, Hamas fought another war with Israel during which it claims to have launched more than 1,400 rockets into Israel.  Despite the Egypt-mediated ceasefire between Israel and Hamas in 2012, operatives from Hamas and Palestine Islamic Jihad (PIJ) coordinated and carried out a November bus bombing in Tel Aviv that wounded 29 people.  On July 8, 2014, Israel launched Operation Protective Edge in Gaza with the intent on stopping rocket fire into Israel, which had increased following Israeli military operations after the kidnapping and murder of three Israeli teenagers by Hamas.

PX209

**Strength:**  Several thousand Gaza-based operatives with varying degrees of skills are in its armed wing, the Izz al-Din al-Qassam Brigades, along with its paramilitary group known as the "Executive Force."

**Location/Area of Operation:**  Since 2007, Hamas has controlled Gaza and also has a presence in the West Bank.  The group retains leaders and facilitators that conduct political, fundraising, and arms-smuggling activities throughout the region.  Hamas also has a presence in the Palestinian refugee camps in Lebanon.

**Funding and External Aid:**  Historically, Hamas has received funding, weapons, and training from Iran.  In March 2014, Israel intercepted a weapons shipment containing rockets, mortars, and ammunition destined for Hamas and PIJ in Gaza.  The group also raises funds in the Gulf countries and receives donations from Palestinian expatriates around the world through its charities, such as the umbrella fundraising organization, the Union of Good.  Hamas's supply lines continued to suffer since the crackdown on smuggling tunnels in the Sinai Peninsula by the Egyptian military.

## HAQQANI NETWORK

**aka** HQN

**Description:**  Designated as a Foreign Terrorist Organization on September 19, 2012, the Haqqani Network (HQN) was formed in the late 1970s, around the time of the Soviet Union's invasion of Afghanistan.  Jalaluddin Haqqani, HQN's founder, established a relationship with Usama bin Laden in the mid-1980s, and joined the Taliban in 1995.  After the fall of the Taliban in Afghanistan in 2001, Jalaluddin retreated to Pakistan where, under the leadership of Jalaluddin's son, Sirajuddin Haqqani, the group began participating in the insurgency and became known as the Haqqani Network.

**Activities:**  HQN has planned and carried out a number of significant kidnappings and attacks against U.S. and Coalition Forces in Afghanistan, as well as Afghan government and civilian targets.  HQN's most notorious attacks in recent years include an attack on the Intercontinental Hotel in Kabul in June 2011, which killed 11 civilians and two Afghan policemen; a September 2011 truck bombing in Wardak Province, Afghanistan, which wounded 77 U.S. soldiers; a 19-hour attack on the U.S. Embassy and ISAF headquarters in Kabul in September 2011, which killed 16 Afghans, including at least six children; a June 2012 suicide bomb attack against Forward Operating Base Salerno, which killed two U.S. soldiers and wounded more than 100; and a 12-hour siege of the Spozhmai Hotel in Kabul in June 2012, which resulted in the death of at least 18 Afghans, including 14 civilians.  HQN was also involved in holding U.S. Army Sergeant Bowe Bergdahl, who was kidnapped in 2009 and remained in captivity until he was released in May 2014.

HQN's attacks continued in 2014.  In July, Afghan officials blamed HQN for a suicide attack at a market in Orgun, which killed over 70 people, and an attack against the airport in Kabul.  In November, Afghan officials implicated HQN in an attack in which a suicide bomber killed more than 60 people at a volleyball game in Paktika province.  In addition to these attacks, multiple

PX209

HQN plots, many planned against Afghan officials in Kabul, were disrupted by the Afghan police before they could be carried out.

HQN suffered numerous setbacks in 2014, including the capture of two senior members, Anas Haqqani and Hafiz Rashid, by Afghan security forces in October.

**Strength:**  HQN is believed to have several hundred core members, but it is estimated that the organization is also able to draw upon a pool of upwards of 10,000 fighters with varying degrees of affiliation.  HQN cooperates closely with the larger Afghan Taliban and also draws strength through cooperation with other terrorist organizations operating in Afghanistan, including al-Qa'ida, Tehrik-e Taliban Pakistan, the Islamic Movement of Uzbekistan, and Jaish-e Mohammad.

**Location/Area of Operation:**  HQN is active along the Afghanistan-Pakistan border and across much of southeastern Afghanistan, particularly in Loya Paktia.  The group's leadership has historically maintained a power base around Pakistan's tribal areas.

**Funding and External Aid:**  In addition to the support it receives through its connections to other terrorist organizations, HQN receives much of its funds from donors in Pakistan and the Gulf, as well as through criminal activities such as kidnapping, extortion, smuggling, and other licit and illicit business ventures.

## HARAKAT-UL JIHAD ISLAMI

**aka** HUJI; Movement of Islamic Holy War; Harkat-ul-Jihad-al Islami; Harkat-al-Jihad-ul Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad-e-Islami; Harakat-ul Jihad Islami

**Description:**  Designated as a Foreign Terrorist Organization on August 6, 2010, Harakat-ul Jihad Islami (HUJI) was founded in 1980 in Afghanistan to fight against the Soviet Union. Following the Soviet withdrawal from Afghanistan in 1989, the organization refocused its efforts on India.  HUJI seeks the annexation of Indian-administered Kashmir and the expulsion of Coalition Forces from Afghanistan.  It also has supplied fighters for the Taliban in Afghanistan. In addition, some factions of HUJI espouse a more global agenda and conduct attacks in Pakistan.  HUJI is mostly composed of Pakistani militants and veterans of the Soviet-Afghan war.  HUJI has experienced a number of internal splits and a portion of the group has aligned with al-Qa'ida (AQ) in recent years, including training its members in AQ training camps. Mohammad Ilyas Kashmiri, one of HUJI's top leaders who also served as an AQ military commander and strategist, died on June 3, 2011.

**Activities:**  HUJI has been involved in a number of terrorist attacks.  HUJI reportedly claimed responsibility for the September 7, 2011 bombing of the New Delhi High Court, which left at least 11 dead and an estimated 76 wounded, although another group separately claimed responsibility for the bombing.  HUJI sent an email to the press stating that the bomb was intended to force India to repeal a death sentence of a HUJI member.  HUJI did not publicly claim any attacks in 2014.

PX209

**Strength:**  HUJI has an estimated strength of several hundred members.

**Location/Area of Operation:**  HUJI's area of operation extends throughout South Asia, with its terrorist operations focused primarily in India and Afghanistan.  Some factions of HUJI conduct attacks within Pakistan.

**Funding and External Aid:**  Unknown

## HARAKAT UL-JIHAD-I-ISLAMI/BANGLADESH

**aka** HUJI-B; Harakat ul Jihad e Islami Bangladesh; Harkatul Jihad al Islam; Harkatul Jihad; Harakat ul Jihad al Islami; Harkat ul Jihad al Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad Islami Bangladesh; Islami Dawat-e-Kafela; IDEK

**Description:**  Designated as a Foreign Terrorist Organization on March 5, 2008, Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) was formed in April 1992 by a group of former Bangladeshi Afghan veterans to establish Islamic rule in Bangladesh.  In October 2005, Bangladeshi authorities banned the group.  HUJI-B has connections to Pakistani terrorist groups such as HUJI, al-Qa'ida, and Lashkar e-Tayyiba (LeT) that advocate similar objectives.  The leaders of HUJI-B signed the February 1998 fatwa sponsored by Usama bin Laden that declared American civilians legitimate targets.

**Activities:**  In December 2008, three HUJI-B members were convicted for the May 2004 grenade attack that wounded the British High Commissioner in Sylhet, Bangladesh.  In 2011, Bangladeshi authorities formally charged multiple suspects, including HUJI-B leader Mufti Abdul Hannan, with the killing of former Finance Minister Shah AMS Kibria of the Awami League in a grenade attack on January 27, 2005.  HUJI-B committed no known attacks in 2013, however in March of that year, police in Dhaka arrested a group of militants which included some HUJI-B members.  The group was preparing attacks on public gatherings and prominent individuals; and bombs, bomb-making material, and counterfeit currency were found when the arrest took place.   In October 2014, a number of HUJI-B members were arrested, including a bomb expert.  Some HUJI-B members may have traveled to Pakistan to receive military training from LeT.

**Strength:**  HUJI-B leaders claim that up to 400 of its members are Afghan war veterans, but its total membership is unknown.

**Location/Area of Operation:**  The group operates primarily in Bangladesh and India.  HUJI-B trains and has a network of madrassas in Bangladesh.

**Funding and External Aid:**  HUJI-B funding comes from a variety of sources.  Several international Muslim NGOs may have funneled money to HUJI-B and other Bangladeshi terrorist groups.

## HARAKAT UL-MUJAHIDEEN

**aka** HUM; Harakat ul-Ansar; HUA; Jamiat ul-Ansar; JUA; al-Faran; al-Hadid; al-Hadith; Harakat ul-Mujahidin; Ansar ul Ummah

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, Harakat ul-Mujahideen (HUM) seeks the annexation of Indian Kashmir and the expulsion of Coalition Forces in Afghanistan.  Reportedly under pressure from the Government of Pakistan, HUM's long-time leader Fazlur Rehman Khalil stepped down and was replaced by Dr.  Badr Munir in January 2005.  HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in 2001.  In 2003, HUM began using the name Jamiat ul-Ansar (JUA). Pakistan banned JUA in November 2003.

**Activities:**  HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir.  It is linked to the Kashmiri terrorist group al-Faran, which kidnapped five Western tourists in Kashmir in July 1995; the five reportedly were killed later that year.  HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release. Another former member of Harakat ul-Ansar, Ahmed Omar Sheik, was also released by India as a result of the hijackings and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

HUM targets Indian security and civilian targets in Kashmir.  The group conducted numerous attacks on Indian interests from at least 2005 through 2013.  There were no known HUM attacks in 2014.

**Strength:**  HUM has a few hundred armed supporters, who are mostly Pakistanis and Kashmiris. After 2000, a significant portion of HUM's membership defected to JEM.

**Location/Area of Operation:**  Operating from Muzaffarabad in Pakistan-administered Kashmir, as well as several cities in Pakistan, HUM conducts terrorist operations primarily in Kashmir and Afghanistan.  HUM trains its militants in Afghanistan and Pakistan.

**Funding and External Aid:**  HUM collects donations from wealthy and grassroots donors in Pakistan.

---

## HIZBALLAH

---

**aka** the Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar Allah; Followers of the Prophet Muhammed

**Description:**  Hizballah was designated as a Foreign Terrorist Organization on October 8, 1997. Formed in 1982 following the Israeli invasion of Lebanon, the Lebanon-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini.  The group generally follows the religious guidance of the Iranian Supreme

PX209

Leader, which was Ali Khamenei in 2014.  Hizballah is closely allied with Iran and the two often work together on shared initiatives, although Hizballah also acts independently.  Hizballah shares a close relationship with Syria, and like Iran, the group is providing assistance – including fighters – to Syrian regime forces in the Syrian conflict.

Hizballah has strong influence in Lebanon, especially with the Shia community.  Hizballah plays an active role in Lebanese politics, and the group holds 12 seats in the 128-member Lebanese Parliament and two seats in the 24-member Council of Ministers.  Hizballah's political strength grew in the wake of the 2006 war with Israel and the group's 2008 takeover of West Beirut, although its reputation and popularity have been significantly undermined by the group's active support for the Asad regime.

Hizballah provides support to several Palestinian terrorist organizations, as well as a number of local Christian and Muslim militias in Lebanon.  Besides overt political support, support includes the covert provision of weapons, explosives, training, funding, and guidance.

**Activities:**  Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s.  Hizballah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and on the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires.  In 2000, Hizballah operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. Although the non-combatant survived, on November 1, 2001, Israeli Army Rabbi Israel Weiss pronounced the soldiers dead.  The surviving non-combatant and the bodies of the Israeli soldiers were returned to Israel in a prisoner exchange with Hizballah in 2004.

Two attacks against UN Interim Force in Lebanon peacekeepers – an attack in late July 2011 that wounded six French citizens and a second attack days later that injured three other French soldiers – were believed to have been carried out by Hizballah.  Also in 2011, four Hizballah members were indicted by the U.N.-based Special Tribunal for Lebanon, an international tribunal investigating the 2005 assassination of Lebanese Prime Minister Rafik Hariri.  A fifth Hizballah member, Hassan Habib Merhi, was indicted in October 2013.

In 2012, Hizballah increased the pace of its terrorist plotting, and was implicated in several terrorist plots around the world.  In January 2012, Thai police detained a Hizballah operative on immigration charges as he was attempting to depart Thailand from Suvarnabhumi International Airport.  He led police to nearly 10,000 pounds of urea-based fertilizer and 10 gallons of liquid ammonium nitrate in a commercial building about 20 miles south of Bangkok.  The Hizballah operative was convicted of possessing bomb-making materials by a Thai court in September 2013.  He was sentenced to two years and eight months in prison.

In Cyprus, a suspected Hizballah operative was detained by the Cypriot authorities on July 7, 2012 for allegedly helping plan an attack against Israeli tourists in Cyprus.  The trial began in September 2012, and on March 21, 2013, a Cyprus court found a Hizballah operative guilty of charges stemming from his surveillance activities of Israeli tourist targets.

PX209

In July 2012, a terrorist attack was carried out on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport near the Bulgarian city of Burgas.  The explosion killed five Israelis and one Bulgarian, and injured 32.  On February 5, 2013, Bulgarian Deputy Prime Minister Tsvetan Tsevtanov publicly linked two operatives in the Burgas bombing to Hizballah, and in July 2013, the Bulgarian government identified the operatives as Hassan al-Hajj Hassan, a dual Canadian-Lebanese citizen; and Meliad Farah, a dual Australian-Lebanese citizen.  In August 2013, Hizballah claimed responsibility for an attack on the Lebanese-Israeli border that wounded four members of an Israeli military convoy.

In May 2013, Hizballah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying to support Syrian President Bashar al-Asad.  Hizballah's support for the Asad regime carried into 2014, and the group remained active in Syria.  Separately, in October 2014, Hizballah set off an explosive device on the border between Lebanon and Israel.  The attack wounded two Israeli soldiers.

**Strength:**  Tens of thousands of supporters and members worldwide.

**Location/Area of Operation:**  Hizballah is based in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon.  As evidenced by Hizballah's activities during the course of 2012 and 2013, the group is capable of operating around the globe.  As of December 2014, Hizballah fighters were assisting Asad regime forces in many areas across Syria.

**Funding and External Aid:**  Iran continued to provide Hizballah with training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid; Syria has furnished training, weapons, and diplomatic and political support.  Hizballah also receives funding from private donations and profits from legal and illegal businesses.  Hizballah receives financial support from Lebanese Shia communities in Europe, Africa, South America, North America, and Asia.  As illustrated by the Lebanese-Canadian bank case, Hizballah supporters are often engaged in a range of criminal activities that benefit the group financially.  These have included smuggling contraband goods, passport falsification, trafficking in narcotics, money laundering, and credit card, immigration, and bank fraud.

## INDIAN MUJAHEDEEN

**aka** Indian Mujahidin; Islamic Security Force-Indian Mujahideen (ISF-IM)

**Description:**  The Indian Mujahedeen (IM) was designated as a Foreign Terrorist Organization on September 19, 2011.  An India-based terrorist group with links to Pakistan-based terrorist organizations, IM has been responsible for dozens of bomb attacks throughout India since 2005, and has caused the deaths of hundreds of civilians.  IM maintains ties to other U.S.-designated terrorist entities including Pakistan-based Lashkar e-Tayyiba (LeT), Jaish-e-Mohammed, and Harakat ul-Jihad Islami.  IM's stated goal is to carry out terrorist actions against Indians for their oppression of Muslims.

PX209

**Activities:**  IM's primary method of attack is multiple coordinated bombings in crowded areas against economic and civilian targets to maximize terror and casualties.  In 2008, an IM attack in Delhi killed 30 people; IM was responsible for 16 synchronized bomb blasts in crowded urban centers, and an attack at a local hospital in Ahmedabad that killed 38 and injured more than 100.  Individuals associated with IM probably played a facilitative role in the 2008 Mumbai attacks carried out by LeT that killed 166 people, including six Americans.  In 2010, IM carried out the bombing of a popular German bakery in Pune, India, frequented by tourists, killing 17 and injuring over 60.  In 2013, IM conducted multiple bombings and terrorist attacks, killing dozens of innocent civilians and injuring hundreds more.

In 2014, IM reportedly continued to plan serial bombings throughout India.  The Delhi Police Special Cell and Rajasthan Antiterrorism Squad disrupted a major terrorist attack in Rajasthan on March 23 when they arrested four suspected IM terrorists and confiscated 250 kg of explosives, including over 70 bombs.  Indian authorities stated that IM was planning terrorist attacks in Delhi in September, and police seized a file with IM's letterhead that mentioned plans to target Indian cities.

**Strength:**  Unknown

**Location/Area of Operation:**  India

**Funding and External Aid:**  Suspected to obtain funding and support from other terrorist organizations, and from sources in Pakistan and the Middle East.

## ISLAMIC JIHAD UNION

**aka** Islamic Jihad Group; Islomiy Jihod Ittihodi; al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahedin; The Kazakh Jama'at; The Libyan Society

**Description:**  Designated as a Foreign Terrorist Organization on June 17, 2005, the Islamic Jihad Union (IJU) is a Sunni violent extremist organization that splintered from the Islamic Movement of Uzbekistan in the early 2000s and is currently based in Pakistan's Federally Administered Tribal Areas.  Najmiddin Jalolov founded the organization as the Islamic Jihad Group (IJG) in March 2002, but the group was renamed IJU in May 2005.  Although IJU remains committed to overthrowing the Government of Uzbekistan, it also has a global agenda, seen in its attacks on Coalition Forces in Afghanistan.

**Activities:**  The IJU primarily operates against ISAF and Coalition Forces in Afghanistan and continues to pose a threat to Central Asia.  The group claimed responsibility for attacks in March and April 2004 in Uzbekistan, targeting police at several roadway checkpoints and at a popular bazaar, killing approximately 47 people, including 33 IJU members, some of whom were suicide bombers.  In July 2004, the group carried out near-simultaneous suicide bombings of the Uzbek Prosecutor General's office and the U.S. and Israeli Embassies in Tashkent.  In September 2007, German authorities disrupted an IJU plot to attack U.S. military bases and personnel by detaining and prosecuting three IJU operatives, including two German citizens.  Foreign terrorist fighters

PX209

from Germany, Turkey, and elsewhere in Europe continued to travel to the Afghan-Pakistan border area to join the IJU to fight against U.S. and Coalition Forces.

In 2013, two IJU videos showed an attack against an American military base in Afghanistan and an IJU sniper shooting an Afghan soldier at a base in Afghanistan. In January 2014, IJU released a video threatening the Olympic Games in Sochi, Russia. In May 2014, IJU claimed a joint operation with the Afghan Taliban on an Afghan military base in Khost province, and released a video of the attack.

**Strength:** 100 to 200 members

**Location/Area of Operation:** Based in Pakistan and active in Afghanistan, IJU members are also scattered throughout Central Asia and Europe.

**Funding and External Aid:** Unknown

## ISLAMIC MOVEMENT OF UZBEKISTAN

**aka** IMU

**Description:** Designated as a Foreign Terrorist Organization on September 25, 2000, the Islamic Movement of Uzbekistan's (IMU) goal is to overthrow the Uzbek government and establish an Islamic state. For most of the past decade, however, the group recruited members from other Central Asian states and Europe and has focused on fighting in Afghanistan and Pakistan. The IMU has a relationship with al-Qa'ida, the Taliban, and Tehrik-e Taliban Pakistan (TTP). In April 2012, IMU leader Abu Usman Adil died and Usman Ghazi was named the group's new leader.

IMU's leadership cadre remains based in Pakistan's tribal areas and operates primarily along the Afghanistan-Pakistan border and in northern Afghanistan. Top IMU leaders have integrated themselves into the Taliban's shadow government in Afghanistan's northern provinces. Operating in cooperation with each other, the Taliban and IMU have expanded their presence throughout northern Afghanistan, and have established training camps in the region. Group members may have also traveled to Syria to fight with violent extremist groups.

**Activities:** Since the beginning of Operation Enduring Freedom, the IMU has been predominantly focused on attacks against U.S. and Coalition Forces in Afghanistan. In late 2009, NATO forces reported an increase in IMU-affiliated foreign fighters in Afghanistan. In 2010, IMU claimed responsibility for the September 19 ambush that killed 25 Tajik troops in Tajikistan. On October 15, 2011, IMU claimed responsibility for a suicide assault on a U.S.-led Provincial Reconstruction Team based in the Afghan province of Panjshir that killed two Afghan civilians and wounded two security guards. In 2013, IMU remained active and carried out numerous attacks that killed civilians and police, including a joint attack with the Taliban in May and a suicide attack near Bagram Air Base that targeted a U.S. military convoy.

PX209

On June 8, 2014, IMU claimed an attack on Karachi's international airport that resulted in the deaths of at least 39 people.  IMU posted photos online of 10 men holding AK-47s after the attack.  On September 26, IMU senior leader Usman Ghazi announced the group's allegiance to ISIL.  The IMU released a statement praising the December 16 Peshawar school attack, carried out by TTP.

**Strength:**  200-300 members

**Location/Area of Operation:**  IMU militants are located in South Asia, Central Asia, and Iran.

**Funding and External Aid:**  The IMU receives support from a large Uzbek diaspora, terrorist organizations, and donors from Europe, Central and South Asia, and the Middle East.

## ISLAMIC STATE IN IRAQ AND THE LEVANT

**aka** al-Qa'ida in Iraq; al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; al-Qa'ida of Jihad Organization in the Land of the Two Rivers; al-Qa'ida of the Jihad in the Land of the Two Rivers; al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network; Islamic State in Iraq; Islamic State in Iraq and al-Sham; Islamic State in Iraq and Syria; ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham; Daesh; Dawla al Islamiya; Al-Furqan Establishment for Media Production

**Description:**  Al-Qa'ida in Iraq (AQI) was designated as a Foreign Terrorist Organization on December 17, 2004.  In the 1990s, Abu Mus'ab al-Zarqawi, a Jordanian-born militant, organized a terrorist group called al-Tawhid wal-Jihad to oppose the presence of U.S. and Western military forces in the Islamic world and the West's support for and the existence of Israel.  In late 2004, he joined al-Qa'ida (AQ) and pledged allegiance to Usama bin Laden.  After this, al-Tawhid wal-Jihad became known as AQI.  Zarqawi traveled to Iraq during Operation Iraqi Freedom and led his group against U.S. and Coalition Forces until his death in June 2006.  In October 2006, AQI publicly re-named itself the Islamic State in Iraq, although within the past year the group adopted the moniker Islamic State in Iraq and the Levant (ISIL) to express its regional ambitions as it expanded its operations to include the Syrian conflict.  Since 2012, ISIL has been led by Specially Designated Global Terrorist Abu Bakr al-Baghdadi, aka Ibrahim Awwad Ibrahim Ali al-Badri, aka Abu Du'a.  On May 15, the Department of State amended the Foreign Terrorist Organization designation of AQI to add aliases, including the Islamic State in Iraq and the Levant (ISIL), and to make ISIL the organization's primary name.  In June 2014, ISIL leader al-Baghdadi declared an Islamic caliphate.

PX209

**Activities:**  As AQI, ISIL has conducted high profile attacks, including improvised explosive device attacks against U.S. military personnel and Iraqi infrastructure; videotaped beheadings of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004); suicide bomber attacks against both military and civilian targets; and rocket attacks.  ISIL perpetrates the majority of suicide and mass casualty bombings in Iraq using foreign and Iraqi operatives.  ISIL was active in Iraq in 2012 and 2013; in 2013 alone it was responsible for the majority of deaths of the over 7,000 Iraqi civilians killed that year.  ISIL was heavily involved in the fighting in Syria during 2013, including against other militant opposition groups, and participated in a number of kidnapping incidents against civilians, including aid workers and reporters.

ISIL remained active in 2014, launching numerous attacks on a variety of targets in both Syria and Iraq.  In January, ISIL captured Fallujah, Iraq, and proclaimed an Islamic state there.  In June, the group took over Mosul, the second most populous city in Iraq, and a large part of the surrounding Nineveh province.  In early July, ISIL captured Syria's largest oilfield, the al-Omar.  By late July, they took a Syrian 17th Division base near Raqqah.  In early August, the group captured the Iraqi city of Sinjar, precipitating a humanitarian refugee crisis when the Yazidi, an Iraqi minority ethnic group living in the area, fled to avoid ISIL atrocities.  Reported atrocities include the massacre of Yazidi men and the holding of Yazidi women and girls captive and selling them as slaves.  In mid-August, ISIL beheaded U.S. journalist James Foley; in September, the group beheaded journalist Steven Sotloff; in October, ISIL killed British aid worker Alan Henning; and in November, American aid worker and ISIL hostage Peter Kassig was also murdered.  In late December, ISIL captured a Jordanian pilot after his aircraft malfunctioned and he ejected into ISIL-controlled territory.

**Strength:**  Estimates at year's end placed the number of fighters that ISIL can muster between 20,000 and 31,500.

**Location/Area of Operation:**  ISIL's operations are predominately in Iraq and Syria, although supporters and associates worldwide who are inspired by the group's ideology may be operating without direction from ISIL central leadership.  In October 2014, Ansar al-Shari'a-Darnah publicly pledged allegiance to ISIL, and in November 2014, Ansar Bayt al-Maqdis pledged allegiance to the group.  Also in October 2014, the chief spokesman of Tehrik-e Taliban Pakistan (TTP) and five regional commanders defected from TTP and publicly pledged allegiance to ISIL.

**Funding and External Aid:**  ISIL receives most of its funding from a variety of businesses and criminal activities within areas it controls in Iraq and Syria.  Criminal activities include robbing banks, smuggling oil, looting and selling antiquities and other goods, as well as extortion and kidnapping for ransom.

## JAMA'ATU ANSARUL MUSLIMINA FI BILADIS-SUDAN (ANSARU)

**aka** Ansaru; Ansarul Muslimina Fi Biladis Sudan; Vanguards for the Protection of Muslims in Black Africa; JAMBS; Jama'atu Ansaril Muslimina Fi Biladis Sudan

PX209

**Description:**  Designated as a Foreign Terrorist Organization on November 14, 2013, Jama'atu Ansarul Muslimina fi Biladis-Sudan (Ansaru) publicly splintered from Boko Haram in January 2012.  Ansaru's leadership structure remains unclear; however, Khalid al-Barnawi held one of the top leadership positions within the organization.  Since its inception, Ansaru has targeted western and international civilians and Nigerian government and security officials and is responsible for the deaths of civilians and a number of Nigerian security personnel.  Ansaru's stated goals are to defend Muslims throughout all of Africa by fighting against the Nigerian government and international interests, but to avoid killing innocent Muslim civilians.  While Ansaru claims to identify with Boko Haram's objectives and struggle, it has criticized the group for killing fellow Muslims.

**Activities:**  In November 2012, Ansaru raided a police station in Abuja, killing Nigerian police officers and freeing detained terrorists from prison.  In January 2013, Ansaru attacked a convoy of Nigerian peacekeepers on their way to Mali.  Ansaru has also engaged in multiple kidnapping attacks targeting civilians.  In late 2012, Ansaru kidnapped a French engineer and claimed the action was justified due to French involvement in Mali.  Similarly in early 2013, Ansaru kidnapped and subsequently executed seven international construction workers.  Ansaru committed no known attacks in 2014.

**Strength:**  Total membership is unknown.  Given its narrower scope of operations, it is estimated that Ansaru's membership is much smaller than that of Boko Haram's.

**Location/Area of Operation:**  Ansaru's operations take place in northern Nigeria.

**Funding and External Aid:**  Ansaru maintained a working relationship with Boko Haram and during 2014 may have rejoined with the larger group.

## JAISH-E-MOHAMMED

**aka** the Army of Mohammed; Mohammed's Army; Tehrik ul-Furqaan; Khuddam-ul-Islam; Khudamul Islam; Kuddam e Islami; Jaish-i-Mohammed

**Description:**  Designated as a Foreign Terrorist Organization on December 26, 2001, Jaish-e-Mohammed (JEM) is based in Pakistan.  JEM was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India in exchange for 155 hijacked Indian Airlines hostages.  The group's aim is to annex Indian-administered Kashmir to Pakistan and expel Coalition Forces from Afghanistan, and it has openly declared war against the United States.  Pakistan outlawed JEM in 2002.  By 2003, JEM had splintered into Khuddam-ul-Islam (KUI), headed by Azhar; and Jamaat ul-Furqan (JUF), led by Abdul Jabbar who was released from Pakistani custody in August 2004.  Pakistan banned KUI and JUF in November 2003.

**Activities:**  JEM continued to operate openly in parts of Pakistan despite the 2002 ban on its activities.  Since its founding, JEM has conducted many fatal terrorist attacks in the region.  JEM claimed responsibility for several suicide car bombings in Indian-administered Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly

PX209

building in Srinagar that killed more than 30 people.  The Indian government has publicly implicated JEM, along with Lashkar e-Tayyiba, for the December 2001 attack on the Indian Parliament that killed nine and injured 18.  In 2002, Pakistani authorities arrested and convicted a JEM member for the abduction and murder of U.S. journalist Daniel Pearl.  Pakistani authorities reportedly suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans.  In December 2003, Pakistan implicated JEM members in the two assassination attempts against President Musharraf.  In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.  In December 2013, JEM threatened to kill Indian politician Narendra Modi if he were elected Prime Minister.  Though they did not publicly claim any attacks, JEM members continued to clash with Indian forces in Kashmir in 2014.

**Strength:**  JEM has at least several hundred armed supporters in Pakistan.

**Location/Area of Operation:**  Kashmir in India; Afghanistan; and Pakistan, particularly southern Punjab.

**Funding and External Aid:**  To avoid asset seizures by the Pakistani government, since 2007 JEM has withdrawn funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and the production of consumer goods.  JEM also collects funds through donation requests in magazines and pamphlets, sometimes using charitable causes to solicit donations.

## JEMAAH ANSHORUT TAUHID

**aka** JAT; Jemmah Ansharut Tauhid; Jem'mah Anshorut Tauhid; Jamaah Ansharut Tauhid; Jama'ah Ansharut Tauhid; Laskar 99

**Description:**  The Department of State designated Indonesia-based group Jemaah Anshorut Tauhid (JAT) as a Foreign Terrorist Organization on March 13, 2012.  Formed in 2008, JAT seeks to establish an Islamic caliphate in Indonesia, and has carried out numerous attacks on Indonesian government personnel, police, military, and civilians.  In 2011, Abu Bakar Ba'asyir, the founder and leader of JAT, was convicted and sentenced to 15 years in prison for his role in organizing a militant training camp in Aceh.  Ba'asyir is also the co-founder and former leader of Jemaah Islamiya (JI).  JAT maintains ties to JI and other indigenous terrorist groups in Southeast Asia.

**Activities:**  JAT has conducted multiple attacks targeting civilians and Indonesian officials, resulting in the deaths of several Indonesian police.  JAT has robbed banks and carried out other illicit activities to fund the purchase of assault weapons, ammunition, explosives, and bomb-making materials.  In October 2012, two policemen investigating an alleged terrorist camp linked to JAT were tortured and found dead in Poso, and authorities implicated JAT in the killings.  In December 2012, four police officers were killed and two wounded in an attack by suspected local JAT members in Central Sulawesi after a group of 10 to 15 gunmen ambushed a police patrol in the area.  In 2013, Indonesian authorities conducted two raids that killed five JAT

PX209

members who had fled Poso after they had killed several police officers.  Police found a pipe bomb and other bomb-making materials at the JAT camp.

In July 2014, Abu Bakar Ba'asyir pledged allegiance to ISIL and instructed his followers to fight with ISIL.  JAT members are fighting in Syria, and Indonesian authorities have arrested some JAT members upon their return.

**Strength:**  JAT is estimated to have several thousand supporters and members.

**Location/Area of Operation:**  JAT is based in Indonesia with suspected elements in Malaysia and the Philippines.

**Funding and External Aid:**  JAT raises funds through membership donations; bank robberies, cyber hacking, and other illicit activities; and legitimate business activities such as operating bookstores and other shops.

## JEMAAH ISLAMIYA

**aka** Jemaa Islamiyah; Jema'a Islamiyah; Jemaa Islamiyya; Jema'a Islamiyya; Jemaa Islamiyyah; Jema'a Islamiyyah; Jemaah Islamiah; Jemaah Islamiyah; Jema'ah Islamiyah; Jemaah Islamiyyah; Jema'ah Islamiyyah; JI

**Description:**  Designated as a Foreign Terrorist Organization on October 23, 2002, Jemaah Islamiya (JI) is a Southeast Asia-based terrorist group co-founded by Abdullah Sungkar and Abu Bakar Ba'asyir that seeks to establish an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines.  More than 400 JI operatives have been captured since 2002, including operations chief and al-Qa'ida associate Hambali.  In 2006, several members connected to JI's 2005 suicide attack in Bali were arrested; in 2007, Muhammad Naim (a.k.a.  Zarkasih) and JI military commander Abu Dujana were arrested; and in 2008, two senior JI operatives were arrested in Malaysia and a JI-linked cell was broken up in Sumatra.  In September 2009, JI-splinter group leader Noordin Mohammad Top was killed in a police raid.  In February 2010, the Indonesian National Police discovered and disbanded a violent extremist training base in Aceh in which former members of JI and other Indonesian violent extremist groups participated.  The police raid resulted in the capture of more than 60 militants, including some former JI operatives, and led authorities to former JI senior operative Dulmatin, one of the planners of the 2002 Bali bombing.  In March 2010, Dulmatin was killed outside of Jakarta.  In January 2011, JI member Umar Patek was captured in Abbottabad, Pakistan, and put on trial in Indonesia, where he was convicted and sentenced to 20 years in prison in June 2012 for his role in the Bali bombing.

**Activities:**  In December 2001, Singaporean authorities uncovered a JI plot to attack U.S., Israeli, British, and Australian diplomatic facilities in Singapore.  Other significant JI attacks include the 2002 Bali bombings, which killed more than 200, including seven U.S. citizens; the August 2003 bombing of the J.W. Marriott Hotel in Jakarta; the September 2004 bombing outside the Australian Embassy in Jakarta; and the October 2005 suicide bombing in Bali, which killed 26, including the three suicide bombers.

PX209

On July 17, 2009, a JI faction led by Top conducted the group's most recent high-profile attacks, when two suicide bombers detonated explosive devices at the J.W. Marriott and Ritz-Carlton hotels in Jakarta that killed seven and injured more than 50, including seven Americans.  The Philippine military announced it had killed two JI members in separate incidents in the south of the country in late 2012, including one of the group's senior-most representatives to the Philippines.

In November 2014, Indonesian authorities released former JI bomb-maker Taufik Abdul Halim from prison after serving a 12-year sentence for attempting to bomb a Jakarta shopping mall in 2001.

**Strength:**  Estimates of total JI members vary from 500 to several thousand.

**Location/Area of Operation:**  JI is based in Indonesia and is believed to have elements in Malaysia and the Philippines.

**Funding and External Aid:**  JI fundraises through membership donations and criminal and business activities.  It has received financial, ideological, and logistical support from Middle Eastern contacts and illegitimate charities and organizations.

## JUNDALLAH

**aka** People's Resistance Movement of Iran (PMRI); Jonbesh-i Moqavemat-i-Mardom-i Iran; Popular Resistance Movement of Iran; Soldiers of God; Fedayeen-e-Islam; Former Jundallah of Iran; Jundullah; Jondullah; Jundollah; Jondollah; Jondallah; Army of God (God's Army); Baloch Peoples Resistance Movement (BPRM)

**Description:**  Jundallah was designated as a Foreign Terrorist Organization on November 4, 2010.  Since its inception in 2003, Jundallah, which operates primarily in the province of Sistan va Balochistan of Iran, and the Baloch areas of Pakistan and Afghanistan, has engaged in numerous attacks, killing and maiming scores of Iranian civilians and government officials. Jundallah's stated goals are to secure recognition of Balochi cultural, economic, and political rights from the Government of Iran, and to spread awareness of the plight of the Baloch situation through violent and nonviolent means.

**Activities:**  In March 2006, Jundallah attacked a motorcade in eastern Iran, which included the deputy head of the Iranian Red Crescent Security Department, who was then taken hostage.  The Governor of Zahedan, his deputy, and five other officials were wounded; seven others were kidnapped; and more than 20 were killed in the attack.  An October 2009 suicide bomb attack in a marketplace in the city of Pishin in the Sistan va Balochistan province, which killed more than 40 people, was reportedly the deadliest terrorist attack in Iran since the 1980s.  In a statement on its website, Jundallah claimed responsibility for the December 15, 2010 suicide bomb attack inside the Iman Hussein Mosque in Chabahar, which killed an estimated 35 to 40 civilians and wounded 60 to 100.  In July 2010, Jundallah attacked the Grand Mosque in Zahedan, killing approximately 30 and injuring an estimated 300.  In 2013, attacks continued in the Sistan va

359

**PX209**

Balochistan province; however, it is unclear if Jundallah was involved in these attacks.  There were no known attacks attributed to Jundallah in 2014.

**Strength:** Unknown

**Location/Area of Operation:**  Jundallah has traditionally operated throughout Sistan va Balochistan province in southeastern Iran and the greater Balochistan area of Afghanistan and Pakistan.

**Funding and External Aid:**  Unknown

---

# KAHANE CHAI

**aka** American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description:**  Kach – the precursor to Kahane Chai – was founded by radical Israeli-American Rabbi Meir Kahane, with the goal of restoring Greater Israel, which is generally used to refer to Israel, the West Bank, and Gaza.  Its offshoot, Kahane Chai (translation: "Kahane Lives"), was founded by Meir Kahane's son Binyamin, following his father's 1990 assassination in the United States.  Both organizations were designated as Foreign Terrorist Organizations on October 8, 1997.  The group has attempted to gain seats in the Israeli Knesset over the past several decades but won only one seat in 1984.

**Activities:**  Kahane Chai has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife.  The group is suspected of involvement in a number of low-level attacks since the start of the First Palestinian Intifada in 2000.  Since 2003, Kahane Chai activists have physically intimidated Israeli and Palestinian government officials who favored the dismantlement of Israeli settlements.  Although they have not explicitly claimed responsibility for a series of mosque burnings in the West Bank, individuals affiliated with Kahane Chai are widely suspected of being the perpetrators.  There were no known Kahane Chai attacks during 2014.

**Strength:**  Kahane Chai's core membership is believed to be fewer than 100.  The group's membership and support networks are overwhelmingly composed of Israeli citizens that live mostly in West Bank settlements.

PX209

**Location/Area of Operation:**  Israel and West Bank settlements, particularly Qiryat Arba in Hebron.

**Funding and External Aid:**  Receives support from sympathizers in the United States and Europe.

# KATA'IB HIZBALLAH

**aka** Hizballah Brigades; Hizballah Brigades in Iraq; Hizballah Brigades-Iraq; Kata'ib Hezbollah; Khata'ib Hezbollah; Khata'ib Hizballah; Khattab Hezballah; Hizballah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizballah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah

**Description:**  Designated as a Foreign Terrorist Organization on July 2, 2009, Kata'ib Hizballah (KH) was formed in 2006 and is a radical Shia Islamist group with an anti-Western outlook and violent extremist ideology that has conducted attacks against Iraqi, U.S., and Coalition targets in Iraq.  KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.  The group is notable for its extensive use of media operations and propaganda by filming and releasing videos of attacks.  KH has ideological ties to Lebanese Hizballah and receives support from that group and its sponsor, Iran.

**Activities:**  KH has been responsible for numerous terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. In 2007, KH gained notoriety with attacks on U.S. and Coalition Forces in Iraq.  KH was particularly active in the summer of 2008, recording and distributing video footage of its attacks. In June 2011, five U.S. soldiers were killed in a rocket attack in Baghdad when KH assailants fired between three and five rockets at U.S. military base Camp Victory.  The group remained active in 2014, participating in fighting in Syria and Iraq against the Islamic State in Iraq and the Levant ISIL, but has not conducted an attack on U.S. interests since July 2011.

**Strength:**  Membership is estimated at 400 individuals.

**Location/Area of Operation:**  KH's operations are predominately Iraq-based, but also include fighting alongside pro-regime forces in Syria.  Traditionally, KH conducted the majority of its operations in Baghdad, but its operations have expanded across Iraq in response to ISIL.

**Funding and External Aid:**  KH is heavily dependent on support from Iran and Lebanese Hizballah.

# KURDISTAN WORKERS' PARTY

**aka** the Kurdistan Freedom and Democracy Congress; the Freedom and Democracy Congress of Kurdistan; KADEK; Partiya Karkeran Kurdistan; the People's Defense Force; Halu Mesru Savunma Kuvveti; Kurdistan People's Congress; People's Congress of Kurdistan; KONGRA-GEL

PX209

**Description:**  Founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization, the Kurdistan Workers' Party (PKK) was designated as a Foreign Terrorist Organization on October 8, 1997.  The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984.  The PKK's original goal was to establish an independent Kurdish state in southeastern Turkey, but in recent years it has spoken more often about autonomy within a Turkish state that guarantees Kurdish cultural and linguistic rights.

**Activities:**  In the early 1990s, the PKK moved beyond rural-based insurgent activities to include urban terrorism.  Anatolia was the scene of significant violence; some estimates placed casualties at least 40,000 persons.  Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues.  Ocalan's death sentence was commuted to life imprisonment; he remains the symbolic leader of the group.  The group foreswore violence until June 2004, when the group's hardline militant wing took control and renounced the self-imposed ceasefire of the previous five years.  Striking over the border from bases within Iraq, the PKK engaged in terrorist attacks in eastern and western Turkey.  In 2009, the Turkish government and the PKK resumed peace negotiations, but talks broke down after a PKK-initiated attack in July 2011 that left 13 Turkish soldiers dead.  In 2012, there were multiple car bombings resulting in the deaths of at least 10 people.  Primary targets included Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey.

Widely publicized peace talks between Ocalan and the Turkish government to resolve the conflict began at the end of 2012.  Peace talks continued throughout 2014 with the ceasefire holding, even with sporadic PKK attacks on Turkish government forces, including one attack in September where three Turkish police officers were killed.

**Strength:**  Approximately 4,000 to 5,000 members; 3,000 to 3,500 are located in northern Iraq.

**Location/Area of Operation:**  The PKK operates primarily in Turkey, Iraq, Syria, and Europe.

**Funding and External Aid:**  The PKK receives financial support from the large Kurdish diaspora in Europe and from criminal activity.

## LASHKAR E-TAYYIBA

**aka** al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir; Jamaat-ud-Dawa; JUD; Jama'at al-Dawa; Jamaat ud-Daawa; Jamaat ul-Dawah; Jamaat-ul-Dawa; Jama'at-i-Dawat; Jamaiat-ud-Dawa; Jama'at-ud-Da'awah; Jama'at-ud-Da'awa; Jamaati-ud-Dawa; Idara Khidmat-e-Khalq; Falah-i-Insaniat Foundation; FiF; Falah-e-Insaniat Foundation; Falah-e-Insaniyat; Falah-i-Insaniyat; Falah Insania; Welfare of Humanity; Humanitarian Welfare Foundation; Human Welfare Foundation; Al-Anfal Trust; Tehrik-e-Hurmat-e-Rasool; Tehrik-e-Tahafuz Qibla Awwal

PX209

**Description:**  Designated as a Foreign Terrorist Organization (FTO) on December 26, 2001, Lashkar e-Tayyiba (LeT) is one of the largest and most proficient of the traditionally anti-India-focused terrorist groups, with the ability to severely disrupt already tense regional relations.  LeT formed in the late 1980s as the terrorist wing of the Islamist extremist organization, Markaz ud Dawa ul-Irshad, a Pakistan-based Islamic fundamentalist mission organization and charity originally founded to oppose the Soviet presence in Afghanistan.  Led by Hafiz Muhammad Saeed, LeT is not connected to any political party.  Shortly after LeT was designated as an FTO, Saeed changed its name to Jamaat-ud-Dawa (JUD) and began humanitarian projects to circumvent restrictions.  LeT disseminates its message through JUD's media outlets.  In addition to LeT's creation of JUD, LeT has repeatedly changed its name in an effort to avoid sanctions; other LeT aliases and front groups include Al-Anfal Trust, Tehrik-e-Hurmat-e-Rasool, and Tehrik-e-Tahafuz Qibla Awwal.  Elements of LeT and Jaish-e-Muhammad (JEM) combined with other groups to mount such attacks as "The Save Kashmir Movement."  The Pakistani government banned LeT in January 2002, and JUD in 2008, following the 2008 Mumbai attack.  LeT and Saeed continue to spread terrorist ideology, as well as virulent hate speech condemning the United States, India, Israel, and other perceived enemies.

**Activities:**  LeT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993; several high profile attacks inside India; and operations against Coalition Forces in Afghanistan.  The group uses assault rifles, machine guns, mortars, explosives, and rocket-propelled grenades.

Indian government officials hold LeT responsible for the November 2008 attacks in Mumbai against luxury hotels, a Jewish center, a train station, and a popular café that killed 166 people – including six American citizens – and injured more than 300.  India has charged 38 people in the case; most are at large and thought to be in Pakistan.

In March 2010, Pakistani-American businessman David Headley pled guilty in a U.S. court to charges related to his role in the November 2008 LeT attacks in Mumbai, as well as to charges related to a separate plot to bomb the Danish newspaper *Jyllands-Posten*.  In May 2011, Headley was a witness in the trial of Tahawwur Rana, who was charged with providing material support to LeT.  Rana was convicted for providing material support to LeT in June 2011, and was sentenced to 14 years in prison in January 2013.

In June 2012, Indian authorities arrested LeT member Sayeed Zabiuddin Ansari, alias Abu Jindal, one of the instigators of the November 2008 Mumbai attack.  LeT is alleged to have been responsible for a March 2013 attack on Indian paramilitary forces in the Indian-controlled Kashmir city of Srinagar, which killed five people and wounded 10 others.

LeT continued carrying out attacks in 2014.  LeT was responsible for the May 23 attack on the Indian consulate in Herat, Afghanistan.  Throughout the course of 2014, LeT terrorists have engaged in repeated gun battles with Indian security forces in Kashmir.  These clashes have killed or injured over 20 Indian law enforcement agents, military personnel, and civilians.

PX209

**Strength:**  The size of LeT is unknown, but it has several thousand members in Pakistan-administered Kashmir and Pakistani Punjab; Khyber-Pakhtunkhwa and Punjab Provinces in Pakistan; and in the southern Jammu, Kashmir, and Doda regions.

**Location/Area of Operation:**  LeT has global connections and a strong operational network throughout South Asia.  LeT maintains a number of facilities, including training camps, schools, and medical clinics in Pakistan.

**Funding and External Aid:**  LeT collects donations in Pakistan and the Gulf as well as from other donors in the Middle East and Europe, particularly the UK.  LeT front organizations continued to openly fundraise in Pakistan and solicited donations in the Pakistani press during 2014.

## LASHKAR I JHANGVI

**aka** Army of Jhangvi; Lashkar e Jhangvi; Lashkar-i-Jhangvi

**Description:**  Designated as a Foreign Terrorist Organization on January 30, 2003, Lashkar I Jhangvi (LJ) is the terrorist offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan.  LJ focuses primarily on anti-Shia attacks and other attacks in Pakistan and Afghanistan, and was banned by the Government of Pakistan in August 2001 as part of an effort to rein in sectarian violence.  Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties.  After the collapse of the Taliban as the ruling government in Afghanistan, LJ members became active in aiding other terrorists, providing safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.  LJ works closely with Tehrik-e Taliban Pakistan.

**Activities:**  LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan.  In January 1999, the group attempted to assassinate Prime Minister Nawaz Sharif and his brother Shahbaz Sharif, Chief Minister of Punjab Province.  Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens.

LJ attacks in 2012 killed hundreds of people; attacks ranged from suicide bombings to targeted shootings of ethnic Hazaras.

In 2013, LJ continued targeting individuals and groups of different ethnic or religious backgrounds.  A January dual bombing in Quetta left upwards of 80 Pakistanis dead and over 100 wounded.  In February, LJ claimed responsibility for a deadly bombing in Quetta that killed at least 84 people and wounded around 200 more.  In June, LJ conducted a complex attack in which they detonated a bomb targeting a bus carrying female university students.  After the students were brought to a local hospital for treatment, LJ stormed the hospital with small arms and grenades.  The attacks resulted in the deaths of at least 20 Pakistani civilians.

PX209

In January 2014, at least 24 people were killed and 40 others wounded in a bombing that targeted a bus carrying Shia pilgrims.  LJ claimed responsibility for the attack.  Also in January, LJ attempted to carry out a suicide bombing at a school in the predominantly Shia area of Hangu, Pakistan.  The attack was thwarted when a 15-year old student tackled the bomber; the student, Aitezaz Hassan, died of his injuries.  No other staff or students were harmed.

**Strength:**  Membership is assessed in the low hundreds.

**Location/Area of Operation:**  LJ is active primarily in Pakistan's Punjab province, the Federally Administered Tribal Areas, Karachi, and Baluchistan.

**Funding and External Aid:**  Funding comes from wealthy donors in Pakistan, as well as the Middle East, particularly Saudi Arabia.  The group engages in criminal activity to fund its activities, including extortion.

## LIBERATION TIGERS OF TAMIL EELAM

**aka** Ellalan Force; Tamil Tigers

**Description:**  Founded in 1976 and designated as a Foreign Terrorist Organization on October 8, 1997, the Liberation Tigers of Tamil Eelam (LTTE) became a powerful Tamil secessionist group in Sri Lanka.  Despite its military defeat at the hands of the Sri Lankan government in 2009, the LTTE's international network of sympathizers and financial support persists.

**Activities:**  Although the LTTE has been largely inactive since its military defeat in Sri Lanka in 2009, in the past the LTTE was responsible for an integrated battlefield insurgent strategy that targeted key installations and senior Sri Lankan political and military leaders.  It conducted a sustained campaign targeting rival Tamil groups, and assassinated Prime Minister Rajiv Gandhi of India in 1991 and President Ranasinghe Premadasa of Sri Lanka in 1993.  Although most notorious for its cadre of suicide bombers, the Black Tigers, LTTE also had an amphibious force, the Sea Tigers, and a nascent air wing, the Air Tigers.  Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2008.

In early 2009, Sri Lankan forces recaptured the LTTE's key strongholds, including their capital of Kilinochchi.  In May 2009, government forces defeated the last LTTE fighting forces, killed LTTE leader Prabhakaran and other members of the LTTE leadership and military command, and declared military victory.  There have been no known attacks in Sri Lanka that could verifiably be attributed to the LTTE since the end of the war, but a total of 13 LTTE supporters, several of which had allegedly planned attacks against U.S. and Israeli diplomatic facilities in India, were arrested in Malaysia in 2014.

LTTE's financial network of support continued to operate throughout 2014.

**Strength:**  Exact strength is unknown.

**Location/Area of Operation:**  Sri Lanka and India

PX209

**Funding and External Aid:**  The LTTE used its international contacts and the large Tamil diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies.  The group employed charities as fronts to collect and divert funds for its activities.

## LIBYAN ISLAMIC FIGHTING GROUP

**aka** LIFG

**Description:**  The Libyan Islamic Fighting Group (LIFG) was designated as a Foreign Terrorist Organization on December 17, 2004.  In the early 1990s, LIFG emerged from the group of Libyans who had fought Soviet forces in Afghanistan and pledged to overthrow Libyan leader Muammar al-Qadhafi.  In the following years, some members maintained an anti-Qadhafi focus and targeted Libyan government interests.  Others, such as Abu al-Faraj al-Libi, who was arrested in Pakistan in 2005, aligned with Usama bin Laden and are believed to be part of the al-Qa'ida (AQ) leadership structure.  On November 3, 2007, AQ leader Ayman al-Zawahiri announced a formal merger between AQ and LIFG.  However, on July 3, 2009, LIFG members in the UK released a statement formally disavowing any association with AQ, suggesting the group had fractured/lost internal cohesion.  In September 2009, six imprisoned LIFG members in Libya issued a 417-page document that renounced violence.  More than 100 LIFG members pledged to adhere to this revised doctrine and have been pardoned and released from prison in Libya since September 2009.

**Activities:**  LIFG has been largely defunct operationally in Libya since the late 1990s when members fled predominately to Europe and the Middle East because of tightened Libyan security measures.  In early 2011, in the wake of the Libyan revolution and the fall of Qadhafi, some LIFG members returned to Libya and some created the Movement for Change (LIMC), and became one of many rebel groups united under the umbrella of the opposition leadership known as the Transitional National Council.  Former LIFG and LIMC leader Abdel Hakim Bil-Hajj was appointed the Libyan Transitional Council's Tripoli military commander during the Libyan uprisings, and has denied any link between his group and AQ.  There were no known terrorist attacks carried out by LIFG in 2014.

**Strength:**  Unknown

**Location/Area of Operation:**  Since the late 1990s, many members have fled to southwest Asia, and European countries, particularly the UK.

**Funding and External Aid:**  Unknown

## MUJAHIDIN SHURA COUNCIL IN THE ENVIRONS OF JERUSALEM

**aka:** Mujahidin Shura Council in the Environs of Jerusalem; MSC; Mujahideen Shura Council in the Environs of Jerusalem; Mujahideen Shura Council;  Shura al-Mujahedin Fi Aknaf Bayt al-Maqdis; Majlis Shura al-Mujahidin; Majlis Shura al-Mujahideen; Magles Shoura al-Mujahddin

PX209

**Description:**  The Mujahidin Shura Council in the Environs of Jerusalem is a consolidation of several Salafi terrorist groups based in Gaza that have claimed responsibility for numerous attacks against Israel since the group's founding in 2012.

**Activities:**  On August 13, 2013, MSC claimed responsibility for a rocket attack targeting the southern Israeli city of Eilat.  Previously, MSC claimed responsibility for the March 21, 2013 attack in which Gaza-based militants fired at least five rockets at Sderot, Israel, and the April 17, 2013 attack in which two rockets were fired at Eilat, Israel.  In addition to the rocket launches, MSC claimed responsibility for a cross-border improvised explosive device attack on June 18, 2012 that targeted an Israeli construction site, killing one civilian.

**Strength:**  MSC is estimated to have several hundred fighters.

**Location/Area of Operation:**  MSC operates in Gaza.

**Funding and External Aid:**  MSC's access to resources in 2014 is unclear.

## AL-MULATHAMUN BATTALION

**aka** al-Mulathamun Brigade; al-Muwaqqi'un bil-Dima; Those Signed in Blood Battalion; Signatories in Blood; Those who Sign in Blood; Witnesses in Blood; Signed-in-Blood Battalion; Masked Men Brigade; Khaled Abu al-Abbas Brigade; al-Mulathamun Masked Ones Brigade; al-Murabitoun; The Sentinels

**Description:**  The al-Mulathamun Battalion (AMB) was designated as a Foreign Terrorist Organization on December 19, 2013.  Originally part of al-Qa'ida in the Islamic Maghreb (AQIM), AMB became a separate organization in late 2012 after its leader, Mokhtar Belmokhtar, split from AQIM.  In Belmokhtar's first public statement after the split, he threatened to fight against Western interests and announced the creation of the sub-battalion, "Those Who Sign in Blood."  In August 2013, AMB and the Mali-based Movement for Unity and Jihad in West Africa (MUJAO) announced that the two organizations would merge under the name "al-Murabitoun."

**Activities:**  AMB's Those Who Sign in Blood sub-battalion claimed responsibility for the January 2013 attack against the Tiguentourine gas facility near In Amenas, in southeastern Algeria.  Over 800 people were taken hostage during the four-day siege, resulting in the death of 39 civilians, including three U.S. citizens.  Seven other Americans escaped the attack.

Before their merger, in May 2013, AMB cooperated with MUJAO in twin suicide bombings in northern Niger on a Nigerien military base in Agadez and a French uranium mine in Arlit.  The coordinated attacks killed at least 20 people, including all of the attackers.

AMB's attacks continued in 2014.  In February, AMB claimed responsibility for attacking French forces with rockets near the Timbuktu airport.  In May, AMB claimed responsibility for an attack against a military base and a separate car bomb attack against a mine in Agadez region,

PX209

Niger, which wounded 14 employees.  In July, AMB claimed responsibility for a car bomb targeting a patrol of French soldiers in Gao, Mali, which killed one and wounded seven.

**Strength:**  Membership levels of AMB are unknown; however, the al-Murabitoun terrorist group constitutes one of the greatest near-term threats to U.S. and international interests in the Sahel, because of its publicly stated intent to attack Westerners and proven ability to organize complex attacks.

**Location/Area of Operation:**  Algeria, Libya, Mali, and Niger

**Funding and External Aid:**  In addition to the support it may receive through its connections to other terrorist organizations in the region, AMB is likely funded through kidnapping ransoms and other criminal activities.

## NATIONAL LIBERATION ARMY

**aka** ELN; Ejercito de Liberacion Nacional

**Description:**  The National Liberation Army (ELN) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ELN is a Colombian Marxist-Leninist group formed in 1964.  It is primarily rural-based, although it also has several urban units.  The ELN remains focused on attacking economic infrastructure, in particular oil and gas pipelines and electricity pylons, and extorting foreign and local companies.  The Colombian government began exploratory peace talks with the ELN in January 2014, although formal peace negotiations had not started by year's end.

**Activities:**  The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities.  The group also uses intimidation of judges, prosecutors, and witnesses; and has been involved in the murders of teachers and trade unionists.  The group has targeted Colombia's infrastructure, particularly oil pipelines and equipment.  In recent years, including 2014, the ELN launched joint attacks with the Revolutionary Armed Forces of Colombia (FARC), Colombia's largest terrorist organization.

During 2014, the ELN launched fewer attacks against oil pipelines, but according to Colombian authorities, the group caused more damage than in 2013.  The ELN was responsible for eighty percent of the pipeline attacks in 2014.  On June 20, the ELN bombed a police station in Bogota injuring three people.  On June 29, the group attacked a pipeline in Arauca department which resulted in 13 people injured and suspended production at the Occidental Petroleum Corporation's oil field.  In a demonstration of its ability to attack the capital city and in advance of the August presidential election, the ELN placed five leaflet bombs in Bogota on July 29, with several exploding prior to detection.  On September 14, an ELN sniper shot dead two workers sent to repair a damaged section of an oil pipeline that had been bombed by the group near the town of Teorama, Norte de Santander.

**Strength:**  Approximately 2,000 armed combatants and an unknown number of active supporters.

PX209

**Location/Area of Operation:**  Mostly in the rural and mountainous areas of northern, northeastern, and southwestern Colombia, as well as the border regions with Venezuela.

**Funding and External Aid:**  The ELN draws its funding from the illicit narcotics trade and from extortion of oil and gas companies.  Additional funds are derived from kidnapping ransoms. There is no known external aid.

## PALESTINE ISLAMIC JIHAD - SHAQAQI FACTION

**aka** PIJ; Palestine Islamic Jihad; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya al-Quds; Al-Awdah Brigades

**Description:**  Palestine Islamic Jihad (PIJ) was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed by militant Palestinians in Gaza during the 1970s, PIJ is committed to both the destruction of Israel through attacks against Israeli military and civilian targets and the creation of an Islamic state in all of historic Palestine, including present day Israel.

**Activities:**  PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets.  PIJ continues to plan and direct attacks against Israelis both inside Israel and in the West Bank and Gaza.  Although U.S. citizens have died in PIJ attacks, the group has not directly targeted U.S. interests.  PIJ attacks between 2008 and 2011 were primarily rocket attacks aimed at southern Israeli cities, and have also included attacking Israeli targets with explosive devices.  In November 2012, PIJ operatives, working with Hamas, detonated a bomb on a bus in Tel Aviv, leaving 29 civilians wounded.  In December 2013, four PIJ operatives were arrested by Israeli authorities for their role in a bus bombing near Tel Aviv.  In March 2014, PIJ carried out a wave of rocket attacks into Israeli territory.  While the grouped claimed they fired 130 rockets and mortars, 60 were believed to have reached Israel. In September 2014, PIJ members claimed they were building tunnels from Gaza to use during future attacks against Israel.

**Strength:**  PIJ has fewer than 1,000 members.

**Location/Area of Operation:**  Primarily Gaza with minimal operational presence in the West Bank and Israel.  Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**Funding and External Aid:**  Receives financial assistance and training primarily from Iran.

## PALESTINE LIBERATION FRONT - ABU ABBAS FACTION

**aka** PLF; PLF-Abu Abbas; Palestine Liberation Front

**Description:**  The Palestinian Liberation Front – Abu Abbas Faction (PLF) was designated as a Foreign Terrorist Organization on October 8, 1997.  In the late 1970s, the Palestine Liberation

369

PX209

Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and then later split into pro-Palestinian Liberation Organization (PLO), pro-Syrian, and pro-Libyan factions.  The pro-PLO faction was led by Muhammad Zaydan (a.k.a.  Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:**  Abbas's group was responsible for the 1985 attack on the Italian cruise ship *Achille Lauro* and the murder of U.S. citizen Leon Klinghoffer.  The PLF was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s.  In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq.  The PLF took part in the 2006 Palestinian parliamentarian elections but did not win a seat.  In 2008, as part of a prisoner exchange between Israel and Hizballah, Samir Kantar, a PLF member – and purportedly the longest serving Arab prisoner in Israeli custody – was released from an Israeli prison.

After 16 years without claiming responsibility for an attack, the PLF claimed responsibility for two attacks against Israeli targets on March 14, 2008.  One attack was against an Israeli military bus in Huwarah, Israel, and the other involved a PLF brigade firing at an Israeli settler south of the Hebron Mountain, seriously wounding him.  On March 28, 2008, shortly after the attacks, a PLF Central Committee member reaffirmed PLF's commitment to using "all possible means to restore" its previous glory and to adhering to its role in the Palestinian "struggle" and "resistance" through its military.  There were no known PLF attacks in 2014.

**Strength:**  Estimates have placed membership between 50 and 500.

**Location/Area of Operation:**  PLF leadership and membership are based in Lebanon and the West Bank and Gaza.

**Funding and External Aid:**  Unknown

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE

**aka** PFLP; Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles; Martyr Abu-Ali Mustafa Battalion

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Popular Front for the Liberation of Palestine (PFLP), a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967.  The group earned a reputation for large-scale international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.  A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:**  The PFLP increased its operational activity during the Second Intifada.  This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001, to avenge Israel's killing of the PFLP Secretary General earlier that year.  In 2008 and 2009, the PFLP was involved in several rocket attacks launched primarily from Gaza against

PX209

Israel, and claimed responsibility for numerous attacks on Israeli Defense Forces in Gaza, including a December 2009 ambush of Israeli soldiers in central Gaza. The PLFP claimed responsibility for numerous mortar and rocket attacks fired from Gaza into Israel in 2010, as well as an attack on a group of Israeli citizens. In October 2011, the PFLP claimed responsibility for a rocket attack that killed one civilian in Ashqelon. In 2012, the Israeli Shin Bet security agency arrested several members of PFLP for plotting to carry out attacks on IDF checkpoints and planning to conduct kidnappings.

On November 18, 2014, two Palestinians reportedly affiliated with the PFLP entered a synagogue and attacked Israelis with guns, knives, and axes, killing five people, including three American citizens, and injuring over a dozen, per media reporting.

**Strength:** Unknown

**Location/Area of Operation:** Syria, Lebanon, Israel, the West Bank, and Gaza.

**Funding and External Aid:** Leadership received safe haven in Syria.

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE-GENERAL COMMAND

**aka** PFLP-GC

**Description:** The Popular Front for the Liberation of Palestine-General Command (PFLP-GC) was designated as a Foreign Terrorist Organization on October 8, 1997. The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics. Originally, the group was violently opposed to the Arafat-led Palestinian Liberation Organization. Ahmad Jibril, a former captain in the Syrian Army, has led the PFLP-GC since its founding. The PFLP-GC is closely tied to both Syria and Iran.

**Activities:** The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary recent focus was supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and smuggling weapons. The PFLP-GC maintained an armed presence in several Palestinian refugee camps and at its own military bases in Lebanon and along the Lebanon-Syria border. In recent years, the PFLP-GC was implicated by Lebanese security officials in several rocket attacks against Israel. In 2009, the group was responsible for wounding two civilians in an armed attack in Nahariyya, Northern District, Israel. In 2011, the PFLP-GC targeted Israeli communities in a March 20 rocket attack by its Jihad Jibril Brigades in the city of Eshkolot, Southern District, Israel. The attack caused no injuries or damage.

In November 2012, PFLP-GC claimed responsibility for a bus bombing in Tel Aviv that injured 29 people, although four Palestine Islamic Jihad and Hamas operatives were later arrested for being behind the attack. In 2013, the PFLP-GC issued statements in support of the Syrian government, Hizballah, and Iran. The group was accused of participating, along with Syrian

PX209

regime forces, in a battle at the al-Yarmouk refugee camp in July, using a rocket to target and kill civilians in the camp.  In 2014, PFLP-GC appointed new leadership to conduct military operations and deploy Palestinian fighters.

**Strength:**  Several hundred

**Location/Area of Operation:**  Political leadership is headquartered in Damascus, with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.  The group also maintains a small presence in Gaza.

**Funding and External Aid:**  Received safe haven and logistical and military support from Syria and financial support from Iran.

## AL-NUSRAH FRONT

**aka** Jabhat al-Nusrah; Jabhet al-Nusrah; The Victory Front; al-Nusrah Front for the People of the Levant; al-Nusrah Front in Lebanon; Jabhat al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad

**Description:** Al-Nusrah Front (ANF) was designated as a Foreign Terrorist Organization on May 15, 2014, and is led by Specially Designated Global Terrorist Abu Muhammad al-Jawlani. It was formed in late 2011 when al-Qa'ida in Iraq (AQI) leader Abu Bakr al-Baghdadi sent al-Jawlani to Syria to organize terrorist cells in the region.  In 2013, the group split from AQI and became an independent entity.  ANF's stated goal is to oust Syria's Asad regime and replace it with a Sunni Islamic state; it currently controls a portion of Syrian territory from which it participates in the Syrian conflict.

**Activities:**  ANF has been active in a number of operations against other factions in the Syrian Civil War.  The group claimed responsibility for the Aleppo bombings in 2012, the al-Midan bombing in January 2012, a series of Damascus bombings in 2012, and the murder of journalist Mohammed al-Saeed.  In December 2013, ANF abducted 13 nuns from a Christian monastery in Maaloula and held them until March 9, 2014.  In late February 2014, ANF claimed responsibility for a suicide bomb attack on an army checkpoint in Hermel, Lebanon, claiming it was in retaliation for Hizballah's involvement in the civil war in Syria.  In March, ANF reportedly kidnapped 30 Palestinians in the Yarmouk refugee camp, located near Damascus.  In May, American citizen Abu Huraira al-Amriki, reportedly working for ANF, carried out a suicide truck bombing in Idlib.  There were no reported casualties, but this is believed to be the first example of an American conducting a suicide attack in Syria.  Also in May, high-ranking Syrian military official and head of Syria's air defense, Lt. Gen. Hussein Ishaq was killed in clashes with ANF.  In June, it was reported that ANF had enlisted child soldiers into its ranks.  In the same month, it was also reported that ANF militants killed a 14-year-old boy in Lebanon. On August 28, ANF militants kidnapped 45 Fijian UN peacekeepers from Golan Heights in the UN Disengagement Observer Force Zone.  The Fijian soldiers were later released in September.  In early November, ANF attacked moderate rebel groups associated with the Free Syrian Army in Idlib.  The rebel groups surrendered local towns to ANF and some members defected to ANF, while others were arrested.

PX209

**Strength:**  Total membership is unknown, although estimated to be in the low thousands.

**Location/Area of Operation:** Syria.

**Funding and External Aid:**  Al-Nusrah Front receives funding from a variety of sources, such as ransom payments accrued through kidnapping operations and donations from external Gulf-based donors.

## AL-QA'IDA

**aka** al-Qa'eda; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Laden Network; the Usama Bin Laden Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1999, al-Qa'ida (AQ) was established by Usama bin Laden in 1988.  The group helped finance, recruit, transport, and train Sunni Islamist extremists for the Afghan resistance against the Soviet Union.  AQ's strategic objectives are to remove Western influence and presence from the Muslim world, topple "apostate" governments of Muslim countries, and establish a pan-Islamic caliphate governed by its own interpretation of Sharia law that ultimately would be at the center of a new international order.  These goals remain essentially unchanged since the group's 1996 public declaration of war against the United States.  AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders," saying it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere.  AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.  Many AQ leaders have been killed in recent years, including bin Laden and then second-in-command Atiyah Abd al-Rahman, in May and August 2011, respectively.  Al-Rahman's replacement, Abu Yahya al-Libi, was killed in June 2012.  Leader Ayman al-Zawahiri remained at-large at year's end.

**Activities:**  AQ and its supporters conducted three bombings that targeted U.S. troops in Aden in December 1992, and claim to have shot down U.S. helicopters and killed U.S. soldiers in Somalia in 1993.  AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam, killing up to 300 individuals and injuring more than 5,000.  In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and the last into a field in Shanksville, Pennsylvania – leaving over 3,000 individuals dead or missing.

PX209

In November 2002, AQ carried out a suicide bombing of a hotel in Mombasa, Kenya that killed 15.  In 2003 and 2004, Saudi-based AQ operatives and associated violent extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia.  Al-Zawahiri claimed responsibility on behalf of AQ for the July 7, 2005 attacks against the London public transportation system.  AQ likely played a role in the unsuccessful 2006 plot to destroy several commercial aircraft flying from the UK to the United States using liquid explosives.  AQ claimed responsibility for a 2008 suicide car bomb attack on the Danish embassy in Pakistan that killed six, as retaliation for a Danish newspaper re-publishing cartoons depicting the Prophet Muhammad and for Denmark's involvement in Afghanistan.

In January 2009, Bryant Neal Vinas – a U.S. citizen who traveled to Pakistan and allegedly trained in explosives at AQ camps, was captured in Pakistan, extradited to the United States, and charged with providing material support to a terrorist organization and conspiracy to commit murder.  Vinas later admitted his role in helping AQ plan an attack against the Long Island Rail Road in New York and confessed to having fired missiles at a U.S. base in Afghanistan.  In September 2009, Najibullah Zazi, an Afghan immigrant and U.S. lawful permanent resident, was charged with conspiracy to use weapons of mass destruction, to commit murder in a foreign country, and with providing material support to a terrorist organization as part of an AQ plot to attack the New York subway system.  Zazi later admitted to contacts with AQ senior leadership, suggesting they had knowledge of his plans.  In February 2010, Zazi pled guilty to charges in the U.S. District Court for the Eastern District of New York.

In a December 2011 video, AQ leader al-Zawahiri claimed AQ was behind the August kidnapping of American aid worker Warren Weinstein in Pakistan.  Weinstein remained in captivity until his death in January 2015 in a U.S. counterterrorism operation in the border region of Afghanistan and Pakistan.  In September 2014, AQ leader al-Zawahiri and other AQ leaders announced the establishment of Pakistan-based AQ in the Indian Subcontinent (AQIS).  Two days after the announcement, two Pakistani warships were attacked in Karachi; AQIS took responsibility for plotting the attack almost one week later.  The thwarted plan included commandeering the ships and missile system to attack nearby American warships.  AQIS claims the orders came from al-Zawahiri.  In February 2014, AQ removed the Islamic State in Iraq and the Levant as an affiliate.

**Strength:**  In South Asia, AQ's core has been seriously degraded.  The death or arrest of dozens of mid- and senior-level AQ operatives – including bin Laden in May 2011 – have disrupted communication, financial, facilitation nodes, and a number of terrorist plots.  However, AQ serves as a focal point of "inspiration" for a worldwide network of affiliated groups – AQAP, AQIM, al-Nusrah Front, and al-Shabaab  – and other violent Sunni Islamist extremist groups, including the Islamic Movement of Uzbekistan, the Islamic Jihad Union, Lashkar i Jhangvi, Harakat ul-Mujahadin, and Jemaah Islamiya.  Tehrik-e Taliban Pakistan and the Haqqani Network also have ties to AQ.  Additionally, supporters and associates worldwide who are "inspired" by the group's ideology may be operating without direction from AQ central leadership, and it is impossible to estimate their numbers.

**Location/Area of Operation:**  AQ was based in Afghanistan until Coalition Forces removed the Afghan Taliban from power in late 2001.  Since then, the group's core leadership is believed to

PX209

reside largely in Pakistan's Federally Administered Tribal Areas.  AQ affiliates – al-Nusrah Front, AQAP, AQIM, and al-Shabaab – operate in Syria and Lebanon, Yemen, the Trans-Sahara, and Somalia, respectively.

**Funding and External Aid:**  AQ primarily depends on donations from like-minded supporters, as well as from individuals who believe that their money is supporting a humanitarian cause. Some funds are diverted from Islamic charitable organizations.

## AL-QA'IDA IN THE ARABIAN PENINSULA

**aka** al-Qa'ida in the South Arabian Peninsula; al-Qa'ida in Yemen; al-Qa'ida of Jihad Organization in the Arabian Peninsula; al-Qa'ida Organization in the Arabian Peninsula; Tanzim Qa'idat al-Jihad fi Jazirat al-Arab; AQAP; AQY; Ansar al-Shari'a

**Description:**  Al-Qa'ida in the Arabian Peninsula (AQAP) was designated as a Foreign Terrorist Organization (FTO) on January 19, 2010.  In January 2009, the leader of al-Qa'ida in Yemen (AQY), Nasir al-Wahishi, publicly announced that Yemeni and Saudi al-Qa'ida (AQ) operatives were working together under the banner of AQAP.  This announcement signaled the rebirth of an AQ franchise that previously carried out attacks in Saudi Arabia.  AQAP's self-stated goals include establishing a caliphate in the Arabian Peninsula and the wider Middle East, as well as implementing Sharia law.  On September 30, 2011, AQAP cleric and head of external operations Anwar al-Aulaqi, as well as Samir Khan, the publisher of AQAP's online magazine, *Inspire,* were both killed in Yemen.

The FTO designation for AQAP was amended on October 4, 2012, to include the alias Ansar al-Shari'a (AAS).  AAS represents a rebranding effort designed to attract potential followers in areas under AQAP's control.

**Activities:**  AQAP has claimed responsibility for numerous terrorist acts against both internal and foreign targets since its inception in January 2009, including: a March 2009 suicide bombing against South Korean tourists in Yemen, the August 2009 attempt to assassinate Saudi Prince Muhammad bin Nayif, and the December 25, 2009 attempted attack on Northwest Airlines Flight 253 from Amsterdam to Detroit, Michigan.  AQAP was responsible for two unsuccessful attempted attacks against British targets during 2010.  In October 2010, AQAP claimed responsibility for a foiled plot to send explosive-laden packages to the United States via cargo plane.  The parcels were intercepted in the UK and in the United Arab Emirates.  AQAP attacks in 2012 targeted the Yemeni military, including a February 2012 suicide car bombing that killed 26 Yemeni soldiers in Hadramawt Governorate.

AQAP, operating under the alias AAS, carried out a May 2012 suicide bombing in Sana'a that killed 96 people.  Also in May, press reported that AQAP allegedly plotted to detonate a bomb aboard a U.S.-bound airliner using an improvised explosive device (IED).  Although there was no imminent threat to U.S. jetliners, the device, which was acquired from another government, was similar to devices that AQAP had previously used in past attempted terrorist attacks.

PX209

In 2013, AQAP focused its targeting efforts on the Yemeni military.  In September, AQAP carried out a coordinated attack on two military targets in southern Yemen that killed at least 21 Yemeni soldiers.  In December, an AQAP attack on the Yemeni Defense Ministry headquarters compound in Sanaa, Yemen killed 52 people, including civilian medical personnel.

In 2014, AQAP claimed responsibility for over 150 attacks in Yemen, using tactics such as IEDs, suicide bombings, and small-arms attacks.  The group aggressively targeted both Houthis and Yemeni military and government institutions, including military bases, the Presidential palace in Sana'a, military checkpoints and vehicles, and the police academy in Sana'a.  Over 75 Yemeni government or military personnel were killed in these attacks.

In September 2014, AQAP launched a rocket attack against Yemeni security forces around the perimeter of the U.S. Embassy in Sana'a.  The attack did not cause any casualties, but was followed two months later by an IED attack at the northern gate of the embassy that injured multiple embassy security guards.  Also in November, AQAP attempted to detonate explosives targeting the U.S. and British Ambassadors to Yemen.  In December, AQAP claimed responsibility for an attack against the Iranian ambassador's residence in Sana'a that killed one guard and two pedestrians.

**Strength:**  AQAP is estimated to have approximately one thousand members.

**Location/Area of Operation:**  Yemen

**Funding and External Aid:**  AQAP's funding primarily comes from robberies and kidnap for ransom operations, and donations from like-minded supporters.

## AL-QA'IDA IN THE ISLAMIC MAGHREB

**aka** AQIM; Group for Call and Combat; GSPC; Le Groupe Salafiste Pour la Predication et le Combat; Salafist Group for Preaching and Combat

**Description:**  The Salafist Group for Call and Combat (GSPC) was designated as a Foreign Terrorist Organization on March 27, 2002.  After the GSPC officially joined with al-Qa'ida (AQ) in September 2006 and became known as al-Qa'ida in the Islamic Maghreb (AQIM), the Department of State amended the GSPC designation on February 20, 2008, to reflect the change.  Although AQIM remains largely a regionally-focused terrorist group, it has adopted a more anti-Western rhetoric and ideology, and has aspirations of overthrowing "apostate" African regimes and creating an Islamic state.  Abdelmalek Droukdel, aka Abu Mus'ab Abd al-Wadoud, is the group's leader.

**Activities:**  After 2007, when AQIM bombed the UN headquarters building and an Algerian government building in Algiers killing 60 people, AQIM's northern leadership was largely contained to the mountainous region of northeastern Algeria, and the group's southern battalions focused mostly on its kidnapping for ransom efforts.  In 2011 and 2012, however, AQIM took advantage of the deteriorating security situation across Tunisia, Libya, and Mali, to plan and conduct expanded operations.  Militants with ties to AQIM were involved in the September 11,

PX209

2012 attack on U.S. facilities in Benghazi that killed J. Christopher Stevens, the U.S. Ambassador to Libya, and three staff members.

In 2013, AQIM attacked regional security forces, local government targets, and westerners in the Sahel, including a suicide bombing that killed two Malian civilians and injured six Malian soldiers.

In April 2014, AQIM killed 14 Algerian soldiers in an ambush on a convoy in mountains to the east of Algiers, making it one of the deadliest attacks on the Algerian military in several years. AQIM claimed responsibility for the May 27 attack on the house of Tunisia's interior minister, Lotfi Ben Jeddou.

In addition to conducting attacks, AQIM continues to conduct kidnap for ransom operations. The targets are usually Western citizens from governments or third parties that have established a pattern of making concessions in the form of ransom payments for the release of individuals in custody. In November 2014, AQIM released a video of two Western hostages, a Dutch national and a French national who were later released in December.

**Strength:** AQIM has several hundred fighters operating in Algeria with a smaller number in the Sahel. Since the French intervention in northern Mali, AQIM's safe haven in northern Mali is less tenable for the organization and elements have moved to remote regions of northern Mali or to southwestern Libya. AQIM is attempting to reorganize in the wake of setbacks inflicted upon them by the combined French and African forces.

**Location/Area of Operation:** Northeastern Algeria (including but not limited to the Kabylie region), Libya, Tunisia, northern Mali, and Niger.

**Funding and External Aid:** AQIM members engage in kidnapping for ransom and criminal activities to finance their operations.

## REAL IRA

**aka** RIRA; Real Irish Republican Army; 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Oglaigh Na hEireann

**Description:** Designated as a Foreign Terrorist Organization on May 16, 2001, the Real IRA (RIRA) was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland. The RIRA has historically sought to disrupt the Northern Ireland peace process and did not participate in the September 2005 weapons decommissioning. In September 1997, the 32 County Sovereignty Movement opposed Sinn Fein's adoption of the Mitchell principles of democracy and non-violence. Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a ceasefire and disbandment, the RIRA has pledged additional violence and continued to conduct attacks.

PX209

**Activities:**  Many RIRA members are former Provisional Irish Republican Army members who left the organization after that group renewed its ceasefire in 1997.  These members brought a wealth of experience in terrorist tactics and bomb making to the RIRA.  Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, and police in Northern Ireland.  The Independent Monitoring Commission, which was established to oversee the peace process, assessed that RIRA members were likely responsible for the majority of the shootings and assaults that occurred in Northern Ireland.

The group remained active.  In February 2013, two alleged RIRA members were arrested by Irish police while attempting to carry out the assassination of a local drug dealer.  Police searched the van they were traveling in and found two loaded handguns and facemasks.

**Strength:**  According to the Irish government, the RIRA has approximately 100 active members.  The organization may receive limited support from IRA hardliners and Republican sympathizers who are dissatisfied with the IRA's continuing ceasefire and with Sinn Fein's involvement in the peace process.

**Location/Area of Operation:**  Northern Ireland, Great Britain, and the Republic of Ireland.

**Funding and External Aid:**  The RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers.  The RIRA was also reported to have purchased sophisticated weapons from the Balkans and to have occasionally collaborated with the Continuity Irish Republican Army.

## REVOLUTIONARY ARMED FORCES OF COLOMBIA

**aka** FARC; Fuerzas Armadas Revolucionarias de Colombia

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Revolutionary Armed Forces of Colombia (FARC) is Latin America's oldest, largest, most violent, and best-equipped terrorist organization.  The FARC began in the early 1960s as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology.  Today, it only nominally fights in support of Marxist goals, and is heavily involved in illicit narcotics production and trafficking.  The FARC has been responsible for large numbers of kidnappings for ransom in Colombia, and in past years has allegedly held as many as 700 hostages.  The FARC's capacity has been degraded by a continuing Colombian military offensive targeting key FARC units and leaders that has, by most estimates, halved the FARC's numbers – estimated at approximately 8,000 in 2013 – and succeeded in capturing or killing a number of FARC senior and mid-level commanders.  In August 2012, the Colombian President announced that exploratory peace talks between the Colombian government and the FARC were underway.  The formal talks began in Norway and then moved to Cuba, where they continued in 2014.  These talks are the first such peace negations in over a decade and the fourth effort in the last 30 years.  Although the government and the FARC reached a tentative partial agreement on three of the five agreed upon points, no overall peace agreement was concluded by the end of 2014,

PX209

**Activities:**  Over the years, the FARC has perpetrated a large number of high profile terrorist acts, including the 1999 murder of three U.S. missionaries working in Colombia, and multiple kidnappings and assassinations of Colombian government officials and civilians.  In July 2008, the Colombian military made a dramatic rescue of 15 high-value FARC hostages including U.S. Department of Defense contractors Marc Gonsalves, Keith Stansell, and Thomas Howe, who were held in captivity for more than five years, along with former Colombian presidential candidate Ingrid Betancourt.

In 2014, the FARC focused on launching mortars at police stations or the military, placing explosive devices near roads or paths, and using snipers attacks, and ambushes.  In 2014, FARC attacks on infrastructure, particularly on oil pipeline and energy towers, decreased.  Security forces and government buildings were the most common terrorist targets, although civilian casualties occurred throughout the year.

Although FARC attacks decreased in 2014, the group committed a number of significant attacks.  On March 15, the FARC killed two policemen in Tumaco, Nariño, after kidnapping and torturing them.  In the run-up to the August presidential elections, the FARC increased terrorist attacks throughout the country.  A FARC attack on a transmission tower in Buenaventura left 400,000 people without power.  Three soldiers died when they detonated land mines laid by the FARC in Norte de Santander.  A FARC attempt to attack a military base in Miranda, Cauca with grenades killed a four-year-old girl and wounded two others.  FARC attacks in Meta left 70 oil wells without power and 16,000 people without potable water.  On September 16, the FARC attacked a police patrol in Tierradentro, Córdoba, killing seven police and injuring five others.  On November 5, the FARC killed two indigenous leaders near the southwestern municipality of Toribio for taking down a sign honoring a late FARC leader.  On November 16, the FARC kidnapped a Brigadier General and two companions near Quibdo, Choco.  Several days earlier, the FARC kidnapped two soldiers in Arauca.  On November 22, the FARC launched an amphibious attack on Gorgona Island, in the Pacific Ocean, killing the island's police commander and injuring six police officers.

**Strength:**  Approximately 8,000 to 9,000 members, with several thousand additional supporters.

**Location/Area of Operation:**  Primarily in Colombia; however, FARC leaders and combatants have been known to use neighboring countries for weapons sourcing and logistical planning.  The FARC often use Colombia's border areas with Venezuela, Panama, and Ecuador for incursions into Colombia; and used Venezuelan and Ecuadorian territory for safe haven.

**Funding and External Aid:**  The FARC is primarily funded by extortion, ransoms from kidnapping, and the international drug trade.

## REVOLUTIONARY ORGANIZATION 17 NOVEMBER

**aka** Epanastatiki Organosi 17 Noemvri; 17 November

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Revolutionary Organization 17 November (17N) is a radical leftist group established in 1975.

PX209

Named for the student uprising in Greece in November 1973 that protested the ruling military junta, 17N is opposed to the Greek government, the United States, Turkey, and NATO.  It seeks the end of the U.S. military presence in Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the EU.

**Activities:**  Initial attacks consisted of assassinations of senior U.S. officials and Greek public figures.  Between 1975 and 1991, four American citizens were killed by 17N.  The group began using bombings in the 1980s.  17N's most recent attack was a bombing attempt in June 2002 at the port of Piraeus in Athens.  After the attempted attack, Greek authorities arrested 19 17N members.  The convictions of 13 of these members have been upheld by Greek courts.  There were no known 17N attacks in 2014.

**Strength:**  Unknown

**Location/Area of Operation:**  Athens, Greece

**Funding and External Aid:**  Unknown

## REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT

**aka** DHKP/C; Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Revolutionary People's Liberation Party/Front (DHKP/C) was originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth).  It was renamed in 1994 after factional infighting.  "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations.  The group advocates a Marxist-Leninist ideology and opposes the United States, NATO, and Turkish establishments.  Its goals are the establishment of a socialist state and the abolition of harsh high-security Turkish prisons.

**Activities:**  Since the late 1980s, the group has primarily targeted current and retired Turkish security and military officials, although it has conducted attacks against foreign interests, including U.S. military and diplomatic personnel and facilities, since 1990.  The DHKP/C assassinated two U.S. military contractors and wounded a U.S. Air Force officer in the 1990s, and bombed more than 20 U.S. and NATO military, diplomatic, commercial, and cultural facilities.  DHKP/C added suicide bombings to its repertoire in 2001, with attacks against Turkish police in January and September of that year.  Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and U.S. targets of opportunity.

Operations and arrests against the group have weakened its capabilities, although attacks have continued.  In June 2004, the group was suspected of a bus bombing at Istanbul University that killed four civilians and wounded 21.  In July 2005, police intercepted and killed a DHKP/C suicide bomber who attempted to attack the Ministry of Justice in Ankara.  In June 2006, the

PX209

group killed a police officer in Istanbul; four members of the group were arrested the next month for the attack.

The DHKP/C was dealt a major ideological blow when Dursun Karatas, leader of the group, died in August 2008.  After the loss of their leader, the DHKP/C reorganized in 2009 and was reportedly competing with the Kurdistan Workers' Party for influence in both Turkey and with the Turkish diaspora in Europe.

The group was responsible for a number of high profile attacks in 2012 that included a suicide bombing of a police station in Istanbul.  This tactic continued in 2013 when, on February 1, a DHKP/C operative exploded a suicide vest inside the employee entrance to the U.S. Embassy in Ankara.  Besides himself, the explosion killed a Turkish guard and seriously wounded a visiting Turkish journalist.  In March 2013, using grenades and rocket launchers, three members of the group attacked the Ministry of Justice and the Ankara headquarters of the Turkish Justice and Development political party.  The DHKP/C also claimed a similar attack in September 2013, when two members of the DHKP/C fired rockets at the Turkish National Police headquarters and a police guesthouse.  One operative was arrested and the other killed after the attack.  No other Turkish casualties were reported in either attack.  In March 2014, DHKP/C claimed a shooting at a protest that left one man dead.

**Strength:**  Membership includes an estimated several dozen members inside Turkey, with a support network throughout Europe.

**Location/Area of Operation:**  Turkey, primarily in Istanbul, Ankara, Izmir, and Adana.  Other members live and plan operations in European countries.

**Funding and External Aid:**  The DHKP/C finances its activities chiefly through donations and extortion, and raises funds primarily in Europe.

## REVOLUTIONARY STRUGGLE

**aka** RS; Epanastatikos Aghonas; EA

**Description:**  Designated as a Foreign Terrorist Organization on May 18, 2009, Revolutionary Struggle (RS) is a radical leftist group with Marxist ideology that has conducted attacks against both Greek and U.S. targets in Greece.  RS emerged in 2003 following the arrests of members of the Greek leftist groups 17 November and Revolutionary People's Struggle.

**Activities:**  RS first gained notoriety when it claimed responsibility for the September 5, 2003 bombings at the Athens Courthouse during the trials of 17 November members.  From 2004 to 2006, RS claimed responsibility for a number of improvised explosive device (IED) attacks, including a March 2004 attack outside of a Citibank office in Athens.  RS claimed responsibility for the January 12, 2007 rocket propelled grenade (RPG) attack on the U.S. Embassy in Athens, which resulted in damage to the building.  In 2009, RS increased the number and sophistication of its attacks on police, financial institutions, and other targets.  RS successfully bombed a Citibank branch in Athens in March 2009, but failed in its vehicle-borne IED attack in February

381

PX209

2009 against the Citibank headquarters building in Athens.  In September 2009, RS claimed responsibility for a car bomb attack on the Athens Stock Exchange, which caused widespread damage and injured a passerby.

In 2010, the Greek government made significant strides in curtailing RS's terrorist activities.  On April 10, Greek police arrested six suspected RS members, including purported leadership figure Nikos Maziotis.  In addition to the arrests, the Greek raid resulted in the seizure of a RPG launcher, possibly the one used against the U.S. Embassy in Athens in the 2007 attack.  On April 3, 2013, five members of RS were convicted by an Athens appeals court, three of them receiving maximum prison sentences.  Maziotis and one other accused RS conspirator were convicted in absentia.  Both remained at-large after disappearing in July 2012, after they were released following 18 months pre-trial confinement.  Greek police alleged that Matziotis was involved in an armed robbery of a bank in Methana, Greece, after his fingerprints were found at the crime scene.  On July 16, 2014, Maziotis was arrested after a shootout with Greek police in an Athens shopping district.

After a period of inactivity, the group remerged in April 2014 with a bomb attack outside a Bank of Greece office in Athens; the blast caused extensive damage to surrounding structures but no casualties.

**Strength:**  Unknown

**Location/Area of Operation:**  Athens, Greece

**Funding and External Aid:**  Unknown

---

# AL-SHABAAB

**aka** The Harakat Shabaab al-Mujahidin; al-Shabab; Shabaab; the Youth; Mujahidin al-Shabaab Movement; Mujahideen Youth Movement; Mujahidin Youth Movement

**Description:**  Designated as a Foreign Terrorist Organization on March 18, 2008, al-Shabaab was the militant wing of the former Somali Islamic Courts Council that took over parts of southern Somalia in the second half of 2006.  Since the end of 2006, al-Shabaab and associated militias have undertaken a violent insurgency using guerrilla warfare and terrorist tactics against the series of transitional Somali governments.  In 2014, the group continued to fight to discredit and destabilize the Federal Government of Somalia.

Al-Shabaab is an official al-Qa'ida (AQ) affiliate and has ties to other AQ affiliates including al-Qa'ida in the Arabian Peninsula (AQAP) and al-Qa'ida in the Islamic Maghreb (AQIM).  In September 2014, former al-Shabaab leader, Ahmed Abdi Godane, was killed and replaced by Ahmed Diriye.

The group is composed of Somali recruits as well as a number of foreign fighters.  Since 2011, al-Shabaab has seen its military capacity reduced due to the efforts of the AU Mission in Somalia (AMISOM) and Somali forces against al-Shabaab; and clashes, some violent, within the group

PX209

itself.  Despite al-Shabaab's loss of key territory since 2012, the organization was able to maintain its hold on large sections of rural areas in south-central Somalia in 2014, and conducted attacks in Somalia, Kenya, and Djibouti.

**Activities:**  Al-Shabaab has used intimidation and violence to exploit divisions in Somalia and undermine the Federal Government of Somalia, recruit new fighters, and kill activists working to bring about peace through political dialogue and reconciliation.  The group has claimed responsibility for several high profile bombings and shootings throughout Somalia targeting AMISOM troops and Somali officials.  It has been responsible for the assassination of numerous civil society figures, government officials, and journalists.  Al-Shabaab fighters and those who have claimed allegiance to the group have conducted violent attacks and have assassinated international aid workers and members of NGOs.

In its first attack outside of Somalia, al-Shabaab was responsible for the July 11, 2010 suicide bombings in Kampala, Uganda during the World Cup, which killed nearly 76 people, including one American citizen.  In 2013, al-Shabaab again expanded its activities outside of Somali and staged a significant attack in September against the Westgate Mall in Nairobi, Kenya.  The siege resulted in the death of at least 65 civilians – including foreign nationals from 13 countries outside of Kenya – six soldiers and police officers, and hundreds of injured.

In 2014, al-Shabaab carried out several attacks, including a May attack on the building of the Federal Parliament of Somalia, that injured at least two lawmakers; a May bombing attack on a restaurant in Djibouti that was popular with foreigners that killed 20 and wounded at least 15; and an attempted attack in July on Villa Somalia, the Somali Presidential Headquarters.  In mid-November, al-Shabaab attacked a bus traveling in northern Kenya, singling out and killing 28 non-Muslims.  In early December, al-Shabaab killed 36 Christians working in a quarry in northern Kenya.  On December 25, al-Shabaab fighters penetrated the Mogadishu International Airport compound for the first time in several years, ambushing and killing at least 10 AMISOM soldiers and contractors.

**Strength:**  Al-Shabaab is estimated to have several thousand members, including a small cadre of foreign fighters.

**Location/Area of Operation:**  Al-Shabaab has lost full control of significant areas of territory.  In September 2012, al-Shabaab lost control of Kismayo, a vital port it used to obtain supplies and funding through taxes.  In October 2014, al-Shabaab lost another strategic port in Baraawe to AU and Somali troops.  Despite these losses, al-Shabaab continued to control large sections of rural areas in the middle and lower Juba regions, as well as Bay, Shabelle, and Bakol regions, and maintained its presence in northern Somalia along the Golis Mountains and within Puntland's larger urban areas.

**Funding and External Aid:**  Since 2012, al-Shabaab has seen its income diminish due to the loss of the strategic port cities of Kismayo, Merka, and Baraawe; furthermore, it lost a general ability to freely levy taxes in certain urban areas in southern and central Somalia.  Al-Shabaab continued to operate and carry out attacks despite fewer financial resources, however, and still

PX209

obtained some funds through illegal charcoal production and exports, taxation of local populations, and foreign donations.

Because al-Shabaab is a multi-clan entity, it reportedly receives donations from individuals in the Somali diaspora; however, the donations are not always intended to support terrorism, but also to support family members.

## SHINING PATH

**aka** SL; Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:**  The Shining Path (Sendero Luminoso or SL) was designated as a Foreign Terrorist Organization on October 8, 1997.  Former university professor Abimael Guzman formed SL in Peru in the late 1960s, and his teachings created the foundation of SL's militant Maoist doctrine. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime.  It also opposes any influence by foreign governments.  In the 1980s, SL was one of the most ruthless terrorist groups in the Western Hemisphere.  The Peruvian government made dramatic gains against SL during the 1990s, capturing Guzman in 1992, and killing a large number of militants.

Today, SL operates primarily in the Apurimac, Ene, and Montaro River Valley (VRAEM), an area that accounts for half of Peru's total cocaine production.  The organization was significantly weakened by an August 2013 operation conducted by a joint military-police task force in the VRAEM that resulted in the deaths of two of the SL's top operational leaders, Alejandro Borda Casafranca (also known as Comrade Alipio) and Martin Quispe Palomino (also known as Comrade Gabriel).  The demise of Alipio and Gabriel was the biggest blow sustained by the SL since the capture of SL's then-national leader, Comrade Feliciano, in 1999.

**Activities:**  SL carried out approximately 20 terrorist attacks in 2014, a significant drop from the estimated 50 attacks the group conducted in 2013.  The attacks resulted in the deaths of two soldiers and the wounding of six soldiers, two police officers, and seven civilians.  SL did not demonstrate the ability to conduct attacks in Lima.

**Strength:**  Peruvian officials estimated that SL consisted of approximately 100 fighters.

**Location/Area of Operation:**  Peru, with most activity in rural areas, specifically the Huallaga Valley and the Apurimac, Ene, and Montaro River Valley of central Peru.

**Funding and External Aid:**  SL is primarily funded by the illicit narcotics trade.

## TEHRIK-E TALIBAN PAKISTAN

PX209

**aka** Pakistani Taliban; Tehreek-e-Taliban; Tehrik-e-Taliban; Tehrik-e Taliban Pakistan; Tehrik-i-Taliban Pakistan; TTP

**Description:** Designated as a Foreign Terrorist Organization on September 1, 2010, Tehrik-e Taliban Pakistan (TTP) is a Pakistan-based terrorist organization formed in 2007 in opposition to Pakistani military efforts in the Federally Administered Tribal Areas. Previously disparate tribal militants agreed to cooperate and eventually coalesced into TTP under the leadership of now deceased leader Baitullah Mehsud. TTP was led by Hakimullah Mehsud from August 2009 until his death in November 2013. Following Hakimullah Mehsud's death, TTP has been led by Mullah Fazlullah, formerly the leader of TTP's chapter in the Swat area of Pakistan. Since Fazlullah became TTP's leader, the group has been engaged in violent infighting. A rival faction led by Khan Said – a former TTP commander who had previously clashed with Hakimullah – publicly split from TTP in May 2014. Separately, TTP entered into peace talks with the Pakistani government in early 2014, but the talks collapsed in June 2014. In October 2014, the chief spokesman and five regional commanders defected from TTP and publicly pledged allegiance to ISIL.

TTP's goals include waging a terrorist campaign against the Pakistani military and state, as well as against NATO forces in Afghanistan, and overthrowing the Government of Pakistan. TTP uses the tribal belt along the Afghan-Pakistani border to train and deploy its operatives, and the group has ties to al-Qa'ida (AQ). TTP draws ideological guidance from AQ, while AQ relies on TTP for safe haven in the Pashtun areas along the Afghan-Pakistani border. This arrangement gives TTP access to both AQ's global terrorist network and the operational experience of its members.

**Activities:** TTP has carried out and claimed responsibility for numerous terrorist acts against Pakistani and U.S. interests, including a December 2009 suicide attack on a U.S. military base in Khowst, Afghanistan, which killed seven U.S. citizens; and an April 2010 suicide bombing against the U.S. Consulate in Peshawar, Pakistan, which killed six Pakistani citizens. TTP is suspected of involvement in the 2007 assassination of former Pakistani Prime Minister Benazir Bhutto. TTP directed and facilitated the failed attempt by Faisal Shahzad to detonate an explosive device in New York City's Times Square on May 1, 2010.

Throughout 2011 and 2012, TTP carried out attacks against the Government of Pakistan and civilian targets, as well as against U.S. targets in Pakistan. Attacks in 2011 targeted civilians, Pakistani government and military targets, and an American consulate convoy in a series of suicide bombings and attacks. In 2012, TTP carried out attacks targeting a mosque, police checkpoint, a Pakistani Air Force base, and a bus carrying Shia Muslims.

In 2013, TTP attacked both civilian and government targets. In May, three TTP bombings, two targeting political parties and a third targeting a newly-created elite police force killed 14 people and wounded 54 others. In September, a TTP suicide bomber struck outside a church in Peshawar, Pakistan, killing 81 and wounding approximately 140. In October, a Pakistani government minister and nine other civilians were killed when a suicide bomber, believed to be a member of a local branch of the TTP in Khyber-Pakhtunkhwa Province, struck outside the

PX209

official's home during the Eid al-Adha holiday.  In November, twin bomb attacks targeting a Shia neighborhood of Karachi, Pakistan killed six people and wounded 35 others.

TTP continued attacking both civilian and Pakistani government targets in 2014.  In January, a TTP suicide attack on a police convoy in Karachi killed three and injured 10 others.  Also in January, a bombing against a military convoy, which was carried out by TTP in the Pakistani town of Bannu, killed at least 20 Pakistani soldiers and wounded at least 30.  Two days later, a TTP suicide bombing at a bazaar in Rawalpindi killed eight soldiers and three children.  In February, at least 13 policemen were killed and almost 60 others were injured in a suicide bombing targeting a bus carrying officers to a local training center near Karachi.  In June, TTP launched two consecutive attacks against Karachi's international airport, one on June 8 and the second followed two days later.  In the June 8 attack, carried out in conjunction with Islamic Movement of Uzbekistan, a squad of commandos, disguised as government security forces, stormed the airport.  The ensuing fight between security forces and the TTP, which lasted through the night, killed at least 36 people.  The second attack, in which at least two gunmen opened fire on a guard post at the airport perimeter, caused no casualties.  In December, TTP laid siege to a primary school in Peshawar, Pakistan.  The eight-hour assault on the school killed 145 people, 132 of whom were children.

**Strength:**  Several thousand.

**Location/Area of Operation:**  Federally Administered Tribal Areas, Pakistan

**Funding and External Aid:**  TTP is believed to raise most of its funds through kidnapping ransoms, criminal activity, and extortion.

PX209

## Chapter 7
## Legislative Requirements and Key Terms

*Country Reports on Terrorism 2014* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.  Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

**Excerpts and Summary of Key Statutory Terms:**

Section 2656f(a) of Title 22 of the United States Code states as follows:
(a) … The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing -

*(1) (A) detailed assessments with respect to each foreign country -*

*(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;*

*(ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and*

*(iii) which the Secretary determines should be the subject of such report; and*

*(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;*

*(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;*

*(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on -*

*(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals*

PX209

*responsible for the act; and*

*(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and*

*(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).*

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;

(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and

(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

**Interpretation and Application of Key Terms.**  For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above).  The term "non-combatant," which is referred to but not defined in 22 USC 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report.  The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the U.S. government on how these terms should be interpreted or applied for any other purpose.  Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

**Statistical Information.**  Pursuant to 22 USC § 2656f(b), this report should contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year."  This is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Consortium for the Study of Terrorism and Responses to Terrorism (START), a Department of Homeland Security Science and Technology Center of Excellence, based at the University of Maryland.  The statistical annex includes a discussion of the methodology employed by START in compiling the

PX209

relevant data.  This report does not contain statistical information specifically concerning combatants.  The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets.

**Contextual Reporting.**  Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists.  Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations.  It is terrorist groups--and their actions--that are the focus of this report.

Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw.  This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence.

Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily "international terrorism" and therefore are not subject to the statutory reporting requirement.

PX209

PX210

# Country Reports on Terrorism 2017

## September 2018

United States Department of State Publication
Bureau of Counterterrorism
Released September 2018

*Country Reports on Terrorism 2017* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

PX210

2

PX210

# COUNTRY REPORTS ON TERRORISM 2017

## Table of Contents

Foreword

**Chapter 1 – Country Reports on Terrorism**

**AFRICA**
Overview
Trans-Sahara Counterterrorism Partnership
Partnership for Regional East Africa Counterterrorism
Burkina Faso
Cameroon
Chad
Djibouti
Eritrea
Ethiopia
Kenya
Mali
Mauritania
Niger
Nigeria
Senegal
Somalia
South Africa
Tanzania
Uganda

**EAST ASIA and PACIFIC**
Overview
Australia
China
Indonesia
Malaysia
Philippines
Singapore
Thailand

**EUROPE**
Overview
Albania
Austria
Azerbaijan
Belgium

3

PX210

Bosnia and Herzegovina
Bulgaria
Cyprus
Denmark
France
Georgia
Germany
Greece
Italy
Kosovo
Macedonia
The Netherlands
Norway
Russia
Serbia
Spain
Sweden
Turkey
United Kingdom

**THE MIDDLE EAST AND NORTH AFRICA**
Overview
Algeria
Bahrain
Egypt
Iraq
Israel, Golan Heights, West Bank, and Gaza
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**SOUTH AND CENTRAL ASIA**
Overview
Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyz Republic

PX210

Maldives
Nepal
Pakistan
Sri Lanka
Tajikistan
Turkmenistan
Uzbekistan

**WESTERN HEMISPHERE**
Overview
Argentina
Brazil
Canada
Colombia
Mexico
Panama
Paraguay
Peru
Trinidad and Tobago
Venezuela

Chapter 2 – State Sponsors of Terrorism
Democratic People's Republic of Korea
Iran
Sudan
Syria

Chapter 3 – The Global Challenge of Chemical, Biological, Radiological, or Nuclear (CBRN) Terrorism

**Chapter 4.  Terrorist Safe Havens (Update to 7120 Report)**
**Terrorist Safe Havens**
- Africa
- Southeast Asia
- Middle East and North Africa
- South Asia
- Western Hemisphere
Countering Terrorism on the Economic Front
Multilateral Efforts to Counter Terrorism
**Long-Term Programs and Initiatives Designed to Counter Terrorist Safe Havens**
- Countering Violent Extremism
- Civilian Counterterrorism Capacity Building Programs
Support for Pakistan
Counterterrorism Coordination with Saudi Arabia
Broadcasting Board of Governors Initiatives:  Outreach to Foreign Muslim Audiences
Visas for Participants in United States Programs

PX210

Basic Education in Muslim Countries
Economic Reform in Muslim Majority Countries

**Chapter 5 –** Foreign Terrorist Organizations

Abdallah Azzam Brigades (AAB)
Abu Sayyaf Group (ASG)
Al-Aqsa Martyrs Brigade (AAMB)
Ansar al-Dine (AAD)
Ansar al-Islam (AAI)
Ansar al-Shari'a in Benghazi (AAS-B)
Ansar al-Shari'a in Darnah (AAS-D)
Ansar al-Shari'a in Tunisia (AAS-T)
Army of Islam (AOI)
Asbat al-Ansar (AAA)
Aum Shinrikyo (AUM)
Basque Fatherland and Liberty (ETA)
Boko Haram (BH)
Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
Hamas
Haqqani Network (HQN)
Harakat ul-Jihad-i-Islami (HUJI)
Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
Harakat ul-Mujahideen (HUM)
Hizballah
Hizbul Mujahedeen (HM)
Indian Mujahedeen (IM)
Islamic Jihad Union (IJU)
Islamic Movement of Uzbekistan (IMU)
Islamic State of Iraq and Syria (ISIS)
Islamic State's Khorasan Province (ISIS-K)
ISIL-Libya
ISIS Sinai Province (ISIS-SP)
Jama'atu Ansarul Muslimina Fi Biladis-Sudan (Ansaru)
Jaish-e-Mohammed (JeM)
Jaysh Rijal Al-Tariq Al-Naqshabandi (JRTN)
Jemaah Ansharut Tauhid (JAT)
Jemaah Islamiya (JI)
Jundallah
Kahane Chai
Kata'ib Hizballah (KH)
Kurdistan Workers' Party (PKK)
Lashkar e-Tayyiba (LeT)
Lashkar i Jhangvi (LJ)

PX210

Liberation Tigers of Tamil Eelam (LTTE)
Mujahidin Shura Council in the Environs of Jerusalem (MSC)
Al-Mulathamun Battalion (AMB)
National Liberation Army (ELN)
Al-Nusrah Front (ANF)
Palestine Islamic Jihad (PIJ)
Palestine Liberation Front – Abu Abbas Faction (PLF)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qa'ida (AQ)
Al-Qa'ida in the Arabian Peninsula (AQAP)
Al-Qa'ida in the Indian Subcontinent (AQIS)
Al-Qa'ida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary People's Liberation Party/Front (DHKP/C)
Revolutionary Struggle (RS)
Al-Shabaab (AS)
Shining Path (SL)
Tehrik-e Taliban Pakistan (TTP)

**Chapter 6 –** Legislative Requirements and Key Terms

PX210

## Foreword

The United States and our international partners made major strides to defeat and degrade international terrorist organizations in 2017.  We succeeded in liberating nearly all of the territory ISIS once held in Iraq and Syria.  We increased pressure on al-Qa'ida to prevent its resurgence.  We amplified efforts to expose and curtail Hizballah's malign activities inside Lebanon, in the Middle East, and across the globe.  We worked with allies and partners around the world to expand information sharing, improve aviation security, enhance law enforcement and rule of law capacities, and prevent terrorist recruitment and recidivism.

Despite our successes, the terrorist landscape grew more complex in 2017.  ISIS, al-Qa'ida, and their affiliates have proven to be resilient, determined, and adaptable, and they have adjusted to heightened counterterrorism pressure in Iraq, Syria, Afghanistan, Libya, Somalia, Yemen, and elsewhere.  They have become more dispersed and clandestine, turning to the internet to inspire attacks by distant followers, and, as a result, have made themselves less susceptible to conventional military action.  Further, the return or relocation of foreign terrorist fighters from the battlefield has contributed to a growing cadre of experienced, sophisticated, and connected terrorist networks, which can plan and execute terrorist attacks.

As ISIS lost territory, it continued to shift away from a centralized command and control structure toward a more diffuse model.  It has experimented with and employed small unmanned aerial systems and has used rudimentary chemical weapons.  The group encouraged sympathizers to use whatever weapons were at hand – such as large vehicles – against soft targets and public spaces.  Increasingly, the responsibility for deciding where, when, and how to attack has devolved to homegrown terrorists inspired or enabled by ISIS to conduct operations far from the war zone.  In 2017, we saw such attacks in Manchester, UK; Barcelona, Spain; Sinai, Egypt; Marawi, Philippines; New York City; and elsewhere.

Al-Qa'ida quietly expanded its membership and operations in 2017.  Its global network includes the remnants of its core in Afghanistan and Pakistan, al-Nusrah Front (in Syria), al-Qa'ida in the Arabian Peninsula, al-Qa'ida in the Islamic Maghreb, al-Shabaab (in Somalia), and al-Qa'ida in the Indian Subcontinent.  Nusrah's formation of Hayat Tahrir al-Sham, drawing in other hardline Syrian opposition groups, exemplified its effort to rebrand itself to appeal to a wider segment of the Syrian population.  Al-Qa'ida affiliates also conducted major attacks, such as in October 2017, when al-Shabaab detonated a truck bomb in the heart of Mogadishu, killing over 300 people, the deadliest terrorist attack in Somali history.  Al-Qa'ida leader Ayman al-Zawahiri continued to publicly call for supporters to attack the U.S. government and citizens globally.

Iran remained the world's leading state sponsor of terrorism and continued to support attacks against Israel.  It maintained its terrorist-related and destabilizing activities through the Islamic Revolutionary Guard Corps (IRGC) Qods Force and the Lebanon-based terrorist group Hizballah.  Iran is responsible for intensifying multiple conflicts and undermining the legitimate governments of, and U.S. interests in, Afghanistan, Bahrain, Iraq, Lebanon, and Yemen.  In particular, Iran and Hizballah are emerging from the Syria conflict emboldened and with valuable battlefield experience that they seek to leverage across the globe.  IRGC leader Qasem Soleimani recruited and deployed Shia militias from diverse ethnic groups across the Middle

PX210

East and South Asia to fight in defense of the Assad dictatorship in Syria.  Beyond the Middle East, Iran and its terrorist affiliates and proxies posed a significant threat and demonstrated a near-global terrorist reach.  Notably, in June 2017, the FBI arrested two suspected Hizballah operatives in Michigan and New York who allegedly were conducting surveillance and intelligence gathering on behalf of the organization, including in the United States.

Regionally focused terrorists groups remained a threat in 2017.  For example, Hamas continued to rebuild its military infrastructure and capabilities to support terrorist attacks against Israel. Additionally, Pakistan-based Jaish-e-Mohammed and Lashkar e-Tayyiba continued to pose a regional threat in the subcontinent.  Some regional and local terrorist groups have avoided greater international attention by remaining independent from ISIS and al-Qa'ida while others may have concluded that the benefits of greater expertise, resources, and prominence outweighed the risks of a formal connection with a notorious transnational terrorist network.

In short, the nature of the terrorist threat confronting the United States and our allies around the world evolved in 2017.  While the immediate dynamics that led terrorists to flock to Iraq and Syria since 2014 have diminished, other factors that terrorists exploit to recruit new followers remained a challenge, such as sectarianism, failing states, and conflict zones.  More than ever, it remains a critical priority for the United States and our allies to defeat our terrorist adversaries.

<div align="center">*****</div>

In 2017, the United States led efforts to enhance the international community's law enforcement and other civilian capabilities that are increasingly essential in the next phase of global counterterrorism.  In December, with U.S. leadership, the UN Security Council unanimously adopted Resolution 2396, with 66 co-sponsors.  UN Security Council resolution (UNSCR) 2396 requires member states to collect airline reservation data to block terrorist travel, to develop watchlists of known and suspected terrorists, and to use biometrics to spot terrorists who might be trying to cross their borders.  The resolution also calls on UN members to enact serious criminal offenses that will enable them to prosecute and penalize terrorists who have returned from the battlefield.

In addition, throughout 2017, the State Department led bilateral diplomatic efforts with key countries to improve border and aviation security and information sharing.  We increased the number of Homeland Security Presidential Directive 6 (HSPD-6) arrangements to share information about known and suspected terrorists by almost 15 percent in 2017.  Our total number of HSPD-6 partners now stands at 69, including all 38 members of the Visa Waiver Program.  The United States also deployed the latest border security systems to key counterterrorism partners, provided screening technology and training, and worked to expand global engagement on transportation-related threats.  Border security support through the Personal Identification Secure Comparison and Evaluation Systems (PISCES) expanded to 260 ports of entry in 23 countries.

We also used foreign assistance resources to enable our partners to better identify, deter, disrupt, apprehend, prosecute, and convict terrorists and their supporters.  Our goal is for partners to be able to confront the terrorist threats they face themselves without turning to the United States for

PX210

assistance.  We placed special emphasis on helping partner countries enact appropriate legal frameworks to bring criminal charges against terrorist offenders.  At the end of 2017, 70 countries had laws in place to prosecute and penalize foreign terrorist fighters, and 69 had prosecuted or arrested foreign terrorist fighters or their facilitators.

The United States also worked to stanch the flow of money to terrorist networks by designating 30 organizations and individuals as Foreign Terrorist Organizations (FTOs) and/or Specially Designated Global Terrorists (SDGTs).  This included top ISIS and al-Qa'ida leaders and operatives.  The State Department also continued to expose and sanction states that back terrorism.  We designated the Democratic People's Republic of Korea as a State Sponsor of Terrorism in 2017, and also designated key Hizballah figures as SDGTs as we pushed back on Iranian support for terrorism across the globe.

These efforts are only a snapshot of our ongoing work to protect the United States, our allies, and interests from terrorism.  *Country Reports on Terrorism 2017* provides a more detailed review of last year's successes and challenges so we can consider how to strengthen our counterterrorism efforts going forward.  As we look to the rest of 2018 and beyond, the United States remains committed to working with our allies and partners to confront the shared threat of global terrorism.  I hope this report will serve as a useful resource for those seeking to better understand this threat and our efforts to defeat it.

<div style="text-align:right">

Ambassador Nathan A. Sales
Coordinator for Counterterrorism

</div>

PX210

# Chapter 1 – Country Reports

## AFRICA

### Overview

African countries expanded their efforts to develop regional counterterrorism solutions while they struggled to contain the expansion of terrorist groups, affiliates, and aspirants involved in attacks or other activities in 2017.  In East Africa, the Somalia-based terrorist group al-Shabaab continued to threaten regional security.  It retained safe haven, access to recruits and resources, and de facto control over large parts of Somalia through which it moves freely.  Similar to 2015 and 2016, however, al-Shabaab did not claim any attacks outside of Somalia and northeastern Kenya in 2017.  In October, the group was blamed but did not claim responsibility for the deadliest terrorist attack in Somalia's history, despite having lost a number of operatives to counterterrorism operations in the months prior.  Northeastern Kenya experienced a significant increase in activity attributed to al-Shabaab, primarily in the form of improvised explosive device attacks targeting Kenyan security forces and vehicles transporting civilians.  Al-Shabaab maintained its allegiance to al-Qa'ida, remaining intent on limiting the influence and reach of the northern Somalia-based group of ISIS-linked fighters responsible for local suicide bombings and other attacks against Somali security forces.

The African Union Mission in Somalia (AMISOM) and Somali security forces increased cooperation with the United States to exert pressure on al-Shabaab, primarily through coordinated counterterrorism operations in southern Somalia.  The United States continued to support East African partners in their efforts to build counterterrorism capacity, including in the areas of aviation and border security, advisory assistance for regional security forces, training and mentoring of law enforcement to conduct investigations and manage crisis response, and advancing criminal justice sector reforms.  East African partners undertook efforts to develop and expand regional cooperation mechanisms to interdict terrorist travel and other illicit activities.

In the Lake Chad region, Boko Haram and its offshoot ISIS-West Africa (ISIS-WA) increased asymmetric attacks against civilians, government, and security forces, which resulted in deaths, injuries, abductions, and destruction of property.  Nigeria, along with its neighbors Cameroon, Chad, and Niger – often through the Multinational Joint Task Force – worked to counter these threats.  These countries also responded to the ongoing and devastating humanitarian crisis, protected civilians, and restored governance and rule of law in the affected areas.  The United States continued to provide advisors, intelligence, training, logistical support, and equipment to Lake Chad region countries and supported a wide range of stabilization efforts.  Continued attacks by Boko Haram and ISIS-WA have caused nearly 2.5 million displaced people in Nigeria.  Approximately 8.5 million people in Nigeria alone require humanitarian assistance.

In the Sahel, terrorist groups – including affiliates and adherents of al-Qa'ida and ISIS – have expanded their operations in central Mali and the Tri-Border Region of Burkina Faso, Mali, and Niger.  In response, the African Union Peace and Security Council authorized a new G-5 Sahel Joint Force in April 2017, comprising military and police forces from Burkina Faso, Chad, Mali,

PX210

Mauritania, and Niger.  The Joint Force began operations in late 2017 along the shared border to interdict the flow of terrorist groups and criminal trafficking.

## TRANS-SAHARA COUNTERTERRORISM PARTNERSHIP

Established in 2005, the Trans-Sahara Counterterrorism Partnership (TSCTP) is a U.S.-funded and -implemented, multi-faceted, multi-year effort designed to build the counterterrorism capacity and cooperation of military, law enforcement, and civilian actors across North and West Africa.  TSCTP partners include Algeria, Burkina Faso, Cameroon, Chad, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, and Tunisia.  TSCTP has built capacity and cooperation despite setbacks caused by a restive political climate, terrorism, ethnic rebellions, and extra-constitutional actions that interrupted work and progress with select partner countries.

Regional cooperation, a strategic objective of U.S. assistance programming globally, continues to improve in West and Central Africa among most of the partners of the TSCTP.  Lake Chad region governments in Cameroon, Chad, Niger, and Nigeria remained actively engaged in countering Boko Haram and ISIS-West Africa, including coordinating forces with Benin to form the Multinational Joint Task Force.  In the Sahel, regional partners Burkina Faso, Chad, Mali, Mauritania, and Niger formed the G-5 Sahel Joint Force to combat al Qa'ida and ISIS elements operating primarily in northern Mali and in the Burkina Faso, Mali, and Niger Tri-Border Region.  The United States added four Sahel states to the Counterterrorism Partnerships Fund in 2016 – Cameroon, Chad, Niger, and Senegal – which provided comprehensive assistance to targeted partners.  This funding is also complementary to the efforts of TSCTP and seeks to produce tangible results in a range of counterterrorism-related fields.

## PARTNERSHIP FOR REGIONAL EAST AFRICA COUNTERTERRORISM

First established in 2009, the Partnership for Regional East Africa Counterterrorism (PREACT) is a U.S.-funded and -implemented framework designed to build counterterrorism capacity and cooperation between military, law enforcement, and civilian actors across East Africa.  PREACT serves as a coordination mechanism for the U.S government's regional counterterrorism programming to help partners enhance criminal justice, defense, and financial sector reform. PREACT programming complements the U.S. government's assistance by promoting collaborative training environments and mentorship initiatives that emphasize respect for human rights, the rule of law, and good governance.

Through PREACT, the United States supports joint training exercises for Kenyan, Tanzanian, and Ugandan first responders and law enforcement professionals as part of a broader effort to encourage regional coordination and cooperation, protect shared borders, and respond to terrorist incidents responsibly and effectively.  Active PREACT partners include Djibouti, Ethiopia, Kenya, Somalia, Tanzania, and Uganda.  Inactive members of PREACT are Burundi, Comoros, Rwanda, Seychelles, South Sudan, and Sudan; they did not receive PREACT assistance in 2017.

## BURKINA FASO

PX210

**Overview:**  Burkina Faso experienced a slow but steady increase in terrorist activity in 2017, including numerous cross-border attacks in its northernmost region bordering Mali.  The Government of Burkina Faso has made numerous arrests of terrorist suspects, augmented the size of its special terrorism detachment *Groupement des Forces Anti-Terroristes* (GFAT) in the country's north, and joined the newly-created G-5 Sahel Joint Force to fight terrorism and criminal trafficking groups with regional neighbors Chad, Mali, Mauritania, and Niger.

In 2017, the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together to form Jama'at Nusrat al-Islam wal-Muslimin (JNIM).  JNIM and other groups like Ansarul Islam and ISIS in the Greater Sahara are all known to operate in Burkina Faso.

The French military's Operation Barkhane continued its integrated counterterrorism mission for the Sahel region.  Cooperating with Malian forces, Barkhane sought to degrade terrorist elements in northern and central Mali, particularly JNIM.

Terrorist organizations successfully recruited marginalized, poor, and historically disadvantaged Fulani inhabitants.  Burkinabe security forces have been accused of torture, extrajudicial killings, burning of property, and arbitrary detention in their response to terrorism in the north.  The Government of Burkina Faso has opened an investigation into these allegations, which was ongoing at year's end.  We refer you to the State Department's *Country Reports on Human Rights Practices* and *Report on International Religious Freedom* for further information.

The United States was in the process of implementing USAFRICOM's US $5.6 million program to build upon a previously Trans Sahara Counter Terrorism Partnership (TSCTP)-funded Gendarmerie border security program in the northern region of Burkina Faso.  In 2017, the United States pledged US $30 million for the Burkinabe military to equip its security components of the G-5 Sahel Joint Force and another US $30 million for the other G-5 countries for a total of US $60 million.

Additionally, TSCTP funded US $6 million in other security assistance programs to reinforce security at the airbase in Ouagadougou and equip the Gendarme Special Intervention Unit with radios, body armor, and ballistic shields.  It will also make improvements to the peacekeeping training center in Loumbila.

**2017 Terrorist Incidents:**  Approximately 50 attacks that took place mainly in Burkina Faso's northernmost region along the border with Mali were believed to be terrorist-related.  Attacks have included targeted killings, kidnappings, improvised explosive devices (IEDs), and attacks on security outposts, police stations, and barracks.  Attacks using IEDs were witnessed for the first time in 2017 and targeted Burkinabe security forces and civilians.  The deadliest attack occurred on August 17, when an IED detonated under a military vehicle patrolling the Djibo area, causing three deaths and seriously injuring two.  Attacks have also targeted Burkinabe government officials, schools, and markets.  On November 17, in the village of Taouremba, six heavily armed individuals on motorcycles conducted a targeted attack on a municipal councilor in the town market that resulted in the death of 10 individuals.

PX210

The largest attack in Burkina Faso took place on August 13 in Ouagadougou at the Aziz Istanbul Café, a Turkish-owned restaurant frequented by expatriates.  Two armed gunmen wounded 25 and killed approximately 19 people, including 10 Burkinabe and nine foreigners.  Two of the foreigners were Kuwaiti – one of whom was imam of the Kuwaiti Great Mosque, Dr. Waleed Al-Ali.  Both were in Burkina Faso for a charitable mission.

**Legislation, Law Enforcement, and Border Security:**  In 2017, Burkina Faso began making changes to its legal framework.  In January, lawmakers created a Special Judicial Interagency working group based on best practices across the region that will have jurisdiction over terrorism-related legal cases.  However, it was not fully operational by the end of 2017.

Approximately 22 judicial investigations linked to attacks committed against civilians and security forces were ongoing at the end of 2017.  Some of the cases started on the basis of citizen claims that someone was a terrorist or suspected of belonging to terrorist groups.  Many cases stagnated while awaiting information from neighboring countries.  Burkina Faso has not yet brought to trial any of the approximately 150 alleged terrorists detained in Burkina Faso's High Security Prison, opened in 2014.

Burkinabe security and law enforcement officials continued to cite border security as a major area of concern.  Burkina Faso's Counterterrorism Strategy, Mission de Securitization du Nord, strives to address terrorist activities along its northern border.  To accomplish this, Burkina Faso operationalized and deployed a joint Army-Gendarmerie-Police counterterrorism task force known as the Groupement des Forces Anti-Terroristes (GFAT) in January 2013.  This force's level has increased from 500 troops in 2016 to 1,600 troops in 2017 in an effort to counter the growing terrorist threat.

Burkina Faso relies on the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System (PISCES), and uses International Organization for Migration-provided screening equipment and software to conduct traveler screening and watchlisting.

The Department of State's Antiterrorism Assistance program provided workshops on cross-border security, crisis management, criminal justice procedures, and prosecution of terrorists.  This included an Advanced Rural Border Patrol course and Border Unit mentorship to assist Burkina Faso in securing its borders.  The United States partnered with the UN Office for Drugs and Crime for a program on Burkina Faso's legal framework to counter terrorism.

**Countering the Financing of Terrorism:**  Burkina Faso is a member of the Inter-Governmental Action Group against Money Laundering in West Africa (GIABA), a Financial Action Task Force-style body.  Burkina Faso's financial intelligence unit (*Cellule Nationale de Traitement des Informations Financières* – CENTIF) tracks terrorist financing, but had not tried any cases by year's end.  In 2017, the Minister of Territory Office of Public Freedoms and Associations took responsibility for terrorism financing from the Ministry of Finance and Ministry of Foreign Affairs.  In 2017, CENTIF required non-profit organizations to declare their funding sources.  For further information on money laundering and financial crimes, see the *2018*

PX210

*International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Burkinabe government launched the Sahel Emergency Plan in 2017 to strengthen the role of government, enhance community law enforcement, and generate economic opportunities in its Sahel region.  Burkina Faso did not have programs to rehabilitate or reintegrate terrorists into mainstream society.

The U.S. Agency for International Development's CVE programming included a regional messaging project, called Voices for Peace, which counters terrorist narratives through radio programs and social media.  It also includes an effort called Partnerships for Peace to strengthen the capacity of the national government, civil society organizations, and regional organizations – G-5 Sahel and the Economic Community of West African States – to counter violent extremism and a research initiative to identify the conditions terrorists exploit for recruitment in local communities.

**Regional and International Cooperation:**  Burkina Faso participates in the G-5 Sahel Joint Force and provides forces to improve security along shared borders to interdict the flow of terrorist groups and criminal trafficking.  Burkina Faso maintains two peacekeeping battalions in Mali as part of the UN Multidimensional Integrated Stabilization Mission in Mali.

## CAMEROON

**Overview:**  In 2017, Cameroon experienced significant terrorist activity in the Far North Region.  The Government of Cameroon attributed the violence to Boko Haram as opposed to ISIS-West Africa (ISIS-WA).  Lake Chad region governments and media rarely make a distinction between Boko Haram and ISIS-WA and instead generally refer to both groups as Boko Haram.  Boko Haram continued to regularly carry out attacks in Cameroon, primarily through the use of suicide bombers, while ISIS-WA attacked less frequently, targeting military outposts and generally refraining from killing civilians.

Countering terrorist threats remained a top security priority for the Government of Cameroon.  It continued its cooperation with the international community, remained a member of the Trans-Sahara Counterterrorism Partnership, contributed significantly to operations of the Multinational Joint Task Force, and continued to work with the United States to improve the capacity of its security forces.

The Cameroonian government began formulating a reintegration plan for former Boko Haram fighters for the first time in 2017.  On October 20, four ex-terrorists who claimed to have defected from Boko Haram were allowed to return to their village in Tolkomari.  Although local residents expressed skepticism, the government declared it was the state's duty to protect them and treat them with respect.  Although efforts to institutionalize formal defections and reintegration policies were nascent, the government announced that a permanent location for ex-combatants in Zamai would serve as a de-radicalization and re-socialization center.

Cameroon joined the Global Coalition to Defeat ISIS in 2017.

PX210

**2017 Terrorist Incidents:**  Boko Haram continued to take advantage of weaknesses in Cameroon's border security to conduct terrorist attacks in the country's Far North Region, including suicide bombings, targeted killings, kidnappings, and raids in search of supplies.  Boko Haram perpetrated multiple and indiscriminate killings against civilians – Muslim and Christian alike – but also against government officials and military forces.  Although Cameroonian forces have become more effective at combatting Boko Haram, dozens of attacks, often suicide bombings, occurred in 2017.  These included an attack in February that killed three soldiers, one in April that killed four vigilance committee members (vigilance committees are groups of ordinary residents who help protect the area from Boko Haram attacks), one in July that killed 14 people and wounded 32 others, and one in August that left 15 dead and eight abducted.  In the very far northern area of the country, ISIS-WA conducted a few attacks, targeting military outposts, and generally refrained from killing civilians.

**Legislation, Law Enforcement, and Border Security:**  There were no significant changes since the 2016 report.  In 2017, the Department of State's Antiterrorism Assistance program delivered two Explosive Incident Countermeasures trainings, an Explosive Ordnance Disposal (EOD) Commanders Workshop, and a mentorship program with Cameroonian EOD personnel to build Cameroon's counter-improvised explosive device capacity.

**Countering the Financing of Terrorism:**  Cameroon is a member of the Task Force on Money Laundering in Central Africa (GABAC), a Financial Task Force-style regional body, and its financial intelligence unit, the National Agency for Financial Investigation, is a member of the Egmont Group.  There were no significant changes since the 2016 report.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Cameroon does not have a national CVE action plan, but officials at all levels acknowledged radicalization to violence as a significant concern and said they integrate it into their work and planning.  The government partnered with faith-based organizations, such as the Council of Imams and Religious Dignitaries of Cameroon (CIDIMUC), to educate citizens on the dangers of radicalization to violence, to promote religious tolerance, and to present religion as a factor for peace.  Programs furthered these objectives through targeted messaging in mosques, special prayer sessions, press releases, and through roundtable discussions and conferences bringing together people from various religious backgrounds.  One of CIDIMUC's strategies has been to improve the living conditions of imams.

In 2017, the U.S. Agency for International Development expanded the scope of a community resilience and peace-building program it launched in December 2015.  Using a network of community radio stations, the program focused on strengthening the resilience of communities through radio programs focused on peace building, which were transmitted in 26 languages in the north and far north regions.

Cameroonian cities Yaounde II, Kolofata, Kousseri, Meri/Diamare, and Mokolo are members of the Strong Cities Network.

PX210

**International and Regional Cooperation:** There were no significant changes since the 2016 report.

___

## CHAD

**Overview:** The Government of Chad continued to focus on counterterrorism efforts at the highest level, however, the worsening financial crisis affected its ability to meet even basic financial commitments, such as paying police and military salaries. Although financial hardships have limited the country's ability to provide external counterterrorism assistance, Chad engaged in external military operations in neighboring countries. Chad provided approximately 2,000 combat forces to the Lake Chad Region's Multinational Joint Task Force (MNJTF), which also includes Benin, Cameroon, Niger, and Nigeria, but drew down some of those troops in mid-2017 to focus on other issues such as insecurity along Chad's northern border with Libya. Chad continued to host the French government's Operation Barkhane, France's integrated counterterrorism mission for the Sahel region that has partnered with forces in the Sahel to launch numerous operations to degrade terrorist groups in the region. Chad had 1,450 soldiers supporting the UN Multidimensional Integrated Stabilization Mission in Mali at year's end.

Chad joined the Global Coalition to Defeat ISIS in 2017.

**Legislation, Law Enforcement, and Border Security:** The Government of Chad updated its Penal Code in April 2017. Penalties for lesser terrorist offenses were increased to life imprisonment. Some civil society organizations expressed concern that the law was overly restrictive, required little evidence to prosecute individuals, and could be used to curtail freedoms of expression and association. We refer you to the State Department's *Country Reports on Human Rights Practices* for further information.

While Chadian law enforcement units displayed basic command and control capacity, the Director General of the Chadian National Police requested training in investigations, crisis response, and border security capacity. Law enforcement leadership publicly acknowledged the requirement for all law enforcement officers to respect human rights. In practice, however, there were reports the government or its agents committed arbitrary and unlawful killings, including by torture, and impunity was an issue. The Director General of the Police has improved the Chadian National Police's performance by fostering more efficient and effective communication across bureau lines. Its forensics unit has opened its files to the Regional Security Office for passage of photo and fingerprint records of suspected Boko Haram terrorists imprisoned in Chad.

The Chadian government operated at a heightened level of security and has instituted screenings at border-crossings to prevent infiltration by members of Boko Haram, ISIS-West Africa (ISIS-WA), and Central African militias, as well as transit of illegal arms, drugs, and other contraband. Border patrols were provided by a combination of border security officials, gendarmes, police, and military. Chad screened travelers using the U.S.-provided Personal Identification Secure Comparison and Evaluation System (PISCES) at major ports of entry.

PX210

Chad participated in the Department of State's Antiterrorism Assistance (ATA) program in 2017. It received ATA training in support of its Crisis Response Team and received deliveries in support of its participation in the multilateral Flintlock 2017 exercise.

The U.S. Embassy's Special Programs for Embassy Augmentation and Response (SPEAR) team continued its training and development.  This team is composed of Chadian National Police and Groupe Mobile d'Intervention Police and is expected to be on call to respond to emergencies at the embassy and affiliated facilities.

**Countering the Financing of Terrorism:**  Chad is a member of the Task Force on Money Laundering in Central Africa, a Financial Action Task Force-style regional body.  Chad's financial intelligence unit, the National Agency for Financial Investigation (ANIF), is a member of the Egmont Group.

Chad criminalized terrorist financing through the 2003 adoption of an anti-money laundering/ countering the financing of terrorism (AML/CFT) law drafted by the Economic and Monetary Community of Central Africa.  The law allows immediate freezing and confiscation of terrorist assets and requires a variety of organizations involved in financial transactions to monitor money/value transfers and report any anomalies.  The law does not appear to list non-profit organizations specifically within the list of organizations required to comply.  The government also requires know-your-customer standards enforcement for both foreign and domestic transactions.

ANIF, which falls under the authority of the Ministry of Finance and Budget, is tasked with ensuring public and private financial institutions in Chad implement the AML/CFT law.  It investigates suspicious transactions brought to its attention by financial institutions and refers cases to the Attorney General's office in the Ministry of Justice for further action and prosecution.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Chad adopted a national strategy and action plan to "Counter Violent Extremism and Radicalization" in December 2017.  Prior to the strategy and action plan, the government used its five-year development strategy as its primary tool to prevent and counter radicalization to violence.

The number of Chadians joining terrorist organizations remained low in 2017.  Chadians who joined Boko Haram or ISIS-WA came primarily from the Buduma ethnic group who reside on Lake Chad islands.  Separately, there was evidence that a few individuals had become radicalized to violence through propaganda accessed on social media platforms.

Efforts to encourage defections and returnees among the Buduma people around Lake Chad were informal.  Moderate messaging was broadcast over 12 community radio stations and one state-

PX210

operated radio station under a U.S. Agency for International Development (USAID) project.  Additionally, USAID committed to a multi-year CVE program.

**International and Regional Cooperation:**  Chad remained active in the Trans-Sahara Counterterrorism Partnership.  Chad is a member of the G-5 Sahel Joint Force, which also includes Burkina Faso, Mali, Mauritania, and Niger.  As a member of the Lake Chad Basin Commission, Chad participated in efforts to develop the MNJTF.  Chad cooperated actively with Cameroon, Niger, and Nigeria in operations to counter the threat of Boko Haram and ISIS-WA on its borders.

## DJIBOUTI

**Overview:**  Djibouti offered a vital platform for regional counterterrorism and countering violent extremism (CVE) efforts in 2017.  Since 2002, Djibouti has hosted Camp Lemonnier, the headquarters of AFRICOM's Combined Joint Task Force-Horn of Africa and the only enduring U.S. military installation in Africa.  Djibouti's Armed Forces also participated in the U.S.-funded Africa Contingency Operations Training and Assistance program and deployed soldiers to the African Union Mission in Somalia (AMISOM) campaign.  Djibouti hosts the Inter-Governmental Authority on Development (IGAD) Center of Excellence for Preventing and Countering Violent Extremism, which serves as a regional CVE hub and resource for CVE research, development, and training.  IGAD positions Djibouti as a regional leader on counterterrorism and CVE.

In 2017, the Government of Djibouti hosted several conferences:
- A Ministry of Islamic Affairs-led conference with Muslim religious leaders from the Horn of Africa on strategies to address "extremist" messaging directed at youth;
- A Ministry of Justice-led conference with the international organization of La Francophonie and the Association of Francophone Prosecutors on counterterrorism prosecutions; and
- A Central Bank-led conference with the Common Market for Eastern and Southern Africa on anti-money laundering and countering the financing of terrorism.

As in previous years, Djiboutian government officials, particularly law enforcement and members of the High Islamic Council, worked closely to identify and address terrorist activity.

Djibouti joined the Global Coalition to Defeat ISIS in 2017.

**Legislation, Law Enforcement, and Border Security:**  Djibouti has a legal framework for prosecuting terrorism-related crimes and can try terrorists in criminal courts using its penal code.  As such, there were no significant changes on terrorism-related legislation in 2017.  The Djiboutian government continued to use counterterrorism legislation to suppress criticism by detaining and prosecuting opposition figures and other activists.  We refer you to the State Department's *Country Reports on Human Rights Practices* for further information.

In 2017, the Djiboutian government made structural and judicial counterterrorism-related changes.  The Minister of Justice appointed a new State Prosecutor, who reorganized the

PX210

Prosecutor's office to allow deputy prosecutors to specialize in terrorism-related cases.  Djibouti also passed a comprehensive refugee law and two implementing decrees to ensure refugees have freedom of movement, education, work, and access to public services, including those related to criminal justice, which were not *de jure* rights for refugees prior to their passage.  Recognizing that refugees account for more than three percent of the population, the government's decision to provide them access to the criminal justice system serves as an effective long-term response to address the risk of any vulnerable population, including this one, to recruitment, radicalization to violence, and other terrorist-related activity.

Djiboutian law enforcement entities continued to prioritize counterterrorism due to Djibouti's geographic location and an al-Shabaab attack in Djibouti City in May 2014.  Djibouti maintained a system of checkpoints and conducted cordon-and-search operations within the capital, Djibouti City, and concentrated security forces at border control points to screen for potential security threats.  Government officials enhanced the protection of soft targets, including hotels and grocery stores, measures first implemented after the May 2014 attack.  Djiboutian law enforcement also extended vehicle searches throughout the capital in an effort coordinated through the Ministry of Foreign Affairs.

Djibouti's law enforcement organizations include the Djiboutian National Police (DNP), the Djiboutian National Gendarmerie, the National Security Judiciary Police (NSJP), and the Djiboutian Coast Guard.  In 2017, the DNP, National Gendarmerie, and NSJP received training from both the Department of State's Antiterrorism Assistance (ATA) program and the International Law Enforcement Academy in Gaborone.  ATA assistance focused on building technical capacity for improved crisis response and border security capabilities.  The DNP, National Gendarmerie, and the NSJP also received training through the U.S. Federal Bureau of Investigation's Legal Attaché office in Addis Ababa, Ethiopia.

Djibouti's law enforcement organizations routinely interacted with U.S. government counterparts and frequently sought U.S. input to identify potential terrorist suspects.

Djiboutian law enforcement personnel acknowledged the difficulty of securing their land and sea borders.  The DNP controls border checkpoints and Djibouti's armed forces are responsible for patrolling land borders in remote locations, with support from the Gendarme patrolling between border posts.  Djibouti continued to process travelers on entry and departure at its international airport and seaport with the Personal Identification Secure Comparison Evaluation System (PISCES).  While the airport and seaport remain important entry points, the vast majority of travelers cross into Djibouti by land at one of three land border points, one of which is the Loyada crossing at the Somali border, which was refurbished with U.S. funding.

**Countering the Financing of Terrorism:**  In 2017, Djibouti applied for membership to the Middle East and Northern Africa Financial Action Task Force (MENAFATF)), a Financial Action Task Force-style regional body.  Its application is under consideration by MENAFATF members.  The Central Bank of Djibouti houses a financial intelligence unit known as the Financial Information Service (SRF).  Due to limited financial and human resources, the SRF has been unable to perform the core functions of a financial intelligence unit and has focused instead

PX210

on banking supervision.  The SRF referred no cases to law enforcement involving suspected terrorist financing in 2017.

Djibouti's Central Bank places the responsibility for staying updated on sanctions lists with the financial institutions themselves.  Many of the financial institutions operating in Djibouti have software packages that include links to UN sanctions lists, lists of designated terrorists, or terrorist entities provided by the U.S. Department of the Treasury's Office of Foreign Assets Control and the European Union.  The Central Bank monitors compliance with these lists through routine supervision and audits of the financial institutions.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Law enforcement agencies worked with the High Islamic Council to identify and monitor activity that promoted terrorist ideology.  Djibouti continued to host and provide oversight for the operation of the IGAD Center of Excellence for Preventing and Countering Violent Extremism and has also prioritized economic growth to address the high unemployment among youth.

**International and Regional Cooperation:**  Djibouti hosts the IGAD's headquarters offices and Secretary General.  The Djiboutian military continued its participation in AMISOM, which includes military forces from Burundi, Kenya, Ethiopia, and Uganda.

## ERITREA

**Overview:**  The Government of Eritrea continued to make regular public statements about its commitment to fighting terrorism.  Eritrea also continued and broadened its support for the Saudi-led coalition in Yemen, and it allowed military elements of the coalition to base in Eritrea.

In May 2017, the United States recertified Eritrea as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. In considering this annual determination, the Department of State reviewed Eritrea's overall level of cooperation with U.S. efforts to counter terrorism, taking into account U.S. counterterrorism objectives and a realistic assessment of Eritrean capabilities.

Eritrea has been subject to UN Security Council (UNSC) sanctions since December 2009 due to past evidence of support for al-Shabaab and other activities that have contributed to regional instability.  UN Security Council resolutions (UNSCR) 1907 (2009) and 2011 (2013) established and consolidated a two-way arms embargo on Eritrea, most recently renewed in UNSCR 2385 (2017).  The sanctions regime on Eritrea also includes provisions for a travel ban and asset freeze measures with regard to individuals or entities designated by the UN Sanctions Committee for Somalia and Eritrea.  At present, there are no UN listings for the sanctions regime as it relates to Eritrea.  While the Somalia and Eritrea Monitoring Group's (SEMG) 2017 report did not find conclusive evidence that Eritrea is supporting al-Shabaab, the Government of Eritrea continued to refuse to allow the SEMG inspectors to visit Eritrea, limiting the scope of its investigations.

PX210

The SEMG did not find evidence of continued Eritrean support to armed groups intent on destabilizing Ethiopia and Djibouti.

Due to the Government of Eritrea's lack of transparency, there was no clear picture of the methods it used to track terrorists or safeguard its citizens.  For a number of years, members of the police have refused to meet with security officials from western nations to discuss policy matters, although the United States had informal contact with some law enforcement counterparts in 2017.

**Legislation, Law Enforcement, and Border Security:**  There were no significant changes since 2016.

**Countering the Financing of Terrorism:**  Eritrea is not a member or observer of a Financial Action Task Force-style regional body or a member of the Egmont Group.  Eritrea is a member of the Common Market for Eastern and Southern Africa, which has a maritime security program that focuses on building the capacity of law enforcement agencies to combat money laundering and terrorist financing.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  There were no significant changes since 2016.

**International and Regional Cooperation:**  In December, Eritrea co-sponsored UNSCR 2396 on returning and relocating foreign terrorist fighters.

## ETHIOPIA

**Overview:**  The continuing al-Shabaab threat emanating from Somalia dominated the Government of Ethiopia's security posture and the Ethiopian National Defense Force's (ENDF) 2017 counterterrorism efforts.  Ethiopia also focused its counterterrorism strategy on pursuing potential threats from armed opposition groups often based in neighboring countries.  The Ethiopian Federal Police (EFP) and the U.S. Federal Bureau of Investigation (FBI) shared information on counterterrorism matters pursuant to a memorandum of understanding.  The Ethiopian government contributed to FBI cases related to al-Shabaab and other U.S.-designated Foreign Terrorist Organizations by providing information, evidence, and access to witnesses.

Ethiopia joined the Global Coalition to Defeat ISIS in 2017.

**Legislation, Law Enforcement, and Border Security:**  The Government of Ethiopia uses the 2009 Anti-Terrorism Proclamation (ATP) to prosecute crimes associated with terrorist activity.  Ethiopia convicted 23 individuals in 2017 for planning to conduct terrorist attacks in Ethiopia after making contact with al-Shabaab and al-Qa'ida.

Ethiopia also continued to use the ATP to suppress criticism by detaining and prosecuting journalists, opposition figures – including members of religious groups protesting government interference in religious affairs – and other activists.  The Ethiopian government released some,

PX210

but arrested several others during the year.  These arrests peaked under the State of Emergency the Ethiopian government imposed in October 2016 in the wake of anti-government protests and violence that resulted in tens of thousands of arrests and several hundred deaths.  We refer you to the State Department's *Country Reports on Human Rights Practices* and *Report on International Religious Freedom* for further information.

In late August, the International Institute for Justice and the Rule of Law conducted a workshop in Addis Ababa for judges handling ATP cases.  Ethiopian judges are often overwhelmed with hundreds of ATP-related cases because Ethiopian prosecutors often seek to bring the highest charges for cases that they cannot resolve with plea agreements.  With U.S. support, the Attorney General's Office is working on revising Ethiopia's Criminal Procedure Code to include plea agreements.

The ENDF, the EFP, Ethiopian intelligence, and regional special police worked to detect and deter al-Shabaab attacks in Ethiopia.  The National Intelligence and Security Service (NISS), which has broad authority for intelligence, border security, and criminal investigation, is responsible for overall counterterrorism management in coordination with the ENDF and EFP. The three security organizations comprise the Ethiopian Task Force for Counterterrorism, a federal-level committee to coordinate counterterrorism efforts.  The NISS facilitated some coordination with the United States to include several domestic counterterrorism cases.

Border security was a persistent concern for Ethiopia, which worked to tighten border controls with Eritrea, Kenya, Somalia, and South Sudan.  Ethiopia employed the Terrorist Interdiction Program's Personal Identification Secure Comparison and Evaluation System (PISCES) to conduct traveler screening and watchlisting at airports and other ports of entry.

Ethiopia is East Africa's only last point of departure to the United States, one of only a few on the African continent.  The U.S. Transportation Security Administration continued to conduct semi-annual inspections of Ethiopia's national carrier and of Bole International Airport, including one that occurred in early December.  Inspectors reported implementation of all recent enhanced security measures and that cooperation with Ethiopian aviation security officials remains strong.

**Countering the Financing of Terrorism:**  Ethiopia is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force (FATF)-style regional body.  In October, the FATF and the European Commission listed Ethiopia as one of 11 high-risk and non-cooperative jurisdictions with strategic deficiencies in its anti-money laundering and countering the financing of terrorism (AML/CFT) regimes and recommended that any financial flows from the country be subject to additional counter checks and know-your-customer rules.  Ethiopia is one of eight countries named on both the FATF and European Commission lists.

Following the completion of the National Risk Assessment for money laundering and terrorism finance in early 2017, Ethiopia approved and began implementing a National Risk Mitigation Action Plan.

PX210

Ethiopian law enforcement handles low-end money laundering investigations but is ill equipped to expand to larger AML/CFT investigations.  Law enforcement lacks the forensic tools, human resources, and training to focus on these types of cases.  In addition, the Financial Intelligence Centre (FIC) and law enforcement did not appear to coordinate their efforts fully.  The FIC processes and submits suspicious transaction reports to the police for money laundering and to the NISS for terrorist financing cases.  However, there appeared to be a lack of follow-up on AML/CFT investigations.

Ethiopia has made no apparent attempt to investigate and prosecute cases on suspicious or fraudulent mobile money transactions.  This is especially significant since it appears that a large number of mobile money transactions occur within the Somali region of Ethiopia, an area where the Ethiopian government has concentrated much of its counterterrorism efforts.  The two mobile money platforms in Ethiopia reported growth in its revenues, especially from transactions originating in rural areas, and have expressed interest in cooperating with law enforcement on investigations under certain conditions.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Ethiopia has not yet developed a CVE strategy.  In 2017, the U.S. Agency for International Development provided assistance through a local Ethiopian civil society organization to undertake research on the existing potential vulnerabilities to extremism in Ethiopia.  This research was conducted in communities across eight of the nine regional states as well as in Dire Dawa and Addis Ababa, cities deemed at risk of radicalization to violence and terrorist recruitment.  The findings of this research were presented and validated by Ethiopian government (federal and regional state) officials and non-government interlocutors (religious leaders) in November.

The government's continued restrictions on funding to civil society and non-governmental organizations under the Charities and Societies Proclamation limited the activity of non-governmental organizations, including CVE programming targeting at-risk youth and engaging communities and credible leaders.

**International and Regional Cooperation:**  There have been no significant changes since the 2016 report.  The ENDF continued its participation in the African Union Mission in Somalia, which includes military forces from Burundi, Djibouti, Kenya, and Uganda.  Ethiopia joined the UN Security Council (UNSC) as an elected member in January 2017 and served as a vice chair of the UNSC 1373 Committee on Counterterrorism.  In December, Ethiopia co-sponsored UNSC Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

---

## KENYA

**Overview:**  Kenya saw a significant increase in al-Shabaab terrorist attacks in the region bordering Somalia during 2017, particularly through improvised explosive devices (IEDs) and ambushes.  Kenya is a strong U.S. partner in counterterrorism investigation, prosecution, and

PX210

incident response, and continued to play an important role in regional counterterrorism cooperation.  The Kenya Defense Forces (KDF) continued to participate in the African Union Mission in Somalia (AMISOM) and supported border security and counter-IED efforts within Kenya.  Kenyan security services responded to numerous terrorist incidents, while also disrupting al-Shabaab and ISIS attack planning, recruitment, and travel.  Reports of human rights violations by security forces during counterterrorism operations continued, including allegations of extra-judicial killings, disappearances, and torture.  We refer you to the State Department's _Country Reports on Human Rights Practices_ and _Report on International Religious Freedom_ for further information.

**2017 Terrorist Incidents:**  Al-Shabaab increased its attacks against Kenyan security forces inside the country, primarily along the border with Somalia.  Terrorist incidents included:

- On January 27, al-Shabaab fighters – including Somalis and Kenyans – attacked a KDF camp at Kolbio, on the Somali border, using vehicle-borne improvised explosive devices (VBIEDs), mortars, and small arms.  The KDF claimed nine Kenyan service members and 70 al-Shabaab terrorists died, while media reported at least 20 KDF soldiers had been killed.  Al-Shabaab employed numerous IEDs and ambushes targeting police patrols in Kenya's northeastern counties and Lamu County.
- In four attacks from May 16 to 25, police reported approximately 30 security officials and civilians died, including five police officers in an attack on the Mandera County Governor.
- On July 8 and September 6 in attacks in Lamu County, al-Shabaab militants killed at least 13 civilians, beheading the victims.
- On July 13, al-Shabaab militants in Lamu County attacked the vehicle of, and attempted to abduct, the Principal Secretary of the national Ministry of Public Works, who later died.  According to police and media, at least six police officers died in the ambush and subsequent rescue operation.

**Legislation, Law Enforcement, and Border Security:**  Kenya's government used the Prevention of Terrorism Act (amended in 2014) to aggressively investigate and prosecute terrorism, but it has fallen short in implementing initiatives to improve access to justice among terrorism suspects in 2017.  In August, the government launched a National Legal Aid Action Plan but has not funded a public defender service envisioned by law.  The Office of the Director of Public Prosecutions worked to finalize national plea-bargaining rules, which awaited publication in the Kenya Gazette at year's end.  The judiciary supported a rule of law-based approach to prosecutions, applying equal legal and evidentiary standards to terrorism cases as in other criminal cases.  In a January ruling, the High Court overturned five convictions for attempted terrorist travel to Somalia, as the Kenyan government had not followed legal procedures designating Somalia as a prohibited destination.

Counterterrorism functions were divided among the three branches of the National Police Service – the Kenya Police's paramilitary General Service Unit, the Directorate of Criminal Investigations (including the investigative Anti-Terrorism Police Unit, the Bomb Disposal Unit, and the Cyber Forensics Investigative Unit), and the Administration Police (including the Rural Border Patrol Unit).  The National Intelligence Service and elements of the KDF.  Interagency

PX210

also shared responsibility.  Coordination was uneven, with improved information sharing in some cases and failure to appropriately pass threat information in others.  Overall, resource constraints, insufficient training, corruption, and unclear command and control hindered effectiveness.  Kenya's National Counterterrorism Center (NCTC) expanded outreach to private security companies and key sectors on soft target attacks.  Kenya's security agencies focused on soft target threats in major cities and tourist areas, primarily universities, shopping malls, hotels, and resorts.

Terrorists exploited Kenya's sparsely populated border regions and largely uncontrolled land borders to conduct attacks and move operatives in and out of the country.  The Department of State's Antiterrorism Assistance (ATA) program trained and equipped rural Border Patrol Unit personnel in tactical ground sensor operations and border security operations.  Other ATA programs included law enforcement training to respond to active shooter threats.

Kenyan officials continued efforts to draft a coordinated interagency border control strategy.  In April, Kenya signed an agreement with the United States to implement the Automated Targeting System-Global to facilitate sharing of Advance Passenger Information for air travelers.  Kenya worked to improve aviation safety and security at Nairobi's Jomo Kenyatta International Airport.  Kenya established an interagency Joint Operations Centers at several ports of entry and border crossings to promote information sharing and maintained its traveler screening partnership with the United States using the Personal Identification Secure Comparison and Evaluation System (PISCES) at major ports of entry.  Immigration officers employed government watchlists.  Watchlist screening and basic equipment at smaller ports of entry was generally lacking.

The Kenyan government worked to prevent the transit of foreign terrorist fighters, including Kenyans attempting to join al-Shabaab or ISIS, and those returning from abroad.  In March, police arrested three alleged ISIS travel facilitators in Malindi.  In May, South Sudanese and Kenyan police cooperated in the repatriation of three Kenyans and a Somali, who were arrested in South Sudan after the Malindi group allegedly recruited them to travel to join ISIS-Libya.  Kenyan security services also detected and deterred terrorist plots and responded to dozens of terrorism-related incidents.  The Kenyan government or its agents continued to face allegations that they committed arbitrary and unlawful killings, particularly of known or suspected criminals, including terrorists.

Court trials in terrorism cases often proceeded slowly.  At the end of 2017, trials continued in the cases of four Kenyans accused of providing support for the 2013 Westgate Mall attack and of four Kenyans and one Tanzanian in connection with the 2015 Garissa University College attack.  The Tanzanian defendant was found competent to stand trial in January after previously being found unfit in late 2016.  The trial on explosives charges against British terrorism suspect Jermaine Grant, who was serving a nine-year sentence from a separate conviction in 2015, was pending a verdict at year's end.

The Kenyan government cooperated with the United States regarding threat information and security at the U.S. Embassy in Nairobi, including through a dedicated General Service Unit counterterrorism response team funded by U.S. assistance.  Kenya's national elections required

PX210

additional resources and personnel to conduct security operations, compelling the Kenyan government to limit certain counterterrorism-related training and redeployments.

**Countering the Financing of Terrorism:** Kenya is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force-style regional body. In July, the Kenyan government appointed the first permanent Director General of its financial intelligence unit, the Financial Reporting Center (FRC), since its establishment in 2012. The FRC remained hampered by a lack of essential resources and faced challenges meeting minimum staffing, physical security, and information technology requirements. The FRC also lacked an electronic reporting system for analyzing suspicious transactions. The use of unregulated informal financial mechanisms, including *hawalas*, continued. For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** Kenya's government worked in 2017 to implement its 2016 National Strategy to Counter Violent Extremism, primarily through county-level action plans. Kenya's NCTC worked with county governments, security actors, and civil society to launch action plans in Kwale, Mombasa, Lamu, and Kilifi Counties. The NCTC also led Kenya's Country Support Mechanism for the Global Community Engagement and Resilience Fund (GCERF), which began awarding grants for community initiatives to counter violent extremism. Kenya is also a GCERF beneficiary country. Police in Nairobi, coastal, and northeastern counties participated in community policing, dialogues on post-traumatic stress, and early warning and early response programs. Prison officials improved their handling of terrorist offenders. Other small-scale efforts to rehabilitate and reintegrate former terrorists, facilitators, and sympathizers continued, but these lacked a clear legal framework and supportive public messaging. Kenya's second-largest city, Mombasa, is an active member of the Strong Cities Network.

**International and Regional Cooperation:** Kenya continues to host the United Nations (UN) Office in Nairobi, serving as a hub for regional coordination against transnational threats. The KDF continued its participation in the African Union Mission in Somalia, which includes military forces from Burundi, Djibouti, Ethiopia, and Uganda. In December, Kenya cosponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## MALI

**Overview:** The Government of Mali remained a willing U.S. counterterrorism partner in 2017, despite serious challenges. Widespread terrorist activity continued in Mali's largely ungoverned northern regions and in the country's center and Tri-Border Region with Burkina Faso and Niger. Slow implementation of the June 2015 peace accord between the Malian government and two coalitions of armed groups hampered the return of public services and security to the north and parts of the center. Mali continued to rely heavily on the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA) and French forces to help stabilize and secure the northern regions. Terrorist groups increased their attacks on all accord signatories, including former rebel groups with whom they had briefly allied. Terrorist activities also increased in number and severity in the central and southern regions.

PX210

The French military's Operation Barkhane continued its integrated counterterrorism mission for the Sahel region.  Cooperating with Malian forces, Operation Barkhane sought to degrade terrorist elements in northern and central Mali, particularly Jama'at Nusrat al-Islam wal-Muslimin (JNIM), the umbrella group that formed after the Sahara Branch of al-Qa'ida in the Islamic Maghreb (AQIM), al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front merged to form the group.

MINUSMA maintained its northern presence in 2017, particularly in the Gao, Kidal, and Timbuktu regions.  It continued its work with the Malian government and various militia groups to facilitate the redeployment of government administrators and security forces to the north as part of implementing the 2016 Peace Accord.

**2017 Terrorist Incidents:**  AQIM and JNIM continued to conduct terrorist attacks, primarily targeting Malian and international military forces.  The terrorist groups launched attacks against civilians, security forces, peacekeepers, and others they reportedly perceived as not adhering to their interpretation of Islam.  Attacks by terrorist groups expanded beyond the traditional conflict zone in the north to Mali's center and south.  Malian Security Forces continued to suffer the largest number of casualties resulting from terrorist attacks.  An estimated 138 Malian soldiers were killed in numerous incidents.  Terrorist incidents included:

- On June 18, an attack at Le Campement Kangaba resort northeast of Bamako left nine dead including four guests, a Malian Counterterrorist Force member, and four terrorists. Three people were wounded.  JNIM claimed responsibility.
- On October 31, an attack between Dia and Diafarabé, against a convoy of Member of Parliament and President of the High Court of Justice Abdramane Niang, caused at least six deaths, including five Malian soldiers and one civilian.  JNIM claimed responsibility.
- On November 24, an attack against a MINUSMA convoy in Indelimane, Menaka region killed three Nigerien United Nations (UN) peacekeepers and wounded many others. JNIM claimed responsibility.

**Legislation, Law Enforcement, and Border Security:**  In June, the Malian Gendarmerie Crisis Response Team, trained by the Department of State's Antiterrorism Assistance (ATA) program, responded to the Campement Kangaba terrorist attack and aided Malian forces in killing four assailants.  At least 50 people were at the hotel at the time, and the fact that more patrons were not killed is evidence of the improvement of Malian first responders at the tactical level since the November 2015 Radisson Blu Hotel attack, which killed 20 people.  In 2017, ATA provided additional advanced training and mentoring to the Malian Gendarmerie Crisis Response Team.

The Malian Armed Forces under the Ministry of Defense (MOD) remained the primary entities responsible for securing Mali against terrorist threats.  The General Directorate of State Security under the Ministry of Security and Civil Protection (MOS) had the authority to investigate and detain persons for terrorism offenses.  Combined counterterrorism missions involving law enforcement and military units lacked delineation and coordination.

PX210

Although Mali has basic border security, law enforcement units lacked the capacity, training, and necessary equipment to secure Mali's porous borders, which extend approximately 4,500 miles and touch seven countries.  The United States worked with Malian security forces at Bamako's Senou International Airport to expand the U.S.-funded Personal Identification Secure Comparison and Evaluation System program (PISCES).  The gendarmerie, which reports to both the MOD and the MOS – and the national border police, which reports to the MOS – both provide paramilitary support to prevent and deter criminal activity at borders.  Customs officials under the Ministry of Economy and Finance monitor the flow of goods and enforce customs laws at borders and ports of entry.  Mali receives INTERPOL notices, but the INTERPOL database is unavailable at some of Mali's points of entry.  The UN International Organization for Migration is managing a project with the Malian Border Patrol to provide portable biometrics systems for scanning at primary border crossing areas to counter trafficking of persons, but this system lacks connection to a central database.  The information is not centralized or searchable and is largely inaccessible and unusable.  Exit and entry stamps used by border officials have inconsistent size and shape, which undermines efforts to authenticate travel documents.

Malian passports, including diplomatic and official versions, incorporate security measures including ultraviolet features and a full-color digital photo.  Unfortunately, imposters can obtain fraudulent documents, such as birth and marriage certificates, with relative ease.

In 2017, the government opened 69 terrorism-related cases and detained 30 people for terrorism-related crimes.  Resource constraints, a lack of training in investigative techniques, and inexperience with trying terrorism cases plagued a weak judicial system.  The Malian government has never investigated, prosecuted, and sentenced any terrorists from start to finish.  Mali has taken steps to improve its institutional capacity to fight terrorism, passing laws that create new terrorism-related offenses and allow for the use of special investigative techniques.  This includes setting up a Special Judicial Interagency Work Group against terrorism and its equivalent for law enforcement – the specialized judicial brigade – and working with international partners to build the capacity of these units, including the UN Office of Drugs and Crime.

Mali worked cooperatively with the United States to prevent acts of terrorism against U.S. citizens.  The Malian judicial system continued its cooperation with U.S. law enforcement agencies in the investigation into the November 2015 Radisson Blu Hotel attack, which killed one U.S. citizen.

**Countering the Financing of Terrorism:**  Mali is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body.  Mali's financial intelligence unit, the Cellule Nationale de Traitement des Informations Financières (CENTIF-Mali), is a member of the Egmont Group.  There were no significant changes since 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In June, the Government of Mali adopted a national strategy for the prevention of radicalization to violence and terrorism.  The Ministry of Religious

PX210

Affairs is responsible for developing and monitoring the national strategy and for working with the High Islamic Council and other religious associations to promote moderate Islam and maintain a secular state.  Considerations to counter violent extremism were integrated into Mali's "Program for Accelerated Development in the Northern Regions," as was a draft decentralization policy.

Mali is a Global Community Engagement and Resilience Fund beneficiary country.

The government launched the Integrated Central Region Security Plan in August, which aims first to secure and then re-establish government services across the Mopti region and the neighboring Segou region, which also experienced increasing insecurity.

**International and Regional Cooperation:**  Mali remained active in regional organizations and international bodies, including the Economic Community of West African States, the UN, the African Union, and the Trans-Sahara Counterterrorism Partnership.  Mali also participated in Global Counterterrorism Forum events.

The Malian military participated in multinational border security operations under the G-5 Sahel mandate.  Following a December U.S.-led Joint Combined Exchange Training event, Malian units deployed to the center sector of the G-5 Sahel Joint Force.

## MAURITANIA

**Overview:**  Mauritania was an excellent U.S. security and regional counterterrorism partner in 2017.  Since 2011, when U.S. engagement with Mauritanian security forces greatly increased and Mauritanian forces defeated al-Qa'ida elements in three separate battles, Mauritania has not suffered a terrorist attack, despite continuing terrorist violence in neighboring Mali.

The Government of Mauritania continued to oppose terrorism effectively, building on an approach that hinges on community outreach, improving the capacity of security forces, and securing the country's borders.  The government has continued its counterterrorism cooperation with the United States and seized opportunities to participate in U.S.-sponsored training on counterterrorism tactics and techniques.

Mauritania Armed Forces and Law Enforcement Services worked with the United States to track, monitor, and counter terrorist groups, which include al-Qa'ida in the Islamic Maghreb (AQIM), ISIS, and Jama'at Nusrat al-Islam wal-Muslimin (JNIM) – the group that formed after the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together in 2017.

Through the support of the United States and other partners such as France, Mauritania deployed 20,000 soldiers, divided between seven military regions around the country.  Despite these efforts, regions in the interior of Mauritania remained imperfectly monitored, owing to their geographic isolation from population centers and inhospitable desert conditions.  AQIM elements and like-minded terrorist groups were present in the region, particularly along the southeastern border with Mali, which remained the leading terrorist threat to Mauritania in 2017.

PX210

On November 6, Mauritanian press reported that AQIM released a new video in which it warned Mauritania of consequences for its cooperation with the so-called "crusaders' forces."

**Legislation, Law Enforcement, and Border Security:**  Border security remained inadequate due to a standing policy that accords responsibility for different sections of the country's land borders to different formations of the security forces.  Owing to their geographic isolation from population centers, hard-to-access areas of the Sahara Desert further complicated efforts to monitor and secure borders.

On November 12, Mauritania declared its border with Algeria a military "Red Zone," forbidden to civilians.  This decision was motivated by the increased and diverse trafficking of prohibited goods through this region.

In collaboration with Mauritanian authorities, the Senegalese security forces arrested two suspected Algerian terrorists from ISIS on October 6 at the Mauritanian border crossing of Rosso.  The two suspects were wanted by the Government of Algeria.

The Department of State's Antiterrorism Assistance program, in cooperation with host nation partner forces, provided training for 160 police officers and gendarmerie in topics including facilities protection, border security, interviewing terrorist suspects, crisis incident management, weapons of mass destruction, and border security and interdiction.

**Countering the Financing of Terrorism:**  Mauritania is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  In 2017, Mauritania applied for membership within the Egmont Group.  There were no other significant changes since 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Mauritanian government continued to support CVE programs and offer alternatives to at-risk individuals.  During 2017, the Ministry of Islamic Affairs and Traditional Education (MIATE) hosted a two-day regional workshop in Nouakchott to share the Mauritanian CVE experiences with representatives from the Maghreb countries and the G-5 Sahel countries.  The workshop was organized in cooperation with the American Friendship Project.

The MIATE collaborated with independent Islamic religious groups to counter radicalization to violence in a series of workshops in all 15 provinces.  The MIATE organized an international conference on "Violence and Extremism from Sharia's Perspective," held on March 19, 2017.

In coordination with two University of Nouakchott professors, a think tank, and some society leaders, the U.S. Embassy organized a two-day awareness training workshop for university students on violent extremism, how to recognize possible recruitment activities, and strategies to counter them.

PX210

The southern Mauritanian city of Kiffa is a member of the Strong Cities Network.

Mauritanian political and religious personalities periodically condemned ISIS's aims, methods, and activities in public statements.

**International and Regional Cooperation:**  Nouakchott serves as host to the headquarters of the G-5 Sahel, which includes Burkina Faso, Chad, Mali, Mauritania, and Niger.  Mauritania will be responsible for the western sector of the G-5 Sahel Joint Force located along the border between Mauritania and Mali.

Under the auspices of the G-5 Sahel, Mauritania, the European Union, and the German Agency of International Cooperation, the UN Office on Drugs and Crime organized a meeting of experts on mechanisms and standards for information exchange within the Security Cooperation Platform of the G-5 Sahel in Nouakchott on October 24-25, 2017.

## NIGER

**Overview:**  Terrorist groups active in Niger included the Movement for Unity and Jihad in West Africa (MUJAO), ISIS in the Greater Sahara (ISIS-GS), Boko Haram, ISIS-West Africa (ISIS-WA), and Jama'at Nusrat al-Islam wal-Muslimin (JNIM), the group that formed after the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together in 2017.

Terrorists freely crossed many of Niger's borders.  In the southeast, Boko Haram and ISIS-WA profited from porous borders with Chad and Nigeria to attack civilian and security targets in Niger's Diffa region.  Al-Qa'ida (AQ) and ISIS affiliates transited the Mali and Burkina Faso borders in the west to attack security targets in the Tillabery region and crossed the Libyan and, to a lesser extent, the Algerian borders in the Agadez region in the north.  Terrorists, weapons, and contraband transited freely through the vast northern part of Niger.

Niger remained a strong opponent of terrorism in the region, continued to cooperate with international partners, and received substantial international counterterrorism assistance.  From 2012 to the end of 2017, the Departments of Defense and State executed approximately US $240 million in security assistance, counterterrorism, and countering violent extremism (CVE) programming.  The U.S. Agency for International Development (USAID) is programming an additional US $30.9 million, including US $16 million for USAID/Office of Transition Initiatives for CVE programs.  Foreign assistance has helped the Nigerien military increase its capability to patrol, collect information, and interdict terrorists.

Niger is standing up the Central Sector Command Post in Niamey for the G-5 Sahel Joint Force.  Niger conducted joint patrols with Chad and Nigeria as part of its increased cooperation with Lake Chad Basin Commission member countries in the fight against Boko Haram and ISIS-WA.  Niger has increased its number of border control facilities and is working with the international community to construct and equip these facilities.

Niger joined the Global Coalition to Defeat ISIS in 2017.

PX210

**2017 Terrorist Incidents:**  Numerous terrorist attacks occurred in the Diffa and Tillabery regions, leading to dozens of deaths and injuries.  Terrorist organizations frequently stole military vehicles and equipment that they then used in later attacks.  Terrorist attacks in western Niger focused almost exclusively on security forces, while Boko Haram and ISIS-WA attacked both civilian and military targets in the southeast.  Attacks included:

- On June 28, two suspected Boko Haram suicide bombers attacked a refugee camp in Kabelewa, Diffa, killing three refugees and wounding 11 others.  This was the first suicide attack in Diffa in more than one year.
- On July 2, Boko Haram terrorists kidnapped 39 women and killed nine civilians in N'Galewa village in Diffa region.
- On October 4, suspected ISIS-GS terrorists attacked U.S. and Nigerien Special Operations Forces in Tongo Tongo, Tillabery, killing four U.S. soldiers and five Nigerien soldiers and wounding two U.S. soldiers and four Nigerien soldiers.

**Legislation, Law Enforcement, and Border Security:**  Niger's laws criminalize acts of terrorism consistent with international instruments.  Nigerien law enforcement and security services were actively engaged in detecting, deterring, and preventing acts of terrorism on Nigerien territory, but they suffered from insufficient manpower, funding, and equipment.  Counterterrorism investigations in Niger are primarily the responsibility of the Central Service for the Fight against Terrorism (SCLCT), an interagency body comprising representatives from Niger's National Police, National Guard, and Gendarmerie.  Information sharing occurred among the law enforcement agencies of SCLCT.

Niger's long borders and vast areas of harsh terrain made effective border security a challenge.  Through the U.S. Global Security Contingency Fund, a joint interagency program between the U.S. Departments of Defense, Justice, and State, Niger developed a Draft National Border Security Strategy and corresponding Implementation Plan.  Niger continued to use rudimentary terrorism watchlists that it shared with the security services and at border checkpoints.  The Government of Niger continued to screen travelers using the U.S.-provided Personal Identification Secure Comparison and Evaluation System (PISCES).  Niger is one of six African countries participating in the Security Governance Initiative to strengthen coordination among Niger's military and law enforcement services.

In 2017, the SCLCT arrested 250 terrorist suspects on charges that included planning acts of terrorism, association with a terrorist organization, recruitment, and terrorist financing.  Courts tried or dismissed approximately 550 terrorism cases.  Approximately 1,100 terrorism suspects remained in detention awaiting trial at year's end.  While the law prohibits torture and degrading treatment, there were indications that security officials were sometimes involved in abusing or harming detainees suspected of terrorist activity.

The United States provided counterterrorism assistance to Nigerien law enforcement – including through the Department of State's Antiterrorism Assistance (ATA) program and a Resident Legal Advisor from the Department of Justice.  ATA training included improvised explosive

PX210

device awareness and command and control in support of Niger's participation in the multilateral Flintlock exercise.

As part of a broader counterterrorism strategy, the United States is working with the Government of Niger to improve its capacity to employ forensic investigative tools.  From April to May, the U.S. Federal Bureau of Investigation and the Department of Defense collected the biometric information of more than 1,300 terrorism detainees and digitized more than 600 terrorism-linked paper fingerprint records.  Niger is the only country in the region where terrorist suspects are identified systematically in a biometric enrollment initiative.

**Countering the Financing of Terrorism:**  Niger is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body.  There were no significant changes since 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Niger, through the High Authority for the Consolidation of Peace and the Ministry of Interior, increased its focus on CVE programs, although international partners and non-governmental organizations drove most of Niger's programming.  In May, the University of Diffa hosted an international Symposium on De-radicalization and Reintegration.  The Ministry of Interior organized a high-level national conference, "Violent Extremism and Youth in Niger."

In late December 2016, the Minister of Interior announced an amnesty policy for Boko Haram and ISIS-WA fighters who wished to defect.  In 2017, 172 former fighters and affiliated non-combatants officially defected, with 167 housed in a government-run camp in the Diffa region.  The Government of Niger had not put forth a formal reintegration plan for former combatants by the end of 2017.

**International and Regional Cooperation:**  In early 2017, Niger, Burkina Faso, and Mali signed an accord creating the Liptako-Gourma authority to direct security operations in the Tri-Border Region where ISIS-GS and AQ are active.  In mid-2017, the Liptako-Gourma authority was folded into the G-5 Sahel Joint Force, a military effort fielded by Burkina Faso, Chad, Mali, Mauritania, and Niger, to address security threats in the region.  Niger was standing up the Central Sector Command, based in Niamey.

On a rotational basis, Niger deploys an infantry battalion to the UN Multidimensional Integrated Stabilization Mission in Mali.

Niger conducted joint patrols with Chad and Nigeria and increased its cooperation with Lake Chad Basin Commission member countries to fight Boko Haram and ISIS-WA.  Nigerien officials hosted and attended multiple international meetings on countering the two groups.  Niger is a member of and contributes troops to the Multinational Joint Task Force along with Benin, Cameroon, Chad, and Nigeria.

PX210

Niger is a member of the Trans-Sahara Counterterrorism Partnership.  Nigerien officials continued to participate actively in regional programs organized by the Global Counterterrorism Forum's Sahel Region Capacity-Building and Criminal Justice/Rule of Law working groups.  Niger participates in a judicial cooperation organization, the Sahel Judicial Platform, with other countries in the region.

## NIGERIA

**Overview:**  Boko Haram and its offshoot, ISIS-West Africa (ISIS-WA), carried out killings, bombings, and attacks on civilian and military targets in northern Nigeria, resulting in thousands of deaths, injuries, and significant destruction of property.

Nigeria continued to work with other terrorism-affected neighbors in the Multinational Joint Task Force, including Benin, Cameroon, Chad, and Niger to counter-Boko Haram and ISIS-WA, regain control over territory previously held by these groups, and launch efforts to rebuild civilian structures and institutions in cleared areas.

Terrorist activity accounted for the internal displacement of nearly two million persons in the states of Adamawa, Borno, and Yobe, and the external displacement of more than 200,000 Nigerian refugees to neighboring countries, principally Cameroon, Chad, and Niger.  The Nigerian government negotiated with Boko Haram for the May 6 release of 82 of the 276 female students abducted by Boko Haram in Chibok in 2014.  According to the *Bring Back Our Girls* campaign, 113 students remained missing at the end of 2017.

Nigeria is a member of the Global Coalition to Defeat ISIS.

An interdisciplinary assistance team composed of personnel from the Department of State, the Department of Defense, the Federal Bureau of Investigation, and the U.S. Agency for International Development continued to coordinate efforts with the Nigerian military at the Defense Intelligence Agency, with daily military-to-military engagement at the Joint Combined Fusion Cell and the Joint Coordination Planning Committee.

In its response to Boko Haram and ISIS-WA attacks, and at times in response to crime and insecurity in general, Nigerian security service personnel perpetrated extrajudicial killings and engaged in torture, sexual exploitation and abuse, arbitrary detention, mistreatment of detainees, use of children by some security elements, looting, and destruction of property.  We refer you to the State Department's *Country Reports on Human Rights Practices* and *Report on International Religious Freedom* for further information

**2017 Terrorist Incidents:**  Boko Haram and ISIS-WA carried out hundreds of attacks in Nigeria using suicide bombers, improvised explosive devices (IEDs), vehicle-borne IEDs, raids, ambushes, and kidnappings.  The following list details only a fraction of the incidents that occurred:

- On June 7, suspected Boko Haram militants launched an attack on Maiduguri, Borno State, and engaged Nigerian forces in a gunfight.  In coordination, three suicide bombers

detonated explosives on civilian targets in the Muna Garage neighborhood of Maiduguri. The attack killed at least 17 civilians and injured 34 others.
- On July 25, an ISIS-WA attack on the Nigerian National Petroleum Company (NNPC) surveying project resulted in the deaths of at least 69 people. Victims included 19 soldiers, 33 civilian militia, and 17 NNPC and University of Maiduguri staff. Three university faculty were also abducted.
- On November 21, a Boko Haram suicide bomber detonated explosives at a mosque in the town of Mubi, in Adamawa State, killing at least 50 people.

**Legislation, Law Enforcement, and Border Security:** Nigeria's 2011 counterterrorism law was amended in 2013 and was strengthened by the 2014 National Security Strategy and the 2016 National Counter Terrorism Strategy.

The Nigerian Office of the National Security Advisor is responsible on paper for coordinating all security and enforcement agencies. The Nigerian military has primary responsibility for combating terrorism in the Northeast. Several government agencies also perform counterterrorism functions, including the Nigerian Police Force (NPF), Nigeria Security and Civil Defense Corps (NSCDC), and the Ministry of Justice. The NPF has a Counterterrorism Unit and a Terrorist Investigation Branch. Both units are responsible for investigating acts of terrorism and conducting proactive measures to prevent terrorist attacks. Interagency cooperation and information sharing was limited. Due to their knowledge of the local context, community-based security groups, often collectively referred to as the Civilian Joint Task Force, provided critical and necessary responses to the terrorism threat in the Northeast.

In October, the Government of Nigeria began closed-door hearings in front of civilian judges for more than 1,600 suspected supporters of Boko Haram and ISIS-WA. According to a government statement, 600 suspects were arraigned in the initial proceedings. Of these, 45 pled guilty to various charges and were sentenced to between three and 31 years in prison, 468 persons were ordered to undergo a de-radicalization and rehabilitation program before being released, 34 cases were dismissed, and 28 cases were remanded for trial in civilian courts elsewhere in the country. Some human rights groups alleged terrorist suspects detained by the military were denied their rights to legal representation, due process, and to be heard by a judicial authority.

On December 8, the government said it adopted a new strategy for the screening of suspected Boko Haram members and other terrorists. This involved developing a national terrorism database and providing training in investigative interviewing techniques and evidence collection.

Border security responsibilities are shared between NPF, NSCDC, Customs, Immigration, and the military. Coordination among agencies was limited.

The Nigerian government continued to participate in U.S. capacity-building programs, worked with the FBI to investigate specific terrorism matters, and provided IED components to the FBI for analysis at the Terrorist Device Analysis Center. The Economic and Financial Crimes Commission and NPF also received crime scene training relevant to counterterrorism investigations.

PX210

In 2017, the Department of State's Antiterrorism Assistance (ATA) program continued to mentor Nigeria's explosive ordnance disposal personnel.  ATA also delivered a Crisis Intervention Seminar, Senior Leadership Seminar, and an IED awareness seminar in support of Nigeria's participation in the Flintlock multilateral exercise.

The Nigerian government actively cooperated with the United States and other international partners to assist with counterterrorism investigations.  On April 12, Nigeria's state security agency said it had thwarted plans by terrorists they believed affiliated with Boko Haram to attack the British and U.S. embassies.

**Countering the Financing of Terrorism:**  Nigeria is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body.  On July 5, the Egmont Group suspended Nigeria for its failure to restructure its financial intelligence unit to make it operationally autonomous and isolated from possible political control, a requirement the Egmont Group places on all of its members.  To rectify this deficiency, the Nigerian Senate, in November, passed the Nigerian Financial Intelligence Agency Bill.  At the end of 2017, this legislation was awaiting passage by the Nigerian House.  Additionally, the Money Laundering Prevention and Prohibition Bill of 2017, amending and strengthening the 2011 Money Laundering Act, was under active review in the Nigerian Senate and House.  Other active, but not yet passed, legislation with a nexus to terrorist financing includes the Mutual Legal Assistance in Criminal Matters Bill and the Proceeds of Crime Bill.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In August, Nigeria, with direct support from the British Department for International Development, adopted a Policy Framework and National Action Plan for Preventing and Countering Violent Extremism.  The framework was in accordance with relevant UN policy and developed in coordination with various ministries and civil society organizations.  In December, under this framework, the government launched an Action Plan for Demobilization, Disassociation, Reintegration, and Reconciliation in Nigeria. Nigeria is a Global Community Engagement and Resilience Fund beneficiary country.  Kaduna state and Kano state are members of the Strong Cities Network.

**International and Regional Cooperation:**  Nigeria continued its high-level participation in regional security and counterterrorism conferences.  This included President Buhari's participation in the Aqaba Conference on countering terrorism and radicalization in West Africa (sponsored by Jordan in December) and the AU-EU Summit held in Cote d'Ivoire in November.  Nigeria is a member of the Trans-Sahara Counterterrorism Partnership, a founding member of the Global Counterterrorism Forum, and part of the Security Governance Initiative between the United States and six African partners.

**SENEGAL**

PX210

**Overview:**  Senegal experienced no terrorist attacks in 2017, however, security forces arrested three individuals suspected of having ties to ISIS.  In light of its deep concerns about terrorist activity in the region, the Government of Senegal worked closely with U.S. military and law enforcement officials to strengthen its counterterrorism capabilities.

The risk of terrorist activity in Senegal arises from external and internal factors.  Externally, transnational threats arose due to the Senegalese military presence in several theaters of operation in the region and the activities of terrorist groups in neighboring countries.  Internally, the promotion of fundamentalist ideologies by a small number of religious leaders constituted the chief concern, however, these ideologies are outside the Islamic norms that predominate in Senegal.

**Legislation, Law Enforcement, and Border Security:**  The Government of Senegal enacted no important changes to its counterterrorism laws in 2017.  However, Senegal did make fully operational its specialized Inter-Ministerial Framework for Intervention and Coordination of Counterterrorism Operations (CICO) during the year.  The CICO, which is intended to fully coordinate the government's response to terrorism, was initially formed in 2016.

Senegal's gendarmerie and national police have specialized units to detect, deter, and prevent acts of terrorism.  Effective interagency cooperation and information sharing challenged the various governmental bodies that have counterterrorism functions in Senegal, but the advent of the CICO is leading to steady improvement in these areas.  Senegal works to develop specific plans and capabilities to prevent and respond to terrorist attacks against soft targets and held a major exercise in 2017 in Dakar to test the ability of security forces to respond effectively.

Senegalese officials identified a continued lack of border resources and regional cooperation as security vulnerabilities.  These vulnerabilities were exacerbated by the absence of systems to ensure travel document security, the effective use of terrorist screening watch lists, and the collection of biographic and biometric screening capabilities beyond those deployed at major ports of entry.  The southern and eastern portions of the country have far fewer resources to detect and deter terrorists who might travel through those areas.

Senegal is working to improve its law enforcement capacity by participating in multilateral efforts, such as the Border Security Initiative of the Global Counterterrorism Forum (GCTF), programs of the African Union (AU), and the Economic Community of West African States (ECOWAS).  Additionally, Senegal has been working with the International Organization for Migration (IOM) to promote cooperation and coordination between border agencies, including creating three new joint points of entry, funded by the European Union (EU) and the Government of Japan, on the border with Mauritania.  With U.S. funding, the IOM implemented a complementary program to enhance institutional capacities in securing and managing national borders.  This included developing and emphasizing stronger community engagement and more coherent approaches to border management; interagency cooperation and coordination; cross-border interoperability; and trust between border communities and security officials that contributes to establishing open, but well-controlled and secure borders that guarantee the full respect of human rights of persons on the move.  Senegal also participated in the Department of

PX210

State's Antiterrorism Assistance (ATA) program, which provided courses and consultations directly focused on soft target identification and protection.

Significant law enforcement actions in 2017 included the February arrest of two Malian nationals suspected of involvement in terrorism and the September arrest of two Algerian nationals on similar charges.  The trial of Imam Alioune Badara Ndao and 31 other individuals charged in 2015 with criminal conspiracy in connection with terrorist groups, money laundering for terrorist activities, and terrorist financing, continued through the end of 2017.  Imam Ndao has been associated with the Diokhane terrorist network and its links to Boko Haram and ISIS.

In November, when reporting indicated a possible terrorist plot to attack certain soft targets, the Senegalese government responded professionally and appropriately by increasing its security posture in Dakar.

**Countering the Financing of Terrorism:**  Senegal is a member of the Inter-Governmental Action Group against Money Laundering in West Africa, a Financial Action Task Force-style regional body.  Its financial intelligence unit, the National Financial Intelligence Processing Unit, is a member of the Egmont Group.  While Senegal criminalizes the offense of terrorist financing, it does not criminalize the provision of funds to terrorist organizations or to individual terrorists in the absence of a link to a specific terrorist act.  Senegal also lacks specific measures to criminalize the provision of support to foreign terrorist fighters.  Additionally, while Senegal has a framework in place to carry out its obligations under the UN Security Council (UNSC) ISIL (Da'esh) and al-Qa'ida sanctions regime, the procedures for accessing and freezing assets of listed individuals is not clarified in existing regulations.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  There have been no significant changes since 2016.  The Senegalese government did not have a national CVE strategy or plan of action, although Senegalese civil society groups were active in this field.  The government was reportedly working on a strategy document built around the pillars of prevention, protection, intervention, and resilience, but it had not been completed at the end of 2017 and the draft had not been made public.

**International and Regional Cooperation:**  Senegal is a member of the United Nations, the AU, ECOWAS, the Organization of Islamic Cooperation, and the Trans-Sahara Counterterrorism Partnership.  In December, Senegal ended a two-year term as an elected member of the UNSC. Senegal co-sponsored UNSC resolution 2396 on returning and relocating foreign terrorist fighters.

Although not a member of the GCTF, Senegal participated in the GCTF's Sahel Region Capacity Building working group.  The French and the EU provided financial support and training to reinforce Senegal's counterterrorism and border security capabilities.  In November, the Government of Senegal hosted the Fourth Dakar International Forum on Peace and Security in Africa, which included a strong focus on terrorism.

PX210

## SOMALIA

**Overview:**  Through the African Union Mission in Somalia (AMISOM), Somali National Army (SNA), and U.S. and partner military actions, al-Shabaab experienced significant military pressure during 2017, but the group still maintained control over large portions of the country. Al-Shabaab retained the ability to carry out high-profile attacks using vehicle-borne improvised explosive devices (VBIEDs), suicide bombings, mortars, and small arms.  Al-Shabaab was believed responsible for an October bombing in Mogadishu that killed more than 500 people and wounded several hundred more.  An ISIS-linked group in Puntland was unable to expand its territory beyond a handful of camps in the mountains.

Despite several law enforcement actions in Mogadishu and other major cities to disrupt plots, many leading to prosecutions and convictions, Somalia remained a terrorist safe haven. Terrorists used their relative freedom of movement to obtain resources, recruit fighters, and plan and mount operations within Somalia and in neighboring countries, mainly in Kenya.  Following the February presidential election, the Federal Government of Somalia (FGS) in May launched a Comprehensive Approach to Security (CAS) in partnership with the international community. The CAS includes military, law enforcement, and countering violent extremism-specific "strands" to address Somalia's security challenges at the federal, state (Federal Member State or FMS), and local levels.

The FGS increased efforts to encourage defections from terrorist groups as part of its broader counterterrorism strategy and made progress in promoting high-level reconciliation with disengaged terrorists, namely former al-Shabaab leader Mukhtar Robow.

Somalia is a member of the Global Coalition to Defeat ISIS.

**2017 Terrorist Incidents:**  Al-Shabaab used a range of asymmetric tactics in its targeted campaign against AMISOM and Somali security forces, members of parliament, and other government personnel, as well as soft targets with less security measures, such as hotels, restaurants, and cafes.  The group launched multiple, often coordinated attacks, on a weekly or monthly basis throughout the country, using suicide bombers, VBIEDs, ambush-style raids, targeted killings, and mortar attacks.  Al-Shabaab also continued to use its tactic of amassing fighters to overrun AMISOM or SNA bases, allowing the group to capture weapons, ammunition, uniforms, and other equipment to replenish its supplies.  The ISIS affiliate in Puntland also carried out a number of suicide bombings, targeted killings, and small arms attacks in Bosasso and smaller towns, including one in May that killed at least five security officers.

Other notable incidents included:

- On January 2, al-Shabaab employed two VBIEDs to attack a perimeter checkpoint at Mogadishu International Airport, which additionally houses the United Nations and AMISOM headquarters as well as numerous diplomatic missions.  Police reported and U.S. mission personnel confirmed at least seven security personnel and civilians dead, with approximately 17 injured.

PX210

- On June 7, al-Shabaab fighters using VBIEDs, small arms, and mortars attacked and overran an SNA base in Puntland.  Security forces reported approximately 70 soldiers and civilians killed.
- On October 14, a VBIED exploded at a major traffic crossing in Mogadishu, killing more than 500 people and injuring approximately 300 more, according to an FGS investigative committee.  Al-Shabaab did not claim responsibility but is believed responsible.
- On October 28-29, al-Shabaab fighters attacked a Mogadishu hotel with a VBIED and small arms, followed by a lengthy standoff with police.  At least 29 police and civilians were killed, according to police.
- On December 14, an al-Shabaab suicide bomber attacked the Somali Police Force Academy.  Police reported at least 18 officers were killed and 15 injured.

**Legislation, Law Enforcement, and Border Security:**  There are no significant updates to the 2016 report, with the exception of border management.  Somalia's porous borders contributed to regional insecurity as al-Shabaab and others continued to move throughout the region mostly undetected.  Most countries do not recognize Somali identity documents, leaving Somalia with few options for travel document verification and regional partners unable to properly vet Somali travelers.  Somalia has a national immigration screening watchlist and uses Migration Information and Data Analysis System (MIDAS) screening equipment and software provided by the International Organization for Migration at 15 ports of entry.  MIDAS provides biographic and biometric screening capabilities but procedural and network connectivity deficiencies limited its effectiveness.  There was little law enforcement cooperation between the FGS and FMS governments, which hampered U.S. law enforcement's ability to investigate suspected terrorists, kidnappings, and other terrorism incidents.

**Countering the Financing of Terrorism:**  Somalia is an observer to the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  There have been no significant changes since the 2016 report.  The Government of Somalia continued to work towards strengthening anti-money laundering and countering the finance of terrorism bodies, including the Financial Reporting Center, the country's financial intelligence unit.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes.*

**Countering Violent Extremism (CVE):**  Within the CAS process, the Somali government re-launched Somalia's 2016 National Strategy to Counter Violent Extremism in September, and federal ministries and FMS counterparts agreed on a revised National Strategy to Prevent and Counter Violent Extremism in November.  With support from the European Union, three FMS governments developed regional action CVE plans, and three others were underway at year's end.  The FGS supported CVE research, including a study published in December based on interviews with 70 former al-Shabaab members.  The FGS also funded counter-messaging efforts and supported religious and secular curriculum development.

Following the February presidential election, the FGS announced its intent to offer amnesty to any al-Shabaab members willing to denounce terrorism and support the FGS.  At the London Conference in May, the FGS stated its intent to develop new amnesty legislation as part of the

PX210

CAS, and subsequently continued messaging encouraging al-Shabaab members to defect. A donor-supported effort to reintegrate former al-Shabaab combatants continued to expand, primarily through reintegration centers that have been operating in Mogadishu, Kismayo, Baidoa, and Beletweyne for more than three years. Although exact estimates were difficult to verify given limited government oversight of these programs, officials have attributed higher defection rates to ongoing counterterrorism pressure from U.S. airstrikes as well as funding shortfalls that often strain al-Shabaab payments to low-level fighters. In August, former senior al-Shabaab commander and co-founder Muktar Robow publicly denounced al-Shabaab and pledged his support to FGS reconciliation efforts. The FGS welcomed Robow's announcement and reiterated its call for al-Shabaab members to leave the group.

**International and Regional Cooperation:** There are no significant updates to the 2016 report. The Somali National Army partners with AMISOM, which includes military forces from Burundi, Djibouti, Ethiopia, Kenya, and Uganda.

## SOUTH AFRICA

**Overview:** Following the September 2013 Westgate Mall attack in Kenya, the South African Police Service (SAPS) began improving its counterterrorism cooperation with the United States to increase its preparedness for similar terrorist attacks in South Africa. The Crimes Against the State (CATS) unit within the SAPS Directorate for Priority Crime Investigation (DPCI) and the SAPS Crime Intelligence Division (SAPS CI), along with other South African agencies, productively collaborated with U.S. law enforcement and exchanged best practices to enhance risk management efforts and better identify challenges at its borders. Since publicly acknowledging the presence of ISIS facilitation networks and cells in 2016, the South African government has not publicly provided estimates of the number of South African nationals who have immigrated or returned from ISIS-controlled territories. South Africa is a major international transit hub that has proven an appealing location for terrorists and other criminal networks to facilitate illicit travel abroad.

**Legislation, Law Enforcement, and Border Security:** South Africa's law enforcement and judiciary used existing legislation to respond to an increased level of terrorism activity. The Protection of Constitutional Democracy Against Terrorist and Related Activities Act (POCDATARA) criminalizes acts of terrorism, as well as the financing of terrorism, and sets out specific obligations related to international cooperation. The Regulation of Foreign Military Assistance Act of 1998 applies to nationals who attempt to or who have joined ISIS. The CATS, DPCI, and South Africa's State Security Agency (SSA) are tasked with detecting, deterring, and preventing acts of terrorism within South Africa. The SAPS Special Task Force is specifically trained and proficient in counterterrorism, counterinsurgency, and hostage rescue. The National Prosecuting Authority (NPA) is committed to prosecuting cases of terrorism and international crime. The South African Revenue Service (SARS) protects South African borders from illegal smuggling of goods.

Border security is challenging in South Africa due to its numerous land, sea, and air ports of entry for international travelers. South Africa has multiple law enforcement agencies policing its borders, but they are often stovepiped and inadequate communication limits their border control

PX210

ability.  Counterterrorism measures at the international airports include screening with advanced technology x-ray machines, but land borders do not have advanced technology and infrastructure.  Trafficking networks made use of these land borders for many forms of illicit smuggling.  Citizens of neighboring countries are not required to obtain visas for brief visits.  Regulation of visa, passport, and identity documents remained a challenge within South Africa.  The SAPS internal affairs office investigated allegations of corruption within the Department of Home Affairs concerning the sale of passports and identity documents, but the use of illegitimately obtained identity documents continued.

In January, twin brothers Brandon Lee Thulsie and Tony Lee Thulsie, both arrested in 2016 for planning to attack the U.S. embassy and Jewish institutions in South Africa, appeared in court to face charges on three counts of contravening the POCDATARA.  As of December, the cases against the Thulsie twins and siblings Ebrahim and Fatima Patel, both charged for having links to ISIS, were ongoing.  The Thulsie case is an important test of the POCDATARA and interagency cooperation.

**Countering the Financing of Terrorism:**  South Africa is a member of the Financial Action Task Force (FATF) and the Eastern and Southern Africa Anti-Money Laundering Group, a FATF-style regional body.  South Africa's financial intelligence unit, the Financial Intelligence Centre (FIC), is a member of the Egmont Group.  Since FATF published its mutual evaluation report on South Africa in 2008, the country's legal and institutional frameworks for terrorist financing issues have improved, including bank supervision capacity and criminalization of money laundering and terrorist financing activities.  In June 2017, President Zuma signed the FIC Act Amendment Bill.  The Minister of Finance subsequently amended the Money Laundering and Terrorist Financing Control Regulations and withdrew exemptions made under the Financial Intelligence Centre Act, 2001 (FICA), effective  October 2, 2017.  The amendments addressed "threats to the stability of South Africa's financial system posed by money laundering and terrorist financing."  Among the amendments, the bill assigns responsibility to the FIC to freeze the assets of persons on UN sanctions lists.  The implementation of FICA regulations led FATF to determine South Africa had made enough progress on customer due diligence standards and will no longer be identified by FATF as requiring follow-up.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes.*

**Countering Violent Extremism (CVE):**  There have been no significant changes since 2016.

**International and Regional Cooperation:**  South Africa is a member of the African Union, the Global Counterterrorism Forum, and the Southern African Development Corporation.

## TANZANIA

**Overview:**  The Government of Tanzania cooperates with the United States and regional partners on select security and counterterrorism initiatives.  In 2017, Tanzania experienced a series of suspected terrorist attacks in the coastal region of Pwani, primarily on police and low-level ruling party officials.  Tanzanian security services led the counterterrorism response,

PX210

mainly through an increased presence in affected areas and a broad exercise of police power. The police's heavy-handed approach in Pwani may have helped deter further attacks in the region in 2017, however, the Tanzanian government failed to adopt a whole-of-government approach to address the underlying dynamics of such attacks.  We refer you to the State Department's *Country Reports on Human Rights Practices* and *Report on International Religious Freedom* for further information.

**2017 Terrorist Incidents:**  Between April and July, masked gunmen killed more than 30 police and local political officials in the Pwani region in a series of small-scale attacks, largely at night.  The perpetrators, who did not claim allegiance to a terrorist group, used weapons and ammunition captured from the police in subsequent attacks and left intimidating notes at the scene warning against cooperation with the authorities.  The attacks continued on an almost weekly basis into July despite intense government countermeasures.  No subsequent attacks were reported, but the Special Police Zone staffed by the Field Force Unit and other security officers, remained in place at the end of 2017.  In August, the Inspector General of Police declared the situation in the outskirts of Dar es Salaam resolved following the killing of more than a dozen suspected perpetrators, including the alleged leader of the attacks.  Police arrested and detained hundreds of suspects alleged to have been involved in the attacks under the auspices of the Prevention of Terrorism Act.  At year's end, most had not been formally charged and many were held in remand.

Official government statements and the media frequently refer to suspects involved in violent crimes as "bandits," making it unclear whether additional incidents are the result of terrorism.

**Legislation, Law Enforcement, and Border Security:**  Tanzania's counterterrorism legal framework is governed by the Prevention of Terrorism Act of 2002.  There were no significant changes to the legislation in 2017.  In November, the Department of Justice's State Department-funded Resident Legal Advisor facilitated a week-long workshop with 29 participants from 15 key governmental agencies to assess Tanzania's counterterrorism laws, guide stakeholders in drafting recommendations for legislative and procedural amendments, and modernize laws regarding the prosecution of foreign terrorist fighter cases.  The workshop is part of a larger initiative to strengthen the country's counterterrorism legislative framework.

Tanzania's National Counterterrorism Center (NCTC) is an interagency unit composed of officers from the intelligence, police, defense, immigration, and prison sectors who coordinate regularly on counterterrorism issues.  The organization struggles to operate effectively due to a weak mandate, a limited budget, and uneven interagency cooperation.  The NCTC has participated in capacity-building efforts including training.  In 2017, seven senior law enforcement officials, including representatives from the NCTC, attended the International Law Enforcement Academy Executive Policy and Development Symposium on Countering Violent Extremism and Crisis Leadership to develop deeper knowledge of leadership principles and violent extremism.  The U.S. National Counterterrorism Center also led crisis management training in October for security and emergency personnel.

The Department of State's Antiterrorism Assistance program delivered a Senior Crisis Management Seminar to bolster senior law enforcement's ability to function during a crisis.

PX210

Securing Tanzanian borders is a chronic challenge for the government. The use of temporary or emergency identity and travel documents was widespread and complicates immigration security efforts. Additionally, border management systems were fragmented, with some crossings using the U.S.-provided Personal Identification Secure Comparison and Evaluation System (PISCES), some using International Organization for Migration (IOM) or other unknown systems, or in some cases border officials do not use an electronic records systems at all.

**Countering the Financing of Terrorism:** Tanzania is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force-style regional body. The Tanzania Financial Intelligence Unit is a member of the Egmont Group. Tanzania continued to make progress on strengthening anti-money laundering and countering the financing of terrorism including through regulatory oversight of foreign exchange bureaus and money remitters. In January and March, the United States co-sponsored workshops for Tanzanian stakeholders to improve Tanzania's mutual legal assistance procedures and increase international cooperation in the investigation of transnational crimes, including terrorist financing and money laundering. For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** Tanzania's NCTC continued to lead CVE efforts and is the UN Development Program's partner in a multi-year project to prevent violent extremism that began in the spring of 2017. Efforts were underway to draft a national preventing violent extremism strategy and action plan.

In general, the Government of Tanzania views terrorism as primarily an external threat to Tanzanian security and continued to focus on law enforcement and intelligence services with little engagement or coordination with civil society.

**International and Regional Cooperation:** Tanzania is a member of the African Union, the Southern African Development Community (SADC), and the East African Community, all of which implemented counterterrorism initiatives. Tanzania hosted a counterterrorism-focused SADC Special Forces Exercise in Tanga in August. Special Forces units from all SADC countries participated, and the exercise included a hostage rescue scenario.

## UGANDA

**Overview:** The Government of Uganda continued to make important contributions toward countering terrorism in East Africa and the Horn of Africa in 2017 and demonstrated strong and sustained political will to apprehend suspected terrorists and disrupt terrorist activity in its territory. The Government of Uganda at times labeled conventional criminal acts as terrorism and leveled terrorism charges against journalists, public officials, and others the government deemed were acting against its interests, potentially diverting attention and resources from core counterterrorism goals. As the largest troop contributing country to the African Union Mission in Somalia (AMISOM), Uganda remained a key partner in regional efforts to neutralize al-Shabaab.

PX210

**Legislation, Law Enforcement, and Border Security:**  In May 2017, the Ugandan government enacted an Anti-Terrorism Amendment Bill that expands the definitions of "terrorism" and "act of terrorism" to better align with international standards and broadens prohibitions on terrorist financing.

The Uganda Police Force (UPF) Directorate of Counterterrorism is the lead law enforcement entity charged with investigating, disrupting, and responding to terrorist incidents.  Resource and training gaps, as well as corruption, affected the UPF's overall capacity to detect, deter, and respond to terrorist incidents.  Interagency coordination among Ugandan security and intelligence organizations also remained a significant challenge.

The United States continued to provide some capacity-building assistance to the UPF through the Department of State's Antiterrorism Assistance program.  Border security remained a persistent concern for the Ugandan government, with especially porous borders between Uganda and both South Sudan and the Democratic Republic of the Congo.  Uganda used the U.S.-provided Personal Identification Secure Comparison and Evaluation System (PISCES) to conduct traveler screening at the country's major ports of entry.

**Countering the Financing of Terrorism:**  Uganda is a member of the Eastern and Southern Africa Anti-Money Laundering Group, a Financial Action Task Force (FATF)-style regional body.  In November, the FATF Plenary Meeting approved a recommendation from the International Cooperation Review Group to remove Uganda from the FATF Compliance Document, noting that the Ugandan government had made significant progress in addressing the strategic deficiencies previously identified.  Notably, Uganda signed and ratified all relevant UN conventions relating to money laundering and terrorism finance, passed the Anti-Money Laundering (Amendment) Act to address deficiencies in the principal Act, amended the Anti-Terrorism Act, conducted a money laundering and terrorism finance national risk assessment, and established an anti-money laundering/countering terrorist finance National Task Force.

A significant portion of financial transactions in Uganda are in the form of "mobile money" or payments and electronic funds transfers initiated through mobile phones, which are vulnerable to exploitation by criminals and terrorists.  While Uganda's Anti-Money Laundering (Amendment) Act requires financial institutions to conduct comprehensive customer due diligence, it does not put the same requirements on mobile money transfers.  Banking institutions do not monitor mobile money payments and transfers in Uganda; mobile money transactions are instead under the purview of the individual telecommunications company that facilitates the specific transaction.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Uganda does not have a CVE National Action Plan, as recommended by the UN Secretary-General's Preventing Violent

46

**PX210**

Extremism Plan of Action, but has committed to putting one in place in 2018.  The Ministry of Internal Affairs, at the direction of the prime minister, appointed a lead to oversee this process.

**International and Regional Cooperation:**  Uganda is a member of the Intergovernmental Authority on Development, the East African Community, the Partnership for Regional East Africa Counterterrorism, and the International Conference on the Great Lakes Region.  Uganda is the largest troop contributing country to AMISOM, which also includes military forces from Burundi, Djibouti, Ethiopia, and Kenya.

## EAST ASIA AND PACIFIC

**Overview**

Governments in East Asia and the Pacific continued to work to strengthen legal frameworks, investigate and prosecute terrorism cases, increase regional cooperation and information sharing, and address critical border and aviation security gaps throughout the year.  Regional cooperation between domestic law enforcement and judicial authorities within countries throughout Southeast Asia resulted in high numbers of terrorism-related arrests and, in many cases, successful prosecutions.  Despite these efforts, Southeast Asia remained a target for terrorist recruitment.

The threat posed by transnational terrorism was particularly prominent when ISIS-affiliated domestic groups in the southern Philippines occupied parts of Marawi City for five months before finally succumbing to Philippine counterterrorism forces.  Several countries – including Australia, Japan, and the United States – provided counterterrorism and reconstruction assistance to the Philippines as its government began to develop a plan to rebuild the city.  Southeast Asian governments remained concerned about foreign terrorist fighters returning from Iraq or Syria and using their operational skills, connections, and experience to launch domestic attacks.

East Asian countries actively participated in regional and international efforts to counter terrorism.  Australia, Japan, the Republic of Korea, Malaysia, New Zealand, Singapore, and Taiwan are partners in the Global Coalition to Defeat ISIS.  In September, Australia and Indonesia became the co-chairs of the Global Counterterrorism Forum's Countering Violent Extremism working group.

The Japanese government continued to participate in international counterterrorism efforts in global, regional, multilateral, and bilateral fora.  It followed up on the G-7 counterterrorism action plan adopted during its 2016 presidency and completing its second and final year as an elected member of the United Nations Security Council.  Japan, with several other countries across the globe – including Australia and New Zealand – is a donor to the Global Community Engagement and Resilience Fund.

In May in Jeju, the Republic of Korea – with the UN Counter-Terrorism Executive Directorate and the ICT4Peace Foundation – sponsored a regional workshop that focused on use of the

PX210

internet for terrorist purposes, the "Asia Information and Communication Technology and Counter-Terrorism Dialogue."

China's counterterrorism efforts remained focused primarily on "extremists" that Beijing ascribes to the so-called East Turkistan Islamic Movement (ETIM). China continued to state that ETIM has influence in the Xinjiang Uighur Autonomous Region (XUAR) and was responsible for at least one domestic attack. China continued to express concerns that Chinese citizens have traveled to Syria and Iraq to fight with ISIS. A message posted by ISIS in March calling for action against unspecified Chinese targets lent credence to China's concern.

## AUSTRALIA

**Overview:** Australia strengthened counterterrorism laws, investigated and disrupted suspected terrorist plots, and maintained high levels of cooperation with U.S. and international partners. Australia played a major role in the Global Coalition to Defeat ISIS in 2017 and was a leading contributor to coalition military support, humanitarian assistance, and efforts to disrupt foreign terrorist fighters. At the end of 2017, Australia's National Terrorist Threat Advisory System remained at "Probable."

On December 20, Australia established the Home Affairs Department, its most significant domestic security and law enforcement reform in decades. Home Affairs combined the existing Department of Immigration and Border Protection with relevant elements of existing departments of Prime Minister and Cabinet, Attorney-General, Social Services, and Infrastructure and Regional Development. It also drew in the Australian Border Force, Australian Criminal Intelligence Commission, Australian Federal Police, and Australia's financial intelligence agency, the Australian Transaction Reports and Analysis Centre (AUSTRAC). Agencies falling under the Home Affairs portfolio will maintain their operational independence while the Department provides strategic leadership and consistent policy coordination.

Australia is focused on counterterrorism threats in Southeast Asia. In October, Australia announced enhanced counterterrorism assistance to the Philippines, featuring closer intelligence-sharing, increased bilateral maritime reconnaissance, and facilitation of post-conflict rehabilitation efforts across military and civil spheres.

Foreign terrorist fighters returning to Australia and the role of social media in inspiring domestic radicalization to violence were also chief concerns. Australian security agencies believe approximately 110 Australian citizens remain with terrorist groups in Iraq and Syria. Approximately 40 fighters have returned, and the government estimates between 68 and 85 Australian foreign fighter fatalities. The government is also aware of about 70 children who either traveled with their parents to or were born in ISIS-controlled areas.

Since September 2014, Australian counterterrorism authorities disrupted 14 terrorism plots domestically, and have cautioned that a major terrorist event in Australia is "inevitable."

PX210

The United States worked closely throughout the year with Australia to identify and develop new capabilities that meet a wide variety of requirements for countering terrorist threats. Through a cost-sharing bilateral relationship, both countries advanced their technical ability to defeat or mitigate the evolving capabilities of terrorists and criminal organizations.

**2017 Terrorist Incidents:**  Australia experienced one terrorist-related attack and two disrupted plots.  A Somali-born man, who proclaimed allegiance to ISIS and al-Qa'ida, shot one woman to death and took another hostage before police killed him in a standoff.

**Legislation, Law Enforcement, and Border Security:**  Australia continued to apply its comprehensive counterterrorism legislation against domestic threats and passed additional legislation to strengthen national security protections.  In July, Prime Minister Turnbull announced the implementation of a new Department of Home Affairs by mid-2018, calling it "the most significant reform" in four decades.  The Office of Prime Minister and Cabinet stood up a task force to manage ministerial portfolio and statutory realignments of several entities, including the Department of Immigration and Border Protection, the Attorney General's Department, and the Australian Security and Intelligence Organization.

In August, the Australia-New Zealand Counterterrorism Committee released its Strategy for Protecting Crowded Places from Terrorism, drawing on expertise from the Crowded Places Advisory Group, comprising representatives from law enforcement, intelligence, and business sectors.

Coordination among states and territories and between agencies is strong and cooperative.  In October, Australia released its fourth National Counterterrorism Plan, outlining national, state, and territory responsibilities.  Almost simultaneously, the Council of Australian Governments (COAG) committed to a raft of national counterterrorism measures, including nationwide leveraging of state biometric information, expansion of the national emergency warning system, and increasing the pre-charge detention hold period to 14 days for suspected terrorists.  COAG also agreed to develop new Commonwealth criminal penalties for those possessing "terrorist material" and perpetrating terrorist hoaxes, such as false online warnings of impending threats.

Significant law enforcement actions in 2017 included:

- In February, an Australian man in New South Wales was arrested for assisting ISIS to develop laser missile technology.
- In July, police charged four Lebanese men in an ISIS-linked plot to bring down a commercial airliner with an improvised explosive device.
- In November, police arrested a Somali-Australian man for attempting to obtain an automatic rifle to kill holiday revelers in Melbourne.

Australia's border security remained robust.  Australia is a leader in the Association of Southeast Asian Nations (ASEAN) Regional Forum (ARF), in which it raised concerns about traveler data, cargo and aviation security, developed mitigation strategies, and expanded regional information sharing on threats.  Australia announced in November that Australian citizens would no longer face penalties for traveling to or remaining in Raqqa without a legitimate purpose, but

PX210

emphasized that providing support to any listed terrorist organization remains a punishable offense.  Approximately 219 Australian passports have been cancelled in relation to the Iraq and Syria conflict.

**Countering the Financing of Terrorism:**  Australia is a member of the Financial Action Task Force (FATF), co-chair of the Asia/Pacific Group (APG) on Money Laundering, and a member of the APG's Mutual Evaluation Working Group.  Its financial intelligence agency is a member of the Egmont Group.  Australia also chairs or co-chairs the Egmont Group's Information Exchange Working Group and the FATF Risks, Trends, and Methods Group.

Australia remained a regional and global leader in countering terrorist financing.  During the Australian fiscal year (July 1, 2016 – June 30, 2017), AUSTRAC (Australian Reports and Analysis Centre) reported 3,255 exchanges of financial intelligence with international partners.  AUSTRAC attributes the nearly doubling of exchanges over the previous fiscal year to terrorist finance concerns.  AUSTRAC also applied rigorous detection, monitoring, and alerting to triage over 74,000 Suspicious Matter Reports, an amount comparable to the previous year.  In August, AUSTRAC published a 600-page report accusing Australia's largest bank of breaching anti-money laundering and terrorist finance laws nearly 54,000 times between 2012 and 2015.  On December 15, AUSTRAC expanded its regulatory probe by filing 100 new allegations against the bank, saying that the alleged breaches reflect "systematic non-compliance" stemming from at least three years of failure to report anonymous cash deposits exceeding US $7,800.

On December 18, days after passing the Anti-Money Laundering and Counter-Terrorism Financing Amendment Bill 2017, to close gaps in e-currency regulation and investigatory reach, Australia announced it would also dedicate an additional US $33.7 million to help AUSTRAC strengthen its non-compliance enforcement.  The following day, Australia redirected US $4.3 million retrieved from proceeds of crime to expand AUSTRAC's overseas presence from Indonesia and the Philippines to China, Malaysia, Singapore, the Middle East, the United Kingdom, and the United States.

In November, Australia co-hosted the third Counterterrorism Financing Summit with Indonesia and Malaysia, attended by 445 representatives from 32 countries.  Australia will assist a resultant multilateral financial intelligence exercise to jointly analyze suspicious financial activities of individuals operating outside their ordinary countries of residence.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Australian Attorney General's Department (AGD) remained the lead coordinator for national CVE efforts.  The AGD continued to focus on four overlapping streams that build strength in diversity and social participation, target work with vulnerable communities and institutions, address online terrorist propaganda, and assist diversion and de-radicalization.  Additionally, Australia is a donor to the Global Community Engagement and Resilience Fund.

PX210

**International and Regional Cooperation:**  Australia is a member of the United Nations, ASEAN, ARF, the Pacific Island Forum, the East Asia Summit, Asia-Pacific Economic Cooperation (APEC), the Global Counterterrorism Forum, and the Global Initiative to Combat Nuclear Terrorism.  Australia is the chair of the APEC Counter-Terrorism working group for 2017-2018.

Australia remains focused on counterterrorism threats in Southeast Asia and in October committed the Australian Federal Police to help rebuild Philippine counterterrorism capabilities post-Marawi with training and joint maritime patrols.  Australia will also add 20 staff to its embassy in Manila.

In November, Australia hosted the United States and Japan at the Trilateral Strategic Dialogue Counterterrorism Consultations.  Outcomes included coordinated support to Southeast Asian countries on expanding INTERPOL connectivity and border security, and support for Global Community Engagement and Resilience Fund expansion to the Philippines.  In December, Australia co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## CHINA (HONG KONG AND MACAU)

**Overview:**  Referring to "terrorism, separatism, and extremism" as "three evil forces" that threaten domestic stability, China continued enhancing domestic counterterrorism efforts and called for greater regional cooperation to combat terrorism.  During March-April, China initiated a major security campaign in the Xinjiang Uighur Autonomous Region (XUAR) that targeted Uighur and other Muslim ethnic groups and was reportedly aimed at rooting out what officials describe as "separatist, extremist, and terrorist activity."  The campaign included detentions widely reported to number in the thousands, along with intensified use of traditional policing measures, the deployment of high-tech surveillance and monitoring systems, the involuntary collection of DNA and other biometric data, and the closure of mosques.

China's primary counterterrorism focus remained on ethnic Uighur extremists Beijing ascribes to the East Turkistan Islamic Movement (ETIM).  China maintains that ETIM is responsible for much of the violence in the XUAR, despite a lack of independent information that ETIM is active in China.  China's response to the threat of terrorism remained difficult to distinguish from its suppression of activities its leadership deems separatist in nature or politically subversive to the Chinese Community Party.  In response to alleged separatist or subversive concerns, China intensified its security and surveillance in the XUAR, including the implementation of stricter security controls, restrictions on travel, and curbs on religious practice.

There were signs that ISIS posed a threat to China and its interests abroad, and the Chinese government reported that some Chinese citizens have joined ISIS and other terrorist organizations in the Middle East.  China also issued public statements warning of growing threats to Chinese nationals abroad.  In March, ISIS released a half-hour video in which it pledged to attack unspecified Chinese targets.

PX210

**2017 Terrorist Incidents:**  The Chinese government claimed its escalated security and surveillance policies reduced the number of what it considered terrorist-related incidents in the XUAR.  Details about alleged terrorism-related incidents inside China were difficult to verify due to a lack of transparency and information from the Chinese authorities.  China also impeded third party efforts to independently verify state media accounts, which are often the only source of reporting on incidents on Chinese territory.  In addition, requests by U.S. law enforcement officials for information on terrorist incidents from Chinese officials went largely unanswered.

Incidents described by the government as terrorism-related included:

- In February, three attackers alleged to be Uighurs detonated a homemade explosive device and killed five residents outside a government compound near Pishan County in the XUAR.
- In June, Islamic State's Khorasan Province executed two Chinese nationals who had been kidnapped in May in southwestern Pakistan.

**Legislation, Law Enforcement, and Border Security:**  China continued to enhance surveillance and security throughout the country, sometimes citing the Counterterrorism, National Security, Counter-Espionage, and Cyber-Security laws.  The 2017 Supreme People's Court report departed from past practice by not reporting the number of individuals convicted in 2016 on terrorism-related charges.  Nevertheless, publicly available verdicts related to terrorism prosecutions in 2016 indicate that efforts to implement the Counterterrorism Law have focused on punishing the possession or distribution of materials that authorities deemed "fake terrorism information" or "terrorist" or "extremist" in nature.  Specifically, the individuals in these cases were convicted of possessing, accessing, and distributing terrorism-related video or audio material.  The implementation of the Counterterrorism Law has also focused on punishing hotels and courier services for failing to comply with "real name registration" requirements.

Lawmakers in XUAR passed a regional Anti-Religious Extremism Law in March.  The law prohibits advocating or propagating what it considers "extremist" thoughts and publishing, downloading, sharing, or reading articles and audio-video material containing "extremist" content.  The law also criminalizes the wearing of long beards and other practices.  There were also reports that authorities compelled Uighurs and other minorities to return to the locality listed on their identification documents and that authorities confiscated the passports of members of ethnic minorities and restricted them from leaving the country.  Citing terrorism concerns, authorities required some vehicles in the XUAR to install mandatory satellite tracking and required all residents there to install a surveillance "app" that automatically detects "terrorist and illegal" religious videos, images, e-books, and electronic documents on smart phones.  The app reportedly has the capability to remotely delete this content.  The government's broad definitions of "terrorism" and "extremism" and its unclear definition of "fake terrorism information" continued to raise human rights concerns.  We refer you to the State Department's *Country Reports on Human Rights Practices* for further information.

Beyond China's borders, China pursued security and counterterrorism cooperation with countries that drew a similarly broad definition of "extremism" and raised human rights concerns.  For example, Egyptian authorities arrested and deported at least 34 Chinese-nationality Uighurs in

PX210

July, reportedly following a Chinese government order that Uighur students in Egypt return to China.  Those Uighurs who returned were reportedly sent to re-education camps, where at least two have died.  Also, Chinese authorities confirmed in December they were monitoring some international Twitter accounts allegedly linked to ETIM.  In another incident, Italian authorities detained a Uighur activist with German citizenship, preventing him from delivering a scheduled speech about human rights in the XUAR.  This detention was allegedly responding to an INTERPOL Red Notice.

**Countering the Financing of Terrorism:**  China is a member of the Financial Action Task Force, the Asia/Pacific Group on Money Laundering, and the Eurasian Group on Combating Money Laundering and Terrorist Financing.  Based on current law enforcement investigations, the United States is concerned that China does not adequately control terrorist financing.  Chinese law enforcement claims to have limited ability to freeze funds and investigate banking transactions.  Additional concerns include a lack of guidance for designated non-financial businesses and professions, underdeveloped procedures for individuals and groups who seek to be delisted from domestic sanctions, and inadequate regulations defining the rights of bona fide third parties in seizure and confiscation actions.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*

**Countering Violent Extremism (CVE):**  China continued to implement broad campaigns in the XUAR under the rubric of countering what the Chinese government considered "extremism."  The XUAR government also mandated "re-education" programs for members of ethnic minority communities and students who study overseas.  The government implemented a number of other programs aimed at "stability maintenance," many of which promote cultural assimilation in the XUAR and place restrictions on the practice of Islam.  For further information, please see the Department of State's *Report on International Religious Freedom for 2017*.

**Regional and International Cooperation:**  China continued to promote the United Nations as the primary international fora for counterterrorism while increasing its engagement in other multilateral, regional, and bilateral fora.  In June, China and other members of the Shanghai Cooperation Organization (SCO) signed the SCO Convention on Combating Extremism.  In August, China participated in the 2nd High-level Military Leaders' Meeting on Quadrilateral Cooperation and Coordination Mechanism in Counterterrorism with Afghanistan, Pakistan, and Tajikistan in Dushanbe, and the four parties signed agreements to coordinate counterterrorism efforts.  More than 80 countries sent representatives to attend China's Forum on International Cooperation in Countering the Use of Cyberspace for Criminal and Terrorist Purposes in December.

Beijing pursued the return of ethnic Uighurs and others in Malaysia and other countries to China in the name of counterterrorism cooperation, although evidence of these individuals' connection to terrorism was not made public.

PX210

Hong Kong

Hong Kong continued its effective security and law enforcement partnership with the United States through the Hong Kong Customs and Excise Department's joint implementation of the Container Security Initiative and participation in U.S.-sponsored training in port and border security.

Counterterrorism remained an operational priority for the Hong Kong Police Force.  The Police Security Wing coordinates potential terrorist threat information with relevant counterterrorism units.  The Police Counterterrorism Response Unit provides a strong deterrent presence.  It assists police districts with counterterrorism strategy implementation and complements the tactical and professional support of existing police specialist units, such as the Explosive Ordnance Disposal Bureau, the Special Duties Unit, the Airport Security Unit, and the VIP Protection Unit.

Hong Kong is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering, a FATF-style regional body.  Hong Kong's Joint Financial Intelligence Unit is a member of the Egmont Group.  Terrorist financing is a criminal offense in Hong Kong, and financial institutions are required to search continuously for terrorist financing networks.  They must also screen accounts using designations lists provided by the United States under relevant authorities, as well as the UNSC ISIL (Da'esh) and al-Qa'ida and 1988 (Afghanistan/Taliban) Sanctions Committees' lists.  In June, the Legislative Council passed a bill on the cross-border transportation of large quantities of currency and bearer negotiable instruments to combat terrorist financing.  At year's end, the Secretary for Security had not yet designated the date when the bill would go into force.

In June, Hong Kong introduced the United Nations (Anti-Terrorism Measures) (Amendment) Bill 2017 to update the ordinance to adequately comply with UNSC resolution 2178 (2014) on Foreign Terrorist Fighters.  Filing suspicious transactions reports irrespective of transaction amounts is obligatory, but because the bill passed in June 2017 and had not gone into force, Hong Kong did not require mandatory reporting requirements for cross-border currency movements in 2017.  In advance of its 2018 FATF Mutual Evaluation, the Hong Kong government in June 2017 introduced in Legislative Committee two bills to bring its regulatory regime fully in line with FATF recommendations.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

Hong Kong law enforcement officers attended U.S. government-sponsored capacity-building training at the International Law Enforcement Academy on personnel and facility security, law enforcement techniques to counter terrorism, and financial investigations.

Macau

PX210

Macau's counterterrorism cooperation with the United States included information sharing. The Police Intervention Tactical Unit (UTIP), which falls under the Macau Public Security Police Force, is responsible for protecting important installations and dignitaries and conducting high-risk missions, such as improvised explosive device deactivation. UTIP's Special Operations Group's mission is counterterrorism operations. Macau cooperated internationally on counterterrorism efforts through INTERPOL and other security-focused organizations. Macau law enforcement officers attended U.S. government-sponsored capacity-building training at the International Law Enforcement Academy on personnel and facility security, financial and crime scene investigations, computer investigations, and evidence protection.

Macau is a member of the Asia/Pacific Group on Money Laundering, a FATF-style regional body. Macau's Financial Intelligence Office is a member of the Egmont Group. In response to FATF recommendations, the Macau government enacted a new law on the cross-boundary transportation of large quantities of currency and bearer negotiable instruments in June. The law went into effective in November. Two amended laws on anti-money laundering and counterterrorist financing, which widen the scope of identifiable criminal offences and strengthen customer due diligence measures, became effective in May.

Terrorist financing is a criminal offense in Macau. Banks and other financial institutions are required to search continuously for terrorist financing networks and screen accounts using designations lists provided by the United States under relevant authorities and UNSC ISIL (Da'esh) and al-Qa'ida and 1988 (Afghanistan/Taliban) Sanctions Committees' lists. Filing suspicious transactions reports irrespective of transaction amounts is obligatory.

For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_

---

## INDONESIA

**Overview:** Indonesia applied sustained pressure to detect, disrupt, and degrade terrorist groups operating within its borders and deny them safe haven. ISIS-affiliated Jamaah Ansharut Daulah (JAD) and its offshoots continued to target police and other symbols of state authority. The capability of terrorist groups to launch coordinated mass casualty attacks was assessed as low, but the intent remained high. Failed plots included attempts by terrorist groups to use low-grade radioactive material for bombs and recruit female suicide bombers. Returning foreign terrorist fighters with new operational training, skills, experience, networks, and access to funding could help launch more sophisticated attacks against Indonesian government personnel or facilities, Western targets, and other soft targets and public spaces. While not a member of the Global Coalition to Defeat ISIS, the Indonesian government and Muslim civil society leaders forcefully and repeatedly denounced ISIS and actively promoted a "soft approach" to countering violent extremism to complement "hard" law enforcement counterterrorism efforts.

**2017 Terrorist Incidents:** JAD targeted police throughout the year, including May 24, when two JAD suicide bombers fatally detonated pressure cooker bombs at a busy bus station in East Jakarta that killed three police officers and injured seven civilians. The police were the target of

PX210

multiple other JAD-linked attacks, including a June 25 stabbing at a police post in North Sumatra that killed one police officer and injured another, and a June 30 stabbing at a mosque in Jakarta that injured two police officers.

**Legislation, Law Enforcement, and Border Security:**  Since 2002, Indonesia has successfully used a civilian-law-enforcement-led, rule-of-law-based approach to counterterrorism.  Relevant legislation includes the Law on Combating Criminal Acts of Terrorism (15/2003), the Law on Prevention and Eradication of Terrorist Financing (9/2013), and the 1951 Emergency Law; and Indonesia's Criminal Code.  An amendment to CT Law 15/2003, first proposed in February 2016, would strengthen provisions against foreign terrorist fighters by criminalizing extraterritorial fighting, preparatory acts, and material support for terrorism.  In 2017, the Indonesian legislature continued to discuss edits to the draft amendment.  The Indonesian government also passed legislation enabling the banning of groups that seek to undermine Indonesian national unity and also banned the non-violent, pro-caliphate group Hizbut Tahrir Indonesia.

The elite police counterterrorism force, Detachment 88, leads counterterrorism operations and investigations.  Law enforcement was increasingly able to detect, deter, and prevent most terrorist attacks.  On August 18, police re-arrested JAD's Aman Abdurrahman, who was due for an early release from a nine-year sentence, and charged him for his involvement in the January 14, 2016, central Jakarta attack of a police post and a U.S.-franchise coffee shop with small arms and homemade bombs.  Three Indonesian citizens and a dual national Algerian-Canadian were killed and at least 23 others were injured in the attack.

Terrorism case conviction rates were high.  Sentences tended to be short, with some exceptions. Recidivist JAD member Juhanda received a life sentence for an attack on a church in East Kalimantan in November 2016.  Indonesia's first female would-be suicide bomber, Dian Yulia Novi, received a seven-and-a-half year sentence for her role in a December 2016 plot to attack the presidential palace.

Corrections officials took steps to improve terrorist prisoner management and implemented a new risk assessment and classification tool.  On August 28, Indonesia designated Pasir Putih prison on the island of Nusa Kambangan in Central Java as a specialized prison for high-risk terrorist prisoners.

Border security remained a challenge for this vast archipelagic nation.  Advanced Passenger Information and Passenger Name Record systems were not fully in use.  Customs continued to struggle with targeting, analysis, management systems, and high-level management turnover. Police maintained a watchlist of suspected terrorists, but lines of communication and coordination among stakeholder agencies were not always clear.  Immigration officials at major ports of entry had access to biographic and biometric domestic-only centralized databases.  In November, Indonesia began systematic border screening against INTERPOL's Stolen and Lost Travel Document and nominals databases at three major airports.

**Countering the Financing of Terrorism:**  Indonesia is a member of the Asia/Pacific Group on Money Laundering (APG), a Financial Action Task Force (FATF)-style regional body.

PX210

Indonesia's financial intelligence unit, the Indonesian Financial Transaction Reports and Analysis Center (PPATK), is a member of the Egmont Group.  Indonesia's Counterterrorist Financing Law 9/2013 criminalizes money laundering and terrorist financing and authorizes terrorist asset freezing pursuant to UN Security Council resolution 1373, the UN Security Council (UNSC) ISIL (Da'esh) and al-Qa'ida sanctions regime, and the 1988 Afghanistan/Taliban sanctions regime.  In February, Indonesia issued a presidential regulation to strengthen a FATF-driven risk-based approach to limit terrorism finance within the non-profit and charity sector.  The APG conducted a Mutual Evaluation Review peer assessment of Indonesia's anti-money laundering/countering terrorist financing regime (AML/CFT) in November.  Indonesia was removed from APG's monitoring list due to progress in its AML/CFT framework in 2017.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Government and civil society leaders promoted a moderate and tolerant practice of Islam as an alternative to terrorist teachings.  They also reinforced the national ideology of Pancasila (five principles that form the philosophical foundation of the Indonesian state).

The National Counterterrorism Agency (BNPT) began developing a national CVE action plan.  A variety of civil society organizations is active in CVE programming, but there was minimal coordination with BNPT programs.

In 2017, the process for a nationwide reorganization of the police began with the goal of a community-focused police service that can better identify the early warning signs of radicalization to violence.

The BNPT managed de-radicalization programs for terrorist convicts.  In February, it opened a de-radicalization center in Sentul, south of Jakarta.

Indonesians deported from third countries for attempting to travel to Iraq and Syria were enrolled in a one-month de-radicalization program at a Ministry of Social Affairs shelter in East Jakarta.  The BNPT used former terrorists for outreach campaigns and helped establish religious boarding schools for the children of former terrorists.

**International and Regional Cooperation:**  Indonesia participated in counterterrorism efforts in several international, multilateral, and regional fora, including the United Nations, the Global Counterterrorism Forum (GCTF), the Association of Southeast Asian Nations (ASEAN), and Asia Pacific Economic Cooperation (APEC).  Indonesia remained active in the ASEAN Regional Forum Inter-Sessional Meetings on Counter-Terrorism and Transnational Crime and the APEC Counter-Terrorism working group.  Indonesia was co-chair of the former GCTF Detention and Reintegration working group until September.  Beginning in September, Indonesia and Australia co-chaired the GCTF Countering Violent Extremism working group.  Indonesia formalized trilateral counterterrorism cooperation with Malaysia and the Philippines and

PX210

co-hosted a sub-regional meeting with Australia in Manado, North Sulawesi.  Indonesia continued to use the Jakarta Center for Law Enforcement Cooperation as a regional training center.

## MALAYSIA

**Overview:**  Although Malaysia did not experience ISIS-related attacks in 2017 and the overall number of foreign terrorist fighters from Malaysia decreased, the country remained a source, transit, and, to a lesser extent, a destination country for suspected ISIS supporters.  This included suspected ISIS supporters who were deported from Turkey and those planning to travel to the southern Philippines.  Malaysia monitored, arrested, deported, and tried suspected ISIS supporters throughout the year.  Malaysia also cooperated with the United States and others to increase border security capacity at airports and in the Sulu Sea and to counter terrorist messaging on social media.  Malaysia is a member of the Global Coalition to Defeat ISIS.

**Legislation, Law Enforcement, and Border Security:**  On April 4, the House of Representatives re-authorized the maximum 28-day detention-without-charge period for national security suspects contained in the 2012 Security Offenses (Special Measures) Act for another five years, or until July 2022.  Opponents of the extension cited the misuse of national security legislation to arrest critics.

During the year, Malaysian authorities continued to broaden INTERPOL connectivity at air, land, and sea ports of entry, but lacked legislation to authorize the collection of Advance Passenger Information.

In August, police arrested eight Philippine citizens suspected of planning an attack on the closing ceremony of the Southeast Asia Games.  The lead suspect was believed to be a member of the Abu Sayyaf Group and to have participated in combat operations, kidnappings for ransom, and beheadings in the Philippines prior to his arrest.

Malaysian law enforcement continued to participate in the Department of State's Antiterrorism Assistance (ATA) program.  Training and equipment focused on enhancing Malaysian border security and investigative capabilities.

**Countering the Financing of Terrorism:**  Malaysia is a member of the Financial Action Task Force (FATF) and of the Asia/Pacific Group on Money Laundering, a FATF-style regional body. In its annual National Risk Assessment for 2016 (published in 2017), the National Coordination Committee to Counter Money Laundering did not consider terrorism financing to be a high risk in Malaysia.  The Committee did note, however, that a small but growing number of "self-financed" terrorists have sought to raise funds through family, friends, and the internet to support their travel to Syria and Iraq to fight with ISIS.

Between 2016 and April 2017, 29 terrorist finance prosecutions were brought to court and 11 convictions were secured.  The increase in convictions over the previous year was due to closer public-private partnership in detecting terrorist financing-related activities in Malaysia and greater coordination within the law enforcement community.

PX210

Although the general risk was low for the use of cryptocurrencies in terrorist financing, Malaysia's central bank (BNM) announced during the year that it had begun drafting a framework to regulate the exchange of cryptocurrencies to fiat currencies to ensure that all such exchange entities and their transactions were registered with the central bank.

According to a 2017 regional not-for-profit sector risk assessment (unique from the National Risk Assessment) co-published by BNM, the terrorism finance risk facing not-for-profit organizations (NPOs) in Malaysia was rated medium.  The report highlighted the potential for Malaysia to be used as a transit country for recruits joining terrorist groups because its porous borders were vulnerable to terrorists moving funds and other material support into neighboring countries.  Malaysia was the only country commended in the regional assessment for having significant regulatory oversight, terrorist financing-focused outreach, national and international mechanisms for coordination, and regulatory powers to remove and revoke NPO-status and enforce actions against NPOs.  However, the existence of four different registrars for NPOs and the absence of requirements for NPOs to register and file suspicious transaction reports created limitations to detecting and combating terrorist financing.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Ministry of Youth's Institute for Youth Research published a set of guidelines in 2017 to educate the public on "the dangers of radicalism and involvement in extremism."  The guidelines were based on government-sponsored research on ISIS ideology.

The government also announced two new counter-messaging initiatives during the year, including the King Salman Center for International Peace, a partnership with the Government of Saudi Arabia; and the ASEAN Center for Islam, Peace, and Non-Violence, a center that would be based at the Universiti Sultan Azlan Shah.  The ASEAN center was not operational by the end of 2017.

Police engaged in extensive community outreach activities during the year and enhanced security partnerships with communities in Eastern Sabah.

**International and Regional Cooperation:**  Malaysia continued to support counterterrorism efforts in regional and multilateral organizations and participated in numerous counterterrorism events hosted by the United Nations, the Global Counterterrorism Forum, ASEAN, and the ASEAN Regional Forum (ARF).  In 2017, Malaysia hosted an ARF workshop on countering online extremism, a regional workshop on handling returning foreign terrorist fighters and ISIS External Operations, and a regional counterterrorism financing summit.  In cooperation with Indonesia and the Philippines, Malaysia announced the commencement of joint maritime patrols in June to "maintain stability in the region in the face of non-traditional real threats such as piracy, kidnapping, terrorism, and other transnational crimes in regional waters."  The three

PX210

governments also announced the commencement of joint air patrols in October to counter the movement of violent extremists and terrorists across the borders of the three countries.

Malaysia is also a member of the Saudi-led Islamic Military Counter Terrorism Coalition.  In November, Malaysian officials joined representatives from 41 other Muslim-majority states to formally launch the coalition and coordinate their counterterrorism efforts.

## PHILIPPINES

**Overview:**  The Philippines improved its counterterrorism capabilities in the face of an evolving and increasingly robust terrorist threat.  The Philippine government consistently acknowledged the dangers from ISIS-affiliated terrorist groups and welcomed assistance from the United States and a range of international partners.  In addition to exchanges and U.S. materiel and advise-and-assist support, the September 2017 Tempest Wind drill showcased whole-of-government U.S.-Philippine cooperation with more than 1,200 civilian and military participants simulating a hostage rescue scenario.

From May to November, terrorist organizations pledging support to ISIS – including a faction of the Abu Sayyaf Group, the Maute Group, and others – occupied and held Marawi City.  When the siege began, President Duterte declared martial law over the entire Mindanao region – approximately one-third of the country's territory – and Congress granted an extension of martial law until the end of 2018.  Security forces ultimately cleared the city and eliminated much of the terrorist leadership, but suffered many casualties during the siege.

Political settlements to long-running insurgencies remained elusive, thereby driving recruitment and fueling terrorist activities among certain groups.  The Bangsamoro Basic Law, intended to implement the previous administration's 2014 peace agreement with the Moro Islamic Liberation Front (MILF), was awaiting action in Congress at the end of 2017.  Delays in passing the Law have provided recruitment propaganda for former MILF fighters and commanders who formed more extreme breakaway groups, including the Bangsamoro Islamic Freedom Fighters (BIFF), Ansar al-Khalifa, and the Maute Group.

The Government of the Philippines and the Communist Party of the Philippines/New People's Army (CPP/NPA) ended their six-month unilateral ceasefires in February, and the CPP/NPA increased its attacks against security forces following the failure of the most recent round of peace talks in May.  On December 5, President Duterte signed a presidential proclamation to formally designate the CPP/NPA a terrorist group, but the courts must still rule on the designation.

**2017 Terrorist Incidents:**  During the Battle of Marawi City, radical groups aligned with ISIS attacked, occupied, and destroyed several key public buildings and held dozens of civilians hostage as human shields.  They also reportedly massacred and beheaded captive civilians.  Beyond Marawi, Philippine media observed that kidnapping-for-ransom cases declined from previous years.  Armed attacks against civilians and security forces continued, however.  The press reported that on June 22, security forces rescued at least 60 civilians held hostage after a BIFF attack in North Cotabato.  Suspected members of the Abu Sayyef Group attacked a village

60

PX210

in Basilan on August 21, killing at least nine civilians and wounding a dozen more. The December 3 attack on a police station in Misamis Oriental by approximately 100 CPP/NPA members exemplified the group's frequent strikes at military, police, and local government official targets.

**Legislation, Law Enforcement, and Border Security:**  President Duterte identified amending the Human Security Act of 2007, the country's principal counterterrorism legislation, as a priority in both of his state of the nation addresses. Efforts to revise the legislation, thereby enabling more effective investigation and prosecution of terrorism as a crime, were ongoing at the end of 2017.

Interagency information sharing continued to improve among Philippine law enforcement units, despite the country lacking a fully operational 24/7 joint fusion center to monitor and address terrorist threats and activities. The Joint Terrorist Financing Investigation Group is the only multi-agency "center" in Manila that routinely meets and exchanges counterterrorism intelligence.

The Philippines increased its aviation security capacity by procuring updated x-ray technology and more widely using explosive trace detection units, but it faced understaffing challenges at security checkpoints and lacked a comprehensive national aviation security strategy. Four Japanese-donated maritime rescue and response vessels allowed the Philippine Coast Guard to extend its maritime security capabilities in key areas of their Exclusive Economic Zone and the Sulu Sea. In the area of identity tracking, collection of high value target biometric attributes expanded to include the Philippines' largest prison.

Key counterterrorism law enforcement actions included the National Bureau of Investigation's October 2017 arrest of a woman suspected of using the internet to spread terrorist propaganda and recruit foreign terrorist fighters to the Philippines. The Philippine Department of Justice charged the Maute clan matriarch, the former Marawi mayor, and nine other individuals with rebellion in June. Additionally, the Philippines effectively exercised its capabilities to protect the 2017 Association of Southeast Asian Nations (ASEAN) Summit and related events from terrorist attacks.

In 2017, the Philippine National Police participated in the Department of State's Antiterrorism Assistance (ATA) program. It received training and equipment on crisis response, border security, and investigations – including cyber investigations.

The Philippine justice system made progress on past instances of terrorism, including the November 2017 conviction of a man responsible for the 2007 bombing of the Philippine House of Representatives. Meanwhile, hearings continued on the 2009 landmine attack that killed two U.S. Army Special Forces soldiers in Jolo Province.

**Countering the Financing of Terrorism:**  The Philippines is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body. Its financial intelligence unit, the Anti-Money Laundering Council, is a member of the Egmont Group. The Philippines amended its Anti-Money Laundering Act to include gambling and

PX210

casinos, a critical step to avoid placement on the FATF "grey" list.  The Philippines continued to make efforts to bring its banking controls up to international standards.

The Joint Terrorist Financing Investigation Group continued to work with the United States to investigate suspected terrorist finance cases.  Notably, the Philippines seized US $1 million from the Maute family during the 2017 Marawi siege.

For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):**  At year's end, the Anti-Terrorism Council was working to finalize a National Action Plan for Countering Violent Extremism that will outline a whole-of-government strategy.

**International and Regional Cooperation:**  The Philippine Navy began joint patrols with its Indonesian and Malaysian counterparts under a June 2017 trilateral arrangement to combat piracy, terrorism, and the illegal drug trade.  In November, regional partners also founded the Southeast Asia Counter Terrorism Financing working group, an information-sharing mechanism that comprises regional financial intelligence units co-led by Australia and the Philippines.  As the 2017 chair of ASEAN, the Philippines hosted key leadership summits that facilitated dialogue and coordination on counterterrorism issues.

## SINGAPORE

**Overview:**  Singapore identified counterterrorism as a top policy priority and has developed a comprehensive counterterrorism strategy based on global and regional trends.  This strategy includes vigilant security measures, regional and international law enforcement cooperation, counter-radicalization efforts, and strategies to prepare the populace for eventual attacks.  As such, Singapore remained a committed, active, and effective counterterrorism partner in 2017. Counterterrorism remained a pillar of the civilian sector security relationship between Singapore and the United States.  The highly productive levels of counterterrorism cooperation developed in recent years continued as did expanded information sharing.  Singapore's domestic counterterrorism apparatus and its ability to detect, deter, and disrupt threats remained effective.  Singapore has been a member of the Global Coalition to Defeat ISIS since 2014 and expanded its support in 2016 beyond military assets to include medical teams in Iraq.

The United States worked closely throughout the year with Singapore to identify and develop new capabilities that meet a wide variety of requirements for countering terrorist threats.  Through a cost-sharing bilateral relationship, both countries advanced their technical ability to defeat or mitigate the evolving capabilities of terrorists and criminal organizations.

**Legislation, Law Enforcement, and Border Security:**  Singapore uses its Internal Security Act (ISA) to arrest and detain suspected terrorists.  The ISA authorizes the Minister for Home Affairs (MHA), with the consent of the president, to order arrest and detention without warrant if it is determined that a person poses a threat to national security.  The initial detention may be for up

PX210

to two years and the MHA may renew the detention for an unlimited period – in increments of up to two years at a time – with the president's consent. Alternatively, the government can issue a restriction order limiting a person's international travel and changes of residence or employment without government approval. ISA cases are subject to review by the courts to ensure strict compliance with procedural requirements under the act.

Singapore's existing legal framework, in conjunction with the ISA, provides the government with the necessary tools to support the investigation and prosecution of terrorism offenses. In October, Singapore passed the "Infrastructure Protection Act" that mandates enhanced counterterrorism security measures for public buildings and sensitive sites. Law enforcement agencies displayed coordination, command, and control in responding to threat information affecting Singapore's security.

The Government of Singapore has a "not if, but when" stance regarding the likelihood of terrorist attacks within the city-state. The government's SGSecure public awareness campaign was launched in 2016 to improve emergency preparedness, promote security awareness, and build national resiliency. The campaign continued in 2017 with a broad advertising campaign and public information sessions with local police.

To better detect possible terrorist movements via air into or transiting through Singapore, the Immigration and Checkpoints Authority worked with the United States to improve its passenger screening system by integrating both Advanced Passenger Information and Passenger Name Record data transmitted from air carriers into its border screening processes. Implementation of this program by Singapore will help its government safeguard international travel and supply chains against terrorism by analyzing traveler data and developing targeting rules and methodologies.

Singapore issued at least four detention and two restriction orders to Singaporeans under the ISA in 2017. With these arrests, Singapore has issued detention or restriction orders to at least 19 Singaporeans for terrorism-related activities since 2015. In 2017, Singapore expelled several radicalized foreign domestic workers, fined and expelled a foreign Muslim teacher for reciting an inflammatory prayer, and banned three foreign Muslim preachers from entering the country due to the preachers' "divisive" comments that were contrary to Singaporean policies of racial and religious harmony and inclusion. We refer you to the State Department's *Country Reports on Human Rights Practices* for further information.

**Countering the Financing of Terrorism:** Singapore is a member of the Financial Action Task Force (FATF) and Asia/Pacific Group on Money Laundering, a FATF-style regional body. Singapore's Suspicious Transaction Reporting Office is a member of the Egmont Group. In April 2017, Singapore announced the creation of an Anti-Money Laundering and Countering the Financing of Terrorism Industry Partnership (ACIP). The ACIP is a joint initiative between the Monetary Authority of Singapore and the Commercial Affairs Department of the Singapore Police Force, with the goal of bringing together relevant government agencies and private sector participants to strengthen Singapore's capabilities to combat money laundering and terrorist financing. For further information on money laundering and financial crimes, see the *2018*

PX210

*International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes.*

**Countering Violent Extremism (CVE):**  Through entities such as the International Centre for Political Violence and Terrorism Research (ICPVTR) and the Religious Rehabilitation Group (RRG), Singapore serves as a regional CVE hub.  The ICPVTR conducts research, training, and outreach programs aimed at understanding the causes of radicalization to violence and formulating practical rehabilitation programs.  The government also encourages inter-religious and inter-ethnic dialogue through Interracial and Religious Confidence Circles, local community fora that bring leaders from Singapore's religious and ethnic communities together to discuss issues of concern and build trust.

The government believes in building regional capacity to counter violent extremism and has highlighted opportunities for constructive engagement, such as promoting legitimate charities working to ease suffering in Syria and Iraq.  The Islamic Religious Council of Singapore, the Islamic authority in charge of Muslim affairs, maintains a Facebook presence and holds outreach and educational events to counter terrorist propaganda and recruitment efforts.

The RRG, a volunteer organization, has had success in counseling detainees held under the Internal Security Act.  The comprehensive program includes religious and psychological counseling and involves the detainee's family and community.  In 2016, the RRG launched a smart phone app designed to counter terrorist voices by providing users with opportunities to ask questions and have conversations with RRG imams and counselors.

**International and Regional Cooperation:**  Singapore is an active participant in counterterrorism cooperation efforts in the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum, and Asia Pacific Economic Cooperation, and has prioritized regional counterterrorism cooperation as ASEAN chair.  In December, Singapore hosted Philippine forces at its new urban conflict training center and participated in its first counterterrorism tabletop exercise with Indonesian forces in November.  In March, Singapore co-hosted, with Turkey and the United States, the First Regional Workshop of the Global Counterterrorism Forum's Protection of Soft Targets in a Counterterrorism Context Initiative.

## THAILAND

**Overview:**  Thailand's principle vulnerability to international terrorism is its status as a transit and facilitation country.  Thailand is an attractive facilitation hub for illicit activity given the high volume of travelers through Bangkok's main airport, coupled with an available market of illegal goods and relatively weak banking oversight.  Domestic terrorist incidents were largely confined to Thailand's four southernmost provinces, the scene of a longstanding separatist conflict between ethno-nationalist Malay Muslim insurgent groups and the central Thai government.  Although Thai security officials have expressed moderate concern about the threat to Thailand from ISIS, security authorities continued to assert there was no confirmed evidence of Thai citizens joining the group or of operational linkages between the southern insurgent groups and international terrorist networks.  Thailand remained a productive counterterrorism

PX210

partner, even as the Thai government continued to focus on domestic political challenges as its primary security priority.

**2017 Terrorist Incidents:**  Ethno-nationalist Malay Muslim insurgents carried out hundreds of attacks in the southernmost provinces of Pattani, Yala, Narathiwat, and parts of Songkhla, known as Thailand's Deep South.  Methods included shootings, arson, improvised explosive devices (IEDs), and vehicle-borne IEDs (VBIEDs).  Since the conflict surged in 2004, insurgents have largely confined their attacks to the four southernmost provinces.  Terrorism-related attacks included:

- On April 6, a series of at least 20 near-simultaneous bomb and arson attacks were carried out in Thailand's southern provinces, causing widespread blackouts.  The attacks occurred a day after the country enacted the new constitution, and many political analysts believed the attacks were likely intended to undermine the military government.  A second string of attacks occurred in 11 districts of Thailand's Deep South on April 19.
- On May 9, two bombs exploded at a supermarket in Pattani, injuring 61 people, including 13 children, but caused no fatalities.  A small bomb was triggered inside the store before a VBIED was triggered outside the store approximately 15 minutes later.  While violence and bombings in the Deep South are common, the use of a VBIED on civilian targets is rare.  Many analysts believe the incident was not intended to cause high civilian casualties, as the initial smaller bomb was likely intended to evacuate the area prior to the VBIED's explosion.  Although no group took responsibility for the bombing, it was believed the work of the southern separatist movement.  The lack of a claim of responsibility is not unusual, as the various ethnic Malay insurgent groups generally do not publicly claim responsibility for attacks.
- On May 22, a small bomb exploded in Bangkok's Phra Mongkut Hospital, injuring 24 people.  The hospital is military-run and the blast took place on the third anniversary of the 2014 military coup.  A suspect arrested in June allegedly confessed to planting the bomb and claimed to despise the military regime.
- On August 16, a group of seven armed men stole six pick-up trucks from a used car dealership in Songkhla, took four people hostage, and killed one dealership employee.  The men subsequently drove five of the cars south to Pattani.  The men planted two of the cars with bombs that later exploded, injuring four soldiers in the first explosion and one police officer in the second.  One car contained an IED that the police safely defused.  Police found the two other vehicles abandoned in Pattani and the sixth vehicle abandoned in Songkhla.

**Legislation, Law Enforcement, and Border Security:**  Thailand's law enforcement authorities demonstrated some capacity to detect, deter, and respond to terrorist incidents.  Multiple entities – including the Royal Thai Police (RTP), Department of Special Investigation, and components of the Thai military – have law enforcement responsibilities on counterterrorism cases.  Interagency cooperation and coordination was sporadic, information sharing was limited, and the delineation of duties between law enforcement and military units with counterterrorism responsibilities was unclear.  Annual routine reassignments of senior government and military officials hampered continuity in leadership.

PX210

Throughout the year, officers from Thailand's Anti-Money Laundering Office, the Ministry of Justice, the RTP, and the National Intelligence Agency participated in regional workshops focused on counterterrorism threats including Hizballah and ISIS.  The regional workshops also covered investigative techniques, countering the financing of terrorism, and legal reforms.

Thailand hosted and participated in the International Law Enforcement Academy in Bangkok, which conducted courses on post-blast investigations, border interdictions, law enforcement techniques to counter terrorism, and financial investigative techniques.

Thailand's borders are relatively porous.  The market in fraudulent documents remained active despite government efforts to crack down on criminal counterfeit networks.  Information sharing within Thailand and with neighboring countries appeared limited.  Beginning in 2016, Thailand began to collect and analyze Advanced Passenger Information And Passenger Name Record data on commercial flights at all international airports.  Although the Royal Thai Police in May signed an agreement with the INTERPOL National Central Bureau to gain access rights to INTERPOL's 16 databases, including the Stolen and Lost Travel Document database, Thai immigration systems at border crossings still lacked the capability for real-time connectivity with these INTERPOL databases.

Thailand participated in the Department of State's Antiterrorism Assistance program and received training in border security and investigations.

**Countering the Financing of Terrorism:**  Thailand belongs to the Asia-Pacific Group on Money Laundering, a Financial Action Task Force-style regional body.  Thailand's financial intelligence unit, Anti-Money Laundering Office Thailand, is a member of the Egmont Group.  Thailand does not have a significant unregulated informal banking and money transfer system that could aid terrorism financing activities.  In cases where the central bank has discovered unauthorized remittances, the central bank has coordinated with the police to arrest the offenders.  An estimated two-thirds of Thailand's non-government organizations operate as unregistered entities and therefore represent a high risk for terrorist financing.  Thailand continues to implement UN Security Council 1373 obligations, especially in the banking and insurance sectors.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Thailand lacked a national CVE action plan, although the draft national counterterrorism strategy includes elements of CVE.  The government's Internal Security Operations Command continued to organize outreach programs to ethnic Malay-Muslims in southern Thailand to counter radicalization to violence.  The government also worked with Muslim leaders to promote the teaching of moderate Islam and to improve interfaith dialogue between Muslims and Buddhists.  Non-governmental organizations continued to reach out to communities in the southern provinces to provide services, identify the underlying causes of the area's violence, and provide outlets for peaceful political expression.  Civil society and academic leaders received training through State Department-funded programs.

PX210

In July, the State Department, Australia's Department of Foreign Affairs and Trade, and the Thai National Broadcasting and Telecommunications Commission, co-sponsored a conference in Bangkok on best practices to counter radicalization to violence.

**International and Regional Cooperation:**  Thailand participated in international counterterrorism efforts, including through the Asia-Pacific Economic Cooperation, the Association of Southeast Asian Nations (ASEAN), and the ASEAN Regional Forum.

## EUROPE

## Overview

Europe faced a number of ongoing terrorist threats and concerns in 2017, including from foreign terrorist organizations operating out of Iraq and Syria, foreign terrorist fighters returning to Europe to conduct attacks, and homegrown terrorists who were inspired or remotely directed by ISIS.  Despite increased military pressure in 2017, ISIS inspired and took credit for terrorist attacks against European symbolic targets and public spaces.  Within Europe, ISIS inspired self-directed terrorists primarily in France, Spain, Turkey, and the United Kingdom, at times adopting the tactic of ramming large motor vehicles into crowds of civilians.

Many European countries remain concerned about returning foreign terrorist fighters.  Concurrently, terrorist groups espousing left wing and nationalist ideologies, such as the Kurdistan Workers' Party and the Turkey-based Revolutionary People's Liberation Party/Front, respectively, continued strikes against police and military targets in Turkey and fundraising activity throughout the rest of Europe.

European countries contributed immensely to worldwide counterterrorism efforts in 2017.  Thirty-nine European countries, the European Union, and INTERPOL collaborated within the force-multiplying framework of the Global Coalition to Defeat ISIS.  As a result, the Coalition, which had already liberated Fallujah, Ramadi, and Tikrit, successfully completed military campaigns to liberate Mosul, Iraq and Raqqa, Syria.  European officials and civil society members participated in counterterrorism and countering violent extremism policies and programs within multilateral and regional fora, such as the United Nations, the Global Counterterrorism Forum, the Organization for Security and Co-operation in Europe (OSCE), and the Council of Europe.  North Atlantic Treaty Organization (NATO) allies agreed to a Counterterrorism Action Plan in May, enhancing the Alliance's counterterrorism role by: joining the Defeat-ISIS Coalition, increasing information sharing, forming a new terrorism intelligence cell at NATO Headquarters, and appointing a coordinator to oversee NATO's counterterrorism efforts.

A number of European governments also participated in the U.S.-Europol Law Enforcement Coordination Group (LECG), which was established in 2014 to improve international cooperation in countering Hizballah's terrorist and illicit activities.  The LECG met twice in 2017, in Washington in May and in Europe in December.  Almost 30 governments participated in the December meeting, including representatives from Europe, the Middle East, South

PX210

America, Southeast Asia, and Africa, along with Europol and INTERPOL.  This is a growing recognition of the need to cooperate on efforts to counter Hizballah's global terrorist networks.

NATO and the EU launched the European Center of Excellence for Countering Hybrid Threats in April 2017.  The Center serves as a major facilitator among individual nations and key organizations to bolster resilience and ability to counter hybrid threats by working with academia, the private sector, and governments.

The OSCE's annual counterterrorism conference in May focused on rehabilitation, reintegration, and the prevention of radicalization to violence.  Moreover, the OSCE has developed and implemented a methodology for counterterrorism tabletop training seminars as a contribution to regional security.  In November, the Committee of Experts on Terrorism of the Council of Europe held a plenary meeting in Strasbourg to agree on guidelines to prevent lone actor terrorist attacks and enhance cooperation on countering use of the internet for terrorist purposes by establishing a platform for governments, internet companies, and non-governmental organizations to exchange information, while respecting human rights and the rule of law.

## ALBANIA

**Overview:**  Albania was a strong supporter of counterterrorism efforts in 2017 and continued its participation in the Global Coalition to Defeat ISIS, making significant donations of weapons and ammunition.

**Legislation, Law Enforcement, and Border Security:**  Albania criminalizes terrorist acts, financing of terrorism, conducting transactions with persons on United Nations (UN) sanctions lists, recruiting and training people to commit terrorist acts, incitement of terrorist acts, and establishing, leading, and participating in terrorist organizations.  Albania is establishing and sustaining a port security oversight system to more fully comply with requirements under the International Maritime Organization's International Ship and Port Facility Security Code.

Albanian law enforcement increased its efforts to counter potential terrorist threats.  The recently expanded Albanian State Police Anti-Terrorism Unit (ATU) worked closely with the U.S. Department of Justice's (DOJ's) International Criminal Investigative Training Assistance Program (ICITAP) and the Department of State's Antiterrorism Assistance (ATA) program to match Albanian government requirements for equipment and training with U.S. expertise and resources.  As a result, the ATU developed its own plans and programs for improving equipment, training, and development, and renovated the central ATU facility.  Through participation in the ATA Program, the ATU received training on interviewing terrorist suspects.  Other Department of State funding provided counter-surveillance training, vehicles, intelligence analysis training, surveillance equipment, and computer workstations for investigators.  Despite a scarcity of resources, the ATU also participated in several successful interdictions of known or suspected terrorists.

DOJ's Office of Overseas Prosecutorial Development Assistance and Training Program, funded by the Department of State, continued to provide mentorship, assistance, and training to prosecutors, law enforcement officials, financial investigators, intelligence analysts, and judges

PX210

from Albania, Bosnia, Kosovo, Macedonia, and Serbia.  These officials work on foreign terrorist fighter and terrorism-related cases through the Balkan Regional Counterterrorism program located in Tirana.

Corruption and barriers to information sharing among government agencies, insufficient intra-agency coordination, and a poorly functioning judicial system continued to hinder Albania's law enforcement efforts at all levels.  Recent constitutional and legal reforms to the judiciary are underway, beginning with the vetting of Albania's 800 judges and prosecutors for corruption, proficiency, and ties to organized crime.  As of December 2017, the vetting commission and international monitoring operation began work on the first 57 personnel files.  Other reforms will begin after this first group is vetted.

**Countering the Financing of Terrorism:**  Albania is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body.  The General Directorate for the Prevention on Money Laundering, Albania's financial intelligence unit, is a member of the Egmont Group.

Albania continued to work with the FATF and MONEYVAL to address identified weaknesses in its anti-money laundering/countering the financing of terrorism regime.  As a result, Albania made major improvements to its legal framework for identifying, tracing, and freezing terrorist assets; enhanced international cooperation; extended customer due diligence; and required the filing of suspicious transaction reports and currency transaction reports.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Albania implemented a "Schools for Safer Communities" program aimed at educating teachers throughout Albania about the risks of radicalization to violence among youth.  It included processes for teachers to recommend interventions for students on the path to radicalization to violence.  The Albanian cities of Cerrik, Elbasan, Librazhd, and Tirana are members of the Strong Cities Network.

**Regional and International Cooperation:**  Albania is a member of the UN, the Organization for Security and Co-operation in Europe, the North Atlantic Treaty Organization, the Regional Cooperation Council for Southeast Europe, the Council of Europe, and the Organization of Islamic Cooperation.  Albanian criminal justice actors participated regularly in various regional associations, conferences, and other counterterrorism information sharing exchanges.  In December, Albania co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## AUSTRIA

**Overview:**  Austria continued to prioritize counterterrorism measures throughout 2017.  U.S.-Austrian law enforcement cooperation remained strong.  Austria's Office for State Protection

PX210

and Counterterrorism (BVT) – the key counterterrorism agency within the Ministry of the Interior – reported ongoing radicalization to violence efforts by terrorist groups.

The BVT estimated the number of Austrian foreign terrorist fighters fighting in Syria and Iraq, or wanting to travel to the conflict zone for terrorist purposes, at 300 between 2014 and 2017.  During this period, authorities prevented 50 persons from leaving the country to go to conflict zones, including 22 women.  Forty-four men who had traveled from Austria to Syria and Iraq are presumed dead.  The BVT monitored an estimated 80 persons who had returned to Austria, and officials believed approximately 110 could still plan to return.  Overall, the BVT noted that terrorist mobilization substantially declined after 2015.  As of August 2017, there were 64 foreign terrorist fighters in Austrian prisons; 20 percent of them were aged 16 to 21.

Austria made the fight against terrorism a key priority for its 2017 chairmanship of the Organization for Security and Co-operation in Europe (OSCE).  Austria is a member of the Global Coalition to Defeat ISIS and a member of the Defeat-ISIS foreign terrorist fighters and stabilization working groups.  Throughout the year, the Ministries of Interior, Justice, and Foreign Affairs increased efforts to counter radicalization to violence and to address the problem of foreign terrorist fighters.  Law enforcement agencies focused on intelligence gathering and investigations, as well as sharing information with international partners.

**Legislation, Law Enforcement, and Border Security:**  Austria has an extensive legal structure to counter terrorism.  Relevant statutes criminalize training in terrorist camps abroad and allow wiretapping of individual suspects or small groups with the permission of an independent judge or ombudsman.  Specific regulations prohibit the use and distribution of symbols attributable to ISIS or al-Qa'ida.  Regulations allow border authorities to prevent minors from leaving Austria upon suspicion they will participate in fighting activities abroad.  Authorities are allowed to withdraw citizenship from an Austrian dual national citizen who voluntarily and actively participates in fighting in a terrorism-related armed conflict.

Austrian law enforcement and BVT officials routinely cooperated with U.S. law enforcement in a range of investigative areas, including joint, multilateral investigative projects and enforcement operations.  Border security forces made effective use of security measures, including biographic and biometric screening capabilities at ports of entry and information sharing internally and with other European Union (EU) countries.  Border security officials at ports of entry have discretion when determining which documents and passengers will be subject to screening on arrival.

Austria has taken a whole-of-government approach to implementing UN Security Council resolutions (UNSCRs) related to counterterrorism as well as Global Counterterrorism Forum (GCTF) good practices on foreign terrorist fighters.

In a series of high-profile trials in 2017, Austrian courts sentenced convicted terrorists to what were considered by local standards to be unusually long prison terms.

Austria has rigorous processes in place to register and screen individuals applying for asylum, lawful residence, and citizenship.  Applicants' fingerprints are checked against the EU's asylum fingerprint database (Eurodac), and in select cases, against criminal databases as

PX210

well.  Individuals are again screened against national and international law enforcement databases before citizenship is approved.

**Countering the Financing of Terrorism:**  Austria is a member of the Financial Action Task Force (FATF).  Austria's financial intelligence unit, located in the Federal Criminal Police Office, is a member of the Egmont Group.  Austria has a comprehensive legislative and regulatory framework for anti-money laundering/combating the financing of terrorism (AML/CFT).  FATF approved of regulatory changes implemented in 2017, leading to a significant upgrade in Austria's AML/CFT technical compliance rating.

Austria criminalizes the financing of terrorism in line with international standards and freezes terrorist assets in accordance with UN Security Council resolutions implemented through EU legislation.  Austria has a national listing mechanism for terrorist financing, which is faster than the EU mechanism.  Money or Value Transfer Services, dealers in precious stones and metals, real estate agents, and exchange houses are monitored and regulated in Austria.  The number of terrorist financing cases successfully prosecuted in Austria has increased due to improved monitoring and prosecution capabilities.

Austria implements the collection of Know Your Customer data for wire transfers through implementation of the Fourth EU Anti-Money Laundering Directive.  This requires identification of clients who want to establish a business relationship with a financial institution, who perform a transaction of 15,000 euros (US $18,300) or more, or where there is suspicion of money laundering or terrorist financing.

While Austria has taken measures to require closer monitoring of non-profit organizations (NPOs), they are still not required by law to file suspicious transaction reports (STRs).  As a consequence, STRs from NPOs are rare.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Austria continued its CVE efforts largely in response to the foreign terrorist fighter phenomenon.  In addition, the Austrian government undertook or continued several other initiatives.  The Ministry of Foreign Affairs, in cooperation with the Islamic Faith Community, continued its information campaign in mosques, Islamic organizations, community centers, and prisons.  The initiative included education outreach to encourage Austrians to differentiate between Islam and what Austria describes as violent extremism.  In an effort to counter radicalization to violence and improve integration in the newly arrived refugee population, the Integration Office within the Foreign Ministry developed an educational program focused on German language acquisition and education on Austrian values, such as equality and democratic principles.  The Austrian government maintained a counseling center and a de-radicalization hotline aimed at friends and family members of potential terrorists.

PX210

**International and Regional Cooperation:**  Austria is a member of various international and regional security platforms, including the UN, EU, OSCE, the Salzburg Forum, and the Central European Initiative.  Austria regularly leads law enforcement training programs with Salzburg Forum countries and the Balkan states.  In its role as OSCE chairman in 2017, Austria organized an OSCE Counterterrorism Conference in May with a focus on rehabilitation, reintegration, and prevention of radicalization to violence.  Austria also focused on engaging and empowering youth in preventing radicalization to violence.  In December, Austria co-sponsored UNSCR 2396 on returning and relocating foreign terrorist fighters.

## AZERBAIJAN

**Overview:**  In 2017, Azerbaijan was a strong counterterrorism partner to the United States.  Azerbaijan's government actively worked to detect and defeat terrorist efforts to move people, money, and materials across its land and maritime borders and within the South Caucasus.  Azerbaijani law enforcement and security services conducted operations to disrupt and prevent terror attacks, arrested and prosecuted suspected terrorists, and prosecuted returning Azerbaijanis who had joined terrorist groups fighting outside Azerbaijan.  Azerbaijani counterterrorism cooperation significantly reduced the risk of terrorist attacks against tourist locations frequented by U.S. citizens and U.S. economic interests in Azerbaijan.

**Legislation, Law Enforcement, and Border Security:**  In 2017, Azerbaijan expanded the legal definition of terrorists and terrorism.  According to the amended law, "A terrorist is one who, directly or indirectly, takes part in a terrorist activity as an organizer, instigator, assistant, or actor, or one who masterminds a terrorist act or attempts to carry it out or assists an organized criminal group with carrying out terrorist acts."  The law previously described a terrorist as "one who takes part in the carrying out of a terrorist activity in any way."  The amended law provides that "a terrorist organization is an organization created for the purpose of carrying out terrorist acts or considering the option of terrorism probable in carrying out its activities.  If a structural unit of an organization engages in terrorist activities with the permission of management, the organization is considered to be a terrorist organization."

Azerbaijani law enforcement and security services have demonstrated the capacity to detect, deter, and prevent acts of terrorism in Azerbaijan's territory.  Responsibility for counterterrorism is vested in several government agencies.  The Ministry of Internal Affairs (MIA) is Azerbaijan's primary law enforcement agency, and its Organized Crime Unit is tasked with leading the Ministry's counterterrorism efforts.  The MIA cooperates closely with the State Security Service (SSS), Azerbaijan's domestic intelligence and counterterrorism service.  The SSS is responsible for identifying and preventing criminal activities by terrorist groups, and countering international terrorism and transnational crimes.  The State Border Service (SBS) and State Customs Committee (SCC) jointly manage border security, and interdict terrorist efforts to move people, money, and materials – including weapons of mass destruction – across Azerbaijan's land and maritime borders.  The SBS is responsible for defending oil platforms against terrorism.  The Prosecutor General's Office is responsible for prosecuting suspects accused of terrorism, conspiracy to commit and aid terrorism, and other terrorism-related crimes.  The government continued to cite "countering violent extremism" as a justification for incarcerating members of the secular and religious political opposition whom it alleges are "religious extremists."  We

PX210

refer you to the State Department's <u>Country Reports on Human Rights Practices</u> and <u>Report on International Religious Freedom for 2017</u> for further information.

Azerbaijan used terrorist and criminal watchlists and biographic/biometric screening at some ports of entry.  Azerbaijan's law enforcement and security services shared information among themselves, and with regional and international partners.

In 2017, Azerbaijani law enforcement and security services reported preventing several potential terrorist attacks, including:

- On January 27, Azerbaijani SSS officers killed suspected "religious extremist" Jeyhun Ojagov.  The SSS reported Ojagov had resisted arrest.
- On February 1, the SSS conducted a raid and killed four members of a group the SSS said was linked to terrorist organizations operating in foreign countries planning terrorist acts in Azerbaijan.
- On August 28, the SSS reported its officers killed terrorist suspect Yashar Javadov while trying to arrest him.  The SSS reported Javadov bought weapons and explosives with funds received from a foreign terrorist organization.
- On October 27, the SSS detained Azerbaijani citizens Hasrat Aliyev, Emil Nasrullayev, Elshad Dadashov, and Zaur Eynalov on suspicion of fighting in Syria and Iraq.

**Countering the Financing of Terrorism:**  Azerbaijan is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force-style regional body.  The government's Financial Monitoring Service is a member of the Egmont Group.  In 2017, Azerbaijan continued implementing its "National Action Plan for 2017-2019 on combatting criminally acquired money, legalization of other properties, and financing of terrorism."

On June 29, Azerbaijan's Parliament ratified the Council of Europe's Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime and on the Financing of Terrorism.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Azerbaijan does not have a formal national CVE strategy, but state bodies such as the State Committee for Work with Religious Associations and the Caucasus Muslim Board work to prevent radicalization to violence in Azerbaijan's religious communities.  The State Committee conducts informational campaigns around the country on the dangers of terrorist recruitment.  In 2017, the Azerbaijani government cooperated with a U.S. government assessment of the level of risk posed by terrorist organizations and the potential for terrorist ideologies to gain ground in Azerbaijan.

**International and Regional Cooperation:**  Azerbaijan maintained membership in the Organization for Security and Co-operation in Europe, the Organization of Islamic Cooperation,

PX210

and other international bodies. Azerbaijan hosted the 4th Annual World Forum on Intercultural Dialogue, aimed at building societies based on equal opportunities as well as an inclusive framework of tolerance and respect for diversity. Azerbaijan also continued supporting North Atlantic Treaty Organization counterterrorism initiatives as one of the Alliance's Partnership for Peace countries.

Azerbaijan continued efforts to improve Afghan security and stability by co-chairing the Heart of Asia-Istanbul Process; as its co-Chair, Azerbaijan hosted senior officials' meetings and a Ministerial Conference. Azerbaijan also hosted a working group meeting that highlighted the role of narcotics traffickers in financing terrorism.

## BELGIUM

**Overview:** Policy reforms, improved information sharing, and additional resources for counterterrorism efforts enhanced Belgian authorities' ability to investigate and prevent terrorist attacks. Belgium's complex, highly decentralized government structure continues to be a challenge for internal information sharing and cooperation. The greatest terrorism threat in Belgium comes from ISIS-inspired homegrown terrorists. The large number of Belgian foreign terrorist fighters in Syria and Iraq led to concern about attacks by returned fighters, although fewer have returned than anticipated. Belgium is a member of the Global Coalition to Defeat ISIS. Belgium also assumed leadership of the European Union (EU) Training Mission in Mali in 2017, which aims to support and rebuild Malian armed forces to better counter local al-Qa'ida-linked terrorists

**2017 Terrorist Incidents:**
- On June 20, soldiers shot and killed an attempted suicide bomber at Brussels Central train station after the attacker's bomb failed to detonate. There were no additional casualties.
- On August 25, a man with a knife attacked and injured two soldiers near Brussels' Grand Place. The attacker was shot and killed at the scene.

**Legislation, Law Enforcement, and Border Security:** Belgium plays a significant role in international efforts to disrupt, prevent, detect, and punish acts of terrorism. The United States and Belgium maintained a close, cooperative counterterrorism partnership through two ongoing Joint Investigative Teams. Belgium's legal system does not permit plea agreements, which contributes to an overburdened court system. The primary actors in Belgian law enforcement are the Belgian Federal Police and its multiple counterterrorism units, the Civilian and Military Intelligence Services, Office of the Federal Prosecutor, and the Crisis Center. The interagency Coordination Unit for Threat Analysis plays an analytic threat assessment role, particularly with regard to foreign terrorist fighters, and advises the government on setting the national threat level. The Belgian National Security Council also plays a significant role in the intelligence and security structure. Belgian law enforcement and intelligence services disrupted a number of terrorist plots in 2017.

In 2017, Belgium approved a constitutional amendment to extend the amount of time a terrorist suspect can be detained before being charged from 24 hours to 48 hours. Belgium also passed legislation to expand the definition of "terrorist activities," and facilitate terrorism-related

PX210

deportations of legal residents.  Belgium partially implemented the EU Passenger Name Record (PNR) directive into Belgian law, and has been a proponent for extending PNR to international, rail, bus, and maritime travel.

In May, the federal government announced 28 security measures it plans to enact; 14 directly relate to counterterrorism.  These measures were in addition to the 30 counterterrorism measures proposed by the Government of Belgium in 2015, which the government was still working to implement.  Some of the new proposals included allowing the use of civilian informants, issuing stronger sentences for certain crimes, developing biometric identification, and including homegrown terrorists in the dynamic database of foreign terrorist fighters.

On October 24, a Parliamentary Investigative Commission concluded an 18-month investigation into the March 22, 2016 Brussels terrorist attacks.  The investigation produced three reports in 2017 on topics including assistance to victims of the attacks, Belgium's security architecture, and radicalism in Belgium.  The reports contained many recommendations, including increasing funding for intelligence services, improving information sharing between agencies, and requiring imams to be trained in Belgium and to speak either Dutch or French.

**Countering the Financing of Terrorism:**  Belgium is a member of the Financial Action Task Force and Belgium's financial intelligence unit, the Cellule de Traitement des Informations Financieres, is a member of the Egmont Group.  On September 18, Belgium passed a law to implement EU Directive 2015/849.  This Directive aims to prevent money laundering and terrorist financing, and allows for sanctions to be imposed on institutions that assist in either.  This law replaces the January 1993 anti-money laundering law.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Parliamentary Investigative Commission's final report on radicalism suggested Islamist fundamentalism was among the key drivers of terrorism in Belgium's Muslim community.  The report recommended greater federal oversight of mosques, new requirements for imam training, and increased intelligence sharing between law enforcement, immigration, and social services.

Belgium's federal, regional, and local governments remained engaged in CVE efforts.  In June, the regional government of Flanders approved a new action plan aimed at early detection and prevention of radicalization to violence.  The plan called for additional training for front-line practitioners, establishing a network of Islamic experts to support practitioners, a telephone hotline for concerned individuals, and additional funding for community projects aimed at promoting social cohesion.  The government of the French Linguistic Community created two new agencies to train front-line practitioners and provide individualized assistance for victims of terrorism.  Local municipal governments began to exchange best practices on developing and managing local integrated security cells.  In December, the federal government's Coordination Unit for Threat Analysis expanded access to its database of hate preachers and terrorist suspects to judicial, regional, and local partners.

PX210

Prisoners charged or convicted with terrorism-related offenses are transferred to prisons with specialized sections for radicalized inmates. Although prison de-radicalization remained a priority in 2017, the Parliamentary Investigative Commission found little improvement from 2016. Radicalization to violence is a growing challenge in Belgian prisons. The Ministry of Justice is developing e-learning programs for prison staff to help address this issue in the interim.

The Belgian cities of Antwerp and Vilvoorde are members of the Strong Cities Network.

**International and Regional Cooperation:** The Parliamentary Investigative Commission's Report on Belgium's security architecture called for increased cooperation with international partners, particularly Turkey and other EU member states. Belgium participates in EU, the North Atlantic Treaty Organization, the Organization for Security and Co-operation in Europe, and Council of Europe counterterrorism efforts. Belgium is a member of the advisory board of the UN Counterterrorism Center.

Belgium has also been an active proponent of Europol databases and EU-wide information sharing. As an EU member state, Belgium has contributed trainers and capacity-building expertise to EU counterterrorism assistance programs in Sahel countries, and the Belgian Federal Police provided training to counterparts in the Maghreb. From July 2016 to January 2018, Belgium led the EU training mission in Mali (EUTM) to build Malian armed forces' capacity to reduce terrorist threats. In addition to continued troops support to EUTM, Belgium provides troops and overall force command to the UN Multidimensional Integrated Stability Mission in Mali.

Belgium participated in all EU efforts to interdict foreign terrorist fighter travel across land and maritime borders, encouraged efforts to strengthen Schengen zone external borders, assumed a leading role in the European Strategic Communication Network (formerly the Syria Strategic Communications Advisory Team), and promoted the implementation of EU and domestic PNR systems. UN Secretary-General António Guterres appointed Belgium's Michèle Coninsx as Executive Director of the UN Counterterrorism Executive Directorate in August, with Coninsx assuming the post in November. In December, Belgium co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## BOSNIA AND HERZEGOVINA

**Overview:** Bosnia and Herzegovina (BiH) remained a cooperative counterterrorism partner and continued to increase its counterterrorism capacity in 2017. Legislative loopholes and lenient sentencing, however, remained major challenges. Some operational domestic coordination exists, but interpersonal and interagency infighting and stovepiping undermined effective cooperation. Extremist ideology and regional nationalist extremist groups remained potential sources of terrorism in BiH, and little progress was made on rehabilitation and de-radicalization. BiH is a member of the Global Coalition to Defeat ISIS.

**Legislation, Law Enforcement, and Border Security:** BiH did not pass any major counterterrorism legislation at the national level in 2017. The sub-state entity Republika Srpska adopted a new criminal code that aligns terrorism offenses with international standards and

PX210

criminalizes membership in foreign paramilitary and para-police forces.  At the state level, BiH also has laws prohibiting membership in para-military and para-police organizations, but sentencing remained a major challenge.  Foreign terrorist fighters frequently received sentences below the minimum prescribed by the BiH criminal code, a result of judges taking mitigating circumstances into account.  If sentenced to one year or less of incarceration, a convicted terrorist may opt to pay a fine rather than serve time in custody.

Although the Ministry of Justice (MoJ) proposed a draft list of amendments to strengthen foreign terrorist fighter/counterterrorism legislation in 2017, there was little political will, including in the MoJ, to secure buy-in.  The amendments have been stalled since June.  A proposal to remove the option for convicted foreign terrorist fighters and terrorists to pay a fine in lieu of jail time, or to secure early release (both of these amendments were included in the MoJ draft), was under consideration in parliament at the end of 2017.

A member of parliament proposed increasing foreign terrorist fighter minimum sentencing from five to eight years, although this would not address the mitigating circumstances issue.  A Ministry of Security working group was in the preliminary stage of developing comprehensive amendments to the criminal code on these issues, but there was little political will to proceed given an upcoming election in October 2018.

The State Investigation and Protection Agency (SIPA) is the lead law enforcement unit performing counterterrorism functions.  With approximately 25 officers working on counterterrorism cases, its effectiveness is limited.  In 2017, the BiH Ministry of Security proposed legislation to increase the number of counterterrorism-focused SIPA officers to approximately 50 by upgrading the relevant unit to a department.

Law enforcement cooperation continued to suffer from interpersonal and institutional infighting.  A BiH Prosecutor's Office-led task force met only two times in 2017, and public disagreements between the Acting Chief Prosecutor, Minister of Security, and SIPA leadership undermined strategic progress on counterterrorism initiatives.  At the operational level, law enforcement and prosecutors meet and work jointly on certain cases.  However, shortages of counterterrorism investigators and interagency cooperation often led to investigative disruptions and the release of suspects after a brief detention.

There were no significant changes since 2016 on border security.

BiH continued its efforts to disrupt terrorist activity in 2017 through arrests:
- On November 29, police arrested Emir Hodzic – who previously served a one-year sentence for a foreign terrorist fighter conviction – for possession of illegal weapons, including a rocket launcher.
- In June, police arrested Enes Mesic when he attempted to illegally cross the border to Serbia, where police suspected he planned to conduct a terrorist attack.  Mesic had been sentenced to three years in prison two months earlier in April for terrorist activities, but was not immediately incarcerated, highlighting another problem with the BiH justice system.  In addition to Mesic, six other convicted terrorists were rearrested or returned into custody after the State Court did not imprison them immediately after sentencing.

PX210

BiH continued to cooperate with the United States on counterterrorism.  For example, the BiH government worked with the United States on the extradition of Mirsad Kandic, an ISIS facilitator living in Sarajevo.

**Countering the Financing of Terrorism:**  BiH is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  BiH's financial intelligence unit, the Financial Intelligence Department, is a member of the Egmont Group.  BiH completed its FATF Action Plan in September, which included making progress on customer due diligence and suspicious transaction reporting, as well as increasing regulation on financial and non-financial institutions.  During the FATF plenary in October, FATF was granted an on-site visit to ensure implementation of these reforms.  This is the next step in removing BiH from the FATF "grey list."  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In 2017, the main religious communities in BiH (Catholic, Islamic, Jewish, and Orthodox) worked together through the Interreligious Council to promote tolerance and confront acts of bigotry or violence directed at any of these communities.  The BiH Ministry of Security named its first state-level coordinator for international and domestic efforts to prevent violent extremism, largely in response to an increasing number of international programs and resources targeting violent extremism in BiH.  Working in close partnership with the International Organization for Migration and other well-known international organizations, BiH supported efforts to strengthen resiliencies within identified at-risk communities, developed the capacity of religious leaders and civil society actors to counter expressions of intolerance, and piloted comprehensive community-led intervention procedures at the local and municipal level.  The BiH cities of Bihac, Bijeljina, Doboj, Jablanica, Prijedor, Srebrenik, and Tuzla – and the municipality of Centar (Sarajevo) – are members of the Strong Cities Network.

**International and Regional Cooperation:**  BiH's criminal code and related legal framework are generally consistent with United Nations (UN) and European Union counterterrorism standards.  The State Prosecutor's Office also works frequently with counterparts in Serbia and Montenegro.  BiH is a member of the UN, the Organization for Security and Co-operation in Europe, the Regional Cooperation Council for Southeast Europe, and the Council of Europe.

## BULGARIA

**Overview:**  The United States and Bulgaria strengthened counterterrorism cooperation through the Bilateral Counterterrorism working group established in 2015.  In addition, Bulgaria is in the process of completing an update to its 2015-2020 National Strategy for Countering Radicalization and Terrorism.  Bulgaria is a member of the Global Coalition to Defeat ISIS and has repeatedly responded to requests for assistance.

PX210

Bulgaria worked with the U.S. Department of Homeland Security to improve its biometric screening of individuals entering and transiting the country.

**Legislation, Law Enforcement, and Border Security:**  Bulgaria prosecutes terrorism under several general provisions of the penal code, which has been amended multiple times since it was first enacted in 1968.  In 2015, the National Assembly adopted amendments to the penal code that provide for the prosecution of individuals, including foreign terrorist fighters, who support and plan the commission of terrorist acts in Bulgaria and abroad.  In 2016, the Bulgarian National Assembly approved new counterterrorism legislation, which provides a legal mechanism for a whole-of-government response to terrorist threats.  The bill defines three levels of terrorist threats and four levels of response readiness.  The bill also regulates the role of the military in counterterrorism activities and delineates the cooperation between the central and local governments.  Amendments to the legislation provided the military with powers to search individuals, private property, check identification, enter homes in the owners' absence, and arrest or use physical force and arms if needed to prevent or manage the consequences of a terrorist act.  In 2017, Bulgaria implemented new legislation directing that public buildings, including schools, transportation hubs, tourism sites and facilities, and houses of worship develop counterterrorism risk assessments and prevention and response measures in the event of a terrorist attack.  The Council of Ministers provides overall guidance on counterterrorism activities, and has adopted a counterterrorism strategy and a national plan.

The Ministry of the Interior (MOI) has operational units responsible for deterring, detecting, and responding to terrorist incidents, including the specialized unit for combating terrorism, security police, and special police forces, which successfully completed a multi-year training mission with a U.S. special operations liaison element.  The State Agency for National Security (DANS) has intelligence-gathering units responsible for counterterrorism.  DANS also houses the National Counterterrorism Center, which was designed as an interagency body during crisis incidents.  Specialized law enforcement units are generally well equipped and supported with relevant training, but their focus has been primarily on Sofia, while other regional centers lack resources.  In 2015, the specialized court for organized crime and its prosecutors' office received jurisdiction to prosecute and try all terrorist cases in the country.  The court is working to develop expertise in handling such cases.  The court is hearing the case against two suspected accomplices in the 2012 Burgas airport bombing, although procedural issues have caused multiple delays in the trial with the most recent delay occurring in November 2017.

After the migrant crisis in 2014-2015 and the spate of terrorist attacks in Europe in recent years, Bulgaria tightened its border control rules and began screening all travelers at its border crossings.  Within the European Union (EU), Bulgaria shares advanced passenger information appearing on the biographical data page of passports and has begun collecting and using Passenger Name Record data in air traveler screening.  Based on bilateral police cooperation agreements, Bulgaria also shares this data with non-EU countries for law enforcement purposes on an as-needed basis.

In October 2017, the Government of Bulgaria apprehended a dual Bulgarian-Syrian national and three accomplices for suspected ties to ISIS and for taking part in terrorist and terrorism-related activities.

PX210

U.S. government agencies continued to work closely with Bulgarian counterparts through a variety of counterterrorism programs aimed at enhancing Bulgaria's capacity and capabilities.  The Department of State partnered with Bulgaria to implement key programs in the areas of border security, aviation security, and interagency cooperation.  Through participation in the Department of State's Antiterrorism Assistance (ATA) program, Bulgaria received training on interviewing terrorist suspects, critical incident management, and integrating counterterrorism strategies at the national level.  In 2017, the U.S. Federal Bureau of Investigation provided a post-blast investigations course to Bulgaria's Special Counterterrorism Force and a big data analytics course to DANS.

**Countering the Financing of Terrorism:**  Bulgaria belongs to the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  Bulgaria's Financial Intelligence Directorate (FID) has primary responsibility for anti-money laundering and countering the financing of terrorism (AML/CFT) measures for all reporting entities and is a member of the Egmont Group.  The Bulgarian National Bank also has a special supervision directorate to investigate banks for compliance with AML/CFT requirements.

In 2016, the parliament passed amendments to the Measures against Financing of Terrorism Act, introducing direct application of United Nations (UN) lists, as well as mechanisms to increase the efficiency of Bulgaria's national list of persons subject to the anti-terrorist financing measures.  Bulgaria criminalizes terrorism financing in accordance with international standards.  Since there is no publicly available information on terrorist-related assets frozen or seized, it is hard to assess the effectiveness of Bulgaria's process.  Thirty-one reporting entities, including banks, real estate brokers, and financial and exchange houses, are required to file regularly with FID currency transaction reports for all transactions valued at more than US $17,000.  There are penalties for non-compliance (administrative sanctions), and enforcement is generally effective.  Bulgaria requires the collection of know-your-customer data for wire transfers.  All non-governmental organizations are obliged to report suspicious transactions.

For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):**  At the end of 2015, a new government strategy and action plan on countering radicalization to violence and terrorism was approved by the Council of Ministers.  At the end of 2017, the Bulgarian government was conducting an update of this strategy with a greater emphasis on providing prevention tools and resources to frontline practitioners such as teachers and police officers.  The strategy spells out mechanisms for improved cooperation with civil society, business organizations, local communities, and religious leaders.  It also aims to strengthen existing government counterterrorism efforts by involving all possible agencies and by optimizing interagency coordination.

The Grand Mufti of Bulgaria has been a voice of tolerance and moderation and has stressed that government efforts must complement CVE community efforts.

PX210

**International and Regional Cooperation:**  Bulgaria is a member of and active contributor to counterterrorism initiatives at the UN, the EU, the North Atlantic Treaty Organization, the Council of Europe, the Organization for Security and Co-operation in Europe, and the Organization for Black Sea Economic Cooperation.  In December, Bulgaria co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## CYPRUS

**Overview:**  The Republic of Cyprus collaborated closely with the United States, the European Union (EU), and other countries – bilaterally and multilaterally – in international counterterrorism efforts in 2017.

Since 1974, Cyprus has been divided de facto into the Republic of Cyprus government controlled area, composed of the southern two-thirds of the island, and the northern third not under the effective control of the Republic of Cyprus, which is administered by the Turkish Cypriots.  The United Nations (UN) peacekeeping force in Cyprus patrols the UN buffer zone, also called "the Green Line," which separates the two sides.  The buffer zone is largely open to civilian traffic and remains a significant route for the illicit transit of people, narcotics, and other contraband.

The division of the island has impeded counterterrorism cooperation between the two communities and between the Republics of Cyprus and Turkey, which do not maintain diplomatic relations.

Cyprus is a member of the Global Coalition to Defeat ISIS and regularly participates in the Coalition's Foreign Terrorist Fighters and Counter-ISIS Finance working groups.

**Legislation, Law Enforcement, and Border Security:**  In April 2017, Cyprus signed the Additional Protocol to the Council of Europe Convention for the Prevention of Terrorism.  Draft laws regulating the use of surveillance of private communications by law enforcement and undercover activities by police officers were submitted to the House of Representatives.

The Cyprus National Police Service increased patrols of identified soft targets and critical infrastructure.  The police have proactively engaged owners and managers of soft targets and representatives of the tourist industry to raise awareness about potential terrorist threats, as well as provide specialized training to private security guards.

Cyprus was preparing for implementation of the EU Directive on Passenger Name Record (PNR) data.  A draft law was being finalized at year's end and the government had begun discussions on the technical implementation of the PNR directive.  Cyprus also started the process to implement EU directive 2017/541 on combatting terrorism, which will require amendments to national counterterrorism laws.

Cypriot officials participate in regular European Commission meetings on aviation security to ensure implementation of security measures required of all EU member states.  Cyprus has also deployed new passenger screening technology that exceeds the current EU requirement.

PX210

**Countering the Financing of Terrorism:**  Cyprus is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  In July, the country enacted an amendment to its national counterterrorism laws to address recommendations by the 2015 FATF Fact Finding Initiative.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism:**  In addition to continuing activities cited in prior iterations of this report, Cyprus provided all secondary school directors with training on identifying radicalized behavior.  The Ministry of Justice and Public Order also trained the staff of the Cyprus Youth Board.

**International and Regional Cooperation:**  There were no significant changes since the 2016 report.

---

## DENMARK

**Overview:**  The Kingdom of Denmark (which includes the autonomous constituent countries of Greenland and the Faroe Islands) devoted significant assets to counterterrorism programs and initiatives to counter violent extremism, domestically and abroad.  Denmark cooperates closely with the United States, the United Nations (UN), and the European Union (EU) on counterterrorism initiatives, including within the Global Counterterrorism Forum (GCTF) and the Global Coalition to Defeat ISIS.

According to the Danish Security and Intelligence Service (PET), at least 145 Danish citizens and residents voluntarily left Denmark to fight in Syria and Iraq since the summer of 2012. PET remained concerned that Danish fighters returning to Denmark with terrorist training would seek to radicalize others.  PET was also concerned about the potential for small groups or individuals to commit terrorist acts.  Danish security agencies worked together to prevent terrorist attacks and counter ISIS's attempts to recruit foreign terrorist fighters in its territory. According to the PET-administered Center for Terror Analysis (CTA), up to 10 percent of foreign terrorist fighters from Denmark are female.

**Legislation, Law Enforcement, and Border Security:**  Denmark continued to use its 2006 terrorism legislation that allows information sharing between its agencies responsible for counterterrorism and foreign terrorist fighters – the PET and the Danish Defense Intelligence Service (DDIS).  This year the government began to implement its National Action Plan to Prevent and Counter Extremism and Radicalization, approved in October 2016.  Efforts to counter terrorism are also shared among the Danish National Police, the Public Prosecution Service, and the Danish Prison and Probation Service.  Danish security and law enforcement agencies share information via the CTA, which – as the Danish government's intelligence fusion center – constitutes the focal point for reporting from the Danish National Police, PET, DDIS,

PX210

the Ministry of Foreign Affairs, and the Danish Emergency Management Agency.  The Danish police and the Danish defense forces share responsibility for preventing terrorist attacks in Copenhagen and on the borders.

Denmark implemented electronic passport checks at its points of entry for individuals arriving from outside of Schengen countries.  Checkpoints for identity documents at Denmark's border with Germany were established in response to Sweden's decision to impose document checks at its border with Denmark in January 2016.  Random checks for identity documents at many border crossings remained in place.

To free up police resources for anti-gang efforts, the military supplemented the police at the borders and as security for the Jewish synagogue in Copenhagen.  In May, the government banned six religious figures, who had been deemed a threat to public order due to their alleged role in promoting "hate speech," from entering the country for two years, including one U.S. citizen.

Counterterrorism-related actions by law enforcement included:
- In March, Hamza Cakan (aka Enes Ciftci) was stripped of his Danish citizenship and sentenced to six years in prison for joining a terrorist group in Syria.  He will be returned to Turkey after serving his prison term.
- In September, PET and the Danish police arrested and charged a man and a woman for purchasing and sending materials to support ISIS.
- In November, a court sentenced a 17-year-old woman to eight years' imprisonment for plotting to bomb two schools, one of which was a private Jewish school in Copenhagen. The woman was originally arrested in January 2016.

**Countering the Financing of Terrorism:**  Denmark is a member of the Financial Action Task Force (FATF).  Its financial intelligence unit (FIU), the Money Laundering Secretariat, is a member of the Egmont Group and cooperates closely with other Nordic FIUs.  Denmark has a robust legal framework to combat the financing of terrorism.  PET is the lead organization for investigation in this area.

The Danish government continued anti-money laundering and counterterrorist financing initiatives in East Africa and Yemen as a part of its foreign assistance.  Denmark continued its efforts to counter illicit financial flows with national banks and other financial institutions in Jordan, Iraq, and Lebanon.  In June, parliament passed a law to strengthen efforts to prevent the Danish financial system from being involved in money laundering and terrorist financing. The law dictates that companies and financial institutions must increase their focus on the risk associated with currency trading and conduct a risk analysis annually.

According to an evaluation conducted by the FATF in August, Denmark has a legal system in place to apply targeted financial sanctions, but "implementation has technical and practical deficiencies in large part due to delays at the EU level...and the absence of any specific measures to freeze the assets of EU internals."

PX210

In January, the Minister of Employment announced it was stopping payment of unemployment benefits to identified ISIS foreign terrorist fighters.  In December, the media reported that Danish aid money may have been used to support the Nour al-Din al-Zinki extremist group through a program the government coordinated with the Free Syrian Police.  The foreign minister suspended support for the program while the case is being investigated.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Danish Parliament continued funding its CVE Action Plan.  The plan calls for a multi-level approach that includes information sharing between schools, social services agencies, municipalities, and the police.  The coordination between these entities takes place in "info-houses" throughout the 12 police districts that act as storehouses of knowledge regarding radicalized behavior among youth.  A national hotline was established where residents can seek advice and guidance if they know of someone on the path to terrorism.

In May, the City of Aarhus and the East Jutland Police Department partnered with the Strong Cities Network (SCN) to host a three-day training event for 500 stakeholders from 50 countries. Through SCN, Denmark helped launch a prevention network in six municipalities in Jordan and Lebanon.  The Danish cities of Aarhus, Copenhagen, Viborg, Guldborgsund, and Gentofte are all SCN members.

In June, the government presented its new foreign and security policy strategy for 2017-2019. The strategy includes policies to block websites with terrorist propaganda and design programs to discourage continued radicalization of persons involved in gangs or showing signs of extremism.

**International and Regional Cooperation:**  The Danish government is committed to working within the UN framework, through the EU, and with other international and regional organizations.  Denmark is a member of and actively participates in the GCTF, the Council of Europe, the Organization for Security and Co-operation in Europe, the North Atlantic Treaty Organization, INTERPOL, the Bern Club, and the European Counterterrorism Center. In December 2015, voters rejected a proposition to end the country's opt-out from the EU's Justice and Home Affairs area, which would have permitted Denmark to continue to cooperate with Europol after May 2017.  However, through a cooperation agreement, Denmark maintains its access to Europol's databases and will have observer status at board meetings.  In December, Denmark co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.  Denmark also implemented programs to support national strategies to combat terrorist finance and to counter violent extremism in the Middle East, North Africa, the Horn of Africa, and Southeast Asia.

**FRANCE**

PX210

**Overview:**  France remained an important counterterrorism partner of the United States in 2017. It is a longstanding and important member of the Global Coalition to Defeat ISIS.  France continued to conduct counterterrorism operations in Iraq, Syria, Libya, Mali, other parts of the Sahel region, and the Lake Chad region.

The terrorist threat in France remained high and terrorists allegedly inspired by or affiliated with ISIS perpetrated multiple small-scale attacks in 2017.  As first observed in 2016, the profile of realized attacks has shifted from the large-scale, externally directed plots of 2015 to more modest attacks perpetrated by solitary local actors with little, if any, direct guidance from established terrorist organizations.  French law enforcement and intelligence thwarted a number of attacks in 2017 and arrested scores on terrorism-related charges, but government officials emphasized that self-radicalized lone actors using rudimentary weapons present a threat much more difficult to detect and disrupt.

**2017 Terrorist Incidents:**  Multiple small-scale suspected terrorist attacks took place in 2017. Most targeted French security forces, although a knife attack in Marseille killed two civilians. Assailants used firearms in one attack.  For example:

- On February 3, a 29-year-old Egyptian citizen wielding a machete was shot and seriously wounded by a French army patrol near the Louvre Museum in Paris after he attacked and lightly wounded one of the soldiers.  Despite having posted several tweets indicating support for ISIS, the attacker told investigators he had no links to the group and "acted on his own will."
- On April 20, a 39-year-old French citizen used an automatic rifle to fire on a police van stationed on the Champs-Elysées in Paris, killing one officer and wounding two others and a tourist before being shot dead.  ISIS claimed responsibility for the attack.  Police found a note on the attacker's body praising ISIS.
- On June 19, a 31-year-old French citizen deliberately rammed his car containing two gas canisters and ammunition into a convoy of gendarmerie vehicles on Champs-Elysées. The perpetrator died but caused no other casualties.  He reportedly sent a letter pledging allegiance to ISIS leader Abu Bakr al-Baghdadi and the organization later claimed responsibility for the attack in July.
- On August 9, a 36-year-old Algerian citizen drove his vehicle into a domestic military detachment patrolling a suburb west of Paris, injuring six soldiers.  French authorities pressed charges for "attempted murder of security forces in connection with a terrorist enterprise," claiming the attacker "had radical beliefs and showed interest in the Islamic State group."
- On October 1, a Tunisian citizen stabbed two women to death at Marseille's main train station before being shot and killed by security forces.  ISIS claimed responsibility for the attack.

**Legislation, Law Enforcement, and Border Security:**  New counterterrorism legislation enacted October 31, 2017, replaced and codified certain aspects of the expired state of emergency that had been initiated in the wake of the November 2015 attacks in Paris and Seine-Saint-Denis.  The law grants expanded powers to conduct searches, restrict and monitor the movements of suspected extremists, close religious institutions for disseminating extremist

PX210

ideas, enhance security measures at public events, and expand identity checks near France's borders. The core provisions of the bill will expire at the end of 2020 unless renewed by parliament. The law also formalized France's Passenger Name Record system, as required by a 2016 European Union (EU) directive, and increased the maximum sentence for adults convicted of encouraging minors to commit a terrorist act or join a terrorist organization to 15 years in prison, among other measures.

President Macron announced several security-related reforms since taking office in May. Macron reinforced and expanded the authorities of the National Intelligence Council (CNR), a DNI-like body established in 2008. President Macron appointed a former chief of domestic intelligence to head the CNR and plans to double its staff from 15 to 30 analysts and advisors. In September, the Ministries of Interior and Defense announced a reorganization of Operation Sentinelle, which includes the domestic deployment of approximately 7,000 French army personnel to bolster security at high-threat sites after the January 2015 terrorist attacks in Paris. These changes aim to make Sentinelle a more flexible and reactive force, rather than a static deterrent. In October, the interior ministry announced details of a community policing program proposed by President Macron during his presidential campaign. Also in October, France extended border controls in place since November 2015 with its Schengen neighbors for an additional six months.

French authorities made multiple terrorism-related arrests and claimed to have thwarted at least 20 specific plots in 2017. France's domestic intelligence and security agency and judicial police antiterrorism unit were responsible for most significant arrests. Police discovered two plots after neighbors reported suspicious behavior to authorities. Most of the arrests involved individuals and groups with direct or indirect links to ISIS. In October, authorities arrested 10 far-right terrorists suspected of planning an attack against politicians, migrants, and mosques.

In November, Abdelkader Merah, brother of the al-Qa'ida-linked terrorist Mohamed Merah, who was responsible for the 2012 Toulouse attacks, was sentenced to 20 years in prison for criminal terrorist conspiracy. Prosecutors had sought a life term. The court found that Abdelkader Merah indirectly supported the attack and contributed to his brother's radicalization, but that he was not directly responsible for the deaths.

**Countering the Financing of Terrorism:** France is a member of the Financial Action Task Force and its financial intelligence unit is a member of the Egmont Group. There are no significant changes to the information provided on countering the financing of terrorism in the 2016 report.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** A critical senate report on France's de-radicalization efforts released in July led to greater scrutiny of the service providers contracted by the government to implement its prevention and reintegration programs. The Inter-Ministerial Committee for the Prevention of Delinquency and Radicalization refocused its efforts on

PX210

disengagement, reintegration, and prevention as opposed to de-radicalization.  It continues to employ multidisciplinary social service teams to provide counseling and support to individuals at risk of radicalization to violence as well as their families.  In June, after all participants left the program, the Committee closed the voluntary residential Citizenship and Reintegration Center it had opened nine months earlier.  President Macron called for an inter-ministerial committee to meet in December to begin designing a new comprehensive government plan to counter radicalization to violence.  In November, Macron pledged additional resources for economically disadvantaged neighborhoods throughout France to address conditions that terrorists exploit for recruitment.  The French cities of Bordeaux, Montreuil, Paris, and Sarcelles are members of the Strong Cities Network.

**International and Regional Cooperation:**  France is a founding member of the Global Counterterrorism Forum.  Sworn in in 2013, France's Jean-Paul Laborde's tenure ended as Executive Director of the UN Counter-Terrorism Executive Directorate in July.  France plays a strong role on the UN Security Council ISIL (Da'esh) and al-Qa'ida Sanctions Committee.  In December, France co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.  In September, France co-led with the United Kingdom and Italy a UN General Assembly high-level side event on "Preventing Terrorist Use of the Internet" focused on technology industry engagement.  The French government undertook joint counterterrorism operations with several EU partners and played an active role in counterterrorism capacity building in other countries, particularly in the Sahel region, both bilaterally and through the EU.

## GEORGIA

**Overview:**  Georgia, a longstanding member of the Global Coalition to Defeat ISIS, continued its strong engagement with the United States across a range of counterterrorism-related issues.  It participated in numerous bilateral exercises and remained a solid U.S. security partner.  In May, U.S. and Georgian leadership signed the Agreement of the United States of America and the Government of Georgia Concerning Security Measures for the Protection of Classified Information, establishing a legal foundation for bilateral intelligence sharing that will strengthen counterterrorism cooperation and enhance the Georgian military's interoperability with North Atlantic Treaty Organization (NATO) member states.

**Legislation, Law Enforcement, and Border Security:**  Georgia continued to enhance its counterterrorism legislation in 2017.  Georgia introduced legislation with a view to reform and increase management oversight of covert investigative operations and the use of electronic surveillance.  The parliament adopted other amendments in 2017, including granting authority to law-enforcement bodies to request electronic communications directly from the agency conducting the surveillance and strengthening security protections for individuals involved in criminal cases.  The government also implemented a new law on international protection. The law was designed to allow the government to refuse refugee, asylum, or other international protection to persons reasonably considered involved in acts of terrorism and/or have connections to terrorist organizations or groups the government deemed "extremist."

PX210

Overall, the Georgian government is generally capable of detecting, deterring, and responding to terrorist incidents.  The State Security Service of Georgia (SSSG) has the lead in handling terrorism-related incidents and is generally well equipped and well trained.  In 2017, Georgia's law enforcement bodies signed a Memorandum of Understanding on Improving the Efficiency of Interagency Cooperation in the Law Enforcement Sphere, which provides for the creation of an Operational Headquarters on Management of Extreme Situations, in the event of a terrorist act.

Georgia improved infrastructure in five land border sectors (four along the Azerbaijani border and one along the Turkish), and added four along the Turkish border.  Georgia also established the Risk and Threat Assessment Unit, which operates in line with the European Common Integrated Risk Analysis Model, and signed the Tactical Memorandum with the NATO Maritime Command, promoting cooperation and information sharing between NATO and Georgia's Joint Maritime Operations Center.  This makes Georgia a non-operational partner of the NATO-led Operation Sea Guardian, one of NATO's activities to counter terrorism.  The government passed additional safety measures in the aviation sector as the State Program on Safeguarding Civil Aviation Security Against Acts of Unlawful Interference legislation was adopted, in conformity with the Chicago Convention on International Civil Aviation, and standards and recommended practices established by International Civil Aviation Organization.  Finally, the government approved and implemented the Joint Action Plan on the Management of Crisis – Extreme Situations in the Field of Civil Aviation.

On November 21-22, the SSSG's counterterrorism unit led an operation in a residential building in Tbilisi, intending to detain four suspected terrorists who opened fire on the Special Forces.  One member of the terrorist group was detained, two were killed, and a fourth suspect detonated an explosive, killing himself.  The Georgian government later identified one of the dead as international terrorist Akhmet Chataev.  One Georgian officer was killed and four others were wounded.  On December 26, following judicial authorization, the SSSG counterterrorism department launched an early-morning counterterrorism raid in Pankisi Gorge.  Authorities detained four individuals based on their alleged connection to Chataev.  One man was critically wounded in the raid and later died.  As of late December 2017, investigations into both raids were ongoing.

In July, Georgia launched an investigation and subsequent criminal proceedings against a Georgian citizen who was allegedly fighting with ISIS.

**Countering the Financing of Terrorism:**  Georgia is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  Georgia's financial intelligence unit, the Financial Monitoring Service of Georgia, is a member of the Egmont Group.  Georgia's anti-money laundering and countering the financing of terrorism legal framework remains largely in compliance with international standards, in particular with updated FATF recommendations.

In late 2017, the Government of Georgia adopted the *Rules of Providing Information and Filling the Illegal Income Legalization and Terrorism Financing Risk Supervisory Reports by the Commercial Banks*, with the intent to improve reporting forms.

PX210

Based on reports provided by Georgia's Financial Monitoring Service, the SSSG launched an investigation into a potential terrorism financing case involving a foreign citizen attempting to open an account in a local private bank who was suspected of having links with an entity operating in Syria.  The investigation was ongoing at the end of 2017.  Three terrorism-financing cases from 2016 remained ongoing in 2017.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In 2017, the Georgian government continued its CVE efforts in vulnerable populations by focusing on initiatives in equality and integration, education, civic and political participation, media and access to information, gender equality, and preserving minority culture and identity.

The Georgian government launched a three-month internship pilot program for ethnic minority students that included over 65 students interning in 20 state agencies and local self-government bodies.  Another project initiated in 2017 was the "Young European Ambassadors" program, aimed at providing various minority target groups with information on Georgia's Euro-Atlantic aspirations in their native languages.  The Ministry of Culture and Monument Protection organized multiple cultural events in both the Pankisi Gorge and Akhaltsikhe, promoting cultural diversity through various fora.  The Ministry of Internal Affairs launched a pilot program focusing on community policing in one district in Tbilisi with the hope of identifying gaps and implementing the program on a broader scale.

**International and Regional Cooperation:**  Georgia is actively engaged on counterterrorism issues at the international, regional, and bilateral levels.  Georgia also cooperates closely with NATO; participates in the Global Coalition to Defeat ISIS, including its Foreign Terrorist Fighters working group; the Council of Europe Convention on the Suppression of Terrorism, and the Organization of Black Sea Economic Cooperation.  In December, Georgia co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

In 2017, Georgia signed the Operational Strategic Cooperation Agreement with Europol, an agreement with Germany on the Exchange and Mutual Protection of Classified Information, and an agreement with the European Union on Security Procedures for Exchanging and Protecting Classified Information.  Separately, Georgia signed bilateral treaties focused on further law enforcement cooperation with Greece and Sweden.  Georgia has similar cooperation agreements in place with 28 countries.  In 2017, more than 150 representatives from the SSSG and other relevant law-enforcement agencies participated in more than 30 counterterrorism-related trainings, seminars, conferences, and capacity-building exercises organized with the support of their international partners.

**GERMANY**

PX210

**Overview:**  In 2017, Germany significantly increased the number of its terrorism-related investigations, arrests, and prosecutions, and to a lesser extent, increased prosecutorial and law enforcement resources to handle the increased caseload.  Law enforcement targeted a range of terrorist groups including violent Islamist extremists (approximately 90 percent of cases, and the greatest threat according to German officials), the Kurdistan Workers Party (PKK), the Turkish Revolutionary People's Liberation Party/Front (DHKP-C), and domestic left wing and right wing actors.  The government increased monitoring of *Gefaehrder* (i.e., dangerous persons who have not been accused of crimes but have come to the attention of law enforcement), began deportations of foreign terror suspects, and actively investigated returning foreign terrorist fighters.  Terrorism was a major issue for all political parties in the September national elections, and counterterrorism will continue to be a top priority.  Germany is a member of the Global Coalition to Defeat ISIS and continued its counterterrorism cooperation with the international community.

**2017 Terrorist Incidents:**  On July 28, a United Arab Emirates-born Palestinian refugee who had been denied asylum allegedly killed one and injured five others with a machete while shouting *Allahu akhbar* in a Hamburg grocery store.  Reportedly radicalized shortly before the attack, the defendant was known to the police and assessed as mentally unstable rather than a security risk.  The incident sparked widespread calls for stronger enforcement of deportation laws and discussion of the difficulty of identifying threats.

On November 27, the Mayor of Altena in North-Rhine Westphalia was seriously injured in a knife attack.  His attacker said the mayor's refugee-friendly policies were the motive for the attack.

**Legislation, Law Enforcement, and Border Security:**  Germany bolstered its existing counterterrorism laws with several pieces of legislation, including:  expanded use of mobile license plate reading systems to assist police and border security personnel; legalization of electronic ankle bracelet monitors; implementation of European Union (EU) Directive 2016/681 concerning Passenger Name Record (PNR) data; implementation of EU regulations to strengthen EU-wide law enforcement data sharing and align data protections with Europol regulation 2016/794; authorization of online search and source telecommunication surveillance; and enhanced prosecution tools for hate crimes and online propaganda posted by terrorist organizations.  In August, the Constitutional Court upheld a law permitting expedited deportations of persons on the *Gefaehrder* list.

Counterterrorism investigations are conducted by both federal and state-level law enforcement agencies and coordinated through the Joint Counter-Terrorism Center, which is composed of 40 internal law enforcement and security agencies.  The Ministry of Justice estimates there were 1,119 active terrorism investigations during January to November 2017, a sharp increase from 238 in 2016.  Some cases were offshoots of refugee processing (for example, asylum seekers claiming to be threatened by violent Islamist extremists) and many will likely be dropped.  Law enforcement agencies significantly expanded use of the *Gefaehrder* designation, used to monitor "extremists," and completed the first deportations of known terrorists.  Thirty-six *Gefaehrder* were deported in 2017, the majority to Algeria, Bosnia and Herzegovina, and Tunisia.

PX210

Germany continues to participate in international efforts to enhance border security.  In 2017, Germany introduced a new passport with enhanced security features, tested wider biometric collection upon entry in connection with the EU Smart Border pilot, and began preparations to introduce the EU Entry Exit System and EU Travel Information and Authorization System.  It is on track to collect and analyze PNR by the May 2018 EU deadline.

Significant law enforcement actions included:

- On October 3, Federal Police arrested a 19-year-old Syrian refugee in Schwerin (in the state of Mecklenburg-Vorpommern) on suspicion of planning an attack using bomb-making components purchased online.
- On November 21, six Syrian refugees were arrested in a series of coordinated raids in four states on suspicion of plotting a terrorist attack.  German law significantly limits pre-trial and/or preventative detention, and the six were released two days later.
- Two high profile 2017 cases highlight increased sentences for terrorism convictions.  Four defendants associated with the 2012 Bonn Rail Station Bombing Plot were convicted on charges that included founding and/or membership in a terrorist organization, conspiracy to commit murder, and weapons violations.  The main defendant received a life sentence with no possibility of parole, which is rare in Germany.  The accomplices received between nine years and nine months and 12 years, which are atypically long sentences.
- In a separate case, prominent Salafist preacher Sven Lau (36) received a five-and-a-half year prison term for providing support to the ISIS-connected terrorist organization, Jamwa ("Army of Emigrants and Supporters"), including providing financial aid to Jamwa's Syrian operations, recruiting foreign fighters, and providing night vision goggles obtained from German Army inventories.

Germany continued to examine the December 19, 2016 Christmas Market terrorist attack, and two state parliaments (North-Rhine Westphalia and Berlin) established special parliamentary inquiry committees into law enforcement's performance in the case.  Shortcomings identified by the Berlin inquiry – including lack of law-enforcement coordination among different agencies and states, failure to monitor a known criminal who carried false identification papers, and poor collection of physical evidence – were discussed in a press conference.  A state senator called for a formal Federal Bundestag inquiry.  In March, the Federal Justice Ministry appointed a temporary victims' representative and at least US $1.9 million in compensation was paid to victims and their families.

**Countering the Financing of Terrorism:**  Germany is a member of the Financial Action Task Force and its financial intelligence unit (FIU) is a member of the Egmont Group.  In June, Germany transferred its FIU to the Customs Office.  The government adopted legislation implementing EU-Directive 2015/849 against Money Laundering and Terrorism Financing, which establishes a transparency register of beneficial owners, extends anti-money laundering and countering the financing of terrorism laws to all goods traders, adopts the EU High Risk Third Country List, expands the list of sanctionable situations, and raises fines from a maximum of US $118,000 to US $1.18 million.  Germany remained a strong advocate of the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime.

PX210

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In 2017, Germany expanded funding for existing CVE programs and earmarked a total of approximately €218 million (US $255 million) for programming targeting all types of violent extremism.  The majority of programs are federally funded and implemented locally through non-governmental organizations.  Several federal states also have CVE offices.  In March, the German Cabinet announced a new €101 million (US $118 million) National Prevention Strategy against Islamist Extremism, part of the €218 million (US $255 million) total CVE funding.  The program is led jointly by the Federal Interior and Family Ministries and implemented with the states, remaining federal ministries, Federal Commission for Migration, Refugees and Integration, and other stakeholders.  Focusing on local communities, schools, refugee integration centers, and mosques, the program will give special attention to prevention and de-radicalization through the internet, refugee integration, and prisons.  In July, the government released the inaugural report of the Federal Extremism Prevention Strategy.  In 2017, local research institutions, including universities and private think tanks, began to engage in CVE-related research.  As of the end of 2017, the German cities of Augsburg and Dresden were members of the Strong Cities Network.

**International and Regional Cooperation:**  In December, Germany co-sponsored UN Security Council resolution (UNSCR) 2396 on returning and relocating foreign terrorist fighters.  Besides its memberships in the EU, the North Atlantic Treaty Organization, and the Organization for Security and Co-operation in Europe, Germany is also a member of the Global Counterterrorism Forum.  In response to UNSCR 2309 on aviation security, the German government was funding initiatives in Egypt, Kenya, and Nigeria aimed at improving aviation security.

---

## GREECE

**Overview:**  The Greek government remained a cooperative counterterrorism partner in 2017, increasing information sharing under auspices of the U.S. Visa Waiver Program and other bilateral agreements, and making arrests of terrorism suspects.  Greece experienced intermittent small-scale terrorist attacks.  Greece is a member of the Global Coalition to Defeat ISIS.

**2017 Terrorist Incidents:**  Greece experienced small-scale attacks conducted primarily by domestic terrorist organizations, which targeted government officials and property in Greece as well as European creditors.

- On March 14, Conspiracy of Fire Nuclei claimed responsibility for sending a number of explosive devices in mail parcels to Greek and European leaders, institutions, and multinational companies, including to the offices of German Finance Minister Wolfgang Schaeuble.  The German Finance Ministry's mail department intercepted the device before it reached Minister Schaeuble.  Police also attributed to the group a March 16 parcel bomb that exploded at International Monetary Fund headquarters in Paris, injuring

one person.  In March, Greek police intercepted eight more parcel bombs intended for EU leaders, institutions, and multinational companies.

- On April 19, a bomb left in a bag exploded outside the entrance to a bank situated close to two busy avenues in Athens, causing minor damage to the building but no injuries.  An anonymous call to a television station provided advance warning and police evacuated the area before the bomb detonated.  The far-left militant Popular Fighters Group claimed responsibility for the attack.
- On May 25, a bomb in an envelope exploded in the car of former Prime Minister Lucas Papademos, injuring Papademos and two others.  On October 29, Greek police arrested Konstantinos Giatzoglou, a 29-year-old Greek male suspected of sending the bomb and others to European targets as part of the Conspiracy of Fire Nuclei attacks.
- On November 6, an unknown assailant opened fire on riot police guarding the headquarters of the Panhellenic Socialist Movement political party and fled the scene on a motorcycle with an accomplice.  No one was hurt in the attack.  Police matched bullet casings from the shooting to past attacks carried out by the far-left Revolutionary Solidarity group, which later claimed responsibility for the attack in an online statement.
- On December 22, a bomb exploded outside one of Greece's main courthouses, damaging the façade and breaking several windows but causing no injuries.  Police cleared the area around the court after receiving two anonymous warning calls.  The far-left militant Popular Fighters Group later claimed responsibility for the incident in an online statement.

**Legislation, Law Enforcement, and Border Security:**  There were no changes to Greece's legal framework or legislation with respect to countering terrorism since 2016.  On November 12, Germany notified the European Commission of temporary internal border controls on flights departing from Greece due to an increased number of passengers arriving without Schengen visas and reports of irregular travel documents.  Belgium also reportedly increased checks in December for some passengers on flights from Greece but did not formally implement internal controls.  Greece's national identification card remained extremely vulnerable to alteration and photo substitution; it has not incorporated certain security features, such as a digitized photo and biometrics.  To mitigate this vulnerability, in 2015 police authorities instituted a system for conducting electronic checks of civil registries and national databases to confirm documents submitted as part of the application for identification cards and passports.  The Greek government has committed to address this vulnerability through the introduction of a biometric national identification card.

The porous nature of Greece's borders remained a concern, particularly given the challenge the refugee and migration crisis presents in Greece.  Six of the individuals responsible for the 2016 attacks in Paris and Brussels passed through Greece.  Greece worked with the U.S. Department of Homeland Security (DHS) to improve its screening of immigrants, asylum seekers, and refugees entering Greece.  Personnel from the Hellenic National Police (HNP) and the Hellenic Coast Guard participated in DHS-sponsored training related to border screening, interdictions, and investigations in May.  The FBI trained HNP officers on counterterrorism analysis in August and December.

Greek authorities took action against terrorists in high-profile arrests:

PX210

- On January 5, authorities arrested convicted member of the terrorist group Revolutionary Struggle, Panagiota (Paula) Roupa.  Roupa was first arrested in 2010 for her role in a series of bomb attacks against political, police, and financial targets, including the 2007 rocket attack against the U.S. Embassy but was released from pre-trial custody, having served the maximum 18 months on remand.  A condition of her release was to remain in the Attica region, but she absconded in 2012 and was convicted in absentia in 2013 to 50 years in prison.
- On October 29, authorities arrested Konstantinos Giatzoglou, the 29-year-old Greek male suspected of sending parcel bombs to European targets, including in an incident that wounded former Prime Minister Lucas Papademos in May.
- On November 28, authorities arrested nine Turkish nationals suspected to be members of Foreign Terrorist Organization Revolutionary People's Liberation Party/Front.  They were charged with a number of terrorism-related offenses, including forming and joining a terrorist organization, acquisition and possession of explosive materials and bombs as an act of terrorism, illegal possession of weapons and explosives, and forgery and use of fake public documents.

Over the objections of the U.S. government, the prison council of Greece's high-security prison for the first time granted convicted terrorist Dimitris Koufontinas a two-day furlough November 9-11.  Koufontinas is serving 11 life sentences plus 25 years for the murder of 11 people and his leadership role in the terrorist group November 17 that targeted and assassinated members of the U.S. Mission to Greece, as well as British and Turkish diplomats, Greek politicians, and Greek citizens.  Koufontinas stated to the press his intention to apply for another furlough after 60 days, as permitted by law.

**Countering the Financing of Terrorism:**  Greece is a member of the Financial Action Task Force, and its financial intelligence unit, the Hellenic Anti-Money Laundering and Anti-Terrorist Financing Commission (HAMLC), is a member of the Egmont Group.  The Foreign Ministry's Sanctions Monitoring Unit ensured that Greece met its commitments to enforce international sanctions, including terrorism-related sanctions.  The HAMLC inspected more than 2,000 suspicious transactions in 2017 but did not report evidence of terrorist financing in Greece. As described in the 2016 report, Greece freezes terrorist assets until completion of judicial proceedings and requires banks to report suspicious transactions of any kind, regardless of the type of entity (for- or not-for-profit).  The Greek government directly monitors such entities if necessary.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  There were no significant changes in Greece's CVE efforts since the 2016 report.

**International and Regional Cooperation:**  Greece continued to engage on counterterrorism initiatives in international fora and participated in regional information exchange and seminars through the United Nations, the European Union, the Organization for Security and Co-operation

PX210

in Europe, the Southeast European Law Enforcement Center for Combating Trans-Border Crime, and the Organization of the Black Sea Economic Cooperation.

## ITALY

**Overview:**  Italy aggressively investigated and prosecuted terrorist suspects and dismantled suspected terrorist-related cells within its borders.  Authorities continued to implement counterterrorism legislation adopted in 2015 aimed at identifying and disrupting the recruitment and flow of foreign terrorist fighters.  Criminal and low-level terrorist acts, such as those involving incendiary devices or small improvised explosive devices, remained a threat.  Italy maintained a high level of professional cooperation with the United States and international partners in all areas, including terrorist information sharing and in the Global Coalition to Defeat ISIS.  Italy was the second largest contributor of troops, after the United States, to the North Atlantic Treaty Organization's Resolute Support Mission in Afghanistan, as well as the Defeat ISIS Coalition's efforts to train Iraqi police and security forces in Iraq.  There were approximately 1,400 personnel deployed to Iraq from Italy, including about 500 Italian troops providing site security for workers employed by Trevi, an Italian engineering firm engaged in critical repair work on the Mosul Dam.  Italy continued to co-chair the Coalition's Counter-ISIS Finance working group with the United States and Saudi Arabia.

Italy has identified approximately 100 foreign terrorist fighters that traveled to Iraq or Syria.  Italian authorities are concerned about the risk posed by returning fighters, as well as fighters dislodged from areas formerly under ISIS control in Libya who may try to use migrant flows to reach Italy.  In addition, officials are concerned that fighters returning from the Western Balkans could also pass through its territory, given the significant Balkan-origin communities in Italy.

At the conclusion of the G-7 Interior Ministerial at Ischia on October 20, Italy and the United States signed an arrangement to implement a Secure Real Time Platform on data exchange to screen arriving migrants against U.S. terrorism databases.

**2017 Terrorist Incidents:**  On May 18, a homeless man stabbed two army officers and a police officer at a train station in Milan.  The man was arrested and later investigated for alleged Facebook posts expressing pro-ISIS views.  The investigation was ongoing at the end of 2017.  On December 7, two anarchist groups linked to the Informal Anarchist Federation and the International Revolutionary Front claimed responsibility for a rudimentary improvised explosive device that detonated in front of a Carabinieri police station in Rome.  There were no injuries.

**Legislation, Law Enforcement, and Border Security:**  In 2017, law enforcement took significant actions against terrorists and terrorist groups, including proactive, well-publicized disruptions, arrests, and prosecutions.  The Italian government continued to make use of 2005 legislation that facilitated the detention of terrorist suspects and expedited procedures for expelling non-citizens suspected of endangering national security.  As of December 12, Italy had deported 100 individuals on security grounds, up from 60 in 2016.  Prominent arrests and expulsions included the following:

PX210

- Police arrested one Moroccan and two Tunisian members of an alleged cell in Perugia on March 23, following a Postal Police cyber investigation.  The cell allegedly spread terrorist propaganda in Arabic and Italian, posting pictures and video of ISIS attacks on Facebook.
- On August 19, the Ministry of Interior deported one Syrian/Tunisian and two Moroccan nationals, citing national security concerns.  On August 28, as part of the same action, the Ministry of Interior deported a 37-year-old Moroccan citizen for the same reason.  The man had been incarcerated in an Italian prison for petty crimes.
- On October 7, at the request of French authorities, Italian police in Ferrara arrested Anis Hanachi, a 25 year-old Tunisian who is the brother of Ahmed Hanachi, the attacker who stabbed two women in Marseille on October 1.  Investigators believe that Anis, who was a foreign terrorist fighter in Syria and Iraq between 2014 and 2016, indoctrinated his brother and instigated him to commit the attack.

**Countering the Financing of Terrorism:**  Italy is a member of the Financial Action Task Force, and its financial intelligence unit is a member of the Egmont Group.  Italy remained a co-lead of the Defeat ISIS Coalition's Counter-ISIS Finance Group, along with the United States and Saudi Arabia.  There have been no significant changes to its policies for countering the financing of terrorism since the 2016 report.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In February, the government reached an agreement with the Union of Islamic Communities and Organizations in Italy that involved moderate imams working in six prisons to prevent radicalization to violence among prisoners.  This was one of the measures recommended by a government commission in September 2016.  On July 18, the Chamber of Deputies approved a bill intended to prevent radicalization to violence.  Pending final approval in the Senate, the new legislation would establish a National Center on Radicalization within the Ministry of the Interior to implement the national CVE strategy, including training of police and magistrates.

**International and Regional Cooperation:**  Italy continued to support counterterrorism efforts in regional and multilateral organizations, including the North Atlantic Treaty Organization, the Organization for Security and Co-operation in Europe, and the Global Counterterrorism Forum.  In September, Italy co-led with the United Kingdom and France a UN General Assembly high-level side event on "Preventing Terrorist Use of the Internet" focused on technology industry engagement.  At the October 19-20 Ischia G-7 Interior Ministerial, Italy brought together G-7 members and private information technology and social media companies to sign a declaration of intent to monitor radicalization to violence on the internet and the use of social media as a recruitment tool by terrorists.  Italy was a member of the UN Security Council in 2017 and in December co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

Italy strengthened its counterterrorism capacity building efforts in Libya, focusing on coast guard cooperation, investigative training for law enforcement, and border security measures.

PX210

## KOSOVO

**Overview:**  Kosovo continued to fight the growing threat of terrorism in 2017.  Approximately 403 Kosovo citizens have traveled to Syria and Iraq to fight for or join ISIS or al-Nusrah Front, of which approximately 74 are deceased.  Some 133 of these individuals have returned, while approximately 196 remain in these conflict zones.  This number includes 40 children born to Kosovo citizens in conflict zones.  The government continued to implement its comprehensive strategy and updated its action plan for countering violent extremism (CVE).  In 2017, the government drafted its third counterterrorism strategy and action plan.  The Minister of Interior took the role of Counterterrorism National Coordinator in November.

The CVE strategy and action plan provide a five-year roadmap for stemming the growing threat of terrorism through a whole-of-government approach, emphasizing the critical role of local stakeholders and civil society.  Thus far, implementation has been uneven across government ministries and a lack of capacity and inadequate resources remained challenges.  On December 5, the Global Community Engagement and Resilience Fund approved US $2.5 million in CVE program funding that could significantly bolster the government's capacity to implement its CVE action plan.  The Kosovo Police (KP) Counterterrorism Directorate continued to enhance its investigative capacities by increasing personnel and developing a cyber-counterterrorism unit.

The security and political situation in northern Kosovo continued to limit the government's ability to exercise its authority in that region, although the government successfully integrated Serbian judges, prosecutors, and staff into Kosovo's judicial institutions in October, extending the country's judicial authority and access to justice for citizens.  The North Atlantic Treaty Organization Kosovo Force (KFOR) and European Union Rule of Law Mission (EULEX) continued to work with the KP to maintain a safe and secure environment and strengthen the rule of law, including at the borders.

Kosovo is a member of the Global Coalition to Defeat ISIS and pledged US $100,000 in support of the Coalition.

**Legislation, Law Enforcement, and Border Security:**  Kosovo's legislative framework is sufficient to prosecute individuals suspected of committing or supporting terrorist activities, but prosecutors lack experience with such cases.  Kosovo officials recognize the need to improve interagency cooperation.

Recognizing the threats and consequences of terrorism, the government strengthened its existing counterterrorism provisions and drafted a new counterterrorism strategy in 2017.  The new counterterrorism strategy provides a comprehensive approach to preventing and combating terrorism and is one of the government's strategic priorities.  On November 30, the Kosovo Assembly held the first reading of the Law on Critical Infrastructure, which passed and aims to identify, preserve, and protect national and European critical infrastructure.

Law enforcement authorities demonstrated adequate capacity to detect and prevent individuals from joining the conflicts in Syria and Iraq.  The KP Counterterrorism Directorate, which is

PX210

responsible for counterterrorism investigations, increased capacities to track suspects, although they still lacked resources for online investigations and surveillance.

The KP and Border Police successfully interdicted several individuals attempting to join foreign conflicts, although border security gaps remained.  On August 11, KP arrested two Kosovo citizens for attempting to join terrorist groups in Syria and Iraq.  The individuals left Kosovo on July 25 via the Macedonian border and arrived at the Ataturk Airport in Istanbul on July 26.  On July 28, Turkish security forces caught them trying to enter Syria and deported them to Kosovo on August 11.  On October 31, they pleaded guilty and were sentenced to 18 months in prison.  The Border Police regularly updated their watch list of persons suspected of connections to terrorism or criminal activities; they had 4,481 hits in 2017.

Trials and investigations continued for 51 suspects and 29 cases, which included several imams arrested since 2014 on terrorism charges.  In 2017, Kosovo authorities arrested five additional individuals on terrorism-related charges.  Authorities issued seven new indictments on terrorism charges involving 17 individuals.

On June 8, a Defeat-ISIS Coalition drone strike in Syria killed Kosovo terrorist leader Lavdrim Muhaxheri and fellow foreign terrorist fighter Bilall Haqifi.  On June 9, Kacanik municipality's head imam, Florim Neziraj, offered condolences at the city's main mosque for Muhaxheri.

On June 28, Pristina's Basic Court held the first hearing for nine Kosovo citizens suspected of planning an attack at the November 2016 Israel-Kosovo soccer match in Albania and other attacks against local and international targets in Albania and Kosovo.  The KP and the Kosovo Intelligence Agency were instrumental in stopping this attack.

Kosovo continued to demonstrate political will to address threats related to terrorism, and the state possesses the legal framework to do so.  Although national institutions continued to strengthen their capacities, limited resources and experience continue to hinder their ability to handle terrorism cases effectively.

**Countering the Financing of Terrorism:**  On February 1, Kosovo's financial intelligence unit became a member of the Egmont Group.  There are no other significant changes since the 2016 report.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The government updated its CVE action plan, which corresponds to its 2015 National Strategy.  The government appointed its third National Countering Violent Extremism Coordinator on October 30, 2017.  The Kosovo Justice Ministry, supported by the U.S. government, continued its implementation of a corrections program aimed at enhancing management of terrorists, and setting up frameworks for the rehabilitation and eventual reintegration of convicted terrorists.  The Ministry of Interior established a reintegration department, which aims to integrate returned fighters and their accompanying families into communities.  The Kosovo government took proactive steps to prepare a repatriation strategy for its citizens returning from conflict zones.  The Kosovo cities of Ferizaj, Gjilan, Gjakova,

PX210

Gracanica, Hani I Elezit, Kacanik, Mitrovica South, Peja/Pec, Prishtina, Prizren, Viti, Vushtrri and Zvecan are members of the Strong Cities Network.

Kosovo's CVE strategy includes promoting counter-narratives to challenge terrorist messaging.

**International and Regional Cooperation:**  There have been no significant changes since the 2016 report.

## MACEDONIA

**Overview:**  Macedonia cooperated with U.S. counterterrorism efforts and was a member of the Global Coalition to Defeat ISIS.  Macedonia's authorities assessed that ISIS members and sympathizers maintained a presence in Macedonia.  Additionally, the Ministry of Interior (MOI) and Intelligence Agency estimated that at least 150 Macedonia nationals traveled to join terrorist groups in Syria and Iraq.  Of that number, 30 were killed, 40 remained there, and 80 returned home to Macedonia.

**Legislation, Law Enforcement, and Border Security:**  A Joint Combined Exchange Training with U.S. Special Forces took place in January to improve Macedonia's ability to respond to terrorist incidents.  Authorities at the MOI reported they developed operational plans to prevent and respond to terrorist attacks on soft targets including stadiums and hotels.

The MOI International Cooperation Unit upgraded from the Mobile INTERPOL Network Database (MIND) to the Fixed INTERPOL Network Database (FIND), with assistance from partner nations, to systematically screen travelers and documents at border crossings against INTERPOL databases on terrorists, fugitives, and lost and stolen travel documents.  Macedonia Border Police used INTERPOL and Europol watch lists that are regularly updated and they have biometric screening capability.  The Border Police also shared and received information through alerts via the Joint Contact Centers with neighboring countries (Albania, Bulgaria, and Kosovo) and INTERPOL.

Additionally, the MOI's Bureau of Public Security worked with U.S. authorities to address corruption among border officials, resource constraints, training gaps for border police officers, and issues related to border management.

Macedonia engaged in one terrorist-plot disruption operation.  In April, just before the Orthodox Easter observance, Macedonia's authorities, in coordination with a regional partner, detained persons of interest for questioning.  No charges were filed as a result of the operation.

Authorities conducted approximately four terrorism investigations into suspected terrorism-related activity of approximately 50 individuals.

On November 2, the Skopje Criminal Court found 33 defendants guilty of terrorism charges and acquitted four in connection with the May 2015 armed incident in Kumanovo, which left eight police officers and 10 members of the armed group dead.  The court issued life sentences to seven defendants while another 13 were sentenced to 40 years in prison.  An additional 13 were

PX210

sentenced to lesser terms ranging from 12 to 20 years in prison.  On November 3, another defendant who had been tried separately in connection with the same 2015 incident was sentenced to life in prison.

**Countering the Financing of Terrorism:**  Macedonia is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body. Macedonia's financial intelligence unit, the Financial Intelligence Office (FIO), is a member of the Egmont Group and developed new indicators for financial transactions that could be related to terrorism financing in 2017.  Macedonia's anti-money laundering and countering the financing of terrorism legal framework remains largely in compliance with international standards, especially after it incorporated the latest FATF recommendations.  The government continued to address deficiencies noted in MONEYVAL's Fourth Round Evaluation Report from 2014 by drafting a new law on restrictive measures.  Pending approval in parliament, the draft law will harmonize domestic legislation with United Nations Security Council resolution 1373 as well as with FATF recommendations on targeted financial sanctions related to terrorism and proliferation.

Deficiencies remained in Macedonia's confiscation regime, which remains conviction-based and hinders effective freezing and confiscation of terrorist assets.  Macedonia has an agency for the management of seized and forfeited assets, but it has limited capacity and activity.  In 2017, Macedonia's FIO received two suspicious transaction reports for terrorist financing and has sent three reports to relevant institutions for further investigation.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In July, the government created and appointed a 44-member National Committee for Countering Violent Extremism (CVE) and Counterterrorism (CT) as well as a National Coordinator for CT/CVE with a Deputy Coordinator for CT and a Deputy Coordinator for CVE.  The government tasked the Committee and Coordinators to revise the 2017-2020 National CT Strategy and to draft a new National CVE Strategy as well as CT and CVE National Action Plans.  The National CT/CVE Committee and Coordinator met for the first time in November to map out a plan to draft the National CVE Strategy and Action Plan, however, the government failed to provide funding to implement this plan.

The Islamic Community of Macedonia (ICM) said that it incorporated counter narratives into Friday sermons with Muslim worshipers.  The ICM also conducted one CVE training session for approximately 12 imams.  Local think tanks continued to research the drivers of terrorism.

The Macedonian municipalities of Aracinovo, Cair (Skopje), Gostivar, Kicevo, Kumanovo, Ohrid, Struga, and Tetovo are members of the Strong Cities Network.

**International and Regional Cooperation:**  Macedonia is a willing regional and international counterterrorism partner.  Fourteen members of the National CT/CVE Committee and the

PX210

National CT/CVE Coordinator and Deputies participated in a three-day U.S.-funded counterterrorism-themed regional Tabletop Exercise (TTX).  During the event, which was co-organized with the Organization for Security and Co-operation in Europe, participants read through a foreign terrorist fighter scenario and discussed what the government could do during the prevention, intervention, and rehabilitation phases.  Participants in the TTX included delegations from Albania and Kosovo, led by those countries' National CVE Coordinators.  The Prime Minister provided opening remarks at the exercise emphasizing a whole-of-society approach to address terrorism.

Macedonia's Border Police and Customs are members of the Southern Border Initiative, whose goal is to establish a cross-border working group consisting of border security agencies from Albania, Kosovo, Macedonia, and Montenegro to combat corruption, illicit cross-border trafficking, transnational crime, and terrorism.

## THE NETHERLANDS

**Overview:**  The Netherlands continued to respond effectively to the global terrorist threat in the areas of border and transportation security, counterterrorist financing, countering violent extremism, and bilateral and multilateral counterterrorism cooperation.  Since March 2013, the national threat level has been "substantial" (the second highest ranking).  The main terrorism threat is Islamist terrorism, with risks posed by both networks and lone actors.  The Netherlands has a comprehensive national counterterrorism strategy in which policies are implemented at the local level through multidisciplinary interagency cooperation.  In the wake of terrorist attacks in Europe, Dutch authorities reviewed their security measures.  Some cities have placed large concrete obstacles on streets to prevent vehicles from driving into soft targets.  In October, the government announced an increase of US $15 million (€12.5 million) in the annual counterterrorism budget beginning in 2018.

The Netherlands is a member of the Global Coalition to Defeat ISIS and co-chair of the Coalition Foreign Terrorist Fighter Working Group, and has liaisons embedded at various operational command centers.  The Netherlands previously conducted air strikes against terrorist targets in Iraq and Syria.  In 2017, it provided force protection and contributed military personnel and trainers in Iraq.  The Netherlands participates in all coalition working groups.  Together with Morocco it co-chaired the Global Counterterrorism Forum (GCTF) and, until September 2017, also co-chaired its Foreign Terrorist Fighters working group.

**Legislation, Law Enforcement, and Border Security:**  The Netherlands implemented counterterrorism legislation in line with United Nations Security Council resolutions.  Within the European Union (EU), the Netherlands pushed for implementation of the road map to improve information exchange.  There has been no change in law enforcement structures, capacity, international cooperation, or border security legislation, and there were no cases of terrorism affecting U.S. citizens in 2017.  The Dutch government announced it will invest an additional US $180 million in the national police in 2018.  On March 1, three new counterterrorism laws entered into force:

PX210

- A law enabling the Minister of Justice and Security to revoke without court order Dutch citizenship of dual nationals who have joined a terrorist organization.
- The *Temporary Law Administrative Measures*, which expands the government's toolbox of non-criminal measures to disrupt potential terrorist activities, including a requirement for certain individuals to report to police stations at regular intervals and obey area, contact, and travel bans.
- A change to the passport law that declares passports and ID cards for individuals subject to a travel ban as expired.

Significant law enforcement and judicial actions related to counterterrorism included:

- On November 13, a district court in Rotterdam convicted a Dutch woman for preparing and promoting acts of terrorism but acquitted her of participation in a terrorist organization. She had traveled to Syria in 2015 but returned in 2016. The court concluded her marriage to an ISIS fighter made her guilty of preparatory acts for terrorism, even if she did not personally participate in acts of terrorism. She was sentenced to two years in prison, with 13 months suspended.
- On November 2, a district court in Rotterdam convicted a man for preparing to commit a terrorist attack and sentenced him to four years in prison. Authorities arrested him in December 2016 after hearing of plans to attack the Turkish Consulate in Rotterdam. Police found an AK-47, ammunition, illegal heavy fireworks, and instructions on how to make a bomb in his residence.
- On September 13, the Minister of Justice and Security announced the revocation in absentia of Dutch citizenship for four foreign terrorist fighters. This marked the first time the government used the new legislation that entered into law March 1. All four individuals were presumed to be in Syria.

**Countering the Financing of Terrorism:** The Netherlands is a member of the Financial Action Task Force (FATF) and is one of the Cooperating and Supporting Nations of the Caribbean Financial Action Task Force, a FATF-style regional body. The Financial Intelligence Unit – Nederland (FIU-NL) is a member of the Egmont Group. On January 1, new legislation entered into force expanding the reach of anti-money laundering regulations to include the possession of stolen goods. Implementation of the Fourth EU Anti-Money Laundering Directive remains ongoing. The Dutch framework for countering the financing of terrorism applies to all EU-designated terrorist organizations and the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime. The Netherlands successfully prosecuted two terrorist financing cases in 2017. The government's national terrorist watch list grew to include 135 individuals and three organizations as of December 2017. In 2017, FIU-NL declared more than 3,000 transactions it received as suspicious. For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** The Netherlands government's 2016-2020 National Counterterrorism Strategy, released in July 2016, contains measures to strengthen communities, build resilience to radicalization to violence, and prevent persons from becoming foreign terrorist fighters. In November, the new cabinet announced prioritization of five topics:  intelligence

PX210

gathering, prevention, protection of physical objects and persons, preparation for incidents, and prosecution. The Dutch government uses a multi-disciplinary approach and develops tailored plans of action to intervene with individuals suspected of adhering to or being susceptible to radicalization to violence. Community police officers are the cornerstone of the local approach.

Other stakeholders include local governments, with the support of the Office of the National Coordinator for Security and Counterterrorism, the public prosecutor's office, social workers, child protective services, educators, and community leaders. This approach prioritizes the use of preventive measures, including mentoring, counseling, and access to job-training programs and other social services to steer individuals away from becoming radicalized to violence. Similar programs also rehabilitate former terrorists. To counter terrorist messaging, local governments use outreach efforts with community and religious leaders to amplify credible voices. The government generally views repressive measures, including arrest and prosecution, as steps to take only when preventive measures fail. Returned foreign terrorist fighters undergo a threat assessment by the government; some returnees are prosecuted.

The Dutch cities of The Hague, Rotterdam, and Utrecht are members of the Strong Cities Network.

**International and Regional Cooperation:** The Netherlands participates in the UN, the GCTF, the EU, the Council of Europe, the Organization for Security and Co-operation in Europe, and the North Atlantic Treaty Organization. As co-chair of GCTF, the Netherlands hosts the GCTF Administrative Unit. The Netherlands has dedicated GCTF officers at four embassies. Under the auspices of the GCTF Foreign Terrorist Fighter working group, the Netherlands and the United States are co-leading the *Initiative on Addressing the Challenge of Retuning Families of Foreign Terrorist Fighters*. The Netherlands is on the governing board of the three GCTF-inspired institutions: the International Center of Excellence for Countering Violent Extremism (Hedayah) in the United Arab Emirates, the International Institute for Justice and the Rule of Law in Malta, and the Global Community Engagement and Resilience Fund in Switzerland. The Netherlands also participates in the Global Initiative to Combat Nuclear Terrorism. In December, the Netherlands co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

On April 13, the Netherlands signed an agreement with the Kenyan National Coordinator for Counterterrorism on Dutch support for the new Kenyan CVE strategy. The Netherlands will support training of police officers and teachers to identify radicalization to violence and rehabilitate former terrorists. On July 19, the Netherlands signed a memorandum of understanding with the Indonesian National Counterterrorism Agency on sharing best practices and exchanging information.

The Netherlands continued to finance a wide variety of capacity-building projects. The Dutch Ministry of Foreign Affairs appointed regional security coordinators at six embassies who are dedicated to capacity building to identify radicalization. The Netherlands is an active participant in the Counter Terrorism Group (the intelligence services of all EU member states plus Norway and Switzerland) to improve cooperation and information exchange between European counterterrorism services.

PX210

## NORWAY

**Overview:**  Norway's internal security service continued to assess that Islamist terrorism remains the primary terrorism threat to Norway, although officials expressed concerns about increasing violent right wing threats.  A small but outspoken group of Islamist extremists in and around Oslo remained active, although they did not conduct any attacks.  In 2017, authorities convicted several Norwegians for supporting or aiding ISIS.  The flow of Norwegian citizens or residents who traveled to Syria and Iraq to fight on behalf of ISIS continued to decrease in 2017.  Since the April arrest of the leader of an Islamist extremist group, no known individual has left Norway to join ISIS.  Police Security Service (PST) officials continued to assess publicly that approximately 100 individuals have traveled as foreign terrorist fighters in total.  Norway and the United States maintained good collaboration on counterterrorism.

Norway is a member of the Global Coalition to Defeat ISIS.  The government co-sponsored UN Security Council resolutions 2178 (2014) and 2396 on foreign terrorist fighters and is contributing to the Coalition's five lines of effort, including with military personnel in a capacity-building mission for Iraqi security forces in Anbar.  Norway provided approximately US $345 million in assistance in 2017 to address the humanitarian crises in Iraq and Syria.

**Legislation, Law Enforcement, and Border Security:**  Terrorism is a criminal offense in Norway.  Norway continued to prosecute foreign terrorist fighters and supporters of terrorism under its amended law from 2013.  The law increased the maximum prison sentence to 30 years for serious terrorism offenses and made it illegal to conduct or plan to conduct a terrorist attack, receive terrorism-related training, or provide material support to a terrorist organization.  In 2016, Norway passed legislation criminalizing traveling, as well as the intent to travel, to fight on behalf of a non-state actor.

The most significant terrorism-related conviction in 2017 was that of Ubaydullah Hussain, leader of the extremist group, the Prophet's Ummah.  Hussain was sentenced to nine years in prison for being an ISIS member, recruiting foreign terrorist fighters to the organization, and for providing financial and material support to ISIS.  In another trial, one of the few Norwegians to have returned from Syria was sentenced to seven years and six months in prison for terrorist fighting and association.

The PST is responsible for domestic security, including counterterrorism activities.  A joint analysis cell called the Joint Counter Terrorism Center became fully operational in 2014.  This unit includes participants from the PST and the Norwegian Intelligence Service (NIS), which is the external security service.  Both the PST and the NIS have devoted significant resources to identifying, tracking, and taking action against Norwegian citizens intending to travel to and from Syria and Iraq to engage in fighting.  The PST and NIS maintain a list of those who have traveled to Syria and Iraq, those who have returned, and those who have expressed an interest in traveling to the two countries.  Norway continued to reinforce local PST units across the country that handle counterterrorism and to improve coordination among PST, local police, municipal authorities, and centers for asylum seekers.

PX210

In May 2016, Parliament approved an agreement on the sharing of fingerprint information in criminal investigations with the European Union (EU), the parties to the Prüm Convention, as well as with the United States under the Preventing and Combating Serious Crimes data-sharing agreement.  Norway continued to explore an agreement on sharing Passenger Name Record (PNR) data with the EU and is simultaneously developing a national PNR system.  In November 2016, Norwegian police piloted an automated biometric identification system, which officials aim to implement nationally in 2018.  Immigration to Norway is facilitated and regulated by the Norwegian Directorate of Immigration, which processes all applications for asylum, visas, family immigration, work and study permits, permanent residence, and travel documents.  The Norwegian police and the Ministry of Foreign Affairs issue passports.

In 2017, Norway implemented security measures on soft targets in the capital, Oslo, such as placing physical barriers in the streets of one of the city's main pedestrian thoroughfares and directly outside the buildings.  Additionally, police at Oslo's Gardermoen Airport have been armed on a trial basis.

**Countering the Financing of Terrorism:**  Norway is a member of the Financial Action Task Force (FATF).  Norway's financial intelligence unit (FIU), which operates within the National Authority for the Investigation and Prosecution of Economic and Environmental Crime, is a member of the Egmont Group.  Norwegian law incorporates FATF standards and recommendations.  Norway is a member of the Defeat ISIS Coalition's working group to Counter Terrorist Financing.  The government also continued to operate a domestic interagency group, which included the Ministries of Justice, Finance, and Foreign Affairs to counter money laundering and the financing of terrorism.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Norway continued to implement its National Action Plan against Radicalization and Violent Extremism, published in 2014, which is a whole-of-government CVE approach.  Priorities include strengthening CVE research, improving national and local cooperation on counter-radicalization efforts, helping to promote reintegration of former terrorists, and preventing recruitment and radicalization to violence online.

In 2017, Norway improved coordination among authorities responsible for managing the release from prison and reintegration of those convicted of terrorism-related offenses.  PST assesses that several municipalities around Oslo fjord are home to communities and individuals most vulnerable to radicalization to violence.  These municipalities have increased their efforts, including passing action plans and increasing budgets for countering violent extremism and counter-radicalization activities.  The national government also hosts an annual conference on radicalization and violent extremism.  Participants at the 2017 conference discussed how best to use dialogue as a method of preventing radicalization.

Norway continued to support the Youth Civil Activism Network and the Strong Cities Network (SCN).  Two Norwegian cities, Oslo and Kristiansand, are members of the SCN.

PX210

**Regional and International Cooperation:**  Norway is active in multilateral fora in efforts to counter terrorism, including the North Atlantic Treaty Organization, the EU's Radicalization Awareness Network, and the Organization for Security and Co-operation in Europe (OSCE).  As Chair of the OSCE Security Committee in 2017, Norway actively supported the CVE agenda, including the role of women.  Although not a member, Norway has been an active participant in Global Counterterrorism Forum working group meetings, through which it coordinates projects related to counterterrorism and countering violent extremism.  Norway continued to support implementation of the UN Secretary General's Plan of Action to Prevent Violent Extremism.  Norway provided support to phase two of The Prevention Project, which focuses on localized interventions.  In 2017, Norway, together with Jordan, established the Group of Friends at the UN on preventing violent extremism and supported the publication of the UN study on foreign terrorist fighters.  Norway supports the Global Community Engagement and Resilience Fund.  In December, Norway co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

---

## RUSSIA

**Overview:**  The Russian Federation remained a target of international terrorist groups, particularly ISIS.  The majority of Russian domestic counterterrorism activities conducted in 2017 targeted armed groups in the North Caucasus.  Russian officials noted that Russia encountered increased ISIS-related activity in its domestic law enforcement activities.

In 2017, the Russian military intervention in Syria factored heavily in public counterterrorism messaging.  Moscow regularly cited the threat posed by terrorists fighting in Syria to help justify its military operations there.  As of October 2017, the Russian government estimated that over 3,400 Russian citizens had fought with ISIS in Syria and Iraq.  Russia also continued to pursue counterterrorism cooperation with foreign partners.  On December 6, President Vladimir Putin announced that Russia's counterterrorist operation in Syria had come to an end "with a complete victory and defeat of the terrorists"; the Russian military, however, remained active in Syria for the rest of the year.  Moscow has also expressed concern about the Islamic State's Khorasan Province threat in northern Afghanistan, calling it one of the most significant threats to the Russian homeland.  U.S. counterterrorism cooperation remained limited due to a number of factors, including repeated false claims that the United States supports ISIS, Russia's targeting of civilians and civilian infrastructure through indiscriminate bombings in Syria, and concerns about Russian anti-terrorism/anti-extremism legislation that could permit the prosecution of peaceful protesters, the political opposition, independent media, and certain religious groups.

**2017 Terrorist Incidents:**  The highest profile terrorist attack in Russia in 2017 occurred on April 3 in St. Petersburg, where a bomb detonated by a suicide bomber on the city's metro system killed 15 people and injured 60 others.  Katiba Al Imam Shamil, an alleged al-Qa'ida affiliate primarily active in the North Caucasus, claimed responsibility for the attack.  Additional representative attacks included:

- On March 24, a group of eight alleged ISIS-affiliated militants attacked a Russian National Guard outpost near Grozny in Chechnya, resulting in the deaths of six soldiers and six attackers.

PX210

- On April 4, two Russian police officers were killed in a shooting in the southern city of Astrakhan; ISIS claimed responsibility.  Two days later, Russian National Guard troops killed four men suspected of involvement in the attack.
- On August 19, a 19-year-old resident of the Siberian city of Surgut attacked and injured seven people with a knife before he was shot and killed by police.  ISIS claimed responsibility for the attack.
- On November 5, two attackers shot and killed one police officer and injured two others in the Nazran district of Russia's North Caucasus.  Firearms, ammunition, and a homemade explosive device were found at the scene after the operation.

**Legislation, Law Enforcement, and Border Security:**  Russia continued to build a comprehensive counterterrorism legal framework that includes provisions of the Criminal Code and various federal laws.  Throughout 2017, however, the Russian government continued to use its "anti-extremism" legislation to prosecute peaceful individuals and organizations, including the political opposition, independent media, and certain religious organizations.  On July 29, President Putin signed a law revoking Russian citizenship from those convicted of terrorism and extremism who became citizens through naturalization.  On November 16, the State Duma passed a bill calling for life sentences for terrorist recruiters who incite a person to commit a terrorist attack, provide training on committing a terrorist attack, organize a terrorist cell, or join a terrorist group.  Additionally, the Chairman of the Investigative Committee suggested introducing further legislation to block extremist materials, including internet sites.

Terrorism-related law-enforcement activities continued apace in 2017.  The majority of operations occurred in the North Caucasus regions of Dagestan and Chechnya, but several high profile cases took place in major Russian cities.  Significant events include:

- On August 14 outside Moscow, the Federal Security Service (FSB) arrested four people on suspicion of plotting attacks on public transportation and shopping centers in Moscow using suicide bombers and explosives.  According to the FSB, those arrested included two would-be suicide bombers, an expert in explosives, and an ISIS member.
- On August 31, the FSB detained two individuals in the Moscow region for plotting terrorist attacks planned for September 1.  According to the FSB, one suspect pledged allegiance to ISIS, while the other claimed to be carrying out ISIS instructions.  The FSB seized a powerful makeshift explosive device and bomb-making components intended for use in a suicide bomb attack.
- On September 26, Russia's Interior Ministry, the FSB, and the National Guard arrested a member of ISIS, for whom an INTERPOL Red Notice had been issued, in Irkutsk, East Siberia.  The suspected terrorist was a 30-year-old native of a former Soviet republic.

**Countering the Financing of Terrorism:**  Russia is a member of the Financial Action Task Force (FATF) and two FATF-style regional bodies:  the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, and the Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG), for which it is a primary funding source.  Through the EAG, Russia provides technical assistance and other resources towards improving legislative and regulatory frameworks and operational capabilities in the region.  Russia's financial intelligence unit, the Federal Service for Financial

PX210

Monitoring (Rosfinmonitoring), is a member of the Egmont Group.  In July, Russia ratified the 2005 Council of Europe Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime and on the Financing of Terrorism (aka the "Warsaw Convention").

In December 2017, Rosfinmonitoring's list of persons and entities tied to "extremist activities" or terrorism increased nearly fourfold over the previous year to include almost 9,000 individuals and legal entities.

Russian financial regulators continued efforts to reduce persistently high capital outflows and fictitious transactions.  The primary regulator is the Central Bank of Russia, which has revoked a large number of banking licenses over the past several years, often citing the existence of dubious transactions.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In May, Russia participated in the Organization for Security and Co-operation in Europe (OSCE) conference in Vienna on "Preventing and Countering Violent Extremism and Radicalization that Lead to Terrorism."  The Russian government's CVE work focuses on enforcement mechanisms and program administration through governmental agencies or organizations controlled by the government.  The Russian government refused to cooperate in this area with independent non-governmental organizations, including Russian-based ones.  We refer you to the State Department's *Country Reports on Human Rights Practices* and *Report on International Religious Freedom for 2017* for further information.

**International and Regional Cooperation:**  Russia is a founding member of the Global Counterterrorism Forum.  Russia participated in numerous regional counterterror exercises, including the Collective Security Treaty Organization's November 2017 *Combat Brotherhood* exercise held in Tajikistan.  Russia also advanced counterterrorism agendas in several multilateral groups, including the Commonwealth of Independent States, the Shanghai Cooperation Organization, the OSCE, the Association of Southeast Asian Nations' Regional Forum, and the Asia-Pacific Economic Cooperation Forum.  In 2017, Russia held consultations, participated in joint counterterrorism exercises, or signed formal counterterrorism agreements with Belarus, China, India, the Kyrgyz Republic, Pakistan, Saudi Arabia, Serbia, Tajikistan, Turkey, and Uzbekistan.

## SERBIA

**Overview:**  With no terrorist attacks in 2017 and low levels of ISIS recruitment activities, the main terrorism threats in Serbia remained the potential movement of money and weapons through its territory, returning foreign terrorist fighters, and radicalization to violence.  The government took steps to improve its ability to fight terrorism with the adoption of the *National Strategy for the Prevention and Countering of Terrorism for the Period 2017-2021*, and continued cooperation with international partners particularly focused on law enforcement and cyber-security efforts.  A member of the Global Coalition to Defeat ISIS, Serbia pledged

PX210

donations of medical supplies in May.  However, inexperience as a donor and internal red tape have delayed delivery of these donations and will likely limit additional financial or material contributions to the Coalition.

Serbia continued to benefit from U.S. government training to build counterterrorism capacity.  As a result of multiple study visits with the Joint Terrorism Task Force, Serbia adopted a similar interagency counterterrorism task force.  The Office of Defense Cooperation and the Special Operations Command Europe conducted two Joint Combined Exchange Trainings with the Ministry of Interior's Counterterrorism Unit.  The Office of Defense Cooperation also sponsored 13 military officers, ministry of defense officials, and security officials to attend Counter Terrorism Fellowship Program courses.  The Export Control and Related Border Security (EXBS) program provided training and equipment to Customs and Border Police.  EXBS works extensively with a Tri-Border Initiative that brings Serbian, Croatian, and Bosnian agencies together for regular training, consultations, and meetings.  The U.S. Department of Justice's Office of Overseas Prosecutorial Development Assistance and Training Program and International Criminal Investigative Training Assistance Program provided numerous law enforcement and judicial training programs.

**Legislation, Law Enforcement, and Border Security:**  In 2017, Serbia passed the *Law on Organization and Jurisdiction of State Authorities Combatting Organized Crime, Terrorism and Corruption.*  The law mandates each state body have a liaison officer to assist in criminal investigations and establishes four specialized anti-corruption prosecutorial units and judicial courts.

Serbia's law enforcement capacities need improvement, but progress is steady.  The Service for Combating Terrorism and Extremism (TES), a part of the Criminal Police Directorate, proactively works on terrorism detection, deterrence, and prevention.  The Government of Serbia has also established interagency working groups to handle security at both the strategic and operational levels.  The Operational working group consists of TES, the Security Information Agency, and the Prosecutor's Office.  Soft targets such as hotels, stadiums, tourist resorts, and shopping centers are required to have their own terrorism contingency plans in place, with TES officers providing consultation and oversight.

The Serbian Border Police use a national border management information system called "System to Check Persons and Vehicles" to screen passengers and vehicles at all border crossing/check points and other ports of entry.  This system verifies the validity of travel documents, collects biographic and biometric data, checks visa status, searches national and international databases, and stores information for future use, although the transmission of this data to the central system can sometimes take several days.

Serbia's criminal code outlaws unauthorized participation in a war or armed conflict in a foreign country consistent with United Nations Security Council resolution (UNSCR) 2178 (2014) and prescribes a sentence of six months to 10 years' incarceration.  Advance Passenger Information and Passenger Name Record programs are not yet legally authorized, although adoption of UNSCR 2396 in December 2017 now makes both obligatory for all UN member states.  Serbia's Civil Aviation Directorate is working toward integration with the European Common Aviation

PX210

Area and has been cooperating with international partners to enhance capacities in accordance with UNSCR 2309 on aviation security.

**Countering the Financing of Terrorism:**  Serbia is a member of the Council of Europe Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL).  The Serbian Administration for the Prevention of Money Laundering (APML) is a member of the Egmont Group.  The APML participates in trainings organized by MONEYVAL, the United Nations, the European Union, and the Organization for Security and Co-operation in Europe.

The Serbian Government has a "National Strategy for the Fight Against Money Laundering and Terrorism Funding" and existing laws to comply with the UNSC ISIL (Da'esh) and al-Qa'ida sanctions regime.  In October, amendments were submitted to the National Assembly aimed at better aligning the *Law on Freezing Assets with the Aim of Preventing Terrorism* and *the Law on Prevention of Money Laundering and Terrorism Financing* to international standards as recommended in a 2016 MONEYVAL report.

The Organized Crime Prosecutor's Office is prosecuting a case in which seven individuals are accused of criminal offenses related to terrorism and terrorism financing.  The case has been ongoing since September 2014.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Serbia's National Counterterrorism Strategy and accompanying Action Plan outline planned CVE activities aimed at identifying early factors leading to radicalization to violence, enhancing the security culture of citizens, and intercepting threats from social media messaging.  The Action Plan identified 22 CVE activities and directed several ministries to develop their own strategies for implementation, including the Ministries of Culture and Information, Education, Youth and Sports, and Interior, among others.  Serbia's Interior Minister advocated for a regional center for de-radicalization that would cooperate with other Western Balkan countries.  According to government officials, the threat of radicalization to violence in Serbia's prisons is minimal, and de-radicalization is handled on a case-by-case basis through the Administration for Enforcement of Penal Sanctions.

The Serbian cities of Bujanovac, Novi Pazar, Presevo, and Tutin are members of the Strong Cities Network.

**Regional and International Cooperation:**  Serbia is engaged in limited regional and international cooperation on counterterrorism issues.  Elements of the government, including the Ministry of Interior and the Security Information Agency, cooperate with INTERPOL and Europol on counterterrorism activities, including watch lists.  Serbia is a member of the North Atlantic Treaty Organization (NATO) Partnership for Peace program and assisted in NATO training of Iraqi military medical personnel.  Serbia routinely participates in law enforcement training from a variety of international partners.  The United Kingdom is funding a large CVE

PX210

research and youth engagement program in five Serbian municipalities.  In November, the Serbian gendarmerie participated in a terrorist response exercise with the Canadian Embassy.  In December, Serbia co-sponsored UNSCR 2396 on returning and relocating foreign terrorist fighters.

Serbia has well-developed bilateral border security cooperation programs with Bulgaria, Hungary, and Romania, and a Tri-Border partnership with Bosnia and Croatia.  Serbian agencies also routinely engage with Albania, Kosovo, Macedonia, and Montenegro.

## SPAIN

**Overview:**  Spain experienced its first major terrorist attack since 2004 on August 17-18, 2017, when two vehicular attacks claimed 16 lives, including one U.S. citizen.  Spanish authorities arrested 75 terrorist suspects in 2017, including terrorist financiers.  Spanish counterterrorism cooperation with the United States was excellent.  After a two-year delay, Spain launched implementation of its national plan to counter violent extremism.  Spain expanded its contribution to the Global Coalition to Defeat ISIS (Defeat ISIS Coalition), with more than 500 personnel deployed to Iraq in military and police training missions.  Spain continued to exercise leadership in regional and global counterterrorism fora, including the Global Counterterrorism Forum (GCTF) and the 5+5 Defense Initiative.  Central government law enforcement agencies worked to improve information sharing and coordination with the Catalan region's autonomous police force.

On April 8, Basque terrorist group ETA announced its intent to disarm fully.  ETA has observed a unilateral ceasefire since 2011, following a decades-long campaign of violence that claimed more than 800 victims.

**2017 Terrorist Incidents:**  On August 17-18, two vehicular attacks in Barcelona and nearby Cambrils left 16 dead, including a U.S. citizen, and more than 100 injured.  ISIS subsequently claimed credit for the attacks.  On August 21, Catalan police shot and killed the suspected driver, Younes Abouyaaqoub, in the August 17 vehicular attack in the Las Ramblas area of Barcelona. In addition to killing 14 in the vehicular attack, Abouyaaqoub killed another person in a carjacking as he fled the scene of the attack.  Abouyaaqoub was part of a cell believed to have been radicalized and led by Abdulbaki Es Satty, an imam in the Catalan town of Ripoll.  Es Satty had spent extensive time in Spanish prison on drug trafficking and other charges; he was killed along with one other cell member in an August 16 house explosion while attempting to produce explosives for use in the attacks.  The police killed five other members of the cell following an August 18 vehicular attack in the Catalan town of Cambrils that killed one Spanish civilian.

**Legislation, Law Enforcement, and Border Security:**  Spain's terrorism alert level remained at four (high) on a five-point scale throughout 2017.  In the aftermath of the August attacks, Spanish authorities considered raising the level to five, which would have enabled deploying military forces to secure civilian areas, but Spain opted to adopt a series of enhanced level four measures instead.  These measures included intensified border controls, increased police presence in heavily trafficked areas, and heightened counterterrorism cooperation with local police.  The Spanish criminal code punishes any act of "collaboration with the activities or

111

PX210

purposes of a terrorist organization," including glorification of terrorism on social media, self-radicalization on the internet, training remotely, operating without clear affiliation, or traveling in support of non-state terrorist actors.

In 2017, Spanish authorities arrested 75 individuals on terrorism-related charges in 52 separate police operations.  According to the Ministry of Interior, 36 Spanish citizens and residents traveled to Syria and Iraq in 2017 to support ISIS and other terrorist organizations as of November.

Spanish authorities have identified 222 Spanish foreign terrorist fighters, including 47 who are believed deceased.  On December 1, Spain adopted a new National Security Strategy, which states that "jihadist terrorism is one of the principal problems confronting the international community."  The Strategy identified ISIS as the leading terrorist threat but noted terrorist groups' "rapid mutability and adaptation to change and to the strategies pursued against them."

**Countering the Financing of Terrorism:**  Spain is a member of the Financial Action Task Force (FATF) and has observer or cooperating status in the following FATF-style regional bodies:  the Caribbean Financial Action Task Force, the Financial Action Task Force of Latin America, and the Middle East and North Africa Financial Action Task Force.  Spain maintained funding levels for its financial intelligence unit, the Executive Service for the Prevention of Money Laundering and Monetary Offenses, which is a member of the Egmont Group.  Spain is a member of the Defeat ISIS Coalition's Counter ISIS Financing working group.  In June, the new European Union (EU) Funds Transfer Regulation entered into effect in Spain.  Spanish authorities made multiple arrests on terrorist finance charges, including the June 1 arrest of an alleged ISIS fundraiser on the outskirts of Madrid and the June 23 arrest of a Danish ISIS financier in the North African enclave of Melilla.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Spain began implementation of its national CVE plan, led by the Intelligence Center for Countering Terrorism and Organized Crime.  The plan was developed in 2015 but lacked funding and high-level political support for most of the last two years.  It seeks to build partnerships at the local level between civil society leaders from vulnerable communities and representatives of law enforcement and other public agencies.

Separately, in October the Ministers of Interior and Justice launched a campaign supported by Google and the Spanish government called #SomosMás (We Are More), highlighting the role of minority youth leaders in countering discrimination and extremism.  In the aftermath of the August 17-18 vehicular attacks, a coalition of 150 civic and religious groups organized a large rally in Barcelona to condemn terrorism and declare the solidarity of Spain's Muslim community with the victims.

The Spanish cities of Fuenlabrada and Malaga are both members of the Strong Cities Network.

**International and Regional Cooperation:**  Spain is a founding member of the Global Counterterrorism Forum and supports counterterrorism initiatives in the United Nations, the

PX210

Council of Europe, the North Atlantic Treaty Organization, and the Organization for Security and Co-operation in Europe. Spain maintained forces throughout 2017 in EU training missions in Mali and Somalia. Spanish officials participated in meetings of the Law Enforcement Coordination Group on disrupting Hizballah's activities. Spain continues to support the 5+5 Defense Initiative bringing together European (France, Italy, Malta, Portugal, Spain) and North African (Algeria, Libya, Mauritania, Morocco, Tunisia) countries to build capacity on counterterrorism, maritime and aviation security, and disaster management. In December, Spain co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## SWEDEN

**Overview:** Sweden experienced its deadliest terrorist attack in decades in April 2017 when an Uzbek national with ISIS sympathies used a stolen truck to overrun pedestrians on a major shopping street in Stockholm, killing five people and wounding several others. The Swedish Security Service (SÄPO) estimated the number of violent extremists to have increased significantly from 200 in 2010 to about 3,000 in 2017, of which two-thirds are Islamist extremists. The National Center for Terrorism Threats stated that the biggest danger to Sweden is terrorist attacks inspired by radical ideology, such as those promoted by ISIS and al-Qa'ida. SÄPO reported that returning foreign terrorist fighters posed one of the most significant threats to Sweden's security. There is broad political unity to strengthen Sweden's defenses against terrorism.

Sweden continued its counterterrorism cooperation with the international community. At the end of 2017, the national alert level was a three (elevated threat, no evidence of planning) on a scale of five (attack imminent, evidence of planning). The national alert level has been graded a three since 2010, except for when it was temporarily raised to a four (high threat, evidence of planning) for several months following the November 2015 attacks in Paris. Sweden is a member of the Global Coalition to Defeat ISIS and made humanitarian contributions to ISIS-impacted populations in Iraq (US $23.5 million in 2017). In October, Sweden doubled the number of military trainers deployed in northern Iraq in support of Coalition efforts from 35 to 70 service men until the end of 2018.

Johan Gustafsson, a Swedish citizen who was kidnapped by al-Qa'ida in the Islamic Maghreb when visiting Mali in November 2011, was released in June 2017 and returned to Sweden.

**2017 Terrorist Incidents:** On April 7, Rakhmat Akilov, a citizen of Uzbekistan who was illegally in Sweden after having his request for asylum denied, rammed a stolen truck into pedestrians in Stockholm, killing five people and injuring 10. Akilov had expressed sympathies with ISIS before the attack. He was in Swedish custody at the end of 2017.

On July 7, three men with ties to the neo-Nazi Nordic Resistance Movement were sentenced to up to eight-and-a-half years in prison for a series of bomb attacks in western Sweden to protest the government's refugee policy, including a January 2017 attack against an asylum center where one man was seriously wounded. Two of the men were reported to have received paramilitary training in Russia.

On December 9, an estimated 10 to 20 persons threw Molotov cocktails at a synagogue in Gothenburg.  The incendiaries did not ignite the building, and nobody was hurt.  The prosecutor stated that "our theory is that this is connected to the Israel-Palestinian conflict."  The police investigation was ongoing at the end of 2017.

**Legislation, Law Enforcement, and Border Security:**  Sweden's legislation criminalizes the incitement of terrorist acts, recruiting on behalf of terrorist organizations, travel to support terrorist organizations, and providing terrorism training.  After the terrorist attack in central Stockholm April 7, the government and the opposition agreed to several additional counterterrorism measures, such as facilitating information exchange between authorities, reviewing security in public spaces, broadening close circuit television monitoring, and promoting the use of electronic monitoring on suspects.  The new legislation will go into effect in 2018.

The Swedish government increased SÄPO's budget for countering terrorist threats and violent extremism by US $9.5 million for 2017, US $20.2 million for 2018, US $23.7 million for 2019, and US $23.7 million for 2020.

Sweden is party to the European Union's (EU's) identity verification and border management tools such as the Schengen Information System and the Visa Information System, which results in traveler information exchanges with other member states on irregular immigration and border control.  Sweden was updating legislation at year's end to implement the EU Passenger Name Recognition Directive.

On November 12, the temporary border controls justified by the massive influx of asylum seekers in 2015 ended as the EU Commission declared it will no longer extend border controls with respect to the refugee crisis.  Sweden instead prolonged unilaterally the temporary border controls until mid-May 2018 using a national security justification, permitted under the Schengen Border Code if a "serious threat to public policy or internal security" exists.

**Countering the Financing of Terrorism:**  Sweden is a member of the Financial Action Task Force (FATF) and has observer or cooperating status in the following FATF-style regional bodies:  the Caribbean Financial Action Task Force, the Financial Action Task Force of Latin America, and the Middle East and North Africa Financial Action Task Force.  Sweden's financial intelligence unit, the National Financial Intelligence Service, is a member of the Egmont Group.  The FATF's assessment of Sweden's anti-money laundering and counterterrorist financing controls in April concluded that Sweden has a strong regime to tackle money laundering and terrorist financing, but needs to improve its national policy coordination.

A report from Sweden's National Defense University showed that a majority of the 300 confirmed foreign terrorist fighters who traveled from Sweden to Iraq and Syria between 2012 and 2016 received some form of welfare benefits and government grants, many under false pretenses, during their time outside of the county.

For further information on money laundering and financial crimes, see the *2018 International*

PX210

*Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Sweden's CVE strategy is to address the factors underlying radicalization to violence.  In 2014, the government appointed a temporary National Coordinator for Safeguarding Democracy from Violent Extremism, who reported to the Ministry of Culture.  The new team at the Swedish National Council for Crime Prevention will coordinate its efforts with national-level authorities, municipalities, and civil society.  Local authorities will obtain support in developing CVE-focused risk assessments and action plans.  The government tasked the Defense Research Agency with gaining better insight into terrorist propaganda and the National Agency for Education with giving teachers better tools to address CVE in the classroom.  The Swedish cities of Malmo and Stockholm are both members of the Strong Cities Network.

**International and Regional Cooperation:**  Sweden is a member of the EU and supports counterterrorism efforts in regional and multilateral organizations, including the European Commission's Radicalization Awareness Network, the EU-9 (focusing on foreign terrorist fighters), the Counter-Terrorism Group, the Police Working Group on Terrorism, and Europol.

Sweden continued to contribute to counterterrorism capacity-building projects through the development assistance work carried out by the Swedish International Development Cooperation Agency, and also via funding to the United Nations (UN) Office on Drugs and Crime-Terrorism Prevention Branch and the Organization for Security and Co-operation in Europe.  Sweden supported the EU's work with capacity-building projects in prioritized countries and regions, such as Pakistan, Yemen, the Horn of Africa, the Maghreb, and the Sahel.  Sweden provided trainers to the UN Multidimensional Integrated Stabilization Mission in Mali.  Sweden is a member of the UN Security Council for 2017-2018 and in December, co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## TURKEY

**Overview:**  Turkey continued its intensive efforts to defeat terrorist organizations both inside and outside its borders, including the Kurdistan Workers' Party (PKK) and ISIS, respectively.  Turkey's eight-month military operation, referred to as Operation Euphrates Shield, to clear ISIS from a 98-kilometer segment of the Turkey-Syria border concluded in March 2017.  Turkey remained an active contributor in international counterterrorism fora, including the Global Counterterrorism Forum (GCTF).

Turkey is a source and transit country for foreign terrorist fighters seeking to join ISIS and other terrorist groups fighting in Syria and Iraq.  Turkey is also an active member of the Global Coalition to Defeat ISIS and continued to provide access to its airspace and facilities for operations in Iraq and Syria.  The United States and Turkey continued sharing comprehensive counterterrorism information.  According to government authorities, as of October 23, Turkey's "Banned from Entry List" included 53,781 individuals from 145 countries.  Turkey deported 5,446 individuals from more than 100 countries for suspected terrorism ties.

**PX210**

The PKK continued to conduct terrorist attacks in Turkey.  Turkey's security forces conducted operations domestically along with airstrikes against PKK leadership positions in northern Iraq. The Ministry of National Defense claimed that, as of April, the government had killed, wounded, or captured more than 11,300 PKK terrorists since July 2015, when a two-year ceasefire between the government and the PKK ended.  Turkish authorities reported more than 1,000 government security personnel have died in clashes with the PKK since the end of the ceasefire.  Detentions and arrests of individuals suspected of aiding the PKK increased in 2017.

According to interior ministry data, law enforcement forces detained more than 15,000 suspects for allegedly aiding and abetting the PKK during the January 2 to October 30 timeframe. The PKK also targeted Turkish elements operating in northern Iraq.  Turkish authorities in October announced that PKK elements in northern Iraq had kidnapped two Turkish National Intelligence Organization (Millî İstihbarat Teşkilatı or MİT) officers.

As a counterterrorism partner of the United States, Turkey continued to receive U.S. assistance to address the terrorist threat posed by the PKK in 2017.

Turkey's counterterrorism efforts were impacted in the aftermath of the July 2016 coup attempt due to the government's investigation into the movement of self-exiled Islamic cleric Fethullah Gulen, which Turkey refers to as the "Fethullah Terrorist Organization" ("FETO"). This resulted in detentions, arrests, and dismissals of military, security, and civil servants from public office. Turkey designated "FETO" as a terrorist organization in May 2016 and later accused it of perpetrating the attempted coup.  The state of emergency instituted by the Turkish government July 21, 2016, remained in effect at the end of 2017.  As of November, the government had dismissed approximately 150,000 civil servants from public service for alleged "FETO" or terrorism-related links, often on the basis of scant evidence and minimal due process.  Detentions of "FETO" suspects continued at year's end, with 35,145 detained in the January 2 to October 30 timeframe, according to interior ministry data.

**2017 Terrorist Incidents:**  Representative attacks included:

- On January 1, an ISIS gunman killed more than 35 people, including 27 foreigners, and wounded 65 others, including a U.S. citizen, in a nightclub shooting in Istanbul. Police captured the attacker, Uzbek national Abdulkadir Masharipov, in Istanbul January 16.
- On January 20, the Revolutionary People's Liberation Front attacked the Istanbul police directorate and the Justice and Development party's provincial office with rocket-propelled grenades.  No casualties were reported.
- On February 17, a PKK vehicle-borne improvised explosive device attack near a housing complex for judges in Sanliurfa province killed two people and wounded 17 others.
- On July 8, a PKK attack against a construction convoy in Hakkari province killed four people and wounded two others.

**Legislation, Law Enforcement, and Border Security:**  Turkey has a broad definition of terrorism that includes crimes against constitutional order and internal and external security of

PX210

the state, which the government regularly used to criminalize what the United States would consider the legitimate exercise of freedom of expression and assembly.  According to the Ministry of Interior, from April 24 to October 30, authorities suspended over 28,500 social media accounts and detained over 2,000 individuals affiliated with these accounts for alleged terrorist-related propaganda.

Turkey has advanced law enforcement capacity to combat terrorism, and efforts continue to streamline interagency information sharing.  Detentions and arrests of suspected foreign terrorist fighters and Turkish nationals with links to ISIS increased in 2017.  According to interior ministry data, from January 2 to October 30, authorities detained over 2,090 individuals for links to ISIS.  In March, the justice ministry reported that more than 1,100 ISIS members were incarcerated and another 310 convicted.  Turkey will sometimes deport suspected foreign terrorist fighters to countries without advance notice.

On March 29, Turkey's National Security Council announced the completion of the eight-month Operation Euphrates Shield, which authorities say secured the Turkey-Syria border against threats emanating from ISIS-controlled territory in Syria.  On March 9, Turkish General Staff reported the operation neutralized 3,060 ISIS members.

On August 25, the Government of Turkey issued a decree pursuant to the state of emergency that placed the MİT under the Presidency.  The MİT is one of several agencies involved in counterterrorism activities in Turkey.  This decree increased the threshold for external oversight of MİT and its activities.

On October 6, authorities announced the completion of construction of a 911-kilometer modular wall along the entirety of the Turkey-Syria border.  According to Turkish General Staff data, during the January to October timeframe, Turkish Land Forces apprehended more than 330,000 individuals, mostly irregular migrants, attempting to illegally cross Turkey's borders.

On October 28, four individuals believed to be ISIS sympathizers were arrested in possession of firearms and explosives outside Istanbul's Forum Shopping complex.  One of the alleged ISIS individuals was wounded by police gunfire; no other casualties were reported.

The United States continued to provide bilateral and regional training programs in the areas of border, aviation, and sea-based security and investigations, in partnership with Turkish law enforcement authorities and counterparts.

**Countering the Financing of Terrorism:**  Turkey is a member of the Financial Action Task Force (FATF), and its financial intelligence unit, the Financial Crimes Investigation Board, is a member of the Egmont Group.  Turkey was subject to a review of its compliance with FATF's recommendations related to the criminalization of terrorist financing as well as targeted financial sanctions.  There have been no significant changes to the country's counterterrorism financing regime since 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

PX210

**Countering Violent Extremism (CVE):**  The Turkish National Police (TNP) undertake social projects, activities with parents, and in-service training for officers and teachers.  Programs prepare medical, community, and religious officials to intervene to undermine terrorist messaging and to prevent recruitment.  The Ministry of Justice implements rehabilitation and reintegration programs for convicts and former criminals.

Turkey's Religious Affairs Presidency (Diyanet), tied to the Prime Ministry, also works to undermine terrorist messaging by promoting a moderate and inclusive version of Islam.  All Sunni imam preachers in Turkey are employees of the Diyanet.

Turkey co-hosted the fourth annual International Countering Violent Extremism Research Conference in Antalya October 30-November 1.  The Turkish city of Antalya is a member of the Strong Cities Network.

**International and Regional Cooperation:**  Turkey is an active member of the United Nations (UN), the North Atlantic Treaty Organization, and the Committee of Experts on Terrorism of the Council of Europe.  Turkey is a founding member of the International Institute for Justice and the Rule of Law and provides expert support to assist training for judges and prosecutors handling terrorism cases.  Turkey participates in the Organization for Security and Cooperation in Europe (OSCE) expert meetings on the Prevention of Violent Extremism and Radicalization that Lead to Terrorism organized by the OSCE Office of Democratic Institutions and Human Rights and the OSCE Secretariat.

Turkey has bilateral security cooperation agreements with more than 70 countries.  The TNP contributes to counterterrorism capacity-building programs of partner countries and offers specialized international law enforcement training.  During the 1997-2017 timeframe, TNP provided training to approximately 26,000 law enforcement officials from more than 60 countries.  Turkey's military has trained more than 30,000 foreign military personnel from more than 55 countries in a range of subjects, including counterterrorism operations.

In 2017, Turkey and the United States co-led the GCTF's Soft Target Protection Initiative.  The resulting good practices document, the Antalya Memorandum on the Protection of Soft Targets in a Counterterrorism Context, was endorsed at the Eighth GCTF Ministerial Meeting in September 2017.  Turkey concluded its co-chair responsibilities (with the European Union) to the GCTF's Horn of Africa Capacity Building working group in September 2017.  In December, Turkey co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## UNITED KINGDOM

**Overview:**  In 2017, the United Kingdom (UK) suffered five major terrorist attacks and the UK government briefly raised its terrorism threat level to the highest rating (critical) twice, with the threat level remaining the second-highest rating (severe) the remainder of the year.  The UK continued its military efforts against ISIS as a partner in the Global Coalition to Defeat ISIS, and worked alongside the United States on operations in Iraq, Libya, Syria, and Yemen.  In Iraq, the UK has worked to deepen its counterterrorism relationship, pledging to invest approximately

PX210

US $13.5 million over the next three years to build Iraq's counterterrorism capability to meet the evolving threat. Programs will include training and advising Iraqi agencies and deploying law enforcement resources to develop an effective judiciary. More broadly, the UK is working with regional partners to develop border infrastructure, watchlists, and biometric capabilities to counter foreign terrorist fighter movement.

An updated UK counterterrorism strategy, known as CONTEST, was slated for release in April, but was delayed as a result of terrorist attacks and the call for a general election. According to the the Metropolitan Police, MI5 and other intelligence agencies have stopped 23 attacks since the murder of British Army soldier Lee Rigby in May 2013, including 10 since March 2017. The UK separately assesses the Northern Ireland-related terrorism threat level for Northern Ireland and for Great Britain (England, Scotland, and Wales). The threat level in Northern Ireland from Northern Ireland-related terrorism remained severe, while the threat level for Northern Ireland-related terrorism in Great Britain remained substantial. Northern Ireland's 2016 action plan sought to eliminate residual paramilitary structures. To this end, in 2017, a new four-member Independent Reporting Commission was formed to provide progress reports on efforts to eradicate paramilitaries. Additionally, in 2017, the government launched a new Paramilitary Crime Taskforce to provide greater investigative and law enforcement capabilities to address the problem.

The United States worked closely throughout the year with the UK to identify and develop new capabilities that meet a wide variety of requirements for countering terrorist threats. Through a cost-sharing bilateral relationship, both countries advanced their technical ability to defeat or mitigate the evolving capabilities of terrorists and criminal organizations.

**2017 Terrorist Incidents:** Major terrorist incidents in 2017 included:

- In March, 52-year-old Khalid Masood drove a vehicle into pedestrians on Westminster Bridge, near British Parliament, and then stabbed a police officer. Five people were killed and more than 50 injured.
- In May, 22-year-old Salman Abedi detonated a homemade shrapnel bomb at Manchester Arena. More than 110 people were hospitalized and 23 died, including Abedi.
- In June, three attackers drove a van into pedestrians on London Bridge then exited the vehicle to stab bystanders in nearby Borough Market, killing eight people and injuring 48.
- Later in June, 47-year-old Darren Osbourne drove a van into pedestrians gathered outside Finsbury Park Mosque in north London. At least eight people were injured and one man died.
- In September, 18-year-old Ahmed Hassan partially detonated a bomb at London's Parsons Green tube station during morning rush hour. Although 30 people suffered injuries, authorities believe if the bomb had exploded as planned, fatalities would have been certain.

**Legislation, Law Enforcement, and Border Security:** The UK structures counterterrorism policing efforts through a network of regional counterterrorism units and counterterrorism

PX210

intelligence units comprised of MI5, the Metropolitan Police Service, and regional police. Counterterrorism efforts are managed through National Counter Terrorism Policing Headquarters, which is responsible for unified counterterrorism policy and strategy. The central operational command for regional counterterrorism units is the National Counter Terrorism Policing Operations Center, which consists of specialized teams responsible for all ports, intelligence, and operational coordination.

The UK has advanced biometric screening capabilities at some points of entry, but at others, such as ferry ports, there is no biometric screening. The UK requires international airlines to collect advance passenger information. In April, the government demonstrated strong leadership in successfully encouraging the Council of the European Union (EU) to approve a directive regulating the use of Passenger Name Record data. All major airports in the UK use e-gate technology (for passengers presenting UK, EU, European Economic Area, or Swiss passports), which incorporates facial recognition technology to match travelers with data recorded in the e-chip of eligible passports.

**Countering the Financing of Terrorism:** The UK is a member of the Financial Action Task Force (FATF) and has observer or cooperating status in the following FATF-style regional bodies: the Eastern and Southern Africa Anti-Money Laundering Group; the Caribbean Financial Action Task Force; Asia Pacific Group on Money Laundering; and the Middle East and North Africa Financial Action Task Force. The UK Financial Intelligence Unit is a member of the Egmont Group.

The UK's Criminal Finances Act, elements of which came into force in July and October, expands UK law enforcement's authority to investigate terrorist financing by permitting law enforcement to request more information in relation to a suspicious activity report (SAR) and allowing more time to investigate SARs. The UK is improving its ability to share terrorist financing information between the financial sector, law enforcement, and regulators through the Joint Money Laundering Intelligence Task Force. The UK implements the EU Fourth Money Laundering Directive.

The UK actively prosecutes those involved in terrorist financing. Since 2001, 63 individuals have been charged under "fundraising"-related sections of the Terrorism Act 2000, and of those, 30 individuals were convicted. Additionally, individuals suspected (but not charged) of funding terrorism were convicted of related offenses, such as fraud and money laundering.

The UK complies with obligations under the United Nations (UN) Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime. Like other members of the EU, the UK implements UN listings by way of EU regulation, which involves a delay between UN adoption and listings taking legal effect. Following the passing of the Policing and Crime Act 2017 in January and associated secondary legislation in April, the UK immediately began implementing all new UN sanctions listings on a temporary basis until the EU regulations can be amended. Action was taken immediately for domestic asset freezes under UN Security Council resolution 1373.

PX210

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Prime Minister announced the creation of a Commission for Countering Extremism that would "promote and defend Britain's pluralistic values."  The commission had not been formed by the end of 2017.  Birmingham and London are both members of the Strong Cities Network.

**International and Regional Cooperation:**  The UK continued to support counterterrorism efforts in regional and multilateral organizations.  The UK develops its international counterterrorism strategy through the Joint International Counterterrorism Unit, which is partially responsible for the international recommendations in the new strategy.  The UK is a founding member of the Global Counterterrorism Forum and co-chaired its CVE working group until September 2017.  It contributes to an international task force that assists countries with development of CVE plans.  In December, the UK supported and co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## THE MIDDLE EAST AND NORTH AFRICA

### Overview

While significant terrorist activities and safe havens continued to persist in the Middle East and North Africa throughout 2017, the Global Coalition to Defeat ISIS and its partners experienced success against ISIS in Iraq and Syria.  By the year's end, the Coalition and its partners had successfully liberated nearly all of the territory ISIS once controlled in Iraq and Syria, including the group's so-called capital Raqqa.  With the loss of territory in Iraq and Syria, however, ISIS began to convert to more insurgent tactics toward the end of 2017.

Beyond Iraq and Syria, ISIS branches, affiliates, and sympathizers across the Middle East remained active in 2017, including in Libya, Saudi Arabia, the Sinai Peninsula, and Yemen. In Egypt, ISIS continued its terrorist campaign in the Sinai through its affiliate, ISIS-Sinai Province (ISIS-SP, formerly Ansar Bayt al-Maqdis).  On November 24, suspected ISIS-SP terrorists conducted the deadliest terrorist attack in Egypt's history when they attacked a mosque in Al-Rawdah village in North Sinai, killing 312 people.

ISIS's presence and capabilities in the Maghreb were significantly reduced in 2017 by U.S. airstrikes in Libya and the counterterrorism efforts of the Algerian, Moroccan, and Tunisian governments.  In Libya, the Government of National Accord (GNA) led by Prime Minister Fayez al Sarraj remained a determined partner to the United States and cooperated with U.S. and international counterterrorism efforts during the year.

Along with ISIS, al-Qa'ida (AQ) and its affiliates continued to maintain safe havens amidst the fragile political and security climate across the region, particularly in Yemen and Syria. In January, Syrian AQ affiliate al-Nusrah Front (ANF) merged with other terrorist groups to

create Hayat Tahrir al-Sham (HTS).  While the emergence of HTS has been described in various ways, ANF dominated and operated through HTS to pursue its objectives.  In July, HTS effectively defeated other major opposition groups in Idlib province in northwest Syria; the group held a safe haven there through the rest of 2017.

In Yemen, the ongoing conflict between the Government of Yemen and Houthi forces continued to create a security vacuum for al-Qa'ida in the Arabian Peninsula (AQAP) and ISIS's Yemen branch to exploit.  AQAP used its tribal connections to continue to recruit, conduct attacks, and operate in areas of southern and central Yemen with relative impunity, although counterterrorism operations eliminated key leaders and pressured the group's networks.  AQAP also released several videos reiterating its intent to attack the West.  Although significantly smaller than AQAP, ISIS's Yemen affiliate conducted large-scale attacks targeting security forces and government targets in Aden.

Beyond Yemen, countries in the Persian Gulf region continued to take important steps to combat terrorism, including through its financing with commitments made during the U.S.-Gulf Cooperation Council summit in Riyadh in May.  An unexpected break in ties with Qatar by Saudi Arabia, the United Arab Emirates, Bahrain, and Egypt in June had a negative impact on regional counterterrorism cooperation.  The United States signed a counterterrorism Memorandum of Understanding with Qatar to increase bilateral cooperation in July 2017.

In the Levant, Jordan and Lebanon both remained committed Global Coalition to Defeat ISIS partners.  Jordanian security forces thwarted several plots and apprehended numerous terrorists in 2017; the Lebanese Armed Forces (LAF) expelled ISIS militants along the Lebanese-Syrian border near Aarsal.  Still, several terrorist groups continued to operate in Lebanon throughout the year, most notably Hizballah.  The terrorist group remained the most capable terrorist organization in Lebanon, controlling areas across the country.

Hizballah's presence in Lebanon and Syria continued to pose a threat to Israel throughout the year.  Although Palestinian terrorist groups in Gaza and the West Bank continued to threaten Israel, Israeli and Palestinian Authority security forces continued their coordination in an effort to mitigate violence.  After the United States announced its intention to move its embassy to Jerusalem, Gaza-based Palestinian terrorist organizations launched rockets into Israeli territory; Israel responded with strikes against terrorist positions inside Gaza.  Terrorists continued their arms and dual-use smuggling efforts through the Sinai into Gaza via tunnels, although the Government of Egypt undertook efforts to prevent such smuggling from its side.

Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force, its Ministry of Intelligence and Security, and Tehran's proxy Hizballah, which remained a significant threat to the stability of Lebanon and the broader region.  (See Chapter 2, State Sponsors on Terrorism, for more information about Iranian activities.)

**ALGERIA**

PX210

**Overview:**  Algeria continued significant efforts to prevent terrorist activity within its borders. Figures published by the Algerian armed forces show continued pressure on terrorist groups as indicated by the numbers of terrorists killed, captured or surrendered, as well as weapons seized and hideouts destroyed.  Some analysts assess that continuing losses have substantially reduced the capacities of terrorist groups to operate within Algeria.  Nevertheless, al-Qa'ida in the Islamic Maghreb (AQIM), AQIM-allied groups, and ISIS elements, including the Algerian affiliate locally known as Jund al-Khilafah in Algeria (JAK-A or Soldiers of the Caliphate in Algeria), remained in the country.  These groups aspired to impose their interpretations of Islamic law in Algeria and to attack Algerian security services, local government targets, and Western interests.  Terrorist activity in Libya, Tunisia, and Mali contributed to the overall threat.

Algeria is not a member of the Global Coalition to Defeat ISIS, although it observed some coalition meetings.  Algeria actively supported the effort to counter ISIS in other ways, such as counter-messaging, capacity-building programs with neighboring states, and co-chairing the Global Counterterrorism Forum's (GCTF's) West Africa Capacity Building working group.

**2017 Terrorist Incidents:**  JAK-A claimed responsibility for attacks on security forces.  Within the region, AQIM continued attacks using improvised explosive devices (IEDs), bombings, false roadblocks, and ambushes.  The Algerian government maintained a strict "no concessions" policy with regard to individuals or groups holding its citizens hostage. Attacks in 2017 included:

- In February 26, a man wearing a suicide belt attempted to enter a police station in Constantine, in eastern Algeria.  Police shot his belt, causing it to explode and killing the attacker.  Two police officers were injured.  ISIS claimed responsibility for the attack in a statement posted on the internet.
- On August 31, a man wearing an explosive belt blew himself up, killing two police officers, at the entrance to the Tiaret police station, about 270 kilometers southwest of Algiers.  ISIS claimed responsibility for the attack via its propaganda arm, the AMAQ News Agency.  AQIM also claimed responsibility and denounced the ISIS claim as a lie.

**Legislation, Law Enforcement, and Border Security:**  On September 29, a new law entered into effect making significant changes to Algerian criminal procedure.  While increasing the number of jurors in many serious criminal cases, the amendments specify that in cases involving terrorism, trials, and appeals will be heard before judges only.  The new law provides for greater prosecutorial control of judicial police, including judicial police within the armed forces.

Military forces and multiple law enforcement, intelligence, and security services addressed counterterrorism, counter-intelligence, investigations, border security, and crisis response.  These included under the Ministry of Interior the various branches of the Joint Staff, the National Gendarmerie, Border Guards under the Ministry of National Defense (MND), and approximately 210,000 national police, or General Directorate of National Security.  Public information announcements from the MND provided timely reporting on incidents during which MND forces captured or eliminated terrorists and seized equipment, arms, ammunition caches, and drugs.

PX210

Border security remained a top priority.  Algerian and Tunisian customs officials continued to coordinate along their shared border.  Algeria created a ditch and berm along the southern part of its border with Tunisia, deployed 3,000 additional troops to the Libyan border, and placed surveillance equipment and a concrete wall along the Moroccan border.  According to media, Algeria sought to increase use of aerial surveillance technologies.  The Government of Algeria closely monitored passenger manifests of inbound and outbound flights.  Government officials reported that all border posts had access to INTERPOL databases.

In 2017, six disciplines at the Gendarmerie's forensics laboratory were accredited to International Organization for Standardization standards, a first in the region.  Algerian law enforcement agencies participated in training and exchanges offered by the U.S. government and by third countries.  Algerian participants attended numerous workshops conducted under the aegis of the GCTF.  A U.S.-Algeria Mutual Legal Assistance Treaty entered into force April 20, facilitating cooperation in transnational terrorism cases and other criminal matters.

**Countering the Financing of Terrorism:**  Algeria is a member of the Middle East and North Africa Financial Action Task Force, a financial action task force-style regional body.  Its financial intelligence unit, known as the Financial Intelligence Processing Unit (CTRF), is a member of the Egmont Group.  The CTRF regularly publishes administrative orders signed by the Minister of Finance, directing the immediate freezing and seizure of the assets of persons and entities on the United Nations (UN) sanctions list under UN Security Council resolution (UNSCR) 1267 (1999) and its successor resolutions.  In implementing UNSCR 2178 (2014), the Algerian Penal Code specifies liability for foreign terrorist fighters and those who support or finance them.

Foreign exchange restrictions and distrust of banks push Algerians to cash transactions and informal currency-exchange markets.  Media reports suggest the scale of the informal market grew, partly in response to government import limitations.  Multiple fiscal initiatives by the government have failed to motivate illegal traders to formalize their businesses.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Algeria emphasized a whole-of-government CVE approach, including rehabilitation and reintegration programs for repentant terrorists.  Stressing the importance of an inclusive society, the foreign ministry published a booklet on *The Role of Democracy in the Fight Against Violent Extremism and Terrorism*.  Regulation of mosques to ensure they are "de-politicized" and "de-ideologized" is a key aspect of the Algerian approach.  The foreign minister recently lauded the "crucial role" of women in CVE efforts, highlighting the *mourchidates*, female clerics who work with young girls, mothers, and prisoners.  The Algerian government monitors mosques for possible security-related offenses and prohibits the use of mosques as public meeting places outside of regular prayer hours.  Government officials publicly affirmed Algeria's Sunni Maliki tradition of Islam, which the Algerian government believes provides a moderate religious vision for the country.  There have been complaints that the government imposes restrictions on other variants of Islam.

PX210

**International and Regional Cooperation:**  Algeria is an active member in the Organization of Islamic Cooperation and the Arab League and is a founding member of the GCTF.  In 2017, the African Union (AU) named Algeria coordinator of its counterterrorism efforts.  Algeria is a founding member of the Institute for International Justice and the Rule of Law and participated in counterterrorism-related projects implemented by the UN Office on Drug and Crime's Terrorism Prevention Branch.  Algeria also participates in Comité d'État-Major Opérationnel Conjoint (CEMOC), a cooperative body between Algeria, Mali, Mauritania, and Niger created to fight AQIM activities in the Sahel; and hosts CEMOC's Liaison and Fusion Center for information sharing.

Algeria sits on the UN Counter-Terrorism Center's Advisory Board and hosts the headquarters AU Mechanism for Police Cooperation (AFRIPOL), a pan-African organization to foster police training and cooperation.  Algeria hosts the AU's counterterrorism center of excellence, the African Center for the Study and Research on Terrorism.  As co-chair of the GCTF's West Africa Capacity Building working group, Algeria hosted that group's plenary meeting in October 2017.

On a bilateral basis, Algeria continued strong diplomatic engagement to promote regional peace and security.  Algeria chaired the implementation committee for the peace accord in Mali and continued to press stakeholders to support the UN political process in Libya.  Algeria also participated in various Sahel-Saharan fora to discuss development and security policies, the evolution of regional terrorism, and donor coordination.  Political disagreement between Algeria and Morocco over the status of Western Sahara remained an impediment to bilateral and regional counterterrorism cooperation in 2017.

## BAHRAIN

**Overview:**  Terrorist activity in Bahrain increased in 2017.  Bahraini Shia militants remained a threat to security forces and attacks in 2017 resulted in the death of four police officers.  During the year, the Bahraini government made gains in detecting and containing terrorist threats from violent Bahraini Shia militants, often backed by Iran, and ISIS sympathizers.  The government offered diplomatic support to the Global Coalition to Defeat ISIS's efforts and supported its military operations through hosting the Fifth Fleet and Naval Central Command.  The closure of an independent newspaper and two opposition political societies along with government suppression of peaceful protests have combined to exacerbate political tensions, which could increase the risk of radicalization to violence.

**2017 Terrorist Incidents:**  Suspected Bahraini Shia militants continued to instigate low-level violence against security forces using real and fake improvised explosive devices (IEDs).  Bahrain regularly experienced low-level violence between Bahraini Shia youth, using Molotov cocktails and other homemade devices, and predominantly Sunni security forces in mostly-Shia villages.  The most prominent attacks in 2017 included:

- On January 29, unidentified assailants killed an off-duty police officer in Bilad Al-Qadeem.

PX210

- On June 19, a Bahraini Shia militant died in Al Hajar when an IED he allegedly attempted to plant detonated.
- On October 1, the Shia militant group Wa'ad Allah (God's Promise Brigades), a suspected al-Ashtar Brigades affiliate, detonated an IED targeting a Ministry of Interior (MOI) checkpoint in Daih, injuring five police officers.
- On October 27, Shia militants detonated an IED along a major highway targeting an MOI police bus killing one officer and injuring eight others.
- On November 10, an oil pipeline exploded in the village of Buri.  MOI officials asserted Bahraini Shia militants trained in Iran conducted the attack.

**Legislation, Law Enforcement, and Border Security:**  There were no changes to counterterrorism legislation or border security procedures in 2017.

In April, Bahrain approved a constitutional amendment granting military courts the right to try civilians accused of threatening state security.  On December 25, military courts sentenced six Bahrainis to death and seven to seven years in prison in the first trial since the amendment was ratified.

In January, Bahrain restored the Bahrain National Security Agency's (BNSA) arrest authority for suspected terrorists.  BNSA lost its arrest authority after torture allegations amid unrest in 2011.  In April 2017, the Bahrain Defense Force established a Counterterrorism Center combining five special operations entities in a new crisis-response mechanism.  In December, those forces conducted a mock terrorist attack exercise at a Manama shopping mall.

**Countering the Financing of Terrorism:**  Bahrain is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body, and its financial intelligence unit is a member of the Egmont Group.  In December, Bahrain did not issue visas for a Qatari representative to participate in MENAFATF's plenary meeting, held in Manama, likely due to Bahrain's ongoing political dispute with Qatar.  Bahrain is also a member of the Defeat ISIS Coalition's Counter ISIS Finance Group and participates in the Egmont Group's Counter ISIS project.  In November, a FATF evaluation team conducted an onsite visit to Bahrain to gather information for its second Mutual Evaluation Report.  The team found that Bahrain has progressed in terrorism finance investigations and prosecutions.

Bahrain criminalizes terrorist financing in accordance with international standards and can immediately freeze suspicious financial assets.  The government obliges non-profit organizations to file suspicious transaction reports and monitors them to prevent misuse and terrorist financing.  The government routinely distributes UN sanctions lists under relevant UN Security Council resolutions to financial institutions.

On October 25, the Ministry of Foreign Affairs imposed sanctions on several individuals and two entities linked to ISIS and al-Qa'ida in the Arabian Peninsula (AQAP) for their support for or funding of terrorism, blocking their assets and banning transactions in Bahrain.  These actions were announced under the newly established U.S.-Saudi Arabia co-chaired Global Terrorist

PX210

Financing Targeting Center, which acts as an information sharing and coordinating body for the Gulf Cooperation Council countries' terrorism financing efforts.

The potential politicization of terrorism finance and money laundering issues risks conflating legitimate prosecutions of militants with politically motivated actions against the mainstream opposition. In May, the government convicted Shia cleric Isa Qassim on money-laundering charges related to his collection of *khums*, alms giving unique to the Shia sect, without proper authorization. Activists and opposition-aligned clergy claimed that increased scrutiny of *khums* is part of a wider crackdown on the political opposition, whereas the Bahraini government has argued that some *khums* collections directly and indirectly support Bahraini militants.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** The Bahraini government continued its efforts to adopt a National CVE strategy in line with the UN Secretary-General's Preventing Violent Extremism Plan of Action. Additionally, numerous officials from the government, legislature, and non-governmental organizations have developed programming targeting youth and other vulnerable populations.

Within the Bahraini Sunni community, a limited circle of individuals became radicalized to violence in the past several years and joined local terrorist factions or traveled to Syria and Iraq to fight with ISIS and other terrorist groups. A small number of extremist religious preachers helped radicalize these individuals.

The government attempted outreach through initiatives such as the community police, which recruits Shia Bahrainis to bridge the divide between predominantly Shia villages and the mostly Sunni (and largely non-Bahraini origin) police force. The government has not published statistics on the force's composition or track record.

There is no overall strategic messaging campaign to counter terrorist narratives, although government leaders often publicly speak about tolerance and reducing sectarian rhetoric. However, the government also dissolved secular opposition political group Waad and closed independent opposition-leaning newspaper Al Wasat, limiting the space for opposition voices in the country.

**International and Regional Cooperation:** Bahrain's air, land, and sea forces participated in Saudi-led coalition operations against AQAP and Houthis in Yemen. As of November 2017, there were approximately 170 members of the Bahrain Defense Forces deployed in Yemen. Bahrain is an active member of the Gulf Cooperation Council, Organization of Islamic Cooperation, and the Arab League. The Bahraini government frequently attends conferences related to multilateral counterterrorism cooperation. In December, Bahrain co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

**EGYPT**

PX210

**Overview:**  In 2017, Egypt suffered numerous deadly terrorist attacks.  Despite efforts by President Abdel Fatah Al Sisi's government and the Egyptian Security Forces (ESF), especially in North Sinai, terrorist attacks remained persistent.  ISIS affiliates, including ISIS-Sinai Province (ISIS-SP) and a distinct group calling itself Islamic State Egypt (IS Egypt), posed the most significant threat, as did groups such as Harakat Sawa'd Misr (HASM) and Liwa al-Thawra.  For much of the year, these attacks primarily targeted Egyptian security personnel; however, on November 24, terrorists likely affiliated with ISIS killed more than 312 civilians at a Sufi mosque in North Sinai, resulting in the worst terrorist attack in Egypt's history.

In April, the Egyptian government passed legislation facilitating the prosecution of terrorist cases.  Egypt continued its efforts to combat the financing of terrorism and is a member of the Global Coalition to Defeat ISIS and its Counter-ISIS Finance working group.

**2017 Terrorist Incidents:**  ISIS affiliates and other terrorist groups carried out numerous attacks throughout Egypt, particularly in the Sinai.  Methods included complex assaults involving dozens of terrorists, improvised explosive devices (IEDs), vehicle-borne IEDs, ambushes, kidnappings, and targeted assassinations.  The following list details only a fraction of the incidents that occurred, particularly against Egyptian civilian and military security forces.

- Between late January and late February, terrorists threatened and targeted Copts in North Sinai, killing at least seven people and displacing more than a hundred Coptic families.
- On April 9, an IS Egypt suicide bomber killed 30 people and injured at least 70 during Palm Sunday services at a Coptic Church in Tanta.  In a coordinated attack on the same day, another IS Egypt suicide bomber killed 16 people and injured 66 outside Saint Mark's Church in Alexandria.
- On May 26, ISIS operatives killed 28 people and wounded 25 after gunmen opened fire on a bus carrying Coptic Christians near Minya.
- On July 7, suspected ISIS operatives detonated a car bomb at a police checkpoint and then engaged in heavy gunfire, killing 26 people and wounding more than 20 others in the village of al-Barth near Rafah.
- On October 16, terrorists robbed a local bank of approximately US $1 million in local currency and traded gunfire with security forces in Al Arish, North Sinai, killing seven, including three civilians.
- On October 20, Ansar al-Islam, a new group with assessed links to al-Qa'ida, claimed responsibility for ambushing an ESF convoy near al-Bahariya Oasis in the Western Desert, killing at least 16 police officers and injuring 15, according to official statistics.  Some press reports put the number of fatalities at more than 50 police officers.
- On November 24, in the deadliest terrorist attack in Egypt's history, suspected ISIS-Sinai terrorists attacked a mosque in Al-Rawdah village in North Sinai, killing 312 people, including 27 children, and wounding 128.  The attackers detonated explosives around the mosque when worshipers came out after Friday prayers and then engaged in gunfire.

**Legislation, Law Enforcement, and Border Security:**  In April, parliament approved and the president ratified legislation eliminating some standard legal procedures and allowing for swifter prosecution in terrorism-related cases.  The changes allow the detention of suspects without

PX210

charge for a 14-day period, which is renewable once.  Multiple media outlets and human rights groups criticized the government for using counterterrorism measures to crack down on political dissent.

The National Security Sector of the Ministry of Interior (MOI) is primarily responsible for counterterrorism functions in the Nile Valley but also works with other elements of the MOI, the Egyptian General Intelligence Service, and the Egyptian Armed Forces (EAF).  There appeared to be limited interagency cooperation and information sharing among the relevant Egyptian government entities in 2017.

At border crossings and airports, Egyptian authorities checked for the presence of security features within travel documents.  They also scanned and cross-referenced documents with criminal databases containing derogatory information.  Egypt maintains a terrorist watchlist with a simple listing for Egyptian immigration officials at the ports of entry and detailed information maintained by the security services.

Egypt's most significant physical border security concerns were along the borders with Gaza and Libya, although smuggling remained a problem along the border with Sudan.  There have been several attacks against ESF checkpoints in Upper Egypt, likely due to smugglers or terrorist groups moving through the area.  The ESF continued to maintain the de-populated, 1.5-kilometer buffer zone along the border with Gaza.  Egypt maintained an increased military presence along the Libya border.

**Countering the Financing of Terrorism:**  Egypt is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  Egypt's Money Laundering and Terrorist Financing Combating Unit is a member of the Egmont Group.

The Egyptian government continued to improve its legal framework for countering terrorist financing.  Egypt remains vulnerable to terrorist financing because of its large, informal, cash-based economy and proximity to several terrorist organizations.  The Central Bank of Egypt and the Federation of Egyptian Banks have taken steps to encourage Egyptians to enter the formal financial sector.  Despite legislative efforts, exploitation of banking technologies and social media for terrorism funding also remained an issue.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Egypt's Dar Al-Iftaa, an official body that issues religious edicts, has taken the lead in CVE messaging via religious channels.  Dar Al-Iftaa sends scholars to engage communities considered vulnerable to terrorist messaging.  It also trains new muftis, organizes international outreach and speaking tours throughout Muslim majority countries and the West, publishes books and pamphlets to challenge the alleged religious foundations of terrorist ideology, runs rehabilitation sessions for former terrorists, and confronts terrorists in cyberspace.  Dar Al-Iftaa also held an international conference in October on regulating fatwas as part of the government's efforts to improve religious discourse against

129

PX210

terrorist ideology.  On November 15, the Supreme Council for Media Regulation, in coordination with Egypt's religious institutions, issued a list of 50 religious scholars authorized to issue fatwas to curb aberrant fatwas and to counter extremist and radical ones.

Al-Azhar University continued to publish short posts related to tolerance and coexistence via its online platforms and co-sponsored a series of CVE conferences.

The Ministry of Islamic Endowments (Awqaf) is legally responsible for issuing guidance to which all imams throughout Egypt must adhere, including a weekly theme for Friday sermons.  The Ministry also licenses all mosques in Egypt; however, many continued to operate without licenses.  The Ministry has trained up to 250 female preachers as part of its outreach program to women who may be susceptible to terrorist recruitment.  These preachers have teamed up with Christian nuns to promote religious dialogue.  The government appoints and monitors the imams in licensed mosques and pays their salaries.  In 2017, Awqaf published and translated numerous books on violent extremism and the protection of minorities, and it launched new initiatives to foster Muslim-Christian dialogue.

**International and Regional Cooperation:**  Egypt continued to participate in the Global Counterterrorism Forum (GCTF), co-chairing the Criminal Justice and Rule of Law working group through September 2017.  Egypt held a UN Security Council (UNSC) seat through the end of 2017 and presided over the UNSC Counter-Terrorism Committee.  It is also a member of the African Union, the Organization of Islamic Cooperation, and the Arab League.  Starting in September 2017, Egypt served as the co-chair of the GCTF Capacity Building in the East Africa Region working group.

## IRAQ

**Overview:**  By the end of 2017, Iraqi Security Forces (ISF), with the support of the U.S.-led Global Coalition to Defeat ISIS, had reclaimed all of the territory that ISIS had captured in 2014 and 2015.  As ISIS retreated from Mosul and other cities, its fighters used improvised explosive devices, homemade mines, and mortars to booby-trap homes, public spaces, and critical infrastructure to impede the movement of Iraq's security forces and terrorize returning residents.  Despite Iraqi progress on the battlefield, ISIS maintained the capability to conduct deadly terrorist attacks.  U.S.-designated Foreign Terrorist Organization Kata'ib Hizballah continued to operate in Iraq during 2017, exacerbating sectarian tensions.  Along with its nefarious activities, Kata'ib Hizballah continued to combat ISIS alongside the Iraqi military, police, and other Popular Mobilization Force units during the year.  Iraq expanded its cooperation with the United States and other members of the international community to counter terrorism, including taking steps to dismantle ISIS's financial activity.  Iraq passed 31 resolutions aimed at stopping terrorist financing and made significant progress implementing its 2016 Anti-Money Laundering/Countering Terrorism Finance law, including establishing a committee that designated at least 30 individuals in 2017.

**2017 Terrorist Incidents:**  According to the United Nations (UN), acts of terrorism, violence, and armed conflict with ISIS killed more than 3,000 civilians and injured more than 4,600 in 2017.  ISIS's continued ability to use captured and improvised military equipment allowed it to

PX210

employ sophisticated methods including the use of armored vehicle-borne improvised explosive devices and chlorine gas.  ISIS continued to commit atrocities involving the use of child soldiers, mass murder, and enslavement of ethnic and religious minorities, rape, forced marriage, and executing civilians, including women and children, attempting to flee its rule.  As the ISF recaptured territory, ISIS killed thousands of Iraqi civilians, forcing residents to remain as human shields to discourage airstrikes and shooting those attempting to flee.  ISIS continued to carry out suicide and hit-and-run attacks throughout the country, the most significant being the coordinated attack on a security checkpoint and restaurant on the outskirts of Nasariyah on September 14 that killed more than 80 Iraqis.  Other prominent ISIS attacks included:

- On February 28, two suicide bombers detonated explosives in a market in Sadr City, Baghdad, killing at least 60 people.
- On June 9, a suicide bomber detonated his explosive belt at a crowded market in Musaiyab, Babylon, south of Baghdad, killing 30 people.
- Also on June 9, a female suicide bomber detonated her explosives belt in the market east of the city of Karbala, killing 30 people.
- On November 21, a powerful truck bomb exploded in Tuz Khurmatu, Kirkuk, killing at least 32 people.

**Legislation, Law Enforcement, and Border Security:**  Iraq improved its ability to detect and prevent terrorist threats and continued to disrupt terrorist activities, detaining, arresting, and trying thousands of suspected terrorists in 2017.  A lack of centralized databases hindered its ability to track the number of terrorism suspects it detained and arrested in 2017.  Iraq has multiple security, law enforcement, and intelligence organizations with overlapping responsibilities, including the Counterterrorism Service, National Security Service, Iraqi National Intelligence Service, military intelligence, and assorted Ministry of Interior units including national and local police.  Lack of interagency cooperation is a vulnerability that Iraq has identified through its security sector reform program.  During the campaign to liberate Iraq, many Iraqi counterterrorism and law enforcement personnel also acted as front-line soldiers, which degraded their organizations' ability to carry out their intended roles.  Additionally, ISIS destroyed large portions of the law enforcement infrastructure, including prisons.  Suspected terrorists are often detained in overcrowded facilities for extended periods.

Iraq re-established control over its border crossings with Syria in 2017 but border security remained a critical capability gap, as the ISF has limited capability to prevent smuggling across the Iraq-Syria border.  Iraq conducted biographic and biometric screening at multiple land and air ports of entry and announced plans to begin issuing biometric passports in early 2018.  It shared biometric information on known and suspected terrorists and exemplars of its identity documents with the United States, INTERPOL, and other international partners.

**Countering the Financing of Terrorism:**  Iraq is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body.  Iraq is under review by the FATF, due to a number of strategic deficiencies in its anti-money laundering/countering the financing of terrorism (AML/CFT) regime.

131

PX210

Iraq has improved this regime, including issuing a set of regulations in accordance with its 2016 law, to help bolster its compliance with the FATF recommendations. In 2017, FATF postponed an evaluation on Iraq's AML/CFT regime due to uncertainty about the continued applicability of the Federal AML/CFT Law in the Iraqi Kurdistan Region (IKR) following the IKR's September 2017 referendum on independence.

In 2017, the Government of Iraq, including the Central Bank of Iraq, law enforcement, and the judiciary, continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS-controlled areas. It cut off salary payments to government employees to prevent those salaries from being "taxed" by ISIS and prohibited exchange houses and transfer companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes in the central bank's currency auctions. It also shared a list of banned exchange houses and money transfer companies with regional regulators and took judicial action against more than a dozen individuals and companies suspected of illicit financial activity. These actions ranged from business closures to the arrest of suspects. Iraq also barred ISIS financial facilitators Salim Mustafa Muhammad al Mansur and Umar al-Kubaysi, as well as al-Kubaysi's company, the Al Kawthar Money Exchange, from Iraq's financial system and froze all of their assets under Iraq's jurisdiction.

For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):** Iraq remained active in its strategic messaging to discredit ISIS and was finalizing its 2018 CVE strategy at the end of 2017. In November, it organized, planned, and held the Third International Conference to Counter ISIS Media, which focused on sharing information to combat terrorist ideology.

Many foreign terrorist fighters are in Iraqi custody and Iraq has detained a large number of foreign women and children with family affiliations to ISIS fighters. Additionally, displaced Iraqis, whose extended family members are suspected of supporting ISIS, remain vulnerable to revenge attacks or retribution killings, or are denied access to services. Consequently, ISIS-affiliated families are often unwilling or unable to return to their place of origin. Iraq acknowledged that the return and reintegration of family members of suspected ISIS supporters is important to prevent future radicalization to violence.

In June, Iraq signed a bilateral agreement with Saudi Arabia that aims to combat violent extremism and terrorism through means like eliminating the financing of terrorism and combating sectarian discrimination.

**International and Regional Cooperation:** Iraq continued to work with multilateral and regional organizations including the United Nations, the Organization of Islamic Cooperation, and the Arab League to support counterterrorism efforts. In May, the UN Security Council Counter-Terrorism Committee held a meeting on Iraq's counterterrorism assistance needs.

PX210

## ISRAEL, GOLAN HEIGHTS, WEST BANK, AND GAZA

Israel and the Golan Heights

**Overview:**  Israel was a committed counterterrorism partner in 2017, closely coordinating with the United States on a range of counterterrorism initiatives.  For instance, Israel and the United States held numerous interagency counterterrorism dialogues to discuss the broad array of threats in the region and determine areas of collaboration to address these challenges.

Israel faced threats on its northern border from Lebanese Hizballah (LH) and along the north-eastern frontier from LH and other groups in Syria.  Israeli security officials and politicians expressed concerns that Iran was supplying LH with advanced weapons systems and technologies as well as assisting the group in creating infrastructure that would permit it to indigenously produce rockets and missiles to threaten Israel from inside of Lebanon and Syria.

Along its southern border with Egypt and Gaza, Israel faced threats from terror organizations including Hamas, Palestine Islamic Jihad (PIJ), and ISIS-Sinai Province.  Israel continued to be concerned about Hamas and PIJ tunneling activities, and in October and December destroyed tunnels it found under the Israel-Gaza boundary.  Israel suffered numerous rocket attacks originating from Gaza and the Sinai during 2017, none of which resulted in Israeli fatalities. In addition, while the number of terrorist attacks declined since 2015, Israel still experienced numerous terrorist attacks, including those committed by lone actors with no clear affiliation to terrorist organizations.

The United States worked closely throughout the year with Israel to identify and develop new capabilities that meet a wide variety of requirements for countering terrorist threats, including those posed by unmanned aerial systems and underground tunnels.  Through a cost-sharing bilateral relationship, both countries advanced their technical ability to defeat or mitigate the evolving capabilities of terrorists and criminal organizations.

**2017 Terrorist Incidents:**  Israelis experienced numerous terrorist attacks in 2017 involving weapons ranging from rockets and mortars to small arms and knives.  The wave of violence that began in late 2015, termed the "knife intifada," continued to decrease in 2017.  Stabbing attacks by Palestinians resulted in numerous Israeli injuries and fatalities.  These attacks comprised the majority of terrorist attacks inside Israel.  Many perpetrators of these attacks were neutralized during their acts of terrorism.  The following is a partial list of the terrorist incidents that occurred during the year:

- On February 10, a Palestinian from the West Bank opened fire on a group of Israeli soldiers at a bus stop in Petah Tikva.  Sadeq Nasser Abu Mazen, an 18-year-old man from a village near Nablus, fled the scene after local residences attempted to apprehend him.  He entered a shop and opened fire until his weapon malfunctioned.  He then used a screwdriver to stab an Israeli man in the shop.  Local residents subdued the gunman and Israeli authorities took him into custody.  The gunman wounded at least five people in the attack.

133

PX210

- On July 14, two Israeli Druze border police officers were killed and two more wounded after three male Arab-Israeli citizens opened fire near the Temple Mount/Haram al-Sharif.  Israeli police shot and killed the three attackers, whom authorities identified as Mohammed Ahmed Mafdal Jabrin, Mohammed Hamed Abed Eltif Jabrin, and Mohammed Ahmed Mohammed Jabrin.  All were Arab citizens of Israel from the town of Umm al-Fahm, with apparent ties to the northern branch of the Islamic Movement in Israel.
- In December, several rockets launched from Gaza struck inside Israel.  Israeli authorities confirmed that at least two rockets hit the city of Sderot, which resulted in damage to a kindergarten and several vehicles.  Another rocket fell in an open area near the city of Ashkelon, with no reported casualties or significant damage.  The Israeli Defense Forces (IDF) responded with strikes against Hamas and PIJ positions in Gaza.

**Legislation, Law Enforcement, and Border Security:**  In 2017, the Israeli government made no notable changes to the 2016 Combatting Terrorism Law, although the Knesset began action on an amendment during the year.

Israeli security forces took numerous significant law enforcement actions against suspected terrorists and terrorist groups in 2017.  The examples below represent only a fraction of the law enforcement actions taken throughout the year.

- On February 7, the Israel Security Agency (ISA) arrested Valentin Vladimir Mazalevsky, an Israeli citizen residing in Shibli, for supporting ISIS and attempting to travel to Syria to join the terrorist organization.  Israeli courts convicted Mazalevsky and sentenced him to 32 months' imprisonment.
- On February 12, the ISA, with the assistance of the Israel National Police (INP), arrested Gaza resident Muhammad Murtaja, Gaza coordinator of a Turkish humanitarian aid organization, for attempting to provide Hamas with satellite photos to improve the precision of its rocket attacks against Israel.  A subsequent investigation also uncovered Murtaja's alleged diversion of the aid organization's funds to the Hamas military wing.

**Countering the Financing of Terrorism:**  Israel is an observer to the Financial Action Task Force (FATF) and is subject to evaluation by the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism, a FATF-style regional body.  Israel's financial intelligence unit, the Israeli Money Laundering and Terror Finance Prohibition Authority, is a member of the Egmont Group.

The Knesset approved a first reading of an amendment to the 2016 Combatting Terrorism Law on October 30, 2017.  If passed, this amendment would transfer terrorism designation authority from the Ministers' Committee for Security to the Minister of Defense and would ensure that Israel enforces United Nations (UN) sanctions on foreign terrorist organizations and individuals until it can complete a domestic review process of the designation.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

PX210

**Countering Violent Extremism (CVE):**  Israel's national program, "City without Violence," supported municipalities and local authorities in conducting programs to counter violence, crime, and violent extremism.  Civil society supported this initiative.

The Arab-Israeli media portal, "Bokra," sought to reduce tension through a social initiative using Facebook and videos featuring prominent figures who discouraged racism and violence such as sheikhs, rabbis, and priests.

**International and Regional Cooperation:**  Israel continued its counterterrorism cooperation with a range of regional and international institutions, including the UN, the Organization of American States (OAS), the Organization for Security and Co-operation in Europe (OSCE), and the North Atlantic Treaty Organization.  In December, Israel co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.  Israel cooperated with numerous countries bilaterally on counterterrorism initiatives and programs of mutual benefit, in addition to those aimed at thwarting terrorist attacks and plots specifically against Israelis or Israeli interests abroad.

<u>The West Bank and Gaza</u>

**Overview:**  The Palestinian Authority (PA) continued its counterterrorism and law enforcement efforts in the West Bank, where Hamas, PIJ, and the Popular Front for the Liberation of Palestine remained present.  The PA Security Forces (PASF) constrained the ability of those organizations to conduct attacks, including through arrests of Hamas members planning attacks against Israelis.  Per Oslo-era agreements, the PA exercised varying degrees of authority over the West Bank.  Israeli Defense Forces (IDF) and Shin Bet arrested members of terrorist organizations operating in the West Bank.

The United States assisted the PA's counterterrorism efforts by providing training, equipment, and infrastructure support to the PASF.  U.S. training and support assisted in the PA's continued development of professional, self-sufficient, and capable security forces.  The United States also assisted the PA with criminal justice investigations and prosecutions of terrorist financing and terrorist-related activity.

Palestinians committed acts of violence and terrorism in the West Bank in 2017.  The heightened period of violence from October 2015 to April 2016 decreased in 2017.  However, Palestinians continued to commit stabbings, shootings, and vehicular attacks against Israelis.

Israelis, including settlers, committed acts of violence, including "price tag" attacks (property crimes and violent acts by extremist Jewish individuals and groups against Palestinians) in the West Bank in 2017.

Hamas maintained security control of Gaza.  Several militant groups launched rocket attacks against Israel from Gaza.  The primary limitation on PA counterterrorism efforts in Gaza remained Hamas' control of the area and the resulting inability of the PASF to operate there.

PX210

The PA and PLO continued to provide "martyr payments" to the families of Palestinian individuals killed carrying out a terrorist act. The PA and PLO also provided payments to Palestinians in Israeli prisons, including those convicted of acts of terrorism against Israelis. Israeli government officials criticized this practice as incentivizing acts of terror. These payments and separate canteen stipends that the Israeli government allows for prisoners were first initiated by the PLO in 1965 and have continued under the PA since the Oslo Accords with Israel.

**2017 Terrorist Incidents:**
- In January, four Israeli soldiers were killed and approximately 13 others wounded when a Palestinian man used a heavy truck for a vehicular attack in Jerusalem. Soldiers and a civilian who were at the scene shot and killed the attacker.
- In July, a Palestinian resident of a nearby village stabbed and killed three Israeli civilians in their family home in the West Bank Israeli settlement of Halamish. Another member of the family sustained injuries. Police and IDF arrested the attacker after an off-duty soldier shot and wounded him.
- In September, a Palestinian man from the West Bank village of Beit Surik shot and killed an Israeli Border Police officer and two Israeli security guards outside the West Bank settlement of Har Adar, northwest of Jerusalem. Israeli security officials shot and killed the attacker at the scene.

**Legislation, Law Enforcement, and Border Security:** The PA lacked comprehensive legislation specifically tailored to counterterrorism, although existing Palestinian laws criminalize actions that constitute terrorist acts. Presidential decrees prohibit incitement to violence, illegal associations, providing financial support to terrorist groups, and acts against PLO agreements with other states (an indirect reference to the Oslo Accords with Israel). Other decrees also criminalize armed militias and assistance to such militias as well as carrying unlicensed weapons and explosives. The Palestinian parliament, the Palestinian Legislative Council, has not met since 2007 and is thus unable to pass new legislation.

The Preventive Security Organization (PSO) is the key PA institution that works to prevent internal terrorist attacks and investigates security-related criminal conduct. In practice, the General Intelligence Organization also plays a critical role in this effort as does, to a lesser extent, the Military Intelligence Organization. The United States assisted the PSO and the Security Forces Justice Commission to help the PA move the prosecution of all civilian cases – including those involving terrorism and security-related offenses – to the exclusive jurisdiction of the civilian courts. The United States also helped enhance cooperation between security service investigators and public prosecutors.

The PA advanced its forensic capabilities with the opening of the Palestinian Civil Police (PCP) forensic laboratory in November 2016 and continued its operation throughout 2017. The laboratory conducted basic manual analyses and examinations of firearm evidence, document examination, and drug and chemical analysis. The PA also augmented its ability to examine and compare unknown fingerprints with the delivery by the U.S. government of 40 fingerprint scanners, which are now used by law enforcement across the West Bank.

PX210

Per the Oslo-era Accords, Israel controlled border security in the West Bank.

**Countering the Financing of Terrorism:**  The PA is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  The Palestinian Financial Follow-Up (FFU) Unit is the PA's financial intelligence unit.  Banks file suspicious transaction reports and currency transaction reports electronically through the FFU computer system.  In 2017, banks filed 118 STRs compared to 117 in 2016.

The Palestinian Monetary Authority (PMA) increased regulations and restrictions on the more than 300 money changers in the West Bank.  For example, the PMA increased the capital requirement from US $250,000 to US $500,000 for money changers to register with the PMA before they are allowed to operate.  Additionally, the PMA imposed reporting requirements in 2017 on money changers for amounts over US $7,000.  The PMA also required that money changers have US $1 million in capital before the PMA will authorize international transactions.  Money changers in Gaza were licensed and regulated by Hamas.  According to business contacts in Gaza, Hamas does not impose reporting requirements on Gaza-based money changers.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The PA's Palestinian Broadcasting Company's code of conduct states it does not allow programming that encourages "violence against any person or institution on the basis of race, religion, political beliefs, or sex."  Some official PA media channels, as well as social media accounts affiliated with the ruling political movement Fatah, have featured content praising or condoning acts of violence.  Palestinian leaders did not always publicly condemn individual terrorist attacks nor speak out publicly against members of their institutions who advocated for violence.  PA President Abbas maintained a public commitment to non-violence, however.

The PA maintains control over the content of Friday sermons delivered in approximately 1,800 West Bank mosques to ensure that they do not endorse incitement to violence.  Weekly, the PA Minister of Awqaf and Religious Affairs distributed approved themes and prohibits incitement to violence.

**International and Regional Cooperation:**  The Palestinian Authority is an active member of the Arab League and the Organization of Islamic Cooperation.  In September 2017, the "State of Palestine" acceded to INTERPOL despite Israeli objections.  PA justice and security leaders continued to participate in regional conferences and meetings to combat terrorism.  PASF personnel attended a variety of international training courses related to counterterrorism at training facilities in Jordan, Europe, and the United States.

**JORDAN**

PX210

**Overview:**  Jordan remained a committed partner on counterterrorism and countering violent extremism in 2017.  As a regional leader in the Global Coalition to Defeat ISIS, Jordan played an important role in Coalition successes in degrading the terrorist group's territorial control and operational reach.  Although Jordan experienced a decrease in terrorist activity in 2017 compared to the previous year, the country faced a continued threat posed by terrorist groups, both domestically and along its borders.  Jordanian security forces thwarted several plots and apprehended numerous terrorists.  Following several high-profile attacks in 2016, Jordan took important steps to improve coordination among the security services for terrorism response capabilities and prevented several terrorist attacks.

Jordan remained a target for terrorist groups (including ISIS and al-Qa'ida) for several reasons, including its proximity to regional conflicts in Iraq and Syria, the state's official rejection of Salafi-Jihadi interpretations of Islam, and its membership in the Defeat-ISIS Coalition.  Terrorist entities continued to express interest in attacking soft targets, such as high-profile public events, hotels, tourist sites, places of worship, restaurants, schools, and malls.

In June, the Border Guard Force engaged and killed three attackers on motorcycles attempting to enter Jordan from Syria near the Rukban border camp.

**Legislation, Law Enforcement, and Border Security:**  There were no significant changes since 2016 on counterterrorism legislation, law enforcement capacity, or the State Security Court (SSC).

During 2017, Jordanian authorities took legal action against numerous individuals accused of terrorism under Jordanian law, including rulings on previous years' cases of terrorism.  State Security Court verdicts related to terrorism are published almost daily in local media.  Among the most notable cases is the conviction of several terrorists arrested in a preemptive 2016 raid on a suspected ISIS safehouse in Irbid.  The operation lasted 12 hours and resulted in the death of one JAF officer and seven suspected terrorists.  Some of the more prominent cases follow:

- On September 13, the SSC convicted 17 defendants of attempting to join terrorist organizations including ISIS and al-Nusrah Front, and promoting the ideology of a terrorist group.  The sentences ranged between three and 15 year prison terms.
- On October 4, the SSC sentenced 11 people to hard labor ranging between three and five years for promoting terrorist ideology and attempting to join terrorist groups.  The court also convicted two women of terrorist recruiting and promoting ISIS ideologies.
- On December 4, the SSC convicted five Syrians of aiding ISIS to carry out a 2016 car bomb attack near the Rukban border camp, which killed seven Jordanian border guards.  One was sentenced to the death penalty, three to lifetime sentences of hard labor, and the fifth was cleared of terrorism-related charges, but sentenced to two years imprisonment for illegal entry and exit into the country.  Four admitted receiving monthly payments from ISIS.  The defendant sentenced to death filmed the attack on his mobile phone and shared the footage with ISIS.
- The SSC prosecuted several other individuals in 2017 for propagating ISIS ideology and affiliation with a terrorist organization.  Sentences for such cases typically ranged from two- to 15-year prison terms.

PX210

There were no significant changes on border security since 2016.  The Jordan-Iraq border crossing at Karama/Treybil reopened on August 30, 2017.  Jordan conducts official screening of travelers at Ports of Entry, including at airports, and uses biometric systems in line with international standards.

Throughout 2017, Jordanian security services disrupted a number of terrorist plots in various stages of operational planning.  Examples included a proposed attack at the Marka Military Airport in Amman with a suicide belt, a plot to down a U.S. aircraft at Marka with a rocket-propelled grenade, proposed attacks on a military bus and tourist sites, and plans to kidnap tourists at the Roman theater in downtown Amman.

A U.S. criminal complaint was unsealed in March charging Ahlam Aref Ahmad Al-Tamimi, a Jordanian national in her mid-30s, with conspiring to use a weapon of mass destruction against U.S. nationals outside the United States resulting in death.  The charge is related to her participation in an August 9, 2001, suicide bomb attack at a restaurant in Jerusalem that killed 15 people, including two U.S. nationals.  Four other U.S. nationals were among the approximately 122 others injured in the attack.  Also unsealed was a warrant for Al-Tamimi's arrest and an affidavit in support of the criminal complaint and arrest warrant.  Jordan's courts have ruled that their constitution forbids the extradition of Jordanian nationals.

The Department of State's Antiterrorism Assistance (ATA) program provided four mentors for a three-year program to support enhancing the Government of Jordan's law enforcement capabilities.  One mentor was assigned to the Public Security Directorate's Criminal Investigation Department, one to its Forensics Lab, and two to its K-9 Unit.

**Countering the Financing of Terrorism:**  Jordan is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body, and is also a member of the Coalition's Counter-ISIS Finance Group.  Jordan's financial intelligence unit, the Anti Money Laundering and Counter Terrorist financing Unit (AMLU Jordan), is a member of the Egmont Group.  There were no significant changes in Jordan's countering the financing of terrorism regime since 2016.  The number of suspicious transaction reports received by AMLU Jordan in 2017 was on track to exceed 2016, with 590 suspicious transaction reports through November 29, compared to 602 in all of 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  King Abdullah II continued to promote his "Amman Message" of 2004, calling for tolerance and peace within the Islamic community and rejecting "wanton aggression and terrorism."  The Jordanian government's CVE efforts included counter-messaging and religious education, awareness-raising, and rehabilitation support for former terrorists.  Jordan worked with the UN Development Program to create a National Strategy on Preventing and Countering Violent Extremism, with the goal of establishing roles and responsibilities for government entities and promoting the involvement of non-governmental organizations, civil society, and the private sector.  The Jordanian government took steps to centralize training of imams and messaging for Friday prayers in an effort to forestall what it

PX210

viewed as radical versions of Islam.  The Jordanian cities Karak and Zarqa are members of the Strong Cities Network.

**International and Regional Cooperation:**  Jordan is a major non-North Atlantic Treaty Organization ally and founding member of the Global Counterterrorism Forum (GCTF), is part of NATO's Mediterranean Dialogue, and is a member of the Arab League and the Organization for Islamic Cooperation.  Jordan co-chairs the GCTF Foreign Terrorist Fighter working group with the United States.

In 2017, King Abdullah hosted international leaders for two sessions of the Aqaba Process, a forum he launched in 2015 to maintain international and regional cooperation in the fight against terrorism.  These meetings focused on Southeast Asia and West Africa.

Jordan hosted the meeting of the Small Group of the Global Coalition to Defeat ISIS on November 15.

Jordan hosted and conducted training for Palestinian Authority Security Forces and Civil Defense, in addition to other police forces from around the region.

## KUWAIT

**Overview:**  During 2017, the Government of Kuwait initiated new lines of effort as part of its multi-agency endeavor to foster moderation and address violent extremism.  New initiatives included imam training and school outreach programs as well as a new TV channel targeting demographics thought more susceptible to radicalization to violence.  Kuwait took important steps to implement the United Nations (UN) Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime, and joined both the Egmont Group and the Terrorist Financing Targeting Center (TFTC), a U.S.-Gulf Cooperation Council(GCC) initiative announced during President Trump's May visit to Saudi Arabia.  Despite continued efforts by ISIS to target Kuwait, there were no terrorist incidents in its territory in 2017.  Kuwait was an active partner in post-ISIS stabilization and reconstruction efforts in Iraq.  Kuwait also co-chaired and participated in numerous meetings for the Global Coalition to Defeat ISIS.  During the second U.S.-Kuwait Strategic Dialogue, held in Washington, D.C. in September, Kuwait signed a counterterrorism information-sharing arrangement aimed at deterring terrorist attacks and enhancing the bilateral security partnership with the United States.

In July, the Kuwaiti Higher Authority for Communication established a new Directorate for Cybersecurity, which it tasked, inter alia, with "fighting violent extremism."

**Legislation, Law Enforcement, and Border Security:**  There were no substantial changes in counterterrorism legislation since 2016.

In April, authorities in the Philippines arrested and extradited to Kuwait a 40-year old Kuwaiti ISIS foreign terrorist fighter.  The Kuwaiti Public Prosecutor pressed charges of manufacturing explosives and attempting to carry out terrorist attacks in Kuwait.

PX210

In June, a criminal court sentenced to life an Egyptian expatriate for the attempted murder of three U.S. military servicemen in October 2016. In the same month, the Court of Cassation (Kuwait's highest appeal's court) upheld lower court imprisonment verdicts against three ISIS members, including the group's leader in Kuwait.

In June, the Court of Cassation issued appeal verdicts for the 26 suspects convicted of amassing a large cache of ammunition, weapons, and explosives at a farm near the Iraqi border in August 2015. The court commuted one of the two death sentences issued by the lower court. It increased the sentences issued by the lower court against 19 defendants and upheld the acquittals of the remaining appellants. In August, after weeks of speculation that 16 of the 19 appellants in the case had escaped to Iran, Kuwaiti authorities announced their re-arrest and remand to prison to begin serving their sentences.

In September, the Court of Appeals reduced the sentence from seven to five years imprisonment of a 19-year-old Kuwaiti man convicted of plotting to bomb a Shia mosque and a police station in 2016.

In October, the Public Prosecutor filed terrorism finance charges against three Syrian expatriates in Kuwait for allegedly transmitting collected charitable donations to ISIS in Syria. Also in October, the Appeals Court rejected a petition from UN-designated Kuwaiti terrorism financer Jaber al-Jalahmah to unfreeze his assets.

During the course of 2017, the Ministry of Interior sent 35 of its law-enforcement personnel to the United States to complete several short-term training programs as part of Kuwait's efforts to build its counterterrorism capacity.

In September, as part of the bilateral Strategic Dialogue, Kuwait and the United States expressed their intent to expand their partnership in counterterrorism, including through the creation of a security committee focused on improving the information exchange on foreign terrorist fighters.

**Countering the Financing of Terrorism:**  Kuwait is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body, and served as its president in 2017. Kuwait's Financial Intelligence Unit became a member of the Egmont Group in July 2017. Kuwait is also a member of the Defeat-ISIS Coalition's Counter-ISIS Finance Group.

In October, Kuwait joined the United States and GCC member countries in announcing 13 designations under each country's respective domestic authorities of individuals and entities affiliated with AQAP and ISIS-Yemen. This was the first such cooperative measure under the newly established TFTC, which acts as an information sharing and coordinating body for the Gulf countries' terrorism financing efforts. Kuwait's National Committee on Combating Money Laundering and Terrorist Financing finalized its National Risk Assessment with the help of the World Bank at the end of 2017.

The Central Bank of Kuwait implemented a "same business-day" turnaround policy for implementing new UN terrorist financing-related sanctions, which has proven difficult for local

PX210

bank compliance departments to achieve.  Banks are now required to monitor UN sanctions lists proactively as well those made domestically by the Ministry of Foreign Affairs.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In October, the Ministry of Education started implementing an eight-month program to fight "extremist ideologies" at all public schools through teacher training and student counseling programs.  As part of the government's National Plan to Reinforce Moderation, the Ministry of Information launched a youth-dedicated TV channel with programming targeting audiences believed to be at higher risk of radicalization to violence.  The Ministry of Islamic Affairs started a training program for imams and sent teams to social salons (*diwaniyas*) to engage attendees and detect the potential presence of radicalizing influencers and recruiters.

The Kuwaiti government founded a dedicated bureau in the Ministry of Information to engage youth on social media platforms.  The bureau has established a presence on Twitter, Facebook, Instagram, and SnapChat.

**International and Regional Cooperation:**  In March, Kuwait hosted and co-chaired the Defeat-ISIS Coalition's Foreign Terrorist Fighters working group.  More than 100 counterterrorism experts and diplomats from more than 40 coalition partners participated.  Kuwait went on to participate in nine meetings for various working groups of the Coalition in Amman, Berlin, Copenhagen, London, Rome, Vienna, and Washington, D.C., throughout the year.  Additionally, Kuwait joined the International Cooperation Review Group meeting in Rome in September to explore ways to stabilize the Syrian city of Raqqa after its liberation from ISIS.  Kuwait participated in two meetings for the FATF in Valencia, Spain and Buenos Aires, in addition to hosting a third one in December.  In July, the Kuwaiti government announced that it would host an international donor conference for Iraq in early 2018.  Kuwait is an active member of the Arab League and the Organization of Islamic Cooperation.  As a member of the GCC, Kuwait has been playing a lead role in mediating the GCC dispute between Bahrain, Saudi Arabia, and the United Arab Emirates over claims of Qatari support to terrorism.

## LEBANON

**Overview:**  Lebanon was a committed ally in the defeat-ISIS fight during 2017, and its ground forces represented one of the most effective counterterrorism partners in the region.  The United States provided security assistance and training to the Lebanese Armed Forces (LAF), and worked with Lebanon's defense and law enforcement organizations, such as the Internal Security Forces (ISF), to build its counterterrorism capabilities.

Terrorist groups operating in Lebanon included U.S. government-designated Foreign Terrorist Organizations Hizballah, ISIS, Hamas, and the Abdullah Azzam Brigades.  Hizballah remained the most capable terrorist organization in Lebanon, controlling areas in the Bekaa Valley, southern Lebanon, and south Beirut.  Even though the Lebanese government reaffirmed its official policy of disassociation in 2017, Hizballah continued its military role in Syria in support

PX210

of the Syrian regime and admitted that it has a military presence in Iraq. Lebanon's 12 Palestinian refugee camps, particularly the largest, Ain el-Helweh, remained outside the jurisdiction of local security forces and posed a security threat due to potential militant recruitment and terrorist infiltration.

In 2017, the Lebanese security forces sought to impede Sunni foreign terrorist fighter flow to and from Syria and Iraq via border security and counterterrorism operations, including increased security measures at airports, border crossings, and ports to prevent the flow of ISIS and al-Nusrah Front (ANF) fighters to Syria and Iraq. In August, the Lebanese government was involved in an arrangement that led to the departure of 4,800 al-Qa'ida-affiliated Syrian fighters from Aarsal, Lebanon to Idlib, Syria, and 670 ISIS fighters from Raas Baalbek, Lebanon into Syria. Lebanese President Michael Aoun declared "victory over terrorism" following an August 2017 LAF campaign to expel ISIS militants along the Lebanese-Syrian border near Aarsal. It was the LAF's largest and most successful military operation in over a decade. Lebanon is a member of the Global Coalition to Defeat ISIS, and participates in all four of the Coalition's civilian working groups.

**2017 Terrorist Incidents:**
- On January 21, Lebanese security forces thwarted an attempted suicide bomber at a coffee shop in Beirut.
- On May 26, an ISIS-affiliated suicide bomber detonated an explosive vest, wounding several Lebanese soldiers during a raid by Lebanese soldiers in Aarsal.
- On June 30, five suicide bombers and a sixth militant killed one civilian and wounded seven Lebanese soldiers during a LAF raid on two Syrian refugee camps near Aarsal.

**Legislation, Law Enforcement, and Border Security:** Lebanon does not have a comprehensive counterterrorism law, but several articles of Lebanon's criminal code are used to prosecute acts of terrorism. Lebanon's confessional power-sharing system and Hizballah's restriction of access to areas under its control hinders implementation of these articles. Hizballah's political power make consensus on any anti-Hizballah legislation impossible.

The LAF, ISF, Directorate of General Security, and General Directorate of State Security are the primary government agencies responsible for counterterrorism. The law enforcement capacity of these agencies was overstretched due to the magnitude of terrorism-related threats. Although inter-service cooperation was inconsistent, services took steps to improve information sharing and were receptive to additional capacity building.

Department of State Antiterrorism Assistance (ATA) in 2017 focused on border security and building law enforcement's investigative and leadership capabilities. The Department of State also provided assistance to improve ISF capabilities through a program that includes construction of training facilities, establishment of a secure radio communications system, and the provision of vehicles and protective gear. In 2017, the Department of State's Counterterrorism Partnerships Fund program planned to build on the ATA program and provide ISF with assistance to further enhance its digital investigative capabilities.

PX210

The LAF has primary responsibility for securing Lebanon's borders and worked collaboratively with other Lebanese security services to do so. Security services increased border security measures to prevent the flow of ISIS and ANF fighters to Syria and Iraq, with an emphasis on detecting counterfeit passports. The Directorate of General Security, under the Ministry of Interior, controls immigration and passport services and collects biographic data for travelers at the airport, but it does not collect biometric data at land borders. Lebanon collects and disseminates Passenger Name Record data for commercial flights, and in 2017, began collecting Advanced Passenger Information.

In addition to the major military victory in August to clear ISIS militants from the Syrian-Lebanese border, the Lebanese security services disrupted multiple terrorist networks and made several high profile arrests in 2017. On April 22, the LAF killed an ISIS leader and detained 10 other suspected militants in Aarsal. On November 15, the army arrested Mustafa al-Hujeiri, a senior Sunni extremist figure and cleric involved in the 2014 kidnapping of 30 Lebanese soldiers and policemen.

The United States maintained close ties with the Lebanese security services, both receiving and providing support. Several individuals on the U.S. Federal Bureau of Investigation's most wanted list and the Department of State's Rewards for Justice are reportedly located in Lebanon.

**Countering the Financing of Terrorism:**  Lebanon is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force-style regional body. The Central Bank of Lebanon's financial intelligence unit, the Special Investigation Commission (SIC), is a member of the Egmont Group. The SIC Secretary is the Vice-Chairman worldwide of the Egmont Group. Lebanon is a member of the Counter-ISIS Finance Group (CIFG), a working group of the Defeat-ISIS Coalition.

The Central Bank of Lebanon and members of the Association of Lebanese Banks reasserted their commitment to fully implement the U.S. Hizballah International Financing Prevention Act (HIFPA) of 2015, in accordance with Central Bank directives. They met frequently with U.S. government officials to understand compliance and potential new auditing and reporting requirements related to the proposed 2017 amendments to HIFPA.

Cooperation between the SIC and local enforcement authorities on terrorist financing cases improved in 2017. During the first nine months of 2017, the SIC received 12 terrorism and terrorism financing cases from local sources. During the same period, the SIC referred seven terrorism financing cases to the General Prosecutor.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Several government institutions and civil society organizations conducted CVE programs and messaging platforms. The UN Special Coordinator for Lebanon continued to work with the prime minister's office on advancing a "National Action Plan to Prevent Violent Extremism." The LAF developed a comprehensive counter-messaging

PX210

strategy that amplifies moderate voices and uses television spots, social media, billboards, and SMS texts to counter terrorist narratives.  The Lebanese cities Madjal Anjar, Saida, and Tripoli are members of the Strong Cities Network.

**International and Regional Cooperation:**  Lebanon supported counterterrorism efforts in regional organizations and participated in counterterrorism finance programs as a member of the Organization of Islamic Cooperation, the Arab League, and the Union of Arab Banks.  In the framework of MENAFATF and the Egmont Group, Lebanon offered training to regional peers in international standards to combat terrorist financing.  Lebanon voiced its commitment to fulfilling relevant UNSCRs, including 1559 (2004), 1680 (2006), and 1701 (2006).  The Special Tribunal for Lebanon, an international body investigating the 2005 assassination of former Prime Minister Rafiq Hariri, received Lebanon's annual contribution of approximately US $32.5 million in June.  The LAF also partnered on security assistance initiatives with several nations, most regularly with the United Kingdom.

---

# LIBYA

**Overview:**  Libya's Government of National Accord (GNA) proved a reliable counterterrorism partner in 2017, and worked closely with the United States to counter the spread of terrorist groups such as ISIS-Libya and al-Qa'ida in the Islamic Maghreb (AQIM).  While Libya has made considerable progress against ISIS, including dislodging ISIS fighters from its stronghold of Sirte in 2016, terrorist groups have taken advantage of political instability and limited government presence in other parts of the country.  Through coordination with the GNA, the United States conducted periodic precision airstrikes on ISIS-Libya desert camps and AQIM cells, degrading their numbers and displacing remaining elements to other areas both inside and outside Libya.  Toward the end of 2017, ISIS elements were in a position to carry out only local-level operations.  The GNA has also cooperated with the United States on the investigation of suspected terrorists.

While Sirte had previously served as ISIS-Libya's center of governance in Libya, ISIS-Libya cells also existed in other areas of the country, including the eastern Libyan cities of Benghazi and Darnah.  The eastern Libya-based "Libyan National Army" (LNA) drove groups of ISIS and other extremist fighters out of Benghazi as part of its campaign to gain control of Benghazi.  The LNA, led by General Khalifa Haftar and not aligned with the GNA, has expressed the desire to rid Libya of terrorist groups.

Other terrorist organizations, including AQIM, maintained a presence in Libya.  These groups continued to take advantage of the political instability throughout the country, but efforts by GNA-aligned forces, international partners, and the LNA have degraded terrorist capabilities in some areas.  AQIM has sought to establish a longer-term presence in Libya.

**2017 Terrorist Incidents:**  ISIS-Libya and al-Qa'ida-aligned terrorists carried out dozens of attacks throughout 2017.  Methods included suicide bombers, vehicle-borne improvised explosive devices (VBIED), ambushes, kidnappings, and targeted assassinations.  The following list details only a small fraction of the terrorist incidents that occurred.

PX210

- On August 23 in al-Jufra, ISIS fighters killed 11 individuals and injured one during an attack on a road checkpoint.  The victims were either shot or beheaded.
- On October 4 in Misrata, two suicide bombers detonated explosives inside the Misrata Courthouse killing four civilians and injuring dozens.  Authorities discovered an unexploded VBIED.  ISIS claimed responsibility.
- On October 25 in Ajdabiya, two LNA soldiers were killed and four injured at a roadside checkpoint.  One victim was burned in his car and the other beheaded.  ISIS claimed responsibility.

**Legislation, Law Enforcement, and Border Security:**  Libya lacks a comprehensive counterterrorism law, although the Libyan penal code (under Title 2, Section 1, Chapter 1, Article 170 and Title 2, Chapter 2, Article 207) criminalizes offenses that may threaten national security, including terrorism, the promotion of terrorist acts, and the handling of money in support of such acts.  Libya has ratified the African Union's (AU) Convention on the Prevention and Combating of Terrorism, which requires states to criminalize terrorist acts under their national laws.

The GNA has continued to support and seek international cooperation to combat ISIS.  Neither the GNA, nor factions in the east associated with the House of Representatives in Tobruk, has produced a strategy to combat the terrorist threat.  The GNA conducted internal consultations to develop a counterterrorism strategy, but had not passed any legislation as of December 31, 2017.  In November 2017, the Presidency Council appointed a new counterterrorism coordinator, who sits in the office of the prime minister, to coordinate among Libyan counterterrorism stakeholders and with the international community.

A multitude of organizations under the GNA claimed counterterrorism responsibilities, such as the Counterterrorism Unit, the Presidential Guard, the Central Investigations Division, General Investigations Division, and the Libyan Intelligence Service.  Due to the limited reach of these organizations, however, they were not effective in deterring or reducing terrorist activities beyond their localized areas of control.  Libyan law enforcement personnel lacked clear mandates and the capacity to detect, deter, respond to, or investigate terrorist incidents due to continued political and security force fragmentation.

There were no reported terrorism-related prosecutions in 2017.  In many parts of Libya, security and law enforcement functions, including detention of terrorist elements, are provided by armed groups rather than state institutions.  National police and security forces are fragmented, inadequately trained and equipped, and lack clear reporting chains and coordination mechanisms.  Security and law enforcement officials, including prosecutors and judges, have been targeted in kidnappings and assassinations.  Libya's military forces are similarly weak and fragmented.  Formal security structures are often overmatched by non-state armed groups.

The Libyan government lacked a comprehensive border management strategy and was unable to secure the country's thousands of miles of land and maritime borders, enabling the illicit flow of fuel, goods, weapons, antiquities, narcotics, migrants, and foreign terrorist fighters that pose serious security challenges to the region.  Libyan border security forces were generally poorly trained and underequipped, and participated in illicit cross-border trade.  Border security

PX210

infrastructure has not been repaired or replaced in nearly a decade.  Ongoing conflicts since 2011 have affected border security infrastructure along Libya's border with Tunisia.

Security at Libya's airports is minimal, with limited document screening, use of Passenger Name Record systems, or biometric technology.  Existing legislation outlining the responsibilities of various government agencies in border management is vague and often contradictory, resulting in ad hoc and poorly coordinated efforts.  In November 2017, the International Organization for Migration estimated there were more than 700,000 migrants in Libya.

Libya lacked the resources, manpower, and training to conduct sufficient maritime patrols to interdict or dissuade illicit maritime trafficking and irregular migration, although Italy and the European Union (EU) began training members of the Libyan Naval Coastguard to increase the effectiveness of the organization.

In 2013, the Libyan Ministry of Justice signed a Declaration of Intent to facilitate law enforcement cooperation with the United States on investigations, including that of the 1988 Pan Am Flight 103 bombing.  The GNA has cooperated in the investigation of terrorist attacks against U.S. citizens and interests, including the September 2012 killing of Ambassador Christopher Stevens and three other Americans at U.S. government facilities in Benghazi.

The Department of State provided training in securing airports against the threat of terrorism, which included preventive security measures consisting of access control, passenger and cabin baggage screening, hold baggage screening, and air and mail cargo handling.

**Countering the Financing of Terrorism:**  Libya is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  Libya is also a member of the Counter-ISIS Finance Group, a working group of the Global Coalition to Defeat ISIS.   Libya adopted an Anti-Money Laundering and Combating the Financing of Terrorism Decree-Law on October 24 and a regulation to implement UN Security Council resolutions related to Terrorism and the Financing of Terrorism on November 1.  For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):**  There were no significant changes since 2016.

**Regional and International Cooperation:**  Many international organizations and diplomatic missions are reestablishing a presence in Tripoli after nearly all evacuated in 2014.  Many other countries and organizations maintain a permanent presence in Tunis, Tunisia, to conduct diplomacy and outreach to Libya.  The political conflict and limitations on the international presence in Libya hindered counterterrorism cooperation.  International assistance increased in 2017, including U.S. government-provided training on airport security and land border management.  Other border security initiatives, through the EU Border Assistance Mission, the UN Development Program, and the UN Office on Drugs and Crime focused on improving policing and criminal justice functions, and counterterrorism legislation and legal frameworks.  Libya is an active member of the Organization of Islamic Cooperation and the Arab League.

PX210

## MOROCCO

**Overview:**  Morocco has a comprehensive counterterrorism strategy that includes vigilant security measures, regional and international cooperation, and counter-radicalization policies.  In 2017, Morocco's counterterrorism efforts effectively mitigated the risk of terrorism, although the country continued to face sporadic threats, largely from small, independent terrorist cells, the majority of which claimed to be inspired by or affiliated with ISIS.  During the year, authorities reported a decrease in the number of terrorist-related arrests (186) for the first time since 2013.

Following the August attacks in Barcelona, Morocco assisted the Spanish investigation and promised to expand cooperation to track terrorists of Moroccan origin radicalized abroad.  The government remained concerned about the threat posed by the return of Moroccan foreign terrorist fighters (estimated at approximately 1,660) and their families.  Morocco participates in the Global Coalition to Defeat ISIS and, in September, renewed its term as co-chair of the Global Counterterrorism Forum (GCTF) with the Netherlands.

**Legislation, Law Enforcement, and Border Security:**  Morocco effectively investigates, prosecutes, and sentences defendants charged under its comprehensive counterterrorism legislation enacted in 2003 and expanded in 2015.  The legislation is in line with UN Security Council resolution (UNSCR) 2178 (2014).

Moroccan law enforcement units, coordinating with the Ministry of Interior, aggressively targeted and effectively dismantled terrorist cells by leveraging intelligence collection, police work, and collaboration with international partners.  The Central Bureau of Judicial Investigation (BCIJ), which reports to the General Directorate for Territorial Surveillance and operates under the supervision of the public prosecutor of the Court of Appeals, is the primary law enforcement agency responsible for counterterrorism law enforcement.

The General Directorate for National Security has primary responsibility for conducting border inspections at ports of entry such as Casablanca's Mohammed V Airport.  Law enforcement officials and private carriers worked regularly with the United States to detect and deter individuals attempting to transit illegally and to address watchlisted or mala fide travelers.  Moroccan airport authorities have excellent capabilities in detecting fraudulent documents, but lacked biometric screening capabilities.  In addition, police, customs officers, and Gendarmerie Royal operate mobile and fixed checkpoints along the roads in border areas and at the entrances to major municipalities.  Moroccan naval and coast guard units monitor and patrol Morocco's extensive coastal waters, including the Strait of Gibraltar, to interdict illicit traffickers.

Morocco participated in a wide range of U.S.-sponsored programs to improve its technical and investigative capabilities, including financial investigation, intelligence analysis, and cybersecurity.  Through the Trilateral Initiative funded by the Department of State's Antiterrorism Assistance program, Morocco and the United States continued to deliver critical incident management training to African partners.  In partnership with the Department of Defense and the Defense Threat Reduction Agency, Morocco's Royal Armed Forces are taking tangible steps to protect critical infrastructure from cyber-attacks, control and protect logistical

148

PX210

hubs, and ensure readiness to prevent or respond to a catastrophic chemical, biological or nuclear terrorist attack.

Moroccan authorities reported disrupting a number of alleged terrorist cells throughout the year, announcing that they had arrested 186 individuals and broken up nine cells planning to attack a range of targets, including public buildings and tourist sites.

- In March, BCIJ dismantled a 15-person cell dispersed amongst 10 cities, which planned to perpetrate attacks using explosives on soft targets and assassinate public and military officials.
- In August, cooperating with Spanish counterparts, Moroccan authorities arrested two suspects related to the Barcelona and Cambrils attacks, including one who was allegedly planning to attack the Spanish Embassy in Rabat.
- In October, BCIJ dismantled a cell linked to ISIS in Fes, arresting 11 suspects and uncovering a cache of guns, ammunition, knives, and explosive material at the alleged leader's house in Khouribga.

**Countering the Financing of Terrorism:**  Morocco is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body. Its financial intelligence unit (FIU), the Unité de Traitement du Renseignement Financier (UTRF), is a member of the Egmont Group.  Morocco criminalizes money laundering and terrorist financing in accordance with international standards.  Through November 2017, UTRF received 350 suspicious transaction reports.  It has signed memoranda of understanding facilitating information exchange with regional FIUs, is working to update current legislation to better implement the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime, and is preparing a national risk assessment to inform more effective counter measures against terrorist financing.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Morocco has a comprehensive CVE strategy that prioritizes economic and human development in addition to oversight of the religious sphere and messaging.  Morocco has accelerated its creation of education and employment initiatives for vulnerable youth.  To counter religious extremism, Morocco promotes its moderate interpretation of the Maliki-Ashari school of Sunni Islam.  The Ministry of Endowments and Islamic Affairs has developed an educational curriculum for Morocco's nearly 50,000 imams, as well as the hundreds of African and European imams studying at Morocco's international imam training center in Rabat, which expanded its capacity to 1,800 students in 2017.  In Fes, Morocco hosts the Institute for African Islamic Religious Scholars, which brings together religious scholars from more than 30 African countries to promote scholarship and to counter terrorist ideology. Domestically, the royal Mohammedan League of Ulema (Rabita Mohammedia) counters radicalization to violence by producing scholarly research, ensuring conformity in educational curricula, and conducting youth outreach on religious and social topics.

In the prisons, the Department of State has supported General Delegation for Prison Administration and Reintegration (DGAPR) efforts to modernize prison management, develop

PX210

prisoner classification tools that keep terrorists segregated from the mainstream prison population, and construct new more secure facilities.  To rehabilitate returning foreign terrorist fighters, the DGAPR worked closely with National Center for Human Rights and religious leaders from Rabita Mohammedia.  In August, the King pardoned 14 detainees following their renunciation of terrorist views after their successful completion of the DGAPR's rehabilitation program.

The U.S. Agency for International Development (USAID) continued to address youth marginalization in areas known for recruitment by terrorist organizations by helping youth stay in school, develop skills, and become active in their communities.  In addition, USAID's Community Oriented Policing Activity provided opportunities for dialogue that has resulted in greater trust and a freer flow of information between police and communities.

**International and Regional Cooperation:**  Morocco rejoined the African Union in 2017.  Morocco is a founding member of the GCTF and is a current co-chair.  In 2017, Morocco was a co-chair of the GCTF Foreign Terrorist Fighters working group with the Netherlands.  The United States and Morocco were co-leading the *Initiative on Addressing Homegrown Terrorism* in partnership with the International Institute for Justice and Rule of Law (IIJ).  Morocco is a member of the Global Initiative to Counter Nuclear Terrorism and the Proliferation Security Initiative.  In December, Morocco co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.  Morocco is an active member of the Organization of Islamic Cooperation and the Arab League.

Morocco, a Major Non-North Atlantic Treaty Organization ally, is a stable security-exporting partner that trains security, military, and law enforcement officials from sub-Saharan Africa and participates actively in the 5+5 Defense Initiative to address Mediterranean security issues.  Morocco hosts the annual multilateral AFRICAN LION exercise and participates in multilateral regional training exercises, such as the maritime-focused PHOENIX EXPRESS and OBANGAME EXPRESS and the FLINTLOCK special operations exercise.  Morocco is also an active member of the Trans-Sahara Counterterrorism Partnership.  Political disagreement between Morocco and Algeria over the status of Western Sahara remained an impediment to bilateral and regional counterterrorism cooperation in 2017.

## OMAN

**Overview:**  Oman is an important regional counterterrorism partner that actively worked in 2017 to prevent terrorists from conducting attacks or using the country as a safe haven.  The Omani government remains concerned about the conflict in Yemen and the potential for al-Qa'ida in the Arabian Peninsula and ISIS-Yemen to threaten Oman's land and maritime borders.  Omani officials regularly engaged with U.S. officials on the need to counter violent extremism and terrorism, but rarely broadcast their counterterrorism efforts publicly.  The Government of Oman sought training and equipment from the U.S. government, commercial entities, and other countries to support its efforts to control Omani land, air, and maritime borders.  Oman also used U.S. security assistance to improve its counterterrorism tactics and procedures.  Oman is a member of the Global Coalition to Defeat ISIS, the Saudi-led Islamic Military Counter Terrorism

PX210

Coalition, as well as the Riyadh-based Terrorist Finance Targeting Center.  The Government of Oman issued a series of official statements condemning terrorist attacks in 2017.

**Legislation, Law Enforcement, and Border Security:**  Royal Decree 8/2007 outlines specific penalties, including the death penalty and life imprisonment, for various terrorist acts, including establishment or leadership of a terrorist group, attempts to join a terrorist group, attempts to recruit for a terrorist group, development of an explosive or weapon, or takeover of any mode of transportation for purposes of terrorism.

Counterterrorism investigations, crisis responses, and border security capabilities were limited by local capacity and a challenging operating environment due to Oman's extensive coastline and long, remote borders with Saudi Arabia and Yemen.  Nevertheless, Oman had good interagency communication and coordination among its many agencies that have counterterrorism jurisdiction.  The Sultan's Special Forces and the Royal Oman Police (ROP) Special Task Force are Oman's primary counterterrorism response forces.  The Omani Internal Security Service and Royal Office also play key roles in securing Oman from terrorist threats.  Omani authorities have developed specific plans to prevent or respond to terrorist attacks against soft targets.

The Government of Oman recognized the need to improve its capabilities and took advantage of U.S. counterterrorism and law enforcement training and assistance.  In 2017, the ROP, Ministry of Defense, Ministry of Foreign Affairs, Ministry of Legal Affairs, Ministry of Transportation and Communication, and Ministry of Commerce and Industry participated in U.S. Export Control and Related Border Security (EXBS) programs designed to enhance the government's interdiction capabilities at official ports of entry on land and at sea.  A 10-week EXBS training program helped the Government of Oman establish a port control unit at the Port of Sohar.  The port control unit, which will serve as a model at other Omani ports of entry, improves Omani interagency collaboration by placing representatives from Omani agencies responsible for interdiction into single units at each port.

Oman participated in the Department of State's Antiterrorism Assistance program, which included training on border security, exercise development, interdicting terrorist activities, maritime security, fraudulent documents, medical skills, and crisis response.  Omani security officials representing the ROP, the Public Authority for Civil Defense and Ambulance, and a number of civilian agencies participated in the training.

The Omani government sent senior military and civilian leaders to the Near East South Asia Center for Strategic Studies and the George C. Marshall Center for counterterrorism study and training.

The major deterrents to more effective law enforcement and border security are limited resources, nascent Omani interagency coordination, and the need for continued training to develop advanced law enforcement skills.  Oman's border with Yemen, which features rugged, mountainous terrain, further challenges border security efforts.  Despite these significant hurdles, Omani authorities continued to make progress on the construction of a fence along the border with Yemen to prevent illegal entry into Oman, and the Omani and U.S. governments continued to engage in frequent border security-related training.

PX210

**Countering the Financing of Terrorism:**  Oman is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body.  Royal Decree 30/2016, Oman's countering the financing of terrorism (CFT) law, requires financial institutions, private industry, and non-profit organizations to screen transactions for money laundering or terrorist financin and requires the collection of know-your-customer data for wire transfers.  The CFT law also consolidates CFT authority within the National Center for Financial Information and establishes the Center as an independent government entity.  While progress has been made, a number of gaps remain.  These include completing the drafting and implementation of certification procedures for anti-money laundering (AML) and CFT, issuing directives for the immediate freezing and seizure of the assets of persons and entities on the UN sanctions list under UN Security Council resolution 1267 (1999) and its successor resolutions, and designating wire transfer amounts for customer due diligence procedures.  In May, Oman joined the Riyadh-based Terrorist Finance Targeting Center, along with all other Gulf Cooperation Council countries and the United States.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Radicalization to violence in Oman was not considered a significant threat during 2017.  The full nature and scope of Oman's initiatives to address domestic radicalization and recruitment to violence were unclear, but it is believed that Oman maintains tightly controlled and non-public initiatives to counter terrorist recruitment.

As he has done in prior years, the Grand Mufti of Oman, Sheikh Ahmed al-Khalili, called on all Muslims to reject terrorism and promote tolerance in his popular and widely broadcast weekly television program.  The government also continued to promote an advocacy campaign titled "Islam in Oman," designed to encourage tolerant and inclusive Islamic practices.  The project highlighted the commonalities between Islam's sects and between Islam and other religions.  A Ministry of Endowments and Religious Affairs program, "Tolerance, Understanding, Co-existence – Oman's Message of Islam," was part of the government's effort to enhance interfaith dialogue.

**International and Regional Cooperation:**  Oman participates in the U.S.-Gulf Cooperation Council (GCC) Strategic Cooperation Forum, participated in the U.S.-GCC Riyadh summit in May, and attended the Islamic Military Counter Terrorism Coalition meeting in November.  Oman regularly votes in favor of counterterrorism measures in the UN General Assembly, the Arab League, and the Organization for Islamic Cooperation.

## QATAR

**Overview:**  The United States and Qatar significantly increased counterterrorism cooperation in 2017, under the Counterterrorism Memorandum of Understanding (MoU) signed by the Secretary of State and Foreign Minister Mohammed bin Abdulrahman Al Thani in July.  In the MoU, Qatar and the United States set forth mutually accepted means of increasing information sharing, disrupting terrorism financing flows, and intensifying counterterrorism activities.  At the November 8, 2017, U.S.-Qatar Counterterrorism Dialogue, the two governments affirmed the

PX210

progress made on implementing the MoU and committed to expand bilateral counterterrorism cooperation.  Qatar is an active participant in the Global Coalition to Defeat ISIS, is active in all Defeat-ISIS Coalition working groups, and has provided significant support in facilitating U.S. military operations in the region.  Qatar hosts approximately 10,000 U.S. servicemen and women on two military installations critical to coalition efforts.  Security services capable of monitoring and disrupting terrorist activities have maintained the status quo.  In June, Bahrain, Egypt, Saudi Arabia, and the United Arab Emirates unexpectedly severed diplomatic ties with and imposed sanctions on Qatar, alleging the government supported terrorist groups in the region, among other purported grievances.

**Legislation, Law Enforcement, and Border Security:**  In July, the Qatari government promulgated Decree 11 of 2017, which amended the 2004 Law on Combating Terrorism.  The amendment set out definitions of terrorism-related activities, penalties for terrorism-related offenses, and the establishment of a national designations list.  In October, the U.S. government led a workshop for relevant Qatari authorities on the planned establishment of a domestic designations regime.

The State Security Bureau maintains an aggressive posture toward monitoring internal extremist and terrorism-related activities.  The Ministry of Interior (MOI) and Internal Security Force are well-positioned to respond to incidents with rapid reaction forces that routinely engage in structured counterterrorism training and exercises.  The Office of Public Prosecution is tasked with prosecuting all crimes, including any related to terrorism, and plays a significant role in terrorism investigations.  Qatar maintains an interagency National Anti-Terrorism Committee (NATC) composed of representatives from more than 10 government agencies.  The NATC is tasked with formulating Qatar's counterterrorism policy, ensuring interagency coordination, fulfilling Qatar's obligations to counter terrorism under international conventions, and participating in multilateral conferences on terrorism.  U.S. officials met regularly with the chairman of the NATC to discuss implementation of the counterterrorism MoU and overall counterterrorism cooperation.

As a result of the counterterrorism MoU, the United States and Qatar significantly increased information sharing, including on identities of known and suspected terrorists.  Aviation security information sharing also increased, as new protocols were agreed to and established.  During 2017, MOI authorities cooperated with DHS officials to enhance screening capabilities of the approximately 50 million travelers that pass through Hamad International Airport each year.  U.S. technical assistance to Qatari law enforcement and judicial agencies increased, a result of the counterterrorism MoU.  The Departments of Justice, State, and the Treasury led a workshop on domestic designations, while the FBI provided training on watchlists and terrorism financing investigations and the Department of Justice provided two advisors for capacity building within the Office of Public Prosecution.  In February 2017, the Department of State and relevant Qatar agencies established a framework for ATA program security-related training in 2017-2019.

In June, Qatar expelled six Hamas members, including Saleh al-Arouri, one of the founders of the Izz al-Din al Qassam Brigades.  Israel, in the past, has accused al-Arouri of plotting attacks in the West Bank.

PX210

**Countering the Financing of Terrorism:**  Qatar is a member of the Middle East North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force-style regional body. In 2017, Qatar commenced preparations for the 2019 MENAFATF Mutual Evaluation, including establishing an interagency task force, formalizing cooperation with the International Monetary Fund, and intensifying coordination with U.S. counterparts.  Qatar's financial intelligence unit, the Qatar Financial Information Unit, is a member of the Egmont Group.  Qatar is a member of the Defeat-ISIS Coalition's Counter-ISIS Finance Group and the Terrorist Financing Targeting Center (TFTC), a U.S.-Gulf Cooperation Council (GCC) initiative announced during President Trump's visit to Saudi Arabia in May 2017.

In 2017, Qatar passed updated terrorism financing legislation.  Decree 11 of 2017 defined terrorism financing-related activities, laid out penalties, and established a domestic designations list.  Qatari legislation requires the Office of Public Prosecution to freeze the funds of individuals and organizations included on the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions list.  The Qatar Central Bank works with financial institutions to confirm asset-freezing compliance with respect to these UN obligations.

Qatar deepened cooperation with the United States on combatting terrorism financing during 2017.  In October, Qatar joined the United States and other TFTC countries in coordinated domestic designations of individuals and entities associated with AQAP and ISIS-Yemen.

Two UN-designated financiers who were acquitted in a 2015-2016 trial were placed under arrest and imprisoned in July 2017.  The Qatari Attorney General initiated proceedings to appeal the prior acquittals.  Additionally, Qatari authorities also placed under arrest two other terrorism financiers previously convicted in the 2015-2016 trial.

In July, Qatari authorities took sweeping measures to monitor and restrict the overseas activities of Qatari charities, requiring all such activity to be conducted via one of the two approved charities.  Authorities also significantly increased procedures to monitor private donations.  The sector is overseen by the Regulatory Authority for Charitable Activities, in coordination with the Central Bank and law enforcement agencies.

While the Government of Qatar has made progress on countering the financing of terrorism, terrorist financiers within the country are still able to exploit Qatar's informal financial system.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The core of Qatar's CVE strategy remained intensive investment in education through the 45 entities comprising the Qatar Foundation.  This includes Qatar campuses of six U.S. universities, as well as through its national university and the public K-12 school system.  The government is undertaking a review of its K-12 education system and sought the input of U.S. academic institutions.  The growing Qatar Foundation school system follows an International Baccalaureate curriculum, which is grounded in liberal education principles.

PX210

A Qatari foundation, Education Above All (EEA), provided educational opportunities to communities stricken by poverty or crisis, primarily in Africa, Asia, Latin America, and the Middle East – impacting an estimated 10 million children worldwide since 2013. Reach Out to Asia provided access to education for youth in that region.  The EEA's Al Fakhoora initiative provided scholarships to Palestinian and Syrian youth. These and other EEA initiatives are designed to facilitate understanding and education, and deter isolationist, xenophobic, and extremist thought and ideology."

Qatar continued its robust financial support for the Global Community Engagement and Resilience Fund, and in December hosted its seventh annual Board Meeting.  Qatar continued to fund the Education for Justice Initiative, a CVE program focused on crime prevention and criminal justice implemented by the UN Office on Drugs and Crime.

**International and Regional Cooperation:**  Qatar is an active participant in the United Nations, the Organization of Islamic Cooperation, and the Arab League on counterterrorism activities. Qatar is also a founding member of the Global Counterterrorism Forum.  Qatar was active in GCC activities, but the Gulf dispute that broke out in June froze most GCC-wide engagements. In December, Qatar co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## SAUDI ARABIA

**Overview:**  Saudi Arabia continued to maintain a strong counterterrorism relationship with the United States and supported enhanced bilateral cooperation to ensure the safety of both U.S. and Saudi citizens within Saudi territories and abroad.  The Crown Prince and Minister of Defense Mohammed bin Salman vowed October 24 to return Saudi Arabia to a country of "moderate Islam."  During President Trump's visit to Saudi Arabia in May 2017, the two countries released a Joint Strategic Vision Declaration announcing new initiatives to counter terrorist messaging and disrupt the financing of terrorism.  Saudi Arabia remained a key member and active participant in the Global Coalition to Defeat ISIS.

On November 4, the Saudi government announced a revision of its Counterterrorism and Counter Terror Financing Law (CT Law, detailed below) to reinforce its capacity to counter terrorism.  Saudi Arabia implemented the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime.  It expanded existing counterterrorism programs and messaging to address returning foreign terrorist fighters and leveraged terrorist finance provisions of the new CT Law to counter the funding of terrorist groups.

Saudi Arabia maintained a high counterterrorism operational tempo, made a number of highly publicized arrests of alleged terrorist suspects, and disrupted active terrorist cells across the Kingdom.

**2017 Terrorist Incidents:**  On October 7, a terrorist conducted a small arms attack at one of the entrances to Al-Salam Palace in Jeddah that resulted in the deaths of two Royal Guards and the attacker.  According to an official statement June 23, Saudi security forces thwarted a terrorist

PX210

plot to carry out a major attack near the Grand Mosque in Mecca, resulting in the death of the suicide bomber near the mosque and the wounding of five security officers and six bystanders when the bomber blew himself up to avoid arrest.

On October 4, security officials released details of a counterterrorism operation targeting three locations in Riyadh that resulted in a raid of a presumed makeshift suicide vest factory and arrests or deaths of members of the suspected ISIS cell, who were reportedly in the final stages of executing a plot against two Ministry of Defense targets.

**Legislation, Law Enforcement, and Border Security:**  King Salman issued major decrees July 20 amending the organizational structure of the Ministry of Interior (MOI) and creating a new independent domestic intelligence and counterterrorism authority called the State Security Presidency (SSP).  In October, the Saudi government also established the National Cyber Security Authority to formalize its cybersecurity infrastructure and combat cyber threats.  The Saudi government announced an expansive new CT Law November 4, updating its 2014 law.  Among the most significant aspects, the new law expands the range of activities defined as "terrorist" crimes and transfers many of the counterterrorism authorities previously held by the MOI to the SSP and the new Public Prosecutor's Office.  Human rights organizations have asserted that the new law – like its predecessor – restricts freedom of expression and association by establishing an overly broad definition of terrorism that is applied to nonviolent offenses, including peaceful political or social activism.

On April 30, the Saudi government announced the arrest of 46 alleged militants belonging to a terrorist cell in Jeddah on charges related to the July 2016 attacks near the Prophet's Mosque in Medina and the U.S. Consulate General in Jeddah.

**Countering the Financing of Terrorism:**  Saudi Arabia is a member of the Middle East and North Africa Financial Action Task Force, a FATF-style regional body.  Its financial intelligence unit, the Saudi Arabia Financial Investigation Unit, is a member of the Egmont Group.  In 2017, Saudi Arabia reaffirmed its commitment to countering terrorist financing in the Kingdom and the Gulf region.  Saudi Arabia, along with the United States, co-chairs the Terrorist Financing Targeting Center (TFTC), a U.S.-Gulf Cooperation Council initiative announced during President Trump's visit to Saudi Arabia in May.  In October, Saudi Arabia joined the United States and the other TFTC member countries in jointly announcing designations against individuals and entities supporting AQAP and ISIS-Yemen.  The new CT Law aims to further buttress the government's effort to obtain full membership in FATF.

Earlier in the year, the Government of Saudi Arabia directed domestic authorities to impose financial sanctions on individuals and entities providing support to or acting on behalf of Hizballah.  The Saudi Arabian Monetary Authority (SAMA, the Kingdom's central bank) suspended three leading money service businesses in late-September for deficient anti-money laundering and countering the financing of terrorism (AML/CFT) controls.

While the Kingdom has maintained strict supervision of the banking sector, tightened the regulation of the charitable sector, and stiffened penalties for financing terrorism, some funds are allegedly collected in secret and illicitly transferred out of the country in cash, sometimes under

PX210

the cover of religious pilgrimages.  To address this issue, the Saudi government continued efforts to counter bulk cash smuggling.  Regional turmoil and the sophisticated use of social media have enabled charities outside of Saudi Arabia with ties to terrorists to solicit contributions from Saudi donors, but the government has worked to pursue and disrupt such funding streams.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Saudi Arabia continued to lay the groundwork for a long-term CVE strategy.  In April, the Center for Ideological Warfare, which operates under the auspices of the Ministry of Defense, officially started operations designed to blunt ISIS's ideological appeal and counter terrorist messaging by discrediting "distortions" of Islamic tenets.  King Salman inaugurated the Global Center for Combating Extremist Ideology (or Etidal in Arabic) in Riyadh May 21, further expanding efforts to counter terrorist messaging.  President Trump attended the Center's inauguration.

Senior Saudi officials reinvigorated outreach with visits, including to the Vatican to meet with Pope Francis September 20 and to the Grand Synagogue in Paris November 20, in an effort to cultivate an image of greater tolerance with followers of other faiths.  King Salman issued a royal order on October 17 creating a religious center in Medina to scrutinize the written collections of the Prophet Muhammad's *hadiths* (sayings) for content that could be interpreted as encouraging terrorism.  The Saudi government expanded counter-radicalization programs through the King Abdullah Center for National Dialogue to address the rising threat to youth from recruitment efforts by groups like ISIS.

The Saudi government continued to modernize the educational curriculum, including revising textbooks to eliminate teachings that may encourage intolerance of other peoples and religions.  While the Saudi government has reported progress, some textbooks continued to contain teachings that promote intolerance.  Saudi Arabia has also taken steps to rein in unauthorized religious proselytization since April 2016, including restricting the authorities of the Committee for the Promotion of Virtue and Prevention of Vice (the so-called religious police), tightening control over Islamic charities, and restricting the ability of Saudi-based clerics to travel abroad for proselytization without first obtaining Saudi government permission.  The Saudi government has also reiterated existing restrictions on the content of Saudi imams' sermons, charitable activities, and media appearances at home.

**International and Regional Cooperation:**  Saudi Arabia continued to encourage greater international coordination on counterterrorism issues.  The Saudi government hosted international conferences on subjects ranging from countering violent extremism to cyber-terrorism.  On May 21, participants of the Arab-Islamic-American Summit released the Riyadh Declaration to demonstrate the close partnership between the leaders of the Arab and Islamic countries and the United States to counter terrorism and terrorist ideology.  In December, Saudi Arabia pledged US $100 million to support the G-5 Sahel force to counter terrorism in West Africa.  Saudi Arabia is a founding member of the Global Counterterrorism Forum.

PX210

Throughout the year, Saudi security professionals continued to participate in joint military and counterterrorism programs around the world and with partners inside the Kingdom. The Saudi-led Islamic Military Counter Terrorism Coalition (IMCTC), established in December 2015, hosted its Inaugural Meeting of the IMCTC Ministers of Defense Council on November 26 to address the ideological, financial, military, and media aspects of counterterrorism.

## TUNISIA

**Overview:** The risk of terrorist activity in Tunisia remained high in 2017, including the potential for terrorist attacks and the movement of arms and terrorists from neighboring countries. In 2017, al-Qa'ida in the Islamic Maghreb (AQIM)-aligned Uqba bin Nafi' Battalion and ISIS-affiliated groups continued small-scale attacks against Tunisian security personnel. Tunisian security forces improved, however, their ability to preempt terrorist activities. There were no major terrorist attacks in Tunisia in 2017. The last terrorist attack on tourists occurred on June 26, 2015.

The government has made counterterrorism a top priority, and Tunisia continued to cooperate with the international community, including the United States, to professionalize its security apparatus. U.S. security assistance to Tunisia grew in 2017, but Tunisia needs more time and international support to complete the overhaul of its military and civilian security forces.

Instability in Libya has allowed terrorist groups, including ISIS, to continue cross-border smuggling operations, although there were no reported terrorist attacks in 2017 originating from Libya. The last major attack came in March 2016 in the border town of Ben Guerdan. The disproportionate numbers of Tunisians who previously travelled to fight in Syria and Iraq – and their potential return – remains a cause for concern.

**2017 Terrorist Incidents:** Terrorist organizations were active in Tunisia throughout the year but there were no attacks against foreigners or civilians. There were also no large-scale attacks against Tunisian security personnel. The list below highlights the most significant terrorist incidents of 2017.

- On March 12, four motorcyclists attacked a security checkpoint in the Tunisian city of Kebili, killing one guard. Two attackers were killed in the ensuing shootout and the two remaining terrorists were captured. A Tunisian bystander assisted the police during the attack by stopping one of the terrorists from reaching his motorcycle to detonate explosives.
- On November 1, two policemen were attacked by a man wielding a knife outside Parliament. One of the officers died November 2 from his wounds. The attacker was apprehended shortly after the assault. ISIS claimed responsibility for the attack.
- On November 6, three Tunisian soldiers were wounded by explosive devices planted by terrorists on Mt. Chaambi.

**Legislation, Law Enforcement, and Border Security:** There has been significant improvement in protecting tourism zones. The collaboration and cooperation between security forces, private security, and hotel staff has notably improved with training provided by

PX210

international partners.  As a result of significant improvements in soft target, aviation and maritime security, the United Kingdom and other European governments removed their travel restrictions for Tunisia.  In addition, the return of cruise ship tourism and increasing volume at major tourist sites are preliminary indications of the successful application of proactive preventative measures throughout Tunisia.

Border security remained a priority, and interdiction and border security capabilities have improved as a result of international support through training and equipping of Tunisian border forces.  Tunisia has received support from Germany and the United States to install electronic surveillance equipment to augment Tunisian-built berms along its border with Libya.

The government's counterterrorism efforts have expanded considerably in the last year, with successful weapons seizures, arrests, and operations against armed groups throughout the country.  Significant law enforcement actions and arrests included:

- On April 30, Tunisian security forces killed Algerian terrorist Abu Sufian al-Sufi during an operation in Sidi Bouzid.
- On May 31, weapons and equipment were seized in a terrorist camp during a military operation on Mount Sammama in Kasserine governorate.  The armed forces seized a Kalashnikov, 90 cartridges, equipment to manufacture explosives, and six landmines.
- On November 28, Tunisian military units engaged a group of terrorists in the Kasserine Mountains, killing terrorist Yahya Argoubi, alias Abi Talha, whom the Ministry of the Interior described as one of the most wanted terrorists in Tunisia.

Tunisian security personnel continued to participate in the Department of State's Antiterrorism Assistance (ATA) program and additional training funded through the Department of State's Counterterrorism Partnerships Fund (CTPF).  Ministry of Interior personnel received ATA/CTPF training in the areas of tactical crisis response, counterterrorism investigations, protection of soft targets, the mitigation of improvised explosive devices and other explosive ordnance disposal threats, and command and control.  Primary intervention operational units were granted tactical and enabling equipment.  Department of State programs supported improved quality and access to justice, training for and implementation of new criminal codes, improved prison functionality, and other training and assistance for the Ministry of Justice.  In close collaboration with the MOI, the Department of State is implementing a US $12 million new police academy modernization project that includes curriculum development.  U.S. programs also provided the Ministries of Interior and Justice with armored vehicles, ambulances, surveillance cameras, and other equipment to enhance internal and border security.  The Tunisian Armed Forces consider counterterrorism and border security their principal mission, and they have successfully employed U.S.-funded patrol craft, vehicles, weapons, and training in border security and counterterrorism operations.

**Countering the Financing of Terrorism:**  Tunisia is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body, and the country's Tunisian Financial Analysis Committee intelligence unit is a member of the Egmont Group.  While Tunisia has endeavored to implement anti-money laundering and countering the financing of terrorism (AML/CFT) mechanisms, FATF categorized the country as

PX210

having strategic deficiencies in November.  Tunisia developed an action plan to address these gaps.  It included:  (1) implementing risk-based supervision of the financial sector and integrating designated non-financial businesses and professions into the AML/CFT regime; (2) maintaining comprehensive commercial registries and strengthening penalties for transparency violations; (3) increasing the efficiency with which CTAF processes suspicious transaction reports ; (4) establishing a terrorism-related targeted financial sanctions regime; and (5) establishing WMD-related targeted financial sanctions.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Tunisia made a concerted effort to improve socioeconomic conditions in the country through economic development and education programs to prevent conditions that terrorists can exploit for recruitment.  The government also attempted to prevent the radicalization of Tunisians by minimizing their exposure to inflammatory rhetoric in mosques by replacing imams deemed extremist, although local populations in several cases resisted the changes.  The National Counterterrorism Strategy reportedly expanded the fight against terrorism to all ministries, including those that focus on culture, education, media, and religious affairs, and assigned each ministry concrete actions to accomplish.  Tunisia is a founding member of the Strong Cities Network.

**International and Regional Cooperation:**  Tunisia participates in multinational and regional efforts to counter terrorism, such as those at the United Nations, the Arab League, the Global Counterterrorism Forum (GCTF), and the African Union.  It is a founding member of the GCTF-inspired International Institute for Justice and the Rule of Law (IIJ), and it participated in numerous IIJ trainings and workshops focused on improving criminal justice actors' capacity to prevent and address terrorism-related crimes.  In December, Tunisia co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

Tunisia is an active member of the Trans-Sahara Counterterrorism Partnership, a U.S. multi-year interagency regional program aimed at building the capacity of governments in the Maghreb and Sahel to confront terrorist threats.  Tunisia is also part of the Security Governance Initiative.  Tunisian authorities continued their coordination on border security with Algerian counterparts.

## UNITED ARAB EMIRATES

**Overview:**  The United Arab Emirates (UAE) did not experience any terrorist attacks in 2017.  The UAE government continued to prosecute numerous individuals for terrorism-related offenses.

In line with previous years, the UAE government continued its collaboration with U.S. law enforcement on counterterrorism cases; its membership in the Global Coalition to Defeat ISIS; and support for counter messaging and countering violent extremism platforms, such as the Sawab and Hedayah Centers, respectively.  The UAE government remained co-chair of the Coalition Communications working group along with the United States and the United Kingdom (UK).

PX210

The government's security apparatus continued monitoring suspected terrorists in the UAE and foiled potential terrorist attacks within its borders. UAE customs, police, and other security agencies improved border security and worked together with financial authorities to counter terrorist finance. UAE government officials worked closely with their U.S. law enforcement counterparts to increase the UAE's counterterrorism capabilities.

The UAE continued to deploy forces in Yemen to counter al-Qa'ida in the Arabian Peninsula (AQAP) and ISIS, and support local forces in counterterrorism operations.

**Legislation, Law Enforcement, and Border Security:** In 2017, the UAE continued to prosecute numerous individuals in terrorism-related cases using existing legislation. There were no changes to counterterrorism legislation in the calendar year. International human rights non-governmental organizations and activists have asserted the UAE uses its counterterrorism and cyber-crime laws as cover to pursue cases against peaceful political dissidents and activists.

The State Security Directorate (SSD) in Abu Dhabi and Dubai State Security (DSS) remained primarily responsible for counterterrorism law enforcement efforts. Local, emirate-level police forces, especially Abu Dhabi Police and Dubai Police, were frequently the first responders in such cases and often provided technical assistance to SSD and DSS, respectively. Overall, the UAE security apparatus demonstrated capability in investigations, crisis response, and border security, and forces were trained and equipped to detect, deter, and respond to terrorist incidents.

According to press reports, the Court of Appeal examined more than a dozen new terrorism-related cases in 2017 and the Federal Appeal Court's State Security Court retried a number of high-profile cases from 2016. The Federal Supreme Court upheld life sentence verdicts issued by the lower Court for two Emiratis convicted of terrorism-related activities in two separate cases, one of which involved the targeting of a U.S. citizen. Most cases involved defendants accused of promoting or affiliating with UAE-designated terrorist organizations, including ISIS, AQAP, al-Nusrah Front, Hizballah, and the Muslim Brotherhood.

As in previous years, the Government of the UAE worked closely with the United States, through the U.S. Department of Homeland Security (DHS), to improve its border security posture. Law enforcement information sharing between Abu Dhabi Police's Criminal Investigations Division and DHS Homeland Security Investigations helped counter transnational criminal organizations and terrorist groups. UAE points of entry used an internal name-based watchlist system populated by local immigration, deportation, corrections, and security agencies to identify individuals who were prohibited from entering the country or were sought by UAE authorities. Some human rights organizations claimed that activists, academics, and journalists who had written critically about UAE policy were included on such lists and barred from entry. INTERPOL and Gulf Cooperation Council (GCC) watchlists were incorporated into the UAE's internal watchlist.

**Countering the Financing of Terrorism:** The UAE is a member of the Middle East and North Africa Financial Action Task Force, a Financial Action Task Force-style regional body. The UAE's financial intelligence unit, the Anti-Money Laundering and Suspicious Cases Unit, is a

PX210

member of the Egmont Group.  The UAE also participates in the Coalition's Counter-ISIS Finance Group.

The UAE remained a regional and global financial and transportation hub, and terrorist organizations exploited it to send and receive financial support.  Operational capability constraints and political considerations sometimes prevented the government from immediately freezing and confiscating terrorist assets absent multilateral assistance.  The UAE requires financial institutions and designated non-financial businesses and professions to review and implement the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime on a continuous basis.

Except for free trade zones (FTZs) specifically established for financial activities, which were well-regulated, the UAE's numerous FTZs varied in their compliance with and supervision of anti-money laundering and countering the financing of terrorism (AML/CFT) international best practices.  Exploitation by illicit actors of money transmitters, including licensed exchange houses, *hawalas*, and trading firms acting as money transmitters, remained a significant concern.

The UAE continued its efforts to enhance its regulatory measures to strengthen its domestic AML/CFT regime and was increasingly willing and able to implement its laws and regulations.  In May, the UAE joined the United States and other GCC countries to create the Terrorist Financing Targeting Center in Riyadh, Saudi Arabia.  In October, the UAE jointly designated several individuals and entities associated with AQAP and ISIS-Yemen in coordination with other TFTC members.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The UAE government continued to support Hedayah, the International Center of Excellence for Countering Violent Extremism, and the Sawab Center, a collaborative partnership with the United States to amplify credible voices to counter terrorist messaging online.  The government separately worked to amplify credible alternative narratives by supporting the annual Forum for Promoting Peace in Muslim Societies and the Muslim Council of Elders.  Through the General Authority of Islamic Affairs and Endowments, the government continued to regulate all mosque sermons and religious publications to "instill the principle of moderation in Islam."  In September, the UAE began implementing compulsory moral education classes for public and private school students in all grades, in an effort to promote religious tolerance and counter violent tendencies in youth.

Prominent UAE officials and religious leaders continued to publicly criticize and highlight the dangers of terrorist narratives.  In addition, in an October cabinet reshuffle, the position of Minister of State for Tolerance was elevated to become Minister of Tolerance.  Through this ministry, the government continued to promote interfaith engagement and dialogue.

**International and Regional Cooperation:**  The UAE was a vocal and active participant in counterterrorism efforts at both the regional and international levels.  The UAE signed a

PX210

memorandum of understanding with the European Union Parliament expressing the country's commitment to combat terrorism around the world.  It also continued to play a role in global counterterrorism efforts through its training of Somali forces and deployment in Yemen, to counter terrorist organizations such as al-Shabaab, AQAP, and ISIS-Yemen.  In December, the UAE co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.  The UAE is also a founding member of the Global Counterterrorism Forum, and until September, was co-chair with the UK of its Countering Violent Extremism working group.

## YEMEN

**Overview:**  Throughout 2017, al-Qa'ida in the Arabian Peninsula (AQAP) and ISIS-Yemen have continued to exploit the political and security vacuum created by the ongoing conflict between the Yemeni government under President Abd Rabu Mansour Hadi and Houthi-forces.  A Saudi-led coalition of 10 member states continued its air campaign to restore the legitimacy of the Republic of Yemen Government (ROYG) that started in March 2015.  The ROYG, in partnership with the Saudi-led Coalition, controlled the majority of Yemeni territory at the end of 2017, including the population centers of Aden, Mukalla, Ta'izz, and Al Ghaydah. Houthi forces controlled the capital of Sana'a.  AQAP's area of influence has increased since the onset of the civil war.

The ROYG under President Hadi cooperated with the U.S. government on counterterrorism efforts.  However, because of the instability and violence in Yemen, the ROYG cannot effectively enforce counterterrorism measures.  A large security vacuum persists, which gives AQAP and ISIS-Yemen more room to operate.  Counterterrorism gains in 2017 removed several key leaders and decreased AQAP's freedom of movement, but AQAP and ISIS-Yemen continue to carry out terrorist attacks throughout government-held territory.  In southern Yemen, UAE forces continued to play a vital role in counterterrorism efforts.

ISIS-Yemen remained considerably smaller in size and influence compared to AQAP, but remained operationally active.  ISIS-Yemen attacks increased in late 2017, exploiting the tenuous security environment in Aden.  The United States conducted successful airstrikes against two ISIS-Yemen training camps – its first against the group – in October 2017.

**2017 Terrorist Incidents:**  AQAP and ISIS-Yemen terrorists carried out hundreds of attacks throughout Yemen in 2017.  Methods included suicide bombers, vehicle-borne improvised explosive devices (VBIEDs), ambushes, kidnappings, and targeted assassinations.  The following list details only a small fraction of the incidents that occurred:

- On March 27, government forces killed an AQAP suicide bomber driving a VBIED directed at a local government compound in al-Houta, southern Yemen.  After neutralizing the VBIED, security forces clashed with militants who were dressed in military uniforms and armed with automatic weapons.  Six security personnel and five attackers died in the fighting.
- On November 5, ISIS-Yemen launched an attack on the Criminal Investigation Department (CID) building in the Khormaksar district of Aden.  An ISIS militant

PX210

detonated a VBIED outside the building, followed by armed men storming the facility. The car bomb and ensuing clashes killed at least 15 people, mostly Yemeni security personnel.

- On November 14, ISIS-Yemen detonated a car bomb in a suicide mission targeting forces in Aden, Sheikh Othman district, killing at least six people and causing scores of injuries. ISIS-Yemen claimed responsibility for the attack, naming the suicide bomber as Abu Hagar al-Adani, a Yemeni national.

**Legislation, Law Enforcement, and Border Security:**  There have been no significant changes in legislation, law enforcement, or border security in Yemen since 2016.  Yemen does not have comprehensive counterterrorism legislation and no progress was made due to the state of unrest and the fact that most of Yemen's government remains in exile outside of Yemen.  Due to a lack of resources and organization, police forces throughout the country struggle to exert authority.

Draft counterterrorism legislation has been pending in the parliament since 2008.  This legislation has remained at a standstill due to the lack of a legitimate parliament.  Prior to the political instability in the capital, the draft was under review by the three parliamentary subcommittees responsible for counterterrorism law issues (Legal and Constitutional Affairs; Security and Defense; and Codification of Sharia Law).  This law would facilitate the detention of suspects and include mandatory sentencing for a number of terrorism-related crimes.  There have been no clear moves to implement legal structures compliant with UN Security Council resolution (UNSCR) 2178 (2014), relating to countering foreign terrorists, due to the ongoing conflict.  There are limited commercial flights operating out of airports in Yemen and the government did not have the capacity or resources to implement UNSCR 2309 mandates on aviation security.

Prior to March 2015, the National Security Agency and President's Office drafted a National Counterterrorism Strategy.  This draft was reviewed by a Ministerial Committee, but the committee was unable to finalize its task due to developments in the country.  Therefore, Yemen's National Counterterrorism Strategy had not been officially adopted or implemented by the end of 2017.

Yemen employs the U.S.-provided Personal Identification Secure Comparison and Evaluation System (PISCES) in an effort to secure borders and identify fraudulent travel documents.  In consultation with the ROYG, the United States relaunched in December 2017 bilateral discussions to upgrade and expand PISCES in ROYG-controlled areas.  In spite of the conflict, Yemen has been able to maintain traveler screening at a limited number of points of entry.

In past years, the Yemeni government's coast guard played a critical role in interdicting weapons and other illegal materials destined for Yemen-based terrorist groups, although Yemen's maritime borders remained extremely porous due to a lack of capacity.  The central southern coast remains highly vulnerable to maritime smuggling of weapons, materials, and goods used to sustain AQAP and other terrorist activities.  During 2017, the United States planned multiple training courses for coast guard personnel.  These courses, funded by the State Department's Export Control and Related Border Security (EXBS) Program, provided hands-on training to conduct illicit weapons interdiction operations at sea and in port, focusing on conventional

PX210

weapons, explosives, ammunition, MANPADS, ballistic missile components, and WMD materials.  U.S. partners provided training and technical assistance in a number of counterterrorism-related areas, although the conflict hampered in-country efforts in 2017.

**Countering the Financing of Terrorism:**  Yemen is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force-style regional body.  These measures are the first coordinated effort under the Terrorist Financing Targeting Center (TFTC), co-chaired by the U.S. and Saudi Arabia.  Due to a lack of judicial capacity and territorial control, the Yemeni government is unable to unilaterally implement UN Security Council resolutions related to terrorist financing.  After Houthi forces occupied the Sana'a-based Central Bank of Yemen in 2015, the government moved the bank's headquarters to Aden in September 2016.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Due to the conflict in Yemen, the ROYG had no CVE initiatives.  Before hostilities escalated in 2014, the government-developed Comprehensive National Counterterrorism Strategy included social measures to raise awareness of the causes and consequences of terrorism and a planned de-radicalization center based on the Mohammed bin Nayef Counseling and Care Center.  As noted previously, the Houthi coup halted the implementation of these measures.

**International and Regional Cooperation:**  The ROYG continued to cooperate with and be advised by the Gulf Cooperation Council, the United States, and other donor countries as it focused on working towards a peaceful solution to the conflict.  Despite the challenges, the ROYG remained an international partner as it worked to reestablish rule of law within the territory it holds.  Along with the United States and the Kingdom of Saudi Arabia, Yemen developed the Yemen Security Working Group in 2017.  The working group includes high-level military and diplomatic representatives from the three member states, which have developed several cooperative capacity-building initiatives for Yemeni military and security forces, particularly regarding border security and border management.  Yemen also belongs to the Organization of Islamic Cooperation and the Arab League.

## SOUTH AND CENTRAL ASIA

## Overview

Although al-Qa'ida (AQ) in Afghanistan and Pakistan has been seriously degraded, remnants of AQ's global leadership, as well as its regional affiliate al-Qa'ida in the Indian Subcontinent (AQIS), continued to operate from remote locations in the region that historically have been exploited as safe havens.  Afghan and Pakistani forces continued to contest AQ's presence in the region, and Pakistan's military operations in the Federally Administered Tribal Area (FATA) further degraded the group's freedom to operate.  Pressure on AQ's traditional safe havens has

PX210

constrained its leadership's ability to communicate effectively with affiliate groups outside of South Asia.

Afghanistan continued to experience aggressive and coordinated attacks by the Afghan Taliban, including the affiliated Haqqani Network (HQN) and other insurgent and terrorist groups. A number of these attacks were planned and launched from safe havens in Pakistan. Afghan National Defense and Security Forces (ANDSF) retained full responsibility for security in Afghanistan. In partnership, the ANDSF and Coalition Forces took aggressive action against terrorist elements across Afghanistan, including against ISIS's formal branch in the region, Islamic State's Khorasan Province (ISIS-K).

While terrorist-related violence in Pakistan is down from levels prior to 2014, when Pakistan began its military operations in the FATA, the country continued to suffer significant terrorist attacks, particularly against vulnerable civilian and government targets. The Pakistani military and security forces undertook operations against groups that conducted attacks within Pakistan, such as Tehrik-e-Taliban Pakistan. The Pakistani government pledged support to political reconciliation between the Afghan government and the Afghan Taliban but did not restrict the Afghan Taliban and HQN from operating in Pakistan-based safe havens and threatening U.S. and Afghan forces in Afghanistan. Pakistan did not take sufficient action against other externally focused groups such as Lashkar e-Tayyiba (LeT) and Jaish-e-Mohammad (JeM) in 2017, which continued to operate, train, organize, and fundraise in Pakistan. Pakistan detained Hafiz Saeed, the leader of LeT and its front organization Jamaat ud-Dawa (JuD) in January 2017, but a Pakistani court ordered Hafiz Saeed released from house arrest in November 2017.

ISIS-K remained active in 2017, although counterterrorism pressure from Afghan and Coalition Forces, and battles with the Afghan Taliban, removed large numbers of fighters from the battlefield and restricted the group's ability to control territory in Nangarhar province in eastern Afghanistan. Nevertheless, the group was able to conduct a number of high profile, mass-casualty attacks in both Afghanistan and Pakistan and expanded its territory in provinces in eastern and northern Afghanistan.

India continued to experience attacks, including by Pakistan-based terrorist organizations as well as tribal and Maoist insurgents. Indian authorities blamed Pakistan for cross-border attacks in the state of Jammu and Kashmir. Over the course of 2017, the Government of India sought to deepen counterterrorism cooperation and information sharing with the United States, including through the first-ever Designations Dialogue, held in Delhi in December. The Indian government closely monitored the domestic threat from transnational terrorist groups like ISIS and AQIS.

Bangladesh experienced three terrorist attacks in 2017 claimed by ISIS, a decrease from 2016. Transnational groups such as ISIS and AQIS remained a threat. The Government of Bangladesh may have disrupted dozens of ISIS plots but insisted all terrorists in Bangladesh were from local organizations.

Individuals from Central Asia have traveled to Iraq or Syria to fight with militant and terrorist groups, including ISIS. Central Asians, like Western Europeans, have been drawn to the fighting

PX210

in Iraq and Syria for many reasons and have fought on several sides.  Central Asian leaders remained concerned about their involvement and their return to their home countries, however, more Central Asian nationals were suspected of committing attacks in third countries than returning to attempt attacks in their countries of origin.

Ministers and high-level officials from Kazakhstan, the Kyrgyz Republic, Tajikistan, Turkmenistan, and Uzbekistan, accompanied by the heads of counterterrorism agencies structures and national security organs, participated in a High-Level UN-Central Asian Dialogue on Implementing the UN Global Counter-Terrorism Strategy in Central Asia held in Ashgabat on June 13.  There they reviewed progress on the implementation of the Joint Plan of Action for the Strategy in Central Asia and defined future strategic counterterrorism priorities for the region.

## AFGHANISTAN

**Overview:**  Afghanistan cooperates with the United States in a bilateral counterterrorism effort as part of Operation Freedom's Sentinel (OFS), the U.S. operation in Afghanistan.  The U.S. military also works with Afghanistan to improve the Afghan National Defense and Security Forces' (ANDSF) ability to combat insurgent groups through Resolute Support (RS), the North Atlantic Treaty Organization "Train, Advise, and Assist" mission.  The Taliban, the affiliated Haqqani Network (HQN), and groups claiming affiliation with the Islamic State's Khorasan Province (ISIS-K) increased high-profile terrorist attacks targeting Afghan government officials and members of the international community.  Terrorist groups targeting Pakistan, such as Tehrik-e-Taliban Pakistan, exploit ungoverned spaces in the Afghanistan-Pakistan border region, using them as safe havens to coordinate terrorist attacks inside Pakistan.

President Ghani and the National Unity Government have strongly supported the new U.S. South Asia strategy, which was announced by President Trump in August 2017 and seeks to create conditions for a political settlement with the Taliban.  The Afghan High Peace Council (HPC) effectively replaced the Afghanistan Peace and Reintegration Program in 2017, agreeing with donor nations in July to a new UN Development Program-drafted action plan intended to promote reconciliation with insurgent groups.  While the HPC action plan outlines a strategic approach to reintegration and implementation of peace agreements, the HPC's focus was on building the capacity of its Provincial Peace Committees and their subsequent outreach to build a national consensus for the peace process.

The peace agreement signed between the Afghan government and Hizb-e Islami Gulbuddin (HIG) in September 2016 hit some roadblocks, but it has led to party leader Gulbuddin Hekmatyar's return to Kabul, the removal of UN sanctions against him, and peaceful reintegration of HIG supporters.  The parts of the agreement that have not been fully implemented include the release of some HIG detainees, the provision of land to HIG returnees, and the disarmament of all HIG members.

Afghanistan is a member of the Global Coalition to Defeat ISIS.

**2017 Terrorist Incidents:**  Insurgents continued to use vehicle-borne improvised explosive devices (VBIEDs) and complex attacks involving multiple attackers wearing suicide vests to

PX210

target ANDSF, Afghan government buildings, foreign governments, and soft civilian targets to include international organizations.  Kabul remained a focus of high-profile attacks.  The following list details a fraction of the incidents that occurred:

- On May 31, a VBIED on the perimeter of the international zone killed more than 150 and wounded at least 400 people.  While there was no claim of responsibility, Afghanistan's intelligence service blamed the attack on HQN.
- On July 24, a VBIED detonated in a Kabul neighborhood whose residents were primarily of Hazara ethnicity.  The explosion killed 28 and wounded 43.  The Taliban claimed responsibility for the attack, which was reportedly targeting a bus carrying government employees.
- On August 1, ISIS-K claimed responsibility for an attack on a Shia mosque in Herat City, which left 29 civilians dead and 64 injured.
- On September 27, ISIS-K insurgents launched more than 30 rockets at the Hamid Karzai International Airport during Defense Secretary Mattis's visit to Kabul.  During the attack, ISIS insurgents also directly targeted Camp Sullivan, a U.S. Chief of Mission facility in Kabul, with mortars and heavy weapons fire.
- On October 17, Taliban insurgents used VBIEDs to launch complex suicide attacks on police headquarters in Paktiya and Ghazni provinces.  The attacks killed 21 police, including Provincial Chief of Police Toryalai Abdiani and 20 civilians, and wounded more than 150 police and civilians.  In Ghazni, more than 30 ANDSF personnel were killed and 25 others injured.  The Andar district police headquarters building was destroyed.

**Legislation, Law Enforcement, and Border Security:**  The Afghan Attorney General's Office investigates and prosecutes violations of the laws that prohibit membership in terrorist or insurgent groups, violent acts committed against the state, hostage taking, murder, and the use of explosives against military forces and state infrastructure.  These laws include Crimes against the Internal and External Security of the State (1976 and 1987), Combat Against Terrorist Offences (2008), and Firearms, Ammunition, and Explosives (2005).

Notable cases in 2017 included:

Anas Haqqani:  In 2016, the Primary and Appellate Courts sentenced him to death for terrorist acts (including recruiting and fundraising), terrorist membership, and forgery.  In February, the Supreme Court remanded the case to the Appellate Court.  Anas is the brother of Sirajuddin Haqqani, the operational leader of the Haqqani Network.  Anas's co-accused is Hafiz Abdul Rasheed, whose case followed the same path.

Abdul Saboor:  The Appellate Court affirmed a 20-year sentence and murder conviction after he shot and killed two U.S. advisors at the Ministry of Interior.  The case is pending Supreme Court review.

Abdul Qahir Korasani:  One of the earliest prominent Afghans to pledge allegiance to ISIS-K, he served as a mullah and judge for ISIS-K.  Korasani used internet videos and publications to recruit and issue fatwas.  He was convicted in the Primary and Appellate Courts for terrorist acts

PX210

and membership.  He received a sentence of 16 years in the Primary Court and 20 years in the Appellate Court.  Prosecutors are seeking the death penalty in the Supreme Court.

U.S. law enforcement assisted the Ministry of Interior, National Directorate of Security (NDS), and other Afghan authorities with disrupting and dismantling terrorist operations and prosecuting terrorist suspects.

Specialized police units known as Crisis Response Units (CRUs) for Afghanistan's major cities continued to thwart attacks.  For example, CRU-222 responded swiftly during the March 2017 Kabul hospital attack, clearing all eight floors of the hospital after entering from both the roof and ground.  This same unit responded and killed the attackers during Secretary Mattis' visit and President Ghani aims to double the number of these units.

Twenty-five checkpoints have been established around the international zone, and the Afghan government is standing up a new unit with sole responsibility for security of an expanded perimeter.  The new unit will replace a patchwork of police, military, and private security contractors that report to MoI or MoD through different chains of command in order to establish a unity of effort with IZ security.

Afghan civilian security forces continued to participate in the Department of State's Anti-Terrorism Assistance program, receiving capacity-building training and mentorship in specialized counterterrorism-related skillsets such as crisis response, methods of entry, and response to active shooter.

Afghanistan continued to face significant challenges in protecting the country's borders, particularly in the border regions with Pakistan.  Afghan and Pakistani officials have agreed in principle to create a mechanism for communication between forces on each side of the border.  The means for implementation was still under discussion at the end of 2017.

Afghanistan continued to process traveler arrivals and departures at major points of entry using a U.S.-provided border security system, the Personal Identification Secure Comparison and Evaluation System (PISCES), which has been successfully integrated with INTERPOL's I-24/7 system.

**Countering the Financing of Terrorism:**  Afghanistan is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  In June, FATF removed Afghanistan from the list of "jurisdictions with strategic deficiencies" (the "grey list").  Despite technical compliance, insufficient cooperation and lack of capacity still hamper terrorist finance investigations.

Afghanistan's financial intelligence unit, the Financial Transactions and Reports Analysis Center of Afghanistan (FinTRACA), distributes UN sanctions lists under the 1267 and 1988 sanctions regimes to financial institutions via a circular and a link on FinTRACA's website.  As of October 31, FinTRACA revoked 49 business licenses and imposed US $42,000 in fines on money service businesses for failure to comply with anti-money laundering/countering the financing of terrorism laws.

PX210

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Five thousand out of 160,000 mosques are registered with the Ministry of Hajj and Religious Affairs and the Ministry of Education.  Many mosques and associated religious schools (madrassas) are unregistered and operate independently of the government.  The government estimated 370,000 students attend independent madrassas.

**Regional and International Cooperation:**  Other multilateral fora include an Afghanistan-Pakistan-China trilateral on border security and counterterrorism as well as a C5+Russia+Afghanistan forum, which includes the security chiefs of the five Central Asian states, Russia, and Afghanistan.  Afghanistan is also an observer state within the Shanghai Cooperation Organization (SCO), which revived the long-dormant SCO-Afghanistan Contact Group to focus on enhanced security and counterterrorism.

## BANGLADESH

**Overview:**  Bangladesh experienced three terrorist attacks in March 2017.  Since then, Bangladesh security forces have foiled dozens of plots by terrorist groups.  The Government of Bangladesh continued to articulate a "zero-tolerance" policy towards terrorism and the use of its territory as a terrorist safe haven.  While the Government of Bangladesh often attributed terrorist violence to local militants, al-Qa'ida in the Indian Subcontinent (AQIS) and ISIS together have claimed responsibility for nearly 40 attacks in Bangladesh since 2015.  Terrorist organizations used social media to spread their ideologies and solicit followers from Bangladesh.  Bangladeshi militants have been featured in multiple publications, videos, and websites associated with ISIS and AQIS.

**2017 Terrorist Incidents:**  ISIS claimed responsibility for three attacks in March.

- On March 17, a suspected suicide bomber snuck into a temporary facility belonging to the Rapid Action Battalion (RAB), a counterterrorism-focused Special Mission Unit, detonating a suicide vest, killing himself and injuring two RAB officers.
- On March 24, an unidentified adult male self-detonated at a police checkpoint near Dhaka's Hazrat Shahjalal International Airport, killing only himself.
- On March 25, eight people were killed and more than 40 injured in two blasts during a raid on a suspected ISIS safehouse in Sylhet.

**Legislation, Law Enforcement, and Border Security:**  Bangladesh's criminal justice system is in the process of fully implementing the Antiterrorism Act of 2009 as amended in 2012 and 2013.  Although Bangladesh's Antiterrorism Act does not outlaw recruitment and travel in the furtherance of terrorism, the broad language of the Act provides several mechanisms by which Bangladesh can implement UN Security Council resolution (UNSCR) 2178 (2014) on addressing foreign terrorist fighters.  Despite lacking laws specific to foreign terrorist fighters, Bangladesh

PX210

arrested suspected foreign terrorist fighters or facilitators of such fighters on other charges under existing law.

Bangladesh cooperated with the United States to further strengthen control of its borders and ports of entry, as called for by UNSCR 2178 (2014). The international community remains concerned about security procedures at Dhaka's Hazrat Shahjalal International Airport, although the International Civil Aviation Organization certified this airport as 77.46 percent effective in "implementation of aviation safety standard compliance," more than 26 percentage points higher than a previous audit in 2012. Bangladesh shared law enforcement information with INTERPOL but does not have a dedicated terrorist watchlist. Bangladesh also does not have an interactive Advanced Passenger Information system.

The Rapid Action Battalion and the Counter-Terrorism and Transnational Crime Unit of the Dhaka Metropolitan Police, as well as other elements of the Bangladesh Police, continued a campaign of arrests and raids against suspected militants. Many suspects died in these operations, oftentimes described as the result of a "cross-fire," a euphemism for extrajudicial killings by the police. Observers also believe at least some of the raids were staged by law enforcement.

In early November, a pilot with Bangladesh's Biman Airlines pled guilty to a conspiracy to crash a passenger jet into the Prime Minister's residence. The suspect's father was allegedly part of a group of terrorists that killed themselves by detonating explosives when confronted by Bangladesh security forces in early September. Throughout 2017, Bangladesh security forces claimed credit for foiling dozens of terrorist plots, many of which were reportedly in the final stages of planning.

Bangladesh continued to participate in the Department of State's Antiterrorism Assistance program and received counterterrorism training on building unit capacity in crisis response, evidence collection, crime scene investigation, infrastructure protection, instructional development and sustainment, as well as enhancing cyber and digital investigation capabilities. Bangladesh also received Department of Justice prosecutorial skills training and community policing support. Bangladesh is receiving assistance from the United States in developing an Alert List of militants to better screen for persons of interests at its ports of entry.

The Department of Defense's PACOM Augmentation Team worked to monitor and counter terrorist messaging through television and online media, as well as in workshops with students in various cities.

**Countering the Financing of Terrorism:**  Bangladesh is a member of the Asia/Pacific Group on Money Laundering. The Bangladesh Financial Intelligence Unit (BFIU) is a member of the Egmont Group. The Bangladesh central bank and the BFIU lead the government's efforts to comply with the international anti-money laundering/countering the financing of terrorism (AML/CFT) standards and international sanctions regimes.

The terrorist finance provisions of Bangladesh's Antiterrorism Act make illegal the receipt and collection of money, services, and material support where "there are reasonable grounds to

PX210

believe that the same has been used or may be used for any purpose by a terrorist entity." The Act prohibits membership in and support of prohibited organizations, i.e., organizations engaged or involved in terrorist activities, including the organizations listed in the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime. The Bangladesh Bank also publishes lists of domestically designated and UN-sanctioned individuals and groups on its website. The Act includes a broad provision providing for mutual legal cooperation on terrorism matters with other nations and a comprehensive forfeiture provision for assets involved in terrorism activities, although there was an absence of significant terrorist financing and money laundering cases.

The judicial sector is under-resourced for carrying out prosecutions and obtaining convictions in complex financial and material support cases. The Evidence and Criminal Procedure Codes date back to the nineteenth century and there is no provision for plea bargaining. Government of Bangladesh counterparts agree that the lack of a career civil service prosecution unit remains a serious problem. Civilian attorneys are appointed *ad hoc* to prosecute cases. There is little coordination between law enforcement and prosecutors. Consequently, the overall conviction rate is approximately 10 percent and a case can take as long as seven years from the filing of charges to sentencing.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Bangladesh organizations continued cooperative activities through the Country Support Mechanism under the Global Community Engagement and Resilience Fund (GCERF), a public-private global fund to support local, grassroots CVE efforts in at-risk communities. The Bangladeshi cities of Dhaka North, Dhaka South, and Narayanganj are members of the Strong Cities Network. The Ministry of Religious Affairs and the National Committee on Militancy, Resistance, and Prevention work with imams and religious scholars to build public awareness against terrorism. The police are engaging religious leaders to counter terrorist propaganda with appropriate scripture-based messages and engaging imams to speak to surrendered militants to explain that the Quran does not support terrorist violence.

The police also are continuing community policing efforts. Law enforcement authorities are working with local universities to identify missing students and curb radicalization to violence among university students. Local research institutions, including private think tanks and both public and private universities, continued to engage in CVE-related research. However, Bangladesh's lack of a publicly available strategy to counter violent extremism hindered sustained engagement with the United States and the international community.

## INDIA

**Overview:**  The parts of India most seriously impacted by terrorism in 2017 included the state of Jammu and Kashmir, the northeast Indian states, and parts of central India in which Maoist terrorists remain active. India continued to apply sustained pressure to detect, disrupt, and degrade terrorist organizations' operations within its borders. Indian leadership expressed

PX210

resolve to prevent terrorist attacks domestically and to bring to justice the perpetrators of terrorism, in cooperation with the United States and other like-minded countries.

Counterterrorism cooperation between India and the United States increased in 2017. The two pledged to strengthen cooperation against terrorist threats from groups including al-Qa'ida (AQ), ISIS, Jaish-e-Mohammad (JeM), Lashkar-e-Tayyiba (LeT), and D-Company. During a June 2017 summit, President Trump and Prime Minister Modi directed officials to establish a new mechanism for cooperation on terrorist designations. The first meeting of the bilateral Designations Dialogue was held in December. India welcomed the U.S. State Department's June designation of Hizbul Mujahideen (HM) senior leader Mohammad Yusuf Shah, also known as Syed Salahuddin, and the August designation of HM as a Foreign Terrorist Organization.

**2017 Terrorist Incidents:**
- On March 7, ISIS-inspired, self-radicalized terrorists attacked the Bhopal–Ujjain passenger train at Jabri railway station in Shajapur district in Madhya Pradesh state, injuring 10 passengers. Six persons were later arrested and a key suspect was killed when the police tried to arrest him.
- On March 17, Maoists killed 25 security personnel in an ambush in Sukma, Chhattisgarh.
- On July 10, alleged LeT terrorists killed seven Hindu pilgrims near Anantnag in the state of Jammu and Kashmir.
- On August 27, eight security personnel were killed when two JeM terrorists snuck into Pulwama town in the state of Jammu and Kashmir and targeted buildings used by the state Police Special Operation Group.

**Legislation, Law Enforcement, and Border Security:** India made no major changes to its counterterrorism laws in 2017. The Indian government continued to address terrorism-related activities through existing statutes, including the Unlawful Activities Prevention Act (UAPA) (1967), the South Asian Association for Regional Cooperation Convention on Suppression of Terrorism Act (1993), and various state-level laws. The UAPA presumes the accused to be guilty if the prosecution can produce incriminating evidence indicating the possession of arms or explosives or the presence of fingerprints at a crime scene, regardless of whether criminal intent is demonstrated. State governments held persons without bail for extended periods before filing formal charges under the UAPA.

India's state-level law enforcement agencies play a significant role detecting, deterring, and preventing acts of terrorism. These state agencies have varying degrees of capability. After the Mumbai attacks of 2008, state Anti-Terrorism Squads (ATS) were created to handle rapid, first-responder duties. At the central government level, the National Investigation Agency (NIA) is the lead law enforcement investigation agency. The National Security Guard (NSG) retains the mandate for nationwide response. Despite its rigorous training, NSG's rapid response capability is somewhat limited, due in part to its small staff relative to India's large size. Continued weaknesses in intelligence and information sharing negatively impacted state and central law enforcement agencies. In 2016, India and the United States signed an arrangement to exchange terrorism screening information, and the Indian Multi Agency Centre/Intelligence Bureau continued work on implementation.

PX210

In an example of a significant counterterrorism law enforcement action, police arrested Jamaat-ul-Mujahideen Bangladesh (JMB) leader Mohammad Idris from a central Kolkata hideout on March 8.  Police believe Idris was involved in the July 1, 2016, Holey Artisan Bakery attack in Dhaka, Bangladesh.  On November 21, local police arrested two Bangladeshi terrorists belonging to Ansarullah Bangla Team in Kolkata.  The police stated the two planned to murder bloggers in Bangladesh and had come to Kolkata to buy arms.

In April, an Indian court sentenced two Indian ISIS financiers to seven years in prison, in the country's first ISIS-related convictions.  The two pled guilty to a criminal conspiracy to propagate ISIS ideology, recruit persons, raise funds, and facilitate the travel of those recruited to join ISIS in Syria.  India detained an alleged AQIS facilitator in September.  The case was pending in court at the end of 2017.

India participated in the Department of State's Antiterrorism Assistance program and received training in internet, dark web, mobile device, and advanced digital forensics capabilities.

**Countering the Financing of Terrorism:**  India is a member of the Financial Action Task Force (FATF) as well as two FATF-style regional bodies – the Eurasian Group on Combating Money Laundering and Financing of Terrorism and the Asia/Pacific Group on Money Laundering.  India's financial intelligence unit is a member of the Egmont Group.  India has formed an interagency committee to conduct its National Risk Assessment in accordance with FATF guidance.  Under the chairmanship of the Additional Secretary (Revenue), the committee will form several working groups to examine specific topics, e.g., financial institutions, financial inclusion, and anti-money laundering.  Once complete, the committee will present the assessment to the Finance Minister for approval.

India took steps to pass legislation to allow for the confiscation of assets and prosecution of individuals involved in certain third-party transactions.  India also took steps to amend its laws related to recovering confiscated property.  At year's end, India was in the final process of approving an amendment to bring dealers of precious metals, stones, and other high-value goods under the jurisdiction of the Prevention of Money Laundering Act from 2002.

Between August 2016 and May 2017, India initiated 117 anti-money laundering/countering the financing of terrorism investigations, filed 83 prosecution complaints, arrested 19 individuals, and secured two convictions and two property/asset confiscations.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Indian CVE programs in 2017 targeted disaffected sectors of Indian society that were at the highest risk of vulnerability for terrorist recruitment.  On October 23, the Ministry of Home Affairs appointed a Special Representative to begin dialogue with all stakeholders in the state of Jammu and Kashmir to discuss issues of street violence, cross-border terrorism, and pervasive alienation, particularly among youth.

PX210

Indian government officials raised concerns over the use of the internet – including social media – for terrorist recruiting, radicalization to violence, and fomenting inter-religious tensions.  In particular, officials expressed concern about ISIS's ability to recruit online, following incidents in which Indians were attracted to join or support the group.

The Maharashtra Anti-Terrorism Squad produced four short, high-quality films to counter terrorist recruitment, which were played before movies in theaters in the state.

The city of Mumbai is a founding member of the Strong Cities Network.

**International and Regional Cooperation:**  India is a founding member of the Global Counterterrorism Forum (GCTF) and participated in GCTF and other UN fora on counterterrorism in 2017.  India also used multilateral fora and bilateral visits to highlight terrorism concerns and their impacts.  During the 2017 BRICS Summit (with Brazil, Russia, China, and South Africa) and the 2017 SCO (Shanghai Cooperation Organization) Summit, India led efforts on declarations condemning terrorism and calling for joint efforts to counter it.  At the 15th ASEAN-India Summit in November in Manila, India pledged to cooperate closely with ASEAN nations to stem terrorism.

India continued to increase bilateral cooperation on counterterrorism.  India provided US $500,000 to the Philippines to aid the rehabilitation of inhabitants of Marawi who were affected by fighting between the Philippine military and ISIS-inspired militants.

## KAZAKHSTAN

**Overview:**  Kazakhstan continued to express interest in expanding counterterrorism cooperation with the United States, particularly in countering violent extremism.  The government has long feared the potential return of foreign terrorist fighters from Iraq and Syria, but two domestic attacks in 2016 refocused government attention on homegrown terrorists.  Despite concerns from some outside experts that the government's "law enforcement-first" approach to countering radicalism could backfire absent increased attention to other factors driving "extremism." Kazakhstan has increased restrictions on religious freedom for both minority religious groups and its Muslim-majority population, for the stated purpose of combating what it considers "extremism."

**Legislation, Law Enforcement, and Border Security:**  Kazakhstan has a comprehensive counterterrorism legal framework.  It is illegal for citizens to fight in foreign wars.  The government takes a two-pronged approach to the few returning ISIS fighters, pursuing rehabilitation for some while arresting and prosecuting others.

On July 11, the president signed a law that allows the government to deprive Kazakhstanis of citizenship if they are convicted of a range of "grave terrorism and extremism-related crimes," and for other vague crimes like causing 'grave harm to the vital interests of the state.'

PX210

Law enforcement units demonstrated a strong capacity to detect, deter, and respond to terrorist incidents.  The government's counterterrorism plan allowed for enhanced interagency cooperation, coordination, and information sharing, but the extent to which this actually occurred remained unknown.  There were four special counterterrorism detachments under the Ministry of Internal Affairs, and one under the National Security Committee (KNB), the main security and intelligence agency.  Before and during EXPO 2017 in Astana, security services bolstered resources and capacity to protect soft targets.

Kazakhstan's Border Guard Service (BGS), part of the KNB, uses specialized passport control equipment, allowing officers to check for fraudulent documents.  BGS officers receive risk-profiling training by the U.S. Department of State to identify traffickers and terrorists, as well as K9 unit training for counterterrorism operations.  In recent years, Kazakhstan has strengthened security on its southern border by adding radar systems, inspection equipment and vehicles, and specialized mobile inspection groups.  The government proactively worked to prevent Kazakhstanis from traveling to fight abroad in Syria and Iraq, in keeping with UN Security Council resolution 2178 (2014).  The KNB announced in October that no Kazakhstanis had left for conflict zones in 2017.

Courts delivered numerous sentences for promotion of "extremism" and terrorism, and recruitment and plotting terrorist acts, although few involved allegations or threats of violence.  KNB Deputy Chairman Nurgali Bilisbekov announced December 12 that security services had prevented 11 "terrorist attacks" in 2017, although he later clarified this number included plots to travel to conflict zones.  While the government does not release annual statistics of counterterrorism-related arrests, media sources routinely reported on the topic.  For example, press reports indicated that in November, the KNB arrested four people, alleging they had amassed weapons and had ISIS-propaganda.  However, some cases the government identified as "extremism" were unrelated to terrorism, such as the six-year prison sentence handed down to an Almaty man charged only with having Arabic-language songs praising Allah on his cell phone.  We refer you to the State Department's Country Reports on Human Rights Practices and Report on International Religious Freedom for 2017 for further information.

**Countering the Financing of Terrorism:**  Kazakhstan belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force-style regional body.  The government criminalizes terrorist financing in accordance with international standards and freezes and confiscates known terrorist assets without delay.  The government monitors and regulates money/value transfer and other remittance services and requires the collection of data for wire transfers (i.e. requires originator and recipient name, address, and account number).  Additionally, authorities routinely distributed the names of organizations listed in the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime to financial institutions.  The Prosecutor General's Office Crime Statistics Committee reported nine terrorist financing cases were transferred to the court system, but information is not available on convictions.  Kazakhstan's unregulated financial sector is relatively small.  For further information on money laundering and financial crimes, see the 2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes.

PX210

**Countering Violent Extremism (CVE):**  Kazakhstan is still implementing a five-year state program on fighting religious extremism and terrorism that was adopted in 2013.  This program is not the equivalent of a national CVE strategy, and the program relies heavily on the government-affiliated Spiritual Association of Muslims in Kazakhstan to promote what the government calls "traditional Islam."

The Government of Kazakstan's CVE initiatives focused on preventing "radicalization," with efforts to educate and provide alternatives to youth through social programs and economic opportunities.  Initiatives to build rule of law are lacking and the government has taken steps to restrict space for independent civil society groups while also funding several CVE-focused non-governmental organizations.  Religious experts from the government-controlled Committee for Religious Affairs and regional offices reach out to at-risk youth directly.  The government continued rehabilitation and reintegration work with individuals convicted of what the government considered "extremism"-related offenses, and their relatives, although the results of the nascent programs were still unclear.  The government focused its prevention efforts on detention and prosecution of recruiters and proselytizers sharing what the government deemed "extremist" ideas.  Most convicted recruiters were placed in general-regime penal colonies for three to six years.

The government censors online content in an effort to reduce "extremist" messaging.  Religious leaders reached out to youth via official websites such as E-Islam.  Government-controlled religious experts created groups on social networks such as Facebook and VKontakte, where they posted information and answered user questions about "religious extremism."  Committee for Religious Affairs officials provided training for local imams, non-governmental organizations, and the media.

**Regional and International Cooperation:**  Kazakhstan participates in counterterrorism activities within the Collective Security Treaty Organization, which has established a joint task force for preventing the propagation of terrorist and "extremist" ideas online.  Kazakhstan is a member of the Community of Independent States' Anti-Terrorism Center, which hosts a data bank of banned terrorist and extremist organizations accessible to law enforcement and financial intelligence bodies of the member states.  The Prosecutor General's Office and the Committee for Religious Affairs cooperated with the OSCE on countering violent extremism and terrorism workshops.  In December, Kazakhstan co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

## KYRGYZ REPUBLIC

**Overview:**  The Kyrgyz Republic's counterterrorism efforts continue to focus on rooting out those it considered "extremists," countering the spread of "extremism," limiting the flow of Kyrgyz national foreign terrorist fighters, and preventing those returning from conflicts abroad from engaging in terrorist activities.  Terrorist attacks in the country remain rare, but the August 2016 suicide bombing against the Chinese Embassy in Bishkek and a noticeable increase in reports of terrorism-related arrests in 2017 underscored the potential threat facing the country.  The Kyrgyz government restricts public information on national security issues, making it very difficult to assess the efficacy of its counterterrorism operations and the true

PX210

extent of the threat. The country remained vulnerable to transnational threats, especially in the remote south, where ill-defined and porous borders allowed for the relatively free movement of people and illicit goods in and out of the country. According to government statistics, approximately 800 Kyrgyz citizens have left the country to join ISIS or other terrorist groups. Most experts believe the true number is higher.

**Legislation, Law Enforcement and Border Security:** There were two notable legislative changes in 2017. In May, the president ratified amendments to the "Law on Countering Terroristic Acts" to require the government to publish its list of banned extremist and terrorist organizations. In June, a Bishkek district court ruled to ban the Yakyn Inkar Islamic sect, bringing the total number of banned groups to 21. There were no reports in 2017 of the government using counterterrorism laws to prosecute political opponents.

There have been no changes to the host country's law enforcement capacity related to counterterrorism since 2016, other than that the Ministry of Interior (MVD) 10th Department, which is the lead law enforcement agency on countering "extremism," has been renamed to the "Service for Countering Extremism and Illegal Migration."

The government does not maintain a terrorist screening watch list or have biographic or biometric screening capabilities at ports of entry. Information sharing with other countries occurs rarely and usually only by request in the context of criminal investigations. The government has expressed interest in developing a program to collect and use Advance Passenger Information on commercial flights, but it is still only in the discussion phase. The State Border Service has limited capacity to adequately patrol and control the country's land border due to vast distances, rough terrain, and extremely limited resources.

There was a steady stream of terrorism- and "extremism"-related arrests throughout the year, roughly on par with 2016. Beginning in April there was a noticeable shift in the pattern of reported arrests, with an increase in terrorism-related charges, involving returnees from foreign conflict zones, weapons seizures, and alleged planned attacks. This corresponded with a decrease in small-scale arrests of unarmed members of banned "religious extremist" groups, which were most prevalent in the past. In 2017, law enforcement agencies reported the successful disruption of at least seven planned terrorist attacks, and arrested almost three dozen people on terrorism-related charges, close to a third of whom were reported to be returnees from foreign conflict zones. During a particularly active period from August 29-September 22, Kyrgyz authorities reportedly broke up three separate alleged terrorist plots, during which time police killed two suspects and arrested another nine. Authorities claimed the perpetrators had links to international terrorist organizations and were planning to carry out attacks using improvised explosive devices during the October presidential elections and the August 31 Independence Day celebrations. Because of the opaque nature of the Kyrgyz government's counterterrorism operations, it is impossible to verify information about these and other incidents.

Kyrgyz police units participated in the Department of State's Antiterrorism Assistance program. Courses included combating domestic and transnational terrorism and border security.

PX210

**Countering the Financing of Terrorism:**  The Kyrgyz Republic is a member of the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force (FATF)-style regional body.  During 2017, the Kyrgyz Republic underwent its mutual evaluation by the FATF; however, the outcome report from that evaluation has not been finalized at year's end.  There were no significant changes to the Kyrgyz government's efforts and capacity to counter the financing of terrorism in 2017, other than the signing of three new international agreements on exchanging information related to money laundering and terrorist financing.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In 2017, the Kyrgyz government approved its first national program and action plan on combatting terrorism and "extremism."  The action plan lays out approximately three dozen tasks that relevant government agencies will implement over the next five years, in cooperation with civil society and the international community, in some cases.  The bulk of the action plan is focused on a comprehensive approach to preventing "extremism."

The Ministry of Education, in cooperation with the State Commission for Religious Affairs (SCRA), is in its second year of a program to develop a new curriculum for high school-aged students on moderate Islam and identifying terrorist recruitment tactics.  This program was expanded to include 56 schools in 2017.  The MVD and the SCRA, often in cooperation with local religious leaders, focused much of their engagement activities in 2017 on preventing radicalization amongst youth and women.  Additionally, the SCRA and the Spiritual Administration of Muslims of Kyrgyzstan held CVE training and religious education seminars for officers from the military and the State Border Service to reduce their vulnerability to "extremist" recruitment.  In 2017, the Kyrgyz government cooperated with the United Nations, the Organization for Security Co-operation in Europe (OSCE) and other international organizations and foreign governments, to facilitate CVE training and related assistance programs.

In 2017, the UN Office on Drugs and Crime launched a project with the Kyrgyz Prison Service to develop strategies to manage the spread of "extremism" among prisoners and prevent radicalization.  This project will provide training for prison staff, develop a prisoner classification and risk assessment tool, and help design a pilot rehabilitation program for "extremist" convicts.

In 2017, the GKNB continued its public awareness campaign in the Kyrgyz press to discredit the efforts of ISIS recruiters.  The SCRA also conducted activities through television and other forms of mass media to counter "extremist" narratives, with a particular focus on religious women.  The Kyrgyz government organized a two-day international conference entitled "Islam in the Modern Secular State," during which the president delivered remarks calling for the harmonious coexistence of the state and religion and tolerance towards all faiths.

**Regional and International Cooperation:**  In 2017, the Kyrgyz Republic participated in counterterrorism activities and trainings organized by the OSCE, the North Atlantic Treaty

PX210

Organization, the Commonwealth of Independent States, Shanghai Cooperation Organization (SCO), and the Collective Security Treaty Organization (CSTO).  The Kyrgyz Republic participated in five CSTO and two SCO counterterrorism exercises in 2017.

## MALDIVES

**Overview:**  The Government of Maldives' counterterrorism efforts concentrate on countering violent extremism and limiting the flow of foreign terrorist fighters.  Marginalized Maldivians, especially those within the penal system or involved in criminal gangs, are at heightened risk of radicalization to violence, with some joining terrorist groups.  On April 23, assailants stabbed to death blogger Yameed Rasheed, whom some in Maldives perceived to espouse anti-Islamic views.  Maldives Police Service (MPS) arrested two Maldivians accused of conspiring with ISIS in a suicide attack plot.  MPS investigated 12 cases of Maldivians intending to participate in foreign wars and charged four in two separate cases for leaving to fight in Syria.  The government claims 49 radicalized Maldivians were fighting with terrorist organizations, whereas the UN and media estimated approximately 200.  These incidents illustrate a pattern of Maldivians transiting through third countries to become foreign terrorist fighters.

MPS reported no confirmed cases of returning foreign terrorist fighters, but it was developing strategies and procedures to monitor, assess, and take actions against any returning fighters.

Social media users continued to spread radical ideologies and target moderate and secular individuals and organizations characterized as "insulting Islam."  Maldives participated in the U.S. Department of State's Antiterrorism Assistance program training on interview techniques and aviation security.

**2017 Terrorist Incidents:**  On April 23, blogger Yameen Rasheed, a critic of the political establishment who had received repeated death threats for his allegedly anti-Islamic views, was found murdered with multiple stab wounds in the stairwell of his apartment building in Malé.  Some suggested Rasheed may have been killed for his criticism of the government, but police asserted that perpetrators believed that Rasheed had "mocked" Islam.  Police arrested eight suspects and filed charges against seven.  Legal proceedings, which were closed to the public, had not concluded at year's end.

**Legislation, Law Enforcement, and Border Security:**  The Prevention of Terrorism Act (PTA) is the primary legislation for preventing and prosecuting terrorism.  Maldives also continued to use the PTA to suppress criticism by detaining and prosecuting journalists, political opposition figures, and other activists.  It released some, but also made new arrests during the year, including of an individual who wrote social media posts critical of President Yameen.  The PTA criminalizes joining or fighting in a conflict abroad.  MPS reported investigating 17 cases involving 40 Maldivians under the PTA during 2017:  five with intent to commit violence in Maldives and 12 with intent to participate in a foreign war.  In November, the Prosecutor General's Office (PGO) charged two Maldivians for allegedly conspiring with IS to launch a suicide attack in Malé.  In August, the PGO charged four others with possessing improvised explosive device (IED)-related items and conspiring to commit an act threatening national

PX210

security.  Media reported a separate incident in November in which authorities arrested two other men for making bombs.  Authorities refused to comment publicly on these reports.

Maldives enacted a new Criminal Procedures Act (CPA), which introduced, codified, and harmonized the practices of the criminal justice system.  The Attorney General's Office reported the CPA does not apply in terrorism cases and that the PTA outlines procedures for arrest, detention, search, and seizure in terrorism cases.  MPS is responsible for counterterrorism investigations and transfers cases to the PGO for the duration of the trial.  The National Counterterrorism Center (NCTC) has the mandate to coordinate interagency policy on counterterrorism and countering violent extremism and to liaise with international security partners.  The NCTC falls under the MNDF, with participation from MPS, customs, immigration, and other agencies.  Responsibility for counterterrorism operations, including investigations, primarily rests with MPS.  MNDF, including the marines and coast guard, is responsible for counterterrorism response.  Information sharing between agencies remains limited.  Resort security managers and diplomats were unaware of specific government plans to prevent or respond to terrorist attacks.

The appointment of partisan personnel to independent institutions impedes interagency cooperation and creates distrust.  Similarly, an inadequately trained judiciary unfamiliar with counterterrorism legislation impairs adequate prosecution of terrorism cases.  In October, the courts acquitted three men detained in 2016 at the Turkey-Syria border and charged with attempting to travel to Syria to fight with terrorist groups.  MPS did not arrest two returned Maldivians charged on suspicion of planning to travel to Syria from Kuala Lumpur.  Corruption, lack of political will, and misuse of counterterrorism laws against political opponents obstruct cooperation.

Maldives uses a U.S.-provided border security system, the Personal Identification Secure Comparison and Evaluation System (PISCES), to process passengers at Maldives' main international airport and at Malé seaport.

The Department of State's Antiterrorism Assistance program provided Maldivian law enforcement units with training on interview techniques and aviation security best practices.

**Countering the Financing of Terrorism:**  Maldives is a member of the Asia/Pacific Group (APG) on Money Laundering, a Financial Action Task Force-style regional body.  Maldives has authority to criminalize money laundering and terrorist financing under the Prevention of Money Laundering and Terrorist Financing Act, although authorities have not investigated or prosecuted any cases since it became law in 2016.  Authorities previously reported that individuals transferred funds through informal money transfer networks (*hawala*) between islands, but they did not report the extent to which these systems were employed to transfer illicit funds.  Maldives introduced a new Remittance Business Regulation that prohibits conducting domestic and international money transfer activities without a Central Bank-issued license.  The Central Bank's Financial Intelligence Unit was unaware of any *hawala*-type remittance activities in 2017, but it increased terrorist financing-related information sharing with MPS and the NCTC.  MPS established an internal financial intelligence unit to collect intelligence on terrorist financing.  Maldives implemented the UN Security Council ISIL

PX210

(Da'esh) and al-Qa'ida sanctions regime, but it did not seize any terrorist assets in 2017.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In November, the NCTC launched a National Strategy on Preventing and Countering Violent Extremism.  The NCTC identified islands prone to radicalization through a nationwide study.  It intends to launch community-based programs and awareness campaigns throughout the country.

The government launched national campaigns to raise awareness about religious extremism and promote moderation.  The campaign targeted schools, Friday sermons, and public fora held at the Islamic Centre in Malé, which is a member of the Strong Cities Network.

Government actions at times led to threats of violence against secularists and activists.  We refer you to the State Department's Country Reports on Human Rights Practices and Report on International Religious Freedom for 2017 for further information.

**International and Regional Cooperation:**  The NCTC, with UN support, held a regional counterterrorism conference in Maldives for 46 experts from 16 countries.  In December, Maldives co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

The Ministry of Tourism, with MPS and British counterterrorism experts, held a conference for more than 100 resort security managers to discuss challenges to security planning.  MNDF was a member of the Global Special Operations Force network, which collaborates on common security challenges and actively supports multilateral and regional security cooperation efforts, such as global programs focused on counterterrorism and de-radicalization.

## NEPAL

**Overview:**  Nepal experienced no acts of terrorism directed against U.S. or Western targets in 2017.  However, Nepal did see an increase in incidents of terrorism against domestic targets, largely surrounding elections held in late 2017.  The Government of Nepal attributed the majority of the attacks to the Communist Party of Nepal (Maoist), a Maoist faction also known as the "Netra Bikram Chand Group" or "Biplav Group" that split from the mainstream Communist Party of Nepal (Maoist Center) several years ago.  In response to these incidents, Nepal's security organs largely directed their counterterrorism efforts against the Biplav Group, forming special teams to identify and arrest its leaders.

**2017 Terrorist Incidents:**  Nepal experienced an increase in terrorist attacks during the year, primarily in connection with local, provincial, and national elections held around the country in April, June, September, November, and December.  None of these attacks were directed against U.S. or Western targets.  It was generally believed that these attacks, which resulted in one death and multiple injuries, were intended to intimidate political candidates, convince voters to stay home, and undermine the elections.  The incidents initially resulted only in property damage and

minor injuries, but they increased in frequency and severity later in the year.  By the time elections ended in early December, more than 100 such attacks had occurred throughout Nepal, resulting in one death and numerous injuries.  In the lead-up to the various phases of elections, security forces found and defused IEDs before they could explode.  For example, the Nepalese Army defused an IED discovered near a voting center in Dhading district on November 25.  The attacks increased in sophistication toward the end of the year, with one IED that detonated at an early December election rally held for Prime Minister Sher Bahadur Deuba that resulted in injuries to nine people, four of them critically.  On December 7, the Biplav Group publicly claimed responsibility for all of the elections-related IED attacks, but the group later retracted this statement.  The Nepal Police announced on December 6 that around 600 Biplav Group cadres had been detained for anti-election activities.  The attacks largely ceased as campaigning stopped in the days before the last set of polls opened on December 7.

**Legislation, Law Enforcement, and Border Security:**  There were no significant legislative changes since 2016.

The law enforcement organ directly responsible for counterterrorism activities is the Special Bureau of the Nepal Police.  This unit consists of approximately 120 officers.  The Special Bureau is supplemented by Nepal Police and Armed Police Force officers when necessary.  The Nepalese Army Special Forces units are tasked with incident counterterrorism response and received training in hostage rescue, response to hijackings, and similar terrorism incidents.  The Nepal Police and the Armed Police Force participated in the Department of State's Antiterrorism Assistance program in courses that included Explosive Detection Canine Handlers Course (EDCHC), Combatting Domestic and Transnational Terrorism, Fraudulent Document Recognition – Behavioral Analysis, and Post Blast Investigation.  The EDCHC also included the granting of five explosive detection trained canines.  In addition, between 300 and 500 Nepali Police, immigration, and airline personnel received a three-day training on travel document security features that included imposter recognition.

Kathmandu's Tribhuvan International Airport – Nepal's only international airport – does not pre-screen passengers, and landing data are not entered into any database.  Physical security checks of passengers are rudimentary.  There is no travel document security and the airport lacks ultraviolet lights to examine documents.  The Special Bureau of the Nepal Police assigns approximately 10 personnel to the airport and approximately 15 officers to its INTERPOL office, which is located at Nepal Police headquarters.  The INTERPOL office, however, has no designated personnel at Tribhuvan International Airport.  INTERPOL notices are maintained in a database, but passengers are not routinely screened through this database.  Security and immigration officials are generally responsive to U.S. requests for information, but often have little information to provide.

Nepal shares an open border with India.  The 1,000-mile border has a few checkpoints, but they lack sufficient security controls and are sometimes manned by as few as one immigration official.  Most people crossing the border are neither stopped nor checked, and the crossing points can easily be circumvented to avoid scrutiny.  The primary constraint preventing more robust border-control capability is a lack of resources.  The security services lack the personnel,

PX210

technology, databases, basic equipment, and often even electrical power to provide effective border control.  Additional constraints include lack of training and widespread corruption.

**Countering the Financing of Terrorism:**  Nepal belongs to the Asia Pacific Group on Money Laundering, a Financial Action Task Force-style regional body.  While the Government of Nepal has made progress in constructing an anti-money laundering/countering the financing of terrorism (AML/CFT) regime, additional work is required to develop expertise in financial crimes investigations, case management, interagency and departmental coordination, and border control.  In February, the UN Counter-Terrorism Committee Executive Directorate facilitated a workshop in Nepal attended by judges, prosecutors, and investigators and focused on terrorist financing and anti-money laundering.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  There were no significant changes since 2016.

**International and Regional Cooperation:**  The Nepal police sent three officers to the annual regional counterterrorism seminar hosted by INTERPOL.  In April, Nepal engaged in a joint exercise with China focused on anti-hijacking.  Nepal also engaged in a two-week joint exercise with India focused on counter-insurgency.

## PAKISTAN

**Overview:**  Pakistan continued to experience significant terrorist threats in 2017, although the number of attacks and casualties has decreased from previous years.  Major terrorist groups focused on conducting attacks in Pakistan included the Tehrik-e-Taliban Pakistan (TTP), Jamaat-ul-Ahrar, and the sectarian group Lashkar-i-Jhangvi al-Alami (LJA).  Islamic State's Khorasan Province (ISIS-K) claimed several major attacks against Pakistani targets, some of which may have been conducted in collaboration with other terrorist groups.  Groups located in Pakistan, but focused on conducting attacks outside the country, included the Afghan Taliban, the Haqqani Network (HQN), Lashkar e-Tayyiba (LeT), and Jaish-e-Mohammad (JeM).  Terrorists used a range of tactics – stationary and vehicle-borne improvised explosive devices (VBIEDs), suicide bombings, targeted assassinations, and rocket-propelled grenades – to attack individuals, schools, markets, government institutions, and places of worship.

The Pakistani government and military continued high-profile efforts to disrupt terrorist attacks and eliminate anti-state militants.  Progress, however, remained slow on the government's efforts to implement UN sanctions related to designated entities and enforce anti-money laundering/countering the financing of terrorism (AML/CFT) controls.

The Pakistani government pledged support to political reconciliation between the Afghan government and the Afghan Taliban but did not restrict the Afghan Taliban and HQN from operating in Pakistan-based safe havens and threatening U.S. and Afghan forces in Afghanistan.  The government failed to significantly limit LeT and JeM from openly raising money, recruiting, and training in Pakistan – although Pakistan's Elections Commission refused to allow a LeT-affiliated group register as a political party.

PX210

In November, a Pakistani court ordered the release of Hafiz Saeed, the alleged mastermind of the 2008 Mumbai attacks.

**2017 Terrorist Incidents:**  Pakistan suffered numerous terrorist attacks throughout 2017.  The following examples include some of the more destructive and high-profile attacks and show a variety of methods, targets, and perpetrators.

- On February 16, a suicide bomber killed at least 88 people at the Sufi shrine of Lal Shahbaz Qalandar in Sindh Province and injured more than 300.  ISIS-K claimed responsibility for the attack.
- One June 24, twin explosions in Parachinar in Pakistan's Federally Administered Tribal Areas (FATA) killed at least 67.  LJA claimed responsibility for the attacks.  The heavily Shia area suffered several other large attacks in 2017, including a January 21 bombing and a March 31 suicide attack.  Each of these two attacks killed at least 25 people and injured many others.
- On July 24, a suicide bomber killed at least 26, including nine policemen, in downtown Lahore, the provincial capital of Punjab.  TTP claimed responsibility for the attack.

**Legislation, Law Enforcement, and Border Security:**  The Government of Pakistan continued to implement the Antiterrorism Act (ATA) of 1997, the National Counterterrorism Authority Act (NACTA), the 2014 Investigation for Fair Trial Act, and 2014 amendments to the ATA, all of which allow enhanced law enforcement and prosecutorial powers for terrorism cases.  The law allows for preventive detention, permits the death penalty for terrorism offenses, and creates special Anti-Terrorism Courts.  On March 31, however, the government renewed for two more years a constitutional amendment allowing military courts to try civilians on terrorism charges. Critics argued the military courts were not transparent and were being used to silence civil society activists.

Military, paramilitary, and civilian security forces conducted counterterrorism operations throughout Pakistan.  The Intelligence Bureau has nationwide jurisdiction and is empowered to coordinate with provincial counterterrorism departments.  The Ministry of Interior has more than 10 law enforcement-related entities under its administration.  The National Counter Terrorism Authority acts as a coordinating body.

Pakistan collects biometric information at land crossings with its International Border Management Security System.  Authorities had limited ability to detect smuggling via air travel. The Customs Service attempted to enforce anti-money laundering laws and foreign exchange regulations at all major airports, in coordination with other agencies.  Customs' end-use verification managed the entry of dual-use chemicals for legitimate purposes, while attempting to prevent their diversion for use in improvised explosive devices (IEDs).  In keeping with UNSCR 2178 (2014), returning foreign terrorist fighters may be prosecuted under Pakistani law. NACTA compiles and verifies data on returning fighters.

In February, Pakistan's military announced the nationwide Radd-ul-Fasaad or "Elimination of Strife" operation to prevent cross-border terrorist attacks and limit militants' access to explosives

PX210

and weapons.  Government and military sources reported scores of military and police operations to disrupt, kill, and apprehend terrorists.  Military courts sentenced at least 15 convicted terrorists to death in 2017.

**Countering the Financing of Terrorism:**  Pakistan is a member of the Asia Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  Pakistan criminalizes terrorist financing through the ATA, but implementation remains uneven. FATF continued to note concern that Pakistan's outstanding gaps in the implementation of the UN Security Council ISIL (Da'esh) and al-Qa'ida sanctions regime have not been resolved, and that UN-listed entities – including LeT and its affiliates – were not effectively prohibited from raising funds in Pakistan, nor being denied financial services.  Although Pakistan's laws technically comply with international anti-money laundering/countering the financing of terrorism standards, authorities failed to uniformly implement UN sanctions related to designated entities and individuals such as LeT and its affiliates, which continued to make use of economic resources and raise funds.  In November, the Lahore High Court refused to extend the detention of LeT founder Hafiz Saeed as it judged the government had not provided sufficient evidence against him nor had it charged Saeed with a crime.

Pakistan's National Action Plan to combat terrorism includes efforts to prevent and counter terrorist financing, including by enhancing interagency coordination on CFT.  The law designates the use of unlicensed *hundi* and *hawala* systems as predicate offences to terrorism and also requires banks to report suspicious transactions to Pakistan's financial intelligence unit, the State Bank's Financial Monitoring Unit.  These unlicensed money transfer systems persisted throughout the country and were open to abuse by terrorist financiers operating in the cross-border area.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In November, NACTA finalized a National Narrative to Counter Violent Extremism, which will serve as the basis of the government's future efforts in this area.  The Ministry of Information and Broadcasting and the military's public relations wing shaped media messages to build support for the military's counterterrorism initiatives.  The government operated some de-radicalization camps offering "corrective religious education," vocational training, counseling, and therapy.  A Pakistani non-governmental organization administered the widely praised Sabaoon Rehabilitation Center in Swat Valley, which was founded in partnership with the Pakistani military and focused on juvenile terrorists.  The Pakistani cities of Nowshera, Peshawar, and Quetta are members of the Strong Cities Network.

There were continued reports that some madrassahs taught extremist doctrine.  Increasing government supervision of madrassahs is a component of the National Action Plan, and there was evidence of continued government efforts to increase regulation of the sector.  Security analysts and madrassah reform proponents observed, however, that many madrassahs failed to register with the government, to provide to the government documentation of their sources of

PX210

funding, or to only accept foreign students with valid visas, a background check, and the consent of their governments, as required by law.

**International and Regional Cooperation:**  Pakistan participated in the South Asian Association for Regional Cooperation meetings on counterterrorism and in other multilateral fora where counterterrorism cooperation was discussed, including the Shanghai Cooperation Organization (as an observer), the Heart of Asia-Istanbul Process, and the Global Counterterrorism Forum, of which it is a founding member.

## SRI LANKA

**Overview:**  There were no terrorist attacks in 2017.  In January, police claimed they disrupted a plot by former Liberation Tigers of Tamil Eelam (LTTE) members to assassinate a Tamil politician.  The government maintained a large military presence in post-conflict areas and continued to voice concern about the possible reemergence of LTTE sympathizers, but it has also begun to shift its focus to emerging threats, amid reports of Sri Lankans joining ISIS and other terrorist groups.

Counterterrorism cooperation and training is a growing part of the U.S. relationship with Sri Lanka.  For example, two Sri Lankan naval officers attended an anti-terrorism training in Florida in November and December.  Additionally, the Sri Lankan government regularly sends officers to U.S.-sponsored regional counterterrorism workshops and courses such as the Comprehensive Security Response to Terrorism at the Daniel K. Inouye - Asia Pacific Center Security Studies (APCSS).

**Legislation, Law Enforcement, and Border Security:**  The Government of Sri Lanka continued to use the Prevention of Terrorism Act (PTA), enacted in 1982 as a wartime measure, which gives security forces broad powers to search, arrest, and detain individuals.  The National Police claimed there were no arrests made under the PTA during the year.  On February 8, the government announced it had indefinitely suspended making arrests under the PTA, pending the release of a new counterterrorism act, a draft of which remained under consideration at the end of 2017.  Significant flaws with that draft remain, according to international and domestic legal experts.

The Special Task Force is a unit of the Sri Lanka Police Service specializing in counterterrorism and counterinsurgency operations and a major security arm of the state charged with ensuring security of top government and foreign government officials, protecting sensitive terrorist targets, and suppressing activities that pose a threat to national security.  There is also a Terrorism Investigation Division within the regular police structure.

Border security remained a significant issue for the Sri Lankan government.  The Sri Lankan Immigration and Emigration Department is implementing a new information system to process immigration activity.  The new system will connect several relevant departments with INTERPOL databases for criminal investigation and intelligence collection purposes, and it is expected to be fully operational in early 2018.  The Sri Lankan government expanded its partnership with the U.S. Departments of State, Homeland Security, Defense, and Energy on

PX210

securing its maritime border.  The U.S. Coast Guard, under the Department of State's Export Control and Related Border Security program, continued to train Sri Lankan Coast Guard and Navy personnel on border and export control matters, and the Government of Sri Lanka continued to cooperate with U.S. Customs and Border Protection and Department of Energy through the container security initiative, megaports, and related initiatives.  The Government of Sri Lanka continued to collaborate with the European Union Immigration Department on an Advanced Passenger Information system, which transmits passenger information to Sri Lankan immigration officials upon arrival.

**Countering the Financing of Terrorism:**  Sri Lanka belongs to the Asia Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  Sri Lanka's financial intelligence unit is a member of the Egmont Group.  Although it is neither an important regional financial center nor a preferred center for money laundering, Sri Lanka remained vulnerable to money laundering and terrorist financing.  On November 3, FATF added Sri Lanka to its Public Statement entitled "Improving Global AML/CFT Compliance:  On-going process," also known as the "grey list."  Sri Lanka agreed to an action plan to address several vulnerabilities, including improving mutual legal assistance, issuing customer due diligence rules for designated non-financial businesses and persons, and enhancing risk-based supervision.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Sri Lanka continued to operate a rehabilitation program for persons allegedly linked to the LTTE, participation in which was mandatory for a majority of the prisoners formerly held under the PTA who were released on bail.  The number of persons participating in this program has dropped dramatically in recent years, however.  Limited access by independent bodies to known rehabilitation camps precluded reliable evaluations of the government's efforts.  At the provincial level, Sri Lanka is implementing educational outreach programs to address issues of religious tolerance and non-violent conflict resolution.  These programs focus on post-conflict areas of Jaffna, Mannar, Kilinochchi, Mullaitivu, and Vavuniya where the local populations are considered vulnerable to re-radicalization.

**International and Regional Cooperation:**  Sri Lanka continued to cooperate with a number of donor countries to improve its land and maritime border security.  Sri Lanka is a partner nation in the Global Initiative to Combat Nuclear Terrorism.  In September, Sri Lanka's Ministry of Defense signed an MOU with Australia's Department of Immigration and Border Protection on enhanced information sharing on methods for investigating, tracking, and intercepting people smugglers.  The agreement also furthers cooperation between the two nations on countering human trafficking, stopping the movement of illicit goods, and targeting money laundering and proceeds of crime.  In December, Sri Lanka co-sponsored UN Security Council resolution 2396 on returning and relocating foreign terrorist fighters.

**TAJIKISTAN**

PX210

**Overview:**  Tajikistan continued to prioritize counterterrorism efforts in 2017.  The majority of Tajik domestic counterterrorism activities conducted in 2017 targeted organizations and individuals allegedly linked to violent Islamist extremism in Tajikistan, but the government also arrested terrorist suspects returning from Afghanistan, Iraq, Russia, and Syria.  According to public sources, approximately 1,300 Tajik citizens have traveled to Iraq and Syria to join ISIS since 2015.  The government viewed northern Afghanistan as the primary potential source of terrorist activity, and continued to take steps to strengthen its border defense capabilities.  Tajikistan has been willing to engage with the United States on counterterrorism issues.

**Terrorist Incidents:**
- On January 30, an explosive device detonated on the outskirts of the city of Qurghon-teppa (now called Bokhtar).  The blast damaged a vehicle but the vehicle's owner was not hurt.  No one claimed responsibility for the explosion.
- On March 12, four men in the southern city of Bokhtar planted an explosive device near the military prosecutor's office.  A 67-year-old man who worked as a guard at the technological lyceum located next door to the military prosecutor's office picked up the device which exploded in his hands, killing him.  The perpetrators of this attack were involved in prior terrorism-related incidents including attempted recruiting for ISIS.

**Legislation, Law Enforcement, and Border Security:**  Tajikistan adopted the Law on Combating Terrorism in 1999, and has since made a series of amendments, including one in 2017.  The government has used this counterterrorism legislation to suppress independent voices, including journalists, opposition figures, and representatives of peaceful religious groups.

In late 2016, Tajikistan published its "National Strategy on Countering Extremism and Terrorism of the Republic of Tajikistan for 2016-2020."  The State Committee for National Security (GKNB) and the Ministry of Internal Affairs (MVD) have primary responsibility for counterterrorism in the country and also have the greatest resources.  These two organizations are tasked with detection, prevention, and deterrence of terrorist acts, but do not always work well together.  Cooperation and information sharing were sometimes hampered by interagency competition to curry favor with the country's leadership, but the published national strategy seeks to improve this situation.  The GKNB and MVD both have dedicated special tactical units that handle active counterterrorism actions; both units have received training and equipment from the United States, the Russian Federation, and China.

Tajikistan has developed specific plans for the protection of soft targets, and the U.S. embassy sees frequent evidence of city- and nation-wide drills to exercise these plans.  These plans appear to cover critical national infrastructure, foreign diplomatic missions, and state agencies, but may not be comprehensive enough to cover major hotels, stadiums, or cultural sites.

Travel document security and biographic and biometric screening capabilities are lacking at ports of entry, particularly land crossings.  Major entry points have access to INTERPOL data and other lists, but connectivity at smaller border posts is lacking.  Although Dushanbe International Airport does have some biometric capability, this is not in full use.  A recent Department of State Antiterrorism Assistance program capabilities assessment noted aging equipment in need of repair or replacement, and simple visual matching of face to passport photo by Border Guards

PX210

officers is the primary method of identity confirmation. The Border Guards database was not linked to databases of other law enforcement agencies, and only in Dushanbe International Airport are photos taken of visitors; such capability does not yet exist at land border crossings. Tajikistan does maintain an extensive "wanted" list of citizens believed to have joined ISIS and other terrorist organizations, and this list is readily available online. Tajikistan regularly updates its Red Notice requests with INTERPOL.

On July 21, the Minister of Internal Affairs stated that Tajik law enforcement authorities prevented 12 terrorist acts in the country in the first six months of 2017 and detained 228 Tajik citizens for involvement in terrorist organizations.

**Countering the Financing of Terrorism:** Tajikistan is a member of the Eurasian Group on Combating Money Laundering and Financing of Terrorism, a Financial Action Task Force-style regional body. The laws of Tajikistan provide for criminal penalties for crimes associated with money laundering and terrorist financing. Tajikistan's Financial Monitoring Department, is a member of the Egmont Group. For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** At the end of 2016 Tajikistan completed its national strategy for CVE. The government's strategy, designed for implementation from 2016 to 2020, is a whole of government approach to combat radicalization to violence in Tajik society. The Tajik government worked closely with the Organization for Security and Co-Operation in Europe to craft the strategy and called a public meeting in September 2017 to ask for the support of the international community in its funding and implementation. The government has supported the implementation of U.S.-sponsored community-policing programs. Additionally, representatives of Tajikistan's Ulema Council, including the chairman of the council, took part in religious meetings in Russia with Tajik labor migrants to allay fears expressed by the head of the Muslim Spiritual Board (MSB) of Russia, mufti Albir Krganov of Moscow, about the danger of radicalization among Tajik migrants.

Tajikistan amended its criminal laws in 2015, allowing authorities to pardon Tajik fighters who voluntarily return home from Iraq or Syria and renounce foreign militant groups. This is not a blanket amnesty and applies only to those who have not taken part in violence. Some 100 Tajik nationals have since returned from Syria and Iraq. Those pardoned remained on government watch lists but were not legally prevented from applying for jobs, enrolling in universities, or traveling abroad.

In an effort to counter what it considers "extremism," the government has placed multiple restrictions on forms of political and religious expression and groups it classifies as "extremist." In 2016, Tajikistan was designated a "Country of Particular Concern" under the International Religious Freedom Act of 1998.

**International and Regional Cooperation:** Tajikistan is an active participant in regional security arrangements like the Collective Security Treaty Organization and the Shanghai Cooperation Organization. Tajikistan held military exercises in May with Commonwealth of

PX210

Independent States Anti-Terrorism Center as part of an event named Dushanbe-Anti-Terror 2017.  In October 2017, Russia's 201st Motorized Rifle Division military base (which has garrisons in the cities of Dushanbe and Bokhtar) conducted counterterrorism exercises in Tajikistan that included repelling a simulated terrorists attack on the base's facilities.

## TURKMENISTAN

**Overview:**  The Government of Turkmenistan continued its efforts to improve the capacity of law enforcement agencies to combat terrorism, ensure border security, and detect terrorist financing.  The government continued to cooperate with international organizations and participated in the C5+1 regional framework to counter violent extremism.  Government officials participated in training sessions on combating money laundering, preventing terrorist financing, and strengthening border security.  Turkmen authorities continued to maintain close surveillance on its population and borders.

**Legislation, Law Enforcement, and Border Security:**  On November 25, President Berdimuhamedov approved, and the Turkmen Parliament adopted, a new Law on Combating Terrorism.  The law defines which crimes are considered terrorist acts by nature.  This law is supplemented by Articles 271-273 of the Criminal Code, which pertain to terrorist acts and terrorist financing and are used to prosecute terrorism-related offenses.

The Ministries of National Security, Internal Affairs, and Defense, along with the State Border, Customs, and Migration Services perform counterterrorism functions and share information through an interagency commission.  The country's law enforcement capacity still needs further improvement, since law enforcement units do not proactively conduct investigations and have a dismal record of accountability and respect for basic human rights.  Prosecutors, however, play a significant role in the investigation phase of a case, and specialized law enforcement units exist to conduct investigations.

The Government of Turkmenistan participated in training programs sponsored by international organizations.  These included responding to counterterrorism threats at large public events and passenger screening and baggage x-ray at aviation checkpoints.  The Organization for Security and Co-operation in Europe (OSCE) organized training for trainers on aviation checkpoints and x-ray image interpretation for instructors.

Turkmenistan's State Border Service (SBS) operated frontier garrisons on the border with Iran and Afghanistan.  SBS managed eight radiation portal monitors donated by the Department of Energy through its Second Line of Defense program.  The monitors help to detect, deter, and prevent the dissemination of explosives and radioactive materials.  The SBS possesses biometric screening capabilities at ports of entry.

**Countering the Financing of Terrorism:**  Turkmenistan is a member of the Eurasian Group on Combating Money Laundering and Financing of Terrorism, and the government continued to express interest in gaining admission to the Egmont Group.

191

PX210

On July 28, the Governments of Turkmenistan and the United States signed an intergovernmental agreement to implement the provisions of the Foreign Account Tax Compliance Act.

The government continued to monitor and regulate alternative remittance services, collected data on wire transfers, and monitored non-profit organizations to prevent misuse of financing to sponsor terrorist activities.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  In 2017, the Government of Turkmenistan cooperated with international organizations and participated in the C5+1 regional CVE framework.

**International and Regional Cooperation:**  Turkmenistan supports some regional and international efforts to fight terrorism.  In 2017, law enforcement officials participated in OSCE and UN Office on Drugs and Crime training on border security.  Government officials also participated in regional CVE training provided by the UN Regional Center for Preventive Diplomacy in Central Asia.  Turkmenistan continued to participate in the Central Asia Regional Information and Coordination Center.

## UZBEKISTAN

**Overview:**  The Government of Uzbekistan remained concerned about the potential spillover of terrorism from Afghanistan and its Central Asian neighbors and about radicalization of Uzbeks abroad.  President Mirziyoyev sought to improve relations with Uzbekistan's neighbors in many areas, including security cooperation.  Uzbekistan has actively participated in the C5+1 regional framework with the United States and the Central Asian countries (Kazakhstan, Kyrgyz Republic, Tajikistan, Turkmenistan, and Uzbekistan), which includes a program related to countering violent extremism.  Uzbekistan's Ministry of Internal Affairs (MOI) stepped up its law enforcement cooperation with the United States following the October 31 New York City terrorist attack in which an ethnic Uzbek who was a U.S. permanent resident was charged.  While Uzbekistan remains concerned about ISIS recruitment of Uzbeks and shares U.S. interests in combating ISIS, it did not formally join the Global Coalition to Defeat ISIS.  The government restricts information on internal matters, making it difficult to analyze the extent of the terrorist threat and the effectiveness of Uzbek law enforcement efforts.

**2017 Terrorist Incidents:**  All of the 2017 terrorist attacks suspected of being committed by Uzbeks or ethnic Uzbeks happened outside of Uzbekistan.  A U.S. permanent resident from Uzbekistan is under investigation for driving a rented van into a crowd in New York City on October 31, killing eight people and injuring 12 others.  An ethnic Uzbek was arrested in Sweden in April for running a truck into a crowd in Stockholm and killing four people.  Another ethnic Uzbek is on trial for committing the Istanbul nightclub attack that killed 39 people and injured 65 others on New Year's Eve.  Dozens of Uzbeks were arrested in Russia throughout 2017 in various anti-terrorism investigations.

PX210

**Legislation, Law Enforcement, and Border Security:**  The "Law on Combating Terrorism" governs terrorism-related investigations and prosecutions and identifies the National Security Service (NSS) as the lead counterterrorism law enforcement agency.  Uzbekistan also criminalizes terrorism under Article 155 of the criminal code.  In 2017, President Mirziyoyev announced the National Development Strategy for 2017-2021, Article 2.4 of which targets corruption, extremism, and terrorism.

In September 2017, President Mirizyoyev announced the careful screening and subsequent removal of approximately 16,000 people from a 17,000-person security watch list of suspected Muslim extremists.  Despite this positive development, security concerns related to terrorism were commonly used as grounds for detaining people.

Uzbekistan's officials committed to enhanced police and other information sharing and cooperation in specific cases, such as the October 31 New York City attack, when the Ministry of Interior helped arrange witness interviews and shared information on the interviews and record checks conducted by the MOI.  However, Uzbekistan does not publicly share operational counterterrorism information.  Both the NSS and the MOI have dedicated counterterrorism units.  Uzbek law enforcement maintains its own terrorist watchlist and contributed to INTERPOL databases.  Most border posts and airports are equipped with biometric data scanners, and Uzbekistan is working to convert all passports to a new biometric version by July 1, 2018, and to introduce international biometric passports for travel abroad starting January 2019.

Uzbekistan has not reported specific actions to implement UN Security Council resolution 2178 (2014).  Frequent document checks and resident-list checks seek to identify potential foreign terrorist fighters.  In 2017, human rights activists noted an increase in the number of arrests of returning migrant workers on suspicion of involvement in ISIS or religious extremism.  In May, Tashkent City Criminal Court sentenced a group of 11 Muslims to prison terms of up to six years for religious extremism.  In August, the same court sentenced two Uzbek nationals to 15 years each for trying to join terrorist groups in Syria.

**Countering the Financing of Terrorism:**  Uzbekistan belongs to the Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG), a Financial Action Task Force-style regional body.  Article 155 of the criminal code criminalizes the financing of terrorism and includes a prison sentence of eight to 10 years.  The anti-money laundering and countering the financing of terrorism law provides for freezing of assets and mandates that all financial entities check parties to a transaction against lists of persons involved or suspected of involvement in terrorist activities.  An additional regulation establishes a procedure for the creation of such lists and delisting requests.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Uzbekistan remains concerned about ISIS recruitment of Uzbeks.  Ethnic Uzbeks formerly associated with the Islamic Movement of Uzbekistan continued to fight in Afghanistan.  Local government organizations strived to educate citizens

PX210

about the dangers of "religious extremism."  President Mirziyoyev requested the creation of an Islamic Cultural Center in Tashkent to "promote Islam's true values."  Uzbekistan is developing a draft law "On combating extremism," which should define violent extremism for purposes of Uzbek law.  The law bans a number of religious groups as "extremist."  We refer you to the State Department's Country Reports on Human Rights Practices and Report on International Religious Freedom for 2017 for further information.

There were few reintegration efforts underway in Uzbekistan.  When the President announced the removal of 16,000 people from the blacklist of alleged religious extremists, he said that 9,500 of these individuals had been given jobs and urged Muslim clerics and officials to ensure that the rest of the delisted individuals have employment.  Official media and Tashkent Islamic University produced public messages about the dangers of "extremism" and posted them on social media platforms and messaging apps.

**International and Regional Cooperation:**  Uzbekistan is a member of the Organization of Islamic Cooperation and the Shanghai Cooperation Organization (SCO).  In 2017, Tashkent hosted the 30th meeting of the SCO Regional Anti-Terrorist Structure (RATS) and the fifth SCO RATS Conference on Fighting Terrorism, as well as signed the SCO Convention on Countering Extremism.  Uzbekistan has also worked with the Organization for Security and Co-operation in Europe and the UN Office on Drugs and Crime on security issues.  In October 2017, Uzbekistan held the first joint Russian-Uzbek military exercise since 2005, which included a simulated counterterrorism operation.

Although Uzbekistan welcomed closer cooperation in fighting terrorism and "extremism" during high level and working meetings with officials from Azerbaijan, Kazakhstan, Russia, Turkey, and at the Commonwealth of Independent States summit in Sochi, the government does not release detailed information about such efforts.

## WESTERN HEMISPHERE

### Overview

Foreign terrorist fighter travel from the Western Hemisphere to Iraq and Syria virtually stopped in 2017, as heightened awareness of the threat led to tightened border security.  However, Canada, and to a lesser extent, the Caribbean – particularly Trinidad and Tobago – had previously been significant per capita sources of foreign terrorist fighters and the potential return of these trained individuals remains of great concern.  In addition, many Latin American countries have porous borders, limited law enforcement capabilities, and established smuggling routes.  These vulnerabilities offer opportunities to foreign terrorist groups, but there have been no cases of terrorist groups exploiting these gaps to move operations through the region.

As has been the case for decades, transnational criminal organizations posed the most significant threat to the region, demanding the majority of attention from law enforcement and intelligence resources.  Corruption, weak government institutions, insufficient interagency cooperation, weak or non-existent legislation, and a general lack of resources likewise remained obstacles to

PX210

improving security.  Nevertheless, some Western Hemisphere countries made significant progress in their counterterrorism efforts in 2017.

In addition to its financial and fundraising activities in the Western Hemisphere, Hizballah also maintained interest in the region during 2017.  A Hizballah operative was arrested by the FBI in the United States in June 2017.  Among other accusations, he was allegedly involved in surveilling U.S. and Israeli targets in Panama.  And according to early 2017 media reporting, the Bolivian security services previously uncovered and disrupted a Hizballah cache of explosive precursors in the La Paz area.  The Peruvian government's prosecution of a Hizballah member arrested in 2015 is still ongoing, with the Peruvians successfully appealing a ruling acquitting this operative of terrorism charges.

The Government of Colombia and the Revolutionary Armed Forces of Colombia continued to make progress in normalizing relations after reaching a historic agreement to end their five-decade conflict in late 2016.  In 2017, the Colombian government began formal peace negotiations with the National Liberation Army, agreeing to a ceasefire towards the end of the year.  Peru's Shining Path terrorist group remained active, but with reduced strength, and focused mostly on criminal activities in the remote Apurimac, Ene, and Mantaro River Valleys in eastern Peru.

The free trade zones in Panama and the Tri-Border Area of Argentina, Brazil, and Paraguay remained regional nodes for money laundering and were vulnerable to terrorist financing.

In 2017, the Organization of American States' Inter-American Committee Against Terrorism (CICTE) focused programs and activities on border security, legislative assistance to combat terrorist financing, and critical infrastructure and resilience.  The 17th CICTE Regular Session took place in April in Washington, D.C.; delegations from 28 OAS member states attended to discuss terrorist financing and the proliferation of weapons of mass destruction.

Leaders of the 15-member Caribbean Community (CARICOM) adopted a regional arrest warrant treaty, an asset sharing (forfeiture) agreement, and model CARICOM counterterrorism legislation at their July 4, 2017 Summit.  Recognizing the potential threat posed by returning foreign terrorist fighters, home-grown terrorism, and the vulnerability of its tourist industry, CARICOM's Implementation Agency for Crime and Security prepared its first-ever counterterrorism strategy, which will be adopted by heads of government after a final review in 2018.  Together these efforts raise the profile of terrorism as a security concern in the region and provide a solid base for strengthening the region's ability to combat terrorism.

The United States collaborated with both Canada and Mexico to protect our shared borders through regular exchanges of intelligence and other information.

## ARGENTINA

**Overview:**  During 2017, Argentina consolidated plans to redefine its counterterrorism strategy with a focus on its remote northern and northeastern borders, which include the Tri-Border Area where Argentina, Brazil, and Paraguay meet, and where suspected terrorism financing networks

PX210

operate.  Robust U.S.-Argentine law enforcement and security cooperation continued in 2017.  While no terrorist acts occurred in Argentina during 2017, five Argentine nationals were among the random victims of the October 31 terrorist attack perpetrated by a lone actor in New York.

The UN Executive Director for the Counter-Terrorism Executive Directorate visited Argentina in 2017 to evaluate Argentina's legislative efforts to combat terrorism.

**Legislation, Law Enforcement, and Border Security:**  In 2017, the Government of Argentina proposed changes to the penal code to reform its counterterrorism legal framework.  The proposed legislation would include penal system reforms, a new approach to combating terrorism financing, and a modernization of security and intelligence capabilities.  The 1994 bombing of the Argentine Jewish Mutual Association (AMIA) remained in the news and prompted a separate proposal to reform the penal code by incorporating trials in absentia as a mechanism to prosecute fugitives.  In December 2017, an Argentine federal judge issued pre-trial detention orders for former Argentine President Cristina Fernandez de Kirchner and several former associates accused of treason for allegedly covering up Iran's involvement in the AMIA attack.

Multiple security agencies maintained specialized law enforcement units that have substantial capabilities to respond to criminal activities, including terrorist incidents.  The Government of Argentina established a Counter Narcotics Task Force in Salta Province composed of the four Argentine federal law enforcement agencies and provincial forces.  As a result of its success, the Ministry of Security (MOS) created a second task force focused on the northeastern provinces covering the Tri-Border Area of Argentina, Paraguay, and Brazil.

Throughout 2017, the Argentine National Directorate for Migration (DNM) improved its capacity to use Advance Passenger Information to identify known or suspected terrorists attempting to enter Argentina via commercial carrier.

By deploying additional technology, personnel, and equipment, the Argentine MOS improved its law enforcement capacity at high-risk ports of entry along its northern border.  U.S. Customs and Border Protection (CBP) and the Department of State's Export Control and Related Border Security (EXBS) Program further contributed to these efforts through the donation of contraband inspection kits to Argentine Customs officials at the Posadas, Aguas Blancas, and La Quiaca ports of entry.  In June, officers from the Argentine Gendarmeria Nacional and Argentine Customs joined their Brazilian counterparts in a four-day International Border Interdiction Seminar sponsored by CBP and EXBS.

Partly in support of the Preventing and Combating Serious Crime agreement signed in 2016 by the MOS and the U.S. Departments of Justice and Homeland Security, MOS and its federal security forces worked to incorporate biometric data into their fight against international terrorism and transnational crime.  The MOS incorporated biometrics into its security vetting process to prevent known or suspected terrorists from exploiting its immigration system.

PX210

Argentina continued its participation in courses at the International Law Enforcement Academy in San Salvador, El Salvador.

**Countering the Financing of Terrorism:**  Argentina is a member of the Financial Action Task Force (FATF), as well as the Financial Action Task Force of Latin America, a FATF-style regional body.  Argentina held the presidency of the FATF from July 2017 through the end of the year; its presidency expires June 30, 2018.  Its Financial Information Unit (UIF) is a member of the Egmont Group.  Recent reforms have empowered the UIF to act as the lead agency on all financial intelligence matters.

In 2017, Argentine Customs fully re-established its Trade Transparency Unit in partnership with DHS, strengthening Argentina's ability to identify and disrupt trade-based money laundering, smuggling, and other transnational crimes linked to terrorist financing.  The Ministry of Security and Homeland Security Investigations co-hosted the country's first-ever Transnational Financial Investigations Seminar, which was attended by 50 participants from more than a dozen Argentine law enforcement, border security, judiciary, and prosecutorial agencies involved in combating money laundering and the financing of terrorism.

Argentina's UIF participated in a June fact-finding mission to gather information on financial activities and illicit finance risks in the Tri-Border Area encompassing Puerto Iguazu, Argentina; Ciudad del Este, Paraguay; and Foz do Iguazu, Brazil.  This was a joint project with the U.S. Department of the Treasury, the Argentine, Brazilian, and Paraguayan financial intelligence units, and the Argentine and Paraguayan Central Banks, and supervisory authorities.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Argentina has systematically issued statements of condemnation against major acts of terrorism.

**International and Regional Cooperation:**  The Government of Argentina and the United Nations (UN) Office of Counter-Terrorism signed a Memorandum of Understanding in which the UN pledged its support for Argentina's ongoing efforts to adjust its penal code to comply with "international standards on cyberterrorism and terrorist financing."  Argentina participated in the Organization of American States Inter-American Committee against Terrorism and the Southern Common Market Special Forum on Terrorism.  Argentina, Brazil, and Paraguay coordinated law enforcement efforts in the Tri-Border Area via their Trilateral Tri-Border Area Command.

In February 2017, Argentina hosted a Practitioner's Workshop on Countering Transnational Terrorist Groups in the Tri-Border Area.  The conference was hosted by the Argentine Federal Intelligence Agency with the sponsorship of the U.S. Departments of State and Justice.  The two-day workshop included prosecutors, judges, law enforcement investigators, financial intelligence/sanctions officials, and intelligence officials from the region.

197

PX210

**BRAZIL**

**Overview:**  Brazil and the United States maintained strong counterterrorism cooperation in 2017, building on collaborative efforts the previous year during the lead up to the 2016 Summer Olympics.  Brazilian officials increased public attention to the issue.  The Brazilian Federal Police (DPF), Brazil's lead counterterrorism agency, worked closely with the United States and other nations' law enforcement entities to assess and mitigate potential terrorist threats.  The Brazilian government continued to support counterterrorism activities, which included third-country technical assistance for controlling sensitive technologies and investigating fraudulent travel documents.

**Legislation, Law Enforcement, and Border Security:**  There were no major changes since 2016 in counterterrorism legislation or in the division of responsibility among agencies tasked with counterterrorism efforts.

On May 4, Brazil handed down its first convictions under counterterrorism Law 13.260, sentencing eight Brazilian citizens to between five and 15 years of imprisonment for "promoting ISIS and terrorist acts" through social media.  The convictions were related to 2016's Operation Hashtag, which dismantled a loose, online, pro-ISIS network prior to the Olympics, the first arrests under the law.

On October 10, the DPF made its second counterterrorism arrest, taking into custody an individual with alleged online links to ISIS.

Brazil shares vast international borders with 10 countries and many of its borders are porous.  Irregular migration with Brazil often serving as a transit country is a problem, especially by aliens that raise terrorist concerns from areas with a potential nexus to terrorism.  Brazil increased its focus on border security in 2017 as part of an overall National Public Security Plan, largely out of concerns about the growing problem of transnational organized crime.  On October 30, in the border state of Acre, 20 state governors and the Ministers of Defense, Justice, Institutional Security, and Foreign Relations signed an accord to establish a National Public Security System to address border security in an integrated fashion between state and federal authorities.  Brazil also increased cooperation and information sharing with neighboring nations on border issues.  A new immigration law took effect in November, but aside from reaffirming the importance of border security, it did not have a specific terrorism focus.

All law enforcement agencies, including those tasked with border security and counterterrorism, continued to suffer in 2017 from budget constraints caused by the deepest economic decline in Brazil's history.  These effects were particularly acute at major ports of entry, including air, sea, and land borders.

Brazilian authorities continued to work with other concerned nations – particularly the United States – to counter document fraud.  Regional and international joint operations successfully disrupted a number of document vendors and facilitators, as well as related human-smuggling networks.  The Department of State provided comprehensive and ongoing counterfeit and fraudulent document recognition training to airline and border police units through its

PX210

Investigations Program.  The Department of Homeland Security's Immigration and Customs Enforcement, Homeland Security Investigations, and Customs and Border Protection have trained Brazilian airline employees on identifying fraudulent documents.

The U.S.-Brazil Container Security Initiative (CSI) in Santos, which began in 2005, operated throughout 2017.  The CSI was designed to increase security for container cargo shipped to the United States.  Similarly, the National Civil Aviation Agency, DPF, and Brazilian Customs continued to work with the U.S. Transportation Security Administration (TSA) to make modifications to Brazil's National Cargo Security Program to obtain TSA recognition of commensurability for cargo security procedures, training, and operations at Brazil's international airports.

The Brazilian Army continued to implement an Integrated Border Monitoring System to monitor the country's borders using a combination of personnel, cameras, sensors, and satellites.  The strategic initiative is underway in the state of Mato Grosso do Sul with intention to cover the entire Brazilian border by 2021.

**Countering the Financing of Terrorism:**  Brazil is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force of Latin America, a FATF-style regional body.  Its financial intelligence unit, the Council for Financial Activities Control, is a member of the Egmont Group.  While it has made progress mitigating the shortcomings identified in its third round mutual evaluation report (MER) from 2010, Brazil continued work to address the remaining deficiencies, most notably its domestic designation framework.

On January 31, 2017, Brazil issued two implementing regulations for Laws 13.170 and 13.260 to address gaps in its countering the financing of terrorism (CFT) regime, specifically allowing for domestic terrorism designations and facilitating international cooperation on terrorism investigations.  Despite this progress, in its 14th follow-up report to the 2010 MER, FATF noted deficiencies remained with the CFT regime in terms of full compliance with FATF standards.  In response to FATF's observations, Brazil committed to an action plan for addressing the remaining deficiencies.  As part of the plan, the Brazilian government has drafted new legislation with a target for adoption by June 2018.

Brazil's financial intelligence unit (FIU) participated in a June fact-finding mission to gather information on financial activities and illicit finance risks in the Tri-Border Area encompassing Puerto Iguazu, Argentina; Ciudad del Este, Paraguay; and Foz do Iguazu, Brazil.  This was a joint project with the U.S. Department of the Treasury, the Argentine, Brazilian, and Paraguayan financial intelligence units, and the Argentine and Paraguayan Central Banks, and supervisory authorities.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Brazil consistently issued statements of condemnation for terrorist acts around the world.  The Senate and various

PX210

government agencies, including the DPF and Ministry of Foreign Relations, also organized or participated in numerous conferences addressing international terrorism, with a particular emphasis on countering online radicalization to violence and preventing the use of the internet for terrorist purposes.

**International and Regional Cooperation:**  Brazil participated in regional counterterrorism fora, including the Organization of American States and its Inter-American Committee Against Terrorism (CICTE), the BRICS Joint Working Group on Counterterrorism (with Russia, India, China, and South Africa), and the working group on terrorism and sub-working group on financial issues of the Southern Common Market.  Argentina, Brazil, and Paraguay coordinated law enforcement efforts in the Tri-Border Area via their Trilateral Tri-Border Area Command.

In February 2017, Brazil participated in a Practitioner's Workshop on Countering Transnational Terrorist Groups in the Tri-Border Area.  The conference was hosted by the Argentine Federal Intelligence Agency with the sponsorship of the U.S. Departments of State and Justice.  The two-day workshop included prosecutors, judges, law enforcement investigators, financial intelligence and sanctions officials, and intelligence officials from the region.

In September, Brazil hosted an international OAS CICTE training event focused on preventing illegal and terrorist use of the internet in Sao Paulo.

## CANADA

**Overview:**  Canada experienced minimal terrorist activity in 2017.  The main external terrorist threats to Canada are from terrorist groups such as ISIS and al-Qa'ida and their sympathizers, while the main internal threat is from lone actors inspired by these groups and ideologies.  By the end of 2017, approximately 180 Canadian citizens or permanent residents had traveled abroad to engage in terrorist activity in Syria and Iraq to fight for ISIS and approximately 60 have since returned to Canada.  The government has policies and legislation to counter these threats and worked to address the radicalization of its citizens to violence.

The United States worked closely throughout the year with Canada to identify and develop new capabilities that meet a wide variety of requirements for countering terrorist threats.  Through a cost-sharing bilateral relationship, both countries advanced their technical ability to defeat or mitigate the evolving capabilities of terrorists and criminal organizations.  Canada is a member of the Global Coalition to Defeat ISIS.

**2017 Terrorist Incidents:**  Canada experienced three terrorist incidents in 2017:

- On January 29, Alexandre Bissonnette entered and opened fire on an Islamic Cultural Centre in Quebec City, killing six people and injuring 19 others.  The assailant was charged with six counts of first-degree murder and five of attempted murder.  Canada's prime minister classified the mass shooting as a terrorist attack.
- On June 3, Rehab Dughmosh, a Toronto-area Syrian-born Canadian woman, allegedly attacked several people with a golf club at a Canadian Tire store in Scarborough, Ontario and brandished a large knife from her clothes.  Police laid terrorist-related charges against

200

PX210

Dughmosh (32) in July, including attempted murder for the benefit of or in association with a terrorist group.

- On September 30, Abdulahi Sharif allegedly stabbed one police constable outside a local football game in Edmonton, Alberta and then hit four pedestrians with a truck, in which an ISIS flag was found. A Somalian national and refugee, Sharif (30) was detained by U.S. Immigration and Customs Enforcement in California in 2011 and subsequently released with an "order of supervision." He crossed into Canada in January 2012, where he claimed asylum and was later granted refugee status.

Also, on June 21, Amor Ftouhi, a Tunisian-born Canadian resident of Montreal, Quebec, stabbed a U.S. police officer at Bishop International Airport in Flint, Michigan. During the attack, Ftouhi made reference to killings in Syria and Afghanistan. He was awaiting trial in Detroit, Michigan at the end of 2017.

**Legislation, Law Enforcement, and Border Security:** In 2017, the following legislative activity impacting the investigation or prosecution of terrorism offenses occurred:

- C-6 ("An Act to Amend the Citizenship Act") was enacted by the Parliament and received Royal Assent (the final legislative stage) in June. The law repealed conviction for a national security offense as grounds to revoke the citizenship of Canadians with dual nationality.
- C-22 ("An Act to establish the National Security and Intelligence Committee of Parliamentarians") was enacted by the Parliament and received Royal Assent in June. The law authorized a new parliamentary oversight body to oversee the activity of federal national security and intelligence agencies across government. The Act also allowed the Parliament to review the legislative, regulatory, policy, administrative, and financial framework for national security and intelligence.
- C-23 ("Preclearance Act, 2016") was passed by the Parliament and received Royal Assent in December. It will not go into force immediately, but at a date to be determined by the cabinet.

Canada conducted numerous law enforcement actions against terrorists and terrorist groups over the past year, the most significant of which were:

- In January, Tevis Gonyou-McLean agreed to the terms of a peace bond, including that he wear a GPS ankle bracelet for 12 months. The Royal Canadian Mounted Police had arrested Gonyou-McLean in August 2016, following a tip-off that he had threatened to "avenge the death" of ISIS supporter Aaron Driver two days earlier. Gonyou-McLean was subsequently re-arrested in November for breaching the bond's conditions.
- In September, Ismail Habib received a nine-year prison sentence after being found guilty in June of attempting to travel to Syria to participate in terrorist activity. Habib was the first adult in Canada convicted of attempting to leave Canada to join ISIS.
- In October, Kevin Omar Mohamed was sentenced to four-and-a-half years in prison after pleading guilty to one count of terrorist activity in June. Mohamed was arrested and charged with carrying a concealed weapon and for possession of a weapon dangerous to

PX210

public peace on March 26, 2016; on March 29, 2016 he was charged with participating in the activity of a terrorist group over a two-year period.

**Countering the Financing of Terrorism:**  Canada is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering, a FATF-style regional body. Canada's financial intelligence unit, the Financial Transactions and Reports Analysis Centre of Canada (FINTRAC) is a member of the Egmont Group.  In June 2017, amendments to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act came into force that strengthened Canada's anti-money laundering/counterterrorist finance regime and improved compliance.  These amendments expanded FINTRAC's ability to disclose information to police, the Canada Border Services Agency, and provincial securities regulators.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  On June 26, Public Safety Canada officially launched the Center for Community Engagement and Prevention of Violence with a budget of C\$35 million (US \$26.7 million) over five years and C\$10 million (US \$8 million) annually thereafter to counter radicalization to violence.  In addition, the city of Montreal is a founding member of the Strong Cities Network.

**International and Regional Cooperation:**  Canada prioritizes collaboration with international partners to counter terrorism and regularly seeks opportunities to lead.  Canada makes major contributions to the Global Counterterrorism Forum (in which it co-chairs the Capacity-Building in the West Africa Region), the Global Community Engagement and Resilience Fund (GCERF), the Global Initiative to Counter Nuclear Terrorism, and the G-7 Roma-Lyon Group.  Global Affairs Canada maintains a Counterterrorism Capacity Building program, which provides training, funding, equipment, and technical and legal assistance to nations, enabling them to prevent and respond to a broad spectrum of terrorist activity.

## COLOMBIA

**Overview:**  Colombia experienced a continued decrease in terrorist activity in 2017, due in large part to the November 2016 peace accord with the Revolutionary Armed Forces of Colombia (FARC).  The UN ended the disarmament phase of its monitoring and verification mission on September 25, collecting 8,994 arms, 1.7 million rounds, and more than 40 tons of explosives. The Government of Colombia accredited roughly 11,000 ex-combatants for transition to civilian life. There were challenges implementing the peace accord, however, and a small number of dissident groups rejected the process.  Reports confirmed some of these groups continued extortion and illicit activities.

Peace talks between the Colombian government and the other major terrorist organization active in the country, the National Liberation Army (ELN), continued.  In an effort to generate trust between parties, the government and ELN agreed to a three-month ceasefire, beginning October 1, which was the first such agreement during the 50-year conflict.  ELN kidnappings, forced displacements, and attacks on the military, civilian population, and critical infrastructure dropped dramatically since October, with only one confirmed ceasefire violation.  Nevertheless,

PX210

ELN attacks spiked in rural and border regions prior to the ceasefire, and local communities reported ELN-related extortion and displacement continued even after the ceasefire.

Overall, the number of dissident FARC and ELN individuals who were either killed or captured decreased compared to 2016, while individual desertions increased.  Civilian deaths caused by terrorism continued to fall nationwide.  Colombian-U.S. counterterrorism cooperation remained strong and Colombia has openly condemned ISIS and its objectives.

**2017 Terrorist Incidents:**  Colombian government statistics showed a 40 percent decrease in terrorist incidents from 2016.  This does not include incidents related to organized criminal groups.  FARC dissident groups have conducted a small number of attacks on security forces and civilians.[1]

Prior to the October 1 ceasefire, the ELN continued low-cost, high-impact asymmetric attacks.  An explosive device was detonated June 17 in the Andino Mall in Bogotá, killing three and injuring 10.  The Colombian National Police (CNP) believe the People's Revolutionary Movement – a relatively new violent group with ideological connections to the ELN – was responsible.  An investigation led to the capture of nine suspected perpetrators.  Among 2017 attacks, several others were notable for their severity or press coverage:

- The ELN claimed responsibility for a February 19 attack in the La Macarena neighborhood in Bogotá in which a police officer was killed.
- On September 30, three police officers were killed in Miranda, Cauca department, in an attack believed to have been conducted by FARC dissidents.
- In September, just before the October 1 ceasefire, the ELN carried out a series of attacks on the Caño Limon-Covenas oil pipeline in Norte de Santander and Arauca departments.  In 2017, there were 45 attacks on the pipeline prior to the ceasefire.
- On October 25, members of the ELN claimed responsibility for killing an indigenous leader in Choco department.  The ELN later acknowledged it was a ceasefire violation.

**Legislation, Law Enforcement, and Border Security:**  There have been no changes to terrorism-related legislation and investigation procedures since 2016.  Colombian authorities continued to operate joint police-military task forces to enhance coordination in countering terrorism.

The State Department's Bureau of International Narcotics and Law Enforcement Affairs supported the U.S. Department of Justice, through its International Criminal Investigative Training Assistance Program (ICITAP), to continue to work with the Attorney General's Office and other agencies to improve standards for investigators, forensic experts, and criminal analysts.  In 2017, ICITAP trained more than 160 wire communication analysts.  In addition, at

---

[1] The FARC remains a Foreign Terrorist Organization under the Immigration and Nationality Act. However, the Colombian government classifies FARC dissidents as criminals. While the ideological motivations of such groups and ongoing connections with demobilized FARC are unclear, we have included acts of violence by FARC dissidents in this report.

PX210

the request of the CNP criminal investigation unit, ICITAP began working with the National Police Cyber Center to achieve accreditation.

Colombian border security remained an area of vulnerability.  Law enforcement officers faced the challenge of working in areas with porous borders and difficult topography plagued by the presence of illegal armed groups and drug trafficking.  The CNP lacked the personnel to enforce uniform policies for vehicle or passenger inspections at land crossings.  Biometric and biographic screening was conducted only at international airports.  The Colombian government uses Advance Passenger Information but does not collect Passenger Name Record data.  Of its 184,000 officers, the CNP has 2,202 working on customs enforcement activities.

Colombia remained a transit point for the smuggling of third-country nationals who may seek to enter the United States illegally.  In 2017, economic challenges in Venezuela contributed to the migration of 660,000 Venezuelans, roughly half of whom entered Colombia illegally, according to Colombia's immigration authority.  While the authority regularly detained third-country nationals who entered the country illegally, it lacked the personnel, enforcement power, and resources to respond to possible threats and repatriate migrants.

There were no significant changes since 2016 in cooperation on border security, evidence sharing, and joint law enforcement operations with neighboring countries.  Law enforcement cooperation between Colombia and the United States remained strong.

In 2017, security forces captured or killed a number of high-value dissident FARC and ELN targets wanted for homicide, narcotics trafficking, and forced displacement.

**Countering the Financing of Terrorism:**  Colombia is a member of the Financial Action Task Force of Latin America, a Financial Action Task Force-style regional body.  Colombia's Financial Information and Analysis Unit is a member of the Egmont Group.  There were no significant changes in countering the financing of terrorism since 2016.  For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The peace accord with the FARC initiated a disarmament, demobilization, and reincorporation process that allowed 11,000 ex-combatants and militia members to disarm.  The accord's reincorporation council continues to determine protocols and institutional arrangements for reincorporation of ex-combatants.  The Agency for Reincorporation and Normalization (ARN), formerly the Colombian Reintegration Agency (ACR), is the implementing arm of this process.  Delays in implementing the program, caused by the refusal of FARC leadership to permit members to actively and effectively participate, increased the prospects that some ex-combatants would return to engaging in criminal activities.

Colombia continued to employ a modern, multi-agency approach to CVE, with a focus on encouraging individual guerrillas to demobilize.  In 2017, the number of ex-combatants successfully graduating from the ARN's individual program (separate from those demobilized as a result of the accord with the FARC) reached more than 18,960.  The number of FARC and

PX210

ELN members who demobilized individually increased from 704 to 827.  The city of Medellin is a founding member of the Strong Cities Network.

**International and Regional Cooperation:**  There have been no significant changes to Colombia's international and regional security cooperation since 2016.  Colombia is a founding member of the Global Counter Terrorism Forum and continues to lead in providing security training and assistance to other countries in the region.  In 2017, Colombia conducted more than 400 security trainings for thousands of non-Colombian individuals on citizen security, crime prevention and monitoring, military and police capacity building, anti-kidnapping, anti-extortion, hostage negotiation, and cyber-security.

## MEXICO

**Overview:**  Counterterrorism cooperation between Mexico and the United States remained strong in 2017.  Improved information sharing regarding migrant populations constituted a major step forward.  At year's end there was no credible evidence indicating that international terrorist groups have established bases in Mexico, worked with Mexican drug cartels, or sent operatives via Mexico into the United States.  The U.S. southern border remains vulnerable to potential terrorist transit, although terrorist groups likely seek other means of trying to enter the United States.

**Legislation, Law Enforcement, and Border Security:**  There were no changes since 2016 in Mexico's legal system as it pertains to counterterrorism, other than those described under the terrorist financing section.

Mexico's southern border is porous.  Under the Merida Initiative, the Mexican and U.S. governments launched several projects designed to increase border security, including the first stages of construction of a telecommunications system for law enforcement and mentoring and training for immigration officials.  The two governments also collaborate to improve airport security at last departure point airports to the United States.  The United States partnered with Mexico to create an information-sharing system for Mexico that will vastly improve Mexico's ability to partner with U.S. law enforcement to prevent terrorism and other illegal activity.

Challenges for law enforcement and border security include corruption and insufficient inter-agency communication.  Also, many prosecutors and judges have not yet mastered navigation of the new criminal justice system.  Improvements in nation-wide police professionalization are occurring through the State Department's Bureau of International Narcotics and Law Enforcement Affairs' program to assess, train, certify, and accredit police officers and institutions at state and federal levels.  These efforts aim to improve the likelihood of criminal prosecutions and convictions.  Mexican migration officials' resources were stretched thin and funding for repatriations by air was severely limited.

The Department of State's Antiterrorism Assistance training included two iterations of Critical Infrastructure Security and Resilience, which focused on securing physical and cyber critical infrastructures against the threats of terrorism and natural disasters.  The trainings additionally

demonstrated methods of building proactive community partnerships, recognizing pre-attack indications through surveillance detection, and understanding the physical effects of explosives.

**Countering the Financing of Terrorism:**  Mexico is a member of the Financial Action Task Force (FATF), and the Financial Action Task force of Latin America, a FATF-style regional body (FSRB).  Mexico has observer or cooperating status in FSRBs: the Caribbean Financial Action Task Force and the Committee of Experts on the Evaluation of Anti-Money Laundering Measures.  Mexico's financial intelligence unit (FIU), Unidad de Inteligencia Financiera, is a member of the Egmont Group and proactively shares financial intelligence on shared threats with its U.S. counterpart, the Financial Crimes Enforcement Network.

Mexico recently underwent its fourth round FATF mutual evaluation.  In October, Mexico's Supreme Court ruled the FIU's freezing of accounts in one specific case violated constitutional protections including due process rights.  The ruling only impacted one entity's frozen accounts, but other similarly affected entities have already filed cases in Mexican federal court.  Once four more cases reach the same conclusion at the Supreme Court level (or if the entire Supreme Court bench similarly rules on one case) then the initial ruling will become binding precedent.  The FIU can continue to freeze accounts under the current legal framework, but that power may end soon barring a legislative fix.  Given that law enforcement and judicial authorities have struggled to investigate and prosecute financial crimes, this development may hamper the government's ability to fight potential terrorist financing until a legislative or procedural fix can be implemented.  Mexico was in the process in 2017 of drafting an amendment to their domestic sanctions legislation to address the Supreme Court's finding.  Mexico's Finance Ministry has emphasized the ruling does not impact its authority to block accounts associated with UN sanctions, nor impact banks that voluntarily comply with the Office of Foreign Asset Control Specially Designated Nationals (SDN) List.  Many Mexican banks made progress in 2017 in terms of training on SDN List implementation.

Mexico lacks workable asset forfeiture laws.  The lower chamber of Congress passed amendments to improve the legal framework, including an effort to lower high standards for burden of proof, but the amendments remain pending with the Mexican Senate.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  There have been no changes since 2016 other than Mexico's presentation of a successfully adopted resolution at the UN Human Rights Council encouraging protection of human rights while countering terrorism.

**International and Regional Cooperation:**  Mexico participates in the Organization of American States Inter-American Committee against Terrorism and is also a member of the Global Initiative to Combat Nuclear Terrorism.

**PANAMA**

PX210

**Overview:** Panama's air travel infrastructure combined with its financial infrastructure – it is the second largest free trade zone in the world – along with its canal and geographic location, make Panama a key transit hub, but also attracts a fair share of illicit travel. For instance, in 2017 more than 8,000 migrants entered Panama illegally. To ensure domestic and regional security, Panamanian authorities continued to work with the U.S. government to detain and repatriate individuals for whom there were elevated suspicions of links to terrorism.

The Darien jungle is a well-known smuggling route and represents a potential vulnerability that terrorist groups could exploit. Panamanian security, immigration, and intelligence authorities have greatly improved their ability to operate in the Darien region, effectively exercising control over the sparsely populated terrain, and increasing situational awareness and coordination among government agencies.

While the conclusion of the Colombian Peace Process with the Revolutionary Armed Forces of Colombia (FARC) has reduced the threat of the FARC itself in the Darien, transnational criminal organizations still use old FARC routes for illicit transit of travelers that raise terrorist concerns and contraband goods. Building on previous cooperation with its neighbors, Panama conducted a series of targeted operations with Colombia and Costa Rica in an effort to secure its borders against illicit migration and illicit narcotics trafficking.

Panama is a member of the Global Coalition to Defeat ISIS and remained involved in the Coalition's Counter-Finance working group.

**Legislation, Law Enforcement, and Border Security:** Panama does not have comprehensive counterterrorism legislation or a robust counterterrorism legal framework. Officials from the National Security Council, the border service, the immigration service, and the police meet frequently amongst themselves and with U.S. government officials to coordinate and act on migration alerts and detain and deport travelers who may represent a security risk.

In May 2017, President Varela signed Executive Decree 81, which was Panama's first step toward implementing controls over dual-use goods. The decree created a committee and sub-committee charged with its implementation, including a licensing regime, protocols for classification, verification, and end-use analysis. In addition, in April 2017 the president signed Executive Decree 129, which endorsed the National Interagency Plan for the Prevention and Response to Threats or Incidents involving Chemical, Biological, Radioactive, Nuclear, Explosive Weapons and their Delivery Systems under the direction of the National Security Council.

Separately, the lack of funding for maintenance of non-intrusive inspection equipment operated by the National Customs Authority has led to a sharp decrease in cargo scans in 2017. This has significantly reduced interdiction efforts at key inspection stations, as demonstrated by reduced numbers of inspections and seizures. This reduction in capability limits the government's ability to analyze cargo transiting the country, including at the international airport and entry and exit of the Colon free trade zone.

PX210

A key focus of counterterrorism efforts in Panama is the enhanced screening of individuals entering Panama's borders, including through Darien foot routes, airports, and seaports. Panama, through the U.S. Department of Homeland Security's Biometric Identification Transnational Migration Alert program, collaborates with its regional partners to enhance risk-based traveler screening and migration and criminal databases.  Mobile security teams, including those operating under the U.S. Customs and Border Protection Joint Security Program, partnered with Mexican law enforcement officers at Tocumen International Airport to identify air passengers linked to terrorism, narcotics, weapons, and currency smuggling, as well as to intercept fugitives, persons associated with organized crime, and other travelers of interest.

Panama cooperated with U.S. law enforcement on various counterterrorism cases this year, including individuals linked to Hizballah.

**Countering the Financing of Terrorism:**  Panama served as vice-president of the Financial Action Task Force of Latin America (GAFILAT) in 2017 and will assume the GAFILAT presidency in 2018.  Panama's financial intelligence unit, Financial Analysis Unit Panama, is a member of the Egmont Group.

Panama conducted a national risk evaluation in 2017 to identify the sectors most vulnerable to money laundering and terrorist financing.  The results of the evaluation were used to prepare a national strategy in conjunction with the International Monetary Fund, the *National Strategy to Combat Money Laundering, Terrorism Financing and WMD Proliferation*.  This national strategy recognizes that while the terrorism risk in Panama is relatively low, its financial sector could be vulnerable to terrorist financing without the proper safeguards.

In February 2017, the Securities Market Superintendency implemented stricter Know Your Customer regulations including a requirement for the subscriber to provide identity, bank reference, beneficiary declaration, and origin of funds documentation.

Panama's Merchant Marine Ship Registry de-flagged vessels linked to sanctionable trade as outlined in UN resolutions and the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List.  Panama has yet to identify and freeze assets belonging to terrorists or sanctioned individuals and organizations.  It has not prosecuted terrorist financing cases.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):** There have been no changes since the 2016 report.

**International and Regional Cooperation:**  Panama is an active participant in the United Nations and regional security initiatives such as the Organization of American States Inter-American Committee Against Terrorism (OAS-CICTE).  Panama has held the presidency of the OAS-CICTE since March 2017.  During the 17th CICTE Session in April 2017, members

PX210

adopted a declaration to strengthen national financial systems in an effort to prevent terrorism and the proliferation of weapons of mass destruction.

## PARAGUAY

**Overview:**  In 2017, the Government of Paraguay continued to be a receptive partner on counterterrorism cooperation with the United States.  Paraguay's challenges stem from ineffective immigration, customs, and law enforcement controls along its porous borders, particularly the Tri-Border Area (TBA) with Argentina and Brazil, and its dry border with Brazil from the TBA to Pedro Juan Caballero.

Since 2008, persons claiming to be part of the Paraguayan People's Army (known by its Spanish acronym EPP) – a domestic criminal group initially dedicated to a socialist revolution in Paraguay – have been involved in violence meant to extort and intimidate the population and local governments in the northern departments of Concepcion, San Pedro, and Amambay. Paraguayan authorities officially consider the EPP and its offshoots organized criminal groups rather than terrorist organizations, but public discourse of Paraguayan leaders occasionally refers to the EPP informally as a terrorist organization.  The Government of Paraguay believes the EPP is a small, decentralized group of between 20 and 50 members.  EPP and offshoot groups' activities have consisted largely of isolated attacks on remote police and army posts, or against ranchers and peasants accused of aiding Paraguayan security forces.  Ranchers and ranch workers in northeastern Paraguay, including members of the Mennonite community, claimed the EPP frequently threatened both their livelihoods and personal security.  As of December 12, authorities believe the EPP held four hostages, while the offshoot Mariscal Lopez's Army (known by its Spanish acronym EML) held one.  The longest-held victim has been in captivity since 2014.  The EPP released farmer Franz Wiebe on February 25 after 214 days in captivity.

**2017 Terrorist Incidents:**  The EPP continued to conduct kidnappings, killings, and sabotage operations:

- On March 17, EPP members kidnapped a farmer, burned his vehicle, and later released him near Colonia Rio Verde in Santa Rosa del Aguaray.
- On April 17, EPP members kidnapped and killed Estancia Santa Adelia worker, Fabio Ramon Duarte Candia.
- On April 26, authorities found an alleged EPP murder victim, Davalos Galeano at Estancia Ka'aguy Poty, Cuero Fresco, Arroyito.
- On August 21, EPP members ambushed and kidnapped 32-year old Mexican national Franz Hieber Wieler at the Estancia San Eduardo, San Pedro Department.  In addition to setting fire to the tractor Wieler was operating, the band of five attackers left behind a pamphlet with EPP propaganda.
- On September 1, alleged EPP members intercepted a vehicle near the La Yeyaa Mennonite colony in Amambay Department and took 22-year old Bernhard Blatz Friessen hostage.

**Legislation, Law Enforcement, and Border Security:**  The Paraguayan government continued to make use of a 2013 counterterrorism law that allows for the domestic deployment of the

PX210

Paraguayan military to counter internal or external threats. The Paraguayan National Police (PNP) Secretariat for the Prevention and Investigation of Terrorism officially handles counterterrorism functions, although other PNP units and agencies such as the National Anti-Drug Secretariat work such cases as well, particularly when related to drug trafficking. Military forces and police officials continued to operate jointly in the San Pedro, Concepcion, and Amambay departments against the EPP, with limited success.

On September 18, President Cartes signed the Seized and Forfeited Asset Management law. The law establishes a National Secretariat of Seized and Confiscated Assets to administer confiscated property and assets associated with criminal activity, such as terrorist financing.

On October 18, Paraguayan authorities arrested 61-year old Genaro Meza, the alleged EPP caretaker of hostage Franz Wiebe. Prosecutors charged Meza with terrorism, terrorist association, kidnapping, unlawful imprisonment, and aggravated extortion.

On November 24, Brazilian and Paraguayan authorities apprehended two alleged EPP leaders in Brazil and charged them with murder and kidnapping. The suspects had been on the run since 2004. Paraguayan prosecutors continued to work with their Brazilian counterparts to extradite the suspects to Paraguay for trial.

With the help of U.S. counterparts, Paraguayan law enforcement officials arrested multiple Lebanese Hizballah-linked suspects in the Ciudad del Este area who were engaged in money laundering and drug trafficking activities, some with links to the United States.

The TBA has been attractive to individuals engaged in terrorist financing, as the minimal, and often corrupt, police and military presence along these borders allows for a largely unregulated flow of people, goods, and money. Paraguay's efforts to provide more effective law enforcement and border security suffered from a lack of interagency cooperation and information sharing, as well as pervasive corruption within security, border control, and judicial institutions.

**Countering the Financing of Terrorism:** Paraguay is a member of the Financial Action Task Force of Latin America (GAFILAT), a Financial Action Task Force-style regional body. Paraguay's Financial Intelligence Unit is a member of the Egmont Group. Paraguay continued its preparations for a GAFILAT mutual evaluation, scheduled for January 2019. Paraguay has counterterrorist financing legislation and the ability to freeze and confiscate terrorist assets immediately. FATF experts noted Paraguay possesses an adequate legal framework but falls short on implementation. In particular, government agencies struggled to coordinate effectively to detect, deter, and prosecute money laundering and terrorism financing.

The Paraguayan government registers and has reporting requirements for non-governmental organizations (NGOs), including non-profit organizations, and mandates that NGOs set up internal monitoring and training to guard against criminal or terrorist financing. Paraguay also requires the collection of data for wire transfers. Despite these mechanisms, government agencies' efforts to enforce anti-money laundering/counterterrorist financing laws were lacking.

PX210

Paraguay's Central Bank and financial intelligence unit participated in a June fact-finding mission to gather information on financial activities and illicit finance risks in the Tri-Border Area encompassing Ciudad del Este, Paraguay; Puerto Iguazu, Argentina; and Foz do Iguazu, Brazil.  This was a joint project with the U.S. Department of the Treasury, the Argentine and Brazilian FIUs, the Argentine and Paraguayan Central Banks, and supervisory authorities.

For further information on money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  Paraguay had no CVE program in 2017.

**International and Regional Cooperation:**  Paraguay participated in the Organization of American States and its Inter-American Committee Against Terrorism (CICTE).  It continued to collaborate with Argentina and Brazil on border security initiatives, regional exchanges, and law enforcement projects.  Argentina, Brazil, and Paraguay coordinated law enforcement efforts in the Tri-Border Area via their Trilateral Tri-Border Area Command.  The Interior Ministers of Argentina, Brazil, and Paraguay met on November 27 to discuss cooperation on all these fronts.

In February 2017, Paraguay participated in a Practitioner's Workshop on Countering Transnational Terrorist Groups in the Tri-Border Area.  The conference was hosted by the Argentine Federal Intelligence Agency with the sponsorship of the U.S. Departments of State and Justice.  The two-day workshop included prosecutors, judges, law enforcement investigators, financial intelligence/sanctions officials, and intelligence officials from the region.

## PERU

**Overview:**  The Shining Path (Sendero Luminoso or SL) operated in 2017 in the Apurímac, Ene, and Mantaro River Valleys (VRAEM) – a remote and rugged region slightly larger than Tennessee that accounts for more than two-thirds of the cocaine produced in Peru.  Estimates of SL's strength vary, but most experts and the Peruvian security services assess SL to number 250 to 300 members of which 60 to 150 are armed fighters.  Deadly SL attacks against Peru's security forces in 2017 held steady compared to the previous year.  In some instances, SL may have set ambushes in revenge for successful counternarcotic operations.

SL is involved in all logistical aspects of drug trafficking in its area of influence.  It collects "revolutionary taxes" from those involved in the drug trade, and, for a price, provides security and transports narcotics for drug trafficking organizations.  SL continued to use Maoist ideology to justify its illegal activities and armed opposition to the Peruvian government.

SL founder Abimael Guzmán and key accomplices remain in prison serving life sentences for numerous crimes committed in the 1980s and 1990s.  Many former SL members and leaders have served 25 to 30 year sentences on terrorism charges.  Several members were released from prison in 2017 and others are due to be released in the coming months and years.  The Peruvian courts are re-trying 12 imprisoned SL leaders, including Guzman, for the 1992 Tarata Street bombing in Miraflores that killed 25 people.  Guzmán and other captured SL figures from the

PX210

1980s and 1990s are no longer associated with the active SL group in the VRAEM emergency zone.

**2017 Terrorist Incidents:**

- On March 13, SL snipers killed three Peruvian National Police officers in the VRAEM who were driving from the Palmapampa police base to the VRAEM Special Command base in Pichari.
- On May 31, SL snipers killed two police officers on a rural road in Ayacucho's Huanta province in the VRAEM.
- On July 21, SL ambushed a police convoy in the VRAEM's Llochegua district to free a local drug-trafficking leader.  SL injured nine police officers and one prosecutor, but failed to free the captured drug-trafficker.
- On September 6, the Ministry of Interior reported that SL operatives killed three police officers in Huancavelica's Churcampa province, just outside the VRAEM.  The police suspect the attack was connected to drug trafficking.

**Legislation, Law Enforcement, and Border Security:**  Over the past three decades, Peru has decreed a variety of laws specifically designed to counter terrorism.  These measures have broad political and public support.  On July 19, the Government of Peru amended its "terrorism apology" law, which prohibits making public statements that justify or defend terrorism.  The amendments increase the punishment for publicly sympathizing with terrorism and lower the threshold to press charges.  On November 4, Congress added a provision to Peru's electoral code to prohibit Peruvians convicted of terrorism or supporting terrorism from running for public office.

The most significant Peruvian government actions against SL this year were:

- On July 26, the police arrested David Bazan Arévalo, the provincial mayor of Tocache, on terrorist financing charges.  He allegedly financed a Shining Path operation in June 2007 to assassinate a prosecutor and three police officers, who were investigating his links to drug trafficking.
- In early October, the Government of Peru launched a joint military-police operation, code-named Tenaz, in the VRAEM.  The operation resulted in two confirmed Shining Path deaths, eight unconfirmed dead or wounded, and 13 drug traffickers arrested.
- In December, the police and military captured three alleged SL terrorists, one of whom is the son of "Alipio," a SL leader killed in 2013.  The MOI believes these three individuals may have carried out ambushes against the PNP in Ayacucho and Huancavelica.

The Minister of Defense announced on August 2 the formation of a 400-strong joint police and military unit focused on targeting the Shining Path and pacifying the VRAEM.

On border security, immigration authorities collected limited biometrics information from visitors.  Citizens of South American countries were allowed to travel to Peru by land using

PX210

only national identification cards.  There was no visa requirement for citizens of most countries from Europe, Southeast Asia, and Central America (except El Salvador and Nicaragua).

In October 2014, Peruvian police arrested Muhammad Ghaleb Hamdar, a Lebanese citizen suspected of links to Hizballah.  According to reports, there was residue and traces of explosives in Hamdar's apartment.  On April 20, a Peruvian court acquitted Hamdar of terrorism charges, but sentenced him to six years in prison for using false documents.  On October 20, the Peruvian Supreme Court overturned Hamdar's acquittal.  He remains in custody with a retrial scheduled for early 2018.

**Countering the Financing of Terrorism:**  Peru is a member of the Financial Action Task Force of Latin America, a Financial Action Task Force (FATF)-style regional body.  The Financial Intelligence Unit of Peru is a member of the Egmont Group.  Under Decree Law 25475, Peru criminalizes any form of collaboration with terrorists, including providing financial support.  For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):**  The Government of Peru stressed the importance of heavily investing in the VRAEM as a means of ending the relationship between VRAEM residents and SL.  The Government of Peru allocated approximately US $523 million in the VRAEM in 2017 for economic development and pacification efforts.

**International and Regional Cooperation:**  Peru participates in counterterrorism activities in international and regional organizations, including the United Nations, the Organization of American States and its Inter-American Committee Against Terrorism, and the Union of South American Nations.

## TRINIDAD AND TOBAGO

**Overview:**  In November 2017, the Trinidad and Tobago National Security Council approved a comprehensive counterterrorism strategy.  The strategy document focuses on deterring people from participating in or supporting terrorism, enhancing national counterterrorism operational capabilities, and building national resilience in the event of an attack.  The Government of Trinidad and Tobago continued its broad counterterrorism cooperation with the United States, which included information sharing.  In April, the Governments of Trinidad and Tobago and the United States signed a Memorandum of Intent to provide for the installation of the Personal Identification Secure Comparison and Evaluation System (PISCES) at certain points of entry in Trinidad and Tobago.  Preparations for the PISCES installation were ongoing at the end of 2017.

The Government of Trinidad and Tobago has stated that approximately 135 people, including women and minors, have traveled or attempted to travel to Syria and Iraq to fight with ISIS in the past few years.  The threat from the possible return of foreign terrorist fighters remains a primary concern.

PX210

**Legislation, Law Enforcement, and Border Security:**  In February, the government proposed a bill to amend its existing Anti-Terrorism Act (ATA):

- To criminalize terrorism-related actions both within Trinidad and Tobago and outside the country, the support of terrorism, or joining a terrorist organization or training with one;
- To require citizens of Trinidad and Tobago to give notice of travel to conflict areas; and
- To freeze the assets of those who commit a terrorist act, among other changes.  The legislation lapsed before approval at the end of the last parliament session in September 2017, but the current government expects to reintroduce in 2018.

A lengthy judicial process can mean years before criminal prosecutions are resolved, and there has not been a conviction under the ATA to date.  A number of new or amended laws and regulations to reform the criminal justice system, including codifying the practice of plea bargaining, improving access to bail, and new rules of criminal procedure, were adopted in 2017 to allow for more timely prosecutions.

In 2017, Trinidad and Tobago's security agencies received increased counterterrorism training and equipment from the U.S. government.  As a result, the government's tactical ability to respond to terrorist threats increased significantly.

An interagency task force created in 2017 made progress in gathering terrorism-related intelligence and converting it into evidence that resulted in the designation of persons or entities involved in terrorism under the ATA.  A committee was also created to examine issues relating to children and terrorism.  Law enforcement agencies and the Trinidad and Tobago Defense Force continue to face resource constraints, however.

In August 2017, pursuant to a proposal by Trinidad and Tobago, Shane Crawford, a Trinidad and Tobago national, was added to the UN Security Council ISIL (Da'esh) and al-Qa'ida Sanctions List.  Since November 2015, approximately 350 individuals and entities, including six with a nexus to Trinidad and Tobago, have been designated under the ATA and a small amount of assets have been frozen.  Trinidad and Tobago has also requested that other jurisdictions list certain nationals with a nexus to Trinidad and Tobago under their respective domestic regimes, where appropriate.

**Countering the Financing of Terrorism:**  Trinidad and Tobago is a member of the Caribbean Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body, and the Financial Intelligence Unit of Trinidad and Tobago is a member of the Egmont Group.  Following its last FATF mutual evaluation in 2015, Trinidad and Tobago took a number of steps to address the anti-money laundering and countering the financing of terrorism (AML/CFT) deficiencies identified in the evaluation.  The FIU has increased the size of its analytical staff, enhanced its outreach to stakeholders regarding AML/CFT obligations, and participated in the Egmont Group ISIL project, among other steps.  Nonetheless, in October 2017, FATF placed Trinidad and Tobago on its list of jurisdictions with strategic deficiencies in their AML/CFT regimes, and will continue to review Trinidad and Tobago's progress under its FATF action plan.  With respect to CFT, the FATF-identified deficiencies relate to the need to implement its counterterrorism strategy and address the gaps identified in the ATA.  For further information on

PX210

money laundering and financial crimes, see the *2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes*.

**Countering Violent Extremism (CVE):**  The Government of Trinidad and Tobago has not developed a national CVE strategy, although the counterterrorism strategy adopted in November 2017 includes some elements.  Much progress has been through programs that address violence and gang prevention at large, which the government sees as a higher priority than terrorist recruitment.  One such program is the creation of Police Youth Clubs, where local police engage with at-risk youth after school within their communities.  These community engagements assist in addressing youth marginalization and isolation while curbing negative perceptions of law enforcement within at-risk communities.

In March, the city of Chaguanas joined the Strong Cities Network.  Other cities, such as Rio Claro and San Fernando, have been eager to work with the United States to implement CVE programs within their communities.

**International and Regional Cooperation:**  As a member of the Caribbean Community (CARICOM) and the lead country with responsibility for crime and security, Trinidad and Tobago is working with other CARICOM member states to develop a regional counterterrorism strategy.

## VENEZUELA

**Overview:**  In May 2017, for the twelfth consecutive year, the U.S. Department of State determined, pursuant to section 40A of the Arms Export Control Act, that Venezuela was not cooperating fully with U.S. counterterrorism efforts.  The country's porous borders offered a permissive environment to known terrorist groups.

**Legislation, Law Enforcement, and Border Security:**  The Venezuelan criminal code and other Venezuelan law explicitly criminalize terrorism and dictate procedures for prosecuting individuals engaged in terrorist activity.  The government routinely levies accusations of "terrorism" against its political opponents.

Some Venezuelan military and civilian agencies perform counterterrorism functions.  Within the Venezuelan armed forces, the General Directorate of Military Counterintelligence and the Command Actions Group of the National Guard have primary counterterrorism duties.  The Bolivarian National Intelligence Service and the Division of Counterterrorism Investigations in the Scientific, Penal, and Criminal Investigation Corps within the Ministry of Interior, Justice, and Peace have primary civilian sector counterterrorism responsibilities.  The degree of interagency cooperation and information sharing among agencies is unknown due to a lack of government transparency.

Border security at ports of entry was vulnerable and susceptible to corruption.  The Venezuelan government routinely did not perform biographic or biometric screening at ports of entry or exit.  There was no automated system to collect advance Passenger Name Record data on commercial flights or to cross-check flight manifests with passenger disembarkation data.

PX210

**Countering the Financing of Terrorism:**  Venezuela is a member of the Caribbean Financial Action Task Force, a Financial Action Task Force-style regional body, and its National Financial Intelligence Unit is a member of the Egmont Group.  Venezuela's existing anti-money laundering and countering the financing of terrorism legal and regulatory framework criminalizes the financing of terrorism and includes requirements to report transactions that qualify as suspicious under the statute.  Significant deficiencies remained in the terrorist asset freezing regime, including a lack of adequate procedures to identify and freeze terrorist assets. For further information on money laundering and financial crimes, see the _2018 International Narcotics Control Strategy Report (INCSR), Volume II, Money Laundering and Financial Crimes_.

**Countering Violent Extremism (CVE):**  Venezuela had no CVE program in 2017.

**International and Regional Cooperation:**  Previously, the Venezuelan government participated as official observers in peace negotiations between the Colombian government and the FARC. However, in 2017, President Maduro's rhetoric was at times bellicose (on one occasion he referred to Colombia as a "failed state") and served to heighten tensions between the two countries.

PX210

# Chapter 2
# State Sponsors of Terrorism

**This report provides a snapshot of events during 2017 relevant to countries designated as State Sponsors of Terrorism.  It does not constitute a new announcement regarding such designations.**

To designate a country as a State Sponsor of Terrorism, the Secretary of State must determine that the government of such country has repeatedly provided support for acts of international terrorism.  Once a country is designated, it remains a State Sponsor of Terrorism until the designation is rescinded in accordance with statutory criteria.  A wide range of sanctions is imposed as a result of a State Sponsor of Terrorism designation, including:

- A ban on arms-related exports and sales;
- Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism;
- Prohibitions on economic assistance; and
- Imposition of miscellaneous financial and other restrictions.

## DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA

On November 20, 2017, the Secretary of State designated the Democratic People's Republic of Korea (DPRK) as a State Sponsor of Terrorism.  The Secretary determined that the Government of the DPRK has repeatedly provided support for acts of international terrorism, as the DPRK has been implicated in assassinations on foreign soil.  These terrorist acts are in keeping with the DPRK's wider range of dangerous and malicious behavior, including continued nuclear and ballistic missile testing and development as well as Kim Jong Un's threats against American cities and territories and those of our allies.

The DPRK was previously designated as a state sponsor of terrorism in 1988 primarily on the basis of its involvement in the bombing of a Korean Airlines passenger flight in 1987.  The DPRK's designation was rescinded in 2008 after a thorough review found that the DPRK met the statutory requirements for rescission.  In 2017, the Secretary of State determined that the DPRK has repeatedly provided support for acts of international terrorism since the DPRK's state sponsor of terrorism designation was rescinded in 2008.

In addition to the DPRK's support for acts of international terrorism that led to its 2017 designation, the DPRK has continued to violate UN Security Council resolutions and has historically provided support for acts of international terrorism.  Four Japanese Red Army members wanted by the Japanese government for participating in a 1970 Japan Airlines hijacking continued to shelter in the DPRK.  The Japanese government also continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities in the 1970s and 1980s; only five such abductees have been repatriated to Japan since 2002.

PX210

**IRAN**

Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity in 2017, including support for Lebanese Hizballah (LH), Palestinian terrorist groups in Gaza, and various groups in Syria, Iraq, and throughout the Middle East. Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the Middle East. Iran has acknowledged the involvement of the IRGC-QF in both of the conflicts in Iraq and Syria, and the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorists abroad. Iran uses regional proxy forces to provide sufficient deniability to shield it from the consequences of its aggressive policies.

In 2017, Iran supported various Iraqi Shia terrorist groups, including Kata'ib Hizballah. It also bolstered the Assad regime in Syria. Iran views the Assad regime in Syria as a crucial ally and Syria and Iraq as crucial routes to supply weapons to LH, Iran's primary terrorist group ally. Through financial or residency enticements, Iran has facilitated and coerced primarily Shia fighters from Afghanistan and Pakistan to participate in the Assad regime's brutal crackdown in Syria. Iranian-supported Shia militias in Iraq have also committed serious human rights abuses against primarily Sunni civilians. Iranian forces have directly backed militia operations in Syria with armored vehicles, artillery, and drones.

Since the end of the 2006 Israeli-Lebanese Hizballah conflict, Iran has supplied LH with thousands of rockets, missiles, and small arms, in direct violation of UNSCR 1701. Iran has also provided hundreds of millions of dollars in support of LH and has trained thousands of its fighters at camps in Iran. Lebanese Hizballah fighters have been used extensively in Syria to support the Assad regime. In Bahrain, Iran has continued to provide weapons, support, and training to local Shia militant groups. In March 2017, the Department of State designated two individuals affiliated with the Bahrain-based al-Ashtar Brigades (AAB), which receives funding and support from the Government of Iran, as Specially Designated Global Terrorists under Executive Order 13224.

Iran continued to provide weapons, training, and funding to Hamas and other Palestinian terrorist groups, including Palestine Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command. These Palestinian terrorist groups have been behind a number of deadly attacks originating in Gaza and the West Bank, including attacks against Israeli civilians and Egyptian security forces in the Sinai Peninsula.

The Iranian government maintains a robust offensive cyber program and has sponsored cyberattacks against foreign government and private sector entities.

Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members residing in Iran and has refused to publicly identify the members in its custody. Iran has allowed AQ facilitators to operate a core facilitation pipeline through Iran since at least 2009, enabling AQ to move funds and fighters to South Asia and Syria.

**SUDAN**

218

**PX210**

Sudan was designated as a State Sponsor of Terrorism in 1993 for its support to international terrorist groups, including the Abu Nidal Organization, Palestine Islamic Jihad, Hamas, and Lebanese Hizballah. Sudan does, however, work with the United States on counterterrorism, despite its designation as a State Sponsor of Terrorism. The Government of Sudan continued to pursue counterterrorism operations alongside regional partners, including operations to counter threats to U.S. interests and personnel in Sudan. Sudan's "de-radicalization" program focused on reintegration and rehabilitation of returned foreign terrorist fighters and those espousing terrorist ideologies.

In June 2010, four Sudanese men sentenced to death for the January 1, 2008 killing of two U.S. Embassy staff members escaped from Khartoum's maximum security prison. That same month, Sudanese authorities recaptured one of the escaped convicts; the individual remains in custody serving a life sentence. Two of the escaped convicts were killed in 2011 and 2015 while fighting for terrorist organizations outside of Sudan. In November 2017, the final escaped convict was killed in Somalia during an air strike against an ISIS affiliated terrorist group.

In February 2017, an unidentified group of individuals likely prematurely detonated a bomb in an apartment in the Arkawit neighborhood of Khartoum, causing an explosion. Sudanese officials reported that they had arrested several foreign nationals and seized explosive material, weapons, and foreign passports after a post-blast raid of the apartment. No other terrorist attacks were reported in 2017.

On October 6, 2017, the United States lifted certain economic sanctions on Sudan due to progress the government made through the Five Track Engagement Plan, which includes a process to evaluate Sudan's counterterrorism cooperation with the United States. The Plan calls on Sudan to improve its counterterrorism efforts through enhanced interagency and international cooperation. As part of the government's counterterrorism strategy, Sudanese forces patrol the Sudanese-Libyan border to interdict the flow of suspected terrorists transiting through the region, and to prevent arms smuggling and other illicit activities. Sudan's expansive size, and the government's outdated technology and limited visa restrictions, presented challenges for border security.

## SYRIA

Designated in 1979 as a State Sponsor of Terrorism, Syria continued its political and military support to a variety of terrorist groups. The regime continued to provide weapons and political support to Lebanese Hizballah (LH) and continued to allow Iran to rearm the terrorist organization. The Assad regime's relationship with LH and Iran grew stronger in 2017 as the regime became more reliant on external actors to fight regime opponents. President Bashar al-Assad remained a staunch defender of Iran's policies, while Iran exhibited equally energetic support for the Syrian regime. Syrian government speeches and press releases often included statements supporting terrorist groups, particularly LH.

Over the past decade, the Assad regime's permissive attitude towards al-Qa'ida and other terrorist groups' foreign terrorist fighter facilitation efforts during the Iraq conflict in turn fed the

PX210

growth of al-Qa'ida, ISIS, and affiliated terrorist networks inside Syria. The Syrian government's awareness and encouragement for many years of terrorists' transit through Syria to enter Iraq for the purpose of fighting Coalition Forces is well documented. Those very networks were among the terrorist elements that brutalized the Syrian and Iraqi populations in 2017. Additionally, Shia militia groups, some of which are U.S.-designated Foreign Terrorist Organizations aligned with Iran, continued to travel to Syria to fight on behalf of the Assad regime.

As part of a broader strategy during the year, the regime portrayed Syria itself as a victim of terrorism, characterizing all of the internal armed opposition as "terrorists." From Syria, ISIS plotted or inspired external terrorist operations. Additionally, the Syrian regime has purchased oil from ISIS through various intermediaries, adding to the terrorist group's revenue.

Syria is not in compliance with its obligations under the Chemical Weapons Convention (CWC). The United States assesses that Syria has used chemical weapons repeatedly against the Syrian people every year since acceding to the Convention in 2013, and is therefore in violation of its obligations of the CWC. There have been numerous reports of chemical weapons use by the regime during the current conflict. On April 4, 2017, the Syrian regime attacked the town of Khan Shaykhun with sarin killing up to 100 people. The Joint Investigative Mechanism of the Organization for the Prohibition of Chemical Weapons and the United Nations has attributed four chemical weapons attacks in 2014, 2015, and 2017 to the Syrian government.

PX210

# Chapter 3
# The Global Challenge of Chemical, Biological, Radiological, or Nuclear (CBRN) Terrorism

The use of chemical, biological, radiological, and nuclear (CBRN) materials and expertise remained a terrorist threat in 2017.  The harm caused by ISIS's repeated use of sulfur mustard in Iraq and Syria over the past three years vividly exemplified this threat.  Terrorists' stated intent to acquire, develop, and use these materials has not waned.  The United States has continued to work proactively to disrupt and deny ISIS's – and other non-state actors' – CBRN capabilities.

A number of international partnerships have either the explicit or the implicit purpose of countering the CBRN threat from terrorists and other non-state actors.  The United States routinely provides technical and financial assistance and training to partner nations, and to international organizations, as necessary, to help strengthen their abilities to adequately protect and secure CBRN-applicable expertise, technologies, and material.  U.S. participation within and contribution to these groups is vital to ensuring our continued safety from the CBRN threat.

**Nuclear Security:**  The United States continued to advance the objectives of the 2016 Nuclear Security Action Plans for the United Nations (UN), International Atomic Energy Agency (IAEA), INTERPOL, the Global Initiative to Combat Nuclear Terrorism, and the Global Partnership Against the Spread of Weapons and Materials of Mass Destruction.  The United States also actively participated in the multilateral Nuclear Security Contact Group (NSGC) to sustain high-level attention and momentum for building a strengthened, sustainable, and comprehensive global nuclear security architecture.  The United States continued to support the IAEA's Division of Nuclear Security (DNS), whose mandate is to strengthen nuclear security worldwide.  Overall U.S. contributions to the IAEA's Nuclear Security Fund for FY 2017 totaled US $15,025,000.  The key mission of DNS is to assist member states in preventing, detecting, and responding to threats of nuclear terrorism.  This is achieved through the development of guidance as well as the provision of training, technical advice, peer reviews and other advisory services.  The Division convened an annual conference that allowed States to share best practices and lessons learned across many aspects of nuclear security.

**G-7 Global Partnership:**  The Global Partnership Against the Spread of Weapons and Materials of Mass Destruction (GP) was launched at the 2002 G8 Summit in Kananaskis, Canada to prevent terrorists, or states that support them, from acquiring or developing weapons of mass destruction.  Today, the GP has expanded beyond its original G-8 (now G-7) membership to 30 countries and the European Union, with Jordan being the newest member in 2017.  The GP remains a vital forum for countries to exchange information on national priorities for CBRN programmatic efforts worldwide, and to coordinate assistance for these programs.  In 2017, the GP issued statements in support of the Global Health Security Agenda and the Biological and Toxin Weapons Convention.

**The Proliferation Security Initiative (PSI):**  Launched in 2003, the PSI has increased international awareness and capability to address the challenges associated with stopping the trafficking of WMD, WMD-related components, and their means of delivery.  The PSI remains

PX210

an important tool in the global effort to combat CBRN material transfers to both state and non-state actors of proliferation concern.  Since its launch, 105 states have endorsed the PSI Statement of Interdiction Principles, by which states commit to take specific actions, consistent with their respective national legal authorities and relevant international law and frameworks, to support efforts to prevent the trafficking of WMD, related materials and their delivery systems. In 2017, there were 14 bilateral and multilateral activities designed to promote and exercise the Critical Capabilities and Practices to diminish the likelihood that WMD materials fall into the hands of state and non-state actors of proliferation concern.

**UN Security Council resolution 1540:**  In 2017, the United States was actively engaged in strengthening implementation of UN Security Council resolution (UNSCR) 1540 (2004) through partnerships with other UN member states and international and regional organizations.  The 1540 Committee has become a critical part of the international framework to control proliferation of nuclear, chemical, and biological weapons and their means of delivery to non-state actors.  The Organization of American States used funds the United States contributed to the UN Trust Fund for Global and Regional Disarmament Activities to hire a UNSCR 1540 coordinator to promote increased implementation of the Resolution in the Western Hemisphere.

**The Global Initiative to Combat Nuclear Terrorism (GICNT):**  The GICNT is an international partnership of 88 nations and five official observer organizations dedicated to strengthening global capacity to prevent, detect, and respond to a nuclear terrorist event.  In 2017, partner nations hosted nine multilateral activities under the auspices of GICNT across the areas of nuclear forensics, nuclear detection, and emergency preparedness and response.  These events raised awareness of the threat of terrorist use of nuclear and radioactive materials, and provided opportunities for countries to share information, expertise, and best practices in a voluntary, non-binding framework.

**Nuclear Trafficking Response Group (NTRG):**  The NTRG is the U.S. interagency group charged with coordinating the U.S. government response to foreign requests for assistance with incidents of illicit trafficking of nuclear and other radioactive (R/N) materials.  The U.S. Department of State chairs the NTRG, which includes representatives from the U.S. government's nonproliferation, law enforcement, and intelligence communities.

**Counter Nuclear Smuggling Program (CNSP):**  The CNSP advances U.S. national security by enhancing global capacity to prevent, detect, and respond to terrorist acquisition and use of nuclear and other radioactive (R/N) materials.  The U.S. Department of State, with support from its U.S. interagency partners, conducts diplomatic and programmatic activities to secure vulnerable radioactive sources, strengthen partner countries' R/N smuggling-related legislation, train prosecutors to support R/N smuggling prosecutions, build nuclear forensics capabilities, and strengthen national-level interagency coordination for responding to R/N smuggling incidents.  In 2017, the U.S. Department of State used CNSP funds to conduct or support more than 20 counter R/N smuggling-related activities and strengthened its partnerships with key donor countries and international organizations, such as INTERPOL and the IAEA, to leverage respective efforts.

**Export Control and Related Border Security (EXBS) Program:**  The EXBS Program contributed to U.S. national security by helping partner countries fulfill their international

PX210

obligations and commitments, including those related to UN Security Council resolution 1540 and adherence to the guidelines of multilateral export control regimes, and by developing, strengthening, and institutionalizing related border security enforcement best practices.  In 2017, EXBS sponsored 400+ activities for 60+ countries, trained 2,000+ officials, provided inspection and detection equipment worth more than US $4 million, and worked on several border security infrastructure development-related projects.  EXBS has begun to reorient program focus towards top national security priorities such as the Global Coalition to Defeat ISIS and disrupting Iran and the Democratic People's Republic of Korea's WMD-related procurement networks.

**Nuclear Smuggling Detection and Deterrence (NSDD):**  The U.S. Department of Energy's National Nuclear Security Administration, Office of Nuclear Smuggling Detection and Deterrence (NSDD) collaborates with partner countries to build their capacity to deter, detect, and investigate illicit trafficking of nuclear and other radioactive materials.  NSDD's assistance to partner countries' national nuclear detection architecture included deployments of radiation detection technologies for use at official crossing points (land, air, and seaports), unofficial checkpoints (land and sea borders) and interior locations.  NSDD coordinates its capacity-building activities with multiple U.S. government agencies as well as other international nuclear security assistance entities such as INTERPOL, the European Commission, and the IAEA. Further information on this program is available here.

**Global Threat Reduction (GTR):**  Through GTR, the Department of State's Office of Cooperative Threat Reduction (CTR) worked to prevent states and terrorist groups from acquiring or proliferating WMD to attack the United States.  In 2017, CTR's nuclear, chemical, and biological security programs implemented capacity-building projects to ensure foreign partners addressed proliferation and WMD terrorism threats emanating from the Middle East, Africa, and South and Southeast Asia.

To counter ISIS, CTR trained and equipped Iraqi counterterrorism forces prior to military operations in Mosul, Tal Afar, and Hawija, and helped secure weaponizable chemical and biological materials in newly-liberated areas.  In Syria, CTR organized the provision of chemical weapons detection, sampling, and protective gear for civilian first responders operating in country.  CTR programs in 2017 also trained Libyan partners to neutralize weaponizable chemicals and provided medical training for Yemeni first responders on chemical injury diagnosis and treatment protocols.

To prevent bioterrorism attacks, CTR secured dangerous pathogens in Yemen, where critical security upgrades at vulnerable laboratories were completed in 2017.  CTR also trained law enforcement personnel to identify potential bioterrorism threats and rapidly detect and respond to potential bioterrorism incidents.

**Biological Weapons Convention Inter-Sessional Work Program (BWC):**  The December 2017 BWC Meeting of States Parties adopted a final document with new language on a program of work for the 2018-2020 intersessional period.  This new program of work entails several expert working groups that will meet annually to address topics including national implementation and international cooperation.  The United States will continue to press for greater efforts to acquire better information about and promote international cooperation on

223

PX210

BWC States Parties' measures to implement the Convention.  The United States advocated a range of efforts  to:  criminalize and deter malicious use of biological agents; promote sustainable, effective approaches to laboratory biosecurity; raise international awareness of the need for appropriate, balanced oversight of dual-use life science research with significant potential for harm; and identify and address impediments to international coordination and response in the event of a bioterrorism attack or a significant disease outbreak of unknown origin.

**Organization for the Prohibition of Chemical Weapons (OPCW):**  In response to the growing concern about chemical weapons use by state and non-State actors, the OPCW Director-General established a sub-working group on Non-State Actors (SWG) to stimulate discussion and generating specific recommendations that the Technical Secretariat and/or States Parties could implement to address the non-State actor challenge now.  Many of these actions were memorialized in the October 2017 OPCW Executive Council decision, "Addressing the Threat Posed by the Use of Chemical Weapons by Non-State Actors."  Additionally, the Director-General established a Rapid Reaction and Assistance Mission (RRAM) to provide assistance to states parties impacted by chemical weapons use by both State and non-State actors.

The OPCW Fact-Finding Mission (FFM) continued to investigate credible allegations of chemical weapons use in Syria.  In 2017, the JIM confirmed that the Syrian regime was responsible for the April 4, 2017 sarin attack in Khan Shaykhun, in addition to three previous incidents of chemical weapons use in Syria.  Further, the JIM confirmed ISIS was responsible for the September 15-16, 2016, use of sulfur mustard in Um Housh, in addition to a previous use on Marea in 2015.

PX210

## Chapter 4
## Terrorist Safe Havens (Update to 7120 Report)

Terrorist safe havens described in this report include ungoverned, under-governed, or ill-governed physical areas where terrorists are able to organize, plan, raise funds, communicate, recruit, train, transit, and operate in relative security because of inadequate governance capacity, political will, or both.

**As defined by section 2656f(d) of Title 22 of the U.S. Code, the term "terrorist sanctuary" or "sanctuary" excludes the territory of a country the government of which is subject to a determination under section 4605(j)(1)(A) of Title 50; section 2371(a) of Title 22; or section 2780(d) of Title 22– the state sponsors of terrorism.  You can find information regarding the Democratic People's Republic of Korea, Iran, Sudan, and Syria in Chapter 3, State Sponsors of Terrorism.**

## TERRORIST SAFE HAVENS

**AFRICA**

**Somalia.**  In 2017, terrorists used under-governed areas throughout Somalia as safe havens to plan, conduct, and facilitate operations, including mass-casualty bombings in major urban areas. Somali officials failed to implement critical national security reforms and pass legislation that could help enhance the government's capacity to secure and govern effectively at all levels. Despite these critical gaps in its counterterrorism strategy, the Somali government remained a committed partner and vocal advocate for U.S. counterterrorism efforts.

Despite facing increased pressure from strikes and other counterterrorism operations, al-Shabaab retained much of its safe haven throughout the country, and, in some cases, regained ceded territory after African Union Mission in Somalia (AMISOM) forces continued to consolidate positions throughout southern Somalia in 2017.  With the notable exception of targeted operations carried out by U.S.-trained and -equipped units of Somali commandos, the Somali National Army, as a whole, remained incapable of securing and retaking towns from al-Shabaab independently.  This critical gap allowed al-Shabaab to continue to extort local populations and forcibly recruit fighters, some of whom were children.

In northern Somalia, ISIS-linked fighters used the limited safe haven they established in Puntland to launch a suicide attack against regional security forces in May, killing five and wounding several more.  In the months that followed, the group failed to expand its foothold in the face of targeted airstrikes and other counterterrorism operations that commenced in the latter part of 2017, as well as fierce opposition from al-Shabaab cells operating in the region.  As if to declare itself the more capable and potent threat in Puntland, al-Shabaab launched an attack against Puntland security forces in Af Urur that killed more than 60 soldiers and civilians.

PX210

As seen in previous years, al-Shabaab kept much of its safe haven in the Jubba River Valley as a primary base of operations for plotting and launching attacks throughout Somalia and northern Kenya.  The group maintained control of several towns throughout the Jubaland region, including Jilib and Kunyo Barow, and increased its base of operations in the Gedo region to exploit the porous Kenya-Somalia border and attack targets in northeastern Kenya.  Al-Shabaab also used its safe havens in Somalia to escalate its campaign in northern Kenya, primarily using buried improvised explosive devices and other explosives against Kenyan security forces and civilian passenger vehicles.  The Kenyan government increased its presence throughout the border region, including in the Boni forest area best known as one of al-Shabaab's primary facilitation routes, but security officials continued to struggle with border security and crisis response in the more remote areas of northeastern Kenya.

Somalia remained heavily dependent on regional and international partners to support almost all major security functions throughout the country, making little progress on improving interagency coordination to limit terrorist transit through the country.

According to independent sources and non-governmental organizations engaged in demining activities on the ground, there was little cause for concern for the presence of weapons of mass destruction in Somalia.

**The Lake Chad Region.**  In 2017, Boko Haram and its offshoot ISIS-West Africa (ISIS-WA) maintained limited safe havens in parts of Northeast Nigeria and on islands in Lake Chad, and prevented the reestablishment of state administration, service delivery, and humanitarian relief in broader territory surrounding Lake Chad.  These safe havens are greatly reduced from the territory Boko Haram controlled in 2014-2015.  Forces from Nigeria and other members of the Multinational Joint Task Force (Benin, Cameroon, Chad, and Niger) conducted operations to clear these safe havens, but lacked the capacity and resources to secure borders and hold and administer liberated territory.  Both Boko Haram and ISIS-WA continued to conduct asymmetric attacks against civilians, military, and government personnel, including through suicide bombers, vehicle-borne improvised explosive devices, raids, ambushes, kidnappings, and other means.  As a result of this insecurity, at year's end over two million people in the Lake Chad Region remained displaced and millions more remain dependent on humanitarian assistance.

No government in the Lake Chad Region was known to support or facilitate the proliferation or trafficking of weapons of mass destruction in or through its territory.

**The Trans-Sahara.**  In 2017, the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together to form Jama'at Nusrat al-Islam wal-Muslimin (JNIM).  JNIM and other groups like Movement for Unity and Jihad in West Africa, Ansural Islam, and ISIS in the Greater Sahara continued to stage asymmetric attacks in the Trans-Sahara region.  These terrorist groups were able to exercise relatively unimpeded freedom of movement in northern and central Mali and certain border regions of Niger and Burkina Faso.

Following their degrading and scattering in 2013 by combined African and French operations, these terrorist groups took a year to reorganize and began a campaign of asymmetric warfare that

226

PX210

included small raids, soft target attacks, and use of improvised explosive devices, land mines, and suicide bombers.

The groups are no longer able to conduct major military-style campaigns as they did in 2012, but, in 2017, these groups have once again become serious challenges to the security of the Sahel region.

No government in the region was known to support or facilitate the proliferation or trafficking of weapons of mass destruction in or through its territory, although the region remained prone to arms and munitions smuggling, which can have a destabilizing effect on security.

## SOUTHEAST ASIA

**The Sulu/Sulawesi Seas Littoral.**  The sheer expanse of the area, its numerous islands, and substantial maritime traffic in the Sulawesi Sea and the Sulu Archipelago make it a difficult region to secure.  Traditional smuggling and piracy groups often supported terrorist networks, including through the movement of personnel, equipment, and funds.  Kidnapping-for-ransom remained an ongoing threat and a source of funding for terrorist networks based in the southern Philippines.

Indonesia, Malaysia, and the Philippines have made concerted new efforts to control their shared maritime boundaries.  In 2016, the three countries signed a trilateral agreement that envisions joint air and maritime patrols, information sharing, and standard operating procedures for "hot pursuit" of criminal and terrorist elements actively conducting attacks.  The agreement took effect in June 2017, and the Philippines, Indonesia, and Malaysia began joint patrols to combat piracy, terrorism, and the illegal drug trade.

Southeast Asia serves as a global trade hub, with some of the highest volume transit and transshipment ports in the world.  Lack of political will, incomplete legal and regulatory frameworks, weak strategic trade controls, inadequate law enforcement and security capabilities, and emerging and re-emerging infectious disease and burgeoning bioscience capacity, make Southeast Asia an area of concern for weapons of mass destruction proliferation and transit. Malaysia, the Philippines, and Singapore are the only countries in the region with strategic trade control laws, and countries across Southeast Asia struggle with controls over dual-use items, as well as end-use or "catch-all" provisions.  Assisting countries in the region to develop strong laws that meet international standards and help to build effective targeting and risk management systems are major goals of the Department of State's Export Control and Related Border Security program.

**The Southern Philippines.**  From May to November 2017, terrorist organizations pledging support to ISIS – including a faction of the Abu Sayyaf Group, the Maute Group, and others – seized and occupied Marawi City.  When the siege began, President Duterte declared martial law over the entire Mindanao region – approximately one-third of the country's territory – and Congress granted an extension of martial law until the end of 2018.  Security forces ultimately cleared the city and eliminated much of the terrorist leadership, but suffered many casualties during the siege.

PX210

While the Philippine government possesses the political will to apply security measures against terrorist threats, and has consistently partnered with the United States and other nations to build the capacity to do so, it struggles to apply a coordinated whole-of-government approach to prevent terrorism.  Terrorist organizations' continued ability to operate in the southern Philippines is a reflection of the centuries-long challenge of governing effectively in areas outside of Manila, and establishing consistent security in a region possessing a strong separatist identity, endemic poverty, and religious differences.

## THE MIDDLE EAST AND NORTH AFRICA

**Egypt.**  Portions of Egypt's Sinai region remained a safe haven for terrorist organizations in 2017, primarily for ISIS-Sinai Province (ISIS-SP).  Throughout the year, ISIS-SP used this under-governed safe haven to plan and carry out attacks against civilian and military targets both in the Sinai and in mainland Egypt.  In November, ISIS-SP attacked the Al-Rawad Mosque in northern Sinai, killing 311 people.  In December, it attempted to assassinate the Egyptian Minister of the Interior at the El Arish International Airport.

In response to these attacks, the Egyptian Armed Forces began planning a major offensive against ISIS-SP, beginning with a buildup of personnel and equipment in the Sinai.

The United States supported Egypt's efforts to combat ISIS-SP and other terrorist groups in Egypt by providing AH-64 "Apache" helicopters, mine-resistant ambush protected vehicles, counter-improvised explosive devices training, mobile sensor towers, and border security training programs.  The United States routinely engages in military-to-military discussions on how it can help Egypt defeat ISIS-SP and other terrorist groups in Egypt.  The United States remains concerned about the deteriorating security situation and potential impacts on the Multinational Force and Observers peacekeeping mission in the Sinai.

Through the Department of State's Export Control and Related Border Security Program, the United States worked with the Government of Egypt to enhance its border security capabilities. It provided land, air, and maritime border enforcement and targeting and risk management training for Egyptian Customs, Ministry of Defense, Ministry of Interior, Ministry of Transportation, and Ministry of Foreign Affairs officials.  In addition, since 2009, the Department of State's Nonproliferation and Disarmament Fund has assisted Egypt with the provision of passenger and cargo vehicle x-ray detection equipment with the capability to inspect vehicular and truck traffic at fixed transportation checkpoints for weapons of mass destruction-related materials, conventional weapons, and other illicit items.

**Iraq.**  Supported by the 75-member Global Coalition to Defeat ISIS, the Government of Iraq retook the remaining territory held by ISIS in 2017.  Prime Minister Abadi declared on December 9 that Iraq was fully liberated.  The series of successive ISIS defeats included the Iraqi Security Forces' (ISF) liberation of Mosul, Tall Afar, Hawija, and finally al-Qaim and Rawa, in November.  As the ISF liberated territory, ISIS killed thousands of Iraqi civilians, forcing residents to remain as human shields to discourage airstrikes and shooting those attempting to

PX210

flee.  ISIS remained a terrorist threat in Iraq in 2017 and continued to carry out suicide, hit-and-run, and other asymmetric attacks throughout the country.

The terrorist organization Kata'ib Hizballah continued to maintain an active presence in Iraq.

ISIS continued to use the territory under its control in 2017 to produce sulfur mustard and improvised explosive devices filled with chlorine.  The United States has proactively worked with our allies to dismantle this chemical weapons capability, as well as deny ISIS access to chemical, biological, radiological, and nuclear (CBRN) materials and expertise through interdictions and strengthening the ability of regional governments to detect, disrupt, and respond effectively to suspected CBRN activity.

Due to security conditions in Iraq, the Export Control and Related Border Security program had difficulty implementing its outreach activities from 2015-2017.

The United States and Iraq also continued their bilateral partnership to counter nuclear smuggling under the framework of the 2014 Joint Action Plan on Combating Nuclear and Radioactive Materials Smuggling.

**Lebanon.**  Lebanon remained a safe haven for certain terrorist groups in both undergoverned and Hizballah-controlled areas.  Hizballah used areas under its control for terrorist training, fundraising, financing, and recruitment.  The Government of Lebanon did not take significant action to disarm Hizballah, even though Hizballah maintained its weapons in defiance of UNSCR 1701.  The government was unable to limit Hizballah's travel to and from Iraq or Syria to fight in support of the Assad regime.  The Lebanese government did not have complete control of all regions of the country, or fully control its borders with Syria and Israel.  Hizballah controlled access to parts of the country and had influence over some elements within Lebanon's security services.

Ungoverned areas along the un-demarcated Lebanese-Syrian border also served as safe havens for al-Nusrah Front, ISIS, and other Sunni terrorist groups in 2017, which operated in mountainous, mostly uninhabited zones where the government had limited reach.  In late summer 2017, Hizballah cleared out al-Nusrah Front positions along the Syria-Lebanon border. Separately, the Lebanese Armed Forces (LAF) later undertook a major military offensive to expel ISIS fighters from Lebanon.  Other terrorist groups, including Hamas, the Popular Front for the Liberation of Palestine, the Popular Front for the Liberation of Palestine General Command, Asbat al-Ansar, Fatah al-Islam, Fatah al-Intifada, Jund al-Sham, Palestinian Islamic Jihad, and the Abdullah Azzam Brigades, continued to operate within Lebanon primarily inside Lebanon's 12 Palestinian refugee camps.  These groups used the Palestinian camps as safe havens to house weapons, shelter wanted criminals, and plan terrorist attacks.

The United States worked closely with the LAF and Internal Security Forces (ISF) to counter terrorist threats within Lebanon and along its border with Syria by providing counterterrorism training, military equipment, and weaponry.

PX210

Lebanon was not a source country for weapons of mass destruction (WMD) components, but its porous borders and limited controls on strategic trade made the country vulnerable for use as a transit and transshipment hub for proliferation-sensitive transfers, particularly with the conflict in Syria. The LAF Engineer Regiment partnered with U.S. government agencies to detect and prevent proliferation and trafficking of WMD along the Syrian border.

The Department of State's Export Control and Related Border Security program (EXBS) provided commodity identification training for items that could be used in chemical, biological, radiological, and nuclear weapons, to keep these items from transiting through Lebanon. A frontier border security interdiction-training program, in partnership with the Department of Defense, strengthened LAF and ISF border security and interdiction capabilities. In addition, the U.S. Department of Energy's Office of Nuclear Smuggling Detection and Deterrence equipped the Port of Beirut with radiation detection equipment to scan cargo for the presence of radiation.

**Libya.** Libya's vast, undergoverned territories constituted potential safe havens for terrorist organizations in 2017, including Benghazi, Darnah, and the deserts in the south and the west. U.S. airstrikes in cooperation with the GNA successfully targeted ISIS camps and drove remaining ISIS remnants to coastal areas or locations elsewhere. Due to the difficulties of controlling the southern and desert borders in particular, the GNA remained unable to effectively track flows of foreign terrorist fighters in and out of its territory. Rival factions and political stakeholders outside of the GNA, including in the House of Representatives and the "Libyan National Army," had also not stemmed or tracked the flow of foreign terrorist fighters.

The Department of State's Export Control and Related Border Security (EXBS) program provided training to the Libyan Ministries of Defense, Customs, Interior, Foreign Affairs, Libyan Airport Authority, and Libyan Intelligence Service officials. This aimed to enhance Libya's contribution to preventing weapons of mass destruction (WMD) proliferation and diversion of conventional arms and explosives to ISIS and other terrorist organizations. The country's history with WMD, its significant conventional stockpiles, and the continuing strength of armed groups with independent allegiance make these priority engagements. In 2017, targeted technical training included airport security and cargo interdiction training, basic and advanced land border security training, counter-proliferation investigations training, and fraudulent documentation training and counter-improvised explosive device training. These activities encourage interagency cooperation and promote regional and international cooperation to counter illicit trafficking in strategic items.

**Yemen.** Saudi Arabia and the United Arab Emirates (UAE), on behalf of the Republic of Yemen Government, are fighting to reclaim territory currently held by Houthi forces and al-Qa'ida in the Arabian Peninsula (AQAP). The northwest of the country, as well as portions of the southern coast interior are beyond governmental control, severely constraining the Yemeni government's ability to prevent terrorist training, funding, recruitment, and transit. AQAP and ISIS-Yemen continued to benefit from the ongoing conflict with the Houthis, successfully insinuating themselves among elements of the anti-Houthi coalition and exploiting the security vacuum in large parts of the country to increase support. Under President Hadi's leadership, the Government of Yemen has been as cooperative with U.S., Saudi, and UAE counterterrorist operations as its limited capacity will allow. In 2017, counterterrorism operations, led primarily

PX210

by UAE-supported forces, targeted AQAP safe havens for clearance in Abyan Shabwah and Hadramawt Governorates.

Yemen's political instability continued to hinder efforts to enact or enforce comprehensive strategic trade controls to counter the flow of weapons and munitions in the region.  This left Yemen vulnerable as a transit point for destabilizing weapons.  Nonetheless, the Department of State's Export Control and Related Border Security (EXBS) program provided Yemeni authorities with training to reconstitute land border and maritime security capabilities – with a counter-proliferation focus – through a series of training programs for border guards, customs officers, and the coast guard.

## SOUTH ASIA

**Afghanistan.**  Terrorist and insurgent groups are active in the border region of Afghanistan and Pakistan.  The Government of National Unity (GNU) struggled to assert control over this remote terrain, where the population is largely detached from national institutions.  Afghanistan generally cooperated with U.S. counterterrorism efforts, including participation in joint operations against insurgents in districts bordering Pakistan.

The potential for weapons of mass destruction (WMD) trafficking and proliferation remained a concern.  In 2017, the United States and Afghanistan worked to finalize a bilateral framework to help Afghanistan enhance its capabilities to prevent, detect, and respond to nuclear and other radioactive material smuggling incidents.  The Afghanistan and U.S. governments also continued to work to implement comprehensive strategic trade controls and strengthen Afghanistan's border security.

The United States continued to assist the GNU in building capacity to secure potentially dangerous biological materials and infrastructure housed at Afghan facilities, to promote surveillance capabilities to detect and identify possibly catastrophic biological events, and to engage Afghan scientists and engineers that have WMD or WMD-applicable expertise.

**Pakistan.**  Although Pakistan's National Action Plan calls to "ensure that no armed militias are allowed to function in the country," several terrorist groups focused on attacks outside of the country continued to operate from Pakistani soil in 2017.  These groups included the Haqqani Network, Lashkar e-Tayyiba, and Jaish-e-Mohammad.  Pakistan continued military operations to eradicate terrorist safe havens in the Federally Administered Tribal Areas, although their impact on all terrorist groups was uneven.

Pakistan is committed to combating the trafficking of items that could contribute to WMDs and their delivery systems.  Pakistan was a constructive and active participant in the Nuclear Security Summit process and in the Global Initiative to Combat Nuclear Terrorism, and worked to strengthen its strategic trade controls, including updating its national export control list.  The State Department's Export Control and Related Border Security Program increased the Government of Pakistan's enforcement capacity by sponsoring training for Pakistani Customs and the Strategic Export Control Division officials on how to properly identify strategic

PX210

commodities of concern.  These commodity identification and advanced interdiction trainings were implemented by the U.S. Department of Energy.

EXBS also sponsored regional collaboration through nonproliferation fellowships and cross-border coordination with Pakistan and Afghanistan through the UN Office of Drugs and Crime – World Customs Organization's Container Control Program (CCP)  Under the CCP, training was provided to enhance the targeting skills of port control unit officials at the Jalalabad border-crossing and encouraged sharing of customs data between countries.

## WESTERN HEMISPHERE

**Colombia.**  Rough terrain and dense forest cover, coupled with low population densities and historically weak government presence, define Colombia's borders with Brazil, Ecuador, Peru, and Venezuela.  Historically these conditions have allowed for safe havens for domestic terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN).  The peace accord between the Government of Colombia and FARC in 2016 led to a normalization of relations, with the latter even entering the political sphere.  Similar negotiations with the ELN stalled in 2017, precipitating a return to violence by the group.  The Government of Colombia maintained pressure on the ELN to deny safe haven, disrupt terrorist financing efforts, and degrade its logistics infrastructure.  In addition, Colombia conducted operations to counter the ability of the ELN to conduct terrorist attacks.  Despite these efforts, the ELN and illegal armed groups continued to use the porous border, remote mountain areas, and jungles to maneuver, train, conduct kidnappings for ransom, cultivate and transport narcotics, operate illegal mines, "tax" the local populace, and engage in other illegal activities.

Improved relations with neighboring Ecuador have led to some increased cooperation on law enforcement issues.  Colombia also continued to cooperate and share information with the Panamanian National Border Service.  Additionally, Brazil continued implementing its Integrated Border Monitoring System in an effort to monitor its entire border, and along with continued cooperation with the Government of Colombia, addressed potential safe haven areas along their shared borders.  The Export Control and Related Border Security program has recently assisted Brazil in making border security improvements to prevent any groups that may potentially seek to export illicit weapons of mass destructor and precursor goods from being able to do so.

**Venezuela.**  Venezuela's porous border with Colombia has made its territory useful to the National Liberation Army and illegal armed groups, who used it to transit in and out of its territory.

PX210

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

In 2017, the Department of State designated the Democratic People's Republic of Korea (DPRK) as a State Sponsor of Terrorism, designated one new Foreign Terrorist Organization (FTO), and amended three existing FTO designations by adding aliases.  In addition, the Department designated 30 organizations and individuals as Specially Designated Global Terrorists (SDGTs) under Executive Order (E.O.) 13224 and amended an existing E.O. 13224 designation by adding aliases.  The Department revoked the FTO and SDGT designation of one entity.

The Department of the Treasury also designated organizations and individuals under E.O. 13224.  For a full list of all U.S. designations, see the Department of the Treasury's Office of Foreign Assets Control.

**2017 State Sponsor of Terrorism Designation:**

- On November 20, the President announced the Secretary of State's designation of the Democratic People's Republic of Korea (DPRK) as a State Sponsor of Terrorism based on the determination that the DPRK repeatedly provided support for acts of international terrorism.

**2017 Foreign Terrorism Organization/Executive Order 13224 Group Designations:**

- On August 17, the Department of State designated Hizbul Mujahideen (HM) under E.O. 13224 and as an FTO.  (See Chapter 5, Foreign Terrorist Organizations, for further information on HM.)
- On June 23, the Department of State amended the E.O. 13224 and FTO designations of Hizballah to add aliases including Lebanese Hizballah as well as the Foreign Relations Department and the External Security Organization, key components of the terror organization.  (See Chapter 5, Foreign Terrorist Organizations, for further information on Hizballah.)
- Also on June 23, the Department of State amended the E.O. 13224 and FTO designations of al-Qa'ida in the Arabian Peninsula (AQAP) to add aliases Sons of Abyan, Sons of Hadramawt, and National Hadramawt Council, among others.  (See Chapter 5, Foreign Terrorist Organizations, for more information on AQAP.)
- On November 2, the Department of State amended the E.O. 13224 and FTO designations of Abdallah Azzam Brigades (AAB) to add aliases, including Marwan Hadid Brigades.  The Department has concluded that the group remains active and operates in Syria under the name Marwan Hadid Brigades, which has carried out attacks jointly with the FTO and SDGT al-Nusrah Front and has trained at a terrorist camp in Syria.  (See Chapter 5, Foreign Terrorist Organizations, for more information on AAB.)

**2017 Executive Order (E.O.) 13224 designations:**
- On January 10, the Department of State designated Ibrahim al-Banna, a senior member of FTO and SDGT group AQAP, who served as its security chief and provided military and

PX210

security guidance to AQAP leadership.  He praised the 9/11 attacks in an online magazine and threatened to target Americans domestically and abroad.

- Also on January 10, the Department of State designated Hamza bin Laden, son of Usama bin Laden and member of FTO and SDGT group, al-Qa'ida.  Hamza bin Laden repeatedly called for acts of terrorism in western capitals and against U.S. interests.
- On January 12, the Department of State designated Ali Damush and Mustafa Mughniyeh, both members of Hizballah, an FTO and SDGT entity supported by Iran.  Damush is a senior Hizballah leader and an aide to overall leader, Hassan Nasrallah.  Damush leads Hizballah's Foreign Relations Department, which engages in covert terrorist operations around the world on behalf of Hizballah, including gathering intelligence and recruiting.  Mughniyeh is a commander in Hizballah and once led Hizballah's operations in the Golan Heights, helping organize the group's terrorist infrastructure.
- Also on January 12, the Department of State designated Alexanda Amon Kotey.  Kotey is one of four members of an execution cell for ISIS.  The notorious cell, dubbed "The Beatles," was responsible for holding captive and beheading approximately two dozen hostages, including several Westerners.  As a guard for the cell, Kotey likely engaged in the group's executions and exceptionally cruel torture methods, including electric shock and waterboarding.  Kotey acted as an ISIS recruiter and recruited several UK nationals to join the terrorist organization.
- On January 13, the Department of State designated the Indonesia-based Jamaah Ansharut Daulah (JAD).  JAD was formed in 2015 and is composed of almost two dozen Indonesian extremist groups that pledged allegiance to Abu Bakr al-Baghdadi, the leader of ISIS, an FTO and SDGT-designated group.  In January 2016, four people were killed and 25 wounded following a JAD-attributed attack by a suicide bomber and gunmen in central Jakarta.
- On March 29, the Department of State designated Ahmad Hasan Yusuf and Alsayed Murtadha Majeed Ramadhan Alawi, both members of the militant group al Ashtar Brigades (AAB) that receives funding and support from the Government of Iran.  AAB has claimed responsibility for numerous terrorist attacks – some of which have resulted in casualties – mainly against police and security targets in Bahrain.  Yusuf is an Iran-based senior member of the group.  Alawi is based in Bahrain.
- On April 4, the Department of State designated Shane Dominic Crawford and Mark John Taylor, both affiliated with ISIS.  Crawford is a citizen of Trinidad and Tobago and is believed to have been a foreign terrorist fighter in Syria carrying out terrorist activity on behalf of ISIS, including acting as an English language propagandist for the group.  Taylor is a New Zealand national who began fighting in Syria with ISIS in 2014.  Taylor has used social media in support of ISIS, including appearing in a 2015 ISIS propaganda video to encourage terrorist attacks in Australia and New Zealand.
- On April 5, the Department of State designated El Shafee Elsheikh and Anjem Choudary, both affiliated with ISIS.  Elsheikh was identified as a member of the ISIS execution cell known as "The Beatles," a group accused of beheading approximately two dozen hostages and said to have earned a reputation for waterboarding, mock executions, and crucifixions.  Choudary is a British terrorist with links to convicted terrorists and terrorist networks in the UK.  In September 2014, Choudary was arrested by London police for pledging allegiance to ISIS and for acting as a key figure in ISIS's recruitment drive.

PX210

- Also on April 5, the Department of State designated Sami Bouras, a Swedish citizen of Tunisian descent, who is a member of AQ and who has been involved in planning suicide attacks.
- On April 12, the Department of State designated Abu Anas al-Ghandour, a military commander for the FTO and SDGT group, Hamas.  Al-Ghandour leads a brigade in Gaza, has been involved in many terrorist operations, including the 2006 attack on the Israel Defense Forces (IDF) outpost at the Kerem Shalom border crossing.  The attack killed two IDF soldiers and wounded four others, and led to the kidnapping of dual French-Israeli citizen, Corporal Gilad Shalit.
- On April 19, the Department of State designated Tarek Sakr and Farah Mohamed Shirdon.  Sakr is a Syrian-born Canadian citizen who has conducted sniper training in Syria, periodically travels to Turkey, and has been linked to al-Nusrah Front, al-Qa'ida's affiliate in Syria.  Shirdon is a Canadian citizen who traveled to Iraq and Syria to fight with ISIS; he is a prominent ISIS fighter and recruiter and has been involved in fundraising.
- On April 26, the Department of State designated Mubarak Mohammed A Alotaibi, the Syria-based deputy leader of ISIS-Saudi Arabia, an SDGT-designated branch of ISIS.
- On May 26, the Department of State designated Muhammad al-Isawi, the leader of ISIS-Sinai Province, as an FTO and SDGT group.
- Also on May 26, the Department of State designated Hashem Safieddine, a senior leader in Hizballah.  Safieddine is a key member of Hizballah's executive council, which oversees Hizballah's political, organizational, social, and educational activities.
- On June 16, the Department of State designated Marwan Ibrahim Hussayn Tah al-Azawi, an Iraqi ISIS leader connected to ISIS's development of chemical weapons for use in ongoing combat against Iraqi Security Forces.  ISIS has repeatedly used sulfur mustard in chemical weapons attacks in Syria and Iraq.
- Also on June 16, the Department of State designated Majelis Mujahidin Indonesia (MMI) as an SDGT group.  MMI is an Indonesia-based terrorist group formed in 2000 by Abu Bakar Bashir, leader of the FTO and SDGT group, Jemaah Islamiya.  The group has conducted attacks in Indonesia.  It claimed responsibility for a May 2012 attack at the book launch of Canadian author Irshad Manji; the attack left three attendees hospitalized.
- On June 16, the Department of State designated Mohammad Shafi Armar, Oussama Ahmad Atar, and Mohammed Isa Yousif Saqar Al Binali.  Shafi Armar is a leader and head recruiter in India for ISIS.  He has cultivated a group of dozens of ISIS sympathizers who are involved in terrorist activities across India, such as plotting attacks, procuring weapons, and identifying locations for terrorist training camps.  Atar is a senior leader of ISIS's external operations efforts, has established a network to carry out attacks in Europe, and was a leading coordinator of the November 2015 Paris attacks and March 2016 Brussels attacks.  The Belgian-Moroccan national was responsible for recruiting, training, and sending at least some of the individuals to Paris to launch the November 2015 attacks, which killed and injured hundreds, including Americans.  Al Binali is also a senior member of ISIS who departed Bahrain to join the terrorist group in 2014 and has since appeared in multiple ISIS propaganda videos calling on Bahrainis, specifically members of Bahrain's security forces, to join ISIS.
- On June 30, the Department of State designated Mohammad Yusuf Shah, also known as Syed Salahuddin, who, as the senior leader for FTO and SDGT-designated HM, vowed to

block any peaceful resolution to the Kashmir conflict, threatened to train more Kashmiri suicide bombers, and vowed to turn the Kashmir valley "into a graveyard for Indian forces" in 2016. Under his leadership, HM has claimed responsibility for several attacks.

- On July 26, the Department of State amended the designation of Yarmouk Martyrs Brigade (YMB) to change the group's primary name to Khalid bin Al-Walid Army and to add new aliases. The YMB is allegiant to ISIS, was formed in 2012, and was first designated by the Department of State in 2016. It has staged attacks throughout southern Syria. Near the time of the U.S. designation, the YMB changed its name to Khalid bin Al-Walid Army after merging with groups operating in southern Syria.
- On August 23, the Department of State designated two ISIS leaders – Ahmad Alkhald and Abu Yahya al-Iraqi – as SDGTs. Alkhald is an ISIS bomb-maker responsible for the deaths of numerous civilians, including Americans, in Europe. He is the explosives chief of the terrorist cell that carried out the November 2015 attacks in Paris and the March 2016 attacks in Brussels. Al-Iraqi is a senior ISIS figure who reports to ISIS leader Abu Bakr al-Baghdadi. Al-Iraqi oversees ISIS security in Iraq and Syria and reportedly plays a key role in al-Baghdadi's security.
- On September 20, the Department of State designated Tony-Lee Thulsie and Brandon-Lee Thulsie, twin brothers with links to ISIS. In July 2016 at the time of their arrest, the brothers had been plotting attacks targeting Jewish individuals and institutions and foreign embassies, including the U.S. Embassy in South Africa. Both attempted to travel to Syria to fight for ISIS and recruited others to join the terrorist group.

# MULTILATERAL EFFORTS TO COUNTER TERRORISM

In 2017, the United States continued to work through multilateral organizations to strengthen regional and international efforts to counter terrorism, including by developing and promoting global norms and building the capacities of states to implement them.

Of particular note is the unanimous adoption of UN Security Council Resolution (UNSCR) 2396 on December 21, which obligates member states for the first time to develop and use certain tools to detect and counter returning foreign terrorist fighters and homegrown terrorists. The United States drafted and led the negotiation of UNSCR 2396, which requires all UN members to use Passenger Name Record data to stop terrorist travel. It further directs UN members to collect biometric data and develop watchlists of known and suspected terrorists. Resolution 2396 also calls for stricter aviation security standards and urges UN members to share counterterrorism information both internally and with each other. Other examples of U.S. multilateral engagement include:

**The Global Counterterrorism Forum (GCTF).** Since its launch in September 2011, the GCTF has mobilized support for national and regional efforts to strengthen civilian institutions to counter terrorism and to counter violent extremism. This includes support for the development and implementation of GCTF framework documents, such as non-binding international good practices and recommendations related to addressing the full life cycle of radicalization to violence, including the foreign terrorist fighter phenomenon and juvenile justice in a counterterrorism context, and the protection of soft targets, such as malls, restaurants, hotels,

PX210

and other public spaces, against terrorist attacks.  The GCTF is comprised of five thematic and regional Working Groups:  Countering Violent Extremism; Criminal Justice and the Rule of Law; Capacity Building in the East Africa Region; Capacity Building in the West Africa Region; and Foreign Terrorist Fighters.  The United States and Egypt co-chaired the Criminal Justice and the Rule of Law Working Group until September 2017, when the United States and Jordan became co-chairs of the Foreign Terrorist Fighters Working Group.

With its primary focus on countering violent extremism and strengthening civilian criminal justice, the GCTF aims to diminish terrorist recruitment and increase countries' capacity for dealing with terrorist threats within their borders and regions.  The United Nations (UN) is a close partner of, and participant in, the GCTF and its activities.  The GCTF serves as a mechanism for furthering the implementation of the universally agreed UN Global Counter-Terrorism Strategy and, more broadly, to complement and reinforce existing multilateral counterterrorism efforts, starting with those of the UN.  The GCTF also partners with a wide range of regional multilateral organizations, including the Council of Europe, the Organization for Security and Co-operation in Europe, the African Union, and the Inter-Governmental Authority on Development.

In 2017, the GCTF launched three new initiatives:

- **Initiative on Addressing the Challenge of Returning Families of Foreign Terrorist Fighters:**  Co-led by the United States and the Netherlands, this initiative has two objectives:
  1) Raise awareness, identify needs, and leverage expertise and experiences to better understand the push and pull factors of family members of FTFs, and tailor the existing tools to deal with the challenge of returning family members potentially radicalized to violence; and
  2) Develop a set of internationally recognized, non-binding good practices.

- **Initiative to Address Homegrown Terrorism:**  Co-led by the United States and Morocco, in coordination with the International Institute for Justice and Rule of Law, this initiative will develop new good practices on addressing the challenge of dealing with homegrown terrorists.

- **Nexus between Transnational Organized Crime and Terrorism Initiative:**  The Netherlands is leading an initiative to discuss the links between terrorism and transnational crime.  The initiative will aim to raise awareness of the nexus, and expand and tailor the tools available to deal with it as it manifests itself in different regional contexts.  The initiative will develop a set of internationally recognized, non-binding good practices.

In 2017, the GCTF formally endorsed two new framework documents, the *Antalya Memorandum on the Protection of Soft Targets in a Counterterrorism Context,* and the *Zurich-London Recommendations on Preventing and Countering Violent Extremism and Terrorism:*

PX210

- **Antalya Memorandum on the Protection of Soft Targets in a Counterterrorism Context:**  The United States and Turkey, co-leads of the *Protection of Soft Targets in a Counterterrorism Initiative*, put forth the *Antalya Memorandum* for formal endorsement at the GCTF Ministerial Meeting in 2017.  The Memorandum informs and helps guide governments and the private sector in jointly developing policies, practices, guidelines, programs, and approaches for the protection of their citizens from terrorist attacks on soft targets, such as malls, restaurants, hotels, and other public spaces.

- **Zurich-London Recommendations on Preventing and Countering Violent Extremism and Terrorism:**  Switzerland and the United Kingdom, co-leads of the *Strategic Communications and Social Media Aspects in Preventing and Countering Violent Extremism Initiative*, put forth the *Zurich-London Recommendations* for formal endorsement at the GCTF Ministerial Meeting in 2017.  The resulting good practices document, the *Zurich-London Recommendations*, is subdivided into three sections: addressing overall good practices for preventing and countering violent extremism and terrorism online; good practices for content-based responses; and good practices for communications-based responses.

During 2017, the GCTF also continued work on three earlier initiatives:

- The *Initiative to Address the Lifecycle of Radicalization to Violence* Toolkit
- The International Counterterrorism and Countering Violent Extremism Capacity-Building Clearinghouse Mechanism
- The Border Security Initiative

**GCTF Inspired Institutions:**  The following three institutions were developed and supported by GCTF members as mechanisms for supporting strengthening civilian criminal justice responses to terrorism and countering violent extremism.

- **The International Institute for Justice and the Rule of Law (IIJ).**  The IIJ was created in June 2014.  Its mission is to provide rule of law-based trainings to lawmakers, police, prosecutors, judges, corrections officials, and other justice sector stakeholders on how to address terrorism and related transnational criminal activities.  With funding from the United States, the IIJ in 2017 trained 749 practitioners on a myriad of issues such as combating prison radicalization, increasing international cooperation in terrorism investigations and prosecutions, improving adjudications of terrorism cases, rehabilitating and reintegrating foreign terrorist fighters, and dealing with juveniles who are charged with terrorism-related offenses.

  **Hedayah.**  On December 14, 2012, ministers and senior officials from the 30 members of the GCTFinaugurated Hedayah, the first-ever international center of excellence for countering violent extremism (CVE), headquartered in Abu Dhabi, United Arab Emirates.  Hedayah's mandate focuses on three core areas: capacity building programs, dialogue and communications, and research and analysis.  By the end of 2017, Hedayah had hosted counterterrorism-funded training and capacity-building courses on community policing and community engagement, CVE and education, and CVE and

238

PX210

communications.  Hedayah has organized expert workshops on prison disengagement and reintegration, victims of terrorism, CVE and education, security and development, and the development of national and regional CVE strategies.

**Global Community Engagement and Resilience Fund (GCERF).**  In September 2013, the GCTF called for the establishment of the GCERF to serve as the first (and only) global fund to strengthen community resilience to violent extremism.  Based in Geneva, Switzerland, GCERF focuses on preventing and countering violent extremism by building the capacity of small, local, community-based organizations.  In 2017, GCERF operated in Bangladesh, Kenya, Kosovo, Mali, and Nigeria.  Thirteen countries, plus the European Union, have contributed funds to GCERF, totaling over US $50 million.

**The International Criminal Police Organization (INTERPOL).**  Through its I-24/7 secure global police communications system, INTERPOL connects its member countries' law enforcement officials to its investigative and analytical databases, and its system for sending messages and notices.  The United States has been working with INTERPOL's U.S. National Central Bureau (USNCB) to provide technical expertise to a number of member countries to extend their I-24/7 connectivity from their National Central Bureaus to the air, land, and sea ports of entry to increase their ability to screen and interdict the international transit of foreign terrorist fighters and other transnational criminals.

Acknowledging the value of this initiative and the remaining connectivity gaps in countries at risk of foreign terrorist fighter travel, in 2016, the G-7 committed to extending connectivity to I-24/7 to 60 countries by 2021.  Since that time, the United States has engaged INTERPOL and USNCB to help fulfill the G-7 commitment by providing funding for projects aimed at extending connectivity in 10 countries.

The United States continued to support the INTERPOL Counter-Terrorism Fusion Centre's Foreign Terrorist Fighter project, which manages an analytical database containing identity profiles of foreign terrorist fighters compiled by connecting various types of available data (biometrics, travel documents, names, etc.).  These profiles are effective in supporting law enforcement and border control authorities' abilities to identify and interdict suspected terrorists, ensuring that the right piece of data reaches the right officer on the frontlines.  To support this initiative, the United States has also offered seed funding to support an INTERPOL project to improve its analytical capacity to allow the various databases to cross-reference data that links, for example, individual terrorist profiles with lost and stolen travel documents, or fingerprints found on improvised explosive devices.  This capability will improve and speed up member states' investigative capacity.

**European Union (EU).**  The 2010 U.S.-EU Agreement on the Terrorist Finance Tracking Program continued to enable the EU and the United States to share information related to financial messaging data for the purpose of identifying, tracking, and pursuing terrorists and their networks.

In 2017, the EU Council adopted a regulation amending the Schengen borders code to strengthen external border checks against the relevant database and a directive on combating terrorism.

PX210

These two acts strengthen the EU's legal framework to address the phenomenon of foreign terrorist fighters and prevent terrorist attacks. Europol has officers and personnel in all the migration hotspots (in Italy and Greece) to work alongside border security and immigration officers to assist in screening incoming migrants against Europol databases. In addition, the EU Commission published an Action Plan to support the protection of public spaces, which aims to enhance member states' capacities to protect and reduce the vulnerability of soft targets, such as malls, restaurants, hotels, and other public spaces, against terrorist attacks.

The EU also continued six military and law enforcement capacity-building missions in the Horn of Africa and the Sahel, working closely with U.S. elements in counterterrorism, border security, and stabilization efforts.

**Organization for Security and Co-operation in Europe (OSCE).** Under the 2017 Austrian Chairman in Office, the OSCE focused on building support for a comprehensive approach to addressing terrorism-related challenges, in particular with regard to foreign terrorist fighters, information sharing, and countering radicalization to violence. The May 23-24 OSCE Counterterrorism conference in Vienna, chaired by Austria, focused on countering violent extremism and radicalization that lead to terrorism. The conference included interventions and side events on how OSCE countries are dealing with the challenge of returning foreign terrorist fighters. The OSCE continued to address terrorism and violent extremism, including online, in a manner that respects human rights, such as freedom of expression. In 2017, the OSCE, enabled by U.S. support, conducted counterterrorism finance training for the countries of Central Asia, strengthened criminal justice sector responses to terrorism in the OSCE states, and implemented a project on sharing lessons learned from the (U.S.-funded) Good Practices Guide on Non-Nuclear Critical Energy Infrastructure Protection from Terrorist Attacks Focusing on Threats Emanating from Cyberspace. The United States has developed scenario-based, multi-stakeholder seminars to promote collaboration and disseminate good practices among regional, national, and community leaders. In addition, the United States has partnered with the OSCE on several tabletop exercises to build interagency coordination and whole-of-society collaboration.

**North Atlantic Treaty Organization (NATO).** NATO's counterterrorism efforts focus on improving awareness of the threat, developing response capabilities, and enhancing engagement with partner countries and organizations. NATO Allies endorsed an Action Plan to increase NATO's role in the fight against terrorism at the May 2017 NATO Senior Leaders Meeting. As part of this plan, allies decided NATO should formally join the Global Coalition to Defeat ISIS, and expand NATO's Airborne Warning and Control System support to the Coalition.

In addition, NATO members committed to:

- Sustaining the NATO training mission in Afghanistan;
- Continuing defense capacity building and training for Iraqi forces;
- Establishing a new intelligence cell to increase information exchange on terrorist threats;
- Naming the Deputy Secretary General as counterterrorism coordinator within NATO;
- Seek opportunities to increase cooperation between NATO and the European Union on terrorism threats; and

PX210

- Providing more counterterrorism-related training and capacity building support for partners.

NATO's Civil Emergency Planning and Resilience efforts complement military efforts to deter or counter potential threats or disruptions to the civil sector, such as critical infrastructure, including from terrorism.

**Council of Europe.**  The Council of Europe develops legal standards to prevent and suppress acts of terrorism through criminal law and other measures while respecting human rights and in full respect of the rule of law.  In November, the Committee of Experts on Terrorism of the Council of Europe held a plenary meeting in Strasbourg to develop guidelines to prevent lone actor terrorist attacks and enhance cooperation on terrorist misuse of the internet.  The Council also strengthened its cooperation with the private sector to promote an open and safe internet, where human rights, democracy, and the rule of law are respected.  The companies partnering with the Council include Apple, Deutsche Telekom, Facebook, Google, Microsoft, Orange and Telefónica.  The associations are Computer and Communications Industry Association, DIGITALEUROPE, the European Digital SME Alliance, the European Telecommunications Network Operators' Association, the GSM Association, and the multi-stakeholder Global Network Initiative.

**Group of Seven (G-7).**  Within the G-7 Roma-Lyon Group meetings on counterterrorism and combatting crime, the United States worked with its counterparts to implement the G-7 Ise Shima Action Plan on Countering Terrorism and Violent Extremism, including an initiative to generate greater G-7 political and financial support to connect priority countries to INTERPOL's I-24/7 secure global communications system.  The G-7 Action Plan also promoted reforms of the UN's counterterrorism architecture and support for greater use of Passenger Name Record systems, which was reflected in UN Security Council resolution 2396.  The United States also sought to advance projects through the Roma-Lyon Group's expert groups on counterterrorism, transportation security, high-tech crime, migration, criminal legal affairs, and law enforcement.

**Organization of American States' Inter-American Committee against Terrorism (OAS/CICTE).**  OAS/CICTE, which has 35 member states and 70 observers, seeks to prevent the financing of terrorist activities, increase border controls, strengthen cyber-security efforts, and increase law enforcement efforts across the Western Hemisphere.  Working closely with its member states, CICTE establishes policies and implements programs to address these issues and bolsters counterterrorism partnerships, cooperation, and information sharing through promoting counterterrorism policies, training, and capacity building.  The 17th OAS/CICTE Regular Session took place April 6-7 in Washington, DC.  With participation from 28 delegations, the session addressed the dual themes of terrorism financing and the proliferation of weapons of mass destruction.  In 2017, OAS/CICTE began implementation of a U.S.-funded grant to improve member states' domestic terrorist designation regimes, focused on Paraguay, Panama, and Trinidad & Tobago.  OAS/CICTE also began implementation of a grant to research drivers of violent extremism and resiliencies and collect baseline data on high-risk communities in Trinidad and Tobago.

PX210

**The Caribbean Community (CARICOM).**  Leaders of the 15-member Caribbean Community adopted a regional arrest warrant treaty, an asset sharing (forfeiture) agreement, and model CARICOM counterterrorism legislation at their July 4, 2017, Summit.  Recognizing the potential threat posed by returning foreign terrorist fighters, homegrown terrorism, and the vulnerability of its tourist industry, CARICOM prepared its first-ever counterterrorism strategy.  This strategy identifies the threats facing the region and calls for an organized approach to prevent violent extremism, deny terrorists means and opportunities, disrupt terrorist activities, improve preparedness, and respond effectively to a terrorist attack.

**Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum (ARF), and the East Asia Summit (EAS).**  Counterterrorism activities of the 10-member ASEAN and 27-member ARF countries included annual meetings on counterterrorism and transnational crime and capacity building through ARF institutions.  In 2017, the United States continued to provide technical assistance, equipment, and training to improve and automate ASEAN member state reporting to INTERPOL's I-24/7 secure global communications system.  The EAS, which includes the 10 ASEAN members, plus Australia, China, India, Japan, New Zealand, Republic of Korea, Russia, and the United States, issued three statements with a counterterrorism nexus:  a U.S.-sponsored statement on chemical weapons; an Australia-sponsored statement on countering terrorist finance/anti-money laundering; and a Russia-sponsored statement on countering ideological challenges of terrorism and terrorist narratives and propaganda.

**Asia-Pacific Economic Cooperation (APEC).**  In 2017, APEC continued to implement its comprehensive Consolidated Counterterrorism and Secure Trade Strategy.  The Strategy, adopted in 2011, endorsed the principles of security, efficiency, and resilience and advocated for risk-based approaches to security challenges across supply chains, travel, finance, and infrastructure.  In October 2017, APEC member economies endorsed the APEC Counter-Terrorism Working Group Strategic Plan 2018-2022, which set priorities in such areas as the evolving threat of foreign terrorist fighters, terrorist financing, border and critical infrastructure security, and information sharing.

**The African Union (AU).**  The U.S. Mission to the African Union and the AU held the first Countering Violent Extremism Week at the AU Commission October 25-27, 2017.  This event brought together professionals from across the world to discuss ways to deepen partnerships to prevent and counter the rise of violent extremism in Africa.  The AU High Level Forum on Counterterrorism in December recommended that countries incorporate UN Security Council resolutions into national legislation, improve information sharing, adopt whole-of-government approaches to counter violent extremism, and cut off terrorist financing, including from trafficking in drugs, wildlife and cultural artifacts, and ransom payments.

**The Arab League.**  The Arab League is a member of the Global Coalition to Defeat ISIS and participated in the March 2017 Coalition Ministerial in Washington, DC.  In the Amman Declaration following the March Arab Summit, the Arab League's heads of state committed to "dedicate all necessary abilities to eliminate terrorist groups and defeat terrorists in all ideological, security, and military battlefields."  On August 21-22, senior officials met to implement the Amman Declaration and established a task force that included Egypt, Jordan, Kuwait, Mauritania, the Palestinian Authority, and Saudi Arabia.

PX210

**The Organization of Islamic Cooperation (OIC).**  In 2017, the OIC worked with the UN's Counter-Terrorism Implementation Task Force on ways to promote implementation of the Plan of Action to Prevent Violent Extremism.  The OIC an important partner in the *Fostering Peaceful Communities in Morocco* pilot program funded by the Department of State.  The program identified provincial-level religious and community leaders in targeted Moroccan communities and conducted a series of workshops and trainings to increase their understanding of violent extremism risks in their communities and gain tools to address those risks.  The OIC also manages the New York-based "Network for Religious and Traditional Peacemakers," a religious scholar network composed of community-level imams, priests, and rabbis who foster problem solving and conflict resolution.

**Intergovernmental Authority on Development (IGAD).**  IGAD's Center of Excellence for Preventing and Countering Violent Extremism completed its first full year of operations in 2017. Based in Djibouti, the Center held multiple workshops, conducted analysis and research, and established media platforms and networking opportunities for civil society organizations.  The Center received support from a host of international donors, including the Turkish government, to furnish its new headquarters, and the Italian government, for human rights training of gendarmerie that support counterterrorism operations in Somalia.

**G-5 Sahel.**  Burkina Faso, Chad, Mali, Mauritania, and Niger formed the G-5 Sahel in 2014 to focus on the four pillars of security, resilience, infrastructure, and governance.  In February 2017, the G-5 announced its intent to stand up a Joint Force of up to 5,000 military, civilian, and police components.  The aim of the Joint Force is to disrupt the activities of terrorist operations in trans-border regions of the five member states.  Multiple countries and the European Union have pledged donor support to the G-5 Sahel Joint Force, with the United States joining by pledging US $60 million of bilateral security assistance to the G-5 member countries.

**The Gulf Cooperation Council (GCC).**  In May 2017, the United States and GCC held a summit in Riyadh to examine issues of security and stability.  The GCC Terrorist Financing Targeting Center was created and announced during President Trump's May 2017 visit to Saudi Arabia.  It is designed to track the financial movement and interdiction of terrorist resources.

**The United Nations (UN).**  Sustained and strategic engagement at the UN on counterterrorism issues is a priority for the United States.  Throughout 2017, the UN remained actively engaged in addressing the evolving terrorist threat.  The UN Security Council (UNSC) adopted several resolutions to address the threat of terrorism to international peace and security.  These included:

- UN Security Council Resolution (UNSCR) 2341 to protect critical infrastructure from terrorist attack,
- UNSCR 2354 to counter terrorist narratives,
- UNSCR 2368 to further disrupt ISIS and al-Qa'ida's sources of revenue,
- UNSCR 2370 to prevent terrorists from acquiring weapons,
- UNSCR 2395 to reemphasize the importance of Counter-Terrorism Committee Executive Directorate and extend its mandate, and

PX210

- UNSCR 2396 to address the threat posed by returning and relocating foreign terrorist fighters.

The United States supported the creation of the UN Office of Counterterrorism in June 2017 as a means of streamlining UN counterterrorism efforts, coordinating an all-of-UN approach to counterterrorism, mainstreaming Preventing Violent Extremism efforts across the UN system, and ensuring a balanced implementation of the Global Counterterrorism Strategy across its four pillars.  Other U.S. engagement with UN actors on counterterrorism and countering violent extremism included:

- **The Counter-Terrorism Committee Executive Directorate (CTED).**  The United States supported CTED efforts to analyze capacity gaps of member states to implement UNSCRs 1373, 1624, 2178, 2396, and other relevant counterterrorism resolutions and to facilitate training and other technical assistance to UN member states.  This included participating in Counter-Terrorism Committee thematic debates on a range of issues including depriving terrorist groups from accessing, raising, and moving funds; enhancing international law enforcement cooperation on counterterrorism; developing national and regional comprehensive and integrated counterterrorism strategies; and technical assistance needs-identification for Iraq and Afghanistan.

- **The United Nations Office of Counterterrorism (UNOCT).**  The United States supported the creation of UNOCT and is working with it to ensure balanced implementation of the UN Global Counter Terrorism Strategy through a whole-of-UN approach.

- In 2016-2017, the State Department contributed over US $13 million to fund a range of UN Office of Drugs and Crime, UN Interregional Crime and Justice Research Institute, UN Development Program, and International Office for Migration activities including:

  - Strengthening the capacity of the judicial antiterrorism unit and specialized antiterrorism chambers in Niger;
  - Development of counterterrorism rule-of-law Plans of Action in the Sahel;
  - Promoting effective use of alternatives to imprisonment;
  - Supporting Kenyan prisons and probation for counterterrorism cases and the Development of two counterterrorism specific court houses;
  - Work with Mali's Special Judicial Pole;
  - A returning foreign terrorist fighter initiative;
  - Building the capacity of states to obtain digital evidence for terrorism investigations and prosecutions;
  - Development of a counterterrorism prison database in Bangladesh;
  - Border community engagement in Niger and Senegal; and
  - Strengthening community-police partnerships in high-risk communities.

- **The UNSC 1267/1989/2253 ISIL (Da'esh) and al-Qa'ida Sanctions Committee.**  The United States worked closely with the UN Sanctions Committee and its Monitoring Team in 2017 by proposing listings and de-listings, providing amendments, engaging the

PX210

Committee's Ombudsperson in petitions for de-listings, and providing input to the Committee to enhance its procedures and implementation of sanctions measures. The United States also assisted the Monitoring Team with information for its research and reports. In 2017, 12 individuals and five entities were added to the 255 individuals and 80 entities listed on the al-Qa'ida Sanctions List. The Committee also worked to ensure the integrity of the list by conducting regular reviews and by endeavoring to remove those individuals and entities that no longer meet the criteria for listing. In 2017, 13 individuals were de-listed, of which seven individuals were de-listed following the submission of a petition through the Office of the Ombudsperson.

- **The UN Office on Drugs and Crime (UNODC).** At its annual UN Crime Commission in May 2017, which oversees UNODC including its Terrorism Prevention Branch (TPB), the United States joined other member states to negotiate and adopt an updated resolution on "Technical Assistance for Implementing the International Conventions and Protocols Related to Counter-Terrorism." The UN General Assembly adopted this as Resolution 72/194 in September. The UNODC's TPB continued to provide assistance to countries seeking to ratify and implement the universal legal instruments against terrorism and provided assistance for countering the financing of terrorism in conjunction with the UNODC's Global Program against Money Laundering. The United States has engaged UNODC/TPB as a counterterrorism assistance implementer and supported programming focused on strengthening the criminal justice system's response to terrorism by member states. In 2017, the United States continued to support UNODC/TPB programs designed to strengthen the legal regime against terrorism within a rule of law framework in Africa, the Middle East, and the Central and South Asia regions.

- **The UN Inter-Regional Crime Research Institute (UNICRI).** The focus of UNICRI's work has been on rehabilitation efforts in prisons. The United States has provided assistance support to UNICRI to strengthen the capacity of prison officials to implement the good practices contained in the GCTF's *Rome Memorandum on Good Practices for the Rehabilitation and Reintegration of Violent Extremist Offenders*. For example, in Indonesia, UNICRI worked on helping to create a specialized assessment tool for prison officials to use on terrorist inmates. In addition, UNICRI conducted a pilot program to identify and help juvenile offenders demonstrating signs of radicalization to violence before they commit acts of terrorism.

- **The UN Development Programme (UNDP).** The UNDP engages countries to mitigate and prevent conflicts, including in the Maghreb, by developing national and regional strategies to counter and prevent violent extremism and deepening research on preventing violent extremism (PVE) through its center in Oslo, Norway. In 2017, the United States provided assistance funding to UNDP to help strengthen community-police partnerships in high-risk communities. UNDP sponsored a global conference in Oslo in March, which brought together non-governmental organizations' regional and country directors to discuss PVE approaches. The UNDP later established the position of a global PVE director.

PX210

- **The UN Security Council (UNSC) 1540 Committee.**  The Committee monitors and facilitates efforts to implement the obligations and recommendations of UN Security Council resolution (UNSCR) 1540, addressing the nexus of proliferation of chemical, biological, and nuclear weapons and their means of delivery, and illicit activities by non-state actors, including terrorist activities.  The Committee submitted its annual review on implementation to the UN Security Council in December 2017.

  The Committee's Group of Experts also participates as part of the UN Counter-Terrorism Implementation Task Force, and cooperates with INTERPOL, the UN Office of Drugs and Crime, the Financial Action Task Force, and other counterterrorism bodies.  In 2017, as coordinator of the transparency and media outreach working group, the United States led the revision of the 1540 Committee's website to reflect the findings of the 2016 second comprehensive review of the implementation of UNSCR 1540 (2004) as well as provisions of UNSCR 2325 (2016).  In addition to raising public awareness, the Committee website serves as a main source of information and resources relating to UNSCR 1540 for use by member states, committee members, civil society, and industry.

  In 2017, the U.S. contribution to the UN Trust Fund for Global and Regional Disarmament Affairs funded a range of UNSCR 1540 activities, including the establishment of a 1540 regional coordinator position in the Organization of American States Inter-American Committee against Terrorism (OAS/CICTE) to promote the full implementation of the resolution in the Western Hemisphere.

- **The International Civil Aviation Organization (ICAO).**  In September 2017, ICAO hosted its first aviation security symposium at its headquarters in Montreal.  The symposium brought together aviation security professionals from around the world to address the threat posed by terrorists targeting civil aviation by reinforcing, strengthening, and promoting the international framework of aviation security standards.  In December 2017, the UN Security Council unanimously adopted UNSCR 2396, which welcomed ICAO's approval of the new Global Aviation Security Plan.  The Plan provides the foundation for ICAO, member states, the civil aviation industry, and other stakeholders to enhance aviation security worldwide and to achieve five key priority outcomes.  The outcomes are to enhance risk awareness and response, develop security culture and human capability, improve technological resources and foster innovation, improve oversight and quality assurance, and to increase cooperation and support.  Member states continued to prioritize UNSCR 2309 implementation, which calls on UN members to ensure that effective, risk-based measures are in place at the airports within their jurisdiction, that such measures reflect the ever-evolving threat picture, and are in accordance with international standards and recommended practices.  UNSCR 2309 further calls on all states to strengthen information sharing and requires airlines operating in their territories to provide Advance Passenger Information to appropriate national authorities to track the movement of individuals identified by the UN's counterterrorism committees.  It also urges all states to ensure cooperation among their domestic departments, agencies, and other entities and encourages continued close cooperation between ICAO and the Counter-Terrorism Executive Directorate on identifying gaps and vulnerabilities in aviation security.

PX210

- **The Global Initiative to Combat Nuclear Terrorism (GICNT).**  The United States serves as Co-Chair of GICNT, a voluntary partnership of 88 nations and five international observer organizations committed to strengthening national and global capacity to prevent, detect, and respond to the shared threat of nuclear terrorism.  The GICNT conducts multilateral activities that strengthen the plans, policies, procedures, and interoperability of partner nations in technical areas such as nuclear detection, nuclear forensics, national emergency response frameworks, legal frameworks, radioactive source security, and sustainability.  In addition to serving as Co-Chair, the United States provides both financial and human resources to support the initiative's multilateral undertakings.

## LONG-TERM PROGRAMS AND INITIATIVES DESIGNED TO COUNTER TERRORIST SAFE HAVENS AND RECRUITMENT

**COUNTERING VIOLENT EXTREMISM** refers to proactive actions to counter efforts by terrorists to radicalize, recruit, mobilize, and inspire followers to violence and to address specific factors that facilitate terrorist recruitment and radicalization to violence.

State and USAID leverage a range of available diplomatic, development, and foreign assistance tools to prevent and counter radicalization and recruitment to violence, both online and offline.

The following five objectives guide our assistance and engagement:

1. Expand international political will, partnerships, and expertise to better understand the drivers of terrorist radicalization and recruitment and to mobilize effective interventions.
2. Encourage and assist partner governments to adopt more effective policies and approaches to prevent and counter the spread of terrorist ideology, including changing unhelpful practices where necessary.
3. Employ foreign assistance tools and approaches, including development, to reduce specific factors that contribute to community support for terrorism in identifiable areas or put particular segments of a population at high risk.
4. Empower and amplify locally credible voices that can change the perception of terrorist groups and their ideology among key demographic segments.
5. Strengthen the capabilities of government and non-governmental actors to isolate, intervene with, and promote the rehabilitation and reintegration of individuals caught in the cycle of radicalization to violence.

State also works to counter the use of the internet for terrorist purposes, including countering violent extremism online.  For more information on this effort, we refer you to the 2016 report.

State and USAID are pursuing a range of programs to assist partners around the world.  Key areas of programming include:

247

PX210

- **Supporting the Development and Implementation of National Action Plans to Counter Violent Extremism:** The United States provides technical assistance to governments as they design and implement national action plans to counter violent extremism (CVE), in partnership with civil society and the private sector. To reinforce these efforts, the United States supports Hedayah, the international CVE center in Abu Dhabi, which provides capacity building and technical expertise to interested governments.

- **Researching Drivers of Violent Extremism and Effective Interventions:** The United States supports innovative regional, country-based, and thematic research on the drivers of radicalization and recruitment to violence and on programming approaches. The United States supports the Researching Solutions to Violent Extremism (RESOLVE) Network, which connects academics and researchers to study the dynamics of countering violent extremism in specific local contexts and identify effective interventions. The United States also works with the Global Counterterrorism Forum to implement an expanded toolkit for addressing the life cycle of radicalization to violence.

- **Building the Capacity of Criminal Justice Actors and Institutions:** The United States is supporting programs, especially in the Horn, Sahel, and Maghreb regions of Africa to strengthen the capacity of law enforcement to counter violent extremism, including police deployed to peace and stabilization operations, prison management, and justice sector actors. The United States also supports programs to train and assist corrections officials to counter radicalization to violence in prison settings and to promote rehabilitation.

- **Strengthening Efforts to Counter Violent Extremism by Sub-National, City, and Local Partners:** The United States supports the Strong Cities Network, a global network of municipal and other sub-national leaders and local government practitioners involved in building community resilience. The United States also contributes to the Global Community Engagement and Resilience Fund, the first multilateral fund supporting community-based projects that counters local drivers of recruitment and radicalization to violence.

- **Enhancing Civil Society's Role in Countering Violent Extremism:** The United States supports programs that empower youth to prevent radicalization to violence among their peers. The United States also supports programs that elevate the role of women in recognizing and preventing the spread of violent extremism in their families and communities.

**Counter-Messaging and Promoting Alternative Narratives:** With the leadership of the U.S. Department of State's Global Engagement Center (GEC), the United States supports efforts to help government and non-governmental partners counter ISIS and other terrorist messaging, and to promote alternative narratives. The United States supports a network of messaging centers such as, the Sawab Center, a joint U.S.-United Arab Emirates initiative that exposes, refutes, and counters online terrorist propaganda. These centers harness the creativity and expertise of local actors to generate positive content that challenges the rhetoric of ISIS and its supporters. The United States has worked collaboratively and voluntarily with private sector technology

PX210

companies to help the companies better identify and address online terrorist content, which many companies choose to remove based on their terms of service.  In 2017, counter-ISIS content had become more prevalent online and pro-ISIS content continued to decline.

**CIVILIAN COUNTERTERRORISM CAPACITY-BUILDING PROGRAMS.**  As the terrorist threat has evolved and grown more geographically diverse in recent years, it has become clear that our success depends in large part on the political will and capabilities of our partners to counter terrorism.  To succeed over the long term, we must have partners who can not only militarily disrupt threats and degrade networks in a way that comports with international laws and norms, but who have strong civilian capabilities, as well.  We need partners in law enforcement, the justice sector, and corrections that can disrupt attacks and investigate, arrest, prosecute, and incarcerate terrorists and their facilitation networks.

The United States uses various funding authorities and programs to build the capacity of law enforcement, justice, and corrections officials to counter terrorism.  The Department of State's Bureau of Counterterrorism oversees the following capacity-building programs:  Antiterrorism Assistance, Countering the Financing of Terrorism, Counterterrorism Engagement with Allies, the Regional Strategic Initiative, the Terrorist Interdiction Program, and the Counterterrorism Partnerships Fund (CTPF).

In FY 2017, CTPF allowed the State Department to significantly expand civilian counterterrorism capacity-building activities with key partner nations in the Middle East, North Africa and the Sahel, the Horn of Africa, South and Central Asia, Southeast Asia, and other regions to mitigate the threat posed by foreign terrorist fighters, prevent and counter terrorist safe havens and recruitment, and counter Iranian-sponsored terrorism.  For further information on these programs, we refer you to the 2017 Annual Report on Assistance Related to International Terrorism.

---

### Rewards for Justice

The U.S. Department of State's counterterrorism rewards program, Rewards for Justice (RFJ), was established by the 1984 Act to Combat International Terrorism, Public Law 98-533 (codified at 22 U.S.C. § 2708).  RFJ's goal is to bring international terrorists to justice and prevent acts of international terrorism against U.S. persons or property.

Under this program, the Secretary of State may authorize rewards for information that leads to the arrest or conviction of anyone who plans, commits, aids, or attempts international terrorist acts against U.S. persons or property, that prevents such acts from occurring in the first place, that leads to the identification or location of a key terrorist leader, or that disrupts terrorism financing.

Since the inception of Rewards for Justice in 1984, the United States has paid more than US $145 million to over 90 people who provided actionable information that put terrorists behind bars or prevented acts of international terrorism worldwide.

PX210

In 2017, the RFJ program announced the following reward offers for information.

- March 15:  Up to US $5 million for information leading to the arrest or conviction in any country of any individual who committed, conspired to commit, or aided or abetted in the commission of the murder of U.S. citizen Joel Shrum.  On March 18, 2012, Shrum, 29, was shot and killed on his way to work in Taizz, Yemen.  A few days after the attack, the terrorist organization al-Qa'ida in the Arabian Peninsula claimed responsibility for the murder.

- May 10:  Up to US $10 million for information leading to the identification or location of Muhammad al-Jawlani, leader of al-Nusrah Front (ANF), al-Qa'ida's branch in Syria. This was the first Rewards for Justice reward offer for a leader of ANF.

- October 10:  Up to US $7 million for information on Talal Hamiyah, and up to US $5 million for information on Fu'ad Shukr – both Haniyah and Shukr are two key leaders of the Lebanon-based terrorist group Hizballah.

## SUPPORT FOR PAKISTAN

The President announced a new South Asia strategy on August 21, 2017, emphasizing Pakistan's role in supporting regional security, the need for Pakistan to address aspects of its nuclear program, and the threat posed by the Haqqani Network and other terrorist groups that operate in Pakistan.  The strategy also emphasized that Pakistan, a long-standing and important partner, is critical to the success of the South Asia strategy.  Counterterrorism cooperation between the United States and Pakistan continued on the effort to defeat Islamic State's Khorasan Province and Tehreek-e Taliban Pakistan.

From August to December 2017, the Trump Administration placed a pause on spending new Foreign Military Financing for Pakistan, holding these funds until Pakistan addressed key U.S. concerns, including the threat posed by the Haqqani Network and other terrorist groups that enjoyed safe haven with Pakistan.  Pakistan did not adequately address these concerns in 2017.

Civilian assistance continued in 2017 and strengthened Pakistan's civilian institutions by fostering trade and growth, building education systems and educational ties, bolstering Pakistan's law enforcement capacity, and helping Pakistan address terrorism, including on the Afghanistan-Pakistan border.  The United States also fostered commercial cooperation that benefits U.S. businesses by encouraging trade and investment with Pakistan, as well as creating opportunities to forge lasting connections between Americans and emerging Pakistani leaders through educational and cultural exchanges.

U.S. support for civilian law enforcement and rule of law was crucial to helping Pakistan provide security and justice for Pakistani citizens, and to disrupting terrorism and transnational organized crime.  Civilian assistance programs also helped Pakistan disrupt terrorist networks that operated within Pakistan's borders.

PX210

| Account | FY 2016 Actuals | FY 2017 Appropriated | FY 2018 Request |
|---|---|---|---|
| Total Foreign Assistance | **534.7** | **512.4** | **344.6** |
| Economic Support Fund | 200.0 | 200.0 | |
| Economic Support and Development Fund | | | 200.0 |
| Global Health Programs | 22.5 | 22.5 | 11.3 |
| Intl. Narcotics Control and Law  Enforcement | 40.0 | 38.0 | 25.0 |
| Nonproliferation, Antiterrorism, Demining | 9.9 | 4.8 | 4.8 |
| Foreign Military Financing | 255.0 | 242.3 | 100.0 |
| International Military Education and Training | 4.8 | 4.8 | 3.5 |
| Food for Peace Title II | 2.5 | 0.0 | |

*figures in millions, US $

251

PX210

## COUNTERTERRORISM COORDINATION WITH SAUDI ARABIA

The United States and Saudi Arabia have a strong bilateral counterterrorism relationship. Multiple high-level visits in 2017 served to advance this relationship at the personal and institutional level and provided senior officials from both countries the chance to discuss means of improving counterterrorism coordination.  During the President's May visit to Riyadh, the two countries announced a Joint Strategic Vision Declaration to include new initiatives to counter terrorist messaging and disrupt the financing of terrorism.  Crown Prince and Minister of Defense Mohammed bin Salman vowed on October 24 to return Saudi Arabia to being a country of moderate Islam, pledging that the Kingdom would "not spend the next 30 years of our lives dealing with destructive ideas."

During 2017, the Saudi Arabian government, working with the United States, continued to build and augment its capacity to counter terrorism and terrorist ideology, including al-Qa'ida in the Arabian Peninsula (AQAP) and ISIS.  Saudi Arabia maintained its long-term counterterrorism strategy to track and halt the activities of terrorists and terrorist financiers, dismantle the presence or reconstitution of al-Qa'ida (AQ) affiliates, impede the ability of militants to operate from or within Saudi Arabia, and continued to implement laws against supporting terrorist groups and travel to conflict zones.  Saudi Arabia reinforced its efforts as a key member and active participant in the Global Coalition to Defeat ISIS.  In November, the Saudi government announced an expansive revision of its Counterterrorism and Counter Terror Financing Law (CT Law, detailed below) to reinforce its capacity to counter terrorism and purportedly align with international standards.

The Saudi government conducted operations against ISIS, condemning its activities and participating in the coalition's military action to defeat the group in Syria and Iraq, and pursuing an aggressive campaign against ISIS at home.  Saudi Arabia implemented UN Security Council resolutions (UNSCRs) 2178 and 2199, and the UNSC ISIL (Da'esh) and al-Qa'ida sanctions regime; expanded existing counterterrorism programs and messaging to address the phenomenon of returning foreign terrorist fighters; and leveraged terrorist finance provisions of its CT Law and Royal Decree A/44 to counter the funding of terrorist groups in Iraq, Syria, Lebanon, and elsewhere.

King Salman issued major decrees on July 20 amending the organizational structure of the Ministry of Interior (MOI) and creating a new independent domestic intelligence and CT entity called the State Security Presidency (SSP).  In October, the government also established the National Cyber Security Authority to formalize its cybersecurity infrastructure and combat cyber threats.  The Government of Saudi Arabia announced an expansive new CT Law on November 4, updating its 2014 law.  Among the most significant aspects, the new law expands the range of activities defined as "terrorist" crimes and transfers many of the CT authorities previously held by the MOI to the SSP and the new Public Prosecutor's Office.  These recent changes and initiatives instituted by the Saudi government have the stated aim to streamline the fight against terrorism and violent extremism, and to reinforce its capacity to counter terrorism, although human rights groups view the new CT Law as overly sweeping.

PX210

Saudi Arabia continued to cooperate with the United States to prevent acts of terrorism both through engagement in bilateral programs and through information-exchange arrangements with the United States. This was particularly evident with Saudi efforts to counter terrorist financing in the Kingdom and the Gulf region. Saudi Arabia, along with the United States, co-chairs the Terrorist Financing Targeting Center (TFTC), a Riyadh-based initiative announced during the President's visit to Saudi Arabia in May. In October, Saudi Arabia joined the United States and the other TFTC member countries in jointly announcing sanctions against individuals and entities supporting AQAP and ISIS-Yemen. The new CT Law is aimed at further buttressing the Saudi government's effort to obtain full membership in the Financial Action Task Force. Earlier in the year, the government directed domestic authorities to impose financial sanctions on individuals and entities providing support to or acting on behalf of Hizballah. The Saudi Arabian Monetary Authority, the Kingdom's central bank, demonstrated strong supervisory authorities when it suspended three leading money service businesses in late-September for deficient anti-money laundering/countering the financing of terrorism controls.

Saudi Arabia also continued to lay the groundwork for a long-term countering violent extremism (CVE) strategy, opening potential new avenues for counterterrorism coordination. The Center for Ideological Warfare, launched in 2016, became operational in April to blunt ISIS's ideological appeal and counter terrorist messages by discrediting what Saudi officials characterized as "distortions" of Islamic tenets used in recruiting and ISIS propaganda. King Salman inaugurated the Global Center for Countering Extremist Ideology (*Etidal* in Arabic) in Riyadh on May 21, which the President attended, further expanding efforts to counter terrorist messaging and promote a culture of moderation.

Senior Saudi officials reinvigorated CVE outreach with visits, including to the Vatican to meet with Pope Francis September 20 and to the Grand Synagogue in Paris November 20, in an effort to cultivate an image of greater tolerance with followers of other faiths. King Salman issued a royal order October 17 creating a religious center in Medina to scrutinize the written collections of the Prophet Muhammed's *hadith*s (sayings) for content that could be interpreted as encouraging terrorism. The Saudi government expanded counter-radicalization programs through the King Abdullah Center for National Dialogue to address the rising threat to youth from recruitment efforts by groups like ISIS.

The Saudi Ministry of Islamic Affairs continued to train and more strictly regulate imams, prohibiting them from inciting violence, and continued to monitor mosques and religious education. The Ministry of Interior continued to operate its flagship de-radicalization program (the Sakina Campaign for Dialogue) to counter internet radicalization. The government continued to improve oversight of proselytization and Islamic charitable activities, especially during Hajj. The Saudi government appointed new leadership in various Islamic organizations to bolster efforts to counter radicalization to violence and streamline these organizations' charitable activities to enhance compliance with counterterrorism finance regulations. The Ministry of Islamic Affairs (MOIA) announced restrictions on foreign travel of Saudi-based clerics for *da'wa* (proselytization) activities, requiring them to obtain the government's permission before traveling. Additionally, the MOIA promulgated regulations restricting Saudi clerics' internal activities, for instance, requiring clerics to obtain permission before making media appearances even on Saudi networks. These are all part of centrally coordinated efforts driven by the Saudi

PX210

government's leadership to limit the ability of individuals with questionable credentials or affiliations to propagate extremist messages at home and abroad, and to restrict their ability to interfere in the domestic affairs of other countries.

During 2017, the Saudi government continued its ongoing program to modernize the educational curriculum, including textbooks, although this has not been completely implemented and some textbooks containing derogatory and intolerant references to Shi'a and non-Muslims remained in circulation.  Under the rubric of Vision 2030, the Ministry of Education worked to consolidate religious courses, increase the focus on modern educational needs, and improve the quality of instruction, including through the development of teacher training initiatives.

The United States continued to support Saudi Arabia in reforms it is undertaking by: facilitating Saudi nationals' study in the United States and promoting educational exchanges; encouraging increased bilateral trade and investment; urging Saudi Arabia to take actions necessary to attract job-creating partnerships with U.S. companies; and supporting programming in such areas as judicial reform and women's entrepreneurship, as well as the Ministry of Interior's well-developed extremist rehabilitation program, the Mohammed bin Naif Counseling and Care Center, to reduce recidivism among former terrorist fighters charged with crimes related to terrorism.

Saudi Arabia cooperated regionally and internationally on counterterrorism issues, including through its status as a founding member of and continuing participant in the Global Counterterrorism Forum.  On July 11, Saudi officials participated in the Defeat-ISIS Global Coalition's Working Groups on Counter Finance, Foreign Terrorist Fighters, Stabilization Support, and Communications in Washington, DC.  The working groups individually assessed the campaign and discussed ways to intensify pressure on ISIS in each of these critical areas. The following day the full Coalition met for in-depth discussions on how to accelerate Coalition efforts to defeat ISIS in the remaining areas it holds in Iraq and Syria and maximize pressure globally on its branches, affiliates, and networks.  Saudi Arabia is also a critical partner for the United States in combating financial support of ISIS and serves as a co-lead, along with the United States and Italy, of the Counter ISIS Finance Group (CIFG).  In December, Saudi Arabia pledged US $100 million to support the G-5 Sahel force to combat terrorism in West Africa. Throughout the year, Saudi security professionals continued to participate in joint military and CT programs around the world and with partners inside the Kingdom.  The Saudi-led Islamic Military Counter Terrorism Coalition (IMCTC), established in December 2015, hosted its Inaugural Meeting of the IMCTC Ministers of Defense Council November 26 to address the ideological, financial, military, and media aspects of counterterrorism.

PX210

# BROADCASTING BOARD OF GOVERNORS INITIATIVES: OUTREACH TO FOREIGN MUSLIM AUDIENCES

### This section is provided by the Broadcasting Board of Governors (BBG)

Four of the five broadcast entities under the supervision of the BBG provided programming for countries with large Muslim populations in 2017.  These are the Voice of America (VOA), the Middle East Broadcasting Networks, Inc. (Alhurra TV, Radio Sawa, and Afia Darfur), Radio Free Europe/Radio Liberty (RFE/RL), and Radio Free Asia (RFA).

- Fifteen of RFE/RL's broadcast languages – approximately two-thirds of its languages – were directed to regions with majority-Muslim populations, including Afghanistan, Azerbaijan, Bosnia and Herzegovina, Iran, Kazakhstan, Kosovo, the Kyrgyz Republic, Pakistan, Tajikistan, Turkmenistan, and Uzbekistan.  Additional broadcasting to regions in the Russian Federation included the majority Muslim populations of Bashkortostan, the North Caucasus, and Tatarstan.
- VOA has been particularly successful in reaching non-Arabic-speaking Muslim audiences in Afghanistan, Bangladesh, the Balkans, Indonesia, Iran, Iraq, Mali, Nigeria, Pakistan, Somalia, and Tanzania, among other places.
- MBN's Alhurra Television, Radio Sawa, and Afia Darfur broadcast to more than 340 million people.
- MBN continued its successful *Raise Your Voice* initiative across television, radio, and digital platforms, which encouraged Iraqis to speak out against terrorism and look for solutions to unite their country.
- VOA and RFE/RL provided news and information to Afghanistan and the Afghanistan-Pakistan border region in Dari and Pashto.  Together, RFE/RL and VOA reached 39 percent of Afghan adults each week.  (VOA is at 29 percent and RFE/RL at 27 percent.)
- Radio Free Asia broadcasts to the more than 16 million mainly ethnic Uighur Muslims in the Xinjiang Uighur Autonomous Region of northwestern China and Central Eurasia.
- In partnership with Radio Free Asia, the online news operation *BenarNews* reached predominantly Muslim audiences in Bangladesh, India, Indonesia, Malaysia, and Thailand.  *BenarNews* countered terrorist narratives by publishing credible domestic news, features, analysis, and commentary in text, video, and pictures, in Bahasa Indonesia, Bahasa Malaysia, Bengali, English, and Thai.

BBG used the latest communications technologies to avoid jamming of its signals, and to reach audiences through digital and other communications tools, such as mobile and messaging apps and social media platforms.

## THE MIDDLE EAST

**Arabic:**  Middle East Broadcasting Networks, Inc. (MBN) has seven bureaus/production centers in the region in addition to its main studios in Virginia, and a network of regional correspondents.  MBN broadcast to a population that included an estimated 317 million Muslims, 23.2 percent of the world's Muslim population (according to the *2017 CIA World Fact*

PX210

*Book*).  MBN used three platforms:  television (Alhurra TV, Alhurra-Iraq TV), radio (Radio Sawa, Radio Sawa Iraq, and Afia Darfur), and digital (Alhurra.com, RadioSawa.com, and Irfasaatak.com) – and all of their corresponding social media pages.  Topics included freedom of speech, religion, and the role of women in society and politics.

To build on the success of the *Raise Your Voice* initiative and to inform and engage with the people of the Maghreb region, MBN launched MaghrebVoices.com and corresponding social media platforms.  The website targets nearly 100 million people and focuses on issues such as terrorism, corruption, human trafficking, including slavery, and minorities' rights.  *Maghreb Voices* facilitates dialogue and interaction with its audience through community managers.  It goes to the streets of Algeria, Libya, Mauritania, and Tunisia to interview citizens and hear their views.  Maghreb Voices has a section of the website dedicated to defectors' stories.  This section includes interviews and firsthand accounts of people who joined and then left terrorist groups such as ISIS after they became disillusioned.  Audiences also will find video content, polls, question of the day, citizen journalist content, and articles.

In addition to *Maghreb Voices*, MBN launched several new initiatives and programs:

- **Being an Outlet for Independent Voices:**  For the first time, MBN launched an op-ed section on the Alhurra.com website.  *From a Different Angle* provided a space for free expression on a variety of topics, including terrorism.  Articles included commentary by featured writers who are journalists, intellectuals, and human rights advocates from the Middle East and the United States.
- **ISIS Defectors Share Horror Stories of Life under the Rule of ISIS:**  Alhurra launched a documentary series, *Exiting ISIS*, in which ISIS defectors provide first-hand accounts of the terrorist group's entrenched culture of deception, intimidation, cruelty, and sexual abuse.
- **Investigative Journalism Exposing Topics Not Addressed in the Arab Media:**  In 2017, Alhurra began developing an investigative team to address topics absent from other Arabic television stations, such as Hizballah's growing influence throughout the Middle East and elsewhere.
- **Focus on the Role of Women as an Important Part of Society:**  Alhurra Television launched the third season of its program *Sit B'Mit Ragel* (*A Lady is Worth 100 Men*).  The series followed four young Egyptian women and their professional aspirations and resilience in overcoming social and culture barriers to succeed and realize their dreams.

**Iraq:**  Every week, 42.6 percent of Iraqi adults – some 6.3 million people – listened to or watched Alhurra TV, Radio Sawa, and VOA Kurdish.  One-third (34.5 percent) of Iraqis said they relied on Alhurra-Iraq (TV and digital) for news and information during the past week.  Radio Sawa Iraq is one of the top radio stations among adults.  VOA Kurdish reached 8.5 percent of Kurdish-speaking Iraqis weekly.

As Iraqi troops pushed out ISIS from Mosul, Alhurra and Radio Sawa provided the latest accounts from the frontlines.  They also told the stories of Iraqis living in displacement camps.

PX210

MBN continued to increase the audience of the *Raise Your Voice* initiative, a multi-platform campaign for Iraqi audiences across television, radio, and digital, composed of five television programs, one radio program, an interactive website, and a digital team to engage audiences on social media properties.  This Arabic-language initiative was designed as a non-sectarian platform to encourage citizens to speak out about the fight against terrorism.

**VOA Extremism Watch Desk:**  In late 2015, VOA launched the Extremism Watch Desk to acquire content in eight languages focused on ISIS and its activities.  Since then, the desk has expanded to cover other terrorist groups, including al-Shabaab, Boko Haram, al-Qa'ida, the Taliban, Hamas, and ISIS's various branches.  Content is translated into English and shared with VOA's 47 language services, VOA Central News, and other BBG networks.

The Watch Desk maintains a social media presence on Twitter and YouTube, and has established a blog for VOANews.com.  On Facebook, the number of followers has reached nearly one million people with 3.7 million views.

The Desk has added a producer to handle video content for TV and all web platforms.  The VOA News Center continues to provide permanent placement on VOANews.com for *Extremism Watch*, where English-language content from the Extremism Watch Desk is disseminated to a worldwide audience.  The Extremism Watch Desk has broken news on terrorism and produced special projects such as *Descent into Jihad*, which was translated into more than 20 languages.

In 2017, the Extremism Watch Desk introduced *VOA 60 Extremism,* a daily 60-second video on terrorism around the world.  The product is produced in English and shared with language services for adaptation into target languages in South and Central Asia.  The Desk also produces short web videos in English from materials provided by VOA stringers in various regions.  The short videos are posted on the main VOANews.com page and on Extremism Watch Desk social media pages.  Total interactions on the Extremism Watch Desk Facebook page reached 1.57 million in 2017, with average 120,000 monthly interactions (Source: Crowd Tangle).

**Kurdish:**  The VOA Kurdish Service covered ISIS attacks in the Iraqi Kurdistan Region on a daily basis, with interviews, analysis, and stringer reports from the region.  VOA Kurdish reports, which featured interviews with people on the ground, including individuals who had escaped ISIS captivity, were shared with the Watch Desk and the VOA newsroom.

Braving significant security risks, VOA Kurdish stringers reported from Mosul as Iraqi forces liberated neighborhoods.  VOA interviewed refugees as they fled ISIS and reported on Iraqi soldiers as they liberated the city.  A VOA Kurdish stringer in Raqqa also reported on military operations there.  The service added hourly news updates during key listening times in Kurdish-speaking areas of northern Iraq as the push to drive ISIS from Mosul and other areas gained momentum.

In Syria's Kurdish region, VOA stringers reported on the local fight against ISIS, generating daily TV coverage.  Call-in shows and roundtable discussions focused on ISIS.  Many Kurdish TV stations (including NRT TV, Rudaw TV, and Orient TV) conducted Skype interviews with VOA Kurdish Service staffers who discussed events in the region.

PX210

To provide context and to explain events, the Kurdish Service regularly interviewed officials and analysts.  The Service also covered numerous ISIS-related conferences in Washington, D.C.

**Persian:**  VOA's Persian Service provided global and regional news related to Iran and information about U.S. policy toward Iran and the region.  Highlights of VOA Persian interviews and reports in 2017 and recent audience survey research results are below.

Samples of key 2017 interviews conducted by VOA Persian included:  Senator Chris Murphy; Behnam Ben Taleblu, Iran analyst with the Foundation for Defense of Democracies; Ambassador Thomas Pickering, Brookings Institution; Anthony H. Cordesman, Strategy Chair, Center for Strategic and International Studies; Michael Pregent, Adjunct Fellow at Hudson Institute; and Ambassador Dennis Ross, counselor and William Davidson Distinguished Fellow, The Washington Institute for Near East Policy.

- VOA reaches 15.9 percent of adults (age 15+) in Iran at least once a week via a combination of satellite TV and digital platforms (based on July-October 2017 survey).  This is approximately 9.6 million people.  (VOA's daily audience was 6.3 percent, or 3.8 million people.)  This represents a 4 percent increase in VOA audience in Iran since 2015.
- The bulk of VOA's audience in Iran comes from satellite TV broadcasts.  More than 15 percent of Iranian adults (15.2 million people) watch one or more VOA TV programs on a weekly basis.  Four-and-a-half percent of adults (2.7 million people) access VOA content online weekly.  Most of those who consume VOA content online also watch VOA satellite television programs.
- Nearly 60 percent of VOA's weekly audience in Iran – almost six million people – says their understanding of current events is enhanced by VOA programming and 52 percent of VOA's audience in Iran says that VOA helps them understand U.S. foreign policy.
- In 2017, VOA Persian continued to focus on covering the U.S.-led coalition providing training and equipment to Peshmerga units in the Iraqi Kurdistan Region, to help them in their fight against ISIS and the battle in Mosul.  VOA Persian's correspondent hosted the weekly show "New Horizon," which focused on Operation Inherent Resolve.
- VOA Persian continued to expose the role that the Islamic Revolutionary Guard Corps play in supporting Hizballah units in Syria.
- VOA Persian provided in-depth broadcast and digital coverage of U.S. congressional hearings.
- VOA Persian conducted interviews with numerous experts on Saudi Arabia's support of the U.S.-led Defeat-ISIS Coalition.
- VOA Persian observed the 16th anniversary of the 9/11 terrorist attacks by hosting a panel discussion that featured Ronen Bergman, senior correspondent for Military and Intelligence Affairs for *Yedioth Ahronnoth;* and Thomas Sanderson, director of the Center for Strategic and International Studies' Transnational Threats Project.

RFE/RL's Radio Farda features newscasts at the top of the hour, followed by reports, interviews, and segments on youth, women, culture, economics, and politics.  Coverage in 2017 included:

PX210

- Reporting from Mosul and from Aleppo, Syria.
- *Taboo*, a radio and digital program that provided a forum to discuss such topics as religious extremism and identity.
- Comprehensive monitoring of human rights inside Iran.
- A Facebook page with more than two million followers.  Farda increased its social media engagement with audiences on digital media platforms that were not blocked in Iran.
- The Farda website attracted a monthly average of 12.5 million visits and 24.3 million pages views.  Approximately two-thirds of all traffic originates from inside Iran despite an official government ban on the website and the need for a proxy to access it.

## SOUTH and CENTRAL ASIA

VOA South and Central Asia Division (SCA) has been one of the most active divisions in its terrorism coverage around the world.  It covers Syria to Iraq, Turkey, Central Asia, and all of South Asia.  During 2017, the division provided news coverage of ISIS activities in Iraq, Syria, Turkey, and the South and Central Asia regions, and U.S. policies and activities to address the threat.  Broadcasts spanned radio, television, online, and social media.

**Afghan Service:**  VOA Afghan devoted a significant amount of coverage across all broadcast platforms – TV, radio, web, and social media across all broadcast platforms – to President Trump's Strategy for Afghanistan, and the Afghan Government's efforts to curb terrorist activities.

VOA Afghan reporters were on the scene when ISIS fighters attacked the Shamshad TV station in Kabul.  The service interviewed key leaders including the country's acting Defense Secretary and provincial governors.  This was complemented by comment and analysis from U.S. military and NATO leaders, and other experts.

VOA Dari and VOA Pashto saw an increase in audience engagement as they carried the service's reporting on terrorism on its social media sites.  Short videos on the Shamshad attack generated more than 140,000 views on Facebook and hundreds of comments.

**The Pakistan/Afghanistan Border Region:**  VOA Deewa and RFE/RL Radio Mashaal broadcasts go directly to the Pakistan-Afghanistan border regions.

**VOA Deewa** broadcasts to millions of Pashtuns in the critical northwestern tribal and semi-tribal region of Pakistan, close to the Afghan border.  VOA Deewa's daily broadcasts are focused on engaging leading moderate voices, at-risk youth, and women.  In 2017, VOA Deewa extensively covered the expanding ISIS network in the Afghanistan-Pakistan border region, its global activities, and the digital caliphate of ISIS.  VOA Deewa covered the U.S.-sponsored Defeat-ISIS Coalition summit in Washington, DC.

VOA Deewa enhanced its daily women's show and began using an extra hour of time on Asia Sat 3.  The current two-hour women and youth daily *Radio on TV* show has optimized VOA's outreach to those groups.  VOA Deewa engaged U.S. members of Congress and covered ISIS

PX210

and terrorism-specific events with exclusive interviews with representatives from Washington-based think tanks and prominent moderate religious scholars.

**Urdu Service:**  VOA Urdu's coverage has concentrated on terrorism in Pakistan.  In 2017, the service provided comprehensive coverage of Pakistani military operations against terrorist groups.  Several high-profile interviews with Alice Wells, the Acting Special Representative for Afghanistan and Pakistan for the United States, U.S. members of Congress, and Pakistan and Afghanistan terrorism experts were conducted live on Urdu's newly launched TV show *View 36*, and on corresponding radio, web, and social media platforms.

**Bangla Service:**  A prime example of VOA Bangla's 2017 programming was the series *Extremism: Conflicts, Concerns & Consensus to Overcome*.  In this series, VOA Bangla looked closely at global to regional aspects of terrorism.  VOA Bangla examined the definition, scope, and extent of terrorism from various angles.

Following the arrest of an alleged Bangladeshi terrorism suspect in New York, VOA's Bangla Service broadcast several interview-based programs on Bangladeshi terrorists inside and outside Bangladesh and provided audiences with an opportunity to participate in VOA Bangla call-in shows.

**RFE/RL's Central Asian Services** engaged audiences with fact-based, objective reporting about events in the region.  RFE/RL is the only Western media outlet in Central Asia that has a significant reputation for credibility and that operates in all major Central Asian languages (Kazakh, Kyrgyz, Tajik, Turkmen, Uzbek, and Russian), with data showing that audiences find RFE/RL reporting trustworthy (i.e., Kazakhstan: 84.8 percent average (87 percent Kazakh; 82.6 percent Russian)).  Each language service has consistently reported on terrorism in the region.  In fiscal year 2017, RFE/RL launched two additional programs to engage audiences on this topic:

- **Not in Our Name:**  RFE/RL intends to offer an engaging and informative series of anti-terrorism video programs targeted primarily toward youth audiences in Kazakhstan, Kyrgyzstan, and Tajikistan.  RFE/RL will report on terrorist activities, facilitate discussions with youth, and then report on these discussions for youth to "hear it in their own words."  Using video from these in-person engagements, RFE/RL will produce a documentary, as well as short, popular social media-friendly videos and articles.  Reporting on the topic of terrorism and the dangers it poses to individuals, families, and society will increase local awareness of the issue.  The goal of the program is to provide people – especially youth aged 16-22 – with the knowledge and tools necessary to resist becoming affiliated with terrorist groups and activities.

- **Raise Your Voice:**  In September 2017, RFE/RL launched a *Raise Your Voice* project for Central Asia to engage social media audiences in a dialogue about terrorism-related world events.  The project will counter the terrorist narrative by engaging young people in Central Asia on popular social media platforms.  Social media community managers in each country will identify a topic or news event of interest for discussion, post related questions to social media, and actively encourage youth to "raise their voice on that topic."  Discussion topics will include breaking international or local news, such as

PX210

terrorist attacks in Europe or a woman in Dushanbe, Tajikistan, being attacked on the street for wearing western-style dress.  BBG will adapt *Raise Your Voice* to meet the needs in each country, incorporating multimedia (text, video, and audio).

**Kazakhstan:**  RFE/RL's bilingual Kazakh Service, Radio Azattyq, reports on stories that would receive little or no coverage from local media.  It provides a platform for audiences in Kazakhstan to engage and share ideas.  The Service focused primarily on digital distribution of reporting and digital TV programs.  The Service covered stories that were otherwise suppressed or did not receive widespread attention, such as recruitment and radicalization to violence of Kazakh youth in ISIS.

**Kyrgyz Republic:**  RFE/RL's Kyrgyz Service, Radio Azattyk, connects Kyrgyz society with informed reporting and debate on such topics as interethnic tolerance, minority rights, terrorism, and government corruption.  Sample weekly television programs include the political talk show *Inconvenient Questions* and the youth-oriented *Azattyk+*.

**Tajikistan:**  RFE/RL's Tajik Service, Radio Ozodi, provides professional news and information in a largely government-controlled media environment.  Ozodi is one of the most trusted media outlets in Tajikistan, connecting citizens with their political and civil society leaders to support greater pluralism and better governance.  The main advantages of the service are its access to important sources of information and that it raises sensitive and relevant issues.  The Service's coverage of Tajik youth who were killed while fighting for ISIS featured original interviews with their parents and shed light on ISIS for Tajik society and the government.

**Turkmenistan:**  RFE/RL's Turkmen Service, Radio Azatlyk, offers Turkmen-speaking audiences locally-sourced information about current affairs within their society.  It is the only international media broadcaster operating in Turkmenistan with original video reporting and photojournalism on breaking news, human rights and civil society, freedom of the press and expression, and reports on religious and ethnic minorities.

**Uzbekistan:**  VOA's Uzbek Service addressed growing ISIS recruitment in Central Asia with in-depth stories related to radicalization to violence among young males and females in Northern Afghanistan, the Kyrgyz Republic, Tajikistan, and Uzbekistan.  VOA Uzbek also covered ethnic and religious tolerance among different U.S. communities.  After a New York terrorist attack, the Service conducted exclusive interviews from Uzbek community leaders and religious figures from the United States.

RFE/RL's Uzbek Service is one of the few sources of reliable news and information for people in Uzbekistan.  The Service relies on constant innovation and a wide network of local sources to uncover news and engage with audiences.  It has thousands of contacts on Skype, Viber, WhatsApp, Telegram, and IMO who act as citizen journalists, sending news, photos, and videos from all corners of Uzbekistan.  Contacts also help verify information, since the Service is prevented from having a bureau in Tashkent.

In late 2015, RFE/RL launched an experimental wire service for Central Asia, to provide objective news to media outlets.  In 2017, the number of subscribers to the service exceeded

PX210

1,200 media professionals and outlets.  The service provided news in the Kazakh, Kyrgyz, Russian, Tajik, and Uzbek languages.

## EAST ASIA AND PACIFIC

**China:**  VOA delivered news, including coverage of religious and local issues affecting more than 23 million Chinese Muslims via satellite television, radio, internet, social media, and mobile channels in Cantonese, Mandarin, and Tibetan.  Coverage included Chinese government policies and treatment of ethnic Uighurs.

**Indonesia:**  VOA Indonesian broadcasts to the country with the largest Muslim population in the world.  It reaches more than 48 million people per week, which is about 28.4 percent of the adult population – a 33 percent increase from 2014.  In 2017, the Service increased reporting on Islam in America, giving context and insight to the freedoms of religion and speech in the United States.  VOA Indonesian continued to routinely cover terrorist threats in Indonesia as well as the Indonesian government's increased counterterrorism efforts.

**Thailand:**  VOA's Thai Service has 16 affiliate radio stations in every region in Thailand.  VOA Thai broadcast more than nine hours of news and information per week to its affiliates.  It also produced a weekly video report for placement with Thai News Network (a 24-hour news channel) and VOICE TV.  VOA Thai broadcast to south Thailand via three radio affiliates in Songkhla and Pattani province.  VOA Thai has also expanded its online platform, sharing its news and content on its website, Facebook, YouTube, and a mobile application.

**Radio Free Asia's Uighur** language service broadcast two hours daily, seven days a week.  It was the only international radio service providing impartial news and information in the Uighur language to the potential audience of more than 16 million Uighur Muslims in northwestern China and Central Eurasia.  Consistent with RFA's mandate, the Uighur service acted as a substitute for indigenous media reporting on local events in the region.  Its programs included breaking news, analysis, interviews, commentary, a weekly news review, and feature stories.

- RFA launched a web page devoted to the Uighur diaspora in the west, *Between Identity and Integration*.  The page charted ethnic Uighur migration since 1949, with interviews, research, and multimedia content.
- The Uighur Service first reported on Chinese authorities in Xinjiang ordering local residents to attend a weekly patriotic flag-raising ceremony and sing the Chinese national anthem, in addition to further controls imposed during the holy month of Ramadan, when officials restricted Uighurs from attending prayers at mosques and observing religious practices.

**Radio Free Asia's BenarNews** is an RFA-affiliated news portal for Muslim populations in Bangladesh, Indonesia, Malaysia, the Philippines, and Thailand, who are exposed to terrorist narratives.  BenarNews counters those narratives by publishing credible domestic news, features, analysis, and commentary in multiple formats and languages, including Bahasa Indonesia, Bahasa Malaysia, Bengali, English, and Thai.

PX210

In May 2017, BenarNews launched coverage of the Philippines, particularly the southern region. Weeks later, ISIS-linked militants took over the southern city of Marawi.  BenarNews provided extensive coverage during the five-month battle that ensued.  BenarNews reporters were among the first allowed back into Marawi after the Philippine military liberated the city in October.

BenarNews helped give voice to Rohingya refugees in Bangladesh.  More than 700,000 fled persecution in Myanmar in 2017; terrorist groups like al-Qa'ida exploited their suffering in recruitment propaganda.

## EUROPE AND EURASIA

**The Russian Federation and Ukraine:**  In February 2017, the BBG officially launched the Current Time TV and digital network providing Russian speakers globally with access to balanced, accurate, topical, and trustworthy information.  Led by RFE/RL in cooperation with VOA, Current Time TV provides viewers with informed and up-close coverage of major news and events that are not reported, or are misreported, elsewhere.

In fiscal year 2017, Current Time went from providing one hour of daily TV programming to a full-fledged 24/7 channel stream.  One year ago, the full Current Time stream was carried by 26 distributors in 11 countries.  At year's end, the channel was carried by 76 distributors in 17 countries.  In addition to its TV operation, Current Time Digital engages audiences with its content via social media.  Current Time is active on multiple social platforms, including Facebook, YouTube, VKontakte, Twitter, Instagram, Odnoklassniki, and Telegram.  Current Time Digital doubled total video views on digital platforms in 2017, with well over 300 million views – half of them from inside Russia.

As part of Current Time's "Behind the Scenes" program, RFE/RL journalist Shahida Yakub went to Kabul, Jalalabad, and the remote northern regions outside Mazar-e Sharif, where she spoke to local police and self-organized militias who have found themselves fighting off attacks by both ISIS and the Taliban.

VOA's Russian and Ukrainian Services regularly addressed terrorism-related issues and threats in Europe and the United States, and other areas of interest to the target audience.

VOA Russian Service reporter Roman Mamonov provided exclusive and comprehensive coverage of the October 2017 terrorist attack on a New York City bicycle trail, with live, on-the-scene reports on the *Current Time* network and Facebook.  VOA's reports, news updates, and interviews with eyewitnesses garnered more than 100,000 views on Facebook.  VOA Russian reporters also visited Uzbek communities in New York and Los Angeles whose members denounced the Uzbek-born terrorist who allegedly carried out the attack.

In 2017, VOA Russian journalists produced more than 250 original reports and exclusive interviews focusing on U.S.-led counterterrorism efforts and terrorism-related threats to U.S. national security.  These stories were often picked up by Russian-language media outlets and discussed in social media forums.

PX210

**South Caucasus:**  VOA's Georgian Service continued to provide extensive coverage of developments in Georgia's Pankisi Gorge Region.  In a series of reports distributed online and through social media, the Georgian Service examined ISIS's propaganda and recruiting efforts and interviewed members of the local community who exposed ISIS's efforts of luring young Georgian recruits with fraudulent promises of jobs and a better life.

**Azerbaijani Service:**  VOA Azerbaijani continued its coverage of issues relating to religious radicalism and efforts to counter terrorism by interviewing current and former officials, as well as political experts and civil society activists.  VOA Azerbaijani closely monitored the political trials of individuals accused of being involved in terrorist activities and sought to inform the public.

**The Balkans:**  During 2017, VOA's Balkan services provided comprehensive and accurate coverage regarding U.S. and Defeat-ISIS Coalition operations.  VOA's coverage, reaching more than 4.7 million adults weekly across broadcast and digital platforms, focused on terrorist recruitment of young Muslims; actions taken by local law enforcement against ISIS fighters who returned home; and weapons from the Balkans, which had made it to the hands of ISIS fighters and terrorist attackers in Europe.  VOA's Bosnian and Albanian services produced documentary series on the radicalization to violence of traditionally secular Muslims and measures taken by local governments to fight terrorism.  VOA Bosnian's documentary series, *Salafis in Bosnia*, prepared by Aldin Arnautovic, was aired on a number of TV stations throughout the Balkans. The series was also published on Facebook, where it was viewed more than 1.6 million times.

VOA's Albanian Service's documentary series included exclusive interviews with Liridon Kabashi and Albert Berisha, returned terrorist fighters from Syria.  They revealed the false nature of ISIS propaganda and its utopian promises to those who traveled abroad to join ISIS, as well as the group's brutality.  Both are now part of an initiative to set up a charity persuading potential ISIS recruits not to leave and help those that return to re-integrate into society.  In June 2017, the VOA Albanian documentary, *Kosovo Foreign Fighters*, was aired during primetime on the influential national TV21.  The top Muslim religious leaders, Kosovo and Bosnian muftis, were interviewed by VOA Albanian and Bosnian.  VOA Bosnian Service also partnered with the Balkan Investigative Reporters Network to co-produce a series of TV reports concerning problems of corruption and rule of law in Bosnia.  One report in the series focused on problems of radicalization to violence in Bosnian prisons.

Additionally, in FY 2017, the Service launched a new title:

- **#notinmyname:**  In September, RFE/RL's Balkan Service launched a rubric for Kosovo and Bosnia to counter terrorism by engaging young people in dialogue on popular social media platforms.  Social media community managers in each country identified topics or news event of interest for discussion, posted related questions to social media, and actively encouraged youth to "raise their voice on that topic."  Discussion topics were drawn from either breaking international or local news, such as terrorist attacks in Europe or families devastated by ISIS.

PX210

**Tatarstan/Bashkortostan and North Caucasus:** The Tatar and Bashkir communities are the two largest Muslim communities in Russia. RFE/RL's Tatar/Bashkir Service was the only major international media organization that produced content in both languages.

Broadcasting in Chechen and Russian, RFE/RL's North Caucasus Service reports news in a region where media freedom and journalists remain under severe threat, and offers audiences reporting and analysis of the insurgency in Chechnya and Dagestan.

In both markets, RFE/RL also operated regional websites in the Russian language to expand audience reach and target areas. These efforts complement the Services' continuing reporting in the Bashkir, Chechen, and Tatar languages while extending their reach to new audiences.

**Turkish Service:** VOA Turkish coverage of counterterrorism and ISIS operations in Turkey, Europe, and the Middle East continued in 2017. The VOA Turkish Service maintained a strong presence on Turkish television and the internet and is the only foreign broadcaster directly broadcasting on Turkish TV stations, with reporters providing live coverage from the United States on-demand.

VOA Turkish has assumed the role of a reliable news agency for digital and print media. The Turkish Service's Facebook live reports achieved record high audience gains during international and domestic coverage of terrorist attacks and counterterrorism efforts. Many Turkish media outlets have been using VOA Turkish's exclusive live coverage with full attribution.

VOA Turkish produces 2.5 hours of weekly news and a 30-minute weekly magazine show for TGRT Haber TV Channel, a 24-hour nationwide network with a weekly audience share of over 30 percent of Turkey's estimated 25 million regular viewers. VOA Turkish also produces 2.5 hours weekly of "Studio Washington" for Ege TURK TV with an additional 7.5 hours of repeats. "Studio Washington" is a 30-minute program that includes news, interviews, a U.S. press opinion roundup, and health, science, technology, and lifestyle features.

## AFRICA

**Hausa:** VOA's Hausa Service challenged the terrorist ideology of Boko Haram across the Lake Chad Basin with daily multimedia news programming, interactive call-in shows, town hall meetings, and exclusive digital content. In 2017, VOA produced *Boko Haram: Journey from Evil*, a 60-minute television documentary showing the group's brutality in video shot by the terrorists themselves while also presenting the counter-narrative of four women who stood-up to the violence. Those women include an organizer of the Bring Back Our (Chibok) Girls group, a photographer with positive images from Maiduguri, a psychiatrist working to rehabilitate Boko Haram fighters, and a Sambisa Forest hunter who is tracking the terrorists. Produced in cooperation with Creative Associates and the U.S. Agency for International Development, the film premiered at Washington's U.S. Institute of Peace and London's Chatham House before it was shown in full or in parts at public screenings in 13 cities in Nigeria and Niger, as well as on more than 40 broadcast and digital partners in English, Hausa, and French, in Cameroon, Chad, Niger, and Nigeria. Leaders of Nigeria's most-populous Muslim state, Kano, are showing the VOA production as part of a campaign to counter violent extremism in more than 900 public

PX210

schools.  The film continues to drive online traffic to the original VOA TV production *Boko Haram: Terror Unmasked*, which has more than 18 million video views in English, French, Hausa, Khmer, Pashto, Persian, Russian, Somali, Swahili, and Urdu.

Offering an alternative to terrorist violence by highlighting stories of entrepreneurial opportunity, VOA Hausa produced a video profile of 14-year-old self-taught cobbler Zainab Mu'azu.  At a time when many girls in Northern Nigeria are street hawkers, Mu'azu's small business produces 20 pairs of shoes a day.  The video reached more than 1.6 million people and helped raise donations for Mu'azu to expand her business.

Former Boko Haram fighter Bana Umar says international radio helped convince him to escape.  "I listened to these radio stations frequently to the extent that when I lay down to sleep I would be thinking of what I heard.  I realized that all our activities were evil," he told VOA Hausa at a military debriefing camp in Maiduguri.  "We killed.  We stole.  We dispossessed people of their properties in the name of religion.  But what we are doing is not religion.  Finally I got fed up with the group."

**Somali Service:**  VOA Somali broadcast live the election of a new president, Somali-American Mohamed Abdullahi Farmajo, who promised to redouble efforts to build a national army capable of taking over from AMISOM.

On October 14, when a vehicle-borne improvised explosive device exploded at a major traffic crossing in Mogadishu, killing more than 500 people and injuring approximately 300 more, VOA went live with on-the-scene reporting.  VOA helped put a face to the toll of the terrorist violence by profiling victim Maryan Abdullahi Gedi, a medical student killed while shopping for her graduation gown.  Her father was traveling from London to attend her graduation.  Instead, he attended her funeral.

Mohamed Dhere escaped from al-Shabaab when his commander sent him on a training mission.  He was profiled as part of a VOA special report on rehabilitating al-Shabaab fighters.  "There are clerics who give awareness lectures and hold debates about Islam and extremism," explains Reintegration Director Abdirashid Ibrahim Mohamed.  "Normally, when these youngsters defect from al-Shabaab, they already know what they were involved in is wrong, and they come to us to save themselves."

Forced al-Shabaab recruitment in the southwestern Bay and Bakool regions drove hundreds of boys into Baidoa, where VOA broadcast appeals from local lawmaker Abdishakur Yaqub Ibrahim who says militant leaders told local elders that "if a family has two sons, they will draft one as a militant.  If they have three, they will take two of them.  They are saying they will educate the children, but they are going to turn them into bombs."

**French to Africa:**  VOA's French-to-Africa Service broadcast to Muslims throughout Francophone Africa online, on television, and on 24/7 FM broadcasts in Abidjan, Bamako, Bangui, Dakar, Goma, Lubumbashi, Ndjamena, Niamey, and Ouagadougou.

VOA reporters were the first to interview the mayor of the Nigerien town where four U.S. Green

266

PX210

Berets were killed in an ambush.  Exclusive VOA reporting was picked up by many American news outlets including The Washington Post, MSNBC, and Buzzfeed.

**Swahili Service:**  VOA's Swahili Service broadcast to large Muslim populations in Kenya and Tanzania, and to smaller Muslim communities in Burundi, Rwanda, and Uganda.  VOA Swahili produced a series of multimedia reports from Mombasa about efforts to educate girls about the dangers of radicalization to violence through marriage.

---

**The VOA News Center** expanded its terrorism coverage with innovative multimedia projects that focused on the global effort to defeat ISIS in addition to comprehensive daily coverage of related news developments in Washington and around the world.  A collaboration with the Africa division produced a documentary and multimedia project that showed Boko Haram's devastating impact on Nigerians.

**Multimedia Projects:**  Middle East Correspondent Heather Murdock presented her extensive multimedia coverage of the battle to reclaim Mosul from ISIS in *Mosul is Falling/Mosul: What's Next After IS*, detailing through first-person accounts, frontline videos, and analysis of the crucial fight to oust ISIS from its Iraqi stronghold and the formidable challenges to keep terrorism from taking hold once again.

**Boko Haram documentary:**  The Boko Haram project is an ongoing collaboration between the News Center and the Africa Division.  Journalists have produced compelling content by taking 18 hours of Boko Haram footage and combining it with additional reporting using VOA resources around the world to tell in-depth stories about the group and its victims.

**Afghanistan/Pakistan:**  Correspondent Ayesha Tanzeem reported from remote areas of Afghanistan and Pakistan in late 2017, filing a series of multimedia reports tracking how terrorism and war are shaping communities and how local governments are responding.  From an Afghan village coping with the aftermath of forcing out ISIS fighters to widows in Herat to grieving family members killed while fighting in Syria, her stories highlight how vulnerable communities are coping with terrorism.  Reporter Ayaz Gul in Islamabad also covered the region's struggle with terrorist attacks and political jockeying by terrorist organizations.

**Iraq/Syria:**  Heather Murdock traveled extensively through northern Iraq and parts of Syria in 2017, with incisive on-the-ground reporting featuring the people directly affected by ongoing violence.  Dorian Jones in Istanbul covered Turkey's volatile entry into the conflict and rising tensions with Syrian Kurds.

**Europe:** Correspondent Luis Ramirez and reporters Henry Ridgwell and Jamie Dettmer filed multimedia reports from Brussels, London, Rome, and elsewhere in Europe on how countries are responding to ISIS attacks.  Stories explored de-radicalization efforts, outreach to local Muslims, and tightened security.

---

## VISAS FOR PARTICIPANTS IN UNITED STATES PROGRAMS

PX210

The U.S. Department of State's Bureau of Consular Affairs' current visa policies and procedures have two fundamental missions:  protecting national security by helping secure U.S. borders against actual or potential threats, while at the same time facilitating legitimate travel and international exchange.  Focusing on these two fundamental missions ensures timely adjudications of visa applications for individuals to participate in exchange visitor programs while at the same time protecting our nation's borders.

It is the Bureau of Consular Affairs' policy to facilitate and make a priority visa interviews for all student and exchange visitors for them to arrive in the United States by their program start dates, provided they qualify under the law for the visa.  During the interview process, all applicants are screened through a robust, interagency vetting system drawing on both biographic and biometric data elements.  This policy is in place at every embassy and consulate worldwide where nonimmigrant visas are processed.

In countries with significant visa interview wait-times, due to high demand, this policy may reduce wait times for students and exchange visitors from weeks to days.  Applications may require additional administrative processing after the interview.  Because of this, program sponsors and applicants should coordinate to initiate visa applications well in advance of their planned travel.  We would advise applicants to obtain passports immediately and visit travel.state.gov for instructions on applying for U.S. visas.

## BASIC EDUCATION IN MUSLIM COUNTRIES

In Fiscal Year (FY) 2017, USAID allocated US $384,234 million for basic education in countries with large Muslim populations.  Approximate amounts for each region were:

- **Asia:**  US $34 million was allocated to Bangladesh, Indonesia, the Kyrgyz Republic, Philippines (Mindanao), and Tajikistan.  An additional US $94 million was allocated to Afghanistan and Pakistan.
- **Europe and Eurasia:**  USAID has ongoing basic education activities in Kosovo, although there were no FY 2017 funds allocated.
- **Middle East and North Africa:**  US $125 million was allocated to Egypt, Jordan, Lebanon, Morocco, the West Bank and Gaza, and Yemen (however, the Administration has placed all funding to Palestinians on hold pending an interagency review and the WBG Mission has yet to receive any of its FY 2017 funds).
- **Sub-Saharan Africa:**  US $129 million was allocated to Djibouti, Ethiopia, Kenya, Mali, Nigeria, Senegal, Somalia, and Tanzania, and on regional programs.

### ASIA

**Afghanistan:**  USAID/Afghanistan continued to improve access to and quality of education, emphasizing early grade reading.  The "Afghan Children Read" program developed, distributed, and tested early grade reading materials in Dari and Pashto to 68,228 students and 1,414 teachers in grades 1 and 2 at pilot schools in Herat and Kabul.  United States assistance is part of a multi-donor collaborative effort to implement the "Increasing Access to Basic Education and

PX210

Gender Equality" program.  More than 1,600 community-based education teachers who teach more than 170,000 children received training.  USAID's support to UNICEF resulted in nearly 94,000 student enrollments – about half of which were girls – and supported the production and distribution of more than 72,000 teaching and learning materials.  The Global Partnership for Education enrolled an additional 42,004 students in community-based schools.  Through the "Education Quality Improvement Project," a World Bank-managed Afghanistan Reconstruction Trust Fund program, USAID and other donors funded a teacher-training program for nearly 71,000 teachers to improve education through better classroom instruction.  The "Strengthening Education in Afghanistan" program helped prepare girls in 300 secondary schools to improve their learning achievements.  The students received tutorials and other related support to help them prepare for the Kankor examination, a test required for admission to public universities.  Additionally, USAID distributed 197 tablets and 900 solar panels to public schools to support exam preparation.

**Bangladesh:**  The USAID/Bangladesh basic education program aimed to increase access to education and improve reading skills for children in lower primary grades.  Several programs assisted with this goal.  The "Innovation for Improving Early Grade Reading" program opened 1,000 new schools reaching 27,301 out-of-school youth; approximately half were girls in urban slums.  The "Reading Enhancement for Advancing Development" program expanded its literacy interventions to 2,949 government primary schools in all seven of Bangladesh's states.  The program trained 3,912 teachers and provided approximately 1.5 million individuals with teaching and learning materials.  One major accomplishment of USAID's literacy activities in Bangladesh was the creation of 2,201 classroom libraries, each with 155 approved supplementary reading materials to complement the national textbook.  USAID also continued supporting *Sisimpur*, the early childhood development program that is Bangladesh's version of *Sesame Street*.  Through the development and broadcasting of 26 episodes in FY 2017, the program shared pre-reading skill lessons with more than 12 million viewers.

**Indonesia:**  USAID/Indonesia completed the "Prioritizing Reform, Innovation, and Opportunities for Reaching Indonesia's Teachers, Administrators, and Students" initiative with notable achievements.  These include a cadre of 3,833 district facilitators ready to conduct training in teaching-and-learning and school-based management, community participation in school-management oversight, and training in participatory and accountable school management for more than 1,585 school supervisors, principals, community members, and teachers.  More than 44,300 educators in 11,668 non-partner schools received best practices in improved teaching methods and school governance, leveraging more than US $2.1 million in Government of Indonesia funding.  The Ministry of Education and Culture selected nine districts to promote a culture of reading, and local government and technical ministries replicated the project's good practices using their own funds by training 44,332 educators from 11,668 non-project schools in 2017.  Approximately US $2.1 million of local funds were spent to replicate USAID's investment to the benefit of 2.8 million students.

**Kyrgyz Republic:**  The USAID/Kyrgyzstan basic education program "Quality Reading Project" continued to focus on improving reading skills for children.  USAID developed reading standards and in-service training materials to train and officially certify 10,166 educators.  An additional 23 teachers from two Schools for the Blind and Visually Impaired received training on

PX210

reading instruction and adaptive technologies and materials.  Donations were made of more than 419,000 books to primary schools, children's libraries, and students.

The U.S. Embassy's Public Affairs Section also expanded equitable and inclusive education services through the "Book Translation Program," which translated, printed, and distributed children's literature.  These books illustrated key American values such as tolerance, diversity, inclusion, and the empowerment of women, girls, and disadvantaged groups.  Several Democracy Commission small grants supported basic education, including a grant to increase school access for disabled students.  A Democracy Commission grantee created a Kyrgyz speech synthesizer for Windows and Android platforms, thereby ensuring students' access to secondary and special education in their mother tongue.

**Pakistan:**  USAID/Pakistan supported building and rehabilitating infrastructure and improving the quality of education in several areas of the country.  Programs like the multi-sectoral infrastructure program "Khyber Pakhtunkhwa Reconstruction Program" resulted in the completion of four schools, while the government-to-government "Sindh Basic Education Program School Construction Component" resulted in 30 schools.  Two hundred forty schools were rehabilitated in the Federally Administered Tribal Areas (FATA) and Khyber Pakhtunkhwa (KP) grant to UNICEF for the "Pakistan Safer Schools Program."  This grant provided assistance to 199 schools in targeted districts of Balochistan, Sindh, and KP.  The USAID Office of Transition Initiatives' "School Rehabilitation" program rehabilitated 223 schools in the FATA and KP, and its reading program created and distributed more than 5,200,000 teaching and learning materials to students and teachers in Sindhi, Urdu, and English.  Thirty-four thousand teachers had training in instructional techniques that have effectively boosted the reading skills of more than 1,300,000 children.

**Philippines:**  USAID/Philippines focused on education service delivery and early-grade reading by bolstering the capacity of educators and administrators, education governance, and community engagement.  The Philippines program increased reading activities at an additional 1,700 schools, expanding outreach to more than one million primary students receiving reading interventions.  USAID also provided 627,615 units of teaching and learning materials. Five thousand six primary school classrooms received a complete set of essential reading instructional materials.  More than 21,281 primary school educators and 5,300 local authorities and school administrators received training to improve their understanding of evidence-based reading instruction.

The "Education Governance Effectiveness" program focused on local government, local school boards, and school governing councils to strengthen fiscal management, transparency, and accountability for education.  It trained 2,528 Parent-Teacher Associations and community-based school governance structures while delivering 94,090 textbooks and other teaching and learning materials to 1,804 classrooms.

The "Mindanao Youth for Development" program provided youth susceptible to violent extremism in Mindanao with access to educational opportunities through the Department of Education's Alternative Learning Systems.  The program offered pathways for out-of-school

270

PX210

youth to gain equivalency certification or re-enter the formal school system.  The program trained 6,987 youth in social, life, and leadership skills.

In addition, a USAID and U.S. Peace Corps project engaged youth in a weeklong, life skills training and leadership session, and trained teachers to improve youth management strategies and teaching practices.

In its final year of post-Typhoon Haiyan reconstruction work, the "Rebuild" program built and equipped 164 disaster-resilient classrooms at 25 primary and secondary schools in Leyte province.  These classrooms are capable of withstanding winds of up to 224 miles per hour and an 8.5 magnitude earthquake.  In total, 24,040 students in primary and secondary schools benefited from the classrooms.

**Tajikistan:**  USAID/Tajikistan supported education programs by supporting revisions of obsolete Soviet training practices.  The "Quality Reading Project" closed out its interventions at the end of FY 2017.  This project reached more 65 percent of primary schools nationwide (462,000 students and 17,608 teachers in more than 1,800 schools).  An Early Grade Reading Assessment conducted in 2017 demonstrated that grade 4 reading comprehension increased by 19.1 percent more than the 2014 baseline for Tajik students and by 37.4 percent more than the baseline for Russian students for the national sample.  On July 31, 2017, USAID and the Ministry of Education signed a Memorandum of Understanding to reaffirm the commitment to partnership and investment in the primary education sector through direct programming.  As a result, four national-level working groups were established to engage on professional development for teachers; assessment, innovations and public private partnerships; and provision of age-appropriate, curriculum-aligned reading materials.

A Multi-Input Area Development Financing Facility for Tajikistan partnership with the Aga Khan Foundation implemented an approach called "Relevance Pedagogy" in select schools. Education interventions in 48 schools provided mentoring for more than 1,000 teachers and 141 administrators, benefiting more than 12,000 learners.

## EUROPE AND EURASIA

**Kosovo:**  USAID/Kosovo was not allocated basic education funding in the FY 2017.  It implemented activities with prior year funds.  These included a Basic Education Program to develop twenty-first century skills for children in primary school grades 1-9; assisting Kosovo education institutions to undertake reforms such as decentralizing the Municipal Education Directorates, improving the quality of teaching and learning outcomes of primary school students, and improving teacher professional development through school-based training.

## MIDDLE EAST

**Egypt:**  USAID/Egypt awarded three new programs ranging from adult literacy and community education to technical support to the Ministry of Education, Professional Academy of Teachers, and Early Grade Learning Unit.  USAID continued its support to Egypt's network of Science, Technology, Engineering, and Math (STEM) high schools, expanding its presence to 11 schools

PX210

in nine governorates, providing equal learning opportunities for 1,292 boys and 1,049 girls. STEM schools participated in international science fairs in the United States and Taiwan and won several awards. One hundred fourteen boys and 64 girls graduated and continued their studies at top-ranked public and private universities in Egypt, Germany, Japan, and the United States.

In support of the government's effort to end illiteracy, USAID/Egypt awarded a four-year literacy program in March 2017. The implementing partner signed a Protocol of Cooperation and formalized a plan with the Adult Education Authority to guide implementation over the next four years. Two major awards were signed at the end of FY 2017 to further support to children in early grades. The first is a US $15 million four-year government-to-government partnership that seeks to enhance the quality of education in primary and middle schools nationwide through improving teaching and learning in grades 1-3. The second, a US $3 million task order for technical assistance, will provide the Ministry of Education with technical capacity to plan and successfully implement the partnership.

**Jordan:** USAID/Jordan improved the quality of basic education for children in Jordan and ensured equitable access to public schooling. In 2016-2017, the Ministry of Education saw the enrollment of more than 126,000 Syrian children in the public school system, further straining the government's strapped resources. USAID supported a multi-donor pooled funding mechanism to support the enrollment of 126,097 Syrian children in formal education and 1,262 previously unenrolled students in a "catch up" program. In addition, 28 non-formal education centers for out-of-school Jordanian and Syrian youth were established and equipped.

USAID revised, printed, and distributed 95,752 teacher guides for early grade reading and mathematics and trained 11,432 educators on teaching techniques and standards, provided more than 64,000 coaching sessions for trained teachers, established 914 community-reading groups, and held competitions via social media to encourage parents and teachers to read to children. USAID/Jordan has multiple, ongoing school infrastructure activities that expand, renovate, and build schools.

**Lebanon:** USAID/Lebanon improved the quality of and access to basic education. The program "Quality Instruction Towards Access and Basic Education Improvement" attempts to improve Arabic reading outcomes for public school students in grades 1-4 delivered more than 62,000 Arabic books, established 492 classroom libraries in 117 public schools, provided 359 packs of educational materials to 59 schools, and installed 2,442 sets of classroom technology equipment in 260 schools. It also installed 400 technology resource rooms in 300 public schools and trained teachers to use the technology. As per the international community's pledge to support Lebanon within the context of the Syria refugee crisis, USAID/Lebanon covered the school fees of a total of 110,976 students – 27,532 of whom were non-Lebanese – through UNICEF's Access Program and Retention Support Program. It also provided 18,800 vulnerable students, who were struggling academically, with remedial and homework support activities.

USAID continued to fund the Research4Results two-year grant in partnership with the United Kingdom's Department for International Development and the World Bank to support

PX210

education research in Lebanon.  The research sought to address the issues of school retention, school dropouts, community engagement, and learning measurements, especially in relation to vulnerable Syrian refugees.

**Morocco:**  USAID/Morocco continued its program to improve students' reading skills.  The "Reading for Success" project focused on gender equity, inclusiveness, and capacity development, and experimented with the first "Summer School" to reduce summer learning loss among early graders.  The program "Reading for Success – Improving Deaf Children's Reading through Technology" refined computer software to produce reading materials for deaf and hard of hearing children in grades 1-3.  The program's most significant change was the Ministry of Education's registration of deaf students in the official school system to grant them the primary education certificate and ability to obtain secondary education.  This program also resulted in the Government of Morocco's creation of an office dedicated to inclusive education.  Additionally, "Reading for Success – Human and Institutional Capacity Development" – in partnership with the Millennium Challenge Corporation – completed a study on the institutional and human resources of the Ministry of Education.

**Syria:**  Both USAID and the Department of State's Bureau of Near East Affairs (NEA) programs provided basic education programming in Syria.  USAID supported light refurbishment of facilities, training, workshops, short-term technical assistance to education directorates, community-based organization capacity building, youth mapping, and assessments.  The Department of State (NEA) established child centers throughout Raqqa that provided psychosocial support and remedial literacy and numeracy to vulnerable children.  The centers' personnel worked with grassroots organizations and the Raqqa Civil Council Education Committee to provide light rehabilitation to schools, psychosocial support training to teachers, build the capacity of education committees and local education providers, and conduct educational surveys to better assess academic needs.  NEA provided education services for children and youth in the northwest in close coordination with other international donors.

**West Bank and Gaza:**  USAID/West Bank and Gaza focused on infrastructure, teacher development, and schools in East Jerusalem and the West Bank.  With USAID support, the "Palestinian Community Infrastructure Development Program" constructed and furnished a three-floor building expansion, including classrooms, science and computer labs, staff and administration rooms, a counselor's office, handicap-accessible bathroom facility, ramps, and a small kindergarten.  In addition, Braille signage was set up in a marginalized area in the West Bank.  The school's total student capacity has increased by about 42 percent, from 170 to 240.

The "School Support Project" supplied 45 school libraries with 50 computers, 45 science labs, internet connectivity, and books.  The project also offered expanded youth extracurricular activities during and after school hours.  More than US $1 million was leveraged from the Joint Financing Partners for teacher training activities.  The "Leadership and Teacher Development Project" provided internet connectivity and equipment to 151 schools and technical expertise to improve classroom assessment policy and plan for management restructuring and decentralization.  The Masters of Arts in Teaching enabled nine in-service teachers to receive a joint degree offered by Bard College and Al-Quds University.

PX210

**Yemen:**  USAID/Yemen helps to stabilize communities while ensuring that children have access to safe classrooms or remedial education opportunities.  USAID supported UNICEF through a Public Institution Organization grant to refurbish schools and school bathrooms, support a Back-to-School campaign, provide recreation kits for psychosocial support, and provide teachers with training to identify children suffering from post-traumatic stress disorder.  In addition, a "Self-Learning Program" was developed and provided to children to guide their own learning when school is cancelled.  The program reached more than 600,000 youths and more than 160,000 students benefited from school refurbishment and rehabilitation.  Additionally, more than 30,000 children received counseling to learn to cope with the trauma of war and to focus on learning.

## SUB-SAHARAN AFRICA

**Djibouti:**  USAID/Djibouti focused its activities on designing a new early-grade reading program.  USAID/Djibouti completed several reading analyses to inform the development of the program.

**Ethiopia:**  USAID/Ethiopia implemented the "Reading for Ethiopia's Achievement Developed (READ)" Technical Assistance Project.  In coordination with the Ethiopian Ministry of Education, results of the project included the revision of Ethiopia's primary-level English curriculum, training of 47,767 teachers, distribution of more than 1.9 million textbooks and supplementary reading materials, and the establishment of 10,582 reading spaces.  In addition, teachers in Dolo Ado and Jigjiga refugee camps received training in collaboration with the Administration for Refugee and Returnee Affairs.

**Kenya:**  USAID/Kenya supported reading and youth development activities.  The "All Children Reading *Tusome*" program aims to improve early grade reading comprehension.  Tusome reached 3,363,687 pupils and 77,478 teachers in 23,890 schools with interventions that will define how Kenyan children learn to read for decades to come.  Tusome also delivered 5,398,194textbooks and learning materials for a textbook to student ratio of one to one, a notable benchmark for the continent.  The program also integrated Information and Communication Technology to operationalize Kenya's Education Management Information System via a national training platform.

USAID/Kenya also used the President's Emergency Plan for AIDS Relief funds to provide scholarships and leadership training to Kenyan orphans and vulnerable children mired in extreme poverty.  The "Wings to Fly" program mobilized the resources of a local financial institution and engaged other development partners in a Global Development Alliance to help 2,495 children access secondary education and mentoring, counseling, leadership development, and career guidance.  Similarly, the "Global Give Back Circle" program partnered with 30 private sector entities to support an employment transition program for 428 disadvantaged girls and boys with scholarships, mentoring, life skills, internships, and job placements.

The "Kenya Youth Employment and Skills" program targeted out-of-school youth aged 18 to 35 who have not completed high school, resulting in 16,309 youth gaining new or better

PX210

employment.  USAID/Kenya also continued to implement the "Young African Leaders Initiative," which builds skills, assets, and competencies for leadership in business and entrepreneurship, civic leadership, and public management for youth age 18 to 35, resulting in 733 young leaders – 48 percent of which are women –completing the program.

**Mali:**  USAID/Mali addressed violence and insecurity from terrorist groups, which led to the closing of 500 schools in conflict-affected regions.  The "Selected Integrated Reading Program" benefitted 134,296 learners, provided reading kits to 3,595 schools and trained 10,661 teachers and school directors on balanced literacy.  The program also trained 7,503 parents to use the "Does my child know how to read and write?" booklet.  The "Equitable Access to Quality Education for Children in Conflict-Affected Regions" project enrolled 417,611 children in accelerated learning programs.  USAID launched two new activities to support deaf and blind children:  the "Inclusion of Deaf and Blind Children in Mainstream Schools" project, and the "Inclusive Education for Visually Impaired Primary School Children" project in Bamako, Gao, Koulikoro, and Segou.

**Nigeria:**  USAID/Nigeria continued to improve reading outcomes for primary-school-age children and increase access to education.  The "Northern Education Initiative," which operates in the northern states of Sokoto and Bauchi, printed and distributed more than two million Hausa language student textbooks and teaching manuals to train more than 12,000 teachers and instruct nearly 400,000 primary school children.  The "Education Crisis Response" program supported the needs of internally displaced children in the northeastern states of Adamawa, Bauchi, Borno, Gombe.  The children learned basic literacy, numeracy, and life skills.  In addition, displaced children were offered psychosocial services to help them cope with post-traumatic stress.  The program funded 746 non-formal learning centers, including 387 co-educational centers and seven centers for people living with disabilities.  This reached a total of 80,341 beneficiaries.

**Senegal:**  USAID/Senegal supported reading for early grades through the "Reading for All" program.  The program initiated development of the materials that improved reading in subsequent years of the program.  Students' classroom tools and take-home reading material were developed and validated in the three national languages:  Wolof, Pulaar, and Serer.  Teacher guides and training modules were developed and printed in each of the three languages for the start of school in October 2017.  The "Our Sisters Read" program mobilized communities in the region of Fatick to improve girls' success in education and in the foundational subject of reading.  The program awarded scholarships to 139 elementary students who were in danger of dropping out of school and supported two mobile libraries that reached more than 9,000 children.  USAID also worked with several host country institutions to carry out a national study of out-of-school children and youth.

**Somalia:**  USAID/Somalia supported the provision of education in a country where three million children are out-of-school.  Al-Shabaab has increasingly focused its recruitment efforts on children under 15, launching an alternative school curriculum in April 2017 and actively recruiting in Gedo and Middle Shabelle.  USAID funded a five-year, US $10 million "Alternative Basic Education" program supporting non-formal education that supported 16,000 students in the regions of Bakool, Gedo, and Bay which were acutely affected by the recent drought and where children are particularly vulnerable to al-Shabaab recruitment efforts.

PX210

Interventions included the creation of safe and sustainable learning spaces, distribution of teaching and learning materials, and training of 371 community teachers.

**Tanzania:** USAID/Tanzania worked closely with the Government of Tanzania to embed activities within government structures.  The "Let's Read Together" – "Tusome Pamoja" program made significant gains during its second year of implementation, reaching 552,764 and 12,722 students in the four mainland regions and the islands of Unguja and Pemba in Zanzibar.  Collaborating closely with the Tanzania Institute of Education, approximately one million teacher and student teaching and learning materials were printed and distributed in FY 2017, and two sets of professional development programs began for more than 1,000 teachers.

The "Let Them Learn" (*Waache Wasome*) program, which aims to address discriminatory gender norms and practices, started in six pilot schools.  During this inception phase, USAID reached 1,923 students through "Protect Our Youth" clubs, which were designed to serve as safe spaces in schools for girls to learn to navigate risks and build protective assets.  Teachers and heads of school had training in school-related gender-based violence prevention.  To round out the socio-ecological model that supports girls as individuals within their household, school, and community, 24 savings and lending groups were created in villages surrounding the pilot schools to build households' resilience to keep their girls in secondary school.

## ECONOMIC REFORM IN MUSLIM MAJORITY COUNTRIES

We refer you to https://www.usaid.gov/what-we-do/economic-growth-and-trade and https://www.usaid.gov/reports-and-data for information on the U.S. Agency for International Development's programs on Economic Reform.

PX210

# Chapter 5
# Foreign Terrorist Organizations

Designations of Foreign Terrorist Organizations (FTOs) expose and isolate the designated terrorist organizations, deny them access to the U.S. financial system, and create significant criminal and immigration consequences for their members and supporters.  Moreover, designations can assist or complement the law enforcement actions of other U.S. agencies and other governments.

In 2017, the Department of State designated Hizbul Mujahedeen as a FTO.  The Department of State also amended the FTO designations of Hizballah to include the alias Lebanese Hizballah, among others; of Abdallah Azzam Brigades to include the alias Marwan Hadid Brigades; and of al-Qa'ida in the Arabian Peninsula to include several additional aliases, among them Sons of Abyan, Sons of Hadramawt, and National Hadramawt Council.  Finally, the Department of State revoked the designation of the Abu Nidal Organization.

**Legal Criteria for Designation under Section 219 of the INA as amended:**

1. It must be a *foreign organization.*

2. The organization must *engage in terrorist activity*, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C.  § 1182(a)(3)(B)), or *terrorism*, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C.  § 2656f(d)(2)), *or retain the capability and intent to engage in terrorist activity or terrorism*.

3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

### U.S. Government Designated Foreign Terrorist Organizations

Abdallah Azzam Brigades (AAB)
Abu Sayyaf Group (ASG)
Al-Aqsa Martyrs Brigade (AAMB)
Ansar al-Dine (AAD)
Ansar al-Islam (AAI)
Ansar al-Shari'a in Benghazi (AAS-B)
Ansar al-Shari'a in Darnah (AAS-D)
Ansar al-Shari'a in Tunisia (AAS-T)
Army of Islam (AOI)
Asbat al-Ansar (AAA)
Aum Shinrikyo (AUM)
Basque Fatherland and Liberty (ETA)
Boko Haram (BH)
Communist Party of Philippines/New People's Army (CPP/NPA)

277

PX210

Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
Hamas
Haqqani Network (HQN)
Harakat ul-Jihad-i-Islami (HUJI)
Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)
Harakat ul-Mujahideen (HUM)
Hizballah
Hizbul Mujahedeen (HM)
Indian Mujahedeen (IM)
Islamic Jihad Union (IJU)
Islamic Movement of Uzbekistan (IMU)
Islamic State of Iraq and Syria (ISIS)
Islamic State's Khorasan Province (ISIS-K)
ISIL-Libya
ISIS Sinai Province (ISIS-SP)
Jama'atu Ansarul Muslimina Fi Biladis-Sudan (Ansaru)
Jaish-e-Mohammed (JeM)
Jaysh Rijal Al-Tariq Al-Naqshabandi (JRTN)
Jemaah Ansharut Tauhid (JAT)
Jemaah Islamiya (JI)
Jundallah
Kahane Chai
Kata'ib Hizballah (KH)
Kurdistan Workers' Party (PKK)
Lashkar e-Tayyiba (LeT)
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Mujahidin Shura Council in the Environs of Jerusalem (MSC)
Al-Mulathamun Battalion (AMB)
National Liberation Army (ELN)
Al-Nusrah Front (ANF)
Palestine Islamic Jihad (PIJ)
Palestine Liberation Front – Abu Abbas Faction (PLF)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qa'ida (AQ)
Al-Qa'ida in the Arabian Peninsula (AQAP)
Al-Qa'ida in the Indian Subcontinent (AQIS)
Al-Qa'ida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary People's Liberation Party/Front (DHKP/C)
Revolutionary Struggle (RS)
Al-Shabaab (AS)

PX210

Shining Path (SL)
Tehrik-e Taliban Pakistan (TTP)

## ABDALLAH AZZAM BRIGADES

**aka** Abdullah Azzam Brigades; Ziyad al-Jarrah Battalions of the Abdallah Azzam Brigades;
Yusuf al-'Uyayri Battalions of the Abdallah Azzam Brigades; Marwan Hadid Brigades;
Marwan Hadid Brigade

**Description:**  Designated as a Foreign Terrorist Organization on May 30, 2012, the
Abdallah Azzam Brigades (AAB) formally announced its establishment in a July 2009 video
statement claiming responsibility for a February 2009 rocket attack against Israel.  The
Lebanon-based group's full name is Ziyad al-Jarrah Battalions of the Abdallah Azzam Brigades,
named after Lebanese citizen Ziad al Jarrah, one of the planners of and participants in the
September 11, 2001 attacks on the United States.

**Activities:**  After its initial formation, AAB relied primarily on rocket attacks against Israeli
civilians.  It is responsible for numerous rocket attacks fired into Israeli territory from Lebanon
targeting – among other things – population centers, including Nahariya and Ashkelon.

In November 2013, AAB began targeting Hizballah.  AAB claimed responsibility for a suicide
bombing outside the Iranian Embassy in Beirut, Lebanon, which killed 23 people and wounded
more than 140.  The group warned it would carry out more attacks if Hizballah did not stop
sending fighters to Syria in support of Syrian government forces.

In February 2014, AAB again attacked Hizballah for its involvement in the Syrian conflict,
claiming a twin suicide bomb attack against the Iranian cultural center in Beirut, which killed
four people.  AAB was also believed to be responsible for a series of bombings in
Hizballah-controlled areas around Beirut.  AAB was also blamed for a suicide bombing in June
2014 in the Beirut neighborhood of Tayyouneh, which killed a security officer and wounded
25 people.

In June 2015, the group released photos of a training camp for its "Marwan Hadid Brigade"
camp in Syria, likely located in Homs province.  In 2016 and 2017, AAB continued its
involvement in the Syrian conflict, and was active in Lebanon's Ain al-Hilwah refugee camp.  In
December 2017, AAB called for violent jihad by Muslims against the United States and Israel
after the announcement recognizing Jerusalem as Israel's capital.

**Strength:**  Unknown

**Location/Area of Operation:**  AAB is based in Lebanon but operates in both Lebanon and
Syria.

**Funding and External Aid:**  Unknown

PX210

## ABU SAYYAF GROUP

**aka** al Harakat al Islamiyya (the Islamic Movement)

**Description:**  The Abu Sayyaf Group (ASG) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ASG split from the Moro Islamic Liberation Front in the early 1990s and is one of the most violent terrorist groups in the Philippines.  The group claims to promote an independent Islamic state in western Mindanao and the Sulu Archipelago.

**Activities:**  The ASG has committed kidnappings-for-ransom, bombings, ambushes of security personnel, public beheadings, assassinations, and extortion.  In April 2000, an ASG faction kidnapped 21 people, including 10 Western tourists, from a resort in Malaysia.  In May 2001, the group kidnapped three U.S. citizens and 17 Philippine citizens from a tourist resort in Palawan, Philippines; several hostages were murdered, including U.S. citizen Guillermo Sobero.  A hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham; her husband, U.S. national Martin Burnham was killed during the operation.  In February 2004, the ASG bombed SuperFerry 14 in Manila Bay, killing 116 people, and in July of the same year, ASG militants killed 21 people, including six children, celebrating the end of Ramadan.

In a July 2014 video, senior ASG leader and U.S. Federal Bureau of Investigation most-wanted terrorist Isnilon Hapilon swore allegiance to ISIS and ISIS leader Abu Bakr al-Baghdadi.  Hapilon was considered the leader of all ISIS-affiliated groups in the Philippines.

Throughout 2015, the ASG was responsible for multiple attacks, kidnappings, and the killing of hostages.  In September 2016, the ASG abducted two Canadians, a Norwegian, and a Philippine woman from a resort on Samal Island.  The ASG set ransom at US $60 million.  The ASG beheaded the two Canadian citizens later that year, and in early 2017, the ASG beheaded German citizen Jürgen Kantner when ransom deadlines were not met.  The group continued its kidnapping-for-ransom operations in 2017, after collecting approximately US $7.3 million during the first six months of 2016.  In August 2017, ASG members killed nine people and injured others in an attack on Basilan Island.

On May 23, 2017, Philippine forces launched an operation attempting to capture Hapilon in the city of Marawi.  ASG fighters opened fire on security forces and called on support from the pro-ISIS Maute Group.  Together, the ASG and Maute Group militants laid siege over Marawi and clashed with government forces until October, resulting in the deaths of over 150 security forces, more than 800 militants, and 47 civilians.  Over 400,000 residents of Marawi were displaced due to the fighting.  Hapilon was killed by government forces in the last days of his group's attempted siege of Marawi.

**Strength:**  The ASG is estimated to have 400 members.

**Location/Area of Operation:**  The group is located mainly in the Philippine provinces of the Sulu Archipelago – namely Basilan, Sulu, and Tawi-Tawi, the Zamboanga Peninsula, and Mindanao – but has also conducted cross-border operations into eastern Malaysia.

PX210

**Funding and External Aid:**  The ASG is funded primarily through kidnapping-for-ransom operations and extortion.  It may receive funding from external sources, including remittances from overseas Philippine workers and Middle East-based sympathizers.  In the past, the ASG has also received training and other assistance from regional terrorist groups such as Jemaah Islamiya.

## AL-AQSA MARTYRS BRIGADE

**aka** al-Aqsa Martyrs Battalion

**Description:**  Designated as a Foreign Terrorist Organization on March 27, 2002, the al-Aqsa Martyrs Brigade (AAMB) is composed of small cells of Fatah-affiliated activists that emerged at the outset of the al-Aqsa Intifada in September 2000.  AAMB strives to drive the Israeli military and West Bank settlers from the West Bank to establish a Palestinian state loyal to Fatah.

**Activities:**  During the 2000 Intifada, AAMB carried out primarily small-arms attacks against Israeli military personnel and settlers.  By 2002, the group was striking Israeli civilians inside Israel.  In January 2002, AAMB claimed responsibility for the first female suicide bombing in Israel.  In 2010 and 2011, the group launched numerous rocket attacks on Israeli communities, and in November 2012, AAMB claimed it had fired more than 500 rockets and missiles into Israel during an Israel Defense Forces operation in Gaza.

In 2015, AAMB declared an open war against Israel and asked Iran for funds to help it in its fight against Israel in a televised broadcast.  In the same broadcast, an AAMB fighter displayed a new two-mile tunnel crossing the border beneath Gaza and Israel, which the leader claimed would be used in the next rounds of battle.  Throughout 2015, AAMB continued attacking Israeli soldiers and civilians.

In March 2016, armed confrontation in Nablus between Palestinian youths and Palestinian security officials broke out following the arrest of an AAMB associate on charges of murder; seven youths and six Palestinian security officials were injured in the unrest.  The AAMB claimed responsibility for two rockets fired at Israel from the Gaza Strip in March 2017, although the rockets did not cause any casualties.

**Strength:**  The group is estimated to have a few hundred members.

**Location/Area of Operation:**  Most of AAMB's operational activity is in Gaza but it has also planned and conducted attacks inside Israel and the West Bank.  AAMB has members in Palestinian refugee camps in Lebanon.

**Funding and External Aid:**  Iran has provided AAMB with funds and guidance, mostly through Hizballah facilitators.

## ANSAR AL-DINE

**aka** Ansar Dine; Ansar al-Din; Ancar Dine; Ansar ul-Din; Ansar Eddine; Defenders of the Faith

PX210

**Description:**  The Mali-based group Ansar al-Dine (AAD) was designated as a Foreign Terrorist Organization on March 22, 2013.  AAD was created in late 2011 after AAD's leader Iyad ag Ghali failed in his attempt to take over another secular Tuareg organization.  Following the March 2012 coup that toppled the Malian government, AAD was among the organizations (that also included al-Qa'ida in the Islamic Maghreb (AQIM) and Movement for Unity and Jihad in West Africa) to take over northern Mali, destroy UNESCO World Heritage sites, and enforce a severe interpretation of Sharia law upon the civilian population living in the areas under its control.

Beginning in January 2013, French and allied African forces conducted operations in northern Mali to counter AAD and other terrorist groups, eventually forcing AAD and its allies out of the population centers they had seized.  Ghali, however, remained free, and has appeared in AAD videos in 2015 and 2016 threatening France and the UN Multidimensional Integrated Stabilization Mission in Mali (MINUSMA).

In September 2016, the International Criminal Court (ICC) convicted AAD leader Ahmad al-Faqi al-Mahdi of the war crime of intentionally directing attacks against religious and historic buildings in Timbuktu in 2012.  In September 2017, the ICC ordered al-Mahdi to pay more than US $3 million in reparations for his part in the group's 2012 destruction of the Timbuktu World Heritage site.

In 2017, the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together to form Jama'at Nusrat al-Islam wal-Muslimin.

**Activities:**  In early 2012, AAD received backing from AQIM in its fight against the Government of Mali, including for its capture of the Malian towns of Agulhok, Gao, Kidal, Tessalit, and Timbuktu.  In March, AAD members were reportedly among the Tuareg rebels responsible for killing 82 Malian soldiers and kidnapping 30 others in an attack against Agulhok.  Before the French intervention in January 2013, Malian citizens in towns under AAD's control who refused to comply with AAD's laws allegedly faced harassment, torture, and death.

AAD was severely weakened by the 2013 French intervention, but increased its activities in 2015 and 2016.  In 2016, AAD claimed attacks targeting the Malian army and MINUSMA.  In July 2016, AAD attacked an army base, leaving 17 soldiers dead and six missing, and in the following month the group claimed three attacks: two improvised explosive device attacks on French forces and a rocket or mortar attack on a joint UN-French base near Tessalit.  In October and November of 2016, AAD claimed responsibility for a series of attacks on UN and French forces.

**Strength:**  The group's exact membership numbers were unknown at the end of 2017.

**Location/Area of Operation:**  AAD is active in Mali and has also threatened to attack Mauritania and the Ivory Coast.

PX210

**Funding and External Aid:**  AAD cooperates closely with and has received support from AQIM since its inception.  AAD is also said to receive funds from foreign donors and through smuggling.

## ANSAR AL-ISLAM

**aka** Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:**  Ansar al-Islam (AAI) was designated as a Foreign Terrorist Organization on March 22, 2004.  AAI was established in 2001 in the Iraqi Kurdistan region with the merger of two Kurdish terrorist factions that traced their roots to the Islamic Movement of Kurdistan.  On May 4, 2010, AAI's leader Abu Abdullah al-Shafi'i was captured by U.S. forces in Baghdad; he remained in prison at the end of 2017.  On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim.  AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law.

**Activities:**  AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, and U.S. and Coalition Forces.  AAI has carried out numerous kidnappings, murders, and assassinations of Iraqi citizens and politicians.  In 2012, the group claimed responsibility for the bombing of the Sons of Martyrs School in Damascus, which was occupied by Syrian security forces and pro-government militias; seven people were wounded in the attack.

During summer 2014, part of AAI issued a statement pledging allegiance to ISIS, although later reports suggest that a faction of AAI continues to oppose ISIS.  In 2016 and 2017, AAI continued to operate in Syria.

**Strength:**  Precise numbers are unknown.

**Location/Area of Operation:**  AAI is active primarily in northern Iraq, but also maintains a presence in western and central Iraq.  Since 2011, AAI has operated in Syria.

**Funding and External Aid:**  AAI receives assistance from a loose network of associates in Europe and the Middle East.

## ANSAR AL-SHARI'A IN BENGHAZI

**aka** Ansar al-Sharia in Libya; Ansar al-Shariah Brigade; Ansar al-Shari'a Brigade; Katibat Ansar al-Sharia in Benghazi; Ansar al-Shariah-Benghazi; Al-Raya Establishment for Media Production; Ansar al-Sharia; Soldiers of the Sharia; Ansar al-Shariah; Supporters of Islamic Law

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Benghazi (AAS-B) was created after the 2011 fall of the Qadhafi regime in Libya.

PX210

It has been involved in terrorist attacks against civilian targets, and assassinations and attempted assassinations of security officials and political actors in eastern Libya.

**Activities:**  Members of AAS-B were involved in the September 11, 2012, attacks against the U.S. Special Mission and Annex in Benghazi, Libya.  Four U.S. citizens were killed in the attack: Glen Doherty, Sean Smith, Tyrone Woods, and U.S. Ambassador to Libya J. Christopher Stevens.

During 2016, AAS-B continued its fight against the "Libyan National Army" in Benghazi that resulted in the deaths of both Libyan security forces and civilians.  Additionally, AAS-B controlled several terrorist training camps in Libya, and has trained members of other terrorist organizations, some which operate in Syria, Iraq, and Mali.

In May 2017, AAS in Libya announced its formal dissolution due to heavy losses, including the group's senior leadership, as well as defections to ISIS in Libya.

**Strength:**  The group is dissolved.

**Location/Area of Operation:**  AAS-B operated in Benghazi, Libya.

**Funding and External Aid:**  AAS-B obtained funds from al-Qa'ida in the Islamic Maghreb, charities, donations, and criminal activities.

## ANSAR AL-SHARI'A IN DARNAH

**aka** Supporters of Islamic Law; Ansar al-Sharia in Derna; Ansar al-Sharia in Libya; Ansar al-Sharia; Ansar al-Sharia Brigade in Darnah

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Darnah (AAS-D) was created after the 2011 fall of the Qadhafi regime in Libya.  It has been involved in terrorist attacks against civilian targets, and assassinations and attempted assassinations of security officials and political actors in eastern Libya.

**Activities:**  Members of AAS-D were involved in the September 11, 2012, attacks against the U.S. Special Mission and Annex in Benghazi, Libya.  Four U.S. citizens were killed in the attack: Glen Doherty, Sean Smith, Tyrone Woods, and U.S. Ambassador to Libya J. Christopher Stevens.

In 2013 and 2014, AAS-D is believed to have cooperated with Ansar al-Shari'a in Benghazi in multiple attacks and suicide bombings targeting Libyan security forces in Benghazi.  In 2016, AAS-D continued its involvement in fighting in and around Darnah.  In addition to its attacks, AAS-D maintained several terrorist training camps in Darnah and Jebel Akhdar, Libya, and has trained members of other terrorist organizations operating in Syria and Iraq.

In May 2017, AAS in Libya announced its formal dissolution due to heavy losses, including the group's senior leadership, as well as defections to ISIS in Libya.

PX210

**Strength:**  The group is dissolved.

**Location/Area of Operation:**  AAS-D operated in Darnah, Libya.

**Funding and External Aid:**  Unknown

## ANSAR AL-SHARI'A IN TUNISIA

**aka** Al-Qayrawan Media Foundation; Supporters of Islamic Law; Ansar al-Sharia in Tunisia; Ansar al-Shari'ah; Ansar al-Shari'ah in Tunisia; Ansar al-Sharia

**Description:**  Designated as a Foreign Terrorist Organization on January 13, 2014, Ansar al-Shari'a in Tunisia (AAS-T) was founded by Seif Allah Ben Hassine in early 2011.  AAS-T has been implicated in attacks against Tunisian security forces, assassinations of Tunisian political figures, and attempted suicide bombings of locations frequented by tourists.  AAS-T has also recruited youth in Tunisia to fight in Syria.

**Activities:**  AAS-T was involved in the September 14, 2012 attack against the U.S. Embassy and American school in Tunis, which threatened the safety of more than 100 U.S. Embassy employees.  In February and July 2013, AAS-T members were implicated in the assassination of Tunisian politicians Chokri Belaid and Mohamed Brahmi.

Tunisian authorities continued to confront and arrest AAS-T members in 2016 and 2017.

**Strength:**  Unknown

**Location/Area of Operation:**  Tunisia and Libya

**Funding and External Aid:**  Unknown

## ARMY OF ISLAM

**aka** Jaysh al-Islam; Jaish al-Islam

**Description:**  Designated as a Foreign Terrorist Organization on May 19, 2011, the Army of Islam (AOI), founded in late 2015, is a Gaza-based terrorist organization responsible for numerous terrorist acts against the Israeli and Egyptian governments and British, New Zealand, and U.S. citizens.  The group, led by Mumtaz Dughmush, subscribes to an extremist Salafist ideology.

**Note:** Army of Islam is a separate and distinct group from the Syria-based Jaysh al-Islam, which is not a Foreign Terrorist Organization.

**Activities:**  AOI is responsible for a number of rocket attacks on Israel, and the 2006 and 2007 kidnappings of civilians, including a U.S. journalist.  AOI also carried out the early 2009 attacks

285

**PX210**

on Egyptian civilians in Cairo and Heliopolis, Egypt, and planned the January 1, 2011, attack on a Coptic Christian church in Alexandria that killed 25 and wounded 100. In November 2012, AOI announced that it had launched rocket attacks on Israel in a joint operation with the Mujahidin Shura Council in the Environs of Jerusalem. In August 2013, an Israeli official reported that AOI leader Dughmush was running training camps in Gaza.

In September 2015, AOI reportedly released a statement pledging allegiance to ISIS. In the short post attributed to the group, AOI declared itself an inseparable part of ISIS-Sinai Province. In 2016 and 2017, AOI continued to express support for ISIS. The group released a video in October 2017 in an effort to encourage ISIS fighters defending Mosul. There were no attacks claimed by AOI in 2017.

**Strength:**  Membership is estimated in the low hundreds.

**Location/Area of Operation:**  The group operates in Egypt, Gaza, and Israel.

**Funding and External Aid:**  AOI receives much of its funding from a variety of criminal activities in Gaza.

# ASBAT AL-ANSAR

**aka** AAA; Band of Helpers; Band of Partisans; League of Partisans; League of the Followers; God's Partisans; Gathering of Supporters; Partisan's League; Esbat al-Ansar; Isbat al-Ansar; Osbat al-Ansar; Usbat al-Ansar; Usbat ul-Ansar

**Description:**  Designated as a Foreign Terrorist Organization on March 27, 2002, Asbat al-Ansar (AAA) is a Lebanon-based Sunni terrorist group composed primarily of Palestinians. Linked to al-Qa'ida and other Sunni terrorist groups, AAA aims to thwart perceived anti-Islamic and pro-Western influences in the country. AAA's base is largely confined to Lebanon's refugee camps.

**Activities:**  AAA first emerged in the early 1990s. In the mid-1990s, the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. The group has also plotted against foreign diplomatic targets. Between 2005 and 2011, AAA members traveled to Iraq to fight Coalition Forces. AAA has been reluctant to involve itself in operations in Lebanon due in part to concerns of losing its safe haven in the Ain al-Hilwah refugee camp. AAA remained active in Lebanon in 2017.

**Strength:**  The group has at least 650 members.

**Location/Area of Operation:**  The group's primary base of operations is the Ain al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**Funding and External Aid:**  It is likely the group receives money through international Sunni extremist networks.

PX210

## AUM SHINRIKYO

**aka** A.I.C.  Comprehensive Research Institute; A.I.C.  Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:**  Aum Shinrikyo (AUM) was designated as a Foreign Terrorist Organization on October 8, 1997.  It was established in 1987 by now-jailed leader Shoko Asahara and gained legal status in Japan as a religious entity in 1989.  The Japanese government revoked its recognition of AUM as a religious organization following AUM's deadly 1995 sarin gas attack in Tokyo.  Despite claims that it has renounced violence and Asahara's teachings, members of AUM continue to adhere to the violent and apocalyptic teachings of its founder.

**Activities:**  In March 1995, AUM members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 13 and causing up to 6,000 people to seek medical treatment.  Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and injured approximately 500.  Japanese police arrested Asahara in May 1995; in February 2004, authorities sentenced him to death for his role in the 1995 attacks, but have yet to carry out the sentence.

Although AUM has not conducted a terrorist attack since 1995, concerns remain regarding its continued adherence to the violent teachings of Asahara.  The group consists of two factions, both of which have recruited new members, engaged in commercial enterprises, and acquired property.  In July 2000, Russian authorities arrested a group of Russian AUM followers who planned to detonate bombs in Japan as part of an operation to free Asahara from jail.  In August 2012, a Japan Airlines flight to the United States turned back after receiving a bomb threat demanding the release of Asahara.

In March 2016, Montenegro expelled 58 people associated with AUM found holding a conference at a hotel in Danilovgrad.  One month later, Russian authorities carried out dozens of raids on 25 AUM properties and opened a criminal investigation into an AUM cell.  In November 2017, Japanese police raided the offices of a "successor" group to AUM.

**Strength:**  Recent estimates suggest the group has around 1,500 followers.  AUM continues to maintain facilities in Japan and Russia.

**Location/Area of Operation:**  The group operates in Japan and Russia.

**Funding and External Aid:**  Funding primarily comes from member contributions and group-run businesses.

## BASQUE FATHERLAND AND LIBERTY

**aka** ETA; Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; XAKI

PX210

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, Basque Fatherland and Liberty (ETA) was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles in the Spanish Basque provinces of Alava, Guipuzcoa, and Viscaya; the autonomous region of Navarre; and the southwestern French territories of Labourd, Lower-Navarre, and Soule.

**Activities:**  ETA has primarily conducted bombings and assassinations.  Targets typically include Spanish government officials, businessmen, politicians, judicial figures, and security and military forces; however, the group has also targeted journalists and major tourist areas.  ETA is responsible for killing 829 civilians and members of the armed forces and police, and injuring thousands since it formally began its campaign of violence in 1968.

In December 2006, ETA exploded a massive car bomb destroying much of the covered parking garage at Madrid's Barajas International Airport.  ETA marked its fiftieth anniversary in 2009 with a series of high profile and deadly bombings, including the July 2009 attack on a Civil Guard Barracks that injured more than 60 men, women, and children.

ETA has not launched any attacks since it announced a "definitive cessation of armed activity" in October 2011.

Authorities seized ETA weapons in 2016, including a cache found in a forest north of Paris, and the top ETA leader was captured.  In April 2017, ETA reported that it relinquished its last caches of weapons, although it has not formally dissolved as a group.

**Strength:**  Since 2004, more than 900 ETA militants have been arrested both in Spain and abroad.  It is unknown how many ETA members remain but it is likely in the hundreds.

**Location/Area of Operation:**  Primarily in the Basque autonomous regions of northern Spain and southwestern France, and Madrid.

**Funding and External Aid:**  ETA is probably experiencing financial shortages given that the group announced publicly in September 2011 that it had ceased collecting "revolutionary taxes" from Basque businesses.  Sources of ETA funding were unknown in 2017.

## BOKO HARAM

**aka** Nigerian Taliban; Jama'atu Ahlus-Sunnah Lidda'Awati Wal Jihad; Jama'atu Ahlis Sunna Lidda'awati wal-Jihad; People Committed to the Prophet's Teachings for Propagation and Jihad; Sunni Group for Preaching and Jihad

**Description:**  Nigeria-based Boko Haram (BH) was designated as a Foreign Terrorist Organization on November 14, 2013.  The group is responsible for numerous attacks in northern and northeastern Nigeria, and the Lake Chad Basin in Cameroon, Chad, and Niger that have killed thousands of people since 2009.

PX210

In March 2015, BH pledged allegiance to ISIS in an audiotape message. ISIS accepted the group's pledge and the group began calling itself ISIS-West Africa. In August 2016, ISIS announced that Abu Musab al-Barnawi was to replace Abubakar Shekau as the new leader of the group. Infighting then led the group to split. Shekau maintains a group of followers and affiliates concentrated primarily in the Sambisa Forest; this faction is known as Boko Haram. The Governments of Cameroon, Chad, Niger, and Nigeria routinely call both groups Boko Haram, with some differentiation on the "Shekau faction" versus the "al-Barnawi faction."

**Activities:** BH was responsible for the August 26, 2011 bomb attack on the UN building in Abuja that killed at least 21 people and wounded dozens more. The group was also responsible for a series of bomb attacks in 2012 in Kano, Nigeria.

Boko Haram crosses porous Lake Chad region borders to target civilians and military personnel in northeast Nigeria, the Far North Region of Cameroon, and parts of Chad and Niger. The group continued to evade pressure from Lake Chad country forces, including through the regional Multinational Joint Task Force. In 2013, the group kidnapped over a dozen French citizens in northern Cameroon for ransom.

In 2014, BH killed approximately 5,000 Nigerian civilians in various attacks. The kidnapping of 276 female students from a secondary school in Chibok, Borno State, brought global attention to Boko Haram's activities and highlighted its deliberate targeting of non-combatants, including children. The group continued to abduct women and girls in the northern region of Nigeria and the Lake Chad region, some of whom it later subjected to domestic servitude, other forms of forced labor, and sexual servitude, including through forced marriages to its members. For further information, refer to the *2017 Trafficking in Persons Report*.

Between January 3 and 7, 2015, BH carried out a massacre in Baga, Borno State; reported casualties ranged from 150 to more than 2,000 killed, injured, or disappeared. The January 2015 attacks and other BH operations in surrounding smaller villages in 2015 displaced an estimated 35,000 people and allowed BH to gain control of Borno State. On April 6, BH militants disguised as Islamic preachers killed at least 24 people and wounded several others in an attack near a mosque in Borno State; the attackers gathered people in the village of Kwajafa, offering to preach Islam, then opened fire.

BH continued its operational tempo through 2015 and into early 2016 under the name ISIS-West Africa, with January operations in Cameroon that killed 16 people. In February 2016, the group resumed attacks in Nigeria, killing 30 people on February 13 in a spate of attacks in Borno State that included forcing worshipers into a mosque and killing them. In October, BH released 21 Chibok schoolgirls to Nigerian authorities in exchange for the release of selected BH members; it was the first mass release of Chibok hostages since the 2014 abductions.

In January 2017, around 100 BH fighters attacked a refugee camp in Nigeria, killing over 150 people. BH continued its attacks, mostly concentrated in and around Borno state, throughout early 2017, razing villages, abducting women and girls, and killing Nigerian security forces. In May, BH members released an additional 82 Chibok schoolgirls to the Nigerian government. Between April and September, BH militants killed over 400 people in Nigeria and Cameroon,

PX210

and the group increasingly forced abducted women and girls to carry out suicide attacks on civilians.  Since 2009, BH has killed approximately 20,000 people and displaced over two million others.

**Strength:**  Membership is estimated to be several thousand fighters.

**Location/Area of Operation:**  BH operates in northeastern Nigeria, northern Cameroon, southeast Niger, and areas of Chad along the Nigerian border.

**Funding and External Aid:**  BH largely self-finances through criminal activities such as looting, extortion, kidnapping-for-ransom, and bank robberies.

## COMMUNIST PARTY OF PHILIPPINES/NEW PEOPLE'S ARMY

**aka** CPP/NPA; Communist Party of the Philippines; the CPP; New People's Army; the NPA

**Description:**  The Communist Party of the Philippines/New People's Army (CPP/NPA) was designated as a Foreign Terrorist Organization on August 9, 2002.  The military wing of the Communist Party of the Philippines (CPP) – the New People's Army (NPA) – is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare.  NPA's founder, Jose Maria Sison, reportedly directs CPP/NPA activity from the Netherlands, where he lives in self-imposed exile.  Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands.  Although primarily a rural-based guerrilla group, CPP/NPA has an active urban infrastructure to support its terrorist activities and, at times, uses city-based assassination squads.

**Activities:**  CPP/NPA primarily targets Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes."  CPP/NPA also has a history of attacking U.S. interests in the Philippines.  In 1987, for example, CPP/NPA killed three U.S. soldiers in four separate attacks in Angeles City.  In 1989, the group issued a press statement claiming responsibility for the ambush and murder of Colonel James Nicholas Rowe, chief of the Ground Forces Division of the Joint U.S.-Military Advisory Group.

Over the past several years, CPP/NPA has continued to carry out killings, raids, kidnappings, acts of extortion, and other forms of violence primarily directed against Philippine security forces.  In May 2013, the Armed Forces of the Philippines reported that from 2011 through the first quarter of 2013, 383 people – including 158 civilians – were killed in encounters between CPP/NPA and government forces.  Despite a ceasefire with the Government of the Philippines in December 2014, CPP/NPA continued to carry out attacks.

Throughout 2016, several attempts were made to establish a ceasefire and peace deal between the CPP/NPA and the Armed Forces of the Philippines.  Reported violations from both sides, however, including reports of CPP/NPA's continued recruitment in the Philippines and attacks against government forces and civilians, have stalled any peace efforts.

PX210

In February 2017, after several attempts from both parties to establish a bilateral ceasefire in late 2016, the CPP/NPA terminated its unilateral ceasefire after a number of earlier clashes between the group and the Philippine Armed Forces.  President Duterte responded with ending its ceasefire and peace talks with the CPP/NPA.  Attempts to reach a ceasefire continued in 2017 without success, as a number of conflicts and skirmishes have erupted between the CPP/NPA and the Philippine Armed Forces.  President Duterte signed a proclamation declaring the CPP/NPA as a terrorist organization in December, although the decision must obtain court approval.

**Strength:**  The Philippine government estimates the group has approximately 4,000 members.  CPP/NPA also retains a significant amount of support from communities in rural areas of the Philippines.

**Location/Area of Operation:**  The Philippines, including Rural Luzon, Visayas, and parts of northern and eastern Mindanao.  There are also CPP/NPA cells in Manila and other metropolitan centers.

**Funding and External Aid:**  The CPP/NPA raises funds through extortion and theft.

## CONTINUITY IRISH REPUBLICAN ARMY

**aka** Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:**  Designated as a Foreign Terrorist Organization on July 13, 2004, the Continuity Irish Republican Army (CIRA) is a terrorist splinter group that became operational in 1986 as the clandestine armed wing of Republican Sinn Fein following its split from Sinn Fein.  "Continuity" refers to the group's belief that it is carrying on the original goal of the Irish Republican Army (IRA), to force the British out of Northern Ireland.  CIRA cooperates with the larger Real IRA (RIRA).

**Activities:**  CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion operations, and robberies.  On occasion, it has provided advance warning to police of its attacks.  Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups.

In July 2015, Police Service of Northern Ireland officers narrowly escaped harm when an explosive detonated as they were investigating a concealed device they later described as an "elaborate trap."  In February 2016, CIRA claimed responsibility for a shooting at a boxing event in Dublin that left one dead.  In June 2017, CIRA released a statement claiming that it would disband and decommission some of its arms in the following three months, describing the conflict as a "futile war."

**Strength:**  Membership is small, with possibly fewer than 50.  Police counterterrorism operations have reduced the group's strength.

**Location/Area of Operation:**  CIRA operates in Northern Ireland and the Republic of Ireland.

PX210

**Funding and External Aid:**  CIRA supports its activities through criminal activities, including smuggling.

## GAMA'A AL-ISLAMIYYA

**aka** al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI; Islamic Gama'at; IG; Islamic Group

**Description:**  Gama'a al-Islamiyya (IG) was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed in the 1970s, IG was once Egypt's largest terrorist group.  In 2011, it formed the Building and Development political party that competed in the 2011 parliamentary elections and won 13 seats.  The external wing, composed mainly of exiled members in several countries, maintained that its primary goal was to replace the Egyptian government with an Islamist state.  IG's "spiritual" leader Omar Abd al-Rahman, or the "blind Sheikh," served a life sentence in a U.S. prison for his involvement in the 1993 World Trade Center bombing and died in prison in February 2017.

**Activities:**  In the 1990s, IG conducted armed attacks against Egyptian security, other government officials, and Coptic Christians.  IG claimed responsibility for the June 1995 attempted assassination of Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia.  The group also launched attacks on tourists in Egypt, most notably the 1997 Luxor attack.  In 1999, part of the group publicly renounced violence.  IG is not known to have committed a terrorist attack in recent years; the group remained dormant in 2017.

**Strength:**  At its peak, IG likely commanded several thousand core members and a similar number of supporters.  Security clampdowns following the 1997 attack in Luxor and the 1999 cease-fire, along with post-September 11, 2001 security measures and defections to al-Qa'ida, have likely resulted in a substantial decrease in what is left of the group.

**Location/Area of Operation:**  Unknown

**Funding and External Aid:**  Unknown

## HAMAS

**aka** the Islamic Resistance Movement; Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Izz al-Din al Qassam Forces; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, Hamas was established in 1987 at the onset of the first Palestinian uprising, or Intifada, as an outgrowth of the Palestinian branch of the Muslim Brotherhood.  The armed element, the Izz al-Din al-Qassam Brigades, has conducted anti-Israeli attacks, including suicide bombings against civilian targets inside Israel.  Hamas also manages a broad, mostly Gaza-based, network of *Dawa* or ministry activities that include charities, schools, clinics, youth camps, fundraising, and political

PX210

activities.  After winning Palestinian Legislative Council elections in January 2006, Hamas gained control of significant Palestinian Authority (PA) ministries in Gaza, including the Ministry of Interior.  In 2007, Hamas expelled the PA and Fatah from Gaza in a violent takeover.  Hamas remained the de facto ruler in Gaza in 2017.  The group selected a new leader, Ismail Haniyeh, who is based in Gaza, on May 6, 2017.

**Activities:**  Prior to 2005, Hamas conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised explosive device (IED) attacks, and shootings.  U.S. citizens have died and been injured in the group's attacks.  In June 2007, after Hamas took control of Gaza from the PA and Fatah, the Gaza borders were closed, and Hamas increased its use of tunnels to smuggle weapons into Gaza via the Sinai and maritime routes.

Hamas fought a 23-day war with Israel from late December 2008 to January 2009.  From November 14 to 21, 2012, Hamas fought another war with Israel during which it claims to have launched more than 1,400 rockets into Israel.  Despite the Egypt-mediated ceasefire between Israel and Hamas in 2012, operatives from Hamas and Palestine Islamic Jihad (PIJ) coordinated and carried out a November bus bombing in Tel Aviv that wounded 29 people.  On July 8, 2014, Israel launched Operation Protective Edge in Gaza with the intent of preventing rocket fire into the country; rocket fire had increased following Israeli military operations after Hamas kidnapped and murdered three Israeli teenagers in June 2014, including 16-year-old U.S.-Israeli citizen Naftali Fraenkel.

In April 2016, a Hamas member carried out a suicide attack on a bus in Jerusalem, killing 20.  The attack came just two months after Hamas released a music video on its al-Aqsa TV and several social media sites encouraging suicide bombings of Israeli buses.  The group was also held responsible for several Gaza-based rocket attacks, including a July strike in Sderot that hit a kindergarten and damaged several buildings.

Throughout 2016, Hamas cooperated with ISIS-Sinai Province, providing its members with funding, training, and organizational support.

Since 2007, Hamas and Fatah have made several attempts to reconcile, though all attempts through the end of 2017 have failed.  The latest reconciliation attempt began in Cairo in October 2017, yet its implementation has stalled as neither Hamas nor Fatah can agree on security control or governance over Gaza.  Throughout 2017, Israel bombed a number of Hamas targets in response to sporadic rocket attacks coming from Gaza.

**Strength:**  Hamas is comprised of several thousand Gaza-based operatives.

**Location/Area of Operation:**  Since 2007, Hamas has controlled Gaza and also has a presence in the West Bank.  Hamas also has a presence in the Palestinian refugee camps in Lebanon.

**Funding and External Aid:**  Historically, Hamas has received funding, weapons, and training from Iran and raises funds in Gulf countries.  The group receives donations from Palestinian expatriates as well as its own charity organizations.

PX210

## HAQQANI NETWORK

**aka** HQN

**Description:** Designated as a Foreign Terrorist Organization on September 19, 2012, the Haqqani Network (HQN) was formed in the late 1970s, around the time of the then-Soviet Union's invasion of Afghanistan. HQN's founder Jalaluddin Haqqani established a relationship with Usama bin Laden in the mid-1980s, and joined the Taliban in 1995. After the fall of the Taliban in Afghanistan in 2001, Jalaluddin retreated to Pakistan where, under the leadership of Jalaluddin's son Sirajuddin Haqqani, the group continued to direct and conduct terrorist activity in Afghanistan. In July 2015, Sirajuddin Haqqani was appointed Deputy Leader of the Taliban.

**Activities:** HQN has planned and carried out a number of significant kidnappings and attacks against U.S. and Coalition Forces in Afghanistan, the Afghan government, and civilian targets. In September 2011, HQN wounded 77 U.S. soldiers in a truck bombing in Wardak Province and also conducted a 19-hour attack on the U.S. Embassy and International Security Assistance Force headquarters in Kabul, killing 16 Afghans. In June 2012, a suicide bomb attack against Forward Operating Base Salerno killed two U.S. soldiers and wounded more than 100 others.

In April 2016, HQN was blamed for an attack in Kabul against a government security agency tasked with providing protection to senior government officials, killing 64 people and injuring more than 300 others in what was the deadliest attack in Kabul in 15 years. Afghan officials blamed HQN for being involved in a June 2016 double suicide attack outside of Kabul against Afghan police cadets and first responders; 30 people were killed.

On May 31, 2017, a truck bomb exploded in Kabul, killing over 150 people. Afghan officials blamed HQN for the attack. In October, an American woman and her family were recovered after five years of HQN captivity.

**Strength:** HQN is believed to have several hundred core members, but it is estimated that the organization is able to draw upon a pool of upwards of 10,000 fighters. HQN is integrated into the larger Afghan Taliban and cooperates with other terrorist organizations operating in the region, including al-Qa'ida and Lashkar e-Tayyiba.

**Location/Area of Operation:** HQN is active along the Afghanistan-Pakistan border and across much of southeastern Afghanistan, particularly in Loya Paktia, and has repeatedly targeted Kabul in its attacks. The group's leadership has historically maintained a power base around Pakistan's tribal areas.

**Funding and External Aid:** In addition to the funding it receives as part of the broader Afghan Taliban, HQN receives much of its funds from donors in Pakistan and the Gulf, as well as through criminal activities such as kidnapping, extortion, smuggling, and other licit and illicit business ventures.

## HARAKAT-UL JIHAD ISLAMI

PX210

**aka** HUJI; Movement of Islamic Holy War; Harkat-ul-Jihad-al Islami; Harkat-al-Jihad-ul Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad-e-Islami; Harakat-ul Jihad Islami

**Description:** Harakat-ul Jihad Islami (HUJI) was designated as a Foreign Terrorist Organization on August 6, 2010.  The group was formed in 1980 in Afghanistan to fight against the former Soviet Union.  Following the Soviet withdrawal from Afghanistan in 1989, the organization redirected its efforts to India.  HUJI seeks the annexation of the state of Jammu and Kashmir and the expulsion of Coalition Forces from Afghanistan, and has supplied fighters to the Taliban in Afghanistan.

Since 2001, HUJI has refocused its activities on the Afghanistan-Pakistan front and has established several camps in Pakistan.  HUJI is mostly composed of Pakistani terrorists and veterans of the Soviet-Afghan war.  In recent years HUJI has experienced a number of internal splits and a portion of the group has aligned with al-Qa'ida.

**Activities:** HUJI has been involved in a number of terrorist attacks.  HUJI claimed responsibility for the September 7, 2011 bombing of the New Delhi High Court, which left at least 11 dead and an estimated 76 wounded.  The group sent an email to the press stating that the bomb was intended to force India to repeal a death sentence of a HUJI member.  HUJI did not publicly claim any attacks in 2016 or 2017.

**Strength:** Unknown

**Location/Area of Operation:** HUJI's area of operation extends throughout South Asia, with its terrorist operations focused primarily in Afghanistan, India, and Pakistan.

**Funding and External Aid:** Unknown

## HARAKAT UL-JIHAD-I-ISLAMI/BANGLADESH

**aka** HUJI-B; Harakat ul Jihad e Islami Bangladesh; Harkatul Jihad al Islam; Harkatul Jihad; Harakat ul Jihad al Islami; Harkat ul Jihad al Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad Islami Bangladesh; Islami Dawat-e-Kafela; IDEK

**Description:** Designated as a Foreign Terrorist Organization on March 5, 2008, Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) was formed in April 1992 by a group of former Bangladeshi Afghan veterans wanting to establish Islamist rule in Bangladesh.  In October 2005, Bangladeshi authorities banned the group.  The leaders of HUJI-B signed the February 1998 *fatwa* sponsored by Usama bin Laden that declared U.S. civilians legitimate targets.  HUJI-B has connections to al-Qa'ida and Pakistani terrorist groups advocating similar objectives, including HUJI and Lashkar e-Tayyiba (LeT).

**Activities:** In December 2008, three HUJI-B members were convicted for the May 2004 grenade attack that wounded the British High Commissioner in Sylhet, Bangladesh.  In 2011, Bangladeshi authorities formally charged multiple suspects, including HUJI-B leader Mufti

PX210

Abdul Hannan with the killing of former Finance Minister Shah AMS Kibria in a grenade attack on January 27, 2005. In 2013, Bangladeshi police arrested a group of terrorists, including HUJI-B members, who were preparing attacks on public gatherings and prominent individuals. In 2014, HUJI-B continued its operations; reports at the time suggested that some HUJI-B members may have traveled to Pakistan to receive military training from LeT. There were no known terrorist acts carried out by HUJI-B in the last three years.

On April 12, 2017, Bangladeshi authorities executed HUJI-B leader Hannan and two associates for the May 2004 grenade attack.

**Strength:** HUJI-B leaders claim that up to 400 of its members are Afghan war veterans; its total membership is unknown.

**Location/Area of Operation:** HUJI-B operates primarily in Bangladesh and India; the group trains and has a network of madrassas in Bangladesh.

**Funding and External Aid:** HUJI-B funding comes from a variety of sources. Several international non-governmental organizations may have funneled money to HUJI-B.

## HARAKAT UL-MUJAHIDEEN

**aka** HUM; Harakat ul-Ansar; HUA; Jamiat ul-Ansar; JUA; al-Faran; al-Hadid; al-Hadith; Harakat ul-Mujahidin; Ansar ul Ummah

**Description:** Designated as a Foreign Terrorist Organization on October 8, 1997, Harakat ul-Mujahideen (HUM) seeks the annexation of the state of Jammu and Kashmir and the expulsion of Coalition Forces from Afghanistan. In January 2005, HUM's long-time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir. HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in 2001. In 2003, HUM began using the name Jamiat ul-Ansar; Pakistan banned the group in November 2003.

**Activities:** HUM has conducted a number of operations against Indian troops and civilian targets in the state of Jammu and Kashmir. In December 1999, HUM hijacked an Indian airliner, which led to the release of Masood Azhar – an important leader who later founded Jaish-e-Mohammed (JeM). India also released Ahmed Omar Sheik as a result of the hijacking. Sheik was later convicted of the 2002 abduction and murder of U.S. journalist Daniel Pearl.

HUM has conducted numerous attacks targeting Indian interests including the late December 2015 strikes in Handwor and Poonch, which resulted in the deaths of five Indian army personnel.

**Strength:** After 2000, a significant portion of HUM's membership defected to JeM and only a small number of cadres are reported to be active.

PX210

**Location/Area of Operation:**  HUM conducts operations primarily in Afghanistan and in the state of Jammu and Kashmir.  It operates from Muzaffarabad and in other cities in Pakistan.

**Funding and External Aid:**  HUM collects donations from wealthy donors in Pakistan.

<div align="center">

**HIZBALLAH**

</div>

**aka** the Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar Allah; Followers of the Prophet Muhammed; Lebanese Hizballah; Lebanese Hezbollah; LH; Foreign Relations Department; External Security Organization; Foreign Action Unit; Hizballah International; Special Operations Branch; External Services Organization; External Security Organization of Hezbollah

**Description:**  Hizballah was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed in 1982 following the Israeli invasion of Lebanon, the Lebanon-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini.  The group generally follows the religious guidance of the Iranian Supreme Leader, which in 2017 was Ali Khamenei.  Hizballah is closely allied with Iran and the two often work together on shared initiatives, although Hizballah also acts independently.  Hizballah shares a close relationship with Syria, and like Iran, provides assistance – including fighters – to Syrian regime forces in the Syrian conflict.

**Activities:**  Hizballah is responsible for multiple large scale terrorist attacks, including the 1983 suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut; the 1984 attack on the U.S. Embassy annex in Beirut; and the 1985 hijacking of TWA flight 847, during which U.S. Navy diver Robert Stethem was murdered.

Hizballah was also implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and in the 1994 bombing of the Argentine-Israelite Mutual Association in Buenos Aires.

In 2000, Hizballah operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli reserve officer in Dubai.  In an exchange between Israel and Hizballah in 2004, the Israeli abducted in Dubai as well as the bodies of the three Israeli soldiers were returned to Israel.

Hizballah is believed to have carried out two attacks against UN Interim Force in Lebanon peacekeepers, an attack in late May 2011 that wounded five Italian peacekeepers and a second attack in July 2011 that wounded six French soldiers.

In January 2012, Thai police detained Hizballah operative Hussein Atris on immigration charges as he was attempting to depart Thailand.  Atris was convicted of possessing bomb-making materials by a Thai court in September 2013 and sentenced to two years and eight months in prison.  He was released in September 2014 and is believed to reside in Lebanon.

PX210

In July 2012, a suspected Hizballah operative was detained by Cypriot authorities for allegedly helping plan an attack against Israeli tourists on the island.  On March 21, 2013, a Cyprus court found the operative guilty of charges based on his surveillance activities of Israeli tourists.  The group was also responsible for the July 2012 attack on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport in Bulgaria, near the city of Burgas.  The explosion killed five Israelis and one Bulgarian, and injured 32 others.

In Iraq, Hizballah assisted Iraq Shia militant and terrorist groups, and in January 2007, attacked the Karbala Provincial Joint Coordination Center, killing five American soldiers.  In May 2013, Hizballah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying support for Syrian President Bashar al-Assad.  Hizballah's support for Syria's al-Assad regime continued into 2017.  There were reportedly about 7,000 Hizballah fighters in Syria; several senior Hizballah military commanders and hundreds of fighters have died in the Syrian conflict.

In May 2013, Nigerian authorities arrested three Hizballah operatives who had stored anti-tank weapons, rocket propelled grenades and launchers, small arms, and a large quantity of ammunition and explosives.

In October 2014, Peruvian authorities arrested a Hizballah operative who had been planning to carry out attacks against Israeli and Jewish targets.  Investigators found traces of explosives in his home.

In May 2015, Cypriot authorities arrested Hizballah member and Lebanese-Canadian national Hussein Bassam Abdallah after finding 8.2 tons of liquid ammonium nitrate in the basement of a residence in Larnaca.  Abdallah was charged by the Republic of Cyprus on five offenses, including participation in a terrorist organization and providing support to a terrorist organization.  On June 29, 2015, Abdallah was sentenced to six years in prison.

In August 2015, Kuwaiti authorities arrested three Hizballah operatives who had stored 42,000 pounds of ammonium nitrate, 300 pounds of C4, dozens of small arms, and 204 grenades under a residential house.

In 2017, Bolivian authorities identified a Hizballah-affiliated warehouse, seizing enough explosive precursor material to produce a 2.5 ton bomb, as well as a vehicle-borne improvised explosive device.

In June 2017, two Hizballah operatives were arrested in the United States.  One operative arrested in Michigan had identified the availability of explosives precursors in Panama in 2011 and surveilled U.S. and Israeli targets in Panama as well as the Panama Canal from 2011-2012.  Another operative arrested in New York had surveilled U.S. military and law enforcement facilities from 2003-2017.

**Strength:**  The group has tens of thousands of supporters and members worldwide.

PX210

**Location/Area of Operation:**  Hizballah is based in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon, but the group operates around the world.  Since 2013, Hizballah fighters have assisted Assad regime forces in many areas across Syria.

**Funding and External Aid:**  Iran continues to provide Hizballah with the majority of its funding, training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid.  Syria has furnished training, weapons, and diplomatic and political support. Hizballah also receives funding in the form of private donations from Lebanese Shia diaspora communities around the world, including profits from legal and illegal businesses.  These include smuggling contraband goods, passport falsification, narcotics trafficking, money laundering, and credit card, immigration, and bank fraud.

## HIZBUL MUJAHIDEEN

**aka** HM, Hizb-ul-Mujahideen

**Description:**  Hizbul Mujahideen (HM) was designated as a Foreign Terrorist Organization on August 17, 2017.  The group was formed in 1989 and is one of the largest and oldest militant groups operating in the state of Jammu and Kashmir.  HM is led by Mohammad Yusuf Shah, also known as Syed Salahuddin, and officially supports the liberation of Kashmir and its accession to Pakistan, although some cadres are pro-independence.  The group focuses its attacks on Indian security forces and politicians in Kashmir and has conducted operations jointly with other Kashmiri militants.  It reportedly operated in Afghanistan through the mid-1990s and trained alongside the Afghan Hizb-e-Islami Gulbuddin (HIG) in Afghanistan until the Taliban takeover.  The group is made up primarily of ethnic Kashmiris.

**Activities:**  Hizbul Mujahideen has claimed responsibility for several attacks in the state of Jammu and Kashmir.  On April 17, 2014, HM launched two grenades into an area where preparations were taking place for an election rally in Beerwah of Jammu and Kashmir.  The attacks injured 17 people.  Later that year, HM killed two and injured 24 others after launching a grenade in a crowded market in south Kashmir.  In May 2015, HM claimed an attack on Indian security forces in Kupwara that killed three Indian troops, according to the targeted forces.  HM launched additional attacks against Indian security forces in 2015 and 2016.  On May 1, 2017, HM killed seven people – including five policemen – when it attacked a bank van carrying cash in the state of Jammu and Kashmir.

**Strength:**  Exact numbers are unknown, but there may be several hundred members in Pakistan and in the state of Jammu and Kashmir.

**Location/Area of Operation:**  HM conducts operations primarily in India, including the state of Jammu and Kashmir.

**Funding and External Aid:**  Unknown, but suspected to receive funding from sources in Pakistan.

PX210

## INDIAN MUJAHEDEEN

**aka** Indian Mujahidin; Islamic Security Force-Indian Mujahideen (ISF-IM)

**Description:** The Indian Mujahedeen (IM) was designated as a Foreign Terrorist Organization on September 19, 2011. The India-based terrorist group is responsible for dozens of bomb attacks throughout India since 2005, and has caused the deaths of hundreds of civilians. IM maintains ties to other terrorist entities including Pakistan-based Lashkar e-Tayyiba, Jaish-e-Mohammed, and Harakat ul-Jihad Islami. IM's stated goal is to carry out terrorist actions against Indians for their oppression of Muslims. IM has also expanded its area of operations into Nepal, which is now the biggest hub for IM operatives.

**Activities:** IM is known for carrying out multiple coordinated bombings in crowded areas against economic and civilian targets to maximize terror and casualties. In 2008, for example, IM was responsible for 16 synchronized bomb blasts in crowded urban centers, including an attack in Delhi that killed 30 people and an attack at a local hospital in Ahmedabad that killed 38. In 2010, IM bombed a popular German bakery in Pune, India, frequented by tourists; 17 people were killed and more than 60 people were injured in the attack.

In January 2015, the arrest of three IM militants linked the group to the December 2014 low-intensity blast near a restaurant in Bangalore that killed one woman and injured three others. The arrest also uncovered that the group planned to carry out attacks on Republic Day and had provided explosives to carry out attacks in other parts of the country.

In 2016, IM was increasingly linked to ISIS. In May, for example, six IM operatives were identified in an ISIS propaganda video threatening attacks on India. A month later, it was reported that an IM cell linked to ISIS was plotting attacks on multiple targets in Hyderabad and had purchased chemicals to make high-grade explosives for the planned operations. In September 2017, Indian law enforcement uncovered the plans of an IM militant in custody to conduct attacks in India, including targeted killings and bombing a temple in Gaya.

**Strength:** Unknown

**Location/Area of Operation:** IM operates in India, Nepal, and Pakistan.

**Funding and External Aid:** The group is suspected to obtain funding and support from other terrorist organizations, as well as from sources in Pakistan and the Middle East.

## ISLAMIC JIHAD UNION

**aka** Islamic Jihad Group; Islomiy Jihod Ittihodi; al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahedin; The Kazakh Jama'at; The Libyan Society

**Description:** The Islamic Jihad Union (IJU) was designated as a Foreign Terrorist Organization on June 17, 2005. The group splintered from the Islamic Movement of Uzbekistan in the early 2000s. Najmiddin Jalolov founded the organization as the Islamic Jihad Group in March 2002,

PX210

but the group was renamed Islamic Jihad Union in May 2005.  Although IJU remains committed to overthrowing the Government of Uzbekistan, it also has a global agenda, demonstrated by its attacks on international forces in Afghanistan.

**Activities:**  The IJU primarily operates against international forces in Afghanistan and remains a threat to Central Asia.  IJU claimed responsibility for attacks in 2004 in Uzbekistan, which targeted police at several roadway checkpoints and at a popular bazaar, killing approximately 47 people, including 33 IJU members, some of whom were suicide bombers.  In July 2004, the group carried out near-simultaneous suicide bombings of the Uzbek Prosecutor General's office and the U.S. and Israeli Embassies in Tashkent.  In 2013, two IJU videos showed attacks against an American military base in Afghanistan and an IJU sniper shooting an Afghan soldier.

According to statements and photos released by the group, IJU participated in the April-September 2015 Taliban siege of Kunduz city.  At least 13 police officers were killed in the attacks, and hundreds of civilians were killed.  In August 2015, IJU pledged allegiance to the then newly appointed Taliban leader Mullah Mansour.

In 2017, IJU released a video showing its militants using assault rifles and rocket-propelled grenades engaging in combat with Afghan troops in late 2016.

**Strength:**  The group consists of 100 to 200 members.

**Location/Area of Operation:**  IJU was last known to operate in Uzbekistan, with members scattered throughout Central Asia and Europe.

**Funding and External Aid:**  Unknown

## ISLAMIC MOVEMENT OF UZBEKISTAN

**aka** IMU

**Description:**  Designated as a Foreign Terrorist Organization on September 25, 2000, the Islamic Movement of Uzbekistan (IMU) seeks to overthrow the Uzbek government and establish an Islamic state.  For most of the past decade, however, the group has recruited members from other Central Asian states and Europe.  Despite its objective to set up an Islamic state in Uzbekistan, the group operates primarily along the Afghanistan-Pakistan border and in northern Afghanistan, where it fights against international forces.  Several IMU members are also suspected of having traveled to Syria to fight with terrorist groups.

The IMU has had a decade-long relationship with al-Qa'ida (AQ), the Taliban, and Tehrik-e Taliban Pakistan (TTP).  Top IMU leaders have integrated themselves into the Taliban's shadow government in Afghanistan's northern provinces.

In August 2015, IMU leader Usman Ghazi publicly announced the group's shift of allegiance to ISIS.  Numerous IMU members, including possibly Ghazi himself, were subsequently reported to have been killed as a result of hostilities between ISIS and its former Taliban allies.

PX210

**Activities:** Since the beginning of Operation Enduring Freedom, the IMU has predominantly been focused on attacks against international forces in Afghanistan. In late 2009, NATO forces reported an increase in IMU-affiliated foreign terrorist fighters in Afghanistan. In 2010, the IMU claimed responsibility for the September 19 ambush that killed 25 Tajik troops in Tajikistan. On June 8, 2014, IMU claimed responsibility for an attack on Karachi's international airport that resulted in the deaths of at least 39 people.

Throughout 2015, the IMU actively threatened the Afghan government, specifically in the northern part of the country. In April, the group released a video showing IMU members beheading an individual they claimed to be an Afghan soldier and threatened to behead Hazara (a historically persecuted ethnic group in Afghanistan) hostages, in supposed retaliation for the Afghan security forces capture of several female members of IMU. Also in 2015, Uzbek refugee Fazliddin Kurbanov was convicted and sentenced by a U.S. federal court to 25 years in prison for planning a bomb attack in Idaho. Kurbanov had been in contact with members of IMU online, seeking advice on how to make explosives and discussing attacking U.S. military bases.

In June 2016, a faction of IMU announced its continued commitment to the Taliban and AQ, marking a split with its leader Ghazi and the rest of the group, which announced its loyalty to ISIS in 2015 and has since cooperated with Islamic State's Khorasan Province.

**Strength:** 200 to 300 members

**Location/Area of Operation:** Central Asia, Iran, Afghanistan, Pakistan

**Funding and External Aid:** The IMU receives support from a large Uzbek diaspora, terrorist organizations, and donors from Europe, Central and South Asia, and the Middle East.

## ISLAMIC STATE OF IRAQ AND SYRIA (ISIS)

**aka** al-Qa'ida in Iraq; al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; al-Qa'ida of Jihad Organization in the Land of the Two Rivers; al-Qa'ida of the Jihad in the Land of the Two Rivers; al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network; Islamic State in Iraq; Islamic State in Iraq and al-Sham; Islamic State in Iraq and Syria; ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham; Daesh; Dawla al Islamiya; Al-Furqan Establishment for Media Production; Islamic State; ISIL; ISIS

**Description:** Al-Qa'ida in Iraq (AQI) was designated as a Foreign Terrorist Organization on December 17, 2004. In the 1990s, Jordanian militant Abu Mus'ab al-Zarqawi organized a

PX210

terrorist group called al-Tawhid wal-Jihad to oppose the presence of U.S. and Western military forces in the Middle East and the West's support for, and the existence of, Israel. In late 2004, he joined al-Qa'ida (AQ) and pledged allegiance to Usama bin Laden. At this time his group became known as al-Qa'ida in Iraq (AQI). Zarqawi led the group in Iraq during Operation Iraqi Freedom to fight against U.S. and Coalition forces until his death in June 2006.

In October 2006, AQI publicly renamed itself the Islamic State in Iraq and in 2013 it adopted the moniker ISIS to express its regional ambitions as it expanded operations to include the Syrian conflict. ISIS is led by Abu Bakr al-Baghdadi, who declared an Islamic caliphate in June 2014. In October 2017, the U.S. military fighting with local Syrian allies announced the liberation of Raqqa, the self-declared capital of the ISIS "caliphate."

**Activities:** As AQI, ISIS conducted numerous high profile attacks, including improvised explosive device attacks against U.S. military personnel and Iraqi infrastructure, videotaped beheadings of U.S. citizens, suicide bombings against both military and civilian targets, and rocket attacks. ISIS perpetrated these attacks using foreign and Iraqi operatives. In 2014, ISIS was responsible for the majority of the 12,000 Iraqi civilian deaths that year. ISIS was heavily involved in the fighting in Syria, including against other militant opposition groups, and participated in a number of kidnappings of civilians, including aid workers and journalists.

In 2015 and 2016, ISIS conducted several large-scale attacks in Iraq and Syria and across the globe. In February 2016, a series of ISIS suicide and car bombs killed at least 129 people in Homs and Damascus, Syria. In March, ISIS carried out a suicide attack at a crowded park in Iskandariya, Iraq at the end of a football match, killing approximately 29 and wounding more than 60 others.

In early May 2016, two suicide car bombs claimed by ISIS killed 32 and wounded another 75 in Samawa, in southern Iraq. In mid-May, ISIS conducted a series of attacks in and around Baghdad, including suicide bombings and a car bombing at a crowded market in Sadr City that killed at least 88 people – most of them women and children. In July, ISIS claimed a car bombing at a popular shopping center in Baghdad that killed nearly 300 people, making it the single deadliest bombing in Iraq's capital city since 2003. In October, it was revealed that ISIS was using hundreds to thousands of Iraqi civilians as human shields when fighting Iraqi forces.

In February 2017, ISIS killed 48 people in a car bombing in Baghdad, and another four attacks around Baghdad killed an additional eight people on the same day. In early April, the group killed 33 Syrians in eastern Syria, and on the same day, killed another 22 people in Tikrit, Iraq when ISIS gunmen opened fire on police and civilians before detonating explosives they were wearing. On June 7, ISIS gunmen and suicide bombers killed over a dozen people in two separate attacks in Tehran, including an attack inside the Parliament building. In September, ISIS killed over 80 people at a checkpoint and restaurant in Nasiriyah, Iraq, an area frequented by Shia Muslims on pilgrimage. In November, a car bombing in a predominantly Shia area of Salah ad Din province killed at least 36 people, including 11 Iraqi Security Forces personnel.

Since at least 2015, the group has integrated local children and children of foreign terrorist fighters into its forces and used them as executioners and suicide attackers. ISIS has

PX210

systematically prepared child soldiers in Iraq and Syria using its education and religious infrastructure as part of its training and recruitment of members. Furthermore, since 2015, ISIS abducted, raped, and abused thousands of women and children, some as young as eight years of age. Women and children were sold and enslaved, distributed to ISIS fighters as spoils of war, forced into marriage and domestic servitude, or subjected to physical and sexual abuse. (For further information, refer to the *2017 Trafficking in Persons Report*.)

ISIS also directs, enables, and inspires individuals to conduct attacks on behalf of the group around the world, including in the United States and Europe. In November 2015, ISIS carried out a series of coordinated attacks in Paris, France, including at a rock concert at the Bataclan concert hall, killing approximately 130 people and injuring more than 350 others; 23-year-old U.S. citizen Nohemi Gonzalez was among the dead. In March 2016, ISIS directed two simultaneous attacks in Brussels, Belgium – one at the Zaventem Airport and the other at a metro station. The attacks killed 32 people, including four U.S. citizens, and injured more than 250 people. In June 2016, a gunman who pledged allegiance to ISIS killed 49 individuals and injured 53 others at the Pulse nightclub in Orlando, Florida. In July 2016, ISIS claimed an attack in which a terrorist driving a cargo truck attacked a crowd in Nice, France, during Bastille Day celebrations, resulting in 86 deaths, including three U.S. citizens. In December 2016, ISIS claimed responsibility for a truck attack on a crowded Christmas market in Berlin, Germany that killed 12 people and injured 48 others.

On March 22, 2017, ISIS claimed responsibility for a terrorist attack on London's Westminster Bridge when a man drove his car into pedestrians and stabbed others, killing five people. In early April 2017 a man who claimed to be a member of ISIS drove a truck into a crowded shopping center in Stockholm, Sweden, killing five and injuring many more. In May, ISIS claimed a suicide bombing in Manchester, England that killed 22 people outside of a live concert.

**Strength:** Estimates suggest ISIS fighters in Iraq and Syria number between 6,000 and 10,000, although this number was likely reduced further in 2017 military operations.

**Location/Area of Operation:** ISIS's operations are predominately in Iraq and Syria, but the group has created external ISIS branches and networks. In addition, supporters and associates worldwide inspired by the group's ideology may be operating without direction from ISIS central leadership.

**Funding and External Aid:** ISIS received most of its funding from a variety of businesses and criminal activities within areas it controls in Iraq and Syria. Criminal activities included robbing banks, smuggling oil, looting and selling antiquities and other goods, as well as extortion, human trafficking, and kidnapping-for-ransom. However, in recent years, ISIS has lost over 98 percent of the territory (including oil and gas fields and population centers) it once controlled in Iraq and Syria, which has directly impacted ISIS's ability to generate revenue. By 2017, ISIS's revenue from oil sales and extortion was significantly lower than in 2015.

## ISLAMIC STATE'S KHORASAN PROVINCE

304

PX210

**aka** ISIL Khorasan; Islamic State's Khorasan Province; ISIS Wilayat Khorasan; ISIL's South Asia Branch; South Asian chapter of ISIL

**Description:**  Islamic State's Khorasan Province (ISIS-K) was designated as a Foreign Terrorist Organization on January 14, 2016.  The group is based in Afghanistan, conducts operations in Afghanistan and Pakistan, and is composed primarily of former members of Tehrik-e Taliban Pakistan, the Afghan Taliban, and the Islamic Movement of Uzbekistan.  ISIS-K's senior leadership has pledged allegiance to ISIS leader Abu Bakr al-Baghdadi, which was accepted in late January 2015.  ISIS-K has carried out suicide bombings, small arms attacks, and kidnappings in Afghanistan against civilians and Afghan National Security and Defense Forces. The group has also claimed responsibility for attacks on civilians and government officials in Pakistan.

It was reported that ISIS-K leader Hafiz Saeed Khan was killed in July 2016.  Khan's former deputy and the former Taliban Commander from Logar Province, Abdul Hasib, took over leadership for ISIS-K.  Abdul Hasib was killed in a joint Afghan and U.S. operation in April 2017.  His successor is Abu Sayed, who was reported killed in 2017 although his death was not subsequently confirmed

**Activities:**  In January 2016, the group claimed it carried out a strike on a Pakistani consulate in Afghanistan, resulting in the deaths of seven Afghan security personnel.  In July, the group conducted a bomb attack at a peaceful protest in Kabul, Afghanistan that killed approximately 80 people and wounded another 230.  In August, ISIS-K claimed it carried out a shooting and suicide bombing at a hospital in Quetta targeting lawyers, which killed 94.  It also claimed responsibility in November 2016 for a suicide bombing at the Shah Noorani Shrine in Baluchistan province, Pakistan, killing more than 50 people.

On July 31, 2017, ISIS-K fighters attacked the Iraqi embassy in Kabul, killing two people including a security guard on the compound.  The next day, ISIS-K bombed a mosque in western Afghanistan, killing 29 people and injuring 60 others.  Between October and December of 2017, ISIS-K claimed responsibility for several deadly attacks in Kabul, including ones targeting a television station, a Shia cultural center, and an Afghan intelligence office near the U.S. embassy.

ISIS-K also claimed multiple attacks in Pakistan in 2017, including an attack on a Sufi shrine in Sindh province in February that killed at least 88 people, and an attack on a church in Quetta that killed at least nine people.

**Strength:**  Estimates of ISIS-K strength ranged from 1,500 to 3,000 fighters in 2017.

**Location/Area of Operation:**  The group operates in eastern and parts of northern Afghanistan and western Pakistan.

**Funding and External Aid:**  ISIS-K receives some funding from ISIS.  Additional funds come from taxes and extortion on the local population and businesses.

PX210

## ISLAMIC STATE OF IRAQ AND THE LEVANT-LIBYA (ISIL-LIBYA)

**aka** Islamic State of Iraq and the Levant in Libya; Wilayat Barqa; Wilayat Fezzan; Wilayat Tripolitania; Wilayat Tarablus; Wilayat al-Tarabulus

**Description:**  ISIL-Libya was designated as a Foreign Terrorist Organization on May 20, 2016. In 2014, ISIS leader Abu Bakr al-Baghdadi dispatched a group of ISIS operatives from Syria to Libya to establish a branch of the terrorist group.  In October 2014, several hundred operatives set up a base in Darnah, and the next month, Baghdadi formally established the branch after announcing he had accepted oaths of allegiance from fighters in Libya.

**Activities:**  Since being established, the group has carried out multiple attacks in the country and has threatened to expand ISIS's presence into other countries in Africa.  In January 2015, ISIL-Libya claimed responsibility for a suicide attack on a luxury hotel in Tripoli that killed eight people, including a U.S. contractor.  That same month, ISIL-Libya killed 16 people in an attack on a Libyan army checkpoint.

In February 2015, ISIL-Libya released a propaganda video showing the murder of 21 Egyptian Coptic Christians who had been kidnapped in Sirte, Libya, in two separate incidents in December 2014 and January 2015.  Also in February, ISIL-Libya claimed responsibility for bomb attacks against a petrol station, a police station, and the home of parliamentary speaker Agila Salah in the town of al-Qubbah.  The attacks killed at least 40 people and wounded dozens of others.

Between 2015 and 2016, ISIL-Libya doubled its presence in the country; in early 2016, reports suggested the group counted as many as 6,000 fighters in its ranks.  In 2016, ISIL-Libya expanded operations into Libya's oil crescent, launching attacks on some of the country's largest oil installations: burning oil tanks, killing dozens, and forcing facilities to shut down operations. In March, the group attacked a Sirte hospital and kidnapped 20 medical workers.  The group attacked other medical facilities and carried out other attacks in Benghazi and Tripoli.

In December 2016, Libyan forces drove ISIL-Libya from its stronghold and main base in Sirte into the desert areas and neighboring cities.  In January and September 2017, U.S. air strikes killed an estimated 100 ISIL fighters in Libya.

**Strength:**  In May 2017, ISIL-Libya was reported to have around 500 fighters, fallen from 6,000 members in early 2016.

**Location/Area of Operation:**  ISIL-Libya is no longer in control of any major cities in Libya but continues to operate in rural regions in southern Libya and in the western town of Sabratha.

**Funding and External Aid:**  ISIL-Libya's funding comes from a variety of sources, including criminal activity, such as smuggling and extortion, and external funding.  The group also receives support from ISIS.

PX210

## ISLAMIC STATE-SINAI PROVINCE (ISIS-SP)

**aka** Ansar Bayt al-Maqdis; Ansar Jerusalem; Supporters of Jerusalem; Ansar Bayt al-Maqdes; Ansar Beit al-Maqdis; ISIL Sinai Province; Islamic State in the Sinai; Jamaat Ansar Beit al-Maqdis; Jamaat Ansar Beit al-Maqdis fi Sinaa; Sinai Province; Supporters of the Holy Place; The State of Sinai; Wilayat Sinai

**Description:**  Originally designated as a Foreign Terrorist Organization on April 9, 2014, Ansar Bayt al-Maqdis (ABM) rose to prominence in 2011 following the uprisings in Egypt.  It is responsible for attacks against Israeli and Egyptian government and security elements, and against tourists in Egypt.  In November 2014, ABM officially declared allegiance to ISIS.  In September 2015, the Department of State amended ABM's designation to add the aliases ISIL Sinai Province and Islamic State-Sinai Province (ISIS-SP), among others

**Activities:**  ISIS-SP has claimed responsibility for numerous attacks against Israeli interests, including a July 2012 attack against a Sinai pipeline exporting gas to Israel and a September 2012 attack targeting an Israeli border patrol, which killed one soldier and injured another.

In October 2013, ISIS-SP claimed responsibility for a suicide bombing targeting the South Sinai Security Directorate in el Tor, which killed three people and injured more than 45.  In January 2014, ISIS-SP successfully downed an Egyptian military helicopter in a missile attack, killing five soldiers on board.  ISIS-SP has targeted government officials, including the January 2014 assassination of the head of the Interior Minister's technical office.  In February 2014, ISIS-SP claimed responsibility for the bombing of a tour bus in the Sinai  Peninsula, killing the Egyptian driver and three South Korean tourists; the attack was ISIS-SP's first against foreign tourists.

In October 2014, ISIS-SP claimed a strike on a security checkpoint that killed 33 Egyptian soldiers and wounded 26 others, including civilians.  On November 4, 2015, ISIS-SP released an audio recording in which it claimed responsibility for the October 31 bombing of a Russian passenger plane carrying 224 people from the Egyptian resort town of Sharm el-Sheikh to St. Petersburg, Russia.  All 224 passengers and seven crew members were killed.

On August 5, 2015, ISIS-SP claimed responsibility for the July 22 abduction of Croatian citizen Tomislav Salopek, who worked as a topographer for a French energy company.  Salopek was kidnapped on October 6 in the western desert, approximately 20 km west of the suburbs of Cairo. ISIS-SP demanded the release of all female Muslims in Egyptian prisons within 48 hours in exchange for Salopek.  Salopek was ultimately beheaded and ISIS-SP claimed responsibility for the killing.

Throughout the course of 2016, ISIS-SP carried out numerous attacks in the Sinai, including a January double-bombing that killed two Egyptian policemen and two military officers.  The group was also responsible for a July wide-scale coordinated attack on several military checkpoints that reportedly killed more than 50 people.

PX210

On September 11, 2017, ISIS-SP attacked an Egyptian police convoy in an ambush that killed 18 soldiers and injured more.

**Strength:**  ISIS-SP is estimated to have between 800 and 1,200 fighters in the Sinai Peninsula and affiliated cells in the Nile Valley.

**Location/Area of Operation:**  ISIS-SP operations are based out of the Sinai Peninsula, but its reach extends to Cairo, the Egyptian Nile Valley, and Gaza.

**Funding and External Aid:**  Although the source of ISIS-SP's funding is largely unknown, there are indications that it may receive funding from external actors.

## JAMA'ATU ANSARUL MUSLIMINA FI BILADIS-SUDAN (ANSARU)

**aka** Ansaru; Ansarul Muslimina Fi Biladis Sudan; Vanguards for the Protection of Muslims in Black Africa; JAMBS; Jama'atu Ansaril Muslimina Fi Biladis Sudan

**Description:**  Designated as a Foreign Terrorist Organization on November 14, 2013, Jama'atu Ansaril Muslimina fi Biladis-Sudan (Ansaru) publicly splintered from Boko Haram in January 2012.  Ansaru's leadership structure is unclear, although Khalid al-Barnawi held a top leadership position until his alleged capture by the Nigerian army in 2016.  Since its inception, Ansaru has targeted civilians, including Westerners, and Nigerian government and security officials.  Ansaru purportedly aims to defend Muslims throughout all of Africa by fighting against the Nigerian government and international interests.  While Ansaru claims to identify with Boko Haram's objectives and struggle, it has criticized the group for killing fellow Muslims.

**Activities:**  In November 2012, Ansaru raided a police station in Abuja, killing Nigerian police officers and freeing detained terrorists from prison.  Ansaru has carried out multiple kidnapping operations targeting civilians.  In late 2012, Ansaru kidnapped a French engineer allegedly due to French involvement in Mali.  In early 2013, Ansaru kidnapped and subsequently killed seven international construction workers.

Ansaru did not publicly claim any attacks between 2014 and 2017.  On April 4, 2016, the Nigerian army announced the capture of Ansaru leader Khalid al-Barnawi.

**Strength:**  Total membership is unknown.  Given its narrower scope of operations, it is estimated that Ansaru's membership is much smaller than that of Boko Haram.

**Location/Area of Operation:**  The group operates in northern Nigeria.

**Funding and External Aid:**  Unknown

## JAISH-E-MOHAMMED

PX210

**aka** the Army of Mohammed; Mohammed's Army; Tehrik ul-Furqaan; Khuddam-ul-Islam; Khudamul Islam; Kuddam e Islami; Jaish-i-Mohammed

**Description:**  Pakistan-based Jaish-e-Mohammed (JeM) was designated as a Foreign Terrorist Organization on December 26, 2001.  JeM was founded in early 2000 by former senior Harakat ul-Mujahideen leader Masood Azhar upon his release from prison in India in exchange for 155 hijacked Indian Airlines hostages.  The group aims to annex the state of Jammu and Kashmir to Pakistan and expel international forces from Afghanistan.  JeM has openly declared war against the United States.

**Activities:**  JeM continues to operate openly in parts of Pakistan, conducting fatal attacks in the region, despite the country's 2002 ban on its activities.  JeM has claimed responsibility for several suicide car bombings in the state of Jammu and Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people.  The Indian government has publicly implicated JeM, along with Lashkar e-Tayyiba (LeT), in the December 2001 attack on the Indian Parliament that killed nine people and injured 18 others.

In 2002, Pakistani authorities arrested and convicted a JeM member for the abduction and murder of U.S. journalist Daniel Pearl.  In December 2003, Pakistan implicated JeM members in two assassination attempts against then President Pervez Musharraf.

In 2016, Indian officials blamed JeM for a January attack on an Indian Air Force base in Pathankot.  One civilian and seven Indian security force personnel were killed.  From February through May 2016, both LeT and JeM were suspected of engaging in at least three firefights with Indian security forces in Kupwara district, Jammu and Kashmir, injuring approximately two Indian personnel.

In June 2017, Indian police stated JeM conducted multiple attacks against security forces in five locations across the state of Jammu and Kashmir, injuring over a dozen people.  Another attack in October left one Indian Border Security Force personnel and three JeM militants dead.

**Strength:**  JeM has at least several hundred armed supporters.

**Location/Area of Operation:**  JeM operates in India, including the state of Jammu and Kashmir; Afghanistan; and Pakistan, particularly southern Punjab.

**Funding and External Aid:**  To avoid asset seizures by the Pakistani government, since 2007 JeM has withdrawn funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and the production of consumer goods.  JeM also collects funds through donation requests, sometimes using charitable causes to solicit donations.

## JAYSH RIJAL AL-TARIQ AL-NAQSHABANDI (JRTN)

PX210

**aka** Jaysh Rijal al-Tariq al-Naqshabandi; Army of the Men of the Naqshbandi Order; Armed Men of the Naqshbandi Order; Naqshbandi Army; Naqshabandi Army; Men of the Army of al-Naqshbandia Way; Jaysh Rajal al-Tariqah al-Naqshbandia; JRTN; JRN; AMNO

**Description:** Jaysh Rijal al-Tariq al-Naqshabandi (JRTN) was designated as a Foreign Terrorist Organization in September 2015. The group first announced insurgency operations against international forces in Iraq in December 2006 in response to the execution of Saddam Hussein. Izzat Ibrahim al-Douri, former vice president of Saddam Hussein's Revolutionary Council, leads the group, which consists of former Baath Party officials, military personnel, and Sunni nationalists. JRTN aims to overthrow the Government of Iraq, install a new Ba'athist regime, and end external influence in Baghdad.

**Activities:** Between its founding in 2006 and the 2011 withdrawal of Coalition Forces from Iraq, JRTN claimed numerous attacks on U.S. bases and forces. JRTN is also known to have used vehicle-borne improvised explosive devices against Iraqi government security forces.

In 2014, elements of JRTN joined military forces with ISIS in opposition to the Iraqi government. The group played a major role in the capture of Mosul from Iraqi security forces in 2014. Elements of JRTN continued cooperating with ISIS in 2016, but did not publicly claim any specific attacks in 2016 or 2017.

**Strength:** In 2013, the group was estimated to have about 5,000 fighters; membership is almost certainly much lower today.

**Location/Area of Operation:** The group is based primarily in Iraq.

**Funding and External Aid:** JRTN historically received funding from former regime members, major tribal figures in Iraq, and from Gulf-based financiers of terrorism.

## JEMAAH ANSHORUT TAUHID

**aka** JAT; Jemmah Ansharut Tauhid; Jem'mah Ansharut Tauhid; Jamaah Ansharut Tauhid; Jama'ah Ansharut Tauhid; Laskar 99

**Description:** The Department of State designated Jemaah Anshorut Tauhid (JAT) as a Foreign Terrorist Organization on March 13, 2012. Formed in 2008, the Indonesia-based group seeks to establish an Islamic caliphate in Indonesia and has carried out numerous attacks on Indonesian government personnel, police, military, and civilians. In 2011, Abu Bakar Ba'asyir, the founder and leader of JAT, was sentenced to 15 years in prison for his role in organizing a militant training camp in Aceh. Ba'asyir is also the co-founder and former leader of Jemaah Islamiya (JI). JAT maintains ties to JI and other terrorist groups in Southeast Asia.

**Activities:** JAT has conducted multiple attacks targeting civilians and Indonesian officials, resulting in the deaths of numerous Indonesian police and innocent civilians. In December 2012, four police officers were killed and two wounded in an attack by suspected local JAT members in Central Sulawesi. Since Abu Bakar Ba'asyir's pledge of allegiance to ISIS in 2014, many

PX210

JAT members have joined Indonesia's ISIS-affiliated groups, while others have joined al-Qa'ida-affiliated groups.  Although JAT did not publicly claim any attacks in 2016 or 2017, JAT members are believed to have been involved in ISIS operations in Southeast Asia.

**Strength:**  JAT is estimated to have several thousand supporters and members, although internal disagreements over aligning with ISIS have likely reduced its membership.

**Location/Area of Operation:**  The group is based in Indonesia.

**Funding and External Aid:**  JAT raises funds through membership donations and legitimate business activities.  JAT has also conducted cyber hacking, robbed banks, and carried out other illicit activities to fund the purchase of assault weapons, ammunition, explosives, and bomb-making materials.

## JEMAAH ISLAMIYA

**aka** Jemaa Islamiyah; Jema'a Islamiyah; Jemaa Islamiyya; Jema'a Islamiyya; Jemaa Islamiyyah; Jema'a Islamiyyah; Jemaah Islamiah; Jemaah Islamiyah; Jema'ah Islamiyah; Jemaah Islamiyyah; Jema'ah Islamiyyah; JI

**Description:**  Designated as a Foreign Terrorist Organization on October 23, 2002, Jemaah Islamiya (JI) is a Southeast Asia-based terrorist group co-founded by Abdullah Sungkar and Abu Bakar Ba'asyir.  The group seeks to establish an Islamic caliphate in the region.  More than 400 JI operatives have been captured or killed since 2002, including operations chief and al-Qa'ida (AQ) associate Hambali and, in January 2015, bomb-maker Zulfiki bin Hir (aka Marwan).

**Activities:**  Significant JI attacks include the 2002 Bali bombings, which killed more than 200 people, among them seven U.S. citizens; the August 2003 bombing of the J.W. Marriott Hotel in Jakarta; the September 2004 bombing outside the Australian Embassy in Jakarta; and the October 2005 suicide bombing in Bali, which left 26 dead.

On July 17, 2009, a JI faction led by Noordin Mohamed Top claimed responsibility for suicide attacks at the J.W. Marriott and Ritz-Carlton hotels in Jakarta that killed seven people and injured more than 50, including seven U.S. citizens.

In January 2015, 44 Philippines policemen and three civilians were killed when a police counterterrorism squad was ambushed while conducting a raid in Mamasapano in the southern island of Mindanao in an attempt to arrest two JI members.  In October 2015, two senior JI leaders – Zarkashi and JI military leader Abu Dujana – were released from prison after serving seven years each in Indonesian jails.  There were no reported attacks by JI in 2016 or 2017.  JI is believed to be recruiting, restructuring, and strengthening its network and finances.

**Strength:**  Estimates of JI membership vary from 500 to several thousand members.

PX210

**Location/Area of Operation:**  In its earlier years, JI focused its operations and presence in Indonesia, and is beginning to regain its strength there.  The group has also carried out attacks in Malaysia and the Philippines in the past.

**Funding and External Aid:**  JI fundraises through membership donations and criminal and business activities.  It has received financial, ideological, and logistical support from Middle Eastern contacts and illegitimate charities and organizations.

## JUNDALLAH

**aka** People's Resistance Movement of Iran (PMRI); Jonbesh-i Moqavemat-i-Mardom-i Iran; Popular Resistance Movement of Iran; Soldiers of God; Fedayeen-e-Islam; Former Jundallah of Iran; Jundullah; Jondullah; Jundollah; Jondollah; Jondallah; Army of God (God's Army); Baloch Peoples Resistance Movement (BPRM)

**Description:**  Jundallah was designated as a Foreign Terrorist Organization on November 4, 2010.  Since its inception in 2003, Jundallah, which operates primarily in the province of Sistan VA Balochistan of Iran, and the Baloch areas of Pakistan and Afghanistan, has engaged in numerous attacks, killing and maiming scores of Iranian civilians and government officials.  Jundallah's stated goals are to secure recognition of Balochi cultural, economic, and political rights from the Government of Iran, and to spread awareness of the plight of the Baloch people.

**Activities:**  Jundallah claimed responsibility for an October 2009 suicide bomb attack in the Sistan va Balochistan province that killed more than 40 people and was reportedly the deadliest terrorist attack in Iran since the 1980s.  In a statement on its website, Jundallah also claimed the December 15, 2010 suicide bomb attack inside the Iman Hussein Mosque in Chabahar, which killed an estimated 35 to 40 civilians and wounded 60 to 100.  In July 2010, Jundallah attacked the Grand Mosque in Zahedan, killing approximately 30 and injuring an estimated 300. Jundallah did not publicly claim any attacks in 2016 or 2017.

**Strength:**  The 2010 execution of Jundallah's leader by Iran and the killing and arrest of many Jundallah fighters seriously diminished Jundallah's capacity to operate.

**Location/Area of Operation:**  Jundallah has traditionally operated throughout the Sistan va Balochistan province in southeastern Iran and the Balochistan area of Afghanistan and Pakistan.

**Funding and External Aid:**  Unknown

## KAHANE CHAI

**aka** American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea;

**PX210**

Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description:**  Radical Israeli-American Rabbi Meir Kahane founded Kach – the precursor to Kahane Chai (KC) – with the aim of restoring Greater Israel (Israel, the West Bank, and Gaza). Its offshoot, Kahane Chai (translation: "Kahane Lives"), was founded by Meir Kahane's son Binyamin, following his father's 1990 assassination.  Both organizations were designated as Foreign Terrorist Organizations on October 8, 1997.  In 1994, the group was banned from running in Israeli elections.

**Activities:**  KC has harassed and threatened Arabs, Palestinians, and Israeli government officials, and vowed revenge for the December 2000 death of Binyamin Kahane and his wife. The group is suspected of involvement in a number of low-level attacks since the start of the Second Palestinian Intifada in 2000.  KC was last linked to an attack in 2005, when a member of the terrorist group shot dead four people on a bus in Shfaram, Israel.  The group was dormant in 2017.

**Strength:**  Since 2005, KC's core membership has been estimated to be fewer than 100.  The group's membership and support networks were overwhelmingly composed of Israeli citizens that lived mostly in West Bank settlements.

**Location/Area of Operation:**  KC is based in Israel and West Bank settlements, particularly Qiryat Arba in Hebron.

**Funding and External Aid:**  KC has received support from sympathizers in the United States and Europe.

## KATA'IB HIZBALLAH

**aka** Hizballah Brigades; Hizballah Brigades in Iraq; Hizballah Brigades-Iraq; Kata'ib Hezbollah; Khata'ib Hezbollah; Khata'ib Hizballah; Khattab Hezballah; Hizballah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizballah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah

**Description:**  Formed in 2006 and designated as a Foreign Terrorist Organization on July 2, 2009, Kata'ib Hizballah (KH) is an anti-Western Shia group with a terrorist ideology. Prior to the withdrawal of U.S. troops in 2011, the group conducted attacks against Iraqi, U.S., and Coalition targets in Iraq, and threatened the lives of Iraqi politicians and civilians supporting the legitimate political process in Iraq.  The group is notable for its extensive use of media operations and propaganda, including filming and releasing videos of attacks.  KH has ideological ties to and receives support from Iran.

**Activities:**  KH has claimed responsibility for numerous terrorist attacks since 2007, including improvised explosive device bombings, rocket-propelled grenade attacks, and sniper operations. In 2007, KH gained notoriety for its attacks against U.S. and Coalition Forces in Iraq.  In June 2011, five U.S. soldiers were killed in Baghdad when KH assailants fired multiple rockets at U.S. military base, Camp Victory.  The group remained active in 2015, participating in fighting in Syria in support of the Assad regime, and in Iraq against ISIS.  In June and July 2015, the group broadcast its recruitment contact information and an appeal for donations on a pro-Iran channel and on YouTube in an effort to recruit fighters to Syria and Iraq.

In 2016, KH continued to fight ISIS alongside the Iraqi Army and participated in the operation to liberate Mosul, though they were only active outside the city.  In 2017, the group threatened to fight "American occupiers" in Iraq, in an article published on the group's official website.

**Strength:**  Exact membership numbers are unknown.  Estimates range from 1,000 to the group's claim of 30,000 fighters

**Location/Area of Operation:**  Predominately Iraq-based, but the group also fights alongside pro-Assad regime forces in Syria.

**Funding and External Aid:**  KH is heavily dependent on support from Iran.


## KURDISTAN WORKERS' PARTY

**aka** the Kurdistan Freedom and Democracy Congress; the Freedom and Democracy Congress of Kurdistan; KADEK; Partiya Karkeran Kurdistan; the People's Defense Force; Halu Mesru Savunma Kuvveti; Kurdistan People's Congress; People's Congress of Kurdistan; KONGRA-GEL

**Description:**  Founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization, the Kurdistan Workers' Party (PKK) was designated as a Foreign Terrorist Organization on October 8, 1997.  The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984.  The PKK's original goal was to establish an independent Kurdish state in southeastern Turkey.

**Activities:**  In the early 1990s, the PKK moved beyond rural-based insurgent activities to include urban terrorism.  Anatolia became the scene of significant violence, with some estimates suggesting at least 40,000 casualties.  Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues.  The PKK foreswore violence until June 2004, when its hardline militant wing took control and renounced the self-imposed ceasefire.  Striking over the border from bases within Iraq, the PKK engaged in terrorist attacks in eastern and western Turkey.  In 2009, the Turkish government and the PKK resumed peace negotiations, but talks broke down after the PKK carried out an attack in July 2011 that left 13 Turkish soldiers dead.  In 2012, the PKK claimed responsibility for multiple car bombings resulting in the deaths of at least 10 people.

PX210

Between January and mid-July 2015, the PKK carried out small-scale armed attacks against Turkey's security forces and military bases.  In August 2016, the group claimed a vehicle-borne improvised explosive device strike against Sirnak police headquarters, which killed 11 people and wounded more than 70 others.  In January 2017, Turkish officials blamed the PKK for a car bomb and shooting outside of a courthouse that killed two people.  In June, the PKK attacked a military convoy in southeastern Turkey, using mortar and machine gun fire to kill over 20 soldiers.  Since 2015, the group has been responsible for the deaths of over 1,200 Turkish security officials and civilians.

**Strength:**  The PKK consists of approximately 4,000 to 5,000 members, 3,000 to 3,500 of which are located in northern Iraq.

**Location/Area of Operation:**  The group is located primarily in Turkey and Iraq.

**Funding and External Aid:**  The PKK receives financial support from the large Kurdish diaspora in Europe and from criminal activity.

## LASHKAR E-TAYYIBA

**aka** al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir; Jamaat-ud-Dawa; JUD; Jama'at al-Dawa; Jamaat ud-Daawa; Jamaat ul-Dawah; Jamaat-ul-Dawa; Jama'at-i-Dawat; Jamaiat-ud-Dawa; Jama'at-ud-Da'awah; Jama'at-ud-Da'awa; Jamaati-ud-Dawa; Idara Khidmat-e-Khalq; Falah-i-Insaniat Foundation; FiF; Falah-e-Insaniat Foundation; Falah-e-Insaniyat; Falah-i-Insaniyat; Falah Insania; Welfare of Humanity; Humanitarian Welfare Foundation; Human Welfare Foundation; Al-Anfal Trust; Tehrik-e-Hurmat-e-Rasool; Tehrik-e-Tahafuz Qibla Awwal; Al-Muhammadia Students; Al-Muhammadia Students Pakistan; AMS

**Description:**  Designated as a Foreign Terrorist Organization (FTO) on December 26, 2001, Lashkar e-Tayyiba (LeT) is an anti-India-focused terrorist group.  LeT formed in the late 1980s as the terrorist wing of Markaz ud Dawa ul-Irshad, a Pakistan-based extremist organization and charity originally formed to oppose the Soviet presence in Afghanistan.  LeT is led by Hafiz Muhammad Saeed.  Shortly after LeT was designated as an FTO, Saeed changed the group's name to Jamaat-ud-Dawa (JUD) and launched humanitarian projects to circumvent restrictions.  LeT disseminates its message through JUD's media outlets.  In addition to the creation of JUD, LeT has repeatedly changed its name in an effort to avoid sanctions.

Elements of LeT and Jaish-e-Muhammad (JeM) combine with other groups like Hizbul Mujahideen (HM) to mount anti-India attacks.  The Pakistani government banned LeT in January 2002 and temporarily arrested LeT's leader Hafiz Saeed following the 2008 Mumbai attack.  On January 30, 2017, Pakistan placed Hafiz Saeed under house arrest; however, he was released in November after a Lahore High Court rejected a government request to renew his detention.

PX210

**Activities:**  LeT has conducted operations, including several high profile attacks, against Indian troops and civilian targets in the state of Jammu and Kashmir since 1993.  The group has also attacked Coalition Forces in Afghanistan.  LeT uses assault rifles, machine guns, mortars, explosives, and rocket-propelled grenades.

LeT was responsible for the November 2008 attacks in Mumbai against luxury hotels, a Jewish center, a train station, and a popular café that killed 166 people – including six U.S. citizens – and injured more than 300.  India has charged 38 people in the case; most are at large, however, and thought to be in Pakistan.

In March 2010, Pakistani-American businessman David Headley pled guilty in a U.S. court to charges related to his role in the November 2008 LeT attacks in Mumbai, and to charges related to a separate plot to bomb the Danish newspaper, *Jyllands-Posten*.  Headley testified in the trials of other LeT supporters in 2011 and 2015.

LeT was behind a July 2015 attack in Gurdaspur, Punjab, which killed seven people.  In August 2015, operatives affiliated with LeT attacked Indian security forces in Udhampur district, Jammu and Kashmir.  In December 2015, LeT carried out an attack on a paramilitary convoy after it left Srinagar, Kashmir; three militants opened fire on the convoy, injuring one civilian and seven Indian military personnel.

From February through May, 2016, LeT was suspected of engaging in at least three firefights with Indian security forces in Kupwara district, Jammu and Kashmir, injuring two Indian personnel.  In June 2016, LeT was suspected of conducting an ambush on an Indian security force convoy in Pulwama district, Jammu and Kashmir, killing eight and injuring 20.  Some media reports also alleged the group's involvement in the September 2016 attack on an Indian Army camp in Uri, Jammu and Kashmir; 20 soldiers were killed in the attack.

In June 2017, LeT conducted an attack in the state of Jammu and Kashmir that left six police officers dead.  The next month, LeT militants attacked a bus of pilgrims returning from the Amarnath Yatra shrine, killing seven people.

**Strength:**  The precise size of LeT is unknown, but it has several thousand members in various provinces in Pakistan. It also has a presence in  India in areas near the Line of Control.

**Location/Area of Operation:**  LeT has global connections and a strong operational network throughout South Asia.  LeT maintains a number of facilities, including training camps, schools, and medical clinics in Pakistan.  LeT is also active in Afghanistan.

**Funding and External Aid:**  LeT collects donations in Pakistan and the Gulf as well as from other donors in the Middle East and Europe – particularly the United Kingdom, where it is a designated terrorist organization.  In 2017, LeT and its front organizations continued to operate and fundraise in Pakistan.

## LASHKAR I JHANGVI

PX210

**aka** Army of Jhangvi; Lashkar e Jhangvi; Lashkar-i-Jhangvi

**Description:**  Designated as a Foreign Terrorist Organization on January 30, 2003, Lashkar I Jhangvi (LJ) is the terrorist offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan.  LJ carries out anti-Shia and other sectarian attacks in Afghanistan and Pakistan.  The Government of Pakistan banned the group in August 2001 as part of an effort to rein in sectarian violence, causing many LJ members to seek refuge in Afghanistan with the Taliban, with whom the group had existing ties.  After the collapse of the Taliban government in Afghanistan, LJ members became active in aiding other terrorists and have provided safe houses, false identities, and protection in Pakistani cities.  LJ works closely with Tehrik-e Taliban Pakistan.  LJ chief Asif Chotu was killed along with three other LJ militants in January 2017 in a police operation in Pakistan.

**Activities:**  LJ specializes in armed attacks and bombings and has admitted to numerous killings of Shia religious and community leaders in Pakistan.  In January 1999, the group attempted to assassinate Prime Minister Nawaz Sharif and his brother Shahbaz Sharif, Chief Minister of Punjab Province.  Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens.

In January 2014, at least 24 people were killed and 40 others wounded in a bus bombing by LJ targeting Shia pilgrims.  LJ also claimed responsibility for the December 2015 suicide bombing that targeted a market in the predominantly Shia town of Parachinar, Pakistan that killed at least 23 people and wounded 50.  In November 2016, two individuals suspected of belonging to LJ were arrested by police in Pakistan for their alleged involvement in 25 cases of targeted killings, which included the murder of Pakistani singer Amjad Sabri as well as army and police personnel.

**Strength:**  Membership of the group is assessed to be in the low hundreds.

**Location/Area of Operation:**  This group is primarily based in Pakistan's Punjab province, the Federally Administered Tribal Areas, Karachi, and Balochistan.

**Funding and External Aid:**  Funding comes from wealthy donors in Pakistan as well as the Middle East, particularly Saudi Arabia.  The group engages in criminal activity, including extortion, to fund its activities.

## LIBERATION TIGERS OF TAMIL EELAM

**aka** Ellalan Force; Tamil Tigers

**Description:**  Founded in 1976 and designated as a Foreign Terrorist Organization on October 8, 1997, the Liberation Tigers of Tamil Eelam (LTTE) is a Tamil secessionist group in Sri Lanka.  Despite its military defeat at the hands of the Sri Lankan government in 2009, the LTTE's international network of sympathizers and financial support has persisted.

PX210

**Activities:**  Although largely inactive since 2009, the LTTE was previously responsible for an integrated insurgent strategy that targeted key installations and senior Sri Lankan leaders.  In early 2009, Sri Lankan forces recaptured the LTTE's key strongholds, including their capital of Kilinochchi.  In May 2009, government forces defeated the last LTTE fighting forces, killed members of its leadership including leader Velupillai Prabhakaran, and declared military victory.

There have been no known attacks in Sri Lanka attributed to the LTTE since 2009, but a total of 13 LTTE supporters, several of whom had allegedly planned attacks against U.S. and Israeli diplomatic facilities in India, were arrested in Malaysia in 2014.  Additional members were arrested in Malaysia and India in 2015, one of whom was accused of exhorting other Sri Lankans to fund and revive the LTTE.

**Strength:**  The group's exact strength is unknown.

**Location/Area of Operation:**  The LTTE is based in Sri Lanka and India.

**Funding and External Aid:**  LTTE's financial network of support continued after the LTTE's military defeat in 2009 and employed charities as fronts to collect and divert funds for its activities.


## MUJAHIDIN SHURA COUNCIL IN THE ENVIRONS OF JERUSALEM

**aka** MSC; Mujahideen Shura Council in the Environs of Jerusalem; Mujahideen Shura Council; Shura al-Mujahedin Fi Aknaf Bayt al-Maqdis; Majlis Shura al-Mujahidin; Majlis Shura al-Mujahideen; Magles Shoura al-Mujahddin

**Description:**  The Mujahidin Shura Council in the Environs of Jerusalem (MSC) was designated as a Foreign Terrorist Organization on August 19, 2014.  The MSC is a consolidation of several Salafi terrorist groups based in Gaza that have claimed responsibility for numerous attacks against Israel since the group's founding in 2012.

**Activities:**  On August 13, 2013, MSC claimed responsibility for a rocket attack targeting the Israeli city of Eilat.  Previously, MSC claimed responsibility for the March 21, 2013, attack in which Gaza-based militants fired at least five rockets at Sderot, Israel; and the April 17, 2013, attack in which two rockets were fired at Eilat.  There were no known MSC attacks in 2017.

**Strength:**  MSC is estimated to have several hundred fighters.

**Location/Area of Operation:**  MSC operates in Gaza.

**Funding and External Aid:**  Unknown


## AL-MULATHAMUN BATTALION

**aka** al-Mulathamun Brigade; al-Muwaqqi'un bil-Dima; Those Signed in Blood Battalion; Signatories in Blood; Those who Sign in Blood; Witnesses in Blood; Signed-in-Blood Battalion;

PX210

Masked Men Brigade; Khaled Abu al-Abbas Brigade; al-Mulathamun Masked Ones Brigade; al-Murabitoun; The Sentinels

**Description:**  The al-Mulathamun Battalion (AMB) was designated as a Foreign Terrorist Organization on December 19, 2013.  AMB was originally part of al-Qa'ida in the Islamic Maghreb (AQIM) but became a separate organization in late 2012 after its leader, Mokhtar Belmokhtar, split from AQIM.  After the split, Belmokhtar threatened to fight against Western interests and announced the creation of the sub-battalion, "Those Who Sign in Blood."  In August 2013, AMB and the Mali-based Movement for Unity and Jihad in West Africa (MUJAO) announced that the two organizations would merge under the name "al-Murabitoun."  In late 2015, AMB announced a re-merger with AQIM.  In 2017, the Sahara Branch of al-Qa'ida in the Islamic Maghreb, al-Murabitoun, Ansar al-Dine, and the Macina Liberation Front came together to form Jama'at Nusrat al-Islam wal-Muslimin.

**Activities:**  AMB's "Those Who Sign in Blood" sub-battalion claimed responsibility for the January 2013 attack against the Tiguentourine gas facility near In Amenas, in southeastern Algeria.  More than 800 people were taken hostage during the four-day siege, resulting in the deaths of 39 civilians, including three U.S. citizens.  Seven other U.S. citizens escaped.

In May 2013, AMB cooperated with MUJAO in twin suicide bombings on a northern Nigerien military base and a French uranium mine in Arlit.  The coordinated attacks killed at least 20 people, including all of the attackers.

In March 2015, AMB claimed responsibility for an attack at La Terrasse restaurant in Bamako, Mali.  A French national, a Belgian national, and three Malians were killed when a masked gunman fired indiscriminately on the restaurant.  AMB also claimed the August hotel siege in central Mali; 17 people were killed, including four Malian soldiers and nine civilians.  In November, AMB operatives participated in the strike against the Radisson Blu Hotel in Bamako, Mali, taking more than 170 people hostage – including U.S. citizens.  As many as 27 people were killed in the attack; one of those killed was a U.S. international development worker.

AMB also was reportedly involved in the AQIM January 2016 attack on a popular tourist hotel in Burkina Faso that killed nearly 30, including one U.S. citizen.  AMB claimed a suicide car bombing at a military camp in Mali that killed 47 people in January 2017.

**Strength:**  Membership levels of AMB are unknown.

**Location/Area of Operation:**  The group operates in Algeria, Burkina Faso, Libya, Mali, and Niger.

**Funding and External Aid:**  In addition to the support it may receive through its connections to other terrorist organizations in the region, AMB is likely funded through kidnapping-for-ransom and other criminal activities.

## NATIONAL LIBERATION ARMY

PX210

**aka** ELN; Ejercito de Liberacion Nacional

**Description:**  The National Liberation Army (ELN) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ELN is a Colombian Marxist-Leninist group formed in 1964.  The ELN remains focused on attacking economic infrastructure – in particular oil and gas pipelines and electricity pylons – and on extorting foreign and local companies.

**Activities:**  In 2016, the ELN continued to target Colombia's infrastructure, particularly oil pipelines.  The ELN also launched mortars at police stations and the military, placed explosive devices near roads, and engaged in sniper attacks, roadblocks, and ambushes.  In February, the ELN initiated a wave of violent attacks to force a 72-hour economic shutdown in several parts of the country.  On October 27, 2016, the ELN killed two civilian truck drivers in Arauca.

In June 2017, the ELN released two Dutch journalists that it had kidnapped, unharmed.  Throughout 2017, the Government of Colombia and ELN conducted peace talks but did not ultimately reach an agreement.  Rebel fighters continued attacks on the Colombian public, security forces, and infrastructure.  A bilateral ceasefire was in place as of the end of 2017.

**Strength:**  The group consists of about 1,500 combatants and an unknown number of supporters.

**Location/Area of Operation:**  The group is based in the rural and mountainous areas of northern, northeastern, and southwestern Colombia as well as border regions with Venezuela.

**Funding and External Aid:**  The ELN draws its funding from the illicit narcotics trade and from extortion of oil and gas companies.  Additional funds are derived from kidnapping ransoms.

## AL-NUSRAH FRONT

**aka** Jabhat al-Nusrah; Jabhet al-Nusrah; The Victory Front; al-Nusrah Front for the People of the Levant; al-Nusrah Front in Lebanon; Jabhat al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad; Support Front for the People of the Levant; Jabhat Fath al-Sham; Jabhat Fath al Sham; Jabhat Fatah al-Sham; Jabhat Fateh al-Sham; Front for the Conquest of Syria; The Front for liberation of al Sham; Front for the Conquest of Syria/the Levant; Front for the Liberation of the Levant; Conquest of the Levant Front; Fatah al-Sham Front; Fateh Al-Sham Front

**Description:**  Al-Nusrah Front (ANF) is al-Qa'ida's affiliate in Syria and was designated as a Foreign Terrorist Organization on May 15, 2014.  It is led by Abu Muhammad al-Jawlani, aka al-Julani.  The group was formed in late 2011 when then-al-Qa'ida in Iraq (AQI) – now ISIS – leader Abu Bakr al-Baghdadi sent al-Jawlani to Syria to organize terrorist cells.  In 2013, the group split from AQI and became an independent entity.  ANF's stated goal is to oust Syria's Assad regime and replace it with a Sunni Islamic state.  The group is present throughout Syria, but is concentrated in and controls a portion of territory in northwest Syria, where it is active as an opposition force, in local governance, and in external plotting.

**Activities:**  ANF has been active in a number of operations against other factions in the Syrian conflict.  In December 2013, ANF abducted 13 nuns from a Christian monastery in Maaloula,

PX210

holding them for three months.  In 2014, ANF also carried out multiple suicide bomb attacks and kidnappings, including the abduction of UN peacekeepers.

ANF continued fighting in Syria throughout 2015, attacking other opposition groups and kidnapping civilians.  In March, ANF claimed an attack on the intelligence headquarters of Syria's air force in Aleppo, killing an estimated 20 members of the security force.  In June, ANF claimed responsibility for the massacre of the Druze village Qalb Lawzeh in Idlib province, Syria, which killed 20.  In July, the group claimed responsibility for a suicide bombing of an army outpost in Aleppo, which killed at least 25 soldiers and allied militia.

In 2016, the group carried out attacks in Aleppo and in other parts of Syria controlled by the Syrian army, killing both military officials and civilians.  In July 2016, ANF leader Jawlani announced the group had adopted a new name, Jabhat Fath al-Sham, and would no longer be known as Al-Nusrah Front.  The Department of State amended the designation in November 2016 to add additional aliases, including Jabhat Fath al-Sham.

In early 2017, ANF joined with four smaller Syrian factions and created "Hay'at Tahrir al-Sham" (HTS) as a vehicle to advance its position in the Syrian insurgency and further its own goals as al-Qa'ida's affiliate in Syria.  ANF continued to dominate and operate through HTS in pursuit of its objectives.  In October, ANF launched an attack near the Turkish border against the Syrian army, killing several soldiers.  The group carried out multiple suicide bombings in Damascus, including suicide attacks using vehicle-borne improvised explosive devices in March. ANF took control of Idlib in July 2017, and it exercised an effective military monopoly over other local opposition groups there, as it continued plotting against U.S. and allied interests.

**Strength:**  ANF has an estimated 18,000 members.

**Location/Area of Operation:**  The group is based in Syria and Lebanon.

**Funding and External Aid:**  ANF receives funding from a variety of sources, including kidnapping-for-ransom payments and donations from external Gulf-based donors.

## PALESTINE ISLAMIC JIHAD

**aka** PIJ; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya al-Quds; Al-Awdah Brigades

**Description:**  Palestine Islamic Jihad (PIJ) was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed by militant Palestinians in Gaza during the 1970s, PIJ is committed to the destruction of Israel through attacks against Israeli military and civilian targets and to the creation of an Islamic state in historic Palestine, including present day Israel.

**Activities:**  PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings, against Israeli civilian and military targets.  Although U.S. citizens have died in PIJ attacks, the group has not directly targeted U.S. interests.  Between 2008 and 2011, PIJ primarily

PX210

conducted rocket attacks and used other explosive devices to target southern Israel. Through 2014, PIJ operatives carried out attacks on Israeli buses in Tel Aviv. In March 2014, PIJ carried out a wave of rocket attacks into Israeli territory; up to 60 rockets may have reached Israel.

In early 2015, PIJ began re-arming and replenishing its ranks. In March of that year, reports suggested that approximately 200 new recruits between the ages of 19 and 22 were undergoing training programs lasting anywhere from 36 days to six months. That same month, PIJ revealed its militants were smuggling weapons, including rockets and mortars made inside Gaza, through tunnels in Gaza, in preparation for future attacks against Israel. In May, Israeli forces blamed PIJ for firing a rocket that landed in Gan Yazne, a region close to the Gaza border. The rocket was the first mid-range rocket fired at Israel since the August 2014 ceasefire. In August, the Israel Defense Forces (IDF) claimed PIJ operatives in Syria fired four rockets at the Golan Heights and Upper Galilee.

Over the course of 2016, PIJ continued to strike Israel, primarily through light arms fire at IDF patrols. In September, Israeli authorities arrested PIJ operative Mahmoud Yusuf Hasin Abu Taha upon his entry into Israel from Gaza, interrupting a PIJ plot to abduct and kill an IDF soldier and carry out a mass-casualty attack on a reception hall in Beersheba.

In 2017, PIJ praised a number of shootings, bombings, and other attacks in Israel that resulted in multiple deaths.

**Strength:** PIJ has close to 1,000 members.

**Location/Area of Operation:** PIJ operates primarily in Gaza, with minimal presence in the West Bank and Israel. Other leaders reside in Lebanon and throughout the Middle East.

**Funding and External Aid:** PIJ receives financial assistance and training primarily from Iran. PIJ has partnered with Iranian- and Syrian-sponsored Hizballah to carry out joint operations.

## PALESTINE LIBERATION FRONT – ABU ABBAS FACTION

**aka** PLF; PLF-Abu Abbas; Palestine Liberation Front

**Description:** The Palestinian Liberation Front – Abu Abbas Faction (PLF) was designated as a Foreign Terrorist Organization on October 8, 1997. In the late 1970s, the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). It later split into pro-Palestinian Liberation Organization (PLO), pro-Syrian, and pro-Libyan factions. The pro-PLO faction was led by Muhammad Zaydan (aka. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:** The PLF was responsible for the 1985 attack on the Italian cruise ship *Achille Lauro* and the murder of U.S. citizen Leon Klinghoffer. The PLF was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s. In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq. After not claiming an attack for 16 years,

PX210

the PLF claimed responsibility for the March 14, 2008, assault against an Israeli military bus in Huwarah, Israel, and the shooting of an Israeli settler.  On February 18, 2010, the PLF claimed responsibility for an improvised explosive device (IED) attack against an Israel Defense Forces patrol, which caused minor injuries to a soldier; another IED was discovered during a search of the area.  The group did not publicly claim any attacks in 2016 or 2017 but continued to maintain a strong presence in many refugee camps in Gaza, Lebanon, and Syria.

**Strength:**  Estimates have placed membership between 50 and 500.

**Location/Area of Operation:**  PLF leadership and members are based in Gaza, Lebanon, and the West Bank.

**Funding and External Aid:**  Unknown

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE

**aka** PFLP; Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles; Martyr Abu-Ali Mustafa Battalion

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Popular Front for the Liberation of Palestine (PFLP) is a Marxist-Leninist group that was formed in 1967 by George Habash after splitting from the Arab Nationalist Movement.  The group earned a reputation for large-scale international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.

**Activities:**  The PFLP increased its operational activity during the Second Intifada.  During that time, the group assassinated Israeli Tourism Minister Rehavam Ze'evi in 2001, carried out at least two suicide operations, and launched multiple joint operations with other Palestinian terrorist groups.  Between 2008 and 2011, the PLFP claimed responsibility for numerous attacks on Israel Defense Forces (IDF) in Gaza as well as mortar and rocket attacks fired from Gaza into Israel.  In 2012, the Israeli Security Agency arrested several members of the PFLP for plotting to carry out attacks on IDF checkpoints and planning to conduct kidnappings.

On November 18, 2014, two Palestinians reportedly affiliated with the PFLP entered a Jerusalem synagogue and attacked Israelis with guns, knives, and axes, killing five people – including three U.S. citizens – and injuring 12.  The next month, the PFLP claimed responsibility for several rocket attacks along the Lebanon-Israel border.

In August 2016, the Abu Ali Mustafa Brigades, the military wing of PFLP, fired a rocket at the Israeli town of Sderot.  No casualties or damages were reported.

In June 2017, three Palestinian militants launched an attack near Jerusalem's Old City, stabbing and killing an Israeli border security agent.  Two of the militants were members of PFLP, although ISIS claimed the attack.

PX210

**Strength:**  Unknown

**Location/Area of Operation:**  The PFLP operates in Gaza, Israel, Lebanon, Syria, and the West Bank.

**Funding and External Aid:**  Unknown


## POPULAR FRONT FOR THE LIBERATION OF PALESTINE-GENERAL COMMAND

**aka** PFLP-GC

**Description:**  The Popular Front for the Liberation of Palestine-General Command (PFLP-GC) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PFLP-GC split from the Popular Front for the Liberation of Palestine (PFLP) in 1968, claiming it wanted to focus more on resistance and less on politics.  Ahmad Jibril, a former captain in the Syrian Army, has led the PFLP-GC since its founding.  The PFLP-GC is closely tied to both Syria and Iran.

**Activities:**  The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s.  The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders.  Since the early 1990s, the group has primarily focused on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and smuggling weapons.  More recently, the PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel.  In 2009, the group was responsible for wounding two civilians in an armed attack in Nahariyya, Northern District, Israel.

In November 2012, PFLP-GC claimed responsibility for a bus bombing in Tel Aviv that injured 29 people, although four Palestine Islamic Jihad and Hamas operatives were later arrested for the attack.  In 2015, the PFLP-GC reportedly began fighting alongside the Assad regime in Syria, while also receiving logistical and military aid from Hizballah and Iran.

Separately, in December 2015, the PFLP-GC took responsibility for rocket fire aimed at Israeli territory.  The attack, in which at least three rockets were fired from Lebanon into northern Israel, landed near Shlomi, a small town near the Lebanese border.  Although the PFLP-GC did not carry out any attacks in 2016 or 2017, the group remained an active participant in the Syrian conflict.

**Strength:**  Several hundred members

**Location/Area of Operation:**  Political leadership is headquartered in Damascus, with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.  The group also maintains a small presence in Gaza.

PX210

**Funding and External Aid:**  The PFLP-GC receives safe haven and logistical and military support from Syria and financial support from Iran.

## AL-QA'IDA

**aka** al-Qa'eda; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Laden Network; the Usama Bin Laden Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1999, al-Qa'ida (AQ) was established in 1988.  The group helped finance, recruit, transport, and train fighters for the Afghan resistance against the former Soviet Union.  AQ strives to eliminate Western influence from the Muslim world, topple "apostate" governments of Muslim countries, and establish a pan-Islamic caliphate governed by its own interpretation of Sharia law that would ultimately be at the center of a new international order.  These goals remain essentially unchanged since the group's 1996 public declaration of war against the United States.  AQ leaders issued a statement in 1998 under the banner of "The World Islamic Front for Jihad against Jews and Crusaders," saying it was the duty of all Muslims to kill U.S. citizens – civilian and military – and their allies everywhere.  AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.  Many AQ leaders have been killed in recent years, including Usama bin Laden in May 2011.  AQ's leader Ayman al-Zawahiri remained at-large in 2017.

**Activities:**  AQ and its supporters conducted three bombings targeting U.S. troops in Aden in December 1992 and claimed responsibility for shooting down U.S. helicopters and killing U.S. soldiers in Somalia in 1993.  AQ also carried out the August 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam, killing up to 300 individuals and injuring more than 5,000.  In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39 others.  On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon, and the last into a field in Shanksville, Pennsylvania.  Nearly 3,000 civilians, police, and first responders were killed.  The dead included U.S. and foreign citizens from at least 77 countries.

In a December 2011 video, al-Zawahiri claimed AQ was behind the kidnapping of U.S. aid worker Warren Weinstein in Pakistan.  Weinstein was held captive until his death in January 2015.

In February 2014, AQ removed ISIS as an AQ-affiliate.  In September 2014, al-Zawahiri announced the establishment of Pakistan-based al-Qa'ida in the Indian Subcontinent (AQIS).  Two days later, two Pakistani warships were attacked in Karachi.  AQIS claimed responsibility for the plot, which aspired to commandeer missile systems to attack nearby U.S. warships.

PX210

In September 2015, five senior AQ leaders were released from Iranian custody in exchange for an Iranian diplomat kidnapped in Yemen.  Of the five, Saif al Adel and Abu Mohammed al Masri are wanted for the August 1998 U.S. Embassy bombings in Kenya and Tanzania.

In January 2016, AQ leader Ayman al-Zawahiri publicly released two audio messages and one seven-page statement, condemning the Government of Saudi Arabia and its role in the Syrian conflict, encouraging AQ activity in Southeast Asia – especially Indonesia, Malaysia, and the Philippines, and acknowledging support for its affiliate in Syria, al-Nusrah Front.  On October 3, Abu al-Faraj al-Masri, a senior AQ leader involved in planning attacks, was killed in Syria.  As of September, AQ leaders and members were active in at least seven provinces in Afghanistan.

In February 2017, AQ senior leader Abu al-Khayr al-Masri was killed in Syria.  In September 2017, a U.S. person was convicted in New York of charges related to supporting AQ to attack a U.S. military base in Afghanistan in 2009 using two truck bombs.  In October, al-Zawahiri released a video calling for jihadists around the world to conduct attacks against the United States.

**Strength:**  In South Asia, AQ's core has been seriously degraded.  The death or arrest of dozens of mid- and senior-level AQ operatives, including bin Laden, has disrupted communication, financial support, facilitation nodes, and a number of terrorist plots.  AQ, however, remains a focal point of "inspiration" for a worldwide network of affiliated groups – al-Qa'ida in the Arabian Peninsula (AQAP), al-Qa'ida in the Islamic Maghreb (AQIM), al-Nusrah Front, al-Shabaab, and AQIS – and other terrorist groups, including the Islamic Movement of Uzbekistan, Islamic Jihad Union, Lashkar i Jhangvi, Harakat ul-Mujahideen, and Jemaah Islamiya.  The Tehrik-e Taliban Pakistan and the Haqqani Network also have ties to AQ.  In addition, supporters and associates worldwide "inspired" by the group's ideology may operate without direction from AQ central leadership.

**Location/Area of Operation:**  AQ was based in Afghanistan until Coalition Forces removed the Afghan Taliban from power in late 2001.  Subsequently, the group's core leadership was largely based in Pakistan's Federally Administered Tribal Areas, until Pakistani military operations in 2014 significantly degraded the group there.  AQ affiliates – al-Nusrah Front, AQAP, AQIM, al-Shabaab, and AQIS – operate in Syria and Lebanon, Yemen, the Trans-Sahara, Somalia, and Afghanistan and Pakistan, respectively.

**Funding and External Aid:**  AQ primarily depends on donations from like-minded supporters as well as from individuals who believe that their money is supporting a humanitarian cause. Some funds are diverted from Islamic charitable organizations.

## AL-QA'IDA IN THE ARABIAN PENINSULA

**aka** al-Qa'ida in the South Arabian Peninsula; al-Qa'ida in Yemen; al-Qa'ida of Jihad Organization in the Arabian Peninsula; al-Qa'ida Organization in the Arabian Peninsula; Tanzim Qa'idat al-Jihad fi Jazirat al-Arab; AQAP; AQY; Ansar al-Shari'a; Sons of Abyan; Sons of Hadramawt; Sons of Hadramawt Committee; Civil Council of Hadramawt; and National Hadramawt Council

PX210

**Description:** Al-Qa'ida in the Arabian Peninsula (AQAP) was designated as a Foreign Terrorist Organization on January 19, 2010.  In January 2009, the now-deceased leader of al-Qa'ida in Yemen, Nasir al-Wahishi, publicly announced that Yemeni and Saudi al-Qa'ida (AQ) operatives were working together under the banner of AQAP.  The announcement signaled the rebirth of an AQ franchise that previously carried out attacks in Saudi Arabia.  AQAP's self-stated goals are to establish a caliphate and Sharia law in the Arabian Peninsula and the wider Middle East.

**Activities:** AQAP has claimed responsibility for numerous terrorist acts against both internal and foreign targets since its inception in January 2009, including a March 2009 suicide bombing against South Korean tourists in Yemen and the December 25, 2009, attempted attack on Northwest Airlines Flight 253 from Amsterdam to Detroit, Michigan.  In October 2010, AQAP claimed responsibility for a foiled plot to send explosive-laden packages to the United States via cargo planes.  The parcels were intercepted in the United Kingdom and in the United Arab Emirates.

AQAP, operating under the alias Ansar al-Shari'a (AAS), carried out a May 2012 suicide bombing in Sana'a that killed 96 people.  Also in May 2012, the media reported that AQAP allegedly planned to detonate a bomb aboard a U.S.-bound airliner using an improvised explosive device.

In September 2014, AQAP launched two rocket attacks against the U.S. Embassy in Sana'a.  The second attack injured multiple embassy security guards.  Also in 2014, AQAP attempted attacks against the U.S. and British ambassadors to Yemen, and carried out a strike on the Iranian ambassador's residence in Sana'a that killed one guard and two pedestrians.

In January 2015, brothers Cherif and Said Kouachi attacked the satirical newspaper *Charlie Hebdo* in Paris, France, killing 12 people.  One of the brothers, who had traveled to Yemen in 2011 and met with now-deceased Anwar al-Aulaqi, claimed the attack on behalf of AQAP.

Also in 2015, AQAP took advantage of Yemen's deteriorating political and economic environment after the Yemeni government was overthrown by Houthi rebels.  The United States and several other countries closed their embassies amid the violence.  In April, AQAP stormed the city of Mukalla, seizing control of government buildings, releasing terrorists from prison, and stealing millions from the central bank.  From 2015 into 2016, AQAP consolidated its control over Mukalla and expanded its reach through large portions of Yemen's south.

In early 2016, AQAP swept through southern Yemen, gaining control of al-Hawta, Azzan, and Habban in Lahij Governorate, and Mahfad and Ahwar in Abyan Governorate.  By February 2016, AQAP controlled most of Yemen's southeastern coast.  Although the group lost control of Mukalla in April, when the port city was retaken by forces backed by the Saudi-led Coalition, these territorial losses did not significantly degrade AQAP's capabilities, although they did deprive the group of an important source of income.

PX210

AQAP also attempted to carry out multiple attacks targeting Yemeni government and security forces.  In July 2016, two car bombs targeting security checkpoints outside Mukalla killed at least nine Yemeni soldiers and wounded many others.

In early 2017, a U.S. Navy SEAL was killed in a raid against AQAP leaders in Yemen.  In June, AQAP conducted an attack using a car bomb and guns at a Yemeni army camp, killing at least two soldiers.

**Strength:**  AQAP fighters are estimated to be in the low thousands.

**Location/Area of Operation:**  The group is based in Yemen.

**Funding and External Aid:**  AQAP's funding has historically come from theft, robberies, oil and gas revenue, kidnap-for-ransom operations, and donations from like-minded supporters.  After seizing Mukallah in April 2015, the group had access to additional sources of revenue, including the millions it stole from the central bank.  This access continued until Mukallah was retaken by Yemeni government forces in April 2016.

## AL-QA'IDA IN THE INDIAN SUBCONTINENT (AQIS)

**aka** al-Qaeda in the Indian Subcontinent; Qaedat al-Jihad in the Indian Subcontinent

**Description:**  In September 2014, al-Qa'ida announced the establishment of a new AQ affiliate, al-Qa'ida in the Indian Subcontinent (AQIS).  The Department of State designated AQIS on July 1, 2016 as a Foreign Terrorist Organization (FTO).  AQIS focuses on terrorist activity in Afghanistan, Bangladesh, India, and Pakistan.  Its leader is Asim Umar, a former member of the FTO Harakat ul-Mujahidin.

**Activities:**  AQIS claimed responsibility for the September 6, 2014, attack on a naval dockyard in Karachi, in which militants attempted to hijack a Pakistani Navy frigate.  AQIS has also claimed attacks against human rights activists and secular writers in Bangladesh, including U.S. citizen Avijit Roy, U.S. embassy local employee Xulhaz Mannan, and Bangladeshi nationals Oyasiqur Rahman Babu, Ahmed Rajib Haideer, and A.K.M. Shafiul Islam.  In September 2017, AQAP called on AQIS to launch more attacks on Burmese authorities, because of Burma's policies towards Rohingya Muslims.

**Strength:**  AQIS is estimated to have several hundred members.

**Location/Area of Operations:**  AQIS members are thought to be located primarily in Afghanistan, with elements operating in Bangladesh, India, and Pakistan.

**Funding and External Aid:**  AQIS likely receives funding from al-Qa'ida senior leadership and engages in general criminal activity, kidnapping, and extortion.

## AL-QA'IDA IN THE ISLAMIC MAGHREB

PX210

**aka** AQIM; GSPC; Le Groupe Salafiste Pour la Predication et le Combat; Salafist Group for Preaching and Combat; Salafist Group for Call and Combat; Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya

**Description:**  The Salafist Group for Call and Combat (GSPC) was designated as a Foreign Terrorist Organization on March 27, 2002.  The Department of State amended the GSPC designation on February 20, 2008, after the GSPC officially joined with al-Qa'ida (AQ) in September 2006 and became al-Qa'ida in the Islamic Maghreb (AQIM).  Although AQIM remains largely a regionally focused terrorist group, it has adopted a more anti-Western rhetoric and ideology, and has aspirations of overthrowing "apostate" African regimes and creating an Islamic state.  Abdelmalek Droukdel, aka Abu Mus'ab Abd al-Wadoud, is the group's leader.

**Activities:**  Following AQIM's 2007 bombing of the UN headquarters building and an Algerian government building in Algiers, which killed 60 people, AQIM's northern leadership was contained to northeastern Algeria, while the group's southern battalions focused mostly on kidnapping-for-ransom efforts.  In 2011 and 2012, however, AQIM took advantage of the deteriorating security situation across Libya, Mali, and Tunisia to plan and conduct expanded operations.  Militants with ties to AQIM were involved in the September 11, 2012, attack on U.S. facilities in Benghazi that killed U.S. Ambassador to Libya J. Christopher Stevens and three other Embassy staff members.  In April 2014, AQIM killed 14 Algerian soldiers in an ambush east of Algiers.

In January 2015, AQIM claimed responsibility for an attack on a UN vehicle in Kidal, which wounded seven peacekeepers.  Also in 2015, AQIM twice attacked UN convoys near Timbuktu with small arms and rocket-propelled grenades; three peacekeepers were killed in a May attack and six in a July attack.  In November, AQIM, in cooperation with other terrorist groups, attacked the Radisson Blu Hotel in Bamako, Mali, taking more than 170 people hostage, including U.S. citizens.  As many as 27 people were killed in the attack; one of those killed was an U.S. international development worker.

In January 2016, AQIM carried out an attack on a hotel in Burkina Faso, resulting in 28 deaths and another 56 injuries.  In March, AQIM claimed responsibility for a strike on a popular tourist beach resort in Cote d'Ivoire; at least 16 people were killed and another 33 were injured.

AQIM has also continued to conduct kidnapping-for-ransom operations.  Its targets are typically Western citizens from governments or third parties that have established a pattern of paying ransom for the release of individuals.  In November 2014, AQIM released a video of two Western hostages, a Dutch and a French national, who were later released in December 2014.

In June 2015, AQIM published a video featuring one Swedish and one South African hostage who continued to be held captive since they were kidnapped in Timbuktu in 2011.  Both were released in 2017.

In January 2017, AQIM conducted a suicide attack that left over 50 people dead in Gao, Mali.

PX210

**Strength:**  AQIM has an estimated 1,000 fighters operating in the Sahel, including Algeria, northern Mali, southwest Libya, and Niger.  Since the French intervention in northern Mali, AQIM's safe haven in northern Mali is less tenable for the organization and elements have moved to remote regions of northern Mali or to southwestern Libya.  However, AQIM has been reorganizing and expanding in recent years.

**Location/Area of Operation:**  The group is based in southern and eastern Algeria (including isolated parts of the Kabylie region), Burkina Faso, Cote D'Ivoire, Libya, northern Mali, Niger, and Tunisia.

**Funding and External Aid:**  AQIM members engage in kidnapping-for-ransom and criminal activities to finance their operations.  AQIM also successfully fundraises globally, and received limited financial and logistical assistance from supporters residing in Western Europe.

## REAL IRA

**aka** RIRA; Real Irish Republican Army; 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Oglaigh Na hEireann

**Description:**  The Real Irish Republican Army (RIRA) was designated as a Foreign Terrorist Organization on May 16, 2001.  The group was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland.  The RIRA has historically sought to disrupt the Northern Ireland peace process and did not participate in the September 2005 weapons decommissioning.  Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, the RIRA has pledged additional violence and has continued to conduct attacks.

**Activities:**  Many RIRA members are former Provisional Irish Republican Army members who left the organization after the group renewed its ceasefire in 1997.  These members brought extensive experience in terrorist tactics and bomb-making to the group.  Targets have included civilians (the most notorious example is the Omagh bombing in August 1998), British security forces, and police officers in Northern Ireland.  The Independent Monitoring Commission, which oversees the peace process, assessed that RIRA was likely responsible for the majority of the attacks that occurred post-Irish Republican Army (IRA)-decommissioning in Northern Ireland.

In May 2015, Irish police carried out 20 searches aimed at known dissident republicans across Ireland.  Six individuals with links to RIRA and the Continuity Irish Republican Army (CIRA) were arrested after police discovered explosive devices.  In spring 2016, the RIRA bombed the van of an Irish prison officer in east Belfast; the officer died from complications following the attack.  Dublin police also linked the RIRA to an explosives cache they found in Dublin in April 2016.

In January 2017, RIRA gunmen fired at police officers in north Belfast, injuring one officer.

PX210

**Strength:**  According to the Irish government, the RIRA has approximately 100 active members.  The organization may receive limited support from IRA hardliners and sympathizers who are dissatisfied with the IRA's ceasefire and with Sinn Fein's involvement in the peace process.

**Location/Area of Operation:**  The group operates in Northern Ireland and the Republic of Ireland.

**Funding and External Aid:**  The RIRA was suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers.  The RIRA reportedly purchased sophisticated weapons from the Balkans and occasionally collaborated with the CIRA.

## REVOLUTIONARY ARMED FORCES OF COLOMBIA

**aka** FARC; Fuerzas Armadas Revolucionarias de Colombia

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Revolutionary Armed Forces of Colombia (FARC) is Latin America's oldest, largest, and best-equipped terrorist organization.  The FARC, founded in 1964, is responsible for large numbers of kidnappings-for-ransom in Colombia, holding as many as 700 hostages in past years.  In November 2016, after four years of negotiation in Havana, Cuba, a peace agreement was crafted and approved by Colombia's Congress, putting in motion a six-month disarmament, demobilization, and reintegration process.  In accordance with the peace agreement, the FARC began to demobilize in early December 2016 under UN supervision.  Demobilization continued in 2017, with an estimated 7,000 FARC militants turning in over 8,000 weapons.

**Activities:**  Over the years, the FARC has perpetrated a large number of high profile terrorist acts, including the 1999 murder of three U.S. missionaries working in Colombia, and multiple kidnappings and assassinations of Colombian government officials and civilians.  In July 2008, the Colombian military conducted a dramatic rescue of 15 high-value FARC hostages including U.S. Department of Defense contractors Marc Gonsalves, Keith Stansell, and Thomas Howe, who were held captive for more than five years, along with former Colombian presidential candidate Ingrid Betancourt.

In 2016, there were no significant attacks by the FARC, but there have been reports of continued extortion and threats against local officials.  FARC did not claim any attacks in 2017 during the demobilization process.

**Strength:**  Prior to the peace accord, the FARC was estimated to have 7,000 members, with several thousand additional supporters.

**Location/Area of Operation:**  FARC leaders and combatants were located in Colombia.

**Funding and External Aid:**  Prior to the peace accord, the FARC has been primarily funded by extortion and the international drug trade.

PX210

## REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT

**aka** DHKP/C; Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:**  Designated as a Foreign Terrorist Organization on October 8, 1997, the Revolutionary People's Liberation Party/Front (DHKP/C) was originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth).  It was renamed in 1994 after factional infighting.  "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations.  The group advocates a Marxist-Leninist ideology and opposes the United States, the North Atlantic Treaty Organization (NATO), and Turkish establishments.  It strives to establish a socialist state and to abolish Turkish prisons.

**Activities:**  Since the late 1980s, the group has primarily targeted current and retired Turkish security and military officials.  In 1990, the group began to conduct attacks against foreign interests, including against U.S. military and diplomatic personnel and facilities.  The DHKP/C assassinated two U.S. military contractors and wounded a U.S. Air Force officer in the 1990s, and bombed more than 20 U.S. and NATO military, diplomatic, commercial, and cultural facilities.  DHKP/C added suicide bombings to its repertoire in 2001, with attacks against Turkish police in January and September of that year.  Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish and U.S. targets.

After the death of its leader, Dursun Karatas, the DHKP/C reorganized in 2009 and was reportedly in competition with the Kurdistan Workers' Party for influence in Turkey.  The group was responsible for a number of high profile attacks in 2012 that included a suicide bombing of a police station in Istanbul.  This tactic continued in 2013 when, on February 1, a DHKP/C operative exploded a suicide vest inside the employee entrance to the U.S. Embassy in Ankara.  The explosion killed a Turkish guard and seriously wounded a Turkish journalist.  In March 2013, three members of the group attacked the Ministry of Justice and the Ankara headquarters of the Turkish Justice and Development political party using grenades and rocket launchers.

In 2015, the DHKP/C claimed responsibility for a suicide bombing that killed a police officer and wounded another.  In March, Turkish prosecutor Mehmet Selim Kiraz was taken hostage and killed from multiple gunshot wounds by the DHKP/C after police attempted to rescue him.  In August, two women opened fire on the U.S. Consulate in Istanbul; one woman was identified as a member of the DHKP/C.

On January 20, 2017, a DHKP/C militant launched an anti-tank missile into Istanbul police headquarters, which did not result in any deaths or injuries.  Turkish police initiated a series of raids after the attack and apprehended the militant two days later.

**Strength:**  Membership includes an estimated several dozen members inside Turkey, with a support network throughout Europe.

PX210

**Location/Area of Operation:**  DHKP/C is located in Turkey, primarily in Adana, Ankara, Istanbul, and Izmir.  Other members live and plan operations in European countries.

**Funding and External Aid:**  The DHKP/C finances its activities chiefly through donations and extortion.  The group raises funds primarily in Europe.

## REVOLUTIONARY STRUGGLE

**aka** RS; Epanastatikos Aghonas; EA

**Description:**  Designated as a Foreign Terrorist Organization on May 18, 2009, Revolutionary Struggle (RS) is a radical leftist group with Marxist ideology that has conducted attacks against both Greek and U.S. targets in Greece.  RS emerged in 2003 following the arrests of members of the Greek leftist groups 17 November and Revolutionary People's Struggle.

**Activities:**  RS first gained notoriety when it claimed responsibility for the September 5, 2003, bombings at the Athens Courthouse during the trials of 17 November members.  From 2004 to 2006, RS carried out a number of improvised explosive device attacks, including a March 2004 attack outside of a Citibank office in Athens.  RS claimed responsibility for the January 2007 rocket-propelled grenade attack on the U.S. Embassy in Athens, which damaged the building, and the March 2009 bombing of a Citibank branch in Athens.

The Greek government has made significant strides in curtailing RS' terrorist activity.  On April 10, 2010, Greek police arrested six suspected RS members, including purported leader Nikos Maziotis, who later escaped.  On April 3, 2013, five members of RS were convicted by an Athens appeals court, three of them receiving maximum prison sentences.  Maziotis and another accused RS conspirator, Paula Roupa, were convicted in absentia.  Prior to Maziotis's recapture, RS conducted a bomb attack outside a Bank of Greece office in Athens in April 2014; the blast caused extensive damage to surrounding structures but no casualties.

In March 2016, a Greek court sentenced Maziotis to life in prison plus 129 years.  Roupa was sentenced in absentia to 11 years in prison on misdemeanor charges.  Greek authorities suspect she was involved in a September 2016 bank robbery in Malesina, Greece.  In January 2017, Roupa was arrested by Greek anti-terrorist police.

**Strength:**  Unknown

**Location/Area of Operation:**  The group is based in Athens, Greece.

**Funding and External Aid:**  The group's funding is unknown but most likely supports itself through criminal activities, including bank robbery.

## AL-SHABAAB

333

PX210

**aka** The Harakat Shabaab al-Mujahidin; al-Shabab; Shabaab; the Youth; Mujahidin al-Shabaab Movement; Mujahideen Youth Movement; Mujahidin Youth Movement

**Description:**  Al-Shabaab was designated as a Foreign Terrorist Organization on March 18, 2008.  Al-Shabaab was the militant wing of the former Somali Islamic Courts Council that took over parts of southern Somalia during the second half of 2006.  Since the end of 2006, al-Shabaab and associated militias have undertaken a violent insurgency using guerrilla warfare and terrorist tactics against the transitional governments of Somalia.

Al-Shabaab is an official al-Qa'ida (AQ) affiliate and has ties to other AQ affiliates, including al-Qa'ida in the Arabian Peninsula and al-Qa'ida in the Islamic Maghreb.  The group's leader is Ahmed Diriye aka Ahmed Umar aka Abu Ubaidah.

Al-Shabaab is composed of Somali recruits and foreign terrorist fighters.  Since 2011, al-Shabaab has seen its military capacity reduced due to the efforts of the African Union Mission in Somalia (AMISOM) and Somali forces, and clashes within the group itself.  Despite al-Shabaab's loss of urban centers since 2012, the group has maintained its hold on large sections of rural areas throughout Somalia and has conducted attacks in Somalia, Kenya, Uganda, and Djibouti.

**Activities:**  Al-Shabaab has used intimidation and violence to exploit divisions in Somalia and undermine the Somali government, recruit new fighters, extort funding from local populations, and kill activists working to bring about peace through political dialogue.  The group has claimed responsibility for several high profile bombings and shootings throughout Somalia targeting AMISOM troops and Somali officials.  Al-Shabaab has assassinated numerous civil society figures, government officials, journalists, international aid workers, and members of non-governmental organizations.

Al-Shabaab was responsible for the July 11, 2010, suicide bombings in Kampala, Uganda – its first attack outside of Somalia.  The attack, which took place during the World Cup, killed 76 people, including one U.S. citizen.  Al-Shabaab was blamed for the 2011 kidnapping of international aid workers from the Dadaab refugee camp in Kenya.  Both hostages were eventually freed in 2013.  In September 2013, al-Shabaab again expanded its area of operations when it staged a significant attack against the Westgate Mall in Nairobi, Kenya.  The multi-day siege resulted in the deaths of at least 65 civilians, including foreign nationals from 13 countries and six soldiers and police officers; hundreds of others were injured.  In April 2015, al-Shabaab carried out a raid with small arms and grenades on Kenya's Garissa University College that left 148 people dead.

Al-Shabaab claimed responsibility for one of the deadliest attacks against AMISOM troops in Somalia in January 2016.  Using a vehicle-borne IED and small arms fire, al-Shabaab massed against a Kenyan AMISOM base and killed more than 100 soldiers.  In February, al-Shabaab attempted to down Daallo Airlines Flight 321 with 74 passengers on board.  Only the suicide bomber was killed and the plane made an emergency landing in Mogadishu shortly after take-off due to an explosion that created a large hole in the fuselage near the wing.  In August,

PX210

al-Shabaab claimed a double suicide bombing in Galkayo, Somalia, that killed at least 20 people. Al-Shabaab carried out a series of raids in northeast Kenya in October, including one attack that killed at least 12 people at a guesthouse in Mandera, and in November, the group claimed responsibility for a car bombing targeting an army convoy near Parliament in Mogadishu that killed at least two soldiers and injured another five.

Al-Shabaab continued a steady pace of attacks in 2017.  In January, a car bomb killed 39 people in a busy section of Mogadishu.  A similar attack in the capital killed over a dozen people on March 13, and approximately 20 people were killed in a car bomb and shooting at a hotel and adjacent restaurant in June.  On October 14, although the group didn't claim responsibility, it is believed that al-Shabaab conducted a double truck bombing in a Mogadishu intersection with heavy vehicle and pedestrian traffic that killed over 500 people and injured 300 others.

**Strength:**  Al-Shabaab is estimated to have between 7,000 and 9,000 members.

**Location/Area of Operation:**  Al-Shabaab has lost full control of major urban centers in Somalia.  In September 2012, the group lost control of Kismayo, a vital port it used to obtain supplies and funding through taxes.  In October 2014, al-Shabaab lost another strategic port in Baraawe to AMISOM and Somali troops.  Despite these losses, throughout 2016 and 2017, al-Shabaab continued to control large swaths of rural areas in the middle and lower Juba regions, as well as the Gedo, Bakol, Bay, and Shabelle regions.  The group also maintained its presence in northern Somalia along the Golis Mountains and within Puntland's larger urban areas, and launched several attacks against targets in the border regions of Kenya.

**Funding and External Aid:**  While al-Shabaab has seen its income diminish due to the loss of the strategic port cities of Baraawe, Kismayo, and Merka, it still receives enough income to launch attacks throughout Somalia, including against AMISOM bases and other civilian targets.  Al-Shabaab obtains funds through illegal charcoal production and exports, taxation of local populations and businesses, and via remittances and other money transfers from the Somali diaspora (although these funds are not always intended to support al-Shabaab members).

## SHINING PATH

**aka** SL; Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:**  The Shining Path (Sendero Luminoso or SL) was designated as a Foreign Terrorist Organization on October 8, 1997.  The Peru-based terrorist organization was formed in the late 1960s by former university professor Abimael Guzman, whose teachings created the foundation of SL's militant Maoist doctrine.  In the 1980s, SL was one of the most ruthless terrorist groups in the Western Hemisphere.  In 1992, the Peruvian government captured Guzman who, along with key accomplices, is serving a life sentence in prison.  SL is now led by brothers Victor and

PX210

Jorge Quispe Palomino as well as Tarcela Loya Vilchez.  Under their direction, the group aims to overthrow the Peruvian government and names the United States a principal enemy.

**Activities:**  SL committed 13 terrorist attacks in 2015, in comparison to 20 terrorist acts in 2014 and 49 in 2013.  In 2016, SL terrorist attacks declined further.  On April 9, 2016, the group attacked a six-vehicle military caravan transporting election materials ahead of the country's election; eight soldiers and two civilian contractors were killed by SL members armed with long-range rifles and grenades.

In separate incidents in 2017, SL killed several policemen in an area where the group controls territory and facilitates drug trafficking.

**Strength:**  Estimates of SL's strength vary, but experts assess SL to number between 250 and 300 combatants.

**Location/Area of Operation:**  The group is located in Peru, with almost all activity taking place in rural areas, specifically the Apurimac, Ene, and Montaro River Valleys of eastern Peru.

**Funding and External Aid:**  SL is primarily funded by the illicit narcotics trade.

## TEHRIK-E TALIBAN PAKISTAN

**aka** Pakistani Taliban; Tehreek-e-Taliban; Tehrik-e-Taliban; Tehrik-i-Taliban Pakistan; TTP

**Description:**  Designated as a Foreign Terrorist Organization on September 1, 2010, Tehrik-e Taliban Pakistan (TTP) is a Pakistan- and Afghanistan-based terrorist organization formed in 2007 to oppose Pakistani military efforts in the Federally Administered Tribal Areas.  Previously disparate tribal militants agreed to cooperate and eventually coalesced into TTP under the leadership of now deceased leader Baitullah Mehsud.  Mullah Fazlullah led the group before his death (in 2018).  TTP entered into peace talks with the Pakistani government in early 2014, but the talks collapsed in June of that year.  In October 2014, the chief spokesperson and five regional commanders defected from TTP and publicly pledged allegiance to ISIS.

TTP aims to push the Government of Pakistan out of the Federal Administered Tribal Areas (FATA) and parts of Khyber Pakhtunkwa Province and establish Sharia law by waging a terrorist campaign against the Pakistani military and state.  TTP uses the tribal belt along the Afghanistan-Pakistan border to train and deploy its operatives, and has ties to al-Qa'ida (AQ).  TTP draws ideological guidance from AQ, while elements of AQ rely in part on TTP for safe haven in the Pashtun areas along the Afghanistan-Pakistani border.  This arrangement has given TTP access to both AQ's global terrorist network and the operational expertise of its members.

**Activities:**  TTP has carried out and claimed responsibility for numerous terrorist acts against Pakistani and U.S. interests, including a December 2009 suicide attack on a U.S. military base in Khost, Afghanistan, which killed seven U.S. citizens; and an April 2010 suicide bombing against the U.S. Consulate in Peshawar, Pakistan, which killed six Pakistani citizens.  TTP is suspected

336

PX210

of being involved in the 2007 assassination of former Pakistani Prime Minister Benazir Bhutto. TTP directed and facilitated the failed attempt by Faisal Shahzad to detonate an explosive device in New York City's Times Square on May 1, 2010.

Between 2011 and 2017, TTP continued to carry out attacks against the Government of Pakistan and civilian targets, as well as against U.S. targets in Pakistan.  In 2012, TTP carried out attacks against a mosque, a police checkpoint, a Pakistani Air Force base, and a bus carrying Shia Muslims.  In 2013, TTP attacked churches, the home of a government minister in Khyber-Pakhtunkhwa Province, and a Shia neighborhood in Karachi, Pakistan.  TTP's attacks in 2013 killed and wounded hundreds of civilians and Pakistani government and law enforcement officials.  In 2014, TTP targeted military and police convoys, bazaars, buses, and schools including two consecutive attacks against Karachi's international airport and a siege on a primary school in Peshawar, Pakistan that killed 145 people, 132 of whom were children. Throughout 2015, TTP focused many of its small-scale attacks on Pakistani government and law enforcement officials by targeting convoys, government buildings, motorcades, and police checkpoints.  The group also bombed a Shia mosque near Peshawar and carried out suicide bombings at two churches in Lahore.  In 2016, the group continued carrying out attacks, claiming responsibility for a December attack that left the Deputy Superintendent of the police counterterrorism department dead and his son injured in an attack on their vehicle in Peshawar.

In February 2017, TTP killed 13 people and injured over 80 when a suicide bomber targeted a protest in Lahore, and in March, TTP targeted a mosque in northwestern Pakistan, killing over 20 people and injuring dozens more.  In July, the group killed 26 people, including nine policemen, using a suicide bomber in Lahore.  In December, TTP militants disguised as women stormed an agricultural training school in Peshawar, leaving nine dead, including the attackers.

**Strength:**  The group consists of several thousand fighters.

**Location/Area of Operation:**  TTP operates in Pakistan and Afghanistan.

**Funding and External Aid:**  TTP likely raises most of its funds through kidnapping ransoms, criminal activity, and extortion.

PX210

# Chapter 6
# Legislative Requirements and Key Terms

Country Reports on Terrorism 2017 is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.  Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

Excerpts and Summary of Key Statutory Terms:

Section 2656f(a) of Title 22 of the United States Code states as follows:

(a) …The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing -

(1) (A) detailed assessments with respect to each foreign country -

(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;

(ii) about which the Congress was notified during the preceding five years pursuant to section 4605(j) of Title 50; and

(iii) which the Secretary determines should be the subject of such report; and

(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;

(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 4605(j) of Title 50, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;

(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on -

338

(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and

(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and

(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

(1) The term "international terrorism" means terrorism involving citizens or the territory of more than one country;

(2) The term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and

(3) The term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

Interpretation and Application of Key Terms. For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the U.S. government on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

Statistical Information. Pursuant to 22 USC § 2656f(b), this report should contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Consortium for the Study of Terrorism and Responses to Terrorism (START), a Department of Homeland Security Science

PX210

and Technology Center of Excellence, based at the University of Maryland.  The statistical annex includes a discussion of the methodology employed by START in compiling the relevant data.  This report does not contain statistical information specifically concerning combatants.  The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets.

Contextual Reporting.  Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists.  Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations.  It is terrorist groups--and their actions--that are the focus of this report.

Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw.  This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence.

Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily "international terrorism" and therefore are not subject to the statutory reporting requirement.

PX210

PX212



## Occasional Paper Series

# Iranian Strategy in Iraq
## Politics and "Other Means"

Joseph Felter
Brian Fishman

October 13, 2008

1

PX212

# Contents

Preface……………………………………………………………….....   3

Author's Note……………………………………………………….…   4

Introduction………………………………………………………....   6

Chapter 1: Iranian Intervention in Iraq before 2003……………….   14

Chapter 2: Iran's Political Strategy in Iraq…………………………   26

Chapter 3: Iranian Training for Iraqi Militias………………………   55

Chapter 4: Iranian Lethal Aid in Iraq……………………………….   71

Chapter 5: Findings and Recommendations…………………………   83

Acronym List……………………………………………………….…   90

2

PX212

# Preface

Iranian strategy in Iraq is a subject of great importance and intense study. Many discussions of Iran concentrate on reports of lethal aid, pronouncements of Iranian leaders, or Iranian nuclear ambitions. While these data points provide part of the picture, it is vital to put each of the Iranian actions into their broader, historical context. In this light, Iran's actions are part of a deliberate, strategic policy to increase its power and influence in Iraq and throughout the region.

In this report, Colonel Joe Felter and Brian Fishman of the Combating Terrorism Center (CTC) at West Point have detailed the objectives, methods, and expansiveness of the Iranian attempts to affect policy and politics in Iraq. Having spent much of the summer 2008 in Iraq, they have identified many of the documents, reports, and interviews that explain the Iranian strategy and provide both the historical context and the strategic motivation for Iranian actions. By using first hand reports from detainee interviews, Iraqi intelligence services, and coalition forces, they have a unique, empirically-based study that provides rich detail about Iranian action. They combine those reports with volumes of scholarly writing to provide the strategic and intellectual context for Iranian actions.

This report is significant not only for its conclusions, but because we are following the tradition of previous CTC reports and releasing all possible supporting documents on our website. We encourage other scholars to examine these documents and reach their own conclusions. Through that increased study all of us will become better educated and better education can contribute to better policy.

This report supports the CTC's mission to better understand terrorist threats, to educate leaders, and to provide policy analysis. As part of the Department of Social Sciences at the U.S. Military Academy, the CTC's faculty and staff are integral to teaching cadets and providing outreach to educate and inform current and future leaders.

Michael J. Meese, Ph.D.
Professor and Head, Department of Social Sciences
U.S. Military Academy, West Point, New York

PX212

# Authors' Note

*Iranian Strategy in Iraq: Politics and "Other Means"* assesses Iran's strategy to project influence in Iraq and the means it uses to do so. This report is not a comprehensive analysis of Iranian foreign policy. Iranian support for terrorism outside Iraq and its burgeoning nuclear program are beyond the scope of this report. Furthermore, the report does not fully address Iran's efforts to use economic and social levers to project influence in Iraq, primarily because of our inability to find good data. This area demands further research.

In addition to public sources, this report draws on a substantial body of information never before released to the public. These include internal Iraqi intelligence documents written before 2003, details from reports of Significant Activities by U.S. and Coalition Forces, as well as summaries of interrogations of detained militants.

We recognize the inherent problems in using some of the sources cited in this report. For example, we cannot independently confirm the accuracy of information contained in the Iraqi intelligence documents. Indeed, we have serious concerns that Iraqi intelligence agents relied on information from the anti-Iranian terrorist group, the Mujahidin-e Khalq Organization. Data provided by the MKO is sometimes accurate but often considered not credible because of the MKO's endemic interest in portraying Iran in as negative a light possible. Likewise, unclassified information from Coalition Forces' significant activities reports can lack important context. Finally, information obtained from interrogations of detained militants must be interpreted with extreme caution. Detainees may be misinformed or lying, interrogators may misunderstand or poorly transcribe information, and the context of a detainee's story may be missing. Readers should be wary of these problems, as we have tried to be.

In an attempt to address legitimate concerns about our data, we provide as much original source documentation as possible and identify the data's limitations in the text and in footnotes. When possible, we strive to corroborate newly released data with already public information to avoid relying on a single document, transcript, or summary report.

Much of our research would not have been possible, however, without the unique access afforded academics based at West Point. We accept that this situation makes peer review difficult, though all of our sources are being

PX212

released with our paper.  We have done our best to balance the sometimes conflicting demands of soldiers whose lives often depend on secrecy and the need for more informed academic and public debate of issues critical to U.S. national security.  There is no doubt our effort is imperfect, but we have worked to be as forthright as possible and provide this report and its supporting documentation with the hope and expectation that others will expand on this research to learn more about Iranian policy and strategy.

We thank many officials at U.S. Central Command and Multi-National Force Iraq (MNF-I) for their cooperation with our unusual requests to release raw information.

Supporting documentation and sources can be accessed at http://www.ctc.usma.edu.  Please contact the authors at the emails listed below for substantive questions about the report.  Please direct other questions regarding the report to the U.S. Central Command Public Affairs Office POC LCDR Bill Speaks at speakswh@centcom.mil or 813-827-2240.

Joseph H. Felter, PhD                    Brian Fishman

*Colonel Joe Felter is National Security Affairs Fellow at the Hoover Institution, Stanford University. From 2005-2008 he was Director of the Combating Terrorism Center at West Point and Assistant Professor in the U.S. Military Academy's Department of Social Sciences. He can be reached at Felter@hoover.stanford.edu or 650-725-8558.*

*Brian Fishman is Director of Research at the Combating Terrorism Center at West Point and Assistant Professor in the Department of Social Sciences at the U.S. Military Academy,  West Point, New York. Brian can be contacted at Brian.Fishman@usma.edu or 845-938-8495.*

The opinions expressed in this report are the authors' and do not reflect the official positions of the U.S. Military Academy, the U.S. Army, the Department of Defense, the U.S. government, or any of the individuals or organizations that agreed to release information for this report.

PX212

# Executive Summary

Iran has a robust program to exert influence in Iraq in order to limit American power-projection capability in the Middle East, ensure the Iraqi government does not pose a threat to Iran, and build a reliable platform for projecting influence further abroad.  Iran has two primary modes of influence.  First, and most importantly, it projects political influence by leveraging close historical relationships with several Shi'a organizations in Iraq: the Islamic Supreme Council of Iraq (ISCI), the Badr organization, and the Dawah political party.  Second, Iran uses the Iranian Revolutionary Guard Corps (IRGC) and Qods Force (QF) to provide aid in the form of paramilitary training, weapons, and equipment to various Iraqi militant groups, including Moqtada al-Sadr's Jaysh al-Mahdi (JAM) and the Special Group Criminals (SGCs).  Iran also projects influence through economic initiatives and various religious programs.  Iranian influence in Iraq is inevitable, and some of it is legal and constructive.  Nonetheless, Iranian policy in Iraq is also duplicitous.  Iran publicly calls for stability while subverting Iraq's government and illegally sponsoring anti-government militias.

Although Iran publicly protested the U.S.-led invasion of Iraq in 2003, its agents and allies initially cooperated with U.S. forces.  Iraqi refugee groups with deep ties to Iran participated in U.S.-sponsored pre-invasion conferences, and Iran urged its surrogates to assist U.S. forces and position themselves to seize power through the electoral process.  Yet even as its political allies came to power in Baghdad with U.S. backing, Iran began supporting anti-government, anti-coalition militia movements typified by JAM and, later, the SGCs.  The two-tracked strategy offered Iran unique levers to increase violence in Iraq and then to benefit when violence subsided.  Another advantage has been that, intentionally or not, Iran's two-pronged approach obscured the importance of Iran's political influence in Iraq by focusing the international media and U.S. policymakers on Iran's lethal aid to militia groups.

Iran has achieved three major accomplishments in Iraq.  First, the unstable security situation and political opposition means the U.S. is not in a position to use Iraq as a platform for targeting Iran.  Second, Iran's political allies have secured high-ranking positions in the Iraqi government.  Third, the Iraqi constitution calls for a highly federalized state.  Iran values a decentralized Iraq because it will be less capable of projecting power, and because Iran is primarily concerned with Iraq's southern, oil-rich, Shi'a-dominated provinces.  Iran

6

PX212

believes that increased southern autonomy will leave those provinces more open to Iranian influence.  Iran's successes in Iraq are not all a function of its own efforts. For example, a democratic Iraq will almost certainly be highly federalized because of the power of Iraqi Kurds to distance themselves from the Iraqi government, and because of increasingly heated sectarian divisions that can be mitigated by devolving power to regional governments.

Iran's effort to manipulate Iraqi surrogates predates the 2003 U.S. military operations.  During the 1980s and 1990s, Iran helped organize and finance ISCI's predecessor, the Supreme Council for Islamic Revolution in Iraq (SCIRI), and its Badr Corps Militia.  It also worked closely with elements of the Islamic Dawah Party and helped train and fund its militant wing.  Before 2003, the Badr Corps served as Iran's most important action arm inside Iraq, and was considered an official component of the IRGC-QF.  Badr received training and weapons from the IRGC-QF and Lebanese Hizballah to attack both the Iraqi regime and the Mujahidin-e Khalq Organization (MKO), an Iranian terrorist group.  Numerous senior individuals in the Badr Corps during the 1990s play critical logistical roles funneling weapons to militants in Iraq today, including Abu Mustafa al-Sheibani—the first major Explosively Formed Penetrator (EFP) smuggler—and Abu Mahdi al-Muhandis, the terrorist and former Badr Corps commander who was elected to the Iraqi parliament before fleeing to Iran.  In some cases, these people had direct ties to current Iraqi politicians, including Hadi al-Ameri, who was al-Muhandis' Chief of Staff.

Iran's support for Iraqi refugee groups in the 1980s and 1990s has important consequences today.  The refugee groups often disagreed over how closely to associate with the Iranian regime.  SCIRI was most closely linked to Iran's clerical regime, going so far as to recognize Ayatollah Khomeini's doctrine of guardianship of the jurist—*velayat-e faqih*—which implied Ayatollah Khomeini was their Supreme Leader.  The Dawah party, however, was bitterly split over *velayat-e faqih*.  Meanwhile, many Shi'a that remained in Iraq grew resentful of the Iraqi refugees that pontificated about Saddam's regime without facing its brutality firsthand.  Most supported Iran's religious government but rejected *velayat-e faqih.*  The political and doctrinal disagreements were often reflected in debates about which religious figures to follow.  SCIRI was led by Ayatollah Baqir al-Hakim, while many Dawah supporters and Iraqis still in Iraq supported Ayatollahs from the al-Sadr family.  These divisions laid the groundwork for contemporary divisions between the establishment ISCI and Dawah parties in Baghdad and the anti-establishment Sadrist movement.

7

PX212

Despite its successes, Iran faces numerous hurdles projecting influence in Iraq. Many Iraqis—including Shi'a—despise ISCI, Iran's primary political ally, precisely because of its close relationship with Iran.  In 2007, ISCI took its current name and abandoned the title Supreme Council for Islamic Revolution in Iraq, which had implied a closer relationship with Tehran.  ISCI also publicly stated that Grand Ayatollah Ali al-Sistani is its most important religious influence—thereby distancing the organization from Iranian Supreme Leader Ayatollah Khamenei, whom it had previously considered supreme.  Meanwhile, Iran's militia allies in Iraq tend to oppose Iranian political influence there.  Moqtada al-Sadr and others are willing to accept Iranian training and weapons to pursue their political, religious, and criminal aims, but they remain hostile to Iranian political influence and thus are unreliable allies.

**Key Findings**

- Iran's primary strategy to influence events in Iraq since the U.S. invasion has been to support allies in the Iraqi political establishment.  To do so, Iran has supported Iraq's electoral process and supported its Iraqi allies' political ambitions.  An elected Iraqi government is the U.S.' best hope for a stable Iraq but also Iran's primary mode of projecting power in Iraq.

- The primacy of Iran's political strategy is particularly important now because of the political sensitivity of the U.S.-Iraqi negotiations on a Status of Forces Agreement (SOFA) and a Strategic Framework Agreement (SFA), which will govern the role of U.S. forces in Iraq after December 31, 2008. Iran likely prioritizes using supportive Iraqi politicians to influence the SOFA/SFA negotiations as a means to constrain U.S. freedom of action in Iraq over the long-term, rather than increase violence now.

- Popular opposition suggests that Iraqi politicians will be more amenable to publicly support a SOFA/SFA after the Iraqi provincial elections, which were originally planned for October 2008, but will not occur until 2009.

- Iranian programs to support Iraqi militias are very robust.  The IRGC-Qods Force, augmented by Lebanese Hizballah trainers, sponsor basic and advanced paramilitary training at camps in Iran and Lebanon.  Iranian supplied weapons are being employed against Coalition and Iraqi forces, including the most lethal of improvised explosive devices (IEDs), known as Explosively Formed Penetrators.  Iran has supplied shaped IEDs that resemble EFPs to Iraqi opposition groups since at least 2001.

8

PX212

- The Iraqi government has cracked down on Iranian-affiliated militias in the last six months.  The Iraqi government's effort does constrain Iran's ability to employ violence inside Iraq, but it will not prevent Iran from exerting influence through supportive Iraqi politicians.

- Iranian influence in Iraq can be beneficial when it is a force for stability and economic growth.  Iranian pilgrims to Iraq's shrine cities bring in needed revenue; cross-border trade is natural and productive; even the presence of Iraqi politicians with strong links to Iran does not necessarily undercut Iraqi sovereignty or security.  These politicians will serve an important moderating function when the inevitable disputes between Iran and Iraq arise.

- Iran will likely try to maintain a non-governmental militant action arm inside Iraq for the foreseeable future, regardless of the political orientation of the Iraqi government or the presence of U.S. troops.  These militant elements will serve both as a hedge against a potentially hostile Iraqi government and a lever to pressure any U.S. troops that remain inside Iraq.

- Moqtada al-Sadr is personally erratic and a determined opponent of the U.S. presence in Iraq, but his history of ardent Iraqi nationalism and support for a strong Iraqi central government means he is a potentially important bulwark against Iranian political influence in Iraq.

- Iran aims to evict all U.S. troops from Iraq.  In lieu of achieving that goal, Iran will target U.S. troops and resources in order to demonstrate it has the capability to undermine the U.S. project in Iraq.  At least one purpose of Iran's strategy is to demonstrate a credible deterrent against a U.S. strike on Iran's nuclear facilities.  If the U.S. maintains a persistent force of any kind in Iraq, it should be structured to minimize Iran's ability to credibly threaten that force.

- Confrontations with the U.S., in Iraq and elsewhere, bolters the political stature of Iranian leaders with their own constituencies.

- Some ISCI/Badr politicians will retain a close relationship with the Iranian regime for the foreseeable future.  However, ISCI/Badr members, like all Iraqi politicians, will become increasingly independent of Iran as they are

PX212

forced to cultivate a politically viable constituency within an Iraqi population suspicious of Iran. Many political leaders, including Prime Minister al-Maliki, a Dawah party member, have shown promising signs of frustration with Iranian meddling in Iraq. Even superficial demonstrations of independence from Iran are positive developments that reflect the maturing of the Iraqi political process.

**Key Recommendations**

- The United States should counter Iran's overarching Iraq strategy, not just its support for militias. Whether designed as such or not, Iran's support for JAM and SGC has obscured its support for ISCI/Badr, as well as its political efforts to weaken the Iraqi central government. Victories over JAM and the SGC militias are important, but they will be pyrrhic if not coupled with a focused strategy to constrain Iranian influence in the Iraqi political system. This strategy must be built on a policy that clearly explains which forms of Iranian influence are acceptable and which are not acceptable. If the U.S. overlooks Iranian efforts to shape Iraqi politics and society, it may suffer a severe strategic setback even if violence in Iraq subsides.

- The United States' strategy should use all forms of national power, including diplomacy, to counter negative Iranian influence in Iraq. Iran has a relatively cohesive strategy in Iraq that coordinates military, economic, and diplomatic efforts. The U.S. strategy should be similarly nuanced and coordinated. Diplomatic efforts, including both direct negotiations with Iran and a stronger effort to coordinate Arab responses to Iran's meddling in Iraq should be a part of that strategy. A key diplomatic goal should be to increase transparency of economic development money spent in Iraq to ensure that Iranian-sponsored projects can be identified and are difficult to use as cover for more nefarious activities.

- Encourage Prime Minister al-Maliki's increasingly nationalist views. Prime Minister al-Maliki comes from a staunchly pro-Iranian wing of the Dawah Party; his recent crackdown on JAM and the SGCs is an effort to improve his party's electoral prospects in the provincial elections and to weaken al-Sadr politically. Although the crackdown is self-serving, it demonstrates the increasing importance al-Maliki places on a domestic Iraqi constituency.

10

PX212

- <u>Increase accountability in the Iraqi Government.</u>  Neither the United States nor Iraqi nationalists have effectively responded to Iranian infiltration of the Iraqi government through ISCI/Badr or the Dawah Party.  One way to increase accountability is to force all Iraqi politicians to be directly accountable to specific constituents, whether by using single-member districts or allowing Iraqi voters to vote for individuals rather than political parties.  Legislation to maximize transparency of government and political parties would enable and compel ISCI/Badr politicians to be more independent of their Iranian suitor.

- <u>Offer Moqtada al-Sadr incentives to participate in the Iraqi political process.</u>  Moqtada al-Sadr is unpredictable and violent, but he symbolizes Iraqi nationalism for millions of Iraqis.  The United States should not tolerate JAM violence, but should incentivize al-Sadr's participation in the Iraqi government; his presence serves as a counterweight to Iranian-backed groups that favor a federalized Iraqi state.

- <u>Target IRGC-QF operatives and logisticians in Iraq.</u>  U.S. and Coalition forces should prioritize identifying and targeting Iranian agents who provide Iraqi militias such as JAM and Special Groups with training and weapons. Undermining the logistical support will have more significant, long-term effects than will strikes on rank and file militia members.

- <u>Support a Shi'a "Sons of Iraq" program to employ low-level JAM and SGC militiamen.</u>  In limited cases, the Iraqi government and the U.S. should officially authorize former JAM and SGC members to support Iraqi Security Forces, in a program similar to the Sons of Iraq program.  This will require developing some form of amnesty criteria commensurate with the program provided to former Sunni militants in exchange for cooperation.  The Iraqi government should also embed professional cadres from the Iraqi Army for command, control, and monitoring.

- <u>Increase international public accountability for Iran's illegal activities in Iraq.</u>  Sunshine is the best disinfectant.  The Government of Iraq should aggressively confront Tehran with evidence of Iran's illegal activities in Iraq and expose them broadly to the international community.

PX212

# Introduction

Since 2003, the United States, al-Qa`ida, and Iran have implemented programs to influence Iraqi politics and society.  Of the three, Iran has the most at stake in Iraq and is the most integrated in Iraqi society.  Iran's goals for Iraq directly impact its fundamental and enduring strategic interests: preventing chaos on its border, limiting American power-projection capability in the region, ensuring Iraq does not threaten its political or cultural integrity, and building a platform for projecting influence across the Middle East.  Although many aspects of these objectives clash with U.S. interests, Iran shares important ends with the United States, primarily: preventing widespread chaos in Iraq that could spark a regional conflict and the return of dictatorial Arab nationalist rule.

This report provides an overview of Iran's multi-faceted efforts to pursue its national interests by influencing the political and security dynamics in Iraq from the Iranian Revolution to the present day.  Although the report describes Iran's direct and indirect lethal aid to surrogates in Iraq since the U.S. led invasion, it ultimately concludes that U.S. policy focuses on Iranian lethal aid to Iraqi militias at the expense of countering Iran's primary mode of power projection in Iraq: support of Iranian-affiliated Iraqi political parties.  The misplaced prioritization is a function of the fact that, as an unnamed U.S. general said of these political parties to the New York Times, "They aren't trying to kill us."[1]  This rationale is entirely understandable considering the U.S. military's tactical and operational necessities in Iraq.  However, the strategic focus on Iran's lethal aid to Iraqi militias—at the expense of countering its overall power projection strategy—may result in a major U.S. policy failure and vastly increased Iranian influence in Iraq and the Middle East.  The U.S. needs a comprehensive strategy for countering Iranian influence in Iraq that includes rolling back the influence of Iranian-backed Iraqi politicians.

Since the 1979 Iranian Revolution, Iran has actively tried to influence Iraq's domestic affairs, primarily by supporting Iraqi political refugees and militias to weaken Saddam Hussein's regime.  Iran uses many of the same methods today.  The fundamental consistency of Iran's strategy through the Iran-Iraq war, the post-Gulf War decade, and the post-Saddam era suggests that ending this policy will be very difficult.  In contrast to American *goal-based* policymaking, Iran views its policy toward Iraq as a long-term *process* to contain Iraq-based threats

---

[1] Glanz, James and Alissa Rubin "US and Iran Find Unexpected Common Ground in Iraq's Shiite Conflict" *The New York Times* April 21, 2008

12

PX212

and manipulate Iraqi territory and resources, rather than a policy with a clearly defined end-state.  This distinction is critical because it suggests that Iran's means and methods to influence Iraq may shift, but its interventionist policy will not, no matter the setbacks it faces.  Iranian strategy in Iraq is currently tailored to meet the challenge of U.S. presence, but its intervention will persist in various forms long after the U.S. withdraws.

Iran uses the Iranian Revolutionary Guard Corps (IRGC) and its Qods Force (QF) as its primary mechanisms to intervene in Iraq.  The IRGC-QF funds political parties, funnels money and weapons to anti-coalition militias, and provides Iraq significant economic aid.  Consistent with Iran's practice in both Lebanon and Iraq for the past 25 years, Iran supports a variety of organizations, often backing factions on multiple sides of a dispute.  In Iraq, that dichotomy is often between the Islamic Supreme Council of Iraq (ISCI, formerly the Supreme Council of Islamic Revolution in Iraq (SCIRI)) and Moqtada al-Sadr's Office of the Martyr al-Sadr (OMS) and Jaysh al-Mahdi (JAM) militia.  Iran's primary means of projecting power in Iraq is to support friendly politicians from ISCI, the affiliated Badr Organization, and friendly factions of the Dawah party.  Iran has also found OMS/JAM useful for disrupting U.S. plans in Iraq, but has likely determined OMS/JAM is an unreliable proxy for achieving its long-term political goals.  Iran's division of support between various political factions suggests it is less concerned about dictating specific outcomes in Iraq than in ensuring its continued influence to shape the general tone of Iraqi politics.

It is a mistake to think of all Iranian influence in Iraq as nefarious.  Iran should have a close relationship with the Iraqi government and strong economic and social ties to the Iraqi people.  Nonetheless, Iranian policy over the last five years has been two-faced: offering Iraq's government moral support while arming militias that undermine governmental authority; funneling advanced weapons to attack its enemies, but providing humanitarian aid for the Iraqi people; and encouraging free elections, but attempting to manipulate their results.

Iran's memory of the 1980-1988 Iran-Iraq War and concerns of a resurgent Sunni dictatorship drive its Iraq policy as much as its fear of the United States.  Nonetheless, Iran likely sees its ability to disrupt the U.S. project in Iraq as a means to foil or deter a U.S. strike against Iranian nuclear facilities.  Although Iran's proximate goal is to drive all U.S. troops out of Iraq, it is likely to continue to support non-governmental militant elements in Iraq whether or not U.S. troops remain in the country.  At the same time, Iran will certainly maintain its close relationship with Iraqi politicians.

13

PX212

> **"War is merely the continuation of policy
> by other means."**
> *"On War"*
> Carl von Clausewitz

**Chapter 1**
**Iranian Intervention in Iraq Before 2003**

**Iranian Strategy: Ideology and Interest**

The revolutionary ideology that fueled the 1979 Iranian revolution continues to inform Iran's current senior leadership.  Inspired by the specific brand of Islamism articulated by the revolution's de-facto leader, Ayatollah Khomeini, the clerical leaders of Iran continue to stress the importance of Khomeini's ideas.  Important among these are the notions of anti-imperialism and *velayat-e faqih*, the guardianship of the jurist, which is the basis of Iran's theocratic government.

The Iranian notion of anti-imperialism is often enunciated as anti-Americanism and anti-Zionism.  Khomeini (and other revolutionary ideologues) contextualized Iran's struggle as the same fight that was being waged by other nations in the third world.  They considered the Iranian struggle to be a conflict between a nation of the indigenous oppressed and foreign oppressors.  This translated into a struggle against U.S. policy in Iran and support for the Shah's regime.  To make his argument, Khomeini borrowed from other revolutionary ideologies emanating from the third world, especially leftist-populism.  Today, it is this anti-imperialism, fused with Khomeini's own Islamist doctrine, that form an ideology that is both Islamist and populist, which separates the motivations of Iran and its Shi'a allies from those of the Sunni world.

The second central doctrine of the Khomeinist ideology—*velayat-e faqih*— conceives of an Islamic state led by a top member of the Shi'a clerical class.[2]  The concept contradicts centuries of Shi'a tradition, wherein the clergy played a powerful, but apolitical role in society.  Nonetheless, Khomeini's success in the aftermath of the 1979 revolution enabled him and his supporters to enshrine the *velayat-e faqih* as a key component in the constitution of the Islamic Republic of Iran.  When the Iranian constitution was ratified by popular referendum, Khomeini succeeded to the role of the clerical ruler—*vali-ye faqih*—and became Iran's "Supreme Leader."  Loyalty to the *velayat-e faqih* doctrine, and Iran's

---

[2] Milani, Mohsen The Making of Iran's Islamic Revolution (Westview Press) 1994

clerical leader, became the touchstone of political viability in post-revolutionary Iran.[3]

The two concepts of anti-imperialism and *velayat-e faqih* animated Iran's early external operations.[4]  One of the earliest ideas for combating global imperialism was to "export" the Islamic revolution that had been so successful in Iran.  The idea was popular with the more radical members of the post-revolutionary regime, but was largely abandoned by Khomeini after Saddam Hussein invaded southwestern Iran in September 1980.  The "Imposed War" (as Iran calls it) drastically shifted Iran's domestic and foreign priorities.  Suddenly, Iran needed to mobilize its resources to push back Iraq's forces and could not afford to support substantial operations abroad.  The ensuing trench warfare—which lasted eight years—strengthened the post-revolutionary regime domestically, but limited its influence outside of Iran's borders.

Despite the war, Iran did not completely forsake its plans to export the revolution.  Instead, Iran took advantage of regional conflicts, such as the Israeli invasion of Lebanon and the Soviet invasion of Afghanistan.  In the 1970s, many Iranian revolutionaries trained at Fatah and Amal camps in Lebanon to learn guerilla tactics.  Iran was able to establish strong support among the Shi'a community that was radicalized in the wake of the Israeli invasion.  Using the IRGC and mid-level clerical leaders, Iran was able to organize a Shi'a Lebanese militia and imbue it with Khomeinist ideology.  This militia, which eventually became Hizballah, embraced nearly all of Khomeini's ideological doctrine, including *velayat-e faqih*.  Theoretically, at least, this meant that Hizballah members acknowledged Ayatollah Khomeini (and his successor, Ayatollah Khamenei) as their Supreme Leader.

**IRGC and the Qods Force**
The Islamic Revolutionary Guard Corps was established in the early days of the Iranian revolution of 1979.  Khomeini himself ordered the group organized under the auspices of the clerical Revolutionary Council.  The early IRGC was essentially an umbrella organization for various armed groups and organizations that supported Khomeini and the pro-clerical Islamist camp during the revolution.

---

[3] Wells, Matthew C. "Thermidor in the Islamic Republic of Iran: The Rise of Muhammad Khatami" *British Journal of Middle Eastern Studies,* Vol. 26, No. 1 (Summer 1999) pp. 27-39
[4] Arjomand, Said Amir "Iran's Islamic Revolution in Comparative Perspective" *World Politics*, Vol. 28, No. 3 (Apr., 1986) pp. 383-414

PX212

The pro-Khomeini Mujahidin of the Islamic Revolution (MIR) was the most significant organization that constituted the early IRGC leadership.  The MIR was itself an umbrella organization composed of seven regional guerilla groups within Iran.  These groups were all started by former members of the Islamo-Marxist Mojahedin-e Khalq Organization who left the MKO because of ideological disputes linked to the group's embrace of Marxist ideology.  The seven groups formed the MIR in the early days of the revolution with the express purpose of preventing the anti-clerical MKO from having any influence in the post-revolutionary regime.

Many MIR members, including Mohsen Rezai, were brought into the IRGC by the pro-Khomeini Revolutionary Council to organize and lead the fledgling ideological army.[5]  Although MIR members only made up one part of the early IRGC cadre, their faction became dominant when Rezai took command in 1981.[6]  The early IRGC was tasked with both "protecting the revolution" at home and "exporting" it abroad.[7]

Although the MIR faction was passionate about the need to export the revolution outside of Iran's borders, they were more passionate about their support for Khomeini.  So, when Khomeini focused his attention on defeating Iraq, the MIR faction of the IRGC turned away from its operations in Lebanon and toward Iraq.

When the Iran-Iraq war ended in 1989, the IRGC again took a more active role outside Iran's borders.  Through SCIRI/Badr and Lebanese Hizballah, the IRGC already had access to extensive support networks in both Iraq and Lebanon, and it hoped to develop new networks elsewhere.  To this end, in 1990, the IRGC transferred all of its extra-territorial activities to a new branch called the Qods (Jerusalem) Force, led by Brigadier General Ahmad Vahidi.[8]  The Qods Force continued to support groups associated with the Palestinian struggle, but it also expanded into new areas, particularly in the former Soviet Bloc and the Balkans.

---

[5] Cody, Edward "Iran Makes Gains in War with Iraq" *The New York Times* January 31, 1982. A1

[6] Branigin, William "Iranian Clerics Take Control of Revolution's Institutions" The New York Times June 16, 1980

[7] Branigin, William "Khomeini Militia Vows to Spread Iran's Revolution" The Washington Post May 6, 1979 A1

[8] Harmony Document ISGZ-2005-001122-19954; The Qods Force's name refers to its stated purpose, which is to liberate Jerusalem.

16

PX212

In 1998, Ahmed Vahidi was replaced by Brigadier General Qassem Suleimani. Suleimani has a long history of militancy, and is accused of being complicit in the 1994 bombing of a Jewish Community Center in Argentina.[9]  Today, he presides over a complex organization with both paramilitary, diplomatic, and intelligence gathering branches.  The Qods Force is not restrained geographically; it operates in Iraq, Lebanon, Central Asia, Europe, and the Americas.  The Qods Force's extremely broad mandate means it operates largely parallel to Iran's normal foreign policy-making bureaucracy, operating under Supreme Leader al-Khamenei's direct supervision.

The IRGC-QF has established regional commands for the entire world, but the first four are dedicated to the areas immediately surrounding Iran.[10]   The following description of the Qods Force's structure is taken from an Iraqi intelligence document:[11]

1. First Corps, also known as the "Ramazan Headquarters," is dedicated to Iraq.  In the mid-1990s Iraqi intelligence reports suggested the Ramazan Headquarters operated three camps along the Iraqi border: in the South near Ahvaz, in the Center near Kermanshah, and in the North, the al-Nasr camp, which was led by Mahmoud Farhadi.[12]  In September 2007, Farhadi was captured by U.S. forces while posing as a trade representative in Iraqi Kurdistan.[13]  He is almost certainly one of the highest ranking Qods Force members captured by U.S. forces in Iraq.

2. Second Corps, Nabi al-Akram Command Center, is based in Zahedan and is responsible for Pakistan and Iran's border provinces.

3. Third Corps, Al-Hamzah Command Center, is focused on Turkey and Iran's complex relationship with Kurdish militant groups.

---

[9] *See* Intelligence and Terrorism Information Center at the Israel Intelligence Heritage and Commemoration Center "Using the Quds Force of the Revolutionary Guard as the Main Tool to Export the Revolution Beyond the Borders of Iran" April 2, 2007
[10] Harmony Document ISGZ-2005-001122-19954
[11] *Id.*
[12] *Id*.
[13] Von Zielbauer, Paul "US Calls Iranian Official Part of Elite Force" *The New York Times* October 8, 2007

17

PX212

4. Fourth Corps, al-Ansar Command Center, is based in Mashhad and is responsible for projecting Iranian influence in Afghanistan and Central Asia.

Figure 1 is a translated chart produced in an Iraqi intelligence report on the Iranian Qods Force in 2000.

*Figure 1: Iraqi Intelligence Schematic of Qods Force Organization circa 2000[14]*



One of the Qods Force's primary intelligence targets was the MKO, which supported and fought alongside Saddam during the Iran-Iraq war, and

---

[14] Harmony Document ISGZ-2005-001122-19954 The embedded chart is taken directly from the English translation.  See Harmony Document ISGZ-2005-001122-19954 for the original text.

18

maintained an operational military wing in Iraq.  Since 2003, the group has remained, with U.S. acquiescence, holed up at a camp inside of Iraq.[15]

**Iranian Surrogates in Iraq**

Despite its moralistic rhetoric against MKO "traitors," Iran sponsored its own cadre of Iraqi refugees to fight against Saddam's regime during the Iran-Iraq war.  Most of the fighting took place in or near Shi'a-dominated regions of Iraq, so both Iraqi soldiers and defectors tended to be Shi'a.  Millions of Iraqis were displaced by the war, and up to one million sought refuge in Iran.[16]  Defectors and refugees were given special treatment and encouraged to support toppling Saddam's regime.

At the time, Iraqi Shi'a were split into two main camps: those who followed the top Iraqi Shi'a cleric Ayatollah Baqir al-Sadr and those who followed Ayatollah Muhammad Baqir al-Hakim.  The two Ayatollahs led the Shi'a Islamist movement in Iraq before the war with Iran, and most of their followers supported the Iranian revolution.  Saddam feared a Khomeinist-style uprising in his own population, and in 1980, assassinated Ayatollah Baqir al-Sadr as part of his larger campaign to crush any hint of a Shi'a revolt.  Ayatollah al-Hakim subsequently fled to Iran in order to avoid the same fate, and he settled down to lead the Iraqi refugee movement from his new home.

When war broke out between Iraq and Iran, al-Hakim's supporters began to organize on both sides of the border.  Iran and the IRGC helped the group establish a new political party and a corresponding militia: the Supreme Council for the Islamic Revolution in Iraq and the Badr Brigade.  Al-Hakim abandoned al-Sadr's traditional approach to Shi'a doctrine and subscribed to Khomeini's

---

[15] Note that much of the material about the Qods Force comes from Iranian dissident organizations, almost all of which are linked directly or indirectly to the MKO—which is listed as a terrorist organization by the US, EU, and Canada.  *See* US Department of State Fact Sheet April 8, 2008 available at http://www.america.gov/st/texttrans-english/2008/April/2008041011249xjsnommis0.111355.html.  Without any corroborating evidence, information obtained or produced by the MKO is problematic, and is likely a mix of truth, speculation, and falsehood.  Analysts, from government, academia, and the media, are rightly skeptical of such material.  This report does source some material that appears to have been "obtained" first by the MKO and then passed to the Iraqi government.  Readers are encouraged to treat this material with appropriate skepticism; the authors have tried to put the information in proper context and, where possible, corroborate the information with other sources.

[16] Ehteshami, Anoushiravan "Iran-Iraq Relations After Saddam" *The Washington Quarterly* Autumn 2003

19

PX212

doctrine of *velayat-e faqih*.  Like Hizballah, both SCIRI and Badr accepted
Khomeini, and his successor Ayatollah Khamenei, as their Supreme Leader.
Until 2007, when SCIRI changed its name to the Islamic Supreme Council of Iraq
(ISCI) and seemed to endorse Ayatollah al-Sistani, SCIRI/Badr and Lebanese
Hizballah were the only two significant organizations to accept this doctrine.
The ties between SCIRI/Badr and the Iranian regime were very deep.  The Badr
Brigade operated as a component unit of the IRGC and the Qods Force, and
acted under the command of Qods Force officers.

Meanwhile, many Iraqi Shi'a still looked to al-Sadr as their spiritual leader,
despite his assassination.  These Iraqis generally joined the Islamic Dawah Party,
which had been founded two decades earlier to catalyze public opinion for an
Islamic State in Iraq.  The Dawah cadres, unlike their comrades who formed
SCIRI, were more divided on Khomeinist ideology.  The late al-Sadr had not
subscribed to *velayat-e faqih*, which made it difficult for his followers to do so.
Although the Dawah Party was supported by the Iranian regime, and its militia
was partially funded by the IRGC, there was a split between Dawah's leaders on
doctrinal issues.  Dawah's clerical leaders and their supporters (including current
Iraqi Prime Minister Nuri al-Maliki), for the most part supported Khomeini's
central doctrine, whereas Dawah's professional leaders (such as former Iraqi
Prime Minister Ibrahim al-Jafaari) largely did not.

Iran maintained its support for both SCIRI/Badr and Dawah's political and
military activities long after the Iran-Iraq war ended.  Dawah's most infamous
attack was the 1983 bombing of the U.S. and French Embassies in Kuwait, attacks
that had compelling ties to Iran and Lebanese Hizballah.[17]  The bomb-maker,
Mustafa Youssef Badreddin, was the brother-in-law of Hizballah's master
terrorist Imad Mugniyeh.[18]  Despite Dawah's high-profile strike in Kuwait, the
Badr Corps was the most important Iranian-backed Iraqi militant organization in
the 1990s.  The militia organized structured military units in Iran that played a
critical role in the 1991 uprisings following Iraq's defeat in the Gulf War.[19]
Captured Iraqi intelligence documents provide a wealth of information about the
structure of Badr Corps, including its organization around the time of the U.S.
invasion in 2003.  This data is critical because the smuggling networks used in
the 1990s are funneling weapons and people into Iraq today.

---

[17] Abdul-Zahra, Qassim "US Probes Embassy Bombing in Kuwait" *Associated Press* February 6,
2007
[18] Murphy, Caryle "Bombs, Hostages: A Family Link" *The Washington Post* July 24, 1990
[19] Nasr, Vali "When the Shi'as Rise" *Foreign Affairs* July/August 2006; Tyler, Patrick E. "After the
War; Iran-Iraq Tension is Worrying US" *The New York Times* April 26, 1991

PX212

**Iranian-Sponsored Militancy in Iraq**

The Badr Corps was a fully functional militia by the early 1990s with an extensive network inside Iraq, backed by the Qods Force's Ramazan Headquarters.[20]   The Qods Force operated several training camps at the time, including the "Imam Ali" camp in Tehran to train for "operations outside its borders."   According to Iraqi intelligence reports, the IRGC-QF provided the Badr Corps approximately $20 million per year until at least 2001.[21]

By 1999, the Badr Corps  had established four "axes" inside Iraq to coordinate operations against the Iraqi regime and the MKO.[22]   The axes were organized geographically, and were tasked with recruiting dissidents, disseminating propaganda, conducting sabotage, and procuring weapons.  According to Iraqi intelligence documents from the late 1990s, Badr's Axis 3, in the Baghdad area, was led by Abu Mustafa al-Sheibani, who in 2005 would lead one of the most important IED smuggling networks in Iraq.  According to *Time Magazine*, Sheibani's group was the first to bring Explosively Formed Penetrators (EFP) into Iraq from Iran.[23]  Figure 2 is the translation of an Iraqi intelligence schematic of the Badr Corps structure inside Iraq:

*Figure 2: Diagram of Badr Corps circa 1999*[24]



---

[20] Harmony Document ODP1-2005-008247_TRANS

[21] Harmony Document ISGQ-2005-00038283

[22] *Id.*

[23] Ware, Michael "Inside Iran's Secret War for Iraq" *Time* August 15, 2005

[24] Harmony Document ISGQ-2005-00038283 The schematic is recreated in the document itself.

PX212

The Badr Corps would often establish offices in businesses, hospitals, and non-governmental organizations operating in Iraq.  One document describes Badr Corps members meeting in offices run by the Iranian Red Crescent society and in a hospital in Sulaymaniyah.[25]  An undated Iraqi intelligence report from the Saddam era describes why these enterprises were useful for the Badr Corps:[26]

1. Secure and support the Badr Corps, and the different groups belonging to the Al-Qods Force, such as the movement of Hizballah, 15 Sha'aban, Sayid al-Shuhada' Movement, and Tharallah [God's Vengeance].

2. Distribute food and products among the citizens in order to win popular support.

3. Establish cover companies to transport elements of the Al-Qods Force into Iraq.

4. Coordination and supervision of economic and social organizations belonging to the Iranian regime in Iraq.[27]

Such tactics are not surprising for Iranian supported groups; both HAMAS and Lebanese Hizballah operate legitimate businesses, both to provide cover for their illicit operations and to provide services that build political support for the movement.

Throughout the 1990's, Iraqi intelligence was extremely concerned about Iranian-supported sabotage in Baghdad and elsewhere.  The Iraqi reports often cite specific intelligence about a pending threat.  Although it is possible that Iraqi intelligence officers overstated Badr Corps' capabilities, the Corps' history in 1991 and Iranian backing suggests that at least some of the reports reflect actual events.  Some of their tactics mirror those used by Shi'a militias against coalition forces after the 2003 invasion of Iraq, including the use of uniforms to confuse guards and timers to launch mortars and artillery.[28]

---

[25] Harmony Document ODP1-2005-00009023
[26] Harmony Document MNCI-2005-001140
[27] *Id.*
[28] Harmony Document ISGQ-2003-00052520; Harmony Document  ISGQ-2003-00032998

PX212

Politically and militarily, the Badr Corps was composed of several factions that often disagreed with one another.  By 2000, according to Iraqi intelligence papers, the Badr Corps had multiple competing ideological trends, separated by disputes over the same Shi'a clerical positions that had divided Iraqi Shi'a since the beginning of the Iran-Iraq war.[29]  One Iraqi document describes the internecine violence between Badr Corps factions:

> [C]ontinuous rivalry between the supporters of (Mohammed Sadiq) al-Sadr and al-Khaw'i (Abdel Majid al-Khoei) on one hand… and the supporters of (Abu Baqir) al-Hakim on the other hand.  This rivalry reached the degree of clashes with machine guns between the supporters of both trends…  As to the followers of al-Sadr, they ask for an Iraqi rule and consider al-Sadr more entitled to the command because he is more knowledgeable and gives better advisory opinions during Friday prayer.[30]

Original followers of Ayatollah Baqir al-Sadr—who had been assassinated by Saddam in 1980—tended to support his brother, Ayatollah Muhammad Sadiq al-Sadr, who remained in Iraq.  Badr Corps members that had lived in or had closer connections to Iran often supported Ayatollah Abu Baqir al-Hakim.  Among Shi'a who remained in Iraq, however, al-Hakim and the SCIRI Party were viewed with great suspicion because of their close ties to the Iranian regime and adoption of the Khomeinist doctrine *velayat-e faqih.*  Unsurprisingly, it was the clerics that remained inside Iraq who tended to garner more popular support among that group, in part because they were seen as sharing the suffering of lay Shi'a oppressed by Saddam.[31]

The competition between Sadrists and Abu Baqir al-Hakim complicated Shi'a opposition to Saddam during his reign.  Internal Badr Corps politics from the 1990s are still defining current Shi'a infighting in Iraq.  For example, Muhammad Sadiq al-Sadr's son, Moqtada al-Sadr, is involved in a violent rivalry with Abd al-Aziz al-Hakim, who took over SCIRI when his elder brother Abu Baqir was assassinated.  And in 2003, al-Sadr's followers brutally murdered another major cleric from the early era, Abdel Majid al-Khoei.

---

[29] Harmony Document ISGP-2003-00023756.  Observers should be careful about drawing too many conclusions about groups using the Hizballah moniker. Many organizations in the Shi'a world admire Lebanese Hizballah's fight against Israel—similar names do not necessarily imply operational links.

[30] Harmony Document ISGP-2003-00023756

[31] *Id.*

23

PX212

Despite the conflict within the Badr Corps, the organization had the forethought to anticipate and prepare for life after Saddam Hussein.  An Iraqi intelligence report from October 2002 described the Badr Corps' considerations regarding the prospect of a U.S. attack to overthrow Saddam's government:

> The Corps held a meeting for its cadres on 12/12/2001, in which was discussed the possibility of a US attack against Iraq leading to the overthrow of the regime (but they were disappointed).  The agents discussed two possibilities.  The first one is the open dispatch of military formations organized in the form of convoys inside Iraq.  In the second possibility, the US would exert a pressure on Iran, putting it in an embarrassing situation.  Therefore, they would enter secretly in the form of groups.[32]

When the U.S. did finally enter Iraq in March 2003, the Iraqi expatriates that "entered secretly in the form of groups" arrived with different ideas about how to influence Iraq's future.  Today, some of Iraq's most wanted Shi'a insurgents share Badr Corps lineage with Iraqi politicians operating openly in Baghdad.  For example, Abu Mahdi al-Muhandis (Jamal Ja'far Muhammad 'Ali) was a member of the Dawah cell that perpetrated the 1983 Kuwaiti embassy bombing, was an elected member of the Iraqi parliament in 2005, and is one of the most wanted men in Iraq.  After the Kuwait bombing, Muhandis rose through the ranks to lead the Badr Corps, where he worked with Ayatollah Baqir al-Hakim and the Qods Force to challenge Saddam's regime.[33]  According to Iraqi documents, Muhandis' Chief of Staff at the time was Hadi al-Ameri, the present leader of the Badr Organization, and a leading Iraqi parliamentarian.[34]  Furthermore, Abu Mustafa al-Sheibani, the Commander of Badr Corps Axis 3 in the 1990's and major smuggler of Iranian EFPs into Iraq actually lived in the same IRGC compound with Muhandis.[35]

There is evidence that Muhandis resigned from the Badr Corps in 2002 after becoming upset that SCIRI members were holding talks with the United States.[36]  Despite that political disagreement, Muhandis was elected to the Iraqi Council of Representatives in Iraq in December 2005.  By the time CNN's Michael Ware

---

[32] Harmony Document ISGQ-2005-00038283
[33] Ware, Michael "US Military: Iraq Lawmaker is US Embassy Bomber" *CNN* February 22, 2007 www.cnn.com/2007/world/meast/02/05/iraq.lawmaker/index.html; Harmony Document ISGZ-2005-001122-19954
[34] Harmony Document ISGQ-2005-00038283
[35] Harmony Document ISGP-2003-00023756; Harmony Document ISGZ-2005-001122-19954
[36] Harmony Document CMPC-2003-000562

PX212

broke the story about the Iraqi parliamentarian's incriminating history, Muhandis had fled to Tehran.[37]  Muhandis's animosity toward the United States, personal connections, experience running underground networks in Iraq, and suspected support of anti-coalition violence make him a very dangerous man.

---

[37] Ware, Michael "US Military: Iraq Lawmaker is US Embassy Bomber" *CNN* February 22, 2007 www.cnn.com/2007/world/meast/02/05/iraq.lawmaker/index.html

PX212

**"There are strategic attacks that have led directly to peace, but these are the minority.  Most of them only lead up to the point where their remaining strength is just enough to maintain a defense and wait for peace. Beyond that point the scale turns and the reaction follows with a force that is usually much stronger than that of the original attack."**

*"On War"*
Carl von Clausewitz

## Chapter 2
## Iran's Political Strategy in Iraq

Since 2003 Iran has supported multiple allies in Iraq, including political allies like ISCI/Badr and militant allies like Moqtada al-Sadr's Jaysh al-Mahdi and the Special Group Criminals.  Although it supported multiple groups, Iran's actions over the past five years indicate it has prioritized its political allies and their efforts to seize power through the Iraqi political process.  Most of Iran's actions have been designed to shape the general progression of the Iraqi political system rather than produce specific outcomes.  Indeed, Iran has benefited greatly from inherently Iraqi political processes over which it has very little influence.  Nonetheless, Iran has occasionally inserted itself directly in the Iraqi political process, most often when violence has threatened to derail the political process that has served to bring its political allies to power.

Immediately following the March 2003 U.S.-led invasion Iraq, Iran tried to avoid direct confrontation with U.S. forces, and felt that democratic elections in Iraq would be effective means by which it could emplace its allies—SCIRI and, to a lesser extent, the Dawah Party—in leading positions within the Iraqi government.  Saddam's government tracked internal SCIRI/Badr deliberations over how to approach the U.S. invasion, noting that Supreme Leader Khamenei himself approved of the conciliation strategy, but that some Badr personnel were so upset by the prospect of working with the U.S. that they left the organization.[1]

Despite its cooperative posture, Iran was clearly preparing the necessary networks and relationships for violent activities in Iraq.  It ushered thousands of Badr Corps members back into Iraq, seized an early opportunity to influence Moqtada al-Sadr's Jaysh al-Mahdi militia, and may have even funneled a few Lebanese Hizballah members into the country to provide expertise and training

---

[1] Harmony Document CMPC-2003-000562

26

PX212

to its new would-be surrogates.[2]   One Iraqi General explained Iranian strategy as follows: "Iranians are frightened by the U.S. – and frightened nations act badly."[3]

Nonetheless, in the run-up to major political milestones, such as elections, Iranian-linked militias have tended to reduce their violent activities, sometimes in the face of overt Iranian pressure.  The recent decline in violence from Shi'a militias in Iraq should be seen in this light.  No doubt Iran laments the loss of militia capability when fighters are rounded up by Iraqi and U.S. forces, but it is likely focused on the task of ensuring that the U.S.-Iraq SFA and SOFA agreements curtail the U.S.' ability to maintain troops and operational flexibility in Iraq.

**Conciliation Not Confrontation**

Although Iran publicly opposed the U.S. invasion of Iraq, it welcomed the opportunity for its allies to work within the new U.S.-backed Iraqi political structure. Many Iranian-backed groups reframed themselves to prepare for a more political future.  The Badr Corps tried to deemphasize its military nature by renaming itself the Badr Organization and publicly refocusing on social and political outreach.[4]

In the aftermath of the U.S. invasion, Shi'a politics in Iraq were dominated by three groups, SCIRI, Dawah, and Moqtada al-Sadr's movement, which was bifurcated between its political wing—the Office of the Martyr Sadr (OMS)—and its militia—Jaysh al-Mahdi (JAM).  SCIRI clearly had the closest ideological and political ties to Iran, but it also cultivated good relations with the United States, even attending dissident conferences in London prior to the invasion.  SCIRI's soft-spoken approach worked wonders with coalition forces after the invasion, as

---

[2] Harmony Document ISGP-2003-00027262; Risen, James "A Region Inflamed: The Hand of Tehran; Hizballah, in Iraq, Refrains From Attacks on Americans" *The New York Times* November 24, 2003

[3] July 3, 2008 author interview with Major General Michael Oates, Commanding General of 10th Mountain Division and Multi-National Division- Central, whose area of responsible includes a large sector of Iraq's border with Iran.

[4] A document reputed to be written by the Badr Corps shortly after the invasion urged followers to, "Cooperate with the coalition foreign forces and supply them with information about all issues…  Offer help and support to the foreign forces in order to accomplish our targets of striking (Sunnis)…Kneel, become obedient, beg and pretend that you are oppressed by them." Harmony Document ISGQ-2004-02311818.  Because of the document's overt messaging and public distribution shortly after the US invasion, many observers considered the document to be fabricated by the Badr Corps' enemies.

27

PX212

popular attention tended to focus on JAM's militant activities rather than SCIRI's historical, political, ideological, and financial links to Iran.[5]

Although SCIRI was a well-organized political machine, the Sadrist movement had several political advantages over its rival, including vocal opposition to the U.S. presence in Iraq, a nationalist platform, and a reputation as being independent of Iran, which helped the group attract support among Iraqis. Many Iraqis resented the time that SCIRI and Dawah exiles had spent outside of Iraq, while others were attracted by Moqtada al-Sadr's anti-American rhetoric, or remained loyal to the Sadr family legacy. The assassinations of Ayatollah Baqir al-Sadr in 1980 and Abu Muhammad al-Sadr in 1999 defined notions of identity for many Iraqi Shi'a. Likewise, most of al-Sadr's top lieutenants were former students of his father. Al-Sadr's lineage, coupled with his visceral opposition to U.S. occupation and Iranian influence, satisfied Iraqis concerned about foreign influence of any kind. SCIRI was better funded, better organized, and had more religious legitimacy than the Sadrist movement, but Moqtada al-Sadr tapped into the deep-seated anger of impoverished people that had never had the opportunity to govern themselves.

Al-Sadr took full advantage of SCIRI's weakness in the months running up to the U.S. invasion, setting the stage for the political fight that would come. For instance, on January 22, 2003 al-Sadr warned the crowd at the Great Mosque in Kufa about Iraqis that had not lived under Saddam and to defend Iraq until his death. It was the message that earned al-Sadr massive support from Iraq's impoverished Shi'a in the years since:

> Let it be known to all that I will not succumb to any party who has broken with the Iraqi people and who is not experiencing their suffering. The Iraqi people will remain my sole advisor, Islam my religion, Iraq my homeland, and my protectors "the two Sadr's" (may God hallow their gracious spirits). Even if I retire from public life for legitimate reasons, my heart will remain with you, and I will remain willing to sacrifice my body and soul for your sakes. I will never abandon you, in good times or in bad, for, if I have registered opposition, it has been in an attempt to carry out my father's counsel (may God hallow his secret). Even if it has been abrogated in one way or another, I have cleared my own conscience before God, the descendents of the Prophet, and my father, and I will

---

[5] Taremi, Kamran "Iranian Foreign Policy Toward Occupied Iraq, 2003-05" *Middle East Policy*, Vol. XII, No. 4, Winter 2005

PX212

devote myself entirely to other important matters, even though this might expose
me to the danger of being murdered or arrested.[6]

Although al-Sadr's sermon was inherently religious, he was also a strong voice
for Iraqi nationalism, which voiced suspicion of both the U.S. and Iran.  The
sentiment resonated with many Iraqi Shi'a.  Despite the fact that co-religionists in
Iraq and Iran do share a kinship, different cultures and languages, separate
histories, and the legacy of the brutal Iran-Iraq war engender deep mistrust.
Years after al-Sadr's January 2003 speech, a captured Iraqi militant explained this
nationalist distrust that many al-Sadr supporters felt toward SCIRI/Badr and
Iran.  The following quote is from a U.S. interrogation report *paraphrasing* the
Iraqi militant's description of events:

> Badr Organization wants to give Iraq to Iran.  The biggest reason Muqtada al-
> Sadr has problems working with the Government of Iraq is because
> approximately 60 percent of the Iraqi Government are members of Badr
> Organization.  Detainee's father was a POW for approximately eight years
> during the Iran-Iraq war and was tortured by members of the Badr Organization.
> Badr Organization members say they are Muslims, but Muslims would not give
> their country away.  Anyone who has a mind and watches the news can see
> clearly the Badr Organization [is] trying to give Iraq to Iran.[7]

Despite his popular appeal, al-Sadr's religious naiveté was a serious hindrance.
He was unqualified to issue fatwas, and could not compete with senior religious
jurists like Grand Ayatollah Ali al-Sistani, Mohammed Baqir al-Hakim—leader
of SCIRI—or Abdel Majid al-Khoei, who was brought back into Najaf from
London by U.S. Special Forces.[8]  Al-Sadr's need to rectify this imbalance offered
Iran its first opportunity to co-opt al-Sadr and his unexpectedly strong popular
movement.

On April 7, 2003, with U.S. troops on Baghdad's outskirts, Kadhem al-Husseini
al-Haeri, a senior Iranian cleric with strong links to the IRGC, named al-Sadr his

---

[6] Al-Sadr, Moqtada Speech. January 22, 2003

[7] See IR 022. This report and many of the following reports from detainees are paraphrases from
the actual interrogations.  They are paraphrased to provide summaries and do not significantly
change the meaning of any of the statements by detainees.  Whenever possible, context for the
interrogation is provided.  Sometimes perspective in these summaries shifts from first to third
person because they are summaries.  It is our understanding that this is a transcription issue and
that all of the information including in this IR and others was explained by the detainee.

[8] Smith, Craig S. "A Nation at War: Najaf; A Long-Simmering Power Struggle Preceded Killings
at an Iraqi Holy Shrine" *The New York Times* April 13, 2003

deputy in Iraq.[9]  Al-Haeri's burgeoning relationship with al-Sadr offered Iran a way to influence Iraq's most populist, nationalist, and militant Shi'a leader.[10] The union made sense; al-Haeri had been a student of Moqtada's uncle, Ayatollah Baqir al-Sadr, before he was assassinated.  Likewise, Moqtada's father, Abu Muhammad al-Sadr, had named al-Haeri his theological successor before being killed by Saddam Hussein's agents.[11]  One day after naming Moqtada al-Sadr his representative, al-Haeri urged Iraqi Shi'a to "fill the power vacuum in the administration of Iraqi cities."[12]  Al-Sadr immediately began taking control of key administrative offices, particularly in the infamous Baghdad slum that came to be called Sadr City.[13]  One month after the relationship was established, al-Sadr was invited to visit Tehran for the first time.[14]  Al-Sadr's relationship with al-Haeri does not indicate that he was controlled by Iran, but it was a clear indication that al-Sadr was willing to compromise his nationalist impulses to obtain from Iran the means to actualize his political aspirations.

By spring 2004, when al-Sadr directed violent uprisings around Najaf and Karbala, Iran had reportedly supplied up to $80 million to al-Sadr and was establishing camps along the Iran-Iraq border to provide basic military training to JAM members.[15]  In al-Sadr, Iran had found a collaborator whose militancy would weaken its rivals and create havoc for the U.S. occupation at the same time.  Perhaps most importantly, Iran had achieved these objectives while SCIRI and Badr had maintained their reputation with the U.S. as forces of stability.

Al-Sadr's movement was based in Najaf, home to Iraq's most important Shi'a shrine and Iraq's most senior Shi'a cleric, Grand Ayatollah Ali al-Sistani.  Al-Sistani is a Shi'a traditionalist who has long opposed clerics overtly participating in politics.  He therefore eschewed both Khomeini's *velayet-e faqih* doctrine and the outspoken militancy of Moqtada al-Sadr.  As al-Sadr attempted to inspire an

[9] Fathi, Nazila "Ex-Mentor of Rebel Iraqi Cleric Breaks from His Protégé" *The New York Times* September 5, 2004

[10] Smith, Craig "Aftereffects: Iran's Influence; Cleric in Iran Says Shi'as Must Act" *The New York Times* April 26, 2003

[11] Wong, Edward and Nazila Fathi "The Reach of War: Looming Presence; Iran is in Strong Position to Steer Iraq's Political Future" *The New York Times* July 3, 2004

[12] Smith. April 26, 2003

[13] Murphy, Dan "Sadr the Agitator: Like Father, Like Son" *The Christian Science Monitor* April 27, 2004

[14] Taremi. pp 37

[15] Zadah, Ali Nuri "Iranian Figure Says Revolutionary Guard Trains Moqtada al-Sadr's Supporters on Fighting Techniques" *Asharq al-Awsat* April 9, 2004

PX212

uprising, al-Sistani's comparatively cautious approach to Iraqi politics soothed the frustrations of many Iraqi Shi'a.

Al-Sistani was an outspoken proponent of Iraq's electoral process, which reinforced the Iranian political strategy despite the fact that al-Sistani was probably not collaborating directly with Iran.  To the contrary, he was viewed by many as a potential threat to the Iranian regime.[16]  Al-Sistani is indisputably the most senior Shi'a cleric in the world; if he were to become an outspoken opponent of the Iranian regime, he could undermine the very doctrinal foundation of the Iranian revolution.  It is unlikely that al-Sistani would openly confront Iran, not least because he has important considerations in Iran, particularly at the Qom theological seminary.  If he outwardly criticizes Iran, he risks his substantial operations in the Qom seminary.

**Two Murders**

From the United States' perspective, both SCIRI and the Dawah Party have been agents of stability in Iraq, at least when compared to al-Sadr.  Despite their political links to Iran, both parties have cooperated with the U.S. and generally supported the U.S. plan for Iraqi elections.  For the United States, the desire for stability in Iraq has made SCIRI and Dawah's approach even more appealing.

Al-Sadr's aggressive behavior also highlighted the importance of Grand Ayatollah Ali al-Sistani, whose immense religious authority demanded that even the upstart al-Sadr defer to him on some questions.  Al-Sadr's public deference to al-Sistani did not reflect a broad appreciation for his clerical leaders.  Al-Sadr's challenge to the clerical establishment was illustrated by the April 2003 murder of Ayatollah al-Khoei, an esteemed cleric who spent his exile in London and returned to Najaf escorted by U.S. Special Forces.[17]  It is likely that U.S. commanders hoped that al-Khoei would facilitate productive relations between U.S. forces and Grand Ayatollah al-Sistani.  However, days after arriving in Najaf, al-Khoei was brutally killed by a mob in front of the Imam Ali Shrine in Najaf.  Although the Iranian media immediately blamed the murder on Sunnis, widespread suspicion fell on al-Sadr and his followers, who had pledged to oppose anyone that worked with Coalition Forces.[18]  This suspicion was fueled by the fact that the mob-killing in the heart of Najaf had all the characteristics of a Sadrist demonstration.

---

[16] Zadah. April 9, 2004
[17] Smith, Craig. April 13, 2003
[18] *Id.*

PX212

Official Iranian media quoted SCIRI condemning al-Khoei's murder as "an inhuman way of imposing one's own opinion and beliefs on others."[19] Nonetheless, Iran's Iraqi friends were rid of a potential threat.  Al-Sadr was rid of another cleric that outranked him and SCIRI/Badr did not have to worry about a senior cleric willing to cooperate with the U.S.  Thus, while there is no evidence that Iran had anything to do with al-Khoei's murder, the incident underscored the value to Iran of having different kinds of agents inside Iraq—those that violently challenge the occupation and the political system, and those that seek power through that system.  With one hand, Iran could stoke a crisis, while using the other to resolve it and bolster the political viability and legitimacy of its political allies.  The capacity to affect and benefit from Iraq's internal political dynamics—both creating tensions and intervening to alleviate them—remains an important way that Iran can exert its influence in Iraq.

On August 29, 2003, five months after al-Khoei's murder, a car bomb ripped through a crowd in Najaf, killing more than 100 people, including SCIRI's longtime religious and political leader, Ayatollah Muhammad Baqir al-Hakim. The killing dramatically altered Shi'a politics in Iraq.  Al-Hakim led the best organized Shi'a political party, had strong religious credentials, and had deep ties with Iran.  His elimination meant that SCIRI was at least temporarily directionless.  In Iran, Supreme Leader Ayatollah Ali al-Khamenei declared three days of mourning and blamed the United States for the attack.[20]  Meanwhile, U.S. and Iraqi investigators immediately began rounding up suspects, many of whom were linked to Abu Mus'ab al-Zarqawi's group, Tawhid wa'l Jihad.  Tawhid wa'l Jihad eventually revealed that Zarqawi's father-in-law had been the suicide bomber that killed al-Hakim and that a Zarqawi acolyte named Thamir Mubarak, who also planned Zarqawi's bomb attack on the United Nations headquarters in Baghdad, planned the al-Hakim's assassination.[21]

Al-Hakim's murder disrupted SCIRI's rise to power, and created even more space for a challenger like Moqtada al-Sadr.  Despite lacking the religious authority of his older brother, Abd al-Aziz al-Hakim succeeded his old brother Muhammad Baqir al-Hakim as SCIRI's leader.  The leadership change did not weaken SCIRI's ties to Iran.  Abd al-Aziz had been active in the Badr Corps since

---

[19] "Iraq's SCIRI Condemnis al-Khoei's Assassination" *IRNA* April 12, 2003
[20] Voice of the Islamic Republic of Iran. August 29, 2003
[21] Documentary on Abu Mus'ab al-Zarqawi *Lebanese Broadcasting Corporation* November 27, 2004; Biographies of Eminent Martyrs—Part Four. November 22, 2005

PX212

the mid-1980s and was well-steeped in SCIRI's ideology and its long-term relationship with Iran.[22]

**The Najaf Crisis**

In the spring of 2004, after a Sadrist newspaper was closed in Baghdad, Moqtada al-Sadr's JAM staged a series of violent uprisings centered on the holy city of Najaf.[23]  Weeks of heavy fighting between JAM militiamen, U.S. troops and Iraqi Security Forces (ISF) followed.  The crisis waned after several weeks, but exploded again in August before degenerating into a stalemate when al-Sadr and several hundred supporters retreated into the Imam Ali Mosque.  U.S. troops were unwilling to attack the mosque itself for fear of inciting wider rebellion, and Iraqi commanders were worried that troops would desert en masse if ordered to assault such a revered site.

At the time, Iran, SCIRI, and Dawah were promoting General Assembly elections in January 2005 that would likely bring SCIRI and Dawah to power.  A delay in the elections, Iran felt, would allow the U.S. to consolidate its influence in Iraq.[24] Although Iran was likely pleased by the anti-American uprising, had the Sadrist violence in Najaf lasted until late 2004, it might have delayed the General Assembly elections.  This calculation is likely why Iran increased its pressure on al-Sadr to cut a deal and end the violence in August 2004.  Iranian diplomats arrived in Baghdad to help negotiate a solution to the crisis, and Iran's President Mohammad Khatami publically criticized al-Sadr's uprising as a threat to Shi'a people and shrines in Najaf.[25]  Most significantly, al-Sadr's Iranian clerical mentor, Kadhem al-Husseini al-Haeri, renounced al-Sadr, and said al-Sadr no longer represented him in Iraq.  The change was in line with Iran's desire to end the crisis and "clearly done with the consent and support of the Iranian leaders."[26]

Despite the Iranian pressure, Grand Ayatollah al-Sistani held the real power in Najaf.  Ultimately, he negotiated free passage for al-Sadr to leave his sanctuary in the Imam Ali Shrine so long as he abandoned violence and entered the political

---

[22] Visser, Reidar "Shi'a Militancy in Iraq: Patterns and Ideological Roots" in Assaf Moghadam ed. CTC Report (forthcoming)

[23] Al-Obeidi, Abdul Hussein Shiite Shrine Damaged in Najaf Fighting *Associated Press* May 25, 2004

[24] Taremi. pp 37

[25] Burns, John and Nazila Fathi and Steven R. Weisman "The Struggle for Iraq: Mediation; Iranians in Iraq to Help in Talks on Rebel Cleric" *The New York Times* April 15, 2004

[26] Fathi, Nazila. September 5, 2004; Taremi. pp 38

PX212

process.  At the same time, al-Sistani insisted that the General Assembly election must occur as a precondition to selecting a constitutional drafting committee, a decision designed to ensure that Iraqis, rather than the U.S., controlled the shape of the Iraqi constitution.[27]  Al-Sistani's insistence on General Assembly elections dovetailed very closely with SCIRI's interests and virtually ensured that Iran's political ally would play a central role in drafting the Iraqi constitution.  Unlike al-Sadr, SCIRI did not have a vast popular movement that could generate power simply by demonstrating in the streets.  SCIRI was, however, very well organized, and expected to do well in the tightly controlled electoral process.  Al-Sadr's organization was structured to fight street battles, not for get-out-the-vote efforts.

Ultimately, the Najaf crisis served Iran's political goals, despite the fact that Iran was unable to directly control the primary actors in the crisis.  Most importantly, the Najaf confrontations reemphasized the centrality of Iraq's electoral process to the constitutional drafting committee, which put Iran's closest political allies in a position to shape Iraq's future over the long-term. Iran's goals were not antithetical to the United States' at the time.  The U.S. was also pushing for elections, though U.S. planners were concerned about the timing, especially because of increasing violence across much of the country.  Iran's calculation was entirely rational; its allies were the best organized parties among Iraq's most populous sectarian bloc.  Elections, not firefights, were the easiest path to influence.

The Najaf crisis also illustrated the weaknesses of Moqtada al-Sadr.  Although a useful tool, al-Sadr was a wildcard.  Al-Sadr had independent popular support, did not take instruction well, and was prone to excessively escalating crises.  Al-Sadr knew how to energize a crisis, but not how to end one.  For Iran, that made him a useful but dangerous surrogate.  Whereas Iran's strategy was nuanced and careful not to provoke U.S. antagonism during a period of heightened tensions, al-Sadr was a blunt instrument.

The Najaf crisis also expedited concerns within the Sadrist movement over Moqtada al-Sadr's leadership.  One of the most important rising leaders was Qais Khazali, al-Sadr's official spokesman during the Najaf uprisings and one of al-Sadr's father's star pupils.  During the Najaf crisis, rumors circulated that al-Sadr and Khazali feuded often over strategy, disagreements that were likely just as

---

[27] Baldauf, Scott "Sistani Aide: Najaf Peace Deal Reached" *The Christian Science Monitor* August 27, 2004

PX212

personal as they were professional.[28]  Although Khazali remained loyal to al-Sadr during the crisis, he and his brother Laith Khazali went on to become two of the most important leaders of the Special Group Criminals (SGCs), a loose network of Iranian trained and supplied militants responsible for some of the worst violence in 2007 and 2008.  When the Khazali brothers were captured by U.S. forces in 2007, al-Sadr claimed, somewhat suspiciously, that he had completely ended his relationship with the men in 2004 after Qais Khazali issued unauthorized instructions to JAM fighters during the Najaf uprisings.

In 2004, budding leaders like Qais Khazali and a plethora of JAM splinter movements presented Iran choices other than al-Sadr.  The groups were often little more than neighborhood militias; many lacked a cohesive ideology.  From Iran's perspective, however, these prospective weaknesses may have been attractive.  Iran was not looking for a militia capable of taking over the Iraqi government, but rather an ally capable of knocking the government, and its American suitor, off its bearings.  Al-Sadr's unreliable showing in Najaf had demonstrated the risks of supporting ambitious and unreliable militia leaders.  The new JAM splinter movements offered Iran the ability to disrupt Iraq with fewer political complications.

The episode in Najaf also demonstrated the utility of Iran's dual-track strategy—the crisis initiated by al-Sadr embarrassed the U.S., and the resolution of that crisis bolstered SCIRI politically.  The crisis also underscored the danger of entrusting violent confrontations to inexperienced, volatile surrogates, but ultimately the episode served Iran's core goals by reemphasizing the importance of Iraq's political process and ensuring SCIRI/Badr and Dawah were in strong positions to compete. Both parties stayed in the good graces of the U.S. by remaining largely on the sidelines of the fight in Najaf and focusing on the January 2005 General Assembly elections.

Finally, the Najaf battles illustrated the primacy of Iran's political strategy over its support for militias.  Since the U.S. invasion of Iraq, Iran has provided military aid to various surrogates in Iraq, but its fundamental long-term strategy is built around its allies assuming power through the formal political process.  When the 2004 Najaf crisis reached the point where a U.S. attack on al-Sadr might throw Iraq into complete chaos, Iran intervened and took strong steps to ensure the continued viability of the electoral political process.

---

[28] "Holy Al-Najaf: Ahmad al-Shaybani Denies Assassination of Qays al-Khaz'ali" *Al-Najaf News* August 4, 2004

35

PX212

**Strategic Reversal**

The decision by SCIRI and Dawah to avoid violent confrontation with the United States paid off after the January 30, 2005 General Assembly elections.  The two parties won major contingents of the 275-member General Assembly and Ibrahim al-Jafaari, a Dawah member, was sworn in as Prime Minister.  By contrast, Moqtada al-Sadr's new political party won just 23 seats, although the party was guaranteed several cabinet-level positions.[29]

One reason SCIRI/Badr and Dawah were able to capitalize so successfully on the elections is that voters select a political slate to determine the number of seats it controls, but the party apparatus determines which of its members actually accede to parliament.[30]  This method increases the power of party leaders and limits the political accountability of individual representatives to their Iraqi constituents, which makes them more susceptible to outside influence.

By the time the new Iraqi government was approved in April 2005, it was clear that violence and instability in Iraq would not be resolved in the near-term.  Al-Qa`ida in Iraq (AQI) had declared its presence in October 2004, and subsequently engaged in a brutal campaign against the Iraqi government, Iraqi Shi'a, and Coalition Forces.  Sectarian murders, ethnic cleansing, and torture were increasingly common, and popular support for Shi'a militias to exact retribution against Sunnis was increasing.  Al-Sadr's JAM was also increasingly violent in the summer of 2005, which was likely an attempt to demonstrate that it could not be ignored just because of its weak showing in the election.

Iraq's political structure that emphasized party leadership clearly benefitted Iran.  But SCIRI's success winning seats raised the possibility that an electorally empowered SCIRI might be able to operate more independently of Tehran.  As Anoushiravan Ehteshami wrote in mid-2003, "As the SCIRI gets embedded in Iraq itself…  Tehran's grip over it is bound to loosen, particularly because SCIRI's leadership will have to strike compromises with an emerging Iraqi leadership if it is to remain a force in the post-Saddam power structure."[31]  Although SCIRI was able to take a leading role in Iraqi politics, it cannot dominate them independently.  Compromise is still the price of leadership.

---

[29] Worth, Robert F. "Iraq's Assembly Accepts Cabinet Despite Tension" *The New York Times* April 28, 2005

[30] "Iraqi Elections: Human Rights Concerns" *Human Rights Watch* http://www.hrw.org/english/docs/2005/01/21/iraq10058.htm

[31] Ehteshami. pp 126

PX212

Thus, Iran faces a fundamental Catch-22: it wants allies in positions of power, but the more political responsibility its allies obtain, the more they are accountable to Iraqis and less dependent on Iran.

Nonetheless, the U.S. and Iranian strategic positions in Iraq were reversing in 2005.  The U.S. had entered Iraq hoping to use it as a platform for extending democracy around the Middle East, while Iran was mostly on the defensive, aiming primarily to prevent a U.S. attack on Iran. By 2005, however, American policymakers were scaling back their hopes for a democratic tidal wave in the Middle East, and instead were aiming for the lesser goal of delivering stability and security to Iraq.  Iran could now begin to hope that Baghdad's new government would be very friendly and that the U.S. would be forced to leave Iraq humiliated.

**Backup Plan?**

Because of Iran's dual-strategy of supporting political and militia allies, it was prepared for a less favorable outcome if its friends did not fare well in the January 2005 election.  It is difficult to determine, however, how detailed Iran's preparations with militia groups actually were.  It is clear that Iran was sponsoring some Iraqi militias, but some of the data asserting Iran's militant influence in Iraq is suspect.  For example, a letter reportedly from an official in the Office of Iran's Supreme Leader to the Commander of the IRGC directed him to keep Qods Force operatives in Iraq underground until after the January 2005 elections so they would be prepared to initiate a coup if necessary.  Specifically, the letter stated:

> Qods Force personnel which have been established in Iraq will not carry out any operations whatsoever which might identify themselves until the elections, and that these actions be entrusted to other supporters of the Islamic Revolution.  Let that force prepare itself for coup d'état operations and carry out the necessary planning, so that if the elections are against the policy of Islam, they can enter the scene in a serious way.[32]

A translator's comment on the document suggests it was leaked by internal opponents to the Iranian regime, probably the MKO.  Information from the MKO is sometimes accurate, but it is difficult to trust data released by a partisan organization deeply invested in the content of the information it is revealing. Despite some overstated or even fabricated claims, the basic assertion that Iran

---

[32] Harmony Document RLSP-2005-000618

PX212

was supporting numerous Iraqi militias is accurate and appears in both declassified and open sources.

The most important smuggling network to Iran's military efforts in Iraq may have been run by Abu Mustafa al-Sheibani.  In August 2005, a *Time* magazine article claimed that al-Sheibani—former commander of Badr Corps Axis 3—had begun smuggling a "new breed" of IEDs across the border into Iraq as early as January 2005.[33]  In fact, Sheibani and his Badr Corps allies may have been using EFPs in Iraq as early as 2001, two years ***before*** the U.S. invasion of Iraq.[34]  An Iraqi intelligence document dated July 11, 2001 describes a shipment of Iranian weapons that were delivered to Badr Corps personnel in Diyala, Salah al-Din, and Baghdad governorates, areas that seem to correspond to Badr Corps' Axis 3. In addition to traditional weaponry such as 107mm and 122mm rockets, the memo describes new "conically shaped bombs filled with TNT, weighing 5-6 kg and using a locally made metal base."[35]  The description of these "conically shaped bombs" matches the description of the highly lethal EFPs allegedly imported from Iran beginning in 2005.[36]

Michael Ware described Sheibani's network as 280 individuals divided into 17 teams that trained in Baghdad's Sadr City, Lebanon and "another country," almost certainly a gentle way of saying Iran.[37]  The attacks became worrisome enough that the United States formally protested to Iran on July 19, 2005, accusing the Islamic Revolutionary Guard Corps of funneling these weapons and the components to construct them into Iraq.[38]

The Sheibani Network is important because of its ties into multiple—and sometimes competing—Iraqi factions, including JAM and Badr.  Nonetheless, the group rarely perpetrates violent attacks directly.  By focusing on logistics, the Sheibani Network (and others like it) can regulate the flow of advanced

---

[33] *Id.*; Ware, Michael "Inside Iran's Secret War for Iraq" *Time* August 15, 2005

[34] Harmony Document ISGQ-2005-00038283

[35] Harmony Document ISGQ-2005-00037289

[36] Made from advanced explosives and round, curved copper plates, the EFPs smuggled by Sheibani and others are capable of sending a molten slug of metal directly through even heavily armored vehicles.  As the war wore on, EFPs became the bane of coalition forces throughout Iraq. Buried, or otherwise concealed, the weapons are very difficult to identify and largely indefensible if triggered.

[37] Ware. August 15, 2005. Ware worked from confidential documents provided by intelligence sources.

[38] Gordon, Michael and Scott Shane "US Long Worried that Iran Supplied Arms in Iraq" *The New York Times* March 27, 2007

PX212

weaponry into Iraq without getting its hands dirty with the low-level operators that perform much of the direct action against Iraqi and coalition forces. Such networks do not explicitly direct attacks, but they shape the overall pace and level of violence.

Another key element of Iran's strategy was to provide weapons in a "non-attributable" manner.[39] Maintaining plausible deniability for attacks in Iraq was—and still is—critical for Iran because of its tenuous relationship with the United States and the rest of the international community. Unlike in the Levant, where Iranian support for Hizballah and HAMAS actions against Israel bolsters Iran's image in the Mideast, Iranian assistance to Shi'a militias in Iraq heightens fears among Sunni-Arab countries that Iran has hostile intentions towards Iraq, and Iraqi Sunnis in particular. Clear and irrefutable evidence of Iranian support to militant groups might have alienated SCIRI and Dawah leaders eager to demonstrate their ability to govern Iraq and wary of erratic leaders like Moqtada al-Sadr.

With the exception of the overtly militant JAM, most Iranian-sponsored groups made their mark on Iraqi society in a non-violent manner. In August, 2004, Iran pledged $300 million for construction projects in Iraq; much of this money went to purchase hotels, restaurants and other service-oriented businesses that profited from pilgrimages to Iraq's primary shrine cities, Najaf and Karbala.[40] Sheikh al-Haeri, in addition to giving Moqtada al-Sadr religious legitimacy, provided money to support his new social movement.[41] The financial support offered Iranian surrogates means besides violence to influence the Iraqi population.

JAM and the SGCs were not the only groups preparing for violence in Iraq. The Badr Organization's policy of cooperation with Coalition Forces was not universally accepted. Some Badr members were reportedly so upset with Abd al-Aziz al-Hakim's political machinations that they left Iraq and returned to Iran, presumably to prepare for the sort of militant operations that Hakim and mainstream SCIRI were avoiding.[42] In late 2004, Iraq's national intelligence chief accused some Badr members of assassinating 10 of his agents.[43]

---

[39] *Id*.

[40] Taremi. pp 39

[41] Pound. November 14, 2004

[42] *Id*.

[43] *Id*.

PX212

**Drafting the Iraqi Constitution**

Despite the early signs of Iranian lethal aid to militias in Iraq, the most important developments during 2005 were on the political front. After the January 2005 elections that brought SCIRI and Dawah into central positions in the government, a draft Iraqi constitution was set to be completed by mid-August and submitted for referendum in October. The referendum was followed by a new General Assembly election in December. The constitutional drafting committee was dominated by the United Iraqi Alliance (UIA), originally a collaboration of SCIRI and Dawah.[44] Sunnis, having boycotted the January General Assembly election, were effectively shut out of the constitution drafting process.

Al-Sadr did not have a particularly strong position either. The UIA held a majority of the seats on the constitutional drafting committee and did not need his support. Al-Sadr's political strengths were his popularity and his militia. Al-Sadr was not going to let anyone forget that if he was ignored his militia could dramatically disrupt the constitutional referendum in October. As he had in 2004, al-Sadr ratcheted up tension in the spring and summer of 2005, ushering his troops into street battles with SCIRI/Badr personnel in Najaf and elsewhere.[45] Al-Sadr's message was clear: he might not have much pull at the negotiating table, but an agreement in Baghdad would have little practical meaning without his acquiescence.

The UIA wanted to enshrine the principle of Shi'a autonomy in the new Iraqi constitution, much as Iraqi Kurds were self-governing in northern Iraq.[46] Sunnis feared the move was the first step toward the dissolution of Iraq, but SCIRI and Dawah politicians—who feared a return of Sunni authoritarianism—felt it was a means to ensure that Shi'a leaders would direct governance in majority Shi'a provinces. Although there were many differences over details, the Shi'a coalition had an ally in the Kurds, who demanded virtual autonomy in Northern Iraq. Al-Sadr, an ardent Iraqi nationalist, opposed regional autonomy, which effectively allied him with Iraq's Sunni minority. Since the UIA controlled a majority of seats on the constitutional drafting committee (28 of 55) their views largely held sway, despite U.S. protests to consider Sadrist and Sunni concerns about federalization.

---

[44] "Q&A: Drafting Iraq's Constitution" *The New York Times* May 12, 2005

[45] Semple, Kirk "Shi'a Cleric's Soldiers Battle Rivals in Najaf and Basra" *The New York Times* August 25, 2005

[46] Filkins, Dexter and Steven Weisman "The Struggle for Iraq: The Constitituion; Iraqi Talks Move Ahead on Some Issues" *The New York Times* August 21, 2005

PX212

The Iraqi constitution that was ratified on October 15, 2005 reflects some of these compromises. It does not explicitly call for Shi'a autonomy, but it does enable provinces to hold referendums to declare their autonomy, individually or in collaboration with other provinces. SCIRI and Dawah wanted Shi'a autonomy, but they would have to face down popular support for al-Sadr in another set of elections to get it.

Despite not directly authorizing Shi'a autonomy, the new constitution devolved a tremendous amount of governing authority to the provinces, prompting one commentator to write:

> [T]he Constitution encourages the transformation of governorates and local administrations into powerful, nearly sovereign regions… this guarantees that the more Iraqi provinces opt for regional status, and get it, the more the federal state will shrivel up and die… it is in the interest of every populist demagogue to press for regional status, because it is at that level that the lawmaking that truly affects day-to-day life will take place…[47]

Iran did not drive the Iraqi constitutional drafting process, but its goals were largely served by the outcome. A decentralized, federal Iraq is less capable of threatening Iran in the future and more easily undermined from within. Just as important, most of Iran's interests in Iraq are in the south, home to most of Iraq's Shi'a population.[48] The prospect of a largely self-regulating, if not completely autonomous, southern region offers Iran the opportunity to exert a large amount of influence in the region without bothering with Sunni and nationalist opposition in Baghdad. Iraqi nationalism is still a concern, but Iran is free to cut deals with and exert pressure on local and regional politicians, away from the media glare and international supervision in Baghdad. Ultimately, the Iraqi constitution offered Iran new venues to influence the parts of Iraq it valued most.

**Moqtada, the Politician**
After the Iraqi constitution was ratified in October 2005, Iraqi politicians looked forward to a new General Assembly election in December. Battered by sectarian violence and offered a historic opportunity to assert Shi'a authority in Iraq, the Sadrist OMS agreed to align their candidates with SCIRI and Dawah under the

---

[47] Makiya, Kanan "Present at the Disintegration" *The New York Times* December 11, 2005
[48] Nasr, Vali "When the Shi'as Rise" *Foreign Affairs* July/August 2006

41

PX212

broad, sectarian UIA slate.[49]  The agreement united the Shi'a parties for electoral purposes, but the parties remained split by questions of federalism and, just as importantly, how hard to push the United States to leave Iraq.  SCIRI and Dawah politicians, who did not have a fervent popular movement to fall back on—and depended on the U.S.-backed electoral system for power—were far more willing to tolerate the U.S. presence in the short-run.  Al-Sadr meanwhile remained a vociferous Iraqi nationalist; he opposed the federalization of Iraq and cooperated with Sunni political groups opposed to the U.S. presence in Iraq.[50]  He still mistrusted SCIRI and Dawah politicians because of their close ties to Iran and focus on safeguarding Shi'a interests in Southern Iraq.  Furthermore, OMS demonstrators continued to demand an immediate U.S. withdrawal from Iraq.  Despite these divisions, Iran supported the UIA parties, comfortable that a fractured Shi'a Islamist coalition was better than allowing Sunni political power.

In fact, Iran may have assisted too much.  Just days before the election, Iraqi border police interdicted a tanker truck from Iran filled with thousands of forged ballots.[51]  The specter of electoral fraud resurrected concerns from the constitutional referendum over localities where as many as 99% of the ballots cast supported the new constitution.[52]  It is unlikely that tampering changed the outcome of either election, but the cross-border effort reinforces the central role that influencing Iraq's political process plays in Iran's strategic objectives in Iraq.

Al-Sadr's cooperation in the UIA forced him to skirt a very fine line.  The UIA's victory in the December 2005 elections did not satisfy his core supporters who had joined the Sadrist movement because of its violent opposition to U.S. occupation.  Al-Sadr was now part of a political coalition built to control a U.S.-backed political system.  The collaboration gave al-Sadr the ability to address issues like Iraqi federalism in a substantive way, but distanced him from some of his grassroots supporters.  Still, his strategy was not without successes; in early 2006 al-Sadr asserted his newfound power to ensure that Nuri al-Maliki of the Dawah Party would be Iraq's new Prime Minister.[53]  Apparently, al-Sadr thought

---

[49] Wong, Edward "Iraqi Parties Rush to Meet Deadline for Election Registration" *The New York Times* October 25, 2008

[50] Worth, Robert F. and Sabrina Tavernise "Radical Rising as a Kingmaker in Iraqi Politics" *The New York Times* February 16, 2006

[51] Filkins, Dexter "Police Seize Forged Ballots Headed to Iraq from Iran" *The New York Times* December 14, 2005

[52] Filkins, Dexter and Robert F. Worth "Monitors in Iraq Review Votes Where 'Yes' Ballots Hit 90%" *The New York Times* October 18, 2005

[53] NY Times Biography of Nuri al-Maliki July 23, 2007

42

PX212

that al-Maliki would be more cooperative than the previous Prime Minister, Ibrahim al-Jafaari, or the SCIRI candidate, Adel Abd al-Mahdi.  Al-Sadr's newfound political clout was not enough to satisfy all of his supporters, however.  As one commentator put it, "the more settled (al-Sadr) becomes in the establishment, the looser his grip is over his fighters on the streets and those increasingly infiltrating the security forces."[54]

**Samarra and Civil War**

In February 2006, al-Qa`ida in Iraq destroyed the famous golden dome of the Askariya Mosque in Samarra.  Outraged by an attack on one of the holiest sites in Iraq, Shi'a marched in the streets while organized militia groups, neighborhood gangs, and individuals exacted revenge on their Sunni neighbors.  Although sectarian violence had existed for years in Iraq, the bombing provoked the full-blown sectarian war that Abu Mus'ab al-Zarqawi had been trying to spark since early 2004.

During the wave of sectarian violence, extra-judicial killings were commonplace and bodies were left to rot in the streets, in mass graves outside Baghdad, or dropped off in front of hospitals, schools, and police stations.  Self-defense, revenge, and pure anger—rather than complex political calculation—drove much of the violence.  Both Badr and JAM participated in the violence, killing political enemies and hapless bystanders alike.  Many Badr members in the Iraqi Security Forces even wore their uniforms while slaughtering Sunnis.[55]  But the spasm of violence unleashed an anger among many Shi'a that neither JAM nor the Badr Organization could control completely.

A new category of loosely organized Shi'a militias known as "Death Squads" emerged as the most feared groups in Iraq.  Some of these groups were simply groups of young Shi'a participating in semi-organized violence against Sunnis. But some of the Death Squads had evolved out of the JAM splinter groups that began leaving the formal Sadrist movement in mid-2004.  The most infamous Death Squad leader was Abu Dura, who was known as "the Shi'a Zarqawi." During the 2004 Najaf uprisings, Abu Dura had fought for al-Sadr, but he grew disillusioned with al-Sadr's leadership and by 2006 was running operations in and around Sadr City on his own.[56]  Abu Dura gained a brutal reputation for

---

[54] Tavernise, Sabrina "Influence Rises but Base Frays for Iraqi Cleric" *The New York Times* November 13, 2006

[55] Visser, Reidar "Shi'a Militancy in Iraq: Patterns and Ideological Roots" in Assaf Moghadam ed. CTC Report (forthcoming)

[56] Swain, Jon "Is this Iraq's Most Prolific Mass Killer?" *The Sunday Times* January 21, 2007

PX212

killing victims with power tools, but was immensely popular in Sadr City, where he was seen as a Robin Hood figure: a man of the people using whatever means necessary to defend them. Abu Dura's popularity was a function of his ability to protect allies and effectively use violence against enemies, as well as a criminal network that offered supporters financial and status benefits. Unlike al-Sadr, Abu Dura and other Death Squad leaders did not want to join the formal political system and saw no reason to moderate their violence in order to smooth passage into the established political hierarchy.

Conversely, al-Sadr was deepening his connections with the political establishment even as the post-Askariya violence was raging. His efforts to emplace Nuri al-Maliki as Prime Minister occurred just after the Askariya Mosque was bombed. The result was not a coup or disintegration in JAM's leadership, but a fraying of the JAM organization at its vengeful, uneducated base, which had lost faith in the Iraqi government and was often dependent on Death Squad leaders and neighborhood militias for security. JAM had never been a hierarchical organization, neatly controlled from the top down. Local cells acquired weapons and organized attacks independently, which enabled local commanders to pursue their own agenda. For many JAM supporters, revenge, criminality, and visceral anti-occupation sentiment had always motivated action more than grand political arguments. Moqtada al-Sadr symbolized their mission, but he did not control it.

As it became clear that the roaming bands of Shi'a were part of a deeper movement that was not solely a knee-jerk reaction to the Askariya bombing or a function of al-Sadr, U.S. commanders coined a new term for the "Death Squads." They were called Special Group Criminals (SGCs), and recognized as JAM offshoots that had developed a very loose, but discernible command structure. Many of the SGCs looked to Qais Khazali, al-Sadr's former spokesman, for political guidance.

Even with the lack of a formalized command structure, Moqtada al-Sadr sensed the unrest within his organization. In October 2006, he formally expelled 40 JAM commanders from his organization.[57] The move was largely symbolic because al-Sadr could not break those commanders' ties to their cell members, or prevent them from launching attacks independently. But it was al-Sadr's attempt to define what violence should be attributed to him. Since al-Sadr's political power

---

[57] Tavernise, Sabrina "Influence Rises but Base Frays for Iraqi Cleric" *The New York Times* November 13, 2006

44

PX212

was ultimately a function of his ability to plausibly threaten violence, and then plausibly claim to be able to end it, rogue commanders operating under the JAM rubric but pursuing their own agenda undermined his credibility and leverage. Al-Sadr did not have a mechanism to ensure his commanders followed instructions, but he could publicly disavow the commanders that were not, and hope that he would no longer be blamed.

Al-Sadr was walking a very fine line.  Some viewed his political participation as a betrayal, but he was still at odds with the established Shi'a political elite, who viewed his uneducated followers with disdain.  Even as al-Sadr's support among some militiamen was slipping, JAM was fighting on the streets of Najaf with Badr Organization gunmen loyal to SCIRI.  Al-Sadr's dilemma was that his militia and popularity among the mass of Iraq's frustrated Shi'a was the basis of his political influence, but he sacrificed some of his influence over that base by working within the political system.

Al-Sadr was not, however, willing to cut JAM loose entirely.  Still politically weak, al-Sadr knew the only way to guarantee his political power was to maintain a credible threat to upset the political system itself.  Disbanding JAM completely would have been to abandon his leverage.  Other Iraqi officials, particularly those from SCIRI, clamored for al-Sadr to dissolve JAM.  Although it seems perfectly reasonable for government officials to demand the dissolution of an anti-government militia, SCIRI politicians were no doubt comforted by the fact that their own militia, the Badr Corps, had largely integrated itself into the Iraqi Security Forces.  In other words, SCIRI could call for the dissolution of a rival militia, and appear to maintain the moral high ground.

Al-Sadr's perspective on the political process must have demonstrated again to Iran why he was an unreliable surrogate.  The JAM militia was a useful mechanism for disrupting the U.S., but al-Sadr's predilection for politics was disconcerting, particularly because he had retained his nationalist, anti-Iranian views.  Al-Sadr's independence might lead him to start, or cease, military activities at an inopportune moment for Iran.  On the contrary, the SGCs were much more committed to violent confrontation with the Iraqi government and the coalition.  They too were nationalists hostile toward Iran, but their disposition toward violence as the only basis for their social power in Iraq— rather than, as with al-Sadr, a means to establish political influence—made them more reliable from Iran's perspective.  Thus, even as Iran continued to support JAM it increased support for the SGCs, providing training and weapons, thus increasing its array of options to employ in support of its strategic goals.

45

PX212

**SCIRI to ISCI, and Sadrist Overstretch**

Moqtada al-Sadr realized too late how precarious his political position actually was.  In late 2006 and early 2007, al-Sadr's militia was fighting Sunni insurgents, Coalition Forces, and fellow Shi'a, particularly Badr personnel.  Al-Sadr was trying to establish himself as a political figure, but leaned on the disruptive power of JAM to support his political aspirations.  Worst, he was losing control over the militia as local commanders defected to the SGC model of self-determined operations and independent logistical connections to Iran.

True to form, SCIRI showed more political sophistication than al-Sadr.  In late 2006 Prime Minister Nuri al-Maliki began seriously trying to cobble together a political coalition that would marginalize Moqtada al-Sadr.[58]  Clashes between JAM and Badr forces—with and without official imprimatur—were increasingly common.  SCIRI wanted to force al-Sadr to show his hand: would he be a militia commander or a political leader?  The choice was impossible for al-Sadr; by embracing politics completely, he would abandon his operational leverage, but he no longer had the support to challenge the government's authority.  SCIRI knew popular opinion for al-Sadr had softened, especially as militia violence turned into little more than criminality.  Although the SGCs were responsible for much of the unrest, the SGC's relationship and continued links with mainstream JAM members ensured that al-Sadr would suffer politically from their criminality.

In late November 2006, Prime Minister al-Maliki met President Bush in Amman, Jordan.  Days later, SCIRI leader Abd al-Aziz al-Hakim visited Washington to meet President Bush and the Iraq Study Group released its report recommending U.S. negotiations with Iraq's neighbors.  The political tide was turning on Moqtada al-Sadr, and the U.S. was growing increasingly close to Iran's closest political allies in Iraq.  The developments once again highlighted Iran's strategic paradox; its allies must collaborate with the U.S. in order to maintain power in Baghdad, but their collaboration inherently weakens their dependence on Iran. The paradox is one key reason Iran backs multiple political and militia groups in Iraq.  SCIRI and Dawah check Sadrist radicalism through their political power, and al-Sadr's populist challenge to the U.S.-supported Iraqi political system ensures SCIRI and Dawah cannot get too cozy with the U.S.  Iran clearly cannot

---

[58] Wong, Edward "Iraqis Weigh Alliance to Marginalize Sadr and Bolster Maliki" *The International Herald Tribune* December 11, 2006

PX212

control all actions of SCIRI, Dawah, or al-Sadr, but it has encouraged and supported the competing groups, and benefits from their conflict.

In May 2007, SCIRI's leaders took a series of symbolic steps to ameliorate the perception that it was linked to Iran.  The Supreme Council for Islamic Revolution in Iraq renamed itself the Islamic Supreme Council of Iraq (ISCI), dropping the word "revolution" that connoted Khomeinist uprising and ideology.[59]  The group also changed its doctrinal platform to recognize Grand Ayatollah al-Sistani, rather than Iran's Supreme Leader Ayatollah al-Khamenei, as its primary religious guide.  The shifts were widely hailed as SCIRI's first steps toward independence from Iran, but some observers have commented that the group's language was intentionally vague, particularly regarding Ayatollah al-Khamenei's status.[60]

Nonetheless, SCIRI's transformation into ISCI was clearly designed with Iraqi politics in mind.   In November 2007, Reuters reported that 600 tribal leaders in southern Iraq, along with over 300,000 Iraqi Shi'a, signed a petition condemning the interference of the Iranian regime in Iraq.[61]  One Shi'a religious leader was quoted in this report saying:[62]

> The most poisonous dagger stabbed in us, the Iraqi Shiites, is the (Iranian) regime shamefully exploiting the Shiite sect to implement its evil goals…  They have targeted our national interests and began planning to divide Iraq and to separate the southern provinces from Iraq.

ISCI's attempt to placate its Iraqi constituents—even if superficial—indicated that the group recognized that its leading position in the government depended on a solid relationship with Iraqis, not Iran.  ISCI was clearly trying to position itself as the political slate closest to al-Sistani and win over everyday Iraqis sympathetic to al-Sadr.  There is little evidence to show ISCI made substantial progress winning over everyday Iraqis, but there is no doubt that al-Sadr continued to make political missteps.  Buffeted by the fraying base of his militia and isolated politically, al-Sadr moved away from both JAM and the Iraqi

---

[59] Cave, Damien "Changes by Iraqi Shi'a Party Signal Distancing From Iran" *The New York Times* May 13, 2007
[60] Visser, Reidar "Shi'a Militancy in Iraq: Patterns and Ideological Roots" in Assaf Moghadam ed. CTC Report (forthcoming)
[61] "300,000 Iraqis sign petition condemning Iran" *Reuters* November 22, 2007 available at http://www.iraqupdates.com/p_articles.php/article/24252
[62] *Id.*

government and tried to return to the social services model that launched his movement in 2003.  By August 2007, al-Sadr had pulled out of the government, renounced sectarian violence, and declared a ceasefire to end months of ugly intra-Shi'a violence.[63]  Al-Sadr's ceasefire was certainly an indication of weakness, as was his subsequent decision to decamp to Qom, Iran for religious study.  He has not returned.  Rumors continue to swirl that al-Sadr is being held under house arrest in Qom.[64]  Indeed, al-Sadr's quick decision to end the intra-Shi'a violence and head to Iran does seem to indicate that Iran helped broker some kind of agreement for al-Sadr.

The "surge" of U.S. troops in Iraq also shaped the environment in ways that limited violence.  In addition to operations focused on eliminating al-Qa`ida in Iraq from Sunni areas of western and northern Iraq, the strategy increased the American presence in Baghdad.  This strategy upped the pressure on Shi'a political actors and Iran.  An important element of the surge was the decision to reorganize U.S. relations with tribal elements of the Sunni insurgency.  The new groups, known as Awakening Councils and the Sons of Iraq, were an important part of the U.S. strategy to destroy AQI.  Though useful allies against AQI, the new groups continue to terrify Iraqi Shi'a, many of whom worry that the U.S.-armed and supported groups are a coup waiting to happen.

Iran probably favored the reduction in violence because it reflected al-Sadr's weakened political position, but it also benefitted from political dynamics beyond its control.  Out of government and his militia weakened, al-Sadr was increasingly vulnerable to Iranian leverage despite his continued anti-Iranian nationalist rhetoric.  More importantly, ISCI increased its influence within the Iraqi government when al-Sadr left the governing coalition.[65]  To ensure al-Maliki would remain in power when the Sadrists left the governing coalition, ISCI and Dawah cut a deal with Iraq's Kurdish parties to form a governing majority.[66]

---

[63] Tavernise, Sabrina "Relations Sour Between Shi'as and Iraqi Militia" *The New York Times* October 12, 2007

[64] Rahimi, Babak "The Mumahidun:  Muqtada al-Sadr's New Militia" *Jamestown Terrorism Monitor* September 4, 2008

[65] Visser, Reidar "Shi'a Militancy in Iraq: Patterns and Ideological Roots" in Assaf Moghadam ed. CTC Report (forthcoming)

[66] Rubin, Alissa "Cleric Switches Tactics to Meet Changes in Iraq" *The New York Times* July 19, 2007

PX212

**Agents in Iraq**

Iran's covert influence in the Iraqi government came to the fore in late December 2006. U.S. forces arrested four Iranians in Baghdad who were suspected of being Qods Force officers with extensive ties to the Iraqi government.[67]   At least two were in Baghdad at the invitation of Jalal Talabani, head of the Patriotic Union of Kurdistan. Several of the arrests were made inside Abd al-Aziz al-Hakim's compound, at the home of Hadi al-Ameri, leader of the Badr Organization and former Deputy to the terrorist Abu Mahdi al-Muhandis. The men had just come from the Buratha Mosque, which is led by Sheikh Jalal al-din al-Saghir, an acolyte of Grand Ayatollah al-Sistani and an ISCI/Badr politician. The detentions infuriated Iraqi political leaders, who demanded the men be released despite U.S. assertions that they were encouraging violence in Iraq.[68]  Under intense pressure from the Iraqi government, the United States transferred several of the Iranians to the Iraqi government, who in turn released them.

The arrests in Baghdad were followed by the arrest of five Iranian nationals in northern Iraq in early January 2007, which also drew a strong rebuke from the Iraqi government.[69]  The U.S. was intent on demonstrating Iran's support for militia groups, but Iraqi government officials resisted the U.S. efforts.

Perhaps the most important Iranian captured by U.S. forces in Iraq was Mahmoud Farhadi. Arrested in September 2007, Farhadi was a long-time Qods Force operative that U.S. forces considered "very senior."[70]  Captured Iraqi intelligence documents list Farhadi as the director of a Qods Force camp along the Iran-Iraq border.[71]

---

[67] Glanz, James and Sabrina Tavernise "US Is Holding Iranians Seized in Raids in Iraq" *The New York Times* December 25, 2006

[68] Tavernise, Sabrina "US Says Captured Iranians Can Be Linked to Attacks" *The New York Times* December 27, 2006

[69] "Iran Demands Release of Iranian Arrested in Iraq" *Radio Free Europe/Radio Liberty* January 14, 2007; "Detained Iranians Had Insurgent Ties" *The Associated Press* January 14, 2007

[70] Von Zielbauer, Paul "US Calls Iranian Official Part of Elite Force" *The New York Times* October 8, 2007

[71] Harmony Document ISGZ-2005-001122-19954. There is a slight discrepancy, however, between the Iraqi intelligence information released with this report and information released by Multi-National Forces—Iraq. In an October 3, 2007 press conference, Brigadier General Kevin Bergner described Farhadi as the leader of the Zafr command of the Qods Force's Ramazan Headquarters, while the Iraqi documents indicate he actually led the Nasr command, with responsibility for the northern sector of the Iran-Iraq border. See Bergner, Kevin. Press Conference October 3, 2007; ISGZ-2005-001122-19954. It is worth noting that the Iraqi intelligence documents often contradict

49

PX212

The Special Group Criminals were particularly active. Qais Khazali's network was receiving Iranian assistance and training from Lebanese Hizballah. Khazali's most prominent attack was a daring kidnapping of five American soldiers in Karbala. The attackers used stolen uniforms to infiltrate a coalition base, kidnapped the soldiers, and escaped. American officials claim it was planned with at least tacit cooperation from Ali Musa Daqduq, a Lebanese Hizballah operative that had traveled from Lebanon to Iran in 2006 and was captured in Iraq alongside Khazali in the spring of 2007.[72] Along with the SGC's increasing use of Iranian-made EFPs, the attack demonstrated that Iran had found a new kind of partner for kinetic strikes against the U.S. in Iraq.

**SOFA and Provincial Elections**

In the spring of 2008, events turned sharply against al-Sadr. Prime Minister Maliki ordered the Iraqi Security Forces (ISF) to first retake the southern city of Basra in March. In May and June, they entered Sadr City in Baghdad and the border city of Amara. The combination of JAM, SGCs, local militias, and criminal gangs that had held sway in these areas largely dissipated before Iraqi troops arrived en masse.

Al-Maliki's assertive use of ISF to crush JAM bolstered his reputation with the Iraqi political class and is a clear indication that the ISF is improving. Nevertheless, not all Iraqis viewed the operation in Basra, or the ensuing operations, a non-partisan effort to restore order. Al-Sadr's supporters—and some outside analysts—argued that al-Maliki's move against JAM strongholds was, in fact, a blatantly partisan effort to weaken al-Sadr's ability to compete in the October provincial elections.[73] Not only would such attacks disrupt JAM's military capability, they would prevent it from mobilizing supporters for the provincial elections. There is some truth to these arguments. The Iraqi government's crackdown on Sadrist groups in southern Iraq, together with the targeting of the Sunni Awakening movements in politically sensitive areas inside and north of Baghdad, suggest a coherent effort to suppress viable political opposition in areas where Baghdad's ruling coalition can win votes.

---

one another. This is not surprising. There are discrepancies in the Iraqi documents over the number of Iranian commands along their border and the number of training camps, etc.

[72] Partlow, Joshua "Iran's Elite Force is Said to Use Hezbollah as 'Proxy' in Iraq; General Describes Aid to Shiite Militias" *Washington Post* July 3, 2007

[73] Visser, Reidar "Shi'a Militancy in Iraq: Patterns and Ideological Roots" in Assaf Moghadam ed. CTC Report (forthcoming)

PX212

Iran did not sit on the sidelines during the Iraqi government's crackdown on al-Sadr in 2008.  As in previous bouts of violence, Iran stepped in to mediate among Shi'a parties in Iraq.  During the spring violence in Basra a delegation of Hadi al-Ameri of Badr and Ali al-Adeeb of Dawah traveled to Qom to negotiate a ceasefire with al-Sadr.  The meeting was allegedly arranged and mediated by Qassem Suleimani, leader of Iran's Qods Force and the man coordinating Iran's intervention in Iraq.[74]  The meeting did predate a slowing of the violence in Basra, but the Iraqi government's campaign against Shi'a militias continued, first in Baghdad's Sadr City and then in Amara.  Interestingly, both the United States and Iran publicly supported the crackdown.  Iran's ambassador to Iraq, Hassan Kazemi Qumi, went out of his way to publicly support the operation, while U.S. forces provided substantive support to the Iraqi forces involved.[75]

There was very little organized resistance to the Iraqi government in either Sadr City or Amara, in part because of ceasefire agreements between the Iraqi government and JAM fighters.[76]  Iran's support for the intra-Shi'a ceasefire and the Iraqi operations to reassert control in former Sadrist strongholds is only the most recent tactical application of its politics-first strategy.  As in 2004 and 2005, Iran has moved to limit violence before a major political benchmark.  In 2004 and 2005, those were elections.  Today, it is a combination of Iraq's provincial elections and Iraq's SFA/SOFA negotiations with the U.S.

**Iran's Goals Today**
Since the March meeting in Qom, Iran has pursued a policy with two basic goals, both of which are generally consistent with its Iraq policy for the past five years.  First, enable the Dawah/ISCI/Badr led Iraqi government to extend control over geographical regions held by Sadrists, and thereby consolidate thei political influence of Iranian-influenced parties.  Second, limit the amount of violence between the Iraqi government and JAM and SGC fighters as government forces move into those areas.  Both goals have largely been achieved.  The government of Iraq now controls Basra, Sadr City, and Amara and Prime Minister Maliki has consolidated control over the government.  And the Mahdi Army and SGCs largely avoided hopeless fights against more capable Iraqi and coalition forces.

---

[74] Fadel, Leila "Iranian General Played Key Role in Iraq Cease-Fire" *McClatchy Newspapers* March 30, 2008

[75] Glanz, James and Alissa Rubin "United States and Iran Find Unexpected Common Ground in Iraq's Shiite Conflict" *The New York Times* Arpil 21, 2008

[76] Dunn, Katie "Iraqi Army Secures Sadr City" *National Public Radio* May 20, 2008

PX212

Iran's recent behavior is consistent with its core Iraq strategy over the past five years.  However, the most recent manifestations of that strategy are particularly important because of the SFA/SOFA negotiations between Iraq and the U.S. and the general sense that the U.S. is preparing to withdraw the bulk of its troops from Iraq.  The SFA/SOFA negotiations between Iraq and the U.S. offer Iran the best way to evict most U.S. troops from Iraq and limit their flexibility to threaten Iran in the future.  Whereas Iran once hoped to embarrass the U.S. as it leaves Iraq, security gains since early 2007 have forced Iran to accept the lesser goal of simply evicting the U.S. from Iraq and limiting its operational reach in the region.

Iran's recent efforts to bolster al-Maliki politically have improved his negotiating position with the U.S.  Likewise, Iran still maintains the capacity to increase violence in Iraq in the future because its most important militia proxies remain intact.  Al-Maliki's dilemma is that the political system he dominates still relies on U.S. support for stability.  Like many of Iraq's more sophisticated politicians, al-Maliki almost certainly wants SFA/SOFA agreements that maintain some U.S. presence in Iraq, not only as an internal stabilizing influence, but as a check against Iran.[77]  The government of Iraq, and its partisan leaders, will play the U.S. and Iran against one another in order to pursue its own interests.

Al-Maliki's immediate problem is supporting an SFA/SOFA with the U.S. without ruining his party's electoral prospects in Iraq's provincial elections. Many Iraqis remain adamantly opposed to the U.S. presence in Iraq.  SFA/SOFA agreements seen as capitulating to the U.S. would damage the Dawah party's prospects.  This is particularly true because al-Maliki—at the urging of Grand Ayatollah Ali al-Sistani—has pledged to submit any agreement to the Iraqi parliament.[78]  Moqtada al-Sadr would have the most to gain politically from SFA/SOFA agreements seen as too accommodating to the U.S. because of his consistent and outspoken Iraqi nationalism and opposition to the U.S. presence in Iraq.  Conquering Sadrist strongholds has mitigated this risk to al-Maliki because it limits al-Sadr's ability to mobilize politically.  Maliki has also banned political parties with militias from participating in the elections, a clear shot at al-Sadr.

---

[77] Parker, Ned "Iraq's Nouri Maliki Breaking Free of US" *The Los Angeles Times* September 16, 2008
[78] Chon, Gina "U.S., Iraq Near Pact on Troop Presence" *The Wall Street Journal* October 13, 2008

PX212

Nonetheless, al-Sadr remains a more potent political force today than he would have been without the ceasefire negotiated by Iran in March.  If al-Sadr had stood toe to toe with Iraqi government forces backed by the U.S., his militia might have been irretrievably crushed.  Meanwhile, Al-Sadr is taking steps to remain politically viable.  He is downsizing his militia, but professionalizing it to make it more effective and ensure that he has tight control over its behavior.[79]

Iran's support for the ceasefire also demonstrated to Prime Minister al-Maliki that Iran, more than the U.S., is capable of controlling the Shi'a elements of Iraqi society most critical to his base of support.  At the same time al-Maliki's political position was strengthened, which improved his ability to negotiate with the U.S. on the SFA/SOFA.[80]  Using its influence with multiple groups, Iran is highlighting the carrots and sticks it wields in Iraq.

Al-Sadr's relative quiet from his new home in Qom suggests that Iran closely controls his public statements and thus serves to shape his political maneuvering.  All told, al-Sadr's public statements seem designed to ensure he remains a credible enough player on Iraq's political scene to ensure Iraqi politicians cannot acquiesce to U.S. demands, but weak enough that he cannot incite a broad-based uprising that would interrupt Prime Minister al-Maliki's political maneuvering.

The ultimate SFA/SOFA agreement will help determine how Iran conceives of the threat posed by the U.S. presence in Iraq, and thus on its strategy going forward.  If the SFA/SOFA provides U.S. forces broad latitude of action in Iraq, Iran's incentive to support violent militia activities against coalition forces will increase.  On the other hand, if the SFA/SOFA is more restrictive—limiting the amount and freedom of action of U.S. troops in Iraq—Iran's incentive to promote violent militias will decrease.  Such a reduction in violence would undoubtedly be a boon for Iraq, but it might also indicate that Iran has at least partially accomplished its goals in Iraq.  If Iran does want to increase violence in the future, it will likely not rely on al-Sadr and his downsized militia.  Rather, Iran will increase ties with the SGCs and the elements of JAM not integrated into al-Sadr's new militia.  These numerous small cells offer less politically complex means of disrupting Iraqi social and political events.

---

[79] Rahimi, Babak "The Mumahidun: Muqtada al-Sadr's New Militia" *Jamestown Terrorism Monitor* Volume VI Issue 17 September 4, 2008
[80] *Id*.

Although many Iraqi politicians depend on the U.S.-backed political system, they also know that Iran will be a constant presence.  SCIRI politicians Jalal al-Din al-Saghir reflected the sentiment, saying "The Iranians will stay in the place forever till the Judgment Day and the Americans will withdraw.  The Americans built their status on their military and their political viewpoints.  They didn't try to find shared lines of interest or common ground… The Iranians dealt with this matter in a more positive way."[81]

Al-Sadr is being marginalized.  His new militia is still capable of causing trouble, but he can no longer credibly threaten to disrupt wide swaths of Iraq, which has been the basis of his political leverage.  Despite al-Sadr's weakness, al-Maliki runs a serious risk if he prevents al-Sadr from participating in the provincial elections.  Al-Sadr remains a popular figure in Iraq and flat out excluding him may reduce the election's domestic and international credibility.

Iran's position today is strong, but not without challenges.  Political parties sponsored by Iran for 20 years are in charge in Baghdad, al-Maliki must negotiate restrictive SFA/SOFA agreements with the U.S. to remain politically viable, the U.S. seems destined to drawdown forces in Iraq, and the offshoots of al-Sadr's Jaysh al-Mahdi offer innumerable levers to increase violence in Iraq when it is politically expedient.  At the same time, however, Iranian-linked political parties are increasingly responsive to the political needs of their Iraqi constituents, al-Maliki himself has shown signs of frustration with Iranian meddling in Iraq, and Iraqi politicians seem relatively content to maintain some level of U.S. troops in the near-term.

---

[81] Parker, Ned "Iraq's Nouri Maliki Breaking Free of US" *The Los Angeles Times* September 16, 2008

PX212

> **"The enemy's expenditure of effort consists in the *wastage of his forces*—our *destruction* of them...and far the most important method, judging from the frequency of its use, is to *wear down the enemy*. That expression is more than a label; it describes the process precisely, and is not so metaphorical as it may seem at first."**
>
> *"On War"*
> Carl von Clausewitz

## Chapter 3
## Iranian Training for Iraqi Militias

Although Iran's primary strategy for projecting power in Iraq remains centered on the Iraqi political system, Iran has also built a complex system to provide paramilitary training for Iraqi militia groups.  These efforts increase the durability of Iran's influence operations in Iraq and complement its main effort by providing different means to address threats to its interests in Iraq.

Most of the Iranian-sponsored paramilitary training has been directed to JAM and the SGCs, but there is evidence of support to other smaller militia groups as well.  The trend toward smaller, less politically active groups will likely increase as JAM downsizes.[1] At the most basic level, Iran's military aid is a hedge against unforeseen developments in the Iraqi political system, such as the sudden defection of ISCI members or a Sunni coup in Baghdad.  Independent militias serve other purposes as well: embarrassing the United States, facilitating Iran's ability to continually pressure the U.S. while publicly supporting the Government of Iraq, and ensuring that U.S. attention is focused on the militias while Iran's political allies consolidate power.  The militias, even as they were supported but not precisely controlled by Iran, served to sow the seeds of instability and chaos, especially when coalition forces were attempting to facilitate stability.

The IRGC-QF program to train Iraqi militants is quite robust.[2]  Consistent with its political efforts, Iran has built an overlapping series of relationships to exert

---

[1] The Arabic daily newspaper *Azzam* reported in early July 2008 that Iraqi Minister of Interior Jawad al-Bulani acknowledged evidence obtained through confessions of Special Groups members that indicated close links between Iran and Special Groups operating in Iraq. See http://www.azzaman.com/indexq.asp?code=azq01.

[2] This claim is based on open source press reporting as well as the accounts of multiple Iraqi militants detained since mid-2007 that claim to have participated in Iranian hosted paramilitary training.

PX212

influence.  A document found during the capture of Qais Khazali and his brother describes a plan to establish three distinct, but overlapping, militant groups.[3] The groups were designed to range in sophistication, from a large, less-trained group to smaller, more elite organizations.  The Khazali schematic likely only scratches the surface in describing the variety of Iraqi militant groups.  It is clear, however, that in the past year the SGCs have been the most disruptive— emplacing IEDs, rocketing the Green Zone, and attacking Iraqi Security Forces and Coalition troops.

Iraqi militants who have participated in Iranian-sponsored training insist that the instruction is designed primarily to evict coalition forces from Iraq—not to stoke the kind of sectarian warfare that rocked Iraq in 2006 and early 2007.  This explanation is consistent with both Iran's core goals in Iraq and the nationalist sentiments of many of the militia members attending the training.  The following quote is from a U.S. intelligence report paraphrasing an alleged SGC member's assessment of Iranian interests:

> Iran does not care about the fight between Shi'a and al-Qaeda.  Iran just wants to force CF (Coalition Forces) out of Iraq because Iran is afraid CF will use Iraq as a base for an attack in the future.  Iran is training people to fight CF, not Al-Qaeda.[4]

Interestingly, Iran seems to have outsourced some of the actual military instruction provided to Iraqi militants to agents from Lebanese Hizballah.  Although there is little available evidence of Lebanese Hizballah activities inside Iraq, there are numerous reports that they are providing IRGC-QF coordinated training in Iran and Lebanon for Iraqi militants.

**Iraqi Recruitment and Travel to Iran**
Although Iraq's Shi'a militias often operate independently, hierarchy is an important part of their structure.  Iraqis claiming to have trained at camps in Iran describe varying levels of instruction based on expertise and function.  The entire training program is extremely well organized, all the way down to the selection of trainees.  Most trainees hail from the predominately Shi'a towns of southern Iraq—Najaf, Nasiriyah, Kut, Amara, and Basra—as well as eastern border towns in the Diyala Province and from Shi'a enclaves in Baghdad such as Sadr City.[5]

---

[3] Harmony Document NMEC-2007-624223
[4] IR002
[5] This assessment is based on background information provided by multiple captured Iraqi militants that received training in Iran.

PX212

Trainees are selected based on certain minimal qualifications as well as available resources and specific needs identified by SGC leaders.[6]  For example, before going for training, candidates are required to be able to read and write.[7]  One captured SGC leader described the attributes he looked for in prospective trainees: "Open Mindedness"; "Physical Stamina"; "Maturity"; "Organizational Skills"; "Responsible"; and individuals "who are not a problem."[8]

Iraqi militants seem to be well-informed about the training opportunities in Iran even before they are asked to attend.  The following quote is from a U.S. intelligence report paraphrasing the SGC member's description of events:

> [DETAINEE] was well aware of the fact that SG (Special Group) members sometimes train in Iran prior to [DETAINEE] being told he would attend such training.  It is common knowledge that SG members receive training in Iran.  Without a doubt, all training received in Iran is intended for use against CF (Coalition Forces).[9]

Captured Iraqi militants in 2007 and 2008 recount taking numerous routes from their homes in Iraq to Iran, including a pathway through the southeastern Iraqi city of Amara.[10]  Iraqis bound for training in Iran often converge in Amara and stay at designated JAM and SGC safe houses where they are introduced to the other traveling militants and the guides that will take them across the border.  The following quote is from a U.S. intelligence report paraphrasing an SGC member's description of events:

> When the training travel was ready, ███ would call the SG (Special Group) areas and have the trainees travel to Amara.  The trainees would usually travel by taxi, a seven to eight passenger vehicle, to the Baghdad garage in Amara.  Once in Amara, the trainees would contact ██ and inform him of their arrival.  ███ would arrange to have someone, usually ██ meet the trainees and take

---

[6] IR 007

[7] *Id.*

[8] *Id.*

[9] IR 002. In this quotation and in all other quotations, where "NAME WITHHELD" is listed, the names are provided to the Combating Terrorism Center on an "unclassified but for official use only" basis.  They are not listed in this document because there is no particular need for the reader to know the specific name of the detainee and such listing of the specific name could possibly be construed as improperly attempting to publicize or otherwise exploit the capture of a specific detainee.

[10] The Iraqi Army's 10th Infantry Division moved through and occupied Amara in June 2008 and its effect on cross border smuggling of arms and individuals participating in Iranian training programs has not yet been assessed.

57

them to an Amara SG safe house. ██ would meet the trainees at the safe house where he would provide each 100 USD, brief them on their travel and what to be aware of, and verify their passports. The trainees would then wait at the safe house until ██ told them it was time to depart for Iran. The trainees would again use taxis, usually seven to eight person vehicles, in their travel to the Iranian and Iraqi border. [11]

After passing through the safe houses in Amara, trainees and their guides cross the border in two major ways:[12]

1. Legally—through established border crossing points using Iraqi passports.[13] Intelligence and media reports indicate that many cross near Amara, others cross further south near Basra.

2. Illegally—without clearing Iranian customs. Accounts from a number of militants beginning their travel from Amara describe walking across unchecked by Iranian officials. Others describe taking a boat into Iran via the marshes that straddle the Iran-Iraq.

One SGC member described crossing the border illicitly, but indicated that Iranian soldiers at a checkpoint waved his van through after recognizing the driver. The following quote is from a U.S. intelligence report paraphrasing the SGC member's description of events after leaving a safe house in Amara:

[DETAINEE] trip began with a 90 minute bus ride to the marshes on the border where he boarded a row boat for a 15 minute trip on an unmarked route through dense reeds and marsh grasses to the Iranian side of the border. Once across, he made a 10 minute walk up a hill on a dirt and gravel road where he and the other Iraqi's traveling with him boarded a waiting vehicle. The car took him through a nearby Iranian Army checkpoint where it was waived through by Iranian soldiers when they appeared to recognize the driver- no identity documents were examined. [14]

Since the training in Iran is allegedly organized and funded by IRGC-QF, a branch of the Iranian government, it is interesting that the SGCs go to the trouble

---

[11] IR 007

[12] Details for both legal and illegal crossing descriptions are compiled from multiple accounts of Iraqi militants that traveled to Iran. See IR019, IR008, IR021, IR020, IR003, and IR016

[13] Documents from multiple Iraqi militants contain passports with entry and exit stamps into and out of Iran.

[14] IR 003

PX212

of smuggling their charges across the border.  The purpose is probably to avoid detection upon returning to Iraq, as well as to minimize the overall record of suspicious Iraqis inside Iran.  It is also possible that many SGCs do not have Iraqi passports and do not want to risk applying for an official document.

Once on the Iranian side of the border, training candidates meet Iranian guides and move over land—generally by taxi or bus—to the western Iranian border towns of Ahvez or Kermanshah where they spend a short period of time at designated safe houses or hotels.  From there, the IRGC-QF arranges air travel to Tehran.[15]  The following quote is from a U.S. intelligence report paraphrasing a former SGC member's description of his group's trip into Iran:

> The following morning the group took off in two vehicles, traveling from Amara to Shayikh Sa'ad.  The group ate at a restaurant, and the driver called for a vehicle to come and pick up the group for the next leg of the journey.  All of them crammed into a Land Cruiser, 12 people, plus the driver and the interpreter.  They drove on a dirt road for several hours.  They arrived at around sundown at a house in a desolate area.  The driver got out and went toward the house.  He came back with a man with a black tracksuit.  In later conversation, he said he was from Al-Sadr City.  The unidentified man said they should wait until it got a little darker.  The man from the house had an AK slung on his back and night vision device on a neck strap.  The glow when he put the device to his ears was either yellow or red.  After a short drive, the group got out and walked through the countryside.  They crossed rivers, ran in a flat open country, and went up and down hills for between two and three hours.  The man from the house picked up a signal from an automotive light.  The group rendezvoused with two four-door pickups.  One was white and the other red.  The pickups took the Iraqi trainees to a house in Mehran.  Along the way to Mehran, they were given chocolate, biscuits, and snacks.  In Mehran, the training group went to an apartment.  They ate a meal and stayed the night.  In the morning, the group was divided and taken to the Kermanshah Airport.  Their tickets were waiting and they boarded a flight for Tehran.[16]

Once in Tehran, former SGC members recount staying in apartments on the outskirts of the city.  Some portions of the training that do not require training facilities are conducted at these apartments/safe houses.[17]  Many Iraqi militants describe traveling two to three hours by bus from Tehran to military style training complexes manned by uniformed Iranian soldiers.  Both the testimonies

---

[15] IR019, IR008, IR021, IR020, IR003, IR016, and IR018
[16] IR008 and IR001
[17] IR025

of captured Iraqi militants and open sources suggest that the IRGC-QF uses several locations to provide paramilitary training to Iraqis in Iran.[18] Haj Reza, a former general in the IRGC claims that four camps are used, in Ahvaz, Elam, Qom, and Tehran.[19] Iraqi intelligence reports also describe camps in the vicinity of Tehran.[20]

Figure 3 depicts the most cited routes from Iraq to training facilities in Iran according to Iraqi militants that participated in this training since 2006.

*Figure 3: Common Routes Traveled to IRGC-QF Paramilitary Training in Iran*



---

[18] Brigadier General Kevin Bergner, July 2, 2007. A frequently mentioned training camp is in the vicinity of Jalalibad which is approximately a 3 hour drive south of Tehran. This site is frequently referred to as the Al Shahad training complex by detainees. See IR020, IR023, and IR001

[19] Nuri-Zadeh Ali, "A Former Official of the Revolutionary Guards, Says Hundreds of the Al-Mahdi Army Personnel Received Training in Iran on Missiles and Diving. He told Al-Sarq al-Awsat Tehran used Hizballah to Train Iraqis because of the Language Problem" *Al-Sharq al-Awsat* May 8, 2008

[20] Harmony Document ODP1-2005-008247_TRANS

60

PX212

A summary of the typical routes militants claim to have taken from their native Iraq into Iran for training and return along with a map is summed up at Figure 4 below:

*Figure 4: Synopsis of Iraqi Militant Routes to Iran for Paramilitary Training*

| | |
|---|---|
| 1. Movement to Point of Embarkation/Safe Houses in Iraq | Prospective participants in Iranian-sponsored training travel independently to designated safe houses to link up with their coordinators, guides and other members traveling in the same training cohort.  Many participants described Amara as the most frequent link-up point and safe house location for follow on travel to Iran. |
| 2. Iraqi Safe House – Iranian Border Crossing | Iraqi militants attending training in Iran since 2006 identify several routes and means of travel used to cross the border into Iran.  According to the accounts reviewed, many began their journey in a group from Amara.  Fighters crossed the border in a number of ways, including driving, walking, and using small boats. |
| 3. Iranian Border— Training Camp | Once across the border, the groups of candidates for paramilitary training are met by facilitators to move to the training camps.  Fighters often travel by car or bus to Ahvaz, and in some cases Kermanshah, just inside the Iranian border. From there, a number of militants flew to Tehran where they stayed for several days at an apartment/safe house on the outskirts before taking buses or cars to training camp locations outside of the city. |
| 4. Return from Training to Iraq | Militants returning from IRGC-sponsored paramilitary training in Iran return via similar routes they arrived. |

PX212

**The Training Program in Iran**

Qods Force officers and Lebanese Hizballah provide a variety of military training to Iraqi militants, from entry level weapons and tactics to advanced skills, including production and use of EFPs, sniper operations, vehicular ambushes, and kidnapping.[21] According to General Reza, Iran began providing rudimentary instruction for JAM-style militants in 2003, but high-level training did not start until 2007, and the Iranian-run training courses have grown increasingly sophisticated since then.[22]  The estimate of the total number of Iraqi militants trained in Iran varies widely with reports of camps closer to the border with Iraq providing very basic military training allegedly to thousands of militants while advanced training conducted at camps deep in to Iranian territory is provided to smaller numbers of militants.[23] Captured Iraqi militants confirm that Iran offers an extensive list of paramilitary training courses, which generally fit into the following broad categories:

*Basic Paramilitary Skills and Weapons Course*

The basic weapons course is a basic training regimen that stresses weapons familiarization and employment for newly recruited militants.  Iraqi militants that attended this training claim it lasts approximately 20 days and includes introductory training on mortars and IEDs in addition to firearms.[24]

*Advanced Paramilitary Training Courses*

Iraqi militants returning to Iran for advanced training describe the topics covered in this training with reasonable consistency.  The emphasis is on conducting advanced operations and tactics, and is more intensive than the basic military training class.  These courses seem to be designed for individuals assuming leadership positions within Special Group Criminals.  The training's purpose appears to be in developing militant leaders' capacity to plan and prepare for

---

[21] Detainee reporting includes complete program of instruction details with a day by day record of the types of training received. See IR001 for an example.

[22] Nuri-Zadeh. May 8, 2008. Reza's description of JAM-associated individuals likely refers to both mainstream JAM and SGC members.

[23] The Associated Press reported in April 2007 that Shiite Mahdi Army leaders claimed as many as 4,000 of their militia members had trained in Iran . See "U.S.: Iran training Iraqi militants in bombings" *USA Today* April 12, 2007 available at http://www.usatoday.com/news/world/iraq/2007-04-11-iran-iraq-bombs_N.htm.  Recently released accounts of Iraqi militants that received more advanced training in Iran suggests that fewer militants are receiving this advanced training than are receiving basic training at camps closer to the border.

[24] The details of Iraqi militants' descriptions of initial basic training vary somewhat but include similar basic topics. See IR004 for an example.

62

PX212

operations executed by graduates of the Basic/Conventional Weapons Training Course.  According to Iraqi militants that have attended these courses, the program of instruction includes training on numerous topics.  Frequently mentioned topics in this program of instruction include:[25]

- Logistics and support
- Weapons employment
- Engineering/explosives
- Tactics
- Information Operations

Participants in this course are selected based on aptitude, education, and leadership potential.  Most have already been to Iran at least once.[26] The training is quite advanced.  The account below is a quote from a U.S. intelligence report paraphrasing a SGC member's description of training at the paramilitary camp:

> A specific target ambush is normally conducted against a convoy of vehicles.  A specific ambush will begin with engineers detonating roadside bombs focused on one vehicle of the convoy.  The support weapons teams will then attack the other vehicles with mortars and rockets to force them back, while the conventional weapons teams assault the objective with small arms and RPGs. The conventional weapons teams will assault the target vehicle and take whatever equipment is available.  If there is a person still alive in the target vehicle, then that person should be kidnapped if the situation permits.  The indirect fire teams are responsible for keeping enough pressure on the other vehicles to prevent them from helping the target vehicle.  The conventional weapons teams will withdraw with the seized equipment and persons while the indirect fire teams keep the other personnel from responding.[27]

Veterans of this advanced paramilitary training appear equipped to integrate multiple basic individual skills of militants and to synchronize them in sophisticated operations with deadly effect.

---

[25] IR011 and IR004

[26] It is plausible that experienced militants with sufficient prior training and experience would be sent to advanced training without any prerequisite basic skills courses. The records reviewed suggest that individuals selected for advanced skills training and leadership roles in Special Groups tend to have prior record of training in Iran.

[27] Harmony Document IR001.

PX212

*Master-trainer Course*

Bringing Iraqis to Iran for basic weapons training is logistically challenging, costly, and potentially exposes the existence of the program.  To ameliorate these risks in the future, IRGC/Qods Force has developed a training program to prepare Iraqi trainers to instruct Iraqi militants inside of Iraq[28].  The following is translated from an actual quotation from an SGC member, who was recalling the words of the SGC recruiter that urged him to go to Iran for the third time:

> I want to send you over there because you're an educated guy, so we'll send you to Iran…  You're gonna have some experiences and with this experience you're gonna pass it to your friends. [29]

This description of a master-trainer program designed to train Iraqis in the skills and techniques needed to provide basic paramilitary training in Iraq is not surprising.[30]   Many military training programs, including those run by the United States Special Forces, are designed to create master-trainers that can pass knowledge on to others.  The purpose is to maximize the impact of the training while minimizing investment and risk.  The technique is particularly useful when the sponsoring state—such as Iran—wants to obscure their role in the training.[31]  One Iraqi militant who had attended the training explained this logic in a U.S. intelligence report paraphrased below:

> The Iranian instructor told [DETAINEE] and ███ that they would be in charge of starting a training program inside Iraq.  This is necessary because the border will be under heavy scrutiny as CF (Coalition Forces) begins to look more closely at Iran's association with fighters in Iraq.  [DETAINEE] and ███ who were told that they have enough knowledge on all subjects in order to train fighters in Iraq, because Iran does not want this type of attention right now, will conduct the training.[32]

---

[28] US Officials refer to this training as "train the trainer."  See Gordon, Michael "Hezbollah Trains Iraqi's in Iran" *The New York Times* May 5, 2008 available at http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html

[29] This quote was extracted from  an unreleased briefing developed by MNF-I. It is consistent with other statements made by the same former Iraqi militant in subsequent statements.

[30] Iranian sponsored "train the trainer" activities were highlighted by the British press in the Fall of 2005 in an article citing British Defence sources claiming "Insurgents are being taught to kill in special camps run by fanatics from the country's (Iran's) Revolutionary Guard…  They then slip back over the border to attack our Boys in southern Iraq—and pass on bombing techniques to DOZENS of other extremists. See Newton, Tom "Trained to Kill our Boys" *The Sun* October 12, 2005

[31] IR 005, IR 002, and IR001

[32] IR 002

PX212

The master-trainer course graduates expert cadres able to raise, train, and employ a larger force when they return to Iraq.  These classes develop a self sustaining capacity inside Iraq to produce effective fighters for Iranian-backed SGCs, while allowing Iran to avoid direct confrontation in Iraq and maintain plausible deniability for its actions.[33]  Participants in the master-trainer program have at least completed the basic weapons training course and are on return trips to Iran.[34]  Master-trainers are taught instructional techniques, required to give mock classes, and receive feedback from both their instructors and peers.[35]   The master-trainers specialize in one of four areas, where they receive specialty training:[36]

- Explosively Formed Penetrators[37]
- Projectile Weapons, *e.g.,* mortars and rockets
- Conventional Weapons[38]
- Tactics and Guerrilla Warfare[39]

Several captured SGC members described a 16-man cohort that attended the master-trainer program in Iran and made several trips in 2006 to late 2007 preparing for this role.  Four trainees were allocated into each of the specialty areas.[40]

---

[33] In 2007, Coalition Forces gained access to information on a cohort of Iraqi militants recruited to undergo a "train the trainer" program of instruction hosted by IRGC Qods Force operatives in Iran.  Shortly afterwards, Coalition Forces were able to capture several members of this cohort and question them individually on the nature of the IRGC Qods Force efforts to train Iraqi militant cadres in Iran and send them back to Iraq to as force multipliers that would train exponentially larger numbers of militants to attack the GoI and Coalition Forces.

[34] This conclusion is based on review of a sample of participants in this training – all of whom made at least 3 trips to Iran for paramilitary training.

[35] IR001

[36] The specific areas and weapon systems trained are spelled in detail by recipients of this training . See IR 009

[37] See IR 016 for a detailed description of IRGC-QF training on EFPs.

[38] See IR013 for an example of the training schedule as describerd by one Iraqi militant that attended a conventional weapons instructor course in Iran.

[39] Specific topic areas taught in this course according to one militant that attended this training include: Booby Traps; POW Abduction; Attacking Coalition Force Bases; and Attacking Convoys. See IR 011

[40] IR 011

PX212

*Other Paramilitary Training Courses in Iran*

Several captured Iraqi militants referred to "Special Forces" training that lasted over thirty days, which is longer than most other paramilitary courses taught at Iranian facilities. The program of instruction includes courses in swimming, diving, driving, and fitness.[41] The curriculum seems to echo claims by Iranian defectors that some Iraqis were learning swimming and watercraft techniques.[42] Other captured Iraqis described a twelve-day training course on the tactics and employment of Iranian made Strella Anti-Aircraft missiles,[43] a course on advanced sniper skills,[44] and administration and management courses, which are offered both in Iran and in Lebanon.[45]

*Religious Training*

The Iranian training camps aim to indoctrinate as well as instruct. Many Iraqi militants acknowledge mandatory religious education as part of the daily training regimen.[46] This approach, however, is fraught with risk for Iran. Iraqi militants complain that the Iranian sheikhs providing the instruction tend to have a very poor command of Arabic and that the religious training on the whole is uninspiring.[47] Sometimes, the training programs even involve field trips to religious shrines.[48] One Iraqi militant who was training in Iran over Ramadan recounted one such experience. The following quote is from a U.S. intelligence report paraphrasing this militant's description of events:

> When it came time for the celebration of Eid the instructors took the group to the Imam Khomeini shrine. [DETAINEE] decided not to go because [DETAINEE] did not want to spend his Eid celebrating at the shrine of the Imam Khomeini. [DETAINEE] follows Sayid Moqtada al-Sadr because Sayid Moqtada has always helped the poor Shi'a like his father Sayid Muhammad. Sayid Moqtada does not put himself above the poor people and is a very simple man… [DETAINEE] got the impression that everyone in Iran was attempting to draw the trainees into following a different leader than Sayid Moqtada al-Sadr.[49]

---

[41] IR 004 and IR014
[42] Nuri-Zadeh. May 8, 2008
[43] IR 020 and IR002
[44] IR016
[45] IR020
[46] IR011 and IR013
[47] IR011
[48] IR023
[49] *Id.*

66

PX212

The incidents illustrate the tenuous ideological relationship between Iran and its militant surrogates in Iraq.  Theirs appears to be a marriage of convenience and little more.

**Lebanese Hizballah**

Lebanese Hizballah has had links to Iraqi militant groups since the 1980s, when Hizballah personnel worked with Dawah to attack the U.S. embassy in Kuwait.[50] More recently, Lebanese Hizballah's support for Iraqi militants was coordinated by Ali Musa Daqduq, who was captured alongside Qais Khazali by U.S. troops.[51] Daqduq spent years in Iran and, according to Multi-National Forces—Iraq (MNF-I), coordinated training for JAM and SGC.[52]  Indeed, MNF-I reports that the Qods Force provided Daqduq up to $3 million every month.[53]  Iran's reliance on Lebanese Hizballah likely reflects weakness as much as operational flexibility. Lebanese Hizballah trainers are proficient in Arabic and, according to some captured Iraqis, have a better rapport with the Iraqi trainees.[54]  The same claim was repeated by General Reza, the former IRGC member.[55]

Significantly, not all Lebanese Hizballah training takes place in Iran.  In some cases, Iraqi militants traveled to Hizballah's home territory in Lebanon.  The accounts of some militants indicate they received training first in Iran, and then traveled onward to Lebanon for additional training.  Other accounts suggest some militants received training from Lebanese Hizballah in Lebanon without any training in Iran.

Regardless of whether initial training is scheduled in Iran, the accounts of Iraqi militants claiming to have trained in Lebanon consistently describe their route into Lebanon as beginning with travel to Tehran following the same routes and supported by the same facilitation networks used by militants bound for Iranian training described above.  From Tehran, Lebanon bound Iraqi militants fly to Damascus and then take an overland route across the border into Lebanon.[56]

---

[50] Ware, Michael "U.S. Military: Iraqi Lawmaker is U.S. Embassy Bomber" *CNN* February 22, 2007

[51] Najm, Haydar "Security Source: Lebanese Hizballah's Senior Member Pretended to Be Deaf and Mute at Moment of Arrest in Basra.  Sources Said Daqduq Operated with a Monthly Budget of up to $3 Million" *Al-Sharq al-Awsat* July 4, 2007

[52] GEN Kevin Bergner Press Briefing. July 2, 2007

[53] *Id*.

[54] IR010

[55] Nuri-Zadeh. May 8, 2008

[56] IR014 and IR003. Using available unclassified information, it is difficult to determine the location of the training camps used by Lebanese Hizballah to train Iraqi militants in Lebanon-or

PX212

The following account is composed of excerpts from a U.S. intelligence report paraphrasing an Iraqi militant's description of his follow on travel to Lebanon for training after completing a course in Iran:

> After training concluded in Iran, [DETAINEE] left Iran on a commercial plane and arrived in Damascus, Syria.  [DETAINEE] and his fellow students were walking up the Jetway, leaving the plane from Iran.  They were greeted halfway up the Jetway by an unidentified male.  This individual collected their tickets and baggage tags.  [DETAINEE] and his fellow students were led away from the passenger terminal, out a door, onto the airport operations area.  There was an airport bus waiting for them.  They got onto the airport bus, and were driven to the edge of the airport property.  [DETAINEE] knew he was in Damascus when [DETAINEE] saw Syrian license plates that had the words Halab and Damascus on them…  [DETAINEE] and his fellow students got onto a 21 passenger bus…  The bus left the highway, and drove into a farm area.  At this point in time, the group was still in Syria…  Approximately one hour after leaving the farm they stopped.  [DETAINEE] and his fellow students got out of the GMCs, walked up a hill and located two vehicles waiting for them.  [DETAINEE] and his fellow students were instructed to load themselves and their luggage into two vehicles, one of which was a four passenger pick up truck. The drivers did not get out of the vehicles, or address Detainee or his fellow students.  The Syrian drivers of the GMCs approached the drivers of the two new vehicles.  The Syrian drivers greeted the others by a standard greeting wishing them the peace of God and Imam Hussein.  The Lebanese drivers of the new vehicles responded by saying "Keefak," which Detainee knows is greeting commonly used in Lebanon, but rarely used outside of Lebanon.[57]

Iraqi militants that claimed to have attended training in Lebanon describe a three-to-four week course on small unit tactics, special weapons, and other skills designed to prepare the Special Groups' leadership to manage and employ a paramilitary organization.  One Iraqi militant described learning to fire advanced anti-armor missiles and a German sniper rifle.[58]  Others, recruited to perform management and logistics roles within SGCs, were sent to Lebanon for advanced training and claimed to have received instruction in topics such as personnel supervision and management, project planning, weapons inventory control,

---

the route taken to these camps from Damascus. Based on the reports of participants in this training, the camps are likely close to the border of Lebanon and Syria.

[57] IR014

[58] The Lebanese instructors commented to the Iraqi trainees that the training in Lebanon for Hizballah soldiers consisted of more than two years of instruction in their specialties. See IR 020 and IR 006

68

PX212

communications, weapons warehousing, and security.[59]  Lebanon was also reportedly used for more extensive intelligence training, specifically for techniques effective in gaining information on Coalition Force activities in Iraq.[60]

Based on the accounts of multiple Iraqi militants that claimed to have been trained by Lebanese Hizballah, the training in Lebanon is considered to be superior to the training conducted in Iran.  Part of this assessment appears to be based on the fact that the instructors and students share Arabic as their native language and have an Arab cultural affinity.[61]  One Iraqi militant expressed his strong preference for Lebanese Hizballah training over IRGC-QF.  The following quote is drawn from a U.S. intelligence report paraphrasing that militant's preference for Lebanese Hizballah trainers:

> Iraqi SG trainees do not like their Iranian trainers.  The Iranians do not show the SG trainees any respect and feel they are better than the SG trainees.  The SG trainees like and respect the Lebanese Hizballah trainers because the Lebanese trainers speak Arabic and treat the SG trainees with respect.[62]

There is some evidence to support press reports claiming that Lebanese Hizballah does run operations inside Iraq itself.[63]  The following quote is drawn from a U.S. intelligence report paraphrasing the assessment of one Iraqi militant that claimed to have trained in Iran:

> ████     is the Lebanese Hizballah trainer in charge of the training camp [Detainee] attended in Iran.  ████ was always calm and collected ████ had very distinct cat-like eyes that were either bright green or bright blue.  [Detainee] thinks ████ has operated in Iraq because ████ always used to talk about how Iraqi food is not good and how the Iraqis do not have good water ████ would drop hints like this to let the trainees know that ████ has worked in Iraq.  ████ was one of the more respectful of the LH trainers, and appeared to demonstrate some knowledge of Iraqi culture.  ████ would say things about Iraq in a way that let the trainees know that ████ has been to Iraq before.  There are two kinds of LH, the kind you see on television, and the secret underground kind.  All the trainers

---

[59] IR 003, IR 014, and IR 015

[60] IR 020

[61] For example, one detained Iraqi militant claimed to have overheard the Lebanese Hizballah and IRGC instructors talking about the fact that Iraqis train in Lebanon for paramilitary training and that this training is far superior to the training conducted in Iran.  IR001 and IR005.

[62] IR012

[63] Hendawi, Hemza and Qassim Abdul-Zarra "Hezbollah said to train Shiite militiamen in Iraq" *Associated Press* July 1, 2008

69

in Iran were the secret LH.  If ███ was in Iraq it would not be for a trip, ███ would only go to do secret LH work ███ spoke Iraqi dialect very well but it was still apparent that ███ was Lebanese.[64]

Despite the evidence of Lebanese Hizballah trainers inside Iraq, it is dangerous to assume that groups in Iraq operating under the name "Hizballah" are tied to the Lebanese group.  Several Iraqi organizations claim the moniker, but it is not clear whether or not they have a true command and control relationship with Lebanese Hizballah, or are just imitators.

**Conclusions**

Iran's extensive training programs for Iraqi militants offer Iran a way to influence the rate and scope of violence in Iraq without risking direct involvement. Employing Lebanese Hizballah trainers provides additional insulation and ameliorates the cultural tension between nationalist Iraqi militants and their Iranian sponsors.  The tension between Iranian trainers and Iraqi militants partly explains why Iran prioritizes support for its political allies in Iraq.  Iran's militia allies do not trust their Iranian suitors, and it is likely that Iran has very little confidence that the JAM and SGC fighters they train are willing to pursue Iran's political interests.

This tension offers the Iraqi and U.S. governments an opportunity to divide the militia members from their Iranian partner.  By offering militia members legitimate ways to participate in the Iraqi economy and local security forces, it may be possible to drive a wedge between Iran and its insurgent partners in Iraq. Insurgent rehabilitation programs will be a key part of any long-term reconciliation program in Iraq. To be effective, the Iraqi government must organize and maintain such a program.  In the short term, however, the Iraqi government will probably not pursue a Shi'a reconciliation program.  The Dawah and ISCI political parties that control the Iraqi government will be loath to cooperate with difficult-to-control militia members with ties rival politicians, including Moqtada al-Sadr. Nonetheless, without a procedure for incorporating JAM and SGC members into the legitimate social and economic system, and leaders like Moqtada al-Sadr into the political process, Iraq will remain inherently unstable even if violence subsides.

---

[64] See IR005.

PX212

> "Thus the expert at getting the enemy to make his move shows himself, and the enemy is certain to follow.  He baits the enemy, and the enemy is certain to take it.  In so doing, he moves the enemy, and lies in wait for him with his full force."
>
> *The Art of War*
> Sun Tzu

## Chapter 4
## Iranian Lethal Aid in Iraq

U.S. officials continue to claim that they have compelling evidence directly linking Iran with the provision of weapons and munitions to insurgents in Iraq.[1] Iran staunchly denies these claims, and counters that they are desperate attempts by the United States to recast responsibility for failure in Iraq.  Both sides are engaged in a public relations war: Iran to prevent the U.S. from catalyzing international condemnation of its meddling in Iraq, the U.S. to convince Arab states and others to respond to Iran's activities and also to offer skeptical audiences globally an explanation for slow progress in Iraq.

Iran does acknowledge that Iranian weapons have been discovered in Iraq, but claims they are either left over from the 1980-1988 Iran-Iraq war or were purchased on the open market.  Iran also stresses that many countries produce weapons and munitions similar to those made in Iran—*e.g.*, the ubiquitous 107mm rocket—and claims that such ordnance found in Iraq is often mistakenly or purposely assessed to be Iranian.  The Tehran-based Fars News Agency published an article in late May 2008 titled, "U.S. Unable to Prove Allegations against Iran," that illustrates Iran's basic argument:

> The US military command in Iraq continues to talk about an alleged pipeline of Iranian weapons to Iraqi Shi'as opposing the US occupation, implying that they have become dependent on Iran for indirect-fire weapons and rocket-propelled grenades (RPGs).  But US officials have failed thus far to provide evidence that would support the claim, and a long-delayed US military report on Iranian arms is unlikely to offer any data on what proportion of the weapons in the hands of Shi'a fighters are from Iran and what proportion comes from purchases on the

---

[1] Rubin, Alissa "Iran Halts Talks With US on Iraq" *The New York Times* May 6, 2008. See Kagan, Kimberly "Iran's Proxy War against the United States and the Iraqi Government" published by The Institute for the Study of War and www.weeklystandard.com for a comprehensive assessment using publicly available information linking Iran with the provision of lethal aid to militants in Iraq through 2007.

71

**PX212**

open market…  Bergner's [Brigadier General Bergner, MNF-I Spokesman] refusal to address that question reflects a fundamental problem with the US claims about Iranian weapons in Iraq: there are indeed no Iranian rockets and mortars, and RPGs in the Mahdi Army's arsenal of stand-off weapons.[2]

Claims of Iran's malign influence in Iraq are echoed by other Coalition Force members.  In late April 2008, following a sharp increase in violence attributed to Iranian backed Shi'a militias, British Defense Secretary Browne explained to lawmakers in London, "There is evidence to suggest a significant proportion of the equipment and the armaments being used by insurgents used in Iraq is of Iranian origin or has been transited through Iran."[3]   However, such accusations are met with similar dismissals as those coming from U.S. officials.  Almost immediately after Browne's remark, Iranian Foreign Ministry Spokesman Mohammad Ali Hosseini responded, "Lambasting such undocumented and fabricated allegations which are to create negative impacts are to serve the policies of the occupying forces."[4]

The Iraqi government – generally reluctant to publicly confront its Persian neighbor – has also voiced its concern over Iran's nefarious destabilizing activities within its borders.  Significantly, Iraq's Prime Minister Nuri al-Maliki visited Tehran and President Ahmedinejad in June 2008.  He is believed to have personally presented evidence of Iranian support to rogue Shi'a militias and demanded that Tehran cease such egregious violations of Iraqi sovereignty.[5]

Iran has been successful parrying these accusations, especially those coming from U.S. officials.  In the wake of the United States' false claims about Iraqi WMD, many in the media and international community are understandably suspicious of U.S. claims about Iranian weapons arriving in Iraq.  Proof of such activities is further complicated by Iran's extensive influence at the local government and ministerial level in the southeastern border provinces where much of the aid arrives.  Despite Iranian protests, however, there is clear evidence of Iranian support to Iraqi militias, including many weapons

---

[2] See "US Unable To Prove Allegations Against Iran" Tehran *Fars News Agency* May 25, 2008

[3] "UK says 'significant proportion' of Iraqi insurgent weapons come from Iran" *Associated Press* April 28, 2008

[4] *Tehran Times* April 29, 2008

[5] This visit was widely reported in the media. See Kramer, Andrew  "Iraqi Prime Minister May Discuss Allegations in Iran Visit" *The New York Times* June 10, 2008  available at http://www.nytimes.com/2008/06/03/world/middleeast/03iraq.html

PX212

manufactured after the Iran-Iraq war, some of which were produced after the 2003 invasion.[6]

Iranian lethal aid to militias in Iraq is not surprising.  Though often characterized as the behavior of an irrational or aggressive regime, Iran's program to support Iraqi militants is a product of realpolitik rather than Islamist ideology.  From Iran's perspective, the U.S. presence in Iraq is inherently threatening.  Iran's support for Iraqi militias is entirely rational considering its strategic position, relationship with the U.S., and history.  Before the U.S. invasion of Iraq, U.S. planners should have predicted and planned for the range of activities Iran conducts today.

Conceding the rationality of Iran's strategy and behavior in Iraq does not mean those activities should be acceptable to Iraqi or U.S. policymakers.  Indeed, Iran's meddling in Iraq poses a real threat to the national security of both countries and must be countered forcefully and, in some cases, violently.  Nonetheless, it is important to recognize the cold-hearted realism at the center of Iran's present Iraq strategy because it suggests that a combination of well-placed sticks and creative carrots are capable of changing Iranian behavior.

Targeting the IRGC-QF linked logistical networks funneling weapons into Iraq is particularly important.  The most famous, and perhaps the most important, is led by Abu Mustafa al-Sheibani, the former Badr Corps commander in Baghdad.  But there are others, including a largely criminal network run by Ahmad Sajad al-Gharawi in Maysan Province.[7]  The most important indicators of Iranian support involve the infamous and highly lethal Explosively Formed Penetrators, which have been employed in increasing numbers in Iraq since they were first observed in 2004.  Other particularly compelling evidence of Iranian support is found in the indirect fire and IED attacks on Coalition and Iraqi Security Forces using rockets, mortars, and explosives believed to have come across the border from Iran.

**Smoking Guns or Smoke and Mirrors?**
The complexity of international arms markets and the legacy of warfare between Iran and Iraq complicate efforts to assess the scope of Iranian lethal aid in Iraq.

[6] Brigadier General Kevin Bergner, Deputy Chief of Staff for Strategic Effects, MNF-I provided many details of Iran's lethal aid in regular press briefings such as the one he provided to the press on September 13, 2007.
[7] Gordon, Michael and Scott Shane "US Long Worried That Iran Supplied Arms in Iraq" *The New York Times* March 27, 2007

73

PX212

Many of the Iranian weapons scattered across Iraq do appear to have been left in Iraq during the Iran-Iraq War in the 1980s.[8]  Caches recovered by Coalition Forces in Iraq include older weathered munitions that likely have been in the ground for some time.[9]  Likewise, some reports erroneously attribute munitions similar to those produced in Iran as Iranian, while other Iranian munitions found in Iraq were likely purchased on the open market.[10]

Imprecise reporting and claims that are not clearly substantiated about Iranian weapons backfire against U.S. forces and make Iran's public denials seem more compelling.  For example, Coalition Force officials and numerous accounts in the media report that Iran purchases arms from China and smuggles them to Shi'a militias in Iraq for use against Coalition Forces.[11]  But since many Chinese manufactured weapons closely resemble models made in other countries, it is difficult to determine the source of the weapons. [12]  Such problems make identifying the exact number of Iranian weapons in Iraq very difficult.  To

---

[8] Based on author review of  photos accompanying multiple Coalition Force cache reports and expert assessments provided by MNF-I Explosives Ordnance Disposal personnel.

[9] Photos accompanying multiple cache reports include rusty munitions and unserviceable weapons all of which appear to be left over from conflict long passed.

[10] See Appendix A for a compilation and assessment of caches recovered by Coalition and Iraqi Security Forces containing suspected Iranian weapons and munitions. Iran openly markets its arms and munitions. See http://www.diomil.ir/ for the Defense Industries of Iran website. This site even offers to allow purchases of lethal munitions by credit card!  Significantly, many of the photos of Iranian munitions such as mortar rounds and rockets provided on this open site closely match photos of munitions recovered in Iraq.

[11] MNF-I spokesman Admiral Mark Fox press briefing July 22, 2007. See also Tkacik, John "China's Secret Arms Dealings" *The Weekly Standard* August 8, 2007.

[12] For example, in 2005 Iran purchased 800 Steyr .50 caliber HS sniper rifles from Steyr Mannlicher GmbH, an Austrian precision weapons company. According to Austrian officials, the weapons were originally purchased for use by the National Iranian Police Organization, ostensibly to support counter narcotics smuggling operations.  In February 2007, press accounts claimed that Coalition Forces recovered over one hundred sniper rifles in Iraq and were initially reported to have been traced to this same Iranian purchase.  US officials subsequently denied finding Austrian made sniper rifles in Iraq. Interestingly,  a number of accounts from Iraqi militants that trained in Iran in 2007 acknowledge receiving familiarization training on a rifle that closely resembled the Steyr .50 caliber HS sniper rifle – the same model legally purchased by Iran in 2005. Steyr Mannlicher company notes that the patent on this sniper rifle had expired-thus it is a possibility that the rifles of alleged Austrian origin were in fact made elsewhere and potentially China.  See Harding, Thomas "Iraqi Insurgents Using Austrian Sniper Rifles in Iraq" *Telegraph Newspaper* February 14, 2007 available at http://www.telegraph.co.uk/news/worldnews/1542559/Iraqi-insurgents-using-Austrian-rifles-from-Iran.html.  See also Brummet, Chris "Pace Questions whether Iran Arming Iraq" *The Washington Post* February 13, 2007.  See IR 013 for Iraqi militants' accounts claiming to have trained on the Steyr at paramilitary camps in Iran.

PX212

strengthen their credibility, U.S. officials should remain silent on issues of Iranian weapons in Iraq unless they can provide clear evidence substantiating their claims.

*Alleged Iranian Weapons Caches*

According to Coalition and Iraqi Security Force reporting, a total of 20,067 caches containing a combination of weapons, explosives, and/or munitions were recovered in Iraq between January 2004 and June 2008.[13]  Beginning with reports from July 2006, MNF-I flagged caches with suspected evidence of Iranian weapons and munitions.  The number of Iranian-linked weapons in each cache range from a single item to much larger collections with enough weapons and ordnance to supply multiple major operations.  The MNF-I reporting indicates that nearly 200 caches with weapons and/or munitions suspected to have originated in Iran were discovered in Iraq between July 2006 and May 2008.[14] This number increased markedly over those two years, going up from nine caches in the six month period between July 2006 and December 2006 to 98 reported caches from January to May 2008.

*Figure 5: Iranian Weapons Caches Reported July 2006- May 2008[15]*

| Event | July-Dec 2006 | Jan-Jun 2007 | July-Dec 2007 | Jan-May 2008 | July06-May08 |
|-------|---------------|--------------|---------------|--------------|--------------|
| Cache | 9 | 43 | 47 | 98 | 197 |

*Coalition Efforts to Confirm Origin of Iranian Weapons/Munitions*

Due in part to the increasing concern over suspected Iranian provision of lethal aid, in January 2008 MNF-I stepped up its efforts to confirm the accuracy of

---

[13] This data is extracted from Unclassified information in the SIGACTS 3 Database maintained by MNF-I and compiled in support of the Empirical Studies of Conflict (ESOC) project co-hosted by the US Military Academy and Princeton University.

[14] This number is compiled from Unclassified fields extracted from data maintained by MNF-I. This data also includes indirect fire attacks and IED attacks believed to involve Iranian munitions. It is likely that additional incidents with possible Iranian connections occurred that were not reported and that a number of the events involve vintage Iranian weapons, weapons similar to Iranian models,  or those purchased on the open market. The list does not include some types of weapons and munitions including most EFPs.  Additionally, Coalition Forces have not focused on data collection related to Iranian influence in Iraq until recently; thus, there are bound to be reporting inaccuracies.

[15] This unclassified information is consolidated from Coalition and Iraqi Security Forces reporting and provided to author by MNF-I's Iranian weapons task force.

PX212

Coalition Force reports of Iranian weapons and munitions found in Iraq.[16] Explosives Ordnance Disposal personnel from MNF-I's Iranian weapons task force—highly trained experts particularly skilled at determining the origins of weapons and ordnance—began physically assessing caches with contents of suspected Iranian origin.  After January 2008, all caches were evaluated by experts from the task force to assess the source and production date of the materials found and, in particular, whether or not the cache contained Iranian munitions produced after the 2003 U.S. invasion of Iraq.[17]

Based on the findings of this expert assessment, MNF-I reported that Iranian munitions were recovered in 166 incidents between 1 January and 23 May 2008.[18] Of these incidents, 85 were determined to include weapons and/or ordnance produced in 2003 or later and 28 incidents had sufficient evidence to determine they were manufactured before 2003.  The remaining 53 recorded incidents were deemed not to have sufficient information to determine when the weapons and munitions were produced.[19]

---

[16] July 3-5, 2008 author interviews with munitions experts from MNFI's Iranian weapons task force, Baghdad Iraq.

[17] MNFI's Iranian weapons task force's methodology for categorizing caches identified contents that were produced before 2003 and after.  Importantly, the task force pointed out during an author visit to the Headquarters on 3 July 2008 that weapons provided by Iran to militants in Iraq after the 2003 invasion could still have an earlier manufacture date and could even be weapons and munitions made in countries other than Iran.

[18] MNFI's Iranian weapons task force's munitions experts broke these incidents down further to include the categories of "caches"—which are weapons and munitions being intentionally stored in Iraq  and "Enemy Remnants of War" (ERW)—which are weapons and munitions that are not believed to be left behind  intentionally in Iraq. Author interview with task force personnel 3-5 July 2008.

[19] These cache and Enemy Remnants of War  incidents were still determined to have some evidence of Iranian weapons and/or munitions despite the lack of sufficient information to determine the manufacture dates.

PX212

An example of reporting from this database of Iranian-linked caches found in Iraq between January and May 2008 is included below:

| Date | Region | Contents |
|------|--------|----------|
| 5 May 2008 | Southeast | 2x Iranian PG-7-AT, 5x Iranian PG-7-AT-1, 2x Iranian 120mm mortar, Lot 1/2008, 2x Iranian 81mm mortar, Lot 2/2008, 3x Iranian 107mm rocket, and 102x Iranian C-4, 2x 8" directional frag, 1x 24" incomplete EFP, 11x EFP arrays encased in foam, 3x improvised claymores, 1x fuel canister encased in foam, 10x 4" copper EFP, 3x 6" steel EFP, 48x 6" copper EFP, 9x 8" copper EFP, 3x 8" Steel EFP, 23x 10" copper EFP, 3x 10" steel EFP, 4x 12" copper EFP, 30x 14" copper EFP, 3x PIR lenses, 8x EFP telemetry devices, 6x camera flash slave unit, 2x firing pack, 1x time regulator, 10x timing connectors, 1x DTMF 20B board, 1x washing machine timer, 3x power distribution unit, 2x 12v motorcycle battery, 3x Snya box, 1x US-military RF tracking tag - 5357804 |

The complete data collected on the 166 incidents where Iranian weapons/munitions discovered in Iraq between January and May 2008 is available as Appendix C.

*Explosively Formed Penetrators*
The most lethal Iranian supplied weapons are the Explosively Formed Penetrators, rounded copper and steel IEDs.[20]  The key component of most EFPs are the precision made copper disks that form a molten slug when detonated that can slice through even the most hardened armored vehicles.  EFP incidents are widely considered the most undeniable and overt manifestations of Iranian influence.  The technology required to manufacture the copper warheads for these deadly weapons is believed to be Iranian, and not available in Iraq.[21]

---

[20] See Gordon, Michael R. "The Deadliest Bomb in Iraq is made in Iran, US Says" *The New York Times* February 10, 2007

[21] Anecdotal evidence indicates broad concern that Iran's surrogate militias may succeed in developing an EFP production capacity within Iraq using Iranian made presses for the critical copper disk components of the EFP.  This would be consistent with Iran's concerted efforts to maintain plausible deniability for its role in sponsoring attacks in Iraq.

PX212

According to Iraqi intelligence documents, Iranian-backed militias have been using rounded IEDs inside Iraq since at least 2001.  Indeed, the networks used to smuggle Iranian EFPs into Iraq today were probably largely in place long before the U.S. invasion.  One of the most important EFP smugglers today, Abu Mustafa al-Sheibani, was a core Badr Corps member in the 1990s, working to attack and weaken Saddam Hussein's regime.  Today, EFPs have become the weapon of choice of Iranian supplied militants in Iraq.[22]

Figure 6 provides the number of EFP attacks and attempted attacks recorded each month from January 2005 through June 2008. [23]



*Figure 6: EFP Incidents January 2005- May 2008*

Attacks vary by week but show a significant upward trend over time.  Many of the spikes depicted in Figure 6 correspond to significant political/security related

---

[22]  The total number of Coalition Force casualties attributed to EFP attacks is not publicly releasable.

[23] These EFP incidents include those that detonated as well as those found and cleared. They do not reflect currently classified information on casualties attributed to these attacks. These figures are aggregated from Coalition Force reporting  and compiled by Colonel Lee Ewing Commander's Initiatives Group at MNF-I.

PX212

events.  For example, the increase in EFP attacks in the fall of 2005 occurred during the run up to the December 15 parliamentary elections.  The upward trend of EFP attacks beginning in early 2007 and extending through late summer corresponds to the arrival of the additional U.S. combat brigades making up the "surge" of forces in Iraq.  The number of EFP attacks—like other insurgent attacks—dropped precipitously in mid-2008, shortly after a spike that coincided with the U.S. and Iraqi push into Sadr City.

The large majority of EFP attacks/attempts occur in Baghdad.  Indeed, 67 percent of the 623 EFP incidents recorded in 2007 were clustered within Iraq's capital city.  Figure 7 shows the number of EFP incidents by province in 2007.[24]

*Figure 7: EFP Incidents in 2007*[25]

| PROVINCE | # EFP Incidents 2007 | % of Total Incidents |
|---|---|---|
| Baghdad | 417 | 66.9% |
| Babil | 53 | 8.5% |
| Basra | 50 | 8.0% |
| Qadisiyah | 38 | 6.1% |
| Dhi Qar | 29 | 4.7% |
| Diyala | 9 | 1.4% |
| Wasit | 7 | 1.1% |
| Ta'mim | 7 | 1.1% |
| Maysan | 4 | 0.6% |
| Karbala | 3 | 0.5% |
| Ninawa | 2 | 0.3% |
| Sal al Din | 2 | 0.3% |
| Muthanna | 2 | 0.3% |
| **Total** | 623 | 100% |

In the first four months of 2008, EFP incidents were clustered almost exclusively in Baghdad, which saw almost 90 percent (202 out of 228) of the total reported EFP incidents.[26]  The concentration of EFPs in Baghdad is not surprising.  EFPs

---

[24] These figures include both EFP attacks executed as well as EFPs found and cleared by Coalition and/or Iraqi forces prior to being employed.

[25] The unclassified information indicating the place and location that an EFP related incident occurred is extracted from Iraqi and Coalition reporting in MNF-I SIGACTS III and provided by Colonel Lee Ewing, MNF-I Commander's Initiatives Group.

[26] MNF-I reporting provided by Colonel Lee Ewing.

PX212

are used primarily against U.S. forces, in part because U.S. forces use more heavily armored vehicles which require a more advanced weapon to destroy. Iraq's Shi'a militias are concentrated in Baghdad and in Iraq's southern provinces, where there are fewer U.S. forces.  Baghdad, therefore, is the venue where Shi'a militias are likely to have the strong logistical infrastructure and access to U.S. troops they would need to make use of EFPs.  As U.S. troops move further south and east, EFP attacks will likely proliferate geographically, if not in overall number.

Nonetheless, U.S. and other Coalition Forces are not the only victims of EFP attacks.  Militias have used EFPs for a number of high profile attacks and assassinations on Iraqi officials and Iraqi Security Forces, including the August 20, 2007 assassination of Governor Muhannad al-Hassani; the October 4, 2007 assassination of Mayor Abbas Kafaji of Iskandariyah; and the December 9, 2007 assassination of Iraqi LTG Qais Hamza Aboud al Mamuri.[27]

*JAM and SGC Accounts of Iranian Lethal Aid*
After being captured, JAM militiamen, SGC fighters, and other militants have described the nature and scope of Iranian weapons smuggling into Iraq.  The following quote is from a U.S. intelligence report paraphrasing a captured SGC member's description of his interaction with weapons smugglers bringing Iranian-supplied weapons into Iraq:

> The SG (Special Groups) weapons smugglers often spoke of receiving EFP shipments from Iran through Basra, Amara, and Diwaniyah.  The weapons are being smuggled from Iran into Iraq by trucks hauling sheep, cigarettes, and cement…   The weapons smuggled into Iraq through Basra, Amara, and Diwaniyah are taken to Sadr City and distributed to SG in outlying provinces from Sadr City.[28]

Another detained Iraqi militant familiar with weapons smuggling activities, described an area in the marshes next to the Iraqi border town of Qal 'at Sali, southeast of Amara, as a primary thoroughfare for Iranian weapons and other contraband.  The following quote is from a U.S. intelligence report paraphrasing the militant's description of events:

---

[27] This list is not exhaustive and was compiled from press reports.  Notwithstanding high profile assassinations of Iraqi officials, EFP attacks are almost always used against CF targets.  Evidence of this is seen in the lack of attacks on Iraqi Army units moving in to Sadr City in May 2008 as well as in Amara in June 2008.
[28] This is a summary account from a US Intelligence Report.  See IR026.

PX212

> This area (marshes vicinity Qal 'at Sali) is used heavily by small boats carrying weapons from IR (Iran). The boat handler's [*sic*] most likely use the same drivers each trip and make arrangements prior to leaving IR (Iran). Drugs and contraband are smuggled into IZ (Iraq) by the same routes. The area is dangerous and everyone carries weapons even while fishing. The boats carrying weapons are covered with reeds and are easily hidden. The boats can be unloaded anywhere along the shoreline, and the weapons are placed in the beds of pickup trucks, which are then covered with bundles of reeds. Most smugglers use local dirt roads to avoid CF (Coalition Force) checkpoints.[29]

The marshy areas on Iraq's southeastern border described in the above account and allegedly used to smuggle lethal aid from Iran is mentioned frequently by Iraqi militants when asked how weapons, munitions, and other lethal aid are brought into Iraq from Iran. Other militants' accounts describe overland border crossings as especially porous and with officials on both sides susceptible to the inherent corruption associated with illicit smuggling activities.

**Conclusions**

General David Petraeus, former Commanding General of MNF-I, emphasized to U.S. lawmakers in his April 2008 Senate testimony that malign Iranian influence is the most significant long-term threat to the security of Iraq.[30] And such influence is unlikely to stop any time soon. The decline of EFP incidents after May 2008 highlights a general decline in violence, but it is very unlikely that Iran has abandoned its program to fund and support Iraqi militias. Rather, the decline is probably associated with a concerted effort to minimize violence during the SFA/SOFA negotiations. The Iraqi government has taken a firmer stand against Iranian meddling in 2008 than in previous years, but even a concerted Iraqi government effort will not staunch a dedicated program to smuggle weapons across the border. It is important to remember that Iran was able to effectively sponsor Iraqi militants even during the authoritarian Saddam era

Iranian support to Iraqi militants will continue even if Iran is able to achieve its core political goals via the Iraqi political system. Funneling weapons across the border will remain a useful hedge against unforeseen political developments in Iraq. Indeed, supporting Iraqi militias should be considered a core element of

---

[29] IR 027.
[30] General Petraeus' Senate Testimony April 8, 2008 available at
http://www.senate.gov/~foreign/testimony/2008/PetraeusTestimony080408p.pdf

PX212

Iranian grand strategy.  Essentially, Iran has engaged in similar behavior since the 1979 revolution.  There was no reason to believe that Iran would have stopped with the arrival of U.S. forces in Iraq—and no reason to believe it will stop if they leave.

The challenge for the Iraqi government is both a function of supply and demand. Obviously building a comfortable, cooperative relationship with its Eastern neighbor is important to limiting nefarious Iranian meddling, but so must be integrating potential militants into Iraq's legitimate political and economic systems.

82

PX212

> **"So to win a hundred victories in a hundred battles is not the highest excellence; the highest excellence is to subdue the enemy's army without fighting at all."**
> *"The Art of War"*
> Sun Tzu

## Chapter 5
## Findings and Recommendations

KEY FINDINGS

**Iran's primary mode of influence in Iraq is to maintain strong ties to friendly Iraqi political parties.**  It is entirely possible that in five years Iran will have more influence in Baghdad than the United States.  The core members of the Islamic Supreme Council of Iraq (ISCI), the Badr Organization, and the Dawah Party were organized, supported, and trained by Iran during their twenty years in exile.  Iranian ties to these leaders are political, religious, and personal.  Many of the Iraqi members of these organizations called Iran home for two decades, speak Farsi, and embrace Persian culture.  Nonetheless, despite continued financial support from Iran, neither ISCI/Badr nor Dawah is an Iranian proxy.  Many ISCI/Badr and Dawah leaders retain a strong nationalistic and personal connection to their Iraqi homeland.  Iran fears their Iraqi allies' growing relationships with the United States and, more importantly, their electoral-driven need to appeal to Iraqi nationalism.  Despite these fears, Iran has repeatedly supported the electoral process in Iraq as a means to emplace its allies in positions of power, and has pressured its anti-government allies—including Moqtada al-Sadr—to cease militant activities that would fundamentally disrupt the political process.

**Iran has achieved many of its core goals in Iraq.**  Iran has achieved its most important strategic successes in Iraq without violence.  In the January 2005 General Assembly elections, SCIRI/Badr won control of nine of the eleven Shi'a dominated provinces.  The Iraqi constitution approved later that year weakened the central Iraqi government in favor of Iraq's provinces.  Now, the government of Iraq is actively dismantling al-Sadr's militia, which limits the electoral viability of Iraq's most nationalist Shi'a political party.  By doing so, Iran and its Iraqi political allies have effectively circumscribed Iraq's central government in ways that will enable Iran to exert considerable pressure and authority over Iraq's southern provinces.

PX212

**Iran provides training and weapons to various Iraqi militias, including Moqtada al-Sadr's Jaysh al-Mahdi (JAM) and the Special Group Criminals (SGCs).**  Like the United States, Iran did not fully anticipate the role that nationalist—anti-American and anti-Iranian—militias like JAM and the SGCs would play in post-invasion Iraq.  Nonetheless, Iran uses the Islamic Revolutionary Guard Corps (IRGC) and the Qods Force to provide extensive training programs for Iraqi militants inside Iran.  Both JAM and SGC members have deep reservations about working with Iran, but they accept Iranian support because they are adamantly opposed to the U.S. presence in Iraq, power-hungry, and sometimes criminal.  For Iran's part, its support for the militias serves as a hedge against the central Iraqi government growing too powerful or too close to the U.S.  Iran enjoys being able to pressure the United States militarily while simultaneously empowering its political surrogates, ISCI/Badr and parts of the Dawah Party, to work with the U.S. through the Iraqi government.

**Iran's training program for Iraqi Shi'a militias is robust.**  Iraqi militants captured by the United States describe a complex Iranian program equipped to illicitly move, train, and arm Iraqis.  Classes range from basic weapons courses and paramilitary training to courses designed to create Iraqi master-trainers that can continue military education and training inside Iraq.  Iran employs Lebanese Hizballah agents as trainers inside Iran and sponsors Iraqi militants' travel to train with Hizballah in Lebanon.  Many Iraqi militants prefer the Lebanese Hizballah trainers to Iranians because they speak fluent Arabic, are deemed more polite than Iranians, and are often considered better instructors.  Militants that had attended Iranian sponsored training conducted by Hizballah in Lebanon considered it to be more advanced training than the Iran-based classes.

**Iran's strategy and violent activities in Iraq today are derivative of Iranian covert activities in Iraq in the 1980s and 1990s.**  Iran has looked to export the ideals of the Iranian Revolution since 1979.  Those efforts were thwarted in the 1980s primarily by Saddam Hussein, whose 1980 invasion of Iran required the regime's full attention.  During the Iran-Iraq war, Iran sponsored numerous Iraqi opposition movements, the most important of which was the Supreme Council for Islamic Revolution in Iraq (SCIRI, which subsequently became the Islamic Supreme Council of Iraq (ISCI)) and its militia, the Badr Corps.  The Badr Corps launched guerilla attacks against Iraqi forces and the Mojehadin-e-Khalq (MKO), an anti-Iranian terrorist group sheltered in Iraq.

**There are deep, personal ties between Iranian-linked militants in Iraq and Iraqi politicians.**  Several senior figures in the Badr Corps from the 1990s,

84

PX212

including Abu Mustafa al-Sheibani and Abu Mahdi al-Muhandis, are central figures in the logistical networks funneling highly lethal EFPs and other Iranian weapons to Iraqi militia groups.  Al-Muhandis is also wanted for bombing the U.S. embassy in Kuwait in 1983.  Many members of the Iraqi parliament were deeply integrated into the Badr Corps in the 1980s and 1990s, including Hadi al-Ameri, head of the Badr Organization today and the former Chief of Staff for Abu Mahdi al-Muhandis.

**Iran wants to force U.S. troops out of Iraq, but so long as Americans remain, Iran will use direct access to U.S. forces to attempt to deter a strike against its nuclear facilities.**  The U.S. presence in Iraq and Afghanistan leaves Iran feeling cornered.  Forcing U.S. troops out of Iraq will relieve some of that pressure and open the door to increased Iranian influence in Iraq.  If unable to evict U.S. troops from Iraq, Iran will likely leverage its ability to inflict casualties on American forces and use this credible threat to deter any possible U.S. strike against Iranian nuclear facilities.  By demonstrating its ability to kill U.S. troops and undermine Iraqi civil society, Iran will try to show it can strike back if its nuclear sites are threatened.

**Iraqi politicians will not ratify a Strategic Framework Agreement or Status of Forces Agreement with the United States before the Iraqi provincial elections.**  No elected Iraqi official wants to publicly support a continued U.S. presence in Iraq.  Although many Iraqi politicians depend on the U.S.-backed system for power, and many Iraqis trust U.S. troops more than their own government, overt and public support for continued U.S. presence is politically untenable.  U.S. officials should expect that Iraqi politicians will try to postpone any final SFA/SOFA agreement until after provincial elections.

**Iran will try to retain a non-governmental militant capability in Iraq, no matter how friendly the Iraqi government becomes.**  Iran sees no contradiction in working with both the Iraqi government and continuing to sponsor violent militias capable of inflicting violence inside Iraq's borders.  Actual violence perpetrated by Iran's surrogate militants will subside as U.S. forces leave; nevertheless, Iran will still strive to maintain a responsive capacity to "dial up" violence levels as conditions demand.  Iran worries about the possibility of a Sunni uprising or power grab, will want to pressure any U.S. troops that remain in Iraq, and will seek to maintain covert networks for conveying goods and personnel across Iraq.  These networks will likely be built from existing SGC networks, which tend to be more criminal in nature than JAM, which has a more

PX212

ardently nationalist ideology.  Iran will likely provide these personnel with advanced military training, ideological courses, and high financial compensation.

**Resurgent Iraqi nationalism will challenge Iranian influence efforts.**  Iranian influence is strongest when Iraqi Shi'a can rally around a common enemy or shared grievance—formerly the oppression of Saddam's Bathist regime and now the occupation of Iraq by U.S. forces.  However, Iranian support will lose its base of appeal without a common foe.  The accounts of Iraqi militants that have been trained, equipped, and armed by the IRGC-QF and their surrogates are rife with passages describing altercations and tensions with their Iranian sponsors.  These underscore many of the tensions that exist between JAM, SGC, and their Iranian cadres.  Although Iraqi Shi'a militants and their Iranian sponsors have a shared religion and common interest in ending the occupation of Iraq by American and Coalition Forces, their historical animosities, exacerbated by cultural and ethno-linguistic cleavages, belie a tension that will challenge any long-term relationship between Iran and its Iraqi Shi'a counterparts.  This dynamic is likely to become more dysfunctional with the strengthening of the Iraqi central government and the reduction of U.S. troops in Iraq.

**Iranian influence in Iraq is inevitable and, in many cases, constructive.**  Iranian influence in Iraq will persist as long as these countries share a border.  This influence will be productive so long as it is channeled into a force for stability and economic growth.  Tourism, religious visits, and other cross-border relations bring needed revenue, and even the presence of Iraqi politicians with strong links to Iran does not necessarily undercut Iraqi sovereignty or security.  These politicians will serve an important moderating function when the inevitable disputes between Iran and Iraq arise.

## KEY RECOMMENDATIONS

**Attack Iran's strategy with a strategy.**  Whether designed as such or not, Iran's lethal aid for JAM and SGC has obscured its political support for ISCI/Badr and its effort to extend influence in Iraq's southern provinces by weakening the Iraqi central government through the political system.  Military gains against JAM and the SGC are important successes, but these triumphs will be pyrrhic if not coupled with a focused strategy to constrain Iranian influence in the Iraqi political system.  Defeating Iranian-backed militias while conceding creeping Iranian influence over the Iraqi government may actually reduce violence in Iraq, but this strategy does not serve U.S. or Iraqi long-term interests.  The U.S. needs a comprehensive strategy to counter all aspects of negative Iranian influence.  At

86

PX212

its heart, this strategy requires clearly delineating which forms of Iranian influence are unacceptable, which are tolerable, and which should actually be encouraged.

**Exploit common ground with Iran through diplomacy.**  The United States and Iran are not engaged in a zero-sum game in Iraq.  Both countries want greater stability and democracy, as well as a reduction of U.S. troops.  Neither Washington nor Tehran wants a hostile relationship that could lead to unnecessary conflict.  There are serious disagreements over the quality of the emerging democratic government in Iraq, as well as the pace of U.S. troop withdrawals.  In part <u>because</u> of the latent threat of the U.S. military, Iran will likely view it in its interest to engage the U.S. as well.  Clearly, Iran crosses a red line by providing support to Iraqi militias targeting U.S. troops.  Nonetheless, the conflict is compounded by misunderstanding and excess fear on both sides.  The overlapping interests provide space for compromises in which all sides' interests are better met than with the *status quo*.  Establishing better communications channels and mechanisms to exercise prudent diplomatic measures are key to more accurate assessments of interests and intentions on both sides.

**Circumvent Iran's hardliners.  Negotiate with its pragmatists.**  The Iranian state is not uniform.  Although IRGC-QF clearly works with the acquiescence of Iran's Supreme Leader, there are influential politicians in Iran that have a more pragmatic outlook on the United States.  Many of these leaders are wary of the U.S., but open to peaceful interaction.  The U.S. should seek opportunities to communicate with such leaders via Track 2 dialogue and other unofficial means where compromises and concessions can be discussed and allow those Iranian pragmatists to demonstrate the potential viability of peaceful interaction.

**Offer Moqtada al-Sadr and his followers incentives to participate in the Iraqi political process.**  Moqtada al-Sadr is volatile, but for millions of Iraqis, he is the bulwark of nationalism.  The United States should crackdown on JAM violence, but offer incentives to promote al-Sadr's participation in the Iraqi government; his presence serves as a counterweight to ISCI, BADR and other Iranian-backed groups that favor a hyper-federalized Iraqi state.

**Encourage Prime Minister Maliki's increasingly nationalist views.**  Because Prime Minister al-Maliki comes from a pro-Iranian wing of the Dawah Party, it is likely that at least some of his crackdown on JAM and the SGCs is an effort to improve his party's electoral prospects in the October provincial elections and weaken al-Sadr.  Nonetheless, al-Maliki's willingness to challenge Iran with

87

PX212

evidence of its logistical support for anti-government militias illustrates growing independence from Iran.  The U.S. should support the Prime Minister, particularly against the political machinations of ISCI/Badr, which has deeper ties to Iran.

**Weaken Iranian influence over ISCI/Badr.**  Neither the United States nor Iraqi nationalists have effectively responded to Iranian infiltration of the Iraqi government through ISCI/Badr.  A very limited number of ISCI/Badr members may need to be removed from government for serving as agents of a foreign government, but a more effective long-term strategy is to force ISCI/Badr members to be directly accountable to discrete constituents.  The Iraqi constitution emphasizes political parties rather than independent legislators. Legislation to maximize transparency in government and public financing of political parties would enable and compel ISCI/Badr politicians to be more independent of their Iranian suitor.

**Prioritize targeting IRGC-QF operatives and logisticians in Iraq.**  JAM and SGC militiamen are a mortal danger to Coalition and Iraqi security forces in Iraq, but ultimately policing these rogue militias must be the responsibility of the Iraqi government.  U.S. forces will better leverage their capabilities if they prioritize identifying and targeting Iranian agents that facilitate these militias with training and weapons.

**Aggressively support a program to employ low-level JAM and SGC in Iraq's Security Forces.**  In limited cases, the Iraqi government should officially authorize former JAM and SGC members to support Iraqi Security Forces, in a program aimed at achieving similar successes against Iranian backed militants that the Sons of Iraq program achieved against AQI.  This will require developing prudent amnesty criteria commensurate with the program provided to former Sunni militants in exchange for cooperation and shifting loyalties.  The Iraqi government should also embed professional cadres from the Iraqi Army in any units composed of former JAM/SGC members for command, control, and monitoring.

**Engage Iran with multiple instruments of national power.**  Iran uses multiple aspects of national power in Iraq; the U.S. should use multiple forms to counter the negative portions of that influence.  Reliance on military power alone is insufficient to effectively counter Iran's political and economic strategies.  In fact, employing military power may actually backfire and enhance Iranian influence in regions suspicious of the overt influence of outsiders.  Economic and

88

PX212

diplomatic tools are critical to build stable, transparent institutions in Iraq capable of supporting a strong, independent Iraq.

**Decouple the most contentious issues with regard to Iran**.  The U.S. should take advantage of emerging windows of opportunity—likely after the next American election regardless of the outcome—to pursue a multi-pronged strategy with feasible and incremental objectives as part of the overarching U.S. strategy.  In particular, the U.S. must decouple efforts aimed at addressing Iran's malign activities in Iraq from other contentious issues, including Iran's nuclear program, support for terrorism, and lack of support for the Israeli peace process.  Making progress on any of these issues is desirable and should not be constrained by a requirement to make progress on all simultaneously.[1]  At the same time, the U.S. should avoid cornering Iran without providing constructive options and incentives to make progress, lest the two countries become engaged in a high stakes game of chicken whose dangerous outcome is in neither state's interests.

---

[1] Ray Takeyh develops this point eloquently in his insightful book, *Hidden Iran.*

PX212

# Acronym List

| | |
|---|---|
| CENTCOM | Central Command |
| EFP | Explosively Formed Penetrator |
| IED | Improvised Explosive Device |
| IRGC | Iranian Revolutionary Guard Corps |
| ISCI | Islamic Supreme Council of Iraq |
| JAM | Jaysh al-Mahdi (Mahdi Army) |
| MKO | Mujahdin-e Khalq Oraqnization |
| MNF-I | Multi National Forces—Iraq |
| OMS | Office of the Martyr Sadr |
| QF | Qods Force |
| SCIRI | Supreme Council of Islamic Revolution in Iraq |
| SGC | Special Group Criminals |
| SFA | Strategic Framework Agreement |
| SOFA | Status of Forces Agreement |

90

PX212

PX213



PX213

# Report Documentation Page

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for the collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to a penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

| 1. REPORT DATE **FEB 2009** | 2. REPORT TYPE | 3. DATES COVERED **00-00-2009 to 00-00-2009** |
|---|---|---|

| 4. TITLE AND SUBTITLE **Hard Lessons. The Iraq Reconstruction Experience** | 5a. CONTRACT NUMBER |
|---|---|
| | 5b. GRANT NUMBER |
| | 5c. PROGRAM ELEMENT NUMBER |
| 6. AUTHOR(S) | 5d. PROJECT NUMBER |
| | 5e. TASK NUMBER |
| | 5f. WORK UNIT NUMBER |

| 7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES) **Office of the Special Inspector General for Iraq Reconstruction (SIGIR),400 Army-Navy Drive,Arlington,VA,22202-4704** | 8. PERFORMING ORGANIZATION REPORT NUMBER |
|---|---|

| 9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES) | 10. SPONSOR/MONITOR'S ACRONYM(S) |
|---|---|
| | 11. SPONSOR/MONITOR'S REPORT NUMBER(S) |

12. DISTRIBUTION/AVAILABILITY STATEMENT
**Approved for public release; distribution unlimited**

13. SUPPLEMENTARY NOTES

14. ABSTRACT

15. SUBJECT TERMS

| 16. SECURITY CLASSIFICATION OF: | | | 17. LIMITATION OF ABSTRACT | 18. NUMBER OF PAGES | 19a. NAME OF RESPONSIBLE PERSON |
|---|---|---|---|---|---|
| a. REPORT **unclassified** | b. ABSTRACT **unclassified** | c. THIS PAGE **unclassified** | **Same as Report (SAR)** | **378** | |

**Standard Form 298 (Rev. 8-98)**
Prescribed by ANSI Std Z39-18

PX213

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2104 Mail: Stop IDCC, Washington, DC 20402-0001

ISBN 978-0-16-080817-3

PX213



# HARD LESSONS

## THE IRAQ RECONSTRUCTION EXPERIENCE



PX213

PX213

# Hard Lessons: The Iraq Reconstruction Experience

## Contents

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Key U.S. Figures in Iraq Reconstruction . . . . . . . . . . . . . . xi

Acronyms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

Map of Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xix

Part I: Planning for Postwar Iraq . . . . . . . . . . . . . . . . . . . 1
1. Planning Begins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2. The Agencies Engage . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
3. The Department of Defense Takes Charge . . . . . . . . . . . . . . 32
4. Staging in Kuwait . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
5. ORHA in Baghdad . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Part II: The Coalition Provisional Authority
Leads Reconstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67
6. Charting a New Course . . . . . . . . . . . . . . . . . . . . . . . . . . 69
7. CPA's Shortfalls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
8. Treasury's Triage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
9. Bremer's Grand Vision . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
10. Contracting Billions for Reconstruction . . . . . . . . . . . . . . . 105
11. Restoring Iraq's Capacity to Govern . . . . . . . . . . . . . . . . . . 115
12. Reconstructing Iraqi Security Forces . . . . . . . . . . . . . . . . . . 124
13. Restarting Oil Production . . . . . . . . . . . . . . . . . . . . . . . . . 136
14. Rebuilding the Electricity Sector . . . . . . . . . . . . . . . . . . . . 144
15. Iraq Reconstruction in Transition . . . . . . . . . . . . . . . . . . . . 153

Part III: The U.S. Embassy Takes Charge . . . . . . . . . . . . . .163
16. Negroponte's Revisions . . . . . . . . . . . . . . . . . . . . . . . . . . 165
17. Contingency Contracting and Program Management . . . . . . . 172
18. Building in a War Zone . . . . . . . . . . . . . . . . . . . . . . . . . . 179
19. Iraqi Security Forces and Counterinsurgency . . . . . . . . . . . . 193
20. Elections, Rule of Law, and Fighting Corruption . . . . . . . . . . 203
21. Investigating Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

PX213

**Part IV: Overcoming Roadblocks
to Reconstruction** . . . . . . . . . . . . . . . . . . . . . . . . . . **227**
22. Khalilzad's Adaptations . . . . . . . . . . . . . . . . . . . . . . 229
23. Returning to the Provinces . . . . . . . . . . . . . . . . . . . . . 247
24. The Primacy of Capacity Development . . . . . . . . . . . . . . . 258
25. Reconstruction Amid Sectarian Violence . . . . . . . . . . . . . . 274
26. The Civilian Surge . . . . . . . . . . . . . . . . . . . . . . . . . . 295

**Part V: Lessons Learned** . . . . . . . . . . . . . . . . . . . . . . . . **321**
27. Hard Lessons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323
Afterword: Reforming Contingency Relief and
Reconstruction Operations . . . . . . . . . . . . . . . . . . . . . . . 338

**Annexes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **343**
I. The Genesis and Methodology of *Hard Lessons* . . . . . . . . . . . 345
II. Oversight of Reconstruction Programs and Expenditures. . . . . . . 348

**Acknowledgements** . . . . . . . . . . . . . . . . . . . . . . . . . . **357**

**Notes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **359**

PX213

## Preface

*Hard Lessons: The Iraq Reconstruction Experience* appears virtually upon the five-year anniversary of my appointment as Inspector General in Iraq. Shortly after that appointment, I met with Secretary of Defense Donald Rumsfeld, to whom I reported, to discuss the mission. His first words were: "Why did you take this job? It is an impossible task." I began to understand why he offered so startling a "welcome" during the following week, when I made my first trip to Iraq to begin setting up oversight of the Coalition Provisional Authority (CPA), then in charge of Iraq's reconstruction. My office in the Republican Palace, which housed the CPA—and would later house the U.S. Embassy—was adjacent to the CPA Comptroller's. What I saw was troubling: large amounts of cash moving quickly out the door. Later that same day, walking the halls of the palace, I overheard someone say: "We can't do that anymore. There is a new inspector general here."

These red flags were the first signs of how challenging executing oversight in Iraq would be. But it has not been impossible, chiefly because of the professional, productive, and courageous conduct of the many auditors, inspectors, and investigators who have worked diligently to fulfill the mission of the Office of the Special Inspector General for Iraq Reconstruction (SIGIR).

SIGIR's oversight jurisdiction covers about $50 billion in U.S. funds appropriated by the Congress for Iraq—the largest relief and reconstruction effort for one country in U.S. history. This sea of taxpayer dollars flowed to a wide spectrum of initiatives, ranging from training Iraq's army and police to building large electrical, oil, and water projects; from supporting democracy-building efforts to strengthening budget execution by provincial councils; and from funding rule-of-law reforms to ensuring that the Iraqi government sustains what the U.S. program provided. Some of these initiatives succeeded, but, as this report documents, many did not.

*Hard Lessons* reviews the Iraq reconstruction experience from mid-2002 through the fall of 2008. Like SIGIR's previous lessons learned reports, this study is not an audit. Rather, it arises from our congressional mandate to provide "advice and recommendations on policies to promote economy, efficiency, and effectiveness" in programs created for Iraq's relief and reconstruction.

The report presents a chronological history of the reconstruction program, threading together a number of themes including:

- the enormous challenges that security problems posed for rebuilding efforts

PX213

• Preface •

- the dramatic and frequently reactive course-changes in reconstruction strategy

- the turbulence engendered by continual personnel turn-over at every level

- the waste caused by inadequate contracting and program management practices

- the poor integration of interagency efforts caused by weak unity of command and inconsistent unity of effort.

The text of this report—through vignette, interview, and factual detail—explicates these themes by, in turn, laying out the blinkered and disjointed prewar planning for postwar Iraq; the CPA's large and ultimately too ambitious expansion of the reconstruction program; the security-driven reprogrammings required by the exploding insurgency; the strongly resourced response of the surge; and the rise of Iraq's role in its own reconstruction.

*Hard Lessons* answers some important questions about the U.S. relief and reconstruction program in Iraq:

- *Did the program meet the goals it set for itself?* Generally no on the infrastructure front, but generally yes regarding the development of Iraq's security forces. Electricity and oil outputs remain below goals set by the CPA more than five years ago, and the number of successful project completions in the key water and health sectors fell far short of hopes.  But after several false starts and greatly increased U.S. investment, Iraq's security forces have achieved substantial operational capabilities, despite remaining doubts about overall unit readiness and potential performance levels.

- *Was the program grossly burdened by waste and fraud?* Regarding waste, yes; regarding fraud, no. The overuse of cost-plus contracts, high contractor overhead expenses, excessive contractor award fees, and unacceptable program and project delays all contributed to a significant waste of taxpayer dollars. Although SIGIR and other law enforcement agencies have uncovered egregious examples of fraud, the size of the total criminal wrongdoing known to date amounts to a relatively small percentage of the overall reconstruction investment, and the number of individuals involved was

• viii •

PX213

relatively low. The vast majority of those who served the U.S. reconstruction program—soldier, civilian, and contractor—did so honorably.

- *Why did reconstruction efforts so often fail to meet their mark?* Security. That single explanation has been offered up thousands of times since the 2003 invasion as the prevailing reason for shortfalls, large and small, in the U.S. program. But this explanation leads to a further question. Why was an extensive rebuilding plan carried out in a gravely unstable security environment? This question underscores an overarching hard lesson from Iraq: beware of pursuing large-scale reconstruction programs while significant conflict continues. But beyond the security issue stands another compelling and unavoidable truth: the U.S. government had neither the established structure nor the necessary resources to carry out the reconstruction mission it took on in mid-2003. As Under Secretary of Defense for Policy Douglas Feith said, "Every time the United States has had a substantial stabilization and reconstruction project, pretty much from World War II forward, we've [had to] improvise."

The research for *Hard Lessons* comprised interviews with hundreds of individuals and the review of thousands of documents. SIGIR reached out to virtually every major player in the Iraq reconstruction experience and almost all agreed to be interviewed or provide useful responses. Among others, Secretaries Powell, Rumsfeld, Gates, and Rice; USAID Administrator Natsios and Deputy Administrator Kunder; Deputy Secretaries Wolfowitz, England, Armitage and Negroponte; Under Secretary Feith; Ambassadors Bremer, Khalilzad, Crocker, Jeffrey, Satterfield, Speckhard, Taylor, and Saloom; and Generals Garner, Abizaid, McKiernan, Strock, Eaton, Sanchez, Casey, Petraeus, Odierno, Chiarelli, Dempsey, and McCoy were all interviewed by SIGIR or gave helpful information or advice. We also interviewed Iraqi leaders, including former Prime Ministers Allawi and Ja'afari, Deputy Prime Ministers Chalabi and Salih, Ambassador Sumaida'ie, Judge Radhi, and Minister Baban.

Equally important to the study, SIGIR staff interviewed hundreds of military members, government officials, and civilian contractors who carried out the "brick and mortar" work of Iraq's relief and reconstruction. The report also draws

PX213

• Preface •

on the body of SIGIR audits, inspections, and investigations, as well as reports from other investigative bodies.

Finally, a somber note. Although this oversight mission has not been "impossible," it has been dangerous. During 2007, five SIGIR staff members were injured by indirect fire in Iraq. And on March 24, 2008, SIGIR auditor Paul Converse died from wounds he received during the Easter Day rocket barrage of the Green Zone. This report is dedicated to him and to all who gave their lives in Iraq in service to our country.

**Stuart W. Bowen, Jr.**
Inspector General
February 2, 2009

PX213

## KEY U.S. FIGURES IN IRAQ RECONSTRUCTION

**General John Abizaid** – Commander, United States Central Command (July 2003-March 2007)

**Elliot Abrams** – Special Assistant to the President and National Security Council Senior Director for Near East Affairs (December 2002-February 2005); Deputy National Security Advisor for Global Democracy Strategy (February 2005-January 2009)

**Hilda "Bambi" Arellano** – USAID Iraq Mission Director (August 2006-August 2007)

**Richard Armitage** – Deputy Secretary of State (March 2001-February 2005)

**Joshua Bolten** – Director, Office of Management and Budget (June 2003-April 2006); White House Chief of Staff (April 2006-January 2009)

**Major General Thomas P. Bostick** – Commanding General, U.S. Army Corps of Engineers-Gulf Region Division (June 2004-June 2005)

**Ambassador L. Paul Bremer III** – Administrator, Coalition Provisional Authority (May 2003-June 2004); Presidential Envoy to Iraq (May 2003-June 2004)

**President George W. Bush** – President of the United States

**General George Casey** – Director, Joint Staff (October 2001-January 2003); Commander, Multi-National Force-Iraq (June 2004-February 2007); Chief of Staff, U.S. Army (April 2007-present)

**Ambassador Wendy Chamberlin** – Assistant Administrator for the Bureau for Asia and the Near East, USAID (December 2002-December 2003)

**Vice President Richard B. Cheney** – Vice President of the United States

**Lieutenant General Peter Chiarelli** – Commanding General, 1st Cavalry Division (2003-2005); Commander, Multi-National Corps-Iraq (January 2006-December 2006)

**Robin Cleveland** – Associate Director for National Security Programs, Office of Management and Budget (March 2001-June 2005)

PX213

• Key U.S. Figures in Iraq Reconstruction •

**Ambassador Ryan Crocker** – United States Ambassador to Iraq (March 2007-present)

**Christopher Crowley** – USAID Iraq Mission Director (September 2007-present)

**Lieutenant General Martin E. Dempsey** – Commanding General, 1st Armored Division (June 2003-July 2005); Commander, Multi-National Security Transition Command-Iraq (August 2005-June 2007); Deputy Commander, United States Central Command (August 2007-March 2008); Acting Commander, United States Central Command (March 2008-October 2008)

**Major General Paul Eaton** – Commander, Coalition Military Assistance Training Team and the Office of Security Cooperation (June 2003-June 2004)

**Gordon England** – Deputy Secretary of Defense (January 2006-January 2009)

**Douglas Feith** – Under Secretary of Defense for Policy (July 2001-August 2005)

**Henrietta Fore** – Administrator, United States Agency for International Development (November 2007-January 2009)

**General Tommy Franks** – Commander, United States Central Command (July 2000-July 2003)

**Lieutenant General (Ret.) Jay Garner** – Director, Office of Reconstruction and Humanitarian Assistance (January 2003-May 2003)

**Robert Gates** – Secretary of Defense (December 2006-present)

**Brigadier General Steven Hawkins** – Commander, Joint Task Force Four (December 2002-March 2003); Commanding General, Task Force Fajr (April 2003-June 2003); Commanding General, Task Force Restore Iraqi Electricity (September 2003-June 2004)

**Charles Hess** – Director, Project and Contracting Office (August 2004-April 2005)

**Ambassador James Jeffrey** – Deputy Chief of Mission (June 2004-March 2005); Senior Advisor to the Secretary of State on Iraq (August 2005-August 2006); Principal Deputy Assistant Secretary, Near Eastern Affairs (August 2006-July 2007); Deputy National Security Advisor (August 2007-January 2009)

PX213

• Hard Lessons: The Iraq Reconstruction Experience •

**Ambassador Zalmay Khalilzad** – United States Ambassador to Iraq (June 2005-March 2007)

**James Kunder** – USAID Deputy Assistant Administrator for Asia and the Near East (July 2002-July 2004); USAID Assistant Administrator for Asia and the Near East (July 2004-January 2009); USAID Acting Deputy Administrator (July 2006-January 2009)

**Dawn Liberi** – USAID Iraq Mission Director (April 2005-July 2006)

**Lewis Lucke** – USAID Iraq Mission Director (March 2003-February 2004)

**Major General William H. McCoy** – Commanding General, U.S. Army Corps of Engineers-Gulf Region Division (June 2005-October 2006)

**Lieutenant General David McKiernan** – Commander, Combined Forces Land Component Command (September 2002-May 2003)

**Peter McPherson** – Chief of Economic Policy, Coalition Provisional Authority (April 2003-September 2003)

**Frank Miller** – Chairman, Executive Steering Group of the National Security Council (August 2002-March 2003); Senior Director for Defense Policy and Arms Control, National Security Council (January 2001-March 2005)

**Christopher Milligan** – Iraq Deputy Director, USAID (March 2003-2005)

**Rear Admiral (Ret.) David Nash** – Director, Program Management Office (July 2003-May 2004); Director, Project and Contracting Office/Iraq Reconstruction Management Office (June 2004-August 2004)

**Andrew Natsios** – Administrator, United States Agency for International Development (May 2001-January 2006)

**Ambassador John Negroponte** – United States Ambassador to Iraq (June 2004-March 2005); Deputy Secretary of State (February 2007-January 2009)

**General Raymond T. Odierno** – Commanding General, 4th Infantry Division (October 2001-June 2004); Commander, Multi-National Corps-Iraq (December 2006-February 2008); Commander, Multi-National Force-Iraq (September 2008-present)

PX213

**Rear Admiral (Ret.) David Oliver** – Director, Office of Management and Budget, Coalition Provisional Authority (June 2003-November 2003)

**General David Petraeus** – Commanding General, 101st Airborne Division (March 2003-June 2004); Commander, Multi-National Security Transition Command-Iraq (June 2004-September 2005); Commander, Multi-National Force-Iraq (February 2007-September 2008); Commander, United States Central Command (October 2008-present)

**General (Ret.) Colin Powell** – Secretary of State (January 2001-January 2005)

**Dr. Condoleezza Rice** – National Security Advisor (January 2001-January 2005); Secretary of State (January 2005-January 2009)

**Donald Rumsfeld** – Secretary of Defense (January 2001-December 2006)

**Ambassador Joseph Saloom** – Director, Iraq Reconstruction Management Office (May 2006-May 2007)

**Lieutenant General Ricardo Sanchez** – Commander, Combined Joint Task Force-7 (June 2003-June 2004)

**Ambassador David Satterfield** – Deputy Chief of Mission in Iraq (May 2005-July 2006); Senior Advisor to the Secretary of State on Iraq (August 2006-present)

**Major General Darryl A. Scott** – Commander, Joint Contracting Command-Iraq (January 2006-January 2008)

**Brigadier General Stephen Seay** – Commander, Joint Contracting Command-Iraq/Head of Contracting Authority (October 2004-2005)

**Ambassador Daniel Speckhard** – Director, Iraq Reconstruction Management Office (June 2005-August 2006); Deputy Chief of Mission (August 2006-November 2007)

**James "Spike" Stephenson** – USAID Iraq Mission Director (February 2004-March 2005)

**Lieutenant General Carl Strock** – Deputy Director of Operations, Coalition Provisional Authority (June 2003-September 2003); Commanding General and Chief of Engineers, U.S. Army Corps of Engineers (2004-2007)

PX213

**Ambassador William B. Taylor** – Director, Iraq Reconstruction Management Office (July 2004-May 2005)

**Brigadier General Michael Walsh** – Commanding General, U.S. Army Corps of Engineers-Gulf Region Division (October 2006-October 2007)

**Thomas Warrick** – Director, Future of Iraq Project (April 2002-March 2003)

**Ross Wherry** – USAID Senior Reconstruction Advisor for the Bureau for Asia and the Near East (October 2002-August 2004); and USAID Director, Office of Iraq Affairs (2004-March 2006)

**Dr. Paul Wolfowitz** – Deputy Secretary of Defense (March 2001-May 2005)

PX213

## Acronyms

| | |
|---|---|
| AIRP | Accelerated Iraq Reconstruction Program |
| BSA | Board of Supreme Audit |
| CAP | Community Action Program |
| CCCI | Central Criminal Court of Iraq |
| CENTCOM | United States Central Command |
| CERP | Commander's Emergency Response Program |
| CFLCC | Coalition Forces Land Component Command |
| CJTF | Combined Joint Task Force |
| CMATT | Coalition Military Assistance Training Team |
| CPA | Coalition Provisional Authority |
| CPA-IG | Coalition Provisional Authority Inspector General |
| CPATT | Coalition Police Assistance Training Team |
| CPI | Commission on Public Integrity |
| CSIS | Center for Strategic and International Studies |
| CSP | Community Stabilization Program |
| DART | Disaster Assistance Relief Team |
| DCAA | Defense Contract Audit Agency |
| DCMA | Defense Contract Management Agency |
| DFI | Development Fund for Iraq |
| DoD | Department of Defense |
| DoJ | Department of Justice |
| DoS | Department of State |
| ePRT | Embedded Provincial Reconstruction Teams |
| ESF | Economic Support Fund |
| FAR | Federal Acquisition Regulation |
| FEST | Forward Engineering Support Teams |
| FOB | Forward Operating Base |
| FPS | Facilities Protection Service |
| GAO | Government Accountability Office |
| GRD | Gulf Region Division |
| GST | Governorate Support Team |
| IAF | Iraqi Armed Forces |
| IAMB | International Advisory and Monitoring Board |
| ICDC | Iraqi Civil Defense Corps |
| ICITAP | International Criminal Investigative Training Assistance Program |
| IDIQ | Indefinite Delivery, Indefinite Quantity [contract] |

PX213

| | |
|---|---|
| IED | Improvised Explosive Device |
| IG | Inspector General |
| IGC | Iraqi Governing Council |
| IIF | Iraqi Intervention Force |
| IIG | Iraqi Interim Government |
| IJ | Investigative Judges |
| IMF | International Monetary Fund |
| ING | Iraqi National Guard |
| IPS | Iraqi Police Service |
| IRDC | Iraqi Reconstruction Development Council |
| IRMO | Iraq Reconstruction Management Office |
| IRRF | Iraq Relief and Reconstruction Fund |
| ISF | Iraqi Security Forces |
| ISFF | Iraq Security Forces Fund |
| ITAO | Iraq Transition Assistance Office |
| JCC-I | Joint Contracting Command – Iraq |
| JMD | Joint Manning Document |
| JSAT | Joint Strategic Assessment Team |
| JSPA | Joint Strategic Planning and Assessment |
| JTF | Joint Task Force |
| LGP | Local Governance Program |
| LOGCAP | Logistics Civil Augmentation Program |
| MAAWS | Money as a Weapons System |
| MBPD | Million Barrels Per Day |
| MNC-I | Multi-National Corps – Iraq |
| MNF-I | Multi-National Force – Iraq |
| MNSTC-I | Multi-National Security Transition Command – Iraq |
| MoD | Ministry of Defense |
| MoI | Ministry of Interior |
| MW | Megawatt |
| NGO | Nongovernmental Organization |
| NRRRF | Natural Resources Risk Remediation Fund |
| NSC | National Security Council |
| NSPD | National Security Presidential Directive |
| OIF | Operation Iraqi Freedom |
| OMB | Office of Management and Budget |
| OPLAN | Operations Plan |

PX213

• Acronyms •

| | |
|---|---|
| ORHA | Office of Reconstruction and Humanitarian Affairs |
| OTI | Office of Transition Initiatives |
| PCO | Project and Contracting Office |
| PHC | Primary Healthcare Center |
| P.L. | Public Law |
| PMO | Program Management Office |
| PRB | Program Review Board |
| PRDC | Provincial Reconstruction Development Council |
| PRT | Provincial Reconstruction Team |
| QRF | Quick Response Fund |
| REO | Regional Embassy Office |
| RFP | Request for Proposal |
| RIE | Restore Iraqi Electricity |
| RIO | Restore Iraqi Oil |
| RSCMA | Reconstruction and Stabilization Civilian Management Act of 2008 |
| S/CRS | Department of State-Office of the Coordinator for Reconstruction and Stabilization |
| SAMP | Single Acquisition Management Plan |
| SIGIR | Special Inspector General for Iraq Reconstruction |
| SOE | State-owned Enterprise |
| SOMO | State Oil Marketing Organization |
| SOW | Statement of Work |
| SPMO | Sector Program Management Office |
| TAL | Transitional Administrative Law |
| TNA | Transitional National Assembly |
| TRA | Transition Readiness Assessment |
| UN | United Nations |
| UNSCR | United Nations Security Council Resolution |
| USAAA | United States Army Audit Agency |
| USACE | United States Army Corps of Engineers |
| USAID | United States Agency for International Development |
| USIP | United States Institute of Peace |
| WMD | Weapons of Mass Destruction |

PX213

• Hard Lessons: The Iraq Reconstruction Experience •



PX213

PX213

# Part I
# Planning for Postwar Iraq
### September 2001 to May 2003

PX213

PX213

# Chapter 1
# Planning Begins

> *I have no idea what CENTCOM was planning, and I have absolutely no idea what the Joint Chiefs of Staff were planning. I do know that the political guidance they were getting from Rumsfeld, the NSC, and the White House was, 'You got about three months to get [the postwar Iraqi government] up and running.'\**

**General Colin Powell**
Secretary of State (2001-2005)

The origins of U.S. reconstruction policy in Iraq are rooted in a series of debates that occurred during the fall of 2001, when President Bush ordered the Pentagon to revise its plans for deposing Iraqi dictator Saddam Hussein.[1] From the outset, Secretary of Defense Donald Rumsfeld believed that, after Saddam's fall, power should rapidly transfer to an interim Iraqi authority. Reflecting this belief, Pentagon officials conceived of U.S. forces as liberators who would leave Iraq within months of toppling the regime. In this scenario, the United States would not need to administer the functions of Iraq's government after major combat operations ceased.[2]

A different view of regime change developed at the State Department. Some senior officials in Foggy Bottom believed that Iraq, with its history of sectarian violence, could not be easily reshaped. They concluded that invading Iraq and replacing its totalitarian regime would require a U.S. commitment of enormous scope, carried out over a period of years, engaging everything from Iraq's judiciary to its electrical grid. Secretary of State Colin Powell pointedly told the President that "when you hit [Iraq], it's like a crystal glass. It's going to shatter. There will be no government. There will be civil disorder. You'll have 25 million Iraqis standing around looking at each other."[3]

The tense interplay between these competing visions fundamentally shaped the process of prewar planning for postwar Iraq in the fifteen months that preceded the March 2003 invasion. As planning moved forward, experts inside and outside government—including some at the Department of Defense—warned that failing to prepare for a more extensive engagement after regime change exposed the United States to extraordinary risks. Although the NSC agreed that

---

\* SIGIR interview with General (Ret.) Colin Powell, former Secretary of State, February 4, 2008.

PX213

• Chapter 1 •

Iraq should be liberated from Saddam's tyranny, the disagreements about the postwar plan remained unresolved right up to the invasion. They arose from differing assessments of prewar conditions in Iraq and what the consequences of deposing Saddam would be.

### A Brief History of Modern Iraq

Shortly after World War I, Winston Churchill, then head of Britain's War Office, told the commander of British forces in Iraq: "The fate of the province depends entirely upon whether a reasonable scheme for maintaining order can be devised at a cost which is not ruinous."[4] Creating a "reasonable scheme," however, proved exceedingly difficult.

The British shaped and laid claim to modern Iraq through the 1916 Sykes-Picot agreement, negotiated by the United Kingdom, France, and Russia in anticipation of the fall of the Ottoman Empire at the end of World War I. By 1920, Iraqis living under British military occupation had compiled a list of grievances against their foreign rulers. Shi'a clerics in the south demanded an independent Islamic government. The Kurds in the north wanted autonomy. Tribesmen throughout the country opposed the British-imposed tax system and forced labor. Eventually, senior Sunni and Shi'a clerics joined together to issue a *fatwa* calling for rebellion. An insurgency started in Baghdad and quickly spread across the country, forcing the British to move up their timetable for granting Iraq full sovereignty.[5]

In their efforts to build an independent state, British officials faced the challenge of melding three distinct social structures (tribal, clerical, urban), three ethno-religious groups (Sunni Kurds, Sunni Arabs, Shi'a Arabs), and three territorial regions (north, central, south).[6] The solution they ultimately settled on, undertaken with the advice of British Arabists Gertrude Bell and T.E. Lawrence, was to install a king, Emir Faisal, to lead the new country. The 1921 investiture of Faisal—a Sunni—entrenched a pattern of volatile sectarian politics that would burden Iraq for decades.[7]

The exercise of power by the minority Sunnis over the majority Shi'a produced instability: 58 separate governments ruled Iraq in the 37 years between 1921 and the 1958 revolution that overthrew the monarchy.[8] In 1963, the Sunni-controlled Ba'ath party took power in a coup.[9] By the mid-1970s, a middle class had emerged in Iraq that was a model for its neighbors. High oil prices briefly pushed the country's per capita gross

• 4 •

PX213

domestic product past that of Spain's. A secular state with an excellent education system and a thriving economy, Iraq seemed poised to break with its turbulent past. But this relative renaissance was not to last.

In 1979, a law school dropout named Saddam Hussein seized power. He would rule Iraq for the next 24 years at ruinous cost. In 1980, Saddam launched his country on a disastrous eight-year war with Iran that left a half million Iraqis dead. The war ended the country's brief period of prosperity, decimated a generation of young men, and roiled tensions between the regime's Sunni Arab elite and their Shi'a and Kurdish countrymen. In 1990, Saddam invaded Kuwait and the United States quickly responded, leading to the 1991 Gulf War.[10] Saddam was badly defeated by a broad coalition of forces, and his regime became an international pariah. By the year 2000, the impact of multiple wars, severe international sanctions, and repressive rule had left Iraq a broken country.

## Iraq Under Saddam

In 2003, Iraq's population of around 27 million people lived in an area about the size of California. The land between the Tigris and Euphrates Rivers, known as the cradle of civilization, had given birth to remarkable innovations in writing, farming, law, medicine, and governance. But Iraq suffered under a brutal tyrant whose destructive policies had led to the imposition of harsh United Nations (UN) sanctions. The deterioration of the country's physical infrastructure stemmed, to varying degrees, from these sanctions, Saddam's neglect, the Iran-Iraq War, and the 1991 Gulf War.

During the Gulf War, Iraq inflicted significant damage on Kuwait. Under the supervision of then-Secretary of Defense Richard Cheney, Kuwaiti and U.S. officials planned the reconstruction of Kuwait in advance of its liberation. Kuwait's quick recovery largely resulted from work carried out by the U.S. Army Corps of Engineers (USACE) and private contractors, including Bechtel, and Brown and Root, both of which would later play major roles in Iraq's reconstruction.[11]

Although Saddam restored some essential services after the Gulf War, the larger recovery of Iraq proved more daunting. United Nations-imposed sanctions and an international trade embargo, aimed at preventing the regime from acquiring ballistic missiles and weapons of mass destruction, limited the country's capacity to recover.[12] Iraq's non-oil economy was especially hard hit. By the mid-1990s, unemployment and under-employment exceeded 50 percent.[13] Iraq's

PX213

gross domestic product, which peaked in 1990 at $74.9 billion, remained below $20 billion throughout most of the decade.[14]

Under Saddam, Iraq had plunged from a gradually advancing middle-income country to a poor and underdeveloped one. In its shift "from relative affluence to massive poverty," 60 percent of Iraq's population was left heavily dependent on the government-provided food ration for their livelihood.[15] By the mid-1990s, these rations, delivered through the country's public distribution system, provided only 1,100 calories per person per day, causing widespread malnutrition.[16]

Faced with rising social and economic instability, Saddam acceded in 1995 to a UN proposal, on the table since 1991, to allow the use of proceeds from controlled oil and gas sales to purchase food and medicine.[17] Under the new "Oil-for-Food Program," the UN managed monthly distributions of 450,000 tons of flour, clarified butter, peas, lentils, beans, sugar, tea, salt, and soap through a network of 44,000 privately owned corner stores. At one level, the program worked, effectively doubling the population's per capita caloric intake.[18] But beneath the sanctions and authorized oil sales, an illicit economy flourished. Institutionalized corruption infected both the government and the supporting UN programs, spawning powerful criminal elements within Iraq.[19]

The reversal in U.S.-Iraqi relations during Saddam's rule—with Saddam first an ally and then an enemy—increased Iraqi suspicion that the West had designs on its territory and oil wealth. These suspicions—together with the effects of internal political violence, Saddam's ceaseless propaganda, a corrupt public sector, regular shortages of food, medicine, and everyday goods, and frequent U.S. bombing of air-defense installations in the no-fly zones—led to a siege mentality among many Iraqis.

The peculiar mix of charity and harsh sanctions that defined the international community's relations with Iraq in the years following the Gulf War presented a paradox. Saddam's brutal secrecy and intrigue shrouded the inner workings of the Iraqi state, while the UN's distribution scheme for goods and services provided the international organization with extensive connections in the country.[20] Thus, in 2003, the UN sanctions committee had a list of every good it had permitted Iraq to import for about a decade, down to fuses in power plants.[21] Although the UN's records were not organized as a needs assessment of the infrastructure, a diligent review of them could have revealed how much cement a particular Iraqi factory produced or what spare parts an Iraqi electricity plant had ordered.

PX213

• Planning Begins •

### Initial Planning

On September 29, 2001, Secretary Rumsfeld ordered a review of existing Iraq war plans.[22] Shortly thereafter, General Tommy Franks, Commanding General of the U.S. Central Command (CENTCOM)—the combatant command with responsibility for the Middle East and Central Asia—removed a small group of key planners from the Afghanistan campaign and directed them to revise plans to attack Iraq.[23] At the outset, Secretary Rumsfeld did not advise the planners to prepare for a lengthy occupying military administration after Saddam's regime fell.[24] He presumed that others in the government, probably the Department of State, would handle the governance aspects of "Phase IV," military parlance for operations after the end of major combat.[25]

The concept of operations Rumsfeld and Franks devised in four videoconferences between Thanksgiving and late December 2001 focused chiefly on the combat phase. The war plan Secretary Rumsfeld briefed to President Bush on December 28, 2001, anticipated a rapid postwar handoff to a provisional Iraqi government and a minimal continuing military footprint.[26]

In early 2002, the State Department's Bureau of Near Eastern Affairs launched the "Future of Iraq Project" to assess postwar requirements. Six days after the President named Iraq as part of the "Axis of Evil" in his January 29, 2002 State of the Union address, project director Thomas Warrick submitted an outline of subjects to Ambassador Ryan Crocker, then serving as Deputy Assistant Secretary of State for Near Eastern Affairs. The outline anticipated seventeen working groups, composed primarily of Iraqi exiles, that would evaluate post-invasion needs in areas ranging from rule of law and public finance to oil, energy, and anticorruption.[27] The project would serve both as a means to expand postwar planning and as a vehicle to consolidate competing Iraqi exile groups, who were involved with the project from its earliest days.

White House coordination of nascent planning for Iraq began in the spring of 2002 during twice-weekly meetings of the National Security Council's Deputies Committee, which comprises the second-in-command officials—or their representatives—from the Departments of State and Defense, the CIA, and the military's Joint Staff.[28] Ideas about how to handle the postwar phase took shape during these meetings. The Deputies Committee focused on three concepts: a liberation model in which Iraqis would quickly take charge through a provisional government; a military administration led by CENTCOM; or a civilian transitional authority, perhaps run under UN auspices. Irrespective of which concept or combination of concepts would apply, policymakers addressed three linked issues: how to secure public order, what relief and reconstruction operations

• 7 •

PX213

would be necessary, and how to promote U.S. interests in Iraq's longer-term economic and political stability.[29]

"One of our main themes was liberation rather than occupation," Under Secretary of Defense for Policy Douglas Feith said. "There was this constant debate between those of us who said we've got to push the Iraqis forward," Feith recounted, and others who judged that the Iraqis would be ready to govern themselves only after several years.[30] Reflecting the views of Secretary Rumsfeld, Feith advocated a rapid transition to Iraqi control. Drawing lessons from past nation-building efforts, he and Rumsfeld believed that minimizing the military's presence would force local populations to rely more rapidly upon their own leaders to resolve problems. They were convinced that by limiting the military's postwar role in Iraq, the United States could avoid the "culture of dependency" that had taken root in other post-conflict interventions.[31]

The U.S campaign in Afghanistan appeared to support the rapid-transfer approach.[32] After a small U.S. force achieved military victory, political authority passed to Hamid Karzai, an Afghan exile leader selected by a *loya jirga*—a grand assembly of Afghan tribal leaders—and subsequently appointed president of Afghanistan at an international conference in Bonn. Per capita reconstruction expenditure in Afghanistan had remained modest. Officials viewed this seemingly successful postwar transition as a vindication of the Administration's break with conventional wisdom about nation building, buttressing arguments of Defense officials that Afghanistan should serve as the model for Iraq.[33]

The State Department argued against applying the Afghanistan model to Iraq. State experts believed that Iraqi exile leaders were unlikely to garner the same level of support from their countrymen as Karzai had enjoyed from Afghans. Moreover, State's analyses suggested that Iraq would need a longer transitional period because of the need to reconcile Iraq's competing ethnic and sectarian groups. The State Department advocated a U.S.-led "Transitional Civil Authority" that would govern postwar Iraq during a "multi-year transitional period to build democratic institutions."[34] This approach ultimately was embodied by the Coalition Provisional Authority, which ruled postwar Iraq from May 2003 to June 2004 ostensibly under the Defense Department's aegis.

**Interagency Planning Accelerates**

By mid-2002, an invasion of Iraq remained in the realm of speculation for all but a handful of senior officials in Washington. The machinery of interagency planning in the National Security Council largely sat idle, leaving open the fissure between planning for war and planning for war's aftermath. The differences among the three underlying policies for a postwar framework—rapid transfer to

PX213

Iraqi control, military administration, or civilian transitional authority—had yet to be seriously addressed, much less resolved. Nor had officials reached consensus on the public order and reconstruction requirements for each scenario.[35]

In August 2002, the President and his advisors enlarged the Iraq planning effort to include civilian agencies that ostensibly would administer the postwar phase. *Iraq: Goals, Objectives, Strategy*, a national security document signed by President Bush on August 29, 2002, articulated an evolving strategy that would employ "all instruments of national power" to free Iraq from Saddam. The document stated that the United States would "work with the Iraqi opposition to demonstrate that we are liberating, not invading Iraq, and give the opposition a role in building a pluralistic and democratic Iraq, including the preparation of a new constitution." As for rebuilding, the U.S. strategy would:

> … demonstrate that the United States is prepared to play a sustained role in the reconstruction of post-Saddam Iraq with contribution from and participation of the international community, that rapidly starts the country's reconstruction, that preserves but reforms the current Iraqi bureaucracy and reforms Iraqi military and security institutions.[36]

Secretaries Powell and Rumsfeld and Vice President Cheney met with Iraqi exile leaders to show support and to express the seriousness of U.S. intentions.[37]

To help execute the ambitious mission envisioned by the August 29 document, the Joint Staff instructed CENTCOM that it should begin planning to administer Iraq for an interim period after the invasion. This order appeared to counter the earlier Rumsfeld presumption that the Defense Department would not bear principal responsibility for managing the country after the combat phase concluded. Despite the Joint Staff order, "there wasn't a whole lot of intellectual energy being focused on Phase IV," one of CENTCOM's key planners said.[38] While most of CENTCOM's staff focused on Phases I, II, and III, Major Thomas Fisher and Major Ray Eiriz, two mid-level officers who had served in Bosnia and Kosovo, took charge of Phase IV.[39]

To jump-start postwar planning efforts across the government, National Security Advisor Condoleezza Rice established a National Security Council (NSC) Executive Steering Group on Iraq in August 2002 and asked Frank Miller, an NSC senior director, to chair it. The Joint Staff had already formed a political-military team to link detailed operational planning at CENTCOM with interagency planners in Washington. An energy infrastructure working group, a diplomatic working group, a global communications office, and a humanitarian working group eventually joined the planning effort.[40]

PX213

Under Secretary Feith also enlarged the Pentagon office responsible for Iraq policy planning. Until then, only four people in Defense's Near East and South Asia Office had worked full-time on Iraq.[41] Feith brought together a staff of about a dozen under a new "Office of Special Plans" to engage in large-scale planning for war. Later, officials working on the management of postwar Iraq would discover that this office had produced relevant analyses and concept papers that were not shared during interagency consultations or with those who eventually played a leading role in postwar Iraq—emblematic of the extensive compartmentalization of prewar planning for postwar Iraq.[42]

### NSC's Humanitarian Working Group

Assessing how the war might disrupt the provision of food, water, and shelter fell to an interagency Humanitarian Working Group led by Elliot Abrams, an NSC senior director, and Robin Cleveland, associate director of the White House Office of Management and Budget (OMB).[43] The working group, which began weekly meetings in Cleveland's office in September 2002, included officials from the CIA, United States Agency for International Development (USAID), the Joint Staff, and the Departments of Defense, State, Treasury, Justice, and Commerce.[44]

One nightmare scenario loomed above all others—the possibility that Saddam would use chemical or biological weapons against an invading force or his own people. In the wake of such a disaster, hundreds of thousands or even millions of Iraqis might flee. Very large refugee flows were thought by Pentagon analysts to be the most likely challenge the United States would face in the aftermath of an invasion.[45] Accordingly, Cleveland and Abrams focused their working group on how the U.S. government would respond to large-scale humanitarian contingencies.

They also considered the role of the UN. Several officials initially resisted continuing the Oil-for-Food Program—which partially financed Iraq's public distribution system, through which 25 million Iraqis received a monthly food staple—on grounds that it ceded too much control to the UN. But USAID and State officials argued that the program would help prevent starvation if food became scarce. A related question was how to administer oil revenues accruing under the Oil-for-Food Program. Several working group members again argued against continuing UN control, with State and USAID officials again urging that the international body was best suited to serve as custodian of Iraq's oil wealth. Several rounds of adjudication through the Deputies Committee left the UN in control of the Oil-for-Food program and its revenues.[46]

Under the leadership of Elliot Abrams, the Humanitarian Working Group quietly coordinated with the international aid community to develop a "no-strike" list of civilian infrastructure, such as hospitals and power plants. To separate the

PX213

regime's military command and control facilities from known civilian sites, the UN and NGOs familiar with Iraq nominated locations that the military would then cross-walk through an intelligence-community database.[47]

Although the working group had been chartered to evaluate only humanitarian contingencies, its participants soon realized that Iraq's infrastructure and ministries would play essential roles in postwar operations.[48] Ambassador Wendy Chamberlin and Ross Wherry of USAID thus began a reconstruction assessment that considered what it would take to get the infrastructure and ministries up and running after the invasion.[49] This raised a fundamental strategic question: how extensive should postwar reconstruction be? Reconstruction geared to repair war damage would differ greatly from attempting to reverse the deleterious effects of the Iran-Iraq war, sanctions, and Saddam's own destructive policies.[50]

The lack of information about Iraq's infrastructure and government institutions made it difficult to determine what was necessary to restore essential services. "We never had anything more than a PowerPoint briefing," a Defense official later commented. "We might have had some financial estimate papers, but it was a lot of back-of-the-envelope, 'what will it take to fix the Ministry of fill-in-the-blank.' It was all guesstimates made on top of suppositions." [51] The few detailed reports reviewed by the working group suggested that sanctions had significantly limited Iraq's recovery from the first Gulf War. For example, a UN assessment of the electrical sector concluded that a lack of spare parts left the system remarkably fragile. In light of Iraq's substantial oil wealth, however, the scope of expected infrastructure repairs seemed manageable. The group assumed that long-term repairs could be undertaken and funded by the Iraqis.[52]

With military, political, and democratization plans developed out of sight of the Humanitarian Working Group, its members could consider only in general terms how reconstruction might help legitimize a new Iraqi state. The group asked for but never received a briefing on how public-order requirements would be met. It was also not permitted to examine the potential role of reconstruction in civil administration. Department of Justice proposals to employ police trainers were dismissed as falling outside the group's mandate.[53] The Defense Department asserted that it had plans for postwar security well in hand.[54] As one working group member said, it appeared that "a lot of things were decided but never discussed."[55]

In the absence of direction from above, the working group's co-chairs, Abrams and Cleveland, developed a set of core judgments about postwar Iraq. "It was taken as an assumption," one participant said, "that the war would be brief, war damage would be minimal, and oil revenues would finance almost all of recon-

PX213

struction."[56] They also assumed that the political people would somehow "pull a Karzai out of the hat," and that the Iraqis would take care of the rest.[57]

Towards the end of 2002, with time running out and war a few months away, working group officials were putting in eighteen-hour days to make sure their parts of the plan came together. General Franks at CENTCOM did not seriously question the approach developed under Abrams's and Cleveland's leadership. Briefed twice by the working group's members on their findings, General Franks reacted favorably. "On both occasions, he said this was good," an official recalled. Franks said that the reconstruction and humanitarian planning "basically jibes with what we're thinking."[58]

**Structuring Postwar Administration**

On October 15, 2002, Under Secretary Feith briefed the National Security Council on a proposed structure for CENTCOM's military administration of postwar Iraq. The structure consisted of a military headquarters, known as Combined Joint Task Force-Iraq (CJTF-I), headed by a three-star general, and a civil administration, headed by a civilian "Iraq coordinator." Both would fall under CENTCOM's command.

The briefing recommended that the Secretary of Defense be placed in charge of the entire effort, reflecting Rumsfeld's view that political, economic, and security activities in postwar Iraq should not be managed by separate institutions.[59] This proposed structure touched off a vigorous debate among interagency planners. Lieutenant General George Casey, who would command military forces in Iraq from 2004 to 2006, later said, "We lost, in my view, two months while we fought over who was going to be in charge."[60]

CENTCOM divided Phase IV into three overlapping stages—Alpha, Bravo, and Charlie.[61] During Alpha, the military would have the lead; during Bravo, a U.S. civilian authority would move to the forefront; during Charlie, the Iraqis would take charge. "None of this was exclusive," CENTCOM's chief of war plans explained. "It was who dominated and who had the lead during those phases."[62] The "A-B-C" approach was a way for the military to conceptualize what and when certain tasks would have to be performed, given that planners did not yet know whether U.S. policy ultimately would call for a rapid handoff to Iraqi leaders or to a civilian transitional authority of longer duration. The phases were set; their duration was not.

On October 18, 2002, Secretary Rumsfeld asked Feith to stand up the postwar planning office that would prepare for the civil administration of Iraq. But Rumsfeld canceled that order just a few days later. Feith later learned from Deputy National Security Advisor Steven Hadley that the reversal came from a

PX213

Presidential decision that the U.S. government should not engage in highly visible postwar preparations while in the middle of international efforts to defuse the threat posed by Iraq without war.[63]

These decisions reflected a strategic resistance to bringing postwar planning into the open. All the interagency Iraq planning groups worked in secret. Few knew the others existed. Officials justified the extreme secrecy on the grounds that ongoing diplomatic negotiations would be undercut if Saddam knew that postwar planning was well underway. "There was a reluctance to pull that all together," Feith explained, "because, while you're saying that you want to resolve this dispute through non-military means, there's a sense that you're contradicting yourself if you're not only planning for the war but planning for the postwar."[64] While postwar planning efforts progressed under strict secrecy, the build-up of troops and materiel around Iraq's borders continued—a necessary threat to make diplomatic negotiations credible in the eyes of Saddam.

The structure of postwar administration and the mechanics of political transition remained undecided through the fall. A revised version of the strategy paper, *Iraq: Goals, Objectives, Strategy*, issued in late October 2002, reflected the lack of a clear decision on these matters. Rather than articulating a detailed timetable for transition to Iraqi control, the memorandum spoke only of an interim administration that would provide for "external and internal security," "humanitarian assistance," and "the country's political, economic, and security reconstruction."[65]

**Early Warnings**

As planning for the invasion moved forward, the Departments of Defense and State produced assessments of what could go wrong. In October 2002, Secretary Rumsfeld, Chairman of the Joint Chiefs of Staff General Richard Myers, Vice Chairman General Peter Pace, Deputy Secretary Wolfowitz, and Under Secretary Feith developed a "Parade of Horribles" memo that presented 29 possible catastrophes the invasion of Iraq might engender. In retrospect, the memo proved remarkably prescient. Number thirteen was not finding weapons of mass destruction. Other fears included sectarian and ethnic strife among Sunnis, Shi'a, and Kurds; the failure to capture Saddam Hussein; Iraq fracturing into two or three pieces; U.S. postwar involvement lasting ten years, rather than two to four; the cost of the postwar effort being too high; and a turnabout in world opinion.[66] Rumsfeld shared the memo at an NSC meeting with the President, the Vice President, the Secretary of State, the National Security Advisor, and the CIA Director.[67]

In mid-December, Secretary Powell received a twelve-page warning—coauthored by Ryan Crocker, eventual Ambassador to Iraq—titled "The Perfect

PX213

Storm." This memo accurately warned that the struggle for dominance after the fall of Saddam would inspire violent clashes among Iraq's sects, tribes, and ethnic factions, possibly leading to the country's fragmentation.[68] Deputy Secretary of State Richard Armitage believed that this memo was shared with the NSC, although members of Frank Miller's Executive Steering Committee were not privy to it or to Rumsfeld's "Parade of Horribles" memo.[69]

Caveats about what lay ahead could also be found in the history of nation building.[70] Of the sixteen countries in which the United States attempted to implant institutions of democratic government over the past century, only four—West Germany, Japan, Panama, and Grenada—remained democratic a decade after U.S. forces ended their active involvement in governance. In three countries—Cuba, Haiti, and Nicaragua—intervention led to worse misrule and greater economic decline.[71] Some political scientists and historians noted that Iraq's social and political attributes could make the country inherently resistant to political reform by outsiders, and that any effort there would be unlike the U.S. occupation of Germany and Japan.[72] Both Germany and Japan were highly developed societies with homogeneous populations and established bureaucracies. Operational planning for their occupation began within months of the bombing of Pearl Harbor, and thousands of native speakers were trained.[73]

The potential difficulty in remaking Iraq's political system was underscored in January 2003 by a then-classified National Intelligence Council assessment, *Principal Challenges in Post-Saddam Iraq*, which predicted that establishing a democratic system in Iraq "would be a long, difficult, and turbulent process."[74] CIA Director George Tenet and his deputy, John McLaughlin, did not highlight the findings of the assessment to interagency planners or ask that it be briefed to the NSC's Executive Steering Group on Iraq or to the NSC's Deputies Committee.[75]

Several other studies outlined how the expected difficulties of regime change would affect the military and civil missions in Iraq.[76] The most comprehensive was by Conrad Crane and Andrew Terrill of the Army War College Strategic Studies Institute. In coordination with the Army Deputy Chief of Staff for Operations, Crane's interdisciplinary team began work on their study in October 2002. Two dozen officials from the Joint Staff, Joint Forces Command, and the Departments of Defense and State vetted its interim findings in mid-December. Published February 1, 2003, the report identified 135 tasks that military and civilian agencies would need to perform across 21 categories of activity.[77]

The Congress also examined postwar scenarios. On August 1, 2002, the Senate Foreign Relations Committee held a hearing at which members heard warnings from scholars about potential challenges an invasion of Iraq could bring. It would be the only congressional examination of postwar scenarios before the

PX213

Congress authorized the President to "use the Armed Forces of the United States as he determines to be necessary and appropriate" to defend the United States against the threat from Iraq and to enforce UN resolutions regarding Iraq.[78] Although six committees and two subcommittees held more than a dozen hearings subsequent to the vote in Congress to approve the use of force, most of the hearings focusing on post-Saddam Iraq did not occur until just before hostilities began in March 2003.[79]

### The Future of Iraq Project

By late 2002, participants in the State Department's Future of Iraq Project began formulating their own vision of postwar administration. Working independently of other planning teams, fourteen of the project's seventeen working groups met between July 2002 and April 2003, bringing some 200 Iraqi exiles together with government and international experts.[80] The project identified a range of issues that an invading army inevitably would confront, from the possibility of political violence to the decrepit electricity, oil, and water infrastructures. The richly developed reports constitute the single most rigorous assessment conducted by the U.S. government before the war. Although the findings of each working group did not amount to an operational plan, their reports contained facts and analysis that could—and in some cases did—inform operational planning.

Several factors—particularly timing—kept most project findings from influencing interagency deliberations. Of the fourteen working groups that did meet, many carried their deliberations into 2003—too late to influence prewar planning.[81] Moreover, the completed reports proved of varying utility. The Transitional Justice Working Group, for example, offered a detailed analysis of Iraq's political-military establishment. The specific suggestions it contained came close to constituting an action plan on the legal front. Others, such as the Public Health and Humanitarian Needs Working Group, offered only a generalized set of recommendations drawn from previous international crises.

The NSC's Executive Steering Group invited the project's director, Thomas Warrick, to brief the group shortly before the invasion, but the project's unwieldy reports—which in toto ran more than 1,000 pages—could not be easily reduced to a set of slides that policymakers could absorb.[82] Warrick's briefing did not raise a single issue for decision and was not viewed as useful at the time. To planners preparing for war and a short postwar operation, the Future of Iraq Project did not look like a coherent operational plan.[83] Only when Warrick produced an edited volume of findings after the war began could the project be seen as a comprehensive guide to issues the United States could face—and, by then, was already facing.[84]

PX213

Perhaps most critically, the project's reports did not capture the attention of the State Department's senior decision-makers. Secretary of State Colin Powell and his Deputy Secretary Richard Armitage did not use them to bolster their cautionary views or to push for more detailed planning on worst-case scenarios. Without a high-level patron, the project's reports lacked the visibility and clout to reach key decision-makers in time.[85] "I never felt that the Future of Iraq Project was embraced or connected to the actual planning effort for regime change," Ambassador Ryan Crocker said, "and the farther we went into the calendar, the more noticeable that became."[86]

**Fragmented Planning**

The divergence Crocker noticed was the consequence of a planning process that had been fragmented from its beginning. For nearly a year, the NSC exercised loose coordination over separate efforts by State and Defense and did not seek the participation of post-conflict experts at USAID. The marked separation between civilian and military preparations, which had existed since late 2001, was followed by further fragmentation within the interagency planning process, which had begun in earnest in August 2002. Even as officials thought they were moving toward an integrated master plan, the building blocks of that plan were being developed in a piecemeal fashion that rendered risks and needs less visible.

The reasons for the fragmentation were in part bureaucratic, but, in an important sense, they were also the product of higher-level strategic judgments. Calls for better-integrated planning and greater capacity to address worst-case scenarios were subordinated to the views of Defense Department officials who were committed to a rapid transfer of power. The liberation approach they and others backed became the operative strategy, with the White House elevating it to official U.S. policy by late fall 2002.[87]

As the fall turned to winter, NSC officials moved to integrate this vision of regime change into operational plans being prepared by the government's civilian agencies. USAID was among the first to be mobilized.

PX213

• Planning Begins •

## Essential Services Overview: Prewar Levels in Iraq

| Metric[88] | Pre-invasion |
|---|---|
| Electricity Production | |
| *Megawatts* | 4,075 |
| Oil Production | |
| *Million Barrels per Day* | 2.58 |
| Iraqi Security Forces | |
| *Soldiers and Police* | 1,300,000[89] |
| Telecommunications | |
| *Landline Subscribers* | 833,000 |
| *Mobile Subscribers* | 80,000 |

Iraq's electricity sector suffered from years of inadequate maintenance and poor management under Saddam.[90] According to the International Monetary Fund (IMF), Iraq's monthly electricity production, from March 2002 to March 2003, averaged 4,075 megawatts per day.[91] The distribution of power under Saddam heavily favored Baghdad, which received between 16 and 24 hours of power per day, while the average Iraqi household outside the capital received power for just 4 to 8 hours per day.[92]

The U.S. Department of Energy estimated that Iraq's oil production fell to 2.0 million barrels per day (MBPD) in 2002, but increased to 2.58 MBPD just before the war.[93] Although oil production itself is not an essential service, oil feeds the refineries that produce petroleum products for domestic consumption, is critical to electricity generation, and provides Iraq with much of the revenue that supports other services.

PX213

## Chapter 2
## The Agencies Engage

*We needed to be thinking at a much different order of magnitude of what is required to reconstruct a failed state, in the context of a U.S. military invasion.*

**James Kunder**
USAID Deputy Assistant Administrator for
Asia and the Near East (2002-2004)*

In 2002, the United States Agency for International Development administered nearly $7.5 billion in foreign aid programs.[1] Its 2,000 employees and 5,000 contractors worked in more than 100 developing countries across the world.[2] Many in government nonetheless viewed USAID as a minor player running small projects in faraway places. Despite its relative lack of capacity, USAID was fast becoming an essential player in the late 2002 planning for postwar Iraq. The National Security Council assumed that USAID's disaster response teams could help contain humanitarian crises that might follow the invasion, and that its development know-how could help repair Iraq's infrastructure and support the country's transition to democracy. Some Pentagon planners—particularly those unfamiliar with USAID's missions in Bosnia, Kosovo, and Afghanistan—imagined that the agency had vast powers to rush in civilians behind the troops and establish conditions that could lead to the soldiers' deployment home.

USAID officials first learned of their expected role in Iraq well after war planning had begun. Notably, USAID Administrator Andrew Natsios was not formally consulted in the early planning phases.[3] Ross Wherry, who ultimately directed much of the agency's reconstruction preparations, began to learn about Iraq planning in mid-2002 through a series of chance encounters, cryptic notes, and indirect suggestions that the agency should develop contingency scenarios.[4] The agency did not become formally involved until August 2002, when USAID Assistant Administrator Wendy Chamberlin was asked to serve on the NSC's Humanitarian Working Group.

White House officials would ask several USAID officials to join the planning efforts over the next month.[5] The agency's Asia and Near East Bureau soon took charge of reconstruction planning, while the Bureau for Democracy, Conflict and Humanitarian Assistance prepared for humanitarian relief operations.[6] In early October 2002, Administrator Natsios formed USAID's Iraq Task Force, chairing

---

* SIGIR interview with James Kunder, USAID Acting Deputy Administrator, February 15, 2008.

PX213

its weekly meetings thereafter to coordinate the agency's efforts. Several hundred USAID employees eventually would work full time on Iraq plans.[7]

When it came to mobilizing resources for possible humanitarian disasters in Iraq, USAID officials proceeded with full Administration support.[8] Mobilizing reconstruction resources, however, was a different matter. The NSC conceived of reconstruction primarily in terms of brick-and-mortar work, but USAID viewed such rebuilding as only part of a long-term social and political transformation necessary to achieving a fully democratic Iraq.[9] This divergence reflected larger disagreements among the President's advisors over what the postwar mission in Iraq demanded, making for a difficult and tense planning process.[10] In every aspect of the effort—in both the humanitarian and reconstruction areas—complex contracting regulations and time pressures pushed USAID's capacities to the limit, exposing structural weaknesses in the U.S. government's capacity to mobilize for contingency relief and reconstruction operations.[11]

USAID's *Vision for Post-Conflict Iraq*, first drafted in October 2002, stated the Administration's emerging policy that "reconstruction will aim to bring Iraqi facilities back to a modestly improved pre-conflict level." It also included this pointed—and, in retrospect, markedly accurate—assessment: "complete reconstruction to the economic and institutional capacity of 1980 (conditions prior to the Iran-Iraq war) will require years of public investment."[12]

**Planning to Prevent a Humanitarian Disaster**

The fear that Saddam would severely damage his own country in response to a U.S. invasion drove much of USAID's humanitarian planning. "What happens if Saddam blows up the dikes, the dams, floods the country?" Natsios asked.[13] Refugees also were a paramount concern. In response, USAID mobilized its cadre of U.S.-based and international NGOs that carry out the agency's humanitarian missions. The agency's disaster relief expert, Jonathan Dworken, chaired regular meetings in the USAID crisis room to plan their deployment.

USAID's Office for Foreign Disaster Assistance built the largest Disaster Assistance Response Team in the agency's history.[14] USAID's Office of Transition Initiatives (OTI), which works to stabilize countries making the transition from violence to peace, also mobilized much of its staff to work on Iraq planning.[15] Programs to prevent or minimize acts of reprisal and to maximize high-visibility projects that would symbolize U.S. goodwill were geared toward best-case, worst-case, and middle-range scenarios.[16]

Food was also a top priority.[17] The World Food Program, the food-aid branch of the UN, was deemed best suited to manage the logistics; it had the capacity to rush in 600,000 metric tons of food to feed 25 million people each month.[18] In

PX213

the early fall of 2002, the Director of USAID's Office of Food for Peace alerted World Food Program officials in Rome that hostilities in Iraq might be imminent. Robin Cleveland, co-chair of the NSC's humanitarian working group, then authorized up to $200 million for the World Food Program to survey roads, identify warehouses, and preposition trucks, supplies, and staff.[19] It was the first U.S. down payment on postwar Iraq.

Success in Iraq would depend significantly upon synchronizing civilian relief efforts with military combat operations. In early November 2002, a contingent from the NSC's Humanitarian Working Group spent two days at CENTCOM headquarters in Tampa, Florida.[20] The Humanitarian Planning Team, as this contingent came to be known, worked to improve coordination between planners at CENTCOM and USAID.[21] In Tampa, the planning team and its military counterparts walked through what each agency and the military would do in the event of mass civilian casualties, refugee flows, and disruptions in the water and food supply.

Institutional differences made this joint planning difficult.[22] In the view of some USAID officials, CENTCOM planners had a circumscribed view of postwar operations. Military planning naturally emphasized the combat phase. "They were very focused on operations orders: take this hill by this date, take this crossroads," Wherry said. USAID planners realized that meeting humanitarian needs would fall almost entirely on their shoulders."[23]

**Planning for Reconstruction**

The evolving postwar plan called for a shift to reconstruction efforts once humanitarian needs were met. The scope of reconstruction would depend upon the amount of damage.[24] The Humanitarian Working Group developed reconstruction plans for various sectors and assigned an agency to lead each one. USAID would bear responsibility for most sectors, including health, water and sanitation, electricity, education, transportation, telecommunications, and agriculture/rural development. It also would complement governance efforts by the Department of State. Officials at Treasury would handle plans for financial recovery and economic development. Oil was assigned to the Pentagon.[25]

Wendy Chamberlin, Ross Wherry, and Christopher Milligan managed USAID's reconstruction planning.[26] The agency's institutional culture embraced a concept of development that went beyond merely rebuilding what war destroyed. Physical rehabilitation of damaged infrastructure would be one step in a larger democratic transition. Neighborhoods would need to elect their own governing councils to restore civil order. Teachers and civil servants would have to stay on the job. Employment programs, micro-lending, and other economic

PX213

stimuli would be offered alongside programs that fostered reconciliation. This conflict transformation framework had informed international peacekeeping missions in Somalia, Haiti, Bosnia, and Kosovo.[27] USAID officials proposed that it should also be adopted in Iraq.

White House officials were skeptical. This was exactly the kind of nation building the Administration had wanted to avoid. Robin Cleveland, co-chair of the NSC's Humanitarian Working Group, articulated a more limited view of U.S. objectives, insisting that only war damage would be repaired; the new Iraqi state would do most of the rebuilding, paying for it with Iraqi oil revenues. USAID planners, however, warned that achieving a stable and economically prosperous Iraq would require significant U.S. investment.[28]

The postwar policy for Iraq envisioned a democratic state that would threaten neither its regional neighbors nor U.S. interests. "Security, humanitarian assistance, and reconstruction aid," National Security Advisor Condoleezza Rice stated, would be deployed "in support of this vision."[29] How much reconstruction aid would be enough to achieve these goals was a matter of dispute between White House and USAID officials.

The U.S. postwar strategy had a two-phased approach. USAID would attend first to providing food, water, public health, and emergency electricity. Once Iraq stabilized, it would expand its focus to improving basic infrastructure, including electricity, roads, irrigation systems, hospitals, markets, and schools. The overarching goal of infrastructure repair was to return service delivery to pre-conflict levels.

Alongside physical reconstruction, USAID planned to promote economic renewal by bolstering Iraq's private sector, improving its banking system, and modernizing its agricultural economy. One of the primary goals was to establish a regulatory regime favorable to private enterprise that would, in time, make Iraq competitive in the world market. USAID put forth its plans, recognizing that fostering democratic governance in Iraq based upon the rule of law would be an enormous challenge.

The Department of State had the lead on developing a specific governance strategy, with USAID participating by preparing assistance programs that would help reform Iraq's local governance. USAID expected State to provide guidance, but in the absence of a detailed framework from the Department, the agency developed its own plan in which authority over funding many civic services would devolve to local governments, which had no previous experience in managing the delivery of essential services or administering the rule of law.[30] This proposed radical restructuring of Iraqi governance institutions was meant to promote a clean break from Saddam's highly centralized control.

PX213

USAID's approach to reconstruction embraced the Administration's transformational ambitions for Iraq, but also revealed the gulf between those ambitions and the limited resources that White House officials were willing, at the time, to commit. These differences came into stark relief when USAID's *Vision for Post-Conflict Iraq* contrasted the goals for each sector with the status of Iraq's dilapidated infrastructure. In the electricity sector, for instance, restoring service to prewar levels depended on finding enough portable generators and securing adequate supplies of fuel, substantial logistical challenges in a country with minimal refining capacity.[31]

A similar gap between goals and resources existed in the agricultural sector, Iraq's largest industry after oil. Fostering "commercial processes and a market-based food economy" would require repairing irrigation systems on more than two million acres of land, engaging in extensive technology-transfer programs, and immediately providing assistance for upcoming rice and barley harvests.[32] To meet the education sector's goal of reopening schools for the new term, the United States would need to repair 3,000 schools and provide supplies and instructional kits to 12,500 more.[33]

## Conflicted Planning

Planners framed reconstruction policy for postwar Iraq by setting benchmarks in each sector at one month, three months, six months, and twelve months. These benchmarks developed through a sustained back-and-forth debate between White House officials and those at USAID and other agencies. For example, OMB's Robin Cleveland argued that the number of schools rehabilitated would be a good indicator for progress in the education sector. But the idea of counting buildings was anathema to USAID, whose subject-matter experts insisted that the percentage of children in school would be a more accurate measure of progress toward primary-education goals. The number of schools became the benchmark.

Cleveland's demands often pushed planners beyond what they believed they could reasonably deliver. Missing from the intelligence, according to USAID's Wherry, were assessments of the economy, governance, agriculture, and other "soft" aspects of Iraq's condition. "If it couldn't be got by a satellite, we just didn't have it," he said.[34] At one point, Chris Milligan was directed to establish indicators for the transportation sector. "I had a turn-around time of four hours to determine how many miles of roads would be re-opened or repaired," he said. To meet the deadline, he went to the USAID reference library, researched the available data on Iraq's road networks, and provided his "best estimate" based upon limited information.[35] The estimate went directly into USAID's *Vision for Post-Conflict Iraq*. "A targeted 50 percent, or about 2,200 kilometers, of economically important roads and bridges open to high speed traffic," was the sector goal.[36]

PX213

• The Agencies Engage •

## USAID Reconstruction Sector-Goals Timeline

| | Immediate Post Conflict | 60 Days | 6 months | 12 months | 18 months |
|---|---|---|---|---|---|
| Water and Sanitation | Rubber water bladders and purification equipment for up to one million displaced persons. Generators will be provided to power water systems pumps as required. | Repairs will begin on up to 10 urban water systems, assuming secure access to them. | Dependable minimum water supply will have been re-established in 15 cities. | Water systems will begin to be returned to local control. Revenue generation will be an issue at that point. | Dependable minimum water supply will have been re-established in all cities greater than 25,000 persons. Primary sewage treatment will have been restored in ten urban centers. |
| Public Health | Delivery of medicines and consumable surgical supplies to treat injured civilians and operate medical facilities. | Basic health services will be available to a targeted 25% of the population, and maternal/child health up to 50% of the population, in secure areas. | Basic health services will be available to a targeted 50% of the population, and maternal/child health up to 100% of the populations, in secure areas | The reformed Ministry of Health will begin operating the health care system. Referral hospitals will be functioning in 21 urban locations. | Basic Health services available to the entire population. Advanced surgical services available. |
| Transportation | Damage assessments will be reviewed to prioritize reconstruction efforts. Repairs to Umm Qasr and Basra International proceed. | Port of Umm Qasr and Basra International Airport reopened for humanitarian traffic. Flour mills connected to seaport. | A targeted 50%, or about 2,200 kilometers, of economically important roads and bridges are open to high-speed traffic. Ports of entry for highways are appropriately controlled. | Reconstruction of roads, rail and barge landings completed to minimal level. | The Ministry of Public Works will be restructured, and furthered transportation assistance will make a transition to being the responsibility of the Ministry and local governments. |
| Electricity | Install emergency generators at hospitals, pumping stations, other priority sites. | A targeted 550 diesel-driven emergency generators will be installed. Rapid assessments conducted as security permits, and a power restoration plan prepared. | 15% of the high voltage (132Kv and 33Kv) distribution net repaired, including rehabilitation of a targeted 50 substations and 5 generation plants in key urban areas. 40% of the previously served population has electricity. | Generation of 6,750 MW achieved. | An additional 60 substations and another 5 generation plants operational. Total electric supply a targeted 75% of pre-1991 level, with electricity reaching most, if not all, of the urban population. |
| Local Development | Prevent destruction of land records, ration lists, public documents. | Identify key local leaders and councils; connect them to opportunities for relief and reconstruction assistance, using small grants for immediate assistance as appropriate. Radio stations operating in secure areas. | Reconstruction offices established in all 18 provinces to coordinate projects and facilitate service provision. Interim local assemblies have clear roles and responsibilities. | Local governments counterbalance recentralization tendencies; interim democratic institutions demonstrate representative and transparent local governance. | Local administrations have responsibility for revenue generation for local services. |
| Economic Governance | Technical assistance teams will begin work outside Iraq to prepare for the needs of the Finance Ministry and the banks. | Technical teams ready to move into Iraq to assist a vetted Iraqi financial leadership team. Small business lending facility prepared to open. | Central Bank and MOF operating. Central Bank and SOMO cooperate on oil sales and food imports. Permissive environment for private banks. If a new currency is needed, ready for issuance. Programs promote competitiveness and global trade | MOF handles all government payrolls. Legal framework is hospitable to private business. | Privatization of state-owned businesses is occurring. Widespread access to private commercial banks. |

Source: USAID, *Vision for Post-Conflict Iraq*, February 19, 2003.

Although some USAID officials had taken part in interventions in Bosnia, Kosovo, and Haiti, the agency had not had a role in large-scale contingency relief and reconstruction operations since the Civil Operations and Revolutionary Development Support (CORDS) program in Vietnam.[37] USAID's office computers were not even outfitted to email the classified plans agency officials were developing. Each time its planners completed a new draft, they had to hand-carry copies to the White House.[38]

• 23 •

PX213

Navigating between agency views and White House demands proved difficult. Realizing that he could not bridge some of the divides, USAID's Milligan decided to "jump through hoops" to get as many resources as possible to mobilize contractors and agency personnel in advance of the invasion. "Just tell me what I need to do to secure the money so we can be reasonably prepared," Milligan remembers thinking.[39] Although members of the Humanitarian Working Group had disagreements along the way, at no point did they take these issues to the level of Frank Miller's Executive Steering Group on Iraq or to Stephen Hadley's Deputies Committee.[40]

By December 2002, USAID had arrived at a picture of what the agency thought it would take to reconstruct Iraq within the policy guidelines set by the NSC. Officials consolidated humanitarian and reconstruction plans in a huge spreadsheet that became known as the "horse blanket."[41] The horse blanket showed the order in which USAID would mobilize its workforce and the many contractors it employed. It was a checklist of what would need to happen inside the agency to get ready for postwar Iraq.

In a briefing to the NSC Deputies Committee on December 10, 2002—with war just over three months away— Robin Cleveland and Elliot Abrams presented the Humanitarian Working Group's final recommendations. Most of the briefing slides detailed humanitarian preparations; a few dealt with reconstruction and the complex Iraqi political situation that would emerge after the invasion.[42] The presentation listed the assumptions on which the group had based its plans. A secure environment was first.[43] The briefing also made clear that the working group had planned for only a modest intervention. After the meeting, USAID was "instructed to go full bore with detailed planning," including drawing up the contracts to carry it out.[44]

### USAID Mobilizes Contractors

Like most U.S. civilian agencies, USAID had little in-house surge capacity. Almost all of its mission in Iraq would be executed by NGOs and the small circle of companies that traditionally bid on the agency's contracts. By early 2003, six in ten of the personnel running USAID's overseas missions were contractors, the result of a 37 percent cutback in government staff in the decade following the Cold War.[45] "We lost a third of the Foreign Service and a third of the civil service in the mid-90s," Administrator Natsios said, "and we never got them back."[46]

Mobilizing USAID's contractors was complicated. By law, U.S. agencies must follow the Federal Acquisition Regulation (FAR), an encyclopedic compendium of rules governing federal contracting.[47] The FAR values procedural fairness and transparency over expediency.[48] Its mandatory reviews and restrictions would

PX213

later rankle officials in Baghdad, who thought its provisions were not well-suited for contingency contracting in a war-zone. A number of FAR exemptions allowed for flexibility in unusual circumstances.[49] One of the most important was the "notwithstanding authority" clause, which permitted USAID's Office of Foreign Disaster Assistance to award grants to relief organizations outside normal FAR processes, if international disaster relief demands required it.[50]

USAID had existing contracts for frequently used services, which enabled it to set up some postwar contingency programs for Iraq rapidly. These "indefinite delivery, indefinite quantity" (IDIQ) contracts were held by firms that maintained ready-response capabilities. As planners identified needs, agency officials would issue "task orders" under an IDIQ contract, which the contractor would then carry out. Pre-authorization letters also enabled USAID to mobilize contractors and emergency-relief organizations before specific task orders were written or grants awarded.[51] In extraordinary situations, agency officials could waive the FAR's "full and open competition" requirement.

On January 16, 2003, with war looming, USAID Administrator Andrew Natsios did just that, waiving the FAR's full and open competition requirement for all war-related contracts. USAID's late entry into planning, Natsios argued, made it impossible to use the normal bidding processes.[52] The agency's Inspector General later certified that USAID properly justified the waivers for each contract it let with less than full and open competition.[53]

A number of USAID's contractors received urgent phone calls during this period. The day after Christmas 2002, Bruce Spake, Vice President at Development Alternatives, Inc. (DAI), heard from USAID official Rob Jenkins: "Bruce, we're interested in talking to you about some possible work in a place in the Middle East. You read the newspapers, don't you?" Jenkins asked Spake to write a concept paper for working in a destabilized country in the Middle East "without using that country's name." Spake turned in a paper the next day, and DAI was awarded a contract shortly thereafter. In February 2003, the company dispatched an advance team to begin operations in Kuwait, weeks before senior U.S. civilian leadership arrived in the region.[54]

USAID also awarded a total of $41 million in international disaster assistance to a broad array of NGOs, including Mercy Corps, Save the Children, and the International Rescue Committee.[55] By the end of February, the agency had provided $17.3 million for prepositioning relief commodities in theater.[56]

Contracting was more complicated on the reconstruction side, in part because USAID's development ethos had long since moved away from viewing large infrastructure projects as catalysts for economic growth. Although the agency activated several of its standing IDIQ contracts, it still needed new contracts

PX213

• Chapter 2 •

for the large-scale construction tasks looming ahead.[57] Crafting their language was a crucial step in the mobilization process. To ensure that reconstruction policy formulated by the NSC translated into the right assets on the ground, contracting officers from USAID's management bureau had begun working with experts across the agency in the late fall of 2002 to write the necessary "statements of work," which are basic—but critical—descriptions of a project and what is required to implement it. Many of the statements of work mirrored the goals outlined in USAID's *Vision for Post-Conflict Iraq* and the indicators developed by the NSC's Humanitarian Working Group.[58]

Eleven teams finalized the statements of work in early December and wrote requests for proposals during the last two weeks of the year.[59] "The instruction was … get in, get it [done], get out," Ross Wherry recalls. But because USAID's experts believed rebuilding would take longer, its contracting officers added options to extend each contract.[60]

From February through May 2003, USAID awarded eight major contracts worth $1.3 billion, the largest short-term burst of contracting in the agency's history.[61] This was just the beginning. The agency would soon let many more contracts, and it would dramatically increase the value of those already awarded.[62] The contracting surge put the agency in a cash crunch. Officials drew $110 million from existing accounts on an emergency basis, "mortgaging the fourth quarter of AID's budget in order to do what we had to do in January, February, and March," Wherry said.[63] The Iraq Relief and Reconstruction Fund (IRRF 1), which the Congress created in April 2003, ended up funding most of these contracts.[64]

PX213

◆ The Agencies Engage ◆

**USAID's Initial Reconstruction Contract Awards**

| Date Awarded | Contractor & Sector | Original Contract Amount ($ Millions) | Original Contract Ceiling or Current Obligation ($ Millions) | Contract Length | Contract Type & Procurement Method |
|---|---|---|---|---|---|
| 02/07/03 | International Resources Group (IRG): Personnel Services Contract | $7.000 | $27.10 | 3 month, with 2 option years | CPFF: Sole Source |
| 03/17/03 | AFCAP: Logistics | $26.00 | $91.50 | 2 years | CPAF: Interagency agreement |
| 03/21/03 | SkyLink Air: Airport Administration | $10.200 | $27.20 | 18 months, with 2 option years | CPFF: Less than full and open |
| 03/07/03 | SSA Marine: Iraq Seaport Assessment | $4.800 | $14.32 | 1 year with no option year | CPFF: Less than full and open |
| 04/11/03 | Research Triangle Institute: Local Government I | $168.000 | $241.91 | I year, with 2 option years | CPFF: Less than full and open |
| 04/11/03 | Creative Associates, Inc. (CAI): Education I | $62.628 | 56.50 | 1 year, 2 option years | CPFF: Less than full and open |
| 04/17/03 | Bechtel National: Infrastructure | $680.000 | $1,029.83 | 18 months | CPFF: Less than full and open |
| 04/30/03 | Abt Associates: Health Systems | $43.800 | $23.03 | 1 year | CPFF: Less than full and open |
| 06/01/03 | Army Corps of Engineers: Architecture and Engineering Services | $3.00 | $38.09 | 1 year, 2 option years | Interagency agreement |
| 06/25/03 | Management Systems International: Monitoring and Evaluation | $5.038 | $15.12 | 1 base year and 2 option years | Task Order: RFP to all holders of IQC |
| 07/24/03 | Bearing Point: Economic Recovery I | $79.583 | $79.58 | 1 year with 2 option years | CPFF: Less than full and open |
| 10/15/03 | Development Alternatives, Inc.: Agricultural Development | $36.900 | $106.70 | 1 year with two option years | CPFF: Full and Open |

Source: SIGIR, "Iraq Reconstruction: Lessons Learned in Contracting and Procurement," July 2006, 32.

By far the most substantial IRRF 1 contract during this period—and the largest single contract ever let by USAID—went to Bechtel International on April 17, 2003: $680 million for major infrastructure reconstruction. The expedited bidding process shortened the procurement time normally required for so large a contract from seven months to three.[65] Of the seven contractors invited to compete, only two submitted bids.[66]

The Bechtel contract's statement of work reflected the planners' beliefs that rebuilding Iraq's infrastructure would help achieve U.S. foreign policy goals. "The

PX213

U.S. government envisions a postwar reconstruction effort," the statement read, "as a highly visual symbol of good faith toward building trust for economic, social and cultural benefits as well as for political stability in the region."[67] Five months later, USAID would increase the Bechtel contract's value to $1.03 billion.[68]

**Defense's Oil Sector Plan**

As USAID planned for its sectors, the Department of Defense prepared for the oil sector, while Treasury focused on financial and economic recovery plans. Senior officials believed that a rapid post-invasion restoration of Iraq's oil sector was central to achieving U.S. strategic goals. The prospect that oil revenues could finance Iraq's reconstruction led the Administration to assert in March 2003 that total costs to the American taxpayer would be limited.[69] With 115 billion barrels of known reserves and potentially 100 billion more lying in wait—the world's third-largest reserves—Iraq, in theory, could rely exclusively on oil to provide not only electricity, gasoline, and cooking fuel, but also most of the revenue it needed for reconstruction.[70] But Iraq's dilapidated oil infrastructure stood in the way.

During the 1991 Gulf War, the U.S. bombing campaign severely damaged the country's refineries and oil distribution networks.[71] The lack of proper maintenance during the sanctions era further degraded the oil sector to the point that Saddam was unable to make use of a 1998 UN authorization that allowed oil sales to double.[72] Despite the import of more than a billion dollars in spare parts and equipment under the Oil-for-Food program, Iraq's production capacity only marginally improved during the latter half of the 1990s.

On September 20, 2002, Under Secretary Feith established the Energy Infrastructure Planning Group inside the Department of Defense, placing it under the leadership of Michael Mobbs.[73] Representatives from the Departments of State, Energy, and Defense, and the Central Intelligence Agency eventually joined.[74] Formal meetings began in November, with draft plans due by mid-December.[75]

The task of determining how to revitalize Iraq's oil sector far exceeded the U.S. government's in-house expertise. The need to turn to a specialized private sector company led to the first significant—and the most controversial—contract in Iraq reconstruction. Although a number of firms could repair oil infrastructure, the decision to classify the oil cell's planning restricted the universe of supporting contractors to those with security clearances.[76] Mobbs thought that the Houston-based firm of Kellogg Brown and Root (KBR), the prime contractor for the U.S. Army's massive Logistics Civil Augmentation Program (LOGCAP), was a logical choice.[77] LOGCAP is the Army's standing IDIQ contract for the worldwide support of military operations, chiefly providing troops in the field with food, fuel, and billeting.

PX213

Just as USAID had outsourced much of its work in the years after the Cold War, the military also had turned to the private sector to perform work once done by its own personnel. Under the LOGCAP contract, which KBR held for all but a few years since the program's inception in 1985, contractors provide services ranging from building bases to cooking food and doing laundry. LOGCAP grew out of the post-Vietnam downsizing of the armed services, reflecting the government-wide growth of outsourcing, which would dramatically affect the war and reconstruction efforts in Iraq.[78] In World War II, one contractor was deployed for every seven soldiers.[79] During the 2003 invasion, that number had increased to one for every 2.4.[80] By 2006, contractors outnumbered soldiers in Iraq.[81]

KBR's responsibilities under LOGCAP meant that it was already working in support of the Defense Department's Iraq war plans. Mobbs wanted to capitalize on this existing relationship. Hiring KBR, though, could create the appearance of a conflict of interest, because Vice President Cheney was the former CEO of KBR's parent company Halliburton.[82] Under Secretary Feith raised this issue at a Deputies Committee meeting and even alerted the Vice President's office. According to Mobbs, White House officials said the mission took priority over whatever political fallout might occur from granting a sole-source contract to KBR.[83]

A second possible conflict arose. The General Counsel of the Army Materiel Command ruled that asking KBR to assist the oil cell was outside the scope of activities permitted under the LOGCAP contract. The legal opinion acknowledged that a contract for the logistical support of military operations was not an appropriate vehicle for funding plans to repair a foreign country's oil infrastructure. The matter was forwarded up the chain, first to the Army General Counsel, and then to the Department of Defense General Counsel, who settled the matter on November 8, 2002.[84] So long as the job did not extend to actual repair work, the opinion stated, the contract could go forward under LOGCAP.[85] A task order for $1.9 million was issued to KBR the same day.[86]

The link between planning and executing oil sector repairs, however, could not be easily severed. On March 8, 2003, just three months after KBR had received its planning contract and one week before the invasion of Iraq, the U.S. Army Corps of Engineers (USACE) awarded KBR a $7 billion sole-source contract for repair work on Iraq's oil sector.[87] As the contracting documents reveal, part of the basis for this award was the previous task order issued to KBR.[88] This would be the single largest reconstruction contract in Iraq and the largest known sole-source contract in U.S. history.

A subsequent review by the Government Accountability Office (GAO) found that the original November task order was beyond the scope of the LOGCAP contract and that the Army Field Support Command should have prepared a

PX213

written justification to authorize the work without competition.[89] But Defense officials later justified their use of LOGCAP by citing overriding national security interests in getting planning started. "We certainly did not have time to run a competition to see who was going to support us," Mobbs said.[90]

USACE mobilized to help with the oil sector work. General Robert Crear, commander of the Corps' Southwest Division, established Task Force Restore Iraq Oil (RIO) as part of the plan to rush engineers into theater. Task Force RIO's projected strength was 129 personnel, 90 of whom would be civilians.[91] By February 2003, a Task Force RIO advance team had deployed to Kuwait.

As Task Force RIO and the Energy Infrastructure Working Group proceeded, Frank Miller and NSC staffer Pamela Quanrud developed a longer-term plan for moving control of Iraq's oil infrastructure back to Iraqis. Avoiding the perception that the United States would annex Iraq's oil wealth for its own purposes was a crucial goal. Miller and Quanrud devised a way to manage downstream and upstream production while also assembling a governing board of Iraqis. Decisions about Iraq's oil wealth were not to be seen as made by the United States alone. Their plan was approved by the President—who came to call Quanrud "the petroleum lady"—in January 2003, when war with Iraq was two months away.[92]

**Treasury's Financial Reconstruction Plan**

The NSC gave the Treasury Department a unique mission for postwar Iraq—preserving and restoring the country's financial system—that Treasury ultimately executed with success in the chaotic months after Saddam's fall. Treasury officials recognized that the financial recovery of Iraq depended upon the simultaneous accomplishment of two interdependent feats: maintaining confidence in the country's currency and restoring operations at Iraq's financial institutions, including its central and commercial banks and the Ministry of Finance. Without a functioning financial system and a stable currency, commerce in Iraq—and thus much of ordinary life—would grind to a halt.

Addressing these and other economic challenges fell to Treasury Under Secretary John Taylor, who, beginning in September 2002, led the agency's Iraq planning efforts, along with Van Jorstad, George Mullinax, and David Nummy.[93] Taylor established the Treasury's Task Force on Iraq Financial Reconstruction, setting up offices in the Treasury Department's Market Room. Taylor and his team soon found that reliable information about Iraq's economy was almost nonexistent.

The International Monetary Fund had not done a technical analysis of Iraq's economy for twenty years, and Iraqi data-collection entities had atrophied under Saddam. Almost no bank in Iraq transferred money electronically, and the regime

PX213

had co-opted the once-functional Central Bank to "lend" money to Saddam's cronies. There was also the issue of dealing with Iraq's dual system of currency—the "Swiss" dinar used in the Kurdish region in northern Iraq and the "Saddam" dinar used everywhere else.[94]

Taylor worked with Iraqi participants drawn from the Future of Iraq Project and experts across the government to draft contingency plans to prevent a monetary collapse and stabilize Iraqi assets.[95] The plan focused on securing key financial institutions after Saddam's regime fell and then using seized Iraqi assets to pay the government's employees and pensioners until a permanent system could be established. In support of this planning, the President issued an executive order on March 20, 2003—the day the war began—authorizing the freezing of Iraqi funds held in U.S. banks. The United States ultimately vested about $1.9 billion of these assets in the Treasury Department for—among other things—paying Iraqi salaries.[96]

## NSC's Asymmetry

A striking asymmetry resulted from the NSC-led planning process: the U.S. government planned for the worst-case humanitarian scenario while it simultaneously planned for the best-case reconstruction one. Humanitarian planning for postwar Iraq advanced smoothly because the humanitarian disaster contingencies involved were straightforward, and the President had backed the effort from the beginning. Consequently, humanitarian planners could mobilize any part of the government and were free to reach out to international institutions to obtain help in formulating what became a robust multilateral approach. By contrast, irreconcilable views of how extensive the U.S. financial and administrative role in Iraq might become impeded reconstruction planning. Repairing war damage ultimately became the policy goal, but little connection was made between how the rebuilding would—or even could—bring about a democratic transition.[97]

The reality was that most policymakers considered reconstruction a relatively minor issue. They saw USAID's contract with Bechtel as a "standby" measure—for emergency use only.[98] USAID officials—who, in 2002, had privately predicted a $90 billion rebuilding scenario over three to five years—could not have gotten "traction" for a large reconstruction plan with the officials to whom they reported in the interagency planning group.[99]

The responsibility for reconstruction, along with all the other bureaucratic and administrative duties playing out in the fragmented planning process, would soon fall under the Department of Defense, which, at Secretary Rumsfeld's request, would be given full responsibility for administering postwar Iraq.

PX213

## Chapter 3
## The Department of Defense Takes Charge

> *It has long been a concern of mine that the U.S. Government lacks a standing capability in the area of reconstruction and that there is no long-established team of civilians, let alone an experienced joint civilian-military team, to handle the challenges of major post-conflict tasks.* \*
>
> **Donald Rumsfeld**
> Secretary of Defense (2001-2006)

In the wake of the October 2002 decision to delay establishing a civilian office in the Department of Defense to coordinate interagency planning for postwar Iraq, the existing planning groups pressed on independently.[1] USAID created a detailed plan for humanitarian relief and reconstruction operations. A Department of Defense team prepared to restore Iraq's oil infrastructure, and a team at the Department of the Treasury planned to restore Iraq's financial infrastructure. An interagency humanitarian planning team, with representatives from agencies across the government, worked at CENTCOM headquarters. But the absence of a single coordinating office meant there was no management locus around which postwar planning could coalesce. "What was lacking," Under Secretary Douglas Feith would later say, "[was] the integration."[2]

The postwar structure briefed to the National Security Council in mid-October—a three-star military headquarters and a parallel civilian administration—still existed only as a diagram on a briefing slide. The Administration lacked a consensus policy on key matters, such as the formation of an interim Iraqi authority and a timeframe for transferring power to it. "Liberation" had become the dominant assumption, but whether liberation could be easily achieved and stability secured was viewed differently by defense, diplomatic, and development officials. All the while, troops and materiel flowed to the Gulf.

At CENTCOM headquarters in Tampa, Florida, the small building that housed Iraq war planners was a beehive of activity. Every week seemed to bring a new major event requiring action. First was the President's speech to the UN in September 2002, then the war resolution before the Congress in October. Next came the issue of obtaining basing rights in the region. Periodically, yet another Rumsfeld-directed revision of the war plan would arrive, triggering

---

\* Donald Rumsfeld, former Secretary of Defense, letter to SIGIR, April 4, 2008.

PX213

commanders' conferences, new iterations of deployment schedules, and a blizzard of briefing slides.[3]

Through all of this activity, Phase IV got short shrift—but not without notice. Since late August 2002, the Joint Staff had worried that Phases I through III had swamped CENTCOM and that planning for Phase IV had fallen behind.[4] The Joint Staff recognized that CENTCOM had devoted insufficient resources to integrate government-wide postwar planning within Phase IV and to coordinate it with phases I through III.[5] Majors Thomas Fisher and Ray Eiriz, the CENTCOM planners working on Phase IV, had other responsibilities that pulled them from their postwar planning work.[6]

On December 11, 2002, the Phase IV planners, spurred by the Joint Staff, started catching up. Major Fisher quickly initiated an intense postwar planning session with a 40-person interagency team. Three days later, he briefed the Joint Staff on the draft Phase IV plan. It predicted rough going ahead. "We were assuming that there would be no government that moves in, so we were anticipating chaos," Major Fisher said. "We did make the assumption that at some point there would be an international mandate, either of the Coalition or of the United Nations."[7] After Fisher's briefing, the Director of the Joint Staff, Lieutenant General George Casey, realized that CENTCOM needed to augment the Phase IV effort, so he created a joint task force—designating it JTF-4—to supply 58 more personnel to help with postwar planning.[8]

**Defense Leads Postwar Planning**

On December 18, 2002, the President used the phrase "war is inevitable" at an NSC meeting.[9] The remark prompted Secretary Rumsfeld to launch the long-awaited civil-administration office that would help manage postwar Iraq. Soon thereafter, the President resolved the question of its chain of command.

At Secretary Rumsfeld's request, and with Secretary of State Colin Powell's concurrence, the President placed the Defense Department in charge of all postwar activity.[10] "State does not have the personnel, the capacity, or the size to deal with an immediate postwar situation in a foreign country that's eight thousand miles away from here," Secretary Powell explained.[11] Lodging oversight of both military and civilian functions in the Defense Department, Rumsfeld had argued, would ensure a seamless transition from combat to reconstruction. A unified chain of command, running from the Secretary down through CENTCOM, would prevent the split between the military and civil reconstruction seen in Bosnia and Kosovo.[12]

The President formalized the decision on January 20, 2003, by issuing National Security Presidential Directive 24 (NSPD 24), consolidating responsibility for

PX213

managing postwar Iraq in a new organization, the Office of Reconstruction and Humanitarian Affairs (ORHA), housed within the Defense Department.[13] With a stroke of his pen, the President superseded the existing system for interagency postwar planning inside the NSC. This dramatic shift shocked some Iraq planners. "Within a 24-hour period all of a sudden Robin and Elliot go away," USAID Administrator Natsios said, referring to the Humanitarian Working Group led by Robin Cleveland and Elliot Abrams.[14] "We were just stunned," the agency's acting Deputy Administrator James Kunder said. "It was our first insight into the fact that there were big processes going on that we were oblivious to."[15]

As Defense officials consolidated control, the period of adjustment that followed was turbulent. Some compared the implementation of NSPD 24 to a hostile takeover. "You don't need to worry about the nuts and bolts of basic reconstruction," NSC Senior Director Frank Miller remembers two Defense officials saying. "It's now an [Office of the Secretary of Defense] operation." "Thereafter," Miller said, "it was 'you guys stay out, we don't need your help.'"[16]

NSPD 24's new arrangements directly affected CENTCOM's Phase IV planning. "There were two phases to the plan we had developed," Major Eiriz said. First, the Humanitarian Planning Team would ensure that the rest of the government be "in synch" with CENTCOM's plans for humanitarian contingencies. "Then there was going to be the reconstruction planning team," to address the restoration of Iraq's civil institutions and infrastructure. But after NSPD 24 was issued, CENTCOM stood down the Humanitarian Planning Team and assigned the reconstruction mission to JTF-4.[17]

**Strategy and Force Levels**

The standing war plan for Iraq, developed by General Franks's predecessors at CENTCOM, called for a half million troops—a number Secretary Rumsfeld and his aides thought much too high in light of advances in war-fighting technology and service integration.[18] Relying on a large force would bring more troops into theater than needed, Rumsfeld argued, and would also constrain the President's ability to respond quickly to any other provocations.[19] "We got told that it was old think, too big, wasn't innovative, and to readdress the planning using a different set of assumptions," said Colonel Mike Fitzgerald, CENTCOM's chief of war plans.[20]

Secretary Rumsfeld pushed General Franks to develop a more flexible plan, one that would rely on fewer troops. "It was clear to the planners, over time," Fitzgerald said, "that some of the assumptions we had made were not going to be accepted very well unless they went the way the Office of the Secretary of Defense was thinking."[21] The revised war plan significantly reduced aggregate

PX213

• The Department of Defense Takes Charge •

force levels. General Franks ultimately recommended to the President that he send only 160,000 combat soldiers, two-thirds less than the number initially suggested by CENTCOM planners.[22]

The President questioned whether this lower troop level would affect security after the invasion. "In the area of law-and-order, the President and Rice asked Tommy Franks if it was covered," Frank Miller recalled. "He said it was—'every village will have a mayor, a lieutenant, captains, a structure.' He was asked again if he was sure—he emphatically answered, '*It's covered.*'"[23]

The Coalition ground forces commander, Lieutenant General David McKiernan, "really felt strongly about the inadequacy of the force," said Colonel Mike Fitzgerald.[24] The idea of fewer troops similarly unsettled CENTCOM Phase IV planners, as Major Fisher explained:

> The thing we kept going back to was we've only got so many people. Do you want them on the streets protecting people? Do you want them on the borders keeping WMD from getting away and keeping terrorists from getting in? Do you want them on the oil pipelines to keep the oil flow flowing? Do you want them handing out food to people that need food? Do you want them securing bank vaults and things of that nature? Do you want them conducting [medical programs] to build good will? I would sit there and talk to these people from [the office of the Secretary of Defense] and they'd say, 'You know, we need to improve security on the borders.' And I'd say, 'Do you know when you stretch the border of Iraq out, it's longer than our border with Mexico? How many divisions would you have to put in Arizona, New Mexico, California, Texas to secure our border?'[25]

**Building ORHA**

On Thursday, January 9, 2003, Jay Garner, a retired Army Lieutenant General and president of the defense contractor SY Technology, was lunching at a restaurant in New York when Under Secretary Douglas Feith called his cell phone. Garner had successfully led Operation Provide Comfort, a humanitarian mission in Northern Iraq, after the 1991 Gulf War. "We just got out of the Secretary's office," Feith said, "The Secretary would like for you to consider coming in and helping us put together a postwar organization."[26]

Garner and Rumsfeld had served together on a federal advisory panel, and the Secretary thought it would be easier for a former military man—especially

PX213

one who knew Iraq—to work with CENTCOM.[27] Garner met with Feith and Rumsfeld the following week. When he agreed to lead ORHA, Lieutenant General Garner could not have known he was "embarking on mission impossible," as one national security aide described his job.[28] Just 56 days after ORHA moved into its empty Pentagon offices, the United States would be at war.[29]

Created by NSPD 24, ORHA started with no staff, was barely integrated into the military command structure, and—from day one—encountered hostility from the very parties whose activities it was asked to coordinate. Three military commands, two civilian agencies, and the circle of White House officials expecting to oversee postwar administration learned of Garner's appointment after the fact.[30] "Rumsfeld pulled the rug out from under them," Garner recalls. "They never forgave us for that."[31]

The success of ORHA was premised on the idea that Garner would "operationalize" plans that had already been well developed through the interagency process. But when Lieutenant General Garner arrived at the Pentagon, no master civilian plan was there to greet him. "They hadn't lined up anybody to brief us … we really had to find out what they were doing by word of mouth." Garner later learned about the Office of Special Plans—Feith's Pentagon unit dedicated to postwar planning—but its products, Garner said, were "never given to us, we never saw it, didn't know about it." Garner learned of the office's existence just before the invasion, when one of his aides happened across it by chance.[32]

The logistical and staffing challenges inherent in starting ORHA from scratch were overwhelming. "We didn't have a desk, we didn't have an office, we didn't have a telephone, we didn't have anything," Garner recalls. Arabic linguists, regional specialists, and military planners were nowhere in evidence. Garner himself started work on a volunteer basis when the Pentagon was unable to process his hiring as a temporary employee.[33]

Lieutenant General Garner moved quickly to build a team. He brought in retired Lieutenant General Ron Adams as his deputy and hired retired Lieutenant General Jerry Bates and Colonel Paul Hughes as senior advisors. Colonel Thomas Baltazar was assigned by Feith's office, and Chris Milligan came over from USAID. USACE sent Major General Carl Strock to be ORHA's seventh member. National Security Advisor Condoleezza Rice meanwhile urged government agencies to provide more personnel to support the fledgling organization.[34]

Garner organized ORHA into three pillars: humanitarian assistance, civil administration, and reconstruction.[35] When Chris Milligan moved into the Pentagon the week of January 20, 2003, he helped Garner and Bates flesh out the pillar structure.[36] The reconstruction and civil administration pillars would oversee Iraq's 22 ministries. To get the ministries back on their feet, an American

PX213

• The Department of Defense Takes Charge •

"senior advisor" assigned to each would serve as the liaison between ORHA and the new Iraqi government.

Garner wanted a U.S. government agency in charge of each pillar. "Adams and I sat down," he remembers, "and we put State Department over humanitarian affairs, and we put State Department over civil administration, and we put USAID over reconstruction."[37] It was a division that reflected each agency's expertise, as well as existing interagency plans. But Rumsfeld objected to Garner's decision, demanding that a Defense official control all three pillars. "I had a running gun battle with the Defense Department on who were the leaders of each of these pillars," Garner recalled.[38]

Secretary Rumsfeld eventually relented, claiming only the civil administration pillar as Defense's own, but he still questioned the appropriateness of several officials selected by State and USAID. "The White House," Rumsfeld later wrote, "believed [the selections] would not be a good fit within ORHA."[39] Garner named Ambassador George Ward to lead the humanitarian pillar, with Dick Owen, a USAID official, as his deputy. USAID official Lew Lucke took charge of the reconstruction pillar, with Christopher Milligan in the deputy slot.[40]

Finding a lead for civil administration proved difficult.[41] Feith eventually nominated Michael Mobbs, who had overseen the department's oil-planning cell.[42] The State Department immediately protested the appointment of a lawyer rather than a professional diplomat to such a key position. Under Secretary of State Marc Grossman told Garner that Mobbs was unqualified for the job. Garner brokered a compromise in which Ambassador Barbara Bodine, an experienced Arabist who had previously served in Baghdad, would join ORHA to support civil administration and provide experience that Mobbs lacked.[43]

Unable to assemble a large civilian support staff quickly, Garner filled much of the rest of his staff with military personnel. When he asked the Joint Chiefs for 90 military personnel, Lieutenant General Casey, Director of the Joint Staff, initially refused. "No, too many people," Casey said, telling Garner that ORHA would not be operating 24 hours a day. "If you think we're not going to have a 24/7 operation over there," Garner thundered, "where the hell have you been in your career?"[44] Only after Garner scheduled a meeting with Secretary Rumsfeld to protest the refusal did Casey relent.[45]

The staff Garner cobbled together was an ad hoc team—a portent of things to come in post-invasion Iraq. Many of the leadership positions were filled by officials pulled from retirement or outside government. Senior State Department officials were conspicuously absent. "There was not a lot of participation or enthusiasm for the mission even at senior levels at the State Department," George Ward said. "It was 'if you don't want us, we're not going to play the game.'"[46]

PX213

**Struggling for Resources and Control**

As ORHA organized itself at the Pentagon, JTF-4, the Joint Staff's Phase IV task force, was doing the same thing at CENTCOM headquarters in Tampa. In mid-December, Casey had tapped Brigadier General Steven Hawkins, his subordinate from operations in Bosnia, to command JTF-4. Hawkins arrived at CENTCOM the same day Garner was asked by Secretary Rumsfeld to lead ORHA.[47] Phase IV planning was transferred from the CENTCOM planning cell to JTF-4 during the third week of January 2003, about two months before the invasion would begin.[48]

The division of duties between ORHA and JTF-4 was ambiguous. Hawkins saw JTF-4 as more than just an organization to assume control of CENTCOM Phase IV planning. Casey, who launched JTF-4 before ORHA's formation, had intended it to become the command center for postwar operations in Iraq, led by a three-star general.[49] In this formulation, JTF-4—not ORHA—would have the postwar operational lead after the fall of Saddam's regime. Dozens of area specialists and the best military planners would help it work directly with USAID, the Department of State, USACE, and the Coalition Forces Land Component Command (CFLCC).[50] ORHA's creation fundamentally altered this vision, but the new arrangement was anything but clear.

CENTCOM's leadership was not happy with either ORHA or JTF-4. Although Rumsfeld envisioned ORHA as a "module that fit within the CENTCOM structure," military commanders viewed it as an unwanted interloper. "I was getting phone calls from Jay Garner, even after he deployed," Feith said. "CENTCOM was referring to ORHA as 'they' and ORHA would refer to CENTCOM as 'they.'"[51]

JTF-4 received the same arms-length treatment from CENTCOM. "I couldn't even get office supplies back [at CENTCOM headquarters in] Tampa," Brigadier General Hawkins remembered. "I went to the craft trade show at the Officers' Club and took office supplies off of every display table," he said. "That's how I put the first pads of paper on the desk to put the task force together."[52]

The cold receptions Garner and Hawkins received reflected the frustration within CENTCOM over the ever-shifting management of Phase IV. "What we had asked for was a Corps Commander and staff that was already developed," Colonel Fitzgerald said in reference to the three-star command the Joint Staff envisioned for postwar Iraq. "What we got [with JTF-4] was General Hawkins—a one-star general—and 50 great Americans trying to do great work, but with no guidance, no headquarters to accept them, no resources available. They were just orphan children."[53]

Others at CENTCOM viewed ORHA and JTF-4 as the long-promised "interagency cavalry" riding to the post-invasion rescue. ORHA and JTF-4 personnel, however, had an opposite view, seeing CENTCOM as subject to their direction

PX213

on postwar matters and obligated to furnish the military resources they needed to manage postwar Iraq. Each side tried to have its way. CENTCOM Commander General Tommy Franks cited an operational order that placed ORHA under his control. In response, Garner asserted his independence by invoking his reporting relationship to the Secretary of Defense and the Presidential charter for ORHA. "It was a continual battle on who worked for whom," Fitzgerald said.[54]

In a period of three weeks, the Pentagon's military and civilian leadership had launched what became competing postwar organizations. This failure in organizational unity hobbled the efforts of both ORHA and JTF-4 to mobilize for the mission. The resulting "confusion-of-command" dynamic foreshadowed problems that would afflict the Iraq reconstruction program in various ways over the next six years.[55]

**Two Chains of Command**

ORHA's Garner tried to broker a solution to the crossed lines of postwar authority. He asked that ORHA and JTF-4 be merged, with Hawkins becoming commander of "ORHA's operational arm." When this was rejected, Garner advocated placing General John Abizaid, CENTCOM's Deputy Commanding General, in charge of the Iraq theater, with McKiernan and Garner as co-equal subordinates.[56] McKiernan would oversee security and troop movements, and Garner would handle civil administration, reconstruction, and humanitarian relief.[57] It seemed logical to have a "military guy" in charge, Garner reasoned. "I didn't own any helicopters, and I didn't own any fuel, and I didn't own any trucks," he said.[58]

The Department of Defense weighed this option, but, on the eve of war, Rumsfeld backed away from it as well. Garner made one last phone call to Rumsfeld from Kuwait. "He finally got so mad at me, he said, 'We're not discussing this anymore,' and hung up."[59] General Franks also opposed a major postwar military command and told his planners he did not see a headquarters commanded by a four-star general—which the military would eventually create in June 2004—as necessary.[60]

Ironically, this chain-of-command confusion was exactly what Secretary Rumsfeld had hoped to avert by placing postwar administration under the control of the Department of Defense. Yet, by establishing ORHA in parallel to JTF-4, and then not having the CENTCOM commander effectively arbitrate between them, Rumsfeld created the very situation he had sought to prevent. "I pointed out to the President and to Dr. Rice," Secretary Powell said, "that they authorized and set up two chains of command." "'They said 'no we didn't,'" but then "checked and realized that's what they had done."[61]

PX213

*ORHA Prepares*

While Lieutenant General Garner navigated through the colliding chains of command, his staff focused on preparing for postwar Iraq. The humanitarian pillar took charge of the food program and the disaster relief that the NSC's Humanitarian Working Group had planned. Food, water, medicine, and shelter were being positioned in Kuwait and Jordan.[62] The reconstruction pillar began using the new USAID contracts, especially the International Resources Group (IRG) contract for technical experts.[63]

Tom Wheelock, IRG's chief of party, arrived at the Pentagon in February 2003 to augment ORHA's reconstruction staff, which now numbered more than 30. He reviewed the reconstruction targets previously established by the NSC, and immediately noted that they went well beyond what could be accomplished with the level of funding provided. The $680 million Bechtel reconstruction contract, according to Wheelock, would be "a drop in the bucket."[64]

The arrival of more USACE personnel into ORHA reignited debates about what reconstruction should accomplish. USACE saw physical rebuilding as reconstruction's primary goal. "When [USACE] said reconstruction," Major General Strock said, "[those at USAID] were not thinking of bricks and mortar and concrete. They were thinking of governance and human rights and those kinds of softer aspects of reconstruction, which are very important," Strock said. "But at the end of the day, the laws of physics apply, and if you're going to get water to people you need to understand Bernoulli's equation."[65]

The civil administration pillar was the least developed.[66] Finding reliable information about Iraq was a challenge. CIA briefings on public services and ministry functions were of limited use. "Nobody could tell how many ministries currently existed in the Iraqi government," an ORHA official said. Garner kept asking, "Where is my list of ministries?"[67]

## Iraq's Postwar Politics

Ordinarily, a political-military plan would have clearly articulated a detailed strategy for engaging with the leaders of Iraqi factions in postwar Iraq. But because Defense officials intended to transfer control rapidly to an interim Iraqi authority, ORHA was told it would not need such a plan.[68] "The expectations derived from policy set in Washington were that the establishment and devolution of authority to an Iraqi entity would proceed quickly," an ORHA planner wrote, obviating the need for a governance strategy.[69]

Garner wanted a second opinion on how to approach the politics of Iraq. In late February, one of his staff placed a call to Len Hawley, a former NSC staffer with expertise in political-military planning. After evaluating ORHA's staffing

PX213

structure, Hawley advised Garner that—at a minimum—he needed a political deputy and a political intelligence section.[70] Trying to govern Iraq with the civil-administration staff he had, Hawley said, would be akin to "running Fairfax County [a major suburban area in northern Virginia] with eight people." Failure to move immediately to control the struggle for power would permit powerful criminal constituencies to develop. "In this kind of work," Hawley said, "the clock ticks. Nothing can wait."[71]

### ORHA's Resource Problem

Iraq's postwar politics was only one of many worries. At the end of February, just three weeks before the invasion, Garner was still trying to hire enough staff. The President authorized agencies to "detail" personnel temporarily to ORHA, but they were not compelled to do so—and few did.[72] ORHA secured some personnel through defense contractors, but these personnel were prohibited by law from formulating policy or managing government resources.[73] To help solve its personnel shortfalls, Garner exploited a temporary-appointment category within U.S. law that is normally used to staff boards and commissions.[74] These "3161 appointments" enabled ORHA and later the CPA to bypass the cumbersome hiring procedures required by civil service regulations.[75]

ORHA also needed administrative, logistics, and other operational support. Colonel Robert Costello, detailed by the Department of Defense to serve as ORHA's logistics chief, joined the team on January 27, 2003. With Garner's approval, Costello immediately began using the LOGCAP contract to meet ORHA's support needs. Costello developed a statement of work that envisioned an ORHA contingent in Baghdad of 200, with 50 more in three regional offices.[76] Although the military staff ORHA needed was forthcoming, Garner ultimately had to rely on a commercial contract to supply the organization's communications support because his request for dedicated military communications assistance was denied. This denial proved to be a consequential decision. Rather than being seamlessly integrated into the secure communications systems used by war planners at CENTCOM as well as McKiernan's theater ground command, ORHA had to rely on commercial services, such as Internet connections and personal email accounts. Unable to send or receive classified information, ORHA's staff, at a critical juncture, would effectively be cut off from both war planners in Kuwait and officials in Washington.

Securing resources for postwar relief and reconstruction was yet another battle. In several meetings with National Security Advisor Condoleezza Rice, Garner presented anticipated requirements for reconstruction funding.[77] At each successive meeting, he brought Rice an ever-expanding list of requests, but few

PX213

were granted.[78] "I needed $28 million up front for judicial reform, indigenous media, food, refugees, internally displaced persons, and energy," Garner recalls. "Never did get any of those."[79]

Garner also approached Rumsfeld for reconstruction funding, but the Secretary was similarly unpersuaded by Garner's long list. Garner laid out four rebuilding scenarios for Rumsfeld, from "do what absolutely needs to be done and no more" to "redo the whole country of Iraq."

"What do you think that'll cost?" Rumsfeld asked.

"I think it's going to cost billions of dollars," Garner said.

"My friend," Rumsfeld replied, "if you think we're going to spend a billion dollars of our money over there, you are sadly mistaken."[80]

In the five years following that remark, the United States appropriated nearly $50 billion for Iraq's relief and reconstruction.

**The "Rock Drill"**

One month before combat operations began, representatives from all military and civilian agencies involved in postwar administration met together for the first time. The occasion was a "Rock Drill," an interagency rehearsal convened by Garner. In a packed conference room at the National Defense University, ORHA's staff joined officials from the NSC, the Vice President's office, the Joint Staff, the Office of the Secretary of Defense, USAID, and the Departments of Treasury, Commerce, and State. Admiral James Robb, head of policy and planning at CENTCOM, flew in. From Kuwait, Lieutenant General McKiernan dispatched Major General Albert Whitley, his British deputy, whom he had put in charge of Phase IV planning. JTF-4's Brigadier General Hawkins was also there.[81]

Not everyone made it to the Rock Drill, and some of those who came had orders not to participate fully. Senior State Department officials were conspicuously absent.[82] Officers from CENTCOM, CFLCC (CENTCOM's ground combat arm), and JTF-4's Hawkins arrived with instructions that limited the extent of their cooperation with ORHA. These "red lines," an ORHA planner wrote, "related both to the supporting/supported commander issue and to the feelings of inadequate force structure to address post-conflict planning requirements."[83] Most worrying, General Abizaid—who Garner assumed would be named the overall commander in Iraq—was absent.[84]

During the two-day conference, key ORHA officials briefed six aspects of their evolving strategy: planning assumptions; requirements; high-impact actions; measures of effectiveness at 30, 90, 180, 270, and 360 days; policy decisions required; and "showstoppers." Security was the number-one showstopper.

PX213

Official meeting notes state that "current force packages are inadequate for the first step of securing all the major urban areas, let alone for providing an interim police function."[85]

Ambassador George Ward, head of ORHA's humanitarian pillar, asked, "How am I going to protect humanitarian convoys, humanitarian staging areas, humanitarian distribution points?" A flag officer who had flown in from CENTCOM said, "Hire war lords." "Wait a minute," Ward thought, "folks don't understand this. There are warlords in Afghanistan, not in Iraq. There were no warlords to rent." "At that point," Ward said, "I thought this was going to fail because no one is paying serious attention to civilian security."[86]

Dick Mayer, a former police officer and deputy director of the Department of Justice's International Criminal Investigative Training Assistance Program, proposed that 5,000 international police advisors be rushed into Iraq to bolster rule-of-law efforts after the military victory. But no plans were made for such a deployment. "What happens to law and order in the meantime?" the meeting notes say. "We risk letting much of the country descend into civil unrest and chaos whose magnitude may defeat our national strategy of a stable new Iraq."[87]

The lack of adequate reconstruction budgets was the second showstopper. "It seems likely that we will begin military action before we know whether sufficient Phase IV funds will be available," the notes read. Everyone was desperate for skilled interpreters. Participants were told to expect "economic-related violence." "We should expect to see the economically disadvantaged residents of Saddam City [the Shi'a slum in Baghdad, renamed Sadr City after Saddam's fall] do a bit of Robin Hooding … in short, civil unrest will be the rule, not the exception." The absence of a governance plan also concerned Rock Drill participants. "What sort of future Government of Iraq do we have in mind," the summary notes read, "and how do we plan to get there?"[88]

The Rock Drill exposed problems created by the disjointed postwar preparations. "It became clear," said one participant, "that not everything was going to be as well organized by the civilians as it was by the military. In part the civilians either weren't fully on board, or didn't take [planning and preparation] seriously, or didn't throw their best people at [the subjects]—but the civilians weren't prepared."[89]

Lieutenant General Garner noticed a man seated near the front who asked tough, insightful questions. It was Thomas Warrick. When Garner pulled him aside during a break, he learned that Warrick had led a year-long State Department study on postwar Iraq.[90] Dumbfounded that no one had told him about the Future of Iraq Project, Garner asked Warrick to join ORHA on the spot.

PX213

**Briefing the President**

On March 10, 2003, just over a week before the bombing started, Garner briefed President Bush in the White House Situation Room on ORHA's postwar plan. Rice, Rumsfeld, Powell, CIA director George Tenet, and General Franks sat around the table. Vice President Cheney joined by video link.

Garner's briefing slides outlined ORHA's pillars, the gaps the Rock Drill revealed, and what remained to be done. He told the President that a tremendous amount of work was still necessary to make the interagency postwar plans operational. Garner outlined his major concerns, including some of the "showstoppers" identified at the Rock Drill. He focused on the need to fund Iraq's public servants, police, and army; to rush in international stability forces after Saddam's fall; and to employ the Iraqi army for reconstruction.[91]

The President authorized Garner's proposal to use the Iraqi army on reconstruction projects. Envisioning something like the Depression-era Civilian Conservation Corps, Garner hoped to help demobilize the army and use it to populate a large labor force for reconstruction efforts. The plan, first developed by USACE's Major General Strock, anticipated marching the disarmed soldiers into camps, forming 200-man construction units, and putting them immediately to work.[92] Everyone in the situation room agreed that this was an excellent idea.

The President was receptive to Garner's briefing, asked a few questions, and thanked him for his service. The meeting was over in less than an hour.[93] On the same day, Frank Miller presented the President with an overview of postwar political strategy, specifically addressing de-Ba'athification and recommending that it be undertaken lightly, so as to preserve Iraqi administrative capacity. The President approved Miller's recommendation for a "light" de-Ba'athification policy.

Two days later, Under Secretary Feith, echoing Garner, briefed the President that the Iraqi Army would not be demobilized.[94] Feith also presented a plan to transfer governance authority shortly after Saddam's fall to a new entity called the "Iraqi Interim Authority." The President previously had decided against forming a provisional Iraqi government in advance of the invasion, a decision conveyed to the Iraqi opposition by Zalmay Khalilzad, the President's Ambassador to Free Iraqis, in late February 2003 at the Salah al-Din political conference in Kurdish Iraq. Feith proposed brokering a formal power-sharing agreement between the new Iraqi Interim Authority and the U.S.-led Coalition shortly after Saddam was deposed. The leadership committee formed at the Salah al-Din conference, comprising Iraqi exiles and Kurdish leaders, would serve as the core group for the new authority, which would work in partnership with the Coalition's transitional authority.[95] This concept would allow Iraqis to exercise some political control from the outset, with the Coalition controlling the pace at which power

PX213

was transferred. The President endorsed Feith's proposal. Because it was premised on the notion that Iraqi governmental institutions would emerge from the war reasonably intact, the plan's actual implementation would depend on the course of the war.

## The Eve of Departure

Garner's last week before deploying was a tough one. Shortly before his briefing to the President, Secretary Rumsfeld asked him to remove two key members of his staff—Thomas Warrick, head of the Future of Iraq Project, and Meghan O'Sullivan, a young State Department employee who worked in the agency's Office of Policy Planning.[96] Rumsfeld eventually permitted O'Sullivan to return, but Warrick was gone for good. A separate "hold" by the Department of Defense was placed on Garner's request for seven ambassadorial-level appointments from the State Department, three of whom were Middle East experts. In exasperation, Secretary Powell told Secretary Rumsfeld, "Don, we're trying to help."[97]

The final surprise came on March 14, 2003, two nights before deployment. Late in the evening an aide called to say that Rumsfeld wanted to see Garner at eight the next morning.[98] Rumsfeld told Garner that he was not comfortable with the people selected as ORHA ministerial advisors, and that he would rather make the appointments himself.[99]

"I'm going to give you a new set of ministry officials," Rumsfeld said.[100] Garner was incredulous.

"It's too late. I'm leaving tomorrow. In a month from now we'll be doing this."

"No," Rumsfeld shot back. "I want [Defense] to run all these."

Garner asked, "Is [Defense] going to run Agriculture? [Defense] is going to run Health?"

Rumsfeld requested that Garner send a list of advisors essential to keep. "I never told anybody about this," Garner said, figuring that "if they show up, we'll give them the job."[101]

Garner's frustration led him to reflect on lessons learned just before he deployed. "The Administration started way too late," Garner said. "We've only really been in business six weeks, and we only began to get people three weeks ago." Garner nevertheless was hopeful that ORHA would overcome its late start. "We'll get there," he said. "It will look like hell, but we'll all come together on the objective."[102]

PX213

CHAPTER 4
## STAGING IN KUWAIT

> *The funding was too little, it was too late, and it was too damn hard to get.* *

**Lieutenant General Jay Garner**
Director of ORHA (2003)

In the six weeks since Jay Garner started work as coordinator of postwar relief and reconstruction, 167 military and civilian personnel had joined ORHA. On the morning of March 16, 2003, they gathered in a parking lot at the Pentagon to begin their journey to Baghdad. Secretary Rumsfeld stepped outside the building to wish the men and women of ORHA well. They then took buses to Andrews Air Force Base, where they boarded a chartered plane bound for Kuwait.[1] In less than a week, the invasion would begin.

Jay Garner had barely arrived in Kuwait before a second round of sparring broke out over senior advisors. Now the Office of the Secretary of Defense was calling to say that the candidates Rumsfeld was in the process of selecting had been superseded by new White House selections. The 23 senior advisors on board the flight—Garner's original picks—would arrive in Kuwait unaware there had been two attempts to strip some of them of their positions. As he had done with Rumsfeld's candidates, Garner decided he would ignore the White House appointees until they arrived—if they ever did.[2]

The start-up of ORHA had turned into a tug of war between cabinet secretaries. Ten of thirteen USAID contracts had yet to be signed. ORHA had no directive authority over military resources. Only about a dozen passengers on the flight knew any Arabic.[3] So much of Garner's time had been spent arguing over who was to deploy that he was still developing basic plans for managing postwar Iraq.

### Camp Villa

General Franks placed ORHA under the operational control of the Coalition Forces Land Component Command (CFLCC), Lieutenant General McKiernan's ground command in Kuwait. Garner wanted to co-locate with McKiernan's headquarters at Camp Doha, one of several U.S. military bases outside Kuwait City, but the advance party he dispatched found there was no room left at the base.[4] ORHA would have to find its own place to stay.

---

* ORHA/CPA Historian interview with Lieutenant General (Ret.) Jay Garner, former Director of ORHA, April 22, 2004.

PX213

• Staging in Kuwait •

Garner turned to the LOGCAP contractor KBR, which quickly arranged quarters for ORHA at the Kuwaiti Hilton Resort. Locating the Coalition's postwar headquarters at a four-star hotel seemed extravagant at first, but few alternatives existed, and the Hilton's perimeter walls gave a measure of security. McKiernan's soldiers, who slept in tents and portable trailers, dubbed it "Camp Villa."[5]

ORHA's staff members from USAID did not remain at the Hilton long, moving instead to the Radisson, some 30 miles away, where the NGOs they worked with were staying. Garner's logistics chief argued with USAID's mission director, Lew Lucke, urging that it was important for all of ORHA's staff to stay together, but Lucke saw advantages to the Radisson. Garner sided with Lucke, deciding that it was acceptable for USAID to co-locate with its implementing partners.[6]

This left ORHA, JTF-4, and CENTCOM's postwar planners scattered among five places: on three sides of Kuwait City, at CENTCOM rear in Tampa, and CENTCOM forward in Qatar. Sophisticated military networks are set up to allow "real-time" communication of classified material, but without a supporting military communications unit, ORHA was unable to tap into these networks. Passing classified plans through the hotel's Internet network would have been a criminal offense. Nor could the plans be discussed on unsecure phones. When Rumsfeld could not reach Garner on a protected line his first night in Kuwait, two aides brought a secure satellite phone on the next flight.[7] The rest of the staff bought phone cards at the poolside gift store and did what they could with their personal email accounts.

Garner soon found he could not buy much, either. The Army contracting command serving as ORHA's purchasing department refused to "warrant" the officers sent to Kuwait with letters authorizing them to sign contracts on the government's behalf.[8] Without this crucial authority, ORHA could not purchase the resources it needed. The Defense Contract Management Agency stepped into the breach, but by the time Lieutenant Colonel Steve Elliot arrived in late March 2003 with a minimal staff, a long list was waiting.[9] The $146 million ORHA had in its account, hardly enough for staff and supplies, was supposed to pay for interpreters, translators, start-up funds for a new Iraqi media, seed money for demobilizing the Iraqi military, and Iraqi expatriates to serve as subject-matter experts.[10]

### Coordination in Chaos

ORHA had barely unpacked its bags in Kuwait before war was unleashed in Iraq. Operation Iraqi Freedom began on March 20, 2003 (Iraq time).[11] Shortly thereafter, Garner's deputy, Ron Adams, flew to Qatar to meet with General Abizaid, only to discover a large parallel universe of planners and plans at the CENTCOM

PX213

• Chapter 4 •

forward command. "I felt frustrated, betrayed," Adams said, "that we were having access to this kind of material and this kind of energy so late in the game." "Why," Adams wondered, "weren't they co-located with us in February?"[12]

McKiernan's staff at Camp Doha had its hands full. To the great displeasure of its commander, Brigadier General Hawkins, JTF-4 had been subsumed at Doha into the staff of Major General Albert Whitley, the British two-star general whom McKiernan had deputized to lead Phase IV planning for CFLCC.[13] By the end of March, little of JTF-4 remained intact. Whitley and McKiernan supported Garner, at least rhetorically, but in the end they did not meet ORHA's needs—not the least of which was the implementation of a unified Phase IV effort. CENTCOM treated ORHA's requests as low priority, setting many of its incoming communications in a pile that remained untouched until April 19.[14]

Garner was one of the few go-betweens among the four postwar-planning factions—ORHA, JTF-4, CFLCC, and CENTCOM. He demanded that everyone meet.[15] On March 27 and 28, representatives from each staff convened at the Hilton, but no unified mission plan emerged, as Garner had hoped. With the war underway, all that could be done was de-conflict the separate plans in places where the execution of one would interfere with another. By the time two ORHA staffers managed to produce a unified plan, it was largely overcome by events.[16]

As Garner made last-ditch efforts to coordinate plans on the ground in Kuwait, the fight over personnel continued. Determined to keep as many of his senior advisors as possible, Garner contacted Secretary Rumsfeld by commercial email from the Hilton. "Sir, on Saturday you questioned the Agency leads for 12 of the 23 Iraq Ministries … We might not agree with State's nominees, but they did step up to the plate a month ago and began nominating people," Garner wrote. An enclosed chart outlined who among his senior advisors should stay and whom he could permit to go. "Of greater concern," Garner noted, were vacancies in ministries for which the Defense Department assumed responsibility. Five of them still had no assigned senior advisor.[17]

Two days later, a briefing slide from the Office of the Secretary of Defense arrived. It listed a star-studded mix of former cabinet members, senators, and governors, both Republican and Democrat, as ministerial advisor candidates. Harvard President Larry Summers was listed for Finance; the former head of General Electric, Jack Welch, for Electricity; Bill Bennett for Education; and Senator Rick Santorum (R-PA) for Trade.[18] Few had ever worked in developing countries. None spoke Arabic.

Secretary Powell reacted immediately. "We have identified qualified people to fill all eight positions that Garner assigned us. All have regional, functional management experience, several of them speak Arabic," Powell wrote Rumsfeld.

PX213

• Staging in Kuwait •

"We have frozen these assignments until you and I deal with this at an early opportunity."[19] Powell's intervention helped. Garner kept his State Department senior advisors.

### USAID Efforts

As the invasion got underway, USAID accelerated its humanitarian assistance preparations. Dozens of NGOs and hundreds of workers were in position. Tens of thousands of hygiene kits, plastic sheeting, and blankets were at the ready.[20] The UN World Food Program mounted the largest relief operation in its history, filling warehouses in Kuwait, Jordan, and Turkey with food, water, and medicine.[21]

To coordinate its army of relief workers, USAID set up a Humanitarian Operations Center in Kuwait. This meeting place for USAID and its NGO partners was about ten miles away from the Radisson in a compound donated by the Kuwaiti government.[22] Maps, communications equipment, and computers were spread among the buildings. After USAID entered Iraq, it established similar Humanitarian Operations Centers across the country. Together with their military equivalent—Civil-Military Operation Centers—the humanitarian centers coordinated delivery of aid in each of Iraq's regions.[23]

Behind the army of soldiers and the army of relief workers came a third organized force—the army of contractors. They were the last to arrive. Because the order to begin the long and complicated contracting process was not issued until December 2002, most reconstruction contracts were not awarded until late April 2003. The compressed timetable meant that, at war's start, many companies had yet to receive word on their bids.[24]

The gap was the inevitable result of a contracting cycle begun only ten weeks before war started—a consequence of excluding USAID from the planning process for an entire year. As soon as USAID and ORHA made the awards, contractors began mobilizing. But this usually entailed an extended process of activating staff and recruiting the "muddy boots" operators who know how to get things done.[25] Notably, USAID did not award its major infrastructure contract to Bechtel until April 17—over a week after Baghdad fell—and the company did not deploy personnel into Iraq in any strength until May. Contractors working for the USAID's Office of Transition Initiatives arrived sooner. The office used its IDIQ contract (SWIFT I) to mobilize its contractors immediately, including Development Alternatives, Incorporated, which had established a Kuwait office more than two weeks before ORHA arrived.[26]

PX213

• Chapter 4 •

**Governance Questions Answered**

How military units would administer Iraqi territory under their control remained an open question as late as mid-March 2003. With no political-military plan formulated in Washington, CENTCOM moved ahead with its own ad hoc plan, deciding to establish Governorate Support Teams (GSTs) primarily from civil affairs units, whose reservist soldiers frequently brought applicable civilian skills. The GSTs would follow closely behind the invasion force, taking charge of towns once they fell under Coalition control. They would serve as the point of contact with town mayors and municipal governments across Iraq, helping to bring order by standing up town councils in places where none existed. The eventual transition to civilian control under ORHA and then to an interim Iraqi authority would open the door for the military's exit.[27] CENTCOM officers had presented a rough version of the GST strategy at Garner's March 27-28 meeting at the Kuwait Hilton.[28]

CENTCOM's GST plan was compatible with USAID's Local Governance Program (LGP), which assumed that a national political process, overseen by the Department of State, would quickly shift the deposed regime's centralized authority to local democratic entities. USAID proposed a "transfer" of central-government civil servants to the local level, paring back national ministries to their essential functions.[29] Teams of experts funded by USAID's LGP would arrive shortly after the invasion to help newly elected town councils improve education, health, water, markets, and roads. By devolving control directly to local officials and empowering them to spend U.S. reconstruction money, planners hoped to quickly break Iraq from the pattern of centralized authoritarianism that had gripped the country for decades.[30]

Implementing these loosely coordinated local governance plans yielded a number of unanticipated consequences. Saddam's regime had been like a giant octopus with tentacles reaching down into every village in Iraq through a system of ministry "directors general." Through these directors general, ministries controlled the disbursal of resources in each Iraqi province. Coalition plans superseded the director general system, shifting authority to town councils created by GSTs or USAID's LGP teams.[31] This radical and rapid restructuring of local government would shape debates about Iraqi federalism for years to come.

Governance plans at the national level were equally loose. Garner planned on using the "big tent" method to bring Iraqi leaders together to form a national interim government.[32] This approach had worked reasonably well with the *loya jirga* process in Afghanistan, which had quickly named Hamid Karzai the leader of postwar Afghanistan. Garner hoped to use his good relations with the Kurds to help move quickly to the appointment of an Iraqi interim authority, as approved by the President on March 10, 2003.

PX213

• Staging in Kuwait •

## ORHA Expands

In early April 2003, as ORHA continued postwar planning at the Hilton, its staffing needs kept growing. The Office of the Secretary of Defense estimated that the staff of ORHA might reach 1,268, plus a 600-person military police battalion provided for security.[33] Even this estimate—many time higher than originally expected—would prove too small.

After ORHA arrived in Baghdad on April 21, its staff quickly increased, eventually peaking at 2,500—about eight times its original estimate of 350.[34] Back at the Pentagon, the comptroller's office was asked why there was such a huge rise in ORHA's staffing. Dov Zakheim, the Defense Department Comptroller, responded: "ORHA projected staffing levels and budget requirements will vary greatly as they get a better grip on the requirements of their mission."[35]

ORHA's rapid expansion unsettled its contracting staff. Lieutenant Colonel Elliot, ORHA's contracting officer from the Defense Contract Management Agency, had only three officers on staff with warrants to write contracts.[36] As needs mounted rapidly and the details of contracts were often left unspecified, Elliot found he was forced to make policy decisions. "I'm making the decision as to what's prudent. And that shouldn't be my job. That should be the customer's job," Elliot said. From his perspective, "There [was] no planning"—it was all reaction.[37]

## Views From Washington

As ORHA struggled to carry out its mission, several Administration officials gave hopeful briefings. During an interview on April 23, USAID Administrator Natsios predicted that the cost of reconstruction to American taxpayers would be minimal. "The American part of this will be $1.7 billion. The rest of the rebuilding of Iraq will be done by other countries … and Iraqi oil revenues."[38] But National Security Advisor Condoleezza Rice offered a more cautious assessment in an April 4 press briefing. "Our goals are clear," she said. "We will help Iraqis build an Iraq that is whole, free and at peace with itself and with its neighbors; an Iraq that is disarmed of all WMD; that no longer supports or harbors terror; that respects the rights of Iraqi people and the rule of law; and that is on the path to democracy."[39]

The National Security Advisor was circumspect about the details of Administration plans. "Specific means of achieving these goals are being worked out now. Many can only be developed once Saddam's regime is gone. To a large extent, the means to these goals will depend on things outside our current control." She further noted that the Administration did not know what conditions it would find inside Iraq. "We do not know, for instance, what damage Saddam Hussein's regime may inflict on the Iraqi people in the regime's last gasps. We do

PX213

• Chapter 4 •

not know what we'll find on the ground once the regime is gone—for instance, the condition of Iraqi natural resources or its infrastructure."

Rice pointedly observed that a long-term occupation was far from the minds of the President's advisors. "ORHA is not a provisional government for Iraq, civilian or military. The goal is to transition responsibilities to the Iraqi people as soon as possible," she said.[40] Within weeks, this approach would be superseded when the Coalition Provisional Authority was installed to occupy and rule Iraq.

Saddam's regime fell the week after Rice's briefing. Soon looting and chaos began to engulf Baghdad and many provincial capitals. As ORHA's senior advisors watched their ministries burn on CNN, a fatalistic mood took hold at the Hilton. Garner had been so hopeful that things would all come together, but now he had grave doubts. ORHA was about to face a far greater challenge than harnessing the interagency system. They were about to cross the berm into Iraq.

PX213

## CHAPTER 5
# ORHA IN BAGHDAD

*At the end of this there is [a] real simple truth. If you don't plan and organize and rehearse together, you end up with ad hoc solutions during execution. [Iraq] is a classic case of not having done it all together.\**

**Lieutenant General David McKiernan**
Commander of Coalition Forces
Land Component Command (2002-2003)

As the Coalition prepared for war, so did Saddam Hussein. In the fall of 2002, he declared a general amnesty, freeing thousands of violent criminals.[1] As U.S. troops massed along the Iraqi border in the spring of 2003, Saddam deployed Iraqi military units both to defend against the invasion and to prevent a coup in the rebellious Shi'a south. Ministers made contingency plans, just as they had in 1991, to weather the conflict and repair damage once hostilities ceased.[2] Saddam sent a memorandum instructing state agencies to sabotage infrastructure, shoot dissident Shi'a clerics, and burn the regime's records if U.S. troops entered Baghdad.[3]

As the country braced for impending attack, Saddam's workers moved furniture out of his main palace and removed the palace doors to minimize damage caused by the concussion of bombing.[4] Bank managers personally safe-guarded the financial data of customers at 170 branches across Iraq.[5] The director of computer services at the Ministry of Trade secured in his home the list of every Iraqi household eligible for food rations.[6] After the official Oil-for-Food ration list vanished amid looting, this copy was later used as a basis for registering voters in Iraq's first democratic election.[7]

The Iraqi people also prepared.[8] Shopkeepers boarded up their stores, women stockpiled food and water, and men headed to gun shops.[9] Tens of thousands of families fled Baghdad and its suburbs for safety in the countryside.

The reckoning began on March 17, 2003. In an Oval Office address, President George W. Bush gave Saddam Hussein and his two sons, Uday and Qusay, an ultimatum to leave the country within 48 hours. But they did not leave. Bombing started on March 20 (Iraqi time), and U.S. ground units rolled into Iraq the next day.

---

\* SIGIR interview with Lieutenant General David McKiernan, former Commander of Coalition Forces Land Component Command, December 5, 2006.

PX213

• Chapter 5 •

**Invasion**

The experience of the invasion force differed by region. In the north, a small number of U.S. Special Forces troops linked with Kurdish Peshmerga, the armed force of Iraq's autonomous northern region, which opposed Saddam. Together they pushed south against Iraqi Army units dug into defensive positions. In Baghdad, Iraqis had such confidence in the accuracy of American "smart weapons" that many watched the bombing from their rooftops, but the precision targeting had serious second-order effects. Telephone service ceased. Explosions broke pipes all over the city, causing sewage to contaminate what water still flowed out of the tap. Then, on April 4, power surges shorted out most of Baghdad's electrical infrastructure. Much of the city went dark.[10]

Because Turkey and Saudi Arabia had denied U.S. troops passage, the main invasion force came through Kuwait. Special operations units captured oil fields and dams almost immediately, and oil engineers from Halliburton extinguished the few oil-well fires that were set. Thousands of troops with the Third Infantry Division and First Marine Expeditionary Force then pushed north. Rather than advancing methodically to capture and hold territory, the war plan called for a daring sprint to the capital.[11] The idea was to put the regime down before it could deploy chemical weapons. Lieutenant General McKiernan's troops sped by most population centers, avoiding combat in favor of pushing to Baghdad.

The fast-moving U.S. invasion force meant that troops engaged Saddam's forces only briefly in many towns. Some cities were occupied quickly, but in the west and north, U.S. troops did not arrive until weeks after Baghdad fell. Many Iraqis were left listening to conflicting accounts of the invasion's outcome on regime and foreign radio broadcasts, never seeing troops from either side.[12] The uniformed Iraqi military largely abandoned their posts after little or no fight, but sustained resistance materialized in many southern towns. Sandal-clad fighters in civilian garb, both foreign and Iraqi, used rocket-propelled grenades and pick-up trucks to organize ambushes that frequently turned deadly for the attackers as they encountered first-hand the lethal power of the invading force.[13]

"The enemy we're fighting is different from the one we'd war-gamed against," said Lieutenant General William S. Wallace, commander of V Corps, one of the main ground units.[14] To General John Abizaid, the only Arabic-speaking senior commander in theater, the signs were ominous. Garner remembers Abizaid telling him the first week in April: "I've been listening to everything they're saying on the radio. I've been reading Al Jazeera, and I'm looking at what's happening. I'm telling you. We're going to have a guerrilla war on our hands."[15]

PX213

### Initial Assessments

Sixty-two people from USAID's Disaster Assistance Response Team (DART)—the largest ever fielded—followed quickly upon the heels of the invading force.[16] On March 27, DART members crossed into Iraq to assess the humanitarian situation in the port town of Umm Qasr, a major supply node in Iraq where 60 percent of Iraq's Oil-For-Food imports were offloaded. British commandos had seized the port after sustained fighting. Elements from the U.S. Army's 354th Civil Affairs Brigades began repair work after British troops took control.[17]

USAID's DART team found the port in poor but working condition. Team members identified two back-up generators that, with minor repairs, could power the entire facility. Three grain vacuums were operational, and the port's 24 silos were available for storage once swept for explosives. A day later, the *Sir Galahad*, a British relief ship carrying more than 230 metric tons of food, medicine, and blankets, was able to dock.[18]

All seemed to be going reasonably well. There were no major signs of humanitarian crisis, and no chemical weapons had been used. But worrisome news soon arrived from USACE, which had embedded Forward Engineering Support Teams (FESTs) in U.S. combat brigades.[19] Traveling in Humvees equipped with a satellite link to their headquarters, these highly mobile military and civilian engineer teams quickly assessed the state of the power plants and other civil infrastructure they came across during their advance into Iraq.[20] The dilapidated infrastructure reported everywhere by FEST personnel confirmed USACE's prewar assessment that a major reconstruction effort—on the order of $35 billion for a "middle-range" damage scenario—would be necessary.[21]

To augment the information from the FEST reports, Garner asked USAID's DART team to shift its role and begin conducting infrastructure assessments. At first they refused.[22] The team members were reluctant to take on activities that fell outside the mandate of a normal DART mission, which is to assess humanitarian conditions—such as food supply availability and likelihood of disease outbreak. Their leadership, at USAID's Office of Foreign Disaster Assistance in Washington, was also averse to allowing the unarmed teams to operate in an environment where residual fighting continued.[23] By the first week of April, the DART team's failure to carry out Garner's request threatened to unravel the fragile cooperation between the military and civilian communities inside ORHA.[24]

Garner was seething. "They refused to come in," he said, "because it wasn't permissive. You know, I have this civilian organization in this not-permissive environment in Suburbans, which are not hardened. Yet you [the DART commander] have $350,000 hard Mercedes. You have body armor, which these

PX213

people [ORHA personnel] don't have, and your people refuse to come in here, and they're staying in very expensive hotels."[25]

Ambiguity about lines of authority aggravated the situation. Did a USAID asset, the DART team, report to its agency headquarters in Washington or was the team now under operational control of ORHA, an office of the Department of Defense? Instead of appealing to the NSC for arbitration, Secretaries Donald Rumsfeld and Colin Powell had a "war of memos" trying to settle the issue.[26] Relations between the Departments of State and Defense had become increasingly tense in the late winter and early spring of 2003.[27] Only when Garner phoned Powell and threatened to oust the DART teams did they agree to comply with Garner's direction.[28]

**ORHA Enters Iraq**

ORHA personnel first crossed into hostile territory on April 1 at the port of Umm Qasr, where the situation had deteriorated rapidly since the DART team's first forays four days before. Coalition soldiers, who cautioned that they did not have enough troops to stop the looting, reported, on April 2, 2003, that more than 200 residents had carried off every useful piece of equipment at the port. Looters took desks and chairs, electrical generators, conveyor belts, and even a forklift. "Anything not nailed down" was gone, the DART team reported on its second visit.[29] Work to rehabilitate the port was set back by weeks. The looting itself—the first major episode reported in Iraq—presaged a period of extraordinary difficulty that the Coalition would face in the weeks ahead.

ORHA used Umm Qasr as a testing ground to calibrate its approach to the post-invasion environment. "We thought of Umm Qasr as a laboratory where we could see what worked and what didn't," an ORHA official explained. "It gave us a chance to get some real work done as opposed to just theorizing and writing position papers."[30]

Restoring Umm Qasr presented three significant challenges. First was simply performing the brute physical work of reconstruction. The port was badly in need of dredging. Sunken obstacles and unexploded ordnance posed a danger to approaching ships.[31] The second was luring Iraqis back to work. Port workers who encountered Coalition soldiers were understandably skittish.[32] The third was coordinating civil and military authorities, which proved extremely difficult, a precursor to similar problems that would burden the U.S. relief and reconstruction endeavor in Iraq for years to come.[33]

On April 11, 2003, Lieutenant General Garner crossed into Iraq at Umm Qasr. He visited the port, delivered a speech before a newly formed town council, inspected a school, and was briefed by his staff.[34] He and his team then began making plans to move to Baghdad, which had fallen four days before.

PX213

## Baghdad Falls

British troops took control of Basrah on April 6. Baghdad began to capitulate the next day, after armored columns made "thunder runs" into the city center. As U.S. troops took over Saddam's presidential palace on the Tigris River's west bank, jubilant Iraqis, with the help of U.S. Marines, toppled the statue of Saddam Hussein in Firdos Square. Looting on a wide scale began that day, first on the fringe of the fighting and then later in plain view of American military patrols.[35] In response, protective Iraqi militias sprang up in neighborhoods across the city, putting men with AK-47s atop makeshift barricades. Gunfire could be heard throughout the night as robberies and revenge killings took place.[36]

Deteriorating conditions on the ground began to supersede Coalition plans. The rush to the capital meant that fewer than two divisions—about 25,000 soldiers—occupied the capital, a city of about six million, amounting to an approximate ratio of one U.S. soldier to every 250 residents. "That's not enough to control a city of six million people," Lieutenant General David McKiernan said.[37] With U.S. troops scattered across Baghdad, looting seemed almost impossible to prevent. Patrols had no appetite or mandate to stop it, and McKiernan had orders to continue pushing troops north to carry out the search for weapons of mass destruction that were assumed to be in central Iraq. One option was to impose martial law and shoot looters on sight, but McKiernan could not bring himself to issue the order. "This is not just the Saddam Feyadeen that are in there looting the stores, it's the population," McKiernan explained. "It's children and women. What are you going to do? What's a soldier on the street going to do? Fire warning shots around them? The answer is, and I'll accept full responsibility, I said 'we are not going to shoot to kill. We're not going to do that.'"[38]

Laith Kubba, a prominent Iraqi exile who helped found the Iraqi National Congress, later observed that the lack of an effective media organization from day one hamstrung the Coalition, which might have been able to calm the public had it communicated a clear message. "Iraqis are used to military coups. When they take place, they tune in to their radios," Kubba said. "They wait for an announcement, number one, to tell them, 'All important personnel working in electricity and water, report back to work, and you'll be given access. Everybody else is under curfew from so-and-so hours.' Instead there was a day, two days and three days of no authority."[39]

The interactions between occupier and occupied were aggravated by the way troops were assigned to patrol zones. "We had divided the city up into target areas that didn't have any relevance to political boundaries," Lieutenant General Strock said. Some brigade commanders were spread across four neighborhoods. To Strock, the arrangement was far from ideal. "I remember saying, you know,

PX213

it would be really nice if we could align up our security zones with our political boundaries and then you would have much more synergy."[40]

The frequent movement of units from one zone to the next undermined the incipient personal relationships developing between commanding officers and community leaders. Yet another complication arose when civilians entered the mix. The military used a specialized system of grid coordinates to plot patrol zones, but civilians in ORHA, and the NGOs with whom they worked, normally used longitude and latitude to mark locations.[41] The Coalition was literally not working off the same maps, adding unnecessarily to the confusion on the ground.

## ORHA Arrives in Baghdad

Garner was eager to get to Baghdad, but the military leadership had a different view of when ORHA should deploy. "Tommy Franks didn't want us to be there for 60 to 90 days," Garner recalled.[42] The CENTCOM Phase IV plan called for the military to secure Iraq for six to eight weeks before beginning the transition to civil administration. It was all part of the three stages of Phase IV. But Garner believed conditions were right for ORHA to start its operations, even if the timing was in advance of what military planners had expected.[43]

On April 17, Garner flew to meet Franks in Qatar. "I got in a big argument, pretty tense argument," Garner said. "Look, Jay," Franks told him, "there's still fighting going on in Baghdad. The last thing I need is a bunch of damn civilians running around there and me having to worry about taking care of them. Dave McKiernan doesn't have the force to do that." "I realize that," Garner replied, "but what's happening is vacuums are being created and they're being filled up with what you and I don't want them filled up with, and the only way to prevent that is to get us in there."[44]

"He was exasperated with me," Garner remembered. "He finally just, kind of, shook his head and shrugged his shoulders." The next day, Franks called to say that ORHA could go in. "We don't have the force in there to give you the proper amount of security," Franks said. "God bless you and good luck."[45]

Garner immediately dispatched a small advance party. He followed two days later, on April 21, flying with his senior staff aboard a C-130 to Baghdad International Airport and traveling from there to the Republican Palace, one of Saddam's grand edifices on the banks of the Tigris, which would house ORHA for its brief tenure.[46] Most of the rest of ORHA's staff drove up from the south in several convoys over the next week.

During ORHA's first days in Baghdad, achieving effective communications was again a debilitating problem. Some ORHA officials had Thuraya commercial satellite phones, but they were unable to receive calls inside the palace without an

PX213

• ORHA in Baghdad •

outside antenna. No phone system was yet established, so the staff had to walk from office to office to communicate.[47] With the Baghdad telephone exchange down, it was impossible to reach Iraqis. Commercial communications equipment acquired by ORHA had also failed to operate, leaving the Baghdad team out of touch with its regional offices in Erbil, Hilla, and Basrah.[48] After an urgent call from Garner, Lieutenant General McKiernan dispatched a communications unit to the Republican Palace to connect ORHA to SIPRNET, the military's classified network. Even with this support system, bottlenecks still impeded communications.[49]

**Looting and its Consequences**

Two weeks had passed since Saddam's regime had fallen. Outside the gates of the Republican Palace where ORHA was trying to set up shop, anarchy reigned. "We found the city in utter chaos," said Richard Miller, one of six police advisors sent by the Justice Department. In some places, "corpses littered the streets, AK-47 fire was near constant, and looters operated with impunity."[50] Many government buildings had been destroyed.

"A lot of the ministries turned out to be blasted cinders," noted Ambassador Tim Carney, senior advisor for the Ministry of Industry and Minerals.[51] "They not only took everything out of there, but they stripped the electrical wires out of the wall, and they stripped most of the plumbing out, and then they set the buildings on fire," Garner said.[52] Fires burned so hot that concrete in many buildings exploded.[53] ORHA advisor Christopher Spear waded into ransacked rooms filled three feet deep with paper debris. Clean-up crews hauled away six tons of scattered documents from the Ministry of Health alone. "We would say they took everything but the kitchen sink, [but] they took that, too," Spear said.[54]

The looting quickly changed into organized theft by gangs of Iraqi criminals and insurgents trying to destabilize the country. In a military compound under nominal guard by U.S. soldiers, one of these gangs smashed through a rear wall and used a crane to remove valuable precision milling equipment used to manufacture Scud missiles. "They knew exactly what they were going for," Spear said.[55]

Millions of dollars in cash stored in Rafidain and Rasheed bank branches and at the Central Bank were looted or destroyed, as were the contents of safety deposit boxes.[56] "Organized crime found its golden opportunity," the Iraqi politician Samir Sumaida'ie said.[57] Some government officials joined in the melee. In Mosul, a prison guard sold all the prison beds for scrap.[58] In time, ORHA's senior advisors would learn that the theft of Iraq's assets had, in truth, started years before, when corrupt government officials began regularly selling ministry property "to pad their own pockets."[59]

• 59 •

PX213

The looting went on for several weeks. "In a lot of cases," Garner said, "after we began to try to reoccupy buildings, they still got set on fire. The Health Ministry got set on fire two or three times after we occupied it, because there just wasn't enough force to provide security on everything."[60] The Oil Ministry was the only ministry to escape major damage. It was protected by Coalition troops as soon as they entered Baghdad, minimizing but not preventing looting. The ministry was reopened on May 2, in advance of others.[61] To ORHA senior advisors, it stood as a symbol of what might have been.

The oil infrastructure seemed to have emerged from the invasion largely intact. Fewer than ten oil well fires were set. But post-invasion looting in the oil sector went on for ten weeks, from March 20, 2003, through the end of May.[62] Of the oil sector damage the Coalition had to repair, only one-third resulted from the war. The remaining two-thirds of the damage—amounting to $943 million—was caused by looting.[63]

The contours of post-Saddam political life could be seen taking shape in the patterns of destruction. Eleven of Baghdad's thirty-three hospitals were protected by a Shi'ite militia. These hospitals survived completely intact but others left unprotected were stripped clean.[64] Shi'ite militias also took control of the city of Amarah, preventing looting before it could get started.[65] In isolated cases, loyal staff at public institutions held looters at bay. Thirty engineers secured the Basrah refinery by using heavy equipment to block the gates.[66]

The looting had three major effects. The first was its high cost. Estimates vary, but looting clearly caused billions of dollars in damage, greatly adding to the total cost of relief and reconstruction.[67] The second—the looting of conventional munitions depots—had severe long-term consequences for U.S. forces in Iraq. The war plan assumed that some elements of Iraq's security forces would be used to "provide internal security," including guard duty at the hundreds of arms caches across the country.[68] This assumption did not hold. Thousands of tons of munitions were looted in the weeks after Baghdad fell, and some of it doubtlessly was later used to build improvised explosive devices that would be employed against U.S. personnel.[69]

The third effect—the lost opportunity to restore government services quickly—also had long-term consequences. With public institutions and critical infrastructure reduced, in some cases, to smoldering rubble, ORHA's senior advisors would have to rebuild ministries, not just restart them. The unexpected extent of the destruction dealt a critical setback to Administration plans for a rapid transfer of power and would eventually force a significant course change.

PX213

• ORHA in Baghdad •

*Troop Strength*

On April 21, the day Lieutenant General Garner arrived in Baghdad, Secretary Rumsfeld—following the advice of CENTCOM Commander General Franks— canceled the deployment of 50,000 additional combat troops scheduled to arrive in the region and ordered the withdrawal of the Third Infantry Division as soon as the First Armored Division arrived.[70] Rumsfeld's decision shocked some commanders on the ground, including CFLCC Commander Lieutenant General McKiernan, who were counting on the additional manpower to provide a secure environment for post-conflict stabilization. The reversal also dumbfounded McKiernan's CFLCC staff, that had just sat through two video conferences with senior Pentagon officials who had affirmed the decision to continue deploying forces.[71] Garner called Rumsfeld and said, "You've got to stop this. You can't pull troops out. In fact, we probably need more right now."[72]

*Paying for Reconstruction*

The widespread looting and the damage it wrought meant that the reconstruction funds the Congress had just appropriated would be inadequate to quickly restore Iraq's essential services to prewar levels. On April 16, 2003, President Bush had signed Public Law 108-11 creating the Iraq Relief and Reconstruction Fund.[73] The $2.475 billion congressional appropriation funded the program of humanitarian relief and reconstruction planned by the NSC, which had assumed that an extensive reconstruction would not be needed because Iraq's infrastructure would remain largely intact after the war and that Iraqi oil revenues would fund most reconstruction. On the same day, General Franks issued his "Freedom Message," declaring the Coalition's intention to "exercise powers of government temporarily, and as necessary." Franks's message also identified an entity, called the Coalition Provisional Authority (CPA), that would be responsible for the governance of Iraq.[74]

USAID was the largest recipient of IRRF 1 money, receiving just over 70 percent of the appropriation. A separate provision of the bill established an $800 million Natural Resources Risk Remediation Fund (NRRRF) to support emergency fire fighting, repair damage to oil facilities and related infrastructure, and preserve oil distribution capability. NRRRF funds were used to help pay part of the costs of Task Force Restore Iraqi Oil (RIO), administered by USACE.[75]

*New Iraqi Politics*

Chaos on the ground threw the plan for a rapid political transfer to an interim Iraqi authority into confusion. On April 15, Garner and Presidential Envoy Zalmay Khalilzad assembled more than a hundred key Iraqi leaders in the southern city of Nassriya.[76] To encourage leaders within Iraq to step forward, the United States

• 61 •

PX213

excluded the heads of exile opposition groups, who had formed the Leadership Committee from the Salah al-Din conference. Although the Nassriya meeting was boycotted by several clerics and the Supreme Council for the Islamic Revolution in Iraq, a larger follow-on gathering was planned for Baghdad later in April.[77]

On April 22, Garner flew to meet with Kurdish leaders he knew from the humanitarian operation he led in 1991. He undertook this trip and other meetings with Iraqi politicians to further the process of forming an interim Iraqi authority, in accord with the President's approved plan. "He was really pushing them both pretty hard," Lieutenant General Strock said of Garner's interaction with Ahmed Chalabi and Jalal Talabani. "He was playing hardball with them, saying, 'Look, you guys got to stand up and come together and set aside your differences,'" Strock said.[78]

Secretary of State Colin Powell then dispatched Khalilzad and Ambassador Ryan Crocker to southern Iraq for talks on political transition, but there were intense disagreements over how to proceed.[79] Garner was trying to carry through the standing plan for a rapid transfer.[80] But in Washington, officials were concerned that conditions were not right for creating the interim authority. The next step would come on April 28, when more than 250 Iraqi leaders would convene a second political conference in Baghdad.

### ORHA's Goals

On April 24, 2003, Garner briefed CFLCC Commander Lieutenant General McKiernan on eleven goals he wanted ORHA to help accomplish. McKiernan and Garner both assigned a member of their senior staff to the leadership of each task. The goals were:

1. Security
2. Salaries Paid Nationwide
3. Return Police to Work and Train Them
4. Return Ministries to a Functional Level
5. Restore Basic Services to Baghdad
6. Prevent a Fuel Crisis
7. Purchase Crops
8. Solve Food Distribution Challenges
9. Install Town Councils Nationwide.
10. Deploy and Integrate Government Support Teams With Local Government
11. Prevent Cholera and Dysentery[81]

PX213

• ORHA in Baghdad •

The goals Garner had set for himself were enormous, as were the obstacles to accomplishing them. For example, adequate and reliable power was unavailable. "It is a Catch-22," senior oil advisor Gary Vogler explained.[82] Without fuel oil, electric plants cannot produce electricity, yet without a steady supply of electricity, crude cannot be refined into fuel oil.

In Basrah, Coalition personnel trying to restart essential services faced a similar conundrum. "The circle was amazing," JTF-4's Lieutenant Colonel Joseph Morgan said. "Just in that one area, just looking at how we could turn on power, so we could turn on water, so we could turn on electricity."[83]

Many of Garner's other goals fell under the purview of the civil administration pillar, where plans were less developed and leadership weakest.[84] The part of the mission that Rumsfeld told Garner would be least essential was now crucial, and ORHA was not well staffed to carry it out.

### ORHA's Early Departure

In the last week of April 2003, Baghdad was descending into further disorder. ORHA's limited resources were consumed with finding ministerial staff members who had fled, reconstituting records, and locating workspace for almost the entire central government. Garner could not arrange enough military security escorts for his staff to move unfettered around the city. As for the rest of the country, ORHA had not established formal mechanisms for coordination with the military units occupying towns and villages across Iraq, much less with Iraqi leadership at the provincial level. Coordination was in short supply everywhere: between ORHA and Washington, ORHA and the military, and ORHA and the Iraqis.[85] Suddenly Iraq seemed very large, and ORHA's staff seemed very small.

In this chaotic atmosphere, more than 200 Iraqi leaders arrived in Baghdad for the "big tent" meeting on April 28, 2003. Garner presided, with Ambassadors Khalilzad and Crocker in support. The political conference was attended by all the key Iraqi players, including representatives from the major Shi'a political party, the Supreme Council for the Islamic Revolution in Iraq. Under Garner's guidance, the Iraqis at the conference resolved to create an interim government at their next meeting in four weeks. After the meeting, Garner announced this decision through the Iraqi and U.S. media. It appeared to some in Washington that the concept of an interim Iraqi authority might still be realized.[86] But out of view, a significant change in strategy was developing.

On May 6, just fifteen days after Jay Garner had arrived in Baghdad, President Bush announced that L. Paul Bremer III, a former ambassador and career Foreign Service Officer, as his new Presidential Envoy to Iraq. Bremer also would lead

PX213

• Chapter 5 •

the Coalition Provisional Authority, the civil authority that General Franks an-
nounced in his April 16 freedom message.[87]

Ambassador Bremer had first been approached at the beginning of April by
senior officials in the Defense Department and the Office of the Vice President.[88]
Although Garner had been told when first appointed to lead ORHA that he would
eventually be followed by a person with a diplomatic or political background, he
did not learn of Bremer's selection until Rumsfeld phoned him with the news on
the evening of April 21, Garner's first night in Baghdad. "I never saw CPA coming,"
Garner said.[89] He did not immediately tell his staff of the impending change.

Bremer's arrival would reflect a sea change in U.S. policy. ORHA was designed
as a short-term holding mechanism, to be followed by a rapid shift to an interim
Iraqi authority, mirroring the swift transition that occurred in Afghanistan. But
the deteriorating situation in Iraq apparently had caused the White House to
change plans. Zalmay Khalilzad, the President's envoy to the Free Iraqis, re-
called: "The idea that I was working on initially, with support from everyone in
Washington, was to form an interim authority that we could work with. A deci-
sion was made not to pursue that option until later, and therefore the Coalition
Provisional Authority was established."[90]

During the summer of 2003, the U.S. role in Iraq, under Bremer's leadership,
rapidly and massively expanded, far eclipsing the minimalist liberation vision that
had set planning for war in motion a year and a half earlier, and superseding the
quick transfer to an interim Iraqi authority that the President had approved at
the March 10, 2003 NSC meeting.

• 64 •

PX213

## Essential Services Overview: The Effects of Invasion

| Metric[91] | Pre-invasion | Post-invasion |
|---|---|---|
| **Electricity Production** | | |
| *Megawatts* | 4,075 | 711 |
| **Oil Production** | | |
| *Million Barrels per Day* | 2.58 | 0.30 |
| **Iraqi Security Forces** | | |
| *Soldiers and Police* | 1,300,000 | 7,000-9,000[92] |
| **Telecommunications** | | |
| *Landline Subscribers* | 833,000 | 0 |
| *Mobile Subscribers* | 80,000 | 0 |
| **Human Toll** | | |
| *U.S Troop Fatalities* | - | 139 |
| *Civilian Contractors[93]* | - | 1 |
| *U.S. Civilians* | - | ~9 |
| *Iraqi Civilians* | - | 7,413 |
| **Financial Cost ($ billions)** | | |
| *U.S Funding* | - | $3.45 |
| *Iraqi Funding* | - | $0.00 |
| *International Funding* | - | $0.00 |
| *Total Funding* | - | $3.45 |

Production of electricity came to a near-complete halt during the 2003 invasion. By mid-April 2003, the grid was generating an average of just 711 megawatts of electricity per day.[94] Postwar looting and sabotage had destroyed nearly 1,000 electrical towers, and the loss of numerous electrical control systems caused frequent blackouts in Baghdad.[95]

Without electricity, oil production also came to a standstill. Many oil facilities were safely shut down, but some oil stocks were destroyed by fire. Although production restarted fairly quickly, it averaged only 300,000 barrels per day—about one-eighth of prewar levels—in May 2003.[96]

Already in a state of severe disrepair, Iraq's essential services declined precipitously after the March 20 invasion due to war damage, looting, and sabotage. ORHA had neither the time nor the resources to fix these problems. Thus, the CPA took them on, shouldering the responsibility for restoring broken essential services and distributing them more fairly among all Iraqis.

PX213

PX213

# Part II
## The Coalition Provisional Authority Leads Reconstruction
### May 2003 to June 2004

PX213

PX213

## Chapter 6
## Charting a New Course

*But the President's instructions to me… when I had lunch with
him alone on May 6th, were that we're going to take our time
to get it right… The President had effectively, though perhaps
not formally, changed his position on the question of a short or
long occupation, having before the war been in favor of a short
occupation. By the time I came in, that was gone.\**

**Ambassador L. Paul Bremer III**
CPA Administrator (2003-2004)

Ambassador L. Paul Bremer III landed in Baghdad on May 12, 2003, less than two
weeks after President Bush appointed him Presidential Envoy to Iraq and desig-
nated him to lead the Coalition Provisional Authority (CPA). Just under a month
had passed since the first members of ORHA had settled into Saddam's Republican
Palace. But ORHA's days were numbered. Bremer's arrival and Garner's quick de-
parture marked the beginning of a significant shift in U.S. reconstruction policy.

The new envoy, then 62 years old, enjoyed a solid reputation as a diligent,
intelligent public servant. He had enjoyed a long career at the State Department,
followed by distinguished private- and public-sector stints.[1] But the choice of
Bremer raised some eyebrows. Neither his Foreign Service background nor his
private-sector work included experience in post-conflict peacekeeping, con-
tingency operations, or reconstruction. He had never participated in a joint
civilian-military operation, had little experience in international development,
had never served in the Middle East, and did not speak Arabic.[2]

Ambassador Bremer was first contacted about leading the CPA in early April
2003, when the Vice President's chief of staff, Lewis "Scooter" Libby, called to
ask whether he would consider serving in Iraq.[3] Meetings at the Pentagon soon
followed, and, by the end of April, he was preparing to deploy to Iraq. All of
this occurred just as Jay Garner was settling into Baghdad with his ORHA staff.[4]
Secretary Powell recalled that Rumsfeld telephoned him about this time to say
that the White House wanted to remove Garner because he did not seem to be
the right man for the job. When Rumsfeld asked Powell if he knew Bremer, Powell
said yes and that he "didn't have any reason to object."[5] Rumsfeld later said that
the Administration always intended that Garner's position within CENTCOM

---

\* SIGIR interview with Ambassador L. Paul Bremer III, former CPA Administrator, March 18, 2008.

PX213

would be eliminated, and that a senior diplomat outside the military chain of command would be appointed to head the CPA.[6]

On May 6, the President appointed Bremer as envoy to Iraq, directing him to "oversee Coalition reconstruction efforts and the process by which the Iraqi people build the institutions and governing structures that will guide their future."[7] In a May 13, 2003 memo, Secretary Rumsfeld informed Bremer that he, as Administrator of the CPA, would be "responsible for the temporary governance of Iraq." Rumsfeld directed Bremer to "oversee, direct and coordinate all executive, legislative, and judicial functions necessary to carry out this responsibility, including humanitarian relief and reconstruction and assisting in the formation of an Iraqi interim authority."[8]

Ambassador Bremer took charge of a country in political and economic chaos, with no government, no electricity, and no functioning security forces. Not a single drop of oil flowed to export spigots. He now faced the daunting task of restoring virtually every aspect of Iraqi life, from reopening ministries to paying government salaries, from restarting essential services to providing healthcare, and from collecting garbage to cleaning sewage from the streets.

The CPA quickly subsumed ORHA, retaining many of its members. Ambassador Bremer reported to the President through the Secretary of Defense. But, as a Presidential envoy, Bremer also reported directly to the President. "I was neither Rumsfeld's man nor Powell's man. I was the President's man," said Bremer.[9] These parallel chains of command would create problems for the Iraq program. CENTCOM was tasked by Rumsfeld to "directly support the Coalition Provisional Authority by deterring hostilities; maintaining Iraq's territorial integrity and security; searching for, securing and destroying weapons of mass destruction; and assisting in carrying out U.S. policy generally."[10] Despite this order, unity of effort in Iraq proved elusive during the CPA's early days because Ambassador Bremer and General Franks reported to the Secretary of Defense through separate channels.

**The Occupation Begins**

Within days of arriving in Baghdad, Ambassador Bremer issued three important directives. The first established the CPA as an occupying authority. The second banned certain Ba'ath Party members from public service. The third dissolved Iraq's military and other security forces.

*CPA Regulation Number 1: Liberation to Occupation*

On May 16, 2003, Ambassador Bremer signed and issued CPA Regulation Number 1, establishing the CPA's mission, authority, and responsibilities.[11] The regulation provided that the CPA "shall exercise powers of government

PX213

• Charting a New Course •

temporarily in order to provide for the effective administration of Iraq" for an undefined transitional period. The CPA would work:

> …to restore conditions of security and stability, to create conditions in which the Iraqi people can freely determine their own political future, including by advancing efforts to restore and establish national and local institutions for representative governance and facilitating economic recovery and sustainable reconstruction and development.[12]

This order also vested Ambassador Bremer with "all executive, legislative and judicial authority necessary to achieve [CPA's] objectives." Iraqi law would continue in effect unless it was "suspended or replaced by the CPA."[13]

The new regulation signaled a developing shift in U.S. policy. The postwar strategy for Iraq—approved by the President on March 10, 2003—assumed that the country's governing institutions would survive the invasion and remain sufficiently intact to continue to administer the offices of government and provide the Iraqi people with essential services. The President's policy anticipated establishing an interim Iraqi authority with which the CPA would work to develop a political process for the eventual permanent transfer of sovereignty to a new, democratically elected government. The March 10 NSC Situation Room briefing to the President, however, did not define how the members of the new interim Iraqi authority would be chosen and what its authority would be during the postwar period.[14] On April 28, 2003, the Office of the Secretary of Defense produced a briefing book on the development of the Iraqi Interim Authority, stating that the Department and "the U.S. government interagency process have yet to decide upon a final structure for the IIA, and have not announced an approach or timetable for implementing the concept."[15]

When Bremer arrived in Iraq on May 12, the United States did not have a well-developed plan in place for transferring political power to an interim Iraqi authority, despite operative orders anticipating a fairly imminent withdrawal of most U.S. forces. The unexpected complete collapse of Iraq's governing institutions, widespread and debilitating looting, and disagreements among U.S. government officials about the composition of the interim authority prevented the Coalition from promptly effecting the hoped-for quick transition. The absence of clarity on the way forward amid Iraq's evolving post-invasion conditions was underscored in Under Secretary of Defense Douglas Feith's May 15, 2003 congressional testimony, given the day before the CPA issued Regulation Number 1. He said: "We are pursuing [our] goals with a two-part determination: a commitment to stay and a commitment to leave."[16]

PX213

• Chapter 6 •

Ambassador Bremer said that, by the time he was appointed, senior Washington officials had agreed that the political transition would take much longer than initially anticipated at the March 10 briefing. On May 6, President Bush told Bremer "to take the time necessary" to set Iraq on the path to democracy. Two days after Bremer's meeting with the President, Secretary Rumsfeld presented a paper at his morning staff meeting stating that the transition from despotism to a democracy will not happen fast or easily. It concluded that it could not be rushed.[17]

The rapid policy change in Washington was slow to filter to Iraq, where both civilian and military leadership assumed that the March 10 strategy still controlled. When Ambassador Bremer arrived, ORHA's Jay Garner and Zalmay Khalilzad, the President's envoy to Iraqi exile groups, were actively engaging with Iraqi leaders, primarily from the exile community, to quickly form an interim authority. Bremer's issuance of Regulation Number 1 effectively ended this initiative.

On May 22, Bremer proposed a new political plan under which the Iraqis would form a governing council, produce a new constitution, and then hold elections for a permanent government. On that same day, he submitted his first report to the President through Secretary Rumsfeld, stating that he had "re-launched the political dialogue with Iraqi leaders" and that "full sovereignty under an Iraqi government can come after democratic elections, which themselves must be based on a constitution agreed by all the people." The President wrote back, "You have my full support and confidence. You also have the backing of our Administration that knows our work will take time."[18]

Meanwhile, CENTCOM was still following its original strategy. General Franks had issued orders in April—pursuant to prewar plans—to move much of the initial invasion force out of Iraq by the end of July. He anticipated a U.S. military presence in Iraq of "fewer than 30,000 troops by the first of August."[19] By May 1, 2003, CENTCOM had dismantled its forward command-and-control center in Qatar. Two weeks later, the Defense Department announced that Lieutenant General David McKiernan's command (CFLCC) would soon leave Iraq and that his large headquarters would be replaced by a much smaller Combined Joint Task Force 7 (CJTF-7), led by Lieutenant General Ricardo Sanchez.[20] During this period, Lieutenant General Sanchez repeatedly expressed concern to General John Abizaid about the ongoing troop withdrawals, while Ambassador Bremer also warned Washington that security was deteriorating.[21]

General Abizaid assumed command of CENTCOM on July 8. Three days later he issued orders halting the U.S. troop withdrawal. Forces withdrawn during that early summer included U.S. Army Engineer units that could have

PX213

supported the incipient reconstruction mission. The loss of these units hampered the Coalition's capacity to carry out quick-impact rebuilding projects during the CPA's first weeks.[22]

CPA Regulation Number 1, which made the CPA the occupying authority of Iraq and Bremer—in effect—a proconsul, "completely flabbergasted" many Iraqis, according to senior exile leader Ali Allawi, who would serve as the Minister of Trade, Defense, and Finance in successive Iraqi governments. Allawi was shocked that, "within the space of a few days, the entire process that was to lead to a provisional Iraqi government had been abruptly stopped, and then upended."[23] The change raised suspicions among Iraq's indigenous tribal, political, and religious leadership, who chafed at the idea of an occupation by foreigners, after suffering under Saddam's dictatorship for decades.

On May 22, 2003, the UN Security Council approved Resolution 1483, recognizing the CPA as the temporary governing authority in Iraq, directing it to work to "promote the welfare of the Iraqi people," and advising it to "comply fully" with all obligations under international law.[24]

### CPA Order Number 1: De-Ba'athification

On the same day that he signed CPA Regulation Number 1, Ambassador Bremer issued CPA Order Number 1, a de-Ba'athification directive that stripped certain former members of Saddam's Ba'ath Party of political influence in Iraq. In his April 16 Freedom Message, General Franks already had done away with the Ba'ath Party, which had about two million members in 2003.[25]

Conceived in Washington and promulgated with little Iraqi involvement, the de-Ba'athification order eliminated all Ba'ath Party structures and banned "Senior Party Members"—those in the top four ranks of the party—from serving in Iraq's public sector.[26] The order also provided for the immediate dismissal of anyone in the top three layers of management in any government institution (including ministries, state-owned enterprises, universities, and hospitals) if he or she had been a "full member" of the Ba'ath Party.[27] Because the vast majority of senior officials in Saddam Hussein's regime were Ba'ath Party members, the order effectively fired most senior leaders in Iraq's government, severely depleting the bureaucracy of key personnel. The order also allowed for exceptions and waivers.

Before the war began, interagency planners debated the delicate trade-off between the need to eliminate the Ba'ath Party and the need to retain an effective administrative bureaucracy in postwar Iraq. A consensus developed favoring a policy to remove the Ba'ath Party's most-senior ranks; but the meaning of "most-senior ranks" was left undefined.[28] The intelligence community estimated that implementing the order down to the Party's fourth level would affect "only about

PX213

one percent of all party members or approximately 20,000 people, overwhelmingly Sunni Arabs."[29] Many in the Shi'a and Kurdish communities believed that a strong de-Ba'athification policy was crucial to prevent a Ba'athist return to power.

Some senior U.S. officials opposed the de-Ba'athification order. They argued that it would strip Iraq's governance institutions of key senior management and thus jeopardize the Coalition's primary goal of stabilizing the country. For example, ORHA's Jay Garner and the CIA station chief in Baghdad urged Ambassador Bremer to modify the order, believing the policy needlessly would create enemies for the Coalition and undercut national reconciliation.[30] Bremer refused, saying he had his instructions from Washington.[31]

Most Iraqis agreed that some de-Ba'athification was necessary, but many believed that the CPA order had gone too far. For example, Nazar Janabi, the Director General for Defense Policy and Requirements in Iraq's Ministry of Defense from 2004 to 2006, thought that only the top three levels of the Ba'ath Party should have been subject to the order. It would have had a far "less disenfranchising impact" if it had been restricted to just those levels, he said.[32]

The de-Ba'athification order arguably reached beyond what President Bush had approved on March 10, 2003, when the NSC's Frank Miller had briefed him on the policy. The President had then determined that "we ought to remove what we understood to be the top layer" of the Ba'ath Party (although no further definition was given to what the top layer comprised). Whether "the top layer" reached down to the fourth rung is subject to dispute. Miller believed that "the Ba'athist regime ought to [have been] dealt with in truth and reconciliation panels. Membership in the Ba'ath Party ought not to [have been] an immediate disqualification for office."[33]

Whatever its reach should have been, the consequences of the de-Ba'athification order quickly became clear: it reduced the ranks of Iraq's capable bureaucrats and thus limited the capacity of Iraqi ministries to contribute to reconstruction. "The impact of this de-Ba'athification order was devastating," said Lieutenant General Sanchez, Commander of Coalition forces in Iraq at the time. "Essentially, it eliminated the entire government and civic capacity of the nation. Organizations involving justice, defense, interior, communications, schools, universities, and hospitals were all either completely shut down or severely crippled, because anybody with any experience was now out of a job."[34]

Some of Iraq's Sunnis equated the order with a "de-Sunnification" of the government. Samir Sumaida'ie, a Sunni who became a member of the Iraqi Governing Council (IGC) and then served as Iraq's Minister of Interior, criticized the order for focusing on removing people rather than getting rid of an outmoded ideology. "The whole thing was applied in a very negative way," he said. "It was far too wide-ranging,

PX213

and as a result, created a backlash. There were a lot of people who were just ordinary people who [joined the party simply because they] wanted to survive."[35]

On May 25, 2003, Bremer signed CPA Order Number 5, creating an Iraqi De-Ba'athification Council to "investigate and gather information" on "the extent, nature, location and current status of all Iraqi Ba'ath Party property and assets" as well as "the identity and whereabouts of Iraqi Ba'ath Party officials and members involved in human rights violations and exploitation of the Iraqi people." The council, composed entirely of Iraqis, was tasked to help the CPA Administrator identify and classify former Ba'ath Party members, eliminate Ba'ath Party structures, and reclaim Ba'ath Party assets. Importantly, it also advised Bremer about who should be exempted from de-Ba'athification.[36]

The CPA gave the council responsibility for de-Ba'athification, but "did not provide enough authority, resources, or oversight for them to manage the process."[37] It eventually turned the de-Ba'athification process over to the Iraqi Governing Council.[38] In November 2003, the Supreme National De-Ba'athification Commission replaced the Iraqi De-Ba'athification Council; Ahmed Chalabi, the Shi'a expatriate politician, served as its first chairman.[39]

*CPA Order Number 2: Disbanding the Military*

One week after issuing the de-Ba'athification order, Ambassador Bremer handed down another momentous order that also had unanticipated and significant consequences. CPA Order Number 2, titled "Dissolution of Entities," abolished seven institutions: the Ministry of Defense, the Ministry of Information, the Ministry of State for Military Affairs, the Iraqi Intelligence Service, the National Security Bureau, the Directorate of National Security, and the Special Security Organization.

The order put every member of Iraq's army, air force, navy, and air defense force, as well as the Republican Guard, the Special Republican Guard, the Directorate of Military Intelligence, and the Emergency Forces—some 500,000 men—immediately out of work, many without any compensation. Although the roughly 300,000 conscripts could receive a small termination payment, no soldier with the rank of colonel or above was eligible for either a termination payment or a pension.[40]

This CPA order surprised some policymakers in Washington. The NSC had not vetted the decision, and NSC Iraq coordinator Frank Miller said that the President had expected the army to continue after regime change because the Coalition could not "afford to put 300,000 men with guns in their hands on the street."[41] Secretary Powell first learned of the order at a May 22, 2003 NSC meeting at which Bremer, via secure video-teleconference from Iraq, announced his intent to issue the order the following day.[42]

PX213

"When the Army was disbanded," Secretary Powell recalled, "I called Dr. Rice and said, 'What happened?' Nobody seemed to know about this and [her] answer was, 'We have to back Jerry [Bremer].' There was no meeting on it; there was no, 'Gee, is this a good idea?' You couldn't even tell who had decided it … I saw Peter Pace, the Vice Chairman, a little later and I said, 'Peter, did you guys know about this?' He said, 'Hell, no!'"[43]

The order was drafted by the CPA's senior advisor for national security, Walt Slocombe, in consultation with the Office of the Secretary of Defense and circulated to senior military leaders, including the Chairman of the Joint Chiefs of Staff.[44] Under Secretary Feith later acknowledged that it was an error in judgment for the Pentagon not to have discussed disbanding the army with senior-level officials of other agencies before formally approving the issuance of the order. But he maintains that it was the right decision substantively because the Iraqi army was top-heavy with generals, otherwise badly organized, corrupt, and had been an instrument of oppression in Iraq.[45] Slocombe later said that the order merely reflected facts on the ground because Iraq's forces had essentially disbanded in the wake of the invasion. Moreover, the Kurdish and Shi'a leaders objected to any reconstituted version of Saddam's army.[46]

Key U.S. generals in Iraq expressed concerns about the order before it was issued.[47] CENTCOM's Phase IV plan, approved by the President, anticipated using the Iraqi army to help stabilize the country and assist with reconstruction. To this end, the military had dropped leaflets across Iraq before the invasion urging soldiers not to fight and promising no reprisals against those who laid down their arms. Some U.S. ground commanders argued that the army had not "dissolved," but that Iraq's soldiers had gone home, awaiting direction. In each region across the country, U.S. brigade commanders had contacted Iraqi military leaders and, through them, had begun to reconstitute army units.[48]

To replace the disbanded forces, Bremer and Slocombe proposed creating a small volunteer Iraqi army.[49] The plan called for the Coalition to train about 40,000 Iraqi soldiers, divided into three light infantry divisions, over the next two and a half years. The first division would be ready for deployment in the fall of 2004, the second division in the fall of 2005, and the third in early 2006.[50] The plan would allow the "New Iraqi Army" to draw on carefully vetted officers from Saddam's old force, but it had to exclude the top ranks of the Ba'ath Party and anyone from the inner circle of the old security forces.[51]

Leading Iraqis disagreed with the CPA's decision to disband the army. Ali Allawi said Iraqi attitudes toward the army were far more complicated than Americans understood. The police (which were not disbanded) and other internal security forces were "detested," but the armed forces "generated considerable

PX213

sympathy and respect throughout Iraq." According to Allawi, the public at large saw the army "as an integral part of the identity of the state of Iraq," and it was difficult, "even for the Shi'a, to accept a wholesale dissolution of the armed forces and to leave the country bereft of an army."[52]

Laith Kubba—one of the founding members of the Iraqi National Congress, an advisor to the Future of Iraq Project, and later a spokesman for the Iraqi government—said, "the measure to dissolve the Iraqi army was not a smart one." Kubba believed that Ambassador Bremer needed the old army to help Iraq make the transition to democratic governance. "Now if that means you need to utilize some of the people who were in the bureaucracy, in the army, in the regime, and if they're vital and crucial to make that transition, then you take them on board." He added, "Alienating large numbers of people ... was not a smart move."[53]

Within days of the announcement of the "Dissolution of Entities," crowds of former soldiers gathered outside the CPA's palace gates in Baghdad and around U.S. military compounds across the country, demanding the restoration of their salaries and pensions. In Mosul, where Major General David Petraeus was commanding the 101st Airborne Division, disbanded military members demonstrated for several days in front of the city hall. Iraqi policemen shot and killed one of the protestors and wounded three others, sparking a riot. Over the next two days, eighteen of Petraeus's soldiers were wounded, and two Humvees were burned. Riots in Baghdad and elsewhere claimed American and Iraqi lives. Ten days later, Bremer modified the policy, announcing that the CPA would pay salaries and pensions to members of the disbanded army.[54]

Major General Petraeus later said that the order to disband the army sparked an anti-Coalition sentiment that fueled the nascent insurgency in Iraq, igniting nationalist impulses against "the occupiers." Petraeus believed that the order created "tens of thousands, if not hundreds of thousands, of additional enemies of the Coalition."[55]

PX213

Chapter 7
# CPA's Shortfalls

*Jerry [Bremer]—God bless him—he was never given a set of coordinated instructions from the Administration. He went in pretty much on his own.\**

**General Colin Powell**
Secretary of State (2001-2005)

When Ambassador Bremer arrived in Iraq, he ostensibly had at his disposal both U.S. appropriated funds and Iraqi money that he could use to fund government operations and reconstruction programs. In April 2003, the Congress had approved $2.4 billion for the newly created Iraq Relief and Reconstruction Fund, which would become the primary U.S. funding account for Iraq's reconstruction.

The Office of Management and Budget apportioned the first appropriation to the Iraq Relief and Reconstruction Fund (IRRF 1) among five implementing agencies, with USAID receiving more than 70 percent.[1] USAID already had marked these IRRF 1 funds for use before the CPA's creation, and thus Ambassador Bremer had limited influence over how this money was spent.[2] The CPA's advisors, however, sought to shape specific job orders under the various IRRF 1 contracts USAID managed. Disagreements over these job orders marked the beginning of a disputatious relationship between the CPA and USAID.

Unlike IRRF 1, Ambassador Bremer had virtually complete control over Iraqi money, which came from three sources: vested funds in U.S. bank accounts frozen by an executive order shortly before the March 2003 invasion; seized funds that Coalition forces had recovered in Iraq; and oil and gas revenues controlled by the UN under the Oil-for-Food program. The CPA would expend about $20 billion of these Iraqi funds by the end of its fourteen-month tenure.[3]

**U.S. Funding**
In the April 2003 IRRF 1 legislation, the Congress directed that the funds be used to pay for "humanitarian assistance" and "rehabilitation and reconstruction in Iraq." The Congress identified twelve humanitarian and reconstruction sectors for fund use, with the OMB apportioning the money among the agencies shown on the following chart.[4]

---

\* SIGIR interview with General (Ret.) Colin Powell, former Secretary of State, February 4, 2008.

PX213

• CPA's Shortfalls •

| Breakdown of Iraq Relief and Reconstruction Fund Apportionments by Agency ($ Millions) | | |
|---|---|---|
| Source | Agency | Apportioned |
| IRRF | USAID | $1,820.3 |
| | Department of Defense | $518.3 |
| | Department of State | $125.4 |
| | Department of the Treasury | $6.0 |
| | U.S. Trade and Development Agency | $5.0 |
| | **Total** | **$2,475.0** |

Source: Data as of September 30, 2004; CPA-IG, *Quarterly Report to the United States Congress*, October 2004, 55.

USAID had initiated contracting for Iraq's reconstruction in early 2003 and, by early May, it had awarded twelve contracts, obligating about $1.5 billion in IRRF 1 dollars. The agency divided the contracts between "hard" projects to restore infrastructure and "soft" programs to support health, education, agriculture, and economic reform initiatives. Bechtel received the largest single contract, $680 million, for infrastructure projects in Iraq.[5]

After the March 2003 invasion, USAID quickly began to establish a presence in Iraq, and, by mid-summer, the agency had 30 offices open in 15 of the country's 18 provinces, staffed by more than 400 people. Reflecting USAID's transformation over the previous fifteen years into an agency heavily reliant on contractors, only about a dozen of the deployed personnel were full-time agency employees.[6]

**Iraqi Funds**

In May 2003, the U.S. government, the Coalition, and the United Nations took several important steps to give the CPA access to Iraqi funds for reconstruction programs and to fund government operations. An executive order issued on the eve of the invasion permitted Ambassador Bremer to use $1.7 billion in vested Iraqi assets, which had been drawn from various banks and deposited into the U.S. Federal Reserve Bank of New York.[7] During the invasion, U.S. forces seized about $900 million from various locations across Iraq, finding much of it in Saddam's palaces. Bremer generally used the vested funds to pay Iraqi government salaries and the seized funds to support reconstruction projects. The U.S. military carried out many of the first reconstruction projects using seized funds, which marked the beginning of a critical program that Bremer would soon formalize in a CPA order as the Commander's Emergency Response Program (CERP). Vested and seized Iraqi funds alone, however, could not cover the mounting costs of administering and rebuilding Iraq. For that, the CPA depended on the Development Fund for Iraq (DFI).

• 79 •

PX213

*The DFI*

On May 22, 2003, the UN Security Council passed Resolution 1483 (UNSCR 1483), creating the DFI as the new repository for Iraq's oil and gas revenues.[8] The resolution required the deposit of 95 percent of these funds into the DFI account at the Federal Reserve Bank of New York, from which the CPA could draw to pay for "the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, for the costs of Iraqi civilian administration, and for other purposes benefiting the people of Iraq." The remaining five percent was deposited in the UN Compensation Fund for victims of Saddam Hussein's 1990 invasion of Kuwait.[9]

UNSCR 1483 also created the International Advisory and Monitoring Board (IAMB) to provide oversight of the DFI and to ensure that the CPA used Iraqi revenues for the benefit of the Iraqi people. The IAMB's membership included representatives from the UN, the World Bank, the International Monetary Fund, and the Arab Fund for Social and Economic Development. Notwithstanding the importance of the IAMB's mission, the UN failed to appoint its members until October 24, 2003, and the board did not have its first meeting until December 5, 2003, more than six months after the CPA started using the DFI.[10]

At the end of May 2003, the UN transferred a billion dollars into the DFI account "to provide for immediate reconstruction needs," and the CPA immediately began using it to pay Iraqi governmental salaries and pensions and to finance initial reconstruction projects.[11] Ambassador Bremer created a Requirement Review Board (RRB) to manage the DFI, and the RRB quickly started approving projects, ranging from a $600 water pump to a $4 million radio system for the railroads.[12] "For lack of a better [term]," noted Ambassador James Warlick, the CPA's point person on the Oil-for-Food program, the DFI became CPA's "bank account" for Iraq.[13]

On June 15, 2003, the CPA issued two regulations governing the DFI.[14] One gave Ambassador Bremer complete control of the DFI funds, providing that he alone could direct their disbursement.[15] The other replaced the RRB with the Program Review Board (PRB), directing it to use the DFI in a transparent manner to meet Iraq's humanitarian needs, support the economic reconstruction, fund projects to repair Iraq's infrastructure, continue disarmament programs, and pay for the costs of the country's civilian administration.[16]

*Program Review Board*

Bremer named his new director of economic policy, Peter McPherson, as chairman of the PRB.[17] Under McPherson's guidance, the PRB reviewed numerous reconstruction project proposals, making recommendations to the Administrator

PX213

on which the CPA should pursue.[18] Ambassador Bremer instructed McPherson to "promote the CPA's objective of actively involving Iraqis in the financial planning process, and transferring to the Iraqi interim administration the responsibility for budgeting Iraq's financial resources"—but only one Iraqi representative was on the board.[19] The PRB was also supposed to develop a comprehensive funding plan for the "relief and reconstruction of Iraq," but it never produced such a plan.[20]

Because the CPA was legally deemed an "international organization," Iraqi funds under its control were not subject to U.S. contracting regulations. The CPA thus developed its own contracting regulations, embodied in CPA Memorandum Number 4, which detailed the rules for using the DFI. Among other things, Memo 4 established conditions for the award of DFI-funded contracts and defined the documents required for each contract file. Notably, it put the CPA's Head of Contracting Activity (HCA) in charge of executing all CPA contracts.[21]

The HCA also was directed to manage Iraqi ministry contracting unless the CPA's Administrator had exempted a ministry after certifying that it had established capable contracting systems "adequate to ensure the transparent use and management of Iraqi funds."[22] By the end of the CPA's tenure, Bremer had certified just two ministries. Nevertheless, Iraqi ministries regularly engaged in independent contracting, in breach of Memo 4, throughout the CPA's duration. U.S. and international auditors later raised serious concerns about the CPA's weak oversight of the DFI and its failure to enforce its own contracting procedures.[23]

*Commander's Emergency Response Program*

On June 16, 2003, Ambassador Bremer authorized the use of DFI funds for CERP, an important new program that enabled U.S. military combat units to use Iraqi funds for small-scale reconstruction projects to meet Iraqi needs. Three days later, Lieutenant General Ricardo Sanchez, Commander of CJTF-7, issued Fragmentary Order 89, outlining the regulations governing CERP and defining eligible projects as those for "the building, repair, reconstitution, and reestablishment of the social and material infrastructure in Iraq."[24] CERP grew into a key U.S.-funded reconstruction program in Iraq, ultimately receiving more than $3.5 billion in U.S. appropriations by the end of 2008.[25]

Shortly after creating the program, the CPA expanded CERP's limits on project spending and strengthened its regulations, requiring commanders to appoint trained purchasing agents to document their use of CERP funds. General officers in charge of regional commands could receive $500,000 in CERP money for projects; brigade commanders could receive $200,000. The PRB approved additional tranches upon depletion of these allotments.[26]

PX213

The CERP made it possible for U.S. commanders to improve life in Iraqi communities by quickly repairing roads and bridges, rebuilding schools, improving health care, and removing trash.[27] The program would later play a critical role in U.S. counterinsurgency efforts in Iraq.

## Staffing Problems

Soon after arriving in Baghdad, Ambassador Bremer replaced ORHA's pillars, organizing the CPA into political, economic, administrative, budgeting, and planning sections, which roughly resembled the traditional embassy structure with which Bremer was familiar. The CPA absorbed 600 ORHA staff members but was still far short of what it needed to manage its burgeoning relief and reconstruction program.[28]

On May 21, 2003, Deputy Secretary of Defense Wolfowitz moved to address the CPA's shortfalls by directing the Department of the Army to meet its administrative, logistical, and contracting needs.[29] The Army promptly opened a contracting office at CPA headquarters in the Republican Palace in Baghdad, appointing an Army colonel to lead the new office. When he arrived at the end of June 2003, he found that there were just three contracting officers on staff to manage all of the CPA's work.[30] He desperately needed more qualified personnel to help produce statements of work—the key element in defining a contract's scope—and more lawyers to review contracting documents. Throughout the CPA's tenure, the contracting office was grievously understaffed.[31]

These personnel problems were symptomatic of those afflicting the entire CPA. With no formal recruiting process in place, the CPA resorted to a "pull system" in which senior advisors determined their staffing needs on an ad hoc basis and then sent the requests to the CPA's human resources office in Baghdad. The Baghdad office would then send the request to the CPA's Pentagon office.[32] This procedure was too slow, so CPA officials in Iraq began recruiting staff directly from federal agencies and presenting them to human resources for immediate processing.[33] The CPA also suffered from a very high personnel turnover rate. Part of the cause was that, in the summer of 2003, the U.S. still expected a short stay in Iraq, and so most people signed up for three-month tours.[34]

Because of the CPA's myriad personnel problems, the White House sent Katja Bullock, special assistant to the President for presidential personnel, to assist in developing a Joint Manning Document (JMD). Bullock promptly produced a JMD that included personnel needs from federal agencies, contractors, and Coalition partners. Submitted to the Joint Staff by July 2003, the JMD called for a CPA staff of around 1,200 people, which would double its size.[35] The Joint Staff quickly filled the military slots, but ignored the civilian ones because it

PX213

had no mechanism in place for forwarding staffing requests to the civilian agencies.[36] Colonel Dennis DeGraff, CPA's personnel director, said that "the civilian [personnel] piece … just sat on somebody's desk in [the Office of the Secretary of Defense]."[37]

At the end of 2003, Secretary Rumsfeld deployed a team to Iraq to assess the CPA's personnel situation. Its report concluded that the CPA was "a pick-up organization [seeking] to design and execute the most demanding transformation in recent U.S. history."[38] A CPA Inspector General audit of the organization's personnel management system also found problems, noting that "CPA staffing needs changed constantly in terms of the number of required personnel," and that the CPA could not keep an accurate count of its personnel.[39]

Throughout its tenure, the CPA operated with about one-third fewer people than it needed and turnover was constant.[40] Retired Lieutenant General Jeffrey Oster, who served as the CPA's deputy administrator and chief operating officer during 2004, observed: "If you couldn't get somebody for 90 days, you'd take somebody for 60 days." When the CPA dissolved on June 28, 2004, only seven people had served for the CPA's entire fourteen-month duration.[41]

*The 3161 Provision*

During mid-summer 2003, it became apparent that the CPA was going to be in Iraq longer than the few months the Pentagon's leadership had hoped. Meeting personnel needs to support the occupation thus quickly moved up on the list of priorities. U.S. civilian agencies were failing to provide enough personnel, so the Pentagon established a new recruiting team within its White House Liaison Office to find and employ staff. Like ORHA, the new team used a special federal law designed for temporary organizations—Section 3161 in Title 5 of the United States Code—to fill CPA positions quickly. The 3161 provision permitted federal hiring free of the usual position classifications and competition requirements.[42]

Although the Pentagon's recruiting team had an efficient and effective hiring tool, it still needed a pool of candidates with the right skills and experience to support a contingency relief and reconstruction operation. Because a ready pool did not exist, many of the personnel that the team recruited were poorly qualified for the jobs to which they were assigned.[43] Furthermore, using the Pentagon's White House Liaison Office as the locus for senior official recruitment exposed the effort to charges of politicization.

By the spring of 2004, more than twenty percent of the CPA's staff had been hired under the 3161 provision. Coalition partners contributed another thirteen percent, and around five percent were contractors. Only 149 of the CPA's 1,196 staff were detailed from the civilian agencies. Most of these came from the State

PX213

Department, USAID, and the U.S. Treasury. The Defense Department drew on its military assets to provide the rest.[44] The civilian agencies in the federal bureaucracy failed to muster more staff for Iraq because they had neither the financial nor personnel resources to support a contingency operation.[45] Also, the worsening security situation in Iraq proved a deterrent.

*Matching Skills to Jobs*

The CPA's Office of Management and Budget staff exemplified the CPA's personnel problems. When Retired Rear Admiral David Oliver, the first Director of CPA's OMB, started in June 2003, he requested 31 people to meet his enormous mission. When he left five months later, in November 2003, only four of his positions were filled.[46] Rodney Bent, who worked for OMB in Washington, replaced Oliver, finding severe shortages in staff numbers and skills. Bent discovered that none of his employees had ever worked on a budget before being deployed to Iraq. "I had a relatively young staff that was completely inexperienced and had no particular training either in the Middle East or on budget matters," said Bent. "I would think, if we're ever in this kind of situation again, that we'd want to draw on some of the professional staff that does exist" in Washington.[47]

*The Iraq Reconstruction and Development Council*

Deputy Secretary Wolfowitz and Under Secretary Feith created the Iraq Reconstruction and Development Council (IRDC) to bolster cultural awareness and Iraqi outreach. First ORHA and then the CPA used the IRDC's 150 members as technical advisors to Iraq's ministries and provincial offices. These Iraqi exiles—most of whom were American citizens—had an ambiguous status that set them apart from their CPA colleagues (as well as from Iraqi nationals).[48] Some CPA officials had concerns that some IRDC members brought potentially troublesome political baggage with them, including ties to factions controlled by exile politicians.[49]

A few IRDC members achieved success. For example, Dr. Sinan al-Shabibi later became the governor of the Central Bank of Iraq.[50] But the IRDC program was far from an overall success. It suffered from severe attrition. In the waning days of the CPA, only 27 IRDC members still remained on CPA's roster.[51]

A post-mortem of the IRDC effort found that it was poorly planned and inadequately managed.[52] The difficult IRDC experience underscores the need for a preplanned, well-prepared cadre of experts who understand the culture, history, and economic foundations of a country undergoing a major relief and reconstruction operation.[53]

PX213

• CPA's Shortfalls •

Although the United States was generally unprepared to take on a large-scale occupation and rebuilding mission in Iraq in 2003, one agency notably stepped up and performed its mission admirably. The U.S. Department of the Treasury, having dispatched a well-staffed and well-qualified team, worked first with ORHA and then CPA in 2003 to help prevent the collapse of Iraq's economy.

PX213

## Chapter 8
# Treasury's Triage

*The banking system [in Iraq] was in shambles. Electronic transfer of funds, widely made to people in developed countries, was virtually non-existent, making Iraq's payment system the equivalent of a Model-T Ford.\**

**John B. Taylor**
Under Secretary of the Treasury for International Affairs (2001–2005)

When the first group of U.S. Treasury experts arrived in Baghdad in April 2003, they found Iraq's financial system in ruins. Looters had ransacked the Rafidain and Rasheed banking chains and pillaged safe-deposit boxes. Just two of the 170 Rafidain branches, the largest bank chain in the country, were open.[1] The vault of the Central Bank of Iraq contained only $350 million in gold and waterlogged bank notes.[2] Nearly a billion dollars in foreign currency had been withdrawn from the bank before the war. In early May, Iraq's ministries were bankrupt, unable to pay salaries and pensions, and the country's currency was dangerously unstable.

The U.S. Treasury team worked through the spring and summer of 2003 to battle these devastating problems, shoring up Iraq's banking system, resuming civil servants' payments, stabilizing the currency, and securing a moratorium on repayment of Iraq's international debts. Negotiations that began later in the year would significantly reduce this debt. These efforts, among the most successful and most important during the early CPA period, prevented the country's financial collapse. But the larger goal of transforming Iraq's statist economy into one powered by free-market principles would prove much more difficult.

### Paying Iraqi Salaries

In May 2003, the CPA began paying Iraqi governmental salaries and pensions, using vested and DFI funds. To end the inequities of Saddam's payment system, Ambassador Bremer approved a four-tier monthly pay scale that permitted civil servants, based on their grade, to receive $50, $100, $150, or $250 per month.[3] Treasury officials in Baghdad worked with the Iraqi Ministry of Finance to develop a roster of eligible civil servants and pensioners. Ministry officials, who had secured their payroll records when the war started, turned them over to the CPA, and Bremer's senior advisors used them to develop employee registers for each

---

\* John B. Taylor, *Global Financial Warriors: The Untold Story of International Finance in the Post-9/11 World* (New York: W.W. Norton, 2007), 200.

PX213

• Treasury's Triage •

ministry.[4] The senior advisors then requested budgets to pay salaries based on the new payroll grades. Some professions received instant pay raises. Teachers, for example, received $50 per month under the new system, a tenfold increase.[5]

The CPA initially used the $1.7 billion in vested Iraqi funds to pay salaries.[6] The cash was packaged at the Federal Reserve Bank in New York, put on pallets, and flown to Baghdad for distribution. These money flights would occur continually over the next year, transporting more than $12 billion—or 237.3 tons of cash—from the United States to Baghdad to fund Iraqi budgets and reconstruction projects.[7]

Ged Smith, the director of Treasury's Office of Technical Assistance, remembered calling the New York Federal Reserve Bank to order the first shipment of $20 million in small bills: "The guy just laughed and asked, 'How many planes do you have?'"[8] When the money arrived, CPA's senior advisors loaded bricks of cash—nicknamed "footballs"—into trucks and Chevy Suburbans, delivering them personally to their respective ministries to pay salaries and other costs. Senior Iraqi officials distributed the money to ministry employees.[9] Although the payment process lacked the controls necessary for proper accountability, it met the urgent need to provide salaries, inject money into the economy, and prevent a political crisis.

Treasury advisors to Iraq's Ministry of Finance and the Central Bank moved quickly to establish a more controlled payroll system. By late June 2003, procedures were in place to pay government salaries through the Rafidain Bank, whose branches were quickly reopening. Forty-six branches were operating by August in Baghdad, with another 85 branches across the country.[10]

More than 90 percent of the salary payments during the CPA's tenure—all paid with either vested or DFI funds flown from the United States—went from the CPA Comptroller to the Central Bank and then out to recipients through the Rafidain Bank chain.[11] John Taylor, the Under Secretary of the Treasury, testifying before the Senate Foreign Relations Committee during the first week of June 2003, reported that more than 1.5 million workers and pensioners had already started receiving regular payments. He described the payments as an "initial financial life-line to the Iraqi people."[12]

Although the CPA's payments and new pay-scale provided a "life-line" for many Iraqis, they nearly caused a revolt among oil workers. "In the one-product economy that Saddam's disastrous economic policies had developed for Iraq," said Admiral Dave Oliver, Director of CPA's Office of Management and Budget, "the oil workers were accustomed to being specially pampered and not reluctant to express their displeasure." The CPA promised to come up with a new pay-scale by September, which "kept the oil and electrical ministries working without

• 87 •

PX213

significant protest."[13] CPA Order Number 30 created thirteen civil-service clas-sifications, each divided into ten steps on a career ladder that mirrored that of the U.S. civil service.[14]

---

### Flying Billions to Baghdad

The CPA relied on the DFI to fund the operations of Iraq's ministries and to pay for reconstruction projects. Held in a Federal Reserve Bank account in New York, DFI cash was flown to Baghdad in very large sums whenever the CPA requested. These shipments—the largest airborne transfer of currency in history—proved an enormous logistical challenge. A typical pallet of DFI cash had 640 bundles, with a thousand bills in each bundle. Each loaded pallet weighed about 1,500 pounds. The pallets were flown into Baghdad's airport at night and were then driven to the Central Bank of Iraq for deposit.[15]

The first emergency air-lift of money to Iraq was for $20 million, but the shipments rapidly grew in size. In December 2003, the CPA requested a $1.5 billion shipment, at the time the largest single payout of U.S. currency in Federal Reserve Bank history.[16] But that record was soon broken when, in June 2004, more than $4 billion was flown to Iraq, just before the CPA's transfer of sovereignty to the Iraqi Interim Government.

---

### The Currency Exchange

Before the war, U. S. Treasury officials were concerned about the two different currencies in circulation in Iraq. In northern Iraq, the Kurds used the old Iraqi currency, known as the "Swiss" dinar, so named because the currency's original plates were made in Switzerland. In the south, Iraqis used the "Saddam" dinar, which bore Saddam Hussein's picture. The fact that the Saddam dinar was em-blazoned with the dictator's portrait was just one of its problems. It was also easy to counterfeit, had only two denominations in circulation, and had plunged in value since the 1991 Gulf War. [17]

Treasury officials knew that a stable and unified currency system would be essential to Iraq's long-term economic health, so they developed a currency ex-change program as part of the agency's prewar strategy.[18] In July 2003, Bremer announced the currency exchange plan, noting that the CPA would print and distribute new Iraqi banknotes and make them available to the Iraqi public in mid-October.[19] The Central Bank of Iraq, with Treasury's support, would manage

PX213

• Treasury's Triage •

the exchange and the "New Iraqi Dinar" would replace both the Swiss and the Saddam dinars.[20]

"Currently everyone in Iraq carries a reminder of Saddam in their pockets—on the banknotes they're using," Bremer said. "Shortly after October 15, the first batch of Saddam notes will go into the incinerator. At close of business January 15, 2004, Saddam notes will no longer be legal tender."[21] Between October 2003 and January 2004, the CPA carried out the exchange with armed convoys delivering the new Iraqi dinars to 243 banks across Iraq. Insurgents attacked fifteen of the convoys, wounding eleven people.[22] But the attacks did not stop the conversion. Iraqis exchanged their old dinars for new ones at banks across the country, with the old notes shipped to Baghdad for burning.[23]

President Bush hailed the exchange program as an important achievement: "A stable currency, a new currency, a currency without the picture of the dictator or tyrant, or the torturer, however you want to define him, is important for the future."[24] The new dinar was stable enough by the end of 2006 to begin appreciating against the dollar.[25]

### Relieving Iraq's Debt

Estimates of Iraq's external debt in 2003 ran as high as $130 billion.[26] Fearing that interest payments on the debt alone could consume most of the country's income, Treasury made it a priority to persuade Iraq's international creditors to forgive or restructure Iraq's mammoth debt.[27] It secured an initial agreement with the G-8—comprising the world's top eight industrialized democracies—to give Iraq eighteen months before seeking interest payments on any Iraqi debt. Treasury then embarked on an intense negotiation process which eventually secured extraordinary debt relief for Iraq.[28]

In December 2003, President Bush appointed former Secretary of State and Secretary of the Treasury James Baker as his special envoy for Iraq's debt to lead the negotiations. Baker heavily engaged with the Paris Club, a debt forum comprising the world's nineteen richest countries, eventually securing a commitment from Club members to write down Iraq's foreign debt.[29]

At their economic summit in June 2004, the G-8 endorsed an IMF finding that Iraq's debt should be reduced by 90 to 95 percent. Iraq's new Minister of Finance Abdul al-Mahdi then asked the Paris Club creditors to reduce Iraq's debt by 95 percent and to reschedule payments of the remaining debt over a 23-year period. The United States, Canada, and Britain supported the request. Baker's negotiations over the next five months produced a hugely beneficial outcome: 80 percent of Iraq's $38.9 billion debt to Paris Club creditors was forgiven.[30] More significant debt forgiveness would follow over the next few years, which helped

PX213

the country's foundering economy to stabilize and begin to grow. The extraordinary elimination of much of Iraq's debt since 2003 amounts to one of the most generous acts of collective international debt-forgiveness in modern times.

## CPA's Economic Reform Agenda

In May 2003, Peter McPherson, the CPA's Director of Economic Policy, oversaw the CPA effort to pay Iraqi government salaries, restart the banking system, and manage the currency exchange program, he began to implement reforms to open Iraq's economy to the free market.[31] Some in the CPA contended that these reforms should be implemented gradually; others urged letting Iraqis resolve their own issues regarding the country's economic structure after the CPA left.[32] The IMF warned that in transition economies like Iraq, "implementation of these reforms has typically been difficult and time consuming, reflecting the need to build political support for reforms to ensure that they are durable, and that adequate institutional capacity exists to ensure effective implementation."[33] But McPherson pointed to the IMF's report on economic reform efforts in Eastern Europe, which concluded that the earlier reforms are made, the faster economic growth will occur.[34] McPherson and his economic team moved briskly ahead, focusing much of the CPA's reformist effort on Iraq's state-owned enterprises and the country's banking system.

### State-owned Enterprises

After the March 2003 invasion, most of Iraq's SOEs shut down because of looting. Three wars and a decade of international sanctions had left them "seriously de-capitalized, asset-starved, obsolescent, inefficient, saddled with high production costs, over-staffed, and—as a result of looting—in a state of physical degradation."[35] But Iraq's 192 SOEs were the "sole providers of essential public utilities and the leading providers of a large number of public goods and services as well as of consumer and industrial products." They accounted for 90 percent of the country's industrial capacity. Eleven different ministries oversaw various SOEs, which employed an estimated 500,000 people, or roughly one-eighth of the country's workforce.[36]

The CPA considered three separate but related issues regarding the SOEs. First, how much budget support should it provide to these state businesses? Second, should the SOEs be able to draw upon their deposits held by state banks? And third, should the debt between the SOEs be cancelled?[37]

Regarding budgetary support, McPherson and the ministry advisors differed on the degree to which the CPA should assist the largely inefficient and outdated state-run businesses. The CPA did continue to pay all SOE salaries and, in the early

PX213

days, gave some financial support to a number of SOEs in the electricity, oil, water, and health sectors. But McPherson, who saw the SOEs as vestiges of Saddam's statist economy, did not want to risk wasting additional money on businesses about which the CPA had little knowledge. He demanded proof that support for the SOEs would stimulate the economy and, in time, create viable companies.[38] Some of CPA's senior advisors, however, pushed to have more money allocated immediately to the SOEs, which they saw as vital to Iraq's economy.[39]

As to SOE bank accounts, McPherson made the controversial decision in July, when the two largest government banks began opening branches, to freeze all SOE deposit accounts at these banks. The move prevented individual SOEs from drawing on their accounts to purchase supplies, make needed capital improvements, or pay debts. McPherson was concerned about the viability of the state banks, which had recorded deposits amounting to about $2 billion but had only about $1 billion on hand.[40] He feared that any attempt by the SOEs to withdraw their money could spark a run on the banks.[41]

At the same time that the CPA froze the SOE bank accounts, it also cancelled all of their debts. McPherson contended that the "maze of obligations between government entities" was so complicated and that so many records had been destroyed by looting, that it would take more than a year to sort them out and "even then you would not have an accurate record."[42] He concluded, with Bremer's concurrence, that "we should clean the slate and move on."[43] McPherson said that many of the SOEs could not survive without huge subsidies, and that he wanted to fund only "those that could make practical use of CPA money."[44]

Some members of the Treasury's economic team and senior advisors to the ministries objected to these decisions. They contended that debt cancellation could weaken the Iraqi government's long-term credit standing. Moreover, they argued that freezing the bank deposits and cancelling all the debt among the SOEs hurt the most viable companies—those with money in their accounts—and risked leaving Iraq without a manufacturing base and with a huge unemployment problem.[45] There were also legal concerns about the CPA's authority under international law to effectively shut down much of Iraq's manufacturing base.[46]

Timothy Carney—the CPA's senior advisor to the Ministry of Industries and Minerals, which supervised a number of SOEs—urged that Iraqis should have a say in this significant economic decision. In a June 15, 2007 memo to McPherson, Carney warned that the proposed SOE policy "risks [undermining the] assets of the Iraqi people" and "was drawn up without adequate Iraqi participation."[47]

The CPA changed course at the end of July, and started to provide additional operating budgets for those SOEs, such as the cement and fertilizer companies, that could produce goods and services needed to support reconstruction. By the

PX213

end of August, about one-third of the SOEs had reopened.[48] Dr. Sami al-Araji, an American-trained mechanical engineer who had been working for the Ministry of Industry and Minerals, criticized the policy on SOEs, because he believed they "would have been able to support the [reconstruction] work in the electrical, oil, health, water and sewerage, and transport sectors."[49]

**Banking Reforms**

During Saddam's rule, banks functioned as "vehicles for storing and moving cash around the country and—in some cases—outside the country." They were not commercially viable institutions that promoted economic growth.[50] The CPA economic team and USAID agreed that Iraq's banking sector needed modernizing, but disagreed on how to do it.[51]

The CPA promulgated three orders to reform the Iraqi banking system. The first, issued on July 7, 2003, suspended the country's old banking laws, which had allowed only the Ministry of Finance to authorize loans to government ministries, and gave the Central Bank of Iraq the "authority to determine and implement monetary and credit policy without the approval of the Ministry of Finance."[52] The second order, issued on July 14, 2003, created the Trade Bank of Iraq to manage DFI funds and to help Iraqi businesses finance the imports of goods. Noting that Iraq lacked "financial institutions capable of facilitating imports and exports of goods and services to and from Iraq," the CPA authorized the Trade Bank's capitalization at $100 million.[53] The Trade Bank, one the CPA's more important achievements, would issue letters of credit worth more than $16 billion over the next five years.[54] The third banking order, issued on September 19, 2003, established rules for bank licensing, capitalization, and management.[55]

These orders collectively effected two major economic changes simultaneously. They modernized the banking system—making it more structured and stable—and changed the credit system, giving more Iraqis greater access to capital. Under Saddam, Iraqi banks required hard collateral, such as houses, jewelry, gold, or property, to secure a loan. The CPA wanted the banks to make credit more available, hoping that increased access to financing would spur economic growth.[56]

The CPA's banking reforms, however, did not have a significant effect on credit practices because the bank branches continued to require 100 percent collateral for loans. They could not quickly break their Saddam-era habits, even though the Finance Ministry had provided a written guarantee of 50 percent against possible losses made on small business loans.[57]

PX213

• Treasury's Triage •

### The Limits of Economic Change

A number of factors constrained the CPA's ability to make sweeping economic reforms in post-invasion Iraq.[58] Disagreement within the Coalition's ranks over the scope of economic reform measures, together with Iraqi opposition, stalled ambitious attempts to create a more open economy in Iraq and sidetracked SOE reform. There was never any serious discussion about the privatization of electricity, and the oil industry was considered off limits from the beginning.

The deteriorating security situation and the November 15, 2003 decision to accelerate the return of sovereignty to Iraq made it all but impossible for the CPA to tackle other significant economic issues, like the state subsidies for food, electricity, and fuel.[59] By the beginning of 2004, the CPA had set aside its free-market reform agenda, focusing instead on planning the political transition and implementing a wave of new reconstruction projects. According to Ali Allawi, who served as Minister of Trade during 2003, "there was not one [Iraqi] voice raised in support of the CPA's economic plans."[60]

• 93 •

PX213

# Chapter 9
# Bremer's Grand Vision

*We seem to have transitioned from a cautious beginning to requesting funding for everything without a plan or a thorough justification. And not only have the cost estimates been unrealistic, the entire postwar experience appears to have taken us by surprise. We were told that we would be welcomed with open arms by the Iraqi people and that Iraqi government institutions would be restored after a short hiatus. The vision of postwar reconstruction presented to Congress at that time was for many of us either hopelessly naive or grossly incompetent. \**

**Representative Nita Lowey (D-NY)**
Chair, House Appropriations Subcommittee on State and Foreign Operations

During mid-2003, several U.S. agencies and international organizations travelled to Iraq to conduct assessments on the country's reconstruction needs. The resulting surveys projected rebuilding costs ranging up to $60 billion, far higher than prewar estimates. In the wake of these assessments, Dave Oliver, Director of CPA's Office of Management and Budget, observed: "Our invasion seemed to have occurred just as the condition of the entire infrastructure teetered on the edge of the cliff of disaster."[1]

The assessments also caused Ambassador Bremer to push the CPA to develop a new and much more ambitious reconstruction plan. His new vision embraced a rebuilding program many times larger than any previously proposed, which would require enormous increases in U.S. funding for Iraq's relief and reconstruction.

## 2003 Assessments of Iraq

Four organizations conducted major reviews of Iraq's infrastructure and economy during the CPA's first three months: Bechtel, USACE, the UN, and the Center for Strategic and International Studies. Their reporting helped shape the next phase of the U.S. relief and reconstruction effort.

---

\* Representative Nita Lowey, Statement before the House Appropriations Subcommittee on Foreign Operations, Export Financing and Related Programs Hold Hearing on FY2004 Supplemental: Iraq Reconstruction Funds, September 24, 2003.

PX213

• Bremer's Grand Vision •

*The USAID/Bechtel Infrastructure Assessment*

Bechtel's first job under its $680 million contract with USAID was to assess Iraq's infrastructure in six areas: surface transportation, aviation, buildings, water, electricity, and the Umm Qasr Port in southern Iraq. During late April and May 2003, Bechtel teams surveyed dozens of sites across the country. What they found disturbed them. Iraq's infrastructure had collapsed. They estimated rehabilitation costs at about $16 billion.[2]

Bechtel's assessment identified five challenges then confronting the U.S. reconstruction program: (1) worsening security, (2) poor interagency coordination, (3) limited access to information, (4) confusing contracting regulations (5) the prevalence of unexploded ordnance. The report predicted that Iraq's deteriorating security situation would cause reconstruction costs to skyrocket.

The ultimate success of the reconstruction program, Bechtel further noted, demanded improved coordination among the U.S. government agencies involved.[3] Bechtel urged the CPA to adopt a new systemic approach to rehabilitating Iraq's infrastructure because: "Power, water, airports, rail, and the port are all integrated systems, and each has to be understood as critical components of an overall infrastructure network to arrive at the most economic and effective implementation plan."[4]

*The USACE Oil Sector Assessment*

In May 2003, USACE, working with Task Force Restore Iraqi Oil, KBR, and the Iraqi Ministry of Oil, surveyed Iraq's oil infrastructure. USACE's report approximated oil sector damage at $457 million from the war and $943 million from postwar looting, estimating reconstruction funding requirements at $1.7 billion. But USACE advised that this figure could vary by as much as 40 percent.[5]

USACE's assessment underscored the need to sequence and integrate oil facility repair with infrastructure work in other sectors. The electrical power grid depended on fuel from the oil sector, and oil production facilities required a steady supply of electricity. Power plants and oil facilities needed water to cool generators. The assessment found that "[a] failure of one component in the system [created] a related problem elsewhere in the system."[6]

Systemic interdependence demanded a high degree of coordination between the Iraqi ministries of oil and electricity—coordination that would be missing for most of the next five years. USACE emphasized the importance of obtaining Iraqi input at every step of the rebuilding process, highlighting the need to build capacity so that Iraqis could properly operate and maintain the new parts of their infrastructure. Like Bechtel, USACE flagged the growing security problem as a major obstacle to further progress.[7]

PX213

• Chapter 9 •

*The UN Assessment*

A joint assessment team from the UN and the World Bank spent the summer of 2003 in Iraq evaluating the country's development needs, in part to prepare for a donors' conference scheduled for October 2003 in Madrid. The team's report documented the severe consequences of Saddam's neglect of and under-invest-ment in Iraq's infrastructure, economy, and social institutions.[8]

The UN calculated that rebuilding Iraq would cost at least $56 billion over three years, with $36 billion needed for health, education, agriculture, private-sector development, government capacity building, and the rule of law. The assessment addressed neither oil nor security, opting instead to include CPA's $20 billion estimates for these sectors.[9] Like Bechtel and USACE, the UN report warned that, unless the Coalition restored security across Iraq, the economic and political transformation of the country could not proceed:

> Security concerns are paramount to the Iraqi population, influencing their ability to move freely, engage in work and education, and participate in the burgeoning political process. Without security, progress in rebuilding the critical infrastruc-ture, health and education systems, and access to electricity and clean water that have been degraded and destroyed by years of corruption, conflict, neglect, and sanctions may be too slow to provide a noticeable improvement in the quality of life and reassure the Iraqi people of the benefits of a transition to an open and democratic society.[10]

The UN also emphasized the need to strengthen government institutions and to restore "core human services." It identified factors that could impede Iraq's recovery. High on the list was the requirement to restore the almost nonexistent executive and administrative capacities of Iraq's public institutions, most acutely revealed in the absence of an effective financial management system.[11]

*The CSIS Assessment*

In June 2003, at the request of Secretary Rumsfeld, John Hamre, president of the Center for Strategic and International Studies (CSIS), led a delegation of post-conflict reconstruction experts to Iraq to determine the country's rebuild-ing needs. Hamre and his team visited nine of the country's eighteen provinces and met with the CPA's senior leadership. The CSIS report concluded that the United States faced an "enormous task" in Iraq, would have "to stay the course" for several years, and would need to provide significant initial funding for recon-struction programs.[12]

PX213

CSIS also pointedly warned that the CPA had to address immediately the deteriorating security situation in Iraq. Hamre recommended engaging more Iraqis at every level of the reconstruction effort, expanding programs that could provide Iraqis with employment opportunities, and decentralizing political power to the provinces. The CSIS report advised that "[the] CPA must be given rapid and flexible funding," adding that "business as usual" was "not an option for operations in Iraq, nor can it be for the funding."[13]

## A New Strategic Vision

Concurrent with the outside assessments, the CPA's Office of Strategic Planning drafted CPA's *Vision for Iraq*, which supplanted ORHA's *Unified Mission Plan*.[14] Dayton Maxwell, a former USAID official who had served with JTF-4 during prewar planning, was the senior civilian in CPA's policy planning office, and Lieutenant Colonel Robert Polk was the senior military officer.[15] They both had helped craft ORHA's *Unified Mission Plan* before the war.[16]

The *Vision for Iraq* defined the CPA's mission as working to achieve "the conditions for a free, sovereign, democratically elected representative government." The document outlined, in general terms, five "core foundations" that CPA would lay to support Iraq through its democratic transformation: security, essential services and civil society, economy, governance, and strategic communications.

The highest priority, according to the *Vision*, was "to create a secure and safe environment, without which the CPA recognized there could be little progress on other goals." The CPA would work to restore security across the country by recruiting and training Iraqi police and military forces. Other goals included promoting a rapid transition to a market economy and establishing an effective rule-of-law system. The document called for new programs to develop democracy, to create equitable criminal justice processes, to implement a new and fair penal code, and to construct new courthouses and prisons. The success of the *Vision* depended upon a "coherent and coordinated information campaign" that would explain the scope and nature of U.S. programs to all Iraqis.[17]

In mid-July, Ambassador Bremer sent the *Vision for Iraq* to the Pentagon. "I am confident," he wrote, "that this will put us on course for success."[18] By July 18, 2003, senior Pentagon officials had approved it.[19]

In the meantime, Ambassador Bremer had tasked Maxwell and Polk to expand the *Vision for Iraq* by identifying specific tasks aimed at implementing the five core foundations, and they quickly completed a new detailed framework, entitled *Achieving the Vision to Restore Full Sovereignty to the Iraqi People*. In late July, Bremer took the framework to Washington for briefings with the Congress, senior Administration officials, and the press. The 30-page document was the

PX213

CPA's first attempt to develop, in some detail, the litany of actions required to achieve the core foundational goals of the *Vision for Iraq*.[20]

The CPA's *Achieving the Vision* suffered from some serious flaws. First, Iraqis were not sufficiently consulted on it. The Iraqi Governing Council, which was appointed on July 13, was never given a chance to provide advice on it. Maxwell and Polk expressed concern at the time that the CPA was handing the Iraqis a fait accompli—a plan they were "just going to have to eat."[21] The CPA also had established overly ambitious infrastructure outcomes before ascertaining baseline conditions and before determining costs. Moreover, the outcomes had unrealistic completion dates, some by October 2003, just three months later.

The ambitious goals contained in *Achieving the Vision* included deploying 30,000 trained Iraqi police, re-establishing the Iraqi Border Guard, reopening all courthouses, building eleven new prisons and detention centers, reforming the ministries, improving electricity generation capacity to 4,000 megawatts, restoring basic health care services to prewar levels, rehabilitating 1,000 schools, and reopening the airports and railroads.[22] Even under the best of conditions, achieving these outcomes on a short timetable was virtually impossible.

**Developing Iraq's Budget**

In early July 2003, the CPA published a budget to fund ministry needs for the rest of calendar year 2003. CPA's senior advisors, then serving as the de facto ministers for each ministry, compiled what data they could find and developed a budget totaling $6.10 billion. The CPA predicted oil revenues for the rest of 2003 to be $3.46 billion and expected $432.7 million from taxes and the state-owned enterprises, leaving a deficit of $2.2 billion. Bremer planned to cover the difference with vested and seized Iraqi funds, the DFI, and new U.S. appropriations.

The new Iraqi budget provided only $609.5 million for reconstruction and capital improvements.[23] This could not begin to meet Iraq's many reconstruction needs. The CPA's economic team knew that without a major infusion of additional funds, it would not be possible to realize any of the objectives listed in *Achieving the Vision*.

On adoption of the 2003 budget, Ambassador Bremer ordered his senior advisors to develop, with their Iraqi counterparts, a 2004 budget. This effort produced more than $35 billion in ministerial requests, but Iraq's projected 2004 revenues amounted to less than $13 billion, leaving a projected deficit of $23 billion.[24]

"No matter how we pared the list," said Oliver, "we needed [over] $20 billion more than we had available."[25] Faced with a huge shortfall, Ambassador Bremer decided to ask the Congress for a dramatic increase in funding to support Iraq's

PX213

• Bremer's Grand Vision •

relief and reconstruction. He would also look to the international community for significant contributions.

In July and August 2003, Oliver and the CPA's economic team developed a new supplemental funding request for Iraq reconstruction that would go to the Congress in September. They also shaped the U.S. proposal for the International Donors Conference planned in October.[26]

### Asking Congress for Money

In late July 2003, Dave Oliver directed the CPA's senior advisors involved with infrastructure to contribute to a new reconstruction plan, which would provide the basis for the new supplemental request. Oliver charged Dave Nash, a retired rear admiral recently arrived in Baghdad as the deputy senior advisor to the Ministry of Transportation and Communications, to coordinate the plan's development.[27]

Just a few months earlier, Nash had been working as a construction manager in Birmingham, Alabama, for Parsons Brinckerhoff (a large U.S. contractor that would later receive sizable Iraq reconstruction contracts). He had made his career as a Navy engineer, rising to command the Naval Facilities Engineering Command and serving as Chief of Civil Engineers. Like many of the CPA's early recruits, he was in Iraq on a 90-day contract. With a wealth of experience in large public-works projects, Admiral Nash arrived at the Republican Palace just as CPA's leadership needed someone with significant construction expertise to develop an expansive strategy to rebuild Iraq's infrastructure.[28]

After briefly considering asking the Congress for $5 billion, Nash and his planners developed a much larger request. Working with CPA's senior advisors, Nash pulled together a long list of infrastructure projects that would cost about $27 billion. After whittling it down to $20.3 billion, Bremer approved the proposal in early August and sent it to Washington.

On August 15, 2003, Joshua Bolten, Director of the White House OMB, wrote Secretary Rumsfeld, objecting to the size of the CPA's request. The White House had already told the Congress that it would not ask for additional funding for Iraq and Afghanistan in 2003. Bolten said the CPA would have to provide a detailed justification before the Administration would consider going back to the Congress to argue for more money for Iraq reconstruction.[29]

The CPA had hired Tom Korologos as a senior counselor. Korologos, a veteran lobbyist, addressed Bolten's concerns in a memo to Bremer on August 17, 2003. "To delay getting our funds will be a political disaster for the President," he wrote. "His election will hang for a large part on show of progress in Iraq and without the funding this year, progress will grind to a halt." Korologos added that he did not believe that the Congress would turn down the supplemental request

PX213

• Chapter 9 •

because "the faster the Iraq CPA succeeds, the quicker 'our 150,000 boys over there' will start coming home."[30]

By the end of August, the CPA had answered Bolten's demand for more data, producing a "Program/Integration Management Plan for Recovery, Reconstruction and Redevelopment of Iraq." The plan's stated objective was to "assist in restoring the stability of Iraq and the Iraqi economy by means of infrastructure and development." It emphasized that U.S. funds were essential to meet Iraq's critical infrastructure needs because oil production and revenues were stagnant.[31] "These needs are immediate and urgent," the plan asserted, adding that the CPA would "begin execution of these funds before the end of 2003."[32]

The CPA's answer satisfied Bolten. On September 6, 2003, OMB submitted a $20.3 billion supplemental request to the Congress. President Bush announced the next day that he had asked the Congress for a total of $87 billion to support Iraq and Afghanistan, including the $20.3 billion for Iraq's reconstruction, noting:

> This budget request will support our commitment to helping the Iraqi and Afghan people rebuild their own nations, after decades of oppression and mismanagement. We will provide funds to help them improve security. And we will help them to restore basic services, such as electricity and water, and to build new schools, roads, and medical clinics. This effort is essential to the stability of those nations, and, therefore, to our own security.[33]

*USAID's Complaints*

USAID officials were perturbed by both the process and the substance of the CPA's supplemental request, having been shut out from its development. They believed Bremer had acted "in a non-transparent way" and expressed grave concerns about the plan's failure to include sufficient money for capacity building, democracy programs, agriculture efforts, and economic development.[34] USAID Administrator Andrew Natsios sharply disagreed with the CPA's premise that a large-scale infrastructure program would quickly create jobs and help solve Iraq's most pressing problems. "Development is not building things," he said. "It's not engineering. It's institution building."[35]

USAID was particularly concerned about underinvestment in the agricultural sector, which, at the time of the 2003 invasion, was the country's second-largest employer. Natsios was shocked to find that the supplemental had zero for agricultural programs, which he said are essential "to stimulate the economy and keep all the young men in the rural areas," rather than have them stream into the cities where they could be recruited as insurgents.[36]

PX213

• Bremer's Grand Vision •

In August 2003, before the submission of the supplemental, USAID's Baghdad office sent a memo to Oliver outlining its objections and encouraging him to revise the request so that it addressed Iraq's long-term needs for capacity building and sustainability. Oliver responded that the Congress would not fund "soft" projects and that the request would not be changed.[37]

The dispute between the CPA and USAID intensified when USAID discovered that the CPA, a Defense Department organization, would manage all of the IRRF 2 funds. Lewis Lucke, USAID's Mission Director in Iraq, complained to Oliver:

> To exclude us—especially considering the success we have achieved and are achieving to date in our programs, and the fact that we are a professional development organization that is by nature operational overseas—seems short-sighted and territorial in the extreme to the detriment of the overall U.S. mission in Iraq.[38]

USAID then developed its own $5 billion supplemental funding request, emphasizing public health and education, the economy, government accountability, and technical support. It called for $3.25 billion to restore essential electricity, transportation, irrigation, and water infrastructure.[39] The proposal gained no traction, either within the Administration or on Capitol Hill. Relations between USAID and CPA officials continued to deteriorate during and after the submission of the 2003 supplemental request. These breakdowns, both personal and bureaucratic, would continue to affect the reconstruction program for years to come.[40]

*Congressional Debates on the Supplemental*

During the last two weeks of September 2003, the Congress held seven hearings on the supplemental, during which members from both parties demanded to know why Iraq was not shouldering more of the reconstruction program's financial burden. Some argued that the United States should provide support through loans, while others saw CPA's request as an extravagant "wish list."[41]

"When I look at some of these justifications and when I look at some of the postwar planning in general, two thoughts strike me," said Representative David Obey (D-WI), the ranking member of the House Committee on Appropriations. "It looks like it was put together by the president of an Optimists Club, rather than someone with an understanding of the world; and secondly, it looks like the execution plans have been put together more like an MBA term paper than a document that reflects a realistic understanding of the society that we're wishing to operate in."[42]

PX213

• Chapter 9 •

Senate and House committee members peppered the CPA with written "questions for the record" about contracting, management, and oversight. Some legislators were struck by the fact that the CPA request contained more than $15 billion for construction, but provided virtually no information about the contracting process. Others raised concerns that the CPA had failed to prioritize the sectors or projects within sectors and had not provided timetables for program completion.[43] One member observed that a construction program of the size and scope proposed by the CPA would take five to seven years to complete in the United States.

The CPA brushed off all objections: "Our estimates differ. While some of the most complex projects may take several years to complete, we anticipate that the majority of construction can be completed much sooner."[44]

The Congress also raised concerns that the huge appropriation would serve as a disincentive to international donors. The CPA countered that Iraq would need between $50 billion and $75 billion for reconstruction—well above the supplemental request—and that it planned on presenting a "rich package of projects that should appeal to the donors" at the Madrid conference in October.[45]

**The Madrid International Donors Conference**

Creating that "rich package" fell to CPA's Council for International Coordination. CPA Regulation Number 5 created the council on June 18, 2003, "to be the CPA's focal point and coordination body for international assistance in the relief, recovery and development of Iraq."[46] Bremer tasked the council, chaired by Marek Belka—an economics professor who had served as Poland's deputy prime minister and minister of finance—to coordinate assistance from governments as well as international and nongovernmental organizations, make recommendations to the PRB on international assistance efforts in Iraq, coordinate with the IMF and the World Bank, and—most important—prepare for the October 2003 Madrid Donors Conference.[47]

As he organized for Madrid, Belka faced two significant challenges. First, he had to put together a plausible list of projects that interested donors might support. Second, he had to overcome the lack of interest on the part of certain countries, such as Germany, France, and Russia, that had opposed the Iraq invasion and thus might be disinclined to support Iraq's economic recovery.

Planning for Madrid suffered a devastating blow when, on August 19, 2003, a truck bomb destroyed the UN headquarters in Baghdad, killing the Secretary-General's Special Representative, Sergio Vieira de Mello, and 21 others.[48] This tragedy caused the UN to pull out of Iraq, and cast a pall over Belka's efforts.[49] The attack eventually led many countries to conclude that security was so bad in Iraq that contributing funds could have little positive effect in the near term.

PX213

• Bremer's Grand Vision •

On October 16, 2003, the UN issued Security Council Resolution 1511, which aimed to assuage international concerns about America's expanding role and lengthening stay in Iraq. The new resolution stressed the temporary nature of the Coalition's occupation and encouraged the United States to transfer sovereignty to the Iraqis as soon as practicable. Issued shortly before the Madrid Donors Conference, UNSCR 1511 was crafted in part to calm the concerns of donor nations about U.S. plans for Iraq and thereby persuade them to contribute to Iraq's reconstruction.[50] But it did not have this effect.

On October 23 and 24, 2003, a total of 76 countries, 20 international organizations—including the IMF and the World Bank—and 13 nongovernmental organizations participated in the Madrid Donors Conference. The United States pledged $18.4 billion (the amount of the pending supplemental), and the other countries combined pledged a total of $13.5 billion in grants and loans. Fewer than half of the attendees announced contributions. Germany, France, and Russia pledged nothing. Japan offered the most, contributing more than a third of the total non-U.S. amount pledged—$1.5 billion in grants for 2004 and $3.4 billion in loans.[51]

To help manage international donations, the UN created the International Reconstruction Fund Facility, which the UN Development Group and the World Bank would oversee. All qualified companies from any country could bid on contracts for projects paid for by the fund.[52]

**Congress Passes IRRF 2**

The Congress debated the CPA's supplemental request during October 2003, and, on November 6, it passed the "Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan for Fiscal Year 2004," allocating $18.4 billion to the Iraq Relief and Reconstruction Fund (IRRF 2). The Congress made the money available for two years, meaning that it had to be fully contracted by September 30, 2006. Notably, the Congress required the CPA to provide an accounting for all revenues—domestic and foreign, including Iraqi—used for Iraq's reconstruction.[53] The Act also created a new oversight office—the Inspector General for the Coalition Provisional Authority—which became SIGIR in October 2004.

Although the Congress approved the CPA's funding request almost intact, the legislators imposed greater controls and more oversight for IRRF 2, dividing the money among ten sectors and giving the CPA limited authority to make adjustments. The Congress provided that the CPA could shift up to ten percent from one sector to another, but no sector could be increased by more than twenty percent without congressional approval.

• 103 •

PX213

• Chapter 9 •

| Iraq Relief and Reconstruction 2 Sector Allocations ($ Billions) | |
|---|---|
| Sector | Allocation |
| Electricity | $5.56 |
| Water Resources and Sanitation | $4.33 |
| Security and Law Enforcement | $3.24 |
| Oil Infrastructure | $1.89 |
| Justice, Public Safety Infrastructure, and Civil Society | $1.32 |
| Health Care | $0.79 |
| Transportation and Telecommunications | $0.50 |
| Roads, Bridges, and Construction | $0.37 |
| Education, Refugees, Human Rights, and Governance | $0.28 |
| Private Sector Development | $0.15 |
| Total | $18.44 |

Source: P.L. 108-106, Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan for Fiscal Year 2004, November 6, 2003. Numbers may not add up due to rounding.

The IRRF 2 legislation stipulated that, in addition to the CPA, only five agencies could use the funds to implement reconstruction programs—the Department of Defense, the Department of State, the Department of the Treasury, the Department of Health and Human Services, and USAID. The Congress encouraged each to "provide significant financial resources, technical assistance, and capacity building to counterpart organizations led by Iraqis."[54]

Section 2207 of the legislation required the OMB, in consultation with the CPA's Administrator, to submit quarterly reports to the Congress on the status of IRRF 2 projects. The first *Section 2207 Report* was due on January 5, 2004, and it had to contain a complete list of proposed projects.[55] The CPA now had less than two months to compile the list of projects, develop a spend plan, and build an office to manage what quickly had become the largest foreign reconstruction program for a single country in U.S. history.

PX213

CHAPTER 10
# CONTRACTING BILLIONS FOR RECONSTRUCTION

*They [CPA] sat down in a four-day period and came up with a
list of projects of what they wanted to do. And they were all high-
end capital expenditures: build the big this, build the big that.**

**Lieutenant General Peter Chiarelli**
Commander, Multi-National Corps-Iraq (2006)

In early November 2003, the Congress appropriated $18.4 billion to the Iraq
Relief and Reconstruction Fund (IRRF 2). The CPA had established the Program
Management Office (PMO) to oversee the burgeoning reconstruction program,
and Bremer had appointed Dave Nash, the man who had helped develop the
new reconstruction plan, as the PMO's first director. Nash quickly shaped a new
management structure for the CPA's reconstruction efforts and began developing
a program of projects. In the IRRF 2 legislation, the Congress required the CPA
to produce a "spend plan"—a comprehensive list of projects, including estimated
costs and timelines for completion by early January 2004.

The $18.4 billion IRRF 2 program would included $12.6 billion for construc-
tion projects and another $4 billion for procurement, including everything from
personal protective gear, weapons, and vehicles for Iraq's security forces to con-
struction materials for the oil, water, and electricity sectors. The remaining $1.8
billion was for capacity development, governance, and economic reform pro-
grams.[1] Almost all of the IRRF 2 was designated as Defense Department money,
meaning that the Pentagon was ultimately responsible for the use of this recon-
struction money.

### Creating the Program Management Office

The CPA created the PMO because USACE and USAID—the two U.S. agencies
with established systems for managing large construction and international assis-
tance programs—reported that they did not have the resources in Iraq to manage
an $18.4 billion rebuilding effort. USAID said it did not have the staff or organi-
zational capacity to manage more than a $5 billion program. USACE was just
starting to establish its new office in Iraq—the Gulf Region Division (GRD)—to
manage infrastructure projects, and it would not open until January 2004.[2]

---

* SIGIR interview with Lieutenant General Peter Chiarelli, former Commander of MNC-I, February
19, 2008.

PX213

• Chapter 10 •

Ambassador Bremer had to move rapidly on his mammoth new reconstruction plan to demonstrate the U.S. commitment to restoring Iraq's essential services and promoting the country's economic development. The question was how to do so. With USACE and USAID out of the picture, Admiral Nash persuaded Bremer that, by consolidating management of the entire program under the PMO and staffing it largely with contractors, the CPA could launch the IRRF 2 program by the end of 2003. To meet this timeline, Nash proposed outsourcing most of the management to private contractors.

Steve Browning, who headed the CPA's Office of Iraqi Infrastructure, warned Ambassador Bremer that it would be impossible to begin so large a program that quickly because contracting regulations demanded a rigorous bidding process. "You can't get contracts in place by that time," Browning told Bremer. But Nash had assured Bremer that, given the importance of the mission, the CPA could get special dispensation from the Defense Department to accelerate contracting processes.[3] Although the Defense Department did expedite the process, it was not able to award contracts as quickly as Nash predicted.

Dov Zakheim, the Under Secretary of Defense (Comptroller) and chief financial officer for the Department of Defense, initially opposed the creation of the PMO, which he saw as a form of "empire building."[4] He thought it a duplication of existing USAID and USACE expertise. But Nash met with Zakheim at the Pentagon in mid-September and "convinced him that no entity in Iraq or Washington was going to take on this work with existing resources and using current procedures."[5]

At the beginning of September 2003, the PMO had a staff of one—Admiral Nash—and no money. On September 9, Zakheim—despite his reservations about the office—allocated $10 million to it for "personnel, logistics and contractor support for approximately six months."[6] A week later, the Department of the Army authorized USACE to spend another $9 million to support the PMO.[7] USACE then provided Nash with fifteen people from two private firms, Stanley Consultants and Michael Baker Corporation.[8]

**Outsourcing Oversight**

Nash created a four-tiered organization to oversee the Iraq reconstruction effort: the PMO, the PMO Support Office, six Sector Program Management Offices (SPMOs), and twelve design-build contractors.[9] Although the organizational structure included government supervision of contractors (as required by the FAR), Nash's plan ultimately outsourced to private contractors much of the program-management and oversight responsibilities, thus diluting the government's authority.

PX213

• Contracting Billions for Reconstruction •

**Iraq Relief and Reconstruction Design-build Program Management Structure**



*SPMO: Sector Program Management Office
**D-B: Design-build

Source: SIGIR, *Iraq Reconstruction: Lessons in Contracting and Procurement,* July 2006, 54.

Staffed by a small group of government employees at the top, the PMO nominally oversaw the entire operation. Immediately under it (on the organizational chart) was a private management company that worked with USACE in the PMO Support Office to supervise the six SPMOs, which were run by private contractors who supplemented a handful of government employees. Each of the six SPMOs supervised two design-build construction contractors that carried out projects in a specific reconstruction sector.[10]

Major General Ronald Johnson, the USACE Director of Military Programs, was Nash's deputy director, and he supervised the overall reconstruction operation. USACE engineers provided much of the quality assurance for IRRF 2 contract execution. In January 2004, Major General Johnson became Commanding General of USACE's Gulf Region Division and continued to supply most of the manpower for reconstruction quality-assurance programs.[11]

To staff the management offices, Nash proposed hiring 100 government personnel to perform the inherently governmental management and oversight functions required by government regulations.[12] But the PMO was never able to hire more than half the government staff it needed. Thus, it relied heavily—perhaps excessively—on the contractors in the SPMOs to oversee reconstruction. This unprecedented outsourcing of traditionally governmental responsibilities raised concerns on Capitol Hill.[13]

The six primary infrastructure sectors under the PMO's aegis were: electricity; public works and water; security and justice; communications and transportation; oil; and buildings, education, and health. The SPMOs wrote construction requirements and worked with the design-build firms to develop projects. USACE oversaw construction after project designs were completed and work had commenced.[14]

PX213

The twelve "design-build" construction contractors were awarded indefinite delivery, indefinite quantity (IDIQ) cost-plus contracts for design, engineering, and physical work in the sectors. To prevent conflicts of interest, contractors could not win management and design-build contracts in the same sector. The government also reserved the right to restrict any company to a total of four contracts.[15]

*Start-up Problems*

At the end of October 2003, just before the Congress passed the IRRF 2 supplemental, the PMO had insufficient funds and too few personnel to operate effectively. Although Pentagon Comptroller Zakheim had authorized $10 million for the PMO, it took two months for the money to wend its way through the bureaucracy. The PMO did not receive this operating capital until mid-November 2003. According to Zakheim, OMB acted slowly in allocating the money. "The problem was that the OMB insisted on approval," Zakheim said, "and OMB became kind of a black hole, from which funds would emerge on what appeared to be a whimsical basis."[16] The OMB demanded detailed descriptions from the CPA on how it planned to spend IRRF 2 dollars before it would release them.[17] It released no IRRF 2 funds until after the CPA submitted its spend plan in early January 2004.

When the Congress passed the IRRF 2 supplemental in early November 2003, the PMO consisted of Admiral Nash, two government employees detailed from USACE, and thirteen USACE contractors. Of the 100 government employees Nash requested, only 8 had arrived by January 2004.[18]

Staff shortages were not the only problem; the skills the new PMO employees brought to the job were frequently not the right ones. A year after the PMO was created and just before the Program Contracting Office subsumed it in the summer of 2004, a frustrated Admiral Nash would have just half the number of people he needed—roughly one government employee for every $400 million the PMO was overseeing, or about ten times more than the average State Department contracting officer managed.[19]

**The Contracting Plan**

In early September 2003, Admiral Nash notified Tina Ballard, Deputy Assistant Secretary of the Army for Policy and Procurement, that the CPA would need a major acquisition plan to award the IRRF 2 contracts. Ballard quickly assembled a joint Department of Defense team, which included contracting personnel from USACE and the Navy, to develop a Single Acquisition Management Plan (SAMP) for IRRF 2.[20]

PX213

The SAMP established procedures for the award of twelve large IRRF 2 design-build contracts and six reconstruction management contracts. It created selection boards and developed guidelines to prevent conflicts of interest. To maximize flexibility, the SAMP provided that all contracts would be IDIQ contracts. These contracts allow for the provision of an indefinite quantity of supplies or services during a fixed period of time; they are used when the government cannot determine in advance the precise construction requirements.[21]

The SAMP team issued requests for bids in mid-December 2003.[22] Only companies from the United States, Iraq, and force-contributing nations could bid.[23] All proposals—except for those in the oil sector, which USACE had solicited during summer 2003—had to be submitted by February 5, 2004. The government received 53 bids on the contracts but made no awards until late March.[24]

Several factors caused the IRRF 2 contract-award process to be slower than Ambassador Bremer wanted. Because of concerns raised by the Congress about prewar sole-source contracting and IRRF 1's many limited-competition awards, the SAMP source-selection boards scrupulously complied with the requirements of the Federal Acquisition Regulation. But complying with the FAR's complex procedural requirements meant that more time was needed to review the bids.[25]

**The Program of Projects**

The PMO built its project list based on the ten sectors defined by the IRRF 2 legislation. Nash and his fifteen USACE contractors, in consultation with the CPA's senior advisors, developed the first master project list. The senior advisors had already developed reconstruction proposals with their ministers, as part of the 2004 budget process, and they incorporated many of these into the IRRF 2 project list. The PMO tracked the projects by using Project Identification Forms (PIFs), which described the justification, scope, and estimated cost of each proposed project and gave it a priority.[26] The information from 5,000 PIFs was entered into a "monster Excel spreadsheet," from which the PMO derived its final project list.[27]

The quality of the project list was uneven. Some ministries, such as Water Resources, had complete designs sitting on the shelf that had been "waiting for Saddam to go away so they could build these projects."[28] But others had nothing. Moreover, some ministries disagreed with the CPA's decisions. For example, the Ministry of Health favored building large hospitals, but the CPA wanted to focus on small primary-care clinics. Although Iraqis were accustomed to providing and receiving medical services through a hospital system, the senior advisor to the Ministry of Health believed that a network of clinics focusing on preventive and primary health care would most effectively and efficiently help Iraq meet nationwide health care needs.[29]

PX213

To estimate the costs for each project, the PMO took the base cost of each project and added fixed charges for security, transportation, procurement, program management, and award fees. The PMO estimated that security costs would add seven percent, a figure provided by Bechtel. Bechtel developed this figure, assuming that the environment would be, in military parlance, "semi-permissive."[30] But by late 2003, Iraq's security environment had drastically deteriorated.[31]

On December 1, the PMO presented a list of 1,706 prioritized projects to Ambassador Bremer and representatives of USAID, the military, and CPA's senior advisors. This was the first time that most of the participants, including USAID, had seen a comprehensive project list.[32] The group had nine days to review the plan and comment on it before Bremer sent it to Washington. "It was like a grocery list," said Nash, "You could go down so far, draw a line, and that's how much money you had, and then we took the rest of the projects and we said, 'We'll give those to the Iraqis.'" Projects that fell below the funding cut-off for each sector were assigned to Iraq's Ministry of Development, Planning, and Cooperation.[33] The ministry was expected to find other donors to fund them.[34]

In mid-December 2003, after receiving the CPA's program of projects, the OMB convened an interagency meeting to discuss it, inviting USAID Administrator Andrew Natsios to attend. Other participants included National Security Advisor Condoleezza Rice; her deputy, Stephen Hadley; Robin Cleveland, associate director of the OMB; the Pentagon Comptroller, Dov Zakheim; and Deputy Secretary of Defense Wolfowitz. According to Natsios, Cleveland—who had been skeptical about the CPA's planned use of the IRRF 2 allocations—wanted him in the room because she knew he would make a strong argument against certain aspects of the proposed plan.[35]

Cleveland was right. Natsios told the group: "If this thing gets approved, you'll have no money for elections, no money for rebuilding local governance, no money for building the university system, no money for the health system." Calling the plan "a recipe for disaster," he recommended reserving some of the money for non-construction projects and contingencies.[36] Natsios strenuously objected to the CPA's big infrastructure approach, arguing that it flouted the lessons learned from decades of international development experience. Wolfowitz and Hadley responded to Natsios's concerns by directing that $4 billion in IRRF 2 funds be held in reserve, preventing the PMO from immediately allocating or obligating that money.[37]

Two weeks later, Natsios received an angry call from Ambassador Bremer, accusing him of destroying the IRRF 2 plan. Natsios countered that CPA had put together an unrealistic and excessively optimistic construction timeline. Bremer

PX213

• Contracting Billions for Reconstruction •

believed that, under his original plan, the CPA could have begun construction by March. But Natsios, who had managed Boston's "Big Dig," one of the largest and most problem-ridden construction projects in American history, viewed the CPA's timetable as "utterly ridiculous."[38]

On January 5, 2004, the OMB delivered the CPA's project plan in the first *Section 2207 Report*, to the Congress. The submission included the first of what would become many requests for re-allocations of IRRF 2 funds. In this initial re-alignment, the OMB shifted funds within the security sector to allocate additional funds for democracy-building efforts, a step driven in part by the November 15, 2003 decision to transfer sovereignty to Iraq by June 30, 2004.[39] Other readjustments included taking $150 million from the budget for the New Iraqi Army to augment the border enforcement program and moving $25 million from the witness protection program to support democracy projects.[40] The OMB observed that maintaining "flexibility in the allocation of resources among projects and for new projects" was critical, given the evolving security and political situations in Iraq.[41]

**Managing Project Information**

The Congress authorized $50 million as part of the IRRF 2 supplemental to help the CPA meet its reporting and monitoring obligations. The OMB apportioned the money to the Department of Defense for the CPA's operating expenses, but the PMO did not get any of this money until May 2004, a month before the CPA expired.[42]

The PMO's leadership decided against adopting any existing project information management systems, because none offered "the full complement of integrated capabilities" they believed they needed.[43] The PMO developed a hybrid system, combining an asset-management program with off-the-shelf software, but the hybrid system did not work well.[44] The PMO needed an integrated program management system from the start in order to stay on top of the program, track contracts, prevent overspending, and measure progress. But it would be many months before it had a usable system.

"You lose track of a program, a big program like this with 3,000 projects, you never get it back," observed Nash.[45] The delay in creating an integrated information system that could track projects had long-term consequences, hampering program and project management for years to come.

**The "Bridging" Contracts**

When it became clear in late 2003 that the Defense Department would take longer than hoped to award the IRRF 2 design-build contracts, USAID and PMO took innovative steps to implement projects by other contractual means.

• III •

PX213

*The Bechtel Contract*

In October 2003, USAID solicited proposals for Phase II of its infrastructure program to bridge the period between the end of IRRF 1–funded operations and the time that IRRF 2 design–build contractors could mobilize to Iraq. USAID had awarded its original contract to Bechtel without full and open competition. This time three firms, including Bechtel, submitted bids.

On January 4, 2004, USAID awarded Bechtel another large Iraq reconstruction contract, this one for $1.82 billion. Upon award, Bechtel quickly bolstered its Iraq staff, anticipating an array of new projects from the PMO. But the PMO made little use of this contract, issuing just four task orders to Bechtel—for a total of $180 million of work—between January and March 2004.[46]

The reason for PMO's minimal use of the Bechtel bridge contract may have stemmed from the increasingly fractious relationship between USAID and the CPA. USAID officials believed that, after Natsios's successful fight to put a hold on $4 billion in IRRF 2 money, Admiral Nash reacted by limiting the number of task orders issued to Bechtel.[47] Nash denies this was the case.[48] He said his problems with USAID boiled down to a simple power struggle. Describing it as a great "harangue," Nash said the "argument was over who is in charge" and "how things will be run." He insisted that the CPA needed one central organization, in this case the PMO, to manage the program, but that USAID "did not understand—or agree with—this concept."[49]

The simmering enmity between the CPA and USAID weakened reconstruction progress at this critical juncture. With no new work forthcoming during the winter of 2004, USAID's Mission Director James "Spike" Stephenson confronted Nash in March about the lack of task orders and "reminded him of the Bechtel contract's purpose." Nash demurred, saying that he wanted all the work to move ahead in unison. Stephenson took his complaints to Bremer but nothing changed.[50]

At the end of March 2004, Stephenson met with Tom Gibb, Nash's deputy for programs, and they worked out a truce that resulted in a trickle of task orders. The Bechtel contract, however, would not be fully utilized until after the CPA dissolved in June 2004. During this period of relative inactivity, USAID still had to pay Bechtel's entire overhead costs, ultimately reducing the amount available for reconstruction projects.[51]

*The Air Force Center for Environmental Excellence*

The CPA's reconstruction priorities in December 2003 included renovating Iraqi military facilities for the New Iraqi Army by June 2004. Realizing that the design-build contracts would be awarded later than hoped, Nash looked for existing contracts that he could use for construction projects.

PX213

• Contracting Billions for Reconstruction •

The Air Force Center for Environmental Excellence (AFCEE) in San Antonio, Texas, had an existing IDIQ contract—called the Worldwide Environmental Restoration and Construction Contract—for a wide range of construction services at U.S. military bases around the world. In January 2004, the U.S. Air Force Chief of Staff approved the CPA's request to use the AFCEE contract to accomplish construction projects in Iraq.[52]

The IRRF 2 supplemental had allotted $745 million for the construction of New Iraqi Army facilities. By the end of May 2004, the PCO had awarded AFCEE fifteen task orders valued at $481.2 million. Three of these, totaling $42.3 million, went to non-military projects, such as the reconstruction of schools, government buildings, and pumping stations. These appeared to be beyond the scope of the CPA's original request. A CPA Inspector General (CPA-IG) audit of the contracts subsequently found that "AFCEE's role in awarding task orders on behalf of the CPA was not clearly defined, and the continued use of AFCEE's contract vehicle provided less than necessary transparency to the public."[53]

### IRRF 2 Contract Awards

In March 2004, the Defense Department announced the award of the major IRRF 2 design-build construction and program management contracts for Iraq's reconstruction. Over $5 billion in new contracts had been approved in less than 90 days. A typical contracting process involving awards of this size could take over a year.[54]

AECOM Technology Corporation won the umbrella services management contract, valued at $50 million, to support PMO's program management. The following two tables show the program management contracts and design-build construction contracts that were awarded:

| IRRF 2 PMO Program Management Contracts | | |
|---|---|---|
| Sector | Contractor(s) | Maximum Value ($ Millions) |
| Electricity | Iraq Power Alliance Joint Venture (Parsons Energy and Chemical Group, Parsons Brinckerhoff – USA/UK) | $55 |
| Water and Public Works | CH2M Hill and Parsons Water Infrastructure (USA) | $55 |
| Communications and Transportation | Berger/URS Joint Venture (Louis Berger Group & URS Group – USA) | $15 |
| Building, Education and Health | Berger/URS Joint Venture (Louis Berger Group & URS Group – USA) | $15 |
| Security and Justice | Berger/URS Joint Venture (Louis Berger Group & URS Group – USA) | $30 |
| Oil | Foster Wheeler (UK) | $30 |

Source: SIGIR, "Iraq Reconstruction: Lessons Learned in Contracting and Procurement," July 2006, 59-60.

PX213

• Chapter 10 •

| IRRF 2 Design-Build Construction Contracts | | |
|---|---|---|
| Sector | Contractor(s) | Maximum Value ($ millions) |
| Electricity, Generation | Fluor-Amec Joint Venture (USA/UK) | $500 |
| Electricity, Transmission and Distribution (North) | Washington Group International (USA) | $500 |
| Electricity, Transmission and Distribution (South) | Perini Corp. (USA) | $500 |
| Public Works (North) | Fluor-Amec Joint Venture (USA/UK) | $600 |
| Public Works (South) | Fluor-Amec Joint Venture (USA/UK) | $500 |
| Water Resources | Washington Group International & Black and Veatch (USA) | $600 |
| Communications | Lucent Technologies (USA) | $75 |
| Transportation | Contrack/AICI/OIC/Archirodon Joint Venture (USA/Egypt/Netherlands/Panama/UAE) | $325 |
| Building, Education, and Health | Parsons Delaware (USA) | $500 |
| Security and Justice | Parsons Delaware (USA) | $900 |

Source: SIGIR, "Iraq Reconstruction: Lessons Learned in Contracting and Procurement," July 2006, 59-60.

USACE already had awarded two design-build contracts for the oil sector in January. The one for northern Iraq went to Parsons Iraq Joint Venture ($800 million); the one for the oil-rich southern region went to Kellogg, Brown and Root ($1.2 billion).[55]

Nash demanded that the IRRF 2 contractors move quickly, giving them 30 days to deploy to Iraq and directing that each be prepared to execute $500 million dollars in work. This proved an expensive demand. The contractors did quickly mobilize significant numbers of personnel and equipment, putting large construction forces on the ground in very short order. But most contractors did not receive task orders for reconstruction work until months later because of the PMO's slow management practices, the worsening security situation, and the widespread uncertainties that accompanied the CPA's administrative transition, as well as the program review by Ambassador John Negroponte after he took over from Bremer.

By the time the CPA closed its doors at the end of June 2004, the PMO had spent only $366 million of the $18.4 billion IRRF 2 appropriation.[56] Bremer was never able to realize his grand reconstruction vision.

PX213

CHAPTER 11
# RESTORING IRAQ'S CAPACITY TO GOVERN

*The CPA came and they were obsessed [with] decentralized
government… I kept telling them, before you devolve power, you
have to have power to devolve. We don't have power to devolve.\**

**Samir Sumaida'ie**
Iraqi Governing Council Member (2003-2004)

The CPA, the military, and USAID adopted different approaches to restoring Iraq's national, regional, and local governments. The CPA initially concentrated on finding suitable candidates for the new Iraqi Governing Council and on restarting the national ministries. Ambassador Bremer issued a series of orders to improve governance by reforming Saddam-era institutions and creating new organizations to combat corruption. At the same time, the U.S. military and USAID launched an array of projects to establish regional and local councils across Iraq and to encourage community participation in governance.

## Local Governance Needs

In Saddam Hussein's Iraq, Baghdad firmly controlled all aspects of governance. The Ba'ath Party appointed provincial governors—known as "mini-Saddams"—and Saddam's directors general extended ministry control into the provinces, exerting authority over local budgets, administering essential services, and managing state-owned enterprises. The provincial councils possessed nominal power, while local councils protected Saddam's interests at the district and neighborhood level.[1]

The 2003 invasion shattered this repressive system, with most senior Ba'ath Party officials fleeing as local bureaucracies dissolved.[2] Remnants of provincial councils and a handful of directors general continued minimal operations, but virtually all connections between Baghdad and local governments collapsed.[3] Ambassador Bremer arrived in Iraq to find governance in disarray. Several initiatives—some led by the U.S. military, some by USAID—were underway, all seeking to fill the post-Saddam governance vacuum.

---

\* SIGIR interview with Samir Sumaida'ie, Iraqi Ambassador to the United States and former Iraqi Governing Council Member, March 11, 2008.

PX213

*The Military Builds Local Governments*

Coalition military commanders entered Iraq with, among other duties, a general mission to establish regional and local councils with whom they could work to develop governance in their areas of operation. They did not, however, have any specific guidance on how to establish new councils. Consequently, each commander devised a political process as he saw fit.

In early May 2003, Major General David Petraeus—then commanding the 101st Airborne Division in northern Iraq—assembled a new city council in Mosul, the capital of Ninewa province, establishing qualifications for council members and deciding how the local populace would select them. Over a 10-day period, Petraeus and his team organized a city-wide convention where some 270 delegates, representing all of Mosul's religious and ethnic groups, elected a new 24-member city council and a mayor.[4] "We had to hammer all this out, and obviously all of it was very torturous and bloody battles, and nobody thought they had enough representation," said Petraeus. "I think it was the ten toughest days of my life because everybody wanted something more than what they had. Everybody had a grievance."[5]

Lieutenant General James Conway, Commander of the 1st Marine Expeditionary Force, which controlled Najaf in central Iraq, took a different approach. He scheduled province-wide elections so that Iraqis could directly choose a new provincial council. Conway, who would later become the Commandant of the Marine Corps, set the elections for July 4, 2003. By mid-June, the Marines had registered political parties and were printing ballots. When Scott Carpenter, CPA's Director of Governance, found out about Conway's plan, he told him that Iraq had neither a constitution nor an electoral law upon which to base such an election.[6] Ambassador Bremer also said he was concerned that Shi'a Islamist parties "would clamor for them across the south since they were most likely to win in those early days."[7] At the last moment, the CPA persuaded Conway to cancel the elections.[8]

As the U.S. military established provincial and local Iraqi councils, they expected civilian agencies to rush in with resources to support the new councils. USAID had awarded three contracts to support local governance, to develop community-based organizations, and to provide local grants for reconstruction projects. The largest governance contract—valued at $168 million—went to the Research Triangle Institute (RTI) for the creation of transparent and accountable local and provincial governments, the provision of training to strengthen civil society, and the restoration of basic services.[9]

PX213

*USAID's Local Governance Program*

On April 22, 2003—eleven days after receiving its contract—RTI sent an advance team to Kuwait, expecting to have about a month to organize before entering Iraq. But USAID ordered RTI to move out immediately.[10] The first group of RTI contractors promptly crossed the border and headed for Basrah, while the second set out for Baghdad to help create the capital's new city council.[11]

Within days of getting the "go order," the first RTI team—driving Chevy Suburbans loaded with tents, fuel, food, satellite phones, and office supplies—pulled into Basrah, the largest city in southern Iraq. What they found was a disaster: public offices stripped of all furnishings, widespread looting, and no basic services.[12] The British forces controlling the city asked RTI to engage with the city's provincial council, and so Aaron Williams, RTI's team leader, consulted with the local Shi'a leaders on the councils "to determine what their priorities and needs were."[13]

The team sought out Iraqi technocrats to identify projects the city urgently needed for essential services.[14] By mid-May RTI had hired about two dozen Iraqis and was working with the local council to implement emergency water and electricity projects. The Basra office was the first of what would become 22 offices that RTI opened across Iraq during the spring and summer of 2003.[15]

Money for the provinces usually came from the Central Bank in Baghdad, but with the collapse of governing institutions, not a single dinar from the bank could make its way to the provinces. In the absence of funding from the capital, the U.S. military supported local councils by providing money through the fledgling CERP program. USAID also provided grants to assist councils with small infrastructure projects.[16]

Clarifying roles, responsibilities, and working relationships among the military, the CPA, and USAID and its contractors proved a major challenge. The military perceived USAID and its contractors as "relief in place" and "expected to rapidly hand over [to them] public services restoration, infrastructure reconstruction planning and coordination, and managing relationships with newly formed local councils throughout Iraq." But neither USAID nor its contractors had sufficient resources to sustain this mission.[17]

*The Community Action Program*

In April 2003, USAID began a Community Action Program (CAP) in Iraq, awarding contracts worth $120 million to five contractors.[18] Unlike other USAID-funded activities in Iraq, the CAP required local groups to contribute to projects. Implementation depended upon local facilitators and contractors, and "community action groups" composed of Iraqis elected by their neighbors.

PX213

The CAP used small amounts of reconstruction funding as a catalyst for local capacity-building initiatives. During the CPA's tenure, CAP contractors started more than 1,700 projects, costing about $61.7 million, ranging from sewage-system repair to rehabilitating schools and health clinics. A USAID Inspector General audit found that CAP generally achieved its intended goals, including citizen participation, local government cooperation, and local employment generation.[19]

### The National Ministries

To help restart the looted and broken national ministries, USAID contractor Development Alternatives Incorporated (DAI) created a package called "Ministry in a Box." Each kit cost $122,000 and provided furniture and supplies for 100 civil servants. USAID employed dozens of small Iraqi companies across Baghdad to manufacture and assemble all the elements that went into each package. The ministries soon demanded more of them, and DAI had delivered 132 "Ministries in a Box" by the fall of 2003.[20]

The CPA depended chiefly on its senior advisors for hands-on capacity development. Among other things, the senior advisors assisted new Iraqi ministers in implementing the de-Ba'athification order, appointing and developing new ministry leadership, devising new budgets, identifying reconstruction projects, and securing sufficient CPA funding for ministry operations. But these efforts fell far short of meeting ministry capacity-development needs.

The CPA used the DFI to fund ministry budgets, which included paying for salaries, operating expenses, and capital projects. By April 2004, the CPA had authorized the expenditure of about $20 billion in DFI funds for Iraq's national budget. When the CPA transferred sovereignty to Iraq at the end of June 2004, the ministries had received $8.8 billion dollars to pay for administrative operations. But this money was poorly controlled, as a SIGIR audit would later find.[21]

### The Iraqi Governing Council

Soon after his arrival in Baghdad, Ambassador Bremer directed his governance team to create a new Iraqi Governing Council as the first step in a process to transfer political power back to Iraqi control. The IGC would be the initial post-invasion Iraqi authority, although it would serve only in an advisory capacity. The IGC's creation also would satisfy UNSCR 1483's requirement that CPA form an Iraqi transitional administration (to work in partnership with the CPA) until the Iraqi people elected a new government.[22]

To find candidates for the IGC, the CPA's governance team canvassed the country, meeting with economic, religious, and tribal leaders.[23] Under the CPA's plan, the IGC would appoint a committee to draft a new constitution

PX213

for Iraq. This would pave the way for national elections and a democratically elected government.

At the end of June 2003, while the CPA was still evaluating potential IGC members, Iraq's most respected Shi'a religious leader—the Grand Ayatollah Ali Husaini al-Sistani—issued a *fatwa* declaring that a council chosen by occupying authorities could not be charged with drafting the constitution. Grand Ayatollah Sistani said there was no guarantee that such a committee would write a constitution reflecting the true interests of the Iraqi people and expressing the nation's Islamic identity. Sistani demanded immediate elections for a new national assembly to draft a new constitution and present it to the people for a vote.[24] Bremer rejected Sistani's demand, pressing forward with his plans to form the IGC and have that body name a constitutional drafting committee.

The CPA named 25 Iraqi leaders of different religious and ethnic backgrounds to the IGC in mid-July. By early September 2003, the IGC had appointed new ministers to run the country's 25 ministries. The ministers reflected the religious and ethnic balance of the council. Although the diversity was commendable for its pluralist aims, it was also controversial because it laid the foundations for sectarian strongholds that would later develop in some ministries.[25] With the appointment of new ministers, the role of the CPA's senior advisors changed. They had been serving as the de facto ministers of Iraq, but they now took on an advisory capacity, serving the new Iraqi ministers. The senior advisors still greatly influenced ministry policy, but this shift signaled that the slow process of transferring governance authority back to Iraqi control had begun.

On September 8, 2003, Ambassador Bremer published a transitional roadmap for Iraq in a *Washington Post* opinion piece.[26] The article—a framework for an extended occupation by the CPA—set off alarm bells in Washington. Secretary Rumsfeld said it was the first time he realized that "Bremer was not ready to hand over responsibilities for governance of Iraq to Iraqi leadership" as quickly as originally envisioned and was instead "taking a route somewhat different than what we had believed would be the approach."[27] Bremer said that the op-ed contained nothing new, and that the Pentagon had approved the transition plan. He added that he spoke regularly with Rumsfeld and had sent the opinion piece to the Pentagon three days before it was published.[28]

Washington reacted quickly to the perception that the CPA was planning a long occupation. The White House formed an Iraq Stabilization Group under National Security Advisor Rice's aegis, and a push began to return full sovereignty to Iraqis more quickly than Bremer perhaps had anticipated.[29] Secretary Rumsfeld also convened strategic review meetings with Ambassador Bremer and General Abizaid to discuss the ramifications of Bremer's proposed transition plan.

PX213

• Chapter 11 •

**Accelerating Sovereignty's Return**

In late September 2003, Iraqi leaders, representatives of the international community, and senior officials in Washington began to pressure the CPA to announce a new timeline for returning sovereignty to Iraqis. Pentagon officials, in particular, pushed for a shortened timeline. Rumsfeld expressed "enthusiasm for the concept of granting sovereignty as soon as possible to the Council or some other group of Iraqis." Bremer replied that Iraqis should quickly be given more responsibility, but urged that it be done "in a manner that [has] a fair chance of success."[30]

On October 6, Bremer learned that President Bush had put National Security Advisor Condoleezza Rice in charge of the newly created White House Iraq Stabilization Group to coordinate Iraq policy and speed up reconstruction efforts.[31] Secretary Rice said the new organization was to support the Pentagon, not supplant it, but the move reflected growing tensions among agencies in Washington, between agencies and the White House, and between Washington and Baghdad.[32] Rice asked Ambassador Robert Blackwill, who had become deputy national security adviser for strategic policy in August 2003, to manage the new group. According to Blackwill, there was an "estrangement, [a] very serious estrangement, between the Pentagon and the State Department. The interagency process was essentially not working."[33]

Deputy Secretary of State Richard Armitage recalled an exchange illustrating the estrangement of which Blackwill spoke:

> One day, in the fall of 2003…we were coming out of the [White House situation] room and Dr. Rice turned to Rumsfeld and I was between the two of them—but she kind of leaned over…and said, 'Don, would you call Jerry [Bremer] and have him do X, Y, or Z?' And [Rumsfeld] said, 'No, he doesn't work for me.' [Rice] said, 'Yes, he does. Who does he work for?' And [Rumsfeld] said, 'He works for the NSC.' And this is because Rumsfeld found out that Jerry was at least communicating with—if not taking instructions from—the National Security Advisor.[34]

Blackwill travelled to Iraq in September 2003 and quickly concluded that the United States would not be able to sustain its position there on Bremer's timetable because "the occupation would become more and more intolerable to the Iraqis."[35] In close collaboration with Dr. Rice and senior officials at the Defense and State Departments, Blackwill helped implement a major course correction for the occupation. This change was driven in part by the fact that some at the Pentagon and

PX213

at the NSC believed that Bremer had been making momentous decisions about the future of Iraq that had not been "debated seriously at the principals level."[36]

On October 16, 2003, the international community joined in by formally pushing for a speedier return to full Iraqi sovereignty. UN Security Council Resolution 1511 stated that "the day when Iraqis govern themselves must come quickly," and asked the Iraqi Governing Council, in conjunction with the CPA, to provide the Security Council with "a timetable and a program for the drafting of a new constitution for Iraq and for the holding of democratic elections under that constitution." It further called on the CPA to "return governing responsibilities and authorities to the people of Iraq as soon as practicable."[37]

One month later, on November 15, 2003—barely a week after the U.S. Congress passed the $18.4 billion IRRF 2 reconstruction package—the CPA announced an agreement to pass sovereignty to an interim Iraqi government by the end of June 2004, just seven months later.[38]

The agreement required a series of predicate events. By the end of February 2004, the IGC had to approve the Transitional Administrative Law (TAL), which would define the laws for the interim government. Three months later, local caucuses in each of Iraq's eighteen provinces would elect delegates to an Iraqi Transitional National Assembly, which would then elect leaders of the new government. On June 30, 2004, the CPA and the IGC would dissolve, and the Iraqi Interim Government would take power. Provincial elections would occur on January 30, 2005, the constitution would be written and approved by referendum on October 15, 2005, and national elections would be held on December 31, 2005. The agreement further stipulated that "Coalition forces will continue to work side-by-side with new Iraqi police and security institutions to ensure a peaceful transition to a sovereign, democratic and secure Iraq."[39]

This was an extraordinary timetable: provincial and national elections—and a constitutional referendum—all to be held in a violence-stricken Iraq within thirteen months.

### Supporting Provincial and Local Governments

The CPA divided Iraq into four administrative regions—north, central, south central, and south. It also appointed coordinators and established offices in each provincial capital.[40] Because of its gradual expansion into the provinces, most of the CPA's coordinators arrived after the military and USAID contractors had established relationships with their Iraqi counterparts.[41] The ensuing confusion over roles and responsibilities made for a mix of government employees, contractors, and troops whose plans and programs often worked at cross-purposes.

PX213

• Chapter 11 •

Mark Etherington, the CPA's coordinator in Wasit province, said he had assumed that USAID would help form councils and establish their rules of procedure. Instead, the USAID team in his area "consisted of specialists in subjects such as women's rights, agriculture, and water supply" who "knew nothing about Councils or any of the fields that were pressing priorities for us at the time." Etherington noted that USAID's private contractors made his job more difficult. As he put it, "one was left with a raft of largely unaccountable companies with their own sets of rules and security procedures, arriving at intervals, whose roles had never been properly defined or harmonized with CPA's political objectives."[42]

A SIGIR audit of USAID's local governance program noted a lack of clear policy guidance, and criticized both USAID and its contractor for failing to define the program's goals. USAID's contractor was supposed to submit quarterly work plans, but failed to do so, producing instead an implementation plan in August 2003 that simply listed the core activities planned for the year.[43]

In December 2003, Ambassador Bremer convened a "Commanders and Leaders" conference in Baghdad to address the implications of the November 15 sovereignty transfer agreement. At the conference, Bremer announced that the CPA would triple spending over the next three months to create jobs and foster stability, which would help facilitate the transfer of power.[44]

The CPA created two new DFI-funded programs—the Rapid Regional Response Program (known as R3P) and the Accelerated Iraqi Reconstruction Program (AIRP)—to funnel money into provincial reconstruction projects. The CPA's provincial offices received $120 million in R3P funds to support projects to improve essential services, create jobs, and stimulate the economy.[45] In addition, the CPA approved $277 million for the AIRP to fund high-impact, high-visibility projects in ten strategic cities: Baghdad, Ba'quba, Falluja, Mosul, Ramadi, Samarra, Tikrit, Najaf, Diwaniya, and Kerbala.[46] AIRP projects aimed to improve access to potable water, sanitation, health, education, and transportation.[47]

In April 2004, after ten months of governing Iraq, Ambassador Bremer promulgated CPA Order Number 71, strengthening the powers of local and provincial governments. The order specifically spelled out the powers of local officials, from mayors to police chiefs, and provided that the provincial councils were to be "funded from national budget allocations that are separate from the budgets of the ministries and other national institutions," and were to "perform their responsibilities independently from the control or supervision of any ministry." The provincial councils could even "approve or veto" the appointment of directors general and "local ministerial officials for positions designated as 'senior positions,'" a dramatic departure from Saddam-era practices.[48]

PX213

• Restoring Iraq's Capacity to Govern •

The order's radical decentralization of power was not well received by many Iraqi political parties, who differed about how much control should remain in Baghdad. Thus, the CPA—which had two months left in power—made little attempt to implement the order.

The Iraqi budgets for 2004 did not allocate any money directly to local and provincial governments.[49] Consequently, with no budget and no real authority over any other financial resources, the provincial councils were unable to do much for their constituent populations. By the time the CPA dissolved in June 2004, the Iraqi public had little faith in the appointed provincial councils, seeing them as creations of the occupation authorities.[50]

As the Coalition struggled to assemble local, provincial, and national governments, it also tried, with too few resources, to rebuild Iraq's police and army.

PX213

## Chapter 12
# Reconstructing Iraqi Security Forces

*[The U.S.] Army was absolutely focused in May [2003]
on wrapping up the fight… They had just finished combat
operations, and then we went through this terrific problem of
social mayhem, looting, the lawlessness that occurred, so the
Army was absolutely focused on its mission of bringing order to
the country… There was zero thought on what the Army could
do to develop security forces—zero.\**

**Major General Paul Eaton**
Commander of CMATT and OSC (2003-2004)

The CPA planned to create a new security force—the New Iraqi Army—accountable to Iraq's civil authorities and capable of maintaining national security. But the CPA's efforts in this regard foundered because of poor planning, insufficient resources, and the failure to effectively counter the growing insurgency. However, mounting violence and the November 15, 2003 decision to return sovereignty to the Iraqis forced acceleration of plans to rebuild and deploy Iraq's security forces.

Although a spirit of liberation briefly prevailed in Baghdad after it fell, post-invasion Iraq quickly descended into a maelstrom of looting and violence as Iraqi military and police personnel fell from view and the paramilitary and intelligence services dissolved.[1] CPA Order Number 2 exacerbated matters by essentially "firing" the entire Iraqi military, with—at least initially—no compensation. Amid the ensuing chaos, the CPA sought to rebuild Iraq's security forces, aiming to inculcate Western concepts of accountability and rule of law. Critical resource shortages, a dearth of qualified trainers, and the violent environment finally forced major U.S. policy changes on the security front as the CPA era ended.

### The Iraqi Police Service

Contingency operations—particularly in post-conflict situations—usually occur in environments characterized by broad insecurity and unpredictable violence, with indigenous security forces too weak or too corrupt to maintain order.[2] A prewar assessment by the U.S. Department of Justice's International Criminal Investigative Training Assistance Program (ICITAP) recommended that 5,000

---

\* ORHA/CPA Historian interview with Major General Paul Eaton, former Commander of CMATT and OSC, December 27, 2004.

PX213

international police advisors be deployed to Iraq to reform the country's police system.[3] But NSC planners believed that postwar security in Iraq would not be a significant problem and that the Iraqis would be able to maintain public order, concluding that ICITAP's proposal for police training was unnecessary.

"With the police, we recommended that we leave the administration of justice and law and order in Iraq in Iraqi hands, because we didn't understand the culture, we didn't understand the language, we didn't have a corps of people we could rush there," recalled Frank Miller, who headed the NSC's Iraq group. "We didn't want Americans enforcing the Iraqi law. We did not envision occupation."[4]

Unlike the Ministry of Defense, Iraq's Ministry of Interior with its large Iraqi police force was not dissolved by CPA Order Number 2. The MoI was expected to take on the civil security mission, as part of a quick handover of internal security responsibilities to Iraqi police.[5] "We had bad intelligence," Miller later conceded. "We believed that the Iraqi police were a corrupt, but generally efficient police force. It turns out they were both corrupt and not a particularly efficient police force."[6]

Soon after the invasion, an assessment team comprising personnel from ICITAP and the State Department's Bureau of International Narcotics and Law Enforcement Affairs (INL) travelled to Iraq to assess the Iraqi Police Service (IPS), judiciary, and prison system. By the time this team of 25 experts arrived in May 2003, looters had destroyed most of the Ministry of Interior, as well as many police stations across the country, leaving the police force infrastructure in tatters. Gerald Burke, a member of the six-person team assigned to assess the police, said their conclusions could be summed up in one sentence: "The police need everything."[7]

The assessment team submitted its report to the CPA at the end of May 2003. Its conclusions were troubling: the Iraqi police were incapable of restoring public order and, unless quickly reformed, they could "not constitute a suitable, viable, and sustainable police service that can engender public trust and confidence."[8] The assessment recommended the immediate deployment of 2,500 international police officers to restore order and the recruitment of 360 professional police trainers and 6,600 international police advisors to reform the Iraqi police.[9] But the NSC again rejected these recommendations, viewing them as too ambitious and too expensive. Ultimately, Ambassador Bremer requested IRRF 2 funding for 1,500 police advisors—of whom 1,000 would be American.[10]

PX213

### Training Iraq's Police

Bernard Kerik became the first senior advisor to the Ministry of Interior in May 2003. The controversial former New York City police commissioner faced dual challenges: quickly reconstituting Iraq's police forces so they could restore public order and reforming an institutional culture in which respect for human rights and community policing was unknown.

The rapidly worsening security environment increased the tension between the need to provide short-term security and the goal of long-term institutional reform. Moreover, criminal looting had gutted law enforcement's public infrastructure. To address these myriad problems, Kerik put six members of the ICITAP/INL assessment team in charge of rebuilding police stations and training academies, retraining the police forces, and improving ministerial capacity.[11]

Although Kerik, according to his own estimates, reopened 35 police stations in Baghdad and recalled 40,000 police officers in three months, some contend he spent too much time conducting tactical operations—leading teams of recalled Iraqi police on nighttime raids in Baghdad—and not enough time on developing a workable strategy to train, equip, and employ Iraqi police across the country.[12] Lieutenant General Sanchez considered Kerik's efforts "a waste of time and effort." He thought they were too Baghdad-centric and neglected critical equipment needs.[13]

Lieutenant General Scott Wallace, Commander of the Army's V Corps, tasked the 18th Military Police Brigade with organizing and mentoring the residual police force. Joint U.S.-Iraqi patrols were policing the streets of Baghdad by May 9, 2003.[14] But when Ambassador Bremer arrived on May 12, only 4,000 poorly trained, pistol-wielding police were on duty in Baghdad, a city of more than 7 million people.[15] Determined to bolster these numbers, Bremer issued a directive in June 2003 that police who failed to return to work by July 3 would be fired; about 38,000 former police returned by the deadline. Their ranks were further strengthened by an additional 30,000 new officers recruited across the country by Lieutenant General Sanchez's Combined Joint Task Force 7 (CJTF-7) staff.[16]

Finding a facility large enough to train tens of thousands of Iraqi police was an important priority. According to John Meiklejohn—the CPA advisor in charge of police academies and curriculum—the Ministry of Interior's infrastructure had been "totally ransacked." USACE began reconstructing police academies by the end of May, and instruction started as classrooms were finished. With the help of U.S. Military Police instructors, the first four classes of 25 to 30 students began on June 28, 2003.[17]

The CPA needed to expand Iraq's police training capacity quickly. Security conditions were deteriorating rapidly, so the CPA looked abroad, first contemplating

PX213

using an air base in Hungary. Meiklejohn scrapped the idea in late September 2003, when the Jordanians agreed to train 1,500 Iraqi police per month.[18] He flew to Amman in October to manage the rapid construction of and logistics for the new International Police Training Center in Muwwaqqar, Jordan.[19] In late November 2003, the first class of 456 Iraqi cadets began an eight-week training course in makeshift facilities while construction continued on permanent facilities.[20]

The CPA's police training program was constrained by funding and staffing shortfalls. Its various initiatives depended almost entirely on Iraqi funds because no U.S. money was appropriated for this purpose. The 2003 Iraqi national budget initially provided just $2.4 million for police operations. Although 2004 Iraqi funding increased to $122.4 million, chiefly to pay police salaries, the capital budget for police infrastructure remained low.[21]

During the fall of 2003, crime continued to rise in Iraq, forcing CJTF-7 to increase the training rate of Iraqi police. Ambassador Bremer feared that it was doing little more than rearming elements of Saddam's abusive and ineffective police force, so he had INL design a three-week Transition and Integration Program that CJTF-7 could use.[22] Despite marginal improvements brought about by the new curriculum, military trainers still had little understanding of Iraq's police methods or existing Iraqi criminal justice procedures.[23]

**Border Enforcement and Facility Protection**

The CPA established the Department of Border Enforcement (DBE) on August 24, 2003, but allocated scant resources for training.[24] New recruits had little experience, and previous immigration officials were excluded from employment because of their connection to Saddam's secret police.

After the 2003 invasion, Iraq's borders were porous, subject to easy infiltration by foreign fighters. U.S. soldiers tried to fill gaps, but they had no interpreters, could not read Arabic passports, and were unfamiliar with reviewing customs papers. The soldiers were soon overwhelmed by masses of people trying to enter Iraq; border traffic "backed up literally for miles."[25] By June 2004, only 255 members of the Iraqi DBE had received training from the Coalition.[26] Iraq's porous borders remained an egregious security problem for several years after the 2003 invasion.

The Facilities Protection Service (FPS) was the last major security force to stand up under the Ministry of Interior. It provided site security for ministry facilities and provincial government buildings.[27] By 2004, the FPS ranged from 80,000 to 100,000 personnel, but its members received just three days of training and light equipment, putting it at "the lower end of the spectrum of capabilities."[28] Most notably, some ministers used the FPS to mask militia and sectarian elements within their ministries.[29]

PX213

• Chapter 12 •

**New Iraqi Army**

On May 23, 2003, CPA Order Number 2—the order dissolving Saddam's military structures—announced the formation of the New Iraqi Army.[30] Whatever the negative consequences of Order 2, it provided a clean break from the old force and a new slate for the systematic rebuilding of Iraq's army. It failed to address, however, what resources the CPA should use to accomplish this enormous mission.

CPA Order Number 22, issued in August 2003, expanded upon Order 2, establishing the New Iraqi Army as the basis of "militarily effective, professional, and non-political armed forces for the military defense of the nation."[31] The order provided that the army would be civilian-controlled, a tenth of its previous size, nationally recruited on a volunteer basis, and focused strictly on external defense. The CPA believed that the New Iraqi Army—unlike the police force—need not be fielded immediately. Plans called for training three divisions of light motorized infantry battalions over two years. Including headquarters units, the total end strength for the New Iraqi Army would amount to a modest 40,000.[32]

Responsibility for training the Iraqi army fell to Major General Paul Eaton, who arrived in Iraq on June 13, 2003, to take command of the Coalition Military Assistance Training Team (CMATT). Major General Eaton soon realized that the army training mission was "not a high priority" for the CPA or the U.S. military. The only real policy direction came from a 24-page PowerPoint presentation from CENTCOM. It did not contain "execution level" plans for manning, training, equipping, or employing the 40,000-man force, all of which had to be accomplished with a budget of just $173 million drawn from the DFI. According to Eaton, "there was zero participation on the part of the Army Staff. Zero participation on the part of [the U.S. Army Training and Doctrine Command]. Zero participation on anybody's part except for an ad hoc team on personal request from me." With no strategic plan, limited resources, and only five staff members, CMATT "set out to man, train, and equip the Iraqi Armed Forces essentially in a vacuum."[33]

Major General Eaton set August 1, 2003, as the training start date for the Iraqi army, leaving just six weeks to prepare. In the middle of June, he selected Kirkush, northeast of Baghdad, as the site of the first training base, because its isolation provided a measure of security. CMATT contracted with an Iraqi firm to refurbish the barracks and to provide power, water, and sewerage. Two weeks later, another Iraqi firm was contracted to provide water, food, and fuel for the trainees.[34] Using Iraqi contractors helped leverage CMATT's meager resources and established a civilian contracting model that would form the basis of support for Iraq's Ministry of Defense.[35]

A U.S. contractor was placed in charge of recruiting enlisted men, and CMATT selected the officers. On July 15, 2003, CMATT asked U.S. Army

PX213

division commanders in Iraq to provide 45 former Iraqi lieutenant colonels to populate the new officer corps, hoping these former officers would bring needed experience, but not be so senior that they could not be retrained along Western lines. But when these new officers refused to serve without being reinstated to their Saddam-era rank and pay, CMATT dismissed them and lowered the recruitment requirement to major. Seventy-five percent of the new force—including almost all of the NCOs and officers—had prior military experience.[36]

Security worsened over the summer of 2003 and, during a brief August 2003 visit to Iraq, Secretary Rumsfeld decided to cut the Iraqi army's two-year training time in half.[37] CMATT desperately needed help to meet this new timeline and found some during a visit by Major General Eaton to Jordan to purchase equipment. During his trip to Amman, Eaton asked Jordan's chief of military training to consider whether he could support the training of 2,000 new Iraqi Army officers. In late August, word came that King Abdullah of Jordan had agreed to provide help.[38] Buoyed by this support, CMATT developed a new training model. In the first eight-week segment, the Jordanian military would retrain former Iraqi officers at a base outside Amman, while Coalition partners trained non-commissioned officers (NCOs) at a reconstructed military academy in Taji, Iraq. In the second stage, CMATT would form battalions of Iraqi officers and enlisted soldiers, and the new battalions would train in Iraq as whole units for a three-month period.[39]

Many Iraqi officers resented training in Jordan, but only by using Jordanian and U.S. military units to train officers and NCOs did CMATT have any hope of achieving the training results needed before the new September 2004 deadline. By November 15, 2003, CMATT's plan to stand up the New Iraqi Army was underway, and the CPA had promised more funding through IRRF 2.[40]

**Iraqi Civil Defense Corps**

As the insurgency grew during the latter half of 2003, CJTF-7's overstretched forces were unable to maintain public order. CENTCOM commander General Abizaid and CJTF-7 commander Lieutenant General Sanchez thus began to develop a new Iraqi security force component that could help fight the insurgency.[41] This force—the Iraqi Civil Defense Corps (ICDC)—would assist with constabulary duties, employ former members of the Iraqi military, and give Iraqis a sense of ownership of security in their communities.[42]

CJTF-7 began training the first six ICDC battalions in July 2003. CPA Order Number 28 officially established it as an institution that was "distinct from the Iraqi police force and the New Iraqi Army" on September 3, 2003.[43] Because the ICDC was not part of the original CPA security sector plan, it posed significant

PX213

• Chapter 12 •

coordination problems from its inception. Its chain of command went from Lieutenant General Sanchez to General Abizaid to Secretary Rumsfeld. There was little coordination with the Iraqi police or army and no accountability to any Iraqi ministry or the CPA.

Some in CMATT feared the ICDC could become a parallel security structure, competing with the police in local affairs and diluting the Iraqi Army's authority at the national level.[44] But Coalition commanders valued the ICDC as a way to enable Iraqis to provide security for their own country, while supplementing CJTF-7's overstretched forces. By April 2004, the ICDC had grown from the six battalions initially authorized to 45 battalions across the country, amounting to 36,000 personnel.[45]

## Growing Insecurity

During the summer of 2003, insurgent attacks on Iraq's infrastructure had supplanted looting as the chief reconstruction security problem. Repeated sabotage of pipelines and power lines impeded economic recovery and limited the success of early attempts to restore essential services. The deterioration of the security situation delayed reconstruction projects, interrupted supply delivery, and disrupted daily life across Iraq. All this "fed into Iraqi feelings of resentment and despair, which fueled insurgency and crime, thereby worsening the security climate."[46] The violence prevented many CPA officials from leaving the Green Zone, limiting their contact with—and thus their understanding of—Iraqis.[47]

In October and November 2003, the growing insecurity highlighted the need to hasten security force training and improve its resourcing. Security funding finally received a much-needed boost with the passage of IRRF 2 on November 6, 2003. The sector received $3.29 billion, including $1.22 billion for the police forces, $2 billion for the Iraqi army, and $76 million for the Iraqi Civil Defense Corps.[48]

## Reforming MoD and MoI

The impending June 2004 deadline for the transfer of sovereignty forced CPA officials to rethink security sector development. In mid-November 2003, the CPA's Office of Policy Planning warned Ambassador Bremer that Iraq required "legitimate and accountable systems of security to prevent violent conflict." These included not only the security forces, but also intelligence services and judicial and penal institutions. The CPA's Office of Policy Planning further advised that the CPA's narrow focus on Iraq's short-term security problems had limited the efforts to address longer-term reforms.

The CPA needed to pursue "a more integrated approach to security sector reform that will meet Iraq's future needs and enable the coalition to transfer

PX213

responsibility for security to Iraqis."[49] It also needed to address the absence of a legal framework for the use of force by Iraq's military, the disparity between force requirements and security budgets, the need to ensure that the new Iraqi security forces would operate under civilian control, and the need to insulate the security forces from sectarian influences.[50] The failure to address this last crucial issue would have lethal consequences in 2004 and 2005, as the Iraqi Ministry of Interior became infiltrated by sectarian militias.

Another gap was the need for a new Iraqi Ministry of Defense (MoD). The plan was to create the new MoD in April 2005, but the new date to transfer sovereignty shortened the timeline by a year.[51] The CPA quickly focused on finding senior leadership for MoD.[52] It strove for ethnic balance in the new MoD leadership and sought to ensure that military promotions would be based on merit, not sectarian affiliation. Experience requirements for high-level jobs meant that former military officers (mostly Sunnis) filled a third of the new civilian positions and virtually all of the top military positions.[53] The CPA provided the new leadership with three weeks of training in Washington at the National Defense University and the U.S. Institute of Peace. The training established "a foundation of understanding of civilian control of the military, some basics in defense-sector management and issues, and (not unimportantly) a look at a successful, functional democratic country."[54]

Iraqis themselves had little influence on the new ministry's design. Major General Eaton believed that 30 years of oppression under Saddam had left them unable or unwilling to challenge the ideas posed by CPA advisors and CJTF-7 officials.[55] There was still concern about Iraqi Governing Council involvement in selecting the new Minister of Defense. The CPA feared that political allegiances of IGC members would exert a negative influence.[56] Thus, the choice of the new minister of defense was not discussed with the Iraqis to avoid allegations of politicization.[57]

Reforming the Ministry of Interior was more difficult than restarting the MoD. The Iraqi police force had not been a viable institution during Saddam's reign, so there was no cadre of competent mid-level management from which to draw new leadership. Procurement problems also impeded progress.[58] The State Department's Bureau of International Narcotics and Law Enforcement Affairs had failed to promptly contract with DynCorp for housing, food, security, facilities, and other support for the International Police Liaison Officers (IPLOs). The IPLOs were supposed to train and advise Iraqi police.[59] Because of the contracting delay, only a few dozen came to Iraq during the first six months of the occupation, far short of the 5,000 originally recommended and the 1,500 that Bremer approved.[60]

PX213

## Security Challenges

A few early successes suggest that a counterinsurgency strategy might have proved effective during the CPA's tenure in Iraq. Shortly after occupying Mosul, Major General David Petraeus and the 101st Airborne Division, worked directly with local community leaders in the city to implement critical reconstruction projects that helped reduce violence.[61] Most units in Iraq, though, had little counterinsurgency training or experience, and the Coalition's campaign strategy was "wrapped around killing and capturing the insurgents," not promoting political participation, economic opportunity, and public buy-in.[62] Replicating the 101st Airborne's methods across the country might have helped tamp down the insurgency, but it would have required more troops and a coordinated counterinsurgency strategy. This was eventually used in 2007, during the surge, and ultimately quelled most violence in Iraq.

On October 14, 2003, the White House reported to the Congress that 70,000 Iraqis were engaged in security operations, and another 13,000 were in training.[63] Secretary of State Colin Powell claimed that the Department of Defense "kept inventing numbers of Iraqi Security Forces—the number would jump 20,000 a week! 'We now have 80,000, we now have 100,000, we now have 120,000.'"[64] But Secretary Rumsfeld later said that changes in how the Defense Department tracked Iraqi troop readiness accounted for the changes over time in the numbers reported.[65]

Some CPA and CJTF-7 leaders felt that the perceived inflation of Iraqi troop numbers hurt the Coalition's effort. According to Ambassador Bremer, "it was increasingly clear that the Pentagon's apparent preoccupation with the spring [2004] troop rotation was creating unhealthy pressures to wish a competent Iraqi security force into being faster than possible."[66] Lieutenant General Sanchez echoed the point, noting that, "at various times, the Department of Defense inflated the numbers of effective Iraqi forces," while ignoring the fact that "the enduring challenge was building capable and effective Iraqi forces rather than simply adding numbers."[67]

Given the CPA's persistent personnel shortages, General Abizaid strongly advocated that the U.S. military take over the security force training responsibilities "because [CPA's] people didn't have the capacity" to do it well. He also pushed for a bigger Iraqi army and said it was necessary to "really put the muscle of DoD" behind the training effort.[68] Unsurprisingly, this idea created controversy. Many civilian police advisors feared that giving the police training mission to the military would sacrifice the Iraqi police force's "long-term institutional and personnel development for expediency and would have negative consequences, saddling Iraq with security forces that could possibly endanger the country's future."[69] Major

PX213

General Eaton also had reservations; consolidating training for all Iraqi security forces under a single military command threatened to divert resources from the Iraqi army and thus undermine long-term capacity building there as well.[70]

### The Eikenberry Report

In November 2003, Secretary Rumsfeld ordered an assessment by Major General Karl Eikenberry to determine what reforms were necessary to produce enough capable Iraqi forces to take over security responsibilities. Released in February 2004, the Eikenberry report described CPA training efforts as under-resourced and disorganized, noting in particular that the development of Iraq's police force was so far behind that transferring security responsibilities would not be possible for many months. Eikenberry's report concluded that the U.S. military should manage the training of Iraq's army and police.[71]

Rumsfeld accepted Eikenberry's recommendations and authorized CJTF-7 to form the Office of Security Cooperation (OSC). Major General Eaton assumed command on March 9, 2004. Both CMATT and the newly established police training command—the Coalition Police Assistance Training Team (CPATT)—fell under OSC's purview.[72] "At this point, the distinction between an Iraqi military force and an Iraqi civilian rule-of-law police service became almost interchangeable with the use of the term 'Iraqi Security Forces,'" said Gerald Burke, a member of the CPA's first police training team. "It was at this time that input or control of the police training by civilian police experts was significantly reduced."[73]

With the reorganization of training for the Iraqi Security Forces underway, the Department of Defense advanced an ambitious plan to cede security responsibilities to the Iraqis. In March 2004, Lieutenant General Sanchez announced that, as the Iraqi security forces proved capable and credible enough to maintain local security, Coalition forces would redeploy to bases outside major cities. From there, they would coordinate with the Iraqis and provide quick-reaction forces, but the ISF would have daily policing and patrolling duties.[74] As the security situation improved, the size of Coalition forces would decrease from 130,000 to 115,000, and the number of U.S. forward operating bases within the city would drop to eight in May 2004 from its June 2003 high of 60.[75]

### Iraqi Force Failures

The first test of this new security sector strategy was a disaster. In April 2004, Sunni insurgents attacked Coalition forces in Falluja, Baghdad, Ramadi, Samarra, and Tikrit, while the Mahdi Army occupied Najaf in the south and Sadr City in Baghdad. Many elements of the newly deployed Iraqi Security Forces proved unwilling or unable to fight. Some abandoned their posts and

PX213

aided the insurgency.[76] Others mutinied when they came under fire.[77] Iraqi police units collapsed in Falluja, Najaf, Kerbala, and Kut, and the number of Iraqi police dropped by nearly 3,000 in one week in April 2004. The Iraq Civil Defense Corps fared worst of all. From April 2 to April 16, up to 12,000 ICDC members deserted; the rates reached up to 30 percent in northeastern Iraq, 49 percent in Baghdad, 30 percent in the south-central region, and 82 percent in western Iraq.[78] The Defense Department's plan to transfer security responsibilities rapidly to the Iraqis had failed.

**Recovery and Reorientation**

The April uprisings pitted Iraq's police, military, and civil defense corps against well-armed insurgents and militias across Iraq. Of the 200,000 Iraqi security force personnel rushed into service, "no more than 5,000" were "fully trained and equipped."[79] Few were ready for counterinsurgency operations; only the Iraqi Army was trained to fight organized enemies (although a mere eight percent of its force was considered ready before the uprising).[80]

The Defense Department now focused the various Iraqi military and police forces on a single threat—the insurgency within Iraq. This was a departure not only for the Iraqi army, whose mandate under CPA Order Number 22 had specifically prohibited its participation in domestic affairs, but also for the police, who had to add counterinsurgency to their criminal justice responsibilities.[81] But the disastrous results of the April 2004 uprisings forced the Defense Department to modify how the Iraqi security forces were being trained. Major General Eaton's Office of Security Cooperation began to refocus the mission on the development of more heavily equipped, specially trained counterinsurgency forces.

The Coalition Police Assistance Training Team brought a military approach to equipping the Iraqi police. CPATT analyzed Iraqi police needs for materiel, infrastructure, weapons, and other pacing items.[82] Because of the contracting challenges in Iraq, the requested equipment did not reach the police until after the transfer of sovereignty. According to Lieutenant General Sanchez, it took 30 to 45 days to document requirements and issue contracts and another 45 to 60 days before deliveries began.[83]

CPATT also improved field training programs for Iraqi police, implementing specialized programs in four key areas that had been neglected: counterterrorism, intelligence, organized crime, and corruption. These were implemented at the Jordan and Baghdad police academies, as well as several smaller regional training academies.[84] Meanwhile, the Ministry of Defense reoriented its forces toward domestic security missions. Shortly after the April uprisings, an Iraqi general visited various Iraqi army units, recruiting volunteers for a division that could operate

PX213

anywhere inside the country.[85] Named the Iraqi Intervention Force, the unit was heavily armed and trained specifically for counterinsurgency.[86]

Iraqi officials also wanted a larger regular military, demanding an increase at a May 2004 conference between Department of Defense officials and the Iraqi leadership. General Abizaid recalled that Prime Minister Allawi "actually pounded on the table about as hard as I've ever seen a human being pound on the table and said the army was too small, and that he had to have more."[87]

**A Hard Lesson Learned**

The CPA's July 2003 *Vision for Iraq* declared that "our first priority is to create a secure and safe environment, without which there can be little progress on other goals."[88] This foundational goal proved exceedingly difficult to achieve. During the CPA's tenure, Coalition forces could not provide the secure environment necessary for the Iraqi police and military to develop into competent and accountable security forces. By the time of the June 2004 transition, just half of Iraq's army and two-thirds of its police forces had received any training at all, and the quality of that training varied widely.[89]

A transition team assessment report delivered to the Secretary of Defense on June 23, 2004—five days before Iraq assumed full sovereignty—showed that just six percent of Iraqi Police Service members had completed a police academy program. The report concluded that if this number did not at least triple by the end of the year, the newly sovereign Iraq would be at "high risk."[90] The Iraqi security forces were also poorly equipped. Despite the new IRRF 2 appropriations for security, contracting delays caused serious shortages in weapons, vehicles, body armor, and communications equipment.[91]

The disastrous performance of the Iraqi Security Forces in the April 2004 uprisings revealed that the Department of Defense had prematurely pushed security responsibilities onto Iraqi shoulders. The Iraqi's confidence in the country's security forces—and in their sponsors, CJTF-7 and the CPA—plummeted as violence soared in 2004.[92] The human toll was also severe; thousands of civilians were killed amid the growing violence.[93] Pressed by time and under-resourced, the CPA and CJTF-7 could not adequately prepare the Iraqi Security Forces to fight the growing insurgency. Prematurely substituting Iraqi forces for Coalition forces had proved a mistake. As the performance of the 101st Airborne Division in Mosul suggested, the Coalition needed a new counterinsurgency strategy.

PX213

CHAPTER 13
# RESTARTING OIL PRODUCTION

*There's a lot of money to pay for this that doesn't have to be U.S. taxpayer money… the oil revenues of that country could bring between $50 and $100 billion over the course of the next two or three years… We're dealing with a country that can really finance its own reconstruction, and relatively soon.**

**Dr. Paul Wolfowitz**
Deputy Secretary of Defense (2001-2005)

Iraq has the third-largest oil reserves in the world.[1] Given this immense oil wealth, Iraq should have been able to pay for its own reconstruction from the start. But three debilitating wars, institutionalized governmental corruption, and crippling international sanctions all contributed to a breakdown of the country's oil sector.

Oil output peaked at 3.5 million barrels per day in July 1990, eight months before the first Gulf War. Because of damage inflicted during that war, production plummeted to less than 500,000 barrels per day, gradually increasing over the next decade to reach an average of 2.5 million barrels per day by early 2003.[2]

Iraq's proven natural gas reserves—112 trillion cubic feet—are the tenth-largest in the world. Natural gas production also declined after the first Gulf War, as processing facilities deteriorated for lack of spare parts and maintenance. In 2003, Iraq was "flaring"—igniting, and burning off—about 60 percent of the natural gas released in the production of crude oil, because it lacked the capacity to capture it for domestic consumption or export.[3]

## Iraq's Oil Infrastructure

Iraq's oil industry is an intricate web of what is known in oil-business parlance as "upstream," "midstream," and "downstream" operations. Upstream consists of oil fields, oil wells, and gas-oil separation plants; midstream facilities include refineries, gas-processing and stabilization plants; and downstream operations comprise distribution networks, terminals, and service stations.[4]

Most of Iraq's oil and gas reserves lie in the southeastern and northwestern parts of the country. In 2003, about 70 percent of the oil produced in Iraq came from the north and south Rumaila fields near the southern city of Basrah and

---

* Dr. Paul Wolfowitz, Deputy Secretary of Defense, Statement before the House Appropriations Subcommittee on Defense, March 27, 2003.

PX213

• Restarting Oil Production •

the Kirkuk fields in the western part of Kurdistan.[5] About two-thirds of its oil wells were in the Rumaila fields, and about one-third were in the north, in and around Kirkuk.[6]

Oil from the Rumaila fields has two notable attributes. First, it is "light," meaning it has relatively low viscosity and yields a high percentage of desirable products when refined. Second, it is "sweet," meaning that it has only a small amount of hydrogen sulfide and carbon dioxide, both of which corrode production facilities. "Some of the best crude in the world comes out [of southern Iraq]," said Brigadier General Robert Crear, who commanded Task Force RIO. "When it comes out of the ground, it goes through the gas-oil separating unit, and it goes straight to a ship for export," without further treatment.[7]

At the time of the 2003 invasion, the country had two functioning export pipelines. The Ceyhan line carried oil from Kirkuk to the Turkish port of Ceyhan on the Mediterranean, and a pipeline from the Rumaila fields in the south carried oil to off-shore platforms near Basra.[8]

Iraq also had three main refinery complexes—in Baiji, Basra, and Doura—that collectively possessed the capacity to process about 570,000 barrels of crude oil per day. The Doura refinery, with a capacity of 110,000 barrels per day, supplied most of the fuel for nearby Baghdad. The two refineries at Baiji, in north-central Iraq, had a refining capacity of 310,000 barrels per day, and the Basrah facility near the Umm Qasr port could process 150,000 barrels per day.[9]

Despite this significant nominal capacity, Iraq's refineries did not have the technology to process a broad range of refined products. Their obsolete systems left 45 percent of every barrel of crude oil behind as "heavy fuel oil," a thick, sticky residue of limited commercial value. Iraq and other countries in the Middle East use heavy fuel oil to run large thermal power plants. Before the 2003 invasion, Iraq did not produce enough gasoline and cooking gas to meet domestic demand; thus, it traded its excess heavy fuel oil in exchange for refined products. For every three truckloads of heavy fuel oil exported to Jordan and Turkey, Iraq imported one truckload of gasoline.[10]

**Task Force Restore Iraqi Oil**

Determined to avert the environmental disasters experienced during the first Gulf War—when Saddam started 700 oil-well fires—USACE's Task Force RIO, KBR, and the military developed extensive plans to prevent or put out such fires.[11] One of the first task orders issued under KBR's $7 billion contract with the Army Field Support Command was for a contingency plan to repair and restore Iraq's damaged or destroyed oil structures. A separate contract for $37.5 million was awarded to KBR for the purpose of prepositioning fire-fighting equipment.[12]

PX213

USACE prepared to fight up to 1,500 well fires, but most of the RIO team thought Saddam Hussein loyalists would not have time to sabotage more than thirty percent of the approximately 1,000 wells in the south. The team feared losing most of the 500 wells in the north because Turkey denied the Coalition access to Iraq, lengthening the time it would take for U.S. forces to secure the northern Iraqi oil fields at Kirkuk.[13]

During and immediately after the March 2003 invasion, no serious sabotage of the northern or southern oil fields occurred, with only nine fires recorded.[14] Gary Vogler, a former Exxon-Mobil executive who served as a member of the Energy Infrastructure Planning Group in the run-up to the war and later as an oil advisor to ORHA and the CPA, attributed the small number of fires to USACE's "fantastic planning" and to the fact that Coalition forces prevailed so quickly.[15] USACE found and disarmed explosive devices at several wells and many gas-oil separation plants in the south.[16]

If the good news was that Iraq's oil fields suffered little damage during the invasion, the bad news was that Task Force RIO had not expected the widespread damage that post-invasion looting and the developing insurgency would cause. In the south, where U.S. troops bypassed the oil infrastructure on the way to Baghdad, vandals and thieves stripped facilities of anything of value. Oil advisors had identified key installations that needed to be protected, but "[the military] said they didn't have enough people to do that," recalled one advisor.[17] Task Force RIO had more firefighters than it needed but not enough oil people with operational experience to restore the damaged infrastructure.[18]

**Reopening the Ministry of Oil**

On their first visit to the Ministry of Oil at the end of April 2003, Gary Vogler and Clark Turner, an oil advisor from the Pentagon team, found the offices damaged and most of the files missing. This shocked them because CENTCOM had planned to protect the oil ministry buildings. Apparently, during the brief time between the entry of Coalition forces into Baghdad and the arrival of troops at the oil ministry, significant looting had occurred.[19]

Vogler and Turner's first job was to find an interim minister to oversee restarting ministry operations.[20] On May 3, Vogler, a senior advisor to the ministry, called a meeting of the entire ministry staff to announce that Thamir al-Ghadban, its director of planning before the war, would serve as interim oil minister.[21] Turner recalled that Ghadban then made a short speech that encapsulated Iraqi ambivalence toward the Coalition. He said that, "Whatever you call this unfortunate incident, we don't like to be occupied." He urged the Americans to

PX213

• Restarting Oil Production •

concentrate on providing security. If the Americans could do that, Ghadban said, Iraqis could handle the reconstruction of the oil sector.[22]

Turner and Vogler then began searching for more employees who could help Ghadban stabilize the ministry. "Our philosophy was we weren't going to change anything," said Turner. "We wanted to keep as many of the Ba'athists there as possible to help out and then later do the de-Ba'athification."[23] Ghadban said that, although the de-Ba'athification order affected some high-ranking technical people, its most deleterious impact was to severely politicize the ministry, which had longer-term harmful effects on the ministry's operations.[24]

In 2003, the Ministry of Oil had about 15,000 employees.[25] They oversaw 22 state-owned enterprises, which engaged in everything from drilling and producing oil and gas to processing and exporting it. Dozens of other SOEs supported the ministry, providing a variety of goods and services.[26] These companies had operated under memoranda of understanding with the UN Oil-for-Food program, as well as agreements among themselves. The ministry's director general in charge of national manufacturing bore responsibility for coordinating the activities of the SOEs. He hoped to get some of them to work on oil sector reconstruction, but most of the factories had been looted and were struggling to survive.[27]

The Task Force RIO engineers made progress. The Rumaila fields in the south were soon producing modest amounts of oil, while the Kirkuk fields in the north were producing more than 30,000 barrels per day. By late April, Doura, Baghdad's main refinery, was processing 40,000 barrels per day—still less than half the refinery's capacity.[28]

**Fuel Shortages**

In late spring 2003, the CPA faced a serious fuel crisis. Iraq could not meet domestic demand for kerosene, diesel, liquefied petroleum gas, and gasoline. Looting had shut down some refineries, the invasion had disrupted the distribution system, and huge subsidies continued to encourage smuggling. With the refineries operating at low levels—or out of commission altogether—the Ministry of Oil tried to meet growing demand by drawing on supplies from its reserve inventory.[29]

By mid-May, Iraq was almost out of gasoline. Liquefied petroleum gas, sold in twelve-kilogram bottles and used primarily for cooking, had all but disappeared from the markets. The ministry set up a rationing system that reduced the number of truckloads of gasoline delivered to each gas station by almost 70 percent, trying to ensure that all stations would get some gasoline. Many received none at all.[30]

As the lines at gas stations grew longer, the Coalition turned to Task Force RIO and the KBR contract to solve the immediate problem, and they began to fund the massive import of refined products. Defense Department officials did not know

PX213

how much fuel would be required or how long it would be necessary to import it, but had anticipated that they would need to provide a 10- to 30-day supply.[31]

During the summer and fall of 2003, Iraq's refineries repeatedly shut down because of power shortages, insurgent attacks, or the lack of storage space for the heavy fuel oil that was a byproduct of their refining process. Thus, Task Force RIO's requests for refined fuels rapidly rose during the hot summer in 2003. From July 16 to August 3, USACE continuously raised the amount of fuel that it was requesting under the KBR contract. By the fall, USACE had "increased the funding on Task Order 5 from $24 million to $871 million, a value more than 36 times greater than the initial allocation." Five of the ten task orders ultimately issued to KBR under its $7 billion contract would be for importing fuel.[32]

**Rebuilding Begins**

In July 2003, the Corps of Engineers, the Ministry of Oil, the CPA, and KBR developed a strategy to get Iraq's oil infrastructure back to prewar production capacity. The resulting "Iraq Oil Infrastructure Restoration Plan" identified 220 projects, divided between "procurement only" activities (to obtain materials) and "engineer-procure-construct" contracts (for design and construction). Procurement-only activities used most of the funding.[33]

The Ministry of Oil drew on its own technical experts, as well as those of KBR and Task Force RIO to survey the upstream facilities—the fields and wells that had sustained most of the serious damage from looting and war—and to develop rehabilitation plans for them. But the ministry used its own engineering and construction firm, the State Company for Oil Projects, for most oil sector construction. KBR focused on purchasing and importing spare parts, new vehicles, and safety gear, as well as heavy equipment.[34]

**Infrastructure Security**

Iraq exported no oil from March to June 2003. The UN, which managed the country's oil exports under the Oil-for-Food program, had halted exports when the invasion began.[35] UN Security Council Resolution 1483, passed at the end of May 2003, required all income from oil sales to be deposited into the newly created DFI, paving the way for the resumption of exports in June.[36] Northern exports started almost immediately; on June 22, 7.5 million barrels stored in tanks at the Turkish port of Ceyhan were sold.[37]

Meanwhile, Task Force RIO worked to bring the southern oil fields, badly damaged by looting, back on line. In mid-June, Iraq's State Oil Marketing Organization (SOMO) began issuing "spot" tenders—or sales orders—for both

PX213

southern and northern oil. It was not until the end of July, however, that SOMO signed its first contracts to export 20 million barrels of Basra crude per month.[38]

In June 2003, Vogler estimated that Iraq might be able to produce three million barrels of oil per day within a year.[39] Production climbed steadily during June and July, reaching 1.3 million barrels per day at the end of August 2003.[40] By the end of October, the country was pumping just over two million barrels per day and exporting more than half of it. In the first five months of post-invasion operations, Iraq had earned about $2.6 billion in oil export revenues, depositing them in the DFI for use by the CPA.[41]

Significant insurgent attacks on the oil sector began in June 2003. Seven bombs shut down three pipelines: the Ceyhan line, the north-south pipeline, and a natural gas line. Between June and November 2003, insurgents launched thirteen major attacks on pipelines and oil facilities, severely limiting growth in production and exports.[42] The CPA's senior advisor to the oil ministry said the pattern of attacks indicated an organized insurgent campaign to sabotage Iraq's oil infrastructure.[43]

*Building an Iraq Oil Protection Force*

Protecting the oil infrastructure soon became an important priority. In mid-July 2003, Vogler requested $50 million from the CPA on behalf of the Ministry of Oil for a security contract to protect the pipelines and facilities. He estimated that the Coalition was losing at least $20 million per day from sabotage and continued looting. Advisors to the oil ministry searched for companies that could provide protection and found six already working in Iraq.[44]

On August 6, 2003, the CPA awarded a $39.5 million, one-year fixed-price contract to Erinys Iraq, a subsidiary of a private British security company, to train a 6,500-person Iraqi guard force to protect 140 oil sites across Iraq.[45] By the end of the year, the CPA had modified the contract eleven times and more than doubled the number of guards it wanted Erinys to train to counter the increasing violence. Erinys ultimately was paid $104 million to provide training and site protection over two years.[46]

A month after awarding the Erinys contract, the CPA established Task Force Shield to oversee the training and operation of the Iraq Oil Protection Force. Task Force Shield reported to CJTF-7 until May 2004, when it began reporting to the Multi-National Force-Iraq, CJTF-7's replacement.[47]

SIGIR's audit of the Task Force Shield programs uncovered numerous problems: too short or ever-changing timelines, confusing lines of reporting authority, competing notions of what the contract required, and ambiguity as to which government entity actually oversaw the contract. The pressure to respond to rapidly escalating attacks accounted for some of these problems, but auditors

PX213

• Chapter 13 •

could not verify the many specific line-item costs, could not determine the total number of guards trained by the contractor, and could not account for most of the equipment procured.[48]

According to Erinys, which recruited most of its staff from the British military, the CPA's directive to get "boots on the ground" meant that the company immediately had to assess needs, draw up plans, and implement a program in a "whirlwind of concurrent activity driven by intense Coalition pressure to deploy guards."[49] The security situation deteriorated faster than Erinys or anyone else could train guards to address it. The oil infrastructure sustained nine serious attacks in November 2003.[50]

Already spread thin, the lightly armed pipeline patrols "found themselves frequently overmatched by insurgents operating in strength and armed with rocket-propelled grenades."[51] James Wilshire, the Erinys manager for the central region, and his Iraqi translator, Majid Husein Jasim, were killed in an ambush on November 11, 2003, while traveling between Baghdad and the Doura refinery. Jasim was the first of 23 Iraqis killed while serving with the oil protection force from August 2003 to December 2004.[52]

**Oil at the End of the CPA**

Few oil fires occurred during the March 2003 invasion, but subsequent pipeline sabotage and looting of oil facilities caused severe damage to the oil sector, ultimately preventing the CPA from reaching its oil production or export goals. During the CPA's tenure, insurgents launched more than 70 attacks on pipelines, wells, refineries, storage tanks, and individuals working for the Ministry of Oil.[53] Much of the CPA's efforts and Ministry of Oil resources went into repairing pipelines and other oil facilities.

All the oil pipelines suffered at least some damage during this period, but none more than the one connecting the Kirkuk oil fields in the north to the Turkish port of Ceyhan. This important pipeline, the only one for northern exports, was repeatedly shut down by insurgent attacks.[54] Thus, during most of the CPA's existence, Iraq did not export any oil from the Kirkuk fields by pipeline. By the end of June 2004, Iraq was producing more than 2 million barrels of oil per day, almost all of it in the south, still well short of the prewar 2.58 million barrels per day.[55]

The CPA channeled most of the resources it devoted to the oil sector into repairing pipelines, importing refined fuels, boosting production to increase export revenues, and protecting oil sites. It paid less attention to upgrading Iraq's refining capacity because the refineries, although obsolete and decrepit, had not suffered as much from the war and looting. The refineries were crucial, but had so many mechanical failures in 2003 that they were down a third of the time.[56]

PX213

• Restarting Oil Production •

   With Iraq's refineries unable to meet domestic demand for refined petro-
leum products, the CPA continued to import diesel and gasoline into oil-rich
Iraq. Because many of Iraq's power plants also depended on these refined fuels,
the shortage forestalled progress on another major CPA objective: restoring
electricity.

PX213

CHAPTER 14
# REBUILDING THE ELECTRICITY SECTOR

*We were measuring the wrong things. [Average daily megawatt production] was a metric that you could easily define and would demonstrate some progress, but we weren't really focused on the right things in putting the electrical grids back on line.**

**Lieutenant General Carl Strock**
USACE Commander, Chief of Engineers (2004-2007)

Brigadier General Steven Hawkins received a late-night phone call on April 11, 2003, in Doha, Kuwait. The U.S. Army had completed its "thunder runs"—armored thrusts into the heart of Baghdad—and now occupied a city where the power grid had crashed, taking down all the other infrastructure systems with it, including water and sewerage. Lieutenant General McKiernan wanted the lights back on in Baghdad immediately.[1]

Tapped by Lieutenant General George Casey in January to lead Joint Task Force-4, Brigadier General Hawkins had spent the previous four months planning to manage the transition to a new Iraqi government.[2] Now he was on his way into Iraq, suddenly responsible for what would become one of the Coalition's most intractable challenges—Iraq's broken electricity sector.

Twenty-four hours later, Hawkins and his 28-member team boarded a C-130 bound for Baghdad. Tasked to restore power, water, sewerage, and hospital services to the city, they called themselves Task Force Fajr, the Arabic word for "dawn" or "new light."[3]

## Task Force Fajr

Task Force Fajr landed in Baghdad at 2:30 a.m. on April 13, 2003. Iraqi electrical engineers who knew the capital's power system met them for a pre-dawn conference in downtown Baghdad. The Iraqis and the Americans recognized the mission's urgency. "All of us knew that potable water, sewer systems, and hospitals would not function without power."[4] They also realized it was just a matter of time before the loss of power would cause a humanitarian crisis.

Devising a solution was difficult because the Iraqi engineers did not have complete drawings showing Baghdad's transmission and distribution networks.[5] Someone said that the Karkh water treatment plant just north of Baghdad had an

---

* SIGIR interview with Lieutenant General (Ret.) Carl Strock, former USACE Commander, Chief of Engineers, May 13, 2008.

PX213

operational ten-megawatt generator. Hawkins and his engineers hit on an idea and immediately set to work to get power to Baghdad by routing the Karkh plant's power through an intermediate substation and onto Baghdad's grid. Lights soon began to flicker on across the city, and the grid was gradually patched back together, averting disaster.[6]

After getting Baghdad's lights on, Brigadier General Hawkins and his team then engaged in a form of triage to determine where to distribute the limited available power. Hospitals had first priority, followed by water-treatment facilities and sewerage systems; domestic consumption came next, followed by businesses and factories. Within two weeks, the capital's critical facilities had the power they needed to operate.[7] By the end of April, Iraq's power plants were generating 1,275 megawatts, up 50 percent since the invasion, but still only about a quarter of prewar levels.[8]

While Task Force Fajr pieced together Baghdad's power grid, the Coalition began reconstituting Iraq's Commission of Electricity. The commission, which would later become the Ministry of Electricity, was responsible for the generation, transmission, and distribution of power throughout the country. It had about 38,000 personnel on its payroll before the March 2003 invasion. As with most other ministries, the Commission of Electricity staff had dispersed in the wake of the invasion.

In May, the CPA asked a respected Iraqi electrical engineer, Dr. Kareem Waheed al-Aboudi, to head the commission. He had a doctorate in electrical engineering and previously served as the director general of the commission's technical office.[9] In one of the first acts of U.S. capacity building in Iraq, Hawkins embedded engineers from Task Force Fajr in the commission to help Dr. Kareem and his Iraqi engineers get it operating again.

Task Force Fajr disbanded on June 15, 2003, but many of its members continued working for the CPA on Iraq's electricity problems, some helping to rehabilitate power generation and distribution across the country, which was critical to the CPA's overall mission of establishing a stable and democratic Iraq.[10]

### Challenges in the Electricity Sector

An array of problems hobbled CPA's effort to restore Iraq's electrical system. Wars, sanctions, and decades of mismanagement had left the entire network dilapidated.[11] Moreover, the country did not have enough trained personnel to upgrade and maintain the electrical systems. Iraq did not produce enough refined fuels to sustain operations at all of its power plants and the country's pipeline system was inadequately developed to ensure effective delivery of the right fuel to the right power generation facilities.[12] Finally, the insurgency frequently targeted the electricity infrastructure, causing blackouts and impeding progress.

PX213

*Electricity Infrastructure*

In 2003, Iraq's power sector was a network of electrical generation plants, transmission systems, and distribution networks that fed power to hospitals, industries, government buildings, and neighborhoods. Electrical substations, which adjust voltage levels for distribution, connected power plants to transmission systems and distribution networks. Seven large thermal power plants produced more than 54 percent of the country's electricity, two hydroelectric facilities generated another 24 percent, and nine gas-turbine power plants provided 21 percent.[13]

Before the invasion, Iraq had the "nameplate capacity" to produce over 9,000 megawatts of power.[14] But achieving that level of output required all facilities to be operational and running optimally, which was not possible because of chronic maintenance problems and fuel shortages.[15] The first Gulf War severely damaged Iraq's power plants, transmission lines, and electrical substations, reducing average daily power output in 1991 to 2,325 megawatts.[16] Revenue from the Oil-for-Food program helped fund repair work that had increased generation to a daily average of about 4,000 megawatts by the end of 2002.[17] Although the March 2003 invasion deliberately avoided targeting Iraq's power system, looting, poor maintenance, and a lack of spare parts, made it impossible to restore electricity quickly. By the early summer of 2003, Iraq's power plants were generating about 3,500 megawatts, a five-fold increase from immediate post-invasion levels but still at least 500 megawatts below prewar levels.[18]

Iraq's main generating facilities were in serious disrepair because "most plants [had] been operated in a manner that has degraded the output of the plant and eliminated most environmental controls."[19] To make matters worse, because Iraq had not adhered to uniform standards in equipment acquisition, its power plants were a hodgepodge of "parts and repairs … from many different suppliers using many different codes and standards (and sometimes none at all)."[20]

The transmission systems and distribution networks were even more fragile. "The system was more like a string of old-fashioned Christmas lights than a modern national power grid," said Lieutenant General Strock. "When one key facility went out, the entire system failed."[21] Delicate and deteriorated, Iraq's electricity sector was essentially held together by "Band-Aids and rubber bands."[22]

*Security Problems*

Soon after Baghdad fell, gangs of looters stripped substations and control centers of copper, computers, and communications equipment. Bechtel found thirteen destroyed transmission towers, all stripped clean of their copper.[23] Although USACE estimated that "fewer than 50 high-voltage electricity transmission towers were toppled or significantly damaged as result of the war," by mid-June

PX213

• Rebuilding the Electricity Sector •

vandals and scavengers had destroyed more than 700 towers and taken the copper from thousands of miles of high-voltage wires.[24]

"It was like Pac Man," said USAID's Tom Wheelock, former chief of party for the agency's personnel contractor International Resources Group. "They just started at one end of the transmission line and worked their way up, taking down the towers, taking away the valuable metals, smelting it down, selling it into Iran and Kuwait."[25] At one point the looters had cut all four electric transmission lines connected to Basrah's oil refinery, exacerbating an already severe fuel shortage and causing riots in the city.[26]

In addition to the looting problem, the fledgling insurgency began sabotaging key electricity infrastructure nodes and attacking repair crews. The insurgents "routinely targeted joint U.S.-Iraqi electricity meetings," as well as Iraqis who were associated with the Coalition electricity restoration effort. In early June 2003, insurgents shot to death a senior Iraqi distribution engineer in front of her children as she left her Baghdad home. By the end of June, "attacks on Iraqi electrical engineers and facilities in and around Baghdad" occurred daily.[27]

Many senior Iraqis working for the Commission of Electricity disappeared after the invasion. De-Ba'athification further eroded the commission's staff, and insurgent attacks made some afraid to go to work. Lieutenant General Strock recalled that "many of the local Iraqis with expertise necessary to restore and operate critical infrastructure were either unavailable or fearful of working with the Coalition."[28]

The Electrical Power Security Service (EPSS), which had existed under Saddam Hussein, was supposed to protect power plants and substations. The CPA tried to continue this weak force but found that it lacked trained staff, had limited equipment, and was staffed by personnel with little interest in protecting the power grid.[29] Task Force Shield was charged with training and equipping 6,000 Iraqi EPSS guards for the new Ministry of Electricity. But, as with the Oil Protection Force, Task Force Shield failed to meet its mission.

A SIGIR audit found that only 334 EPSS guards were trained, despite the fact that the contract required 300 per month for two years. Additionally, the EPSS Training Academy at Taji was not built according to the contract's requirements, and $4.7 million in equipment there could not be accounted for. SIGIR's review of the EPSS program concluded that it "barely got underway and only trained a limited amount of guards."[30]

*Fuel Problems*

In 2003, most Iraqi power plants burned diesel, natural gas, or heavy fuel oil to generate electricity. Iraq's seven thermal power plants, which generated more

PX213

than half the electricity for the entire country, could run on heavy fuel oil, a thick, low-value byproduct of Iraq's antiquated refining process and the only fuel that the country had in surplus.[31] Iraq's refineries produced more heavy fuel oil than its thermal plants could use, so Iraq exported the excess, mostly to Jordan and Turkey, in exchange for gasoline, diesel, and other refined products. The war disrupted this quasi-barter system. The storage tanks for heavy fuel oil quickly reached capacity, forcing the refineries to shut down and halting production of other refined fuels needed by other power plants.[32]

Iraqis filled the power gap by buying small generators to provide power to their homes, as well as to small businesses, water plants, and hospitals. But these generators did not contribute to the national grid, were relatively expensive on a per-capita basis to operate, and exacerbated fuel shortages. Nevertheless, Iraqi entrepreneurs imported and sold tens of thousands of the portable systems to households all over Iraq. The boom in home generation increased demand for refined fuels such as diesel and liquefied petroleum gas, stoking black market activity.[33]

The CPA's plan to expand power generation focused on importing gas turbine generators—which are relatively easy to transport and install—rather than building new thermal units.[34] This was the quickest way to add generation capacity to the grid. But Iraq did not produce enough refined fuel to power these generators, and its distribution system was inadequate to deliver the fuel it did produce. Moreover, Iraq did not have enough trained personnel to maintain and operate the more delicate gas turbine engines, which require frequent maintenance. The decision to install gas turbines, based in part on the assumption that the Iraqi oil industry could rapidly rehabilitate its natural gas industry, foundered when plans to develop the national gas delivery system fell by the wayside.[35]

**Developing a Plan**

The first CPA senior advisor on electricity, Peter Gibson, had worked with hydroelectric plants in the Pacific Northwest, but nobody on his small staff of four was an expert in the field.[36] Gibson instituted weekly strategy sessions in the Green Zone that brought together USACE, USAID, Bechtel, and the head of the Commission of Electricity—and his key managers—to develop a work plan for the electricity sector. By the end of June 2003, when Dick Dumford arrived as USAID's electricity specialist, the strategy sessions had yet to produce such a plan.[37] "We started looking around at what needed to be done," said Dumford, "and came up with a list as long as your arm."[38]

The CPA used DFI funds to pay for electricity projects but also had access to U.S. appropriations through USAID's contract with Bechtel. In July 2003, the CPA's Program Review Board approved $77 million from the DFI for the

PX213

capital expenditures portion of the 2003 Iraqi budget for the Commission of Electricity.[39] The CPA looked to Bechtel, which had received funding from USAID for work in the electricity sector, to advise the commission on how best to spend this money.[40]

### Bechtel's Assessment

On April 17, 2003, USAID contracted with Bechtel to assess Iraq's power facilities and systems and to execute critical repairs that would permit and promote "rapid and significant improvements in the quality and reliability of electricity services."[41] After spending the month of May assessing Iraq's electricity system, Bechtel estimated repair costs would amount to about ten times the value of its $680 million contract with USAID.[42] Bechtel warned that the "reconstruction of Iraq's power sector is a long-term effort," and that one of the biggest challenges to come would be conveying to the Iraqi population the reality that "there will be a delay in providing reliable, 24-hour-a-day power."[43]

The Bechtel assessment recommended focusing on rehabilitating power plants, replacing destroyed substations, and installing new generator units. It further advised that the CPA establish a capacity-building program to get Iraqis on the road toward "standardization of operation and maintenance practices," highlighting the need to strengthen coordination between the ministers of electricity and oil.[44]

### The Push for 4,400 Megawatts

In mid-summer 2003, Ambassador Bremer surprised many in Iraq and Washington when he announced that the Coalition would have Iraq's average daily electricity supply back up to prewar levels by early October.[45] He expanded the CPA's operations office, asking its director, Peter Andrew Bearpark, to manage the "infrastructure" ministries involved in providing essential services.[46] Bearpark became the Director of Operations and Infrastructure, with then-Major General Strock as his deputy. At the end of July, Bearpark appointed Stephen Browning, a senior civilian from USACE who had served as a senior advisor to several ministries, to take charge of infrastructure.[47]

Browning found that the Coalition's electricity team had no plan for how the CPA and the Ministry of Electricity would restore electricity to prewar levels by October.[48] He immediately created an Electricity Action Team, comprising personnel from USAID, USACE, and the Iraqi Commission of Electricity.

On August 18 and 19, Browning convened a conference with every one of Iraq's power plant managers to shape the plan to reach the 4,400-megawatt target. Capacity for over 9,000 megawatts existed, but only about 3,000 were being

PX213

generated. The question was how to put some of the idle capacity to work.[49] Browning asked each Iraqi power plant manager to present proposals for improving output.[50]

Browning's team concluded that the only way to reach Bremer's 4,400-megawatt goal was to target quick repairs that would have the greatest impact on generation. The staff put together a list of equipment needs for each plant and then scoured warehouses across Iraq for parts.[51] They found caches of equipment and spare parts, purchased under the UN Oil-for-Food program, which plant managers had been hoarding.[52]

Throughout September, Browning and his team worked diligently with the ministry's engineers to complete targeted repairs. USACE engineers concentrated on downed transmission lines and broken substations; Bechtel provided technical assistance for generation plant repairs; and BearingPoint helped with sector studies and system forecasts. The CPA's senior advisors met with the Ministries of Electricity and Oil once each week to address the recurrent fuel problems. Browning's effort did not include any major construction, but instead focused on minor repairs and technical assistance. The work was feverish, eighteen hours per day. "We pulled out all the stops, and it looked hopeless at times, but we made it," said one team member. On October 6, Iraq produced 4,518 megawatts, exceeding the CPA's target by 118 megawatts.[53]

The effort, though successful, took a toll on the grid's infrastructure. Browning had warned Ambassador Bremer that pushing the system to reach 4,400 megawatts could cause breakdowns that would make sector-wide rehabilitation more difficult. He believed that the focus should have been on building a sustainable power generation system.[54]

The decision to set an output metric like 4,400 megawatts as the goal had both short- and long-term negative effects on management. In the short term, the decision caused senior officials at the Pentagon and the White House to fixate on the metric rather than moving forward on multifaceted improvements of the system. In the long term, the focus created a perennial desire to judge electricity sector performance on one metric—whether current output exceeded prewar levels.

Even before the CPA reached the 4,400 target, Ambassador Bremer set a lofty new goal. In a broadcast to the Iraqi people on August 29, 2003, he said, "About one year from now, for the first time in history, every Iraqi in every city, town, and village will have as much electricity as he or she can use; and he will have it 24 hours a day, every single day."[55] At the time, the CPA estimated the current unsatisfied demand at 6,000 megawatts, but that number would rise as Iraqis anticipated greater amounts of power being available in the foreseeable future.[56]

PX213

**Task Force Restore Iraqi Electricity**

During a visit to Baghdad in July 2003 when the CPA was developing its plans to increase the country's power supply, Lieutenant General Robert B. Flowers, the USACE commanding general, told Bremer that he could bolster electricity reconstruction by deploying a new task force, similar to Task Force RIO. Ambassador Bremer immediately jumped at the idea. In August 2003, CENTCOM authorized USACE to develop and deploy a team, called Task Force Restore Iraqi Electricity (RIE), to provide rapid reconstruction assistance to the electricity sector.[57]

USACE recruited Brigadier General Hawkins, formerly Commander of Task Force Fajr, to return to Baghdad to head Task Force RIE. He and his team—which included 84 USACE civilians and 90 soldiers, many with specialized skills in the electricity field—arrived at the end of September 2003. Task Force RIE also included mechanical, civil, and electrical engineers.[58] Their job was to help CPA reach its 6,000-megawatt goal by the summer of 2004.

Task Force RIE designed a plan for 26 projects to repair and upgrade existing power generation, transmission, and command and control facilities to "restore reliable electricity to national and regional power grids." To manage the work, Task Force RIE established bases in Baghdad and in the northern, central, and southern regions of the country.[59]

USACE used three IDIQ contracts it already had in place with Perini Corporation, Washington Group, and Fluor International to implement the first Task Force RIE projects. These three companies eventually won the three IRRF 2 electricity sector contracts, no doubt in part because of their work with Task Force RIE. USACE tasked each company to start projects to repair the electrical infrastructure in a different region: Perini Corporation in the south, Fluor International in the center, and Washington Group in the north.[60] By October 2003, the contractors had begun many projects, covering everything from refurbishing power plants to restoring transmission towers.[61]

**Electricity at the End of the CPA**

The Congress allocated $5.56 billion—or nearly 30 percent of IRRF 2—to the electricity sector when it passed the supplemental legislation on November 6, 2003.[62] One week after the supplemental was enacted, Robyn McGuckin, the CPA's deputy advisor to the Ministry of Electricity, called a meeting of CPA's electricity team to review the list of proposed electricity projects covered by IRRF 2. The projects were divided among the categories of new generation, rehabilitation, controls and communications, transmission, and distribution. McGuckin needed to have a prioritized list of projects ready for the first *Section 2207 Report* to the Congress. Her list eventually included 110 generation, transmission, and distribution projects.[63]

PX213

In the late spring of 2004, insurgents stepped up attacks on the electricity infrastructure. They targeted contractors working to restore generation plants, substations, and transmission lines, forcing some companies to suspend operations. Washington Group International locked down its power plant construction site in Mosul for three days following an assault that included ambushes, and small-arms and mortar fire.[64] Subcontractors like General Electric and Siemens pulled staff from project sites after attacks in April. Insurgents also targeted Iraqis working on reconstruction projects.[65] Ambushes of convoys carrying reconstruction supplies and materials caused added delays.

The wave of violence drove costs higher, pushing all electricity projects over budget and forcing the prime contractors to spend more on security. Perini's security costs would total $63.4 million, about 18 percent of the $356.5 million it spent; Washington Group's security bill amounted to $44.5 million, 14.3 percent of the $310 million it spent.[66]

Despite the exploding security situation, work in the electricity sector continued. By June 2004, Task Force RIE had launched 66 projects and USACE said it was on target to increase generation by 1,295 megawatts, even though work on seven generation plants was well behind schedule. When the CPA closed its doors on June 28, 2004, Iraq's average daily generation capacity stood at 4,200 megawatts, well short of its 6,000-megawatt goal.[67]

PX213

CHAPTER 15
## IRAQ RECONSTRUCTION IN TRANSITION

*Sovereignty involves more than a date and a ceremony. It
requires Iraqis to assume responsibility for their own future.*\*

**President George W. Bush**

From January to June 2004, the CPA concentrated on preparing to pass sovereignty to the Iraqis and on developing a process for the formation of a new democratic government in Iraq. In collaboration with the UN, the CPA assisted the Iraqi Governing Council in developing the Transitional Administrative Law (TAL), which provided dates for provincial and parliamentary elections and for a referendum on a new constitution. The TAL would serve as the legal foundation upon which the new Iraqi Interim Government would operate.

The CPA also prepared to pass oversight of the U.S. reconstruction program to a new U.S. Embassy, the first in Iraq since 1991. By the end of June 2004, the Department of Defense formally handed over management of the reconstruction program to the Department of State, and a new set of ad hoc organizations assumed control of a faltering reconstruction mission.

### The Transitional Administrative Law

The November 15, 2003 transition agreement anticipated the transfer of sovereignty to an interim Iraqi government by the end of June 2004.[1] But certain Iraqi leaders—including the Grand Ayatollah Sistani—disagreed with Bremer about how the new interim government should be chosen. Bremer proposed holding caucuses in each of the provinces; Sistani insisted on national elections.[2]

In early 2004, the United States and the Iraqi Governing Council turned to the UN for help. It appointed Special Envoy Lakhdar Brahimi, a former Algerian foreign minister who had recently served as the Special Representative of the UN Secretary General in Afghanistan.[3] When Brahimi and his UN team arrived in Iraq, they quickly concluded that it was logistically impossible to hold national elections before the June 30 transfer of sovereignty. He proposed deferring the elections until after the transfer. The Iraqis accepted the recommendations, and the CPA turned to the work of developing the TAL.[4]

---

\* President George W. Bush, "'We Will Finish the Work of the Fallen," Remarks by the President, April 14, 2004.

PX213

• Chapter 15 •

Through the TAL, the CPA sought to enshrine the core principles of Western federalism in Iraqi law; but the Iraqis quickly voiced their disagreement. The Sunnis wanted a united Iraq, so they could continue to play an important role, while Shi'a clerics, led by Sistani, were adamant that the law be clearly informed by Islam.[5] Finally, on March 8, 2004, the CPA and the Iraqi Governing Council approved the TAL, a consensus document full of compromises.[6]

The TAL served effectively as Iraq's interim constitution, with 62 articles that, among other things, guaranteed fundamental rights for all Iraqis, outlined the Iraqi Interim Government's authority, and defined a timeline for electing a permanent democratic government in Iraq. It provided that all Iraqi laws—including the regulations, orders, and directives promulgated by the CPA and in place before the June 30, 2004 transfer of sovereignty—would remain in force unless amended or rescinded by the Iraqi Interim Government or its successors. It made Islam the official faith of Iraq, stating that it was "to be considered a source of legislation."[7] In an important concession to the Kurds, the law recognized the Kurdistan Regional Government, giving it control over its police forces and internal security.[8]

The TAL provided for an eighteen-month transition period, requiring three national elections in less than a year. The Iraqi Interim Government would commence operations no later than June 30, 2004, and would hold the first election—for provincial councils and the National Assembly—by January 31, 2005. The National Assembly would draft a constitution by August 15, 2005, with the Iraqi people voting on it no later than October 15, 2005. National elections would occur by December 15, 2005, for the Council of Representatives, which would be seated by the end of the year.[9]

The task of forming the Iraqi Interim Government was given to Brahimi, who worked closely with U.S. officials and Iraq's major political leaders in developing the new government. At the end of May, the Iraqi Governing Council chose one of its members, Ayad Allawi—a secular Shi'a who had lived in exile during the Saddam years—as interim prime minister. On June 1, 2004, Brahimi and Allawi announced the formation of the new Iraqi Interim Government, including the president, the deputy prime minister, two vice presidents, twenty-six ministers, and five ministers of state.[10]

**The Use and Misuse of the Development Fund for Iraq**

About $20 billion dollars, predominantly from oil sales, were deposited into the Development Fund for Iraq from May 2003 to the transfer of sovereignty to the IIG in June 2004. The DFI roughly equaled the total of both IRRF appropriations ($20.9 billion) approved by the Congress. The CPA used most of the DFI to fund Iraq's national budget, which chiefly supported ministry operations. A

PX213

smaller portion of the DFI—$7 billion—went to CPA-approved relief and reconstruction efforts.[11]

SIGIR audits found that the CPA failed to exert adequate control of the DFI used to support the Iraqi national ministries or reconstruction projects.[12] An audit of DFI disbursements to Iraqi ministries made through the national budget process concluded that the CPA failed to enforce adequate management, financial, and contractual controls over approximately $8.8 billion of DFI money. SIGIR found that there was "no assurance that the funds were used for the purposes mandated by [UN] Resolution 1483." Ambassador Bremer and the CPA disagreed with SIGIR, arguing that the auditors had failed to account for the very difficult security environment the CPA operated in and ignored the steps taken to improve recognized management weaknesses. Although it acknowledged the extraordinary danger confronting the CPA, SIGIR nevertheless found that the "CPA management of Iraq's national budget process and oversight of Iraqi funds was burdened by severe inefficiencies and poor management."[13] Moreover, SIGIR concluded that the chaotic circumstances required more stringent oversight—not less, as the CPA suggested.

The CPA appeared to be averse to oversight of the DFI. Dov Zakheim, the Pentagon comptroller, said that Bremer "resisted the creation of the IAMB for a very long [time]" because "he didn't want to be audited by a bunch of international auditors." Zakheim added, "You can have rules, but if you resist the auditing and you resist the implementation of the rules … what kind of rules are they?"[14]

The CPA did not appoint an accounting firm to audit its use of the DFI until March 2004.[15] Work started on this audit only after the CPA signed the contract with KPMG on April 5, 2004—nearly a year after the DFI had been established and less than three months before the CPA would expire.

**DFI Spending Frenzy**
In late April 2004, as the handover of sovereignty to the Iraqi Interim Government neared, Ambassador Bremer ordered his staff to step up the expenditure of DFI funds while the CPA still had control of them and could use them to support reconstruction projects.[16] Spike Stephenson, the USAID Mission Director in Iraq, described this process as "a frenzied initiation of activities."[17]

On May 15, the Program Review Board approved the very general expenditures of some $2 billion for major projects: Iraqi security forces ($500 million), improvements in the electricity sector ($315 million), oil infrastructure reconstruction ($460 million), and supporting the Iraqi Property Claims Commission ($180 million).[18] Some PRB members disputed the proposed expenditures. Neil Hawkins, an Australian foreign aid official, said that five voting members thought

PX213

the proposals, initially presented as one package on May 12, were "inadequately documented." He added, "You have one paragraph, half a page, for $70 million … You had to say, 'That's not good enough.'" The documentation was improved before the final vote three days later, when most, but not all the components were approved.[19] Bremer was furious at the resistance.[20]

During the final six weeks before the handover, more than $5 billion was either transferred to Iraq's ministries or committed to CPA-administered reconstruction projects—amounting to over one-third of all the DFI funds that the CPA disbursed during its entire fourteen-month existence. In the week before the transition, CPA officials ordered urgent disbursements of more than $4 billion from the Federal Reserve, including one shipment of $2.4 billion—the largest in the bank's history.[21]

## Operation Plan Sovereign Iraq

In concert with the transfer of sovereignty to the IIG, White House officials wanted to normalize relations with Iraq's new government by establishing a U.S. embassy in Baghdad, moving responsibility for managing the U.S.-Iraqi relationship to the State Department.

On March 19, 2004, an interagency Transition Planning Team arrived in Baghdad to develop what became known as "Operation Plan (OPLAN) Sovereign Iraq." The OPLAN was the first attempt since the 2003 invasion to develop an interagency strategy for the coordination of efforts to stabilize and rebuild Iraq. To develop the OPLAN, joint assessment teams looked at security, staffing, financial management, acquisitions and contracting, and communications.

Not surprisingly, the Transition Planning Team identified security as the foremost problem in Iraq but offered no proposals for reducing the violence.[22] During the CPA's existence, the U.S. military's mission did not include providing security for either U.S. civilian government agencies or private firms contracted for reconstruction projects. Thus, the CPA and the private firms working to rebuild Iraq had to hire private security companies to protect them.

By May 2004, the State Department, USAID, USACE, and the CPA had all contracted with private security firms.[23] The transition team identified twelve different private security contractors providing "various levels of force protection" and recognized that these private contractors would continue to play an important role supporting the U.S. program Iraq.[24]

The OPLAN perpetuated the bifurcated military command and civilian management structures. The military would continue to report to CENTCOM, while the civilians working on reconstruction would report to the new ambassador. Although the OPLAN urged cooperation and coordination, it did not mandate

PX213

• Iraq Reconstruction in Transition •

it, stating only that the Commanding General of the Multi-National Force-Iraq should serve as the principal military advisor to the ambassador.[25]

On May 11, President Bush issued National Security Presidential Directive 36, legally formalizing key aspects of the OPLAN.[26] The State Department, through the Chief of Mission to Iraq, would be in charge of all U.S. activities in Iraq except for military operations and the development of Iraq's security forces, which would be the Defense Department's responsibility. The new directive also established new ad hoc organizations to manage the reconstruction program: the Iraq Reconstruction Management Office (IRMO) and the Project and Contracting Office (PCO).

IRMO and PCO inherited the mission of CPA's PMO. IRMO, under the jurisdiction of the State Department, absorbed most of the CPA's former senior advisors (now known as senior consultants), who would continue to provide technical and operational reconstruction assistance to the Iraqi ministries.[27] IRMO eventually concentrated its efforts on building the capacity of the ministries to function independently.

The PCO, a temporary organization within the Defense Department, provided acquisition and project management support for the execution of IRRF construction and non-construction projects. The U.S. Army was responsible for funding, staffing, and operating the new office. Under the transition plan, the PCO would be "responsive" to the U.S ambassador to Iraq "concerning the requirements and priorities for projects to support reconstruction programs that are unrelated to the Iraqi Security Forces" and to the Multi-National Force-Iraq commanding general "with respect to requirements and priorities concerning training and equipping the Iraqi military and police forces."[28]

The PCO took over management of approximately $12.4 billion of the $18.4 billion of IRRF 2.[29] It also took over the financial management systems used to prepare the quarterly *Section 2207 Report* to the Congress. Although the organization was run by USACE, it fell under chief of mission authority, reporting to the embassy's deputy chief of mission, as did IRMO.[30] These crossed lines of reporting created operational conflicts as the IRRF 2 process unfolded.

CENTCOM consolidated Coalition military forces under the new Multi-National Force-Iraq (MNF-I), with Multi-National Corps-Iraq (MNC-I) controlling operations. At the end of June, it also established the Multi-National Security Transition Command-Iraq (MNSTC-I) to organize, train, and equip Iraq's security forces.

PX213

**Leaving the Provinces**

The CPA had opened offices in seventeen of Iraq's eighteen provinces. The OPLAN eliminated all but four: Kirkuk, in Tameem province; Mosul, in Ninewa province; Basrah, in Basrah province; and Hilla, in Babil province. Although driven by security concerns and budget constraints, the decision also reflected an attempt to transition to the more traditional structure of an embassy. The OPLAN called for civilians to be "embedded" in military commands in five regions. They would serve with the military civil affairs units supporting reconstruction and capacity-building initiatives. These early attempts at civil-military cooperation would evolve into the Provincial Reconstruction Team program under Ambassador Khalilzad.

On June 8, 2004, UNSCR 1546 endorsed the formation of the Iraqi Interim Government and approved the timetable for elections and the referendum on Iraq's new constitution. The UNSCR also noted the presence of the multinational force in Iraq, authorizing it to take all necessary measures to preserve the security and stability of Iraq.[31]

**The End of the CPA**

The CPA, which the UN had recognized in UNSCR 1483 as an "occupation authority," had several missions assigned to it by the U.S. government and the international community, including: the administration of Iraq; the reform of the country's bureaucratic, security, and economic institutions; the repair of Iraq's infrastructure; and the establishment of a democratic foundation for a constitutional government that would represent all of the country's people.[32] Each of these missions required a mammoth effort; tackling them all simultaneously, as the CPA had sought to do, called for a level of operational synchronization that was simply beyond the CPA's capacity.

When the CPA came into being, it did not have the staff or resources to lead a comprehensive rebuilding program in Iraq. The Defense Department, which was given the lead over postwar Iraq by NSPD 24, had failed to provide the CPA with sufficient numbers of qualified staff and an integrated overarching plan that articulated achievable objectives for the rebuilding of Iraq. Operating in a crisis environment, the CPA had no time to deliberate or develop alternative implementation plans. Ambassador Bremer made quick decisions that responded to changing circumstances on the ground. This process yielded some ill-advised orders that undermined the CPA's capacity to achieve its very ambitious reconstruction goals.

In 14 months, the CPA promulgated more than 100 orders, numerous regulations, memoranda, and public notices addressing everything from de-

PX213

• Iraq Reconstruction in Transition •

Ba'athification and reforming the criminal justice system to disbanding the Iraqi army and amending trade laws. It stood up new security organizations, including a new Iraqi army, the Iraq Civil Defense Corps, and the Facilities Protection Service. It created new departments and ministries for Iraq, including the Ministry of Electricity, the Department of Border Enforcement, the Ministry of Science and Technology, the Ministry of Environment, the Ministry of Human Rights, and the Ministry of Defense. To fight endemic corruption, the CPA established an Iraqi inspector general system, based on the U.S. model, and the Commission on Public Integrity. It appointed an independent electoral commission to ensure free and fair elections and promulgated regulations seeking to decentralize the authority of Baghdad by devolving power to local government. The CPA orders also reformed banking laws, the penal code, government salaries, and traffic regulations; opened the country to foreign investment; and established a modern stock exchange.[33]

The CPA helped shape the development of a democratic Iraq, but it never had the organizational capacity to realize many of its goals. It was forced to improvise, creating ad hoc offices such as the PMO to perform vital reconstruction tasks. These offices filled boxes on ever-expanding organizational charts but remained under-staffed and under-resourced from the CPA's inception until its end.

In a hastily arranged ceremony, the CPA folded its tent in the Green Zone on June 28, 2004, returning sovereignty to Iraq two days ahead of schedule. As its senior officials departed, the CPA issued a glowing report card on itself titled, "An Historic Review of CPA Accomplishments." Ambassador Bremer compared the reconstruction of Iraq to the Marshall Plan, and the CPA's self-assessment ended with a list of achievements purporting to show that the CPA had done more in a shorter period of time in Iraq than the United States had accomplished nearly six decades earlier in postwar Germany. For example, Bremer noted, the CPA had created an independent central bank in two months; Germany did not have one for three years. Iraq became independent after one year; German sovereignty did not come for a decade. The CPA had "trained a new military" in three months; in Germany it took ten years. The CPA put together a reconstruction program in just four months; the Marshall Plan was designed over three years.[34]

The CPA's self-assessment missed the mark. The Iraq it left behind was in a perilous state. The Coalition's record on improving security, providing essential services, jumpstarting the economy, and laying the foundation for good governance was very mixed. The CPA concluded that "Iraq has many challenges ahead; however, it is poised to be a nation united, prosperous, and able to take its rightful place as a responsible member of the region and the international community."[35] This was a remarkably optimistic assessment given the environment in which it

PX213

• Chapter 15 •

was issued. Iraq had slipped into the grip of a fierce insurgency, more U.S. troops were dying almost every day, and the occupation had soured many Iraqis on the continuing U.S. presence in their country. It would be up to Ambassador John Negroponte and General George Casey to develop new approaches to address the most serious threat to the continuing reconstruction of Iraq: security.

### The Marshall Plan and the Iraq Reconstruction Program

From 1948 to 1951, the Congress appropriated more than $12 billion for the Marshall Plan, equal to about $100 billion in 2008 dollars.[36] The four-year program, a joint U.S.-European venture, provided aid to sixteen countries in the wake of the devastation of Europe caused by World War II.

The most salient difference between the Iraq program and the Marshall Plan was that the latter's aid was conditional, with each recipient country required to deposit money into a counterpart fund. U.S. money spent on rebuilding Iraq was not made contingent on any contribution from Iraq.[37] It effectively was a series of huge grants.

The Marshall Plan's Economic Cooperation Administration (ECA), an independent agency created by the Congress, managed the program for its entire four-year duration.[38] The management of the U.S. reconstruction effort in Iraq, however, changed hands four times in two years—from the NSC to ORHA to the CPA to the U.S. Embassy.

Those who developed the Marshall Plan methodically and successfully cultivated widespread bipartisan congressional and public support, even though opposing parties controlled the White House and the Congress. Secretary of State George C. Marshall made an extensive speaking tour of the country, selling the idea of an enormous foreign aid program for a defeated enemy. The head of the ECA in Washington was auto-industry executive Paul Hoffman, a Republican Party leader; his deputy in Paris was former ambassador and businessman Averill Harriman, a Democratic Party leader. Hoffman gave some 150 speeches about the Marshall Plan's value.[39] In contrast, the CPA's IRRF 2 request was conceived, prepared, and presented in less than three months; the Congress passed it after only four days of debate.

The Marshall Plan recruited a mix of experienced civil servants and professionals from the private sector and academia. Thousands of talented candidates applied for each job opening, with only 1 out of every 200 hired. A streamlined deployment process was able to get prospective

• 160 •

PX213

• Iraq Reconstruction in Transition •

employees medically examined, then hired and issued security clearances, passports, and travel vouchers in only two days.[40] The standard tour of service with the ECA was two years.

The CPA staff, cobbled together and roiled by conflicting lines of authority and institutional allegiances, had a very uneven quality. Although some personnel were hired and deployed quickly, others had to wait up to ten months. Turnover was high; most CPA officials served for only a few months.[41] Similar turnover problems afflicted the U.S. Embassy when it took over the management of the reconstruction program.

The Marshall Plan was structured to restore the remnants of a democratic system. In Iraq, the United States sought to implant an entirely new system of government, building democracy where a dictatorship or monarchy had long prevailed. The nations in Western Europe had homogeneous societies, functioning institutions, a tradition of democratic governance, and advanced technical knowledge. They were also at peace. Iraq lacked a history of democratic government, had weak public institutions, and never had a diversified market economy.[42] Violence in Iraq, stemming chiefly from sectarian disputes, undermined every aspect of the reconstruction effort. Above all, the Iraq program, unlike the Marshall Plan, never received adequate resources to match its ambitious vision.

PX213

• Chapter 15 •

ESSENTIAL SERVICES OVERVIEW– TRANSITION
FROM THE CPA TO THE EMBASSY

| Metric[43] | Pre-invasion | Post-invasion | CPA Transition |
|---|---|---|---|
| Electricity Production | | | |
| *Megawatts* | 4,075 | 711 | 3,621 |
| Oil Production | | | |
| *Million Barrels per Day* | 2.58 | 0.30 | 2.16 |
| Iraqi Security Forces | | | |
| *Soldiers and Police* | 1,300,000 | 7,000-9,000 | 87,000[44] |
| Telecommunications | | | |
| *Landline Subscribers* | 833,000 | 0 | 791,000 |
| *Mobile Subscribers* | 80,000 | 0 | 461,000 |
| Human Toll | | | |
| *U.S Troop Fatalities* | - | 139 | 862 |
| *Civilian Contractors* | - | 1 | 46 |
| *U.S. Civilians* | - | ~9 | 52 |
| *Iraqi Civilians* | - | 7,413 | 16,848 |
| Financial Cost ($ billions) | | | |
| *U.S Funding* | - | $3.45 | $22.93 |
| *Iraqi Funding* | - | $0.00 | $16.00 |
| *International Funding* | - | $0.00 | $13.60 |
| *Total Funding* | - | $3.45 | $52.53 |

When Ambassador Bremer arrived in May 2003, electricity production averaged just 711 megawatts per day. At the time the CPA transferred sovereignty to the Iraqi Interim Government, production had risen to 3,621 megawatts.[45] This significant improvement in one year was still well below the 6,000 megawatts the CPA had set as its ultimate goal.[46] The CPA effort to get electricity production up to 4,400 megawatts was fleetingly successful in October 2003, but the short-term actions taken to meet that target proved counter-productive to long-term progress.[47]

Oil production increased fairly steadily in 2003 and 2004, but still suffered from the consequences of insufficient maintenance and poor infrastructure security. By the time of Ambassador Bremer's departure, production had reached an average of 2.16 million barrels per day, a significant increase from the immediate postwar output, but still below prewar levels.[48]

PX213

PART III
# The U.S. Embassy Takes Charge
JUNE 2004 TO JUNE 2005

PX213

PX213

CHAPTER 16
## NEGROPONTE'S REVISIONS

> *Security was the paramount issue … without security, it was going to be impossible to move these economic projects forward … That was one of the fundamental corrections that had to be made.*\*
>
> **Ambassador John Negroponte**
> U.S. Ambassador to Iraq (2004-2005)

Ambassador John Negroponte presented his diplomatic credentials to the Iraqi Interim Government on June 29, 2004, the day after the CPA passed sovereignty back to Iraq. The President had placed the new ambassador, who had been serving as the U.S. Permanent Representative to the United Nations, in charge of the largest and most challenging diplomatic mission in the world, which then had a staff of about 900 Americans and 550 Foreign Service Nationals.[1] Negroponte would serve in Iraq for nearly nine months before leaving in March 2005 to become the first Director of National Intelligence.[2]

Shortly after arriving in Baghdad, Ambassador Negroponte put the CPA's reconstruction plans on hold and directed a thorough re-examination of the $18.4 billion program. This review led to a series of IRRF 2 reprogrammings intended chiefly to improve security in Iraq by increasing funding for training and equipping Iraq's security forces, and to strengthen democracy by increasing investment in the preparations for three elections scheduled for 2005. During Negroponte's tenure, the U.S. government reallocated $4.41 billion of IRRF 2.[3]

### IRMO vs. PCO

Negroponte took the helm of a reconstruction program in transition. The recently signed National Security Presidential Directive 36 defined the functions of two new offices—the Iraq Reconstruction and Management Office and the Project and Contracting Office. IRMO was a Department of State entity, and PCO was part of the Department of Defense.

NSPD 36 placed IRMO in charge of formulating reconstruction policy, and the CPA's advisors to the Iraqi government continued as ministry "senior advisors" within the new IRMO structure.[4] The senior advisors operated as consultants to Iraqi ministers by helping them coordinate ministry operations and reconstruction projects.[5]

---

\* SIGIR interview with Ambassador John Negroponte, former U.S. Ambassador to Iraq, February 12, 2008.

PX213

The PCO inherited PMO's duties to provide acquisition and project management support to the U.S. relief and reconstruction program. It also took charge of providing program management services for IRRF projects "to ensure [the] integration of projects within and across infrastructure sectors and within and across other sectors when requested by IRMO or other agencies."[6] USACE provided technical support and quality assurance programs for PCO's projects.

Although NSPD 36 sought to clarify reconstruction roles and responsibilities, its ambiguities actually aggravated the management situation in Iraq, making it more difficult to achieve unity of effort by fragmenting reconstruction responsibilities. IRMO and PCO reported to different masters, the Multi-National Security Transition Command-Iraq managed its own affairs, and USAID continued to control its own programs. In practice, the chief of mission was only nominally in charge of the overall reconstruction program.[7] The diffusion of authority limited Ambassador Negroponte's ability to integrate reconstruction programs, weakened management capacity, and fed interagency tensions, all of which impeded progress.

The PMO's Dave Nash ran both the PCO and IRMO during the first two months after the transition. Ambassador William B. Taylor, a career diplomat with extensive reconstruction experience, replaced Nash as the head of IRMO in late summer 2004. Charlie Hess, who had served as director of the operations and response division of the U.S. Department of Homeland Security, took over as director of the PCO at about the same time.[8] Hess understood that he reported to three different people—the commanding general in Iraq, the secretary of the Army, and the ambassador—but he did not believe that he reported to the IRMO director.[9]

### The Strategic Review of IRRF 2

In early July 2004, the MNF-I command was upgraded to a four-star general with General George Casey replacing Lieutenant General Ricardo Sanchez as senior theater commander.[10] General Casey's and Ambassador Negroponte's paramount concern was security. "I felt that we had moved into a reconstruction phase when we were still actually in a conflict phase," said Negroponte. "We were in an insurgency."[11] Negroponte concluded that implementing economic development projects would be fruitless as long as security remained a serious problem.[12] General Casey concurred, noting that the reconstruction program and military operations required integration in a way that was "mutually reinforcing."[13]

Ambassador Negroponte directed IRMO to conduct a complete review of the IRRF 2 program and to develop a new strategic plan that would address the problem that had most bedeviled the CPA—the breakdown of security across Iraq. He asked IRMO to analyze the original CPA spend plan and to provide

PX213

suggestions for adjusting its budget allocations among the ten reconstruction sectors.[14] IRMO's senior staff worked with USAID, PCO, and the military throughout the summer of 2004, identifying ways to use the IRRF 2 program to bolster Iraqi security capabilities.[15]

In the spring of 2004, OMB had apportioned more than $11 billion of IRRF 2 to four implementing agencies: Defense, State, USAID, and Treasury, with Defense receiving over three-quarters of the funds.[16] By the time the CPA dissolved, only a small portion of IRRF 2 had been spent ($366 million).[17] The Congress had earmarked $5.56 billion for electricity and $4.3 billion for water resources and sanitation. IRRF 2 program managers, however, had not planned to begin construction on major projects in these two sectors until 2005.[18] Ambassador Negroponte seized upon these funds as available capital that he could recommit—with congressional approval—to pressing new priorities, most notably security.

### The First Reprogramming

USAID's mission director, Spike Stephenson, was barely on speaking terms with Admiral Nash when the Negroponte/Casey strategic review began. According to Ambassador Taylor, "the relationship between PCO and USAID was not good."[19] USAID, which had been largely ignored during the creation of IRRF 2, welcomed the strategic review because it offered the agency a new opportunity to shape the reconstruction effort. "It gave us a chance to get in on the policy end of it," said Stephenson. "Win or lose, you got to speak your piece."[20]

USAID's piece was a proposed development package for more investment in capacity-building and democracy projects. It also sought an additional $200 million for its Office of Transition Initiatives (OTI). The OTI had been providing expertise to military-led CERP projects, which were increasing Iraqi employment and promoting economic development. Through this program, USAID had helped implement many CERP projects, particularly in Baghdad. "We were doing them literally at the direct request of the major subordinate commanders," particularly Major General Peter Chiarelli (then commanding the 1st Cavalry Division), said Stephenson.[21]

After listening to presentations from all of the major reconstruction and security players, Ambassador Negroponte and General Casey agreed to move $3.46 billion to programs to strengthen Iraq's security forces, promote economic and private-sector development, build democracy, and prepare for the upcoming elections. The security sector alone received an increase of $1.81 billion from reprogrammed funds.[22] At the same time, $1.94 billion was taken from the water sector and $1.07 billion from electricity.[23]

PX213

Because the reallocations amounted to a more than ten percent shift in funding within IRRF 2, the State Department had to submit a request for congressional approval. Deputy Secretary of State Richard Armitage made the department's case for the funding shifts before the House Appropriations Committee, stating that "our most urgent priority right now is security. Short-term stability and long-term prospects in Iraq quite simply depend on improving the security situation."[24] The Congress agreed, approving all the changes on September 30, 2004.[25]

**The Second Reprogramming**

While the Congress evaluated Negroponte's first reprogramming request, the State Department initiated a second review.[26] PCO's new director, Charlie Hess, objected and sent a long email to Ambassador Taylor stating that it was a bad idea to send another group of short-term "helpers" to "squeeze more hypothetical dollars from the IRRF program to accomplish other much-needed program objectives."[27] Hess wanted to avert further delays in starting IRRF projects, which had been frozen during the first reprogramming. He believed that it was time to stop analyzing the program's financial allocations and to start accomplishing rebuilding work. The contractors on the ground were accruing millions of dollars in overhead costs without producing much. "Every day that we rethink what we are all about is one less day of getting on with the job."[28] His complaints fell on deaf ears.

In December 2004, the State Department announced the second reprogramming, moving $457 million in IRRF 2 money, again mostly out of the water sector. The reallocation restored $211 million to the electricity sector for quick-impact projects and transferred $246 million for projects to improve essential services in the embattled cities of Falluja, Samarra, Najaf, and Sadr City. The latter shift sought to mollify restive populations in the most dangerous parts of Iraq.[29]

For the second time in four months, Ambassador Taylor had to tell the Minister of Municipal and Public Works, Nesreen Berwari, that the funding for her water treatment, waste management, and irrigation projects was going to be cut significantly. She had worked closely with the CPA to develop the program, and Taylor, who had previously gone to her office to inform her of the first cut, did not look forward to giving her more bad news. Minister Berwari told Taylor she never wanted to see him in her office again. "She said it with a little bit of a smile," Taylor said, "but not much."[30]

PX213

### The Third Reprogramming

In the spring of 2005, Charlie Hess again was exasperated to learn that the State Department was planning yet another reprogramming of IRRF 2, this time focusing on new operations and maintenance efforts, the electricity sector, and project cost overruns. Hess complained to his Defense Department boss, Claude Bolton, Assistant Secretary of the Army for Acquisition, Logistics and Technology, stating:

> The impact of incremental reprogramming has a significant detrimental effect on the momentum of program execution (it slows the pace) and consequently results in increased overhead costs while we sort out the skills and contracting staffing levels necessary to execute the remaining work. This is particularly debilitating when accomplished in a series of back-to-back reprogramming exercises where, as we finish dealing with the first reprogramming cycle, it is followed by yet another round of reprogramming reviews. Again, this stifles momentum, generates added costs and typically reduces effectiveness of program dollars.[31]

Hess's complaints again had no effect.

On March 25, 2005, the State Department notified the Congress of its desire to reallocate $832 million.[32] Drawing mostly from pending energy-sector projects and five large water projects, the realignment provided $225 million to bolster the essential services infrastructure in Baghdad, and $607 million to fund operations and maintenance programs.[33] Sustainability had become an increasing concern among U.S. officials, who worried that Iraq did not have the capacity to maintain new or refurbished facilities once transferred.[34] Most of the new sustainment funding went to the electricity sector.[35]

PX213

• Chapter 16 •

**Iraq Relief and Reconstruction Fund Allocations by Sector for June 2004, December 2004, and June 2005 ($ Millions)**

| Sector | June 2004 Allocation | December 2004 Allocation | June 2005 Allocation | Percent Change from Original |
|---|---|---|---|---|
| Security & Law Enforcement | $3,235.0 | $5,045.0 | $5,017.6 | 55% |
| Justice, Public Safety Infrastructure, and Civil Society | $1,484.0 | $1,953.0 | $2,188.5 | 47% |
| Electricity Sector | $5,465.0 | $4,369.0 | $4,318.5 | -21% |
| Oil Infrastructure | $1,701.0 | $1,701.0 | $1,723.0 | 1% |
| Water Resources and Sanitation | $4,247.0 | $2,279.0 | $2,146.0 | -49% |
| Transportation and Telecommunications Projects | $500.0 | $513.0 | $508.4 | 2% |
| Roads, Bridges, and Construction | $368.0 | $360.0 | $334.0 | -9% |
| Health Care | $786.0 | $786.0 | $786.0 | 0% |
| Private Sector Employment Development | $183.0 | $843.0 | $840.0 | 359% |
| Education, Refugees, Human Rights, Democracy, and Governance | $259.0 | $379.0 | $363.0 | 40% |
| Administrative Expenses | $213.0 | $213.0 | $214.0 | 0% |
| Total | $18,439 | $18,439 | $18,439 | |

Source: OMB, *Section 2207 Report*, Funding Table, July 2004; and DoS, *Section 2207 Report*, Status of Funds, July 2005. Note: Totals may not add up due to rounding.

**The Impact of the Reallocations**

Negroponte's reallocations reflected the U.S. government's response to changing conditions in Iraq, chiefly the worsening security situation. They also demonstrated recognition of the need to increase investment in Iraq's political process. Each funding shift, however, caused the elimination or curtailment of planned or ongoing infrastructure projects.

The water sector suffered the most, losing nearly 50 percent of its funding (from $4.25 billion to $2.15 billion), which forced the cancellation of numerous projects.[36] The electricity sector was the second-hardest hit, suffering a loss of almost a quarter of its IRRF 2 money (from $5.47 billion to $4.32 billion), resulting in a reduction of proposed power projects. This cut planned increases in electricity capacity from 3,400 megawatts to 2,100 megawatts.[37]

Notwithstanding these infrastructure funding cuts, Negroponte and Casey firmly believed that the reprogrammings were necessary to implement their new strategy. They recognized that the CPA's vision had given inadequate weight

PX213

to security, democracy, and project sustainment.[38] Along with the security and democracy increases, the reprogrammed funds supported new sustainment programs across the ministries.[39] But these funds, although an important start, addressed only a fraction of Iraq's operation and maintenance needs. As the State Department noted, "the process of capacity development to manage and sustain infrastructure projects will take time."[40]

PX213

## Chapter 17
# Contingency Contracting and Program Management

> *I was the deputy prime minister in charge of reconstruction, and I still have difficulty understanding what USAID, IRMO, and GRD-PCO actually do.**
>
> **Dr. Barham Salih**
> Deputy Prime Minister of Iraq (2004–present)

The United States struggled in Iraq to establish integrated contracting and program management systems that could provide effective direction, support, and oversight of the reconstruction program. Beginning with the creation of the CPA's Program Management Office in August 2003, a succession of contracting and program management offices suffered under varying sets of complex contracting regulations, divergent chains of authority, changing program requirements and shifting reconstruction priorities. A shortage of qualified contracting officers, continuous staff turnover, and poor program management practices, particularly regarding quality assurance programs, weakened oversight of reconstruction projects. Finally, contracting officers did not have adequate information systems to track contract activity.

**Contracting Shortfalls**

Every reconstruction project begins with a contract that defines the government's expectations of a contractor. A good contract clearly describes the work requirements, the construction schedule, and the budget. Contractors perform only what the contract provides, albeit in an environment that anticipates change orders. The government manages quality-assurance programs to ensure contract compliance, and the contractor manages quality-control programs to ensure that its workers accomplish contract requirements effectively.

In February 2004, Brigadier General Stephen Seay took over as CPA's Head of Contracting Activity. Seay brought an extensive Army contracting and program management background to his new job. He inherited an office that was grossly understaffed and completely overwhelmed by hundreds of DFI contracts. The most serious problem was the dearth of qualified contracting personnel who could develop good project requirements and statements of work.

---

* SIGIR interview with Dr. Barham Salih, Deputy Prime Minister of Iraq, June 20, 2006.

PX213

• Contingency Contracting and Program Management •

Brigadier General Seay concluded that the contracting office could not manage the approaching wave of IRRF 2 contracts. He thus rapidly reorganized and expanded the small office, recruiting a dozen new people, including acquisition professionals who could draft statements of work, thereby free contracting officers to do their job of writing contracts.[1] Seay also requested more lawyers "to troubleshoot solicitations and to support contracting so that procurement and construction delays did not result from disputes relating to the contracting process." He wanted to make sure that each solicitation and contract award process followed the FAR and the IRRF 2 statutory requirements.[2]

Despite implementing many improvements, Brigadier General Seay still struggled with familiar problems: personnel shortages, poor program management, and inadequate information management systems. For example, his staffing chart called for 69 people. Throughout his one year in Iraq, over a third of Seay's staff positions remained vacant.[3]

**Contracts and Task Orders**

A Pentagon team handled the contract award process for the twelve IRRF 2 contracts but the PMO and then the PCO planned and managed their execution. Under the PMO's organizational structure, the sector program-management contractors—private firms hired to help manage the design-build contractors— were supposed to develop project requirements and prepare them for execution through task orders. They took reconstruction projects identified by the PMO/ PCO and defined the work requirements, schedules, and budgets.[4] Seay's contracting office then took this information and developed task orders, which the PMO/PCO would assign to construction contractors. GRD provided quality assurance for the projects.

Developing and managing task orders in 2004 and 2005 proved to be difficult. The contracting office did not have management or information systems that could effectively track them. The PCO did not have enough information about potential projects to develop good scopes of work; and it had too few career government employees capable of negotiating with contractors to define good requirements. The SPMOs tried to fill this void, but they "were really just construction supervisors, not program managers."[5]

Seay attempted to solve these problems by holding program-wide reviews with all the contracting officers, program managers, and contractors. This remedial measure had some success but Seay still had to contend with PCO program managers who "preferred to build facilities" rather than think through the "pre-construction and task order award process."[6]

PX213

Andy Bailey, vice president of the Louis Berger Group, which had the program management contracts for three sectors—Communications and Transportation; Building, Education, and Health; and Security and Justice—thought that the design-build management concept was "brilliant," but the execution poor. He said that the PMO/PCO had neither the systems nor the processes in place to support the effort. Moreover, there were serious disagreements regarding the proper role of contractors who served as program managers. For example, the contracting office and the GRD argued for more government oversight, believing that too many contractors were overseeing other contractors.[7] A SIGIR assessment later noted that "the many layers of management, including program management contractors, made it difficult to determine who had ultimate authority over money, people, and projects."[8]

**Information System Challenges**

The IRRF 2 legislation required the Administration to submit reports to the Congress every three months updating the use of the funds on a project-by-project basis and including estimates of the costs required to complete each project. The Congress provided $50 million to develop a system to manage the program and track projects, but the PMO failed to create a good information management database for IRRF 2.[9]

When Brigadier General Seay arrived in early 2004, he found no existing information management program to track contracts. "We had to scramble to assemble an automated system," he said. "There was a computer system in boxes, but there was no one who was a qualified system administrator who could set it up for us and keep it running."[10]

In the absence of a single integrated database, each implementing agency established its own. USAID used its proprietary financial and program management system while the Department of Defense used its system to track CERP projects. Because these systems were not compatible, someone from Seay's office had to go to IRMO and PCO every day to ensure that everyone all had the same information on every contract.[11]

In 2004, in response to SIGIR audits criticizing the lack of a single project-management system, the PCO created the Iraq Reconstruction Management System (IRMS), to integrate data on all projects in Iraq.[12] Through IRMS, the PCO sought to reconcile various incompatible information management systems by developing a "PCO Solution" that would assemble essential data and thus allow managers visibility into the entire range of reconstruction activity.[13] But it would be years before the United States had a reasonably integrated system to manage and monitor reconstruction. A subsequent SIGIR review found that the failure

PX213

• Contingency Contracting and Program Management •

to develop a cohesive information management system "hampered the work of others who rely upon the PCO data set for reporting purposes."[14] The IRMS ultimately was able to track only about 70 percent of all reconstruction projects.

**Contracting Waste**

During the spring of 2004, the IRRF 2 design-build contractors quickly mobilized and deployed to Iraq, but most of the task orders for construction work were not ready. While the PMO and the contracting office struggled to develop task orders, the construction companies, awaiting new work, continued to charge high overhead costs.[15] Five design-build firms during this period submitted invoices totaling $62.1 million in overhead costs and only $26.7 million in construction costs, an example of the scope of waste caused by project delays.[16]

As costs rose, U.S. civilian and military authorities in both Baghdad and Washington became increasingly anxious to see reconstruction projects started. Apart from curbing waste, they wanted to demonstrate the U.S. commitment to Iraq by improving essential services, building the Iraqi Security Forces, and helping the Iraqi Interim Government prepare for the 2005 elections. They also hoped to undercut the insurgency by providing electricity, clean water, and jobs, while simultaneously stimulating economic progress and fostering democratic political processes. This new urgency forced the PCO to issue task orders rapidly, before they had been "definitized"—meaning before the government and the contractor had reached formal agreement on what would be done, how much it would cost, and when it would be completed.[17]

Contracting regulations allow "undefinitized contracts" under two conditions: when there is not enough time to negotiate a definitized contract or when it is imperative to make a binding commitment that allows work to begin immediately. But by law, these contracts must eventually be definitized.[18] A SIGIR audit found that some contracting officials in Iraq erroneously believed that the definitization requirements did not apply to Iraq task orders. This incorrect assumption caused millions of dollars in waste.[19]

**The Creation of the Joint Contracting Command-Iraq**

In November 2004, CENTCOM formally established the JCC-I to support reconstruction and military contracting in Iraq.[20] The Assistant Secretary of the Army for Acquisition, Logistics, and Technology designated Brigadier General Seay as the new commander of the JCC-I and appointed two Principal Assistants Responsible for Contracting, one to supervise U.S. military contracting and the other to manage reconstruction contracting. JCC-I assumed responsibility for managing all remaining DFI-funded contracts and for developing a training

PX213

program to help Iraqi ministries strengthen their contracting and procurement procedures. USACE still maintained its own contracting office, based in Washington, D.C., with a forward contingent in Iraq.[21] The change also did not affect USAID or the Department of State, which continued to write their own contracts and manage the IRRF 2 funds apportioned to them.[22]

### A New Contracting Strategy

During the late summer of 2004, the embassy re-evaluated the wisdom of continuing to use the large IRRF 2 design-build contracts. The reconstruction program was shifting emphasis from big infrastructure projects to targeted programs supporting security, governance, and economic development. Moreover, the design-build cost-plus contracts were proving too expensive and difficult to manage.

Task orders were issued under the design-build contracts on either a cost-plus or fixed-price basis, but virtually all were cost plus "incentive fee" contracts. Under cost-plus contracts contractors are reimbursed for all expenses, regardless of whether projects are successfully completed. The incentive-fee formula determines the contractor's award fee on top of the guaranteed fixed fee. The design-build contractors in Iraq usually received a guaranteed fee of three percent and were eligible for an additional incentive award fee of up to twelve percent. Thus, contractors could earn up to fifteen percent of the costs of any contract in award fees.[23]

In the unstable environment of mid-2004, cost-plus contracts appeared to some to be tantamount to "an open checkbook."[24] The contractors countered these complaints by asserting that running construction programs in Iraq's dangerous environment justified the high costs. The government was also negligent in controlling costs. For example, many contracts had clauses that permitted the government to convert them from a cost-plus to a fixed-price contract (after a percentage of design work was completed). But government contracting offices failed to exercise these conversion provisions, and they were frequently excised from contracts after the first year.

High contract costs ultimately led the PCO to stop issuing new task orders under the design-build IDIQ contracts and to begin contracting directly on a fixed-price basis with Iraqi firms.[25] The FAR's "simplified acquisition" rules, which require fewer bids and less cost data for contracts valued under $500,000, allowed contracting officers to rapidly award new work to local contractors. When the Congress increased the threshold for simplified acquisition to $1 million, more direct contracting became possible.[26]

In the fall of 2004, the high costs of the design-build contractors, the de-emphasis on large infrastructure projects, and a new push to create jobs led embassy

PX213

officials to urge the PCO to move work from big firms to Iraqi companies. PCO director Charlie Hess opposed the move. "My professional belief is that we are in an extremely precarious acquisition position if we attempt to move more than a modest amount of awarded work to some other contract vehicle (unless the contractor is failing to perform)," he wrote. "Work that has been awarded to the [design-build contractors] under full and open competition in accordance with the criteria established at the time of award should not be moved to accomplish other worthwhile purposes now."[27]

Hess believed that, because of increased security risks, the design-build contractors had opted to work through Iraqi subcontractors anyway. "The [design-build contractors] are on the hook for contract performance whether they subcontract with one firm or many firms," he said. "On the other hand, as we attempt to move to more direct contracting with Iraqi firms, the U.S. government takes on the risk of overseeing many more contractors in terms of execution and contract administration."[28] But the change in reconstruction strategy ultimately proved beneficial and began to reduce costs.

**Monitoring Costs and Performance**

In the IRRF 2 legislation, the Congress required the Administration to provide continuing analysis on how much it was going to cost to complete each IRRF 2 project. Cost-to-complete estimates determine the amount of work, time, and money needed to finish an ongoing project.[29] But neither the CPA nor the embassy was able to develop a system that provided consistent cost-to-complete analysis.

The lack of an integrated program management system significantly contributed to this shortfall. A 2005 SIGIR audit concluded that "IRMO, as well as GRD-PCO, MNSTC-I, and USAID (the reporting entities), failed to develop methodologies to assure reliable and transparent cost-to-complete reporting."[30]

**PCO Merges with GRD**

When the PMO was first established, USACE provided construction management and quality assurance for IRRF 2 construction projects. The Defense Department always envisioned that USACE, which had more experience in managing projects during the construction and closeout phases, would eventually assume all program management responsibilities for IRRF 2 infrastructure projects.[31] In March 2005, the PCO submitted a plan to merge with the GRD. On October 14, 2006, the PCO ceased to exist, and the GRD thus became the sole entity responsible for overseeing the completion of the Defense Department's IRRF 2 construction program.[32]

PX213

**Moving Forward**

As the IRRF 2 program matured, the U.S. government reformed and reorganized reconstruction offices in Iraq, seeking to improve coordination within and among agencies. Some changes—such as the formation of JCC-I—incrementally helped. But others—such as the creation of the PCO and IRMO, with their ambiguous lines of authority—perpetuated existing problems.

The various reorganizations invariably created new layers of management, interweaving public- and private-sector program managers. But none of the reforms vested anyone with the ultimate responsibility—and authority—for the entire reconstruction program. As a result, there was plenty of management oversight, but little accountability.[33]

Contracting and program management problems—coupled with the turbulence engendered by constant organizational change—affected the ability of construction firms to build projects on time and within budget. To add to these many troubles, they were building in a war zone.

PX213

## Chapter 18
# Building in a War Zone

*I felt that because we instituted the program when we did, we had to spend a disproportionate amount of the money on security. I realize that's now accepted as a fact of life, but the cost seemed to me very, very high.**

**Ambassador John Negroponte**
U.S. Ambassador to Iraq (2004-2005)

No aspect of the U.S. program to rebuild Iraq was left untouched by the escalating violence of 2004 and 2005. Coalition troops and members of Iraq's security forces were not the only ones dying: insurgent attacks claimed the lives of many reconstruction workers. More than 400 non-Iraqi civilians had died by September 2005. Of the 147 U.S. civilian deaths that had occurred as of October 2005, 117 were contractors killed by insurgents.[1] The number of non-Iraqi contractor deaths would continue to rise, nearing 1,300 by the end of 2008.[2]

Iraq's dangerous environment posed serious challenges for both design-build contractors and the PCO's program managers. It was often impossible to carry out projects in dangerous areas. And it was more difficult to draft contracts with well-defined statements of work when contracting personnel could not visit project sites. Similarly, U.S. government quality-assurance personnel frequently could not monitor project progress because of rising conflict.

**Reconstruction Under Fire**

Violence also impinged upon the relationships between U.S. reconstruction officials—whose travel outside the Green Zone was increasingly circumscribed—and their Iraqi counterparts. Insurgent attacks on building sites and on the convoys carrying supplies to them delayed construction work. Intimidation of Iraqi employees caused frequent work stoppages. And the design-build firms and their subcontractors experienced a high turnover in Iraqi staff, as personnel were killed or fled to escape the violence. By the end of 2005, deteriorating security conditions had severely slowed work and driven costs higher in every reconstruction sector, threatening the entire effort.

The increasing conflict altered the reconstruction program in two significant ways. First, the United States had to reprogram resources within IRRF 2

---

* SIGIR interview with Ambassador John Negroponte, former U.S. Ambassador to Iraq, February 12, 2008.

PX213

to fund the massive expansion of Iraq's security forces. These reprogrammings had the effect of canceling hundreds of planned and ongoing projects, causing what came to be termed a "reconstruction gap"—the difference between what was intended and what was actually built.[3] Second, the direct security costs for every reconstruction contract escalated. A 2005 SIGIR examination of nine major construction firms that were awarded IRRF 2 contracts found that security costs accounted for up to 16.7 percent of the contract price, more than double the original estimates by PMO.[4]

The U.S. military's mission did not include providing security protection for U.S. civilian government agencies and contractors. These organizations consequently hired private security companies to protect their employees.[5] By December 2004, government agencies and reconstruction contractors had obligated more than $766 million for private security firms.[6] Despite this large expenditure, neither the State Department nor the Pentagon had complete data in 2005 for what these companies actually cost or on the number of people they employed in Iraq. The Defense Department could only estimate that at least 60 private security providers employed as many as 25,000 people.[7] But without the protection provided by these firms, neither the U.S. civilian agencies nor the contractors they employed would have been able to perform their missions. In 2008, a SIGIR review found that $5.3 billion had been obligated to 77 private security contractors to provide security services in support of U.S.-funded projects and programs since 2003.[8]

In the face of growing violence, the U.S. government pressed ahead with major infrastructure projects to improve the provision of essential services. Both the U.S. military and civilian leaders hoped the enhancements would help sustain military successes in the fight against the insurgency. But SIGIR audits of key programs in the oil, electricity, water/sewerage, and health sectors revealed that, between June 2004 and July 2005, the United States reconstruction program made only limited progress because of the unstable security environment.

### The Oil Sector

Under the IRRF 2 program, two design-build firms—Parsons Iraq Joint Venture (PIJV) in the north and KBR in the south—worked on oil projects to rehabilitate pipelines, refineries, gas-oil separation plants, and export facilities. KBR, as part of Task Force RIO, had operated in the southern oil sector since the March 2003 invasion.[9] By July 2005, the United States had provided about $2.7 billion in U.S.-appropriated funds and another $2.7 billion in Iraqi funds—much of it going to KBR—to rebuild Iraq's oil infrastructure, import refined fuels, develop oil security and pipeline repair teams, and provide technical assistance.[10]

PX213

Despite this significant U.S. investment in the oil sector, Iraq's production fell after reaching a peak of 2.54 million barrels per day (MBPD) in September 2004. From June 2004 to June 2005, Iraq averaged less than 2.2 MBPD and exported only about 1.4 MBPD.[11] The worsening security environment, inadequate contractor performance, and frequent program changes accounted for the decline in oil production.[12] In October 2004, the State Department reported that security had driven cost estimates higher and caused delays in projects to repair oil export terminals, pump-compressor stations, and gas-oil separation plants.[13]

In January 2005, a significant decrease in the levels of oil production and exports stemmed from "the number and locations of pipelines sabotaged, combined with an inability to secure some strategic pipelines."[14] Attacks on the northern pipeline brought all pipeline exports from the Kirkuk oil fields to a halt in December 2004.[15] Iraq's Ministry of Oil reported that insurgents launched 186 attacks during 2004, causing more than $6 billion in damage to oil fields and pipelines. At least 138 oil-security and technical employees were also killed during this period.[16]

### The Qarmat Ali Water Treatment Plant

Security was the largest but not the only problem afflicting the oil sector. Reconstruction planners frequently failed to coordinate oil sector projects sufficiently, making it difficult to achieve production objectives. In Iraq's southern oil fields, for example, years of underinvestment and poor maintenance made it impossible to sustain the underground pressure needed to pump oil out of the ground. Clean water had to be pumped into the fields to produce sufficient pressure. But the only source of clean water was the Qarmat Ali water treatment plant and the collection of 48-inch pipes that carried its water to eight pump stations.[17]

Task Force RIO contracted with KBR for a $225 million project to refurbish the Qarmat Ali water treatment plant. By August 2004, KBR had completed much of the work, and six of the eight water-injection pump stations were operational. But repeated breakdowns of the corroded pipes prevented the system from injecting the necessary amounts of water into the oil fields. KBR's contract did not include repair of the field-pipes, so the PCO issued another task order to repair the pipes.[18] This project was still ongoing in mid-2006 because of delays due to the degraded state of the delivery systems.[19] The failure to complete the Qarmat Ali project significantly limited the productivity of the southern oil fields.

In late 2004, the PCO became increasingly concerned about KBR's "failure to adequately control and report costs" of its rehabilitation work in the southern oil fields. The PCO issued a "cure notice"—or intention to terminate the contract—unless KBR provided a more detailed explanation of costs by January

PX213

29, 2005.[20] Six months later, KBR finally convinced the PCO that it had satis-factorily addressed the cost issues. But during this period, the PCO decided to begin shifting work to PIJV, which had the oil sector contract for the north. In the spring of 2005, PIJV mobilized its resources southward to conduct facilities assessments, and the PCO eventually gave it much of the southern oil sector work originally intended for KBR.[21]

*The Al Fatah Pipeline Crossing*

The oil sector problems in northern Iraq were also challenging. During the in-vasion that toppled Saddam Hussein, the United States inadvertently bombed the Al Fatah Bridge, destroying the fifteen oil and gas pipelines it carried across the Tigris River. The damaged lines included the major crude-oil pipeline that originated in the rich Kirkuk oilfields and angled 100 kilometers southwest to Al Fatah, where it crossed the Tigris to supply Iraq's largest refinery and the power plant at Baiji.[22] Al Fatah also connected the oil fields to the Ceyhan pipeline, the direct avenue for oil export to Turkey. The loss of this important connection cost Iraq at least $5 million per day and contributed to keeping export levels below prewar levels.[23]

On June 8, 2003, a group of Task Force RIO engineers, along with repre-sentatives from KBR, USAID, and Bechtel, visited the Al Fatah project site and concluded that the easiest way to repair the pipelines was to restore the bridge and install new pipes across it. The engineers recommended that USAID use its Bechtel contract to rebuild the bridge and that Task Force RIO use its KBR contract for the pipe installation. Task Force RIO engineers estimated the proj-ect's total cost at about $5 million and calculated that it would take two to four months to complete.[24]

The first delay occurred when Bechtel said it could not start the job for two months. The CPA and Iraq's Ministry of Oil, concerned that the site was vulner-able to insurgent attacks, looked for an alternative solution. One of the CPA's oil experts suggested using a technique called "horizontal directional drilling," which entailed excavating a tunnel under the river for the placement of pipes. With CPA approval, the advisor contacted Laney, Inc., an American company that special-ized in horizontal drilling. Laney advised that a 40-inch crude-oil pipe could be installed in as little as six weeks, depending on soil conditions.[25]

The CPA considered awarding a sole-source contract to Laney so work could proceed quickly but instead authorized KBR to manage a competitive subcontracting process for the project.[26] KBR posted the Al Fatah job, received responses from four qualified bidders, and awarded the subcontract, valued at nearly $50 million, to a joint venture of Wilbros, Inc., and Laney. KBR also

PX213

awarded a $10,000 contract to Fugro, Inc., to do a geotechnical analysis of the Al Fatah soil. The Fugro report described the geology in the area as complex and recommended that KBR do further field exploration before beginning horizontal drilling.[27] KBR instead opted against doing the field studies—a fatefully expensive decision, as time would reveal.

The subcontractors on the project mobilized in October 2003 but refused to begin work until a secure camp was established at Al-Fatah. Insurgent activity had made the area increasingly dangerous. By the end of January 2004, the contractors finally began horizontal drilling only to discover that the riverbed's loose subsurface made it impossible to tunnel a hole large enough to accommodate a 40-inch pipe.[28] For the next five months, the contractors drilled unsuccessfully into the crumbling shale and loose gravel, with tunnels repeatedly collapsing. USACE finally cancelled the project in August 2004, a year after it had started. KBR attributed the failure to unforeseen subsurface geologic conditions. But the Fugro report had raised exactly this issue.[29]

A SIGIR inspection found that USACE and KBR failed to ensure that the necessary engineering studies were completed before the project began. "The government and the contractor failed to adequately research, plan, design, and manage the project," the SIGIR assessment concluded, and thus "$75.7 million allocated to the project was exhausted, while only 28 percent of the drilling scope was completed."[30] Because this was a cost-plus contract, the government was unable to recover the taxpayer dollars that KBR unwisely spent—and thus wasted—on this project.

*Oil Sector Challenges*

Partly as a result of continuing cost problems with KBR, the PCO restructured the way it managed projects in the oil sector, melding the resources of the oil ministry's state-owned enterprises with the expertise of design-build contractors. The design-build companies provided engineering, procurement, and technical support, while the Iraqi companies supplied labor and equipment for construction. This collaborative approach allowed the PCO to stretch the remaining IRRF 2 funds for the oil sector and to complete repairs on more gas-oil separation plants than would have been otherwise possible.[31]

By the spring of 2005, the PCO had definitized task orders for 82 oil sector projects worth $781 million and was negotiating another 55 projects worth $323 million. The delay in finalizing the 55 pending projects arose from a change in contracting strategy as well as an "insufficient staff to execute the workload."[32]

The U.S. emphasis on increasing oil production meant that two important and related issues were left largely unaddressed: increasing the supply of refined

PX213

petroleum products and reforming Iraq's subsidy system for those products. With little money in IRRF 2 for refineries, the embassy encouraged Iraq to invest in upgrading them.[33] Estimates for rehabilitating the country's existing refinery system ranged as high as $7 billion.[34]

The shortage of refined fuels in Iraq presented a conundrum. Iraq needed to boost its supplies of refined fuels and increase its production and export of crude oil. But projects to increase refinery capacity and those to improve production competed for the same limited ministry funds. Oil production projects, which quickly put cash in the government's coffers, usually trumped refining. But that outcome limited Iraq's capacity to meet its own refining needs, which made it more difficult to rebuild another vital sector that depended heavily on these fuels: electricity.

### The Electricity Sector

From the start of the reconstruction program, increasing Iraq's electricity production to prewar levels was a top U.S. priority. When Ambassador Negroponte initiated his strategic review in mid-2004, the sector's $5.54 billion allocation—amounting to nearly one-third of IRRF 2—was divided among generation ($2.79 billion), transmission ($1.55 billion), distribution ($998 million), an automated monitoring and control system ($150 million), and security ($50 million).[35] Negroponte's reprogrammings first reduced and then restored IRRF 2 funds for electricity projects, so that by July 2005, the sector was down about twenty percent from its original IRRF 2 allocations.[36] By the end of March 2005, about $5.7 billion in U.S. appropriations and Iraqi funds had been allocated to improve the electricity infrastructure across Iraq.[37] Only the security sector would get more money—in fact, five times more.

Although the U.S. reconstruction program made progress in rebuilding the electricity sector during the two years following the 2003 invasion, by the spring of 2005, Iraq's average daily power output was still below prewar levels.[38] U.S. officials attributed the shortfall to a litany of familiar problems: security, sabotage, shortages of appropriate fuels for generating facilities, limited ministerial capacity, inadequate operations and maintenance, poor program management, and project cancellations caused by cost overruns and realignments.[39]

The government had awarded contracts to four design-build firms to rehabilitate and rebuild the electricity grid in Iraq. Through the PCO, the Defense Department managed three of the firms: FluorAMEC Joint Venture for nationwide generation projects, Washington Group International for transmission and distribution projects in the north, and Perini Corporation for transmission and distribution projects in the south.[40]

PX213

• Building in a War Zone •

About $1.1 billion in USAID money was contracted to Bechtel for the electricity sector work.[41] Bechtel was supposed to implement 22 electricity projects during the 2003 to 2005 period, but SIGIR and USAID Inspector General audits found that Bechtel's projects frequently failed to meet their objectives.[42] The Bechtel effort at the Doura Power Plant, one of the main facilities providing electricity for Baghdad, illustrates the problems that design-build contractors encountered in the electricity sector.

*The Doura Power Plant*

USAID tasked Bechtel to rehabilitate two of the four steam turbines at the Doura power plant. The two turbines were designed to produce 160 MW each, but—because of poor maintenance—neither was operational at the time of the 2003 invasion. Bechtel began work at the plant on August 1, 2003, planning to complete the project within nine months. A series of delays pushed the completion date to the end of 2005, more than a year overdue, and the final cost was more than four times greater than planned (rising from $34.1 million to $121.1 million).[43]

The security situation at the project site had deteriorated in late 2003, and ministry employees and Bechtel's subcontractors refused to go to work. The contractor camp at Doura "was a shoot 'em up place."[44] Bechtel beefed up security, and the U.S. military agreed to guard the gate to the project, a rare example—during this period—of U.S. forces providing infrastructure security. Nevertheless, by the summer of 2004, several subcontractors had pulled out, and Bechtel had to employ new support for the project.

The two Doura turbines were reported substantially complete by June 2005, but only one had been commissioned by February 2006.[45] The other was almost ready, needing only a process called steam blowing before becoming fully operational. Because the project was over budget, USAID decided to turn it over to the ministry to complete the finishing touches.[46] But the ministry was not ready to operate or maintain it.

In August 2006, one of the Doura units experienced "catastrophic failure" because of poor maintenance of the "exciter," a key component that supplies power to the generator's rotor. The ministry removed an exciter from another unit to replace the broken one, and the repaired unit operated until April 2007, when another major failure occurred. USACE/GRD then stepped in and took over the project, eventually bringing both units online by the end of the summer.[47] But more U.S. money had to be expended on this project after it had been turned over to the Iraqis.

PX213

• Chapter 18 •

*Case Studies in Waste*

During 2004 and 2005, rising costs and the re-allocation of IRRF 2 funds forced the embassy to cancel or reduce the scope of several large projects undertaken by Bechtel and Perini in the electricity sector. These included building new power generation plants, as well as restoring transmission and distribution lines.

*Bechtel:* As part of the first realignment of IRRF 2 resources, USAID cancelled the $100.6 million Bechtel project to rehabilitate Units 4 and 5 of the Baiji Thermal Power Plant. The project would have increased the plant's output by 275 MW, but USAID halted the project in late September 2004, just three months after it began. At that time, Unit 4 was producing about 125 MW, just 57 percent of its design capacity. About $7 million was spent on the project before its cancellation.[48]

USAID terminated another large Bechtel effort—the $381 million Mansuria Natural Gas Power Plant project—after very substantial U.S. investment. Bechtel was contracted to build two new electric plants about 65 miles northeast of Baghdad. The site was selected so that the plant could use the natural gas in the Mansuria fields to power its turbines. In February 2004, after an urgent request from CPA for a quick increase in the Baghdad electricity supply, USAID fast-tracked the project, increasing costs. But it was halted in the summer of 2004 in the wake of the first IRRF 2 reprogramming.[49]

The Mansuria power plant project was finally cancelled in the spring of 2005, but not before Bechtel had billed the government for $62.7 million for a base camp and for the purchase of turbines, generators, transformers, and other equipment. In June 2005, USAID transferred much of the Mansuria equipment to the Ministry of Electricity, which said it would install all of it at projects in the Najaf area.[50]

*Perini:* In March 2004, the Defense Department awarded Perini a $500 million IRRF 2 contract to repair the electrical transmission and distribution lines in southern Iraq. By late 2004, however, the PCO concluded that Perini's overhead costs—which included security costs—were too high and began to cut back on issuing task orders. The PCO eventually terminated half of Perini's task orders because of its cost proposals that "significantly exceeded budgets and available funding," and "concerns about the company's management of project schedules."[51]

Perini's Basrah substation task orders illustrate the cost problem. Perini had received a task order in May 2004 for eight projects to improve Basrah's electricity-distribution network. The PCO budgeted $36 million to rebuild five substations and to rehabilitate the distribution network. Substations convert high-voltage electricity from transmission lines to low-voltage electricity that

PX213

feeds distribution lines, which carry power to local communities. In July 2004, Perini submitted a $105 million cost proposal for these projects. The PCO then reduced the project's scope to just the substation work, and Perini consequently dropped its price to about $44 million. By October 2004, further negotiations brought the cost down to about $23 million and work began. Perini completed the substations in September 2005, at a cost of $28.8 million.[52]

A March 2006 SIGIR inspection of the substations reported that, although the construction met the "standards of the design," they were not operating because the Ministry of Electricity had failed to install transmission and distribution lines as agreed.[53] A follow-up visit by SIGIR found the substations finally operational in October 2006—more than a year and a half after Perini completed them.

Between June and October 2004, the PCO issued additional task orders to Perini to build more substations and distribution networks in Babil, Anbar, Thi-Qar, Najaf, Umm Qasr, and Basrah. But by the end of the year, the PCO had terminated much of this work. A SIGIR audit found that Perini completed five of the ten task orders issued under the $500 million contract, and that the PCO cancelled the remainder. The U.S. government ultimately paid $123 million to Perini—including its mobilization costs and its $8 million award fee—on a contract that produced just $26 million in finished projects.[54]

*An Evolving Reconstruction Strategy*

In late January 2004, the embassy used money freed up by de-scoping design-build contracts to initiate a new Rapid Recovery Program with the Ministry of Electricity. The program sought to increase the hours of available power in advance of the January 2005 elections by completing projects begun during the CPA period that had been turned over to the ministry before completion because of cost overruns.[55] Recognizing that the Iraqis did not have the capacity to manage and maintain new infrastructure, IRMO and PCO continued the shift away from the "design-build-handover" model, moving toward inculcating a "build-train-handover" approach, which emphasized not just project completion, but also the need for Iraq to invest in operations and maintenance programs.[56]

**The Water and Sewerage Sector**

The original IRRF 2 plan earmarked $4.33 billion for the water sector, giving it the second-highest infrastructure priority, behind electricity, but Negroponte's strategic reviews cut $2.2 billion from the sector.[57] Nearly $1.5 billion of the remaining funds went to projects to provide clean drinking water for Iraq's population. The rest was used to build sewerage systems, improve irrigation, and repair the 149-mile Sweetwater Canal in southern Iraq, which delivered fresh water to Basrah.[58]

PX213

Three design-build contractors worked on U.S. water projects: Bechtel, FluorAMEC, and a joint venture between Washington Group International and Black & Veatch. By the summer of 2005, USAID had assigned 34 water and sanitation rehabilitation projects worth $369 million in IRRF 1 money to Bechtel.[59] Meanwhile, the PCO issued task orders funded by IRRF 2 to FluorAMEC and to Washington Group to provide potable water, build sewage systems, and help Iraq manage its water resources.[60]

As of June 2005, Bechtel had completed eighteen task orders, repairing six sewage treatment facilities, rehabilitating two water treatment plants, and constructing a large water-supply system for a city in southern Iraq. But a dozen of Bechtel's water projects suffered significant delays.[61]

A GAO assessment identified several reasons for the delays. GAO found that, in addition to ubiquitous security challenges, the CPA's initial assessments for the sector had underestimated water-project costs by 25 to 50 percent, thus requiring the re-scoping of many projects and the cancellation of others. High staff turnover and poor project-site selection also created delays.[62]

A SIGIR audit of the $500 million FluorAMEC contract found that, of four water sector task orders awarded to FluorAMEC in 2004, the PCO had terminated two by July 2005 because of funding constraints caused by project delays.[63] The other two were significant projects, including the largest single IRRF 2 project, which was supposed to provide water to 300,000 Iraqis in the Nassriya area.

*The Nassriya Water Supply System*

The PCO awarded the task order for the Nassriya water supply project in April 2004, estimating then that it would cost between $90 million and $120 million. But shortly after FluorAMEC began construction in August 2004, the PCO's water-sector manager realized that the project's cost would be much higher, and would exceed the available budget. He recommended merging two nearby water projects into the Nassriya project. In January 2005, the PCO definitized the task order for the merged projects at $172 million. Five separate modifications over the next year increased the price tag to just over $244 million. By October 2007, FluorAMEC had finished the Nassriya project and turned it over to the Iraqis, at a final cost of $277 million—almost three times the estimated cost, and about two years late.[64]

Sustaining this complex water treatment facility became an issue. A September 2005 GAO report concluded that "the long-term outlook for sustaining reconstructed Iraqi [water] facilities remains unclear."[65] GAO's concerns were substantiated in late 2007, when SIGIR inspectors visited the Nassriya water project to find it operating at just twenty percent of capacity, three months after being commissioned and transferred to Iraqi control.

PX213

• Building in a War Zone •

*The Falluja Wastewater Treatment System*

Fierce fighting between Sunni-backed insurgents and Coalition forces erupted in Falluja in the spring of 2004 and continued through November when U.S. military officials finally secured the city. Although the fighting had forced many residents to flee, Falluja's population was still around 180,000. With no existing wastewater treatment system, much of the city's raw sewage was dumped directly into the Euphrates River. Sewage ran in the streets, exposing the city's residents to serious public health problems.[66]

Seeing Falluja as a "hub for the campaign of violence aimed at destabilizing Iraq's interim government and driving foreign military forces from the country," the embassy wanted to launch a project that would benefit the city's population and demonstrate the U.S. commitment to enhancing life in that beleaguered Sunni bastion.[67] In June 2004, the PCO issued a $32.5 million task order to FluorAMEC to design and construct a new wastewater treatment system that would serve most of the city. The embassy prioritized the project, identifying it as a "key national reconciliation issue."[68] The task order provided a completion date eighteen months out.[69] Four years later, when SIGIR inspectors visited Falluja to assess the project, work was still ongoing.

FluorAMEC experienced a series of security problems as it attempted to build the Falluja wastewater treatment system. Insurgent activity prevented it from conducting proper site evaluations. One member of a survey team was wounded by gunfire. Contractors also had to deal with unexploded ordnance, improvised explosive devices, and intimidation.[70]

But security was not the only obstacle. The contractor had based its design on an Iraqi engineering firm's plans for a typical wastewater stabilization pond—known as a lagoon system—that recycles water, which is then used for irrigation. The system's principal advantages were "simplicity, low cost, and high efficiency."[71] But in August 2005, the new Iraqi Ministry of Municipalities and Public Works notified the embassy that the lagoon system was unacceptable; it wanted a system of more-sophisticated compact sewage-treatment units.[72] IRMO and PCO spent the next three months negotiating with ministry officials about which system best suited Falluja. Finally, in November 2005, the United States abandoned the lagoon-system design, with all of the investment that had already gone into building it, and agreed to build the more modern system that the minister wanted.[73] This change caused substantial cost increases and more delay. Whether the Iraqis could operate so modern a water treatment system also became an issue.

Because of slow progress, the U.S. government terminated FluorAMEC's task order for the Falluja project in September 2005, after expending $18.7

PX213

• Chapter 18 •

million—more than half the cost of the original task order. Then, between 2005 and 2008, the U.S. government spent an additional $79.3 million—drawn from IRRF, CERP, and DFI funds—on 45 other contracts, mostly with Iraqi firms, in an attempt to complete the system.

SIGIR's 2008 inspection of the Falluja project found that, when finally finished, the wastewater treatment system, which was supposed to serve the entire population of Falluja, will serve a little more than a third of the city's population, will have cost three times its original price, and will have been completed four years later than originally planned. Moreover, serious questions remain about whether the Iraqis can sustain the system once it becomes operational in the spring of 2009.[74]

**The Health Sector**

IRRF 2 allocated $786 million for Iraq's health sector. The CPA designated $439 million of that money for a program to build 150 new primary healthcare centers (PHCs) across Iraq and to renovate 17 hospitals. Another $297 million was allocated for procuring medical equipment for the clinics and hospitals, setting up a mobile blood collection program, rebuilding the Academy of Health Science, training PHC staff, and providing technical assistance to the Ministry of Health. Fifty million dollars supported construction of a modern pediatric hospital in Basrah.[75] None of the Negroponte reprogrammings affected these allocations. Nevertheless, no single U.S. construction program encountered more problems than the health sector's effort to construct 150 PHCs across Iraq.

Fundamental disagreements between U.S. officials and the Iraqi Ministry of Health about the approach to health care stymied sector progress from the outset. U.S. experts wanted to move Iraq away from its hospital-based national health care system to one emphasizing preventive care delivered at local clinics. This change was necessary, U.S. experts believed, to ensure health care delivery in rural areas, where access to basic medical services did not exist.[76] The Iraqi medical community resisted this change, urging reconstruction officials to put U.S. money into renovating hospitals rather than into a new chain of rural clinics. Their complaints had no effect.

*The Primary Health Clinic Program*

In March 2004, the Defense Department awarded a $243 million design-build contract to Parsons Delaware to upgrade 17 hospitals, repair 3 ministry buildings, and build 150 new primary healthcare centers across Iraq.[77] The contract also required Parsons to provide and install medical and dental equipment for each of the primary healthcare centers.[78] In May 2004, Parsons received three task

• 190 •

PX213

orders from PMO, initially valued at $88 million, to build 41 healthcare centers in central Iraq, 49 in the northern region and 60 in the south. The equipment was to cost an additional $70 million.

For a variety of reasons, the program fell far short of meeting its goals. A SIGIR audit concluded that Parsons and the U.S. government agencies in charge of managing the contract—IRMO, PCO, and USACE—shared responsibility for the program's failure. SIGIR cited the high turnover in personnel, poor program management, and weak quality assurance as the primary factors that caused the program to fail.[79] From May 2004 to the end of 2005, eight different contracting officers, six different program managers, and five different PCO sector leads worked on the clinic program.[80] This constant turnover made it difficult to resolve the many problems that arose among the contractor, the U.S. government, Parsons, and the Iraq Ministry of Health.

SIGIR auditors found that the U.S. government's program managers lost track of program costs and schedules. In September 2005, the JCC-I reduced the scope of the project and formally notified Parsons that it had lost confidence in the company's ability to deliver the projects on schedule and within budget.[81] The PCO terminated the contract because Parsons had completed only six clinics, while spending $186 million on the program (about 77 percent of the definitized costs).[82] After the termination of the Parsons contract, over 100 of the partially built clinics were completed through direct contracts with Iraqi firms.

SIGIR inspections of five primary healthcare centers in Kirkuk revealed that the clinics' construction was so shoddy that it "raised questions as to the safety of occupancy of the structures." The inspections concluded that "inadequate quality control and quality assurance on the part of the contractor and the U.S. government, respectively, resulted in not properly identifying and correcting construction deficiencies."[83]

Parsons also had a $70 million contract for the delivery and installation of medical equipment to each of the primary healthcare centers, including X-ray machines, exam tables, patient beds, ventilators, defibrillators, incubators, dental chairs, lights, and cabinets.[84] The clinic supplies began arriving in Baghdad in the spring of 2006, long before any clinic was open, but the U.S. government did "not fully know the type, quantities, and condition of the equipment" it received. By June 2006, Parsons had delivered 115 "full or partial medical equipment sets to the warehouse in Abu Ghraib."[85] Jack Holly, a retired Army colonel who was asked by CPA to manage its logistics operation, said he had to build a new climate-controlled storage facility to house the medical supplies.[86] He cited the Parsons equipment-delivery fiasco as a prime example of poor coordination in Iraq reconstruction operations.[87]

PX213

• Chapter 18 •

**The Demise of Design-Build Contracts**

During 2004 and 2005, reconstruction efforts across the sectors faced many challenges: deteriorating security, poor project integration, insufficient collaboration with and acceptance by Iraqis, weak Iraqi capacity to sustain projects, and poor U.S. contract and program management. Overhead costs skyrocketed as all reconstruction contracts required increasing security. Many projects were descoped and then declared complete, while others were simply cancelled. Virtually every project ended up over budget and behind schedule.

But there was some progress in the program as well. By June 2005, PCO, IRMO, and the JCC-I had decisively moved away from the design-build model, which would yield cost savings and build Iraqi capacity. Reallocated funds frequently went to support security initiatives, operations and maintenance, and programs promoting democracy. But Iraq's security forces were far from ready for the task that confronted them.

PX213

CHAPTER 19
# IRAQI SECURITY FORCES AND COUNTERINSURGENCY

> *In the fall of 2004, it was very difficult. I remember a day of 55 dead bodies of [Iraqi] soldiers who were trying to go on leave from Mosul… Ambushes of three minibuses full of recruits who had just completed basic training and going home. Just endless challenges during that time on the security front.\**

**Lieutenant General David Petraeus**
Commander of MNSTC-I (2004-2005)

The scope and nature of U.S. support to Iraq's security forces changed dramatically after the June 2004 transfer of sovereignty. By Presidential order, the Multi-National Force-Iraq was assigned responsibility for building the Iraqi security forces and it designed an ambitious new program to train, equip, employ, and support Iraq's forces. Faced with escalating violence across the country, MNF-I aimed to boost the Iraqi Security Forces' capacity and effectiveness, so that the Iraqi government eventually could assume control of security in all eighteen provinces.

MNF-I divided responsibilities for Iraq's security forces between two subordinate commands. The Multi-National Security Transition Command-Iraq was responsible for training and equipping Iraqi security forces; the Multi-National Corps-Iraq was responsible for the operational control of trained and equipped units.[1]

## Iraq's Growing Security Needs

In July and August 2004, a formal "troops-to-task" assessment was conducted by a team of senior military officers under the leadership of MNF-I's commander, General George Casey and the commander of MNSTC-I, Lieutenant General David Petraeus. "We started by figuring out what we wanted those forces to do," Lieutenant General Petraeus said. "What are their tasks and purposes? Number two, based on certain assumptions, what types of forces do you need? How are you going to organize them?"[2]

The assessment concluded that the Iraqi forces were not prepared to combat the violent insurgency then threatening the fledgling democracy. The country urgently needed more forces—both police and military—trained, equipped, and prepared for counterinsurgency operations.

---

\* SIGIR interview with General David Petraeus, Commander of MNF-I and former Commander of MNSTC-I, March 2, 2008.

PX213

• Chapter 19 •

The CPA designed the Iraqi police and military forces to deal with the mundane missions of domestic law enforcement and national defense; they had not trained and equipped the police to face heavily armed and well-organized insurgents, nor had they prepared Iraq's army to provide internal security. The April 2004 uprisings made clear that Iraq's security forces did not have the capacity to successfully combat the growing insurgency.[3] Significant change was needed immediately.

MNF-I called for three major initiatives to bolster the Iraqi Security Forces (ISF) structure. The Iraqi Police Service would expand from 90,000 to 135,000; the Iraqi Civil Defense Corps—renamed the Iraqi National Guard—would add 20 battalions, for a total of 65; and the number of border patrol officers would double to 32,000.[4] In all, the plan called for bringing the number of trained and equipped personnel to approximately 271,000.[5] Virtually all Iraq's security forces—from the local police to the special operations forces—would receive counterinsurgency training.

General Casey's and Lieutenant General Petraeus's conclusion that the growing insurgency required a substantially larger Iraqi force heavily influenced Ambassador Negroponte's strategic review of reconstruction funds.[6] The IRRF 2 legislation provided $3.24 billion of its total $18.44 billion to support the ISF, but the expansions to meet the security requirement proposed by MNF-I's troops-to-task assessment immediately created additional funding needs.[7] Ambassador Negroponte's first reallocation included $1.81 billion to strengthen Iraq's forces.[8]

**Building Iraqi Capacity**

In preparing the ISF for its many missions, MNSTC-I faced enormous challenges: equipment procurement lagged behind training and logistical support was nonexistent. MNSTC-I commander Lieutenant General Petraeus knew that building institutions to enable the ISF to prevail in the field would be "very, very painful and very difficult."[9] Petraeus began by improving MNSTC-I's flexibility, funding, and contracting capacity, allowing it to increase quickly the ISF's rate of expansion.[10] MNSTC-I first established flexible contracting mechanisms for procurement and construction, working with an array of military agencies, such as the Joint Contracting Command-Iraq, USACE, the Defense Logistics Agency, and the Air Force Center for Engineering and the Environment.[11] This contracting flexibility was complemented by an increase in capacity as MNSTC-I bypassed PCO and IRMO to get more contracting officers and purchasing agents from CENTCOM.[12] As Lieutenant General Petraeus would later note, this strategy also saved money.

• 194 •

PX213

By October 2004, security construction was booming. Work rapidly progressed at Al Kasik, An Numaniyah, Tallil, and Kirkuk military bases, and was completed at Umm Qasr Naval Base. Police academies were built or refurbished in Mosul, Baghdad, Al Sulaymaniyah, Hilla, Al Kut, Al Asad, and Basrah. The camp at Taji was expanded to accommodate the new elite Special Police Forces, and hundreds of police stations across the country were under construction.[13]

The equipping of Iraq's security forces similarly accelerated. Contracts awarded in early 2004 finally began to deliver. The Iraqi National Guard received 310 vehicles, nearly 30,000 AK-47s, 969 PKM machine guns, and other much-needed equipment in summer 2004.[14] The Ministry of Interior forces began receiving equipment as well, including trucks, sport-utility vehicles, AK-47 assault rifles, Glock pistols, radios, and body armor.[15]

**Transforming the ISF**

Through the second half of 2004 and into 2005, the Iraqi Armed Forces (IAF) and the Iraqi Police Service grew rapidly. MNSTC-I developed new units with greater capabilities, making possible Iraqi participation in counterinsurgency activities.

*Ministry of Interior*

The CPA had envisioned the IPS as a traditional law-and-order police force accountable to local authorities. This vision reflected a community-policing model, where the primary police task is upholding the rule of law by conducting criminal investigations, questioning witnesses, and arresting suspects.[16] As in most insurgencies, however, the police bore the brunt of the violence. Pitted against heavily armed and motivated foes, the IPS experienced high casualty and desertion rates in 2004. The insurgency also undermined the IPS in other ways: training was disrupted, morale was low, and increasing attacks kept many officers confined to their stations.[17]

One of the main conclusions of MNSTC-I's troops-to-task assessment was that the Iraqi police needed better training and equipment. This required more funding, so Petraeus recommended moving more IRRF 2 funds to support MNSTC-I.[18] In June 2004, $849.3 million was reprogrammed to supplement the $1.04 billion already shifted to improve police training, equipping, and employment.[19] MNSTC-I also added specialized courses in leadership, internal affairs, negotiation, investigation, and crowd control.[20] The new programs combined counterinsurgency training with courses in survival skills and counterterrorism.[21]

The CPA's efforts to create Ministry of Interior (MoI) paramilitary units for special operations achieved minimal results. The Emergency Response Units—based on U.S. SWAT teams—were well trained and equipped, but only

PX213

• Chapter 19 •

40 personnel were operationally ready by July 2004.[22] MNSTC-I and the MoI thus created additional heavily armed and specially trained police units called the Special Police Forces, consisting of the Special Police Commandos, Mechanized Police, and the Public Order Battalions. In April 2006, these forces were reorganized into the National Police.[23]

In September 2004, Iraq's Minister of Interior, Bayan Jabr, created the Special Police Commandos, an elite paramilitary force for indigenous counterinsurgency support.[24] When Lieutenant General Petraeus was given a demonstration of their abilities, he was impressed and committed more MNSTC-I funds to support them, developing a six-week intensive training course at the Special Police Commando Academy in northern Baghdad.[25]

The MoI also created the Mechanized Police for rapid response deployment, fixed-site security, and cordon-and-search operations. Training in operations, communications, and maintenance began at Taji Military Base in November 2004.[26] Once trained, these forces were stationed mostly in and around Baghdad, where they conducted vehicle-mounted operations to secure high-value routes, such as "Route Irish," the road to Baghdad International Airport.[27] MNSTC-I awarded a $43.9 million contract to build permanent facilities for the Mechanized Police.[28]

Public Order Battalions rounded out the MoI's elite civil-security forces. They were a lighter force intended for situations not requiring the greater combat power of the Special Police Commandos and the Mechanized Police.[29] Although Public Order Battalions conducted counterinsurgency operations, they primarily performed traditional police functions in very hostile environments.[30] Their first training program began in late September 2004 at An Numaniyah military base, and nearly 1,110 students graduated in mid-November, comprising the first three Public Order Battalions.[31]

*Ministry of Defense*

The size and capability of the security forces under the Ministry of Defense increased dramatically during late 2004 and 2005. The IAF grew from three divisions to ten, incorporating the Iraqi National Guard (ING)—formerly the Iraqi Civil Defense Corps—and developing new specialized counterinsurgency units. The Iraqi special operations forces attained more proficiency, and the Iraqi navy and air force took their first formative steps. The ICDC had been a key Combined Joint Task Force-7 initiative, but it performed disastrously during the April 2004 uprisings, when almost half its personnel deserted. Local commanders reconstituted much of the force as the ING, and implemented new vetting and training procedures to make it a more reliable and effective force.[32]

• 196 •

PX213

The 2004 troops-to-task assessment pointed to the ING as critical to the counterinsurgency effort. The Congress—at Ambassador Negroponte's request—reallocated $442 million in IRRF 2 funds to support its growth.[33] By January 2005, 42 of the 45 ING battalions were manned above 70 percent—a major recovery from their April 2004 collapse.[34] The increasing professionalism of the ING was recognized on January 6, 2005, when the Iraqi Interim Government announced that it would be integrated into the Iraqi army.[35]

Like the MoI, the MoD developed new special counterinsurgency units following the April 2004 uprisings, calling them the Iraqi Intervention Force (IIF), which began operating in Baghdad in June 2004.[36] Although smaller than the ING, the IIF was designed specifically for counterinsurgency operations. Its members received an extra five weeks of training, better equipment, and more tactical support from MNC-I.[37]

The nascent Iraqi Air Force and Navy were the weakest components of the IAF. MNSTC-I, following the CPA's original plan, did not equip the Air Force with fixed-wing fighters or bombers—considering them "unnecessary and incapable of influencing the counterinsurgency fight"—and instead favored aerial reconnaissance and transport aircraft.[38] By August 2004, two Iraqi Air Force reconnaissance aircraft were conducting airborne assessments of damage to Iraqi oil-pipelines. The fledgling Iraqi Navy policed Iraq's waterways to deter smuggling and other illicit activities and to protect Iraq's port and oil assets in the Persian Gulf.[39] Like the Air Force, Iraq's Navy had limited operational capacity.[40]

In July 2004, the MoD established the Iraqi Special Operations Force (ISOF) as an elite force operating outside the Iraqi Armed Forces chain of command.[41] The ISOF consisted of a Commando Battalion, which was trained to conduct raids and seize airfields, and the Iraqi Counter-Terrorism Force (ICTF), which was trained to fight high-threat terrorist organizations.[42] U.S. Special Forces provided instruction to the ISOF, using the U.S. Ranger program for the Commando Battalion and U.S. elite counterterrorism forces programs for the ICTF. In time, the ISOF became the most effective counterinsurgency force in Iraq.[43]

**Training Adapts**

After being trained and equipped by MNSTC-I, Iraqi units were transferred to the control of MNC-I, which deployed them in support of the counterinsurgency campaign. In the fall of 2004, Special Police Commandos acquitted themselves well in offensive operations in Baghdad, Falluja, Samarra, Mosul, North Babylon, and elsewhere.[44] An ISF high-water mark came on January 30, 2005, when 130,000 security force personnel provided security at more than 5,200 polling sites throughout the country so that more than 8 million Iraqis could vote.[45]

PX213

• Chapter 19 •

U.S. commitment to training also increased. From November 2003 to November 2004, the number of U.S. soldiers whose primary mission was to advise Iraqi units grew from 350 to 1,200.[46] Many of these new advisors came from the Army Reserve 98th Division, an institutional-training division known as the "Iroquois Warriors," which had been filling many of MNSTC-I's headquarters billets.[47]

MNSTC-I designed new advisory programs to partner U.S. teams with Iraqi units in basic training, and then to stay together during deployments.[48] Between ten and fifteen U.S. military personnel comprised each team. The advisory teams mentored their Iraqi counterparts and served as a critical link to U.S. logistics, communications, medical, and fire-support capabilities.[49]

Retired General Gary Luck's early 2005 assessment reaffirmed the importance of these embedded advisory teams. He advocated doubling or tripling the number of advisors partnering with Iraqi units, believing that this increase would allow Iraqi units to take the lead sooner in the counterinsurgency campaign.[50] In response to Luck's assessment, MNSTC-I expanded the embedded advisors program. In the late spring of 2005, MNSTC-I changed the name of the partnered advisory teams to Military Transition Teams to reflect more accurately MNF-I's goal of transitioning security responsibility to Iraq.[51]

*Measuring Progress*

During the CPA's tenure, the primary metric used to measure the ISF's progress was the number of security force personnel "on duty." But this metric obscured the distinction between trained and untrained personnel, leading to exaggerated expectations, constantly changing force-size numbers, and consequent credibility problems regarding these numbers.[52] For example, of the 83,789 IPS personnel reportedly on duty shortly before the transition of sovereignty in June 2004, only 26,876 (32 percent) had received any training. Of those trained, more than three-quarters had received just the short Transition Integration Program training, meaning that only 5,857 academy-trained personnel were in the IPS.[53] MoI manning data were further skewed because personnel who were absent without leave or deceased were not removed from the "on duty" rolls. Corrupt Iraqi officials collected the payments to these "ghost employees," who accounted for 20 to 30 percent of the MoI staff.[54]

During 2004, MNSTC-I made a number of important reforms that improved U.S. policymakers' ability to measure progress. Immediately after the transition, MNSTC-I replaced the "on duty" metric with a "trained and equipped" personnel metric.[55] The net result was that the report showed a 75 percent drop in MoI force totals, from 181,297 "on duty" personnel on June 15, 2004, to 47,255 "trained and equipped" personnel on August 25, 2004.

• 198 •

PX213

• Iraqi Security Forces and Counterinsurgency •

In the winter of 2004-2005, MNSTC-I developed a Transition Readiness Assessment (TRA), based on the U.S. military's readiness-reporting system, to measure both training and equipping status, as well as operational effectiveness.[56] MNC-I Transition Teams administered the TRAs every month, reflecting MNF-I's belief that "the best measure of the capabilities of Iraqi units and improvements in the security situation comes from commanders on the ground."[57]

The TRAs graded units on a four-level scale, assessing their ability to conduct counterinsurgency operations. At level one, they could operate independently. At level two, Iraqi units needed MNC-I "enablers"—such as medical evacuation, transport, and fire support—to operate. At level three, Iraqis could operate only alongside MNC-I forces. And at level four, ISF units were still in training or otherwise not capable. Transition teams used the TRAs to estimate how many months it would take a unit to advance to the next level.[58] By July 2005, only one IAF unit was rated at level one, although 24 were judged at level two.[59]

### Iraq Security Forces Fund

National Security Presidential Directive 36 resolved many of the ISF training and equipping problems by authorizing the Defense Department to take charge of all security force development in Iraq. But it did not solve the resource problem. MNF-I still depended on IRRF 2 to fund most of its training programs.[60] The $1.81 billion reallocation approved by the Congress in September 2004 had helped, but MNSTC-I needed more.

By January 2005, MNSTC-I had obligated $1.44 billion of the $2.32 billion available in IRRF 2 funds for the Ministry of Interior security forces. It also had obligated $1.69 billion of the $2.64 billion available to the MoD security forces.[61] Even with this new investment, the expanding ISF were unable to stem the rising violence, and the Iraqi Ministries of Defense and Interior could not sustain and support the forces without U.S. assistance.[62]

It was clear that transitioning security responsibilities would cost much more than IRRF 2 could provide. Thus, in November 2004, MNSTC-I began developing its own supplemental request for the specific purpose of increasing U.S. investment in training and equipping the ISF.[63] After months of negotiation, OMB submitted a congressional budget request on February 14, 2005.[64]

On May 11, 2005, the Congress approved the request, appropriating $5.39 billion to the newly created Iraq Security Forces Fund (ISFF). The Congress provided the Defense Department flexibility on the use of the funds, allowing it to reallocate large amounts of money for different ISF purposes without seeking congressional approval, as was required under IRRF 2.[65] Additional appropriations through 2008 would bring the total value of ISFF appropriations to $17.9

• 199 •

PX213

billion.[66] Coupled with nearly $5 billion in IRRF 2 allocations, investment in Iraq's security sector was by far the single largest Iraq reconstruction expense.[67]

**Perilous Progress**

By the end of June 2005, MNSTC-I had spent $544 million on construction projects for the IAF, up from $57 million a year earlier. It also had spent $346 million on military equipment, compared to just $11 million the previous year.[68] But even with these dramatic increases, new problems surfaced regarding ISF equipment accountability, logistics capability, and sectarian infiltration of the forces.

*Logistics*

In June 2004, the capacity of Iraq's Ministries of Interior and Defense to support security forces in the field was very weak. "There wasn't even a Ministry of Defense building, much less something that you would call a Ministry of Defense," said Lieutenant General Petraeus. Only "about five guys with cell phones and a couple of old generals" remained.[69] Petraeus added that the Ministry of Interior "was nascent, to put it mildly."[70]

Iraqi Army units could not sustain independent operations for any significant period of time without U.S. support.[71] The police struggled with vehicle maintenance and equipment distribution.[72] As a consequence, the ISF remained heavily dependent on MNF-I funding, logistics, transportation, and fire support as their mission evolved and as they became more proficient in counterinsurgency operations.[73]

Continuing security problems across Iraq meant that, for MNSTC-I, strengthening the ministries' logistical capabilities was secondary to equipping and training security forces. Unfortunately, this caused MNSTC-I to overlook oversight functions necessary to account for all equipment. For example, it failed to implement a tracking system for weapons issued to the ISF. As a SIGIR audit concluded, MNSTC-I should have appointed, at its inception, an officer accountable for property (including weapons). It finally did appoint one in the spring of 2005, but the absence of an effectively managed distribution system hindered MNSTC-I's ability to track equipment provided to the Iraqi forces.[74]

In response to the audit, MNSTC-I developed a tracking system that catalogued equipment by serial number, vehicle identification number, or some other unique identifying number. When MNSTC-I issued the equipment to the Iraqis, the Iraqi recipient had to sign for it.[75] But even with these new policies, security problems prevented MNSTC-I staff from consistently collecting physical records, which led to accountability weaknesses. As a consequence of these shortfalls, MNSTC-I could not properly account for many of the weapons it issued, both before and after implementing the new tracking system. Thus, too

PX213

many U.S.-supplied weapons intended for ISF use may have ended up in militia or insurgent hands.[76]

Regarding logistics, MNSTC-I established a fixed-base logistics doctrine for supporting the ISF.[77] This meant that Iraqi supply, transportation, and maintenance capabilities above the unit level would be centrally located and directed to units as needed. In support of the program, MNSTC-I constructed a logistics depot for weapons and equipment at the Taji Army Base and started training a transportation regiment to deliver equipment to the Iraqi security forces.[78] But authority to advise the Ministries of Defense and Interior on logistics and other issues still resided with IRMO and the U.S. mission. It was not until October 1, 2005, that MNSTC-I became responsible for institution-building at the ministerial level, thus ending a bifurcated approach that had hindered progress.[79]

*Sectarianism*

As the ISF grew, a number of serious recruiting and manning problems also arose. MNSTC-I recruited nationally for the Iraqi Army, with the goal of creating a diverse security force whose personnel were not tied to a particular province, sect, ethnicity, or tribal group.[80] Recruiting was more complicated for the police because it was difficult for MNSTC-I to vet recruits for the IPS.[81] It consequently relied on Iraqis, especially community leaders, for vetting, but this approach opened the IPS manning process to politicization. The huge expansion of the police payroll during Ambassador Negroponte's tenure and beyond stemmed in part from the growth of new IPS patronage networks.[82]

The CPA's Transitional Administrative Law outlawed militias, and CPA Order 91, issued in March 2004, established a process to integrate them into the ISF. But the program was underfunded and understaffed.[83] The larger sectarian militias, particularly the Kurdish Peshmerga and the Shi'a Badr Corps, remained largely intact. Muqtada al-Sadr's Mahdi Army—one of the main adversaries during the April 2004 uprisings—was also not part of the integration plan.[84] Compounding the problem, many Iraqis viewed militias as the primary guarantors of security in certain areas, and some members of the Iraqi parliament depended on militias for protection.[85]

Some militia members who integrated into the ISF retained their old loyalties; their sectarian agendas undermined certain segments of the ISF, especially within the Ministry of Interior.[86] The Special Police Force proved most problematic regarding infiltration. The Ministry of Interior's desperate need for experienced recruits forced them to piece together units from Saddam-era commando units and Shi'a militia, each of which were likely to have their own sectarian agendas.[87] The result was a force "riddled with corruption and sectarian influence," whose members

PX213

engaged in routine shakedowns for private gain and committed appalling human rights abuses.[88] These elite Iraqi units, trained and equipped by MNSTC-I for counterinsurgency, were regularly accused of human rights abuses. The sectarian and militia influences in Iraq's security forces fed the country's growing communal violence and threatened the return of abuses commonplace under Saddam.[89]

## Security Redux

In its first year of existence, MNF-I made significant progress in training, equipping, and employing the ISF. MNF-I and the Iraqi Ministries of Interior and Defense expanded the size of the various Iraqi forces and added new counterinsurgency units that could better address Iraq's security needs. Improved measures of training and equipping and unit effectiveness helped MNF-I, CENTCOM, and the Pentagon track progress, adjust policy, and allocate resources. During the year, MNF-I also initiated a large-scale advisory program to mentor and support Iraqi forces in the field and took critical first steps in developing Iraq's logistical capabilities, so that security responsibilities could eventually be transferred.

Progress was expensive. But the additional resources improved the ability of the Iraqi security forces to fight the insurgency. Under the command of MNC-I, Iraqi units performed well in Falluja in November 2004, across the country in late January 2005, and in May 2005, when Iraqi forces engaged in their first coordinated counterinsurgency operation without significant U.S. assistance. During "Operation Lightning," the ISF operations across Baghdad resulted in the capture of 108 suspected insurgents.[90]

Problems nonetheless remained. Iraqi ministerial capacity continued to be weak.[91] MNC-I commanders reported that some Iraqi units who assumed control over their own territory subsequently collapsed. In March 2005, for example, an Iraqi unit that deployed to the border "virtually disintegrated, allowing foreign fighters to enter Iraq from over the Syrian border."[92] The new counterinsurgency mission assigned to the ISF placed them in direct contact—and often confrontation—with the Iraqi populace, and they increasingly became the target of insurgent attacks. Service in the ISF was dangerous: a total of 296 Iraqi police and military personnel were killed in June 2005—nearly ten per day.[93]

The ISF was not yet the professional force that the CPA had envisioned. Many of the elite forces created to fight the insurgency were increasingly infiltrated by sectarian elements and implicated in human rights abuses.[94] Factions within the ISF became politicized, feeding the growing conflict.[95] MNF-I faced a moving target: as it trained and equipped Iraqi security forces for counterinsurgency, it was unwittingly feeding the sectarianism that would rack Iraqi society in 2005 and 2006.

PX213

Chapter 20
# Elections, Rule of Law, and Fighting Corruption

> *Corruption is a disease which is connected with many aspects of the government and in this society. It has become now a social phenomenon from the low rank and class to the higher rank in government… and for that reason there is no remedy for that except privatization. I think the government failed to defeat the corruption.\**

**Ali Baban**
Minister of Planning, Government of Iraq (2006-present)

The United States intended to build strong and democratic national and local governments in Iraq. Notwithstanding this noble goal, the original IRRF 2 plan allocated relatively few resources for governance and democracy programs.

The original plan divided support for democracy, rule of law, anticorruption, and governance programs in Iraq between two sectors: $1.3 billion went to the Justice, Public Safety Infrastructure, and Civil Society sector, while $280 million went to the Education, Refugees, Human Rights, and Governance sector. Most of the money in the justice sector was allocated for physical infrastructure projects, including courts and prisons. Democracy-building activities initially received $100 million—about one-half of one percent of the $18.4 billion IRRF 2.[1] Just $10 million in IRRF 2 funding went to civil-society programs. Almost no money was designated for anticorruption programs.[2]

Although the new constitution and the 2005 elections were signal achievements for Iraq, sustaining democratic institutions required a strong foundation in the rule of law. But, as with many U.S. programs in Iraq, several government agencies engaged in the effort, with none in charge. Moreover, support for Iraq's anticorruption entities—necessary to protecting Iraq's resources from waste or theft—was very weak.

## Building Democracy

In 2003 and 2004, the CPA and then U.S. Embassy recognized the need for more money to support the political process outlined in the Transitional Administrative Law.[3] The CPA moved money into democracy projects just after

---

\* SIGIR interview with Ali Baban, Minister of Planning, November 23, 2008.

PX213

• Chapter 20 •

the November 15, 2003 agreement to return sovereignty to Iraqis. It also reprogrammed $358 million from infrastructure projects to efforts aimed at establishing the democratic foundations for a new Iraq. OMB divided these reprogrammed funds among the Defense Department, the State Department, and USAID to support a wide range of new projects, including developing political parties, building governance capacity, and promoting transparency in political and civic life.[4]

Following Ambassador Negroponte's mid-2004 strategic review, the State Department shifted another $380 million into democracy building, pushing the total reallocation to this sector above $830 million. This new money included $100 million to strengthen local and provincial governments and $200 million to help reduce sectarian conflict.[5] By the summer of 2005, total funding adjustments had increased U.S. investment in democracy building to $942 million.[6]

In late 2004 and 2005, the United States obligated approximately $130 million for non-security assistance to support two national elections and the constitutional referendum in 2005. The Department of State awarded $30 million to the National Democratic Institute and the International Republican Institute to organize political parties and provide training to build their capacity.[7] But almost a third of this money—$41.1 million—supported the work of the new Independent Electoral Commission as it readied Iraq for the three elections.

*The Independent Electoral Commission*

At the end of May 2004, the CPA established the Independent Electoral Commission of Iraq to "organize, oversee, conduct, and implement all elections" required by the TAL.[8] A week later, it promulgated Order Number 96, delineating the "legal framework for genuine and credible elections" to elect the members to a new Transitional National Assembly (TNA), which would eventually follow the CPA and Iraqi Interim Government as the third temporary governing body ruling Iraq in less than a year. CPA Order 96 further provided that the elections, which would be for provincial councils and the Kurdistan Regional Government, as well as the TNA, had to take place by the end of January 2005. Any "political entity" could present a list of candidates to the electoral commission for approval, but one-third of the candidates on any submitted list had to be women.[9]

The UN team that advised the Iraqi government on voter registration and other electoral issues recommended treating the entire country as a single voting district. There was not enough time to draw a system of geographical districts for the 275 assembly seats before the mandated election date.[10] Although easier to organize, the single-district approach had inherent problems. The most significant was that members elected to the assembly would primarily be accountable to their parties—not the voters.

• 204 •

PX213

• Elections, Rule of Law, and Fighting Corruption •

With $40 million in U.S. funding, the International Foundation for Election Systems helped the Independent Electoral Commission prepare for the January 30, 2005 elections by drafting regulations, training staff, planning logistics, and procuring voter registration forms.[11] The electoral commission began distributing voter registration materials in October 2004 and registered more than 14 million Iraqis by January 2005. The ballot offered 256 political entities from which to choose, representing nearly 19,000 candidates running for the Transitional National Assembly, the provincial councils, and the Kurdistan National Assembly.[12]

*Elections and Increasing Violence*

During the summer and fall of 2004, the Iraqi Interim Government and the Coalition faced renewed conflicts with the followers of Shi'a leader Muqtada al-Sadr in Najaf, as well as with insurgents in the Sunni cities of Falluja and Samarra. Grand Ayatollah Sistani stepped in again to end a tense standoff in Najaf between Muqtada al-Sadr and the Coalition-backed ISF.[13] In the wake of the Najaf crisis, Sistani forged a new coalition—the United Iraqi Alliance, combining the major Shi'a parties—to compete for seats in the January 2005 elections. Meanwhile, continuing battles against extremists in Samarra and Falluja hardened Sunni sentiment against the Coalition.

On November 9, 2004, in the wake of the Coalition attacks on Falluja, Iraq's most prominent Sunni political party—the Iraqi Islamic Party—announced its withdrawal from the Iraqi Interim Government, having decided against participating in the January 2005 elections.[14] Sunni Arabs—who had dominated Iraq's governing and economic institutions under Saddam Hussein and who comprised about twenty percent of Iraq's population—had the most to lose from a single-list election.[15] Some predicted that if elections took place without Sunni participation, they "would be cut out of the process of governing and constitution-making for the duration of the transition, leaving them little option but violent resistance."[16]

The elections occurred as scheduled on January 30, 2005. About 130,000 members of Iraq's security forces, with U.S. support, guarded polling stations across the country. The Iraqi Interim Government had banned vehicular traffic and closed the borders two days before the election. On election day, insurgents launched about 300 attacks, killing at least 35 people and wounding more than 100. Despite this violence, attacks were fewer than anticipated.[17]

Some 8.5 million Iraqis, nearly 60 percent of the registered electorate, cast ballots. President Bush hailed the results: "Today, the people of Iraq have spoken to the world, and the world is hearing the voice of freedom from the center of the Middle East."[18]

PX213

Twelve political groups won seats in the Transitional National Assembly. The United Iraqi Alliance, with its coalition of predominantly Shi'a groups, received more than 50 percent of the vote, giving it 140 of the 275 seats. The Kurdish bloc earned 27 percent of the vote, giving it 75 seats. Ayad Allawi's Iraqi List, with about 14 percent of the vote, garnered 40 seats.[19] Only 17 Sunni Arabs were elected, giving them about six percent of the seats in the new body.[20]

Six weeks later, the TNA met for the first time in the heavily fortified Green Zone, but factional disputes delayed the formation of the government until April 2005 when the Presidency Council finally took shape. Kurdish leader Jalal Talabani was named president, and Sunni Sheikh Ghazi al-Yawar and Shi'a Adel Abdel Mahdi were named vice presidents. The Presidency Council then named Shi'a leader Ibrahim al-Ja'afari as Prime Minister.[21]

At the end of April, the TNA approved a cabinet that still needed ministers for five critical ministries: Defense, Oil, Electricity, Industry, and Human Rights. Even with some of these key cabinet positions vacant, Iraq's first elected government was sworn into office on May 3, 2005. A week later, the TNA named a 55-member committee to draft the country's permanent constitution.[22] Only two of the committee's members were Sunnis, sowing yet another seed of dissension that would burst forth in 2006's sectarian violence.[23]

Although many Iraqis and international observers called for extending the deadline for producing a new constitution, the United States pushed the drafting committee to meet the August 15 deadline provided by the TAL. To speed the process, Shi'a and Kurdish leaders removed the negotiations from the drafting committee, placing them instead in the hands of a new Leadership Council. By the end of August, the new council formally submitted a draft constitution to the TNA, just two weeks overdue.[24]

The Sunnis, who had been largely cut out of negotiations by the Shi'a alliance and the Kurds, strongly opposed the constitution. Former Prime Minister Ayad Allawi, a Sunni, and Muqtada al-Sadr, a Shi'a, criticized the content and the hurried, secretive process by which the document was drafted.[25] Sunnis objected to the federal model, favoring instead a stronger central government.[26]

**The Rule of Law**

As the United States sought to help Iraq form a representative government based on a constitution that protected the rights of all Iraqis, it also used reconstruction dollars to try to rebuild Iraq's justice system. A mix of U.S. government agencies—the Department of Defense, the Department of State, USAID, and the Department of Justice—bore responsibility for various aspects of the rule-of-law program in Iraq, but none was in charge of coordinating their disparate efforts.

PX213

• Elections, Rule of Law, and Fighting Corruption •

The lack of any concentrated responsibility for this critical area meant that there was no coordinated leadership on rule-of-law initiatives and a paucity of personnel devoted to the effort. For example, only in June 2005 would the embassy, in response to SIGIR audits, appoint a rule-of-law coordinator for Iraq initiatives.[27]

A State Department Inspector General review of the rule of law in Iraq, issued two and a half years after Coalition forces toppled Saddam Hussein, found an absence of coordination "among U.S. elements in Iraq, between Washington and the field, and between the United States and coalition partners and potential donors or NGO implementers."[28] The report concluded that the government had been very slow to disburse the few funds allocated for rule-of-law projects, particularly regarding capacity building.[29] Most of the funds obligated in 2004 and 2005 in the justice sector went for infrastructure projects, which were supposed to be carried out under the $900 million IRRF 2 contract awarded to Parsons Delaware for border-control posts, police and civil defense facilities, fire stations, and courthouses and prisons.[30] Parsons fell far short of fulfilling its obligations, and the United States terminated the contract in 2007, after expending $333 million.

*Rebuilding Prisons*

In May and June 2003, a Department of Justice team surveyed 21 of Iraq's 151 prisons and detention facilities, finding that almost all had "been looted, trashed, burned, and everything of any value either destroyed or stolen."[31] The CPA estimated that the total cost of rehabilitating the prisons would range from $50 million to $100 million.[32]

Despite its history as a brutal detention center under Saddam, Abu Ghraib, the country's largest prison, was the only maximum-security facility capable of housing dangerous inmates.[33] During the first months after the invasion, the Coalition housed prisoners in temporary facilities—tents or plywood buildings—and in hastily rehabilitated detention centers. In July 2003, the CPA re-opened Abu Ghraib, which had the capacity to hold 400 people.[34]

From March to November 2004, the PMO/PCO issued 53 task orders to Parsons Delaware for construction projects, including prisons, in the security and justice sector. By December 2004, due to Parsons poor progress, the U.S. government cancelled 26 of the task orders, most before much work had been accomplished. A SIGIR audit found that of the 53 original task orders assigned to Parsons, the contractor successfully completed only eighteen, which included the construction of border posts, courts, fire stations, and military or police academies.

The government terminated nine of the 53 task orders, seven for convenience and two for default. The two terminated for default involved two

• 207 •

PX213

Western-style prisons—the Nassriya Corrections Facility and the Khan Bani Sa'ad Corrections Facility. SIGIR's audit of Parsons concluded that "terminated and canceled task orders accounted for approximately $142 million of the $366 million disbursed to Parsons."[35]

Before its contract was terminated, Parsons had completed about 45 percent of the work on two security buildings at the Nassriya prison but much less was accomplished at the Khan Bani Sa'ad prison north of Baghdad. While the Nassriya prison was eventually finished by a follow-on contractor, the Khan Bani Sa'ad story—perhaps the single greatest project failure in the U.S. reconstruction program—illustrates many of the problems the government and its contractors faced in Iraq.[36]

*The Khan Bani Sa'ad Prison*

In May 2004, the CPA awarded a task order for $73 million to Parsons to build a maximum-security prison in Diyala Province. The project, scheduled to begin immediately and be finished by November 2005, had problems from the start.[37] Construction did not begin until November 2004 and progressed very slowly, chiefly because of poor security conditions and weak subcontractor performance.

In the spring of 2006, Parsons notified USACE-GRD that the prison would not be completed until September 2008, three years late. The U.S. government promptly terminated the contract for default, noting that "Parsons has endangered completion both by continued schedule slips and by incurring massive cost overruns that cannot be sustained by the Government … The circumstances that have caused the vast majority of the schedule slips have, in fact, been within Parsons' control."[38]

Parsons attributed the many delays to poor security, contending that when the contract was awarded the U.S. government indicated that Iraq would be relatively stable. The U.S government disagreed, pointing out that neither the original contract nor the task order suggested that Parsons would be working in a permissive environment.[39]

The government continued work on the prison, awarding a fixed-price bridging contract to an Iraqi subcontractor of Parsons. In September 2006, the GRD awarded two contracts to an Iraqi contractor for further construction on the prison and one to a U.S. contractor to rehabilitate the prison's electrical system. None of these contractors made significant progress. In March 2007, GRD sent the Iraqi company a list of items it had failed to deliver and, in June 2007, GRD terminated the contract.

At this point, the U.S. government stopped all work, having spent three years and approximately $40 million on the project, with just 52 percent of it finished.

PX213

Moreover, the completed work had major structural problems, including improperly laid concrete floors and poorly built walls. GRD informed Iraq's Deputy Minister of Justice that it would turn the incomplete Khan Bani Sa'ad prison over to the Iraqi government on August 1, 2007, but the deputy minister refused to accept it, stating that the ministry had no plans to "complete, occupy, or provide security for this facility."[40]

When SIGIR inspectors visited Khan Bani Sa'ad in June 2008, they found an unoccupied, unsecured site with numerous construction problems; $1.2 million worth of material was missing.[41] Ultimately, the U.S. program spent $40 million on the project, terminating it in 2007—without any prospect of return on the investment. Khan Bani Sa'ad will probably never house an inmate. The Iraqis in Diyala derisively referred to the skeletal, half-built prison on the flatlands north of Baghdad as "the whale."[42]

### Building Courts

The Ba'athist constitution consolidated Iraq's civilian court system in the Ministry of Justice, giving Saddam strict executive control over the judicial system. Saddam tightened his stranglehold on the legal system by creating military and security courts.[43] CPA Order Number 2, which disbanded the Iraqi military and intelligence services, abolished these courts as well.[44] An array of other courts—appellate, criminal, civil, and juvenile—continued under the jurisdiction of the Ministry of Justice.

In mid-2003, the CPA and the Department of Justice estimated that the country had 130 courthouses, 570 courts, and 710 judges.[45] Early U.S. judicial reform initiatives foundered, in part because some in the Iraqi legal establishment felt detached from the planning and rehabilitation process. Sermid Al-Sarraf, a member of the Iraqi Jurists Association, testifying before the U.S. Congress at the end of June 2003, said that the CPA had largely left Iraqi lawyers and judges out of discussions about how to reform the country's legal system. He pointed out that a Department of Justice assessment team failed to include a single Iraqi legal professional and that the CPA had inexperienced people making arbitrary decisions affecting Iraqi law. "Iraqis are feeling like strangers in their own country," Al-Sarraf said. "Either through neglect, lack of understanding, or for the sake of expediency, current efforts seem to be avoiding direct Iraqi involvement and their opinions in important decisions."[46]

The CPA created a critically important new legal institution—the Central Criminal Court of Iraq (CCCI)—empowering it to try serious offenses committed since the invasion and giving it jurisdiction over "any and all criminal violations," regardless of where they occurred within Iraq. By August 2003, the new court

PX213

was open in the Green Zone and trying its first cases. The CCCI concentrated its limited resources on offenses involving "terrorism, organized crime, government corruption, and acts intended to destabilize democratic institutions."[47]

To ensure that justice was administered fairly in the new Iraq, the CPA first had to resolve the issue of whether judges who had served under the Saddam regime, and had been Ba'athists, could continue in office. In one of its first orders, the CPA created a Judicial Review Committee to vet former judges and prosecutors for connections to the Ba'ath Party, vesting it with the power to remove those with significant connections.[48] Over the next year, the committee removed about 180 judges.[49]

By the fall of 2003, too few Iraqi courts were up and running. At the end of November, Judge Daniel Rubini, a senior advisor to the Ministry of Justice, sent a memo to CPA's leadership noting that there had only been twenty criminal convictions in Baghdad since the criminal courts re-opened in May and only 80 trials nationwide. Many investigative judges feared bringing cases to trial because of potential attacks. Corruption was also a major problem. "Police, court investigators, and investigating judges hold out for bribes before acting upon a defendant's case," said Rubini.[50]

The CPA also sought to construct courthouses, but did not devote sufficient resources to the effort, partly because the IRRF 2 money was not available until the end of its tenure. In April 2004, the OMB allocated $135 million for the construction and repair of courthouses, as well as for increasing their security.[51] This funding sought to address the very serious problem of judicial security in Iraq. In November 2003, gunmen kidnapped and killed Muhan Jabr al-Shuwaili, the top judge in Najaf, who had supported the creation of a judicial commission to investigate former Ba'ath Party officials.[52] A month later, insurgents killed Youssef Khoshi, a senior judge in Mosul, firing six bullets into his back.[53] Attacks on judges have plagued the reconstruction program since its inception. By the end of 2008, more than 40 judges or their family members had been murdered in Iraq since the 2003 invasion. Many more had quit their jobs and fled the country because of threats.[54]

**Anticorruption Initiatives**

Corruption permeated Saddam Hussein's Iraq. Although it infected every level of Iraq's government, it was concentrated chiefly among the ruling elite of the Ba'ath Party and those who served them. The fact that the problem of corruption persisted after the U.S. invasion is no surprise because, as scholars have noted, "Corruption thrives in the environment of post-conflict reconstruction," which combines "large public procurement projects, major funding infusions, and inadequate government economic management."[55] Throughout the life of the U.S.

PX213

reconstruction program, Iraqi corruption "exerted a corrosive force upon [the] fledgling democracy," contributing to a flight of capital that "directly harmed the country's economic viability."[56]

Corruption in Iraq's government, which Prime Minister Maliki has referred to as a "second insurgency," fundamentally impeded U.S. efforts to develop ministry capacity.[57] Institutions of government were "undermined by the widespread association of political elites with corrupt activities."[58] The oil sector's corrupt practices were particularly egregious.

A 2006 GAO report noted that "about 10 percent of refined fuels are diverted to the black market, and about 30 percent of imported fuels are smuggled out of Iraq and sold for a profit."[59] Some oil-smuggling money reportedly ended up in the hands of insurgents.[60] Failing to exert effective oversight came at a high price: the cost of corruption to Iraq during 2004 and 2005 was estimated at $4 billion per year.[61]

### Developing a New Anticorruption System

To combat this "second insurgency," U.S. officials implemented comprehensive reforms of Iraq's anticorruption system, setting up new institutions and drafting new laws. But the U.S. efforts to help develop effective Iraqi oversight institutions, begun under the CPA and continued by the embassy, produced mixed results, primarily because of underfunding and a lack of coordination among the U.S. agencies administering various initiatives.

Before the U.S. invasion, the Board of Supreme Audit (BSA) served as Iraq's primary government oversight agency. Created by Great Britain during its occupation of Iraq in the 1920s, the BSA had become a paper tiger under Saddam. To augment the BSA's efforts, the CPA established two new anticorruption institutions: the Commission on Public Integrity (CPI) and the ministry inspectors general (IGs) system.[62]

The CPA's conception of how these new entities should function was simple and quintessentially American. An IG would notice something amiss that could be the result of corruption and would forward to the CPI a file documenting his suspicions, along with whatever evidence he managed to gather. The CPI then would conduct a criminal investigation, much as the FBI does upon receiving a referral from a U.S. inspector general. After completing the investigation, the CPI would deliver its findings to the CCCI's investigative judges. The judges, functioning much like U.S. prosecutors, would decide whether to bring the case to trial, close it, or send it back to the CPI for further investigation.[63]

In practice, things rarely ran this smoothly. To begin with, the CPA failed to provide adequate resources to the two institutions it created. Ambassador

PX213

Bremer authorized a budget of just $35 million—$20 million from the DFI and $15 million from IRRF 2.[64] Most of these funds went to the CPI, with the IGs receiving nothing until the very end of the CPA's tenure.

Compounding these funding troubles was the fact that nothing like either institution had previously existed in Iraq. This led to misunderstandings and suspicions about them among ministry officials. Modeled on Hong Kong's much-lauded Independent Commission Against Corruption, the CPI was intended to be Iraq's primary corruption-fighting agency. The IGs were modeled on the U.S. system of federal inspectors general and were designed to be frontline anticorruption watchdogs in every ministry.[65] But the perception of foreign taint burdened both the CPI and the IGs from their inception.

High-ranking Iraqi officials expressed confusion about where these two institutions fit within the country's highly formalized legal hierarchy. Many mistakenly believed that the CPI had independent arrest authority. Similarly, many GOI ministers mistrusted their IGs and perceived them as spies for either the Prime Minister's Office or the Americans. Grafted onto the existing Iraqi legal system and inadequately supported by their U.S. creators, the CPI and the IGs struggled to find their footing in a new, corrupt, and dangerous Iraq.[66]

*The Commission on Public Integrity*

On January 28, 2004, CPA Order Number 55 established the CPI, giving it statutory authority to investigate allegations of corruption against Iraqi governmental officials and to forward cases meriting judicial action to the CCCI. Order 55 further charged the CPI with educating the Iraqi populace about the dangers of corruption, drafting and administering financial disclosure regulations for government employees, and revising Iraq's Code of Conduct for public servants.[67]

Although established in January 2004, the CPI remained leaderless until the waning days of the CPA. Finally, in June 2004, the last month of the CPA's existence, Ambassador Bremer appointed Judge Radhi Hamza al-Radhi as CPI's first Commissioner. Radhi had served as a judge during Saddam's regime. Because of his independence and integrity, he had been imprisoned and tortured.[68]

Almost from the first day of its existence, American advisors were involved with the CPI's operations. The State Department's Bureau of International Narcotics and Law Enforcement Affairs committed $11 million to train the CPI's investigators and to purchase equipment. The CPA allocated this money to the U.S. Department of Justice's International Criminal Investigative Training Assistance Program, which provided a handful of trainers.[69] By the summer of 2005, more than 150 CPI investigators were being trained by 20 ICITAP advisors.[70] Significant INL-funded training programs for the CPI continued until

PX213

2008, when the embassy scaled them back, partly because of the CPI's diminishing effectiveness as a law enforcement institution.

During the eighteen months following its formation, the CPI filed 541 cases with the CCCI, including 42 against ministers, their deputies, and ministerial directors general. Judge Radhi later told a U.S. congressional oversight committee that, for perhaps the first time in Middle East history, "a minister was arrested, in accordance with the rule of law, in a non-political, non-sectarian manner on corruption charges." He noted, however, that early cases like this inflamed strong opposition to the CPI, resulting in efforts to limit its powers.[71]

The CCCI, which received all corruption case referrals, proved an unsatisfactory vehicle for prosecuting them. The overburdened court—charged with prosecuting terrorism, organized crime, and ethnic and sectarian violence—was either unwilling or unable to devote adequate attention to corruption cases.[72] Of the 3,000 cases forwarded to the court by the CPI between 2004 and 2007, the CCCI adjudicated and rendered only 241 guilty verdicts—about 8 percent. "However, the cost of corruption that my Commission has uncovered so far across all ministries in Iraq has been estimated to be as high as $18 billion," Judge Radhi said.[73]

Article 136(b) of the Iraqi Penal Code—first enacted in 1971—also hampered the CPI's ability to investigate corruption. This law provides that no case against a ministry official or former official can go to trial without the permission of the minister of the agency involved. In June 2004, the CPA suspended the law, but the Iraqi government later reinstated it.[74] In the six months from September 2006 to February 2007, Article 136(b) was invoked to block investigations by the CPI in 48 cases involving 102 defendants.[75] CPI Commissioner Radhi believed that the use of Article 136(b) "prevented CPI from transmitting many corrupt employees' cases to court until CPI received permission of the agency it was investigating…presenting obvious problems." In the spring of 2007, Prime Minister Maliki issued an executive order similarly providing that no action could be taken against any minister without permission of the Prime Minister's Office. Radhi stated that this official action blocked many corruption cases, "at an estimated worth of 100 billion Iraqi dinar [approximately $80 million]."[76]

Despite often being stymied by these and many other roadblocks, the CPI's modest efforts to enforce the law soon made it a target. Between 2004 and 2007, 31 CPI employees were assassinated, and 12 family members were murdered. Judge Radhi himself lived under constant threat. He ultimately had to flee Iraq, seeking political asylum in the United States in August of 2007.[77] Since then, the CPI has struggled to open new investigations and has been unable to establish a true nationwide presence. It remains an open question whether the CPI

PX213

is rooted firmly enough in the Iraqi political structure to survive the eventual withdrawal of U.S. support.

*Iraq's Inspectors General*

CPA Order 57, signed by Ambassador Bremer on February 10, 2004, "established within each Iraqi ministry an Office of Inspector General…headed by an Inspector General [IG]."[78] The IGs were initially appointed by Ambassador Bremer to serve a five-year term, which could be renewed for an additional five-year period. By the time the CPA closed its doors in June 2004, Bremer had named 29 IGs to five-year terms. When sovereignty was returned to the Iraqis in 2004, the power to appoint and re-appoint IGs shifted to the prime minister's office.[79]

The duties of Iraqi IGs, virtually identical to those of their American counterparts, include auditing ministry records and activities; conducting administrative investigations; addressing allegations of waste, fraud, and abuse; recommending corrective actions to the minister; and cooperating with investigative agencies and the judiciary on cases.[80] To accomplish these many tasks, the Government of Iraq is supposed to accord the IGs "full and unrestricted access to all [ministerial] offices." Order 57 also gave the IGs the power to subpoena witnesses and documents. The IGs are supposed to report their findings to their minister and to issue an annual report to the Iraqi public.[81]

Today, more than 30 IGs serve in the Government of Iraq. Most of them are housed within its ministries, with the remainder working at quasi-ministerial government entities, such as the Shi'a, Sunni, and Christian Endowments. Each IG's staff ranges in size from the very small (the Ministry of Foreign Affairs IG has approximately 20 employees) to the very large (the Ministry of Defense IG is authorized a staff of several thousand). The budget to pay staff and fund other expenses comes from the IG's parent ministry through the Ministry of Finance.[82]

The perception of the IGs as a foreign antibody inserted into Iraq's body politic by the Americans persists. Many IGs believe that "everyone assumes we're just spies for the Americans." One IG noted: "If we're too active, our minister will fire us." Another said, "If I do my job, they'll kill me."[83]

Since 2004, the U.S. government has provided limited support to build the capacity of Iraq's IG system. CPA Order 57 stated that "to be effective" the IGs required "adequate resources."[84] The CPA, however, budgeted no DFI funds for the IGs, nor was any money forthcoming from the Departments of State or Justice. It fell to the Department of Defense to lead the way.

In March 2004, a Department of Defense Inspector General (DoD IG) official detailed to SIGIR, Dr. Charles Johnson, arrived in Iraq to help the new IGs. He quickly developed good relations with the beleaguered and ill-trained group,

PX213

providing them their first instruction on oversight. Johnson soon submitted a request for $11 million for the IGs to the CPA's Program Review Board, but the proposal lost by one vote. However, on June 27, 2004—the day before the CPA closed shop—Ambassador Bremer overturned the vote, directing that $11 million in Iraqi funds be allocated to support the IG system. But, Johnson recounted, "the IG offices were anything but operational at the time of the transition" to Iraqi sovereignty on June 28, 2004.[85]

In 2005, a team from the DoD IG Investigations and Evaluations Directorate traveled to Baghdad to train and advise the IGs in the government's two largest ministries: the Ministry of Interior and the Ministry of Defense. To this day, the Defense Department, through MNSTC-I, continues to train, mentor, and advise the IGs and their staffs in these ministries. Scant U.S. assistance has been provided to any of the other Iraqi IGs. While the State Department was pouring millions of dollars and dozens of personnel into capacity building efforts at the CPI, it offered almost nothing to the IGs. Finally, in February 2007, State appointed a senior consultant to Iraq's Inspectors General. He alone—with no budget—was responsible for training, mentoring, and advising the non-security ministry IGs.[86]

### The Board of Supreme Audit

CPA Order Number 77, signed by Ambassador Bremer in April 2004, reconstituted the BSA, the oldest and most highly regarded anticorruption institution in Iraq and the analogue to the U.S. Government Accountability Office.[87] The CPA's creation of the CPI and the IG system removed and redistributed some of the BSA's responsibilities, but it still remained the sole government-wide auditing agency in Iraq, with "jurisdiction to oversee all public contracts."[88] Mindful of its 70-year history, the BSA guards "jealously what it perceives as its prerogatives." It has been a reluctant player in the "U.S.-imposed anticorruption structure … often hesitant about providing its audit findings to the two other anticorruption agencies."[89]

When the CPA ceased operations, the BSA was still "severely antiquated in terms of its methodology, in terms of its requirements, and in terms of its abilities." With a staff of 1,200, it had only five computers and "only between 100 and 150 real … auditor[s]—for an entire nation."[90] The first head of the BSA, Dr. Ihsan Karim Ghanem, appointed by Ambassador Bremer, was killed by a suicide bomber on the streets of Baghdad in 2004.[91]

U.S. support for the BSA has been meager. INL allocated money to the GAO for an Arabic translation of its Government Auditing Standards. The GAO also trained a small number of mid-level auditors, but very little capacity-building

PX213

funding was allocated to the BSA.[92] International funding was also limited.[93] Today, the BSA is functional, but its capacity to provide effective oversight of the Iraqi government's expenditures needs bolstering.

*An Uphill Battle*

A 2006 joint survey by SIGIR and the State Department Inspector General found that the institutional framework for Iraqi anticorruption activities that the CPA put in place was "fragile." The absence of adequate financial support further weakened that framework. The survey also found that, "despite the fact that attacking corruption is among the top U.S. priorities in Iraq," the total amount allocated through June 15, 2006, was only $65 million, "less than .003 percent of the total IRRF funding to date." Furthermore, these very modest funds were poorly managed.[94]

SIGIR's subsequent reviews of the Anti-Corruption Working Group, formed by the embassy to oversee U.S. anticorruption programs, found that it suffered from a lack of consistent leadership and interagency coordination. In 2008, a SIGIR audit noted that, despite an articulated commitment to improving the U.S. anticorruption program, much more "remains to be accomplished to establish and implement a comprehensive and effective program."[95]

PX213

CHAPTER 21
INVESTIGATING FRAUD

*If an IG team was in there from the get-go, we may have had free rein, but it would not be the Wild West. They could have told us, if you do A, B, C, D, you won't get in trouble. It might have been a pain in the butt, but we would live with it.\**

**Robert J. Stein**
Comptroller, CPA South-Central Region (2003-2004)
(now serving nine years in prison)

Since April 2003, hundreds of thousands of U.S. civilian and military personnel have participated in the Iraq reconstruction effort. The vast majority of them served honorably, but some did not. During the CPA's existence, when there was little oversight of the reconstruction effort and no fraud-fighting presence in Iraq, an unscrupulous few took advantage of the chaotic circumstances to enrich themselves. Not until SIGIR (then operating as the CPA Inspector General) began to deploy to Baghdad in March 2004, did the United States have meaningful numbers of auditors and investigators permanently based in Iraq to pursue allegations of fraud, waste, and abuse.

As the chart at the end of this chapter shows, there have been at least 35 convictions resulting from criminal misconduct committed during the U.S. reconstruction program. Although this amounts to a small percentage of the total number of Americans who have served in Iraq, the egregious acts by those who chose to break the law harmed the rebuilding effort in two important ways. First, their criminal activity diverted funds from important projects, sidetracking the programs in which those projects played a part. Second, their criminality tarnished the reputation of the United States in the eyes of many Iraqis. Although the scope of the fraud was relatively small, the brazen nature of many of the crimes underscores the importance of maintaining a strong oversight presence from the beginning of any contingency relief and reconstruction operation.

**The Bloom-Stein Conspiracy**

During the U.S. occupation's first months in 2003, rumors of theft and fraud were rife throughout the CPA and contractor communities. Once SIGIR established a presence in the Republican Palace in March 2004, whistleblowers had a place

---

\* SIGIR interview with Robert Stein, former Defense Department contractor, Federal Penitentiary, Petersburg, VA, June 13, 2007.

PX213

to report alleged crimes. In April 2004, one such individual told SIGIR auditors about troubling financial practices he had witnessed—and, in fact, had participated in—as a member of the CPA Comptroller's office. He specifically raised concerns about the regional comptroller for the CPA's South-Central Region.

### The Scheme Unfolds

Robert J. Stein, Jr., served as Comptroller for the CPA's South-Central Region in late 2003 and 2004. Stein, who liked to dress in black and tell people he had been a member of the U.S. Army's elite Delta Force (one of many lies he told), was hired by S&K Technologies, a company with a $5 million contract to provide administrative support services to the CPA. Despite a federal credit-card fraud conviction in 1996—for which he served eight months in prison—Stein was cleared to serve in Iraq. He also had been sued for embezzling $750,000 from a previous employer.[1] SIGIR auditors later learned that Stein reportedly had an accomplice who helped him hide these potentially disqualifying facts.[2]

Stein arrived in Iraq in November 2003, and was sent to the South-Central Region headquarters in Hilla, about an hour's drive southwest of Baghdad and the site of the ancient city of Babylon and Nebuchadnezzar's palace. Stein's first assignment was as director of security, logistics, and re-supply operations. In December 2003, when the sergeant then serving as the South-Central Region's comptroller went on leave, Stein was placed in the position, making him responsible for overseeing, disbursing, and accounting for millions of reconstruction dollars. "I was supposed to be the operations specialist," Stein later said, "I wasn't there to be comptroller."[3]

Almost immediately upon assuming his new office, Stein entered into a criminal conspiracy with Philip Bloom, a corrupt American contractor with burgeoning businesses in Iraq. From December 2003 to June 2004, Stein rigged bids for and funneled contracts to Bloom, who received more than $8.6 million in cash from this fraudulent activity. Bloom repaid Stein and other complicit CPA employees with a variety of kickbacks, including jewelry, deluxe cars, weapons, business-class airline tickets, and cash. Bloom also laundered more than $2 million in stolen funds for Stein and his fellow CPA South Central criminals, using bank accounts in Iraq, Switzerland, and Romania (of which he was a dual citizen).[4]

### The Scheme Unravels

On the day the SIGIR (then the CPA-IG) was appointed—January 20, 2004—Stein emailed Bloom: "I love to give you money."[5] The Bloom-Stein conspiracy was, at that moment, in full tilt. But its unraveling began in April 2004, when complaints about Stein came to SIGIR's attention. In response to these allegations, SIGIR immediately deployed auditors to Hilla to investigate.[6]

PX213

• Investigating Fraud •

SIGIR's auditors met in Hilla with Lieutenant Colonel Deborah Harrison, the South-Central Region's deputy comptroller. Harrison—known as the "bird lady of Hilla" because of the large bird cage in her office populated by more than twenty birds—told the auditors that regional comptroller Robert Stein was on emergency leave in the United States because his son had brain cancer. The auditors later would learn that Stein was actually on a trip to Disneyland with his son, for which Bloom had paid all expenses.[7]

The auditors pressed Harrison for documentation on the South-Central Region's use of money on reconstruction projects. She was unable to provide any records, but attempted to allay concerns by assuring the auditors that she would get all the documents from Stein when he returned. Harrison then emailed Stein, warning him that the SIGIR auditors were onto his criminal scheme. "Don't worry," Stein retorted, "[SIGIR] will never figure it out."[8]

*The Audits Begin*

The auditors were now highly suspicious that significant fraud was occurring in the CPA office at Hilla. They initiated an audit to track every dollar spent by the South-Central Region and to determine how much money the CPA's Comptroller had disbursed to Stein to fund reconstruction activities.

The CPA Comptroller's documents indicated that Stein had received three disbursements totaling $57.8 million in cash.[9] But the lead SIGIR auditor found a picture in Hilla showing Stein surrounded by a mountain of cash, with a sign saying, "$58.8 million." When the auditors alerted the CPA Comptroller to this fact, the Comptroller responded, "I have no idea how much [money] Stein got." The auditors found other incriminating photos, including one showing several hands reaching into a suitcase containing millions of dollars in cash, with one hand—Stein's—sporting an expensive Breitling watch, which he had recently received from Bloom.[10]

After Stein returned to Hilla, SIGIR's auditors confronted him about the fund discrepancies they had found. Stein recounted that he had traveled to Baghdad in January 2004 with three others from Hilla in two unarmored SUVs to pick up tens of millions of dollars in cash for reconstruction from the CPA Comptroller's vault. He said he met with the CPA Comptroller's staff, signed a receipt (which the CPA Comptroller could not produce for SIGIR's auditors), backed up his SUV to the palace entrance, and loaded more than $58 million in cash into the back. "It's amazing," he later said. "The vault had pallet upon pallet of hundred dollar bills. This was more cash than Donald Trump had ever seen in his life. When you work around money like that, it becomes 'so what, it's just paper.'

• 219 •

PX213

The procedures were so lax it was unbelievable. I worked government contracts before in the States, so I know."[11]

After their meeting with Stein, the auditors called the IG with troubling news—there was evidence of rampant fraud in Hilla. The IG promptly deployed a team of investigators to support the auditors' work. SIGIR's lead auditor had documented a litany of various acts of alleged fraud, waste, and abuse by Stein and Bloom. The most flagrant examples involved two pet projects of Stein's: the Babylon Police Academy and the Kerbala Library.

*The Babylon Police Academy*
The Babylon Police Academy was intended to be the leading police training institute for the South-Central Region. Stein awarded eleven contracts and four grants to Bloom for demolition work, barracks and classroom construction, and the purchase of generators and other equipment. Upon review of the contracts and grants, the auditors found that Stein had kept the costs of each contract and grant below $500,000—the ceiling above which he would have had to seek approval from the CPA's Comptroller before award.[12] The auditors further discovered that Stein had disbursed most of the contract and grant money before any contracts had been signed. When SIGIR auditors visited the police academy, they saw that much of the work was incomplete or had not begun.

The contracts and grants for the police academy totaled $7.3 million. Of that, SIGIR concluded that CPA officials "needlessly expended almost $1.3 million in contract funds for duplicate construction" and for "equipment not needed, not delivered, and overpriced." Moreover, Stein "could not account for more than $2 million of disbursed grant funds." The auditors were also "unable to clearly determine" whether the remaining $4 million had been used to meet contract obligations.[13]

*The Kerbala Library*
Located 45 kilometers south of Hilla, the Kerbala Library houses southern Iraq's most important collection of Arabic translations of western literature—as well as books on history, philosophy, politics, and science. Stein awarded five contracts to Bloom's companies, ostensibly to repair the aged library, to purchase furniture and new bookcases, to provide Internet services and landscaping, and to train librarians. Stein also approved a $210,000 grant to pay librarian salaries and issued 33 micro-contracts—worth approximately $535,000—to purchase 30,000 books. The total outlays came to $2,128,916.[14]

When SIGIR auditors visited the library, they found the same problems they had seen at the police academy: circumvention of regulations, improper

PX213

disbursements, and the failure to monitor contracts. The quantity and quality of equipment delivered was far below the requirements stipulated in the contract. For example, the contractor provided only 14 personal computers and desks, not the 68 computers and 60 desks required by the contract. There were no Internet connections. Flimsy plastic patio chairs, not the upholstered metal ones specified in the contract, sat in the hall. The library's manager said he had received no grant money for salaries or books.

SIGIR's auditors concluded that CPA officials had needlessly disbursed more than $1.8 million on the project to rehabilitate the library. Of this, about $1.6 million was spent on work that was never done.[15]

### End Game

During 2004 and 2005, several auditors from SIGIR spent many months in Hilla, carefully reviewing documentation, visiting project sites, and interviewing CPA South-Central Region personnel. A series of audits issued in 2005 detailed numerous findings of egregious misconduct, mismanagement, and potential fraud, concluding that the CPA's "controls" of cash disbursements were so weak that "the South-Central Region paying agents and the DFI Account Manager could not properly account for or support $96.6 million in cash and receipts."[16]

SIGIR's investigators, along with partners from the Internal Revenue Service and Immigration and Customs Enforcement, soon pieced together this spectacular array of incriminating evidence, bringing into relief the complex Bloom-Stein conspiracy and implicating a handful of senior officials in Hilla. SIGIR took the case to Department of Justice prosecutors, who presented it to a grand jury. Subpoenas were issued and, in November 2005, Robert Stein was arrested at his home in Fayetteville, North Carolina.[17]

Six people were eventually convicted for their roles in the Bloom-Stein criminal scheme; another was charged and is awaiting trial. Stein, convicted on money laundering and fraud charges, received a prison sentence of nine years. Bloom pleaded guilty to three counts of conspiracy, bribery, and money laundering, and received a sentence of 46 months. Lieutenant Colonel Bruce Hopfengardner, who conspired to direct contracts to Bloom and received $100,000 in kickbacks, was convicted and sentenced to 21 months in prison. Lieutenant Colonel Harrison, the deputy comptroller at the South-Central Region headquarters, pleaded guilty to fraud after admitted to receiving a Cadillac Escalade from Bloom and stealing more than $300,000 from the CPA. She awaits sentencing.[18]

After a lengthy trial in October 2008, Colonel Curtis Whiteford, once the second-most senior official in Hilla, and Lieutenant Colonel Michael Wheeler, an advisor on South-Central Region reconstruction projects, were convicted of

PX213

conspiracy to commit bribery and for interstate transportation of stolen property. Whiteford and Wheeler also await sentencing.[19]

Although federal prosecutors proved beyond a reasonable doubt that the Bloom-Stein criminals stole at least $8.6 million, the full extent of their fraud was probably greater. How much they actually stole will probably never be known.

### The Cockerham Case

In mid-2006, agents from SIGIR and the Departments of Defense, Treasury, Homeland Security, and Justice initiated a lengthy joint investigation that broke up a multi-million-dollar bribery scheme at Camp Arifjan, Kuwait. On July 22, 2007, U.S. Army Major John Cockerham, the chief perpetrator of the scheme, was arrested at his home in San Antonio, Texas, by SIGIR and other federal agents for bribery, money laundering, and conspiracy. While serving as a contracting officer in Kuwait, Cockerham solicited and received more than $9 million in bribes from Defense Department contractors in exchange for awarding them contracts for bottled water and other goods and services funded in part by money from the Iraq Relief and Reconstruction Fund. Cockerham's wife and sister were also charged for their money-laundering activities. Cockerham and his wife pleaded guilty on January 31, 2008. They await sentencing. Cockerham's sister was scheduled for trial in March 2009.[20]

Major James Momon, Jr., the officer who replaced Cockerham in Kuwait and who continued the crime scheme, also pleaded guilty to bribery and conspiracy to commit bribery. According to his plea agreement, entered on August 13, 2008, Momon accepted $5.8 million in bribes from five Defense Department contractors supplying goods and services to U.S. military bases in Kuwait. He also awaits sentencing.[21]

### Investigative Results

From 2004 to 2008, SIGIR has built a robust investigative capacity, with 26 investigators on staff, including 6 stationed in Iraq. SIGIR's investigations, which frequently have involved teaming with other law enforcement organizations, have produced eighteen indictments, thirteen convictions, five imprisonments, and more than $17 million in fines, forfeitures, and restitution payments as of December 31, 2008.

SIGIR and the other law enforcement agencies operating in Iraq have obtained at least 35 convictions. The following table provides an overview of those cases.

PX213

• Investigating Fraud •

| Name | Charges | Date of Conviction | Sentence |
|------|---------|--------------------|----------|
| Maj. Theresa Baker, USAR Contracting Officer | Conspiracy and bribery | 12/22/2008 | Pending |
| Col. Curtis Whiteford, USAR Senior Official, CPA South-Central Region | Conspiracy, bribery, and wire fraud | 11/7/2008 | Pending |
| Lt. Col. Michael Wheeler, USAR CPA Reconstruction Advisor | Conspiracy, bribery, wire fraud, interstate transportation of stolen property, and bulk cash smuggling | 11/7/2008 | Pending |
| David Ramirez Contractor, Readiness Support Management, Inc. | Bulk currency smuggling and structuring transactions | 10/9/2008 | Pending |
| Lee Dubois Contractor, Future Services General Trading and Contracting Company | Theft of government property | 10/7/2008 | Pending |
| Robert Bennett Contractor, KBR | Violating the Anti-Kickback Act | 8/28/2008 | Pending |
| Maj. James Momon, Jr., USA Contracting Officer | Conspiracy and bribery | 8/13/2008 | Pending |
| Lt. Col. Debra M. Harrison, USA Acting Comptroller for CPA South-Central Region | Conspiracy, bribery, money laundering, wire fraud, interstate transportation of stolen property, smuggling cash, and preparing false tax returns | 7/28/2008 | Pending |
| Maj. John Lee Cockerham, Jr., USA Contracting Officer | Bribery, conspiracy, and money laundering | 6/24/2008 | Pending |
| Melissa Cockerham Wife of Maj. John Cockerham | Conspiracy and money laundering | 6/24/2008 | Pending |
| Lt. Col. Levonda Selph, USAR Contracting Officer | Conspiracy and bribery | 6/10/2008 | Pending |
| Raman International Corp. | Conspiracy and bribery | 6/3/2008 | $500,000 fine and $327,192 restitution |
| Michael Carter Project Engineer, Force Protection Industries | Violating the Anti-Kickback Act | 1/25/2008 | Pending |
| Capt. Austin Key, USA Contracting Officer | Bribery | 12/19/2007 | Pending |
| Maj. John Rivard, USAR Contracting Officer | Bribery, conspiracy, and money laundering | 7/23/2007 | 10 years in prison; 3 years supervised release; $5,000 fine; and $1 million forfeiture order |
| Kevin Smoot Managing Director, Eagle Global Logistics, Inc. | Violating the Anti-Kickback Act and making false statements | 7/20/2007 | 14 months in prison; 2 years supervised release; $6,000 fine; and $17,964 restitution |

PX213

• Chapter 21 •

| Name | Charges | Date of Conviction | Sentence |
|------|---------|-------------------|----------|
| Anthony Martin Subcontractor Administrator, KBR | Violating the Anti-Kickback Act | 7/13/2007 | 1 year and 1 day in prison; 2 years supervised release; and $200,504 restitution |
| Jesse Lane, USAR 223rd Finance Detachment | Conspiracy and honest services wire fraud | 6/5/2007 | 30 months in prison and $323,228 restitution |
| Steven Merkes DoD Civilian, Operational Support Planner | Accepting illegal gratuities | 2/16/2007 | 12 months and 1 day in prison and $24,000 restitution |
| Chief Warrant Officer Peleti Peleti, Jr., USA Army's Food Service Advisor for Kuwait, Iraq, and Afghanistan | Bribery and smuggling cash | 2/9/2007 | 28 months in prison and $57,500 fine and forfeiture |
| Jennifer Anjakos, USAR 223rd Finance Detachment | Conspiracy to commit wire fraud | 11/13/2006 | 3 years probation; $86,557 restitution; and $100 assessment |
| Sgt. Lomeli Chavez, USAR 223rd Finance Detachment | Conspiracy to commit wire fraud | 11/13/2006 | 3 years probation; $28,107 restitution; and $100 assessment |
| Sgt. Derryl Hollier, USAR 223rd Finance Detachment | Conspiracy to commit wire fraud | 11/13/2006 | 3 years probation; $83,657.47 restitution; and  $100 assessment |
| Sgt. Luis Lopez, USAR 223rd Finance Detachment | Conspiracy to commit wire fraud | 11/13/2006 | 3 years probation; $66,865 restitution; and $100 assessment |
| Bonnie Murphy Contracting Officer | Accepting unlawful gratuities | 11/7/2006 | 1 year supervised release and $1,500 fine |
| Samir Mahmoud Employee of U.S. construction firm | Making false statements | 11/3/2006 | 1 day credit for time served; and 2 years supervised release |
| Gheevarghese Pappen USACE Civilian | Soliciting and accepting illegal gratuities | 10/12/2006 | 2 years in prison; 1 year supervised release; and $28,900 restitution |
| Lt. Col. Bruce Hopfengardner, USAR Special Advisor to CPA South-Central Region | Conspiracy, conspiring to commit wire fraud and money laundering, and smuggling currency | 8/25/2006 | 21 months in prison; 3 years supervised release; $200 fine; and $144,500 forfeiture |
| Faheem Mousa Salam Interpreter, Titan Corp. | Violating the Foreign Corrupt Practices Act's Anti-Bribery Provisions | 8/4/2006 | 3 years in prison; 2 years  supervised release; 250 hours community service; and  $100 special assessment |
| Mohammad Shabbir Khan Director of Operations for Kuwait and Iraq, Tamimi Global Co. Ltd. | Violating the Anti-Kickback Act | 6/23/2006 | 51 months in prison; 2 years supervised release; $10,000 fine; $133,860 restitution; and $1,400 assessment |

PX213

• Investigating Fraud •

| Name | Charges | Date of Conviction | Sentence |
|------|---------|--------------------|----------|
| Philip Bloom<br>Owner - Global Business Group, GBG Holdings, and GBG-Logistics Division | Conspiracy, bribery, and money laundering | 3/10/2006 | 46 months in prison; 2 years supervised release; $3.6 million forfeiture; $3.6 million restitution; and $300 special assessment |
| Stephen Seamans, Subcontracts Manager, KBR | Wire fraud, money laundering, and conspiracy | 3/1/2006 | 12 months and 1 day in prison; 3 years supervised release; $380,130 in restitution; $200 assessment |
| Christopher Cahill Regional Vice President, Middle East and India, Eagle Global Logistics, Inc. | Major fraud against the United States | 2/16/2006 | 30 months in prison; 2 years supervised release; $10,000 fine; and $100 assessment (a civil settlement with EGL arising from the same facts resulted in a settlement of $4 million) |
| Robert Stein CPA South-Central Comptroller and Funding Officer | Felon in possession of a firearm, possession of machine guns, bribery, money laundering, and conspiracy | 2/2/2006 | 9 years in prison; 3 years of supervised release; $3.6 million forfeiture; $3.5 million restitution; and $300 special assessment |
| Glenn Powell Subcontracts Manager, KBR | Major fraud and violating the Anti-Kickback Act | 8/1/2005 | 15 months in prison; 3 years supervised release; $90,973.99 restitution; and $200 assessment |

Source: SIGIR, *Quarterly Report to the United States Congress*, January 2009, Section 4.

## Fighting Fraud in Contingency Operations

In the first year of the reconstruction experience in Iraq, weak or absent oversight permitted unscrupulous individuals to commit fraud and other crimes. This hard lesson underscores the need to ensure that future contingency operations include strong oversight from their outset so that U.S. taxpayers' dollars are kept as safe as possible from criminal abuse, and that when crimes do occur, the perpetrators are caught and brought to justice. Although maintaining the proper balance between operational effectiveness and strong oversight will always be challenging in a contingency operation, ensuring a robust inspector general presence from an operation's inception must never again be overlooked as it was in Iraq.

PX213

• Chapter 21 •

## Essential Services Overview – Transition from Negroponte to Khalilzad

| Metric[22] | Pre-invasion | Post-invasion | CPA Transition | Negroponte Era |
|---|---|---|---|---|
| **Electricity Production** | | | | |
| *Megawatts* | 4,075 | 711 | 3,621 | 4,262 |
| **Oil Production** | | | | |
| *Million Barrels per Day* | 2.58 | 0.30 | 2.16 | 2.13 |
| **Iraqi Security Forces** | | | | |
| *Soldiers and Police* | 1,300,000 | 7,000-9,000 | 87,000 | 171,300 |
| **Telecommunications** | | | | |
| *Landline Subscribers* | 833,000 | 0 | 791,000 | 998,000 |
| *Mobile Subscribers* | 80,000 | 0 | 461,000 | 2,422,000 |
| **Human Toll** | | | | |
| *U.S Troop Fatalities* | - | 139 | 862 | 1,745 |
| *Civilian Contractors* | - | 1 | 46 | 217 |
| *U.S. Civilians* | - | ~9 | 52 | 113 |
| *Iraqi Civilians* | - | 7,413 | 16,848 | 29,155 |
| **Financial Cost ($ billions)** | | | | |
| *U.S Funding* | - | $3.45 | $22.93 | $29.21 |
| *Iraqi Funding* | - | $0.00 | $16.00 | $21.03 |
| *International Funding* | - | $0.00 | $13.60 | $13.87 |
| *Total Funding* | - | $3.45 | $52.53 | $64.11 |

In June 2005, Iraq's average daily electricity production was 4,262 megawatts, an increase of approximately 600 megawatts from the year before.[23] A variety of problems—including security, cuts in IRRF 2 funding, and decisions to defer maintenance in favor of short-term generation initiatives—made these levels of production unsustainable.

More than $5 billion was drawn from IRRF 2, Defense Department funds, and Iraqi money to support oil sector reconstruction, but Iraq's unstable security environment—including numerous attacks on pipelines and other oil facilities—delayed projects and reduced production and exports. Thus, oil production had not returned to prewar levels by the time Ambassador Negroponte left Iraq in mid-2005.[24]

PX213

PART IV
**OVERCOMING ROADBLOCKS
TO RECONSTRUCTION**
JUNE 2005 TO OCTOBER 2008

PX213

PX213

## Chapter 22
## Khalilzad's Adaptations

*The Khalilzad approach was very much a systems-management
RAND-style approach, which is come in, assume nothing… and
take a new look from the ground up. What are the mission tasks?
What are the mission resources? And what are the structures to
apply those resources most effectively?\**

**Ambassador David Satterfield**
Deputy Chief of Mission (2005-2006)

The Iraq that Zalmay Khalilzad left in the spring of 2003—after serving as Special Presidential Envoy and Ambassador-at-large to the Free Iraqis—was not the country to which he returned as the new U.S. Ambassador in June 2005. Khalilzad's April 2003 attempt to piece together an interim Iraqi government with Jay Garner had been superseded by a fourteen- month occupation during which the CPA assumed all governing responsibilities. Iraqi factions reacted violently to the occupation, turning against each other and the Coalition. Two years later, the violence had claimed the lives of nearly 25,000 Iraqi civilians, 1,328 Coalition soldiers, and 330 contractors.[1] "Security," Ambassador Khalilzad said, "was a defining issue, shaping everything, and it got more complicated over time."[2]

Khalilzad—the Bush Administration's highest-ranking Muslim official—is an American who was born in Afghanistan and raised as a Sunni. He watched Iraq's descent into violence from the country of his birth, where he had served as ambassador since November 2003. During his ambassadorship, Khalilzad succeeded in helping Afghan leaders draft a constitution, strengthen their new democratic government, and develop their economy. Most notably, Khalilzad pioneered Provincial Reconstruction Teams (PRTs), a novel approach to stabilizing Afghan provinces that placed civilian development experts in military units.[3]

The U.S. reconstruction program that Khalilzad took over in Iraq was several orders of magnitude larger than the effort in Afghanistan. In the economy-of-force operation that Khalilzad led in Kabul, all the relevant high-level military and civilian staff could fit around a single table. In Baghdad, he arrived to an immense, sprawling enterprise, with separate military and civilian headquarters on opposite sides of the city managing separate—and frequently disconnected—reconstruction missions.

---

\* SIGIR interview with Ambassador David Satterfield, former Deputy Chief of Mission, April 14, 2008.

PX213

Iraq's desperate political and security situations required Khalilzad's immediate intervention. The Sunni boycott of the January 2005 elections left the Iraqi Interim Government dominated by Shi'a and Kurdish factions, which maneuvered to consolidate control over federal and provincial institutions. The ensuing polarization fueled an escalation in sectarian violence that slowed the pace of reconstruction and dimmed prospects for national reconciliation. Khalilzad needed a new strategy.

**Strategic Reassessment**

Before the new ambassador's arrival, the Departments of Defense and State had begun independent reviews of reconstruction strategy. Secretary Rumsfeld dispatched retired General Gary Luck to Iraq to review security force training. Luck's call to expand in-the-field training of Iraq's army and police seconded an emerging consensus in Washington for increased investment in the security sector.[4] The new Iraq Security Forces Fund (ISFF), with its $5.7 billion for ISF support, opened a new stream of significant reconstruction funding that, in time, would rival the IRRF in size.[5]

In early February 2005, newly confirmed Secretary of State Condoleezza Rice sent a team to Iraq led by Ambassador Richard Jones, the former CPA deputy administrator.[6] Jones concluded that violence and fragmentation had caused the Iraqi state to fail and called for the reconstruction effort to pivot from a capital-investment approach to a capacity-building focus. The Jones report reached troubling conclusions about the civilian element of the program, finding that reconstruction efforts as then configured—with personnel generally restricted to the Green Zone and only four regional outposts—was ill suited to reviving Iraq's provincial and local governments. Jones called for new joint civil-military teams to deploy into the provinces, possibly placing one in every combat brigade.[7] The Jones team also found that the lack of on-the-job mentoring of police forces led to poor neighborhood policing, a critical weakness in a country in the grip of an insurgency.[8]

Ambassador Khalilzad used these and other reviews to develop a new strategy.[9] First, he sought to broaden Sunni participation in the political process, hoping to convince Sunni insurgents to view the United States as an "honest broker" and thus to encourage them to lay down their arms. Khalilzad believed that only if Sunnis reengaged with the government could he shepherd the country's leaders through the difficult process of writing a constitution.[10]

Khalilzad's second priority was to defeat the insurgency, a task that demanded close collaboration with General George Casey, commanding general of MNF-I. After considering several counterinsurgency strategies, Khalilzad favored the

PX213

"oil-spot" approach advocated by defense policy analyst Andrew Krepinevich, which called for the targeted application of military force to create safe havens from which stability could be extended.[11] The success of the oil-spot approach hinged upon the delivery of reconstruction aid immediately after military clearing operations that suppressed violence. Local populations would support Coalition efforts only if they saw tangible, sustainable improvements in their quality of life. Whether to adopt a more aggressive country-wide counterinsurgency posture or keep the military mission focused on the transition to Iraqi security forces would later become the subject of intense debate between Secretaries Rumsfeld and Rice. Rumsfeld favored the transitional approach.[12]

Finally, Khalilzad had to reevaluate the complex and disjointed reconstruction effort.[13] Upon his arrival in Baghdad, his first act—like Negroponte's before him—was to freeze all IRRF 2 obligations while he conducted a bottom-up review. "He was not convinced that the decisions of 2002 and 2003 were relevant to the world of summer 2005," said Ambassador David Satterfield, Khalilzad's deputy chief of mission.[14] Khalilzad wanted to move funding into civilian stability operations that would help support a counterinsurgency campaign and emphasize IRRF projects that would have an immediate impact. "I came to do a job," said Khalilzad of his IRRF 2 review, "And the question was really, 'how much did I have of the $18 billion?'"[15]

## Reconstruction at an Impasse

Khalilzad landed in Iraq as the actual rebuilding work under IRRF 2 peaked. By the end of June 2005, the Congress had appropriated almost $30 billion in taxpayer dollars for Iraq's reconstruction to an alphabet soup of funding accounts, including IRRF 1, IRRF 2, ESF, CERP, and ISFF.[16] The DFI and international donors also funded reconstruction, but only a small percentage of the international pledges had been kept.[17]

After a long planning and mobilization phase, the sweeping reconstruction program initiated by Ambassador Bremer's CPA—and modified by Ambassador Negroponte's re-programming—was in high gear, with a thousand projects finished and a thousand more underway. Tens of thousands of private contractors from hundreds of firms now worked across Iraq, employing an estimated 180,000 Iraqis on U.S.-funded projects.[18] Of the $18.4 billion IRRF 2 appropriation, nearly three-quarters had been obligated and a third disbursed.[19] Under the structure set up in Baghdad, State Department officials directed most programs, while the Defense Department officials executed the lion's share of their funding, managing seventy cents of every U.S. dollar spent. The rest was divided among USAID, the Department of State, and Treasury.[20]

PX213

Despite extraordinary outlays of cash and other resources, the IRRF 2 program had not achieved its goal of stabilizing Iraq or significantly improving infrastructure outputs. Delivery of essential services continued to lag behind targets established by reconstruction managers.[21] Oil revenues were not yet sufficient to fund all Iraqi government operations and a nationwide reconstruction program.[22] The power grid remained unreliable; fuel shortages, sabotage, and a fragile distribution system caused frequent blackouts, including a nationwide one in August 2005.[23] Rising security costs and the cancellation or delay of dozens of water-sector projects made it unlikely that the Coalition's original goals for potable water and sewage would be met.[24]

In all sectors, rebuilding was more difficult, more expensive, and more time consuming than anticipated, primarily because of continuing violence, but also because of contracting snarls and quality-control shortfalls. Maintaining what the United States built—what officials called the challenge of sustainment—emerged as yet another problem for reconstruction managers. Some completed projects transferred to Iraqi control were falling apart, raising concerns that Iraqi administrators—with their outmoded technical skills, limited management capacity, and uneven access to spare parts and supplies—would be unable to maintain new U.S.-provided facilities.[25]

Despite some significant local successes, the reconstruction effort had yet to generate the hoped-for nationwide goodwill that might temper attacks against Coalition forces and calm tensions among Iraq's rival groups. Most Iraqis perceived their lives as no better than under Saddam; for some, life seemed worse.[26]

**Reconstruction Gaps**

By the spring of 2005, policymakers were beginning to identify internal weaknesses in the reconstruction program. Poor interagency cooperation across the vast enterprise was plainly evident. At least a dozen offices representing six U.S. agencies directly spent IRRF 2 funds. According to a SIGIR report, there was "minimal, if any, integration among the various systems that these offices used to manage information on contracting, finance, and projects."[27]

Incompatible data systems made generating a reliable, consolidated view of all activities a virtually impossible task. The reconstruction program lacked the basic elements of integrated program management, including a database that could match projects with the contracts that fund them and estimate how much their completion would cost. The organizational fragmentation made it difficult to present an accurate picture of progress.[28]

How the institutions that managed reconstruction interfaced with each other was also a leading cause for concern. The July 2003 decision by the CPA to create

PX213

an ad hoc contracting and management structure—the PMO—had by 2005 led to many degrees of separation among Coalition officials, contractors, and the mid- and lower-level Iraqi officials who would inherit what had been built or rebuilt.

At the very bottom of this administrative ladder was an army of contractors who actually did the brick-and-mortar work. The project scopes and requirements to which they built frequently were not determined in partnership with the ultimate customer—the Iraqis—as should ordinarily happen. Instead, the attempt by U.S. program officers to work on the Iraqis' behalf frequently ran afoul of what they wanted. By 2005, most U.S. reconstruction managers were concentrated in the PCO. But USAID, State, MNF-I, JCC-I, and USACE also had contracting and program officers; and for almost all rebuilding projects, the GRD provided quality assurance and independent verification of results.[29]

IRMO was yet another player. The Ambassador made IRMO responsible for overall policy guidance on reconstruction and granted its director the additional title of "Strategic Director of Economics and Governance," with broad responsibilities for ensuring program coordination.[30] In the opinion of Lieutenant General Peter Chiarelli, who returned to Iraq as MNC-I commander in November 2005, IRMO "became another layer that I felt, in many instances, was detached from reality."[31] To Ambassador Khalilzad, however, IRMO was a central node that helped him manage the massive reconstruction enterprise.[32]

The complex of administrative structures that managed Iraq's reconstruction in 2005 and 2006 would have been difficult to navigate in peacetime. But Iraq was not safe, and the violence was killing more contractors each month. MNF-I did not have enough forces to provide fixed security for Iraq's critical infrastructure—oil pipelines, refineries, and electrical substations—and still conduct its other counterinsurgency operations. Contractors and civilian government officials continued to rely heavily on the private sector for security.

Private security services, provided by dozens of companies, protected reconstruction people and programs; security costs could increase a typical project's price tag by up to 22 percent.[33] The need to guard Coalition advisors as they worked within Iraqi ministries drove security costs for capacity-building projects higher still, ranging from 24 to 53 percent.[34] Because contracts let under IRRF 2 assigned responsibility for security to the contractor, expenses for guards and hardening facilities were taken directly from funds that would otherwise have been used for brick-and-mortar work. To make up the difference, mangers had to de-scope projects or provide additional funds.

The insurgency had a powerful second-order effect. By restricting most reconstruction personnel to the Green Zone, the violence disrupted the oversight

PX213

relationships necessary to ensure a project's successful completion. Program managers, contracting officers, contractors, and the engineers who conduct quality assurance normally work together in the field, but insurgent activity made such face-to-face collaboration impossible. Oversight ordinarily done on site was now done via email, sometimes through hired Iraqi surveyors using digital cameras to take pictures—or not done at all. Teams from GRD continued conducting missions from their offices in south, central, and northern Iraq, but security conditions drastically curtailed their size and number.[35]

Although a number of Iraqis found employment as subcontractors, IRRF 2 did not bring about the large-scale job creation originally envisioned. Rather than hiring local firms directly, IRRF 2 introduced a competitive contracting process similar to that used in the United States. Letting contracts under the FAR was a roadblock for many Iraqi firms, most of whom knew nothing about federal contracting. The acquisition regulations mandated by U.S. law thrust Web-based personal identification numbers and thousand-page rulebooks on family-run businesses that had yet to join the global business environment. Online contracting, which frequently entailed bids of more than a hundred pages, bewildered Iraqi contractors who were used to sealing a business deal with just a handshake. Ruth-Ann Ijames, a senior advisor to JCC-I, described the challenge as "trying to make U.S. rules work in a non-U.S. country to mobilize a non-U.S. economy."[36]

A second roadblock for Iraqi contractors was the difficulty of obtaining start-up capital. IRRF 2 contracting used a purchase-order system in which payment was rendered upon delivery of services, not in advance. As a result, Iraqi contractors who had performed satisfactory work on a pay-as-you-go cash basis for military contracting officials in the pre-IRRF 2 days were relegated to the role of subcontractors, working for other firms—often from Gulf States—who had mastered the art of bidding on projects and possessed sufficient capital to cover start-up costs.[37] This subsidiary position, combined with their unfamiliarity with the complexities of modern contracting, left Iraqi companies vulnerable to predatory business partners from the United States and elsewhere.[38]

Ambassador Daniel Speckhard, IRMO's second director, explained that "layers of middlemen" emerged as large multinationals "tried to find local partners to be able to implement their programs."[39] Even as the U.S. objective to "employ Iraqis" grew more pressing, the Coalition's actual capacity to do so trended in the opposite direction. The U.S. program was allowing too many reconstruction dollars to exit Iraq into the coffers of non-Iraqi firms.

IRRF 2 emphasized capital expenditures—the building of new facilities—rather than improving existing infrastructure and the ability of Iraqis to sustain it. The end result was that the U.S. invested billions of dollars for only marginal

PX213

gains in essential services. In the view of one assessment, Iraq was a bleeding patient, hemorrhaging at an alarming rate, kept alive only by expensive American transfusions.[40]

When Khalilzad arrived, many planned reconstruction projects had yet to start and a significant number that were underway would not be finished, giving rise to what became known as the "reconstruction gap."[41] Increased spending on security needs, higher costs for materials, project delays, cost overruns, multiple reprogrammings, and added expenses for maintenance all contributed to the gap between the number of projects promised and the number actually completed.[42] All of this left Khalilzad with a stark bottom line: "There was very little money left," he said, to meet ambitious reconstruction goals.[43]

The program of infrastructure reconstruction set in motion by Bremer, and amended by Negroponte, had yet to achieve its goal of giving Iraq a reasonably modern infrastructure upon which a stable economy could be built. It had produced neither a reduction in sectarian conflict nor a decrease in attacks against Coalition forces.

**Devising a New Strategy**

To assess the situation and propose a way forward, Khalilzad formed the Joint Civil-Military Strategic Planning Group, known informally as the Red Cell. "I took a couple of months to take a top-to-bottom look," Khalilzad said.[44] The current strategy was based on the Joint Mission Plan issued by Ambassador Negroponte and General Casey in February 2005, and a cable sent in April by the Secretary of State.[45]

Khalilzad asked the Red Cell to devise a plan that would break the back of the insurgency in one year and defeat it in three. The Red Cell assessment was more pessimistic: it would take three years to break the insurgency and five years to defeat it.[46] Moreover, the current strategy—overly focused on transitioning security responsibilities to the Iraqis—would fail if it was followed. A new approach was needed, one that recognized that it was unwise to hand off security responsibilities to provinces that were at best only marginally ready to perform them. A different way of linking security and reconstruction was also necessary, one that would require tighter integration of civil and military efforts and greater focus on civilian stability operations in support of a counterinsurgency campaign.[47]

The heavy reliance on private-sector firms to carry out civilian operations meant that major change would come slowly. "The instruments were pretty constrained," one senior advisor to Khalilzad recalled. "On the civilian side, almost nothing is done directly: virtually everything is done through a contractor. It's much tougher. If we didn't have a primary contractor on the scene, you can

PX213

imagine the delay that there would be to put a bid out and get someone over. It's a very tough way to do business."[48]

Ambassador Khalilzad's first impulse was to request a new appropriation from the Congress for civilian stabilization operations. While he was exploring this option, Hurricane Katrina struck New Orleans. After the scale of the devastation became apparent, Khalilzad realized it was unlikely that the Congress would fund new civilian programs for Iraq and instructed his staff to craft a strategy based on the appropriations that had already been made.[49] The strategy they produced focused on three crucial areas: integrating military and civilian activities, achieving the right balance of reconstruction programs, and returning a civilian presence to the provinces.

*Military and Civilian Integration*

Like Ambassador Negroponte before him, Khalilzad recognized the fundamental imbalance between civilian and military assets. Civilian agencies, because of their comparatively small size and concentration in the Green Zone, had limited insight into Iraqi society. On the other hand, military personnel at the brigade level ventured daily into Iraqi neighborhoods, but were not as cognizant of the political process playing out in Baghdad or as expert in economic and political development as their civilian colleagues.[50] This mismatch of expertise and reach, along with poor agency integration, persisted from the occupation's earliest days. As in 2003, the challenge in 2005 was to pair the knowledge of civilian experts with the military's on-the-ground presence.

The concerted movement toward greater integration of civilian and military reconstruction began in mid-2004, when military representatives were encouraged to attend meetings of the embassy country team and the Joint Steering Committee. After General Casey's arrival, a new Deputy Chief of Staff for Political-Military-Economics at MNF-I worked closely with the embassy's Political-Military Counselor and the Director of IRMO on economics, governance, and reconstruction issues. General Casey also established an interagency Strategic Operations Center, which hosted regular briefings for senior military and civilian staff.[51]

Khalilzad and Casey further augmented these joint staff structures. In 2005, IRMO established "post-kinetic" coordinators whose job was to bring civilian reconstruction resources to bear once military operations had stabilized an area. Key civilian and military staff met weekly in core groups on reconstruction, economic policy, political issues, and public communications, each of which became part of an integrated line of operation and reporting in support of goals established in the campaign plan.[52] Joint participation was nurtured, to a degree,

PX213

• Khalilzad's Adaptations •

in the standing committees that the military uses to evaluate effects, including the Effects Synchronization Board. Khalilzad also created the Joint Strategic Planning and Assessment office (JSPA) to conduct strategic planning, provide independent analysis, and act as a liaison to the MNF-I planning and assessment offices.[53] JSPA gave civilian analysts more scope to evaluate strategy options in partnership with the military, whose planning staff dwarfed that of their civilian counterparts. "As Zal always said," Ambassador Speckhard remembers, "he wanted to talk about integration, not coordination."[54]

*Balancing Reconstruction Programs*

"Jointness" was not an end in itself. Above all, U.S. policymakers were asking what combinations of civilian and military operations would produce the desired effects. The Jones assessment team, and later Khalilzad, examined how the panoply of individual reconstruction projects, stovepiped under various categories, could work better as an integrated whole. Military and civilian strategists pushed for an examination of the approaches underlying reconstruction and how civilian operations could be better incorporated into overall strategy.

By mid-2005, five functional types of reconstruction projects were being executed: public infrastructure; quick-impact, high-visibility; democracy building; transitional stabilization; and capacity building. Each had a role in seeking to pacify Iraq and enabling its newly elected government to function independently of Coalition support.

*Public infrastructure projects:* Public infrastructure projects, underwritten largely by IRRF 2, are generally quite complex. With the exception of road building and other simple construction, they require specialized engineering and design capabilities that call for international firms that generally employ non-Iraqi workers. Although a boon to economic development over the long term, upgrades to the water, sewer, electricity, transportation, communication, and oil sectors are expensive, take a long time to complete, usually generate little local employment, and often are invisible to the public.

*Quick-impact, high-visibility projects*: Small, quick-impact projects undertaken by military commanders are at the other end of the reconstruction spectrum. The military has long used "walking around money" to help tactical units on the ground gain community support, improving public perceptions of the Coalition ("winning hearts and minds") and enhancing troop safety (force protection). In Iraq, CERP fulfilled this purpose. Typical projects included trash cleanups—which improve local sanitation, but also can eliminate hiding places for

PX213

improvised explosive devices—constructing soccer fields, and building health clinics.[55] Although many of these projects were congruent with broad Coalition goals, when implemented they often were not coordinated with IRRF 2 programs or the Iraqi government.[56] CERP projects generally did not foster long-term change on their own, but rather served as vehicles for allowing the military to operate with greater local cooperation in the short-term.

*Democracy-building projects*: A small portion of IRRF 1 and IRRF 2 funds went to programs to build democracy and civil society, and to foster reconciliation. The community action and local governance programs developed by USAID specifically for post-conflict situations were the primary instruments supporting this approach. They encouraged participatory politics at the community level, with the goal of helping a viable democratic infrastructure take root. The goal of these "soft" programs was to help Iraqis develop a process for managing their affairs in a democracy and to train civil servants and political leaders at all levels. It was hard to measure the impact of programs that sought to instill an understanding of, and allegiance to, the principles of participatory democracy. Evaluating their success or failure posed challenges for both embassy management and oversight organizations.[57]

*Transitional stabilization projects*: The Coalition pioneered another type of intervention. Aimed at stabilizing violent cities, transitional stabilization projects sought to bridge quick-impact projects with longer-term development efforts. In a prototypical partnership in the spring of 2004, USAID's OTI worked with the 1st Cavalry Division in Baghdad's Sadr City—a key stronghold of the militant Shi'a cleric Muqtada al-Sadr—to repair battle damage and jump-start economic rebuilding in the wake of major clearing operations.[58] On-the-spot grant-making authority and the ability to let contracts without having to comply with some of the more cumbersome parts of the FAR—mostly for projects employing people in the neighborhood—led to quick results.[59] These projects, which ranged from sewer repair to grants to local businesses, were typically initiated and monitored exclusively by Iraqi employees of the Coalition, who operated with relative freedom. Keeping the Iraqi employees who spearheaded these collaborations safe from insurgent attack often meant disguising the project's source of funding; keeping the projects themselves safe meant not advertising their location, even within the Coalition. The full impact of USAID transitional stabilization projects thus remained hidden from both Iraqis and many U.S. officials.[60]

PX213

*Capacity-building projects:* For infrastructure projects to produce the desired essential services and for the Iraqi government to function effectively, personnel at all levels had to be properly trained and supported with effective planning, budgeting, and operations. Some IRRF 2 projects aimed to build this "capacity" where it did not exist and to strengthen existing administrative systems. Capacity-building programs undertaken with IRRF funds ranged from classroom training for operators of electrical power plants to installation of accounting and information management systems inside government ministries. The U.S. investment in Iraq could be sustained only by building institutional capacity within Iraqi ministries and the infrastructure they oversaw.

Ambassador Khalilzad's advisors concluded that they needed a framework for determining the right mixture of these approaches to apply and how to match funding and support for them in the constituent parts of the reconstruction effort.[61] IRMO senior advisors to Iraqi ministries, USAID program managers, MNF-I personnel, and soldiers on the ground each worked according to their own priorities, using their own funding streams, and were only loosely coordinated by an overarching plan.

**Focusing on Provincial Support**

Ambassador Khalilzad moved to expand civilian operations in the provinces, reversing a trend begun after June 2004, when concerns about deteriorating security and budget shortfalls led the State Department to close most CPA provincial offices. The 2004 pullback reflected the views of incoming State personnel who argued for the development of a normal embassy structure, in which fewer Coalition personnel would be involved in Iraqi affairs. In the prevailing State Department view, this would push the Iraqi Interim Government to assume more responsibility. It was also thought that consolidating advisors within the embassy's political and economic sections would enhance the ambassador's in-house capacity to support the management of political and economic affairs. "The State Department tried to make it a normal mission," strategic analyst Andrew Rathmell said, but "quickly discovered this would not be possible."[62]

Hopes of returning to a normal embassy stayed alive, however. Khalilzad had to rebut calls for implementing traditional State Department structures and protocols so often that he came up with a one-line riposte: "As soon as we have a normal mission," Khalilzad would shoot back, "we'll have a normal embassy."[63]

In contrast to the embassy's June 2004 pullback from the provinces, the number of U.S. military personnel assisting in developing Iraqi Security Forces across Iraq had increased over the previous year as MNSTC-I embedded teams of advisors in Iraqi units down to the battalion level. The opportunity to forge

PX213

enduring relationships between Coalition and Iraqi personnel and fine-tune operations from within the system proved to be "a formula for success" in the eyes of its practitioners.[64]

In reconstruction, the strategy of "pulling back to let the Iraqis do it themselves" failed to stabilize Iraq.[65] Iraqi provincial governments remained weak and disconnected from the central government. Improving the delivery of essential services and the credibility of Iraq's government would occur only if provincial institutions were strengthened.

By the late spring of 2005, the embassy reached consensus on two courses of action: to reconstitute its ability to influence and monitor provincial affairs, and to expand on the concept of embedding U.S. personnel in Iraqi institutions in order to develop their capacity for self-rule. Khalilzad seized on the consensus that more should be done locally by launching two far-reaching initiatives: Provincial Reconstruction Development Councils (PRDCs) and Provincial Reconstruction Teams.

*Provincial Reconstruction Development Councils:* In the spring of 2005, the U.S. Embassy reinforced the PRDCs, the first joint Iraqi-American vehicle explicitly aimed at building capacity in regional governing institutions.[66] The councils, which had existed in fifteen provinces in various forms since the CPA days, became an important instrument of coordination that brought together local Iraqi officials and the Coalition personnel overseeing reconstruction in their provinces. Everyone had a seat at the table: elected Iraqi officials and their municipal staffs, USAID representatives, civil affairs soldiers, and embassy representatives. The development councils became a forum where these stakeholders could collectively evaluate provincial needs and match them with available U.S. and Iraqi resources.[67]

In most provinces, PRDCs drew up prioritized lists of projects in line with national and provincial development plans. They then worked to secure funding. In June 2005, IRMO allocated $241 million to the PRDC partnership—$80 million through CERP and $161 million through USAID's Community Action Program and Local Governance Program.[68] Councils also had their own funding provided by the Iraqi government, which, together with U.S. funding, eventually amounted to about $10 million per province.[69] This was a relatively modest amount, but it marked the start of a trend toward greater spending and control by provincial governments.

*Provincial Reconstruction Teams:* Khalilzad's introduction of PRTs in Iraq—a concept he brought from Afghanistan—would be his most enduring contribution to the reconstruction program.[70] Building on the PRDC concept and

PX213

recommendations of the Jones review to project civilian power beyond the Green Zone, he and General Casey deployed mixed teams of military and civilian reconstruction personnel in the regions. Their mission was to work directly with provincial governments and military brigades. Some advisors—including Lieutenant General Raymond Odierno and Dr. Philip Zelikow, the State Department's Counselor—called for small teams to be embedded in every brigade. But Khalilzad preferred fielding fewer larger teams that remained under embassy control and maintained their own arrangements for basing and support.[71]

The PRT initiative in Iraq was originally conceived as a two-phase program over four years. It was to have a complement of ten PRTs, seven led by the United States and one each by the United Kingdom, Italy, and Korea.[72] The PRTs' mission, set forth in a joint cable to the Secretary of State, was to "assist Iraq's provincial governments with developing a transparent and sustained capability to govern, promote increased security and rule of law, promote political and economic development, and provide the provincial administration necessary to meet the basic needs of the population."[73] PRTs harkened back to the CORDS program in Vietnam, in which USAID and military personnel worked on rural development as part of a counterinsurgency campaign.[74]

Secretary of State Rice delayed announcing the PRT program until the Iraqi constitution was ratified by national referendum on October 15, 2005. She did not want to give the impression that the U.S. government presumed the existence of the regional governance structure before the Iraqis had approved it. In a surprise visit to Iraq, she inaugurated the first PRT in Mosul on November 11, 2005.[75]

The PRT program established a formal framework in which military and civilian personnel could work as an integrated team, rather than as a partnership between separate military and civilian offices. Coaxing the Departments of State and Defense to set the terms of their first major operational collaboration in Iraq required a herculean effort that touched off frequent arguments between MNF-I, the embassy, and Washington. A patchwork quilt of memoranda of agreement, cables, and military orders—many of them at cross-purposes—evolved to codify policy for PRTs. More than a year elapsed before basic issues of budgets, the provision of security, and command and control relationships were resolved, delaying full deployment of the PRTs and limiting their early effectiveness in the field.[76]

*PRT control and support:* The PRT command structure put the Department of State in charge of the program. A military deputy was assigned to each civilian team leader. The chain of command and the legalities of program support, however, were ambiguous. By law, State Department officials do not have a place in the military's chain of command. Some Defense Department officials thought

PX213

the PRT guidelines gave the State Department more control over military assets than was permitted under Title 10 of the U.S. Code.[77]

The exceptionally high cost of providing security for PRTs led to a second disagreement. Throughout Iraq, civilians and their movement teams donned armor-plated vests when they ventured "outside the wire," traveling on roads that at times were mined with explosives and through neighborhoods where ambushes sometimes occurred. Only when supported by platoon- and company-level firepower could the PRTs carry out their mission in an active combat zone. The question of whether PRTs were to be supported by military units, as the Department of State wanted, or by private security details, as the Department of Defense advocated, remained unsettled for some time.[78] Early consideration was given to the use of civilian security contractors for all PRTs, but the notion was abandoned because of the unsustainable price tags.[79]

Debates also raged over budget resources. According to the original agreement reached in Baghdad, the Department of State would pay for establishing and hosting PRTs at Regional Embassy Office (REO) sites, and MNF-I would fund those located on forward operating bases.[80] In April 2006, the MNC-I Judge Advocate General ruled that the Department of State was responsible for the mission and that Department of Defense operation and maintenance funds could not be used to support PRTs.[81]

The operational impact of this administrative stalemate was immediate. When the REO in Mosul closed, the Mosul PRT suddenly had no security or housing, forcing the team to relocate to Forward Operating Base Marez. The first PRT, personally launched by the Secretary of State, lost its dedicated budgetary and movement support, forcing it to rely on the support of the base commander, who redirected funds intended for other purposes as a stop-gap. For months the PRT had no budget for office supplies or for maintaining its network of computers, and no dedicated funds of its own for reconstruction.[82]

The unexplored frontier of civil-military operations in Iraq was the root problem, leading to shortfalls in financial and policy support by two departments unaccustomed to working together. "The PRT policy emerged well before resources started flowing," Andrew Rathmell explained.[83] Thus began what one officer called "the REO-PRT shell game."[84] To end the impasse, Major General Bill Caldwell, the MNF-I Deputy Chief of Staff for Strategic Effects, proposed that Ambassador Khalilzad and General Casey sign a memorandum declaring PRTs a joint mission. The draft included a cost-sharing formula that increased the burden on the Department of State. State officials in Washington sought redress from the NSC and the Joint Staff, who left it to the embassy and MNF-I to

PX213

• Khalilzad's Adaptations •

negotiate a solution. It took nearly a year before government lawyers negotiated a cooperative security agreement for the PRTs.[85]

*PRT personnel:* Staffing the PRTs proved another enormous challenge. Finding individuals with the right combination of experience, expertise, and judgment was difficult. The Department of State and other civilian agencies struggled to field adequate numbers of civilian advisors, leaving many PRTs at half capacity and forcing the military to fill positions with soldiers who did not have the right expertise or experience.[86]

The mismatch of needs and staff had significant consequences in the field. A SIGIR review of the PRTs' first year of operation found that a veterinarian was developing agriculture programs, an aviation maintenance manager was a PRT co-leader, and advisors to Iraqi provincial governors included a Navy submariner, an ultrasound technician, and an infantry drill sergeant.[87] On the whole, PRTs were short of personnel who could best assist Iraqis in developing the capacity to administer the economy, establish the rule of law, and foster good governance. Staffing challenges, the unresolved budget issue, and troop shortages at prospective PRT sites hindered the operations of several PRTs and canceled the deployment of another. SIGIR's 2006 audit found that of the nine PRTs and four satellite offices reviewed, four were "generally able," four were "somewhat able," three were "less able," and two were "generally unable" to carry out their mission.[88]

| Iraq and Afghanistan: A Brief Comparison |
| --- |

Early success in Afghanistan in 2002 suggested a model that might work in Iraq in 2003. The U.S. goals in the two countries were similar—to establish democracy and defeat terrorism. But their geopolitical, economic, historical, and cultural differences complicated applying the Afghan model to Iraq.

Soon after Afghanistan's Taliban government was toppled in late 2001, the U.S. installed a new government led by Afghan expatriate Hamid Karzai. Under Karzai's leadership, the Afghan Transitional Authority sought to set the country on a path toward democratic stabilization. Karzai was formally elected president on November 3, 2004, and was still holding that office at the end of 2008.[89]

ORHA's director Jay Garner and Special Presidential Envoy to Iraq Zalmay Khalilzad aimed to replicate the Afghan model by rapidly transferring power to an interim Iraqi authority. But no "Karzai-like" figure emerged. For a variety of reasons, the plan to quickly create a sovereign interim

PX213

• Chapter 22 •

government in Iraq was abandoned. After more than a year of a CPA-led occupation, the U.S. transferred sovereignty to the Iraqi Interim Government in late June 2004. Iraq has since been successively led by Prime Ministers Ayad Allawi, Ibrahim Ja'afari, and Nouri al-Maliki.[90]

In 2002, the vast majority of Afghans had no access to essential services such as water and electricity. By contrast, Iraqi citizens were accustomed to such services under Saddam and expected them to continue after his fall. Afghanistan's literacy rate was less than 30 percent when the Coalition invaded, and Iraq's was 74 percent (though it fell during Saddam's rule).[91] Twenty-five years of conflict had driven educated Afghans abroad, but Iraq retained a large professional class and a capable workforce during Saddam's reign (although many left during the violence that followed his fall).[92]

After the U.S. invasion of Afghanistan, U.S. military forces added to the existing Afghan forces, aiming to develop an army of about 70,000 soldiers.[93] In Iraq, the CPA disbanded the Iraqi Army shortly after the 2003 invasion and began to build a New Iraqi Army of 40,000.[94] Initially, the CPA, not the U.S. military, oversaw the training of the New Iraqi Army. That changed in 2004 when MNSTC-I took the lead in building the Iraqi Security Forces. By late 2008, MNSTC-I had trained well over 200,000 soldiers for Iraq's military.[95]

Ambassador Khalilzad developed PRTs in Afghanistan and adapted the concept to Iraq in late 2005, with a different mission and organizational structure. In Afghanistan, the PRTs sought to "extend the authority of the Afghan government into the provinces in order to develop a stable and secure environment, enable security sector reform and economic and social development." In Iraq, the PRTs worked with Iraqi provincial and municipal councils and civil-society groups to build local governance capacity, carry out reconstruction projects, and improve security in the provinces.[96] In both countries, the PRTs were staffed by civilian and military personnel, but in Afghanistan staffing was weighted toward the military, while in Iraq it was mostly civilian.

Since 2001, the Congress has appropriated about $50 billion for Iraq's relief and reconstruction, while just over $30 billion was appropriated for Afghanistan.[97] About half of the money provided to each country was spent on developing security forces.

PX213

• Khalilzad's Adaptations •

### Clear-Hold-Build

By the fall of 2005, many of the threads of civil-military operations were coming together. The growing recognition in military circles that reconstruction is a tactically useful "non-lethal effect" was expressed in a handbook for commanders, "Money as a Weapons System (MAAWS)." Published by MNC-I in October 2005 and distributed widely across Iraq, MAAWS embraced reconstruction as a "critical enabler of everything we do on the battlefield." "Effective application of all available resources," the handbook begins, "is vital to the success of our mission."[98]

At the same time, MNF-I and the embassy made progress employing civilian reconstruction resources in the military counterinsurgency campaign. Using the partnership between USAID's OTI and the military in Falluja, Najaf, Samarra, and Baghdad as a model, officials developed a more robust package of civilian stability operations for the Strategic Cities Initiative.[99] In the initiative, MNF-I coordinated with the NSC to periodically designate Iraqi cities for targeted intervention.[100] Now, civilian resources would play a major role in what had been a primarily military-led operation.

While the use of reconstruction resources as part of a military-led campaign gained traction with lower-level ground commanders in Iraq, a debate erupted in Washington. High-level backing for a robust counterinsurgency strategy that blended military and civilian resources materialized in the NSC and in the Office of the Secretary of State. It became known as "Clear-Hold-Build," an apt description of the succession of clearing and stability operations undertaken in some of the strategic cities.[101] But Secretary Rumsfeld and General Casey initially opposed this strategy because it would shift the military focus from transitioning security responsibilities to the Iraqis and preparing to draw down U.S. forces.

The rift broke into public view after Secretary Rice testified in favor of the Clear-Hold-Build approach before the Senate on October 19, 2005, only to be rebuffed by Secretary Rumsfeld, who disavowed the strategy in favor of continuing the emphasis on transition.[102] "Anyone who takes those three words and thinks it means the United States should clear and the United States should hold and the United States should build," Rumsfeld said, "doesn't understand the situation. It is the Iraqis' country. They've got 28 million people there. They are clearing, they are holding, they are building. They're going to be the ones doing the reconstruction in that country."[103]

Settling the argument in Rice's favor, the President publicly put his seal of approval on Clear-Hold-Build in a Veterans Day speech on November 11, 2005.[104] Two weeks later, the White House announced "Clear-Hold-Build" as official policy in the document "National Strategy for Victory in Iraq."[105] The strategy's integration of military, political, and economic lines of operation was a

PX213

notable milestone in the evolution of the U.S. approach to Iraq. However, critics inside and outside the government asked whether the strategy was sufficiently resourced—with adequate numbers of troops and funding for civilian operations—to be effective. Disagreements between the President's key advisors in the Departments of State and Defense soon appeared to be impeding the execution of the new strategy.[106]

Within six months of Ambassador Khalilzad's arrival in Iraq, the U.S. reconstruction program moved beyond its original emphasis on infrastructure construction. Bringing to the table experts in development and counterinsurgency refocused the debate on how reconstruction dollars could support political transition and reduce violence. From spring 2005 forward, the reconstruction effort began to shift. Now the emphasis was on modest Iraqi-led projects designed to deliver jobs and services to the most vulnerable, violent, and strategically significant neighborhoods, and on working as much as possible through municipal and provincial institutions.

In engineering this shift, MNF-I and embassy officials forged a more comprehensive model of civil-military integration that returned U.S. civilian personnel to the regions and put them back inside Iraqi institutions. The gradual acceptance of the need to integrate civilian and military efforts, and to embed coalition personnel with Iraqis at every level, amounted to a rejection of CPA's approach to nation-building, which relied primarily on infrastructure construction and did not sufficiently focus on building capacity inside Iraqi institutions.[107] Although the Rumsfeld-Rice debate on overall strategy continued, leaving the Clear-Hold-Build strategy under-resourced for over a year, the utility of its approach became increasingly apparent. Nevertheless, forging cooperative relationships with Iraqis and between U.S. civil and military personnel below the level of the Ambassador and the Commanding General remained a major challenge.

Although Khalilzad and a series of strategic review teams succeeded in reconfiguring reconstruction in accordance with a more sophisticated approach to nation building and the ongoing counterinsurgency campaign, a signal challenge awaited the nascent strategy. The movement of reconstruction personnel out to the provinces and back into Iraqi regional institutions brought to light the deeply dysfunctional relationship between officials in Iraq's central and provincial governments. By 2006, reconstruction managers would come to see that U.S. efforts to make Iraq into a federal democratic state had actively undermined the country's public institutions.

PX213

CHAPTER 23
# RETURNING TO THE PROVINCES

*We must not forget the importance of… improving Iraqi lives
in their communities across the country. Iraq requires not
only good government at the center, but also effective local
government and strong coordination between the provincial and
central governments.**

**Ambassador Zalmay Khalilzad**
U.S. Ambassador to Iraq (2005-2007)

"Go out Assassin's Gate, over the 3rd ID bridge, onto the highway of death, left
down through the overpass of assault, and then turn right," Lieutenant Colonel
Otto Busher said.[1] It was Sunday, June 25, 2006, and members of the Baghdad
PRT were on their way to a meeting of the city's Water and Sewer Board. Their
convoy of Humvees plowed through Baghdad's crowded streets, sirens blaring,
for the short but dangerous trip from the Green Zone to the Amanat—or city
hall—whose 14,000-man workforce provides basic services to Baghdad residents.
With weapons ready, the team entered a conference room and waited for Iraqi
engineers to filter past the armed sentries Busher placed at the door. Tea was
served before the meeting began.[2]

The Army Reservist from New Hampshire was on his third tour in Iraq. Using
skills honed as a city manager in civilian life and as a civil affairs officer in Kosovo, he
was known in reconstruction circles for his dogged pursuit of water projects across
Baghdad. With Busher as essential services lead, the Baghdad PRT had forged links
with the Iraqi engineers working to repair Baghdad's sewer and water system. Only
with the Iraqis' active cooperation would Coalition-sponsored projects be success-
ful. Since their weekly meetings began several months before, the team had helped
the Baghdad Water and Sewer Board make progress toward self-governance; the
board's deputy director general for water, not Busher, chaired meetings.[3]

## The Politics of Service Delivery

At the Amanat that morning, Baghdad's plumbing was not the only item for
discussion: politics were also on the agenda. The struggle for power between
Iraq's warring factions had by now engulfed municipal institutions across Iraq.
Assassinations were an all too common occurrence. More than 50 members of

---

* Ambassador Zalmay Khalilzad, "Remarks by Ambassador Zalmay Khalilzad for the Inauguration of
the Salah ad Din PRT," Baghdad embassy Press Release, October 12, 2006.

PX213

the assorted Baghdad councils—city, district, sub-district, neighborhood—had been struck down.[4] The Amanat itself had been the site of a sectarian "municipal coup." On August 8, 2005, members of the Badr militia, the armed wing of the Shi'a Supreme Council for the Islamic Revolution in Iraq (SCIRI), deposed the mayor, a secular technocrat who had been appointed by the central government. SCIRI replaced him with the man whom the newly elected and SCIRI-dominated provincial council had also appointed governor of Baghdad Province.[5]

One of the first agenda items for the meeting concerned what Busher called "the water pipe to nowhere."[6] An enterprising district council in a Sunni neighborhood had convinced a civil affairs company to build a pipe connecting their constituents, then without fresh water, to a nearby water plant under construction. The plan sounded reasonable to the civil affairs team, which used CERP funds to initiate construction through a local contractor.

There was, however, a technical stumbling block. The plant pumped water at far higher than household pressures. Had the lines been connected, "everyone's faucets would have ended up in their backyards," Busher said.[7] Worse yet was a political issue: the construction commissioned by the civil affairs team crossed a de facto sectarian boundary. The Shi'a who held sway over city government took a "Shi'a first" view of service delivery. Even if the pipes were completed, city officials would not allow the connection to a Sunni neighborhood to be activated.[8]

Next on the agenda was a bigger problem—a water treatment plant in the city's Karkh neighborhood that was being refurbished by the Coalition—the same plant whose generator Task Force Fajr used to turn on Baghdad's lights after the invasion. When finished, the plant and its adjacent reservoir would hold a week's worth of fresh water for Baghdad's seven million residents, a vital supply that would help blunt the insurgents' efforts to sabotage the city's essential services. Engineers on the water board, however, had identified a potential show-stopper. A contractor on the project had purchased a PVC reservoir liner that was not certified for human use. The Iraqi water engineers were outraged and threatened to reject the project unless the liner was replaced.[9]

As Busher worked to address these and other problems, a car bomb exploded two blocks up the street, sending black smoke billowing skyward. Amanat security guards had witnessed insurgents casing Busher's convoy from nearby rooftops, and now an Iraqi police checkpoint had been attacked by a vehicle-borne IED.[10]

Busher's meeting at the Amanat demonstrates many of the issues the reconstruction effort faced in 2006. Projects had to pass through a maze of Iraqi and Coalition institutions before they even began. Coordination was a perennial challenge, in part because it was not always clear who was in charge on either side. To corral the disparate players, the PCO mandated in June 2006 that all relevant

PX213

Iraqi and Coalition authorities sign a memorandum of agreement before moving forward with any project.[11] Even when this rudimentary level of coordination was achieved, political agendas often intervened. Sorting out who was Shi'a and who was Sunni was hard enough; discerning who was following a sectarian agenda and who was impartially carrying out the job was almost always impossible.

As PRTs penetrated the institutions of the Iraqi state, they discovered that sectarianism and the battle for control between provincial and ministerial officials had crippled once-functioning organs of public administration. The never-ending stream of minor catastrophes that resulted made some reconstruction officials compare their lives to the movie *Groundhog Day*, in which the protagonist suffers through a bad day he is condemned to repeat perpetually.[12] The cycle's root causes were apparent. The struggle for power in Iraq's new electoral system, hurriedly arranged in the last days of the CPA, had overwhelmed the public institutions that manage reconstruction. The seeds of this tangled story were planted in 2003, matured in 2004, and finally burst open in 2005.

**Reconstructing Governance in Iraq**

After the 2003 invasion, Coalition military units across Iraq worked to restore local government. They did so under a loose plan, developed after the invasion started, in which Governorate Support Teams composed of civil affairs personnel and USAID contractors assisted military commanders in forming local councils. The plan, however, reflected an unresolved tension in U.S. policy over how to connect the councils formed in neighborhoods, cities, and provinces to the national government in Baghdad. The United States had begun the war without any notion of how the new councils it was installing—and attempting to empower—at the community level of Iraqi society would integrate with existing institutions at the top.[13] The councils immediately found themselves at odds with the provincial directors general, who reported to national ministries in Baghdad and jealously guarded their prerogative to oversee public services and disburse funding.[14]

The debate over how to make central ministries accountable to local communities, and thereby decentralize the power of a formerly tyrannical regime, played out during the CPA era. As Ambassador Bremer sought to usher Iraq into a democratic era, the extent to which Iraq's central and provincial governments would share power remained contested. The CPA put enormous resources into electing councils across Iraq, envisioning a system in which they held most of the power in each province.[15]

Iraqis were divided over Bremer's plan to radically devolve power from Baghdad to the provinces. The Shi'a in the south and the Kurds in the north wanted an even greater devolution of power, one that maximized local control

PX213

in regions with Kurdish and Shi'a majorities. Sunnis and many leaders in the national ministries in Baghdad, however, preferred continued concentration of power in the central government. This struggle was at the heart of what the new Iraqi state was to be. Bremer's actions—including enshrining the decentralization of power in the TAL—marked the opening gambit in what became an extended imbroglio over Iraqi federalism.[16]

**Ministry Politicization**

As the Iraqi debate over federalism unfolded in the occupation's first three years, Iraq's political parties battled not only for victory in the country's first democratic elections, but also for control of the central ministries and their powerful chains of directors general. Under the CPA, members of the Iraqi Governing Council were able to exploit what control Bremer allowed them over the ministries. Each council member was permitted to appoint a minister and thereby control a ministry.[17] This undisguised power grab continued under the Iraqi Interim Government established after the return of sovereignty on June 28, 2004. Given the traditional mores of Arab culture and widespread nepotism under Saddam, IGC members—and many of the interim ministers who followed them—appointed their sons, cousins, and other members of their own families, tribes, or parties to ministry positions, establishing a ruling clique that further stocked ministerial ranks with political loyalists.[18]

Almost overnight, a majority of the ministries of Iraq's central government— once controlled by the Ba'ath Party, but largely staffed by technocrats—became aligned with, and then dominated by, competing political parties. Sadrists seized the Health and Education ministries. Employing the model of service delivery embraced by Hezbollah—the radical Islamic Shi'a group based in Lebanon—they openly deployed ministry resources to build support among the Shi'a underclass. At the same time, SCIRI, the largest Shi'a political party, took control of the Ministry of the Interior—and its powerful internal security apparatus—and later the Ministry of Finance. The major Sunni party, the Iraqi Accord Front, would exert a lesser degree of control over the newly formed Ministry of Defense. Who received services and who did not was increasingly decided on the basis of political allegiance and sectarian identity.[19]

The capture of central ministries by political parties had enduring consequences for reconstruction and for the development of a functioning Iraqi state. A new cadre of directors general was selected for party loyalty rather than technical competence. As parties put their people in power, political rivalries affected relations among ministries and between national and provincial governments. Ministerial appointments of provincial officials injected national party politics

PX213

into local affairs. The result was, at times, a significant breakdown in local order. In several instances, the Minister of Interior refused to assent to the dismissal of police chiefs by provincial authorities and insisted that party loyalists remain in the job—exactly the kind of central-government control Ambassador Bremer's reforms had sought to reverse.[20]

Another dynamic eroded ministry competence. Each time the cabinet was reshuffled and ministers changed, a whole new clique moved into the upper echelons of ministry staff. Institutional knowledge of ministry operations, as well as training paid for by U.S. capacity-development programs, went out the door with their predecessors.

**Local-National Disconnect**

After the January 2005 elections, the Shi'a parties took full advantage of the Sunni boycott to consolidate their influence, especially in the capital. A primer on city politics written by the Baghdad PRT chronicles what happened next. "The lopsided nature of political power, with SCIRI/Badr domination, has created a desperate chemistry for the province," it states. A "political Darwinism" prevailed in which the Shi'a party elite centralized authority.[21] The result of the Sunni boycott was that Iraq's capital was ruled by what one official characterized as a "Shi'a dictatorship."[22] During this period, SCIRI deposed Baghdad's mayor and took over the Amanat.

The Shi'a takeover opened rifts between provincial councils, stacked with SCIRI supporters, and many of the 437 neighborhood, 195 sub-district, and 96 district councils that USAID had established across Iraq as part of its LGP.[23] Although provincial councils were supposed to represent a province's entire population, the Sunni boycott of the 2005 election yielded Sunni-majority provinces ruled by Shi'a councils. Projects and services came to be distributed along sectarian lines, reflecting the "Shi'a first" mentality that Lieutenant Colonel Busher witnessed at the Amanat. By mid-2006, the party grip was entrenched. "SCIRI/Badr has worked diligently to maintain and increase their hold on power," the primer continues, "trying to delay new elections or any structural changes that might weaken their position."[24]

One of USAID's local governance advisors took an even bleaker view of the effect of the elections. During 2004, the LGP had worked to "solidify and extend the role of sub-national governmental institutions to prevent, or at least discourage, a recentralization of power."[25] "The party list system sabotaged [the LGP]," the advisor said, laying waste to two years of diligent work fostering authentic local governance in Iraq.[26] USAID had helped create a mechanism in Iraq for

PX213

local representation that was undermined both by the electoral formula and a disregard for decentralization that dated back to the CPA.[27]

Issues of federalism and provincial government that would directly impact reconstruction were again on the negotiating table when the constitution was drafted during the late spring and summer of 2005. Ambassador Khalilzad pressured the constitutional drafting committee to clearly demarcate federal from provincial responsibilities, but the issue proved too explosive to settle.[28] The draft constitution deferred until a later time the question of provincial powers—and thereby how public administration would be controlled at the local level.

The continuing disagreements between Iraq's Shi'a, Sunni, and Kurdish populations, over how much power the central government should have nearly caused the constitutional referendum to fail. In the electoral formula governing the referendum process, a simple majority was required for approval, but the constitution could also have been defeated by a "no" vote with a two-thirds majority in three or more governorates.[29] When Iraqis went to vote on October 15, 2005, Kurdish- and Shi'a-dominated provinces supported the constitution by overwhelming margins, while Sunni-dominated provinces voted against it in equal measure.[30] A simple nationwide majority was achieved, but the constitution narrowly missed defeat by the governorate rule. Two predominantly Sunni provinces—Anbar and Salah Al-Din—voted against the constitution by more than the required two-thirds majority. Although a majority of voters in a third province—Ninewa—rejected the constitution, it fell short of the two-thirds majority required to qualify as a "no" vote, allowing the constitution to be passed.[31]

Under the new constitution, national elections were held two months later, on December 15, 2005, to select members of Iraq's first permanent legislature. This time, Iraq was divided into electoral districts by province, although the party-list system remained in force.[32] Sunni participation in the elections brought some balance to the distribution of power in the National Assembly, but elections for local and provincial offices were postponed repeatedly, perpetuating the Shi'a over-representation on provincial councils. The failure to hold provincial elections complicated reconstruction efforts at the local level. Who held government office did not necessarily reflect who held power in the province. As a result, provincial elections remained a political grievance held by almost all non-Shi'a parties, as well as those Shi'a parties not aligned with the ruling coalition.

Three years would pass before the issue was resolved. Provincial elections planned for September 2006 were postponed until March 2007 after the Shi'a-majority parliament failed to appoint an electoral commission and draft election bylaws. Soon another delay was announced, putting off still further the prospect of a democratic rebalancing of Iraq's provincial and local governments. Throughout

PX213

2007, parliament refused even to consider implementing legislation on provincial powers. A law eventually passed in February 2008 but was then vetoed by the Presidency Council. Although the veto was later rescinded, the law would not come into effect until a law on national elections was fashioned.[33] On September 24, 2008, the Provincial Election Law was finally passed, mandating national elections before January 31, 2009.[34]

The long delay in holding competitive local elections left political conflicts simmering across the country, complicating efforts of reconstruction personnel to work at the local level. Despite the approval of the new constitution and the seating of an elected national parliament, the organization of Iraq's local governments, as specified in CPA Order 71, was by now a poor guide to who actually wielded control. In the absence of a clear legal framework, power fell to those best positioned to seize it, both inside and outside institutions of government. The resulting breakdown between the central government and provincial councils—and in turn between the provincial governments and neighborhood and district councils—crippled the administration of public services the U.S. reconstruction program was trying to rebuild.

**Regional Responses**

In response to the fragmentation of the Iraqi state, military and civilian officials used USAID soft programs, PRTs, and brigade combat teams to strengthen local administrative capacities and connect provincial governments with national ministries. The sheer logistics of setting up the PRTs and assessing the status of reconstruction and institutional development in each province was difficult. All PRTs were explicitly tasked to bridge the local-national disconnect, but it was often the larger and more powerful brigade combat teams who made the most difference. By 2006, brigade commanders came to see improving local governance as an essential part of their mission. In addition to their primary tasks of securing the battle space, brigades often would provide security for local government facilities and at times for local officials. They also used their CERP funds and civil affairs brigades to support local government initiatives.

Both brigade commanders and PRT leaders found that pushing past Ba'athist practices and transforming the roles and responsibilities of local officials was difficult. One PRT official commented, "It's still 'big man' diplomacy," in which people rather than institutions wield power.[35] Provincial council members, not used to discretionary authority, were often reluctant to act independently on behalf of their constituencies. "In a post-authoritarian society, where you have to be told what you are allowed to do (not what you aren't), provincial and local government leaders are not going to be risk takers," a PRT political officer explained.

PX213

• Chapter 23 •

"In the end, if people do not know what they are allowed to do, or what they are supposed to do—they will end up either doing nothing, or they will do what is in their best interest."[36]

In Diyala province, relations deteriorated so badly that the governor resorted to arresting directors general to force them to attend council meetings. Despite the trying conditions, PRTs and brigade commanders helped create legitimacy for the provincial governments and had some success at uniting officials from different sects. One PRT leader said, "Without our presence you would have a full-scale civil war."[37]

Coaxing local officials to work together productively was only half the battle. Relations had to be nurtured between municipal governments and the provinces, and between the provinces and Baghdad. In many places, relationships were so lacking that provincial leaders wanting to meet with ministerial officials transmitted their requests through the embassy.[38] Many also relied on Coalition commanders for transportation to and from Baghdad, a practice that military commanders came to call "helicopter diplomacy." "Making the lack of ground rules even worse," a political officer remarked, "is the incredibly poor communication between and among all levels of the Iraqi government. If, by some stroke of luck or hard work, there are clear and comprehensive rules for something, it is highly likely that they have not been transmitted to all of the appropriate people in an effective or open manner."[39]

The efforts of the PRTs and brigades slowly opened a conversation between provincial and national officials. In the late summer of 2007, five governors from the northern non-Kurdish provinces arrived in Baghdad to attend a conference arranged by the office of the Deputy Prime Minister. It was one of the first meetings of its kind. Governors from some of the most violent provinces of Iraq were allowed to air their concerns. They complained that some ministry directors general were operating in the provinces outside the control of provincial authorities. The governor of Diyala stood up and said that he did not even have the phone numbers for ministry officials in Baghdad.[40] It was clear that provincial and local governments were not yet ready to govern, and that focused PRT support to build local and provincial capacity would be necessary for an extended period.

**USAID Expands Local Governance Program**

Operating in parallel with the PRTs, USAID soft programs also played an essential role in helping local governments improve. The LGP began a $350 million initiative on October 1, 2005, which aimed to join the citizen councils it formed across Iraq into an integrated network and build their capacity for local administration. Democracy advisors from the LGP also worked at the national level as

PX213

advocates for writing clearly stated powers, roles, and responsibilities for local governments into Iraqi law.[41] The challenge was to provide a forum and a legal framework in which a fledgling cadre of Iraqi civil servants and elected officials could bridge the institutional gaps that had resulted from the Coalition's remaking of the Iraqi political system into federal, provincial, and local institutions.[42]

The LGP was unlike the Coalition's other methods of assistance. Its physical isolation from other U.S. government agencies, its predominantly Iraqi face, and its work at political levels far removed from national government created what was in effect a parallel reconstruction effort. Four USAID regional offices—in Baghdad, Hilla, Erbil, and Basrah—were embedded in local neighborhoods, rather than being housed on forward operating bases. When the compounds needed food, they sent Iraqi employees, many of whom lived in surrounding neighborhoods, to purchase it at nearby markets. The compounds' outer rings of security were manned by Iraqi details, not U.S. military or international guard forces. One compound shared a wall and part of its security detail with a next-door mosque.[43] For every international advisor staffing the program, more than ten fulltime Iraqi professionals provided management training and assisted with projects.[44]

USAID's emphasis on distancing themselves from the embassy and blending with local communities was met with dismay in some corners of the U.S. mission. A huge American purse was being emptied in parts of Iraq about which the State Department knew little, and the success in realizing its goal—developing a functional local government—was hard to measure.

An audit of the LGP program by the USAID Inspector General in 2007 found that "the local governance activities did not have intended outputs or baselines to measure progress against because USAID/Iraq failed to enforce contract requirements." The inspector general's office also stated, "In our view, [USAID's contractor] reported only on successful achievements rather than progress achieved toward specified targets."[45] A subsequent SIGIR audit raised similar concerns, noting that although program outcomes appeared to be positive, identifying and tracking project funds and outcomes required improvement.[46]

The LGP's high-water mark of institution building was the creation of the Iraq Local Government Association in August 2006. Council members across Iraq recognized the need for a local government advocacy group within Iraq's developing political framework. With USAID support, members of the Baghdad provincial council worked throughout the summer of 2006 to plan a conference in Baghdad that would be a vehicle for provincial authorities to lobby the national government, which was attempting to draft a provincial powers law. Council members from around the country wanted to make sure that the

PX213

process of political decentralization would not be derailed. Conference attendees included 110 representatives from all of Iraq's 18 provincial councils. They unanimously adopted a draft local government code and moved to form a permanent Local Government Association, electing a member of the Baghdad Provincial Council as its chair.

The Local Government Association became a single voice speaking at the national level for local institutions and built a caucus of support in the Council of Representatives.[47] It was an impressive opening of a dialogue between Iraq's local and national leaders over how the devolution of power would proceed and how the capacities of local government would develop.

**Barriers to Progress**

Despite the Coalition's best efforts, the provision of government services became more rather than less politicized in the years following the CPA. By 2006, the U.S. approach to democratizing Iraq, while simultaneously federalizing its government structures, yielded mixed results. The local and district councils created immediately after the invasion had not become formally linked to the directors general who administered services using funding provided by the central government. Soon, ministries were deeply riddled with partisan infighting. The elections that were to be the capstone of a new democracy were based on a formula that only increased the forces driving Iraqis apart. The failure to hold new provincial elections also compromised the legitimacy of provincial councils through with which power was to be shared.

Even though Iraq's constitution ostensibly defined the framework for a unified state, political authority had fragmented into Kurdish, Arab Shi'a, and Arab Sunni constituencies, themselves split by deep and violent divisions. Rival Shi'a parties, each with their own militias, fought over key government positions in the south and over the central question of federal unification. In the Sunni areas, a combustible mix of terrorists, insurgents, and powerful rural tribes rejected Shi'a dominance in a government that was the inevitable result of nominally democratic elections. Despite the deployment of substantial Coalition resources beyond the Green Zone, there seemed to be an unbridgeable gap between provincial governments and the increasingly isolated national government.

By the end of 2006, U.S. officials agreed that the single most important governance challenge was to strengthen the connection between Iraq's national and provincial institutions, so services could be delivered and government properly administered in the new decentralized framework. "Capacity building"—ensuring the ability of the Iraqi government to handle its own affairs—became the catchword for reconstruction's next phase. Doing this would require the

PX213

• Returning to the Provinces •

Coalition to continue stitching together its "top-down" efforts in Baghdad with the "bottom-up" efforts in the provinces, linking all levels of the Iraqi government and the reconstruction. While this effort was underway, a series of failures in reconstruction projects turned over to Iraqi control underlined how important Iraqi capacity would be. The sustainment of facilities had fallen into crisis, yet another casualty of Iraq's failed administrative state.

PX213

CHAPTER 24
THE PRIMACY OF CAPACITY DEVELOPMENT

> *Our job is not to build it for them, our job is to help them build the capacity so that they can use their own substantial resources to do things for themselves.\**
>
> **Ambassador Joseph Saloom**
> Director, Iraq Reconstruction Management Office (2006-2007)

On most days in Baghdad, plumes of black smoke from at least one of the Doura power plant smokestacks are visible in the southwest sky—a sign that the generators beneath them are turning, putting a few dozen megawatts each on the grid. Blue sky over Doura almost always means that something is wrong, as was the case in August 2006, when an electrical surge disabled the plant. Despite a three-year, $90-million project to restore it, the plant that supplied much of Baghdad's power ground to a halt.[1]

Doura's failure had many causes. Plant technicians had overlooked dust and debris collecting in the generators' cooling systems. The debris should have been discovered by a routine check, but plant managers had yet to establish a formal maintenance program for Doura's equipment. They had also followed orders from directors general at the Ministry of Electricity to swap critical components between the generators, which caused parts to deteriorate faster and break down more frequently. The directors general themselves were hamstrung by a ministry policy that forbade plant-level employees from purchasing replacement parts before emergencies occurred.[2] The minister was under pressure from the Prime Minister, who gave continuous power-generation precedence over scheduled shut-downs for repairs.[3] Ultimately, this chain of failures was a product of U.S. reconstruction policy that emphasized rebuilding Iraq's physical infrastructure but not the institutions to maintain it.

All across Iraq in late 2005 and beyond, a series of SIGIR inspections discovered that physical infrastructure put in place by U.S.-funded reconstruction was breaking down and coming off-line.[4] Failures plagued both refurbished and new facilities in the water, electrical, sewer, and oil sectors. It was not just a question of maintaining individual plants and teaching Iraqi engineers who run them to master more advanced machinery. It was about building the systems and processes within Iraq's government to sustain the infrastructure it had just received.

---

\* SIGIR interview with Ambassador Joseph Saloom, former IRMO director, April 21, 2008.

PX213

• The Primacy of Capacity Development •

Unless the government could manage these necessary operations, the Doura power plant and facilities like it would continue to fall apart.

From the beginning, reconstruction policymakers knew it would be a challenge to build capacity inside Iraq's government and marshal it to sustain reconstruction facilities.[5] A variety of U.S. agencies and organizations made efforts to develop functioning institutions within Iraq's ministries, but—despite millions of dollars in contracts and, at times, furious activity—the embassy failed to create large-scale capacity-building programs until late 2006. Even then, the effectiveness of the U.S. strategy was mixed.

**Iraq's Capacity Crisis**

In Iraq, the story of capacity development—the ability of the government to operate effectively—begins with Saddam Hussein. Iraq's government did function before the 2003 invasion. Despite significant deficiencies on every front, some three dozen ministries controlled virtually every factory, warehouse, administrative office, and service facility in the Iraqi inventory, as well as the distribution of essential commodities, including fuel and food. Even after the imposition of international sanctions choked the flow of spare parts and cash, the Saddam regime expected its ministries to perform as usual.

To meet Saddam's demands, officials became "entrepreneurial" and, at times, draconian. Ministries made shadowy credit arrangements so that ledgers would remain in the black; raw materials produced within Iraq were stockpiled and often withheld from other ministries; ministries imported materials in contravention of international sanctions; and a climate of fear kept workers in line.[6] Power over the ministries was jealously guarded by Iraqi officials at the highest ranks, many of whom sought to profit from their positions.[7] All these practices left a legacy of corruption for the embassy to try to overcome.

Looting following the 2003 invasion dealt the first major blow to government capacity. Next came the exodus of both people and property from Iraq's government offices, effectively redefining reconstruction from restarting a government to building one anew. The goal was to restore the core capacities of government— its strategic and policy-planning ability, as well as its financial, information, and human resources management. To this end, USAID contracted in July 2003 with BearingPoint to give Iraq's Ministry of Finance the tools to start collecting, tracking, and disbursing state revenue.[8] Part of the BearingPoint contract required the provision of a state-of-the-art financial management information system, which turned out to be unworkable. It was a harbinger of the challenges to come: having been built with U.S. rather than Iraqi accounting practices in mind, it was rejected by the Iraqi civil servants who were to use it.[9]

PX213

In the summer of 2003, three major funding streams—CERP, IRRF 1, and the DFI—were available for capacity-building efforts. Working independent of U.S. government agencies, CPA senior advisors drew on what they could get from the military and USAID, as well as on funds for projects approved by the Program Review Board. Most funds came from Iraqi money in the DFI. More than $10 billion was set aside during the first year for ministerial operations; $1.2 billion came from U.S. funds.[10]

Down in the trenches of reconstruction, U.S. military engineers and international contractors were in a position to develop sustainment programs for the effective operations and maintenance of the infrastructure projects they were building. But the IRRF 1 contract with Bechtel, like the other infrastructure contracts, did not emphasize sustainment. A short paragraph in the contract required Bechtel to "provide technical assistance and training to build the capacity for effective operation and maintenance."[11] What the sustainment programs might include or how their success would be measured was not specified.

USAID officials in charge of administering the IRRF 1 contracts assumed that a core cadre of ministry employees would carry over the maintenance practices of the old era.[12] The CPA, however, had dismissed many of those ministry employees in the de-Ba'athification process, and those that remained found it difficult to push past the culture of centralized management and take responsibility for maintaining local facilities.[13] Even if Iraqi officials had taken the initiative, few in the summer of 2003 had functioning procurement systems or even regular communication with ministry offices in Baghdad. USAID's second Bechtel contract, reflecting the expansion of reconstruction's scope and duration under IRRF 2, placed greater emphasis on maintenance and sustainability. It required that every job order written under the contract specify the level of technical capacity that would be passed to the Iraqis.[14]

As the CPA's PMO grew to administer the larger part of IRRF 2 funding, it too approached capacity building and sustainability with greater purpose. PMO internal guidelines suggested that contracting officers use Iraqi services "to the greatest extent practicable," and that design-build contractors collaborate with ministries in drafting project requirements. As much as 16 percent of a contractor's award fee became dependent on the ability to train local staff and transition projects effectively to the Iraqis.[15]

Simply writing language into IRRF 2 contracts, however, did not constitute a true sustainability program. There was no U.S. commitment to fund projects aimed exclusively at maintenance objectives, an oversight that troubled USAID officials experienced with infrastructure construction in the developing world. In their view, PMO's staff, largely composed of engineers without development

PX213

• The Primacy of Capacity Development •

experience, tended to issue infrastructure contracts without attention to follow-on maintenance.[16] USAID's own infrastructure cell was acutely aware of the problem by late winter 2004, but the agency's loss of influence during the early CPA period marginalized its ability to advocate for sustainability contracts.[17] "Bremer," according to USAID Mission Director Spike Stephenson, "was not interested in anything but construction."[18] The CPA went so far as to remove $50 million from an operations and maintenance budget that USAID proposed.[19] Although specific task orders would allow training at the ministry level to continue, the lack of dedicated sustainability contracts left it to the Iraqis to make critical purchases for maintaining facilities—which most ministries were unable to do.[20]

Despite the lack of emphasis on sustainability and capacity building, some international contractors found that the professional development of Iraqi subcontractors was in their own best interests. They went beyond what was required by their contracts to establish substantial training programs. One example, "Bechtel University," introduced a cadre of Iraqi contractors to international procurement policies, safety routines, and quality assurance practices.[21] The theory was that if Iraqi firms were taught these skills, they would effectively use them in the future. Graduates of Bechtel University later took leadership roles in other reconstruction projects.[22]

Widespread success in IRRF-sponsored training programs at the plant level, however, was elusive in 2003 and 2004. Thomas Wheelock, who helped lead USAID's management of the Bechtel IRRF contracts, noted that there was such a range of competence among Iraqi technicians that it was difficult to design any universally applicable curricula. Some of the greatest challenges to facility-level sustainability were found in the management ranks at central ministries, where maintenance programs were designed and critical spare parts were procured. The PMO could require sustainment measures in the task orders it issued to contractors, but without a program to link them to efforts at the ministry level, there was little chance for long-term, effective management.[23] In the reconstruction program's first two years, there was no coordinated effort among the U.S. organizations working in Iraq to draft and implement strategies for interagency capacity building or sustainment that would reach all parts of the reconstruction effort.

**The Problem of Sustainability**

In the fall of 2004, Bruce Parmelee, a program officer in USAID's Community Action Program, discovered a rehabilitated water-treatment plant on the outskirts of Hilla sitting idle after repairs costing $5 million. Work on the plant had been completed, but there was no effective effort to transfer the facility to local Iraqi authorities. Because the job order focused only on the facility, contractors did not

PX213

connect the plant to the city's network of water-pipes and sewers or teach Iraqi employees how to use it. Few people in Hilla even knew it existed, and the facility had already started to decay. It was a perfect example of the failure to incorporate an adequate plan for transfer and sustainability.[24]

A similar set of sustainment issues arose across the reconstruction effort in 2004 and 2005.[25] Contracts written for physical reconstruction frequently left out the crucial next step of ensuring that the new facilities would be used and maintained. A policy of keeping international contractors on hand for 90 days to assist with early operations was seen by IRMO as woefully insufficient.[26] The security situation compounded the challenge, with targeted attacks on infrastructure, the withdrawal of international engineers, and widespread attrition among Iraqi technicians. The effort was also affected by Iraq's political process, which led to constant changes in ministries' leadership in the three years before the installation of a permanent government in 2006.[27]

All of these factors hampered the delivery of essential services that reconstruction was supposed to provide. The major indicators of government performance in 2004 and 2005 were generally flat.[28] "It became clear," Ambassador David Satterfield said, "that we ran the real risk of huge multi-million dollar projects … sitting alone, non-operative, because we had not put the same focus on sustainability as we have on building it." Satterfield added, "It had been assumed that Iraqis would take on the last-mile connectivity but they never did."[29]

**PCO Addresses Capacity Development**

Working closely with contractors building essential services facilities, PCO took the earliest steps to prioritize sustainability efforts. Much of the initiative began in the water sector where, by the late summer of 2004, the sheer number of projects outlined by the IRRF 2 spending plan convinced water-sector program managers that a separate capacity-development program was necessary. The 79-page Management and Interface Plan, which PCO briefed to agencies, think-tanks, congressional staff, and contractors, outlined five critical levels at which the embassy could help develop the Iraqi government's capacity to sustain reconstruction.[30]

The PCO focused on level 5 of this framework—infrastructure—while encouraging other parts of the U.S. mission to engage further upstream. By early 2005, the mission had established an internal office, staffed by two people in Baghdad and two in Washington, specifically charged with coordinating PCO's capacity-development initiatives. In March 2005, PCO modified statements of work for the IRRF 2 sector program-manager support contractors to include key sustainability objectives.[31]

PX213

• The Primacy of Capacity Development •

**PCO's Five-Level Approach**



Source: PCO, *"Capacity Development: A Foundation for a Sustainable Future,"* undated.

The PCO sustainability office also created reporting systems that tracked the new contract requirements, ranging from the number of Iraqi technicians trained on a project to documenting overall lessons learned by contractors working in the field. One result was a new set of confidential PCO databases that tracked the effectiveness of all Iraqi subcontractors hired by the design-build contractors, as well as the progress of PCO-sponsored capacity-development activities.[32] Training programs run by prime contractors ultimately reached 509,000 Iraqis and comprised more than a million hours of training.[33]

The focus on sustainability by the PCO eventually led it to look beyond the infrastructure level. In 2005, it established eight technical learning centers in seven provinces.[34] The centers offered hands-on training in equipment maintenance and engineering innovations that had been unknown in sanctions-era Iraq. Six focused on the water sector, the first sector to embrace all aspects of PCO's sustainment strategy, and two were established for workers in oil and electricity.[35]

Further up the ladder, a new PCO grant program encouraged ministries to shoulder a larger portion of the management of reconstruction. The PCO would reimburse ministries for the costs of projects if they agreed to manage their planning, solicitation, bidding, financing, and construction. The entire

PX213

capacity-building effort, from vocational training to ministerial agreements, was encapsulated in an IRMO white paper in May 2005. The paper praised the "PCO Management and Interface Plan," which became the basis of the first interagency capacity development strategy in Iraq reconstruction.[36]

However, this strategy—and, in particular, the cooperation it presumed between IRMO, the State Department, USAID, and PCO—did not take hold in 2005. Events quickly overtook the white papers circulating in the embassy. During Ambassador Khalilzad's tenure, failures in infrastructure sustainment became more significant. More completed projects were not operating, and essential service benchmarks in key sectors like electricity and oil remained unmet.[37] Nearly a year after the PCO introduced its interagency engagement strategy, the State Department concluded that a more "integrated approach was essential." Agencies had implemented reconstruction programs "without a clear understanding of the programs' objectives or their contribution to the larger goal of transferring responsibility for reconstruction to the Iraqi government."[38]

**Reorganizing Capacity-Development Efforts**

The Department of State initiated a "National Capacity Development Program" in late 2005. The plan focused on the twelve key ministries that accounted for 65 percent of Iraq's government workforce of 2.2 million people, and oversaw 74 percent of the national budget. Instead of assigning responsibility for the ten civilian ministries to one organization or agency—as had been done for the Ministries of Interior and Defense—the embassy asked USAID to focus on medium-term capacity issues while IRMO and the Departments of State looked after immediate needs.[39] "We tried to build on the senior consultants," recalled Ambassador Speckhard, who served first as IRMO director and then as deputy chief of mission under Ambassador Khalilzad. "The first step was to go out and have each one of them do an intensive survey of their own ministries to make judgments on how they were doing on strategic planning, on leadership and personnel, on budget and finance, and on public communications."[40]

The Embassy tapped IRMO to coordinate the new capacity-building effort, but overseeing the capacity-development activities of so many permanent and semi-permanent agencies in the U.S. government proved too tall an order for an ad hoc group of senior consultants.[41] The consultants' principal charge had always been to maintain relationships with key Iraqi officials—including the minister—in each ministry, allowing the exchange of information and resources between the embassy and the Iraqi government. Many senior consultants focused on keeping these crucial connections going and simply did not have the time to deal with all the other U.S. agencies who were supposed to be involved in capacity building.

PX213

IRMO was itself burdened with developing its own capacity—that is, recruiting enough qualified advisors to replace those who were leaving. "Every year," Ambassador Speckhard said, "you're turning over some 90 percent."[42]

In March 2006, when it became apparent that IRMO alone could not effectively coordinate the initiative, the deputy chief of mission ordered the creation of a Ministerial Capacity Team. The idea was to link the work of senior consultants with other efforts in the Green Zone by bringing everyone together in a coordinating body. Vested with a $15 million dollar budget, the Ministerial Capacity Team began a series of efforts to build capacity into the ministries. It constructed a new press room for the office of the prime minister, created a digitized copy of the Iraqi legal code, and assembled a much-needed survey of Iraq's health infrastructure. Projects like this, however, did not amount to a systemic strategy for correcting plant-level failures by redressing ministerial deficits at the top.[43]

By summer 2006, the formula changed yet again. Thirty officers from Coalition forces and a similar number of reporting officers from the State Department joined IRMO senior advisors in what were called Ministerial Assistance Teams.[44] The teams developed one-year programs designed to jump-start capacity just as ministries received permanent ministers for the first time. By early 2007, twenty advisors worked in the Ministry of Oil, eighteen in the Ministry of Finance, and eighteen in the Ministry of Electricity.[45]

The introduction of new faces into a tightly knit group of advisors and ministers—one that already had to work around language barriers, cultural differences, and gaps in technical knowledge—disrupted the solid relationships that had been established. For this reason, the ministry assistance teams failed to gain the necessary momentum. Neither IRMO's senior consultants nor the Iraqi ministry officials who for three years had built very specific partnerships wanted others to intrude.[46]

The failure of Ministerial Assistance Teams in 2006 opened again the question of who was in control. In 2006, the embassy created a Joint Task Force for Capacity Development that included representatives from USACE, USAID, MNSTC-I, the embassy, and IRMO.[47] For the first time in more than three years, a central body met to oversee the agencies and organizations that had significant relationships with various components of the Iraqi government. Unfortunately, the task force was yet another meeting of men and women in the Green Zone who lacked the authority to mandate action by their constituent agencies.[48]

The task force coincided with a new initiative by USAID to provide medium-term capacity assistance to Iraqi ministries. The $165 million *Tatweer* program—Arabic for "development"—focused initially on enhancing the professional qualifications of civil servants at the ministries of Planning, Finance, Oil,

PX213

Electricity, and Water Resources. Management Systems International (MSI), USAID's implementing partner, intended to attach its own training programs to Iraq's National Center for Consultation and Management Development, a training academy in Baghdad's suburbs run by the Ministry of Planning. MSI also sought to establish its own ministry assistance teams staffed by Arabic-speaking advisors.[49]

Implementation of the *Tatweer* program was slow. By December 2006, MSI had positioned advisors in only the Ministries of Oil and Electricity, even though the other ten civilian ministries mentioned in the National Capacity Development Plan were scheduled for assistance. The lack of MSI advisors and the limited reach of the Ministerial Coordination Team over USAID programs seriously compromised the overall effort. The Center for Consultation and Management Development did not fare much better. By December 2006, USAID reported that the center's ability to host and expand on MSI training programs was limited.[50] Two subsequent audits found that implementers were having difficulty finding Iraqis who were willing to participate in the training programs, and that the center prohibited foreign advisors from visiting its premises because their presence would draw attention to the compound and create a security risk to Iraqi attendees.[51]

To direct these myriad activities, the embassy turned finally to the Joint Executive Steering Committee. With high-ranking representatives from MNF-I, USAID, GRD, MNSTC-I, IRMO, and each embassy section, the steering committee had originally served as the policy planner for the emergent PRT program. In late summer 2006, the steering committee's mandate was enlarged to make it the strategic hub for all joint efforts among agencies in Iraq, including capacity-building programs.[52] The Joint Task Force on Capacity Development now reported to the steering committee, which was chaired by the deputy chief of mission.[53] Although this structure in theory brought the ambassador into closer contact with the capacity-development program, policy influence remained with IRMO, whose director frequently chaired steering committee meetings in the absence of the deputy chief of mission.[54]

An imminent deadline soon complicated these arrangements. In the continuing effort to "normalize" operations, the embassy set IRMO's demise as an organization for early 2007. IRMO's last director, Ambassador Joe Saloom, arrived in May 2006 to begin shutting down the three-year-old organization.[55] His own perception was that the State Department wanted to create a year-long "glide-path" for senior consultants, who would continue overseeing reconstruction in their ministries, but increasingly under the direction of section heads at the embassy.[56] It was all part of a trend to bring the functions of many ad hoc

PX213

• The Primacy of Capacity Development •

offices created to manage reconstruction together under the traditional embassy structure, with its political and economic sections.

The transition to Saloom's leadership in IRMO revived the search for adequate measures of success in capacity development. IRMO's initial effort—started in September 2006 to measure core indicators of Iraqi ministry capacity—quickly ran out of steam and failed to produce further findings.[57] Nevertheless, the assessment confirmed that most ministry staff lacked sufficient training to do their jobs, and that a quarter of all ministerial functions depended on Coalition or other foreign support.[58]

**The Rise of Budget Execution**

By late 2006, a growing awareness that the Iraqi government was ill-prepared to move money from its treasury to the many offices that actually spend the budget helped bring focus to the capacity-building program. Iraq's capital reserves were growing, and much of the money was not being spent. Embassy officials wanted to prepare for the day when Iraqi revenues alone would carry reconstruction forward.[59] Exasperated with the scope of ongoing capacity-building efforts, IRMO leaders were happy to narrow their focus. "It became obvious, once again," Ambassador Speckhard said, "that we bit off more than we could chew, in the timeframes we were talking about." "To make noticeable differences in the short-term," he said, "you really need to focus on a few things."[60]

With new input from the Ambassador and a working group established on budget execution, U.S. officials zeroed in on the failure of Iraqi institutions to spend their capital budgets, citing it as "the most important capacity restraint to the Government of Iraq's performance."[61] Improving the ability of the Iraqi government to spend its own revenue became the keystone in a new arc of capacity-development activities. It was all part of a shift in the reconstruction program to supporting Iraqi priorities with Iraqi resources. Iraqi budget performance would be tracked daily on both the civilian and military side of the U.S. program, and all efforts would be made to increase the rate at which Iraqi money flowed from ministry budgets to reconstruction contracts.

Once the embassy identified budget execution as a clear measure of progress, it marshaled nearly every agency at its disposal to improve it. IRMO, JCC-I, the Department of the Treasury, USACE, the embassy economic section, and the ambassador's front office all became deeply involved in providing program management and contracting assistance to Iraqi ministries. The Iraqi Prime Minister's office and the office of Deputy Prime Minister Barham Salih also engaged in the effort. Salih convened weekly meetings on procurement and spending approval processes with the Ministers of Planning and Finance and officials in

• 267 •

PX213

provincial and city government.[62] It was an "all-government approach," according to Ambassador Saloom. [63]

The Ministry of Planning was one of the weak links in the chain. Iraqi law requires the Ministry of Planning to approve all requests for funding by other parts of the Iraqi government. Only after receiving Ministry of Planning approval can the Ministry of Finance disburse funds to ministries or provinces. A Ministry of Planning "fusion cell" was created. Dozens of Americans, many of them of Iraqi origin, took desks next to ministry employees in order to coach them at every step. In some cases, they even answered the phones. The support of Iraqi bureaucrats, often untrained and not used to making major funding decisions, accelerated the pace at which the Iraqi government increased its capital expenditures.[64]

These innovative efforts yielded modest results at first. Before budget execution was identified as a priority, the Iraqi government as a whole spent just 17 percent of its capital budgets, meaning that badly needed infrastructure projects had either not begun or were being executed entirely with U.S. funds.[65] In 2007, the government substantially improved budget execution at the ministerial level, spending $4 billion of its $7.9 billion capital budget for an execution rate of just over 51 percent. Results in the provinces, however, were mixed. Rates varied from a high of 64 percent in Najaf to zero in Diyala province. Strategically crucial Anbar province reported spending only $4 million of the $107 million available—an execution rate of less than 4 percent.[66]

Violence was also a major impediment. "The bread and butter of a director general's job is dealing with his superiors in Baghdad," Treasury attaché Jeremy Pam explained. "Without a war on, he would go back to Baghdad every two weeks. But if he can't drive on the roads, you have the different levels of government increasingly cut off from each other." "Imagine," Pam said, "if the Internet went down, and you didn't have email. Our budget execution would go down, too."[67]

The U.S. mission's focus on budget execution raised two fundamental issues. The first was whether it was wise to be so concerned about the Iraqi capacity to spend money quickly.[68] The second had to do with the long-term value of the more intensive capacity-building approaches directed at the security ministries and the Ministry of Planning. In 2007, a GAO audit of the capacity-development program concluded that with so many international advisors in effect "sitting in" for Iraqi government employees, "the Coalition's involvement in [Iraq's] budgeting and procurement processes may have hindered the ministries' capacity to improve their own procurement and contracting systems and perform other vital services."[69] "We were not convinced that ministries actually were building their own capacity to do those things that we were doing for them," Ambassador Satterfield said.[70]

PX213

**Transferring Completed Projects**

As the United States worked to enhance ministerial capacity, the process for transferring completed reconstruction projects to the Iraq government broke down. Beginning in 2006, a series of SIGIR audits revealed that the process of asset transfer—as project handover is formally called—was not ensuring that the Iraqi government was capable and willing to assume responsibility for maintaining U.S.-built facilities.[71] Transferring responsibility for sophisticated facilities, such as electrical or water treatment plants worth tens of millions of dollars, was a difficult task by any measure. Detailed operational and maintenance procedures had to be drawn up. Manuals and technical documentation had to be handed over. Most critically, the Iraqis had to be adequately trained to operate and maintain the facilities on their own, a task that would require careful planning and budgeting skills in perpetuity, at both the facility and the ministry responsible for it.

The breakdown between Iraq's central and local governments made asset transfer an especially arduous task. A municipality's pledge to care for a facility was no guarantee that the central ministry actually responsible for its upkeep was prepared to support it over the long term—or even knew it existed. Handing over smaller projects, such as schools and clinics, was also fraught with difficulty. Although not necessarily difficult to maintain or operate, smaller projects still needed to be kept supplied and staffed year after year to realize the full value of U.S. investment.

The asset transfer process was the ultimate test of Iraqi buy-in to the U.S. reconstruction effort. If done properly, it would provide three crucial checks. First, it would ensure formal recognition by the Iraqi government that a project was satisfactorily complete and ready for transfer. Second, it would provide an opportunity for the Iraqi ministries involved in operating and maintaining the facility to acknowledge their technical readiness and show that they had dedicated adequate budgetary and personnel resources for all future operations, maintenance, and capital-replacement costs. Third, and most important, it would provide an occasion for the United States and the Iraqi government to certify that the U.S. investment would be cared for responsibly in the years to come.[72]

The scope of asset transfer, like the reconstruction itself, was enormous and involved many projects that the Iraqis never agreed to or wanted in the first place. By the middle of 2006, 579 IRRF projects, valued at $765 million, had been officially transferred to the Iraqi Ministry of Finance. However, this was only 18 percent of the total number of completed IRRF projects. Still more projects would come from the other reconstruction funds, including CERP and the ISFF. The cost of maintaining IRRF projects alone was estimated in 2006 at approximately $1.2 billion annually. As that year drew to a close, the United

PX213

States planned to have the Iraqis shoulder most of this burden. An estimated $372 million in sustainment funds would be available within IRRF for short-term operations, spare parts, consumables, and contracted support during 2007. The government of Iraq would fund the remaining $828 million.[73]

One of the flaws of the asset transfer approach as it was structured in 2006 was that each U.S. agency working in Iraq had different procedures, levels of detail, and due diligence requirements for transferring projects. A sampling showed that one agency provided an exhaustive accounting of asset values and maintenance requirements in its transfer package while another provided no information at all.[74] Procedures differed even within agencies for separate reconstruction funds.

SIGIR's asset transfer audits found that the lack of uniformity confused Iraqis and caused some assets to be transferred to Iraqi control with insufficient technical documentation. SIGIR recommended that, at a minimum, U.S. managers provide formal notification of a project's transfer to the Iraqi Ministry of Planning, Ministry of Finance, and the appropriate operating ministry. The notification should list all relevant data and specifications that would allow the Iraqis to plan better for long-term upkeep, including the start date, asset cost, estimated short-term and long-term sustainability costs, terms of warranties, and the location of maintenance and systems manuals.[75]

The lack of one centralized authority to manage asset transfer for the entire U.S. reconstruction effort was problematic. Policy guidance issued by the embassy's Asset Transfer Working Group in April 2006 was not binding. Agencies were pursuing different and uncoordinated approaches to transferring completed assets to Iraqi control.

In mid-2008, a SIGIR audit found that U.S. agencies continued to develop their own transfer procedures—confusing the government of Iraq in the process. USAID, for instance, elected not to use the process established by the Asset Transfer Working Group. MNSTC-I took a different approach altogether, trying to develop the capacity within the MoI to sustain all transferred projects.[76] MNSTC-I unilaterally transferred 388 projects to the government of Iraq even though they did not obtain formal assent—thus putting a billion dollars of U.S. investment at potential risk.[77]

Unilateral transfers caused many problems. A report in 2007 by the BSA, Iraq's audit agency, found that many Iraqi ministries did not have records showing the U.S.-funded reconstruction projects supposedly under their control.[78] Later modifications to the asset transfer policy addressed some of the issues identified by the reviews, but these modifications did not apply to all projects provided by U.S. reconstruction funds and did not centralize the management of the asset

PX213

transfer process. The Iraqi government also failed to respond to a memorandum of agreement forwarded by the United States, leaving any policy agreement between the two governments at an impasse into the fall of 2008.[79]

**Beyond the Green Zone**

By late 2005, nurturing capacity at the provincial and municipal levels had become a strategic objective. Four Coalition entities were at work supporting the development of capacity in local and provincial governments: Provincial Reconstruction Development Councils, Provincial Reconstruction Teams, Brigade Combat Teams, and USAID's Local Governance Program. In 2006, policymakers used each of these institutions to help link the capacity development underway in Baghdad with efforts in the provinces.

PRDCs became a way to tutor Iraqi officials in program and project management while at the same time increasing the Iraqis' commitment to maintaining U.S. projects. "We were dissatisfied with what appeared to be a disconnect between our projects and Iraqi sense of ownership and buy-in," Ambassador Satterfield explained. "We were creating white elephants that did not have Iraqi buy-in or training to keep going." PRDCs fostered joint decision making between American and Iraqi officials and helped harness Iraqi government capacity in the ongoing reconstruction. "The skills gained in doing [the PRDC process]," Satterfield said, "would then translate into the ability to use Iraqi funds when the provinces were funded."[80]

PRTs also played a leading role. Having existed principally as capacity-building institutions, PRTs were staffed to provide guidance to provincial councils, governors, directors general, and other local officials. As violence increased across Iraq in 2006, new tasks were given to the PRTs, including the execution of economic components of counterinsurgency programs. Becoming an important link between provincial reconstruction efforts and the military's counterinsurgency strategy, however, risked undermining PRTs' original capacity-building mission.[81] At first, they were not equipped to become project and program managers in their own right.[82] The solution was more staff and support from Baghdad, but the National Coordination Team, which came to supplant the role of IRMO's Directorate of Operations in overseeing PRTs, was unable to keep pace with the increased demands.

In the spring of 2007, with the PRTs fully deployed, the embassy attempted to address staffing and capability shortages for both the teams and the offices that supported them from Baghdad by developing a new organization, the Office of Provincial Affairs (OPA), with a "direct-report" to the ambassador. This bureaucratic restructuring, along with the appointment of a more senior official to head

PX213

the office, gave the PRT program a greater opportunity to help lead capacity-development efforts in the provinces. OPA, however, was not well staffed, and at first was overwhelmed with carrying out basic reporting and support functions.[83]

### Capacity Building: A Missed Opportunity

Despite the importance of comprehensive capacity-development and sustainment programs to the long-term success of the U.S. mission in Iraq, the United States failed to develop them in the initial years after the invasion. This did not mean that reconstruction officials completely ignored the problem. In the first year of occupation, the CPA expended more than $10 billion of Iraqi and U.S. funds on ministry operations.[84] In 2004, the PCO modified contracts and introduced a series of programs designed to address emerging sustainability challenges in infrastructure rebuilding. By the end of 2006, the U.S. government allocated $169 million to build Iraq's governing capacity, and many sustainment efforts began.[85]

A unified effort to coordinate capacity-building activities proved to be elusive. Officials concentrated on what they knew: diplomats focused on political reform, businesspeople on the Iraqi private sector, and engineers on sustaining facilities. As a result, many of the weak links in the chain of Iraqi institutions were neither understood nor properly addressed, leading to a crisis of Iraqi government mismanagement. Efforts to address this crisis have had only partial success. Years after some capacity-building programs began, it was not clear whether they had any lasting effect, and no overall strategy had been put in place until the end of 2007.[86]

A look at Diyala province four years after the invasion illustrates how slowly Iraq's governing capacity had developed. None of Diyala's service directorates had a dedicated maintenance budget. Although central-government ministries still controlled 80 percent of Iraq's capital budgets in 2007, the local government in Diyala knew no more about ministry projects planned in its territory than it did in 2004.[87]

These shortfalls raise hard questions about how capacity-development programs in Iraq should have been managed. While MNSTC-I flooded the ministries of Interior and Defense with more than 200 advisors, each working hand-in-hand with Iraqi counterparts, the ten other major civilian ministries had only a handful of advisors, except for those involved in the Ministry of Planning effort to increase budget execution.

Finally, the lack of security threatened all capacity-development efforts. Iraqi officials often had to limit their days at the office to just two or three hours because of threats from insurgents and warring sects and the length of time it took to navigate safely the checkpoints between home and workplace. By 2007, the

PX213

• The Primacy of Capacity Development •

kidnapping and killing of capacity-development advisors when they left the Green Zone led to restrictive policies that limited contacts between Coalition and Iraqi officials, sometimes preventing interaction altogether.[88] Raising a new system of government and endowing it with the capacity to sustain its infrastructure effectively was a never-ending challenge, one that still had not been overcome toward the end of 2008.

PX213

## Chapter 25
## Reconstruction Amid Sectarian Violence

*To provide security you need to engage people. You need to tackle unemployment. You need to create job opportunities, substantial opportunity so people would be more involved in their well-being rather than explosives and insurgency.\**

**Dr. Ayad Allawi**
Prime Minister of Iraq (2004-2005)

Hope that Iraq's democratic elections would defuse sectarian tensions unraveled on the morning of February 22, 2006. At five minutes before seven, al-Qaeda terrorists in Samarra destroyed the golden dome of the al-Askari mosque, the revered Shi'a holy site on the east bank of the Tigris River, 60 miles north of Baghdad. Desecrating the gravesite of the Tenth and Eleventh Imams was a psychic blow to Iraq's Shi'a and accelerated the pace of sectarian killing that had been rising steadily for months. At least 1,300 Iraqis, mostly Sunni, were murdered in the next four days, many slain in the streets by organized killing squads associated with the militia of Muqtada al-Sadr.[1]

The humanitarian and political crisis precipitated by the Samarra bombing forced reconstruction policymakers to shift course on a number of fronts. Refugees posed the first problem. A quarter-million Iraqis fled their homes, hastening the segregation of Baghdad and south-central Iraq into Sunni and Shi'a enclaves.[2] By the end of 2006, one out of every eight Iraqis had left the country or became displaced within it.[3] Tent cities sprouted to accommodate the most desperate homeless, triggering food and water shortages that exacerbated already poor conditions.

In keeping with previous trends, attacks were concentrated in Baghdad and the provinces of Anbar, Diyala, and Salah Al-Din.[4] The difference was that in the month after Samarra, execution-style killings claimed eight times more Iraqi lives than insurgent attacks, indicating a shift from insurgency to civil conflict.[5] Iraq's history could be seen in the patterns of violence. Tribal codes drove revenge killings between Sunni and Shi'a, while the methods of torture and execution—power drills and severed heads—echoed Ba'athist practices.[6]

The mass violence between Iraq's sects came amid a deadlock over seating the new government. Members of the Shi'a, Sunni, and Kurdish factions—elected

---

\* SIGIR interview with Dr. Ayad Allawi, former Prime Minister of Iraq, February 25, 2008.

PX213

• Reconstruction Amid Sectarian Violence •

to parliament under Iraq's newly ratified constitution—could not agree who should be named ministers. The United States lobbied against nominating the incumbent Prime Minister, Ibrahim Ja'afari, to that post again, viewing his divisiveness and political wavering as profoundly unhelpful to reconciliation.[7] With government at a standstill, the killing continued.

The Iraqi government's inability to contain the flow of displaced persons within Iraq further radicalized the population. With the Ministry of Displacement and Migration and the Red Crescent unable to meet their basic needs, displaced Iraqis turned to neighborhood mosques and the religious offices that supported them. SCIRI's charitable organization, Shahid al-Mihrab, and the offices of Grand Ayatollah Sistani and Muqtada al-Sadr distributed cash and material assistance to Shi'a refugees, while the Association of Muslim Scholars and the Islamic Party aided displaced Sunnis.[8]

In response to the security vacuum, the Mahdi Army and the Badr Brigade manned hundreds of informal checkpoints to stem the incursion of Sunni terrorists in Shi'a neighborhoods, while a parallel network of Sunni militiamen attempted to stop Shi'a killing squads from infiltrating Sunni areas. Numerous militia barricades slowed the flow of goods, disrupting Baghdad's economy. The market soon adapted. Informal exchange points on the city's west side let Sunni drivers off-load their wares to Shi'a trucks.[9]

When government forces could not stop the killing, refugees also became increasingly dependent on sectarian militias for their safety. The militias that came to rule whole sections of Baghdad also penetrated the state security apparatus. In 2006, the United States discovered evidence of Shi'a death squads operating from the Ministry of Interior, and a secret network of prisons across Baghdad.[10] Rival Shi'a factions asserted claims to the spoils of government, commandeering floors of the MoI and appropriating U.S.-purchased weapons and vehicles for militia activity.[11] Shi'a militias in particular successfully placed large numbers of their fighters on the government payroll. The National Police became so compromised that Sunnis began calling it a "Shi'a militia in uniform."[12]

The Balkanization of Baghdad ushered in a new calculus of risk, in which moving between neighborhoods became a kind of Russian roulette. A fake ID card bearing a Shi'a name was no longer good enough to get Sunnis through Shi'a checkpoints. Websites also advised Sunnis to play Shi'a devotional music and hang pictures of Imam Ali, considered the founding leader of the Shi'a, from the rear-view mirror.[13]

• 275 •

PX213

• Chapter 25 •

**Reconstruction Under Fire**

The volatile conditions undermined the ability of the United States to carry out reconstruction activities at construction sites and to visit government offices in central and south-central Iraq. Baghdad was especially dangerous. The segregation of Sunni and Shi'a neighborhoods became so pervasive that color-coded maps charted sectarian contours and relative levels of violence with block-by-block accuracy.[14] The U.S. military office overseeing security for reconstruction produced its own version of these maps, replete with "no-go" zones that were off-limits to reconstruction convoys. Taken collectively, these maps constitute a cartographic history of the reach of U.S. power in Iraq, showing the extent to which sectarian violence prevented Coalition contractors from working on reconstruction.[15] "I had gotten security-related delays on projects down to under five percent by the February [2006] timeframe," said Major General McCoy, in command of USACE-GRD. "We were actually into a fairly permissive environment for us to do construction, and then it started to back away."[16]

To coordinate security for construction activities, the GRD relied on its regional offices, which were co-located with military units. "We very conscientiously tried to make that coordination a part of the daily battle rhythm for the maneuver unit," McCoy said. "We needed them to either directly or indirectly put eyes on those projects to make sure things were continuing." During the year following Samarra, McCoy found himself railing at contractors who often failed to account for the delays. "If there are security issues, we'll accommodate those," he found himself saying, "but you're a professional contractor, and you ought to be managing the labor, the materials, [and] the construction quality that ensures we get the construction done on time as much as we can."[17]

Government oversight of three of McCoy's priorities—public health clinics, prisons, and border forts—was affected by the ongoing violence. Violence, however, was not the only impediment to effective monitoring. The complicated relationships between the various U.S. reconstruction offices were also at fault.[18]

In McCoy's assessment, the presumption that reconstruction contracts could be managed centrally from Baghdad was part of the problem. "You can't do construction remotely," McCoy said. "You have to put your eyes on it to see it. That's why we never knew if a project was on time or not. And it was a perfect environment for design-build contractors, because they get paid whether it's on time or not."

The convoluted management structure also prevented reconstruction managers from holding contractors accountable. "I was up outside Erbil, looking at a health clinic," he said. "There were seven or eight safety violations. I looked over at the District Commander and I said, 'Why aren't we having a cease work here?'

• 276 •

PX213

He said, 'We don't have the authority to do that. That's PCO's call.' I was finding contractors who were like kids playing Mom and Dad," McCoy said. "They'd go to PCO and ask a question, and if they didn't get the answer they liked, they'd go to GRD and ask a question, and they'd keep playing this Mom-and-Dad thing back and forth until they got the answer they were looking for."[19]

The new wave of violence caused a tide of Iraqi officials to leave the country. Although no sources fully document the emigration of the Iraqi professional class, one estimate suggests that more than 12,000 doctors fled the country since the war began.[20] The attenuation of state capacity undermined the effort to rebuild. One PRT political officer explained that his province had no "bench," no backup team of capable, educated citizens able to step in and run the government.[21] In Baghdad, senior advisors searched in vain for young energetic "champions" to help them carry out crucial tasks. They found instead "a bunch of people who were too old and too locked into the system to leave," as one senior advisor said. "Everyone else is in Jordan."[22]

The naming of the Dawa Party's Nouri al-Maliki as the compromise choice for Prime Minister on May 28, 2006, did not ease the violence. Daily attacks against U.S. and Iraqi soldiers increased by 44 percent from June 2005 to June 2006, with IEDs at four times the recorded levels of January 2004.[23] Civilian deaths proved harder to measure; the estimates range from tens of thousands to hundreds of thousands.[24]

Maliki's appointment soon sparked more discontent. "By the middle of July," MNC-I Commander Lieutenant General Peter Chiarelli said, "it was clear that his government … wasn't a government of national reconciliation. The Sunnis felt they'd been sold a bill of goods." Chiarelli believed that "Samarra was an accelerator, but nothing near Maliki coming into power."[25] Sunni ministers would later pull out of Maliki's government in protest of unmet political demands and not rejoin the government for more than a year.[26]

Amid the violence, infrastructure attacks skyrocketed. "The insurgents figured out that the best way to fight back against the government of Maliki," Ambassador Khalilzad explained, "was to try and strangle Baghdad on the infrastructure side." Rapid-response teams created within the Ministry of Electricity struggled to undo damage and stay ahead of the sabotage. Water treatment plant workers and garbage collectors also become targets. Infrastructure security, Khalilzad said, was an "uphill battle."[27]

In early summer 2006, U.S. military and Iraqi security forces mobilized to quell the violence. Operation Together Forward deployed 49,000 Iraqi soldiers and police and 7,200 Coalition troops to patrol Baghdad's most insecure neighborhoods, enforce nighttime curfews, and continue a Friday vehicle ban.[28] To

PX213

coordinate the application of reconstruction resources for the security plan, a Joint Planning Commission, which included representatives from U.S. agencies and the government of Iraq, met weekly. MNC-I also established a Joint Reconstruction Operations Center under the auspices of the GRD.[29]

When violence levels did not drop significantly, the Americans and Iraqis initiated a second phase of the operation in August 2006. More troops were redeployed from Anbar province to the capital, in effect giving up ground to one enemy to fight another. In September, military officials announced their intention to construct a series of trenches and berms around Baghdad's 60-mile circumference and control entry to the city through 28 checkpoints.[30]

**Drawing Down IRRF 2**

The violence triggered by Samarra reached its highest pitch just as the primary program of infrastructure reconstruction drew to a close. Ambassador Khalilzad's concern that IRRF 2 would not achieve its goal of pacifying Iraq proved well founded. As the last IRRF 2 dollars were being obligated, Iraqi popular support for attacks against American troops became a majority position: six in ten Iraqis viewed attacks on Coalition forces favorably.[31]

The reconstruction program funded by IRRF made its final project allocations in as much haste as it had been formulated by CPA officials. The Congress had appropriated IRRF 2 in 2003 as "three-year money." All funds not obligated to a specific project or re-obligated to specific sectors by September 30, 2006, could be used only to pay adjustments toward existing contracts. In a move reminiscent of the rush to spend DFI funds in 2004, the PCO launched a drive to meet the deadline, raising concerns in the Congress that the "race to obligate" would lead to waste and extravagance.[32] "Obligator" posters, in which PCO sector heads superimposed their photographs on a picture of Arnold Schwarzenegger's *Terminator* movie character, adorned the office's halls, and a massive banner hung in PCO's main workroom: "Obligating 'R' Us: Getting 'Er Done (by 30 Sep 2006)."[33]

The irony was not lost on those working on reconstruction. "The goal of PCO isn't to complete projects—it's to obligate the money," Lieutenant Colonel Busher said. "Do you see on the walls, 'Quality Projects for the Iraqi People by September 30'? No—you see the 'obligator' posters."[34] The review of IRRF projects and programming holds imposed by Ambassador Khalilzad had shortened the timeframe in which PCO had to work.[35] Despite the rush, PCO generally succeeded in awarding contracts in the largest program of reconstruction since the Marshall Plan, although a later SIGIR audit faulted it for improperly shifting some funds into holding accounts.[36] On the day PCO fully obligated the last of the IRRF funds, 88 percent of the IRRF projects had been completed; most of

PX213

• Reconstruction Amid Sectarian Violence •

the rest would be finished by the end of 2007.[37] The problem was what had been left undone in Iraq.

When night fell on September 30, 2006, much of Baghdad was still dark. Attacks on power lines and substation failures left the capital with only three hours of government-provided electricity per day, although some parts of the city were lit at night by private generators.[38] The rest of the country was faring better: most provinces received fourteen hours. Although average peak generation surpassed prewar levels for the first time, demand still outstripped supply by a factor of two.[39]

Iraq's other sectors showed uneven progress. Oil production, the government's predominant source of revenue, averaged 2.2 million barrels per day.[40] A worrisome internal assessment written by the Ministry of Oil advisor warned that "inadequate expenditures for maintenance and lack of replacement of critical parts" threatened to undo recent production gains.[41] The water sector lagged most of all. U.S.-funded projects were on track to bring access to potable water to 8.2 million Iraqis.[42] Although this met the goal set by IRMO after water funds had mostly been reprogrammed to security, only one in three Iraqis had regular access to fresh water.[43]

The lack of essential services depressed the economy. Half the adult population was unemployed or underemployed, and the country's manufacturing and agricultural sectors were mostly in a state of collapse.[44] This was not the Iraq that Ambassador Bremer envisioned as the legacy of IRRF 2. Speaking to the dramatically scaled-back ambitions, GRD's Major General Bill McCoy said that the United States "never intended to completely rebuild Iraq."[45]

## The Rise of CERP

As IRRF funds began to wind down, reconstruction entered a new phase. The PCO stood down after two years as the primary reconstruction executing agency. Most of its personnel moved seamlessly to the GRD, which thereafter became the leading project contracting office for ongoing construction in Iraq. The drawdown of IRRF also marked a shift in the U.S. approach to reconstruction.

As a result of changes made by Ambassador Khalilzad in his initial months as Chief of Mission, reconstruction became more defined in purpose even as it grew more diffuse in execution. With the massive upgrade of Iraq's physical infrastructure drawing to a close, the design-build contractors that executed IRRF 2 began packing up. Bechtel, the first large contractor on the ground in 2003, removed all but two of its 200 employees by November 2006.[46] It had been a harrowing three years for the construction firm. Fifty-two people working on Bechtel projects had been killed, and another 49 had been seriously wounded.[47] In place of the

• 279 •

PX213

design-build contractors, Iraqi firms that had served as subcontractors assumed increasingly prominent roles. GRD often contracted with them directly to finish projects not completed under design-build contracts.[48]

The focus shifted from building new facilities to maintaining the new infrastructure's more complex systems, which overextended Iraqi engineers, who lacked technical skills and reliable supply chains. Targeted sustainment and capacity-development programs launched by USAID and PCO/GRD brought technical assistance into all levels of the Iraqi government. At the same time, the PRDCs and PRTs developed by Ambassador Khalilzad moved reconstruction money and expertise farther into the provinces to sustain and expand the delivery of essential services.

In this new post-IRRF phase, the military oversaw a significant evolution of the Commander's Emergency Response Program.[49] Lieutenant General Peter Chiarelli had pioneered stability operations in Sadr City while leading the 1st Cavalry in 2004, and he returned to Iraq in January 2006 as MNC-I commander. The many rounds of de-scoping had left Iraq littered with half-finished projects—a power plant that ran at partial capacity here, a waste treatment facility left unconnected to the sewer system there.

Chiarelli saw an opportunity, realizing that a creative application of CERP funds—a $510 million program that supported 3,800 projects in fiscal year 2006—could wring more from what was already constructed.[50] Power lines, which are comparatively inexpensive to construct, could connect under-utilized power plants to Iraqi homes. The same could be done for sewer and water treatment plants. The "invisible capacity" that existed in a variety of sectors could make an enormous difference in the lives of the Iraqi people, if only production and distribution networks finally meshed.[51] What had begun as "walking around money" for soldiers became a powerful tool for linking IRRF-constructed infrastructure with the people it was designed to serve. "Our commanders will tell you that CERP is probably the most important 'bullet' they have," said Deputy Secretary of Defense Gordon England. "I mean, you can help somebody instantly." [52]

Rather than fixing on the number of projects started or completed, as embassy reconstruction accounting practices did, officials began to define success as the delivery of services to the Iraqi people. Putting their day-to-day needs first was part of a larger recognition of the need to reorient U.S. strategy around counterinsurgency goals—the "winning of hearts and minds" through quality-of-life improvements. "I made it a purpose of every one of my troops out to brigade commanders to not only be briefed on what they were doing kinetically [on the battlefield], but what they were doing non-kinetically," Chiarelli said. "As part of my battlefield tour I always make them take me to a project that was going on."[53]

PX213

A transformation in military thinking was underway. "The CERP program grew as the military really got into the role of post-kinetic stabilization," Ambassador David Satterfield said. "You had a succession of people like Pete Chiarelli who really believed in the value of civil-military work—buying people out of violence, out of conflict."[54] The increasing use of CERP for infrastructure construction and other large-scale projects brought new challenges. Although small humanitarian relief applications for which the program was originally conceived constitute almost half of CERP projects in numerical terms, only four percent of total expenditures went to support them. From fiscal year 2004 through 2006, more than a third of the budget went to CERP projects that cost more than $500,000, although these comprised only three percent of all projects.[55]

Efficiently managing these projects and ensuring their sustainment by the government of Iraq was difficult. The military officers who initiated them often lacked a background in project management. Occasionally, project documentation lagged or was missing altogether. Although the Joint Reconstruction Operations Center tracked CERP projects in Baghdad, no similar centrally administered repository tracked them in the rest of the country.[56] Nevertheless, CERP functioned in 2006 for brigades, PRTs, and PRDCs as an essential bridge linking the capital expenditures made by IRRF 2 to real gains in essential services and quality of life for Iraqis.

**Hitches and Roadblocks**

As Chiarelli refocused CERP, he found himself managing an unexpected decrease in the civilian programs the military needed most. USAID's OTI, whose pioneering collaboration with the 1st Cavalry Division in 2004 served as a model for Clear-Hold-Build, was being moved out of the country. The office's mandate normally permits it to remain active for three years in any one country; at the military's request, this had been extended twice.[57] To replace the office, the USAID country director began developing other long-term programs, first called "Focused Stabilization," but subsequently renamed "Community Stabilization."[58]

The transition to focused stabilization would strengthen the ability of USAID and other civilian organizations to contribute to counterinsurgency operations in the "strategic cities" designated by MNF-I and the NSC.[59] The operational concept for this unique mix of civilian and military assets was published in MNF-I's Joint Campaign Plan. To coordinate its implementation, MNC-I established the Interagency Stabilization Task Force.[60] This steering body brought Iraqi officials from the ministerial and provincial governments together with embassy and military personnel at all levels—from IRMO and USAID down to PRTs and NGOs.[61] Beginning with the task force's first meeting on May 28, 2006, the

PX213

• Chapter 25 •

military's counterinsurgency campaign would be much better coordinated with civilian and Iraqi efforts.

There was, however, a "small" hitch. "[Focused stabilization] didn't get funded," Chiarelli said.[62] USAID was able to obligate only $30 million of IRRF funding to International Relief and Development, the contractor that was to replace OTI.[63] Budgeting and acquisition delays also slowed the program's deployment.[64] A strategy that called for mounting significant civilian-led reconstruction operations in at least nine cities appeared in the summer of 2006 to have funding for merely three or four.

The shaky transition to a new vehicle for rapid assistance caused intermittent slowdowns in high-performing programs funded by USAID. At the same time, the challenges of staffing and funding PRTs delayed their full deployment. The White House had issued its *National Strategy for Victory in Iraq*, but the Department of State and USAID seemed unable to follow through with the Clear-Hold-Build strategy it prescribed.[65] A lack of capacity was only part of the problem. Disagreements continued among the President's advisors on whether the U.S. military should assume a different counterinsurgency posture.[66]

The partial implementation of Clear-Hold-Build exacerbated a structural weakness in the reconstruction program. Although the U.S. capacity to undertake rapid, localized interventions through projects funded by CERP and OTI could deliver immediate results, the benefits of longer-term development and capacity-building efforts pioneered by IRRF often took years to be seen.

The need for "middle-range" interventions was acutely felt in violent provinces like Anbar, where counterinsurgency operations were underway. Lieutenant Colonel Christian Shomber, a Reservist on his second tour in the violent Sunni-dominated province, served as an economics liaison officer for the Marine command. Since his first tour, the situation had grown dire. Shomber saw no purpose in continuing approaches to reconstruction that had already failed in the province. "If it wasn't working," he said, "doing more won't help." In place of existing programs, he proposed the kind of interventions that fell outside IRRF 2's focus on infrastructure construction, but beyond CERP's purview. "We need local community action plans—livestock vaccines, seed distributions, housing funds," Shomber said, projects that could jump-start Anbar's idle factories and farms.[67] USAID programs could provide some of these, but it was for the most part too dangerous for them to operate in the province.

Other roadblocks existed. Advisors in the embassy, including several who had been architects of the CPA's free-market policies, refused to support Shomber's requests. Shomber, who in civilian life worked as an investment banker on Wall Street, was struck by the embassy's continued reliance on market mechanisms

PX213

to drive recovery in a province where violence made a "normal" market impossible. It was not the first time that embassy advisors were reluctant to support short-term projects that they did not think were likely to be catalysts of long-term growth. OTI's withdrawal from Iraq further hamstrung Shomber's efforts to deliver economic and political gains that met Iraqi needs and supported the counterinsurgency campaign. "Anybody who says [the troops] are getting what we need is not listening," he said.[68]

### Neglecting Agriculture

Shomber was right to notice that U.S.-funded reconstruction programs had overlooked the agriculture sector. Although agriculture was Iraq's second-largest economic activity, with the potential to employ an estimated 25 to 30 percent of the population, the IRRF 2 supplemental did not fund any agriculture programs in 2003.[69] The CPA ultimately stepped back from its initial policy and tasked USAID to work with the Ministry of Agriculture to develop a plan. Three years later, activity levels were still low. In 2006, the primary instrument was still the "Agricultural Reconstruction and Development Program for Iraq," which USAID had launched with $5 million in October 2003.[70] During the November 2004 IRRF 2 reprogramming, Ambassador Negroponte increased its funding to $72 million, but even this amounted to an investment of only $3 per Iraqi.[71]

In the wake of decades of inefficient central planning and the systemic underinvestment of the Saddam years, advisors faced difficult decisions to make the U.S. agriculture investment stretch as far as possible. The last major infusion of agricultural technology had come in the late 1980s, when the United States sold Iraq $800 million worth of goods, part of which was an aid package to support Iraq's war against Iran.[72] Since then, agricultural production had mostly collapsed as a result of dilapidated irrigation systems and limited water supply, as well as the high salinity that affected 75 percent of Iraq's arable land. By 2004, production had dipped below pre-war levels.[73]

Development Alternatives Incorporated, the contractor implementing the USAID agriculture program, produced an assessment in April 2004 calling for short-term job creation measures to be paired with longer-term reform.[74] The master plan, developed in coordination with the Ministry of Agriculture, called for a two-phase recovery targeted on physical, human, and institutional resources. Raising the availability of agricultural inputs was among the most crucial short-term measures. In the winter of 2003, farmers in Iraq's non-Kurdish provinces had access to only eight percent of the nitrogen fertilizer they needed.[75] Pesticides, seeds, diesel for machinery, and spare parts were necessary to help spur production and re-establish the domestic market for wheat and other high-value crops.

PX213

A subsidy fund of $200 million of Iraqi funds in the custody of the Ministry of Finance helped purchase some of these agriculture inputs. Livestock improvement was also planned, with poultry and sheep a priority.

In addition to these short-term measures, fundamental reforms were also started, including land and water reclamation and privatizing state-owned farms. The USAID plan envisioned that the Ministry of Agriculture would be transformed from its historical role as a manager of production to a regulatory body that would facilitate a free-market agricultural economy. The U.S. Department of Agriculture was also enrolled to help modernize Iraq's agricultural science base and the country's capacity to engage in regional trade. In 2006, a consortium of U.S. universities helped revamp the Iraqi university curricula used to train farmers and veterinarians. The Agriculture Department also supplied a handful of advisors who worked at the embassy, Ministry of Agriculture, and on PRTs. However, only two agriculture advisors were on PRTs at the end of 2006.[76]

By the end of 2006, when the program shut down, the outputs of USAID's agricultural program appeared impressive: it had helped repair more than 3,000 tractors, delivered 4,000 tons of wheat seed to a storage facility in Mosul, restored 70 veterinarian clinics, and distributed 169 seed-cleaning machines.[77] In addition, longer-term planning had begun: the Ministry of Water joined with the Ministry of Agriculture to develop an integrated approach to land and water reclamation.[78] Other IRRF 2 funds for water and irrigation projects contributed to the agriculture sector, as did smaller expenditures from CERP and other USAID programs.

On the whole, though, this was not enough to transform Iraq's beleaguered agricultural sector into a modern, market-based system able to produce enough for domestic consumption and compete in the regional market. Even if the United States had invested more heavily, the failure to deliver reliable essential services would have undercut commercial farms. Commercial poultry operations, for instance, require stable electric power to see chicks through their fourth week of life. Power and affordable diesel fuel are also essential to operate the pumps that irrigate field crops.[79] Agriculture, like Iraq's other economic enterprises, was in need of both modernization and the basic services typically supplied by the state.

For these reasons, in May 2007, USAID provided $343 million for a three-year modernization program called *Inma*—Arabic for growth—targeted on the development of agribusiness and agricultural markets.[80] The program aimed to forge stronger linkages among farmers, agribusinesses, and markets—both domestic and international. *Inma*'s implementers would work closely with PRTs and continue the technology transfer and modernization programs begun under the earlier agricultural effort. It was an aggressive approach in keeping with the

PX213

sector's potential, but one that came years too late for Shomber and his fellow soldiers in Anbar.

### Standing Up the Iraqi Security Forces

As in many reconstruction sectors, investment in agriculture had been diverted to an even more pressing need—Iraq's security forces. It was part of the U.S. approach, announced by Prime Minister Ja'afari and MNF-I in June 2005, to transition security responsibilities to the Iraqis through a process known as provincial Iraqi control (PIC).[81] President Bush succinctly stated the strategy in a June 2005 address. "As Iraqis stand up," he said, "we will stand down."[82]

With the new focus on transitioning security responsibilities, the ISFF surpassed IRRF 2 as the primary reconstruction fund. Appropriations through 2008 brought the total value of ISFF to $17.94 billion.[83] Coupled with $4.97 billion in IRRF 2 allocations, spending on the Iraqi security sector was larger than U.S. spending on all other sectors combined.[84]

| Iraq Security Forces Fund Appropriations  ($ Millions) | | |
|---|---|---|
| Appropriation | Public Law | Amount |
| Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 | P.L. 109-13 | $5,391 |
| Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 | P.L. 109-234 | $3,007 |
| Department of Defense Appropriations Act, 2007 | P.L. 109-289 | $1,700 |
| U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 | P.L. 110-28 | $3,842 |
| Consolidated Appropriations Act, 2008 | P.L. 110-161 | $1,500 |
| Supplemental Appropriations Act, 2008 | P.L. 110-252 | $2,500 |
| Total | | $17,940 |

Source: SIGIR, *Quarterly Report to the United States Congress,* October 2008, 26.

MNSTC-I used ISFF to organize, train, equip, and sustain the Iraqi security forces. In addition, more than 4,000 U.S. personnel served in MNC-I transition teams, which lived, worked, and fought alongside Iraqi battalions. This constituted an enormous investment of resources that had produced an impressive new force, at least on paper. Tens of thousands of police and soldiers had been trained, and more than 1,200 facilities were built.[85]

Despite the outlay of U.S. human and financial resources, Iraqi forces were mostly unable to contain the rising violence in 2006. They were extremely vulnerable to sectarian and insurgent attack and also stretched thin, with fewer members in per capita terms than security forces in other countries facing similar

PX213

challenges.[86] In the year and a half following the Samarra bombing, three times as many Iraqi army and police were killed than Coalition forces in Iraq.[87]

The sectarian conflict gripping Iraq also played out inside its government. Soldiers, police, and judges could not easily shed their sectarian identities when on the job. For many, loyalties to sect or tribe competed with their willingness to serve the Iraqi state. The police and military also depended on the support of a set of institutions that were not yet competent to manage the various forces as they confronted the insurgency.

When June 2006 arrived, not one province had attained what Iraqi and U.S. officials considered the requisite degree of stability for the transition to provincial control to proceed.[88] Target dates for the PIC process shifted five more times over the next year and a half. By the end of 2007, handoff had occurred in only nine of eighteen provinces, and three of those handed off had long been under de facto Kurdish control.[89]

*Ministry of Defense*

The Ministry of Defense was one of the relatively better functioning parts of the Iraqi government, although it too suffered from rampant corruption.[90] The army as a whole, however, underperformed in a number of key areas just when its services were needed most. Few units were operationally ready and able to conduct missions in tandem with U.S. forces or on their own. A byzantine and reportedly corrupt contracting and procurement system meant that soldiers lacked the guns, body armor, radios, and vehicles to take on the militias and insurgents they were fighting—who often had heavy weapons of their own.

In October 2005, formal responsibility for building capacity in the Ministries of Interior and Defense shifted from IRMO to MNSTC-I, ratifying the shift that began with the creation of the CPATT and the CMATT in 2004. To help develop Iraq's capacity to equip its own troops, MNSTC-I fielded a team of 68 advisors, mostly civilian contractors, to assist the ministry's civilian leadership. A separate Joint Headquarters Transition Team of about 50 personnel, also mostly contractors, worked with the Iraqi military staff to improve command and control and to train and equip the nascent forces.[91] The purpose of both teams was to mentor their Iraqi colleagues while at the same time strengthening capacity inside the ministry.

Their work yielded mixed results. They first tried to bypass the Iraqi procurement system altogether, but attempts to use the U.S. Foreign Military Sales system turned into what one senior U.S. commander lamented as "a national embarrassment" for the United States. Of $1.7 billion in acquisitions made by the government of Iraq in 2006, only $300 million had arrived by mid-2007.[92] "We

PX213

• Reconstruction Amid Sectarian Violence •

overwhelmed the system," said Lieutenant General Martin Dempsey, MNSTC-I commander. "There was a period of time when we had one desk officer in the Department of Defense watching the Iraqi account. Of course, that was just not going to work."[93] Although deliveries eventually improved, unexpected delays in the U.S. system hamstrung Iraqi forces at a critical moment.

By October 2006, the CPA or MNSTC-I had trained more than 115,000 Ministry of Defense personnel.[94] Ninety-two Iraqi Army and Special Operations battalions were deemed capable of operating independently or "in the lead," a nearly four-fold increase since July 2005.[95] These units increasingly took "primary area security responsibility" in many parts of the country, and in September 2006, Thi-Qar Province became the second province to transfer to PIC.[96] The most significant continuing shortcomings were the ISF's logistics and sustainment capabilities.[97]

Coalition advisors also pursued longer-term solutions, including the installation of a new financial management and accounting system. As with the unsuccessful effort to install a government-wide financial management system in the Ministry of Finance, the design of the Defense Ministry system was ill-suited to Iraqi norms and experience.[98] Logistics capability nevertheless slowly improved, and by 2007 Iraqi expenditures on its security services would exceed those of the U.S. government.[99]

*Ministry of Interior*

Iraq's police, even more than the army, were deeply divided by sectarian rivalry and hobbled by administrative malaise. The fragmentation of police training identified in reviews of the program in 2005—which faulted a lack of cohesion among the civilian trainers, MNSTC-I advisors, and MNC-I officials—had been partially addressed.[100] A three-phase training program had been introduced by MNSTC-I—which named 2006 the "Year of the Police"—and more U.S. forces were now mentoring Iraqi police after their graduation. A planned total of 750 State Department contractors and 2,250 U.S. military personnel would be deployed in police training teams.[101]

By August 2006, 160 Coalition police transition teams circulated among Iraqi police in the field, while an additional 38 teams worked with the Iraqi National Police.[102] Modules on detecting suicide bombers were added to the training courses for new recruits, and local intelligence collection—a key element of the counterinsurgency campaign—gradually improved. However, in 2006, the Coalition had enough personnel to monitor only a quarter of the 1,200 police stations across Iraq. Two hundred stations were considered too dangerous for U.S. personnel even to visit.[103]

PX213

• Chapter 25 •

Like the army, the Iraqi police were supported by a ministry that was not yet entirely functional. The Ministry of the Interior, described by some as an "eleven-story powder keg of factions," was viewed by many as a protector of Shi'a interests.[104] It was also a key site of intra-Shi'a rivalry. Political parties, religious groups, tribes, families, and members of the government each struggled to bolster their authority over forces in the provinces. The Ministry became notorious for discriminating by sect in its hiring practices. At times, who got paid came down to ethnicity.[105]

After the Samarra bombing, Ministry of Interior leadership hastened the integration of a Shi'a militia into the force. Bayan Jabr, who served as Minister of Interior from April 2005 to May 2006 and thereafter as Minister of Finance, appointed members of the Badr Organization, the armed wing of the political party SCIRI, to key ministerial posts. Much of the controversy centered on the Iraqi National Police, an elite counterterrorism force that was 85 percent Shi'a. In 2005, units had been implicated in a prison torture scandal. Sunni communities violently rejected the National Police, seeing it as an extension of Shi'a militia killing squads.[106]

Jawad al-Bolani, who followed Jabr as Minister of Interior, ultimately removed commanders from 7 of 9 National Police brigades and 17 of 26 National Police battalions, but even this failed to curb sectarian infiltration. A later review found the National Police so riddled with sectarian influences that it recommended disbanding it altogether—a suggestion disregarded by Lieutenant General Petraeus, who viewed the force as redeemable. Al-Bolani himself was only partially successful in taking the reins. The Interior Ministry's proximity to Sadr City made travel there exceptionally dangerous. On most days, he ran the ministry from an office just outside the Green Zone. So many officials were assassinated on their way to work that many started sleeping in their offices.[107]

To help establish capacity within the Ministry of Interior, MNSTC-I assembled a 90-person transition team. The danger forced Coalition officials to move around inside the ministry with body armor and heavily armed escorts. Although the provision of equipment reached rates of 70 to 80 percent of assessed needs in some places, the police—like the military—were still frequently outgunned. Ill-trained police patrolling in soft-sided trucks with AK-47s and pistols were little match for militias attacking with heavy weapons, rocket-propelled grenades, and mortars. As was the case in the Ministry of Defense, the Ministry of Interior's budget execution was a perennial problem. Two years after MNSTC-I assumed responsibility for capacity development, one third of the ministry's $3 billion budget remained unspent.[108]

• 288 •

PX213

• Reconstruction Amid Sectarian Violence •

Sectarian rivalry and an open power struggle between provincial and central authorities were often the root cause of poor performance. Once the power to hire police devolved to the provinces, tribal sheikhs—who asserted an increasing influence over local government—placed tribal members on the job rolls. Although it was expected and often helpful for the police to mirror the sectarian character of the neighborhoods they patrolled, payroll remained under control of the central ministry, opening the door to favoritism and abuse. A separate system for new recruits complicated matters further. Rather than being disbursed through the Ministry of Interior payroll system, pay was distributed by provincial police chiefs, whom the Ministry of Finance supplied directly with funds. "Ghost employees" were a constant concern.[109]

The attempts to vet police and rid the system of sectarianism and corruption, first begun by the qualifying committees in early 2005, grew ever more sophisticated.[110] New recruits were made to submit to a retinal scan and fingerprinting, which were crosschecked against criminal databases and allowed for more rigorous scrutiny of payroll and rosters. All through 2006 and 2007, purges of the police force occurred when the will of local political authorities overcame the coercive power of factions controlling the force.[111]

The militarization of the police was also a growing concern. One review found that MNSTC-I's assumption of leadership over police training inadvertently marginalized the civilian police advisors best positioned to teach Iraqis policing skills. The Bureau of International Narcotics and Law Enforcement Affairs trainers were older—and therefore more respected in Iraqi culture—than the younger MNC-I soldiers who manned police training teams. They were also professional law enforcement officers with experience in civilian policing. Fielding sufficient numbers of them was the problem. Although the police command with MNSTC-I requested 6,000, the Congress authorized only 1,000. A year and a half after Samarra, 900 were in Iraq, along with some 3,500 military personnel. By 2007, they oversaw a police force of more than 230,000—a ratio of 1 to 50.[112]

**Expanding Rule of Law Programs**

The range of activities falling under the rubric "rule of law" included everything from digitizing the Iraqi legal code to training judges, securing court houses, and building prisons. Even getting fuel oil to the generators so the courts could operate with air-conditioning and light was part of the job. By the end of 2005, the United States had expended more than $400 million for law- and security-related programs other than police training, $300 million of which went toward brick-and-mortar projects and $100 million to capacity building.[113]

PX213

• Chapter 25 •

The sheer number of agencies and funding streams involved in rule-of-law activities gave rise to all sorts of bureaucratic complications. Funding for resident legal advisors from the Department of Justice came through the State Department's Bureau of International Narcotics and Law Enforcement Affairs. Military officials overseeing detainees relied upon prison funds under the control of the embassy, and State Department officials on PRTs used the military's CERP funds to support courts. Coordination was a constant challenge on both the Iraqi and American side.

Ambassador Khalilzad instituted a Rule of Law Task Force in 2005, but an overall coordinator was not named until 2006. Only in 2007 did Ambassador Crocker delegate real authority to the position. "We were sometimes our own worst enemies because we did not talk to each other and did not coordinate with each other," said James Santelle, the embassy's third rule-of-law coordinator.[114] The Iraqis were equally disorganized. To promote the integration of police, courts, and prisons, INL facilitated the Iraqi Integration Commission, comprising the ministers of interior and justice and the chief justice, which first met on July 26, 2005.[115] A second committee, the Ministerial Committee on Rule of Law and Detention, with even wider participation from Iraqi ministries, began meeting in 2007. "It was the first time [Iraqi] agencies involved in the rule of law sat down at the same table in the Ministry of Justice and talked about these issues," Santelle said.[116]

The whole effort had many moving parts, the largest of which was the Central Criminal Court of Iraq, originally established by the CPA to prosecute terrorism and corruption cases. The CCCI had twelve panels operating at secure sites throughout Iraq, but most of the work took place in Baghdad. During 2006, the CCCI processed 118 insurgency cases per month.[117] Support for a number of high-level prosecutions came from the Major Crimes Task Force—a team of twelve American law enforcement agents and eleven Iraqi officers, as well as five translators—established after a series of bombings went uninvestigated in 2004 and 2005.[118]

Processing detainees, whether arrested by U.S. forces or Iraqi authorities, was a bottleneck. "It's bad to have someone in jail for eighteen months without seeing a judge," Santelle said. However, bringing together judges, case files, and detainees for hearings that would rule on release or continued incarceration was a monumental effort.[119] The lack of a developed penal system of jails and prisons was part of the problem. Initial designs by design-build contractor Parsons for the major prison complexes at Nassriya and Khan Bani Sa'ad included air-conditioning—a luxury few Iraqis could afford—and were constructed to U.S. standards rather than Middle Eastern norms. "Iraqi penal theory calls for prisons

• 290 •

PX213

• Reconstruction Amid Sectarian Violence •

to be less comfortable than the inmate's home," a State Department review found. The air-conditioning units stood "a good chance of being unplugged once the Americans leave."[120]

The large U.S. investment in the CCCI had effectively created a two-tiered Iraqi justice system. "For the average Iraqi," Santelle said, "day-to-day justice being doled out is not at the CCCI." Rather, people were getting divorced, suing each other, and working out other legal problems in provincial courts.[121] The United States was seen to have invested heavily in the CCCI, which served its own national interest by prosecuting terrorism cases, but to have done little for the courts that Iraqis use most. "We have co-opted the Iraqi justice system for our own use and left ordinary Iraqis with nothing," said Stephen Andersson, a resident legal advisor in the Baghdad PRT.[122] To the average Iraqi, the CCCI courts are an American creation. "We call them the Potemkin Courts," one former judge said.[123]

In the courts where ordinary Iraqis sought justice, the insecure environment took its toll on the judiciary. The Islamic State of Iraq, an umbrella organization of insurgent groups, mounted continual attacks on Baghdad courthouses. The chief judge at the al-Rusafa Appellate District Court kept bullets fired at his office stacked in his ashtray.[124] The danger extended beyond the courthouses themselves. Unlike the CCCI judges, who were granted secure housing in the Green Zone or on U.S.-protected rule- of-law compounds, the vast majority of Iraq's judges lived in their own homes with no protection. "Judges are living in places like Doura and Kadhamiya," Santelle said, "and they've got to go home at night and live amongst the other communities where they are not protected … That's tough for anyone to do."[125]

The judges' vulnerability may have compromised their ability to render impartial verdicts. One former Iraqi judge estimated that nine of every ten decisions in the common court system are shaped by extra-judicial considerations, in contrast to four to seven out of ten in the CCCI courts—both unacceptable ratios by Western standards.[126] Corruption had always been a part of judicial practice under Saddam, but after the invasion its motivating factor changed from money to safety. "It's for keeping their life, and keeping their job," one former judge said. The result is that "the courts are functioning but the system is not."[127]

## Iraq Policy in Crisis

The country had begun coming together again—however slightly—during Ambassador Khalilzad's early tenure, but sectarian violence, accelerated by the Samarra bombing, blew it back apart. As summer 2006 turned to fall, U.S. Iraq policy fell into crisis. The stalled deployment of the PRTs and slow establishment

PX213

of the focused stabilization effort undercut the President's Clear-Hold-Build strategy. Chiarelli's push to use CERP funds for "last-mile" construction could not by itself make up for the under-performance of IRRF 2. Enormous capacity-building and sustainability challenges loomed, but efforts to address them were still unformed.[128] Those programs that seemed to work were spread too thinly across the war-torn country. Sectarian violence escalated: more than 1,000 Iraqis died at the hands of their countrymen every month.[129]

The day after congressional elections in 2006, the White House announced the resignation of Secretary of Defense Donald Rumsfeld. The man who oversaw the planning and management of the war for more than three years, and who opposed some of the White House's most recent policies, would be replaced by Robert Gates, who had directed the CIA in the early 1990s. Gates was then serving on the bipartisan review of Iraq policy led by former Secretary of State James Baker and former Congressman Lee Hamilton.[130]

The Iraq Study Group, commissioned by the Congress and eventually welcomed by the White House, was given access to all intelligence and information on Iraq.[131] In anticipation of its report and at the direction of the President, Deputy National Security Advisor J.D. Crouch began a review of Iraq options. The Joint Chiefs of Staff also undertook their own assessment, as did a number of think-tanks in Washington. Plans under consideration ranged from a complete pull-out to a major escalation.[132]

Issued on December 6, 2006, the Iraq Study Group report argued that continuing the current course would lead to failure. Its 79 recommendations addressed the full spectrum of policy issues: geopolitics, political dynamics at work in Iraq, and the performance of U.S. institutions assisting the Iraqi government.

To resolve sectarian aggression, the study group set out specific milestones. One of the most important was holding local elections to break the monopoly on service delivery held by what one official called a "Shi'a dictatorship" that ruled most of Iraq's provincial governments.[133] The study group also called for reordering the responsibility for Iraq's security forces and shifting the U.S. role to that of training and equipping the Iraqi army and police so that U.S. troops could begin to withdraw. The 4,000 American troops now serving in this role were seen as inadequate; the study group called for the number to be increased to a total of 10,000 to 20,000.[134]

To ready the Iraqi government for its transition to self-reliance, the study group recommended a further $5 billion in economic assistance per year focused on capacity development and job creation. The study group also criticized the poor coordination between USAID and the Departments of State and Defense. "There are no clear lines establishing who is in charge of reconstruction," the report

PX213

• Reconstruction Amid Sectarian Violence •

stated. It prescribed a major overhaul of the U.S. effort, calling for the appointment of a reconstruction coordinator reporting directly to the President, authorizing the ambassador to provide or rescind funding on a project-by-project basis, and for the takeover of rule-of-law programs by the Department of Justice.[135]

Some observers thought the Iraq Study Group members had not fully appreciated the effectiveness of the Clear-Hold-Build strategy or what a possible increase in troop strength could achieve, and had instead bought into the prevailing thinking of General Casey and supporters of the "transition to Iraqis" approach.[136] It would be up to the President to decide between the competing military strategies. By the end of the year, the White House would make its decision.

PX213

• Chapter 25 •

## Essential Services Overview – Transition from Khalilzad to Crocker

| Metric[137] | Pre-invasion | Post-invasion | CPA Transition | Negroponte Era | Khalilzad Era |
|---|---|---|---|---|---|
| **Electricity Production** | | | | | |
| *Megawatts* | 4,075 | 711 | 3,621 | 4,262 | 3,475 |
| **Oil Production** | | | | | |
| *Million Barrels per Day* | 2.58 | 0.30 | 2.16 | 2.13 | 1.95 |
| **Iraqi Security Forces** | | | | | |
| *Soldiers and Police* | 1,300,000 | 7,000-9,000 | 87,000 | 171,300 | 328,700 |
| **Telecommunications** | | | | | |
| *Landline Subscribers* | 833,000 | 0 | 791,000 | 998,000 | 1,111,000 |
| *Mobile Subscribers* | 80,000 | 0 | 461,000 | 2,422,000 | 8,720,000 |
| **Human Toll** | | | | | |
| *U.S Troop Fatalities* | - | 139 | 862 | 1,745 | 3,248 |
| *Civilian Contractors* | - | 1 | 46 | 217 | 916 |
| *U.S. Civilians* | - | ~9 | 52 | 113 | 224 |
| *Iraqi Civilians* | - | 7,413 | 16,848 | 29,155 | 72,858 |
| **Financial Cost ($ billions)** | | | | | |
| *U.S Funding* | - | $3.45 | $22.93 | $29.21 | $36.96 |
| *Iraqi Funding* | - | $0.00 | $16.00 | $21.03 | $37.27 |
| *International Funding* | - | $0.00 | $13.60 | $13.87 | $15.20 |
| *Total Funding* | - | $3.45 | $52.53 | $64.11 | $89.43 |

During Khalilzad's tenure, project delays and increasing security costs limited improvements in essential service delivery. The output increases of the Negroponte era were short-lived, especially in the oil and electricity sectors. Insurgent attacks and a lack of fuel drove average levels of electricity generation down below prewar levels, and power outages again became common. Attacks on critical infrastructure increased in 2006, causing electricity production to fall to a daily average of 3,475 megawatts by March 2007.[138]

The oil sector continued to be plagued by corruption and smuggling. Between 10 and 30 percent of refined fuels was diverted to the black market or smuggled out of Iraq.[139] Although the oil sector's capacity was estimated at 3 million barrels per day, only about 2 million barrels per day were produced during 2005-2006.[140]

• 294 •

PX213

CHAPTER 26
# THE CIVILIAN SURGE

> *2006 was a bad year in Iraq. The country came close to unraveling politically, economically, and in security terms. 2007 has brought improvement. Enormous challenges remain. Iraqis still struggle with fundamental questions about how to share power, accept their differences and overcome their past. The changes to our strategy last January—the surge—have helped change the dynamics in Iraq for the better.\**

> **Ambassador Ryan Crocker**
> U. S. Ambassador to Iraq (2007-present)

President Bush unveiled his new Iraq strategy on January 10, 2007, a day after fierce fighting broke out in Baghdad off Haifa Street, a thousand yards from the Green Zone.[1] In a nationally televised speech, the President announced a "surge" of more than 20,000 troops whose primary mission would be to reduce violence nationwide.[2] The new focus on civilian security was premised on the notion that stemming sectarian violence would enable Iraq's leaders to reach reconciliation.[3] When complete, the surge would add two Marine battalions in Anbar province and five Army brigades in Baghdad province.[4]

The surge in troops would be coupled with an intensive focus on neighborhood reconstruction by joint civilian and military teams and by an expansion of USAID programs. The President announced that smaller "embedded" Provincial Reconstruction Teams (ePRTs) would place development experts directly inside brigade combat teams. More of the larger "traditional" PRTs would also be added.[5] This "civilian surge" would double the number of reconstruction advisors serving outside the Green Zone, bringing the total to 700 by the end of a 9-month build-up.[6]

USAID's Community Stabilization Program (CSP), which operated through Iraqi intermediaries with little visible association with U.S. civilian or military forces, would expand to work with all PRTs.[7] Iraqi neighborhoods would be flooded with modest infrastructure projects that hired unskilled labor for trash pickups, awarded grants to invigorate small businesses, and provided vocational training and youth programs.[8] It would be an "all-hands-on-deck" approach to reversing the acceleration of violence that followed the Samarra bombing.[9]

---

\* Ambassador Ryan Crocker, U.S. Ambassador to Iraq, Testimony before the House Committee on Foreign Affairs and the Committee on Armed Services, September 10, 2007.

PX213

• Chapter 26 •

**A New Military Strategy**

The surge plan pushed back the possibility of a phased withdrawal of U.S. forces for 12 to 18 months. Although it incorporated many of the Iraq Study Group's performance benchmarks, the plan departed from the policies of General George Casey, the outgoing commander, and the Iraq Study Group's call for gradual disengagement.[10] Like many members of the group, Casey viewed an intrusive American presence as counterproductive to solving Iraq's underlying political and security problems and therefore advocated a rapid hand-off to Iraqi forces.[11]

To carry out the surge, the President nominated—and the Senate unanimously confirmed—General David Petraeus as MNF-I's new Commanding General in Iraq. After his command of MNSTC-I in 2005, which followed his 2003-04 command of the 101st Airborne in Mosul, Petraeus had directed the first rewrite of the Army and Marine Corps' counterinsurgency manual since the Vietnam War. The revised doctrine called for increased use of forces to protect the population, even if that put soldiers at greater risk of attack. It also suggested that a focus on quality-of-life improvements could help turn the population against insurgents.[12] Stationing troops in neighborhoods in small combat outposts and stepping up patrols would reverse the trend, begun in 2005, of consolidating the U.S. presence on large forward operating bases.[13] To teach counterinsurgency tactics, the U.S. Army erected a mock Iraqi village at Ft. Irwin, California, complete with 400 native Arabic speakers playing insurgents, shopkeepers, and security forces. The training course, built at a facility originally used for mock tank battles, aimed to replicate the dilemmas that soldiers would face on patrol in Iraq.[14] The military also mandated that officers rotating into Iraq attend a one-week course on counterinsurgency, known as "the COIN Academy."[15]

Change-of-command ceremonies took place on February 10, 2007, a month after the President's speech. Four days later, General Petraeus and the commander of MNC-I, Lieutenant General Raymond Odierno, presented eight slides to President Bush showing how they intended to implement the surge.[16] Petraeus put the third iteration of the Baghdad Security Plan into effect quickly. By the end of February, 2,700 new U.S. troops had arrived in the capital. By June, that number reached 16,700—enough for 400 to 600 combat troops to secure each security district established under the plan.[17]

The troop increases enabled a strategy that Major General Joe Fil, commanding Coalition forces in Baghdad, described as "clear, control, and retain." U.S. forces and capable Iraqi Security Forces would continue to hold territory rather than turning it over to ill-prepared Iraqi forces. After mounting clearing operations to drive out insurgents, troops found houses and public buildings to use as combat outposts, creating a permanent presence in neighborhoods that had

PX213

been only occasionally patrolled.[18] As soon as security was established, USACE moved in to restore water and electricity service.[19] The military also strengthened existing population control measures to separate Shi'a and Sunni enclaves. Many of Baghdad's districts were cordoned off by multiple series of twelve-foot-high concrete walls, the longest of which ran for three miles.[20]

Negotiating with what the campaign plan termed "reconcilable elements" was also a key component of the surge.[21] A realignment of Sunni tribes in Anbar was underway, and their loyalty was up for grabs. Ambassador Khalilzad had been quietly talking to them for months; Marine Corps officers had been doing so for years. Now it looked as if popular dissatisfaction with al-Qaeda's brutal tactics, along with its infringement on traditional tribal prerogatives, might drive them to forge an alliance with the Coalition.

In one of the war's most extraordinary stories, small special operations teams had been escorting Lieutenant General Graeme Lamb, a British officer familiar with the peacemaking negotiations with the Irish Republican Army, to secret meetings with insurgent leaders. The response to Lamb's initiative, which began before Petraeus arrived, was promising. Petraeus and his advisors moved to expand this engagement strategy by having brigade and battalion commanders reach out to insurgents in their area. "Come in, let's talk about what it would take, and figure it out," was the rubric.[22] The Sunni tribes eventually formed U.S.-funded security forces, known in turn as Awakening Councils, Concerned Local Citizens, or Sons of Iraq, which would also contribute significantly to the success of the surge. Eventually, similar groups were established within some Shi'a communities.

## A New Reconstruction Strategy

The surge also ushered in new diplomatic leadership. Ambassador Ryan Crocker, the State Department's senior Arabist, replaced Zalmay Khalilzad as U.S. Ambassador to Iraq. At the time of his appointment, Crocker was Ambassador to Pakistan. He had previously served as ambassador to Syria, Kuwait, and Lebanon; his prior experience in Iraq included a posting there in the late 1970s and a short tour with CPA in 2003 as the director of governance.[23] The Secretary of State also appointed Ambassador Timothy Carney as Coordinator for Economic Transition in Iraq, a new position designed to centralize authority for reconstruction and economic affairs.[24] A veteran diplomat, Carney had initially served with ORHA in 2003, but left Iraq, as did Crocker, soon after Ambassador Bremer took charge.[25]

The diplomatic and economic elements of the surge were slower to materialize. Petraeus arrived to find a collection of reconstruction programs that ran mostly independent of one another. In the words of his economic advisor,

PX213

• Chapter 26 •

Colonel Michael Meese, reconstruction consisted of "stovepiped programs out of specific appropriation and oversight lines with specific purposes that have a logic of their own." The categorization of funding and authorities, while undertaken for "all the right legal reasons," meant that the Commanding General and the Ambassador had little ability to allocate resources among competing programs without first returning to the Congress. "What you did as a commander is pull on all these strings," Meese explained. "The answer was full speed ahead on all these things."[26]

With funding streams essentially fixed until the Congress passed the 2008 supplemental later in the spring of 2007, Petraeus and Crocker focused on how the reconstruction was administered in concert with combat operations and how the military itself conceived of its mission. They convened a group of advisors with broad expertise in counterinsurgency and political science, dubbed the Joint Strategic Assessment Team. After a period of study, they recommended in April that political accommodation become the goal of all lines of operation. Every tool in the Coalition arsenal—including the use of force, but also political negotiation and economic aid—would be used to foster accommodation between warring groups. Although falling well short of true reconciliation, this would at least bring about local ceasefires that could subsequently be expanded across Iraq.[27]

The campaign plan later developed on the basis of the JSAT report incorporated several new ideas that would guide the actions of commanders and reconstruction personnel. In the previous campaign plan, preparing Iraqis for the transition to self-rule was seen as a separate activity. Transition remained an important future goal for Petraeus, but he viewed it as inherent in every line of operation. The new standard, Meese explained, was "if it can't be done by the Iraqis, we probably shouldn't do it." "What is better is a project that takes 60 days instead of 30 days—but is done by the Iraqi manager and is sustainable by the Iraqis [and] that their operations can support."[28] Nevertheless, Petraeus's advisors understood that economic incentives would have little traction in a sectarian conflict. "People who are killing for political reasons or to ethnically cleanse an area are rarely going to stop because of a new job opportunity," stated one memorandum to the commanding general.[29]

Ambassador Carney largely concurred with Petraeus's assessment. "On the overall policy, we were continuing to proceed without sufficient Iraqi participation," he said. "I was appalled when I learned that Iraqis were simply not signing off to accept huge numbers of projects." In Carney's view, the problem began in 2003. "We got an insurgency because we didn't have Iraqis completely with us on the effort to move the country forward after we destroyed Saddam Hussein's regime," he said in 2008. According to his assessment, the endgame was by now

• 298 •

PX213

• The Civilian Surge •

completely in Iraqi hands. "We essentially wound up in the position, as we are in today, of being able to act as a shield and to provide resources, but we are much less of an accepted mentor than we might have been if we had taken Iraqis into our counsel from the outset," Carney said. "This is a position of great weakness because we are vulnerable to Iraqi bad decisions."[30]

To redress the lack of Iraqi participation, the embassy moved to coordinate all U.S. economic and reconstruction actions with Deputy Prime Minister Barham Salih, Minister of Planning Ali Baban, and Minister of Finance Bayan Jabr. Together with National Security Advisor Mowaffak al-Rubaie, the trio said they would do their best to ensure that Iraq's ministries made use of their capital budgets and that provincial governments spent funds allotted to them.[31] It would be an essential step toward fiscal self-reliance, one that now seemed within reach.

Between existing ministry budgets, central government grants to provinces in 2006, and provincial line-item funds in the 2007 Iraqi budget, Iraqis "had more than $5 billion to spend." Spending this Iraqi money became an essential political benchmark in the eyes of U.S. lawmakers. "If the Iraqis remained unable or unwilling to spend their own capital investment budget, there was certainly no reason for the Congress of the United State to appropriate money for Iraq," Carney said.[32]

By late spring, Petraeus, Crocker, and their advisors were still waiting for the economic surge to take shape. Although Petraeus arrived in Baghdad early in February 2007, the rest of the civilian leadership appeared much later. Ambassador Crocker did not assume chief of mission duties until March 29.[33] The team that Crocker selected to take over key positions in the embassy came still later, in early summer. The staggered arrival hampered coordination between the military and civilian leadership, and slowed the implementation of surge policies on the civilian side.[34]

Delays in the deployment of rank-and-file civilian personnel slowed the transition still further. Carney was surprised to find it just as difficult to bring people into Iraq in 2007 as it had been in 2003. He resorted to hiring his deputy as a contractor when the State Department was unable to add him to the rolls quickly. "The recruitment process is in sclerosis," Carney said. "We are not responsive to the President's policy for Iraq if we cannot get people hired in fewer than six weeks."[35]

A funding slowdown further complicated matters. Supplemental funds appropriated by the Congress for fiscal year 2006 did not reach Iraq for a longer-than-usual period, forcing programs to scale back activity temporarily. From the date when the Congress authorized its spending, money contained in the supplemental took between 62 and 218 days to be disbursed in Iraq.[36] When combined with the longer-than-anticipated time for contractors associated with

PX213

the economic surge to set up in country, the effects were significant. "Ensuring that the non-DoD organizations have the resources provided to do what is necessary is of enormous importance," Petraeus said later.[37]

**Embedding Reconstruction**

As the Baghdad Security Plan was put into effect, the ePRT and PRT teams started arriving at posts across Iraq. Three waves of PRT staff would provide almost every brigade with a dedicated staff of development experts, realizing the original vision advanced nearly two years before by Lieutenant General Raymond Odierno and Dr. Philip Zelikow, the State Department's Counselor.[38] Led primarily by State Department officials, and staffed in part by USAID and reservists and civilians from the Department of Defense, ePRT teams of four to eight people would help brigades leverage their resources in new ways.

The expansion of the PRT program was a landmark event in the reconstruction effort. For the first time in four years, a formal civil-military structure enabled civilian reconstruction experts to work side-by-side with maneuver commanders who were prosecuting the war. The experiment in civil-military relations that Ambassador Khalilzad saw to an uneasy start in 2005 was taking hold. Reconstruction became embedded in brigades and in Iraqi society and focused as much on building capacity inside Iraqi institutions as infrastructure construction.[39]

The brigades, whose substantial resources were increasingly applied to the reconstruction and capacity-building missions, welcomed the arrival of ePRTs. "You can tell when you walk in, when the PRT chief is finishing the Battalion Commander's sentences, that's a great relationship," Meese said. On the other hand, "if the PRT chief can't find the bathroom because he hasn't been to the HQ often enough," the relationship has not developed.[40] Most of all, ePRTs augmented the capability of brigades to engage with local governments.

Nowhere in a normal brigade staff structure could "you find people that are organized and trained to go help municipal governance and reconstruction issues," explained Lieutenant Colonel Douglas Winton, Executive Officer of the First Brigade Combat Team, Third Infantry Division. By helping brigades integrate their use of CERP funds with embassy reconstruction plans and tying the actions of civil affairs teams to the development of local and provincial governments, ePRTs were helping brigades take "essential services to the next level." The war had evolved so that reconstruction, the functioning of local government, and security reinforced each other. "Gains in governance and gains in reconstruction are linked," Winton said.[41]

The PRTs' daily contact with municipal and provincial officials allowed them to gain a level of insight into Iraqi affairs unreachable inside the embassy, which

PX213

usually dealt with Iraq in a more detached fashion. "We are here on the ground, face to face, every day, with the mayor, [directors general], sheiks," one ePRT member commented.[42] The relationships developed by PRT and civil affairs team members allowed them to gauge what interventions would be most effective, and allowed Iraqis, rather than Americans, to take the lead in articulating Iraqi needs. "We've got to start listening to the Iraqis. That's Development 101," said David Atteberry, the USAID representative on the Rasheed ePRT, located in one of the most dangerous neighborhoods in Baghdad. "The answer to most of your questions can be found by talking to the people you are working with."[43]

To help manage their relationships with Iraqis, many PRTs and Civil Affairs teams compiled "facebooks" with digital pictures of directors general and neighborhood and district council members, their mobile phone numbers, and short biographical sketches. More sophisticated techniques were sometimes used. Wall-sized diagrams mapping relationships among sheiks, provincial council members, and municipal officials were updated to reflect assassinations and changing loyalties. Some PRTs even kept detailed logbooks, with entries for each encounter with an Iraqi official, including notes on their moods and personality quirks.[44] This social network analysis gave PRT members a better sense of the complexity of the society in which they were working and a greater ability to pass that knowledge to replacements when unit rotations occurred every nine to twelve months.

The military's acceptance and support of the reconstruction mission, more widespread in 2007 than any other previous year of the war, provided the biggest boost to PRT and Civil Affairs efforts. The brigades' wider reach had a multiplier effect in achieving reconstruction goals that was an essential part of the surge strategy. Lieutenant Colonel Winton explained:

> When an NGO shows up and says, I want to establish some agriculture programs, we think we have the ability to put fish farms in along the Euphrates. Does anybody know of a good place to establish a fish farm? The brigade commander turns to his battalion commanders, who turn to the company commanders, who turn to their platoon commanders. In 96 hours you get the data back. Here are ten historic fish farms. Here are their locations. And oh by the way, we have a relationship with the guy that owns this one, and we trust him. And oh by the way, this one over here has been used as a mortar firing point. Don't go there. We can flood the zone and bring back the information.[45]

PX213

This was exactly the dynamic envisioned by earlier assessments that suggested the key to success in Iraq would be marrying civilian development expertise to the military's circulation within local communities.[46]

**PRT Problems**

The extensive insight ePRTs gained into the communities they served highlighted dilemmas that had plagued reconstruction from the beginning. One of the biggest challenges was figuring out whom to trust. With money flooding in, some Iraqi government offices took on the atmosphere of the proverbial "smoke-filled back room," where unsavory business was conducted. "My favorite description is the bar scene of Star Wars," one ePRT member recalled. "When you go to a [district advisory council] meeting, it's just a parade of characters."[47] The characters were assembled in part to divide up the spoils handed out by the PRT and military. "Our district council chairman has become the Tony Soprano of Rasheed, in terms of controlling resources," Atteberry said.[48] "You will use my contractor, or your work will not get done," the chairman told the PRT.[49]

The cozy relationships between Iraqi officials and the contractors employed through reconstruction programs attracted allegations of fraud and waste that were hard to verify. An audit of USAID's Community Stabilization Program, which made extensive use of Iraqi intermediaries to implement short-term employment projects, discovered that program funds might have been diverted to militia activity in one Baghdad district.[50] It was the worst fear of any development officer, and also an inevitable risk of pushing large sums of money into a warzone.

The need to keep the loyalty of fledgling local governments in effect left PRTs, soldiers using CERP funds, and USAID programs vulnerable to over-pricing of materials and services. The PRTs and military units channeling development and CERP funds were frequently paying for more than the costs of material in construction. "We're pumping over $1 million just to renovate the [district advisory council] hall," Atteberry said. "We're building a farmer's market across from the Doura market, and we're spending over a million dollars. It's just a concrete slab and a tin roof. And the contract is $900,000."[51]

Dealing with local powerbrokers sometimes put the PRTs' long-term development goals in conflict with the brigades' immediate needs. On the one hand, many of the powerbrokers could make good on their promises to "make things happen," an important skill to soldiers whose first interest is security. Brigades taking casualties often resorted to CERP "fast cash" projects that pay Iraqis to administer services that local municipalities should already have been providing. However, using Coalition cash rather than Iraqi institutions set back efforts to foster self-reliance.

PX213

• The Civilian Surge •

Trash pickup was the archetypal municipal service in which the brigade's security needs were in opposition with the traditional development approach. "The XO [Executive Officer] of a battalion comes in here," one ePRT leader recalls. "'If the trash isn't picked up,' the XO will say, 'somebody will put an IED in it and one of my guys will go down. I'm not going to get my guys killed. I'm going to pay someone to pick up the trash.'"[52] It was a pragmatic approach to security, but one that provided a disincentive for municipalities to discharge their responsibilities promptly. Complicating matters further, the contractors the Coalition employed often distorted local labor markets. The USAID Inspector General found that wages paid for trash pick-up by the CSP were higher than the average for skilled laborers, which put pressure on local officials to continue employing them rather than transition to other forms of development.[53]

In the view of some civilians on PRTs, the set of metrics used by the military to measure CERP progress placed too much emphasis on spending money and not enough on achieving the right effects. "They are being graded on how many projects are being carried out, how much money is flowing to the districts," said Tim Zuniga-Brown, team leader of the Rasheed ePRT. "They should be graded on how many projects are being turned over to the Iraqis and how much less money they are spending. That would be a better indicator of success." "Success," Zuniga-Brown said, "is getting Iraqis to deliver their own services using their own funds and their own people."[54] Still other PRT officials viewed this type of Coalition assistance as wholly counterproductive. "The best thing we could do," one ePRT official said, "is cut off CERP money," adding that the Iraqis are less likely to "spend their money when we're just pumping in ours."[55]

Balancing the brigade's short-term imperative of force protection against the PRT's longer-term development goals was difficult. Because of the party-list electoral structure and the failure to hold new provincial elections, the provincial and district councils through which PRTs and ePRTs worked were to some extent a theater for decisions made elsewhere—in party structures that operated outside Iraqi government institutions. Making sense of this murky world was mostly beyond the PRTs' abilities. "It's so presumptuous to think we have any idea what's going on," David Atteberry said. "We are continually stumbling around in the dark blind. We're worse than the blind because at least the blind know they are blind."[56] Linguistic and cultural expertise had always been in short supply and still was. Only 29 of the 610 PRT personnel deployed by mid-2007 were Arabic-speaking cultural advisors, and several of them, including highly effective Kurds, subsequently quit in protest of the Coalition alliance with Sunni tribes.[57] "If you don't have an interpreter," a military officer serving on an ePRT said, "it's like Wimbledon. You just watch it go from side to side."[58]

• 303 •

PX213

Some PRT members doubted that the assistance they provided would affect Iraqi politics. It was the same worry that Petraeus's economics advisor expressed when he wrote that economic incentives carried limited currency in a civil conflict. One ePRT member said, "Through the delivery of essential services, we might extend legitimacy to the local government, but I don't know if that's necessarily true." When asked what motivated the focus on essential services, the official replied, "Out of a sense of moral imperative, out of a sense of wanting to do the right thing." "I know the Iraqis appreciate that we are doing this," the official said, "but it might not translate into strategic success for us."[59]

The other main reservation voiced by PRT leaders concerned the daunting scope of their mission. The area of operations of the East Rasheed ePRT had as many people in it as the city of Detroit. To advise the brigade on how best to serve these 800,000 people and to carry out its own projects, the ePRT had a staff of six.[60]

**Boosting Iraq's Manufacturing Base**

As ePRT staff moved out into local neighborhoods and PRTs continued their work with provincial governments, reconstruction entities in the Green Zone began implementing the economic surge with newly available funding and personnel. Steering reconstruction and military procurement contracts to viable Iraqi businesses became a key U.S. objective. The idea was straightforward. Sustaining the Coalition's presence in Iraq cost more than twice Iraq's gross domestic product.[61] The military spent a significant portion of these costs on goods and services that could be procured locally. If properly channeled, military needs could drive job creation in the Iraqi industrial base and thus help end the insurgency soldiers were there to fight.

During the transition to direct, fixed-price contracting in late 2006 and 2007, USACE-GRD moved diligently to "Iraqify" their workforce, relying as much as possible on Iraqi contractors and vendors, many of whom had been trained by Bechtel University and other multinational firms.[62] A special effort called the "Iraqi First" program was begun in mid-2006 by Major General Darryl Scott, head of JCC-I.[63] From October 2006 to September 2007, JCC-I awarded $2.7 billion in contracts to Iraqi firms who collectively employed an estimated 75,000 Iraqis. In the first half of 2007 alone, it provided Iraqi businesses with more than a billion dollars of business.[64] By early 2008, more than 4,100 Iraqi companies were registered with the Coalition, which awarded 85 percent of them at least one contract. Overall, 90 percent of reconstruction projects awarded by USACE-GRD were going to Iraqi firms.[65] It was the latest of many attempts by the Coalition to involve Iraqi firms in the reconstruction of their country.[66]

PX213

• The Civilian Surge •

An effort to revive Iraqi factories also got underway. Deputy Under Secretary of Defense Paul Brinkley led a task force to explore what it would take to breathe life into a sector of the economy that had employed an estimated 500,000 Iraqis in 2003.[67] "Frankly, we had exported a lot of our business processes to Iraq, and they were inappropriate," said Deputy Secretary of Defense Gordon England, who recruited Brinkley to go to Iraq.[68]

Brinkley became convinced that the CPA-era decision to close Iraq's state-owned enterprises should be reversed.[69] There were an unknown number of shuttered factories that could put Iraqis back to work. With private investment not yet entering the country, Brinkley advocated using Coalition funds to pay start-up and capital improvement costs that would bring these enterprises back online. Many in the State Department doubted the wisdom of this initiative. Although State Department officials had resisted Defense Department plans to decommission the state-owned enterprises in 2003, by 2007 the embassy's economics section was skeptical that reviving long-closed factories would be the best use of U.S. resources.

Once again, the U.S. failed to achieve a unified policy on what role state-owned industries should play in Iraq's economic recovery. The debates became so vituperative that Brinkley moved his staff from the embassy to separate quarters in the Green Zone. He also drew his budget exclusively from Defense Department funding, over which State personnel had little or no say.[70] Deputy Secretary of Defense England later said "that the whole Brinkley operation was also part of the interagency confusion in terms of who is responsible for what."[71]

By March 2007, Brinkley had selected 140 factories as candidates for Coalition assistance.[72] The factories manufactured everything from farm equipment to pharmaceuticals. Brinkley based decisions on how to allocate assistance on the potential speed and economic impact of a factory's restart.[73] By September 2007, he had succeeded in opening 17 of them. Brinkley intended his $200 million budget for assistance to be the catalyst for eventually creating 150,000 Iraqi jobs.[74]

**The End of IRRF 2**

Elsewhere around the embassy, programs that had existed since 2003 and 2004 were in a state of transition. Most remaining IRRF 2 projects were closed out during 2007. About 450 were still on the books in 2008.[75] GRD personnel anticipated that only fifteen to twenty of the largest and most complicated among them would still be underway by mid-2009.[76] Although the drawdown of IRRF 2 had led most large design-build contractors to pack up, new projects and ongoing military construction needs kept more than a thousand GRD employees working across Iraq's three regions. The 2008 supplemental budget also provided $285

• 305 •

PX213

million for sustainment programs and $60 million for capacity development, which the GRD used to fund vocational training of young apprentices and on-the-job training for more experienced workers at both infrastructure sites and in ministries.[77]

The focus of reconstruction shifted overwhelmingly to supporting Iraqi initiatives, in national as well as local ventures. In this new phase, Ambassador Crocker said, "You have to listen as much as you talk. Let them tell you the problem and then use ways they think it can be fixed with our help. It is not going to resemble how the Walla Walla, Washington City Council deals with Olympia, but it may work in Iraqi terms. So we talk about Iraqi solutions ….It has to work for them."[78]

**Reorganizing the Embassy**

Just as the civilian surge reached its highest point, Ambassador Crocker reorganized the embassy, strengthening his ability to give high-level direction for the reconstruction program.[79] The IRMO had housed the senior advisors who worked with Iraqi ministries and oversaw reconstruction in the various sectors. Of its 258 positions, 147 moved to embassy sections, and 44 others were eliminated. The remaining 67 became the staff of the embassy's Iraq Transition Assistance Office (ITAO), which retained responsibility for the Ministries of Electricity and Water, as well as residual ministerial capacity-building efforts.[80]

The reorganization further realized the desire of State Department management to bring reconstruction more directly under the embassy's control. The embassy's economics section assumed responsibility for the Ministries of Oil, Agriculture, Trade, Transportation, and Communication. The Rule-of-Law Task Force took the Ministries of Justice and Interior. The Health and Human Services section took on the Ministry of Health, and Treasury attachés had the Ministry of Finance. The National Coordination Team, which directed the PRTs, became the Office of Provincial Affairs. The Public Affairs section assumed responsibility for the Ministries of Education and Culture. At times, these shifts were confusing. The formal point of contact for the Ministry of Planning, for instance, was at first unclear. Initially, representatives of the embassy's political and economic sections and ITAO disavowed their assigned role.[81]

The new staffing structure was devised by Patrick Kennedy, the State Department's Undersecretary for Management, whom Crocker had invited to review embassy operations. Kennedy's report aimed to prepare officials for the move to the new embassy complex, still under construction, where space would be at a premium.[82] The Kennedy Report also recommended increased staffing in the embassy's economic and political sections, lengthening tours to eighteen

PX213

• The Civilian Surge •

months, and ensuring at least one-week overlaps during personnel rotations. Wider dissemination of PRT weekly reports were also needed, in part because State Department personnel paid less attention to dispatches not distributed in cable form.[83]

**Embassy 2007 Organizational Chart**
**USG Funds Flow for Iraq**



Source: SIGIR Audit 07-008, "Fact Sheet on the Roles and Responsibilities of U.S. Government Organizations Conducting IRRF-Funded Reconstruction Activities," July 26, 2007, i.

To many, the embassy reorganization made reporting chains more complex than before. The cadre of U.S. personnel in IRMO whose primary job was to travel "outside the wire" to interface with senior managers in the Iraqi government was now dispersed through multiple offices. Its convoluted organizational chart depicts the complexity inherent in an effort that by July 2007 involved at least 62 agencies or sub-agency offices in reconstruction alone.[84]

When Petraeus arrived, his advisors identified eight major coordination bodies.[85] "We have an underdeveloped Iraqi bureaucracy and an overdeveloped U.S. bureaucracy," Colonel Meese observed, "and the two of them [make] each other [stagnate]."[86] By 2007, spending too much time dealing with the Coalition bureaucracy—and not enough meeting with Iraqis—was a frequent complaint of officials based in the Green Zone. It was a far cry from the CPA period, where individuals could more easily take the initiative. "We so rapidly went from … the Wild West days," one senior advisor lamented, "to a different kind of waste."[87]

• 307 •

PX213

The lack of executive authority was apparent everywhere. Even though Crocker and Petraeus assigned coordinators to the political, economic, military, communication, and rule-of-law lines of operation, the coordinators in most cases did not have tasking or budget authority over the offices they were responsible for managing. A truly joint command structure never evolved. To Crocker and Petraeus, achieving unity of effort, in which everyone worked toward common goals, was more important than unity of command, where action was not always predicated upon achieving consensus. This arrangement worked well enough when the military and civilian leadership saw eye to eye, but when they disagreed, the civilian and military arms of the U.S. government would at times work at cross-purposes.[88]

The complexity of the Coalition effort and its chain of command was especially difficult for the Iraqis to understand. Figuring out whom to contact for help was often the first problem. Frustration at the ever-growing Green Zone staff evoked suggestions for radical change. "If I were you," USAID's acting-Deputy Administrator James Kunder advised Ryan Crocker, "I'd reduce the embassy presence to a hundred people and give everybody else two choices: they can either go to a PRT, or they can go home."[89]

Crocker and Petraeus were acutely aware of the management challenge that faced them. "You have to be joined at the hip," Petraeus said. "That's why the Ambassador and I have offices next to each other." "If all else fails," Petraeus said, "once a week, the ambassador and the MNF-I commander get to sit down with the President of the United States and the NSC. And you can again cut through quite a few layers of bureaucracy in a real hurry in that kind of situation."[90] The physical proximity maintained by Crocker and Petraeus, however, did not always extend to their staffs, who continued working in separate office space, frequently attending separate morning meetings, and reporting through separate chains of command.[91] Despite this litany of challenges, the civil-military relationship between the embassy and MNF-I improved steadily during 2007.

**Social Capital and the Civilian Surge**

Relationships with Iraqis that often eluded embassy personnel flourished just miles away in compounds maintained by USAID contractors, and to a lesser extent on PRTs. The Community Stabilization Program, the Community Action Program, and the Local Governance Program employed Iraqis to work in neighborhoods not far from the Green Zone, as well as in other places across Iraq. By 2007, this approach to reconstruction—the strengthening of Iraqi civil society by operating within it—was viewed as a crucial tool.[92]

PX213

• The Civilian Surge •

Through interventions large and small, in places from community halls to main street businesses, the CAP and LGP continued to reinforce democratic processes, build capacity, and spur commerce in more than a hundred neighborhoods across Iraq. The CSP, designed in 2005 to execute the civilian component of Clear-Hold-Build, mounted the largest effort in monetary terms.[93] By providing short-term employment and vocational training programs, as well as micro-grants and youth activities, the $544 million program harnessed underemployed populations in the wake of clearing operations—a cohort that would otherwise be vulnerable to the cash-for-violence scheme of insurgents and militias.[94]

The program operated in tandem with military campaigns in Baghdad, Kirkuk, Mosul, Falluja, Ramadi, Al Qaim, Habaniyah, Ba'quba, Basrah, and eventually nine other cities, often gaining access to neighborhood leaders and organizations through relationships established by other USAID initiatives.[95] By the end of 2007, it employed 319,583 Iraqis in short-term labor projects and provided 13,275 with vocational training for a total of 260,000 man-months of employment.[96] More than 260,000 man-months of short-term employment helped make visible community improvements, many of which were overseen by municipal governments in places just swept by violent clearing operations.[97] The role of this economic stimulus in solidifying security gains, although hard to measure, was seen by its implementers and military personnel as an essential element of the surge's success.[98]

All of these programs were carried out with little overt evidence of U.S. funding. The low-profile facilities maintained by USAID, along with the outreach it did in local neighborhoods, meant its people were rarely attacked. USAID, perhaps more than other reconstruction entities, believed that security could be achieved by muting the association with the Coalition and by gaining community trust and cooperation.

It was a sociological, rather than an exclusively physical conception of security. The office of Grand Ayatollah Sistani, for instance, issued a carefully worded *fatwa* permitting Shi'a to work with USAID implementing partners, but not the Coalition military. Sistani's office even issued identification cards to Iraqi workers hired by one of the USAID programs, giving them safe passage through militia checkpoints when collaborating with the Coalition would have meant certain death.[99]

### The Security Net

USAID's compounds constituted a parallel reconstruction apparatus that in 2007 many embassy personnel did not know existed. The secrecy was in part by design to keep the Iraqis who worked there safe, but it was also because the embassy's regional security officer deemed these compounds unsafe for government

PX213

personnel. According to standing Regional Security Office rules, they were off-limits to civilian officials. At a time when mentoring was essential, one of the few venues in which Western advisors and their Iraqi protégés could build solid relationships was walled off in the name of security.[100]

The security office's restrictions gave rise to a curious asymmetry. During the surge, the military, State officials in ePRTs, and USAID contractors exposed themselves to greater risk by frequently meeting with Iraqis in their communities, while other civilian personnel, under more restrictive Chief of Mission security protocols, were prevented from holding or attending such meetings.[101] If the State Department's conservative protocol for measuring danger had been strictly observed, the embassy in Baghdad itself would have closed.[102] The ePRTs were able to achieve the high degree of engagement enjoyed by USAID contractors because the military brigades they worked with assumed responsibility for their security, and the units had a higher acceptance of risk in allowing site visits.[103]

By mid-2007, the Regional Security Office sought to extend its control to vetting assistance provided to Iraqis. In the process, the office nearly smothered the PRT Quick Response Program before it began. Since their creation in 2005, PRTs had lobbied for a CERP-like fund so they could sponsor small and medium-sized projects autonomously. Eighteen months later, the embassy developed the Quick Response Fund, funded by ESF. With an initial tranche of over $100 million, the QRF program was to be the surge's signature civilian resource—the primary financial means by which PRTs could independently undertake short-term capacity-development projects in their areas.[104]

The initial procedures that governed the fund's distribution for projects larger than $25,000 entailed three stages of review.[105] After the PRT completed a seven-page grant application and a five-page summary, a technical committee at the embassy reviewed the proposal.[106] From there, proposals went to Washington, where a separate technical committee evaluated them. Once these two operational hurdles were cleared, a new requirement mandated that they be sent for review by the Regional Security Office, which had never before played an active role in vetting recipients of grant funds.[107] The QRF funds thus were initially saddled with administrative requirements that far exceeded the military's parallel CERP program, in which a brigade commander could unilaterally approve expenditures up to $200,000.

PRT members were flabbergasted when they received an email in September 2007 from a mid-level staffer in the Office of Provincial Affairs detailing these extensive vetting procedures.[108] Rather than checking potential grant recipients against a government database of terrorist suspects, as had been the original policy, the Regional Security Office requested Iraqi applicants to list their

PX213

• The Civilian Surge •

associations and life histories on a multipage form similar to that used for U.S. government security clearances.[109] In addition, the Iraqis were required to submit fingerprints and agree to have their information stored in a database. Forms could not be faxed or scanned; the security office required an original signature.[110]

Although the danger of money falling into the wrong hands was real, PRT members knew that if the new rules were followed, the fund would be unusable. Iraqis, wary of who would have access to information about their whereabouts and associations, would not consent to the security review. It would be humiliating for grant recipients, usually esteemed members of their communities, to submit fingerprints as though they were common criminals. Finally, no PRT leaders would be willing to send their personnel into the Red Zone for the sake of chauffeuring paperwork. PRT personnel began calling the program the "Quagmire Response Fund."[111]

The rules were eventually streamlined. Micro-purchases would not need prior approval, and the embassy could approve projects up to $25,000. Only those larger than $25,000 would be sent to Washington for review. Nevertheless, the dispute over procedures limited total disbursements in the program's first five months to just $3.5 million.[112] As a consequence, PRTs initially lost much of their "surge" capacity to engage provincial governments, missing opportunities for progress during early lulls in violence. As of late September 2008, 2,065 programs have been approved through QRF grants, and almost 50 percent of funds have been disbursed.[113]

**Status of the Sectors**

As the civilian surge developed more effective tools, reconstruction went on in each of the major sectors: electricity, oil and gas, water and sewer, security, and justice. The IRRF program had essentially ended. By the end of 2007, just under four percent of the IRRF 2 monies had yet to be obligated; only six percent was unexpended.[114] Security and justice was ultimately the largest sector of the IRRF reconstruction program, constituting 40 percent of its expenditures. Electricity was next at 23 percent, water at 11 percent, and oil and gas at 9 percent. Of the contractors responsible for the program's execution, Bechtel expended more than $1.1 billion, followed closely by FluorAMEC, Parsons, KBR, and the Washington Group International.[115]

In the new post-IRRF phase, Iraqi expenditures began to rival and then exceed U.S. funding in many areas. Provincial and ministerial budget execution, although still low in absolute terms, nevertheless pushed increasing amounts of Iraqi revenues into capital projects. On the U.S. side, reconstruction was mostly funded by CERP, ESF, and ISFF, with much of new construction occurring in the security

PX213

• Chapter 26 •

sector and through efforts in the provinces.[116] PRDCs were increasingly active in developing ESF-funded and embassy-approved projects in the provinces.

In 2006 and 2007, funding for PRTs and PRDC projects totaled $790 million, and PRDCs managed more than 400 projects, with a cumulative value of $495 million. In addition, $217 million went to the Infrastructure Security Program, which spent $110 million constructing pipeline exclusion zones—essentially large berms and other obstacles blocking access to the major oil pipelines—designed to prevent illegal tapping and sabotage. Another $51 million was spent hardening critical sites and making improvements to the facilities used by Strategic Infrastructure Battalions, the main Iraqi force responsible for infrastructure security.[117]

But it was not an easy time. The heightened levels of violence following the Samarra bombing continued well into the first half of 2007. Reconstruction personnel faced extraordinarily trying conditions, and many lost their lives. From January 2006 until March 2007, 418 contractors working on reconstruction or for the military were killed.[118]

In some places, contractors continued their work, often at great risk, while others suspended operations altogether, leading to high overhead costs as contractors sat idle waiting for projects to resume or be re-scoped. A SIGIR audit found that for reasons of security, mismanagement, and cost overruns, the U.S. government terminated 1,262 contracts and task orders, either for default or convenience, during the course of the reconstruction program. Of the nearly $1 billion value of these contracts and task orders, the government had already paid $600 million. Although a few of these projects were near completion, the vast majority were not.[119]

*Electricity*

In the electricity sector, the push continued to raise generation capacity and put more megawatts on the grid, as did the efforts to stabilize and expand the distribution networks that carried power to Iraqi homes and businesses. In the transition from the IRRF-funded effort, the scope of activities pursued by the embassy broadened to include training of personnel at generation plants and at the Ministry of Electricity. On the generation side, connecting to the right fuel sources remained problematic. In 2007, 16 of the 35 gas turbines built by the United States were using diesel, crude oil, or heavy fuel instead of the natural gas they were designed for, resulting in higher maintenance costs and the loss of an estimated 2,000 MW of daily production. Improving access of these turbines to natural gas and to reliable fuel sources at generation plants nationwide was linked to ongoing work in the oil and gas sector, as well as Coalition efforts to interdict oil smuggling.[120]

PX213

Meanwhile, the Iraqi government struggled to gain control over the many substations responsible for routing power across the grid, which remained unstable and prone to insurgent attack. In June 2007, eight of the twelve major transmission lines feeding Baghdad were out of service. Coalition and Iraqi forces moved to improve security along these lines while constructing dozens more transmission lines and substations. Average daily output, however, was still 1,740 megawatts below the CPA's 6,000 megawatt goal.[121]

*Oil and Gas*

Increasing capacity in the oil and gas sector remained linked to progress in the electricity sector and to the overall security situation: refineries need reliable power to function, and the network of pipes was vulnerable to attack and criminal tapping. For almost all of 2007, interdiction of the northern pipelines left the southern oil terminal at Basrah as the only node for oil export.

Output hovered at just over two million barrels per day, even though the system's capacity—if free from attacks and without maintenance shutdowns—by now reached three million. Ongoing facility upgrades included installing communication links at oil terminals, repairing multiple liquid-natural-gas plants, and installing oil-metering equipment at the terminal. Sustainability and capacity-building challenges remained a high priority.[122]

*Water*

By mid-2007, the 1,095 water projects funded by IRRF were 90 percent complete. Although the revised targets for increasing access to potable water and sewage were largely met, cutbacks dating from the 2004 reprogrammings, which removed more than a billion dollars from the sector to fund pressing security needs, meant that the Coalition's original ambitions in the water sector would not be realized. In Baghdad, only 30 percent of homes were connected to distribution lines. Sewer service reached 40 percent in Najaf and 50 percent in Basrah, but remained essentially nonfunctional in Kirkuk, Samarra, and Falluja.[123]

The challenges that plagued the water sector nationwide could be seen in the $277 million Nassriya water delivery system. Designed to produce potable water for a half-million Iraqis in five cities, the plant suffered from a long list of problems that curbed output: the lack of a reliable power supply, a weakened pipe system unable to withstand the plant's higher pressure flow, illegal taps on the transmission lines, and poorly qualified staff unwilling to attend contractor-provided training.[124] Ambassador Crocker's personal intervention in the failing project spurred performance improvements in the months after it was found to be operating substantially below capacity. "The Nassriya water treatment plant

PX213

is not going to be the largest monument to American folly in decades out here," Crocker said. His focus was on helping the Iraqis reach solutions on their own. "How can we help the Iraqis complete the Nassriya main drain?" he said. "We put so much money into sustainment. Don't let it go to waste."[125]

*Security and Justice*

Throughout 2007, re-training of National Police brigades—a process known as "re-bluing"—continued, as did the training and equipping of Iraq's other security forces, which now numbered more than 350,000.[126] The decline in violence was especially helpful to the court system.[127] The construction of the Rusafa rule-of-law complex, bringing together multiple parts of the justice system in one place, greatly facilitated the processing of cases in Baghdad.[128] Although coaxing judges to use modern investigative methods—including forensic evidence—and to eschew sectarian influences remained a challenge, progress in the judicial system continued.[129]

By mid-2008, 655 courts operated in Iraq. Major Crimes Courts—regional branches of the Central Criminal Court of Iraq—were being established in all 18 provinces. The 567 judges, 281 investigative judges, 312 assistants, and 645 judicial investigators working nationwide were protected by a force of more than 5,000 guards.[130] Nonetheless, just under half of all inmates in Iraqi detention were awaiting trial, contributing to overcrowding in four of the six prison facilities transferred to Iraqi control.[131]

**The Surge in Late 2007**

The surge brought more personnel and funds into Iraq, but more important, it redefined the terms of reconstruction. Brigades became a center of gravity in the reconstruction effort in a new way: brigade commanders and ePRTs each viewed capacity as a top priority. No longer was transition, the Casey-era watchword, the primary goal. The surprising agility with which the military embraced the economic and reconstruction missions was made possible by the wide support in its ranks for the counterinsurgency doctrine articulated and implemented by Petraeus. What was resisted in 2003 and 2004 was seen as absolutely necessary by 2007. Using brigades as "landlords" for the ePRT program yielded the intended multiplier effect on capacity building and reconstruction. Through these innovations, civil-military cooperation reached new heights.

Despite significant progress in specific places, Iraq in 2007 proved stubbornly resistant to many of the surge's political and economic innovations and to the Coalition effort overall. In July 2007, the new Prime Minister of Britain, Gordon Brown, proposed a host of policy initiatives in a letter to Iraqi Prime Minister

PX213

• The Civilian Surge •

Nouri al-Maliki. These included "an integrated energy strategy," "banking reform," and possibly a "National Investment Commission"—ideas that had been minted by the Coalition back in 2003 and were still relevant only because they had not been fulfilled.[132] In August 2007, Minister of Finance Bayan Jabr announced that completing Iraq's reconstruction would require an additional investment of $100 billion to $150 billion—an amount equal to what had already been spent.[133] It was a sobering reminder of how the continuing violence had undone so much of the infrastructure investments made by the United States and Iraq.

Targeted killings also continued. On the first day of Ramadan, Sheikh Abd al-Sattar, leader of the Anbar awakening, was assassinated just a week after President Bush, during a September 2007 visit, personally commended his efforts at fighting al-Qaeda.[134]

By fall 2007, the surge and other political developments in Iraq, including the Sunni awakening, brought about a modest reduction in violence, with total attacks trending downward across Iraq.[135] Calmer conditions did not immediately translate into progress on reconciliation or passage of the legislative articles the Congress had hoped Iraqi leaders would tackle.[136]

The Congress wrote eighteen benchmarks into the 2007 emergency supplemental appropriations act that funded the surge; the President had to certify that the Iraqi government was making progress toward meeting the benchmarks before it could receive further support from the Economic Support Fund, absent a Presidential waiver of the requirement.[137] An initial White House assessment in July 2007 found that few of the benchmarks had been fulfilled, but that satisfactory progress was being made.[138]

A later GAO audit, released in advance of the September 15, 2007 testimony of General Petraeus and Ambassador Crocker before the Congress, found that the Iraqi government had met three, partially met four, and had not met eleven of the eighteen benchmarks.[139] Petraeus and Crocker acknowledged in their testimony that few of the benchmarks had been met, but cited continued Iraqi progress toward achieving them as reason enough for the Coalition to continue the surge.[140]

A second set of benchmarks came into play in the International Compact with Iraq, a framework negotiated in 2007 through which international donors and aid organizations, including the World Bank, United Nations, and International Monetary Fund, pledged support in return for progress in bringing Iraq's laws and economy in line with international best practices.[141] Along with the standby arrangement negotiated with the International Monetary Fund, the International Compact with Iraq was another step toward reintegrating Iraq into the regional and international economy.

PX213

• Chapter 26 •

Although signs of progress could be discerned, the road ahead remained long. Iraq in 2007 was rated by analysts at the World Bank in the bottom 10 percent of all countries in measures of corruption and accountability, political stability, government effectiveness, regulatory quality, and rule of law.[142] In December 2008, the International Monetary Fund agreed to cancel 80 percent of Iraq's foreign debt.[143]

**The Surge and Its Aftermath in 2008**

As 2008 dawned, violence continued to recede. The military effort to pacify first Baghdad and then western and north central Iraq paid off, but at great cost to U.S. and Iraqi troops. Attacks against Coalition forces during the initial phases of the surge reached their highest level since 2003. However, relative calm returned to large parts of the country, partly because of the surge, but also because of the organization of Sunni groups—and eventually Shi'a groups—into local security forces. Neighborhoods gripped by near-constant violence since the increase in attacks after Samarra returned to something like normalcy, and levels of ethno-sectarian violence fell precipitously.

During 2008, the Iraqi Army demonstrated increasing ability as it performed clearing operations in Basrah and Sadr City with limited U.S. support. Although fierce fighting persisted in parts of Ninewa, Diyala, Salah Al-Din, and Basrah provinces, overall attacks in late 2008 fell to their lowest level since 2003.[144] The improving security situation was a boon to civilian programs. In the summer of 2008, a USAID contractor estimated that with fewer cancellations of meetings and convoys, the LGP was achieving a 25 percent higher mission-accomplished rate.[145]

More than any year since the 2003 invasion, 2008 produced a gradual and persistent transition to Iraqi leadership in reconstruction and security. Establishing uniform contracting and funds-disbursal regulations by the Ministries of Planning and Finance enabled directors general across Iraq's government to execute their budgets more easily. The existence of clear rules and a national budget passed by Iraq's parliament meant that U.S. reconstruction officials increasingly worked to reinforce Iraqi priorities, rather than retrofitting U.S. projects into the Iraqi system. "You don't have to worry about getting post-hoc buy-in," said the Treasury attaché, when "things originate in the Iraqi system."[146]

In April, Ambassador Crocker testified before the Congress that "the era of U.S. major infrastructure projects is over."[147] Although some new construction continued, the effort to build capacity was in full swing; 238 Coalition employees worked in the non-security ministries, and many large sustainment programs were being carried out across the country.[148]

PX213

• The Civilian Surge •

The global economy provided an unexpected boost to Iraq's reconstruction. Record oil prices—which peaked at over $140 per barrel during the summer of 2008—and sustained export production buoyed Iraq's coffers and continued the trend toward greater capital expenditures by its ministries and provincial governments.[149] A subsequent decline in prices, however, constrained Iraq's burgeoning reconstruction plans, forcing budgetary revisions upon the government.

Political progress was uneven in 2008. Passage of the important hydrocarbons law remained elusive, but the parliament did pass provincial powers and provincial elections laws that would lay the foundation for eventual provincial elections in January 2009.[150] Although the Iraqi government began performing at ever higher levels, the U.S. presence still remained large, with 164,000 contractors and 157,000 troops seemingly an enduring feature of the political and security landscape.[151]

Despite the continued engagement of so many soldiers and advisors, care was not always taken to ensure Iraqi input and acceptance. Officials conducting a review of PRTs—now the signature reconstruction program—were astonished to learn that Prime Minister Maliki had never been fully briefed on the program's details. The teams of U.S. advisors interacted with an entire swath of the Iraqi government without having formally sought the Prime Minister's permission.[152]

**The Ultimate Impact of Reconstruction**

Toward the end of 2008, there were few direct ways to take a final measure of the impact of U.S. reconstruction programs. U.S. goals went beyond putting megawatts on the grid or providing more gallons of treated water. Using reconstruction as a tool, the goal was to create a self-reliant Iraqi government and a satisfied population, and to increase trust between Iraqis and the United States and among Iraqis themselves.

Only recently have nationwide surveys measuring satisfaction rates with essential services been undertaken with any degree of consistency. The data suggest that, broadly speaking, a majority of Iraqis remain unsatisfied with the delivery of basic services, including electricity, water and sewer, and trash removal. More significantly, these satisfaction rates tend to vary by location and sectarian identity. Rates in Baghdad, for instance, are markedly lower than many other areas in the country, especially the Kurdish region. Interestingly, the rates of satisfaction with essential service delivery during the surge have been broadly similar among Sunnis and Shi'a for potable water, sewage, food, and trash, but divergent for electricity, fuel delivery and, to a lesser extent, health.[153] For electricity in particular, this is counterintuitive, because Sunni-majority provinces typically enjoyed more hours of power per day than almost all Shi'a-majority provinces during the same

• 317 •

PX213

time period.[154] Actual differentials in service delivery thus do not alone account for the differing rates of satisfaction among sectarian communities. Historical entitlements, perceived political disenfranchisement, and expectations raised by early Coalition pledges also likely affected satisfaction rates.

Even with Iraqi levels of satisfaction trending upward and violence trending downward, the United States was still caught in a nation-building effort it had not anticipated and still did not fully understand. In 2000, future Secretary of State Condoleezza Rice articulated her belief that the U.S. military should focus primarily on combat operations. "Carrying out civil administration and police functions is simply going to degrade the American capability to do the things America has to do," she said, adding, "We don't need to have the 82nd Airborne escorting kids to kindergarten."[155] Eight years later, during the surge, the 82nd Airborne, serving its second Iraq deployment, was helping oversee the construction of greenhouses outside Tikrit.[156]

More than five years after the overthrow of Saddam Hussein, the ultimate success of the reconstruction program and the future of Iraq were still unresolved. The Joint Campaign Plan that Crocker and Petraeus promulgated was predicated on the belief that stopping openly violent clashes would allow Iraqis gradually to resolve their conflicts through elections rather than militias. Such a transformation was both elusive and extraordinarily costly—for Americans and Iraqis—in lives and national treasure.

Even as the security situation improved dramatically through the second half of 2008, potentially violent rivalries between political groups competing for power still threatened Iraq's fragile government structures. "SCIRI is fighting Sadr is fighting Fadhila," said an Iraqi whose home is in Basrah, where clashes have frequently taken place. The social effects of violence have taken their toll on family life. For most of the past four years, he said, "it is too dangerous for my kids to play outside the house. They have bicycles; they are walking on the roof. They play football inside the house." Even as violence recedes, and life regains a degree of normalcy in many provinces, the new realities of post-Saddam life bring their own complications. Before, he said, many Iraqis could remain largely ignorant of politics. "Now it's a truth for all life."[157]

PX213

• The Civilian Surge •

## ESSENTIAL SERVICES OVERVIEW – AFTER THE SURGE

| Metric[158] | Pre-invasion | Post-invasion | CPA Transition | Negroponte Era | Khalilzad Era | Surge Ends |
|---|---|---|---|---|---|---|
| **Electricity Production** | | | | | | |
| *Megawatts* | 4,075 | 711 | 3,621 | 4,262 | 3,475 | 4,400 |
| **Oil Production** | | | | | | |
| *Million Barrels per Day* | 2.58 | 0.30 | 2.16 | 2.13 | 1.95 | 2.43 |
| **Iraqi Security Forces** | | | | | | |
| *Soldiers and Police* | 1,300,000 | 7,000-9,000 | 87,000 | 171,300 | 328,700 | 478,500 |
| **Telecommunications** | | | | | | |
| *Landline Subscribers* | 833,000 | 0 | 791,000 | 998,000 | 1,111,000 | 1,200,000 |
| *Mobile Subscribers* | 80,000 | 0 | 461,000 | 2,422,000 | 8,720,000 | ~13,000,000 |
| **Human Toll** | | | | | | |
| *U.S Troop Fatalities* | - | 139 | 862 | 1,745 | 3,248 | 4,115 |
| *Civilian Contractors* | - | 1 | 46 | 217 | 916 | 1,229 |
| *U.S. Civilians* | - | ~9 | 52 | 113 | 224 | 271 |
| *Iraqi Civilians* | - | 7,413 | 16,848 | 29,155 | 72,858 | 95,236 |
| **Financial Cost ($ billions)** | | | | | | |
| *U.S Funding* | - | $3.45 | $22.93 | $29.21 | $36.96 | $50.46 |
| *Iraqi Funding* | - | $0.00 | $16.00 | $21.03 | $37.27 | $50.33 |
| *International Funding* | - | $0.00 | $13.60 | $13.87 | $15.20 | $17.00 |
| *Total Funding* | - | $3.45 | $52.53 | $64.11 | $89.43 | $117.79 |

By mid-2008, daily electricity production had edged up above prewar levels, with outputs averaging 4,400 megawatts per day. The third quarter of 2008 showed postwar highs, averaging over 4,900 megawatts per day. But Iraqi demand still far outpaced production. The electricity distribution system improved too, but equitable allocations among the provinces and major cities remained a problem.[159]

Oil production continued to rise through 2008, falling just short of prewar levels of 2.58 million barrels per day by mid-year. The July 2008 production rate reached 2.43 million barrels per day—the highest since the 2003 invasion. Because of the success of infrastructure security measures, no successful pipeline attacks occurred in 2008.[160]

PX213

PX213

# PART V
## LESSONS LEARNED

PX213

PX213

## Chapter 27
## Hard Lessons

*I don't think we had the right structure… We tried in Iraq to give it to a single department, the Department of Defense. That's why the President has now said that we need a civilian response corps that can do those activities. But clearly, we didn't have the right structure.* *

**Dr. Condoleezza Rice**
Secretary of State (2005-2009)

In March 2003, the United States invaded Iraq, made short work of its armed forces, and easily toppled Saddam Hussein's government. A well-trained and properly equipped force achieved a quick and efficient military victory. But the United States was unprepared and ill-equipped to deal with what came next: a "post-conflict" environment torn by violence, looters, criminals, and a nascent insurgency; a governmental system in a state of complete collapse; and an economy that had slipped into idle and then switched off.

With no established plans to manage the increasing chaos it faced, no developed doctrine of nation building to rely on, and no existing governmental structures through which to carry out contingency relief and reconstruction operations, policymakers struggled to respond to a broken Iraq. They abandoned the hoped-for quick transfer of power to an interim Iraqi authority and entered into an occupation. Thrust into this deepening crisis, Ambassador L. Paul Bremer III and the Coalition Provisional Authority were asked to do the virtually impossible: restore order, restore governance, restore the economy, and restore basic services—quickly, with limited resources, and little capacity to act.

Focusing on the economy, Bremer improvised an infrastructure-heavy reconstruction program that became the largest foreign assistance effort undertaken by the United States since the Marshall Plan. Although a short period of shaky peace followed Saddam's fall, the rapidly growing problems in Iraq—especially in the security sector—were beyond the CPA's capacity to solve. The formal dissolution of Iraq's military and a more extensive de-Ba'athification effort than anticipated aggravated matters by sidelining two expected sources of Iraqi assistance.

The United States struggled over the next six years to develop and implement a strategy for reconstructing Iraq as a stable and democratic nation on

---

\* Fox News interview with Dr. Condoleezza Rice, Secretary of State, December 7, 2008.

PX213

the path to prosperity. Deteriorating security both informed and complicated every decision. Employing a variety of tactics to address the growing violence, the United State poured money and—finally—more troops into the country, all while trying to rebuild Iraq's physical infrastructure, its security forces, and its capacity to govern. U.S. governmental agencies, military units, nongovernmental organizations, international groups, and private-sector firms engaged in the massive effort.

Through trial and error, the U.S. strategy moved away from the CPA's large infrastructure approach to a more modest, Iraqi-driven program focused on developing the fledgling government's capacity for self-rule. Along the way, the U.S. government created a series of ad hoc offices and systems as it moved from crisis to crisis. The government and the private contractors it employed adapted as they learned hard lessons from the rebuilding program, gradually becoming more effective in an exceedingly lethal environment. Notwithstanding this progress, the United States still struggled in late 2008 to make Iraq's reconstruction a success.

Each of the four periods of reconstruction chronicled in *Hard Lessons* yields unique conclusions. Taken collectively, they underscore the need for the U.S. government to reform its approach to contingency relief and reconstruction operations and to develop greater capacity to execute them.

**Prewar Planning and ORHA (September 2001-April 2003)**

The U.S. approach to Iraq reconstruction had its origins in the fall of 2001, when the President and the Secretary of Defense began fashioning the Iraq war plan according to a "liberation" model. From the outset, the Pentagon's leadership believed that victory would be swift and that a new interim Iraqi authority would quickly assume power. They planned on Iraq's police providing postwar security and anticipated that Iraqi oil revenues would fund most relief and reconstruction projects. When Iraq's withering post-invasion reality superseded these expectations, there was no well-defined "Plan B" as a fallback and no existing government structures or resources to support a quick response.

During prewar preparations, certain officials at the Department of State and the U.S. Agency for International Development argued that the postwar reconstruction of Iraq would be more difficult, would take more time, and would require an extraordinary commitment of financial and human resources. But even veteran development experts misjudged what would be necessary to rebuild the country's physical, security, and governmental infrastructure. "We needed to be thinking at a much different order of magnitude [about] what is required to

PX213

• Hard Lessons •

reconstruct a failed state, in the context of a U.S. military invasion," USAID's Deputy Administrator James Kunder later said.[1]

Force size was a central issue. Planners across the government and within the military disagreed on how many troops would be necessary. Prewar analyses of post-conflict situations suggested that at least 300,000 troops—and perhaps as many as 500,000—would be required to maintain post-invasion order in a country with the size and population of Iraq. But the President and his advisors, both military and civilian, decided against deploying so large a number and chose not to prepare for large-scale reconstruction operations. Instead, the invasion plan called for deploying a light and agile force. Post-conflict efforts focused on averting humanitarian disasters like those that followed the first Gulf War. The plan assumed the best-case reconstruction scenario and the worst-case humanitarian scenario.

Historically rooted conceptions of defense, diplomacy, and development shaped the content of prewar reconstruction discussions. Military planners excluded post-conflict experts from early deliberations that determined the scope of U.S. policy. USAID Administrator Andrew Natsios, the highest-ranking Administration official with both development and combat experience, was not invited to NSC meetings until long after the war began.

The way the U.S. government is structured facilitated this exclusion. Since 1947, the Departments of Defense and State—and later USAID—have operated mostly independently of one another, even though in today's world overseas missions usually require a blending of each one's strengths, along with those of other U.S. government agencies. Integrating their various capabilities was left to the President's war cabinet and the NSC staff, where joint planning is difficult to manage and tends to be subject to the personalities of those who inhabit key posts. "Don't try to use Iraq as the model [for reform]," Secretary of State Colin Powell cautioned, "without recognizing and acknowledging that it was as much a process and personality as it was a structural problem."[2]

The government's lack of strong mechanisms to integrate the work of separate departments led the White House to delegate interagency missions to a lead agency just months before the invasion. The battle over whether the liberation model would guide Administration policy in Iraq became, in truth, a battle over which department would control reconstruction itself. In the absence of a clear precedent on how to coordinate postwar operations of this magnitude, the President decided, in late 2002, to hand operational control for planning and managing post-invasion Iraq to the Department of Defense, sidelining the only interagency system—the NSC—designed to orchestrate the government's actions in international security matters.

PX213

• Chapter 27 •

Secretary of Defense Donald Rumsfeld recognized that this was not a perfect solution. "The U.S. government has had to rely on quickly assembled, ad hoc efforts, such as [the Office of Reconstruction and Humanitarian Assistance], to coordinate reconstruction," he later wrote.[3] "The truth is," Secretary of State Condoleezza Rice would later say, "we really did not have, either in any department or in the U.S. government as a whole, an institution that could really deal with post-conflict stabilization."[4] "A lot of it wasn't handled very well," Rice added. "There are a lot of things, if I could go back and do them differently, I would."[5]

**The Coalition Provisional Authority (May 2003-June 2004)**

The liberation model—in which a rapid transfer of power to Iraqi authorities would enable U.S. troops to depart 90 days after the regime's fall—broke down almost immediately after the invasion. Neither the U.S. military nor the civilian leadership was prepared for the complete disintegration of Iraq's government and the subsequent loss of law and order. The looting and the chaos it engendered destroyed plans for a rapid transfer of power. With public institutions and critical infrastructure crippled, the mission of ORHA's successor agency—the Coalition Provisional Authority—turned from restoring essential services to rebuilding from scratch the ministries that provided them.

The CPA adopted a maximalist approach to reconstruction, developing plans to transform every aspect of Iraqi society, from the banking system to traffic laws. But the CPA—and the U.S. government agencies that supported it—demonstrated an inadequate understanding of both Iraqi culture and the complicated internal political relationships that existed among and within various Iraqi groups.

During the first weeks of its existence, the CPA issued momentous orders—de-Ba'athification and disbanding the military—with insufficient interagency debate. Although there may have been sound reasons for removing members of the Ba'ath party from senior government positions and for dissolving the army, both decisions added considerably to the difficulty of reconstruction and establishing a functioning government. Had these issues been fully discussed by the war cabinet and within the CPA, the United States might have acted differently. Instead, the U. S. rebuilding program was left to deal with the instant loss of many of the Iraqi technocrats it would later need. It also had to build entirely new Iraqi security forces, a task that would ultimately consume more than half of all U.S.-appropriated reconstruction dollars.

In 2003, the United States lacked an accepted doctrine for contingency relief and reconstruction operations that could inform how decision-makers should address the complex array of problems then at play in Iraq. There was no agreed-upon approach to Iraq's reconstruction, little understanding of the dynamics of

PX213

post-conflict rebuilding, and no structure for the rapid provision of resources to the CPA. Moreover, those at the head of what quickly became the largest overseas rebuilding effort in U.S. history struggled to differentiate between the pursuit of transformational goals for their own sake and what it would take to achieve rapidly the U.S. national objective of a stable Iraq. Efforts across many sectors were poorly conceived, overambitious, and often at cross-purposes. Part of the problem was that the CPA failed to consult sufficiently with Iraqis to understand what they really wanted from the reconstruction program. Consequently, the CPA made decisions that often undercut the goals they were trying to reach.

The reform of Iraq's economy was a striking example of how the lack of an accepted doctrine undermined U.S. objective. The CPA decided, over considerable internal opposition, to discontinue support to Iraq's state-owned enterprises. Its senior economic advisor apparently did not appreciate the interdependence among factories producing chlorine, agricultural fertilizer, and cement and the impact their closing would have on Iraq's oil, electricity, water, and agricultural sectors. Rather than committing resources to their continued existence, the CPA hoped that an emergent private-sector in Iraq would generate a new manufacturing sector, employ large numbers of people, and produce the goods the country needed. But Iraq's harsh postwar reality quickly trumped economic theories that suggested a market solution was possible.

By mid-summer 2003, the CPA had settled on a strategy to spur growth by rebuilding infrastructure, focusing particularly on the electricity, oil, and water sectors. The CPA hoped that these projects, once completed, would energize the economy and supply Iraqis with needed essential services. The Administration persuaded the U.S. Congress to appropriate $18.4 billion to fund this grand vision, and the CPA created the first of what would be several ad hoc organizations to manage reconstruction—the Program Management Office. Like the organizations that came before and after, the PMO did not have the personnel and the systems to administer so large a program effectively.

Believing that conditions in Iraq demanded speed, the CPA developed its reconstruction program in great haste, missing opportunities to integrate adequately the views of Iraqis and implementing agencies—USAID, the State Department, and the military—in the process that led to the creation of the second Iraq Relief and Reconstruction Fund. Many of the program's infrastructure projects also suffered from inadequate design, weak government oversight, and a lack of planning for Iraqis to sustain them.

Growing Iraqi opposition to the prolonged transition to self-rule—complemented by the U.S. desire to disengage from a lengthening occupation—resulted in the announcement on November 15, 2003, to transfer sovereignty from the

PX213

CPA to Iraq by June 30, 2004. Reconstruction plans that had just been devised on a two-year timetable now had to shift, and the rush began to prepare Iraq's government to stand on its own in seven months. The announcement also meant that U.S. appropriations for reconstruction—slowed by the NSC's high-level review in Washington—would not arrive until the very end of the CPA's tenure. Ambassador Bremer had to fund most of the CPA's early reconstruction projects, as well as Iraqi government operations, with Iraqi funds held in trust by the UN and the United States. But the CPA failed to keep detailed accounts of how most of this money was spent. Expenditures of the roughly $20 billion in DFI money used by the CPA were initially tracked on an Excel spreadsheet—hardly a sufficient control. At its end, the CPA had barely begun to execute the grand reconstruction program it had designed.

An even more fundamental problem plagued the CPA's efforts. Its reconstruction strategy was premised on a "permissive" environment, meaning one generally free from violence; but most of Iraq was racked by violence for most of the CPA's existence. Almost immediately after the invasion, many in Iraq—from the CPA Administrator and the Commanding General of Coalition forces to Iraqis in the ministries and on the streets—recognized that security was the most compelling issue confronting the country. Lieutenant General Sanchez, the man in charge of the U.S. military in Iraq, requested more troops in May 2003. Until mid-July, though, the United States stuck to its original plan to reduce troop strength as quickly as possible. The troop withdrawal stopped only when General Abizaid replaced General Franks as CENTCOM commander.[6]

With the increase in violence, planners confronted a political and economic landscape that was evolving faster than they could adapt to or understand. All the while, the magnitude of what needed to be done was overwhelming. The absence of a well-defined doctrine or an effectively coordinated strategy caused the CPA's approach to reconstruction to have a disjointed and ad hoc quality: Get the oil flowing. Stop the smugglers. Get the electricity up and running. Clean out the sewers. Re-write the textbooks. Change the currency. Employ more Iraqis. Focus on the cities. Focus on agriculture. Focus on security.

### The U.S. Embassy under Negroponte (July 2004–June 2005)

When the new U.S. Embassy in Iraq inherited the CPA's reconstruction program in July 2004, the U.S. ambassador faced two critical problems. First, the United States had to adjust the reconstruction program to address the deteriorating security conditions in Iraq. Second, more capabilities needed to be mobilized to implement the rebuilding program. The U.S. reconstruction management structure was overwhelmed by the challenges of building in a war zone. Contractors found it difficult

PX213

• Hard Lessons •

to carry out projects in the dangerous environment, and the lack of adequate oversight by government contracting officers, program reviewers, and other agencies permitted wasteful spending to career out of control. Safeguarding reconstruction personnel, equipment, and work sites against insurgent attacks further drove up costs. The violence also prevented managers and quality control engineers from visiting projects to check progress. The system of oversight so crucial to effective reconstruction had collapsed. The United States had to change course.

Immediately after his arrival in Iraq, Ambassador John Negroponte ordered a review of all reconstruction priorities, which led to a reprogramming of $3.46 billion, with most of the shifted funds going to the security sector. More reprogramming followed and, by September 2005, U.S. officials had shifted a total of $5.59 billion—nearly a third of reconstruction appropriations—to support security, job creation, and economic reform projects, drawing the money chiefly from the water and electricity sectors. The CPA designed its program to be executed in a secure postwar environment, but the rise of a violent insurgency forced the reconstruction effort to change course from laying the foundation for long-term economic growth to producing short-term results in support of a counterinsurgency campaign. The challenge was to achieve security gains while fostering economic and democratic development.

By the middle of 2005, the United States had completed a thousand projects using IRRF 2 funding and had another thousand underway. Hundreds of firms were active across the country, employing tens of thousands of foreign contractors and an estimated 180,000 Iraqis. The rebuilding effort, however, proved to be more expensive and time consuming than planners anticipated. Power generation and distribution continued to fall short of Coalition goals, as did oil production, chiefly because so much of Iraq's critical infrastructure was vulnerable to sabotage and in poor condition.

Project management systems remained problematic. In late 2005, the embassy still could not match projects with the contracts that funded them, nor could it estimate how much they would cost to complete. Completed projects also were failing after being turned over to Iraqis who were unable to properly maintain and operate the facilities. These failures highlighted the need to build capacity in Iraqi institutions so the country could manage the new infrastructure the United States was providing.

PX213

### The U.S. Embassy under Khalilzad and Crocker (June 2005-2008)

U.S. reconstruction strategy continued to evolve during the tenure of Ambassador Zalmay Khalilzad, who arrived in Baghdad in June 2005. A new approach for counterinsurgency operations, called Clear-Hold-Build, further integrated military and civilian efforts. Khalilzad deployed Provincial Reconstruction Teams across Iraq, adapting a concept that he developed during his tenure as ambassador to Afghanistan. The PRTs, together with Provincial Reconstruction Development Councils, helped Iraq's provincial governments improve their working relationships with Iraq's central government and strengthened the coordination of Iraqi and Coalition resources.

From Khalilzad forward, the reconstruction effort moved quickly away from the large infrastructure approach and toward more modest projects designed to deliver jobs and services to the most vulnerable, violent, and strategically consequential Iraqi cities and towns, and to do this, as much as possible, through provincial, municipal, and local institutions. By going through official Iraqi institutions instead of around them, U.S. reconstruction expenditures directly served the goal of building a functioning Iraqi state.

As the U.S. ability to deliver reconstruction resources improved, the amount of money it had left to spend diminished. Meanwhile, Iraq fell further into chaos. As many as 300 companies provided security services to the U.S. reconstruction effort, increasing costs on some large reconstruction contracts by 24 to 53 percent.[7]

The Samarra bombing in February 2006 exacerbated sectarian tensions, overlaying the insurgency with civil conflict among Iraq's sects. The resulting political fragmentation complicated efforts to build capacity in ministries held captive by political parties with sectarian or regional agendas. As the nature of the violence evolved from a traditional insurgency to a sectarian struggle, economic incentives proved less and less effective and military force became more necessary.

The 2007 surge of troops and the complementary civilian effort—driven by a revised counterinsurgency strategy formulated by General David Petraeus and Ambassador Ryan Crocker—ushered in a new era. As the major program of U.S. infrastructure rebuilding began drawing to a close, emphasis moved to building capacity inside Iraqi institutions and using direct contracts with Iraqi firms to help the country's economy recover.

As the surge of troops and civilian resources peaked, the U.S. investment in Iraq's security forces also began to pay dividends. In 2005, the Congress had authorized the Iraq Security Forces Fund, a major new appropriation that eventually matched the IRRF in size. During the following three years, the ISFF channeled more than $18 billion into training and equipping Iraq's police and soldiers,

PX213

Case 1:18-cv-02248-CRC   Document 85-3   Filed 05/06/22   Page 2125 of 2178

• Hard Lessons •

building the facilities they used, and developing the Ministries of Defense and Interior. The increase in the size, reliability, and readiness of Iraqi forces contributed to a significant reduction in violence that began in the summer of 2007 and was sustained through 2008.

The surge's hard-won security gains led to a more secure reconstruction environment. With the accumulation of oil revenues in Iraqi capital budgets, the Government of Iraq now had in its coffers the resources necessary to pursue its own relief and reconstruction program. Helping Iraq execute this new budget emerged as a key objective. By the end of 2008, the reconstruction program was many orders of magnitude more Iraqi-driven and Iraqi-funded than when it had begun in 2003.

Over nearly six years, the U.S. program had undergone an extraordinary evolution. What was originally conceived as a modest program to repair war damage and treat refugees had ballooned into an expansive and expensive nation-building effort. This in turn was supplanted by a counterinsurgency campaign and then a countrywide initiative to build Iraqi capacity. Constant re-evaluations of how U.S. resources could be employed to achieve the desired result of a stable Iraq led to a shift from large infrastructure reconstruction to a program that combined "soft" and "hard" projects aimed at mitigating security problems and building capacity.

Of the many lessons to be drawn from Iraq reconstruction, the most compelling speak to the need to develop an agreed-upon doctrine and structure for contingency relief and reconstruction operations to guide the use of military and economic power so that the United States is ready when it next must intervene in a failed or failing state. The Iraq reconstruction experience chronicled in this report, in hundreds of audits and inspections, and in three previous Lessons Learned reports led SIGIR to identify these most significant hard lessons:[8]

*First Principles for Contingency Relief and Reconstruction Operations*

- **Security is necessary for large-scale reconstruction to succeed**. A successful reconstruction program requires a balancing of security, political, and economic interests. Reconstruction cannot proceed on a large scale without the requisite security to protect those carrying out the projects and those overseeing them. In Iraq, the scope of reconstruction was too often unmatched by available security resources. To this day, Iraq's reconstruction environment has never been truly "post-conflict." Endlessly rebuilding in the wake of sustained attacks on reconstruction personnel and critical infrastructure proved to be a demoralizing and

PX213

wasteful proposition. To guide decisions on funding projects facing security threats, the U.S. government should analyze whether and at what costs those security risks can be mitigated. Projects should only proceed when senior leaders determine that the strategic objective they fulfill outweighs the risk of failure and the costs of mitigating security risks.

- **Developing the capacity of people and systems is as important as bricks and mortar reconstruction**. The CPA's reconstruction program focused chiefly on large infrastructure projects aimed at improving service delivery. Little of its money was set aside to boost government capacity. The failure to pursue capacity-building efforts alongside infrastructure construction led to a crisis in sustainability that continues to this day. The deterioration of poorly maintained infrastructure projects after transfer to Iraqi control could end up constituting the largest source of waste in the U.S. reconstruction program. A robust capacity-development program implemented from the outset of the reconstruction effort could have helped obviate this circumstance. Such a program should be an essential component of future contingency relief and reconstruction operations.

- **Soft programs serve as an important complement to military operations in insecure environments**. An emerging lesson from Iraq is that when violence is pervasive, soft programs—like those orchestrated by USAID and Provincial Reconstruction Teams—are especially important in advancing U.S. goals. Operating through Iraqi intermediaries reduced the exposure of reconstruction personnel to violent attack and helped deliver economic stimuli to local communities even when Coalition military forces were engaged in clearing operations. The apparent success of these programs, although often hard to quantify, highlights the extent to which social capital matters. Working through indigenous networks seems to increase community acceptance and provide a higher and more lasting degree of local security than military or private-security protection alone could achieve. Especially because many such programs operate out of view of most U.S. personnel, the selection of metrics and careful monitoring of expenditures are critical to ensuring value for the U.S. taxpayer.

- **Programs should be geared to indigenous priorities and needs**. Host country buy-in is essential to reconstruction's long-term success. Much of the early and some later efforts in Iraq focused on large projects that were meant to benefit Iraqis directly. Other projects devised new and more efficient systems for conducting business inside

PX213

• Hard Lessons •

the Iraqi government. In many cases, there was a lack of sufficient Iraqi participation in deciding how or what to reconstruct and ensuring that projects could be maintained afterwards. Detailed joint planning with Iraqi officials—perhaps the most important prerequisite for success after security—only gradually improved over time.

- **Reconstruction is an extension of political strategy**. The reconstruction experience in Iraq revealed deficiencies in how the U.S. government understands the dynamics of societies it seeks to influence through military and non-military means. War, politics, and reconstruction are linked in ways that individuals within the government failed to appreciate in the opening years of the Iraq conflict. If war, as Clausewitz said, is an extension of politics by other means, so too is relief and reconstruction an extension of political, economic, and military strategy. In this regard, there is a distinct difference between pursuing reconstruction to catalyze long-term economic growth and deploying reconstruction to support a counterinsurgency campaign.

*Organizing the Interagency System for Contingency*
*Relief and Reconstruction Operations*

- **Executive authority below the President is necessary to ensure the effectiveness of contingency relief and reconstruction operations**. The role of executive authority—and the lack thereof—over interagency coordination lies at the heart of the failures in the Iraq reconstruction program. The question of who was in charge, both in Washington and in Baghdad, was fiercely contested throughout the reconstruction effort. Was the CPA Administrator the President's envoy or an employee of the Secretary of Defense? Was the ambassador to Iraq the President's personal representative, with authority over all U.S. personnel and resources, or merely the chief State Department official? Do personnel on detail report through their agency chain of command or to the heads of embassy sections? To what extent can the "lines-of-operation" coordinators designated by the ambassador and the commanding general task agencies under their purview for support? The lack of unity of command in Iraq meant that unity of effort was seldom achieved. Too often, programs were designed to meet agency goals, rather than U.S. national interests. Stronger integration was needed not only between the military and civilian agencies but also among the civilian agencies themselves. With weak

PX213

• Chapter 27 •

interagency cooperation an endemic feature of the U.S. national security system, reform efforts should press for structures that will promote the development of a unifying strategy with clearly delineated agency responsibilities and adequate authority to enforce its execution.

- **Uninterrupted oversight is essential to ensuring taxpayer value in contingency operations**. In the absence of effective management by government officials, contractors in Iraq were often left in dangerous circumstances to carry out insufficiently defined contracts written by inexperienced contracting officers who lacked situational awareness. In this chaotic environment, it was, at times, difficult to differentiate between reliable contractors who could carry out good work and those whose ad hoc operations and lack of experience pointed to failure. As a result, contractors fell into two clusters. Most companies responsibly complied with the requirements of their contracts, even if the U.S. administrative apparatus did not make the best use of their capabilities. A relative few took advantage of the situation by committing fraud. In this context, uninterrupted oversight by inspectors general and the Congress—accompanied by adequately staffed quality-control and quality-assurance programs—is essential to ensuring the efficient and effective use of taxpayer dollars.

- **An integrated management structure is necessary to ensure effective interagency reconstruction efforts**. After the reconstruction program got underway in 2003, at least 62 offices and agencies ultimately became involved in managing IRRF-funded projects.[9] There were no interagency project management and information systems that could coordinate the activities of the hundreds of firms and subcontractors performing construction work orders at thousands of sites across Iraq. An integrated management structure—coupled with an interoperable information system—could have helped to ensure that programs and projects were planned and executed with effective communication, control, and cooperation.

- **Outsourcing management to contractors should be limited because it complicates lines of authority in contingency reconstruction operations**. By law, contractors report solely to the government contracting officers or the designated representatives of the agency that awarded the contract. In Iraq, authority for reconstruction plans and policy was given to the IRMO, under control of the ambassador. At the same time, contracting officers operating out of the PCO were under Defense

• 334 •

PX213

• Hard Lessons •

Department supervision and thus only nominally under the authority of the ambassador. The proliferation of contractors serving as managers and advisors in each of the offices raised questions regarding what constituted inherently governmental activity, and the extent to which oversight authority can be delegated to a contractor.

*Contracting Mechanisms and Human Resources*
*in Contingency Relief and Reconstruction Operations*

- **The U.S. government should develop new wartime contracting rules that allow for greater flexibility**. The United States needs contracting reform that enables U.S. dollars to be more effectively used in contingency relief and reconstruction operations. A "Contingency FAR" should be developed by the Congress and the executive branch. The Federal Acquisition Regulation's complicated contracting regulations, which can be modified by agency rules, should be knitted into a single set of simplified, uniform rules for conflict environments that all contracting agencies would have to use. A much larger corps of well-trained and experienced contracting officers must also be developed and then maintained for deployment during all phases of contingency operations, including planning. Similarly, a diverse pool of contractors with expertise in post-conflict reconstruction should be pre-competed and pre-qualified to be available when a contingency operation begins.

- **The U.S. government needs a new human-resources management system capable of meeting the demands of a large-scale contingency relief and reconstruction operation.** Supplying adequate numbers of personnel with the requisite expertise emerged as a critical bottleneck early in the reconstruction effort. Employing experts to work temporarily in Iraq often entailed long delays before their deployment, and many of those who finally arrived stayed for only three to six months. Although personnel recruitment improved somewhat as the reconstruction enterprise matured, at no time were there sufficient numbers of experienced advisors to meet Iraq's critical capacity-building needs. Washington was unable to draw effectively on the extraordinary talent available in America to form a cadre of workers that combined private-sector expertise with academic knowledge and bureaucratic skill. Further, the failure to provide unambiguous authority to the Chief of Mission in NSPD 36 and the reluctance of the several chiefs of mission to exercise that authority made the effective cross-jurisdictional management of

PX213

• Chapter 27 •

personnel almost impossible. A uniform set of human resource rules that would apply to all federal personnel deployed for contingency operations is needed, as are stronger recruiting mechanisms and a large stable of ready-to-deploy personnel.

- **The U.S. government must strengthen its capacity to manage the contractors that carry out reconstruction work in contingency relief and reconstruction operations.** Once Baghdad fell and the looting began, the scope of reconstruction quickly overwhelmed the U.S. government's standing capacity to respond. The post-Cold War downsizing of USAID and military construction capacities increased reliance on the private sector. Neither the NSC, the CPA, nor the Pentagon could mobilize contractors fast enough as they struggled to comply with complex FAR regulations while awarding large cost-plus contracts. Nor were they able to provide the degree of government oversight that was necessary. The decision to reduce the number of warranted contracting officers during the ten years preceding the Iraq invasion proved particularly consequential.[10] It became clear that the U.S. and international contractors hired by the CPA were not ready to quickly mount a large-scale reconstruction operation in a dangerous security environment.

- **Diplomatic, development, and area expertise must be expanded to ensure a sufficient supply of qualified civilian personnel in contingency reconstruction operations**. Despite the crucial need for diplomatic skills and development expertise in contingency relief and reconstruction operations, as well as for area experts fluent in local culture and politics, the civilian agencies that provide them proved unable to staff the number of positions needed in Iraq. The Iraq reconstruction experience illustrates the extent to which civilian agencies do not have the capacity to project power abroad. Cuts at USAID have halved the number of permanent government employees at that agency, severely attenuating its technical competence and managerial facility.[11] To remedy this weakness, Secretary of Defense Robert Gates has called for a "dramatic increase in spending on the civilian instruments of national security."[12] The Congress and the President should consider a long-term strategy for building technical and area expertise in the government's civilian diplomatic and development agencies and creating mechanisms for deploying such capabilities abroad in times of crisis and peace.

• 336 •

PX213

• Hard Lessons •

•     •     •

The following Afterword suggests ways the hard lessons of Iraq reconstruction can be addressed further, focusing on the Reconstruction and Stabilization Civilian Management Act of 2008, which the Congress recently passed to enhance the ability of the United States to carry out contingency relief and reconstruction operations abroad.

PX213

Afterword
# Reforming Contingency Relief and Reconstruction Operations

*History will judge the war against Iraq not by the brilliance of its military execution, but by the effectiveness of the post-hostilities activities.\**

**Lieutenant General Jay Garner**
Director of ORHA (2003)

Since the Marshall Plan transformed Europe after World War II, the United States has undertaken large and small contingency relief and reconstruction operations in countries from Bosnia and Haiti to Sri Lanka and Somalia. Every President since Harry Truman has faced at least one contingency requiring the deployment of civilian and military resources abroad. Even so, the government as a whole has never developed a legislatively sanctioned doctrine or framework for planning, preparing, and executing contingency operations in which diplomacy, development, and military action all figure.

On October 14, 2008, the President signed into law "The Reconstruction and Stabilization Civilian Management Act of 2008" (RSCMA), as part of the Duncan Hunter National Defense Authorization Act for 2009. It is the most significant congressional legislation ever passed regarding the structure of and planning for contingency relief and reconstruction operations.[1]

RSCMA addresses a number of recommendations for contingency operations reform that SIGIR put forward in its three previous lessons learned reports.[2] Most notably, the Act creates a structure to address planning, personnel, and program management needs. The Act places responsibility for preparing the civilian side of contingency relief and reconstruction operations within the Department of State and directs the Secretary of State—in consultation with the Administrator of USAID—to develop an interagency strategy for executing reconstruction and stabilization operations.[3]

RSCMA provides for a presidentially appointed, Senate-confirmed Coordinator for Reconstruction and Stabilization, whose significant duties and responsibilities include:

- coordinating the development of interagency contingency plans and procedures to mobilize and deploy civilian personnel

---

\* ORHA, "A Unified Mission Plan for Post-Hostilities Iraq," April 2003.

PX213

and conduct reconstruction and stabilization operations for
various types of crises

• identifying personnel in state and local governments and
in the private sector who are available to participate in the
Civilian Reserve Corps or otherwise participate in reconstruc-
tion and stabilization activities

• taking steps to ensure that training and education of civilian
personnel to perform reconstruction and stabilization activi-
ties are adequate and are carried out, as appropriate, with other
agencies involved with stabilization operations

• planning, in conjunction with USAID, to address require-
ments, such as demobilization, disarmament, rebuilding of
civil society, policing, human rights monitoring, and public
information, that commonly arise in reconstruction and sta-
bilization crises

• maintaining the capacity to field on short notice an evalua-
tion team consisting of personnel from all relevant agencies to
undertake on-site needs assessments[4]

The Act further states that the Secretary of State, in consultation with the
USAID Administrator, may create a Response Readiness Corps and a Civilian
Reserve Corps. The Response Readiness Corps, if formed, "shall be composed of
active and standby components consisting of United States Government person-
nel, including employees of the Department of State, the United States Agency
for International Development, and other agencies." The Civilian Reserve Corps,
if formed, shall employ and train "individuals who have the skills necessary for
carrying out reconstruction and stabilization activities, and who have volunteered
for that purpose."[5]

## A Giant First Step

The new architecture created by RSCMA establishes in U.S. law reforms that
the President set in motion when he signed NSPD 44, which assigned the State
Department the lead in managing government-wide civilian preparation for
contingency operations.[6] The duties that must now be carried out by the State
Department's Coordinator for Reconstruction and Stabilization (S/CRS) are
monumental. The coordinator's office must monitor activities worldwide, pre-
pare contingency plans, coordinate the development of relief and reconstruction

PX213

• Afterword •

strategy across the government, and perform human-resources functions (recruitment, training, equipping) on a grand scale. But without adequate funding and a large staff, S/CRS will not be able to accomplish all these tasks. Three things are necessary to fulfill the Act's purpose.

*First, the Congress must provide appropriations suitable to meet the RSCMA mandate.* Some of the necessary funding may come from the President's Fiscal Year 2009 Budget Request to the Congress, which included $249 million for a Civilian Stabilization Initiative that would vastly improve the civilian partnership with United States Armed Forces in post-conflict stabilization situations.[7] But the new Congress should address the funding mandates contained in RSCMA with all due speed.

*Second, more must be done to ensure that the interagency coordination and integration required by RSCMA actually occurs.* The State Department's S/CRS office was initially created in June 2004 to lead civilian planning for contingency operations, but it has been hamstrung both by weak budgets and a lack of authority. Only in late 2008, more than four years after its creation, were the office's proposals for government-wide reform beginning to gain any traction.[8] Even though the Congress has now written the roles of S/CRS fully into law, its ability to foster change across the government remains unproven, and many of the same structural obstacles remain. Contingency relief and reconstruction operations are not inherently the function of any single department, and the concept has no single constituency in the Congress, whose oversight committees are organized along departmental lines.[9]

The Department of Defense, usually the largest player in contingency relief and reconstruction operations, has pursued its own course toward enhancing its capacities for such operations. DoD Directive 3000.05, issued in November 2005, provided that "stability operations are a core U.S. military mission" that "shall be given priority comparable to combat operations and be explicitly addressed and integrated across all DoD activities." The directive assigns the military departments responsibility to conduct contingency relief and reconstruction operations if civilian agencies cannot.[10] In response to this directive, USACE has strengthened its engineering support to combatant commands and enhanced its own capacity to deploy divisions specializing in post-conflict reconstruction.[11] In addition, the Army has made stability operations a central part of its doctrine.[12] However, progress toward meeting the goals of directive 3000.05 has been uneven, as noted by many reports, including the Gansler Commission on Contracting.[13]

*Third, the Administration should work to revise and integrate the civilian and military components of contingency relief and reconstruction operations.* The President and the relevant cabinet secretaries should ensure that all

PX213

• Reforming Contingency Relief and Reconstruction Operations •

agencies—especially Defense and State—better integrate the structure and resources for contingency relief and reconstruction operations. The Iraq reconstruction experience was characterized by a continuing and disabling lack of coordination among the government agencies, contractors, and other organizations involved. As much as any other factor, this lack of coordination—arising from weak integration—kept the U.S. program from achieving its objectives. Only by strengthening agency integration and preparation can the United States move toward the "jointness" necessary for successful contingency operations.

**Unity of Command and Unity of Effort**

The Iraq reconstruction experience makes clear that contingency relief and reconstruction operations are inherently complicated, and that they require coordinated and cross-jurisdictional structures, planning, resources, and management. This broaches a difficult conundrum—finding a way to achieve unity of command in a multi-agency operation. The military has the security role; State has the diplomatic mission; USAID provides humanitarian relief and development expertise; and other agencies have specific missions. Although roles may adjust as conditions change, agency personnel always report to their department heads in Washington. This chain of command, as it currently stands, will inevitably exert a countervailing force on interagency coordination.

As General Petraeus said:

> State is never going to put an ambassador under a general, and DoD is never going to put a general under an ambassador. So you have to resolve to work together. You have to make way and pull together and be joined at the hip. You have to have unity of purpose is the bottom line.[14]

When unity of command is missing and unity of purpose does not foster unity of effort, a solution can only be implemented at the top. Interagency working groups operating at several levels across the government can and do make decisions that affect many departments and agencies. But under the current system, only the President has the decisive authority necessary to require interagency coordination for contingency relief and reconstruction operations.

The Iraq endeavor fell short on many occasions because the absence of unity of command prevented unity of effort. Too often, agencies and offices worked in their respective stovepipes without ensuring that their activities fully supported U.S. goals and objectives and avoided duplicating other agencies' efforts. The NSC apparently was powerless to break many of the logjams that occurred.

PX213

• Afterword •

The Project on National Security Reform, under the auspices of the Center for the Study of the Presidency, recently issued a report that noted: "Presidential intervention to compensate for the systematic inability to integrate or resource missions well centralizes issue management and burdens in the White House." The fact that "integration across disciplines is left to the President" has serious consequences; the government often cannot coordinate its own actions in a contingency environment.[15] A new integrated interagency management system for contingency relief and reconstruction operations is necessary to ensure their future success.

As the Iraq reconstruction experience demonstrates, the U.S. government was neither prepared for nor able to respond to the ever-changing demands of the contingency relief and reconstruction mission it faced in Iraq. Reform of U.S. policy for contingency operations—embodied in RSCMA—is a prerequisite for future success. As Secretary of Defense Robert Gates observed, "In recent years the lines separating war, peace, diplomacy, and development have become more blurred, and no longer fit the neat organizational charts of the 20th century."[16] The inevitability of future contingency relief and reconstruction operations after or during conflict, disaster, or political chaos demands that the U.S. government develop new ways of preparing for and managing the projection of civil-military power.

The President and the Congress should take further steps toward achieving this goal. Time and resources must be devoted to assembling a sound doctrine for contingency relief and reconstruction operations and for developing the capabilities throughout the government to carry them out. Great effort, reflection, and imagination could put the Iraq reconstruction experience to good use, yielding new structures, resources, and approaches that apply and build on the hard lessons learned in Iraq.

PX213

**Annexes**

PX213

PX213

## Annex A
## The Genesis and Methodology of *Hard Lessons*

### Genesis of the Project

The Special Inspector General for Iraq Reconstruction (SIGIR) is the successor to the Coalition Provisional Authority Inspector General (CPA-IG), which was created by the Congress in November 2003. The Congress created SIGIR in October 2004 by amendment to Public Law 108-106. The agency's mandate, expanded several times by the Congress, is the oversight of the use of reconstruction funds for Iraq, most notably the two Iraq Relief and Reconstruction Funds (IRRF 1 and 2) and the Iraq Security Forces Fund, the Commander's Emergency Response Program, and the Economic Support Fund. To carry out this mandate, SIGIR conducts audits, inspections, reviews, and investigations.[1]

SIGIR's work is embodied in quarterly reports to the Congress, audit reports, project assessment reports, congressional testimony given by the Special Inspector General, and the SIGIR Lessons Learned Initiative. SIGIR's lessons learned reports capture and apply the lessons learned from the Iraq reconstruction experience, comporting with SIGIR's congressional mandate to provide advice and recommendations that "promote economy, efficiency, and effectiveness in the administration of [reconstruction] programs and operations" in Iraq.[2]

The SIGIR lessons learned initiative began with "Lessons Learned in Human Capital Management" (released in February 2006), the development of which included a day-long forum at Johns Hopkins University on September 20, 2005, where more than 30 experts, many of whom served in Iraq, discussed issues of human capital policy, recruitment, retention, and continuity of staff, among other issues that related to personnel in Iraq reconstruction programs. Similar sessions were part of SIGIR's two subsequent lessons learned reports: Contracting and Procurement (released in July 2006) and Program and Project Management (released in March 2007).[3] Shortly after the second report's release, SIGIR began work on a more-comprehensive narrative of the reconstruction effort, focusing on the major events that shaped its course and the central themes that emerged from the program, aiming to produce a cumulative report on lessons learned from Iraq reconstruction.

*Hard Lessons* is that report, capping SIGIR's Lessons Learned Initiative. It seeks to answer the following questions:

- How—and how well—did the U.S. government meet its
  mission to restore Iraq's infrastructure and economy, rebuild

PX213

the country's military, foster civil society, and establish democratic institutions?

- What lessons have been learned that can guide the United States in making future contingency relief and reconstruction operations more coordinated, efficient and thus successful?

## Methodology

The *Hard Lessons* team drew on SIGIR's audits, investigations, inspections, and other reports to root the book's findings in the broader context of the U.S. mission in Iraq. Its members used government archives, including the unclassified documentary record from ORHA, the CPA, and the U.S. Embassy Baghdad, as well as those records in the Departments of Defense and State, USAID, and the White House that relate to Iraq reconstruction. Further documentary resources included USAID contractor reports and data from the Project Contracting Office and the U.S. Army Corps of Engineers Gulf Region Division.

It should be noted that this report is not an audit product. Its methodology differs from the standards set for audit reports, which use generally accepted government auditing norms, issued by the Comptroller General of the United States—the head of the U.S. Government Accountability Office. SIGIR's historical account of reconstruction is also drawn from a wider range of source material, including books, articles, and reports by scholars, think tanks, and individuals who were participants in the effort.

This documentary evidence, however useful, can tell only part of the story of Iraq's reconstruction. The account was greatly strengthened by hundreds of interviews conducted by SIGIR staff and the Special Inspector General. These provided a great deal of information on when key decisions were made, why they were made, and what their consequences were. Efforts were made to interview key Iraqi officials, as well as American and Coalition participants. The writers made every attempt to balance the statements of individual interviewees with other sources, so that conclusions were not based solely on the memory or opinion of one person.

Research was conducted mainly in SIGIR's offices in Arlington, Virginia, but also included several staff trips to Iraq between 2006 and 2008. These trips yielded many interviews with U.S. and Coalition personnel, contractors, Iraqi government officials, and Iraqi private citizens.

The Special Inspector General interviewed key civilian and military leadership, including virtually all of the high-ranking officials from the Departments of

PX213

State and Defense, the U.S. Agency for International Development, and the U.S. Army Corps of Engineers involved in Iraq reconstruction. Among these were the current and former commanding generals of Multi-National Force-Iraq and the current and former U.S. ambassadors to Iraq.

While in Iraq, team members observed reconstruction first-hand as they visited military civil affairs units, the Army Corps of Engineers, military brigades, NGOs, and contractors working on behalf of the U.S. mission. Team members, along with staff from SIGIR's audits, inspections, and investigations directorates, conducted site visits at major reconstruction institutions and projects in cities across Iraq.

In addition, SIGIR researchers consulted scholars who are conducting similar projects. Dr. Gordon Rudd, the ORHA/CPA historian, graciously agreed to provide access to his many interviews of key officials. The United States Institute of Peace, the Center for Strategic and International Studies, and the Center for Army Lessons Learned also provided interview transcripts and other documentation.

The report's major conclusions were presented to and discussed by a diverse group of experts on April 30, 2008, at a peer roundtable hosted by the Center for Strategic and International Studies. Participants included experts on Iraq and reconstruction from academia, major Washington think tanks, nonprofit organizations, and U.S. government agencies. Representatives attended from the Departments of State and Defense, USAID, the U.S. Institute of Peace, the U.S. Army Corps of Engineers, the Government Accountability Office, the Army's Peacekeeping and Stability Operations Institute, and the National Defense University.

The project was also ably served by the ongoing advice of outside reviewers. Several editorial advisors—all experts in the field of post-conflict operations—commented on drafts at various points in the project and met four times in 2007 and 2008 to review chapter drafts and provide advice on the project's direction. This project also had the benefit of insights from individuals both inside and outside of government who made helpful comments on early drafts. In addition, officials from SIGIR's audits, investigations, and inspections divisions provided the writing team with invaluable help at various stages of the drafting process.

Lastly, SIGIR asked stakeholder agencies to vet a final draft. Copies were sent to the Departments of State and Defense, USAID, and the U.S. Army Corps of Engineers. While this occurred formally near the end of the editing process, all of these agencies were involved in the project at various times along the way. Their staffs provided helpful technical and analytical observations that were subsequently integrated into the text.

PX213

Annex B
## OVERSIGHT OF RECONSTRUCTION PROGRAMS AND EXPENDITURES

Since 2003, the U.S. Congress has appropriated more than $50 billion for the support of relief and reconstruction efforts in Iraq, including the restoration of the country's oil and electricity sectors, the establishment of new security forces, and the strengthening of Iraq's capacity to govern itself.[1] A number of federal agencies—including SIGIR, the U.S. Army Audit Agency, the Inspectors General of the Departments of Defense, State, and USAID, and the Government Accountability Office—have conducted oversight of and reporting on the expenditure of funds for Iraq relief and reconstruction activities.[2]

This extensive body of work is available in studies, reports, audits, inspections, and congressional testimony covering issues that arose during the expenditure of U.S. government funds for or in Iraq. They range from the meticulous analysis of specific projects to broad overviews of entire programs and sectors. Most included recommendations for improving the management of reconstruction efforts now and in the future.

In 2008, the Congress established the independent, bipartisan Commission on Wartime Contracting to study U.S. wartime contracting in Iraq and Afghanistan. Its mandate is to study, assess, and make recommendations concerning contracting for "the reconstruction, logistical support, and performance of security functions" in both theaters from 2003 to the time of the commission's final report in 2010. Its objectives include assessing "the systemic problems identified with interagency wartime contracting," identifying instances of waste, fraud, and abuse and "ensuring accountability for those responsible.[3]

The tension inherent in maintaining financial accountability while achieving foreign policy objectives has long had a place in the history of nations. In an iconic letter, the Duke of Wellington asked the British Foreign Office in 1812 if he was to "train an army of uniformed clerks in Spain for the benefit of the accountants … in London or, perchance, to see to it that the forces of Napoleon are driven out of Spain." He had, he said, accounted for every farthing, "with two regrettable exceptions." One, he claimed, was a "hideous confusion as to the number of jars of raspberry jam issued to a cavalry regiment during a sandstorm in Western Spain," and the other a shilling-and-nine-pence unaccounted for in a battalion's petty cash. "This reprehensible carelessness," Wellington wrote, "may be related to a pressure of circumstance, since we are at war with France, a fact which may come as a bit of surprise to you gentlemen in Whitehall."[4]

PX213

Those overseeing and reporting on the expenditure of billions of U.S. dollars appropriated for the reconstruction of Iraq had to face many of the same challenges faced by the reconstruction managers themselves, particularly in providing an adequate number of personnel to accomplish oversight work. Given the vicissitudes of the reconstruction effort—which was dogged from the start by persistent violence, shifting goals, constantly changing contracting practices, and undermined by a lack of unity of effort—a complete accounting of all reconstruction expenditures is impossible to achieve.

Oversight of the Iraq reconstruction program began slowly. No oversight plan accompanied either Lieutenant General Garner or Ambassador Bremer as they went to Baghdad to head the Office of Reconstruction and Humanitarian Assistance and the Coalition Provisional Authority, in April and May of 2003. During the run-up to war and the initial months following the invasion, oversight did not exist, with the notable exception of limited efforts by the USAID OIG. USAID included an IG as part of the Iraq Task Force set up within the agency during the planning phase in advance of combat operations.

USAID OIG staff went into Iraq ahead of other federal oversight agencies, establishing a Baghdad office in the early summer of 2003. At first, the office was staffed by assignments on a three-month temporary duty (TDY) rotation basis until July 2004; at that point, it became permanent and tour length became more regular.[5]

During its short duration, ORHA had no IG dedicated to provide oversight of its reconstruction programs. For the CPA, Ambassador Bremer, in June of 2003, appointed an interim IG—a single official on loan from the DoD OIG—but he had no staff and the IG had very little effect. An Iraq-specific oversight presence, with a clear mandate, was not created until passage of the law that funded the second tranche to the Iraq Relief and Reconstruction Fund in November 2003—the CPA-IG, which later became SIGIR.[6]

### The Federal Oversight Agencies in Iraq

*USAID*

Until the March 2004 arrival in Baghdad of CPA-IG's first auditors, inspectors, and investigators, the USAID OIG was the only IG to house a fully staffed in-country office in Baghdad. The USAID OIG had institutional experience in conducting oversight abroad. Since 2008, the office has conducted audits of the contracts comprising most of the USAID-based effort in Iraq. The USAID OIG released its first Iraq audit in March 2004, followed by audits of the first ten Iraq reconstruction contracts issued by the agency. Although the audits identified some minor irregularities, they found no substantial problems and lauded USAID

PX213

• Annex B •

staff for their performance under the trying circumstances in which contracts were awarded and executed. As of the end of 2008, the office had released a total of 28 Iraq audits reporting on both "hard" and "soft" infrastructure programs.[7]

*Government Accountability Office*

The Government Accountability Office (GAO) is charged with enabling the Congress to meets its constitutional responsibility to ensure that federally programmed funding is expended properly for its legislated purpose and used for the benefit of the American people. By 2008, GAO's responsibilities in Iraq had substantially increased since the planning stages of the Iraq war. Since January 2002, GAO has produced more than 160 testimonies and reports on the Iraq war. More than 100 of these reports specifically targeted reconstruction issues. The agency's remaining reports on Iraq focused heavily on military or veterans' affairs.[8]

*Department of State Office of the Inspector General*

DoS OIG conducted five Iraq reconstruction-related reviews in 2004; three of them addressed routine aspects of embassy operations. In 2005, DoS OIG issued fourteen Iraq-related reports on topics ranging from a review of the U.S. Embassy in Baghdad to Iraqi police training. Seven reports were released in 2006, five of which dealt with indirect cost rates (such as the costs of operating and maintaining facilities and equipment and administrative salaries). The other two focused on Department of State contracting procedures. In 2007, the office released three Iraq reports, examining the Iraqi Police contract with the Bureau of International Narcotics and Law Enforcement (a joint audit with SIGIR), the delivery of security services by DynCorp International, and projects conducted by the National Endowment for Democracy. By the end of 2008, the DoS OIG had issued 33 Iraq audits.[9]

*Department of Defense Office of the Inspector General*

The DoD OIG role in oversight of Iraq reconstruction, governance, and security efforts included supporting other DoD audit and investigative organizations. DoD OIG did the first auditing on Iraq contracting.[10] Between 2004 and the end of 2008, DoD OIG produced 46 audits relating to Iraq reconstruction, and many others related to military operations in Iraq.[11] In July 2008, a DoD OIG report on recommendations made by the panoply of audit agencies regarding oversight in Iraq identified the "most prevalent" systemic management and performance challenges. These included: contract management and resource limitations; asset accountability; and financial management, including accuracy of cost reporting and accountability.[12]

PX213

*U. S. Army Audit Agency*

Between May 2004 and the end of 2008, USAAA—which effectively serves as the internal auditor for the Secretary of the Army— released 61 Iraq reports or audits. The major focus of the agency's oversight efforts has been various aspects of the Logistics Civil Augmentation Program (LOGCAP), which was the contracting mechanism for approximately half the Army's Iraq reconstruction-related work. The agency has also examined various other programs, such as the Commander's Emergency Response Program, as well as the procurement and repair of military and logistical equipment.[13]

Like many other agencies, USAAA did not initially send auditors to Iraq and when they were finally deployed, their numbers fluctuated. By the fall of 2005, nine were working in Iraq and six in Kuwait. In April 2006, fourteen were assessing LOGCAP contracts in both places; that number fell to eleven by July 2006 and was down to four at the end of 2006, although it increased to 29 following the holiday season.[14] During the summer of 2007, USAAA had seven auditors working in Iraq and six others working on LOGCAP in Kuwait. As of September 30, 2008, a staff of seventeen auditors worked in Iraq and seven in Kuwait.[15]

*Defense Contract Audit Agency*

With a staff of more than 4,000 in 300 field offices across the world, the Defense Contract Audit Agency (DCAA)—which effectively serves as internal auditor for the Comptroller of the Department of Defense—is a major force for accountability of contracts awarded by the Department of Defense.[16] Although the audits are not generally public documents, DCAA has conducted thousands of audits on Iraq reconstruction, including some undertaken in coordination with SIGIR.

Early in the reconstruction program, the DCAA alerted the DoD OIG to irregularities it had noticed in contracts awarded by the Defense Contracting Command-Washington for ORHA and CPA. A subsequent review found that, although procedural shortcuts had led to less than full accountability, contracting officers had not acted in bad faith. The commander of Defense Contracting Command-Washington wrote that it would be "unconscionable to recommend that administrative action be taken against the contracting officials and not hold senior officials responsible for generating the demands."[17]

Later DCAA reviews identified more serious problems. In early 2006, a controversy arose over the near-full payment of fees of $263 million billed by the contractor KBR for oil-sector work, including what appeared to be exorbitant charges for transporting fuel to Iraq from Turkey and Kuwait. DCAA auditors raised serious questions about these charges.[18] Although a 2004 audit reported that the costs were inflated and not supported by documentation, the Army

PX213

decided to pay KBR all but $10.1 million of those contested costs. That meant the Army withheld payment on just 3.8 percent of the charges questioned by the Pentagon audit agency, far below the rate at which the agency's recommendation is usually followed or sustained by the military.[19]

*The Special Inspector General for Iraq Reconstruction*

Some six months after the CPA took over the reconstruction mission in Iraq, the Congress created the office of the CPA-IG, through the November 2003 IRRF 2 legislation.[20] Had an operational IG been in place from the start of CPA, irregularities discovered post hoc might have been prevented. During the ORHA and early CPA periods, there were frequent uses of procedural shortcuts and liberal interpretation of federal acquisition regulations, leading to contracting irregularities. Some—but not all—of these can be understood in light of the exigencies associated with jump-starting Iraq's reconstruction program in a wartime environment. An audit criticizing the CPA oversight of $8.8 billion in Development Fund for Iraq money provided to Iraqi ministries was challenged by Ambassador Bremer on exactly those grounds, arguing that it was unrealistic to demand anything else in the midst of a country in chaos.[21]

During the process leading to passage of IRRF 2 legislation, a lively debate in the Senate followed the introduction by Senator Robert Byrd (D-WV) of an amendment proposing that the GAO audit the CPA. Although some senators thought that enough oversight already existed, and that the GAO would serve as the default oversight agency, a number were in favor of even more stringent oversight to be conducted by a Special Inspector General. Senator Russ Feingold (D-WI) introduced an amendment that proposed setting aside $10 million for the creation of the Office of Inspector General for the CPA. When the bill went to conference, the Feingold amendment was ultimately adopted.[22]

The legislation gave the CPA-IG the same powers as other federal agency inspectors general, but President Bush, in his signing statement, added some restrictions. He said that the IG was to refrain from "initiating, carrying out, or completing an audit or investigation, or from issuing a subpoena, which requires access to sensitive operation plans, intelligence matters, counterintelligence matters, ongoing criminal investigations by other units of the Department of Defense related to national security, or other matters the disclosure of which would constitute a threat to national security." The statement added, however, that the Secretary of Defense "may make exceptions to the foregoing direction in the public interest."[23] The restrictions never impeded CPA-IG or SIGIR's work.

The IG was appointed on January 20, 2004, and the first CPA-IG auditors arrived in Baghdad in mid-March 2004, just over three months before the CPA was

PX213

to close its doors. The transfer of sovereignty to the Iraqi Interim Government, which took place on June 28, 2004, started the clock toward the sunset of the CPA-IG—which was scheduled to occur six months after the CPA's demise.[24]

In June 2004, Robin Cleveland, Deputy Director of the Office of Management and Budget, put forward a plan to transfer the CPA-IG's oversight responsibilities to the IGs of USAID, the Department of State, and the Department of Defense. However, in October 2004, again at Senator Feingold's impetus, the Congress took oversight in a different direction by passing a new law that transformed the CPA-IG into the Special Inspector General for Iraq Reconstruction and giving it oversight responsibilities for all IRRF 2 relief and reconstruction dollars.[25]

SIGIR initiated new oversight activities under its mandate to report on IRRF 2. Independent accountability in Iraq was buttressed by the full-scale staffing of SIGIR, the development of innovative oversight practices by a new staff of inspectors, a focus on timely performance auditing rather than ex post facto financial review, and on increased coordination among executive-branch audit and investigative agencies overseeing Iraq.

*Audits and Inspections:* SIGIR has produced more than 250 audits and inspections since 2004, covering a range of reconstruction issues, including contracting, anticorruption, funding obligations, asset transfers, and the Iraqi Security Forces. The purpose of SIGIR audits has been to determine whether programs and operations funded by the United States are being managed efficiently and effectively and to promote effective change through "real time" reporting.[26]

SIGIR's inspections focus on the construction and/or sustainment of specific projects. Assessments determine if project components were adequately designed before construction or installation, if construction or rehabilitation adequately met the standards of the design, if the contractor's quality-control plan and the U.S. government's quality-assurance program were adequately carried out, if project sustainability and operational effectiveness were adequately addressed, and if project results were consistent with the original objectives.[27]

In July 2008, SIGIR issued a capping report prepared by its audits directorate that identified key recurring systemic management issues identified in the agency's audits of Iraq reconstruction efforts. Four broad issues, which fed into and are widely evinced in *Hard Lessons*, were seen as central contributing causes to the deficiencies noted in the body of SIGIR's audit work:

- The difficulty of implementing reconstruction programs in an insecure environment points to the need for a better

PX213

understanding of the potential impact of the lack of security on contingency reconstruction efforts.

- The lack of an integrated management structure that provides clear lines of authority, interagency coordination, and program accountability impacted the successful delivery of projects.

- The need to attract, develop, and retain qualified program and contract-management personnel was not anticipated and worked against the effective implementation of reconstruction programs.

- Working closely with host-country government officials and other groups is essential in developing reconstruction projects and programs that will—and can be—accepted and maintained.

Understanding these issues, the report states, is "critical to avoid repeating them in the future." Their prevalence in Iraq "contributed significantly to reduced program effectiveness and increased the potential for fraud, waste, and abuse."[28]

*Investigations:* In addition to audits, inspections, and the lessons learned initiative, SIGIR undertook a number of criminal investigations, with more than 370 cases opened between the agency's inception and the end of 2008. At that time, SIGIR had 67 open investigations, more than 30 of which had been assigned to prosecutors at the Department of Justice. The investigatory work of SIGIR had also resulted in eighteen arrests, seventeen indictments, thirteen convictions, and five imprisonments. The investigators' work yielded fines, forfeitures, recoveries, and restitution of more than $17 million.[29]

*Lessons Learned Initiative:* SIGIR's Lessons Learned initiative first focused on three main areas of Iraq reconstruction: human capital management, contracting and procurement, and program and project management. Three reports were issued in February 2006, July 2006, and March 2007—the latter two at hearings before the Senate Homeland Security and Governmental Affairs Committee. The initiative's purpose was to identify significant challenges in reconstruction and to identify actionable recommendations to improve the overall reconstruction effort. Much of the data, documentation, and personal observations supporting the lessons-learned conclusions were gleaned from a series of forums which brought

PX213

• Oversight of Reconstruction Programs and Expenditures •

together experts representing the full spectrum of agencies, organizations, and individuals participating in the reconstruction of Iraq.[30]

The reports have led to legislative and executive action to improve both Iraq's ongoing reconstruction and the government's approach to managing contingency contracting and operations. For example, the Office of Federal Procurement Policy adopted SIGIR's contracting recommendation as guidance for contingency situations. The Accountability in Government and Contracting Act, introduced by Senator Susan Collins (R-ME) and unanimously approved by the Senate in 2007, proposed implementation of a number of SIGIR's recommendations.[31]

*Quarterly Reports:* SIGIR's quarterly reports to the Congress provide a snapshot of the current state of Iraq reconstruction. Twenty reports have been issued between March 2004 and January 2009. They break down reconstruction progress by sector and funding stream, with a focus on IRRF-funded programs and projects. Published 30 days following the end of each quarter of the fiscal year, the reports summarize SIGIR findings, including audits, inspections, investigations, and analysis of data and developments related to Iraq reconstruction progress, as well as a summary of oversight conducted by other agencies. The activities of the IG during each quarter and updates on various SIGIR initiatives are also reported.[32]

*Interagency Initiatives*

As the number of oversight agencies deploying auditors and inspectors to Iraq increased after 2003, SIGIR spearheaded several coordinating bodies to ensure that duplicate work did not take place and to provide additional support to incoming agencies. These include: the Iraq Inspectors General Council, the Iraq Accountability Working Group, the Special Investigative Task Force for Iraq Reconstruction, and the International Contract Corruption Task Force. Each body has a specific purpose, but all provide a forum for discussion and collaboration on oversight efforts in Iraq. For example, the Iraq Inspectors General Council—based in Arlington, Virginia—is a vehicle for collaboration among the IGs and staff of the many agencies involved in using and overseeing IRRF 2; the Iraq Accountability Working Group also coordinates audit efforts in Baghdad. The Special Investigative Task Force for Iraqi Reconstruction—a partnership including the IRS, FBI, Department of Homeland Security, and the Department of State IG—pursued the Bloom/Stein conspiracy and followed a number of leads arising from that case. The International Contract Corruption Task Force is a group of federal agencies that combines resources to investigate and prosecute cases of contract fraud and public corruption in U.S. government spending

PX213

• Annex B •

on Iraq reconstruction. In addition to SIGIR, it includes the Defense Criminal Investigate Service, U.S. Army Criminal Investigations, and the IGs of the State Department and USAID.

Oversight of contingency operations is important and must begin early in their planning. Although there is a trade-off between operational necessity and accounting accuracy during conflict, the danger that huge amounts of money may be potentially wasted or stolen makes it essential to provide a meaningful and robust oversight presence in contingency operations. All future post-conflict reconstruction plans should include a strong oversight function to make sure American taxpayers' money is properly used to achieve the nation's objectives.

PX213

**ACKNOWLEDGEMENTS**

A word of heartfelt thanks to all the SIGIR staff who helped plan, develop, and compile *Hard Lessons*. I especially commend my two senior writers, Victoria Butler and Christopher Kirchhoff, who shouldered virtually all the writing burden, which included research travels to Iraq. Thanks to Executive Editor Colonel (Ret.) John R. Martin and Senior Editor Barbara Wolfson for good insight and guidance. I thank the researchers—Jennifer McGee, Bradley Larson, and Gwendolyn Toops—for thousands of hours of detail work to help ensure the report's accuracy. I thank our editorial advisors for their invaluable assistance: Dr. Philip D. Zelikow of the University of Virginia; Fredrick D. Barton of the Center for Strategic and International Studies; Dr. Dana Eyre of the U.S. Institute for Peace; Dr. Terrence K. Kelly of RAND Corporation; Dr. Ernest R. May of Harvard University; and Dr. Gordon W. Rudd of the U.S. Marine Corps School of Advanced Warfighting.

Each of these advisors provided consistently helpful advice and insights, but one deserves special recognition. Dr. Rudd, the ORHA/CPA Historian, conducted hundreds of nearly contemporaneous interviews with key reconstruction figures during the early stages of the program, and he provided them all to SIGIR. Our report is stronger and deeper for his diligent work and generous spirit.

I also thank the many SIGIR staff-members who supported the research, writing, and review of *Hard Lessons*, including: Ginger Cruz, Brian Flynn, Dave Warren, Jon Novak, Hillel Weinberg, Lynne Halbrooks, Danny Athanasaw, Glenn Furbish, Barry Holman, Karl Tool, Dan Willkens, Paul Cooksey, Christopher Griffith, Andrea Bernardo, Kristine Belisle, Bill Maly, Joan Hlinka, Kevin O'Connor, Christopher Williams, Dena Nevarez, Sandy Keith, Rick Olson, Mike Boisvenue, Scott Michaud, Robin Raphel, Hunter Keith, Roger Williams, Kirk Johnson, Rick Whitaker, and David Gandle. Thanks also to Ed Gold, Christine Bath-Zachery, Barbara Lewis, and Nell Todd. Tender thanks to my wife, Adriana Sanchez Bowen, who put up with my many hours away working on this project.

Finally, I sincerely thank the hundreds of people who contributed to *Hard Lessons* by giving of their time, talent, and knowledge in interviews, written responses, or comments on early drafts. Their service and sacrifice in supporting Iraq's reconstruction—and in telling its story—made this report possible.

Stuart W. Bowen, Jr.
Inspector General

PX213

PX213

PX217

```
VZCZCXYZ0222
OO RUEHWEB

DE RUEHC #4292 0672348
ZNY SSSSS ZZH
O 072342Z MAR 08
FM SECSTATE WASHDC
TO RUEHRO/AMEMBASSY ROME IMMEDIATE 0000
INFO RUEHLO/AMEMBASSY LONDON IMMEDIATE 0000
RUEHFR/AMEMBASSY PARIS IMMEDIATE 0000
RUEHBS/USEU BRUSSELS IMMEDIATE
RUEATRS/TREASURY DEPT WASHINGTON DC 0000
```

S E C R E T STATE 024292

SIPDIS

SIPDIS

E.O. 12958: DECL: 03/07/2018
TAGS: <u>EUN</u> <u>IT</u> <u>KNNP</u> <u>PARM</u>
SUBJECT: INFORMATION ON BANK MELLI FOR ITALY,S
CONSIDERATION IN EU DISCUSSIONS ON AUTONOMOUS SANCTIONS

Classified By: ISN PDAS Patricia A. McNerney
for reasons 1.4 (b) and (d)

¶1.  (U)  This is an action request.  Please see paragraph 3.

-------
SUMMARY
-------

¶2.  (S) The EU is expected to consider sanctions against Iran
the week of March 10.  On February 6, EU experts prepared a
list of 19 new entities and 15 new individuals to be
designated under the EU's Common Policy on Restrictive
Measures Against Iran.  EU Member States agreed implicitly
that the new designations would not actually be implemented
until after the adoption of the third sanctions UNSCR, but
they planned to go ahead with preparations so that EU foreign
ministers could approve the new measures at their monthly
meeting (GAERC) on March 10-11.  However, the Italians
(followed by the Cypriots) subsequently insisted on placing a
"hold" on the entire process, delaying even the technical
work of preparing a new list of entities for designation
until the third UNSC sanctions resolution was approved. The
third UNSC sanctions resolution was approved on March 3 and
we would like the EU both to implement the new resolution as
quickly as possible and to move forward with autonomous
actions immediately. The Italians have recently indicated
that they are likely to lift the hold on all of the entities
and individuals on the EU list, except Bank Melli.

------------------------
OBJECTIVE/ACTION REQUEST
------------------------

¶3. (S) Washington requests Embassy Rome deliver the nonpaper
in paragraph 4 to Italy's Director General for Multilateral
Affairs and Human Rights Giulio Terzi, for Italy's
consideration in discussions with EU partners on autonomous
sanctions on Iran and as a follow up to A/S Fried's
conversation with Terzi.  Treasury U/S Levey shared the
nonpaper with Italy's Ambassador to the U.S. late afternoon
March 7, but in the interest of time, Embassy Rome should
ensure delivery to DG Terzi prior to his departure for the
GAERC meeting on Monday.  Embassies London and Paris should
inform appropriate host government officials that we are
sharing information with Italy on Bank Melli that is similar
to the information we shared with the P5 in January 2008.

-----------------------------------------
S/REL NONPAPER ON BANK MELLI'S ACTIVITIES
-----------------------------------------

¶4.  BEGIN S/REL NONPAPER
```

PX217

(U) Overview

(S//REL TO USA, ITA) Information available to Treasury indicates that Bank Melli has facilitated numerous transactions with Iranian proliferation entities and others listed under the asset freeze provisions of UNSCRs 1737 and 1747, including transactions that took place following the date of these entities' designations. This information, which is summarized below, is cause for concern and should be taken into consideration as we develop options for increasing financial pressure on Iran.

(U) Iran employs several sophisticated deceptive financial practices that obscure the true nature of the activities of entities such as Bank Melli. Thus, an investigation of Bank Melli's activities could find that its activities appear benign when Iran is really using deceptive practices to continue its proliferation and terrorism activities.

(U) Background on Bank Melli

(U) Bank Melli, Iran's largest bank, is a state-owned institution founded in 1928. Its assets as of March 2005 were over $35 billion, according to Banker's Almanac. Bank Melli has over 3,000 domestic branches and 16 foreign branches.

(U) Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.

(S//REL TO USA, ITA) Bank Melli provides such banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the UN for their involvement in those programs.  This includes handling transactions in recent months for Bank Sepah, Aerospace Industries Organization (AIO), Defense Industries Organization (DIO), Shahid Bakeri Industrial Group (SBIG), Shahid Hemmat Industrial Group (SHIG), Mesbah Energy Company, Energy Novin and the Islamic Revolutionary Guard Corps (IRGC).

(U) Bank Sepah (Sepah)

(U) Following the designation of Bank Sepah under UNSCR 1747 in March 2007, Bank Melli took precautions not to identify Sepah in transactions. Bank Sepah has also layered transactions through other Iranian banks to hide Bank Sepah's role when routing funds internationally.

-- (U) Bank Sepah routed a payment through Bank Melli in Tehran and a Bank Melli branch abroad to a foreign bank. Because Bank Melli is not under international sanctions, the funds can be routed internationally.

(U) Bank Sepah has increasingly relied on third party and private banks. Private Iranian banks and foreign financial institutions and jurisdictions that lack proper due diligence or have other systemic weaknesses are most attractive.

-- (S//REL TO USA, ITA) The Hong Kong branch of Bank Melli PLC, a UK-based subsidiary of Bank Melli, facilitated transactions involving Bank Sepah after Sepah's E.O. 13382 designation.

(S//REL TO USA, ITA) Bank Melli was facilitating a transaction in April 2007 involving a North Korean shipment to Iran; the cargo was consigned to Bank Sepah.

(U) Aerospace Industries Organization (AIO)

(S//REL TO USA, ITA) Intermediaries used Bank Melli accounts

designee Aerospace Industries Organization (AIO), which oversees Iran's R&D and production of missiles and rockets.

(S//REL TO USA, ITA) Bank Melli in mid-2007 facilitated payments from companies associated with AIO.

(U) Defense Industries Organization (DIO)

(S//REL TO USA, ITA) The DIO, which conducts research and development for Iran's defense and military forces and produces a wide variety of military-related weapons, technologies, and other equipment, uses Bank Melli/Hamburg to receive payments and to transfer funds.

(S//REL TO USA, ITA) In mid-2007, Bank Melli facilitated two payments for DIO.

(U) Shahid Bakeri Industrial Group (SBIG)

(S//REL TO USA, ITA) Between April and July 2007, Bank Melli was listed as the consignee on multiple purchases for a company affiliated with SBIG.

(U) Shahid Hemmat Industrial Group (SHIG)

(S//REL TO USA, ITA) If a deal negotiated during March 2007 between a SHIG front company and a Swiss firm were finalized, financing would be arranged through Bank Melli.

(U) Mesbah Energy Company and Energy Novin

(S//REL TO USA, ITA) Two entities associated with Iran's nuclear program, Mesbah Energy Company and Energy Novin, held accounts at Bank Melli until at least late 2005.

(U) Islamic Revolutionary Guard Corps (IRGC)

(U//FOUO) Iran's Islamic Revolutionary Guard Corps (IRGC) relies heavily on Bank Melli Iran, Bank Mellat Iran and the Central Bank of Iran for the provision of banking services. These banks hold deposits, send and receive funds for domestic and international payments, and handle letters of credit on behalf of the IRGC. Several elements of the IRGC rely on Bank Melli, Bank Mellat and the Central Bank of Iran, including organizations headed by UNSCR 1737 & 1747 designees Yahya Rahim Safavi and Ghassem Soleimani, as of July 2007.

(U//FOUO) IRGC-controlled Companies' use of Bank Melli & Bank Mellat

(S//REL TO USA, ITA) Bank Melli and Bank Mellat are the principal banks used by Khatam al-Anbiya, an IRGC-controlled construction and engineering company headed by UNSCR 1737 designee and former IRGC Commander Rahim Safavi, as of July ¶2007. Khatam al-Anbiya serves as an important source of funding for the IRGC, as the organization has been awarded Iranian government contracts in recent years estimated to total over USD $7 billion.

-- (S//REL TO USA, ITA) From 2002 through 2007, Bank Melli and Bank Mellat sent and received payments totaling nearly USD $100 million for Khatam al-Anbiya.

-- (S//REL TO USA, ITA) Bank Melli and Bank Mellat also aid the IRGC's Khatam al-Anbiya and its subsidiaries by handling their letters of credit. These letters of credit are primarily used to finance Khatam al-Anbiya's purchase of equipment and services from overseas suppliers.

-- (S//REL TO USA, ITA) Khatam al-Anbiya subsidiaries serviced by Bank Melli and/or Bank Mellat include Ghorb Nooh, Sepasad, Sahel Consultant Engineers and Gharargah Sazandegi Ghaem.

(U//FOUO) IRGC-Qods Force use of Bank Melli & the Central Bank of Iran

PX217

(S//REL TO USA, ITA) Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Rizballah, Ramas and the Palestinian Islamic Jihad.

-- (U) Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force.

(U//FOUO) Bank Melli use of Deceptive Banking Practices

(U//FOUO) When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

END S/REL NONPAPER

------------------
REPORTING DEADLINE
------------------

¶5.  (U) Post should report results by close of business Monday, March 10.  Please slug replies for ISN, T, Treasury, NEA, and EUR/WE.  Please include SIPDIS is all replies.

----------------
POINT OF CONTACT
----------------

¶6.  (U) Washington point of contact for follow-up information is Anthony Ruggiero, ISN/CPI, (202) 647-5181, ruggieroaj@state.sgov.gov, or Jennifer Chalmers, ISN/CPI, (202) 647-9715, chalmersja@state.sgov.gov.

¶7.  (U) Department thanks Posts for their assistance.
RICE

PX217

PX224

# Marriage of Convenience: The Evolution of Iran and al-Qa`ida's Tactical Cooperation

✈ **ctc.usma.edu**/marriage-of-convenience-the-evolution-of-iran-and-al-qaidas-tactical-cooperation

April 14, 2017

PDF

*Abstract: The relationship between Iran and al-Qa`ida goes back at least a quarter of a century, but it remains one of the most understudied and poorly understood chapters in the history and evolution of the jihadi organization founded by Usama bin Ladin. Recently declassified letters seized in 2011 from bin Ladin's Abbottabad hideout and U.S. government and court documents, however, have shed some additional light on their partnership. The existing information suggests that the relationship is best understood as a "tactical cooperation"—one that, despite the intervention of Iran and its proxies in opposition to al-Qa`ida in the Syrian civil war, is likely to continue for as long as the parties perceive the benefits of cooperation to exceed the costs.*



On February 26, 2017, a U.S. drone strike in Syria killed al-Qa`ida deputy leader Abu al-Khayr al-Masri (Abdullah Muhammad Rajab Abd al-Rahman).[a] A 59-year-old Egyptian with longstanding membership in al-Qa`ida's shura council, al-Masri was targeted in Syria's northwestern Idlib province, where he managed al-Qa`ida's relations with its Syrian affiliate Jabhat Fateh al-Sham (JFS). Before moving to Syria, al-Masri, who was a close associate of al-Qa`ida leaders Usama bin Ladin and Ayman al-Zawahiri, spent most of the years following the attacks of September 11, 2001, in Iran. Iranian authorities released al-Masri in mid-2015 as part of a prisoner swap. Four other al-Qa`ida members were released along with him, including Saif al-`Adl and Abu Muhammad al-Masri, two senior al-Qa`ida operatives who are believed to have traveled to Syria as well, raising concerns among U.S. counterterrorism officials of a reinvigorated al-Qa`ida in close proximity to Western nations.[b]

The killing of al-Masri and the movement of senior al-Qa`ida members from Iran to Syria is the latest episode in one of the least examined and most poorly understood chapters of al-Qa`ida's history, namely its relationship with Iran. Recently declassified documents seized in 2011 from bin Ladin's hideout in Abbottabad, Pakistan, along with a review of additional material—much of it released by the U.S. Department of the Treasury—offer an opportunity to revisit an elusive partnership that links one of the most consequential Sunni terrorist organizations of the modern era with the Shi`a majority state described by the U.S. State Department as the "foremost state sponsor of terrorism."[1] This relationship, the author argues, is best understood as a tactical cooperation—one that goes back a quarter of a century

and continues into the present.[c] The article examines the nature of tactical cooperative relationships by contrasting this type of collaboration from other partnerships between militant actors. It then examines the al-Qa`ida-Iran relationship based on this framework.

## Tactical Cooperation

Cooperative relationships between militant actors that adopt terrorist tactics—be they states, formal organizations, informal networks, or individuals—can vary significantly in terms of their quality. A review of the empirical and theoretical literature of terrorist cooperation suggests four general types of cooperation.[2] In descending order of strengths, these are mergers, strategic alliances, tactical cooperation, and transactional collaborations.[3] These four types of cooperation differ in terms of five main factors central to cooperative relationships: the expected duration of cooperation; the degree of interdependence between the two entities; the variety of cooperative activities that groups engage in; their ideological affinity; and the level of mutual trust.[4]

Mergers, for example, will score highly on all five factors. Two merging terrorist groups—take, for example, the Egyptian Islamic Jihad and al-Qa`ida, which merged in June 2001—will expect an indefinite duration of cooperation; full interdependence; cooperation on the entire spectrum of activities (operational, logistical, and ideological); full ideological affinity; and complete levels of trust. Transactional relationships are situated on the opposite end of the spectrum. They can include isolated transactions, such as barter exchanges, between two groups that do not intend to establish a longer-term relationship, that retain their full autonomy, and that may have divergent ideological orientations.

In between these two poles are strategic alliances and tactical relationships. Strategic alliances, like mergers, are "high-end" relationships that score relatively high on the five factors, but the partners maintain a degree of their autonomy.[5] Strategic allies expect their partnership to last for an extended period of time and, like mergers, expect to cooperate on multiple activities (spanning ideological and logistical) and frequently on operations.[6] These partnerships are dependent on a high degree of ideological affinity, although groups may retain differences of emphasis and interpretation in terms of their ideological or strategic agendas. They are also marked by a relatively high degree of trust between the partners. The relationships between al-Qa`ida and most of its formal affiliates, such as al-Qa`ida in the Arabian Peninsula or Jabhat Fateh al-Sham, exemplifies a strategic alliance. Breakups of strategic partnerships—such as the split between al-Qa`ida and the Islamic State in Iraq and the Levant (ISIL)—are oftentimes the outcome of a gradual erosion of trust.

Tactical cooperative relationships are "low-end relationships" that fall short of strategic alliances, but are also more intensive than transactional collaborations. Whereas strategic alliances (and mergers) are built to last, no such expectation is inherent in a tactical cooperation. Neither is a tactical cooperation necessarily based on ideological affinity. Actors engaged in a tactical alliance do not necessarily pursue the same strategic objectives, and they tend to maintain their organizational independence. Tactical alliances are not conditional upon mutual trust; on the contrary, these partnerships can bring together uneasy, even distrustful partners. A necessary condition for a tactical cooperation, however, is the perception of common interests—oftentimes the identification of a common enemy.

PX224

Since such interests are subject to change based on shifting circumstances, tactical alliances can be uneven, even unpredictable. Because partners in a tactical cooperation entertain a variety of interests—some of which converge, while others may diverge—such relationships frequently manifest not only signs of cooperation, but also signs of conflict.

While there are significant informational gaps on the puzzling relationship between al-Qa`ida and Iran, the available evidence on the ties between these actors supports the conclusion that they should be viewed as an example of tactical cooperation.

### Pre-9/11 Cooperation

Ties between al-Qa`ida and Iran predate the 9/11 attacks by roughly a decade. Several accounts date initial relevant contacts to April 1991, when al-Zawahiri, then the emir of the Egyptian Islamic Jihad (EIJ), secretly visited Iran. Al-Zawahiri had been a supporter of the 1979 Islamic Revolution in Iran and had hoped that Egyptians would follow the Iranian example and set up a theocratic regime of their own.[7] The Iranians, for their part, had celebrated the 1981 assassination of Egyptian President Anwar Sadat by an EIJ operative, Khalid Islambouli, and even named a street in Tehran in the assassin's honor.[8]

On his secret trip to Iran, al-Zawahiri asked his Iranian interlocutors to support his group's attempted overthrow of the Egyptian regime. According to former al-Qa`ida trainer Ali Mohamed, the Iranians granted al-Zawahiri's request and began training EIJ members in both Iran and Sudan, while also providing $2 million in financial support.[9] Al-Zawahiri also reportedly met Hezbollah commander Imad Mughniyeh during that visit and later sent EIJ members for training with Hezbollah in Lebanon.[10]

In late 1991 or 1992, the talks between the EIJ and Iran began to include al-Qa`ida. The discussions were the fruits of a growing friendship between al-Zawahiri and bin Ladin and were held in Sudan, which harbored members of the EIJ, al-Qa`ida, Hezbollah, and hundreds of Islamic Revolutionary Guard Corps operatives during the 1990s.[d] According to the 9/11 Commission Report, these meetings resulted in an informal agreement between al-Qa`ida and Iran—and, by extension, the EIJ and Hezbollah—to cooperate "in providing support—even if only training—for actions carried out primarily against Israel and the United States."[11] It included training in explosives and suicide operations that would later enable al-Qa`ida to carry out the 1998 U.S. Embassy bombings in Kenya and Tanzania.[12]

After al-Qa`ida's return from Sudan to Afghanistan in 1996, Iran helped facilitate al-Qa`ida training and logistics in the Gulf region and helped the group set up its network in Yemen, thereby facilitating the bombing of the USS Cole in October 2000.[13] Iranian officials also frequently granted transit through Iran to al-Qa`ida members seeking to travel into or out of Afghanistan. Saif al-`Adl, a senior Egyptian al-Qa`ida operative, wrote in his biography of al-Zarqawi that al-Qa`ida suggested setting up guest houses in Tehran and Mashhad to facilitate the movement of fighters to al-Zarqawi's training camp in Herat, Afghanistan.[14] Iranian border inspectors were instructed not to stamp the passports of the jihadis in transit.[15]

PX224

Among the al-Qa`ida members transiting through Iran were also no less than eight of the 9/11 muscle hijackers. While the 9/11 Commission found "no evidence that Iran or Hezbollah was aware of the planning for what later became the 9/11 attacks," the persistence of contacts between Iranian security officials and senior al-Qa`ida figures in the decade from 1991 to 2001 raised important questions that the commission believed warranted further investigation by the U.S. government.[16]



*A screen capture of Sulayman Abu Ghayth, al-Qa`ida spokesman, and Usama bin Ladin released by Al-Jazeera in 2001. (0851/GAMMA/Gamma-Rapho via Getty Images)*

### Post-9/11 Cooperation

Following the attacks of September 11, 2001, members of al-Qa`ida fled Afghanistan. While most of the senior leadership moved to Pakistan, Iran provided "safe passage" to many jihadis, as al-`Adl acknowledged.[17] These jihadis were part of a first wave of "Afghan Arab" fighters who, along with their families, entered Iran shortly after the 9/11 attacks. According to a statement provided by former al-Qa`ida spokesman Sulayman abu Ghayth to the FBI, they included hundreds of people, consisting of both formal al-Qa`ida members and other jihadis not formally associated with the group such as Abu Musab al-Suri and al-Zarqawi, as well as their families.[18] A few months later, Iranian officials indicated their willingness to provide "shelter" to some two dozen al-Qa`ida members, while expelling the other jihadis. According to Abu Ghayth, the reason for the expulsion was a growing resentment on the part of the Iranian population who were "not happy" with the growing number of Arab families "spread[ing] among the Iranian population."[19] Whatever the reason, al-Qa`ida members in Iran saw the expulsion as a betrayal.[20] This was relayed in a comprehensive report provided to bin Ladin in an October 2010 letter by a onetime al-Qa`ida member who had been detained in Iran and was allowed to leave the country around 2010. The letter was authored by Abu Abd al-Rahman Anas al-Subay'i, most likely an alias for famed operative Abu Anas al-Libi (Nazih Abdul-Hamed Nabih al-Ruqaii)—a onetime Libyan member of al-Qa`ida and a

PX224

longtime member of the Libyan Islamic Fighting Group (LIFG). Al-Libi was indicted for the 1998 U.S. Embassy bombings in Kenya and Tanzania and died in a New York hospital in January 2015.[e]

In January 2002, one month after U.S. President George W. Bush's State of the Union Address in which he referred to Iran as part of an "axis of evil," Iran provided access to a "second wave" of *al-Qa`ida*-linked jihadis and their families. Abu Ghayth, who entered Iran as part of the second wave, and al-Subayi/al-Libi both confirmed that members of the second group were initially allowed to roam relatively freely. According to al-Libi, al-Qa`ida members and associated jihadis found shelter in Zahedan, Shiraz, Mashhad, Tehran, Karaj, and other cities.[21] This relative freedom of movement allowed the group to establish a "management council" in 2002 that was charged with providing strategic support to the main leadership in Pakistan. The council would eventually include Saif al-`Adl, Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, Abu Hafs al-Mauritani, bin Ladin's son Saad, and longtime al-Qa`ida-Iran middleman Abu al-Walid al-Masri (Mustafa Hamid), among others.[22]

Their relative freedom during 2002 and early 2003 allowed the Iran-based operatives to plan and direct acts of terrorism. In May 2003, for example, *The New York Times* reported that U.S. intelligence officials intercepted communications strongly suggesting that Saif al-`Adl and Saad bin Ladin, among others, communicated with the cell that planned and executed the May 2003 attacks on a Western housing complex in Riyadh, Saudi Arabia, using three truck bombs.[23] In October 2003, *The Washington Post* reported that many experts believed that Saad bin Ladin coordinated the May 16, 2003, suicide attacks against multiple targets in Casablanca.[24]

Starting in early 2003, the lax treatment of the al-Qa`ida contingent in Iran began to change. Iranian authorities, according to al-Libi, started monitoring the al-Qa`ida members closely, eventually detaining them over the course of 2003 under conditions that were initially harsh, but improved over time.[25][f]

In his letter to bin Ladin, al-Libi provided a broad report about the conditions of the "brothers" in Iran. He reported to bin Ladin that the Arab "brothers"—by which he means both formal members of al-Qa`ida as well as affiliated jihadis such as members of the LIFG— were divided into four groups. The first group included mostly senior al-Qa`ida members who had been detained in Shiraz, including Abu Ghayth, al-`Adl, Abu Muhammad al-Masri, and Muhammad Islambouli, the brother of the assassin of Anwar Sadat.[g] The second group included members of the LIFG who appear to have been detained in Tehran. The third group included Abu Hafs al-Mauritani and others who were living in the Karaj area. The fourth group was apparently composed of those jihadis who were detained in Mashhad. Apart from these four groups, there were also "single men" as well as jihadis who were married (some with families) who were not detained along with one of the four groups. Of these, Abu al-Walid al-Masri is probably the most prominent person.[26]

PX224

Abu Ghayth told the FBI that he was arrested in Shiraz on April 23, 2003, together with al-`Adl, Abu Muhammad al-Masri, and Abu Khayr al-Masri, and placed under "forced incarceration" in an "Iranian intelligence building in Tehran" for about 20 months. The detainees were then moved to a second location in or near Tehran, described as a 100-square-meter "military camp" that was "akin to a rest area for soldiers."[27] Al-Libi, in his report to bin Ladin, referred to this location as Sisast (Farsi for "300") and suggests that it was a training ground for militant groups associated with the Iranian regime.[28] At that location, the Iranians allowed the wives al-`Adl, Abu Muhammad, and Abu Khayr to join their husbands. After six months at the second location, the detainees were moved to a third location that Abu Ghayth described as an "apartment-like housing without any windows in which they stayed for approximately four years."[29] The third location was, according to Abu Ghayth, in a different section of the same military compound. During that period, they were joined by bin Ladin's family, including his sons Saad, Hamed, Uthman, and Hamza, as well as the al-Qa`ida emir's daughter Fatima, whom Abu Ghayth married in 2008.[30] Conditions at the third location were unsanitary. Abu Ghayth reports that some of the women developed "mental conditions" as a result and staged a protest. In response to the protest, the detainees were "beaten and tortured."[31]

Despite the difficult conditions, some aspects of their detention apparently improved in location number three. The detainees were now allowed to have a satellite television, having previously been allowed only to read books. Nevertheless, Abu Ghayth reports that they were only rarely allowed communication with the outside world.[32]

After roughly four years at the third location, Abu Ghayth and the other al-Qa`ida members, along with their families, were moved to a fourth location within the same military compound—a "walled off area" in which each family had their own house with a yard, and all houses "surrounding a central court-yard/playground."[33] Overall, conditions at the fourth location improved, but the detainees demanded internet access as well as better educational facilities for their children.[34]

The detention of al-Qa`ida members and associates notwithstanding, Iranian officials continued to allow al-Qa`ida to use Iran as a facilitation hub. Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command David Petraeus stated that al-Qa`ida "continues to use Iran as a key facilitation hub, where facilitators connect al-Qaida's senior leadership to regional affiliates ... and although Iranian authorities do periodically disrupt this network by detaining select al-Qaida facilitators and operational planners, Tehran's policy in this regard is often unpredictable."[35]

In July 2011, the U.S. Treasury Department stated that the Iranian government had entered into an agreement with al-Qa`ida operatives to use Iran as a transit point for funneling money and people from the Gulf to Pakistan and Afghanistan. Outlining extensive fundraising operations involving Iran-based operatives who drew from donors in oil-rich Gulf countries such as Kuwait and Qatar, Treasury highlighted the role of Ezedin Abdel Aziz Khalil, aka Yasin al-Suri.[h] A Syrian-born senior al-Qa`ida member who had operated in Iran since 2005, al-Suri was arrested by Iranian authorities in December 2011, at which time he was al-Qa`ida's key facilitator in Iran.

PX224

Al-Suri was temporarily replaced in this position by Muhsin al-Fadhli, a close confidant of bin Ladin. Under Fadhli, al-Qa`ida elements in Iran began supporting the movement of fighters and money through Turkey to "support al-Qa'ida-affiliated elements in Syria."[36] Fadhli would later leave Iran to become a leader of al-Qa`ida's so-called "Khorasan Group" in Syria, where he was killed in a U.S. airstrike in Syria in July 2015.[37]

According to the Rewards for Justice Program, al-Suri resumed his role as al-Qa`ida's lead facilitator in Iran at some point. The role involved overseeing the transfer of jihadis to Afghanistan, Pakistan, Syria, and the West; fundraising and facilitation of fund transfers; and working directly with the Iranian government to facilitate and manage the release of al-Qa`ida operatives from Iranian detention.[38]

Al-Suri's facilitation role also involved the use of Iran as a staging ground for attacks against the West. One such plan was the so-called "Europlot," which was overseen by bin Ladin and envisioned commando-style attacks in Germany, France, and the United Kingdom and which led to a U.S. security advisory being issued for Europe in October 2010.[39] The Europlot conspirators included German and British jihadis who traveled to the Waziristan region of Pakistan to receive training. The plotters traveled through Iran and relied on al-Suri and his network for transit support. After the foiled attacks, some of the network's members found refuge in Iran for a limited time.[40]

In another example, Canadian authorities disrupted a plot in April 2013 to derail a passenger train heading from New York to Toronto. According to the assistant commissioner of the Canadian Royal Mounted Police, the two suspects had received "direction and guidance" from "Al Qaeda elements living in Iran," although there was no evidence that Iran had sponsored the plot.[41]

While al-Qa`ida could use Iran to plot attacks abroad, striking Iran was—and remains— strictly taboo. Before his detention in December 2011, al-Suri had brokered a deal with Iran on behalf of al-Qa`ida according to which the latter "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa`ida network freedom of operation and uninhibited ability to travel for extremists and their families."[42] The benefits of the deal for al-Qa`ida were substantial. In a letter from October 2007 to an unknown jihadi called "Karim" penned most likely by bin Ladin, the al-Qa`ida founder described Iran as "our main artery for funds, personnel, and communication."[43]

Bin Ladin's acknowledgement of the benefits of al-Qa`ida-Iran cooperation is all the more interesting when contrasted with the group's on-the-record, deep mistrust of the Shi`a Iranians. In an August 2009 As-Sahab interview, for example, then deputy al-Qa`ida leader al-Zawahiri accused Iran of being "willing to sell Muslims in any place to the invading Crusaders and support them against Muslims, if it believes that its imminent interests will be achieved through this collusion."[44] He went on to present the following view of what drives Iranian behavior: "[T]he key to explain Tehran and its followers is that they are looking for a

political influence by all means … If the political influence will be reached by them by assisting the Crusader invaders against Muslims, then they will assist the Crusaders against the Muslims without hesitation."[45]

Despite the deep and open mistrust between Iran and al-Qa`ida, they continue to collaborate into the present. As recently as July 20, 2016, the U.S. Treasury Department imposed sanctions on three senior al-Qa`ida members located in Iran: Faisal Jassim Mohammed al-Amri al-Khalidi, Yisra Muhammad Ibrahim Bayumi, and Abu Bakr Muhammad Muhammad Ghumayn. The three carried out a range of activities for or on behalf of al-Qa`ida, including weapons acquisition, liaising with other militant groups, assisting al-Qa`ida members in Iran, fundraising, and facilitating funds transfers.[46]

### Analysis

A look at the available evidence strongly suggests that the relationship between these two strange bedfellows most closely resembles a tactical cooperation. First, Iran and al-Qa`ida's relationship, rather than consistently strong, was marked by ebbs and flows. This is typical of such "low-end" relationships because they are based not on common strategic objectives, but upon identifying common tactical and operational goals that are subject to change. Such shifts naturally cause friction among the partners. The changes in Iran's policy appeared so erratic that even al-Qa`ida members failed to understand its rationale. Iran's detention of al-Qa`ida members, Saif al-`Adl once admitted, "confused us and foiled 75 percent of our plan."[47]

Second, the two parties retained their full autonomy throughout their periods of cooperation. Even though al-Qa`ida members in Iran were detained, and hence not strictly independent, there is no evidence to suggest that either party transferred resources to the other or shared command and control functions with the other. On the contrary, their deep mutual distrust consistently thwarted any such strategic-level cooperation.

Third, the cooperative activities between Iran and al-Qa`ida have been limited mainly to the logistical domain and have possibly extended to the operational domain, but they have not included ideological collaboration. Fourth, Iran and al-Qa`ida maintained separate and incompatible ideologies in the process—Shiism and Sunni jihadism, respectively.

Finally, their relationship was marked by deep mutual distrust, as the above referenced interview with al-Zawahiri as well as declassified letters seized from bin Ladin's compound in Abbottabad indicate. In one letter to his confidant, the al-Qa`ida leader suggests that returning detainees from Iran "should be warned on the importance of getting rid of everything they received from Iran … since the Iranians are not to be trusted then it is possible to plant chips in some of the coming people's belongings."[48] In a later letter to two of his sons, bin Ladin similarly cautions about injections by Iranian doctors that may contain "a tiny chip … as long as a seed of grain but very thin and smooth."[49]

Despite their enmity, al-Qa`ida and Iran's mutual ideological antagonism has been trumped by pragmatism and the belief that limited cooperation is more beneficial in the long run than conflict. Iran likely calculates that cooperation affords the Shi`a state with "options for

PX224

possible or even unforeseen contingencies,"[50] as Georgetown University professor Daniel Byman put it. It provides Iran with a credible way to deter or retaliate against unwanted actions from the United States.

Detaining al-Qa`ida members also provides Iran with an insurance policy against al-Qa`ida attacks directed at it. Evidence to support this claim is contained in the letter to al-Zarqawi intercepted by the United States and published in 2005. In it, al-Zawahiri chastises the emir of al-Qa`ida in Iraq: "Why kill ordinary Shia considering that they are forgiven because of their ignorance? And what loss will befall us if we did not attack the Shia? … And even if we attack the Shia out of necessity, then why do you announce this matter and make it public, which compels the Iranians to take counter measures? And do the brothers forget that both we and the Iranians need to refrain from harming each other at this time in which the Americans are targeting us?"[51]

Though they continued to target Shi`a in Iraq, AQI and its successor organizations clearly heeded al-Zawahiri's injunction when it came to Shi`a in Iran. In May 2014, Abu Muhammad al-Adnani, then the chief spokesman for AQI's successor organization the Islamic State, admitted that his group "has kept abiding by the advices and directives of the sheikhs and figures of jihad. This is why [the Islamic State] has not attacked the Rawafid [a derogatory term for Shiites] in Iran since its establishment. It has left the Rawafid safe in Iran … Let history record that Iran owes al Qaeda invaluably."[52]

Letters found in bin Ladin's compound and statements by al-Qa`ida members who defected to the Islamic State similarly indicate that al-Qa`ida is adamant about honoring its commitment to refrain from attacking Iran directly. In the letter "to Karim" declassified by the Office of the Director of National Intelligence, for example, bin Ladin told the recipient that "there is no need to fight with Iran, unless you are forced to," and if forced to fight, bin Ladin continues, Karim should "not announce [his] intentions and threats" but instead "deliver [the] strikes in silence."[53]

Another confirmation that al-Qa`ida has honored its pledge not to attack Iran was alleged more recently by a former al-Qa`ida member, Abu Ubaydah al-Lubnani, who defected to the Islamic State, according to the latter group. Speaking to the Islamic State's Al Naba magazine, al-Lubnani stated that "Iran's biggest concern is that no operations happen on its soil." Hence, it hosts the "majority of al-Qa`ida's leaders," thereby "secur[ing] the loyalty of al Qaeda."[54]

Al-Qa`ida's calculations in cooperating with Iran are no less pragmatic than those of its counterpart. Iran was a convenient safe haven when it opened its doors to jihadis in the aftermath of the 9/11 attacks, and it also served as a shield against aggressive U.S. counterterrorism efforts in subsequent years.[i] As a declared enemy of the United States, Iran was unlikely to meet any U.S. requests to arrest or extradite suspected al-Qa`ida members. Al-Qa`ida members expected to also enjoy protection from drone strikes, as the United States would clearly refrain from acts of targeted killings on the soil of a country that would

view such strikes as an act of war. Finally, Iran's geographic location between Iraq and Afghanistan and next to the Gulf, Pakistan, Turkey, and other countries coupled with an important jihadi presence offers al-Qa`ida additional strategic advantages.

The Abbottabad documents contain several letters indicating bin Ladin's concern for his family members in Iran, raising the question over the extent to which these concerns were driving al-Qa`ida's policy to refrain from attacking Iran. In one letter, for example, bin Ladin complained that the Iranians refused to release his daughter Fatima.[55] In more recently declassified letters to his sons Uthman and Muhammad, bin Ladin expresses concern about the "personal conditions and circumstances" of his sons, adding that "we are longing to see you."[56] In yet another letter written by bin Ladin's son Khalid to Iranian Supreme Leader Ayatollah Khamenei, Khalid called for the release of the remaining members of his family and plainly expressed his frustration that numerous earlier requests had been ignored by the Iranian government.[57]

Though bin Ladin obsessed about the safety of his family members, the detention of parts of his family in Iran is neither a necessary nor sufficient explanation of the partnership between al-Qa`ida and Iran, which predated the detention of al-Qa`ida operatives in Iran by many years. Similarly, the non-aggression pact between Iran and al-Qa`ida survived following the death of bin Ladin, so it could have hardly been the reason that the agreement continues to this day. That said, the detention of members of the bin Ladin family likely served as an additional incentive to ensure 'good behavior' on the part of al-Qa`ida.

In sum, the Iran-al-Qa`ida connection has alternated between periods of more or less intensive cooperation interrupted by periods of tension, reminiscent of a "longstanding … shotgun marriage or marriage of convenience," as memorably described by former DNI James Clapper.[58] Despite their divergent ideological and strategic objectives, both al-Qa`ida and Iran identified, at various moments in their shared history, tactical or operational interests that could be advanced by mutual cooperation and whose importance overrode any doctrinal reservations to such collaboration.

The implications for policy that follow from this discussion are that al-Qa`ida and Iran are tied in a pragmatic relationship that is unlikely to change unless the partners fundamentally reevaluate the costs and benefits of their partnership. Fundamental ideological divisions that exist between the parties have not led to a reassessment of these costs and benefits, and there is no reason to believe that they will in the future. Iran may change its assessment if it perceives al-Qa`ida as too weak to significantly strike Iran or to be used as a stick against the United States. But with the decline of the Islamic State and al-Qai'da's "long-game strategy," this eventuality seems remote. For al-Qa`ida, on the other hand, a fundamental reassessment of its relationship is likely only if another country will substitute for Iran as al-Qa`ida's "main artery for funds, personnel, and communication."[59] Here, too, no contender is currently in sight that can replace the value that Iran provides to the group. Another condition under which the existing rules of the game could change is a fundamental reassessment on the part of Iran and/or al-Qa`ida about its respective role in the world. Such

a reassessment appears unlikely, however, short of a regime change in Iran or a fundamental change in al-Qa`ida's leadership. Until then, cooperation is simply too valuable for these partners to be abandoned.   **CTC**

*Assaf Moghadam, a non-resident fellow at the Combating Terrorism Center, is an associate professor at the Interdisciplinary Center Herzliya and Director for Academic Affairs at the International Institute for Counter-Terrorism (ICT). His book,* Nexus of Global Jihad: Understanding Cooperation among Terrorist Actors *will be published next month by Columbia University Press. Follow @assafmoghadam*

## Substantive Notes

[a] This article draws from a chapter examining the al-Qa`ida-Iran-Hezbollah connection in the author's forthcoming book on terrorist cooperation. See Assaf Moghadam, *Nexus of Global Jihad: Understanding Cooperation Among Terrorist Actors* (New York: Columbia University Press, 2017), chapter 8.

[b] To date, al-Qa`ida has not officially confirmed the presence of Saif al-`Adl and Abu Muhammad al-Masri in Syria. The release of the four al-Qa`ida operatives was first reported by Sky News and later confirmed by U.S. officials and online activists close to al-Qa`ida. "Terror Fears as Iran Frees Al Qaeda Members," Sky News, September 14, 2015; Rukmini Callimachi and Eric Schmitt, "Iran Released Top Members of Al Qaeda in a Trade," *New York Times*, September 17, 2015; Thomas Joscelyn, "Senior al Qaeda Leaders Reportedly Released from Custody in Iran," Long War Journal, September 18, 2015.

[c] Most recently, on July 20, 2016, the U.S. Department of the Treasury designated three Iran-based al-Qa`ida operatives who were considered part of al-Qa`ida's support network in the country. U.S. Department of the Treasury, "Treasury Designates Three Senior Al-Qaida Members," July 20, 2016.

[d] Former al-Qa`ida trainer Ali Mohamed, for example, testified that he provided security for a meeting between bin Ladin and Mughniyeh in Sudan; that Hezbollah provided explosives training for al-Qa`ida; that Iran provided weapons to EIJ; and that Iran used Hezbollah to transfer weapons. Peter L. Bergen, *The Osama bin Laden I Know: An Oral History of al Qaeda's Leader* (New York: Free Press, 2006), p. 143.

[e] According to the U.S. State Department's Rewards for Justice Program, "Anas al-Sabai" was a known alias of Abu Anas al-Libi. It is also widely believed that following the 9/11 attacks, al-Libi indeed spent about a decade in Iran. Tim Lister and Paul Cruickshank, "Senior Al Qaeda Figure Living in Libyan Capital," CNN Security Clearance, September 27, 2012. Editor's note: For more on Abu Anas al-Libi, see Paul Cruickshank, "A View from the CT Foxhole: Bernard Kleinman, Defense Attorney," *CTC Sentinel* 10:4 (2017).

[f] The statements by both Abu Ghayth and al-Subay'i/al-Libi are the most important primary sources on al-Qa`ida members in Iran released thus far. While both sources describe relatively similar conditions and suggest that conditions varied for individual members of al-Qa`ida, the two sources do not always correspond in their description of dates

and location of the detention of al-Qa`ida and affiliated jihadi operatives. Given that the length of their detention and lack of information flow, it is not surprising that the dates provided by these two sources do not always match up.

[g] According to the comprehensive report of al-Libi, there were at least four groups of jihadi detainees in Iran. A cross-check between al-Libi's letter and the statement provided by Ghayth to the FBI suggests that Ghayth was a member of the first of the four groups mentioned by al-Libi. Indeed, in recounting his experience in Iran, Ghayth seems to refer exclusively to the experience of this first group. Al-Libi's letter is therefore more comprehensive in recounting the experience of al-Qa`ida operatives in Iran than the statement by Ghayth. Ghayth's statement, however, provides a large amount of detail on his specific group.

[h] The Treasury report also named five other operatives who contributed to al-Qa`ida's activity in Iran, including the prominent bin Ladin emissary Atiyah Abd al-Rahman. Bin Ladin appointed al-Rahman al-Qa`ida's envoy in Iran before tasking him with commanding al-Qa`ida in Pakistan's tribal areas.Helene Cooper, "Treasury Accuses Iran of Aiding Al Qaeda," *New York Times*, July 28, 2011; Solomon, "U.S. Sees Iranian, al Qaeda Alliance."

[i] The author is grateful to Dan Byman for this point. Author correspondence, Daniel Byman, October 12, 2015.

**Citations**

[1] U.S. Department of State, "Country Reports on Terrorism 2015," June 2016, p. 10.

[2] Assaf Moghadam, *Nexus of Global Jihad: Understanding Cooperation Among Terrorist Actors* (New York: Columbia University Press, 2017), chapters 1 and 4.

[3] Assaf Moghadam, "Terrorist Affiliations in Context: A Typology of Terrorist Inter-Group Cooperation," *CTC Sentinel* 8:3 (2015); Moghadam, *Nexus of Global Jihad*, chapter 4.

[4] On this point, see also Tricia Bacon, "Strange Bedfellows: Why Terrorist Organizations Ally" (Ph.D. Dissertation: Georgetown University, 2013), p. 756.

[5] Moghadam, *Nexus of Global Jihad*, chapter 4. For comparable typologies, see also Phil Williams, "Cooperation among Criminal Organizations," in Mats Berdal and Monica Serrano eds., *Transnational Organized Crime and International Security: Business as Usual* (Boulder, CO: Lynne Rienner, 2002).

[6] The distinction between operational, logistical, and ideological cooperation was first made by Ely Karmon. See Ely Karmon, *Coalitions between Terrorist Organizations: Revolutionaries, Nationalists and Islamists* (Boston: Martinus Nijhoff, 2005), pp. 49-50.

[7] Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11* (New York: Vintage, 2006), p. 56.

[8] Ali Alfoneh, "Iran's Suicide Brigades: Terrorism Resurgent," *Middle East Quarterly* 14:1 (2007).

[9] Wright, p. 197.

[10] "Affidavit of Dr. Ronen Bergman," United States District Court, Southern District of New York, Civil Action No. 03 MDL 1570 (GBD), April 8, 2010, p. 15.

[11] National Commission on Terrorist Attacks upon the United States, *The 9/11 Commission Report*, 1st ed. (New York: Norton, 2004), p. 61.

[12] *9/11 Commission Report*, p. 68; Peter L. Bergen, *The Osama bin Laden I Know: An Oral History of al Qaeda's Leader* (New York: Free Press, 2006), p. 143; Marc A. Thiessen, "Iran Responsible for 1998 U.S. Embassy Bombings," *Washington Post*, December 8, 2011.

[13] Spencer S. Hsu, "U.S. Judge Finds Iran Liable in 2000 Attack on USS Cole," *Washington Post*, April 1, 2015.

[14] Fuad Husayn, *Zarqawi . . . The Second Generation of Al-Qaeda*, part 8, translated by Foreign Broadcast Information Service, Al-Quds al-Arabi, May 2005.

[15] *9/11 Commission Report*, p. 240.

[16] *9/11 Commission Report*, p. 241.

[17] Bergen, pp. 353–54.

[18] "Statement by Sulayman Abu Ghayth to the Federal Bureau of Investigation," document number 415-A-NY-307616, March 1, 2013, p. 7. See also Brynjar Lia, *Architect of Global Jihad: The Life of Al-Qaida Strategist Abu Mus'ab al-Suri* (New York: Columbia University Press, 2008), p. 326 and Mark Hosenball, "The Iran Connection," *Newsweek*, March 3, 2003.

[19] "Statement by Sulayman Abu Ghayth," p. 7.

[20] Office of the Director of National Intelligence, "Letter by Abu abd al-Rahman Anas al-Subayi," Bin Laden's Bookshelf, October 13, 2010.

[21] "Letter by Abu abd al-Rahman Anas al-Subayi."

[22] See, for example, Seth Jones, "Al Qaeda in Iran: Why Tehran is Accommodating the Terrorist Groups," *Foreign Affairs*, January 29, 2012.

[23] Kenneth M. Pollack, *The Persian Puzzle: The Conflict between Iran and America* (New York: Random House, 2005), p. 358; Douglas Jehl and Eric Schmitt, "Havens: U.S. Suggests a Qaeda Cell in Iran Directed Saudi Bombings," *New York Times*, May 21, 2003; Paul Hastert, "Al Qaeda and Iran: Friends or Foes, or Somewhere in Between?" *Studies in Conflict & Terrorism* 30:4 (2007): pp. 333–34; Daniel Byman, "Unlikely Alliance: Iran's Secretive Relationship with Al-Qaeda," *IHS Defense, Risk and Security Consulting*, July 2012, p. 31.

[24] Douglas Farah and Dana Priest, "Bin Laden Son Plays Key Role in Al Qaeda," *Washington Post*, October 14, 2003.

PX224

[25] "Letter by Anas al-Subayi;" "Statement by Sulayman Abu Ghayth."

[26] "Letter by Anas al-Subayi."

[27] "Statement by Sulayman Abu Ghayth," p. 8.

[28] "Letter by Anas al-Subayi."

[29] "Statement by Sulayman Abu Ghayth," p. 9.

[30] Ibid., pp. 8-9, 11.

[31] Ibid., p. 12.

[32] Ibid., p. 11.

[33] Ibid., p. 12.

[34] Ibid., p. 13.

[35] Joby Warrick, "U.S. Accuses Iran of Aiding Al-Qaeda," *Washington Post*, July 28, 2011.

[36] U.S. Department of State, "Rewards for Justice—al-Qaeda Reward Offer," October 18, 2012.

[37] U.S. Department of the Treasury, "Treasury Further Exposes Al-Qa'ida's Iran-based Network," October 18, 2012; Eric Schmitt, "Leader of Qaeda Cell in Syria, Muhsin al-Fadhli, is Killed in Airstrike, U.S. Says," *New York Times*, July 21, 2015.

[38] U.S. Department of State, "Rewards for Justice: Yasin al-Suri."

[39] For more on this plot, see Guido Steinberg, *German Jihad: On the Internationalization of Islamist Terrorism* (New York: Columbia University Press, 2013); Yassin Musharbash, "'Euro Plot': Al- Qaida Said to Be Planning European Hostage-Takings," Spiegel Online, October 27, 2010; and Nic Robertson and Paul Cruickshank, "Hamburg cell at heart of terrorist plot against Europe," CNN, October 4, 2010.

[40] Benjamin Weinthal and Thomas Joscelyn, "Al Qaeda's Network in Iran," *Weekly Standard*, April 2, 2012.

[41] Ian Austen, "Two Are Accused in Canada of Plotting Train Derailment," *New York Times*, April 22, 2013.

[42] "Rewards for Justice—al-Qaeda Reward Offer."

[43] Office of the Director of National Intelligence, "Letter to Karim," Bin Laden's Bookshelf, p. 1.

[44] "Al-Zawahiri Interview 'The Facts of Jihad and the Lies of Hypocrisy,'" World News Connection, August 4, 2009.

PX224

[45] Ibid.

[46] U.S. Department of the Treasury, "Treasury Designates Three Senior Al-Qaida Members," July 20, 2016.

[47] Saif al-`Adl, "Jihadist Biography of the Slaughtering Leader Abu Mus'ab al-Zarqawi," 2005, as quoted in Ari R. Weisfuse, "The Last Hope for the Al-Qa'ida Old Guard? A Profile of Saif al-`Adl," *CTC Sentinel* 9:3 (2016): p. 26.

[48] "SOCOM-2012-0000019," p. 42, available at www.ctc.usma.edu.

[49] "Letter to Sons Uthman and Muhammad," Office of the Director for National Intelligence, Bin Laden's Bookshelf.

[50] Affidavit of Daniel L. Byman, United States District Court, Southern District of New York, Civil Action No. 03 MDL 1570 (GBD), June 8, 2010, p. 10.

[51] "Letter from al-Zawahiri to al-Zarqawi," available at http://fas.org/irp/news/2005/10/letter_in_english.pdf.

[52] "A Speech by Abu Muhammad al-Adnani al-Shami," translated by Musa Cerantonio, Jihadology.net.

[53] "Letter to Karim," p. 2.

[54] The comments were made in Issue 19 of Al-Nada. See Thomas Joscelyn and David Daoud, "Al Qaeda Defector Discusses Group's Secrets in Islamic State Magazine," Long War Journal, May 3, 2016.

[55] "SOCOM-2012-0000019," pp. 42-43, available at www.ctc.usma.edu.

[56] "Letter to Sons Uthman and Muhammad." For another example, see Office of the Director for National Intelligence, "Letter to Son Hamzah," Bin Laden's Bookshelf.

[57] Khalid bin Ladin, "Min Khalid Bin Usama bin Ladin ila Murshid al-Thawra `Ali Khameni'j," as quoted in Nelly Lahoud, Stuart Caudill, Liam Collins, Gabriel Koehler-Derrick, Don Rassler, and Muhammad al-`Ubaydi, *Letters from Abbottabad: Bin Ladin Sidelined?* (West Point, NY: Combating Terrorism Center, 2012), p. 46.

[58] Thomas Joscelyn, "DNI Clapper: 'Shotgun Marriage' between Iran and Al Qaeda," *Weekly Standard*, February 17, 2012.

[59] "Letter to Karim," p. 1.

PX224

# PX227

Reviewed for Declassification by"
MAJ W.C. Blythe Jr.
Date: 23 July 2015



**Multi-National Force - Iraq**
**Combined Intelligence Operations Center**

**CIOC INFORMATION PAPER**                                      **05 August 2007**

Subject:  Overview of Jaysh al-Mahdi Financial Flow (U)

██████████████████  *Summary:  This paper responds to a question from the MNF-I Commanding General regarding the flow of funding for mainstream Jaysh al-Mahdi and the Office of the Martyr Sadr, addressing sources and distribution.  It is based on sensitive and special reporting.*

(U) Key Findings:

● ███████████████  Aside from Iranian support, the Office of the Martyr Sadr (OMS) and Jaysh Al-Mahdi (JAM) receives at least one third of their funding from a variety of Iraqi sources including community and religious donations, criminal activity, Sadrist-owned businesses, and corruption of government contracts through Sadrist-controlled government ministries.

● ██████████████  Although the exact amounts of Sadrist annual revenue are unknown, estimates place the non-Iranian revenue totals within the range of $12 million and probably significantly higher.

● █████████████  JAM provides employment to young, military age males. Given high unemployment rates, many JAM units likely will turn to criminal sources of funding should centralized sources of funding be reduced.  This would likely further degrade JAM/OMS leadership's authority over the organization.

████  **Domestic Income.**  Sadrist income from internal sources totals at least $12 million to $17 million per year, but probably significantly higher.  Because much of the Sadrist income is illegal, decentralized, and otherwise hidden, any estimates of JAM income are by their nature incomplete.

████  Using estimates of various sources of funding, DIA assessed that current Sadrist income from domestic sources is at least approximately $17 million per year, compared to $8 million to $12 million per year from Iran.

● ██████████████  Detainee Qayis Hadi Sa'id Al-Khazali, a former high-ranking advisor to Muqtada Al-Sadr and JAM Special Group leader, claimed that OMS had an operating budget of $36 million per year, of which $12 million came from internal sources and $24 million came from Iran.

● ████  Sources of Sadrist Domestic income.  OMS and JAM receive funding from a number of legal and illegal sources within Iraq including religious donations, corruption of the contracting process through Sadrist controlled government ministries, extortion rackets,

1

████████████

000317

PX227

providing jobs through control of government ministries, smuggling, extortion, bank robbery, and other criminal activity.

- ▨▨▨▨▨▨▨▨▨▨ The Sadr Trend receives money in the form of religious donations such as Khums, a tax on one fifth of income, and Zakat. According to a detainee, as of early 2007 the local OMS office of general administration in the Shu'ala neighborhood of Baghdad requested that all members donate 20 percent of their income to JAM through *zakat* and *khums*.

- ▨▨▨ OMS and JAM derive revenue through a number of corrupt contracting schemes. One of the primary intentions of the Sadrist Economic Committee is to derive illicit profit from the contracting process in conjunction with Sadrist controlled ministries and JAM elements in areas where contracts are executed. The Economic Committee will accept kickbacks from companies for assistance in securing government contracts and often receives a percentage of the profits derived of these contracts. The committee also provides equipment, workers, and supplies. In addition, contractors working in areas where JAM can project influence are subject to permission and protection fees.

- ▨▨▨ Based on a wide body of reporting, Sadrist elements in the upper echelons of key service ministries steer contracts to sympathetic businesses, which in return provide kickbacks to the committee. JAM exploits its control over government services to offer jobs to local residents. In turn, these residents are expected to provide financial or other support to JAM and Special Group activities.

- ▨▨▨ Many JAM units engage in kidnapping-for-ransom operations to generate income to support their own operations and do not contribute the proceeds to OMS. These kidnappings are sometimes facilitated by JAM sympathizers in the ISF and target wealthy Sunnis and foreigners, netting between $20,000 and $100,000 with high-profile kidnappings.

- ▨▨▨▨▨▨▨ Black market oil smuggling and control of gas stations are also major revenue earners for OMS and JAM. As of mid-July 2007, OMS in Najaf was receiving about 500,000,000 Iraqi dinar (over 402,000 USD) per month from black market oil revenue out of southern Iraq. JAM also controls a large number of gas stations in Baghdad, the profits which go towards JAM operations.

- ▨▨▨▨▨▨▨ Since April 2006, over $27 million has been stolen from banks in Iraq, potentially by JAM elements. According to a detainee in March 2007 reporting, an individual known as Haydar works in the Central Bank of Iraq and tips off a JAM affiliated cell about customers leaving the bank with large sums of money so that they can rob them. A JAM Special Groups commander known as Abu-Bilal then uses these funds to bankroll his JAM kidnapping and extra judicial killing group.

- ▨▨▨▨▨▨▨ Other criminal techniques JAM utilizes to fund their operation include the sale of cars stolen from ports such as Umm Qasr, and general protection fees for businesses in Sadrist areas.

- ▨▨▨ The Sadrists are also expanding their revenues sources through ownership of a number of legitimate businesses. Numerous reports indicate that Sadrists own the Baghdad Cooperative Association (BCA) for Telecommunication Services. JAM members run the company and channel the profits to OMS and JAM. JAM built several office buildings and

2

000318

PX227

████████████

shops across from the Jamila Market in Sadr City that are rented out. One source estimated that the rent generates approximately $9.4 million per year for OMS.

████████████ **Collection and disbursement of funds.** Reporting indicates that the Economic Committee manages JAM commercial activities and may have some responsibility in distributing these funds. Mustafa al-Yaqubi reportedly oversees the JAM financial distribution office, probably separate from the Economic Committee based in Najaf, which probably handles the distribution of funds to mainstream tactical and regional levels. Some funds raised at local levels likely remain in part at that level to help pay fighter salaries.

- ████████████ Control and administration of at least a portion of Iraq-generated funds for OMS and JAM appear to flow upstream from local OMS offices to a centralized processing point as mechanism for controlling use and distribution. According to the now-detained JAM commander for Baghdad, funding via local taxes and fees imposed on residents are reportedly collected at the local level by local OMS representatives, delivered to local OMS offices, and sent to the economic committee in Najaf,.

- ██████ Mustafa al-Yaqubi probably receives funding from several sources that he transfers to JAM's financial managers, Muhammad Al Sa'adi and Jabar Al Khafaji. Each JAM brigade in Iraq has a designated director of finance who travels to the Najaf office—often with the brigade commander—to retrieve monthly brigade stipends, according to a detainee with direct access. The amount of money being distributed to each brigade is unknown but probably varies based on each brigade's operational needs and staffing level.

- ████████████ According to a detainee claiming direct access, Muqtada al-Sadr created an Economic Committee in the beginning of 2004 to organize OMS financial matters and to ensure each location received sufficient funding for operations. Sadr was the final approving authority for all of the Economic Committee's decisions on the dispersal of funds to the Financial Committee.

████████████ **JAM Competition for Resources.** If funding becomes scarcer due to a number of factors, JAM elements are likely to turn to domestic sources of funding, to include increased criminal activity as lower level fighters replace salary income with increased criminal activity. The increased competition at the lower levels of JAM would likely reduce the ability of the OMS/JAM senior leadership to control the organization.

- ████████████ Reporting indicates that OMS was facing a cash crisis in July 2007 after Mustafa al-Ya'qubi, the Iran-based 'paymaster' of the OMS, failed to receive his regular supply of funds.

- ████████████ According to late June 2007 reporting, while recent US Military arrests of senior JAM commanders have compounded JAM's fractured state, much of the internal conflict revolved around disputes over JAM revenue-generating sources such as gas stations, bus stops, electrical generation, and propane distribution. *(Due to this loss of senior JAM commanders individual groups were attempting to encroach upon each other's territory and ensue revenue sources.)*

- ██████ CJSOTF-AP reports in mid-Jun 07 JAM financial corruption, misappropriation, and mismanagement of funds has manifested itself in the short payment of monthly stipends to JAM members. JAM's shortage of funds apparently resulted from a lack of oversight of the

3

████████████

PX227

finance departments which allows extravagant expenditures by leadership while JAM commanders on the ground went into debt to fund operations, pay salaries, and continue humanitarian payments.

- ███ At the fighter level, JAM members are assessed to join for financial purposes, especially in provinces with high unemployment, such as 65% unemployment in Muthana. In Dhi Qar, JAM is reported to draw its membership from young, unemployed men, who intimidate shopkeepers and some have been assessed to kidnap for profit.

- ███ In Dhi Qar, JAM was reported in early 2007 to be getting the reputation as thugs rather than an army of devout Shi'ites. According to one report, JAM's targeted violence and acts of harassment are causing resentment and intimidation in the local population in Muthana. In this case, tribal sheiks are reported to threaten action against JAM to create a truce

███ *Conclusion: OMS and JAM obtain their funding from a variety of legal and illegal sources in addition to direct support from Iran. Although the dearth of reliable data precludes an accurate estimate of size and structure of the Iraqi sources of Sadrist funding, it represents a large portion of the Sadrist budget. In addition, this money is obtained at the lowest levels of JAM, and thus is not as controlled as the Iranian funding.*

(U) Prepared by: Iraq Threat Finance Cell (ITFC), JWICS #MNF-ICIOCTHREATFINANCEINTELLIGENCEUNIT@centcom.ic.gov, SIPRNET ITFC@s-iraq.centcom.smil.mil, DSN 318-835-1414.

(U) Approved by: Col Jeffry Smith, OIC & DoD Co-lead, Iraq Threat Finance Cell

(U) *Sources:*
TS-0168-07.IZIC, Evolution and Scope of Sadrist Revenue, 25 May 07; IIR 6 105 4501 07
TD-314/20399-07; IIR 6 067 0472 07; IIR 6 059 1662 07; IIR 6 059 1888 07
IIR 6 059 2315 07; IIR 6 105 4358 07; IIR 6 059 1467 07; IIR 7 921 2231 07
IIR 6 067 8320 07; IIR 6 110 2255 07; IIR 6 105 4443 07
TS-22,078-07/MIO-8, Jaysh Al Mahdi Financial Distribution Structure, 22 May 07
IIR 6 067 0472 07; CJSOTF-AP INTSUM #1505, 12 Jun 07; TD-314/48803-07
US Embassy Cable, 13638ZMAR06; US Embassy Cable, 300135ZDEC06
US Embassy Cable, 81640ZJAN07

PX227