PX235



**59302** **Federal Register** / Vol. 84, No. 213 / Monday, November 4, 2019 / Rules and Regulations

(c) * * * For additional definitions that apply for purposes of their respective sections, see §§ 1.385–3(g) and 1.385–4T(e).

*　*　*　*　*

(4) * * *

(iv) * * * For purposes of the section 385 regulations, a corporation is a member of an expanded group if it is described in this paragraph (c)(4)(iv) immediately before the relevant time for determining membership (for example, immediately before the issuance of a debt instrument (as defined in § 1.385–3(g)(4)) or immediately before a distribution or acquisition that may be subject to § 1.385–3(b)(2) or (3)).

*　*　*　*　*

(d) * * *

(1) * * *

(i) *In general.* If a debt instrument (as defined in § 1.385–3(g)(4)) is deemed to be exchanged under the section 385 regulations, in whole or in part, for stock, the holder is treated for all Federal tax purposes as having realized an amount equal to the holder's adjusted basis in that portion of the debt instrument as of the date of the deemed exchange (and as having basis in the stock deemed to be received equal to that amount), and, except as provided in paragraph (d)(1)(iv)(B) of this section, the issuer is treated for all Federal tax purposes as having retired that portion of the debt instrument for an amount equal to its adjusted issue price as of the date of the deemed exchange. In addition, neither party accounts for any accrued but unpaid qualified stated interest on the debt instrument or any foreign exchange gain or loss with respect to that accrued but unpaid qualified stated interest (if any) as of the deemed exchange. This paragraph (d)(1)(i) does not affect any rules in Title 26 of the United States Code that otherwise apply to the debt instrument prior to the date of the deemed exchange (for example, this paragraph (d)(1)(i) does not affect the issuer's deduction of accrued but unpaid qualified stated interest otherwise deductible prior to the date of the deemed exchange). Moreover, the stock issued in the deemed exchange is not treated as a payment of accrued but unpaid original issue discount or qualified stated interest on the debt instrument for Federal tax purposes.

(ii) * * * Notwithstanding the first sentence of paragraph (d)(1)(i) of this section, the rules of § 1.988–2(b)(13) apply to require the holder and the issuer of a debt instrument that is deemed to be exchanged under the section 385 regulations, in whole or in part, for stock to recognize any exchange gain or loss, other than any exchange gain or loss with respect to accrued but unpaid qualified stated interest that is not taken into account under paragraph (d)(1)(i) of this section at the time of the deemed exchange. * * *

(iii) *Section 108(e)(8).* For purposes of section 108(e)(8), if the issuer of a debt instrument is treated as having retired all or a portion of the debt instrument in exchange for stock under paragraph (d)(1)(i) of this section, the stock is treated as having a fair market value equal to the adjusted issue price of that portion of the debt instrument as of the date of the deemed exchange.

(iv) * * *

(A) A debt instrument that is issued by a disregarded entity is deemed to be exchanged for stock of the regarded owner under § 1.385–3T(d)(4);

*　*　*　*　*

### § 1.385–2   [Removed]

■ Par. 3. Section 1.385–2 is removed.

■ Par. 4. Section 1.385–3 is amended by revising paragraph (g)(4) to read as follows:

### § 1.385–3   Transactions in which debt proceeds are distributed or that have a similar effect.

*　*　*　*　*

(g) * * *

(4) *Debt instrument.* The term debt instrument means an interest that would, but for the application of this section, be treated as a debt instrument as defined in section 1275(a) and § 1.1275–1(d).

*　*　*　*　*

■ Par. 5. Section 1.1275–1 is amended by revising the last sentence of paragraph (d) to read as follows:

### § 1.1275–1   Definitions.

*　*　*　*　*

(d) * * * See § 1.385–3 for rules that treat certain instruments that otherwise would be treated as indebtedness as stock for Federal tax purposes.

*　*　*　*　*

**Sunita Lough,**

*Deputy Commissioner for Services and Enforcement.*

Approved: September 30, 2019.

**David J. Kautter,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2019–23817 Filed 10–31–19; 4:15 pm]

**BILLING CODE 4830–01–P**

## DEPARTMENT OF THE TREASURY

### Financial Crimes Enforcement Network

### 31 CFR Part 1010

**RIN 1506–AB42**

### Imposition of Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern

**AGENCY:** Financial Crimes Enforcement Network, ("FinCEN"), Treasury.

**ACTION:** Final rule.

**SUMMARY:** FinCEN is issuing this final rule, pursuant to Section 311 of the USA PATRIOT Act, to prohibit the opening or maintaining of correspondent accounts in the United States for, or on behalf of, Iranian financial institutions, and the use of foreign financial institutions' correspondent accounts at covered U.S. financial institutions to process transactions involving Iranian financial institutions.

**DATES:** This final rule is effective November 14, 2019.

**FOR FURTHER INFORMATION CONTACT:** The FinCEN Resource Center, (800) 949–2732, refer to FDMS Docket No. FinCEN–2019–0002.

**SUPPLEMENTARY INFORMATION:**

### I. Statutory Provisions

On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107–56 (USA PATRIOT Act). Title III of the USA PATRIOT Act amended the anti-money laundering (AML) provisions of the Bank Secrecy Act (BSA), codified at 12 U.S.C. 1829b, 12 U.S.C. 1951–1959, and 31 U.S.C. 5311–5314, 5316–5332, to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing the BSA appear at 31 CFR chapter X. The authority of the Secretary of the Treasury (Secretary) to administer the BSA and its implementing regulations has been delegated to FinCEN.

Section 311 of the USA PATRIOT Act (Section 311), codified at 31 U.S.C. 5318A, grants FinCEN the authority, upon finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States, one or more financial institutions operating outside of the United States, one or more classes of transactions within or involving a jurisdiction outside of the United States, or one or more types of

accounts is of primary money laundering concern, to require domestic financial institutions and domestic financial agencies to take certain "special measures." The five special measures enumerated in Section 311 are preventative safeguards that defend the U.S. financial system from money laundering and terrorist financing. FinCEN may impose one or more of these special measures in order to protect the U.S. financial system from these threats. Special measures one through four, codified at 31 U.S.C. 5318A(b)(1)–(b)(4), impose additional recordkeeping, information collection, and reporting requirements on covered U.S. financial institutions. The fifth special measure, codified at 31 U.S.C. 5318A(b)(5), allows FinCEN to prohibit, or impose conditions on, the opening or maintaining in the U.S. of correspondent or payable-through accounts for, or on behalf of, a foreign bank, if such correspondent account or payable-through account involves the foreign jurisdiction, financial institution, class of transaction, or type of account found to be of primary money laundering concern.

Before making a finding that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is required to consult with both the Secretary of State and the Attorney General.[1] The Secretary must also consider such information as the Secretary determines to be relevant, including the following potentially relevant factors:

• Evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction ("WMD") or missiles have transacted business in that jurisdiction;

• the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

• the substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

• the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

• the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

• whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of U.S. law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

• the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

Upon finding that a jurisdiction is of primary money laundering concern, the Secretary may require covered financial institutions to take one or more special measures. In selecting which special measure(s) to take, the Secretary "shall consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate federal banking agency (as defined in Section 3 of the Federal Deposit Insurance Act), the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and at the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find appropriate."[2] In imposing the fifth special measure, the Secretary must do so "in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System."[3]

In addition, in selecting which special measure(s) to take, the Secretary shall consider the following factors:

• Whether similar action has been or is being taken by other nations or multilateral groups;

• whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

• the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

• the effect of the action on U.S. national security and foreign policy.[4]

## II. Public Participation

FinCEN's decision to take this action as a final rule is consistent with the Administrative Procedure Act (APA) and in the interest of U.S. foreign policy. Section 311's fifth special measure "may be imposed only by

regulation."[5] The APA exempts regulations involving "a military or foreign affairs function of the United States" from its requirements for notice of proposed rulemaking, the opportunity for public participation, and a 30 day delay in effective date.[6] As set forth in more detail below, this rule imposes a special measure with regard to the jurisdiction of the Islamic Republic of Iran (Iran). Iran is the subject of a national emergency declaration identifying it as an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and is the subject of multiple Executive Orders identifying it as a supporter of terrorism as well as other malign activities.[7] The special measure described herein relates to important foreign policy goals of the U.S. Government, namely to deny the Iranian regime resources to support terrorism, develop nuclear weapons and/or the proliferation of weapons of mass destruction, advance its ballistic missile program, oppress the Iranian people, and fuel conflicts in Syria, Afghanistan, Yemen and elsewhere. Rapid imposition of the fifth special measure pursuant to Section 311, without any procedural delays caused by soliciting public comments concerning U.S. foreign policy, will further protect the U.S. financial system from Iran by ensuring that U.S. financial institutions are not exposed to Iran's ongoing illicit finance activities, including its support for international terrorism. Because this rule involves a foreign affairs function, it is exempt from the provisions of the APA requiring notice of proposed rulemaking, the opportunity for public participation, and a 30 day delay in effective date. Because no notice of proposed rulemaking is required for this rule, the Regulatory Flexibility Act (RFA) (5 U.S.C. 601–612) does not apply. To ensure orderly implementation, FinCEN will delay its effective date until November 14, 2019.

## III. Summary of the Final Rule

This final rule sets forth (i) FinCEN's finding that Iran is a jurisdiction of primary money laundering concern pursuant to Section 311, and (ii) FinCEN's imposition of a prohibition under the fifth special measure on the opening or maintaining of

---

[1] 31 U.S.C. 5318A(c)(1).

[2] 31 U.S.C. 5318A(a)(4)(A).
[3] 31 U.S.C. 5318A(b)(5).
[4] 31 U.S.C. 5318A(a)(4)(B).

[5] 31 U.S.C. 5318A(a)(2)(C).
[6] 5 U.S.C. 553(a)(1).
[7] *See, e.g.,* E.O. 12957, "Prohibiting Certain Transactions With Respect to the Development of Iranian Petroleum Resources" (1995); E.O. 13848, "Reimposing Certain Sanctions With Respect to Iran" (2018); E.O. 13876, "Imposing Sanctions With Respect to Iran" (2019).

PX235

correspondent accounts in the United States for, or on behalf of, Iranian financial institutions, and the use of foreign financial institutions' correspondent accounts at covered U.S. financial institutions to process transactions involving Iranian financial institutions.

## IV. Treasury Actions Involving Iran

The U.S. Department of the Treasury (Treasury) has taken numerous actions to publicly highlight and counter Iran's malign activities, including implementation of a multitude of sanctions programs and issuance of several advisories. On November 5, 2018, the United States fully re-imposed the sanctions on Iran that had been lifted or waived under the Joint Comprehensive Plan of Action (JCPOA).[8] However, Iran has continued to evade these sanctions, fund terror and destabilizing activities, and advance its ballistic missile development. As a result, Treasury and the U.S. Department of State (State Department) have continued imposing sanctions on Iranian persons, as well as persons in third countries who have continued to transact with Iran, or who have acted for or on behalf of designated Iranian persons.

On November 28, 2011, FinCEN issued an NPRM proposing the implementation of the fifth special measure against Iran as a jurisdiction of primary money laundering concern pursuant to Section 311.[9][10]

## V. Finding Iran To Be a Jurisdiction of Primary Money Laundering Concern

Based on information available to FinCEN, including both public and non-public reporting,[11] and after considering the factors listed in the 311 statute and performing the requisite interagency consultations with the Secretary of State and Attorney General as required by 31 U.S.C. 5318A(c)(1), FinCEN finds that reasonable grounds exist for concluding

that Iran is a jurisdiction of primary money laundering concern. While FinCEN has considered all factors set forth in Section 5318A(c)(2)(A), a discussion of those factors most relevant to this finding follows.

### Iran's Abuse of the International Financial System

Iran has developed covert methods for accessing the international financial system and pursuing its malign activities, including misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran (CBI). Iran has also used precious metals to evade sanctions and gain access to the financial system, and may in the future seek to exploit virtual currencies. These efforts often serve to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC–QF), Lebanese Hizballah (Hizballah), Hamas, the Taliban and other terrorist groups.[12]

Factor 1: Evidence That Organized Criminal Groups, International Terrorists, or Entities Involved in the Proliferation of Weapons of Mass Destruction or Missiles Have Transacted Business in That Jurisdiction [13]

### a. Role of CBI Officials in Facilitating Terrorist Financing

Senior CBI officials have played a critical role in enabling illicit networks, using their official capacity to procure hard currency and conduct transactions for the benefit of the IRGC–QF and its terrorist proxy groups. The CBI has been complicit in these activities, including providing billions of U.S. dollars (USD) and euros to the IRGC–QF, Hizballah and other terrorist organizations. Since at least 2016, the CBI has provided the IRGC–QF with the vast majority of its foreign currency. During 2018 and early 2019, the CBI transferred several billion USD and euros from the Iranian National Development Fund (NDF) to the IRGC–QF.

In September 2019, Treasury designated the CBI and NDF under its counterterrorism authority, Executive Order (E.O.) 13224, as amended by E.O. 13886. The Iranian government established the NDF to serve the welfare of the Iranian people by allocating revenues from oil and gas sales to economic investments, but has instead used the NDF as a slush fund for the IRGC–QF, for years disbursing hundreds of millions of USD in cash to the IRGC–QF. In coordination with the CBI, the NDF provided the IRGC–QF with half a billion USD in 2017 and hundreds of millions of USD in 2018.

In November 2018, Treasury designated nine persons—including two CBI officials—involved in an international network through which Iran provided millions of barrels of oil to Syria via Russian companies, in exchange for Syria's facilitation of the movement of hundreds of millions of USD to the IRGC–QF, for onward transfer to Hizballah and Hamas.[14] The designations highlighted, as the Secretary stated, that ''[CBI] officials continue to exploit the international financial system, and in this case even used a company whose name suggests a trade in humanitarian goods as a tool to facilitate financial transfers supporting this oil scheme.'' [15]

The scheme was centered on Syrian national Mohammad Amer Alchwiki and his Russia-based company, Global Vision Group. Global Vision worked with Russian state-owned company Promsyrioimport to facilitate shipments of Iranian oil to Syria. To assist the Bashar Al-Assad regime in paying Russia for this service, Iran sent funds to Russia through Alchwiki and Global Vision. To conceal its involvement, the CBI made payments to Mir Business Bank [16] using Iran-based Tadbir Kish Medical and Pharmaceutical Company. Following the CBI's transfer of funds from Tadbir Kish to Global Vision, Global Vision transferred payments to Promsyrioimport.

CBI senior officials were crucial to the scheme's success. CBI International Department Director Rasul Sajjad and CBI Vice Governor for International Affairs Hossein Yaghoobi both assisted in facilitating Alchwiki's transfers. First Deputy Director of Promsyrioimport Andrey Dogaev worked closely to

---

[8] The JCPOA was finalized on July 14, 2015, between the U.S., China, France, Germany, Russia, the United Kingdom, the European Union, and Iran to ensure that Iran's nuclear program would be exclusively peaceful. The U.S. announced it would cease its participation in the JCPOA on May 8, 2018.

[9] *See* 76 FR 72878 (November 28, 2011), Imposition of Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern.

[10] FinCEN intends to issue a separate document withdrawing the 2011 NPRM.

[11] FinCEN may submit classified information used in support of a Section 311 finding and special measure(s) determination to a reviewing court *ex parte* and *in camera*. *See* Section 376 of the Intelligence Authorization Act for fiscal year 2004, Public Law 108–177 (amending U.S.C. 5318A by adding new paragraph (f)).

[12] *Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System,* FinCEN, October 11, 2018.

[13] 31 U.S.C. 5318A(c)(2) states that in making a finding that a jurisdiction is of primary money laundering concern, the Secretary shall consider in addition to such information as the Secretary determines to be relevant, the potentially relevant factors enumerated in section 5318A(c)(2)(A). Due to Iran's role as a state sponsor of terrorism and the extraterritorial nature of its malign conduct, FinCEN determined it was relevant to consider terrorism and weapons proliferation transactions with the government of Iran in addition to such transactions in the jurisdiction of Iran, as discussed in this section.

[14] *Treasury Designates Illicit Russia-Iran Oil Network Supporting the Assad Regime, Hizballah, and Hamas,* November 20, 2018, *https://home.treasury.gov/news/press-release/sm553.*
[15] *Id.*
[16] Treasury designated Mir Business Bank on November 5, 2018. It is a wholly-owned subsidiary of Iran's Bank Melli, which was designated for acting as a conduit for payments to the IRGC–QF.

coordinate the sale of Iranian crude oil to Syria with Yaghoobi, who has a history of working with Hizballah in Lebanon and has coordinated financial transfers to Hizballah with IRGC–QF and Hizballah personnel. Using this scheme, the network exported millions of barrels of Iranian oil into Syria, and funneled millions of USD between the CBI and Alchwiki's Mir Bank account in Russia.[17]

Separately, in May 2018, in connection with a scheme to move millions of USD for the IRGC–QF, Treasury designated the then-governor of the CBI, Valiollah Seif, the assistant director of CBI's international department, Ali Tarzali, Iraq-based al-Bilad Islamic Bank, Aras Habib, Al-Bilad's Chairman and Chief Executive, and Muhammad Qasir, a Hizballah official. Treasury designated them as Specially Designated Global Terrorists (SDGTs) pursuant to E.O. 13224. Treasury stated that Seif had covertly funneled millions of USD on behalf of the IRGC–QF through al-Bilad Bank to support Hizballah's radical agenda, an action that undermined the credibility of his commitment to protecting CBI's integrity.[18]

Also in May 2018, Treasury, in a joint action with the United Arab Emirates (UAE), designated nine Iranian individuals and entities involved in an extensive currency exchange network that was procuring and transferring millions in USD-denominated bulk cash to the IRGC–QF to fund its malign activities and regional proxy groups. The CBI was complicit in the IRGC–QF's scheme, actively supported the network's currency conversion, and enabled it to access funds that it held in its foreign bank accounts.[19]

The CBI and senior CBI officials have a history of using exchange houses to conceal the origin of funds and procure foreign currency for the IRGC–QF. During periods of heightened sanctions pressures, Iran has relied heavily on third-country exchange houses and trading companies to move funds to evade sanctions. Iran uses them to act as money transmitters in processing funds transfers through the United States to third-country beneficiaries, in support

of business with Iran that is in violation of U.S. sanctions targeting Iran. These third-country exchange houses or trading companies frequently lack their own U.S. Dollar accounts and instead rely on the correspondent accounts of their regional banks to access the U.S. financial system.[20]

Additionally, according to information provided to FinCEN, in 2017, the CBI coordinated with Hizballah to arrange a single EUR funds transfer to a Turkish bank worth over $50 million USD.

### b. IRGC's Abuse of the International Financial System

Iran is the world's leading state sponsor of terrorism, providing material support to numerous Treasury-designated terrorist groups, including Hizballah, Hamas, and the Taliban, often via its IRGC–QF. The IRGC–QF is an elite unit within the IRGC, the military and internal security force created after the Islamic Revolution. IRGC–QF personnel advise and support pro-Iranian regime factions worldwide, including several which, like Hizballah, Hamas, and the Taliban, the United States has similarly designated as terrorists.

Treasury has designated the IRGC pursuant to several E.O.s: E.O. 13382 in connection with its support to Iran's ballistic missile and nuclear programs; E.O. 13553 for serious human rights abuses by the Iranian government; E.O. 13606 in connection with grave human rights abuses; E.O. 13224 for global terrorism, and consistent with the Countering America's Adversaries Through Sanctions Act, for its support of the IRGC–QF. Treasury has designated the IRGC–QF pursuant to E.O. 13224 for providing material support to terrorist groups, including the Taliban, E.O. 13572 for support to the Syrian General Intelligence Directorate, the Assad regime's civilian intelligence service, and E.O. 13553 for serious human rights abuses by the Iranian government.

In April 2019, the State Department designated the IRGC, including the IRGC–QF, as a Foreign Terrorist Organization (FTO).[21] It was the first time that the United States designated a part of another government as an FTO—an action that highlighted Iran's use of terrorism as a central tool of its statecraft and an essential element of its

foreign policy. The IRGC is integrally woven into the Iranian economy, operating institutions and front companies worldwide, so that the profits from seemingly legitimate business deals may actually fund Iranian terrorism.[22]

The IRGC–QF's misuse of the international financial system to enable its nefarious activities include numerous examples that have occurred in the United States. In May 2018, the United States and the UAE took joint action to disrupt an extensive currency exchange network that was procuring and transferring millions in USD-denominated bulk cash to the IRGC–QF to fund its malign activities and regional proxy groups. Treasury designated nine Iranian individuals and entities, and noted that key CBI officials supported the transfer of funds.[23]

On November 5, 2018, in connection with the re-imposition of U.S. nuclear-related sanctions that had been lifted or waived under the JCPOA, Treasury sanctioned over 700 individuals, entities, aircraft, and vessels in its largest ever single-day action targeting Iran. The action included the designations of more than 70 Iran-linked financial institutions and their foreign and domestic subsidiaries. Bank Melli was among those banks designated pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or other services to or in support of, the IRGC–QF. As of 2018, the equivalent of billions of USD in funds had transited IRGC–QF controlled accounts at Bank Melli. Moreover, Bank Melli had enabled the IRGC and its affiliates to move funds into and out of Iran, while the IRGC–QF, using Bank Melli's presence in Iraq, had used Bank Melli to pay Iraqi Shia militant groups.[24]

On November 20, 2018, Treasury designated nine individuals and entities in an international network through which the Iranian regime worked with Russian companies to provide millions of barrels of oil to the Assad regime in Syria. The Assad regime, in turn, facilitated the movement of hundreds of

---

[17] *Treasury Designates Illicit Russia-Iran Oil Network Supporting the Assad Regime, Hizballah, and Hamas,* November 20, 2018, *https://home.treasury.gov/news/press-release/sm553.*

[18] *Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force,* May 15, 2018, *https://home.treasury.gov/news/press-release/sm0385.*

[19] *United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC–QF,* May 10, 2018, *https://home.treasury.gov/news/press-releases/sm0383.*

[20] *Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System,* FinCEN, October 11, 2018.

[21] *Designation of the Islamic Republic Revolutionary Guard Corps,* April 8, 2019, *https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corp/.*

[22] *Intent to Designate the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization,* April 8, 2019, *https://www.state.gov/intent-to-designate-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/.*

[23] *United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC–QF,* May 10, 2018, *https://home.treasury.gov/news/press-releases/sm0383.*

[24] *U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign,* November 5, 2018, *https://home.treasury.gov/news/press-releases/sm541.*

millions of USD to the IRGC–QF for onward transfer to Hamas and Hizballah.[25]

In March 2019, Treasury took action against 25 individuals and entities, including a network of Iran, UAE, and Turkey-based front companies that transferred over a billion USD and euros to the IRGC, IRGC–QF and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL). The action included a designation of Ansar Bank, an Iranian bank controlled by the IRGC, and its currency exchange arm, Ansar Exchange, for providing banking services to the IRGC–QF.[26]

In June 2019, Treasury designated an Iraq-based IRGC–QF financial conduit, South Wealth Resources Company (SWRC), which trafficked hundreds of millions of U.S. dollars' worth of weapons to IRGC–QF-backed militias. SWRC and its two Iraqi associates covertly facilitated the IRGC–QF's access to the Iraqi financial system to evade sanctions, while also generating profits in the form of commission payments for a Treasury-designated advisor to the IRGC–QF's commander, Qasem Soleimani. Soleimani has run weapons smuggling networks, participated in bombings of Western embassies, and attempted assassinations in the region.[27]

Iran's activities include acts of attempted violence in the United States. In October 2011, pursuant to E.O. 13224, Treasury designated four senior IRGC–QF officers and Mansoor Arbabsiar, a naturalized U.S. citizen, for plotting to assassinate the Saudi Arabian Ambassador to the United States. In an example that laid bare the risks financial institutions take when transacting with Iran, payment for the assassination reached Arbabsiar from Tehran via two wire transfers totaling approximately $100,000 USD, sent from a non-Iranian foreign bank to a U.S. bank.[28]

c. Iranian Support to Terrorists

Hizballah

Despite its attempts to portray itself as a legitimate political entity, Hizballah is first and foremost a terrorist organization, responsible for the most American deaths by terrorism prior to the September 11, 2001 terrorist attacks. A Lebanon-based Shia militant group formed in Lebanon in 1982, Hizballah was responsible for the suicide truck bombings of the U.S. Embassy in Beirut, Lebanon in April 1983, the U.S. Marine barracks in Beirut in October 1983, the U.S. Embassy annex in Beirut in 1984, the hijacking of TWA 847 in 1985, and the Khobar Towers attack in Saudi Arabia in 1996.[29] Iran provides upwards of $700 million USD annually toward Hizballah's estimated $1 billion USD budget.

Hizballah is listed in the annex to E.O. 12947 from January 1995, "Prohibiting Transactions With Terrorists Who Threaten to Disrupt The Middle East Peace Process." The State Department designated Hizballah in October 1997 as an FTO and in October 2001 as an SDGT pursuant to E.O. 13224. Treasury issued additional sanctions against Hizballah in August 2012 pursuant to E.O. 13582 (which targets the government of Syria and its supporters) specifically in connection with Hizballah's efforts to coordinate with the IRGC–QF in support of the Assad regime.[30] At the request of the IRGC–QF, Hizballah has deployed thousands of fighters into Syria in support of the Assad regime.

As recently as September 2019, Treasury took action against a large shipping network directed by and financially supporting both the IRGC–QF and Hizballah. In the past year, the IRGC–QF has moved Iranian oil worth at least hundreds of millions of USD through the network for the benefit of the Assad regime and other illicit actors. The sprawling network uses dozens of ship managers, vessels, and other facilitators and intermediaries to enable the IRGC–QF to obfuscate its involvement; to broker associated contracts, it also relies heavily on front companies and Hizballah officials (including Muhammad Qasir, designated by Treasury in November 2018 in connection with the illicit Russia-Iran oil network supporting Assad, Hizballah, and Hamas). Pursuant

to E.O. 13224, Treasury identified several vessels as property in which blocked persons have an interest, and pursuant to E.O. 13224, designated 16 entities and 10 individuals, including senior IRGC–QF official and former Iranian Minister of Petroleum Rostam Qasemi, who oversees the network. Treasury Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker noted that the designations demonstrated Iran's economic reliance on the terrorist groups IRGC–QF and Hizballah as financial lifelines.[31]

In July 2019, Treasury designated key Hizballah political and security figures—two members of Lebanon's Parliament and one Hizballah security official—who were leveraging their positions to facilitate Hizballah's agenda and do Iran's bidding. Noting that one of the Parliament members, Amin Sherri, has been photographed with IRGC–QF Commander Soleimani, Treasury stated that Hizballah uses its operatives in Lebanon's Parliament to bolster Iran's malign activities.[32] Also in July 2019, Treasury designated Salman Raouf Salman pursuant to E.O. 13224. Salman, a senior member of an Hizballah organization dedicated to carrying out attacks outside Lebanon, coordinated the devastating attack in 1994 against the AMIA Jewish community center in Buenos Aires, Argentina, and has been directing terrorist operations in the Western Hemisphere ever since. The designation of Salman marked over 50 Hizballah-linked designations by Treasury since 2017.[33]

Hizballah is a global terrorist organization, active in Syria, Iraq, and Yemen, and Hizballah plots have been thwarted in South America, Asia, Europe, and the United States. In June 2017 in New York, Ali Kourani and Samer El Debek were arrested and charged for alleged activities on behalf of Hizballah. Kourani conducted surveillance of potential U.S. targets, including military and law enforcement facilities in New York City, and was subsequently convicted on all eight counts, which included terrorism, sanctions, and immigration-related offenses. El Debek allegedly conducted missions in Panama to locate U.S. and

[25] *Treasury Designates Illicit Russia-Iran Oil Network Supporting the Assad Regime, Hizballah, and Hamas,* November 20, 2018, *https://home.treasury.gov/news/press-release/sm553.*

[26] *United States Disrupts Large Scale Front Company Network Transferring Hundreds of Millions of Dollars and Euros to the IRGC and Iran's Ministry of Defense,* March 26, 2019, *https://home.treasury.gov/news/press-release/sm639.*

[27] *Treasury Targets IRGC-Qods Force Financial Conduit in Iraq for Trafficking Weapons Worth Hundreds of Millions of Dollars,* June 12, 2019, *https://home.treasury.gov/news/press-release/sm706.*

[28] *Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States,* October 11, 2011, *https://www.treasury.gov/press-center/press-releases/pages/tg1320.aspx.*

[29] *Hizballah,* Counterterrorism Guide, Office of the Director of National Intelligence, *https://www.dni.gov/nctc/groups/hizballah.html.*

[30] *Treasury Targets Hizballah for Supporting the Assad Regime,* August 10, 2012, *https://www.treasury.gov/press-center/press-releases/Pages/tg1676.aspx.*

[31] *Treasury Targets Wide Range of Terrorists and Their Supporters Using Enhanced Counterterrorism Sanctions Authorities,* September 10, 2019, *https://home.treasury.gov/news/press-release/sm772.*

[32] *Treasury Targets Iranian-Backed Hizballah Officials for Exploiting Lebanon's Political and Financial System,* July 9, 2019, *https://home.treasury.gov/news/press-release/sm724.*

[33] *Treasury Targets Senior Hizballah Operative for Perpetrating and Plotting Terrorist Attacks in the Western Hemisphere,* July 19, 2019, *https://home.treasury.gov/news/press-release/sm737.*

**Federal Register** / Vol. 84, No. 213 / Monday, November 4, 2019 / Rules and Regulations **59307**

Israeli Embassies and assess the vulnerabilities of the Panama Canal and the ships that transit it.[34][35]

According to information available to FinCEN, in early 2015, the IRGC–QF provided approximately $20 million USD to Hizballah, over half of which was to be used for ballistic missile expenses. In 2017, the CBI coordinated with Hizballah to arrange a single EUR funds transfer to a Turkish bank worth over $50 million USD.

More recently, and as noted in the previous section, in November 2018, Treasury designated nine persons involved in an international network through which Iran provided millions of barrels of oil to Syria via Russian companies, in exchange for Syria's facilitation of the movement of hundreds of millions of USD banknotes to the IRGC–QF for onward transfer to Hizballah and Hamas. Treasury noted at the time of the designations that Mohammad Amer Alchwiki, a central player in this scheme, was acting as a critical conduit for the transfer of the USD banknotes. Alchwiki worked with the Central Bank of Syria to coordinate transfers to Hizballah official Muhammad Qasir, in charge of the Hizballah unit responsible for weapons, technology, and other support transfers. In its press release, Treasury included a photo of a letter dated April 17, 2018, from Alchwiki and Qasir to a CBI official, confirming receipt of $63 million USD.[36]

Also as noted previously, in May 2018, in connection with a scheme to move millions of USD for the IRGC–QF, Treasury designated a network that included Valiollah Seif, Iran's then-governor of the CBI, Iraq-based al-Bilad Islamic Bank, and Muhammad Qasir, a Hizballah official. Treasury designated them as SDGTs pursuant to E.O. 13224 after finding that Seif had covertly funneled millions of USD on behalf of the IRGC–QF through al-Bilad Bank to support Hizballah's radical agenda.[37]

## Hamas

Iran also has a history of supporting Hamas. Hamas was established in 1987 at the onset of the first Palestinian intifada. Prior to 2005, Hamas' numerous attacks on Israel included U.S. citizens as casualties. The State Department designated Hamas as an FTO in October 1997, and Treasury designated it as an SDGT pursuant to E.O. 13224 in October 2001.[38]

Iran provides Hamas with funds, weapons, and training. During periods of substantial Iran-Hamas collaboration, Iran's support to Hamas has been estimated to be as high as $300 million USD per year, but at a baseline amount, is widely assessed to be in the tens of millions per year. The Iran-Hamas relationship was forged in the 1990s as part of an attempt to disrupt the Israeli-Palestinian peace process, but in 2012, their divergent positions on Syria caused a rift. Subsequently, Iran sought to rebuild the relationship, and in October 2017, Hamas leaders restored the group's relations with Iran during a visit to Tehran.[39]

According to information available to FinCEN, in March 2015, Hamas expressed gratitude for Iran's previous financial support, and requested that Iran resume providing aid. In January 2016, Hamas officials in Gaza were awaiting monetary payments from the IRGC–QF. The Hamas officials expected the Iranian government to transfer money to the IRGC–QF in Beirut, who would then transfer it onward to them. Additionally, in 2016, Hamas had received a significant sum of IRGC–QF funding via financiers in Turkey.

In August 2019, Treasury, in partnership with the Sultanate of Oman, designated financial facilitators who funneled tens of millions of USD between the IRGC–QF and Hamas's operational arm, the Izz-Al-Din Al-Qassam Brigades, for terrorist attacks originating from Gaza. The Izz-Al-Din Al-Qassam Brigades is a designated FTO and SDGT. At the center of the scheme uncovered by Treasury and Oman was Mohammad Sarur, a Lebanon-based financial operative in charge of all financial transfers between the IRGC–QF and the Izz-Al-Din Al-Qassam Brigades. Sarur was a middle-man between the IRGC–QF and Hamas and worked with Hizballah operatives to ensure the Izz-Al-Din Al-Qassam

Brigades received funds. The IRGC–QF transferred over $200 million USD to the Izz-Al-Din Al-Qassam Brigades in the past four years.[40]

In September 2019, in an action targeting a wide range of terrorists and their supporters using enhanced counterterrorism sanctions authorities, Treasury designated two Iran-linked Hamas officials. Pursuant to the amended counterterrorism E.O., E.O. 13224, Treasury designated Turkey-based Redin Exchange and its Deputy Head, Ismael Tash. Since at least 2017, Tash has had contact with a money transfer channel managed by Mohammad Sarur that transferred IRGC–QF money to Hamas; as of January 2019, Tash was a key player in many Iran-Hamas financial transfers. Treasury also designated Zaher Jabarin, the Turkey-based head of Hamas' Finance Office. Jabarin has overseen the transfer of hundreds of thousands of USD in the West Bank to finance Hamas' terrorist activities; he has also served as a primary interlocutor between Hamas and the IRGC–QF.[41]

## Taliban

Iran seeks influence in Afghanistan in a number of ways, including by offering economic assistance and engaging the central government—but also by arming Taliban fighters and supporting pro-Iranian groups. In October 2010, then-President Hamid Karzai admitted that Iran was providing about $2 million USD annually in cash payments to his government.[42] Treasury designated the Taliban as an SDGT in 2002.

In October 2018, the seven member nations of the Terrorist Financing Targeting Center (TFTC),[43] designated nine Taliban-associated individuals, including those facilitating Iranian support to bolster the Taliban. The Secretary described Iran's provision of support to the Taliban as yet another example of its support for terrorism, and its utter disregard for United Nations Security Council Resolutions (UNSCRs) and other international norms. Treasury noted that the action's inclusion of IRGC–QF members supporting Taliban elements highlighted the scope of Iran's regionally destabilizing behavior.

[34] *Bronx Man and Michigan Man Arrested for Terrorist Activities On Behalf Of Hizballah's Islamic Jihad Organization,* June 8, 2017, *https://www.justice.gov/usao-sdny/pr/bronx-man-and-michigan-man-arrested-terrorist-activities-behalf-hizballah-s-islamic.*

[35] *Ali Kourani Convicted in Manhattan Federal Court for Covert Terrorist Activities on Behalf of Hizballah's Islamic Jihad Organization,* May 17, 2019, *https://www.justice.gov/opa/pr/ali-kourani-convicted-manhattan-federal-court-terrorist-activities-behalf-hizballah-s.*

[36] *Treasury Designates Illicit Russia-Iran Oil Network Supporting the Assad Regime, Hizballah, and Hamas,* November 20, 2018, *https://home.treasury.gov/news/press-release/sm553.*

[37] *Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force,* May 15, 2018, *https://home.treasury.gov/news/press-release/sm0385.*

[38] *Country Reports on Terrorism 2016,* U.S. Department of State, Chapter 3: State Sponsors of Terrorism, Iran, Chapter 6, Foreign Terrorist Organizations, Hamas.

[39] *Iran's Foreign and Defense Policies,* Congressional Research Service, R44017, Version 56, Updated October 9, 2018.

[40] *Treasury Targets Facilitators Moving Millions to HAMAS in Gaza,* August 29, 2019, *https://home.treasury.gov/news/press-release/sm761.*

[41] *Treasury Targets Wide Range of Terrorists and Their Supporters Using Enhanced Counterterrorism Sanctions Authorities,* September 10, 2019, *https://home.treasury.gov/news/press-release/sm772.*

[42] *Iran's Foreign and Defense Policies,* Congressional Research Service, R44017, Version 70, Updated July 23, 2019.

[43] The seven TFTC member states are the U.S., Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the UAE.

Among those designated were Mohammad Ebrahim Owhadi, an IRGC–QF officer, and Abdullah Samad Faroqui, the Taliban Deputy Shadow Governor for Herat Province. In 2017, Owhadi and Faroqui reached an agreement for the IRGC–QF's provision of military and financial assistance to Faroqui, in exchange for Faroqui's forces attacking the Afghan government in Herat. Also designated were Esma'il Razavi, who was in charge of the training center at the IRGC–QF base in Birjand, Iran, which as of 2014, provided training, intelligence, and weapons to Taliban forces in Farah, Ghor, Badhis, and Helmand Provinces, Afghanistan. In 2008, as the senior IRGC–QF official in Birjand, Razavi's base supported anti-coalition militants in Farah and Herat. Also designated by the TFTC were Naim Barich, previously Treasury- and UN-sanctioned, who as of late 2017 was the Taliban Shadow Minister of Foreign Affairs managing Taliban relations with Iran, and Sadr Ibrahim, the leader of the Taliban's Military Commission, whom Iranian officials agreed to provide with financial and training support in order to build the Taliban's tactical and combat capabilities.[44]

d. Entities Involved in the Proliferation of WMD or Missiles

Under UNSCR 2231 (2015), which endorsed the JCPOA, the sale, supply, or transfer to Iran of Nuclear Suppliers Group (NSG)[45]-controlled items requires advance approval by the UNSC. Despite this, in July 2019, Treasury identified and acted against a network of front companies and agents involved in procuring sensitive materials—including NSG-controlled materials—without UNSC approval for sanctioned elements of Iran's nuclear program. Treasury designated seven entities and five individuals in Iran, China, and Belgium, for acting as a procurement network for Iran's Centrifuge Technology Company, which plays a crucial role in Iran's uranium enrichment through the production of centrifuges for Atomic Energy Organization of Iran facilities.[46]

Additionally, in August 2019, Treasury designated two Iranian regime-linked networks pursuant to E.O. 13382 for engaging in covert procurement activities benefiting multiple Iranian military organizations. One network has used a Hong Kong-based front company to evade U.S. and international sanctions and procure tens of millions of dollars' worth of U.S. technology and electronic components on behalf of the IRGC and Iran's missile program. The other network has procured NSG-controlled aluminum alloy products on behalf of MODAFL subsidiaries.[47]

Iran's ongoing pursuit of ballistic missile technology is well known. In 2018, Iran conducted nine ballistic missile tests in defiance of UNSCR 2231 (2015), including the launch of short range ballistic missiles in September and October 2018, which were inconsistent with paragraph 3 of Annex B of UNSCR 2231.[48] The U.S. Secretary of State described Iran's test-firing of a medium-range ballistic missile capable of carrying multiple warheads in December 2018 as another violation of UNSCR 2231.[49] In July 2017, Iran tested a Simorgh space launch vehicle, which the United States, France, Germany, and the United Kingdom all assessed to have used technology similar to that of intercontinental ballistic missiles.[50] In January 2017, Iran launched a medium-range missile able to carry a payload greater than 500 kilograms in excess of 300 kilometers, making it inherently capable of delivering a nuclear explosive device. In 2016, Iran unveiled two short-range ballistic missiles and announced that it was pursuing long-range precision-guided missiles.[51]

In January 2018, two Iranian nationals tried to buy Kh-31 missile components in Kiev, Ukraine, which would have been a violation of the UN arms embargo on Iran. Ukraine's security service detained the men while they were in possession of the missile parts and technical documents on their use. Ukraine subsequently deported the men,

one of whom was a military attaché at Iran's Embassy in Kiev.[52]

According to information available to FinCEN, Iran's Shahid Bakeri Industrial Group (SBIG) and Shahid Hemmat Industrial Group (SHIG), respectively its solid and liquid propellant ballistic missile producers, utilize foreign entities and networks to procure missile-related materials and technology and disguise their involvement in the process. SBIG and SHIG are listed in the annex to E.O. 13382, which targets proliferators of WMD and their supporters. Among the targets in Treasury's August 2019 designation action was the Iranian firm Ebtekar Sanat Ilya, which helped procure more than one million dollars' worth of export-controlled, military-grade electronic components for Iranian military clients—including both SBIG and SHIG.

In February 2017, Treasury designated entities and individuals that were part of the Abdollah Asgharzadeh network in connection with their procurement of dual-use and other goods on behalf of organizations involved in Iran's ballistic missile program. The network coordinated procurement through intermediary companies that obfuscated the true end-user of the goods, and relied on the assistance of trusted brokers based in China.[53]

Factor 2: The Extent to Which That Jurisdiction Is Characterized by High Levels of Official or Institutional Corruption

The endemic corruption of Iran's government is well-known. According to information available to FinCEN, in late 2017, IRGC officials were aware of corruption and mismanagement at an IRGC economic development firm. The officials estimated the cost of the corruption to be approximately $5.5 billion USD—a figure which represented losses, debts, and funds required for a capital injection to facilitate the firm's dissolution.

Also according to information available to FinCEN, as of mid-January 2018, after hearing complaints about corruption in the armed forces' financial institutions, Iranian Supreme Leader Ali Hoseini Khamenei issued a directive requiring Iran's armed forces to sell the private companies they owned. However, because Khamenei permitted

---

[44] *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters,* October 23, 2018, *https://home.treasury.gov/news/press-release/sm532.*

[45] The NSG is a multinational export control regime that seeks to prevent nuclear proliferation by controlling the export of materials, equipment, and technology that can be used to manufacture nuclear weapons.

[46] *Treasury Sanctions Global Iranian Nuclear Enrichment Network,* July 18, 2019, *https://home.treasury.gov/news/press-release/sm736.*

[47] *Treasury Targets Procurement Networks Supporting Iran's Missile Proliferation Programs,* August 28, 2019, *https://home.treasury.gov/news/press-release/sm759.*

[48] *Letter from the Permanent Representative of Israel to the UN,* November 23, 2018.

[49] *Pompeo Condemns Iran Missile Test,* Reuters, December 1, 2018.

[50] *Letter from the Permanent Mission of the Federal Republic of Germany to the UN, United Kingdom Mission to the UN, and the Mission Permanente De La France Aupres Des Nations Unies to H.E. Mr. Ma Zhaoxu, Ambassador, Permanent Representative of the People's Republic of China to the UN,* November 20, 2018.

[51] *Iran's Missile Proliferation: A Conversation with Special Envoy Brian Hook,* Hudson Institute, September 19, 2018.

[52] *Busted: Ukraine Catches Iranian Military Attaché Trying to Smuggle KH–31 Parts out of Kiev,* The National Interest, July 2, 2019.

[53] *Treasury Sanctions Supporters of Iran's Ballistic Missile Program and Iran's Islamic Revolutionary Guard Corps-Qods Force,* February 23, 2017, *https://www.treasury.gov/press-center/press-releases/Pages/as0004.aspx.*

PX235

the armed forces to use revenue from the sales to then purchase shares in the same companies, the directive appeared to be a mere symbolic gesture to placate public pressure, not a genuine effort to lessen the IRGC's role in the economy or curb corruption.

In October 2018, Treasury designated an Iran-based network comprised of businesses providing financial support to the Basij Resistance Force, a paramilitary force subordinate to the IRGC. As noted at the time of the designation, among other malign activities, the IRGC Basij militia recruits, trains, and deploys child soldiers to fight in IRGC-fueled conflicts across the region. The Basij also employs shell companies and other measures to mask its ownership and control over a variety of multibillion-dollar business interests in Iran's automotive, mining, metals, and banking industries.[54]

In June 2019, Treasury designated Iran's largest and most profitable petrochemical holding group, Persian Gulf Petrochemical Industries Company, for providing financial support to Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC. Treasury noted that the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile, and mining industries.[55]

Factor 3: The Substance and Quality of Administration of the Bank Supervisory and Counter-Money Laundering Laws of That Jurisdiction

For more than a decade, the international community has been concerned about the deficiencies in Iran's anti-money laundering/countering the financing of terrorism (AML/CFT) program. As far back as October 11, 2007, the Financial Action Task Force (FATF) issued a statement on Iran's lack of a comprehensive AML/CFT regime, noting it represented a significant vulnerability in the international financial system. The FATF called upon Iran to urgently address its AML/CFT deficiencies, and advised financial institutions to apply enhanced due

diligence.[56] In February 2009, the FATF elevated its call for enhanced due diligence by calling upon its members and urging all jurisdictions to apply effective counter-measures to protect their financial sectors from money laundering and terrorist financing risks emanating from Iran.

In June 2016, due to Iran's adoption of, and high-level political commitment to, an Action Plan to address its strategic AML/CFT deficiencies, the FATF agreed to suspend counter-measures for 12 months in order to monitor Iran's progress in implementing its Action Plan. At the same time however, the FATF expressed its continuing concern with the terrorist financing risk emanating from Iran and the threat this posed to the international financial system, and called for financial institutions to continue applying enhanced due diligence with respect to Iran-related business relationships and transactions.[57] The FATF issued similar statements between October 2016 and June 2017, and in October 2018 and February 2019 identified specific types of enhanced due diligence measures to be applied against Iran-related business relationships and transactions.[58]

In its June 2019 and October 2019 Public Statements, the FATF noted that Iran's Action Plan had expired in January 2018 and that major items remained outstanding, including (1) adequately criminalizing terrorist financing, including by removing the exemption for designated groups "attempting to end foreign occupation, colonialism, and racism;" (2) identifying and freezing terrorist assets in line with the relevant UNSCRs; (3) ensuring an adequate and enforceable customer due diligence regime; (4) clarifying that the submission of suspicious transaction reports for attempted terrorist financing-related transactions is covered under Iran's legal framework; (5) demonstrating how authorities are identifying and sanctioning unlicensed money/value transfer service providers; (6) ratifying and implementing the Palermo and Terrorist Financing Conventions and clarifying the capability to provide mutual legal assistance; and (7) ensuring that financial institutions verify that wire

transfers contain complete originator and beneficiary information.[59][60]

Due to these critical deficiencies, in June 2019, the FATF decided to call upon its members and urge all jurisdictions to increase supervisory examination for branches and subsidiaries of financial institutions based in Iran.[61] In October 2019, the FATF decided to call upon its members and urge all jurisdictions to introduce enhanced relevant reporting mechanisms or systematic reporting of financial transactions; and require increased external audit requirements for financial groups with respect to any of their branches and subsidiaries located in Iran.[62] The FATF followed this new requirement with a warning stating that if before February 2020, Iran does not enact the Palermo and Terrorist Financing Conventions in line with the FATF Standards, then the FATF will fully lift the suspension of counter-measures and call on its members and urge all jurisdictions to apply effective counter-measures.[63]

A number of public statements from senior Iranian government officials suggest that Iran has no real intention of adhering to international norms, including the FATF standards. On March 8, 2019, Gholamreza Mesbahi Moghaddam, senior member of Iran's Expediency Council, the highest-level political institution after the office of the Supreme Leader, said "Passing CFT and Palermo means giving away our only remaining mechanism to bypass U.S. sanctions which is to register shell corporations in Iran and other countries to do international trade deals."[64] On February 1, 2019, former Iranian Defense Minister Brigadier General Ahmad Vahidi, also an Expediency Council member, said, the [FATF] recommendations threaten Iran's economy and it is a framework adopted by the global arrogance to impose restrictions on Iran and pursue the

[54] *Treasury Designates Vast Financial Network Supporting Iranian Paramilitary Force That Recruits and Trains Child Soldiers,* October 16, 2018, *https://home.treasury.gov/news/press-release/sm524.*

[55] *Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents,* June 7, 2019, *https://home.treasury.gov/news/press-release/sm703.*

[56] *FATF Statement on Iran,* 11 October 2007, *https://www.fincen.gov/sites/default/files/shared/FATFOct2007.pdf.*

[57] *Public Statement—24 June 2016, https://www.fatf-gafi.org/publications/high-riskandnon-cooperativejurisdictions/documents/public-statement-june-2016.html.*

[58] *Public Statement—23 June 2017, https://www.fatf-gafi.org/publications/high-riskandnon-cooperativejurisdictions/documents/public-statement-june-2017.html.*

[59] *Public Statement—June 2019, https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/public-statement-june-2019.html.*

[60] *Public Statement—October 2019, https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/public-statement-october-2019.html.*

[61] *Public Statement—June 2019, https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/public-statement-june-2019.html.*

[62] *Public Statement—October 2019, https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/public-statement-october-2019.html.*

[63] *Id.*

[64] *Mesbahi Moghaddam: We Will Not Stop Evading Sanctions,* Iran International, March 9, 2019, *https://iranintl.com/en/iran/mesbahi-moghaddam-we-will-not-stop-evading-sanctions.*

sanctions re-imposed against Tehran in smarter ways.'' [65] On September 9, 2018, Ayatollah Ahmad Jannati, secretary of Iran's powerful Guardian Council, said, ''I've studied both the Persian and English versions and I soon came to the conclusion that they want to give our financial and banking information to the enemy. They want us to sanction ourselves. They want us to sanction the individuals and institutions that the enemy disagrees with. They want us to sanction the [IRGC], revolutionary institutions, and individuals.'' [66]

Factor 4: Whether the United States Has a Mutual Legal Assistance Treaty (MLAT) With That Jurisdiction, and the Experience of U.S. Law Enforcement Officials and Regulatory Officials in Obtaining Information About Transactions Originating in or Routed Through Such Jurisdiction

The United States and Iran have not had a substantive relationship since the hostage-taking of U.S. Embassy personnel by Iranians in November 1979, and subsequent severing of diplomatic relations in April 1980.

MLATs facilitate the exchange of information and financial records with treaty partners in criminal and related matters. The State Department negotiates MLATs in cooperation with the U.S. Department of Justice. As of the date of this document, no MLAT is in force with Iran. Additionally, the Egmont Group is an international organization through which many countries' financial intelligence units (FIUs) share invaluable financial and other information useful in law enforcement and regulatory investigations. As the U.S. FIU, FinCEN is the U.S. representative to the Egmont Group. No Iranian government entity is, nor ever has been, a member of the Egmont Group.

Given the lack of any cooperative relationship generally, as well as Iran's inability to share information with the United States via an MLAT or the Egmont Group, the level of U.S.-Iran cooperation on AML/CFT matters is nonexistent. As a result, U.S. law enforcement and regulatory officials have an extremely limited ability to obtain information about transactions originating in or routed through Iran.

## VI. Considerations in Selecting the Fifth Special Measure

Below is a discussion of the relevant criteria FinCEN considered in selecting a prohibition under the fifth special measure with respect to Iran, after having completed the required interagency consultations with Chairman of the Board of Governors of the Federal Reserve System, the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the National Credit Union Administration Board in accordance with 31 U.S.C. 5318(a)(4)(A) and the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System in accordance with 31 U.S.C. 5318A(b)(5).

### Whether Similar Action Has Been or Will Be Taken by Other Nations or Multilateral Groups Against Iran

FinCEN notes that two Iranian banks are currently designated by the European Union as entities subject to an asset freeze and prohibition to make funds available: Ansar Bank and Mehr Bank. FinCEN is unaware of any other nation or multilateral group that has prohibited or placed conditions on Iranian banks' correspondent banking relationships, or has plans to do so. However, as noted previously, in October 2019, the FATF decided to call upon its members and urge all jurisdictions to introduce enhanced relevant reporting mechanisms or systematic reporting of financial transactions; and require increased external audit requirements for financial groups with respect to any of their branches and subsidiaries located in Iran. The FATF followed this new requirement with a warning stating that if before February 2020, Iran does not enact the Palermo and Terrorist Financing Conventions in line with the FATF Standards, then the FATF will fully lift the suspension of counter-measures and call on its members and urge all jurisdictions to apply effective counter-measures.[67] Regardless of the FATF's future actions, FinCEN assesses that the correspondent account prohibition under the fifth special measure is necessary to ensure the security of the U.S. financial system and combat Iran's malign and illicit activities, including its support for international terrorism.

### Whether the Imposition of the Fifth Special Measure Would Create a Significant Competitive Disadvantage, Including Any Undue Cost or Burden Associated With Compliance, for Financial Institutions Organized or Licensed in the United States

Existing sanctions programs on Iran administered by OFAC generally prohibit the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services to Iran. As a result, U.S. financial institutions are already broadly prohibited under existing OFAC sanctions from opening or maintaining correspondent accounts for, or on behalf of, Iranian financial institutions, or conducting any financial transactions involving Iranian financial institutions unless exempt from U.S. sanctions or authorized by OFAC. In addition, as of late September 2019, 24 Iranian financial institutions had been designated under E.O. 13224, ten Iranian financial institutions under E.O. 13382, one Iranian financial institution under E.O. 13846, and one Iranian financial institution under E.O. 13553. Secondary sanctions apply to certain transactions with each of these Iranian banks.[68] FinCEN assesses that secondary sanctions already deter most foreign financial institutions from doing business with targeted Iranian financial institutions, and the correspondent account prohibition under the fifth special measure will create no competitive disadvantage for U.S. financial institutions.

### The Extent to Which the Action or Timing of the Action Will Have a Significant Adverse Systemic Impact on the International Payment, Clearance, and Settlement System, or on Legitimate Business Activities of Iranian Financial Institutions

FinCEN has no information indicating that Iranian financial institutions are major participants in the international payment system or that they are relied upon by the international banking community for clearance or settlement services. Further, as of mid-November 2018, the Society for Worldwide Interbank Financial Telecommunication (SWIFT) had disconnected designated Iranian financial institutions, including the CBI, from its financial messaging service. Lastly, FinCEN assesses that most Iranian payments are made using currencies other than USD due to a long

---

[65] *Iran Warns Europe to Avoid Tying Up INSTEX to FATF,* February 5, 2019, *https://en.farsnews.com/newstext.aspx?nn=13971116000195.*

[66] *Iran Faces Challenges in Implementing Its FATF Action Plan,* October 26, 2016, *https://www.washingtoninstitute.org/policy-analysis/view/iran-faces-challenges-in-implementing-its-fatf-action-plan; https://www.aryanews.com/news/20160909150648732* (original Farsi-language article)

[67] *Public Statement—June 2019, https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/public-statement-june-2019.html.*

[68] Secondary sanctions generally are directed toward non-U.S. persons for specified conduct involving Iran that occurs entirely outside of U.S. jurisdiction, according to OFAC's website.

PX235

history of U.S. sanctions and actions targeting Iran. Thus, there is no reason to conclude that the imposition of a prohibition under the fifth special measure against the jurisdiction of Iran will have an adverse systemic impact on the international payment, clearance, and settlement system. FinCEN also considered the extent to which this action could have an impact on the legitimate business activities of Iranian financial institutions, and has concluded that the need to protect the U.S. financial system from Iran strongly outweighs any such impact.

*The Effect of the Action on U.S. National Security and Foreign Policy*

FinCEN assesses that prohibiting covered financial institutions from maintaining correspondent accounts for Iranian financial institutions, and preventing Iranian financial institutions' indirect access to U.S. correspondent accounts, will enhance national security. The action serves as a measure to further prevent illicit Iranian actors from accessing the U.S. financial system. It will further the U.S. national security and foreign policy goals of thwarting and exposing illicit Iranian financial activity. Further, to the extent that other nations, particularly those that are strong U.S. trading partners, choose to transact with Iran, there is a greater risk of indirect activity occurring between U.S. financial institutions and Iran. Imposition of the fifth special measure will impose a higher standard of due diligence on U.S. financial institutions in their engagement with non-U.S. financial institutions.

*Consideration of Alternative Special Measures*

As an alternative to a prohibition under the fifth special measure on the opening or maintenance of correspondent accounts in the United States for or on behalf of Iranian financial institutions, and the use of foreign financial institutions' correspondent accounts at covered U.S. financial institutions to process transactions involving Iranian financial institutions, FinCEN considered special measures one through four, which impose additional recordkeeping, information collection, and reporting requirements on covered U.S. financial institutions. Under special measure five, FinCEN also considered imposing conditions on the opening or maintaining of correspondent accounts as an alternative to a prohibition on the opening or maintaining of correspondent accounts.

Given the nature of the illicit finance threat, including the terrorist-finance threat, that the jurisdiction of Iran poses to the United States and the U.S. financial system, Iran's well-documented history of obscuring the true nature of its illicit finance activities, and Iran's apparent disregard of regulatory reform and enforcement measures, as evidenced by the FATF's longstanding criticisms of its inadequate AML/CFT program, FinCEN assesses that any condition, additional recordkeeping, information collection, or reporting requirement would be insufficient to guard against the risks posed by covered financial institutions that process Iran-related transactions designed to obscure the transactions' true purpose, and that are ultimately for the benefit of illicit Iranian actors or activities. Special measures one through four and the imposition of conditions under special measure five would therefore fail to prevent Iran from accessing the U.S. financial system, either directly or indirectly, through the correspondent accounts at covered U.S. institutions. FinCEN assesses that a prohibition under the fifth special measure is the only special measure that can adequately protect the U.S. financial system from the illicit financial risk posed by Iran.

**VII. Section-by-Section Analysis for the Imposition of a Prohibition Under the Fifth Special Measure**

*Section 1010.661(a)—Definitions*

1. Iranian Financial Institution

The final rule defines "Iranian financial institution" as any foreign financial institution, as defined at 31 CFR 1010.605(f), organized under Iranian law wherever located, including any agency, branch, office, or subsidiary of such a financial institution operating in any jurisdiction, and any branch or office within Iran of any foreign financial institution.

2. Correspondent Account

The final rule defines "correspondent account" to have the same meaning as the definition contained in 31 CFR 1010.605(c). In the case of a U.S. depository institution, this broad definition includes most types of banking relationships between a U.S. depository institution and a foreign bank that are established to provide regular services, dealings, and other financial transactions, including a demand deposit, savings deposit, or other transaction or asset account, and a credit account or other extension of credit. FinCEN is using the same definition of "account" for purposes of this final rule as was established for depository institutions in the final rule

implementing the provisions of Section 312 of the USA PATRIOT Act requiring enhanced due diligence for correspondent accounts maintained for certain foreign banks.[69] Under this definition, "payable-through accounts" are a type of correspondent account. In the case of securities broker-dealers, futures commission merchants, introducing brokers-commodities, and investment companies that are open-end companies ("mutual funds"), FinCEN is also using the same definition of "account" for purposes of this final rule as was established for these entities in the final rule implementing the provisions of Section 312 of the USA PATRIOT Act requiring enhanced due diligence for correspondent accounts maintained for certain foreign banks.[70]

3. Covered Financial Institution

The final rule defines "covered financial institution" with the same definition used in the final rule implementing the provisions of Section 312 of the USA PATRIOT Act, which in general includes the following:

• An insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h)));

• a commercial bank;

• an agency or branch of a foreign bank in the United States;

• a Federally-insured credit union;

• a savings association;

• a corporation acting under section 25A of the Federal Reserve Act (12 U.S.C. 611);

• a trust bank or trust company;

• a broker or dealer in securities;

• a futures commission merchant or an introducing broker-commodities; and

• a mutual fund.

4. Foreign bank

The final rule defines "foreign bank" to mean a bank organized under foreign law, or an agency, branch, or office located outside the United States of a bank. The term does not include an agent, agency, branch, or office within the United States of a bank organized under foreign law. This is consistent with the definition of "foreign bank" under 31 CFR 1010.100.

5. Subsidiary

The final rule defines "subsidiary" to mean a company of which more than 50 percent of the voting stock or analogous equity interest is owned by another company.

---

[69] *See* 31 CFR 1010.605(c)(2)(i).
[70] *See* 31 CFR 1010.605(c)(2)(ii)–(iv).

PX235

*Section 1010.661(b)—Prohibition on Accounts and Due Diligence Requirements for Covered Financial Institutions*

1. Prohibitions on Opening or Maintaining Correspondent Accounts

Section 1010.661(b)(1) and (2) of this final rule prohibits covered financial institutions from opening or maintaining in the United States correspondent accounts for, or on behalf of, Iranian financial institutions, unless such account is authorized by OFAC. In addition, under § 1010.661(b)(2) of this final rule, a covered financial institution shall take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves an Iranian financial institution, unless such transactions or payments are authorized by OFAC.

Section 1010.661(b)(2) requires covered financial institutions to take reasonable steps to not process transactions for the correspondent accounts of foreign banks in the United States involving Iranian financial institutions that are prohibited transactions.

The general licenses (*i.e.,* those of general applicability) issued pursuant to the Iranian Transactions Sanctions Regulations (ITSR) 31 CFR part 560 are either published in the ITSR or available on OFAC's website: *http:// www.treasury.gov/resource-center/ sanctions/programs/pages/iran.aspx*. To ensure that those permitted activities are available as a practical matter, correspondent accounts covered by the exception may continue to be used to conduct those permitted transactions. Such reasonable steps are described in § 1010.661(b)(3), which sets forth the special due diligence requirements a covered financial institution will be required to take when it knows or has reason to believe that a transaction involves an Iranian financial institution.

2. Special Due Diligence for Correspondent Accounts

As a corollary to the prohibition set forth in § 1010.661(b)(1) and (2), § 1010.661(b)(3) of the final rule will require covered financial institutions to apply to all of their foreign correspondent accounts special due diligence that is reasonably designed to guard against such accounts being used to process prohibited transactions involving Iranian financial institutions. As part of that special due diligence, covered financial institutions are required to notify those foreign correspondent account holders that the covered financial institutions know, or

have reason to believe, provide services to Iranian financial institutions, that such correspondent institutions may not provide the Iranian financial institutions with access to the correspondent accounts maintained at the covered financial institutions to process prohibited transactions. A covered financial institution may satisfy this notification requirement using the following notice:

Notice: Pursuant to U.S. regulations issued under Section 311 of the USA PATRIOT Act, see 31 CFR 1010.661, we are prohibited from opening or maintaining in the United States a correspondent account for, or on behalf of, any Iranian financial institution. The regulations also require us to notify you that you may not provide an Iranian financial institution, including any of its agencies, branches, offices, or subsidiaries, with access to the correspondent account you hold at our financial institution to process transactions that are prohibited, and not authorized or exempt, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), any regulation, order directive or license issued pursuant thereto, or any other sanctions program administered by the Department of the Treasury's Office of Foreign Asset Control ("prohibited transactions"). If we become aware that the correspondent account you hold at our financial institution has processed any prohibited transactions involving Iranian financial institutions, including any agencies, branches, offices, or subsidiaries thereof, we will be required to take appropriate steps to prevent such access, including terminating your account.

The purpose of the notice requirement is to aid cooperation with correspondent account holders in preventing transactions involving Iranian financial institutions from accessing the U.S. financial system. FinCEN does not require or expect a covered financial institution to obtain a certification from any of its correspondent account holders that access will not be provided to comply with this notice requirement. Methods of compliance with the notice requirement could include, for example, transmitting a notice by mail, fax, or email. The notice should be transmitted whenever a covered financial institution knows or has reason to believe that a foreign correspondent account holder provides services to an Iranian financial institution.

Special due diligence also includes implementing risk-based procedures designed to identify any use of correspondent accounts to process transactions involving Iranian financial institutions. A covered financial institution is expected to apply an appropriate screening mechanism to identify a funds transfer order that on its face listed an Iranian financial institution as originator or beneficiary,

or otherwise referenced an Iranian financial institution in a manner detectable under the financial institution's normal screening mechanisms. An appropriate screening mechanism could be the mechanisms used by a covered financial institution to comply with various legal requirements, such as the commercially available software programs used to comply with the economic sanctions programs administered by OFAC.

3. Recordkeeping and Reporting

Section 1010.661(b)(4) of this rule clarifies that paragraph (b) of the rule does not impose any reporting requirement upon any covered financial institution that is not otherwise required by applicable law or regulation. A covered financial institution must, however, document its compliance with the notification requirement under § 1010.661(b)(3)(i)(A).

## VIII. Paperwork Reduction Act

The collection of information contained in this final rule is being submitted to the Office of Management and Budget for review in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), and has been assigned OMB Control Number 1506–0074. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number.

*Description of Affected Financial Institutions:* Banks, broker-dealers in securities, futures commission merchants, introducing brokers-commodities, and mutual funds.

*Estimated Number of Affected Financial Institutions:* 23,615.[71]

*Estimated Average Annual Burden in Hours per Affected Financial Institution:* The estimated average burden associated with the collection of information in this final rule is two

---

[71] This number is a total of: (1) The institutions represented in the most recent reports of the following regulators: the NCUA, who reported 5,375 institutions as of December 31, 2018 in its *Quarterly Credit Union Data Summary: 2018 Q4,* and the FDIC, who reported 5,358 FDIC-insured institutions in its *Key Statistics* as of April 25, 2019; (2) a March 2017 Government Accountability Office *Report PRIVATE DEPOSIT INSURANCE: Credit Unions Largely Complied with Disclosure Rules, but Rules Should Be Clarified,* that indicated that approximately 125 credit unions were insured privately; (3) 1,130 introducing brokers and 64 futures commodities merchants reported by the National Futures Association on its website as of March 31, 2019; (4) 3,607 securities firms as of December 31, 2018 as reported by FINRA on its website; and, (5) 7,956 U.S. mutual funds, according to the *2018 Investment Company Fact Book* published by the Investment Company Institute.

PX235

hours per affected financial institution.[72]

*Estimated Total Annual Burden:* 47,230 hours.

## List of Subjects in 31 CFR Part 1010

Administrative practice and procedure, Banks and banking, Brokers, Counter-money laundering, Counter-terrorism, Foreign banking.

## Authority and Issuance

For the reasons set forth in the preamble, Part 1010, chapter X of title 31 of the Code of Federal Regulations, is amended as follows:

## PART 1010—GENERAL PROVISIONS

■ 1. The authority citation for Part 1010 continues to read as follows:

**Authority:** 12 U.S.C. 1829b and 1951–1959; 31 U.S.C. 5311–5314, 5316–5332; Title III, sec. 314, Pub. L. 107–56, 115 Stat. 307; sec. 701, Pub. L. 114–74, 129 Stat. 599.

■ 2. Add § 1010.661 to read as follows:

### § 1010.661  Special measures against Iran.

(a) *Definitions.* For purposes of this section:

(1) *Iranian financial institution* means any foreign financial institution, as defined at § 1010.605(f), organized under Iranian law wherever located, including any agency, branch, office, or subsidiary of such a financial institution operating in any jurisdiction, and any branch or office within Iran of any foreign financial institution.

(2) *Correspondent account* has the same meaning as provided in § 1010.605(c).

(3) *Covered financial institution* has the same meaning as provided in § 1010.605(e)(1).

(4) *Foreign bank* has the same meaning as provided in § 1010.100.

(5) *Subsidiary* means a company of which more than 50 percent of the voting stock or analogous equity interest is owned by another company.

(b) *Prohibition on accounts and due diligence requirements for covered financial institutions*—(1) *Opening or maintaining correspondent accounts for Iranian financial institutions.* A covered financial institution shall not open or maintain in the United States a correspondent account for, or on behalf of, an Iranian financial institution, unless such account is authorized by United States Department of the

Treasury's Office of Foreign Assets Control (OFAC).

**Note 1 to paragraph (b)(1):** *Note that covered financial institutions should block and report to OFAC any accounts that are blocked pursuant to any OFAC sanctions authority and therefore should continue to maintain such accounts in accordance with the Reporting Procedures and Penalties Regulations, 31 CFR part 501.*

(2) *Prohibition on use of correspondent accounts.* A covered financial institution shall take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves an Iranian financial institution, unless the transaction is authorized by, exempt from, or not prohibited under the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 *et seq.*), any regulation, order, directive, or license issued pursuant thereto, or any other sanctions program administered by the Department of the Treasury's Office of Foreign Asset Control.

(3) *Special due diligence of correspondent accounts to prohibit use.* (i) A covered financial institution shall apply special due diligence to the correspondent accounts of a foreign bank that is reasonably designed to guard against their use to process transactions involving Iranian financial institutions that are prohibited, and not authorized or exempt, pursuant to the IEEPA, any regulation, order, directive, or license issued pursuant thereto, or any other sanctions program administered by the Department of the Treasury's Office of Foreign Asset Control ("prohibited transactions"). At a minimum, that special due diligence must include:

(A) Notifying those foreign correspondent account holders that the covered financial institution knows or has reason to believe the correspondent account is being used to process transactions involving Iranian financial institutions that such prohibited transactions may not take place; and

(B) Taking reasonable steps to identify any use of its foreign correspondent accounts for prohibited transactions involving Iranian financial institutions, to the extent that such use can be determined from transactional records maintained in the covered financial institution's normal course of business.

(ii) A covered financial institution shall take a risk-based approach when deciding what, if any, other due diligence measures it reasonably must adopt to guard against the use of its foreign correspondent accounts to process prohibited transactions involving Iranian financial institutions.

(iii) A covered financial institution that knows or has reason to believe that a foreign bank's correspondent account has been or is being used to process prohibited transactions involving Iranian financial institutions shall take all appropriate steps to further investigate and prevent such access, including the notification of its correspondent account holder under paragraph (b)(3)(i)(A) of this section and, where necessary, termination of the correspondent account.

(4) *Recordkeeping and reporting.* (i) A covered financial institution is required to document its compliance with the notice requirement set forth in this section.

(ii) Nothing in this section shall require a covered financial institution to report any information not otherwise required to be reported by law or regulation.

**Kenneth A. Blanco,**

*Director, Financial Crimes Enforcement Network.*

[FR Doc. 2019–23697 Filed 11–1–19; 8:45 am]

**BILLING CODE 4810–02–P**

## NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

## National Endowment for the Humanities

## 45 CFR Part 1169

## RIN 3136–AA18

## Implementation of the Privacy Act of 1974

**AGENCY:** National Endowment for the Humanities, National Foundation on the Arts and the Humanities.

**ACTION:** Final rule; technical correction.

**SUMMARY:** On July 19, 2019, the National Endowment for the Humanities (NEH) published in a final rule implementing its agency-specific Privacy Act regulation. This document makes technical corrections to that rule.

**DATES:** Effective November 4, 2019.

**FOR FURTHER INFORMATION CONTACT:** Elizabeth Voyatzis, Deputy General Counsel, Office of the General Counsel, National Endowment for the Humanities, 400 Seventh Street SW, Room 4060, Washington, DC 20506; (202) 606–8322; gencounsel@neh.gov.

**SUPPLEMENTARY INFORMATION:** On July 19, 2019, NEH published a final rule at 84 FR 34788 implementing its agency-specific Privacy Act regulation. That rule amended 45 CFR chapter XI, subchapter D, by adding part 1169.

---

[72] The estimated burden is two hours per financial institution—one hour for a senior executive of the financial institution to review and approve the notice to be provided to correspondent account holders, and one hour for a compliance officer to provide notice to correspondent account holders.

PX241



# THE U.S. ARMY IN THE
# IRAQ WAR

## VOLUME 1

## INVASION • INSURGENCY • CIVIL WAR

### 2003-2006

Colonel Joel D. Rayburn
Colonel Frank K. Sobchak
Editors

*with*

Lieutenant Colonel Jeanne F. Godfroy
Colonel Matthew D. Morton
Colonel James S. Powell
Lieutenant Colonel Matthew M. Zais

UNITED STATES
ARMY WAR COLLEGE
PRESS
Carlisle Barracks, PA

PX241

lower-class neighborhoods in Baghdad's Saddam City (later renamed Sadr City in 2003) and other areas where jobs were scarce.[50]

## The Iraqi Resistance to Saddam

The regime's mid-1990s restructuring coincided with a series of internal challenges to Saddam's rule. The most prominent came from within his own family. In August 1995, Saddam's son-in-law and kinsman, Hussein Kamal al-Majid, defected from his senior post overseeing Iraq's weapons of mass destruction (WMD) programs and set himself up in opposition to Saddam in Jordan. Just 6 months later, however, Saddam lured Hussein Kamal back to Baghdad with a promise of amnesty, only to immediately execute him for treason.[51]

Other challenges came from within Ba'athist and Sunni tribal networks that had once been Saddam loyalists. After the 1991 uprising, Saddam hoped to bolster his regime by empowering Iraq's tribes, just as he had empowered its Islamists. He reversed the long-standing Ba'athist policy of suppressing tribal identity and restored the power of tribal sheikhs, even allowing the arming of tribal militias with heavy weapons meant to be used against invaders or insurgents if a 1991-type crisis should recur. But the pro-tribal policy created new dangers as well. In May 1995, the Albu Nimr tribe, part of Anbar's large Dulaim tribal confederation, rose in revolt in Ramadi after the regime executed three senior Dulaimi generals who had criticized Uday. The Special Republican Guard quickly suppressed the uprising, but the incident demonstrated Ramadi's restiveness and the fractures between Anbaris and the Ba'athist regime.[52] Nor was Saddam's support within the Ba'ath Party fully assured. In June 1996, Saddam's intelligence apparatus uncovered a coup plot involving more than 100 officers coordinated by former Iraqi general Mohammed Shahwani, a Sunni Turkoman from northern Iraq who lost three sons among the 85 Iraqis executed for their roles in the conspiracy.[53]

Others among Saddam's opponents took advantage of his Faith Campaign to mobilize against the regime. The Salafi networks that Saddam had encouraged contained not just Ba'athists sent for religious indoctrination, but also "pure" Salafis opposed to secular states in the Muslim world. In the late 1990s, the most militant of the pure Salafis began a low-level terrorist campaign against the Ba'ath Party, carrying out intermittent attacks against Ba'athist targets.[54] The emergence of this threat led Saddam's half-brother and intelligence chief Barzan al-Tikriti to warn Saddam in 2000 that the Islamist groups the regime was supporting would eventually try to topple the Ba'ath.[55]

Finally, from their bases inside Iran, Badr Corps members conducted cross-border operations into Iraq throughout the 1990s. Formed by the Iranian regime during the Iran-Iraq war, the Badr Corps was comprised of Iraqi prisoners of war who had defected to Iran, as well as Iraqi refugees who had fled to Iran. The Badr Corps and affiliates such as the shadowy Sheibani Network sought to gather intelligence and carry out acts of sabotage and subversion in the Shi'a south, intending to lay the groundwork for an eventual revolt. The Iranian regime directly sponsored these activities through the Quds Force of the Islamic Revolutionary Guards Corps, which by 1998 came under the command of Iranian general Qassem Soleimani.[56]

PX241

campaign to topple the Taliban in Afghanistan had a profound impact on U.S. decision makers as well. The apparent success of a tiny footprint of U.S. forces—mainly special operations forces—working with indigenous Afghan fighters from the Northern Alliance appeared to some in the U.S. national security apparatus, especially those who already espoused RMA, to point the way toward a similar method by which Saddam might be toppled with far less cost and trouble than the Clinton administration or CENTCOM's Desert Crossing had assumed. In other words, the experience of the 9/11 attacks and the weeks that followed them indicated to some U.S. leaders that the removal of Saddam was not only an immediate necessity, but also an easy prospect—a dramatic change from the outlook of the 1990s.

Back in Baghdad, for reasons well documented by the Iraqi Perspectives Project and other engagements with former Ba'athist regime insiders, the 9/11 attacks and the U.S. invasion of Afghanistan made little impact on Saddam's strategic calculus. He continued to harbor a greater fear of an internal Iraqi uprising than of an attack by the United States and remained convinced that he had to maintain the fiction of possessing WMD in order to deter regional enemies, especially Iran. Saddam took from the Afghanistan example only those points that reinforced his assumptions about the United States, including his overarching judgment that the United States would never mount a large-scale land invasion to remove him from power, just as the United States had declined to do against the Taliban, relying largely on indigenous forces instead. Nor did the demonstration of U.S. military technology make an impact on the Iraqi Army's operating concepts. Saddam did not recognize that the U.S. will to use force to remove him had fundamentally changed after 9/11, and, as a result, he would fail to allow his military leaders to make professionally sound plans to resist a U.S. invasion.[75]

The invasion of Afghanistan had a much more significant impact on other American adversaries. Abu Musab al-Zarqawi, who had commanded a group of Arab mujahideen in Afghanistan, led his organization into Iran as the United States and its Afghan allies toppled the Taliban in late 2001, proceeding from there to Iraqi Kurdistan. There they sheltered in a small enclave near Halabjah controlled by Ansar al-Islam, a militant group comprised of mainly Kurdish Islamists who had fought in Afghanistan and were actively fighting against local PUK peshmerga. From his Iraqi sanctuary, Zarqawi began to organize his Tawhid wal-Jihad terrorist group to carry out attacks in the region, including the 2002 assassination of U.S. Agency for International Development (USAID) official Laurence M. Foley, Sr., in Jordan, and to look for opportunities to expand his jihad.[76]

\*\*\*

On the eve of the 2003 invasion of Iraq, the U.S. Army was much decreased from its Cold War size, while sustaining a high tempo of stability operations around the world. Defense thinkers concluded that Operation DESERT STORM marked a revolution in the nature of war, after which technology would enable the U.S. military to defeat any enemy with a relatively small force. The U.S. military of the 1990s, writ large, had developed a low tolerance both for casualties and for mistakes by tactical commanders. As it reduced its combat formations, the Army had outsourced much of its logistical services, including for contingency operations, on which it had become accustomed to deploying

PX241

Al-Qaeda leaders viewed the emergence of Ansar al-Islam as an opportunity to expand their foothold in the Middle East. Ansar al-Islam's leaders, Mullah Krekar and Abu Abdullah al-Shafi, worked openly with al-Qaeda, and al-Qaeda, in turn, provided resources, training, and guidance to the group, enabling it to carve out a miniature Islamic state in the Halabjah area. From there, Shafi used his ties with Iraqi Salafis to grow Ansar al-Islam's support base further by incorporating underground Sunni extremist networks in Ninawa Province.[60]

With the fall of the Taliban in late 2001, Ansar al-Islam sheltered a number of al-Qaeda members and affiliates fleeing Afghanistan. One of those who sought refuge with Ansar al-Islam was Abu Musab al-Zarqawi, who had served with al-Qaeda in Afghanistan but had been



Source: Wikimedia Commons, the free media repository by Frida Tørring.

**Ansar al-Islam Leader Mullah Krekar.**[61]

reluctant to swear fealty to al-Qaeda's senior leadership. Zarqawi's stubborn independence and international ambitions complicated Ansar al-Islam's efforts to establish an Islamic emirate in Kurdistan. The secular PUK viewed Ansar al-Islam and Zarqawi as a threat, particularly after the organization began targeting Kurdish civilians and PUK affiliates. Zarqawi also used the Ansar al-Islam infrastructure to conduct crude experiments with chemical and biological weapons, though the limitations of the group's facilities and his peoples' lack of chemical expertise constrained his efforts. One unintended consequence of these experiments was that they attracted the attention of Western and Middle Eastern security services that began targeting and detaining members of Zarqawi's network.[62] The experiments brought Ansar al-Islam unwanted attention that would eventually lead the coalition, with support from the PUK, to destroy the group's Halabjah safe haven, though the alliance between Ansar al-Islam's survivors and Zarqawi's fledgling Salafi group would become the core of al-Qaeda in Iraq.

\*\*\*

The dearth of information about Iraq's social dynamics and internal turmoil since the 1991 Gulf war led the United States to misjudge Iraqi military activities and to formulate policies and plans at odds with the reality of a deeply segmented and traumatized Iraqi society. U.S. policymakers and CENTCOM failed to account for the amount of distrust Iraqis felt toward the United States because of the 1991 uprising and the 1990s sanctions regime. Flawed U.S. assumptions about how the Iraqi people and state institutions would respond to regime decapitation led to inadequate preparation for post-regime governance and stability requirements. At the same time, while the national intelligence agencies and

PX241

for Iraqi support, Saddam expected these groups to follow guidance from Baghdad when required.[56]

In the early 2000s, Saddam and his security and intelligence directorates became keenly interested in using assassinations, suicide bombings, and improvised explosive devices (IED) against Iraqi opposition groups and Iranian targets. To that end, Saddam's "Ghafiki Project," nested within the Iraqi Intelligence Service (IIS), began recruiting suicide bombers from other countries, while special mission units in the IIS criminology (M16) directorate received training on building car bombs and other IEDs. The IIS worked extensively to perfect IED construction, analyze the technical aspects of terrorist attacks, and conduct lessons learned sessions for failed operations and explosive uses. At the same time, the IIS Directorate of Liberation Movements (M8) hosted Palestinian, Lebanese, Libyan, Syrian, and North African fighters in paramilitary training camps and proposed in its 2002 annual report to activate another training camp for an Arab Liberation Front inside Iraq.[58]

The Fedayeen Saddam benefited from Saddam's growing interest in using terrorism domestically and abroad. In 1999, Saddam decided that he would assign the top 10 recruits from each Fedayeen class to conduct operations in Europe against Iraqi opposition leaders, with Ahmad Chalabi explicitly among the targets. Other Fedayeen were designated for operations in the Kurdish regions of Iraq and Iran. Saddam later outfitted the Fedayeen's Golden Company to wage war against any rebellion or uprising that might occur inside Iraq, to include one that might arise with support from an American invasion. The Golden Company's primary tactic was suicide bombings using vests or other similar mechanisms.[58]

There was one independent Islamist terrorist organization known to be operating on Iraqi territory. Ansar al-Islam, an affiliate of al-Qaeda, was engaged in an active war with the Patriotic Union of Kurdistan (PUK) as the terrorist group attempted to expand its territory beyond a small corner of Sulaymaniyah Province. After Saddam attacked the northeastern Iraqi Kurdish town of Halabjah with chemical weapons in 1988, many of the Kurds in the area fled across the border to Iran, where an extremist Sunni Kurdish cleric, Sheikh Abd al-Latif, convinced a number of the refugees that jihad was the proper response. His adherents returned to Halabjah under the leadership of another extremist cleric, Mullah Bin Abdulaziz, and together they formed the Islamic Movement of Kurdistan (IMK). In the 1990s, the IMK took advantage of the civil war between the Kurdistan Democratic Party (KDP) and PUK to expand its influence from Halabjah into other areas of Sulaymaniyah and eventually into parts of Erbil. Military pressure from the PUK later fractured the IMK into several splinter groups, some of which became hardened Salafis and developed relationships with al-Qaeda. With al-Qaeda's encouragement, these organizations merged in September 2001 into a single group that eventually became known as Ansar al-Islam.[59]

PX241

THE U.S. ARMY IN THE IRAQ WAR

Al-Qaeda leaders viewed the emergence of Ansar al-Islam as an opportunity to expand their foothold in the Middle East. Ansar al-Islam's leaders, Mullah Krekar and Abu Abdullah al-Shafi, worked openly with al-Qaeda, and al-Qaeda, in turn, provided resources, training, and guidance to the group, enabling it to carve out a miniature Islamic state in the Halabjah area. From there, Shafi used his ties with Iraqi Salafis to grow Ansar al-Islam's support base further by incorporating underground Sunni extremist networks in Ninawa Province.[60]

With the fall of the Taliban in late 2001, Ansar al-Islam sheltered a number of al-Qaeda members and affiliates fleeing Afghanistan. One of those who sought refuge with Ansar al-Islam was Abu Musab al-Zarqawi, who had served with al-Qaeda in Afghanistan but had been



Source: Wikimedia Commons, the free media repository by Frida Tørring.

**Ansar al-Islam Leader Mullah Krekar.**[61]

reluctant to swear fealty to al-Qaeda's senior leadership. Zarqawi's stubborn independence and international ambitions complicated Ansar al-Islam's efforts to establish an Islamic emirate in Kurdistan. The secular PUK viewed Ansar al-Islam and Zarqawi as a threat, particularly after the organization began targeting Kurdish civilians and PUK affiliates. Zarqawi also used the Ansar al-Islam infrastructure to conduct crude experiments with chemical and biological weapons, though the limitations of the group's facilities and his peoples' lack of chemical expertise constrained his efforts. One unintended consequence of these experiments was that they attracted the attention of Western and Middle Eastern security services that began targeting and detaining members of Zarqawi's network.[62] The experiments brought Ansar al-Islam unwanted attention that would eventually lead the coalition, with support from the PUK, to destroy the group's Halabjah safe haven, though the alliance between Ansar al-Islam's survivors and Zarqawi's fledgling Salafi group would become the core of al-Qaeda in Iraq.

\*\*\*

The dearth of information about Iraq's social dynamics and internal turmoil since the 1991 Gulf war led the United States to misjudge Iraqi military activities and to formulate policies and plans at odds with the reality of a deeply segmented and traumatized Iraqi society. U.S. policymakers and CENTCOM failed to account for the amount of distrust Iraqis felt toward the United States because of the 1991 uprising and the 1990s sanctions regime. Flawed U.S. assumptions about how the Iraqi people and state institutions would respond to regime decapitation led to inadequate preparation for post-regime governance and stability requirements. At the same time, while the national intelligence agencies and

PX241



Lieutenant General David D. McKiernan (left).
Source: DoD photo by Lance Corporal Bryan J. Nealy, USMC (Released).

**Lieutenant General David D. McKiernan, Commanding General, Third Army/CFLCC (2002-2004) and Brigadier General Richard Natonski, CG, 2nd Marine Expeditionary Brigade.[1]**

Two important changes followed from the decision to remove Mikolashek. First, the Office of the SECDEF—seconded by Franks—proposed setting up a separate combined joint task force for Afghanistan and the War on Terrorism so that CFLCC could focus entirely on Iraq for the time being. Second, Franks received permission to replace Mikolashek as CFLCC commander with Lieutenant General David D. McKiernan. McKiernan, then serving as the Army's operations officer or G–3, had most recently commanded the 1st Cavalry Division and was familiar with the Iraq invasion plan. He had also served in the Gulf war and Bosnia; although Franks and McKiernan had not previously worked together, McKiernan's rapport with General Eric Shinseki combined with his reputation for being cool under fire had earned him Franks's respect.[2]

McKiernan's appointment as the new CFLCC commander signaled to CFLCC forces that the invasion of Iraq was near certain to occur. At the CFLCC headquarters, he welcomed a number of new senior staff officers hand-picked by the Army's senior leadership to prosecute the war, including Major General William "Fuzzy" Webster as McKiernan's deputy, Brigadier General James "Spider" Marks as his intelligence director, and Major General James D. Thurman as his operations chief. The I Marine Expeditionary Force (I MEF) was also placed under CFLCC's tactical control, meaning the MEF and its new commander, Marine Lieutenant General James "Jim" Conway, effectively worked for McKiernan, allowing the CFLCC commander to plan a land campaign as a coalition and a joint component command. By October 22, McKiernan relocated the entire CFLCC headquarters from Fort McPherson, GA, to Camp Doha, Kuwait. He then began a series

PX241

by a suicide car bomb driven by female attackers who had made videotapes prior to the suicide mission and aired them on the Al Jazeera television network, with the message that they intended to wage jihad to expel the Americans from Iraq.[50]

As they turned back successive Iraqi attacks, the Rangers actually found themselves engaged in another battle to prevent the dam from collapsing. Poor maintenance had caused its turbines and overflow machinery to deteriorate to such a degree that the dam was close to catastrophic failure at the time the Rangers seized it, even as many of the dam workers fled to avoid the fighting. Recognizing the danger, the Rangers and civil affairs personnel persuaded the captured dam superintendent that the U.S. troops did not intend to destroy the dam and convinced him and many of the remaining dam work-ers to return to work.[51] By the time Baghdad fell on April 9, Haditha Dam was secure, albeit still in need of repair.

### Kirkuk and Operation VIKING HAMMER

While the Rangers seized the Haditha Dam, Cleveland's CJSOTF-N was linking up with the Kurds and receiving Mayville's 173d Airborne Brigade under its tactical control. Executing a combat jump into a secured airfield in northern Iraq on March 26, the 173d provided Cleveland with additional combat power that could take and hold ground as special operations and peshmerga forces advanced on Kirkuk.[52]

Elsewhere, to the northeast, the 3d Battalion, 10th Special Forces Group, began Oper-ation VIKING HAMMER to remove Ansar al-Islam from its base in Iraqi Kurdistan. With PUK peshmerga helping the 3d Battalion move to its targets, the special operators esti-mated the Ansar al-Islam sites at Halabjah and Sharqat contained approximately 700 fighters and a suspected biological warfare development site. Special operations forces and PUK peshmerga commenced the main attack on March 28, a week after 64 tomahawk missiles had first hit the Ansar al-Islam building and facilities. The fighting continued until March 30, by which time all the Ansar al-Islam fighters had either been killed or fled across the border to Iran. It would be far from the last time the coalition would hear from this terrorist group.[53]

### THE REGIME FALLS

### Securing Baghdad and Basrah

While the 101st and 82d Airborne Divisions cleared the V Corps lines of communi-cations, I MEF finished clearing Nasiriyah and moved along the east side of the CFLCC area of operations toward Diwaniya. A growing problem was that Highway 8, which ran through Diwaniya, was in the V Corps area of operations and not occupied by any Army units, thereby creating an area 80 kilometers wide that was a virtual Fedayeen sanctu-ary. Alerted to Fedayeen who were massing in Diwaniya, V Corps called in an air strike that destroyed a stadium in the city where the Fedayeen were gathering, after which CFLCC ordered Marine units to secure and clear the city. On March 31, CFLCC ordered I MEF to attack east along Highway 6 toward Amarah to provide a second clear line into Kut. From April 2 to 3, the 1st Marine Division crossed the Tigris River at Numaniyah,

PX241

Diwaniya, Numaniyah, and the highways leading into Kut before advancing east toward Maysan. En route to Amarah, the Marines destroyed abandoned equipment from the 10th and 14th Iraqi Army Divisions but encountered no resistance. In Basrah Province, the British 1st Armoured Division secured the remainder of the Rumaila oil fields and Qurnah and patrolled Basrah and Zubayr.[17]

While Task Force Tarawa isolated Kut, other I MEF units maneuvered north of Baghdad. The I MEF troops crossed the Diyala River northeast of Baghdad on April 9 and prepared to secure areas near Saddam's home in Salahadin Province. Between April 13 and 15, I MEF attacked Baqubah and Tikrit and secured Bayji, Samarra, and the highways leading from those cities into Baghdad. They then prepared to secure the remainder of Salahadin Province ahead of the arrival of the 4th Infantry Division, which had made its way by sea to Kuwait after its northern invasion route was shut off by the Turkish Government.[18]

Elsewhere in northern Iraq, Colonel Charles Cleveland's Combined Joint Operations Task Force-North (CJSOTF-N) fought remnants of the Iraqi Army and Republican Guard divisions. By April 13, the task force judged that the Iraqi I and II Corps were reduced to about 30 to 40 percent of their original strength, with the remainder of the forces having deserted. The fighters of Ansar al-Islam who survived the coalition air strikes had crossed over into Iran, and CJSOTF-N verified that the organization no longer had a presence on Iraqi soil. In Ninawa Province, CJSOTF-N and its peshmerga partners had put the Iraqi V Corps to flight and entered Mosul, northern Iraq's largest population center and the location at which the Iraqi V Corps commander surrendered to the task force on April 11.[19]

Meanwhile, CJSOTF-West (CJSOTF-W) began establishing checkpoints on Iraq's considerable borders with Jordan and Syria. Portions of a separate special operations task force, the Rangers, and the 160th Special Operations Aviation Regiment, started to transition from operations against Iraqi military and paramilitary forces to hunting high-value regime targets.[20]

## A Country Full of Weapons

In the turbulent weeks after Baghdad's fall, coalition units discovered an astonishing amount of munitions across the country. In the months prior to the invasion, Saddam's forces placed large numbers of weapons and stockpiles of ammunition in dispersed caches to improve access for Iraqi forces that Saddam assumed would be immobilized by coalition air power. Many of those caches remained intact after the Iraqi regime was defeated, along with the vast stores the Iraqi military had dispersed during the 12 years of no-fly zones. In addition, many usable tanks, armored personnel carriers, and artillery pieces, abandoned during combat operations, remained vulnerable to looters and militia groups. CFLCC and Coalition Forces Special Operations Component Command (CFSOCC) leaders worried that munitions and equipment looted from these caches would find their way into the black market and either be used against coalition forces or be used by Iraq's factions against one another if the caches were not secured.[21]

For coalition ground forces, the scale of that mission was overwhelming. Many of the caches were spread across large areas virtually impossible for units to physically secure, and the sheer volume of munitions was equally daunting. When 4th Infantry Division

PX241

were operating in Iraq.[80] In turn, unidentified militias attacked Badr Corps headquarters across Iraq as the summer approached, including a strike against one in Baqubah that included a female suicide bomber on May 25.[81] CJTF-7 also determined that at least one major intra-Shi'a rivalry was already getting out of hand—that between Moqtada Sadr and his followers in Najaf and eastern Baghdad, and SCIRI's representatives in Karbala and parts of Najaf. The Iranian regime appeared to be supporting SCIRI at that time, but it was also encouraging the Sadrists' anti-coalition stance. These activities led at least the special operators of the CJSOTF to judge, in June 2003, that Iran was "executing a long-term campaign to further its national interest."[82]

Throughout Iraq, the removal of the Ba'ath Party and Saddam from power opened the door for more open expression of religious freedom, although along with that freedom came a rise in religious extremism. Beginning in late May 2003, nongovernmental organizations in Iraq reported that female schoolchildren and teachers were receiving death threats from an organization calling itself "The Popular Committee for Punishment," as well as the Badr Corps, designed to deter their attendance. In many places, women began to fear kidnapping and rape and avoided going to work or school because of the risk. CJTF-7 later identified at least two Islamic fundamentalist groups trying to jump-start political parties in order to seize power in areas of Iraq the coalition had not occupied, and Sunni Islamic fundamentalism, including Salafism, was thought by CJTF-7 to be the unifying factor among restive groups in Anbar. Many Iraqi Salafis were virulently anti-coalition, calling for and executing attacks against coalition forces. Signs emerged that Ansar al-Islam, having survived the coalition's attack on it in early April, was beginning to reestablish itself in northern Iraq with support from al-Qaeda.[83] Unlike CJTF-7, the armed groups and anti-coalition factions appeared to conduct effective information operations, emphasizing in their messaging the coalition's failure to restore security, services, and jobs or highlighting the damage the coalition's Western values would supposedly inflict on Iraqi society. By mid-June, coalition units were reporting that local radio stations had begun to broadcast anti-coalition propaganda, while imams continued to spread anti-coalition messages during their Friday sermons. In mid-May, CJTF-7 units observed graffiti suggesting that Baghdadis seemed to be losing confidence in the ability of U.S. forces to control the situation. When some Iraq-based and international media outlets began inciting elements of the Iraqi population to violence, CPA issued a proclamation criminalizing the practice on June 13, and CPA shut down an Iraqi paper called *Nation's Echo* in Najaf because it advocated violent resistance to the coalition.[84]

Farther south, British expectations that their experience in Iraq would be similar to their peacekeeping efforts in Northern Ireland or the Balkans were upended on June 23, 2003, in a violent incident in the town of Majar al Kabir, 20 kilometers south of Amarah. When the British 1st Parachute Regiment began conducting searches for heavy weapons in the town, an angry mob of several thousand Iraqis closed in on the British troops. After an exchange of gunfire that left several Iraqis dead, the troops had to be extracted under fire, after which the mob surrounded a small patrol of six British military policemen who had taken refuge in a police station. With little ammunition and no means to contact other British forces, the British patrol was quickly overwhelmed and massacred.[85]

It was the most costly engagement for the British military since the 1991 Persian Gulf war, and the deaths had significant military and political consequences.[86] Concluding the

PX241

bolstered by an influx of Islamist fighters who had been organized by the Ba'athist regime before the fall of Baghdad. One senior Islamist militant who had been among the "Iraqi Afghans"—Islamist fighters who had traveled to Afghanistan to fight in the anti-Soviet jihad of the 1980s—said that he and other militants in the Ba'athist-sponsored Iraqi Quds Army continued an irregular resistance against U.S. troops after the fall of the regime and had eventually joined their fellow Islamist insurgents in Jaysh al-Islami.[27]

Mohammed Yunis al-Ahmad's Jaysh Muhammad and Abdullah al-Janabi's Jaysh al-Islami operated separately from one another, but they shared a common approach that would eventually permeate other, similar organizations in Iraq: the use of Islamic imagery and themes in describing their resistance movements. Islamist rhetoric would grow with time into a major component of these groups' recruiting efforts, propaganda, and competition for resources as the conflict in Iraq's Sunni heartlands escalated.

**The Salafi Resistance**

The rise in Salafi influence sparked by Saddam's faith campaign in the 1990s continued as coalition forces prepared to invade Iraq in early 2003. Resistance to the invasion based on Islamic rather than nationalist principles became paramount in some sectors of society after the Islamic Research Center of al-Azhar University in Egypt issued a declaration legitimizing violent attacks against the coalition forces as jihad, or holy war, in March.[28] This development assisted Salafi militant group Ansar al-Islam as it worked to recover from the tactical defeat it suffered at the coalition's hands in March and April. The group had lost its enclave in northern Iraq, its training camps, and many of its veteran fighters, but the coalition's inability to close off escape routes from Kirkuk and Sulaymaniyah into Salahadin and Diyala allowed surviving members of the organization to reach the Sunni Triangle and Iran, where they joined forces with al-Qaeda and other Islamist resistance groups. In short order, Ansar al-Islam established a network of safe houses and other logistics operations for foreign fighters inside Iraq.[29] Ansar al-Islam members who escaped the coalition bombings in March and April were able to use that network to regroup and broaden their appeal to Iraqis beyond Kurdistan with assistance from Douri's organization and from Zarqawi.[30] Signs soon emerged that Ansar al-Islam had relationships with surviving pre-invasion Islamist foreign fighters numbering in the hundreds in Fallujah, Tikrit, Bayji, and Baghdad.[31]

In June 2003, members of Ansar al-Islam working for the organization's military chief, Abu Abdullah al-Shafi, broke with group founder Mullah Krekar and initiated a strategy to expand Ansar al-Islam beyond its Kurdish roots into an umbrella organization that could unite Iraq's Sunni Islamist groups. In Anbar Province, this new branch of Ansar al-Islam established ties to al-Qaeda, which influenced Ansar al-Islam to develop a cell-based structure similar to al-Qaeda's, each of which was organized into small units of 10 to 15 members led by an emir or commander.[32] As in al-Qaeda, only a small handful of people in the entire organization were aware of or connected to, multiple cells, making the organization more difficult to destroy.[33] As the group's membership grew, it reorganized some of its members and cells into battalions consisting of both Iraqi nationals and foreign fighters from al-Qaeda seeking to battle the coalition presence inside Iraq.[34]

PX241

Iraq by a Ba'athist crackdown in 1979. From the Da'wa Party branch that fled to Iran, the Iranian regime had carved out a portion that became SCIRI in 1982 during the Iran-Iraq war. Iran supported both SCIRI and Da'wa against Iraq and its Western allies during that war, and Da'wa's most effective militant strike was the bombing of the American and French embassies in Kuwait in 1983. For 2 decades, Da'wa remained suspicious of U.S. motivations and intentions and participated only reluctantly in discussions between the United States and Iraqi expatriate political parties in 2002–2003.[59]

Although the Iranian regime continued to provide some support to Da'wa after the Iran-Iraq war ended, most Iranian aid went to the SCIRI-organized anti–Saddam militia force, the Badr Corps, an organization initially formed during the Iran-Iraq war by the Islamic Revolutionary Guard Corps of Iran (IRGC) from Iraqi prisoners of war.[60] By May 2003, CJTF-7 was tracking the Badr Corps presence in Iraq but was largely unaware of Badr's systematic reprisal attacks against former Ba'athists, which included targeted assassinations of Iraqi Air Force pilots.[61] Soldiers of Major General Raymond T. Odierno's 4th Infantry Division also monitored some of Badr's reprisals in Diyala and arrested militia members in a Badr headquarters in Baqubah. Odierno was confused and frustrated when orders came from CJTF-7 and the CPA to release members of the Badr Corps, not realizing that SCIRI leaders were already using their growing influence with the coalition to facilitate Badr activities.[62]

The Badr Corps had ample time to prepare for these attacks. Captured Iraqi and Iranian documents later revealed that the Badr Corps had four geographic commands, or axes, inside Iraq that dated to at least 1999, and each of these commands had experience conducting operations against the regime and the Saddam-sponsored Iranian opposition group Mujahedin e Khalq. Iraqi intelligence officers believed Badr Corps outposts were spread throughout Iraq in hospitals, businesses, and NGOs, including the Red Crescent. The Baghdad-based axis of the Badr Corps, one of the group's more powerful arms, was supervised from nearby Bakhtaran in Iran by Hamid A'atabi al-Sheibani, also known by the nom de guerre Abu Mustafa al-Sheibani. Sheibani's group developed extensive smuggling routes for moving weapons, relief supplies, men, money, and propaganda from Iran into Iraq to resource Badr activities in Baghdad, Diyala, and Wasit. It is likely that Sheibani's group was the arm of the Badr Corps with which Odierno's 4th Infantry Division had difficulties in the summer of 2003.[63] These smuggling networks and Iran's involvement with Badr would later be instrumental in funneling lethal support such as explosively formed penetrators (EFP) into Iraq to be used against Iran's enemies and the coalition military.

Despite being suspicious of U.S. intentions, SCIRI did not sanction attacks against coalition military targets in the summer of 2003 but was unable or unwilling to stop some portions of the Badr Corps from collaborating with Iran and attacking the coalition. One senior Badr commander, Jamal Jafar Mohammed Ali, who went by the nom de guerre Abu Mahdi al-Muhandis or "the Engineer," had participated in the Da'wa attacks on the U.S. and French embassies in 1983 along with Lebanese Hizballah, and he had no love for the United States.[64] Muhandis and some senior Da'wa members were reportedly unhappy with SCIRI for participating in talks with the United States in 2002, and Muhandis allegedly resigned his leadership position in the Badr Corps, leaving the group under the control of Hadi al-Amiri.[65] Muhandis would later be elected to the Iraqi

PX241

interest of dividing and controlling the Iraqi Ba'ath Party. Assad reportedly sponsored Ahmad and approximately 100 of his followers as an artificial competitor wing to Douri's much larger following, with Ahmad's branch sustained by Syrian regime money.[97] In any case, Assad allowed both organizations to gain substantial footholds inside Syria and created an easy path for men, money, and materials from a host of insurgent and terrorist organizations to transit between Syria and Iraq with comparative ease.

## The Iranian Regime

Iran had a greater stake in the future of Iraq than any of Iraq's other neighbors, and Iranian regime leaders had long considered the survival of their Islamic republic to be intertwined with Iraq's future. Although Iranian leaders were pleased with the disappearance of their number one enemy, Saddam, and his Sunni-dominated Ba'athist regime, it was unlikely that the United States would establish a new Iraqi Government friendly to Iran. While Iranian leaders hoped to see a Shi'a majority rule in Iraq, a Shi'a-led democratic government in Iraq might threaten the legitimacy of Iran's clerical regime. Iranian leaders also had to consider that, absent Ba'athist repression, the Shi'a religious centers in Najaf and Karbala could become competitors to Iranian primacy in Shi'a Islam, as pilgrims and clerics moved far more freely to the Iraqi holy cities than they had been able to do under Saddam.[98] Iranian Supreme Leader Ali Khamenei's religious credentials were meager, and since he ruled via the principle of *velayat e faqih*—the belief that an Islamic government should be ruled by its supreme clerical judge—the proximity of a non-authoritarian Islamic democracy supported by better-credentialed, Iraq-based religious leaders such as Grand Ayatollah Ali Husayni Sistani might show the Iranian people an alternative to the supreme leader's Iranian Government.[99]

Iranian leaders were also likely concerned about the proximity of the American military, now present on Iran's western and eastern borders. To Iranian eyes, if the United States retained a close relationship with a democratic Iraq, the new Iraq might become an American platform for targeting the Iranian regime.[100] To prevent the new Iraqi state from becoming too close to the United States, the Iranian regime embarked on a multifaceted strategy to bind a new, more federated Iraq closer to Iran while simultaneously forcing the United States to withdraw from the region. This strategy involved creating instability inside Iraq, placing the responsibility for the chaos on the United States and its Iraqi partners, and ensuring pro-Iranian Iraqi politicians dominated the new Iraqi Government. Once pro-Iranian Iraqi leaders were in place, Iran could then reduce the violence, and their Iraqi proxies could claim to be strong leaders who had brought peace and order.[101] To that end, the Iranian regime would support multiple Shi'a political parties and Shi'a militias. The regime, through its Islamic Revolutionary Guard Corps, already had close relationships with Da'wa and SCIRI and would support members of these parties in leading positions in Iraq's transitional government. Iranian leaders also aimed to broaden their popular influence in Iraq, and, with this in mind, they reached out to the Sadrists through Grand Ayatollah Haeri in the spring of 2003, eventually arranging Sadr's visit to Tehran later in the summer.[102]

Iran's IRGC was well equipped to develop the emerging Iraqi Shi'a militias. Through its preexisting relationships with the Badr Corps and Lebanese Hizballah, the IRGC had created extensive support networks in Iraq and Lebanon and hoped to develop new

PX241

south, shoulder to shoulder with RCT 7. As the insurgents' operating space contracted, their fighting cells grew in size, sometimes reaching 50 fighters, many of whom chose to fight to the death rather than flee.[68] Meanwhile, though MNF-W had hoped that the rebuilt Iraqi Army units would independently mop up insurgents that had remained behind in the northern part of the city, the Iraqi units proved unequal to that task, forcing each RCT to leave a full Marine battalion north of the highway to do the job.[69] By November 13, MNF-W had crushed virtually all organized resistance, but fighting would continue for weeks as small cells of insurgents who had remained behind were gradually rooted out in sustained search and attack missions.

## The Fall of Mosul

As the assault on Fallujah proceeded, the coalition was unexpectedly spared the worldwide attention that had undermined the April 2004 operation. The sudden death of Palestinian leader Yasser Arafat on November 11 dominated the Arabic-language airwaves and distracted the Arab world and much of the international media from the events in Fallujah. Perceiving that the coalition had been given a window of opportunity in information operations, Casey pressed Sattler to take advantage by accelerating the operation, telling the MNF-W commander, "we've got to get this over before they put Yasser in the ground."[70] Despite the relative dearth of international attention, however, the battle in Fallujah was sending shockwaves through Iraq and, as it had done in April, spilling over into fighting elsewhere. In Hadithah, soon after RCT 7 had left its area of operations, insurgents seized control and executed the town's police force on a local soccer field, sending a warning to tribes in Anbar that cooperating with U.S. troops was cause for severe punishment.[71]

The most significant spillover was hundreds of kilometers away in Ninawa Province. On November 10, fewer than 48 hours after U.S. troops began their assault on Fallujah, fighters from Abu Musab al-Zarqawi's organization and other Sunni insurgent groups mounted a coordinated attack on Mosul, taking advantage of the coalition's economy of force posture there. The attack led to the shocking collapse of Mosul's government security forces within 24 hours.

Though the fall of Mosul happened quickly, it had been months in the making. In the time since Brigadier General Carter F. Ham's Task Force Olympia had replaced then Major General David H. Petraeus's much larger 101st Airborne Division in early 2004, Sunni insurgents had realized that Ninawa Province was an economy of force area for the coalition and had begun to flow on the path of least resistance toward Mosul. Facing insurgent threats, Ninawa's police forces became reluctant to investigate the insurgent activity. Mosul University, to which the United States had contributed $3 million, fell under the control of fundamentalist Sunnis who imposed gender segregation and banned coalition force visits. Intimidation hollowed out Iraqi Army units, with one Iraqi National Guard battalion experiencing 100 percent turnover in 2 months due to soldiers being absent without leave, and another battalion losing its commander when he resigned under threat.[72] By midsummer 2004, Zarqawi's fighters, Ansar al-Islam, and other insurgent groups had taken control of the strategic city of Tel Afar, about 80 kilometers west of Mosul astride the main highway to Syria.

PX241

As Tel Afar became a staging base for foreign fighters entering from Syria, Task Force Olympia had mounted an operation to retake the city of 200,000 people. In September 2004's Operation BLACK TYPHOON, the 3d Brigade, 2d Infantry Division (Stryker), cleared Tel Afar in a difficult battle resembling the April 2004 operation in Fallujah. The intense fighting resulted in 102 insurgent deaths, the destruction of a portion of the city, and the exodus of almost half of the population.[73] The level of destruction stoked international and local discontent, with the Turkish Government accusing U.S. forces of killing 58 Turkoman civilians during the operation.[74] Despite the operation's costs, once it had ended, the thinly stretched U.S. brigade had withdrawn from the city to a base 10 kilometers away, allowing Zarqawi's jihadists and other insurgents to reestablish themselves.

By mid-October, Ham recognized that his command was in grave danger. On October 18, he sent an urgent warning to Metz, the MNC-I commander, that Mosul could fall to insurgents at any moment if the coalition did not take immediate action.[75] However, with all available forces committed to Fallujah, including CENTCOM's theater reserve, Metz had no troops to provide. On October 29, Ham again signaled his concerns, this time briefing Casey that "the point of collapse is very near. . . . Mosul, the leading city in the north, is in jeopardy of being lost to Anti-Iraqi Forces' control due to neglect by the Iraqi Interim Government."[76]

Thus the Sunni insurgents' assault on Mosul on November 10 had been neither a hasty target of opportunity nor entirely unexpected. As AL FAJR's lengthy shaping operations unfolded and coalition troops massed around Fallujah, Zarqawi and other insurgent commanders had exploited the light coalition footprint in Mosul to deliver a counterpunch and relieve pressure from their fellow insurgents in Fallujah. Interrogations later revealed that the insurgents had decided to focus on Mosul out of a belief that "they couldn't stop things in Baghdad or disrupt the election significantly, because there were seven or eight brigades in Baghdad [but] there was [only] one brigade up north."[77]

On November 10, the Sunni insurgents quickly overran much of Mosul and recaptured Tel Afar, ransacking and burning government buildings and seizing five of Mosul's Tigris River bridges. Mosul's security forces, which the coalition had been training for nearly a year, disintegrated as insurgents moved from one police station to the next, demanding the surrender of the police at each station, and seizing their weapons and equipment. After only 2 days of fighting, an active insurgent force of 400-500 with a support base of 2,000-2,500 had driven 80 percent of the city's 4,000 police officers from their posts, leaving about 35 stations unmanned or destroyed.[78] Following reports that some of the police officers had supported the insurgents' assault, the Iraqi Government fired Mosul's police chief, Brigadier General Mohammed Barhawi.[79] Ham later recalled, "We did in fact lose control."[80]

The fall of Mosul forced MNC-I to scramble to turn back the insurgent counterattack. Responding with operational-level maneuver again to reposition his scarce resources, Metz directed his corps reserve, the 1st Battalion, 5th Infantry Regiment (Stryker), to leave the cordon around Fallujah and return to Mosul—from which it had come just days before—within 72 hours.[81] After this move, however, MNC-I did not reconstitute its corps reserve because there was not an uncommitted maneuver unit in the entire theater. With no other coalition units immediately available, commanders instead committed two

PX241

of the Iraqi Interior Ministry's Special Police Commando Battalions, paramilitary units with a mission similar to that of the Italian Carabinieri.

The battle to retake Mosul would last nearly a week. Given the initial confusion, the two U.S. battalions in Mosul, 1st Battalion, 24th Infantry Regiment, and 3d Battalion, 21st Infantry Regiment, first had to determine which police stations had fallen and which were still held by the Iraqi security forces.[82] By November 13, the two units had gained a better understanding of the insurgent situation and began conducting battalion-level clearing operations, with 1st Battalion in west Mosul, and 3d Battalion in east Mosul as the commandos helped recapture police stations throughout the city.[83] Equipped as light infantry, the Iraqi police commandos rode into battle in unarmored pickup trucks provided by MNSTC-I and quickly ran into trouble in west Mosul. On their way to rescue Iraqi police trapped in the Four West police station on November 14, a quick reaction force of Iraqi commandos and their U.S. adviser, Colonel James H. Coffman, were encircled and almost overrun. Nearly out of ammunition and surrounded by 60 wounded and dead Iraqi commandos,[84] Coffman rallied the Iraqis to beat back several attacks until U.S. Strykers arrived, actions for which Coffman would receive the Distinguished Service Cross.[85] Four Americans died during the battles to clear the city, compared to 71 insurgents confirmed killed.[86] While insurgents no longer controlled the terrain outright, intermittent fighting would continue in Mosul through the end of December 2004.

### The Marez Dining Facility Bombing and the Combat Outpost Tampa Attack

To restore sufficient order in Mosul to allow the January 2005 elections to proceed there, MNC-I committed three additional infantry battalions to MNB-NW, one each from the 82d Airborne Division, the 25th Infantry Division, and the Oregon National Guard.[87] After the elections, the units would return to their parent brigade combat teams and render Ninawa Province an economy of force once again. Recognizing that this force would not be a long-term solution to the challenges of Mosul, Casey requested additional special operations forces for Ninawa Province. To meet Casey's request, the special operations task force in Iraq grew in size, with the new elements going directly to Mosul. There they established a collaborative relationship with the conventional force leaders in MNB-NW as had been done in MNF-W. However, the clearing of the city and the arrival of the reinforcing troops did not render the Sunni insurgents of Mosul impotent. On December 21, an Ansar al Sunna suicide bomber wearing an Iraqi military uniform blew himself up in the dining facility at Forward Operating Base Marez, the largest coalition base in Mosul. The bombing killed 21, including 14 American Soldiers, and wounded 75, making it the most deadly single attack on U.S. troops since the invasion.[88]

The following week brought another large insurgent attack. In the wake of the Iraqi security forces' collapse in Mosul, 1st Battalion, 24th Infantry, Commander Lieutenant Colonel Erik Kurilla, decided to reverse course on MNF-I's directives to consolidate forces and instead established platoon-sized combat outposts throughout west Mosul.[89] Regaining footholds in the insurgent-dominated territory was not easy. The battalion fought multiple battles during December, culminating in a December 29 assault on Combat Outpost Tampa in which a suicide bomber rammed a dump truck filled with artillery shells into the base entry point, followed by an assault force of at least 50 insurgents. The

PX241

heads, destroyed a lot of houses, destroyed infrastructure. Not a single city was without dozens of bodies thrown everywhere, whether in the street or elsewhere. . . . Speaking for myself, . . . I said, I will cooperate with the Americans, even with the devil, if it means kicking al-Qaeda out of the area.[80]

While al-Qaeda in Iraq's activities were the primary reason for the tribe's actions, the change in the coalition's posture in Anbar also contributed to the tribe's decision. The increased U.S. combat power that had flowed into Anbar as part of Casey's border campaign, along with new outreach from units such as Alford's Marines, had helped to persuade some tribal leaders that the coalition could be a counterbalance to AQI.

The intensity of the tribal uprisings, as well as the decisions of insurgent groups such as the Ramadi Shura Council to seek reconciliation with the Iraqi Government, alarmed al-Qaeda's senior leadership in Pakistan into sending one of its senior leaders, Abdul Hadi al-Iraqi, to Iraq on a fact-finding mission.[81] Its alarm had been magnified by exaggerated warnings from the insurgent group Ansar al Sunna, which had long resented Zarqawi and believed it—rather than AQI—should be in charge of al-Qaeda's franchise in Iraq. Ansar al Sunna held Zarqawi personally responsible for the destruction of its parent organization, Ansar al-Islam, in northern Iraq in 2003, and, like some other insurgent groups, opposed Zarqawi's targeting of Iraqi civilians and brutal beheadings. Moreover, Ansar al Sunna's leaders believed that AQI and Zarqawi frequently took credit for attacks that Ansar al Sunni launched, and poached members from among their ranks.[82] Relations between the two insurgent groups were bad enough that al-Qaeda's senior leaders received reports that open fighting might break out.[83] To resolve this dispute and get a better grasp of the situation in Iraq, Abdul Hadi, part of Osama Bin Laden's inner circle, twice requested Zarqawi's help to infiltrate Iraq, but Zarqawi claimed the security situation would not permit it.[84] Abdul Hadi's visit to mediate between the two groups was delayed 7 months because of Zarqawi's intransigence, and the AQI–Ansar al Sunna feud festered in the meantime.

The disputes between insurgent groups and the uprising of Anbari tribes against AQI reached MNF-I's attention by September when an MNF-I assessment noted, "since May [2005] select western Sunni tribes . . . have been in armed conflict with AQI for the town of Qusaybah in the Western Euphrates River Valley area. . . . Intelligence reports indicate Sunni tribal members—as many as 1,000—are increasingly disillusioned with AQI and are formulating plans to expel Foreign Fighters."[85] Sensing an opportunity to extend his Sunni outreach efforts, Casey authorized meetings with the exiled Albu Mahal tribe in Jordan and later sent an aircraft to bring the tribe's senior leader, Sheikh Sabah, to Baghdad to negotiate a formal alliance, though Casey was wary of providing too much assistance and creating another local militia for his units to handle.[86]

As Casey's diplomatic initiative with the Albu Mahal was developing, CJSOTF units were returning to Anbar for the first time in a year and were eager to reenergize the irregular force they had tried to create in 2004. Because of the CJSOTF's relatively low personnel turnover, many of the same troops who had led the 2004 effort now returned to the same locations in Anbar. Master Sergeant Andy Marchal and other special operators who had worked with the Albu Nimr tribe in 2004 returned to Hit and quickly reestablished contact with the tribe. At the same time, Major Adam Such, who had helped pioneer the 2004 effort, was now the battalion operations officer responsible for planning the new

PX241

**AQI Retakes Ramadi**

With the Anbar People's Committee out of the way, AQI immediately enjoyed greater freedom of movement in Ramadi and increased its attacks against coalition and Iraqi Government forces. During January 20-21, AQI and local fighters carried out two complex attacks against the Ramadi government center and nearby coalition bases using indirect fire, small-arms fires, rocket-propelled grenades (RPG), and car bombs.[11] AQI also stepped up its shadow governance throughout Anbar, offering compensation payments to Iraqis whose homes were damaged by the coalition, an offer 300 families accepted.

Against this increased AQI activity, Gronski's brigade's practice of conducting battalion-sized sweeps through Ramadi's neighborhoods and then returning to forward operating bases without leaving a large presence inside the city proved ineffective, a fact that the brigade's frustrated Soldiers and commanders increasingly recognized.[12] Even so, the practice was in line with the brigade's top stated objective of "protect[ing] the force," which, as the brigade explained in briefings to General George W. Casey, Jr., it had ranked in priority above the objective of "defeat[ing] the insurgency"—an approach that ran counter to MNF-I's goals.[13]

AQI fighters routinely mounted attacks against the government center from the abandoned buildings that surrounded it. They also moved freely around the city, skirting coalition checkpoints using side roads through the Sufiyah and 2d Officer districts. AQI leaders even set up a command-and-control center inside the Al Hajj Mosque in the city's Qatana district from which they oversaw attacks. They also issued coded orders using selected excerpts from the Koran recited over the mosque's loudspeakers. In their well-planned attacks, AQI commanders used operations orders and sand tables to rehearse their operations and synchronize massed attacks by up to 150 fighters—equivalent to an infantry company-sized attack.[14]

With limited intelligence on AQI's organization inside the city, Gronski responded by employing forward observers from the 1st Battalion, 506th Infantry Regiment to identify enemy targets that could be engaged by guided multiple-launch rocket systems fired from Camp Fallujah—a practice Gronski discontinued when he concluded the indirect fire was doing more harm than good.[15] The situation was a curious role-reversal from most other coalition-held cities: in Ramadi, the coalition launched harassing fire against an insurgent force conducting coordinated battalion-sized maneuvers from bases inside the city.

By April, AQI had also taken over the city's black market and become financially self-sufficient. In Ramadi alone, AQI grossed more than $500,000 per month on black-market fuel sales, which, when combined with its extensive criminal enterprises, produced a monthly influx of several million dollars, more than enough to cover expenses, acquire real estate, and make significant inroads into the provincial economy.[16] These and similar revenues elsewhere in Iraq also allowed Zarqawi to operate independently of the senior al-Qaeda leadership outside the country.

The funds also kept fighters flowing into AQI's ranks. Coalition troops killed over 200 AQI fighters in March and April, but they were easy for Zarqawi to replace. By May 2006, with AQI's financial network in place, the starting salary for an AQI fighter in Ramadi was the equivalent of $1,000 per month. The next highest-paying insurgent group, Ansar

PX241

al Sunna, paid far less at $250 per month. AQI also funded bonuses: $200 for a successful improvised explosive device (IED) attack, $500 to $700 for destroying a High Mobility Multi-Purpose Wheeled Vehicle (HMMWV), and $7,000 for shooting down a helicopter. In Fallujah, where AQI's presence was more contested and lacked Ramadi's financial sophistication, al-Qaeda fighters were paid between $190 and $380 per month.[17] By the end of the spring, AQI considered much of central Ramadi and its outlying regions to be safe areas, as well as the center of its activities across Iraq.

### "No One is Really in Control of the City"

As violence escalated in Ramadi in early 2006, Casey's plans to reduce the footprint of U.S. forces in Iraq collided with AQI's expansion in Anbar. In his deliberations over force levels with Secretary of Defense (SECDEF) Donald Rumsfeld in early March, Casey judged that the situation in Iraq had improved enough to allow for Gronski's 2d Brigade, 28th Infantry Division, Pennsylvania National Guard to depart in June without another brigade to backfill it.[18] Within days, however, Casey realized the situation in Ramadi had deteriorated with such speed that the plan to transition control of the city to Iraqi security forces upon 2d Brigade, 28th Infantry Division, Pennsylvania National Guard's departure might have become infeasible. On March 30, he issued a warning order to Colonel Sean MacFarland and his 1st Brigade, 1st Armored Division to prepare to move from Tel Afar to Ramadi to replace 2d Brigade, 28th Infantry Division, Pennsylvania National Guard in June.[19] MacFarland's brigade had replaced Colonel H. R. McMaster's 3d Armored Cavalry Regiment in western Ninawa only the month before, but having decided in December 2005 to off-ramp two U.S. brigades, Casey had to cover the insurgent hot spot in Anbar by uncovering another insurgent hot spot in Ninawa.

The violence in eastern Anbar touched Casey directly when mortar fire interrupted his April 13 meeting with Zilmer near Fallujah, killing two Marines and injuring 19 others. Following the incident, Casey questioned whether his Anbar consolidation plan could proceed without a major offensive in Ramadi.[20] AQI's 11 complex attacks against the U.S. and Iraqi forces in the city between April 9 and 24 seemed to reinforce these doubts.[21] Even so, as late as May 5, Casey briefed Rumsfeld that he still intended to hand Ramadi over to the Iraqis instead of replacing 2d Brigade, 28th Infantry Division, Pennsylvania National Guard with another American unit. However, within 2 weeks, the MNF-I commander acknowledged the need for additional resources as well as a major operation to reestablish control of the city. Casey hoped the plan to transition Anbar could be kept on track by having 2d Brigade, 28th Infantry Division, Pennsylvania National Guard conduct a large operation in May, just before the brigade was scheduled to return home. On May 6, Casey met with Gronski, Zilmer, and Lieutenant General Peter Chiarelli to hear 2d Brigade, 28th Infantry Division, Pennsylvania National Guard's plan. He came away discouraged. The overall plan was "not imaginative," the MNF-I commander told his staff afterward, adding that the plan was being executed by a unit that lacked a good intelligence picture, had too few forces, and "seemed to be distracted by their imminent departure."[22] "No one is really in control of the city right now," Casey observed, "not the government, not the terrorists, not the coalition."[23]

PX241

# PX242



# THE U.S. ARMY IN THE
# IRAQ WAR

## VOLUME 2

### SURGE AND WITHDRAWAL

## 2007-2011

**Colonel Joel D. Rayburn**

**Colonel Frank K. Sobchak**

Editors

*with*

**Lieutenant Colonel Jeanne F. Godfroy**

**Colonel Matthew D. Morton**

**Colonel James S. Powell**

**Lieutenant Colonel Matthew M. Zais**

UNITED STATES
ARMY WAR COLLEGE
PRESS
Carlisle Barracks, PA        STRENGTH—WISDOM

PX242

In the meantime the coalition's primary task, as Odierno saw it, was to assist the Iraqi Government in its efforts to "fill the gap," including, whenever necessary, by direct coalition action.[89] It was an approach to addressing the problems in Iraq that would differ markedly from that of MNF-I under Casey.

## THE SHI'A MILITANTS ON THE EVE OF THE SURGE

AQI and its Sunni militant allies were not the only group aiming for control of the belts around Baghdad. JAM and other Shi'a militant groups, including the Badr Corps and Asa'ib Ahl al-Haqq, had begun to expand their operations in an effort to seize Sunni towns north and south of Baghdad and control the lines of communications running into the capital. The JAM expansion in fall 2006 to Mahmudiyah, south of Baghdad, served as one of the more dramatic examples. Over the course of 90 days, JAM wrested control of the town through a campaign of targeted killings and the seizure of public services. By October, using Mahmudiyah as a springboard, JAM had begun to conduct similar operations in the nearby town of Yusufiyah.[90] MNC-I's operations to establish control of the belts would have to take the Shi'a militants into account.

During the previous summer, MNF-I had sensed the growing threat that Shi'a militias posed to coalition objectives, though Casey had resisted categorizations that portrayed them as a greater danger than AQI. Militant factions led by one-time Sadr loyalists made the landscape of the Shi'a threat even more complex. Isma'il Hafiz al-Lami, known as Abu Dura, had broken with Sadr in 2004 but still orchestrated death squad and kidnapping operations out of Sadr City, a role that led Western reporters to dub him "the Shia Zarqawi" in 2006.[91] Another former JAM leader who defied Sadr, Abu Gharawi, ran a major EFP network out of Amarah.[92] Some Badr Corps operatives were involved in the shadowy war against the coalition as well. Abu Mustafa al-Sheibani rose to prominence as an intelligence officer and front commander in the Badr Corps before supposedly falling out with the Hakims before the war. In July 2003, he received $40 million from the Iranians to organize a logistics network that would funnel weapons to Shi'a militants.[93] The elusive Sheibani drew upon his prewar experience in clandestine operations, as well as his deep pool of contacts in the Badr Corps to build a potent EFP network. He went on to finance and supply other key networks and remained a key node in the Quds Force's controlled distribution of advanced weaponry.[94]

These and other Shi'a militant networks with shared associations, shifting loyalties, and divergent political aims made for a complex battlefield. Iranian regime support was the common denominator. The major Shi'a militant networks all owed their potency—and even existence—to the Iranian regime's Quds Force and its powerful commander, Qassem Soleimani. The lethal materiel supplied through these networks entered Iraq through ports of entry along the eastern border. Key cities across the southern provinces served as waypoints for the smuggled goods as they traveled hundreds of miles over roads and "ratlines" and passed through multiple tribal areas. Amarah was a major crossroads, from which EFPs were funneled south to Basrah or north through Kut—another critical hub—and Numaniyah, Suwayrah, and eventually Baghdad. Alternatively, facilitators shipped EFPs west from Amarah to Diwaniyah and Najaf and then north through Hillah and Karbala before reaching the outskirts of the capital.[95] A separate "ratline,"

PX242

surge announcement, many Shi'a militia commanders hunkered down and adopted a "wait-and-see" approach.[155] Many of those who believed they had made a name for themselves feared capture and fled Baghdad.[156] Confirming this trend, reports reached MNF-I in late January that the Iranian Embassy had issued some 200 special passports to Shi'a militia members. Sadr himself secretly departed for Iran around this time.[157] The flight of the Sadrist leaders within days of the surge announcement illustrated that the psychological effects of the surge would be as important as its physical effects, both in cowing the coalition's enemies and in emboldening its partners. The same effect applied to Abu Mahdi al-Muhandis, who reportedly fled to Iran at the end of January.[158]

Hoping to lower JAM's profile as it braced for more frequent and intense coalition and Iraqi attacks, Sadr called for his militia to stand down following the kickoff of the revised Baghdad Security Plan. Mainstream JAM units generally obeyed. Many leaders that spurned Sadr's instructions did so not for strategic or ideological reasons but to sustain their lucrative criminal enterprises. Groups of loyal fighters formed. The Najaf-based "Golden JAM" and Baghdad's "Noble JAM," as they called themselves, attempted to persuade rogue elements to comply with Sadr's wishes or purged them altogether, showing that the Shi'a militants were fighting one another even as they postured to fight the coalition.[159]

### The Battle Against the Soldiers of Heaven

Far from Baghdad, another confrontation took place on the eve of the surge that highlighted the complexity of the Shi'a militant problem. Iraqi and coalition troops found themselves in a strange battle against a Shi'a militia with no ties to the Sadr movement or any other Shi'a extremist faction known to the coalition. Early on the morning of January 28, 2007, 10 miles north of Najaf, Iraqi security forces became embroiled in an unexpected gunfight. The first coalition unit on the scene—a U.S. Special Forces detachment from Najaf—arrived to find dozens of police and troops from the 1st Brigade, 8th Iraqi Army Division, locked in combat with a dug-in, battalion-sized foe reportedly equipped with heavy machine guns, mortars, and rocket-propelled grenades. As the fighting intensified, the enemy's identity and how the battle began remained a mystery to the Americans. Under fire themselves, the Green Berets called for close-air support as reinforcements consisting of Iraqi special operations forces and U.S. advisers from nearby Hillah made their way to the sound of the guns. Multiple strafing and bombing runs from F-16 Falcon jets and A-10 Thunderbolts failed to suppress the enemy position. Rocket fire brought down one AH-64 Apache helicopter that had arrived to help, killing the two pilots when it fell from the sky into no-man's-land between the opposing sides. A U.S. Army transition team returning to the coalition base in Diwaniyah after training with its Iraqi battalion attempted to secure the crash site, but gunfire kept the American Soldiers pinned down. The precarious situation stabilized only when two U.S. Stryker companies arrived at dusk, along with another Iraqi Army company.[160] Taking control of the operation that evening, the Strykers bombarded the enemy position through the night and launched an assault shortly after dawn as the militants began to surrender en masse. The battle ended in a lopsided victory for U.S. and Iraqi troops, with reports of up to 400 militants killed and another 400 people detained.[161]

PX242

Apaches too aggressive for a complex battlefield where U.S. and Iraqi troops maneuvered in conjunction with Sunni irregular forces. When MND-C's attack helicopters mistook an armed group of tribesmen in Kershaw's sector for AQI and fired on them, the brigade commander began to rely on OH-58 reconnaissance helicopters for support instead.[134]

Kershaw's decision to employ the CLCs as "shock companies," rather than merely informants or guards at fixed sites, also ran afoul of Lynch's more conservative guidance. Concluding that an auxiliary force of armed tribesmen only would lead to more bloodshed, the MND-C commander initially prohibited the practice. Forbidding his units to issue weapons and ammunition to the CLCs, Lynch also banned the act of fighting alongside them. "They can give us the intel and we will fight al-Qaeda," he directed.[135] Having already gone through months of trial and error with Awakening forces, Kershaw considered Lynch's restriction unnecessary and self-limiting, especially if U.S. units could monitor the armed groups closely and oversee them in operations.[136] Kershaw also disagreed with Lynch's view that the coalition should avoid working with Sunni fighters who had American blood on their hands and dismissed his commander's concern that AQI could infiltrate the armed groups cooperating with the brigade. In a midsummer memorandum to his subordinates, Kershaw emphasized the utility of prudent control measures, but implicitly criticized MND-C's directives by warning against the impracticality of overly prescriptive guidance. "As I look at the daily disposition of the groups, it occurs to me that they exactly mirror the same cells that we were fighting against 2 months ago," Kershaw explained to his units. "We are now working with many of the same people we were fighting against. . . . So, the groups are already 'infiltrated.' Get over it."[137]

## THE WAR AGAINST IRAN'S MILITANT PROXIES

### EFP Networks and the Iranian Border Problem

As the MNC-I operations against AQI intensified in the Baghdad belts and beyond, the coalition's Shi'a militant problem grew, requiring more attention from U.S. commanders. Taking advantage of MNF-I's renewed focus against Sunni militants elsewhere, Shi'a militants increased their attacks in the first half of 2007, conducting 65 explosively formed penetrator (EFP) attacks against coalition troops in April alone.[138] As in 2006, a well-established network of Iranian-sponsored militants was smuggling EFP devices and other weapons across the Iran-Iraq border in the south and in the Diyala Valley. The most active EFP smugglers were the operatives headed by Abu Mustafa al-Sheibani and his brother Abu Yaser al-Sheibani, who moved the Iranian weapons through Maysan and Wasit Provinces to deliver them to JAM and other militant groups. In addition to the border crossings near Amarah and Kut, coalition analysts suspected the Sheibani brothers and other smugglers were using routes through the vast marshes that spanned the border south of Amara, just as they had done in their shadowy war against Saddam's regime during and after the Iran-Iraq War. Though coalition special operators were able to capture Abu Yaser al-Sheibani on April 20, the incidence of EFP attacks nevertheless increased as the summer approached, eventually rising to 99 attacks during July.[139]

PX242



Source: DoD photo by Staff Sergeant Russell Bassett (Released).

**Fully Constructed EFPs.[140]**

The nature of the EFP smuggling operation and the employment of EFPs left U.S. commanders with no doubt that the weapons were part of an Iranian regime proxy war against the United States and parts of the Iraqi Government, a judgment that Petraeus and Crocker relayed to the visiting Nebraska Senator Charles T. Hagel on April 15.[141] At that time, U.S. analysts believed that 100 percent of EFPs were meant to target coalition troops, though they often killed or wounded Iraqis as collateral damage.[142] The EFPs also never proliferated into the hands of Sunni militants, indicating that the Iranians kept tight control of their distribution.

For coalition commanders, the operational problem was the difficulty of controlling the porous southeastern border—the same problem Lieutenant General Peter W. Chiarelli had reported to Casey almost exactly a year before. Reporting to Gates in mid-May 2007, Petraeus noted that the Iranian regime appeared to be directly involved in the cross-border smuggling, with the coalition detecting at least 10 Iranian helicopter incursions into Iraq in the marsh-covered border area of southeastern Iraq since January. "Most of the observed flight paths followed smuggling routes," Petraeus noted, "which may mean those routes are being reconnoitered to allow smugglers to avoid detection by border patrols and also assess deployed Coalition Forces."[143]

To improve the coalition's monitoring of the troublesome border area, Petraeus and Odierno expected MND-C to deploy coalition combat power to Wasit Province, in addition to its continuing efforts to support the Sunni Awakening and interdict AQI in Baghdad's southern belts. Situated between the Iranian border and Baghdad, Wasit Province contained key routes between Iran and various Shi'a militias and Special Groups, and in the past efforts to disrupt these supply lines suffered from a distinct lack of coalition troops and resources. The closest permanent coalition presence to the main border crossing of Zurbatiyah was a hazardous 80-kilometer drive away from Forward Operating Base Delta, near the city of Kut, and coalition border security teams were able to search only a handful of the approximately 300 trucks that crossed into Iraq daily.[144] The arrival of the 2,000 soldiers of the 3d Infantry Brigade from the Republic of Georgia in July 2007

PX242

enabled MNC-I to "thicken" the space between Kut and the border with a coalition troop presence and checkpoints designed to disrupt smuggling of weapons and explosives. In addition to the Georgian checkpoints, coalition commanders made plans to secure the primary border crossings with six new outposts constructed as a secondary screen to the existing Iraqi outposts. These new facilities would be outfitted with X-ray machines that would permit more effective vehicle searches as well as biometric systems to allow guards to identify known terrorists or militants.[145] In September, construction began on Combat Outpost Shocker, which would allow MNC-I to station U.S. troops just 8 kilometers from the Zurbatiyah crossing and allow a permanent coalition contingent on the border.[146] Although smugglers would no doubt still find alternative routes along smaller roads or across the open desert, they would be vulnerable to detection by satellites or aerial surveillance.[147]

South of MND-C's area of operations in Wasit Province, Maysan Province and its unruly capital of Amarah represented another, more complicated problem. In keeping with the transition campaign plan of 2006, the province had been passed to Provincial Iraqi Control in mid-April 2007, making the coalition's ability to operate there unilaterally more difficult.[148] Unlike the border crossing area in Wasit, Maysan's marshy border was largely unwatched by either Iraqi or coalition forces, and coalition commanders suspected Amarah to be a major Shi'a militant logistics hub. The province was riddled with Shi'a militant activity. On June 18, for example, coalition troops conducting a series of raids against the Special Groups (a term referring to highly trained, Iranian-sponsored Shi'a militants such as Asa'ib Ahl al-Haqq) in Amarah and the border town of Majar al Kabir came under heavy small arms and RPG fire. In the ensuing firefight, they killed at least 20 militants before leaving the area with a captured member of an EFP smuggling network.[149] Throughout June and July, coalition troops made similar raids throughout the province to try to stem the flow of EFPs into central Iraq, but with no real coalition presence in Amara or on Maysan's border, U.S. commanders would have difficulty preventing the Sheibani Network or other Shi'a militants from moving lethal materials into Iraq at will.

**The Trilateral Talks and Iranian Involvement**

In addition to the clear forensic evidence of Iranian-sponsored lethal assistance across the Iran-Iraq border, coalition commanders were learning more about Iranian involvement with Shi'a militant groups from top Shi'a militant leaders themselves. On March 20 in Basrah, coalition troops had captured Qais al-Khazali and his brother Laith al-Khazali based on evidence that the two men and their Asa'ib Ahl al-Haqq group had been behind the January 2007 killing of U.S. military advisers at the police compound in Karbala. They had also captured a third man whose identity was unknown but who had pretended to be mute. On May 1, the third detainee, whom coalition officers referred to as "Hamid the mute," began speaking to his captors in a coalition detention center, revealing himself to be Ali Mussa Daqduq, a senior leader of Lebanese Hizballah's external operations group. Daqduq admitted that he had deployed to Iraq to advise Qais al-Khazali and Asa'ib Ahl al-Haqq in their campaign against the coalition. Once talking, he and Khazali revealed extensive details about their Iranian-sponsored operations. "The evidence is impressive," Petraeus wrote to Gates in late May:

PX242

is more of a hindrance to long-term security in Iraq than is AQI," he had written to Gates on June 30, adding that, "JAM is a much tougher nut and will require kinetics against the rogue leaders and active engagements to make the mainstream more constructive."[173] In terms of the militias' lethality, Petraeus was right—about two-thirds of U.S. casualties in the following month of July came at the hands of Shi'a militants. The events of the summer also showed a Sadrist militant front that was in disarray as it faced pressure from both the coalition and its rivals in the Iraqi Government. The Sadrists' top problem was that their leader, Moqtada Sadr, appeared not to be in full control of his numerous militant commanders and fighters. In early July, he had suddenly returned to Iran, leaving Sheikh Ahmed al-Sheibani in charge of JAM activities and issuing little guidance to his organization.[174] As Sheibani took command back in Iraq, MNF-I detected that JAM leaders were purging their ranks, and as JAM groups mounted large-scale indirect fire attacks in Baghdad, coalition commanders could not tell how many of the Sadrist militant groups actually followed Sadr's commands.[175] Sheibani left for Iran in mid-July, part of an exodus of JAM commanders who were spending more time in Iran as Maliki consented to more coalition operations against longtime JAM sanctuaries in Baghdad and elsewhere.[176] By mid-August, Petraeus judged that "Sadr is at least a bit marginalized; even the Iranians think he is a weak leader."[177]

The most significant factor working against the Sadrists, however, was that they had worn out their welcome with Nuri al-Maliki, and the Prime Minister was increasingly willing to fight them. After the Sadrists had withdrawn from his cabinet in April, Maliki had spent 3 months working toward fashioning a new governing coalition among Iraq's four major parties that excluded the Sadrists. Petraeus anticipated that Maliki was "setting the stage for a more direct confrontation with the radical elements of JAM."[178] Both Petraeus and the Iraqi Prime Minister detected an erosion of JAM's popular support as well. A late July coalition clash against JAM in Karbala had revealed local disaffection with the militia when JAM fighters commandeered a hospital and demanded that the doctors treat their wounded, instigating a "ruckus" when the doctors refused. "This attitude seems to match that of many Karbala residents, who believe JAM's presence will bring on AQI attacks," Petraeus reported.[179] When an August 8 coalition operation in Sadr City resulted in 32 JAM militiamen killed, Petraeus observed, "while such an operation would have received great opposition only a few months ago, today Iraqis are happy to have these rogue militias cleaned off of their streets."[180]

### The Karbala Fiasco and the JAM Freeze

The week following the assassination of Governor Hamza in Diwaniya, Maliki told Petraeus that "many Shi'a communities are getting fed up with JAM," and discussed the Sadrists' prospects among a Shi'a population that was growing resentful of them. Reflecting on the discussions, Petraeus reported to Gates on August 18:

> my take on JAM is that they, like AQI, have overplayed their hand in some areas. . . . JAM continues to demonstrate the destructive nature of their organization, and we are seeing a growing rejection by Iraqi citizens of JAM. JAM protected Shi'a communities when AQI and Sunni insurgents threatened them, but with that threat dissipating in some areas, JAM is being viewed more as criminal gangs and thugs than protectors. Many Iraqi leaders talk about the danger of the Hezbollization of Iraq by

PX242

PX250



COMBATING TERRORISM CENTER AT WEST POINT

# CTCSENTINEL



*OBJECTIVE · RELEVANT · RIGOROUS*  |  AUGUST 2019 · VOLUME 12, ISSUE 7

FEATURE ARTICLE

# Iran's Expanding Militia Army in Iraq

Michael Knights

A VIEW FROM THE CT FOXHOLE

# Suzanne Raine

Former Head, U.K. Joint
Terrorism Analysis Centre

PX250

# Contents

**FEATURE ARTICLE**

**1**  Iran's Expanding Militia Army in Iraq: The New Special Groups
Michael Knights

**INTERVIEW**

**13**  A View from the CT Foxhole: Suzanne Raine, Former Head of the United
Kingdom's Joint Terrorism Analysis Centre
Raffaello Pantucci

**ANALYSIS**

**18**  Western Balkans Foreign Fighters and Homegrown Jihadis: Trends and
Implications
Adrian Shtuni

**25**  Returnee Foreign Fighters from Syria and Iraq: The Kosovan Experience
Kujtim Bytyqi and Sam Mullins

**31**  Maduro's Revolutionary Guards: The Rise of Paramilitarism in Venezuela
Ross Dayton

**CTCSENTINEL**

*Editor in Chief*

Paul Cruickshank

*Managing Editor*

Kristina Hummel

**EDITORIAL BOARD**

Colonel Suzanne Nielsen, Ph.D.

*Department Head*

*Dept. of Social Sciences (West Point)*

Brian Dodwell

*Director, CTC*

Don Rassler

*Director of Strategic Initiatives, CTC*

**CONTACT**

Combating Terrorism Center

U.S. Military Academy

607 Cullum Road, Lincoln Hall

West Point, NY 10996

Phone: (845) 938-8495

Email: sentinel@westpoint.edu

Web: www.ctc.usma.edu/sentinel/

**SUBMISSIONS**

The *CTC Sentinel* welcomes submissions.
Contact us at sentinel@westpoint.edu.

The views expressed in this report are
those of the authors and not of the U.S.
Military Academy, the Department of the
Army, or any other agency of the U.S.
Government.

*Cover: In this June 8, 2018, photo, Iraqi
Popular Mobilization Forces march as they
hold their flag and posters of Iraqi and
Iranian Shiites spiritual leaders during "al-
Quds" or Jerusalem Day, in Baghdad, Iraq.
(Hadi Mizban/AP Photo)*

**FROM THE EDITOR**

In our feature article, Michael Knights draws on six research visits to Iraq in 2018 and 2019 to document the expanding footprint region-by-region of pro-Iranian militias in Iraq that were previously labeled "Special Groups" by the United States and in some cases designated as terrorist organizations. Knights assesses "that the Special Groups (not including 18,000-22,000 Badr troops) currently have 63,000 registered personnel ... 15 times the size of the Special Groups in 2010, when there were probably as few as 4,000 Special Group operatives in Iraq (again not including Badr personnel in 2010)." He notes a key driver for their growth in manpower and popularity in Iraq was their role in fighting the Islamic State and liberating Sunni population centers under Islamic State control. He writes that "a pantheon of smaller, newer pro-Iran militias is arguably closer to the Islamic Revolutionary Guard Corps than larger and older pro-Iranian militias such as Badr and Asa'ib Ahl al-Haq" and identifies Kata'ib Hezbollah led by U.S.-designated terrorist Abu Mahdi al-Muhandis as the greatest threat to U.S. interests. With pro-Tehran militias expanding their presence across Iraq and U.S. influence in Iraq reduced since its 2011 troop withdrawal, he argues the United States "needs to be parsimonious and pragmatic if it wishes to push back effectively."

Our interview is with Suzanne Raine, who was the head of the United Kingdom's Joint Terrorism Analysis Centre (JTAC) between 2015 and 2017. She outlines to Raffaello Pantucci the lessons learned from her work in counterterrorism and the threat landscape as she sees it. Two articles in this issue focus on the Western Balkans. Adrian Shtuni provides a qualitative and quantitative assessment of the security threats posed by foreign fighters and homegrown jihadis from the region. Kujtim Bytyqi, the Acting Director of the Department for Analysis and Security Policies at the Kosovo Security Council Secretariat, and Sam Mullins outline Kosovo's experience dealing with returning foreign fighters. Finally, Ross Dayton documents how the Maduro regime in Venezuela has increased its reliance on paramilitary groups, including the Colombian left-wing guerrilla group ELN, which was responsible for the suicide car bomb attack on the National Police Academy in Bogotá, Colombia, in January 2019.

**Paul Cruickshank**, *Editor in Chief*

AUGUST 2019 | CTC SENTINEL 1

# Iran's Expanding Militia Army in Iraq: The New Special Groups

By Michael Knights

**Pro-Iranian militias in Iraq—excluding Badr—have swollen from as few as 4,000 personnel in 2010 to over 60,000 in 2014 when they plugged into government funding through the Popular Mobilization Forces raised to fight the Islamic State. Large, new pro-Iran militias such as Kata'ib Al-Imam Ali deserve more attention from the analyst community, as do new Kata'ib Hezbollah leaders such as Abu Zaynab al-Lami, who are emerging as challengers to the movement's leader Abu Mahdi al-Muhandis. A pantheon of smaller, newer pro-Iran militias is arguably closer to the Islamic Revolutionary Guard Corps than larger and older pro-Iranian militias such as Badr and Asa'ib Ahl al-Haq. Key behaviors for analysts to monitor include corrupt money-making, control of the Iraq-Syrian border, human rights abuses, and development of exclusive bases outside Iraqi state control.**

T he Iraqi state has drawn upon militia-like reserve forces throughout its history to defeat internal and external threats.[1] The use of the Popular Mobilization Forces (PMF, *Hashd al-Sha'abi* in Arabic), raised in 2014 by a combination of executive orders and religious fatwa, is merely the latest example of this trend. Within the PMF—forming its core, in fact—are older pro-Iranian militias that were previously labeled "Special Groups"[a] by the United States and designated as terrorist organizations in some cases. A broader range of Special Groups now exist than when the U.S. military left Iraq in 2011, underlining the diversification of actors that the Islamic Revolutionary Guard Corps' Quds Force (IRGC-QF) works with in today's Iraq. Unlike previous militias that were tolerated and controlled by the state, the Special Groups are already operating outside the state's ability to monitor or discipline them. Building on six research visits to Iraq in 2018 and 2019, where the author interviewed senior Iraqi political and military figures, this article will provide new data on the state of Iranian-backed Special Groups in Iraq today.

Coming out of the main combat stage of the war against the Islamic State, the Special Groups are growing in economic and political power and are attacking foreign entities on Iran's behalf. A dozen attacks have been launched on U.S. military, diplomatic, and commercial targets in Iraq so far in 2019.[2] Then on May 14, 2019, two Saudi oil pumping stations were struck by long-range explosive drones launched from Jurf as-Sakr,[3] the Baghdad outskirts base of the most powerful Iranian-backed Special Group, Kata'ib Hezbollah (KH), led by U.S.-designated terrorist Abu Mahdi al-Muhandis,[4] who is also sought by Interpol and Kuwaiti authorities.[5] The coordinated drone attacks underline KH's graduation as the third major militant force alongside IRGC-QF and Lebanese Hezbollah in Iran's "axis of resistance." Iraq's large population, weak government, and powerful level of IRGC-QF penetration make Iraq the most consequential and fastest-growing arena for Iran's expansion of malign influence in the Middle East.

## Pro-Iranian Militias after the U.S. Withdrawal

The Syrian civil war and the interrelated war against the Islamic State in Iraq breathed life back into the Special Groups after the removal of U.S. forces from Iraq in 2011. As U.S. forces departed, Special Groups like KH harried the withdrawing U.S. presence until the very end but faced a future in which their commonly understood *raison d'etre*—the removal of the U.S. occupation—had expired. In late 2011, the Islamic State's predecessor group, the Islamic State of Iraq, appeared to be defeated and the Iraqi security forces appeared to be robust.

The 2011-2014 period of the Special Groups is important to understand at a time when today's Iran-backed militias are also looking beyond their prior mission, the main combat phase of the war against the Islamic State. Back in 2011-2012, the Special Groups immediately began deploying to a new battlefield as the United States was leaving Iraq. Providing an Iraqi foreign fighter cadre to the Iranian intervention in Syria provided one outlet for militancy and most of the Special Groups contributed, including KH, Kata'ib Sayid al-Shuhada (under U.S.-sanctioned terrorist Abu Mustafa al-Sheibani[6]), and Asa'ib Ahl al-Haq (AAH).[7] Within Iraq, the Special Groups remained ready to support Iran in the case of an Iranian clash with the United States, the Gulf States, or Israel. On March 27, 2012, a 12-rocket attack was partially undertaken (nine misfired) during the lead-up to the first post-Saddam Arab League summit in Baghdad. AAH, meanwhile, focused on assassinating its militia rivals in Moqtada al-Sadr's Promised Day Brigades (forerunner to today's Saraya Salam) and negotiating with the government

---

a    The original "Special Groups" were breakaways from Moqtada al-Sadr's Jaish al-Mahdi such as Asa'ib Ahl a-Haq and breakaways from Badr, such as the Sheibani network and Kata'ib Hezbollah. For further discussion, see Michael Knights, "The Evolution of Iran's Special Groups in Iraq," *CTC Sentinel* 3:11-12 (2010): p. 2.

*Dr. Michael Knights is a Senior Fellow with the Military and Security Program at The Washington Institute for Near East Policy. He has traveled extensively in Iraq since 2003, including periods embedded with a variety of security forces in militia-dominated environments. He has visited the country three times this year to interview Iraqi political and security figures about pro-Iranian militias. Knights has written for the* CTC Sentinel *since 2008. Follow @mikeknightsiraq*

PX250

to release its detained members.

As the security situation in Iraq worsened in 2012-2014, the Special Groups began to mobilize more strongly. Their Syrian deployments—which violate Article 9 of the Iraqi Constitution,[b] undertaken without approval, but overlooked by the government of Iraq[c]—required larger-scale recruitment and resulted in the injection of new, intense battlefield experience into the movements. Inside Iraq, then Prime Minister Nouri al-Maliki began to draw small units of Special Group fighters into "Sons of Iraq" forces, and he accelerated his planning to raise larger Popular Defense Brigades (Saraya al-Dif'a al-Sha'abi) to operate under the prime minister's command, alongside the conventional armed forces.[8] On June 13, 2014, following the fall of Mosul to the Islamic State, the highest Shi`a authority in Iraq, Ayatollah Ali al-Sistani, issued a fatwa (religious edict), the al-Jihad al-Kifa'i (collective obligation)—calling for able-bodied male citizens to "volunteer and join the security forces."[9]

### The PMF and War Against the Islamic State
The resultant Hashd al-Sha'abi Commission of the Prime Minister's Office (the PMF) reflected al-Maliki's vision[10] of a predominately Shi`a reserve army that contained both new recruits and what al-Maliki called "mujahedeen" from Special Groups such as KH, AAH, and Kata'ib Sayyid al-Shuhada, plus new pro-Iranian militias like Harakat Hezbollah al-Nujaba (led by U.S.-designated terrorist Akram Kaabi[11]), Kata'ib al-Imam Ali (led by U.S.-designated terrorist Shibl al-Zaydi[12]), and Kata'ib Jund al-Imam. From the outset, however, the key leader in the PMF was Abu Mahdi al-Muhandis, the most inveterate opponent of the United States among the Special Group leaders, and al-Muhandis worked assiduously to develop the PMF into an organization that was neither subject to full prime ministerial command nor subordinate to the conventional security forces.[d]

The PMF phenomenon and the war against the Islamic State greatly altered the political and military profile of the Special Groups. Prior to 2014, a figure like Abu Mahdi al-Muhandis was an obscure former MP in Iraq with little public profile.[13] Likewise, opinion polling from pre-2011 Iraq shows that Iraqis frequently found it hard to differentiate or remember differences between groups like Promised Day Brigades, Kata'ib Hezbollah, or Asa'ib Ahl al-Haq.[14] Respondents were often unaware of the tight connections between Special Groups and the Iranian government.[15] In 2011, only 15.5% of respondents had high or very high confidence that militias could provide security, versus 65.8% for the Iraq army.[16]

Much of this changed after 2014: militia leaders and individual armed groups (fasa'il in Arabic) gained widespread name recognition.[e] In opinion polling, members of the public express differentiated views on KH, AAH, Kata'ib Al-Imam Ali, Kata'ib Sayyid al-Shuhada, and Badr.[17] Compared to pre-2014, following the PMF role in liberating many Sunni cities, the Iraqi public has considerably more faith that militias within the PMF structure are positive contributors to local security—91% among Shi`a respondents in 2017 and 64.5% in Sunni areas in 2017, far greater than 15.5% for all respondents in 2011.[18]

### Growth of the Special Groups
The Special Groups also militarily transformed as a result of the Syrian civil war and the anti-Islamic State fighting in Iraq. First, more Iran-backed Special Groups were formed, and each grew larger than in the pre-2011 period due to their adoption as government-paid fighters under the PMF Commission.

- In 2011, KH was assessed to have 400 active members in Iraq,[19] while today KH (PMF brigades 45, 56, 57) maintain around 7,500 fighters assigned to Iraqi operations, 2,500 fighters assigned to Syria, for a total of 10,000.[20]
- AAH (PMF brigades 41, 42, 43) has likewise swollen from a small Sadrist[f] splinter militia of under 3,000 members in 2011[21] to an equivalent KH-size three-brigade force of around 10,000.[22]
- Kata'ib Al-Imam Ali (PMF brigade 40) has expanded from a tiny Sadrist splinter group to an 8,000-strong PMF mega-brigade with deployments across Iraq.[23]
- Kata'ib Jund al-Imam (PMF brigade 6) has around 5,000 registered fighters,[24] Kata'ib Sayyid al-Shuhada (PMF brigade 14) and Saraya Talia al-Khurasani (PMF brigade 18) each have around 3,000 fighters,[25] and even the smaller Harakat Hezbollah al-Nujaba (PMF brigade 12) now boasts more than 1,500 fighters—nearly four times the KH membership in 2011.[26]
- Newer Special Groups assessed to be primarily loyal to Abu Mahdi al-Muhandis and willing to provide material support to IRGC-QF include (from most militarily capable to least) Harakat al-Abdal (PMF brigade 39), Saraya al-Jihad (PMF brigade 17), Liwa al-Tafuf (brigade 13) and the less capable Liwa al-Muntadher (brigade 7), Ansar Allah al-Tawfiya (brigade 19), Saraya Ansar al-Aqeeda (brigade 28), Kata'ib Ansar al-Hujja (brigade 29), Quwwat al-Shahid al-Sadr al-Awwal (brigade 25), Quwwat al-Shahid al-Sadr (brigade 35), and Kata'ib al-Tayyar al-Risali (brigade 31).[27][g]

Newer Special Groups listed here have, by the author's tally of figures provided by Iraqi contacts, 22,500 registered personnel.

---

b   Article 9 of the Iraqi Constitution states that all armed forces are commanded by the Prime Minister.

c   The author has asked numerous senior Iraqi leaders, in the course of interviews in 2015-2019, whether the Iraqi government authorized, opposed, or simply ignored the issue of Iraqi fighters traveling to Syria to participate in the Syrian civil war. They are almost unanimous that the government turned a blind eye, even though such deployments contravene constitutional provisions about the exclusive authority of the government over foreign policy and the exclusive authority of the prime minister to involve Iraqis in armed conflict.

d   In all the author's interviews with Iraqi leaders in 2014-2019, al-Muhandis has always been recognized as the most dominant individual within the PMF. PMF Commission chairman Falah Fayyadh concentrates on his role as National Security Advisor and leaves the PMF entirely to the deputy PMF chairman al-Muhandis.

e   As of mid-July 2019, AAH leader Qais al-Khazali had 226,912 Twitter followers. Abu Mahdi al-Muhandis had 36,799 followers for his official Facebook page. Kata'ib Al-Imam Ali celebrity fighter Abu Azrael alone has 15,377 Facebook followers.

f   Sadrists are those who identify Mohammed Sadiq al-Sadr, the father of Moqtada al-Sadr who was murdered in 1999 by the Baathist regime, as their object of emulation.

g   The assessment of relative military capability is judged by the author based on combat experience of the unit, its ability to source heavy weapons and surveillance drones, and its access to Iranian and/or Lebanese Hezbollah training and advisory support. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

PX250



*Main areas of operation for Iran-backed militias in Iraq, annotated with PMF brigade numbers (Brandon Mohr)*

Adding in all the other bulleted groups above, the author assesses that the Special Groups (not including 18,000-22,000 Badr troops[h]) currently have 63,000 registered personnel.[i] According to the author's calculation, this is 15 times the size of the Special Groups in 2010, when there were probably as few as 4,000 Special Group operatives in Iraq (again not including Badr personnel in 2010).[j]

The expanded pantheon of Special Groups adopted medium and heavy weapons, attained significant battlefield experience, and openly absorbed training and embedded advisers from IRGC-QF

and Lebanese Hezbollah within Iraq.[28] Each established "economic offices" in Baghdad, southern provinces, and in areas of sustained battlefield presence, which serve as hubs for local organized crime activity.[29]

Special Groups answering primarily to Abu Mahdi al-Muhandis and willing to provide material support to IRGC-QF are scattered across Iraq. Unlike an Iraqi Army division, the Special Groups deploy detachments in many different areas of operation (AOs), but it is nonetheless possible to discern areas of concentration for some of the groups.[30]

## Western Anbar

This area refers to the swath of Iraqi-Syrian border between Walid border crossing and Al-Qaim district. This area is of critical importance to the Special Groups because it contains the Baghdad-Damascus highway crossing—currently blocked by U.S.-backed forces at Tanf, Syria—and also the workaround tracks from the Akashat area to the highway systems north of Tanf.[31] The Akashat sub-sector is garrisoned by brigades Allah al-Tawfiya (brigade 19), Liwa al-Tafuf (brigade 13), and Saraya Talia al-Khurasani (PMF brigade 18).[32]

At the eastern end of this sector is the Husaybah border crossing on the Euphrates, facing the Albu Kamal areas in Syria. Iraqi Special Groups such as Kata'ib Hezbollah (brigade 45), Kata'ib Al-Imam Ali (brigade 40), and Harakat al-Abdal (PMF brigade 39) maintain combat forces in Albu Kamal (in Syria).[33] The Hu-

---

h    Badr has around 18,000 to 22,000 troops registered within the PMF, based on a tallying of the author's interview data. Authors interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

i    This assessment is based on a tallying of the author's interview data. Authors interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

j    This assessment was based on a tallying of an estimate of 3,000 Asa'ib Ahl al-Haq fighters, 400 Kata'ib Hezbollah fighters, and 600 others. These figures were derived from interview material gathered by the author over a range of Iraqi security force intelligence and operational personnel in Iraq during visits in 2008, 2009, and 2010, exact dates, names, and places withheld at request of the interviewees.

saybah/Al-Qaim sub-sector is garrisoned mainly by Liwa al-Tafuf (brigade 13).[34] The Euphrates River Valley leading down to eastern Anbar is garrisoned mainly by a mix of Iraqi Army forces and Liwa al-Muntadher (PMF brigade 7) and Kata'ib Ansar al-Hujja (PMF brigade 29).[35] Within their areas, 122mm rockets are assessed by U.S. government agencies to have been fired by Iran-backed militias at the U.S. advisor site at Al-Asad airbase on February 2, 2019.[36]

Qasim Muslih, the commander of Liwa al-Tafuf, is also the head of the PMF Western Anbar Axis, the sector headquarters for all PMF operations along the border and in Rutbah.[37] The axis headquarters is based in Al-Qaim, and there is a sub-sector headquarters in Rutbah, on the Baghdad-Damascus highway.[38] In collaboration, Liwa al-Tafuf and Kata'ib Hezbollah control all cross-border smuggling and commerce.[39] Kata'ib Hezbollah operatives buttress each of the garrison forces along the border, maintaining checkpoints on the border road (Highway 20).[40] Kata'ib Hezbollah also controls the Husaybah Point of Entry, where it clears its military vehicles to enter and leave Iraq without being inspected by customs.[41] Akashat border crossings—where no customs personnel are present—are coordinated via a KH base at the H-3 airfield, near Rutbah.[42]

### Southern Baghdad Belts

Formally, there is no PMF operational headquarters for Baghdad province,[43] but in practice, the Special Groups have emplaced substantial bases in Baghdad's rural 'belts.'

Kata'ib Hezbollah has carved out an exclusive principality in Jurf as-Sakr, 40 kilometers southwest of Baghdad. This area was liberated in late 2014, when it was celebrated as the first major liberation undertaken by the PMF. Since then, KH has strongly consolidated a "no-go" zone in which displaced Sunni residents cannot return[44][k] and where only KH forces operate,[45] complete with private prisons (holding well over 1,000 illegal detainees).[46] In March 2019, Iraqi air traffic control was instructed by KH to prevent U.S. drone overflights of Jurf as-Sakr, and as noted previously, it was from this site on May 14, 2019,[47] that two explosive drones were launched toward Saudi Arabian oil pipeline pumping stations.[48] According to Iraqi government contacts, KH has even acquired land use rights from the government, making its areas private property.[49]

Kata'ib Al-Imam Ali is trying to build out a similar redoubt in the southeastern Baghdad belts, between Suwayrah and Aziziyah, around 50 kilometers southeast of the capital. A former Iraqi military base was improved in 2018 with the aid of 27 mechanical diggers.[50] Kata'ib Al-Imam Ali's leader, U.S.-designated terrorist Shibl al-Zaydi, is one of the richest Special Group leaders, with broad involvement in legitimate business and property in Baghdad.[51]

### Northern Baghdad Belts and Salah al-Din

Asa'ib Ahl al-Haq is dominant in the swathe of northern Baghdad belts and southern Salah al-Din, including Taji, Dujail, and Balad.[52] Within this area, AAH's Ali Haj Safa al-Saadi leads the PMF Salah al-Din Operations Command, nominally covering all of the Tigris

River Valley inside Salah al-Din.[53] In practice, AAH allows other militias their own sub-sectors of Salah al-Din. Moqtada al-Sadr's militia, Saraya Salam, exclusively controls the shrine city of Samarra.[54] Camp Speicher, a large, unused military base west of Tikrit where 1,700 Shi`a cadets were taken from before being massacred by the Islamic State in June 2014,[55] is dominated by KH, Kata'ib Al-Imam Ali, and Kata'ib Jund Al-Imam (PMF brigade 6).[56] Kata'ib al-Tayyar al-Risali (PMF brigade 31) has leadership of the sector in Bayji, where it has concentrated its activities.[57] Alas oilfield is presently controlled by militias, who divert quantities of oil for trucking to Iran (and the Gulf ports) via the Kurdistan Region.[58]

AAH is the dominant economic and political actor only from Samarra to Baghdad.[59] In July 2018, Sunni tribal groups were forced to push back muscularly on AAH intimidation and extortion in this area.[60] AAH criminal rackets resulted in the complete destruction by looting of Iraq's largest refinery[61] and have even targeted U.S. contractors[62] and stolen major equipment supporting the Iraqi F-16 program at Balad airbase.[63] Rockets are assessed by U.S. government agencies to have been fired by AAH at the U.S. advisor sites in Taji on May 1, 2019, with two AAH operatives arrested by local security forces in connection with the attack.[64]

### Mosul and Rural Nineveh

All PMF units in Nineveh are nominally supposed to answer to the PMF Nineveh Operations Command, which is dominated by al-Muhandis appointee Ali Kadhim al-Musawi and his powerful deputy, Kata'ib Al-Imam Ali operative Hajj Ali Kerwei.[65] In practice, Nineveh is another area where a patchwork of local and outsider militias are largely doing their own thing.

The Nineveh-Syria border and connected wadis in central Nineveh are garrisoned by a collection of smaller pro-Iran units such as Saraya Ansar al-Aqeeda (brigade 28), Kata'ib Ansar al-Hujja (brigade 29), and Quwwat al-Shahid al-Sadr (brigade 35).[66] KH and Kata'ib Al-Imam Ali advisors are occasionally visible.[67] This segment of Syrian border is presently of limited interest to IRGC-QF due to the presence of U.S.-backed Syrian Democratic Forces on the other side.[68]

In Sinjar and Tal Afar, KH and Kata'ib Al-Imam Ali advisors work with Liwa al-Hussein (PMF brigade 53) and Lalish (PMF brigade 36), which are each staffed by local Yazidis and Shi`a Turkmen.[69]

In the Nineveh Plains and eastern Mosul city, two local militias draw on support from al-Muhandis to refuse legal orders from the Iraqi government to redeploy away from Christian areas.[70] One is Liwa al-Shabak/Quwat Sahl Nineveh (PMF brigade 30), led by Waad Qado, and the other is Babiliyun (brigade 50), led the Rayan Khaldani.[71] Both leaders were sanctioned by the United States for human rights abuses under the Global Magnitsky Human Rights Accountability Act.[72] These militias have also dominated the tolling of trucks on the Erbil-Mosul highway and the large-scale scrap metal business in Mosul.[73]

### Badr's Stronghold in Southern Diyala

The fifth major AO for PMF forces covers essentially all the areas east of the Tigris River in Diyala, the Jallam desert east of Sa-

---

k   The issue of Sunni mass displacement and blocked resettlement at Jurf as-Sakr (which militias renamed Jurf an-Nasr after the 2014 battle) is widely discussed and accepted as fact by all major politicians. In the author's interview program with Iraqi politicians and security leaders in 2018-2019, a number of Sunni politicians justified their cooperation with al-Muhandis-linked forces in terms of an effort to negotiate the return of hostages held in Jurf as-Sakr and the broader right to return for their displaced persons in Jurf and elsewhere.

PX250

marra and Tuz Khurmatu district, and Kirkuk.[l] Much of this area has historically been the preserve of the Badr organization, which was originally created as a formation of the Islamic Revolutionary Guard Corps during the Iran-Iraq War.[74] Led by Hadi al-Ameri, Badr remains the "first among equals" in this AO, particularly in al-Ameri's native southern Diyala.[75][m]

The PMF Diyala Operations Command is led by Talib al-Mu-sawi, a Badr commander[76] based at Camp Ashraf, which is the old encampment of the Iranian oppositionist Mojaheddin-e Khalq Organization—Badr's most bitter foes during the Iran-Iraq War.[77] Badr's local forces—Badr-leaning Iraqi Army brigades plus PMF brigades 4, 20, 23, and 24—are all under al-Ameri's effective command[78] and are almost all focused on southern Diyala and the adjacent Jallam Desert.[n]

### Shi`a Turkmen Militias Lean Toward al-Muhandis
Digging deeper, it is clear that neither al-Ameri nor Badr has a monopoly of control in areas east of the Tigris.[79] In Abu Sayda, in northeastern Diyala, AAH militiamen have unsuccessfully contested Badr's control of the town.[o] In Jalula, adjacent and to the northeast of Abu Sayda, AAH has developed a foothold by building out local Sunni-manned militias from the Kerwei tribe,[80] who were displaced from the area by the Kurds based on the high number of Islamic State fighters provided by the Kerwei in 2014.[81] AAH manages these tribal fighters out of Jalula's Cobra camp (an old U.S. forward operating base).[82] The arming of these Kerwei militias, who include many former Islamic State members, coincided with the rise in anti-Kurdish insurgent attacks in the same areas, south of Khanaqin, since May 2018.[83] AAH's involvement also places it astride one of the busiest Iran-Iraq trade arteries, a lucrative tolling opportunity.[p]

Shi`a Turkmen communities in Tuz Kurmatu and Kirkuk were some of the hardest hit by the Islamic State in 2014 and 2015,[84] and their leaders have gravitated toward Abu Mahdi al-Muhandis and IRGC-QF.[85] Tuz Khurmatu and Kirkuk are controlled by the

PMF Northern Axis, which is led by Abu Ridha Yilmaz al-Najjar, a Shi`a Turkoman primarily loyal to Abu Mahdi al-Muhandis.[86] In Kirkuk, Shi`a Turkmen militias look to Mohammed Mahdi al-Bayati, another Shi`a Turkoman primarily loyal to Abu Mahdi al-Muhandis.[87] While often identifying organizationally with Badr, Quwwat al-Turkmen (PMF brigade 16, based in Tuz and Kirkuk) looks toward al-Muhandis and Iran first for direction and support.[88] Al-Muhandis has also placed loyalists within Kirkuk's governor's office.[89]

As a result of the special penetration of the Shi`a Turkmen community in Tuz and Kirkuk, Iran-backed Special Groups have been particularly active in smuggling and the provision of material support to the Islamic Revolutionary Guard Corps.[q] For instance, IRGC-QF leaders have used Tal Ashtah dispersal airfield—just west of Jawwalah (Rashad), 35km southwest of Kirkuk city—for a variety of purposes.[r] On October 16, 2017, this is where IRGC-QF intermediaries including IRGC-QF Colonel Haj Ali Iqbalpour (the long-standing Kirkuk area liaison[90]) met with Kurdish and Iraqi leaders to broker the handover of Kirkuk to federal forces.[91] This is also where IRGC-QF launched and recovered surveillance drones[92] to designate targets for the September 8, 2018, precision rocket strike on the Kurdistan Democratic Party of Iran (KDPI) headquarters in Koya, in Iraqi Kurdistan, which killed 14 and wounded 42 oppositionists.[93]

In Tuz Khurmatu, where Badr has failed to rein in criminal Shi`a Turkmen mafias backed by al-Muhandis, oil is being extracted from the small number of producing wells in Pulkhana field and smuggled into Iran (and thereafter to the Gulf) by local Turkmen militias.[94] The field—sitting astride an area contested by the Islamic State, Shi`a Turkmen forces, and multiple Kurdish groups—has created strange bedfellows who mutually profit from the still-contested area,[95][s] and this has given outlaw groups [96] breathing space to survive outside the reach of Iraqi government and coalition forces.

### Presence in Baghdad City and the South
The PMF was raised to fight the Islamic State, which renders conspicuous the presence of PMF units in peaceful areas of southern Iraq. The PMF Commission maintains administrative offices in each Iraqi province outside Kurdistan, providing a necessary link to wounded fighters and families, as well as a recruitment hub and contact point for off-duty members.[97] Less logically, the PMF also maintains two operational commands in southern Iraq: the PMF Rafidain Operations Command (in Maysan and Dhi Qar) and the

---

l   This area essentially encompasses the old Iraq Tigris Operations Command AO, a now defunct Iraqi Army headquarters sector that Badr has taken over. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

m   This remains the case today, as the author's interviews with Iraqi security officials in 2019 suggests. Hadi al-Ameri continues to head local mediation efforts in southern Diyala whenever inter-tribal or inter-militia tensions spike. Badr leader Hadi al-Amiri personally accompanied 400 Sunni families returning to Mansouriyah in May 2016. See "Diyala Governor Splits Sunnis to Defeat Impeachment Bid," *Inside Iraqi Politics 134*, July 11, 2016.

n   The exception is in Khanaqin district, where the local Shi`a Kurdish (Fayli) PMF brigade 110 is a Badr unit tied to al-Ameri. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

o   On September 21-26, 2016, Badr paramilitaries and AAH paramilitaries were fighting for control of the sub-district center of Abu Sayda. In Tuz Khurmatu, meanwhile, Badr moved against AAH locations within the town. All incident data is drawn from the authors' geolocated Significant Action (SIGACT) dataset. The dataset brings together declassified coalition SIGACT data plus private security company and open-source SIGACT data used to supplement and extend the dataset as coalition incident collection degraded in 2009-2011 and was absent in 2012-2014.

p   The Perwezkhan/Muntheriya point of entry and the Iran-Baghdad highway in Diyala (Highway 5) are a major artery for trucking and pilgrim traffic, both of which can be tolled by militia checkpoints.

q   In additional to being especially brutalized by the Islamic State, Iraqi Turkmen have experienced intense violent factionalism and a search for external sponsors to help them minimize Kurdish influence in places like Tuz Khurmatu and Kirkuk. The traditional Badr leadership of Hadi al-Ameri stressed deal-making with the Kurds and tried to mount crackdowns on new, highly criminalized Shi`a Turkmen militias. Al-Muhandis and IRGC-QF delivered military victories against the Kurds and have shielded militias from crackdowns. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

r   The airfield is located in a zone garrisoned by Federal Police formations, but easily accessible to Liwa al-Turkmen (PMF brigade 16) forces.

s   Multiple interviewees have told the author since 2018 that the reason an insurgent pocket still exists in the small and surrounded enclave in Pulkhana is corruption involving Kurdish forces and Iraqi PMF, all of whom trade in oil, goods, and money to facilitate local ceasefires, smuggling of oil, and movement of people and goods.

PX250



*Abu Mahdi al-Muhandis, left, a commander in the Popular Mobilization Forces, and Adil Abd Al-Mahdi, right, then Minister of Oil and now Prime Minister of Iraq, attend the funeral of Iraqi politician Ahmad Chalabi, in Baghdad, Iraq, on November 3, 2015. (Karim Kadim/AP Photo)*

PMF Basra Operations Command, both led by Badr commanders.[98] These commands appear to be maintained by Badr in readiness for any of a number of contingencies: the deployment of Badr PMF units to restore order during electricity-related or secessionist rioting, to deliver civil engineering and disaster relief, or to crack down on uncontrolled militias.[t]

Militias in Baghdad and southern Iraq also undertake less savory behavior. On September 7-8, 2018, after the burning down of Iran's local consulate, a rash of rocket attacks triggered the closure of the U.S. consulate in Basra,[99] and on July 6, 2019, a roadside bomb detonated in Basra on a logistical convoy hauling supplies to the U.S. embassy in Baghdad.[100] Baghdad has also witnessed repeated rocket launches toward U.S. diplomatic facilities, most recently in September 2018, December 2018, and May 2019.[101] In Basra, some piers at Umm Qasr port and the Shalamcheh land border crossing to Iran are militia-controlled smuggling routes for Iraqi crude oil gathered by militias from oilfields such as Qayyarah and Alas.[102]

Most individual PMF units, including Iran-backed Special Groups like KH and Kata'ib Al-Imam Ali, also maintain local offices in numerous parts of Iraq for fundraising and recruitment. The concentration of unauthorized unit-level economic offices is highest in Baghdad city, where non-PMF Iran-backed militias such as Quwwat Assad Allah al-Ghalib and Qaeda Quwwat Abu Fadl al-Abbas also have economic offices.[103] Within Baghdad, individual militias have carved out zones of dominance: Palestine Street for Kata'ib Hezbollah, Sadr City for Saraya Salam and Asa'ib Ahl al-Haq, Badr and Kata'ib Al-Imam Ali for Karradah and Jadiriyah. Within these areas, most real estate transactions and business enterprises are taxed by the dominant militias.[104] The presence of economic offices have caused so much concern within the Iraqi government due to their racketeering and predatory control of real estate that Prime Minister Adel Abd'al-Mahdi chose on June 18 and July 1, 2019, to issue successive orders for the closure of all PMF unit offices by July 31, 2019.[105] (On July 30, the PMF released a letter asking for two more months to comply.[106])

## The Centrality of al-Muhandis, KH, and Kata'ib Al-Imam Ali

The central nervous system of IRGC-QF influence in Iraq is Abu Mahdi al-Muhandis and Kata'ib Hezbollah, which maintains a stranglehold over most of the key relationships and posts in the PMF structure.[u] As this author noted in this publication in November 2010,[107] KH emerged as the primary IRGC-QF proxy in Iraq when larger and more disparate networks—Badr and splinter groups from Moqtada al-Sadr's Jaish al-Mahdi—proved too unwieldy and prone to infighting for IRGC-QF to control.[v] From the IRGC-QF perspective, a smaller and centrally controlled force was no doubt required[108] to manage and provide Iranian signature weapons (like Explosively Formed Penetrators, or EFPs) to groups that used them effectively against U.S. forces in line with Iranian guidance, rather than against Shi`a rivals.[109][w] Higher-quality Iraqi proxies may have been required by the IRGC-QF due to the difficulty of moving IRGC-QF and Lebanese Hezbollah trainers inside Iraq.[110][x] KH's 'touch points' with the broader Shi`a insurgent networks were the most anti-American and progressively more pro-Iranian splinter groups from Badr and Sadrist militias.[111]

Those touch points have today become the extensions of al-Muhandis' system of control in the much larger PMF structure. Though the most obvious example of this kind of proxy is Abu Mustafa al-Sheibani (U.S.-sanctioned leader of Kata'ib Sayyid al-Shuhada, PMF brigade 14[112]), a more urgent threat is arguably posed by the rapidly expanding powerbase of Shibl al-Zaydi[113] and Kata'ib Al-Imam Ali. The group qualifies as the new Special Group that has experienced the most prolific growth since 2014.[114] IRGC-QF appears

---

t   These forces have provided back-up to Hadi al-Ameri's political effort to demonstrate leadership as a form of "Basra reconstruction czar." See Ali al-Aqily, Jassim al-Jabiri, Samya Kullab, and Staff of Iraq Oil Report, "Hadi al-Ameri appointed czar of Basra," Iraq Oil Report, April, 2019.

u   This is another point of consensus in all the author's interview programs with Iraqi political and military leaders in 2018-2019. Al-Muhandis is feared and respected above all other militias' leaders and above most Iraqi politicians, including successive Iraqi prime ministers since 2014, due to his very strong backing from Qassem Soleimani of IRGC-QF.

v   The U.S. Army's history of the Iraq War makes a similar assessment, stating "Kata'ib Hizballah was designed as a small, disciplined, specially equipped organization of a few hundred highly trained fighters. It remained under the tight control of the Quds Force." See Joel Rayburn and Frank Sobchak (eds.), *The U.S. Army in the Iraq War, Volume 2: Surge and Withdrawal, 2007-2011* (Carlisle, PA: Strategic Studies Institute and U.S. Army War College Press, 2019), p. 66.

w   The most dramatic cases were the internecine assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006, all Shi`a-on-Shi`a political killings using Iranian-provided Explosively Formed Penetrators (EFPs). Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

x   U.S. seizures of senior IRGC-QF and Lebanese Hezbollah officers in Iraq in 2007-2008 hastened the transition to reliance on small, higher-quality Iraqi proxies. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

to have put special effort into cultivating al-Zaydi while ensuring that al-Muhandis provided Kata'ib Al-Imam Ali with a very large number of paid billets within the PMF payroll system, growing the unit to a size on par with al-Muhandis' own KH.[y] In addition to very slick propaganda—including the development of the celebrity fighter Abu Azrael, who carries a samurai sword[z] and boasts of spit-roasting Islamic State captives[115]—Kata'ib Al-Imam Ali has the same dispersed training and advising presence at many strategic points as KH.[116] The group has a stronger financial base than any other militia in Iraq through property holdings, legitimate investments, and corrupt influence within the Ministry of Transport and Communications.[117] In the view of this author, Kata'ib Al-Imam Ali looks very much like a parallel first-tier IRGC-QF proxy that is intended to reduce overdependence on KH. The movement—and its business connections—deserves much closer scrutiny.

Another body that merits closer attention is the Central Security Directorate (CSD) of the PMF Commission.[118] This is the part of the PMF that is sanctioned by al-Muhandis to discipline PMF leaders, a powerful internal affairs agency with its own well-equipped special forces and intelligence capabilities.[aa] The CSD is led by Abu Zaynab al-Lami (real name: Hassan Falah), an associate of Abu Mahdi al-Muhandis and a KH member from Baghdad.[119] The first deputy director is Abu Ali al-Zaydi, and the second deputy director is Abu Wahab al-Maliki.[120] Al-Lami is emerging as a very powerful and widely feared figure who has a direct line to IRGC-QF leader Qassem Soleimani, independent of Abu Mahdi al-Muhandis.[121] It is possible that Abu Zaynab al-Lami is being groomed to eventually supplant al-Muhandis at the top of the Special Group structure in Iraq, and he was already floated as one candidate for the highly influential deputy minister of interior for intelligence role in the Iraqi government in June 2019.[122] The CSD is believed by Iraqi politicians to operate a technical intelligence branch under an official known as Abu Iman, focused on developing compromising material on politicians, ministry directors, and security personnel.[123]

Al-Muhandis' position at the heart of the PMF Commission has historically allowed him to control the purse strings that dictate how many paid billets each unit is allocated, resulting in very significant influence over local leaders, who directly benefit from

skimming off unit salaries.[124 ab] Now the PMF Commission is claiming that the PMF payment, pension, and benefits system has been audited through a biometric registration system about which no details are available.[ac] PMF salaries may, in the future, move from cash payments to the popular QiCard[ad] electronic debit cards to allow easy transfer of money into bank accounts or cash issued by banks. Indications from within the Iraqi power structure suggest, however, that the registration process remains in the hands of al-Muhandis and thus is not an independently verified system.[125] Movement to independent auditing and electronic payment would reduce much of the potential for al-Muhandis to massage the real number of active fighters at unit level, which is his key means of maintaining influence over PMF unit commanders.[126]

## The Role of Badr
Another cross-cutting capability that influences all the PMF units—including the Iran-backed Special Groups—is the Badr organization's function as the most experienced military force in the PMF, with continual operation of a division-sized armed force since the mid-1980s.[127] In today's PMF, Badr is the main provider of expertise and manpower in the PMF "enabler" units, such as the armor, artillery, and missiles directorates.[128] Badr members are in charge of liaising with the Sunni Tribal Mobilization Forces (U.S.-supported elements of the PMF), and they occupy the positions of PMF chief of staff, chief of operations, and head of the training and religious instruction directorates.[129] At the local level, Badr provides the leaders for two operational commands (Basra and Rafidain) and the PMF administrative heads in Basra, Dhi Qar, Qadisiyah, Kirkuk Muthanna, and Wasit.[130] Badr is the heart of the PMF, but not its head, which is Abu Mahdi al-Muhandis.

As noted previously, Badr was a unit of the Islamic Revolutionary Guard Corps in the Iran-Iraq War, so its ties with Iran run very deep. Badr membership is threaded throughout the DNA of many of the non-Badr units in the PMF, such as KH, Kata'ib Sayyid al-Shuhada, Kata'ib Jund al-Imam, and Saraya Talia al-Khurasani.[131] Badr units such as PMF brigade 9 and 10 have operated in Syria in support of Iranian policy.[132] Iran has provided significant material support to Badr units through the transfer of high-end systems like T-72 tanks and HM-20 and HM-27 multiple-barrel

---

y   As noted previously, based on multiple interviewees, Kata'ib Al-Imam Ali has paid billets from around 8,000 fighters, not far short of KH's 10,000 billets. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

z   Abu Azrael is irresistible "clickbait" for today's electronic media. For example, see "The 'Archangel of Death' fighting Islamic State," BBC Trending, March 18, 2015.

aa  Large amounts of imagery exist of the CSD special forces due to the PMF Commission's keenness to demonstrate that it is purging criminality from the PMF. Troopers wear black jumpsuits and wear insignia and equipment that is very hard to distinguish from Iraqi Counter-Terrorism Service troops. Modern night-vision equipment is often clipped to CSD helmets during night raids. For an example of CSD imagery, see Kosar Nawzad, "Iraqi militias crack down on several 'fake headquarters,'" Kurdistan 24, February 12, 2019.

ab  Units receive their monthly salary allocation in cash, and commanders often skim around 30% of each volunteer's salary off for a "unit fund" that nominally pays for life support but also serves as a method of corrupt fundraising by individuals and factions. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

ac  On March 25, 2019, the head of finance for the Hashd Hussein Ismael Khalil announced a biometric (fingerprint) enrollment process for the Hashd that began in October 2018, and which by March 2019 had registered "80,000 out of nearly 160,000" members. See "Financial crowd issues a statement on salaries," Wataniq, March 25, 2019.

ad  QiCard was developed by International Smart Card, a company owned by Iraq's two biggest state-owned banks, Rafidain Bank and Rasheed Bank, together with the Iraqi Electronic Payment System. See the company website at https://qi.iq/

rocket launchers.[ae] Badr-linked local auxiliary units like Babiliyun (PMF brigade 50) and Liwa al-Turkmen (PMF brigade 16) are involved in a range of criminal activities, human rights abuses, and material support to IRGC-QF.[133]

Disentangling Badr networks from al-Muhandis and IRGC-QF networks is thus not a simple proposition. All this being said, however, it is also arguable that Hadi al-Ameri's camp within Badr would prefer not to be digested whole and dissolved into the al-Muhandis-led Special Group structure.[134] As the above sections have detailed, cracks have emerged in al-Ameri's control of Badr[135][af] (mainly in far-flung auxiliary units) and al-Ameri's profile as the most visible Shi`a militia leader has been diluted by the rise of al-Muhandis, Qais al-Khazali (of AAH),[136] and Shibl al-Zaydi.[137] IRGC-QF leader Qassem Soleimani did not support al-Ameri's bid for the Iraqi prime ministership after the 2018 elections, nor did he secure al-Ameri the interior minister's job after the 2014 elections. Now al-Muhandis and up-and-comers like Abu Zaynab al-Lami get Soleimani's attention, while al-Ameri's practical ideas on PMF professionalization—backed by decades of military experience—are sidelined.[138]

### A More Precise U.S. Policy Toward Today's Special Groups

As the above assessment makes abundantly clear, the pro-Iranian militias within the PMF do not represent all—or even most—of the Popular Mobilization Forces. As a result, this author has argued,[ag] that U.S. officials would be wise to never *publicly* use the words PMF, Hashd, Shi`a militias, or any other collective descriptor because the popular mobilization, as a societal experience and as an institution, is viewed with reverence and respect by many Iraqis.[139] Many average citizens have relatives who fought honorably in the PMF structure primarily for the benefit of Iraq, not Iran or pro-Iranian militia leaders. The U.S. government arguably alienates potential allies when it publicly criticizes the PMF phenomenon in a generalized manner.

Even behind closed doors, none of the old descriptors (Shi`a Extremist Groups, Shi`a Militia Groups) make sense due to the multi-ethnic composition of the Iraqi components of Iran's threat network. There is a very strong argument for a new descriptor for those groups with primary loyalty to U.S.-designated terrorist Abu Mahdi al-Muhandis and who are willing to provide material support to IRGC-QF and other sanctioned entities including but not limited to Lebanese Hezbollah. What Iraq faces today are effectively the new 'Special Groups' of the Iraqi militia scene—'special' in that, like their forerunners in 2006-2011, they are not under government control and they provide material support to IRGC-QF and other sanctioned Iranian entities.

### The Main Threat: Kata'ib Hezbollah

The United States does not have the same influence it did in Iraq prior to 2011, and it therefore needs to be parsimonious and pragmatic if it wishes to push back effectively on today's Iran-backed Special Groups. The first step in the process of addressing the challenge posed by today's Iran-backed Special Groups is to clearly define—and continually refine—identification of the main threat group. That main threat is Abu Mahdi al-Muhandis and Kata'ib Hezbollah. A key challenge is that al-Muhandis dominates the finances of the PMF. If Iraq choses to place a second deputy chairman of the PMF Commission alongside al-Muhandis, as was unsuccessfully attempted in 2016,[ah] this could be a start in diluting his influence.

At the same time, the analyst community needs to put significant effort into understanding how the main threat will evolve. Al-Muhandis may try to use a PMF reform process to consolidate his power, providing other factions (like Badr, Saraya Salam, and shrine PMF units) with long-term geographic cantons and salary allocations while keeping the more important core functions of the PMF Commission for himself. Alternately, the analyst community should also watch for the potential evolution of Special Groups beyond al-Muhandis and KH. The rising power of Kata'ib Al-Imam Ali has been overlooked for too long. The rising star of CSD director Abu Zaynab al-Lami is worthy of close attention in the analyst community, particularly in light of sanctionable activities.

### Targeting Second-Tier Special Groups

Beyond these main threat groups, U.S. government analysts should continue to refine the criteria for prioritizing urgent threats to U.S. citizens and U.S. interests, Iraqi stabilization and economic well-being, and the human rights of Iraqis. As PMF units are likely to shed their public use of unit names (for instance, Kata'ib Sayyid al-Shuhada) in the near future,[140] the United States would be wise to always refer to such units using their brigade numbers, as this article has done, which may outlive their faction names. The most capable pro-Iran militias may not be the best known. For instance, Kata'ib Sayyid al-Shuhada (PMF brigade 14) was formed by, and remains led by, Abu Mustapha al-Sheibani, a U.S.-designated terrorist, so it is an obvious target for U.S. sanctions. Yet, newer militias such as Kata'ib Jund al-Imam (PMF brigade 6), Harakat al-Abdal (PMF brigade 39), Saraya al-Jihad (PMF brigade 17), and Liwa al-Tafuf (PMF brigade 13) are larger, are present on the Syrian border, and

---

ae   Imagery and videos of the Badr-provided PMF artillery and armor directorates is widespread because the PMF is proud to show off its capabilities. For a good description of Badr equipment holdings, see Nader Uskowi, *Temperature Rising: Iran's Revolutionary Guards and Wars in the Middle East* (Lanham, MD: Rowman & Littlefield, 2018), p. 100. Also see Michael Knights, "The Future of Iraq's Security Forces," Al-Bayan Center for Planning and Studies, March 2016, p. 78.

af   In a number of the author's interviews, Iraqis expressed the possibility that there will soon no longer be "one Badr." Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

ag   This author wrote: "First, whether Iraq has an institution called the Popular Mobilization Forces is none of our concern. The movement itself has a cherished place within the hearts of millions of Iraqis. Every time a U.S. leader publicly references the Popular Mobilization Forces as a whole, they set back our overall policy in Iraq, especially if these references are negative. Instead, the United States should only discuss our legitimate and specific concerns as a security cooperation partner and donor to Iraqi counterparts behind closed doors." See Michael Knights, "How the U.S. government should think about Iraq's Popular Mobilization Forces," Fikra Forum, Washington Institute, May 9, 2019.

---

ah   Retired Mohsen al-Kaabi was appointed by then Prime Minister Abadi on February 17, 2016, with responsibility for finances and administrative monitoring. He mysteriously withdrew from the position in under a month, and his resignation was announced first by Kata'ib Hezbollah. See "Abadi Assigned Mohsen al-Kaabi as Deputy Head of the PMF," Al-Ghad Press, February 7, 2016. See also "Al-Kaabi withdrew from his post as deputy chairman of the Popular Authority for Administrative Affairs," Al Masalah, March 10, 2016.

may be equally or more valuable to IRGC-QF as proxy forces.

There is a value to sanctioning leaders of smaller militias as a warning to the leaders of larger ones to amend their behavior, but the United States would be wise to make this choice deliberately and not due to a mis-assessment of the threat posed by groups. For instance, Harakat Hezbollah al-Nujaba (PMF brigade 12) is one of the loudest, most anti-Israeli and anti-U.S. groups in Iraq,[141] led by U.S.-designated terrorist Akram Kaabi, and it was duly sanctioned in March 2019.[142] What few observers realize is that Nujaba is one of the smaller and less capable Special Groups at the moment.

The United States should also continue to explore non-terrorism authorities for sanctioning militia leaders. The recent linking of sanctions to corruption and human rights abuses was recently done with the leaders of PMF brigades 30 and 50.[143]

As was the case with these latter brigades, it was their leaders—not their rank and file—that were initially targeted, which may be replicated with future measures. Asa'ib Ahl al-Haq may be a particularly relevant case for the targeting of mid-level commanders. The behavior of some elements of AAH toward other Iraqis remains deplorable—ranging from intimidation of common people all the way up to the Baghdad provincial council chairman[144] and the head of the Shi'a Endowment, appointed by Grand Ayatollah Ali al-Sis-

tani.[ai] This offers a wide variety of non-terrorism issues that could be highlighted in targeted sanctions against mid-level AAH commanders in the future.

## Denying IRGC-QF Deniability

When U.S. Secretary of State Mike Pompeo visited Baghdad on May 7, 2019, he brought a simple and strong message for Iraqi and Iranian ears: any attack by Iran-backed militias that harmed American citizens in Iraq would be considered to be an Iranian attack, triggering a U.S. military response against Iranian interests in Iraq.[145] The demarche appears to have reinforced a pre-existing IRGC-QF preference that harassment of U.S. bases remain non-lethal in nature, corresponding with an "aim to miss" pattern visible in rocket strikes in late 2018 and early 2019.[146][aj] Providing clear and sharable evidence of Iranian and militia malfeasance to support such demarches may become a more important priority for intelligence collectors and analysts.   **CTC**

---

ai   Alaa al-Musawi, the Sistani-appointed head of the Shi'a Waqf (religious endowment), suffered a home invasion by AAH forces on July 10, 2019, and continues to shelter in the Prime Minister's guesthouse at the time of writing. See "Storming the residence of the head of the Shiite Waqf for refusing to take over the Grand Mosque," Kitabat, July 11, 2019.

aj   Both the U.S. Embassy complex in Baghdad and the U.S. consulate in Basra are large enough that highly experienced militia rocketeers ought not to entirely miss these facilities unless they intend to do so.

## Citations

1   Omar Nidawi and Michael Knights, "Militias in Iraq's Security Forces: Historical Context and U.S. Options," *PolicyWatch 2935*, Washington Institute for Near East Policy, February 22, 2018.

2   Michael Knights, "Responding to Iranian Harassment of U.S. Facilities in Iraq," *PolicyWatch 3125*, Washington Institute for Near East Policy, May 21, 2019.

3   Isabel Coles and Dion Nissenbaum, "U.S.: Saudi Pipeline Attacks Originated From Iraq," *Wall Street Journal*, June 28, 2019.

4   "Treasury Designates Individual, Entity Posing Threat to Stability in Iraq," U.S. Treasury, July 2, 2009.

5   Othman al-Mukhtar, "Fugitive From International Justice Now Militia Leader in Iraq," al-Araby, January 4, 2015.

6   "Treasury Designates Individuals, Entity Fueling Iraqi Insurgency," U.S. Treasury, January 9, 2008.

7   See Phillip Smyth, "The Shiite Jihad in Syria and Its Regional Effects," *Policy Focus 138*, Washington Institute for Near East Policy, February 2015. See also Michael Knights, "Iran's Foreign Legion: The Role of Iraqi Shiite Militias in Syria," *PolicyWatch 2096*, Washington Institute for Near East Policy, June 27, 2013.

8   Ned Parker, Ahmed Rasheed, and Raheem Salman, "Sectarian strife threatens Iraq ahead of election," Reuters, April 27, 2014.

9   Quoted from Khotbat Salat al-Jomo'a, allati A'lanat feeha al-Marja'iya al-Deeniya al-Ulya, al-Jihad al-Kifa'ee, published on June 13, 2017, available on the YouTube Channel of the al-Atabat al-Husaniyat al-Muqaddasa at https://www.youtube.com/watch?time_continue=2&v=aFO5KonPlcE

10   Parker, Rasheed, and Salman.

11   "Treasury Designates Individuals and Entities Fueling Violence in Iraq," U.S. Treasury, September 16, 2008.

12   "Treasury Sanctions Key Hizballah, IRGC-QF Networks in Iraq," U.S. Treasury, November 13, 2018.

13   Drawn from "A Survey of Public Perceptions of the Sadr Trend," Human Terrain Team Survey, May 18, 2011. This set of surveys asked Iraqi respondents about a range of Shi`a extremist groups, their ties to Iran, and other reputational issues.

14   "A Survey of Public Perceptions of the Sadr Trend," pp. 5-11.

15   Ibid.

16   Ibid., pp. 10-11.

17   Figures are drawn from Munqith Dagher, "Iraqi Public Opinion: Between a Rock and Hard Place, a 5,000-person poll of Al Mustakilla For Research," IIACSS Group, July 2019.

18   Figures from 2017 are drawn from Munqith Dagher, "2,000-person poll of Al Mustakilla For Research," IIACSS Group, April 2017. Figures from 2019 are drawn from Munqith Dagher, "16 Years Later, Iraq is Still a Country at War with Itself, a 5,000-person poll of Al Mustakilla For Research," IIACSS Group, April 2019.

19   Michael Knights, "The Evolution of Iran's Special Groups in Iraq," CTC Sentinel 3:11-12 (2010): p. 4.

20   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

21   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

22   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

23   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

24   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

25   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

26   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

27   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would like to thank Philip Smyth and Aymenn al-Tamimi for their advice on this section.

28   This aid is detailed in Michael Knights, "The Future of Iraq's Security Forces," Al-Bayan Center for Planning and Studies, March 2016, p. 78.

29   Renad Mansour, "Reining in Iraq`s Paramilitaries Will Just Make Them Stronger," Foreign Policy, June 9, 2019. See also Michael Knights, "Popular Mobilization Force Reform in Iraq: Reintegration or Consolidation of Militia Power?" Defense Post, July 8, 2019.

30   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

31   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

32   See Philip Smyth, "Shia Militia Mapping Project," Washington Institute. Group areas of concentration have been assembled using the dataset of geolocated presence indicators. This dataset is drawn together by Smyth using a social media monitoring program, backed up by interviewing and interacting with individuals in Iraq and Syria.

33   Ibid.

34   Ibid.

35   Ibid.

36   Knights, "Responding to Iranian Harassment of U.S. Facilities in Iraq."

37   Author interviews, multiple Iraqi political and security figures in 2018 and

38   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

39   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

40   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

41   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

42   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

43   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

44   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

45   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

46   "Kata'ib Hezbollah's file returns to the fore," Baghdad - ERM News, July 26, 2018. See also "Fallujah residents fear abuse from Popular Mobilization Units liberators," Al-Monitor, June 17, 2016.

47   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

48   Coles and Nissenbaum.

49   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

50   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

51   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

52   See Smyth, "Shia Militia Mapping Project."

53   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

54   Thanassis Cambanis, "Social Engineering in Samarra," The Century Foundation, May 2, 2019.

55   "Iraq hangs 36 men for Camp Speicher massacre," BBC, August 21, 2016.

56   See Smyth, "Shia Militia Mapping Project." Also drawn from Knights' interview program.

57   See Ibid.

58   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

59   See Smyth, "Shia Militia Mapping Project." Also drawn from Knights' interview program. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

60   Some of AAH's recent human rights violations in Sunni areas are listed in Michael Knights and Frzand Sherko, "Can Asaib Ahl al-Haq Join the Political Mainstream?" PolicyWatch 3078, February 14, 2019.

61   "Once fixable, Baiji refinery plundered beyond repair, Iraq Oil Report," Iraq Oil Report staff, January 28, 2016.

62   Tim Shorrock, "Contractor Kidnappings and the Perils of Privatized War," Nation, February 2, 2016.

63   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. See also "U.S. contractor ignored security violations at Iraq base," Associated Press, May 3, 2017.

64   Knights, "Responding to Iranian Harassment of U.S. Facilities in Iraq."

65   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interview-

ees. The author would also like to thank Aymenn al-Tamimi and Hamdi Malik for their assistance in checking the updated names of militia leadership.

66    See Smyth, "Shia Militia Mapping Project." Group areas of concentration have been assembled using the dataset of geolocated presence indicators.

67    Ibid.

68    The "ISIS Live Map" site provides an updated crowd-sourced set of polygons showing the lines of control between Assad regime, Syrian Democratic Forces and Iraqi forces. See https://isis.liveuamap.com/

69    Ibid.

70    For background on this issue, see Michael Knights, "Normalizing Security in the Nineveh Plains," Iraq In Context, July 5, 2019.

71    "Treasury Sanctions Persons Associated with Serious Human Rights Abuse and Corrupt Actors in Iraq," U.S. Treasury, July 18, 2019.

72    Ibid.

73    John Davidson, "Exclusive: Iran-backed groups corner Iraq's postwar scrap metal market – sources," Reuters, February 13, 2019.

74    For a summary of Badr's long involvement in Diyala, see Michael Knights, "Iraq's Bekaa Valley," Foreign Affairs, March 16, 2015. See also Susannah George, "Breaking Badr," Foreign Policy, November 6, 2014.

75    Ibid.

76    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author would also like to thank Aymenn al-Tamimi and Hamdi Malik for their assistance in checking the updated names of militia leadership.

77    Knights, "Iraq's Bekaa Valley."

78    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

79    This dynamic has been noted as far back as 2015. See "Badr's Bid to Lead Shia Camp Struggles in Diyala, Tuz," Inside Iraqi Politics 130, June 20, 2015, pp. 5-6.

80    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

81    For background on the Kerwei-Kurdish conflict, see Michael Knights and Alex Mello, "Losing Mosul, Regenerating in Diyala: How the Islamic State Could Exploit Iraq's Sectarian Tinderbox," CTC Sentinel 9:10 (2016).

82    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

83    See author's SIGACT dataset. The author wishes to thank Alex Mello, the best-informed security analyst working on Iraq in the author's opinion, for his help in tracking Khanaqin security incidents.

84    The fate of Shi`a Turkmen communities is discussed in Michael Knights, "Iraq's City of Orphans," Foreign Policy, August 14, 2014.

85    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

86    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author held detailed biographical discussions of Northern Axis leaders with Iraqi stakeholders in 2016-2019.

87    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

88    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

89    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

90    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

91    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

92    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. Interviewees describe the drone launches being observed and also

the return flights.

93    Sangar Ali, "Rockets kill, wound dozens at KDP-Iran, PDKI headquarters in Kurdistan," Kurdistan 24, September 8, 2018.

94    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

95    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

96    For more on these dimensions, see Nabih Bulos, "Tuz Khurmatu is Iraq's city of walls. Is it a sign of the country's future?" Los Angeles Times, March 11, 2018.

97    The first detailed description of these offices came in the Institute for the Study of War report in 2017. See Jesse Rose Dury-Agri, Omer Kassim, and Patrick Martin, "Iraqi Security Forces and Popular Mobilization Forces – Order of Battle," Institute for the Study of War, December 2017, p. 36.

98    Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

99    Michael Knights, "Washington Should Reverse Its Retreat in Basra," Policy Watch 3025, October 10, 2018.

100   See an official detail of the explosion of a logistics company in Safwan, in Al-Mirbad, July 6, 2019, available at https://www.almirbad.com/detail/18321

101   Knights, "Responding to Iranian Harassment of U.S. Facilities in Iraq."

102   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

103   See Smyth, "Shia Militia Mapping Project." Group areas of concentration were assembled by Smyth.

104   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

105   Michael Knights, "Iran-Backed Militias Test the Credibility of Iraq's Prime Minister," Policy Alert, June 19, 2019.

106   Ghassan Adnan and Isabel Coles, "Iraq's Militias Seek More Time to Integrate With Country's Security Forces," Wall Street Journal, July 30, 2019.

107   Knights, "The Evolution of Iran's Special Groups in Iraq," p. 3.

108   This is an impression formed from interview material gathered by the author from a range of Iraqi security force intelligence and operational personnel in Iraq during visits in 2008, 2009 and 2010, exact dates, names and places withheld at request of the interviewees. The U.S. Army history of the Iraq War referenced in footnote V hinted at the same conclusion on page 66.

109   This issue is explored in depth in Knights, "The Evolution of Iran's Special Groups in Iraq."

110   Ibid.

111   Ibid. The article discusses the evolution of the Sadrist breakaway movement AAH and Badrist diehard Ali Mustapha al-Sheibani.

112   "Treasury Designates Individuals, Entity Fueling Iraqi Insurgency."

113   Biographical detail and threat financing background can be found in "Treasury Sanctions Key Hizballah, IRGC-QF Networks in Iraq."

114   Another consensus view among a wide range of interviewees since 2018. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names and places withheld at request of the interviewees.

115   See the France24 report, "'Iraq's Rambo' out of favour with his own militia after brutally violent videos," Observers (France 24), July 15, 2017.

116   See Smyth, "Shia Militia Mapping Project." Group areas of concentration have been assembled using the dataset of geolocated presence indicators.

117   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

118   Again, the first detailed work done on the listing of PMF Commission staff directorates was by Dury-Agri, Kassim, and Martin in "Iraqi Security Forces and Popular Mobilization Forces – Order of Battle," pp. 29-36.

119   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

120   Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

121 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

122 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

123 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

124 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

125 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

126 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

127 See Knights, "Iraq's Bekaa Valley," and George.

128 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author wishes to thank Hamdi Malik and Aymenn al-Tamimi for their strong support to the author's knowledge of such enabler units.

129 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author wishes to thank Hamdi Malik and Aymenn al-Tamimi for their strong support to the author's knowledge of such enabler units.

130 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author wishes to thank Hamdi Malik and Aymenn al-Tamimi for their strong support to the author's knowledge of such enabler units.

131 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees. The author wishes to thank Hamdi Malik and Aymenn al-Tamimi for their strong support to the author's knowledge of such enabler units.

132 Author interview, Philip Smyth, May 2019.

133 See some detailing in "Treasury Sanctions Persons Associated with Serious Human Rights Abuse and Corrupt Actors in Iraq."

134 This is the author's impression from his interview program in Iraq with a range of militia and political leaders in 2018-2019.

135 This trend has been detected outside the author's interviews. See Omar al-Jaffal, "Badr strongman Ameri faces dissent within his group's ranks," Al-Monitor, May 4, 2019.

136 For in-depth background on al-Khazali, see Bryce Loidolt, "Iranian Resources and Shi`a Militant Cohesion: Insights from the Khazali Papers," *CTC Sentinel* 12:1 (2019).

137 This is the author's reading of events, backed by material drawn from interviews in Iraq. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

138 Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

139 This is borne out both by the author's interview program and polling data. See Munqith Dagher's aforementioned polls in July 2019, April 2019, and April 2017, which show consistently high levels of Shi`a support for the PMF. Author interviews, multiple Iraqi political and security figures in 2018 and 2019, exact dates, names, and places withheld at request of the interviewees.

140 See discussion of this in Knights, "Popular Mobilization Force Reform in Iraq."

141 For discussion of Nujaba's threats to Israel and disdain for the Iraqi government, see Michael Knights, Barbara A. Leaf, Matthew Levitt, and Phillip Smyth, "The Smart Way to Sanction Iranian-Backed Militias in Iraq," *PolicyWatch 3018*, September 17, 2018.

142 "State Department Terrorist Designation of Harakat al-Nujaba (HAN) and Akram 'Abbas al-Kabi," U.S. State Department, March 5, 2019.

143 "Treasury Sanctions Persons Associated with Serious Human Rights Abuse and Corrupt Actors in Iraq."

144 Knights and Sherko.

145 This was the message according to both U.S. and Iraqi officials interviewed by the author since May 2019.

146 "Aim to miss" dynamics are discussed in Knights, "Washington Should Reverse Its Retreat in Basra."

PX250

# A View from the CT Foxhole: Suzanne Raine, Former Head of the United Kingdom's Joint Terrorism Analysis Centre

## By Raffaello Pantucci

*Suzanne Raine worked for the U.K. Foreign & Commonwealth Office from 1995 until 2019, specializing in counterterrorism. Between January 2015 and September 2017, she was head of the United Kingdom's Joint Terrorism Analysis Centre.*

**CTC: What role does JTAC play in U.K. counterterrorism efforts?**

**Raine:** JTAC stands for the Joint Terrorism Analysis Centre. It was established in response to the 2002 Bali bombings, with the aim of having one central place within the U.K.'s system where terrorism threat assessments are made. It is staffed by analysts from about 16 different government departments who are brought together in a single place. These individuals are linked back into their own systems, reading all of the information available from all of their respective departments and feeding it into their assessments. This makes [for] a system which is greater than the sum of its parts and provides a way of pushing information in both directions. This helps support the threat assessment both in immediate tactical terms in the U.K. and abroad, but also the strategic development of the threat picture and trends within it. Its closest equivalent in the American system is NCTC [National Counterterrorism Center]. JTAC is also responsible for operating the U.K.'s national threat level system. It makes independent judgments free of any political influence, which informs the response posture either in advance of or after a terrorist attack.

**CTC: What is your current evaluation of the threat from the Islamic State, especially in the wake of the Easter 2019 attacks in Sri Lanka? Did those particular attacks change your general assessment of the group's trajectory?**

**Raine:** It is a good time to ask that question because it is now five years since the declaration of the caliphate, and that should give us a moment to pause. It is quite a startling fact that the territorial caliphate survived that long. Not many things last five years. At the end of it all, just at the point where we were declaring territorial defeat, up pops Abu Bakr al-Baghdadi in a video to say, 'I'm still here, guys.'[1] It is an uncomfortable reminder that there still is a strategic mind at the heart of the group. It is not just a group engaged in a war in the desert, but it is an organization with leadership, structure, and organizational goals, however disrupted they have been.

Territory is nice for a terrorist group to have but is not a prerequisite. The establishment of the caliphate enabled them to become a massive global phenomenon, but territory brings with itself its own problems. It requires governance, policing, and defense, all of which requires lots of resource. The challenge for ISIS will be how they manage the transition away from [a] guerrilla state without disintegrating. Al-Baghdadi turning up five years later is their way

of starting to think that through.

In terms of the threat from ISIS, the U.K. had a horrible year in 2017, and 2018 was much better. But this is sometimes an illusion. The question if we look at this five-year period and analyze it properly is, what does that show? To do this, we need to go back to the first three years of the group's caliphate, which were a significant challenge for those of us whose job it was to counter it because it was growing so quickly; they had the impetus and the initiative. It is not true to say that the scale of the problem in 2015-17 took us by surprise, because we had watched it develop in 2013-14, but it is true to say that the way it changed, mobilized young people, generated spontaneity and common cause were exceptionally challenging to deal with. That put real demands on the instruments that we had at our disposal. A lot of things subsequently happened in response, but it took time and finally the coalition efforts in Syria and Iraq have pushed them back and kept them firmly on the back foot over the last couple of years. But it has been at significant cost to the coalition, and there is a huge debt of gratitude to the Syrian Kurds without whom it would not have been possible to push ISIS from their territory in Syria. Now ISIS is on the back foot; their media machine has been significantly disrupted; they've lost a lot of operational planners and have been substantially degraded.

In addition to this, we started to get on top of their networks in the West, leading to a lot of disruptions. This makes it much more difficult for them to conduct the kind of attacks they were conducting earlier on.

But there is a long legacy that the group has left behind. It can be categorized in two ways: their media and their network of foreign fighters. They have had more than five years as a group of living and fighting together, and we are talking about an unprecedented number of nationals from an unprecedented number of countries, including both men and women. The women are equally significant in this regard because I reject any suggestion that the women are less responsible for their decisions and actions than the men are. Foreign fighters are going to continue to pose a huge problem for the international security community because we are going to have to track them as well as find ways to monitor the effect that the inspirational ideas have on our domestic populations.

However weakened ISIS may now be, they are still a truly global movement, and we are globally vulnerable. Paradoxically, nothing should surprise us about what happens next, but we need to be prepared to be surprised. Sri Lanka is a good example of that, because whatever their exact connections, they were clearly inspired and connected to ISIS' ideology at the very least. What Sri Lanka also showed was the difference between a lone-actor and a multiple-actor attack. There is no straightforward equation that says a lone actor will cause lower casualties and do less physical damage, but you can see from Sri Lanka that an attack with multiple actors who conduct their attack simultaneously is very effective. This is something that we see with alarming regularity in places like Afghani-

PX250

stan. We are going to continue to face both the lone-actor inspired attacks, as well as multiple-actor. The threat picture continues to contain almost every sort of threat within it.

**CTC: Given the Islamic State is a globalized threat as you describe, are there any places that are of greater or lesser concern? Where might the next Sri Lanka come from?**

**Raine:** There are multiple different factors at play. One is how many of the foreign fighters are left and whether they get home. And we still don't really know the answer to how many we are talking about in total when it comes to those who left or survived, nor where they are. Local conditions are going to be a determining factor in how they settle. North Africa is clearly of concern, not least because of the numbers of foreign fighters from North Africa, but also as historically the region has tended to produce amongst the most committed and battle-hardened fighters. The environment is one into which they are able to return—either to continue the fight they started in Syria and Iraq, fit into existing groups, or start up something new. This is very concerning. I also continue to worry about Afghanistan, where returning fighters are an additional dimension to the political quagmire. It is possible that a deal done with the Taliban becomes not actually very useful anymore because, in fact, the problem is a whole new generation of people who have been radicalized by a different kind of extremist group. This might lead to new fighting and new groups. It is not a given that this is what is going to happen, but it has to be a concern. And then clearly there are a large number of fighters from Southeast Asia who are going to return somewhere and pose a threat. And finally, I worry about Syria and Iraq because once they cease to pose an international threat, the interest and resource will shift elsewhere while the internal problems remain as complex as they were before the war.

**CTC: Part of the threat spectrum facing Western countries has been instigated or inspired attacks. The Islamic State's use of this methodology was not new. Al-Qa`ida used to use it. But how was the Islamic State able to weaponize it so effectively?**

**Raine:** As you point out, it is not new. AQAP [al-Qa`ida in the Arabian Peninsula] ideologue Anwar al-Awlaki was brilliant at it. He was an incredibly powerful voice in the British community and beyond because of his ability to speak in English about modern things. ISIS has upgraded this approach for the modern generation. They've been exceptionally innovative at exploiting the explosion of new ways of using social media that we use in society today. They had an army of young, dextrous, tech-savvy people who spoke multiple languages and who knew how to speak to people in their home countries. This was a major advantage they had over Anwar al-Awlaki since he only had a very small group of people supporting him. They were able to communicate directly, sitting together building a critical mass in the media center where they would learn from each other and experiment. A fascinating aspect was that they were communicating with us all the time as well. We were not always attentive to what was being said. I was often struck by the amount of humor and mischief they would use in their messaging. One well known example which resonated with a British audience was the Islamic State Health Service, for example, when the group took the National Health Service (NHS) logo and turned it into their own. It was creative and appealed to people.



*Suzanne Raine*

The genius of what they did with the inspired attack was to elevate it into a sort of art form, so that anyone who did anything anywhere in the world that fitted their paradigm could be claimed by them. This created an idea of a mass movement without them actually needing to have one. And once you have this fictive mass movement, it gives greater appeal to the group. You create the impression of an organization that is bigger than it is. For those potential recruits sitting at home living their 'boring' lives, seeking 'meaning,' wanting to be part of something bigger and better, this provides them with a substantial organization to join.

At its height, ISIS had a media machine that was able to publish in 10 languages simultaneously. It has been significantly damaged through a concerted effort in both military and disruptive online terms by multiple actors. But it still exists, and one of the problems we have is that whenever an attack is conducted and a claim is issued, it is rebroadcast all over conventional media. All the group needs to do is get the claim out to create a sense of responsibility around the act without having to have done much work themselves. Sri Lanka was notable in this regard.

The other difference with al-Qa`ida was that ISIS was not afraid to use their media machine and to broadcast rapidly. During the first three years of the caliphate, they took particular advantage of this, as their media broadcasters were in far less danger than al-Qa`ida's. Al-Qa`ida's messengers learned that if you stand there with a telephone, somebody is going to bomb you. Anwar al-Awlaki had to go to enormous lengths to get Inspire magazine out there because he had to hide his identity and hide his location. The chaos in Syria meant that ISIS broadcasters were able to hide much more easily. For as long as they were not afraid, they could do it with real confidence, and they were able to maintain a strong voice in the public domain. This helped them create an identity online which they still take advantage of today. It is obviously not the same now, but it was an element of their game plan which took us a little bit of time to adapt and respond to.

PX250

**CTC: Do you think the group's brand was degraded because of spurious attack claims? For example, they claimed Stephen Paddock's October 2017 Las Vegas massacre, an attack that clearly had no link to the group. How long can you claim such random things without people losing belief in you?**

**Raine:** It is certainly true that in the early years, they did not make false claims. They put effort into making sure and verifying that attacks were conducted by their adherents. And then they became a bit sloppier. The only explanation I can offer is that while we may have noticed that their claims are no longer very accurate, the people who support them did not notice. All their claim does, however spurious, is create a hook into the public conversation. An ISIS claim reminds people about the organization's presence and existence, even if they didn't actually do it. And by the time everyone has proved that the claim was indeed spurious and the incident had nothing to do with them, everyone has forgotten and moved on to the next thing. The group, however, still gets some brief resonance in the public space.

**CTC: There are some indications of a possible al-Qa`ida resurgence.[a] How is that materializing in terms of threats to the West? Where is the actual threat that we see from al-Qa`ida? And to tie into a bigger question, how do we ever know when a terrorist campaign is over?**

**Raine:** This is a problem. One of the biggest difficulties we have with al-Qa`ida is latency—the ability of the group to exist without necessarily being constantly active and visible. We know al-Qa`ida is a thoughtful organization that has demonstrated strategic patience. The leadership has been absolutely consistent about its objectives for a very long time. And although they have been significantly degraded over the last nearly 20 years by a very persistent campaign against them, some of the key leaders are still around and hidden in very difficult to get to places like Yemen, Syria, Iran, Afghanistan, Pakistan, and North Africa. We cannot be sure that we know what they are doing or even what their new generation looks like. We are aware of the group's continued ability to exist, its committed leadership, but we are not clear on what the new generations are like or what they think.

Their experience in Syria has been a real roller coaster ride. On the one hand, it has given them a new purpose at various stages of the conflict and, of course, a lot of new recruits, including a lot of Britons who were always al-Qa`ida supporters, as well as other nationalities, like Chechens. And just as the ISIS foreign fighters have been with the group for around five years now, the al-Qa`ida ones have as well. On the other hand, al-Qa`ida is now completely bogged down with factional in-fighting about who is governing Idlib. This is just indicative of the difficulties of being in Syria. It has given al-Qa`ida a platform, and it has given them a massive headache. And we have insights into what is going on with the group with infighting and governance challenges, but we just don't understand the whole picture.

This highlights the really big challenge for those working in counterterrorism, which is that we know they are there, we know their intent has not changed, we know they have got capability, and the underlying conditions in many parts of the world where they operate are no different now to how they were pre-9/11. In fact, in some parts of the world, they are worse. We know that we cannot get the kind of information that we would want around the group, so how do we interpret the lack of information? How will we know when the absence of information means that an attack is not being planned, or whether it is just that we are not good enough at collecting information on attack plans? And for me, this is the difficulty that we have got ourselves into with the War on Terror because the phrase implies at some point there is going to be a winner and a loser, closure and an end, a treaty. And I just do not see and cannot imagine the point where we are going to be confident enough to say: 'they are still there, but we are confident that they do not mean us any harm.'

**CTC: Is al-Qa`ida or the Islamic State the greater long-term threat to the United Kingdom?**

**Raine:** Rather than one group or another being the long-term threat, the danger comes from the likelihood that they persist and expand—by which I mean, how receptive their target audience is in the long term to the alternative form of governance or ideology that they offer, which is based on a higher belief system and justification for action that is very different to that which secular Western governments offer. Rather than our political system, built on gradual change and reform, they offer a violent and rapid answer, which will consistently be a challenge for us because it is an alternative that will appeal to some people.

We also need to recognize how long some of the participants on their side, be it AQ or ISIL or whomever, have been involved in this fight already. Abu Bakr al-Baghdadi is my age, as is Abdulmalek Droukdel. Ayman al-Zawahiri and Saif al-`Adl are even older. Qasim al-Raymi is relatively young at the age of 41. And if we think about it at a rational human level, very few of us have fundamentally changed our core beliefs in decades, so why should we expect individuals involved in ideologically motivated groups to? And their children and grandchildren are being brought up with this mentality and ideology around them.

I absolutely agree with the need to prevent, de-radicalize, and counter the narrative that these groups espouse in whatever way we can. But I also feel very strongly that this is a very difficult thing to do, and I still can't think of any significant examples where de-radicalization has been successful in serious numbers. Because we are trying to tell people to believe something other than that which they believe. And that's really hard.

In terms of al-Qa`ida or ISIS posing the longer-term threat, it is not so much the groups but the conditions in the world at the moment which pose the threat. Syria, in particular, has created an environment where a whole new generation of threat can emerge. And that will ultimately express itself differently in different places. It may be for the moment that the individuals linked to ISIS or al-Qa`ida stay aligned to the local groups that already exist in the various contexts that they are operating in. It may be that returnees or off-shoots of these groups end up being subsumed into more local conflicts on the ground. Or it may be that they end up becoming

---

a   Editor's note: See, for example, Tim Shipman, "Al-Qaeda terror group returns to target airliners and airports," *Sunday Times* (U.K.), December 23, 2018, and Jami Forbes, "Does al-Qa`ida's Increasing Media Outreach Signal Revitalization?" *CTC Sentinel* 12:1 (2019).

part of groups which play a role in proxy conflicts in different parts of the world—for example, the Kashmiri groups that we have long seen active in South Asia, but there are plenty of others. We are likely entering a phase of everything been thrown up into the air. It will eventually settle down again, and we will have to adjust to whatever form that takes.

There are clearly going to be tactical problems dotted around. Somalia is an example of a tactical problem which is a long-term headache because of al-Shabaab, but also because there are ISIS supporters there. North Africa is really interesting because there is a lot of fluidity between groups across the entire region. While I am not a North African specialist, what is striking is the commitment to the ideology in that particular context, and then the pragmatic decision-making about how to act, which is hugely effective. I think we will see tactical, pragmatic, local reshaping, and then we have to bear in mind something that was noted in Ed Fitton-Brown's recent interview with this publication,[2] which is that it does not take very many people to come up with the big plot. The question for us is where they will be located when they decide that they want to launch an attack and where it will ultimately be that they find the time and space to plan something on that scale, rather than simply become subsumed into a local conflict.

**CTC: You touched briefly on state-sponsored threats. Do you think they are going to become more significant than al-Qa`ida or Islamic State threats? Or will they merge? How will that relationship develop, and what is your assessment of what will become a greater threat going forward?**

**Raine:** The two types of threat have co-existed for a long time. For example, LeT [Lashkar-e-Taiba], the Kashmiri group behind the Mumbai attack, grew out of the jihad in Afghanistan and was linked initially more with Abdullah Azzam and UBL [Usama bin Ladin] before it became more focused on state-supported jihad in Kashmir. The dangerous bit is the overlap between the local and the global. For the U.K., the fusion that was seen in Kashmir was a particular problem, as the struggle in Kashmir provided a strong, local call to action that resonated deeply with Kashmiri diaspora communities in the U.K. At the same time, on the ground in South Asia, these groups were close to al-Qa`ida and ultimately became the connection that produced a series of terrorist plots in the U.K. It is entirely possible that the development of this sort of link could be a product of what emerges from what we have been observing in Syria.

The danger of these sorts of threats, and the many flashpoints in which they exist, is that if they become much more active conflicts, they can become places that draw more people in. The Kashmiri one is the obvious flashpoint that could really draw people in if the violence and conflict were to escalate. The Middle East is another source of potential danger in this regard and has numerous proxy groups and conflicts. In a way, the Syria war is a massive proxy group war, and the war in Yemen is another proxy group war. At the same time, the conflicts become a draw for outsiders and create an environment in which terrorist groups can fight, learn, and plot. States use terrorist groups for their own ends, but don't forget that terrorist groups also use states for their own ends.

**CTC: In a recent issue of this publication, Edmund Fitton-Brown, the Coordinator of the ISIL (Daesh)/Al-Qaida/**

Taliban Monitoring Team at the United Nations, highlighted the large numbers of foreign terrorist fighters (FTFs) that are still around.[b] Young and old, they all pose a potential risk. How do you manage a generational struggle of this scale?

**Raine:** This is a time bomb problem. To start with, none of us really know the exact figures of people who have gone out there and might still be there. It is difficult to know, as I mentioned earlier, the degree to which the threat they pose is something that is blended into a local threat picture or something new and different. What we do know is that there is nothing to suggest that many of them have changed their minds, and there is nothing to suggest that if we do nothing, they will change their mindset. So, we have got to do something. The big challenge for the global counterterrorism community is how do we create a globally coordinated response when we have all got our own domestic considerations and our own legal systems. In Western-allied countries, we have ended up managing this problem largely through defense and security, with the closest possible collaboration we can have. This means sharing data, which enables us to identify potential terrorists who can be disrupted before they do anything, and doing this according to our liberal values, which limits the amount of intrusion into people's privacy or the length of time that people can be locked up.

There are other countries with different values that are applying different solutions to the problem of both foreign terrorist fighters and the broader problem of radicalization at home. The Chinese are locking up, if we believe the reports, around a million Uighurs.[3] The Russians have taken some quite punitive measures in the Caucasus. Then there is a serious question about places which just remain completely lawless—though if we are honest, there is no such thing as an ungoverned space; rather it is governed by someone we do not like. Libya is an example of a place where Western governments have to cooperate with a confusing group of actors on the ground to ensure that the ungoverned spaces are not exploited by Islamist extremists. Then there are countries which are themselves making a complicated series of calculations about how to deal with terrorist problems which have deep local roots, as well as external links. Pakistan and Turkey would fall into that category. The West needs them to be a partner to deal with threats that we are worried about, but they are also trying to manage their own local dynamics. And then finally, there are the countries which cannot cope with these threats, need international support, and need to be part of a global counterterror coalition but are not. We are far from having a unified international response.

The problem is further complicated by the inevitability that the different sets of responses going on around the world will create different sets of unintended consequences. For example, it is not clear what effect repression of the Uighurs will have in terms of the globalist narrative that extremist groups use. It may well be that China's response suppresses the problem to the extent that they are unable to respond, but it may well be that they then fight back in different ways. Or it may be that other groups will take up their

---

b    Editor's note: According to Fitton-Brown, out of the over 40,000 foreign terrorist fighters who joined the so-called caliphate, "We could have anything up to nearly 30,000 who remain alive, but nobody knows the true figure." See Paul Cruickshank, "A View from the CT Foxhole: Edmund Fitton-Brown, Coordinator, ISIL (Daesh)/Al-Qaida/Taliban Monitoring Team, United Nations," CTC Sentinel 12:4 (2019).

banner. This highlights how there is a particular context in which we have to work together, but at the same time, this is rendered almost impossible nowadays because of the geopolitical environment in which we are operating.

A second question for us as liberal democracies is how we do this while also staying true to our values. So, for example, we struggle to convict those we suspect of terrorism-related crimes at home because we cannot collect evidence to the standards we would require in a war zone. At the same time, we expect other countries to manage them without the evidence. We end up asking more of other countries than we ask of ourselves. Additionally, we are rightly prohibited from sharing information with countries where there is too great a misalignment of our legal systems—which could be construed as lack of due process—or where there is a possibility that mistreatment will occur. We cannot cooperate with another state if the outcome might be an act which we would consider unlawful. How do we forge safe partnerships with countries whose approach to human rights is very different from our own without creating legal jeopardy for ourselves? We have not had the kind of conversation we need to about that.

The other big issue these longer-term threats throw up is predictability, something particularly illustrated by the Easter attack in Sri Lanka. People want to know what is safe and what is not. Sri Lanka demonstrated that it is impossible to have certainty. And this is a perennial problem. For example, it is very difficult to say that the conditions which allowed the October 2002 Bali bombings to happen in Indonesia have completely gone away or not been exacerbated by current conflicts in the region or elsewhere. But we cannot tell everybody not to go to Indonesia on holiday just because something bad might happen. This means that the strain of mitigating these risks is taken by protective security measures, and this requires increasing resources to manage these issues in a broad range of places, like North Africa, Turkey, or Southeast Asia to ensure that people are safe when they go there. But the result is that changes the way we live.

**CTC: Looking into the future, what terrorist ideologies are of greatest concern to you?**

**Raine:** Islamist terrorism is not going to go away. It might change and become more local, fueled by proxy wars, but the underlying causes that drive these groups and ideologies have not changed and indeed go back a long way.

In addition to this, over the last few years, we have seen—certainly across the English-speaking and Western world—an increase in seriousness and coherence of extreme right-wing groups. It used to look like the extreme right was made up of political movements, and when they conducted violent acts, it was often a lone actor. What we are seeing now is groups of likeminded individuals coming together and talking in a type of language and approach that is used by violent Islamists, using words such as "embracing martyrdom."

In part, this is a response to the broader political context. The far-right parties and movements now have an increasingly coherent narrative, and stronger links to a shared philosophy. Books which espouse this extreme right-wing philosophy are readily available on Amazon, where they have multiple five-star reviews, very few negative reviews, and through algorithms lead the reader to other similarly extreme material. We have not yet worked out, as we did previously with violent Islamist material, what is and is not acceptable on the extreme right-wing side of the ideological equation. The New Zealand attack demonstrated this very clearly when he titled his manifesto "The Great Replacement," drawing on a French right-wing philosophical tract of the same name.

But in many ways, my biggest concern with the future of terrorism is what we do in response to it. I am concerned that there is an expectation that this can be stopped, but we're a long way from working out what the tools are that will enable us to deliver that outcome. Instead, we go through very predictable cycles of intervention and non-intervention overseas, with unclear results. We are committed to liberal values, but then how do we deal with people who we can't lock up and whose minds we can't change? In many ways, the challenge of getting our response right is as big as the problem itself.

**CTC: Are there terrorist tactics that you've seen develop over your time in government and since that seem to be growing into more worrying problems?**

**Raine:** There have been big changes in the threat picture. The inspired threat is a change that has already happened and is still happening. Then there are things which have not changed—for example, the determination to conduct a spectacular attack against aviation, something that is just a huge challenge for governments and the aviation industry. You don't want to put people off flying by being overly protective. But global coordination of effective aviation security has been very slow. The recent conviction in relation to the 2017 Sydney passenger jet plot is a good example of the persistent nature of this threat.[4]

The two new things that everybody talks about are drones and chemical/biological weapons. The likelihood of their use has increased as a result of the war in Syria and as technology develops, because in Syria a significant amount of people have been able to experiment with both types of weapons on the battlefield. We saw in the United Kingdom what disruption drones could do to airports earlier in the year. But at the same time, while we can sometimes get carried away with our creativity about what terrorists might do, they still seem to revert to type. While the panic and disruption caused by the drones at Gatwick airport were hugely damaging,[5] terrorists seem to continue to prefer incidents that cause horrible deaths and injuries. Notwithstanding the availability of new technology, they still continue to like to focus on trying to blow things up.   CTC

## Citations

1   "Abu Bakr al-Baghdadi: IS leader appears in first video in five years," BBC, April 30, 2019.

2   See Paul Cruickshank, "A View from the CT Foxhole: Edmund Fitton-Brown, Coordinator, ISIL (Daesh)/Al-Qaida/Taliban Monitoring Team, United Nations," *CTC Sentinel* 12:4 (2019).

3   Stephanie Nebehay, "U.N. says it has credible reports that China holds million Uighurs in secret camps," Reuters, August 10, 2018.

4   "Australian guilty of plane bomb plot involving meat grinder," BBC, May 1, 2019.

5   Hallie Detrick, "Gatwick's December Drone Closure Cost Airlines $64.5 million," *Fortune*, January 22, 2019.

**18**   CTC SENTINEL   │   AUGUST 2019

# Western Balkans Foreign Fighters and Homegrown Jihadis: Trends and Implications

By Adrian Shtuni

Over 1,000 adult male foreign fighters, women, and minors from the Western Balkans spent time in Syria and Iraq and around 500 from the region are still there, including children born in theater. After seven years of fighting and at least 260 combat deaths, the last active jihadi unit from the Western Balkans in Syria and Iraq is a modest ethnic Albanian combat unit fighting with Hay'at Tahrir al-Sham in Idlib. The rest of those remaining in Syria and Iraq, mostly minors, are held in Kurdish-controlled IDP camps. Some 460 others have gradually returned home, making the Western Balkans the region with the highest concentration of returning foreign terrorist fighters in Europe and creating a long-term security challenge compounded by inadequate resources and the threat posed by homegrown jihadi militants.

The Western Balkans emerged as a meaningful source of European foreign fighters in the Syrian conflict.[1] Although it appeared suddenly, this jihadi mobilization wave did not materialize in a vacuum. It was and remains the most visible manifestation of a wider religious militancy phenomenon in the region. This article will examine both parts of the phenomenon: the current state of the Western Balkans foreign fighter contingent[a] and the complex challenge they

represent as well as the scope and significance of the homegrown jihadi pool in the region. The metrics provided in this article have been compiled from data that was last updated in early to mid-2019 and was provided or released by Western Balkans law enforcement agencies and/or collected from a wide range of reports released by international organizations and academic institutions.

## Part One: Exploring the Western Balkans Foreign Fighters Contingent

*Data and Observed Trends*

Since 2012, about 1,070 nationals[b] of Kosovo, Bosnia and Herzegovina, North Macedonia, Albania, Serbia, and Montenegro traveled to Syria and Iraq, primarily joining the ranks of the Islamic State and in lesser numbers the al-Qa`ida affiliate Jabhat al-Nusra—most recently rebranded Hay'at Tahrir al-Sham (HTS). This unprecedented outflow of foreign fighters from the region peaked in 2013-2014 and almost grinded to a halt by 2016,[2] although aspiring jihadi militants continued their largely unsuccessful attempts to cross into Syria well into 2017.[3] About two-thirds of the contingent, or 67 percent, were male adults at the time of departure, 15 percent women, and 18 percent children.[c] Kosovo contributed the region's largest number of men (256),[4] whereas Bosnia and Herzegovina contributed the highest number of women (61) and children (81).[5]

Due to new births between 2012 and 2019, the number of children of foreign fighters from the Western Balkans in Syria and Iraq has sizably increased. According to official data, the number of children born in theater to Kosovan and Bosnian parents as of

---

a   In this article, "Western Balkans foreign fighter contingent" encompasses—without prejudice to participation in armed combat or implication (direct or indirect) in terrorist activity—all nationals of Western Balkans countries reported by law enforcement authorities to have spent time in areas controlled by designated terrorist organizations in Syria and Iraq from 2012. It is important to emphasize that minors are a distinct, largely noncombatant subgroup considered part of this contingent due to national affiliation and association with their adult parents. Nevertheless, it is also important to note that many children and minors of all nationalities who have transitioned into adulthood while in Syria and Iraq have systematically received ideological and military training in camps for "the cubs of the Caliphate" and, in some cases, have directly participated in armed combat, execution of prisoners, and suicide attacks. See John Horgan, Max Taylor, Mia Bloom, and Charlie Winter, "From Cubs to Lions: A Six Stage Model of Child Socialization into the Islamic State," *Studies in Conflict & Terrorism*, September 10, 2016. See also Asaad Almohammad, "ISIS Child Soldiers in Syria: The Structural and Predatory Recruitment, Enlistment, Pre-Training Indoctrination, Training, and Deployment," ICCT, February 2018.

---

Adrian Shtuni is CEO and Principal Consultant of Shtuni Consulting LLC. He specializes in foreign policy and security issues with a regional focus on the Western Balkans and the eastern Mediterranean. Follow @Shtuni

---

b   Total number compiled based on data from each of the six Western Balkans countries. For Albania, see "Commission Staff Working Document, Albania 2018 Report," European Commission, April 17, 2018, p. 36; for Kosovo, see "Commission Staff Working Document, Kosovo* 2018 Report," European Commission, April 17, 2018, p. 32; for North Macedonia, see "Commission Staff Working Document, The former Yugoslav Republic of Macedonia 2018 Report," European Commission, April 17, 2018, p. 38; for Bosnia and Herzegovina, see "Commission Staff Working Document, Bosnia and Herzegovina 2018 Report, European Commission, April 17, 2018, p. 25; for Montenegro, see "2019 Transitional Action Plan for the Continued Implementation of Activities in the Strategy for Countering Violent Extremism 2016-2018," Government of Montenegro, January 2019, p. 38; for Serbia, see Joana Cook and Gina Vale, "From Daesh to 'Diaspora': Tracing the Women and Minors of Islamic State," ICSR, 2018, p. 16.

c   The UN Convention on the Rights of the Child defines child as "a human being below the age of 18 years."

PX250

early 2019 stood at 155.[d] These new births have further increased the size of the Western Balkans contingent who have spent time in Syria and Iraq to at least 1,225.[e]

In the last seven years, about 260 of those who traveled to Syria and Iraq from the Western Balkans have been reportedly killed in armed hostilities, or, in a few cases, died of natural causes. That represents almost one-quarter of the original contingent of 1,070 individuals. Some 460 others have returned to their countries of nationality or residence.[f] The majority had returned by 2015.[g] A few others were transferred to North Macedonia by the U.S. military in 2018[6] after being captured by the Kurdish-led Syrian Democratic Forces (SDF), thus making that country one of the first in Europe to publicly repatriate Islamic State fighters detained in Syria.[7] The repatriation continued in April 2019 with Kosovo accepting the transfer of 110 individuals, of whom 74 are children, 32 women, and four alleged male foreign fighters. This was one of the largest repatriations of its kind so far.[8] Bosnia and Herzegovina repatriated only one alleged foreign fighter.[9]

The author estimates the size of the Western Balkans contingent of foreign fighters and family members remaining in Syria and Iraq stands at over 500 individuals, made up one-third by male combatants and two-thirds by children (including those born in theater)

and women.[h] They are mostly being held in Kurdish-controlled prisons and camps for displaced people while a smaller number continues to be embedded with the organizations they joined in Syria and Iraq.[10] At least two foreign fighters, one from North Macedonia and one from Kosovo, are serving life sentences in Turkey.[11] Nationals of Bosnia and Herzegovina currently compose the largest group of the Western Balkans contingent remaining in the conflict theater.[i]

As of mid-2019, the largely mono-ethnic Islamic State-affiliated units of Western Balkans foreign fighters appear to no longer be active in the conflict theater. This is mostly due to successful targeting of their leadership by U.S.-led coalition airstrikes and considerable battlefield casualties that have caused a significant drop in the presence of active Western Balkans foreign fighters in Syria and Iraq, likely to the lowest point since the beginning of the jihadi outflow in 2012.[12]

The last active jihadi presence from the region in Syria is an ethnic Albanian unit within HTS. Xhemati Alban is a *katiba* (combat unit) composed of ethnic Albanian fighters operating in and around the northwestern Syrian province of Idlib. Combatants of other Western Balkans ethnicities continue to fight with HTS, but ethnic Albanians appear to be the only ones from the region to still operate a mono-ethnic unit with its commanding structure.[13] This may be indicative of both a sufficiently large number of fighters and adequate military capabilities. Research by the author[j] and linguistic idiosyncrasies from propaganda footage indicate that these fighters originate primarily from North Macedonia and Kosovo. Video and photographic propaganda material released between 2017-2018 by an affiliated media outlet suggest the unit may have up to two dozen active fighters in its ranks.[k] Other martyrdom propaganda footage indicates that the unit may have suffered at least 18 combat deaths,

d   According to interviews with representatives of law enforcement agencies and investigative journalists from the two countries, as of early 2019, the number of children born to Kosovan nationals was 78 and that of children born to Bosnian nationals was 77. Author interviews, early 2019. For Bosnia and Herzegovina, see also Admir Muslimovic, "Authorities Negotiating the Return of Fighters, Women and Children from Syria," Detektor, February 2, 2019.

e   The reason it was at least this number (and likely higher) is because at the time of this publication, there was no official data available for newborn children of citizens of Albania, Montenegro, North Macedonia, or Serbia in Syria and Iraq.

f   These numbers are derived by the author from various sources. For Albania, see "Commission Staff Working Document, Albania 2018 Report," p. 36; for Montenegro, see "2019 Transitional Action Plan for the Continued Implementation of Activities in the Strategy for Countering Violent Extremism 2016-2018," p. 38; for North Macedonia, see "Commission Staff Working Document, The former Yugoslav Republic of Macedonia 2018 Report," p. 38, and also Ryan Browne, "US transferring some ISIS detainees from Syria to their home countries," CNN, August 7, 2018; for Bosnia and Herzegovina, see Daria Sito-Sucic, "Bosnian women struggle to return female relatives, children from Syria," Reuters, March 8, 2019; and for Kosovo, see "Commission Staff Working Document, Kosovo* 2018 Report," p. 32, and Taulant Qenaj, "The Hard Reintegration of Returnees from Syria," Radio Free Europe, May 7, 2019. Updated information was also received directly from Western Balkans law enforcement representatives in early 2019.

g   About 300 foreign fighters and family members had returned to the Western Balkans by the end of 2015. This figure is derived by the author from a number of sources. For Bosnia and Herzegovina, see "Bosnia To Shut Down Radical Muslim Groups After Imam Threatened," Radio Free Europe, February 27, 2016; for North Macedonia, see Lirim Shabani, "Spasovski: The Returnees Are Being Monitored," Telegrafi, March 25, 2016; for Albania, see Aleksandra Bogdani, "Albania faces 'Jihadi Fighters in the Shadows' Threat," BalkanInsight, March 23, 2016; and for Kosovo, see Adrian Shtuni, "Dynamics of Radicalization and Violent Extremism in Kosovo," *United States Institute of Peace Special Report 397* (2016).

h   This number is derived by the author from various sources with the assumption that individuals not reported as dead or returned are still in Syria and Iraq. It is likely that some foreign fighters relocated to other countries or have slipped back home without being detected by local authorities. For Albania, see "Commission Staff Working Document, Albania 2018 Report," p. 36; for Montenegro, see "2019 Transitional Action Plan for the Continued Implementation of Activities in the Strategy for Countering Violent Extremism 2016-2018," p. 38; for Bosnia and Herzegovina, see Sito-Sucic; for Serbia, see Maja Živanovic, "After ISIS Collapse, Serbian Women Trapped in Syria," BalkanInsight, April 25, 2019; and for Kosovo, see "Commission Staff Working Document Kosovo* 2019 Report," European Commission, May 29, 2019, p. 38.

i   Starting from 2012, Kosovo and Bosnia and Herzegovina with 358 and 323 nationals, respectively, were the two main contributors of Western Balkans foreign fighters to Syria and Iraq. As of mid-2019, Kosovo has experienced 242 returns (including 110 in April 2019). By comparison, Bosnia and Herzegovina has experienced only about 60 returns, of which single digit were children. Given the much smaller number of Bosnian returnees and information provided by Bosnia's prime minister in mid-March that 102 Bosnian adults remained in theater, it follows that Bosnian nationals currently compose the bulk of the Western Balkans contingent remaining in Syria and Iraq. For Kosovo, see "Commission Staff Working Document Kosovo* 2019 Report," p. 38; for Bosnia and Herzegovina, see "Commission Staff Working Document, Bosnia and Herzegovina 2018 Report," p. 25, and also Cvook and Vale, p. 16, and Amina Bijelonja, "The Returnee From Syria Cufurovic Was Transferred to Zenica Prison," Voice of America, April 22, 2019.

j   The author monitored their social media channels and discussed the subject with law enforcement contacts from the Western Balkans.

k   This propaganda was tracked by the author between 2017-2018 on a Telegram messaging channel affiliated with Xhemati Alban.

PX250

one after a SVBIED attack during an offensive in Aleppo in late February 2016.[14] The latest martyrdom announcement was issued by the unit's official propaganda channel on May 13, 2019.

The unit's commander is Abdul Jashari, a 42-year-old ethnic Albanian citizen of North Macedonia, going by the *nom de guerre* Abu Qatada al-Albani. Jashari is an influential figure and close military advisor to Abu Muhammad al-Julani, the leader of HTS, who appointed Abu Qatada al-Albani in the summer of 2014 to lead the organization's military operations in Syria.[15] The U.S. Treasury Department designated Jashari a terrorist on November 10, 2016.[16] His name appeared recently in HTS communiqués as one of the members of a high committee tasked with leading reconciliation efforts with Hurras al-Din, a jihadi faction affiliated with al-Qa`ida.[17]

As part of Xhemati Alban's continued engagement and propaganda efforts via social media channels targeting audiences in the Balkans, in August 2018, the group released a 33-minute video entitled "Albanian Snipers in the Lands of Sham."[18] This high-quality propaganda video, narrated in Albanian with English subtitles, documents various stages of training, planning, and combat efforts of the unit's sniper squad, which appears to be self-sufficient both at weapons craftsmanship and tactical training. Its members use customized, high-precision rifles with relatively expensive scopes and craft-made suppressors.[19] The skillsets displayed in the video indicate possible ex-military or paramilitary background and affiliation.

### The Complex Challenge of Returnees

From the start of the Syrian armed conflict, Kosovo, Bosnia and Herzegovina, and North Macedonia experienced some of the highest rates in Europe for mobilization into jihadi terrorist organizations relative to population size.[20] A similar trend has characterized the reverse flow, where according to official data about 460 individuals from the region have returned home from Syria and Iraq, 242 of whom to Kosovo.[21] By comparison, the countries of the European Union, with a cumulative population size of 500 million, have received about 1,500 returnees.[22] As data indicates, the Western Balkans is currently the region with the highest concentration of returned foreign fighters in Europe. With some 500 other adult male combatants, women, and minors still in Syria, it is not inconceivable that the number of returnees may double in size in the future. Kosovo, with its 134 returnees per million nationals, tops the chart, followed by North Macedonia with 42 per million. The United Kingdom, by comparison, has reported about 6 returnees of "national security concern" per million, whereas Germany and France about four per million.[l] The scale of the Western Balkans challenge in dealing with the long-term social and national security implications of this considerable wave of returnees becomes clearer when considering the very modest resources and capacities available in the region compared to the rest of Europe.

The emerging practice of stripping citizenship or permanent residence to foreign fighters that is gaining traction in some European

countries might complicate things further for the Western Balkans, as it shifts the burden of prosecuting and handling dozens of returnees with dual nationality to countries already overburdened and ill-equipped to do so both in terms of resources and expertise.[m] In October 2018, Kosovan authorities accepted the transfer from Turkey of an ethnic Albanian Islamic State fighter and his three children. He was born in Germany to parents that had emigrated there from Kosovo.[23] That was after Germany revoked his permanent residence permit although he had lived all his life in Germany, had reportedly been radicalized there, and fought in Syria with the so-called "Lohberger Brigade," a German-speaking jihadi unit.[24] He was swiftly indicted, tried, and found guilty in Kosovo within a three-month timeframe for "organizing and participating in a terrorist group."[25] Though, after pleading guilty, he received a five-year prison sentence, that was only for the crime of joining a terrorist organization rather than possible crimes committed during the four years spent fighting with the Islamic State in Syria.[n]

Despite significant capacity and resource challenges, the Western Balkans countries have tried and sentenced a significant number of returning jihadis. Kosovo has been at the forefront of these efforts with 73 successful prosecutions of male returnees as of early 2019, which is more than all the other countries of the region combined.[26] That is six out of every 10 returnees. By comparison, the United Kingdom has prosecuted one in 10 jihadis returning from Syria, for a total of about 40 individuals.[27] [o] Courts in North Macedonia and Bosnia and Herzegovina—the other two countries with the largest numbers of returnees in the Western Balkans—have issued guilty verdicts against 32 and 18 of their foreign fighter nationals, respectively.[28]

Yet, due to generally lenient sentencing regimes[29] in the countries of the Western Balkans, often based on plea bargains, the prison sentences in terrorism-related cases have largely ranged from one to six years with few exceptions in cases of prominent recruiters.[30] For example, in Kosovo, the average sentence in terrorism-related cases

---

l   These numbers are calculated by the author from the tabulation of foreign fighters per country in Richard Barrett, "Beyond the Caliphate: Foreign fighters and the threat of returnees," Soufan Center, October 2017 as well as other sources reporting on the most recent transfer of foreign fighters in the Western Balkans. For North Macedonia, see "Commission Staff Working Document, The former Yugoslav Republic of Macedonia 2018 Report," p. 38, and also Browne; for Kosovo, see "Commission Staff Working Document, Kosovo* 2018 Report," p. 32, and Qenaj.

m   Determining the size of the pool of Western Balkans foreign fighters and homegrown jihadis with dual nationality or residence in Western countries is beyond the scope of this article. Yet, information provided in various publications appears to indicate that the size is not insignificant. According to the U.S. State Department's "Country Reports on Terrorism 2016," of the 300 Austrian foreign fighters in Syria and Iraq and those prevented from departing, ethnic Bosnians represent the second-largest group after the Chechens who had entered Austria as asylum seekers over the past decades. Furthermore, a recent study by the Zurich University of Applied Sciences on 130 Swiss-based jihadis—including 72 foreign fighters—monitored by the Swiss intelligence service FIS revealed that about one-third of them have a Western Balkans background. For more, see Miryam Eser Davolio, Mallory Schneuwly Purdie, Fabien Merz, Johannes Saal, and Ayesha Rether, "Updated review and developments in jihadist radicalization in Switzerland – updated version of an exploratory study on prevention and intervention," June 2019.

n   Recent research has emphasized the legislative and practical challenges of collecting admissible forensic evidence for the successful prosecution of crimes that may have been committed in foreign war zones by returning foreign fighters. For more on this, see Christophe Paulussen and Kate Pitcher, "Prosecuting (Potential) Foreign Fighters: Legislative and Practical Challenges," International Centre for Counter-Terrorism – The Hague, January 30, 2018.

o   There are many possible reasons determining the number of successful prosecutions in each country, including the different standards and rules of admissible evidence in court that vary across legal systems and the different use of negotiated agreements such as plea bargains.

PX250



*Xhemati Alban - Albanian HTS* katiba. *The banner indicates this cohort of fighters is an "infiltration unit." Date posted: October 18, 2017 (Source: Telegram)*

has been 3.5 years.[31] As a result, about 40 percent of those sentenced for terrorist offenses in Kosovo in the past few years have already been released from prison.[p] In Bosnia and Herzegovina, sentencing leniency has gone even further. In one criminal proceeding, a defendant holding dual Bosnian and Austrian citizenship entered a guilty plea for providing recurrent financial support to the Islamic State and settled with the court to pay a fine of about $15,000 in lieu of a one-year prison sentence.[32] Another returning foreign fighter was sentenced in late 2016 to one year in prison after admitting that going to Syria was a mistake.[33] On average, the 25 individuals prosecuted and sentenced by a court of appeals verdict in Bosnia and Herzegovina have received prison sentences of one year and 11 months for terrorism-related activities, including fighting in Syria.[34]

Overall, the sentences handed down in the Western Balkans for terrorism offenses are among the most lenient in Europe. The average sentence in the European Union for terrorism-related offenses was five years in 2017.[35] The average increased to seven years in 2018.[36] By comparison, the average sentence for criminal offenses related to the Islamic State in the United States in mid-2019 stood at 13.5 years in prison.[37] Yet, while E.U. countries have the resources, capabilities, and practical experience required to develop and implement prison-based rehabilitation and post-incarceration aftercare programs—including employment assistance and socioeconomic incentives—that is not the case in the Western Balkans. Uneven progress has been made to date toward putting in place any meaningful rehabilitation and reintegration programs for returning foreign fighters, women, or minors.[38] Although detailed strategies and action plans have been drafted across the region, inadequate allocation of funding has hampered their implementation and impact.[39]

Another concern related to foreign fighter returnees is the likelihood that some may have returned to the region with the assistance of support networks without being detected by the authorities, or at least have been able to evade them for some time. An alleged Kosovo-born Islamic State recruiter and a U.S. permanent resident at the time of travel to Syria in 2013, relocated to Bosnia and Herzegovina in January 2017 using fake travel documents. He was able to hide in Sarajevo for about six months using numerous fake identities before being arrested, at which time he was reportedly found in possession of passports from six countries.[40] He was extradited to the United States in October 2017 where he has been indicted. While the purpose of his relocation to Bosnia and Herzegovina remains unclear, he could face a life sentence in the United States if found guilty.[41]

In another case, a former Islamic State foreign fighter of Kosovan citizenship was arrested in February 2019 by the Albanian customs authorities while attempting to board a ferry to Italy using a forged North Macedonian passport. In January 2017, a court in Kosovo had sentenced him to two years and six months in prison, but the police had been unable to locate him following the completion of the trial until he resurfaced in Albania.[42] Both of these cases illustrate the ability of these returning foreign fighters to evade law enforcement authorities, travel and relocate abroad, and obtain travel documents under false identities. In other cases, returnees under house arrest absconded and returned to Syria.[43] All the above is unlikely to have happened without the logistic and financial assistance of support networks with criminal connections.

## Part Two: Examining the Scope and Significance of the Homegrown Jihadi Pool

The unprecedented jihadi mobilization wave of the last decade in the Western Balkans may have been sudden in its manifestation, but it did not occur in a vacuum.[44] As such, the foreign fighters are only the most visible manifestation of a wider phenomenon of religious militancy in the Western Balkans, the size and threat of which is not easily measured. Numerous counterterrorism operations resulting in hundreds of arrests, convictions, and various foiled terrorist attacks have revealed the instrumental role of well-integrated radicalization, recruitment, and mobilization networks organized around salafi enclaves, 'unofficial' mosques, and a variety of faith-

p    According to information issued by Kosovo judicial authorities and obtained by the author as of March 2019, Kosovan authorities have successfully prosecuted and sentenced 73 returning foreign fighters and 33 individuals found guilty for recruiting, providing support, and engaging in terrorist activities domestically. Of the 106 convicted individuals, 42 had been released after serving their sentence.

based charities, movements, and associations run by local fundamentalist clerics and religious zealots.[45]

In essence, observed radicalization and mobilization patterns are similar to those elsewhere in Europe, where known salafi organizations like Sharia4Belgium, Millatu Ibrahim, and Die Wahre Religion have been heavily linked to foreign fighter flows to Syria and Iraq. In 2015, for example, a court in Belgium found 45 members of the salafi organization Sharia4Belgium guilty of sending fighters to Syria and other terrorist-related offenses.[46] In 2016, Germany banned Die Wahre Religion (The True Religion) known for its proselytizing campaign *"Lies!"* (Read!) that was also active in the Balkans—about 140 of the group's supporters are known to have traveled to Syria and Iraq.[47] One key difference, nonetheless, is that in the Western Balkans, the proliferation of ultraconservative organizations with political agendas was enabled by the post-Balkans conflict environment, where these entities were able to exploit societal vulnerabilities and rifts, mixing humanitarian aid with salafi indoctrination and militantism.[48]

While the contingent of Western Balkans foreign fighters is only the most visible manifestation of the terrorist threat in the region, questions abound as to the size of the less visible component of the problem: the contingent of radicalized individuals that has often provided ideological, logistical, or financial support to foreign fighters and at times has been responsible for plotting terrorist attacks. In a way, terrorism-related arrests and failed plots make some aspects of this problem set more visible. Although no official data exists for these countries, data and trends observed elsewhere in European countries may provide a general indication of the possible size of the problem in the Western Balkans.

According to a report on the terrorist threat in France presented to the French Senate in March 2018 the French intelligence services had identified 1,309 French nationals or residents who had traveled to Syria and Iraq since 2012.[49] The same report indicated that as of February 2018, the "Fichier de traitement des Signalements pour la Prévention de la Radicalisation à caractère Terroriste," (FSPRT) a database used by French security services to monitor and assess the magnitude of the domestic terrorist threat posed by Islamist extremists,[q] had 19,725 "active profiles/entries" of radicalized individuals, 4,000 of which considered "particularly dangerous."[50] [r] In France therefore, the number of radicalized individuals considered to pose a potential national security threat is about 15 times higher than the number of known foreign fighters.

Similarly, the British MI5 has over the years identified 23,000[51] onetime jihadi extremists living in the United Kingdom, 3,000 of whom were the focus of 500 ongoing terrorism investigations or monitoring operations in early 2017.[s] By comparison, the number of reported British foreign fighters in July 2017 stood at about 850,[52] making the number of the homegrown jihadi—posing either a residual or active national security threat—about 27 times higher than the number of foreign fighters.

It is very possible the divergence between the French and United Kingdom ratios is because the FSPRT list and the MI5 list are based on different criteria. But based on the similar trends observed in France and the United Kingdom regarding the much larger size of the homegrown jihadi population relative to the foreign fighter contingent, it would not be inconceivable to assume at least a 15:1 homegrown jihadi to foreign fighter ratio in the Western Balkans context.[t] Nevertheless, it is important to emphasize that methodologies for measuring terrorist radicalization and national security threat differ from country to country. Also, while similar in some ways, jihadi radicalization trends are not uniform across countries as they result from the interplay of a variety of socio-political, historical, and ideological variables that are largely country and region specific.

Two other indicators point to the existence of a robust and ideologically committed contingent of jihadi militants operating in the Western Balkans: the persistent activities of 'social media jihadis' who openly support and disseminate the ideology and propaganda of terrorist organizations, and the unprecedented number (as far as the region is concerned) of both foiled terrorist attacks and arrested homegrown terrorists in recent years. Following the clampdown on accounts disseminating jihadi content by Facebook, local 'social media jihadis' have partially migrated over the past years to other social media platforms such as the messaging application Telegram, which has a relatively less aggressive content removal policy.[u]

Research conducted for this assessment on the week of March

---

q   Editor's note: FSPRT contains only radical Islamists, while the Fiches S (another list maintained by French authorities) includes other types of threats to the national security. FSPRT is specific to Islamist radicalization. Jean-Charles Brisard communication to this publication, July 2019.

r   These 4,000 individuals categorized as "particularly dangerous" met at least one of the following criteria: demonstrated a strong desire (verified instead of assumed) to travel abroad to wage jihad; had a proven link to a terrorist activity or network; and/or were reported as a dangerous Islamist radical.

s   This contingent of 23,000 individuals is considered by the authorities to pose different levels of security risk. Following the May 22, 2017, Manchester Arena bombing the United Kingdom's Security Minister Ben Wallace announced that 3,000 "subjects of interest" were the focus of 500 active terrorism investigations whereas 20,000 "former subjects of interest" who were previously investigated were considered to constitute a residual risk. It is likely that some of the previously investigated individuals no longer pose a threat. Yet, the Manchester Arena bomber, Salman Abedi, was a "former subject of interest," which exemplifies the challenge of accurately assessing the level of threat posed by each subject of interest. For more on this, see Raffaello Pantucci, "Britain on Alert: The Attacks in London and Manchester and the Evolving Threat," *CTC Sentinel* 10:7 (2017).

t   The 15:1 projection is based on the smaller homegrown jihadi to foreign fighter ratio per available information in the cased of France; the projection would be higher if the ratio of the United Kingdom is applied. It should be pointed out that due to the very dynamic nature of terrorist radicalization, the databases of radicalized individuals considered to pose a potential terrorist threat may contain false positives but also miss cases of terrorist radicalization. In the case of France, according to a recent study by GLOBSEC, about 80 percent of the individuals behind 22 terrorist incidents were on terrorist watchlists. The rest were not previously known to the authorities. See Ken Dilanian, "Report: Nearly all terror attacks in France carried out by suspects already known to police," NBC, January 6, 2019. A more precise assessment of the actual size of the pool of radicalized individuals posing a potential national security threat in the Western Balkans would require more specific research.

u   This migration of Western Balkans 'social media jihadis' to Telegram followed a broader trend shift of the Islamic State and other terrorist groups' communication strategy worldwide. For more on this, see Bennett Clifford and Helen Powell, "Encrypted Extremism, Inside the English-Speaking Islamic State Ecosystem on Telegram," George Washington University's Program on Extremism, 2019.

PX250

11, 2019, identified 27 active (not requiring membership) Telegram channels/pages in the Albanian language and 6,352 subscribers/accounts that followed one or more of these pages operated by militants and/or fighters of the Islamic State (13 channels), HTS (six channels), or generic jihadi supporters (eight channels).[v] The content circulated through these channels focused on promotion of jihad; sharing news bulletins from official media channels of jihadi organizations operating in various conflict theaters; salafi literature; sermons of local and foreign salafi clerics generally imprisoned for terrorism-related activities; propaganda videos and infographics; and jihadi *nasheeds*.[w]

While in the past couple of years there has been a drop in jihadi media output in Western Balkans' languages,[x] an avid cadre of committed 'social media jihadis' continue to engage regularly with audiences online, disseminate jihadi propaganda, recruit, incite violence, and even plot attacks. In late 2017, a court in Kosovo sentenced an Islamic State supporter to one year and six months in prison for using social media platforms to incite attacks against Kosovan government institutions and foreign embassies.[53] A few months later, another Islamic State supporter, the sibling of a Kosovan Islamic State suicide bomber, received a sentence of 200 hours of community service for inciting vehicular attacks via social media.[54] In October 2018, they were both found guilty on additional charges, the first for attempting to enlist support and funding for a suicide attack and the other for not reporting the case to the police.[55]

Terrorist plots have been successfully disrupted by counterterrorism operations in the past three years in Kosovo, Albania, North Macedonia, Bosnia and Herzegovina, and Serbia. In a 2016 foiled plot involving an advanced Islamic State-directed plan to carry out simultaneous attacks in the region, including one on the Israeli national soccer team visiting Albania, nine Kosovan citizens were found guilty.[56] According to the prosecution, one of the perpetrators had previously fought in Syria and some of the plotters were taking directives on the attack from their compatriots in leadership positions within the Islamic State.[57]

In 2015, two soldiers were killed in the capital of Bosnia and Herzegovina by an armed Islamist gunman who blew himself up after carrying out the attack. Notes glorifying the Islamic State were found in his house.[58] In June 2018, Kosovan authorities reportedly foiled another attack targeting NATO forces stationed in Kosovo.[59] One of the plotters was arrested previously for attempting to travel to Syria and another one was expelled from Italy.[60] The latest foiled attack was reported in North Macedonia on February 15, 2019, where the police arrested 20 alleged Islamic State supporters.[61]

In sum, some returnees from Syria and Iraq have reportedly been involved in terrorism-related activities and found in possession of illegal firearms and explosives upon their return.[62] Yet, the foiled terrorist plots have largely involved individuals not known to have traveled to Syria and Iraq, although in many cases they were related to or associated with known foreign fighters. Judging from this perspective, the homegrown jihadis have so far been a more significant source of domestic security threat than foreign fighters.

## Conclusions

This assessment has found that the presence of Western Balkans foreign fighters currently active in Syria and Iraq is likely at the lowest point since 2012 and the remaining contingent of about 500 individuals is made up for two-thirds by minors and women. While already the region with the highest concentration of returning foreign fighters in Europe, additional repatriations are bound to compound the Western Balkans' long-term social and security challenge further.

In light of the sizable wave of returnees from Syria and Iraq, special attention and resources should be dedicated to assessing, monitoring, and actively countering the robust jihadi networks in the region. The considerable numbers of terrorism-related arrests, convictions, and foiled attacks in the Western Balkans clearly indicate that the countries of the region have stepped up their CT efforts in response to a heightened terrorist threat. Yet, unless adequately augmented, scarce resources and capacities will likely continue to hamper the scope and effectiveness of these efforts. Prison sentences that are not matched by substantive prison-based rehabilitation and post-incarceration supervision and support efforts are unlikely to duly mitigate the social and security risks posed by returnees and homegrown terrorist offenders.

Policy makers should consider proactively adjusting national security responses to the demographic shifts observed in the composition of the remaining Western Balkans contingent in Syria, currently dominated by noncombatants. The "children of the Caliphate," including those from the Western Balkans, will likely represent a long-term challenge with national security implications. As such, there is a strong case for prioritizing efforts addressing this complex challenge.   CTC

---

v   The total number of subscribers to the 27 channels may not necessarily represent unique individuals/followers.

w   Despite efforts by Telegram to suspend these channels, they are quickly reactivated by their administrators under slightly different names. Hundreds of subscribers would follow the reactivated channels within a short time. During the timeframe of monitoring, despite fluctuations, the number of channels and subscribers remained roughly the same. In the same timeframe, the active Facebook account of an ethnic Albanian foreign fighter posting from Syria had 1,150 followers, while the account of another ethnic Albanian returned and incarcerated Islamic State foreign fighter had over 2,700 followers.

x   This trend observed by the author may have resulted from a number of reasons, including the aggressive policies adopted by social media platforms and the decimated capacities of Islamic State media outlets.

## Citations

1   A.J. Naddaff, "Kosovo, home to many ISIS recruits, is struggling to stamp out its homegrown terrorist problem," *Washington Post*, August 24, 2018; "Bosnia: Islamic state group prime recruitment hotbed in Europe," France 24, December 21, 2015; Carlotta Gall, "How Kosovo was turned into fertile ground for ISIS," *New York Times*, May 21, 2016.

2   For Albania, see "Commission Staff Working Document, Albania 2018 Report," European Commission, April 17, 2018, p. 36; for Kosovo, see "Commission Staff Working Document, Kosovo* 2018 Report," European Commission, April 17, 2018, p. 32; for North Macedonia, see "Commission Staff Working Document, The former Yugoslav Republic of Macedonia

2018 Report," European Commission, April 17, 2018, p. 38; for Bosnia and Herzegovina, see "The Western Balkans: Transition Challenges, European Aspirations and Links to the MENA Region," NATO Parliamentary Assembly, April 21, 2017, p. 8.

3    "Commission Staff Working Document, The former Yugoslav Republic of Macedonia 2018 Report," p. 38.

4    Updated official data provided by Kosovo Police to the author in early 2019. See also "Commission Staff Working Document, Kosovo* 2019 Report," p. 38.

5    "Commission Staff Working Document, Bosnia and Herzegovina 2018 Report," European Commission, April 17, 2018, p. 25.

6    Ryan Browne, "US transferring some ISIS detainees from Syria to their home countries," CNN, August 7, 2018.

7    Carlo Munoz, "Pentagon praises Macedonia for repatriation of ISIS foreign fighters," *Washington Times*, August 7, 2018; Browne.

8    "110 Returnees from Syria to Kosovo," Voice of America, April 20, 2019.

9    "Bosnia brings back, detains Islamic fighter from Syria," Reuters, April 20, 2019.

10   "Syria war: Kosovo brings back 110 citizens including jihadists," BBC, April 20, 2019.

11   "Men behind first DAESH attack in Turkey get multiple life sentences," Daily Sabah, June 15, 2016.

12   "Country Reports on Terrorism 2017," U.S. Department of State, September 19, 2018, p. 98. See also "SIPA: Bajro Ikanovic, a Bosnian citizen previously convicted on terrorism charges, killed in Iraq," Klix, March 23, 2016; "Al-Kosovi, Commander of Albanian ISIS jihadis, killed in Syria," Balkanweb, February 8, 2017; and "Albanian ISIS commander reported dead," Kallxo, April 4, 2016.

13   These observations are based on the author's monitoring of jihadi activities of Western Balkans individuals in Syria and Iraq and communications with law enforcement authorities from the Western Balkans.

14   Adrian Shtuni, "OSINT Summary: Video eulogizes Albanian Jabhat al-Nusra suicide bomber in Syria's Aleppo," IHS Jane's, July 8, 2016.

15   Thomas Joscelyn, "Leaked audio features Al Nusrah Front emir discussing creation of an Islamic emirate," FDD's Long War Journal, July 12, 2014.

16   "Counter Terrorism Designations and Updates," U.S. Department of the Treasury, November 10, 2016.

17   Thomas Joscelyn, "Analysis: Hay'at Tahrir al-Sham and Hurras al-Din reach a new accord," FDD's Long War Journal, February 15, 2019.

18   Aaron Zelin, "New video message from Hayy'at Tahrir al-Sham: Albanian Snipers in al-Sham," jihadology.net, August 4, 2018.

19   "The Albanian Sniper Squad in Syria and their Weapons," Calibre Obscura, December 12, 2018.

20   Adrian Shtuni, "Dynamics of Radicalization and Violent Extremism in Kosovo," *United States Institute of Peace Special Report 397* (2016).

21   "Commission Staff Working Document Kosovo* 2019 Report," European Commission, May 29, 2019.

22   Eric Schmitt, "Defeated in Syria, ISIS fighters held in camps still pose a threat," *New York Times*, January 24, 2018.

23   "Kosovo detains man suspected of joining Syria terror groups," Associated Press, October 9, 2018; Bjorn Stritzel, "9. Dernjani is now scheduled to be deported to Kosovo," Twitter, June 10, 2018; "Germany requested Kosovo to handle the case of the ISIS Albanian fighter who raped minors," Insajderi, December 2018.

24   "ISIS fighter from Dinslaken sentenced to five years in prison," *Bild*, January 15, 2019.

25   Mirvet Thaqi, "The accused who pled guilty to participating in a terrorist group received a five year prison sentence," Betimi Per Drejtesi, January 14, 2019.

26   This is according to information issued by judicial authorities in the Western Balkans and obtained by the author.

27   Lizzie Dearden, "Only one in 10 jihadis returning from Syria prosecuted, figures reveal," *Independent*, February 21, 2019.

28   This is according to information received by judicial authorities in the Western Balkans.

29   "Country Reports on Terrorism 2017," U.S. Department of State, September 19, 2018, p. 76.

30   Sabina Pergega, "Spectacles, trials and sentences handed down to individuals accused of participating and inciting participation in the 'war of nobody,'" Betimi Per Drejtesi, January 2, 2018; Zijadin Gashi, "Zeqirja Qazimi and six others sentenced to 42 years in prison for terrorism,"

Radio Free Europe, May 20, 2016.

31   This is according to information issued by Kosovo judicial authorities and obtained by the author.

32   Haris Rovcanin, "Bosnian ISIS backer avoids jail by paying fine," Balkan Insight, December 19, 2016.

33   Ibid.

34   Albina Sorguc, "Bosnia Court Jails Syria Fighter for Three Years," BalkanInsight, April 17, 2019.

35   "European Union terrorism situation and trend report 2018," Europol, 2018, p. 20.

36   "European Union terrorism situation and trend report 2019," Europol, 2019, p. 26.

37   "GW tracker: the Islamic State in America," George Washington University's Program on Extremism, 2019.

38   Denis Dzidic, "No deradicalization schemes for Bosnian terror convicts," Detektor, March 28, 2017.

39   Albina Sorguc, "Bosnia has plan, but no money, to fight radicalization," Detektor, December 28, 2018.

40   "Mirsad Kandic: ISIS' border guard and intelligence officer," Radio Free Europe, November 16, 2017.

41   Brendan Pierson, "Former Brooklyn resident charged in U.S. with aiding Islamic State," Reuters, November 1, 2017.

42   "ISIS fighter had evaded law enforcement in Kacanik, arrested in Vlore," Insajderi, March 13, 2019.

43   Ervin Qafmolla, "Escape of those accused of terrorism highlights the failure of the justice system in Kosovo," Gazeta JNK, November 8, 2016.

44   Adrian Shtuni, "Ethnic Albanian foreign fighters in Syria and Iraq," *CTC Sentinel* 8:4 (2015). See also "Bosnia's Dangerous Tango: Islam and Nationalism," International Crisis Group, February 26, 2013; Miranda Vickers, "Islam in Albania," Defence Academy of the United Kingdom, March 2008; Nidzara Ahmetasevic, "Emissaries of Militant Islam Make Headway in Bosnia," BalkanInsight, December 10, 2007.

45   "126 years in prison for nine jihadists charged with terrorism," Top Channel, May 3, 2016; Rory Mulholland, "Muslim radicals in mountain villages spark fears in Bosnia," *Telegraph*, April 30, 2016.

46   "Sharia4Belgium trial: Belgian court jails members," BBC, February 11, 2015.

47   Melissa Eddy, "Germany bans 'True Religion' Muslim group and raids mosques," New York Times, November 15, 2016.

48   Shtuni, "Dynamics of radicalization and violent extremism in Kosovo;" Vickers; "Bosnia's Dangerous Tango;" Ahmetasevic.

49   "Terrorist Threat: For a Just but Firmer Republic," Report 639 (2017-2018), French Senate, July 4, 2018, p. 28.

50   Ibid., p. 56; Juliette Campion, "Comment les personnes radicalisées sont-elles suivies en France?" (How have radicalized individuals been tracked in France), France Info, March 26, 2018.

51   Sean O'Neill, Fiona Hamilton, Fariha Karim, and Gabriella Swerling, "Huge scale of terror threat revealed: UK home to 23,000 jihadists," *Times*, May 27, 2017.

52   Grahame Allen and Noel Dempsey, "Terrorism in Great Britain: the statistics," House of Commons Library, June 7, 2018, p. 28.

53   Labinot Leposhtica, "Court of appeals increases sentence for Rakip Avdyli," kallxo.com, 2017.

54   Arita Gerxhaliu, "Court sentences ISIS Facebook propagator," kallxo.com, January 31, 2018.

55   Kastriot Berisha, "Accused terrorists express their 'regret' before being sentences by court," kallxo.com, October 5, 2018.

56   Sylejman Kllokoqi, "8 Kosovo Albanians jailed on foiled attack on Israeli team," Associated Press, May 18, 2018.

57   Leotrim Gashi, "Two verdicts expected on cases related to fourteen indicted of terrorism," Betimi per Drejtesi, May 18, 2018.

58   Zdravko Ljubas, "Murder of two Bosnian soldiers an act of terrorism," *Deutsche Welle*, November 19, 2015.

59   "6 charged in Kosovo with planning terror attacks," Associated Press, October 5, 2018.

60   "Is ISIS inside Kosovo? Who are the four individuals arrested today for planning terrorist attacks," Gazeta Express, June 29, 2018.

61   "Twenty people related to ISIS arrested in North Macedonia," Koha.net, February 16, 2019.

62   "Former jihadist wounded in Syria arrested in Pogradec," Kallxo.com, November 13, 2016.

PX250

AUGUST 2019    CTC SENTINEL    25

# Returnee Foreign Fighters from Syria and Iraq: The Kosovan Experience

By Kujtim Bytyqi and Sam Mullins

**Drawing upon the first author's position within the Kosovo Security Council Secretariat and utilizing internal government reports and statistics, this article provides an overview of the Kosovan experience dealing with returnee 'foreign fighters' from Syria and Iraq. So far, at least five returnees have been involved in planning domestic attacks, thus reaffirming academic analyses and recent reports suggesting that it is a minority of returnees who present an immediate terrorist threat. Nevertheless, a small number of returnees remain highly radicalized and are both willing and determined to attack at home. The Kosovan approach to managing this risk is discussed, to include challenges and lessons learned.**

As of mid-2019, there are still around 2,000 alleged foreign fighters and close to 14,000 foreign women and children being held in overcrowded detention camps in Syria.[1] Naturally, there is widespread concern that these individuals may present a significant threat to national security. Consequently, many countries—most notably those in Western Europe—have been reluctant to bring their citizens home and appear to be delaying the repatriation process as long as possible. In contrast to this, others, including Russia, Tajikistan, Uzbekistan, Turkey, and Kosovo, have taken a more proactive approach in facilitating the return of large numbers of mostly women and children.[2]

Drawing upon the first author's position on the Kosovo Security Council Secretariat, which grants him unfettered access to government officials and returned foreign fighters and their families alike, this article seeks to shed light on the Kosovan experience dealing

Kujtim Bytyqi is Acting Director of the Department for Analysis and Security Policies of the Kosovo Security Council Secretariat. He is responsible for monitoring the implementation of the National Strategy on Prevention of Violent Extremism and Radicalisation Leading to Terrorism. Sam Mullins is an outgoing professor of counterterrorism at the George C. Marshall European Center for Security Studies, Germany, and is currently transferring to the Daniel K. Inouye Asia-Pacific Center for Security Studies in Hawaii. He is also an honorary principal fellow at the University of Wollongong, Australia. Follow them on Twitter @bytyqi_kujtim and @Sam_J_Mullins

*The views expressed in this article are those of the authors alone and do not necessarily represent the official position of the government of Kosovo or the United States.*

with returnees from Syria and Iraq. The article begins with a brief overview of Kosovar foreign fighter activities, followed by an examination of those who returned home between 2013 and 2018, and those who were repatriated in April of this year. In the final section, the discussion focuses on challenges and lessons learned from trying to manage the risk associated with these individuals.

## The Foreign Fighters

Between 2012 and 2015 a total of 355 Kosovars—consisting of 256 men, 52 women, and 47 children—are believed to have traveled to Syria and Iraq.[a] (See Table 1.) This is one of the highest per capita rates of 'foreign fighter' outflows[b] anywhere in the world. Forty-five percent of these individuals left Kosovo before the Islamic State declared its caliphate in June 2014. To begin with, they joined the Free Syrian Army, Jabhat al-Nusra, Ahrar al-Sham, or Kataib al-Muhajirin and were largely focused on the overthrow of Assad.[3] However, the majority of those who stayed subsequently transitioned to the Islamic State. Those who traveled after the declaration of the caliphate (which, along with an increasing amount of jihadi propaganda, was translated into Albanian) mostly joined the Islamic State directly.

*Table 1. Foreign fighters from Kosovo, 2012–2019[4]*

|  | Men | Women | Children | Total |
|---|---|---|---|---|
| *Total travelers* | 256 | 52 | 47 | 355 |
| *Children born in Syria* | N/A | N/A | 76 | 76 |
| *Killed* | 92 | 6 | 1 | 99 |
| *Still in Syria* | 40 | 8 | 42 | 90 |
| *Returned home* | 124 | 38 | 80 | 242 |
| *Involved in domestic terror plots* | 5 | 0 | 0 | 5 |
| *Successfully prosecuted* | 85 | 0 | 0 | 85 |

a    Note that another 76 children were born to Kosovan parents in the conflict zone, bringing the total number to 431. On top of this figure, an additional 30 men, eight women, and two children have been prevented from traveling. Data provided by the Kosovo Police Counter-Terrorism Department.

b    This term will be loosely defined here as individuals who traveled to Syria and Iraq and joined with militant organizations such as the Islamic State, regardless of their activities or status within the conflict zone.

PX250

By far, the most prominent Kosovar to join the fight in Syria was Lavdrim Muhaxheri, who is previously said to have worked at NATO bases in Kosovo and Afghanistan before radicalizing and traveling to the warzone in 2012.[5] Muhaxheri first stepped into the spotlight in October 2013 after appearing in an Islamic State recruitment video posted on YouTube in which he called on Albanian Muslims to join the fight against Assad and other "infidels."[6] He went on to appear in grisly execution videos and became the leader of a group of Albanian Islamic State fighters, while maintaining a fairly prolific presence on social media.[7] Together with another high-profile Islamic State leader from Kosovo named Ridvan Haqifi, Muhaxheri played an important role in promoting the Islamic State in the Balkans and facilitating travel to Syria.[8]

Not content with encouraging others to follow in their footsteps, Muhaxheri and Haqifi turned their attention to inciting attacks at home. In June 2015, Haqifi appeared in an Islamic State video in which he warned that "black days" were coming to Kosovo. "You will be frightened and terrified in your dreams as you sleep," he declared. "We will kill you with the permission of Allah. We will come with explosive belts."[9] The following year, police arrested 19 individuals on suspicion of planning attacks against targets in Kosovo, as well as a soccer match between Albania and Israel that was scheduled to take place in the city of Shkodër, northwest Albania, in November 2016. It soon transpired that the group, which was in possession of more than 2.5 kilograms of explosives, was being jointly coordinated from afar by Muhaxheri and Haqifi.[10] Both men are now believed to be dead,[11] but thanks to their seniority and prominence both as instigators and facilitators they surely left an indelible mark on the foreign fighter phenomenon in Kosovo. In particular, by going beyond merely issuing threats to actually orchestrating a major attack plot, they helped transform it from a movement that initially was very much externally focused to one that also presented a significant threat at home.

### The Returnees (2013–2018)

By 2018, 132 Kosovars who went to Syria (37% of the total) had returned home, consisting of 120 men, six women, and six children. The majority of this cohort made their way back from Syria prior to 2015, with only a handful returning in 2016 and 2018, respectively (thus marking the end of the first wave of returnees).[c] Although authorities in Kosovo have chosen not to prosecute women or children, most of the adult males (71% of those who returned by 2018) have been charged, convicted, and imprisoned on terrorism-related offenses (more on this later).[d]

Returnees have displayed a range of different attitudes toward authorities, along with varying levels of continued commitment to jihadi groups and ideological concepts (including acceptable use of violence against 'enemies' of Islam, and the relative importance attached to establishing a 'true' Islamic State). Many appear to be genuinely disillusioned and repentant, particularly those who returned home during the early stages of the conflict in Syria and Iraq. Albert Berisha, for example, went to Syria in October 2013. There, he came into contact with Jabhat al-Nusra and the Islamic State before joining with Ahrar al-Sham but quickly became disillusioned by widespread in-fighting within the Syrian opposition and returned home after just nine days. Although convicted in Kosovo for membership in a terrorist organization, he insists this was never his intention and together with another Kosovar returnee named Liridon Kabashi, he established the Institute for Integration, Security and Deradicalization (INSID), an NGO dedicated to the rehabilitation and reintegration of former foreign fighters.[12] However, regardless of their views on groups like the Islamic State, few returnees appear to accept that their actions should be punishable under law. As one returnee remarked, "I went there [to Syria] for purely humanitarian reasons. I wanted to help people and contribute with my warfare experience. That's not a crime."[13] Similarly, many believe that being imprisoned is an added hindrance to their (future) reintegration.[14] Accordingly, there is considerable resentment of the government of Kosovo.

More concerning still are those who continue to adhere to violent, extremist ideologies and have adopted an overtly hostile stance toward prison authorities and the state. 'Abu Albani,' who first traveled to Syria in 2013 while still in his early twenties, refused to cooperate with the deradicalization program in prison, and appeared to strengthen his commitment to the Islamic State, despite having become disillusioned with them while in Syria. When interviewed several months after his release, he remained deeply resentful of the government of Kosovo (even though it helped him to get a job) and was also openly supportive of terrorism and violence as a means to achieve a "true" Islamic State.[15]

Of course, showing signs of radicalization and actually following through on such sentiments are two different things. Nevertheless (as indicated in Table 1), at least five returnees so far have been accused of planning attacks. In November 2013, police arrested a total of six individuals in Pristina and Gjilan on suspicion of planning domestic attacks. Reportedly linked to Jabhat al-Nusra, two members of the group, Ardian Mehmeti and Genc Selimi, had recently returned from fighting in Syria.[16] Worryingly, the men were in possession of a sniper rifle, handguns, and explosive-making material and were in the process of trying to acquire additional weapons from undercover police officers at the time of their arrest.[17] The leader of the group, Mehmeti, was eventually convicted and sentenced to seven years' imprisonment, while Selimi—who was the only member of the group convicted of an additional charge of inciting hatred and disunity—received a term of four years and six months.[18]

In a second case uncovered in July 2015, counterterrorism police arrested a group of five men in possession of a Kalashnikov rifle, military uniforms, masks, and an Islamic State flag near Badovc Lake in the Gollak mountains, not far from the nation's capital.[19] Again, two of those arrested had formerly fought in Syria. Besnik Latifi had been there twice, returning most recently in April 2014, while Gazmend Halili had returned to Kosovo a month later.[20] Because Badovc Lake is one of the main sources of drinking water for Pristina, it was initially thought that the men had been planning to poison the city's water supply or perhaps destroy the dam. Although prosecutors soon realized that there was no evidence to support this particular theory, the group was still initially convicted of plotting domestic attacks.[21] Just six weeks prior to the group being arrested, Islamic State leader Abu Bakr al-Baghdadi had called on Muslims to either "migrate to the Islamic State or fight in his land wherever that may be."[22] In court, it was shown that the men were planning

---

c   No returnees from Syria and Iraq are known to have come back to Kosovo in 2017. Information obtained by first author as part of professional duties.

d   For adult males who could not be prosecuted, this was mainly due to lack of evidence.

PX250

to record a video declaring an oath of allegiance to al-Baghdadi, in preparation for which they had written a script swearing "obedience and adherence... accepting every sacrifice."[23] Ultimately, this was all that could be proven, and following a retrial, the suspects were sentenced to between three-and-a-half and four-and-a-half years in prison for "attempted incitement for terrorist acts."[24] Despite being unable to prove more serious allegations in a court of law, prosecutors remain convinced that attacks of some sort were in the pipeline.[25]

The third and final case—the aforementioned plot to attack international targets in Kosovo and a soccer match between Albania and Israel—provides the clearest example of attack planning by returnee foreign fighters in Kosovo to date. As already noted, the plot was orchestrated from overseas by Muhaxheri and Haqifi using Telegram. Muhaxheri had even sent €1,350 to help finance the operation.[26] Additionally, at least one and possibly two members of the group in Kosovo were also veterans of the war in Syria. Lulzim Gashi initially admitted that he had been there, and although he later retracted this, according to the prosecution, he had fought for Jabhat al-Nusra for a period of two weeks.[27] Furthermore, although it has not been proven in court, Kosovar authorities suspect that the leader of the group, Visar Ibishi—who was the key point of contact for Muhaxheri—had likewise been to Syria.[28] In recognition of their lead roles, a judge in Pristina sentenced Ibishi to 10 years in prison, while Gashi was jailed for six.[29] Their co-defendants received sentences of between one-and-a-half and five years, while a final member of the group was merely fined.[30]

Fortunately, none of these plots came to fruition. They nevertheless demonstrate that a small number of returnees remain highly radicalized and are both willing and determined to attack either at home and/or the Balkan region. In the case of Latifi and Halili, both men had been arrested shortly after returning to Kosovo but were released due to lack of evidence and were clearly undeterred by this experience.[31] It was also more than a year after their return that the conspiracy developed and was uncovered (largely, it seems by chance), thus demonstrating that threats may take time to unfold and may not be immediately detectable. It is also noteworthy that the handful of returnees who engaged in domestic attack plots appear to have had considerable recruitment power and acted as leaders, bringing with them important skills as well as connections to Islamic State cadres overseas.

Of course, five or six individuals from 124 (adult male) returnees represents less than five percent of the total number of foreign fighters who spent time in Syria and Iraq and returned to Kosovo thus far. According to the estimation of the first author of this article (who is responsible for monitoring the implementation of Kosovo's National Strategy on Prevention of Violent Extremism and Radicalisation Leading to Terrorism), approximately 87% of male returnees are low risk, nine percent are medium, and four percent are high.[e] If this is accurate, it is indeed only a small minority of returnees who are likely to plan and attempt attacks. Nevertheless, the fallout from even one successful terror attack conducted

in Kosovo by a local foreign fighter who traveled to Syria and/or Iraq would be highly significant, especially given that Kosovo has not experienced this type of event before. Moreover, it is extremely difficult to identify *which* specific individuals are most likely to become violent and *when* they might act.

## The Repatriated (April 2019)

Very few foreign fighters returned to Kosovo from 2016 through 2018. Then in April 2019, the government of Kosovo—assisted by the United States—repatriated 110 of its citizens (four men, 32 women, and 74 children) who were being held in Kurdish detention camps in Syria. When these more recent cases are added to the first wave of returnees, the total number of individuals rises to 124 adult males, 38 adult females, and 80 children who are now back in Kosovo from Syria. (See Table 1.) These 242 individuals amount to 56% of the overall total of 431, including children born in the conflict zone. The recently repatriated men were placed in detention immediately upon arrival, pending prosecution. Meanwhile, the women and children were initially held at an asylum center near Pristina for a period of 72 hours. During this time, they were given medical examinations and assessments of psychological and other needs. Many were judged to be exhibiting symptoms consistent with Post-Traumatic Stress Disorder (PTSD) and depression.[32] Following this initial assessment, women and children were allowed to return home together, with the women being subject to house arrest (initially for one month but since extended for all cases).[33]

Repatriated women and children continue to receive support from the Division for Prevention and Reintegration, which was specially created by the government of Kosovo for this purpose and is composed of officials from the Ministry of Internal Affairs, Ministry of Health, and Ministry of Education, as well as social workers, psychologists, local level representatives, community police, religious experts, and others.[34] As part of the approach to preparing the children for reintegration, they are being given additional classes and assistance to help them catch up in the hope that at least some will be ready for the new school semester in September 2019.[35] Here it is important to note that of 74 children (all from the 2019 repatriation), 54 are under the age of six, which it is hoped will give them a better chance to (re)integrate back into society. On the other hand, those who are older and have never been to school before are expected to be more problematic to work with.[36] Women, too, are given special educational classes as deemed appropriate and supported financially by way of vouchers for food, clothing, and other necessities, which are provided by an international NGO.[37]

In addition to the various forms of support that they are given, both women and children are also monitored by law enforcement.[38] While none of the earlier and much smaller cohort of female returnees (who did not receive the same level of assistance) has been charged with terrorism-related crimes, it is nevertheless recognized that a potential threat exists, particularly among those who stayed in Syria for longer periods of time. Moreover, authorities have substantial evidence indicating that some recently repatriated women were indeed part of the Islamic State, meaning that prosecutions are now a far more likely prospect than in the past and criminal trials of female returnees can be expected.[39]

e   Note that this is roughly comparable to data released by the Belgian Coordination Unit for Threat Analysis (OCAD), which stated that 75% of male returnees, and 90% of females, had distanced themselves from radical ideas. See Guy van Vlierden, "Teruggekeerde Syrië-strijders zijn de grootste zorg niet meer," *De Morgen*, January 15, 2019.

## Managing the Risk: Challenges and Lessons Learned

As already noted, Kosovar authorities have taken a fairly aggressive approach to prosecuting adult male returnees, most of whom have been convicted of terrorism-related offenses under the criminal code.[40] Although lack of evidence from the conflict zone has sometimes proven to be a problem, the rate of prosecution is relatively high (almost 70% of all adult male returnees, compared to an overall rate of about 10% in the United Kingdom.[41 f]). It should also be noted that in 2015 (by which time the bulk of returnees had already come home), Kosovo enacted a new law prohibiting its citizens from joining armed conflicts outside of state territory. Besides direct participation in extraterritorial conflict, the law criminalizes organizing, recruiting, and financing, as well as encouraging, leading, or training others for "the aim of joining or participating in a foreign army or police ... [or] in any other form of armed conflict outside the territory of the Republic of Kosovo."[42] Since this does not depend upon definitions or designations of terrorism, this law may increase the chances of successful prosecution in the future, including of female returnees.

That being said, imprisonment also comes with certain drawbacks, most notably the added resentment that it creates among returnees, plus the added stigma associated with having a criminal record, which may reduce the chances of successful reintegration. Moreover, despite the fact that some terrorism offenses in Kosovo carry prison terms of up to 20 years, most sentences that have been handed down are for a period of less than five years.[g] In fact, by mid-2019, half of the imprisoned returnees had already been released. Of the 85 returnee foreign fighters who have so far been prosecuted, the average prison sentence is 3.5 years.[43] This has serious implications for rehabilitation efforts within the prison system and, therefore, also for reintegration post-release. Systematic efforts by the Ministry of Justice to rehabilitate terrorist inmates in Kosovo only began in March 2018.[44] As a result, there has been insufficient time to implement tailored rehabilitation and reintegration programs, which have been put in place for just 18 of 43 returnees released from prison.[45] As noted above, some of these individuals remain highly radicalized (though none so far have been involved in planning attacks).[46]

Families and members of local communities have posed an additional set of challenges. In some cases, family members also hold extremist beliefs and may have negative influence over imprisoned or recently released returnees.[47] There are also some families and community members who have effectively disowned their extremist relatives or friends and do not want them to return home, leaving the individuals in question bereft of social support. As one returnee complained, "I have lost contact with aunts and uncles whom I used to bring together in the past. They distanced from me after the me-

dia covered my story [facilitation of terrorist activities in Kosovo] continuously for five straight days. They say I brought shame to the family."[48] It is up to the Division for Prevention and Reintegration, and those who support its work, to manage such issues by engaging with communities as well as returnees themselves.[49]

On a more positive note, families have also proven to be valuable partners and often play an important role in the reintegration process. In recognition of this, the government of Kosovo, assisted by international donors, has been providing financial assistance to the families of returnees as well as those who were killed or are still in Syria.[h] This has generated a tremendous amount of goodwill, including among still imprisoned returnees, some of whom were so grateful that their families were being taken care of that they approached officials to ask if there was anything they could do in return.[50]

## Conclusion

Although it is still too early to assess comprehensively either the threat that returnees from Syria and Iraq pose or the measures that the government has put in place to manage it, the Kosovan experience thus far still provides a valuable point of reference. In particular, this is because a relatively large number of foreign fighters are already back in the country and because the government has been very proactive, both in terms of repatriating citizens detained in Syria and implementing risk-management strategies. This stands in contrast to most other countries, which have not experienced the same level of mobilization relative to population size, have not been faced with such a high proportion of returnees, and have generally been reluctant to bring their citizens home.

In terms of the threat, the experience in Kosovo seems to confirm both academic analysis and recent reporting from other countries dealing with returnees from Syria and Iraq, which suggest that it is only a small minority of these individuals that are likely to plan terrorist attacks in the short-term (and this risk may diminish as time goes on).[51] As already noted, however, the threat is still significant and will continue to evolve. Furthermore, Kosovan authorities still do not have a good idea of how many individuals continue to play non-violent support roles—in particular, spreading the ideology that sustains groups like the Islamic State—which may unfold over a much longer period of time. This is particularly true regarding female returnees.

In terms of response, it seems that the Kosovan approach to investigations and prosecutions has thus far been successful, judging by the high rate of convictions in Kosovo compared to countries such as the United Kingdom. More detailed comparative analysis is needed to determine exactly why this has been the case. Moreover, looking beyond the number of prosecutions, it is unclear how effective this approach really is, given that imprisonment has generated substantial resentment against the Kosovan state, including among low-risk returnees.[52] Low sentencing also remains a problem and has stymied efforts to rehabilitate foreign fighters in prison and reintegrate them back into society. This highlights the need for better understanding of the sometimes contradictory relationship between punitive and rehabilitative measures, which should ideally be planned and implemented as part of a coordinated package that takes both individual needs and institutional capacity into account.

---

f   Of course, this does not necessarily automatically imply that one system is better than the other. Different prosecution rates between countries are due to a complex set of factors, including different laws, procedures, and guidelines concerning what can be produced as evidence at trial. It is beyond the scope of this article to delve further into these issues.

g   As noted earlier, leaders of attack plots do tend to receive longer sentences, but even these are often reduced on appeal. The longest sentences for terrorism offenses in Kosovo have been handed out not to returned foreign fighters or attack plotters, but to influential recruiters such as Imam Zeqerija Qazimi. Labinot Leposhtica, "Kosovo Jails Hard-line Imam for 10 Years," BalkanInsight, May 20, 2016.

---

h   As with female returnees, this assistance comes in the form of monthly vouchers.

PX250

Additional challenges experienced on release—particularly those of either extremist, or unforgiving, family members and communities—further increase the complexity of the reintegration process and must be carefully assessed and managed.[53] This calls for a holistic approach to managing the risk associated with returnees from Syria and Iraq that deals not only with the individual returnee, but their immediate and wider social environment as well. Finally, there is the need to be pragmatic, as evidenced by the added trust and goodwill that has been gained by providing returnees and their families with limited (non-monetary) financial support. By itself, this does not provide a solution, but it seems it can be effective as part of a multi-faceted approach—particularly in countries such as Kosovo where unemployment is high.

All of the challenges highlighted in this article are ongoing, and Kosovo does not presume to have all of the answers. Indeed, many of the efforts described are still in their infancy, and the country faces a host of additional hurdles to overcome, not least of them limited financial resources and institutional capacity. With this caveat in mind, this article represents a modest contribution to the literature on returnee foreign fighters from Syria and Iraq, the challenges that they pose, and some of the policy options available for managing the threat. Others who are grappling with similar issues can hopefully learn from this and will perhaps also be motivated to share their own experience.   CTC

## Citations

1   Joana Cook and Gina Vale, "From Daesh to 'Diaspora' II: The Challenges Posed by Women and Minors After the Fall of the Caliphate," *CTC Sentinel* 12:6 (2019); Brian Michael Jenkins, "Options for Dealing with Islamic State Foreign Fighters Currently Detained in Syria," *CTC Sentinel* 12:5 (2019); "Special Envoy for the Global Coalition to Defeat ISIS Ambassador James F. Jeffrey And Counterterrorism Coordinator Ambassador Nathan A. Sales," U.S. Department of State, August 1, 2019.

2   "Repatriate or reject: What countries are doing with IS group families," France 24, June 11, 2019.

3   Timothy Holman, "Foreign Fighters from the Western Balkans in Syria," *CTC Sentinel* 7:6 (2014); "Understanding Push and Pull Factors in Kosovo: Primary Interviews with Returned Foreign Fighters and their Families," UNDP, 2017.

4   Data provided by the Kosovo Police Counter-Terrorism Department.

5   "'Dead' Kosovar Albanian IS Militant Resurfaces in Gruesome Killing Video," Radio Free Europe, May 26, 2015.

6   "Report Inquiring into the Causes and Consequences of Kosovo Citizens' Involvement as Foreign Fighters in Syria and Iraq," Kosovar Center for Security Studies, 2015, p. 18.

7   "'Dead' Kosovar Albanian IS Militant Resurfaces in Gruesome Killing Video."

8   Ebi Spahiu, "Lavdrim Muhaxheri: Kosovo's Link to the Islamic State," *Militant Leadership Monitor* 5:8 (2014); "Understanding Push and Pull Factors in Kosovo," p. 34.

9   Die Morina, "Kosovo ISIS Commander Haqifi Reported Dead in Middle East," Balkan Insight, February 9, 2017.

10   Arben Cirezi, "Kosovo Arrests 19 Suspected of Terror Attacks," Balkan Insight, November 17, 2016.

11   "Coalition removes ISIS terrorists from battlefield," U.S. CENTCOM, August 3, 2017; Morina.

12   Fatos Bytyci, "Remorseful Kosovo militants fight youth radicalization," Reuters, September 30, 2016; Alexander Smith and Vladimir Banic, "What Should the West Do With Fighters Returning From Syria and Iraq?" NBC News, October 12, 2017.

13   "Understanding Push and Pull Factors in Kosovo," p. 48.

14   Ibid., pp. 59-60; professional assessment of first author.

15   Anne Speckhard and Ardian Shajkovci, "Returning ISIS Foreign Fighters: Radicalization Challenges for the Justice System," Homeland Security Today, November 4, 2018.

16   Kastriot Berisha, "I akuzuari për terrorizëm: Në Siri shkova pasi i përcolla qëndrimet e imamëve," Kallxo, December 3, 2018; "Kosovarët e kthyer nga Siria arrestohen si të dyshuar për terrorizëm," Koha, November 12, 2013.

17   Nebi Qena, "Kosovo Police Arrest 6 Terror Suspects," Associated Press, November 12, 2013.

18   "Gjykata në Prishtinë jep 5 dënime për posedim të armëve dhe nxitje të urrejtjes fetare," VOAL, January 22, 2019; Donika Voca-Gashi, "23 vjet burgim për pesë persona," Koha, January 22, 2019.

19   Skender Govori and Leotrim Gashi, "A total of 49 years of prison for five Kosovar terrorists," *Prishtina Insight*, July 18, 2016.

20   "Dy nga të arrestuarit, ish-luftëtarë të ISIS-it," Zëri, July 14, 2015.

21   Skender Govori, "Kosovo Terror Suspects Given Stiff Sentences," Balkan Insight, July 18, 2016.

22   Rukmini Callimachi, "ISIS Releases a Recording It Says Was Made by Its Leader," *New York Times*, May 14, 2015.

23   Govori.

24   Labinot Leposhtica, "Sentences lowered for defendants in the 'Badovci terrorism case,'" *Prishtina Insight*, July 19, 2017.

25   Arbelina Dedushaj, "Rasti "Badovci" në Apel, prokuroria kërkon rritje të dënimit, mbrojtja kthimin e çështjes në rigjykim," Betimi Për Drejtësi, October 24, 2017; author interview, former Chief Prosecutor of the Special Prosecution of the Republic of Kosovo, August 2019.

26   "Liderët e grupit që planifikonin sulmin ndaj kombëtares izraelite të futbollit nuk pendohen para Gjykatës," Gazeta Express, May 15, 2018.

27   "Kështu mbrohen të akuzuarit për planifikim të sulmeve terroriste ndaj lojtarëve të Izraelit," Metro Gazeta, March 27, 2018.

28   Author (Bytyqi) interview, Kosovar security official, July 2019.

29   "Dënohen me 35 vjet burgim të akuzuarit për tentim-sulmin ndaj ekipit të Izraelit," *Epoka Ere*, May 18, 2018.

30   Ibid.

31   "Dy nga të arrestuarit, ish-luftëtarë të ISIS-it."

32   Sara Manisera, "After ISIS: How Kosovo is rehabilitating women and children repatriated from Syria," *National*, July 25, 2019.

33   Ibid. Additional information obtained by first author as part of conducting professional duties.

34   Information obtained by first author as part of conducting professional duties.

35   Information obtained by first author as part of conducting professional duties.

36   Information obtained by first author as part of conducting professional duties.

37   Information obtained by first author as part of conducting professional duties.

38   Information obtained by first author as part of conducting professional duties.

39   Information obtained by first author as part of conducting professional duties; Manisera.

40   Notably, articles 143 and 144 ("Organization and participation in a terrorist group" and "Preparation of terrorist offenses or criminal offenses against the constitutional order and security of the Republic of Kosovo," respectively). Republic of Kosovo, Code No. 04/L-082, Criminal Code of the Republic of Kosovo.

41   Lizzie Dearden, "Only one in 10 jihadis returning from Syria prosecuted, figures reveal," *Independent*, February 21, 2019.

42   Republic of Kosovo, Law No. 05/L-002, "On Prohibition of Joining the Armed Conflicts Outside State Territory."

43   Data provided by Office of the Special Prosecution of the Republic of Kosovo, March 2019, and Kosovo Security Council Secretariat, July 2019.

44   Information obtained by first author as part of conducting professional duties.

45   Data provided by Ministry of Justice, Correctional Service, March 2019, and Kosovo Security Council Secretariat, July 2019.

46   Information obtained by first author as part of conducting professional duties.

47   Information obtained by first author as part of conducting professional duties.

48   "Understanding Push and Pull Factors in Kosovo," p. 58.

49   Manisera.

50   Author (Bytyqi) interview, Kosovar security official, July 2019.

51   See, for example, Thomas Hegghammer, "Should I Stay or Should I Go? Explaining Variation in Western Jihadists' Choice between Domestic and Foreign Fighting," *American Political Science Review* 107:1 (2013): pp. 1-15; David Malet and Rachel Hayes, "Foreign Fighter Returnees: An Indefinite Threat?" *Terrorism and Political Violence* (2018).

52   Professional assessment of first author; "Understanding Push and Pull Factors in Kosovo," p. 59.

53   See also *Responses to Returnees: Foreign Terrorist Fighters and Their Families* (Radicalisation Awareness Network, 2017) and "Understanding Push and Pull Factors in Kosovo."

PX250

# Maduro's Revolutionary Guards: The Rise of Paramilitarism in Venezuela

By Ross Dayton

**The government of Nicolas Maduro has increased its reliance on armed non-state actors as Venezuela's political and economic crisis deepens. Paramilitarism developed under Maduro and his predecessor, Hugo Chávez, as a result of the erosion of the military, expansion of corruption and criminal networks in the government, and the devolution of state power to local loyalist groups. Colombian guerrillas have developed ties with the Venezuelan government and armed 'colectivo' groups as they expand into Venezuelan territory. As a result, the Colombian guerrillas have taken over state functions in parts of the country and have a vested interest in supporting the Maduro regime. Expansion into Venezuela has enabled the Colombian guerrillas to carry out attacks in Colombia and withstand blows from Colombian security forces, which could undermine future prospects for peace negotiations.**

Armed non-state actors are propping up Nicolas Maduro's government as Venezuela faces the worst political, economic, and humanitarian crisis in the Western Hemisphere. International news media have highlighted the role of *colectivos*, a catch-all phrase for armed pro-government civilian groups,[1] using lethal force against civilian protesters. According to the United Nations Office of the High Commissioner for Human Rights (OHCHR), the *colectivos* were key contributors to the killing of 5,287 people by the pro-government forces in 2018.[2]

In addition to the *colectivos*, Colombian left-wing guerrilla groups such as the National Liberation Army (Ejército de Liberación Nacional, or ELN), the Popular Liberation Army (Ejército Popular de Liberación, or EPL), and former members of the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia, or FARC) are expanding their presence in Venezuela, forging close ties with the Maduro regime and pro-government groups, and recruiting Venezuelans into their ranks.[3] The expansion of Colombian guerrillas' networks in Venezuela bolsters them to carry out attacks in Colombia, as illustrated by the ELN's car bomb attack on the General Santander National Police Academy on January 19, 2019, which Colombian authorities labeled a

"terrorist act."[4] The Colombian guerrillas' ideological affinity and transnational criminal networks with pro-government forces in Venezuela effectively make them paramilitary groups with a vested interest in supporting the Maduro regime.

Paramilitarism arose in the early years of Hugo Chávez's presidency (1999-2013).[5] Chávez set the stage for paramilitary groups to ensure that he and his "Bolivarian Revolution" would remain in power. This article outlines how from the beginning of his presidency, Chávez eroded the hierarchy of the military, bolstered loyalist militant structures that run parallel to traditional military and political institutions, and allowed transnational criminal networks to expand within the government. The article also outlines how Maduro (2013-present) has reinforced these practices to remain in power as the national crisis worsened.[6] The development of the *colectivos*, a main component of Venezuelan paramilitarism, and their relationship with the government is also analyzed. Finally, the ties between the Venezuelan government and Colombian guerrillas and the implications of Venezuelan paramilitarism for regional security are discussed.

## Defining Paramilitarism

Defining the term "paramilitary" can be difficult due to the informal usage of the term and varying academic definitions. Paramilitary groups exist across different countries, ideologies, and systems of government. Julie Mazzei, a U.S.-based researcher on paramilitary groups, defines paramilitaries in the Latin American context as "political, armed organizations that are by definition extra-military, extra-State, non-institutional entities, but which mobilize and operate with the assistance of important allies, including factions within the State."[7] Mazzei further adds that "paramilitaries are offensive, not defensive in nature; their very purpose is to eliminate those who are perceived as threatening the socioeconomic basis of the political hierarchy."[8] Paramilitarism can be considered as the "subcontracting" of the state's monopoly of violence to non-state actors.[9] In Venezuela, the groups that exemplify this definition of paramilitarism are the *colectivos*, the Colombian guerrilla groups present in Venezuelan territory, and other pro-government armed groups.

Paramilitarism is often considered as a sign of state weakness, with localized groups taking over state functions in areas that have been neglected.[10] However, states with strong militaries also employ paramilitary groups; paramilitary groups can use irregular tactics not used by conventional security forces and create plausible deniability for human rights abuses and war crimes.[11] In authoritarian regimes, paramilitaries can provide an effective means of conducting surveillance over their civilian populations and repressing political dissidents.

Paramilitarism has been common in contemporary Latin American history. Throughout the Cold War, governments in the region often employed paramilitary groups to fight left-wing insurgents. Chávez received inspiration for paramilitary groups from Pana-

*Ross Dayton is an analyst at Control Risks and specializes in global security and threat analysis, with regional focuses on Latin America and the Middle East. The views presented are those of the author and do not necessarily represent the views of Control Risks and its affiliates. Follow @rdayt_*

ma's Dignity Brigades (local civilian militias trained in insurgent tactics).[12] Right-wing paramilitaries in Colombia with close ties to political and economic elites fought against the anti-government guerrillas.[13] The paramilitaries have often targeted social activists and community leaders and have drawn funds from illicit trafficking.[14] After the United Self-Defense Groups of Colombia (Autodefensas Unidas de Colombia, or AUC), the country's largest coalition of right-wing paramilitary groups, was disbanded in 2006, many paramilitary groups continued operating illegally and financing themselves through transnational criminal activities.[15] In Nicaragua, *turbas sandinistas*—armed pro-government civilian groups that closely resemble Venezuela's *colectivos*—have been repressing protesters and targeting dissidents since mass protests against Daniel Ortega's government began in 2018.[16]

### Table 1: Acronyms

| | |
|---|---|
| AUC | Autodefensas Unidas de Colombia (United Self-Defense Groups of Colombia) |
| CDR | Comités de Defensa de la Revolución (Committees for the Defense of the Revolution) |
| CLAP | Comité Local de Abastecimiento y Producción (Local Supply and Production Committee) |
| CTR | Comando Táctico de la Revolución (Tactical Command for the Revolution) |
| ELN | Ejército de Liberación Nacional (National Liberation Army) |
| EPL | Ejército Popular de Liberación (Popular Liberation Army) |
| FAES | Fuerzas de Acciones Especiales (Special Action Forces) |
| FARC | Fuerzas Armadas Revolucionarias de Colombia (Revolutionary Armed Forces of Colombia) |
| FBL | Fuerzas Bolivarianas de Liberación (Bolivarian Liberation Forces) |
| GNB | Guardia Nacional Bolivariana (Bolivarian National Guard) |
| OHCHR | Office of the United Nations High Commissioner for Human Rights |
| PDVSA | Petroleos de Venezuela |
| PNB | Policía Nacional Bolivariana (Bolivarian National Police) |
| PSUV | Partido Socialista Unido de Venezuela (United Socialist Party of Venezuela) |
| SEBIN | Servicio Bolivariano de Inteligencia Nacional (Bolivarian National Intelligence Service) |

### The Erosion of the Military and the Proliferation of Criminal Networks

In Venezuela, the erosion of military institutions through politicization and corruption under Chávez and Maduro helped lay the groundwork for paramilitarism.[17] Throughout the 19th and 20th centuries, the Venezuelan military regularly intervened in domestic

politics.[18] Fears among "*Chavistas*"[a] that the military would oust Chávez and his "Bolivarian Revolution" from power were almost realized in the 2002 coup attempt.[19] Additionally, a politically independent military may resist orders, as demonstrated when Chávez ordered the military to put down mass demonstrations prior to the 2002 coup attempt.[20] Increasing corruption and politicization within the military not only ensured its loyalty to Chávez's government, but also weakened the military's ability to deter the creation of parallel armed groups that can counterbalance it and carry out extrajudicial activities on the regime's behalf.[21]

After winning the presidency in 1998, Chávez promoted a "civic-military union" that would integrate the armed forces into society and his broader political project.[22] Chávez passed "Plan Bolívar 2000" in 1999, which put the military in charge of various social and economic programs and gave military officials more political influence and greater access to public funds.[23] Military officers were both promoted to higher ranks and appointed to public offices based on loyalty to Chávez's party, the United Socialist Party of Venezuela (Partido Socialista Unido de Venezuela, or PSUV), while dissident senior officers were discharged.[24] The military command structure became more dispersed as the number of regional and local command centers grew.[25] As a result, the military's leadership would, by 2019, balloon to "as many as 2,000 admirals and generals... as much as twice the top brass as the U.S. military – more than 10 times as many flag officers as existed when Chávez became president."[26] Like his predecessor, Maduro further expanded the appointments of military officers to public office positions, including to the state oil company Petroleos de Venezuela (PDVSA).[27]

As part of his vision of the civic-military union to make "every soldier a citizen and every citizen a soldier," Chávez promoted incorporating the populace into a "Bolivarian National Militia."[28] Chávez claimed that this militia would be integral to defending the nation and the Bolivarian Revolution from foreign powers, especially the United States.[29] Maduro claimed that the Bolivarian Militia had 1.6 million soldiers as of December 17, 2018.[30] However, members of the militia are, for the most part, not professionally trained soldiers; militia members featured in training videos are often civilians of middle and senior age.[31] Local militia branches are often informally incorporated into local *colectivo* groups as *colectivo* members are often enlisted into their ranks.[32] Militia members also allegedly help the regime conduct intelligence and counterintelligence on the general population.[33]

Criminal networks within the armed forces proliferated under Chávez and Maduro.[34] These networks, often collectively referred to as the "*Cartel de los Soles*" (Cartel of the Suns), first became public in 1993 when two National Guard generals were investigated for their involvement in drug trafficking.[35] Since then, top military and government officials have become actively involved in drug traffick-

---

a   "*Chavismo*" is a catch-all phrase for ideologies and policies inspired by Hugo Chávez. Chávez promoted his political movement as a "Bolivarian Revolution," named after Venezuela's founding father Simon Bolivar, with the aim of building "21st century socialism" in Venezuela. Chávez implemented social welfare programs to support the lower classes and spewed highly critical rhetoric against the United States. The Maduro regime claims to continue the legacy of *Chavismo*. Supporters of Chávez and Maduro are often called "*Chavistas*." Rory Carroll, *Comandante: Myth and Reality in Hugo Chávez's Venezuela* (London: Penguin Press, 2013), pp. 150; Katy Watson, "Venezuela Crisis: Why Chavez's followers are standing by Maduro," BBC, March 4, 2019.

ing and other forms of illicit financing.[36] Senior military officers and government officials have built relationships with Venezuelan and Colombian drug trafficking organizations, including *colectivos*, Colombian guerrillas, and other transnational criminal organizations.[37]

## Devolution of Power to Communal Organizations and the 'Colectivos'

The devolution of state authority to local community organizations empowered paramilitary groups throughout Venezuela, including the *colectivos*. Venezuelan paramilitarism takes a strong inspiration from Cuba's Committees for the Defense of the Revolution (Comités de Defensa de la Revolución, or CDRs) and the Rapid Response Brigades. The CDRs, in theory, are grassroot communal organizations meant to encourage openness and public participation in local governance.[38] In practice, the CDRs serve as the eyes and ears of the Castro government and maintain surveillance on dissidents.[39] The Rapid Response Brigades, local militias consisting of members of the Cuban Communist Party and its controlled social organizations, are deployed alongside regular Cuban security forces to repress protesters.[40] However, the *colectivos* and other Venezuelan paramilitaries differ from the CDRs and Rapid Response Brigades in having greater autonomy from the state, less formal organization, and more pronounced criminal characteristics.[41]

Chávez's government supported community organizations for social outreach and to devolve state functions to local levels. In 2001, Chávez established the "Bolivarian Circles" in order to build grassroot support for his movement. The Bolivarian Circles provided social services and allow local communities to address socio-economic and political concerns.[42] Additionally, the Bolivarian Circles had a direct line of contact to the Presidential Office for requesting resources.[43] Chávez's opponents immediately compared the Bolivarian Circles to Cuba's CDRs.[44]

Pro-Chávez leaders allegedly provided the Bolivarian Circles with arms to attack anti-Chávez protesters before and during the 2002 coup attempt.[45] The Tactical Command for the Revolution (Comando Táctico de la Revolución, or CTR) was formed in response to growing anti-Chávez protests; among the CTR leadership was Freddy Bernal, then mayor of Caracas and an important organizer of the Bolivarian Circles.[46] As protests outside of the Miraflores Presidential Palace grew, General Manuel Rosendo, the commander of the Venezuelan military at the time, received word from Captain Michael O'Bryan, Rosendo's personal assistant, and Vice Admiral Bernabé Carrero that Bernal had been ordered by the Minister of Defense to arm Bolivarian Circles members with rocks, sticks, and knives to intimidate protesters.[47] As protesters marched toward Miraflores, hundreds of Chávez supporters and Bolivarian Circle members gathered alongside National Guard troops assembled for Chávez's defense.[48] Video footage from April 11, 2002, shows known Chávez supporters and members of the Bolivarian Circles firing pistols at protesters with live ammunition from Llaguno Bridge.[49] A total of 19 people were killed during the events of that day.[50]

The Bolivarian Circles became the basis for what are now called *colectivos*, a term originally used for left-wing urban guerrillas in the 1960s and 1970s.[51] In 2006, the *colectivos* were incorporated into communal councils, local institutions meant to serve as grassroot alternatives to municipal and state governments.[52] Despite

their stated democratic intent, the communal councils were tied to the central government and often became rife with political favoritism and corruption.[53]

The term "*colectivo*" refers to *Chavista* armed groups that vary in terms of size, organization, methods of operating, and arsenals.[54] Many *colectivos* trace their origins to events before Chávez's rise to power, such as left-wing insurgencies and urban guerrilla movements in the 1960s.[55][b] *Colectivos* often espouse far left-wing ideologies that are more militant than the PSUV's party line.[56] Many *colectivo* leaders are members of security forces and often commit crimes in the open with impunity.[57]

*Colectivo* groups often preside over entire neighborhoods in the place of state authorities.[58] The 23 de Enero neighborhood in Caracas, an emblematic *Chavista* stronghold, is controlled by up to 46 *colectivo* groups.[59] The abolition of the Caracas Metropolitan Police in 2011 left the *colectivos* as the de facto authorities in many neighborhoods.[60] The *colectivos* provide social services and control economic life in the communities over which they preside.[61] The Colectivo Alexis Vive in 23 de Enero has even issued its own currency in order to deal with national hyperinflation.[62] The *colectivos* raise funds through criminal means, including drug trafficking, gambling, extortion, kidnapping, and selling scarce supplies on the black market.[63]

Security forces and *colectivos* often operate jointly. Video footage of anti-Maduro protests from 2014 to 2019 regularly show the Bolivarian National Guard (GNB) and Bolivarian National Police (PNB) allowing *colectivos* to physically assault and fire live ammunition at protesters with impunity.[64] *Colectivos* have also worked alongside the Special Action Forces (Fuerzas de Acciones Especiales, or FAES), a PNB unit notorious for extrajudicial killings and other human rights violations.[65][c] In addition to repressing protesters and dissidents, the *colectivos* also worked alongside security forces in Operation Popular Liberation (Operación Liberación del Pueblo), a series of police raids in urban centers throughout Venezuela since July 13, 2015, meant to combat crime that have resulted in civilian massacres and human rights violations.[66]

Despite their support for the Maduro government, *colectivos* still maintain autonomy from the PSUV and have even taken action at times to oppose it. Indeed, many *colectivo* members are openly critical of Maduro's handling of the nation's crisis.[67] In 2010, the Movimiento Revolucionario Carapaicas (simply known as the Carapaicas)—one of the most well-armed *colectivos* in Caracas—released a video accusing the government of deviating from the Bolivarian Revolution and called on Chávez to dissolve the government and military.[68] Tensions between the *colectivos* and security forces came to a head in October 2014 when several *colectivo* members and leaders were killed in police raids.[69] Multiple *colectivos* called for the

---

b   The Movimiento Revolucionario Tupamaro (often simply referred to as the Tupamaros) is a Marxist-Leninist *colectivo* that dates its founding back to 1979. The Colectivo La Piedrita, which is notorious for its violent attacks on political dissidents and the press, was founded in 1985 in order to combat crime in 23 de Enero. "The Devolution of State Power: The 'Colectivos,'" InSight Crime, May 18, 2018.

c   A notable example of the *colectivos* operating alongside the FAES was the raid against Venezuelan rebel leader Óscar Pérez, in which Heiker Vásquez, a leader of the Colectivo Tres Raíces from 23 de Enero, was killed. Giancarlo Fiorella and Aliaume Leroy, "'We are going to surrender! Stop shooting!': Reconstructing Óscar Pérez's Last Hours," Bellingcat, May 13, 2018.

resignation of the Minister of the Interior and head of Bolivarian National Intelligence Service (Servicio Bolivariano de Inteligencia Nacional, or SEBIN) as a result of the incident.[70] Maduro placed Freddy Bernal in charge of police reform to help quell tensions.[71]

Bernal has remained one of the most influential PSUV figures among the *colectivos* since 2002. As the head of the Local Supply and Production Committee (Comité Local de Abastecimiento y Producción, or CLAP), Bernal coordinates food distribution with local *colectivos*.[72] Bernal is also a commissioner in the SEBIN.[73] Appointed as "protector" of the state of Táchira on the Colombian-Venezuelan border in 2018, Bernal founded the "Border Security Colectivo."[74] On February 23, 2019, members of the *colectivo* shot at civilians with live rounds in San Antonio del Táchira to prevent humanitarian aid from crossing the border from Colombia.[75]

## Colombian Guerrillas as Venezuelan Paramilitaries

The proliferation of Colombian guerrillas in Venezuela is a development of paramilitarism under Chávez and Maduro. Despite the government's official denials of any relationship, the Colombian guerrillas have built close political, ideological, and criminal ties with the military, government officials, and *colectivo* groups, allowing them to operate throughout Venezuela with little impediment.[76] Venezuela gives Colombian guerrillas sanctuary from Colombian security forces as well as opportunities for illicit financing and recruitment.[77] In return, the Colombian guerrillas have a vested interest in supporting the Maduro regime and may act to defend it if needed. Indeed, the ELN has already claimed that it is ready to come to Maduro's defense from foreign intervention.[78]

Colombian guerrillas provide several advantages to the Maduro regime as paramilitary forces. Having spent decades operating along the porous Colombian-Venezuelan border,[79] the Colombian guerrillas have access to transnational criminal networks in the region and extensive know-how for illicit trafficking. The Colombian guerrillas also have more combat experience and are better organized than paramilitaries of Venezuelan origin.[80] Their expertise in guerrilla warfare tactics can enhance the capabilities of domestic pro-government groups. Colombian guerrillas have allegedly provided training for multiple Venezuelan armed groups. FARC computers confiscated in 2011 revealed that the FARC provided military training to hundreds of members of the Carapaicas, Tupamaros, and the Bolivarian Liberation Forces (Fuerzas Bolivarianas de Liberación, or FBL).[81] d According to the Táchira-based human rights NGO "Fundación Redes," FARC dissidents have joined and are commanding the Border Security Colectivo.[82] e

---

d   The FBL is an armed pro-government militia based near the Colombian border that models itself after Colombian guerrillas. The group first gained notoriety in the 1990s by carrying out assassination attempts on allegedly corrupt public officials. However, the FBL has supported *Chavismo* since 1998 and has not fought against the Chávez or Maduro governments. "FBL/FPLN," InSight Crime, July 15, 2019.

e   Freddy Bernal, who founded the Border Security Colectivo, is sanctioned by the U.S. government for facilitating arms sales between the Venezuelan government and the FARC in 2011, demonstrating the nexus between the Venezuelan government, the *colectivos*, and Colombian guerrillas. "Treasury Designates Four Venezuelan Officials for Providing Arms and Security to the FARC," United States Department of the Treasury, September 8, 2011.

**Table 2: The most prominant Venezuelan paramilitary groups and known locations**

| Name | Entity Type | Known Locations in Venezuela |
|---|---|---|
| ELN | Colombian guerrilla | The states of Táchira, Zulia, Apure, Trujillo, Anzoátegui, Lara, Falcón, Amazonas, Barinas, Portuguesa, Guárico, Bolívar, and Delta Amacuro[83] |
| FARC dissidents | Colombian guerrilla | The states of Táchira, Zulia, Apure, Trujillo, Lara, Falcón, Amazonas, Barinas, Portuguesa, Guárico, and Bolívar[84] |
| EPL | Colombian guerrilla | The State of Táchira[85] |
| FBL | Domestic pro-government guerrilla | The states of Táchira, Zulia, and Apure[86] |
| Movimiento Revolucionario Tupamaros | Colectivo | In Caracas (State of Libertador): 23 de Enero, Sucre (Catia)[87] |
| La Piedrita | Colectivo | In Caracas (State of Libertador): 23 de Enero, Sucre (Catia), San Juan, El Paraíso, Santa Rosalía, San Agustín[88] |
| Alexis Vive | Colectivo | In Caracas (State of Libertador): San Jose, Santa Teresa, Santa Rosalía[89] |
| Tres Raíces | Colectivo | In Caracas (State of Libertador): 23 de Enero, Sucre (Catia)[90] |
| Border Security Colectivo | State-created colectivo | The states of Táchira, Zulia, and Apure[91] |

**Note:** *There are* colectivo *groups present across 16 states in Venezuela (Miranda, Aragua, Carabobo, Lara, Portuguesa, Yaracuy, Falcón, Mérida, Trujillo, Táchira, Zulia, Sucre, Guárico, Bolívar, Monagas, and Anzoátegui);* colectivos *control up to 10 percent of all urban towns and cities nationwide. Therefore, the* colectivo *groups listed are not necessarily limited to Caracas. See "The Devolution of State Power" and Patricia Torres and Nicholas Casey, "Armed Civilian Bands in Venezuela Prop Up Unpopular President,"* New York Times, *April 22, 2017.*

The ELN is reportedly present in up to 13 Venezuelan states.[92] Colombian guerrilla groups and the FBL employ approximately 15,000 Venezuelans along the Colombian border.[93] In addition to illicit trafficking, the ELN has forcibly taken over illegal mining operations from local criminal groups with the support of the government, including operations in the mineral-rich "Orinoco Mining Arc."[94] Colombian guerrillas actively recruit Venezuelans who are often desperate for food and income. According to Colombian military officials, up to 30 percent of guerrillas in eastern Colombia and 10 percent nationwide are estimated to be of Venezuelan origin.[95]

The ELN established five radio stations in Venezuela to promote its ideology and conducts outreach at Venezuelan schools in order to attract young recruits.[96]

In some areas in Venezuela, guerrillas have reportedly taken over functions of the state. The ELN taxes local residents and businesses in areas it controls for protection from local criminal groups.[97] The ELN also provides local communities with weapons, political education, military training, and food supplies.[98] Fundación Redes found that Colombian guerrillas distribute food supplies through the government's CLAP program in 39 municipalities.[99] The ELN often enforces its rules ruthlessly to keep local communities under its control, including conducting executions for petty crimes and consuming drugs and alcohol.[100] Local community leaders who opposed the ELN have also been killed.[101] Multiple massacres in mining towns have been attributed to the ELN and its quest for territorial expansion in Venezuela.[102]

## Conclusion

Paramilitarism in Venezuela will have long-lasting consequences for the entire region. Transnational criminal networks will continue operating throughout Venezuela with the Maduro government and its paramilitary groups acting as intermediaries. As tensions with Colombia and the United States grow, the Maduro government may provide greater support to Colombian guerrillas under its auspices. The crisis in Venezuela also increases the risk of armed groups obtaining coveted weapons and military equipment, including the 5,000 Russian Igla-S portable anti-air missile systems that the Venezuelan military has stockpiled.[103]

The expanded sources of revenue and recruits from Venezuela enable the ELN and other Colombian guerrillas to escalate attacks on Colombian targets and withstand the brunt of Colombian security forces, as exemplified by the ELN's car bomb attack on the General Santander National Police Academy in Bogotá on January 19, 2019.[104] The Domingo Laín Front, the powerful ELN division responsible for the attack, operates between the border of the Colombian Department of Arauca and the Venezuelan State of Apure.[105] Colombian intelligence believes that the Domingo Laín Front's leadership is headquartered in Apure.[106] Additionally, the suicide bomber in the Bogotá attack is alleged to have taught bomb-making skills to other ELN members in Venezuela.[107] Former FARC members disillusioned with the Colombian peace process and FARC dissident militias are turning to Venezuela as a refuge.[108] Therefore, Colombian guerrilla activity in Venezuela will continue to frustrate future peace negotiation attempts and counterterrorism efforts in Colombia.

Uprooting paramilitary groups will pose a significant challenge for any post-Maduro government. Indeed, many pro-government groups have sworn to start insurgencies if *Chavismo* is removed from power.[109] Venezuela ranks the lowest in Latin America on the AS/COA and Control Risks' Capacity to Combat Corruption Index in terms of legal capacity as well as democratic and political institutions.[110] With weak and heavily politicized institutions, the ties between paramilitaries and security forces will not disintegrate quickly or entirely. As the economic situation remains dire, it is unlikely that any government could take back control of all territories controlled by paramilitaries and provide the economic support and security that local communities need. While some paramilitaries may be willing to reach an agreement with a new government to disband, groups with stronger ideological convictions and deeper involvement in illicit financing will more likely remain resistant. **CTC**

## Citations

1   Alexander Rosemberg, "'Colectivo' Responsibility," Caracas Chronicles, May 12, 2017.

2   "Report of the United Nations High Commissioner for Human Rights on the situation of Human rights in the Bolivarian Republic of Venezuela," United Nations Human Rights Council, July 5, 2019, p. 11.

3   "Gold and Grief in Venezuela's Violent South," International Crisis Group, Report No. 73/Latin America and the Caribbean, February 23, 2019.

4   Ross Dayton, "The ELN's Attack on the National Police Academy in Bogotá and Its Implications," *CTC Sentinel* 12:2 (2019): p. 17; Amy Held, "Deadly Blast At Bogotá Police Academy Stokes Fears Of Return To Colombia's Dark Past," NPR, January 17, 2019.

5   "The Devolution of State Power: The 'Colectivos,'" InSight Crime, May 18, 2018.

6   "Maduro Relies on 'Colectivos' to Stand Firm in Venezuela," InSight Crime, March 18, 2019; Brian Ellsworth and Mayela Armas, "The Maduro mystery: Why the armed forces still stand by Venezuela's beleaguered president," Reuters, June 28, 2019; Anthony Faiola, "Maduro's ex-spy chief lands in U.S. armed with allegations against Venezuelan government," *Washington Post*, June 24, 2019.

7   Julie Mazzei, "Death Squads or Self Defense Forces? How Paramilitary Forces Emerge and Challenge Democracy in Latin America," University of North Carolina Press, 2009, p. 4.

8   Ibid., p. 4.

9   Ibid., p. 7.

10   Guadalupe Correa-Cabrera, "Los Zetas Inc. Criminal Corporations, Energy, and Civil War in Mexico," University of Texas Press, 2017, p. 109-110.

11   Mazzei, p. 7.

12   Brian A. Nelson, *The Silence and the Scorpion: The Coup Against Chávez and the Making of Modern Venezuela* (New York: Nation Books, 2009), p. 64.

13   "Paramilitaries' Heirs: The New Face of Violence in Colombia," Human Rights Watch, February 3, 2010.

14   Ibid.

15   Ibid.

16   "How do the crises in Nicaragua and Venezuela compare?" France 24, July 20, 2018.

17   Ellsworth and Armas.

18   Brian Fonseca, John Polga-Hecimovich, and Harold A. Trinkunas, "Venezuela Military Culture," Florida International University Steven J. Green School of International & Public Affairs, May 2016, p. 4.

19   Ibid., p. 11.

20   Ibid., p. 11-12.

21   Ellsworth and Armas; Iselin Åsedotter Strønen, "Servants of the nation, defenders of la patria: The Bolivarian Militia in Venezuela," Chr. Michelsen Institute (CMI), December 2015, p. 5-6; "The Devolution of State Power."

22   Fonseca, Polga-Hecimovich, and Trinkunas, p. 7.

PX250

23   Ellsworth and Armas.

24   Ibid.

25   Ibid.

26   Ibid.

27   Ibid.

28   Fonseca, Polga-Hecimovich, and Trinkunas, p. 12.

29   Strønen, p. 2.

30   Vivian Sequera, Luc Cohen, and Peter Cooney, "Maduro says Venezuela's civil militia grows to 1.6 million members," Reuters, December 17, 2018.

31   "The Bolivarian Militia: Meet the Venezuelans on a war footing," France 24, April 4, 2019.

32   "Las Milicias Bolivarianas, los 'paras' de Maduro," Tiempo, January 11, 2019.

33   Ibid.

34   "Drug Trafficking Within the Venezuelan Regime: The 'Cartel of the Suns,'" InSight Crime, May 17, 2018.

35   Ibid.

36   Ibid.; Brenda Fiegel, "Venezuela, Military Generals, and the Cartel of the Suns," Small Wars Journal, June 27, 2019.

37   "Drug Trafficking Within the Venezuelan Regime;" Raúl Gallegos, "To Defeat Maduro's Regime, Treat It Like a Crime Syndicate," Americas Quarterly, April 3, 2019.

38   Benigno E. Aguirre, "Social Control In Cuba," Latin American Politics and Society 44:2 (2002): pp. 69-70.

39   Ibid., p. 69-70; Iván García "Los Comités de Defensa de la Revolución, servicio de espionaje del régimen cubano," Diario Las Américas, September 28, 2015.

40   Aguirre, p. 78-79; Nora Gámez Torres, "He now hunts Cuban human-rights abusers in the U.S. Was he once an offender himself?" Miami Herald, July 12, 2018.

41   Kyra Gurney, "Venezuela's Leftists Collectives: Criminals or Revolutionaries?" InSight Crime, November 24, 2014; "Violence and Politics in Venezuela," Latin America Report No 18, International Crisis Group, August 17, 2011, pp. 17-18.

42   Scott Wilson, "Venezuela's 'Bolivarian Circles' Get a Direct Line to President," Washington Post, December 4, 2001.

43   Ibid.

44   Ibid.

45   Nelson, p. 20.

46   Ibid., p. 20.

47   Ibid., pp. 52 and 153.

48   Ibid., p. 16.

49   Ibid., pp. 23 and 81.

50   Ibid., p. 7.

51   "The Devolution of State Power."

52   Ibid.

53   Rory Carroll, Comandante: Myth and Reality in Hugo Chávez's Venezuela (London: Penguin Press, 2013), p. 268.

54   "Violence and Politics in Venezuela," pp. 17-18.

55   "The Devolution of State Power."

56   Ibid.

57   Ibid.; Patricia Torres and Nicholas Casey, "Armed Civilian Bands in Venezuela Prop Up Unpopular President," New York Times, April 22, 2017; "Video Shows Notorious 'Colectivo' Leader Greeted by Venezuela Officials," InSight Crime, February 28, 2019; Mary Beth Sheridan and Mariana Zuñiga, "Maduro's muscle: Politically backed motorcycle gangs known as 'colectivos' are the enforcers for Venezuela's authoritarian leader," Washington Post, March 14, 2019.

58   "The Devolution of State Power."

59   Ibid.

60   Ibid.

61   Ibid.

62   "Colectivos chavistas emiten su propio billete y comercian sus productos," Diario Las Américas, December 12, 2017.

63   "The Devolution of State Power;" Torres and Casey.

64   Rosemberg; Sheridan and Zuñiga.

65   Giancarlo Fiorella and Aliaume Leroy, "'We are going to surrender! Stop shooting!': Reconstructing Óscar Pérez's Last Hours," Bellingcat, May 13, 2018.

66   "Colectivos comandan las OLP y ejecutan a presuntos delincuentes para tomar el control de los territorios," Runrunes, July 16, 2016.

67   Ibid.

68   "Movimiento Carapaica hace llamado contra Chávez," Noticias RCN, January 18, 2010.

69   Giancarlo Fiorella, "November 9: Colectivo-Government Rift Grows," In Venezuela Blog, November 9, 2014.

70   Amanda Macias, "Venezuela Is On Borrowed Time," Economist via Business Insider, November 29, 2014.

71   Ibid.

72   Victor Amaya, "Colectivos armados: los últimos protectores de Maduro," Semana, April 27, 2017.

73   "Controversial Venezuela Official Named 'Protector' of Colombia Border State," InSight Crime, February 6, 2018.

74   "Guerrilla-Trained 'Colectivo' Threatens Humanitarian Aid to Venezuela," InSight Crime, February 6, 2019.

75   "Venezuela: paramilitares chavistas disparan contra manifestantes en Táchira," Comercio, February 23, 2019.

76   "Gold and Grief;" Dayton, p. 18.

77   Dayton, p. 18; Helen Murphy and Luis Jaime Acosta, "Exclusive: Colombian armed groups recruiting desperate Venezuelans, army says," Reuters, June 20, 2019.

78   "ELN asegura estar "dispuesto" a defender a Maduro ante intervención militar," Voz De América, July 12, 2019.

79   "Gold and Grief."

80   Ibid.

81   Hannah Stone, "FARC Computers Shine Spotlight on Chávez Militias," InSight Crime, May 12, 2011.

82   "Informe Anual 2018," Fundación Redes, April 12, 2019, pp. 28-29.

83   "Gold and Grief;" "ELN Now Present in Half of Venezuela," InSight Crime, November 23, 2018.

84   "Boletin 009: Surgimiento de Nuevo Grupo Armado Disidente De Las FARC Vulnera A La Población," Fundación Redes, November 26, 2018.

85   Luis Pico, "Acusan a guerrilleros de desapariciones forzosas en Táchira," Nacional, August 21, 2017.

86   "Informe Anual," p. 26.

87   "The Devolution of State Power."

88   Ibid.

89   Ibid.

90   Ibid.

91   "Informe Anual," p. 26.

92   "Gold and Grief."

93   "Guerrilla Groups Largest Employers at Colombia-Venezuela Border: Report," InSight Crime, April 18, 2019.

94   Valentina Lares Martiz, "Amazonas, el estado venezolano donde manda el Eln," Tiempo, November 13, 2019; "Gold and Grief."

95   Murphy and Acosta.

96   "Informe Anual," pp. 4-6, 9.

97   "Gold and Grief."

98   Ibid.

99   "Informe Anual," p. 15.

100  "Gold and Grief."

101  Ibid.

102  "ELN Now Present in Half of Venezuela."

103  Girish Gupta, "Exclusive: Venezuela holds 5,000 Russian surface-to-air MANPADS missiles," Reuters, May 22, 2017.

104  Dayton.

105  Ibid., p. 19.

106  Ibid., p. 19.

107  Ibid., p. 18.

108  "Gold and Grief."

109  Guillermo D. Olmo, "Crisis en Venezuela: 'Estoy dispuesto a morir por la revolución', hablan 'los colectivos' que resisten en la defensa de Nicolás Maduro," BBC Mundo, February 2, 2019.

110  Robert Simon and Geert Aalbers, "The Capacity to Combat Corruption (CCC) Index," AS/COA, 2019, p. 15.

PX251

**NOVEMBER 2010** . VOL 3 . ISSUE 11-12



COMBATING TERRORISM CENTER AT WEST POINT

# CTC SENTINEL

OBJECTIVE . RELEVANT . RIGOROUS

## Contents

FEATURE ARTICLE
1  AQAP's Soft Power Strategy in Yemen
   By Barak Barfi

REPORTS
5  Developing Policy Options for the
   AQAP Threat in Yemen
   By Gabriel Koehler-Derrick
9  The Role of Non-Violent Islamists
   in Europe
   By Lorenzo Vidino
12 The Evolution of Iran's Special
   Groups in Iraq
   By Michael Knights
16 Fragmentation in the North Caucasus
   Insurgency
   By Christopher Swift
19 Assessing the Success of Leadership
   Targeting
   By Austin Long
21 Revolution Muslim:
   Downfall or Respite?
   By Aaron Y. Zelin

24 Recent Highlights in Terrorist Activity
28 CTC Sentinel Staff & Contacts

## About the CTC Sentinel

The Combating Terrorism Center is an independent educational and research institution based in the Department of Social Sciences at the United States Military Academy, West Point. The CTC Sentinel harnesses the Center's global network of scholars and practitioners to understand and confront contemporary threats posed by terrorism and other forms of political violence.

The views expressed in this report are those of the authors and not of the U.S. Military Academy, the Department of the Army, or any other agency of the U.S. Government.

# AQAP's Soft Power Strategy in Yemen

By Barak Barfi



**A**L-QA`IDA IN THE ARABIAN Peninsula (AQAP) is currently the most successful of the three al-Qa`ida affiliates operating in the Arab world.[1] Unlike its sibling partners, AQAP has neither been plagued by internecine conflicts nor has it clashed with its tribal hosts. It has also launched two major terrorist attacks against the U.S. homeland that were only foiled by a combination of luck and the help of foreign intelligence agencies.[2]

AQAP has avoided many of the domestic battles that weakened other al-Qa`ida affiliates by pursuing a shrewd strategy at home in Yemen.[3] The group has sought to focus its efforts on its primary enemies—the Yemeni and Saudi governments, as well as the United States—rather than distracting itself by combating minor domestic adversaries that would only complicate its grand strategy. Some analysts have argued that this stems from the lessons the group learned from al-Qa`ida's failed campaigns in countries such as Saudi Arabia and Iraq. While true to some extent, AQAP's policies are more the result of the realities it faces in a constricting Yemeni theater. Factors

---

1  Its siblings, in this case, refer to al-Qa`ida in Iraq and al-Qa`ida in the Islamic Maghreb.
2  These two attacks include the attempt by Umar Farouk Abdulmutallab to detonate an explosive device on a Northwest Airlines flight as it approached Detroit on December 25, 2009, as well as the attempt to detonate explosives-laden packages on cargo planes bound for the United States in October 2010.

3  For a discussion of AQAP's strategy, see Barak Barfi, "How Attacking AQAP Influenced Its Strategy," *NATO Review* 5 (2010). For biographies of AQAP's leadership and other details, see Barak Barfi, "Yemen on the Brink? The Resurgence of al Qaeda in Yemen," New America Foundation, January 2010.

PX251

**CTC SENTINEL**　　　NOVEMBER 2010 . VOL 3 . ISSUE 11-12

unique to Yemen but largely absent in other countries where al-Qa`ida operates necessitate adopting a soft touch.

This article details AQAP's "soft power" strategy at home, highlighting the group's positions toward the southern socialists as well as the country's Shi`a, who are known as the Zaydis. As a result of its domestic maneuvering, AQAP is at times less of an international jihadist group than it is just another Yemeni organization battling the regime in Sana`a and playing by ever shifting local rules. Nevertheless, this article contends that AQAP's "soft" approach at home is merely a tactical strategy since the group views itself as too weak to confront multiple enemies at this time. Indeed, AQAP remains firmly in the ideological camp of Abu Mus`ab al-Zarqawi and the Taliban.

### The Southern Socialists

AQAP's attitudes toward Yemen's southern socialists and how they differ from those of other Yemeni Islamists are indicative of this soft touch. Before a 1990 union, Yemen was divided between northern and southern states. By 1994, the southerners, the weaker of the two parties, had soured on the merger and attempted to secede. In the run-up to a civil war, a number of Yemeni Islamists issued *fatawa* (religious edicts) denouncing the Yemeni Socialist Party that ruled South Yemen and which was leading the secessionist charge. Chief among them was `Abd al-Majid al-Zindani, Yemen's most famous Islamist. He demonized the socialists, calling them "idol worshippers" and compared them to the Prophet Muhammad's enemies in Mecca.[4] He urged the region's inhabitants to "persuade Arab rulers that fighting the Yemeni (Socialists) is lawful, against a group of dissenting heretic infidels. Fighting it is a (religious) duty."[5] His ally, `Abd

al-Wahhab al-Daylami, who later became justice minister, made similar comments, declaring, "not killing these Muslims (the Socialists) leads to a greater corruption."[6]

AQAP, in contrast, takes a much more subdued approach toward the southern socialists. In an interview with a Yemeni journalist, AQAP's leader, Nasir al-Wahayshi, commented, "we know that many of you crave freedom and reject

> **"Whereas the Taliban enforced an uncompromising form of Islam, AQAP has tolerated the un-Islamic practices of the clans that shelter it. Whereas al-Zarqawi turned on his tribal hosts, AQAP has merely engaged in verbal spats with Yemeni tribes."**

tyranny, despotism, humility and subjugation. But you have followed an erroneous path."[7] Whereas al-Zindani preached fire and brimstone against the southern socialists, al-Wahayshi instead adopts a gentle "fatherly" tone toward children who have erred.

AQAP's mild position does not stem from love of the socialists or their ideals. Instead, it derives from the realities of Yemeni geopolitics. AQAP has adopted this approach to curry favor with southerners, which it needs for both popular support and tribal protection. The disgruntled population in the south is hostile to the regime of President Ali Abdullah Salih and is thus susceptible to calls by groups opposed to it.

Sectarian tensions equally explain AQAP's position. The group has sought to establish strongholds in the tribal

areas of the country that have historically been disaffected by the regime's policies. Most of these regions are in provinces where a Shi`a sect known as the Zaydis preponderates. The clans there are hostile to groups such as AQAP since it belongs to the puritanical Salafi creed that loathes the Shi`a.[8] Since making inroads with these tribes is a herculean task, AQAP has instead focused its attention on the Sunni tribal regions, which are almost exclusively in the south. This explains why AQAP's bastions are located in the provinces of Marib, Shabwa and Abyan where the population is overwhelmingly Sunni.

Alienating the locals and their leaders by embracing al-Zindani's views on the socialists and the *ancien régime* would hamper the organization's ability to operate there. As such, AQAP's soft touch toward the socialists springs from political necessity rather than affection for their cause.

### The Zaydis

Although the sectarian divide between AQAP and the Shi`a Zaydis has the potential to degenerate into open conflict, al-Wahayshi and his cadres have until recently attempted to minimize tensions between the two groups. To this end, the organization has emphasized the admirable elements of Zaydism. It has showered praise on the progeny of the Prophet Muhammad, known as *ahl al-bayt*, from which the leaders of Shi'ism descend.[9] AQAP has highlighted the fact that `Ali, the first Shi`a leader and fourth caliph, is one of the 10 Muslims promised entrance into heaven.[10] It has argued that he was wronged by the usurper and founder of the Umayya dynasty, Mu`awiyya, positions rarely emphasized in the circles AQAP frequents. It has gone so far as to claim that Yemenis "are endeared to the Zaydi school."[11]

---

4  Such accusations are among the worst a Muslim can hurl at his co-religionists because they paint them as enemies of Islam. These quotes come from a speech recorded on June 10, 1994, available on a cassette entitled "The Duty of the Islamic Nation Towards the Battle."

5  Ibid. These are loaded terms with an Islamic significance. For the significance of the term dissenter (*baghi*), see Majid Khadduri, *War and Peace in the Law of Islam* (Baltimore, MD: The Johns Hopkins University Press, 1955), pp. 77-79; Alfred Morabia, *Le Gihâd dans l'Islam médiéval* (Paris: Albin Michel, 1993), p. 300. For the term heretic (*mulbid*), see Bernard Lewis, "Some Observations

on the Significance of Heresy in the History of Islam," *Studia Islamica* 1 (1953).

6  *Sawt al-Iman* [Sana`a], June 21, 1994.

7  See the interview with Abd Illah Haydar Sha'a, available at www.abdulela.maktoobblog.com. This source will hereafter be cited as "Wahayshi Interview."

8  For Salafism, see Bernard Rougier ed., *Qu'est-ce que le Salafisme?* (Paris: Presses Universitaires de France, 2008).

9  Abu'l-Bara'a al-Sana'ani, "The Huthis are Rafidis in the Guise of the Zaydis," *Sada al-Malahim*, No. 12, February 2010. For the *abl al-bayt* in Islamic thought, see Moshe Sharon, *Black Banners From the East* (Jerusalem: Magnes Press, 1983), pp. 75-82.

10  Wahayshi Interview.

11  Al-Sana'ani.

---

PX251

CTC SENTINEL                                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

AQAP's moderate tone toward the Zaydis contrasts with that of other Yemeni Salafists, although the two draw on a common religious heritage. The founder of Yemeni Salafism, Muqbil bin Hadi al-Wadi`i (c. 1930-2001), struck an uncompromising stance vis-à-vis the Shi`a sect into which he was born.[12] He criticized the competence of their scholars[13] and cast aspersions on their doctrines, saying, "it is incumbent upon a Muslim to disassociate himself from these innovations and deviations (of the Zaydis)."[14] His adherents are not content with rhetorical lashings; they have shattered the tombstones of Zaydi leaders and disrupted religious celebrations and prayers in their mosques.[15]

Al-Wadi`i's hostility toward Zaydism derives from the discrimination he suffered at the hands of the Zaydi elite. Since his tribe neither belonged to the judicial caste nor descended from the *ahl al-bayt*, he could not aspire to be a religious leader in the community.[16] This led him to abandon Zaydism and

embrace Salafism, only intensifying his conflict with the Zaydi leadership. When he established a Salafist center in the Zaydi stronghold of Sa`da in 1979, he again encountered resistance at the hands of their aristocracy and even received death threats.[17]

Since the Zaydis posed a grave danger to him, al-Wadi`i focused all his efforts on combating them. Yet until recently, AQAP considered the Zaydis an insignificant adversary. The organization deferred sparring with them and instead concentrated on its chief enemies—the Yemeni and Saudi

> ## "At this stage of the battle, where AQAP is still weak and the arena full of adversaries, it has chosen pragmatism over ideology."

regimes and their superpower patron. Clashing with the Zaydis would divert the organization from its larger goal and embroil it in local conflicts that would win it few friends at home and abroad. As a result, the organization's soft touch does not derive from its desire to be the region's "Good Samaritan," but from *realpolitik*.

AQAP, however, has sparred with a splinter Zaydi movement known as the Huthis that has been sporadically fighting the regime since 2004. The Huthis' message has proved controversial in Zaydi circles, and they have alienated leading political and religious leaders of the sect. The intra-sectarian feud has rendered the rebels unable to mobilize the Zaydi population behind their program.

For its part, AQAP has sought to highlight the differences between the Huthis and the doctrines of other Zaydis. It has depicted the rebels as Iranian proxies bent on corrupting traditional Zaydi practices.[18] As a result, AQAP considers the Huthis to be outside the pale of Zaydism.

Although AQAP has long limited its conflict with the Huthis to the verbal arena, it appears the dissidents forced its hand by turning over al-Qa`ida members to the authorities. In late November, for example, a bomb ripped through a funeral procession and pilgrims on their way to religious celebrations in Huthi strongholds. While it is too soon to conclude that AQAP was behind the bombing or even offer a definitive explanation—indeed other factors are undoubtedly involved and suggest a more international motive—it appears that retaliation spurred AQAP to take the offensive.[19]

**AQAP's Two-Level Game Strategy**
AQAP's Shi`a dilemma is that its sympathetic views toward the Zaydis do not win it support in Saudi Arabia where it recruits and fundraises.[20] In Saudi Arabia, the Shi`a are esteemed as "chattel," and little attempt is made to differentiate between their various sects.[21] The religious scholars denigrate the Shi`a, while the government discriminates against them.[22] State clergy regularly term them infidels, and one senior cleric even said killing them was not a sin.[23] As a result, any suspicion

---

12 For a brief English account of al-Wadi`i and his theology, see François Burgat, *Islamism in the Shadow of al-Qaeda* (Austin, TX: University of Texas Press, 2008), pp. 22-27.

13 Al-Wadi`i warned against using their manuals in matters of *hadith*, or sayings of the Prophet Muhammad, noting that "they have no knowledge in the science of *hadith*." See his *Sa`aqat al-Zilzal liNasf al-Abatil Ahl al-Rafd w'al-I`tizal* (The Screech of the Earthquake to Destroy the Falsehoods of the Rafidis and Mu'tazilis).

14 Muqbil bin Hadi al-Wadi`i, *Maqtal al-Shaykh Jamil al-Rahman al-Afghani* (Sana`a: Dar al-Athar, 2005), p. 55. The term innovation (*bid`a*) has historical Islamic significance and is among the most important concepts for Salafists. For its historical importance, see Lewis, pp. 52-53. For its use by the spiritual forefather of Salafists, Ibn Taymiyya, see Henri Laoust, *Essai sur les doctrines sociales et politiques de Taki-d-din Ahmad b. Taymiya* (Cairo: L'Institut Français d'Archéologie Orientale, 1939), pp. 228, 264, nt. 5 and 272. For its primary place in Salafist thought, see al-Wadi`i, *Sa`aqat al-Zilzal liNasf al-Abatil Ahl al-Rafd w'al-I`tizal*.

15 For the Salafi-Zaydi conflict, see Shelagh Weir, "A Clash of Fundamentalisms: Wahhabism in Yemen," *Middle East Report*, July-September 1997; Laurent Bonnefoy, *Les Relations Religieuses Transnationales Contemporaines entre le Yémen et l'Arabie Saoudite: un Salafism <<importé>>?*, unpublished doctoral thesis, Institut d'Études Politiques de Paris, 2007.

16 For al-Wadi`i's difficulties with Zaydis in his youth, see Bonnefoy; François Burgat and Muhammad Sbitli, "Les Salafis au Yémen ou...La Modernisation Malgré Tout," *Chroniques Yéménites* 10:2 (2002).

17 Bonnefoy; Bernard Haykel, "The Salafis in Yemen at a Crossroads," *Jemen-Report*, 2002.

18 Al-Sana'ani.

19 AQAP reportedly took responsibility for the attack. See "Al-Qaida Claims Attack on Yemen Shiites," Associated Press, November 28, 2010.

20 For AQAP's Saudi component and monetary sources, see Barfi, "Yemen on the Brink? The Resurgence of al Qaeda in Yemen," pp. 3, 4, 6, 8-9.

21 For historical Wahhabi enmity toward Zaydism, see the comments of Muhammad bin Abd al-Latif, the great-great grandson of the Wahhabi founder, Muhammad Abd al-Wahhab, where he states, "We disassociate ourselves from the doctrines of the Zaydis and other innovators." See Sulayman bin Sahman al-Najdi ed., *al-Hidayya al-Suniyya w'al-Tuhfa al-Wahhabiyya al-Najdiyya* (Cairo: al-Manar, 1923/4), p. 98. For contemporary Wahhabis' complete ignorance of Zaydi practices, see the *fatwa* of the kingdom's former Grand Mufti Shaykh Abdul Aziz bin Baz which he was forced to renounce, entitled "Opinion Concerning Praying Behind One Who Confesses Exaggeration With Respect to the Prophets and the Pious Ones."

22 For the Wahhabi-Shi`a polemic, see Isaac Hasson, "Contemporary Polemics Between Neo-Wahhabis and Post-Khomeinist Shiites," Hudson Institute, September 2009. For the social discrimination the Shi`a face, see "Denied Dignity - Systematic Discrimination and Hostility Toward Saudi Shia Citizens," Human Rights Watch, September 2009.

23 Adil al-Kalbani, the imam of the Grand Mosque in Mecca, told the BBC Arabic satellite channel in May 2009, "as for their scholars, I declare them to be infidels."

PX251

**CTC SENTINEL**   NOVEMBER 2010 . VOL 3 . ISSUE 11-12

that AQAP harbors affection for the Shi`a and their beliefs would damage the group in the eyes of the kingdom's puritanical religious population. Such a stance risks drawing the ire of all the kingdom's subjects in light of the 2009 clashes between the Saudi military and the Huthis, in which at least 133 Saudi soldiers died.[24]

To parry such charges, the organization has issued articles rebuking the mainstream Shi`a known as the Twelvers, thus burnishing its Salafist and jihadist credentials.[25] In doing so, AQAP has adopted a division of labor of the Twelver-Zaydi file, playing what the political scientist Robert Putnam calls "two level games" in addressing local and international constituencies.[26] Sympathetic articles toward the Zaydis are penned by AQAP's Yemenis so as not to alienate them, while anti-Twelver pieces and recordings are issued by the organization's Saudis to target their nationals.

An excellent example of this is an article by AQAP's theological guide Ibrahim al-Rubaysh, who is from Saudi Arabia.[27] In a recent issue of AQAP's journal, *Sada al-Malahim (Echo of Battles)*, he penned a diatribe against the Shi`a. Although presumably written in Yemen, it makes no sense to Yemenis. The article speaks of the Shi`a in the

"Eastern Province,"[28] but the Zaydis reside in Yemen's central plateau and highlands. It further speaks of the Shi`a celebrating the festival of Ashura, but the Zaydis do not.[29] It also refers to market items such as headdresses that are not sold in Yemen.[30]

In fact, these references are all Saudi in nature. Saudi Arabia's Shi`a reside largely in the oases of al-Hasa and Qatif, located in the Eastern Province, where they account for up to 33% of the population.[31] They also celebrate Ashura. Yet at no point does al-Rubaysh indicate the article is speaking of Saudi Arabia. He assumes his readers will understand the references. This indicates that this is a Saudi authored article for a Saudi audience. It also leads to the conclusion that Shi`a polemics are distributed individually in Saudi jihadist circles rather than as part of *Sada al-Malahim* where readers can glean AQAP's complex views on the sect. Other significant AQAP diatribes against the Shi`a were issued by Saudis as well, only validating the view that the organization is seeking to use the kingdom's citizens to target their compatriots on this delicate topic.[32]

### Choosing Pragmatism Over Ideology

AQAP's views on Abu Mus`ab al-Zarqawi and the Taliban should dispel any doubt that the organization's moderate positions toward the southern socialists and the Zaydis stem from conviction rather than necessity. Although the harsh tactics employed by al-Zarqawi led to his downfall and sullied the reputation of jihadism in many Islamic circles, both he and the Taliban are esteemed by AQAP as models to emulate.

Ignorance of the policies of the black sheep of jihadism does not lie at the heart of AQAP's veneration because a number of the group's leaders lived in Afghanistan under the Taliban. AQAP's chief, Nasir al-Wahayshi, resided in the country during the Taliban's entire five

> **"This partially explains why the U.S. homeland is in AQAP's crosshairs. Attacking the superpower wins it friends everywhere and even admiration from its adversaries."**

year emirate.[33] He was also the personal secretary of al-Qa`ida leader Usama bin Ladin. Al-Wahayshi remembers his time in Afghanistan as an idyllic period where justice and stability reigned, noting that "the Shari`a courts and judges did not treat anyone in the country of the Taliban unjustly."[34] For him, the severe penalties they meted out such as beating men whose beards were too short and preventing kite flying were justified.[35] The Taliban are also often cited in *Sada al-Malahim* as one of the organizations at the forefront of the fight against the enemies of Islam.

See www.youtube.com/watch?v=_TytRBiZaxI. For the comments of Abdallah bin Jibrin rendering Shi`a blood licit, see Mamoun Fandy, *Saudi Arabia and the Politics of Dissent* (New York: St. Martin's Press, 2001), p. 206.

24  Robert Worth, "Saudi Border with Yemen is Still Inviting for Al Qaeda," *New York Times*, October 26, 2010.

25  The Shi`a split with the orthodox Sunnis over the right to rule the Islamic community, or *umma*. The Shi`a believe in hereditary rule, holding only the *ahl al-bayt* descended from Muhammad's daughter Fatima and her husband `Ali can claim leadership over the *umma*. Over time, they too split over who was the rightful imam, or leader. The mainstream Twelvers believe there were twelve imams. The Ismailis disagreed with them concerning the seventh imam. The Zaydis broke off from the Twelvers after the fourth imam. They are considered the most moderate Shi`a vis-à-vis the Sunnis. For a brief introduction to Shi`ism, see Etan Kohlberg, "The Evolution of the Shi`a," *Jerusalem Quarterly* 27 (1983).

26  Robert Putnam, "Diplomacy and Domestic Politics: The Logic of Two-Level Games," *International Organization* 42:3 (1988).

27  For al-Rubaysh's biography, see Barfi, "Yemen on the Brink? The Resurgence of al Qaeda in Yemen," p. 3.

28  Ibrahim al-Rubaysh, "The Rafidiyya..and the Stages of Confrontation," *Sada al-Malahim*, No. 11, October 2009.

29  They do, however, celebrate Ghadir Khumm, the festival commemorating `Ali's investiture. See Franck Mermier, "Recit D'Origine et Rituel D'Allegeance," *Peuples Méditerranéens*, 1991.

30  The passage in question speaks of purchasing an `*uqal* in a market. The word does not exist in this context in Yemeni Arabic. In pre-modern usage, it connotes a tribal chieftain. See Moshe Piamenta, *Dictionary of Post-Classical Yemeni Arabic* (Leiden: Brill, 1991), p. 335 where he states it connotes a tribal chieftain. It is used in this manner in the *Kitab al-Tabyin*, an 18th century text on tribal law. A German scholar translated the word as *Sippenführer*, head of the clan or tribe. There it connotes the headband worn by men. See Hamdi Qafisheh, *NTC's Gulf Arabic-English Dictionary* (Columbus, OH: McGraw-Hill, 1997), p. 438.

31  Graham Fuller and Rend Rahim Francke, *The Arab Shi`a* (New York: St. Martin's Press, 1999), p. 180.

32  Abu Sufyan al-Azdi, "The Rafida and the Arabian Peninsula," *Sada al-Malahim*, No. 12, February 2010; Abu Sufyan al-Azdi, "The Sunnis Between the Rafidi Hammer and the Collaborators' Anvil," *Sada al-Malahim*,

No. 13, May 2010. Also see a recording by Muhammad al-Rashid entitled "I am a Sincere Advisor to You." The organization has made passing comments about the Shi`a in several other articles, but nothing as comprehensive as the four items issued by the Saudis.

33  Wahayshi Interview.

34  Ibid.

35  For Taliban justice, see Ahmed Rashid, *Taliban* (New Haven, CT: Yale University Press, 2001), pp. 105-116.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

AQAP's high regard for the Taliban pales in comparison to their veneration of al-Zarqawi. He ranks in their pantheon of heroes, a notch below Bin Ladin and Ayman al-Zawahiri.[36] The organization has reproduced his writings and speeches,[37] and it has wholeheartedly embraced the Jordanian's stance on the Shi`a, a position that drew al-Zarqawi criticism from al-Qa`ida's leadership and the larger Islamic community.[38] It has cited his views on several occasions and urged readers to consult his works on the Shi`a.[39] It has preached al-Zarqawi's Shi`a gospel to the point where the words it uses to describe the sect come straight out of his canon.[40] AQAP's relationship with al-Zarqawi was so good that he allegedly ordered the organization to carry out a September 2006 attack on Yemeni oil installations.[41]

Despite the admiration AQAP has professed for jihadism's black sheep, it has done everything it can to avoid adopting the policies that doomed them. Rather, it has embraced a milder agenda. Whereas the Taliban enforced an uncompromising form of Islam, AQAP has tolerated the un-Islamic practices of the clans that shelter it.[42] Whereas al-Zarqawi turned on his tribal hosts, AQAP has merely engaged in verbal spats with Yemeni tribes.[43]

AQAP has not chosen such strategies out of altruism. Its sympathies lie with the black sheep's dogma, but the organization understands that these ideas cannot be applied in Yemen at this time. At this stage of the battle, where AQAP is still weak and the arena full of adversaries, it has chosen pragmatism over ideology. It simply cannot fight on all fronts and has instead focused its efforts on combating foes that gain it the most admiration among Yemenis, without entangling the group in superfluous feuds and causing unnecessary hardships. This partially explains why the U.S. homeland is in AQAP's crosshairs. Attacking the superpower wins it friends everywhere and even admiration from its adversaries. As such, AQAP defies the simple categorization of fighting "far" and "near" enemies.

Nevertheless, AQAP's calculating strategy and patient foresight is a clear cause for concern since it may mean that the group will not contribute to its own demise as was the case with al-Zarqawi's al-Qa`ida affiliate in Iraq. AQAP is a formidable adversary, the likes of which the United States has not encountered since al-Qa`ida melted away into the snow-capped mountains of Afghanistan's Tora Bora. A unique strategy will be required to defeat it.

*Barak Barfi writes about Arab and Islamic affairs. He was recently a Visiting Fellow with the Brookings Doha Center. Previously, he was a producer with ABC News affiliates in the Middle East where he reported from countries such as Iraq and Lebanon. His articles have appeared in numerous publications including the* Washington Post *and Jane's Islamic Affairs Analyst.*

# Developing Policy Options for the AQAP Threat in Yemen

By Gabriel Koehler-Derrick

THE RECENT ATTEMPT by al-Qa`ida in the Arabian Peninsula (AQAP) to mail package bombs likely designed to detonate in spectacular fashion over the United States has refocused attention on Yemen and the multifaceted security threats that loom over the poorest state in the Arab world.[1] Media discussions of the policy tools under review in Washington to combat AQAP outline a common set of assumptions and logic for how to proceed: increase military aid and training,[2] escalate drone activity,[3] and utilize soft power mechanisms (primarily aid for economic development) to bolster the government of President Ali Abdullah Salih.[4] While experts may disagree on the appropriate balance between these tools, the conventional wisdom suggests that some combination of these three different policy mechanisms will be essential if the United States is to succeed in convincing the Salih government to confront AQAP more aggressively.

This analysis is incomplete because it ignores the fact that large increases in economic aid and military resources to the Yemeni government are likely to increase tensions with the political opposition (which Salih has always viewed as a bigger challenge to his authority than al-Qa`ida) and with tribal leaders hostile to the Salih regime. This is because these key actors in Yemen's decentralized political system are likely to feel threatened by the consolidation of resources and power in the central

---

36 See, for example, the praise the organization heaps on him in "Yusuf's Seminary Peace Be Upon Him," *Sada al-Malahim*, No. 1, January 2008.

37 *Sada al-Malahim*, No. 8, March 2009; *Sada al-Malahim*, No. 10, August 2009.

38 For a partial translation of an al-Zarqawi speech AQAP has twice cited, see Barak Barfi, "The Great Divide," *Jerusalem Report*, October 1, 2007.

39 Ibrahim al-Rubaysh, "The Rafidiyya...and the Stages of Confrontation," *Sada al-Malahim*, No. 11, October 2009; Wahayshi Interview.

40 In his interview with Sha'a, al-Wahayshi noted the Shi`a engaged in "idle talk" (*khuza'balat*). The word is rarely used in Arabic, but does surface in al-Zarqawi's speeches.

41 Wahayshi Interview. Also, for details on the attack, see Hassan Fattah, "Suicide Attacks Foiled at 2 Oil Sites, Yemen Says," *New York Times*, September 16, 2006.

42 For how tribal law differs from Islamic Shari`a in Yemen, Carl Rathjens' article still remains the best introduction: "Tâgh`t gegen Scher`a," *Jahrbuch des Linden-Museums*, 1951, pp. 172-187.

43 For AQAP's relationship with its tribal hosts, see Barfi, "Yemen on the Brink? The Resurgence of al Qaeda in Yemen," p. 8 and the works of Sarah Phillips.

---

1 Duncan Gardham, "Parcel Bomb Set to Go Off Over the US Police Say," *Telegraph*, November 10, 2010.

2 Most experts estimate that this will be somewhere around $250 million per year for a five-year period. See "US Funding Boost is Sought for Yemen Forces," *Wall Street Journal*, September 2, 2010. A Yemeni government spokesman recently stated that Yemen wants $6 billion in total aid over two years. See "Yemen Wants Much More US Aid to Fight Terrorism," Associated Press, November 9, 2010.

3 Greg Miller and Peter Finn, "CIA Sees Increased Threat from al-Qaeda in Yemen," *Washington Post*, August 24, 2010.

4 Marisa Porges, "Saving Yemen," *Foreign Affairs*, November 16, 2010.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

government that will accompany large increases in aid. Without assurances from President Salih that in exchange for U.S. aid he will engage the political opposition and respect their right to organize and protest, U.S. assistance could end up backfiring. To fully appreciate this point and understand the hidden trade-offs inherent in the policy tools currently under consideration, two crucial points must be recognized:

1. The Yemeni state is not failing. Yemen's decentralized political order and the system of tribal law ('urf) that governs much of the country are too often mistaken as leading indicators of state failure. Nothing could be further from the truth. As one scholar recently noted, the rural areas of Yemen where tribal law and custom are the organizing principles for daily life are better understood as "alternatively governed" rather than "ungoverned" regions.[5] A far more serious challenge to Yemen's future than the continued importance of tribal law stems from declining oil revenues and a rapidly diminishing water table that in recent years has dipped to historic lows. Nevertheless, the Yemeni state will endure as long as it avoids civil war. Policymakers must be aware that the policy tools under consideration will ultimately be counterproductive if they de-incentivize negotiations between the Salih government and the complex constellation of actors that compose the Yemeni political opposition. This is crucial because AQAP's long-term survival is predicated on its ability to manipulate the legitimate grievances of Yemen's political opposition to its own advantage.[6]

2. Anti-Americanism must not be confused with support for AQAP. Many journalists and analysts write about Yemen as if it was a readymade recruiting factory for AQAP.[7] This perspective ignores the large rifts that exist between AQAP and many former jihadists, to say nothing of the

Yemeni population—even though anti-American sentiment is widespread.[8] Currently, AQAP utilizes U.S. support for the Salih regime in its propaganda, and Nasir al-Wahayshi, AQAP's leader, has stated that AQAP supports the secessionist southern movement.[9] If the Salih government engages in formal discussions with the opposition, recognizes the legitimacy of their grievances and is willing to make some discrete concessions, AQAP will lose a major propaganda and recruiting tool.

## A Decentralized, Not Failing State

The most violent periods in the long arc of Yemen's history have occurred as a result of attempts to disregard convention and centralize political power in the state. In northern Yemen for almost 1,000 years, different groups took up arms against the Shi`a Zaydi imam, the political and spiritual leader of the northern Zaydi community, when he was perceived to take too much political power.[10] More recently, cliques such as the group of Arab nationalists that deposed the imam in the Northern Civil War that lasted from 1962 to 1970 have encountered similar resistance when they tried to extend their authority over that of local tribes without acknowledging their grievances. Invariably the cycle is the same in Yemen: too much centralization of power in the state leads to political overreach that alienates tribal factions, who rise up in rebellion to reassert their independence and territorial control.

In contrast, stability in Yemen has been achieved by those leaders who, while militarily strong, were aware of the limits inherent in Yemen's decentralized political system. The most successful Zaydi imams were highly adept at ceding authority, particularly religious and legal, to their Shafi'i subjects.[11] While President Salih has ruled for decades, he did participate in an election, a first in this region of monarchs, in which his primary rival won 20% of the vote.[12] Enlightened Yemeni leaders have always understood that in a rugged, rural country where tribal authority has always been strong, a ruler must

> "Invariably the cycle is the same in Yemen: too much centralization of power in the state leads to political overreach that alienates tribal factions, who rise up in rebellion to reassert their independence and territorial control."

be willing to cede power in order to maintain it. This delicate balancing act stems from a contradictory reality that is essential to understanding Yemeni politics: while the idea of Yemen as a territorial entity is widespread, it has never been associated with a powerful, hierarchical state. As one long-time Yemen expert observed, "the idea of Yemen as a natural unit has been embedded in literature and local practice. Unified power has not."[13] In a country of high mountains and vast deserts, where even today 70% of the

5 Stewart M. Patrick, "Are 'Ungoverned Spaces' a Threat?" Council on Foreign Relations, January 11, 2010.

6 This argument is made in great detail in Alistair Harris, "Exploiting Grievances: Al-Qaeda in the Arabian Peninsula," Carnegie Endowment for International Peace, May 2010.

7 For one typical example, see Brad Lendon, "Yemen Fertile Ground for Terror Groups," CNN, January 4, 2010.

8 This generational gap and divisions between jihadists is presented in Ghaith Abdul-Ahad, "Al-Qaida in Yemen: Poverty, Corruption and an Army of Jihadis Willing to Fight," Guardian, August 22, 2010. A 2006 interview with the head of the opposition al-Islah party, Shaykh Abdullah bin Hussein al-Ahmar, provides evidence of a more conventional split between globally-oriented jihadists such as al-Qa`ida and Islamist leaders such as al-Ahmar who are certainly virulently anti-American, praise Hamas in their rhetoric and are critical of the government yet are not advocates for global jihad. See Hussein al-Jibrani, "Asharq Al-Awsat Talks to Yemeni MP Sheikh Abdullah Bin-Hussein al-Ahmar," Asharq al-Awsat, December 25, 2006.

9 This statement came via a recorded message entitled, "To Our People in the South," from AQAP's leader Nasir al-Wahayshi. The statement was discussed in Mareb Press, July 13, 2009.

10 The Zaydis, while nominally a Shi`a sect, are much closer to Sunnis in terms of religious practice.

11 The Shafi'is are followers of the teachings of Imam Shafi'i, one of the four principle madhhabs or schools of interpretation of Sunni Islam. See Bernard Haykel, "Al-Shawkani and the Jurisprudential Unity of Yemen," Revue du monde musulman et de la Mediterranece 67 (1993), for an excellent example of how Yemen's most prominent jurist, Muhammad al-Shawkani, blended Shafi'i jurisprudence in his own legal rulings to make the reign of the four imams who appointed him lead jurist more palatable to their Shafi'i subjects.

12 "Yemeni President Wins Re-Election," New York Times, September 24, 2006.

13 Paul Dresch, A History of Modern Yemen (Cambridge: Cambridge University Press, 2000), p. 1.

PX251

population still lives outside of major urban centers, a strong, centralized state authority is viewed with extreme wariness and outright hostility when it intrudes in local affairs and runs roughshod over local customs.[14]

Historically, rulers who ignored this fact did so at their own peril. Yemeni resentment and insurgency in reaction to government intrusion has been especially virulent against foreign powers that interfered in Yemeni politics, particularly those colonial powers that sought to bring tribal regions under the dominion of the state. The British, for example, had little influence over the far-flung territories of Southern Arabia (their colony in the Yemeni south) for almost the entire duration of the colony. For close to 70 years, practically the only interaction between southern tribal leaders and the colonial administration was an annual visit to Aden to be given weapons and salaries for their fighters.[15] It was only with the introduction of airpower and the ability to bomb rebellious villages from the safety of the skies that the British brought the most remote tribal territories under control.[16]

Foreign Muslim and secular powers fared no better than the English. Traditional songs about the suffering of Ottoman troops in Yemen are still sung in Turkey, and Egyptian Prime Minister Ali Sabri famously called Gamal Abdel Nasser's decision to send thousands of troops in support of the Arab nationalists who overthrew Crown Prince Muhammad al-Badr "Egypt's Vietnam."[17] While the United States realistically has no other partner than President Salih, aid provided

without conditions risks destabilizing the situation if it emboldens the Salih government to ignore the legitimate political grievances of its rivals and disregard the delicate balancing act that has always been essential to Yemen's stability.

## Yemen's Opposition: Political Narrative and Grievances, Not Jihadists
Yemen is awash in political opposition to President Salih and his regime. Some prominent members of the opposition, such as Tariq al-Fadhli, are former jihadists. To date, however, there is no evidence to support claims that veterans of the Soviet jihad are supporting AQAP en masse. An examination of the ideology and grievances of the major opposition groups shows few avenues of overlap with AQAP beyond hatred of the Salih regime.[18]

### The Huthis
The initial drivers of the Huthi rebellion in the north stemmed from "Zaydi revivalists who were originally fighting to protest the dilution of Zaydi identity and influence."[19] More recently, the conflict has become a violent insurgency fueled by the lack of development in Sa`da Province (where most Huthis live) and as a reaction to "outside" military incursions into Sa`da by the Yemeni military. While the animosity is high between the Huthis and the secular clique surrounding President Salih, a strategic alliance between the Shi`a Huthis and AQAP based on their mutual hatred for the regime is improbable, especially given that the Yemeni government has reportedly sent some "Salafists" north to fight the Huthis.[20] The strongly sectarian and vitriolic anti-Shi`a rhetoric that is an essential part of AQAP's ideology

makes an alliance based on "enemy of my enemy" logic unlikely.[21]

### The Southern Movement
In the south, the prospects for an alliance with AQAP are similarly unpromising. The secessionist South Yemen Movement is composed of a diverse mix of opposition groups from a variety of different ideological stripes, making it an unlikely partner for AQAP. Furthermore, the South Yemen Movement's grievance narrative is one of dispossession, insufficient oil revenues, and political disenfranchisement;

> **"AQAP, however, has cleverly tried to latch onto southerners' anger with the Salih government in an effort to reorient them away from the project of creating an independent southern state and toward jihad and the establishment of an Islamic state in southern Yemen."**

their proposed solution is secession and the recreation of an independent southern state. The most popular candidates for leadership roles (if the south were to become independent) are not jihadists, but prominent leaders of the former socialist government.[22] The South Yemen Movement is clearly a parochial project motivated by local

---

14  "At a Glance: Yemen," UNICEF, available at www.unicef.org/infobycountry/yemen_statistics.html.

15  Dresch, pp. 9-10.

16  As one colonial official said, "Pacification has mainly been negotiated, backed up with retribution for the evildoer from the Royal Air Force in the air and predominantly Arab forces on the ground." See A.P. Cummings-Bruce, "The Emergence of Aden since 1956," *Journal of the Royal Central Asian Society* 49:3-4 (1962).

17  Tim Mackintosh-Smith recounted hearing a Turkish folksong describing the suffering of Ottoman troops in Yemen. See Tim Mackintosh-Smith, *Travels with a Tangerine: From Morocco to Turkey in the Footstep's of Islam's Greatest Traveler* (New York: Random House Trade Paperbacks, 2004).

18  The Salih government has also alleged that the Huthis, the southern movement and AQAP are all in league against the government. See *al-Thawra*, July 31, 2009.

19  Christopher Boucek, "War in Saada: From Local Insurrection to National Challenge," Carnegie Endowment for International Peace, April 2010.

20  Laurent Bonnefoy, "Deconstructing Salafism in Yemen," *CTC Sentinel* 2:2 (2009). Also see Ghaith Abdul-Ahad's interview with Khaled Abdul Nabi, former founder of the Abyan-Aden Islamic Army, who said that he was released from prison by President Salih on condition that he would help the government to fight the Huthis and the southern movement: "Al-Qaida in Yemen: Poverty, Corruption, and an Army of Jihadis Willing to Fight," *Guardian*, August 22, 2010.

21  See issue 13 of *Sada al-Malahim* for the article by Abu Yahya al-Libi called, "We are not Houthis, nor are We like them," refuting Saudi allegations that AQAP was assisting the Huthis. In the second issue of *Inspire*, an "interview" with Shaykh Abu Sufyan, AQAP's vice *amir*, provided examples of much more virulent anti-Shi`a rhetoric: "The Shi`a are polytheists and therefore amongst the worst enemies of Islam. They speak in the names of Islam but against the Muslims of *ahl as-sunnah*." A recent claim of responsibility (if verified) for two attacks against Huthis on November 25 and 27 calls the Huthis *rawafid* or "rejectionists" and describes them as "legitimate targets" for further attacks.

22  For an in-depth look at the southern movement and its leadership, see Stephen Day, "The Political Challenge of Yemen's Southern Movement," Carnegie Endowment for International Peace, March 2010.

**CTC SENTINEL**     NOVEMBER 2010 . VOL 3 . ISSUE 11-12

grievances and does not fit into al-Qa`ida's narrative of global jihad. AQAP, however, has cleverly tried to latch onto southerners' anger with the Salih government in an effort to reorient them away from the project of creating an independent southern state and toward jihad and the establishment of an Islamic state in southern Yemen.[23] While it is not inconceivable that some tribes in the south might willingly look the other way or extend hospitality to

> **"While there certainly are a small number of Yemenis who are drawn to AQAP and lured by the prospect of doing battle against the West and its regional allies, it must be stressed that it is not AQAP's grievance narrative that motivates the vast majority of Yemenis to fight the government."**

AQAP fighters and perhaps to Anwar al-`Awlaqi (whose relationship to AQAP's leadership is far from clear), nothing is surer to alienate the tribes of southern Yemen than civilian casualties at the hands of U.S.-trained and equipped northern troops and the sense that President Salih, their primary military rival, has access to an unlimited spigot of military aid at his disposal, provided by the United States.

**The Way Forward**
To date, AQAP and its affiliates have been diligent in attacking security forces and not Yemeni civilians. In fact, 64% of the attacks claimed by AQAP and its predecessor organizations from 1998-2008 have targeted security forces, government officials or utilities.[24] As

long as tensions remain high between the Salih government and disaffected individuals in regions such as Marib and al-Jawf, AQAP will be able to continue this strategy. Yet if the Salih government begins dialogue with local leaders and is willing to engage the leaders of the southern movement in political negotiations and make concessions on key issues, AQAP will find itself in an uncomfortable position. Although it cannot be known for certain, it is possible that at this point AQAP, as have so many al-Qa`ida affiliates, would begin to attack civilians and local leaders in an attempt to dissuade collaboration and dialogue with the government. Such a course could lead to the group's marginalization.

The security challenges in Yemen stem from a complex array of grievances that if they are to be resolved require Machiavellian levels of political engagement and negotiation by local leaders. This is a process that the jihadists—who are master propagandists—cannot succeed at because they do not have a political platform. Indeed, they have rejected the path of political compromise to take up arms and establish an Islamic state. They have only their own claims of righteousness and piety to legitimate the controversial attacks that they claim are essential to bring about this aspirational goal.[25] They will succeed only if their narrative is more credible than the Salih government's. Recently, this has not been too difficult a barrier to surpass. Even with all of the Salih government's shortcomings and widespread anti-American sentiment in Yemen, however, the entirety of the country is not an al-Qa`ida training camp. While there certainly are a small number of Yemenis who are drawn to AQAP and lured by the prospect of doing battle against the West and its regional allies, it must be stressed that it

is not AQAP's grievance narrative that motivates the vast majority of Yemenis to fight the government. Most Yemenis have taken up arms because of distinct political grievances and a perception that politics is a dead end.

There is little doubt that Washington's Yemen deliberations will result in some mixture of additional military aid and training, an escalation of drone activities, and some additional economic aid. To the greatest degree possible, the United States should provide, through appropriate channels, transparent proposals for economic development, specific and timely releases of the evidence of AQAP's plots against the United States, and engage the Yemeni public through editorials and press conferences explaining the rationale behind U.S. policy.[26]

While drones will probably be brought to bear in some capacity, the open source reporting on the history of drone and missile strikes in Yemen paints a very mixed picture. The value of the successful strike that killed Abu Ali al-Harithi in 2002 was undermined by U.S. claims of responsibility, which eliminated any chance of plausible deniability for the government, thus causing President Salih enormous embarrassment. More recently, a missile strike in December 2009 reportedly caused significant civilian casualties and was widely criticized by human rights groups and Yemeni officials.[27] A subsequent missile strike in May 2010 killed a deputy provincial governor, again causing the Salih government significant difficulties.[28] Furthermore, it is local actors and networks outside of Sana`a that provide the intelligence essential for drone strikes to be successful. As long as AQAP is operating primarily in areas outside of government control, it is doubtful the Salih government will be able to provide this intelligence in any consistent fashion. Moreover,

---

23 See "The Southern Issue: Secession or Unity is there another Option?" in issue 13 of *Sada al-Malahim*, in which the author presents jihad as the right path, not political participation in either the North or South "apostate" regimes.

24 This figure is based on an analysis of 17 terrorist attacks from 1998 until 2008 claimed by the "Adan-Abyan

Islamic Army," "Al-Qa`ida," "Al-Qa`ida in Yemen," and "Sympathizers of Al-Qa`ida" using data from The Global Terrorism Database at the University of Maryland. An analysis of a second open source database, the WITS from the National Counterterrorism Center, shows a slightly different perspective: of 34 incidents committed by Sunni extremist groups from July 2007 until June 2010 in which there were victims, 41% were against civilians and 42% were against military and police targets.

25 Nelly Lahoud, "The Strengths and Weaknesses of Jihadist Ideology," *CTC Sentinel* 3:10 (2010).

26 Gregory D. Johnsen has been particularly persuasive in arguing this last point. See Gregory D. Johnsen, "Yemen: Confronting Al-Qaeda, Preventing State Failure, testimony before the U.S. Senate Foreign Relations Committee," January 20, 2010.

27 "Yemen: Cracking Under Pressure," Amnesty International, 2010, pp. 31-32.

28 Greg Miller, Greg Jaffe, and Karen DeYoung, "U.S. Drones on the Hunt in Yemen," *Washington Post*, November 7, 2010.

PX251

CTC SENTINEL     NOVEMBER 2010 . VOL 3 . ISSUE 11-12

local leaders will refrain from providing such intelligence if drone strikes are causing civilian casualties in their regions.[29]

Finally, military aid and training, while essential, will undermine their own utility if they are the catalyst that convinces the Huthis and the leaders of the southern movement that they have more to gain by striking now rather than waiting until the military balance has turned decisively against them. This would risk sinking Yemen into a chaos worse than anything AQAP could hope to create on its own.

The strategy devised for Yemen must be one that keeps only a light U.S. footprint in the country and exploits the contradictions and weaknesses inherent in al-Qa`ida's ideology, which offers no political solutions in a country swimming in political problems. The greatest current danger is that through an overly heavy intervention in Yemeni affairs, the United States provides AQAP a perfect propaganda tool to point to the hand of the United States as the only force sustaining the Salih government and further exploit the grievances of the wide ranging political opposition to its own ends. Pressure on the Salih government to engage with its political rivals and an understanding that maintaining power in Yemen often requires ceding it to local leaders is essential to minimize the threat posed by AQAP to both the United States and Yemen.

*Gabriel Koehler-Derrick is an Associate at the Combating Terrorism Center and an instructor at the U.S. Military Academy, West Point. Mr. Koehler-Derrick holds an M.A. in International Affairs from Columbia University's School of International and Public Affairs and a B.A. in International Relations from Tufts University.*

# The Role of Non-Violent Islamists in Europe

By Lorenzo Vidino

DURING THE LAST few years, European authorities have invested significant resources in understanding the radicalization patterns that have led scores of European Muslims to engage in terrorist activities. One particularly thorny issue has been the role of non-violent Islamists in the process. Offshoots of the Muslim Brotherhood, Jamaat-i-Islami, Milli Görüs, so-called non-jihadist/political Salafists, and other Islamist movements have in fact established an extensive presence in most European countries. Although there are important differences in the strain of Islamism embraced by these groups, it is fair to say that while they support acts of violence in regions where they believe Muslims are under attack, they all oppose attacks in Europe of the kind plotted by al-Qa`ida and affiliated networks. The two questions debated by European scholars and policymakers have been: what is the role of non-violent Islamists in the radicalization process? Could they become government partners in the fight against violent radicalization?

### The Debate Over Non-Violent Islamists
As for the first question, one strand of thinking considers non-violent Islamist groups as "conveyor belts" for further radicalization. This is the view of former British Home Secretary Jacqui Smith, who has stated that non-violent Islamists "may not explicitly promote violence, but they can create a climate of fear and distrust where violence becomes more likely."[1] Critics challenge this attitude by arguing that there is "no empirical evidence of a causal link between extremism and violent extremism."[2] The image of a "slippery slope from political mobilisation to anger and, finally, to violent extremism and terrorism" is, according to some, flawed and not supported by facts.[3]

Many of those who hold this view also argue that any government would be foolish in not harnessing the enormous potential that a partnership with non-violent Islamists holds. While some of their views might be offensive, they possess a unique legitimacy and street credibility more amenable to young Muslims close to jihadist views. In fact, they "have a much deeper and nuanced understanding of the 'ecology' in which radical and violent movements operate" than Muslim organizations generally considered more "moderate."[4] According to this argument, governments should empower the work of these groups, which constitute the ultimate bulwarks against violent radicalization.

One of the most vocal proponents of this view is Robert Lambert, the former head of the Muslim Contact Unit (MCU), the section of the London Metropolitan Police devoted to engaging the city's Muslim community. Lambert argues that the "ideal yes-saying" Muslim leaders lack legitimacy in their communities and have no knowledge of radicalization. He advocates "police negotiation leading to partnership with Muslim groups conventionally deemed to be subversive to democracy."[5] Lambert uses as example of this potential STREET (Strategy to Re-Empower and Educate Teenagers), a counter-radicalization program run by strict Salafists in the Brixton area of London. According to Lambert, STREET, thanks to its combination of "street skills and religious integrity," has been particularly successful in contrasting the recruitment efforts of al-Qa`ida-linked preachers in the area.[6]

Danish security services share this analysis, arguing that in some cases "it is precisely these individuals who have the best chance of influencing the attitudes of the young people who are in a process of radicalisation, in a non-

proaches to Counter-Terrorism," Demos, 2006.

4 Peter Mandaville, "Engaging Islamists in the West," *CTC Sentinel* 1:7 (2008).

5 Personal interview, Robert Lambert, London, December 2008; Robert Lambert, "Empowering Salafis and Islamists Against Al-Qaeda: A London Counterterrorism Case Study," *Political Science & Politics* 41:1 (2008).

6 Jonathan Githens-Mazer and Robert Lambert, "Why Conventional Wisdom on Radicalisation Fails: The Persistence of a Failed Discourse," *International Affairs* 86:4 (2010).

1 Alan Travis, "Time to Tackle the Non-Violent Extremists, Says Smith," *Guardian*, December 11, 2008.

2 Rachel Briggs, "Community Engagement for Counter-Terrorism: Lessons from the United Kingdom," *International Affairs* 86:4 (2010).

3 Rachel Briggs, Catherine Fieschi, and Hannah Lownsbrough, "Bringing It Home: Community-Based Ap-

29 Ibid.

PX251

**CTC SENTINEL**   NOVEMBER 2010 . VOL 3 . ISSUE 11-12

violent direction."[7] Lambert and the Danish security services embrace the view that, rather than conveyor belts, non-violent Islamists act as "firewalls." An individual who embraces their views might be considered a "radical," in some cases espousing opinions that are repugnant to the majority, but the firewall represented by non-violent Islamists prevents that person from becoming a violent radical.

Critics argue that while it might be true that most non-violent Islamists do not become violent radicals, it is unquestionable that some do. Umar Farouk Abdulmutallab, who tried to detonate a bomb on an airplane over the United States on Christmas Day in 2009, and Cüneyt Ciftci, Germany's first suicide bomber, are just the latest examples of militants whose radicalization path started with non-violent Islamist groups before progressing further. The firewall effect of these groups is, according to critics, only occasional and there is no empirical evidence to support the view that it is a constant. To the contrary, according to the Quilliam Foundation, non-violent Islamist groups "advocate separatist, confrontational ideas that, followed to their logical conclusion, lead to violence. At the very least, the rhetoric of radicals provides the mood music to which suicide bombers dance."[8]

Furthermore, argue some, even assuming non-violent Islamists can indeed sway some individuals from becoming violent radicals, the long-term implications on social cohesion and integration of any partnership the government might enter with them would greatly offset the yet-to-be-proven, short-term benefits in the security field. This position has been repeatedly championed, among others, by the German security services. In its annual report, the Bundesamt für Verfassungsschutz (BfV) has stated that "'legalistic' Islamist groups represent an especial threat to the internal cohesion of our society."[9] The BfV admits that

non-violent Islamist groups "do not carry out recruitment activities for the purpose of the violent 'Holy War' (Jihad)," and that, to the contrary,

> they might rather claim to immunise young Muslims against jihadist indoctrination by presenting to them an alternative offer of identification…However, one has to critically ask whether their activities that are strongly directed at preserving an "Islamic identity" intensify disintegration and contribute to the development of Islamist parallel societies.[10]

Moreover, they argue, embracing the conveyor belt theory, there "is the risk that such milieus could also form the breeding ground for further radicalization."[11]

Many security officials in various European countries similarly accept the view that identifying the enemy only in violent groups is a self-deceiving act. Alain Grignard, the deputy head of the Belgian police's counterterrorism unit and a professor of Islamic studies at Brussels Free University, calls al-Qa`ida an "epiphenomenon," the most visible aspect of a much larger threat that is political Islam.[12] Alain Chouet, the former head of France's counterintelligence service, the DGSE, agrees with Grignard and believes that

> Al-Qaeda is only a brief episode and an expedient instrument in the century-old existence of the Muslim Brotherhood. The true danger is in the expansion of the Brotherhood, an increase in its audience. The wolf knows how to disguise itself as a sheep.[13]

Chouet's comparison of the Muslim Brotherhood to a wolf in sheep's clothing is echoed by many security experts who fear that non-violent

Islamists are attempting to benefit from what in social movement theory is known as positive radical flank effect.[14] According to the theory, more moderate wings of a political movement improve their bargaining position when a more radical fringe emerges. Applied to non-violent Islamist groups, the positive radical flank effect would explain why the emergence of al-Qa`ida and other jihadist groups has led European governments to see non-violent Islamists more benignly and even to flirt with the idea of establishing forms of partnership. The emergence of a severe and prolonged terrorist threat, argue people such as Chouet, has led European governments to lower the bar of what is acceptable and endorse organizations holding highly controversial and anti-democratic views as long as they oppose violence in the Old Continent.

**The French Example**
Chouet's warning is echoed by unlikely supporters of this view: social workers from France, the country that first experimented with informal partnerships with non-violent Islamist groups and where their long-term impact is easier to detect. In the early 1990s, in fact, French authorities became concerned by the surge of criminal activities, unemployment and a more general sense of disenfranchisement that pervaded the *banlieues*, the housing projects that surround most French cities. In response, French authorities began empowering local Muslim Brotherhood-linked organizations that already engaged in grassroots initiatives to sway young Muslims from crime and drugs.[15] The perception that non-violent Islamist groups could succeed where the state had failed led many French policymakers, particularly at the local level, to provide financial support to them.[16] This security-based partnership

7 "A Common and Safe Future: Proposal for an Action Plan to Prevent Extremist Views and Radicalisation among Young People," Danish Ministry of Refugee, Immigration and Integration Affairs, June 2008.

8 This quote is drawn from the Quilliam Foundation's launch publication in April 2008.

9 Annual report of the German Federal Office for the Protection of the Constitution, 2005, p. 190.

10 "Integration as a Means to Prevent Extremism and Terrorism: Typology of Islamist Radicalisation and Recruitment," German Federal Office for the Protection of the Constitution, January 2007, p. 5.

11 Annual report of the German Federal Office for the Protection of the Constitution, 2005, p. 190.

12 Sylvain Besson, *La Conquête de l'Occident* (Paris: Seuil, 2005), p. 40.

13 Caroline Fourest, *Brother Tariq: The Doublespeak of Tariq Ramadan* (New York: Encounter, 2008), p. 103.

14 See, for example, Herbert H. Haines, "Black Radicalization and the Funding of Civil Rights: 1957-1970," in Doug McAdam and David A. Snow, *Social Movements* (Los Angeles: Roxbury Publishing Company, 1997), pp. 440-441.

15 Frank Peter, "Leading the Community of the Middle Way: A Study of the Muslim Field in France," *The Muslim World* 96:4 (2006).

16 Dounia Bouzar, *L'Islam des Banlieues: Les Prédicateurs Musulmans: Nouveaux Travailleurs Sociaux?* (Paris: Syros la Découverte, 2001); Marie-France Etchegoin and Serge Raffy, "La Vérité sur l'Islam en France," *Le Nouvel Observateur*, February 2, 2006; Personal interview, French

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

was widely implemented, albeit never as a formal policy and not across the board, and received a boost after the September 11 attacks on the United States.[17] If during the 1990s some French policymakers envisioned non-violent Islamists as "social pacificators" keeping order inside the *banlieues*, the emergence of terrorism and radicalization as state priorities added a new responsibility, as non-violent Islamists were seen as a possible antidote to the jihadists.[18]

Yet 15 years later the results have left many skeptical. They point to the fact that crime and the sense of disenfranchisement that plagued the *banlieues* have not been reduced by the activities of non-violent Islamist groups. Most importantly, others point at the negative social developments that their influence has brought. One particularly loud voice has been that of the women's association Ni Putes Ni Soumises, a feminist group traditionally linked to the French Left. "In the 1980s [in the *banlieues*], there were mixed marriages and sexuality was treated in far less intolerant terms," recounted a Ni Putes Ni Soumises militant. As Brotherhood organizations began their government-subsidized activities, she argued, the social climate changed significantly: "Today, there is nothing left in these neighborhoods: no sense of life, no love, nothing but prohibition."[19]

A similar view is held by Father Christian Delorme, the liaison to the Muslim community for the diocese of Lyon. Since the 1980s, Father Delorme had been active in organizing protests and popular marches against the discrimination North Africans faced in France and was among the most vocal backers of government support for the activities of Islamic organizations in the *banlieues*, arguing that more piety would have a beneficial effect.[20] By the end of

the 1990s, however, Father Delorme became convinced that not all Muslim organizations were the same. "There is an Islam of the families, which is for the most part an Islam of hospitality and piety," argued the clergyman in a 2001 interview with *Le Monde*, stating that the majority of French Islam is as such, "neither static nor dominating."[21]

"What I criticize," continued Father Delorme, who has worked for decades in Lyon's most troubled neighborhoods,

is the work of hardening of the religious identity operated by some organizations that have an interest in discrediting such popular Islam; I am thinking in particular at the current of the Muslim Brothers...I came to understand that they were dangerous when I saw that they cut the ties between the young and their families, explaining that their parents did not practice the true Islam, that they were not on the right path. I also understood that they wormed their way into institutions, taking advantage of secularism, using the rhetoric of secularism, but using it only as a means; for basically they were against integration, and the identity they sought was that of a community of Muslims, living autonomously in the Republic, like a potent countervailing power.[22]

### No Conclusive Evidence

Any decision on the opportunity to partner with non-violent Islamists would ideally be based on an empirical assessment of their role in both the radicalization and counter-radicalization process. Yet, in reality, there is little evidence to conclusively back either the conveyor belt or the firewall argument. There is substantial anecdotal evidence supporting both positions simultaneously, but no systematic, comprehensive studies that can definitively prove either. This deficiency is due to a variety of factors, from an only recently reversed lack of interest from the research community to problems in obtaining access to

substantial bodies of information that would provide a comprehensive glimpse into a person's path to radicalization. Moreover, while it might be relatively easy to determine cases in which non-violent Islamists acted as firewalls, assessing their role as conveyor belts is significantly more challenging. While it might be true that they provide the "mood music to which suicide bombers dance" and that they have made mainstream a narrative over which violent groups build their recruiting efforts, empirically proving such an intangible role is almost impossible.

Given this lack of empirical evidence, intuitively it can be argued that in some cases non-violent Islamist groups act as firewalls while in others as conveyor belts. Radicalization is a highly individualized and unpredictable journey. Many who join non-violent Islamist networks will never make the leap to jihadist networks and, to the contrary, will actively challenge their influence. Yet many cases have shown that others will make the leap. In substance, the dearth of evidence on the radicalization process and its lack of linearity makes conclusive assessments on the role of non-violent Islamists almost impossible. Furthermore, some of the potentially negative implications of partnering with non-violent Islamists are not strictly security-related, but rather involve broader issues of integration and social cohesion with which most European governments are still grappling. As a consequence, positions and policies on the issue swing almost erratically.

*Dr. Lorenzo Vidino is a Fritz Thyssen Stiftung visiting fellow at the RAND Corporation. His latest book,* The New Muslim Brotherhood in the West, *was published by Columbia University Press in September 2010.*

government official, Paris, February 2007; Personal interview, French government official, Lyon, June 2006.

17  Gilles Kepel, *The War for Muslim Minds: Islam and the West* (Cambridge, MA: Harvard University Press, 2004), pp. 273-274.

18  Vincent Geisser and Aziz Zemouri, *Marianne et Allah: Les Politiques Français face à la "Question Musulmane"* (Paris: La Découverte, 2007), p. 117; Nicolas Sarkozy, *La République, les Religions, l'Espérance* (Paris: Éditions du Cerf, 2004), p. 100.

19  Fourest, p. 191.

20  "Il Faut Reconnaître la Sur-Délinquance des Jeunes

Issus de l'Immigration," *Le Monde*, December 4, 2001.

21  Philippe Bernard and Xavier Ternisien, "Il Faut Reconnaître la Sur-Délinquance des Jeunes Issus de l'Immigration," *Le Monde*, December 4, 2001.

22  Fourest, p. 191.

PX251

CTC SENTINEL    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

# The Evolution of Iran's Special Groups in Iraq

By Michael Knights

FOLLOWING IRAN'S APPARENT role in kick-starting the long-delayed formation of a government in Baghdad, Tehran is seen by many as the most influential external power in Iraq.[1] While this may or may not be true, it is clear that Iran has a proven ability to commission violence inside Iraq.[2] Yet while the covert programs run by the Iranian Revolutionary Guard Corps (IRGC) Qods Force is a source of influence in Iraq, paramilitary operations come at a cost. The militarization of Iranian influence is often counterproductive in Iraq, reinforcing Iraqis' generally negative attitudes toward Iran.[3] Tehran's concern about negative Iraqi perceptions of its paramilitary proxies has influenced the evolution of Iranian support to the so-called "Special Groups" of militant Shi`a diehards in Iraq.

## Iranian Support to "Special Groups"

As the unclassified Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate, the Islamic Republic of Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence.[4] In some cases, the same Iraqi individuals run like a thread throughout the entire story, from Islamic terrorists, to exiled anti-Saddam guerrillas, to anti-American Special Group fighters in post-Ba`athist Iraq.[5] Many of the historical patterns of Iranian support to Iraqi proxies hold true today.

Although paramilitary action is just one strand of Iranian influence-building in Iraq, it plays a particularly important role in Iran's pursuit of security-related objectives. Seeking to replicate the model used by Lebanon's Hizb Allah, the Special Groups are considered a vanguard that will leverage its record of resistance against the United States after major U.S. forces depart Iraq in December 2011. As well as seeking to hasten the U.S. withdrawal, the Special Groups demonstrate Iran's ability to destabilize Iraq and may be used to pressure a future government into reducing the long-term presence of U.S. forces in the country. More broadly, the Special Groups represent a flexible tool that might be used to aid Iran's effort to prevent nationalist and former Ba`athists from rising to the top of Iraqi politics and to maintain leverage over a new Shi`a-led government.

According to pre-2003 Iraqi government reporting on Iranian proxy operations, the IRGC Qods Force had already anticipated the need to split its support between groups that would "work openly" and others that would "work secretly" in a post-invasion Iraq.[6] Ba`athist reporting appears to have been well-sourced and accurate in many respects: they correctly anticipated Iran's ability to support public organizations such as the Islamic Supreme Council of Iraq (ISCI) and the paramilitary Badr Organization, while also backing covert Special Groups. A consistent feature of Iran's patronage has been careful efforts to spread Tehran's bets across many different horses.

## The Politics of Special Group Operations

The armed factions that make up the Special Groups have passed through significant changes in the last two years, and they continue to evolve. The government security offensives of spring 2008 caused considerable damage to Iranian-backed networks, and many Special Group operators fled to sanctuaries in Iran. Since the summer of 2009, these groups have been allowed breathing space to recover and begin to reestablish their presence in Iraq.

There are many reasons why recovery has been possible. In June 2009, the U.S.-Iraq security agreement ended the ability of U.S. forces to operate unilaterally in Iraq's cities, where much of the fight against the Special Groups has been conducted. The U.S. military thereafter required an Iraqi warrant and Iraqi military cooperation to undertake raids against the Special Groups. In the extended lead-up to Iraq's March 2010 elections, Prime Minister Nuri al-Maliki sought to win favor with other Shi`a factions by using his direct operational control of Iraq's Counterterrorism Command to place a virtual embargo on such raids. Lacking the judicial evidence to hold Special Group detainees transferred to the Iraqi government, and facing pressure from Shi`a groups, the government began to release Special Group prisoners as soon as they were transferred to Iraqi custody by the United States.[7]

The military cells supported by Iran are spread across the legal spectrum, from completely covert organizations to political parties with deniable connections to the IRGC Qods Force. They include:

### Kataib Hizb Allah

Kataib Hizb Allah (KH) was formed in early 2007 as a vehicle through which the IRGC Qods Force could deploy its most experienced operators and its most sensitive equipment.[8] Much can be gleaned from the positioning of Abu Mahdi al-Muhandis (whose real name is Jamal al-Ibrahimi) as the leader of KH. Born in Basra, al-Muhandis is an adviser to IRGC Qods Force commander Qasem Soleimani. The life history of al-Muhandis describes the arc of Iranian support for Iraqi Shi`a proxies, with al-Muhandis starting as an exiled member of the outlawed Da`wa Party, working with the IRGC Qods Force to undertake

---

1  A sober analysis of the situation is Martin Chulov, "Iran Brokers Behind-the-Scenes Deal for Pro-Tehran Government in Iraq," *Guardian*, October 17, 2010.

2  Probably the best primer on this issue is Joseph Felter and Brian Fishman, *Iranian Strategy in Iraq: Politics and 'Other Means'* (West Point, NY: Combating Terrorism Center, 2008).

3  Good polling data is available to support the strong anecdotal and media evidence available on this issue to Iraq watchers. See David Pollock and Ahmed Ali, "Iran Gets Negative Reviews in Iraq, Even from Shiites," The Washington Institute for Near East Policy, May 4, 2010.

4  See Annex B of Felter and Fishman, which contains Ba`ath-era intelligence documents.

5  "Treasury Designates Individual, Entity Posing Threat to Stability in Iraq," U.S. Treasury Department, July 2, 2009.

6  "Study About the Disloyal Badr Corps 9," Iraqi General Security Office, January 2002, translated as part of the Harmony records, reference number ISGQ-2005-00038283, p. 71. Available in Felter and Fishman, p. 324.

7  Personal interview, U.S. intelligence analyst, Washington, D.C., August 4, 2010. In private conversations, U.S. intelligence personnel are candid about the limitations that now face any U.S.-initiated actions against Special Group operators.

8  KH has been closely associated with the fielding of the RPG-29 and with sensitive communications security equipment. KH was credited with having accessed an encrypted datalink feed from a U.S. Predator unmanned aerial vehicle. For details, see Michael Hoffman, John Reed and Joe Gould, "Army: Working to Encrypt UAV Video Feeds," *Army Times*, December 21, 2009.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

terrorist operations against the Kuwaiti royal family and the U.S. and French embassies in Kuwait in the early 1980s.[9] Al-Muhandis then joined the Badr movement while living in Iran in 1985, rising to become one of the Iraqi deputy commanders of Badr by 2001.[10] He is a strategist with extensive experience dealing directly with the most senior Iraqi politicians; indeed, al-Muhandis was, until the March 2010 elections, an elected member of parliament, albeit spending most of his time in Iran.[11] Under al-Muhandis, KH has developed as a compact movement of less than 400 personnel that is firmly under IRGC Qods Force control and maintains relatively good operational security.[12]

*Asaib Ahl al-Haq*
Asaib Ahl al-Haq (AAH) emerged between 2006 and 2008 as part of an effort by the IRGC Qods Force to create a popular organization similar to Lebanese Hizb Allah that would be easier to shape than Moqtada al-Sadr's uncontrollable Jaysh al-Mahdi (JAM) movement.[13] AAH was built around one of al-Sadr's key rivals, a protégé of al-Sadr's father called Qais al-Khazali who had consistently opposed al-Sadr's cease-fire agreements with the U.S. and Iraqi militaries. After AAH undertook the kidnap and murder of five U.S. soldiers on January 20, 2007, al-Khazali was captured by coalition forces alongside his brother Laith Khazali and Lebanese Hizb Allah operative Ali Musa

Daqduq in Basra on March 20, 2007.[14] In time, al-Khazali was transferred to Iraqi custody and then released in exchange for kidnapped Briton Peter Moore on January 5, 2010.[15] Although far less senior in the IRGC Qods Force hierarchy than al-Muhandis and 20 years his junior, Qais al-Khazali could become a significant political force in mainstream politics and is being courted by both al-Maliki and al-Sadr precisely because he has the capability to draw away a portion of Moqtada's supporters if he so chooses.

During al-Khazali's absence in prison, AAH played a delicate game, balancing the need to negotiate for the release of detainees against the desire of many AAH members to continue attacking U.S. forces. Like its predecessor, Jaysh al-Mahdi, AAH is becoming a catch-all for a wide range of militants who seek to engage in violence for a host of ideological, sectarian or purely commercial motives.[16] Notorious Special Group commanders such as Sadrist breakaway Abu Mustapha al-Sheibani (whose real name is Hamid Thajeel al-Sheibani) and infamous Shi`a warlord Abu Deraa (whose real name is Ismail al-Lami) are reported to be returning from Iran to join AAH.[17]

*Promised Day Brigades*
The Promised Day Brigades (PDB) are the least understood of the major Iranian-influenced Shi`a militant groups. In theory, PDB is a Shi`a nationalist militia that provides Moqtada al-Sadr's militant followers a way to justify staying within his organization while reserving the theoretical right to fight U.S. forces. In practice, many purported members of PDB appear to collaborate with KH and AAH organizers to participate in small numbers of attacks on U.S. forces.[18]

*Badr Organization*
Although the Badr Organization is a major political organization with seats in the new parliament, it also arguably plays a significant role in facilitating Special Group operations in Iraq. When it was formed in the early 1980s, the Badr movement was, in effect, the first Special Group.[19] A proportion of senior Special Group commanders such as Abu Mahdi al-Muhandis are Badr personnel, with long-standing ties to current Badr leader Hadi al-Amiri. After 2003, Badr became the part of the IRGC Qods Force that was selected to "work openly" within the new Iraq. Badr inserted hundreds of its Iranian-trained operatives into the state security organs (notably the Ministry of Interior intelligence structure and key special forces and Iraqi Army units). As a result, the Special Groups have regularly received tip-offs and targeting guidance from their "fellow travelers" in the Badr movement.[20]

**Iran's Changed Approach**
The period since 2003 has witnessed a balance of Iranian successes and failures in its proxy operations in Iraq. On the one hand, Iran has kept up military pressure on U.S. forces in Iraq and has demonstrated its ability to destabilize key areas. On the other hand, Iranian paramilitary involvement in Iraq is widely resented by Iraqis and has contributed to the downturn in the political fortunes of pro-Iranian parties such as the ISCI, driving other Shi`a blocs (such as al-Maliki's Da`wa Party) to distance themselves from Iran.

This trend was most clear in the early months of 2007 when Iran's political allies in Iraq issued a demarche to the IRGC Qods Force to scale back its support of Iraqi militias. After Lebanese Hizb Allah's successful "summer war" against Israel in July 2006, the IRGC Qods Force sought to replicate this victory in Iraq, opening the floodgates to provide advanced Explosively-Formed Projectile (EFP) munitions and other weapons to a wide range of Shi`a Islamist factions. The

9 "Treasury Designates Individual, Entity Posing Threat to Stability in Iraq;" "Study about the Disloyal Badr Corps 9," p. 71.

10 Ibid.

11 See the brief article recounting a meeting with al-Muhandis by Thomas Strouse, "Kata'ib Hezbollah and the Intricate Web of Iranian Military Involvement in Iraq," *Terrorism Monitor* 8:9 (2010).

12 Personal interview, U.S. intelligence analyst, Baghdad, July 3, 2010. Also see "ISF Campaigns Against Kata'ib Hezbollah Weapons Smuggling, Rocket-Attack Network Along Iraq-Iran Border," press release, United States Forces – Iraq, February 12, 2010.

13 For a good study on AAH, see Marisa Cochrane Sullivan, "Asaib Ahl al Haq and the Special Groups," Institute for the Study of War, January 13, 2009. Jaysh al-Mahdi was uncontrollable—to both Moqtada al-Sadr and Iran—because it grew so rapidly and under such chaotic conditions in post-Saddam Iraq. Unlike the Badr Corps, an organization designed by the IRGC Qods Force over a period of years, JAM quickly incorporated criminal elements and untrained civilians into a sprawling and loosely-structured movement in a number of months.

14 U.S. Brigadier General Kevin Bergner, "Press Briefing, July 2," Multinational Force-Iraq, July 2, 2007.

15 Ned Parker and Saad Fakhrildeen, "Iraq Frees Shiite Militant in Exchange for Briton, Followers Say," *Los Angeles Times*, January 6, 2010.

16 Personal interview, U.S. intelligence analyst, Baghdad, July 3, 2010.

17 Ma'ad Fayad, "Iraq: Notorious Shiite Warlord Returns to Baghdad," *al-Sharq al-Awsat*, August 18, 2010; "Iraq: Return of Sheibani's Killer Squads," United Press International, September 30, 2010.

18 Personal interview, U.S. Central Intelligence Agency analyst, Washington, D.C., February 2010; Bill Roggio, "Iranian-Backed Shia Terror Group Remains a Threat

in Iraq: General Odierno," *The Long War Journal*, July 13, 2010.

19 "Study about the Disloyal Badr Corps 9," pp. 255-330.

20 Since 2003, the author has seen literally dozens of U.S. and British intelligence documents highlighting the Badr role in paramilitary operations in Iraq.

PX251

result was internecine assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006, all Shi`a-on-Shi`a political killings using EFPs. The IRGC resolved to narrow its support for groups to more trusted entities after rival Shi`a groups began fighting in the shrine city of Karbala in late August 2007, which was the final straw for Iraq's Shi`a political and religious leaders.[21]

The re-think of Iranian support to Iraqi militants has had far-reaching effects. The development of alternatives to the out-of-control Jaysh al-Mahdi is one reason why new formations such as KH and AAH were developed. The need to place Iraqis in leadership roles is another factor, reflecting arrests of IRGC personnel in Iraq in 2005-2007, which showed that it was too risky to deploy significant numbers of Iranian IRGC personnel or even Lebanese Hizb Allah operatives to Iraq.[22] According to U.S. and Iraqi security force interviewees, the IRGC Qods Force centralized its resupply operations to KH and AAH cells, adding a system of accounting for Iranian-supplied weapons. This meant moving from the "pull" system—where Iraqis came to ask a cell leader for weapons—to a more secure and selective "push" system, where the cell leader would allocate weapons to well-paid and experienced fighters who were known to be reliable. Each major arms cache now has a "hide custodian" who signs out weapons such as EFPs and is responsible for their proper use against U.S. forces and the minimization of Iraqi casualties. Money continues to be provided in significant volumes, allowing cells to be paid between $4,000 and $13,000 per rocket or roadside bomb attack, depending on the circumstances.[23] Communications

security and operational security are aided by the compact size of cells.

A constant feature of Iran's policy for more than 20 years has been the importance of uninterrupted cross-border resupply for Iran's proxies in Iraq. The broad outlines of cross-border movement have not changed greatly from the early 1990s in many places. The general principle is that personnel and equipment move through official points of entry (POE) whenever

> **"The most visible symbol of Iran's support is the 20-30 rocket attacks launched against U.S. bases each month in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists."**

possible. For personnel, this is almost always possible due to the primitiveness of Iraq's customs and immigration services and due to the combined effects of corruption and professionally-forged documentation. Until the introduction of U.S.-provided vehicle scanning equipment, the Special Groups could bring weapons and explosives into Iraq through the POE on flatbed trucks, concealed beneath herds of sheep or bags of cement.[24] Even now, corruption and the slow degradation of the equipment make it possible to use border crossings to bring specialized equipment such as the milled copper cones for EFP munitions into the country.

The use of professional smugglers is an age-old Iranian practice, involving cross-border tribes and corrupt border guards. Smuggling boats make daylight transits of the Hawr al-Howeiza, marshes in Maysan Province, with rockets and other equipment concealed under tarpaulins covered with fishing gear and fresh fish.[25] On land, the key routes continue to be the Badra area of Wasit Province, the northern Maysan border at multiple points, and eastern Basra (south of Majnoon and north of Shalamcheh).[26] Iran's armed forces support border crossings with a number of means, including use of its own unmanned aerial vehicles, helicopters, long-range optics, signals intelligence and intimidation firing to discourage Iraqi border guard patrolling.[27]

**Operations and Tactics**

Iran's support to Special Groups appears to be largely focused on anti-U.S. resistance operations as opposed to other types of sectarian and factional violence. The most visible symbol of Iran's support is the 20-30 rocket attacks launched against U.S. bases each month in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists.[28] The IRGC has been supporting such attacks since the early 1980s, when Badr was supplied with rockets to use in Iraq during and after the Iran-Iraq War. Although local sourcing of rockets is undertaken whenever possible, most rocket artillery rounds in Iraq are too degraded to function properly. This has led Iran to smuggle large numbers of

---

21 Greg Hoadley, "Sadrists Fume After Karbala Clashes: At Least 50 Dead in Fighting; Millions of Pilgrims Flee," Iraq Slogger, August 28, 2008. The added detail on Iraqi-Iranian discussions is based on personal interviews. See personal interview, U.S. Central Intelligence Agency analyst, Washington, D.C., February 2010.

22 The most notable instance was the detention of five Iranian intelligence personnel in Arbil. See James Glanz, "GI's in Iraq Raid Iranians' Offices," *New York Times*, January 12, 2007.

23 This section reflects interview material gathered by the author from a range of Iraqi security force intelligence and operational personnel in Iraq during visits in 2008, 2009 and 2010. Also see personal interview, U.S.

Central Intelligence Agency analyst, Washington, D.C., February 2010.

24 Personal interview, U.S. intelligence analyst, date and location withheld. The author also has unclassified documentary analyses of smuggling tactics produced by coalition intelligence officers.

25 Ibid. The author also has numerous photographic and map references developed by U.S. and Iraqi security forces that show exact crossing routes and identify cache sites and "hide custodians."

26 Ibid.

27 Ibid.

28 The Iranian government does not appear to be unduly concerned about plausible deniability, deploying new Iranian-produced "signature" weapons across Iraq. The U.S. government has released many photographic slideshows of newly-produced weapons systems in Iraq that are known to be manufactured by Iran. See the previously referenced briefing slides from Brig. Gen. Kevin Bergner for one example. The author has many weapons intelligence images that have not been released, including images from caches that were kept under surveillance after having been observed entering Iraq from Iran via boat.

PX251

**CTC SENTINEL**   NOVEMBER 2010 . VOL 3 . ISSUE 11-12

107mm Hesab and 122mm Grad rockets into Iraq, as well as some larger 240mm Fajr rockets.[29] Although the mechanical reliability of firing switches (usually mechanical timers) is low—with up to half of each planned salvo often failing to fire—reduced U.S. air cover plus less effective Iraqi ground patrolling are allowing greater numbers of indirect fire attacks on U.S. bases.[30]

The sophistication of indirect fire attacks is also increasing. In Baghdad and other cities, Special Groups tend to make greater use of 60mm and 81mm mortars to precisely target small U.S. Joint Security Stations.[31] Banks of Improvised Rocket-Assisted Mortars (IRAM) have been used to great effect against urban U.S. bases in Baghdad and Amara.[32] Efforts have also been made to increase the effectiveness of rocket attacks by launching horizontally at close range from within parked vehicles, launching at shallow angles to reduce warning and prevent interception by close-in weapons systems, or by overwhelming defenses with salvoes of 16-20 truck-launched rockets.[33] Although indirect fire attacks are largely a harassment weapon, they have caused five fatalities to U.S. personnel and contractors in the last year.[34]

The other visible sign of Special Group activity are roadside bombs. At present, these are almost entirely targeted on U.S. military vehicles plus the distinctive personal security detail vehicles that service U.S. reconstruction officials (which carry electronic countermeasures not seen on other vehicles). As a signature weapon

for Iranian-backed groups, EFPs are employed carefully to reduce Iraqi casualties. Due to this restriction plus the reduced number of U.S. targets on Iraq's roads, the incidence of EFP use has dropped from around 60 per month at the height of the "surge" in 2007 to an average of 17 per month in the first nine months of 2010.[35] To access U.S. targets, EFP cells have activated in areas where they were previously rarely encountered such as in Abu Ghurayb, Khalis and Muqdadiyya (in Diyala Province), and Kirkuk.[36]

Per incident lethality has declined significantly since 2008 due to U.S. countermeasures and less effective weapons assembly and emplacement capabilities. Sporadic shortfalls in EFP components are apparent in the varying sophistication and composition of devices. Iranian-made C4, identifiable through chemical analysis, is less frequently used in EFPs today; more often the main charge is composed of five to 40 pounds of unidentified bulk explosive.[37] The EFP "liners" (the metal cone used to form the penetrator) come in up to a dozen sizes, with diameters between 2.75 inches and 16 inches.[38] The liners are largely better-quality copper cones, although some steel liners are used and some multiple-array devices have included a mix of copper and steel liners.[39]

Despite the downscaling of EFP operations, the "engineer" cells capable of assembling EFPs and mounting such attacks continue to show signs of adaptation. Cells in Basra, Baghdad and along the main Supply Route Tampa South (between Baghdad and the Kuwaiti border) switch attack sites to match the movement patterns of U.S. units. The cells attempt to overcome U.S. countermeasures by offsetting the aiming points for devices (to take into account the "rhino" booms on U.S. vehicles), angling devices upwards to strike windows, and elevating devices

up lampposts and within T-walls or abandoned checkpoints to avoid the booms.[40] Cells also show adaptability in their combination of EFP elements (such as passive infrared firing switches) with claymore-style direction fragmentation charges.[41] Large-caliber "daisy-chained" artillery shells (122mm to 155mm) are also periodically used to target U.S. vehicles. The highest quality Special Group bomb-maker cells active in Iraq appear to be based in northern Baghdad, Basra and in the Suq ash Shuyukh area, a marshland market town east of Nasiriyya that was a Badr stronghold throughout the Saddam era and a notorious den of thieves for hundreds of years before then.[42]

A final and even murkier aspect of the Special Groups is their involvement with the deliberate killings of Iraqis. In the past, this aspect of Special Group activity has brought significant criticism onto Iran and its proxies. Although some Iraqis are killed in Special Group operations (as unintended civilian deaths in rocket or roadside bombing attacks or Iraqi Army deaths when joint U.S.-Iraqi patrols are bombed), deliberate targeting of Iraqis appears to be rare and selective. Evidence from arms caches suggests that Iranian-backed groups that stockpile EFP components and other Iranian signature weapons (240mm rockets, for instance) also maintain stocks of silenced pistols and under-vehicle magnetic IEDs ("sticky bombs").[43] These assassination tools suggest that some "direct action" is still undertaken against Iraqis to serve the political agenda of Iranian proxies or Iran's direct interests, or that such action could be undertaken again in the future.

29  This data is drawn from Olive Group intelligence reports gathered between 2006-2010.

30  This data is drawn from Olive Group Iraq Monthly Intelligence Report June 2010 and Olive Group Iraq Monthly Intelligence Report August 2010.

31  This data is drawn from Olive Group intelligence reports gathered between 2006-2010.

32  IRAMs usually consist of 8-14 propane cylinders filled with C4 explosive, propelled by 107mm rocket motors. Although often inaccurate, they can be lethal. On April 28, 2008, a barrage of 14 IRAMs killed two U.S. personnel and injured 16 in Baghdad. For details, see Ernesto Londono, "U.S. Troops in Iraq Face a Powerful New Weapon," Washington Post, July 10, 2008.

33  This data is drawn from Olive Group intelligence reports gathered between 2006-2010.

34  Personal interview, Olive Group analyst, October 10, 2010.

35  This data is drawn from Olive Group intelligence reports gathered between 2006-2010.

36  This data is drawn from Olive Group intelligence reports gathered in 2010.

37  Personal interviews, U.S. intelligence analysts and weapons intelligence specialists, dates and locations withheld.

38  Ibid.

39  Ibid.

40  Ibid.

41  Ibid.

42  Ibid.

43 See the August 1, 2010 cache that was found in Zubayr, near Basra. As well as 76 rockets, 15 tons of TNT and significant amounts of bomb-making materiel, the cache included 41 magnets for making under-vehicle IEDs and silenced weapons. This information is based on Olive Group Basra Daily Intelligence Report, August 1, 2010.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

**Outlook for the Special Groups**

The political situation in Iraq will have a significant effect on the further evolution of Special Groups. If, as seems likely, Moqtada al-Sadr joins key Iranian-backed parties such as Badr in the new government, many elements of PDB, AAH and KH will probably be drawn into the security forces as Badr personnel were in the post-2003 period. Some types of violence (such as rocketing of the government center in Baghdad) may decline, while targeted attacks on U.S. forces would persist or even intensify due to the new latitude enjoyed by such groups. Kidnap of Western contractors or military personnel has been the subject of government warnings during 2010 and could become a significant risk if U.S.-Iran tensions increase in coming years. Sectarian utilization of the Special Groups to target Sunni nationalist oppositionists could become a problem once again. If Iraqi government policy crosses any "red lines" (such as long-term U.S. military presence in Iraq, rapid rearmament or anti-Iranian oil policy), the Special Groups could be turned against the Iraqi state in service of Iranian interests, showering the government center with rockets or assassinating key individuals.

As has been shown throughout the Islamic Republic of Iran's 30-year engagement in Iraq, however, other Iraqi militant groups will continue to chart their own course and will make and break cease-fires according to their own interests.

*Dr. Michael Knights is the Lafer fellow at The Washington Institute for Near East Policy. He has been writing on Iraq since the 1990s and is the author of four books and the editor of one anthology on Saddam-era and post-war Iraq. Dr. Knights has operated extensively in Iraq as the head of analysis at Olive Group, a security provider with more than 2,000 days of consecutive operations in Iraq.*

# Fragmentation in the North Caucasus Insurgency

By Christopher Swift

THE OCTOBER 19, 2010 attack on the parliament building in Grozny, Chechnya's capital city, underscores the ferocity and tenacity of the North Caucasus insurgency. Timed to correspond with a visit by Russian Interior Minister Rashid Nurgaliev, the assault killed four and injured 17. The perpetrators took no hostages, issued no statements, and made no demands. Each died by his own hand, detonating explosive vests during the initial attack and following the ensuing firefight with Interior Ministry (MDV) forces.[1]

This short-lived siege followed a series of similar attacks across the Russian Federation. On March 29, two Dagestani *shahidki* attacked the Lubyanka and Park Kultury metro stations in Moscow, killing 40 commuters and wounding more than 100.[2] On March 31, a double suicide bombing in the Dagestani city of Kizlyar killed 12 and injured 23.[3] On May 26, a suicide attack on a concert hall in Stavropol killed seven and injured another 40.[4] Finally, on September 9, a suicide attack by Ingush militants in Vladikavkaz killed 16 and injured 140.[5]

The frequency and intensity of these attacks illuminate a persistent, low-level insurrection. According to Russian Interior Minister Nurgaliev, insurgent attacks in Dagestan have killed 89 police officers and wounded 264 in the last year alone.[6] Similar trends are evident in Ingushetia, where more than 400 police officers and 3,000 civilians were killed during the last five years.[7] Even Kabardino-Balkaria has succumbed to insurgent violence, with a May 1 bombing in the capital Nalchik killing one victim and wounding another 29.[8]

Until recently, Chechnya was the exception to this rule. Backed by the Kremlin, Chechen President Ramzan Kadyrov ruthlessly yet effectively suppressed the secessionist insurgency through a mixture of aggressive counterterrorism tactics and repressive state surveillance. Amnesties and patronage reinforced Kadyrov's authority, with some rebels abandoning the insurrection and others joining pro-Kremlin militias. As recently as February 2009, the 34-year-old Chechen strongman appealed to exiled militants to return home.[9] Kadyrov even appropriated religion, implementing a state-sponsored Islamization campaign in an effort to undermine Islamist and Salafist activism. From prohibiting alcohol and promoting polygamy, to mandating Islamic attire and religious education in Chechen schools, the result has been an uncertain mixture of superficial Shari`a and secular autocracy.

The Chechen parliament siege raises serious questions about Kadyrov's stabilization strategy. Despite Chechnya's relative autonomy and substantial federal support, secessionist impulses still persist. It also reveals important new developments within the insurgency itself. Coming just two months after the August 29 assault on Tsentoroi, Kadyrov's home village, the attack on Chechnya's parliament marks a shift from the diffuse bombing and ambushes witnessed in recent years to a more focused strategy targeting the Chechen regime. That focus, in turn, reflects ethnic and operational fragmentation within the Caucasian Front. With prominent field commanders challenging separatist leader Doku Umarov's authority, the North

---

1 "Terrorist Attack on Chechen Parliament in Grozny," RIA Novosti, October 19, 2010.

2 "Moscow Metro Bombing Masterminds 'Will Be Destroyed,'" BBC, March 29, 2010.

3 "12 killed, 23 Hospitalized in Dagestan Blasts," RIA Novosti, March 31, 2010.

4 "Death Toll from South Russia Terrorist Attack Reaches 6," RIA Novosti, May 27, 2010.

5 "Chislo postradavshikh vo vremya terakta vo Vladikavkaze previisipo 160 chelovek," Interfax, September 10, 2010.

6 James Broder, "Gunmen Attach Chechen Parliament, 6 Reported Dead," Voice of America, October 19, 2010.

7 "Ingushetia Militants Announce Moratorium on Killing Police," Radio Free Europe/Radio Liberty, October 6, 2010.

8 "Nalchik Bombing Classed as Terrorist Attack," RIA Novosti, May 1, 2010.

9 Muslim Ibragimov, "President of Chechnya Calls Former Militants Back Home from Europe," Caucasian Knot, February 6, 2009.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

Caucasus insurgency may be assuming a more localized, compartmentalized character.

This article examines that fragmentation in three stages. First, it describes the formation and limitations of the Caucasus Emirate and its military wing, the Caucasian Front. Second, it discusses the growing tensions between Umarov and three of the Front's leading field commanders. Third, it examines the operations undertaken by this breakaway faction, as well as the implications this schism could have for Islamic militancy in the wider region. The article concludes by evaluating the role of local agendas and national identities in limiting collaboration between militants, including those with a common ideology and adversary.

### The Virtual Emirate
Protracted armed conflict has had a pernicious radicalizing effect across the North Caucasus. Launched in 1992 as an anti-colonial movement, the Chechen rebellion swiftly splintered into nationalist and Islamist factions with competing agendas and irreconcilable ideologies. By 1996, the quasi-autonomous Chechen Republic of Ichkeria (ChRI) found itself mired in an internecine battle between these two groups, with nationalists advocating a constitutional republic within the boundaries of Chechnya's recognized borders, and Islamists imagining a regional emirate that would unify the North Caucasian Muslims under a system of Islamic law. Renewed hostilities with Russia gradually empowered the latter faction, with atrocities on both sides reinforcing notions of a perpetual, existential conflict between Muslims and non-believers.

This radicalization coincided with the decline of traditional Sufi orders, the diminution of the ChRI's military capacity, and the diffusion of insurgent violence to neighboring Muslim-majority republics. It also undermined the moderate ChRI leadership, with regional field commanders such as Umarov abandoning their ethno-nationalist agenda in favor of a more globalized Salafist outlook. By the time Umarov assumed command of the ChRI in June 2006, the insurgency had devolved into a series of loosely-coordinated *jama`ats* operating in

Dagestan, Ingushetia, and Kabardino-Balkaria, and even in the Orthodox Christian enclave of North Ossetia.

These conditions set the stage for Umarov's repudiation of the ChRI in October 2007 and subsequent declaration of a multiethnic Caucasus Emirate dedicated to "establishing Shari`a in its land and expelling the *kuffar*."[10] This decision de-nationalized the Chechen rebellion, reducing Chechnya to a mere province, or *vilayat*,

> **"The attack on Chechnya's parliament marks a shift from the diffuse bombing and ambushes witnessed in recent years to a more focused strategy targeting the Chechen regime."**

within the newly-established Emirate. Prompting swift and unequivocal condemnation from ChRI officials in the West, it drew an indelible line between the insurgency's Islamist and nationalist wings.[11]

Umarov's declaration also challenged Chechen parochialism. Eager to attract foreign support and volunteers, the self-styled *amir* expressed solidarity with Muslims "fighting in Afghanistan, Iraq, Somalia, and Palestine" while denouncing the United States, the United Kingdom, Israel, "and all those waging war against Islam and Muslims" as his enemies.[12] The result was a shift from localized forms of Islamist resistance to a delocalized Salafist ideology that framed jihad in pan-Islamic and increasingly millenarian terms.

This shift produced limited results. Despite endorsements from prominent Salafist ideologues including Abu Muhammad al-Maqdisi and Abu

Basir al-Tartusi, the number of foreign fighters participating in the Caucasian Front continued to decline.[13] Furthermore, Umarov's appeals to pan-Islamic solidarity failed to establish clear lines of command and control. Rather than augmenting the Chechen struggle, Ingush, Dagestani and other militants pursued their own local agendas under a nominal Chechen figurehead.

### Diffusion and Fragmentation
Limited capacity perpetuates these problems. As a virtual state, the Caucasus Emirate lacks the defined territory or fiscal-military apparatus associated with robust, self-sustaining insurgencies. This explains the overreliance on ambushes, suicide attacks, and other provocative operations. Unable to impose and enforce their will, local *jama`ats* resort to theatrical violence aimed a provoking authorities and educating the masses. The result is an erratic pattern of insurrection, rather than a coordinated insurgency.

Equally important, however, is the Emirate's failure to galvanize indigenous aspirations and identities. On one level, Umarov's homogenized Salafist tropes create common cause among like-minded militants. They also open new avenues for self-radicalizing volunteers, including Muslims from other post-Soviet societies. Yet they have not produced the patterns of sustained social and political mobilization necessary to field an effective fighting force. United by a common ideology but divided into discrete ethnic and geographic entities, Umarov's imagined community lacks meaningful cohesion.

These deficiencies inform the fragmentation now evident in the Caucasian Front. Starting in late spring 2010, Chechen field commanders Aslambek Vadalov and Hussein Gakayev challenged Umarov's leadership, arguing that major decisions should be made by a war council, or *majlis*, rather than by decree.[14] Joined by Ingush commander

---

10 "Amir Dokka's Statement of the Declaration of the Caucasian Emirate," Kavkaz Center, November 22, 2007.

11 Akhmed Zakayev, "Statement by the Minister for Foreign Affairs for the Chechen Republic of Ingushetia," Chechenpress.com, October 31, 2007.

12 "Amir Dokka's Statement of the Declaration of the Caucasian Emirate."

13 Cerwyn Moore and Paul Tumelty, "Foreign Fighters and the Case of Chechnya: A Critical Assessment," *Studies in Conflict and Terrorism* 31:5 (2008).

14 "Clarification of Emir Dokku Abu Usman in Connection with the Fitna Among the Mujahedeen," Kavkaz Center, October 18, 2010.

PX251

CTC SENTINEL                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

Tarkhan Gaziev, Vadalov and Gakayev sought greater autonomy, including the appointment of an independent Chechen *amir*.

These challenges precipitated a leadership crisis. On July 24, Umarov resigned and appointed Vadalov as his successor.[15] Citing health concerns, he explained that "the jihad should be led by younger and more energetic commanders."[16] This announcement was a watershed, illuminating operational and perhaps even generational differences long obscured by triumphant jihadist rhetoric. Yet within days, the Emirate's Kavkaz Center information agency reported that Vadalov's appointment was merely a proposal. On August 4, Umarov repudiated his resignation, calling it "completely fabricated" and arguing that it was "not possible to step down" given conditions in the North Caucasus.[17]

The ensuing struggle drew clear lines between two increasingly irreconcilable factions. Led by Vadalov, Gakayev and Gaziev renounced their allegiance to Umarov.[18] Umarov subsequently issued orders dismissing this newly-formed troika from their offices within the Emirate. The Emirate's supreme *qadi* also intervened, with Seyfullah Gubdensky issuing a statement confirming Umarov as the insurgency's sole legitimate leader. "[A] single province of the Caucasus Emirate has no right, according to Shari`a, to appoint or remove the *amir*," Seyfullah argued, "and if they try to do so, they become bugats and sinners."[19] Yet by August the damage was already done, with more than 20 local commanders flocking to the troika's banner.[20]

**Parochial Priorities**
At first blush, the troika's repudiation of the Caucasus Emirate suggests a resurgent Chechen nationalism. Exiled ChRI officials initially welcomed the split, with the London-based Akhmed Zakayev describing Vadalov as a fellow patriot who rejected Umarov's strategy of targeting civilians.[21] Some Russian analysts adopted a similar view, noting that collaboration between Zakayev's ChRI and Vadalov's faction could open the way for a revitalized Chechen secessionist movement.[22]

Such speculation remains premature. Although Vadalov, Gakayev, and Gaziev repudiated Umarov and abandoned the Emirate, they still espouse a radical Islamist agenda. Moreover, their close and continuing collaboration with the foreign Arab fighter Khaled Yusef Muhammad al-Emitat (also known as Muhannad) indicates a strong Salafist outlook. These facts indicate fragmentation, not transformation. Rather than reverting to secular nationalism, the troika is merely pursuing a more parochial agenda.

This agenda involves a simplified target set. Unlike Umarov, who speaks of liberating Astrakhan and the Volga region,[23] the troika emphasizes Chechnya and the Kremlin-backed Chechen regime. On September 3, for example, Vadalov and Muhannad released a video confirming their role in the August 29 Tsentoroi operation.[24] On October 20, the MVD implicated Gakayev's forces in the attack on the Chechen Parliament.[25] Combined with propaganda reviving ethnocentric terms such as "Ichkerii" and "Nokhchii," these operations suggest a re-animation of the same intra-Chechen struggles that once dominated the North Caucasus insurgency.

The re-localization of Chechen resistance carries serious consequences for the Caucasus Emirate. On one level, the troika's withdrawal exposes the weaknesses in Umarov's multiethnic coalition. Although neither faction has come to blows, their rhetoric and mutual recrimination suggests little room for meaningful collaboration. The move also isolates smaller insurgent groups such as Yarmouk in Kabardino-Balkaria and Kataib al-Khoul in North Ossetia from Jama`at Shari`at in Dagestan. These conditions invite new alignments. With Umarov increasingly dependent on Gubdensky and other Jama`at Shari`at commanders, Dagestan could become the locus for future Emirate operations.

These observations focus greater attention on indigenous factors—on the aspirations that inform Islamic militancy and the resentments that fuel it. The fact that senior Chechen commanders would repudiate the Caucasus Emirate reveals an ethnic parochialism at odds with cosmopolitan notions of jihad. Far from subordinating themselves to a pan-Islamic enterprise, the troika appears to be selectively adapting globalized ideologies to their own highly localized agenda.

The net result is a change in policy and strategy, rather than a reversion to ethno-nationalist ideology. Yet the outcome may ultimately prove much the same. By distinguishing themselves as an essentially Chechen endeavor, the troika elicits support from a discrete, concrete community with a long history of grievances. By targeting Kadyrov, they give those grievances a tangible, immediate outlet. Informed by nearly two decades of chronic, persistent conflict, the troika's parochialism may succeed where Umarov's pan-Islamism failed.

*Christopher Swift is Fellow at the University of Virginia Law School's Center for National Security Law. His forthcoming book examines the role of local insurgencies in al-Qa`ida's global jihad.*

---

15 "Amir IK Dokku Abu Usman obyavil o svoem preem-nike. Im stal Amir Aslambek," DhamaatTakbir.com, July 24, 2010.

16 "CE's Emir Dokku Abu Usman Resigned and Appointed Aslambek Vadalov Emir of the Caucasus Emirate," Kavkaz Center, August 1, 2010.

17 "Emir of the Caucasus Emirate Dokku Abu Usman Cancels His Resignation, Calling it Fabricated, and Makes Special Statement on this Occasion," Kavkaz Center, August 4, 2010.

18 "Aslambek Vadalov Resigns as Deputy Emir of Caucasus Emirate," Kavkaz Center, August 13, 2010.

19 "CE Supreme Judge, Emir of Dagestan Province Seyfullah: 'Emir Dokku Abu Usman is the Sole Legitimate Ruler,'" Kavkaz Center, August 13, 2010.

20 "Madzhis Amirov Vilaiata Nokhchiichov," Daymohk.

org, August 2010.

21 Marina Golovinina, "New Chechen Rebel Leader is No Terrorist, Says Ally," Reuters, August 3, 2010.

22 "Akhmed Zakayev svyazal ukhod Umarpova c potereii doveriya boevikov," Lenta.ru, August 3, 2010.

23 "Caucasus Emirate's Emir Dokka Abu Usman: 'We Will Liberate the Krasnodar Territory, Astrakhan and the Volga Lands...'" Kavkaz Center, March 8, 2010.

24 "Amirii mudzhakhedov Ichkerii," Chechenews.com, September 3, 2010.

25 "Probable Organizer of Grozny Attack Named by Chechen Government," Russia Today, October 20, 2010.

PX251

**CTC SENTINEL**   NOVEMBER 2010 . VOL 3 . ISSUE 11-12

# Assessing the Success of Leadership Targeting

By Austin Long

WAR IS FUNDAMENTALLY a clash of organizations. Organizations provide the vital mechanisms that mobilize and convert resources into combat power as well as applying that combat power against the enemy.[1] This is true not only of conventional militaries, but also of insurgent and terrorist groups.[2] One operational technique deployed against insurgent and terrorist groups seeks to destroy or cripple the organization by targeting senior and mid-level leadership. In particular, this technique has been a major component of the U.S.-led campaigns in Iraq and Afghanistan.[3] This technique, termed leadership targeting, has attracted a modest amount of recent scholarship seeking to evaluate its effectiveness.[4]

Yet despite its policy importance, leadership targeting remains understudied. This is especially true of leadership targeting in Iraq and Afghanistan, and it is in part due to the high levels of secrecy that surround these efforts as well as the general difficulty in evaluating the effects of such targeting on clandestine organizations operating in war zones. More can be done, however, to develop both the theoretical understanding of these efforts and also the empirical picture of what has and is happening in Iraq and Afghanistan.

This article begins with the argument that the key variable in determining the overall effectiveness of leadership targeting is the level of institutionalization of the organization targeted. Moreover, this is true not only of insurgent or terrorist groups targeted, but also of groups opposed to such organizations that are targeted by insurgents or terrorists. This argument is then illustrated by evidence and vignettes from Iraq.

**The Importance of Institutionalization**
In combat, whether conventional or not, all organizations lose leadership at various levels. On the Eastern Front in World War II, for example, the German Army suffered massive losses among its officer corps. Omer Bartov estimates that from May 1942 to May 1945, the elite Grossdeutschland Division suffered casualties among its officers equivalent to three or four times its initial complement.[5] Yet even this is an understatement of the scale and speed of leadership casualties among the division's frontline combat units. The division's Sixth Grenadier Company had 10 different leaders from July 26 to September 5, 1943. During the course of fighting on March 8-9, 1944, the company had three different commanders.[6] In November 1942, the 2nd Battalion of the division's 2nd Infantry Regiment "lost its commander, adjutant, as well as all company and platoon commanders in the course of one single Russian artillery barrage which lasted only twenty minutes."[7]

Despite these ferocious casualties, the Grossdeutschland Division was able to continually replace leaders and remained a coherent and effective combat unit, serving as a mobile reserve for much of the Eastern Front until almost the end of the war.[8]

What explains the Grossdeutschland Division's ability to remain an effective combat force despite loss of leadership? The answer is that it could efficiently and effectively replace its lost leaders due to institutionalization.[9] Institutionalization requires two elements. The first is the existence of hierarchy and specialization in the organization. The second is that authority and position in the organization derives from that hierarchy. These two factors allow the organization to routinely and smoothly replace lost leaders.

This process is so normal and routine in conventional military organizations that it is simply taken for granted. Yet it is also applicable to other organizations such as insurgent groups or anti-insurgent militias. These organizations are not equally institutionalized, and therefore variation in the effects of the loss of leadership should be expected. This leads to a simple testable hypothesis. Organizations that are well-institutionalized should be expected to suffer only temporary disruption from losing leadership, while groups that are poorly institutionalized should be crippled or even collapse when subjected to a leadership targeting campaign.

The coding used for "institutionalization" will be based on whether an organization exhibits functional specialization, hierarchy, and bureaucratic processes for conducting operations.[10] An

1 Allan R. Millet, Williamson Murray, and Kenneth Watman, "The Effectiveness of Military Organizations," *International Security* 11:1 (1986); Martin van Creveld, *Fighting Power: German and U.S. Army Performance, 1939-1945* (Westport, CT: Greenwood Press, 1982).

2 Mary Anderson, Michael Arnsten, and Harvey Averch, *Insurgent Organization and Operations: A Case Study of the Viet Cong in the Delta, 1964-1966* (Santa Monica, CA: RAND Corporation, 1967); Nathan Leites and Charles Wolf Jr., *Rebellion and Authority: An Analytic Essay on Insurgent Conflicts* (Santa Monica, CA: RAND Corporation, 1970); Jeremy M. Weinstein, *Inside Rebellion: The Politics of Insurgent Violence* (New York: Cambridge University Press, 2007); Abdulkader H. Sinno, *Organizations at War in Afghanistan and Beyond* (Ithaca, NY: Cornell University Press, 2008).

3 Graham Turbiville, *Hunting Leadership Targets in Counterinsurgency and Counterterrorist Operations* (Hurlburt Field, FL: Joint Special Operations University Press, 2007); Michael T. Flynn et al., "Employing ISR: SOF Best Practices," *Joint Forces Quarterly* 50 (2008); Seth Jones, *In the Graveyard of Empires: America's War in Afghanistan* (New York: W.W. Norton, 2010); Mark Urban, *Task Force Black: The Explosive True Story of the SAS and the Secret War in Iraq* (London: Little, Brown, 2010).

4 Jenna Jordan, "When Heads Roll: Assessing the Effectiveness of Leadership Decapitation," *Security Studies* 18:4 (2009); Michael Freedman, "The Headless Horseman: A Theoretical and Strategic Assessment of Leadership Targeting," paper presented at the 2010 International Studies Association Convention; Alex Wilner, "Targeted Killings in Afghanistan: Measuring Coercion and Deterrence in Counterterrorism and Counterinsurgency," *Studies in Conflict and Terrorism* 33:4 (2010).

5 Omer Bartov, *The Eastern Front, 1941-45: German Troops and the Barbarisation of Warfare* (New York: Palgrave, 2001), p. 16.

6 Ibid., p. 17.

7 Ibid.

8 For an overview of the division's operations, see James Lucas, *Germany's Elite Panzer Force: Grossdeutschland* (London: Macdonald and Jane's, 1978).

9 On the institution for replacing lost German Army officers, see William S. Dunn, *Heroes or Traitors: The German Replacement Army, the July Plot, and Adolf Hitler* (Westport, CT: Praeger, 2003), pp. 1-14.

10 The coding is binary, with each of the three attributes either coded as present or absent. This is clearly an abstraction, as these attributes are actually continuous rather than binary. However, this abstraction should be valid for at least a plausibility probe of the hypothesis. Functional specialization is coded based on the presence or absence of specialized sub-units (such as those focused on recruitment or finance) and/or a division

PX251

organization that possesses these attributes will be coded as "well-institutionalized," while one that does not will be coded as "poorly institutionalized." The remainder of this article tests this hypothesis with a series of vignettes from Iraq.[11]

**The Iraqi Case**
In Iraq, Anbar Province was the heartland of the Sunni insurgency from 2003-2007. The insurgency in Anbar had multiple organizations, with some more institutionalized than others. Al-Qa`ida in Iraq (AQI) was, in 2004, a new organization but one that was rapidly institutionalizing, creating hierarchy and specialization through a system of *amirs* (leaders), who by 2006 were functionally specialized and existed in a hierarchical order with bureaucratic processes for conducting operations (as evidenced by copious captured documents and computer records).[12] For example, AQI in a given town or region would be led by an overall *amir*, who was supported by an administrative *amir*, a military *amir*, a media *amir*, and possibly others depending on the time and place. There were also specific sub-units within the organization dedicated to bringing foreign fighters into the country and to generating revenue through various licit and illicit activities. These *amirs* both directed local cells beneath them and reported to more senior leadership. In short, by 2006 at the latest AQI was a well-institutionalized organization.

Yet in 2004 other organizations existed and were at least as potent in terms of raw manpower and assets. One organization in particular was the Falluja Shura Council, headed by Abdullah Janabi, a prominent cleric. Yet unlike AQI, which was seeking to institutionalize, the Falluja Shura Council relied heavily on Janabi's personal gravitas and charisma (*wasta*) to hold the organization together. There is no evidence it developed functional specialization or more than a very loose hierarchy, much less any bureaucratic

> **"Well-institutionalized organizations such as AQI have proven extraordinarily resistant to even sustained leadership targeting efforts, suffering disruption but able to continually replace lost leaders."**

procedures. Janabi, along with AQI's Omar Hadid, was one of the primary leadership targets when coalition forces launched Operation al-Fajr (The Dawn) to retake Falluja in November 2004. Omar Hadid was killed and Janabi was forced to flee Iraq and has not returned. As a result, the Falluja Shura Council collapsed, while AQI regrouped in other parts of Iraq, including Ramadi and al-Qaim.[13]

In Ramadi, AQI, led by an Iraqi known as Abu Khattab, came into conflict with local tribal leaders as well as other insurgent groups. By the end of 2005, this conflict had turned violent, with AQI engaging in skirmishes with members of the nationalist 1920 Revolution Brigade affiliated with the cleric Muhammad Mahmoud Latif, and with tribal elements including the Anbar People's Committee affiliated with the prominent Shaykh Nasir al-Fahadawi. Like the Falluja Shura Council, the Anbar People's Council relied heavily

on the *wasta* of Shaykh Nasir and Muhammad Mahmoud Latif, with little evidence of institutionalization.

AQI's response to this resistance was to unleash its own leadership targeting campaign, which killed both Shaykh Nasir and nearly killed Mohammed Mahmoud Latif, who was forced to flee Iraq. In the same time period, Abu Khattab was killed along with other AQI leaders. The effects of these leadership losses varied greatly. AQI continued to grow in strength in 2006, while the Anbar People's Committee collapsed and other tribal leaders were cowed into ceasing resistance against AQI, at least temporarily.[14]

The situation in Ramadi began to change in the summer of 2006 when some tribal leaders were able to mitigate AQI's ability to target them by allying with the United States.[15] These tribal leaders, along with U.S. forces, continued to target AQI's leadership. Yet AQI remained combat effective, even preparing to launch a massive assault on Ramadi in June 2007.[16]

AQI successfully targeted one of the main leaders of the Ramadi resistance, Shaykh Sattar al-Rishawi, in late 2007, but by that time the U.S. military had enabled some institutionalization to the resistance (principally by having tribesmen join the police or quasi-police units called Provincial Security Forces).[17] Shaykh Sattar's death in late 2007 therefore had substantially less effect (although it did provoke frictions among potential successors) than it likely would have had a year earlier. Leadership targeting has continued by both sides in 2010, with AQI continuing to show resilience while anti-AQI

---

of labor among leaders along functional lines (e.g. the military staff system with officers focused on personnel, intelligence, operations, logistics, etc.). Hierarchy is coded based on the presence of clear chains of command and reporting derived from position in the organization rather than personal charisma or traditional authority. Bureaucratic process is coded based on the presence or absence of record-keeping, standard operating procedure, creation and distribution of codes of conduct or lessons learned. An organization where all three are present is coded as highly institutionalized; all others are coded as poorly institutionalized.

11 In addition to specific citations, these vignettes are amplified by the author's personal experience and interviews in Iraq in 2007-2008.

12 On AQI organization, see Jacob Shapiro, "Bureaucratic Terrorists: Al Qaida in Iraq's Management and Finances," and Anonymous, "Smuggling, Syria, and Spending," in Brian Fishman ed., *Bombers, Bank Accounts, and Bleedout: Al Qaida's Road In and Out of Iraq* (West Point, NY: Combating Terrorism Center, 2008).

13 "Two Locals Headed Fallujah Insurgency," Associated Press, November 24, 2004; Carter Malkasian, "Signaling Resolve, Democratization, and the First Battle of Fallujah," *The Journal of Strategic Studies* 29:3 (2006).

14 "Marine Corps Assessment of Iraq Situation," *Washington Post*, February 2, 2007; "AQI Situation Report," declassified, translated internal AQI document, available at www.ctc.usma.edu/aq/pdf/IZ-060316-01-Trans.pdf; Toby Harnden, "US Army Admits Iraqis Outnumber Foreign Fighters as its Main Enemy," *Daily Telegraph*, December 3, 2005; "Tearing Down al-Qaida in Iraq," press briefing, Multi-National Force-Iraq, December 2006.

15 Austin Long, "The Anbar Awakening," *Survival* 50:2 (2008); John A. McCary, "The Anbar Awakening: An Alliance of Incentives," *Washington Quarterly* 32:1 (2009).

16 Ann Scott Tyson, "A Deadly Clash at Donkey Island," *Washington Post*, August 19, 2007.

17 Alissa Rubin, "Sheik's Allies Vow Revenge for His Killing," *New York Times*, September 15, 2007.

PX251

groups (known as the Sons of Iraq) are reporting defections to AQI at least in part because U.S. forces and the government of Iraq are not acting to mitigate AQI's leadership targeting.[18]

A final vignette illustrates the differing effect of leadership targeting on well-institutionalized versus poorly institutionalized organizations. On June 26, 2008, a major meeting of shaykhs,

> **"This does not mean that leadership targeting has no effect on well-institutionalized organizations. It is still disruptive at a minimum as even very effective replacement of leaders is not instantaneous."**

political figures, and coalition forces in Karma, a small town northeast of Falluja, was struck by a suicide bomber (presumed to be an AQI affiliate). The blast killed several prominent Iraqis and Americans, including the respected mayor of Karma and a U.S. Marine battalion commander.[19] The battalion commander was almost immediately replaced, on an interim basis, by one of his subordinates. In contrast, the attack created turmoil in the local tribe, the al-Jumayli. While it did not kill the tribe's shaykh, it substantially intimidated and discredited him. After some deliberation, during which the tribe's ability to act was limited, the shaykh was effectively sidelined in favor of a respected kinsman of a more martial bent.

---

18  Jane Arraf, "Two Iraq Al Qaeda Leaders Killed: Did They Really Get Abu Omar al-Baghdadi?" *Christian Science Monitor*, April 19, 2010; Timothy Williams and Duraid Adnan, "Sunnis in Iraq Allied With U.S. Quitting to Rejoin Rebels," *New York Times*, October 16, 2010.

19  Hannah Allam and Jamal Naji, "3 Marines Among Dead in Attack on Iraqi Tribal Leaders," McClatchy Newspapers, June 26, 2008; Sam Dagher, "SUVs and Rifles," *New York Times*, January 23, 2009.

## Conclusion

The foregoing is suggestive at best but does support the hypothesis. Well-institutionalized organizations such as AQI have proven extraordinarily resistant to even sustained leadership targeting efforts, suffering disruption but able to continually replace lost leaders. In contrast, poorly institutionalized organizations, both insurgent and anti-insurgent, appear vulnerable to leadership targeting.

This does not mean that leadership targeting has no effect on well-institutionalized organizations. It is still disruptive at a minimum as even the effective replacement of leaders is not instantaneous. Furthermore, such efforts also exert a suppressive effect on leaders, as they must undertake extensive security measures to avoid being targeted. Yet these are tactical and operational rather than strategic effects. In terms of President Barack Obama's declared goal of "disrupting, dismantling, and defeating" al-Qa`ida, leadership targeting, whether carried out by special operations forces in Afghanistan or drones in Pakistan, can create disruption and temporary dismantling, but it cannot defeat the organization.

For policymakers, this in turn suggests that expectations and resource allocation should be managed with an eye to the institutionalization of both hostile and allied organizations. If confronted by poorly institutionalized insurgent organizations, leadership targeting can have a substantial effect and should be resourced accordingly. However, dedicating massive resources to leadership targeting of well-institutionalized groups, while under-resourcing efforts to protect poorly institutionalized but useful anti-insurgent organizations, appears sub-optimal.

*Austin Long is an Assistant Professor at the School of International and Public Affairs and a Member of the Arnold A. Saltzman Institute of War and Peace Studies at Columbia University. He was previously an Associate Political Scientist at the RAND Corporation. While at RAND, he served in Iraq as an analyst and adviser to Multinational Force-Iraq's Task Force 134/Detention Operations and the I Marine Expeditionary Force.*

## Revolution Muslim: Downfall or Respite?

By Aaron Y. Zelin

IN JULY 2010, Zachary Chesser was arrested in the United States for trying to join Somalia's al-Shabab terrorist group. His arrest brought attention to a U.S.-based extremist group operating in the New York City area, known as Revolution Muslim, of which Chesser was a member.[1] Chesser's arrest, however, appears to be the apex that disguised the seeming decline of Revolution Muslim. After suffering a series of leadership problems and disputes, Revolution Muslim was increasingly used by UK-based extremists seeking to skirt British hate speech and incitement laws by using the U.S.-based Revolution Muslim website to distribute their literature and notifications of public events.[2] The violent calls by British extremists eventually led to the shutdown of the Revolution Muslim website in November 2010. Shortly after, Revolution Muslim's leader said that the group had been disbanded, and he announced the creation of a new, supposedly more moderate organization, called Islam Policy.

Since this transition is recent, it is too early to determine whether Revolution Muslim will follow in the footsteps of the British group al-Muhajiroun by returning to confrontation merely under a different name, or if it will follow a model closer to groups such

---

1  See, for example, Paul Cruickshank's article in the *CTC Sentinel* that provided a detailed explanation and analysis of the roots of the Revolution Muslim group in the United Kingdom, its evolution in the United States, and how the organization had led to recent arrests of American jihadists. See Paul Cruickshank, "The Growing Danger from Radical Islamist Groups in the United States," *CTC Sentinel* 3:8 (2010).

2  The United Kingdom's policing of websites that host extremist content is much stricter than in the United States, where the First Amendment provides significant protection to extremist discourse. For example, when speaking about the extremist content of Yemeni-American cleric Anwar al-`Awlaqi, UK Baroness Neville-Jones said, "The websites in which feature his [al-`Awlaqi] terrorist message would categorically not be allowed in the UK. If they were hosted in the UK they would be taken down." For details on that quote, see Jim Wolf, "Britain Urges U.S. to Take Down Extremist Websites," Reuters, October 26, 2010.

PX251

as Hizb al-Tahrir, Tabligh Jama`at, or the Muslim Brotherhood by adopting a less hostile posture. This article recounts the factors that led to the recent demise of Revolution Muslim, while also providing insight on its new incarnation, Islam Policy.

### Leadership Disputes

Revolution Muslim was founded by Yousef al-Khattab[3] and Younes Abdullah Muhammad[4] in late 2007 and early 2008.[5] In late 2009, al-Khattab resigned as *amir* (leader) of Revolution Muslim, reportedly due to the radical direction that Younes was taking the group.[6] Al-Khattab subsequently promoted Abdullah as-Sayf as the new *amir* while Younes was away in Saudi Arabia. Upon Younes' return to the United States in April 2010, however, he forcefully retook the reins of leadership and removed as-Sayf from the organization because of as-Sayf's Sufi leanings. Younes designated himself as the sole *amir*.[7]

Exacerbating the leadership disputes, three members of the group were arrested in the United States in June and July 2010. On June 6, Carlos Eduardo Almonte and Mohamed Mahmood Alessa were apprehended while trying to leave the United States to join al-Shabab.[8] Similarly, on July 21, Zachary Chesser was arrested for the same crime.[9] Following Chesser's arrest, Younes went "underground," likely due to fear of further law enforcement action. While Younes was underground, British jihadists seemingly took an

even greater role in the dissemination of content on the Revolution Muslim website, moving the group in an even more radical direction and eventually causing the website's demise.

### Rise of British Influence

The content on Revolution Muslim's website could be divided into four categories: news, original articles, upcoming events, and propaganda materials. When Revolution Muslim first came online in 2008, much of its

> "It appears that the overzealousness of British extremists helped lead to the demise of the Revolution Muslim website."

content highlighted key daily news articles, which they called *Akbar al-Yawm* (news of the day), along with its "Street Daw'ah" (outreach) efforts in the New York City metropolitan area. Examples of the larger "Street Daw'ah" events included boycotting Starbucks due to the company's alleged ties with Israel, protesting the sentencing and alleged mistreatment of Aafia Siddiqui, and an outreach event in front of Wall Street following the collapse of the economy in 2008 to highlight the injustices of the capitalist system.[10] The website posted many writings from Yemeni-American cleric Anwar al-`Awlaqi, as well as speeches from Jamaican cleric Abdullah al-Faisal.

Although Revolution Muslim's website had always featured content relevant to both the British and American Muslim extremist scenes, beginning in April 2010 that content had more of a British bent. Since April, the Revolution Muslim website highlighted 15 events and protests in Britain, in contrast to

only three in the United States.[11] For example, Muslims Against Crusades, an al-Muhajiroun successor group, organized an event in Westminster titled "One Law for All...Shar'iah [sic]" in June.[12] The Muslims against Crusades also announced an "Emergency Demonstration" on the Revolution Muslim website in late July in response to an alleged report, which is not cited on the website, regarding the murder of innocent Muslims.[13] The Revolution Muslim website also started posting more content from Islam4UK and from Shaykh Omar Bakri Mohammed, the founder of al-Muhajiroun who is now exiled in Lebanon but still active with British jihadists. Additionally, only one of the three events announced in the United States were actually organized or associated with Revolution Muslim. Moreover, during this period there was no longer information or content about "Street Daw'ah" events in the New York city area.

---

3  Yousef al-Khattab is a Jewish convert to Islam from New Jersey.

4  Younes Abdullah Muhammad is a convert to Islam, and he reportedly received a degree in international affairs from Columbia University.

5  According to J.M. Berger, the Revolution Muslim website domain was registered in December 2007. The website went live in January 2008 and was originally a forum, but was later changed to a blog format in April 2008.

6  For more details, read al-Khattab's explanation on his personal website, available at www.yousefalkhattab.com/p/why-i-left-revolution-muslim.html.

7  Ibid.

8  Perry Chiaramonte, C.J. Sullivan, Murray Weiss, and Chuck Bennett, "Bloodlust of NJ 'Jihadists,'" *New York Post*, June 7, 2010.

9  Andrew Lebovich, "The LWOT: FBI Arrests 'Revolution Muslim' Writer; Gitmo Prisoner Forced to Return to Algeria is Missing," *Foreign Policy*, July 22, 2010.

10  For more on the *da`wa* activities mentioned, see: "Starbucks Boycott Trailer," Revolution Muslim, February 18, 2008; "Protest – Court Hearing for Aafia Siddiqui," Revolution Muslim, August 25, 2008; "A Rally for Aafia Siddiqui and Other Muslim Political Prisoners in America!" Revolution Muslim, May 4, 2010; "Dawa Tour – Wall Street," Revolution Muslim, September 23, 2008.

11  The British events, along with the date announcement was posted on the Revolution Muslim website, included: "International Day in Support of Victims of Torture, the London Guantánamo Campaign," June 25, 2010; "Ummah Rise: Demonstration to Defend the Symbols of Islam," June 30, 2010; "Ummah Rise," July 21, 2010; "UK Women Only Conference; Burqa or no Burka? 11th July 2010," June 29, 2010; "Islamic Conference: State Terrorism: 24 July 2010," July 7, 2010; "Football Tournament," July 25, 2010; "Demonstration: Today, 5th August," August 4, 2010; "Shariah4Pakistan - Demonstration Against Traitor: Asif Ali Zardari in London," August 19, 2010; "Slave to the Streets - Today, 27th August 2010 - Ramadhan Conference," August 25, 2010; "International Burn the American Flag Day 2010: Demonstration In Response To Burn The Quran Day On 9/11 @ 1pm," September 11, 2010; "Conference: Ramadan-The Month of Victory," August 31, 2010; "Muslims Confront Pope Benedict XVI - Saturday 18 September Demonstration in London," September 18, 2010; "Islamic Revival Conference," November 2, 2010. The U.S. events, along with the date announcement was posted on the Revolution Muslim website, included: "Protest Netanyahu in New York City," July 6, 2010; "Stand with Lynne Stewart - The Lawyer of Omar Abdul Rahman," July 14, 2010; "Global Islamic Conference: Today, 31st July 2010," July 30, 2010.

12  Al-Muhajiroun (which now goes under other alias names) was founded by Omar Bakri Muhammad who fled London following the 7/7 attacks and was recently arrested in Lebanon. Currently, Anjem Choudary leads al-Muhajiroun and the group's current primary alias is "Muslims Against Crusades."

13  "Emergency Demonstration," Revolution Muslim, July 26, 2010.

PX251

CTC SENTINEL    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

It appears that the reason for the increase in content related to the United Kingdom is that British Muslims were using the U.S.-based Revolution Muslim website to skirt recent hate speech and incitement laws that have hampered their activities in the United Kingdom. In 2006 and 2007, British authorities passed two laws that made it increasingly difficult to distribute material that could be viewed as hate speech or incitement to crime or terrorism. The Racial and Religious Hatred Act of 2006 amended the Public Order Act of 1986 by adding Part 3A, which prohibits "a person who uses threatening words or behavior, or displays any written material which is threatening, is guilty of an offence if he intends thereby to stir up religious hatred."[14]

Although the intent of the hate speech law was not necessarily established to curb anti-Christian or anti-Jewish rhetoric, it created an issue for British Muslim extremists who were distributing such materials on the internet.[15] Furthermore, a year and a half later, the Serious Crime Act of 2007 legislation passed, replacing the British common law crime of incitement with a statutory offense of encouraging or assisting crime.[16] Along with the former law, it became harder for al-Muhajiroun successor groups (such as Islam4UK, The Savior Sect, and al-Ghuraba) to cross the boundaries of hate speech or incitement using UK-hosted servers, as UK hosting companies apparently remove such content quickly. As a result of these laws, British Muslim extremists have used foreign web servers, including those in the United States, to disseminate their content.[17] Revolution Muslim was part of this trend.

Nevertheless, it appears that the overzealousness of British extremists helped lead to the demise of the Revolution Muslim website. On November 3, one of the website's users, Bilal Ahmad, published a "hit list" of UK parliamentary members who voted for the war in Iraq.[18] Two days later, the Revolution Muslim website was suspended, reportedly by its hosting company at the prompting of U.S. and UK government officials.[19]

**The Dawn of Islam Policy**
On November 12, more than a week after the suspension of the Revolution Muslim website, Younes returned to the public spotlight. He announced the formation of a new group, Islam Policy, into which Revolution Muslim would be absorbed. Younes also said that the days of abrasive outreach activities were over, and that a new strategy had to be adopted. The suspension of the Revolution Muslim website apparently made Younes realize that he needed to take the U.S.-based extremist scene in a new direction: "I have been going through some personal alterations with regard to physical, mental and spiritual space and was eager to alter some of the approach I had been being informed of when this recent spate of bad news hit."[20] Younes said that the Islam Policy website will focus more on educating individuals so that they can better understand the issues important to Muslims and thus make more coherent arguments to promote their ideological beliefs.

On November 20, Younes released a new treatise for Islam Policy, titled "On Crafting Islamic Policy: The Methodology of Islamic Social Science."[21] It would be a worthwhile study for practitioners to compare this new tract with Younes' essay titled "By All Means Necessary," which he wrote on December 7, 2008. This might shed light on whether Islam Policy is truly breaking from Revolution Muslim or continuing that cause using innuendo and less confrontational tactics.

**Conclusion**
Although Revolution Muslim's website is down and Younes seems to be taking its successor group in a new direction, the Britons who helped create Revolution Muslim are still using U.S.-hosted websites to disseminate their content.[22] This tactic could become an innovative model for other European jihadists who live in countries with strict hate speech and incitement laws.

Despite the apparent decline of Revolution Muslim and its confrontational tactics, the domestic terrorism threat to the United States has not diminished. The recent case of Somali-American Mohamed Osman Mohamud, who attempted to detonate what he believed was an explosives-laden vehicle near a tree-lighting ceremony in Portland on November 26, is demonstrative of this. Lessons from past extremist movements show that many of Revolution Muslim's more radical followers may not agree with Younes' seemingly less confrontational direction. Indeed, this is one reason why Almonte, Alessa, and Chesser chose to travel to Somalia to fight with Somalia's al-Shabab. For them, fighting the jihad with words was not enough.

*Aaron Y. Zelin is a research assistant in the Department of Politics at Brandeis University and maintains a blog at Jihadology.net.*

---

14 Racial and Religious Hatred Act 2006 (c. 1), United Kingdom Statute Law, February 16, 2006.

15 The law that passed in 2006 was the third time the UK Parliament attempted to pass it into legislation. The Labor Party first tried in the 2001 Anti-Terrorism, Crime and Security Bill and later in the 2004-2005 Serious Organised Crime and Police Bill.

16 Serious Crime Act 2007 (c. 27), United Kingdom Statute Law, October 30, 2007.

17 The reason U.S. web hosting companies are especially popular (compared to hosting companies in other countries) is because they are more reliable and have less downtime.

18 "MPs That Voted for War on Iraq," Revolution Muslim, November 3, 2010; Bilal Ahmad, a member of Islam4UK (a successor group to al-Muhajiroun), was arrested on November 10 for publishing the hit list post. Ahmad was charged under the The Racial and Religious Hatred Act of 2006 since his post was actionable incitement. Most cases are merely "incitement," so the police/security services prefer monitoring the individuals since they do not represent an immediate threat. For more, see "Man Arrested over Website Listing Iraq War MPs," BBC, November 10, 2010.

19 James Gordon Meek and Alison Gendar, "Local Jihadist Website Tied to Terror Thugs Returns Under New Name, IslamPolicy.com," *New York Daily News*, November 21, 2010.

20 "Announcement from IslamPolicy.com - on Transfer from RevolutionMuslim," Islam Policy, November 12, 2010.

21 "IslamPolicy.com – On Crafting Islamic Policy: The Methodology of Islamic Social Science," Islam Policy, November 20, 2010.

22 To name a few, the following websites, which are based in the United Kingdom, are hosted on web servers in the United States: Salafi Media; Muslim's Against Crusades; Izharudeen; Authentic Tawheed; and The Tawheed Movement.

PX251

**CTC SENTINEL**    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

## Recent Highlights in Terrorist Activity

**October 1, 2010 (GLOBAL):** Usama bin Ladin purportedly released a new audio message, titled "Pauses with the Method of Relief Work." In the message, Bin Ladin criticized flood relief efforts in Pakistan, saying, "Millions of children are out in the open air, lacking basic elements of living, including drinking water, resulting in their bodies shedding liquids and subsequently their death." He said there was a need for action against climate change, saying that global warming was causing "great catastrophes throughout the Islamic world." – *Reuters, October 1*

**October 1, 2010 (IRAQ):** Ali al-Maliki, the chief of security for southern Iraq, warned that the Islamic State of Iraq (ISI) plans to attack "a number of oil facilities" in the country. – *UPI, October 1*

**October 1, 2010 (PAKISTAN):** Approximately 20 militants destroyed at least 27 NATO supply trucks in Shikarpur in Sindh Province. – *The News International, October 2*

**October 2, 2010 (GLOBAL):** Usama bin Ladin purportedly released a second audio statement in two days, again warning of the dangers of climate change. Bin Ladin discussed the cost and equipment necessary to build embankments to control flooding. He also criticized affluent Muslim countries for not providing more assistance to Pakistanis in the wake of catastrophic flooding. – *New York Times, October 2*

**October 2, 2010 (PAKISTAN):** A U.S. drone strike killed nine militants from the Badar Mansur group in Datta Khel of North Waziristan Agency in the Federally Administered Tribal Areas. – *New York Times, October 2*

**October 2, 2010 (PAKISTAN):** A U.S. drone strike killed eight militants in Datta Khel of North Waziristan Agency in the Federally Administered Tribal Areas. It was the second drone strike of the day. – *New York Times, October 2*

**October 3, 2010 (UNITED STATES):** The U.S. State Department issued a travel alert for U.S. citizens in Europe due to increased concern about the possibility of a large-scale al-Qa`ida attack on the continent. According to the *Los Angeles Times*, "Intelligence officials in the U.S. and Europe have said an increase in activity in recent weeks suggests that a small cell of potential terrorists hiding in North Waziristan, a Pakistani tribal region, is preparing an attack [in Europe] that could be as spectacular as the 2008 raids in Mumbai, India, that killed 166 people." – *Los Angeles Times, October 4*

**October 3, 2010 (ITALY):** Officials in France announced that Italian police arrested a French national in early September suspected of having links to a network recruiting fighters for Afghanistan. The man, identified as Riahd Hennouni, was arrested in Naples in southern Italy. Italian newspapers reported that Hennouni is 28-years-old, of Algerian origin, and a possible member of al-Qa`ida. – *AP, October 3; CNN, October 4*

**October 3, 2010 (PAKISTAN):** Assailants on motorcycles sprayed bullets at 28 NATO oil tankers near Islamabad, causing the tankers to catch fire. Six people were killed in the attack. – *The News International, October 4*

**October 4, 2010 (JORDAN):** A Jordanian military court sentenced Nabil Mohammed Amer to life in prison for leading a cell that plotted attacks against the country's army and intelligence services. Nine others were jailed for 15 years in prison as part of the plot, which involved plans to kidnap the children of intelligence officers. – *BBC, October 4; Bloomberg, October 4*

**October 4, 2010 (PAKISTAN):** Approximately 20 tanker trucks carrying fuel for NATO troops in Afghanistan were attacked at a depot in Islamabad. At least three people were killed during the pre-dawn incident. The Pakistani Taliban claimed responsibility. – *Voice of America, October 4*

**October 4, 2010 (PAKISTAN):** Two gunmen on motorcycles torched two NATO supply trucks in Baluchistan Province. – *Voice of America, October 4*

**October 4, 2010 (PAKISTAN):** A U.S. drone strike killed at least eight militants in Mir Ali in North Waziristan Agency of the Federally Administered Tribal Areas. A number of German nationals were reportedly among the dead. – *Voice of America, October 4*

**October 4, 2010 (PHILIPPINES):** The United States assured the Philippines that it will maintain its military presence in the country until the al-Qa`ida-linked Abu Sayyaf Group is defeated. – *AFP, October 4*

**October 5, 2010 (FRANCE):** French authorities arrested 12 men suspected of having ties to al-Qa`ida and terrorism. – *Jerusalem Post, October 5*

**October 5, 2010 (AFGHANISTAN):** NATO forces announced the capture of a Taliban leader "directly involved" in the kidnapping of *New York Times* journalist Stephen Farrell in September 2009. The militant was identified as the Taliban's district leader for Chahar Darah district in Kunduz Province. He was captured in Takhar Province. – *CNN, October 5*

**October 5, 2010 (SAUDI ARABIA):** Al-Qa`ida in the Arabian Peninsula (AQAP) threatened to launch new attacks against Saudi royal family members. AQAP warned, "We say to the tyrants that we can get you in your offices, we can get you in your bedrooms. I advise you to check before going to bed that there's no suicide bomber or bomb in the room." – *AFP, October 5*

**October 6, 2010 (YEMEN):** A rocket-propelled grenade struck a British diplomatic vehicle in Sana`a, wounding three people. The vehicle was carrying Britain's deputy ambassador to Yemen, Fionna Gibb. She escaped unhurt. The attack occurred on Khawlan Street in the capital. Authorities suspect that al-Qa`ida in the Arabian Peninsula was responsible. – *AFP, October 5; Daily Telegraph, October 7*

**October 6, 2010 (AFGHANISTAN):** Afghan and NATO forces killed 20 Taliban fighters in Takhar Province. – *UPI, October 7*

PX251

October 6, 2010 (PAKISTAN): Approximately 77 NATO supply tankers were attacked by militants in Nowshera District of Khyber-Pakhtunkhwa Province. Some 54 tankers were completely destroyed in the incident. – *The News International, October 8*

October 6, 2010 (PAKISTAN): Militants attacked a NATO truck terminal in Quetta, Baluchistan Province, destroying 20 oil tankers. – *The News International, October 7*

October 7, 2010 (UNITED STATES): U.S. Admiral Michael Mullen, the chairman of the Joint Chiefs of Staff, said that the U.S. military will "continue to raise the pressure and certainly seek to kill or capture the top two [leaders] in Al-Qaeda." He also said that al-Qa`ida "has been significantly diminished over the course of the last two or three years but by no means are they no longer lethal." – *AFP, October 7*

October 7, 2010 (AFGHANISTAN): A suicide bomber killed one German soldier in Baghlan Province. – *BBC, October 7*

October 7, 2010 (PAKISTAN): Two suspected suicide bombers killed at least nine people at a crowded Sufi shrine in Karachi, Pakistan's most populated city. – *Reuters, October 7; CNN, October 8*

October 8, 2010 (UNITED STATES): The U.S. Immigration and Customs Enforcement announced that Mohammed Warsame, who pled guilty in the United States in May 2009 to providing material support to al-Qa`ida, has been deported to Canada. Warsame, who was born in Somalia, trained at an al-Qa`ida military camp and attended lectures delivered by Usama bin Ladin. He is a naturalized Canadian citizen. – *Fox News, October 8*

October 8, 2010 (AFGHANISTAN): A suspected suicide bomb ripped through a mosque in Takhar Province, killing 20 people including the governor of Kunduz Province. – *AP, October 8*

October 8, 2010 (PAKISTAN): A U.S. drone strike killed six militants in the Miran Shah area of North Waziristan Agency in the Federally Administered Tribal Areas. – *CNN, October 8*

October 9, 2010 (PAKISTAN): Approximately 30 militants attacked NATO supply tankers in Bolan district of Baluchistan Province, destroying 29 tankers. – *The News International, October 10*

October 10, 2010 (AFGHANISTAN): Afghan President Hamid Karzai told reporters that his government is in talks with the Taliban in hopes of finding a political settlement to the country's conflict. He said, "The Taliban, those of whom who are Afghans and the sons of Afghan soil who have been driven to violence by various factors beyond their control... we want them to come back to their country. They are like kids who have run away...from the family. But those who are a part of Al Qaeda and the other terrorist networks who are ideologically against us or who are working against Afghanistan knowingly and out of the purpose of hatred and enmity, those of course we have to work against." – *Christian Science Monitor, October 11*

October 10, 2010 (PAKISTAN): A U.S. drone strike killed seven militants at a compound in Shewa district of North Waziristan Agency in the Federally Administered Tribal Areas. – *Dawn, October 10*

October 12, 2010 (GLOBAL): Al-Qa`ida in the Arabian Peninsula released the second issue of its English-language magazine, *Inspire*. The issue includes two articles from Yemeni-American cleric Anwar al-`Awlaqi. The issue offers a number of tips on how to kill Americans in the United States, including opening fire on lunch-hour crowds in Washington, D.C. to "knock out a few government employees." – *AP, October 12; NPR, October 12*

October 12, 2010 (UNITED STATES): The trial of accused terrorist Ahmed Ghailani opened in New York City. Ghailani is accused of involvement in the 1998 bombing of the U.S. Embassy in Tanzania. – *Voice of America, October 12*

October 12, 2010 (YEMEN): Qasim al-Raymi, a leader of al-Qa`ida in the Arabian Peninsula (AQAP), said in an audio recording that the group has created a new army to free Yemen of "crusaders and their apostate agents." The new army has been named the Aden-Abyan Army, and al-Raymi vowed to overthrow the government of President Ali Abdullah Salih. – *Wall Street Journal, October 13*

October 12, 2010 (AFGHANISTAN): Taliban militants fired a rocket at a U.S. helicopter in Kunar Province, wounding eight soldiers and killing an Afghan interpreter. – *AFP, October 12*

October 12, 2010 (IRAQ): The Islamic State of Iraq threatened to kidnap "wives, daughters and sons" of Iraqi politicians and ministers unless the government freed the family of Abu Ayyab al-Masri, who was killed in April 2010. – *AP, October 12*

October 12, 2010 (PAKISTAN): Pakistani Prime Minister Yusuf Raza Gilani said that peace talks between the Afghan government and the Taliban cannot succeed without the assistance of Pakistan. Gilani told reporters that peace talks cannot happen "without us because we are part of the solution. We are not part of the problem." – *AP, October 12*

October 12, 2010 (PAKISTAN): Militants killed three anti-Taliban tribal elders in Mohmand Agency of the Federally Administered Tribal Areas. – *AP, October 13*

October 13, 2010 (PAKISTAN): Pakistani police arrested seven militants who were allegedly planning to assassinate the country's prime minister in a gun and suicide attack at his house. The suspects are accused of being members of Lashkar-i-Jhangvi. – *AP, October 14*

October 14, 2010 (SOMALIA): Somali President Shaykh Sharif Shaykh Ahmad named Somali-American Mohamed Abdullahi Mohamed as prime minister. The country's previous prime minister, Omar Abdirashid Ali Sharmarke, resigned on September 21, 2010. – *New York Times, October 14*

PX251

October 15, 2010 (NORWAY): Norwegian authorities released David Jakobsen from custody after the Supreme Court rejected an attempt by the police to keep him in detention. Jakobsen, who is an Uzbek national, was one of three suspects arrested in July 2010 for involvement in a terrorist plot connected to the same al-Qa`ida operatives behind plots to target the New York subway system and a mall in the United Kingdom. According to the Associated Press, "Prosecutors later revealed that Jakobsen had been a police informant in the case, but he still faces terrorism charges because the allegations against the group rely partly on events that took place before he approached police last year." The Norwegian court ruled that Jakobsen is not a flight risk. – *AP, October 15*

October 15, 2010 (SWEDEN): Authorities charged two men of Somali descent with plotting terrorist attacks in Somalia. Prosecutors allege that the men are linked to al-Shabab. – *Voice of America, October 15*

October 15, 2010 (YEMEN): Yemeni authorities arrested a man accused of financing al-Qa`ida in the Arabian Peninsula. The man, identified as a Yemeni expatriate living in Saudi Arabia, was apprehended at Sana`a International Airport. – *CNN, October 16*

October 15, 2010 (PAKISTAN): Approximately three separate U.S. drone strikes killed 13 militants in North Waziristan Agency of the Federally Administered Tribal Areas. – *CNN, October 16*

October 17, 2010 (WESTERN EUROPE): French Interior Minister Brice Hortefeux told reporters that Saudi Arabia's intelligence services are warning of a new terrorist plot targeting Europe. Saudi officials said that the threat comes from al-Qa`ida in the Arabian Peninsula. – *CNN, October 17*

October 17, 2010 (AFGHANISTAN): Taliban fighters attacked a construction company in Farah Province, kidnapping 20 workers. – *al-Jazira, October 18*

October 17, 2010 (AFGHANISTAN): NATO airstrikes killed Abdul Jamil, who was identified as a Taliban leader for two districts in Baghlan Province. – *CNN, October 19*

October 17, 2010 (MAURITANIA): A Mauritanian court jailed two militants linked to al-Qa`ida in the Islamic Maghreb. – *AFP, October 17*

October 17, 2010 (TAJIKISTAN): Tajik security forces reportedly killed three Islamist militants. An Interior Ministry official said that the three militants had trained at a terrorist camp in Afghanistan and were operating in Tajikistan's Rasht region. – *UPI, October 17*

October 18, 2010 (AFGHANISTAN): Taliban fighters attacked a checkpoint in Helmand Province, killing nine private security guards. All of the guards were Afghan citizens. – *al-Jazira, October 18*

October 18, 2010 (IRAQ): A suicide bomber drove an explosives-laden vehicle into a U.S. military convoy in northern Iraq, killing an Iraqi soldier. – *AFP, October 18*

October 18, 2010 (IRAQ): A bomb ripped through an Iraqi government convoy in Baghdad, killing an official. – *AFP, October 18*

October 18, 2010 (PAKISTAN): Multiple U.S. drones killed at least six militants in the Datta Khel area of North Waziristan Agency in the Federally Administered Tribal Areas. – *Dawn, October 18*

October 18, 2010 (PAKISTAN): Police killed a suicide bomber driving an explosives-laden vehicle in Lakki Marwat District of Khyber-Pakhtunkhwa Province. – *The News International, October 18*

October 18, 2010 (YEMEN): Yemen sentenced Saleh al-Shawish to death for being an al-Qa`ida bomb-maker and for preparing suicide bombers. – *Reuters, October 18*

October 19, 2010 (UNITED STATES): Leon Panetta, the director of the U.S. Central Intelligence Agency, told the media that the CIA's heightened operations in Pakistan have taken a "serious toll" on al-Qa`ida. – *AFP, October 20*

October 19, 2010 (RUSSIA): Militants attacked the parliament building in Grozny, the capital of Chechnya, killing four people. – *RIA Novosti, October 19*

October 20, 2010 (UNITED STATES): Zachary Chesser, who is 20-years-old, pled guilty in the United States to trying to help Somalia's al-Shabab terrorist group and for threatening the writers of the "South Park" television show for their depiction of the Prophet Muhammad. Chesser, who is from Virginia, faces up to 30 years in prison. – *ABC News, October 20; Christian Science Monitor, October 20*

October 20, 2010 (MAURITANIA): A Mauritanian court sentenced Khadim Ould Semane to death for his role in a militant group linked to al-Qa`ida in the Islamic Maghreb. According to Reuters, "Two other members of the group, Sidi Ould Sidna and Marouf Ould Haiba, also were sentenced to death, though both previously had been sentenced to death in May for their roles in the killing of four French tourists in 2007." – *Reuters, October 20*

October 21, 2010 (PHILIPPINES): A bomb exploded aboard a passenger bus in the southern Philippines, killing nine civilians. – *AFP, October 21*

October 22, 2010 (AFGHANISTAN): A bomb ripped through the vehicle of a district governor for Nangarhar Province. The governor, identified as Khorsheed, was killed. – *AFP, October 21*

October 22, 2010 (PAKISTAN): The United States announced that it will release a $2 billion military aid package to Pakistan over a five-year period. Marking the announcement, Secretary of State Hillary Clinton said, "The United States has no stronger partner when it comes to counterterrorism efforts against the extremists who threaten us both than Pakistan." – *al-Jazira, October 22*

October 22, 2010 (TURKEY): Prosecutors in a Turkish court accused a man, only identified by his initials A.K., of having ties to al-Qa`ida and of trying to help militants shoot down

PX251

Heron military drones in Afghanistan. The 23-year-old mathematics student allegedly had software designed to calculate angles of fire and coordinates of the drones. Authorities also found hydrogen peroxide, gunpowder and other bomb-making materials in the suspect's house. – *Wall Street Journal, October 23*

October 23, 2010 (GLOBAL): Al-Qa`ida spokesman Adam Gadahn released a new video message, calling for Muslims living "in the miserable suburbs of Paris, London and Detroit" to carry out attacks there. "It is the duty of everyone who is sincere in his desire to defend Islam and Muslims today, to take the initiative to perform the individual obligation of jihad…by striking the Zio-Crusader interests," he said. – *CBS News, October 23; Fox News, October 25*

October 23, 2010 (GLOBAL): Yemeni-American cleric Anwar al-`Awlaqi released a new video message, saying that Islam is in "severe need for guidance in these dark situations." Only excerpts of the video were released. – *CNN, October 23*

October 23, 2010 (AFGHANISTAN): Four Taliban militants disguised as policemen and women launched a suicide attack against a United Nations compound in Herat city. According to Voice of America, "Witnesses said the four militants arrived at the U.N. compound in a car packed with explosives. Accounts from Afghan officials and U.N. workers indicated that two of the attackers blew themselves up in the car, and a third man wearing a suicide vest killed himself as he entered the compound. Afghan police shot and killed the fourth attacker." No one inside the compound was injured, although at least two Afghan police guarding the facility were wounded. – *Voice of America, October 23*

October 23, 2010 (PAKISTAN): Authorities announced the capture of Rehmatullah, identified as a former bodyguard to Pakistani Taliban leader Hakimullah Mehsud. He was apprehended in Orakzai Agency of the Federally Administered Tribal Areas. – *CNN, October 23*

October 23, 2010 (RUSSIA): A suicide bomber in an explosives-laden vehicle killed one policeman in the southern Russian republic of Dagestan. – *RIA Novosti, October 23; NTD Television, October 25*

October 24, 2010 (YEMEN): Yemen's foreign minister estimates that there are some 400 al-Qa`ida fighters active in the country. – *AP, October 24*

October 25, 2010 (UNITED STATES): Omar Khadr pled guilty in a U.S. military court to killing a U.S. Army sergeant during a battle in Afghanistan. Khadr, who has been detained at Guantanamo Bay for eight years, will be sent to Canada in a year to serve out his sentence as part of his plea agreement. – *AP, October 25*

October 26, 2010 (TURKEY): Turkish authorities announced that they detained 12 people in Istanbul suspected of providing support to al-Qa`ida militants fighting in Afghanistan. – *Reuters, October 26*

October 27, 2010 (GLOBAL): Usama bin Ladin purportedly released a new audio message, threatening to kill French citizens for their country's support of the U.S.-led mission in Afghanistan and for banning face-covering Muslim veils. "How can it be right that you [the French] participate in the occupation of our lands, support the Americans in the killing of our women and children and yet want to live in peace and security?" he said. "It is a simple and clear equation: As you kill, you will be killed. As you capture, you will be captured. And as you threaten our security, your security will be threatened. The way to safeguard your security is to cease your oppression and its impact on our nation, most importantly your withdrawal from the ill-fated Bush war in Afghanistan." – *AP, October 27*

October 27, 2010 (UNITED STATES): U.S. authorities arrested a Pakistan-born, naturalized U.S. citizen in a sting operation where the suspect believed he was part of an al-Qa`ida plot to bomb the Washington, D.C. subway system. The suspect, Farooque Ahmed, also told authorities that he had trained himself in firearms and hand-to-hand combat and was planning to travel to the Pakistan-Afghanistan region to kill Americans. Ahmed moved to the United States in 1993 and lived in Ashburn, Virginia. According to a Reuters report describing the indictment, "From April to October 25, Ahmed allegedly conducted surveillance, videotaped, photographed, and drew diagrams of the Arlington Cemetery, Courthouse, Crystal City and Pentagon City Metrorail stations and offered suggestions about where to place explosives to kill people in simultaneous attacks planned for 2011…He allegedly told an agent posing as an al Qaeda operative that an attack executed between 4 p.m. and 5 p.m. on the Washington Metro would cause the most casualties." – *Reuters, October 28*

October 27, 2010 (PAKISTAN): U.S. drone strikes killed at least six militants in North Waziristan Agency of the Federally Administered Tribal Areas. – *AFP, October 27*

October 27, 2010 (SOMALIA): An al-Shabab firing squad publicly executed two teenage girls in Beledweyne on charges that they had spied for the government. The girls were reportedly 15 and 14-years-old. – *Voice of America, October 28*

October 28, 2010 (FRANCE): France announced that it could begin withdrawing its troops from Afghanistan as early as 2011. French officials insisted that there was "absolutely no link" between the announcement and an October 27 threat delivered against the country by Usama bin Ladin. France has approximately 3,500 troops deployed in Afghanistan, mostly east of Kabul. – *Christian Science Monitor, October 28; Radio France International, October 28*

October 29, 2010 (GLOBAL): Authorities disrupted a major international terrorist plot involving explosives in packages mailed to the United States from Yemen. They were able to disrupt the plot due to intelligence provided by the Saudi Arabian government, which gathered the tip from an al-Qa`ida militant who had surrendered to Saudi authorities. On November 5, al-Qa`ida in the Arabian Peninsula (AQAP) claimed responsibility for the plot. The AQAP statement said, "We will continue to strike blows against

PX251

**CTC SENTINEL**                    NOVEMBER 2010 . VOL 3 . ISSUE 11-12

## CTC Sentinel Staff

**Editor-in-Chief**
Erich Marquardt
Senior Editor, CTC

**Editorial Board**
COL Michael J. Meese, Ph.D.
Department Head
Department of Social Sciences (West Point)

COL Cindy R. Jebb, Ph.D.
Deputy Department Head
Department of Social Sciences (West Point)

LTC Reid Sawyer
Director, CTC

Christopher Heffelfinger
FBI Fellow, CTC

**CONTACT**
Combating Terrorism Center
U.S. Military Academy
607 Cullum Road, Lincoln Hall
West Point, NY 10996
Phone: (845) 667-6383
Email: sentinel@usma.edu
Web: www.ctc.usma.edu/sentinel/

* For Press Inquiries: (845) 667-6383

**SUPPORT**
The Combating Terrorism Center would like to express its gratitude to its financial supporters, for without their support and shared vision of the Center products like the CTC Sentinel could not be produced. If you are interested in learning more about how to support the Combating Terrorism Center, please visit http://www.ctc.usma.edu/support/ or call Wayne Richardson at West Point's Association of Graduates at 845-446-1553.

The views expressed in this report are those of the authors and not of the U.S. Military Academy, the Department of the Army, or any other agency of the U.S. Government.

American interests and the interest of America's allies." – *CNN, October 29; CNN, November 5; Voice of America, November 1*

October 29, 2010 (IRAQ): A suicide bomber attacked a café in Balad Ruz in Diyala Province, killing at least 25 people. The café is known to be popular among Shi`a Kurds. – *Reuters, October 30; AFP, October 29*

October 29, 2010 (PAKISTAN): Militants set fire to a NATO supply truck 12 miles south of Quetta in Baluchistan Province. – *AFP, October 29*

October 29, 2010 (PAKISTAN): Militants opened fire on a NATO supply truck 174 miles south of Quetta in Baluchistan Province. – *AFP, October 29*

October 29, 2010 (MOROCCO): Moroccan security officials announced that they recently disrupted two radical Islamist cells linked to al-Qa`ida in the country. The cells were reportedly plotting attacks in Morocco and recruiting fighters to send to Iraq. One of the cell members is a Yemeni national who allegedly has close ties to al-Qa`ida. – *Reuters, October 29*

October 30, 2010 (INDONESIA): Indonesian authorities announced that they detained Taufik Marzuki, a suspected terrorist behind a number of attacks in Sumatra. Taufik, the head of the Islam Defenders Front of Aceh, was captured last month. – *Jakarta Post, October 30*

October 31, 2010 (IRAQ): Nine militants wearing suicide vests stormed the Church of Our Lady of Salvation in Baghdad's Karrada district. Police entered the church and killed eight of the militants, while the ninth detonated his suicide vest. At least 52 people, including civilians and members of the security forces, were killed. – *Telegraph, November 1; al-Jazira, November 2*

October 31, 2010 (TURKEY): A suicide bomber detonated explosives at the popular tourist spot Taksim Square in Istanbul, injuring at least 30 people. The bomber targeted a bus full of police officers. The Kurdistan Workers' Party denied involvement in the attack. – *Guardian, October 31; Voice of America, November 1*

PX251

PX257

*United States Senate*
### *PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Tom Coburn, Ranking Minority Member*

# U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History

## MAJORITY AND MINORITY STAFF  REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
JULY 17, 2012 HEARING**

PX257

# SENATOR CARL LEVIN
## Chairman

# SENATOR TOM COBURN, M.D.
## Ranking Minority Member

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

**ELISE J. BEAN**
Staff Director and Chief Counsel
**ROBERT L. ROACH**
Counsel and Chief Investigator
**LAURA E. STUBER**
Senior Counsel
**ALLISON ABRAMS**
Detailee
**ERIC WALKER**
Detailee
**KRISTIN GWIN**
Congressional Fellow
**BRIAN EGGER**
Detailee
**ADAM C. HENDERSON**
Professional Staff Member

**CHRISTOPHER J. BARKLEY**
Staff Director to the Minority
**KEITH B. ASHDOWN**
Chief Investigator to the Minority
**JUSTIN J. ROOD**
Senior Investigator to the Minority

| | |
|---|---|
| **JAMIE BENCE** | **MICHAEL WOLF** |
| Law Clerk | Law Clerk |
| **BILL GAERTNER** | **ARIELLE WORONOFF** |
| Law Clerk | Law Clerk |
| **CURTIS KOWALK** | **TAMIR HADDAD** |
| Law Clerk | Intern |
| **KATIE MARTIN-BROWNE** | **SOFIA KNUTSSON** |
| Law Clerk | Intern |
| **WELLESLEY BAUN** | **NOELIA ORTIZ** |
| Law Clerk | Intern |
| **LAUREN ROBERTS** | **JASWANT SINGH** |
| Law Clerk | Intern |

**MARY D. ROBERTSON**
Chief Clerk

9/6/12

PX257

# U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History

## <u>TABLE OF CONTENTS</u>

I.  **EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  **A. Findings**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (1)  Longstanding Severe AML Deficiencies. . . . . . . . . . . . . . . . . . . . . . . . . 10
    (2)  Taking on High Risk Affiliates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (3)  Circumventing OFAC Prohibitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (4)  Disregarding Terrorist Links. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (5)  Clearing Suspicious Bulk Travelers Cheques. . . . . . . . . . . . . . . . . . . . . 10
    (6)  Offering Bearer Share Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (7)  Allowing AML Problems to Fester. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  **B. Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (1)  Screen High Risk Affiliates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (2)  Respect OFAC Prohibitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (3)  Close Accounts for Banks with Terrorist Financing Links. . . . . . . . . . . . 11
    (4)  Revamp Travelers Cheque AML Controls. . . . . . . . . . . . . . . . . . . . . . . . 11
    (5)  Boost Information Sharing Among Affiliates . . . . . . . . . . . . . . . . . . . . . . 11
    (6)  Eliminate Bearer Share Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (7)  Increase HBUS' AML Resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    (8)  Treat AML Deficiencies as a Matter of Safety and Soundness. . . . . . . . . 12
    (9)  Act on Multiple AML Problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    (10) Strengthen AML Examinations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.  **GENERAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  **A. Background on HSBC Group and HBUS** . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  **B. HBUS AML Program** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    (1)  HBUS Compliance and AML Leadership . . . . . . . . . . . . . . . . . . . . . . . . . 21
    (2)  HBUS AML Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III. **HBMX: PROVIDING U.S. ACCESS TO A HIGH RISK AFFILIATE** . . . . . . . . . . . 35
  **A. HSBC Mexico** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
  **B. Mexico**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    (1)  U.S. Assessment of AML Risk in Mexico . . . . . . . . . . . . . . . . . . . . . . . . 39
    (2)  HSBC Assessment of Risk in Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
  **C. HBMX's History of Weak AML Safeguards** . . . . . . . . . . . . . . . . . . . . . . . 48
  **D. HBMX High Risk Clients** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
    (1)  High Risk Money Service Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
        (a)  Casa de Cambio Puebla . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
        (b)  Sigue Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

PX257

       (2)    Cayman Island U.S. Dollar Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
       (3)    Cashing U.S. Dollar Travelers Cheques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
  **E.**  **Bulk Cash Movements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
       (1)    HBUS' Global Banknotes Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
       (2)    HBMX U.S. Dollar Sales to HBUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
       (3)    Remedial Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
  **F.**  **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**IV.**   **HSBC AFFILIATES:  CIRCUMVENTING OFAC PROHIBITIONS** . . . . . . . . . . . 113
  **A.**  **Background on OFAC Prohibitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
  **B.**  **Executing OFAC-Sensitive Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
       (1)    Transactions Involving Iran . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
           (a)   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
           (b)   Concealing Iranian Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . 122
           (c)   Pressuring HBUS on Iran . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
           (d)   Continuing Pressure on HBUS to Process Iranian Transactions . . . . . . . . 133
           (e)   Reaching Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
           (f)   Processing the Iranian Transactions . . . . . . . . . . . . . . . . . . . . . . . . 151
           (g)   Establishing Group-wide Policy . . . . . . . . . . . . . . . . . . . . . . . . . . 156
           (h)   Shifting Iranian Transactions from HBUS to JPMorgan Chase and
                 and Back Again . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
           (i)   Getting Out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
           (j)   Looking Back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
       (2)    Transactions Involving Other Countries . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
           (a)   2005 and 2006 GCLs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
           (b)   Transactions Involving Cuba . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170
           (c)   Transactions Involving Sudan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172
           (d)   Transactions Involving Burma . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
           (e)   Transactions Involving North Korea . . . . . . . . . . . . . . . . . . . . . . . 176
           (f)   Other Prohibited Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
       (3)    HBUS' OFAC Compliance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
       (4)    Server Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
  **C.**  **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

**V.**    **AL RAJHI BANK: DISREGARDING LINKS TO TERRORIST FINANCING** . . . . 189
  **A.**  **Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
  **B.**  **Saudi Arabia and Terrorist Financing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
  **C.**  **Alleged Al Rajhi Links to Terrorism** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
  **D.**  **HSBC Relationship with Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
  **E.**  **Al Rajhi Trading Establishment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
  **F.**  **2005: Decision to Sever Ties with Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . 206
  **G.**  **2006: HBUS Banknotes Account Reinstated** . . . . . . . . . . . . . . . . . . . . . . . . . . 210
  **H.**  **2007 to 2010: Additional Troubling Information** . . . . . . . . . . . . . . . . . . . . . . . . 221

PX257

**I.  Servicing Other Banks with Suspected Links to Terrorism** . . . . . . . . . . . . . . . . . . 224
   (1)  Islami Bank Bangladesh Ltd.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224
   (2)  Social Islami Bank Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230
**J.  Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

**VI.  HOKURIKU BANK: CASHING BULK TRAVELERS CHECKS** . . . . . . . . . . . . . . 240
  **A.  Hokuriku Bank**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241
  **B.  Travelers Cheques** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
  **C.  2005 Concerns About Hokuriku Travelers Cheques** . . . . . . . . . . . . . . . . . . . . . 244
  **D.  2007 OCC Pouch Examination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
  **E.  2008 OCC Inquiry into Hokuriku Travelers Cheques** . . . . . . . . . . . . . . . . . . . . 248
  **F.  Absence of Hokuriku Bank KYC Information** . . . . . . . . . . . . . . . . . . . . . . . . . . 251
  **G.  2008 Decision to Stop Cashing Hokuriku Travelers Cheques** . . . . . . . . . . . . . . 252
  **H.  Hokuriku Bank's Continued Lack of Cooperation**  . . . . . . . . . . . . . . . . . . . . . . 254
  **I.  2010 OCC Discovery of Hokuriku Account Activity** . . . . . . . . . . . . . . . . . . . . . 257
  **J.  Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

**VII.  HBUS PRIVATE BANK AMERICAS:**
      **OFFERING BEARER SHARE ACCOUNTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
  **A.  High Risk Corporate Accounts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
  **B.  Bearer Share Activity at HBUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
  **C.  Two Examples of Bearer Share Accounts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
  **D.  Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

**VIII.  OCC:  EXERCISING INEFFECTIVE AML OVERSIGHT** . . . . . . . . . . . . . . . . . . . 282
  **A.  Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
    (1)  Key Anti-Money Laundering Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
    (2)  AML Oversight In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
    (3)  OCC AML Oversight in General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292
  **B.  OCC Oversight of HBUS**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299
    (1)  Chronology of OCC AML Oversight of HBUS  . . . . . . . . . . . . . . . . . . . . . . . 299
    (2)  Six Years of AML Deficiencies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315
  **C.  OCC Systemic Failures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318
    (1)  Treating AML Deficiencies As A Consumer Compliance Issue  . . . . . . . . . . . 318
    (2)  Restricting Citations of AML Program Violations . . . . . . . . . . . . . . . . . . . . . . 321
    (3)  Using Narrowly Focused Exams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
    (4)  Failing to Use Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
    (5)  Issuing Weak Supervisory Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329
  **D.  Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

\# \# \#

iii

PX257

# U.S. VULNERABILITIES TO MONEY LAUNDERING, DRUGS, AND TERRORIST FINANCING: HSBC CASE HISTORY

This Report examines the anti-money laundering (AML) and terrorist financing vulnerabilities created when a global bank uses its U.S. affiliate to provide U.S. dollars, U.S. dollar services, and access to the U.S. financial system to high risk affiliates, high risk correspondent banks, and high risk clients. This Report also offers recommendations to strengthen correspondent AML controls to combat money laundering, drug trafficking, and terrorist financing.

## I.   EXECUTIVE SUMMARY

Over the last decade, the U.S. Senate Permanent Subcommittee on Investigations has worked to strengthen U.S. AML efforts by investigating how money launderers, terrorists, organized crime, corrupt officials, tax evaders, and other wrongdoers have utilized U.S. financial institutions to conceal, transfer, and spend suspect funds.[1]  In 2001, the Subcommittee focused, in particular, on how U.S. banks, through the correspondent services they provide to foreign financial institutions, had become conduits for illegal proceeds associated with organized crime, drug trafficking, and financial fraud.[2]  Correspondent banking occurs when one financial institution provides services to another financial institution to move funds, exchange currencies, cash monetary instruments, or carry out other financial transactions. The Subcommittee's 2001 investigation showed not only how some poorly managed or corrupt foreign banks used U.S. bank accounts to aid and abet, commit, or allow clients to commit wrongdoing, but also how U.S. financial institutions could protect themselves and the U.S. financial system from misuse.

In response to that investigation and the money laundering vulnerabilities exposed by the 9/11 terrorist attack, Congress enacted stronger AML laws as part of the Patriot Act of 2002, including stronger provisions to combat the misuse of correspondent services.[3]  Federal bank regulators followed with stronger regulations[4] and examination requirements[5] to guard against

---

[1] See, e.g., U.S. Senate Permanent Subcommittee on Investigations, "Keeping Foreign Corruption out of the United States," S.Hrg. 111-540 (Feb. 4, 2010); "Tax Haven Banks and U.S. Tax Compliance," S.Hrg. 110-614 (July 17 and 25, 2008); "Tax Haven Abuses: The Enablers, The Tools and Secrecy," S.Hrg. 109-797 (Aug. 1, 2006); "Money Laundering and Foreign Corruption: Enforcement and Effectiveness of the Patriot Act," S.Hrg. 108-633 (July 15, 2004); "Role of U.S. Correspondent Banking in International Money Laundering," S.Hrg. 107-84 (March 1, 2 and 6, 2001); and "Private Banking and Money Laundering: A Case Study of Opportunities and Vulnerabilities," S.Hrg. 106-428 (Nov. 9 and 10, 1999).  See also U.S. Senate Committee on Homeland Security and Governmental Affairs, "State Business Incorporation – 2009," S.Hrg. 111-953 (June 18 and Nov. 5, 2009).

[2] "Role of U.S. Correspondent Banking in International Money Laundering," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-84 (March 1, 2 and 6, 2001)(hereinafter "2001 Subcommittee Hearing on Correspondent Banking"), at 1.

[3] See, e.g., Sections 312, 313, and 319(b) of the USA Patriot Act (requiring due diligence to be conducted when opening accounts for foreign banks, with enhanced due diligence for offshore banks and banks in high risk jurisdictions; prohibiting the opening of correspondent accounts for shell banks; and strengthening the ability of U.S. regulators to obtain correspondent account records).

[4] See, e.g., 31 CFR §§103.175,103.176, 103.177, 103.185.

[5] See, e.g., 4/29/2010 "Bank Secrecy Act/Anti-Money Laundering Examination Manual," issued by the Federal Financial Institutions Examination Council, "Foreign Correspondent Account Recordkeeping and Due Diligence," at

2

money laundering through correspondent accounts.  In response, over the next ten years, U.S. banks substantially strengthened their correspondent AML controls.  Before the 2002 Patriot Act, for example, most U.S. banks opened correspondent accounts for any foreign bank with a banking license; now, most U.S. banks evaluate the riskiness of each foreign bank's owners, business lines, products, clients, and AML controls before agreeing to open an account.  They also routinely monitor account activity and wire transfers for suspicious activity, with enhanced monitoring of high risk correspondents.  In addition, before the 2002 Patriot Act, some U.S. banks readily opened accounts for foreign shell banks, meaning banks without any physical presence in any jurisdiction; today, in accordance with the Patriot Act's ban on shell bank accounts, all U.S. banks take measures to ensure they don't provide services to such banks, the ban on shell bank accounts has become an international AML standard,[6] and the thousands of stand-alone shell banks licensed by the Bahamas, Cayman Islands, Nauru, and other jurisdictions have virtually disappeared.

At the same time, the money laundering risks associated with correspondent banking have not been eliminated.  Correspondent accounts continue to provide a gateway into the U.S. financial system, and wrongdoers continue to abuse that entryway.  This investigation takes a fresh look at the U.S. vulnerabilities to money laundering and terrorist financing associated with correspondent banking, focusing in particular on the operations of global banks with U.S. affiliates that enable foreign financial institutions to gain access to the U.S. financial system.

**HSBC Case Study.**  To examine the current money laundering and terrorist financing threats associated with correspondent banking, the Subcommittee selected HSBC as a case study.  HSBC is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, 300,000 employees, and 2011 profits of nearly $22 billion.  HSBC, whose initials originally stood for Hong Kong Shanghai Banking Corporation, now has operations in over 80 countries, with hundreds of affiliates spanning the globe.  Its parent corporation, HSBC Holdings plc, called "HSBC Group," is headquartered in London, and its Chief Executive Officer is located in Hong Kong.

Its key U.S. affiliate is HSBC Bank USA N.A. (HBUS).  HBUS operates more than 470 bank branches throughout the United States, manages assets totaling about $200 billion, and serves around 3.8 million customers.  It holds a national bank charter, and its primary regulator is the U.S. Office of the Comptroller of the Currency (OCC), which is part of the U.S. Treasury Department.  HBUS is headquartered in McLean, Virginia, but has its principal office in New York City.  HSBC acquired its U.S. presence by purchasing several U.S. financial institutions, including Marine Midland Bank and Republic National Bank of New York.

A senior HSBC executive told the Subcommittee that HSBC acquired its U.S. affiliate, not just to compete with other U.S. banks for U.S. clients, but primarily to provide a U.S. platform to its non-U.S. clients and to use its U.S. platform as a selling point to attract still more non-U.S. clients.  HSBC operates in many jurisdictions with weak AML controls, high risk

---

117-129, 183-187, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.  Prior versions of this Manual were issued in 2005 and 2007.
[6] See "International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation: The FATF Recommendations," issued by the Financial Action Task Force (2/2012), FATF Recommendation 13.

PX257

3

clients, and high risk financial activities including Asia, Middle East, and Africa.  Over the past ten years, HSBC has also acquired affiliates throughout Latin America.  In many of these countries, the HSBC affiliate provides correspondent accounts to foreign financial institutions that, among other services, are interested in acquiring access to U.S. dollar wire transfers, foreign exchange, and other services.  As a consequence, HSBC's U.S. affiliate, HBUS, is required to interact with other HSBC affiliates and foreign financial institutions that face substantial AML challenges, often operate under weaker AML requirements, and may not be as familiar with, or respectful of, the tighter AML controls in the United States.  HBUS' correspondent services, thus, provide policymakers with a window into the vast array of money laundering and terrorist financing risks confronting the U.S. affiliates of global banks.

The Subcommittee also examined HSBC because of its weak AML program.  In September 2010, the OCC issued a lengthy Supervisory Letter citing HBUS for violating Federal AML laws, including by maintaining an inadequate AML program.  In October 2010, the OCC issued a Cease and Desist Order requiring HSBC to strengthen multiple aspects of its AML program.[7]  The identified problems included a once massive backlog of over 17,000 alerts identifying possible suspicious activity that had yet to be reviewed; ineffective methods for identifying suspicious activity; a failure to file timely Suspicious Activity Reports with U.S. law enforcement; a failure to conduct any due diligence to assess the risks of HSBC affiliates before opening correspondent accounts for them; a 3-year failure by HBUS, from mid-2006 to mid-2009, to conduct any AML monitoring of $15 billion in bulk cash transactions with those same HSBC affiliates, despite the risks associated with large cash transactions; poor procedures for assigning country and client risk ratings; a failure to monitor $60 trillion in annual wire transfer activity by customers domiciled in countries rated by HBUS as lower risk; inadequate and unqualified AML staffing; inadequate AML resources; and AML leadership problems.  Since many of these criticisms targeted severe, widespread, and longstanding AML deficiencies, they also raised questions about how the problems had been allowed to accumulate and why the OCC had not compelled corrective action earlier.

During the course of its investigation into HSBC's AML deficiencies, the Subcommittee issued multiple subpoenas and collected and reviewed over 1.4 million documents, including bank records, correspondence, emails, and legal pleadings.  The Subcommittee staff also conducted over 75 interviews with officials at HSBC Group, HBUS, and other HSBC affiliates, as well as with U.S. banking regulators.  In addition, the Subcommittee received numerous briefings from HSBC legal counsel, initiated inquiries with foreign banks that had HSBC accounts, and consulted with experts on AML and terrorist financing issues.  HSBC was fully cooperative with the inquiry, producing documentation and witnesses from around the world, including documents for which it could have claimed privilege.

As a result of its investigation, the Subcommittee has focused on five issues illustrating key AML and terrorist financing problems that continue to impact correspondent banking in the United States.  They include opening U.S. correspondent accounts for high risk affiliates without conducting due diligence; facilitating transactions that hinder U.S. efforts to stop terrorists, drug

---

[7] On the same day, in coordination with the OCC, the Federal Reserve issued a Cease and Desist order to HBUS' holding company, HSBC North America Holdings, Inc. (HNAH), citing HNAH for an inadequate AML program and requiring it to revamp and strengthen both its program and that of HBUS.

PX257

4

traffickers, rogue jurisdictions, and other from using the U.S. financial system; providing U.S. correspondent services to banks with links to terrorism; clearing bulk U.S. dollar travelers cheques despite signs of suspicious activity; and offering high risk bearer share corporate accounts.  Avoiding the money laundering risks involved in these activities requires an effective AML program, with written standards, knowledgeable and adequate staff, the infrastructure needed to monitor account and wire transfer activity for suspicious transactions, effective AML training, and a compliance culture that values obtaining accurate client information.  In addition to focusing on these five issues at HBUS, the Subcommittee investigation examined the regulatory failures that allowed these and other AML problems to fester for years.

**Servicing A High Risk Affiliate.**  In 2001, the Subcommittee's investigation debunked the notion that U.S. banks should open a correspondent account for any foreign bank with a banking license, establishing instead the need to use due diligence to evaluate the money laundering and terrorist financing risks posed by a specific foreign financial institution before opening an account.  Today, some U.S. affiliates of global banks engage in an equally ill-advised practice, opening correspondent accounts for any affiliate owned by the parent holding corporation, with no analysis of the AML or terrorist financing risks.

Until recently, HSBC Group policy instructed its affiliates to assume that all HSBC affiliates met the Group's AML standards and to open correspondent accounts for those affiliates without additional due diligence.  For years, HBUS followed that policy, opening U.S. correspondent accounts for HSBC affiliates without conducting any AML due diligence.  Those affiliates have since become major clients of the bank.  In 2009, for example, HBUS determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[8]  HBUS failed to conduct due diligence on HSBC affiliates despite a U.S. law that has required all U.S. banks, since 2002, to conduct these due diligence reviews before opening a U.S. correspondent account for any foreign financial institution, with no exception made for foreign affiliates.

One HSBC affiliate that illustrates the AML problems is HSBC Mexico, known as HBMX.  HBUS should have, but did not, treat HBMX as a high risk correspondent client subject to enhanced due diligence and monitoring.  HBMX operated in Mexico, a country under siege from drug crime, violence and money laundering; it had high risk clients, such as Mexican casas de cambios and U.S. money service businesses; and it offered high risk products, such as U.S. dollar accounts in the Cayman Islands.  In addition, from 2007 through 2008, HBMX was the single largest exporter of U.S. dollars to HBUS, shipping $7 billion in cash to HBUS over two years, outstripping larger Mexican banks and other HSBC affiliates.  Mexican and U.S. authorities expressed repeated concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds.  The concern was that drug traffickers unable to deposit large amounts of cash in U.S. banks due to AML controls were transporting U.S. dollars to Mexico, arranging for bulk deposits there, and then using Mexican financial institutions to insert the cash back into the U.S. financial system.

---

[8] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.

PX257

5

In addition to its high risk location, clients, and activities, HMBX had a history of severe AML deficiencies.  Its AML problems included a widespread lack of Know Your Customer (KYC) information in client files; a dysfunctional monitoring system; bankers who resisted closing accounts despite evidence of suspicious activity; high profile clients involved in drug trafficking; millions of dollars in suspicious bulk travelers cheque transactions; inadequate staffing and resources; and a huge backlog of accounts marked for closure due to suspicious activity, but whose closures were delayed.  For eight years, from 2002 to 2010, HSBC Group oversaw efforts to correct HBMX's AML deficiencies, while those efforts fell short.  At the same time, HSBC Group watched HBMX utilize its U.S. correspondent account, without alerting HBUS to the AML risks it was incurring.

HBUS compounded the AML risks it incurred from HBMX through its own AML deficiencies, which included failing to investigate or evaluate HBMX's AML risks.  HBUS also failed, from mid-2006 to mid-2009, to conduct any AML monitoring of its U.S. dollar transactions with HSBC affiliates, including HBMX, despite the obvious well-known risks attendant with large cash transactions.  In addition, because HBUS deemed HBMX to be located in a low risk country, HBUS failed until 2009, to monitor HBMX's wire transfer or account activity.  HBMX illustrates the money laundering and drug trafficking risks that result when the U.S. affiliate of a global bank serves as the U.S. gateway for a high risk affiliate allowed to operate with no initial due diligence or ongoing monitoring.

**Circumventing OFAC Prohibitions.**  The United States has devoted significant resources to stopping some of the most dangerous persons and jurisdictions threatening the world today from utilizing the U.S. financial system, including terrorists, persons involved with weapons of mass destruction, drug traffickers, and persons associated with rogue jurisdictions such as Iran, North Korea, and Sudan.  To implement the law, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) has developed a list of prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions.  Transactions stopped by this filter typically undergo an individualized review to see if the transaction can proceed or the funds must be blocked.

Because the OFAC filter can end up delaying or blocking transactions that are permitted under U.S. law or by other jurisdictions, some non-U.S. financial institutions have used tactics to circumvent it.  Common tactics include stripping information from wire transfer documentation to conceal the participation of a prohibited person or country, or characterizing a transaction as a transfer between banks in approved jurisdictions, while omitting underlying payment details that would disclose participation of a prohibited originator or beneficiary.  In the case of Iran, some foreign banks also abused what were known as "U-turn" transactions, which were allowable transactions under Treasury regulations prior to November 2008.  In recent years, the United States has imposed steep penalties on banks that violated the OFAC prohibitions.

At HBUS, documents provided to the Subcommittee indicate that, for years, some HSBC affiliates took action to circumvent the OFAC filter when sending OFAC sensitive transactions through their U.S. dollar correspondent accounts at HBUS.  From at least 2001 to 2007, two HSBC affiliates, HSBC Europe (HBEU) and HSBC Middle East (HBME), repeatedly sent U-turn transactions through HBUS without disclosing links to Iran, even though they knew HBUS

**PX257**

6

required full transparency to process U-turns.  To avoid triggering the OFAC filter and an individualized review by HBUS, HBEU systematically altered transaction information to strip out any reference to Iran and characterized the transfers as between banks in approved jurisdictions.  The affiliates' use of these practices, which even some within the bank viewed as deceptive, was repeatedly brought to the attention of HSBC Group Compliance, by HBUS compliance personnel and by HBEU personnel who objected to participating in the document alteration and twice announced deadlines to end the activity.  Despite this information, HSBC Group Compliance did not take decisive action to stop the conduct or inform HBUS about the extent of the activity.  At the same time, while some at HBUS claimed not to have known they were processing undisclosed Iranian transactions from HSBC affiliates, internal documents show key senior HBUS officials were informed as early as 2001.  In addition, HBUS' OFAC filter repeatedly stopped Iranian transactions that should have been disclosed to HBUS by HSBC affiliates, but were not.  Despite evidence of what was taking place, HBUS failed to get a full accounting of what its affiliates were doing or ensure all Iranian transactions sent by HSBC affiliates were stopped by the OFAC filter and reviewed to ensure they were OFAC compliant.  In addition, documents show that, from 2002 to 2007, some HSBC affiliates sent potentially prohibited transactions through HBUS involving Burma, Cuba, North Korea, Sudan, and other prohibited countries or persons.  Other documents indicate that some HSBC affiliates may have sent non-U.S. dollar messaging traffic through U.S. servers in which the OFAC filter was not turned on or was restricted.

An outside auditor hired by HBUS has so far identified, from 2001 to 2007, more than 28,000 undisclosed, OFAC sensitive transactions that were sent through HBUS involving $19.7 billion.  Of those 28,000 transactions, nearly 25,000 involved Iran, while 3,000 involved other prohibited countries or persons.  The review has characterized nearly 2,600 of those transactions, including 79 involving Iran, and with total assets of more than $367 million, as "Transactions of Interest" requiring additional analysis to determine whether violations of U.S. law occurred.  While the aim in many of those cases may have been to avoid the delays associated with the OFAC filter and individualized reviews, rather than to facilitate prohibited transactions, actions taken by HSBC affiliates to circumvent OFAC safeguards may have facilitated transactions on behalf of terrorists, drug traffickers, or other wrongdoers.  While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to the conduct.  HBUS' experience demonstrates the strong measures that the U.S. affiliate of a global bank must take to prevent affiliates from circumventing OFAC prohibitions.

**Disregarding Links to Terrorism.**  For decades, HSBC has been one of the most active global banks in the Middle East, Asia, and Africa, despite being aware of the terrorist financing risks in those regions.  In particular, HSBC has been active in Saudi Arabia, conducting substantial banking activities through affiliates as well as doing business with Saudi Arabia's largest private financial institution, Al Rajhi Bank.  After the 9/11 terrorist attack in 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of al Qaeda.  In 2005, HSBC announced internally that its affiliates should sever ties with Al Rajhi Bank,

PX257

7

but then reversed itself four months later, leaving the decision up to each affiliate.  HSBC Middle East, among other HSBC affiliates, continued to do business with the bank.

Due to terrorist financing concerns, HBUS closed the correspondent banking and banknotes accounts it had provided to Al Rajhi Bank.  For nearly two years, HBUS Compliance personnel resisted pressure from HSBC personnel in the Middle East and United States to resume business ties with Al Rajhi Bank.  In December 2006, however, after Al Rajhi Bank threatened to pull all of its business from HSBC unless it regained access to HBUS' U.S. banknotes program, HBUS agreed to resume supplying Al Rajhi Bank with shipments of U.S. dollars.  Despite ongoing troubling information, HBUS provided nearly $1 billion in U.S. dollars to Al Rajhi Bank until 2010, when HSBC decided, on a global basis, to exit the U.S. banknotes business.  HBUS also supplied U.S. dollars to two other banks, Islami Bank Bangladesh Ltd. and Social Islami Bank, despite evidence of links to terrorist financing.  Each of these specific cases shows how a global bank can pressure its U.S. affiliate to provide banks in countries at high risk of terrorist financing with access to U.S. dollars and the U.S. financial system.

**Clearing Suspicious Bulk Travelers Cheques.**  Another AML issue involves HBUS' clearing more than $290 million in bulk U.S. dollar travelers checks in less than four years for a Japanese regional bank, Hokuriku Bank, despite evidence of suspicious activity.  From at least 2005 to 2008, HBUS cleared bulk travelers cheques for Hokuriku Bank on a daily basis, at times clearing $500,000 or more in U.S. dollars per day.  The cheques were in denominations of $500 or $1,000, submitted in large blocks of sequentially numbered cheques, and signed and countersigned with the same illegible signature.  An OCC examination which determined that HBUS was clearing travelers cheques with inadequate AML controls, discovered the stacks of Hokuriku travelers cheques being processed on a daily basis, and directed HBUS to investigate.  When HBUS sought more information, Hokuriku Bank at first delayed responding, then provided minimal information, and finally declined to investigate further, claiming to be constrained by bank secrecy laws from disclosing client-specific information.  HBUS eventually learned that the travelers cheques were purchased by Russians from a bank in Russia, a country at high risk of money laundering.  HBUS also learned that the Japanese bank had little KYC information or understanding why up to $500,000 or more in bulk U.S. dollar travelers cheques purchased in Russia were being deposited on a daily basis into one of 30 different Japanese accounts of persons and corporations supposedly in the used car business.

In October 2008, under pressure from the OCC, HBUS stopped processing the travelers cheques, but continued the correspondent relationship, despite the Japanese bank's poor AML controls.  Two years later, in 2010, an OCC examination uncovered the ongoing relationship, between HSBC and Hokuriku, which the OCC thought had ended.  In 2012, after the Subcommittee inquired about the account, HBUS closed it.  Since travelers cheques have been misused by terrorists, drug traffickers, and other criminals, the HBUS experience shows how a U.S. affiliate with ineffective AML controls can end up clearing suspicious bulk travelers cheques and facilitating the movement of hundreds of millions of U.S. dollars across international lines to unknown recipients.

**Offering Bearer Share Accounts.**  Over the course of a decade, HBUS opened over 2,000 accounts in the name of bearer share corporations, a notorious type of corporation that

PX257

8

invites secrecy and wrongdoing by assigning ownership to whomever has physical possession of the shares.  At its peak, HBUS' Miami office had over 1,670 bearer share accounts; the New York office had over 850; and the Los Angeles office had over 30.  The Miami bearer share accounts alone held assets totaling an estimated $2.6 billion, and generated annual bank revenues of $26 million.  Multiple internal audits and regulatory examinations criticized the accounts as high risk and advocated that HBUS either take physical custody of the shares or require the corporations to register the shares in the names of the shareholders, but HBUS bankers initially resisted tightening AML controls, and regulators took no enforcement action.

Two examples of the accounts illustrate the risks they posed.  In the first, Miami Beach hotel developers, Mauricio Cohen Assor and Leon Cohen Levy, father and son, used bearer share accounts they opened for Blue Ocean Finance Ltd. and Whitebury Shipping Time-Sharing Ltd. to help hide $150 million in assets and $49 million in income.  In 2010, both were convicted of criminal tax fraud and filing false tax returns, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties totaling more than $17 million.  A second example involves a wealthy and powerful Peruvian family which pressed HBUS to grant a waiver from its AML requirements that bearer share corporations either register their shares or place those shares in bank custody.  Bank documents showed how HBUS bankers pressed Compliance personnel to grant the waiver to please a wealthy client.  These accounts demonstrate the AML risks associated with bearer share accounts, whose owners seek to hide their identities.  Today, following an initiative that concluded in 2011, HBUS has reduced its bearer share accounts to 26, most of which are frozen, while at the same time maintaining a policy that allows the bank to open new bearer share accounts in the future.

**Regulatory Failures.**  HBUS' severe AML deficiencies did not happen overnight; they accumulated over time, even though its primary regulator, the OCC, conducted regular AML examinations.  Part of the reason HBUS' AML problems were not cured is attributable to certain peculiar and ineffective aspects of the OCC's AML oversight effort.

First, unlike other U.S. bank regulators, the OCC does not treat AML deficiencies as a matter of bank safety and soundness or a management problem.  Instead it treats AML deficiencies as a consumer compliance matter, even though AML laws and consumer protection laws have virtually nothing in common.  One consequence of this approach is that the OCC considers AML problems when assigning a bank's consumer compliance rating, but not when assigning the bank's management rating or its overall composite rating.  As a result, AML deficiencies do not routinely lower the ratings that national banks receive as part of their safety and soundness evaluations, and so do not increase the deposit insurance that banks pay for incurring heightened risk, contrary to how AML problems are handled at other Federal banking agencies.  At HBUS, after citing the bank for severe AML deficiencies, the OCC lowered its consumer compliance rating but not its management rating.

A second problem is that the OCC has adopted a practice of foregoing the citation of a statutory or regulatory violation in its Supervisory Letters and annual Reports of Examination when a bank fails to comply with one of the four mandatory components of an AML program.  The four minimum statutory requirements of an AML program are AML internal controls, an AML compliance officer, AML training, and independent testing of the effectiveness of its AML

**PX257**

program.  By consistently treating a failure to meet one or even several of these statutory requirements as a "Matter Requiring Attention" instead of a legal violation, the OCC diminishes the importance of meeting each requirement, sends a more muted message about the need for corrective action, and makes enforcement actions more difficult to pursue if an AML deficiency persists.  In contrast, citing a violation of law when one critical component of a bank's AML program is inadequate sends a strong message to bank management that its AML program is deficient, does not meet minimum statutory requirements, and requires remediation to ensure compliance with the law.  At HBUS, the OCC identified 83 Matters Requiring Attention over five years, without once citing a legal violation of Federal AML law.  It was only when the OCC found HBUS' entire AML program to be deficient that the OCC finally cited the bank for a legal violation.

Additional problems illustrated by the HBUS case history include the OCC's practice of conducting narrowly focused AML examinations of specific banking units without also assessing HBUS' overall AML program; the OCC's reluctance, despite mounting AML deficiencies, to make timely use of formal and informal enforcement actions to compel improvements in HBUS' AML program; and the practice by some OCC examiners to issue Supervisory Letters that sometimes muted AML examination criticisms or weakened recommendations for AML reforms at HBUS.

While the OCC insists that its AML approach has merit, the HSBC case history, like the Riggs Bank case history examined by this Subcommittee eight years ago,[9] provides evidence that the current OCC system has tolerated severe AML deficiencies for years, permitted national banks to delay or avoid correcting identified problems, and allowed smaller AML issues to accumulate into a massive problem before OCC enforcement action was taken.  An experienced OCC AML examiner told the Subcommittee: "I thought I saw it all with Riggs but HSBC was the worst situation I'd ever seen," yet during the six-year period from 2004 to 2010, OCC officials did not take any formal or informal enforcement action to compel HBUS to strengthen its AML program, essentially allowing its AML problems to fester.  In 2009, after learning of two law enforcement investigations involving AML issues at the bank, the OCC suddenly expanded and intensified an ongoing AML examination and allowed it to consider a wide range of AML issues.  The OCC examination culminated in the issuance, in September 2010, of a blistering supervisory letter listing numerous, serious AML problems at the bank.  In October 2010, the OCC also issued a Cease and Desist Order requiring HBUS to revamp its AML controls.

In response, HBUS has announced a number of key organizational and policy initiatives to improve its AML program in the United States and globally.  While those initiatives are promising, HBUS announced similarly promising AML reforms in 2003, when confronted with an AML enforcement action by the Federal Reserve Bank of New York and New York State Banking Department.  Even before the OCC lifted that order in 2006, HBUS' AML program deteriorated.  Both HBUS and the OCC will have to undertake a sustained effort to ensure the newest round of changes produce a better AML outcome.

---

[9] See "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-633 (July 15, 2004).

**PX257**

HSBC is the quintessential global bank, operating hundreds of affiliates in 80 countries, with its U.S. affiliate acting as the gateway into the U.S. financial system for the entire network. The OCC allowed AML problems at HBUS to build up until they represented major AML vulnerabilities for the United States.  Going forward, HBUS needs far stronger controls to ensure it doesn't leave AML risks to the U.S. financial system unattended; the OCC needs a much better approach to resolve AML problems in a more effective and timely manner.

## A.  Findings

This Report makes the following findings of fact.

(1)  **Longstanding Severe AML Deficiencies.**  HBUS operated its correspondent accounts for foreign financial institutions with longstanding, severe AML deficiencies, including a dysfunctional AML monitoring system for account and wire transfer activity, an unacceptable backlog of 17,000 unreviewed alerts, insufficient staffing, inappropriate country and client risk assessments, and late or missing Suspicious Activity Reports, exposing the United States to money laundering, drug trafficking, and terrorist financing risks.

(2)  **Taking on High Risk Affiliates.**  HBUS failed to assess the AML risks associated with HSBC affiliates before opening correspondent accounts for them, failed to identify high risk affiliates, and failed for years to treat HBMX as a high risk accountholder.

(3)  **Circumventing OFAC Prohibitions.**  For years in connection with Iranian U-turn transactions, HSBC allowed two non-U.S. affiliates to engage in conduct to avoid triggering the OFAC filter and individualized transaction reviews.  While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to conduct which even some within the bank viewed as deceptive.

(4)  **Disregarding Terrorist Links.**  HBUS provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing.

(5)  **Clearing Suspicious Bulk Travelers Cheques.**  In less than four years, HBUS cleared over $290 million in sequentially numbered, illegibly signed, bulk U.S. dollar travelers cheques for Hokuriku Bank, which could not explain why its clients were regularly depositing up to $500,000 or more per day in U.S. dollar travelers cheques obtained in Russia into Japanese accounts, supposedly for selling used cars; even after learning of Hokuriku's poor AML controls, HBUS continued to do business with the bank.

(6)  **Offering Bearer Share Accounts.**  Over the course of a decade, HBUS opened over 2,000 high risk bearer share corporate accounts with inadequate AML controls.

**PX257**

11

(7) **Allowing AML Problems to Fester.**  The OCC allowed HBUS' AML deficiencies to fester for years, in part due to treating HBUS' AML problems as consumer compliance matters rather than safety and soundness problems, failing to make timely use of formal and informal enforcement actions to compel AML reforms at the bank, and focusing on AML issues in specific HBUS banking units without also viewing them on an institution-wide basis.

## B.  Recommendations

This Report makes the following recommendations.

(1) **Screen High Risk Affiliates.**  HBUS should reevaluate its correspondent relationships with HSBC affiliates, including by reviewing affiliate AML and compliance audit findings, identifying high risk affiliates, designating affiliate accounts requiring enhanced monitoring, and closing overly risky accounts.  HBUS should conduct a special review of the HBMX account to determine whether it should be closed.

(2) **Respect OFAC Prohibitions.**  HSBC Group and HBUS should take concerted action to stop non-U.S. HSBC affiliates from circumventing the OFAC filter that screens transactions for terrorists, drug traffickers, rogue jurisdictions, and other wrongdoers, including by developing audit tests to detect undisclosed OFAC sensitive transactions by HSBC affiliates.

(3) **Close Accounts for Banks with Terrorist Financing Links.**  HBUS should terminate correspondent relationships with banks whose owners have links to, or present high risks of involvement with, terrorist financing.

(4) **Revamp Travelers Cheque AML Controls.**  HBUS should restrict its acceptance of large blocks of sequentially numbered U.S. dollar travelers cheques from HSBC affiliates and foreign financial institutions; identify affiliates and foreign financial institutions engaged in suspicious travelers cheque activity; and stop accepting travelers cheques from affiliates and foreign banks that sell or cash U.S. dollar travelers cheques with little or no KYC information.

(5) **Boost Information Sharing Among Affiliates.**  HSBC should require AML personnel to routinely share information among affiliates to strengthen AML coordination, reduce AML risks, and combat wrongdoing.

(6) **Eliminate Bearer Share Accounts.**  HBUS should close its remaining 26 bearer share corporate accounts, eliminate this type of account, and instruct financial institutions using HBUS correspondent accounts not to execute transactions involving bearer share corporations.  U.S. financial regulators should prohibit U.S. banks from opening or servicing bearer share accounts.

**PX257**

12

**(7)   Increase HBUS' AML Resources.**  HBUS should ensure a full time professional serves as its AML director, and dedicate additional resources to hire qualified AML staff, implement an effective AML monitoring system for account and wire transfer activity, and ensure alerts, including OFAC alerts, are reviewed and Suspicious Activity Reports are filed on a timely basis.

**(8)   Treat AML Deficiencies as a Matter of Safety and Soundness.**  The OCC should align its practice with that of other Federal bank regulators by treating AML deficiencies as a safety and soundness matter, rather than a consumer compliance matter, and condition management CAMELS ratings in part upon effective management of a bank's AML program.

**(9)   Act on Multiple AML Problems.**  To ensure AML problems are corrected in a timely fashion, the OCC should establish a policy directing that the Supervision Division coordinate with the Enforcement and Legal Divisions to conduct an institution-wide examination of a bank's AML program and consider use of formal or informal enforcement actions, whenever a certain number of Matters Requiring Attention or legal violations identifying recurring or mounting AML problems are identified through examinations.

**(10)  Strengthen AML Examinations.**  The OCC should strengthen its AML examinations by citing AML violations, rather than just Matters Requiring Attention, when a bank fails to meet any one of the statutory minimum requirements for an AML program; and by requiring AML examinations to focus on both specific business units and a bank's AML program as a whole.

PX257

13

## II.  GENERAL BACKGROUND

This section provides a general overview of HSBC Group, HSBC Bank USA (HBUS), and the HBUS compliance and anti-money laundering (AML) program.

### A.  Background on HSBC Group and HBUS

HSBC Group is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, and 2011 profits of nearly $22 billion.[10]  Its parent corporation, HSBC Holdings plc, often referred to by the bank as "HSBC Group," is headquartered in London.  Despite its London headquarters, the principal office of the Group Chief Executive is located in Hong Kong.[11]  Altogether, HSBC has about 300,000 employees and 7,200 offices in over 80 countries, including North America, Europe, Asia, Latin America, the Middle East, and Africa.[12]

**United States Operations.**  Among other entities, the Group owns HSBC Overseas Holdings (UK) Ltd. (HSBC Overseas Holdings), which oversees its operations in the United States and Canada.  HSBC Overseas Holdings owns, in turn, HSBC North America Holdings Inc. (HNAH, pronounced "Hannah"), one of the ten largest bank holding companies in the United States.  HNAH has assets of about $345 billion, is headquartered in New York City, and is overseen by the Federal Reserve.[13]  Through various subsidiaries, HNAH owns three key HSBC financial institutions in the United States:  HSBC Bank USA N.A. (HBUS); HSBC Securities (USA) Inc. (HSBC Securities); and HSBC Finance Corporation.

HBUS operates more than 470 bank branches throughout the United States, manages assets totaling about $210 billion, and serves around 4 million customers.[14]  It holds a national bank charter and its primary regulator is the Office of the Comptroller of the Currency (OCC), which is part of the U.S. Treasury Department.  Because it holds insured deposits, its secondary regulator is the Federal Deposit Insurance Corporation (FDIC).  HBUS is the principal subsidiary of HSBC USA Inc. (HUSI), a bank holding company which is a wholly-owned subsidiary of HNAH.[15]  HBUS is headquartered in McLean, Virginia, and has its principal office in New York City.[16]

---

[10] See "HSBC Holdings plc 2011 Results-Highlights," (2/12/12), at 1-2, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/hsbc2011arn.pdf; "HSBC Holdings plc Annual Report and Accounts 2011," at 1, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/hsbc2011ara0.pdf (hereinafter "HSBC Group 2011 Annual Report").

[11] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.

[12] HSBC Group 2011 Annual Report  at 1; "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.

[13] See "HSBC North America Holdings Inc. Fact Sheet," at 1, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/usshared/Inside%20HSBC/About%20HSBC/Corporate%20Information/Corporate%20Facts/hnah_factsheet_0911.pdf.

[14] "HSBC Bank USA, National Association Fact Sheet," at 1, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/usshared/Inside%20HSBC/About%20HSBC/Corporate%20Information/Corporate%20Facts/hbus_factsheet_0911.pdf (hereinafter "HBUS Fact Sheet").

[15] Id.

[16] Id. at 2.

**PX257**

14

HSBC Securities is a licensed broker-dealer regulated by the Securities and Exchanges Commission (SEC).  HSBC Finance Corporation, formerly subprime lender Household International, provides credit cards, automobile loans, consumer lending, and insurance products, and is overseen by several U.S. regulators including the Consumer Financial Protection Bureau.

HNAH also owns an Edge Act corporation in Miami, HSBC Private Bank International.[17]  The Edge Act allows U.S. national banks to form U.S. subsidiaries designed to engage solely in international banking operations, including holding deposits for non-U.S. persons.[18]  Edge Act corporations are chartered and regulated by the Federal Reserve.  In addition, HNAH sponsors the HSBC Latin American International Center, also referred to as "HSBC Miami Offshore," in Miami.  This center, like HSBC Private Bank International, is designed to help meet the needs of Latin American clients with banking needs in the United States.[19]

HNAH owns several other subsidiaries as well, including HSBC Trust Company, N.A., of Delaware, and HSBC Bank Nevada, N.A., of Las Vegas, Nevada.

**HBUS Major Lines of Business.**  HBUS has six major lines of business in the United States.[20]  The first is "Retail Banking and Wealth Management" which provides deposits, checking, savings, mortgages, loans, brokerage products, and certificates of deposit (CDs) to customers.[21]  HSBC Premier is a product within the retail bank that provides services for more affluent clients.[22]

The HBUS "Private Banking" offers wealth management services for high net worth individuals and families with deposits of at least $1 million.[23]  HSBC Private Bank provides banking, investment, custody, wealth planning, trust and fiduciary, insurance, and philanthropic advisory services to its customers.[24]  Clients receive a dedicated "relationship manager" to manage their Private Bank accounts.

The HBUS "Commercial Banking" offers global banking services to financial institutions, companies, governmental entities, and non-profit organizations worldwide.[25]  These services include deposits, checking, remote deposit capture, payments and cash management, pouch services, corporate loans and financing, merchant services, and insurance products.  HBUS assigns each client a dedicated relationship manager to handle its accounts.[26]

---

[17] See "FAQs – HSBC Money Laundering Enforcement Action," attached to 10/6/2010 email from OCC James Vivenzio to OCC colleagues, "HSBC FAQs," OCC-PSI-00898845-857.
[18] See the Edge Act, P.L. 102-242 (1919), codified at 12 U.S.C. § 611 et seq.
[19] See HSBC Latin American International Center website, https://www.us.hsbc.com/1/2/3/hsbcpremier/miami-offshore.
[20] HBUS Fact Sheet at 1-2.  According to the OCC, HBUS has a total of 32 lines of business altogether.  Subcommittee interviews of OCC examiners Joseph Boss (1/30/2012)  and Elsa de la Garza (1/9/2012).
[21] See https://www.us.hsbc.com/1/2/3/hsbcpremier/miami-offshoreretail.
[22] HBUS Fact Sheet at 1.
[23] Id. at 2; Subcommittee interview of HSBC representatives (6/9/2011).
[24] HBUS Fact Sheet at 2.
[25] HBUS Fact Sheet at 1.
[26] Id.

**PX257**

15

The HBUS "Global Banking and Markets" line of business, with offices in more than 60 countries, provides a wide range of "tailored financial solutions" to major government, corporate, and institutional clients.[27]  This line of business includes an extensive network of correspondent banking relationships, in which HBUS provides banks from other countries with U.S. dollar accounts to transact business in the United States.  Due to its affiliates in over 80 countries, HSBC is one of the largest providers of correspondent banking services in the world.  In 2010, it had about 2,400 correspondent customers, including for more than 80 HSBC affiliates.[28]  Among other services, HSBC provides financial institution clients with access to the U.S. financial system by handling international wire transfers, clearing a variety of U.S. dollar instruments, including travelers cheques and money orders, and providing foreign exchange services. HBUS Payment and Cash Management (PCM) is a key banking division, located in New York, that supports HBUS' correspondent relationships.[29]

In addition, as part of this line of business, until 2010, HBUS housed the Global Banknotes Department, which used offices in New York City, London, Hong Kong, and elsewhere to buy, sell, and ship large amounts of physical U.S. dollars.[30]  The Banknotes Department derived its income from the trading, transportation, and storage of bulk cash, doing business primarily with other banks and currency exchange businesses, but also with HSBC affiliates.[31]  In addition, for a number of years, HBUS held a contract with the U.S. Federal Reserve Bank of New York (FRBNY) to operate U.S. currency vaults in several cities around the world to assist in the physical distribution of U.S. dollars to central banks, large commercial banks, and businesses involved with currency exchange.[32]  In June 2010, however, HBUS exited the wholesale U.S. banknotes line of business, later selling portions of the business to other banks.[33]  It also did not renew its contract to operate FRBNY currency vaults.

The HBUS "Global Asset Management" line of business offers worldwide investment management services to clients, and currently manages nearly $400 billion in assets.[34]  It is one of the largest investment businesses in the world.  Finally, "HSBC Insurance" provides a wide variety of insurance products to customers in the United States and Canada.[35]

In addition to these major lines of business, in recent years, HBUS has become a leader in providing banking services to foreign embassies with a presence in the United States.  HBUS

---

[27] Id.

[28] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]  Subcommittee briefing by HSBC legal counsel (6/20/2012).

[29] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 341-342 [Sealed Exhibit.]; Subcommittee interview of Michael Gallagher (6/13/2012).

[30] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 341-342.  [Sealed Exhibit.]

[31] Id. at OCC-PSI-00864342.

[32] See Form 10-Q filed by HBSC USA Inc. with the SEC for the quarter ending June 30, 2011, at 9-10.

[33] Id.  In 2010, HSBC Holdings plc sold its U.S. wholesale banknotes business in Asia to United Overseas Bank Limited (UOB) for $11 million, and in 2011, sold its European banknotes business to HSBC Bank plc.  It recorded total closure costs of $14 million during 2010.  Id.

[34] HBUS Fact Sheet at 2.

[35] Id.

began this business after Riggs Bank and Wachovia Bank stopped providing those services in 2005, and embassies began looking for a new financial institution.[36]

Through its correspondent banking and Payments and Cash Management (PCM) businesses, HBUS has become one of the largest facilitators of cash transfers in the world. Between 2005 and 2009, the total number of PCM wire transactions at HBUS grew from 20.4 million to 30.2 million transfers per year, with a total annual dollar volume that climbed from $62.4 trillion to $94.5 trillion.[37]  In 2008, HBUS processed about 600,000 wire transfers per week.[38]  In 2009, PCM was the third largest participant in the CHIPS wire transfer service which provides over 95% of U.S. dollar wire transfers across U.S. borders and nearly half of all wire transfers within the United States, totaling $1.5 trillion per day and over $400 trillion in 2011.[39]

**HSBC Affiliates.**  HSBC has hundreds of affiliates located in over 80 countries.  At least 80 HSBC affiliates have turned to HBUS for access to U.S. dollars and the U.S. financial system. These affiliates typically interact with HBUS by opening a correspondent account at HBUS headquarters in New York.  Many use the account to clear U.S. dollars wire transfers; some use the account to cash U.S. dollar instruments like travelers cheques or money orders; still others use the account for foreign exchange purposes.  In addition, some opened a separate account to buy or sell physical U.S. dollars as part of HBUS' wholesale banknotes business, until it was shuttered in 2010.

HSBC affiliates have accounted for a large portion of HBUS' U.S. dollar activities.  In 2009, for example, HSBC determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[40]  HSBC also calculated that, over an eight-year period, its U.S. dollar clearing business had increased over 200%, from processing an average daily amount of $185 billion in 2001, to $377 billion in 2009.[41]  HBUS also executes transactions through HSBC affiliates in other countries.  It has been estimated that, in 2009, HBUS processed 19.4 million transactions, involving $45.9 trillion, through HSBC affiliates.[42]

---

[36] See 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-736, at 529-530; "HSBC to Open D.C. Branch, Pursue Embassy Clients," Washington Post, Terence O'Hara (10/5/2004)(quoting Riggs spokesperson: "As a service to our remaining embassy clients, Riggs is working closely with HSBC to ensure a smooth transition."), http://www.washingtonpost.com/ac2/wp-dyn/A7285-2004Oct4?language=printer.

[37] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]

[38] See 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962, at 4.  [Sealed Exhibit.]

[39] Id.  See also The Clearing House website, "About CHIPS," http://www.chips.org/about/pages/033738.php.

[40] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.

[41] Id. at "USD Payment Statistics – Fact Sheet," HSBC OCC 8874211.

[42] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]

17

One of the largest HSBC affiliates is The Hongkong Shanghai Banking Corporation Ltd., which is incorporated in Hong Kong and is Hong Kong's largest bank.[43]  Established in 1865, when Hong Kong was part of the British empire, it is the founding member of the HSBC Group, but now operates as a subsidiary of HSBC Holdings plc, the Group's parent corporation.  With more than 71,400 employees, it oversees a network of hundreds of HSBC affiliates in 20 countries throughout Asia and the Pacific Region, including Australia, Bangladesh, China, India, Japan, Malaysia, New Zealand, Thailand, and Vietnam.[44]  It is sometimes referred to in internal HSBC documents as HBAP, an abbreviation for HSBC Bank Asia Pacific.

A second key affiliate is HSBC Bank Middle East Ltd. (HBME).  Incorporated in Jersey in the Channel Islands and owned through a chain of subsidiaries reaching back to the Group's parent corporation in London, HBME oversees a network of financial institutions throughout the Middle East and North Africa.[45]  With more than 5,000 employees, HBME provides banking services through nearly 45 branches in Algeria, Bahrain, Jordan, Kuwait, Lebanon, Oman, Pakistan, Qatar, and the United Arab Emirates.[46]  In 1998, HSBC Group established "HSBC Amanah," a "global Islamic financial services division" designed to "serve the particular needs of Muslim communities" in compliance with Islamic law.[47]   HBME offers Amanah banking services to many of its clients in the Middle East and North Africa.

A third affiliate discussed in this Report is HSBC Mexico S.A. Banco (HBMX), the principal operating company of Grupo Financiero HSBC, S.A. de C.V., which owns HSBC's businesses in Mexico.  HSBC's Mexican group is one of Mexico's largest financial service conglomerates, with over 1,000 branches throughout the country, nearly $2 billion in assets, and over 8 million clients.[48]  HSBC purchased HBMX in 2002, when it operated under the name of Banco Internacional, S.A. and was part of Grupo Financiero Bital, S.A. de C.V.[49]  HBMX and its Mexican parent are headquartered in Mexico City and together have about 19,000 employees.[50]

---

[43] See "Hongkong Shanghai Banking Corporation Limited Annual Report and Accounts 2011," at 2, http://www.hsbc.com.hk/1/PA_1_3_S5/content/about/financial-information/financial-reports/bank/pdf/2011report.pdf.

[44] Id.

[45] See "HSBC Bank Middle East Limited Annual Report and Accounts 2011," http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/annual_report_2011.pdf.

[46] See id. at 32.  See also "HSBC Wins its Eighth Best Cash Management Bank in the Middle East Award," http://www.hsbc.ae/1/2/about-hsbc/newsroom/eighth-best-cash-management, viewed 4/2/12; "HSBC Research Picks Up More Regional Awards," (1/12/12), http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/newsroom/euromoney-research-awards-jan-12.pdf, viewed 4/12/12.  HSBC provides banking services in Saudi Arabia through both HSBC Saudi Arabia, in which it is a 49% shareholder, and Saudi British Bank (SABB), in which it is a 40% shareholder. See "HSBC Research Picks Up More Regional Awards," (1/12/12), http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/newsroom/euromoney-research-awards-jan-12.pdf, viewed 4/12/12.

[47] See HSBC website, "About HSBC Amanah," http://www.hsbcamanah.com/amanah/about-amanah.

[48] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.

[49] See "HSBC Consuma la Adquision de GF BITAL," (11/25/02), http://www.hsbc.com.mx/1/PA_1_1_S5/content/home_en/investor_relations/press_releases/infpress/hsbc_consuma.pdf.

[50] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.

**PX257**

18

**HSBC Leadership.**  Over the last few years, HSBC leadership has undergone significant change.  In 2010, HSBC Holdings plc appointed a new Chairman of the Board of Directors, Douglas J. Flint, replacing Stephen Green, who had become a U.K. Cabinet Minister.[51]  A new Group Chief Executive was also selected, replacing Michael Geoghegan, who retired, with Stuart T. Gulliver.  In 2012, HSBC Holdings plc also appointed a new Chief Legal Officer, Stuart Levey, former Undersecretary for Terrorism and Financial Intelligence at the U.S. Treasury Department.  Mr. Levey replaced the Group's General Counsel, Richard Bennett.[52]

Also in 2010, Sandy Flockhart, became Chairman of Europe, Middle East, Africa, Latin America, Commercial Banking; as well as Chairman of HSBC Bank plc.[53]  Mr. Flockhart, who first joined HSBC in 1974, is an emerging markets specialist and, among other posts, headed HBMX in Mexico for five years, from 2002 to 2007.[54]  He was also appointed to the HSBC Group Board of Directors in 2008, and became a director of HSBC Bank Middle East in July 2011.[55]

**HNAH Leadership.**  At HNAH, the U.S. bank holding company, the persons holding leadership positions have often overlapped with those of HNAH's key subsidiaries, HBUS, HSBC Securities, and HSBC Finance Corporation.  HNAH's current Chief Executive Officer (CEO), for example, is Irene Dorner, who is also the CEO of HBUS.[56]  Her immediate predecessor at HNAH, for less than a year, was Niall Booker, who was preceded by Brendan McDonagh, former Chief Operating Officer (COO) of HBUS.  Before Mr. McDonagh, HNAH was headed by Siddharth (Bobby) N. Mehta, who was also head of HSBC Finance Corporation, but left the bank when HSBC Finance Corporation's subprime mortgage portfolio incurred huge losses during the recent financial crisis.

The current HNAH COO is Gregory Zeeman; the current General Counsel is Stuart Alderoty; and the current Chief Auditor is Mark Martinelli, each of whom currently holds the same position at HBUS.[57]  HNAH's Chief Risk Officer is Mark Gunton who holds the same position at both HBUS and HSBC Finance Corporation.

**HBUS Leadership.**  Over the last ten years, HBUS has undergone numerous changes in leadership, with the head of the bank turning over four times.[58]  The current head is Irene Dorner

---

[51] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.
[52] "HSBC appoints Chief Legal Officer," (1/13/12), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2012/chief-legal-officer. Mr. Levey held his position at the Treasury Department from July 2004 to February 2011. Id.  Mr. Bennett had headed HSBC Group's Legal and Compliance department since 1998; in 2010, he had become General Counsel.
[53] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.
[54] See HSBC Group "Board of Directors," http://www.hsbc.com/1/2/about/board-of-directors (describing Mr. Flockhart as "a career banker, being an emerging markets specialist with over 35 years' experience with HSBC in Latin America, the Middle East, US and Asia").
[55] Id.
[56] See "Leadership:  HSBC North America Holdings Inc.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hnah.
[57] Id.
[58] Information on HBUS' leadership is taken from its SEC annual reports.

who serves as HBUS' Chairman of the Board, President, and CEO.  She was appointed to those positions in 2010, after having served as the CEO of HSBC Bank Malaysia and as a director on the HBUS Board.  Her immediate predecessor was Paul J. Lawrence who headed HBUS from 2007 to 2010.  His predecessor was Sandy L. Derickson who served in the post for less than one year and left the bank along with Mr. Mehta after HSBC Finance Corporation, where he was second-in-command, incurred substantial losses.  His predecessor was Martin J.G. Glynn who headed HBUS from 2003 to 2006, and then retired.

HBUS has a six-person Board of Directors.  Its current members are Ms. Dorner; William R.P. Dalton, former CEO of HSBC Bank plc in London; Anthea Disney, former Executive Vice President of NewsCorporation; Robert Herdman, former SEC Chief Accountant; Louis Hernandez, Jr., CEO of Open Solutions Inc.; and Richard A. Jalkut, CEO of TelePacific Communications.

Within HBUS, the current Chief Operating Officer (COO) is Gregory Zeeman.[59]  His immediate predecessor was David Dew[60] who was preceded by Brendan McDonagh, who served as the COO from 2004 to 2006.   Some other key HBUS executives are Marlon Young, the head of Private Banking Americas; Kevin Martin, the head of Retail Banking and Wealth Management; and Mark Watkinson, the head of Commercial Banking.[61]  Since 2007, the bank's Chief Auditor has been Mark Martinelli. From 2000 to 2011, the head of HBUS Payments and Cash Management (PCM) was Michael Gallagher.  The head of Global Banknotes, from 2001 to 2010, was Christopher Lok.

HBUS' current General Counsel is Stuart A. Alderoty.[62]  His predecessor was Janet Burak who served as the bank's General Counsel from 2004 to 2010.  In 2007, she was also made the Regional Compliance Officer for North America.[63]

## B.  HBUS AML Program

The compliance and anti-money laundering (AML) programs at HBUS have undergone continual organizational and leadership changes since 2005.  In April 2003, the Federal Reserve and New York State Banking Department, which oversaw HBUS' predecessor bank, cited the bank for multiple, severe AML deficiencies and required it to enter into a written agreement to

---

[59] See "Leadership:  HSBC Bank USA, N.A.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.

[60] Mr. Dew served as HBUS COO from March 2007 to 2008; prior to that, he served for a month as HBUS Chief Administrative Officer from February 2007 to March 2007; prior to that he served as audit head at HUSI and HSBC North America Inc. from 2006 to 2007, and as audit head of HSBC North America Holdings Inc. from 2004 to 2007.  Mr. Dew currently works as Managing Director of the Saudi British Bank which is 40% owned by HSBC. Subcommittee interview of David Dew (3/5/2012).

[61] See "2011 HSBC Annual Report," http://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus, viewed 3/23/12.

[62] See "Leadership:  HSBC Bank USA, N.A.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.

[63] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00000230-259, at 256.  [Sealed Exhibit.]

**PX257**

20

revamp and strengthen its AML program.[64]  It was at that time that HBUS renamed itself and
converted to a national bank charter under the supervision of the OCC.  During its first year
under OCC supervision, HBUS reorganized its AML program, revamping its AML controls,
country and client risk assessment criteria, Know Your Customer (KYC) due diligence
requirements, and systems for detecting and reporting suspicious activity.[65]  HBUS also acquired
a new system for monitoring account activity, called the Customer Activity Monitoring Program
(CAMP) and established criteria to produce alerts requiring additional reviews.  In addition,
HBUS created a system of KYC client profiles with standard due diligence information
requirements for each client and which was updated on a regular basis and had to be approved by
compliance and other bank officials for an account to be kept open.  HBUS also established a
Financial Intelligence Group to conduct enhanced due diligence reviews.

Although the OCC gave positive reviews to the bank's initial efforts,[66] by 2010, the OCC
issued a lengthy Supervisory Letter again citing the bank for numerous AML deficiencies and
requiring HBUS to revamp its AML program a second time.  In response, the bank issued an
action plan to correct identified problems.  HBUS has, for example, acquired a new AML
monitoring system, NORKOM to replace CAMP, and is working to refine its parameters for
detecting suspicious activity.  In its first month of operation, NORKOM detected more than
100,000 transactions needing further review, demonstrating its ability to catch many transactions
that went previously unchecked under CAMP.

HBUS has also revamped its approach to HSBC affiliates, which make up an important
segment of HBUS' correspondent banking, wire transfer, and cash management businesses and
previously operated without due diligence controls and at times with minimal or no AML
monitoring.  Among other changes, HBUS now requires all subsidiaries to conduct due diligence
on all other HSBC affiliates, including by using internal audit information identifying their AML
risks and AML controls; identifies affiliates posing high AML risks; and treats them accordingly,
thus ending all policies exempting affiliates from standard AML account and wire transfer
monitoring.  In addition, HBUS has revamped its country and client risk assessment criteria,
which now identify high risk clients in a more robust manner; reviewed its correspondent
banking business to reduce the number of high risk financial institutions; and closed some high
risk business lines including its U.S. banknotes program.  HBUS has also hired new AML
leadership and significantly expanded its AML staffing and resources.  HBUS currently employs
over 1,000 compliance personnel.[67]

Some of HBUS' changes have been criticized by the OCC as inadequate.  HBUS has
been informed by the OCC that it must do additional work on its monitoring system in order to
implement the requirements of the 2010 Cease and Desist Order.  The individual hired by HBUS
to serve as its Chief Compliance Officer was asked to leave by the bank shortly after starting in

---

[64] See HSBC Bank USA, Federal Reserve Bank of New York, and New York State Banking Department, Docket
No. 03-012-WA/RB-SM (Board of Governors of the Federal Reserve System, Washington, D.C.), Written
Agreement (4/30/2003), OCC-PSI-00907803-811.
[65] See OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2005, OCC-PSI-
00423650.  [Sealed Exhibit.]
[66] Id.  at 10-11 (describing the formal agreement).
[67] See 7/10/2012 HSBC Group News, "HSBC to Testify at U.S. Senate Hearing." letter by HSBC Group Chief
Executive Stuart Gulliver, PSI-HSBC-76-0001-002, at 002.

**PX257**

2010.  Both HBUS and the OCC will have to work hard to ensure that the latest round of changes will produce a better AML outcome than the changes made in 2004.

### (1)  HBUS Compliance and AML Leadership

Over the last five years, HBUS has experienced high turnover in its Compliance and AML leadership, making reforms difficult to implement.  Since 2007, HBUS has had four Compliance heads and five AML directors.  Currently, both positions are held by the same person, Gary Peterson.  Mr. Peterson has extensive AML experience and was hired in 2010, to be the AML director, but after the Compliance head was asked to leave in 2010, has since held both posts.  In 2012, Mr. Peterson is expected to relinquish his duties as AML director to his deputy, Alan Schienberg, so that the top Compliance and AML positions at HBUS will each have a full time professional.[68]

The top compliance position at HBUS is the Chief Compliance Officer who oversees all compliance issues for the bank.  In the AML field, HBUS has specified two posts which have been held by the same person, the Anti-Money Laundering (AML) Director who is tasked with ensuring bank compliance with U.S. AML laws and regulatory requirements.[69]  HBUS' Compliance and AML leadership positions were relatively stable until 2007, after which the bank has struggled to hire and retain experienced compliance professionals.

HBUS' Chief Compliance Officer from 2000 to 2008 was Carolyn Wind.  Prior to that position, Ms. Wind worked for Republic Bank of New York as a compliance officer and, before that, as an OCC bank examiner.  For the first three years she held the job, Ms. Wind also served as the AML Director.  In 2003, the bank hired a separate AML Director, Teresa Pesce, who served in that post nearly four years, from 2003 to March 2007.  Before taking the position at the bank, Ms. Pesce was a Federal prosecutor with the U.S. Attorney's Office in New York.  Ms. Pesce left the bank in 2007, after which Ms. Wind headed both the Compliance and AML Compliance functions until she left the bank in 2008.  As discussed below, Ms. Wind was dismissed by HBUS after raising the issue of inadequate AML resources with the audit committee of the board of directors of the bank's holding company, HNAH.

In 2007, as part of a "Compliance Transformation Initiative," HSBC established a North America Compliance department at HNAH headed by a Regional Compliance Officer.[70]  HNAH appointed Janet Burak, then Regional Legal Department Head for North America, to also serve as the Regional Compliance Officer; she held both positions from 2007 to 2010.[71]  At the time, HSBC Group Compliance head David Bagley expressed concern about combining the two roles, arguing that each required too much effort for a single person, but was overruled.[72]  Two years

---

[68] See HSBC website, "Leadership:  HSBC Bank USA, N.A.,"
https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.
[69] The AML Director also serves as HBUS' Bank Secrecy Act Compliance Officer.
[70] See also Federal Reserve, at BOG-A-205485.
[71] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 27.  [Sealed Exhibit.]
[72] See 6/21/2007 email from HSBC David Bagley to HSBC Richard Bennett, HSBC OCC 8873871-5 (conveying to HSBC Group's most senior legal counsel, Richard Bennett, the concern of HBUS compliance personnel about "the

22

later, in March 2009, the Federal Reserve issued a negative critique of Ms. Burak's performance, noting in particular that she did not have an adequate understanding of AML risk or controls.[73] The OCC also later criticized her performance as well as the decision to combine the regional legal and compliance roles, noting in 2010, that Ms. Burak "has had to balance a wide range of legal and compliance duties, including establishing the strategic direction for both functions and representing both functions on senior committees at the Group level."[74] The OCC stated that, as a consequence, Ms. Burak had "not regularly attended key committee or compliance department meetings" and had failed to keep herself and other bank executives "fully informed about issues and risks within the BSA/AML compliance program."[75] It also placed some of the blame at her feet for a recently discovered backlog of 17,700 alerts indicating possible suspicious activity at the bank, which had not been reviewed, noting that "[b]acklogged alerts needed to receive the highest level of attention from senior bank management at a much earlier stage to ameliorate the problem."[76] Soon after this critique, Ms. Burak left the bank.

In the two years she held the regional posts, Ms. Burak oversaw three functional compliance teams at HNAH called "Compliance Advisory," "Compliance Center of Excellence," and "Compliance Shared Services Utility."[77] Each team was headed by a senior Compliance manager: Curt Cunningham, Anthony Gibbs, and Lesley Midzain.

Ms. Midzain was hired in 2007 to replace Carolyn Wind and so worked, not only for HNAH, but also for HBUS as both its Compliance head and AML director. She held these compliance posts for two years, from 2007 until 2009. Prior to being placed at the helm of the bank's AML program, Ms. Midzain had no professional experience and little familiarity with U.S. AML laws. In December 2008, HNAH's regulator, the Federal Reserve, provided a negative critique of Ms. Midzain's management of the bank's AML program. The Federal Reserve wrote that Ms. Midzain did "not possess the technical knowledge or industry experience

---

capability of one person to manage a very large legal function and a compliance function" and that "compliance will be pushed down below Legal"). See also 7/28/2010 email from HSBC David Bagley to HSBC Michael Geoghegan, HSBC OCC 8873871-75 (expressing to HSBC CEO Michael Geoghegan, that with regard to the 2007 decision to combine the two roles into one: "I fully accepted that Brendan [McDonagh], Paul [Lawrence] and Richard [Bennett] had the right to make this call, although as I said to you in Vancouver I now wish I had been more vociferous and in the current way my role operates I am confident that I would have a far stronger say.").

[73] The March 2009 Federal Reserve's Summary of Ratings stated: "Interviews conducted as part of our recent governance review revealed that Janet Burak, HNAH Legal and Compliance chief risk officer has only broad understanding of BSA/AML risk and relies on the HNAH BSA/AML officer [Midzain] to manage the risk. … Midzain, as previously stated has weak BSA/AML knowledge and industry experience. Burak's heavy reliance on the inexperienced Midzain is a concern. An example of Burak's limited management oversight of BSA/AML was revealed when we recently met with her to clarify a few items from our Governance review she was unable to respond to the question about the distribution and the purpose of annual AML statements. She subsequently communicated via email that she does not review the annual AML statements provided to her by the HNAH/BSA/AML officer (Midzain). Burak forwards the statements to Group." 3/25/2009 "Summary of Ratings for HSBC North America Holdings," Federal Reserve Bank of Chicago, OCC-PSI-00899234.

[74] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 27. [Sealed Exhibit.]

[75] Id.

[76] Id.

[77] Id. See also Federal Reserve, at BOG-A-205485.

to continue as the BSA/AML officer."[78]  It noted that she "was interviewed by OCC examiners from another team and they supported the conclusion of the OCC resident staff that Midzain's knowledge and experience with BSA/AML risk is not commensurate to HNAH's BSA/AML high risk profile, especially when compared to other large national banks."[79]

In 2009, the OCC also concluded that Ms. Midzain did not have the requisite AML expertise for her position.  An OCC Supervisory Letter echoed the criticisms leveled earlier by the Federal Reserve:

> "Ms. Midzain was selected as the Compliance Director and BSA Officer although she does not have the qualifications or the experience to manage a BSA program at an institution with the size and amount of BSA compliance risk that HBUS has.  She is a Canadian lawyer (a barrister and solicitor) who formerly worked for HNAH.  She is also a member of Group's executive development program. …  Ms. Midzain's assignment as HBUS' BSA Officer and Compliance Director has been her first assignment outside of Canada as a part of that program. …  During its 2009 compliance management examination, the OCC determined that Ms. Midzain lacked the experience and expertise to be the BSA Officer, and the OCC included an MRA in its supervisory letter that required the bank to strengthen its BSA/AML compliance leadership by hiring a BSA Officer who is highly qualified and very experienced."[80]

In response to the Federal Reserve and OCC criticisms, HBUS removed Ms. Midzain from the AML post, but retained her as head of HBUS' Compliance department.  In the fall of 2009, HBUS hired a new AML Director, Wyndham Clark, a former U.S. Treasury official, who assumed the post in the middle of an intensifying AML examination by the OCC and a host of serious AML problems facing the bank.  Mr. Clark was required to report to Curt Cunningham, an HBUS Compliance official who freely admitted having no AML expertise,[81] and through him to Ms. Midzain, whom the OCC had also found to lack AML expertise.  Shortly after he arrived, Mr. Clark began requesting additional resources.[82]  After 30 days at the bank, Mr. Clark sent Mr. Cunningham a brief memorandum with his observations, noting that HBUS had an "extremely high risk business model from AML perspective," had seen recent high turnover in its AML directors, and granted only limited authority to the AML director to remedy problems:

> "AML Director has the responsibility for AML compliance, but very little control over its success.

---

[78] Federal Reserve Bank of Chicago Summary of Ratings for HSBC North America Holdings, March 25, 2009, OCC-PSI-00899234.
[79] Id.
[80] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 28. [Sealed Exhibit.]
[81] Id. at 28.
[82] See, e.g., 10/19/2009 email exchange between HBUS Wyndham Clark and HBUS Debra Bonosconi, "OFAC resources," OCC-PSI-00162661 (Mr. Clark commented after Janet Burak had recently approved three new compliance personnel positions, "Clearly a positive, although I understand that these were requested quite a while ago.  I hope that isn't the typical response time."  Ms. Bonosconi responded:  "Oh, this was express time.  Trust me on that.  Usually the response is 'no.'"").

24

Operate under 'crisis' mode, actions are reactive rather than forward thinking.
AML Director unable to manage at high level.
Several AML Directors/BSA Officers in a short period of time."[83]

As he continued his work, Mr. Clark grew increasingly concerned that the bank was not effectively addressing its AML problems. In February 2010, Mr. Clark met with the Audit Committee of the HNAH board of directors and informed the committee that he had never seen a bank with as high of an AML risk profile as HBUS.[84] He also informed them that AML resources were "insufficient versus current risks and volumes," and the bank's systems and controls were "inconsistent with AML risk profile."[85] On May 10, 2010, Mr. Clark wrote to a senior HBUS Compliance official that with regard to the bank's AML compliance program, "With every passing day I become more concerned…if that's even possible."[86]

In July 2010, less than a year after taking the post, Mr. Clark decided to resign. He sent an email to the head of HSBC Group Compliance David Bagley explaining that he did not have the authority or support from senior compliance managers needed to do his job as AML director:

"[T]he bank has not provided me the proper authority or reporting structure that is necessary for the responsibility and liability that this position holds, thereby impairing my ability to direct and manage the AML program effectively. This has resulted in most of the critical decisions in Compliance and AML being made by senior Management who have minimal expertise in compliance, AML or our regulatory environment, or for that matter, knowledge of the bank (HBUS) where most of our AML risk resides. Until we appoint senior compliance management that have the requisite knowledge and skills in these areas, reduce our current reliance on consultants to fill our knowledge gap, and provide the AML Director appropriate authority, we will continue to have limited credibility with the regulators."[87]

When asked about his experience at the bank, Mr. Clark told the Subcommittee that he did not have either the authority or resources needed as AML director.[88] After his departure, the bank hired Gary Peterson, who was then an AML consultant to the bank, appointing him as HBUS' new AML director.

---

[83] 10/15/2009 HBUS memorandum from Wyndham Clark to HNAH Curt Cunningham, "30 Day Observations and Recommendations Report from AML Director," HSBC PSI PROD 0065332.
[84] Subcommittee interview of Wyndham Clark (11/30/2011); 2/17/2010 "HNAH AML Program, Board Audit Committee Presentation," by HBUS Wyndham Clark to the Audit Committee of the HNAH board of directors, HSBC OCC 3800290.
[85] 2/17/2010 "HNAH AML Program, Board Audit Committee Presentation," by HBUS Wyndham Clark to the Audit Committee of the HNAH board of directors, HSBC OCC 3900290.
[86] 5/10/2010 email from HBUS Wyndham Clark to HBUS Anne Liddy, "AML Townhall," OCC-PSI-00672582. See also 5/9/2010 email from HBUS Wyndham Clark to HNAH Curt Cunningham, "AML Townhall," OCC-PSI-00672571 ("Essentially AML decisions are now being made without AML SME [subject matter expertise]. This will be very apparent to the regulators.").
[87] 7/14/2010 email from HBUS Wyndham Clark to HSBC David Bagley, OCC-PSI-00676731. Mr. Clark formally left the bank in August 2010. Subcommittee interview of Wyndham Clark (11/30/2011).
[88] Subcommittee interview of Wyndham Clark (11/30/2011). Mr. Clark told the Subcommittee that, prior to his leaving, the bank finally approved a number of new AML hires. Id.

**PX257**

25

Around the same time that Mr. Clark left the bank in 2010, Ms. Midzain also departed, leaving open the post of Chief Compliance Officer.  That post remained vacant until 2011, when HBUS hired Eric Larson.  He left after fifteen months on the job.[89]  HBUS then asked Gary Peterson to serve, not only as HBUS' AML Director, but also as its Compliance head, and as HNAH's Regional Compliance Officer following Ms. Burak's departure in 2010.  Mr. Peterson agreed and has served in all three posts since 2010.  Altogether, these personnel changes meant that, over the last five years, HBUS has had four Chief Compliance Officers and five AML Directors.

At HSBC Group, HBUS' parent organization, for nearly ten years, from 2002 to the present, David Bagley has served as the HSBC Group's head of Compliance.  He is located in London and oversees both general and AML compliance issues.  His second-in-command is Warren Leaming, Deputy Head of HSBC Group Compliance, who has been in that position since January 1, 2007.  Susan Wright serves as the head of HSBC's AML efforts.  She is also located in London and has served in that position for more than a decade.  John Root is a senior Group Compliance officer who has concentrated on compliance and AML issues, in part in Mexico and Latin America.  Compliance personnel work with Matthew King who has served as the head of HSBC Group Audit since 2002.

## (2)  HBUS AML Program

Federal law requires banks operating in the United States to have a minimum of four elements, an AML compliance officer in charge of the program, AML internal controls, AML training, and an independent testing of the AML program to ensure its effectiveness.[90]  HBUS' AML program must address a wide range of AML issues, from customer due diligence, to monitoring account and wire transfer activity, to reporting suspicious activity to law enforcement.  It must also cover a wide range of business lines and products, including Correspondent Banking, International Private Banking, Domestic Private Banking, Embassy Banking, Payment and Cash Management, and Banknotes services.

**Inadequate Staffing.**  Despite its high AML risks, millions of customers, and employment of more than 16,500 employees overall, from 2006 to 2009, HBUS' entire Compliance Department numbered less than 200 full time employees; its AML Compliance staff was a subset of that and also included staff in India.[91]  HBUS personnel told the Subcommittee that inadequate AML staffing was one of the biggest problems they faced.[92]  OCC examinations also routinely identified inadequate staffing as a key AML problem, including with respect to

---

[89] Subcommittee interview of OCC Examiner Teresa Tabor (5/17/2012).

[90] See 31 U.S.C. §5318(h); 12 C.F.R. §21.21.

[91] Subcommittee briefing by HSBC legal counsel (6/30/2011).

[92] Subcommittee interview of HBUS Debra Bonosconi (11/17/2011) (Ms. Bonosconi reported to the Subcommittee that staffing was her biggest issue and that by March 2008 it was evident that more staff was needed.  She made several requests for additional resources); Subcommittee interview of HBUS Anne Liddy (2/22/2012) (Ms. Liddy made a request for resources to Carolyn Wind, but was told that there was no appetite to bring on additional staff); Subcommittee interview of HBUS Carolyn Wind (3/7/2012); Subcommittee interview of HBUS Teresa Pesce (3/30/2012) (Ms. Pesce asked for business to provide funding for more AML Compliance positions because Compliance did not have the money).

PX257

unreviewed alerts,[93] PCM processing,[94] Correspondent Banking,[95] OFAC reviews,[96] Embassy Banking,[97] and the Compliance Review Unit that tested the bank's AML controls.[98]

Bank documents show that Compliance and AML staffing levels were kept low for many years as part of a cost cutting measure.  In 2007, HBUS announced a "1509 Initiative," to increase the bank's return on equity by 2009, largely through cost cutting measures.  One component of the plan was to ensure that 2007 and 2008 headcounts remained flat.  This hiring freeze caused HBUS Compliance and the AML staffing requests to be denied or unanswered.  At one point, HBUS Compliance and AML management resorted to requesting temporary staff when persistent AML alert backlogs grew to unmanageable levels.  In 2007, HBUS fired its longtime AML head after she raised resource concerns with the HNAH Audit Committee; an AML director hired in 2009 left after being denied the authority and resources he considered necessary to do his job.  After the OCC issued its lengthy Supervisory Letter criticizing multiple aspects of HBUS' AML program, bank management began to significantly increase AML staff and resources.

**AML Staffing Problems.**  In 2006, HBUS Compliance was already struggling to "handle the growing monitoring requirements" associated with the bank's correspondent banking and cash management programs, and requested additional staff.[99]  In October 2006, HBUS Compliance officer Alan Ketley wrote that despite having very efficient processes, each month his Compliance team was "handling an average of 3,800 [alerts] per person and [was] becoming overwhelmed thus potentially placing the business and the bank at risk."[100]  Despite requests for additional AML staffing, HBUS decided to hold staff levels to a flat headcount.[101]

**1509 Initiative and Hiring Freeze.**  In 2007, against the backdrop of losses stemming from its troubled acquisition of Household International and the beginning of the global financial crisis, HBUS launched the 1509 Initiative which sought to achieve a 15% return on equity for the

---

[93] 3/3/2010 OCC Supervisory Letter HSBC-2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542-545.  [Sealed Exhibits.]

[94] 3/18/2009 OCC Supervisory Letter HSBC-2008-40, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624-625.  [Sealed Exhibit.]

[95] 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618-620.  [Sealed Exhibit.]

[96] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962; 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434-436. [Sealed Exhibits.]

[97] See 3/19/2007 OCC Supervisory Letter HSBC-2006-30, "Government and Institutional Banking BSA/AML Examination," OCC-PSI-00107567-571; 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-536.  [Sealed Exhibits.]

[98] See 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-00000341-345.  [Sealed Exhibit.]

[99] See 10/31/2006 email from HBUS Alan Ketley to HBUS Michael Gallagher, Denise Reilly, and Charles DelBusto, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-43, at 341.

[100] Id. at HSBC OCC 0616342.

[101] See, e.g., 10/31/2006 email exchange between HBUS Michael Gallagher and HBUS Tony Murphy, Charles DelBusto, Alan Ketley, and others, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-343;  9/25/2006 email exchange between HBUS Michael Gallagher and HBUS Teresa Pesce, Alan Ketley, Charles DelBusto, and others, "Additional monitoring resources," HSBC OCC 7688655-657.

bank by 2009, primarily by cutting costs.  One facet of the 1509 Initiative was the "$100 Million Dollar Cost Challenge," which set a goal of cutting costs of $100 million in 2007.[102]

The hiring freeze began in September 2007, when HBUS Compliance had a headcount of 198 full time employees, one below its December 2006 level.[103]  When Compliance sought to fill six open positions, David Dew, HBUS Chief Operating Officer (COO), informed Compliance head and AML director Carolyn Wind that the positions could not be filled:

> "This increase will be almost impossible to justify and therefore I must ask you to please cancel the open positions and ensure that your FTE as at 31 Dec 2007 does not exceed 199."[104]

To make the case for increased staffing resources, in September 2007, HBUS Compliance personnel reached out to compliance peers at other banks and learned that at the three major banks that provided some information, each had a greater number of monitoring staff in the correspondent banking area than HBUS.[105]  In addition, HBUS Compliance personnel noted that HBUS Compliance filed many fewer Suspicious Activity Reports (SARs) than its competitors;[106] while HBUS filed three to four per month in the correspondent banking area, its peers filed 30 to 75 per month, and one major international bank disclosed that it filed approximately 250 SARs per month.[107] Despite these statistics, the Compliance department and AML staff remained stagnant.

**Fired After Raising Staffing Concerns to Board.**  After being turned down for additional staff, Carolyn Wind, longtime HBUS Compliance head and AML director, raised the issue of inadequate resources with the HNAH board of directors.  A month after that board meeting, Ms. Wind was fired.

---

[102] See HSBC internal presentation entitled, "1509," HSBC OCC 0616217-254, at 241-45.

[103] 9/14/2007 email from HBUS David Dew to HBUS Carolyn Wind, Janet Burak, and Kathryn Hatem, "HEADCOUNT," HSBC OCC 0616262.

[104] Id.

[105] On 9/6/2007, Mr. Ketley wrote: "Every bank that responded and provided information about monitoring staff has more than HBUS."  9/6/2007 email from HBUS Alan Ketley to HBUS Alan Williamson, Judy Stoldt, and George Tsugranes, "Correspondent survey," HSBC OCC 0616384-385.  See also 9/6/2007 HBUS chart, "Correspondent Banking Survey," HSBC OCC 3400666.  [Sealed Exhibit.]  See also emails indicating HBUS Compliance personnel were not compensated at levels consistent with its competitors, and risked losing qualified personnel.  See, e.g., 2/1/2007 email exchange among HBUS Carolyn Wind, HBUS Teresa Pesce and others, "MIP overages - URGENT," HSBC OCC 0616314-316, at 314 ("We are not at market with our current comp[etitors" and "[t]hese officers and AML officers can get new jobs in a heartbeat"); 2/27/2007 email from HBUS Karen Grom to HBUS Carolyn Wind, Denise Reilly, Teresa Pesce, David Dew and others, "HUSI Compensation Review," HSBC OCC 0616318 ("The banks who are approaching our employees have deep pockets and are willing to pay to get the talent. … In many cases, we are paying under the 'market data point' (50th percentile)." and "The offers from head-hunters are in some cases double base salaries and double bonuses[.]").

[106] 9/6/2007 email from HBUS Alan Ketley to HBUS Alan Williamson, Judy Stoldt, and George Tsugranes, "Correspondent survey," HSBC OCC 0616384-385 (Mr. Ketley wrote "Our competitors all acknowledge filing more SARs than we do."); 9/6/2007 HBUS chart, "Correspondent Banking Survey," HSBC OCC 3400666.  [Sealed Exhibit.]

[107] 8/27/2007 email from HBUS Alan Ketley to HBUS Michael Gallagher, Charles DelBusto, Chris Davies, and Alan Williamson, "Addressing negative information," HSBC OCC 7688584-587, at 587.

PX257

On October 24, 2007, Ms. Wind met with the Audit Committee of the HNAH board of directors and, during the meeting, raised the staffing issue, particularly with respect to the Embassy Banking area which had been the subject of two recent OCC examinations uncovering severe AML deficiencies.  Her supervisor, Regional Compliance Officer Janet Burak, also attended the Audit Committee meeting.  The day after the meeting, in an email to HSBC Group Compliance head David Bagley, Ms. Burak expressed displeasure that Ms. Wind's comments had caused "inappropriate concern" at the Audit Committee:

> "I indicated to her [Ms. Wind] my strong concerns about her ability to do the job I need her to do, particularly in light of the comments made by her at yesterday's audit committee meeting ….  I noted that her comments caused inappropriate concern with the committee around: our willingness to pay as necessary to staff critical compliance functions (specifically embassy banking AML support), and the position of the OCC with respect to the merger of AML and general Compliance."[108]

A month after the board meeting, after seven years as HBUS' Compliance head, Ms. Wind was notified that she was being fired.  In a January 22, 2008 letter to the head of HBUS Human Resources, Ms. Wind wrote:

> "I was told on November 30, 2007 that I was being terminated effective 2/28/08, due to the fact that the Board had lost confidence in me.  …  If the Board has lost confidence in me based on my comments at the October, 2007 Audit Committee, why have I been allowed to continue to run this critical department without additional supervision or any direct follow-up from Group Compliance?"

Ms. Wind also wrote:  "David [Dew] and I disagree on the extent to which my organization can withstand cost cuts and still maintain an effective compliance risk mitigation program.  I also believe in an open dialog with the Board and its committees, which may go against the desires of some in the organization."[109]  When asked about this document, Ms. Wind told the Subcommittee that she believed she was fired for telling the HNAH board about the need for additional Compliance resources.[110]

**Hiring Freeze Continues.**  After her departure, the hiring freeze continued throughout 2008.[111]  In February 2008, prior to her leaving the bank, Ms. Wind discussed the staffing freeze with HNAH COO Anthony Gibbs:

---

[108] 10/25/2007 email from Janet Burak to David Bagley, OCC-PSI-00704789.

[109] January 22, 2008 letter from Carolyn Wind to Jeanne Ebersole, HSBC OCC 7730334.

[110] Subcommittee interview of Carolyn Wind (3/07/2012).  Anne Liddy also reported that Ms. Wind told her in 2007 that she had been terminated due to Ms. Wind raising resource concerns to the board's audit committee. Subcommittee interview of Anne Liddy (2/22/2010).  Also see, Minutes of the Audit Committee Meeting, October 24, 2007, OCC-PSI-0070680.

[111] On 1/17/08, Jeanne Ebersole, Executive Vice President HBUS Human Resources, wrote to the HBUS Executive Committee [EXCO], "Attached is a draft of the non-hiring freeze note to be sent to all GCBs 0, 1, 2 and the final headcount report for 2007 which we will discuss tomorrow at EXCO." 1/17/2008 email from HBUS Jeanne Ebersole to HBUS Chris Davies, David Dew, Janet Burak and others, "Draft Materials for EXCO," HSBC OCC 0616259-260, at 259.

**PX257**

29

"HBUS Compliance has been required to manage down overall FTE [full time employees] while at the same time redeploying resources to priority needs. We also are in the midst of a 'hiring pause' which means that approval from appropriate EXCO members is required to fill any open position. I do not expect a lot of support for overall HBUS Compliance headcount increasing even if a portion of the time is allocated to other affiliates."[112]

In June 2008, a senior PCM operations manager emailed senior HBUS Compliance official Anne Liddy about growing backlogs in the OFAC Compliance program:

"I have put forth the suggestion of hiring up some first level checkers for OFAC processing in the GSC…we're strapped and getting behind in investigations (on OFAC cases) and have some of our key managers in the queues releasing items… I'm told I cannot hire first level staff unless it's offshored…"[113]

An OCC examination later found that eight Compliance officers were under "rigorous pressure" to complete manual reviews of about 30,000 OFAC alerts per week.[114]

In July 2008, however, HSBC Group senior management determined that the hiring freeze would continue to the end of the year. CEO Michael Geoghegan wrote to HNAH CEO Brendan McDonagh and others: "We have agreed that we will have a headcount freeze until the end of the year."[115]

HBUS Compliance personnel, with the support of their business units, attempted to obtain an exception to the hiring freeze. In a September 2008 email, Michael Gallagher, PCM head at HBUS, requested additional Compliance staff, explaining: "I have expressed considerable concern for some time over the lack of resources both in compliance and within pcm [Payments and Cash Management] to adequately support kyc [Know Your Customer] and related regulatory requirements."[116] Lesley Midzain, then HBUS Chief Compliance Officer, echoed his concerns and requested four additional full time employees:

"Given the hiring freeze in global businesses, I understand that it may also need approval by Paul Lawrence, but this has continued to be an area of notable risk and regulatory attention and which needs some stabilization for Compliance resources."[117]

---

[112] 2/12/2008 email from HBUS Carolyn Wind to HBUS Anthony Gibbs, Curt Cunningham, Denise Reilly and others, "Organizational Changes," HSBC OCC 0616264.

[113] See 6/19/2008 email exchanges among HBUS Anne Liddy and HBUS Nancy Hedges, "OFAC processing in GSC's," HSBC OCC 0616349-350, at 349.

[114] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962 ("the bank's Compliance teams are under rigorous pressure to process alerts and determin[e] a disposition in a timely manner"). [Sealed Exhibit.]

[115] 7/23/2008 email from HSBC Michael Geoghegan to HNAH Brendan McDonagh and others, "2nd Half Costs," OCC-PSI-00727922.

[116] See 9/4/2008 email exchanges among HBUS Michael Gallagher and HBUS David Dew, Lesley Midzain, Andrew Long, Chris Davies and others, "Kyc hires," HSBC OCC 0616352-356, at 356. When asked about this document, Mr. Gallagher said that Mr. Dew had informed him that broader concerns in the U.S. and at Group necessitated a flat headcount. Subcommittee interview of Michael Gallagher (6/13/2012).

[117] Id. at HSBC OCC 0616354.

**PX257**

After expressing concern over how additional hires would impact operating expenses, Mr. Dew, HBUS COO, asked Ms. Midzain if "a couple of temps for two months" would "do the trick."[118]

Hiring did not improve during 2009.  Wyndham Clark, who had been hired in 2009, as the new HBUS AML director, noted in an email that Janet Burak had recently approved three new compliance positions.  He wrote:  "Clearly a positive, although I understand that these were requested quite a while ago.  I hope that isn't the typical response time."  A senior PCM operations officer responded:  "Oh, this was express time.  Trust me on that.  Usually the response is 'no.'"[119]  The Subcommittee was told that in September 2009, the HBUS Compliance department had 130 full time employees handling AML compliance issues.[120]

**OCC Examination.**  During late 2009 and the first half of 2010, the OCC expanded and intensified its examination of the bank's AML program as a whole.  Mr. Clark made increasing use of temporary employees and contractors to answer OCC inquiries and address AML deficiencies.  In August, he left the bank.  By then, he was using nearly 100 temporary employees and contractors and had requested 50 additional permanent full time Compliance personnel.[121]  Even with those additional resources, the OCC's September 2010 Supervisory Letter identifying AML deficiencies at the bank criticized HBUS' failure "to provide adequate staffing and resources to implement and maintain a BSA/AML compliance program commensurate with the bank's high risk profile."[122]  The OCC Supervisory Letter also noted: "Management is still in the process of determining an appropriate level of resources as they consider recommendations from outside consultants and make strategic decisions about the business and risk on a prospective basis."[123]  By October 2010, the Compliance department had increased to over 400 full time employees.[124]

**AML Monitoring Deficiencies.**  In addition to AML leadership problems and inadequate AML staffing, another key component of HBUS' AML program involved its monitoring systems.  During the period reviewed by the Subcommittee, dating from 2004, HBUS used a monitoring system called the Customer Activity Monitoring Program (CAMP).  This system had many limitations and often required manual reviews by HBUS Compliance and AML staff.

By 2006, as indicated earlier, HBUS Compliance was already struggling to handle the monitoring alerts generated by the bank's growing correspondent banking and cash management programs and described its personnel as "becoming overwhelmed."[125]  Backlogs of unreviewed alerts in different areas of the bank began to accumulate, including with respect to alerts

---

[118] Id. at HSBC OCC 0616352.
[119] 10/19/2009 email exchange between HBUS Wyndham Clark and HBUS Debra Bonosconi, "OFAC resources," OCC-PSI-00162661.
[120] Subcommittee briefing by HSBC legal counsel (6/30/2011).
[121] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 29. [Sealed Exhibit.]
[122] Id.
[123] Id.
[124] Subcommittee briefing by HSBC and HBUS executives (6/26/2012).
[125] See 10/31/2006 email from HBUS Alan Ketley to HBUS Michael Gallagher, Denise Reilly, and Charles DelBusto, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-43, at 342.

**PX257**

generated by CAMP monitoring of client accounts and wire transfer activity; alerts triggered by the OFAC filter on transactions by potentially prohibited persons identified on OFAC lists of terrorists, drug traffickers, and other wrongdoers; and alerts related to potentially suspicious activity in Embassy Banking accounts.

With respect to the general CAMP system alerts for PCM, HBUS Compliance set a goal that no more than 2% of AML alerts should remain in the system for over 120 days without being resolved. In addition, the system notified increasingly senior management if the backlog exceeded certain thresholds. For example, when the CAMP alerts hit 3%, bank compliance officials like Anne Liddy were alerted; when it hit 4%, higher level compliance personnel such as AML director Lesley Midzain were notified; if the backlog hit 6%, HNAH's Regional Compliance Officer Janet Burak was notified.[126] In November 2009, the percentage of AML alerts in the system for longer than 120 days spiked from 4% in October to 9%.[127] The backlog remained at 9 or 10% for the next four months, from December 2010 to February 2010, and then stayed around 6 or 7% from March to May 2010.[128] In early 2010, as part of its expanded AML examination, the OCC discovered the CAMP backlog of more than 17,000 unreviewed alerts as well as a backlog of requests for enhanced due diligence (EDD) reviews.[129] On March 3, 2010, an OCC Supervisory Letter ordered the bank to eliminate the alert and EDD backlog by June 30, 2010.[130] The bank met the deadline using "offshore reviewers in India, HBUS staff in Delaware, HBUS temporary volunteers, [and] outside contractors."[131] A subsequent review by the OCC, however, found "deficiencies in the quality of the work," and required an independent assessment.[132] The independent assessment found that 34% of the alerts supposedly resolved had to be re-done.

As Ms. Wind reported to the board in October 2007, backlogs were also an issue in Embassy Banking. A 2008 OCC examination identified a backlog of over 3,000 alerts identifying potentially suspicious activity in Embassy accounts that had yet to be reviewed.[133] In response, HBUS initiated a concentrated effort to review and resolve those alerts prior to a followup OCC examination in July 2008.[134] The followup examination found a backlog of about 1,800 alerts, some of which dated from 2007. The OCC examiners recommended issuance of a c

---

[126] "Bankwide KRI AML Transaction Monitoring Alert Aging – K02854," HSBC OCC 7688689.

[127] Id.

[128] Id.

[129] 3/3/2010 OCC Supervisory Letter HSBC-2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542. [Sealed Exhibit.]

[130] Id.

[131] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 9. [Sealed Exhibit.]

[132] Id.

[133] 8/14/2008 OCC memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227-233, at 231. [Sealed Exhibit.]

[134] July 31, 2008 Memorandum from HBUS Debra Bonosconi to HBUS David Dew, Lesley Midzain, and Cam Hughes. OCC-PSI-00409095. Also see 7/14/2008 Memorandum from HBUS Debra Bonosconi to HBUS David Dew, Lesley Midzain, Cam Hughes, "As shown in the chart below, we currently (as of 7/15) have a total of 1,793 open alerts which is a reduction of 1,519 from 3,312 on June 27th. There are a total of 203 that are open in excess of 120 days and 147 open in excess of 90 days (350 combined) and we are concentrating our efforts on reducing those first. We are closing an average of 84 alerts daily (including Saturday) and based upon current projections, we should have total of 1,499 pending alerts when the OCC arrives on July 21, 2008." OCC-PSI-00285742

PX257

32

Cease and Desist Order to the bank in part due to the backlog, but the OCC instead issued a Supervisory Letter, identified the backlog as a Matter Requiring Attention by the bank, and required the backlog to be cleared by September 15, 2008.[135]   The bank met that deadline.[136]

A third category of alert backlog involved transactions that were stopped by the OFAC filter as possible violations of OFAC regulations.  Each transaction had to be manually reviewed and resolved by two 4-person OFAC Compliance teams in New York and Delaware.  In July 2007, HSBC introduced a new payment system, GPS, in the United States.[137]   The system had undergone several adjustments just prior to its launch, including changes to its OFAC filters, which caused unexpectedly large backlogs.[138]   HBUS assigned a team to assist with clearing the backlog, but the problem still took weeks to resolve.

In December 2009, HBUS' OFAC Compliance team in New York had accumulated a backlog of greater than 700 OFAC alerts.[139]   The OFAC Compliance team requested five or six people from PCM for ten days to help clear the backlog.[140]   PCM responded that it had no resources to loan, and suggested asking the Compliance team in Delaware for help.  The OFAC Compliance team in New York indicated the Delaware Compliance staff was already "fully deployed" dealing with general alerts from the CAMP monitoring system:

> "We have considered all options at this point[;] the Compliance team in DE is already fully deployed dealing with wire camp alerts and bank examiner requests for the current exam.  There is no bandwidth there at all[;] they are behind on the current alert clearing process which we are also dealing with."[141]

Understaffed, HBUS Compliance and AML staff constantly battled alert backlogs while requesting additional resources.  These requests, if answered, generally resulted in additional temporary staff dispatched only when backlogs grew to unmanageable levels. As the backlog increased, tensions grew, and in February 2010, Mr. Clark, the AML Director who had been on the job only a few months, wrote:  "[W]e are in dire straights [sic] right now over backlogs, and decisions being made by those that don't understand the risks or consequences of their decisions!!!!"[142]

---

[135] See 9/4/2008 OCC Supervisory Letter HSBC-2008-07, "Government and Institutional Banking BSA/AML Examination," OCC-PSI-00107607-611. [Sealed Exhibit.]

[136] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 9. [Sealed Exhibit.]

[137] See, e.g., 7/29/2007 email from HBUS Andrew Long to HBUS Michael Gallagher, "draft strawman," HSBC OCC 7688680-682; 7/18/2007 email from HBUS Carolyn Wind to HBUS William Johnson, David Dew, Michael Gallagher, Andrew Long, David Bagley and others, "HBUS GPS Day 2 and 3 Update," HSBC OCC 7688676-678, at 677.

[138] Id.

[139] 12/11/2009 email exchange among HBUS Camillus Hughes and HBUS Michael Gallagher, Charles DelBusto, Sandra Peterson, Thomas Halpin, Chris Davies, and Lesley Midzain, "OFAC Payments," HSBC OCC 7688668-670, at 670.

[140] Id.

[141] Id. at HSBC OCC 7688668.

[142] 2/26/2010 email from HBUS Wyndham Clark to HBUS Debra Bonosconi, OCC-PSI-00165898.  In another email the next day, Mr. Clark wrote:  "At this point the businesses are not accepting that they own the risk, I can

**PX257**

The problems with HBUS' AML monitoring system were not limited to the backlogs. Additional issues involved an array of problematic decisions on what clients and countries should be designated high risk and subject to enhanced monitoring; what accounts and wire transfer activity should be subject to or excluded from routine AML monitoring; what parameters should be used to trigger alerts, including dollar thresholds, key words or phrases, and scenario rules that combine specified elements; and what "negative rules" should be used to decrease the number of alerts that would otherwise be generated for review.[143]  The OCC's September 2010 Supervisory Letter identified multiple problems with each of these elements of HBUS' AML monitoring systems.[144]

**Current Status of HBUS AML Program.**  In the two years since the OCC issued its September 2010 Supervisory Letter and both the OCC and Federal Reserve issued October 2010 Cease and Desist Orders to HBUS and HNAH regarding the many AML deficiencies in their programs, both HBUS and HNAH, as well as HSBC, have made commitments to strengthen their AML programs, including by directing more resources to compliance needs.  HBUS told the Subcommittee that Gary Peterson will remain as its Compliance head, and his deputy will take over the duties of AML director, to ensure both positions have a full time executive.[145]  HBUS also informed the Subcommittee that as of July 2012, it had increased its Compliance and AML staff to over 1,000 full time employees.[146]  It is also in the process of replacing CAMP with an improved AML monitoring system, NORKOM.  Additional reforms include scaling back its correspondent banking and embassy banking relationships by closing higher risk accounts, as well as closing its banknotes business in 2010.[147]  With respect to HSBC affiliates, HBUS told the Subcommittee it has initiated due diligence reviews of all such affiliates to identify those that are high risk, enabled all affiliates to obtain internal audit findings and other information to improve affiliate risk assessments, ended any limits on the monitoring of affiliates, and increased affiliate information sharing to strengthen AML compliance.[148]

---

think of one exception, making the difficult decisions and taking the necessary steps to mitigate the risk.  My view is the risks are being ignored by the business, and they are simply waiting for compliance to tell them what the risks are and to convince them as to what actions need to be taken. If they don't know what the risks are, then why are they opening accounts or continuing with the relationship?"  On the same day, Anne Liddy responded:  "[W]e spend a lot of energy pushing our point and holding our ground and certainly Group member referred relationships/transactions have increased our HBUS risk." 2/27/2010 email exchange between HBUS Anne Liddy, Wyndham Clark, and Debra Bonosconi, OCC-PSI-00165932.

[143] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 10-21.  [Sealed Exhibit.]

[144] Id.

[145] Subcommittee briefing by HSBC and HBUS executives (6/26/2012).

[146] Id.  See also, 7/10/2012 HSBC Group News, "HSBC to Testify at U.S. Senate Hearing." letter by HSBC Group Chief Executive Stuart Gulliver, PSI-HSBC-76-0001-002, at 002.

[147] As of June 2012, HBUS had closed all banknotes accounts, 24 embassy accounts, and 326 correspondent relationships.  In August 2010, as part of this review to exit relationships, HBUS CEO Irene Dorner noted that she was recommending closing relationships with 121 international banks that "do not meet either risk or return hurdles." 9/20/2010 email from Irene Dorner to Andrew Long and others, HSBC OCC 8876104-106.

[148] Id.

**PX257**

34

In addition, on April 30, 2012, HSBC Group issued a new Group Circular Letter (GCL) 120014, announcing the intention of the bank to use the highest global compliance standards for every HSBC affiliate.  The HSBC GCL stated:

> "We must adopt and enforce the adherence to a single standard globally that is determined by the highest standard we must apply anywhere.  Often, this will mean adhering globally to U.S. regulatory standards, but to the extent another jurisdiction requires higher standards, then that jurisdiction's requirements must shape our global standard."[149]

This new GCL could represent a groundbreaking approach for the bank if it, in fact, pushes its affiliates toward uniform and high compliance standards.

These reforms, like those announced in 2004 after the bank's last AML enforcement action, have the potential to resolve the AML deficiencies at the bank and push HBUS to an improved level of AML compliance.  While HBUS has committed to making major changes, the bank made similar commitments under the 2003 enforcement action, which the OCC lifted in 2006, after which the bank's AML program quickly deteriorated.  On many occasions since then, HBUS responded to AML problems identified by the OCC by instituting new policies and procedures that appeared to be effective remedies.  However, it has often been the case that regulators would subsequently cite HBUS for failing to comply with its own policies and procedures.  In 2006, for example, when the OCC lifted the AML enforcement action, HBUS had already incurred over 30 AML-related Matters Requiring Attention, many of which cited AML problems similar to those that had formed the basis of the written agreement.

In addition, not all of the AML reforms proposed since 2010 have proceeded smoothly. The new compliance head hired by the bank left after fifteen months.  The bank's new monitoring system has been the subject of OCC criticisms aimed at whether its monitoring parameters have been correctly set to identify suspicious activity and provide adequate AML oversight of client account and wire transfer activity.[150]  While the recent GCL could represent an important advance in requiring bank affiliates to adhere to the highest AML standards globally, as this report documents, it can take months, if not years, for HSBC affiliates to come into compliance with HSBC GCL directives.  The burden of proof is on HSBC Group to show that its latest directive is taking hold and its affiliates are complying with the highest AML stands, and on HBUS to show that it is moving from an ineffective AML program to one that safeguards the U.S. financial system from abuse.

---

[149] GCL 120014 – HSBC Global Standards.
[150] See 5/25/2012 OCC Supervisory Letter HSBC-2012-19, "Payments and Cash Management (PCM); Bank Secrecy Act and Anti-Money Laundering (BSA/AML) System Examination," PSI-OCC-37-0004.  [Sealed Exhibit.] See also 6/25/2012 HSBC response letter, Supervisory Letter HSBC 2012-19 "Payments and Cash Management (PCM); Bank Secrecy Act and Anti-Money Laundering (BSA/AML) System Examination," HSBC-PSI-PROD-0200315-341.

**PX257**

35

## III.  HBMX:  PROVIDING U.S. ACCESS TO A HIGH RISK AFFILIATE

HBUS has opened correspondent accounts for approximately 80 HSBC affiliates around the world, providing them with access to the U.S. financial system through clearing U.S. dollar wire transfers, cashing U.S. dollar checks, buying and selling physical U.S. dollars, and other services.[151]  Some of those HSBC affiliates operate in high risk countries, provide services to high risk clients, or offer high risk financial products.  Until recently, HSBC Group policy, however, allowed its affiliates to assume that any HSBC affiliate owned 50% or more by the Group met Group AML standards, were low risk, and required no due diligence prior to opening a correspondent account.[152]  In conformance with that HSBC Group policy, for years, HBUS did not conduct any due diligence analysis or risk assessment of an HSBC affiliate prior to supplying it with a U.S. account.  HBUS took that approach, even though U.S. statutory and regulatory requirements explicitly direct U.S. banks to conduct due diligence prior to opening a correspondent account for any foreign financial institution, with no exception for foreign affiliates.[153]

HBMX, an HSBC affiliate in Mexico, illustrates how providing a correspondent account and U.S. dollar services to a high risk affiliate increased AML risks for HBUS.  HBMX was created when HSBC Group purchased a Mexican bank known as Bital in 2002.  A pre-purchase review disclosed that the bank had no functioning compliance program, despite operating in a country confronting both drug trafficking and money laundering.  For years, HSBC Group knew that HBMX continued to operate with multiple AML deficiencies while serving high risk clients and selling high risk products.  HSBC Group also knew that HBMX had an extensive correspondent relationship with HBUS and that suspect funds moved through the HBMX account, but failed to inform HBUS of the extent of the AML problems at HBMX so that HBUS could treat HBMX as a high risk account.  Instead, until 2009, HBUS treated HBMX as low risk.

Contrary to its designation, HBMX engaged in many high risk activities.  It opened accounts for high risk clients, including Mexican casas de cambios and U.S. money service businesses, such as Casa de Cambio Puebla and Sigue Corporation which later legal proceedings showed had been used on occasion, from 2005 to 2007 for Puebla and from 2003 to 2005 for

---

[151] As of February 2010, HBUS had about 2,400 clients in its Payments and Cash Management (PCM) department.  See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]  In June 2012, HBUS had a total of nearly 1,200 correspondent clients, of which 80 were HSBC affiliates.  The HSBC affiliates had 395 HBUS accounts, of which 7 or 8 related to HBMX.  Subcommittee briefing by HSBC legal counsel (6/20/2012).

[152] See, e.g., 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 2 (citing HBUS's 12/1/2008 AML Procedures Manual at 12:  "The only exception to the KYC Profile requirement is any client who is an HSBC Group affiliate in which HSBC has an ownership interest of 50% or more.").  After the Setember 2010 OCC Supervisory Letter criticizing its practice, HSBC Group changed its policy and now requires all affiliates to perform due diligence on all other affiliates.

[153] See, e.g., 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 2 ("The Bank is obligated to conduct due diligence, and, where necessary, EDD [Enhanced Due Diligence], on foreign correspondent accounts. 31 U.S.C. § 5318(i)(1). … Section 5318(i) does not exempt foreign correspondent accounts that a bank maintains for its affiliates.").

**PX257**

Sigue, to launder funds from illegal drug sales in the United States. HMBX also offered high risk products, including providing U.S. dollar accounts in the Cayman Islands to nearly 50,000 clients with $2.1 billion in assets, many of which supplied no KYC information and some of which misused their accounts on behalf of a drug cartel. HBMX was also the single largest exporter of U.S. dollars to HBUS, transferring over $3 billion in 2007 and $4 billion in 2008, amounts that far outstripped larger Mexican banks and other HSBC affiliates. Mexican and U.S. law enforcement and regulatory authorities expressed concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds that had been brought back to Mexico from the United States. In addition, for a three-year period from mid-2006 to mid-2009, HBUS failed to conduct any AML monitoring of its U.S. dollar transactions with HSBC affiliates, including HBMX, which meant that it made no effort to identify any suspicious activity, despite the inherent risks in large cash transactions.[154]

HBMX conducted these high risk activities using U.S. dollar correspondent and banknotes accounts supplied by HBUS. HBMX used those accounts to process U.S. dollar wire transfers, clear bulk U.S. dollar travelers cheques, and accept and make deposits of bulk cash, all of which exposed, not only itself, but also HBUS, to substantial money laundering risks. HBMX compounded the risks through widespread, weak AML controls, while HBUS magnified them by omitting the due diligence and account monitoring it applied to other accounts. HSBC Group also compounded the AML risks by failing to alert HBUS to HBMX's ongoing, severe AML deficiencies.

## A. HSBC Mexico

In November 2002, HSBC Group purchased Mexico's fifth largest bank, Banco Internacional, S.A., then part of Grupo Financiero Bital, S.A. de C.V. (Bital), for about $1.1 billion.[155] At the time of the purchase, Bital had roughly 6 million customers and 15,400 staff.[156] This acquisition significantly increased HSBC's banking presence in Mexico.[157] HSBC later changed the name of the bank to HSBC Mexico S.A. Banco (HBMX) and the name of the holding company to Grupo Financiero HSBC, S.A. de C.V. (GF HSBC). GF HSBC is now one of Mexico's largest financial service conglomerates, owning not only HBMX but also a network of other financial firms.[158] HBMX currently has over 1,100 branches, $2 billion in assets, and

---

[154] See 9/13/2010 OCC Supervisory Letter HSBC 2010-22, OCC-PSI-00000230, at 2. [Sealed Exhibit.]
[155] See "HSBC Consuma la Adquision de GF BITAL," (11/25/02),
http://www.hsbc.com.mx/1/PA_1_1_S5/content/home_en/investor_relations/press_releases/infpress/hsbc_consuma.
pdf; "HSBC Buys Mexican Bank Bital," CNN.com (8/25/2002),
http://archives.cnn.com/2002/BUSINESS/asia/08/21/uk.hsbc.
[156] 8/21/2002 "HSBC agrees to acquire Grupo Financiero Bital," HSBC press release,
http://www.hsbc.com/1/2/newsroom/news/2002/hsbc-agrees-to-acquire-grupo-financiero-bital.
[157] Two years earlier, in 2000, HSBC had acquired a smaller bank in Mexico, Republic National Bank of New York (Mexico) S.A. See 10/21/2011 "Doing Business in Mexico," HSBC publication, at 34,
http://www.hsbc.com/1/content/assets/business_banking/111021_doing_business_in_mexico.pdf.
[158] Among other entities, GF HSBC owns a securities firm, insurance company, and pension fund. See HSBC Mexico website, "Grupo HSBC Mexico," http://www.hsbc.com.mx/1/2/grupo. Former HBMX head Paul Thurston told the Subcommittee that HBMX experienced rapid growth from its purchase in 2002. Subcommittee interview of Paul Thurston (5/1/2012).

over 8 million clients.[159]  HBMX and its Mexican parent are headquartered in Mexico City and together have over 19,000 employees.[160]  HSBC typically refers to its Mexican operations as HSBC Mexico.

Since the purchase of Bital, three persons have served as the head of HSBC Mexico.  The first was Alexander (Sandy) Flockhart who served as Chairman and Chief Executive Officer (CEO) of HBMX, and later also as CEO of HSBC's Latin America operations, from 2002 to 2007.[161]  After he was made Latin American regional head,[162] Paul Thurston took the post of HSBC Mexico CEO and later also served as the HSBC Latin America CEO.[163]  Mr. Thurston headed the Mexico operations for just over a year, from February 2007 to May 2008.  When he was promoted and relocated to London,[164] Luis Pena Kegel became the new HSBC Mexico CEO and remains in that post today.[165]

Mexican banks, including HBMX, are regulated by the Comision Nacional Bancaria y de Valores (CNBV) which oversees Mexican banks and securities firms.  The Mexican central bank, Banco de Mexico, the Mexican Ministry of Finance, the Mexican Treasury Department (SHCP), and the Mexican Financial Intelligence Unit (FIU) also perform oversight functions.  Mexico has a well-developed set of AML laws and regulations.  Mexican regulators and law enforcement agencies work with their U.S. counterparts to combat drug trafficking and money laundering in both countries.

HBMX is a large, sophisticated bank offering a full range of banking services, including deposits, checking, foreign exchange, commercial banking services, private banking and wealth management, and correspondent banking.  HMBX offers correspondent accounts to a wide range of financial institutions.  HBMX also maintains correspondent accounts for itself at other banks around the world, including in the United States.  In 2002, at the time Bital was purchased, the bank had $647 million in correspondent banking deposits in Mexico, $700 million in the

---

[159] See 10/21/2011"Doing Business in Mexico," HSBC publication, at 6, http://www.hsbc.com/1/content/assets/business_banking/111021_doing_business_in_mexico.pdf; "Grupo HSBC México," HSBC website, http://www.hsbc.com.mx/1/2/grupo.

[160] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.

[161] He was Group General Manager, Chairman and Chief Executive Officer of HBMX from 2002 to 2006, and Group Managing Director Latin America from 2006 to July 2007.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/newsroom/media_kit/biogs/100223_sandy_flockhart.pdf.  HSBC also has affiliates in Colombia, Panama, Peru, and Uruguay, among other Latin American locations.

[162] In July 2007, Mr. Flockhart was appointed CEO of The Hongkong and Shanghai Banking Corporation Limited.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/newsroom/media_kit/biogs/101210_paul_thurston.pdf.

[163] In May 2008, Mr. Thurston was appointed head of GF HSBC, and later co-head of the Latin American Region.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/newsroom/media_kit/biogs/101210_paul_thurston.pdf; "HSBC makes key international appointments," (4/15/2008), http://www.hsbc.com/1/2/newsroom/news/2008/hsbc-makes-key-international-appointments.

[164] In May 2008, Mr. Thurston was appointed Managing Director of UK Banking, in charge of HSBC's retail and commercial banking operations in the United Kingdom.  See "HSBC makes key international appointments," (4/15/2008), http://www.hsbc.com/1/2/newsroom/news/2008/hsbc-makes-key-international-appointments.

[165] Mr. Pena was appointed head of GF HSBC.  Id.  Mr. Pena had previously headed Grupo Financiero Banorte and worked for 25 years at Banamax/Citigroup in Mexico.  Id.  Emilson Alonso was appointed Chief Executive of HSBC Latin America.  Id.

38

Cayman Islands, and $143 million in New York.[166]  According to CEO Paul Thruston, HBMX experienced rapid growth in the early years after its acquisition.[167] HBMX also operates a branch in the Cayman Islands, HSBC Mexico S.A, which was established by Bital in 1980, with authority to offer customers U.S. dollar accounts.[168]  At its peak in 2008, the Cayman branch, which has no offices or employees of its own and is run by HBMX personnel in Mexico, had nearly 50,000 client accounts and assets totaling $2.1 billion.[169]

HBMX has had an extensive relationship with HBUS, obtaining U.S. dollar services through both correspondent and banknotes accounts.  HBMX used its HBUS correspondent account primarily to process international wire transfers and clear U.S. dollar monetary instruments such as travelers cheques.  It also made use of HBUS' Remote Deposit Capture service which enabled HBMX to send monetary instruments to HBUS electronically for processing.  HBMX interacted at times with the HBUS Payment and Cash Management (PCM) division regarding this account.  In addition, HBMX interacted with the HBUS Global Banknotes division, until the Global Banknotes business was discontinued in 2010.  HBMX used its banknotes account primarily to sell U.S. dollars received from its customers to HBUS, which HBMX typically transported to HBUS via armed car or aircraft.  In one three-month period from November 2006 to February 2007, HBMX shipped nearly $742 million in U.S. dollars to HBUS; at its peak, HBMX exported $4 billion in bulk cash shipments to HBUS over the course of one year, 2008.  Until it sharply curtailed its U.S. dollar services in Mexico in January 2009, HBMX shipped more U.S. dollars to HBUS than any other Mexican bank or HSBC affiliate.

## B.  Mexico

To understand HBMX's AML risks and, therefore, the risks HBUS incurred as its U.S. correspondent, it is necessary also to understand the AML risks in its home country, Mexico. From 2000 until 2009, HSBC Group and HBUS gave Mexico their lowest AML risk rating, despite overwhelming information indicating that Mexico was a high risk jurisdiction for drug trafficking and money laundering.  In May 2009, HBUS suddenly increased its risk rating for Mexico by three notches, from its lowest to its highest risk level, where it remains today.[170] HSBC Group did not follow suit until 2012 when it raised its risk rating for Mexico from "cautionary" to "high risk."[171]

---

[166]"Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807, at 5.
[167] Subcommittee interview of Paul Thurston (5/1/2012).
[168] This branch operates under a "Class B license," which is given by the Cayman Islands Monetary Authority to offshore banks authorized to do business only with non-residents of the Cayman Islands.  See list of Cayman offshore banks at  http://www.offshore-library.com/banking/cayman_islands/page_3; Subcommittee briefing by HSBC legal counsel on the Cayman accounts (4/20/2012).
[169] See chart at HSBC OCC 8876787, attached to 9/12/2008 email from HSBC John Root to HSBC Adrian Cristiani, "Cayman Accounts," HSBC OCC 8876784.
[170] See 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 484.
[171] Subcommittee briefing by HSBC legal counsel (7/5/2012).

PX257

39

### (1)  U.S. Assessment of AML Risk in Mexico

**INCSR Reports.**  In its annual International Narcotics Control Strategy Reports (INCSRs), which contain a country-by-country assessment of drug trafficking and money laundering risks, the U.S. State Department has consistently classified Mexico as a country of "primary" concern for money laundering, its highest risk rating.[172]  In 2002, the State Department described Mexico's drug trafficking and money laundering risks as follows:

> "Mexico faces a myriad of drug-related problems that include the production and transshipment of illicit drugs, money laundering, consumption and illicit firearms trafficking.  ...  The Government of Mexico's (GOM) longstanding commitment to combat drug trafficking and related crimes resulted in tangible successes against the Arellano Felix Organization (AFO), the Carrillo Fuentes Organization (CFO), and the Gulf Cartel – widely considered the top three drug groups in the country. …  Mexico remains a major supplier of heroin, methamphetamine, and marijuana, and the transit point for more than one half of the cocaine sold in the U.S.  …  The industrial-scale drug trade has transformed narcotrafficking into one of Mexico's deadliest businesses.  …  These organizations have demonstrated blatant disregard for human life as the executions of law enforcement personnel, government officials, and innocent bystanders have increased.  …  In recent years international money launderers have turned increasingly to Mexico for initial placement of drug proceeds into the global financial system."[173]

The State Department also wrote:

> "The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers and armored vehicles, as well as through wire transfers, remain favored methods for laundering drug proceeds.  Mexico's financial institutions engage in currency transactions involving international narcotics-trafficking proceeds that include significant amounts of U.S. currency or currency derived from illegal drug sales in the United States.  Although drug trafficking continues to be the principal source of the laundered proceeds, other crimes including corruption, kidnapping, firearms trafficking, and immigrant trafficking are also major sources of illegal proceeds."[174]

Equally negative assessments of Mexico's drug trafficking and money laundering risks appeared in the State Department's annual INCSR reports over the next four years.  In 2006, for example, the State Department wrote:

> "The illicit drug trade continues to be the principal source of funds laundered through the Mexican financial system.  Mexico is a major drug producing and drug-transit country.  Mexico also serves as one of the major conduits for proceeds from illegal drug sales

---

[172] See, e.g., "2000 International Narcotics Control Strategy Report," U.S. Department of State (hereinafter "2000 INCSR"), at 621; 2002 INCSR at XII-60; 2006 INCSR Vol. II at 39; 2008 INCSR Vol. II at 62; 2012 INCSR Vol. II, at 33.
[173] 2002 INCSR, at V-27-V-28.
[174] Id. at XII-161.

**PX257**

40

leaving the United States.  Other crimes, including corruption, kidnapping, firearms trafficking, and immigrant trafficking are also major sources of illegal proceeds.  The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers, remain favored methods for laundering drug proceeds.  …

According to U.S. law enforcement officials, Mexico remains one of the most challenging money laundering jurisdictions for the United States, especially with regard to the investigation of money laundering activities involving the cross-border smuggling of bulk currency from drug transactions.  While Mexico has taken a number of steps to improve its anti-money laundering system, significant amounts of narcotics-related proceeds are still smuggled across the border.  In addition, such proceeds can still be introduced into the financial system through Mexican banks or casas de cambio, or repatriated across the border without record of the true owner of the funds."[175]

The State Department's relentlessly negative assessments of Mexico's drug trafficking and money laundering vulnerabilities continued unabated.  In 2008, the State Department wrote that "U.S. officials estimate that since 2003, as much as U.S. $22 billion may have been repatriated to Mexico from the United States by drug trafficking organizations."[176]  Four years later, in 2012, the State Department wrote that drug cartels were using Mexican and U.S. financial institutions to launder as much as $39 billion each year:  "According to U.S. authorities, drug trafficking organizations send between $19 and $39 billion annually to Mexico from the United States."[177]

**Warnings.**  The State Department is far from the only governmental agency to have warned about the money laundering risks in Mexico.  The U.S. Congress has held repeated hearings over the years highlighting money laundering and drug trafficking problems in Mexico.[178]  Witnesses have included the U.S. Justice Department, Homeland Security Department, Federal Bureau of Investigations, Drug Enforcement Administration (DEA), Financial Crimes Enforcement Network (FinCEN) of the U.S. Treasury Department, Internal Revenue Service (IRS), Customs and Border Patrol, and Coast Guard, among others.  From 1996 to 2011, these hearings have painted the same grim picture drawn in the State Department's annual reports regarding the drug trafficking and money laundering threats in Mexico.

---

[175] 2006 INCSR, at 268-269.

[176] 2008 INCSR, at 327.

[177] 2012 INCSR, at 140.

[178] See, e.g., "Money Laundering Activity Associated with the Mexican Narco-Crime Syndicate," U.S. House Banking and Financial Subcommittee on General Oversight and Investigations, Serial No. 104-72 (9/5/1996); "Drug Control:  Update on United States-Mexican Counternarcotics Efforts," Senate Caucus on International Narcotics Control, S.Hrg. 106-60 (2/24/1999); "Federal Strategies to End Border Violence," Senate Judiciary Committee, S.Hrg. 109-556 (3/1/2006); "Antidrug Package for Mexico and Central America:  An Evaluation," Senate Committee on Foreign Relations, S.Hrg. 110-311 (11/15/2007); "Escalating Violence in Mexico and the Southwest Border as a Result of the Illicit Drug Trade," House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, Serial No. 111-25 (5/6/2009); "Exploring Drug Gangs' Ever Evolving Tactics to Penetrate the Border and the Federal Government's Ability to Stop Them," Senate Homeland Security and Governmental Affairs Ad Hoc Subcommittee on Disaster Recovery and Intergovernmental Affairs, S.Hrg. 112-384 (3/31/2011).

**PX257**

In addition, warnings about money laundering problems in Mexico have been directed specifically to financial institutions operating in the United States.  In 2005, multiple U.S. agencies worked together to produce a U.S. Money Laundering Threat Assessment which identified thirteen key money laundering methods and specifically identified Mexico as a high risk jurisdiction for several of them, including bulk cash smuggling, misuse of money orders, and suspicious funds sent through money service businesses.[179]  In 2006, FinCEN issued an advisory to all U.S. financial institutions to "better guard against an increasingly prevalent money laundering threat involving the smuggling of bulk U.S. currency into Mexico," warning in particular against "the abuse of their financial services" by Mexican casas de cambio.[180]  The advisory explained that drug traffickers were smuggling bulk cash from the United States into Mexico, then depositing the funds with casas de cambios who were sending the cash back to the United States via armored transport or by selling the U.S. dollars to U.S. banks.[181]  The advisory also warned about multiple wire transfers that "bear no apparent business relationship" with a particular casa de cambio, and U.S. deposits by casas de cambio of sequentially numbered monetary instruments.[182]

**Wachovia Prosecution.**  Criminal prosecutions also alerted U.S. financial institutions to the money laundering problems in Mexico.  In 2008, for example, news articles warned how Mexican drug cartels sent millions of dollars in illegal drug proceeds through a major U.S. financial institution, Wachovia Bank.[183]  In 2010, the United States filed a deferred prosecution agreement detailing how Wachovia Bank had been used by Mexican foreign exchange businesses to launder at least $110 million in drug proceeds.[184]  Filings in the case describe how, from 2003 to 2008, Wachovia Bank provided a variety of services for 22 Mexican casas de cambio (CDCs), despite evidence of suspicious activity.  Those services included processing numerous U.S. dollar wire transfers for deposit into bank accounts around the world;[185] clearing large volumes of sequentially numbered U.S. travelers cheques;[186] and accepting numerous bulk cash shipments transported by armored car from the CDCs.[187]  The filings report that, over a three-year period, the wire activity exceeded $374 billion and the bulk cash shipments exceeded $4.7 billion, far exceeding expected volumes.[188]  Wachovia Bank also processed $20 million in

---

[179] See Dec. 2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service.
[180] "Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the United States," FinCEN Advisory No. FIN-2006-A003 (4/28/2006), at 1.
http://www.fincen.gov/statutes_regs/guidance/pdf/advis04282006.pdf.
[181] Id. at 1-2.
[182] Id. at 2.
[183] See, e.g., "Wachovia Is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez, Glenn Simpson (4/26/2008)(describing AML cases involving not only Wachovia Bank, but also American Express International Bank, which forfeited $55 million as part of a 2007 Federal deferred prosecution agreement, and Union Bank of California, which forfeited $21.6 million as part of a 2007 Federal deferred prosecution agreement, both of which were also charged with inadequate AML programs and suspected of being used by Mexican drug cartels to launder funds).
[184] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010) and Information (3/12/2010).
[185] See id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶¶ 20, 24(1).
[186] Id. at ¶¶ 22, 24(2), 35.
[187] Id. at ¶ 21, 24(3).
[188] Id. at ¶ 23.

PX257

42

sequentially numbered travelers cheques, the majority of which contained illegible names and unusual markings.[189]  The deferred prosecution agreement and supporting factual statement charged Wachovia Bank with willfully failing to maintain an effective AML program,[190] detailing numerous AML deficiencies including a failure to conduct due diligence on high risk clients; a failure to monitor wire transfers, pouch activities, and bulk cash shipments; and a failure to report suspicious activity to law enforcement.[191]  To avoid prosecution, Wachovia Bank acknowledged responsibility for its conduct, paid $160 million in criminal and civil fines, and agreed to undertake significant AML reforms.[192]  The Wachovia case received widespread media attention, providing further notice of the money laundering dangers in Mexico.[193]

### (2)  HSBC Assessment of Risk in Mexico

Despite the overwhelming information available about substantial money laundering risks in Mexico, from 2002 until 2009, HBUS gave Mexico its lowest risk rating for AML purposes.[194]  As a consequence, under HSBC Group policy, clients from Mexico were not subjected to enhanced monitoring by HBUS, unless they were also designated a Special Category Client (SCC), a relatively rare designation that indicates a client poses high AML risks. Had Mexico carried one of the two highest risk ratings, all Mexican clients at HBUS would have been subjected to enhanced due diligence and account monitoring.  Instead, HBUS failed to conduct AML monitoring of most Mexican client account and wire transfer activity involving substantial funds.

**Risk Rating Process.**  Until recently, HSBC Group and HBUS issued AML country risk assessments using four categories of increasing risk, "standard," "medium," "cautionary," and "high."  HSBC Group created a chart listing its country risk assessments, sent the chart to its affiliates characterizing its assessments as recommendations, and then allowed each HSBC affiliate to make its own assessment decisions.[195]  At HBUS, the country risk assessments were compiled every six months by an AML compliance officer who gathered information from a number of sources, assigned numerical scores to each source, and then compiled aggregate scores for over 200 countries.[196]

Those scores were then supposedly used to assign risk ratings.  In fact, however, countries receiving similar scores often received different risk ratings.  Those differences were attributable, in part, to an "HBUS discretion" factor which was listed as an official factor in the

---

[189] Id. at ¶ 35.

[190] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010), at ¶¶ 3-4.

[191] See id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶¶ 28, 30-35.

[192] Id., at ¶¶ 38-40; Deferred Prosecution Agreement (3/16/2010); "Wachovia Enters into Deferred Prosecution Agreement," U.S. Attorney's Office for the Southern District of Florida press release, (3/17/2010), http://www.justice.gov/usao/fls/ PressReleases/100317-02.html.

[193] See, e.g., "Wachovia is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn Simpson, April 26, 2008; "How a big U.S. bank laundered billions from Mexico's murderous drug gangs," The Observer, Ed Vulliamy, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.

[194] See, e.g., Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397 (rating over 235 countries and territories).

[195] Subcommittee interview of Ali Kazmy (2/29/2012).

[196] Id; See also Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.

**PX257**

risk assessment process, included in the risk assessment chart, and used, according to the OCC, to alter the risk ratings for over 60 countries in 2009.[197]   The OCC noted that HBUS offered "no discussion or documentation as to what constitute[d] permissible reasons to change the risk rating" using the HBUS discretion factor.[198]   The OCC also found that HBUS did not apply its risk-rating methodology "in a consistent manner."   The OCC wrote that, in 2009, of 73 countries that received a zero risk assessment score:

> "32 (44 percent) were rated standard, 32 (44 percent) were rated medium, 1 (1 percent) was rated cautionary, and 8 (11 percent) were rated Unclassified.  The OCC found no documentation or support for the difference between the final ratings and the scores. While the bank elevated the risk ratings versus the scores, the bank has not adopted a repeatable, standardized procedure."[199]

The OCC criticized the HSBC country risk assessment process for not taking into account readily available country-specific information on money laundering and drug trafficking risks, including in the annual State Department INCSR reports.[200]   Although INCSR information was often included in HBUS KYC client profiles, the INCSR country-specific risk ratings were inexplicably excluded from the official HBUS country risk assessment scoring matrix.[201]

Still another OCC criticism was the HSBC Group's "unacceptable practice of assigning an overall risk rating to its non-SCC customers based solely on the risk rating that the bank has given the country where the customer is located."[202]   One result of this practice, according to the OCC, was that HSBC had excluded from its routine AML monitoring "more than $60 trillion of wire transfers each year for customers domiciled in countries risk rated as 'standard' or 'medium,' representing two-thirds of the total dollar volume" of wire transfers at HSBC.[203] With respect to Mexico, the HSBC policy meant that, due to its low risk rating, all clients based in Mexico were considered low risk, unless rated an SCC, an outcome that the OCC viewed as a critical AML deficiency.   One consequence was that high risk clients residing in low risk countries routinely escaped enhanced due diligence and account monitoring.

**2009 Change in Mexico Risk Rating.**   In February 2009, HBUS issued a chart with its latest country risk assessments.[204]   The chart provided risk scores and categories for 239 countries.[205]   It assigned a score of "2" for Mexico, which was one of the lowest scores.  When asked about this low score, the HBUS compliance officer then responsible for country risk assessments, Ali Kazmy, told the Subcommittee that, since 2006, HBUS' assessments had

---

[197] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 19.  [Sealed Exhibit.]
[198] Id.
[199] Id.
[200] Id.
[201] See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.
[202] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 18. [Sealed Exhibit.]
[203] Id. at 2.
[204] See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.
[205] Id. The risk scores ranged from 0 to 28, and produced ratings of standard, medium, cautionary, and high.

**PX257**

44

inadvertently failed to take into account a 2006 FinCEN advisory related to Mexico that would have added 10 points to its score each year.[206]  As a result of its low score, Mexico was rated a "standard" risk, the lowest of the four risk ratings.[207]

This low risk rating was awarded despite a May 2008 email from Susan Wright, AML Compliance head for the HSBC Group, singling out AML concerns related to Mexico. Referencing "RMM – Country Risk," Ms. Wright wrote to HSBC Group Compliance head David Bagley and other colleagues:

> "I believe you have sight of our Country Reputational Risk Table but, as previously discussed, unless there are some specific concerns it is not proposed to highlight the highest risk countries as a matter of course.  …
>
> Mexico – there are specific risks in relation to pressure from the US with regard to the laundering of the proceeds of drug trafficking through Mexican cas[a]s de cambios. HBMX have a number of customers who are cambios/money service businesses (MSBs) with links to the US and consequently payments from HBMX are made through HBUS. …  [T]hese are notoriously difficult businesses to monitor ….  [T]here is also US concern with regard to the amount of USD cash deposits and transactions between the US and Mexico and HBMX has been identified as one of the banks with the highest level of activity in this area."[208]

This email shows that the head of HSBC AML Compliance was aware of and communicated to other Compliance personnel the serious AML risks related to Mexico involving drug trafficking, suspect casas de cambio, and bulk cash smuggling, yet the February 2009 HBUS country risk assessments again assigned Mexico the lowest possible risk rating.

Three months after issuing the country risk assessments in February 2009, however, on May 1, 2009, HBUS suddenly revised Mexico's risk rating, increasing it by three notches from the lowest to its highest risk rating.[209]  When asked by the Subcommittee about the timing, Mr. Kazmy explained that, "in early 2009," he had been asked by his supervisor, Anne Liddy, to take another look at Mexico's risk rating due to OCC concerns.[210]

Ms. Liddy's request coincided with an intensifying law enforcement interest in Mexican casas de cambio suspected of laundering illegal drug proceeds through U.S. financial institutions, including HBUS.  In February 2008, and again in November 2008, as detailed below, Mexican regulators confronted HBMX with suspicions that drug proceeds were moving through its

---

[206] Subcommittee interview of Ali S. Kazmy (2/29/2012).  See also Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.  Mr. Kazmy took over the country risk rating process from Lynda Cassell who left HBUS in mid-2006.  The FinCEN Advisory was issued in April 2006, just before Ms. Cassell left.
[207] Mexico had received the same standard rating in 2008.  See 2008 HBUS Country Risk Assessment for Mexico at HSBC-PSI-PROD-0096398-441 and 422.
[208] 5/14/2008 email from HSBC Susan Wright to HBUS David Bagley, HSBC Karl Barclay, HBEU Derek Leatherdale, and others, "RMM – Country Risk," HSBC OCC 8873750.
[209] See 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 484.
[210] Subcommittee interview of Ali S. Kazmy (2/29/2012).

**PX257**

45

accounts at HBUS.  In January 2009, according to an internal HBUS email, a U.S. Homeland Security Department's Immigration and Customs Enforcement (ICE) agent met with HBUS about a money laundering investigation involving one of their clients in Mexico.[211]  That same month, in response to Mexican AML regulatory concerns, HBMX stopped accepting U.S. dollar deposits at any of its Mexican branches.

In June 2009, ICE also informed the OCC that ICE was investigating possible money laundering activity involving banknote accounts at HBUS.[212]  ICE indicated that Mexican drug traffickers appeared to be using the black market peso exchange in New York to transfer funds through a particular Mexican financial institution, which then sent the funds through its U.S. correspondent account at HBUS.[213]  Dan Stipano, OCC Deputy Chief Counsel, explained the scheme to the OCC Examiner-In-Charge at HBUS as follows:

> "The scheme … is similar to activity that we have seen at Union Bank, Wachovia, and Zions.  Basically, the way it works is that drug money is physically hauled across the border into Mexico, then brought back into the United States through wire transfers from casas de cambio or small Mexican banks, or else smuggled across the border in armored cars, etc., before being deposited in US. Institutions.  According to AUSA [Assistant U.S. Attorney] Weitz, most U.S. banks, recognizing the risks involved, have gotten out of this business, but HSBC NY is one of the last holdouts (although, interestingly, he said that HSBC-Mexico will no longer accept U.S. currency)."[214]

What U.S. law enforcement officials had found was that, because drug traffickers in the United States were having difficulty finding a U.S. financial institution that would accept large amounts of cash, due to strict U.S. AML controls, many were instead transporting large volumes of U.S. dollars to Mexico, and depositing the dollars at Mexican financial institutions.  The drug traffickers could then keep their deposits in U.S. dollars through the Mexican financial institution's correspondent account at a U.S. bank, or exchange the dollars for pesos.  The Mexican banks, casas de cambio, and other financial institutions that were the recipients of the cash typically shipped the physical dollars back to the United States for credit to their own U.S. dollar correspondent accounts at U.S. banks.  HBUS' awareness of the increasing U.S. law enforcement and regulatory interest in Mexico may have contributed to its decision to review and, ultimately, in May 2009, to increase its risk rating for Mexico.

---

[211] See 1/19/2009 email from HBUS Denise Reilly to HBUS Lesley Midzain, "HBMX Banknotes Business – HSBC Mexico Press Release and Q&A," HSBC OCC 3633806-807.  In a Subcommittee interview, HBUS AML Compliance officer Daniel Jack indicated that he attended the meeting, and the ICE agent expressed concern about possible money laundering through Consultoria, a former Mexican casa de cambio that had converted into a bank. Mr. Jack told the Subcommittee that HBUS closed the Consultoria account six months later.  Subcommittee interview of Daniel Jack (3/13/2012).

[212] See 9/29/2009 email from Dan Stipano to Sally Belshaw, at 3, OCC-PSI-00928758; 6/28/2009 notes of telephone conversations, prepared by OCC Jim Vivennzio, OCC-PSI-00928759-761 (noting ICE agents had met with HBUS). [Sealed Exhibit.]

[213] See 6/28/2009 notes of telephone conversations, prepared by Jim Vivenzio, OCC-PSI-00928759.  [Sealed Exhibit.]

[214] See 9/29/2009 email from Dan Stipano to Sally Belshaw, at 3, OCC-PSI-00928758.

**PX257**

46

One key consequence of the higher risk rating for Mexico was that, under Group AML policy, HBUS was required to conduct enhanced monitoring of all of its Mexican clients. HBUS' higher risk rating may have also put pressure on HSBC Group and other HSBC affiliates to boost their risk rating of Mexico as well.

On June 18, 2009, Ms. Wright sent an email to Ms. Liddy asking her about the higher rating for Mexico.  Ms. Wright wrote:

"It has been drawn to my attention that in the latest US Country Risk Assessment Mexico has gone from a lower risk to high.  I have received a number of queries from around the Group as to the reason for what they see as quite a dramatic change.

Whilst I appreciate the risks involved in doing business with Mexico I would be grateful for some further and more detailed clarification as to why the change has been so dramatic.  This will enable me to deal with a number of these queries."[215]

In response, Ms. Liddy asked Mr. Kazmy, the AML officer responsible for compiling the country risk ratings, to write up the reasoning for the higher risk rating.  He wrote:

"A number of sources are reviewed, a majority of which are government and international agencies, such as World Bank, IMF, FATF, CFATF, BIS, Central Banks, Transparency International, etc. in order to determine risk levels ….  The U.S. Department of State issues detailed annual assessment[s] of each country via the International Narcotics Control Strategy Report highlighting, inter alia, money laundering, terrorist financing, corruption, and regulatory regime/oversight.  An excerpt of such a report on Mexico … is attached below. …

As a result of events occurring in Mexico during the past several months with respect to drug trafficking and money laundering, as well as the general unrest these developments have caused, we have downgrade[d] Mexico to 'high' risk.  The deteriorated situation is recognized by the Government of Mexico as evidence through the involvement of agencies tasked with the Anti-Money Laundering and Counter Financing of Terrorist (AML/CFT) efforts towards drafting an AML/CFT National Strategy … expect[ed] to be issued sometime during 2009. … Our rating is in conformity with the view of the U.S. law enforcement."[216]

---

[215] 6/18/2009 email from HSBC Susan Wright to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.  See also 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895 ("I fully acknowledge the level of priority and focus that you and the team have given to these issues and the progress that has been made particularly in Mexico and have taken all of this into account. …  The basis for the rating is however:  The inherent AML risk in Mexico is still very high and [t]here are not many other parts of the Group that have what is effectively a drugs war being conducted on the streets and also have the risk posed by potential sting and other operations by the US authorities.  We have of course remediated our high risk accounts, but the historic weak account opening processes mean that we have overall lower levels of KYC across the customer base as a whole. …  Happy to discuss further.").
[216] 6/19/2009 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

**PX257**

Ms. Liddy asked him how Mexico had been rated by the State Department in 2009, and whether that rating was worse than in the previous report, apparently not realizing that the State Department had consistently given Mexico its highest risk rating for years.[217]  Mr. Kazmy told Ms. Liddy, incorrectly, that the State Department INCSR report did not rate countries for risk, but also provided numerous details from the 2009 INCSR report indicating that money laundering and drug trafficking risks had increased.[218]

In 2010, when the OCC sent HBUS a supervisory letter on AML deficiencies at the bank, the letter included criticism of its country rating system.[219]  Under the heading, "Inadequate and Ineffective Procedures for Country Risk Ratings," the OCC listed "significant flaws" with the scoring and risk rating methodology, as well as with HBUS' decision not to monitor wire transfer activity for foreign financial institutions or other clients located in a standard or medium risk country, unless designated as an SCC client.  The OCC wrote:

> "The bank's country risk ratings for its PCM [Payment and Cash Management division] wire monitoring are critical, due to the bank's unacceptable practice of assigning an overall risk rating to its non-SCC customers based solely on the risk rating that the bank has given the country where the customer is located.  However, compounding this deficiency, the bank's procedures for determining the critical country risk ratings are inadequate and ineffective.
>
> To determine the country risk rating, the bank employs a point system based on fifteen factors.  HBUS' methodology appears straightforward … [h]owever … there are significant flaws in the implementation of the point system. …
>
> The bank's failure to risk rate countries appropriately has a significant impact on HBUS' BSA [Bank Secrecy Act] compliance, because customers' risk ratings affect a number of variable requirements relating to due diligence for foreign correspondents.  For example, these variable requirements include the frequency with which the bank conducts site visits (every 12 months versus every 24 months) and the level of due diligence performed on beneficial owner and the senior management team."[220]

---

[217] 6/22/2009 email from HBUS Anne Liddy to HBUS Ali Kazmy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

[218] 6/24/2009 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

[219] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 18-20.  [Sealed Exhibit.]

[220] Id. at 18, 20.  See also 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 3-4.  The problems with HBUS' country risk assessments extended beyond Mexico to other countries as well.  Some of the countries that should have been rated as having a high risk of money laundering, but were instead rated standard or medium, included Antigua, the Bahamas, Cayman Islands, and Switzerland.  See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.  As a consequence, clients from those jurisdictions were treated as low risk, and wire transfers involving those countries were not routinely monitored by HBUS.

48

When asked why past risk assessments of Mexico had been so low, Mr. Kazmy told the Subcommittee that he was unable to explain the low ratings prior to 2009.[221]  He indicated that he first saw the 2006 FinCEN advisory on Mexico in 2009.[222]  He also indicated that, if he had known what he later learned, he would have increased the risk rating earlier.[223]

## C.  HBMX's History of Weak AML Safeguards

In addition to the substantial money laundering and drug trafficking risks plaguing Mexico for a decade, HBMX itself had a history of weak AML controls and a poor compliance culture, which the HSBC Group worked for years to improve, with limited success.  While HSBC Group officials in London were well aware of HBMX's AML deficiencies and immersed in an effort to strengthen them, it did not inform its worldwide affiliates, including HBUS, of the problems.  From 2002 until recently, HBUS remained largely ignorant of the extent of HBMX's AML and compliance deficiencies, despite providing HBMX with extensive correspondent services and giving it free access to the U.S. financial system.

**Non-Existent Compliance Function in 2002.**  In 2002, as part of its decisionmaking process to purchase Bital, HSBC Group reviewed Bital's compliance function, found it wholly inadequate, and determined that a major effort would be needed for the new bank to meet Group standards.  In an email to his colleagues, David Bagley, head of HSBC Group Compliance, put it this way:

> "Sandy [Flockhart, HSBC Mexico head,] acknowledges the importance of a robust compliance and money laundering function, which at present is virtually non-existent.  …  There is no recognizable compliance or money laundering function in Bital at present ….  Sandy thinks it is important to look both at issues affecting Mexico City, but also closer to the border where there appears to be substantial cross-border flows of monies, including USD [U.S. dollars] in cash."[224]

His comments followed a July 2002 audit performed by HSBC Group auditor prior to purchasing the Mexican bank providing a negative assessment of the bank's compliance program.  The HSBC internal audit report detailed a wide range of specific problems as well as broader AML deficiencies:

- "FRBNY [Federal Reserve Bank of New York] review in 12/2000 identified that 82 of the 248 accounts reviewed lacked full documentation.
- A review … of documentation of accounts booked at the target's Cayman Islands branch … found that 41% of the accounts reviewed (92 of 224 reviewed) lacked full client information.  37 files had no client information. …

---

[221] Subcommittee interview of Ali S. Kazmy (2/29/2012).
[222] Id.
[223] Id.
[224] 7/10/2002 email from HSBC David Bagley to HSBC John Root, with copies to Sandy Flockhart and Richard Bennett, "Bital," HSBC OCC 8877797-798.

**PX257**

49

- The [monitoring] system does not have any capacity to aggregate transaction activity for any period other than a given day … [and] does not identify high risk clients as such. …
- Private banking operations per se, are not identified. …
- GFB [Grupo Financiero Bital] was involved in Operation Casa Blanca, a US government undercover sting operation undertaken to combat drug trafficking and money laundering activities in the US and Mexico.  A former GFB account executive was found willing to establish fictitious accounts and moved illegal money through them. …  GFB forfeited $3.1 [million] to the US government in 1998.  …

Conclusions

The GFB Compliance effort is weak, and it appears that the target organization does not have a strong Compliance culture.

- GFB does not, in reality, have a Compliance Department and one would have to be established and implemented ….
- Reviews of account opening procedures and client documentation are sporadic, and the reviews normally do not encompass large populations of client files or activities.  This effort needs to be strengthened.
- Client transaction and activity monitoring is very limited.  The reliance on account managers to identify and report unusual and suspicious transactions of their clients is a serious internal control shortcoming. … High risk clients receive no special monitoring coverage. …
- Internal and external audit recommendations, and issues raised in regulatory reports do not receive proper respect and action. ...
- Measures to promote and ensure staff discipline are not satisfactory. GFB's Code of Conduct lacks content, detail and spirit. …  Appropriate staff related policies would have to be implemented immediately as part of the overall effort to install a dedicated Compliance and internal control culture throughout the organization."[225]

Despite Bital's weak compliance function, HSBC Group completed the purchase on November 22, 2002.[226]

**Five Years of Effort.**  Over the next five years, from 2002 to 2007, HSBC Group initiated a number of efforts to strengthen Bital's compliance and AML programs.  While improvements were made, significant deficiencies persisted.

In November 2002, immediately before purchasing Bital, John Root, a senior HSBC Group Compliance expert whom David Bagley asked to help work on AML issues at HBMX, visited the bank for a week and prepared a report cataloguing compliance issues and needed

---

[225] July 2002 "Group Internal Audit:  Due Diligence Review – Project High Noon," HSBC audit of Bital, HSBC OCC 8873846 -852.

[226] See 11/29/2002 minutes of HSBC Holdings plc Board of Directors, section 109.3, HSBC-PSI-PROD-0198570.

50

initiatives.[227]   Among other problems, his report noted the "lack of a 'control culture' at Bital."[228]   The report also described a meeting with one of Bital's chief Mexican regulators who "was extremely critical" of the bank, repeating a number of times that controls "do not exist."[229] The report noted that "some of his harshest criticism" were directed at the Bital Legal Department "which he averred was 'not guilty of bad faith but extreme mediocrity.'"[230] According to the report, the Mexican regulator recommended "sweeping changes in management."[231]

The report noted that Bital had 83 correspondent relationships with other financial institutions, including 20 well known and reputable banks and some institutions that required additional KYC information.[232]   Mr. Root recommended obtaining that added KYC information or closing some of those accounts by March 2003.  The report also noted that Bital had accounts lodged at its own Cayman branch office, which operated as an offshore shell entity and was managed by Bital employees in Mexico City.  The report recommended undertaking an analysis of all of the correspondent banking deposits, "particularly those in the Cayman Islands," by June 2003.  It also recommended an analysis of "all existing Private Banking, with particular attention to USD [U.S. dollar] accounts and fund transfers to New York and the Cayman Islands."[233]   In addition, it recommended developing a better electronic screening system for all account activity to identify suspicious transactions and a better process for investigating suspicious activity "without any tipping off."[234]

In 2002 and 2003, HSBC Group appointed a new Compliance head for HBMX, Ramon Garcia Gibson, formerly AML Director at Citibank's Mexican affiliate, Banamex; established an HBMX Compliance Department; hired additional staff; and installed a new monitoring system known as Customer Account Monitoring Program (CAMP) to detect suspicious activity.  HBMX also hired a Money Laundering Deterrence (MLD) Director Carlos Rochin.  Nevertheless, in 2003, two inspection reports from Mexican authorities in January and August identified ongoing problems with the detection of suspicious transactions and the adequacy of the bank's Money Laundering Deterrence (MLD) handbook, which HSBC was then in the process of revamping.[235]

---

[227] "Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807.  See also 11/25/2002 email from HSBC John Root to HSBC Richard Bennett and HSBC Matthew King transmitting the report, HSBC OCC 8877800 ("There is very little of what we would call a Compliance function.  …  I did not encounter anybody at Bital who I thought immediately capable of building a Compliance department.").
[228] "Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807, at 1.
[229] Id.
[230] Id.
[231] Id. at 2.
[232] Id. at 4.
[233] Id. at 6.  Mr. Root told the Subcommittee that he became aware of the HBMX Cayman accounts at that time, but thought they were servicing Cayman residents.  Subcommittee interview of John Root (4/26/2012).
[234] Id. at 4-5.
[235] See 1/22 and 26/2004 email exchanges among HBMX Ramon Garcia and HSBC John Root, Susan Wright, and David Bagley, "MLD Regulatory Report,"  HSBC OCC 8873393-394

**PX257**

51

In January 2004, HSBC Group's Board of Directors met in Mexico to allow Board members to familiarize themselves with HBMX.[236]  During the meeting, the Board's Audit Committee reviewed HBMX's ongoing internal control issues.  The Audit Committee's minutes stated that, "after being part of the Group for some 15 months," HBMX had made "very significant progress in raising the standards of its controls.  It will, however, probably take another two years to fully reach Group standards.  From experience with other acquisitions this is not unexpected."[237]

Five months later, in May 2004, HBMX's internal auditors filed a report containing a number of criticisms of the bank's compliance and AML efforts, indicating that much still needed to be done to cure its AML deficiencies.[238]  Finding HBMX's AML function to be operating "Below Standard," the internal audit report stated:

> "HBMX has insufficient controls to detect money laundering transactions in all areas of the Group in a timely manner.  The implementation of the CAMP system is in process yet it only includes the Bank's transactions that have been registered in the Hogan system and fails to monitor those registered in other IT systems/HBMX subsidiaries.
>
> Direccion de Prevencion de Lavado de Dinero [Direction of Money Laundering Deterrence] has identified high-risk areas of money laundering transactions, which are not being monitored.
>
> The communication between LCOs [Local Compliance Officers] and Compliance does not enable the timely detection of the needs and weaknesses of the areas and subsidiaries.
>
> There are inadequate internal controls over the IT systems used to send information to the regulator on suspicious or relevant transactions to authorities.
>
> In our opinion, based upon the foregoing, the Direction of Money Laundering Deterrence is operating with a **BELOW STANDARD** level of Control Risk."[239]

Three months later, in August 2004, John Root, a senior HSBC Group Compliance officer, again visited HBMX to examine the status of its compliance and AML efforts, prepared a report, and sent it to senior officials at both HBMX and HSBC Compliance.[240]  The report indicated that, while substantial progress had been made over the past 18 months, AML deficiencies remained:

---

[236] 1/30/2004 minutes of HSBC Holdings plc Board of Directors, section 04/7, HSBC-PSI-PROD-0198571-572.
[237] Id. at 2.
[238] May 2004 "Informe General de Auditoria HBMX GAQ 040026 Compliance-Money Laundering," prepared by HSBC Group's internal audit (Auditoria Interna Del Groupo), HSBC OCC 8874376-381.
[239] Id. at 4 (emphasis in original).
[240] "HBMX Jul04 GHZ CMP Visit Report," prepared by HSBC John Root, HSBC OCC 8875567-575.  See also 8/10/2004 email from HSBC John Root to HSBC David Bagley, Richard Bennett, Matthew King, David Leighton, and Susan Wright, and HBMX Sandy Flockhart and Ramon Garcia,  transmitting the report, HSBC OCC 8875565-575.

PX257

52

"Senior management has made significant progress in introducing Group Compliance Policy and Standards in HBMX.  The head of the Compliance department, Ramon Garcia Gibson, has set the foundation for an effective Compliance function.

HBMX controls are much improved from the situation that existed 12-18 months ago[.] However, Treasury back-office operations are a source of major regulatory concern, as is accurate and timely reporting to regulators. …

[O]ne of the five commissioners of the CNBV … states, 'In the business area [of HBMX], the resources have arrived.  In the area of controls, the resources have not arrived.'

The CNBV gave us a 'fact sheet' in English with the following 'main concerns' ….

> **Anti-money laundering processes –** Although improvements have been seen, some concerns remain regarding deficiencies in process (no system for unusual operations detection and a poor identification of public figures and high risk customers) and over control of Panama's branch operations. …

In a wide-ranging discussion, CNBV regulators commented that any outsourcing must be able to be audited from Mexico.  They do not want outsourcing to jurisdictions with strong banking secrecy. …

The Trusts department is struggling to improve the poor condition of its files. Notwithstanding a senior manager's optimism ['Most of them, KYC is okay' and 'Most deficiencies are not related to KYC'], by far the greatest problem *is* missing KYC documentation.

Of a total of 15,434 trusts, only 6,868 (41%) have completed documentation.  2,955 (20%) of trusts have no documentation at all. ...

Around USD 16 billion arrive from the United States each year, mostly through the branch network.  Money laundering risk is mitigated by several factors:  (1) remittances are generally small (US200-300), according to two senior managers; (2) due diligence appears to be adequate on the AML procedures of US third-party money services businesses; and (3) CAMP Retail, a software programme to detect suspicious transactions, is scheduled to be installed in the branch network in NOV04.

**Recommendation:**  HBMX CMP [Compliance] should sample periodically remittances from the United States to determine if, in fact, remittances are generally small and in the ordinary course of business."[241]

In September 2004, the CNBV conducted an inspection of HSBC's AML efforts and, contrary to the more positive tone described by HBMX internally, found them unsatisfactory.

---

[241] "HBMX Jul04 GHZ CMP Visit Report," prepared by HSBC John Root, HSBC OCC 8875567-575 (emphasis in original).

PX257

53

According to an internal HBMX compliance report, a CNBV report summarizing the 2004 inspection criticized HBMX for:

> "not considering the risk exposure of the customer to determine the appropriate visitation process, not implementing procedures to update annually the files of high-risk customers and politically exposed persons, not defining internal criteria to determine customers' risk exposure and a delay in formalizing the Communication and Control Committee … responsible for sending SARs to the CNBV … and issuing money laundering deterrence policies."[242]

The Communication and Control Committee (CCC Committee, also called the Money Laundering Deterrence or MLD Committee), which was mandated by a 2004 Mexican law, was intended to act as the bank's primary internal unit to deter money laundering, so the delay in getting the committee underway was seen as a major AML deficiency.  CNBV later fined HBMX more than $75,000 for the AML deficiencies identified in 2004, a fine which HBMX CIBM Compliance proposed contesting.[243]

In early 2005, an internal HBMX whistleblower hotline disclosed that HBMX compliance officials had fabricated records of mandatory monthly meetings by the CCC Committee, and provided the false records to a local CNBV regulator.[244]  An HBMX investigation determined that the false records consisted of attendance sheets and minutes for CCC meetings that should have taken place from July to December 2004, but did not.[245]  They were fabricated by a junior employee at the direction of the HBMX Money Laundering Deterrence Director, Carlos Rochin, who then tendered his resignation and left the bank.[246]  Ramon Garcia, head of HBMX Compliance and the CCC Committee chair, received a written warning and was barred from receiving what would have been a substantial bonus for his work in 2004.  David Bagley, head of HSBC Group Compliance, wrote:

> "Overall RG [Ramon Garcia] has performed credibly, has worked very hard, and would otherwise be hard to replace.  In the circumstances whilst we will need to keep his position under review at this stage I endorse the decision to retain his services given that his failure is limited to one of failing to supervise a very senior and trusted subordinate."[247]

---

[242] "1Q07 Compliance Report to the CIBM Audit Committee," prepared by the HBMX Corporate, Investment Banking and Markets (Private) Audit Committee, HSBC OCC 8873286-287 (describing CNBV criticisms).

[243] Id.

[244] See 1/21/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Compliance Exception," HSBC OCC 8873671.

[245] See 2/16/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Disclosure Line – HBMX CMP," HSBC OCC 8873673; Feb. 2005 "HSBC Whistleblower Item 15 – HBMX:  Investigation Report – Executive Summary," prepared by Head of Group Audit Mexico (GAQ)(hereinafter "Whistleblower Report"), HSBC OCC 8877877-885.

[246] Whistleblower Report at 5-6.

[247] 2/16/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Disclosure Line – HBMX CMP," HSBC OCC 8873673.

**PX257**

54

Mr. Bagley's internal report found that the HBMX AML staff was riven by dissension and resentment and may have "exact[ed] retribution" against the MLD director for the dismissal of a colleague. His report concluded that Mr. Garcia would have to rebuild a "shattered Money Laundering Section."[248] It also noted that CNBV "reiterated … that, by comparison with other Mexican financial institutions, HBMX CMP [Compliance] appeared to be understaffed" and urged the bank to hire additional compliance personnel.[249]

In May 2005, John Root, a senior HSBC Group Compliance officer, made another visit to HBMX for several days to evaluate its compliance and AML efforts. As before, he later prepared a report and provided it to colleagues at HSBC Group and HBMX. In a separate email transmitting the report six weeks later, Mr. Root noted that the HBMX MLD director who resigned in January 2005, had not been replaced despite the passage of six months, and a new director needed to be appointed "as soon as possible in order to reorganize promptly a demoralized department and improve AML controls."[250] The email noted the importance of "an independent, effective professional in the sensitive role of head of AML in Mexico." He also observed that "[p]rojects are started but seldom completed, perhaps because of the many ministerial tasks that have accrued since the departure" of the MLD director. Mr. Root wrote:

> "As you of course know, the work has piled up in the Compliance department, and Ramon needs help with the backlog. It is true that we have increased staff in the department, but they are mostly entry-level analysts in need of direction. It is important we hire an MLCO [Money Laundering Control Officer] as quickly as possible, and perhaps also a sort of 'operating officer' for Ramon to enable him to bring the department up to Group Standards."[251]

Mr. Bagley forwarded the Root email to a colleague and commented that "until we have the right amount and mix of resources I cannot see [how] Ramon can make progress."[252] Later that year, Leopoldo R. Barroso was appointed MLD director for HMBX.

In November 2005, Richard Bennett, then HSBC Group General Manager of Legal and Compliance and the person to whom David Bagley, head of HSBC Group Compliance, reported, paid a brief visit to HMBX.[253] While there, he met with the bank's CNBV regulators who raised a variety of compliance issues. According to an email sent by Mr. Bagley, the concerns included the nature of the HBMX accounts in the Cayman Islands; the referral of clients to Mexico by other HSBC affiliates, especially in France; and access to HBMX AML information from other countries, in particular the United Kingdom.

---

[248] Whistleblower Report at 7.
[249] Id. at 8.
[250] 7/6/2005 email from HSBC John Root to HSBC David Bagley, Susan Wright, and David Leighton, "Visit to HBMX – 18 – 25 May 2005," HSBC OCC 8876670-671.
[251] Id.
[252] 7/6/2005 email from HSBC David Bagley to HSBC Richard Bennett, "Visit to HBMX – 18 – 25 May 2005," HSBC OCC 8876670.
[253] See 11/15/2005 email from HSBC David Bagley to HSBC John Root, "HBMX – Compliance Issues," HSBC OCC 8873264-266.

**PX257**

55

In December 2005, HBMX's internal audit group produced a 55-page report identifying a host of compliance and AML problems at the bank.[254]  It found that HBMX Compliance had improved, but still rated it "Below Accepted Levels."  Major deficiencies included a failure to make full use of the new CAMP monitoring system, a failure to ensure its monitoring parameters met local requirements, inefficient monitoring processes which made detection and analysis of alerts difficult, failure to apply CAMP to foreign remittances and HBMX subsidiaries, inadequate SCC risk profiles, failure to complete a MLD work plan, and inadequate training.[255]

The audit report was actually issued to HBMX in the spring of 2006, and its findings were hotly contested by the HBMX MLD Director, Leopoldo Barroso.[256]  He communicated his views to HSBC Group Compliance and complained that the bank would be required to forward the audit report to the CNBV, which would not only create a "misleading" impression, but also would contradict a recent presentation HBMX had made on how its AML controls had improved.[257]  John Root, senior HSBC Group Compliance officer, forwarded HBMX AML's response to the audit findings to Susan Wright, head of AML and David Bagley, head of Compliance for HSBC Group.[258]  Mr. Root commented:

"[T]he audit points are being strongly rejected by HBMX AML.  AML is also alleging errors of procedure ….  Many, if not most, of the recommendations were 'rejected' or downgraded in importance by AML, which is certainly a heartfelt, but rather unusual formal reaction, to an audit.  Most of just accept audit recommendations, whether perceived to be 'fair' or not, and proceed to implement them.

I have let the dust settle a bit, as AML management clearly feel aggrieved, but closer monitoring is warranted on the specific audit recommendations.  …

[T]he one that most sticks out is apparent lack of monitoring of the (relatively few) AML staff in the field.  This raises a 'red flag' in a place like Mexico, where the drug cartels are very powerful and ubiquitous. …  To aver, as the audit does, that 'we do not really know what our man in the field is doing' is a warning sign, if true.  AML of course vigorously deny this."

Mr. Barroso's email responding to the internal audit noted that HBMX MLD had also recently been audited by CNBV and expected to receive a satisfactory rating, with only two requirements for improvements and several recommendations.[259]

HSBX's internal audit group continued to conduct compliance and AML examinations of HBMX offices and branches.  In September 2006, for example, it examined operations at four

---

[254] See Dec. 2005 "Informe de Auditoria General: HBMX – Direccion de Compliance," prepared by Mexico Group Audit, HSBC OCC 8876223-280.
[255] Id., Executive Summary.
[256] See 5/17/2006 email from HSBC John Root to HSBC Susan Wright and David Bagley, "Internal Audit Reports," attaching 5/8/2006 email from Leopoldo Barroso and a chart entitled, "Internal Audit Main Findings to MLD," HSBC OCC 8874383-392.
[257] Id.392
[258] Id. 383.
[259] Id. 384.

PX257

56

HBMX district offices, each with more than 15 branches, located in the cities of Puebla, Morelos, and Juarez.[260] All four district offices were found to be operating "Below Standard" with respect to their risk controls, which was the same low rating each had received the prior year. For example, all four were found to have KYC and "file integrity" issues that "failed to comply with Group policies."[261] One district office was found to lack knowledge of the procedures to identify Special Category Clients (SCCs).[262] All four district offices had five or six repeat recommendations from prior audits that had yet to be resolved. All four summary reports were circulated to HSBC Group Compliance senior officials.[263]

In October 2006, HBMX's Compliance head Ramon Garcia informed HSBC Group Compliance that HBMX's Money Laundering Deterrence (MLD) Committee had adopted a policy that would require HBMX to consider closure of an account after four Suspicious Activity Reports (SARs) had been filed with respect to an account's activity.[264] In response, John Root, senior HSBC Group Compliance officer, responded: "4 SARs seems awfully indulgent, even by local standards. At any rate, it is against Group policy, as Susan [Wright] points out, so you will need to seek an official dispensation."[265] A "dispensation" was needed, because HSBC Group Policy No. GPP25 required accounts to be closed after two SARs were filed. The next day, HBMX informed HSBC Group Compliance that, rather than seek an official exception, it had decided to adopt the Group policy and would consider account closure after two SARS were filed, rather than four.[266]

**Unimed and Ye Gon Scandal.** In 2007, HBMX learned that one of its longstanding clients was accused of involvement with illegal drug trafficking. On March 15, 2007, in a joint effort with the U.S. Drug Enforcement Administration (DEA), the Mexican Government seized

---

[260] See September 2006 "Group Audit Mexico Audit Report Summary Schedule: GHQ Reportable Audits," for PFS Puebla Z01 C31 District Office (with 17 branches), PFS Puebla Z01 C23 District Office (17 branches), PFS Morelos Z01 A20 District Office (19 branches and 1 Module), and PFS Ciudad Juarez Z03 B02 District Office (21 branches and 1 custom module), HSBC OCC 8876717-720.

[261] Id.

[262] Id. at HSBC OCC 8876718.

[263] See 10/9/2006 email from HSBC David Bagley to HSBC John Root, forwarding message from HSBC Matthew King, "HBMX B/S and U Audit Report Summary for SEP06," HSBC OCC 8876715 (transmitting audit report summaries). See also August 2005 "General Audit Report: HBMX – PFS Torreon District (Z04 C01)," prepared by Group Audit Mexico, HSBC OCC 8876677-680 (finding a district office with 22 branches operating "Below Standard," with "[n]o significant progress … since the previous audits and 11 repeat recommendations").

[264] See 10/17-18/2006 email exchanges among HBMX Ramon Garcia and Leopoldo Barroso and HSBC John Root, David Bagley, Susan Wright, and Emma Lawson, "2Q06 HBMX Compliance Report," and "Compliance with GPP 25," HSBC OCC 8876711-713.

[265] 10/17/2006 email from HSBC John Root to HBMX Ramon Garcia, with copies to HSBC David Bagley and Susan Wright, "2Q06 HBMX Compliance Report," HSBC OCC 8876713.

[266] See 10/17-18/2006 email exchanges among HBMX Ramon Garcia and Leopoldo Barroso and HSBC John Root, David Bagley, Susan Wright, and Emma Lawson, "Compliance with GPP 25," HSBC OCC 8876711-713. GPP 25 stated: "Where the customer is the subject of more than one validated suspicious transaction/activity report, then serious consideration should be given to closure of the relevant account/s and any other connected accounts." Despite adopting the Group policy generally to close an account after two SARs, HBMX apparently did a poor job of implementation. In November 2007, Mr. Garcia revealed at an HSBC conference that HBMX had "numerous cases of accounts with multiple SARs (16 in one case!!) in Mexico that remain open." In response, Ms. Wright asked Warren Leaming to "follow up with Ramon" to strengthen compliance with the Group policy on closing accounts with SARs. 11/16/2007 email from HSBC Susan Wright to HSBC Warren Leaming, copy to David Bagley, "Mexico," HSBC OCC 8875423.

PX257

57

over $205 million in U.S. dollars, $17 million in Mexican pesos, firearms, and international wire transfer records from the residence of a wealthy Chinese-Mexican citizen, Zhenly Ye Gon.[267] The cash, which had been hidden in a secret locked room in the residence,[268] was described as the largest cash seizure in a drug-related case in history.[269]

Mr. Ye Gon, a prominent businessman, was the owner of three Mexican corporations involved in the pharmaceutical field, Unimed Pharm Chem Mexico S.A. de C.V.; Constructora e Inmobiliaria Federal S.A. de C.V.; and Unimed Pharmaceutical, S.A. de C.V.[270] He was accused of using his corporations to import, manufacture, and sell chemicals to drug cartels for use in manufacturing methamphetamine, an illegal drug sold in the United States.[271] He was also accused of displaying "significant unexplained wealth," despite reporting no gross income for his companies for the years 2005, 2006, and 2007.[272] In June 2007, Mr. Ye Gon was indicted in Mexico on drug, firearm, and money laundering charges, but could not be located.[273] In July 2007, he was arrested in the United States, imprisoned, and indicted by U.S. Federal prosecutors for aiding and abetting the manufacture of methamphetamine.[274] Two years later, in 2009, U.S. prosecutors dismissed the charges, after a witness recanted key testimony.[275] Mr. Ye Gon has remained imprisoned, however, subject to proceedings to extradite him to Mexico to stand trial.[276] Since his arrest, he has continually proclaimed his innocence.[277]

Mr. Ye Gon and his corporations were longtime clients of HBMX as well as other banks and casas de cambio in Mexico. One news article reported that the Mexican Ministry of Finance and Public Credit (SHCP) had determined that, from 2003 to 2006, Mr. Ye Gon and his

---

[267] See In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Complaint for Arrest with a View Towards Extradition (9/15/2008) (hereinafter "Ye Gon Extradition Complaint"), at 13; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[268] See Ye Gon Extradition Complaint at 13.

[269] See, e.g., "Mexico seizes $205.6M from luxury house," Associated Press, Joan Grillo (3/22/2007).

[270] See Ye Gon Extradition Complaint at 6.

[271] Id. at 6-15; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html. See also DEA testimony, "Violence Along the Southwest Border," (3/24/2009), at 8, before the U.S. House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies (describing seizures from a "pharmaceutical company CEO who facilitated the importation of metric-ton quantities of ephedrine for the Sinaloa cartel's methamphetamine-manufacturing operations").

[272] Ye Gon Extradition Complaint at 12. The extradition complaint stated that in addition to transferring millions of dollars in U.S. currency abroad, Mr. Ye Gon engaged in a "lavish lifestyle, which included purchasing expensive cars and jewelry, and gambling (and losing a net sum of approximately $125 million U.S. dollars) in Las Vegas, Nevada." Id. at 12-13.

[273] Ye Gon Extradition Complaint at 3-6 (describing Mexican Criminal Case No. 25/2007); "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[274] In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Indictment (7/26/2007).

[275] See id., Order (8/28/2009); "Mexico, the DEA, and the Case of Zhenli Ye Gon," Washington Post, Jorge Carrasco (10/29/2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/10/28/AR2008102801364_pf.html.

[276] See Ye Gon Extradition Complaint.

[277] See, e.g., "Mexico, the DEA, and the Case of Zhenli Ye Gon," Washington Post, Jorge Carrasco (10/29/2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/10/28/AR2008102801364_pf.html.

**PX257**

companies moved $90 million through 450 transactions involving four major Mexican banks, HBMX, Banamex, BBV Bancomer, and Banco Mercantil Del Norte, and multiple currency exchanges, including Casa De Cambio Puebla and Consultoria Internacional Casa De Cambio.[278]

The March 2007 seizure of cash and weapons from Mr. Ye Gon's residence triggered an intense review of his accounts by HBMX and HSBC Group.[279]  According to internal HBMX documents, the Unimed accounts were opened by Bital, retained by HBMX, and housed in HMBX's Personal Financial Services (PFS) division, even though the official clients were corporations and should not have been serviced by the PFS division.[280]  The accounts were not designated as high risk, despite unusual transactions that had attracted bank attention several times from 2003 to 2007.[281]  John Root told the Subcommittee that during the 2003-2004 timeframe, the Unimed account had attracted the attention of HBMX regulators, and Susan Wright had instructed HBMX to terminate the relationship altogether.[282]  He said that the HSBC Group did not realize the account was still open, until he and Ms. Wright saw the press articles regarding Unimed in 2007.

When the scandal broke, Paul Thurston, who had been appointed in February as HSBC Mexico CEO after the former head, Alexander Flockhart, was promoted, wrote:  "This is a very serious, and high profile, case which has potential reputational damage to the HSBC Group, and must be given the highest priority."[283]

Mr. Thurston personally oversaw an extensive review of the accounts and HMBX's AML controls.[284]  When the head of HSBC Latin American internal audits, Graham Thomson, was asked to summarize the AML deficiencies that contributed to the bank's maintaining such a high risk account, Mr. Thomson wrote in part:

"The main systemic weaknesses in HBMX, which I believe remain outstanding, are as follows:
KYC as identified in branch and continuous audit reports.

[278] 10/13/2007 "Reportan ruta de Ye Gon para 'blanquear' dinero" ("Ye Gon reported path to 'launder' money"), El Universal, Francisco Gómez, http://www.eluniversal.com.mx/nacion/155016.html, cited in 7/18/2008 Report of Findings (Update) for Consultoria Inernacional Banco, prepared by HBUS Financial Intelligence Unit, HSBC OCC 1822420-434, at 422.

[279] See 4/19-20/2007 email exchanges among HBMX Paul Thurston, Sandy Flockhart, Graham Tomson, Ramon Garcia, and others and HSBC David Bagley, Matthew King, and others,  "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-014.

[280] See 3/20/2007 email from HBMX Leopoldo Barroso to HSBC Paul Thurston, and others, "[subject redacted by HSBC]," HSBC OCC 8874315-16.

[281] See, e.g., 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, "[subject redacted by HSBC]," HSBC OCC 8874317-318; 4/20/2007 email from HSBC Matthew King to HSBC Michael Geoghegan, and copy to David Bagley, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8874762.

[282] Subcommittee interview of John Root (4/26/2012).

[283] 3/20/2007 email from HMBX Paul Thurston to Leopoldo Barroso, Sandy Flockhart, and others, [subject redacted by HSBC], HSBC OCC 8874316-317.

[284] See, e.g., March and April 2007 email exchanges involving HBMX Paul Thurston and multiple HBMX and HSBC colleagues, "[subject redacted by HSBC]," HSBC OCC 8874315-330 and HSBC OCC 8875010-014.

**PX257**

59

The lack of adequate documentation and filing systems which remain from the former Bital days ….
Lack of a compliance culture ….”[285]

His criticisms about the lack of a compliance culture and poor KYC documentation echoed the criticisms made five years earlier, when HSBC first purchased Bital.

HBMX's internal review determined that, in 2005 and several times thereafter, concerns about suspicious activity involving the Unimed account had been brought to the attention of the HBMX Money Laundering Deterrence Communication and Control Committee (CCC Committee).[286]   The CCC Committee apparently initially advocated closing the account, but then relented, in part because the Personal Financial Services (PFS) division where the account was located had, as one HBMX email put it, “argued that the client was fine, properly documented, and known by the business.”[287]   The key PFS official who vouched for the client apparently later claimed he'd been “lied to” by other bank personnel.[288]   The review also uncovered falsified “KYC visit reports,” documenting site visits to the client which had not actually taken place.[289]   In addition, the review criticized poor analysis of the alerts which had spotted the “unusual” account activity.[290]   One email noted that other Mexican banks with Unimed accounts “had not reported the customer to the authorities, despite hosting apparently unusual transactions similar in nature to those recorded by HBMX.”[291]

As a result of the Unimed scandal, Mr. Thurston developed seven action items to strengthen HBMX's AML and KYC efforts.[292]   They included reviewing the personnel assigned to the HBMX CCC committee and reminding CCC members of the need to take “an independent view” and to be “prepared to challenge their colleagues”; ensuring CCC minutes clearly identified the decisions taken; revamping KYC “analysis, assessment and reporting procedures”

---

[285] 4/2/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Group Audit Committee – APR07,” HSBC OCC 8874328-329.
[286] See, e.g., 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Management Letter: HBMX-[subject redacted by HSBC],” HSBC OCC 8875010-011; 3/20/2007 email from HBMX Leopoldo Barroso to HBMX Paul Thurston and others, “[subject redacted by HSBC],” HSBC OCC 8874315-16; 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, “[subject redacted by HSBC],” HSBC OCC 8874317-318.
[287] 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, “[subject redacted by HSBC],” HSBC OCC 8874317-318.
[288] 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Management Letter: HBMX-[subject redacted by HSBC],” HSBC OCC 8875010-011.  See also 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, “Managerial Letter:  HBMX-[redacted by HSBC],” HSBC OCC 8875013-014.
[289] See 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Management Letter: HBMX-[subject redacted by HSBC],” HSBC OCC 8875010-011; 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, “Managerial Letter:  HBMX-[redacted by HSBC],” HSBC OCC 8875013-014; Subcommittee interview of Paul Thurston (5/1/2012).
[290] See 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Management Letter: HBMX-[subject redacted by HSBC],” HSBC OCC 8875010-011; 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, “Managerial Letter:  HBMX-[redacted by HSBC],” HSBC OCC 8875013-014.
[291] 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, “Management Letter: HBMX-[subject redacted by HSBC],” HSBC OCC 8875010-013.
[292] See 4/19/2007 email from Paul Thurston to multiple HBMX colleagues, “[subject redacted by HSBC],” HSBC OCC 8875011-014.

PX257

to ensure "higher risk cases are brought to senior management attention"; providing additional training on KYC assessment reports; transferring all corporations out of the Personal Financial Services division; and dismissing all branch staff involved with completing the falsified KYC reports.[293]  Mr. Thurston also described the need to bring individual initiatives to improve KYC procedures, account opening and file maintenance into "one coherent programme" with "appropriate emphasis."[294]  In addition, he described holding a special CCC Committee meeting within a week to review cases with similar patterns and other high risk cases.[295]  He also directed the internal audit group to conduct a review of HBMX's AML and CCC processes.[296]

The most senior levels of HSBC Group were kept informed about the case.  On April 20, 2007, for example, Matthew King, head of HSBC Group Audits, sent an email to HSBC Group CEO Michael Geoghegan with this update:

> "I am told the Mexican authorities are taking a relatively benign attitude to our involvement with this customer, which is fortunate because the review has revealed a number of weaknesses.  A series of inaccurate, and possibly fabricated, visit reports seem to have been filed by the business which resisted any reporting of suspicions a number of times.  For its part, the Moneylaundering Department failed to act as a proper check and balance.  I have suggested a thorough review of processes within the Moneylaundering Department and of the Moneylaundering Committee to ensure they are robust.  … There are also a number of personnel decisions to be taken."[297]

Neither HBMX nor HSBC Group informed HBUS about the case.[298]

The Unimed scandal broke nearly five years after HSBC first began working to strengthen HBMX's AML controls and create a compliance culture.  It showed that, while progress had been made, HBMX still had multiple AML deficiencies and a poor compliance culture.

**2007 AML Efforts.**  For the rest of 2007, HSBC Group Compliance devoted attention and resources to strengthening AML controls at HBMX, with limited success.

One step taken was to task the new HBMX Chief Operating Officer, John Rendall, with overseeing HBMX's KYC remediation effort for existing client files, an effort mandated by CNBV authorities but far behind schedule.[299]  Mexican regulators had given Mexican banks until

---

[293] Id. at HSBC OCC 8875012.

[294] Id.

[295] Id. at HSBC OCC 8875012-13.  HBMX did not identify any other corporate clients with a similar profile. Subcommittee interview of Paul Thurston (5/1/2012).

[296] This review produced an audit report in December 2007, discussed below.  See Dec. 2007 "General & Transactional Banking Audit:  HBMX – Money Laundering Deterrence," prepared by Group Audit Mexico, HSBC OCC 8874802-810.

[297] 4/20/2007 email from HSBC Matthew King to HSBC Michael Geoghegan, and copy to David Bagley, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8874762.

[298] Subcommittee interview of Paul Thurston (5/1/2012).

[299] See, e.g., 2/27/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan and others, "CNBV/FIU Update," HSBC-PSI-PROD-0198510-511.

PX257

61

2007, to update the KYC information in all customer files; HBMX had obtained an extension until May 2008, but expected to be hard pressed to meet the new deadline.[300]

In June 2007, David Bagley, HSBC Group Compliance head, visited HBMX for several days, met with CNBV officials, and circulated a report on the outstanding compliance and AML issues.  In an email transmitting his report, Mr. Bagley wrote:

> "[T]here do appear to be a number of issues to be resolved, particularly those relating to accurate ongoing account opening, prompt effective and complete remediation in accordance with CNBV requirements for existing accounts, and completion of the recommended enhancements to the working of the MLD committee. …   [W]e will need on an ongoing basis to consider the nature and extent of the resources currently available in CMP [Compliance].  …  I suspect we are already stretched given the apparent growth that has already, or is intended to take place in this area which appears to be growth of both volume and complexity."[301]

His five-page report detailed a number of compliance and AML problems.[302]  First was HBMX's anticipated failure to meet a Mexican regulatory deadline for reviewing the KYC information for all existing accounts to ensure compliance with regulatory requirements.  The report noted:  "There appeared to be differing opinions as to how many accounts were affected, how many accounts were outstanding and therefore no real tracking of the progress being made."  The report recommended reaching a consensus on the method for tracking accounts and completing the task.  The report also expressed concern about KYC weaknesses in opening new accounts.  It noted:  "If we are opening new accounts badly it will only add to the remediation exercise required by CNBV ….  Accurate and complete account opening is a key AML control, particularly in emerging markets."  A third key issue was "confusion as to the stated aims and purpose of the MLD Committee."  A fourth was that "the CAMP monitoring system produces significant numbers of 'false' alerts.  This is a feature of all AML monitoring systems.  Having said this, steps are being taken across the Group to seek to minimize this," and recommended that similar steps be taken in Mexico.  A fifth concern was that the compliance team was "lightly resourced."

The report also discussed a "cordial" meeting held with CNBV regulators.  It said that the regulators were "overall extremely positive about the bank" but also "had a fairly lengthy list of

---

[300] See 7/27/2007 minutes of LAM Regional Audit Committee, HSBC OCC 8875086-088, at 3 ("CNBV has granted a 1-year extension to MAY08 for HBMX to regularize customer identification files for account[s] opened or contracts signed before MAY04."); 12/2007 audit of "HBMX-Money Laundering Deterrence (MLD)," No. HBMX GAQ 070086, prepared by HSBC Group Audit, Executive Summary, HSBC OCC 8876347 ("HBMI has been given an extension by the Regulator from May 07 to May 08 to ensure that a portion of the client files (known as the UBA project – about 1.8m customers) are completed.").
[301] 6/27/2007 email from HSBC David Bagley to HBMX Paul Thurston and others, "Visit Report," HSBC OCC 8874967-968.  Mr. Bagley visited Mexico and Panama from June 11 to June 14, 2007.  See 7/27/2007 Minutes of LAM Regional Audit Committee, HSBC OCC 8875086-090, at 3.
[302] June 2007 "Summary of Compliance Issues – Mexico," report prepared by David Bagley, HSBC OCC 8874970-974.

**PX257**

issues," most of which focused on compliance matters other than AML issues.[303]  Paul Thurston, head of HSBC Mexico, thanked Mr. Bagley for the "constructive report."  He wrote:

> "I agree with your comment that we need to review the role and resources in the Compliance function. … For all Ramon's strengths, I have equally seen weaknesses in addressing key issues … and in my view the jury is out on his ability to do all that we need in HBMX, let alone try to oversee other countries in the region. …  [W]e should review between the three of us in a few month's time, when we see what progress is being made."[304]

The very next month, July 2007, John Root, a senior HSBC Group Compliance officer, sent a blistering email to Ramon Garcia condemning HBMX's CCC Committee for "rubber-stamping unacceptable risks":

> "A number of items jump out from your most recently weekly report (02JUL-06JUL) but everything pales in comparison with the ML items on page 4.  It looks like the business is still retaining unacceptable risks and the AML committee is going along after some initial hemming and hawing.  I am quite concerned that the committee is not functioning properly.  Alarmed, even.  I am close to picking up the phone to your CEO.
>
> [Redacted by HSBC] looks like another [Unimed[305]] type of situation – what on earth is an 'assumption responsibility letter' and how would it protect the bank if the client is a money launderer?  Please note that you can dress up the USD10 million to be paid … to the US authorities as an 'economic penalty' if you wish but a fine is a fine is a fine, and a hefty one at that.  What is this, the School of Low Expectations Banking?  ("We didn't go to jail!  We merely signed a settlement with the Feds for $ 10 million!") …
>
> So, [Unimed[306]] is strike one. [Redacted by HSBC] is strike two.  Let's now look at strike three.  (I hope you like baseball.)
>
> The same person who is giving the sancrosanct 'assumption responsibility letter' for [Redacted by HSBC] … is being asked by the CEO to explain why he retained the [Casa De Cambio Puebla[307]] relationship after USC11 million was seized by the authority in [Puebla[308]] account with Wachovia in Miami. What?!  The business was okay with this?

---

[303] Id. at 3.
[304] 6/29/2007 email from HBMX Paul Thurston to HSBC David Bagley and John Rendall, "Visit Report," HSBC OCC 8874965.
[305] Although the client name was redacted from the document by HSBC, John Root confirmed that Mr. Thurston was referring to Unimed.  Subcommittee interview of John Root (4/26/2012).
[306] Id.
[307] Although the client name was redacted from the document by HSBC, the reference to a seizure of $11 million from Wachovia Bank in Miami indicates that the client is Casa de Cambio Puebla.  See discussion below.
[308] Id.

63

The AML Committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter. It needs to take a firmer stand. It needs some cojones. We have seen this movie before, and it ends badly."[309]

Mr. Garcia responded that he was escalating the two cases involving high risk clients as part of a revised AML procedure in the CCC Committee.[310] He explained that Mexican law essentially required the CCC committee to give great weight to the opinion of the business side of the bank, because "they are the ones that really know the customer." He said that he had escalated the cases to the HBMX CEO, because MLD had "a different opinion" from the business "about reporting the case to authorities." Essentially, he said that the final decision belonged to the HBMX CEO, rather than the CCC Committee.

The next week, Paul Thurston, HSBC Mexico CEO, supported the CCC Committee's recommendation to close one of the accounts, but not the other. He supported closing the account of Casa de Cambio Puebla, which had been a client for more than 20 years, but whose funds at Wachovia Bank had been seized by the U.S. Justice Department and Drug Enforcement Administration (DEA).[311] Mr. Thurston cautioned John Rendall, the HBMX Chief Operating Officer, to alert CNBV and to ensure CNBV had "no objection."[312] Mr. Rendall also suggested alerting their U.S. counterparts since HBUS had the same relationship with the client.[313] The second account involved a U.S. money services business, Sigue Corporation, which specialized in remitting funds from the United States to Mexico and Latin America. Mr. Thurston, on the advice of Mr. Rendall and the commercial banking division, kept that account open.[314]

Later in July, the HSBC Latin American (LAM) Regional Audit Committee held a meeting in Mexico.[315] Participants included HSBC Group Compliance officials Brian Robertson, David Bagley, and Matthew King; LAM/HBMX officials Paul Thurston, Emilson Alonso, and Graham Thomson; HBMX Compliance head Ramon Garcia; and others from HSBC affiliates throughout Latin America. Mr. Thomson, head of LAM Internal Audit, discussed risk and compliance issues in several countries, and noted that Regional CEOs were now required to "take disciplinary action should a manager record 2 consecutive Below Standard control risk assessments or record significant repeat recommendations."[316] With respect to Mexico, Mr. Thomson noted that although 96% of HBMX electronic records reportedly met regulatory requirements, there was a "high level of exceptions and variance between the paper and

---

[309] 7/17/2007 email from HSBC John Root to HBMX Ramon Garcia, with copies to Susan Wright, David Bagley, and Warren Leaming, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925-927.

[310] 7/18/2007 email from Ramon Garcia to HBC David Bagley, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925.

[311] See July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC]," HSBC OCC 8875132-135.

[312] Id. at 132.

[313] Id.

[314] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC 8875139. Six months later, in January 2008, Sigue Corporation entered into a deferred prosecution agreement with the U.S. Justice Department, admitting that some of its agents had been laundering drug proceeds. See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Deferred Prosecution Agreement Factual Statement (1/28/2008). HBMX's relationship with Sigue Corporation is discussed further below.

[315] See 7/27/2007 Minutes of LAM Regional Audit Committee, HSBC OCC 8875086-090.

[316] Id. at 2.

**PX257**

64

electronic records" which would require "a large rectification effort" to meet the regulatory deadline of May 2008.[317]  He also noted that branch offices were not sufficiently familiar with SCC requirements, and criticized the CCC Committee for failing to followup on instructions to close client accounts.  Mr. Thurston noted that the CCC Committee was introducing an escalation process to senior management to resolve disputes over closing accounts.[318]  Ramon Garcia also reported that automation problems were causing delays in the issuance of Suspicious Activity Reports (SARs), but that interim manual reviews had not detected activity requiring any SARs to be filed.[319]  He also described a new pilot project at 94 HBMX branches to centralize management and control of account documentation using electronically imaged documents.

**CNBV Escalates Concerns.**  Two months later, in October 2007, the CNBV asked to meet with Paul Thurston, the HSBC Mexico CEO, to express ongoing concerns about HBMX's compliance and AML efforts.  Mr. Thurston summarized the meeting in an email to the HSBC Group CEO Michael Geoghegan.[320] He wrote:

> "At their request, I met today with the Head of Banking Supervision, and the Supervisor for HSBC, from our regulator, the CNBV, following their on site examination of various aspects of our business, including cards, money laundering, and treasury operations. …
>
> They walked me through a presentation pack which firstly set out specific points … but then moved on to more general concerns of the CNBV with HSBC in Mexico.  These centered on:
>
> – weaknesses in internal controls … slow progress in tackling KYC data problems and anti money laundering procedures.
>
> – corporate culture, where they comment that … HSBC has driven growth in credit products and launched new products without adequate controls. …
>
> They also expressed concerns at senior management having dual responsibilities for Mexico and the region, stating that 'there are many concerns on how management will be able to implement strong controls within the bank in Mexico, while keeping an eye on other countries.' ...
>
> I indicated to them we were aware of these issues and were progressively tackling them."[321]

---

[317] Id.

[318] Id.  Mr. Thurston explained that if compliance and business personnel disagreed over closing an account, the dispute would be escalated to the HBMX COO, and then to the CEO.  In addition if a business wanted to close an account, a higher ranking Executive Director would have to make the decision.  Subcommittee interview of Paul Thurston (5/1/2012).

[319] Id. at 3.

[320] 10/23/2007 email exchange between HBMX Paul Thurston and HSBC Michael Geoghegan, "CNBV Inspection," HSBC OCC 8873338-342.

[321] Id.

65

His email then outlined the steps he told CNBV that HBMX was taking, including new hires, "customer file centralizing and imaging which would give us more robust KYC data for anti-money laundering," and working to change the culture of the bank which "would not happen over night."[322]  Mr. Thurston wrote that the CNBV officials told him that was "what they wanted to hear and that they would report back positively" to the head of the CNBV.  Mr. Geoghegan responded:  "This is disturbing and clearly we will need to look at the management structure and practices. …  I am copying this to the Group Chairman and Matthew King for their information."[323]

In December 2007, the internal audit group for Mexico issued a report that had been ordered earlier on HBMXs AML efforts.[324]  It found HBMX's AML controls to be "Below Standard" and to pose an overall "high" risk.[325]  It detailed multiple problems, including "[r]egulatory breaches in KYC issues such as the large number of incomplete client files and the inadequate process of SCC identification and monitoring across the network."[326]  It noted that HBMX had a May 2008 deadline for bringing files into compliance with KYC regulations set by the CNBV, and that regulators had been told 86% of client files already met regulatory requirements, while audit work over the past year suggested a much lower percentage, "as low as 46%."  The audit report also noted that the KYC effort was remediating only 1.8 million files involving high risk, excluding another almost 6 million clients "that the Group has in Mexico which are subject to HSBC's own MLD policies."[327]

The 2007 audit report also disclosed SAR filing and alert review backlogs.  It noted "4,890 accounts that reported unusual transactions that took place between APR [April] and AUG07," but which had yet to be reported to Mexican authorities, "thereby breaching the regulations."[328]  It attributed the delay to changed internal criteria for reporting transactions, resulting in an increase in the number of cases to be reported, and "slow decision-making."[329]  The report also noted 7,217 alert warnings of which 858 (12%) had not been reviewed at all, "posing a potential risk that criminal transactions may not be identified which may have an adverse reputational effect on the Institution."[330]  The audit report stated that the failure to review these alerts had been going on for one year due to "insufficient Operations staffing."  The report also criticized "Senior Management" for attending few AML committee meetings, delaying decisions on cancelling accounts, and delaying the imposition of sanctions when cases were not reported to the CNBV on time.[331]  The report also noted a lack of "sufficient understanding" of the AML IT systems and inadequate AML training as evidenced by the "failures regularly identified in branch audits."[332]  In light of the "number and in many cases

---

[322] Id. at HSBC-OC-8873341.
[323] Id. at HSBC-OC-8873338.
[324] See 12/2007 "General & Transactional Banking Audit:  HBMX – Money Laundering Deterrence," No. HBMX GAQ 070086,  prepared by Group Audit Mexico, HSBC OCC 8874802-810.
[325] Id. at HSBC OCC 8874810.
[326] Id.
[327] Id.
[328] Id. at HSBC OCC 8874807.
[329] Id. at HSBC OCC 8874807, 810.
[330] Id. at HSBC OCC 8874808.
[331] Id. at HSBC OCC 8874807.
[332] Id. at HSBC OCC 8874810.

PX257

66

seriousness of the weaknesses identified," the report recommended creating an HBMX Money Laundering Committee to undertake the effort needed to address the widespread AML shortcomings.

Confronted by this long list of AML deficiencies, HSBC Group sent Warren Leaming, HSBC Group Compliance Deputy Head, to Mexico to help determine what should be done.[333]

**CNBV and FIU Dissatisfaction Deepens.**  As 2007 drew to a close, HSBC Group and HBMX worked to strengthen HBMX's AML efforts, but CNBV dissatisfaction with the bank seemed to deepen and the list of AML concerns broaden in 2008, encompassing for the first time concerns about HBMX's participation in bulk cash services.

In February 2008, Mr. Thurston, HSBC Mexico CEO, met again with CNBV officials, at their request, along with the Mexican Financial Intelligence Unit (FIU).[334]  According to an email he sent summarizing the meeting, CNBV handed him a draft report detailing multiple compliance concerns.[335]  Mr. Thurston wrote:

"It is clear in this that our Head of Compliance is not as highly regarded by the CNBV as had been thought by local and Group management, and indeed appears to have misled us about the extent to which the CNBV have been informed of, and/or are satisfied with, our actions."[336]

HSBC Group CEO Geoghegan responded:  "This is most disturbing and we will need to have the most thorough of investigations."[337]

The report provided by the CNBV stated that "[a]s a result of the increase in bank's operations, there has been an increase in deficiencies in internal control."[338]  It described a variety of problems.  With respect to AML issues, the report concluded that "little improvement" in AML controls had occurred since the prior year's on-site inspection.[339]  It noted that, of 110 client files reviewed, "55 files (50%) were incomplete," and 5 files were not provided at all.  It noted a "[l]ack of closer supervision to high profile risk clients"; a lack of risk criteria to classify clients during the account opening process; and missing client updates for high risk customers

---

[333] See, e.g., 12/6/2007 email from HSBC John Root to HSBC Warren Leaming and others, "Warren Leaming HBMX DEC Visit Issues,"  HSBC OCC 8875837 ("I am keeping a list of issues that you might want to raise during your December visit to HBMX," including deteriorating audits of treasury operations, resourcing concerns, "Sinaloa massive money-laundering scheme (+USD 100 million)," "HBMX Trusts backlog," "Banistmo business in regulatory and tax havens," and "AML systems integration").

[334] See 2/18/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Richard Bennett and Matthew King, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331-333.

[335] Id. at HSBC OCC 8873333.

[336] 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 6.  [Sealed Exhibit.]

[337] 2/18/2008 email from HSBC Michael Geoghegan to HBMX Paul Thurston and others, including HSBC Group Chairman Stephen Green, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331.

[338] 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 1.  [Sealed Exhibit.]

[339] Id. at 2.

PX257

and politically exposed persons.[340]  Another deficiency was that the CAMP and HOGAN monitoring systems did not collect transaction profiles for new accounts, as required by law, and the CCC Committee delayed closing suspicious accounts, citing the example of a $2.8 million account kept open for an entire year after it was supposed to be closed.[341]

The report also described a number of AML deficiencies identified by the FIU, stating: "Evidence obtained by the Financial Intelligence Unit of Mexico (UIF) on a frequent basis has seriously raised its concern on the very high level of ML risk that HSBC may be incurring."[342]  It provided a chart showing that HSBC had much more bulk cash transactions using U.S. dollars than other Mexican banks, and expressed U.S. and Mexican law enforcement concern that the cash represented illegal drug sale proceeds from the United States.[343]  The FIU also noted that HBMX frequently failed to provide requested information, claiming the files or basic account documents could not be located, providing a chart showing HBMX's response record was worse than other Mexican banks.[344]  The FIU also noted that "in the majority of the most relevant ML cases" it had investigated in 2007, "many transactions were carried out through HSBC," and in some cases, the FIU detected ML transactions that HSBC had not reported.[345]  The FIU also noted that it had been able to obtain copies of account documents that HBMX had claimed it could not locate.  "These last cases may imply criminal responsibility of HSBC and its personnel – such as that relating to false statements to administrative authorities and complicity – that the law enforcement and judicial authorities must investigate."[346]

Internal HBMX and HSBC Group documents indicate that senior management immediately began to investigate the allegations.  HSBC Group CEO Michael Geoghegan spoke to HSBC Group Chairman Stephen Green, as well as senior HSBC Group and HBMX personnel, and asked David Bagley to lead the review of HBMX Compliance.[347]  Mr. Bagley left for Mexico immediately for a two-week stay.  Mr. Thurston directed the head of Latin American Security to investigate certain allegations, and the head of Latin American internal audit to examine the other CNBV and FIU complaints.[348]  Mr. Thurston promised an updated report to Mr. Geoghegan prior to an upcoming HSBC Group Board meeting.

Three days later, on February 22, 2008, Matthew King composed a draft email as a way to organize the information that should be conveyed to Mr. Geoghegan in a telephone call, and circulated his self-described "brain dump" to Messrs. Thurston, Bagley, Bennett, and Graham Thomson for their thoughts.[349]  The email indicated that the AML concerns raised by the CNBV

---

[340] Id. at 3.
[341] Id.
[342] Id. at 5.
[343] Id.
[344] Id. at 5-6.
[345] Id. at 6.  Recent examples of such cases included Zhenly Ye Gon, Casa de Cambio Puebla, and Sigue Corporation.
[346] Id.
[347] 2/19/2008 email from HSBC Michael Geoghegan to Paul Thurston, Richard Bennett, Matthew King, with copies to Stephen Green and David Bagley, "HBMX – ML Review," HSBC-PSI-PROD-0198506-507.
[348] 2/19/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan and others, "HBMX – ML Review," HSBC-PSI-PROD-0198505-506.
[349] 2/22/2008 email from HSBC Matthew King to HBMX Paul Thurston, HBMX Graham Thomson, with copies to HSBC Richard Bennett and HSBC David Bagley, "CNBV," HSBC-PSI-PROD-0198508-509.

PX257

68

were "pretty similar" to issues raised earlier, but the CNBV had "suddenly become more aggressive." The email speculated on whether that was due to political pressure, FIU concerns, or possibly a separate disagreement with the FIU regarding reimbursing a public utility for a fraud. Mr. King also wrote: "It is also the case that Mexico is suffering a major problem with drugs dealers and the Government is being very robust about dealing with them."

The King email then went through the issues. It noted that the December 2007 internal AML audit of HBMX was "Below Standard," and that the AML Director Leopolodo Barroso would be replaced, "albeit the FIU apparently regard him as trustworthy" so his replacement would have to be "carefully explained."[350] The email said that the "biggest immediate concern" was account KYC, which had been "a systematic problem for some time." Among other matters, the email noted that a pilot project to centralize account documentation through electronic imaging was underway, but "Audit is continuing to identify a high level of exceptions for that process also (around 30%)."[351] Mr. King wrote:

> "Given the concerns now raised by the CNBV and FIU (which apparently includes tapes of a drug lord recommending HBMX as the place to bank) we now have to decide: whether the imaging process can be made to work to everyone'[s] satisfaction[;] how quickly it can be rolled ou[t] across the whole network[; and] in the meantime, whether we can continue to open accounts using the old, flawed process."[352]

The email also described account documentation as "a problem since we bought Bital," and noted that CNBV had again questioned having HBMX personnel handle compliance issues for the Latin American region in addition to Mexico.[353] On "cross-border cash," the email indicated that trends still needed to be clarified, but he thought the United States had "a general concern rather than a specific one about us."

The next day, February 23, 2008, Paul Thurston sent an email to Michael Geoghegan with additional information. He wrote:

> "Firstly, to answer your question of why is this being raised now? The intelligence that we have been able to gather is that with President Felipe Calderon declaring war on the drugs gangs, crime and corruption the judicial authorities have heightened the focus on financial investigations and have been putting increasing pressure on the bank regulators because the banks have been seen as not providing good enough support. … HSBC has historically, and continues to have, a worse record than the other banks, so we have become a focus of attention. The new Head of the FIU has told us that his staff have told him that HSBC has been the most difficult bank to obtain accurate and timely data from for the past 4 years."[354]

---

[350] Id. at 1.
[351] Id.
[352] Id. at 1-2. Both David Bagley and Paul Thurston told the Subcommittee that they asked the CNBV for a copy of the purported tapes, but none was provided. Subcommittee interviews of David Bagley (5/10/2012) and Paul Thurston (5/1/2012).
[353] Id. at 2.
[354] 2/23/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Stephen Green, Matthew King, Richard Bennet, and David Bagley, "CNBV/FIU Update," HSBC-PSI-PROD-0197872-873.

**PX257**

Mr. Thurston wrote that HBMX had taken more corrective action than the regulators were aware of.[355]  He acknowledged an account documentation problem which would be addressed, in part, by a new centralized electronic imaging procedure which was taking effect Mexico-wide that month.  In addition, he wrote that "stronger disciplinary procedures" were being put in place for branch managers who signed off on account openings without personally ensuring all documents were obtained.[356]  He also noted that HBMX received more than 1,000 letters per week from the CNBV asking for account information, and that more resources had to be dedicated to responding to them.

Finally, on the bulk cash issue, Mr. Thurston wrote that the United States had a general concern, "not aimed specifically at HSBC," about the flow of U.S. banknotes from Mexico and the potential linkage to drug related activity."[357]  He wrote that HBMX had undertaken its own analysis of the cash flows, and initial indications were that its handling of U.S. dollars "had been slowly declining in recent years, rather than rising."[358]

On February 27, 2008, Mr. Bagley conducted an exit interview with the HBMX AML Director Leopoldo R. Barroso, who was being replaced.  Mr. Barroso provided a negative view of HBMX AML performance.  According to a meeting summary written by Mr. Bagley, Mr. Barroso said that, while in his position, he had felt civil and criminal "litigation exposure" due to "the continued poor controls in the bank, the fact that there were allegations of 60% to 70% of laundered proceeds in Mexico went through HBMX and because he did not think that senior management had any commitment to robust AML controls."[359]  Mr. Barroso indicated that "it was only a matter of time before the bank faced criminal sanctions and cited a number of cases." Mr. Bagley wrote:

> "It was clear that LRB [Leopoldo R. Barroso] felt very strongly that relevant business heads within HBMX had absolutely no respect for AML controls and the risks to which the Group was exposed and had no intention of applying sensible or appropriate approaches.  Again he cited a number of examples where despite strong recommendations with the CMP [Compliance] business heads had failed or refused to close accounts or indeed on occasions file SARs.  He thought that there was a culture that pursuing profit and targets at all costs and in fact had seen no recent improvement in the standard of controls or the types of decisions being taken.

> He was critical of the level of resources in his team and felt that his team had done much to keep the bank out of trouble by working extra hours against impossible deadlines and handling significant volumes of alerts including those from CAMP. …

> [H]e thought he needed at least 35 new headcount. …

---

[355] Id. at 1.
[356] Id. at 1-2.
[357] Id. at 2.
[358] See also 2/27/2008 email exchange between HBMX Paul Thurston and HSBC Michael Geoghegan, "CNBV/FIU Update," HSBC-PSI-PROD-0198510-512.
[359] 2/27/2008 "Meeting Attendance Note," prepared by David Bagley, HSBC OCC 8874824-825.

**PX257**

70

He was extremely critical of RG [Ramon Garcia] who he described as being indecisive, weak and desperate to retain his job and lacking any understanding of AML matters."[360]

Mr. Bagley later forwarded his summary of the meeting to Mr. Thurston who responded that "the jury is still out on Ramon" and a discussion was needed on structuring the Latin American regional and Mexican compliance responsibilities.[361]

On March 3, 2008, HBMX issued a 12-page response to the internal control issues raised by the CNBV in its draft report of February 27.[362]  The response detailed multiple "corrective actions" being taken by the bank to address each concern.  Among the actions discussed were the new centralized process for ensuring account opening documentation was obtained and electronically recorded; a new effort to centralize PEP files, obtain missing documentation, and strengthen annual PEP reviews; new disciplinary procedures for opening accounts with incomplete documentation; the re-engineering and strengthening of the alert reporting process; replacement of the AML director; and strengthening of the AML staff.  The response also indicated that management changes had been made to split responsibilities for Mexico from the rest of the Latin American region.  On the issue of U.S. banknotes, the response indicated that HBMX U.S. dollar volumes had not increased, but were marginally lower than in 2003.  It also announced a new policy, effective immediately, to deem all customers who deposit more than $100,000 in a month as SCC clients subject to enhanced due diligence.  The response said that 312 customers met that criteria and were being subjected to a KYC review.

Mr. Thurston and Mr. Bagley met with CNBV and FIU officials on March 4, 2008, to deliver the response and discuss the bank's actions.  They reported to Mr. Geoghegan that the meeting was "extremely cordial" and the bank's corrective efforts were "well received."[363]  After Mr. Bagley returned to London, he also discussed the matter with the Financial Services Authority (FSA), HSBC's UK regulator, which had communicated with CNBV.  Mr. Bagley reported that "CNBV confirmed that they were satisfied with the reaction and steps we have taken although will watch implementation closely."[364]  In April 2008, at a meeting of the HSBC Group Board of Directors, Mr. Bagley briefed the HSBC Group Audit Committee about HBMX, indicating that regulators had "expressed their satisfaction with the Group's reaction."[365]

**Restoration Project.**  HBMX spent the next six months working to carry out the corrective actions outlined in its March response to CNBV.  HBMX also underwent personnel changes.  In May 2008, Paul Thurston was promoted and returned to London, having spent a little more than one year in Mexico.  Luis Pena Kegel took over as HSBC Mexico CEO and head of HBMX.  Emilson Alonso was appointed head of HSBC Latin America, carrying out the

---

[360] Id.
[361] 3/7/2008 email exchange among HSBC David Bagley and HBMX Paul Thurston and John Rendall, "HBMX," HSBC OCC 8874821-822.
[362] 3/3/2008 "Internal Control, HSBC Mexico SA," prepared by HBMX, HSBC OCC 8966027-038.
[363] 3/5/2008 email from HSBC David Bagley to HSBC Michael Geoghegan and others, "CNBV/FIU Meeting," HSBC-PSI-PROD-0198513.
[364] 3/15/2008 email from HSBC David Bagley to HBMX Paul Thurston and others, "CNBV," HSBC OCC 8875171.
[365] 4/25/2008 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198539-540.

**PX257**

71

commitment made to CNBV to split the two sets of responsibilities.  In the summer of 2008, a new HBMX AML director was also hired, Jaime Saenz.[366]

One key AML activity undertaken by the bank was to work on bringing the KYC documentation for existing accounts into compliance with CNBV requirements, an effort HBMX deemed "Projecto Restauracion" or the Restoration Project.  HBMX was supposed to have completed the KYC effort by May 2008, after having obtained a one-year extension, but was far behind schedule.  HBMX appointed John Rendall, HBMX COO, to oversee the new project.  One step he took was to limit the project to high risk accounts.[367]  He also assembled a team and began pressing branch personnel to complete their KYC updates.  John Root, a senior HSBC Group Compliance officer, attended a meeting of the Restoration Project team during a visit to Mexico in July, and was "very impressed" by the progress to date.[368]

Also in July 2008, Mr. Rendall provided a progress report to the Latin American regional audit committee on a number of AML and compliance efforts, outlining "9 workstreams."  He described several milestones, including implementing the centralized account opening process for all HBMX branches, initiating the KYC Restoration Project "focused on high risk accounts," achieving a "90% reduction (from 34,700 to 3,300)" in the 2008 CAMP alert backlog, requiring enhanced KYC for customers with over $100,000 in U.S. dollar deposits, and improving FIU response procedures.[369]

On a more negative note in July, HBMX's internal monitoring system generated a number of alerts identifying "significant USD [U.S. dollar] remittances being made by a number of customers to a US company alleged to have been involved in the supply of aircraft to drugs cartels."[370]  The alerts highlighted account activity in the HBMX Cayman branch.[371]  As a "precaution" pending review of the account activity, HBMX stopped opening new Cayman accounts.[372]  The account activity also prompted HSBC Group to take a closer look at the Cayman accounts.[373]  HSBC Group Compliance head David Bagley wrote that the Cayman accounts should be included in the Restoration Project "as a priority area," and should "be seen as high-risk from an AML and reputational perspective."[374]

In September 2008, HBMX's internal audit group reviewed the Restoration Project and quickly identified multiple, growing problems.  In an email describing the audit findings, Graham Thomson, head of the Latin American internal audit group, wrote:

[366] See 7/30/2008 email from HSBC John Root to HSBC David Bagley and others, "HBMX Visit Update," HSBC OCC 8873487-489.
[367] See 6/7/2010 email from HBUS Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.
[368] Id.
[369] See 6/7/2010 email from HBUS Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.
[370] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett with copies to HSBC Michael Geoghegan and others, "HBMX – Cayman Accounts," HSBC OCC 8874832-833.
[371] Id.
[372] Id.
[373] Id.
[374] Id.

PX257

72

> "The key issues … include slow progress with remediating PEPs/SCCs and other high risk customers, with some 40% of the KYC records of PEPs/SCC customer segment … not yet remediated.  These accounts are now in the process of closure by HBMX Legal. …  [C]hecks done by CMP [Compliance] on visit reports … continue to reveal an unacceptable level of 'manufactured' visit reports."[375]

Mr. Alonso, head of HSBC Latin America responded that the audit results were "disappointing" and "not what I was assured by HMBX management."[376]

The audit report found that the Restoration Project had "major weaknesses … that could potentially hinder regulatory compliance and the achievement of the project's overall goals."[377] It said that resources dedicated to the project "appeared insufficient to deliver the quality and timeliness required," and clients engaged in high risk businesses "had not been identified for inclusion" in the project.[378]  It noted that visit reports were incomplete and, in some cases, "created without visits being made."[379]  The audit report also stated:

> "The impact of account cancellation on the business, customers and costs should be analysed against the risks that have been mitigated and accepted, as this will allow having adequate balance between control and business, particularly where cancellations may be attributable to internal errors rather than to the customers."[380]

This recommendation appears to suggest that some high risk accounts not be closed, even where the bank was unable to review the account by the regulatory deadline and KYC deficiencies might exist.  Mr. Thomson's email indicated, however, that unremediated files for PEP and SCC clients subject to the Restoration Project were already in the process of being closed.[381]  In addition, Mr. Rendall reported to the Latin American regional audit committee that "7,941 KYC files for high risk customers had been reviewed & updated, or scheduled for closure."[382]  Mr. Rendall also reported that in the second phase of the project, "47,000 accounts with various risk flags" were being reviewed, with plans for a third phase to examine "83,000 accounts with historic CAMP alert profiles."  These figures were well below, however, the 1.8 million in high risk accounts that were supposed to be reviewed to ensure KYC documentation met CNBV requirements.

**November Meeting with CNBV.**  On November 26, 2008, a high level meeting took place between HSBC and CNBV.  Michael Geoghegan, HSBC Group CEO, traveled to Mexico

---

[375] 10/28/2008 email from HBMX Graham Thomson to HBMX Emilson Alonso, Luis Pena, John Rendall, and others, "HBMX – Projecto Restauracion," HSBC OCC 8873464-465.

[376] 10/28/2008 email from HBMX Emilson Alonso to HBMX Graham Thomson and others, "HBMX – Projecto Restauracion," HSBC OCC 8873463.

[377] Nov. 2008 "Branch Audit Report:  HBMX Special Review of Restoration Project," prepared by HBMX Group Internal Audit, HSBC OCC 8876417-424, at the Audit Report Summary Schedule, HSBC OCC 8876424.

[378] Id.

[379] Id.

[380] Id. at HSBC OCC 8876419.

[381] 10/28/2008 email from HBMX Graham Thomson to HBMX Emilson Alonso, Luis Pena, John Rendall, and others, "HBMX – Projecto Restauracion," HSBC OCC 8873464-465.

[382] 6/7/2010 email from HSBC Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.

PX257

73

to attend.  Along with Emilson Alonso, head of HSBC Latin America, and Luis Pena, head of HSBC Mexico, Mr. Geoghegan met with the President of CNBV, Guillermo Babtz; the head of CNBV bank supervision, Patricio Bustamante; and the head of CNBV AML oversight, Pablo Gomez.[383]  The focus of the meeting was expected to be the actions taken by HBMX to address the CNBV concerns identified in February 2008.

According to an email prepared by the Deputy Head of HSBC Group Compliance, Warren Leaming, who had accompanied Mr. Geoghegan to Mexico and remained there for several days,[384] the CNBV officials acknowledged the "significant progress" made by the bank, but remained "very concern[ed]" about the U.S. dollar accounts at HBMX's Cayman branch, the slow KYC review of those accounts, and the "sheer volume of US Dollars that HBMX repatriates" to the United States.[385]  The email noted that, between January and September 2008, HBMX had repatriated $3 billion to the United States, which represented 36% of the market and double what the biggest bank in Mexico, Banamax, had repatriated, even though HBMX was only the fifth largest bank in the country.[386]  According to the email, CNBV officials were also "concerned that when-ever there is a serious MLD [Money Laundering Deterrence] scheme HSBC seems to be involved" and that "USA authorities are concerned at the very high levels."[387]  Mr. Geoghegan told the Subcommittee that his meeting with the Mexican regulators did not go as he had expected, he told the CNBV that HBMX would address the issues raised, and he immediately took action to ensure that happened.[388]

**Stopping U.S. Dollar Services.**  After the meeting, Mr. Alonso sent an email to Mr. Pena asking him to examine the "export of cash USD to the USA," including the volumes of U.S. dollars being exported, the types of clientele using the HBMX branch network to make U.S. dollar deposits for remittance to the United States, and the branches involved in more frequent deposits or higher volumes.[389]  He also called for the "[i]mmediate elimination of this kind of service in our branches.  Corporate clients that require such service should be approved by you on a very exceptional basis."[390]

Later that same night, Mr. Geoghegan sent an email to Mr. Alonso stating:  "It occurs to me:  We should stop any Dollar remittances or accept any Dollar payments unless they are done via a customer's account.  We should stop shipping Dollars."[391]  He also wrote:  "We should bench mark HBMX CAMP and other search engine systems with HBUS (they have some very

---

[383] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.

[384] See 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall, "Mexico Visit," HSBC-PSI-PROD-0197874 (indicating Mr. Leaming visited HBMX from Nov. 25 to Nov. 28).

[385] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875606.

[386] Id.

[387] Id.

[388] Subcommittee interview of Michael Geoghegan (5/24/2012).

[389] 11/26/2008 email from HBMX Emilson Alonso to HBMX Luis Pena, with copies to HSBC Michael Geoghegan and others, "Visit to CNBV – Findings and Required Actions," HSBC OCC 8874846-847.

[390] Id.

[391] 11/26/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso, "Money Launderying," HSBC OCC 8874849-850.  Mr. Geoghegan told the Subcommittee that he made a unilateral decision to stop these U.S. dollar services.  Subcommittee interview of Michael Geoghegan (5/24/2012).

PX257

sensitive behavior monitors) and see whether we are finding as many suspicious transactions as we should be." Mr. Alonso forwarded the email to Mr. Pena, who responded the next day:

> "The two immediate actions we are taking are:
>
> Starting December 1. We will no longer buy or sell dollars in cash at ANY branch (customers or non customers). We will, as an alternative, offer travelers cheques to customers only. Also customers can withdraw dollars at HSBC ATMs located at airports or from any ATM in the world with their debit card.
>
> Starting January 1. We will no longer accept deposits of cash dollars to any dollar account at any branch.
>
> We are quantifying the impact of lost revenues. On the flipside, we will save the operating cost of transporting and exporting dollar bills.
>
> This should take care of the problem."[392]

Mr. Pena also proposed continuing indefinitely the freeze on opening new U.S. dollar accounts through HBMX's Cayman branch, and prohibiting the acceptance of new cash deposits for the existing Cayman accounts.[393] HSBC Group Compliance Deputy Head Warren Leaming noted in an email to his supervisor, David Bagley, that when Mr. Pena commented that the actions being taken "could result in lost profits of many billions Mike[']s clear response [was] that nothing is worth risk to our reputation."[394] Mr. Leaming also wrote that the proposed actions were "considered extremely sensitive here in Mexico and local management want to get their ducks in a row … so it will be much appreciated if the above could not be … disseminated without discussing further."

**Account Closing Backlog.** Mr. Leaming also noted that "there appears to be a huge back-log in closing accounts," with customers continuing to use accounts in November that had been ordered closed eight months earlier in March. He wrote that those accounts, which were still being used by customers, may be "part of the reasons for multiple SARs" being filed for some accounts, potentially putting HBMX in breach of HSBC policy on account closure after multiple SARs.[395]

Mr. Bagley responded: "What I find most frustrating is the way in which new issues constantly emerge however much time is spent with HBMX."[396] He continued: "The practice of changing USD in the branches pres[u]mably with little or no ID for non customers is in breach of Group policy. When looking at our USD exposure how can this have been missed." He also

---

[392] 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.
[393] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.
[394] Id.
[395] Id.
[396] 11/27/email  from HSBC David Bagley to HSBC Warren Leaming and Richard Bennett, "Mexico," HSBC OCC 8875605.

PX257

75

asked Mr. Leaming to consider challenging the involvement of the Legal Department in the account closing process so that it could proceed more quickly.

The next day, November 28, 2008, Mr. Geoghegan sent an email to top HBMX and HSBC Group Compliance officials stating that it should be made clear to all HBMX personnel "that if there are persistent breaches of KYC in a particular branch, the branch will be closed and all staff dismissed regardless of how much business we will lose on account of it."[397]  He also required HBMX's compensation scorecard to include implementing the CAMP monitoring system to the maximum extent possible and closing accounts with two or more SARs.  He wrote: "[I]f you demonstrate zero tolerance of lapses in implementing KYC then the operations standards of the whole business improves at the same time.  What we are doing in Mexico needs to be copied everywhere else in the region."[398]

**AML Shock Plan.**  Mr. Pena responded that in January 2009, he was planning to close two branches and fire all staff "as exemplary measures" and was working to identify the branches.[399]  This measure was later referred to as the "AML Shock Plan."[400]  Mr. Pena also wrote:

> "Last but not least, I will address the issue of funding.  After all, Cayman and Mexican dollar accounts provide us with US$2.6 billion of cheap funding.  We are likely to lose a big portion of this if we tell customers we no longer receive dollar notes.  We have to provide an alternative to our customers for this:  Miami accounts may be an alternative but we will have to talk to HBUS of how we get this ch[eap] funding back to Mexico to lend."[401]

In December 2008, at the conclusion of his latest visit to Mexico, Mr. Leaming drafted a letter to Mr. Pena summarizing a number of AML issues and sought input from other HBMX officials before finalizing it.[402]  His draft letter discussed the late filing of SARs, the backlog in closing accounts, the failure to close accounts after two SAR filings, slow and weak decisions by the CCC Committee, the need to clarify transaction limits, and the need for further refinement of the CAMP alert system.  He noted that the account closing backlog consisted of over 3,600 accounts, of which 675 involved suspicion of money laundering and had been ordered closed by the CNBV, yet were still open.  He also noted that 16 of the accounts remaining open had been ordered closed in 2005, 130 in 2006, 172 in 2007, and 309 in 2008.  He wrote that he'd been advised that the law did not permit the accounts to be blocked pending closure, which meant account activity was continuing.  To speed up closures, he advised that his research had indicated the Legal Department did not have to participate and clients could be notified of the account closing by certified mail.  Mr. Leaming also noted that 3,000 Cayman accounts had been

---

[397] 11/28/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso with copies to HSBC David Bagley, HBMX Luis Pena, and others, "Final draft for Mike's Letter," HSBC OCC 8874857.
[398] Id.
[399] 11/28/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, who forwarded it to HSBC Michael Geoghegan, David Bagley, and Matthew King, "Final draft for Mike's Letter," HSBC OCC 8874856.
[400] 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall with copies to HSBC David Bagley, John Root, Susan Wright, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.
[401] Id.
[402] Id.

PX257

76

proposed for closure which would further stress the process.  In addition, he warned that the switch from U.S. dollar deposits to travelers cheques could also raise AML concerns, advised lowering the $25,000 ceiling on the amount of travelers cheques that could be purchased by a customer, and creating a new limit on the amount of travelers cheques that could be deposited at one time to a client account.  He recommended setting dollar limits on cashiers cheques as well.

Later in December, HBMX prepared to implement the new AML policies and procedures and close suspicious accounts.[403]  December 22 and 24 were set as the dates to close four HBMX branches "as disciplinary actions," with another 10 to 20 branches that, in January, would have all staff dismissed.[404]  January 1, 2009 was set as the date to stop buying or selling U.S. dollars at HMBX branches.[405]  It was also the date set for closing all accounts opened by casas de cambio. January 31 was set as the date to complete the Restoration Project and begin closing accounts that had incomplete documentation or were subject to at least two SAR filings.[406]

On December 22, 2008, an HBMX employee alerted the HBUS regional head of Banknotes, Gyanen Kumar to the HBMX's plan to stop buying and selling U.S. dollars in the new year.[407]  Mr. Kumar forwarded it to the Banknotes head Christopher Lok with the comment: "I have not been told anything firm as to why this decision is being taken as much as it is a drastic change.  My instincts tell me that perhaps this has something to do with compliance."[408] HBMX apparently did not explain, leaving HBUS uninformed about the compliance and regulatory pressures and AML risks behind HBMX's decision to end its U.S. dollar business.

**Law Enforcement and Regulators Converge.**  In January 2009, HBMX began implementing the planned AML changes.  It stopped buying and selling U.S. dollars and began closing accounts held by casas de cambio.[409]

That same month, U.S. regulators began contacting HBUS to get clarification about HBMX's decision to stop buying and selling U.S. dollars.[410]  When asked, HBMX told HBUS

---

[403] See 12/15/2008 email exchange among HBMX Ramon Garcia and HSBC Warren Leaming, Susan Wright, John Root, David Bagley, and others, "Anti Money Laundering:  Shock plan – Update 081215,"  HSBC OCC 8875786-790; 12/23/2008 email from HSBC Warren Leaming to HBMX Caterine Bussery, with copies to HSBC David Bagley, John Root, and Richard Bennet, "Anti Money Laundering:  Shock plan – Update 081215,"  HSBC OCC 8873474-476; 1/27/2009 email from HSBC David Bagley to HSBC Susant Wright, with a copy to Warren Leaming, "Press Release," HSBC OCC 8873485.

[404] 12/15/2008 email exchanges among Ramon Garcia to HSBC Warren Leaming, Susan Wright, John Root, David Bagley, and others, "Anti Money Laundering:  Shock plan – Update 081215,"  at HSBC OCC 8875786-787.

[405] Id.

[406] Id.  Mr. Leaming expressed skepticism that the proposed closures could be completed by the January 31 deadline. Id.

[407] See 12/22/2008 email from HBMX Mario Langarica to HBUS Gyanen Kumar and others, "USD cash in Mexico," HSBC-PSI-PROD-0095869-870.

[408] 12/23/2008 email from HBUS Gyanen Kumar to HBUS Denis O'Brien and Christopher Lok, "USD cash in Mexico," HSBC-PSI-PROD-0095869.

[409] An email suggests, however, that HBMX had decided to continue to offer U.S. banknotes products to several large reputable Mexican banks, Banamex, Banorte and Ixe, in effect making its first exceptions to the new policy. See 12/22/2008 email from HBMX Mario Langarica to HBUS Gyanen Kumar and others, "USD cash in Mexico," HSBC-PSI-PROD-0095869-870.

[410] See January 2008 email exchanges among  HBUS Christopher Davies, Christopher Lok, Michael Gallagher, Paul Lawrence, Gyanen Kumar, and others, "HBMX Banknotes business," HSBC OCC 3633806-812.

**PX257**

77

the decision had been based primarily on cost considerations, without mentioning the compliance and AML concerns that led to the decision.[411]   The regional head of HBUS' Banknotes department, Gyanen Kumar, who was traveling to Mexico the next week, was asked by his colleagues to get more information.[412]   On January 13, HBMX sent HBUS a copy of its internal press release describing its decision.[413]   Based upon HBMX's actions, HBUS decided to close banknotes accounts used by two Mexican clients, but to retain accounts with the same clients in the Payments and Cash Management (PCM) division.[414]   Closing the banknotes accounts meant that the Mexican clients could no longer make bulk cash sales of their U.S. dollars to HBUS, but the continued operation of their PCM accounts meant that both Mexican clients could still deposit U.S. dollars, execute U.S. dollar transactions, exchange U.S. dollars for Mexican pesos, and access the U.S. wire transfer system.

Around the same time, the Immigration and Customs Enforcement (ICE) arm of the U.S. Department of Homeland Security (DHS) held a meeting with HBUS in New York, and informed it that ICE was conducting an investigation of a particular Mexican casa de cambio that had accounts at both HBUS and HBMX.[415]   HBUS apparently did not relay that information to HBMX.

Six months later, in June 2009, HSBC Group increased its risk assessment for its Latin American operations to its highest risk rating.[416]   When Emilson Alonso, HSBC Latin America head, protested, HSBC Group Compliance head David Bagley explained:

"I fully acknowledge the level of priority and focus that you and the team have given to these issues and the progress that has been made particularly in Mexico and have taken all of this into account. …

The basis for the rating is however:

The inherent AML risk in Mexico is still very high and [t]here are not many other parts of the Group that have what is effectively a drugs war being conducted on the streets and also have the risk posed by potential sting and other operations by the US authorities. We have of course remediated our high risk accounts, but the historic weak account opening processes mean that we have overall lower levels of KYC across the customer base as a whole."[417]

---

[411] Id. at 810.

[412] Id. at 811.

[413] Id at 809.

[414] Id. at 811, 807.

[415] Id at HSBC OCC 3633806.  HSBC Group Compliance head David Bagley remarked near the end of January: "An obvious learning point for HBMX is that if they were contacted by US authorities then they should have thought to advise HBUS.  They can round the web, not just through the middle of the web.  1/30/2009 email from HSBC David Bagley to HSBC Susan Wright, "US issues – Various," HSBC OCC 8873759.

[416] See 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895.

[417] Id.

**PX257**

78

A week or so later, HBUS suddenly reclassified Mexico from its lowest to its highest risk rating. HBMX personnel in Mexico protested, but HBUS did not change its rating. One consequence was that its Mexican clients were automatically deemed to be located in a high risk country, triggering enhanced scrutiny.

Later in June 2009, ICE contacted HBMX about its investigation into a particular Mexican casa de cambio that had an account at the bank.[418] A few days later, ICE contacted HBUS' primary U.S. regulator, the OCC, and alerted the OCC to its investigation.[419] As a result, the OCC began intensifying its regulatory scrutiny of HBUS, in particular with respect to its U.S. banknotes business, which U.S. regulators later said had increased as HBMX's decreased.[420]

In the meantime, AML deficiencies continued to surface at HBMX. For example, in June 2010, HBMX noted that "certain transaction types were not being captured" by its AML account monitoring system, CAMP, and "therefore were not being monitored."[421] HBMX also noted that the CAMP software had not been updated "since its installation in 2005." In September 2010, the OCC issued a Supervisory Letter detailing massive AML deficiencies at HBUS, derived in part from its dealings with Mexico. The OCC followed with a Cease and Desist Order in October.

**Eight Years of HBMX AML Deficiencies.** HBMX and HSBC Group internal documents demonstrate that HBMX's AML deficiencies were longstanding and widespread. Audit after audit detailed long lists of problems, including inadequate compliance resources, missing KYC information, manufactured site visits, inadequate account monitoring, unread alerts, poor training on the monitoring system and assigning SCC designations, internal disputes over closing accounts with suspicious activity, accounts left open despite multiple SARs and orders by regulators to close them, a SAR filing backlog, and an account closure backlog that spanned three years. AML leadership at HBMX was also weak. One AML director was dismissed for manufacturing notes of AML committee meetings that never took place; another was dismissed for inadequate performance; several long periods went by without any AML director in place at all. Even AML projects with resources and high level backing were unsuccessful, such as the Restoration Project which reported in 2008, that 75% of high risk client files still had inadequate KYC documentation.

The evidence obtained by the Subcommittee shows that HSBC Group was fully aware of the years-long, substantial AML and compliance problems at HBMX, originating with the bank's purchase in 2002. The evidence also indicates that HSBC Group executives and compliance personnel worked to build a compliance culture, but repeatedly faced a workforce in Mexico that disregarded the Group's AML policies and procedures, delayed obtaining required KYC data, delayed closing suspect accounts, and delayed reporting suspicious activity to regulators. In 2009, under pressure from regulators, HSBC Group took drastic measures, including prohibiting

---

[418] See 6/28-29/2009 summary of telephone conversations, prepared by OCC Joseph Boss, OCC-PSI-00928759-761.
[419] Id.
[420] Paul Thurston told the Subcommittee that, in retrospect, while HBMX's banknotes business appeared to be declining, HBUS' banknotes business with Mexico had been increasing at the same time, due to its banknotes business with HBMX and former clients of HBMX. Subcommittee interview of Paul Thurston (5/1/2012).
[421] See 6/18/2010 email from HBUS Michael Anderson to HBMX Ken Harvey, with a copy to Andrew Zissell, "RMM action point," HSBC OCC 8875492-493 (attaching Compliance Report on Mexico, numbered 53.2.1).

**PX257**

79

HBMX branches from buying or selling U.S. dollars, shuttering entire branches with checkered histories, and scheduling for closure thousands of accounts with incomplete KYC documentation. Even with those actions, HSBC Group acknowledged internally that HBMX continued to pose a high risk of money laundering to the Group.[422]

The evidence also indicates that while HSBC Group was fully informed about HBMX's AML and compliance deficiencies, little of that information was conveyed to HBUS, despite HBMX' extensive correspondent relationship with HBUS. When asked about the lack of communication, HBMX CEO Paul Thurston indicated that he reported HBMX's AML problems to HSBC Group and believed Group would communicate necessary information to HBUS.[423] HSBC Group CEO Michael Geoghegan told the Subcommittee that HBMX problems were discussed at HSBC Group Management Business (GMB) meetings, which HNAH CEO Brendan McDonagh attended, so he thought HBUS was aware of the problems.[424] HSBC Group Compliance head David Bagley told the Subcommittee that Group Compliance could have informed HBUS Compliance about the problems at HBMX, but "we did not think of it."[425] Instead, he reported the information to HSBC Group's senior management. Several senior HBUS executives told the Subcommittee that the bank was not informed of the extent of AML problems at HBMX. The result was, at the same time HBUS was handling hundreds of billions of dollars in cash transactions for HBMX, processing U.S. dollar wire transfers, clearing U.S. dollar travelers cheques, and opening U.S. dollar accounts for HBMX clients, HBUS was left in the dark by its own colleagues about the extensive AML and compliance problems at HBMX. In addition, in conformance with HSBC Group policy and practice, HBUS conducted no due diligence assessment of HBMX, did not evaluate its riskiness, did not review its audit findings, and did not monitor its wire transfers, cash letter activity, or banknotes transactions for suspicious activity. HBUS had rendered itself blind to the fact that it was servicing a high risk financial institution.

## D. HBMX High Risk Clients

HBMX made extensive use of its correspondent relationship with HBUS. From its acquisition in 2002, HMBX worked with HBUS's Payments and Cash Management (PCM) division and, until 2010, with HBUS' Global Banknotes division, both headquartered in New York. HBMX used its correspondent and banknotes accounts to process U.S. dollar wire transfers, clear U.S. dollar monetary instruments like travelers cheques, and deposit bulk cash shipments of U.S. dollars on behalf of itself and its clients. Three examples of HBMX high risk clients help illustrate how HBMX's AML deficiencies also created risk for HBUS. They include high risk Mexican and U.S. money service businesses, clients using offshore U.S. dollar accounts in the Cayman Islands, and purchasers of millions of dollars in U.S. dollar travelers cheques.

---

[422] See, e.g., 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, with copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895.
[423] Subcommittee interview of Paul Thurston (5/1/2012).
[424] Subcommittee interview of Michael Geoghegan (5/24/2012).
[425] Subcommittee interview of David Bagley (5/10/2012).

PX257

80

### (1)  High Risk Money Service Businesses

Mexican casas de cambio (CDCs) are money service businesses licensed by the Mexican Treasury Department (SHCP), through the CNBV, to exchange foreign currencies for a fee.  In Mexico, CDCs are not licensed as banks and do not hold deposits, maintain checking or savings accounts, or provide other banking services.[426]  Instead, CDCs are typically limited to accepting currency from a customer, exchanging it for another currency, and then either handing it over to the customer or wiring it to a financial institution in another country, such as the United States.[427]

In the United States, some money service businesses perform similar cross-border services, enabling individuals in the United States to wire U.S. dollars to Mexico, where the dollars may be converted into Mexican pesos and paid out to a designated recipient.  Those U.S. money service businesses are sometimes referred to as money remitters.  Both Mexican CDCs and U.S. money service businesses often perform their services for walk-in customers, although they may also have established customers who use their services on a regular basis.  In both Mexico[428] and the United States,[429] CDCs and money service businesses are legally required to establish AML programs to safeguard against laundering criminal proceeds.

### (a)  Casa de Cambio Puebla

Until 2007, Casa de Cambio Puebla (Puebla) was a licensed casa de cambio, founded in 1985, with branch offices throughout Mexico.[430]  On May 16, 2007, the United States obtained a warrant from a Federal court in Florida and froze or seized all Puebla funds on deposit with Wachovia Bank in Miami, as well as with Wachovia Bank in London, affecting funds totaling over $11 million.[431]  In July 2007, Puebla filed a civil complaint seeking the release of those funds.[432]  In 2008, the United States indicted Puebla, two of its officers,[433] and two other individuals on drug smuggling and money laundering charges.[434]  In 2009, one of the defendants was arrested and, in 2010, pled guilty to conspiracy to launder money,[435] and was sentenced to 14 months in prison, while the other defendants, including Puebla, were placed on fugitive status.[436]  In addition, in 2010, Wachovia Bank entered into a deferred prosecution agreement with the U.S. Department of Justice for having failed to maintain an effective anti-money

---

[426] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 12.
[427] Id, at ¶ 11.
[428]  See Article 95 bis of the General Law of Auxiliary Credit Organizations.
[429]  See 31 USC § 5318(h)(1) and § 5312(J) and (R).
[430] Casa de Cambio Puebla, S.A. v. United States, Case No. 10-20165 (USDC SDFL), Petition for Return of Seized Funds (7/12/2007)(hereinafter "Puebla Petition"), at 4.
[431] Puebla Petition, at 2-3.
[432] Id.
[433] See id., at 19.
[434] See United States v. Casa de Cambio Puebla, S.A., Jose A. Gutierrez de Velasco Hoyos, Amador Cordero Vasquez, Pedro Alfonso Alatorre Damy, a/k/a "Pedro Barraza Uruguastegui," and Leonardo Vasquez Estrada, Case No. 08-20097-CR-Graham (USDC SDFL), Indictment (2/1/2008, unsealed 11/4/2009).
[435] Id., Plea Agreement (7/9/2010), at ¶ 1.
[436] See id., docket entries 12, 34, 38-42.

81

laundering program[437] in connection with its casa de cambio business, including with respect to Puebla.[438]  Those legal proceedings, which involved a major Mexican CDC and major U.S. bank, received widespread attention.[439]

Puebla was a longtime customer of HBMX, having first begun a relationship with HBMX's predecessor, Bital, in the 1980s.[440]  In 2004, Puebla also opened a U.S. banknotes account with HBUS.[441]  By 2007, Puebla had several accounts at HBMX, as well as an outstanding loan.[442]  After the United States seized the company's funds at Wachovia Bank in May 2007, HBUS suspended the Puebla account two weeks later and closed the account in June 2007.[443]  HBMX did not actually close the account until November 2007, and then only after the Mexican Attorney General served an order on the bank seizing Puebla funds.

**Puebla at HBMX.**  At the time of the May 2007 seizure of more than $11 million in Puebla funds at Wachovia Bank, HBMX was already reeling from another money laundering scandal involving a March 2007 seizure of cash, weapons, and wire transfer records from the Mexican residence of longtime customer, Zhenly Ye Gon and his pharmaceutical companies, Unimed Pharm Chem, Constructora e Inmobiliaria Federal, and Unimed Pharmaceutical.[444]  That seizure had triggered an intensive review by senior HBMX officials of the Ye Gon-related accounts as well as HBMX's overall AML program.  The Puebla case added another high profile problem for HBMX, not least because Puebla also handled Ye Gon funds.[445]

In late May 2007, HBUS learned of the seizure of Puebla funds at Wachovia Bank, and quickly suspended activity in the Puebla correspondent account at HBUS.[446]  It is not clear when

---

[437] United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010), at ¶ 3.

[438] Id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 11.

[439] See, e.g., "U.S. freezes Mexico exchange bureau accounts for money laundering," EFE News Services Inc. (6/9/2007); see also "Wachovia is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn R. Simpson, April 26, 2008.  In addition, the U.S. State Department discussed the Puebla case in its 2009 International Narcotics Control Strategy Report.  See 2009 International Narcotics Control Strategy Report, U.S. Department of State, at 356-357.

[440] See, e.g., July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC]," HSBC OCC 8875132-135.

[441] See 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance & Casa de Cambio," HSBC-PSI-PROD-0095913.

[442] See 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.

[443] See 12/20/2007 HBUS Compliance Certificate, OCC-PSI-00148844, at 5.

[444] See In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Complaint for Arrest with a View Towards Extradition (9/15/2008) (hereinafter "Ye Gon Extradition Complaint"), at 13; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[445] See 10/13/2007 "Reportan ruta de Ye Gon para 'blanquear' dinero" ("Ye Gon reported path to 'launder' money"), El Universal, Francisco Gómez, www.eluniversal.com.mx (reporting that the Mexican agency SHCP had determined that, from 2003 to 2006, Mr. Ye Gon and his companies had moved $90 million through four major Mexican banks and multiple casas de cambio, including HBMX and Puebla), cited in 7/18/2008 Report of Findings (Update) for Consultoria Inernacional Banco, prepared by HBUS Financial Intelligence Unit, OCC-PSI-00247712.

[446] See 5/31/2001 email from HBUS Alan Ketley to HBUS Gyanen Kumar and others, "With immediate effect we are suspending all activity with the subject client," HSBC PSI PROD 0095908-910; 6/6/2007 email from HBUS

82

HBMX first learned of the seizure, but by early June, both banks were considering whether to close their Puebla accounts.  On June 5, 2007, Leopoldo Barroso, HBMX's AML head, received an email from a senior AML Compliance officer at HBUS, Daniel Jack, asking if Mr. Barroso was the new AML director at HBMX and "wonder[ing] what relationships" HBMX had with Puebla.[447]  Mr. Barroso responded that HBMX had "a few DDAs [Demand Deposit Accounts] and a loan" with Puebla.[448]  He also indicated that HBMX planned to "decide within the next 5 days" whether to terminate its relationship with Puebla, and asked Mr. Jack to let him know if HBUS decided to take that action.[449]

Mr. Jack noted in a later email that he did not tell Mr. Barroso during the June 5 email exchange about "the DEA seizure or Wachovia closing [Puebla] acc[oun]ts," although it is possible that HBMX already knew.[450]  Mr. Jack also did not disclose that HBUS had already suspended Puebla's account activity a week earlier, on May 31, 2007.[451]  Mr. Jack told the Subcommittee that, soon after the June 5 email exchange, he told Mr. Barroso that HBUS had shut down its account with Puebla.[452]  When Mr. Barroso asked if HBUS could provide him with a list of their banknote customers in Mexico and the amount of U.S. dollars they exported from Mexico to the United States, Mr. Jack demurred, responding that there were "privacy issues" but that he would "see what info" he could share.[453]  This exchange between senior AML Compliance personnel at HBUS and HBMX suggests that information sharing between the two banks was guarded, rather than automatic.

In early July 2007, HBMX Compliance head, Ramon Garcia, disclosed in an internal weekly report that went to HSBC Group Compliance that the HBMX CCC Committee had considered closing the Puebla account, but decided instead to retain the client.  In response, John Root, a senior HSBC Group Compliance officer, sent him a blistering email criticizing the CCC Committee for "rubber-stamping unacceptable risks."  This email, cited earlier in a discussion of HBMX's CCC Committee, is relevant again, because it applies to the Puebla account.  Mr. Root wrote:

> "It looks like the business is still retaining unacceptable risks and the AML committee is going along after some initial hemming and hawing.  I am quite concerned that the

Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

[447] 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance and Casa de Cambio," HSBC-PSI-PROD-0095914.

[448] 6/6/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

[449] Id.

[450] Id.

[451] See 5/31/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, "N-NY & Casa de Cambio Puebla in Mexico," HSBC-PSI-PROD-0095908; 5/30/2007 email from HBUS Gyanen Kumar to "US Banknote Dept Sales Team," "Casa de Cambio Puebla," HSBC OCC 7688742.

[452] Subcommittee interview of Daniel Jack (3/13/2012).

[453] 6/6/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

**PX257**

83

committee is not functioning properly.  Alarmed, even.  I am close to picking up the phone to your CEO."[454]

Mr. Root's email went on to harshly criticize the CCC Committee's decisions to keep open accounts for Mr. Ye Gon and another accountholder under suspicion for money laundering, before describing as "strike three," the decision to retain the Puebla "relationship after USD11 million was seized by the authority in [Redacted by HSBC] account with Wachovia in Miami." Mr. Root continued:

"What?!  The business was okay with this?  The AML Committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter.  It needs to take a firmer stand.  It needs some cojones.  We have seen this movie before, and it ends badly."[455]

Mr. Garcia responded that he was escalating the decision on Puebla to the HSBC Mexico CEO, since the relevant HBMX business division had disagreed with a Compliance recommendation to close the account.[456]  The next week, HSBC Mexico CEO Paul Thurston agreed with closing the account.[457]  Mr. Rendall suggested alerting their U.S. counterparts at HBUS, since HBUS also had a correspondent relationship with Puebla.[458]

Despite Mr. Thurston's July 2007 decision to close the Puebla account, HBMX did not actually close or freeze its Puebla account for another four months, allowing Puebla continued use of HBMX's correspondent account at HBUS.[459]  HBMX finally closed the account in November 2007, after receiving a seizure warrant from the Mexican Attorney General seeking all funds in accounts opened in the name of Puebla or related parties.[460]

The seizure warrant named 91 parties related to Puebla, of which 81 were HBMX customers who presumably were also using the HBMX correspondent account at HBUS.[461] HBMX later determined that, from January 1 though October 31, 2007, a period of ten months, approximately 650 wire transactions had cleared through the "HBSC Mexico correspondent

---

[454] 7/17/2007 email from HSBC John Root to HBMX Ramon Garcia, with copies to Susan Wright, David Bagley, and Warren Leaming, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925-927.
[455] Id.
[456] See 7/18/2007 email from Ramon Garcia to HBC David Bagley, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925.
[457] See July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC], HSBC OCC 8875132-135.
[458] Id.
[459] See, e.g., 10/27/2007 Compliance Certificate, prepared by HBUS Compliance and provided to HSBC Group Compliance, HSBC PSI PROD 0095916-922, at 919 (listing major HBUS compliance issues, including "HBUS Ban[k]notes/Casa De Cambio Puebla (RED 3870):  No transactions have been conducted with Casa de Cambio Puebla SA de CV in Mexico since 1JUN07.  Although HBMX continues to deal with this Money Services Business, HBUS plans to formally terminate the Banknotes relationship soon.").
[460] See 12/11/2007 email from HBMX Leopoldo Barroso to HBUS Daniel Jack, "HSBC & Casa de Cambio Puebla in Mexico – Negative Press," HSBC OCC 7688750.  The Attorney General identified 91 related parties.
[461] See 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.

**PX257**

84

account" at HBUS, where Puebla was either the originator or the beneficiary.[462]  Of those transactions, 170 wire transfers totaling $7.3 million were conducted by six individuals or entities linked to Puebla.[463]  All of those wires were later traced back to the Puebla accounts frozen at Wachovia.[464]  The OCC later observed:  "[T]hese discoveries about the level of CDC activity should have raised concerns for HBUS and alerted the bank to the need to obtain basic due diligence for HSBC Mexico and other Group Entities."[465]

   **Puebla at HBUS.**  While HBMX exposed HBUS to considerable money laundering risk through the transactions it conducted for Puebla, HBUS also incurred risk from its own direct dealings with Puebla, including a U.S. banknotes account it opened for Puebla in 2004.  In just three years, Puebla substantially boosted its use of that U.S. banknotes account, swelling its sales of U.S. dollars to HBUS from $18 million in February 2005, to $113 million in March 2007, a tenfold increase.[466]

   When AML monitoring alerts raised red flags about the growing flood of U.S. dollars from Puebla, HBUS bankers provided a number of explanations for the increases, none of which considered whether Puebla might be accepting illegal drug proceeds that drug cartels were then smuggling into Mexico from the United States.  For example, when Puebla's U.S. dollar volumes increased by $3 million between November 2005 and February 2006, an HBUS banker wrote that the "[c]lient is slowing [sic] growing its business volume as a result of better cash flow thanks to dealing with HSBC i.e., faster turnaround of banknotes."[467]  When the volume jumped by another $13 million the very next month, the HBUS banker offered the same explanation, typo and all:  "[c]lient is slowing [sic] growing its business volume as a result of better cash flow thanks to dealing with HSBC i.e., faster turnaround of banknotes."  This cut-and-paste explanation offers no evidence that the banker used due diligence to analyze the sudden multi-million-dollar increase.  When the volume climbed again, by more than $20 million from April 2006 to September 2006, to over $76 million, the HBUS banker asked for an explanation wrote: "Mexico as a whole and more specifically [Puebla] is the premier country/msb [money service business] USD [U.S. dollar] remitter.  There is [a] large population of Mexican[s] working in the U.S. during the summer months (landscaping) that send money back home (religiously) to their families."[468]  While that might have been true, it was equally true when Puebla transmitted just $27 million back to Mexico around the same time the previous year, a nearly $50 million

---

[462] Id.; 9/13/2010 OCC Supervisory Letter HSBC-2010-22,  "Bank Secrecy Act/Anti-Money Laundering ('BSA-AML') Examination – Program Violation (12 U.S.C. §1818(s); 12 C.F.R. §21.21)," at 24.  [Sealed Exhibit.]
[463] Id.  See also 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.
[464] 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.
[465] 9/13/2010, Supervisory Letter HSBC-2010-22, OCC Sally Belshaw to HBUS Irene Dorner and David Bagley, Re:  Bank Secrecy Act/Anti-Money Laundering ('BSA-AML') Examination – Program Violation (12 U.S.C. §1818(s); 12 C.F.R. §21.21)," at 25.
[466] Spreadsheet:  Banknotes – NY Selected Customers' Activity Alerts & Traders' Explanations for USD Purchases & Sales from 2005-2009, OCC-PSI-0005890-894.
[467] Id. at 892.
[468] Id. at 893.

**PX257**

85

difference.[469]  By the end of March 2007, the month before Puebla funds were seized at Wachovia Bank, its monthly U.S. dollar transactions at HBUS had exceeded $113 million.[470]

On May 30, 2007, two weeks after the seizure of Puebla funds on May 16, HBUS ordered all activity in the Puebla account to be suspended with "immediate effect."[471]  A week later, on June 5, 2007, HBUS AML Compliance officer Daniel Jack contacted HBMX to ascertain whether Puebla also had accounts there, which would continue to expose HBUS to the money laundering risks associated with Puebla through the HBMX correspondent account.[472]

HBUS terminated its Banknotes relationship with Puebla after conducting a site visit on June 11, 2007.[473]  In June and July 2007, HBUS was contacted by multiple U.S. law enforcement agencies regarding its correspondent accounts with financial institutions in Mexico, including Puebla.  On June 25, 2007, for example, the Drug Enforcement Administration and other law enforcement told HBUS of their interest in its "banknote trading with" Puebla.[474]  On July 17, 2007, HBUS met with "an analyst from the National Drug Intelligence Center of the US Dep[artmen]t of Justice to explain our business and AML program along with discussing cross-border issues."[475]  On July 20, 2007, HBUS met with FinCEN specialists "to discuss our wholesale banknotes business with clients in Mexico as well as our AML program, CTR filing and related issues."[476]  The extent to which HBUS informed HBMX about the level of U.S. law enforcement interest in Puebla is unclear.

### (b)  Sigue Corporation

Another HBMX client that used HBMX's correspondent account at HBUS was Sigue Corporation (Sigue), a U.S. licensed money service business incorporated in Delaware but headquartered in California.[477]  Sigue's primary business activity was transmitting funds on behalf of third parties from the United States to Mexico and Latin America.[478]  Acting through its operating company, Sigue LLC, it arranged for the remittance of U.S. dollars through a network of more than 7,500 "authorized delegates" or agents across the United States, most of which were small businesses under contract to offer Sigue's money transmission services.[479]

---

[469] Id. at 892.

[470] Id. at 893.

[471] 5/31/2007 email from HBUS Gyanen Kumar to HBUS Alan Ketley and others, "Casa de Cambio Puebla," HSBC-PSI-PROD-0095910.  See also 5/31/2007, email from HBUS Daniel Jack to HBUS Alan Ketley, "N-NY & Casa de Cambio Puebla in Mexico," HSBC-PSI-PROD-0095908.

[472] See 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance and Casa de Cambio," HSBC-PSI-PROD-0095914.  See also 10/26/2007 memorandum from HBUS Carolyn Wind to HNAH Janet Burak and others, HSBC-PSI-PROD-0095919.

[473] See 12/20/2007 "Money Laundering Report for Half-year Ended:  December 31, 2007," prepared by HBUS, OCC-PSI-00148844, at 5.

[474] Id.

[475] 12/20/2007 "Compliance Certificate," prepared by OCC, OCC-PSI-00148844, at 2.

[476] Id.

[477] See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Deferred Prosecution Agreement Factual Statement (1/28/2008), at 1.

[478] Id.

[479] Id.

PX257

86

On January 28, 2008, Sigue entered into a deferred prosecution agreement with the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service, admitting that it had failed to maintain an effective anti-money laundering program.[480]  As part of the agreement, Sigue admitted to "serious and systemic" violations of U.S. AML requirements from 2003 to 2005, which "allowed tens of millions of dollars of suspicious financial transactions to be conducted through Sigue, including transactions involving funds represented by undercover U.S. law enforcement agents to be drug proceeds."[481]  The drug proceeds which U.S. undercover agents transmitted through Sigue totaled more than $500,000, and were sent through 59 separate Sigue agents in 22 states.[482]  The undercover federal agents had explicitly informed Sigue agents that they were transmitting illegal drug proceeds, structured the transactions to evade U.S. reporting obligations, and wired the funds to seven law enforcement agents in Mexico City, creating a money laundering pattern that Sigue should have detected and reported as suspicious activity, but did not.[483]  Sigue admitted its failure to adequately supervise and control its agents, "effectively monitor and investigate high risk transactions," "establish an effective risk-based AML program," and "exercise sufficient enhanced due diligence for high-risk transactions and customers."[484]  As part of the agreement to defer prosecution of the company, Sigue agreed to forfeit $15 million in suspect funds and spend $9.7 million to strengthen its AML program.[485]

The day after the deferred prosecution agreement was made public in court, an article discussing Sigue's misconduct and "record penalty" for a money service business concluded that a "case such as that against Sigue gives banks yet another reason to treat MSBs [money service businesses] as pariahs."[486]  David Bagley, HSBC Group Compliance head, sent a copy of the article to Susan Wright, head of AML Compliance for HSBC Group, with a handwritten note: "Obvious question – I assume they are not our customer."[487]  His assumption, however, was incorrect.

After learning that Sigue was, in fact, a client of HBMX, on February 1, 2008, Ms. Wright sent an email to HBMX Compliance head Ramon Garcia about the account.[488]  She noted that, despite the deferred prosecution agreement and Sigue's admission of wrongdoing, HBMX's commercial banking division wanted to retain the account.  She warned that, if the account were retained, it:

> "will need to be closely monitored and subject to frequent reviews (recommendation for quarterly reviews in current circumstances).  The actions by the US regulators should be

---

[480] Id.
[481] Id.
[482] Id.
[483] Id. at 1-3.
[484] Id. at 6.
[485] Id. at 12-15; Deferred Prosecution Agreement at ¶¶ 5, 9.
[486] "Money Laundering 'Sting' led to MSB's Record Penalty, Says Legal Pact," Complinet, Brett Wolf, (1/29/2008), reprinted at HSBC OCC 8875020.
[487] See handwritten note on copy of article, "Money Laundering 'Sting' led to MSB's Record Penalty, Says Legal Pact," Complinet, Brett Wolf, (1/29/2008), HSBC OCC 8875020.
[488] 2/1/2008 email from HSBC Susan Wright to HBMX Ramon Garcia, with copies to HSBC Warren Leaming and John Root, no subject line, HSBC OCC 8875017-018.

PX257

87

used as a trigger event and our due diligence on this client updated.  In this connection the high risk profile that is in place for Financial Institutions should be used. … If we only see batched transactions then we are relying on the screening undertaken by [Sigue].  It would be helpful to understand the nature of these transactions and currencies involved – could you provide me with an overview?  We should also monitor the volume – you mentioned that we are not [Sigue's] only bankers in Mexico.  If, however, any of the other banks withdraw then we may well see the volume of transactions through us rise and our exposure/risk will increase with a corresponding increase in the cost of monitoring, etc."[489]

Her email was forwarded to HSBC Compliance head David Bagley who, on February 4, 2008, forwarded it to HBMX CEO Paul Thurston and recommended closing the Sigue account.[490]  Mr. Bagley noted Sigue's "serious and systemic violations and a record fine" due in part to the fact that Sigue "had little control over its numerous agents."  He wrote:  "Whilst the company will now need to take steps to address these deficiencies this will inevitably take some time, and instilling the appropriate culture within the business even longer."

Mr. Thurston forwarded Mr. Bagley's recommendation to John Rendall, HBMX COO, and asked for more information about the account.[491]  Mr. Rendall reminded him that "a couple of months back," HBMX Compliance had recommended closing the Sigue account, but was opposed by the HBMX commercial banking division (CMB) that wanted to keep the account open.[492]  The issue was then elevated to Mr. Thurston who decided against closing the account.[493]  Mr. Rendall explained:

"Our recommendation, which you supported, was to maintain this relationship.  It was based on the following factors:  A) our CMB team in Tijuana were relatively on the top of the case; B) the events for which [Sigue] have been fined were relatively historic – from memory, 2-3 years ago, and significant improvements had been made since then."[494]

Despite Sigue's admission of wrongdoing, its admission of lax controls over the actions taken by its agents, and the recommendation of the head of HSBC Group Compliance to close the account, Mr. Thurston decided once again to retain it and to continue to provide Sigue with U.S. dollar transactions through the HBMX accounts at HBUS.

---

[489] Id.

[490] 2/4/2008 email from HSBC David Bagley to HBMX Paul Thurston, [subject redacted by HSBC], HSBC OCC 8875016.

[491] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC 8875139.

[492] See 2/4/2008 emails from HBMX John Rendall and HBUS David Bagley, "[redacted by HSBC]," HSBC OCC 8875139-40.

[493] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC 8875139.

[494] See 1/2/2008 email from HBUS Susan Wright to HBMX Ramon Garcia, "[redacted by HSBC]," HSBC OCC 8875141.

PX257

88

Mr. Thurston told the Subcommittee that Sigue was one of the few accounts he decided to retain over the objection of HBMX Compliance.  He explained that he did so, because he believed the issues were in the past, and Compliance head Ramon Garcia had met with Sigue and believed it was meeting its commitment to strengthen its AML program.[495]

Also on February 4, 2008, after reviewing an earlier media report identifying HBMX as a "pay partner" for Sigue,[496] the OCC AML Examiner then reviewing HBUS' AML program "requested HSBC management to determine what, if any, involvement HSBC had with Sigue."[497]  The OCC inquiry triggered an inquiry into the Sigue account by HBUS, which had not been privy to the exchanges between HSBC Group and HBMX about the account.[498]

On February 5, 2008, HBUS informed the OCC AML Examiner that while Sigue was not an HBUS client, it was a client of HBMX and had executed U.S. dollar wire transfers through HBMX's correspondent accounts at HBUS.[499]  In an internal memorandum summarizing the information, the OCC AML Examiner wrote that HBUS "acts as a pass-through for wire transfers for Sigue."[500]  He noted that, for "the period of January through December 2007 159 wire transfers passed through HSBC originated by Sigue for the benefit of" HBMX, involving more than $485 million.[501]  He wrote that HBUS management had agreed that those wires should have triggered a review of the account activity.[502]

The OCC AML examiner saw the events surrounding the Sigue account as emblematic of a broader problem involving inadequate monitoring and weak AML investigations by HBUS of clients using correspondent accounts to conduct suspect transactions.  In the internal memorandum, the OCC AML examiner wrote:

> "Over the past few years, there have been a number of instances where the OCC has brought to the attention of HSBC management negative media events, publicized indictments, etc., resulting in the need for HSBC management to conduct ad-hoc reviews to determine potential reputational risk.  In the majority of these instances, HSBC management was either not aware of these events or had not been pro-active in determining the level of potential exposure due to these events."[503]

---

[495] Subcommittee interview of Paul Thurston (5/1/2012).

[496] See "California MSB Faces Record Fine From Justice Department in AML Case," Fortent Inform, Brian Monroe (1/11/2008); see also 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736 [sealed exhibit].

[497] 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736, at 2.  [Sealed Exhibit.]

[498] The OCC Examiner noted internally at the time:  "Although HSBC management was previously aware of media reports concerning Sigue, up to the time of our request, HSBC management had not conducted any enhanced due diligence and/or in-depth analysis to determine HSBC's potential exposure resulting from the prosecution of Sigue." Id. at 2 (emphasis in original omitted).

[499] See 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736, at 3. [Sealed Exhibit.]

[500] Id.

[501] Id.  HBUS apparently provided this wire transfer information to the OCC, in response to the OCC request for more information about HBUS' involvement with Sigue.

[502] Id.

[503] Id.

**PX257**

He concluded that if he had "not intervened it is highly unlikely that HSBC management would have performed the proper level of due diligence, [or] determined the potential exposure to risk" in the Sigue matter.[504]

Two months later, on April 26, 2008, a major U.S. newspaper published an article describing an ongoing Federal probe of allegations that Wachovia Bank was laundering drug proceeds supplied by Mexican casas de cambio.[505]  The article also mentioned Sigue, triggering a second round of inquiries at HBUS into the status of the Sigue account which remained open at HBMX and continued to execute U.S. dollar transactions through the HBMX correspondent account at HBUS.

HBUS AML Compliance officer Judy Stoldt and HBUS investigator Gloria Stazza sent a memorandum to their supervisor Denise Reilly, a senior HBUS AML Compliance officer, summarizing the article and discussing HBUS' exposure to the casas de cambio named in the article.[506]  The memorandum began:

> "HBUS does not hold any account for any casa de cambio mentioned in the WSJ article. The only HBUS connection to activity involving those named casas de cambio is activity that was conducted through our correspondent accounts, and most notably through our account with HSBC Bank Mexico (HBMX)."[507]

The May 2008 memorandum described Sigue as a money service business that had allegedly processed $24.7 million in "suspicious money remittances related to drug-trafficking proceeds."[508]  It explained that HBUS had first taken note of Sigue when it entered into a record $25 million settlement with the Justice Department in January 2008, and, as a result, conducted a review of the Sigue accounts, wire transfer activity, and whether either Sigue or its founder, Guillermo de la Vina, had been "the subject of any other negative news or law enforcement activity."[509]  The memorandum reported that, despite having no direct account with Sigue, a "wire review" found that, during 2007, Sigue had sent 159 wire transfers for $485 million through HBMX's correspondent account, all of which were originated by Sigue and sent to its own account at HBMX, which HBUS viewed as suspicious.[510]  The memorandum noted that

---

[504] Id. at 1.

[505] See "Wachovia Is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn Simpson (4/26/2008).

[506] See 5/1/2008 memorandum [carrying incorrect date of  5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517.

[507] Id. at 1.

[508] Id. at 3.  See also 1/28/2008 "Sigue Corporation and Sigue LLC Enter into Deferred Prosecution Agreement and Forfeit $15 Million to Resolve Bank Secrecy Act Violations," press release issued by U.S. Department of Justice, http://www.justice.gov/opa/pr/2008/January/08_crm_068.html (stating that "more than $24.7 million in suspicious transactions were conducted through registered agents of Sigue, including transactions conducted by undercover U.S. law enforcement agents using funds represented to be proceeds of drug trafficking").

[509]  5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517, at 3.

[510] Id. at 4.  The memorandum did not mention that this wire analysis was compiled for the OCC, at its request, in February 2008.  According to Sigue, altogether during 2007, it sent a total of more than $1.8 billion in wire transfers through its HBMX account to a Sigue affiliate in Mexico.  Subcommittee briefing by Sigue (7/25/2012).

**PX257**

90

HBUS had contacted HBMX to discuss Sigue, and HBMX disclosed that it had imposed "parameters" on its relationship with Sigue, including limiting Sigue to "conducting transactions for individual customers to $2,000 USD per transaction."[511]  The memorandum did not explain, however, how that $2,000 limit affected the actual wire activity in 2007, in which each wire transfer apparently batched numerous underlying wires without identifying individual client transactions.  The memorandum also stated that HBUS had found that a Sigue employee had been indicted for assisting drug traffickers with money laundering,[512] and on another occasion Sigue was described as having allowed $295,000 to be transferred from an account at another bank to an illegal alien deported to Mexico,[513] while also noting that Sigue itself had not been implicated in either matter.  Despite this cascade of troubling information, for the next two years, little or no action appears to have been taken by HBUS or HBMX with respect to the Sigue account at HBMX.

On January 30, 2009, having determined that Sigue satisfied the requirements of the Deferred Prosecution Agreement the Justice Department requested and the court granted dismissal of the criminal case against the company.[514]

In 2010, as part of an OCC AML examination, an OCC AML examiner reviewed the May 2008 memorandum regarding Sigue and asked what followup actions had been taken in response to it, in particular whether Sigue had ever been added to the HBUS "wire filter" for purposes of enhanced due diligence and whether any further analysis had been done of Sigue account activity.[515]  HBUS personnel responded that Sigue had not been added to the wire filter, the 2008 memorandum had not been "passed to anyone," and the HBUS Financial Intelligence Group had not conducted any additional due diligence with respect to Sigue.[516]  HBUS explained that "Sigue was not added to the wire filter as Sigue entered into a written agreement with the Department of Justice to enhance its AML program and was not (per the investigative search) the

---

[511]  5/1/2008 memorandum [carrying incorrect date of  5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517,  at 4.
[512] Id. at 3.  The Subcommittee has not obtained evidence of an instance in which a Sigue employee has been indicted for assisting drug traffickers with money laundering; however, in 2006, a Sigue agent pled guilty to money laundering and conspiracy to distribute illegal drugs, and a factual statement supporting his guilty plea described his use of Sigue wire transfers to launder illegal drug proceeds from 2003 to 2005.  See United States v. Gerardo Alvarado Alvarado, Case No. 1:05CR354-1 (USDC MDNC), Plea Agreement (2/24/2006) and Factual Basis in Support of Guilty Plea (2/24/2006).
[513] 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517, at 3-4.  The memorandum  referred to an article as the source of this information.  Id. at 3; see also "Suspicious wire transfers, documents lead to raids in NW Ark," Associated Press, Jon Gambrell (5/25/2007).  The referenced matter involves criminal proceedings in which the employee of a Sigue agent (who had been deported to Mexico) was charged with conducting an unlicensed money transmitting business and supporting illegal aliens in the United States; no drug proceeds were involved.  See United States v. Honorato Pedroza, Case No. 5:07-cr-50050-JLH (USDC WDAK), Indictment (6/27/2007).
[514] See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Order for Dismissal with Prejudice (1/30/2009).
[515] See 2/16-18/2010 exchange of emails among Federal Reserve Patricia Brunner, HBUS Denis O'Brien, Judy Stoldt, and others and OCC Joseph Boss, "June 2008 Audit – Payment Services," OCC-PSI-00378989.
[516] Id.

**PX257**

subject of any other money laundering investigations."[517]  Essentially, despite Sigue's deferred prosecution in 2008, admission of wrongdoing caused in part by an inadequate AML program, past HBMX alerts flagging unusual transactions, past HBUS wire transfer analysis identifying suspicious activity, past recommendations by Compliance to close the account, and past regulatory inquiries, HBUS did not conduct any enhanced monitoring or analysis of the Sigue account.

HBMX's relationships with Puebla and Sigue, a Mexican casa de cambio and a U.S. money service business that remitted funds to Mexico and Latin America, demonstrate its tolerance for high risk clients, and how those clients subjected, not only HBMX, but also HBUS to substantial money laundering risks.  The accounts also disclose how both banks failed to conduct effective monitoring of some financial institution accounts and transactions, even when faced with evidence of lax AML controls and criminal proceedings involving money laundering. They also expose an absence of regular information sharing and coordinated AML efforts between HBUS and HBMX to address common AML problems, including limited communications about particular clients and actions taken to restrict or close accounts.

### (2)  Cayman Island U.S. Dollar Accounts

A second example of high risk HBMX clients posing money laundering risks to HBUS are the tens of thousands of U.S. dollar accounts maintained by HBMX through its branch office in the Cayman Islands.  This branch office is a shell operation with no physical presence in the Caymans, and is managed by HBMX personnel in Mexico City who allow Cayman accounts to be opened by any HBMX branch across Mexico.  Total assets in the Cayman accounts peaked at $2.1 billion in 2008.  Internal documents show that the Cayman accounts had operated for years with deficient AML and KYC controls and information.  An estimated 15% of the accounts had no KYC information at all, which meant that HBMX had no idea who was behind them, while other accounts were, in the words of one HBMX compliance officer, misused by "organized crime."  Because a primary feature of the Cayman accounts is their use of U.S. dollars, HBMX has maintained the account assets and conducted account transactions through its U.S. dollar correspondent accounts at HBUS.  There is no documentation showing that HBUS knew or was informed that, by providing HBMX with correspondent accounts, it was also providing access to the U.S. financial system to high risk accountholders in the Caymans.  By moving the Cayman transactions through its HBUS accounts, HBMX exposed not only itself, but also HBUS to the money laundering risks inherent in its Cayman clients.

**Cayman Accounts.**  HSBC acquired the Cayman branch through its purchase of Bital in November 2002.  According to a letter from HSBC legal counsel:

> "Bital received authorization from Mexican and Cayman authorities to offer Cayman USD [U.S. dollar] accounts to its customers in 1980.  Bital's license and authorization to offer Cayman USD accounts was inherited by HBMX when HSBC acquired Bital in 2002."[518]

---

[517] 5/1/2008, memorandum [dated 5/1/2007, sic] from HBUS Judy Stoldt and HBUS Gloria Stazza to HBUS Denise Reilly, Re: Wall Street Journal Article Regarding Wachovia, OCC-PSI-01358517.
[518] 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 4.

PX257

After the acquisition, the Cayman branch of Bital was renamed HSBC Mexico S.A. and continued to operate under a Cayman Class B banking license, restricting the branch to operating only "offshore" and open accounts exclusively for non-Cayman residents.[519]  From its inception, the branch had no physical office or employees in the Cayman Islands, and operated in that jurisdiction solely as a shell entity.[520]  The Cayman accounts were actually opened and maintained by HBMX personnel in Mexico.  Any HBMX branch across Mexico had the authority to open a Cayman account for a client.[521]

To enable the Cayman branch to provide U.S. dollar accounts to clients, HBMX used its correspondent accounts at HBUS to supply the needed dollars, process U.S. dollar wire transfers, cash U.S. dollar travelers cheques, and perform similar U.S. dollar services.  HBMX did not open a separate correspondent account for the Cayman branch, but included Cayman account transactions within its general correspondent account at HBUS.  The documents and other evidence reviewed by the Subcommittee contain no indication that, until recently, HBMX ever informed HBUS about its Cayman branch or the Cayman U.S. dollar denominated accounts being serviced through the HBMX correspondent accounts at HBUS.[522]

The number of accounts and the volume of assets held in the Cayman accounts have fluctuated over time.  Documentation associated with the 2002 Bital purchase do not indicate how many Cayman accounts then existed or the total amount of assets they held.  A 2006 audit of the Cayman accounts reported just 1,500 accounts in 2005, with no mention of the account balances.[523]  In September 2008, HBMX reported a remarkable increase, over 60,000 Cayman accounts for nearly 50,000 customers, with total assets approaching $2.1 billion.[524]  Three years later, however, those totals dropped significantly.  According to HSBC legal counsel, as of January 2012, the Cayman branch held about 24,000 Demand Deposit and Term Deposit Accounts for nearly 21,000 customers, with a total dollar value of approximately $657 million.[525]  About 9,000 Cayman accounts had been closed in 2009, due in part to insufficient Know Your Customer (KYC) information for the accounts as well as regulatory concerns about their high risk nature.

---

[519] See, e.g., 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874827-33.  See also list of Cayman offshore banks at  http://www.offshore-library.com/banking/cayman_islands/page_3.  According to HSBC, HBMX policy is not to offer the accounts to either Cayman or U.S. residents.  See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.
[520] See, e.g., 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874827-33.
[521] See, e.g., 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1. This audit reviewed files for Cayman accounts that had been opened by 26 HBMX branches in Mexico City.  Id.
[522] Michael Gallagher, for example, who headed the HBUS PCM division that helped handle correspondent accounts, told the Subcommittee he had been unaware of the U.S. dollar Cayman accounts at HBMX. Subcommittee interview of Michael Gallagher (6/13/12).
[523] See 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1.
[524] See chart at HSBC OCC 8876787, attached to 9/12/2008 email from HSBC John Root to HSBC Adrian Cristiani, "Cayman Accounts," HSBC OCC 8876784.
[525] See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.

**PX257**

93

**Inherent Riskiness of Accounts.**  HBMX and HSBC Group were well aware that the Cayman accounts had an inherently higher AML risk than other Mexican accounts, since they were offered in an offshore jurisdiction with strong secrecy laws and a limited tax regime, and permitted accountholders to hold assets in U.S. dollars in contravention of normal Mexican legal restrictions.

In 2008, HSBC Group Compliance head David Bagley noted in an email to senior HSBC Group officials that Mexican regulators knew of the Cayman accounts, which apparently circumvented certain Mexican banking regulations, but nevertheless allowed them to operate:

> "The [Cayman] license, inherited from Bital, allows HBMX to provide USD-denominated services to persons domiciled in Mexico.  Mexican regulation apparently prohibits individual Mexicans (i.e. non-corporate) to hold USD-denominated deposit accounts in Mexico.  …  Although HBMX were recently fined USD50,000, for the inappropriate promotion of these services in Mexico, I am advised that CNBV are aware of the existence of the accounts and services and have raised no concerns."[526]

Mr. Bagley also warned:

> "There continues to be a real focus on the level of USD-denominated activity in Mexico by CNBV and other bodies, and the extent of HBMX's activity in this area.  This account base has to therefore be seen as high-risk from an AML and reputational perspective."[527]

In November 2005, an email from HBMX Compliance head Ramon Garcia to senior HSBC Group Compliance officer John Root flagging compliance issues at HBMX provided this explanation for the Cayman accounts:

> "There is a Cayman Island branch for HBMX.  Since there is a restriction by Mexican Law to open accounts to nationals in USD except for those residing in the Mexico's border, as an alternative, [Bital] decided to open this branch where cheques accounts to Nationals could be opened in USD.  It is also known that these USD accounts were issued also to non Mexican Nationals."[528]

A January 2006 HBMX internal audit report explained the demand for the accounts this way:  "HBMX offers their clients the option to open USD current and investment accounts in Grand Cayman so that clients profit [from] the advantages of that country, such as tax free investments, under confidentiality terms."[529]  In a 2007 email discussing the sale of cross-border financial products in Mexico, HSBC Group Compliance Deputy Head Warren Leaming also

---

[526]  7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN ACCOUNTS," at HSBC OCC 8874832.
[527]  Id.
[528]  11/22/2005 email from HBMX Ramon Garcia to HSBC John Root, "HBMX – COMPLIANCE ISSUES," HSBC OCC 8873261.
[529]  1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1.

**PX257**

94

noted: "Because Mexico's tax scheme is relatively penal (worldwide income) there is a high demand for off-shore products."[530]

**Below Standard AML and KYC Controls.**  The riskiness of the Cayman accounts was magnified by weak AML controls and inadequate KYC information.  Those AML deficiencies meant that HBMX had little real knowledge about the customers using the Cayman accounts.

HSBC Group knew about the weak state of the Cayman AML and KYC controls from the time Bital was purchased in 2002, and it inherited the Cayman branch.  An audit prior to the acquisition found that Bital had no functioning Compliance Department, limited client transaction and activity monitoring, and no KYC focus on high risk clients.[531]  The audit specifically noted the poor state of KYC information in the Cayman accounts: "41% of the accounts reviewed (92 of 224 reviewed) lacked full client information.  37 files had no client information."[532]

In 2004, Mexico strengthened KYC requirements for Mexican financial accounts and required Mexican banks to update the KYC information in all customer accounts by 2007.  In January 2006, HBMX's audit group conducted an audit of the KYC controls in place for the Cayman accounts and rated them "**Below Standard**."[533]  Of the Cayman accounts reviewed, the audit found that 13% of the files lacked material KYC information; more than 50% lacked a visit report with the client; some foreign clients were incorrectly described as Mexican nationals; and 15% of the account files were missing altogether:

> "More than 50% of account files that were reviewed lacked the relevant visit report, which weakens the position of HBMX in terms of KYC process for these types of accounts (Grand Cayman), particularly those accounts opened by foreigners.  In addition, in 13% of files reviewed the visit reports failed to include material information enabling to have adequate KYC.
>
> Weaknesses were noted in the supervision over the account opening process, which also impeded to detect promptly any information missing in account files or inconsistencies between the information produced by the client and the data captured in Cis-Hogan [[HBMX data system].  ...  In addition, the auditors indentified foreign clients who were input to the system as nationals.
>
> In addition to the foregoing, c[irca] 15% (10) of account files were not found at the Branches.  No actions had appeared to be taken to instruct RMs [Relationship Managers] to complete client's file again.

---

[530] 5/24/2007 email from HSBC Warren Leaming to HSBC David Bagley, "He advises that his own compliance team are advising him that such cross border activities should cease.-HBMX," HSBC OCC 8875007.
[531] July 2002 "Group Internal Audit:  Due Diligence Review – Project High Noon," prepared by HSBC internal audit group, HSBC OCC 8873846-852.
[532] Id. at HSBC OCC 8873847.
[533] 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307, at 1 (emphasis in original).

**PX257**

95

In particular the auditors indentified that for accounts opened by foreign clients these had produced expired immigration forms and that Branch staff did not maintain a copy of all the pages composing such a document.  This situation was due, in part, to the fact that circular letter Depvist045 (procedure to open current and term accounts) is not clear in the procedure to open these types of accounts (Grand Cayman)."[534]

The audit concluded with the recommendation: "Branch should ensure that KYC and account opening documentation is complete and in compliance with regulations."[535]

The 2006 audit uncovered severe AML and KYC deficiencies in the Cayman branch requiring remedial action to comply with the Mexican deadline for improving customer file KYC information, but those audit results appear to have been ignored.  The audit recommendations were recorded in HBMX's electronic system, but later closed out without any apparent actions having been taken in response, which does not comport with Group policy.[536]  Two years later, in 2008, John Root, senior HSBC Group Compliance officer, rediscovered the 2006 audit when examining KYC problems in the Cayman accounts.  He wrote: "The real surprise was the existence of an HBMX audit in January 2006 on KYC for the USD Cayman accounts.  It is not clear who in AML responded, and how.  Blank looks all around."[537]  His supervisor, Mr. Bagley, later jokingly remarked to the Head of Group Audit for Latin America and the Caribbean, Graham Thomson:  "I do find it surprising that there can have been no response and yet the audit was closed out.  Is this a breach or are you in audit becoming softer."[538]

**Project Restoration.**  As the 2007 deadline approached for completing the KYC updates mandated by Mexican law and internal reports showed that HBMX's KYC documentation remained in poor condition, HBMX obtained a year-long extension from Mexican regulators, to May 2008, to clean up its files, including client files for the Cayman accounts.[539]

In February 2008, Mexican regulators met with the HBMX CEO and, among other issues, criticized the bank's poor KYC documentation, leading HBMX to initiate "Project Restoration" to intensify its KYC remediation efforts.[540]  John Rendall, HBMX Chief Operating Officer, was put in charge of the project with the understanding that files containing inadequate KYC would be closed.[541]  Project Restoration was closely monitored by senior HBMX and HSBC Group officials.

---

[534] Id. at 3.

[535] Id. at 4.

[536] See 7/30/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-782; 8/5/2008 email exchange among HSBC David Bagley, HSBC John Root and HBMX  Graham Thomson, "HBMX - Cayman accounts," HSBC OCC 8874829-830.

[537] 7/30/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-782.

[538] 8/5/2008 email from HSBC David Bagley to HBMX Graham Thomson, "HBMX Cayman accounts," at HSBC OCC 8874829.

[539] See 7/27/2007 minutes of HSBC LAM Regional Audit Committee, HSBC OCC 8875086-090  (noting extension of time for the KYC effort until May 2008).

[540] See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 2.

[541] See, e.g., 10/28/2008 email from Graham Thomson to Emilson Alonso, Subject: "HBMX – Projecto Restauracion," HSBC OCC 8873464.

PX257

96

At first, the Cayman accounts were excluded from the project.  Then, in July 2008, HBMX's monitoring system suddenly began generating alerts for a number of Cayman accounts.  These alerts, which highlighted suspicious account activity, were brought to the attention of senior Compliance personnel.  The head of HSBC Group Compliance David Bagley told the Subcommittee this incident was the "first point that the Cayman Islands were brought into sharp focus" for him.[542]   He sent an email informing senior HSBC Group and HBMX officials about the alerts which had identified "significant USD [U.S. dollar] remittances being made by a number of [HBMX Cayman] customers to a US company alleged to be involved in the supply of aircraft to drug cartels."[543]   The company was Cabello Air Freight Inc. of Miami.[544]   Mr. Bagley wrote that "[a]s a precaution HBMX have issued instructions that no new [Cayman] accounts be opened pending a review of these activities."[545]   This step was taken with respect to the Cayman accounts, in the words of one HBMX compliance officer, "due to the massive misuse of them by organized crime."[546]

The decision to suspend new Cayman accounts was made by then HBMX CEO Luis Pena who did not specify when the suspension would be lifted.[547]   He also instructed HBMX staff to engage in "a process of enhanced due diligence KYC" for all Cayman accountholders to "end by December 1."  He wrote:

> "After this date we will cancel all the accounts that we were not able to complete files on and will send cashiers checks to all the respective customers.  For the future, Mexicans who wish to open a dollar denominated account will undergo a referencing process, in which the accounts will be … opened by the bank's staff in a proper offshore book as we do in our Premier offering. …  Unfortunately we will likely lose some deposits as we do not expect the KYC process to succeed 100%, but we will offset a significant control and regulatory risk."[548]

Also in July 2008, after reviewing the 2006 audit of the Cayman accounts, Mr. Root informed Mr. Bagley that "a sampling showed that15% of the customers did not even have a file." [549]  Mr. Root wrote:  "Fixing the Cayman accounts will be a struggle.  How do you locate

---

[542] Subcommittee interview of David Bagley (5/10/2012).

[543] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874832-33.

[544] See also Sealed Exhibits.

[545] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874832-33.

[546] 11/27/2008 email from HBMX employee to HBMX Jaime Saenz and Ramon Garcia, "Seriously consider restricting the product Dollars accounts in the zona frontera Product 63," HSBC OCC 8875736-738.

[547] See 7/31/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, HSBC David Bagley, and others, "HBMX - CAYMAN ACCOUNTS," HSBC OCC 8873503-504.  See also undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874561.

[548] 7/31/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, HSBC David Bagley, and others, "HBMX - CAYMAN ACCOUNTS," HSBC OCC 8873503-504.

[549] 7/31/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-782.

**PX257**

clients when there is no file?"  Missing client files, combined with accounts misused by drug cartel operatives, provided stark evidence of the high risk character of the Cayman accounts and the need for HBMX to get a better sense of the clients using them.  In the meantime, the documents contain no indication that either HSBC Group or HBMX informed HBUS about the suspect account activity or the Cayman KYC deficiencies, even though the Cayman accounts were operating solely through the HBMX correspondent account at HBUS.[550]

As a result of the AML alerts regarding money laundering involving some of the Cayman accounts and re-discovery of the 2006 audit exposing the poor state of the Cayman account files, the Cayman accounts were added to the Restoration Project.[551] Mr. Root told the Subcommittee that, in July 2008, the Cayman accounts "went to the top of the list" at the project.[552]

One of the first steps taken with regard to the Cayman accounts was that HBMX Compliance personnel analyzed their risk levels, and sorted customers into three categories:  red, yellow, and white.  Red status indicated that a customer was a "Special Category Client" (SCC), on a "black list," or the subject of a SAR; yellow status indicated that a customer had been flagged by HBMX's internal AML monitoring system with one or more alerts, but no SAR had been filed; white status indicated that the customer had no such derogatory information on file.[553]  Out of a total of 49,935 customers with 61,586 accounts worth about $2.1 billion, HBMX categorized 1,314 customers as "red" status, representing 2,240 accounts worth about $205 million.  HBMX also flagged 2,027 customers as "yellow" status, representing 2,084 accounts worth about $180 million.[554]  HBMX then largely limited its KYC remediation efforts to the 3,341 "red" and "yellow" customers.  The other 46,000 accountholders were not included in the project.[555]

Two months later, in September 2008, senior HSBC Group Compliance officer John Root offered a negative assessment of the KYC remediation efforts directed at the Cayman accounts:

"The HBMX 'Restoration' project chaired by John Rendall, HBMX COO, is endeavoring to regularize these accounts on a risk-basis.  Account opening documentation is generally

---

[550] Another example of a Cayman U.S. dollar account that HSBC Group and HBMX were aware of and expressed concerns about, but apparently did not inform HBUS, were accounts opened for two embassies, one of which was for a country in the Middle East.  See 12/2/2005 email exchange between HSBC David Bagley and John Root, "OFAC," HSBC OCC 8876612-613.  Mr. Bagley told the Subcommittee that although there was no indication of any "sinister" activity, these accounts were later closed, because the bank "did not want the risk."  Subcommittee interview of David Bagley (5/10/12).
[551] Subcommittee interview of David Bagley (5/10/12).
[552] Subcommittee interview of John Root (4/26/12).
[553] See 9/12/2008 email from HBMX Ramon Garcia to HSBC John Root, "Cayman Accounts," HSBC OCC 8876784.
[554] See Attachment to 9/12/2008 email from HBMX Ramon Garcia to HSBC John Root, "Cayman Accounts," HSBC OCC 8875462-465, at 465.
[555] See undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566, at 561 ("It is considered that it will not be possible to complete 50,000 enhanced KYC by 01DEC08.").

**PX257**

98

poor or non-existent and there is a lot of work to do.  Money-laundering risk is consequently high."[556]

An HSBC presentation, which is undated but appears to have been prepared in October 2008, summarized the ongoing Cayman KYC problems and presented a new strategy to address them.[557]  The presentation was entitled, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts."[558]  One key slide noted that "almost no progress [had] been made in enhanced KYC completion" and that only 25% of the files would have complete KYC information by December 1, 2008:

> "• The Bank has been recently been fined for offering this product in Mexico, and money laundering red flags have been identified.
> • On 28JUL, CMP [Compliance] gave instructions to suspend this product.
> • On 31JUL08, Segment Directors were requested by CEO that an enhanced KYC will be completed for all Grand Cayman accounts before 01DEC08.
> • As of JUL08, in Grand Cayman CDA/DDA 49,937 customers, and its portfolio was approximately USD 1,500 million.[559]
> • Currently, this product is expected to be re-opened, as long as necessary adjustments to systems, processes and documentation are made, with stricter controls, and if Group Compliance's sign-off is obtained.
> • On 26SEP, Segment directors reported that almost no progress has been made in enhanced KYC completion.  In addition, a central validation of enhanced KYC quality is not in place.
> • According to Remediation Project results, success rate in file completion is approximately 25%.  This means that if this strategy is followed, it will not be possible to complete more that 25% of required enhanced KYC forms by 01DEC08."[560]

This October 2008 assessment indicates that at least 75% of the Cayman files still had incomplete KYC information six years after HBMX assumed control of the accounts.

Despite this grim assessment, the Strategy also noted efforts underway to allow new Cayman accounts to be opened.[561]  As Graham Thomson, head of Group Audit for Latin America and the Caribbean, explained in an email to colleagues, the accounts needed to continue due to the income they produced:

---

[556] 9/12/2008 email from HSBC John Root to Adrian Cristiani and others, "Cayman Accounts," HSBC OCC 8875462-465, at 462.
[557] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566.  Because of dates mentioned in the presentation, it seems to have been completed between September 27 and October 30, 2008.
[558] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560.
[559] The figure of $1,500 million seems to refer to the Cayman certificates of deposit and does not include additional funds in Cayman Demand Deposit Accounts.
[560] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566, at 561.
[561] Id. at 561.

**PX257**

99

> "Currently the business owner and compliance are still discussing with GMO CMP [Compliance] the product parameters that are to be applied to lift the current embargo and relaunch the CI [Cayman Island] product.  It is important that these discussions result in practical product parameters as the CI portfolio is an important source of funds for HBMX and it is hoped the replacement product will be shortly submitted to the new products committee and then relaunched."[562]

Internal documents show that HSBC Group and HBMX officials considered a variety of criteria to determine when a new Cayman account could be opened, including requirements that the client be an existing HBMX customer for six months, complete an "enhanced KYC Questionnaire," undergo screening against the OFAC list and other "blacklists," and agree to limits on cash deposits.[563]

**U.S. Dollar Restriction.**  In November 2008, HSBC Group CEO Michael Geoghegan traveled to Mexico and met with senior Mexican regulators who were highly critical of HBMX's AML and KYC efforts, the huge volume of U.S. dollars that HBMX was exporting to the United States, and the possibility that a portion of those funds were associated with drug trafficking and money laundering.[564]  The regulators explicitly mentioned the U.S. dollars sent from the Cayman accounts.[565]  In response, Mr. Geoghegan proposed prohibiting all HMBX branches, including the Cayman branch, from offering U.S. dollars to customers, except at automated teller machines in Mexican airports.[566]  Since the Cayman accounts relied on U.S. dollars, the proposed new policy directly impacted Cayman accountholders.  HBMX CEO Luis Pena nevertheless agreed with the proposal, and also ordered the freeze on opening new Cayman accounts to continue indefinitely and prohibiting new cash deposits for existing Cayman accounts.[567]  Mr. Pena noted that the new measures would cost HBMX a lot of money:  "Cayman and Mexico dollar accounts provide us with US$2.6 billion of cheap funding.  We are likely to lose a big portion of this if we tell customers we no longer receive dollar notes."[568]  The new policies took effect in January 2009.

**9,000 Accounts Closed.**  According to HSBC's legal counsel, HBMX took nearly another year to complete KYC remediation of the Cayman accounts, finally completing the work in July 2009.[569]  As part of that KYC effort, HBMX closed approximately 9,000 Cayman

---

[562] 10/20/2008 email from Graham Thomson to HSBC Emilson Alonso and others, "HBMX – Projecto Restauracion," HSBC OCC 8874595-600, at 596-597.

[563] See Sept.-Oct. 2008 email exchanges among HBMX Ramon Garcia, John Rendall, Maria Salazar and HSBC David Bagley, Warren Leaming, Susan Wright, John Root, and Adrian Cristiani, HSBC OCC 8875818-829, at 829.

[564] See 2/18/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Richard Bennett and Matthew King, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331-333; 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026.

[565] See, e.g., 11/26/2008 email from HSBC David Bagley to HSBC Richard Bennett and Warren Leaming, "Mexico," HSBC OCC 8875605-607, at 607.

[566] See 11/26/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso, "Money Launderying," HSBC OCC 8874849-850.

[567] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[568] 11/28/2008 from HBMX Luis Pena to HSBC Emilson Alonso, HSBC OCC 8874856.

[569] 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.

accounts, due in many cases to incomplete KYC information.[570]  At the same time, HBMX allowed the Cayman branch to remain in operation and lifted the ban on new accounts.  Today, over 20,000 HBMX clients have over $657 million in Cayman U.S. dollar denominated accounts.

Because the HBMX Cayman branch continues to offer U.S. dollar accounts, despite a history of poor KYC controls and deficient KYC documentation, and despite the inherent riskiness associated with operating offshore accounts in a secrecy tax haven, the Cayman accounts continue to pose ongoing money laundering risks to HBUS.  Because HBUS is now aware of the Cayman accounts, it will have to evaluate the risk and determine whether to continue to process Cayman account transactions through the HBMX correspondent account.

### 3)  Cashing U.S. Dollar Travelers Cheques

A third example of how HBMX has introduced risk into HBUS involves its issuing and cashing millions of dollars in U.S. dollar travelers cheques through its correspondent accounts at HBUS, at times under suspicious circumstances.

Travelers cheques are paper monetary instruments which, for a fee, are issued and administered by a financial institution.  They can be issued in a variety of currencies and denominations, and carry serial numbers so that, if the cheques are lost or stolen, the issuing financial institution can trace back the purchase and either replace the cheques or refund the money used to purchase them.  Individuals often use travelers cheques to minimize carrying hard currency while traveling and as a way to safeguard their funds.  Some financial institutions issue such cheques only to pre-existing customers; others issue the cheques to anyone who pays the fee.  U.S. financial regulators have long warned financial institutions about the money laundering risks associated with travelers cheques, especially when purchased with cash by a non-customer and used to move substantial funds across international borders in ways that are difficult to trace.[571]  Travelers cheques have been used by terrorists,[572] drug traffickers,[573] and other criminals.[574]

---

[570] Id.

[571] See, e.g., Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Examination Manual, "Core Overview:  Purchase and Sale of Monetary Instruments," (6/23/2005) at 59; FFIEC BSA/AML Examination Manual, "Purchase and Sale of Monetary Instruments-Overview," (8/24/2007) at 212 ("The purchase or exchange of monetary instruments at the placement and layering stages of money laundering can conceal the source of illicit proceeds.  As a result, banks have been major targets in laundering operations because they provide and process monetary instruments through deposits.").

[572] See, e.g., United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005); "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11) at 1 (describing how the convicted defendant cashed $130,000 in U.S. dollar travelers cheques at a bank in Saudi Arabia and then provided the funds to support violent extremists in Chechnya).

[573] See, e.g., United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 35 (describing how Wachovia Bank processed $20 million in suspicious travelers cheques, some portion of which was suspected to include illegal drug proceeds); "How a Big U.S. Bank Laundered Billions from Mexico's Murderous Drug Gangs," The Guardian, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.  See also Albajon v. Gugliotta, 72 F. Supp. 2d 1362, 1365 (S.D. Fla. 1999) (admitting travelers cheques as evidence of drug trafficking

**PX257**

101

HBMX has issued a large number of U.S. dollar travelers cheques, at times selling them to anyone willing to pay the fee and cashing them for customers and non-customers alike.  In 2004, John Root, senior HSBC Group Compliance officer, sent an email to HBMX's Compliance head, Ramon Garcia, and AML head, Carlos Rochin, noting the huge volume of travelers cheques pouring in from Mexico and seeking assurances that HBMX was on guard against money laundering:

> "I note that in the year through 3Q04 [third quarter of 2004], HBMX has sold over USD 110 million of travelers cheques, an amount that eclipses that of HBEU [HSBC Europe] here in the UK, and that is several orders of magnitude higher than any other non-UK entity, including Hong Kong and the US.  In fact, it represents one-third of the Group's total global traveller's cheque business (with the UK representing another third).

> Could you kindly prepare a report for GHQ [Group Headquarters] summarizing the money laundering procedures currently in place for such a booming business.  Please include in this report KYC controls, number of SARs in the YTD [year to date], breakdown by region and branch, etc., etc."[575]

Mr. Garcia responded with preliminary information and a recent case involving travelers cheques, but in response to Mexican legal requirements regarding client-specific information, HSBC has so heavily redacted copies of those documents, as well as a longer report requested by Mr. Root, that they do not provide additional information.[576]

In 2008, when HBMX decided to stop offering U.S. dollars at its branches in most cases, the HBMX CEO Luis Pena recommended greater use of U.S. dollar travelers cheques instead, sold only to pre-existing customers.[577]  In response, the Deputy Head of HSBC Group Compliance, Warren Leaming, warned that travelers cheques also raise AML concerns, and advised lowering the existing $25,000 ceiling on the amount of travelers cheques that could be purchased by one customer at a time, and creating a new limit on the amount of travelers cheques that could be deposited at one time to a client account.[578]

In 2009, after CNBV expressed concerns about HBMX's weak AML controls, among other steps, HBMX tightened its policies on travelers cheques.  As of January 1, 2009, HBMX

---

proceeds); United States v. $41,305.00 in Currency & Travelers Checks, 802 F.2d 1339, 1343 (11th Cir. 1986) (finding travelers cheques could be seized as drug trafficking proceeds).

[574] See, e.g., Folk v. State, 192 So. 2d 44, 46 (Fla. Dist. Ct. App. 1966) (upholding conviction for signing a false name on travelers cheques and cashing them); United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001) (upholding conviction for using undeclared travelers cheques to attempt to move money fraudulently through U.S. customs).

[575] 11/8/2004 email from HSBC John Root to HBMX Ramon Garcia and Carlos Rochin, with copies to HSBC David Bagley and Susan Wright, "Travellers Cheques," HSBC OCC 8876645-646.

[576] See 11/30/2004 email from HBMX Ramon Garcia to HSBC John Root, David Bagley, Susan Wright, and HBMX Carlos Rochin, "Travellers Cheques," HSBC OCC 8876645-664.

[577] See 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.

[578] See 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall with copies to HSBC David Bagley, John Root, Susan Wright, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.

PX257

102

determined that it would sell its travelers cheques only to pre-existing customers and would place a limit on the amount that could be sold to any one customer at a time.[579]  Warren Leaming, Deputy Head of HSBC Group Compliance, who supported those changes, noted in an email: "There remain AML issues in respect of travellers cheques which historically are very high risk from an AML perspective and accordingly we would expect that the limits are reasonably low and that there are very strong controls in place to ensure that branches do not abuse the rules."[580]

At HBUS, the documents reviewed by the Subcommittee indicate that, despite their large volume, HBMX travelers cheques attracted little AML review or attention, even though the travelers cheques would have been presented for payment at HBUS' processing centers in New York and subjected to review.  The HBUS processing centers segregated and reviewed all travelers cheques and were required to send blocks of sequentially numbered cheques exceeding $10,000 to HBUS AML Compliance for review.[581]  At the same time, the processing centers had no information on expected account volume, conducted no trend analysis to identify suspicious transactions, and conducted no due diligence on the persons cashing the cheques.[582]  A 2007 OCC examination of HBUS' pouch activities, which included clearing U.S. dollar travelers cheques, identified numerous deficiencies in the AML policies and procedures and called for stronger AML controls, but it did not appear to result in any greater review of the HBMX travelers cheques.[583]  To the contrary, a 2007 HBUS policy change appears to have further limited AML reviews of travelers cheques presented by HSBC Group affiliates in non-high risk countries, restricting them to cases where the deposits exceeded $1 million.[584]  At that time, HBUS deemed both Mexico and HBMX to be at low risk of money laundering.

In 2009, the OCC conducted a second review of HBUS' pouch activities, including procedures to clear U.S. dollar travelers cheques.[585]  As part of that examination, HBUS produced to the OCC a lengthy description of its AML policies and procedures for foreign financial institutions that present items for processing through a correspondent account, including travelers cheques.[586]  Those procedures contained a number of restrictions or conditions, but did not impose a ceiling on the amount of money that HBUS would provide to a

---

[579] 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall, with copies to HSBC David Bagley, Susan Wright, John Root, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.

[580] Id.

[581] See 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," OCC-PSI-00885828, at 1 [Sealed Exhibit.].  HBUS' AML policies and procedures regarding travelers cheques are discussed in more detail in the Report Section on Hokuriku Bank:  Cashing Bulk Travelers Cheques, supra.

[582] See 4/27/2007 email from HBUS Robert Guthmuller to HBUS Alan Ketley, "Visit to Brooklyn OpsLink," OCC-PSI-00312153, at 4.

[583] See 3/31/2007 OCC Report of Examination, OCC-PSI-00304077 [Sealed Exhibit]; 9/13/2007 OCC Supervisory Letter, "Pouch Services and Middle Market at HBUS," OCC-PSI-00000391-394.  [Sealed Exhibit.]

[584] See 5/7/2007 email from HUBS George Tsugranes to HBUS Alan Ketley and others, "Visit to Brooklyn Ops," OCC-PSI-00312153, at 3.

[585] See, e.g., 2/15/2010 email from HBUS Jane Burak to HBUS Lesley Midzain, "Advice Requested," OCC-PSI-00256833 (describing banknotes examination that included reviews of travelers cheques); 2/11/2010 minutes of a "OCC & Chicago FED update Meeting," prepared by HSBC, OCC-PSI-00256916 (noting that HSBC made a presentation to the OCC on 2/9/2010, on enhancements to its cash letter process and an "internal look-back of cash letter activity for Travelers Checks and Money Orders").

[586] See undated "Request No. 7," prepared by HSBC, OCC-PSI-00000075-195 at 123-130 (providing detailed information  in response to OCC questions regarding HBUS' remote deposit capture and cash letter pouch transactions).  [Sealed Exhibit.]

PX257

correspondent client through the cash letter process.  The procedures did, however, require transactions over a certain amount to be reported to HBUS AML Compliance before processing. The reporting triggers were linked to the risk rating of the foreign financial institution presenting the monetary instrument for payment.  The five relevant risk ratings, from highest risk to lowest, were:  Special Category Client (SCC), high risk, cautionary risk, medium risk, and standard risk. The reporting triggers were as follows:

> For SCC customers – $1,000 for an individual item, and $10,000 in total deposits.
> For high risk customers – $10,000 for an individual item, and $100,000 in total.
> For cautionary risk customers – $50,000 for an individual item, and $200,000 in total.
> For standard and medium risk customers – $50,000 for an individual item and $250,000 in total.

Clients seeking to cash travelers cheques in excess of the reporting threshholds were not automatically prohibited from proceeding; instead, their transactions were reported to HBUS AML Compliance which was then supposed to make a case-by-case decision on whether to allow the transactions to proceed.

By 2009, Mexico and HBMX were considered high risk and, due to the large volume of HBMX travelers cheques it sold, HBMX cheques should have regularly triggered the AML reporting requirement and AML reviews.  In addition, HBMX travelers cheques should have produced numerous alerts due to the large amounts, sequentially numbered cheques, and structuring patterns involved.  Instead, the documentation suggests that few alerts issued and very little review of HBMX travelers cheques took place.

As part of its 2009 examination, the OCC expressed concern that, based on samples taken from 2007, 2008, and 2009, HBUS' monitoring of travelers cheques required too few AML reviews and was inadequate to detect suspicious activity.[587]  In response, HBUS undertook a detailed review of all cash letter items in 2009.[588]  HBUS determined that 280 items had been flagged for review, a tiny number in comparison to the huge number of transactions cleared per year.  In addition, according to HBUS, of those 280 items, less than a handful contained information suggesting suspicious activity.[589]  While HBUS presented that result as evidence of minimal AML risk, it is possible that the criteria used to flag transactions for review were too narrow to catch suspicious transactions.

One reason to think the latter might be the case is that, from 2007 to 2012, other financial institutions have reported significant instances of suspicious activities involving U.S. dollar travelers cheques either issued or cleared by HBMX.[590]  These reports generally describe coordinated teams of individuals, each of whom purchased large numbers of travelers cheques from HBMX, and then cashed or deposited the cheques in suspicious patterns.  Some of the U.S. dollar travelers cheques identified by these financial institutions had a combined value in excess

---

[587] See 2/15/2010 email from HBUS Janet Burak to HBUS Lesley Midzain, "Advice Requested," OCC-PSI-00256833.
[588] Id.
[589] Id.
[590] See Sealed Exhibits.

PX257

104

of $1 million, and some of the suspicious activity occurred over an extended period of time. Many of the suspicious transactions involved sequentially numbered cheques, illegible signatures, or difficult to understand markings or numbers on the cheques. In some cases, groups of cheques were made payable to the same health food business, toy company, or automobile auction house.

Four examples illustrate the issues. In the first example, nearly 1,500 U.S. dollar travelers cheques were purchased from the same HBMX branch in Mexico over a seven-month period from 2007 to 2008, and cashed shortly thereafter at several automobile auctions in the United States. Money launderers have been shown in the past to utilize the purchase of expensive, but liquid items, such as cars to hide illicit funds. The travelers cheques had a combined value of $900,000. In a second instance from 2008, on four occasions over a period of 16 days, individuals purchased from an HBMX branch in Mexico travelers cheques which, each time, had a combined value of $20,000 to $30,000, and altogether added up to $109,000. All of the cheques were then signed and countersigned with the same illegible signature, and made payable to the same toy business in Mexico. Ten months later, in a coordinated effort over a two-week period, all of the cheques were either cashed or deposited. In a third instance, 188 travelers cheques in denominations of $500 and $1000, totaling $110,000, were purchased in nine large blocks of sequentially numbered cheques from a major U.S. bank. Then, over a three-month period from April to June 2011, all 188 cheques were negotiated for payment at the same HBMX branch in Mexico, using illegible signatures so that the cheques provided no information about the payees.

In the fourth instance, two men purchased groups of travelers cheques from the same HBMX branch in Mexico. On 14 occasions over a three month period in 2011, the two men purchased the travelers cheques in batches which, each time, had a combined value of $10,000, and altogether added up to $140,000. All of the cheques were then signed with the same illegible signature. Over time, small groups of the travelers cheques, often with consecutive serial numbers, were cashed or deposited, with the majority of cheques failing to bear a stamp indicating exactly where they were negotiated. The 2011 transactions were part of a larger pattern in which the same HBMX branch sold travelers cheques to the same two men over a three year period from 2009 to 2011, for a combined value of $1.9 million.

While HBMX has tightened its travelers cheque policies by restricting the sale of travelers cheques to pre-existing customers and limiting the dollar amount of travelers cheques that can be provided to one customer at a time, HBMX travelers cheques continue to surface in reports of suspicious activities filed with U.S. authorities. Because many if not all of the cheques are cashed through the HBMX correspondent accounts at HBUS, HBMX continues to expose HBUS to money laundering risks through its issuance and cashing of U.S. dollar travelers cheques.

HBMX's money service business clients, Cayman accountholders, and travelers cheque purchasers all relied on the U.S. dollar services that HBMX was able to provide through its correspondent accounts at HBUS. In some cases, it appears those HBMX clients used HBMX's U.S. dollar correspondent account at HBUS to commit criminal acts. For its part, HBUS should have known of the money laundering risks it was incurring from those and other high risk

**PX257**

105

HBMX clients, accounts, and products.  Because HBMX was an HSBC affiliate and was also categorized for many years as located in a low risk jurisdiction, however, until recently, HBUS did not perform the KYC due diligence or account monitoring needed to uncover HBMX's high risk activities.

### E.  Bulk Cash Movements

In addition to using HBUS correspondent accounts to execute wire transfers, clear cash letter instruments, and conduct other U.S. dollar transactions, in 2007 and 2008, HBMX used its HBUS banknotes account to supply more physical U.S. dollars to HBUS than any other Mexican bank or HSBC affiliate.  The documents indicate that both HBMX and HBUS were unaware of the flood of dollars HBMX was pouring into the United States through HBUS, in part because HBUS had stopped monitoring HSBC affiliates' banknotes accounts for a three-year period, from mid-2006 to mid-2009.  HBUS policy was also consistent with the HSBC Group policy of not performing due diligence or account monitoring for HSBC affiliates.  When, in 2008, Mexican and U.S. regulators began pressing both HBMX and HBUS to explain the huge flow of U.S. dollars from Mexico and whether the funds included illegal drug proceeds, both banks were caught by surprise and eventually took action to turn off the spigot.  In 2009, HBMX stopped accepting U.S. dollar deposits at its branches in Mexico, and then in 2010, HBUS exited the banknotes business.

### (1)  HBUS' Global Banknotes Business

Prior to its exit, HBUS operated a very large U.S. banknotes business which the Federal Reserve estimated in 2010, to be worth approximately $300 billion annually.[591]  As part of that business, HBUS supplied physical U.S. dollars and accepted bulk cash shipments from financial institutions around the world, including over two dozen HSBC affiliates.[592]

Bulk cash shipments typically use common carriers, independent carriers, or U.S. Postal Service carriers to ship U.S. dollars by air, land, or sea to a bank located in the United States.[593] Shipments have gone via airplanes, armored trucks, ships, and railroads.  Most shipments are transported via containerized cargo.  Shippers may be "currency originators," such as businesses that generate cash from sales of goods or services; or "intermediaries" that gather currency from originators or other intermediaries to form large shipments.  Intermediaries are typically central banks, commercial banks, money service businesses, or their agents.[594]  Bulk cash shipments can be made directly to a bank in the United States, or to a U.S. Federal Reserve Bank or branch, which will accept the cash and credit it to the account of the intended recipient bank.[595]  Banks that receive bulk cash shipments via common carriers or the Postal Service have no obligation to

---

[591] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA') Bank Note Business (Revised)," BOG-SR-000442-443, 001402-409. [Sealed Exhibit.]

[592] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 342.  [Sealed Exhibit.]

[593] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA') Bank Note Business (Revised)," at BOG-SR-001404. [Sealed Exhibit.]

[594] Id.

[595] Id.

PX257

report the amount of the cash received to U.S. authorities, though they still must report any suspicious activity.[596]

Until 2010, HBUS was one of about 30 U.S. financial institutions that bought and sold physical currency on a wholesale basis around the world.[597]  The headquarters of HBUS' Global Banknotes business was located in New York, headed by Christopher Lok, with offices in London, Hong Kong, Singapore, and other locations.[598]  Until 2010, HSBC was also one of a relatively small number of international banks that contracted with the Federal Reserve Bank of New York (FRBNY), under the Extended Custodial Inventory (ECI) Program, to manage the FRBNY's U.S. currency vaults.  The ECI Program facilitates the international distribution of U.S. dollars, repatriates old dollars, circulates new designs, and provides information on the international use of U.S. currency.[599]  HSBC operated FRBNY currency vaults in London, Frankfurt, and Singapore.[600]  The currency in those vaults remained on the books of the Federal Reserve, and was used to fill orders from third parties or the operator itself.[601]  When distributing U.S. dollars, HSBC was obligated to comply with U.S. AML and Office of Foreign Assets Control (OFAC) requirements.[602]

While bulk cash shipments are a normal and legitimate part of international banking, they are also vulnerable to misuse by money launderers and other criminals.  In 2001, the U.S. Congress made smuggling large amounts of physical U.S. dollars across U.S. borders a crime.[603]  In 2005, a U.S. Money Laundering Threat Assessment identified bulk cash smuggling as a key method used to launder criminal proceeds and highlighted how drug traffickers were smuggling U.S. dollars obtained from illegal U.S. drug sales across the border into Mexico and then using various means to arrange for their deposit into a U.S. bank.[604]  In 2006, the U.S. Financial Crimes Enforcement Network (FinCEN) issued an advisory to U.S. financial institutions warning them in particular about money laundering associated with bulk cash shipments from Mexican casas de cambios.[605]

---

[596] Id., citing 31 CFR §103.23.
[597] Id. at BOG-SR-001405.  [Sealed Exhibit.]
[598] See 11/2006 HBUS presentation, "Banknotes Trading A Global Reach Organizational Chart as of November 2006," OCC-PSI-00000501-512.
[599] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA'Bank Note Business (Revised)," at BOG-SR-001405. [Sealed Exhibit.]
[600] Id.
[601] Id.
[602] Id.
[603] See Section 371 of the USA Patriot Act, P.L. 107-56, codified at 31 U.S.C. §5332 (outlawing the smuggling or attempted smuggling of over $10,000 in currency or monetary instruments into or out of the United States, with the specific intent to evade U.S. currency reporting requirements).
[604] See Dec. 2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and U.S. Postal Service, Chapter 5 on "Bulk Cash Smuggling" ("Upon leaving the country, cash may stay in Mexico, continue on to a number of other countries, or make a U-turn and head back into the United States as a deposit by a bank or casa de cambio.").
[605] 4/28/2006 "FinCEN Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the U.S.," No. FIN-2006-A003.

PX257

As of 2010, 29 HSBC affiliates had banknotes accounts with HBUS.[606]  Some of those affiliates operated in high risk countries plagued by drug trafficking, corruption, money laundering, or other criminal enterprises, including Angola, Bangladesh, Colombia, Democratic Republic of Congo, Haiti, Mexico, Panama, Paraguay, Saudi Arabia, and Ukraine.  HBUS did not distinguish, however, between high and low risk affiliates with banknotes accounts.[607]

### (2)  HBMX U.S. Dollar Sales to HBUS

For a three-year period, from mid-2006 until mid-2009, HBUS accepted more than $15 billion in physical U.S. dollars from other HSBC affiliates, but failed to conduct any AML monitoring of the bulk cash transactions.[608]  HBUS had performed AML monitoring both prior to and following that time period.  HBUS personnel have been unable to explain why all AML monitoring of its banknotes accounts ceased during that period and then resumed later, but the OCC has noted that the monitoring ceased when a formal AML oversight agreement applicable to HBUS expired, and resumed when an OCC AML examination of the banknotes operations was launched in July 2009.[609]  The absence of AML monitoring meant that HBUS did not track for AML purposes its growing dollar traffic with HBMX, which reached $3 billion in 2007, and then jumped another 25% in 2008 to $4 billion.[610]

In February 2008, Mexican regulators held a private meeting with HBMX CEO Paul Thurston and informed him that HBMX was repatriating more U.S. dollars to the United States than any other Mexican bank – more than each of the four largest Mexican banks, all of which were larger than HBMX.[611]  The CNBV also informed Mr. Thurston that the Mexican Financial Intelligence Unit (FIU) was very concerned about the "high level of ML [money laundering] risk" involved.[612]  The FIU indicated that in the "majority of the most relevant ML cases" they had investigated in 2007, "many transactions were carried out through" HBMX.[613]

In November 2008, the CNBV and FIU held a second private meeting, not only with the HBMX CEO, then Luis Pena, but also with the HSBC CEO of Latin America, Emilson Alonso, and the CEO of the HSBC Group, Michael Geoghegan.[614]  Again, the regulators expressed their alarm at the volume of U.S. dollars that HBMX was sending to the United States and described

---

[606] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 342.  [Sealed Exhibit.]
[607] Id. at OCC-PSI-00864336.
[608] Id. at 336.
[609] See id. at 360.  When asked why HBUS stopped monitoring its affiliates' banknotes activity, HBUS personnel offered conflicting reasons.  Daniel Jack, in charge of HBUS compliance for banknotes, thought that his supervisor, Alan Ketley, had approved the decision to stop monitoring affiliates, but Alan Ketley did not recall the decision.  Neither did their superior, Teresa Pesce.  David Bagley called the decision to stop monitoring banknotes for affiliates "inexplicable."  Subcommittee interviews of Daniel Jack (3/13/2012), Alan Ketley (2/16/2012), Teresa Pesce (3/30/2012) and David Bagley (4/12/2012).
[610] Id.; 6/29/2009 OCC notes of telephone conversations, prepared by OCC AML Examiner Joseph Boss, OCC-PSI-00928760.
[611] See 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 5.
[612] Id.
[613] Id. at 6.  Examples of these cases included Zhenly Ye Gon, Casa de Cambio Puebla, and Sigue Corporation.
[614] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.

PX257

law enforcement concerns about the extent to which those dollars may be the proceeds of illegal drug trafficking in the United States.  A November email from the HSBC Group Compliance Deputy Head summarizing the meeting stated that, between January and September 2008, HBMX had repatriated $3 billion to the United States, which represented 36% of the market volume and double what the biggest bank in Mexico, Banamex, had repatriated, even though HBMX was only the fifth largest bank in the country.[615]  According to an internal OCC document, the Department of Homeland Security's Immigration and Customs Enforcement (ICE) division conveyed that, within Mexico, HBMX "led the market in cash repatriation in 2007 and 2008," with "$3.2 billion repatriated in 2007 and $4.2 billion repatriated in 2008."[616]

A quick analysis undertaken by HBMX immediately after the November meeting found that while HMBX was "very good at buying/acquiring dollars," it did "not seem to sell them and hence our very high repatriation figures."[617]  The analysis also determined that "80% of our dollars come from money exchange business at branches."[618]  It noted further that "there is no limit on the amount of dollars that c[u]stomers can convert to pesos," and that with respect to non-customers, HBMX branches would "convert up to 3000 dollars, and do not require any KYC."[619]  HSBC Group Compliance head David Bagley responded:  "The practice of changing USD in the branches pres[u]mably with little or no ID for non customers is in breach of Group policy.  When looking at our USD exposure how can this have been missed."[620]

At HBUS, an undated analysis was conducted of its banknotes traffic with Mexican financial institutions over a three-month period, from November 2006 to February 2007.[621]  The analysis disclosed that HBUS was doing far more business with HBMX than any other Mexican financial institution.  It showed that during the three-month period:

–HBUS had purchased about $470 million in U.S. dollars from Banco Mercantil Del Norte, a major Mexican bank, while selling it only about $22 million in U.S. dollars.

–HBUS had purchased about $281 million in U.S. dollars from BBVA Bancomer, another major Mexican bank, while selling it only about $5 million.

–HBUS had purchased about $196 million in U.S. dollars from Case de Cambio Puebla, and $194 million from Consultoria International, without selling either any U.S. dollars.

[615] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[616] 6/29/2009 OCC notes of telephone conversations, prepared by OCC AML Examiner Joseph Boss, OCC-PSI-00928760.

[617] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[618] Id.

[619] Id.

[620] 11/27/2008 email from HSBC David Bagley to HSBD Warren Leaming, copy to Richard Bennett, "Mexico," HSBC OCC 8875605.

[621] See undated "HBUS Banknotes NY – USD Bought from or Sold to Customers in Mexico:  3-Month Period (Nov-06 to Feb-07)," prepared by HBUS, OCC-PSI-00151506.  See also undated "Banknotes-NY Selected Customers' Activity Alerts & Traders' Explanations for USD Purchases & Sales from 2005-2009," prepared by HNAH, OCC-PSI-00005890-904.

**PX257**

–During the same period, HBUS had purchased about $742 million in U.S. dollars from HBMX, while selling it only a little more than $1.3 million.

These figures indicate that HBMX was, by far, HBUS' largest banknotes customer in Mexico.

In July 2009, the OCC initiated an AML examination of HBUS' global banknotes operations, and soon discovered that the bank was not monitoring the banknotes activities of its affiliates.[622]  That same month, HBUS resumed monitoring its banknote accounts.[623]  In September, the OCC requested documentation related to banknotes accounts for 25 Latin American financial institutions, including ten in Mexico.  In November 2009, the examination team added examiners from the Federal Reserve.  Additional requests for information were made, including with respect to HSBC affiliates with banknotes accounts, HBMX, Mexican casas de cambios, and HBMX's U.S. dollar accounts in the Cayman Islands.

In August 2009, the OCC summarized some of the information in an internal memorandum.[624]  According to the OCC, due to transaction costs, banknotes transactions at HBUS typically occurred only about once per month and involved large shipments.[625]  In addition, transaction volumes often fluctuated on a seasonal basis, increasing during holidays or tourist seasons.[626]  According to the OCC, HBUS said that it conducted AML monitoring on a monthly basis, examining banknotes transactions by customer and inquiring when significant changes in the volume of U.S. dollar sales or purchases took place.[627]

When the OCC conducted tests on the 2009 HBUS banknotes data, however, it determined that the volume data was not always accurate, and HBUS did not keep records of its reviews or actions:

> "When volumes changed significantly, the bank did not seem to be aware of these changes, and it does not appear that the bank took any action as a result.  For example, even though transactions volumes for customers in Mexico increased significantly from the first 6 months of 2008, over the first 6 months of 2009, there was no documentation in the files that the bank noted the change or took any action. … Bank employees … assured us that adequate monitoring takes place within the business line and Compliance. However, we were unable to find anything in the files that this was the case.  They also cautioned that too much documentation results in increased legal risk.  We explained to the bank that written documentation is necessary, for institutional memory, and to ensure that controls are exercised.  We noted the bank's appetite for risk, as well as the risk

---

[622] See 2/6/2010 email from HBUS Janet Burak to HBUS Brendan McDonagh, "Expanded 'Banknotes Exam,'" OCC-PSI-00787479 (summarizing the banknotes examination effort).  See also Subcommittee interview of Joseph Boss (1/30/2012).
[623] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 360.  [Sealed Exhibit.]
[624] See 8/13/2009 OCC memorandum to OCC AML Examiners from the OCC Compliance Risk Analysis Division, "HSBC Global Banknotes, Compliance RAD assistance," OCC-PSI-00846642.  [Sealed Exhibit.]
[625] Id. at 4.
[626] Id.
[627] Id.

PX257

110

inherent in the Banknotes business.  The business line seemed to resist this message, but Compliance staff seemed to eventually grasp the importance of better documentation."[628]

As the data confirmed that HBMX was the single largest supplier of U.S. dollars to HBUS, transferring billions of dollars that far outstripped the volumes being supplied by larger Mexican banks and other HSBC affiliates, Mexican and U.S. law enforcement and regulatory authorities continued to express concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds.  In a January 2010 meeting, U.S. law enforcement and regulators also expressed concern that the problem extended beyond Mexico:

> "The bulk cash receipts by HSBC's Bank Note Business from certain correspondent accounts based in Central and South America exceed reasonably expected volumes of USDs that should be within those countries from tourism, foreign business, etc."[629]

### (3)  Remedial Action

In response to the concerns expressed by regulators and law enforcement, HBMX took a number of steps to gain a better understanding and control of its U.S. dollar transactions.  The first set of actions, in February 2008, focused on gaining better information.  HBMX announced a new policy, effective immediately, to deem all customers who deposited more than $100,000 in a month as SCC clients subject to enhanced due diligence.  HBMX identified 312 customers that met that criteria and subjected them to a KYC review. [630]  HBMX also undertook a review of its branches to identify the nature and volume of their U.S. dollar transactions,[631] and a review of its money service business clients to determine whether each relationship should continue. [632]  Still another action HBMX took was to change its account monitoring criteria to increase scrutiny of U.S. dollar deposits by customers.[633]

In November 2008, after another meeting with regulators critical of its U.S. dollar transactions, HBMX went further.  It ordered its branches to stop providing physical U.S. dollars

---

[628] Id. at 4-5.

[629] 1/11/2010 meeting memorandum, prepared by the Federal Reserve Bank of Chicago, "DOJ Concerns with HSBC Bank Notes Activities," BOG-SR-001402-1409, at 402 [Sealed Exhibit.]

[630] See undated "Actions taken since 18FEB," prepared by HBMX, HSBC OCC 8875040-041(describing actions taken after a Feb. 18, 2008 meeting with the CNBV); 3/3/2008 "Internal Control, HSBC Mexico SA," prepared by HBMX, HSBC OCC 8966027-038.  But see 7/28/2008 email from HBMX Luis Alverez to HSBC John Root and HBMX Ramon Garcia, "Major Issues Outstanding," HSBC OCC 8873598 ("In order to mitigate risk in HBMX, 100K process was implemented (customers which make USD cash deposits exceeding 100k within a one-month period).  It has been identified that 974 customers made cash deposits for a total amount of USD308 Million from Jan to May.  These customers are classified in our monitoring systems as high-risk customers and an enhanced KYC must be performed for them.  If any customers do not meet requirements, accounts are closed.").

[631] See, e.g., undated "Rectification Programme – 12 major projects in 6 categories," prepared by HBMX, HSBC OCC 8875046 (listing as item 5, on "USD Banknotes":  "Review of USD intensive customers" and "Analysis of transaction patterns through branches").

[632] 7/28/2008 email from HBMX Luis Alverez to HSBC John Root and HBMX Ramon Garcia, "Major Issues Outstanding," HSBC OCC 8873598.

[633] Undated "Actions taken since 18FEB," prepared by HBMX, HSBC OCC 8875040-041(describing actions taken after a Feb. 18, 2008 meeting with the CNBV).

**PX257**

to customers and non-customers alike, other than through ATMs at airports.[634]  It also prohibited branches from accepting U.S. dollar cash deposits from customers.[635]  In addition, HBMX stopped opening new U.S. dollar accounts at its Cayman branch, and prohibiting the acceptance of new cash deposits for existing Cayman accounts.[636]  All of these actions led to a steep drop in the number and volume of HBMX U.S. dollar transactions.

As HBMX cut back dramatically on its U.S. dollar business beginning in early 2009, OCC AML examiners found that HBUS appeared to be increasing its U.S. dollar transactions with Mexican clients, including some of the high risk casas de cambio that could no longer engage in the same volume of U.S. dollars with HBMX.[637]  HSBC Group Compliance knew about HBUS' Mexican casa de cambio clients.  Rather than press HBUS to close the accounts, however, HSBC Group Compliance head David Bagley merely observed to a colleague in January 2009:  "I am surprised that HBUS still have cambio clients."[638]

A year later, in June 2010, HBUS decided to exit the U.S. banknotes business.  It closed the Global Banknotes offices in New York, London, Hong Kong, and Singapore, and later sold portions of the banknotes business to other banks.[639]  HBUS also declined to renew its contract to operate U.S. currency vaults for the Federal Reserve Bank of New York when that contract expired in 2010.  In September 2010, the OCC issued a supervisory letter identifying multiple AML deficiencies at HBUS, including with respect to its banknotes business, and followed with a cease and desist order in October.

## F.  Analysis

Over the years, HBUS maintained correspondent accounts for at least 80 HSBC affiliates and banknotes accounts for at least 29 HSBC affiliates, which accounted for a large portion of its U.S. dollar activities.  In 2009, for example, HSBC determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[640]  HSBC also calculated that, over an eight-year period, its U.S. dollar clearing business had increased over 200%, from processing an average daily amount of $185 billion in 2001, to $377 billion in 2009.[641]  HBUS functioned as the U.S. nexus for the entire HSBC global network of financial institutions.  Some of those

---

[634] See 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.
[635] Id.
[636] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.
[637] See, e.g., 9/1/2009 OCC memorandum  to the Files, "Washington Meeting," OCC-PSI-01416833 ("[O]nce HSBC Mexico ceased its operations, HBUS began significant volume of Banknote activity directly with some of HSBC Mexico's former Banknote clientele.").  [Sealed Exhibit.]
[638] 1/27/2009 email from HSBC David Bagley to HSBC Susan Wright and Warren Leaming, "Press Release," HSBC OCC 8873485.
[639] Id.  In 2010, HSBC Holdings plc sold its U.S. wholesale banknotes business in Asia to United Overseas Bank Limited (UOB) for $11 million, and in 2011, sold its European banknotes business to HSBC Bank plc.  It recorded total closure costs of $14 million during 2010.  Id.
[640] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.
[641] Id. at "USD Payment Statistics – Fact Sheet," HSBC OCC 8874211.

PX257

112

institutions used their access to the U.S. financial system as a selling point to attract clients.[642] Not all of those affiliates operated in high risk jurisdictions like Mexico; not all had high risk clients like casas de cambio; not all had high risk products like U.S. dollar Cayman accounts; and not all had weak AML controls.  But some HSBC affiliates operated under those circumstances, and HBMX provides a case history of the money laundering risks that followed.  HBMX illustrates how the U.S. affiliate of a global bank can better protect itself by conducting careful due diligence of fellow affiliates, as already required by law, identifying higher risk institutions, and understanding their high risk clients, high risk products, AML controls, and money laundering vulnerabilities.  HBMX also illustrates the need for ongoing, effective account monitoring to detect, prevent, and report suspicious activity.  Effective monitoring and SAR reporting require adequate resources and personnel.  Still another lesson is that AML personnel at the parent and affiliates of a global bank should consider all legal avenues for systematically sharing information with each other about suspicious clients and transactions in order to combat misuse of their network by drug traffickers, organized crime, and other wrongdoers.

---

[642] Subcommittee interview of Michael Geoghegan (5/42/2012).

PX257

113

## IV.   HSBC AFFILIATES:  CIRCUMVENTING OFAC PROHIBITIONS

The United States prohibits doing business with certain persons and entities, including terrorists, persons engaged in nuclear proliferation, drug kingpins, and persons associated with rogue jurisdictions such as Iran, North Korea, and Sudan.  To implement the law, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) has developed a list of those prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions.  Transactions stopped by an OFAC filter typically undergo an individualized review to see if the transaction can proceed.

Foreign banks that engage in U.S. dollar transactions typically execute them through the account of a bank in the United States, subject to the U.S. bank's OFAC filter.  While most processing takes less than 24 hours, transactions stopped by the OFAC filter for further review may undergo substantial processing delays and, in some cases, payments may be blocked and held for years.  Because of the additional time and expense involved when transactions are subjected to review, some foreign banks have developed a variety of tactics to avoid the OFAC filter.  Common tactics included intentionally stripping information from the transaction documentation to conceal the participation of a prohibited country or person, or using "cover payments."  In the context of Iranian transactions, cover payments are transfers between correspondent banks in non-sanctioned jurisdictions which lack underlying payment details, including information about a party that is a prohibited country or person.  In the case of Iranian U.S. dollar transactions, some banks used one or both of these practices when conducting so-called "U-turn" transactions, a type of transaction that was allowed under OFAC regulations prior to November 2008, but because the transactions referenced Iran, routinely triggered the OFAC filter and required an individualized review which delayed the transaction's processing.  In recent years, U.S. law enforcement has penalized some international banks that used willfully deceptive tactics to circumvent the OFAC filter and process prohibited transactions.

The Subcommittee conducted a review of issues related to the sending of OFAC sensitive transactions through HBUS' correspondent accounts from 2000 to 2010, by HSBC affiliates.  The evidence indicates that, for years, some HSBC affiliates sending OFAC sensitive transactions involving Iran through their U.S. dollar correspondent accounts at HBUS took steps to conceal them, including by deleting references to Iran from the payment instructions or by characterizing the transaction as a transfer between banks in permitted jurisdictions without disclosing any Iranian connection.  More specifically, from at least 2001 to 2007, two HSBC affiliates, HSBC Europe (HBEU) and later HSBC Middle East (HBME), repeatedly conducted U-turn transactions involving Iran through HBUS, many of which were not disclosed to the bank, even though they knew HBUS required full transparency to process U-turns.  To ensure HBUS cleared the transactions without delay, HBEU routinely altered transaction documentation to delete any reference to Iran that might trigger the OFAC filter at HBUS and also typically characterized the transaction as a transfer between banks in permitted jurisdictions.   The aim of the affiliates' efforts appeared to be to ensure the Iranian transactions utilized HBUS' automated processing procedures and avoided any human intervention or manual review, a process known as straight through processing or STP.  Internal bank documents also indicate that the affiliates viewed the U-turns they sent through HBUS' accounts as permitted by OFAC rather than

114

prohibited transactions under U.S. law, but their failure to provide full transparency prevented any individualized review by HBUS to confirm their legality.

Internal bank documents show that HSBC Group Compliance knew of HBUS' insistence on full transparency for U-turns and the practice of HSBC affiliates to conceal the Iranian transactions sent through their U.S. dollar correspondent accounts at HBUS. HSBC Group Compliance, as well as other senior HSBC Group executives, allowed the HSBC affiliates to continue to engage in these practices, which even some within the bank viewed as deceptive, for more than five years without disclosing the extent of the activity to HBUS. The bank documents show that, from 2000 to 2005, the practice of altering U-turn transaction documentation was repeatedly brought to the attention of HSBC Group Compliance, including by HBEU personnel who objected to participating in the alteration of documents and twice announced deadlines to end the activity. Despite receiving this information, HSBC Group Compliance did not stop HSBC affiliates from sending concealed Iranian transactions through HBUS' accounts until the bank decided to exit Iran altogether in 2007.

At the same time, while some at HBUS claimed not to have known they were processing undisclosed Iranian transactions from HSBC affiliates, internal documents show key senior HBUS officials were informed as early as 2001. In addition, on several occasions, HBUS' OFAC filter stopped Iranian transactions that HBUS had indicated should be disclosed by HSBC affiliates, but were not. Despite the evidence of what was taking place, HBUS failed for years to demand a full accounting of what HSBC affiliates were doing. While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates, stop the conduct, and ensure all Iranian U-turns were subjected to individualized reviews to gauge whether they complied with the law.

In addition to Iranian transactions, HBUS documents indicate that, from at least 2002 to 2007, some HSBC affiliates also sent potentially prohibited transactions through HBUS involving Burma, Cuba, North Korea, or Sudan, although none of the affiliates employed the same type of systematic effort used for transactions involving Iran. In recent years, HBUS' OFAC compliance program as a whole has also displayed AML deficiencies.

In 2010, HBUS hired an outside auditor, Deloitte LLP, to identify and examine the OFAC sensitive transactions involving Iran and other prohibited countries or persons that went through the bank.[643] That review, which is ongoing and has yet to review all relevant transactions, has so far identified, over a seven-year period from 2001 to 2007, more than 28,000 OFAC sensitive transactions sent through HBUS involving a total of $19.7 billion. Of those 28,000 transactions, more than 25,000 totaling more than $19.4 billion involved Iran, while 3,000 involved other prohibited countries or persons. The Deloitte review characterized 2,584 of those transactions, involving assets in excess of $367 million, 79 of which involved Iran, as "Transactions of Interest" requiring additional analysis to determine whether violations of U.S.

[643] See Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919 -989, at 930.

PX257

law occurred. [644]  HBUS is currently in the process of analyzing those transactions, which could lead to financial penalties if it is found to have violated OFAC regulations.

Finally, another issue involves actions taken by some HSBC Latin American affiliates, with the approval of HSBC Group Compliance, to send non-U.S. dollar payment messages through a U.S. server whose OFAC filter was not turned on to screen them for terrorists, drug kingpins, or other prohibited persons.   HSBC Group Compliance allowed those payment messages to move through the United States and utilize U.S. facilities while bypassing the OFAC filter, despite HBUS concerns that such messaging traffic might require OFAC screening to block transfers involving terrorism, drug trafficking, or other wrongdoing.  The transactions were later screened by HSBC Group's WOLF filter.

## A.  Background on OFAC Prohibitions

**OFAC.**  The Office of Foreign Assets Control (OFAC) within the U.S. Department of Treasury administers and enforces economic and trade sanctions stemming from U.S. foreign policy and national security goals, and other threats to the foreign policy, national security, or economy of the United States. [645]  The office was formally established in December 1950, when President Truman blocked all Chinese and North Korean assets subject to U.S. jurisdiction.[646] Its programs seek to prohibit U.S. persons and entities from engaging in trade or financial transactions with terrorists, persons engaged in activities related to the proliferation of weapons of mass destruction, international narcotics traffickers, and rogue jurisdictions.

OFAC's regulatory authority is exercised under Presidential national emergency powers and laws enacted by the U.S. Congress to impose controls on transactions and authorize the freezing of assets under U.S. jurisdiction.  According to OFAC, "[m]any of the U.S. sanctions are based on United Nations and other international mandates, are multilateral in scope, and involve close cooperation with allied governments."[647]  The freezing of assets "immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property," and the owner of the asset must contact OFAC directly to request the release of a frozen asset.  OFAC prohibitions support U.S. and international efforts to combat terrorism, nuclear proliferation, drug trafficking, and other wrongdoing.

OFAC administers both comprehensive and selective sanctions programs. The comprehensive U.S. programs apply to persons and entities within a designated jurisdiction and have applied to Burma (Myanmar), Cuba, Iran, Sudan, and Syria.  The non-comprehensive programs target specific individuals and entities rather than impose broad prohibitions involving an entire country.  These programs have applied at times to persons and entities associated with Iraq, Libya, North Korea, Somalia, and Zimbabwe.  To carry out U.S. sanctions programs, OFAC has developed a list of Specially Designated Nationals and Blocked Persons (SDN).  The

---

[644] Id.

[645] See U.S. Department of Treasury Office of Foreign Assets Control (OFAC), http://www.treasury.gov/about/ organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

[646] Id.  OFAC is the successor to the Office of Foreign Funds Control (the "FFC") that was established at the beginning of World War II in 1940.  However, the Treasury Department administered sanctions as far back as the War of 1812 when sanctions were imposed against Great Britain.  Id.

[647] Id.

PX257

116

SDN designation covers both individuals and entities in which SDN persons have a direct or indirect ownership interest of 50% or more. The SDN designation applies to covered entities whether or not the entity is named on the SDN list.[648] U.S. persons are prohibited from dealing with persons and entities on the SDN list, and all SDN assets in the United States are supposed to be blocked. OFAC also has authority to grant general and specific "licenses," which authorize exceptions for certain categories of transactions, such as those related to humanitarian efforts.[649]

OFAC regulations apply to all U.S. persons, both citizens and permanent resident aliens, regardless of where they are located, as well as all persons and entities within the United States, and all U.S. incorporated entities and their foreign branches.[650] Fines for violating U.S. sanction laws and OFAC regulations can be substantial. Criminal penalties can result in fines ranging from $50,000 to $10 million and imprisonment for 10 to 30 years for willful violations. Civil penalties in various matters range from $250,000 or twice the amount of each underlying transaction to $1,075,000 for each violation.[651]

**Iran and U-turn Transactions.** For more than thirty years, dating back to 1979, the United States has applied sanctions programs to Iran, enforced by OFAC.[652] These programs have generally prohibited U.S. persons from engaging in transactions with anyone associated with Iran, and the OFAC filter has stopped any financial transaction including an Iranian reference.

Between 1995 and November 10, 2008, however, OFAC regulations also included an exception to the prohibition on Iranian transactions commonly referred to as "U-turns." U-turn transactions were authorized by OFAC under regulations issued in 1995. In that year, President Clinton declared that Iran was an international threat for its attempt to obtain a nuclear weapon as well as its role in undermining ongoing peace talks in the Middle East. As such, U.S. financial institutions were generally barred by OFAC from processing transactions involving Iran. In their place, OFAC allowed only those Iran-related transactions that began and ended in non-Iranian foreign banks. According to Treasury:

"This is commonly referred to as the 'U-turn' authorization. It is so termed because it is initiated offshore as a dollar-denominated transaction by order of a foreign bank's customer; it then becomes a transfer from a correspondent account held by a domestic bank for the foreign bank to a correspondent account held by a domestic bank for another

---

[648] See OFAC website, FAQ #10: http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/ques_index.aspx.
[649] Id.
[650] See OFAC website, FAQ #11: http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#10
[651] See U.S. Department of Treasury Office of Foreign Assets Control (OFAC), http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.
[652] See 31 C.F.R. Part 535, Iranian Assets Control Regulations, and 31 C.F.R. Part 560, Iranian Transactions Regulations, which together comprise the Iranian sanctions program. Initial Iranian sanctions regulations, now detailed in Part 535, were created on November 14, 1979, after U.S. diplomats were taken hostage in Tehran, and President Carter blocked assets located in the United States belonging to the Government of Iran. On October 29, 1987, following Iran's expressions of support for international terrorism and aggressive actions against non-hostile shipping in the Persian Gulf, President Reagan issued Executive Order 12613, the predecessor to Part 560. From 1995 to 1997, President Clinton issued three additional Executive Orders, numbered 12957, 12959, and 13059, which culminated in a prohibition of nearly all trade and investment activities with Iran by U.S. persons, regardless of location.

PX257

117

foreign bank; and it ends up offshore as a transfer to a dollar-denominated account of the second foreign bank's customer."[653]

In essence, the new regulations only allowed U.S. financial institutions to clear U.S. dollar transactions involving non-Iranian intermediaries, even if they involved Iranian clients. This restriction meant transactions involving Iran could be processed only if the beginning and ending points were non-Iranian foreign banks.  The purpose of U-turn transactions was to allow U.S. dollar-denominated transactions to continue throughout the world – benefitting both U.S. commerce and the value of the dollar – but to prevent U.S. citizens and institutions from doing business with Iran.  This goal was accomplished by ensuring that the only point such transactions touched the United States was in clearing them for foreign banks.

The U-turn exception was widely used to carry out U.S. dollar Iranian transactions in the United States for many years.  In November 2008, the exception was revoked, and it was no longer legal under OFAC regulations to clear Iran-linked transactions even for foreign banks, although U.S. banks were still permitted to handle Iranian funds in limited circumstances, including transactions supporting humanitarian relief.[654]  U.S. persons were explicitly prohibited, however, from engaging in any transaction or dealing in any property or property interest with any Iranian bank designated under the Nonproliferation of Weapons of Mass Destruction or Specially Designated Global Terrorist programs.[655]

The U-turn exception for Iran in OFAC regulations until 2008 does not appear in any other OFAC regulation, and so does not affect transactions involving any other prohibited country or person.

**Prosecutions for OFAC Violations.**  In recent years, a number of large, international banks have been prosecuted for systematically violating OFAC prohibitions.  In most cases, the violations involved the practice of stripping information from wire transfer documentation to hide the participation of a prohibited person or country, and executing the prohibited transaction through a U.S. dollar account at a U.S. financial institution.  For example, in December 2009, Credit Suisse was fined $536 million by the Department of Justice for altering wire transfer documentation from 1995 to 2006, in transactions involving Burma, Cuba, Iran, and Libya.  That same month Lloyd's Bank was fined $217 million for stripping information from wire transactions over a ten-year period, from the mid 1990s through September 2007.  In May 2010, ABN Amro was fined $500 million for removing information from wire transfers involving OFAC sanctioned countries between 1995 and 2005.

Most recently, on June 12, 2012, the U.S. Justice Department and New York County District Attorney's Office entered into a deferred prosecution agreement with ING Bank N.V.

---

[653] See Treasury website, http://www.treasury.gov/resource-center/sanctions/Documents/fr73_66541.pdf; OFAC website, http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx,  at 2.
[654] See OFAC website, http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx, at 2.
[655] Id. at 2.

PX257

118

and imposed the largest fine ever levied against a bank for OFAC violations.[656]  For processing more than $2 billion in transactions on behalf of Cuban, Iranian, and other prohibited persons, ING Bank agreed to a criminal forfeiture of $619 million.  The Treasury Department's press release revealed that ING Bank had "intentionally manipulated financial and trade transactions to remove references to Iran, Cuba, and other sanctioned countries and entities."[657]  It noted that ING Bank's methods included not referencing a payment's origin, utilizing "misleading" payment messages, and using shell companies.  According to court filings, between the early 1990s and 2007, ING Bank processed more than 20,000 transactions in violation of OFAC prohibitions, "with the knowledge, approval and encouragement of senior corporate managers and legal and compliance departments."[658]

A summary of recent prosecutions and legal actions related to OFAC violations follows.

**Recent Prosecutions and Legal Actions Related to OFAC Violations**

| Bank | Date | Fine | Link | Brief Summary |
|---|---|---|---|---|
| ING Bank N.V. | 6/12/2012 | $619 million | • DOJ Press Release | The Department of Justice and the New York County District Attorney's Office entered into simultaneous deferred prosecution agreements with ING Bank relating to 20,000 transactions totaling $1.6 billion processed through the U.S. financial system on behalf of Cuban and Iranian entities from the early 1990s through 2007. |
| Barclays Bank | 8/18/2010 | $298 million | • DOJ Press Release<br>• Wall Street Journal, Probe Circles Globe to Find Dirty Money | The Department of Justice and the New York County District Attorney's Office entered into deferred prosecution agreements with Barclays Bank for activity relating to transactions illegally conducted for customers in Cuba, Iran, Libya, Sudan, and Burma from the mid-1990s until September 2006. |
| ABN Amro Bank | 5/10/2010 | $500 million | • DOJ Press Release<br>• Wall Street Journal, RBS, DOJ to End Deferred Prosecution Agreement over ABN Amro | The Department of Justice entered into a deferred prosecution agreement with ABN Amro Bank for removing information from wire transfers from 1995-2005 for customers in Iran, Libya, the Sudan, Cuba, and other OFAC-listed countries. |
| Credit Suisse Bank | 12/16/2009 | $536 million | • DOJ Press Release<br>• DOJ Statement of Facts | The Department of Justice entered into a deferred prosecution agreement with Credit Suisse.  The fines related to alterations on wire transfers from 1995 to 2006 from Iran, Cuba, Burma, and Libya. |

[656] See, e.g. United States v. Ing Bank, N.V., Case No. 1:12cr136 (USDC DDC), Information (6/12/2012) and Deferred Prosecution Agreement (6/12/2012).
[657] 6/12/2012 "ING Bank N.V. Agrees to Forfeit $619 Million For Illegal Transactions With Cuban and Iranian Entities," Treasury press release, www.treasury.gov/press-center/press-releases/Pages/tg1612.aspx.
[658] Id.

PX257

| Lloyd's Bank | 01/09/2009 | $217 million | • DOJ Press Release | The Department of Justice and the New York County District Attorney's Office entered into deferred prosecution agreements with Lloyd's Bank for wire stripping transactions from the mid-1990s through September 2007. |
|---|---|---|---|---|
| Australia and New Zealand Bank Group Ltd. | 8/24/2009 | $5.75 million | • Treasury Settlement Statement<br>• Enforcement Documents | The Treasury Department entered into a settlement with the Australia and New Zealand Bank Group relating to currency exchanges from 2004 to 2006, for transactions processed through U.S. correspondent accounts for customers in Cuba and Sudan. |

Prepared by U.S. Permanent Subcommittee on Investigations, July 2012

HSBC is currently under investigation by the U.S. Justice Department and several Federal financial regulatory agencies for engaging in similar practices in possible violation of OFAC regulations.[659]  In October 2010, an internal Federal Reserve email discussing HSBC's decision to hire an outside auditor to review its records "presumably to find problematic transfers," noted that "HSBC was one of the two major UK banks for Iranian banks during the early 2000s (Lloyds being the other), so we can imagine what will be found."[660]

## B. Executing OFAC-Sensitive Transactions

### (1) Transactions Involving Iran

#### (a) Overview

Documents collected by the Subcommittee do not pinpoint when undisclosed Iranian transactions began moving through HBUS in potential violation of OFAC regulations.  HSBC officials were aware of the practice generally as early as 2000, as seen in an email discussion between HSBC Group's Compliance head, then Matthew King, and AML head Susan Wright. Ms. Wright criticized actions taken by a bank client to alter transaction documentation to disguise a wire transfer moving through the United States, but their email exchange does not disclose whether such transactions were already taking place at HBUS.[661]  By 2001, they clearly were, as described in an email from HBEU to HBUS.[662]

In 2001, when HSBC Europe (HBEU) raised the issue of processing U-turn transactions through its U.S. account in compliance with U.S. requirements, HBUS personnel made it clear that any such transactions would need to be fully transparent and include all underlying payment details to enable HBUS to evaluate whether they qualified as permissible U-turns.  From at least 2001 to 2007, however, despite repeated HBUS requests for full transparency, HBEU and later HSBC Middle East (HBME) sent transactions involving Iran through their U.S. dollar

---

[659] See 2/27/2012 HSBC Holdings plc 6-K filing with the Securities and Exchange Commission, item 13, http://sec.gov/Archives/edgar/data/1089113/000119163812000216/hsba201202276k7.htm.
[660] 10/07/2010 email from Federal Reserve Stephen Meyer to Federal Reserve Kwayne Jennings, and others, "HSBC OFAC."
[661] See 6/16/2000 email from HSBC Susan Wright to HSBC Matthew King, HSBC OCC 8875191-92.
[662] See 6/28/2001 email from HBEU John Wilkinson to HBUS Denise Reilly and others, "Bank Melli," HSBC OCC 8876132-133, discussed below.

**PX257**

120

correspondent accounts at HBUS without full disclosure of the transaction details.  In some instances, the HSBC affiliate simply stripped the identifying Iranian information from the transaction documentation.  In others, the HSBC affiliate also sent the transaction as a transfer between banks in permitted jurisdictions, a tactic sometimes referred to as a "cover payment," since the bank-to-bank transfer acted as a cover for the underlying transaction.[663]  Both methods sought to ensure that a transaction would not be stopped by HBUS' OFAC filter and delayed for individualized review to determine whether it, in fact, qualified as a permissible U-turn, but would instead benefit from "straight through processing" or STP.

From 2001 until 2005, the two HSBC affiliates frequently discussed processing Iranian U.S. dollar transactions for various Iranian financial institutions and entities through their HBUS correspondent accounts.  Numerous emails among HBEU, HBME, HBUS, and HSBC Group discuss whether HBUS would be willing to process Iranian U-turn transactions and, if so, how.  At the same time, HSBC Group, HBEU and HBME bankers were pushing to expand contacts with Iran.  The Senior Payments Manager in HBUS reported being told in a July 2001 conference call that the HSBC Group, with backing from the Chairman, was seeking to "significantly grow our presence in Iran."[664]  In 2003, an HBME business proposal estimated that processing 700 U.S. dollar payments for Iranian banks per day using U-turn transactions would produce income of $4 million, while failing to process them would threaten HSBC's current Iranian business which produced annual bank income of $2 million.[665]  HBME also noted that it already had a "number of existing USD accounts for Iranian banks."[666]

Even though discussions with HBUS over processing the transactions continued in 2002 and 2003, documentation shows that HBEU had already begun to send U-turn transactions through HBUS without disclosing an Iranian connection for many of them.[667]  Some HBUE compliance and payments personnel objected to altering payment instructions in connection with the Iranian transactions, and a key payments official even announced deadlines in January 2004 and September 2004, after which no Iranian payment instructions would be altered, but both deadlines were ignored.  HBUS finally approved a protocol to process transparent U-turns in December 2004.[668]  Even after that protocol was approved, however, HBEU continued to send undisclosed U-turn payments through HBUS using cover payments, failing to provide requested information to its own affiliate.

---

[663] The cover method utilizes the MT202 SWIFT message or payment instruction format, which provides a U.S. bank with the names of the foreign banks acting as the originator or beneficiary of the immediate transfer, but is not required also to provide the underlying origination and beneficiary customer information.

[664] 7/12/2001 email from HBUS Denise Reilly to Douglas Stolberg and others, "Bank Melli," HSBC OCC 8876128-129. HSBC legal counsel told the Subcommittee that the HSBC affiliates were already doing business with Iran, but they wanted to increase that business by doing it with Bank Melli.  Subcommittee meeting with HSBC legal counsel (6/20/12).

[665] 1/2003 memorandum from HBME Rick Pudner to HBUS Denise Reilly, HBEU Malcolm Eastwood, and others, "Business Case-USD Payment From Iranian Banks/Entities," HSBC OCC 8876490.

[666] Id.

[667] See, e.g., 12/30/2001 email from Protomastro to Carolyn Wind and others, HSBC OCC 8873909.

[668] See 12/2/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-Turns," HSBC OCC 3407526-527; 12/15/2004 email from HSBC David Bagley to HSBC Marilyn Spearing and HBME David Hodgkinson, "Iran – OFAC," HSBC OCC 8874039; and 5/4/2005 email from HBUS Elizabeth Protomastro to HBUS Teresa Pesce and others, "Wire Payments Suspended," HSBC OCC 8874710.

PX257

121

At HBUS, during the same time period, internal documents show that, as early as 2001, senior HBUS payments, compliance, and business managers were informed that Iranian U.S. dollar payments were being sent by HBEU through HBUS after deleting references to Iran. They were also informed of an HBEU proposal to streamline the processing of U-turn transactions by omitting references to Iran so the transactions would not be halted by the OFAC filter in the United States.  Emails at the time show that senior HBUS officials expressed discomfort with the HBEU proposal, but took no other action to stop or prevent the activity already occurring.[669]  In addition, HBUS' OFAC filter occasionally caught an Iranian-related transaction, sent by an HSBC affiliate, in which the identifying information had not been fully removed, demonstrating that undisclosed U-turns continued to be sent through HBUS correspondent accounts, but again, no HBUS personnel took further action to stop the activity. In 2003, the Iranian issue was discussed again when a new HBUS AML Director arrived, but once more, no decisive action was taken to put a stop to undisclosed U-turns.

Although HSBC Group Compliance was aware of HBUS' concerns, HBEU's practice of stripping information or using cover payments to conceal U-turn transactions involving Iran, and the fact that such undisclosed transactions were routinely slipping through HBUS accounts, HSBC Group did not prohibit the practice for years.  In July 2005, HSBC Group issued a Group-wide directive, Group Circular Letter (GCL) 050047, barring all HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC regulations, but continued to allow their use of cover payments for permissible U-turn transactions, which meant the transactions would continue to circumvent the OFAC filter and individualized review by recipient U.S. banks.  In April 2006, HSBC Group issued a second Group-wide directive, GCL 060011, requiring HSBC affiliates and other financial institutions to use fully transparent payment instructions when sending transactions through HBUS accounts, but again allowed U-turns "to be made as cover payments."  In 2007, HSBC Group decided to exit Iran.

In recent years, OFAC has sent over a dozen so-called Cautionary Letters to HBUS about incidents in which it failed to block a prohibited transaction, including transactions involving Iran.  In 2010, HSBC Group employed an outside auditor, Deloitte LLP, to identify and review OFAC sensitive transactions at HBUS over a seven-year period from 2001 to 2007.  That review has so far examined 58 million payment messages involving assets of $37 billion that passed through the key server, located in the United Kingdom, during that timeframe and identified OFAC sensitive U.S. dollar transactions involving assets totaling $19.7 billion.  The review identified almost 25,000 U.S. dollar transactions involving Iran, involving assets in excess of $19.4 billion.[670]  The vast majority of the Iranian transactions, ranging from 75% to 90% over the years, were sent through HBUS and other U.S. dollar accounts without disclosing any connection to Iran.  While the affiliates may have viewed these U-turns as permissible under U.S. law, the absence of identifying information meant they did not trigger the OFAC filter or an individualized review by HBUS to make sure.

---

[669] 7/11/2001 email from HBUS Douglas Stolberg to HBUS Denise Reilly, HBUS Joe Harpster, and HBUS Michael Gallagher, " Bank Melli," HSBC OCC 8876129.
[670] Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 930.

PX257

122

### (b) Concealing Iranian Transactions

**2000 Notice Regarding Iranian Transactions.**  On June 9, 2000, the HSBC Group AML Compliance head Susan Wright learned in an email that a client bank was using deceptive practices to send OFAC sensitive U.S. dollar transactions through U.S. correspondent accounts while evading detection by the OFAC filter.

In the June 9, 2000 email to Ms. Wright from an HSBC colleague, she was informed that a particular bank, whose name was redacted by HSBC from the email, was "automatically replacing a remitter's name with that of" the bank.[671]  The email stated that the bank planned to cease the practice by the end of June, but in the future, for OFAC sensitive transactions, would "arrange cover for the payment using MT202/203 remittances."  "MT202/203" refers to the SWIFT message or payment instructions used to execute bank-to-bank transfers.  The email explained that bank-to-bank transfers did not require identifying the underlying party who originated the transaction or the ultimate beneficiary of the payment.[672]  It also indicated that the bank planned to send a separate "MT100 message" to the recipient bank providing full payment details for the originator and ultimate beneficiary.  The email stated:  "In this way a payment, in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."[673]

Ms. Wright forwarded the June 2000 email to Matthew King, then head of HSBC Group Compliance, describing the client bank's past procedure of altering transaction documentation when processing OFAC sensitive wire transfers.  She wrote:  "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF[674] concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."[675]  She also described the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers.  Ms. Wright wrote: "From a Group perspective I consider the continuation of this practice to be unacceptable and as a deliberate and calculated method to avoid the US OFAC sanctions has the potential to raise serious regulatory concerns and embarrass the Group."[676]

Ms. Wright's reaction indicates that as early as 2000, HSBC Group Compliance learned of practices being used to avoid detection by the OFAC filter, and viewed them as "unacceptable" and raising potential regulatory concerns that were capable of embarrassing HSBC.

**2001 Bank Melli Proposal.**  Six months later, in January 2001, HBEU approached HBUS with a proposal to use its U.S. dollar correspondent account at HBUS to clear U.S. dollar

---

[671] 6/9/2000 email from HSBC Bob Cooper to HSBC Susan Wright, "Significant Exception 2Q00-04," HSBC OCC 8875192-193.

[672] Id.

[673] Id.

[674] FATF is the Financial Action Task Force, the leading international body that set standards for combating money laundering and terrorist financing.

[675] 6/14/2000 email from HSBC Susan Wright to HSBC Matthew King, "Memo: Significant Exception 2Q00-04," HSBC OCC 8875191-192.

[676] Id.

PX257

123

transactions for Bank Melli, the largest commercial retail bank in Iran.[677]  At that time, Bank Melli's London Branch maintained a U.S. dollar account with several other major international banks, but was interested in establishing a relationship with HSBC that would give the bank the majority of Bank Melli's U.S. dollar clearing business.  HBEU conducted an extensive review, with advice from two outside U.S. law firms, to determine whether transactions originated by Bank Melli would meet the definition of a permissible U-turn transaction under OFAC regulations, and concluded that they would, in fact, be permissible.

Even though the proposed U-turns would be permissible under OFAC regulations, HBEU proposed carrying them out in the form of bank-to-bank transfers, without any reference to the underlying originator or ultimate beneficiary and, so without any reference to Iran.[678]  The aim was to ensure that the transactions would not be delayed by triggering an OFAC filter and having to undergo individualized review.  HBUS compliance personnel responded that any such transactions would have to be done in a more transparent manner, with detailed payment information specifying the underlying originating and beneficiary customer information.  HBUS employees expressed concern about using cover payments, since the limited payment instructions would not enable HBUS to know whether it was processing a valid U-turn transaction involving Iran or whether it was even processing a U-turn transaction at all.[679]  It would see only two banks making the transfer on the payment instructions and would have no knowledge of the underlying customers for whom the transaction was being processed, including whether they were prohibited persons.

**Legal Advice.**  In January 2001, HBUS OFAC Compliance officer Elizabeth Protomastro asked outside legal counsel, Tom Crocker, for an opinion as to whether HBUS could process U.S. dollar transactions from HBEU on behalf of either Bank Melli or Iran's Central Bank, Bank Markazi.[680]  After extensive consultations involving two law firms and OFAC, HBUS was advised that the Bank Melli transactions could qualify as permissible U-turn transactions.[681]

---

[677] HSBC had established a relationship with Bank Melli's office in Tehran in 1999.  7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC-PSI-PROD-0096130-132.

[678] Id. at 0096130.  Under international banking practice, it was legal for bank-to-bank transactions to omit underlying payment details for the originator and ultimate beneficiary.  Subcommittee briefing by OFAC (5/8/2012).

[679] Id. at 0096130-131.

[680] See 1/31/2001 email from Elizabeth Protomastro to Tom Crocker, HSBC OCC 8903860.

[681] On February 1, 2001, HBEU provided Ms. Protomastro with more information about the type of U.S. dollar transactions that would be sent through HBEU's correspondent account at HBUS, explaining that they would include 25 treasury-related payments involving about $750 million per day, 25 treasury-related receipts involving about $750 million per day, and 100 commercial payments involving $200 to $300 million per day, none of which would be related to letters of credit for military goods.  (See 2/1/2001 email from HBEU Peter Blenk to HBUS Elizabeth Protomastro, "Central Bank of Iran," HSBC OCC 8903864-865.)  On February 2, 2001, Mr. Crocker advised that the scenario outlined by HBUE did not appear to qualify for the U-turn exception as stipulated in the OFAC Iranian Transactions Regulations, because HBEU could not serve as both the originating and receiving foreign bank.  (See 2/2/2001 email from Tom Crocker to HBUS Elizabeth Protomastro, "Central Bank of Iran," HSBC OCC 8903859-860.)

In response to Mr. Crocker's opinion, on February 19, 2001, HSBC Group Compliance head Matthew King contacted a second law firm, Winthrop Brown, to obtain a second opinion.  (See 2/19/2001 email from HSBC Matthew King to Winthrop Brown and HBME John Richards, "Memo: OFAC constraints in the Central Bank of Iran operating a USD Clearing account with HSBC Bank plc in London," HSBC OCC 8903876-877.)  One of the

**PX257**

124

HSBC Group Compliance head Matthew King forwarded the legal advice to HBME officials Brian Richards and John Richards, stating: "I confirm I am happy for the business to be undertaken on this basis." He also wrote: "I am assuming this business will be booked in HBEU, hence I am copying Chris Couldrey. If any other Group entity is likely to be involved, could you let me know."[682] Brian Richards responded the following day to confirm that payment orders from Bank Melli's account would originate from HBEU, and credits in favor of Bank Melli would be credited to their account at HBEU. He stated that the payment orders would not mention Bank Melli, and HBUS would not receive payment orders or receipts directly from an Iranian entity. Mr. Richards concluded that the payment chain would meet the U-turn definition provided by Mr. Simons.[683]

**HBEU Payment Instructions.** HBEU, HBUS, and HSBC Group Compliance continued to discuss HBEU's proposal to process U.S. dollar transactions for Bank Melli.

In a letter dated April 30, 2001, HBEU's Multicurrency Payments Department (MPD) sent Bank Melli a proposal to process their payments with "minimal manual intervention."[684] The letter included payment templates with specific instructions on how to format U.S. dollar transactions so the paperwork would not have to be altered by HBEU. MPD proposed that Bank Melli use the provided templates to complete payments fields for both MT202 and MT100 SWIFT messages[685] and to test the proposal.[686] In the letter, MPD Business Development Manager John Fowle advised the Bank Melli Cash and Payments Manager in London, Saeed Pourjam:

> "[F]ollowing tests in our payments environment we are confident that we have found a solution to processing your payments with minimal manual intervention. The key is to **always** populate **field 52** – if you do not have an ordering party name then quote "One of our Clients", **never leave blank**. This means that the outgoing payment instruction from

---

firm's lawyers, John Simons, consulted with OFAC and obtained a copy of the payment processing procedure for qualified "U-Turn Dollar Clearing" transactions. He explained he was waiting to confirm with OFAC's Chief Counsel Office about whether a second U.S. bank was required to process permissible U-turn transactions. The email indicated that they had also determined that a requirement in Section 560.516 (b) for U.S. depository institutions to determine if an underlying transaction was prohibited by OFAC, "prior to initiating a payment on behalf of any customer or crediting a transfer to the account on its books of the ultimate beneficiary," did not apply to U-turns. (See 2/2001 email from John Simons to Winthrop Brown, "Memo: OFAC constraints in the Central Bank of Iran operating a USD Clearing account with HSBC Bank plc in London," HSBC OCC 8903875-876.)

In April 2001, Mr. Simons emailed Mr. King that OFAC had confirmed that a second U.S. bank was not required when processing permissible U-turn transactions and no specific OFAC license was required to engage in U-turn transactions. (See 4/26/2001 email from John Simons to HSBC Matthew King and others, OFAC – Iran," HSBC OCC 8903868-870.)

[682] 4/26/2001 email from HSBC Matthew King to HBME Brian Richards and others, "OFAC – Iran," HSBC OCC 8903868.

[683] 4/27/2001 email from HBME Brian Richards to HSBC Matthew King and others, "OFAC – Iran," HSBC OCC 8903874.

[684] See 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC OCC 8876130-136, at 135-136 (including a copy of the April letter).

[685] MT202 and MT100 are examples of SWIFT messages used by financial institutions to facilitate payment processing. Different messages utilize specialized formats, dependent on the type of transaction, to process the payments. Subcommittee briefing by OFAC (5/8/2012); Subcommittee briefing by Deloitte (5/51/2012).

[686] 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King, "Bank Melli" HSBC OCC 8876130-136, at 133-136.

**PX257**

125

> HSBC will not quote "Bank Melli" as sender – just HSBC London and whatever is in
> Field 52. This then negates the need to quote "DO NOT MENTION OUR NAME IN
> NEW YORK" in field 72."[687]

This email shows HBEU designed a payment method to avoid the OFAC filter by preventing the inclusion of information about the participation of the Iranian bank. The method developed by HBEU ensured that no language that would normally trigger an OFAC review – such as "do not mention our name in New York" – appeared in the transaction documentation.

On May 25, 2001, in an email to colleagues, Michael Gallagher, an HBUS senior official at the Payments and Cash Management (PCM) division, expressed discomfort with the Bank Melli proposal to colleagues, including his supervisor, Douglas Stolberg, head of Commercial and Institutional Banking (CIB): "I wish to be on the record as not comfortable with this piece of business."[688] His statement did not elicit any immediate response. When interviewed, Mr. Gallagher told the Subcommittee that he sent this email to express his concerns to his colleagues, including his supervisor, and then left it to them to determine what should be done.[689]

In the meantime, HBEU had already begun processing Bank Melli U-turns through its account at HBUS, using cover payments so that the transactions would not trigger HBUS' OFAC filter. This fact was disclosed in a June 28, 2001 email from the HBEU Institutional Banking Relationship Manager who handled the Bank Melli account, John Wilkinson.[690] In the email, he was discussing the Bank Melli proposal with the head of HBUS' payment services, Denise Reilly. Mr. Wilkinson explained that once the proposal "goes live," Bank Melli was instructed "to alter the format" of their payments to achieve straight through processing. Mr. Wilkinson wrote:

> "[W]e have further asked them to only put 'One of our clients' in field 52, thus removing
> the chance of them inputting an 'Iranian referenced' customer name, that causes fall out
> of the cover payment sent to HBUS and a breach of OFAC regulations."[691]

He also explained that using "One of our clients" in field 52 "is a standard phrase used by MPD [HBEU's Multicurrency Payments Department] in these situations."[692] Acknowledging Ms. Reilly's concerns following "a recent formatting error" detailed in an earlier email of June 15,

---

[687] Id. at 135 (emphasis in original). Two months earlier, on May 21, 2001, HBEU Institutional Banking (CIB IBL) conducted a call with Bank Melli to inquire about the names of the principal beneficiaries of their payments. The resultant call report indicated that "as expected," Bank Melli was unable to answer with the reasoning that Iran imports from many countries and suppliers worldwide. This information had been previously requested by a Senior Manager in Payment Operations at HBUS, Denise Reilly. An Area Manager within HBEU CIB IBL, Brian Richards, forwarded the response to Ms. Reilly the following day. Ms. Reilly then forwarded Mr. Richard's email to HBUS Compliance personnel. 5/22/2001 email from HBUS Denise Reilly to HBUS Carolyn Wind and others, "Bank Melli," HSBC-PSI-PROD-0096138-142.
[688] 5/25/2001 email from HBUS Michael Gallagher to HBUS Denise Reilly and Douglas Stolberg, "BANK MELLI," HSBC-PSI-PROD-0096138.
[689] Subcommittee interview of Michael Gallagher (6/13/2012).
[690] 6/28/2001 email from HBEU John Wilkinson to HBUS Denise Reilly and others, "Bank Melli," HSBC OCC 8876132-133, at 133.
[691] Id.
[692] Id.

**PX257**

126

2001, Mr. Wilkinson noted that Bank Melli had not yet begun to use the new formatting method detailed in the April letter:

> "Bank Melli are still formatting payments in their usual method, in this instance MPD failed to spot the poor input and did not follow their normal procedure of altering the payment, hence it was blocked.  MPD have again confirmed the new formatting method will achieve straight through processing and overcome these difficulties."[693]

Mr. Wilkinson's email shows that Bank Melli was already processing undisclosed U-turn transactions through HBEU's account at HBUS, using what he calls "their usual method" for formatting the payments, prior to the proposed changes.  His email also described HBEU's "normal procedure" as "altering" Bank Melli's payments to prevent the payments from being blocked.  The proposed new procedure was aimed at eliminating those manual interventions on the part of HBEU to both expedite payments, potentially saving time and therefore money.

This June 2001 email put HBUS on notice that HBEU had at times altered transactions involving Bank Melli in Iran, a practice already so commonplace at HBEU it was called its "normal procedure."  This email was sent to the head of HBUS' payment service operations, who then alerted other HBUS executives.  When asked about this document describing the alteration of documents being engaged in by an HSBC affiliate, senior HBUS Compliance official Anne Liddy, who oversaw HBUS' OFAC compliance program, told the Subcommittee that it would have been a problem if U-turns were being processed in 2001, since HBUS did not then have a process in place to conduct U-turns appropriately.[694]

**HBUS Objections.**  On July 11, 2001, after HBUS Compliance head Carolyn Wind learned of the HBEU proposal, she sent an email to HSBC Group Compliance head Matthew King objecting to it.[695]  What followed was a growing consensus that HSBC should not be pursuing its business in this fashion.  Ms. Wind included the Wilkinson email from June and a copy of the April letter sent to Bank Melli providing payment message instructions.  Ms. Wind expressed several concerns, including whether the transactions sent via the cover payments would be permissible under OFAC regulations and that "HBUS will not be able to confirm whether or not the underlying transaction actually meets the 'U-Turn' requirement."  She noted further that it was "not apparent that HBEU will be able to confirm that each payment meets the requirements."  She wrote:

> "In an effort to facilitate 'straight-through processing', it now appears that HBEU will train Bank Melli on formatting the payments and that we will be relying on Bank Melli to ensure that only qualifying payments are processed through HBEU's account with HBUS."[696]

---

[693] Id.
[694] Subcommittee interview of Anne Liddy (2/22/2012).
[695] 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC OCC 8876130-136.
[696] Id. at 130.

**PX257**

127

Ms. Wind also expressed concern about how it might appear to U.S. regulators that HBEU trained Bank Melli to write payment instructions in such a way, pointing out that if OFAC were to identify a transaction that did not qualify as a permissible U-turn, OFAC might consider "HSBC's actions due to the non-disclosure as having involved willful disregard or evasion."[697]

HBUS payment services head Denise Reilly forwarded Ms. Wind's email to Douglas Stolberg, head of HBUS Commercial and Institutional Banking (CIB). He responded: "With the amount of smoke coming off of this gun, remind me again why we think we should be supporting this business?"[698]

Ms. Reilly responded by sending Mr. Stolberg a memorandum prepared by the HSBC Group Representative for Iran, John Richards, which stated that HSBC Group "with the backing of Bond" – referring to the HSBC Chairman of the Board of Directors – wanted to "significantly grow our presence in Iran" with current lines of credit reported to be $800 million, trade lines of $150 million, and growth anticipated in trade, cash management and Internet banking. The memorandum indicated that HSBC Group and HBEU wanted to expand the bank's presence in Iran and viewed clearing U.S. dollar transactions for Bank Melli as a profitable venture that could help win additional business in Iran, despite U.S. sanctions and HBUS concerns.[699]

These email exchanges show that, by July 2001, senior HBUS compliance, payments, and business managers, as well as the HSBC Group Compliance head, were aware that Iranian U.S. dollar transaction documentation was being altered by HBEU and the transactions were being processed through HBUS.[700] HBUS Compliance head Carolyn Wind complained to HSBC Group Compliance head Matthew King, but neither stopped the practice, nor did HSBC Group obtain a legal opinion about whether its U.S. dollar cover payments were in compliance with OFAC regulations.

**HBUS' Payments Proposal.** In August 2001, HBUS offered its own proposed procedures to clear U.S. dollar transactions involving Bank Melli.[701] Uncomfortable with the formatting solution proposed by HBEU a few months prior, HBUS proposed that Bank Melli be listed as the originator in the payment instructions and proposed establishing a segregated account for the transactions so HBUS could ensure that all Bank Melli payments would be stopped by the OFAC filter for further review and approval.

---

[697] Id. at 131.
[698] See 7/11/2001 email exchanges among HBUS Douglas Stolberg and HBUS Denise Reilly, Joe Harpster, and Michael Gallagher, "Bank Melli," HSBC OCC 8876128-130.
[699] Id. at 128-129.
[700] 7/11/2001 email exchange among HBUS Carolyn Wind, HBUS, Paul Lee, HBUS Anne Liddy, HBUS Douglas Stolberg, HBUS Michael Gallagher, and HBUS Denise Reilly, HSBC OCC 8876129.
[701] The procedures consisted of a two-step debit process and a five-step OFAC review process, and committed to same day processing for transactions determined to be U-turn compliant. The procedures required that Bank Melli transactions be segregated in an "HBEU Special Account" with the account number entered into the OFAC filter so that every Bank Melli transaction would be stopped in the OFAC queue for two reviews and two approvals prior to processing. Bank Melli would appear as the originator for all related transactions. 8/29/2001 email from HBUS Denise Reilly to HBAP Alan Wilkinson and others, "Bank Melli," HSBC OCC 7687346-348.

**PX257**

128

On August 30, 2001, HSBC's John Richards expressed his support for the procedures, noting it would be the first time that an Iranian bank name was mentioned in the payment message.[702]

On September 6, 2001, HBUS met with the Director of the Office of Foreign Assets Control (OFAC) to discuss clearing Bank Melli U-turn transactions. Carolyn Wind commented that although OFAC did not approve or reject the proposal, she walked away from the meeting thinking that OFAC was "okay with it."[703]

**HBME's Iranian Transactions.** While HBEU was processing U-turn transactions for Bank Melli, a second HSBC affiliate, HSBC Middle East (HBME), was also carrying out OFAC sensitive transactions for other clients, using its own and HBEU's U.S. dollar correspondent accounts at HBUS apparently without alerting HBUS to the transactions. In an October 2001 email, David Bagley, then HBME Regional Head of Legal and Compliance, sought guidance from HSBC Group Compliance head Matthew King about how OFAC sensitive transactions should be handled.[704] Mr. Bagley wrote: "As I understand the current position we do routinely, and across the Group, adopt differing approaches to payments potentially subject to OFAC sanctions." Mr. Bagley wrote that, at HBME, payments were not structured "against a specific request from the customer, rather we undertake this structuring as a routine," and that he was not clear about whether those procedures were viewed "as being inappropriate, and thus should be disallowed." He also noted: "I am advised that there may even be software in the UK which filters such payments for restructuring in the event that the original message has been structured in such a way that it will be caught by the OFAC filters."

Mr. Bagley cautioned that subjecting all OFAC sensitive payments to the OFAC filter for further review and approval would likely hurt business. He wrote: "disallowing all payments which are potentially subject to the OFAC process," or the alternative of forwarding "messages in such a way that they would be caught," would have a "significant affect" upon HBME's business within the Middle East and the Group's business within correspondent banking. He also wrote: "given the likely volumes it is impractical to submit each payment to a process of referral to HBUS," as HBUS had proposed. He concluded with a request for clear guidance: "I would be grateful for your clarification as to whether what is currently going on is acceptable, or whether we should be adopting a different practice."[705]

Mr. King responded that the September 11, 2001 terrorist attack on the United States required a reassessment. He wrote: "some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable." Mr. King indicated that an automated screening system was being looked into, and in the interim asked that OFAC sensitive payments be vetted manually.[706]

---

[702] 8/30/2001 email from HSBC John Richards to HBUS Denise Reilly and others, "Bank Melli," HSBC-PSI-PROD-0096147-148.
[703] Subcommittee interview of Carolyn Wind (3/7/2012).
[704] 10/10/2001 email exchange among HSBC Matthew King and HBME David Bagley and others, "OFAC Sanctions," HSBC OCC 8873890-893, at 892.
[705] Id. at 892.
[706] Id. at 890.

**PX257**

129

Mr. Bagley's email alerted Mr. King to the fact that HBME, like HBEU, was routinely sending U.S. dollar transactions through its correspondent account at HBUS using methods intended to circumvent HBUS' OFAC filter.  His email did not limit those transactions to Iranian U-turns, but sought broader guidance on acceptable practice.  Mr. King wrote back: "all we can do is ask that payment from the affected countries are vetted manually."[707]

### (c) Pressuring HBUS on Iran

In April 2002, HBME asked HBUS to re-circulate its proposed procedures for processing Iranian U-turn transactions,[708] indicating that the two affiliates were still attempting to reach agreement on the procedures to be used.[709]

**HBEU Draft Guidelines.**  While the HBEU Relationship Manager for Institutional Banking in HBME, John Wilkinson, was trying to streamline the cover payments procedure used to send Iranian U-turns through HBEU's correspondent account at HBUS, HBEU Compliance was trying at the same time to put a stop to the practice altogether.  On July 15, 2002, an HBEU Compliance officer forwarded draft guidelines for handling OFAC sensitive transactions to HBEU Compliance manager Julie Clarke and HBEU Multicurrency Payments Department (MPD) head Malcolm Eastwood and requested their approval.[710]  The proposed guidelines stated in part that, although HBEU was not legally required to comply with U.S. OFAC prohibitions, "It is strongly recommended … that RMs [Relationship Managers] do not deliberately take action aimed at assisting a customer to circumvent OFAC sanctions.  For example payment instructions should not be amended by IBL staff."  The proposed guidance also stated:  "On no account should you deliberately guide, encourage or coerce the sender into amending the payment details so as to circumvent the OFAC sanctions.  …  We will simply process as instructed."[711]  The draft guidance relied on the following Group Policy:

> "Group members should comply with both the letter and spirit of all relevant laws, codes, rules, regulations and standards of good market practice in each jurisdiction around the world where they conduct business."[712]

---

[707] Id. at 890-891.

[708] 4/15/2002 email from HBUS Denise Reilly to HBEU John Wilkinson and others, "Bank Melli," HSBC OCC 7687376-377.

[709] According to Mr. Bagley, the HBEU Payment Services' December 2002 Compliance Certificate made explicit reference to its practice of altering Iranian U.S. dollar payments.  Subcommittee interview of David Bagley (4/12/2012).  Compliance Certificates from affiliates are normally consolidated and sent to HSBC Group Compliance for review, which would have provided a formal channel for addressing the issue.   David Bagley told the Subcommittee, however, that the reference to U-turn transactions in HBEU's 2002 certificate was not incorporated into the consolidated Compliance Certificate and therefore was not formally escalated to Group Compliance for review.  Id.

[710] 7/15/2002 email from HBEU Paul Proctor to HBEU Julie Clarke, HBEU Malcolm Eastwood, and others, "Monitoring of payment transactions against sanctions," HSBC OCC 8877103-106.

[711] Id. at 106.

[712] Id. at 105. The guidelines also noted that the responsibility for "policing payment and cheque clearings against sanctions" would move to Payment Services in the future.

130

These guidelines were later approved and became effective in the fall of 2003.[713]   They show that HBEU Compliance and business personnel were aware of and concerned about potentially deceptive practices some could use to circumvent OFAC prohibitions.

**HBME Negotiations.**  While HBEU Compliance developed the OFAC guidelines, Gary Boon, HBME Payment and Cash Management (PCM) sales manager in Dubai, spent the second half of 2002, making a concerted effort to reach agreement with HBUS on how to process U-turn transactions.  On August 29, 2002, Mr. Boon emailed Denise Reilly and Nancy Hedges in HBUS Payment Operations, to encourage HBUS to officially approve the processing of U-turn transactions involving Iranian banks.  He wrote:  "I can now confirm that HSBC Bank plc, London does not have any processing or compliance issues in respect of USD payments from existing or new opportunities with Iranian Banks."[714]   He also wrote that HBEU wanted "to ensure the payments are STP [straight through processing]," and HBEU would provide its clients with guidelines for formatting transactions to "ensure that our Iranian clients fully understand, when or how, payments could be rejected."[715]   He indicated that he was seeking HBUS' formal agreement to process the U-turn transactions, from both a resource and reputational risk standpoint, "before I attempt to sell a USD clearing proposition."[716]

On October 8, 2002, Mr. Boon sent an email to senior HBUS Compliance official, Anne Liddy, seeking feedback on the HBEU proposal.[717]   Ms. Liddy responded that the position of HBUS Compliance remained unchanged "in that all transactions involving Bank Melli must be fully disclosed and represented in one single transaction that reflects the complete flow of funds."[718]   Ms. Liddy noted that the HBUS proposed procedures had been approved by Legal Counsel as meeting OFAC requirements.  She also stated that HBUS and HBEU needed to reach agreement on the payment procedures before HBUS Compliance would present an official proposal to HBUS' Senior Management Committee or OFAC for approval.  Ms. Liddy was also clear that these steps had to be taken prior to HBEU's making any proposal to Bank Melli or another Iranian bank.[719]

Mr. Boon responded on the same day that HBEU would soon be complying with the Financial Action Task Force (FATF) regulations requiring full disclosure of payment details on MT100/MT103 message formats, which was already part of the HBEU proposal since HBEU sent those messages to the bank receiving a U-turn payment in addition to sending a cover payment on a MT202 form.  He indicated that the payments sent to HBUS fall into the category of permissible U-turn transactions, and noted that HBUS was already processing U.S. dollar transactions through two existing accounts in London.[720]   Mr. Boon wrote:  "The majority of

---

[713] See 9/8/2003 email from HBEU Julie Clarke to HBEU Paul Proctor and others, "OFAC sanctions evasion – Iranian payments," HSBC OCC 8876819-820.
[714] 8/29/2002 email from HBME Gary Boon to HBUS Nancy Hedges, HBUS Denise Reilly, and others, "IRAN-USD PAYMENTS," HSBC OCC 0948193-195.
[715] Id. at 194.
[716] Id.
[717] See 10/08/2002 email exchanges among HBUS Anne Liddy, HBME Gary Boon, and others, "Bank Melli," HSBC OCC 7687374-375.
[718] Id. at 375.
[719] Id.
[720] Id. at  374-375.

**PX257**

131

payments will be processed with HBEU sending a MT100/MT103 to the beneficiary bank and HBUS will receive the MT202 cover payment (again your already doing this)."[721]  He indicated that, due to "massive opportunities," he would like to resolve the procedural issues prior to a scheduled visit to Iran in November 2002.[722]  In response, Ms. Liddy reluctantly set up a conference call with Mr. Boon and included Carolyn Wind and Denise Reilly.[723]

When asked about this email, Ms. Liddy told the Subcommittee that she did not understand his email and may have misinterpreted Mr. Boon's assertion that HBUS was already processing Iranian payments through existing accounts in London to mean that the issue affected London accounts, but not accounts in the United States.[724]  She said that she became more concerned two months later, in December 2002, when a Bank Melli payment was caught in HBUS' OFAC filter.[725]  Carolyn Wind told the Subcommittee that she was surprised by Mr. Boon's email and didn't know what his comments meant.  Ms. Wind said that she contacted HSBC Group Compliance head Matthew King to follow-up, but didn't know what action he took, if any.[726]

The results of the conference call between HBME and HBUS were discussed in email correspondence later that month.  On October 28, 2002, Mr. Boon wrote to Denise Reilly requesting an update.  Ms. Reilly responded that HBUS had spoken with OFAC; the "MT100/MT103 and MT202 normal cover payment process has been deemed unacceptable"; and OFAC required "full disclosure of the transaction."[727]  Mr. Boon and Ms. Reilly then agreed that HBEU should open a separate "Special nostro account" for all U-turn transactions to ensure each transaction would be caught by the OFAC filter for review and approval.[728]  Mr. Boon requested confirmation that if HBEU met those terms and the HBUS committee approved the proposal, that "HBUS would be in a position to potentially become Iran's USD Clearing Agent, HBEU would be their USD Correspondent Bank?"[729]  Ms. Reilly responded that the current proposal was to "process transactions on behalf of Bank Melli" and if the proposal were broader "then it should be included in the business rationale that we requested in our conference call earlier this week for presentation to HBUS senior management."[730]  She indicated that the HBUS Senior Management Committee was comprised of the President of the bank, key business heads, and the head of key support units.  While these emails suggest HBUS Compliance was poised to present the Iranian U-turn proposal to the HBUS Senior Management Committee, there is no indication in the documentation that the committee ever received or approved it.

---

[721] Id. at 375.

[722] 10/17/2002 email from Gary Boon to Anne Liddy, "IRAN," HSBC OCC 7687373.

[723] 10/21/2002 email from Anne LIddy to Carolyn Wind and Denise Reilly, "IRAN," HSBC OCC 7687373.

[724] Subcommittee interview of Anne Liddy (2/22/2012).

[725] Id.  See also 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.

[726] Subcommittee interview of Carolyn Wind (3/07/2012).

[727] 10/29/2002 email from HBUS Denise Reilly to HBME Gary Boon and HBUS Nancy Hedges, " IRAN-USD Payments," HSBC OCC 0948192-193.

[728] Id. at 192.

[729] Id.

[730] Id.

PX257

132

**Eastwood Memorandum.**   In November 2002, HBEU Multicurrency Payments Department (MPD) head Malcolm Eastwood sent a memorandum to HBUS Payments Services head Denise Reilly and Geoff Armstrong expressing concern that HSBC was exposing itself to unnecessary risk by handling OFAC sensitive payments.[731]   He wrote:

> "I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

Mr. Eastwood stated that HBEU's current process was to send OFAC sensitive payments to HBUS via the "cover" payment method that made no mention of Iran or other prohibited countries.[732]   He noted that two payments, one from Iran and one from Cuba, had recently been caught by HBUS's OFAC filter.  Mr. Eastwood stated that he wanted to resolve the situation, and "we therefore need to seek clarification of HBUS/OFAC's stance so that we can determine our future payments strategy."[733]

The Eastwood memorandum again put HBUS on notice regarding HBEU's practice of concealing U-turn transactions behind cover payments and altering the payment instructions received from Iranian banks.  Mr. Eastwood wrote:  "The Iranian banks continue to send us what I describe as conditional payment instructions which for HBEU require an element of amendment by ourselves."[734]   Mr. Eastwood warned: "If we cannot achieve this [a resolution on how to handle U-turn transactions] I will have to recommend to my General Manager a view that processing these payments is 'unsafe' and that these items should be filtered out and cancelled.  This would have severe repercussions for our Group relationship within the Iranian FIs."[735]

That same day, HBUS Payments Services head Denise Reilly forwarded the Eastwood memorandum to HBUS PCM head Michael Gallagher and HBUS Compliance head Carolyn Wind, with the note: "We need to discuss."[736]   HBUS records do not indicate whether that discussion took place.  When asked about this email, Mr. Gallagher told the Subcommittee that he wasn't sure he received Mr. Eastwood's memorandum because he wasn't named on it.[737]   When shown another email indicating he had discussed the Eastwood memorandum again in December 2003, with the new HBUS AML head,[738] he told the Subcommittee that he did not recall the memorandum, any discussion of it, or taking any action in response to it.[739]   When

---

[731]  11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.
[732]  Id. at 825.
[733]  Id.
[734]  Id. at 826.
[735]  Id.
[736]  11/14/2002 email from HBUS Denise Reilly to HBUS Carolyn Wind and HBUS Michael Gallagher, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688822-827.
[737]  Subcommittee interview of Michael Gallagher (6/13/2012).
[738]  See 12/17/2003 email from HBUS Denise Reilly to HBUS Teresa Pesce, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 3407517-522 ("Attached is the memo that we discussed yesterday in our meeting with Michael Gallagher.").
[739]  Subcommittee interview of Michael Gallagher (6/13/2012).

**PX257**

Carolyn Wind was asked about the Eastwood memorandum, she told the Subcommittee that HBUS kept "pushing back on U-turns."[740]

**Do Not Mention Our Name.**  In late December 2002, HBUS OFAC Compliance officer Elizabeth Protomastro notified Carolyn Wind, Denise Reilly, and Anne Liddy that, on December 27, 2002, the HBUS OFAC filter had stopped and rejected a payment listing Bank Melli as the originator of the payment and containing a field that read, "Do not mention our name in NY." Ms. Protomastro advised rejecting all U-turn transactions containing such language.  The language on the stopped transaction shows how information related to Iranian payments was intentionally withheld from HBUS.  In response, Ms. Liddy went to Carolyn Wind's office and spoke with her, Denise Reilly, and Paul Lee, HBUS' Legal Counsel, about the transaction.  She was told to alert David Bagley, who had become head of HSBC Group Compliance in January 2002.[741]  That same day, Anne Liddy forwarded Ms. Protomastro's email to Mr. Bagley.[742]  Ms. Liddy told the Subcommittee that she was concerned about the Bank Melli payment, because HBEU still had not obtained approval to do those types of transactions.[743]  She told the Subcommittee that neither Mr. Bagley nor Ms. Wind provided any feedback on the incident, and she didn't know what action, if any, Mr. Bagley took.[744]

The 2002 Eastwood memorandum again put senior HBUS compliance and business officials on notice that HBEU was sending undisclosed OFAC sensitive transactions through its U.S. dollar correspondent accounts at HBUS.  Again, HBUS officials alerted their superiors, but no further action was taken.

### (d)  Continuing Pressure on HBUS to Process Iranian Transactions

Although HBEU handled the Bank Melli account, it was HSBC Middle East (HBME) that was at the center of efforts to pressure HBUS to process Iranian transactions without triggering the OFAC filter.  HBME took the lead in dealing with Iran and selling bank services to Iranian banks.  In January 2003, HBME Group Relationship Manager for the Middle East, Nigel Weir, sent HBUS Payments Services head Denise Reilly and HBEU MPD head Malcolm Eastwood a memorandum entitled, "Business Case-USD Payments from Iranian Banks/Entities."[745]  This HBME memorandum laid out the "business case" for HBUS'

---

[740] Subcommittee interview of Carolyn Wind (3/7/2012).

[741] Subcommittee interview of Anne Liddy (2/22/2012).  Mr. Bagley assumed the duties of HSBC Group Compliance head in January 2002, but his appointment did not become official until May 2002, after the U.K. Financial Services Authority approved it.  Subcommittee interview of David Bagley (5/10/2012); Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012).

[742] See 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.

[743] Subcommittee interview of Anne Liddy (2/22/2012).

[744] Id.  See also 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.

[745] 1/2003 memo from HBME Rick Pudner to HBUS Denise Reilly and HBEU Malcolm Eastwood and others, "Business Case-USD Payments From Iranian Banks/Entities," HSBC OCC 8876490-493; 1/21/2003 email exchanges among HBUS Anne Liddy, HBUS Carolyn Wind, HBUS Denise Reilly, and others, HSBC OCC 3407510.  Nigel Weir and Rick Pudner were joint authors of the memorandum.

processing Iranian transactions using the procedures proposed by HBEU back in August 2001.[746] The memorandum stated:

> "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD service providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments.  It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent.  This process minimizes the risk of payment being referred to OFAC."[747]

The memorandum did not state explicitly that both HBME and HBEU were already engaged in the same practice using their U.S. dollar accounts at HBUS.

The HBME memorandum stated that HBME "believe[s] there is a substantial income opportunity to see a USD payments proposition to Iranian Banks," and provided an appendix detailing existing and potential business opportunities in Iran, while noting HBEU already had a "number of existing USD accounts for Iranian banks, which are used for payments clearing purposes."[748]  The memorandum concluded:

> "It is anticipated that Iran will become a source of increasing income for the group going forward and if we are to achieve this goal we must adopt a positive stance when encountering difficulties.  We are aware of the concerns expressed by HBUS but strongly believe that by working together we can overcome them using means which are perfectly legitimate and in accordance with rules laid down by the relevant regulatory bodies.  I hope we will be able to resolve this issue otherwise I fear we will destroy future value in a market which has substantial potential for the group."[749]

HBME asked that the business case be presented to HBUS' Senior Management Committee at the earliest opportunity.

On January 16, 2003, Denise Reilly forwarded the HBME memorandum to HBUS Compliance officials Carolyn Wind and Anne Liddy.[750]   On January 21, 2003, Ms. Liddy forwarded it to Tom Crocker, the outside legal counsel advising HBUS on OFAC matters.[751]

---

[746] Id. at 1.  The memorandum stated:  "This paper has been produced in order for the Senior Management Committee (SMC) of HSBC Bank USA (HBUS) to evaluate whether or not HBUS will process US dollar (USD) payments initiated by Iranian Banks via accounts held with HSBC Bank Plc (HBEU)." Id.
[747] Id. at 490.
[748] Id. at 493.  Internal bank documents indicate that HBEU cleared U.S. dollar transactions through its correspondent account at HBUS for at least six Iranian banks, Bank Melli, Bank Kesharvazi, Bank Markazi, Bank Sepah, Bank Tejarat, and the Export Development Bank of Iran.  See, e.g., 10/23/2003 email from HSBC John Root to HSBC David Bagley and others, "USD Clearing – Iranian Banks," HSBC OCC 8875217.  HBEU senior payments official Rod Moxley told the Subcommittee that he believed seven or eight Iranian banks used HSBC for U.S. dollar correspondent services.  Subcommittee interview of Rod Moxley (6/07/2012).
[749] 1/2003 memo from HBME Rick Pudner to HBUS Denise Reilly and HBEU Malcolm Eastwood and others, "Business Case-USD Payments From Iranian Banks/Entities," HSBC OCC 8876-493, at 492.
[750] Subcommittee interview of Anne Liddy (2/22/2012).
[751] See 1/21/2003 email from HBUS Anne Liddy to External Counsel Tom Crocker and others, "USD Payments from Iranian Banks," HSBC OCC 3407510-511.

135

When asked about the memorandum, Ms. Liddy told the Subcommittee she did not recall it or the outcome of Mr. Crocker's review.[752]

On February 3, 2003, HSBC Group Compliance head David Bagley sent an email to HBME, where he used to work, discussing the issue.[753]  He conveyed that he had asked senior Compliance official John Root to review the OFAC issue from a Group perspective.  He also wrote that he "would be grateful if we could exercise greater care with regard to the content of written material" being sent to HBUS, explaining:  "The business case includes a number of express references to practices which may constitute a breach of US sanctions, including the OFAC provisions, and could provide the basis for action against the HSBC Group for breach of those sanctions, or seeking to facilitate a breach."[754]  Mr. Bagley requested that future communications regarding this subject be cleared through him or John Root "to avoid relative sensitive references," prior to involving HBUS.[755]  The recipient of the email, Nigel Weir, responded that the memorandum was intended to recommend pursuing a significant business opportunity, while complying with applicable regulations.[756]  Mr. Bagley told the Subcommittee that this was the first time, in his role as head of HSBC Group Compliance, he addressed the OFAC issue.  He noted that HBME's actions could potentially "constitute a breach of US sanctions," yet it would take him two more years, until July 2005, to establish Group policy prohibiting such conduct.

Again, there was no indication that a proposal for handling Iranian U-turn transactions was ever presented to or approved by HBUS' Senior Management Committee.  At the same time, undisclosed transactions continued to be sent by HSBC affiliates through their correspondent accounts at HBUS.  A later analysis performed by an outside auditor at HBUS' request found that, in 2002 alone, HBEU sent at least 1,900 and HBME sent at least 400 Iranian transactions through U.S. dollar accounts in the United States.[757]

**Caught in the OFAC Filter.**  On June 13, 2003, another Bank Melli transaction was caught in the HBUS OFAC filter, containing not only a reference to the bank, but also the words "do not mention our name."[758]  On June 16, 2003, HBUS OFAC Compliance officer Elizabeth Protomastro alerted both Carolyn Wind and Anne Liddy.[759]  Ms. Wind forwarded the email to HSBC Group Compliance officer John Root, and Ms. Protomastro provided him with additional details about the payment, including that it involved $150,000.  She explained that when the HBUS Funds Transfer staff saw the message "do not mention our name," they rejected the

---

[752] Subcommittee interview of Anne Liddy (2/22/2012).

[753] 2/3/2003 email from HBUS David Bagley to HBME Rick Pudner and others, "Business Case-US Payments From Iranian Banks/Entities," HSBC OCC 8876487-488.

[754] Id.

[755] Id. at 488.

[756] 2/3/2003 email from HBME Nigel Weir to HSBC David Bagley and others, " Business Case-US Payments From Iranian Banks/Entities," HSBC OCC 8876487.

[757] Deloitte, Results of the transactions Review – UK Gateway, March 29, 2012. HSBC-PSI-PROD-0197919, at 62. The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at both HBUS and JPMorgan Chase.

[758] See 6/17/2003 email from HBUS Elizabeth Protomastro to HSBC  John Root and HBUS Carolyn Wind, "Re: PLC-Re "do not mention our name," at HSBC OCC 8873922.

[759] 6/16/2003 email from HBUS Elizabeth Protomastro to HBUS Carolyn Wind and HBUS Anne Liddy, "PLC-Re "do not mention our name," HSBC OCC 8873925.

**PX257**

136

payment in accordance with HBUS policy, "due to concerns about evasion issues under the OFAC regulations."[760]  Ms. Protomastro explained that HBUS would not process a payment containing such a message, even if it qualified as a permissible U-turn transaction.

On June 17, 2003, Mr. Root forwarded the payment details to HSBC Group Compliance head David Bagley.[761]  Mr. Bagley responded by asking if they should allow a payment "with this sort of instruction to be passed to HBUS, regardless of the wider issue as to the applicability of OFAC to non us persons."[762]

The June 2003 transaction once again made several senior officials at HBUS and HSBC Group aware that HSBC affiliates were sending undisclosed OFAC sensitive transactions through HBUS accounts, even though HBUS had yet to approve a U-turn protocol.  When asked about this incident, Ms. Wind told the Subcommittee that she did not recall what HSBC Group Compliance said or did about the payment.[763]  She also did not recall whether there was an inquiry made to identify similar transactions, whether the transaction was reported to OFAC, or whether a SAR was considered or filed.  When asked who in HBUS was responsible for following up on the incident, she replied that from the business side, Denise Reilly and her supervisor Michael Gallagher, and from the compliance side, herself and Anne Liddy.[764]  When Mr. Gallagher was asked about the incident, he responded that it was not his responsibility to take action, because blocked payments are an operational and compliance effort, not a PCM issue.[765]  He stated that he would not have had the authority to either stop or release a suspect payment; operations staff, including Denise Reilly, did not report to Mr. Gallagher in 2003.

**Using "Selves" Instead of Client Names.**   In August 2003, internal bank documents show that Compliance personnel in HSBC Group and HBEU learned of, and objected to, the practice of some HBEU personnel, when sending Iranian U-turn transactions, to alter the payment instructions and identify HBEU itself as the active party in the transaction, rather than use a client name that might trigger HBUS' OFAC filter.  Despite their objections, the practice continued for years.

On August 20, 2003, the head of HSBC Group Audit Matthew King informed HSBC Group Compliance head David Bagley that "HBEU continues to send remittances to the US with 'selves' noted as the ordering party when the transfer would otherwise be filtered out for OFAC sanctions reasons."[766]  He wrote:  "I recall that this has been raised in the past, but I thought we had agreed the practice would cease.  Are you aware of the current position?"[767]

---

[760] 6/17/2003 email from HBUS Elizabeth Protomastro to HSBC John Root and HBUS Carolyn Wind, "Re: PLC-Re "do not mention our name," HSBC OCC 8873922-923.
[761] Id.
[762] Id.
[763] Subcommittee interview of Carolyn Wind (3/7/2012).
[764] Id.
[765] Subcommittee interview of Michael Gallagher (6/13/2012).
[766] 8/20/2003 email from HSBC Matthew King to HSBC David Bagley and others, "OFAC," HSBC OCC 8876504-505.
[767] Id. at 505.

PX257

137

On September 1, 2003, Mr. Bagley forwarded Mr. King's email to John Root and asked him to investigate.[768]  Mr. Bagley wrote that there is now "some clarity" that OFAC prohibitions do not apply to non-U.S. persons, even when payments are denominated in U.S. dollars.[769]  He also wrote that an established payment mechanism exists for bank-to-bank transfers, which did not require underlying payment information and which might apply to HBEU transfers to HBUS.[770]  Mr. Root agreed to look into the matter.

On September 2, 2003, HBEU Compliance manager Julie Clarke sent an email to an individual whose name was redacted by HSBC seeking more information about the transactions that triggered the inquiry by HSBC Group Audit head Matthew King.[771]  The email recipient responded:

> "During the conversation, I mentioned that historically we used 'selves' but that I had stopped the practice as soon as I had discovered it in mid-2000.  He stated that it was still done in HBEU.  This was not in connection with [redacted] payments and I have no examples."[772]

The following day Ms. Clarke forwarded the email to Rod Moxley in HBEU's Multicurrency Payment Department (MPD), and asked him for more information regarding the practice of using "ourselves" in a payment message.[773]

On September 8, 2003, Mr. Moxley responded to Ms. Clarke.[774]  He explained that the OFAC sanctions issue had been "under discussion for some time" within MPD.[775]  He forwarded to her an August email that he had sent to Pat Conroy, Malcolm Eastwood's supervisor, addressing various issues related to OFAC sensitive transactions.  The August email indicated that a certain person, whose name was redacted by HSBC, had brought "our current practice regarding the alteration of the remitter field on Iranian payments to the attention" of Matthew King and David Bagley.[776]  The August email also stated that "[t]he specific issue with Iran had been formally raised with the RM [Relationship Manager], John Wilkinson" who had been "given a deadline of 31 December 2003 to remedy this situation."  The August email also noted:

---

[768] 9/1/2003 email from HSBC David Bagley to HSBC John Root and HSBC John Allison, "OFAC," HSBC OCC 8876504.

[769] Id.  Mr. Bagley told the Subcommittee that the applicability of OFAC prohibitions to non-U.S. persons was an undecided issue in 2003, with legal opinions offering differing conclusions.  Subcommittee interview of David Bagley (4/12/2012).   OFAC now takes the position that its prohibitions apply to all U.S. dollar transactions, including those involving non-U.S. persons.

[770]  9/1/2003 email from HSBC David Bagley to HSBC John Root and HSBC John Allison, "OFAC," HSBC OCC 8876504.  As explained earlier, at that time, bank-to-bank transfers could be executed on forms which required information on the remitting and beneficiary banks, but not the underlying customers.

[771] 9/2/2003 email from HBEU Julie Clarke to [redacted], "OFAC sanctions," HSBC OCC 8876824-825.

[772] Id. at 8876824.

[773] 9/3/2003 email from HBEU Julie Clarke to HBEU Rod Moxley and Chris Pollard, "OFAC Sanctions," HSBC OCC 8876824.

[774] 9/8/2003 email from HBEU Rod Moxley to HBEU Julie Clarke, "OFAC Sanctions," HSBC OCC 8876820-821.

[775] Id. at 8876821.

[776] 8/22/2003 email from HBEU Rod Moxley to HBEU Pat Conroy, "Project Wolf," HSBC OCC 8876821-822.

**PX257**

138

"Malcolm's stance, I understand, is that any payments after 31 December 2003 will not be processed unless signed off at a very senior level."[777]

That same day, September 8, 2003, Ms. Clarke forwarded the email chain to HBEU Compliance officer Paul Proctor and wrote:  "It appears that John Wilkinson has been allowed to continue (to 31/12/03) to use 'selves' as the remitter name for Iranian payments which I believe contravenes your recently issued guidelines."[778]  Mr. Proctor responded:

> "This is the first time I have seen in writing, an admission that Payments Services are amending payments by removal of either the remitter's name or country to prevent the probable trigger of the US filter and the subsequent freezing of funds.
>
> You indicate that Group Compliance have now forbidden you to tamper with such payments, which I would fully support as it flies in the face of Group policy re complying with the spirit and letter etc."[779]

This email indicates that HBEU Compliance had not been aware that some HBEU personnel were continuing to alter documentation connected to OFAC sensitive transactions, in defiance of new guidelines prohibiting such conduct.  The email also indicates that HSBC Group Compliance had instructed HBEU Compliance that HBEU personnel were "forbidden" to "tamper" with the documentation.

When asked about these emails, Mr. Bagley told the Subcommittee that, in October 2003, Mr. Root reported to him that HBEU Compliance had admitted HBEU was still altering Iranian U-turn transaction documentation, despite a recommendation by HBEU Compliance that it cease.[780]  Mr. Bagley told the Subcommittee that HBEU had explained that it had been sued when payments were blocked by the HBUS filter, so it was using cover payments to avoid additional operational losses.[781]  Mr. Bagley also explained that neither HBEU Compliance nor HSBC Group Compliance could simply order a business unit to cease a particular practice; each could only "recommend" a course of action which it had done.

The internal bank documents show that, in the fall of 2003, Mr. Eastwood and Mr. Moxley in MPD, HBEU Compliance manager Julie Clarke and Compliance officer Paul Proctor, as well as the heads of HSBC Group Audit and Compliance, expressed repeated concern about actions taken by persons like the HBEU Relationship Manager for Bank Melli John Wilkinson to alter U-turn transaction documentation in a way that would avoid the OFAC filter; all agreed the practice should stop.  HBEU Compliance took the step of issuing guidelines recommending against such conduct, but HBEU personnel apparently ignored the guidance.

---

[777] Id.
[778] 9/8/2003 email from HBEU Julie Clarke to HBEU Paul Proctor and others, "OFAC sanctions evasion – Iranian payments," HSBC OCC 8876819-820.
[779] 9/8/2003 email from HBEU Paul Proctor to HBEU Julie Clarke and others, "Re: OFAC sanctions evasion – Iranian payments," HSBC OCC 8876818-819.
[780] Subcommittee interview of David Bagley (5/10/2012).
[781] Id.

PX257

139

**Proposal to Expand U.S. Dollar Clearing for Iranian Banks.**  In October 2003, HBME increased the pressure on HBUS to process Iranian transactions by proposing to expand its U.S. dollar clearing business in Iran.  In early October, HBME Planning head Steve Banner circulated a document entitled, "Iran - Strategy Discussion Paper," to several senior bank executives, including HBME Deputy Chairman David Hodgkinson; HBME Global Relationship Manager for the Middle East Nigel Weir; HSBC Group Compliance deputy head Warren Leaming, HBUS General Counsel Paul Lee, and HBUS Compliance head Carolyn Wind.[782]  The strategy essentially sought approval for HBME offering U.S. dollar payment services to more Iranian banks since, as the strategy noted, "the Iranian market offers substantial untapped potential for the HSBC Group."[783]

The strategy listed "significant business wins" involving Iran, in the Project and Export Finance, Trade Finance, and Treasury and Capital Markets areas with an estimated $7 million per year in revenues generated by Iranian businesses for "various Group entities."[784]  In a section entitled, "Phase 1 – Immediate Opportunities," the strategy stated that Iran's annual international trade business was valued at $25 billion, 80% of which was denominated in U.S. dollars.  It stated that HBEU PCM currently offered U.S. dollar payment services to four Iranian banks, and could market the same services "to other Iranian commercial banks, including Iran's Central Bank (Bank Markazi)."  It estimated the potential business as worth up to $4 million per year.

The strategy also noted an upcoming change in U.K. law that would require U.K. bank-to-bank transfers to identify, not only the banks involved in the transfer, but also their underlying customers.  It stated that the impending U.K. legislation, together with U.S. sanctions laws, would "significantly complicate the USD payments process for Iranian counter-parties," and if "the Group decides to pro-actively promote USD payments services to Iranian banks the payments will need to be processed by HBUS with full details to satisfy OFAC requirements."[785]  To facilitate the process, the strategy said that HBME planned to prepare a paper for HSBC Group requesting an increase in the country risk limits for Iran.[786]  The strategy concluded by asking for HSBC Group's approval and HBUS' "no objection" to HBEU's providing U.S. dollar services to additional Iranian banks.[787]

The strategy stated clearly that, "HBEU PCM currently offer[s] USD [U.S. dollar] payment services to 4 Iranian banks."[788]  It once again alerted HBUS to the fact that HBEU was already processing U.S. dollar transactions for Iranian banks through its account at HBUS.  The strategy was sent to both HBUS' legal counsel and top compliance officer.

On October 15, 2003, the HBUS CEO at the time, Youssef Nasr, sent an email to HBUS PCM head Michael Gallagher noting that with regard to Iranian U-turns, "there remain serious political and reputational risks within the USA if they proceed with this and that he should ensure that Paul Lee is kept in the loop at all times because of the prior work he has done both on

---

[782] Undated HSBC document, "Iran – Strategy Discussion Paper," HSBC OCC 8873949-956.
[783] Id. at 949.
[784] Id. at 951.
[785] Id. at 954.
[786] Id. at 952.
[787] Id. at 955.
[788] Id. at 952.

PX257

this and some recent approaches from Group offices about opportunities in Libya."[789]  When asked if Mr. Gallagher discussed the strategy paper with Mr. Nasr, Mr. Gallagher told the Subcommittee that he did not recall seeing it.[790]  On October 21, 2003, HBUS General Counsel Paul Lee contacted HSBC Group Compliance head David Bagley "expressing some concerns" about the Iranian strategy.[791]

On October 21, 2003, Mr. Bagley sent an email to HBME officials indicating several issues surrounding the U-turn transactions needed clarification and asked whether the costs associated with incurring U.S. legal fees made it worthwhile to continue the discussion.  Mr. Bagley also wrote:

> "I am not sure that HBUS are aware of the fact that HBEU are already providing clearing facilities for four Iranian banks, presumably including USD [U.S. dollar] clearance.  Bank Markazi is named in the OFAC sanctions as a government owned bank and thus on the face of it not able to benefit from U-turn exemptions."[792]

On October 26, 2003, HBME Deputy Chairman David Hodgkinson sent an email in response to Mr. Bagley.  He wrote:  "HSBC earns USD7.5m a year from its business dealings with Iran and we believe that there is significant long-term potential for growth."[793]  Mr. Hodgkinson indicated that he was willing to incur costs to investigate the options and find "an acceptable way to offer the maximum range of services possible without jeopardizing the Group's position in the U.S."[794]  Mr. Bagley then directed senior Compliance official John Root to work with Gary Boon at HBME on a payment solution.[795]

**Root Report.**  As he had been instructed to do by Mr. Bagley, John Root looked into the Iranian U-turn issue. On October 23, 2003, Mr. Root sent an email to Mr. Bagley, HSBC Group AML head Susan Wright, Money Laundering Control Officer John Allison, and HBEU Compliance officer Paul Proctor.  Mr. Root wrote that the Iranian relationship at HBEU consisted of a U.S. dollar clearing service volume of approximately 11 payments every business day for six banks: Melli, Keshavarzi, Markazi, Sepah, Tejarat, and the Export Development Bank.[796]  His email again confirmed that HBEU was altering the payment documentation, despite HSBC Group Audit head, Matthew King's having expressed concerns about the practice, and the HBEU Compliance guidelines calling for the practice to stop by the end of the year.  Mr. Root wrote:

---

[789] 10/15/2003 email from HBUS Youssef Nasr to HBUS Michael Gallagher, "Subject, Re: Iran-USD Payments," HSBC OCC 8873942.
[790] Subcommittee interview of Michael Gallagher (6/13/2012).
[791] See 10/21/2003 email exchange among HSBC David Bagley, HBME Steve Banner, and others, "Iran-Strategy Discussion Paper," HSBC OCC 8873946-947.
[792] Id.
[793] 10/26/2003 email from HBME David Hodgkinson to HSBC David Bagley, "Iran-Strategy Discussion Paper," HSBC OCC 8873959.
[794] Id.
[795] Subcommittee interview of David Bagley (5/10/2012).  See also 10/28/2003 email from HSBC David Bagley to HBME Ajay Bhandoola, "Memo: Iran-Strategy Discussion Paper," HSBC OCC 8873958.
[796] Mr. Root identified two more banks than were referenced in the October Iran strategy paper.

PX257

141

"EPS [the payment services team within MPD where Mr. Eastwood and Mr. Moxley worked] HBEU have been manually intervening in the processing of Iranian bank payment instructions by removing the remitter's name and country to prevent the probable trigger of a filter in the US, and the subsequent declaration to OFAC (and possible freezing) of the funds."[797]

Mr. Root wrote that he believed EPS had been instructed by HBEU Compliance to cease this practice, but was unclear when the instructions were given or by whom.  He noted that HBEU Institutional Banking (IBL) had negotiated an extension until December 31, 2003, due to "long-standing valuable relationships."  After the December 31, 2003 deadline, Mr. Root stated that cover payments would be considered unacceptable, and EPS would have to send HBUS fully formatted payment instructions on a MT100/103 serial basis.

Mr. Root also noted that Project WOLF, an HSBC Group project developing an automated payment filter to screen transactions for terrorists, would not ensure HBEU compliance with U-turn regulations in the United States.  As a result, he said that HBUS would continue to be responsible for screening all U.S. dollar transactions with regard to OFAC prohibitions.[798]

**Moxley Deadline.**  The following day, John Root forwarded David Bagley, Susan Wright, and John Allison an email from Rod Moxley in HBEU's Multicurrency Payments Department (MPD) expressing Mr. Moxley's  objection to participating in procedures designed to conceal U-turn transactions.  In his October 24, 2003 email, Mr. Moxley first objected to the notion that the MPD procedures being used for Iranian transactions were new or unknown:

"I have been alarmed by recent inferences that Payment Services have been amending the Iranian banks' payments without the knowledge or consent of IBAI RIM or IBL Compliance.  This has been a long standing practice and to avoid future doubt, I will reiterate the points made in Malcolm Eastwood's memo to Niger Weir of 22 Jan. 03."[799]

Mr. Moxley also stated that the position of his office in terms of processing the Iranian payments was becoming "increasingly untenable."  He wrote that HBEU Risk Management Services[800] would be controlling the new WOLF filter, but "we have been requested to find ways to circumnavigate our own and other institutions' compliance filters."[801]  He described his role as protecting the bank from reputational risk, but "I now feel uncomfortable in compromising my position by leading IBL, PCM or Iranian counterparties down certain routes which may directly contravene the spirit of the Compliance framework."[802]  Mr. Moxley warned that, given the

---

[797] 10/23/2003 email from HSBC  John Root to HSBC David Bagley and others, "USD Clearing – Iranian Banks," HSBC OCC 8875217.
[798] Id. at 217.
[799] 10/24/2003 email from HBEU Rod Moxley to HBEU John Wilkinson and others, "Iran," HSBC OCC 8874661-663.  Mr. Moxley then outlined a new procedure that he advocated for Iranian payments, the result of which would be that the Iranian banks would enter the payment information instead of HBEU.
[800] RMS was located within HBEU's Payment Services.  Subcommittee interview of Rod Moxley (6/7/2012).
[801] 10/24/2003 email from HBEU Rod Moxley to HBEU John Wilkinson and others, "Iran," HSBC OCC 8874661-663.
[802] Id. at 662.

**PX257**

142

internal HBEU deadline to stop processing concealed Iranian transactions, beginning January 1, 2004, "no Iranian payments will be amended."[803]

On November 11, 2003, HSBC Group Money Laundering Control Officer John Allison sent an email to HSBC Group AML head Susan Wright about his visit to HBEU's Multicurrency Payments Department (MPD) the week prior to discuss Iranian payments.[804]  He wrote that Iranian correspondent bank customers entered payment information on a form, and MPD staff were then expected to review the form to ensure the phrases  "Iran," "do not mention Iran," or any other compromising reference were not included in the MT202 payment message transmitted to HBUS.  He described this process as "established custom" rather than a documented procedure, "believed by MPD to be at the request of relationship management."  He also wrote that the new MPD Compliance manager was "not comfortable with the custom which he has inherited, neither from a moral compliance perspective, nor from the operational loss/embarrassment factor."  Mr. Allison also wrote that MPD Compliance is "very uncomfortable" about periodically being asked by Nigel Weir and Gary Boon in HBME whether a specific payment format will pass through an OFAC filter.[805]  He stated that MPD Compliance viewed all of the Iranian payments they processed as meeting the requirements for a permissible U-turn transaction,[806] and wanted to move toward the legitimate execution of these payments in light of what Mr. Root described as an "instruction" from Mr. Bagley "to cease processing Iranian bank payments."[807]

On November 27, 2003, Mr. Moxley sent Ms. Wright a draft proposal to process Iranian U.S. dollar transactions.  Although the proposal would prohibit altering a transaction document to remove the name of a prohibited country or town, and required a review for OFAC compliance, it did not require the transaction to include full payment details for the originator and ultimate beneficiary as outlined in the HBUS August 2001 U-turn payment procedure.[808]

On December 10, 2003, after having consulted HBUS Compliance head Carolyn Wind, Ms. Wright sent Mr. Moxley an email updating him on the Iranian U-turn payment proposal.[809]  Ms. Wright indicated that the issue of processing payments through HBUS had been "discussed at length" among HBUS Compliance, outside legal counsel Tom Crocker, HBUS payments personnel, and HBEU during the summer of 2001.  She indicated she had asked Ms. Wind to forward the 2001 HBUS proposal for consideration.  The following day, Nigel Weir wrote to Ms. Wright that the HBUS proposal required a method for processing payments that was not HBME's preferred solution.[810]  He also expressed concern that HBEU would be unable to advise

---

[803] Id..

[804] 11/11/2003 email from HSBC John Allison to HSBC Susan Wright, "Iran payments," HSBC OCC 8877136-137.

[805] Id. at 136.

[806] Id. at 137.  The email did not address the issue of whether Bank Markazi, as a government owned Central Bank, was unable to utilize the U-turn exception.  Bank Markazi was added to the OFAC list in 2007.

[807] Id. at 137.  Although Mr. Root indicated that Mr. Bagley had ordered the MPD payments to "cease," they continued for another two years.

[808] 11/27/2003 email from HBEU Rod Moxley to HSBC Susan Wright, "Draft Iranian – USD Payment Procedures," HSBC OCC 8875225-232.

[809] 12/10/2003 email from HSBC Susan Wright to HBEU Rod Moxley and others, HSBC OCC 8875508.

[810] See 12/11/2003 email exchange between HSBC Susan Wright, HBME Nigel Weir, and others, "Iran – U-Turn Payments," HSBC OCC 8877150-154.

PX257

143

their customers of the proposed processing changes before the December 31 deadline and requested an extension.  Ms. Wright forwarded the correspondence to Mr. Bagley.

On December 12, 2003, Mr. Bagley emailed Mr. Weir that if HBUS felt it could agree to processing the Iranian transactions only on the basis of fully transparent documentation, then its views would have to be taken into account.  He also wrote that HBUS "must be comfortable" with the approach.

HBEU continued, however, to object to the new payment procedure.  On December 18, 2003, HBEU wrote to HSBC Group Compliance that HBUS' procedure, which it referred to as "the serial method," " requires a large amount of work prior to commencement, a disproportionate amount of expense and a higher than average risk to the banks reputation being damaged by a future payment."[811]

At the same time HBEU and HBUS were arguing over payment procedures, HBEU and HBME continued to send transactions involving Iran through their correspondent accounts at HBUS, the vast majority of which were undisclosed.  A later analysis performed by an outside auditor at HBUS' request found that, in 2003, HSBC affiliates sent at least 5,400 Iranian transactions to U.S. dollar accounts in the United States, of which about 90% were not disclosed.[812]

Also in December, HBUS payments services head Denise Reilly spoke with HBUS' new AML Director Teresa Pesce, who began work in September 2003, about the Iranian issue and sent her a copy of the 2002 Eastwood memorandum describing how HBEU altered documentation and used cover payments to send U.S. dollar transactions involving Iran through their correspondent account at HBUS without HBUS' knowledge.[813]  Ms. Reilly's email indicated that Ms. Pesce had also discussed the issue with Mr. Gallagher the previous day, although Mr. Gallagher told the Subcommittee he did not recall either seeing the memorandum or discussing it with Ms. Pesce.[814]

---

[811] 12/18/2003 email from HBEU Tony Collins to HSBC John Allison and others, "Memo: Re: Iran – U-Turn Payments," HSBC OCC 8873974-975.  Group Compliance John Allison and John Root sought legal advice from outside counsel Tom Crocker of Alston & Bird and Mr. Crocker determined that "it is not clear that the cover payments meet the requirement of the U.S. Dollar u-turn exception to the Regulations." 1/8/2004 memo from Thomas Crocker to John Root and John Allison, "Iranian U.S. Dollar U-Turn Transactions and Cover Payments," HSBC OCC 8903992-000.

[812] Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.

[813] See 12/17/2003 email from HBUS Denise Reilly to HBUS Teresa Pesce, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 3407517-522 ("Attached is the memo that we discussed yesterday in our meeting with Michael Gallagher.").  See also 11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.

[814] Id.  Subcommittee interview of Michael Gallagher (6/13/2012).

PX257

144

### (e) Reaching Agreement

Despite the HBEU deadline announced by Rod Moxley, that MPD would stop processing concealed Iranian transactions after December 31, 2003, no agreement was reached by that date on how to process the transactions.  Documents obtained by the Subcommittee indicate that HBEU did not adhere to its deadline, but continued to process Iranian transactions using cover payments and deleting any references to Iran in the payment instructions.

On March 10, 2004, after an Iranian transaction was detected and halted in London, HBEU MPD head Malcolm Eastwood wrote:  "I remain extremely uncomfortable with the practice of amending Iranian payment orders for whatever means."[815]  Mr. Eastwood advised HBEU Compliance and Institutional Banking to resolve the issue as soon as possible and remarked that his Compliance certificate is "heavily caveated to reflect that we are not compliant in respect of Iran."[816]  Mr. Eastwood sent a copy of his email to HSBC Group AML head Susan Wright who forwarded it to David Bagley.

The following day, Mr. Bagley responded to Mr. Eastwood by writing that he understood and shared his concerns, but believed his comments underestimated "the complexity of the OFAC regulation, and the competing competitive pressures across the Group."[817]  Mr. Bagley also wrote that one reason for the slow resolution was that "HBUS was unaware that any arrangements existed with Iranian banks."

On March 22, 2004, more than two years after becoming head of HSBC Group Compliance, David Bagley confronted HBME Deputy Chairman David Hodgkinson about the need to change how HBME was handling U.S. dollar clearing activity for Iranian banks.[818]  Mr. Bagley wrote that he was "uncomfortable with this activity in its current form," and "the amount of revenue may not justify" the "additional work and investment" required, "nor would it justify ru[n]ning the reputational and regulatory risk in the US."  He expressed his willingness to discuss the issue further, but suggested "that any such conversation take place over the telephone, as we are seeking to avoid correspondence with HBUS on this sensitive issue other than through lawyers so as to preserve privilege."[819]

**WOLF Filter Announced.**  On March 23, 2004, HSBC Group issued a new Group Circular Letter 040021 implementing a major new initiative on "Payment screening."[820]  The circular announced that HSBC Group had developed an internal filter called "WOLF" to screen against terrorists and sanctioned countries and persons.  The circular explained:

---

[815] 3/10/2004 email from HBEU Malcolm Eastwood to MDBK (Midland Bank) Quentin Aylward and others, "BankMarkazi Payment," HSBC OCC 8873979-980.

[816] Id. at 8873980.

[817] 3/11/2004 email from HSBC David Bagley to HBEU Malcolm Eastwood and others, "Bank Markazi Payment," HSBC OCC 8873985-986.

[818] 3/22/2004 email from HSBC David Bagley to HBME David Hodgkinson and HSBC Warren Leaming, "Iran – Correspondent Banking Services," HSBC OCC 8873995-997.

[819] Id.

[820] 3/23/2004 "GCL 040021: Payment screening," prepared by HSBC Group, HSBC OCC 0953080-084.

**PX257**

"As part of the international effort to combat terrorism, Competent Authorities in numerous countries have published lists of names that are known to be, or are believed to be involved in terrorist activity. … In addition … sanctions against a number of countries and names are imposed …. Compliance with these sanctions and orders has to date relied upon manual processes to identify when relevant names are contained in payment instructions. In order to ensure that compliance with the restrictions … is achieved consistently across the Group, an automated payment screening utility named WOLF has been developed. When installed … WOLF will, before execution, search all fields of a payment message for matches with listed terrorist/sanctioned names. Once a potential match with a word or words … is identified, the unexecuted payments must be reviewed to establish whether the match is actually a true match, with appropriate action taken if it is. WOLF is the Group solution for real-time pre-execution payment screening."[821]

The circular indicated that globally, WOLF would screen against terrorists listed by the United Nations, United States, United Kingdom, European Union, and Hong Kong, as well as countries or persons sanctioned by the United Nations. It indicated that compliance and payment operations personnel in HSBC affiliates were responsible for ensuring WOLF was loaded with other sanctioned names that were applicable locally.[822] It indicated that the screening would be applied first to international transactions, and later to domestic ones. The circular required affected HSBC entities to install the WOLF filter by the end of 2004.

**HBME Extension.** On April 17, 2004, HBME Deputy Chairman David Hodgkinson contacted David Bagley about the unresolved issues involving HBME's U.S. dollar clearing business for Iran, because he anticipated having to explain HSBC's position to the Central Bank during a visit to Tehran in May. Mr. Hodgkinson noted: "The current position as briefed to me last week was that we have not yet found a way to handle major USD clearing business."[823] He informed Mr. Bagley that he had directed his staff to develop a proposal to undertake this business while minimizing risk, "so that if circumstances change we know our preferred way forward."[824]

Mr. Bagley forwarded the email to his supervisor, HSBC Group legal counsel Richard Bennett. Mr. Bagley wrote: "[T]he most pressing issue to be resolved is that relating to the limited number of existing relationships that we have (for two small Iranian Banks) where I suspect that HBUS are not aware that payments may be passing through them. Do not believe that we can allow this situation to continue very much longer, which is the point I will make to David in my response."[825]

---

[821] Id.
[822] Id. HSBC added the OFAC SDN list to the WOLF filter in 2004, and added the OFAC country list in August 2005. Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012).
[823] 4/17/2004 email from HBME David Hodgkinson to HSBC David Bagley and HSBC Warren Leaming, "Iran – Correspondent Banking Services," HSBC OCC 8874671.
[824] Id. at 671.
[825] 4/19/2004 email from HSBC David Bagley to HSBC Richard Bennett, "Iran Correspondent Banking Services – OFAC," HSBC OCC 8873994 and HSBC OCC 8966146. Mr. Bagley had allowed these payments to continue by granting a dispensation since they ran afoul of Group policy. However, an increase in business, which is what HBME was seeking, was on hold pending an agreement between HBUS, HBEU, and HBME.

PX257

146

This email is the third[826] in which Mr. Bagley indicated that HBUS might be unaware it was processing Iranian U-turn transactions that, in his own words, "may constitute a breach of U.S. sanctions," yet contained no indication that Mr. Bagley planned to inform HBUS about the risks it was incurring.

Two days later, on April 19, 2004, Mr. Bagley again pressed HBME to resolve the issue. In an email to Mr. Hodgkinson, Mr. Bagley expressed concern about the correspondent relationships operating through HBME "which do not currently meet the requirement of the US Legal opinion that has now been obtained."[827]  He continued:  "I have sanctioned the continuation of these services pending an early resolution of the way forward, but it is clear from your note that we are some distance away from finalizing our thinking such that we can go to HBUS with any proposal with regard to a way forward."  Mr. Bagley warned:  "I feel that there is little option other than for me to recommend to HBEU that the existing activity be discontinued given the risk that we are posing for HBUS, unless the solution under consideration at your end gives us a satisfactory option."

HBME's Nigel Weir responded to Mr. Bagley's email at the request of Mr. Hodgkinson, stating that he had already spoken with Gary Boon at HBME and John Allison at HSBC Group to develop a solution.  He also requested that Mr. Bagley extend the dispensation from the HBEU decision to stop altering Iranian documentation until June 30, 2004.[828]  Two days later, Mr. Bagley told John Allison that he was reluctant to extend the dispensation "unless there is a clear and agreed solution with a definite and proximate implementation date," and requested an update the following week.[829]  Despite Mr. Bagley's indication that he would not grant an extension without an agreement, the same practices continued amid ongoing negotiations over the agreement's provisions.

**Second Moxley Deadline.** About eight months after Mr. Moxley had raised strong objections to continuing to alter Iranian payments, no agreement had been reached among HSBC affiliates on increasing the transparency of the transactions.  HBEU continued to delete references to Iran from the payment instructions, generate cover payments with incomplete payment information, and send undisclosed Iranian payments to HBUS.  To break the impasse, in June 2004, outside legal counsel in the United States proposed a new payments solution, which essentially required that all U-turns be processed by HBUS in a transparent or "serial" manner that identified the underlying originators and beneficiaries.

---

[826] The other two were a 10/21/2003 email from HSBC David Bagley to HBME Steve Banner, and others, "Iran-Strategy Discussion Paper," HSBC OCC 8873946-947 ("I am not sure that HBUS are aware of the fact that HBEU are already providing clearing facilities for four Iranian banks, presumably including USD clearance."); and a 3/11/2004 email from HSBC David Bagley to HBEU Malcolm Eastwood and others, "Bank Markazi Payment," HSBC OCC 8873985-986 ("The complexity of the OFAC regulations, and the fact that HBUS were unaware that any arrangements existed with Iranian Banks, has made speedy resolution of this issue difficult.").

[827] 4/19/2004 email from HSBC David Bagley to HBME David Hodgkinson, "Iran – Correspondent Banking Services," HSBC OCC 8966135.

[828] 5/2/2004 email from HBME Nigel Weir to HSBC David Bagley and others, "Iran – Correspondent Banking Services," HSBC OCC 8874673-674.

[829] 5/4/2004 email from HSBC David Bagley to HSBC John Allison, "Iran – Correspondent Banking Services," HSBC OCC 8874673.

PX257

147

On June 9, 2004, HBEU senior payments official Rod Moxley reacted negatively to the proposal due to operational difficulties.  At the same time, he wrote: "I feel very uncomfortable recommending that we continue to process Iranian payments."[830]  He requested a formal response by June 18, 2004, and stated that "unless compelling commercial reasons" approved by HSBC Group Compliance and HBUS exist, he would stop handling Iranian payments after September 30, 2004.[831]  This email represented his second attempt to cut off Iranian payments that MPD was uncomfortable processing.

On June 30, 2004, Nigel Weir wrote to Mr. Moxley and asked him to revisit the issue and work with HSBC Group Compliance on a solution enabling HBEU to execute U.S. dollar payments for Iranian banks in accordance with U.S. regulations.[832]  Mr. Weir told Mr. Moxley that if the payments were stopped, "we will be effectively insulting the Government and State of Iran."  Mr. Weir stated that the bank had declined new U.S. dollar payment business from Iranian banks due to the sensitive political situation, "but to exit business which we have been conducting for many years would jeopardize all other existing business activities."  He estimated that the Group profit from existing Iranian business activities amounted to $10 million per year.

Also on June 30, 2004, HBME Deputy Chairman David Hodgkinson forwarded the correspondence between Mr. Moxley and Mr. Weir to then HBEU CEO Michael Geoghegan, asking for his "intervention and support" in positively resolving the long-standing issue, and noting Iran's "significant strategic importance" to the Group.[833]  Mr. Hodgkinson also noted that the volume of Iranian payments was small at 20 per day.  When asked about this email, Mr. Moxley told the Subcommittee that it resulted in HBEU and HBME's obtaining a "dispensation" from having to end the alteration of Iranian transactions until the end of 2004.[834]  When asked about the dispensation approval process, he said that he thought that HSBC Group Compliance approval was needed along with secondary approval from either HSBC Group Audit or another manager.

Later that day, another HBEU official John Ranaldi sent an email to Mr. Geoghegan stating that he was aware of the Iranian situation and would get an update.  He wrote: "[B]asically, our interpretation was that we were being asked to 'fudge' the nature of the payments to avoid the U.S. embargo and seizure."[835]  When asked about this email, Mr. Geoghegan told the Subcommittee that he could not explain what Mr. Ranaldi meant by using the word "fudge," except that it related to Iran.[836]  He said that, at the time, he was unaware that HBEU was altering transaction documentation or using cover payments.  Having since learned what was going on, he told the Subcommittee that he assumed that's what Mr. Ranaldi was talking about.  When asked whether it raised alarm bells at the time, he remarked that he got

---

[830] 6/9/2004 email from HBEU Rod Moxley to HSBC John Allison and others, "Iran," HSBC OCC 8874002-004.
[831] Id.
[832] 6/30/2004 email from HBME Nigel Weir to HBEU Rod Moxley and others, "Memo: Re: Iran," HSBC OCC 8874001-002.
[833] 6/30/2004 email from HBME David Hodgkinson to HBEU Michael Geoghegan, "Memo: Re: Iran," HSBC OCC 8874001.
[834] Subcommittee interview of Rod Moxley (6/7/2012).
[835] 6/30/2004 email from HBEU John Ranaldi to HBEU Michael Geoghegan, "Memo: Re: Fw: Iran," HSBC OCC 8873999.
[836] Subcommittee interview of Michael Geoghegan (5/24/2012).

PX257

148

many emails and Mr. Ranaldi used colorful language.  He said that he also knew Mr. Ranaldi would follow-up with him in a few days.

**HBEU Proposal.**  On July 6, 2004, HBEU's Rod Moxley produced a specific proposal as a potential way forward using his preferred solution of serial payments.[837]  The extensive proposal also shed light on existing practices at HBEU.[838]

The proposal noted that HBEU had been trying to come up with a solution for two years after an HBEU compliance officer challenged the practice of altering Iranian payment instructions in June 2002.  It noted that Bank Melli, Bank Markazi, Bank Tejarat, Bank Kesharvazi, and the Export Development Bank of Iran were the five Iranian financial institutions that took advantage of this practice to effect U.S. dollar payments with a daily volume estimated at between 10 and 50 payments per day at an approximate total value of $500,000 to $1 million.  The proposal also noted that the Central Bank payments were much larger, in the range of $10 million, and were typically made at certain times of the month.[839]  The proposal stated that the "vast majority of payments are valid, falling within the U-turn exception."[840]

The proposal discussed two potential payment options that would meet HBUS' requirement for transparency.  It noted that HBEU preferred the "serial payment" option which would allow the Iranian banks to format their payments in a way that would not require intervention from HBEU.  HBEU believed this aspect of the proposal would relieve it of any responsibility to review the payments, leaving it up to HBUS, or another U.S. bank where a payment was directed, to verify that the payment met the U-turn exception requirements.  The proposal indicated that HBEU would continue to utilize WOLF and other filters to screen the payments, but the Iranian financial institutions would be responsible for ensuring they submitted only valid U-turn payments "permissible under the terms of US legislation."  The proposal indicated this solution would also transfer the risks associated with blocked payments to the Iranian banks.[841]  The proposal acknowledged that HBUS would need to agree to this solution, and HBEU and Group Compliance would need to "sign-off" on it prior to moving forward.

On July 6, 2004, HBEU MPD head Malcolm Eastwood forwarded Mr. Moxley's proposal to John Ranaldi, noting that he continued to have serious concerns about the Iranian U.S. dollar clearing business.[842]  Mr. Ranaldi forwarded the email to then HBEU CEO Michael Geoghegan, writing:  "reference your earlier query."[843]  According to Mr. Ranaldi, Mr. Eastwood's department was being asked to "amend instructions or assume responsibility that the

---

[837] See 7/2004 discussion paper, "HSBC Bank PLC Iranian Payment Processing Proposals," HSBC OCC 8874692-701.
[838] Id.  For example, according to the document, the existing HBEU practice was that if an Iranian financial institution included a cautionary statement, such as "Do not mention Iran," in Field 72 of the payment instructions, the payment would drop out to what was called a repair queue.  Once in the repair queue, HSBC personnel would alter the payment instructions by deleting any reference to Iran.
[839] 7/2004 discussion paper, "HSBC Bank PLC Iranian Payment Processing Proposals," HSBC OCC 8874692-701.
[840] Id.
[841] Id. at 696.
[842] 7/6/2004 email from HBEU Malcolm Eastwood to HBEU John Ranaldi and others, "HBEU Iranian Payments Business," HSBC OCC 8876861
[843] Id.

**PX257**

149

contents of the payment message do not attract the Fed's attention and seize the payment." He explained that a "payment clerk is asked to judge upon a payment kicked out by the filtering system, whether to release, or return." He wrote, "there is an irony; someone could argue that by returning payments to Iran that we are contravening the ofac rules."[844] Mr. Ranaldi characterized the risks associated with the existing practice as including operational losses due to payment seizure, threats to HSBC's reputation, and "incurring hefty fines." He told Mr. Geoghegan that Lloyds Bank had been fined "and few if any u.k. banks are in the business."

When asked about this email, Mr. Geoghegan told the Subcommittee that he was "puzzled" that he didn't act to stop the practice immediately or get out of the business. He remarked that he did respond that way with Mexico, so thought it was odd that he didn't in this case. He couldn't recall whether he talked to any other senior HSBC Group executives about the issue.[845]

Emails in early August 2004 show HBEU and HBME reviewing and discussing the Moxley proposal.[846] On August 6, 2004, Mr. Bagley commented: "My initial reaction is that the proposals are more robust, and therefore more likely to be acceptable that we originally contemplated or proposed."[847] He also said the proposal had to be sent to HBUS' outside legal counsel for confirmation it would meet OFAC requirements.[848] Later that day, the HSBC Global head of Payments and Cash Management, Iain Stewart, forwarded Mr. Bagley's email to Mr. Geoghegan and Mr. Hodgkinson with a note: "Progress report. This will delay it a bit but we are getting there."[849] When asked about this email, Mr. Geoghegan surmised that HBUS was involved and legal opinions were being obtained.[850]

On September 22, 2004, HBEU Nigel White informed Mr. Stewart and others, including Mr. Bagley, that "all involved parties have signed off on the proposal," and the next step was for HSBC Group Compliance to obtain agreement from HBUS.[851] At the same time these negotiations were ongoing, HBEU and HBME continued to send undisclosed Iranian transactions to HBUS with the tacit approval of HSBC Group Compliance.

**HBUS Approval.** The revised Moxley proposal was sent to HBUS in November 2004. On November 30, 2004, HBUS' AML Director Terry Pesce, PCM head Michael Gallagher, and Payment Services head Denise Reilly met with HBUS CEO Martin Glynn, about HBUS processing U-turn transactions. Prior to the meeting, Ms. Reilly circulated the HBUS procedures

---

[844] 7/6/2004 email from HBEU John Ranaldi to HBEU Michael Geoghegan, "HBEU Iranian Payments Business," HSBC OCC 8876861.
[845] Subcommittee interview of Michael Geoghegan (5/24/2012).
[846] See 8/4/2004 email exchanges among MDBK Phil Baines to HBEU Nigel White and others, "Iranian – Payment Processing Proposals," HSBC OCC 8874705-708.
[847] 8/6/2004 email from HSBC David Bagley to HBEU Nigel White and others, "Iranian – Payment Processing Proposals," HSBC OCC 8874703-704.
[848] Id.
[849] 8/6/2004 email from HSBC Iain Stewart to HBEU Michael Geoghegan and HBME David Hodgkinson, "Iranian – Payment Processing Proposals," HSBC OCC 8874703.
[850] Subcommittee interview of Michael Geoghegan (5/24/2012).
[851] 9/22/2004 email from HBEU Nigel White to HSBC Iain Stewart and others, "Iranian U Turn Payments," HSBC OCC 8874023-037.

PX257

that were developed in 2001, "when the topic was last active."[852]  The internal emails suggest that one HBUS employee may have been under the impression that the processing of Iranian transactions had not yet begun and did not know that HBUS had already been processing Iranian U.S. dollar transactions for at least three years.[853]

A few days after the high level meeting among HBUS officials, Ms. Reilly sent Mr. Gallagher a description of "the conditions under which HBUS will accept U-Turn transactions."[854]  Those conditions included that transactions would be formatted to be fully transparent serial payments; HBEU would agree not to alter payment instructions and abide by the U-turn processing requirements; HBUS would not be liable for penalties resulting from OFAC sanction violations; a separate "HBEU Special Account" would be established at HBUS to handle Iranian originated transactions and the account number would be added to the HBUS OFAC filter so all transactions could be reviewed and approved prior to processing; HBUS would be reimbursed for the additional employees needed to handle review of these payments; and fees for the transactions would reflect the processes and risk.[855]  Whereas the 2001 protocol was specific to Bank Melli, this protocol applied to all Iranian transactions.[856]

On December 15, 2004, Mr. Bagley informed the HSBC Global Head of PCM Marilyn Spearing and HBME Deputy Chairman David Hodgkinson that he had advised then HSBC Group CEO Stephen Green "that a compliant solution had been agreed in principle with HBUS." While this agreement was a significant milestone, Mr. Bagley said Mr. Green wanted to consider the issue and possibly discuss it with then HSBC Group Chairman John Bond.

Mr. Bagley asked Ms. Spearing to provide him data on the potential commercial value of the Iranian U.S. dollar transactions to the Group, considering both existing and future business. He wrote:

> "I would not suggest that we seek to try and influence the debate at this stage….but it might be helpful if I was armed with the likely value to the Group if we are in effect making a reputational risk over possible reward type judgment."[857]

Mr. Bagley concluded by writing that it would probably be "sensible" to "gently" proceed "assuming that we may get sign-off."[858]

---

[852] 11/30/2004 email from HBUS Denise Reilly to HBUS Sandra Peterson and HBUS Michael Gallagher, "U-turns," HSBC-PSI-PROD-0096166; 11/29/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-turns," HSBC-PSI-PROD-0096167.

[853] See, e.g., 11/30/2004 email from HBUS Sandra Peterson to HBUS Denise Reilly and HBUS Michael Gallagher, "U-turns," HSBC-PSI-PROD-0096165 (Ms. Peterson:  "Is this proposal for Bank Melli only or is the intent to grow this business?  When this topic first arose it was to support Bank Melli but my understanding is that the business under discussion now is more general, with no specific clients named to date.").

[854] 12/2/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-Turns," HSBC OCC 3407526-527.

[855] Id. at 527.

[856] Subcommittee meeting with HSBC legal counsel (4/12/12).

[857] 12/15/2004 email from HSBC David Bagley to HSBC Marilyn Spearing and HBME David Hodgkinson, "Iran – OFAC," HSBC OCC 8874039.

[858] Id. at 039.

**PX257**

151

An internal OCC memorandum indicates that, in early 2005, HBUS contacted the OCC about a proposal to process Iranian U-turns.[859]  In the memorandum, an OCC examiner described how legitimate U-turns could be processed and wrote:  "[W]e notified Ms. Pesce that we believed the transactions to be permissible.  However, we also informed her that the bank would have to maintain extremely tight controls over the transactions as well as a comprehensive system of controls for monitoring purposes."[860]  Later in the same memorandum, the OCC examiner wrote:  "[O]n February 23, 2005 Ms. Pesce informed the writer that the decision to process the u-turn transactions was not to go forward and that the area business had made the decision not to undertake such processing."[861]

The documentation suggests that even after reaching agreement with HBUS on how to process Iranian transactions, HBEU and HBME continued to send undisclosed Iranian transactions through their HBUS accounts.  A later analysis performed by an outside auditor at HBUS' request found that HSBC affiliates sent about 7,800 Iranian transactions through U.S. dollar accounts in the United States during 2004, of which more than 90% continued to be undisclosed.[862]

### (f)  Processing the Iranian Transactions

The 2004 agreement reached among HSBC affiliates on how to process Iranian U-turn transactions did not end the controversies or new developments affecting those transfers.

**Considering an Exit.**  Four months after agreement was reached with HBUS on how to process Iranian transactions, on April 8, 2005, David Bagley reached out to Mr. Hodgkinson to request an assessment of the nature and extent of Iranian business for an analysis Mr. Bagley was asked to prepare for the HSBC Group Chairman.  It appears that at the top levels of HSBC, there was some discussion about exiting the Iranian business entirely due to a "specific transaction for NPC" about which Mr. Bagley had spoken with Mr. Green.[863]  In the same email, Mr. Bagley wrote, "This is needed partly as part of the risk over reward equation, but also because we will need to both analyze each different type of business and assess how we will deal with legacy issues."[864]  He continued:  "It is not all as bad as it seems as the conversation today gave some clear possible alternative approaches to an outright ban."[865]

Two days later, on April 10, 2005, HBME official Ajay Bhandoola provided Mr. Bagley with a paper discussing payment alternatives for Iran.[866]  The paper laid out two proposals for

---

[859] See 2/28/2005 OCC memorandum, "Issues Update," OCC-PSI-00903648-650, at 2.  [Sealed Exhibit.]
[860] Id.
[861] Id.
[862] Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.
[863] 4/8/2005 email from HSBC David Bagley to HBME David Hodgkinson and HBME Nasser Homapour, "Iranian Business – OFAC," HSBC OCC 8874052.  The reference to NPC is unclear.
[864] Id.
[865] Id.
[866] 4/10/2005 email from HBME Ajay Bhandoola to HSBC David Bagley and others, "Iranian Business – OFAC," HSBC OCC 8874051-057.

# PX257

152

continuing payments from Iranian bank accounts with HSBC "to protect our Iranian franchise while minimizing any possible legal, regulatory or reputational risk to HBUS." The two alternative solutions provided were to use another U.S. dollar correspondent (other than HBUS) for HBME, and to limit U.S. dollar accounts for Iranian banks to specific purposes. [867] HBME did not explain why it was considering using a third party correspondent since HBUS had already agreed to process the Iranian transactions using transparent procedures. [868]

**Stopping Payments.** On April 19, 2005, HBUS' OFAC filter stopped a $362,000 payment from Bank Melli because it contained the phrase "do not mention our name in New York." [869] When asked in general about why payments would be stopped in the HBUS filter, Rod Moxley told the Subcommittee that messages like the one mentioned above should have been deleted in the processing area but was errantly left on the outgoing instructions. [870] This incident indicated that HBEU's MPD was still altering Iranian payment instructions in April 2005, one year after Mr. Moxley had threatened to stop processing all payments if forced to continue altering them, and four months after HBEU and HBUS reached agreement on using fully transparent Iranian U.S. dollar transactions. HBEU resubmitted the payment on April 22, 2005, but HBUS stopped it again and sent a SWIFT message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary. Two follow-up requests were sent by HBUS on April 28 and May 4, 2005. As of May 5, 2005, no response had been received. [871]

In early May 2005, a $6.9 million wire payment involving Iran was also stopped by HBUS because the payment details included the phrase, "Bank Melli Iran." [872] HBUS OFAC Compliance officer Elizabeth Protomastro sent an email to HBEU, as well as HSBC Group, stating:

"Though the payment appears to meet the U-turn under the Iranian Transactions Regulations, we require that the payments should be fully disclosed as to the originator and beneficiary information before processing. We know that this policy is in line with the stance of other U.S. financial institutions …. You are also aware, from past discussions, that this is required by HBUS.

Let us know if you have any questions. Please advise on your side of the delay in processing." [873]

The email chain regarding the stopped payment was forwarded to Mr. Bagley, who then contacted HBUS AML head Teresa Pesce to ask whether HBUS' action "denotes a change of

---

[867] Undated "Iranian Accounts and USD Payments," prepared by HBEU, HSBC OCC 8874055-057.
[868] Id. at 056-057.
[869] 5/5/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison and others, "Payment rejected re Melli Bank PLC – USD 362,000," HSBC-PSI-PROD-0096170-171.
[870] Subcommittee interview of Rod Moxley (6/7/2012).
[871] 5/5/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison and others, "Payment rejected re Melli Bank PLC – USD 362,000," HSBC-PSI-PROD-0096170-171.
[872] 5/3/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison, HSBC Susan Wright, HBEU Rod Moxley, and others, "Wire payment suspended re 'Iran' – USD 6,912,607.82," HSBC OCC 8874710-712, at 711.
[873] Id. at 712.

PX257

policy and approach within HBUS to what I would normally expect to be cover payments." [874]
Mr. Bagley wrote:

> "As you are aware, there are no Group standards which require that the originator and
> beneficiary details go in all payments.  Accordingly, Group Operation globally will not
> habitually require or input this information if the underlying customer instruction is
> received on a basis permitted by the SWIFT format and by local regulation."

He noted that if the payment were suspended due to a reference to Iran, he understood.  But if the
action taken by HBUS denoted a change of policy on what information had to be included in
payment instructions, that change may not have been communicated across the Group and vetted
with business colleagues.  This email was sent in 2005, by Mr. Bagley, after more than two years
of negotiations to increase transparency with regard to Iranian transactions.

   Ms. Pesce forwarded Mr. Bagley's email to HBUS OFAC Compliance officer Elizabeth
Protomastro and senior HBUS Compliance official Anne Liddy.  Ms. Protomastro responded that
"for the most part" the U-turns being processed by HBUS for HBEU had been fully disclosed in
compliance with the conditions specified in December 2004. [875]  Ms. Protomastro stated that the
remitter involved in the $6.9 million transfer was Credit Suisse Zurich, which was "well aware
of the u-turn practices of other U.S. organizations and the requirement for full disclosure of the
name and address of the originator and the beneficiary." [876]

   On June 3, 2005, Ms. Protomastro informed HSBC Group about two more HBEU
transfers, for $1.9 million and $160,000, that had been stopped by HBUS due to the lack of full
disclosure of the originator, beneficiary, and purpose of the payment. [877]  HBEU responded that
both payments were foreign exchange related, the originators were Bank Tejarat and Bank Melli,
and the beneficiaries were Persia International Bank and Credit Suisse Zurich, respectively. [878]
Ms. Protomastro responded by requesting that HBEU follow up with the banks to obtain the
names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation
of the underlying purpose of the payments, in accordance with the "agreement reached in the
past" between HBUS and HBEU requiring full disclosure for U-turn payments. [879]  According to
information provided by Bank Melli through HBEU, the $160,000 payment denoted an internal
transfer from Bank Melli's account with HBEU to Bank Melli's account with Credit Suisse
Zurich. [880]  This information allowed the payment to be released. [881]  Mr. Marsden stated that he

---

[874] 5/4/2005 email from HSBC David Bagley to HBUS Teresa Pesce, "Wire Payments Suspended," HSBC OCC
8874710-711.
[875] 5/4/2005 email from HBUS Elizabeth Protomastro to HBUS Teresa Pesce and others, "Wire Payments
Suspended," HSBC OCC 8874710.
[876] Id.
[877] 6/3/2005 email between HBUS Elizabeth Protomastro and HSBC John Allison and others, "Wire payments from
HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407547.
[878] 6/6/2005 email from HBEU Rod Moxley to HBUS Elizabeth Protomastro and others, "Re: Wire payments from
HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407546-547.
[879] 6/6/2005 email from HBUS Elizabeth Protomastro to HBEU Stephen Cooper and others, "Re: Wire payments
from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407544-545.
[880] 6/7/2005 email from HBEU Anthony Marsden to HBUS Grace Santiago-Darvish, "Re: Wire payments from
HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407543-544.

**PX257**

154

was in the process of contacting Bank Tejerat for additional information about the $1.9 million transfer.

On June 6, 2005, Anne Liddy sent HBUS AML head Teresa Pesce the email correspondence about the two Iranian payments that had been suspended.[882]  She also informed Ms. Pesce that 44 of the approximately 60 payments stopped by the HBUS OFAC filter the previous month, May 2005, and forwarded for review, referenced Iran.  She remarked that this was "quite a lot."  The following day, HBUS OFAC Compliance officer Grace Santiago-Darvish informed HBUS' Payment Services head Denise Reilly that they would be sending a message to all HSBC locations to remind them about the need to fully disclose underlying information in U-turn payments.  She wrote:  "We, in Compliance have noticed that, other locations could be more forthcoming about disclosing orig[inator], and bene[ficiary] information."[883]

**Switch from HBEU to HBME.**  On May 20, 2005, HBME Deputy Chairman David Hodgkinson sent an email to HSBC business heads that, after a meeting with the HSBC Group Chairman and Group CEO, a decision had been made to transfer all Iranian bank U.S. dollar accounts held by HBEU to HBME, and utilize a "third party correspondent in the US for cover and other valid U turn payments."[884]  When asked about this decision, David Bagley told the Subcommittee that the processing of the payments was moved to HBME because that was where the locus of business was located.[885]  In addition, HBME set up a special team to review the transactions to ensure consistent treatment.  Mr. Hodgkinson also informed HSBC business heads that they should suspend new business and the expansion of current activities with Iran until the political situation improved, but that "existing business and commitments with Iran" were allowed to continue.[886]

**JP Morgan Chase.**  On June 20, 2005, David Bagley informed David Hodgkinson that Iranian payments had been discussed in a meeting he had with HSBC Group CEO Stephen Green and HSBC Group legal counsel Richard Bennett.[887]  He wrote that it was decided that all U-turns, whether passing through HBUS or another U.S. correspondent, would have to comply with the U-turn requirements in OFAC regulations.  He wrote that Mr. Green also wanted confirmation that the "agreed arrangements in relation to Iranian payments had been put in place," and that payments, including any cover payments, passing through the United States would comply with OFAC regulations.  Mr. Bagley wrote:

---

[881] 6/7/2005 email from HBEU Anthony Marsden to HBEU Rod Moxley and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407544-545.

[882] 6/6/2005 email from HBUS Anne Liddy to HBUS Teresa Pesce and others, "Fw: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407537.

[883] 6/7/2005 email from HBUS Grace Santiago-Darvish to HBUS Denise Reilly and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407536.

[884] 5/20/2005 email from HBME David Hodgkinson to HBME Nasser Homapour and others, "Iran," HSBC OCC 8874714.

[885] Subcommittee interview of David Bagley (4/12/2012).

[886] 5/20/2005 email from HBME David Hodgkinson to HBME Nasser Homapour and others, "Iran," HSBC OCC 8874714.

[887] 6/20/2005 email from HSBC David Bagley to HBME David Hodgkinson, "Iranian Payments," HSBC OCC 8878027-029.

**PX257**

"Although I may have misunderstood our discussions I was not previously aware that this was a precondition nor did my original paper envisage that if we used a non-Group correspondent we would necessarily consider passing only U-turn exempt payments through them.  In fact in such circumstances there would be no reason to use anyone other than HBUS given that HBUS could not be criticized were it to carry out exempt payments."[888]

Mr. Bagley's comments suggest that he was under the impression that using a non-Group correspondent would have allowed HSBC to process Iranian payments that did not meet the U-turn exception.  However, after his discussion with Mr. Bennett and Mr. Green, he requested that Mr. Hodgkinson confirm they would be sending only compliant U-turn transactions through the United States, regardless of "whether or not through our own correspondent."[889]

On June 27, 2005, David Hodgkinson responded that HBME was attempting to open a U.S. dollar correspondent account with JPMorgan Chase (JPMC) for the purpose of processing Iranian U.S. dollar payments.  Later in the email he wrote: "we never envisaged anything other than U-Turn compliant payments being processed," and confirmed agreement that "there is no reason to use anyone other than HBUS."  He clarified that the only reason they had considered another U.S. correspondent for these payments was due to HBUS being unwilling to process them for reputational risk reasons.[890]  When Michael Gallagher, the head of HBUS PCM, was asked whether he was aware that HBME opened a U.S. dollar account with JPMorgan Chase in 2005, he could not recall.[891]  He further explained that HBME must have thought that HBUS' standards were higher if they went to JPMorgan Chase to do the same service.

Despite that email, HBME did open a U.S. correspondent account with JPMC.  Mr. Bagley alerted HSBC Group CEO Stephen Green to the account on September 19, 2005, writing that HBME had opened a correspondent account with JPMC "through which the pre-screened compliant U-turn Iranian Payments can be made."[892]  A later analysis conducted by an outside auditor at HBUS' request found that HBME sent about 1,800 U-turns to its JPMorgan Chase account in 2005 and 2006.[893]

---

[888] Id.

[889] Id. at 8878028.  With regard to cover payments, Mr. Bagley wrote that failing to consider an entire transaction ("both the cover payment instruction and any linked bank to bank message"), which if considered together "would lead to a different determination in terms of that U-turn exemption," needed to be included in the risk determination. Mr. Bagley also referenced heightened concerns about the level of scrutiny from U.S. authorities regarding cover payments and OFAC compliance by "US banks offering correspondent banking services," stemming from discussions held at a recent Wolfsberg meeting.  The Wolfsberg Group consists of major international banks that meet regularly and work together to combat money laundering.  See http://www.wolfsberg-principles.com/index.html.

[890] 6/27/2005 email from HBME David Hodgkinson to HSBC David Bagley and HSBC Richard Bennett, "Iranian Payments," HSBC OCC 8878026-027.

[891] Subcommittee interview for Michael Gallagher (6/13/2013).

[892] 9/19/2005 email from HSBC David Bagley to HSBC Stephen Green and HSBC Richard Bennett, "GCL050047 "Compliance With Sanctions," HSBC OCC 8874360-361.

[893] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012); Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.

PX257

156

### (g)  Establishing Group-wide Policy

In July 2005, HSBC Group Compliance issued a Group Circular Letter (GCL) that for the first time established Group-wide policy on processing OFAC sensitive transactions, including U-turns involving Iran.  GCL 050047 explicitly barred all HSBC affiliates and offices from participating in any U.S. dollar transaction, payment, or activity that would be prohibited by OFAC regulations.[894]  The GCL also explicitly acknowledged the U-turn transactions permitted under OFAC regulations and required all compliant U-turn transactions be routed through an HBME "Center of Excellence" in Dubai for processing.  While the policy directed all HSBC affiliates to use only permissible Iranian U-turns, the GCL also allowed HSBC affiliates to continue to use cover payments when sending them through U.S. accounts for processing, which meant the transactions would continue to circumvent the OFAC filter and any individualized review by the recipient U.S. bank, including HBUS.[895]

The 2005 GCL also required local U.S. dollar clearing systems, located in Hong Kong and the United Arab Emirates, to implement WOLF screening for all U.S. dollar payments to ensure that non-compliant payments were rejected.  The GCL stated:  "Any dispensation from the terms of this GCL requires GHQ CMP [Group Compliance] concurrence."[896]  Mr. Bagley described the GCL as being "necessary and urgent to protect the Group's reputation."[897]

About a month after the GCL was issued, the HSBC Group head of Global Institutional Banking, Mark Smith, issued a managerial letter, in August 2005, providing guidance on implementing the new policy.[898]  The letter provided a brief summary of Group's relationship with each of the OFAC sanctioned countries.[899]  With respect to Iran, Mr. Smith wrote:  "Iran – extensive relationships with a number of Iranian institutions.  Group Compliance had re-affirmed that OFAC sanctions, including the U-turn exception, apply to all transactions."[900]  The guidance also clarified that the revised policy applied only to U.S. dollar transactions and continued to permit non-U.S. dollar business with prohibited countries and persons on the OFAC list.[901]

---

[894] See 7/28/2005 GCL 050047, "Compliance with Sanctions," HSBC OCC 3407560-561.
[895] Id.
[896] Id.
[897] 7/26/2005 email from HSBC David Bagley to HSBC Mansour Albosaily and others, "OFAC GCL," HSBC OCC 3407550-555. Upon receipt of the GCL, on July 26, 2005, Anne Liddy wrote that she would discuss the need for OFAC training with John Allison and Susan Wright at their monthly meeting the following day to ensure HBEU and HBME "clearly understand OFAC" and "how to identify a true U turn."  7/26/2005 email from HBUS Anne Liddy to HBUS Grace Santiago-Darvish and others, "OFAC GCL," HSBC OCC 3407549.
[898] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[899] 8/25/2005 Managerial Letter from Mark Smith, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[900] Id. at 568.
[901] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.

**PX257**

157

Also in August 2005, HBUS circulated an email identifying correspondent relationships affected by the new policy.[902]  The email identified the number of open correspondent accounts with financial institutions in affected countries, including Iran.  It also explained:

> "The revised policy does not represent an automatic exit strategy with regards to affected clients.  Non-USD business (and for Iran, U-turn exempt transactions) may continue to be undertaken. …  Verbal discussions with affected clients would be preferable.  Any written correspondent seeking to clarify the Group's revised policy should be cleared with local Compliance."[903]

Once the policy was in place, HSBC personnel took a closer look at some of the Iranian transactions.  On August 10, 2005, HBME sales manager Gary Boon sent John Root an email which included an excerpt from an email sent by David Bagley to David Hodgkinson.[904]  In it, Mr. Bagley noted that Mr. Hodgkinson had conveyed that a "significant number" of the trade and other transactions involving HBME would be U-turn compliant.  In response, Mr. Bagley wrote:  "I have to say that a number of potential payments resulting from trade transactions from other Group offices that John Root and I have looked at since the issuance of the GCL are not in our view U-turn compliant."

In September 2005, HBEU senior payments official Rod Moxley completed an analysis of U.K. transactions over a ten day period that were stopped by the HSBC WOLF filter and involved prohibited countries, including Iran.[905]  He forwarded the results to senior HSBC Group Compliance officials John Root and John Allison, noting that over just ten days, 821 of the transactions had involved Iran.[906]

In mid-September 2005, David Bagley provided an update to HSBC Group CEO Stephen Green on implementation of the July 2005 GCL.  He explained that the "required specialist 'U-turn' team" had been established at HBME in Dubai, and a correspondent account with JP Morgan Chase had been opened to process compliant U-turn payments.  He indicated that HBME was also using HBUS to process U-turns, as was HBEU.  Mr. Bagley stated that "a number of Group Offices" had opened U.S. dollar accounts with HBME for routing Iranian payments, but added that he was not convinced that all HSBC affiliates had done so.  As a result, he issued a reminder to the Regional Compliance Officers to discuss the matter with their business heads and requested confirmation by September 23, 2005.

Despite the issuance of the GCL and the existing arrangement with HBUS, an undisclosed Iranian-related transaction was discovered, leading an HBUS executive to believe the practice was ongoing.  In November 2005, another bank stopped a transaction after HBUS had already processed it, without knowing the transaction had involved Iran.  HBUS OFAC

---

[902] See 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.
[903] Id. at 568.
[904] 8/25/2005 email from Gary Boon to John Root, HSBC OCC 8876581.  See also HSBC OCC 8876580.
[905] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.
[906] 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and others, "OFAC sanctions," HSBC OCC 8877213-214.

**PX257**

158

Compliance officer Elizabeth Protomastro notified Mr. Moxley at HBEU that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HBEU's account at HBUS without transparent documentation.  She wrote:

> "We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HBEU].  It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries."[907]

The payment had not been stopped by the HBUS OFAC filter because it did not contain any reference to Iran.  She explained that four days later HBUS received a SWIFT message from HBEU stating that after contacting the remitter, the correct SWIFT should have been "MelliRTH94."  Since a U.S. bank cannot directly credit an Iranian bank, the payment was stopped and rejected by an unrelated bank.  However, HBUS did not have the funds because Credit Suisse had already been paid through another correspondent bank owned by Credit Suisse.  Ms. Protomastro explained that if the payment did involve Bank Melli, it met the U-turn exception.  However, she wanted to know why HBEU continued to submit cover payments involving Iran which ran afoul of the new HBUS agreement.[908]  Mr. Moxley responded that the transaction had uncovered a transparency issue with their payment system, which HBEU would work to address.[909]

A later review performed by an outside auditor at HBUS' request found that, even after the 2004 HBUS agreement, HSBC affiliates continued to send thousands of undisclosed Iranian U-turn transactions through their U.S. dollar accounts at HBUS and elsewhere.  The auditor's review found that, from July 2002 to June 2005, HBEU and HBME together sent about 18,000 Iranian U-turn transactions through their U.S. dollar accounts of which about 90% did not disclose any connection to Iran.[910]  The review found that, from July 2005 to June 2006, HBME sent about 3,000 Iranian U-turns through its U.S. dollar accounts of which about 95% were undisclosed.  The comparable figures for HBEU were 1,700 U-turns of which 75% were undisclosed.[911]

---

[907] 11/23/2005 email from HBUS Elizabeth Protomastro to HBEU Rod Moxley and others, "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," HSBC OCC 8876886-887.

[908] Id.

[909] Id.  Mr. Moxley explained that when a customer directly inputs a transaction through an approved electronic channel, such as Hexagon, and the transaction achieves straight through processing, the cover MT202s are automatically generated by the HBEU payments system by the time the transactions hit the HBEU WOLF queue.  He explained that the WOLF team was reviewing these payments to ensure the U-turn requirements were met, but acknowledged the lack of transparency for HBUS and indicated that a paper had already been submitted to the Head of Payment Services, Malcolm Eastwood, regarding the matter.  Id.

[910] Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113-150, at 143.

[911] Id. at 143.  The figures for 2005 alone, were that HBEU and HBME together sent about 6,300 Iranian payments through U.S. dollar accounts in the United States, of which more than 90% were undisclosed.  Id.

**PX257**

159

### (h)  Shifting Iranian Transactions from HBUS to JPMorgan Chase and Back Again

In 2006, HBME sent a number of Iranian U-turn transactions through its new U.S. dollar account at JPMorgan Chase.  When JPMorgan Chase decided to exit the business later in the year, HBME turned to HBUS to process them.  Again, most of the U-turns HBME sent to HBUS were undisclosed.

**GCL 060011 Barring Cover Payments.**  On April 6, 2006, less than a year after GCL 050047 was issued, HSBC Group issued another Group Circular Letter, entitled "U.S. Dollar Payments," essentially barring non-transparent cover payments for most OFAC sensitive transactions.  It followed an enforcement action by the Federal Reserve Board on December 19, 2005, charging ABN AMRO Bank with OFAC violations for modifying payment instructions on wire transfers used to make OFAC sensitive transactions and using special procedures to circumvent compliance systems used to ensure the bank was in compliance with U.S. laws.[912] About two weeks after the enforcement action, an email exchange among HBEU, HBME, HBUS, and HSBC Group Compliance officials revealed:

> "Group compliance is having a closer look at the [2005] GCL, with more specific reference to the recently published details of the ABN AMRO Enforcement Action.  They are consider[ing] whether it is appropriate, for us to move to use of serial payment methodology.  Group compliance needs to give opinion to Group CEO by next friday."[913]

That same day, an HBUS Global Payments and Cash Management employee sent an email suggesting that commercial U.S. dollar payments be executed as "serial payments in which all payment party details are advised through HSBC Bank USA, your USD correspondent."  The HBUS employee also wrote:  "This will allow our automated transaction monitoring system to appropriately analyze all group transactions for suspicious activity that would otherwise be hidden with the cover payment method.  This system goes beyond simple OFAC checking to

---

[912] See 12/19/2005 Federal Reserve Board, Financial Crimes Enforcement Network, Office of Foreign Assets Control, New York State Banking Department, and Illinois Department of Financial and Professional Regulation press release and Order of assessment of a civil money penalty, http://www.federalreserve.gov/boarddocs/press/enforcement/2005/20051219/121905attachment2.pdf.  Five years later, in May 2010, the Justice Department imposed a $500 million file on ABN Amro for removing information from wire transfers involving prohibited countries.  See 5/10/2010 U.S. Department of Justice press release, http://www.justice.gov/opa/pr/2010/May/10-crm-548.html  ("According to court documents, from approximately 1995 and continuing through December 2005, certain offices, branches, affiliates and subsidiaries of ABN AMRO removed or altered names and references to sanctioned countries from payment messages.  ABN AMRO implemented procedures and a special manual queue to flag payments involving sanctioned countries so that ABN AMRO could amend any problematic text and it added instructions to payment manuals on how to process transactions with these countries in order to circumvent the laws of the United States.  Despite the institution of improved controls by ABN and its subsidiaries and affiliates after 2005, a limited number of additional transactions involving sanctioned countries occurred from 2006 through 2007.").
[913] 1/6/2006 email from HBEU Michele Cros to HBUS Bob Shetty and other HSBC, HBUS, HBEU, and HBME colleagues, "OFAC – Compliance with Sanctions GCL," HSBC OCC 7688873.

detect repetitive transaction trends indicative of money laundering or terrorist financing.  This will assure regulators we are doing everything possible to comply with their requirements."[914]

The new GCL 060011 required all HSBC Group affiliates to use fully transparent "serial" payments when sending U.S. dollar transactions through HBUS or any other U.S. correspondent, with full disclosure of all originators and beneficiaries.[915]  Essentially, it required all HSBC affiliates to use the same procedure already established at HBUS.  The GCL made an exception, however, for Iranian U-turns.  Instead of requiring full disclosure in the transaction documents sent to a U.S. bank, the GCL allowed U-turns to "continue to be made as cover payments."  HSBC affiliates were required, however, to obtain the underlying payment details to ensure the transaction was permissible under OFAC regulations.[916]  In addition, the GCL required all U-turn transactions to continue to be directed through HBME, which had established a dedicated team in Dubai for processing Iranian transactions.  Because the GCL created an exception for Iranian U-turns, it did not stop the use of undisclosed transactions being sent by HBME and HBEU to HBUS.[917]

The policy's effective date was April 30, 2006, and directed HBUS to require all third-party banks for which it provided U.S. dollar correspondent banking services to utilize the same fully transparent payment procedures by December 31, 2006.[918]  The GCL also stated that dispensations from the deadlines could be obtained only from HSBC Group Compliance, with the concurrence of HBUS Compliance.

Soon after the GCL was announced, several HSBC affiliates requested and received dispensation from the April 2006 deadline, the most notable of which ended up giving HBEU more than a year to come into compliance with the new GCL.[919]  HBEU obtained an initial

---

[914] 1/6/2006 email from HBUS Richard Boyle to HBEU Michele Cros and HBUS Bob Shetty, "OFAC – Compliance with Sanctions GCL," HSBC OCC 7688871-873.  The email explained that ABN AMRO used their "USD nostro [account] with ABN AMRO New York to process USD payments originated through 'special procedures'," and that cover payments were used "as a method of masking Iranian and Libyan financial institutions as the originators of USD wire transfers."  It also discussed the recent regulatory actions as establishing "a precedent that the U S entity of a global group will be held responsible for the transactions in USD that may take place any where in the Group," and mentioned other banks where regulatory action had been taken, including one that led to a cease and desist order prohibiting cover payments.

[915] See "GCL 060011 – US Dollar Payments (06/Apr/2006)," HSBC OCC 3407587.[916] The GCL stated that "serial payments cannot qualify as U-turn payments," but OFAC confirmed to the Subcommittee that U-turn payments could, in fact, be processed as serial payments.  Subcommittee briefing by OFAC (5/8/2012).

[916] The GCL stated that "serial payments cannot qualify as U-turn payments," but OFAC confirmed to the Subcommittee that U-turn payments could, in fact, be processed as serial payments.  Subcommittee briefing by OFAC (5/8/2012).

[917] From April through June 2006, about 90% of the Iranian payments sent by HBME to U.S. dollar accounts at HBUS and elsewhere did not disclose their connection to Iran.  In July 2006, an internal HSBC policy was issued that required HBME to send Iranian payments received from Group affiliates to HBUS on a serial basis.  After July 2006, nearly 100% of the Iranian payments sent by HBME to the U.S. disclosed their connection to Iran.  This internal policy did not apply to HBEU until late in 2007.  From April 2006 through December 2007, about 50% of the 700 Iranian payments sent by HBEU to U.S. dollar accounts at HBUS and elsewhere did not disclose their connection to Iran.  Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113-150, at 143.

[918] 4/6/2006 GCL 060011, "US Dollar Payments," HSBC OCC 3407587.

[919] See 4/25/2006 – 5/5/2006 email exchanges among HSBC David Bagley, Group offices, and HBEU Rod Moxley, "Serial Payments – USD – GCL," HSBC OCC 8877231-239.  The emails indicate HSBC Asia Pacific requested dispensation for 19 specific countries until August 31, 2006, to allow time to change its payment systems.  HBEU

**PX257**

161

dispensation until October 31, 2006. On November 21, 2006, HBEU MPD head Malcolm Eastwood requested a second extension until after installation of a new GPS system scheduled for July 1, 2007. In July, due to "the huge volume of HBEU traffic and the potential resolution of the problem by an impending global system change," HBEU received a third extension until November 2007.[920] Since HBEU was one of the top processors of payments for HSBC affiliates, its year and a half dispensation delayed full implementation of the new GCL until November 2007.[921]

The month after the new GCL was issued, HBUS Compliance official Anne Liddy sent an email to HSBC Group AML head Susan Wright indicating she had heard that David Bagley had "issued a dispensation" in relation to the new GCL. Ms. Liddy said that while she recalled discussions about how HSBC Group was "having a difficult time getting our Group offices to switch (mainly due to systems issues)," and the need to provide more time for clients to convert, she did not recall any dispensations being issued. She asked Ms. Wright for more information. Ms. Wright responded: "There have been a limited number of dispensations granted re HSBC's own customers – John is the keeper of the dispensations and so will provide you with more detail."[922] Based on Ms. Liddy's email, it appears that Group Compliance may have granted dispensations, which then allowed cover payments to continue, without obtaining HBUS Compliance's agreement, as the GCL required.

**JPMC Pulls Out.** In May 2006, about six months after HBME opened an account with JPMorgan Chase to process Iranian U-turns, JPMorgan Chase decided to stop processing them. On May 25, 2006, a JPMC representative informed HBME official Gary Boon that they would continue to process HBME's dollar payment transactions, with the exception of Iranian transactions that reference details in the payment narrative.[923] On May 26, 2006, Mr. Bagley wrote to HSBC Group CEO Stephen Green that "JMPC have indicated that they are not willing to process these payments, I assume for reputational rather than regulatory reasons (given that they are within the U-turn exemption)." He continued that HBME would have to "pass these payments through HBUS." He noted that they had previously received concurrence from HBUS to process the transactions, confirmed by HBUS CEO Martin Glynn.[924] That same day Mr.

---

requested a dispensation until the end of October 2006 for MPS, citing a reconfiguration of the new GPP system that was expected by December 31, 2006. Michael Grainger in GTB – PCM, in conjunction with Operations and IT, requested a dispensation for HBEU sites through HUB until the end of 2006 to allow system changes to be implemented and piloted. David Bagley forwarded this email correspondence to John Allison with a request for consideration. He also noted that the serial methodology would put HBEU at a competitive disadvantage with regard to fees charged and the volume of customer complaints. Id.

[920] 7/4/2007 email from HBEU Rod Moxley to HBEU Tony Werby and Andy Newman, "[redacted] – HSBC arrangements for payment of the consideration," HSBC OCC 8876901.

[921] A Deloitte review later determined that HBEU continued to send U-turns without any reference to Iran through the end of 2007, reflective of the dispensation granted to HBEU until November 2007. Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113, at 8966143. See also 11/21/2006 memorandum from HBEU Malcolm Eastwood to HSBC David Bagley and others, "GCL 060011 Dispensation," HSBC OCC 8876896-899.

[922] See 7/16/2007 – 7/25/2007 email exchanges among HBUS Anne Liddy, HSBC Susan Wright, and HSBC John Allison, "Conversion of Clients to Serial Payment Method," HSBC OCC 8875256.

[923] 5/25/2006 email from JPMC Ali Moosa to HBME Gary Boon and others, "US Dollar Transactional Activities via DDA at JPM," HSBC OCC 3243782-787, at 786. .

[924] 5/26/2006 email from HSBC David Bagley to HSBC Stephen Green, "US Dollar Transactional Activities via DDA at JPM," HSBC OCC 3243782-787, at 784.

PX257

162

Bagley alerted HBUS AML head Teresa Pesce that "HBME have no choice but to now pass" U-turn exempt payments through HBUS.[925]

**Iranian Transactions Shift to HBUS.**  HBUS was already processing Iranian U-turn transactions for HBEU, but HBME's decision to route its Iranian U-turns through HBUS as well represented an increase in the volume of transactions that HBUS would have to identify and review.

On May 26, 2006, the same day he learned HBME would begin routing U-turns through its U.S. dollar account at HBUS, HBUS AML officer Alan Ketley emailed HBME's Alan Kerr to clarify how HBUS would process the new volume of payments.[926]  On May 30, 2006, Mr. Ketley wrote to HBME Gary Boon, copying HBUS AML head Teresa Pesce:  "I'm unclear why you would be seeking to have HBUS handle this activity at no notice and am uncomfortable making arrangements for such sensitive activity in this fashion."  He requested examples of payment orders for routing through HBUS and asked for confirmation that HBME would not begin routing U-turns through HBUS until they had the "appropriate controls in place."  He was also concerned from a resource perspective, and stated that HBME intended to pass as many U-turns in a day as HBUS would normally handle in a busy month.[927]  That same day, in response to his email to Mr. Boon, Ms. Pesce wrote:  "Alan – we have no choice.  JPMC won't take them."[928]

HBUS' effort to ensure it had adequate staffing to review OFAC-related alerts from the HBME U-turns was made more difficult by varying information from HBME on the number of transactions to expect.  On June 22, 2006, HBUS Compliance officials Anne Liddy and Alan Ketley reacted to an email exchange involving HBME's Gary Boon discussing U-turn payment volumes being processed through HBUS as between 10 and 25 per day.  Ms. Liddy wrote:

"[B]efore it was about 40.  Yesterday 10.  Now 25ish.  BTW I am going to set up a m[ee]t[in]g with Terry and Denise (as our financier) to discuss resourcing for OFAC.  It is out of hand."[929]

In July 2006, HBME made a policy decision to go beyond the requirements of the Group-wide 2006 GCL and require all of its Iranian transactions to provide fully transparent payment information to its U.S. correspondents.[930]

In addition to the HBME transactions moving to HBUS, one other notable transaction involving Iran in 2006, pertained to 32,000 ounces of gold bullion valued at $20 million.  In May 2006, the HBUS London branch cleared the sale of the gold bullion between two foreign banks

---

[925] 5/26/2006 email from HSBC David Bagley to HBUS Teresa Pesce and others, HSBC OCC 3243782-783.
[926] 5/26/2006 email from HBUS Alan Ketley to HBME Alan Kerr and HBME Gary Boon, "U-Turns," OCC-PSI-00179654
[927] 5/30/2006 email from HBUS Alan Ketley to HBME Gary Boon and HBME Alan Kerr, "U-Turns," OCC-PSI-00179654.
[928] 5/30/2006 email from HBUS Teresa Pesce to HBUS Alan Ketley, "U-Turns," HSBC OCC 3243965.
[929] 6/22/2006 email from HBUS Anne Liddy to HBUS Alan Ketley, "You Turn Payments," HSBC OCC 3250730-732.
[930] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012)

**PX257**

163

for the ultimate benefit of Bank Markazi, Iran's Central Bank. HSBC indicated that it had been aware that Bank Markazi was the beneficiary, but had viewed the transaction as a permissible U-turn.[931] OFAC later told HBUS that it considered the transaction to be a "non-egregious" violation of law, and provided HBUS with an opportunity to explain why it should not be penalized for it; HBUS is still awaiting a final determination as to whether it will be penalized.[932]

### (i) Getting Out

In October 2006, HSBC Group reversed course and decided to stop handling Iranian U-turns. In 2007, it went further and exited all business with Iran, subject to winding down its existing obligations.

**Increasing Risks.** In October 2006, Mr. Bagley provided a warning to his superiors that HSBC might want to reconsider processing U-turns. In an email on October 9, 2006, Mr. Bagley informed Stephen Green, who had become HSBC Group Chairman, Michael Geoghegan, who had become HSBC Group CEO, and David Hodgkinson, who used to head HBME but had become HSBC Group COO, that the risks associated with U-turns had increased due to "actions taken by the US government in withdrawing the U-Turn exemption from Bank Saderat."[933] The prior month, in September 2006, HBUS had stopped an undisclosed transaction that involved Bank Saderat in Iran, which was added to the OFAC SDN list that same month.[934]

Mr. Bagley wrote:

"During my recent visit to the US to attend a Wolfsberg meeting I was discretely advised of the following by a reliable source:

[U.S. Treasury] Under Secretary [Stuart] Levey … and the more hawkish elements within the Bush administration were in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement. …

Certain US Government bodies have however made it known to a number of US banks that, as WMD related transactions are impossible to detect they would run an unacceptable reputational and regulatory risk were they to continue to process U-Turn transactions. The essence of the statement appears to be that as WMD related transactions would be heavily disguised (where even as a trade transaction documents

---

[931] 1/1/2010 – 5/31/2010 Compliance Certificate from HSBC David Bagley to HNAH Brendan McDonagh and Niall Booker, OCC-PSI-01754176, at 17.
[932] See draft HSBC response to pre-penalty notice, OCC-PSI-00299323.
[933] 10/9/2006 email from HSBC David Bagley to HSBC Stephen Green, HSBC Michael Geoghegan, and HBME David Hodgkinson, "Iran – U-Turn Payments," HSBC OCC 8874731-732.
[934] See 9/11/2006 email from HBUS Anne Liddy to HBUS Teresa Pesce, "HBME Wire payment USD 586.00 (Iran-Bank Saderat) – Reject & Report to OFAC," HSBC OCC 4844209 and 12/14/2006 email from Elizabeth Protomastro to John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

**PX257**

164

would in effect be falsified) there is no safe way for a US bank to be involved in even a U-turn exempt transaction however stringent the scrutiny or monitoring. The clear implication made was that being found to be involved in a WMD related transaction, even if wholly innocently, would result in significant and severe action being taken against such a bank.

There were very strong indications that a number of US banks were therefore considering withdrawing from all U-turn related activity. If this happens those continuing in this market are likely to have an increased concentration.

Although I am satisfied that we have put appropriate controls in place to manage the U-Turn transactions, I am concerned that there are now increased risks in continuing to be involved in U-Turn USD payments which would justify our reconsidering our approach. I do recognize that the significance that tightening our policy to withdraw from U-Turn permitted transactions would have in terms of our Middle Eastern and Iranian business."[935]

**GCL 060041 Ending U-turns.** Shortly after Mr. Bagley's email, HSBC decided to stop processing U-turns entirely. On October 25, 2006, HSBC Group Compliance issued Group Circular Letter 060041 which directed all Group offices to immediately stop processing U-turn payments.[936] An exception was made for permissible U-turn payments in connection with legally binding contractual commitments. HSBC decided to stop utilizing the U-turn exception two years before OFAC actually revoked the exception in November 2008.

Despite this decision, HSBC maintained a number of existing Iranian relationships.[937] On March 13, 2007, as a result of a "letter recently filed with the SEC "relating to the extent of our exposure to business in the so-called named countries (Sudan, Syria, and Iran),"[938] HSBC Group Compliance head David Bagley updated HSBC Group CEO Michael Geoghegan on HSBC's relationships with Iranian banks. He wrote:

"The existing levels of business, much of which is historic and subject to ongoing commitments, has been reviewed by CMP [Compliance] as against the requirements of Group policy, particularly where transactions are denominated in USD. Some of this activity related to pre-existing committed obligations which are binding on an ongoing basis. Group policy recognizes that we will have to allow such arrangements to run off. Relevant business colleagues are however aware of the Group's stance in terms of having no appetite for new or extended business activity involving Iranian counterparties. Where transactions appear to potentially conflict with Group policy those transactions are referred to GHQ CMP for determination and sign-off."[939]

---

[935] 10/9/2006 email from HSBC David Bagley to HSBC Stephen Green, HSBC Michael Geoghegan, and HBME David Hodgkinson, "Iran – U-Turn Payments," HSBC OCC 8874731-732, at 732.

[936] 10/25/2006 GCL 060041, "US OFAC Sanctions against Iran – U-Turn Exemption," HSBC OCC 3407606.

[937] See 2/6/2006 Project and Export Finance presentation, "Iranian portfolio," HSBC OCC 8876050-057. This presentation indicated that Project and Export Finance had not taken on any new Iranian business since 2005.

[938] 3/13/2007 email from HSBC David Bagley to HSBC Michael Geoghegan and others, "Iran," HSBC OCC 8878037-038.

[939] Id.

**PX257**

165

The subject of Iran arose again a few months later, in June 2007, when Mr. Bagley informed HSBC Group CEO Michael Geoghegan that he had a private meeting with U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions, Stuart Levey, during a recent Wolfsberg Group conference.  Mr. Bagley indicated that Mr. Levey had questioned him about a HSBC client who, according to Mr. Levey, "had clearly been identified as having acted as a conduit for Iranian funding of" an entity whose name was redacted from the document by HSBC.[940]  Mr. Bagley wrote:  "Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."  Mr. Geoghegan responded: "This is not clear to me because some time ago I said to close this relationship other than for previously contractually committed export finance commitments."[941]  Mr. Bagley replied that the bank had only "limited relationships with [redacted] and in fact overall with Iranian banks."

Mr. Bagley also wrote that he had discussed the matter with David Hodgkinson, and they agreed that HSBC "should immediately withdraw from [redacted] and also withdraw from all Iranian bank relationships in a coordinated manner."  He noted that the bank would have to honor "legally binding commitments" such as Project and Export Finance facilities.[942]  These communications indicate that HSBC officials had previously known about problems with one particular Iranian client but that it did not end the relationship until after a warning from the U.S. Government.

**GCL 070049 on Exiting Iran.**  On September 24, 2007, HSBC Group Compliance issued another Group Circular Letter, this one announcing the bank's decision to exit Iran.  GCL 070049 directed all account relationships with Iranian banks to be "closed as soon as possible" with sufficient notice as required by local law and to "allow an orderly run down of activity" and the "run-off of any outstanding exposures."  The GCL allowed ongoing payments involving existing facilities and transactions "where there are legally binding commitments," such as Project and Export Finance facilities, to continue to be made as serial payments.[943]  The deadline for closure of all Iranian accounts was November 30, 2007.

**2008 and 2009 Iranian Transactions.**  After the GCLs terminating most business with Iran, internal bank documents show that hundreds of Iranian transactions per month continued to surface at HBUS during 2008 and 2009.  These transactions were not, however, the type of undisclosed U-turn transactions that HSBC affiliates had been routinely sending through HBUS accounts prior to HSBC's decision to exit Iran, but represented other types of transactions.

In 2008 and 2009, for example, HBUS' London Banknotes office conducted a series of apparently prohibited transactions benefitting the Iranian Embassy in London.  From July 22, 2008 to February 12, 2009, in more than 30 transactions, HBUS sold over €455,000 to HBEU

---

[940] See 6/8/2007 email exchanges among HSBC David Bagley, HSBC Michael Geoghegan and others, "Iran," HSBC OCC 8878214-216, at 215.
[941] Id. at 215.
[942] Id. at 214.
[943] 9/24/2007 GCL 070049, "Sanctions Against Iran," OCC-PSI-00141529-531 and HSBC OCC 8876013-015.

**PX257**

which, in turn, sold them to the Embassy of Iran in the United Kingdom.[944] According to HBUS, "the funds were used to meet salary obligations" of the Iranian Embassy.[945] In addition, from December 5, 2008 to February 5, 2009, HBEU purchased over $2,500 from the Embassy of Iran and resold the U.S. dollars to HBUS.[946] In 2009, after HBUS discovered that the London Banknotes office was engaging in currency transactions with the Iranian Embassy, it reported the transactions to OFAC and ended the activity.[947]

Other transactions involving Iran processed through HBUS' correspondent accounts from 2008 to 2009, included a March 2009 wire transfer for $300,000, which was mistakenly processed because a HBUS compliance officer did not realize a transaction reference to "Persia" implied a connection to Iran; and two wire transfers totaling over $55,000 which involved a vessel owned by "NITC" which, until it was updated, HBUS' OFAC filter did not recognize as the National Iranian Tanker Company.[948]

### (j)  Looking Back

According to an ongoing outside audit requested by HSBC, from 2001 to 2007, HBEU and HBME sent through their U.S. dollar accounts at HBUS and elsewhere nearly 25,000 OFAC sensitive transactions involving Iran totaling $19.4 billion.[949] While some of those transactions were fully disclosed, most were not. According to the review conducted by Deloitte, from April 2002 to December 2007, more than 85% of those payments were undisclosed.[950]

Despite HBUS pleas for transparency and a 2004 internal agreement to use fully transparent procedures, HSBC affiliates HBEU and HBME often took action, including by deleting references to Iran or using cover payments, to prevent the Iranian transactions sent through their U.S. dollar correspondent accounts at HBUS from being caught in the OFAC filter. Despite the fact that they viewed most of the transactions as permissible under U.S. law, concealing their Iranian origins helped avoid delays caused when HBUS' OFAC filter stopped the transactions for individualized review. HBME, in particular, requested that HBUS allow the use of cover payments to conceal Iranian transactions and circumvent the OFAC filter. When HBUS insisted on fully transparent transactions, the HSBC affiliates sent undisclosed transactions through their HBUS accounts anyway. HSBC Group leadership, including the

---

[944] 3/20/2009 letter from HBUS Elizabeth Protomastro to OFAC, HSBC OCC 0630892. See also 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561, at Attachment (describing the transactions as involving over $606,000 in U.S. dollars). [Sealed Exhibit.]
[945] Id.
[946] Id.
[947] See 3/24/2009 "Compliance Report for 1Q09-HUSI Businesses," sent by HBUS Lesley Midzain, to HNAH Janet Burak, HSBC David Bagley, and HBUS Paul Lawrence, HSBC OCC 3406981; 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566, at Attachment. [Sealed Exhibit.].
[948] See 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566, at Attachment. [Sealed Exhibit.]
[949] See Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919, at 930.
[950] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012); Deloitte presentation, "March 29, 2012," at HSBC OCC 8966113. These payments were sent to the U.S. bank as cover payments, serial payments, or payments that were cancelled and then re-submitted by either an HSBC affiliate or the client without disclosing the connection to Iran in the payment message. Id. at 8966118 and 8966143.

heads of Compliance and AML, were aware in varying degrees of what the affiliates were doing, but for years, took no steps to insure HBUS was fully informed about the risks it was incurring or to stop the conduct that even some within the bank viewed as deceptive.  The HSBC Group Compliance head took no decisive action even after noting that the practices "may constitute a breach" of U.S. sanctions.  At HBUS, senior executives in the Compliance and payments areas knew about the actions being taken by HSBC affiliates to send concealed Iranian transactions through their U.S. dollar correspondent accounts, but were unable or unwilling to obtain information on the full scope of the problem, bring the issue to a head, and demand its resolution at the highest levels of the bank to ensure all U-turns were reviewed for compliance with the law.

### (2)  Transactions Involving Other Countries

Iranian transactions were not the only potentially prohibited transactions sent through HBUS.  Transactions involving Burma, Cuba, North Korea, and Sudan, as well as persons named on the SDN list, were also sent through HBUS accounts, although to a much lesser extent than those related to Iran.  HSBC affiliates were one major source of the transactions, due to poor compliance with HSBC Group policy barring U.S. dollar transactions with prohibited countries or persons, and requiring transparent transactions, but the majority of these transactions appear to have been sent through HBUS by unrelated financial institutions.  The transactions sent by HSBC affiliates also do not appear to be the product of the same kind of systematic effort to avoid the OFAC filter as was the case with the Iranian U-turns.  Some of the transactions sent through HBUS had references to a prohibited person or country deleted or used cover payments, and passed undetected through the OFAC filter.  Others openly referenced a prohibited country or person, but escaped detection by HBUS' OFAC filter or HSBC's WOLF filter due to poor programming.  Still others were caught by a filter, but then released by HBUS personnel, apparently through human error.  An ongoing review by an outside auditor, examining HBUS transactions over a seven-year period from 2001 to 2007, has so far identified about 2,500 potentially prohibited transactions involving countries other than Iran, involving assets totaling about $322 million.[951]

### (a)  2005 and 2006 GCLs

The documents examined by the Subcommittee show that HBUS' OFAC filter blocked a transaction involving a prohibited country other than Iran as early as 2002.[952]  Internal bank documents indicate, however, that transactions involving prohibited persons or countries other than Iran did not receive the same level of attention as the Iranian transactions, until issuance of

---

[951] Deloitte presentation, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 930.  Since the Deloitte review has yet to examine an additional set of U.S. dollar transactions and does not include any transactions during the period 2008 to 2010, its figures represent a conservative analysis of the potentially prohibited transactions transmitted through HBUS.
[952] On May 21, 2002, a $3 million payment from HBEU was blocked by HBUS' OFAC filter due to a reference in the payment details to Cuba.  See 4/24/2006 email from HBUS Charles Delbusto to HBUS Michael Gallagher, "ING Writeup," HSBC OCC 1933599-601. See also 11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.

PX257

168

the July 28, 2005 Group Circular Letter 050047 which barred HSBC affiliates from executing U.S. dollar transactions involving any person or country prohibited by OFAC.[953]

Shortly after the GCL was issued, the HSBC Group head of Global Institutional Banking, Mark Smith, issued a managerial letter, in August 2005, providing guidance on implementing the new policy.[954]  His letter summarized the Group's relationships with Burma, Cuba, Iran, North Korea, Sudan, and Zimbabwe.  He explained that most of HSBC Group's business with Sudan and Cuba was conducted in U.S. dollars and "discussions already initiated with the affected banks will dictate the extent of our ongoing relationship."  The guidance also clarified that the revised policy applied only to U.S. dollar transactions.[955]

In addition, the managerial letter identified correspondent relationships affected by the new policy.[956]  It provided the number of open correspondent accounts with financial institutions in Cuba, Burma, Iran, North Korea, and Sudan.  It also explained:

> "The revised policy does not represent an automatic exit strategy with regards to affected clients.  Non-USD business (and for Iran, U-turn exempt transactions) may continue to be undertaken.  However, for a number of reasons eg. operational simplicity, where the remaining non-USD business is uneconomic or where the client concludes they will have to conduct their business with an alternative provider, the ultimate outcome may be the closure of certain relationships.  Verbal discussions with affected clients would be preferable.  Any written correspondent seeking to clarify the Group's revised policy should be cleared with local Compliance."[957]

The letter noted that "any dispensation from the terms of the GCL require[d] Group Compliance concurrence."[958]

In September 2005, senior HBEU payments official Rod Moxley completed an analysis of U.K. transactions over a 10-day period that were stopped by HSBC's WOLF filter and involved Burma, Cuba, or Sudan.[959]  He forwarded the results to senior HSBC Group Compliance officials John Root and John Allison, noting that there were "a considerable number of USD denominated transactions" for Sudan, and "also to a lesser extent" Cuba and Burma.  He also noted that prior to the effective date of the new GCL, these payments would have been stopped by the WOLF filter but then allowed to proceed, "providing they did not infringe on UN/EU sanctions or terrorist parameters," since HBEU was "not affected directly by OFAC sanctions," but the new GCL would require these payments to be blocked due to OFAC prohibitions.

---

[953] 7/28/2005 GCL 050047, "Compliance with Sanctions," HSBC OCC 3407560-561.
[954] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[955] Id at 566.
[956] Id.
[957] Id. at 568.
[958] Id.
[959] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.

**PX257**

169

Mr. Moxley also wrote:

"Since the issuance of the GCL, it has been made clear that US interests are of paramount importance and we should do nothing, when processing payment transactions, which would leave HBUS in a vulnerable position. The issues surrounding Iran have overshadowed other OFAC payments recently, however, I can advise that we have not so far physically returned any USD payments involving Sudan, Cuba or Burma. I feel we now need to look far more closely at these payments to ensure compliance with the GCL."[960]

Mr. Moxley asked about two alternative responses to transactions stopped by the WOLF filter and barred by the new GCL. One was to continue processing the transactions but ensure that the payment was routed in such a way "that they are not frozen in the US." He explained: "This will involve intelligent usage of the routing system but may perpetuate similar scenarios to those encountered with Iran (customer instructions saying Do not mention Sudan or routing which does not make it apparent that these are Sudanese payments)." This alternative seems to suggest that HSBC would engage in Iran-style transactions in which transaction details are stripped out to avoid triggering the OFAC or WOLF filters. His second alternative was to "strictly" apply the GCL "and return the payments unprocessed." He wrote that his "instinct" was to "return all such USD payments … so that our US colleagues' position is not compromised," but wanted confirmation from HSBC Group Compliance before taking that action.[961] The documents reviewed by the Subcommittee do not indicate what response he received. When asked about his email, Mr. Moxley told the Subcommittee that he could not recall how his inquiry was resolved.[962]

About a year later, on April 6, 2006, HSBC Group issued another Group Circular Letter, GCL 060011, which required all HSBC affiliates, when sending U.S. dollar transactions through a correspondent account at HBUS or another U.S. financial institution to use so-called "serial payments" specifying the transaction's chain of originators and beneficiaries.[963] This policy change was intended to stop HSBC affiliates from using cover payments, which provide less information for banks when processing payments and which can mask potentially prohibited transactions sent through HBUS or other U.S. banks. Its effective date for HSBC affiliates was April 30, 2006; HBUS was required to impose the policy on all third-party banks for which it provided U.S. dollar correspondent banking services by December 31, 2006.[964] At the same time, HSBC Group Compliance granted a year-long extension to HBEU, giving it until November 2007, before it was required to use serial payment instructions.[965]

Internal bank documents indicate that OFAC sensitive transactions involving countries other than Iran took place both before and after the 2005 and 2006 GCLs.

---

[960] Id.
[961] Id. at 214.
[962] Subcommittee Interview of Rod Moxley (6/7/2012).
[963] 4/6/2006 GCL 060011, "US Dollar Payments," HSBC OCC 3407587.
[964] Id.
[965] See 4/25/2006 - 5/5/2006 email exchanges among HSBC David Bagley, Group offices, and HBEU Rod Moxley, "Serial Payments – USD – GCL," HSBC OCC 8877231-239. Subcommittee briefing by OFAC (5/8/2012).

**PX257**

170

### (b)  Transactions Involving Cuba

Internal bank documents indicate that, from at least 2002 through 2007, HBUS processed potentially prohibited U.S. dollar transactions involving Cuba.  HSBC affiliates in Latin America, in particular, had many Cuban clients and sought to execute transactions on their behalf in U.S. dollars, despite the longstanding, comprehensive U.S. sanctions program and the OFAC filter blocking such transactions.[966]

In August 2005, a month after HSBC Group issued its new GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HBUS circulated an email identifying correspondent relationships that would be affected.[967]  The email stated:  "An overriding observation is that the revised policy will most significantly impact the Cuban and Sudan correspondent bank relationships."  It also observed:  "For Sudan and Cuba, most of our business is conducted in USD and the discussions already initiated with the affected banks will dictate the extent of our ongoing relationships."[968]

In September 2005, HSBC Group Compliance head David Bagley told HSBC Group CEO Stephen Green that they had closed "a number of USD correspondent relationships with Cuban … banks."[969]  On October 3, 2005, Mr. Bagley sent an email to Matthew King, then head of HSBC Group Audit, that Mr. Green was "particularly concerned" about ensuring the 2005 GCL was "properly and fully implemented across the Group."[970]  Mr. Bagley asked Mr. King to use HSBC's internal audits to help gauge compliance with the new GCL.  Mr. King relayed the request to various HSBC auditors and, in response, learned from HSBC Mexico (HBMX) Compliance that the OFAC list had not been fully integrated into HBMX's monitoring system and would not be for another six months, until April 2006.[971]  HBMX reported that, pending the systems integration, it had set up "manual controls" in several divisions to implement the new GCL, but "no automated means exists to ensure that these controls are properly being carried out."[972]  HBMX explained further that its "greatest exposure" was "the volume of business historically carried out by HBMX customers with Cuba in US dollars."[973]

Mr. King responded that the HBMX transactions raised two sets of concerns, one with respect to the U.S. dollar transactions involving Cuba being run through HBMX's correspondent account at HBUS, and the second with respect to non-U.S. dollar transactions being "transmitted through the HBUS TP gateway," referring to a U.S.-based server that handled transfers from

---

[966] See OFAC "Sanctions Programs and Country Information," Cuba sanctions (last updated 5/11/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/cuba.aspx.
[967] See 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.
[968] Id. at 3407568.
[969] 9/19/2005 email from HSBC David Bagley to HSBC Stephen Green and HSBC Richard Bennett, "GCL050047 "Compliance With Sanctions," HSBC OCC 8874360-362.
[970] 10/3/2005 email from HSBC David Bagley to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874359-360.
[971] 10/14/2005 email from HBMX Graham Thomson to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874358-359.
[972] Id.
[973] Id.

PX257

171

Mexico and South America.[974]  Since the United States prohibited transactions involving Cuba, both types of transactions raised questions about whether they ran afoul of the OFAC list and the 2005 GCL.  Mr. King responded:

> "I note HBMX continues to process USD payments involving Cuba.  It is very important that is stopped immediately as the regulators are getting very tough and the cost to the Group could be considerable if a breach occurs, both in terms of the fine and the rectification work which is likely to be a pre-requisite to any settlement.
>
> With regard to non-USD payments as described above, GHQ CMP [Group Headquarters Compliance] are urging HBUS to screen out these transactions to avoid any risk, and HBMX would have to put measures in place to p[re]-empt customer dismay."[975]

   HSBC affiliates from outside of Latin America also occasionally sent potentially prohibited transactions involving Cuba through their HBUS accounts.  For example, in December 2006, a payment for $15,350 that had been sent by an HSBC affiliate in the Asia-Pacific region was blocked by HBUS, because the transaction documents referred to "Air Tickets Moscow Havana Moscow 3Pax."[976]

   In 2007, an internal HSBC document entitled, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," revealed that, as of May 2007, HSBC affiliates in Mexico and Latin America were still providing U.S. dollar accounts to Cuban clients, in apparent violation of HSBC Group GCL policy and OFAC regulations.[977]  The document indicated that HBMX had 23 Cuban customers with U.S. dollar accounts containing assets in excess of $348,000, and 61 Cuban customers holding both U.S. dollar and Mexican peso accounts with assets totaling more than $966,000.[978]  In addition, the report disclosed that HSBC affiliates in Colombia, Costa Rica, El Salvador, Honduras, and Panama were also providing U.S. dollar accounts to Cuban nationals or the Cuban Embassy.  The document also indicated that arrangements had been made to "cancel all business relationships with" Cuban clients, in relation to U.S. dollar accounts or commercial relationships for the entire region.[979]  These steps were being taken almost two years after the July 2005 GCL had prohibited HSBC affiliates from executing U.S. dollar transactions involving OFAC sensitive persons.

---

[974] 10/17/2005 email from HSBC Matthew King to HBMX Graham Thomson, HSBC David Bagley, and others, "GCL 050047 "Compliance With Sanctions," HSBC OCC 8874357-358.

[975] Id.

[976] 12/17/2006 email from HBAP Donna Chan to HBUS Alan Ketley and others, "TT NSC770937 Dated 13Dec06 For USD15,350.21," HSBC OCC 3287261-262.

[977] 5/18/2007 HSBC document, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095, at 8876093-095.

[978] Id.  In addition, 1, 284 Cuban clients had nearly 2250 HBMX accounts holding solely Mexican pesos, with assets exceeding a total of $8.9 million.  Id. at 8876093.

[979] 5/18/2007 HSBC report, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095 at 8876093-095.

**PX257**

172

### (c) Transactions Involving Sudan

A second set of OFAC sensitive transactions involved Sudan, a country which is also subject to a comprehensive sanction program in the United States.[980]   Internal bank documents indicate that, from at least 2005 to 2008, HBUS processed a considerable volume of U.S. dollar transactions involving Sudan that, once the new GCL took effect, should have decreased.   The reasons they continued include a wide range of factors, from inadequate bank staffing reviewing OFAC transactions, to deceptive wire transfer documentation, to ongoing actions by HSBC affiliates to send these potentially prohibited transactions through HBUS.

In August 2005, a month after HSBC Group issued the GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter identifying correspondent relationships that would be affected. [981]   The letter stated:  "An overriding observation is that the revised policy will most significantly impact the Cuban and Sudan correspondent bank relationships."  It also observed:  "For Sudan and Cuba, most of our business is conducted in USD and the discussions already initiated with the affected banks will dictate the extent of our ongoing relationships."[982]   In September 2005, a senior HBEU payments official Rod Moxley completed an analysis of U.K. transactions over a 10-day period that were stopped by the WOLF filter and noted "a considerable number of USD denominated transactions" for Sudan.[983]

A year after the GCL took effect, however, one affiliate attempted to clear a Sudan-related transaction through HBUS in violation of company policy.  On December 6, 2006, HBUS blocked a $2.5 million payment originating from an HSBC branch in Johannesburg because the payment details referenced the "Sudanese Petroleum Corporation."[984]   Although the payment had also been stopped by the WOLF filter in HSBC Johannesburg, an employee there had approved its release and sent the transaction through their correspondent account at HBUS.  An internal email from HSBC Johannesburg explained that the release of the funds was:

> "a genuine error in an attempt to push the day[']s work through before the cut-off time.  I believe the loss of three staff in the department leaving only two permanent staff remaining is causing the[m] to work towards clearing their queues rather than slow down

---

[980] See OFAC "Sanctions Programs and Country Information," Sudan sanctions (last updated 2/1/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/sudan.aspx.
[981] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.
[982] Id. at 568.
[983] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.
[984] See 12/14/2006 email from HBUS Elizabeth Protomastro to HBUS John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

**PX257**

to read the warnings such as these. … Having said that I also feel it is a matter of training where seeing the word 'Sudan' alone should have been warning enough."[985]

The email also noted that the transaction had been sent by Commercial Bank of Ethiopia, which was "aware that this payment may not go through as they have attempted to make this payment via their other correspondent banks and failed."[986]

In July 2007, HBUS discovered that another client, Arab Investment Company, had been sending "multiple Sudan-related payments" through its U.S. dollar account at HBUS, that other banks later blocked for specifying a Sudanese originator or beneficiary, "suggesting that HBUS has been processing cover payments for this client."[987] An email identified seven wire transfers over a one-year period, collectively involving more than $1.1 million, in which the documentation provided to HBUS made no reference to Sudan, preventing the transfers from being stopped by HBUS' OFAC filter.[988] The email noted that two of the wire transfers later blocked by other banks had resulted in letters from OFAC seeking an explanation for HBUS' allowing the transfers to take place, and suggested closing the client account to prevent more such incidents.[989] On another occasion, HBUS identified five wire transfer payments between January and November 2007, totaling more than $94,000, that turned out to be intended for a Sudanese company, but had been processed as straight through payments at HBUS, because "there was no beneficiary address and no mention of 'Sudan'."[990]

In still other cases, wire transfers clearly referencing Sudan were stopped by HBUS' OFAC filter for further review, but then allowed by HBUS staff to proceed. An HBUS internal report on OFAC compliance noted, for example, two blocked wire transfers involving Sudan, one for over $44,000 and the other for over $29,000, blocked on November 5 and December 7, 2007, respectively, by HBUS' OFAC filter, but subsequently "released due to human error."[991]

In August 2008, HBUS noted that it was then holding over $3.2 million in Sudan-related payments sent to the bank from other HSBC affiliates.[992] The bulk of the funds came from blocking a $2.5 million payment from HSBC Johannesburg destined for the Sudanese Petroleum Corporation, but three other Sudan-related payments from HSBC affiliates were also identified, a $300,000 payment sent by HSBC Hong Kong; a payment for more than $367,000 payment from HSBC Dubai, and a payment for more than $58,000 from British Arab Commercial Bank Ltd. The email listing these blocked funds noted that a court order was seeking transfer of the funds

---

[985] 12/15/2006 email from HSBC Gimhani Talwatte to HSBC Krishna Patel, "PCM Operational error. Funds frozen in USA – payment on behalf of Commercial Bank of Ethiopia," OCC-PSI-00610597, at 8.
[986] Id.
[987] 7/8/2007 email from HBEU Joe Brownlee to HBEU Giovanni Fenocchi, forwarded by HBEU Peter May to HBUS Anne Liddy and HBUS Alan Ketley, "Arab Investment Company Reportable Event #3948 Notification Entity," OCC-PSI-00620281, at 2.
[988] Id.
[989] Id.
[990] Undated Global Transaction Banking report, "All Open Reportable Events," OCC-PSI-00823408, at 7.
[991] 4/2/2008 HBUS memorandum, "Management Report for 1Q2008 for OFAC Compliance," OCC-PSI-00633713.
[992] 8/8/2008 email from HBUS Anne Liddy to HSBC Susan Wright and others, "USS Cole Case," OCC-PSI-00304783, at 2-3.

174

to a Federal court in the United States in connection with a lawsuit seeking compensation for the families of 17 U.S. sailors killed in a 2000 terrorist attack on the USS Cole in Yemen.[993]

In August 2010, in connection with an effort to exit correspondent relationships with 121 international banks that HBUS determined it could no longer support, HBUS CEO Irene Dorner sent an email noting references to 16 banks in Sudan.  Ms. Dorner wrote:

"In Phase 2 there will be Trade names the exit for which may be more complicated but to give you a flavo[u]r of the problem we seem to have 16 correspondent banks in Sudan which cannot be right."[994]

### (d)  Transactions Involving Burma

Another set of OFAC sensitive transactions involved Burma, also referred to as Myanmar, a country which, like Cuba and Sudan, was subject to a comprehensive sanctions program in the United States.[995]  This program, first imposed in 1997, remains in effect today, although certain aspects of the program were suspended in May 2012.[996]  Internal bank documents indicate HBUS processed potentially prohibited transactions involving Burma from at least 2005 to 2010.

One of the earliest references to transactions with Burma in the documents reviewed by the Subcommittee is a January 2005 email involving HBUS' Global Banknotes business, which involves the buying and selling of large quantities of physical U.S. dollars to non-U.S. banks.[997]  The email, written by HSBC Group Compliance head David Bagley, described a transaction in which HBUS purchased $2.9 million in U.S. dollars from a client, determined that the dollars had come from a certain party whose name was redacted by HBUS, and noted: "Myanmar is currently subject to OFAC regulations prohibiting any transactions by US persons relating to Myanmar counterparties."  Mr. Bagley wrote:

"There appears little doubt that the transaction is a breach of the relevant OFAC sanction on the part of HBUS, that it will need to be reported to OFAC and as a consequence there is a significant risk of financial penalty.  It does not appear that there is a systemic issue, rather we are dealing with an individual incident, although given the potential seriousness of the breach external lawyers have been instructed to assist with the process of resolving matters with OFAC."[998]

---

[993] Id.

[994] 8/20/2010 email from HBUS Irene Dorner to HSBC Andrew Long and others, "Project Topaz US Urgent Requirements," HSBC OCC 8876105-106.

[995] See OFAC "Sanctions Programs and Country Information," Burma sanctions (last updated 4/17/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/burma.aspx.

[996] Id.  The U.S. Government suspended certain aspects of the Burma sanctions on May 17, 2012.  See "U.S. Eases Myanmar Financial Sanctions," Wall Street Journal, Jay Solomon (5/17/2012), http://online.wsj.com/article/SB10001424052702303879604577410634291016706.html ("[T]he U.S. Treasury Department is maintaining and updating its list of sanctioned Myanmar military companies, business tycoons and generals who allegedly engaged in human-rights violations and corruption.").

[997] See 1/21/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Compliance Exception," HSBC OCC 8873671.

[998] Id.

**PX257**

175

In July 2005, HSBC Group issued its new GCL policy barring all HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions.  A few days later, on August 25, 2005, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter, referenced previously, identifying correspondent relationships that would be affected.[999]  The letter noted that the "Group has 2 account relationships with Myanmar entities," and stated that the "GCL applies in full," implying both relationships would have to be terminated.  In September 2005, a senior HBEU payments official, Rod Moxley, who analyzed U.K. transactions stopped by the WOLF filter over a 10-day period noted that a number of the U.S. dollar transactions involved Burma.[1000]

After the GCL's 2005 effective date, Burma-related transactions appear to have been reduced, but continued to occur.  One example is a $15,000 payment that originated in Burma on January 18, 2008, was processed as a straight-through payment at HBUS, and blocked by the OFAC filter at another bank involved with the transaction.[1001]  An HBUS email explained that the payment had not been blocked at HBUS, because its OFAC filter didn't recognize "Yangon," the former capital of Burma, also called "Rangoon," as a Burma-related term.  According to the email, it was the second payment involving "Yangon" that was missed by the HBUS filter.  HBUS Compliance head Carolyn Wind requested that the filter be fixed immediately:  "We are running too much risk that these misses will cause OFAC to start questioning the effectiveness of our controls."[1002]

Four months later, HBUS blocked an April 2008 wire transfer for $12,060 headed for the account of an SDN-listed entity at Myanmar Foreign Trade Bank.  An internal bank document noted that the payment had been blocked by HBUS due to "references to Yangon and Myanmar, rather than blocking it due to the sanctioned entity[']s involvement."  The document noted that the bank code "for the sanctioned entity was not included in the payments filter, as per agreed upon procedure with the UK WOLF team," and a systems fix was implemented in October 2008.[1003]

In May 2010, two additional Burma-related U.S. dollar transactions were processed by HBUS, due to limitations in the WOLF filter.  In one instance, a payment was not blocked, because "the filter did not list 'Burmese' as an a.k.a. [also known as] for Burma."  In the other instance, the "filter did not identify 'Mynmar' as a possible reference to Myanmar."[1004]

---

[999] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.

[1000] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.

[1001] See 1/25/2008 email exchanges among HBUS Carolyn Wind, HBUS Mike Ebbs, and others, "Myanmar-related payment – Missed by filter ('Yangon')," HSBC OCC 0616168-178, at 169.

[1002] Id. at 168.

[1003] Undated Global Transaction Banking report, "All Open Reportable Events," OCC-PSI-00823408, at 4.

[1004] 1/1/2010 – 5/31/2010 Compliance Certificate from HSBC David Bagley to HNAH Brendan McDonagh and HNAH Niall Booker, OCC-PSI-01754176, at 4.

**PX257**

176

### (e)  Transactions Involving North Korea

Still another set of OFAC sensitive transactions involved North Korea which, unlike Burma, Cuba and Sudan, is not subject to a comprehensive U.S. sanctions program, but has particular persons and entities included in the OFAC SDN list.[1005]

In August 2005, a month after HSBC Group issued the GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter identifying correspondent relationship that would be affected. [1006]  The letter stated:  "The Group has 3 account relationships with North Korean entities.  These are all inhibited.  We have been seeking to close the accounts, and will continue to do so, for some time but have not been able to elicit a response from the banks concerned."[1007]

Nearly two years later, in 2007, an internal HSBC document entitled, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," revealed that, as of May 2007, HSBC affiliates in Mexico and Latin America were providing U.S. dollar accounts to North Korean clients.[1008]  The document indicated that HSBC Mexico (HBMX) had nine North Korean customers with nine U.S. dollar accounts holding assets exceeding $46,000, and seven North Korean customers with both U.S. dollar and Mexican peso accounts whose assets totaled more than $2.3 million.[1009]  The document indicated that arrangements had been made to "cancel all business relationships with" North Korea, in relation to U.S. dollar accounts or commercial relationships for the entire region.

In addition, HBUS did not close a U.S. dollar account with the Foreign Trade Bank of the Democratic People's Republic of Korea until April 28, 2010, although a review of the account indicated that no U.S. dollar activity had taken place in it since 2007.[1010]

### (f)  Other Prohibited Transactions

In addition to transactions involving jurisdictions subject to U.S. sanctions programs, some transactions sent to HBUS involved prohibited individuals or entities named on the OFAC SDN list.  While many of these transactions were not sent by HSBC affiliates, some were.

---

[1005] See OFAC "Sanctions Programs and Country Information," North Korea sanctions (last updated 6/20/2011), http://www.treasury.gov/resource-center/sanctions/Programs/pages/nkorea.aspx.

[1006] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.

[1007] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569, at 567.

[1008] 5/18/2007 HSBC document, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095, at 093-095.

[1009] Id.  In addition, 92 North Korean clients had 137 HBMX accounts holding solely Mexican pesos, with assets exceeding a total of $697,000.  Id. at 093.

[1010] See 2007 Deloitte OFAC review, "Results of the Transactions Review-UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 988; Subcommittee briefing provided by Deloitte representatives (5/5/2012).

**PX257**

HBUS did not allow such transactions to proceed, showing the effectiveness of the OFAC filter when all appropriate transactions are run through it.

On November 9, 2006, for example, "at the direction of OFAC," HBUS blocked for further review a $32,000 payment that had been originated by HBME, because the underlying payment details indicated the funds were to be credited to Al Aqsa Islamic Bank.[1011]  This bank had been designated as a "specially designated global terrorist" by OFAC in December 2001, because it was a "direct arm of Hamas, established and used to do Hamas business."[1012]  On November 20, 2006, HBME asked HBUS to cancel the payment, because "it was sent in error." On December 7, 2006, however, OFAC instructed HBUS to continue to block the funds.  HBUS AML Compliance head Teresa Pesce wrote:  "How is it that these payments continue to be processed by our affiliates in light of the GCLs?"[1013]

A report prepared by Deloitte at HBUS' request, examining the period 2001 to 2007, also disclosed that one U.S. dollar correspondent account located in the United Kingdom had been opened for a bank located in Syria, while two U.S. dollar correspondent accounts in the United Kingdom had been established for the "Taliban."[1014]  When asked about the correspondent account for a bank established for the Taliban, HSBC legal counsel told the Subcommittee that HBEU had maintained an account for Afghan National Credit and Finance Limited, the London subsidiary of an Afghan bank that, from October 22, 1999 to February 2, 2002, was designated under OFAC's Taliban sanctions.[1015]  An HBUS representative told the Subcommittee that HBUS was unable to go back far enough in its records to uncover whether or not the Afghan account at HBEU sent transactions through HBUS during that time.[1016]  The fact that HBEU had this account after the 9/11 terrorist attack on the United States again demonstrates how HSBC affiliates took on high risk accounts that exposed the U.S. financial system to money laundering and terrorist financing risks.  These U.S. dollar accounts may also have contravened the 2005 GCL and OFAC regulations by enabling banks in Syria and Afghanistan when it was controlled by the Taliban to engage in U.S. dollar transactions through HBUS.

Another account involving an individual on the OFAC list was housed at HSBC Cayman Islands.  On February 21, 2008, a Syrian businessman by the name of Rami Makhlouf was

---

[1011] 12/14/2006 email from HBUS Elizabeth Protomastro to HBUS John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

[1012] 1/9/2007 email from HBUS Elizabeth Protomastro to HSBC John Allison, HBUS Teresa Pesce, Anne Liddy, and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," OCC-PSI-00610498, at 2.

[1013] See 12/15/2006 email from HBUS Teresa Pesce to HBUS Elizabeth Protomastro and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608.

[1014] 10/18-10/19/2011 "Transaction Review Progress and Results Reporting," prepared by Deloitte LLP, HSBC-PSI-PROD-0096628-672, at 649.

[1015] Subcommittee briefing by HSBC legal counsel (7/9/2012).  See also "UK Observer Reports Taliban Banks Still Operating in London," London The Observer, Sunday edition of The Guardian (10/1/2007); "Schwerer Schlag": Ein kleines Geldhaus in London diente offenbar als Hausbank der Taliban," [Serious Blow:  A small Financial Institution in London apparently served as Taliban's main bank"], Der Spiegel, Christoph Von Pauly (10/8/2001).

[1016] Id.

PX257

placed on the SDN list by OFAC.[1017]  One week later, HSBC Cayman Compliance personnel contacted HBUS to report that HSBC Cayman Islands currently held a trust relationship with Mr. Makhlouf and to inquire as to "what actions if any HSBC Group has taken in relation to the above mentioned individual."[1018]  An HBUS Compliance officer asked the Cayman Compliance officer for more information about the Makhlouf accounts, and the head of HSBC Cayman Compliance responded:  "The Trust is administered by HSBC Geneva.  We raised concerns with this client in August 2007 however we were assured by David Ford that the relationship had been reviewed at a Group level and a decision had been taken to continue with the relationship."[1019]  Ultimately, HBUS determined that it did not have any connection to Mr. Makhlouf and did not need to report any information to OFAC.

### (3)  HBUS' OFAC Compliance Program

Internal bank documentation related to HBUS' OFAC compliance efforts regarding OFAC sensitive transactions portrays a variety of specific problems over the period reviewed by the Subcommittee.  One problem was that some HSBC affiliates continued to offer U.S. dollar accounts to prohibited persons despite HSBC Group policy and OFAC regulations, and continued to send transactions involving those accounts through their U.S. dollar accounts at HBUS.  A second problem was the ongoing practice by some HSBC affiliates and others to use methods of processing transactions which did not disclose the participation of a prohibited person or country when sending a transaction through an account at HBUS.  Even some within HSBC worried that such methods would look deceptive to its U.S. regulators.  In other cases, prohibited transactions were not detected by HSBC's WOLF filter or HBUS' OFAC filter due to programming deficiencies that did not identify certain terms or names as suspicious.  In still other cases, transactions that had been properly blocked by the WOLF or OFAC filter were released by HSBC or HBUS employees in error, due to rushed procedures, inadequate training, or outright mistakes.  Beginning in 2008, spurred in part by an upcoming OCC examination of its OFAC compliance program, HBUS took a closer look at its program as a whole.

On September 28, 2008, HBUS received a cautionary letter from OFAC regarding "12 payments processed from September 4, 2003 through February 1, 2008 which represent possible violations against U.S. economic sanctions."[1020]  That same month, HBUS learned that the OCC planned to review its OFAC operations as part of a November 2008 examination of HBUS' Payments and Cash Management (PCM) division.[1021]  In response, HBUS undertook a detailed analysis of not only the 12 transactions highlighted by OFAC, but also other prohibited transactions that had been processed through the bank since issuance of the 2005 GCL policy.

---

[1017] See 2/21/2008 U.S. Department of Treasury Press Release No. HP-834, "Rami Makhluf Designated For Benefiting from Syrian Corruption," http://www.treasury.gov/press-center/press-releases/Pages/hp834.aspx ("The U.S. Department of the Treasury today designated Rami Makhluf, a powerful Syrian businessman and regime insider whom improperly benefits from and aids the public corruption of Syrian regime officials.").
[1018] 2/28/2008 email exchange among HBUS Andy Im and HSBC Cayman Islands Patricia Dacosta and Michelle Williams, HSBC OCC 8870981.
[1019] Id.
[1020] 9/29/2009 OFAC Cautionary Letter, HSBC-PSI-PROD-0096180-181.
[1021] See 10/3/2008 email from HBUS Lesley Midzain to HBUS Janet Burak, HSBC David Bagley, and HBUS Anne Liddy, "OFAC 'Cautionary Letter' received today," HSBC OCC 3406951-952.

PX257

179

On October 3, 2008, a member of HBUS' OFAC Compliance team Elizabeth Protomastro forwarded the OFAC letter to HBUS Compliance head Leslie Midzain.[1022] Ms. Midzain, in turn, forwarded it to HSBC Group Compliance head David Bagley and HNAH's regional Compliance head Janet Burak.[1023] Ms. Midzain wrote that she was giving them an "immediate heads up" because of the "additional [OFAC] failures since February 2008," the upcoming OCC examination in November, and the "continued sensitivity" surrounding OFAC compliance. She stated that the matter would "receive high priority."[1024]

On November 6, 2008, Ms. Midzain provided Mr. Bagley and Ms. Burak with detailed charts on the 12 prohibited transactions as well as a larger number of prohibited transactions that had been mistakenly processed by the bank.[1025] To provide context to the figures, she noted that HBUS processed approximately 600,000 wire transfers per week, of which about 5%, or 30,000 transactions, generated "possible [OFAC] matches which require review prior to releasing."[1026] She wrote that, over a five-year period from 2003 to 2008, HBUS had "rejected and reported 1,212 transactions valued at $100 million" to OFAC.[1027] She explained that, in addition, HBUS had self-reported 79 missed transactions to OFAC that should have been blocked, but weren't. Of those, she wrote that HBUS had identified "approx[imately] 57" that were issued subsequent to the 2005 GCL that were "contrary to sanction requirements and for which HSBC was the originating bank."[1028] She noted that some of the issues had arisen after HBUS replaced its OFAC filter in July 2007, and may have been due to gaps in the filter that were closed "as the system [was] refined."[1029]

Ms. Midzain reported that the 79 missed transactions primarily involved Iran and Sudan.[1030] Other transactions involved Cuba, Iraq, Syria, Zimbabwe, and persons on the SDN list. Ms. Midzain explained that of the 57 missed transactions that occurred since issuance of the July 2005 GCL policy barring HSBC affiliates from processing U.S. dollar transactions for OFAC sensitive persons, 21 or about one-third had nevertheless originated with an HSBC affiliate.[1031] Of those 21, her analysis noted that about five did not contain a reference to a prohibited person. Her analysis suggests that an HSBC affiliate may have been using a cover payment which would mask the nature of the transaction from HBUS.[1032] Ms. Midzain wrote: "Regarding Group members, since Group policy was issued JUL05, we have nonetheless received a fairly notable number of payments that suggest HSBC banks have not been consistently applying the policy."[1033] She also noted that the analysis had not examined the

---

[1022] Emails between HBUS Elizabeth Protomastro, HBUS Lesley Midzain, and others on October 3, 2008, "OFAC 'Cautionary Letter' received today," HSBC OCC 3406952-953.

[1023] 10/3/2008 email from HBUS Lesley Midzain to HBUS Janet Burak, HSBC David Bagley, and HBUS Anne Liddy, "OFAC 'Cautionary Letter' received today," HSBC OCC 3406951-952.

[1024] Id.

[1025] 11/6/2008 email exchanges among HBUS Leslie Midzain, HSBC David Bagley, HBUS Janet Burak, and others, "OFAC analysis," HSBC OCC 0616010-026.

[1026] Id. at 012.

[1027] Id.

[1028] Id. at 016.

[1029] Id. at 014.

[1030] Id. at 016-017.

[1031] Id. at 017.

[1032] Id. at 016.

[1033] Id.

180

population of payments that HBUS stopped over the years to see how many of them also came from HSBC affiliates. Her figures also did not reflect the larger universe of potentially prohibited transactions that were processed by the bank without either HBUS or OFAC detecting them.

David Bagley, HSBC Group Compliance head, thanked Ms. Midzain for her analysis. He also wrote:

> "As you know, we have just completed and are currently collating the results of a Groupwide Compliance review of compliance with our USD/OFAC policy.

> Whilst some of these apparent breaches of Group policy may be rather historic nevertheless I am determined that we should enforce our policy on a consistent and Groupwide basis.

> Given this, what I would like to do is at Group level track back relevant and apparently offending payments and establish root causes so as to satisfy ourselves that there can be no, or at the very least, far less repetition. It is of course unrealistic to expect that no payments will pass through to HBUS, and at least our move to transparency in form of serial payments should allow these to be caught nevertheless I would prefer that payments were rejected at point of entry."[1034]

The OCC examination took place near the end of 2008. It tested the bank's OFAC systems to determine if OFAC screening was being properly applied to new accounts, wire transfers, and other transactions.[1035] An internal OCC memorandum stated that, as of June 30, 2008, "HBUS reported 370 items on the OFAC blocked report, valuing approximately $20 million." It reported that, from September 2003 to September 2008, HUBS had "rejected and reported to OFAC over 1,200 transactions valuing $100 million."[1036] The memorandum also stated that HBUS was then processing about 600,000 wire transfers per week, of which 6%, or about 30,000, were manually reviewed each week by four-person OFAC Compliance teams in Delaware and New York. The OCC wrote that, of the wire transfers that underwent manual review, 20 to 30 per day were "escalated" and required a "disposition decision from compliance management."[1037] The OCC memorandum reported:

> "Although, according to management, within the past five years (9/03-9/08) there ha[ve] been only 80 missed payments, the bank's Compliance teams are under rigorous pressure to process alerts and determin[e] a disposition in a timely maner. … [T]his strain can and will inhibit their mental capacity leaving gaps for errors even though permanent current staff members are well trained and qualified to complete the OFAC responsibilities."

---

[1034] 11/11/2008 email from HSBC David Bagley to HBUS Leslie Midzain and HSBC Susan Wright, "OFAC," HSBC OCC 0616010-011.
[1035] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962. [Sealed Exhibit.]
[1036] Id. at 3.
[1037] Id. at 4-5.

**PX257**

181

On January 20, 2009, the OCC sent HBUS a Supervisory Letter with generally positive examination findings regarding its OFAC compliance efforts.[1038]   The Supervisory Letter stated:

"• OFAC Compliance is **High and Increasing.**  The quality of risk management systems is satisfactory.

• Compliance with legal and regulatory requirements is satisfactory and no violations of law or regulation were cited at this examination.

• One recommendation is made related to staffing."[1039]

The Supervisory Letter stated that the OFAC risk was high and increasing due to "almost a zero tolerance for error" under OFAC regulations and increasing growth in HBUS' PCM and retail banking businesses.  The staffing recommendation, which did not require corrective action, stated:  "Management should consider a review of current staffing requirements to ensure that there is an adequate number of permanent qualified staff to prolong the timely operations associated with OFAC related matters and to ensure adherence with regulatory requirements … as your business grows."[1040] Despite the OCC's generally positive examination, internal bank documents indicate that HBUS itself had a much more negative view of its OFAC compliance program.  In June 2009, HBUS initiated an "OFAC Program Review Project."[1041]   Four months later, in October 2009, Debra Bonosconi, the HBUS Director for Specialized Compliance overseeing the Embassy Banking business, sent an email to Anthony Gibbs, the COO of HSBC North America Legal and Compliance, commenting on a number of compliance issues, including OFAC compliance.[1042]  Ms. Bonosconi, who had begun working at HBUS in March 2008, wrote that she had only recently become aware of the negative findings of the OFAC Program Review Project.  She explained:

"This project has been underway since June and the findings that have surfaced are no different than those already identified previously.  So, we have a project that has taken far longer than it should have and findings that do not vary significantly from previous reviews.

The bottom line is, our OFAC process is in disarray and in great risk of being noncompliant.  We have multiple systems, inconsistent practices, limited communication between the various functions, and no oversight function."[1043]

This candid description of the bank's OFAC compliance program, as having "inconsistent practices," "limited communication," and "no oversight function," stands in marked contrast to the OCC findings less than a year earlier.

---

[1038] See OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434-436.  [Sealed Exhibit.]
[1039] Id. at 1.
[1040] Id. at 3.
[1041] See  10/23/2009 email from HBUS Debra Bonosconi to HBUS Anthony Gibbs, "comments," HSBC OCC 3405534-537.
[1042] Id.
[1043] Id. at 537.

**PX257**

182

Another sign of the stresses in the OFAC compliance program surfaced in December 2009, when the four-person OFAC Compliance team in New York faced an accumulated backlog of greater than 700 OFAC alerts that had yet to be reviewed.[1044]  The OFAC Compliance team requested five or six people from the Payments and Cash Management (PCM) department for ten days to help clear the backlog.[1045]  PCM responded that it had no resources to loan, and suggested asking Compliance personnel in Delaware for help.  The OFAC Compliance team in New York responded that the Delaware Compliance staff was already "fully deployed" dealing with general alerts from the CAMP monitoring system:

> "We have considered all options at this point[;] the Compliance team in DE is already fully deployed dealing with wire camp alerts and bank examiner requests for the current exam.  There is no bandwidth there at all[;] they are behind on the current alert clearing process which we are also dealing with."[1046]

In late 2011, the OCC conducted a second examination of HBUS' OFAC compliance program and, on January 25, 2012, issued a Supervisory Letter with a more negative assessment.[1047]  The Supervisory Letter stated that the OCC was "concerned about the number and severity of the deficiencies in the enterprise-wide OFAC compliance program" at HBUS and at two other HSBC affiliates in the United States, HSBC Nevada, N.A. and HSBC Trust Company (Delaware), N.A.  It stated that the OCC had reviewed reports prepared by HBUS' own auditors and by an outside consultant that "identified significant deficiencies in the program."  It noted that bank management had taken "significant steps" to address deficiencies, but concluded the "three banks lack a robust OFAC risk assessment that ensures the OFAC risks have been adequately identified so they can be managed appropriately."  The Supervisory Letter contained two Matters Requiring Attention (MRAs) by the bank:  (1) development of a "comprehensive OFAC risk assessment;" and (2) an independent review of certain real estate loans through a California branch between 2009 and 2011, involving Iran, that raised OFAC concerns.[1048]  The Supervisory Letter also included a three-page attachment identifying OFAC violations cited in seven OFAC cautionary letters since June 2009.  The OCC required HBUS to modify the AML action plan it was developing in response to a September 2010 Supervisory Letter necessitating broad improvements in its AML program to include the MRAs on its OFAC compliance program.[1049]

Since the OCC examination, OFAC has issued one more cautionary letter to HBUS.  Altogether, six of the pending OFAC letters warned that the violations might result in a civil monetary penalty, but no penalty has been imposed as of June 2012.

---

[1044] 12/11/2009 email exchange among HBUS Camillus Hughes and HBUS Michael Gallagher, Charles DelBusto, Sandra Peterson, Thomas Halpin, Chris Davies, and Lesley Midzain, "OFAC Payments," HSBC OCC 7688668-670, at 670.
[1045] Id.
[1046] Id. at 668.
[1047] See 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566.  [Sealed Exhibit.]
[1048] Id. at 2.
[1049] Id. at 3.

PX257

183

### (4)  Server Issues

One additional issue involving OFAC-sensitive transactions involves payment messages associated with non-U.S. dollar transactions that were sent through servers physically located in the United States, but which were not processed by HBUS and were not screened by an OFAC filter.  The key issue is whether the electronic presence of those payment messages in the United States, utilizing U.S. facilities on their way elsewhere, required application of the OFAC filter.[1050]  Despite concern expressed by HBUS, the bank decided not to turn on the HBUS OFAC filter to screen these payment messages.

**WHIRL Server.**  In the documents reviewed by the Subcommittee, server issues appear to have first arisen in 2003, when the HSBC Group Executive Committee discussed establishing a new server in the United Kingdom to process credit card transactions, instead of continuing to route those transactions through a server in the United States, for the express purpose of "avoid[ing] contravening the OFAC restrictions."[1051]  In January 2004, the HSBC Group Board of Directors approved installing a separate, so-called "WHIRL system" in the United Kingdom at an estimated cost of $20 million.[1052]  When asked about the WHIRL server, Mr. Bagley told the Subcommittee that the bank had moved the payment processing outside of the United States to protect HBUS, that he viewed it as a broad reading of OFAC rules at the time, and that he saw it as a conservative decision.[1053]

By 2005, the WHIRL server was active.  In November 2005, Mr. Bagley asked Mr. Root to follow up on certain HBMX compliance issues identified by Mexican regulators, including the processing of credit card transactions.  Mr. Bagley wrote that even through the credit card transactions "are, or will be processed on the UK Whirl server the routing of the relevant messages may pass through the U.S. first."[1054]  He also wrote:  "If this is the case then we may still have an issue dependent on how much intervention is theoretically possible on the part of the US leg."  The following day, the head of HBMX Compliance Ramon Garcia informed Mr. Root and Mr. Bagley that WHIRL transaction messages were still being routed through a U.S. server "for a fraction of a second for later transfer to the UK," which could be long enough for a "log file" to exist in the United States identifying the transactions.

**HSBC Affiliates in the Americas.**  Six months later, in April 2006, Mr. Bagley proposed that "countries in the Americas outside USA disconnect their payment routing link to the USA TP Gateway and reconnect to the UK TP."  He indicated doing so would provide two main benefits:  "firstly the ability to make payments in currencies other than USD to countries/names/entities sanctioned by USA OFAC (as permitted by GCL 050047), and secondly

---

[1050] When asked, OFAC declined to provide a definitive answer to the Subcommittee in the abstract, indicating that its analysis would have to examine specific facts.  Subcommittee briefing by OFAC (5/8/2012).
[1051] See 1/30/2004 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198571-572.  The HSBC Group Executive Committee consisted of senior executives in HSBC.
[1052] See 1/30/2004 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198571-572.
[1053] Subcommittee interview of David Bagley (5/10/2012).
[1054] See 11/15-22/2005 email exchanges among HSBC David Bagley, HSBC John Root, and HBMX Ramon Garcia, "HBMX – Compliance Issues," HSBC OCC 8873261-266.

**PX257**

184

to take data records outside USA."[1055]  His email raised the issue of whether electronic payment messages routed through a U.S. server could be subject to HBUS' OFAC filter and the obligation to block all potentially prohibited transactions.

In November 2006, at a meeting of the HBUS Compliance Risk Management Committee, then HBUS Compliance head Teresa Pesce advised:  "Plans are underway to implement OFAC screening for messages sent by the Americas through the global messaging gateway in the US in 2007."[1056]  Her decision to inform the committee of that development indicates that payment messages already being routed through the U.S. server were not being scanned against the OFAC filter.  If the OFAC filter was not being used, all of the payment messages being sent through the United States by HSBC affiliates in Latin America were not being screened for terrorists, drug traffickers, or other wrongdoers.

Four months later, in March 2007, Mr.  Bagley contacted Alexander Flockhart, then HSBC Latin America CEO, about Latin America payment messages being routed through the U.S. server, in light of the increased focus on OFAC compliance "on the part of both OFAC" and "our banking regulators."[1057]  Mr. Bagley noted that HBUS was required to screen all transactions for compliance with OFAC requirements, including all non-U.S. dollar transactions, which "would clearly be disadvantageous from Latin America's perspective," since the logistics of screening all those transactions "would be commercially and operationally challenging" for Latin American affiliates. Mr. Bagley informed Mr. Flockhart that they were developing a stand-alone WHIRL server in the United Kingdom that Latin America could use and which would avoid OFAC screening.  He commented that if Mr. Flockhart "want[ed] to carry out as many transactions permitted by Group policy as possible," he should relocate Latin America's payment processing "to a different Group Messaging Gateway" than the one in the United States.

Mr. Bagley also noted that HSBC Group had already "informally explored" the possible relocation of Latin America payment processing to the U.K. server, but realized that gateway was already experiencing capacity issues.  Mr. Bagley commented further that the existing situation in which "the filtering" was not turned on was making HSBC's U.S. colleagues "extremely uncomfortable":

> "Whilst we have lived with the current position for some time, it is fair to say that now that our US colleagues are on notice they feel extremely uncomfortable in allowing the position to continue indefinitely.  In essence, we will either have to have a pass and timeline for a relocation of the payment messages or will need to turn the filtering on."[1058]

Mr. Bagley does not make it clear how his U.S. colleagues were put "on notice," and when asked, he told the Subcommittee that he did not recall who he talked with at HBUS about the

---

[1055] 4/10/2006 email from HSBC David Bagley to HBBR Luis Eduardo, HBMX David Leighton, and others, "TP Gateways," HSBC OCC 7687437-438.
[1056] 11/13/2006 Compliance Risk Management Committee minutes for HBUS, HSBC OCC 3407449-451.
[1057] 3/13/2007 email from HSBC David Bagley to HBMX Sandy Flockhart, "Group Messaging," HSBC OCC 8874354-355.
[1058] Id. at 355.

PX257

185

issue, but he did indicate clearly that the OFAC filter was not turned on for the U.S. server being used to forward payment messaging traffic from HSBC affiliates in Latin America.[1059]  Five months earlier, HBUS Compliance head Teresa Pesce told the HBUS Compliance Risk Management Committee that payment messages sent by the Americas through the U.S. gateway would be scanned for OFAC beginning in 2007; Mr. Bagley's email indicates that, as of March 2007, the OFAC filter had still not been turned on, and his U.S. colleagues were "extremely uncomfortable in allowing the position to continue indefinitely."

The following day Mr. Flockhart asked for a contact to discuss re-routing Latin American payment messaging traffic through the U.K. server.  A few days after that, Mr. Bagley provided the contact information and also notified Mr. Flockhart that HSBC Brazil was considering "giving up certain payments activity given the challenges of passing that activity through the US."[1060]  Mr. Bagley wrote that the HSBC Group had asked HSBC Brazil to postpone that decision until it was determined whether payment messaging could be "migrated elsewhere." Mr. Bagley also wrote:  "There may also need to be a conversation at some stage with Paul Lawrence [then HBUS CEO] if it is necessary to persuade HBUS to continue with payment messaging pending any migration."[1061]  In this email, the head of HSBC Group Compliance seems to be advocating sending non-U.S. dollar payments through the U.S. gateway without monitoring the transactions for OFAC compliance, pending migration of the Latin American traffic to another server.  When Paul Thurston, former head of HBMX, was asked about Mr. Bagley's comments, he expressed surprise that the HSBC Group Compliance head took that position.[1062]  In June 2007, Mr. Flockhart approved switching Latin America's non-U.S. based SWIFT traffic to the U.K. gateway citing it as the most cost effective solution.[1063]

Around the same time, HSBC Brazil (HBBR) also sought to move its transactions from the U.S. to the U.K. server to avoid the OFAC filter.  In December 2006, HBBR contacted Malcolm Eastwood at HBEU, asking for assistance in obtaining a second SWIFT address to be used for HBBR payments going to Iran, Cuba, and other sanctioned countries.  HBBR explained that these transactions – about 50 per year – were compliant with Group policy, but ran the risk of being blocked by the U.S. server they currently utilized, which was why it wanted to switch the transactions to the U.K. server and execute them in Euros.  HBBR wrote:  "To enable it, we have been informed that we have to create a second SWIFT address (BIC) to be used exclusively for this purpose, which should also not be published by SWIFT in their books."[1064]

---

[1059] Subcommittee interview of David Bagley (5/10/2012).

[1060] 3/22/2007 email from HSBC David Bagley to HBMX Sandy Flockhart, "Group Messaging," HSBC OCC 8875066-067.

[1061] Id.

[1062] Subcommittee interview of Paul Thurston (5/1/2012).  Mr. Bagley said that the reason he suggested to Mr. Flockhart that the messages be moved to the U.K. gateway was because he had received a legal opinion, which he considered "extreme," that non-U.S. dollar messages going through a U.S. messaging center could be impacted by OFAC.  He was, thus, acting in a conservative manner to avoid violating OFAC requirements.  Subcommittee interview of David Bagley (5/10/2012).

[1063] 6/1/2007 email from HBMX Sandy Flockhart to HBMX Neelesh Heredia and others, "Group Messaging Gateway for LAM – Clear Choice Report," HSBC OCC 8874349-350.

[1064] 12/18/2006 email from HBBR Morgana Casagrande to HBEU Malcolm Eastwood and others, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876927-928.

**PX257**

In response, Mr. Eastwood reached out to HSBC Group Compliance and HBEU operational staff to discuss practical issues with Brazil's routing "US sanctioned items" via the U.K. server. He wrote: "I have concerns that we might be breaching at least the spirit of the US Serial Routing GCL if not the letter of it."[1065]  HSBC Group Money Laundering Control Officer John Allison responded that, by using the U.S. server, Brazil was subject to an "all currency prohibition for all OFAC entries," but HSBC Group policy allowed Brazil to make payments in non-U.S. dollar currencies to entities on the OFAC list, so long as they were not linked to terrorism or weapons of mass destruction. At the same time, he expressed concern about the perception of HSBC's obtaining an additional SWIFT address dedicated to payments intended for OFAC sanctioned countries.

Mr. Eastwood forwarded this email correspondence to HBEU colleagues with the comment: "Just fyi. This all makes me very nervous!" HBEU's Rod Moxley responded that trying to identify and process transactions "which have so many conditions attached to them" was a predicament for them. He wrote: "Slightly irritating too that GHQ CMP [Group Headquarters Compliance] seem to have bent over backwards to accommodate a system which looks very dodgy to me. How about no you can't do this?"[1066]  On January 2, 2007, Mr. Moxley sarcastically described setting up a second SWIFT address an "interesting concept," forwarded the idea to a colleague, and wrote: "let's set up a completely different Swift address to help avoid any problems with Cuba and Iran. Wish I'd thought of it."[1067]

On January 26, 2007, Mr. Eastwood responded to Brazil's request.[1068]  He indicated in a memorandum that, after conferring with HSBC Group Compliance and operational personnel, they were not favorable to segregating certain transactions through separate SWIFT addresses, even though the transactions were permissible under Group policy, due to the possible perception of "taking action to avoid certain transactions being examined by the US authorities." Instead, Mr. Eastwood noted that HBBR could re-route all of its SWIFT traffic via the U.K. server, listing several logistical issues that would have to be resolved if Brazil wanted to move forward.

These documents raise the question of whether non-U.S. dollar payment messages referencing transactions routed through a U.S. server by HSBC affiliates were required to be screened by an OFAC filter, or whether they could move across U.S. boundaries and use U.S. facilities without triggering any OFAC prohibitions. On the one hand, HSBC Group Compliance urged Latin America to switch their messaging traffic from a U.S. to a U.K. server to avoid the delays that come with OFAC screening, while on the other hand indicating that for at least a five-month period from November 2006 to March 2007, the OFAC filter had not been turned on to screen the Latin American payment messages going through the U.S. server even though HBUS apparently had expressed concerns about not screening the messages for prohibited activity.

---

[1065] 12/21/2006 email from HBEU Malcolm Eastwood to Bill Rice and others, "Fw: Transactions with Iran/Cuba, etc.," HSBC OCC 8876927.
[1066] See 12/28/2006 - 1/4/2007 email exchanges among HBEU Malcolm Eastwood, HSBC John Allison, HBEU Rod Moxley, and others, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876925-927.
[1067] 1/2/2007 email from HBEU Rod Moxley to HBEU Andy Newman, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876921.
[1068] 1/26/2007 memorandum from HBEU Malcolm Eastwood to HBBR Lucas Fragoso and others, "Trade Transaction with Iran/Cuba etc.," HSBC OCC 8876930-931.

**PX257**

187

HSBC Group knowingly put its U.S. affiliate at regulatory and reputational risk by moving payment messages through a U.S. server without scanning them against the OFAC filter.

**Turning Off OFAC Verification.**  A very different server issue arose in July 2007, when HBUS introduced a new product called Fircosoft to help monitor OFAC sensitive transactions.  The product caused a huge increase in the number of OFAC alerts, creating a backlog that began to overwhelm HBUS OFAC compliance personnel.  According to a fourth quarter 2007 Compliance Report by HBUS, the introduction of the new product caused "serious performance issues" that would "not support HBUS volumes."[1069]  On July 17, 2007, "a risk based decision was made to eliminate the verification step of all OFAC filter alerts on a temporary basis to accelerate the process of clearing the OFAC queue."[1070]  The more limited review process for OFAC sensitive transactions remained in effect for about three weeks, from July 17 to August 6.  On August 1, 2007, HBUS Chief Operating Officer David Dew wrote:  "I think that we simply must now agree on a definitive timetable for reintroduction of full OFAC controls."[1071]  When asked about this matter, Mr. Dew told the Subcommittee that he thought the limitation on the "verification step" in the OFAC filter was only stopped for about a day.[1072]  Anne Liddy told Subcommittee that she recalled that the verification step was turned off for about a month, but didn't view it as a risk to the bank.[1073]

In 2009, the same verification step in the OFAC filter was again turned off by HBUS for a few weeks.  In November 2009, due to an industry-wide switch to SWIFT202 cover payments, OFAC alerts increased dramatically at HBUS.  HBUS was so concerned about the large number of false OFAC hits being generated that it stopped the verification step, as was done in 2007.  Turning off the verification step concerned one HBUS employee enough that the employee quietly reported the action to the Federal Reserve.  The Federal Reserve examiner who spoke with the employee wrote in an email to colleagues that the HBUS employee reported:

> "On Monday Lesley Midzain, former head of BSA/AML turned off the second level filter on Chips activity without consulting anyone and with no supporting documentation.  The rational given for turning the second level filter off was to reduce the daily backlog in lieu of additional resources.  The individual who spoke to me knew this was not appropriate action and decided to call the [regulator]."[1074]

HSBC's legal counsel told the Subcommittee that the verification step was turned off for 13 days, from November 25, 2009 and December 7, 2009.[1075]  The issue raised by both incidents in 2007 and 2009, is whether HBUS' decision to turn off part of the OFAC filtering system reduced its effectiveness in screening for prohibited transactions and increased U.S. vulnerabilities to money laundering and terrorist financing.

[1069] 4Q07 Compliance Report from HBUS Carolyn Wind to HNAH Janet Burak and others, HSBC-PSI-PROD-0000508-016, at 509.
[1070] Global Payments System (GPS) Implementation Issues, 6 Aug 07 HUSI Audit Committee Update, HSBC OCC 1105891.
[1071] 8/01/2007 email from HBUS David Dew to Bandula Wijesinghe and others, OCC-PSI-00188404.
[1072] Subcommittee interview of David Dew (3/05/2012).
[1073] Subcommittee interview of Anne Liddy (2/22/2012).
[1074] 12/16/2009 internal  Federal Reserve memorandum, BOG-A-207130. [Sealed Exhibit.]
[1075] Subcommittee briefing by HSBC legal counsel (6/27/2012).

PX257

188

## C.  Analysis

OFAC enforces U.S. programs aimed at exposing and disabling the financial dealings and resources of some of the most dangerous persons and jurisdictions threatening the world today, including terrorists, persons involved with weapons of mass destruction, drug traffickers, and rogue jurisdictions.  The OFAC filter is the central mechanism used to identify, stop, and block suspect transactions speeding through financial systems.  Global financial institutions have a special responsibility to respect OFAC prohibitions and comply with OFAC restrictions. Actions taken to circumvent the OFAC filter or endanger the effectiveness of a critical safeguard may facilitate transactions undertaken by some of the worst wrongdoers among us.

The evidence reviewed by the Subcommittee indicates that, from 2001 to 2007, HSBC affiliates, with the knowledge and tacit approval of HSBC Group executives, engaged in alarming conduct sending undisclosed Iranian U-turn transactions through their HBUS correspondent accounts, without information that would otherwise have triggered OFAC reviews.  When asked, HBUS insisted on HSBC affiliates using transparent payment instructions so that all U-turn transactions would be stopped by the OFAC filter and reviewed, but when faced with evidence that some HSBC affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to stop the conduct some in its own organization viewed as deceptive.  In addition, from at least 2009 to early 2012, the bank's OFAC compliance program suffered from multiple deficiencies.  Still another issue is that some HSBC affiliates sent non-U.S. dollar messaging traffic through U.S. servers in which the OFAC screening was not turned on or was restricted.  The aim in many of the instances in which HSBC affiliates acted to circumvent the OFAC filter may have been to avoid the time-consuming individualized reviews that followed, rather than execute prohibited transactions.  But expediency in the face of the threats posed by the targets of OFAC prohibitions does not justify potentially violating or undermining OFAC requirements.  HBUS likewise failed to obtain information about the full scope of undisclosed OFAC sensitive transactions going through its correspondent accounts, bring to a head the issue of HSBC affiliates circumventing OFAC safeguards, and ensure all transactions were reviewed for OFAC compliance.

PX257

189

# V.    AL RAJHI BANK:  DISREGARDING LINKS TO TERRORIST FINANCING

For decades, HSBC has been one of the most active global banks in Saudi Arabia, despite AML and terrorist financing risks involved with doing business in that country.  Among other activities, for more than 25 years, HSBC has provided a wide range of banking services to Al Rajhi Bank, Saudi Arabia's largest private bank.[1076]  Those services included providing large amounts of physical U.S. dollars to the bank as part of HSBC's U.S. banknotes business.  After the 9/11 terrorist attack on the United States in 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to organizations associated with financing terrorism, including that one of the bank's founders was an early financial benefactor of al Qaeda.  In January 2005, despite the fact that Al Rajhi Bank had not been indicted, designated a terrorist financier, or sanctioned by any country, HSBC Group Compliance recommended internally that, due to terrorist financing concerns, HSBC affiliates should sever ties with the bank.

In response, some HSBC affiliates disregarded the recommendation and continued to do business with the bank, while others terminated their relationships but protested HSBC's decision and urged HSBC to reverse it.  The protests continued despite a U.S. indictment the next month, in February 2005, of two individuals accused, among other matters, of cashing $130,000 in U.S. travelers cheques at Al Rajhi Bank in Saudi Arabia and smuggling the money to violent extremists in Chechnya.  In May 2005, four months after its initial decision, HSBC Group Compliance reversed itself and announced that all HSBC affiliates could do business with Al Rajhi Bank, thus allowing HBUS to decide for itself whether to resume the relationship.  For nearly two years, HSBC Banknotes repeatedly asked its AML Compliance personnel to allow reinstatement of the Al Rajhi Bank relationship, despite ongoing concerns at HBUS about the bank's possible links to terrorist financing.

On December 1, 2006, despite concern that there is "no smoke without fire," HBUS AML Compliance agreed to allow HBUS to reinstate the relationship and resume supplying U.S. dollars to Al Rajhi Bank.  Earlier, Al Rajhi Bank had threatened to pull all of its business from HSBC if the U.S. banknotes business were not restored, while HSBC personnel estimated that restoring the U.S. banknotes business would produce annual revenues of at least $100,000.  In 2007, additional information surfaced about Al Rajhi Bank's possible links to terrorism, including articles on a 2003 report by the U.S. Central Intelligence Agency (CIA) entitled, "Al Rajhi Bank: Conduit for Extremist Finance," which found that "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."  Despite that and other troubling information, HBUS continued to supply U.S. dollars to the bank, and even expanded its business, until 2010, when HSBC decided, on a global basis, to exit the U.S. banknotes business.

Al Rajhi Bank was not the only bank with links to terrorism serviced by HBUS.  Two additional examples are Islami Bank Bangladesh Ltd. and Social Islami Bank which are also located in Bangladesh.  In each case, in anticipation of revenues of $75,000 to $100,000 per year,

---

[1076] HSBC also operates an affiliate, HSBC Bank Middle East, with branches in Saudi Arabia; owns Saudi British Bank; and provides correspondent banking services to other Saudi financial institutions.

PX257

190

HBUS Banknotes personnel disregarded troubling evidence of possible links to terrorist financing, opened accounts for the banks, and provided them with U.S. dollars and access to the U.S. financial system.

### A. Al Rajhi Bank

Founded in 1957, Al Rajhi Bank is one of the largest banks in Saudi Arabia, with over 8,400 employees and assets totaling $59 billion.[1077]  Headquartered in Riyadh, the bank has over 500 branches, mostly in Saudi Arabia, but also in Malaysia, Kuwait, and Jordan.[1078]  The bank was founded by four brothers, Sulaiman, Saleh, Abdullah, and Mohamed, of the Al Rajhi family, one of the wealthiest in Saudi Arabia.

The bank began as a collection of banking and commercial ventures which, in 1978, joined together as the Al Rajhi Trading and Exchange Company.[1079]  In 1987, the company converted to a joint stock company, and two years later renamed itself the Al Rajhi Banking and Investment Corporation.[1080]  In 2006, the bank rebranded itself as Al Rajhi Bank.[1081]  It is traded on the Saudi Arabian Stock Exchange (Tadawul), and about 45% of its shares are publicly owned.[1082]  Al Rajhi family members remain the bank's largest shareholders.[1083]

Al Rajhi Bank offers a wide range of banking services including deposits, loans, investment advice, securities trading, remittances, credit cards, and consumer financing.[1084]  All services are offered in conformance with Islamic requirements, including the set aside of funds for "zakat," which is used for charitable donations.  The bank has won a number of awards for its operations in the Middle East.

The bank's most senior official is Sulaiman bin Abdul Aziz Al Rajhi, who at various times has held the posts of Chief Executive Officer, Managing Director, and Chairman of the Board of Directors.[1085]  The bank's General Manager is Abdullah bin Abdul Aziz Al Rajhi.  The board of directors consists of eleven directors, six of whom are Al Rajhi family members: Sulaiman bin Abdul Aziz Al Rajhi, Chairman of the Board; Abdullah bin Abdul Aziz Al Rajhi; Sulaiman bin Saleh Al Rajhi; Mohamed bin Abdullah Al Rajhi; Abdullah bin Sulaiman Al Rajhi; and Bader bin Mohammed Al Rajhi.[1086]

---

[1077] Al Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/default.aspx.
[1078] Id.
[1079] Id.; Al Rajhi Bank website, "Our History," http://www.alrajhibank.com.sa/our-history/index.html.
[1080] Al Rajhi Bank website, "Our History," http://www.alrajhibank.com.sa/our-history/index.html.
[1081] Id.  The bank also has various subsidiaries, including Al Rajhi Capital.  See Al Rajhi Capital website, http://www.alrajhi-capital.com/en/Welcome+to+ARFS/Overview/.
[1082] HBUS "Know Your Customer Profile" of Al Rajhi Banking & Investment Corp. (10/15/2010), HSBC-PSI-PROD-0102310, (hereinafter "2010 HBUS KYC Profile on Al Rajhi Bank"), at 2.  About 45% of the bank's shares are publicly traded; the remainder is held primarily by members of the Al Rajhi family.  Id. at 3.
[1083] 2010 HBUS KYC Profile on Al Rajhi Bank, at 3.
[1084] See Al Rajhi Bank website, http://www.alrajhibank.com.sa.aspx.
[1085] See Al Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/board-of-directors.aspx.  See also 2010 HBUS KYC Profile on Al Rajhi Bank, at 3 (describing Sulaiman Abdul Aziz Al Rajhi as Chairman of the Board and Managing Director; Abdullah Sulaiman Al Rajhi as CEO; and Mohammed Lookman Samsudeen as General Manager and Chief Financial Officer).
[1086] Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/board-of-directors.aspx.

**PX257**

191

The bank is part of an extensive group of Al Rajhi business and nonrpofit ventures, which include companies engaged in money exchange services, commodity trading, real estate, poultry, construction, and pharmaceuticals.[1087]  One business which also had an HBUS account was the Al Rajhi Trading Establishment, a money exchange business owned by Abdulrahman Saleh Al Rajhi,[1088]  Its HBUS account was closed in 2005, when it merged with seven other businesses to form a new Saudi bank.  The largest nonprofit venture in the Al Rajhi group is the SAAR Foundation, which is named after Sulaiman bin Abdul Azis Al Rajhi, and supports nonprofit and business ventures around the world.[1089]  Sulaiman Al Rajhi and his family today have an estimated net worth of nearly $6 billion.[1090]

The Subcommittee contacted Al Rajhi Bank regarding its relationship to HSBC and the matters addressed in this section, but the bank has not provided any information in response to the Subcommittee's inquiry.

## B.  Saudi Arabia and Terrorist Financing

The majority of Al Rajhi Bank's operations take place in Saudi Arabia, which the United States has long identified as a country of concern in the area of terrorist financing.[1091]  Following the terrorist attack on the United States on September 11, 2001, the U.S. Government began a decade-long intensive investigation into where and how terrorists obtain funding, repeatedly returning to Saudi Arabia, its banks, and its nationals as a suspected source.

In 2004, the 9/11 Commission charged with investigating the terrorist attack issued a report which found that Osama Bin Laden and al Qaeda had relied on a "financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states."[1092]  The Commission's report explained:

"Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.  Some individual donors surely knew, and others did not, the ultimate destination of their donations."[1093]

The Commission report stated:  "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities.  It was the society that produced 15 of the

---

[1087] See, e.g., Sulimin Abdul Aziz Al Rajhi Holding Company website, http://www.alrajhiholding.com/.
[1088] See, e.g., March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3; 9/8/2008 HSBC Financial Investigations Group (FIG) report on Al Rajhi Bank, HSBC-PSI-PROD-0102813.
[1089] See "Sulaiman Al-Rajhi's life a rags to riches story," Arab News (5/29/2012),
http://www.arabnews.com/?q=economy/sulaiman-al-rajhi%E2%80%99s-life-rags-riches-story.
[1090] See Profile of Sulaiman Al Rajhi & family (March 2012), Forbes, http://www.forbes.com/profile/sulaiman-al-rajhi/.  See also 2010 HBUS KYC Profile on Al Rajhi Bank at 3 (estimating family worth at $22.5 billion).
[1091] See, e.g., International Narcotics Control Strategy Reports prepared by the U.S. Department of State, 2003-2012 (identifying Saudi Arabia as a country "of concern" with respect to money laundering and terrorist financing).
[1092] The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States, (7/22/2004), at 55.
[1093] Id. at 170.

PX257

192

19 hijackers."[1094]  The report also stated that it "found no evidence that the Saudi government as an institution or senior Saudi officials individually funded [Al Qaeda],"[1095] and that after terrorist attacks began occurring in Saudi Arabia, a "Saudi crackdown … ha[d] apparently reduced the funds available to al Qaeda – perhaps drastically – but it is too soon to know if this reduction will last."[1096]

After several major terrorist attacks within its borders in 2003 and 2004, Saudi Arabia took a number of steps to combat terrorist financing.  One report to Congress by the Congressional Research Service summarized those actions as follows:

> "Since mid-2003, the Saudi government has: set up a joint task force with the United States to investigate terrorist financing in Saudi Arabia; shuttered charitable organizations suspected of terrorist ties; passed anti-money laundering legislation; banned cash collections at mosques; centralized control over some charities; closed unlicensed money exchanges; and scrutinized clerics involved in charitable collections."[1097]

Saudi Arabia also reported seizing illicit cash from terrorist organizations, shutting suspect bank accounts, designating several individuals as terrorist financiers, and killing two of them.[1098]  In addition, Saudi Arabia established a Permanent Committee on Combating the Financing of Terrorism and a Financial Investigation Unit which began operations in September 2005.[1099]

Despite those advances, U.S. Government testimony and reports indicate that Saudi Arabia continued to be a focus of concern with respect to terrorist financing.  In 2005, for example, U.S. Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey testified before Congress:  "[W]ealthy donors in Saudi Arabia are still funding violent extremists around the world, from Europe to North Africa, from Iraq to Southeast Asia."[1100]  He also testified that Saudi individuals may be "a significant source" of financing for the Iraq insurgency.[1101]

In 2007, in its annual International Narcotics Control Strategy Report, the U.S. Department of State wrote:  "Saudi donors and unregulated charities have been a major source of financing to extremist and terrorist groups over the past 25 years."[1102]  A 2007 report to Congress

---

[1094] Id. at 370.

[1095] Id. at 171.

[1096] Id. at 383.

[1097] "Saudi Arabia:  Terrorist Financing Issues," Congressional Research Service Report for Congress, RL32499 (9/14/2007), http://www.fas.org/sgp/crs/terror/RL32499.pdf (hereinafter "2007 CRS Report on Saudi Arabia Terrorist Financing Issues"), in the summary.  See also 2007 International Narcotics Control Strategy Report, U.S. Department of State, at 355-357.

[1098] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 25.

[1099] Id. at 24.

[1100] Stuart Levey testimony before the House Financial Services Subcommittee on Oversight and Investigations and House International Relations Subcommittee on International Terrorism and Nonproliferation (5/4/2005).

[1101] Stuart Levey testimony before the Senate Committee on Banking, Housing, and Urban Affairs (7/13/2005) ("Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda.  Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.").

[1102] 2007 International Narcotics Control Strategy Report, U.S. Department of State, at 355.

**PX257**

193

by the Congressional Research Service stated: "U.S. officials remain concerned that Saudis continue to fund Al Qaeda and other terrorist organizations."[1103]  That same year, Congress enacted legislation which found that "Saudi Arabia has an uneven record in the fight against terrorism, especially with respect to terrorist financing," and required the U.S. Government to develop a long-term strategy for working with Saudi Arabia to combat terrorist financing.[1104] On the sixth anniversary of the 9/11 attack, Treasury Under Secretary Levey said in a televised interview on terrorist financing: "[I]f I could somehow snap my fingers and cut off the funding from one country, it would be Saudi Arabia."[1105]

In 2008, the U.S. State Department issued the long-term strategy required by the 2007 law.[1106]  The strategy identified goals and "performance targets" to track progress in strengthening collaboration with Saudi Arabia to clamp down on terrorist financing.  In April 2008, when questioned during a Senate hearing, Treasury Under Secretary Levey testified that, while Saudi Arabia had taken strong action against terrorists operating within its borders and was cooperating with the United States on an operational level, it was not working as hard to prevent funds from flowing to terrorists outside of its borders: "Saudi Arabia today remains the location from which more money is going to terror groups and the Taliban – Sunni terror groups and the Taliban – than from any other place in the world."[1107]

In 2009, a report prepared for Congress by the U.S. Government Accountability Office (GAO) reviewed both the State Department's long-term strategy and Saudi anti-terrorism efforts since 2005.  GAO concluded: "U.S. and Saudi officials report progress on countering terrorism and its financing within Saudi Arabia, but noted challenges, particularly in preventing alleged funding for terrorism and violent extremism outside of Saudi Arabia."[1108]  GAO wrote:

"U.S. officials remain concerned about the ability of Saudi individuals and multilateral charitable organizations, as well as other individuals visiting Saudi Arabia, to support terrorism and violent extremism outside of Saudi Arabia.  U.S. officials also noted that limited Saudi enforcement capacity and terrorist financiers' use of cash couriers pose challenges to Saudi efforts to prevent financial support to extremists."[1109]

GAO also noted that certain performance targets set by the State Department had been dropped in 2009, such as the establishment of a Saudi Commission on Charities to oversee actions taken by Saudi charities abroad as well as certain regulations of cash couriers.[1110]  GAO recommended that the United States reinstate the dropped performance targets to prevent the flow of funds

---

[1103] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, in the summary.
[1104] See Section 2043(c), Implementing Recommendations of the 9/11 Commission Act, P.L. 110-53 (8/3/2007).
[1105] "U.S.: Saudis Still Filling Al Qaeda's Coffers," Brian Ross, ABC News (9/11/ 2007).
[1106] "U.S. Strategy Toward Saudi Arabia, Report Pursuant to Section 2043(c) of the Implementing Recommendations of the 9/11 Commission Act," U.S. Department of State (1/30/2008).
[1107] Stuart Levey testimony before Senate Committee on Finance, "Anti-Terrorism Financing: Progress Made and Challenges Ahead," (4/1/2008).
[1108] "Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 1.
[1109] Id. at 29.
[1110] Id. at 15, 33.

PX257

194

from Saudi Arabia "through mechanisms such as cash couriers, to terrorists and extremists outside Saudi Arabia."[1111]

Recently, Saudi Arabia won praise for its role in foiling a terrorist plan to smuggle a bomb onto an airline flight to the United States.[1112] The State Department's most recent annual International Narcotics Control Strategy Report contains no information about Saudi Arabia's anti-money laundering or terrorist financing efforts.[1113]

## C. Alleged Al Rajhi Links to Terrorism

In the ten years after the 9/11 attack in 2001, U.S. Government reports, criminal and civil legal proceedings, and media reports have alleged links between Al Rajhi family members and the Al Rajhi Bank to terrorist financing. The alleged links include that some Al Rajhi family members were major donors to al Qaeda or Islamic charities suspected of funding terrorism, established their own nonprofit organizations in the United States that sent funds to terrorist organizations, or used Al Rajhi Bank itself to facilitate financial transactions for individuals or nonprofit organizations associated with terrorism.

Many of the suspicions regarding Al Rajhi Bank stem from 2002, when the name of its most senior official, Sulaiman bin Abdul Azis Al Rajhi, appeared on an internal al Qaeda list of financial benefactors, and when a network of Al Rajhi-related nonprofit and business ventures located in Virginia was subjected to search by U.S. law enforcement seeking to disrupt terrorist financing activities in the United States.

**Al Qaeda List of Financial Benefactors.** The al Qaeda list of financial benefactors came to light in March 2002, after a search of the Bosnian offices of the Benevolence International Foundation, a Saudi based nonprofit organization which was also designated a terrorist organization by the Treasury Department, led to seizure of a CD-ROM and computer hard drive with numerous al Qaeda documents.[1114] One computer file contained scanned images of several hundred documents chronicling the formation of al Qaeda.[1115] One of the scanned documents contained a handwritten list of 20 individuals identified as key financial contributors

---

[1111] Id. at 3.

[1112] See, e.g., "International sting operation brought down underwear bomb plot," Los Angeles Times, Brian Bennett and Ken Dilanian (5/8/2012), http://latimesblogs.latimes.com/world_now/2012/05/underwear-bomb-plot.html.

[1113] 2012 International Narcotics Control Strategy Report, Volume II Country Database, U.S. Department of State, at 287-289.

[1114] See United States v. Enaam Arnaout, Case No. 02-CR-892 (USDC NDIL), "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements," (1/6/2003), http://fl1.findlaw.com/news.findlaw.com/wsj/docs/bif/usarnaout10603prof.pdf (hereinafter "Arnaout Evidentiary Proffer"), at 29. See also 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 3; "Terrorism, 2002-2005," FBI report, at 12, http://www.fbi.gov/stats-services/publications/terrorism-2002-2005/terror02_05.pdf ("On August 18, 2003, Enaam Arnaout, the director of Benevolence International Foundation, was sentenced to 11 years in federal prison after pleading guilty on February 10, 2003, to terrorism-related racketeering conspiracy charges. Arnaout had been indicted on October 9, 2002, for conspiracy to fraudulently obtain charitable donations in order to provide financial assistance to al-Qa'ida and other organizations engaged in violence and terrorism.").

[1115] Arnaout Evidentiary Proffer, at 29.

PX257

195

to al Qaeda.[1116]  Osama bin Laden apparently referred to that group of individuals as the "Golden Chain."[1117]  In a report prepared for Congress, the Congressional Research Service explained:

> "According to the Commission's report, Saudi individuals and other financiers associated with the Golden Chain enabled bin Laden and Al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996."[1118]

One of the 20 handwritten names in the Golden Chain document identifying al Qaeda's early key financial benefactors is Sulaiman bin Abdul Aziz Al Rajhi, one of Al Rajhi Bank's key founders and most senior officials.[1119]

The Golden Chain document has been discussed in the 9/11 Commission's report, in Federal court filings, and civil lawsuits.[1120]  Media reports as early as 2004 noted that the al Qaeda list included the Al Rajhi name.[1121]  HSBC was clearly on notice about both the al Qaeda list and its inclusion of Sulaiman bin Abdul Aziz Al Rajhi.[1122]

**2002 Search Warrant.**  Also in March 2002, as part of Operation Green Quest, a U.S. Treasury effort to disrupt terrorist financing activities in the United States,[1123] U.S. law enforcement agents conducted a search of 14 interlocking business and nonprofit entities in Virginia associated with the SAAR Foundation, an Al Rajhi-related entity, and the Al Rajhi family.[1124]  Over 150 law enforcement officers participated in the search, generating widespread media coverage.[1125]  A law enforcement affidavit supporting the search warrant detailed

---

[1116] Id. at 30.

[1117] Id. at 30.  See also 2007 CRS Report on Saudi Arabia Terrorist Financing Issues," at footnote 6.  But see "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004)("Soon thereafter, a senior al Qaeda leader held by the Justice Department in New York confirmed the document's authenticity in an interview with the FBI, referring to it as the Golden Chain, U.S. government court filings say.").

[1118] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues," at 3.

[1119] A copy of the Golden Chain document was provided as Exhibit 5 to the Arnaout Evidentiary Proffer.  Copies have also appeared on the Internet with English translations.  See, e.g.,"The Golden Chain," Wikipedia, http://en.wikipedia.org/wiki/The_Golden_Chain.

[1120] See The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States, (7/22/2004), at 55.  See also, e.g., Arnaout Evidentiary Proffer at 29-30; The Underwriting Members of Lloyd's Syndicate 3500 v. Saudi Arabia, Case 3:11-cv-00202-KRG (USDC WDPA), Civil Complaint (9/8/11), http://www.investigativeproject.org/documents/case_docs/1680.pdf, at 20.

[1121] See, e.g., "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004).

[1122] See, e.g., 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 2830874-879 (transmitting  2007 Wall Street Journal article to HBUS and requesting its response); 2/3/2010 email from HBUS Jon K. Jones to HBUS Ali S. Kazmy, "Islami Bank Bangladesh Ltd. – Poss SCC," OCC-PSI-00453499 ("Al-Rajhi Bank got [its] start as a money chaining network and (Chairman Suleiman al-Rajhi appeared on the 'Golden Chain' of wealthy investors who supported Osama bin Laden.)").

[1123] See "Operation Green Quest Overview," U.S. Customs and Border Protection press release (2/26/2002), http://www.cbp.gov/xp/cgov/newsroom/news_releases/archives/legacy/2002/22002/02262002.xml.

[1124] See "Affidavit in Support of Application for Search Warrant," In Re Searches Involving 555 Grove Street, Herndon, Virginia and Related Locations, (USDC EDVA), submitted by David Kane, Senior Special Agent, U.S. Customs Service (hereinafter "Kane affidavit"), at ¶¶ 3-4 (describing investigation).

[1125] See, e.g., "Raids Seek Evidence of Money Laundering," New York Times, Judith Miller (3/21/2002).

numerous connections between the targeted entities and Al Rajhi family members and related ventures.[1126]   The affidavit stated that over 100 active and defunct nonprofit and business ventures in Virginia were part of what it described as the "Safa Group,"[1127] which the United States had reasonable cause to believe was "engaged in the money laundering tactic of 'layering' to hide from law enforcement authorities the trail of its support for terrorists."[1128]

The SAAR Foundation is a Saudi-based nonprofit organization, founded by Sulaiman bin Abdul Aziz Al Rajhi in the 1970s, named after him, and used by him to support a variety of nonprofit endeavors, academic efforts, and businesses around the world.  In 1983, the SAAR Foundation formed a Virginia corporation, SAAR Foundation, Inc., and operated it in the United States as a tax-exempt nonprofit organization under Section 501(c)(3) of the U.S. tax code.[1129] In 1996, another nonprofit organization was incorporated in Virginia called Safa Trust Inc.[1130] These and other nonprofit and business ventures associated with the Al Rajhi family shared personnel and office space, primarily in Herndon, Virginia.  In 2000, SAAR Foundation Inc. was dissolved,[1131] but the Safa Trust continued to operate.

An affidavit filed by the United States in support of the search warrant alleged that the Safa Group appeared to be involved in providing material support to terrorism.  Among other matters, it alleged that members of the Safa Group had transferred "large amounts of funds … directly to terrorist-front organizations since the early 1990's," including a front group for the Palestinian Islamic Jihad-Shikaki Faction, a designated terrorist organization.[1132]  It also detailed a $325,000 donation by the Safa Trust to a front group for Hamas, another designated terrorist organization.[1133]  In addition, the affidavit expressed suspicion about a transfer of over $26 million from members of the Safa Group to two offshore entities in the Isle of Man.[1134]  The affidavit further alleged that "one source of funds flowing through the Safa Group [was] from the wealthy Al-Rajhi family in Saudi Arabia."[1135]

The search produced about 200 boxes of information which was then analyzed and used in other investigations and prosecutions, although neither the SAAR Foundation or Safa Trust has been charged with any wrongdoing.[1136]  In 2003, Abdurahman Alamoudi, who had worked for SAAR Foundation Inc. from 1985 to 1990, as executive assistant to its president,[1137] pled guilty to plotting with Libya to assassinate the Saudi crown prince and was sentenced to 23 years

---

[1126] See Kane affidavit throughout, but in particular ¶¶ 178-180.

[1127] Kane affidavit at ¶ 1 (page 6).

[1128] Kane affidavit at ¶ 5.

[1129] Kane affidavit at ¶ 132.

[1130] Kane affidavit at ¶¶ 135-136.

[1131] Kane affidavit at ¶ 132.  See also "Raids Seek Evidence of Money Laundering," New York Times, Judith Miller (3/21/2002)(stating that, "although officially dissolved," the SAAR Foundation had recently occupied the Virginia offices subject to search).

[1132] Kane affidavit at ¶ 3.

[1133] Kane affidavit at ¶¶ 10(g), 161.  Executive Order 12947 (1995).

[1134] Kane affidavit at ¶¶ 103-104.

[1135] Kane affidavit at ¶ 111 (emphasis in original omitted).

[1136] See In re Grand Jury Subpoena (T-112), 597 F.3d 189 (4th Cir. 2/24/2010), at 191-192.

[1137] See United States v. Alamoudi, (USDC EDVA)(9/30/2003), "Affidavit in Support of Criminal Complaint," submitted by Brett Gentrup, Special Agent with U.S. Immigration and Customs Enforcement, (hereinafter "Gentrup affidavit"), ¶ 29.

in jail.[1138]  He had also openly supported Hamas and Hezbollah, two terrorist organizations designated by the United States.[1139]  According to an affidavit supporting the criminal complaint against him, Mr. Alamoudi admitted receiving $340,000 in sequentially numbered $100 bills from Libya while in London,[1140] and planned "to deposit the money in banks located in Saudi Arabia, from where he would feed it back in smaller sums into accounts in the United States."[1141]  According to the affidavit, he also admitted involvement in similar cash transactions involving sums in the range of $10,000 to $20,000.[1142]

The documents seized in the 2002 search were returned after about 18 months, but in 2006, were sought again through subpoenas issued by a Federal grand jury in Virginia.[1143]  The Al-Rajhi related business and nonprofit ventures initially refused to re-supply the documents, then turned them over after a court imposed civil contempt fines totaling $57,000.[1144]  The Al Rajhi group then engaged in a four-year, unsuccessful court battle to nullify the fines.[1145]  In addition, in 2004, Al Rajhi Bank filed a defamation lawsuit against the Wall Street Journal for a 2002 article describing how Saudi Arabia was monitoring certain accounts due to terrorism concerns.[1146]  In 2004, the lawsuit settled; the Wall Street Journal did not pay any damages.  It also published a letter from the bank's chief executive,[1147] and its own statement that the newspaper "did not intend to imply an allegation that [Al Rajhi Bank] supported terrorist activity, or had engaged in the financing of terrorism."[1148]

**2003 CIA Report.**  While the widely publicized 2002 search fueled suspicions about Al Rajhi Bank's association with terrorist financing, a 2003 CIA report, discussed in a news article in 2007, provided another basis for concerns about the bank.

In 2003, the U.S. Central Intelligence Agency (CIA) issued a classified report entitled, "Al Rajhi Bank: Conduit for Extremist Finance."[1149]  According to Wall Street Journal reporter, Glenn Simpson, this CIA report concluded:  "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."[1150]  A later civil lawsuit, filed in 2011, provided a longer quotation from the same CIA report as follows:

"Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they

---

[1138] See "Abdurahman Alamoudi Sentenced to Jail in Terrorism Financing Case," press release prepared by U.S. Department of Justice (10/15/2004).
[1139] See Gentrup affidavit at ¶ 35.
[1140] Gentrup affidavit at ¶¶ 39, 43
[1141] Gentrup affidavit at ¶ 44.
[1142] Gentrup affidavit at ¶ 45.
[1143] See In re Grand Jury Subpoena (T-112), 597 F.3d 189 (4th Cir. 2/24/2010).
[1144] Id.
[1145] Id.  See also "A Court Sheds New Light on Terror Probe," The New York Sun, Joseph Goldstein (3/24/2008).
[1146] The article was "Saudis Monitor Key Bank Accounts For Terror Funding at U.S. Request," Wall Street Journal, James Dorsey (2/6/2002), http://online.wsj.com/article/SB109813587680048521.html.
[1147] "Al Rajhi Bank's Statement on Journal's  Article," Wall Street Journal, Abdullah Sulaiman Al Rajhi (10/19/2004), http://online.wsj.com/article/SB109813521879148492.html.
[1148] HSBC Financial Intelligence Group Report of Findings on Al Rajhi Bank, HSBC OCC 7519413 (12/13/2004).
[1149] "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.
[1150] Id.

**PX257**

198

find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound.  Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.  Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's princip[al] managers answer directly to Suleiman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities."[1151]

According to the same <u>Wall Street Journal</u> article by Glenn Simpson, the 2003 CIA report alleged that, in 2000, Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."[1152]  The report also allegedly claimed that in 2002, one year after the 9/11 attacks, the bank's managing director ordered the Al Rajhi Bank's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."[1153]  The 2003 CIA report allegedly stated further that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank.[1154]

**2005 Al Haramain Prosecution.**  A third source of suspicion regarding Al Rajhi Bank's possible links to terrorism arose from a 2005 Federal indictment of al-Haramain Islamic Foundation Inc. and two of its senior officials.  Al-Haramain Islamic Foundation is a Saudi-based nonprofit organization that, in 2005, operated in more than 50 countries around the world.[1155]  Beginning in 2002, the United States designated multiple branches of the Foundation as terrorist organizations.[1156]  After freezing the assets of two such branches for "diverting charitable funds to terrorism," a U.S. Treasury Department press release stated:  "The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing."[1157]  In 2004, a Treasury Department statement called al-Haramain Foundation "one of the principal Islamic NGOs [Non-Governmental Organizations] providing support for the Al Qaida network and promoting militant Islamic doctrine worldwide."[1158]  That same year, the United States added the U.S. branch of the organization to the SDN list for acting as  an "underwrit[er] of terror."[1159]  The Saudi government issued a similar 2004 designation and ordered the al-

---

[1151] <u>The Underwriting Members of Lloyd's Syndicate 3500 v. Saudi Arabia</u>, Case 3:11-cv-00202-KRG (USDC WDPA), Civil Complaint (9/8/2011), http://www.investigativeproject.org/documents/case_docs/1680.pdf (hereinafter "Lloyd's lawsuit"), at ¶ 370.
[1152] "US Tracks Saudi Bank Favored by Extremists," <u>Wall Street Journal</u>, Glenn Simpson (7/6/2007), http://online.wsj.com/article/SB118530038250476405.html.
[1153] Id.
[1154] Id.
[1155] <u>United States v. al-Haramain Islamic Foundation Inc.</u>, Case No. 6:05-CR-60008-HO (USDC Oregon) Indictment (2/17/2005), at ¶ B.
[1156] See "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001).
[1157] 3/11/2002 "Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation," U.S. Treasury Department, http://www.fas.org/irp/news/2002/03/dot031102fact.html.
[1158] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of al-Haramain In The Fight Against Terrorist Financing," U.S. Treasury Department press release No. JS-1108 (1/22/2004), http://www.treasury.gov/press/releases/js1108.htm.
[1159] See Executive Order No. 13,224 (2004); "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release (11/9/2004).

199

Haramain Islamic Foundation to be dissolved.[1160]  In 2008, however, Treasury noted that, despite the Saudi government's action, the organization's leadership appeared to have reconstituted itself under a new name and continued to operate.[1161]

In the United States, representatives of the al-Haramain Islamic Foundation formed, in 1999, an Oregon corporation named al-Haramain Islamic Foundation, Inc. which set up offices in Ashland, Oregon.[1162]  The corporation was operated as a nonprofit organization under Section 501(c)(3) of the U.S. tax code.[1163]  In 2004, the Office of Foreign Assets Control (OFAC) at the Treasury Department deemed al-Haramain Islamic Foundation Inc. in Oregon a "Specially Designated Global Terrorist Entity."[1164]  In 2005, the United States indicted the Foundation and two of its senior officials, Pirouz Sedaghaty and Soliman Al-Buthe, who was later designated by the United States as a terrorist financier.[1165]  Since both men were out of the country when the indictment was filed, the case was dormant for two years.[1166]  In 2007, Mr. Sedaghaty returned to the United States and was arrested at an airport.[1167]  In 2010, he stood trial, was convicted of two felonies, and sentenced to nearly three years in prison.[1168]  In the incident that led to his conviction, he and Mr. Al-Buthe used funds from an Egyptian donor to purchase $130,000 in U.S. travelers cheques from a bank in Oregon; Mr. Al-Buthe then traveled to Saudi Arabia and, in 2000, cashed the travelers cheques at Al Rajhi Bank; the money was then smuggled to violent extremists in Chechnya.[1169]

Al Rajhi Bank's role in the events that formed the basis for the prosecution attracted media attention in 2005, when the indictment was filed; in 2007, when Mr. Sedaghaty was arrested; and in 2010, when the trial took place.  Over the years, it became public that Mr. Al-Buthe, a designated terrorist financier, had been a client of Al Rajhi Bank in Saudi Arabia in

---

[1160] See, e.g., 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 19.

[1161] See "Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 35.

[1162] See United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005), at ¶ B.

[1163] Id.

[1164] See Executive Order No. 13224 (2004); "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release (11/9/2004); Al Haramain Islamic Foundation Inc. v. U.S. Dep't of Treasury, 660 F.3d 1019, 1023 (9th Cir. 2011).

[1165] See United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-CR-60008-HO (USDC Oregon) Indictment (2/17/2005).  The case was featured in the U.S. State Department's annual report on money laundering issues.  See 2005 International Narcotics Control Strategy Report, Volume II, "Money Laundering and Financial Crimes," U.S. State Department, at 16.  See also "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release No. JS-1895 (9/9/2004); "Tax Case Ends Against Charity," Les Zaitz, The Oregonian (8/5/2005).

[1166] Because neither individual was in the United States, the prosecution later dropped the Foundation from the case, to prevent the case from proceeding in a piecemeal fashion.  See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (1/19/2010), at 5.

[1167] Id.

[1168] "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1.

[1169] Id.

PX257

2000,[1170] as had the al-Haramain Islamic Foundation, later designated a terrorist organization.[1171] In 2007, a <u>Wall Street Journal</u> article reported that Al Rajhi Bank had maintained at least 24 accounts for the al-Haramain Islamic Foundation and handled unusual transactions for it.[1172]  In January 2010, after the United States served an administrative subpoena on Al Rajhi Bank to obtain authenticated bank documents for use in the al-Haramain Foundation criminal trial, the bank refused to produce them and filed a motion in court to quash the subpoena,[1173] leading to media reports that it was refusing to cooperate with a terrorist financing prosecution.[1174]

**Links to Suspect Banks.**  In addition to the Golden Chain document, the U.S. search of Al-Rajhi related businesses and nonprofits in the United States, and the al Haramain Foundation prosecution, still another source of concern about Al Rajhi Bank involves its alleged links to other banks suspected of financing terrorism.

In 2011, a civil lawsuit filed by an insurance syndicate against Saudi Arabia and others seeking to recover insurance payments made after the 9/11 terrorist attack discussed two of those suspect banks, Bank al Taqwa and Akida Bank Private Ltd.[1175]  Both banks have been deemed by the United States as Specially Designated Global Terrorist Entities.[1176]  Regarding Bank al Taqwa, the lawsuit noted that two individuals who were former executives at Bank al Taqwa, Ibrahim Hassabella and Samir Salah, were also associated with the SAAR Foundation.[1177]  Mr. Hassabella was a former secretary of al Taqwa Bank and a shareholder of SAAR Foundation Inc. Mr. Saleh was a former director and treasurer of the Bahamas branch of al Taqwa Bank, and president of the Piedmont Trading Corporation which was part of the SAAR network.   The U.S. Treasury Department has stated:  "The Al Taqwa group has long acted as financial advisers to al Qaeda, with offices in Switzerland, Lichenstein, Italy and the Caribbean."[1178]  Regarding Akida

---

[1170] See, e.g., <u>Al Rajhi Banking & Investment Corp. v. Holder</u>, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (filed 1-19-10), at 6.

[1171] See, e.g., "U.S. Tracks Saudi Bank Favored by Extremists," <u>Wall Street Journal</u>, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.  See also 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 3391185 (transmitting the article to HBUS); email from HBUS Ketley to HBUS colleagues, Saudi's," HSBC OCC 3391262 (sharing the article within HBUS).

[1172] "US Tracks Saudi Bank Favored by Extremists," <u>Wall Street Journal</u>, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.

[1173] See <u>Al Rajhi Banking & Investment Corp. v. Holder</u>, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (1/19/2010).  This case was later closed as "moot."  See Order Dismissing Action As Moot (3/2/2010) ("It is hereby ordered that this action is dismissed as moot in light of the ruling issued on February 26, 2010, by Judge Michael R. Hogan of the U.S. District Court for the District of Oregon in <u>United States v. Sedaghaty</u>…granting the government's motion to compel petitioner Al-Rajhi Banking and Investment Corp.'s compliance with an administrative subpoena.") (emphasis in original omitted).

[1174] See, e.g., "Saudi Bank Refuses to Cooperate in U.S. Investigation into Terrorist Financiers," For The Record - The IPT Blog (1/26/2010), http://www.investigativeproject.org/1753/saudi-bank-refuses-to-cooperate-in-us.

[1175] See Lloyd's lawsuit at ¶¶ 459-460.  This lawsuit was withdrawn 11 days after being filed, with no prejudice against its re-filing in the future.  See Lloyd's lawsuit, Notice of Voluntary Dismissal, Docket document 5, 9/19/2011.

[1176] See "The United States Designates Twenty-Five New Financiers of Terror," U.S. Treasury Department press release (8/29/2002), http://www.treasury.gov/press-center/press-releases/Pages/po3380.aspx.  See also E.O. 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001); Kane affidavit at ¶ 112.

[1177] Lloyd's lawsuit at ¶ 459.

[1178] Statement by Treasury Secretary Paul O'Neill (11/7/2001).

Bank, the lawsuit complaint alleged that Sulaiman bin Abdul Aziz Al Rajhi was "on the board of directors of Akida Bank in the Bahamas" and that "Akida Bank was run by Youssef Nada, a noted terrorist financier."[1179]

As explained below, Al Rajhi Bank was also associated with Islami Bank Bangladesh Ltd., which was located in a country at high risk for money laundering, provided an account to a Bangladeshi accused of involvement with a terrorist bombing, and had been fined three times for violating AML requirements in connection with providing bank services to "militants."[1180] HSBC's own research indicated that the Al Rajhi group held about one-third of the bank's shares. In addition, Al Rajhi Bank provided a correspondent account to Social Islami Bank, a Bangladesh-based bank whose largest single shareholder for many years was the International Islamic Relief Organization, which was designated by the United States in 2006, as a terrorist organization.[1181] A second shareholder was the precursor to the Benevolence Islamic Foundation, also later designated by the United States as a terrorist organization.

**Suspect Bank Clients.** A final source of concern about Al Rajhi Bank involves accounts it provided to specific clients linked to terrorism. The accounts provided to the al-Haramain Islamic Foundation and Soliman Al-Buthe, both designated by the United States as linked to terrorism, have already been discussed. Another example is the International Islamic Relief Organization (IIRO) which, as mentioned earlier, is a Saudi-based nonprofit organization which was added to the SDN list by the United States for "facilitating fundraising for Al Qaida and affiliated terrorist groups".[1182] In 2003, HSBC's internal Financial Intelligence Group (FIG) raised questions about the IIRO; in 2006 a FIG report noted that the IIRO had been linked to Al Qaeda and other terrorist groups, plots to assassinate President Bill Clinton and the Pope, attacks on the Brooklyn Bridge and Lincoln Tunnel, and the 1993 attack on the World Trade Center.[1183] According to a CRS report, press reports indicated that, until at least December 2004, the IIRO had arranged for donors to send donations directly to accounts it held at Al Rajhi Bank, advertizing the accounts in various publications.[1184] In addition, the Lloyd's lawsuit alleged that

---

[1179] Lloyd's lawsuit at ¶ 459. Youssef Nada was designated as a terrorist financier by the United States in November 2001. See "Recent OFAC Actions," U.S. Department of the Treasury, (11/7/2001), http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20011107.aspx.

[1180] See Subsection I(1), below.

[1181] See Subsection I(2), below. See also "Islamic Charity Charged with Terrorist Financing," U.S. Justice Department, (1/16/2008), http://www.justice.gov/usao/mow/news2008/iara.ind2.htm.

[1182] See 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted in 8/3/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh," HSBC OCC 3259936. See also 8/3/2006 "Treasury Takes Additional Measures to Combat Iranian WMD Proliferation Iranian Nuclear & Missile Firms Targeted," Treasury press release, http://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[1183] 8/4/2006 FIG Report on Findings (Update) for Social Investment Bank Limited, OCC-PSI-00823818 at 12.; 11/2003 FIG Report on Findings for Social Investment Bank, Ltd., OCC-PSI-00823818, at 18. See also In Re September 11th Litigation, C.A. 04-7280 (S.D.N.Y. 2010), at ¶ 371.

[1184] See, e.g., 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 9, footnote 35 (citing International Islamic News Agency (Jeddah), "IIRO Distributes Aid to Falluja War Victims," (12/21/2004), http://www.saudiembassy.net/2003News/News/RelDetail.asp?cIndex=737). See also Lloyd's lawsuit at ¶¶ 445, 447 (alleging IIRO advertised sending donations to its accounts at Al Rajhi Bank, Accounts No. 77700-77709, in its own publications, and Al Rajhi Bank advertised sending donations to IIRO accounts at the bank in the Al Igatha Journal in several countries).

PX257

202

Al Rajhi Bank made or arranged for large donations to the IIRO.[1185]  Sulaiman bin Abdul Aziz Al Rajhi, the most senior official at Al Rajhi Bank, is also alleged to have been an officer of IIRO.[1186]

Al Rajhi Bank gained notoriety as well for providing banking services to several of the hijackers in the 9/11 terrorist attack, including Abdulaziz al Omari who was aboard American Airlines Flight 11.  A civil lawsuit described the bank's involvement with him as follows:

> "[M]oney was funneled to the Hamburg, Germany al Qaeda cell through the Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar, who in turn provided the al Qaeda cell of September 11th hijackers with financial and logistical support.  Through Al Rajhi Bank, September 11th hijacker Abdulaziz al Omari received funds into his Al Rajhi Bank Account Number ….  Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks.  On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia …."[1187]

Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple links to suspect banks and accountholders – present an unusual array of troubling allegations about a particular financial institution.  When asked about these matters, Al Rajhi Bank has repeatedly condemned terrorism and denied any role in financing extremists.[1188]  In addition, despite all the allegations, neither the bank nor its owners have ever been charged in any country with financing terrorism or providing material support to terrorists.

HSBC was fully aware of the suspicions that Al Rajhi Bank and its owners were associated with terrorist financing, describing many of the alleged links in the Al Rajhi Bank client profile.[1189]  On one occasion in 2008, the head of HSBC Global Banknotes Department

---

[1185] Lloyd's lawsuit at ¶ 446-448 (alleging "Al Rajhi Bank collected charitable donations on behalf of Sanabel al Kheer ('Seeds of Charity'), the financial/investment arm of the IIRO, depositing the donations into Sanabel's Al Rajhi Bank account no. 77707. … Under the guise of IIRO funds labeled and designated for purposes such as 'war and disaster' (Account number for Immigrants, Refugees, and Victims of Disasters: 77702) or 'sponsor a child' (IIRO Account Number of Deprived Children: 77704), charitable organizations such as the IIRO use banks like Al Rajhi Bank to gather donations that fund terrorism and terrorist activities. … Al Rajhi Bank also handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha Journal advertisements … in Somalia, Sri Lanka, India, and the Philippines under IIRO Account number 77709 …. On February 17, 1994, Al Rajhi Bank made a $533,333 donation to the Saudi High Commission ('SHC') in response to a call for donations for Bosnia and Somalia. In August 1995, Al Rajhi Bank contributed $400,000 to the SHC which was collecting donations for Bosnia during a 12-hour telethon. The donation was identified by the Arabic newspaper Asharq al Awsat.").

[1186] See, e.g., Lloyd's lawsuit at ¶ 9.

[1187] Lloyd's lawsuit at ¶ 449.

[1188] See, e.g., "Al Rajhi Bank's Statement on Journal's  Article," Wall Street Journal, Abdullah Sulaiman Al Rajhi (10/19/2004), http://online.wsj.com/article/SB109813521879148492.html; "Al Rajhi Bank responds to Wall Street Journal report," distributed by PR Newswire, (10/24/2003),

http://www.thefreelibrary.com/Al+Rajhi+Bank+responds+to+Wall+Street+Journal+report.-a0109218136.

[1189] See, e.g., 2010 HBUS KYC Profile of Al Rajhi Bank, at 6, 11.

PX257

told a colleague: "In case you don't know, no other banknotes counterparty has received so much attention in the last 8 years than Alrajhi."[1190]  Despite, in the words of the KYC client profile, a "multitude" of allegations, HSBC chose to provide Al Rajhi bank with banking services on a global basis.

### D. HSBC Relationship with Al Rajhi Bank

In the United States, Al Rajhi Bank first became a client of Republic Bank of New York during the 1970s; after Republic Bank of New York was purchased by HSBC, Al Rajhi Bank became a client of HSBC Bank United States (HBUS).[1191]  HSBC also had longstanding relationships with Al Rajhi Bank and other Al Rajhi-related businesses in other parts of the world, including the Middle East, Europe, and the Far East, which HSBC had developed separately from the relationship it assumed from Republic Bank of New York in the United States.[1192]  HSBC provided Al Rajhi Bank with a wide range of banking services, including wire transfers, foreign exchange, trade financing, and asset management services.[1193]  In addition, in 1998, HSBC Group established "HSBC Amanah," a "global Islamic financial services division" designed to "serve the particular needs of Muslim communities" in compliance with Islamic law, and provided those banking services to Al Rajhi Bank and other Al Rajhi-related businesses.[1194]

In the United States, a key service was supplying Al Rajhi Bank with large amounts of physical U.S. dollars, through the HBUS U.S. Banknotes Department.  The physical delivery of U.S. dollars to Al Rajhi Bank was carried out primarily through the London branch of HBUS, often referred to internally as "London Banknotes."  HBUS records indicate that the London Banknotes office had been supplying U.S. dollars to Al Rajhi Bank for "25+ years."[1195]  In addition to the London branch, HBUS headquarters in New York opened a banknotes account for Al Rajhi Bank in January 2001.[1196]  The U.S. dollars were physically delivered to Al Rajhi Bank in Saudi Arabia.[1197]

In January 2005, a little more than three years after the 9/11 terrorist attack on the United States, HBUS decided to end its relationship with Al Rajhi Bank due to terrorist financing concerns, as explained further below.[1198]  Nearly two years later, in December 2006, the relationship was reactivated and continued for another four years, until 2010, when it was ended

---

[1190] 5/2008 email from Christopher Lok to Gary C H Yeung, , "KYC Approval needed for: AL RAJHI BANKING & INVESTMENT CORP," OCC-PSI-00155690.

[1191] See 2010 HBUS KYC Profile of Al Rajhi Bank, at 4.

[1192] Id.

[1193] See, e.g., 2010 KYC Profile of Al Rajhi Bank at 8; 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, at HSBC OCC 0659988-997, at 8.

[1194] See HSBC website, "About HSBC Amanah," http://www.hsbcamanah.com/amanah/about-amanah.

[1195] 2010 HBUS KYC Profile of Al Rajhi Bank, at 3, 5.  The London Banknotes office supplied U.S. dollars to both Al Rajhi Bank and, until its account closed in 2005, Al Rajhi Trading Establishment.  Another HBUS branch office in Hong Kong also did banknotes business with Al Rajhi Bank beginning in 2009 .  See HBUS "Know Your Customer Profile – Banknote Information," for the Hong Kong office regarding Al Rajhi Bank (10/29/2010), HSBC-PSI-PROD-0102782-784, at 1.

[1196] 2010 HBUS KYC Profile of Al Rajhi Bank, at 2, 3.

[1197] Id. at 2.

[1198] Id.

**PX257**

204

once more due to a group-wide decision by HSBC to exit the U.S. banknotes business.  HBUS closed its banknotes account with Al Rajhi Bank in October 2010.[1199]

From 2000 to 2010, HSBC assigned a series of Global Relationship Managers to the Al Rajhi Bank account.  They include Shariq Siddiqi[1200] and Shamzani Bin Md Hussain.[1201]  In 2005, the Relationship Manager for KYC approval purposes was Beth Fisher.  From 2005 to 2010, the head of the HSBC Global Banknotes business was Christopher Lok, who was based in New York; the regional Banknotes head for the Americas was Gyanen Kumar, who was based in New York; and the regional Banknotes head in charge of the London Banknotes office was Stephen Allen.[1202]

HSBC classified Al Rajhi Bank as a "Special Category of Client" (SCC), its highest risk designation.[1203]  This designation was due in part to the bank's location in Saudi Arabia, which HSBC classified as a high risk country.  In addition, HSBC noted that the bank was owned in part by a Politically Exposed Person (PEP), Abdullah Abdul Al Rajhi, who was a major shareholder, a member of the bank's board of directors, and a member of the Northern Borders Provincial Council in Saudi Arabia.[1204]  Al Rajhi Bank was one of only a handful of bank clients that HSBC had classified as SCC clients.[1205]

## E.  Al Rajhi Trading Establishment

In addition to Al Rajhi Bank, HSBC provided accounts to Al Rajhi Trading Establishment, a money exchange business based in Saudi Arabia and owned by Rajhi family members.  This account closed in 2005, when the business, along with seven others, merged into a new bank, Al Bilad Bank in Saudi Arabia.

According to HSBC internal documents, Al Rajhi Trading Establishment opened two accounts in 1994, with Republic Bank of New York before its purchase by HSBC.[1206]  One account processed payments, such as from travelers cheques or money orders, while the other handled foreign currency exchange.  According to HSBC documents, Republic Bank of New York had a policy of not dealing with money exchange businesses, but had made an exception for Al Rajhi Trading Establishment due to a "long relationship with the bank, their knowledge of the stiff penalties (death) for drug trafficking and money laundering within the country and the general good reputation of exchange houses in Saudi Arabia."[1207]  After HSBC purchased

---

[1199] Id. 1, 15.
[1200] 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 7.
[1201] 2010 HBUS KYC Profile of Al Rajhi Bank, at 4.
[1202] 11/2006 HBUS "Banknotes Trading A Global Reach Organizational Chart As of November 2006," OCC-PSI-0000050, at 5.
[1203] 2010 HBUS KYC Profile of Al Rajhi Bank, at 1.
[1204] Id. at 1, 3.
[1205] Id. at 3.[1206] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.
[1206] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.
[1207] Id.

**PX257**

205

Republic Bank of New York, the Al Rajhi Trading Establishment accounts were handled by the HSBC International Private Banking Department.[1208]

In 2002, after the 9/11 attack on the United States, the International Private Banking Department asked to transfer the two accounts to HSBC's Institutional Banking Department in Delaware which had superior ability to monitor account activity.[1209]  In connection with the transfer, HBUS banker Joseph Harpster wrote:

> "The most recent concern arose when three wire transfers for small amounts ($50k, $3k and $1.5k) were transferred through the account for names that closely resembled names, not exact matches, of the terrorists involved in the 9/11 World Trade Center attack. … The profile of the main account reflects a doubling of wire transfer volume since 9/01, a large number of travelers checks but with relatively low value and some check/cash deposits.  According to the account officer, traffic increased because they have chosen to send us more business due to their relationship with Saudi British Bank[1210] and the added strength of HBC versus Republic. …  Maintaining our business with this name is strongly supported by David Hodghinson of [Saudi British Bank] and Andre Dixon, Deputy Chairman of [HSBC Bank Middle East].  Niall Booker and Alba Khoury [of HBUS] also support."[1211]

Douglas Stolberg head of Commercial and Institutional Banking (CIB) at HBUS forwarded the email to Alexander Flockhart, then a senior executive in Retail and Commercial Banking at HBUS, noting:  "As we discussed previously, Compliance has raised some concerns regarding the ongoing maintenance of operating/clearing accounts for Al Rajhi group." He forwarded recommendations on how to handle the account:  "Retain [International Private Banking] as the relationship manager domicile for continuity purposes, and as we understand there is interest in further developing private banking business with family members.  … Domicile the actual accounts with Delaware where HBUS's most robust account screening capabilities reside."  His email also stated:

> "[T]his has become a fairly high profile situation.  Compliance's concerns relate to the possibility that Al Rajhi's account may have been used by terrorists.  If true, this could potentially open HBUS up to public scrutiny and /or regulatory criticism.  SABB [Saudi British Bank] are understandably keen to maintain the relationships.  As this matter concerns primarily reputational and compliance risks, we felt it appropriate for SMC [Senior Management Committee] members to be briefed … so that they may opine on the acceptability of the plan.  Please advise how you would prefer us to proceed."[1212]

Mr. Harpster reported a week later that Mr. Flockhart had decided to transfer the accounts to HBUS in the Delaware office.

---

[1208] Id.
[1209] Id.
[1210] HSBC owned Saudi British Bank.  See "Doing Business in Saudi Arabia," an HSBC publication, http://www.hsbc.com/1/content/assets/business_banking/1100511_hsbc_doing_business_in_saudi.pdf.
[1211] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.
[1212] Id. at 2-3.

**PX257**

206

Three years later, in 2005, eight Saudi money exchangers, including Al Rajhi Trading Establishment, were merged into a new Al Bilad Bank in Saudi Arabia.[1213] The HSBC accounts for Al Rahji Trading Establishment closed in November 2005.[1214]

## F.  2005:  Decision to Sever Ties with Al Rajhi Bank

In 2005, despite its longstanding relationship with Al Rajhi Bank, HSBC Group Compliance decided that its U.S.-based businesses should sever ties with Al Rajhi Bank due to terrorist financing concerns.[1215]  To carry out this decision, on January 28, 2005, Teresa Pesce, head of HBUS AML Compliance, sent an email to HBUS personnel entitled, "Al Rahji Trading/Al Rahji Banking":

> "As some of you may know, the above named clients have been under evaluation by US and Group Compliance based, among other things, on relationships maintained with entities/countries on the OFAC list.  Additionally, US law enforcement has placed these entities under scrutiny.  After much consideration, Group Compliance has recommended that the US businesses sever ties with these clients based on the current regulatory environment and the interest of US law enforcement.  Accordingly, I will not approve customer profiles for or transactions with these entities.  Please make appropriate arrangements.  I am available to answer any questions you might have."[1216]

At the time the email was issued, Al Rajhi Bank had not been indicted, designated as a terrorist financier, or sanctioned by any country, including the United States.  HSBC Group Compliance based its decision on concerns that the bank had relationships "with entities/countries on the OFAC list," the bank was of "interest" to U.S. law enforcement which had placed it "under scrutiny," and severing the relationship was called for in light of the "current regulatory environment."[1217]

The 2005 decision was made several years after the 9/11 terrorist attack, as U.S. law enforcement and bank regulators directed increasing scrutiny to terrorist financing issues.  As discussed earlier, in 2004, the 9/11 Commission issued its report which included information on the role of Saudi Arabia in financing terrorism, described the "Golden Chain" of al Qaeda's financial benefactors, and noted that one of the hijackers had an account at Al Rajhi Bank. Congress held hearings on that report.  The media also disclosed in 2004, that Al Rajhi Bank's

---

[1213] See April 2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Trading Establishment, HSBC OCC 2725168-169.  Another Al Rajhi-related business, the Al Rajhi Commercial Foreign Exchange, was also one of the eight businesses that merged into Al Bilad Bank.  See 7/13/2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Commercial Foreign Exchange, HSBC OCC 2725167-168.

[1214] 4/12/12 HSBC legal counsel response to Subcommittee inquiry.

[1215] 2010 HBUS KYC Profile of Al Rajhi Bank, at 2 ("relationship exited and deactivated on 2 February 2005 due to TF issues").

[1216] 1/28/2005 email from HBUS Teresa Pesce to numerous HSBC colleagues, "Al Ra[jh]I Trading/Al Ra[jh]I Banking," HSBC OCC 1884218.

[1217] When asked about this decision, David Bagley, the head of HSBC Group Compliance, told the Subcommittee that there was no single incident that led to the decision.  Subcommittee interview of David Bagley (5/10/2012).

PX257

207

most senior official was on the Golden Chain list.[1218]  In addition, 2004 saw the United States designate as terrorist organizations several Saudi-based nonprofit organizations that were also clients of Al Rajhi Bank, including the International Islamic Relief Organization and the al Haramain Foundation, adding them to the OFAC list of entities with which U.S. persons were prohibited from doing business.[1219]  U.S. prosecutors also intensified their investigation of al Haramain Foundation Inc., whose 2005 indictment would disclose that its senior officials had cashed $130,000 in U.S. travelers checks at Al Rajhi Bank in Saudi Arabia and used the money to support violent extremists in Chechnya.[1220]

On the regulatory front, in July 2004, this Subcommittee held hearings on how U.S. banks and U.S. bank regulators had failed to fully implement the tougher AML requirements enacted into law as part of the USA Patriot Act of 2001,[1221] highlighting Riggs Bank as an example.[1222]  Among other measures, the Patriot Act required U.S. financial institutions to establish AML programs, conduct special due diligence on correspondent accounts opened for foreign banks, and verify the identity of accountholders.[1223]  The law also deemed money laundering through foreign banks and the laundering of terrorism proceeds as criminal offenses in the United States.[1224]  These new provisions had given rise to new bank regulations, new examination requirements, and a new emphasis on the importance of AML controls.

HBUS' primary U.S. regulator, the OCC, scheduled an AML examination of the HBUS banknotes business to take place in 2005.[1225]  In December 2004, in anticipation of that examination, the HBUS Global Banknotes Department had completed a review of its Know Your Customer (KYC) client profiles.[1226]  In October 2004, the HSBC Global Relationship Manager for Al Rajhi Bank, Shariq Siddiqi, visited the bank and reviewed its KYC/AML procedures in detail.[1227]  Mr. Siddiqi praised the procedures and noted:  "The management

---

[1218] See, e.g., "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004).

[1219] "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001) (see Annex).

[1220] The U.S. Treasury Department was later quoted as saying Al Rajhi Bank maintained at least 24 accounts and handled unusual transactions for the al Haramain Foundation.  "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.

[1221] See Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, P.L. 107-56 (10/26/2001).

[1222] "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act, Case Study Involving Riggs Bank," S.Hrg. 108-633 (July 15 2004).

[1223] See USA Patriot Act, §§ 312, 326, 352.

[1224] See USA Patriot Act, §§ 318, 376, 377.

[1225] See 3/8/2005 email from Daniel Jack, HBUS, to Denise Reilly and Alan Ketley in HBUS, "Re: KYC Deactivation Report for Banknotes in Feb-05," OCC-PSI-00169771 ("There has been a surge in KYC updates in the past few months due to clean-up/prep for OCC."); 6/20/2005 OCC Supervisory Letter on Global Banknote AML examination, OCC-PSI-00107505-510 (containing six Matters Requiring Attention by the bank related to AML deficiencies) [sealed exhibit].

[1226] See 1/4/2005 email from Daniel Jack, HBUS Legal Compliance, to HBUS KYC Account Managers, HBUS KYC Banknote Traders, and others, "KYC Status of Profiles for Banknotes by Office:  December 2004," HSBC OCC 2405588-589.

[1227] 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 3.

PX257

appeared fully cognizant of the reputational risks associated with terrorism financing, and confirmed Al Rajhi Bank's strong commitment to combat it."[1228]

Despite that endorsement of the bank's AML policies and procedures, HBUS AML Compliance did not approve the Al Rajhi Bank KYC profile, an action it took with respect to only a few clients out of more than 930 active client profiles reviewed.[1229] The failure to approve the client profile meant that bank personnel were unable to do business with the client. HBUS AML Compliance Officer Alan Ketley circulated instructions on how to handle clients, including Al Rajhi Bank and Al Rajhi Trading Establishment, whose profiles had been "denied" by HBUS Compliance. He explained that such clients must be given "10 days notice of trading termination unless a dispensation is obtained from the AML Director and an updated profile is approved by the AML Director within that 10 day period. For current customers that 10 day clock will commence on December 7 (so December 17 will be the final day we will transact with them unless a dispensation is obtained.)"[1230]

On January 4, 2005, HBUS AML Compliance head Ms. Pesce sent an email to Daniel Jack, an HBUS AML Compliance Officer who often dealt with the London Banknotes office, instructing him to: "[p]lease communicate that Group Compliance will be recommending terminating the Al Rajhi relationship."[1231] Mr. Jack inquired as to when that recommendation would be made. She responded:

"I expect to see an email from Susan Wright today. She tells me that HBME [HSBC Bank Middle East] does not agree with Compliance and will not be terminating the relationship from the Middle East, but she/David B[agley] recommend that in light of US scrutiny, climate, and interest by law enforcement, we in the US sever the relationship from here."[1232]

Susan Wright was then the Chief Money Laundering Control Officer for the entire HSBC Group. She reported to David Bagley, head of the HSBC Group's overall Compliance Department. The documents do not explain why HSBC Middle East disagreed with the decision or why it was allowed to continue its relationship with Al Rajhi Bank, when HSBC's Group Compliance had decided to sever the relationship between the bank and other HSBC affiliates due to terrorist financing concerns.

The decision to sever ties with Al Rajhi Bank was announced internally within HSBC on January 28, 2005. The decision clearly affected some HSBC affiliates, such as HBUS and its

---

[1228] Id. at HSBC OCC 0659991.
[1229] 1/4/2005 email from Daniel Jack, HBUS Legal Compliance, to HBUS KYC Account Managers, HBUS KYC Banknote Traders, and others, "KYC Status of Profiles for Banknotes by Office: December 2004," at HSBC OCC 2405588-589. See also 3/7/2005 email from Daniel Jack to Alan Ketley and others, "Re: KYC Deactivation Report for Banknotes in Feb-05," OCC-PSI-00169771 (noting that Al Rajhi Bank was one of only two client profiles "deactivated for AML/KYC/Compliance Reasons").
[1230] 12/6/004 email from HBUS Alan Ketley to HBUS Christopher Lok, HBUS Stephen Allen, and others, "KYC Profiles – Impact of CO Denial," HSBC OCC 3185023-025.
[1231] 1/4/2005 email from Teresa Pesce to Daniel Jack, "KYC Status of Profiles for Banknotes by Office: December 2004," HSBC OCC 2405588.
[1232] Id.

PX257

London Banknotes office which discontinued transactions with Al Rajhi Bank, but not others, such as HSBC Bank Middle East which continued doing business with Al Rajhi Bank and other Al Rajhi entities.[1233]   The Subcommittee asked but has received no explanation as to why the decision bound HSBC affiliates in the United States and Europe, but appeared to not apply to the Middle East.

Soon after the decision was announced in January 2005, HSBC Group Compliance began to narrow its scope.  On February 22, 2005, Paul Plesser, head of the HBUS Global Foreign Exchange Department, sent an email to a colleague asking whether, despite the HSBC Group Compliance decision, his office could continue to engage in foreign exchange trades with Al Rajhi Trading Establishment.[1234]  He was told by a trader from the Banknotes department: "For us is business as usual."[1235]  Mr. Plesser double-checked with HBUS AML Compliance officer Alan Ketley, asking in an email: "so I guess we are ok to continue trading?"[1236]  On March 16, 2005, Mr. Ketley affirmed that the trades could continue, forwarding an email from Ms. Pesce, head of HBUS AML Compliance, stating that the earlier HSBC Group decision no longer applied to Al Rajhi Trading:

"Group has clarified the Al Ra[jh]i guidance issued last month.  They have evaluated Al Ra[jh]i Banking and Al Ra[jh]i Trading and now believe that the two are separated enough that relationships may be maintained with the latter but not with the former.  To be clear, recommendation is to sever with Banking only at this time."[1237]

Mr. Ketley commented:  "Looks like you're fine to continue dealing with Al Rajhi.  You'd better be making lots of money!"[1238]

In May 2005, four months after announcing the decision to sever ties with Al Rajhi Bank, HSBC Group Compliance backed down still further.  It announced that HSBC affiliates could re-establish business ties with Al Rajhi Bank, though subtly suggested that HBUS might not.  David Bagley, head of HSBC Group Compliance, announced the decision in a May 23 email sent to HSBC personnel:

"Having now received the updated KYC from Shariq Siddiqi and reviewed the previous information received from Group Securities I am pleased to confirm that we have revised our recommendation in relation to the above.

---

[1233] See, e.g., 1/4/2005 email from Teresa Pesce to Daniel Jack, "KYC Status of Profiles for Banknotes by Office: December 2004," HSBC OCC 2405588.  See also, e.g., 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen, and others, "Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280496-497; 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher and Alan Ketley, "Al Rajhi Banking," HSBC OCC 3280505 (both emails indicating that, in late 2006, HSBC business with Al Rajhi Bank was "substantial," including through the "HSBC Amanah business").
[1234] 2/22/2005 email from Paul Plesser to Georges Atallah, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1235] 2/22/2005 email from Georges Atallah to Paul Plesser and others, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1236] 2/22/2005 email from Paul Plesser to Alan Ketley, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1237] 3/16/2005 email from Alan Ketley to Paul Plesser, "Fw: Al Ra[jh]I Guidance Clarified," HSBC OCC 3114022.
[1238] Id.

**PX257**

210

Accordingly we have lifted our recommendation against the commence or expansion of relationships with the above with immediate effect.[1239]  We will communicate this decision to HBEU [HSBC Europe] where I believe there are a number of pending applications.

Whilst we will advise HBUS CMP [Compliance] of the revised view within GHQ CMP [Group Headquarters Compliance] nevertheless I believe it will remain appropriate for HBUS CMP in conjunction with HBUS senior management to reach their own determination with regard to the expansion of business with Al Rajhi within the US.  Although the revised view from GHQ CMP ought to be a material matter causing them to reconsider their position nonetheless, and particularly in the current US environment, I do not believe it is appropriate for us to seek to influence their determination one way or the other."[1240]

The effect of this decision was to allow HSBC affiliates to do business with Al Rajhi Bank if they chose, which meant HBUS Compliance had to determine for itself whether or not to re-establish ties with Al Rajhi.[1241]

## G. 2006:  HBUS Banknotes Account Reinstated

Although HBUS Compliance in the United States held out almost two years, after a concerted campaign by HBUS Banknotes personnel, it ended up following the lead of HSBC Group Compliance and restoring the Al Rajhi Bank account at HBUS in late 2006.  One precipitating event appears to have occurred in November 2006, when Al Rajhi Bank threatened to pull all business from HSBC, unless the U.S. banknotes services were restored.  Within a month, the account was reestablished.

The two HBUS bankers who spearheaded the effort to restore the Al Rajhi account were Christopher Lok, head of the HSBC Global Banknotes Department, working from New York, and Stephen Allen, head of the HBUS Banknotes branch in London.  For more than 20 years, the London office had supplied physical U.S. dollars to Al Rajhi Bank in Saudi Arabia, until forced to stop by the January 2005 decision.

When HSBC Group Compliance reversed the decision on Al Rajhi Bank for HSBC affiliates on May 23, 2005, HSBC Banknotes personnel expressed a desire to reopen their accounts with Al Rajhi Bank as well, while signaling a willingness to wait until the conclusion of

---

[1239] The new decision lifted the ban on relationships with both Al Rajhi Bank and Al Rajhi Commercial Foreign Exchange, another money exchange business owned by Abdullah Abdul Al Rajhi.  The decision on Al Rahhi Commercial Foreign Exchange was in addition to the earlier decision allowing relationships with Al Rajhi Trading Establishment.

[1240] 5/23/2005 email from HSBC David Bagley to HSBC colleagues, "Al Rajhi Bank," OCC-PSI-00144350, at 2.

[1241] At almost the same time, HSBC CIMB-Institutional Banking, which is part of HSBC Amanah, approved additional banking services for Al Rahji Bank, including trade, treasury, SWIFT wire transfers, foreign exchange, and asset management services. See 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 8.

**PX257**

an upcoming Global Banknotes examination by the OCC.[1242]  On May 23, 2005, Mr. Allen, head of the London Banknotes office, forwarded the HSBC Group Compliance email regarding Al Rajhi Bank to Mr. Lok, head of the Global Banknotes Department, stating: "We'll have to see if this will make any difference!"[1243]  Mr. Lok, in turn, sent an email to Ms. Pesce, head of HBUS AML Compliance, stating:  "After the OCC close out and that chapter hopefully finished, could we re-visit Al Rajhi again.  London compliance has taken a more lenient view."[1244]

The on-site work for the OCC AML examination concluded about a month later,[1245] and the HBUS London branch shortly thereafter began to discuss plans to speak with HBUS AML Compliance to allow it to resume ties with Al Rajhi Bank.  In a July 2005 meeting to discuss KYC issues, members of the HBUS London Banknotes office discussed both the results of the OCC examination and next steps to discuss the future of HSBC's relationship with Al Rajhi Bank:

> "DJ [Daniel Jack]:  We gave the OCC 108 client files.  The primary focus of their finding[s] boiled down to 18 files concentrating on the money service business[es] and high risk clients.  We obtained a satisfactory rating from the OCC although their examiners identified 5 issues considered 'Matters Requiring Attention' with urgency.[1246] …
>
> **Saudi:**  We lost Al Rajhi this year – we discussed this in various compliance meetings already.  SA [Stephen Allen] – a resumption decision was put off because of the OCC audit.  CL [Christopher Lok] to speak to SA after the OCC.  Allen to speak to Terry [Pesce] before his holidays.  Al Rajhi threatened to pull any new business with HSBC, unless we give them a satisfactory reason why we won't trade banknotes with them."[1247]

Al Rajhi Bank communicated the threat to "pull any new business with HSBC" unless given a "satisfactory explanation" why HSBC had stopped supplying it with U.S. dollars via its relationship managers.[1248]  That threat was not mentioned again in the documents provided to the Subcommittee.

The next month, in August 2005, Mr. Allen sent Sally Lomas, KYC manager for the London Banknotes office, a copy of the Lok email asking HBUS AML Compliance to re-visit the Al Rajhi issue, together with the HSBC Group Compliance email allowing re-establishment

---

[1242] See 5/15/2006 OCC letter to HBUS ("On June 12, 2006 we will begin a 3-week Examination of Global Banknotes, London.  We hope to complete on site work on or before June 30, 2006.").
[1243] 5/23/2005 email from HBUS Stephen Allen to HSBC Christopher Lok, "Al Rajhi," OCC-PSI-00144350, at 1-2.
[1244] 5/23/2005 email from HSBC Christopher Lok to HBUS Teresa Pesce, "Al Rajhi," OCC-PSI-00144350, at 1.
[1245] 6/20/2005 OCC Supervisory Letter, Global Banknote examination of HSBC, USA, OCC-PSI-00107505. [Sealed Exhibit.]
[1246] The MRAs cited by the OCC required the London Banknotes Office to conduct a client file review to improve client information and analysis; review client risk ratings; add expected client account activity to the client files; revise written procedures to include the need to obtain expected client activity; and improve AML training in these areas.  Id.
[1247] 7/12/2005 "HBUS London Banknotes Minutes of KYC Review Meeting," OCC-PSI-00835857, at 1, 4 (emphasis in original).
[1248] Subcommittee interview of Christopher Lok (3/29/2012)  and Alan Ketley (2/16/2012).

PX257

212

of the relationship for the rest of HSBC.  Ms. Lomas forwarded the emails to Lynda Cassell, then head of General Compliance at HBUS.  Ms. Lomas wrote:

> "Please find attached an email sent by David Bagley, indicating that there is no longer a recommendation against expanding relationships with Al Rajhi Bank.  I have asked Fig [HSBC Financial Intelligence Group] to check, when they do their additional work, whether the same part of the Al Rajhi fa[m]ily is in[vol]ved in both Banks."[1249]

On the same day, Ms. Pesce, head of HBUS AML Compliance, responded to the Lomas email, warning that re-opening the Al Rajhi Bank account should not be viewed as an easy decision:

> "This is not so simple.  David [Bagley] does not object insofar as HBEU [HSBC Europe] is concerned, but has left it to us to assess the US risk.  We've gotten push back from the OCC on Al Rahji Trading, which is less controversial than the bank.  We can revisit this, but I am not inclined to push ahead precipitously, especially in light of the regulatory scrutiny."[1250]

In January 2006, the Banknotes Department tried again.  Minutes of a London Banknotes meeting to discuss KYC issues recorded the following discussion:

> "Banknotes-London would like to resume business with Al Rajhi, although we have ceased trading (due to rumours in terrorist financing, the U.S. Government has now dropped those charges …)[.] [T]he rest of the HSBC group still deal with them.  LC [Lynda Cassell] advised a conference call with Terry [Pesce] is needed but before this takes place LC would like to see a memo from SA [Stephen Allen] about the history of this matter, subsequently Lynda will take this memo to Terry to arrange the conference call."[1251]

The minutes reflect that a rumor was circulating among several HSBC officials that the U.S. government had "dropped" charges of terrorist financing against the bank, which was not the case since no formal charges had ever been filed.  The minutes also indicate that all HSBC affiliates were then allowed to do business with Al Rajhi Bank other than HBUS, a fact used at one point to try to convince HBUS Compliance to allow the account.

In February 2006, Mr. Allen met with Lynda Cassell, Senior AML Policy Advisor, about Al Rajhi Bank.[1252]  That same month, Gordon Brown, who had taken over London Banknotes KYC issues from Susan Lomas, provided Ms. Cassell with a copy of Al Rajhi Bank's AML policies and procedures.[1253]  Ms. Cassell responded with an email to Mr. Brown, Mr. Allen, and others explaining:

---

[1249] 8/10/2005 email from Sally Lomas to Lynda Cassell with copies to Teresa Pesce, Alan Ketley, Stephen Allen, and others, "Al Rajhi," OCC-PSI-00343527.

[1250] 8/10/2005 email from Teresa Pesce to Sally Lomas and others, "Al Rajhi," OCC-PSI-00343527.

[1251] 1/26/2006 "HBUS London Banknotes Minutes of KYC Review Meeting," OCC-PSI-00835851, at 3.

[1252] See 3/21/2006 email from HSBC Stephen Allen to HBUS Alan Ketley and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695040.

[1253] 2/6/2006 email from HSBC Gordon Brown to HBUS Lynda Cassell, "AML Procedures:  Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250665-667, at 667.

**PX257**

213

"Gordon, in accordance to our previous conversation, the AML compliance decision to do business with Al Rajhi lies with Terry Pesce and as suggested, Stephen [Allen] should speak to Terry regarding his desire to enter into a Banknotes relationship. … In regards to Al Rajhi's AML Policy and Procedures, I find them comprehensive …. Their high risk client base generally mirrors our high risk type clients."[1254]

In March 2006, Mr. Allen and Mr. Brown exchanged emails with Mr. Ketley, a senior HBUS AML Compliance officer who worked for Ms. Pesce.[1255]  Mr. Allen wrote:

"[A]ccording to Al Rajhi, their senior management had been advised by the US State Department that they were no longer considered to be under suspicion and I was wondering whether HBUS Compliance or Security may have a contact at State … that could be explored to verify this statement?"[1256]

Mr. Ketley agreed to try to verify the information, and Mr. Allen responded:

"Thanks Alan, anything that you can do is appreciated as, with the summer heat approaching, this client becomes very active and is commercially extremely important to us – if we can ever get to re-start our business with them that is.  You may recall me telling you that we dealt with Al Rajhi for 30 years prior to being obliged to desist!"[1257]

Also in March 2006, Beth Fisher, an HBUS employee who used to be the corporate relationship manager assigned to Al Rajhi Bank, discovered that HBUS had failed to cancel a $50 million line of credit for the bank when the relationship ended.  She sent an email to Mr. Ketley:  "I thought we exited this name!"[1258]  He responded:  "I gather tha[t] Banknotes wants to revive the relationship but has not yet done so."   The next day, Ms. Fisher explained to a colleague:  "FYI, this was an HBUS London Banknotes (only) relationship which was exited a year ago due to AML Compliance concerns. …  This is NO  LONGER an HBUS relationship. We must remove this bank from our list."[1259]

In April 2006, Susan Wright, head of AML Compliance for the entire HSBC Group, weighed in, sending an email to Ms. Pesce and Mr. Ketley asking, "what the position is with regard to the possibility of a Bank Note relationship in London" with Al Rajhi?[1260]  Ms. Pesce responded:  "It still makes me nervous.  Alan has gone out to Steve Allen for more KYC/EDD

---

[1254] 2/8/2006 email from HBUS Lynda Cassell to HSBC Gordon Brown and others, "AML Procedures:  AlRajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250665-667, at 666.
[1255] 3/20/2006 email exchange between HBUS Alan Ketley and HSBC Stephen Allen and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695040.
[1256] Id.  It is unclear what his email referred to when it said that the State Department told the bank that it was no longer "under suspicion."
[1257] 3/21/2006 email from HSBC Stephen Allen to HBUS Alan Ketley and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695039.
[1258] 3/20/2006 email from HBUS Beth Fisher to HBUS Alan Ketley, "Al Rajhi," HSBC OCC 3224893.
[1259] 3/21/2006 email from HBUS Beth Fisher to HBUS Dorothy Gulman, Alan Ketley and others, "Re: Updated TSO/TCS2 spreadsheet," HSBC OCC 3225386.
[1260] 4/18/2006 email exchange between HSBC Susan Wright and HBUS Teresa Pesce, "Al Rajhi," HSBC OCC 4827027.

**PX257**

214

[Know Your Customer/Enhanced Due Diligence]."  Mr. Ketley told the Subcommittee that the Al Rajhi Bank relationship was the only one where he was influenced by HSBC Group.[1261]

That same day, April 10, 2006, Lynda Cassell sent an email to Mr. Allen at London Banknotes requesting information about whether Al Rajhi Bank did business in countries subject to OFAC sanctions and how they would use U.S. banknotes, if they were restored.[1262]  He arranged for an inquiry to be sent to Al Rajhi Bank which then took five months to respond with limited information.[1263]  For example, in response to a question asking the bank to "confirm the countries outside of Saudi Arabia that you do business with," Al Rajhi Bank wrote:  "All our correspondent banks['] names are available in the Bankers Almanac."[1264]  When asked how the bank ensures it does not utilize HBUS products or services in countries that are "OFAC-sanctioned," the bank's entire response was:  "We apply strict due diligence and KYC procedures to high risk countries."[1265]  Both replies did not sufficiently answer the questions posed.

The bank provided a slightly longer answer when asked how it would use U.S. banknotes:

> "All USD banknotes we purchase [are] for our own branches['] use. … [W]e have a big population of around 7 million foreign workers in the kingdom who mostly prefer USD when traveling back to their countries on vacation or even when remitting money to their families ….  Also during summer time we have a high demand from tourist[s] traveling for their vacations."[1266]

This response suggested that, if resupplied with U.S. dollars, the bank would provide those dollars to a wide group of persons in Saudi Arabia, many of whom would be expected to transport the dollars across international borders into other countries.

In June 2006, HSBC Bank Middle East added its voice to that at the Banknotes group in pushing for the account to be reopened.  Salman Hussain, then Payments and Cash Management (PCM) Regional Sales Manager for HSBC Bank Middle East, sent an email to Mr. Ketley at HBUS AML Compliance highlighting the potential revenue if Al Rajhi Bank were to be reinstated as a banknotes customer:

> "I am sending you this email seeking your assistance to address any issues pertaining to Al Rajhi Bank in order to obtain compliance approval.  …  As I understand from talking to all parties that we had an excellent relationship with Al Rajhi Bank until year 2004, banknote[s] (David Illing) stopped doing business while being the largest revenue generator in the Middle East.  Amanah Finance in London (Emran Ali Reza) still trade[s]

---

[1261] Subcommittee interview of Alan Ketley (2/16/2012).
[1262] 4/10/2006 email from HBUS Lynda Cassell to HBUS Stephen Allen, "Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250665.
[1263] 9/17/2006 email from Al Rajhi Bank Mohd Fazal Haque to HSBC Salman Hussain, "HSBC Bank Middle East Limited," HSBC OCC 3280498-499.
[1264] Id. at HSBC OCC 3280498.
[1265] Id.
[1266] Id. at HSBC OCC 3280499.

**PX257**

215

with Al Rajhi Bank ....  From my side, I would like to use the Islamic Overnight Investment [product] … as an intro to this bank.  The amount of potential business/revenue is quite substantial …."[1267]

Mr. Hussain sent copies of his email to six colleagues in various HSBC departments.

Mr. Ketley responded to Mr. Hussain on the same day as follows:

"This must be the week for Al Rajhi as yours is the second e-mail about the bank that I have received.

HBUS exited the relationship in 2004 primarily for Compliance reasons.  Earlier this year, Banknotes London expressed their desire to re-establish the relationship and there has been a fair amount of discussion about whether or how to do this. …

[C]ertain questions … need to be addressed before any Compliance decision can be made about resuming the relationship.  For your information, Banknotes London has been fully embroiled in (preparing for and now in the midst of) an OCC exam so are unlikely to have been able to pursue these questions.

The concerns about this name in the US have been rather long standing and we will need to get extremely comfortable with Al Rajhi before we would be willing to re-establish a relationship."[1268]

In June 2006, the OCC completed the on-site work for its AML examination of the London Banknotes Office and, in September, sent a Supervisory Letter to HBUS summarizing the results and directing the London office to improve its Know Your Customer information and client risk ratings.[1269]

Also in June 2006, Emma Lawson, who worked for Susan Wright, head of AML Compliance for the HSBC Group, sent an email to Mr. Ketley and Ms. Pesce inquiring about progress on the Al Rajhi Bank account.[1270]  Mr. Ketley responded that they had yet to receive answers to certain AML questions, in part because London Banknotes personnel "have been fully engaged on an OCC exam for the past few months.  The exam will end on June 30 so I expect they will revisit the subject then."[1271]

In July 2006, the London Banknotes office held a meeting to discuss its business activities and prospects, and again brought up Al Rajhi Bank.  A summary of the meeting stated:

[1267] 6/22/2006 email from HBME Salman Hussain to HBUS Alan Ketley with copies to others in HSBC, "Al Rajhi Banking & Investment Corp. (Al Rajhi Bank), Saudi Arabia," HSBC OCC 3250655.
[1268] 6/22/2006 email from HBUS Alan Ketley to HBME Salman Hussain and others in HSBC, "Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250655.
[1269] See 9/26/2006 OCC Supervisory Letter HSBC-2006-29, "London Global Banknote BSA/AML Examination," OCC-PSI-0010755-760.  [Sealed Exhibit.]
[1270] 6/20/2006 email from HSBC Emma Lawson to HBUS Alan Ketley and Teresa Pesce, "Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3281773-774.
[1271] 6/20/2006 email from HBUS Alan Ketley to HSBC Emma Lawson and Teresa Pesce, "Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3281773-774.

216

"**Saudi Arabia** … [W]e are experiencing a lot of competition from Commerz [Bank] who are shipping [U.S. dollars] directly from NY [New York] into Saudi and they are offering nearly 50% cheaper prices than BN [Banknotes] quote, so work has had to be done to offer better prices to re-gain volume in this business.  We only have two customers here … but we continue to press for the re-instatement of Al Ra[jh]I but there remain ongoing KYC issues."[1272]

In the fall, at the request of Gordon Brown, KYC manager at the London Banknotes office, the HSBC Financial Intelligence Group (FIG) provided an update to an existing investigative report on Al Rajhi Bank.[1273]  The report was only three pages long and consisted primarily of information taken from publicly available publications about the bank's ownership and management.  The report also noted that a U.S. judge had dismissed the bank from a lawsuit brought by victims of the 9/11 terrorist attack, and that the World-Check database had listed the bank's Chairman and Managing Director Sulaiman Abdul Aziz Al Rajhi under its category for "terrorism."[1274]

Following receipt of the report, the KYC customer profile was updated by the HBUS Banknotes Department for Al Rajhi Bank with a view toward reinstating the account.  The profile stated in part:

"A multitude of allegations have surrounded the Al-Rajhi family implicating them in a gamut of highly adverse activities ranging from money laundering to terrorist financing.  The current facts, however, do not easily support these allegations.  Presently, no U.S. or foreign government law enforcement or regulatory body has stated, unconditionally, that any member of Al-Rajhi or any company controlled by Al-Rajhi is under sanction.  The U.S. continues to pursue relationship with Saudi Arabia and the Al-Rajhi family irregardless of the allegations being levied against charitable institutions with some presumably direct and indirect links to Al-Rajhi.  The major 9/11 lawsuit, which included Al-Rahji, has been dropped against the family and family-related institutions.

However, there is some reputational risk and the possibility that further investigations by U.S. authorities may ultimately uncover substantiating proof of the Al-Rajhi connection to terrorism is certainly a concern.  Our account relationship with Al-Rajhi will be primarily selling USD banknotes out of London.  The risk of future sanctions and the reputational risk based on the aforementioned allegations should be measured against the current risks involved in our relationship when ultimately deciding our course of action.  Therefore, London Banknotes feels that the bank poses minimal reputational risk to us."[1275]

---

[1272] 7/24/2006 "2Q06 London Banknotes Review Meeting," HBUS London Banknotes branch, HSBC OCC 2691117-124, at 122 (emphasis in original).
[1273] 10/24/2006 email from FIG Michael Ellis to HBUS Gordon Brown and others, "Report of Findings – Al Rajhi Banking & Investment Corp. – FIG," HSBC OCC 7519403-406.
[1274] Id. at 405-406.
[1275] 2010 HSBC KYC Profile of Al Rajhi Bank, at 11-12.  HSBC KYC profiles are evolving documents that retain past information stretching back multiple years.

**PX257**

217

This justification for renewing the account relationship had two key features. First, it asserted that, despite many allegations, no government had stated "unconditionally" that Al Rajhi Bank or its owners were under sanction for financing terrorism. Second, it focused on "current risks" and asserted that, measured against those, Al Rajhi Bank posed only "minimal" reputational risk to HSBC.

On November 14, 2006, Christopher Lok, head of Global Banknotes, submitted the new profile for approval to Beth Fisher, the HBUS corporate relationship manager formerly assigned to Al Rajhi Bank.[1276] Ms. Fisher responded to Mr. Lok, with a copy to Mr. Ketley and Mr. Jack in HBUS AML Compliance, "I thought this was an HSBC exit name."[1277] Mr. Ketley replied to her, "It was exited once (2004?) – Banknotes London is looking to reopen the relationship." He also stated: "The profile had better be bullet proof."[1278]

Three days later, Mr. Allen sent Ms. Fisher and Mr. Ketley an email urging them to expedite their review of the client profile, which he hoped would reestablish the account, citing a threat by Al Rajhi Bank to pull all business from HSBC unless the U.S. banknotes services were restored:

"Salman Hussain, the PCM [Payments and Cash Management] Regional Sales Manager at HBME [HSBC Bank Middle East] in Bahrain, who has recently visited the subject, has called to say that Al Rajhi has now run out of patience waiting for us to re-start our banknote trading relationship and unless we can complete the kyc formalities and advise them accordingly by the end of November, they will terminate all product relationships with the HSBC Group – which I believe to be substantial.

Their main point of contention is that they feel that they were exonerated by all US legal processes from TF [Terrorist Financing] suspicion some time ago and yet we have still not been able to re-start trading with them. Gordon [Brown] finished our latest attempt at the profit on Tuesday and you will find the kyc profile to be currently in the 'IB Pending' inbox. Could I please ask you both to expedite your reviews so that we can attempt to prevent the loss of an important client to the Group?"[1279]

Later in the day, Mr. Allen forwarded to Ms. Fisher and Mr. Ketley an email that had been sent by Mr. Hussain after he met with the bank in Riyadh, Saudi Arabia.[1280] Mr. Hussain had sent the email to Mr. Allen and other colleagues, informing them that Cassim Docrat, an Al Rajhi Bank representative, had told him that if the U.S. banknotes business wasn't reestablished

---

[1276] 11/14/2006 email from HSBC Christopher Lok to HBUS Beth Fisher, "KYC Approval needed for: Al Rajhi Banking & Investment Corp," HSBC OCC 3279589-590.
[1277] 11/14/2006 email from HBUS Beth Fisher to HSBC Christopher Lok and HBUS Alan Ketley, "KYC Approval needed for: Al Rajhi Banking & Investment Corp," HSBC OCC 3279589.
[1278] 11/14/2006 email from HBUS Alan Ketley to HBUS Beth Fisher, "KYC Approval needed for: Al Rajhi Banking & Investment Corp," HSBC OCC 3279589.
[1279] 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher and Alan Ketley, "Al Rajhi Banking," HSBC OCC 3280504-505.
[1280] 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen and others, "Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280496-497. Mr. Salman was meeting with the bank, because HSBC Bank Middle East had never ceased doing business with it.

**PX257**

218

by the end of November, Al Rajhi Bank would "cancel any business dealings with HSBC."[1281] His email also stated that the bank had indicated it had been able to procure a large line of credit from one of HSBC's competitors, JPMorganChase.  Mr. Hussain wrote:

> "I can't stress on the fact that we do want to do business with this institution from PCM [Payments and Cash Management] side.  We do stand a good chance to win a US$ clearing account thru offering Islamic Overnight Investment Product and the US $ checking clearing thru Check 21."[1282]

Mr. Allen also sent a copy of Mr. Hussain's email to Mr. Lok, commenting:  "As ever, we are taking an inordinate amount of time to make our minds up.  I discussed this client with Terry [Pesce], Linda [Cassell] and Alan [Ketley] when I visited in February, we eventually received and have now answered a rate of supplementary questions from Linda and now that she has left, no doubt there will be more questions from Alan!"[1283]  Mr. Lok responded:

> "I would tell Salman that he should relay the 'concern' Alrajhi has expressed to the higher ups.  To cancel the Amanah business is much bigger than not dealing with banknotes.  Hopefully somebody in London will listen and given NYK [New York] Compliance a gentle push."[1284]

That afternoon, Ms. Fisher sent an email to Mr. Allen declining to approve the new Al Rajhi Bank client profile:

> "I am not trying to be difficult, but I do not personally feel comfortable [being the] IB [institutional banker] approving this name.  I do not know this bank.  Additionally, several years ago, when HBUS had relationships with 2 different Al Rajhi names, management would ask me questions about the customer every time the name appeared in the US newspapers.  I do not know this bank personally and therefore not qualified to render an opinion. … Therefore, please ask another officer to IB approve. I am IB-Denied the KYC, so that my name can be removed as RM [relationship manager]."[1285]

Mr. Allen responded:  "I quite understand your position and I will try another tack."[1286]

After receiving her refusal to approve the Al Rajhi Bank profile, Mr. Allen forwarded it to Mr. Lok and asked:  "[W]ho do you suggest can/will sign this profile?  You will see that it is pressing – perhaps David [Wilens] could IS and you could IB approve if Susan [Wright] and I sign it again?"[1287]  Mr. Lok responded:  "At the end of the day, its compliance who's the key.

[1281] 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen and others, "Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280496-497.

[1282] Id.

[1283] 11/17/2006 exchange between HBUS Stephen Allen to HSBC Christopher Lok, "Alrajhi," OCC-PSI-00150798.

[1284] Id.

[1285] 11/17/2006 email from HBUS Beth Fisher to HBUS Stephen Allen, Alan Ketley, Christopher Heusler, "Al Rajhi Banking," HSBC OCC 3280504.

[1286] 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher, Alan Ketley, Christopher Heusler, "Al Rajhi Banking," HSBC OCC 3280504.

[1287] 11/17/2006 email from HBUS Stephen Allen to HSBC Christopher Lok and David Wilens, "Al Rajhi Banking," OCC-PSI-00150795.  In a Subcommittee interview, Mr. Lok explained that he retained the authority to act as the institutional banker for a client and so could approve a client profile.  Subcommittee interview of Christopher Lok

**PX257**

219

I'll speak to Ketley & ask him to re-evaluate this name."[1288]  Mr. Lok also sent an email to Mr. Allen informing him:  "Just spoke to Alan [Ketley].  He's going to read the whole file … and he's aware of the 'threat' you passed along.  His view is Alrajhi may not really walk away if we can't revert by November end, which I agree.  … W[e] should have an answer in the next few weeks."[1289]

Over the next few days, Mr. Ketley reviewed Al Rajhi Bank's AML policies and procedures.  He also asked Mr. Hussain:  "What revenue projections do you have associated with the US$ clearing and Check 21 'cash letter'" services that could be provided by HBUS to Al Rajhi Bank?[1290]  Mr. Hussain responded:  "Estimated revenue will be a minimum of $100k per annum."

Emma Lawson, in AML Compliance at HSBC Group Headquarters, also sent an email to Mr. Ketley asking, "Has progress been made."[1291]  Mr. Ketley responded:

"Your timing is uncanny and I suspect not entirely unrelated to correspondence last week from Banknotes and PCM.  I have reviewed the new documentation provided by the client and discussed it with Terry [Pesce] – she has indicated a desire to discuss with David.  Will keep you posted."[1292]

A later email indicated that Ms. Pesce also raised the matter with "the Bank's executive management."[1293]

On December 1, 2006, Mr. Ketley sent an email to Mr. Allen and Salman Hussain, with copies to Ms. Pesce and Mr. Lok, indicating he would approve re-opening the banknotes account with Al Rajhi Bank:

"[T]he purpose of this note is to confirm to you the willingness of HBUS to recommence a relationship with Al Rajhi Bank.  …

[I] am satisfied that we can do business with this entity as long as our due diligence is thoroughly documented and close transaction monitoring takes place by Compliance along with a high degree of transaction awareness being maintained by the business.

---

(3/29/2012).  David Wilens was the chief operating officer of the London Banknotes office and later became chief operating officer for the entire HBUS Banknotes Department.  See Nov. 2006 HBUS organizational chart, OCC-PSI-00000501, at 505.

[1288] 11/17/2006 email from HSBC Christopher Lok to HBUS Stephen Allen and HSBC David Wilens, "Al Rajhi Banking," OCC-PSI-00150795.

[1289] 11/17/2006 email from HSBC Christopher Lok to HBUS Stephen Allen, "Alrajhi," OCC-PSI-00150796.

[1290] 11/20/2006 email from HBUS Alan Ketley to HBSC Salman Hussain, with copies to Stephen Allen, Gordon Brown, and others, "Re: Fw: Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280945.

[1291] 6/20/2006 email exchange between HSBC Emma Lawson and HBUS Alan Ketley, "Fw: Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3281773-774.

[1292] Id.  Teresa Pesce, then HBUS AML head, told the Subcommittee that she didn't recall any specific pressure exerted by HSBC Group with regard to the Al Rajhi Bank relationship, but she knew that HSBC Group was interested in maintaining it.  Subcommittee interview of Teresa Pesce (3/30/12).

[1293] 6/3/2008 email from HBUS Denise Reilly to HBUS Alan Williamson, Daniel Jack, Anne Liddy and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 1638575.  Ms. Pesce told the Subcommittee that the United States initially raised the idea of exiting the Al Rajhi relationship.  She said she may have raised it with Susan Wright, David Bagley, and "the board."  Subcommittee interview of Teresa Pesce (3/30/2012).

**PX257**

> Over a period of years there has been much negative publicity associated with the principals of this entity – while none of these allegations has been proven or substantiated, the notion of 'no smoke without fire' is one we must bear in mind and any business unit dealing with this entity must acknowledge the associated risks. … [T]o paraphrase an expression from English Banking, if it is in my hand and in order I will approve it."[1294]

Mr. Ketley also placed several conditions on the approval of the client profile, noting that his approval extended only to banknotes transactions and not to cash letter transactions. He also stated that the bank could engage in wire transfers, but "I cannot support paper activity with the degree of close monitoring that would be appropriate."[1295]

Mr. Ketley noted that Christopher Lok, head of Global Banknotes, would act as the "relationship owner" of the account in place of Beth Fisher, and would "approve the profile if he is satisfied with it."[1296]

Mr. Ketley announced the decision to reopen the Al Rajhi Bank account despite, in the words of the 2006 client profile, a "multitude of allegations … implementing [Al-Rajhi] in a gamut of highly adverse activities ranging from money laundering to terrorist financing." The decision was also made despite the refusal of the prior Al Rajhi Bank relationship manager, Beth Fisher, to approve the profile, and immediately after HSBC learned that the outside KYC database it relied on for due diligence, World Check, had identified Al Rajhi Bank's most senior official as linked to terrorism. The decision also came one year after a 2005 U.S. indictment provided a concrete example of Al Rajhi Bank's alleged link to terrorism, disclosing how senior officials from al-Haramain Foundation Inc. had cashed $130,000 in U.S. travelers cheques at Al Rajhi Bank in Saudi Arabia and then smuggled the money to violent extremists in Chechnya.[1297]

The 2006 client profile focused on the fact that no country had indicted, issued a terrorist-related designation, or sanctioned Al Rajhi Bank or its owners, even though that was also true in 2005, when the original decision to close the account was made. The internal HSBC emails indicate that two other major factors in the decision to restore the account were the threat made by Al Rajhi Bank to withdraw its business, and the promise of new revenue exceeding $100,000 per year.

---

[1294] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892. Ms. Pesce told the Subcommittee that the court dismissal of charges against the bank was the single most important reason that she decided to re-open the relationship. Both Mr. Ketley and Ms. Pesce stated that they did due diligence on Al Rajhi Bank, and both thought that the risk could be managed and that they made sure the regulators were aware of the relationship. Subcommittee interviews of Teresa Pesce (3/30/2012) and Alan Ketley (2/26/2012).

[1295] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892. Ms. Pesce confirmed to the Subcommittee that the HBUS relationship with Al Rajhi Bank was limited to a banknotes relationship. Subcommittee interview of Teresa Pesce (3/30/12).

[1296] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892.

[1297] "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1.

221

## H. 2007 to 2010:  Additional Troubling Information

The HBUS Banknotes account for Al Rajhi Bank was formally reestablished on December 4, 2006.[1298]  Once the account was reinstated, HBUS London Banknotes began supplying an estimated average of $25 million in physical U.S. dollars per month to Al Rajhi Bank in Saudi Arabia.[1299]  HBUS informed the Subcommittee that over the next four years Al Rajhi Bank purchased nearly $1 billion in U.S. dollars from HBUS, while selling back less than $10 million.  The annual totals are as follows.

| | U.S. Dollars Sold to Al Rajhi Bank | U.S. Dollars Purchased from Al Rajhi Bank |
|---|---|---|
| 2006 | $ 0 | $ 0 |
| 2007 | $ 123 million | $ 8 million |
| 2008 | $ 202 million | $ 0 |
| 2009 | $ 369 million | $ 0 |
| 2010 | $ 283 million | $ 0 |
| Grand total: | $ 977 million | $ 8 million[1300] |

Over the next three years, troubling information about Saudi Arabia in general and Al Rajhi Bank in particular continued to circulate, but neither HSBC nor HBUS engaged in another round of internal deliberations over whether to maintain the account.  Instead, HBUS's Hong Kong branch opened a new line of banknotes trading with Al Rajhi Bank.

In July 2007, the Wall Street Journal published two lengthy articles by reporter Glenn Simpson examining Al Rahji Bank's links to terrorism.[1301]  The first article disclosed the existence of the 2003 CIA report, "Al Rajhi Bank: Conduit for Extremist Finance," and quoted its statement that "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."  The article repeated the information that the name of the bank's most senior official, Sulaiman bin Abdul Aziz Al Rajhi, had appeared on al Qaeda's list of 20 early financial benefactors.[1302]  After the first article was published, HBUS' primary U.S. regulator, the OCC, asked HBUS to respond to its allegations.[1303]

Also in 2007, reports by the U.S. Department of State[1304] and the Congressional Research Service[1305] stated that Saudi Arabia continued to be a source of financing for Al Qaeda and other terrorist organizations, and expressed particular concern about the use of cash couriers to deliver

---

[1298] See 2010 HSBC KYC Profile of Al Rajhi Bank, at 13.
[1299] See 7/26/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, "BN-LN with Al Rajhi Bank in Saudi Arabia," HSBC OCC 1413726.
[1300] Subcommittee briefing by HSBC legal counsel (7/9/2012).
[1301] "U.S. Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007); "Reported U.S. Concerns over Saudi Bank leave Compliance Officers Reading Tea Leaves," Wall Street Journal, Glenn Simpson (7/27/2007).
[1302] "U.S. Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007).
[1303] 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 3391185.
[1304] See 2007 International Narcotics Control Strategy Report, U.S. State Department, at 355.
[1305] See 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, in the summary.

PX257

funds outside of the country.  In September, on the sixth anniversary of the 9/11 attack, Treasury Under Secretary Levey said in a televised interview on terrorist financing: "[I]f I could somehow snap my fingers and cut off the funding from one country, it would be Saudi Arabia."[1306]  In August 2007, Congress enacted legislation expressing concern about Saudi Arabia's uneven role in terrorist financing.[1307]

In April 2008, Treasury Under Secretary Levey testified that, while Saudi Arabia had taken strong action against terrorists operating within its borders and was cooperating with the United States on an operational level, it was not working as hard to prevent funds from flowing to terrorists outside of its borders: "Saudi Arabia today remains the location from which more money is going to terror groups and the Taliban – Sunni terror groups and the Taliban – than from any other place in the world."[1308]

The 2009 GAO report prepared for Congress stated:  "U.S. officials remain concerned about the ability of Saudi individuals and multilateral charitable organizations, as well as other individuals visiting Saudi Arabia, to support terrorism and violent extremism outside of Saudi Arabia."[1309]  Also in 2009, HBUS received an inquiry from the IRS Criminal Investigation Division asking for contact information for the U.S. agent that receives service of process in the United States on behalf of Al Rajhi Bank.[1310]  In response, HBUS AML compliance officer Daniel Jack reviewed the bank's account activity for the prior 12 months.  He wrote:

> "This bank (an SCC) had a long-standing relationship (25+ years) with Banknotes-London until we closed the account in Feb-05 due to TF [Terrorist Financing] & reputational risk.  With approval from AML (A. Ketley), London re-opened the BN [Banknotes] account in Dec-06 with SCC classification due to PEP.  This client still has relationships with HSBC in the UK, UAE, France, Hong Kong and Italy. …  Following is a listing of all traders' explanations provided for alerts over the past 7+ years."[1311]

His analysis disclosed that, over the prior 12 months, HBUS had provided Al Rajhi Bank with over $200 million in U.S. dollars.[1312]

In 2010, the al Haramain Foundation trial got underway related to the cashing of $130,000 in travelers cheques at Al Rajhi Bank in Saudi Arabia to help violent extremists in Chechnya.  Prior to the trial, the United States served a subpoena on Al Rajhi Bank to obtain authenticated bank documents for use in the trial, but the bank refused to produce the documents and moved to quash the subpoena,[1313] leading to  "negative news articles," in the words of the

---

[1306] "U.S.: Saudis Still Filling Al Qaeda's Coffers," ABC News, Brian Ross (9/11/2007).

[1307] See Section 2043(c), Implementing Recommendations of the 9/11 Commission Act, P.L. 110-53 (8/3/2007).

[1308] Stuart Levey testimony before Senate Committee on Finance, "Anti-Terrorism Financing: Progress Made and Challenges Ahead," (4/1/2008).

[1309] "Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 29.

[1310] See 5/12/2009 HBUS email exchange, "Al-Rajhi Banking and Investment Corporation, Saudi Arabia," OCC-PSI-00823520, with attachments.

[1311] Id.

[1312] Id.

[1313] See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH (USDC OR 1/19/10).

**PX257**

2010 KYC client profile prepared by HBUS for Al Rajhi Bank.[1314]  The trial court denied the bank's motion,[1315] and the case was later closed as "moot."[1316]

      One other 2010 development was action taken by an Al Rajhi related money exchange, Tahweel Al Rajhi, to join with the largest bank in Pakistan, Habib Bank Ltd., to initiate a new funds transfer product called "HBL Fast Cash."  The new product was designed to allow the instant transfer of funds from Riyadh, Saudi Arabia, to any Habib branch in Pakistan, whether or not the sender or recipient of the funds had an account at either financial institution.  According to one media report, Hazem Elhagrasey, the head of Tahweel Al Rajhi, said:  "The new service will assure that the beneficiaries will receive payments in cash within minutes in Pakistan."[1317]  Tariq Matin Khan, Habib Bank's general manager for financial institutions and international banking, said:  "The remitters can benefit from the huge HBL network to send money to any nook or corner of Pakistan."[1318]  The Subcommittee intended to ask Al Rajhi Bank about AML safeguards to prevent misuse of this new transfer mechanism, but the bank declined to provide any information in response to the Subcommittee's inquiry.  It is unclear whether Tahweel Al Rajhi has an account at Al Rajhi Bank.

      Meanwhile, from 2007 to 2010, HBUS continued to supply, through its London branch, hundreds of millions of U.S. dollars to Al Rajhi Bank in Saudi Arabia.  In addition, at Al Rajhi Bank's request, HBUS expanded the relationship in January 2009, by authorizing its Hong Kong branch to supply Al Rajhi Bank with non-U.S. currencies, including the Thai bat, Indian rupee, and Hong Kong dollar.[1319]  At the time, Gloria Strazza, a senior official in HBUS's Financial Intelligence Group, observed: "There was (and may be in the future) a fair amount of press and government attention focused on this entity.  I am not sure we would want to engage in even this limited activity for this entity but I forward some of the intelligence from our files on this bank."[1320]  Mr. Lok responded:  "This is an on-going debate that will never go away.  My stance remains the same, i.e. until it[']s proved we cannot simply rely on the Wall Street Journal[']s

---

[1314] 2010 HBUS KYC Profile of Al Rajhi Bank, at 6.  See also 12/6/2011 HSBC AMLID Case #1434 for Al Rajhi Bank, HSBC-PSI-PROD-0102340-342.

[1315] United States v. Sedaghaty, (USDC D OR), 2010 U.S.Dist.LEXIS 144171, Order (1/12/2010).

[1316] See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Order Dismissing Action As Moot (3/2/2010).

[1317] "Terror-linked Saudi bank launches major remittance program to Pakistan," Khaleej Times in Saudi Arabia (4/10/2010), http://www.khaleejtimes.com/biz/inside.asp?xfile=/data/business/2010/April/business_ April183.xml&section=business&col=.

[1318] Id.

[1319] See 2010 HBUS Hong Kong office KYC Customer Profile for Al Rajhi Bank, HSBC-PSI-PROD-0102304-306 (showing Hong Kong account for Al Rajhi Bank began trading 1/29/2009).  See also 4/3/2008 email from HBME Salman Hussain to HBMD David Illing and HBEU John Scott, "Al Rajhi Bank, Saudi Arabia," OCC-PSI-00156271 (showing Al Rajhi Bank requested the Hong Kong account); 5/5/2008 exchange of emails among HBUS Christopher Lok, Gary Yeung, Stephen Allen, and others, "KYC Approval needed for:  Al Rajhi Banking & Investment Corp," OCC-PSI-00155719; 6/2/2008 email from HBUS Daniel Jack to HBUS Anne Liddy, Gloria Strazza, Alan Williamson, and others, "Banknotes with Al Ra[jh]I Banking in S.A.," OCC-PSI-00343451.

[1320] 6/3/2008 exchange of emails among HBUS Gloria Strazza, Daniel Jack, Christopher Lok, Stephen Allen, and others, "Banknotes with Al Ra[jh]i Banking in S.A.," HSBC OCC 0752005-006.  AML compliance officer Daniel Jack forwarded her email to Mr. Lok, Mr. Allen, and others, noting "there is still some concern in AML/ICRO regarding TF [Terrorist Financing] & reputational risk in dealing with [Al Rajhi]," and asked for an email to "address the negative info, risk analysis and appropriateness of mitigants, and your support for maintaining the HBUS relationship."  Id.

reports and unconfirmed allegations and 'punish' the client."[1321]   In a later email, Mr. Lok commented:  "LON [London Banknotes office] already has a relationship with Alrajhi.  Adding HKG [Hong Kong Banknotes office] won't change Alrajhi's profile."[1322]   AML compliance officer Daniel Jack offered this comment to his fellow compliance officer, Alan Williamson, regarding the account:  "I believe the business owns the customer and the risk. … I don't think you should CO [Compliance Office] deny – or even hesitate now – on this for HK [Hong Kong], despite the negative info on TF [Terrorist Financing] & Rep[putational] risk, which is not new (e.g. WSJ in Jul-07, EDD in Dec-07).  I understand why Denise/Anne/Gloria are not comfortable, but I respectfully do not think it is their decision to terminate the relationship (again)."[1323]   HBUS decided to open the Hong Kong account,[1324] providing Al Rajhi Bank on average another $4.6 million per month in non-U.S. currencies.[1325]

HBUS Banknotes finally ceased doing business with Al Rajhi Bank when, in September 2010, HSBC made a global decision to exit the U.S. banknotes business, one week after the OCC sent a lengthy Supervisory Letter to the bank criticizing its AML program, including with respect to its handling of banknotes.[1326]

## I.   Servicing Other Banks with Suspected Links to Terrorism

Al Rajhi Bank was not the only bank with suspected links to terrorist financing serviced by HSBC.  Two others were Islami Bank Bangladesh Ltd. and Social Islami Bank Ltd.  Both banks cooperated with the Subcommittee's inquiries.

### (1) Islami Bank Bangladesh Ltd.

Islami Bank Bangladesh Ltd. opened its doors in 1983, designed its operations to be in conformance with Islamic requirements, and has grown to become one of the largest private banks in Bangladesh, which is one of the most densely populated countries in the world.[1327]   It

---

[1321] Id.

[1322] 7/18/2008 email from HBUS Christopher Lok to HBUS Alan Williamson and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 0760928.

[1323] 6/3/2008 email from HBUS Daniel Jack to HBUS Alan Williamson, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 1638463.  See also 5/30/2008 emails exchanged among HBUS Daniel Jack, Alan Williamson, and Betty NG, "KYC BankNote Profile is IB Approved for:  Al Rajhi Banking & Investment," OCC-PSI-00239206; HSBC OCC 1638463.

[1324] In July 2008, Mr. Williamson approved the new account and wrote to Mr. Lok, "You're in business now." 7/18/2008 email exchange between Alan Williamson, Christopher Lok, and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 0761014.

[1325] See HBUS Hong Kong office KYC Customer Profile for Al Rajhi Bank, HSBC-PSI-PROD-0102304-306, at 2.

[1326] See 9/20/2010 "HSBC to Exit Asian Banknotes Business," HSBC Holdings plc Announcement, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/sea/ 2010/sea_100920_ wholesale_banknotes_en.pdf.  See also 2010 HBUS KYC Profile on Al Rajhi Bank, at 1 (showing account deactivated on 10/14/2010); 2010 HBUS Hong Kong office KYC Profile on Al Rajhi Bank, HSBC-PSI-PROD-0102304-306, at 1 (showing Hong Kong account deactivated on 10/29/2010).  In addition, in October 2010, both the OCC and Federal Reserve issued Cease and Desist Orders to HBUS and its parent holding company, HNAH, to require them to revamp their AML programs.

[1327] See Islami Bank Bangladesh Ltd. website, "About IBBL," http://www.islamibankbd.com/abtIBBL/abtIBBLAtaGlance.php; 4/19/2005 HSBC FIG report on Islami Bank Ltd.- Bangladesh, HSBC OCC 3241695; 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

225

provides a wide variety of individual and commercial banking services.[1328]   Several of the bank's most senior officials were politically important figures within the country or in Saudi Arabia, leading to their designations as Politically Exposed Persons in the World Check database.[1329] According to Islami Bank Bangladesh, it has an extensive network of more than 600 correspondent accounts.[1330]

Islami Bank Bangladesh applied to open accounts with HSBC in 2000, and currently has correspondent accounts with HSBC in 24 locations around the world.[1331]   According to the bank, it opened a U.S. dollar account with HBUS in 2000, and U.S. dollar clearing accounts with HSBC India and HSBC Pakistan in 2006.  In 2007, the HBUS branch in Singapore also sought approval to open an account for the bank to supply it with physical U.S. dollars, cash U.S. dollar monetary instruments such as travelers cheques and money orders, process U.S. dollar wire transfers, and provide other services.[1332]

**Opening 2007 HBUS Account.**  Documents show that proposals to open the 2007 HBUS account for Islami Bank immediately raised AML concerns within HBUS AML Compliance, not only because the bank was located in a country ranked by HSBC as at "high risk" of money laundering[1333] and ranked by Transparency International as one of the most corrupt country in the world,[1334] but also because members of the Al Rajhi group held a 37% direct ownership interest in the bank.

In the fall of 2007, Kwok Ying Fung at the HBUS office in Singapore asked Beth Fisher at HBUS AML Compliance to approve Islami Bank's KYC profile, but she declined without explaining why.[1335]   On October 24, 2007, after receiving her response, he asked HBUS AML Compliance to suggest someone else to approve opening the account.[1336]   Angela Cassell-Bush suggested that he "reach out to Chris Lok to see if he is willing to be the RM [Relationship Manager] Approver."[1337]   Ms. Fisher warned her colleagues that, given the connection between the Bangladeshi bank and Al Rajhi Bank, "[t]his is not just an RM issue.  This is a KYC due diligence issue."[1338]

---

[1328]  See Islami Bank Bangladesh Ltd. website, "Products & Services,"
http://www.islamibankbd.com/prodServices/prodServices.php
[1329]  See 4/19/2005 HSBC FIG report on Islami Bank Ltd.-Bangladesh, at HSBC OCC 3241696; 5/11/2006 FIG
report on Islami Bank Bangladesh, HSBC OCC 3241693.
[1330]  7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1331]  See HBUS Know Your Customer Profile of Islami Bank Bangladesh Ltd. (3/9/2012), HSBC-PSI-PROD-
0117222-237 (hereinafter "2012 HBUS KYC Profile of Islami Bank"), at 2; 7/4/2012 email from Islami Bank
Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1332]  See 2012 HBUS KYC Profile of Islami Bank at 2.
[1333]  Id. at 1.
[1334]  See 2007 "Corruption Perceptions Index," Transparency International,
http://archive.transparency.org/policy_research/surveys_indices/cpi/2007 (ranking Bengladesh as 162 out of 180
countries in terms of perceived levels of corruption).
[1335]  See 10/24/2007 email from HBUS Kwok Ying Fung to HBUS Jarrett Payne and Angela Cassell-Bush, "KYC
BankNotes Profile is IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739990-991.
[1336]  Id.
[1337]  11/6/2007 email from Angela Cassell-Bush to Kwok Ying Fung with copies to Beth Fisher and others, "KYC
BankNotes Profile is IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739990.
[1338]  11/7/2007 email from HBUS Beth Fisher to HBUS Angela Cassell-Bush and others, "KYC BankNotes Profile is
IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739989.

**PX257**

226

On November 6, 2007, Mr. Fung asked Mr. Lok, head of HSBC Global Banknotes and located in HBUS offices in New York, if he would consider serving as the "RM [Relationship Manager] approver" of the Islami Bank KYC profile, so that the bank could become a "shared client" of HBUS Banknotes and HBUS Payments and Cash Management (PCM).[1339]  On November 8, 2007, Mr. Lok responded that his interest in considering a new account depended upon whether there was enough potential revenue to make the effort of vetting Al Rajhi worth it:

"First, I'm happy to be the RM [Relationship Manager] if this is an account worth chasing. How much money can you expect to make from this name?  If this can be answered positively then I will ask PCM to check out the … alrajhi connection. …  The name Alrajh has been a name heatedly debated for many years.  We terminated our trading relationship following 911 and only a year ago after London Compliance came back telling NYK the group is happy to let us resurrect the relationship that we went back. …  Not saying just because of this connection we won't do business.  It[']s just that if the revenue is there then we're prepared for a good fight."[1340]

Mr. Lok's email suggests that he expected from the outset that HBUS AML Compliance would resist opening an account for Islami Bank and it would take a "fight" to open the account.

Later the same day, Benjamin Saram of HBUS Singapore emailed Mr. Lok and others with information about the likely revenues if an account were opened for Islami Bank.  He wrote that, because approximately 60,000 Bangladeshis traveled to Saudi Arabia each year on religious pilgrimages and would require about $1,000 to $3,000 each, "we're therefore looking at about USD 60 mio [million] of currency needs on an annual basis."[1341]  He noted that, in 2006, HBUS Banknotes had netted about $47,000 in profits in Bangladesh, and expected a 53% increase in 2007, to about $75,000, explaining, "[w]e are a monopoly here, and margins are decent."[1342]  Mr. Saram estimated that, if an account were opened for Islami Bank, the "net profit would be approximately USD 75,000/ year."

Mr. Lok responded:  "One, the money is there and we should go for this account.  Two, I will jump in and wear the GRM [Global Relationship Manager] hat. …  I believe we should be able to get the K[YC] sign off."[1343]  He also asked HBUS AML Compliance to look into the possible connection between Islami Bank and Al Rajhi Bank.

The next day, November 9, 2007, HBUS AML compliance officer Angela Cassell-Bush confirmed a direct link between the two banks:

---

[1339] 11/6/2007 email from HBUS Kwok Ying Fung to HBUS Christopher Lok, "Islami Bank Bangladesh Limited," HSBC OCC 0739989.

[1340] 11/8/2007 email from HBUS Christopher Lok to HBUS Kwok Ying Fung and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739988-989.

[1341] 11/8/2007 email from HBUS Benjamin Saram to HBUS Christopher Lok, Kwok Ying Fung, and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739987-988.

[1342] Id.

[1343] 11/8/2007 email from HBUS Christopher Lok to HBUS Benjamin Saram, Kwok Ying Fung, and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739987.

PX257

227

"[P]lease note that there is a connection between ISLAMI BANK BANGLADESH LIMITED-Bangladesh and Al-Rajhi Bank …. Based on the information we have on file, the Al - Rajhi family has been associated with Islami Bank Bangladesh Limited, since its inception.  They have at least 37% direct ownership … through their ownership within the following companies:  Arabsas Travel & Tourist Agency, 9.999%; Janab Yousif Abdullah Abdul Aziz Al-Rajhi, 9.936%; Al-Rajhi Company for Industry & Trade, 9.94%; Abdullah Abdul Aziz Al-Rajhi, 7.58%.  This same family has major controlling interest within Al-Rajhi bank."[1344]

**Troubling Information.**  HBUS' Singapore branch actually opened the account for Islami Bank in December 2007.[1345]  Mr. Lok and others approved the account, despite ongoing questions about its primary shareholder, Al Rajhi Bank, whose past links to terrorist financing had received additional attention in the media during the summer of 2007.  HBUS also approved the account despite troubling information about Islami Bank itself.

The troubling information about Islami Bank was contained in an internal report that had been prepared less than a year earlier by HSBC's Financial Intelligence Group (FIG).[1346]  The May 2006 FIG report disclosed that, in March 2006, "Abdur Rahman, chief of the Jamaatul Mujahideen of Bangladesh (JMB), and his second-in-command, Bangla Bhai, were arrested for being responsible for the terrorist bomb blasts of August 17, 2005 in Bangladesh."[1347]  The FIG report noted that Mr. Rahman had been found to have an account at Islami Bank.[1348]

The FIG report also disclosed that an investigation by the Central Bank of Bangladesh found that two branches of Islami Bank had been engaged in "suspicious transactions" and urged the bank to take action against 20 bank employees, including for failing to report the suspicious transactions.[1349]  According to the FIG report, in response, Islami Bank reportedly suspended five officers and warned 15 others.[1350]  The FIG report stated that Bangladeshi news articles had

---

[1344] 11/9/2007 email from HBUS Angela Cassell-Bush to HBUS Christopher Lok and others, "Islami Bank Bangladesh Limited-Bangladesh," OCC-PSI-00154139, at 1.  Mr. Lok asked Ms. Cassell-Bush to doublecheck one of the shareholders, Abdullah Abdul Aziz Al-Rajhi, who was listed as holding 7.58% of the shares, suggesting that the wrong company may have been identified as the shareholder.  A later email suggested that the shareholding company was not a member of the Al Rajhi group.  See November and December 2007 exchange of emails among HBUS Christopher Lok, Angela Cassell-Bush, Muhammad Shohiduzzaman, and others, "Islami Bank Bangladesh Limited-Bangladesh," HSBC OCC 0741466-469.  Later KYC profiles for the bank indicate, however, that the shares were, in fact, held through a company that was part of the Al Rajhi group.  See, e.g., 2012 HBUS KYC Profile of Islami Bank, at 7.  Islami Bank Bangladesh Ltd. has confirmed to the Subcommittee that Abdullah Abdul Aziz Al Rajhi has been both a shareholder and director of the bank.  7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1345] See 2012 HBUS KYC Profile of Islami Bank, at 15.
[1346] See 5/11/2006 FIG report on Islami Bank Bangladesh, HSBC OCC 3241692-694.
[1347] Id. at 693.
[1348] Id.  Islami Bank Bangladesh Ltd. told the Subcommittee, however, that it has never had an account for Abdur Rahman.  7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1349] 5/11/2006 FIG report on Islami Bank Bangladesh, at HSBC OCC 3241693.
[1350] Islami Bank Bangladesh told the Subcommittee that it suspended and later fired the bank officials involved.  7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

PX257

228

observed it was the third time Islami Bank had been fined by the Central Bank "for covering up militants' transactions."[1351]

Islami Bank's KYC profile repeated this information and indicated that the HSBC Global Relationship Manager had visited the bank to ask about the matter, and was told that the incident did not involve terrorist financing.[1352]  The Global Relationship Manager advised against taking any further action, attributing the AML failures to the bank's unsophisticated technology platform.[1353]  Neither the KYC profile nor the FIG report indicate whether any steps were taken to verify the bank's explanation of the incident with the Central Bank.  The KYC profile noted that, in 2006, FIG recommended classifying Islami Bank as a "Special Category Client," or SCC, HSBC's designation for its highest risk clients, but that recommendation was rejected, which meant HSBC did not subject the bank to any enhanced monitoring.[1354]

**2009 Information on IIRO Accounts.**  The account was opened near the end of 2007. About 18 months later, in May 2009, a FIG due diligence report prepared for another Bangladeshi bank with which HBUS did business, Social Islami Bank, discussed below, disclosed new information relevant to Islami Bank.  This information related to the International Islamic Relief Organization (IIRO), a Saudi nonprofit organization which, in 2006, had two of its branches and a high ranking IIRO official designated by the United States as terrorist financiers and added to the list of entities with which U.S. persons are prohibited from doing business.[1355]

The 2009 FIG report stated that the IIRO had accounts at both Social Islami Bank and Islami Bank.[1356]  It quoted a 2008 local press article saying that, in response to the action taken by the United States in 2006, Islami Bank had frozen its IIRO accounts.[1357]  The FIG report did not indicate when the accounts were first opened, what actions had been taken beyond freezing them, or how much money was involved.  In 2010, an HBUS KYC profile for Social Islami Bank referenced a letter from the Bangladeshi Central Bank, dated June 30, 2010, indicating that IIRO had accounts at three Bangladeshi banks, including Islami Bank, which needed to be closed.[1358]

Islami Bank Bangladesh confirmed to the Subcommittee that IIRO had two accounts at the bank which opened in 1993 and 1994, when IIRO was a nongovernmental organization in

---

[1351] 5/11/2006 FIG report on Islami Bank Bangladesh, at HSBC OCC 3241693.

[1352] 2012 HBUS KYC Profile of Islami Bank, at 3.

[1353] Id. (The Global Relationship Manager wrote:  "[C]onsidering that Islami Bank is involved in mass banking with a pretty large branch network without a sophisticated or integrated IT platform, there will always be a chance that isolated incidents like this might be found.  As such, we will closely monitor the future events and keep you informed as soon as any issue of concern is detected.").

[1354] Id.

[1355] See 8/3/2006 "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department press release, reprinted in 8/2/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh," HSBC OCC 3259936.

[1356] See 5/5/2009 FIG Report of Findings on Social Investment Bank Limited, OCC-PSI-00823818, at 7 (quoting 10/8/2008 article from Bangladeshnews.com).

[1357] Id.

[1358] 2012 HBUS KYC Profile of Social Islami Bank, at 4 ("The 3 bank accounts of IIRO namely i) Social Islami Bank Ltd. ii) Islami Bank Bangladesh Ltd. iii) Al-Falah Islami Bank Ltd. must be disposed off [sic] and transferred").

**PX257**

good standing.[1359]  It stated that after the IIRO was added to a United Nations sanctions list in 2006, it froze the accounts and reported them to the Bangladeshi Central Bank.  In 2010, according to the bank, it received an "instruction from the Central Bank at the direction of [the] Ministry of Finance" to unfreeze the accounts and "transfer the accounts" to a government owned bank, BASIC Bank, which it did.[1360]

Despite the 2008 published article, the information in the two internal HBUS documents related to Social Islami Bank, and Islami Bank Bangladesh's willingness to discuss the accounts, no information about the IIRO accounts appeared in the HBUS KYC profile for Islami Bank. While the IIRO accounts at Social Islami Bank were the focus of extensive discussions in emails and other documents by HBUS AML Compliance personnel and HBUS bankers working in Bangladesh, no similar discussions appear in any of the HBUS documents related to Islami Bank.

In September 2009, the Islami Bank KYC profile indicates that an unnamed HSBC employee requested a new enhanced due diligence report on the bank.[1361]  HBUS Compliance denied the request, indicating an update "is NOT needed at this time."[1362]

**2010 SCC Designation.**  In February 2010, HBUS AML Compliance personnel reviewed the Islami Bank account and recommended that the bank be designated an SCC client.[1363]  One key reason given for the proposed SCC designation was Islami Bank's links to the Al Rajhi group, noting that the Vice Chairman of the bank and 10% owner was Yousif Abdullah Al Rajhi, that Al Rajhi interests held about a third of the bank's shares, and Al Rajhi itself had links to terrorist financing.[1364]  Another reason given was the information provided in the 2006 FIG report, that the Bangladeshi Central Bank had issued a "notice of cause" to Islami Bank "to explain accounts owned by suspected Islamic Militants," and reportedly fined the bank for the third time "for covering up militants['] transactions."[1365]  No mention was made of the IIRO accounts.  Contrary to the outcome in 2006, in 2010, HSBC designated Islami Bank as an SCC client.[1366]

Later in 2010, an OCC AML examiner reviewing emails related to Islami Bank characterized the information provided about the bank as depicting "extreme circumstances," and recommended that the account be reviewed as part of a larger AML "look back" effort at HSBC.[1367]  In 2011, HSBC engaged in an extensive discussion with Islami Bank regarding its AML policies and procedures, also noting in its KYC profile that the bank acted as a "payout agent" for 53 money exchange businesses across the Middle East.[1368]

---

[1359] 7/4/2012 email from Islami Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001-003, at 003.
[1360] Id.
[1361] 2012 HBUS KYC Profile of Islami Bank, at 2.
[1362] Id.
[1363] See 2/3/2010 email exchange between HBUS Jon K. Jones, Ali Kazmy and others, "Islami Bank Bangladesh Ltd – Poss SCC," OCC-PSI-00453499-500.
[1364] Id.
[1365] Id.
[1366] Id.  See also 2012 HBUS KYC Profile of Islami Bank, at 3.
[1367] 10/27/2010 email from OCC AML Examiner Joseph Boss to OCC colleagues, OCC-PSI-00919631.
[1368] 2012 HBUS KYC Profile of Islami Bank, at 3-4.

PX257

230

Today, although HSBC exited the U.S. banknotes business in 2010, Islami Bank Bangladesh remains a customer of two dozen HSBC affiliates, including HBUS PCM, which continues to provide Islami Bank with access to U.S. dollars, U.S. wire transfers, and U.S. payment systems.[1369]

### (2) Social Islami Bank Ltd.

A third bank serviced by HSBC despite suspected links to terrorist financing is Social Islami Bank Ltd.

Social Islami Bank Ltd. was founded in 1995, changed its name from Social Investment Bank Ltd. in 2009, and is located in Bangladesh.[1370]  It operates 76 branches throughout the country and provides a variety of individual and commercial banking services, including deposits, loans, investment advice, commercial financing, foreign exchange, and wire transfers. It operates in conformance with Islamic requirements and is publicly traded on Bangladeshi stock exchanges.  Its headquarters are in Dhaka, the capital of Bangladesh, one of the world's largest cities with a population of 16 million.

Until May 2012, HSBC was one of the bank's major correspondents, providing it with services in multiple countries.[1371]  HSBC also has an affiliate located in Dhaka.  That affiliate, HSBC Bank Asia Pacific (HBAP) Dhaka, introduced Social Islami Bank to HBUS.[1372]  In 2003, HBUS Payments and Cash Management (PCM) sought to open an account for Social Islami Bank, providing it with U.S. dollar wire transfer and clearing services.[1373]

**Opening of HBUS Account.**  When HBUS first sought to open the account in 2003, it asked for an enhanced due diligence report on the bank from the HSBC Financial Intelligence Group (FIG).  In addition to noting that Bangladesh was a high risk country due to its reputation for corruption, the resulting FIG report contained adverse information about some of the bank's owners and officials.[1374]  Most serious were allegations that two shareholders, the International Islamic Relief Organization (IIRO) and the Islamic Charitable Society Lajnat al-Birr Al Islam (Lajnat al-Birr), had links to terrorism.  IIRO then held 8.62% of the total outstanding shares, and was the bank's largest single shareholder, while Lajnat al-Birr held 1.54%.

The 2003 FIG report stated the following with regard to the two shareholders:

"IIRO is a Saudi-Arabian charity. … The IIRO was named in the 2002 lawsuit brought forward on behalf of family members of victims of the September 11, 2001 terrorist attacks.  The IIRO was accused of having 'played key roles in laundering of funds to terrorist[s] for the 1998 African embassy bombings' and having been involved in the

---

[1369] 2012 HBUS KYC Profile of Islami Bank, at 2, 7.

[1370] See Social Islami Bank website, http://www.siblbd.com/html/homepages.php; HBUS "Know Your Customer Profile" of Social Islami Bank Ltd. (2/7/2012), HSBC-PSI-PROD-0102782-789 (hereinafter "2012 HBUS KYC Profile of Social Islami Bank"), at 2.

[1371] See Social Islami Bank website, "List of Correspondents/Agency Arrangements Overseas," http://www.siblbd.com/download/CorrespondentsAgencyArrangementsOverseas.pdf.

[1372] 2012 HBUS KYC Profile of Social Islami Bank, at 7.

[1373] Id. at 2, 14.

[1374] See 11/2003 Report on Findings for Social Investment Bank, Ltd., HSBC Financial Intelligence Group, OCC-PSI-00823818, at 18 (hereinafter "2003 FIG Report on Social Islami Bank").

**PX257**

231

'financing and aiding and abetting of terrorists in the 1993 World Trade Center bombing.' The IIRO has also reportedly funded al-Qaeda directly as well as several of its satellite groups. Osama bin Laden's brother-in-law, Mohammed Jamal Khalifa, headed the Philippine branch of the IIRO in the 1990's. The Philippine government has charged that the group contributed to terrorist causes there.[1375] …

Lajnat al-Birr Al Islamiah was established in 1987. It has been stated that Lajnat al-Birr Al Islamiah was the original name of the Benevolence International [F]oundation, and that it originally had offices in Saudi Arabia and Pakistan. According [to] the U.S. government, among the purposes of Lajnat was to 'raise funds in Saudi Arabia to provide support to the Mujahadeen then fighting in Afghanistan,' as well as to provide 'cover for fighters to travel in and out of Pakistan and obtain immigration status.' Benevolence International has been tied to terrorism and its director, Enaam Arnaout, was indicted in 2002 with conspiring to defraud his group's donors by secretly providing financial and logistical help to al-Qaeda for a decade."[1376]

The FIG report also contained negative information about the bank's founder:

"Dr. M.A. Mannan was the chairman and founder of Social Investment Bank Ltd. He was fired in 2000 after fault was found with his banking procedure. It was alleged that he created an obstacle to the team of Bangladesh Bank [Bangladesh's Central Bank] during their visit to Social Investment Bank Ltd. Additionally, he was accused of interfering with bank administrative work and with harassing a bank employee."[1377]

The FIG report concluded:

"In conclusion, it is of significant concern that the leading shareholder of Social Investment Bank Ltd. (at 8.62%), International Islamic Relief Organization, has been accused in both the Philippines and in America of funding terrorist groups. The group is currently under investigation by the F.B.I. Another of the bank's shareholders, Lajnat al-Birr Al Islam (at 1.54%) has also been connected to terrorist groups. Additionally, the bank's founder and chairman was let go on allegations of interference and harassment. … Finally, it is important to note that Social Investment Bank Ltd. is located in Bangladesh, which was ranked as the world's most corrupt nation by Transparency International."[1378]

The FIG report offered this cautious analysis about whether to open an account:

"Although the allegations presented in this report, primarily against the International Islamic Relief Organization (IIRO) and the Lajnat al-Birr Al Islamiah, are highly adverse, no U.S. or foreign government law enforcement or regulatory body has stated unconditionally, that these organizations are under sanction. The reputational risk is significant, however, and the possibility that further investigations by U.S. authorities

---

[1375] Id. at 1-2.
[1376] Id. at 2.
[1377] Id. at 3.
[1378] 2003 FIG Report on Social Islami Bank, at 4.

PX257

232

may ultimately uncover substantiating proof of a connection to terrorism.  The risk of future sanctions and the reputational risk based on allegations noted in this report should be measured against the current risks involved in our relationship when ultimately deciding a course of action."[1379]

While the 2003 FIG report provided significant adverse information about Social Islami Bank and noted that Lajnat al-Birr was the original name of the Benevolence International Foundation which "had been tied to terrorism," it failed to state that, in 2002, the United States had designated the Benevolence International Foundation as a "financier of terrorism" with whom U.S. persons are prohibited from doing business.[1380]  This additional terrorism-related designation meant that when HBUS was considering whether to open an account for Social Islami Bank in 2003, Social Islami Bank was partially owned by two organizations associated with terrorist financing.[1381]

Despite its failure to provide that additional information, the 2003 FIG report provided significant negative information about Social Islami Bank and squarely raised the question of whether HBUS should be doing business with it, given the "highly adverse" allegations. Nevertheless, on October 14, 2003, HBUS AML Compliance approved Social Islami Bank as an HBUS PCM client.[1382]  In addition, despite the bank's location in a high risk country, the terrorist links uncovered in connection with two of its shareholders and a director, HBUS opened the account without designating the bank as an SCC client warranting additional monitoring and due diligence reviews.  HBUS immediately began providing the bank with services that included clearing U.S. dollar monetary instruments and U.S. wire transfers.  Those services produced revenues from Social Islami Bank totaling about $100,000 per year.[1383]

**2005 Review.**  Two years after the account was opened, as part of a broader HSBC effort to update its KYC client profiles in 2005, Social Islami Bank was the subject of a second enhanced due diligence review.[1384]  The resulting 2005 FIG report again identified IIRO, the bank's largest shareholder, as linked to terrorism, noting that it was "alleged to have provided funding to terrorist groups such as Al Qaeda in the past," and is "alleged to have acted as a cover

---

[1379] 2003 FIG Report on Social Islami Bank, at 1.

[1380] "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," U.S. Treasury Department press release No. PO-3632 (11/19/2002), www.treasury.gov/press-center/press-releases/Pages/po3632.aspx.  See also Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or support Terrorism" (9/23/2001).

[1381] The 2003 FIG Report also failed to mention that Social Islami Bank had opened an account for Al Rajhi Commercial Foreign Exchange.  That money exchange business was part of the Al Rajhi Group, whose U.S. business and charitable ventures were the subject of a 2002 law enforcement search to disrupt terrorist financing. The FIG may have been unaware of the account at that time, although a 2005 FIG report on Al Rajhi Commercial Foreign Exchange disclosed it. See 7/13/2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Commercial Foreign Exchange, HSBC OCC 2725167-168.  In 2005, Al Rajhi Commercial Foreign Exchange and seven other businesses merged into Al Bilad Bank.  Id.  According to bank counsel, the Al Rajhi Commercial Foreign Exchange account closed in July 2002.  Subcommittee briefing by HSBC legal counsel (6/27/2012).

[1382] 2012 HBUS KYC Profile of Social Islami Bank, at 14.

[1383] Id. at 8.

[1384] See 3/8/2005 email from HBUS Nanayo Ryan to HBUS FIG Michael Ellis, "Social Investment Bank Ltd Bangladesh," HSBC-PSI-PROD-0102689.

233

for Al-Qaeda operations in the Philippines."[1385]  The FIG report stated:  "Based on the frequency with which the group is connected to terrorist financing in the press, it is likely that their activities will always be under scrutiny, and future government sanctions against the group are highly probable."[1386]  The report also noted that Social Islami Bank did "not appear to have correspondent relationships with many of the other major global banking corporations."[1387]  The FIG report "strongly recommend[ed]" that the account not be approved "until the matter is discussed with Senior Compliance Management."[1388]

Despite the concerns raised in the FIG report, HBUS retained Social Islami Bank as a client.  At the same time, to address concerns about the account, HBUS AML Compliance required the HSBC CEO for Bangladesh to provide annual approval of the account for it to stay open.[1389]  Despite this requirement, the Subcommittee uncovered only one instance in which approval was granted, and when asked, HSBC was unable to provide any additional documentation.[1390]

**2006 Terrorist Designation.**  Eighteen months later, on August 3, 2006, the United States designated two branches of IIRO and a high ranking IIRO official as terrorist financiers and prohibited U.S. persons from transacting business with them.[1391]  Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey said:  "We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."[1392]

In response, on the same day, HBUS AML Compliance placed a block on the Social Islami Bank account, so that no funds could be withdrawn.  The email imposing the block noted that the Social Islami Bank brought in HBUS revenues totaling $44,000 per year.[1393]

---

[1385] 3/10/2005 "Report of Findings – Social Investment Bank Ltd. – FIG (UPDATE)," HBUS Financial Intelligence Group, OCC-PSI-00823832 (hereinafter "2005 FIG Report on Social Islami Bank"), at 2.
[1386] Id.
[1387] Id.
[1388] Id.
[1389] HBUS AML head Terri Pesce told the Subcommittee it was "unusual" to obtain CEO approval of an account. Subcommittee interview of Teresa Pesce (3/30/2012).  See, e.g., 2012 HBUS KYC Profile of Islami Bank, at 14-15; 2/9/2010 email from HBUS Jon K. Jones to HBAP Sadique Reza and others, "Compliance Conditions: Social Islami Bank Ltd," HSBC-PSI-PROD-0102645.
[1390] This approval was provided in April 2005 by Steve Banner, HSBC Bangladesh CEO.  He wrote with regard to Social Investment Bank: "I have been in Bagladesh for only 2 months and have not yet met any of the executives from SIBL.  Based on my discussion with Shohid, however, I can see no reason why we should not continue the relationship as at present." 4/16/2005 email from HSBC Steve Banner, HSBC PSI PROD 0102765.  See also Subcommittee briefing by HSBC legal counsel (4/12/2012).
[1391] See 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted in 8/3/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh,"  HSBC OCC 3259936.
[1392] 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted at  HSBC OCC 3259936.
[1393] 8/3/2006 email from HBUS Sharyn Malone to HBUS colleagues, HSBC-PSI-PROD-0102776 ("IIRO holds a 8.62% stake in Social Investment Bank (SIB), Bangladesh who is a US PCM client of HBUS since Oct. 2003.  Their value to US PCM is $44K annualized.").

**PX257**

234

The next day, August 4, 2006, the HSBC Financial Intelligence Group (FIG) issued an updated due diligence report on Social Islami Bank, containing significant adverse information about IIRO.[1394]   Among other information, the FIG report noted that the World Check database relied on by HSBC for KYC information classified IIRO as associated with terrorism, linked it to providing assistance to al Qaeda and other terrorist organizations, and described it as "allegedly linked" to the 1993 World Trade Center bombing, "plots to assassinate Bill Clinton and the Pope," and "the planned destruction of the Lincoln Tunnel and Brooklyn Bridge."[1395]

Two days after that, on August 6, 2006, an HSBC institutional banker from HBAP Dhaka, Muhammad Shohiduzzaman, met with Social Islami Bank to discuss IIRO.[1396]   He wrote to the HSBC CEO in charge of the operations in Bangladesh, Steven Banner, that Social Islami Bank had told him that IIRO "never took part in any activities" at the bank, "did not even take possession of the shares," and had never been a board member.[1397]   Mr. Shohiduzzaman advised: "we are of the opinion that since IIRO is not involved in the operation of SIBL [Social Islami Bank Ltd.], there [are] no issues of concern locally.   But since the matter has been raised by the US treasury, HBUS should take appropriate measure after careful examination of all the present and potential aspects."[1398]   Mr. Banner wrote to Hersel Mehani, the HSBC sales person assigned to the account: "Based on the feedback from SIBL, IIRO's role remains that of a minority shareholder that does not seek to engage in the management of the bank.   We have no reason to disbelieve SIBL's statements.   There are therefore no grounds for me to recommend an account closure or account freeze."[1399]

Mr. Banner continued:

"I appreciate, however, that HBUS may feel compelled to act firmly in the light of OFAC's position.   This is obviously a decision that rests with HBUS and I can confirm that we will not object to such action.   That said, we would much prefer it if SIBL is allowed to withdraw the balances held with HBUS before you freeze or close the account.   From our perspective there appears to be no justification for depriving SIBL of their funds and to do so would open HSBC to unwanted reputational damage / regulatory scrutiny locally."[1400]

In essence, Mr. Banner asked for the account to be kept open but if it were frozen, to allow Social Islami Bank to pull its money first so that none of its funds would be affected.

Later that same day, August 6, 2006, HBUS AML Compliance officer Alan Ketley forwarded the email exchange to his AML Compliance colleagues, George Tsugranes and

---

[1394] See 8/4/2006 FIG Report of Findings (Update) on Social Investment Bank Limited, OCC-PSI-00823818, at 12.
[1395] Id. at 3.
[1396] 8/6/2006 email from HBAP Muhammad Shohiduzzaman to HBAP Steve Banner, "Social Invst Bank Bangladesh," HSBC OCC 3260411-412.
[1397] Id.
[1398] Id.
[1399] 8/6/2006 email from HBAP Steve Banner to HBAP Muhammad Shohiduzzaman, "Social Invst Bank Bangladesh," HSBC OCC 3260411.
[1400] Id.  See also 8/6/2006 email from HBAP Hersel Mehani to HBUS Alan Ketley, HSBC OCC 3260410.

**PX257**

235

Andrew Rizkalla, and asked for their thoughts.[1401]  Both advised closing the account.  Mr. Tsugranes wrote:

> "Although the Philippine and Indonesia branch offices were cited, the Treasury action also cited Abd Al Hamid Sulaiman Al-Mujil who is a high ranking IIRO official.  So although only the 2 branches were cited, having a top official in the organization mentioned should be cause for concern involving the IIRO.  As this organization has a 9.0% stake and does not involve itself on the day to day operations or mgmt – who is to say that they won't sooner or later or start moving funds through this acct."[1402]

Mr. Rizkalla wrote:

> "I remain firm to my first opinion, the account should be closed in an orderly fashion.  We still don't know if there is a nominee shareholder interest to IIRO, the U.S. Govt has designated IIRO for supporting terrorism, so even the small shareholder ownership entitles them to profits and dividends from Soc Invst Bank to reinvest where??.  …. Hersel says monitor the accounts for 6 months, will he be doing the monitoring??"[1403]

Despite their advice to close the account, Mr. Ketley lifted the block on the account four days after it was imposed and approved keeping the account open:

> "After reviewing the information provided by HSBC Dhaka my provisional decision is that this relationship be allowed to continue.  It will need to be designated as an SCC Category 4 (reputational risk) with immediate effect and will be subject to closer monitoring as a result ….  I am not willing to commit to the 6 months suggested by Hersel and we will review activity and determine what further action may be required as events warrant.  …  IIRO's shareholding is a minority holding and information received indicates that they exert neither management control nor have board representation.  While this entity clearly represents a heightened reputational risk to the bank, I believe that with the knowledge we have today and the controls that are being implemented we have mitigated that risk adequately."[1404]

A few days later, FIG forwarded its report on Social Islami Bank to the head of HBUS AML Compliance, Teresa Pesce.  She wrote to Mr. Ketley:  "This makes me very uncomfortable.  Can we talk to the business about this?"[1405]  Despite the discomfort she expressed and the advice of two AML compliance officers, the account was kept open.  Mr. Ketley reported to the Subcommittee that he understood that IIRO was a passive shareholder, that Social Islami was attempting to expel them, and that he talked about the account with Terri

---

[1401] 8/7/2006 email exchange among HBUS Alan Ketley, George Tsugranes, and Andrew Rizkalla, "Social Invest Bank Bangladesh," HSBC OCC 3260409-410.
[1402] Id.
[1403] Id.
[1404] 8/7/2006 email from HBUS Alan Ketley  to Hersel Mehani and others, "Social Investment Bank," HSBC OCC 3260426.
[1405] 8/11/2006 email from HBUS Teresa Pesce to Alan Ketley and Andrew Rizkalla, "Re:  Report of Findings – Social Investment Bank Limited – Bangladesh – FIG," HSBC OCC 3261519.

**PX257**

236

Pesce and Denise Reilly and believed they supported his decision to maintain the account.[1406] Ms. Pesce told the Subcommittee that she did not recall much about the relationship, but the bank should have reached out to OFAC with regard to it.[1407]   HBUS OFAC Compliance officer Elizabeth Protomasto told the Subcommittee that she contacted OFAC about this relationship after the SDN designation, and was told that the bank could continue to do business with Social Islami Bank, because only two branches of the IIRO had been designated by OFAC as SDNs, not all branches and not the branch in Bangladesh.[1408]   Social Islami Bank was also designated an SCC client.[1409]

**IIRO Remained a Shareholder for Six Years.**   In September 2006, Mr. Ketley asked Mr. Mehani to obtain additional information from the Social Islami Bank about its relationship with IIRO.[1410]   In response to a question asking whether IIRO was "a customer of the bank," Mr. Mehani wrote that the bank had told him:  "IIRO has no relationship with the subject bank and do[es] not maintain or operate any account with the bank."[1411]   In 2009, however, an internal FIG due diligence report quoted a 2008 local press article stating that the IIRO did have an account at Social Islami Bank, as well as over 50,000 bank shares which FIG estimated might then be worth $733,000.[1412]   In 2010, the HBUS KYC profile referenced a Bangladeshi Central Bank letter dated June 30, 2010, stating that IIRO had accounts at three Bangladeshi banks, including Social Islami Bank, that needed to be closed.[1413]   Social Islami Bank told the Subcommittee that IIRO did have a "foreign currency account" with the bank that was opened in 1995, but has a current balance of zero.[1414]

In 2006, Mr. Mehani indicated that the bank planned to "oust" IIRO as a shareholder at its next board of directors meeting and sell IIRO's bank shares.[1415]   Mr. Mehani wrote:  "IIRO never responded to their request to provide a full address rather than a PO box and they will use this to oust them by November [2006] which is allowed according to their Articles of Association which I have a copy given by them to me."[1416]   Despite that communication, a 2006

---

[1406] Subcommittee interview of Alan Ketley (2/16/2012).

[1407] Subcommittee interview of Teresa Pesce (3/30/2012).

[1408] Subcommittee interview of Elizabeth Protomasto (6/9/2012).

[1409] See 2012 HBUS KYC Profile of Social Islami Bank, at 14 (applying SCC designation as of 8/7/2006).

[1410] September 2006 emails between HBUS Alan Ketley, Hersel Mehani and others, "Social Invest Bank Bangladesh, HSBC OCC 3260409-418.

[1411] 9/27/2006 email from HBUS Hersel Mehani to HBUS Alan Ketley and others, "Compliance issues from Trip Dhaka," HSBC-PSI-PROD-0102755-756 (answer to Question 5).

[1412] 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, OCC-PSI-00823818, at 7 (quoting 10/8/2008 article from Bangladeshnews.com).   The FIG report also stated:  "You may therefore wish to obtain information from your customer to ascertain the status of the accounts held by the IIRO in the Social Investment Bank Ltd.   You may also wish to consider the risks, including reputational risk involved in maintaining this account relationship."  Id. at 7-8 (emphasis omitted).

[1413] 2012 HBUS KYC Profile of Social Islami Bank, at 4 ("The 3 bank accounts of IIRO namely i) Social Islami Bank Ltd. ii) Islami Bank Bangladesh Ltd. iii) Al-Falah Islami Bank Ltd. must be disposed off [sic] and transferred").

[1414] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 4, PSI-SIBL-01-0001.

[1415] 9/27/2006 email from HBUS Hersel Mehani to HBUS Alan Ketley and others, "Compliance issues from Trip Dhaka," HSBC-PSI-PROD-0102755-756.

[1416] Id.  See also 2012 HBUS KYC Profile of Social Islami Bank, at 5 ("Compliance advised … that IIRO has no involvement in the running of the bank, is not a client of the bank and will likely be ousted as a shareholder [which] give considerable grounds for comfort").

**PX257**

237

Social Islami Bank board resolution authorizing sale of the shares,[1417] and HBUS' repeated inquiries into their status over multiple years,[1418] IIRO has remained a shareholder of Social Islami Bank, although its ownership interest has gradually dropped from 8.62% in 2006, to 3.85% in 2009, to 1.69% by 2010.[1419]   IIRO currently holds a 1.61% interest in the bank, six years after Social Islami Bank promised to ensure the shares would be sold.[1420]

In 2009, Social Islami Bank sent a letter to HBUS indicating that it was planning to seek permission from the country's High Court to sell the shares still held by IIRO.[1421]   In 2010, Social Islami Bank informed HBUS that the Bangladesh government had reached an agreement with IIRO that, after certain safeguards were put in place, would allow IIRO to begin operating in the country again.[1422]   One of the conditions was that the IIRO would have to "dispose" of its Social Islami Bank account,[1423] although that account remains open today with a zero balance.[1424]   Social Islami Bank informed the Subcommittee that, due to the government's actions, "the bank is under definite obligation in paying dividend/issuing bonus shares/right shares to IIRO as per the instructions of the Central Bank and Ministry of Finance which were not paid/issued in their favor till 31/05/2010."[1425]

**A Second Terrorist Financier Shareholder.**  Also in 2009, a due diligence report issued by the HBUS Financial Intelligence Group identified a second, longterm Social Islami Bank shareholder that raised concerns.  It disclosed that Islamic Charitable Society Lajnat al-Birr Al Islam still held a 1.54% ownership interest in the bank.[1426]   The 2009 FIG report explained that World Check, the database relied on by HSBC for KYC purposes, had classified the charity "as a terrorist organization with reported tie[s] to Hamas.  In September 2008, the Israeli government

---

[1417] See 12/14/2006 letter from Social Islami Bank quoting board resolution, HSBC OCC 3342182.
[1418] See, e.g., January 2007 email exchange among HBUS Muhammad Shohiduzzaman, Hersel Mehani, Alan Ketley, and others, "Social Investment Bank – IIRO," OCC-PSI-00808829; 9/23/2008 email exchange among HBUS Alan Williamson, Daniel Jack , Hersel Mahani, and others, "Social Investment Bank," OCC-PSI-00246337; 9/23/2008 email exchange among HBUS Alan Williamson, Daniel Jack, Gloria Strazza, Monique Codjoe, and others, "POSITIVE OFAC MATCH – IIRO –KYC NOTES DATABASE," OCC-PSI-00246334; 9/24/2008 call report from a meeting at Social Islami Bank, HSBC-PSI-PROD-0102615; 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102743, at 1; 2/9/2010 email from HBUS Jon K. Jones to HBAP Sadique Reza and others, "Compliance Conditions: Social Islami Bank Ltd," HSBC-PSI-PROD-0102737.
[1419] See 2012 HBUS KYC Profile of Social Islami Bank at 3-4; 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102743, at 1.
[1420] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 3, PSI-SIBL-01-001; See also 2012 HBUS KYC Profile of Social Islami Bank, at 3, 16.
[1421] 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102621-625, at 1.  Around the same time in 2009, HSBC's Commercial and Institutional Banking in the Asia Pacific region further expanded HSBC's relationship with Social Islami Bank by providing it with new commercial banking services.  The approval form mistakenly characterized Social Islami Bank as "medium risk," erroneously said it was not an SCC designated client, and stated that none of the bank's disclosed shareholders increased the client's risk profile, despite a specific reference to IIRO.  3/10/2009 CIBM-Institutional Banking KYC Profile for Social Islami Bank Limited, HSBC-PSI-PROD-0102646.
[1422] 2012 HBUS KYC Profile of Social Islami Bank, at 4.
[1423] Id.
[1424] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 2, PSI-SIBL-01-001.
[1425] Id. at 3.
[1426] 5/5/ 2009 FIG report, HSBC PSI PROD 0102696, at 3, 5.

**PX257**

238

reportedly declared it an illegal entity."[1427]   Despite this new information in the 2009 FIG report, the HBUS KYC profile on Social Islami Bank does not acknowledge it, stating instead in a note: "Updated EDD [Enhanced Due Diligence] ROF [Report on Findings] received May 5, 2009. Report provided no new, or, up to date information."[1428]   Social Islami Bank has informed the Subcommittee that Lajnat al-Birr remains a 0.22% share owner, but does not have any account at the bank.[1429]

**Sobhan Misconduct.**   The ongoing ownership of the bank's shares by IIRO and Lajnat al-Birr was not the only troubling development.   Social Islami Bank's initial Chairman of the Board, Ahmed Akbar Sobhan, also known as Shah Alam, was a well-known businessman who held, with his son, a 3.35% ownership interest in the bank since its inception.[1430]   Beginning in 2006, however, Mr. Sobhan and his son became the subjects of several criminal investigations involving bribery, corruption, fraud, and tax evasion.[1431]   In 2007, Mr. Sobhan and his son reportedly fled to the United Kingdom, after which Mr. Sobhan was the subject of corruption charges brought in his absence by the Bangladeshi Anti-Corruption Commission which sentenced him to eight years in prison.[1432]   This troubling information was detailed in the 2009 FIG report that was later described in the Social Islami KYC profile as containing no new information.[1433]

In May 2012, HSBC terminated its relationship with Social Islami Bank.[1434]   David Bagley, head of HSBC Group Compliance, told the Subcommittee, when asked, that the closure decision had been a "no brainer."[1435]   He did not explain what factors led to the termination decision.   Social Islami Bank currently has no open account with any HSBC affiliate.[1436]

## J.   Analysis

HSBC is a global bank with a strong presence in many countries confronting terrorist threats.   If safeguards are lacking, HBUS offers a gateway for terrorists to gain access to U.S. dollars and the U.S. financial system.   HSBC has a legal obligation to take reasonable steps to ensure it is not dealing with banks that may have links to or facilitate terrorist financing.

---

[1427] Id. at 5 (emphasis in original is omitted).
[1428] 2012 HBUS KYC Profile of Social Islami Bank, at 4.
[1429] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.
[1430] See "Social Investment Bank Ltd. Director's Business Information," Social Islami Bank, undated, HSBC-PSI-PROD-0102626; 2003 Bankers Almanac at 3891 (listing Mr. Sobhan with a 2.12% interest and Mr. Sobhan and his son, Sadat Sobhan, sharing a 1.23% interest).
[1431] See 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 6-7.  See also "Court orders to arrest Bashundhara chairman," The Daily Star (4/26/2012), http://www.thedailystar.net/newDesign/news-details.php?nid=231738; "Shah Alam lands in jail," The Daily Star (3/21/2011), http://www.thedailystar.net/newDesign/news-details.php?nid=178563.
[1432] See 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 6-7.
[1433] 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 2, 6-7; 2012 HBUS KYC Profile of Social Islami Bank, at 4.
[1434] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.
[1435] Subcommittee interview of David Bagley (5/10/2012).
[1436] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.

**PX257**

239

Banks rarely carry explicit links to terrorist financing, but in the three banks reviewed here, an array of factors raised troubling questions.  In the case of Al Rajhi Bank, the  factors included the naming of a key bank official in a list of al Qaeda financial benefactors, a U.S. law enforcement search of Al Rajhi nonprofit and business ventures in the United States to disrupt terrorist financing, a CIA report targeting the bank for being a "conduit" for extremist finance, the bank's refusal to produce authenticating bank documents for use in the criminal trial of a client who cashed travelers cheques at the bank for use by terrorists, and multiple accounts held by suspect clients.  In the case of Islami Bank, the factors included substantial ownership of the bank by al Rajhi interests, Central Bank fines for failing to report suspicious transactions by militants, and an account provided to a terrorist organization.  In the case of Social Islami Bank, the factors included ownership stakes held by two terrorist organizations whose shares were exposed but never sold as promised, and a bank chairman found to be involved with criminal wrongdoing.

In each case, HBUS and HSBC personnel were aware of the information, but approved or maintained the accounts anyway.  When an AML Compliance officer like Beth Fisher declined to approve an account, HSBC personnel found someone else to take her place.  In several cases, Christopher Lok, head of U.S. Banknotes, took on the role of relationship manager fighting for account approval.  His test for taking on that role depended in part upon how much revenue an account would produce.  Al Rajhi Bank's threat to terminate business with HSBC affiliates also appears to have galvanized HBUS' renewal of the account.

Another striking feature of these accounts is the fact that a decision by one HSBC affiliate to terminate a relationship with a bank due to terrorist financing concerns did not always lead other HSBC affiliates to follow suit.  In the case of Al Rajhi Bank, for example, HBUS terminated the relationship, but HSBC affiliates in the Middle East continued to do business with the bank.  One HBUS executive later argued that, since HSBC was already exposed to the reputational risk posed by Al Rajhi Bank through the accounts at other HSBC affiliates, its reputational risk would not increase if one more account were opened.  In May 2012, HSBC changed its policy to apply decisions to terminate a client relationship to apply globally to all its affiliates.

PX257

240

## VI.  HOKURIKU BANK:  CLEARING BULK TRAVELERS CHEQUES

With few questions asked and despite ongoing evidence of suspicious activity, HBUS cleared tens of millions of dollars per year in bulk travelers cheques for Hokuriku Bank of Japan. According to Hokuriku Bank, from 2005 to October 2008, HBUS cleared travelers cheques totaling between $70 million and $90 million per year for the bank, producing a grand total in less than four years of more than $290 million.  HBUS estimated that, at one point in 2008, it was clearing travelers cheques for the bank at an average of $500,000 to $600,000 per day.  The Hokuriku deposits consisted of U.S. dollar travelers cheques that were in denominations of $500 or $1,000, came in batches of sequentially numbered cheques, and were signed and counter-signed by the same person using an illegible signature.  They were made payable to one of 30 different companies or individuals, all of whom claimed to be in the used car business.  The cheque beneficiaries were clients of Hokuriku Bank, but the cheques were purchased from the same Russian bank for deposit into their accounts in Japan.  When HBUS finally asked Hokuriku Bank about those clients and the business purpose behind Russians cashing massive numbers of U.S. dollar travelers cheques on a daily basis for deposit in Japan, Hokuriku Bank claimed to have little or no KYC information or understanding of its clients' banking transactions.

The documents produced to the Subcommittee disclosed that some HBUS AML Compliance personnel raised concerns about the Hokuriku travelers cheques in 2005, but failed to investigate the transactions.  The Hokuriku travelers checks came to HBUS' attention again in 2007, during the course of an OCC AML examination which found "serious concerns related to weak policies, procedures, systems and controls" with how it processed monetary instruments,[1437] but HBUS again failed to investigate the transactions.  In 2008, during a followup OCC AML examination, the OCC singled out the Hokuriku travelers cheques as suspicious and required HBUS to obtain additional information about them.

The OCC and HBUS quickly uncovered troubling information about the travelers cheques, including that they had originated in Russia, a country at high risk of money laundering, involved millions of U.S. dollars, and had no clear business purpose.  When HBUS sought more information about the cheques, Hokuriku Bank at first delayed responding, then provided minimal information, and finally declined to investigate further, claiming to be constrained by bank secrecy laws from disclosing client-specific information.  In 2008, at the urging of the OCC, HBUS stopped accepting travelers cheques from the bank and told the OCC that it planned to close the Hokuriku account within 30 days.  HBUS later decided to continue to do business with Hokuriku Bank in other areas despite its poor AML efforts.  In 2010, during the course of another AML examination, the OCC uncovered the ongoing relationship with Hokuriku Bank.  In May 2012, HBUS closed the Hokuriku Bank account, although Hokuriku Bank continues to do business with other HSBC affiliates.

---

[1437] 3/31/2007 OCC Report of Examination for HSBC bank, OCC-PSI-00304077.  [Sealed Exhibit.]

PX257

241

## A. Hokuriku Bank

Hokuriku Bank Ltd. is a Japanese regional bank with over 2,800 employees and 185 branches.[1438]  It also has representative offices in New York, London, Singapore, and China.[1439] Hokuriku Bank traces its origins back to 1877; in 1961, it began trading on the Tokyo Stock Exchange.[1440]  In 2003, the Hokugin Financial Group was formed in Japan, and Hokuriku Bank became a wholly-owned subsidiary of the Group.  In 2004, the Group merged with another financial institution and changed its name to Hokuhoku Financial Group Inc. which continues to operate as the bank's holding company today.[1441]  Hokuhoku Financial Group is headed by Shigeo Takagi, who has been the President of both the Group and Hokuriku Bank since 2003.[1442]

According to a 2010 HBUS Know Your Customer (KYC) Profile, Hokuriku Bank is a longstanding customer of HBUS, which has provided it with correspondent banking services in Hong Kong, Korea, and the United Kingdom, as well as the United States.[1443]  In addition to HBUS, Hokuriku Bank has correspondent relationships with several other HSBC affiliates as well, including Hong Kong and Shanghai Banking Corporation, Ltd. and HSBC Middle East.[1444] By 2001, Hokuriku Bank had become a client of HBUS' Payments and Cash Management (PCM) division which used its processing centers in New York to handle most Hokuriku transactions.[1445]

HBUS provided Hokuriku Bank with two accounts, numbered 50385 and 34738. Account No. 50385 was closed on Feb. 6, 2009, and its balance transferred to Account No. 34738, which remained open until May 2012.[1446]  HBUS provided Hokuriku Bank with access to U.S. dollars, primarily by clearing millions of dollars in U.S. dollar travelers checks each year. According to Hokuriku Bank, HBUS cleared travelers cheques totaling about $77 million in 2005, $72 million in 2006, $90 million in 2007, and $52 million in 2008, until HBUS stopped providing clearing services for the bank's bulk travelers cheques.[1447]  Those figures show that, in less than four years, HBUS cleared travelers cheques for Hokuriku Bank totaling over $290 million.  HBUS also processed wire transfers from Hokuriku Bank and provided other banking

---

[1438] See HBUS "Know Your Customer Profile" for Hokuriku Bank (hereinafter "HBUS KYC Profile")(last updated on 9/3/2010), prepared by HBUS Global Payments and Cash Management division, HSBC-PSI-PROD-0102415-425, at 417; "Hokuhoku Financial Group Inc. Annual Report 2011," (year ended March 31, 2011)(hereinafter "Hokuhoku 2011 Annual Report"),  at 59, http://www.hokuhoku-fg.co.jp/english/financial/docs/fg_ar2011.pdf.
[1439] Hokuhoku 2011 Annual Report, at 1, 59.
[1440] See Hokuhoku 2011 Annual Report at 59; HBUS KYC Profile at HSBC-PSI-PROD-0102416.
[1441] Id.
[1442] HBUS KYC Profile at HSBC-PSI-PROD-0102420; Hokuhoku 2011 Annual Report, at 61.
[1443] HBUS KYC Profile at HSBC-PSI-PROD-0102417-418.  HBUS told the OCC that it first opened an account for Hokuriku Bank in 1978, through its U.S. predecessor, Marine Midland Bank, which HSBC purchased during the 1980s.  5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.
[1444] See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.
[1445] HBUS KYC Profile at HSBC-PSI-PROD-0102415-425, at 423.
[1446] Id. at 420.  HBUS closed the second account on May 21, 2012.  6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.
[1447] See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, chart entitled, "Volume of U.S. Dollar Travelers Checks to HBUS for Clearance by year," PSI-HokurikuBank-01-0001-016.  Hokuriku Bank cleared another $52 million in 2008, until HBUS stopped clearing the cheques in October 2008.

services.  In 2007, the Hokuriku account produced revenues for HBUS totaling about $47,000.[1448]

According to the HBUS KYC Profile, the initial HBUS Account Manager for Hokuriku Bank was Nanayo Ryan, and the Relationship Manager for KYC approval purposes was Beth Fisher.[1449]  In 2008, the HBUS Account Manager switched to Kgomotso Hargraves, while the Relationship Manager for KYC approval purposes switched to Wayne W. Ferguson, then Anthony Julian, then Wen Lu Wu.[1450]  The Global Relationship Manager since 2008 has been Machiko Yamashita.[1451]

### B. Travelers Cheques

Travelers cheques are typically sent by one financial institution to another via a "pouch." A pouch is an envelope or package, and pouch activity refers to the sending or receipt and processing of an item that is sent to a bank from another country by common carrier, courier, or referral agent.  Pouches typically contain currency or a monetary instrument, such as a travelers cheque, cashiers cheque, or money order, which is intended to be used to make a deposit or loan payment, or to engage in another transaction.  Pouches can be sent by an unrelated financial institution, a bank affiliate, or by an entity or individual.

In addition to physical delivery of monetary instruments, many banks, including HBUS, provide a service called "Remote Deposit Capture" (RDC).  RDC enables customers who sign up for the service to send electronic images of physical monetary instruments that they wish to present for deposit, including travelers cheques.  Processing these electronically sent deposits are sometimes referred to as part of the receiving bank's pouch activity.

At large banks, pouched monetary instruments are typically sent to a specialized facility for processing.  These facilities typically process a high volume of monetary instruments on a daily basis.  When a bank processes a pouched travelers cheque, it typically credits the amount of the cheque to the correspondent account of the client financial institution that sent the cheque. Pouch activity is often referred to as "cash letter" activity, since it consists primarily of cashing a monetary instrument by crediting an account with the amount specified on the instrument. Providing cash in exchange for a monetary instrument is also referred to as "clearing" the instrument.

HBUS has two processing centers in the United States, one in Brooklyn and one in Buffalo, New York, both of which process a high volume of monetary instruments on a daily basis.  RDC services are provided solely at the Buffalo center.[1452]  Both centers segregate travelers cheques from other types of deposits and process them separately, crediting the U.S.

---

[1448] HBUS KYC Profile at HSBC-PSI-PROD-0102415-425, at 420.
[1449] Id. at 424.
[1450] Id. at 418, 424-425.
[1451] 9/5/2008 email from Hideki Matsumoto to Michio Yamashita and others, "Hokuriku Bank," OCC-PSI-00808695, at 5.
[1452] 10/4/2010 draft OCC Supervisory Letter to HBUS, OCC-PSI-00863984-992, at 2. [Sealed Exhibit.]

**PX257**

243

dollars to the relevant client accounts.[1453]  A processing clerk typically skims each deposit to identify any sequentially numbered travelers cheques.  If the sequentially numbered cheques total more than a designated amount, the clerk is required to refer the deposit to HBUS AML Compliance for approval prior to processing.[1454]  If the sequentially numbered travelers cheques exceed another specified threshold, the processing clerk must attach a Traveler's Cheque/Money Order High Value Deposit Information (TC/MO HVDI) form to the deposit prior to processing.[1455]  If the form is not attached, the deposit must be submitted to AML Compliance for approval prior to processing.[1456]  This procedure is intended to ensure that HBUS AML Compliance is kept apprised of large deposits of sequentially numbered travelers cheques, since such cheques are often associated with money laundering or other misconduct.

U.S. banking regulators have long warned financial institutions about the money laundering risks associated with travelers cheques which can be purchased with cash by a non-customer of the bank and used to move substantial funds across international borders in ways that are difficult to trace.[1457]  Travelers cheques have been used by terrorists,[1458] drug traffickers,[1459] and other criminals.[1460]

---

[1453] 6/26/2008 Memorandum to the OCC Examiner-In-Charge Anthony DiLorenzo from OCC Examiner Elsa de la Garza, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd,"  OCC-PSI-00885828, at 1.  [Sealed Exhibit.]

[1454] Id.

[1455] Id.

[1456] Id.

[1457] See, e.g., Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Examination Manual, "Core Overview:  Purchase and Sale of Monetary Instruments," (6/23/2005) at 59; FFIEC BSA/AML Examination Manual, "Purchase and Sale of Monetary Instruments-Overview," (8/24/2007), at 212 ("The purchase or exchange of monetary instruments at the placement and layering stages of money laundering can conceal the source of illicit proceeds.  As a result, banks have been major targets in laundering operations because they provide and process monetary instruments through deposits.").

[1458] See, e.g., United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005); "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1 (describing how the convicted defendant cashed $130,000 in U.S. dollar travelers cheques at a bank in Saudi Arabia and then provided the funds to support violent extremists in Chechnya).

[1459] See, e.g., United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 35 (describing how Wachovia Bank processed $20 million in suspicious travelers cheques, some portion of which was suspected to include illegal drug proceeds); "How a Big U.S. Bank Laundered Billions from Mexico's Murderous Drug Gangs," The Guardian, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.  See also Albajon v. Gugliotta, 72 F. Supp. 2d 1362, 1365 (S.D. Fla. 1999) (admitting travelers cheques as evidence of drug trafficking proceeds); United States v. $41,305.00 in Currency & Travelers Checks, 802 F.2d 1339, 1343 (11th Cir. 1986) (finding travelers cheques could be seized as drug trafficking proceeds).

[1460] See, e.g. Folk v. State, 192 So. 2d 44, 46 (Fla. Dist. Ct. App. 1966) (upholding conviction for signing a false name on travelers cheques and cashing them); United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001) (upholding conviction for using undeclared travelers cheques to attempt to move money fraudulently through U.S. customs).

**PX257**

244

## C. 2005 Concerns about Hokuriku Travelers Cheques

The documents produced to the Subcommittee show that HBUS AML Compliance personnel were aware of, and expressed concerns about, the large number of travelers cheques being cashed for Hokuriku Bank from at least as early as March 2005, but did little about them for years.

On March 15, 2005, HBUS AML compliance officer George Tsugranes sent an email to the HBUS account manager for Hokuriku Bank, Nanayo Ryan, in which he noted that, in less than 60 days from January to March 2005, Hokuriku Bank had deposited travelers cheques totaling over $2 million.[1461]  The email provided a chart listing 41 separate deposits over a 51-day period, showing that the deposited amounts ranged from $20,000 to $100,000 at a time; often consisted of multiple $1,000 travelers cheques; and referenced about ten different clients, including corporations and individuals.[1462]  All of the deposits were to Hokuriku Bank's Account No. 50385.  Mr. Tsugranes asked Mr. Ryan:

> "to reach out to the bank and ask that adequate KYC is on file for each name listed on the spreadsheet, whether the customer activity is consistent with the KYC, and also who is their customer base (local clients, people buying cars for export, etc.) and why US dollar travelers checks would be used for payment."[1463]

This email shows that, in early 2005, Hokuriku's pattern of making large deposits with multiple travelers cheques triggered a review by HBUS AML Compliance personnel concerned about who was behind the deposits.  Despite the request for more information in the March 2005 email, the Subcommittee received no additional documentation or information indicating that HBUS AML Compliance personnel actually sought or obtained additional KYC information from Hokuriku Bank in early 2005, regarding the travelers cheques it was cashing.

Eight months later, in November 2005, several emails indicate that HBUS AML Compliance personnel took a broader look at the cash letter/pouch activity at its Brooklyn center, apparently in an effort to detect unlicensed money service business activity.[1464]  This inquiry was not specific to Hokuriku Bank.  On Nov. 23, 2005, HBUS AML senior compliance officer Alan Ketley sent an email to AML compliance officer Mark Balawender stating that, while HBUS had "strong monitoring procedures in place for PCM clients," he wasn't sure about what was "in place for other clients" at the Brooklyn center.  He attached to the email a 21-page chart listing

---

[1461] 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku Bank C/L Activity," HSBC OCC 3113976-977.  The chart is unlikely to contain a comprehensive list of all of the travelers cheques presented by Hokuriku Bank over the course of those two months since, during 2005 alone, Hokuriku Bank cleared $77 million in travelers cheques through HBUS.  See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, chart entitled, "Volume of U.S. Dollar Travelers Checks to HBUS for Clearance by year," PSI-HokurikuBank-01-0001.
[1462] 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku Bank C/L Activity," HSBC OCC 3113976-977.
[1463] Id.
[1464] See email exchange among HBUS AML Compliance personnel, from 11/23/2005 - 11/29/2005, HSBC OCC 3180772-797, at 773 ("I do not believe there are any formal or documented checks in place that would identify potential unlicensed money service business activity").

**PX257**

245

the "cash letter volume" for 35 bank clients over a one-year period from April 2004 to March 2005.[1465]  The data disclosed, among other information, that over the course of the year, Hokuriku Bank had cashed an increasingly larger volume of monetary instruments each month into its Account No. 50385, building from 36 items totaling about $209,000 in April 2004, to 109 items totaling over $4.3 million in March 2005.  Altogether for the year, Hokuriku Bank is recorded as having deposited at HBUS 562 "envelopes" with over 24,000 items totaling $11.2 million.[1466]

On November 25, 2005, Mr. Balawender sent an email to Mr. Ketley with his findings.[1467]  He described the Brooklyn center as engaged in "heads down volume process[s]ing."  He stated, "Given the volume/deadline driven/processing nature of the departments above, I am not sure what we can do.  …  I would anticipate a rather strong push-back from Ops and the branches, if AML Compliance were to suggest additional processes."[1468]

No further information or inquiries related to Hokuriku Bank appear in the 2005 timeframe among the documents provided to the Subcommittee in response to a broad request for all documents related to Hokuriku Bank and pouch activity.  When asked for more information about the March and November 2005 reviews, Mr. Ketley indicated that he could not recall either Hokuriku Bank or what happened in either review.[1469]

In sum, despite a specific March 2005 AML inquiry into $2 million in travelers cheques cleared for Hokuriku Bank, and a broader November 2005 inquiry that included evidence of an escalating pattern of Hokuriku deposits, HBUS AML Compliance apparently took no further action to investigate Hokuriku's cash letter activities in 2005.  The 2005 and 2006 OCC annual examination of HBUS also made no mention of AML issues related to its pouch activities or clearance of travelers cheques.[1470]

### D.  2007 OCC Pouch Examination

Two years after the internal HBUS inquiries, in early 2007, the OCC commenced an AML examination of HBUS' pouch activities.[1471]  In response, HBUS AML compliance officer George Tsugranes produced a chart listing clients with a high volume of cash letter activity during the last two months of 2006.[1472]  Hokuriku Bank was repeatedly listed, appearing in the chart more times than any other bank.  Over a 62-day period, the chart identified 100 Hokuriku deposits.  The deposit amounts ranged from $20,000 to $193,000 at a time, often consisted of multiple $1,000 travelers cheques, and referenced about a dozen clients, both corporate and

---

[1465] Id. at 776-797.
[1466] Id. at 776.
[1467] Id. at 773.
[1468] Id.
[1469] Subcommittee interview of Alan Ketley (2/16/2012).
[1470] See OCC Reports of Examination of HBUS, for the examination cycle ending March 31, 2005 and March 31, 2006.  [Sealed Exhibit.]
[1471] See 5/8/2007 OCC Memorandum, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-01298647 [Sealed Exhibit.]; 3/2/2007 email from HBUS George Tsugranes to HBUS Alan Ketley, HSBC OCC 3352026.
[1472] See chart, prepared by HBUS AML Compliance, HSBC OCC 3352034-037.

PX257

246

individual.[1473]  Many of the client names on the 2006 list had also appeared on the March 2005 list compiled by Mr. Tsugranes.  The total amount deposited over the two-month period was about $5.6 million.

Mr. Tsugranes sent the chart to his supervisor, Mr. Ketley, and wrote that "all acc[oun]ts are being checked to ensure activity is reflected on KYC."  Of the documents produced to the Subcommittee, none indicate, however, what information was "checked" with respect to Hokuriku Bank or what Mr. Tsugrantes learned.

Six weeks later, on April 24, 2007, Mr. Ketley asked HBUS AML compliance officers Mr. Tsugranes and Robert Guthmuller, to travel to the HBUS Brooklyn center "to gain a thorough understanding of what is processed … [and] what items are reviewed."[1474]  Three days later, on April 27, 2007, Mr. Guthmuller sent an email to Mr. Ketley providing him with "the Readers Digest version" of their findings after "a high level review of cash letter processing" at the Brooklyn center.[1475]

Mr. Guthmuller's email stated that the Brooklyn center "treat[ed] all clients the same," regardless of whether cash letter items involved "high risk clients."  He wrote:  "We should be drilling down on our high risk customers" and, for example, "identify those clients that in the past have sent a large number of sequentially numbered travelers checks … and monitor accordingly."[1476]  Mr. Guthmuller also wrote that the center staff had "divided loyalty," explaining:

> "Their main job is processing checks – 5:00PM deadline.  But they are also asked to be the 'front line' for monitoring, referring items to Delaware for further investigation.  One job focuses on pushing items through, another is to go slower, review items, ask themselves questions – is it suspicious? – contact Delaware – wait for a response – hopefully before 5:00PM.
>
> [O]ne solution is to have a full time compliance person review items FULLY, that means internet searches, OFAC, wor[l]dcheck etc.  Additionally the compliance person could drill down on the high risk accounts."[1477]

Mr. Guthmuller also stated that HBUS "[m]ust improve trend analysis.  Nothing done in Brooklyn."  He wrote:

---

[1473] Hokuriku Bank told the Subcommittee that, since the mid 1980s, it has limited its clients to deposits of no more than $1,000 in travelers cheques per person per day, unless the cheques were issued by Hokuriku Bank or the depositor was a "regular customer" and the bank "deemed that the funds will be collected from the customer should it turn out that the travelers' che[c]k was not duly issued."  6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 004.

[1474] 4/23/2007 email from HBUS Alan Ketley to HBUS George Tsugranes, Robert Guthmuller, Mark Balawender, and others, "Vist to Brooklyn Ops," OCC-PSI-00312153, at 5-6.

[1475] 4/27/2007 email from HBUS Robert Guthmuller to HBUS Alan Ketley, "Visit to Brooklyn OpsLink," OCC-PSI-00312153, at 4.

[1476] Id. at 5.

[1477] Id. at 5 (emphasis in original).

**PX257**

247

"We have reportedly had all travelers checks $20k and over ... on Excel for 4 years but haven't used/sorted items for trend analysis.  Let's start looking at it.  WHAT ABOUT SEQUEN[T]IALLY NUMBERED TRAVELERS CHECKS AGGREGATING SAY $15K per day, same payee ...?"[1478]

This email indicated that HBUS had compiled an extensive database of travelers cheque information, but was not using it to identify suspicious travelers cheque activity or high risk clients.

Mr. Guthmuller also wrote that the HBUS AML office in Delaware "must improve" its enhanced due diligence (EDD) efforts, including by using "more internet searches, calls on high risk clients asking questions, use of certifications, etc."[1479]  His email indicated that HBUS' AML staff did not engage in sufficient due diligence activity to identify high risk clients depositing bulk travelers cheques.

Mr. Ketley forwarded the email to Anne Liddy, a senior HBUS Compliance official, with the comment, "Food for thought."[1480]  He wrote:  "We will look to have a meeting with Bob [Guthmuller] next week to discuss further."

Ten days later, on May 7, 2007, Mr. Tsugranes sent an email to Mr. Ketley and others stating he had "discussed the issues with the Delaware AML team and asked for some input on ways to improve our cash letter monitoring."[1481]  He stated:  "Below are some recommendations which will allow for both operational benefits and a more risk based monitoring approach."

 His email advised reducing the monitoring of checks from Fortune 100 names, and revising the dollar limit to $100,000 to trigger review of an account of a Special Category Client (SCC).  While reducing review of Fortune 100 names could be seen as an effort to target AML review efforts to higher risk transactions, imposing a $100,000 dollar limit on SCC clients, the bank's highest risk clients, set a high bar to trigger a review.  With respect to Hokuriku Bank and another bank in Korea, Mr. Tsugranes advised that AML personnel track the banks' total daily deposits, "eliminate the check by check comparison," and "only investigate if an apparent MIF [Monetary Instrument Form] was not included."  He wrote:  "To summarize we would be focusing more on SCC clients, cutting back on some Group reviews in non HRCs [non High Risk Clients] and also tracking" a specific bank of concern.

While the Tsugranes email advocated a stronger focus on SCC clients, it did not address Mr. Guthmuller's suggestion to identify other high risk clients by analyzing the bank's travelers cheque data.  His email did not, for example, include the Guthmuller suggestion to strengthen trend analysis of the cash letter activity at the Brooklyn center by utilizing the four years of travelers cheque data already included in Excel spreadsheets.  The Tsugranes email also failed to include the suggestion, urged in capital letters in the Guthmuller email, to identify and investigate clients making deposits of sequentially numbered travelers checks above a specified

---

[1478] Id. at 5 (emphasis in original).
[1479] Id. at 5.
[1480] Id. at 4.
[1481] Id. at 2-3.

PX257

threshold. Instead, the Tsugranes email recommended reducing the monitoring directed toward Hokuriku Bank by eliminating the "check by check comparison" that had been routine practice. In the end, despite another chart disclosing multi-million-dollar Hokuriku deposits of $1,000 travelers checks, the final result of HBUS' review was to advocate devoting less rather than more attention to the bank.

The two OCC examiners who conducted the 2007 examination told the Subcommittee that they were very concerned about the lack of AML controls over HBUS pouch activity and had recommended that the OCC impose a Cease and Desist Order requiring HBUS to revamp them.[1482] They later concluded, however, that they were unable to meet the OCC standards required for issuing the order. Instead, the OCC examiners designated the lack of AML controls over pouch processing as a Matter Requiring Attention (MRA) which was included in the annual OCC Report of Examination provided to the HBUS Board of Directors on July 24, 2007.[1483] The MRA did not, however, explicitly identify the Hokuriku travelers cheques as a problem.

The OCC uses its annual Reports on Examinations to ensure bank boards are kept apprised of serious bank deficiencies requiring action by management. The 2007 Report of Examination notified the HBUS Board about the OCC's "serious concerns related to weak policies, procedures, systems and controls" related to its pouch activities, and urged immediate improvements.[1484] In September 2007, the OCC also issued a Supervisory Letter to HBUS which again urged that "policies, procedures, systems, and controls for pouch need strengthening and augmenting."[1485]

### E. 2008 OCC Inquiry into Hokuriku Travelers Cheques

Nine months later, in June 2008, the OCC commenced a followup AML examination of HBUS pouch activity, looking at pouch services in additional business units.[1486] During the course of that examination, OCC examiners identified the Hokuriku travelers cheque deposits as an activity warranting greater scrutiny.[1487]

---

[1482] See 7/3/2007 OCC memorandum, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-0087773 [Sealed Exhibit.]; Subcommittee interviews of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012).
[1483] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-00304077, at 1. [Sealed Exhibit.] The MRA read in full as follows:
   "The bank provides pouch services in a number of business unites. An examination of HSBC pouch services resulted in serious concerns related to weak policies, procedures, systems and controls. The policies and controls in this area are inferior to BSA/AML controls in other areas of the bank, and remedial action is warranted. The absence of comprhesnive policies, procedures and adequate systems and controls could potentially subject the bank to undue reputation risk and/or lead to BSA/AML violations. Pouch serives facilitate easy movement of funds, and are favored by persons who transfer illgal and terrorist funds. Consequently, the Board should ensure that management implements appropriate policies, procedures, systems and controls for this activity. The Board should communicate the corrective measures to the OCC, and confirm subsequent resolution."
[1484] Id.
[1485] 9/13/2007 OCC Supervisory Letter, "Pouch Services and Middle Market at HBUS," OCC-PSI-00000391-394. [Sealed Exhibit.]
[1486] See 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," OCC-PSI-00885822-826. [Sealed Exhibit.]
[1487] Id.

249

In June 2008, two OCC AML bank examiners visited the HBUS Brooklyn and Buffalo processing centers to examine their pouch activity.[1488]  One of the examiners told the Subcommittee that when they visited the Brooklyn center, they found "stacks and stacks of travelers cheques, some signed and countersigned by the same entity."[1489]  In a memorandum the examiner wrote that, at the Brooklyn center, she reviewed a Hokuriku cash letter deposit in the amount of $110,000, and found it consisted of 220 sequentially numbered travelers cheques, each for $500.[1490]  She wrote that all of the cheques were signed and countersigned by the same individual, whose name was illegible, and all were made payable to SK Trading Company Ltd. The TC/MO HVDI form attached to the deposit described SK Trading as a "used car dealer" and stated that the travelers cheque funds were to be used for a "business purpose."[1491]  The other examiner reviewed another Hokuriku deposit for $240,000 and found a similar situation involving sequentially numbered $1,000 travelers cheques that had been signed and countersigned by the same person as the other deposit and made payable to SK Trading.  The OCC examiners then contacted the HBUS cash letter department manager who explained that the Brooklyn center received three to five Hokuriku deposits daily of travelers cheques which totaled between $500,000 and $600,000 each day.[1492]  He indicated that travelers cheques were the "only types of instruments received through pouch for Hokuriku Bank."[1493]

The OCC examiners researched SK Trading and found that, according to its website, the company appeared to be headquartered in Seoul, Korea, with offices in Japan and the United States, and had been in business since 1984.[1494]  They also found that the company had been identified by other financial institutions as involved with suspicious activity.  These other financial institutions had identified suspicious wire transfers, sometimes involving millions of dollars, which were originated by individuals with Russian surnames who sent the funds from accounts at Russian banks or which were originated by corporations that sent the funds from banks in the British Virgin Islands.[1495]  The ultimate beneficiary of the funds in each case was SK Trading using accounts at various banks in Japan.  The OCC examiners noted that, in November 2006, one of the financial institutions had contacted Hokuriku Bank directly and asked it about the business purpose behind the transactions, but was told that Hokuriku Bank "could not answer this as their customer (S.K. Trading Company Limited) refused to provide information."[1496]

The OCC examiners concluded that SK Trading was "conducting high dollar volumes of activity utilizing wire transfers and pouch services," that SK Trading was involved with "numerous entities," and that the transactions involved "numerous individuals from Russia," and warranted additional investigation.[1497]  The travelers cheques' connections to Russia raised a

---

[1488] Id.
[1489] Subcommittee interview of OCC AML Examiner Elsa de la Garza, (1/9/2012).
[1490] 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," at OCC-PSI-00885822, at 1. [Sealed Exhibit.]
[1491] Id.
[1492] Id. at 2.
[1493] Id.
[1494] Id.
[1495] Id.
[1496] Id. at 3.   (emphasis omitted).
[1497] Id. at 4.

PX257

particular red flag, since the United States has long viewed Russia as a country of "primary" money laundering concern, its highest risk category.[1498]   At the time, a 2008 report by the U.S. State Department, then the latest in a long line of annual U.S. State Department reports summarizing money laundering concerns on a country-by-country basis, described Russia as follows:

> "Criminal elements from Russia and neighboring countries continue to use Russia's financial system to launder money …. Experts believe that most of the illicit funds flowing through Russia derive from domestic criminal activity, including evasion of tax and customs duties and smuggling operations.  Despite making progress in combating financial crime, Russia remains vulnerable to such activity because of its vast natural resource wealth, the pervasiveness of organized crime, and, reportedly, a high level of corruption.  Other vulnerabilities include porous borders, Russia's role as a geographic gateway to Europe and Asia, a weak banking system with low public confidence in it, and under funding of regulatory and law enforcement agencies.  Russia's financial intelligence unit (FIU) estimates that Russian citizens may have laundered as much as U.S. $11 billion in 2007."[1499]

When the Subcommittee asked the OCC about its 2008 inquiry into the Hokuriku travelers cheques, Ms. de la Garza stated that, despite the earlier AML examination in 2007, HBUS seemed to have no AML policies or procedures in place regarding pouch activity.[1500]   She characterized the failure to monitor the travelers cheques being cashed as "not normal," and stated that they immediately brought the matter to the attention of HBUS AML Compliance. Ms. de la Garza indicated that, at first, HBUS Compliance personnel asserted that the travelers check transactions were legitimate, and that the high cost of cars in Russia accounted for the daily deposits of $500,000 or more by SK Trading.  After doing additional research and finding additional accounts with high volumes of traveler cheque deposits, often sequentially numbered and signed and countersigned by the same person, she said that HBUS AML Compliance became more concerned.[1501]

On Sept. 2, 2008, the OCC examiners met with HBUS senior compliance officials Anne Liddy and Mary Ann Caskin.[1502]   According to an OCC memorandum summarizing the meeting, Ms. Liddy disclosed that HBUS had reviewed:

> "all transactions over the past 2 months and identified a total of 20 entities (including SK Trading) which were using Cash Letter services to clear Travelers Cheques.  All 20 entites are used car dealerships. … Four additional companies with significant dollar amounts have been identified.  (Maric Trading - $3.5 Million; Jamsou Traders - $1Million; I K Auto - $929 Thousand and Dean Corp - $587 Thousand – totals for two

---

[1498] See, e.g., "International Narcotics Control Strategy Report, Volume II, Money Laundering and Financial Crimes," U.S. State Department (March 2008), at 62.
[1499] Id. at 390.  See also "International Narcotics Control Strategy Report, Volume II, Money Laundering and Financial Crimes," U.S. State Department (March 2012), at 156 (identifying generally the same AML vulnerabilities in Russia today).
[1500] Subcommittee interview of OCC AML Examiner Elsa de la Garza (1/9/2012).
[1501] Id.
[1502] 9/3/2008 OCC memorandum, "SK Trading Co Update," OCC-PSI-00885817. [Sealed Exhibit.]

PX257

251

months). … The Business Unit has gone back to the Relationship Manager and Hokuriku Bank to obtain additional information on Maric Trading and Jamsou Traders.  They will also be inquiring on the other companies identified. …  The bank will be exiting the Hokuriku relationship within the next 30 days."[1503]

The OCC informed the Subcommittee that the two OCC examiners who attended the meeting understood HBUS to mean that it would close the Hokuriku account, cease all business with the bank, and report any suspicious activity to U.S. law enforcement.[1504]

## F.  Absence of Hokuriku Bank KYC Information

In July 2008, in response to the OCC, HBUS AML Compliance initiated a more in-depth review of the Hokuriku travelers cheques.  A search of HBUS processing records determined that, over a 12-month period from 2007 to 2008, HBUS had received an average of 7,800 travelers checks per month from the bank with an average monthly value of about $7.4 million.[1505]  HBUS determined that "[a]ll deposits are Travellers Checks, no Money Orders found."[1506]  An HBUS AML Compliance officer also noted:  "They seem to sell traveler's checks which are used to purchase cars in Japan.  The purchasers of the cars often provide Russian passports as ID."[1507]

To find out more, on July 15, 2008, HBUS AML compliance officer Stephanie Napier sent an email to Yumi Seto at HSBC Tokyo, PCM Client Service, informing her that HBUS had undertaken a review of Hokuriku Bank Account No. 34738 and asking her to obtain specified KYC information related to certain deposits into that account.[1508]  The Subcommittee was unable to determine why the email asked only about Hokuriku Account No. 34738 and not also Account No. 50385, where the travelers cheques were typically deposited.[1509]  Nor was the Subcommittee able to determine why the email requested information about only four entities associated with the travelers cheque deposits:  De Araujo Roseli Aparecida (an individual), Aksys Corp., R S Corp., and Sanhu Corp.[1510]

Ms. Napier made repeated requests for the information over the next two months without success.[1511]  Her HSBC contact in Tokyo, Ms. Seto, repeatedly responded to her emails that

[1503] Id.
[1504] 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.
[1505] 7/16/2008 email from HBUS Jonathan Dean to HBUS Mary Ann Caskin and others, "Hokuriku Bank," OCC-PSI-00407498, at 1.
[1506] Id.
[1507] Id.
[1508] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry," OCC-PSI-00409214-216, at 8-9.
[1509] See chart accompanying 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku Bank C/L Activity," HSBC OCC 3113976-977; chart accompanying  email exchange among HBUS AML Compliance personnel, from 11/23/2005 - 11/29/2005, HSBC OCC 3180776-797; chart prepared by HBUS AML Compliance in 2007 regarding transactions in 2006, HSBC OCC 3352034-037.
[1510] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry," OCC-PSI-00409214  and attachment OCC-PSI-00409215-216, at 9.
[1511] Id. at 4-8.

PX257

252

Hokuriku Bank had indicated it was preparing a "report."[1512]  In September 2008, Ms. Seto was replaced by Ako Kobayashi who, after several attempts, obtained a single, handwritten page from the bank with the requested information.[1513]  Because the information was provided in Japanese, she translated it and, on September 9, 2008, sent both the original and her typed translation to Ms. Napier's supervisor in HBUS AML Compliance Judy Stoldt.[1514]

The information provided by Hokuriku Bank was minimal.  In the case of the one individual who had been identified, Hokuriku Bank reported that he was a "Business man," gave his address, and stated that he worked with a company called "Sugimoto," and had a "Satisfactory" relationship with the "Originator."  In the case of the three corporations, Hokuriku Bank stated that each was involved in "Sales of Used Cars," which HBUS already knew, and provided the company's address, the date of establishment, and whether it was a private corporation or publicly traded.  Hokuriku Bank also provided the name of one beneficial owner of one company, but wasn't sure of the spelling of his name.  No reasons were given for its clients using sequentially numbered travelers cheques, having the same person sign and countersign them, or generating the high daily volume of cheques.  Ms. Stoldt forwarded the information to HBUS senior Compliance official, Anne Liddy, characterizing it as "very limited information that took us over a month to get."[1515]

## G. 2008 Decision to Stop Cashing Hokuriku Travelers Cheques

On September 4, 2008, even before the KYC information from Hokuriku Bank was formally translated, HBUS PCM Compliance officer Alan Williamson sent an email to multiple HBUS personnel informing them that HBUS would no longer accept bulk travelers cheques from Hokuriku Bank for processing.  He explained:

> "Compliance meets monthly with senior management in the Payments and Cash Management AML Management Review Committee.  Recently we discussed the fact that Hokuriku has been sending a large number of sequential traveller's checks from a number of similar businesses through cash letter here in the US.  This use of cash letter is inappropriate and the Committee has concluded that PCM should no longer allow Hokuriku to send traveler's checks through cash letter.  Hokuriku should therefore cease the activity and make alternative arrangements, such as to make the deposits by wire, by September 30."[1516]

The task of informing Hokuriku Bank was given to Machiko Yamashita, an HSBC employee in Tokyo who was then the designated Global Relationship Manager for Hokuriku Bank.[1517]  On September 11, 2008, he and a colleague met with Hokuriku officials who provided

---

[1512] Id. at 5-7.
[1513] Id. at OCC-PSI-00409215.
[1514] Id. at OCC-PSI-00409216.
[1515] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry," OCC-PSI-00409214, at 1.   The time period was actually closer to two months.
[1516] 9/4/2008 email from HBUS Alan Williamson to HBUS Anthony Julian and others, "Hokuriku Bank," OCC-PSI-00808896, at 5.
[1517] Emails among HBUS and HSBC personnel from Sept. to Nov. 2008, "Hokuriku Bank," OCC-PSI-00808695, at 5.

**PX257**

additional information about the travelers cheque deposits and asked HBUS to continue clearing them.  According to Mr. Yamashita, Hokuriku Bank explained:

> "–Most of their customers related to this issue are used-car dealers for Russian buyers who are cash account holders of Hokuriku Bank through appropriate AML process.
> –The dealers are doing cash on delivery type of deals with buyers in this market therefore cash or TCs [travelers cheques] are normally used to accommodate those deals.  As such Hokuriku Bank considers it is difficult for its customers to shift their payment method to wire transfers or commercial check[s] from TCs. …
> –Since relevant customers are limited [to] around 20 – 25 names and they are all cash account holders of Hokuriku Bank, Hokuriku Bank is well prepared to cooperate with HBUS by providing necessary information."[1518]

The email also stated:  "HBUS is currently the sole Cash Letter provider for Hokuriku Bank."[1519]

The next day, Anthony Julian responded that HBUS senior management had already reviewed the matter extensively "and determined that we can not continue to support this business.  Th[i]s is not an issue for negotiation with Hokuriku."[1520]  Mr. Yamashita replied, in that event, Hokuriku Bank had requested additional time to consider whether to end the business or find a replacement service provider.  He wrote:  "We suggest that we should withdraw very carefully given the fact that Japanese regional banks' world is very small.  If we will push Hokuriku drastically, HSBC may likely have bad reputation on our PCM business in this marketplace."[1521]

A month later, on October 17, 2008, Mr. Julian sent an email to Albert Halley, head of the cash letter department at the Brooklyn processing center, advising him that Hokuriku Bank had been informed verbally and by letter that HBUS would "no longer accept bulk deposits" of travelers cheques "in excess of $5,000."[1522]  Mr. Julian advised Mr. Halley that, after October 31, 2008, any bulk travelers cheques received from the bank should be "returned to Hokuriku" via overnight mail.  Mr. Halley responded that he had been told to return "any deposits" from Hokuriku Bank after October 31 – not just deposits in the form of travelers cheques – and asked Jonathan Dean in Compliance to "confirm/clarify this new request."[1523]  After consulting with his supervisors, Mr. Dean clarified that no travelers cheques could be accepted from Hokuriku Bank, but that other commercial items could still be processed.[1524]  Mr. Dean wrote that he expected the remaining volume to be "extremely low" and asked Mr. Halley to report on the

---

[1518] Id. at 4.
[1519] Id.
[1520] Id. at 2-3.  See also email exchange among HBUS and HSBC personnel from 9/4 to 9/11/2008, OCC-PSI-00196439, at 1.
[1521] Email exchange among HBUS and HSBC personnel from Sept. to Nov. 2008, "Hokuriku Bank," OCC-PSI-00808695, at 2.
[1522] 10/17/2008 email from HBUS Anthony Julian to HBUS Albert Halley and others, "Hokuriku Bank," OCC-PSI-00808896, at 4-5.
[1523] 10/20/2008 email from HBUS Albert Halley to HBUS Anthony Julian, Jonathan Dean, and others, "Hokuriku Bank," OCC-PSI-00808896, at 4.
[1524] Email exchange among HBUS personnel, from 10/20-10/31/2008, "Hokuriku Bank," OCC-PSI-00808896, at 1-3.

PX257

254

types of checks received from Hokuriku Bank after October 31.  This decision to continue the correspondent relationship varied from the September memorandum which stated that senior HBUS AML Compliance official Anne Liddy told the OCC examiners that HBUS would be "exiting the Hokuriku relationship within the next 30 days."[1525]

### H. Hokuriku Bank's Continued Lack of Cooperation

Even after informing Hokuriku Bank that it would no longer process any travelers cheques, HBUS AML Compliance continued to seek KYC information from the bank in connection with the originators of the travelers cheques, in order to complete an analysis of the transactions and determine whether they involved suspicious activity and had to be reported to law enforcement.

In late November or early December 2008, HBUS Compliance provided an update to the OCC about its efforts.  According to an OCC memorandum summarizing the updated information, after receiving an inquiry from HBUS, the company issuing the travelers cheques dispatched investigators to the Russian bank where the travelers checks were being purchased.[1526]  The OCC report stated:

> "The result was that five individuals were identified who were purchasing the travelers checks with cash at the bank.  The five individuals were then providing the checks to Mr. Alexander Tokarenko who is the owner of SK Trading.  Mr. Tokarenko then stamped the checks payable to SK Trading."

All five individuals were Russians living in Russia.  The memorandum stated that HSBC was attempting to determine if Mr. Tokarenko owned, not only SK Trading, but also the 29 other entities that had been identified as clearing bulk travelers cheques with HBUS.  The OCC memorandum reported that "the total dollar amount of bulk travelers' checks processed by HSBC for the 30 entities during the period of November 2007 to October 2008 was over $61 million."[1527]

In late November 2008, HBUS AML Compliance personnel drafted a new information request and asked Stephanie Brown to forward it to Hokuriku Bank.  It asked whether five named Russians (identified in the earlier investigation) were or had been account signatories or "connected in any way" with the accounts opened by 30 specified corporations and individuals involved with the bulk travelers cheques.[1528]  Ms. Brown forwarded the request to Ako Kobayashi at HSBC in Tokyo who, in turn, sent it to Hokuriku Bank.[1529]

On December 3, 2008, Ms. Kobayashi sent an email to Ms. Brown indicating that Hokuriku Bank had raised the following questions:

---

[1525] See 9/3/2008 OCC memorandum, "SK Trading Co Update,"OCC-PSI-00885817.  [Sealed Exhibit.]
[1526] 12/1/2008 OCC memorandum, "SK Trading," OCC-PSI-00888526.  [Sealed Exhibit.]
[1527] Id.
[1528] Email exchange among HBUS personnel, from Nov. to Dec. 2008, "Hokuriku Bank," OCC-PSI-00811358, at 10-13.  SK Trading Company was one of the 30.
[1529] Id. at 9-10.

PX257

"What is the background for your queries? Does it relate to your compliance reason or does it relate to criminal act and the police asks such information? Where did you get those Russian names? Since no cheques has been presented to you since Nov08, why such information is required now?"[1530]

HBUS explained that the information was needed to complete an internal investigation, and was not being requested in connection with a criminal prosecution.[1531]  Hokuriku Bank responded that it did not retain signatory cards or ownership information for the 30 accounts and had to identify and contact each of its branches where the 30 accounts were opened, which would take time.[1532]

On December 15, 2008, Ms. Kobayashi sent an email to multiple HBUS AML personnel forwarding additional questions from Hokuriku Bank about the new request for information.[1533] She also wrote:

"Please be advised that apparently they are not very happy with your request as they have other matters to attend toward the end of the year. … Hokuriku Bank is not saying that they will not assist you to provide the required information however they are upset with the nature of the request without being given sufficient background.  Given the nature of the queries, please understand it is time consuming and consider to allow them more time.  They might not be able to supply the information by the end of the year."[1534]

Two days later, Denis O'Brien, head of HBUS Global Transaction Banking Compliance, sent an email answering the questions posed by Hokuriku Bank.[1535]  Later that same day, the HSBC Money Laundering Control Officer in Japan, Shinji Kawamura, sent an email to Mr. O'Brien indicating that Hokuriku Bank would not provide the requested information.  He wrote:

"They have been good enough to provide information so far but as you may understand from bank secrecy viewpoint, they should not or cannot disclose customer information.  So they will no longer provide information.  If you need my suggestion to clear those backlogs, I will tell you that you should file suspicious transaction report to your authority."[1536]

Notwithstanding that communication, two days later, on December 19, 2008, Ms. Kobayashi sent Mr. O'Brien an email stating that Hokuriku Bank "has provided the information at their risk and confirmed that the purchasers of the travelers checks … are not signers or are NOT connected in any way to the previously requested named relationships at Hokuriku Bank.  This should be the last favour and we cannot expect further or next assistance from them."[1537]

---

[1530] Id. at 9.
[1531] Id. at 8.
[1532] Id. at 6.
[1533] Id. at 4-5.
[1534] Id. at 5.
[1535] Id. at 3-4.
[1536] Id. at 2.
[1537] Id. at 1.

PX257

256

Mr. O'Brien responded: "We are appreciative of your assistance and thank you for your diligence in this regard. We have closed our investigation as it related to this issue."[1538]

The Subcommittee contacted Hokuriku Bank to learn more about the travelers cheques. The bank provided this additional information:

> "Due to the geographic proximity of Russia across the Sea of Japan, many Japanese dealers of pre-owned automobiles are located along the coast, including the Hokuriku region. (Hokuriku means 'North Land' in Japanese.) Hokuriku Bank is headquartered in this area and has several branches in the surrounding areas. Some of such dealers have accounts at Hokuriku Bank.

> In a typical transaction, a customer of Hokuriku Bank (that is to say an account holder) sells a used car (or cars) to a Russian buyer who is a passenger or crew member of a ship at a nearby port. The buyer pays with travelers' checks. The seller/account holder brings the travelers' cheques to its bank (Hokuriku) and deposits them into its account. Hokuriku Bank accepts the travelers' checks, credits the customer's account, and sends the checks to clearing banks."[1539]

This description, which seems to describe a thriving used car business in northern Japan, does not explain why a single individual in Russia was using five individuals to purchase millions of dollars of sequentially numbered U.S. dollar travelers cheques from the same bank in Russia per month, and then signing and countersigning all of them. Nor does it explain why the parties were using U.S. dollars to purchase used cars located in Japan or why the Hokuriku branches had so little information about the 30 clients carrying in U.S. dollar travelers cheques totaling about $500,000 to $600,000 each day.

In February 2009, HBUS closed one of the accounts held by Hokuriku Bank, Account No. 50385, and transferred its balance to Account No. 34738. HBUS has not explained why it closed one account but not the other, or why Account No. 34738 was kept open when it was the subject of the extended HBUS inquiries to Hokuriku Bank in 2008. Because the one account remained open, the correspondent relationship between HBUS and Hokuriku Bank continued.[1540] The OCC examiners told the Subcommittee that they had thought all of the Hokuriku accounts had been closed in 2008, and were unaware of the ongoing relationship for some time.[1541]

---

[1538] Id. at 1.
[1539] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, at 4, PSI-HokurikuBank-01-0001.
[1540] HBUS KYC Profile of Hokuriku Bank, at HSBC-PSI-PROD-0102415, 420.
[1541] Subcommittee interviews of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012); 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.

## I.  2010 OCC Discovery of Hokuriku Account Activity

Two years later, in the summer of 2010, two OCC AML examiners conducted a review of RDC services at the HBUS Buffalo processing center, including RDC processing of monetary instruments presented for deposit through electronic images.[1542]  During that review, one of the examiners was surprised to discover that the Hokuriku account was not only still open, but that HBUS was processing monetary instruments for Hokuriku Bank through RDC.[1543]  In an email to the OCC Examiner-in-Charge summarizing the RDC concerns that were communicated to HBUS after the examination field work, the examiner included:  "Concern related to pouch activity being conducted by HSBC for Hokuriku."[1544]  He informed the Subcommittee that the volume of activity was "significant, but not as extensive as in 2008."[1545]

In October 2010, a draft OCC Supervisory Letter detailing AML deficiencies in HBUS' RDC operations specifically identified concerns related to Hokuriku Bank.  After describing the problems uncovered in 2008, involving the bulk processing of Hokuriku travelers cheques, the letter stated:

> "[I]n late 2008, early 2009, bank management informed the OCC that it would terminate the account relationship with Hokuriku.  During the OCC's RDC review, it was again found that pouch activity was being conducted by HSBC for Hokuriku.  Upon further review, it was determined that at the time that the Bank was to have initially severed its relationship with Hokuriku, there existed two separate accounts for Hokuriku.  At that time, management decided to close the account in which the aforementioned deposits [of travelers cheques] were being processed and continue to maintain the other account.  It was through the second account that the pouch activity continued."[1546]

The draft OCC letter also recited a long list of AML concerns involving the bank's pouch activity.  The final version of this Supervisory Letter included most of the information in the draft, but dropped the paragraph that singled out Hokuriku Bank.[1547]  OCC personnel asked about the letter were unable to remember why the reference to Hokuriku Bank had been dropped.[1548]  HBUS' legal counsel told the Subcommittee that HBUS stopped processing travelers cheques through the Hokuriku account in 2008.[1549]  Hokuriku Bank similarly informed the Subcommittee that HBUS stopped processing its travelers cheques in October 2008.[1550]

---

[1542] See 10/4/2010 draft Supervisory Letter from OCC to HBUS, OCC-PSI-00863984-992.
[1543] See 9/3/2010 email from OCC Joseph Boss to OCC Sally Belshaw and others, OCC-PSI-00887684-685.  HBUS KYC Profile at HSBC-PSI-PROD-0102421; 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.
[1544] 9/3/2010 email from OCC Joseph Boss to OCC Sally Belshaw and others, OCC-PSI-00887684-685.
[1545] 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.
[1546] 10/4/2010 draft Supervisory Letter from OCC to HBUS, at OCC-PSI-00863990.
[1547] 10/21/2010 Supervisory Letter HSBC-2010-24 from OCC to HBUS, OCC-PSI-00880181-185.
[1548] Subcommittee interview of Teresa Tabor (5/17/2012).
[1549] Subcommittee briefing by HBSC legal counsel (5/9/2012).
[1550] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.

PX257

258

The HBUS KYC Profile of Hokuriku Bank, updated in 2010, referenced ongoing AML concerns related to the bank, perhaps due to the OCC's renewed interest in the relationship. Among other matters, the KYC Profile indicated that, as of September 2010, despite a relationship of many years, HBUS did not have a copy on file of Hokuriku's KYC or AML policies and procedures.[1551]  The profile also indicated that HBUS had sent an AML questionnaire to the bank, but Hokuriku Bank had not yet returned it.  HBUS also noted in the 2010 profile that Hokuriku Bank did not have an independent AML compliance function within the bank, raising further questions about Hokuriku's AML efforts.[1552]

In May 2012, HBUS closed the Hokuriku Bank account.[1553]  While that action ended the direct relationship, Hokuriku Bank still has correspondent relationships with other HSBC affiliates which, in turn, have correspondent accounts at HBUS.  Accordingly, it is still possible for Hokuriku Bank to obtain U.S. dollar services through the U.S. dollar correspondent accounts of the HSBC affiliates, although Hokuriku Bank told the Subcommittee it is not doing so.

## J.  Analysis

As a major global bank, HBUS serves as a gateway for foreign banks to obtain U.S. dollars, including through the clearing of U.S. dollar travelers cheques.  HBUS AML Compliance personnel knew that travelers cheques were vulnerable to money laundering abuses, and that large numbers of sequentially numbered travelers cheques were a red flag.  In 2003, it set up a data system that captured travelers cheque information, but in five years, appeared not to use it to identify suspicious activity or high risk clients.  In 2007, the OCC found that HBUS essentially had no effective AML controls over the process used to cash travelers cheques and required the bank to strengthen its policies and procedures.

The Hokuriku Bank example illustrates the problem.  For years, Hokuriku Bank routinely presented a large volume of travelers cheques to HBUS for processing.  Most involved sequentially numbered cheques signed and countersigned illegibly by the same person.  For years, HBUS cleared the cheques with few questions asked.  The cheque volume, which involved $500,000 to $600,000 in travelers cheques per day and $70 to $90 million per year, produced a four-year total of more than $290 million.  When directed by OCC to look into the transactions, HBUS quickly discovered that most of the cheques were being purchased for cash by Russians at a Russian bank and sent to Hokuriku Bank accounts in Japan.  HSBC discovered that Hokuriku Bank had virtually no information about a network of 30, possibly related, accountholders who were physically turning in large stacks of sequentially numbered U.S. dollar travelers cheques to the bank every day.  When asked about the accounts by HBUS, Hokuriku Bank resisted finding out and claimed bank secrecy requirements prevented it from disclosing client-specific information.  HBUS also learned it was the only bank cashing the Hokuriku travelers cheques.  Later, in 2010, HBUS discovered that Hokuriku Bank had no separate AML compliance function and was left waiting to receive a copy of its written AML policies and procedures.  After the Subcommittee inquired about the account, HBUS closed it, although other HSBC affiliates are continuing to service the bank.

---

[1551] HBUS KYC Profile at HSBC-PSI-PROD-0102421.
[1552] Id.
[1553] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, at 1, PSI-HokurikuBank-01-0001.

**PX257**

259

HBUS enabled a number of Russians engaged in suspicious activity to use a relatively small Japanese bank with weak AML controls to gain access to over $290 million in U.S. dollars in less than four years.  HBUS continued to clear the travelers cheques even after it learned of the transactions' suspicious nature.  In so doing, HBUS facilitated the suspicious transactions and failed to live up to its AML obligations, all in return for about $47,000 in annual revenues.

PX257

260

## VII.   HBUS PRIVATE BANK AMERICAS:  OFFERING BEARER SHARE ACCOUNTS

Over the course of a decade, HBUS allowed over 2,000 customers to open accounts in the name of bearer share corporations, a type of corporation that allows secrecy by assigning ownership to whomever has physical possession of the shares.  At its peak, the Miami office had over 1,670 bearer share accounts; the New York office had over 850; and the Los Angeles office had over 30.  The Miami bearer share accounts alone held assets totaling an estimated $2.6 billion, generating annual bank revenues of $26 million.  Multiple internal audits and regulatory examinations criticized the accounts as high risk and advocated that HBUS either take physical custody of the shares or require the corporations to register the shares in the names of the shareholders.

In 2007,  HBUS Compliance circulated a draft to standardize bearer share AML safeguards across the bank, including by designating all of the bearer share accounts as high risk clients requiring enhanced due diligence and monitoring.  Internal documents show Miami and New York bank personnel successfully weakened the standards by enabling the majority of accounts not to be treated as high risk and requiring updated ownership information only once every three years.  Later, HBUS learned that the British Virgin Islands (BVI), which formed most of the bearer share corporations with HBUS accounts, was requiring the registration of all outstanding BVI bearer shares by the end of 2009.  In response, HBUS initiated an effort to require its BVI accountholders to register their shares by the legal deadline.  In 2010, HBUS also contacted its other bearer share accountholders, requiring them either to register their shares or place their shares in the custody of HBUS or a third party.  HBUS ended up obtaining registered shares or share custody for 1,155 accounts, closed over 530 accounts, and by 2012, had substantially reduced the number of bearer share accounts it maintained to 26.

Two examples of the accounts illustrate the risks they pose.  In the first, two Miami Beach hotel developers, Mauricio Cohen Assor and Leon Cohen Levy, a father and son, used bearer share accounts they opened for Blue Ocean Finance Ltd. and Whitebury Shipping Time-Sharing Ltd. to help hide $150 million in assets and $49 million in income.  In 2010, both were convicted of criminal tax fraud and filing false tax returns, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties of more than $17 million.  A second example involves two Panamanian bearer share corporations, Urigeler International S.A. - Holding Company and Birmingham Merchant S.A. - Holding Company, beneficially owned by a wealthy and politically powerful family in Peru.  The family sought a waiver from HBUS' AML requirements to avoid registering their shares or placing them in bank custody.  When asked whether the waiver was granted when the account was opened in 2007, HBUS legal counsel told the Subcommittee that "we don't know."  The account was closed in 2011.  These accounts demonstrate the risks associated with bearer share accounts, whose owners seek to hide their identities.  Today, HBUS has 26 bearer share accounts left, most of which are frozen, but also maintains a policy allowing the bank to open more bearer share accounts in the future.

PX257

## A.  High Risk Corporate Accounts

Bearer share accounts have long been viewed as being at high risk for money laundering, due to the ability of bearer shares to hide ownership of a corporation.  A 2005 U.S. Money Laundering Assessment defined bearer shares as follows:

> "Bearer shares are negotiable instruments that accord ownership of a company to the person who possesses the share certificate.  Such share certificates do not contain the name of the shareholder and are not registered, with the possible exception of their serial numbers.  Accordingly, these shares provide for a high level of anonymity and are easily negotiable."[1554]

Because of the ease of transfer and secrecy attached to bearer share corporations as well as their attractiveness to money launderers and terrorist financiers, their propensity for misuse have made them lose favor with governments and AML organizations.

**Financial Action Task Force.**  The Financial Action Task Force (FATF) is the leading international AML body.[1555]  In its 2006 report, "The Misuse of Corporate Vehicles, Including Trust and Company Service Providers," FATF highlighted the AML problems associated with bearer share corporations.  FATF explained that anonymity is a critical factor in facilitating the misuse of corporate vehicles, and bearer shares present a "special challenge to determining beneficial ownership of a corporate vehicle" because these shares "can be easily transferred without leaving a paper trail."[1556]  The FATF report noted that, while bearer shares can be used for legitimate purposes, they were also used for "money laundering, self-dealing, and/or insider trading."[1557]

**Organisation for Economic Co-operation and Development**.  The Organisation for Economic Co-operation and Development (OECD) is a 50-year-old membership organization of 34 countries including the United States, which tackles issues of common interest to promote economic development.[1558]  In a 2001 report, "Behind the Corporate Veil," the OECD identified bearer shares as one of the primary means used to achieve anonymity for the beneficial owners of corporations.  The OECD report noted that bearer shares' high level of anonymity and ease of transfer "make them attractive for nefarious purposes, such as money laundering, tax evasion, and other illicit conduct, especially when they are issued by private limited companies."[1559]  The

---

[1554] 12/2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service, http://www.justice.gov/dea/pubs/pressrel/011106.pdf, at 47.

[1555] See FATF website, www.fatf-gafi.org.

[1556] 10/13/2006  "The Misuse of Corporate Vehicles, Including Trust and Company Service Providers," at 10, FATF Publication, http://www.fatf-gafi.org/media/fatf/documents/reports/ Misuse%20of%20Corporate%20 Vehicles%20including%20Trusts%20and%20Company%20Services%20Providers.pdf

[1557] Id. at 16.

[1558] See OECD website, www.oecd.org.

[1559] "Behind the Corporate Veil: Using Corporate Entities for Illicit Purposes," OECD publication, at 30, http://www.oecd.org/dataoecd/0/3/43703185.pdf.

**PX257**

OECD noted that bearer shares were especially vulnerable to misuse, because of the lack of information available to authorities in the event of an investigation.[1560]

**U.S. Government.**   The United States has also criticized bearer share corporations.  In 2005, for example, multiple U.S. agencies worked together to produce a U.S. Money Laundering Threat Assessment to identify key money laundering methods.[1561]   The Assessment identified the use of shell corporations as a key AML problem and singled out bearer shares as one of the means, along with nominee shareholders and directors, "to mask ownership in a corporate entity."[1562]   It warned that bearer shares "provide money launderers with the tools to hide their identity from financial institutions and law enforcement."[1563]   In addition, Federal financial regulators warn about the risks associated with bearer shares, because they allow "ownership of the corporation to be conveyed by simply transferring physical possession of the shares."[1564] The Federal regulators' joint AML examination manual states that due to the risk, "in most cases banks should choose to maintain (or have an independent third party maintain) bearer shares for customers."[1565]

**World Bank.**   A 2011 report issued by the World Bank on corporate transparency issues is a recent example of an international body condemning use of bearer share corporations.  It indicates that, in recent years, bearer share corporations have "generally been frozen out of the financial sector," asserts that "[n]o bank with any sort of due diligence standards is willing to conduct business with a company that has free-floating bearer shares," but also states that such corporations remain an AML threat:

> "Concerns have been raised in AML forums that companies that issue bearer shares are used extensively for illegal activities, such as tax evasion and money laundering ….  In most jurisdictions, bearer-share statutes have generally been undergoing a process of reform and elimination ….

> Financial compliance officers and company service providers report that bearer shares have generally been frozen out of the financial sector even if they are still permitted by the laws of a particular jurisdiction. No bank with any sort of due diligence standards is willing to conduct business with a company that has free-floating bearer shares. Companies that are not required under their own laws to have bearer shares immobilized will typically have to place the share in the trust of an agent of the bank, as a condition of being accepted as a customer. …

---

[1560] Id.

[1561] See 12/2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service, http://www.justice.gov/dea/pubs/pressrel/011106.pdf.

[1562] Id. at 47.

[1563] Id. at 48.

[1564] 4/29/2010 "BSA/AML Examination Manual," Federal Financial Institutions Examination Council, "Bearers Shares," at 282, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

[1565] Id.  The AML examination manual also stated:  "In rare cases involving lower-risk, well-known, long-time customers, banks may find that periodically re-certifying beneficial ownership is effective."  Id.

PX257

Given the legislative reforms of the past decade and the fact that bearer shares or share warrants featured in roughly 1 percent of the grand corruption cases we reviewed, one might be inclined to consider bearer securities to be a problem of the past. Investigators interviewed for this study from Latin America and the Caribbean disagree, however. They maintain that bearer-share companies are still a problem for money laundering investigations, that their anonymity prevents detection and impedes prosecution, and that corrupt individuals still can gain access to financial systems and undertake anonymous transactions involving considerable sums.

In practice, there is scant business rationale for the continued use of bearer securities. The claims that bearer securities are necessary to facilitate transfer of ownership and enhance liquidity no longer hold for the vast majority of countries. An electronic system of registered shares is clearly a more efficient platform for transferring equity interests.  In this case, the risks outweigh the benefits."[1566]

## B.  Bearer Share Activity at HBUS

Despite the widespread, longstanding international condemnation of bearer share corporations, until last year, HBUS maintained hundreds, sometimes thousands, of bearer share accounts in the United States.  At its peak, HBUS had over 2,000 bearer share accounts, including 1,667 accounts at the International Private Bank in Miami,[1567] 851 at the International Private Bank in New York;[1568] and 33 at the International Private Bank in Los Angeles.[1569]  The Miami bearer share accounts alone have held assets totaling an estimated $2.6 billion and produced revenues to the bank of $26 million per year.[1570]

These accounts were overseen by two different Federal banking regulators.  The OCC oversaw the accounts in New York and Los Angeles, which were held in the HBUS International Private Banking division.  The bearer share accounts in Miami, however, were lodged with a different HBUS subsidiary, which was often called an International Private Bank, but was actually formed under the Edge Act, a Federal law which allows corporations to be chartered by the Federal Reserve, engage solely in international banking, and serve only non-U.S. citizens

---

[1566] "Puppet Masters:  How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It," World Bank (2011), at 41, 43-44.

[1567] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637 (citing 1,667 accounts in October 2007); 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan and others, "Bearer Share Corporation Policy," OCC-PSI-00226652 (citing 1,679 accounts in December 2007); but see OCC-PSI-00217164 (estimating 600 accounts in July 2007).

[1568] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637 (citing 851 accounts in November 2005); see 8/27/2007 email from Alan Williamson to Terry Westren, OCC-PSI-00318438, with accompanying 2007 List of New York Bearer Share Accounts, OCC-PSI-00318439 (citing 636 accounts in August 2007).

[1569] 11/11/2005 memorandum from OCC C. Seiler, "Bearer Share Activity," at 2, OCC-PSI-01437596 (citing 33 accounts in November 2005).

[1570] 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan, "Bearer Share Corporation Policy," OCC-PSI-00226652.

**PX257**

with U.S. banking needs.[1571]  Edge Act corporations are regulated by the Federal Reserve.[1572]  The Miami bearer share accounts were accordingly overseen by the Federal Reserve Bank of Atlanta which conducted an annual examination of its operations.[1573]

HBUS' bearer share accounts repeatedly raised AML concerns largely because the accounts suffered from missing or inadequate KYC information.  A 2004 internal audit of HBUS' Private Bank International in Miami by HSBC Group auditors found, for example, that sixty bearer share accounts lacked "Certificates of Beneficial Owner" forms, meaning the bank had no information on who owned the accounts.  The audit also repeated a recommendation carried forward from a 2002 Group Audit that management should obtain the missing beneficial ownership information "at the earliest opportunity,"[1574] suggesting the ownership information had been missing for at least two years.  In February 2005, an HBUS Monthly Private Banking Compliance Report to HSBC Group noted that ten bearer share accounts had been frozen due to missing "Beneficial Ownership Letters," and Relationship Managers for the accounts had been notified they had 30 days to obtain the needed documents or the accounts would be closed.[1575]

**OCC Concern.**  In 2005, the OCC identified the HBUS bearer share accounts as an AML concern and, in 2006, directed HBUS to assess their AML risk and take physical control of the bearer shares.

In November 2005, the OCC conducted an AML examination of HBUS' International Private Banking division and looked at the bearer share accounts in its New York and Los Angeles offices.  In November 2005, an OCC AML examiner wrote an internal memorandum summarizing HBUS' "Bearer Share Activity" and recommending that HSBC adopt a policy to "ensure that either the bank or an acceptable third party controls the bearer shares."[1576]  The memorandum stated that the HBUS New York office then had 851 bearer share accounts and the California office had 33.[1577]  The memorandum explicitly noted the AML risks attached to the bearer share accounts and the need to obtain satisfactory evidence of the accounts' beneficial owners.  It noted that bearer share certificates allowed corporate ownership to be transferred without the bank's knowledge, and OCC policy was to require banks to maintain control of all

---

[1571] See 6/12/2008 letter from FRB of Atlanta Robert Schenck to HSBC Private Bank International Board of Directors, OCC-PSI-00107444-449; Section 25A of the Federal Reserve Act, P.L. 102-242, codified at 12 U.S.C. §§611-631.

[1572] Section 25A of the Federal Reserve Act, P.L. 102-242, codified at 12 U.S.C. §§611-631.

[1573] The Miami Edge Act corporation has undergone annual Federal Reserve audits since at least 2006.

[1574] 2/2004 Group Financial Services Audit Report on High Level Controls Review of HSBC Private Bank International, at 5, OCC-PSI-00210878.

[1575] 3/7/2005 report from HSBC Carolyn Wind and HSBC Teresa Pesce to HSBC Curt Cunningham and HSBC Anthony Gibbs, "Monthly Private Banking Compliance Report for February 2005," HSBC OCC 7695260-266.

[1576] 11/11/2005 OCC memorandum, "Bearer Share Activity," OCC-PSI-01437596.  According to the memorandum, the policy at the time was that the International Private Bank required the following for each bearer share account: an explanation for opening the account, CEO approval, and completion of a beneficial ownership letter, to be certified every 3 years, identifying the beneficial owners of the bearer share company.

[1577] Id.

PX257

bearer shares.[1578]  The memorandum also discussed new legislation in the British Virgin Islands that "provides a legal framework for immobilizing bearer shares."[1579]

As a result of the AML examination, on January 31, 2006, the OCC issued a Supervisory Letter to HBUS which included a Matter Requiring Attention (MRA) of the HBUS Board of Directors directing HBUS to strengthen AML controls over its bearer share accounts.[1580]  The Supervisory Letter stated:

> "Management should evaluate the risks associated with bearer share accounts. BSA/AML policy and procedures need to be revised to ensure that either the bank or an acceptable third party controls the bearer shares.  The bank must monitor legal requirements in countries that allow for the organization of International Business Companies (IBCs) and Private Investment Companies (PIC).  Policies and procedures need to define 'acceptable third parties' and any applicable due diligence, and specify documentation required by the bank to ensure that the shares have been properly received by the third party custodian."[1581]

The Supervisory Letter also stated that HBUS management had "agreed to implement revised policies and procedures for bearer shares in accordance with our recommendation by March 31, 2006."[1582]  When asked about this Supervisory Letter, the OCC Examiner-in-Charge at HBUS, Anthony DiLorenzo, did not remember the bearer share issue, but said that, aside from HSBC, he had not seen bearer share accounts at other large banks that he oversaw.[1583]

On March 3, 2006, HBUS responded to the Supervisory Letter with a proposal that did not completely follow the OCC instruction on bearer shares.  Instead of requiring that all bearer share certificates be placed in custody for all of its bearer share accounts, HBUS indicated that it would require custodization only for what it deemed to be high risk bearer share accounts.  For lower risk bearer share accounts, HBUS would not take possession of the shares, but would allow accountholders to submit to the bank a "beneficial ownership letter" every two years stating who had possession of the corporate shares.  HBUS committed to having a plan in place to implement this approach by March 31, 2006.[1584]

At the same time the OCC was reviewing the New York and Los Angeles bearer share accounts, the Federal Reserve was performing a "risk-focused examination" of the Edge Act subsidiary holding the Miami accounts, HSBC Private Banking International.  In January 2006,

---

[1578] Id.

[1579] Id. (explaining that, under the BVI legislation, international corporations formed after January 1, 2005 would have to have their shares held by  either an "authorized" or "recognized" custodian.  Companies formed prior to January 1, 2005, would have a transition period in which to either have the shares registered or have them held by a custodian).

[1580] 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00000317.  [Sealed Exhibit.]

[1581] Id. at 3.

[1582] Id.

[1583] Subcommittee interview of Anthony DiLorenzo (3/22/2012).

[1584] 3/3/2006 letter HSBC Teresa Pesce to OCC Anthony DiLorenzo, "International Private Banking BSA/AML Examination," at 2, OCC-PSI-01358804-821.

the Federal Reserve issued a Report of Examination (ROE) deeming the overall risk management framework for the Miami operation as satisfactory, while identifying as its "primary risk" the "reputational risk, arising from its international private banking and wealth management activities that are directed towards a high net-worth Latin American client base."[1585]  The ROE also deemed the Miami office's AML program as adequate, while noting numerous issues involving offshore accounts, unavailable offshore documentation, offshore shell companies "serving as operating accounts," and the addition of international private banking accounts moved from New York which added "in excess of $1 billion" to the assets under management in Miami, but made no mention of bearer share accounts.[1586]

In February 2006, as the OCC deadline approached for implementing stronger AML controls over HBUS' bearer share accounts, the head of HBUS' International Private Bank (IPB) Operations in Miami, Jeff Clous, asked a Miami law firm prepared an analysis for the bank on the Federal Reserve's policy regarding bearer share accounts.  According to Mr. Clous, the law firm reported that the Federal Reserve expected banks to conduct a risk assessment and assign risk classifications to each account for risk-based monitoring.  According to Mr. Clous, the law firm also informed him that the Federal Reserve provided banks with the option of either obtaining custody of the bearer shares or recertifying beneficial ownership of the shares on a periodic basis, based upon the account's risk classification.[1587]

Mr. Clous emailed his report of the law firm's analysis to senior personnel in the New York International Private Bank (IPB), the CEO of Private Bank America, Philip Musacchio, the Chief AML Officer of Private Bank, Susan Hoggarth, and the Head of Private Bank Operations Terry Westren.  Mr. Musacchio responded that New York would prefer to adopt this "much better and reasonable approach."[1588]  Ms. Hoggarth replied:

> "That may work for Miami, but it won't work for the OCC in NY and California. The OCC has specifically advised us that the Beneficial Ownership letters are not sufficient. We have been advised that the shares need to be held either by ourselves or an accepted third party."[1589]

Mr. Musacchio responded that he had assumed that Ms. Hoggarth would explain the Federal Reserve's position to persuade the OCC to agree to the same approach.[1590]  Ms. Hoggarth replied that the OCC examiners had already advised the bank that beneficial ownership letters were not adequate, and she did not think the OCC would accept the Federal Reserve's approach.[1591]

When the OCC's bearer share deadline arrived at the end of March 2006, however, little had changed in either the New York or Miami IPB offices.  Both continued their policy of

---

[1585] 1/19/2006 letter from FRB Atlanta to HSBC Private Bank International Board of Directors, OCC-PSI-00309434. [Sealed Exhibit.]
[1586] Id. at 2, 4-6.
[1587] 2/9/2006 email exchanges among HBUS Susan Hogart, HBUS Philip Musacchio, HBUS Jeff Clous, HBUS Teresa Pesce, and HBUS Terry Westren, "Bearer Shares – More Info," HSBC OCC 4816460-462.
[1588] Id.
[1589] Id.
[1590] Id.
[1591] Id.

obtaining periodic beneficial ownership letters from most accounts, and arranging for shares to be taken into custody only for a small percentage of accounts deemed to be higher risk.

The documents reviewed by the Subcommittee also contain no indication that the OCC followed up with HBUS on the bearer share MRA in the 2006 OCC Supervisory Letter. When asked why, the OCC AML Examiner told the Subcommittee that he had been informed by HBUS that it had closed all of its bearer share accounts in 2006, and didn't learn until 2010, that the bearer share accounts had, in fact, remained open.[1592]

**Proposed Job Aid on Bearer Shares.** From at least 2002 to 2007, HBUS did not have a standard policy establishing how its various branches should handle bearer share issues and what AML safeguards should be used.[1593] In early 2007, HBUS undertook an effort to develop a standard bearer share policy that would apply to all HBUS offices. It was an effort that would take the rest of the year.

An HBUS AML Compliance officer located in New York, Ali Kazmy, was tasked with developing the policy. In February 2007, he emailed his supervisor, Mary Caskin, that he hoped to finalize a draft that week.[1594] Internal documents indicate that, a few months later, the draft was circulated to other HBUS Compliance personnel for comment. At least one colleague sought to strengthen it. On April 17, 2007, HBUS AML Compliance officer Robert Guthmuller sent an email to colleagues stating that the policy should not make it optional for bearer shares to be classified as high risk. Mr. Guthmuller contended that approach did not mirror other banks' policies: "For at least the last 10 years, all private banks I know classify ALL bearer share PICs as high risk."[1595]

In June 2007, Mr. Kazmy sent a draft "Job Aid" on bearer shares to the IPB offices with bearer share accounts.[1596] HBUS Job Aids were documents designed to provide more specific instructions to bank personnel in implementing higher level policies and procedures.[1597] Mr. Kazmy immediately met strong resistance to strengthening the AML controls on bearer share accounts.

Teresa Garcia, who was a senior Compliance officer at the New York IPB, criticized the draft on several grounds: for requiring all bearer share accounts to be classified as SCC accounts subject to enhanced due diligence and monitoring; requiring all shares to be held in the custody of the bank; and requiring beneficial ownership to be disclosed every two years.[1598] Ms. Garcia wrote that, although the Job Aid was similar to an existing policy at the New York IPB, the New

---

[1592] See 5/10/2010 email exchanges among OCC Joseph Boss, Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts" OCC-PSI-00886601-606 (discussed further supra).

[1593] See 2/26/2007 email exchanges among HBUS Ali Kazmy and HBUS Mary Caskin and others, "APC Interim Procedures," OCC-PSI-00307701 ("At present, we do not have a standard bearer share policy. I am actually working on it and expect it to be finalized this week, however it will require senior management approval.").

[1594] Id.

[1595] 4/17/2007 email from HBUS Robert Guthmuller to HBUS Nerissa Hall and Alan Williamson, OCC-PSI-00211658.

[1596] 6/18/2007 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Job Aid – Bearer Share," OCC-PSI-00617514.

[1597] Subcommittee interview of Ali Kazmy (2/29/2012).

[1598] 6/18/2007 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Job Aid – Bearer Share," OCC-PSI-00617514.

**PX257**

York  IPB did not classify bearer share accounts as SCCs unless the nature of the beneficial owner warranted it, and bearer certificates could be held with a third party custodian instead of the bank.  Ms. Garcia added that the Job Aid should only require beneficial ownership disclosure forms to be renewed every three years.   Later that day, Ms. Garcia sent another email to Mr. Kazmy and others stating: "IPB-NY has about 500 non-high risk bearer share accounts. There is no way we are making all these accounts SCCs."[1599]   These emails, in which Ms. Garcia opposed the proposed AML controls, show that she saw her role in this instance as acting on behalf of the business unit rather than acting on behalf of HBUS Compliance.

The Miami office was also critical of the proposed Job Aid.  Clara Hurtado, Director of AML Compliance for Miami, wrote:

> "Miami also has a large number of bearer share accounts.  I too disagree with making these SCCs.  We are also getting an updated BOL [Beneficial Ownership Letter] every 3 years, not 2 years.  Before anything goes out to the units, we need to be careful that we do not change the agreed upon policies/procedures which have been put in place based on local regulator requirements."[1600]

On July 25, 2007, Ms. Hurtado sent Mr. Kazmy another email stating that Miami had approximately 600 bearer share accounts and they "could not possibly categorize them all as high risk."[1601]   She proposed instead that Miami use the bearer shares as one indicator of a high risk account, but that a second indicator would also have to be present before the account would be classified as high risk and subjected to enhanced due diligence and monitoring.  She wrote: "We feel this is a good way to capture truly high risk bearer share accounts."  Ms. Hurtado also asserted that there was "no way to custodize in Miami and remotely was too difficult."[1602]   She proposed instead that Miami maintain its current practice of requiring a Beneficial Ownership Letter for new accounts with updates every three years.  She noted that the Miami policy had just been approved by HBUS Compliance head Teresa Pesce and Compliance Officer of California Programs, Susan Hoggarth, both of whom had agreed that Miami would not have to custodize the shares.[1603]   These emails show that Ms. Hurtado, like Ms. Garcia, saw her role in this instance as defending the position of the international private bank rather than the position of HBUS Compliance.

Four days later, on July 29, 2007, Ms. Hurtado sent Mr. Kazmy another email suggesting that the AML Director rather than the CEO should be able to approve the opening of bearer share accounts.  She also wrote that the Miami subsidiary "will not be lowering the monitoring thresholds on over 600 bearer share accounts," and that Miami's use of Beneficial Ownership Letters had been approved by HBUS Corporate Compliance and the office "cannot go back and re-paper."[1604]   The next day, Ms. Hurtado forwarded Mr. Kazmy a copy of the Miami bearer share procedures, explaining that if he wanted to change them, he would need to "reach out to

---

[1599] Id.
[1600] Id.
[1601] 7/25/2007 email from HBUS Clara Hurtado to HBUS Ali Kazmy and others, "Bearer Share Meeting," OCC-PSI-00217164.
[1602] Id.
[1603] Id.
[1604] Id.

PX257

the business first," and gave him contact information for Jeff Clous, head of HBUS IPB Operations in Florida.[1605]

On August 6, 2007, Mr. Kazmy forwarded Ms. Hurtado's emails to two more senior HBUS AML Compliance officials, Alan Williamson and Anne Liddy.  Though Mr. Williamson had agreed that IPB Miami should be included in the new policy, he said after reading Ms. Hurtado's emails, "unfortunately I now question my prior inclination to make them be consistent."[1606]  Mr. Williamson suggested that the new guidance be prospective from the date of issuance so that the bank would not have to do a retrospective review of bearer share accounts, stating that "may be a good idea but we should avoid locking ourselves in."  Mr. Williamson also recommended adding an "exception process" in the policy, because there is "always a special case somewhere."[1607]  Mr. Kazmy replied that the bank may have to do a retrospective review over a reasonable time period, but agreed to include the following line in the policy: "Exceptions to this Policy must be sought from the AML Director or designee in writing giving full details of the matter warranting such exception.  The written approval must be maintained in customer file and reported to Oversight & Control Group upon receipt."[1608]  In August 2007, the New York IPB policy for bearer shares was slightly strengthened.  It required all new clients wishing to open a bearer share account to obtain approval from the New York IPB CEO and AML Local Compliance Officer, and further required them to register or custodize their shares.[1609]  This policy essentially treated all new bearer share accounts as high risk, though no mention was made of enhanced due diligence or monitoring obligations.  Existing bearer share accounts were kept divided into high and low risk accounts.  High risk bearer share accounts were required to register or custodize their shares.  Low risk bearer share accounts were allowed to provide a Beneficial Ownership Letter every three years, and their shares were not taken into custody.[1610]  At this time, HBUS New York held over 630 bearer share accounts.[1611]

**American Express Prosecution.**  On August 6, 2007, the U.S. Justice Department, working with the Federal Reserve and FinCEN, filed a Deferred Prosecution Agreement against American Express Bank International for criminal violations of Federal AML laws.[1612]  In August 2007, HBUS Compliance circulated information about the prosecution,[1613] not because HBUS had participated in any of the matters involving American Express,[1614] but to alert

---

[1605] 8/6/2007 email exchange among HBUS Ali Kazmy, HBUS Alan Williamson, HBUS Clara Hurtado, and others, "miami bearer share procedures," OCC-PSI-00217163.

[1606] 8/9/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00316956.

[1607] 8/6/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00217148

[1608] Id.

[1609] 8/27/2007 email exchanges among HBUS Alan Williamson, HBUS Terry Westren, and others, "OCC-PSI-00318438

[1610] Id.

[1611] 2007 List of New York Bearer Share Accounts, OCC-PSI-00318439.

[1612] United States v. American Express Bank International, Case No. 07-20602-CR-ZLOCH/SNOW (USDC SD Flor.), Deferred Prosecution Agreement (8/7/2007).

[1613] 8/9/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00316956.

[1614] 8/7/2007 email exchanges among OCC HBUS Daniel Jack, HBUS Alan Williamson, and others, "AML Enforcement Actions vs AmEx (Banknotes & Metals)" OCC-PSI-00217241.

employees to the prosecution, ascertain if any of the American Express clients were also clients of HBUS, and point out that the Deferred Prosecution Agreement had targeted the bank in part for lack of sufficient AML controls over bearer share accounts.[1615]

In response, on August 16, 2007, Jeff Clous, head of HBUS IPB Operations in Florida, expressed concern to Alan Williamson of HBUS Compliance about HBUS' relative dearth of AML compliance resources compared to American Express, which had twelve full time compliance staff.  He wrote:  "I believe we have resource constraints that impact our AML program that need to be addressed."[1616]

The next day, on August 17, 2007, HBUS Compliance head Carolyn Wind and Alan Williamson met with Federal Reserve officials.  During this meeting, described by HBUS as "friendly," the Federal Reserve referenced the American Express case, suggested HBUS might have similar issues, and suggested the HBUS Miami management and compliance teams take another look at risky products, such as bearer share companies.[1617]  In a summary of the meeting, Ms. Wind noted that one Federal Reserve employee commented with respect to HBUS:  "if you take the facts from the American Express case and lay them over our last report of HSBC, they are all there."[1618]  Earlier in the year, on January 24, 2007, the Federal Reserve had issued a Report of Examination for the Miami IPB which included a requirement that management "enhance the current controls over bearer share accounts to ensure that they are sufficiently risk-based and capable of detecting changes in ownership of these entities on an ongoing basis."[1619]

That same month, HBUS Compliance began conducting a "gap analysis" comparison of the American Express case versus its own AML program. On October 11, 2007, the analysis was issued and identified bearer shares as a particular concern at both American Express and HBUS.[1620]  It also announced the decision by HBUS to stop opening new bearer share accounts as of September 1, 2007, and to consider also eliminating all of its existing bearer share accounts:

"AEBI [American Express Bank International] failed to exercise sufficient control over accounts held in the names of **offshore bearer share corporations**, and until 2004 had

---

[1615] 8/7/2007 email exchanges among HBUS Daniel Jack, HBUS Michael Baez, HSBC/IBEU Gordon Brown, HBMD Sally Lomas, HBUS Michael Karam, and others, "AML Enforcement Action against AmEx businesses," OCC-PSI-00153253.  On August 9, 2007, Ali Kazmy wrote, "At this juncture, your cognizance is drawn to the recently issued enforcement action against American Express entities, who were penalized up to $55 million for BSA/AML violations including those associated with PICS/bearer share accounts." 8/09/2007 email from Ali Kazmy to Alan Williamson, OCC-PSI-00316956.

[1616] 8/20/2007 email exchanges among HBUS Alan Williamson, HBUS Camillus Hughes, and others, "AEBI Deferred Prosecution Agreement," OCC-PSI-00218380.

[1617] 8/23/2007 email exchanges among HBUS Marlon Young, HBUS Carolyn Wind, HBUS Louis Marino, HBUS Jeff Clous, and others, "File Note on Meeting with Federal Reserve Bank of Atlanta," OCC-PSI-00698461.

[1618] Id.

[1619] 1/24/2004 Board of Governors of the Federal Reserve System "Report of Examination of Edge Corporation," OCC-PSI-00388110.  1/24/2004 Board of Governors of the Federal Reserve System "Report of Examination of Edge Corporation," OCC-PSI-00107432.

[1620] 10/11/2007 "High Level Comparison of Key Anti-Money Laundering Program Deficiencies Identified at American Express Bank international," prepared by Alan Williamson and Stefan Hardy, OCC-PSI-00221959.

no policy or procedure requiring beneficial owners of such accounts to certify in writing their continued ownership of the bearer shares.

> ***Bearer share accounts are known and HSBC requires written confirmation every three years. A decision has been taken by the business not to accept new bearer share accounts beginning 9/1/07.  Management is considering a program to eliminate all bearer share customers.***"[1621]

Although HBUS announced a ban on opening new bearer share accounts as of September 1, 2007, it issued a new bank-wide bearer share policy three months later allowing new accounts.

**Final Bearer Shares Policy.**  On December 10, 2007, HBUS Compliance officer Paul O'Sullivan circulated a final draft of the proposed new Bearer Share Policy.  He explained that the policy was more flexible than first proposed, and "we will be able to maintain Bearer Share Company accounts once the requirements of the policy are met."[1622]  The draft policy applied to both new and existing bearer share accounts.  It required all bearer share accounts to either register their shares or keep the shares in custody with the bank or an approved third party.  In addition, Beneficial Ownership Letters would have to be filed every three years.  The draft policy also permitted new accounts to be opened if they were approved by the Business Unit head, AML Local Compliance Officer, and AML Director, or a designee.  The approvals would have to be documented and retained in the customer file.[1623]

On December 11, 2007, HBUS Compliance officer Terry Westren responded as follows:

> "If I read this correctly, it is saying that one year from the issuance of this policy, we have to have all outstanding bearer shares (currently with clients), either registered or in the hands of an approved Custodian.  Is this correct?  I recall when the OCC was here, they asked for this.  AML Compliance was able to negotiate for this requirement to be applicable only to High Risk accounts.  We then complied with this.  It looks like this is now expanded to all outstanding bearer shares?  Of course, with the new BVI rules coming into play in 2009, they will have to do this anyway, but I think it should be noted this could be a considerable exercise."[1624]

Contrary to the statement in this email, however, the 2006 OCC Supervisory Letter had already called for the bank to place all bearer shares in the custody of either the bank or an acceptable third party, with no exceptions made for lower risk accounts.[1625]  While HBUS had responded to the Supervisory Letter that it planning to limit that requirement to higher risk accounts, there is no documentation showing the OCC accepted that position.  When asked about this email, the

---

[1621] Id.  (Emphasis in original.)

[1622] 12/10/2007 email exchanges among HBUS Paul O'Sullivan, HBUS Terry Westren, HBUS Mason Salit, HBUS Tereso Suarez-Obregon, and others, "Bearer Share Corporation Policy," OCC-PSI-00226525.

[1623] 8/29/2007 Bearer Share Corporation Account "Policy Guidance," OCC-PSI-00226526.

[1624] 12/11/2007 email exchanges among HBUS Terry Westren, HBUS Paul O'Sullivan, and others, "Bearer Share Corporation Policy," OCC-PSI-00327917.

[1625] See 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00000317.  [Sealed Exhibit.]

**PX257**

OCC told the Subcommittee it had been under the impression that HBUS had closed all of its bearer share accounts.[1626]

That same day, December 11, 2007, Jeff Clous, IPB Operations head in Florida, repeated the concerns he had voiced to Alan Williamson in September. Mr. Clous asserted that the draft policy would have an adverse effect on IPB business. He noted that, although IPB Miami was no longer opening new bearer share accounts, it still maintained 1,679 accounts with $2.6 billion, which generated $26 million in revenue annually. Mr. Clous also asserted that the draft policy went too far beyond what regulators required. He noted that the proposed policy required the bank to both register and custodize bearer share accounts, while the Federal AML examination manual offered a choice between those options. In addition, he noted that the draft policy would require existing bearer share accounts to register or custodize their shares by the end of 2008, even though the new BVI bearer share regulations would not require the registration of BVI bearer shares until the end of 2009.[1627]

On December 14, 2007, the HBUS Board of Directors approved its first HBUS-wide Bearer Share Policy.[1628] The bearer share policy applied to all new and existing bearer share accounts and required the client to register the shares or agree to hold the shares in custody with HSBC or a third party custodian and provide a periodic beneficial ownership certificate.[1629] AML Director Leslie Midzain gave both IPB New York and Miami IPB a full year, until 2009, to comply with the policy due to the BVI registration project which had a 2009 deadline.[1630] For the next year, New York IPB and Miami IPB continued to follow their own policies and procedures with regard to bearer share accounts.

**Federal Reserve Concern.** In 2008, an HSBC Group Audit of the New York IPB disclosed that it had 610 bearer share accounts, 31 of which had overdue Beneficial Ownership Letters, including 21 which were overdue by more than a year.[1631] In Miami, an earlier HSBC Group Audit disclosed that, as of October 2007, the Miami IPB had 1,667 bearer share accounts, 1,109 or two-thirds of which had Beneficial Ownership Letters that were more than three years old and so were overdue to get new letters.[1632] Both audits indicated that HBUS was at risk of not knowing, in many cases, who owned the corporations behind the bearer share accounts.

---

[1626] Subcommittee interview of Joseph Boss (1/30/2012) and James Vivenzio (3/15 /2012). See also 5/10/2010 email exchanges among OCC Joseph Boss, Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts" OCC-PSI-00886601-606.
[1627] 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan and others, "Bearer Share Corporation Policy," OCC-PSI-00226652.
[1628] August 29, 2007 Bearer Share Corporation Account Policy Guidance, OCC-PSI-00226526.
[1629] Id.
[1630] See 4/18/2008 HBUS KYC Committee Meeting minutes, OCC-PSI-00241046. See also 7/3/2008 memorandum from HBUS Ali Kazmy to HBUS Leslie Midzain, OCC-PSI-00292367 ("Since BVI authorities have granted till December 2009 for all bearer shares to be registered, all BVI bearer share corporations within PB Americas will follow this time frame."). Subcommittee briefing by HSBC legal counsel (7/9/2012).
[1631] 10/2008 Group Financial Services Audit October 2008, OCC-PSI-00248215.
[1632] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637; see also 12/11/2007 HSBC Private Bank International FSA Audit Issues Status Report, OCC-PSI-00226813.

**PX257**

On January 31, 2008, HBUS AML Compliance officer Paul O'Sullivan emailed Clara Hurtado, Compliance officer for the Miami IPB, regarding a "De-Risking Strategy for Miami."[1633]  He also discussed with HBUS Compliance head Carolyn Wind and senior AML Compliance officer Alan Williamson the Federal Reserve's concerns regarding the high-risk nature of the Miami IPB's client-base.[1634]  Mr. O'Sullivan asked Ms. Hurtado to identify the high risk bearer share accounts for which there was no "glue to cement the relationship" and consider terminating them.[1635]

Six months later, on June 12, 2008, the Federal Reserve issued its annual Report of Examination (ROE) for the Miami IPB.  The ROE again identified bearer share accounts as a problem, this time expanding the recommended action to be taken and noting, in particular, that ownership of a bearer share account should be ascertained more frequently than every three years:

> "Assess the risks associated with bearer share accounts and establish risk mitigation control measures that are appropriate for the associated level of risk.  These control measures may include maintaining control over bearer share accounts; entrusting bearer share accounts with a reliable second party; or requiring periodic certification of ownership. At a minimum, management should conduct a review of the bearer share recertification policy and ensure that accounts that pose higher risks are recertified more frequently than every three years."[1636]

On June 25, 2008, Peter Georgeou, deputy head of Group Audit Private Bank, emailed the head of HSBC Group audits, Matthew King, addressing the latest Federal Reserve examination report.  While the Federal Reserve had listed 13 required actions, Mr. Georgeou alerted Mr. King to those he considered "more material."  On his list was: "Improved controls and risk mitigation are required in respect of bearer share accounts and accounts held in the name of PICs.  In addition, policies and procedures should be enhanced for identification and the review of higher risk accounts."[1637]

On July 3, 2008, HBUS Compliance officer Ali Kazmy sent a memorandum to HBUS Compliance and AML head Lesley Midzain summarizing changes that had been made to the IPB's AML Procedures for 2007 and 2008.  He noted that BVI bearer shares would have to be registered by December 2009, in accordance with the time frame set forth by BVI authorities. He wrote that high risk bearer share accounts would also require annual recertification of beneficial owner information, while lower risk bearer share accounts would need to recertify beneficial ownership every three years.  In addition, he wrote that bearer share clients would be

---

[1633] 1/31/2008 email from HBUS Paul O'Sullivan to HBUS Alan Williamson and HBUS Carolyn Wind, "De-Risking," OCC-PSI-00331923.
[1634] When asked about the 1,167 bearer share accounts, Ms. Wind told Subcommittee that she knew there were bearer share accounts, but did not know there were that many.  She said she had talked about getting rid of bearer share accounts and wanted tighter controls.  She also said longstanding bank clients with bearer share accounts were not uncommon in private banking.  Subcommittee interview of Carolyn Wind (3/7/2012).
[1635] Id.
[1636] 6/12/2008 Federal Reserve Audit, at 10-11.
[1637] 7/2/2008 email exchanges among HBUS Janet Burak, HBUS Bob Martin, and others, "Federal Reserve Bank of Atlanta Review of HSBC Private Bank Miami," HBUS OCC-PSI-00725897.

**PX257**

required to attest that they will notify the bank if a change in ownership occurs and provide a new Beneficial Ownership Letter.[1638]  The next day, July 4, 2008, Jeff Clous, head of IPB Operations in Florida, repeated the concerns he had voiced twice before, to Alan Williamson and Paul O'Sullivan.[1639]

On November 12, 2008, the New York International Private Bank sought dispensation to open 80 new bearer share accounts for existing clients.[1640]  New York IPB employee Todd Maddison asked senior HBUS Compliance officer Alan Williamson whether Compliance would provide the needed dispensation.[1641]  Mr. Maddison said that he thought that an email written by Teresa Garcia, which outlined exceptions to the bearer share policy for the Private Bank, implied that the accounts could be opened under these exceptions:

> "Since BVI authorities have granted till December 2009 for all bearer shares to be registered, all BVI bearer share corporations within PB Americas will follow this time frame; High risk bearer share accounts will provide an annual recertification of the beneficial owners through a properly executed BOL; Standard risk bearer share accounts will provide beneficial ownership recertification every three years through a properly executed Beneficial Ownership Letter (BOL); and Clients must attest that they will notify the bank of change in ownership, as and when it takes place. A new BOL will be required from the new beneficial owner."[1642]

Some of the 80 new bearer share brokerage accounts were opened and some of them, as well as some other New York IPB bearer share accounts, were later moved to the Miami IPB.[1643]On March 18, 2009, the OCC issued a Supervisory Letter addressing AML concerns related to the HBUS Private Banking operations.  The letter indicated that one of the OCC's primary examination objectives was to "[e]valuate effectiveness of enhancements to policies and procedures for PUPID activities, bearer share accounts and monitoring processes."[1644]  Despite this objective, the letter did not address bearer share issues in its conclusions or recommendations.[1645]  The OCC's silence on the issue stands in sharp contrast to the Federal Reserve which was not only aware of the bearer share accounts, but tracking actions taken in Miami with respect to them.

---

[1638] 7/3/2008 memorandum from HBUS Ali Kazmy to HBUS Lesley Midzain, "Modifications to the Approved Private Bank Americas AML Procedures," OCC-PSI-00292367.

[1639] 10/29/2008 email exchanges among HBUS Alan Williamson, HBUS Lesley Midzain, and others, "Enquiry – co-branding," OCC-PSI-00219656.

[1640] 11/14/2008 email exchanges among HBUS Todd Maddison, HBUS Alan Williamson, and others, "Bearer share question," OCC-PSI-00248782.  HBUS legal counsel told the Subcommittee that 80 of its clients with bearer shares needed to open new brokerage accounts due to a regulatory change.  Subcommittee briefing by HBUS legal counsel (7/9/2012).

[1641] 11/14/2008 email exchanges among HBUS Todd Maddison, HBUS Alan Williamson, and others, "Bearer share question," OCC-PSI-00248782.  HBUS legal counsel told the Subcommittee it did not know whether or not a dispensation was granted for these accounts.  Subcommittee briefing by HBUS legal counsel (7/9/2012).

[1642] Id.

[1643] Subcommittee briefing by HSBC legal counsel (7/9/2012).

[1644] 3/18/2009 supervisory letter from OCC to HBUS Leslie Midzain, "Private Banking BSA/AML Examination," OCC-PSI-00000445-447, at 445.

[1645] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

**PX257**

On May 19, 2009, the Federal Reserve issued its annual Report of Examination for the Miami IPB, which again mentioned bearer shares as a concern.  It stated in part:

> "[T]he risks posed by the international private banking activities remain significant, given the high transactional nature of the client base, a higher risk target market (Latin America), and the existence of offshore shell companies (including offshore operating companies), including bearer share structures."[1646]

The examination report continued that the risk was increasing due to the bank's transfer of some accounts from the New York International Private Bank to the Miami Edge Corporation.  The report also noted that HBUS had taken steps to address the risk.  It noted that senior compliance personnel had sought to "de-risk" the Miami IPB's private banking activities, primarily by:

> "continued review of offshore operating shell companies, seeking to exit those relationships where the profitability of the relationships does not justify the additional compliance costs associated with the account.  This strategy, coupled with increased approval requirements for new operating company accounts, and a decision to no longer open new bearer share accounts, shows tangible steps taken towards reducing reputational risk at Corporation."[1647]

This was the third Report of Examination over a two year period to have directed HBUS to strengthen its AML controls over its bearer share accounts.

**2009 Bearer Share Project.**  In February 2009, HBUS began the "Bearer Share Project" with the goal of winding down HBUS' bearer share accounts.[1648]  Because the British Virgin Islands (BVI) had passed legislation that would require bearer share certificates to be registered or custodized by the end of the year, HSBC viewed this development as an indication that other laws would soon be passed and decided that it would begin registering or custodizing its bearer shares beginning with the accounts opened by BVI bearer share corporations.[1649]  By 2009, HBUS' international private banks operated under a new organizational structure called Private Bank Americas (PBA), and the bearer shares were treated as a group.  PBA determined that it had a total of 1,833 unregistered bearer share accounts, including 1,257 BVI bearer shares and 576 non-BVI bearer shares.  It determined that 306 were in the New York Private Bank and 1,527 were in the Miami Private Bank.[1650]  The Project began with HBUS' sending a letter to all of its BVI bearer share clients in May 2009.[1651]  The letter explained that as of December 31, 2009, HBUS would "no longer maintain accounts for companies that issue bearer shares."  It indicated that clients would need to register their bearer shares or close their accounts.[1652]

---

[1646] 5/19/2009 Federal Reserve Report of Examination of Edge Act Corporation, BOG-A-300035.  [Sealed Exhibit.]
[1647] Id. at 21.
[1648] Subcommittee briefing by HSBC legal counsel on bearer share issues (4/20/2012 and 7/9/2012).
[1649] Id.
[1650] Id.
[1651] Letter from HBUS to British Virgin Islands bearer share clients, "For Companies Incorporated in the British Virgin Islands," HSBC-PSI-PROD-0197129-133; Subcommittee briefing by HSBC legal counsel (7/9/2012).
[1652] Letter from HBUS to British Virgin Islands bearer share clients, "For Companies Incorporated in the British Virgin Islands," HSBC-PSI-PROD-0197129-133, at 129.

In 2010, the OCC, which had been silent on bearer share issues at HBUS for four years, renewed its focus on the accounts.  On May 10, 2010, one of the OCC AML examiners  sent an email to EIC Sally Belshaw, OCC attorneys in Washington  and others stating that HBUS Compliance head Terry Pesce had told him that all but one bearer share account had been closed in 2006.[1653]  One of the OCC attorneys in Washington wrote in an email that he recalled that the examiner "had been told" that there were no bearer share accounts.[1654]  The AML examiner indicated that he had just learned that HSBC still had 79 bearer share accounts held in Panama, Uruguay, Bahamas, Cayman, Belize, and Netherlands.[1655]  In June 2010, another OCC examiner at HBUS obtained a list from HBUS of 117 bearer share accounts.[1656]  On September 8, 2010, the same examiner forwarded a portion of a May 2010 New York IPB report stating it had 610 bearer share accounts, 31 of which had overdue beneficial ownership declarations.[1657]  The report also indicated that, for some accounts, the bank had no beneficial ownership declaration on file and no information about the location of some of the shares.  Later that same day, the examiner sent another email with a copy of an audit of the Miami IPB indicating it had 925 bearer share accounts, in addition to the 610 accounts in New York.[1658]  The examiner agreed to forward the Miami audit report to the Federal Reserve.[1659]  These internal communications indicate that a primary reason for OCC inaction on bearer share issues was a misimpression that the accounts had been closed four years earlier.[1660]  It also indicates a lack of coordination with the Federal Reserve which had been monitoring the bearer share issue in Miami for several years.

By the time the OCC became aware of the large number of bearer share accounts still open at HBUS, the Bearer Share Project was well underway in its efforts to reduce the account volume.  Having already sent a 2009 letter to accountholders with BVI bearer share corporations about the need to register their shares or close their accounts, HBUS followed in November 2010, by sending a similar letter to all accountholders with non-BVI bearer share corporations.

---

[1653] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

[1654] 9/8/2010 email exchanges among OCC James Vivenzio and OCC Teresa Tabor, "Bearer Share Accounts," OCC-PSI-00894871.

[1655] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

[1656] 6/15/2010 email from OCC Teresa Tabor to OCC Joseph Boss, [no subject], OCC-PSI-00929779 and attachment OCC-PSI-00929780

[1657] 9/8/2010 email exchanges among OCC James Vivenzio and OCC Teresa Tabor, "Bearer Share Accounts," OCC-PSI-00894871.

[1658] 6/15/2010 email from OCC Teresa Tabor to OCC Joe Boss forwarded to OCC Elsa De La Garza, [no subject], OCC-PSI-00929779 and attachment OCC-PSI-00929780.

[1659] 9/8/2010 email exchanges among OCC Teresa Tabor and OCC Joseph Boss, "IPB Miami (Edge)," OCC-PSI-00921759-760, at 759.

[1660] See also 5/12/2011 conclusion memorandum from OCC Teresa Tabor to OCC Kerry Morse, "Latin American International Center (LAIC) Miami – BSA/AML Examination," OCC-PSI-01768568 (finding that LAIC had two bearer share accounts which "only came to the attention of the LAIC Compliance Staff based on Examiner inquiries at the commencement of the examination"; and that LAIC had not fully followed HBUS bearer share policy for these two accounts because Beneficial Ownership Letters were not obtained every three years and the shares were being held by third-party custodians but it was unclear if the custodians had been approved by LAIC and what approval process was utilized).

By June 2011, of the 1257 BVI bearer share accounts, 900 had registered their shares (so that the accounts no longer qualified as bearer share accounts) and 350 accounts had closed.[1661] Of the 576 non-BVI bearer share accounts, 255 had registered their shares, and 182 accounts were closed.[1662]  In November 2011, Private Bank Americas froze the remaining 139 non-BVI bearer share accounts, and began working to contact the accountholders and close the accounts.[1663]

As of July 9, 2012, HSBC legal counsel told the Subcommittee that HBUS Private Bank America still had 26 bearer share accounts.[1664]  HSBC legal counsel also told the Subcommittee that "all but a handful" of those accounts were frozen, because the accountholders had not registered their shares or closed their accounts.[1665]  According to HSBC legal counsel, the handful of bearer share accounts that were not frozen were beneficially owned by a single client, and the shares were being kept in the custody of a law firm in New York.  HSBC legal counsel indicated that, although HBUS' latest bearer share policy continued to allow new bearer share accounts to be opened under limited circumstances, no new bearer share account had, in fact, been opened since that policy took effect.[1666]  Internal HBUS documents indicate that as a result of the Bearer Share Project, on at least two occasions, the bank identified suspicious activity related to the accounts.[1667]

## C. Two Examples of Bearer Share Accounts

Two examples of bearer share accounts illustrate the AML risks they pose.  They involve bearer share accounts opened by Mauricio Cohen Assor and Leon Cohen Levy, which demonstrate how bearer share accounts can be used to conceal assets and evade taxes; and a wealthy Peruvian family, which demonstrates how banks can be pressured to waive AML safeguards when opening bearer share accounts.

**Cohen Bearer Share Accounts.**  Mauricio Cohen Assor and Leon Cohen Levy, father and son, were hotel developers in Miami Beach.[1668]  On April 14, 2010, both were indicted in Florida on charges of conspiring to commit tax fraud and filing false tax returns.[1669]  The Justice Department charged that the Cohens had used bearer share corporations and shell companies to help conceal $150 million in assets and $49 million in income from the IRS.  Both resided in Miami Beach, Florida.

[1661] Subcommittee briefing by HSBC legal counsel on bearer share issues (4/20/2012).
[1662] Id.
[1663] Id.
[1664] The Subcommittee was told that 12 accounts are located in Miami and 14 are located in New York. Subcommittee briefing by HSBC legal counsel on bearer share issues (7/9/2012).
[1665] Id.
[1666] Briefing by HSBC legal counsel to the Subcommittee on bearer share issues (4/20/2012).
[1667] See 5/6/2010 AML Oversight Committee Meeting minutes for HBUS, OCC-PSI-00860859-860, at 859.
[1668] 10/7/2010 "Miami Beach Hotel Developers Convicted of Tax Fraud," Department of Justice press release, http://www.justice.gov/usao/fls/PressReleases/101007-01.html.
[1669] See generally United States of America v. Mauricio Cohen Assor and Leon Cohen Levy, Case No. 10-60159-CR-ZLOCH(s) (USDC SD Flor.), Superseding Indictment (8/3/2010) (hereinafter "Cohen Indictment").  See also "2 Charged in Tax Evasion Scheme Involving HSBC," New York Times, http://dealbook.nytimes.com/2010/04/16/2-charged-in-tax-evasion-scheme-involving-hsbc/.

PX257

The indictment explained that "bearer share corporations are often set up in tax havens to hide the true ownership of assets, because ownership records are not maintained and nominee officers and directors are often used to appear to control the affairs of the corporation."[1670]

The indictment named two bearer share corporations used by the Cohens to open bank accounts, Blue Ocean Finance Ltd., a Panamanian bearer share corporation,[1671] and Whitebury Shipping Time Sharing Ltd., a BVI bearer share company.[1672]  The Cohens used those bank accounts to conceal their ownership of the assets deposited into them.  The indictment also disclosed that, around May 2007, an unnamed international bank asked one of the Cohens to register the shares of Whitebury Shipping and, when the request was refused, the bank closed the account.

Internal bank documents disclose that HBUS was the unnamed bank that maintained a bearer share account for Whitebury Shipping.  April 2007 transcripts of several telephone conversations between Mauricio Cohen and an HBUS banker describe the account, HBUS' request that he register the bearer shares, and his refusal to do so.  According to one of the telephone transcripts, on April 23, 2007, HBUS executive Claude Mandel, the Relationship Manager who handled the bank's relationship with Mauricio Cohen, apparently agreed to remove Mr. Cohen's name from the Whitebury account.[1673]  The next day, Mr. Cohen talked to Mr. Mandel about replacing Whitebury with another bearer share account.  Mr. Mandel offered to convert Whitebury from a BVI to a Bahamian bearer share corporation, but said that the bank no longer opened bearer share accounts.  Mr. Cohen protested and told Mr. Mandel that the bank would lose clients and that other banks take bearer share accounts.[1674]  The telephone transcripts indicate that, on April 25, 2007, Mr. Mandel and Mr. Cohen again discussed Mr. Cohen's bearer share accounts.  Despite Mr. Mandel's insisting that his bearer shares would need to be registered, Mr. Cohen convinced Mr. Mandel to check if he could convert Whitebury into a Panamanian bearer share corporation.  Mr. Cohen indicated again that he did not want to put names on the shares; when Mr. Mandel said that the shares would need to state the names, Mr. Cohen said:  "But, I can't put that, otherwise I have to declare them in the United States?  I can't do that, I don't want to declare … otherwise, I have to close the accounts with you and go to Geneva."[1675]

Minutes from a May 6, 2010 AML Oversight Committee Meeting at HBUS noted that the HBUS Private Bank was providing information on closed bearer share accounts opened by an "ex-client" as part of the investigation of Mauricio Cohen, a former HSBC client.[1676]

---

[1670] Cohen Indictment at 3.
[1671] Id. at 7.
[1672] Id. at 8.
[1673] Transcript of 4/23/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0030891-894.
[1674] Transcript of 4/24/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0030873-877.
[1675] Transcript of 4/25/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0024791-793.
[1676] 5/6/2010 HBUS AML Oversight Committee Meeting Minutes, OCC-PSI-00860859, at 859.

PX257

279

In October 2010, the Cohens were convicted after a jury trial, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties totaling over $17 million. This example demonstrates the risk of bearer share accounts being used to conceal ownership of assets and commit criminal tax evasion.

**Peruvian Family Bearer Share Accounts.** In 2007, a senior Compliance official with the HSBC Private Bank in New York, Teresa Garcia, sought a waiver to open a relationship for a Peruvian businessman for two bearer share accounts.[1677] According to Ms. Garcia, his business group was one of the richest and most powerful in Peru.[1678]

The bearer share corporations, Urigeler International S.A. - Holding Company and Birmingham Merchant S.A. - Holding Company, were formed in Panama.[1679] According to an email exchange among HBUS Compliance personnel, in 2007, opening a new bearer share account required: (1) approval by the New York International Private Bank CEO and AML Local Compliance Officer; and (2) registration or custodization of the bearer shares.[1680]

Ms. Garcia wrote that she was requesting the waiver because the businessman had indicated that he did not want to forfeit confidentiality by registering or custodizing the bearer shares.[1681] She explained: "they wish to maintain confidentiality, and they have never been asked by our competitors with whom they bank to do this."[1682] Manuel Diaz, President and Managing Director of HSBC Private Bank International in Miami, indicated that he supported a waiver, because he was very familiar with the family and interested in establishing a relationship with them.[1683] Marlon Young, CEO of Private Banking Americas, also approved the waiver request.[1684]

Ms. Garcia then escalated the request to senior HBUS Compliance official Alan Williamson to determine who had authority to grant the waiver on behalf of AML Compliance. Mr. Williamson explained that, while he had no objection to granting the waiver, the bearer shares policy was an HSBC Group mandate and any exception would have to be approved by HSBC Group Compliance.[1685] David Ford, HSBC Global Money Laundering Control Officer, confirmed that HSBC Group approval was required for an exception to Group policy. Mr. Ford also wrote that he was "[s]uprised can open bearer share account for offshore client with no bo

---

[1677] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 3.
[1678] Id. at 3.
[1679] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 2.
[1680] Id. at 1.
[1681] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 6.
[1682] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 3-4.
[1683] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 3.
[1684] 6/25/2007 email from HBUS Marlon Young to HBUS Jaime Carvallo and others, "[redacted] Family," OCC-PSI-00214806.
[1685] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 3.

PX257

[beneficial ownership] declaration in US," and suggested checking with HBUS Compliance head Carolyn Wind about the OCC and Federal Reserve "view of such a structure."[1686]  Mr. Williamson asked HSBC Group AML head Susan Wright about the request, and reported that she was reluctant to grant the exception but would consider it.[1687]

There was a strong push for this relationship by the business side.  Manual Diaz, head of the Miami Private Bank International, wrote:  "I FULLY SUPPORT THIS WAIVER."[1688]  Jaime Carvallo, a Miami bank executive, sent an email to the head of Private Banking Americas, Marlon Young, enlisting his support to obtain a waiver.  Mr. Carvallo wrote:

> "Teresa Garcia must have given you heads up on the [redacted] family and the issue regarding their holding companies having bearer shares and the fact that they will not sign the BOL [Beneficial Ownership Letter].
>
> I will see one of the family members tomorrow morning and this still seems to have no resolution.  This is too important a family in Peru for us not to want to do business with, and one that has taken a lot of my time and effort to convince to start a relationship with us. … I would appreciate your involvement at this point, as this has become extremely sensitive."[1689]

Mr. Young signaled his support for the waiver the same day,[1690] and later wrote to senior HBUS Compliance officer Alan Williamson:  "This is an important relationship for IPB [International Private Bank] and a family that has a clean record.  It would be a shame if we are not able to obtain an exception."[1691]  Mr. Cavallo also wrote directly to Mr. Williamson that the family was "too important a family in Peru for us not to want to do business with."[1692]  Mr. Carvallo estimated the family's liquid net worth,[1693] and explained that HSBC was currently competing with another bank to help the family reorganize their businesses and facilitate the succession of their financial assets and operating companies, which could be very profitable.[1694]

---

[1686] Id. at 1.

[1687] 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Jaime Carvallo, Marlon Young, Manuel Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214880, at 1.

[1688] 6/20/2007 email exchange among HBUS Alan Williamson and HBUS Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214534, at 1.

[1689] 6/25/2007 email from HBUS Jaime Carvallo to HBUS Marlon Young and others, "[redacted] Family," OCC-PSI-00214806.

[1690] 6/25/2007 email from HBUS Marlon Young to HBUS Jaime Carvallo and others, "[redacted] Family," OCC-PSI-00214806.

[1691] 6/26/2007 email from HBUS Marlon Young to HBUS Alan Williamson and others, "[redacted] Family," OCC-PSI-00214891, at 1-2.

[1692] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 6.

[1693] 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Jaime Carvallo, Marlon Young, Manuel Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214880, at 1.

[1694] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 5.

PX257

Mr. Williamson responded:  "I thought so.  I would do it without going to Geneva but audit wrote up DPB [Domestic Private Banking] on a similar situation."[1695]  Later, he wrote: "we will do our best."[1696]  Still later:  "Doing what I can."[1697]  David Ford pointed out that the HSBC Group policy was flexible, because the client could either declare beneficial ownership, have HSBC hold the shares, or have an acceptable third party hold the shares.[1698]  On July 5, 2007, Mr. Williamson wrote that the "RM [Relationship Manger] and the Group Head are not seeing eye to eye on this one."[1699]

In 2007, HBUS opened a bearer share account in the name of Urigeler.[1700]  When asked whether a waiver had been granted from the requirements that the bank hold the shares in custody and obtain an Beneficial Ownership Letter from the owner, HSBC legal counsel told the Subcommittee:  "We don't know."[1701]  HSBC legal counsel told the Subcommittee that the accounts was opened in New York, transferred to Miami in 2009, and closed in 2011.[1702]

This account demonstrates the difficulty of adhering to a strong bearer share policy when a wealthy and powerful family asks to open a bearer share account and obtain a waiver from requirements to either register the shares with their names or submit the shares to the custody of the bank.  HBUS' bearer share policy continues to permit the bank to open bearer share accounts.

### D. Analysis

For decades, bank regulators and AML experts have cautioned against opening accounts for bearer share corporations due to the ease with which these corporations hide ownership and the frequency with which they have been used to commit money laundering, financial crime, tax evasion, and other wrongdoing.  From at least 2000 to 2011, HBUS maintained a sizeable number of bearer share accounts, despite repeated regulatory questions and expressions of concern.  HBUS bankers, and at times their compliance officers, pushed to open and maintain bearer share accounts.  Two bearer share accounts illustrate the risks inherent in such accounts and the pressures to circumvent AML controls.  While HBUS finally registered or closed most of the accounts by 2011, its policy continues to allow bearer share accounts to be opened under some circumstances.

---

[1695] 6/20/2007 email exchange among HBUS Alan Williamson and HBUS Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214534, at 1.
[1696] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 1.
[1697] 6/26/2007 email from HBUS Alan Williamson to HBUS Marlon Young and others, "[redacted] Family," OCC-PSI-00214891, at 1.  See also 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211; 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214891.
[1698] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 2.
[1699] Id. at 1.
[1700] Subcommittee briefing by HSBC legal counsel (7/9/2012).
[1701] Id.
[1702] Id.

282

## VIII.  OCC:  EXERCISING INEFFECTIVE AML OVERSIGHT

The mission of the Office of the Comptroller of the Currency (OCC) is to charter, regulate, and supervise all U.S. banks that hold a national charter.[1703]  To carry out that mission, in the words of the OCC, it conducts "regular examinations to ensure that institutions under our supervision operate safely and soundly and in compliance with laws and regulations," including AML laws.[1704]  However, the HSBC case history, like the Riggs Bank case history examined by this Subcommittee eight years ago,[1705] provides evidence that the current OCC examination system has tolerated severe AML deficiencies for years and given banks great leeway to address targeted AML problems without ensuring the effectiveness of their AML program as a whole. As a result, the current OCC examination process has allowed AML issues to accumulate into a massive problem before an OCC enforcement action is taken.

At HSBC, during the five-year period from 2005 to 2010, OCC AML examiners conducted nearly four dozen AML examinations, identified at least 83 AML Matters Requiring Attention, and recommended two cease and desist orders to strengthen HBUS' AML program. Despite the many AML problems identified by its examiners, OCC supervisors took no formal or informal enforcement action during nearly that entire period, allowing the bank's AML problems to fester.  In 2009, after learning that two law enforcement agencies were investigating possible money laundering through HBUS accounts, the OCC legal and enforcement divisions directed OCC AML examiners to hastily intensify and expand an ongoing AML examination to consider HBUS' AML program as a whole.  In September 2010, the expanded OCC examination culminated in a blistering Supervisory Letter identifying numerous, serious AML problems at the bank.  Many of these AML problems had been identified in prior examinations, but were tied to specific HBUS business units rather than applied bankwide, and were not resolved by bank commitments to remedy the identified problems.

The September 13, 2010 Supervisory Letter criticizing HBUS' AML deficiencies ran 31 pages long.[1706]  It cited the bank for five violations of Federal AML law.  Its list of AML problems included a backlog of over 17,000 unreviewed alerts regarding possible suspicious activity, and a failure to timely file hundreds of Suspicious Activity Reports (SARs) based upon those alerts.  The Supervisory Letter also criticized HBUS for failing to conduct any due diligence or to assess the AML risks posed by HSBC affiliates that opened U.S. dollar correspondent accounts at HBUS, even though many of those affiliates operated in high risk jurisdictions, had high risk clients, or offered high risk products.  Another problem was a three-year failure by HBUS, from mid-2006 to mid-2009, to conduct any AML monitoring of billions of dollars in bulk cash transactions, including $15 billion from 2007 to 2008 alone, with those same HSBC affiliates, despite the risks associated with large cash transactions.

---

[1703] See "FAQs – HSBC Money Laundering Enforcement Action," attached to 10/6/2010 email from OCC James Vivenzio to OCC colleagues, "HSBC FAQs," OCC-PSI-00898845, at 5.
[1704] Id.
[1705] See "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-633 (July 15, 2004).
[1706] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335, at 342.  [Sealed Exhibit.]

**PX257**

283

In addition, the Supervisory Letter criticized HBUS' failure to conduct any AML monitoring of $60 trillion annually in wire transfer activity by customers domiciled in countries rated by HBUS as lower risk, unless a customer was individually rated as high risk, while also criticizing the bank's country risk assessment process. The OCC attributed the bank's monitoring failure in part to HBUS' goal of minimizing AML staffing requirements. To place the magnitude of the AML vulnerability created by HBUS in context, the OCC noted that, from 2005 to 2009, HBUS' wire activity had grown from 20.4 million to 30.2 million wire transactions per year, with annual dollar volumes climbing from $62.4 trillion to $94.5 trillion, an increase of 50%. The OCC also noted that HBUS had become the third largest user of the CHIPS wire transfer system which provides 95% of U.S. dollar cross-border and nearly half of all domestic wire transactions totaling $1.5 trillion daily.[1707]

The letter didn't stop there. It also offered a slew of criticisms of the techniques used by HBUS to identify suspicious activity, describing them as "ineffective," "inadequate," and overly reliant on a "highly discretionary manual monitoring approach," all of which decreased the number of AML alerts. Additional problems included inappropriate procedures to close alerts; an "inadequate focus on country risk instead of customer risk"; the failure to assign high risk ratings to high risk clients, including Politically Exposed Persons; inadequate and unqualified AML staffing; inadequate AML resources; and high turnover in AML leadership. Despite its own failures to take proactive steps to oversee the bank, the OCC letter noted that the bank had not been proactive enough in identifying and remediating its own AML problems:

> "Through year-end 2009, the OCC has issued 83 BSA/AML Matters Requiring Attention ('MRAs'). The bank has a history of not identifying BSA/AML problems proactively. Instead, the bank has taken a reactive posture, choosing to focus its attention on correcting specific deficiencies identified by regulators without taking comprehensive action to identify and correct deficiencies in the bank's overall BSA/AML program."[1708]

A month later, on October 4, 2010, the OCC issued a Cease and Desist Order requiring HBUS to revamp its AML program.[1709] In response, HBUS committed to making major changes.

At the time the OCC issued the October Cease and Desist Order, it had been conducting regular AML oversight of HBUS for six years, raising the issue of how such deep-seated AML deficiencies could have gone on at the bank without the regulator's taking action. Part of the answer is that HBUS, like other international banks, presented the OCC with a number of AML challenges. It functioned as the U.S. nexus for one of the largest banks in the world. The HSBC network was not based in the United States, and its central focus was not on U.S. customers or U.S. businesses, but on other areas of the globe. HSBC affiliates operated in a number of jurisdictions which faced huge AML risks from terrorist financing, drug trafficking, tax evasion, and other law enforcement problems. The HSBC Group was also one of the largest participants

---

[1707] Id. at 342-343.

[1708] Id.

[1709] See In re HSBC Bank USA, N.A., Case No. AA-EC-10-98, Department of the Treasury Comptroller of the Currency, Consent Order (10/4/2012), OCC-PSI-00904698. On the same day, the Federal Reserve issued a Cease and Desist Order against HBUS' holding company, HSBC North America Holdings, Inc. (HNAH) to require it to strengthen its AML program. See In Re HSBC North America Holdings, Inc., Case No. 10-202-B-HC, before the Board of Governors of the Federal Reserve System, Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act as Amended (10/4/2012).

PX257

284

in international wire transfer systems and a leader among global banks in moving large amounts of physical currency around the world, with all the attendant AML risks inherent in large cash transactions. HSBC also handled numerous high risk clients and high risk products. In addition, as OCC examinations disclosed over the years, it was a financial institution with inadequate AML resources; inadequate AML systems and controls; and inadequate AML leadership.

HBUS itself was a large, complex, and growing financial institution with numerous business lines, products, and services, as well as millions of customers. It also had correspondent accounts for more than 80 HSBC affiliates as well as financial institutions around the world. From the time the OCC became HBUS' primary regulator in 2004, it oversaw HBUS' AML program and conducted regular examinations throughout the bank. Year after year, those AML examinations exposed AML deficiencies. Each time problems were identified, HBUS promised to correct them and sometimes did. But those corrective actions were narrowly targeted and, instead of improving, the bank's overall AML program deteriorated, resulting in the dramatic failures described in the September 2010 Supervisory Letter.

The focus of this section is to chronicle the OCC's AML oversight efforts at HBUS and draw from that case history potential lessons regarding OCC examinations of AML controls at a large global bank; how AML problems can accumulate over years despite the OCC's presence, and what can be done to strengthen the OCC's AML oversight. Problems include the OCC's decision to treat AML deficiencies as a consumer compliance problem rather than a management problem with safety and soundness implications; its practice of foregoing the citation of legal violations for the failure to comply with mandated components of a AML program; its use of narrowly focused AML examinations without also examining a bank's overall AML program; its failure to make timely use of informal and formal enforcement actions to compel AML improvements; and its use of Supervisory Letters that sometimes muted examination criticisms or weakened recommendations for reforms. Actions to remedy these problems would strengthen the OCC's AML oversight and help protect the U.S. banking system from being misused for terrorist financing, money laundering or other misconduct.

## A. Background

### (1) Key Anti-Money Laundering Laws

Federal law defines money laundering as "the movement of illicit cash or cash equivalent proceeds into, out of, or through the United States [or] … United States financial institutions."[1710] Federal anti-money laundering laws also apply to terrorist financing, including any legally obtained funds if intended for use in planning, committing, or concealing a terrorist act.[1711] These laws arose as a result of law enforcement investigations demonstrating that terrorists, drug traffickers, tax evaders, and other criminals were using financial transactions to execute their crimes, including by transferring funds across international lines, recharacterizing illicit proceeds as legitimate funds, hiding assets, and using financial and corporate secrecy laws

---

[1710] 31 U.S.C. § 5340(2).
[1711] See, e.g., 18 U.S.C. § 981(a)(1)(G) (civil forfeiture laws applicable to laundered proceeds also apply to terrorist assets).

PX257

285

and practices to block inquiries into their activities.  U.S. AML laws are designed to prevent these wrongdoers from misusing the U.S. financial system to commit their crimes.

Three key laws lay out the basic AML obligations of U.S. financial institutions, the Money Laundering Control Act of 1986, the Bank Secrecy Act of 1970, and the USA Patriot Act of 2002, which amended both prior laws.[1712]

The Money Laundering Control Act, enacted partly in response to hearings held by this Subcommittee in 1985, was the first law in the world to make money laundering a crime.  It prohibits any person from knowingly engaging in a financial transaction which involves the proceeds of a "specified unlawful activity."[1713]  The law provides a long list of specified unlawful activities, including, for example, terrorism, drug trafficking, fraud, and foreign corruption.  The Bank Secrecy Act (BSA), as amended by the Patriot Act, imposes AML obligations on a designated list of financial institutions operating in the United States to ensure they do not facilitate money laundering or become conduits for terrorist financing.

**AML Requirements.**  The Bank Secrecy Act mandates that covered financial institutions establish an effective AML program that meets four minimum requirements:

1) It has a system of internal controls to ensure ongoing compliance.
2) It designates an individual responsible for managing AML compliance.
3) It provides AML training for appropriate personnel.
4) It requires independent testing of AML compliance.[1714]

These four components are sometimes referred to as the "pillars" of an effective AML program.  The first requirement for a system of AML "internal controls" involves development of risk-based policies and procedures to detect and prevent money laundering.[1715]  At a large bank, these safeguards would include Know Your Customer (KYC) policies and procedures, including developing a customer identification program, conducting due diligence reviews, and assessing customer risk; a monitoring system to analyze account and wire transfer activity to detect suspicious activity; and a system for reporting suspicious activity to law enforcement.  To ensure AML controls are implemented effectively, banks are also required to provide appropriate resources, infrastructure, and staff.

---

[1712] For a more detailed discussion of U.S. AML laws, see "Anti-Money Laundering:  Issues Concerning Depository Institution Regulator Oversight," testimony of the General Accounting Office, Report No. GAO-04-833T, (6/3/2004), before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, at 4-6. http://www.gao.gov/new.items/d04833t.pdf
[1713] 18 U.S.C. §§ 1956-57.
[1714] See 31 U.S.C. § 5318(h)(1) and 12 C.F.R. Section 21.21(b)(1).  All Federal bank regulators have adopted the same requirements within their own regulations.  The OCC will cite apparent violations of Section 21.21(b)(1).  However, it will not cite violations for the four subcomponents (Sections 21.21 (c)(1)-(4)), whereas the other Federal banking agencies will.  The OCC's practice is inconsistent with the other Federal regulators.  As will be demonstrated later in this report, this practice potentially spares the bank from more strenuous criticism from its regulator.
[1715] 31 U.S.C. § 5318(h)(1)(A) and 12 C.F.R. Section 21.21(c)(1).

**PX257**

The second requirement is to designate a qualified individual for coordinating and monitoring the bank's day-to-day AML compliance.[1716]  The AML compliance officer must be knowledgeable about the law and have the time, expertise, authority, and resources needed to ensure bank compliance with AML requirements.  The AML compliance officer should also have the authority to make regular reports to the bank's board of directors or a board designated committee.

The third requirement is for the bank to provide adequate training to all personnel with AML responsibilities.[1717]  AML training should be ongoing to ensure bank personnel are kept up-to-date with the law.  The fourth requirement is for the bank to conduct independent testing of its AML program and controls to ensure compliance with the law and to identify and correct any AML deficiencies.[1718]  This function is typically performed by a bank's internal audit group or by an outside auditor with AML expertise.

**Other AML Requirements.**  In addition to requiring covered financial institutions to establish effective AML programs, Federal AML laws include a number of other statutory requirements, including requiring banks that keep records outside of the United States to produce them within a specified period of time;[1719] to obtain identifying information for persons seeking to open or maintain accounts,[1720] and requiring appropriate due diligence when opening and administering accounts for foreign financial institutions or senior foreign political figures.[1721]  The Bank Secrecy Act also authorizes and the U.S. Department of Treasury has issued regulations requiring covered financial institutions and other businesses to file reports on large currency transactions and suspicious activities to guard against money laundering.[1722]

## (2)  AML Oversight In General

The Secretary of the Treasury is the primary Federal regulator charged with enforcing key Federal AML laws.[1723]  To help carry out those responsibilities, in 2003, the Secretary established the Executive Office for Terrorist Financing and Financial Crimes, headed by a Deputy Assistant Secretary.  This office oversees the operation of the Financial Crimes Enforcement Network (FinCEN), a Treasury bureau which, among other duties, develops AML regulations and guidance, analyzes currency transaction reports and suspicious activity reports filed by financial institutions, and interacts with local, state, Federal, and international law enforcement as well as other financial intelligence units around the world.  Treasury also oversees the Office of Foreign Assets Control (OFAC) which is primarily responsible for enforcing U.S. sanctions laws to detect and block financial transactions and assets belonging to identified terrorists, persons associated with weapons of mass destruction, drug traffickers, and rogue jurisdictions.

---

[1716] 31 U.S.C. § 5318(h)(1)(B) and 12 C.F.R. Section 21.21(c)(3).
[1717] 31 U.S.C. § 5318(h)(1)(C) and 12 C.F.R. Section 21.21(c)(4).
[1718] 31 U.S.C. § 5318(h)(1)(C) and 12 C.F.R. Section 21.21(c)(2).
[1719] 31 U.S.C. § 5318(k)(2).
[1720] 31 U.S.C. § 5318(l).
[1721] 31 U.S.C. § 5318(i).
[1722] See, e.g., 31 U.S.C. §§ 5313 and 5318(g); 31 C.F.R. §§ 103.11 and 103.21 et seq.
[1723] See, e.g. 31 U.S.C. §§ 5311 et seq.  (Treasury Secretary charged with carrying out key anti-money laundering laws) and § 5341 (Treasury Secretary given lead role in development of national anti-money laundering strategy).

PX257

287

Although FinCEN is the administrator of Federal AML regulations in the United States, it does not examine banks. That task is assigned to Federal bank regulators which are charged with monitoring bank compliance with AML laws through their examination procedures. Any AML violations they discover are reported to FinCEN which can, among other actions, impose civil monetary penalties on financial institutions for the violations.[1724]

Significant responsibility for AML oversight, thus, rests with Federal bank regulators. The decisions they make with respect to AML policies and procedures, AML examinations, and safety and soundness ratings consequences for AML deficiencies will in large measure determine the importance that both regulators and financial institutions place on achieving effective AML controls.

**Oversight of Financial Institutions.** At the end of 2010, the United States had over 7,600 federally insured commercial banks and savings institutions.[1725] In addition, the United States had over 7,300 federally insured credit unions.[1726] On the federal level, these financial institutions are overseen by four agencies: the Federal Reserve which supervises state-chartered banks that are part of the Federal Reserve System and certain financial holding companies; the Federal Deposit Insurance Corporation (FDIC) which supervises state-chartered banks that were not part of the Federal Reserve System;[1727] the Office of the Comptroller of the Currency (OCC) which supervises banks and savings associations with national charters, and certain U.S. affiliates of foreign-owned banks;[1728] and the National Credit Union Administration (NCUA) which supervises Federal and state-chartered credit unions. In addition, state banking authorities supervise and examine state-chartered institutions.

The primary responsibility of the Federal bank regulators is to ensure the "safety and soundness" of the financial institutions they supervise. One key mechanism they use to carry out that responsibility is to conduct safety and soundness examinations on a periodic basis and provide the results in an annual Report of Examination (ROE) to the Board of Directors of each financial institution. Safety and soundness examinations are conducted to assess the risk that an insured bank poses to the Federal Deposit Insurance Fund. All FDIC-insured institutions contribute to this insurance fund through assessments which are typically collected on a quarterly basis. The assessment amounts are based, in part, on a bank's safety and soundness ratings.

---

[1724] See FinCEN Enforcement Actions, http://www.fincen.gov/news_room/ea/ ("Under the Bank Secrecy Act (BSA), 31 U.S.C. 5311 et seq., and its implementing regulations at 31 C.F.R. Chapter X (formerly 31 C.F.R. Part 103), FinCEN may bring an enforcement action for violations of the reporting, recordkeeping, or other requirements of the BSA. FinCEN's Office of Enforcement evaluates enforcement matters that may result in a variety of remedies, including the assessment of civil money penalties.").

[1725] See the Federal Deposit Insurance Corporation's (FDIC) Statistics at a Glance, (Fourth Quarter 2010). This includes 6,529 commercial banks and 1,128 savings institutions. http://www.fdic.gov/bank/statistical/stats/2010dec/industry.html

[1726] See the National Credit Union Administration's (NCUA) 2010 Annual Report, "Insurance Fund Ten-Year Trends" chart, page 133. This figure includes 4,589 Federal and 2,750 state-chartered credit unions. http://www.ncua.gov/Legal/Documents/Reports/AR2010.pdf

[1727] The FDIC also acts as a backup regulator for all financial institutions with Federal deposit insurance.

[1728] Until recently, the Office of Thrift Supervision (OTS) supervised Federal savings associations and institutions, but it was abolished by the Dodd Frank Wall Street Reform and Consumer Protection Act. All OTS duties were officially transferred to the OCC on July 21, 2011.

**PX257**

The largest U.S. financial institutions are supervised under a "continuous examination" program.  Under this program, examiners are always on-site at the institution, as opposed to periodically arriving on-site, conducting an examination, and then departing for the next bank after finalizing the ROE.  Examinations at smaller community banks are typically conducted on a 12- or 18-month exam cycle.  Examiners are typically on-site at smaller community banks for only a few weeks.

**Interagency AML Examination Manual.**  In June 2005, the Federal Financial Institutions Examination Council (FFIEC) issued a joint AML Examination Manual.[1729]  This manual was developed by the Federal bank regulators, in collaboration with FinCEN, OFAC, and state banking agencies.  It was developed to provide current and consistent AML examination procedures and guidance to examiners across the Federal banking agencies and the financial institutions they oversee.  The manual has been updated three times to incorporate regulatory changes and reflect feedback from the banking industry and examination staff.  The most recent version of the manual was released in April 2010.[1730]

**Safety and Soundness Examinations.**  Federal bank regulators conduct several different examinations at the financial institutions they supervise.  The most important is the safety and soundness examination.  Federal bank regulators conduct safety and soundness examinations to assess the risks that a bank poses to the Federal Deposit Insurance Fund (DIF) and to maintain public confidence in the integrity of the banking system.  These examinations help prevent identified problems from deteriorating to the point of bank failures, the costs of which are often borne by the DIF.  The DIF is funded by assessments that the FDIC charges banks.  These assessments are derived from the level of insured deposits that a bank holds and the inherent risks that the bank poses to the DIF, which are calculated in part from a bank's safety and soundness component ratings and composite rating.

Safety and soundness examinations are designed to determine the financial condition of an institution, assess the effectiveness of its risk management practices, and aid in the development of effective and timely corrective actions.  The examinations evaluate the bank's adherence to a variety of laws and regulations, identify and assess key risks, and identify and assess any problems.

**CAMELS Ratings.**  Safety and soundness examinations are organized around a rating system called CAMELS, an acronym for the six components that are evaluated.  The CAMELS rating system evaluates a financial institution's:  (C) capital adequacy, (A) asset quality, (M) management effectiveness, (E) earnings, (L) liquidity, and (S) sensitivity to market risk.  Each component of the CAMELS rating is based upon a qualitative analysis of various factors

---

[1729] The FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the Federal examination of financial institutions by the Federal Reserve, FDIC, OCC, NCUA, and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions.  See FFIEC website, http://www.ffiec.gov/.  In 2006, the State Liaison Committee (SLC) was added to the Council as a voting member.  The SLC includes representatives from the Conference of State Bank Supervisors, the American Council of State Savings Supervisors, and the National Association of State Credit Union Supervisors. The CFPB became an FFIEC member in 2011.  The Office of Thrift Supervision was also an FFIEC member, until the agency was abolished in 2011.

[1730] See 4/29/2010 "BSA/AML Examination Manual," Federal Financial Institutions Examination Council, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

PX257

289

comprising it.  CAMELS ratings use a scale of 1 to 5, with "1" being the best rating and "5" the worst.

The CAMELS component ratings also serves as the basis for a bank's "Composite Uniform Financial Institution Rating," often referred to as the "composite rating" or the overall "bank rating."   The composite rating also uses a scale of 1 to 5, and generally bears a close relationship to the component CAMELS ratings, although it is not simply an average of them. For composite ratings, 1 is the highest rating and signifies a safe and sound institution with no cause for supervisory concern, 3 signifies an institution with supervisory concerns in one or more areas, and 5 is the lowest rating, which signifies an unsafe and unsound bank with severe supervisory concerns.

When the FDIC assesses bank insurance fees for a particular institution, it takes into consideration both the CAMELS component ratings and the composite rating.  Lower ratings, signifying a higher risk institution and a greater threat to the Deposit Insurance Fund, can lead to a higher deposit insurance assessment,[1731] which in turn can affect net income.

**Specialty Examinations and Ratings.**  In addition to safety and soundness examinations, Federal bank regulators also conduct various specialty or secondary examinations targeting particular aspects of the institutions they supervise.  These specialty examinations, which are separate and distinct from safety and soundness examinations, are important in their own right, and focus on such areas as information technology (IT), trust operations, compliance with the Community Reinvestment Act (CRA), and compliance with consumer protection laws.[1732]

Each of these specialty examinations has its own unique rating system based upon an interagency agreement on what elements should be considered and how the rating should be calculated.  For example, IT examinations produce ratings under a "Uniform Rating System for Information Technology"; trust examinations produce ratings under a "Composite Uniform Interagency Trust Rating" system; CRA examinations produce ratings under a "Community Reinvestment Act Rating" system; and consumer compliance examinations produce ratings under a "Uniform Interagency Consumer Compliance Rating" system.[1733]

---

[1731] See page 3 – sample deposit insurance assessment invoice, http://www.fdic.gov/deposit/insurance/assessments/EV2Sample.pdf.

[1732] According to the OCC, typical issues addressed by these specialty examinations are as follows:
  • Information Technology (IT) Examinations – evaluate IT-related risks including operations, information security programs, and IT governance processes within supervised financial institutions and technology service providers.
  • Trust/Asset Management Examinations – determine if an institution's policies or administration of trust accounts has resulted in a contingent liability or estimated loss that could damage the institution's capital.
  • Consumer Compliance Examinations – assess a financial institution's compliance with federal consumer protection laws and regulations.
  • Community Reinvestment Act (CRA) Examinations – ensure compliance with the CRA, to include meeting the credit needs of the community that the financial institution serves, including residents of low- and moderate-income neighborhoods.

See OCC website, "Examinations: Overview," http://www.occ.gov/topics/examinations/examinations-overview/index-examinations-overview.html

[1733] 7/26/2006 OCC Report of Examination of HBUS for the examination cycle ending March 31, 2006, OCC-PSI-00422079, at 4.  [Sealed Exhibit.]

**PX257**

These ratings are typically presented in the annual Report of Examination provided to a financial institution by its primary regulator. They are typically included in a section which lists all of the ratings assigned to the bank during the year. The specialty examination ratings are calculated and presented separately from the CAMELS component ratings which give rise to the bank's overall Composite Uniform Financial Institution Rating. In OCC Reports of Examination, for example, the ratings are usually presented in the following format:

**Ratings**

**Composite Uniform Financial Institution Rating**
        Component Ratings:
                Capital
                Asset Quality
                Management
                Earnings
                Liquidity – Asset/Liability Management
                Sensitivity to Market Risk

**Uniform Rating System for Information Technology**
**Composite Uniform Interagency Trust Rating**
**Uniform Interagency Consumer Compliance Rating**
**Community Reinvestment Act Rating.**[1734]

While specialty examination ratings do not automatically or routinely affect either the CAMELS component or composite ratings, if a specialty examination identifies significant problems that are extensive enough to potentially affect the financial condition of the bank, including through the imposition of large civil money penalties, reimbursable violations, or reputational risk, it may contribute to a downgrade of one or more of the CAMELS component ratings which, in turn, may affect the composite rating.[1735] Downgrades to safety and soundness ratings due to problems identified through specialty examinations are not common, however, and are reserved for extreme cases.

**AML Examinations.** An examination focusing on AML compliance is considered a specialty examination. Each of the Federal banking agencies has examiners specially trained to conduct AML examinations. AML examinations do not, however, produce a separate specialty rating, since no interagency agreement has produced an AML rating system. Instead, at Federal banking agencies other than the OCC, AML examination findings are generally addressed as one of the safety and soundness considerations in the Report of Examination (ROE) and included in the development of the bank's safety and soundness ratings. Typically, AML examination

---

[1734] Id.
[1735] See, e.g., Federal Financial Institutions Examination Council, "Uniform Financial Institutions Ratings System," 61 FR 245, at 67021 (12/19/1996), http://www.gpo.gov/fdsys/pkg/FR-1996-12-19/pdf/96-32174.pdf ("Generally, the impact of specialty area examination findings are reflected in the composite and Management component ratings.").

291

results impact the CAMELS management component rating, which may be downgraded if management fails to maintain an adequate AML program.

The CAMELS management component rating is designed to reflect the ability of bank management to adequately identify, measure, monitor, and control problems and manage risks.[1736]  Although AML compliance is just one factor in rating the management component, a bank's failure to maintain an adequate AML program can expose a bank to significant reputational risk, remedial costs, and civil money penalties.  When such factors are present, Federal bank regulators normally take them into account when assigning the management component rating.  If the management component is downgraded, it may also in certain circumstances lower the bank's overall composite rating, with potentially severe impacts on the financial institution's reputation, risk profile, and insurance assessment fees.

In contrast to this approach, which is used by the Federal Reserve, FDIC, and NCUA, the OCC does not treat AML examinations as a safety and soundness matter and does not routinely take AML deficiencies into account when assigning a bank's CAMELS management rating.  Instead, the OCC treats AML examinations as a matter of consumer compliance and includes consideration of AML deficiencies when determining an institution's consumer compliance rating.  The OCC's approach is explained more fully below.

**Violations of Law.**   In their supervisory programs, Federal bank regulators assign a high priority to the detection and prompt correction of violations of law.  Such violations may involve statutory or regulatory requirements.  Regulators typically list all significant violations of law (as opposed to isolated or technical violations) in the annual Report of Examination provided to a bank's board of directors.  The board of directors, in turn, is charged with initiating prompt and appropriate corrective action.

Listing one or more statutory or regulatory violations in a Report of Examination is not uncommon.  They may result from bank management's unfamiliarity with the governing law, misinterpretation of the requirements, negligence, or willful noncompliance.  The more egregious the nature of the violation, the more severe the repercussions may be.  Willful noncompliance with statutory or regulatory requirements, for example, may result in civil money penalties against the bank or individual bank managers as well as removal actions against bank personnel, officers, or  directors.  Violations are also viewed as significant adverse reflections on bank management capabilities and may lead to a downgrade of the CAMELS management component rating.  The underlying causes of the violation play a significant role in that assessment.

**Enforcement Actions.**   If a bank regulator becomes concerned about the condition of a financial institution, it has a wide range of informal and formal enforcement actions that could be used to require corrective action.  Informal actions are viewed as voluntary actions and include requesting that the financial institution issue a safety and soundness plan, board resolution, or commitment letter pledging to take specific correction actions by a certain date.  Another informal action is a memorandum of understanding, which is a signed agreement by both the regulator and the board of directors addressing various actions that the financial institution will

---

[1736] See, e.g., Federal Financial Institutions Examination Council, "Uniform Financial Institutions Ratings System," 61 FR 245, at 67021 (12/19/1996), http://www.gpo.gov/fdsys/pkg/FR-1996-12-19/pdf/96-32174.pdf.

**PX257**

292

take to correct its problem areas.  Informal actions are nonpublic and are not enforceable in court.  On the other hand, formal enforcement actions are legal proceedings which can include issuing a consent order or a cease and desist order requiring the financial institution to stop an unsafe or unsound practice or to take affirmative action to correct identified problems; imposing a civil money penalty; suspending or removing personnel from the financial institution; suspending or banning personnel from the banking industry; revoking the bank charter; or referring misconduct for criminal prosecution.  Formal actions are disclosed to the public and are enforceable in court.  Failure to comply with an order can subject the bank to civil money penalties.

With respect to AML enforcement, in July 2007, the Federal bank regulators issued joint interagency guidance entitled, "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements."[1737]  This guidance sought to promote consistent implementation of Section 8(s) of the Federal Deposit Insurance Act and Section 206(q) of the Federal Credit Union Act, both of which require Federal bank regulators to conduct AML examinations and identify AML problems in Reports of Examination.  Both sections also require Federal bank regulators to issue a cease and desist order in the event that a bank fails to provide or maintain an adequate AML program.  The guidance affirms the Federal bank regulators authority and responsibility for enforcing AML requirements and use of cease and desist order to correct identified problems.

### (3)  OCC AML Oversight in General

Because it oversees the largest and most complex banks operating in the United States, some of which operate affiliates in high risk jurisdictions, maintain accounts for high risk clients, or offer high risk products vulnerable to money laundering and terrorist financing, the OCC plays a crucial role in ensuring bank compliance with U.S. AML laws.

**OCC Organization.**  The OCC oversees about 2,000 nationally-chartered banks and savings associations and about 50 U.S. affiliates of foreign-owned banks.[1738]  In 2011, the OCC's budget, which is paid for by assessments on the financial institutions it regulates, totaled about $875 million.[1739]  As of 2011, about 3,700 OCC employees were stationed in 66 offices nationwide, organized into four districts known as the Northeastern, Central, Southern, and Western districts, with agency headquarters in Washington, D.C.[1740]

Several groups within the OCC contribute to AML oversight.  Examiners with special expertise conduct the actual AML examinations, evaluate bank AML programs, and identify AML deficiencies.  They provide their findings to the Examiner-In-Charge at a particular

---

[1737] See 7/19/2007 "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements," reprinted in 8/24/2007 FFIEC BSA/AML Examination Manual, at R-1 to R-7, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2007.pdf.
[1738] See 2011 OCC Annual Report, at 1, chart entitled "National Banking System at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf; OCC website, "About the OCC," http://www.occ.gov/about/who-we-are/comptroller-of-the-currency/bio-thomas-curry.html.
[1739] 2011 OCC Annual Report, at 1, chart entitled "OCC at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf.
[1740] 2011 OCC Annual Report, at 1, chart entitled "OCC at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf .Id.; OCC website, "About The OCC," http://www.occ.gov/about/who-we-are/district-and-field-offices/index-organization.html.

**PX257**

293

financial institution.  At large banks, if AML deficiencies are identified, the Examiner-In-Charge works with the OCC Department of Large Bank Supervision to evaluate the AML examination findings and direct efforts to ensure bank compliance with the law.  Bank supervision personnel also work with counsel in the Enforcement and Compliance Department and the Legal Department to determine whether AML enforcement actions are needed and, if so, what actions to take.

During most of the years reviewed by the Subcommittee, the OCC was headed by John C. Dugan who served as the Comptroller of the Currency until his five-year term expired in 2010.  In August 2010, he was succeeded by John Walsh who served as Acting Comptroller until April 2012, when Thomas Curry was confirmed by the Senate to serve as the new Comptroller of the Currency.  The second in command during most of the years reviewed was First Senior Deputy Comptroller and Chief Counsel Julie Williams.  The head of the Department of Large Bank Supervision, which oversees the largest nationally-chartered U.S. banks and U.S. branches of foreign banks was Michael L. Brosnan.  One of his chief deputies was Grace Dailey who helped oversee HBUS, until the end of 2010, when she left that post for another, and was replaced by Sally Belshaw.  Two other key OCC officials in AML enforcement were Daniel Stipano, Deputy Chief Counsel, and James Vivenzio, senior legal counsel for AML matters.  In addition, the Director of the Enforcement and Compliance Department was Richard Stearns.

**OCC Examinations Generally.**  Much of the OCC workforce is devoted to conducting or supporting safety and soundness examinations of the banks regulated by the OCC.  In general, for a large bank, the relevant OCC district office assigns an Examiner-in-Charge (EIC) and a team of examiners to work on-site at the bank, on a fulltime basis under a continuous examination program.

Under the OCC's continuous examination program, the EIC is assigned to a particular institution for five years.  At the five-year mark, the EIC is then assigned to another bank.  The EIC is assisted by a team of examiners that are also assigned to the bank on a full-time basis, but do not have similar five-year term limitations.  Members of the examination team may rotate to other banks at various intervals as needed.  Regardless, examiners work at the bank year-round and should have a firm and immediate grasp on any issues and problems affecting the bank.

**Supervisory Strategy.**  The EIC is responsible for developing an annual supervisory strategy.  The supervisory strategy is a prospective work plan for examining the bank, based on perceived risks.  The strategy addresses supervisory areas of interest, including what targeted examinations will be conducted throughout the coming year.  Targeted examinations address what are called "specialty areas," such as Information Technology, Consumer Compliance, Community Reinvestment Act, and Trust areas.  The EIC develops the supervisory strategy, including strategies with respect to the specialty areas with input from examiners, called "team leads," who have lead responsibility for conducting the examinations in those areas.  At the OCC, AML compliance is not considered a separate specialty area, but is included within Consumer Compliance specialty examinations.  The EIC ultimately presents the annual supervisory plan for approval to the deputy comptroller for Large Bank Supervision at OCC headquarters in Washington.

**PX257**

294

**Targeted Examinations.**  Based on the supervisory strategy, a series of specialized or "targeted examinations" is conducted throughout the year.  OCC "Request Letters" are sent to a bank approximately 30 days before the start of each targeted examination.  Request Letters give the bank advance notice of the examination and include a list of requested items that the bank should assemble for the examiners to review at the start of the examination.

The examiners then conduct an examination of a specific area of the bank and write a "Conclusion Memorandum" summarizing their findings for the EIC.  The examiners may also contribute to any related Supervisory Letter that the EIC sends to bank management and any relevant portion of the annual Report of Examination provided to the bank's board of directors.

Supervisory Letters are used by the OCC officially to inform a bank of the findings of a specialty examination and issues that warrant management's attention. For large banks under continuous examination, the OCC typically uses Supervisory Letters to provide detailed information to bank management about each specialty examination completed throughout the year.  In addition to describing the examination findings, the Supervisory Letter can cite an apparent violation of law or a "Matter Requiring Attention" (MRA), meaning it requires the attention of the bank's senior management.  Both violations and MRAs require prompt corrective action by the bank.[1741]  A Supervisory Letter may also include one or more "recommendations" to enhance bank performance or compliance in a particular area.  Under OCC regulation and practice, "recommendations" do not require corrective action by bank management.[1742]  OCC personnel told the Subcommittee that the Supervisory Letters written by EICs should accurately reflect the findings and criticisms in the conclusion memoranda written by the examiners.[1743]

Before issuing a Supervisory Letter, the EIC is required to forward a draft of the letter to the OCC's Senior Deputy Comptroller in Washington for review.  If the Supervisory Letter cites an AML violation or MRA requiring corrective action, it is referred to the Large Bank Review Committee (LBRC), which is comprised of three senior staff with AML expertise.[1744]  The LBRC members are the senior legal counsel with AML expertise from the Legal Department, the Director for Bank Secrecy Act and Money Laundering Compliance, and the Director for Enforcement and Compliance.  The LBRC was established in response to problems associated with the Riggs Bank AML examinations nearly ten years ago and is intended to ensure that OCC AML experts review field examiners' work and promote consistency in AML enforcement across large national banks.  Until recently, it was optional for the LBRC to have the examiner's Conclusion Memorandum upon which the draft Supervisory Letter is based, but the LBRC has recently begun to require both before it will undertake a review of the draft letter.[1745]

**Report of Examination (ROE).**  On an annual basis, for each large bank, the OCC issues a Report of Examination (ROE), summarizing the condition of the bank.  The ROE normally includes all of the bank's ratings arising from examinations of the bank's safety and soundness and specialty areas, as well as all cited violations of law and significant MRAs.

---

[1741] Subcommittee interviews of Joseph Boss (1/30/2012) and James Vivenzio (3/15/2012).  Mr. Vivenzio told the Subcommittee, "An exam cited with an MRA is a failure" on the part of the bank.
[1742] Id.
[1743] Subcommittee interview of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012).
[1744] Subcommittee interview of James Vivenzio (3/15/2012).
[1745] Id.

Depending on the circumstances, the issues noted in Supervisory Letters provided to bank management throughout the year may or may not be referenced in the ROE.  The EIC sends the ROE with a cover letter to the bank's board of directors so that it has a written record of the regulator's concerns.  In addition, on an annual basis, the EIC attends a board meeting and presents the consolidated examination findings contained in the ROE to ensure the Board is fully informed about the bank's ratings, financial condition, and any deficiencies.

**AML Examinations.**  Like other Federal bank regulators, the OCC treats AML examinations as a specialty or targeted examination, and employs examiners with specialized AML expertise to conduct them.   Upon completing an AML examination, the examiner is required to submit a Conclusion Memorandum to the Examiner-In-Charge of the bank describing the examination findings, any apparent violations of law, and possible recommendations, MRAs, or enforcement actions.  The Examiner-In-Charge then sends a Supervisory Letter to the bank summarizing the AML examination findings and presenting any violations, MRAs, or recommendations.

At the end of the year, when the OCC readies the annual Report of Examination (ROE) for the bank and summarizes examination findings made during the year, the OCC does not treat AML deficiencies as a safety and soundness matter.  It does not discuss AML problems in the ROE's analysis of safety and soundness issues, nor does the OCC routinely take AML deficiencies into account when assigning the bank a CAMELS component rating for management or its overall composite rating.

Instead, unique in the Federal Government, the OCC subsumes AML issues within its consideration of consumer compliance issues.[1746]  The ROE discusses AML compliance in a section entitled, "Consumer Compliance" and combines that discussion with consideration of the bank's compliance with consumer protection and civil rights laws.  In addition, the OCC takes AML deficiencies into consideration when assigning a bank's consumer compliance rating, even though the Uniform Interagency Consumer Compliance Rating System does not include AML considerations when specifying how to calculate that rating.

Consumer compliance examinations normally cover a bank's compliance with consumer protection laws, such as laws requiring accurate disclosures of fees and interest rates, understandable mortgage and credit card disclosures, and avoidance of unfair or deceptive practices.  They also examine a bank's compliance with civil rights laws, such as prohibitions against discrimination against persons on the basis of race, religion, national origin, or other prohibited categories.[1747]  The examinations test, for example, the adequacy of a bank's

---

[1746] See 9/2007 "Comptroller's Handbook – Bank Supervision Process," Appendix D, at 89, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_pdf/banksupervisionprocess.pdf, ("However, the OCC does incorporate into the consumer compliance rating examination findings pertaining to compliance with the Bank Secrecy Act (BSA), anti-money laundering (AML), and Office of Foreign Asset Control (OFAC).").  See also 2006-2010 OCC Reports of Examination for HBUS.  [Sealed Exhibits.]
[1747] The OCC has identified a long list of relevant laws, including the Truth in Lending Act, Fair Credit Billing Act, Consumer Leasing Act of 1976, Fair Credit Reporting Act, Equal Credit Opportunity Act, Fair Debt Collection Practices Act, and Electronic Fund Transfers Act.  See "Comptroller's Handbook**Error! Main Document Only.** – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.

**PX257**

operating systems to track compliance with consumer protection laws, the documentation it uses for consumer products, and the content of files related to such products as mortgages, consumer loans, and credit cards.  Those considerations are key to ensuring bank compliance with consumer protection and civil rights laws, but do not include and have no relevance to compliance with AML requirements to guard against money laundering and terrorist financing.

Like CAMELS ratings, consumer compliance ratings use a scale of 1 to 5, with "1" being the best rating and "5" the worst.[1748]  The consumer compliance rating is calculated and presented separately in the OCC's ROE, and typically has no impact on a bank's component CAMELS ratings or its overall composite rating and thus, no impact on an evaluation of the bank's safety or soundness.[1749]  A bank's consumer compliance rating typically comes into play if a bank wants to open a new branch or expand into a new area of consumer lending; the OCC generally will not approve such an application, unless the bank has a consumer compliance rating of 1 or 2, showing that it is treating its customers fairly.[1750]  Those considerations are not relevant, however, to AML compliance issues.  Additionally, there is no logical reason why poor AML compliance should lower a bank's consumer compliance rating when the two have virtually nothing in common.

An internal OCC review raised these same concerns.  In 2005, following the Subcommittee's report on the OCC's inadequate AML oversight of Riggs Bank, the OCC's Quality Management Division issued an internal report evaluating the OCC's AML supervision program.[1751]  That report found that the interagency consumer compliance rating system was not designed to and did not address AML issues.  It noted that the rating was "geared to more traditional consumer protection regulations, such as Regulation Z and Regulation B, but is silent relative to BSA/AML compliance issues."[1752]  The report also noted:  "Since the consumer compliance rating system was developed as a FFIEC initiative, OCC cannot modify the ratings outside of FFIEC."   The report recommended that the OCC work with the FFIEC to try to change the ratings system to incorporate AML issues, but seven years later, the ratings system still excludes consideration of AML issues, perhaps because no agency other than the OCC attempts to combine consumer compliance and AML concerns into a single rating.

**AML Violations.**  In addition to subsuming AML concerns within its consumer compliance rating system, the OCC also has a unique approach to citing AML violations in its Supervisory Letters and Reports on Examination (ROE).

---

[1748] See "Comptroller's Handbook – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.

[1749] OCC officials told the Subcommittee that, in some circumstances, the consumer compliance rating could be taken into account when evaluating a bank's CAMELS management rating, although that was not typical. Subcommittee interview of James Vivenzio (3/15/2012) and Joseph Boss (1/30/2012).

[1750] See, e.g., 12 C.F.R. Section 5.13(a)(2); branch application for national banks, at 7, http://www.occ.gov/static/licensing/form-branch-relo-app-v2.pdf; Branches and Relocations, Comptrollers Licensing Manual, at 4, http://www.occ.gov/publications/publications-by-type/licensing-manuals/branches.pdf.

[1751] 5/18/2005 "Bank Secrecy Act/Anti-Money Laundering Supervision," prepared by OCC Quality Management Division, HSBC OCC 2495056.

[1752] Id. at 7.

297

Like other Federal bank regulators, the OCC often includes a list of apparent violations of law in its annual Reports of Examination. Those violations span a wide range of banking laws and regulations, including, for example, consumer compliance concerns.[1753] In the AML area, however, the Subcommittee has learned that the OCC has adopted a practice of limiting the types of AML violations it will cite either in a ROE or Supervisory Letter.

Currently, all Federal bank regulators, including the OCC, will cite an apparent violation of law in a Supervisory Letter or ROE if the regulator determines that a financial institution's entire AML program has failed. For the OCC, that citation would be an apparent violation of 31 U.S.C. § 5318(h)(1) and the OCC implementing regulation, 12 C.F.R. Section 21.21(b)(1). On the other hand, if the OCC were to determine that a bank failed to comply with one of the four mandated components of an effective AML program – described earlier as internal controls, an AML compliance officer, AML training, and independent testing – the Subcommittee has been told that, contrary to all other Federal bank regulators, the OCC generally will not cite a violation of one of the individualized program components, even though each component has its own statutory basis. For example, if a bank failed to provide adequate AML internal controls, Federal bank regulators other than the OCC would cite the bank for violating 31 U.S.C. § 5318(h)(1)(A). In contrast, the OCC routinely forgoes the citation of violations of the individual AML program components, instead typically designating such a deficiency as a Matter Requiring Attention (MRA) by the bank.[1754]

To examine the difference in the approach of the OCC versus other Federal banking agencies, the Subcommittee reviewed five years of reports compiled by the U.S. Treasury's Financial Crimes Enforcement Network (FinCEN) which, among other matters, track the AML statutory violations cited by the agencies.[1755] Over the five year period from 2007 to 2011, the FinCEN reports show that the OCC conducted about 6,600 examinations and cited pillar violations only 16 times. In comparison, the Federal Reserve conducted about 4,800 examinations and cited pillar violations 159 times. The FDIC conducted about 12,800 examinations and cited pillar violations 714 times. The OCC approach is out of alignment with that of its peers.

Treating the failure of an AML pillar component as an MRA rather than an AML violation sends a more muted message about the importance of the AML deficiency and the need to correct it in a prompt manner. A matter requiring "attention" simply does not have the same urgency as a statutory "violation." In addition, citing a violation of law when one critical

---

[1753] 7/26/2006 OCC Report of Examination for HBUS, OCC-PSI-00422079, at 2-3 (citing violations of the Equal Opportunity Act and Consumer Protections for Depository Institution Sales of Insurance regarding disclosures). [Sealed Exhibit.]

[1754] One OCC senior legal counsel specializing in AML matters told the Subcommittee that the OCC "will not cite pillar violations" and instead lists them as MRAs which are not enforceable in court. He said that the OCC uses the same approach when reporting AML examination findings to FinCEN, describing the OCC's reporting as "cleaner" and not "cluttered with component violations" like the other agencies. Subcommittee interview of James Vivenzio (3/15/2012).

[1755] See "Federal Banking Agency Bank Secrecy Act Compliance Examination: Consolidated Quarterly Report," (2001-2011), prepared by FinCEN, using data supplied by the OCC, Federal Reserve, FDIC, NCUA and the Office of Thrift Supervision, PSI-FinCEN-04-0063-296; 7/2012 chart, "Bank Secrecy Act Pillar Violations 2007-2011," prepared by the Subcommittee. [Sealed Exhibits.]

**PX257**

298

component of a bank's AML program is inadequate sends a strong message to management that its AML program is deficient, does not meet minimum statutory requirements, and requires remediation to ensure compliance with all four statutory requirements.

**AML Enforcement Actions at Large Banks.**  When the OCC identifies AML deficiencies at a bank, it can use informal or formal enforcement actions to compel the bank to correct the deficiencies and strengthen its AML controls.

Informal actions include nonpublic commitment letters, board resolutions, or memoranda of understanding in which the bank makes written commitments, with fixed deadlines, to take specific actions.  To take an informal action against a large bank, an Examiner-in-Charge must obtain the approval of the Large Bank Supervision Department in Washington.  While these agreements are not enforceable in court, they can provide quick and effective tools to produce reforms.  The OCC, however, disfavors the use of informal actions in AML cases, and has taken only eight informal enforcement actions against large banks for AML deficiencies since 2005.[1756]

To take a formal enforcement action against a large bank, such as a Cease and Desist Order, the Examiner-in-Charge must submit a recommendation to the OCC's Washington Supervision Review Committee (WSRC).[1757]  The WSRC is comprised of senior managers in the agency and acts as an advising body to the Senior Deputy Comptroller.  It was established to promote consistency in the agency's application of formal enforcement actions.  To present a recommendation, the Large Bank Supervision Department and the Legal Department prepare pertinent examination information and a memorandum for the WSRC.  Counsel from the Enforcement and Compliance Division also participates.  The WSRC ultimately determines whether a program violation can be supported and cited, which would also require the OCC to issue a Cease and Desist Order.

According to the OCC, from 2005 to 2011, the OCC issued 43 Cease and Desist Orders against both large and smaller sized banks with AML deficiencies, compared to 2 by the Federal Reserve and 52 by the FDIC, and assessed $124 million AML-related civil money penalties, accounting for 62% of the total penalty assessments by Federal banking agencies.[1758]  At the same time, the statistics also indicate that the OCC is not resolving AML problems at an early stage but, as with HBUS, may be allowing AML problems to accumulate until they necessitate severe enforcement action.

The interagency guidance on AML enforcement provides all Federal banking agencies with guidelines on the use of formal enforcement actions to ensure bank compliance with AML laws, but does not offer any guidance on the use of informal actions.  Among other provisions, the guidance states that if a Supervisory Letter contains an identical AML violation or MRA that was not corrected since the prior examination, typically referred to as a "repeat" violation or MRA, the agency must issue a formal enforcement action to require corrective action.[1759]  Under

---

[1756] Subcommittee briefing by OCC legal counsel (7/13/2012).
[1757] See, e.g., "Process for Taking Administrative Enforcement Actions Against Banks Based on BSA Violations," OCC 2005-45, Attachment, Appendix A to OCC 2004-50, OCC-PSI-00176030.
[1758] Subcommittee briefing by OCC legal counsel (7/14/2012).
[1759] See 7/19/2007 "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements," in the Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money

**PX257**

299

a 2004 Memorandum of Understanding between FinCEN and Federal bank regulators, FinCEN must be notified of, among other things, all AML-related formal and informal enforcement actions taken with respect to a particular bank.[1760]

## B. OCC Oversight of HBUS

HBUS is located within the OCC's Northeastern District which is currently headed by Deputy Comptroller Toney Bland. The OCC Examiner-in-Charge of HBUS was Anthony DiLorenzo from 2004 until 2008, when his term expired, and he was replaced by Sally Belshaw. Ms. Belshaw served as the HBUS Examiner-in-Charge until December 2010, when she was promoted to Deputy Comptroller for Large Bank Supervision.[1761]  The current OCC Examiner-In-Charge at HBUS is Kris McIntire.

### (1) Chronology of OCC AML Oversight of HBUS

The OCC has been the primary regulator of HBUS since July 2004, when it inherited oversight of a bank already subject to a formal enforcement action to strengthen its AML program. HBUS has been criticized at times for poor AML controls for over the past decade, but until 2010, the OCC failed to take any enforcement action to compel the bank to implement an effective AML program.

 **Inheriting an AML Problem.**  Over the past 30 years, HBUS, through its predecessor banks, has changed its bank charter three times, switching between OCC and Federal Reserve oversight in 1980, 1993, and 2004.[1762]  The first switch took place in 1980, when HSBC acquired 51% control over Marine Midland Bank in New York. Marine Midland Bank was then a state-chartered bank, a member of the Federal Reserve System, and subject to oversight by both the New York State Banking Department and the Federal Reserve. In connection with the 1980 acquisition, however, it converted its charter to a national bank subject to oversight by the OCC. By 1987, HSBC had assumed 100% control of the bank. In 1990, the OCC downgraded the bank's CAMELS composite rating, which remained unchanged through 1993.[1763]  On December 31, 1993, Marine Midland switched back to a state-chartered bank in New York subject to Federal Reserve supervision. After its first examination, the Federal Reserve upgraded its rating.[1764]

Six years later, in 1999, Marine Midland Bank acquired two more banks and renamed itself HSBC Bank USA, N.A. (HBUS). In 2003, HBUS was cited by both the Federal Reserve

---

Laundering Examination Manual, Appendix R, at R-4 ("Failure to correct a previously reported problem with the BSA Compliance Program").

[1760] See Memorandum of Understanding between FinCEN and bank regulators, http://www.ffiec.gov/bsa_aml_infobase/documents/FinCEN_DOCs/Memo_Understand_Sept04.pdf.

[1761] See 12/13/2010 "OCC Announces Changes to the Its Large Bank Supervision Leadership Team," OCC press release NR 2010-140, http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-140.html.

[1762] See the Federal Reserve's National Information Center, http://www.ffiec.gov/nicpubweb/nicweb/InstitutionHistory.aspx?parID_RSSD=413208&parDT_END=99991231.

[1763] See 1/19/1990 and 5/31/1993 OCC targeted examinations.  [Sealed Exhibits.]

[1764] See 3/31/1994 Federal Reserve Bank of New York examination conducted jointly with the New York State Banking Department.  [Sealed Exhibit.]

**PX257**

300

and New York State Banking Department for maintaining an inadequate AML program.[1765] Regulators cited fundamental, wide-ranging problems, including ineffective monitoring of wire transfers and monetary instruments, ineffective recordkeeping and reporting of currency transactions, inadequate customer due diligence and enhanced due diligence, and a failure to report suspicious activities. The Federal Reserve noted that AML deficiencies identified in prior examinations had not been corrected, that bank management was reactive rather than a proactive with respect to its AML program, and that the compliance function had a lack of influence as evidenced by ongoing, uncorrected problems.[1766] On April 30, 2003, both regulators entered into a formal agreement with the bank requiring it to "upgrade and improve" its AML internal controls.[1767] The agreement required:

> "○Development of a compliance program,
> ○An effective system and methodology related to monitoring efforts,
> ○A system for evaluating suspicious transactions,
> ○A customer due diligence program, and
> ○The development and implementation of appropriate risk assessments."[1768]

On March 22, 2004, while this formal enforcement action was still unfolding, HBUS announced its intention to once more seek a national bank charter from the OCC. On July 1, 2004, after acquiring Republic Bank Delaware, HBUS changed its charter a third time and again became a national bank subject to oversight by the OCC. As a condition to approval of its new national charter, HBUS agreed to comply with the provisions of the 2003 agreement requiring AML improvements. HBUS, thus, began its tenure with the OCC operating under an agreement requiring it to address a host of AML deficiencies.

**Terminating the AML Agreement Despite 30 MRAs.** The OCC produced its first Report of Examination (ROE) for HBUS less than a year later.[1769] The ROE covered examinations conducted through March 31, 2005. It noted as the first Matter Requiring Attention of the bank its obligation to implement the AML requirements in the 2003 agreement and concluded that the bank had made significant progress. The ROE stated that HBUS had already "developed a written Anti-Money Laundering (AML) program, including a system of internal controls" and established an "AML Oversight and Control Group … responsible for maintaining enterprise wide AML policies and procedures, identifying red flags and establishing transaction monitoring criteria." It stated that the bank had "[i]mplemented controls [that] provide for effective monitoring of various transactions throughout all departments of the bank … for both non-customers and customers … designed to identify unusual and/or suspicious activities." It stated that HBUS had "enhanced monitoring abilities through the Customer Activity Monitoring Program (CAMP) system." The ROE also stated that HBUS had established a "written Customer Due Diligence program" which included procedures to "ensure the identification and timely, accurate, and complete reporting of all known or suspected

---

[1765] See 12/31/2002 Federal Reserve Bank of New York examination conducted jointly with the New York State Banking Department. [Sealed Exhibit.]
[1766] Id.
[1767] OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2005, OCC-PSI-00107637, at 10-11 (describing the formal agreement). [Sealed Exhibit.]
[1768] Id. at 10.
[1769] Id.

PX257

violations of law against or involving the bank, to law enforcement and supervisory authorities." It said that HBUS had also "created risk rating criteria to identify categories of customers whose transactions and banking activities pose heightened risk of money laundering and other illegal activities." It noted that the bank operated an Investigative Control and Reporting Office and a Financial Intelligence Group to conduct enhanced due diligence.

The ROE concluded: "OCC examiners reviewed compliance with the agreement, and found the bank to be in technical compliance with the requirements." It said that termination of the formal agreement would be considered following targeted AML examinations of certain high risk areas in the bank.[1770] Given the breadth and depth of the AML problems depicted in the 2003 agreement signed less than a year earlier and the relatively short time that the bank had to correct its AML deficiencies, the ROE's positive statements were surprising.

Over the next year, until early 2006, OCC AML examiners completed seven AML examinations at HBUS. The examinations reviewed multiple HBUS departments with higher risk activities, including Embassy Banking, Global Banknotes, Foreign Correspondent Banking, wire transfers, and International Private Banking. Each of the examinations identified significant AML deficiencies. The problems included noncompliance with the bank's AML policies (4 of 7 exams), weak monitoring procedures (5 of 7), weak customer due diligence procedures (5 of 7), inadequate written policies requiring revision (6 of 7), and untrained staff (5 of 7). For example, the examination of the Global Banknotes department found that customer information was missing from a number of files and that a number of banknotes clients were not being monitored at all.[1771] The examination of the bank's wire transfer operations found that monitoring was being conducted on a manual rather than automated basis, and identified one trust account that "had a significant amount of wire transfer activity in a short period of time and involved wire transfers to entities and/or individuals from high risk geographies," had undergone no monitoring, and whose accountholder had not received an enhanced due diligence review.[1772] The examination of the Embassy Banking department found over a dozen incidents of suspicious activity involving one embassy account over eight months, yet the bank had failed to close the account, despite an HBUS policy requiring closure in that circumstance.[1773] The International Private Bank examination found 540 high risk accounts that needed annual reviews that had yet to be completed; account reviews whose conclusions were not consistently supported; and high risk bearer share accounts whose shares were not under bank control and posed a risk that the bank was unaware of the true account owners.[1774]

When viewed together, the examinations identified systemic AML problems, a situation consistent with the extensive AML enforcement action instituted by the Federal Reserve and

[1770] Id. at 11.
[1771] 6/20/2005 OCC Supervisory Letter to HBUS on Global Banknote Examination, OCC-PSI-00107505. [Sealed Exhibit.]
[1772] 1/23/2006 OCC Supervisory Letter to HBUS on Wire Transfer Examination, OCC-PSI-00107522. [Sealed Exhibit.]
[1773] 11/23/2005 OCC Conclusion memorandum "BSA/AML Examination – HSBC USA International Private Bank," OCC-PSI-01258252; 1/30/2006 OCC Supervisory Letter to HBUS on Embassy Banking Examination, OCC-PSI-00107529. [Sealed Exhibits.]
[1774] 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00107537-542. [Sealed Exhibit.]

302

New York Banking Department.  Many of the problems cited in the OCC examinations, including weaknesses in customer due diligence and monitoring, were prominent features of the 2003 agreement.  In response to the AML examination findings, the OCC Examiner-in-Charge sent Supervisory Letters which, together, identified 30 Matters Requiring Attention (MRAs) requiring corrective action by HBUS.[1775]  Despite issuing over 30 MRAs in just over 12 months, on February 6, 2006, the OCC determined that the condition of the AML agreement had been met and terminated the agreement.[1776]

**AML Deficiencies Continue.**  On July 26, 2006, the OCC provided HBUS with another annual Report of Examination covering the period up to March 31, 2006.[1777]  In the section entitled, "Matters Requiring Attention," the ROE included AML matters as an MRA, but provided this mixed message about the state of HBUS' AML program:

> "During the year, we identified a number of areas lacking consistent, vigilant adherence to BSA/AML policies, and provided management with supervisory letters addressing specific areas in need of strengthening.  Bank policies are acceptable.  Management responded positively and initiated steps to correct weaknesses and improve conformance with bank policy.  We will validate corrective action in the next examination cycle."[1778]

Later in the report, in the section discussing the bank's "Consumer Compliance Rating," the ROE stated that HBUS had "a satisfactory BSA compliance program," that its controls were generally effective, and "no violations of law were noted."  It also stated:  "However, each examination resulted in MRAs, typically non-adherence to internal policies and procedures ….  This recurring pattern is listed as a Matter Requiring Attention in this Report of Examination."[1779]  The ROE also criticized an internal group dedicated to testing AML

---

[1775] The 30 MRAs required corrective action to address weak AML monitoring procedures, weak AML due diligence, inadequate AML training, and inadequate AML policies.  Monitoring problems were noted, for example, in all four Supervisory Letters issued in January 2006.  See 1/17/2006 OCC Supervisory Letter to HBUS on Foreign Correspondent Banking, OCC-PSI-00000295-301, at 299-300  (Monitoring is weak and is not detecting patterns of activity "below system parameters" and monitoring wire transfers is a "manual process and therefore subject to inefficiencies and potential errors"); 1/23/2006 OCC Supervisory Letter to HBUS on Wire Transfers, OCC-PSI-00107522-528, at 526 ("[T]he effectiveness of automated monitoring through CAMP is diminished in the absence of effective investigations of alerts that the system generates."); 1/30/2006 OCC Supervisory Letter to HBUS on Embassy Banking, OCC-PSI-00107529-536, at 534 ("Embassy Banking Compliance management must ensure that high-risk and Special Category of Client (SCC) accounts are monitored and reviewed on a consistent and frequent basis."); 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00107537-542, at 540-541 ("Management must establish standards for CAMP alert reviews that require well-documented reasons for conclusions .… [E]xisting policies and procedures governing PUPID do not provide for adequate identification, monitoring and controlling of the risk inherent in such activity.… [T]here are no procedures in place to ensure activity logs are kept current on a scheduled basis. To effectively manage, monitor and report the potential risks associated with PUPID activity, logs must be revised to distinguish funds transfers payable to the account holder initiating the transfer, from those payable to a third-party non-account holder.").

[1776] 7/26/2006 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2006, OCC-PSI-00422079, at 5.  [Sealed Exhibit.]

[1777] 7/26/2006 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2006, OCC-PSI-00422079.  [Sealed Exhibit.]

[1778] Id. at 2.

[1779] Id. at 12.

PX257

compliance, the Compliance Review Unit, which, according to the ROE, was understaffed, performed weak analysis, and needed to be revamped.

HBUS' typical response to these examinations was to develop AML policies and procedures in response to the specific AML problems identified by the OCC. Those policies and plans often were narrowly targeted, and later examinations found that bank personnel sometimes failed to implement or comply with them.

A year later, on July 24, 2007, the OCC's annual Report of Examination contained a more negative assessment.[1780] This report covered examinations conducted through March 31, 2007. The letter transmitting the ROE stated:

> "A number of business areas continue to lack vigilant adherence to BSA/AML policies. Supervisory letters issued during the year highlighted a number of thematic deficiencies in the execution of BSA/AML policies and procedures at the business level. Management continues to respond positively to correct weaknesses noted, and to improve conformance with bank policy. However, it remains critical that sound policies adopted by the Board and management are executed consistently in the business lines."[1781]

In the report itself, the section entitled, "Matters Requiring Attention," included this MRA:

> "During the past year, examiners identified a number of common themes in that businesses lacked consistent, vigilant adherence to BSA/AML policies. Bank policies are acceptable; however, the execution of these policies in the various business lines requires strengthening. Management continues to respond positively and initiated steps to improve conformance with bank policy."[1782]

The MRA, which called for "strengthening" the "execution" of AML policies in "the various business lines," provided a general instruction to pay more attention to AML compliance.

A second MRA was more specific and issued a warning about the need to strengthen AML controls on HBUS pouch services, meaning bank services to clear monetary instruments from abroad, including bank checks, money orders, and travelers cheques.[1783] The MRA stated that pouch services "facilitate easy movement of funds, and are favored by persons who transfer illegal and terrorist funds." It noted that pouch services were being provided by multiple HBUS business lines. The ROE described the pouch examination as having "resulted in serious concerns related to weak policies, procedures, systems and controls … inferior to BSA/AML controls in other areas of the bank." The ROE also stated that "remedial attention is warranted,"

---

[1780] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-00304077. [Sealed Exhibit.]
[1781] Id. at 2.
[1782] Id. at 1.
[1783] Id.

**PX257**

304

and warned that ongoing inadequate AML controls over pouch activities "could potentially subject the bank to undue reputation risk and/or lead to BSA/AML violations."[1784]

By the end of 2007, the OCC completed 21 AML examinations, many of which identified serious AML problems.[1785] Many of these examinations identified the same serious problems noted in earlier examinations, some of which cut across business lines. The examinations include AML issues in the London Banknotes office, Corporate and Institutional Banking, Retail Banking, Pouch Services, and Investment Banking. The examination that identified the most serious AML deficiencies, and which was included as an MRA in the annual ROE, related to pouch services which seemed to be operating without any AML controls. The pouch examination cited insufficient AML policies and procedures, a lack of monitoring for suspicious activities, inadequate AML controls and training, and inadequate independent testing of pouch services for AML compliance.[1786] Examples of potentially suspicious activity included sequentially numbered travelers cheques endorsed by the same exchange house and processed through several cash letters; a transaction that included a starter check for $105,000; and $130,000 in sequentially numbered travelers cheques presented in bearer form with the payee line left blank.[1787] OCC examiners initially recommended that a formal enforcement action be taken to effect corrective action in the pouch area, but no formal or informal action was taken.[1788]

The 21 examination reports and the Supervisory Letters that followed identified numerous AML deficiencies, including noncompliance with bank policy, poor monitoring, weak to nonexistent due diligence reviews, inadequate policies requiring revision, and untrained staff. Altogether, from February 2006 to December 2007, the Supervisory Letters identified another 34 AML MRAs, but no violations were identified or enforcement actions taken.

**AML Deficiencies Displaced by Financial Crisis.** On July 15, 2008, the OCC issued its annual Report of Examination for HBUS, summarizing examination activity conducted through

---

[1784] Id. See also the discussion of the bank's Consumer Compliance Rating, at 12.

[1785] Eight of the 21 examinations were limited to following up on corrective actions promised earlier, all of which were found to have been carried out.

[1786] 2/23/2007 OCC "Conclusion memorandum for HSBC Middle Market BSA/AML Examination," OCC-PSI-01263216; 4/10/2007 OCC Conclusion memorandum "BSA/AML Examination – HSBC, USA, NA – Pouch Activities", OCC-PSI-00899202 (reviewing pouch activities at the International Private Bank, Domestic Private bank, retail banking, and Payments and Cash Management business units). [Sealed Exhibits.]

[1787] Id. at 208.

[1788] Subcommittee interview of Joseph Boss (1/30/2012), Elsa de la Garza (1/9/2012), and Anthony DiLorenzo (3/22/2012). Upon receipt of the recommendation, the Examiner-in-Charge asked the AML examiners to prepare an analysis of whether the proposed enforcement action, a Cease and Desist Order, met OCC enforcement standards. The AML examiners concluded that, despite the serious AML deficiencies, the problems in the pouch area did not rise to the level of a violation of law and would be applied to a bank with a high composite rating for safety and soundness, and so did not meet OCC standards for issuing a Cease and Desist Order. See 6/14/2007 OCC memorandum, OCC-PSI-01298625; 7/3/2007 OCC memorandum OCC-PSI-00877731. [Sealed Exhibits.] One examiner told the Subcommittee that although the pouch activity did not meet OCC enforcement standards, he felt a Cease and Desist Order was nevertheless warranted at the time. Subcommittee interview of Joseph Boss (1/30/2012). The deputy head of Large Bank Supervision told the Subcommittee that she did not recall being informed about the enforcement recommendation or seeing the Conclusion Memorandum that laid out the problems in the pouch area at HBUS. Subcommittee interview of Grace Dailey (6/15/2012).

**PX257**

305

March 31, 2008.[1789]  Despite referencing a troubling AML examination involving the bank's Embassy Banking department, described below, for the first time since 2004, the ROE did not contain any MRA related to AML concerns.  This development may have been due, in part, to the deepening financial crisis then sweeping the U.S. financial system, raising questions about virtually every major financial institution.  HBUS' AML issues may have been displaced by OCC efforts to analyze the bank's safety and soundness, including each of its CAMELS components.  Nevertheless, the ROE did reference ongoing AML concerns at the bank.

The OCC letter transmitting the ROE included this paragraph about AML issues:

"Although BSA/AML internal systems and controls are generally effective, the examination of the Government and Institutional Banking (GIB) operations disclosed a number of significant … compliance concerns.  Management developed a plan to address the issues, and we are presently validating that the actions taken are addressing our concerns."[1790]

Although the ROE contained no MRA related to AML concerns, in the section discussing HBUS' composite rating, the ROE again referenced the examination that uncovered serious AML deficiencies in the GIB department:

"Our examination of BSA/AML practices in the Government and Institutional Banking (GIB) department during the first quarter of 2008 resulted in a number of concerns including:  inconsistent adherence to internal policies and procedures, inadequate systems, the need to strengthen controls, and inconsistent monitoring processes.  Management is aware of the deficiencies and developed a plan to address the issues.  We are in process of validating that the corrective action plan addresses our concerns satisfactorily."[1791]

Although these AML deficiencies were discussed in the composite rating section, there is no indication they affected the rating which remained unchanged from the prior year.

AML issues were discussed a third time in the section of the ROE analyzing HBUS' Consumer Compliance Rating.  For the first time, this section included a lengthy discussion of the high AML risks incurred by HBUS' banking operations.  The ROE stated:

"BSA/AML examinations were conducted in Middle Market, Government and Institutional Banking, Corporate Trust, Investment Banking, Customer Activity Monitoring Program, and London Banknotes follow-up. …

HBUS is the largest Embassy banking services provider. The bank is also active in the precious metals, jewelry, garment, and Middle Eastern carpets industries.  HBUS has numerous accounts to Politically Exposed Persons and Money Service Businesses.  The bank ranks in the top three banks in CHIPS and SWIFT wire transfer volume, and is a

---

[1789] 07/15/2008 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2008, HSBC OCC 3601119. [Sealed Exhibit.]
[1790] Id. at 2.
[1791] Id. at 3.

PX257

leader in global foreign correspondent relationships.  As the U.S. dollar clearing bank for the Global HSBC network, HBUS maintains numerous relationships with institutions worldwide. …  The bank does business with numerous customers in both High Intensity Drug Trafficking Area and High Intensity Money Laundering and Related Financial Crime Area locations.  HBUS provides pouch services through several business units. Historically, pouch services are vulnerable to money laundering risk."[1792]

Despite this recitation of the AML risks facing HBUS, the ROE stated that the bank's AML controls were "generally effective, with no violations noted."  It also stated that "certain areas within GIB required strengthening."[1793]

**Embassy Banking Examination.**  The ROE's multiple references to GIB, the Government and Institutional Banking department that housed the bank's Embassy Banking services, were included, because in January 2008, former GIB employees alerted the OCC to a host of problems in the Embassy Banking unit.  HBUS had dramatically increased its Embassy Banking business, after the closure of Riggs Bank and the decision by Wachovia Bank to exit the business.[1794]  By January 2006, the bank had over 2,500 embassy accounts with $485 million of deposits under management,[1795] and the business continued to grow.  The former employees described numerous problems, including apparent employee misconduct, inappropriate business transactions, noncompliance with bank policy, inadequate account monitoring, and erroneous and misleading regulatory and internal reports.

Over the next few months in 2008, an OCC examination confirmed the allegations.[1796] The examination found, for example, that GIB had allowed two high risk embassy accounts involving Libya and Saudi Arabia to operate outside of restrictions specified in Memoranda of Understanding (MOU) established for each Embassy relationship.  The examination found unacceptable levels of risk, inadequate account monitoring, and suspect transactions.  One example involved a $20 million wire transfer that was variously explained as needed to pay the expenses of Libyan prisoners in the United States and elsewhere, or for "legal expenses and consultation that will lead to the establishment of a bilateral agreement with the US for cooperation on judicial affairs that related to future prisoner transfers."[1797]  The examination reported that when HBUS Compliance asked an Embassy Relationship Manager for information about one of the high risk accounts, it received insufficient explanations and, in some cases, the Relationship Manager took up to four months to obtain client responses.

---

[1792] Id. at 13-14.

[1793] Id. at 13.

[1794] See 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-736, at 529-530; "HSBC to Open D.C. Branch, Pursue Embassy Clients," Washington Post, Terence O'Hara (10/5/2004)(quoting Riggs spokesperson: "As a service to our remaining embassy clients, Riggs is working closely with HSBC to ensure a smooth transition."), http://www.washingtonpost.com/ac2/wp-dyn/A7285-2004Oct4?language=printer.

[1795] 1/30/2006 OCC Memorandum,"4Q05 Embassy Banking Examination," OCC-PSI-00107529; 1/30/2006 OCC Supervisory Letter to HBUS, OCC-PSI-00107529.  [Sealed Exhibit.]

[1796] 10/8/2008 OCC Memorandum, "Royal Embassy of Saudi Arabia (RESA) March 2008 Examination Conclusions," OCC-PSI-01434609; 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593; 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00899215.

[1797] 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593, at 5.

307

In addition, the examination found that Embassy Banking had been opening new accounts without notifying HBUS AML Compliance, which was against bank policy and led to unmonitored account activity. The OCC determined that two of five accounts opened for one high risk embassy relationship had not been disclosed to AML Compliance. It found that over 45 letters of credit for other Embassy Banking clients, ranging in amounts from a few thousand dollars to $3 million, were also undisclosed. Another problem was that Embassy Banking was executing transactions for persons who were not clients – so-called PUPID transactions that were Payable Upon Proper Identification – without logging in some of the transactions and without screening the transaction beneficiaries against OFAC's SDN list, in contravention of U.S. law. Still another problem was that Embassy Banking personnel had identified multiple instances of suspicious activity involving some accounts, but had not closed the accounts, despite an HBUS policy requiring closure under those circumstances. The OCC also identified a backlog of over 3,000 unreviewed alerts, some dating back to 2007, relating to potentially suspicious transactions in Embassy accounts.

The OCC examiner concluded that GIB's "AML program is not effective in identifying and mitigating risk, especially considering the nature of its clientele and the types of products and services it provides."[1798] The examiner recommended issuance of a Cease and Desist Order requiring immediate corrective action and prohibiting new Embassy Banking accounts until AML controls were in place. The OCC decided, however, not to issue a Cease and Desist Order or take any other informal or formal enforcement action with respect to the Embassy Banking accounts.[1799] In May 2008, HBUS submitted an action plan to the OCC and began addressing the AML deficiencies at GIB. A later examination was conducted to determine whether the GIB commitments were carried out and found that they were. In July 2008, the Report of Examination sent to HBUS acknowledged the AML deficiencies uncovered in Embassy Banking, but did not treat them as a Matter Requiring Attention by the HBUS board.

**AML Deficiencies Continue Amid Law Enforcement Inquiries.** On July 6, 2009, the OCC sent HBUS the annual Report of Examination covering the period up to March 31, 2009.[1800] Like the prior year's ROE, it contained no Matter Requiring Attention related to AML issues. The letter transmitting the ROE noted, however, that AML concerns were ongoing nonetheless:

> "Compliance with BSA/AML remains a high priority and a key reputation risk. As part of the 'compliance transformation project,' this area is also undergoing significant

---

[1798] 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00899225.

[1799] The AML examiner told the Subcommittee he was not given any reason for OCC's inaction in this matter, but was simply told there would be no enforcement action. He said it was his understanding that the Examiner-in-Charge had discussed the matter with the deputy head of Large Bank Supervision in Washington before telling him: "Grace said there would be no C&D." Subcommittee interview of Joseph Boss (1/30/2012). The Examiner-in-Charge told the Subcommittee that he did not recall talking to a superior about the matter, but thought he "probably did because it was a significant issue." Subcommittee interview of Anthony DiLorenzo (3/22/12). The deputy head of Large Bank Supervision did not recall having a discussion about a Cease and Desist Order involving Embassy Banking at HBUS. Subcommittee interview of Grace Dailey (6/15/12).

[1800] 6/07/2009 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2009, OCC-PSI-00270034. [Sealed Exhibit.]

**PX257**

change.  The company has high-risk clients and businesses and the current leadership needs to be strengthened.  Plans are underway to address this concern."[1801]

This letter was the first to be signed by Sally Belshaw, who had replaced Anthony DiLorenzo as the OCC Examiner-in-Charge at HBUS, upon conclusion of Mr. DiLorenzo's five-year term.  It was the fifth in a row to identify AML compliance as a high priority issue.

For the first time, the ROE contained a "Risk Assessment Summary" table which included a reference to AML issues.  The table indicated that AML risk was "High," AML risk management was "Satisfactory," and the aggregate AML risk at HBUS was "High" and "Stable."[1802]

Later in the report, in the section discussing the bank's "Consumer Compliance Rating," the ROE stated that HBUS' compliance risk was "high due to the bank's lines of business which offer several products historically associated with money laundering."  It repeated much of the language from the last ROE describing the bank's high risk businesses and customers.  It also indicated that HBUS needed to strengthen its AML leadership:

"Although the BSA/AML program is effective overall, we recently highlighted the need to strengthen leadership in the area.  When the BSA Director resigned in 2007 the role of the HBUS Compliance Director was expanded to include oversight of the BSA/AML program.  The current Compliance Director has been in place since second quarter 2008. In addition to BSA responsibility in the U.S., the Compliance Director also has responsibility for Canada, Mexico and the Securities businesses.  We believe that a complex, high-risk institution like HBUS needs a BSA/AML Officer who is highly qualified and experienced and have recommended that such a person be dedicated to the function.  A search is underway."[1803]

The discussion of AML leadership was prompted by the 2007 departure of HBUS' AML head Teresa Pesce after four years on the job, followed by the departure of the head of HBUS Compliance, Carolyn Wind after seven years on the job.  After Ms. Pesce left, Ms. Wind had served as both Compliance and AML head.  Leslie Midzain was then hired to serve in both roles as well, serving as the bank's AML head even though her background was in Canada and she had no U.S. AML experience.  In 2010, the OCC would ask for her replacement due to her lack of AML expertise and would also criticize the weak AML leadership shown by the regional Compliance head, Janet Burak.  In addition to AML leadership problems, the ROE noted that HBUS Compliance was undergoing a reorganization, and that the Compliance Review Unit, originally dedicated to AML independent testing, was also being reorganized and its mission expanded to other compliance issues.

During 2008, the OCC completed six more examinations, one of which focused on reviewing corrective actions to prior problems.  Of the remaining five, one involved additional

---

[1801] Id. at 2.
[1802] Id.
[1803] Id. at 16.

PX257

309

work on the AML deficiencies at GIB's Embassy Banking unit.[1804]  Another focused on AML issues affecting the Payments and Cash Management (PCM) department which helped provide a variety of cash services to clients, including correspondent accounts.[1805]  The PCM examination found fundamental flaws in its AML controls, including inadequate monitoring, poor review of account alerts, and suspicious transactions involving money service businesses.  The PCM examination found, for example, that PCM "systems and controls are less than satisfactory and do not provide an appropriate level of monitoring for suspicious and unusual activity for all of the activities in the business unit."  One example involved an account alert which found that a U.S. money service business was sending wire transfers through its HBUS correspondent account to an Ethiopian bank for credit to an account it held at that bank, in effect sending money to itself.  The alert was reviewed, PCM personnel determined more information was needed, but the alert was closed and the transactions continued.

Similar problems had been identified in a 2006 OCC examination of foreign correspondent banking which resulted in an MRA requiring PCM to conduct a review of its money service business accounts.  As a result of the 2008 examination, OCC examiners recommended three MRAs, one of which directed PCM to conduct a review of its money service business accounts, which appears to be a "repeat MRA" from the 2006 examination.  Several months later, the OCC Examiner-in-Charge sent a Supervisory Letter to HBUS including the three MRAs, but did not characterize the request for an account review as a "repeat MRA" that would necessitate an enforcement action, instead referring to "PCM's delay in initiating a special review for Money Services Businesses (MSB) type of entities, as required by a previous MRA, has resulted in increased risk."[1806]

A third examination in 2008, focused on HBUS Compliance Review Unit (CRU) which was dedicated to reviewing AML compliance at the bank.  The examination found its work satisfactory but also directed HSBC's internal audit unit to test the CRU's workpapers for reliability and directed the CRU to conduct an immediate review of the PCM department which had not undergone an internal AML review for over three years.[1807]  Additional examinations focused on AML issues at Card Services[1808] and Banknotes offices in Singapore and Hong Kong.[1809]

In 2009, the OCC conducted eight more AML examinations.  Three followed up on the problems uncovered in connection with HBUS' pouch activities, Embassy Banking and PCM services.[1810]  Additional examinations assessed HBUS' OFAC compliance[1811] and AML controls

---

[1804] 8/14/2008 OCC Memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227; 9/4/2008 OCC Supervisory Letter to HBUS on GIB examination, OCC-PSI-00107607.  [Sealed Exhibit.]

[1805] 12/7/2007 OCC Memorandum, "BSA/AML Examination - Payment and Cash Management," OCC-PSI-01263586.   [Sealed Exhibit.]

[1806] 4/21/2008 OCC Supervisory Letter HSBC-2007-24, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107597.  [Sealed Exhibit.]

[1807] 4/9/2008 OCC Supervisory Letter to HBUS on CRU examination, OCC-PSI-00107594.  [Sealed Exhibit.]

[1808] 2/11/2008 OCC Memorandum, "Card Services Compliance Examination," OCC-PSI-00938171.

[1809] 6/2/2008 OCC Memorandum, "Singapore/Hong Kong Banknotes Examination," OCC-PSI-00107603.

[1810] 1/22/2009 OCC Supervisory Letter HSBC-2008-16, "Pouch Service BSA/AML Examination," OCC-PSI-00107615; 6/24/2009 OCC Supervisory Letter HSBC-2009-10, "Global Institutional Banking BSA/AML Examination," OCC-PSI-00107628.  [Sealed Exhibits.]

**PX257**

310

involving correspondent banking[1812] and private banking.[1813]  Those examinations identified additional AML problems.  For example, the private banking examination concluded:  "HSBC's Private Bank BSA/AML does not adequately manage the risks associated with DPB-NY/CA [Domestic Private Bank offices in New York and California] and IPB-NY [International Private Bank in New York]."[1814]  Supervisory Letters sent to HBUS described the AML problems, some of which had been detected in a 2006 examination of private banking, but made no mention of repeat MRAs that would require an enforcement action.

Altogether in 2008 and 2009, the Supervisory Letters identified 12 more MRAs in the AML field, but no informal or formal enforcement actions were taken.  These 12 MRAs were on top of the 71 MRAs identified from 2005 to 2007.

In the spring of 2009, a new development intensified OCC's focus on AML problems at HBUS.  The OCC was contacted by two Federal law enforcement agencies regarding separate Federal investigations into possible money laundering through accounts at HBUS.  The first contact, in June 2009, was from the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE) unit investigating possible laundering of illegal drug proceeds.[1815] The second  contact, around August or September 2009, was from a U.S. Assistant Attorney General in West Virginia investigating a Medicare fraud.[1816]

Senior OCC officials in Washington arranged to meet with the ICE representatives. On September 1, 2009, the meeting took place in Washington and was attended by the OCC Deputy General Counsel Daniel Stipano, Deputy Controller in charge of Large Bank Supervision Grace Dailey, OCC senior legal counsel with AML expertise James Vivenzio, the OCC AML examiners at HBUS, and the ICE representatives.[1817]  After the meeting concluded and the ICE representatives left, OCC personnel continued to discuss supervision of HBUS.  According to a memorandum summarizing the meeting, the lead AML examiner at HBUS informed the other meeting participants that, during his tenure at the bank, HBUS had been the subject of 83 AML-related MRAs, and he had twice recommended issuance of a Cease and Desist Order to compel the bank to strengthen its AML controls.[1818]  According to the meeting memorandum, Mr.

[1811] 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434.  [Sealed Exhibit.]
[1812] 3/3/2009 OCC Supervisory Letter HSBC-2008-34,"Correspondent Banking BSA/AML Examination," OCC-PSI-00107618.   [Sealed Exhibit.]
[1813] 3/18/2009 OCC Supervisory Letter HSBC-2008-32, "Private Banking BSA/AML Examination," OCC-PSI-00000445; 9/19/2008 OCC Memorandum "HSBC BSA/AML Private Bank Exam-File Review-Draft," OCC-PSI-01274467.  [Sealed Exhibits.]
[1814] Id.
[1815] See 9/29/2009 email exchanges between OCC Jim Vivenzio, OCC Joseph Boss, OCC Teresa Tabor, OCC Sally Belshaw, and others, "HSBC," OCC-PSI-00928756.
[1816] Subcommittee briefing by OCC (3/15/2012).
[1817] See 9/29/2009 email exchanges between OCC Jim Vivenzio, OCC Joseph Boss, OCC Teresa Tabor, OCC Sally Belshaw, and others, "HSBC," OCC-PSI-00928756-758.
[1818] 9/1/2009 Memorandum to Files from OCC Examiners Joseph Boss and Elsa de la Garza, OCC-PSI-01416833. See also Subcommittee interviews of Elsa de la Garza (1/9/2012), Joseph Boss (1/30/2012), and James Vivenzio (3/15/2012).

**PX257**

311

Stipano "stated that he was unaware of the recent history of HBUS and that he wanted a thorough review."[1819]

After this meeting, the OCC directed its AML examiners to draw up an investigative plan and expand an ongoing AML review to encompass a comprehensive review of the entire AML program at HBUS. On September 3, 2009, the OCC sent a letter to HBUS informing it that a regularly scheduled AML examination of the Banknotes department that started in July and for which field work was completed in August 2009, was being expanded.[1820] Additional staff was added to the AML team.

**Expanded AML Examination.** For the first time since the OCC inherited HBUS from the Federal Reserve, it directed its AML examiners to conduct a holistic review of HBUS' AML program, instead of focusing on AML issues in particular banking services or departments. The AML examiners quickly found fundamental problems related to the specific AML deficiencies identified over the years. This examination would continue throughout 2010.

In March 2010, the OCC issued its first AML-related Supervisory Letter that cited HBUS for a violation of law, for failing to file Suspicious Activity Reports (SARs) in a timely manner.[1821] The Supervisory Letter stated that its AML examination had found that the bank had a backlog of over 17,000 alerts, in four business units, identifying potentially suspicious activity that had not been investigated to determine whether a SAR should be filed.[1822] The OCC determined that 98% of those alerts were generated in the "High Risk Monitoring Group," and 14% were six months or older.[1823] The OCC gave the bank a deadline of June 30, 2010, to clear the backlog and instructed the bank to develop a risk-based system for reviewing and resolving those alerts. In addition to the backlog of alerts, OCC examiners had found significant backlogs in the bank's handling of AML-related subpoenas and Section 314(a), and 314(b) requests for information from other banks, though those items were not specifically discussed in the Supervisory Letter.[1824]

Shortly after delivering the Supervisory Letter, the OCC Examiner-in-Charge for HBUS Sally Belshaw and the head of Large Bank Supervision Grace Dailey met with the HSBC Group CEO Michael Geoghegan and the HNAH and HBUS CEO Brendan McDonough on April 20, 2010. In that meeting, the OCC officials informed the bank officials that the agency had identified serious AML deficiencies throughout the bank. According to a memorandum prepared by Ms. Belshaw summarizing the meeting, the discussion included the following:

---

[1819] 9/01/2009 Memorandum to Files from Examiners Joseph Boss and Elsa de la Garza, at OCC-PSI-01416833. [Sealed Exhibit.]
[1820] On 9/21/2009, the OCC sent HBUS a request letter for an extensive amount of new information on 25 Latin America-based institutions. There would be eight additional requests for more information through early February 2010. See 2/6/2010 HBUS email from Janet Burak to Brendan McDonagh, OCC-PSI-00787479.
[1821] 3/10/2010 OCC Supervisory Letter HSBC 2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542. [Sealed Exhibit.]
[1822] Id.
[1823] 4/28/2010 Report of Examination of HBUS, for the examination cycle ending December 31, 2009, OCC-PSI-00899872, at 7. [Sealed Exhibit.]
[1824] See "Background Information on HSBC's Alert Backlog as of the week of February 8, 2010," prepared by OCC, OCC-PSI-01358494.

**PX257**

312

He [Mr. Geoghegan] asked when I thought things went bad.  Grace and I described the spotty history of the bank relative to BSA/AML compliance. The bank converted to a national charter with a Formal Agreement (Fed) that they addressed. We also noted the regular and frequent citing over the years of MRAs in almost every examination we conducted.  In those cases, management reacted to our findings and took corrective action.  This, however, culminated in a systemic concern that we ultimately characterized as ineffective management (BSA/AML officer last year and now the compliance program overall). We believe that over the years, the people and program did not advance to keep pace with the risk. Systems enhancements are only now being achieved (and moved up in light of our concerns).  Talent left the organization and was not replaced by people with sufficient technical skills to lead.  Succession/bench strength for the compliance area is now inadequate.  MIS has not evolved to permit early identification of risks/concerns.  The backlog issue is a symptom of these management weaknesses….

We discussed several areas in some specificity including HBUS' policies/practices with respect to monitoring of affiliate activity (should be to same, not lesser, standard than other correspondents as is currently the case).  We highlighted findings of weakness in KYC in several areas: bank notes, wire activity, domestic & international customers.  We highlighted our recent concerns/questions about management's ability to address the backlog problem (and violation) given weaknesses we are seeing in data integrity in reports, quality of alert dispositioning, and the lack of independent review/oversight of that process.  Our supervisory letter requires that backlogs be completely corrected by June 30th.  We emphasized that not only must the number be addressed, but they must be effectively dispositioned (qualified reviewers guided by appropriate policy/process, adequate documentation, appropriate/timely SARs filed), and an ongoing system of controls must be in place to ensure the process is sustainable. We will be requiring qualified, independent verification of that as part of the process.[1825]

**2010 Report on Examination.**  On April 28, 2010, three months earlier than normal, the OCC delivered its annual Report of Examination (ROE) to HBUS, covering the period up to December 31, 2009.[1826]  Like the Supervisory Letter, this ROE cited HBUS for violating the Bank Secrecy Act due to its failure to file timely SARs, the only violation listed.[1827]  The letter transmitting the ROE stated:

"Perhaps most disconcerting, we have identified significant weaknesses in compliance, particularly in Bank Secrecy Act/Anti-Money Laundering (BSA/AML), that are likely to have costly financial and reputation implications.  Management is responding to the concerns we are raising, but was not effective in preventing these weaknesses from becoming serious problems. …  An extended examination is revealing serious

---

[1825] 4/20/2010 OCC Memorandum, "Meeting w/Michael Geoghegan and Brendan McDonough," OCC-PSI-00905522.
[1826] 4/28/2010 Report on Examination of HBUS, for the examination cycle ending December 31, 2009, OCC-PSI-00899872 [Sealed Exhibit.]
[1827] Id. at 7.

PX257

313

breakdowns and violations.  We will likely be requiring additional action to address this concern."[1828]

In addition, for the first time, the ROE discussed HBUS' AML problems in the context of HBUS' CAMELS management rating, although the rating remained unchanged from the prior year.  The ROE noted that HBUS was the subject of several ongoing investigations that could damage its reputation, and the OCC was "increasingly concerned with weaknesses in compliance (particularly BSA/AML) risk management," including "the quality of BSA/AML monitoring and compliance."  The ROE stated that the ongoing AML examination "is revealing weaknesses that have impacted our overall assessment of the program and its management."[1829]

The ROE also discussed the AML problems in the section on HBUS' Consumer Compliance Rating and disclosed that it was lowering that rating as a result.  The ROE stated:

"[W] are lowering our assessment of the quality of compliance risk management from satisfactory to weak ….  The high level of BSA/AML/OFAC risk associated with HBUS' business activities is a significant factor in our assessment.  …  In addition to the high level of risk presented by its business activities, HBUS has a high quantity of risk based upon significant indications that the bank is not in compliance with all laws and regulations. …  Based upon our work to date, we have identified deficiencies relating to HBUS' transaction monitoring, analysis of customer due diligence information, adherence to the USA PATRIOT Act; and filing of Suspicious Activity Reports (SARs). …  We are changing our assessments of both HBUS' BSA/AML program and its overall compliance management program from satisfactory to weak.  These changes are based upon our concerns regarding (1) the lack of effective compliance oversight provided by the head of HNAH/HBUS' compliance department, (2) the ineffective results to date of HBUS' project to implement a new model for its compliance structure and process, and (3) the deficiencies that we have identified to date during our expanded examination of HSBC's Global Banknotes business and the concerns raised by multiple external parties."[1830]

The OCC lowered HBUS' Consumer Compliance Rating even though it did not identify any problems related to bank compliance with consumer protection or civil rights laws.  The OCC's actions contravened the interagency agreement on how to calculate this rating, which required a focus on consumer protection and civil rights laws, not AML requirements.

Although its Consumer Compliance Rating was lowered, the bank's safety and soundness ratings remained unchanged.  Neither the CAMELS management component rating nor the overall composite rating were lowered.  These unchanged ratings meant that the bank would also not incur any added Federal deposit insurance fees, despite its elevated AML risk.

On April 15, 2010, the OCC's Washington Supervision Review Committee approved an Order of Investigation "concerning potential violations of law and unsafe and unsound conduct

---

[1828] Id. at transmittal letter.
[1829] Id. at 3-4.
[1830] Id. at 6.

PX257

in connection with the BSA/AML policies and practices of HSBC Bank USA, N.A."[1831]    The issuance of the Order was based on the preliminary findings of the expanded AML examination, which by that point had identified evidence of a backlog of alerts that had not been processed for suspicious activity reporting; failure to adequately monitor foreign affiliates; and failure to adequately monitor wire transfer transactions for customers in countries designated "standard" or "medium" risk by the bank.

On September 13, 2010, the OCC issued the 31-page Supervisory Letter described earlier, outlining a long list of significant AML problems at HBUS.[1832]    The Supervisory Letter also cited the bank for a violation of the Bank Secrecy Act statute for failing to maintain an effective AML program.    The letter informed HBUS that "the bank's compliance program and its implementation are ineffective, and accompanied by aggravating factors, such as highly suspicious activity creating a significant potential for unreported money laundering or terrorist financing."[1833]    In addition, the letter stated:

> "Since the OCC terminated the Formal Agreement in February 2006, the bank has had a
> high number of MRAs and the OCC continues to identify serious deficiencies in the
> bank's BSA/AML compliance program. Over the past two years, the examination scopes
> have included many of same areas that are of concern at this examination. The OCC has
> issued twelve MRAs during this period, many of which address similar issues compared
> to its current concerns, including the adequacy of compliance leadership, alert
> management, and monitoring systems."[1834]

In October 2010, six years after becoming HBUS' primary Federal regulator, the OCC issued its own formal enforcement action, a Cease and Desist Order requiring corrective action on many of the same problems identified by the Federal Reserve seven years earlier in 2003.[1835]

**Federal Reserve Ratings.**    The OCC was not the only Federal banking regulator that examined HBUS.    Because HBUS had federally insured deposits, the FDIC acted as a secondary regulator.    In addition, the Federal Reserve was responsible for regulating HBUS' holding company, HSBC North America Holdings (HNAH) as well as an Edge Act Corporation that HBUS owned in Florida.    The Subcommittee did not attempt to review the oversight exercised by these two other regulators.    The Subcommittee did note, however, that as of 2009, the Federal Reserve Bank of Chicago maintained a lower rating for HNAH's risk management, in part because of the AML problems at HBUS.

The 2009 Federal Reserve report stated:    "[T]he primary driver for the overall rating is the unsatisfactory BSA/AML program.    BSA/AML risk is currently the highest inherent Legal and Compliance risk for HNAH."[1836]    The Federal Reserve report stated that the bank's

---

[1831] 04/9/2010 OCC Memorandum, "Order of Investigation – HSBC Bank USA, N.A., New York, NY", OCC-PSI-00899481.
[1832] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21," OCC-PSI-00864335. [Sealed Exhibit.]
[1833] Id. at 336.
[1834] Id. at 335.
[1835] See In re HSBC Bank USA, N.A., Case No. AA-EC-10-98, Department of the Treasury Comptroller of the Currency, Consent Order (10/4/2012), OCC-PSI-00904698.
[1836] See Federal Reserve Bank of Chicago report as of December 31, 2009, BOG-SR-001368, at 1. [Sealed Exhibit.]

315

compliance program had focused "inward on alignment with Group, cost reduction, and centralization without sufficient focus on implementing and maintaining good risk identification, control, measurement, and management processes."[1837]  It also noted that "HNAH's strategic plan was to focus on customers and business lines with international connections, which present higher levels of BSA/AML and OFAC risks."  According to the Federal Reserve:

> "[T]he significant weaknesses and issues identified by regulators on the BSA/AML program underscores senior compliance management's inability to self-identify compliance risks and to note significant control deficiencies in a timely fashion.  While the inabilities of senior compliance management [are] a primary driver for the downgrade[1838] of board and senior management oversight rating, the lack of a sound risk management function that adequately includes compliance risk is also a contributor."[1839]

In October 2010, on the same day and in coordination with the OCC, the Federal Reserve issued its own formal enforcement action with respect to HNAH, requiring it to strengthen its "firmwide compliance risk management program," including with respect to AML compliance, and ensure that HBUS complied with the OCC order.[1840]

### (2)  Six Years of AML Deficiencies

An OCC presentation providing an "AML Retrospective (2001-2011)" includes a chart showing that, from January 2005 to March 2010, the OCC issued 85 AML-related Matters Requiring Attention to the HBUS Board of Directors, which was a third more AML-related MRAs than the next closest major bank.[1841]  An experienced OCC AML examiner told the Subcommittee:  "I thought I saw it all with Riggs, but HSBC was the worst situation I'd ever seen."[1842]

The following chart summarizes many of the OCC-issued MRAs related to AML problems at HBUS.  It shows that the examinations repeatedly revealed critical AML problems across HBUS business units, many of which offered high risk products, had high risk clients, or engaged in high risk activities vulnerable to money laundering and terrorist financing.  Twenty-one of the examinations identified problems with the bank's AML monitoring systems, including in its wire transfer, pouch, foreign corresponding banking, international and domestic private banking, retail banking, credit cards, Embassy banking, Banknotes, and Payment and Cash

---

[1837] Id. at 2.

[1838] This targeted examination did not result in a downgrade at the overall holding company level.

[1839] Id. at 5.

[1840] See In Re HSBC North America Holdings, Inc., Case No. 10-202-B-HC, before the Board of Governors of the Federal Reserve System, Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act as Amended (10/4/2012).

[1841] See undated presentation, "BSA Officer Roundtable:  Bank Secrecy Act Policy and Legal Update," by John Wagner, OCC Director of BSA/AML Compliance, and James Vivenzio, OCC Senior Attorney for BSA/AML, chart entitled, "BSA/AML MRA:  Large Banks: Full Information System Extract (LBIS)," OCC-PSI-01768523. See also Subcommittee interviews of Elsa de la Garza, Joseph Boss, and James Vivenzio (confirming HBUS had an unusually high number of MRAs compared to other banks); 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335 at 9 ("Since the OCC terminated the Formal Agreement in February 2006, the bank has had a high number of MRAs").  [Sealed Exhibit.]

[1842] Subcommittee interview of Joseph Boss (1/30/2012).

**PX257**

316

Management operations.  Inadequate customer due diligence and client information were similarly identified in multiple business lines and services.  Noncompliance with bank policy was another common problem.  Inadequate staffing and AML training were also repeatedly identified, as were weaknesses in internal reviews of AML compliance.  Later on, weaknesses in AML leadership at the bank were also identified.  When AML examiners were allowed to undertake a broader analysis of the AML program, they identified additional fundamental problems involving backlogs, inappropriate assessment of country and client risk, favored treatment of HSBC affiliates, and massive gaps in monitoring.

For more than six years, from July 2004 until April 2010, despite compiling a litany of AML deficiencies, the OCC never cited HBUS for a violation of law, never took a formal or informal enforcement action, and turned down recommendations to issue Cease and Desist Orders targeting particularly egregious AML problems, even though the same problems surfaced again and again.  The OCC's failure to compel HBUS to remedy the AML deficiencies repeatedly identified by its examiners over a six-year period indicates that systemic weaknesses in the OCC's AML oversight model require correction.

PX257

**Matters Requiring Attention (MRAs) and Recommendations in OCC Supervisory Letters for HSBC Bank USA, N.A.**
**January 2005 - July 2009**

| # of BSA Exams | Supv. Letter Date | Business Line/Area Examined | # MRAs* | # Rec.* | Bank Not Following Policies | Weak Monitoring Procedures | Weak CDD/EDD Procedures | Insuff. Staff Levels | Backlogs Noted | Policies Need Revision | Staff Needs Training | Independent Testing Problems | BSA Officer Inadeq. | OFAC Issues | Sum of MRAs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Internal Control Pillar Issues | | | | | | Training Pillar | Independent Testing Pillar | BSA Officer Pillar | | |
| 1 | 1/26/2005 | 4Q04 USA Patriot Act Exam | 6 | 0 | x | | x | | | x | x | | | | 6 |
| 2 | 6/20/2005 | 1Q05 Global Banknote Exam | 6 | 0 | x | x | x | | | x | x | | | | 12 |
| 3 | 8/9/2005 | Embassy Banking Exam | 0 | 0 | | | | | | | | | | | 12 |
| 4 | 1/17/2006 | 3Q05 Foreign Corresp. Banking Exam | 7 | 0 | x | x | x | | | x | x | | | | 19 |
| 5 | 1/23/2006 | 3Q05 Wire Transfer Exam | 5 | 0 | x | x | x | | | x | | x | | | 24 |
| 6 | 1/30/2006 | 4Q05 Embassy Banking Exam | 4 | 0 | | | | x | | x | | | | | 28 |
| 7 | 1/31/2006 | 3Q05 Int'l Private Banking Exam | 7 | 0 | x | x | x | x | | x | x | | | | 35 |
| | | Provisions of the 2003 Written Agreement were terminated 2/6/2006 with the above similar/systemic findings from the first seven BSA/AML exams. | | | | | | | | | | | | | |
| 8 | 4/12/2006 | 1Q06 Domestic Private Banking Exam | 3 | 0 | | x | x | | | x | x | | | | 38 |
| 9 | 4/27/2006 | 1Q06 GIB Exam | 0 | 1 | | | | x | | | | x | | | 38 |
| 10 | 6/14/2006 | 1Q06 Compliance Review Unit (CRU) Exam | 4 | 0 | | x | x | | | x | | | | | 42 |
| 11 | 7/13/2006 | 1Q06 Trade Services Operations | 0 | 3 | | | | | | x | | | | | 42 |
| 12 | 9/26/2006 | 2Q06 London Global Banknote Exam | 3 | 0 | x | x | x | | | x | x | | | | 45 |
| 13 | 10/19/2006 | Retail Services Compliance Exam | 1 | 0 | | x | | | | | | | | | 46 |
| 14 | 12/1/2006 | Metris Exam (Credit Cards) | 5 | 0 | | x | x | | | x | | | | | 51 |
| 15 | 1/8/2007 | Taxpayer Financial Services Compliance Exam | 0 | 2 | | | | | | | | | | | 51 |
| 16 | 3/8/2007 | Corporate and Institutional Banking Exam | 4 | 1 | x | | x | | | x | x | x | | x | 55 |
| 17 | 3/19/2007 | 3Q06 GIB Exam | 3 | 0 | | x | | x | | x | | | | | 58 |
| 18 | 3/27/2007 | 3Q06 Retail Banking Exam | 3 | 7 | | x | x | | | x | | | | | 61 |
| 19 | 3/29/2007 | 4Q06 CAMP Review | 1 | 0 | | | | | | | | | | | 62 |
| 20 | 5/22/2007 | OCC Visit to India | 0 | 0 | | x | | | | | | | | | 62 |
| 21 | 6/17/2007 | CAMP Follow-up | 0 | 0 | | | | | | | | | | | 62 |
| 22 | 6/20/2007 | 1Q07 Corporate Trust Exam | 0 | 0 | | | | | | | | | | | 62 |
| 23 | 8/6/2007 | 2Q07 Internal Audit and CRU Follow-up Exam | 0 | 1 | | | | | | | | x | | | 62 |
| 24 | 8/21/2007 | 3Q07 London Banknote Follow-up Exam | 0 | 0 | | | | | | | | | | | 62 |
| 25 | 8/21/2007 | 3Q07 GIB Follow-up Exam | 0 | 0 | | | | | | | | | | | 62 |
| 26 | 9/13/2007 | Pouch Services and Middle Market Exam | 5 | 0 | x | x | x | | | x | x | x | | | 67 |
| 27 | 9/21/2007 | Investment Banking Exam | 3 | 0 | | x | | | | x | | | | | 70 |
| 28 | 9/21/2007 | Taxpayer Financial Services Follow-up Exam | 1 | 0 | x | | | | | | | | | | 71 |
| 29 | 10/15/2007 | Retail Services Compliance Exam | 0 | 1 | | | | | | | | x | | | 71 |
| 30 | 2/11/2008 | Card Services Compliance Exam | 0 | 3 | | x | | | | x | | | | | 71 |
| 31 | 4/9/2008 | 1Q08 Audit and CRU Exam | 2 | 1 | | | | | | | | x | | | 73 |
| 32 | 4/21/2008 | 4Q07 PCM Exam | 3 | 0 | | x | | | x | x | x | x | | | 76 |
| 33 | 6/2/2008 | Singapore/Hong Kong Banknotes Exam | 0 | 2 | | | | | | | | | | | 76 |
| 34 | 7/10/2008 | Taxpayer Financial Services Compliance Exam | 1 | 0 | | | | | | | | | | | 77 |
| 35 | 9/4/2008 | 2Q08 and 3Q08 GIB Exam | 2 | 0 | x | x | x | x | x | x | | | | | 79 |
| 36 | 1/20/2009 | 4Q08 OFAC Exam | 0 | 1 | | | | x | | | | | | | 79 |
| 37 | 1/22/2009 | 3Q08 Pouch Follow-up Exam | 0 | 0 | | | | | | | | | | | 79 |
| 38 | 3/3/2009 | 4Q08 Correspondent Banking Exam | 0 | 2 | | | | x | | | | | | | 79 |
| 39 | 3/18/2009 | 4Q08 Private Banking Exam | 2 | 1 | | x | | | | x | x | | | | 81 |
| 40 | 3/18/2009 | 4Q08 PCM Exam | 0 | 1 | | | | x | | | | | | | 81 |
| 41 | 5/27/2009 | Taxpayer Financial Services Compliance Exam | 0 | 0 | | | | | | | | | | | 81 |
| 42 | 6/24/2009 | 2Q09 GIB Follow-up Exam | 1 | 3 | | x | | | | x | x | | | | 82 |
| 43 | 7/7/2009 | Compliance Management Exam | 1 | 0 | | | | | | | | x | x | | 83 |
| | | TOTALS | 83 | 30 | 10 | 19 | 13 | 8 | 2 | 21 | 11 | 9 | 1 | 1 | |

Prepared by the U.S. Senate Permanent Subcommittee on Investigations, July 2012.

PX257

318

## C.  OCC Systemic Failures

The OCC's failure for six years to take action to force correction of fundamental problems in HBUS' AML program allowed those problems to fester and worsen.  Five key weaknesses in OCC oversight contributed to its those failures:  (1) treating AML deficiencies as a consumer compliance issue instead of a management issue; (2) unnecessarily restricting citations of AML program violations; (3) failing to match narrowly focused AML examinations with broader reviews; (4) failing to make better use of formal and informal enforcement actions in the face of continuing AML problems; and (5) issuing Supervisory Letters that sometimes did not accurately convey the AML problems identified in examinations.  AML problems that surfaced even after bank commitments to cure identified problems was also a common thread.

### (1)  Treating AML Deficiencies As A Consumer Compliance Issue

The OCC is the only Federal bank regulator that does not address AML problems within the context of a bank's safety and soundness considerations and ratings, instead treating them as a matter of consumer compliance.  This approach raises at least three concerns.  First, combining AML and consumer compliance concerns undermines and confuses the consumer compliance rating.  AML compliance issues are unrelated to consumer protection and civil rights laws and should have no bearing or impact on a bank's consumer compliance rating.  Inserting AML considerations into the rating process also directly contravenes the Uniform Interagency Consumer Compliance Rating System specifying how that rating is supposed to be calculated and what it is supposed to signify.[1843]  In the case of HBUS, the OCC ended up lowering its consumer compliance rating in 2010, without citing any evidence that the bank was failing to comply with consumer protection or civil rights requirements.

Secondly, failing to maintain an effective AML program is more properly viewed as a management issue that should contribute to a bank's CAMELS management rating and, ultimately, the bank's composite rating.  Federal banking agencies have agreed, for example, that a bank with a "2" CAMELS management rating means that "significant risks and problems are effectively identified, measured, monitored, and controlled" by bank management.[1844]  In contrast, a bank with a "3" management rating signifies "management and board performance that needs improvement or risk management practices that are less than satisfactory given the nature of the institution's fiduciary activities."  A 3 rating also means that the "capabilities of management or the board of directors may be insufficient for the size, complexity, and risk profile of the institution's fiduciary activities.  Problems and significant risks may be inadequately identified, measured, monitored, or controlled."[1845]  These descriptions of the significance of the CAMELS management rating are directly applicable to management efforts to ensure an effective AML program.

---

[1843] See "Comptroller's Handbook – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.  Compare with FDIC, http://www.fdic.gov/regulations/laws/rules/5000-1700.html; Federal Reserve Bank, http://www.fedpartnership.gov/bank-life-cycle/topic-index/bank-rating-system.cfm; Consumer Financial Protection Bureau, http://www.consumerfinance.gov/guidance/supervision/manual/examinations/.
[1844] See Uniform Interagency Management Component Ratings:  http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/banksupervisionprocess/default.htm?startat=bank00108.htm
[1845] Id.

## PX257

319

Interagency agreement on the significance of a bank's overall composite rating is also compatible with this approach. Federal banking agencies have agreed that a composite rating of "2" means that a bank is "in substantial compliance with laws and regulations," that "overall risk management practices are satisfactory," and "there are no material supervisory concerns and, as a result, the supervisory response is informal and limited."[1846]   A "3" composite rating means banks:

> "exhibit some degree of supervisory concern in one or more of the component areas. These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4. Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames. Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2. Additionally, these financial institutions may be in significant noncompliance with laws and regulations. Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile. These financial institutions require more than normal supervision, which may include formal or informal enforcement actions."[1847]

These categories fit seamlessly with management issues related to AML concerns.

Currently, Federal banking agencies other than the OCC routinely consider AML deficiencies as one factor in assigning a bank's management rating and may downgrade that rating if management fails to maintain an adequate AML program. The management component rating is a reflection of management's ability to adequately identify, measure, monitor, and control problems and significant risks. The failure to maintain an adequate AML program exposes a bank to significant reputational risks, potentially large civil money penalties, and criminal prosecution. When such factors are present, it makes sense for a bank regulator to weigh them when assigning the bank's management rating. If the management component is downgraded, it may also in certain circumstances lower the overall composite rating, with potentially severe impacts on the financial institution's reputation, risk profile, and insurance assessment fees.

In the case of HBUS, after documenting widespread and serious AML deficiencies, citing the bank for two violations of law, noting the potential for large civil money penalties, and criticizing both bank management and the board of directors for failing to provide an adequate AML program, the OCC downgraded the bank's consumer compliance rating, but not its CAMELS management rating. The bank's composite rating was also unaffected. The result is

---

[1846] See Uniform Financial Institutions Rating System, discussed in 9/2007 "Comptroller's Handbook – Bank Supervision Process," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_pdf/banksupervisionprocess.pdf, at 55.
[1847] Id.

**PX257**

320

that HBUS executives and directors escaped any CAMELS consequences for their poor AML management.[1848]

A third, related problem is that because consumer compliance is a specialty examination area with its own, separate rating system, a lower consumer compliance rating will rarely impact a bank's composite rating. The OCC Reports of Examination make it clear that the consumer compliance rating is not a contributing factor that has a routine impact on a bank's composite rating. HBUS was also aware that its composite rating was generally insulated from the problems with its AML performance, as indicated in a February 2010 email from the HNAH compliance head Janet Burak to top HNAH and HBUS executives Brendan McDonagh and Irene Dorner. At a time when HBUS was in the midst of an intensifying AML examination which would ultimately lead to a Cease and Desist Order, Ms. Burak wrote:

> "I met with the OCC today. … Sally [Belshaw, the OCC Examiner-in-Charge] also indicated that they are considering downgrading their assessment of Compliance Risk Management … although [Sally] indicated that if they make that decision it will not impact the Bank's composite CAMELS rating … and would not likely impact the Management rating component."[1849]

This email demonstrates that bank officials were aware of how the process for rating AML performance had little real impact on the safety and soundness ratings that carried important consequences. It suggests that if AML problems had CAMELS consequences on a routine basis, they might have greater significance for management.

The OCC Reports of Examination on HBUS occasionally discuss the bank's AML problems in the part of the report analyzing its management rating or composite rating, perhaps because the issue is relevant to those discussions. But the OCC confined the impact of the bank's AML problems to lowering HBUS' consumer compliance rating and not its CAMELS management or composite ratings which remained unaffected.

The OCC's peculiar treatment of AML concerns as a consumer compliance issue has multiple negative consequences. National banks that fail to maintain adequate AML programs may end up receiving more favorable safety and soundness ratings than they deserve, because the consumer compliance ratings have almost no impact on their management or composite ratings. They may also receive lower consumer compliance ratings than they deserve for the opposite reason. Another consequence is that the bank's deposit insurance assessments remain at a lower level than they should, as a result of safety and soundness ratings that do not fully reflect their AML risks. Treating AML concerns as a management issue would mitigate those negative consequences and create a stronger incentive for national banks to focus on their AML obligations. To strengthen its AML oversight, the OCC should bring its practice into alignment with all other Federal bank regulators, remove AML considerations from its consumer compliance ratings, and consider AML issues in the context of the CAMELS management component.

---

[1848] A related problem is that because the Federal Reserve downgraded HBUS' holding company due to the AML problems at HBUS, HNAH executives ended up incurring lower ratings for HBUS' AML management failures, but HBUS executives did not.

[1849]  2/24/2010 email from HNAH Janet Burak to HBUS Brendan McDonagh and Irene Dorner, HSBC OCC 3405315.

**PX257**

321

## (2)  Restricting Citations of AML Program Violations

A second peculiarity in OCC AML oversight is its failure to cite violations of law in its Supervisory Letters and annual Reports of Examination when a bank fails to comply with one of the four statutorily mandated components of an effective AML program – described earlier as internal controls, an AML compliance officer, AML training, and independent testing – even though each of the four program components has its own statutory basis.[1850]  Instead, the OCC has adopted a practice of not citing violations of the individual AML program components, instead treating any such deficiency as a Matter Requiring Attention (MRA) by the bank.[1851]

Although MRAs require corrective action by bank management, they are separate and distinct from violations of law.  OCC guidance provides that MRAs should address bank practices that "deviate from sound fundamental principles and are likely to result in financial deterioration if not addressed," or that "result in substantive noncompliance with laws."[1852] MRAs are intended to target weak policies and practices before they result in violations, and provide an interim step before finding a bank in violation of the law.  At the same time, because MRAs signify matters that require the "attention" of management, they do not carry the same legal weight and urgency as violations of law.  While they play an important role in AML oversight by focusing bank officials on emerging AML problems, if they take the place of statutory violations, MRAs can end up misleading a bank about the seriousness of an AML deficiency, delay remedial action, and allow an AML problem to fester.  Citing a bank for noncompliance with the law, on the other hand, carries more severe consequences if left unaddressed.  It also sends a much stronger message to bank management about the need for prompt corrective action, and lends more weight to any subsequent formal or informal enforcement action in the event the problem continues.

The OCC's practice of not citing a bank for violating the individual statutory requirements for an effective AML program meant that OCC examiners were effectively limited to using only MRAs to compel reform of an identified problem.  In the case of HBUS, OCC AML examiners repeatedly identified instances in which HBUS failed to comply with one or more of the four pillar requirements of an effective AML program.  HBUS often responded by addressing some of the narrow problems identified, but not the broader underlying programmatic deficiencies, perhaps because the problems were identified in the more neutral language of an MRA rather than as a violation of law.

---

[1850] See 31 U.S.C. § 5318(h)(1)(A)-(D).

[1851] One OCC senior legal counsel specializing in AML matters told the Subcommittee that the OCC "will not cite pillar violations" and instead lists them as MRAs which are not enforceable in court.  He said that the OCC uses the same approach when reporting AML examination findings to FinCEN, describing the OCC's reporting as "cleaner" and not "cluttered with component violations" like the other agencies.  Subcommittee interview of James Vivenzio (3/15/2012).  As indicated earlier, annual reports compiled by FinCEN show that, for the five year period from 2007 through 2011, OCC examiners cited only 16 pillar violations in more than 6,600 AML examinations.  That total represents more than 10 times fewer violations than the nearest Federal bank regulator, despite the OCC's having conducted nearly 1,800 more AML examinations.  See 2007-2011 Federal Banking Agency Bank Secrecy Act Compliance Examination, "Consolidated Quarterly Reports," PSI-FinCEN-04-0063-296.  [Sealed Exhibit.]

[1852] OCC's "Examiner's Guide to Problem Bank Identification, Rehabilitation, and Resolution," page 24. http://www.occ.gov/publications/publications-by-type/other-publications-reports/prbbnkgd.pdf

**PX257**

322

**AML Compliance Officer.**  In one case, in 2009, the OCC determined that the HBUS AML head was not qualified for the position, a rare personnel decision prompted by the bank's deteriorating AML program.  Having a qualified AML compliance officer is one of the four critical requirements of an effective AML program and is mandated by statute and regulation.[1853] An OCC AML examiner wrote the following about the problem:

> "Over the past three years, HBUS has had three BSA/AML Officers.  Ms. Lesley Midzain is the current Board designated BSA/AML Officer for HBUS.  She has held this position since April 2008.  She has limited BSA/AML knowledge and industry experience and is not considered qualified for the position of BSA/AML Officer.  This finding is based on numerous interviews by both OCC HSBC resident staff and other OCC large bank staff.  She has not enhanced her knowledge of U.S. law related to BSA/AML through formal training, other than internal web based training.  It should be noted that even with limited knowledge of U.S. law and regulation, Ms. Midzain has assumed responsibility for both BSA/AML and Compliance.

> We communicated to the HBUS President and to Ms. Janet Burak, Chief Compliance Risk Officer that Ms. Midzain does not possess the technical knowledge or industry experience to continue as the BSA/AML  Officer.  Ms. Midzin's knowledge and experience with BSA/AML risk is not commensurate to that of other BSA/AML positions held at other large national banks."[1854]

The FFIEC AML Examination Manual states that "the appointment of a BSA compliance officer is not sufficient to meet the regulatory requirement if that person does not have the expertise, authority, or time to satisfactorily complete the job."[1855]  The OCC viewed HBUS as a large complex financial institution with numerous high risk aspects that required a fully qualified AML expert to administer the bank's AML program.  To express the urgent need for the bank to hire a qualified AML director, the OCC could have cited HBUS for violating the law, but chose instead to issue a Supervisory Letter listing the issue as an MRA.[1856]  The bank responded by keeping the targeted official as its head of compliance, hiring a new AML director, and requiring that new AML director to report to the compliance head with no AML expertise.  The new AML director left after about nine months.[1857]

**AML Internal Controls over Pouch Services.**  In another instance, in January 2007, an OCC examination identified serious AML problems with HBUS' pouch services, which appeared to be operating with virtually no compliance with AML standards.  Pouch services involve clearing U.S. dollar monetary instruments such as travelers cheques, bank cheques, and money orders.  The AML problems included a lack of monitoring for suspicious activity, insufficient policies and procedures, and a lack of AML controls.  As a result, the OCC

---

[1853] See 31 U.S.C. § 5318(h)(1)(B) and 12 C.F.R. Section 21.21(c)(3).

[1854] 5/15/2009 OCC Memorandum, "Compliance Management Exam," OCC-PSI-01438115.

[1855] 4/29/2012 FFIEC BSA/AML Examination Manual, "BSA/AML Compliance Program – Overview – BSA Compliance officer," at 36, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

[1856] 7/7/2009 OCC Supervisory Letter 2009-01 "Compliance Management Examination," OCC-PSI-00107631.

[1857] 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-00000341 (deeming problems with the independent testing pillar component inadequate to justify citing a legal violation]).  [Sealed Exhibit.]

broadened its examination to pouch services at other HBUS business units, including the PCM, International Private Banking, Domestic Private Banking and retail banking departments.  That examination uncovered additional significant AML deficiencies that had been identified in examinations of other business lines, involving pillar program components such as lack of AML internal controls, training, and independent testing, with systemic implications.[1858]  The examination concluded with respect to HBUS pouch services:

> "The results of this examination combined with the history of past examinations (i.e. significant number of MRAs) are an indication that program goals and objectives have not been met.  The board needs to establish a program with defined elements for policies and procedures, systems and controls, training and independent audit to ensure unwarranted risk is being identified, monitored and mitigated to an acceptable level."[1859]

The OCC examiners recommended that a formal enforcement action be brought against the bank to compel immediate correction of the problems in pouch services.  However, after researching OCC standards for bringing enforcement actions, the examiners determined that, to issue a Cease and Desist Order, the agency was required, in part, to cite a violation of law.[1860]

---

[1858] 4/10/2007 OCC Memorandum "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-00899202 at 202 and 204 (reviewing pouch activities at the International Private Bank, Domestic Private bank, retail banking, and Payments and Cash Management business units).

[1859] Id. at 9.

[1860] 6/14/07 OCC Memorandum from Joseph Boss to Anthony Dilorenzo, "Pouch Exam," OCC-PSI-01298625; 7/3/07 OCC memorandum from Elsa de la Garza to Anthony Dilorenzo, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-00877731.  See also OCC Policies and Procedures Manual 5310-3 (Rev).  The June 14, 2007 memorandum described the OCC's enforcement standards as follows:

"There are two types of enforcement actions prescribed by the OCC.  They are 'informal actions' and 'formal actions.'  PPM 5310-3 (Rev.) describes the criteria for considering whether or not an enforcement action should be taken against a financial institution.  Generally, the nature, extent, and severity of the bank's problems will dictate the necessity for an action. The nature, extent and severity of a bank's problems can range from identified weaknesses that arc considered narrow in scope and correctible to significant and substantial problems and weaknesses that jeopardize the safe and sound operation of the bank.  In all instances a number of other factors must be taken into consideration before the imposition of an action. Some of those factors are:
- Overall rating of the financial institution.
- Financial condition of the financial institution.
- Past cooperativeness of management.
- Management's ability and willingness to correct identified problems in appropriate timeframes …."

The examiner also identified the standards used to assess whether or not a violation may be cited:

"As stated earlier, in order for the OCC to take any form of enforcement action, certain criteria must be considered. This also applies in considering citing a violation under 12 CFR 21.21.  For citing a violation of 12 CFR 21.21 the following must be evident:
- The bank lacks a BSA compliance program that covers one or more of the required program elements (internal controls, training, audit, responsible personnel);
- Fails to implement a written BSA compliance program;
- Exhibits significant BSA compliance program deficiencies coupled with aggravating factors such as evidence of widespread, blatant structuring or money laundering, insider complicity, repeat failures to file currency transaction reports or suspicious activity reports, or other substantial BSA violations; or
- Fails to respond to supervisory warnings concerning significant BSA compliance program deficiencies."

PX257

324

Although OCC written guidance states that one criteria for a formal enforcement action is whether: "[t]he bank lacks a BSA compliance program that covers one or more of the required program elements (internal controls, training, audit, responsible personnel)," OCC personnel told the Subcommittee that the OCC had interpreted this language to allow a violation of law to be cited only for a complete program failure, and not when a single pillar or even multiple pillars of an AML program are inadequate.[1861]  The examiners determined that they could not conclude that HBUS' entire AML program was ineffective at that time.  Accordingly, despite the significant AML deficiencies found in connection with HBUS pouch services, the OCC examiners concluded they could not cite a violation of law and so withdrew their request for a formal enforcement action.  Instead the OCC included a single MRA on pouch services in a Report of Examination sent to the bank in July 2007,[1862] and five MRAs in a Supervisory Letter sent to the bank two months later.[1863]

The OCC's decision not to cite violations of law or take formal or informal enforcement action to correct severe AML deficiencies that contravene key AML statutory requirements makes no sense.  An effective AML oversight effort must be able to act in just such circumstances, and premise an enforcement action on any statutory requirement, including that financial institutions have AML internal controls, an AML compliance officer, AML training, and independent testing, without having to find that virtually all four statutory requirements are being violated at the same time.

Federal bank regulators other than the OCC routinely cite violations of law when a bank fails to comply with one or more of the pillar components of an AML program.[1864]  By declining to do the same, the OCC is diluting the importance of the four components; it is essentially sending a message that a bank can lack one or more of the components as long as its entire AML program is not compromised.  In addition, by restricting itself to MRAs rather than citations of legal violations, the OCC is unnecessarily diluting its ability to send a strong message that a bank needs to promptly correct a program element, such as an inadequate AML compliance officer or a set of missing AML controls.  By limiting its examiners to using  MRAs instead of citing statutory violations, the OCC is, in effect, allowing particular problems to fester, as happened in the HBUS case.  In addition, by restricting citation of individualized program violations, the OCC is impairing the ability of examiners to pursue formal enforcement actions, which is exactly what happened in the case of the HBUS pouch activities.

Finally, failing to identify violations of laws and regulations may mislead or confuse bank management.  Violations are addressed prominently in the Reports of Examination and Supervisory Letters.  A bank's directors and managers should be aware of apparent violations of

---

[1861] Subcommittee interviews of OCC James Vivenzio (3/15/2012), Joseph Boss (1/30/2012), and Elsa de la Garza (1/9/2012).
[1862] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-00304077.  [Sealed Exhibit.]
[1863] 9/13/2007 OCC Supervisory Letter HSBC-2007-01, "Pouch Services and Middle Market," OCC-PSI-00000391. [Sealed Exhibit.]  One examiner informed the Subcommittee that, even though they determined the AML deficiencies in HBUS' pouch services did not meet the OCC's enforcement guidelines, he still felt that an enforcement action should have been initiated.  Subcommittee interview of Joseph Boss, (1/12/12 and 1/13/2012).
[1864] See 2007-2011 Federal Banking Agency Bank Secrecy Act Compliance Examination, "Consolidated Quarterly Reports," PSI-FinCEN-04-0063-296. [Sealed Exhibit.]

**PX257**

law, given their potentially punitive nature and the bank's responsibility to initiate appropriate corrective action. Violations that are instead reduced to MRAs may mislead a bank by omitting references to specific laws or regulations; downplay the importance of the targeted activity; and insulate the bank's ratings from downgrades that would spur corrective action. Examiners evaluate bank ratings, including the CAMELS management rating and its consumer compliance rating on a number of factors, including management's compliance with laws and regulations, its responsiveness to previously reported violations of law, MRAs, and audit findings. Removing violations from that equation enables a bank to obtain more favorable ratings than it may deserve. To strengthen its AML oversight, the OCC should bring its practice into alignment with all other Federal bank regulators and allow examiners to cite violations of law when a bank fails to comply with one or more of the four statutorily mandated components of an AML program.

### (3) Using Narrowly Focused Exams

A third AML oversight practice of concern involves the use of narrowly focused AML examinations that don't also include an examination of a bank's overall AML program. At HBUS, the OCC designed an AML supervisory strategy to examine the institution over a three year cycle using targeted examinations. HBUS had 32 different business units with varying degrees of AML risk, all of which were to be examined. The plan called for business units with the highest AML risks to be examined first. According to the examiners, the mandate was to examine all 32 business units over a three-year cycle, taking 8 to 10 weeks to examine a business unit from start to finish, using Supervisory Letters to communicate examination results.[1865] According to the plan, OCC examiners would not return to a previously examined area until it had examined all 32 business units, and the adequacy of management's corrective actions for any MRAs would be reviewed once the entire institution had been examined.

The OCC had to depart from this plan given the significant AML risks uncovered at some business units.[1866] In addition, with only two full-time AML examiners dedicated to HBUS, and given the complexity, breadth, and volume of its high risk activities, the OCC had difficulty meeting the three-year objective but strived to achieve it.[1867] The result was a series of narrowly focused, targeted examinations. As each examination concluded, a Supervisory Letter was issued with MRAs or recommendations addressing the AML issues at each specific business unit.

This examination approach, which failed to provide any mechanism for also taking a holistic view of the bank's AML program, raised at least three issues in the HBUS setting: it impeded understanding of fundamental problems with the bank's AML program and allowed systemic problems to fester, it required duplicative efforts, and it made verification of corrective action more difficult. First, the narrow focus of the individual examinations at HBUS made it difficult for OCC examiners to understand the bank's AML program as a whole, to detect systemic problems, or make the case for correcting them. Instead, the OCC continued to review

[1865] Subcommittee interview of Joseph Boss (1/30/2012), and Elsa de la Garza (1/9/2012).
[1866] The OCC revisited, for example, the Global Banknotes unit in 2005, 2006, 2007, 2008, and 2009 and targeted exams of Embassy Banking in 2005, 2006 (three times), 2007, 2008, and 2009.
[1867] AML examiners told the Subcommittee that two additional full time AML examiners were needed to meet the three-year cycle at HBUS, but that staff dedication would have been disproportionate to AML examination staffing at other large national banks. While they were assisted at times by other examiners, the vast bulk of the AML examinations at HBUS were carried out by two OCC AML examiners.

**PX257**

326

individual business units on a serial basis, addressing the AML problems uncovered in each examination. As a result, the OCC requested and HBUS provided narrow corrective actions, allowing more systemic problems to go unaddressed for years. In addition, it required OCC examiners to address similar AML problems in multiple business units on a repetitive basis.

**HSBC Affiliate Issues Missed.** The limitations of this approach can be seen in the way in which targeted reviews of key bank areas, such as correspondent banking and the Payments and Cash Management (PCM) department, missed major AML deficiencies involving HSBC affiliates. It was only in 2010, when OCC AML examiners were allowed to take a broad-based review of HBUS' AML program, that the examiners focused on the fact that HSBC affiliates played a large role in HBUS' correspondent banking and PCM businesses, but were not subjected to the same AML controls as other clients. The OCC examiners discovered, for example, that HBUS did not conduct any due diligence review of HSBC affiliates or attempt to evaluate their AML risks.[1868] The OCC examiners also discovered that HBUS had stopped monitoring all banknotes business with HBSC affiliates for a three-year period, from mid-2006 to mid-2009, even though those transactions involved billions of dollars of cash and high risk countries like Mexico.[1869] The OCC also learned that HBUS failed to conduct routine account monitoring for dozens of affiliates located in lower risk countries. Still another problem was that OCC examiners determined that HBUS was using an inappropriate process to assess country risk, and was assigning low risk ratings to countries such as Mexico, that should have been designated high risk. Narrowly focused exams, without more, simply didn't identify affiliates as an important AML concern that cut across multiple business lines.

**AML Staffing Issues Fragmented.** A second example involves a series of three AML examinations conducted by the OCC in early 2009, disclosing insufficient staffing to conduct AML monitoring activities in three critical business units, OFAC compliance, Correspondent Banking and the Payments and Cash Management (PCM) department. OCC examiners looked at each business unit individually and the Examiner-in-Charge issued three different Supervisory Letters that questioned the bank's staffing levels and resource commitment in each unit for AML purposes.[1870] By conducting three different examinations with no overarching analysis of AML staffing issues across the bank, the OCC failed to identify inadequate AML staffing as a systemic issue and deal with it in an efficient and effective basis. Instead, each Supervisory Letters focused on a single business line or functional area under review, with no cross references to the other areas having the same problem, at the same time. The recommendations contained in two of the Supervisory Letters, issued in March 2009, contained nearly identical wording, including

---

[1868] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335. [Sealed Exhibit.]

[1869] In the summer of 2009, OCC examiners learned for the first time that affiliates' banknotes activity was not monitored when examining banknotes activity involving an HSBC affiliate in Mexico. The key law enforcement meeting took place the next month, and the banknotes examination was then expanded to look at other AML issues. The banknotes monitoring problem was included in the Supervisory Letter issued a year later identifying a host of AML problems at HBUS. See 8/12/2009 OCC memorandum, "Banknotes Issues," OCC-PSI-00917881-882.

[1870] 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434; 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618; 3/18/2009 OCC Supervisory Letter HSBC-2008-40 "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624. [Sealed Exhibits.]

**PX257**

327

the same misspelled word.[1871]  As a result, the staffing issues were addressed in a fragmented manner in three different recommendations rather than in a single MRA focusing on the broader problem.

It was not until 2010, after the OCC directed its AML examiners in September 2009, to undertake a more holistic analysis of HBUS' AML program that staffing was examined in a broader way.  On March 3, 2010, an OCC Supervisory Letter discussing the discovery of an HBUS backlog of over 17,000 unreviewed alerts noted that staffing concerns had been raised three times in 2009, and identified it as a Matter Requiring Attention by the HBUS Board:[1872]

> "In the past, HSBC has had other backlogs, and we have expressed concerns over the course of our supervision about the levels of staffing and the qualifications of personnel assigned to complete reviews. …
>
> In three Supervisory Letters last year, we expressed concerns about the levels of staffing dedicated to BSA/AML/OFAC compliance. These letters include the supervisory letter issued on January 20, 2009 at the conclusion of our OFAC examination, the supervisory letter issued on March 3, 2009 at the conclusion of the correspondent banking examination, and the supervisory letter issued on March 18, 2009 at the conclusion of the Payment and Cash Management examination."[1873]

Even then, however, the MRA on staffing was narrowly targeted:  "Management must ensure that a sufficient number of qualified professionals are engaged to address the 2,488 alerts within the High Risk Monitoring Unit that were generated six or more months ago."  Six months later, when the OCC concluded its broad-based examination of the HBUS AML program as a whole and issued a 31-page Supervisory Letter analyzing key problems, inadequate and unqualified AML staffing was finally presented as a systemic problem across the bank.[1874]

**We Didn't Know What We Had.**  One of the OCC AML examiners immersed in the HBUS AML examinations for years told the Subcommittee that, upon learning of various law enforcement concerns about HBUS in September 2009, "we'd been doing all of these targeted examinations and we didn't know what we had."[1875]  It apparently took that jolt from law enforcement for OCC senior personnel to authorize the OCC AML examiners to develop a broad-based plan to look at the HBUS AML program as a whole, tie various problems together, and identify the most important AML deficiencies requiring correction.  While the narrowly focused AML reviews were important to examine particular business units and identify specific issues within those offices, such examinations were incomplete and ineffective without a broad-

---

[1871] Compare 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618, at 619, with 3/18/2009 OCC Supervisory Letter HSBC-2008-40 "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624, at 625.  [Sealed Exhibits.]

[1872] 7/7/2009 OCC Supervisory Letter HSBC-2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542.  [Sealed Exhibit.]

[1873] Id.

[1874] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335, at 337-338. [Sealed Exhibit.]

[1875] Subcommittee interview of Joseph Boss (1/30/2012).

PX257

based look at the bank's AML program as a whole to identify fundamental and cross-cutting issues critical to an effective AML effort.

Still another problem created by the narrowly focused AML examinations was that they complicated efforts by OCC examiners to verify that corrective actions mandated in OCC MRAs were implemented before closing out an MRA.  One issue was that examiners weren't supposed to return to re-examine the relevant business unit until much later, theoretically after completing a three-year review of all 32 HBUS units.  In reality, the examiners had to ignore that aspect of the examination plan to verify that corrective action was taken.  But even then, validation of the effectiveness of the remedies often required duplicative, repetitive efforts since many of the same problems had to be analyzed in multiple, individual business units.  In addition, while HBUS and the OCC examiners were focused on AML problems in individual business lines and services, fundamental problems began to build up, including backlogs of unreviewed alerts, collections of unmonitored accounts, and overly favorable treatment of HSBC affiliates.

The HBUS case history provides ample evidence that a stovepipe AML supervisory strategy that focuses solely on serial examinations of individual business lines or services without also examining a bank's AML program as a whole creates a fragmented and inefficient view of a bank's AML program, wastes resources, encourages piecemeal corrective actions, fails to identify fundamental problems which are allowed to fester, and diminishes the usefulness of AML examination findings and corrective actions.  To strengthen its AML oversight, the OCC should require its AML examiners to combine narrowly focused AML examinations with at least an annual examination of key elements of the bank's AML program as a whole.

### (4)  Failing to Use Enforcement Actions

The HBUS case history, like the Riggs Bank case history before it, betrays an ongoing reluctance by the OCC to use either informal or formal enforcement actions to compel AML improvements, even when a bank is cited for years for significant AML problems.

The OCC identified serious AML deficiencies at HBUS for six years in a row, with the most AML-related MRAs of any bank it supervised, without considering or initiating a nonpublic, informal enforcement action.  The reluctance to use informal enforcement actions appears to be a cultural preference rather than the result of any guidance or policy.  As mentioned earlier, the OCC disclosed to the Subcommittee that it has taken only eight informal enforcement actions against large banks for AML deficiencies since 2005.[1876]  This approach is especially disconcerting in the HBUS case, since the bank expressed a willingness to work with the regulator to implement reforms.  Informal remedies – which include requesting that the financial institution issue a safety and soundness plan, board resolution, commitment letter, or memorandum of understanding pledging to take specific correction actions by a certain date – offer useful tools that provide an interim step before a formal enforcement order that is public and carries legal penalties.  These tools can be effective, but were not even considered by the OCC in the HBUS AML context.

The HBUS case history also discloses a reluctance on the part of the OCC to use formal enforcement actions to correct AML deficiencies.  Two examples involve AML examiners' who

---

[1876] Subcommittee briefing by OCC legal counsel (7/13/2012).

PX257

twice recommended issuing a Cease and Desist Order against HBUS after finding severe AML deficiencies in the bank's pouch activities and Embassy Banking unit, but no enforcement action followed. In the case of the pouch activities, as discussed earlier, despite overwhelming evidence of substantial AML deficiencies, two OCC AML examiners agonized over whether they could make the case for an enforcement action and ultimately reversed their initial recommendation for a Cease and Desist Order. In the case of the Embassy Banking unit, as discussed earlier, again despite overwhelming evidence of the bank's failure to implement effective AML controls, an OCC examiner was told point blank by his superiors, with no further explanation, that no Cease and Desist Order would be issued. The failure of OCC officials to seriously consider a formal enforcement action in either of these two extreme cases demonstrates an enforcement problem.

The OCC's AML enforcement guidance is clear in stating: "Even when the facts do not support citation of a BSA compliance program violation, the OCC may take a formal or informal enforcement action to ensure action."[1877] In addition, the OCC website explains:

> "The OCC may take enforcement actions for violations of laws, rules or regulations, final orders or conditions imposed in writing; unsafe or unsound practices; and for breach of fiduciary duty by institution-affiliated parties (IAP)."[1878]

These statements seem to provide the regulatory foundation and flexibility needed for the OCC to act quickly to address serious AML deficiencies, yet the HBUS case history demonstrates that the OCC remains hesitant to act, even in the face of severe AML problems and even after years of AML MRAs on record. To strengthen its AML oversight, the OCC should give strong direction to its examiners about the availability of enforcement options and create new mechanisms to require bank supervisory, enforcement, and legal personnel to review the need for formal or informal enforcement actions at banks with severe or longstanding AML deficiencies.

### (5) Issuing Weak Supervisory Letters

A final issue involves the OCC's use of Supervisory Letters. The HBUS case history indicates these letters do not always accurately convey examination findings or the need for corrective action.

Supervision Letters are the means by which an OCC Examiner-in-Charge officially informs a bank of examination findings, apparent violations of law, and MRAs warranting management attention. Violations and MRAs require corrective action by bank management; "recommendations" do not. In theory, OCC examination findings and changes to resolve AML deficiencies should be conveyed accurately in the related OCC Supervisory Letters sent to bank management; in reality, the HBUS case history showed that some Supervisory Letters muted criticisms or weakened recommended reforms.

**PCM Examination.** One striking example of the discrepancies that arose between examination findings and Supervisory Letters involved the 2007 examination of HBUS' Payment and Cash Management (PCM) operations. PCM specialized in global cash flow

---

[1877] "Process for Taking Administrative Enforcement Actions Against Banks Based on BSA Violations," OCC 2005-45 Attachment Appendix A to OCC 2004-50. OCC-PSI-00176030.
[1878] http://www.occ.gov/topics/laws-regulations/enforcement-actions/index-enforcement-actions.html

PX257

coordination, using such tools as wire transfers, cash letters, and controlled disbursement services. The volume of PCM activity at HBUS, given the bank's size, global reach, and appetite for risk, was huge both in terms of dollars and number of transactions. In 2009, for example, PCM processed 30.2 trillion wire transfers involving $94.5 trillion.[1879]

In December 2007, the OCC completed an examination of AML controls in PCM operations and found that the bank was not adequately monitoring PCM transactions.[1880] The OCC examination noted fundamental flaws in the bank's AML controls and monitoring systems to identify suspicious activity as well as actions to clear alerts without adequately reviewing the circumstances and filing required SARs. It also recited several examples of suspicious activity and criticized the bank's Compliance Review Unit which is supposed to conduct independent testing of HBUS' AML controls but had not reviewed the PCM operations in three years. The examination findings included the following:

- "Systems and Controls are less than satisfactory and do not provide an appropriate level of monitoring for suspicious and unusual activity for all of the activities in the business unit.
- In reviewing customer activity, there were several accounts which warranted additional monitoring and/or in which monitoring practices were inadequate." [1881]

The examination also identified three MRAs that should be brought to the attention of HBUS' board of directors.[1882]

The Supervisory Letter signed by the OCC Examiner-in-Charge and sent to HBUS was issued four months later, on April 21, 2008, and conveyed a very different message about PCM operations, in part because HBUS had begun to correct the identified problems.[1883] The Supervisory Letter stated that the examination of PCM operations found that "the quality of risk management systems is satisfactory"; "compliance with legal and regulatory requirements is satisfactory"; and "the quality of PCM compliance risk management is satisfactory." It continued: "Policies and procedures are adequate; however, control systems needed to detect and report suspicious activity warrant improvement."[1884] These mild statements made in the spring of 2008, are worlds apart from the blunt examination findings issued in December 2007.

---

[1879] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335. [Sealed Exhibit.]

[1880] 12/7/2007 OCC memorandum "BSA/AML Examination – Payment and Cash Management," OCC-PSI-01263586.

[1881] Id.

[1882] The three MRAs were: "1) management needs to improve client monitoring and analysis in order to obtain an accurate view of potential risk. When an alert is generated, a more thorough review of available information needs to be initiated; 2) management must ensure that CRU [Compliance Review Unit] appropriately identifies and accurately reports on all issues, including MRAs. In addition, MRA follow-up by CRU needs to address all corrective action and include testing to determine the adequacy of actions taken; and 3) management needs to ensure that decisions related to not filing SARs are documented and maintain this information in a log." Id.

[1883] 4/21/2008 OCC Supervisory Letter HSBC-2007-24, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107597. [Sealed Exhibit.]

[1884] Id. at 1.

PX257

Despite its language, the Supervisory Letter did include the three MRAs which, together, implied a significant breakdown in the bank's internal controls.

**Embassy Banking Examination.** A second example involved HBUS' Embassy Banking examination. As discussed earlier, in January 2008, after being contacted by two former employees, OCC conducted an examination and confirmed a wide array of troubling practices in the Embassy Banking unit. They included significant internal control problems, suspicious activity involving two high risk embassy accounts, noncompliance with bank policy, inadequate due diligence and monitoring, transactions being conducted without OFAC screening – describing, in short, some of the most egregious AML deficiencies recorded in any HBUS AML examination.[1885] On May 20, 2008, the OCC examiner completed a Conclusion Memorandum with the examination findings, stating that the Embassy Banking's "AML program is not effective in identifying and mitigating risk, especially considering the nature of its clientele and the types of products and services it provides."[1886] The memorandum recommended issuance of a Cease and Desist Order to ensure immediate remediation of the AML risks. The OCC examiner also discussed the recommendation for a formal enforcement action with the Examiner-in-Charge, but was informed that no Cease and Desist Order would be issued. HBUS was verbally informed of the examination findings and immediately began work to address the problems. In July, a follow-up examination looked at the bank's remedial efforts and found that progress had been made.[1887]

On September 4, 2008, a Supervisory Letter summarized the March and July examinations was sent to HBUS.[1888] The letter's mild tone failed to convey any of the egregious AML deficiencies or suspicious activity uncovered during the examinations, using instead bland language that conveyed minimal concern or urgency. The letter began:

- "The quality of risk management is satisfactory, but needs improvements in certain areas.
- Compliance with legal and regulatory requirements is satisfactory and no violations of law or regulation were cited at this examination.
- We noted several deficiencies in the GIB BSA/AML program that warrant the immediate remedial attention of senior management."[1889]

The letter continued with a string of positive statements: "Management is competent and capable." "The automation of existing systems and controls, together with current staff levels, will ensure a timely and efficient process for monitoring accounts …." "Currently, monitoring remains backlogged; however, management has developed a plan to bring the monitoring up to date." "Current systems and controls are satisfactory." "Compliance Risk is stable."

---

[1885] See also earlier discussion; 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00928614; 10/8/2008 OCC Memorandum "Royal Embassy of Saudi Arabia (RESA) March 2008 Examination Conclusions", OCC-PSI-01434609; 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593.

[1886] 5/20/2008 OCC Memorandum "Government and Institutional Banking", OCC-PSI-00899215.

[1887] See 8/14/2008 OCC Conclusion Memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227.

[1888] 9/4/2008 OCC Supervisory Letter HSBC-2008-07, "Government and Institutional Banking BSA/AML Examination," to HBUS, OCC-PSI-00107607. [Sealed Exhibit.]

[1889] Id. at OCC-PSI-00107607-608.

The Supervisory Letter continued:

"Our current review has noted a marked improvement to GIB's BSA/AML program from the second quarter of 2008 examination. Management has implemented corrective action in most of the areas of concern. The new GIB Compliance manager has implemented numerous objectives to ensure that potential risk is readily identified and mitigated to acceptable levels.

There are still some issues with system and controls, resources and alert monitoring; however, based on the current review those deficiencies are noted as MRAs."[1890]

The Supervisory Letter then reduced the AML examiner's request for a formal enforcement action against the bank to two narrow MRAs asking HBUS to: (1) "develop plans with milestones to further define and automate the risk identification and monitoring functions," and, in the interim, "continue to enhance methods to reduce weaknesses associated with manual intervention" and prevent "unauthorized changes" to a spreadsheet with account information; and (2) cure a backlog of 1,800 alerts, some dating back to 2007, by September 15, 2008.[1891]

The September Supervisory Letter simply did not convey the urgency or severity of the examination findings from several months earlier regarding AML problems in the Embassy Banking department. In addition, while it presented two MRAs requiring corrective action, its mild tone and lack of detail may make bringing an enforcement action difficult if the bank fails to remedy the identified problems in a timely fashion.

**AML Staffing Problems.** A third example of discrepancies between examination findings and the Supervisory Letters that follow involved staffing issues.

In 2006, two OCC Supervisory Letters included MRAs that required HBUS to increase AML staffing in its Embassy Banking unit to monitor transactions[1892] and in its Compliance Review Unit to conduct internal reviews of the bank's AML controls.[1893] In 2007, another Supervisory Letter again included an MRA about increasing AML staffing in the Embassy Banking unit.[1894] Two years later, in 2009, OCC AML examiners conducted examinations of HBUS' OFAC Compliance unit, Correspondent Banking, and PCM department, and identified staffing issues at all three. In February 2009, the OCC examiners wrote an internal memorandum to the file recording a disagreement with their supervisor concerning staffing. In the memorandum, the examiners identified inadequate AML staffing as "a repetitive issue that is of concern" that "should be elevated to an MRA instead of a recommendation for the Correspondent Banking (March 3, 2009 Supervisory Letter) and Payment and Cash Management examinations (March 18, 2009 Supervisory Letter)."[1895] The memorandum also noted that the

---

[1890] Id. at 609.
[1891] Id. at 610.
[1892] 1/30/2006 OCC Supervisory Letter to HBUS, OCC-PSI-00107529, at 534-35. [Sealed Exhibit.]
[1893] 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-00000341. [Sealed Exhibit.]
[1894] 3/19/2007 OCC Supervisory Letter HSBC-2006-30, "Government and Institutional Banking BSA/AML Examination," OCC-PSI-00107567, at 569-570. [Sealed Exhibit.]
[1895] 2/5/2009 OCC Memorandum to files, "Staffing issue – Correspondent Banking," OCC-PSI-00899201.

**PX257**

333

two OCC examiners had discussed the issue with the OCC Examiner-in-Charge who disagreed with the examiners' assessment, because "there are no violations being cited and staffing is a management decision." The memorandum concludes: "Based on our growing concerns regarding Ms. Midzain's qualifications to hold the position as BSA/AML officer, her lack of concern with our recommendations and a slow deterioration of the bank's BSA/AML Program, [we] will recommend to EIC Belshaw that we complete a Compliance Management examination to assess BSA management as soon as possible."

The Examiner-in-Charge sent out three Supervisory Letters related to the examinations that had been conducted. Each reduced the requested MRA down to a recommendation that "management should consider a review of current and immediate staffing." At that point, the OCC had identified staffing problems in five business units through six exams over a period of four years, but the most recent Supervisory Letters treated the need to increase AML staffing as a recommendation rather than an MRA requiring corrective action. While it is the function of an Examiner-in-Charge to make the ultimate decision on MRAs and recommendations, this example demonstrates a clear division between the Examiner-in-Charge and her staff and a refusal to take strong action by the more senior OCC official.

In Washington, the OCC's Large Bank Review Committee, which reviewed about six draft Supervisory Letters per year for HBUS and sometimes had a copy of the underlying examinations, also noted occasional discrepancies between the examination findings and draft Supervisory Letters. In addition, some LBRC members began to notice after the fact that some examinations had revealed more significant AML problems and criticism of HBUS operations than were conveyed by the approved Supervisory Letters to HBUS management. As a result, the LBRC now requires both the AML examiner's Conclusion Memorandum and the Examiner-in-Charge's draft Supervisory Letter before it will begin a review of the draft letter.[1896] This change should help reduce the discrepancies and ensure senior OCC officials have a more complete view of AML problems at the banks being examined.

### D.  Analysis

AML laws are not intended to protect bank customers or the bank; they safeguard the U.S. financial system and the nation as a whole. As the regulator of nationally chartered banks, which are among the largest, most complex, and global of U.S. banks, the OCC plays a critical role in ensuring AML compliance. It is the OCC that needs to ensure the U.S. affiliates of global banks function as well-guarded gateways that keep out risk rather than invite it in.

To fulfill its AML obligations, the OCC needs to strengthen its AML oversight and revamp its AML supervisory and enforcement approach to bring them into closer alignment with other Federal bank regulators. Five reforms are key. First, it should treat AML deficiencies as a matter of safety and soundness, not consumer protection, and ensure ineffective AML management is taken into consideration when assigning a bank's CAMELS management and composite ratings. Second, the OCC should allow its examiners to cite violations of law for individual pillar violations as well as program-wide violations. Third, the OCC should ensure that narrowly focused examinations are considered in tandem with examinations that take a holistic view of a bank's AML program. Fourth, the OCC should make more use of informal

---

[1896] Subcommittee interview of James Vivenzio (3/15/2012).

PX257

334

enforcement actions and reconsider its standards for issuing formal enforcement actions to compel AML reforms.  Finally, the OCC should instruct its Examiners-In-Charge to accurately reflect AML examination findings, without turning them into such mild recommendations that they mislead bank management into thinking their AML programs are functioning well, when they are not.  Many OCC examiners see the problems; it is OCC supervisors and enforcement that need to act to strengthen the OCC's AML oversight efforts.

PX257

# PX260



DEFENSE INTELLIGENCE AGENCY

# IRAN
## MILITARY POWER

ENSURING REGIME SURVIVAL *and*
SECURING REGIONAL DOMINANCE

Committed to Excellence In Defense of the Nation   **2019**

PX260

This report is available online at www.dia.mil/Military-Power-Publications
For media and public inquiries about this report, contact DIA-PAO@dodiis.mil
For more information about the Defense Intelligence Agency, visit DIA's website at www.dia.mil

Information cutoff date: August 2019.

Cover image: An Iranian Shahab 3 medium-range ballistic missile on parade in Tehran in September 2017. The placard on the front of the mobile launcher reads: "We will stand until the end."

Source: Islamic Republic of Iran Broadcasting (IRIB).

DIA_Q_00055_A

This report contains copyrighted material. Copying and disseminating the contents are prohibited without the permission of the copyright owners. Images and other previously published material featured or referenced in this publication are attributed to their source.

For sale by the Superintendent of Documents

U.S. Government Publishing Office

www.bookstore.gpo.gov   |   Mail: Stop IDCC, Washington, DC 20402-0001

Phone: (202) 512-1800, toll free (866) 512-1800   |   Fax: (202) 512-2104

ISBN 978-0-16-095157-2

PX260

**INTENTIONALLY LEFT BLANK**

PX260

# *PREFACE*

In September 1981, Secretary of Defense Caspar Weinberger asked the Defense Intelligence Agency (DIA) to produce an unclassified overview of the Soviet Union's military strength. The purpose was to provide America's leaders, the national security community, and the public a comprehensive and accurate view of the threat. The result: the first edition of Soviet Military Power. DIA produced more than 250,000 copies, and it soon became an annual publication that was translated into eight languages and distributed around the world. In many cases, this report conveyed the scope and breadth of Soviet military strength to U.S. policymakers and the public for the first time.

In 2017, DIA began to produce a series of unclassified Defense Intelligence overviews of the major foreign military challenges facing the United States. This volume provides details on Iran's defense and military goals, strategy, plans, and intentions; the organization, structure, and capability of its military supporting those goals; and the enabling infrastructure and industrial base. This product and other reports in the series are intended to inform our public, our leaders, the national security community, and partner nations about the challenges we face in the 21st century.



**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

---

**Iranian Supreme Leader Ali Khamenei's address to graduates of the Iranian Naval Academy, 9 September 2018:**

"Today, the policy that the Front of Arrogance—headed by the oppressive and cruel United States—has adopted is a malicious policy. They have defined their interests in causing instability throughout many parts of the world, particularly in our region…Their goal is to prevent an Islamic power in the region from emerging and rising…The Islamic Republic has stood up against this policy with complete power… My dear ones, what has astounded intelligent people around the world is that with reliance on Allah the Exalted and with reliance on national power, the Islamic Republic has managed to defeat the United States in achieving its main goal in the region."[1]

Throughout its 40-year history, the Islamic Republic of Iran has remained implacably opposed to the United States, our presence in the Middle East, and our support to Israel. While attempting to strengthen its deterrence against foreign attack and influence, Tehran has committed itself to becoming the dominant power in the turbulent and strategic Middle East. Its ambitions and identity as a largely Persian Shia power in a region composed of primarily Arab Sunni states often put it at odds with its neighbors, most of which look to the United States and the West to guarantee their security.

Iran sees itself as closer than ever to achieving its goals. Tehran has played the cards dealt it by the fall of Saddam, the uprising in Syria, the rise and retreat of ISIS, and the conflict in Yemen. It leads a cohesive if informal bloc of Shia and Alawi state and nonstate actors—its "Axis of Resistance" against the West. Meanwhile, a perception that the United States is disinterested and disengaged pervades the region.

By applying a rigorous lessons-learned process during decades of conflict in the Middle East, Iran has adapted its military capabilities and doctrine to account for developments by the United States and its allies. Although still technologically inferior to most of its competitors, the Iranian military has progressed substantially over the past few decades.

To achieve its goals, Iran continues to rely on its unconventional warfare elements and asymmetric capabilities—intended to exploit the perceived weaknesses of a superior adversary—to provide deterrence and project power. This combination of lethal conventional capabilities and proxy forces poses a persistent threat. The Islamic Revolutionary Guard Corps Qods Force leads Iranian power projection through a complex network of state and nonstate partners and militant proxies. Iran's conventional military emphasizes niche capabilities and guerilla-style tactics against its technologically advanced adversaries. Its substantial arsenal of ballistic missiles is designed to overwhelm U.S. forces and our partners in the region. Its swarms of small boats, large inventory of naval mines, and arsenal of antiship missiles can severely disrupt maritime traffic in the Strait of Hormuz—a strategic chokepoint critical to global trade. Each of these forces are becoming increasingly survivable, precise, and responsive.

In more recent years, with the conflicts in Syria and Iraq, Iran has taken nascent steps toward developing a limited expeditionary capability. Iran's conventional forces are now in the regional power projection game as well. At the same time, modern conventional capabilities will be open to Iran for the first time since the revolution, as the UN arms embargo is scheduled to end by October 2020. With these opportunities, we could begin to see significant changes in Iranian strategy and capabilities, as Iran becomes a more traditional military force.

As Tehran expands its capabilities and role as both an unconventional and conventional threat in the Middle East, it is more important than ever that we understand Iran's military power and the threat it poses to our interests, our allies, and our own security.

*Robert P. Ashley Jr*
Lieutenant General, U. S. Army
Director
Defense Intelligence Agency

PX260

**INTENTIONALLY LEFT BLANK**

PX260

IRAN MILITARY POWER  |  *Ensuring Regime Survival and Securing Regional Dominance*

# *CONTENTS*

*Introduction/Historical Overview* . . . . . . . . . . . . . . . . . . . . *1*
1921–1979: The Shah's Army . . . . . . . . . . . . . . . . . . . . . 1
1979–Present: The Guardians of the Revolution . . . . . . . . . . . . . . 3

*National Military Overview* . . . . . . . . . . . . . . . . . . . *10*
Threat Perceptions . . . . . . . . . . . . . . . . . . . . . . . . 12
National Security Strategy . . . . . . . . . . . . . . . . . . . . . 12
Stability Issues . . . . . . . . . . . . . . . . . . . . . . . . . 13
External Defense Relations . . . . . . . . . . . . . . . . . . . . . 15
Defense Budget . . . . . . . . . . . . . . . . . . . . . . . . . 18
Nuclear Program . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Military Doctrine and Strategy* . . . . . . . . . . . . . . . . . . *22*
Perceptions of Modern Conflict . . . . . . . . . . . . . . . . . . . 23
Military and Security Leadership . . . . . . . . . . . . . . . . . . . 24
Major Military and Security Institutions . . . . . . . . . . . . . . . . 24
National Military Command and Control . . . . . . . . . . . . . . . . 26
Key Military Leaders . . . . . . . . . . . . . . . . . . . . . . . 28

*Core Iranian Military Capabilities* . . . . . . . . . . . . . . . . *30*
Ballistic Missiles . . . . . . . . . . . . . . . . . . . . . . . . . 30
Antiaccess/Area Denial . . . . . . . . . . . . . . . . . . . . . . 32
Unconventional Operations . . . . . . . . . . . . . . . . . . . . . 33
Expeditionary Operations . . . . . . . . . . . . . . . . . . . . . 34
Cyberspace . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Intelligence . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

DEFENSE INTELLIGENCE AGENCY

PX260

Space/Counterspace . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Chemical and Biological Warfare . . . . . . . . . . . . . . . . . . . . . 38
Denial and Deception . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Underground Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Outlook: Building a More Capable Conventional Force* . . . . . **40**

*Appendix A: Missile Force* . . . . . . . . . . . . . . . . . . . . **43**

*Appendix B: Naval Forces* . . . . . . . . . . . . . . . . . . . . **48**

*Appendix C: Unconventional Forces* . . . . . . . . . . . . . . . **57**

*Appendix D: Air and Air Defense Forces* . . . . . . . . . . . . **64**

*Appendix E: Ground Forces* . . . . . . . . . . . . . . . . . . . **72**

*Appendix F: Special Operations Forces* . . . . . . . . . . . . . **76**

*Appendix G: Reserves* . . . . . . . . . . . . . . . . . . . . . . **78**

*Appendix H: Intelligence Services* . . . . . . . . . . . . . . . . **81**

*Appendix I: Defense Industry and Modernization Programs* . . **83**

*Appendix J: Arms Transfers* . . . . . . . . . . . . . . . . . . . **88**

*Glossary of Abbreviations* . . . . . . . . . . . . . . . . . . . . **92**

*References* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **95**

PX260

INTENTIONALLY LEFT BLANK

PX260

INTENTIONALLY LEFT BLANK

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*



Image Source: AFP

Iranian clerics watch a Shahab 3 MRBM launch in 2006.

# Introduction/Historical Overview

Persia, as Iran was known before 1935, was one of the great empires of the ancient world. Its military history dates back more than 2,500 years. The country in its present form—the Islamic Republic of Iran—was established in 1979 after the Islamic Revolution. Iran is a theocratic republic with a supreme leader appointed for life as head of state and the highest-ranking political, military, and religious authority under the principle of *velayat-e faqih* (rule of the Islamic jurist), a philosophy in Shia Islam reinterpreted by Iran's first supreme leader, Ayatollah Ruhollah Khomeini, that calls for clerical oversight of elected institutions.

## 1921–1979: The Shah's Army

The modern Iranian military originated in the early 1920s after Reza Khan, a general in the Persian Cossack Brigade, helped lead a coup to strengthen the power of the Persian *shah* (king), Ahmad Shah Qajar. In 1921, Reza was made the commander of all of Iran's disparate military elements, which he combined to form the basis of the modern Iranian military, the *Artesh* ("army" in Persian). As a top priority for Ahmad Shah, the Imperial Iranian Armed Forces then began a long-term effort to grow

PX260

and modernize.[2,3] After becoming minister, Reza Khan orchestrated his own appointment as shah in 1925. Renamed Reza Shah Pahlavi, the new king enacted a secular civil code and set out on a broader modernization of the country, to include the military.[4]

Events throughout the 20th century contributed to Iran's long-held suspicion of foreign powers. During World War II, British and Soviet forces invaded Iran to secure oil resources and protect Allied supply lines to the Soviet Union. Although Iran was officially neutral in the war, the Allied powers considered Reza Shah to be too close to Nazi Germany and forced him to abdicate, installing his son—Mohammad Reza Pahlavi—as shah in 1941. A decade later, the elected prime minister, Mohammad Mossadegh, nationalized the British-owned Iranian oil industry. Britain imposed an economic embargo, and a power struggle between the shah and Mossadegh ensued. After the shah fled Iran, the United States and the United Kingdom in 1953 organized a successful coup—called Operation AJAX—with support from Iranian royalists to overthrow Mossadegh and strengthen the power of the shah.[5,6]



Iranian protestors during the 1953 coup.

Image Source: AFP

After the 1953 coup, Mohammad Reza Shah accelerated efforts to transform Iran into a Westernized and dominant regional power. One of his top priorities was to build a strong military, leveraging close ties to the United States during the Cold War. Funded by increasing oil revenue, the Artesh acquired a wide range of advanced weapon systems during the 1960s and 1970s, primarily from the United States. Tehran's procurement of American arms included F-4, F-5, and F-14 fighter aircraft; AH-1 Cobra attack helicopters; M60 tanks; HAWK and SM-1 surface-to-air missiles (SAMs); and TOW antitank guided missiles (ATGMs). Iran also purchased British tanks and corvettes, French patrol craft, and Soviet armored vehicles.[7,8,9,10,11]

By the mid-1970s, Tehran became the largest customer of U.S. military equipment. At the time of the revolution, its military was one of the most capable in the region, with more than 400,000 personnel. However, Iran still required extensive U.S. training and technical support to operate and maintain its advanced military equipment. Iran ordered other advanced systems from Western suppliers before the revolution—including F-16s, F-18s, frigates, destroyers, and submarines from the United States—but these were never delivered.[12]

The Iranian military was largely unproven in combat until the mid-1970s, when the shah deployed Artesh forces to Oman alongside the British at the request of the sultan to help quell an insurgency. Iran first deployed special forces to Oman in late 1972, followed by a battalion of paratroopers in 1973. By 1974, the Imperial Iranian Task Force numbered more than 3,000 troops, with artillery, heli-

PX260

copter, fighter aircraft, air defense, and naval support. Tehran rotated its deployments every 3 months to maximize the number of returning personnel with combat experience. By the withdrawal of most Iranian forces after 1975, some 15,000 Iranian troops had served in Oman with more than 500 killed in action.[13,14]

Under Mohammad Reza Shah's rule, Iran became increasingly autocratic. Public disapproval for the regime grew, furthered by an economic recession and public perceptions of the shah as a corrupt U.S. puppet.[15] In the late 1970s, widespread protests representing most segments of Iranian society increased across the country. By 1979, the unrest grew into a revolution. Popular Shia cleric Ayatollah Ruhollah Khomeini, who had been in exile, had become the central figure of the revolution and opposition to the shah, who then fled Iran in January 1979. Khomeini returned to Tehran on 1 February and called for nationwide demonstrations. Clashes between armed opposition groups and government forces broke out. Ten days later, the Artesh declared that it would remain neutral to prevent further casualties, effectively ending the revolution with Khomeini in power.[16]



Ayatollah Ruhollah Khomeini returns to Iran from exile on 1 February 1979.

Image Source: AFP

## 1979–Present: The Guardians of the Revolution

In a referendum on 1 April 1979, Iranians approved a new constitution establishing a theocratic republic based on *velayat-e faqih* with Khomeini as supreme leader, ending 2,500 years of monarchical rule. On 5 May, Khomeini established the Islamic Revolutionary Guard Corps (IRGC), consolidating various militias that had formed during the revolution into a single force loyal to the new regime, in parallel with the Artesh.[17] During the first few years after the revolution, fearing internal unrest stemming from old-regime allegiances and antirevolutionary activity, the regime conducted a series of purges through arrests, trials, and executions that affected as many as 4,500 military personnel and nearly 6,000 activists, effectively eliminating any remaining opposition.[18,19]

On 4 November 1979, a group of Iranian students loyal to Khomeini took over the U.S. Embassy in Tehran, taking 52 Americans hostage and leading the United States to sever diplomatic relations with Iran. The crisis lasted 444 days before the regime returned the hostages to the United States. On 24 April 1980, an attempted rescue by U.S. Special Forces—called Operation EAGLE CLAW—failed when two aircraft collided during a sand storm at a staging area in the Iranian desert, killing eight U.S. servicemembers.

The Islamic Revolution and the hostage crisis left Iran diplomatically isolated and militarily weakened. Iran also lost access to tens of thousands

PX260

## An Ideological Army

In establishing and equipping the defense forces of the country, it shall be taken into consideration that faith and ideology are the basis and criterion. Therefore, the Army of the Islamic Republic of Iran and the Revolutionary Guards Corps will be formed in conformity with the above objective, and will be responsible not only for protecting and safeguarding the frontiers but also for the ideological mission, that is, Jihad, for God's sake and struggle for promoting the rule of God's law in the world ("And prepare against them whatever you are able of power and of steeds of war by which you may terrify the enemy of Allah and your enemy and others besides them whom you do not know but whom Allah knows." [Quran 8:60]).

-The Iranian Constitution, Preamble[20]

of foreign technicians to support the advanced military equipment it had purchased under the shah, while deliveries for U.S. and British spare parts were canceled under an arms embargo. Desertions and purges drained roughly 40–60 percent of the Artesh's manpower, leaving the military with a severe shortage of trained personnel and professional leadership.[21]



Iranians students scale the wall of the U.S. Embassy in Tehran on 4 November 1979.

Image Source: AFP

Saddam Hossein sought to capitalize on Iran's post-revolutionary turmoil after years of territorial disputes and competition for regional influence. On 22 September 1980, Iraq invaded Iran. Saddam justified the attack as necessary to prevent Iran from exporting the revolution and overthrowing his regime, which Iranian leaders had advocated.

Initially disorganized and poorly trained, the IRGC was forced to begin to professionalize to repel the Iraqi invasion, which the diminished Artesh was unable to do on its own. The IRGC and Basij, a volunteer paramilitary reserve force, relied on guerrilla-warfare tactics and later used extremely costly human wave attacks along the front.[22,23] By June 1982, Iran had pushed back Iraqi forces and recovered nearly all of its lost territory. Saddam proposed a ceasefire, but Khomeini rejected the offer. Tehran's goals had shifted from liberating captured land to overthrowing Saddam and expanding the revolution. The next month, Iran launched a counterattack into Iraq and generally remained on the offensive for the remainder of the war.[24]

4

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## Major Iran-Iraq War Events

1805-17889



**1980**
- **Sep:** Iraq invades Iran
- **Nov:** Iraq's first use of chemical weapons

**1981**

**1982**
- **Jul:** Iran invades Iraq
- **Oct:** Iraq's first use of ballistic missiles

**1983**

**1984**
- **Feb:** Beginning of the War of the Cities
- **Mar:** Iraq begins attacks on Gulf shipping (beginning of the Tanker War)
- **May:** Iran begins attacks on Gulf shipping

**1985**
- **Mar:** Iran's first use of ballistic missiles

**1986**

**1987**
- **Jul:** UN ceasefire (UNSCR 598); Operation EARNEST WILL starts

**1988**
- **Apr:** USS *Samuel B. Roberts* mined; Operation PRAYING MANTIS
- **Jul:** Iran Air Flight 655 shot down by USS *Vincennes*; Iran accepts UN ceasefire
- **Aug:** War ends

### IRGC-Artesh Tension

In the aftermath of the revolution, there was considerable tension between the IRGC and Artesh at the outset of the war. The Artesh suffered from leadership purges and was distrusted by the new regime and the IRGC. By the end of the war, however, the Artesh had demonstrated its worth and loyalty to the regime. Although today both militaries provide essential security functions for Iran and coordinate regularly, some rivalry remains, resulting from their uneven access to resources, varying levels of influence with the regime, and inherent overlap in missions and responsibilities.[25]

Iran struggled to contend with the deadly facets of modern warfare, including chemical weapons and ballistic missiles, which Baghdad used extensively throughout the war.[26] Iraq reportedly began using chemical weap- ons as early as November 1980. Estimates of the total casualties resulting from Iraqi chem- ical weapons use vary widely, ranging from about 7,500 to more than 25,000, with tens of thousands more injured.[27,28] Iraq first began

PX260



Iraqi soldiers deface an image of Iranian Supreme Leader Khomeini in 1988 near the end of the Iran-Iraq War.

Image Source: AFP

using Soviet-supplied Scud missiles in October 1982 after Iran invaded Iraqi territory. By 1984, Iraq had expanded its attacks on population centers, using strategic air raids, artillery shelling, and Scud missiles, in what became known as the "War of the Cities."[29] Iran purchased its own Scuds from Libya and North Korea for use against Iraqi population centers, launching its first ballistic missiles in March 1985. By the end of the war, however, Iran had acquired and launched significantly fewer missiles than Iraq.[30]

Starting in 1984, attacks on merchant shipping and oil infrastructure in the Persian Gulf—called the Tanker War—became an increasingly significant part of the conflict. In 1987, the U.S. Navy began to escort reflagged Kuwaiti oil tankers as part of Operation EARNEST WILL. On 14 April 1988, the USS *Samuel B. Roberts* was struck by an Iranian naval mine. In response 4 days later, the United States launched Operation PRAYING MANTIS against Iranian naval forces, sinking several Iranian vessels. On 3 July 1988, the USS *Vincennes* shot down Iran Air Flight 655, mistaking the aircraft for an attacking Iranian F-14. All 290 passengers and crew were killed. Tehran still believes the United States deliberately shot down the civilian airliner.[31,32]

By mid-July 1988, Iraqi troops had driven back into Iranian territory, and Tehran had grown increasingly weary of the war's progress. Believing they lacked the support and resources to defeat Saddam, military leaders convinced the supreme leader of the need to end the war. On 20 July, Khomeini accepted a UN ceasefire resolution with great reluctance, stating publicly the decision was more painful than drinking from a "poisoned chalice." The war officially ended on 20 August 1988 with the ceasefire observed across the front.[33]

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*



U.S. naval forces escort oil tankers in the Persian Gulf in 1987 during the Tanker War.

Image Source: AFP

The Iran-Iraq War—which Iran refers to as the "Imposed War" and the "Sacred Defense"—lasted 8 years with more than 200,000 Iranian troops and civilians killed.[34,35] Although devastating for Iran, it helped solidify popular support for Khomeini's new regime.[36] The war had a significant psychological impact on the future of the Iranian military and Tehran's security policy. Tehran viewed Western support for Saddam as proof of efforts to counter the Islamic Revolution. Syria was one of the few countries to support Iran during the war, establishing a key relationship that has persisted for decades. Heavy military and civilian losses, Saddam's use of chemical weapons

and ballistic missiles, the West's embargo of Iran and support for Iraq, and military engagements with U.S. forces in the Persian Gulf all led the regime to emphasize asymmetric capabilities and reinforce the necessity of self-reliance for decades to come. The war contributed to Tehran's belief in the necessity of working with Shias, disenfranchised Sunnis, and nonaligned countries as an "Axis of Resistance" against the West.[37,38]

Since the end of the Iran-Iraq War, Iran has adapted its military thinking and approach to modern conflict. During the 1990s, Iran expanded its outreach to Shia communities and

PX260

other potential allies throughout the Middle East—particularly Hizballah and Syria. Tehran established the IRGC Qods Force (IRGC-QF), the clandestine external operations element of the IRGC, in 1990 to better facilitate these networks and strengthen its covert presence in the Middle East and beyond. As Iran's primary conduit of support and guidance to nonstate partners, the IRGC-QF provides training, funding, and equipment for militias and political groups with common anti-Western ideologies and objectives.

## *Evolution of the Iranian Military*

1805-17887

| Year | Event |
| --- | --- |
| 1921 | Artesh established |
| 1923 | Imperial Iranian Ground Force (IIGF) established |
| 1924 | Imperial Iranian Air Force (IIAF) established |
| 1932 | Imperial Iranian Navy (IIN) established |
| 1979 | IRGC established; Imperial Iranian Armed Forces become Islamic Republic of Iran Ground Force (IRIGF), Air Force (IRIAF), and Navy (IRIN) |
| 1980 | Basij formally established |
| 1981 | Basij incorporated into the IRGC |
| 1985 | IRGC split into Ground Force (IRGCGF), Air Force (IRGCAF), and Navy (IRGCN) |
| 1990 | IRGC Qods Force (IRGC-QF) established |
| 2007 | Basij comes under IRGC command |
| 2008 | Khatemolanbia Air Defense Headquarters (KADHQ) established from IRIAF |
| 2009 | IRGCAF renamed IRGC Aerospace Force (IRGCASF); some Basij units integrated with IRGCGF |
| 2019 | KADHQ elevated to Artesh HQ; Artesh air defense force renamed Islamic Republic of Iran Air Defense Force (IRIADF) |

PX260

Tehran also invested heavily in advancing its conventional weapons capabilities, particularly ballistic missiles, to better prepare itself against future Iraqi attacks. Iran acquired significant assistance from other countries, including North Korea and China, to establish domestic production capabilities for major weapons programs. In the late 1980s, Iran also established a nuclear weapons program, which it halted in the early 2000s.[39]

After the U.S. invasions of Afghanistan in 2001 and Iraq in 2003 and the 2006 Israel-Hizballah War, Tehran began to adjust its military doctrine to better deter and counter the threats from technologically advanced Western militaries. Tehran concentrated on equipping its armed forces with niche capabilities emphasizing asymmetric tactics. The U.S. presence in the region created a sense of encirclement in Tehran, which continued to believe that Washington ultimately sought to overthrow the regime. During the Iraq War, Iran established strong ties with Shia militia groups, some of which have received Iranian financial backing for decades. Using Iranian-provided weapons, these groups were responsible for at least 603 U.S. personnel killed in Iraq between 2003 and 2011.[40,41]

Since the Arab Spring, the start of the Syrian civil war, and the rise of the Islamic State of Iraq and ash-Sham (ISIS), Tehran has become increasingly involved in regional conflicts—particularly in Syria, Iraq, and Yemen—as it responds to new security threats and seeks to strengthen its position as a regional power. Iran has committed extensive resources and deployed military forces to support key partners in these struggles, adapting its long-standing model of proxy warfare to incorporate a more conventional application of military power.[42]

In 2015, Tehran agreed to the Joint Comprehensive Plan of Action (JCPOA), which placed restrictions on its nuclear program in exchange for sanctions relief. Although Iran saw some improvement in its economy and a corresponding increase in government spending, including the defense budget, the benefits of integration into the world economy that Tehran and the Iranian public expected after the JCPOA never fully materialized. In May 2018, the United States withdrew from the JCPOA and began reimposing unilateral sanctions on Iran.

In April 2019, the U.S. State Department formally designated the IRGC as a foreign terrorist organization (FTO) and announced it would not renew exemptions for select countries to import Iranian oil.[43,44] In response to these actions, Iran began its own counter-pressure campaign, which has included gradually exceeding some of the nuclear-related limits stipulated in the JCPOA and conducting provocative maritime actions and unconventional warfare attacks against U.S. allies and interests. Amid this tension, Iran also shot down a U.S. unmanned aerial vehicle (UAV) and seized a British oil tanker.[45]

PX260



Image Source: AFP

IRGC soldiers during the September 2018 Holy Defense Week parade in Tehran marking the anniversary of the outbreak of the Iran-Iraq War.

# *National Military Overview*

Iran's armed forces consist of two separate, parallel militaries—the Artesh, or regular forces, and the IRGC. The Artesh, which long predates the revolution, focuses on defense against external threats; the mission of the IRGC, formed from armed militias during the revolution, is to defend the regime and its Islamic system of government from any threat, foreign or domestic. Iran's national police force, the Law Enforcement Force (LEF), is also considered part of the armed forces.

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## The Iranian Armed Forces at a Glance

| | |
|---|---|
| **Services** | ***Artesh:*** Ground Force, Navy, Air Force, Air Defense Force<br>***IRGC:*** Ground Force, Navy, Aerospace Force, Qods Force, Basij<br>***LEF*** |
| **Personnel** | ***Active military:*** Approximately 600,000<br>***Reserve:*** Approximately 450,000 active reserve, at least 500,000–1 million inactive reserve<br>***LEF:*** Approximately 200,000–300,000 |
| **Recruit Base** | Universal male conscription (18–24 months), some volunteer |
| **Equipment Profile** | Mostly legacy Western, Chinese, and Soviet-era weapon systems, with some newer domestically produced systems |
| **Core Strengths** | Large ballistic missile inventory, littoral naval capabilities, and unconventional partners and proxies abroad |
| **Key Vulnerabilities** | Dual military structure and lack of access to modern technology and weapons |

### *Iranian Military Structure and Size Estimates*

1805-17887

| Islamic Revolutionary Guard Corps (IRGC) | | Regular Forces (Artesh) | |
|---|---|---|---|
| IRGC Ground Force (IRGCGF) | 150,000 | Islamic Republic of Iran Ground Force (IRIGF) | 350,000 |
| IRGC Navy (IRGCN) | 20,000 | Islamic Republic of Iran Navy (IRIN) | 18,000 |
| IRGC Aerospace Force (IRGCASF) | 15,000 | Islamic Republic of Iran Air Force (IRIAF) | 37,000 |
| IRGC Qods Force (IRGC-QF) | 5,000 | Islamic Republic of Iran Air Defense Force (IRIADF) | 15,000 |
| Basij (Reserves) | 450,000 | **Total:** | **420,000** |
| **Total (excl. Basij)** | **190,000** | | |
| **Total (incl. Basij)** | **640,000** | | |
| **Total Military (Active): 610,000** | | | |
| **Total Military (incl. Reserves): 1,060,000** | | | |

Note: Basij number only includes estimated active reserve personnel; Iran may be able to mobilize an additional 500,000 to 1 million Basij in wartime.

DEFENSE INTELLIGENCE AGENCY

PX260

## Threat Perceptions

Iran views the United States as its greatest enduring threat and believes the United States is engaged in a covert and "soft war" to subvert the regime, undermining what Iran perceives as its rightful place as a regional power.[46,47,48] Supreme Leader Ayatollah Ali Khamenei maintains a deep, long-standing distrust of U.S. intentions.[49] Many regime elites view regional dynamics through the lens of perceived U.S. aggression, leading some to adopt the extreme view that the United States created ISIS in part to weaken Iran and its allies.[50] Distrust of the United States predates the regime's founding, dating back to the 1953 coup against Prime Minister Mossadegh that returned the shah to power.[51]

Iran has focused on preparing and equipping its military forces for defense against air attack and ground invasion by a technologically superior adversary, primarily the United States. The U.S. invasions of Iraq and Afghanistan in the early 2000s and international scrutiny of Iran's nuclear program raised Iran's fears of encirclement and potential Western attack.[52,53] Tehran recognizes that it cannot compete with the United States on a conventional level and has prioritized the development of defensive capabilities that emphasize asymmetric tactics to protect the country and the regime.[54]

In recent years, Tehran's immediate perceived threats have shifted to those coming from regional state and nonstate actors. Iran probably views Israel, Saudi Arabia, and Sunni extremist groups, such as ISIS, as its next most dan-



An anti-U.S. mural on the wall of the former U.S. Embassy in Tehran.

Image Source: AFP

gerous threats because of their immediacy and proximity to Iran's territory, allies, and regional influence.[55] Iran's expanding regional activities have only exacerbated these views. The growth in militant Sunni extremism, particularly ISIS, and Iran's perception of its regional adversaries' growing military capabilities has prompted Tehran to adjust some of its military modernization priorities.[56,57] Iran's latest national development plan reflects this shift in threat perceptions by emphasizing a broader range of conventional capabilities than previous plans.[58,59]

## National Security Strategy

Tehran's national security strategy aims to ensure continuity of clerical rule, maintain stability against internal and external threats, secure Iran's position as a dominant regional power, and achieve economic prosperity.[60] Iran has developed its security and military strategies based on these four enduring strategic objectives.

PX260

- **Ensure Continuity of Clerical Rule.** The supreme leader's position is based on the popular acceptance of *velayat-e faqih*. To ensure the regime's continued legitimacy with the Iranian populace, Tehran attempts to control much of the domestic political, social, and cultural environment and promote its interpretation of Islamic ideology.[61,62]

- **Secure the Nation From Internal and External Threats.** The regime uses its military and security capabilities to counter internal threats from political and ethnic opposition movements and terrorist groups and to prevent neighboring states' instability from spilling over or causing violence in Iran.[63] The military defends Iranian territory from foreign adversaries—including perceived existential threats, such as the United States, and regional rivals, such as Israel and Saudi Arabia—and provides support to allies and partners to counter regional threats.[64]

- **Become a Dominant Regional Power.** Tehran aspires to lead a stable regional order in which it has dominant influence. In Iran's vision for the region, its allies remain intact, the influence of the United States and U.S. regional partners is degraded, and Sunni extremist groups are defeated.[65,66,67] In pursuit of these goals, Iran provides extensive military, advisory, and financial assistance to allies and partners, seeking to protect its regional interests and pressure adversaries.

- **Attain Economic Prosperity.** Domestically, President Hasan Fereidun Ruhani's priority is to achieve national economic prosperity by reducing subsidies to the populace, curbing corruption, reforming the financial sector, and attracting foreign investment.[68,69,70] Tehran aims to balance foreign investment and partnerships with the priority it places on economic self-sufficiency, in part to reduce the effects of U.S. and multilateral sanctions.[71,72,73]

Iran remains committed to modernizing its military, forging new partnerships, and building the capacity of its partners across the region—including designated FTOs—all while balancing a desire to benefit from integrating into the global economic system. Despite some internal instability, Iranian military and security forces have also proven able to manage public unrest and low-level insurgencies from several ethnic opposition movements.[74,75]

## Stability Issues

Since the 1979 revolution, the regime has regularly cracked down on dissent to maintain political stability. Iranian political and ethnic opposition groups are largely localized and lack unity, posing little threat to the regime. Iran's internal stability continues to be threatened by a growing schism between the country's leaders, dominated by military and clerical elites, and the common people. The past 40 years have seen a growth in income inequality, increased IRGC political influence and control of key economic sectors, sustained sectarian and ethnic tension, violent suppression of dissent and reformists, persistent gender inequality, and tension stemming from the military's involvement in regional conflicts.

PX260

In 2009, after the disputed reelection of conservative President Mahmoud Ahmadinejad, a loosely organized opposition called the Green Movement emerged with large-scale protests demanding democratic reforms. The demonstrations marked the country's most significant unrest since the revolution. Bolstered by the Internet, hundreds of thousands of protesters turned out across the country. The government responded by ordering security services to crack down, which resulted in dozens of deaths, hundreds of arrests, restricted access to social media, and the closure of several newspapers. The regime quelled the unrest and nearly eliminated the Green Movement.[76]

Between December 2017 and January 2018, small incidents of civil disobedience converged into widespread public protests, the largest unrest Iran has faced since 2009. Some protestors challenged Iran's foreign policy—including



Iranian protestors after the disputed 2009 presidential elections.

Image Source: AFP

its involvement in regional conflict and support to proxy groups—but most focused on economic and social issues. Elected in 2013, President Ruhani promised increased financial benefits and economic growth, but these have not translated into an improved standard of living for everyday Iranians. While oil output had risen before the reimposition of U.S. sanctions, significant economic growth did not follow, and domestic prices for both food and fuel increased.[77]

Some longstanding opposition groups, mostly originating from minority ethnic and religious groups, continue to challenge Iran's internal security. Along the western border, the regime faces several militant Kurdish opposition groups—including the Kurdish Democratic Party of Iran (KDPI) and the Free Life Party of Kurdistan (PJAK)—which advocate for increased autonomy and the right to Kurdish self-determination. Armed opposition from PJAK has been especially violent, resulting in dozens of Iranian deaths annually since 2005.[78] Iran also faces periodic violence from Baluchi militants in southeastern Iran along the Pakistani border. The most prominent of these groups, Jaish ul-Adl (JAA), periodically attacks Iranian military facilities, border posts, and security patrols and occasionally takes military and security personnel hostage.[79,80] JAA hampers Iran-Pakistan relations, with Tehran accusing Islamabad of failing to curb Baluchi militants operating from Pakistani soil.[81] The Iranian military conducts counterinsurgency campaigns against the Kurdish and Baluchi militants in these regions on a nearly annual basis.

The most well-known group opposed to the regime is the People's Mujahedeen of Iran

PX260

(MEK). The MEK, founded in 1965 by Muslim students advocating a combination of Marxist communism and Islamist ideology, is an Iranian political-militant organization in exile that proposes the overthrow of the Iranian regime to establish itself as a new government. After initially supporting the 1979 revolution, the MEK fought on behalf of Saddam late in the Iran-Iraq War and was responsible for a series of bombings and assassinations in the 1990s and early 2000s. Widely unpopular in Iran, the MEK remains one of the regime's foremost internal security concerns. Formerly designated as an FTO by the United States, the Iranian government still considers the MEK a terrorist group.[82]

## External Defense Relations

Tehran maintains defense and security ties to both state and nonstate actors to project power and support Shia groups and Shia-led governments in the Middle East. Iran relies on its regional partnerships to help counter perceived threats from Sunni extremist groups, adversarial states, and Western military presence in the region. Iran refers to its efforts to build a regional network to counter Israeli and Western influence as the "Axis of Resistance," which includes Iran, Syria, Hizballah, Iraqi Shia militias, the Huthis, and some Palestinian militants. Beyond these closer allies, Tehran seeks to cultivate relations with other countries; Iran is also a member of the Nonaligned Movement and has observer status with the Shanghai Cooperation Organization.

Particularly in recent years, Tehran has committed extensive resources and deployed military personnel to support key partners facing internal conflicts. Since at least 2012, Iran has escalated its involvement in the Syrian civil war to include providing arms, training, advisers, and select combat personnel to support the Syrian regime. Since at least 2014, Iran has also provided direct military assistance—including IRGC advisers, training, and materiel support—to Iraqi Shia militias to help combat ISIS, which Tehran views as a critical national security threat, and to strengthen its influence in Iraq.

Iran maintains strong defense ties to Hizballah in Lebanon—its most significant and oldest nonstate partner and a core member of Tehran's "Axis of Resistance"—and provides support to some Palestinian groups in an attempt to pressure Israel. Iran also provides advanced

### The "Axis of Resistance"

Iran uses the term "Axis of Resistance" to describe its loose confederation of like-minded state and nonstate actors across the Middle East to counter Western influence. These partners, proxies, and allies include the Asad regime in Syria, Hizballah in Lebanon, Shia militias in Iraq, the Huthis in Yemen, Bahraini militants, and some Palestinian groups. Most of these are Shia entities, but select Sunni groups—like HAMAS—also align with Iran on key issues. The axis helps Tehran extend its influence in the region and provides a degree of strategic depth for Iran.[83]

PX260

weapons support to the Huthis in Yemen and calibrated support to Shia militants in Bahrain and the Taliban in Afghanistan. The IRGC-QF, the IRGC's external operations element, is Iran's primary conduit of support and guidance to these nonstate partners and proxies.[84,85]

Tehran maintains particularly close military-to-military ties with Syria and Iraq and has signed basic military cooperation agreements with Afghanistan, Belarus, China, Oman, Russia, South Africa, Sudan, and Venezuela.[86,87,88,89,90,91,92,93] Iran has also held discussions on defense and security issues with a wider range of countries, including Azerbaijan, Bolivia, Djibouti, India, Italy, Kazakhstan, Lebanon, Pakistan, Qatar, Tanzania, Turkey, and Turkmenistan.[94,95,96,97,98,99,100,101,102,103,104,105] Djibouti and Sudan have since severed diplomatic ties with Iran. Tehran has also purchased military equipment from Russia, China, North Korea, Belarus, and Ukraine.[106]

Military cooperation between Russia and Iran has grown significantly in recent years, despite Tehran's uncertainty about Moscow's long-term regional objectives.[107] Iran and Russia have cooperated to support Asad's regime in Syria since at least 2015. Iran has briefly allowed Russian combat aircraft to use its Hamadan Airbase as a stopover to launch strikes in Syria, marking the first time Tehran has permitted a foreign military to use its territory since the Islamic Revolution. Iran also seeks to procure Russian military hardware. In 2016, it completed its high-profile purchase of the Russian SA-20c air defense system, which provided Iran with its first capability to defend against a modern air force.[108]



In 2011, the Iranian Navy transited the Suez Canal for the first time since the Islamic Revolution.

Image Source: AFP

The Iranian military is also increasing its defense diplomacy efforts, particularly through near-continuous naval deployments beyond its immediate neighbors. Since 2009, Iran has sent small naval groups to "show the flag" through a series of port calls overseas and counterpiracy operations in the Gulf of Aden. Intended to enhance its soft power, Iran's use of naval diplomacy has demonstrated its capability to conduct out-of-area operations increasingly farther from Iranian shores, extending from the Mediterranean Sea and Bab al-Mandab Strait in the west to the Indian Ocean and Strait of Malacca in the east.

In 2011, the IRIN made its first transit through the Suez Canal since the Islamic Revolution, followed by its first ever port visits to China in 2013 and South Africa in 2016. Sometimes in conjunction with these port calls, Iran has conducted basic joint naval exercises—such as search and rescue drills—with China, Djibouti, India, Italy, Oman, Pakistan, and Russia.[109,110,111,112,113] Iran is also a member of the Indian Ocean Naval

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

Symposium (IONS), a 35-member regional naval cooperation forum. Tehran participated in the IONS's inaugural International Maritime Search and Rescue Exercise in Bangladesh in 2017 and hosted the sixth biannual IONS conference in April 2018 in Tehran.[114,115]

## *Iranian Port Visits and Joint Naval Exercises*

1805-17885



NOTE: Iran currently lacks diplomatic relations with Saudi Arabia, Sudan, and Djibouti.

Graphic Source: DIA, DS Design

DEFENSE INTELLIGENCE AGENCY

**17**

PX260

## Defense Budget

Following a significant increase in Iranian defense spending from 2014 to 2018 after the implementation of the JCPOA, Iran's security forces have experienced a funding decrease in 2019. Key drivers of this defense budget decrease include the reimposition of U.S. oil and banking sanctions, the depreciation of the Iranian rial, and chronic economic mismanagement. Iran's official defense budget for 2019 is approximately $20.7 billion, roughly 3.8 percent of gross domestic product (GDP), as passed by the Iranian Majles. This total includes funding for the major components of Iran's security apparatus, including the IRGC, Artesh, and LEF, as well as the Armed Forces General Staff (AFGS), the Ministry of Defense and Armed Forces Logistics (MODAFL), and security forces pensions. The decline in funding for 2019 is similar to the decrease following the implementation of multilateral oil and financial sanctions in 2012. Iran's current defense funding may face further cuts as Iranian oil export revenue continues to decline.

Although it is smaller in size, the IRGC receives a greater proportion of the defense budget than the Artesh. In 2019, Iran allocated 29 percent of the defense budget to the IRGC, compared with 12 percent for the Artesh.

*Official Iranian Defense Expenditures 2011–2019*

1805-17889



| | Real defense expenditure (Billions 2019 USD, Adjusted for Inflation) | Projected (Subject to change) | —$— % of GDP |

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

The government allocated 34 percent of the budget to pensions for all military personnel, and law enforcement personnel received about a third of the budget.[116,117,118] Iran also distributes funding to its many partners and proxies, expenditures not fully accounted for in the official budget. Between 2012 and 2018, Iran provided more than $16 billion to the Syrian regime, Hizballah, Iraqi Shia militias, the Huthis, and Palestinian groups.[119]

Tehran has a variety of off-budget sources of funding, making it difficult to accurately estimate the true size and scope of Iranian defense spending. The supreme leader can authorize transfers to defense and security organizations from the National Development Fund, Iran's reserve fund, as it reportedly has done to support military activities in Syria.[120] Moreover, the IRGC runs numerous private companies—most notably the wide-ranging *Khatemolanbia* ("seal of the prophets") Construction Headquarters—and exploits its far-reaching political and social influence to raise additional revenue. The IRGC and IRGC-QF can also gain extra income through smuggling and other illicit activities in the region.[121,122,123,124]

Iran's new 5-year national development plan, released in July 2017, emphasizes a broader range of conventional capabilities than past plans. The plan continues to prioritize missiles and naval forces, but it also emphasizes air power, including the first public reference to offensive air capabilities in an Iranian strategic document. The plan also provides new focus on electronic warfare (EW) capabilities.[125]

## Official 2019 Iranian Defense Spending

1805-17889



- **Other** 4% $0.67B
- **MODAFL** 4% $0.86B
- **Artesh** 12% $2.44B
- **Pensions** 34% $7.08B
- **LEF** 17% $3.60B
- **IRGC** 29% $6.09B

## Nuclear Program

Iran's overarching strategic goals of enhancing its security, prestige, and regional influence have led it to pursue nuclear energy and the capability to build missile-deliverable nuclear weapons, if it chooses to do so.

Iran has no nuclear weapons and, under the JCPOA, agreed not to seek, develop, or acquire nuclear weapons. The JCPOA limits Iran's uranium enrichment capabilities until at least 2026 and requires Iran to redesign its Arak reactor, making it more difficult to produce plutonium for weapons. Without a sufficient source of weapons-usable fissile material, Iran cannot produce a nuclear weapon.

DEFENSE INTELLIGENCE AGENCY

PX260

Iran's interest in nuclear technology dates back to the 1950s, when it began receiving assistance through the U.S. Atoms for Peace program, which later included the Tehran Nuclear Research Center and a 5-megawatt-thermal research reactor. Iran signed the Nonproliferation Treaty (NPT) as a nonweapons state and ratified the agreement in 1970. In the mid-1970s, Iran unveiled ambitious plans to expand the nuclear power program. These plans, however, did not come to fruition because of the 1979 revolution.

In the late 1980s, Iran established an undeclared nuclear program, managed through the Physics Research Center (PHRC) and overseen through a scientific committee by the Defense Industries Education Research Institute. The PHRC was subordinate to MODAFL. In the late 1990s, the PHRC was consolidated under the "Amad Plan," Iran's effort to develop a nuclear weapon. Iran's Project 111 was an attempt to integrate a spherical payload into a Shahab 3 missile reentry vehicle. However, Iran halted its nuclear weapons program in 2003 and subsequently announced the suspension of its declared uranium enrichment program. Iran also signed an Additional Protocol to its International Atomic Energy Agency (IAEA) Safeguards Agreement in 2003.

The halt was primarily in response to increasing international scrutiny resulting from the exposure of Iran's previously undeclared nuclear work. After this halt, and in line with its history of poor transparency, Iran continued its efforts to develop uranium enrichment technology with gas centrifuges and constructed an undeclared uranium enrichment plant near Qom, where it began producing near-20-percent enriched uranium in mid-2011. The IAEA also reported in 2011 that Iran may have conducted some dual-use research relevant to nuclear weapons after the 2003 halt. In late 2011, a Department of State compliance report found Iran to be in violation of obligations under the NPT because Iran's past nuclear activities and its failure to report ongoing activities were contrary to its Safeguards Agreement. That same year, the IAEA began an effort to clarify issues surrounding Iran's lack of transparency dating back to 2002, noting that by failing to declare some nuclear activities, including the construction at Qom, Iran was not implementing the Additional Protocol. In 2015, the IAEA concluded that it had no further indications of undeclared work.



Then-President Mahmoud Ahmadinejad tours the Natanz Uranium Enrichment Facility in 2008.

Image Source: AFP

PX260

IRAN MILITARY POWER | *Ensuring Regime Survival and Securing Regional Dominance*

In April 2015, a framework was announced to limit Iran's nuclear program that built on the interim Joint Plan of Action. Under the deal, Iran would commit that under no circumstances would it seek, develop, or acquire nuclear weapons, and it would limit its enrichment program and redesign a heavy-water reactor near Arak; in exchange, all nuclear-related sanctions against Iran would be suspended. On 14 July 2015, Iran and the P5+1 (the five permanent members of the UN Security Council plus Germany) finalized the JCPOA, whereby Iran agreed to curtail its nuclear program significantly in exchange for sanctions relief. On 16 January 2016, the IAEA reported that Iran had taken the technical steps required to meet its Implementation Day obligation. As long as Iran adheres to the agreement, the JCPOA limits the pathways to a nuclear weapon and hampers Iran's ability to conduct activities that could contribute to nuclear explosive device design and development.

Under the JCPOA, Iran must maintain a total enriched uranium stockpile of no more than 300 kilograms of up to 3.67 percent enriched uranium hexafluoride (UF6) or its equivalent in other chemical forms until 2031. Iran also had reduced its low-enriched uranium stockpile of about 8,500 kilograms to below 300 kilograms by shipping the material to Russia and downblending the remaining scrap to natural uranium.[126,127]

UN Security Council Resolution (UNSCR) 2231, which endorses the JCPOA but is separate from the nuclear agreement, sets out the specific limitations on Iran's nuclear program and places additional restrictions on Iran's ballistic missile program and its import and export of conventional arms.[128]

### Recent Developments

In May 2018, the United States ceased participation in the JCPOA and began reimposing unilateral U.S. sanctions on Iran. Tehran announced it would continue upholding its commitments while negotiating with remaining JCPOA participants to try to sustain the deal.[129,130] However, Khamenei warned that Iran would exit the deal if Iran were unable to achieve sufficient economic benefits from the JCPOA absent the United States.[131] In June 2018, Tehran announced that it would begin taking steps to expand Iran's enrichment infrastructure within the bounds of the JCPOA.[132]

Iran announced, in May 2019, that it would begin to cease adhering to some of its JCPOA obligations and warned it would take further action if JCPOA members did not meet certain economic demands.[133] In early July 2019, the IAEA confirmed that Iran had exceeded the JCPOA limit on the size of its low-enriched uranium stockpile and had produced uranium with an enrichment level exceeding the JCPOA limit of 3.67 percent.[134,135] Tehran threatened to continue gradually ceasing other JCPOA commitments unless it receives sufficient sanctions relief.[136]

PX260



Image Source: Iranian Students News Agency (ISNA)

Iranian ballistic missiles on display during the annual Holy Defense Week parade in Tehran on 22 September 2014.

# *Military Doctrine and Strategy*

Tehran employs a complex set of military and security capabilities, including a combination of conventional and unconventional forces. Iran's conventional military strategy is primarily based on deterrence and the ability to retaliate against an attacker. Its unconventional warfare operations and network of militant partners and proxies enable Tehran to advance its interests in the region and attain strategic depth from its adversaries. If deterrence fails, Iran would seek to demonstrate strength and resolve, impose a high cost on its adversary, and reestablish deterrence using the full range of these capabilities.

This strategy is unlikely to change considerably in the near term because of Iran's perception that its military remains technologically inferior to the United States—its primary adversary. However, since 2016, Khamenei and other senior leaders have suggested that Iran be more proactive in defending its territory and interests abroad.[137] Iran may seek to undertake other missions, such as small-scale expeditionary operations in the region and some participation in multilateral peacekeeping missions overseas.[138]

PX260

Iran's "way of war" emphasizes the need to avoid or deter conventional conflict while advancing its security objectives in the region, particularly through propaganda, psychological warfare, and proxy operations. Iran's deterrence is largely based on three core capabilities: ballistic missiles capable of long-range strikes, naval forces capable of threatening navigation in the Persian Gulf and Strait of Hormuz, and unconventional operations using partners and proxies abroad.[139]

## Perceptions of Modern Conflict

The 8-year Iran-Iraq War underscored the importance of strategic depth, ballistic missiles, and self-sufficiency in military capabilities—areas Iran continues to prioritize today. Most of Iran's senior military leaders fought in the war, and their experiences have played a critical role in shaping Iranian military strategy and capabilities.[140]

During the past two decades, Iran has gradually shifted its military thinking and approach to warfare based on the 21st-century conflicts of the Middle East. It developed its military doctrine to face technologically advanced Western militaries, aiming to raise the human and financial costs to a potential adversary to deter an attack. Iran has sought to build its armed forces with niche capabilities emphasizing asymmetric tactics intended to exploit the perceived weaknesses of its enemies, such as an aversion to casualties and overreliance on technology.[141,142]

Iran probably views modern warfare as a spectrum with multiple levels of conflict, including "soft" and "hard" war.[143,144] Iranian decisionmakers realize the importance of engaging an adversary in competition short of armed conflict across all domains of state power: diplomacy with neighboring states and international bodies; information and psychological operations; conventional and unconventional military posture and presence; and economics through its ability to influence global energy markets. Tehran believes the United States is engaged in a hybrid war to subvert the regime and its objectives, blending conventional and unconventional tactics with all elements of state power. Iran views this situation as short of armed conflict.[145,146]

Since at least 2014, Iranian senior officials have stressed the need to improve military capabilities against a wider range of conventional and unconventional threats, such as terrorism and insurgencies, rather than focusing overwhelmingly on the United States and Israel as Iran's primary adversaries.[147,148] Senior Iranian officials, including Khamenei, have called publicly for the military to better address these threats and support Iran's rising regional involvement.[149,150] In 2016, Khamenei for the first time called on the military to boost its offensive capabilities in addition to defensive capabilities.[151] Military officials have since noted Iran's need to invest more in offensive capabilities and missions, such as combat air power and maintaining forward presence, areas it has traditionally neglected. Iranian leaders frequently describe the Middle East's instability as requiring a strategy of "active deterrence," involving intervention in regional conflicts to confront national security threats before they endanger the homeland.[152,153]

PX260

## Military and Security Leadership

The regime often views political, cultural, and social dynamics as national security issues because these domains can affect the regime's ability to maintain clerical rule. Iran's power structures and decisionmaking bodies reflect this clerical oversight in all aspects of military and security policy.

Supreme Leader Khamenei, Iran's head of state since 1989, is the ultimate decisionmaker in the Iranian political system. Khamenei is responsible for delineating and supervising "the general policies of the Islamic Republic of Iran," according to the Iranian constitution, giving him the authority to direct all of Iran's domestic and foreign policies. As commander in chief, the supreme leader can declare war or peace. He has the power to appoint and dismiss military officials and the head of the judiciary, and appoints 6 of the 12 members of the Council of Guardians, which vets Iranian legislation and candidates for public office.[154,155]

President Ruhani is a pragmatic conservative cleric who serves as the popularly elected head of government. The president oversees the cabinet ministries, manages the budgetary process, and chairs the Supreme Council for National Security (SCNS). However, the Iranian constitution limits the authority of the president, who has no operational control of the military and can operate only within the boundaries set by the supreme leader.[156]

## Major Military and Security Institutions

### Supreme Council for National Security

The SCNS is the seniormost body for formulating foreign and security policy. The SCNS is formally chaired by the president, who also appoints the SCNS secretary, currently Vice Admiral Ali Shamkhani. Its members also include the speaker of the Majles; the head of the judiciary; the chief of the AFGS; the commanders of the IRGC and Artesh; and the ministers of defense, foreign affairs, the interior, and intelligence. As SCNS chair, the president holds some influence in Iranian foreign and defense policy. The SCNS reports to



President Ruhani speaks in front of portraits of Supreme Leader Khamenei and former Supreme Leader Khomeini on the 25th anniversary of Khomeini's death in 2014.

Image Source: AFP

PX260

the supreme leader, who makes all final security policy decisions and gives orders to the armed forces.[157]

### Armed Forces General Staff & Khatemolanbia Central Headquarters

The AFGS is the seniormost military body in Iran, setting military policy and strategic guidance as directed by the supreme leader. The Khatemolanbia Central Headquarters (KCHQ) is responsible for coordinating military operations. The AFGS and KCHQ monitor and coordinate the activities of Iran's two militaries. In 2016, the KCHQ was separated from the AFGS as a standing independent command responsible for operational command and control (C2); previously, the KCHQ would only be stood up in wartime. At that time, the supreme leader appointed IRGC Major General Mohammad Bagheri as the AFGS chief—Iran's chief of defense (CHOD)—and IRGC Major General Gholam Ali Rashid as the KCHQ commander.[158]

### Regular Forces (Artesh)

The Artesh primarily focuses on defending Iran's borders from external threats. It consists of ground, naval, air, and air defense components, which in total number about 420,000 personnel. Although generally not as fervent in ideology as the IRGC, the Artesh still adheres to *velayat-e faqih* and remains loyal to the supreme leader. The Artesh commander, currently Major General Adolrahim Musavi, reports to the AFGS chief.[159]

### Islamic Revolutionary Guard Corps

Supreme Leader Khomeini established the IRGC, also known as the *Sepah* (corps) or *Pasdaran* (guard), shortly after the Islamic Revolution. It has a broader mission to defend the Iranian revolution from any foreign or domestic threat. The IRGC—designated as an FTO by the United States—consists of ground, naval, aerospace, and unconventional components, which in total number about 190,000 personnel. Including the estimated active personnel from Iran's paramilitary reserve force, the Basij, the IRGC numbers roughly 640,000 personnel. The IRGC commander, currently Major General Hossein Salami, reports to the AFGS chief. Informally, however, IRGC leaders have close access to the supreme leader's office and routinely advise the supreme leader and his advisers on foreign policy matters.[160]

### Law Enforcement Force

Iran's national police force, the LEF, is responsible for maintaining internal stability and other police functions, such as counternarcotic operations and border security. The LEF formally falls under the Ministry of Interior, which reports to the president, but the supreme leader as commander in chief appoints the LEF commander, who is usually an IRGC general officer. In the event of escalating domestic unrest, the Basij and IRGC would reinforce the LEF.[161,162] In 2018, after the December 2017–January 2018 unrest, the LEF saw a substantial increase in its budget, even eclipsing the amount allocated to the Artesh.[163] The LEF has roughly 200,000–300,000 personnel nationwide, though estimates vary.[164,165]

## *Iranian Armed Forces Organizations Insignia*

1805-17889

    

AFGS          ARTESH          IRGC          MODAFL          LEF

### Ministry of Defense and Armed Forces Logistics

MODAFL is responsible for supporting and equipping the Iranian armed forces through military research, development, production, acquisition, and personnel support. Unlike many ministries of defense, MODAFL does not develop Iran's defense policy and is not in the chain of command.[166]  The current defense minister is Artesh Brigadier General Amir Hatami.

### Ministry of Intelligence and Security

The Ministry of Intelligence and Security (MOIS) is Iran's national-level civilian intelligence service. It is responsible for domestic security and intelligence, foreign intelligence, counterintelligence, monitoring Iranian expatriate communities, liaising with foreign intelligence services, and conducting sanctioned lethal operations. The current head of the MOIS is Mahmud Alavi-Tabar.[167]

### Ministry of Foreign Affairs

Iran's Ministry of Foreign Affairs (MFA) is nominally responsible for executing Iranian foreign policy. However, in practice, other elements of the Iranian government, particularly the IRGC-QF, have more control of Iranian affairs in some countries.[168] The current MFA head is Mohammad Javad Zarif.

## National Military Command and Control

Iran's constitution designates the supreme leader, not the president, as commander in chief of the armed forces, with the power to exercise military C2, declare war and peace, and approve military operations. Khamenei traditionally issues orders through the AFGS and KCHQ, which oversee and coordinate between the IRGC and Artesh, but sometimes bypasses these organizations to give orders directly to lower-level commanders.[169]

During a crisis, the supreme leader probably would consult with the SCNS to coordinate national policy. The president chairs the SCNS, and its members include key ministers and military leaders,



Supreme Leader Khamenei delivers a graduation speech at a military academy in 2006.

Image Source: AFP

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## *Artesh Services Insignia*




**IRIGF**


**IRIN**


**IRIAF**


**KADHQ/IRIADF**

including the head of the AFGS and the highest-ranking officials in the IRGC and Artesh, per the Iranian constitution. The SCNS has an advisory role in policy decisions but no C2 authority.

The AFGS and KCHQ command the Artesh and the IRGC. Both militaries have their own ground, naval, air, and air defense forces; the IRGC also operates Iran's missile force and oversees its external operations element. The Artesh and IRGC usually conduct operations independent of each other. However, IRGC and Artesh com-

manders are increasingly focused on improving collaboration and joint operations as the militaries seek to undertake a wider range of missions domestically and abroad.[170]

Although the supreme leader and political elites depend on the IRGC more than the Artesh, the two organizations increasingly work together to confront internal and external threats. The IRGC is well connected within the Iranian government and the economy, and the supreme leader uses it to help maintain his authority.[171,172]

## *National Military Command and Control*



PX260

## Key Military Leaders



*Major General*
**Mohammad Hossein Bagheri**

*AFGS Chief (CHOD)*

IRGC Major General Mohammad Hossein Bagheri has served as AFGS chief since June 2016. He is responsible for overseeing all Iranian military forces as Iran's highest-ranking military officer. Bagheri is tasked with overseeing and coordinating Iran's two parallel military forces—the Artesh and the IRGC—and reports directly to the supreme leader.[173]



*Major General*
**Gholam Ali Rashid**

*KCHQ Commander*

IRGC Major General Gholam Ali Rashid has served as commander of the KCHQ, Iran's top operational headquarters, since June 2016. He has longstanding connections with other IRGC leaders dating back to the Iran-Iraq War.[174]



*Major General*
**Hossein Salami**

*IRGC Commander*

Promoted and appointed IRGC commander in April 2019, IRGC Major General Hossein Salami is a key decisionmaker on foreign and domestic security issues because the IRGC retains a dominant role in the country's affairs. He oversees all IRGC activities, but has less control of the IRGC-QF, whose commander has a separate line of communication to Khamenei.[175]

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*



*Major General*
**Abdolrahim Musavi**

*Artesh Commander*



*Major General*
**Qasem Soleimani**

*IRGC-QF Commander*



*Brigadier General*
**Amir Hatami**

*Minister of Defense and Armed Forces Logistics*

Appointed Artesh commander and promoted to major general in August 2017, IRIGF Major General Abdolrahim Musavi's career in the Artesh dates back to before the Islamic Revolution. Musavi's top priorities as Artesh commander include improving coordination of Artesh and IRGC operations and advancing Iran's defense self-sufficiency. As Artesh commander, he also holds a position on the SCNS and informs national security decisions.[176]

As commander of the IRGC-QF, IRGC Major General Qasem Soleimani is a key architect and chief executor of Iran's foreign policy in regional conflict zones, including Afghanistan, Iraq, the Levant, and Yemen. He is one of the most recognized and popular military leaders in Iran and wields significant influence in Iranian foreign policy decisionmaking. His close relationship with Khamenei allows him to often directly advise and receive orders outside the traditional chain of command.[177]

IRIGF Brigadier General Amir Hatami—notably the first Artesh defense minister since MODAFL's inception in 1989—is responsible for overseeing research, development, production, and personnel support for the Iranian military. Although as defense minister Hatami plays a significant role in military modernization and defense diplomacy, he has no authority in the military chain of command.[178]



Image Source: AFP

An Iranian Qiam-1 SRBM unveiled in 2010.

# *Core Iranian Military Capabilities*

## Ballistic Missiles

I ran's ballistic missiles constitute a primary component of its strategic deterrent. Lacking a modern air force, Iran has embraced ballistic missiles as a long-range strike capability to dissuade its adversaries in the region—particularly the United States, Israel, and Saudi Arabia—from attacking Iran. Iran has the largest missile force in the Middle East, with a substantial inventory of close-range ballistic missiles (CRBMs), short-range ballistic missiles (SRBMs), and medium-range ballistic missiles (MRBMs) that can strike targets throughout the region as far as 2,000 kilometers from Iran's borders. Iran is also developing land-attack cruise missiles (LACMs), which present a unique threat profile from ballistic missiles because they can fly at low altitude and attack a target from multiple directions.[179,180]

Decades of international sanctions have hampered Iran's ability to modernize its military forces through foreign procurement, but Tehran has invested heavily in its domestic infrastructure, equipment, and expertise to develop

PX260

and produce increasingly capable ballistic and cruise missiles. Iran will continue to improve the accuracy and lethality of some of those systems and will pursue the development of new systems, despite continued international counterproliferation efforts and restrictions under UNSCR 2231. Iran is also extending the range of some of its SRBMs to be able to strike targets farther away, filling a capability gap between its MRBMs and older SRBMs. *[For more details on UNSCR 2231, see Appendix J.]*

Iran can launch salvos of missiles against large-area targets, such as military bases and population centers, throughout the region to inflict damage, complicate adversary military operations, and weaken enemy morale. Although it maintains many older, inaccurate missiles in its inventory, Iran is increasing the accuracy of many of its missile systems. The use of improved guidance technology and maneuverability during the terminal phase of flight enables these missiles to be used more effectively against smaller targets, including specific military facilities and ships at sea. These enhancements could reduce the miss-distance of some Iranian missiles to as little as tens of meters, potentially requiring fewer missiles

to damage or destroy an intended target and broadening Iran's options for missile use.

Iran's more-accurate systems are primarily short range, such as the Fateh-110 SRBM and its derivatives. Iran's longer-range systems, such as the Shahab 3 MRBM, are generally less accurate. However, Iran is developing MRBMs with greater precision, such as the Emad-1, that improve Iran's ability to strike distant targets more effectively. Iran could also complicate regional missile defenses by launching large missile salvos.

Iran lacks intermediate-range ballistic missiles (IRBMs) and intercontinental ballistic missiles (ICBMs), but Tehran's desire to have a strategic counter to the United States could drive it to develop and eventually field an ICBM. Iran continues to develop space launch vehicles (SLVs) with increasing lift capacity—including boosters that could be capable of ICBM ranges and potentially reach the continental United States, if configured for that purpose. Progress in Iran's space program could shorten a pathway to an ICBM because SLVs use inherently similar technologies.[181,182,183,184,185]

*[For more details on Iran's missile force, see Appendix A.]*

### Other Long-Range Strike Options

To supplement its long-range strike capabilities, Iran could also attempt to use its regional proxies and limited airstrike capability to attack an adversary's critical infrastructure. Iran maintains an aging inventory of combat aircraft—such as decades-old U.S. F-4 Phantoms—which it could attempt to use to attack its regional adversaries. However, these older platforms would be more vulnerable to air defenses than modern combat aircraft.[186] Iran could also use its armed UAVs for limited long-range airstrikes, potentially in combination with missiles, as it demonstrated during strikes against ISIS in Syria in 2018.[187]

DEFENSE INTELLIGENCE AGENCY

## Antiaccess/Area Denial

Iran's antiaccess/area denial (A2/AD) strategy seeks to prevent an adversary from entering or operating in areas that it considers essential to its security and sovereignty. Iranian A2/AD relies primarily on Iran's naval forces and geostrategic position along the Persian Gulf and Strait of Hormuz—a critical chokepoint for the world's oil supply. Iran's layered maritime defenses consist of numerous platforms and weapons intended, when used in a combined fashion, to overwhelm an adversary's naval forces. Iran emphasizes asymmetric tactics, such as small boat attacks, to saturate a ship's defenses. The full range of Iran's A2/AD capabilities include ship- and shore-launched antiship cruise missiles (ASCMs), fast attack craft (FAC) and fast inshore attack craft (FIAC), naval mines, submarines, UAVs, antiship ballistic missiles (ASBMs), and air defense systems.[188,189]

### Maritime Threat Capabilities

Capitalizing on the strategic nature of its littoral, Iran's maritime A2/AD strategy employs a combination of surface combatants, undersea warfare, and antiship missiles to deter naval aggression and hold maritime traffic at risk. Particularly with its large fleet of small surface vessels—high-speed FAC and FIAC equipped with machine guns, unguided rockets, torpedoes, ASCMs, and mines—Iran has developed a maritime guerrilla-warfare strategy intended to exploit the perceived weaknesses of traditional naval forces that rely on large vessels. Iran can



IRGCN FAC/FIAC attack a mock U.S. aircraft carrier during an exercise in 2015.

Image Source: AFP

also use its undersea warfare capabilities, which include Yono class midget submarines and Kilo class attack submarines, to attack surface ships in the Persian Gulf, Strait of Hormuz, and Gulf of Oman. Iran operates coastal defense cruise missiles (CDCMs) along its southern coast, which it can launch against military or civilian ships as far as 300 kilometers away. Iran also maintains an estimated inventory of more than 5,000 naval mines, including contact and influence mines, which it can rapidly deploy in the Persian Gulf and Strait of Hormuz using high-speed small boats equipped as minelayers.[190,191,192] *[For more details on Iran's naval forces, see Appendix B.]*

### Long-Range Strike

During a conflict, Iran probably would attempt to attack regional military bases and possibly energy infrastructure and other critical economic targets using its missile arsenal. Even with many of its missile systems having poor accuracy, Iran could use large salvos of missiles to complicate an adversary's military operations

PX260

in theater, particularly if some of Iran's newer, more-accurate systems are incorporated. Iran has also developed short-range ASBMs based on its Fateh-110 system. Iran could use these ASBMs, in concert with its other countermaritime capabilities, to attack adversary naval or commercial vessels operating in the Persian Gulf or Gulf of Oman.[193]

### Air Defenses

Iran operates a diverse array of SAM and radar systems intended to defend critical sites from attack by a technologically superior air force. Operational since 2017, Iran's Russian-provided SA-20c long-range SAM system is the most capable component of its integrated air defense system (IADS).[194] Iran is also fielding more-capable, domestically developed SAM and radar systems to help fill gaps in its air defenses.[195]

### Unconventional Warfare

Iran's unconventional warfare capability serves as a means of power projection and as part of its A2/AD strategy. Iran could use its strong ties to militant and terrorist groups in the region—such as Hizballah, Iraqi Shia militias, and the Huthis—to target critical adversary military and civilian facilities. Proxy attacks against adversary military bases in the region could complicate operations in theater.[196]

## Unconventional Operations

Iran has consistently demonstrated a preference for using partners, proxies, and covert campaigns to intervene in regional affairs because of limitations in its conventional military capabilities and a desire to maintain plausible deniability, thereby attempting to minimize the risk of escalation with its adversaries.[197]

Iran's reliance on unconventional operations—which is enabled by its relationships with a wide range of primarily Middle Eastern militias, militant groups, and terrorist organizations—is central to its foreign policy and defense strategy. The IRGC-QF is Tehran's primary tool for conducting unconventional operations and providing support to partners and proxies. The commander of the IRGC-QF, Major General Soleimani, has a close relationship with Khamenei, often communicating with and taking orders from him directly.

Through the IRGC-QF, Iran provides its partners, proxies, and affiliates with varying levels of financial assistance, training, and materiel support. Iran uses these groups to further its national security objectives while obfuscating Iranian involvement in foreign conflicts. Tehran also relies on them as a means to carry out retaliatory attacks on its adversaries. Most of these groups share similar religious and ideological values with Iran, particularly devotion to Shia Islam and, in some cases, adherence to *velayat-e faqih*. However, Iran has also established relationships with more diverse groups based on shared enemies, common threats, and mutually beneficial goals.

The strength of Iran's relationship with these groups varies widely. Iran's strongest and most successful regional partnership is with Hizballah, dating back to 1982. The relationship today involves Iranian sponsorship, cooperation, and shared sectarian and political interests, espe-

DEFENSE INTELLIGENCE AGENCY

PX260

cially against Israel and the United States. However, Hizballah retains its decisionmaking in internal Lebanese affairs.[198,199,200]

In recent years, the conflicts in Syria, Iraq, and Yemen have placed new demands on the IRGC-QF to manage Iranian involvement in multiple combat zones, including some support from Iranian conventional forces. In Syria, Iran maintains a strong relationship with the Asad regime, which it views as a critical ally and conduit to Hizballah.[201] In Iraq, the IRGC-QF has strong influence with Iranian-aligned Shia groups operating within the Popular Mobilization Forces (PMF), many of whom have cooperated with Baghdad to defeat ISIS.[202] In Yemen, Iran has supported the Huthi rebels with financial assistance, weapons, military training, and operational advice.[203]

Iran also uses the IRGC-QF to provide varying levels of support to Shia groups in Bahrain, some Palestinian militant groups, and the Taliban in Afghanistan.[204] As active combat operations have drawn down in Syria and Iraq, Tehran could choose to increase support to historical unconventional lines of effort in the region or pursue new opportunities.

*[For more details on Iran's unconventional forces, see Appendix C.]*

## Expeditionary Operations

Iran has limited expeditionary warfare and force projection capabilities. It has shown itself capable of sending small groups of conventional forces—including ground forces, military air-lift, and UAV operators—into permissive allied countries to support larger operations. Since the outbreak of the Syrian civil war in 2011, Iran has become increasingly involved in regional conflicts, with varying levels of military intervention in Iraq, Syria, and Yemen. The IRGC-QF remains the lead for these operations, but Iran has adapted its approach to external operations by incorporating conventional Iranian forces in addition to large numbers of Shia foreign fighters. Iran's military has also revised professional military education to emphasize lessons learned from operations in Syria and Iraq, where it also has gained its first experience conducting combined operations with allied military forces.

In Syria, Iran has worked to defeat ISIS and defend the Asad regime against insurgent groups, with Iranian and Iranian-affiliated forces serving as critical force multipliers for the regime. In the spring of 2016, Tehran deployed a small number of ground forces from the Artesh to Syria—the first such deployment outside Iran since the Iran-Iraq War.[205]



Soldiers carry the caskets of IRGC personnel killed in Syria in 2016.

Image Source: AFP

PX260

As early as 2014, Iran deployed military advisers and some conventional ground forces to Iraq to combat ISIS and prevent the state's fragmentation, although Iran maintains a larger conventional military presence in Syria. The IRGC-QF has strong ties to many Iraqi Shia groups that have participated in operations to retake Iraqi territory from ISIS.[206,207]

In Yemen, Iran provides military support to the Huthis against the Saudi-led coalition, enabling Tehran to indirectly pressure Riyadh without entering into a direct military conflict. Huthi missile launches against targets in Saudi Arabia and attacks on Saudi-led coalition ships demonstrate Iran's provision of increasingly lethal capabilities to the Huthis. Tehran's provision of explosive boat technology and Iranian-made missiles, including the extended-range Qiam SRBM, provides the Huthis with systems exceeding the capabilities of the pre-conflict Yemeni inventory.[208,209]

Iran does not participate meaningfully in international peacekeeping operations, contributing only a few personnel to the African Union-United Nations Hybrid Operation in Darfur (UNAMID). However, Tehran has expressed interest in expanding its military support to international peacekeeping missions, potentially as a way to increase legitimacy, participate in multilateral initiatives, and develop expeditionary-like capabilities through operations other than war.[210,211]

Iran can also conduct limited out-of-area naval operations as far as China, South Africa, and the Mediterranean Sea. The Islamic Republic of



Then-IRIN Commander Rear Admiral Habibollah Sayyari discussing Iranian naval operations during a press conference in 2010.

Image Source: AFP

Iran Navy (IRIN) maintains regular rotations of deployed naval groups (DNGs) for counter-piracy, presence, and naval diplomacy missions in the Arabian Sea, Gulf of Aden, and sometimes the Indian Ocean. Often plagued with maintenance issues, the DNGs are largely symbolic, showcasing Iran's projection of force beyond its territorial waters.[212,213]

## Cyberspace

Iran uses cyberspace operations as a tool of statecraft and internal security, and it continues to improve its capabilities. Tehran views these operations as a safe, low-cost method to collect information and retaliate against perceived threats. Tehran often masks its cyberoperations using proxies to maintain plausible deniability. However, there are often clear indications that link these operations to Iran's security apparatus. Domestically,

PX260

the Iranian government pursues domination of the cyberspace environment to influence the population's ideological and cultural exposure. Abroad, Tehran intimidates, harasses, and influences adversaries by conducting cyberoperations and empowers its proxy networks to do the same.

Compared to more technologically advanced states, such as the United States, China, and Russia, Tehran's offensive cyberspace capabilities remain underdeveloped. Although accounts of Iranian hacking first emerged in the early 2000s, state-sponsored cyberspace activities did not appear publicly until 2007. Prompted by the 2010 Stuxnet cyberattack on Iran's nuclear centrifuges, Iran recognized the need to develop its cyberspace capability as a strategic priority. Tehran receives technical assistance for cyberspace defense from Russia and China, and Ruhani has repeatedly made commitments to increase Iran's cyberspace budget. Iran has quickly evolved from using web defacements and basic censorship to conducting more-sophisticated internal information controls, destructive attacks, and espionage campaigns.

Iranian cyberspace actors use phishing and defacing campaigns against commercial enterprises, as well as cyberespionage against military and government data. Iranian cyberactors frequently target aerospace companies, defense contractors, energy and natural resource companies, and telecommunications firms for cyberespionage operations. Since at least 2014, Iranian cyberactors have stolen credentials and spread malware on business networks. These cyberespionage efforts can support Iran's military research and development efforts and commodities industries.[214,215,216]

Iran has shown it is capable of disruptive and destructive offensive cyberattacks, including against U.S. targets. After a 2012 malware attack targeting an Iranian oil facility, Iran responded with a cyberattack on Saudi Aramco and Qatari RasGas, using malware to cause irreparable damage to thousands of computers. During 2012–2013, Iranian hackers launched a distributed denial of service (DDoS) campaign against major U.S. banks and the U.S. Stock Exchange, and in 2014 conducted a data-deletion attack on a U.S. casino. During the 2014 Israel-Gaza conflict, Iranian cyberactors launched a DDoS attack against Israel Defense Forces infrastructure. From late 2016 to early 2017, Iran conducted another larger and more damaging malware attack against Saudi targets, including the civil aviation authority, labor ministry, and central bank.[217]

Iranian cyberactors also conduct ongoing information operations aimed at promoting pro-Iranian political interests via the use of a network of fake social media accounts. These accounts promote anti-Saudi and anti-Western stances and support policies that Tehran views as favorable.[218]

## Intelligence

Iran's intelligence services are capable of sophisticated operations worldwide to counter potential threats to the regime, its revolutionary ideology, and its interests. Iran's intelligence community is composed of 16 organizations charged with foreign intelligence, counterintelligence, and internal monitoring and security missions.[219] These organizations include the MOIS and headquar-

PX260

ters elements and subcomponents within the IRGC and Artesh. Overlapping missions and parallel chains of command—particularly between the MOIS and elements of the IRGC—fuel competition between the organizations for resources, missions, and prestige. The Intelligence Coordination Council, chaired by the MOIS, is charged with coordinating and deconflicting the operations of Iran's intelligence organizations.

The MOIS is Iran's national-level civilian intelligence service. It is responsible for domestic security and intelligence, foreign intelligence, monitoring Iranian expatriate communities, liaising with foreign intelligence services, counterintelligence, and sanctioned lethal operations. The MOIS primarily collects information regarding the intentions and capabilities of foreign governments and dissidents Iran regards as hostile.[220] The IRGC Intelligence Organization (IRGC-IO) is Iran's foremost military intelligence service, capable of all-source collection, analysis, and investigations. The IRGC also operates a Counterintelligence Organization that is charged with protecting



IRGC-IO Chief Hossein Taeb.

Image Source: Wikimedia Commons

IRGC personnel, operations, and facilities from espionage, information leaks, and other counter-revolutionary threats. The Artesh has a joint military intelligence capability tasked with tactical intelligence gathering, counterintelligence operations, and internal security.[221]

*[For more details on Iran's intelligence services, see Appendix H.]*

## Space/Counterspace

Iran recognizes the strategic value of space and counterspace capabilities. Tehran claims to have developed sophisticated capabilities, including SLVs and communications and remote sensing satellites. Iran's simple SLVs are only able to launch microsatellites into low Earth orbit and have proven unreliable with few successful satellite launches. The Iran Space Agency and Iran Space Research Center—which are subordinate to the Ministry of Information and Communications Technology—along with MODAFL, oversee the country's SLV and satellite development programs. Iran initially developed its SLVs as an extension of its ballistic missile program, but it has genuine civilian and military space launch goals.

Iran has conducted several successful launches of the two-stage Safir SLV since its first attempt in 2008. It has also revealed the larger two-stage Simorgh SLV, which it launched in July 2017 and January 2019 without successfully placing a satellite into orbit. The Simorgh could serve as a test bed for developing ICBM technologies. Because of the inherent overlap in technology between ICBMs and SLVs, Iran's development

PX260

of larger, more-capable SLV boosters remains a concern for a future ICBM capability. In 2005, Iran became a founding member of the Asia-Pacific Space Cooperation Organization (APSCO), which is led by China, in order to access space technology from other countries.[222,223]



An Iranian Safir SLV is prepared for launch in 2009.

Image Source: AFP

Iran's counterspace capabilities have centered around jamming satellite communications and GPS, and Iran is reportedly making advancements in these areas.[224,225] Iran is also seeking to improve its space object surveillance and identification capabilities through domestic development and by joining international space situational awareness projects through APSCO.[226]

## Chemical and Biological Warfare

Iranian leaders have long been concerned about the threat of chemical and biological warfare because of the considerable loss of life from chemical weapons during the Iran-Iraq War. Iran is a States party to both the Chemical Weapons Convention (CWC) and the Biological and Toxin Weapons Convention (BWC), which ban the development, production, and stockpiling of certain chemical and biological agents. Iran publicly denounces the use of weapons of mass destruction (WMD), and Khamenei has reportedly issued a *fatwa* (Islamic legal ruling) against chemical weapons.[227]

In November 2018, the United States found Iran noncompliant with its CWC obligations. Iran failed to declare its transfer of chemical weapons to Libya in the 1980s or its holdings of riot control agents, such as the tearing agent CR, and has not submitted a complete chemical weapons production facility declaration. The United States is also concerned that Iran is pursuing central nervous system-acting chemicals for offensive purposes. Although these chemicals have legitimate uses as pharmaceuticals, they can be lethal at certain doses.[228,229]

PX260

## Denial and Deception

Denial and deception (D&D) is a core component of Iranian military doctrine, and Iran uses D&D techniques extensively to reduce the vulnerability and increase the survivability of its military forces. To apply these techniques across the military, Tehran has established what it calls a "passive defense" doctrine. The effort was based on lessons learned from past military conflicts, including U.S. operations in the Middle East and the 2006 Israel-Hizballah conflict. Iran's nationwide passive defense program comprises a wide range of D&D tactics to hinder foreign intelligence collection and ensure the survivability of critical infrastructure and core military capabilities. Key Iranian passive defense measures include camouflage and concealment, force dispersals, underground facilities, and highly mobile units. For example, Iran configures some military vehicles to resemble civilian trucks. Iran's passive defense doctrine also includes aspects of cyberdefense, mainly to protect networks from cyberattack and intrusion from outside influences.

The National Passive Defense Organization (NPDO) sends guidance and regulations to passive defense offices embedded across Iranian industries and civilian organizations. The NPDO has pressed the importance of the passive defense doctrine beyond the military in public forums, including Friday prayers. In 2012, Iran established Passive Defense Week, a nationwide effort to promote awareness for key passive defense measures.[230,231,232,233,234,235,236,237]

## Underground Facilities

Iran has the largest underground facility (UGF) program in the Middle East. Based on the central pillars of Iran's passive defense doctrine, Tehran has invested heavily in constructing UGFs to conceal and protect critical military and civilian infrastructure throughout the country. Iran designed and built these facilities to support various aspects of its defense industries, key nuclear infrastructure, and military forces, including naval sites, missile bases, and equipment storage.[238]

In late 2009, Ali Akbar Salehi, head of the Atomic Energy Organization of Iran (AEOI), stated Iran would build nuclear facilities in mountains as a response to international pressure for Tehran to abandon its nuclear ambitions.[239] Iran houses portions of its nuclear program within deep tunnels and underground bunkers at locations such as Natanz and Fordow (Qom).[240,241] However, both sites are subject to restrictions outlined in the JCPOA and closely monitored by the IAEA.

UGFs support most facets of Tehran's ballistic missile capabilities, including the operational force and the missile development and production program. Missile-related UGFs house weapons and equipment storage, underground basing of mobile missiles, and hardened launch sites.[242] In recent years, Iran has used state media to broadcast the launch of ballistic missiles from underground launch chambers and showcase underground missile garrisons.[243] Regional media also indicates Iran is aiding proxies in the Middle East by helping them construct underground missile production facilities.[244]

PX260

# Outlook: Building a More Capable Conventional Force

Iran will continue to use a combination of conventional and unconventional capabilities to achieve its objectives at home and abroad, as Tehran's core national security objectives are unlikely to change for the foreseeable future. Seeking to strengthen its regional position, Tehran is attempting to bolster its ties in the international community and build the capacity of its partners in the Middle East, while advancing its military capabilities at home for defense and deterrence. Recognizing its inability to defeat an advanced Western military, such as the United States, Iran in the near term probably will continue to emphasize its three core capabilities: ballistic missiles capable of striking targets throughout the region, littoral naval forces capable of threatening navigation in the Persian Gulf and Strait of Hormuz, and support for partners and proxies capable of unconventional operations abroad.

Although the IRGC-QF and its network of proxies will remain central to Iran's military power, Tehran will improve its conventional forces and seek new capabilities. Iran's latest 5-year development plan continues priority for missiles, naval forces, and air defenses, but it also adds new emphasis on combat air power and EW capabilities. Iran probably will continue to focus on domestic development of increasingly capable missiles, naval platforms and weapons, and air defenses, while it attempts to upgrade some of its deteriorating air and ground capabilities primarily through foreign purchases. Under UNSCR 2231, Iran is prohibited from procuring most types of conventional weapon systems from abroad. However, these restrictions are set to expire by October 2020, providing Tehran with the opportunity to acquire some advanced capabilities that have been beyond its reach for decades.

- **Missile Force.** Iran will deploy an increasing number of more accurate and lethal theater ballistic missiles, improve its existing missile inventory, and field new LACMs. It will also pursue technical capabilities that could enable it to produce an ICBM.

- **Naval Forces.** Iran's naval forces will field increasingly capable platforms and weapons, including improved naval mines, faster and more lethal surface platforms, more-advanced ASCMs, larger and more-sophisticated submarines, and new ASBMs.

- **Air and Air Defense Forces.** Iran will modernize its IADS with new air surveillance radars, SAMs, and command, control, communications, computers, intelligence, surveillance, and reconnaissance (C4ISR) systems. Once the UN arms embargo ends, Tehran can purchase advanced fourth-generation fighter aircraft. Iran will also develop and field more-capable UAVs, including armed platforms.

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

- **Ground Forces.** The ground forces will continue structural changes, including the creation of new rapid-response brigades, which could enable them to become more agile and effective in countering threats. Iran also will be able to buy modern main battle tanks after the UN embargo ends.

Despite these goals, ongoing financial constraints and sanctions will challenge Iran's military modernization efforts. Tehran will be unable to meet all of its acquisition priorities and requirements in this environment. The complex security situation of the Middle East—with the continued presence of U.S. forces, the superior force projection capabilities of Israel, and the growing military means of Saudi Arabia and the Gulf states—will further complicate Iran's efforts to build its conventional force.

As Iran's perception of the threats it faces evolves during the coming years, the military will be forced to contend with new roles and missions. Iran's current modernization plans emphasize a broader range of conventional capabilities than in the past. Iranian leaders have repeatedly noted that Iran must improve its capabilities against a wider range of conventional and unconventional threats, such as terrorism and insurgencies, and be more proactive in defending Iranian territory and interests abroad. Since the supreme leader's mandate in 2016 for Iran to improve both its defensive and offensive capabilities, military officials have stressed the need to invest in new capabilities and missions, such as combat air power and maintaining forward presence, areas it has traditionally neglected. Beyond Iran's unprecedented deployment of conventional forces to Iraq and Syria, officials have taken steps—including changes in force structure, training, and tactics—toward revising its military doctrine.

As its capabilities improve and its approach to the region evolves during the next decade, Iran's military could consider undertaking broader missions, such as multilateral peace-keeping missions, expeditionary operations elsewhere in the region, or permanent basing in allied countries. Nevertheless, Iran's conventional forces today remain primarily oriented for defensive missions and continue

### Evolving Military Training

Some recent Iranian exercises have begun to demonstrate changes in Iranian military doctrine. In December 2018, Iran conducted its first major amphibious assault exercise in many years, NOBLE PROPHET 12. The IRGCGF commander described the exercise as Iran's first demonstration of offensive aspects of its defensive doctrine, noting that an ability to conduct offensive operations is a key element of Iran's deterrence. In January 2019, the IRIGF also employed offensive tactics during its EQTEDAR 97 exercise. Officials noted the event displayed Iran's resolve to proactively attack its enemies instead of waiting to respond.[245,246,247]

DEFENSE INTELLIGENCE AGENCY

PX260

to rely on asymmetric tactics. More substantial and sustained institutional reforms and investments in new equipment will be required for Iran to develop a more balanced military capable of both defensive and expeditionary operations.

### Iranian Military Modernization Goals[248,249]

1805-17887

| Capability | Stated Goals |
| --- | --- |
| Missile | Increase the accuracy, lethality, and production of ballistic and cruise missiles |
| Air Defense | Develop longer-range SAMs and improve short- and medium-range systems |
| Air | Develop advanced offensive and defensive air power |
| Navy | Attain regional and deterrent sea power |
| Ground | Strengthen ground combat and rapid-reaction capability |
| EW/C4ISR | Improve EW and C4ISR posture, including space-based capabilities |
| Cyberspace | Increase cyberspace presence and hold adversary infratructure at risk |

42

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

# *Appendix A: Missile Force*

Iran has the largest and most diverse ballistic missile arsenal in the Middle East, with a substantial inventory of close-range ballistic missiles (CRBMs), short-range ballistic missiles (SRBMs), and medium-range ballistic missiles (MRBMs) that can strike targets throughout the region up to 2,000 kilometers from Iran's borders, as far as Israel and southeastern

## *Iranian Ballistic Missile Ranges*

1805-17885



System (Max Range)
- Shahab 1 (300 km)
- Fateh-110 (300-500 km)
- Shahab 2 SRBM (500 km)
- Zolfaghar SRBM (700 km)
- Qiam-1 SRBM (750 km)
- Shahab 3/Emad-1/ Sejjil MRBMs (2,000 km)

Graphic Source: DIA, DS Design

Boundary representation is not necessarily authoritative.

DEFENSE INTELLIGENCE AGENCY

**43**

PX260

Europe. Iran's missile force—the Al-Ghadir Missile Command (AGMC), which falls under the control of the IRGC Aerospace Force (IRG-CASF)—serves as a critical strategic deterrent and a key tool of Iranian power projection.

The AGMC periodically conducts highly publicized national-level exercises demonstrating the capabilities and readiness of the force, often as part of the IRGC's NOBLE PROPHET series of exercises. In 2017, Iran for the first time used the name EQTEDAR-E VELAYAT for its major AGMC exercise. These show-of-force events typically include publicized missile launches and statements highlighting Iran's missile capabilities and deterrent posture. Prior exercises have showcased launches against a mock U.S. airfield and naval targets.[250,251,252]

Iran has also used its missiles in combat on several occasions in recent years. In June 2017 and October 2018, Iran launched SRBMs from western Iran in high-profile strikes against ISIS targets in Syria. Iran conducted both operations in direct response to terrorist attacks in Iran, although some officials noted the attacks were also intended as a message to any of Iran's potential adversaries.[253,254,255] In September 2018, Iran launched SRBMs against Kurdish militant targets in Iraq, damaging the Kurdish Democratic Party of Iran (KDPI) headquarters.[256]

Iran's continued production of missiles and refinement of ballistic missile technology pose a growing threat to U.S. forces and allies in the Middle East. Tehran is also a major proliferator of ballistic missile technology to regional state actors and proxy groups. Although Iranian leaders emphasize self-reliance, Iran continues to depend on foreign suppliers for critical components and technology.

Iran has an extensive missile development program, and the size and sophistication of its missile force continues to grow despite decades of counterproliferation efforts aimed at curbing its advancement. Iran continues to attempt to increase the lethality, reliability, and accuracy of its missile force. In recent years, Iran has unveiled SRBMs with increasingly greater range and precision as well as MRBMs with claimed accuracy and warhead improvements. Iran is fielding an increasing number of theater ballistic missiles, improving its existing inventory, and developing technical capabilities that could enable it to produce an intercontinental ballistic missile (ICBM).[257,258,259,260,261]

## Close- and Short-Range Ballistic Missiles

Iran's liquid-propellant SRBMs—the Shahab 1, Shahab 2, and Qiam-1—are based on Scud technology. The Qiam-1 has a range of at least 750 kilometers, and variants of the system have been used as part of Iranian strikes on ISIS in Syria. Tehran has also supplied extended-range Qiam-1 variants to the Huthis in Yemen. These missiles, launched mostly at Riyadh, Saudi Arabia, have flown to a range of more than 900 kilometers.[262,263,264]

Iran's solid-propellant CRBMs and SRBMs primarily consist of the many variants of the Fateh-110 family of missiles. Most of these systems have ranges up to about 300 kilometers, but Iran

PX260



A Shahab 3 MRBM is launched during an exercise in 2016.

Image Source: AFP



A Shahab 1 SRBM is launched during an exercise in 2012.

Image Source: AFP

has unveiled a variant called the Fateh-313 with a 500-kilometer range. Iran has also advertised several variants of these missiles configured with different terminal seeker technologies, including electro-optical and antiradiation homing, which makes them capable of targeting ships. These systems—which include the Khalij Fars, Hormuz 1, and Hormuz 2—reportedly have ranges of about 300 kilometers.[265] In September 2016, Iran unveiled the new Zolfaghar SRBM, a solid-pro-

pellant system with a 700-kilometer range. Iran used these missiles in its 2017 and 2018 strikes against ISIS in Syria.[266]

### Medium-Range Ballistic Missiles

The liquid-propellant Shahab 3 is the main-stay of Iran's MRBM force. Iran has modified the Shahab 3, which is based on the North Korean No Dong MRBM, to extend its range and effectiveness, with the longest range variant being able to reach targets at a distance of about 2,000 kilometers. In 2015, Iran publicized the first launch of a Shahab 3 variant—called the Emad-1—equipped with a maneuverable reentry vehicle (MARV), which could allow the system to strike targets up to potentially 2,000 kilometers away with near-precision accuracy. Iran has also conducted multiple launches of the solid-propellant Sejjil MRBM, which also has a range of 2,000 kilometers. Iranian officials have announced plans for an Emad-2 with greater

PX260

precision as well as a new Sejjil variant, which can also be guided all the way to the target.[267] In September 2016, Iran claimed production of the new Khorramshar MRBM would begin in 2017. The Khorramshahr, which Iran states has a 2,000-kilometer range, appears to be derived from North Korean Musudan technology.[268,269]

### Land-Attack Cruise Missiles

In 2012, Iran announced the development of its first land-attack cruise missile (LACM), called Meshkat. In 2015, Iran displayed what it called the Soumar LACM, a ground-launched system that appears to be based on the Russian air-launched AS-15. Iran claims the Soumar has a 2,000-kilometer range. LACMs can provide Iran with a precision-strike capability up to MRBM ranges that could further complicate missile defenses.[270]

### Space Launch Vehicles

Since 2008, Iran has launched multi-stage space launch vehicles (SLVs) that could also aid Iran's development of longer-range ballistic missiles



The unveiling of the Simorgh SLV in 2010.

Image Source: AFP

**46**

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

because SLVs use inherently similar technologies. Iran has conducted multiple launches of the two-stage, liquid-propellant Safir SLV, a mix of successes and failures. It has also launched the larger two-stage, liquid-propellant Simorgh SLV, which is designed to carry satellites higher into orbit and could also serve as a test bed for developing ICBM technologies. The Simorgh could be capable of ICBM ranges if configured as a ballistic missile.[271,272]

## *Selected Iranian Ballistic Missiles*[273]

1805-17887

| System | Fateh-110 SRBM (and variants) | Shahab 1 SRBM | Shahab 2 SRBM | Zolfaghar SRBM | Qiam-1 SRBM | Shahab 3 MRBM | Emad-1 MRBM | Sejjil (Ashura) MRBM |
|---|---|---|---|---|---|---|---|---|
| **Maximum Range (km)** | 300–500 | 300 | 500 | 700 | At least 750 | Up to 2,000 | Up to 2,000 | 2,000 |
| **Propellant Type** | Solid | Liquid | Liquid | Solid | Liquid | Liquid | Liquid | Solid |
| **Deployment Mode** | Road-mobile | Road-mobile | Road-mobile | Road-mobile | Road-mobile, Silo | Road-mobile, Silo | Road-mobile | Road-mobile |

Note: This chart does not include all systems in development. All ranges are approximate.

DEFENSE INTELLIGENCE AGENCY

**47**

PX260

# *Appendix B: Naval Forces*

Iran operates two independent naval forces—the Islamic Republic of Iran Navy (IRIN), the Artesh's naval branch, and the IRGC Navy (IRGCN). Iran established the IRGCN in 1985; the IRIN existed as part of the Artesh before the 1979 revolution. The commander of the IRIN is Rear Admiral Hossein Khanzadi, and the commander of the IRGCN is Rear Admiral Alireza Tangsiri.[274]

## *Iranian Naval Headquarters and Areas of Responsibility*



1805-17885

Graphic Source: DIA, IJS Design

48

PX260

IRAN MILITARY POWER | *Ensuring Regime Survival and Securing Regional Dominance*

In 2007, the two naval forces reorganized, and Iran assigned specific areas of operation for each. Tehran assigned the IRGCN sole responsibility for the Persian Gulf and assigned the IRIN the Gulf of Oman and Caspian Sea. Both services continued to share responsibility for the Strait of Hormuz. The geographic split helped streamline command and control (C2) while reducing confusion, miscommunication, and duplication of efforts. With the added responsibility, the IRGCN established two new naval districts (NDs) in the central and southern Persian Gulf. The reorganization also provided the IRIN with a greater mandate to operate farther from the Iranian coast.[275]

U.S. and Iranian naval forces interact on a routine basis in the Persian Gulf. Historically, more than 90 percent of such interactions have been deemed safe and professional, and the vast majority continue to be.[276,277] However, Iran has increased maritime surveillance of U.S. forces in the Persian Gulf using unmanned aerial vehicles (UAVs), and the potential remains for additional unsafe and unprofessional interactions.[278]

Amid increased tension with the United States in mid-2019, Iran has used its naval forces to demonstrate resolve and threaten freedom of navigation. In May and June 2019, Iran conducted limpet mine attacks against several merchant vessels in the Gulf of Oman. In July 2019, the IRGCN also seized a UK-flagged oil tanker in the Strait of Hormuz after the United Kingdom seized an Iranian-flagged oil tanker near Gibraltar.[279,280,281,282]

## Islamic Republic of Iran Navy

The IRIN comprises approximately 18,000 personnel and is considered Iran's "blue water navy" with its larger and more traditional surface ships compared with the IRGCN. Iran is the only Persian Gulf nation with a submarine force, which the IRIN operates. The service's primary mission is to defend Iranian territorial waters and protect the country's economic interests in the Caspian Sea, Gulf of Oman, and beyond. It consists of primarily older, small surface combatants along with mostly small submarines and some logistic support vessels. As part of Iran's layered maritime defenses, the IRIN provides antisurface warfare capabilities focused on the Gulf of Oman with coastal defense cruise missiles (CDCMs), naval mines, surface combatants, and submarines. The IRIN is Iran's first line of defense in the Gulf of Oman and the Arabian Sea. The IRIN also aims to secure Iranian economic interests by safeguarding the flow of commerce in the region from piracy and interdiction.[283,284]

The IRIN is geographically divided into four NDs, with the central IRIN headquarters in Tehran.

- **1st ND:** Headquartered at Bandar Abbas (Strait of Hormuz); also the location of the IRIN's Southern Forward Naval Headquarters (SFNHQ), which coordinates across all southern IRIN NDs

- **2nd ND:** Headquartered at Bushehr (Persian Gulf) and Jask (Gulf of Oman); 2nd ND HQ moving to Jask following 2007 reorganization

DEFENSE INTELLIGENCE AGENCY

PX260

## *IRIN Order of Battle*[285]

1805-17887

| Class | Type | Inventory |
|---|---|---|
| Kilo | Attack submarine | 3 |
| Fateh | Coastal submarine | 1 |
| Yono (Ghadir) | Midget submarine | 14 |
| Nahang | Midget submarine | 1 |
| Jamaran (Mowj) | Corvette | 3 |
| Vosper Mk 5 | Corvette | 3 |
| PF 103 (Bayandor) | Corvette | 2 |
| Combattante II (Kaman) | Fast attack craft, missile | 13 |
| Hendijan | Patrol craft, missile | 3 |
| PGM-71 (Parvin) | Patrol craft, missile | 3 |
| Cape (Kayvan) | Patrol craft, missile | 3 |
| U.S. Mk II | Patrol craft, coastal | 6 |
| U.S. Mk III | Patrol craft, coastal | 10 |
| C-14 | Patrol craft, coastal | 9 |
| FB 40 | Patrol craft, inshore | 6 |
| Hengham | Landing ship, tank | 3 |
| Karbala | Landing ship, logistic | 6 |
| Wellington Mk 4 | Hovercraft | 2 |
| Wellington Mk 5 | Hovercraft | 4 |
| Kharg | Replenishment ship | 1 |
| Bandar Abbas | Fleet supply ship | 2 |
| Delvar | Support ship | 6 |
| Hendijan | Tender | 7 |
| Shahsavar | Training ship | 1 |

PX260

- **3rd ND:** Headquartered at Chah Bahar (Gulf of Oman)
- **4th ND:** Headquartered at Bandar Anzali (Caspian Sea)

One of the IRIN's key missions is to conduct out-of-area operations and naval diplomacy in the region and beyond. Since 2009, the IRIN has maintained near-continuous out-of-area naval deployments for counterpiracy operations in the Gulf of Aden, foreign port visits, and bilateral exercises with regional navies.

Despite its aging platforms, the IRIN has been moderately effective in maintaining readiness and sustaining operations. If the IRIN is to fulfill its longer term ambitions to function as a true blue-water navy, it will have to invest in more modern combatants and support ships. Iran has been able to domestically build corvettes and patrol boats for the IRIN and upgrade legacy platforms with new capabilities, including antiship cruise missiles (ASCMs). Despite its need for new auxiliaries, Iran has given no indication it is planning to invest in acquiring new support



Iran's first domestically produced corvette, the *Jamaran*.

Image Source: AFP

vessels. Iran acquired three Russian Kilo class attack submarines in the 1990s and began domestically producing North Korean Yono class midget submarines in the mid-2000s. Iran continues to invest in domestically developing and producing more-capable subsurface platforms, including larger coastal submarines.[286]

The IRIN typically conducts a major national-level exercise each year called VELAYAT. The event usually entails a series of naval maneuvers involving IRIN surface combatants, submarines, and CDCM forces.[287,288]

### Islamic Revolutionary Guard Corps Navy

The IRGCN, which comprises approximately 20,000 personnel, is tasked with protecting primarily the Iranian littoral. It employs an asymmetric doctrine that emphasizes speed, mobility, large numbers, surprise, and survivability and takes advantage of Iran's geography with the shallow and confined waterways of the Persian Gulf and Strait of Hormuz. Although the IRGCN has significantly upgraded its fleet in terms of size and lethality since the end of the Iran-Iraq War, it remains a force composed of smaller platforms. Rather than acquire larger ships as a more traditional navy might, the IRGCN has pursued smaller, faster vessels armed with a variety of weapon systems. Iran views acquiring these types of vessels in sufficient numbers will allow it to threaten foreign navies and overcome wartime attrition.

The IRGCN aims to overwhelm an adversary's defenses by using multiple platforms and weapons together to achieve tactical surprise. These



IRGCN small boats during a ceremony on 2 July 2012 to commemorate the downing of Iran Air Flight 655 by the USS *Vincennes* in 1988.

Image Source: AFP

systems include small boats armed with guns, rockets, torpedoes, and missiles; CDCMs; naval mines; and maritime special operations forces. IRGCN units train to use hit-and-run attacks against larger enemy naval vessels using swarms of small boats. The IRGCN could also restrict access or even attempt to fully close the Strait of Hormuz. Iran has modified a range of small boats to be able to deliver naval mines rapidly. In support of these goals, IRGCN acquisition efforts have focused on fielding a large fleet of faster and more-capable small boats; developing more-advanced ASCMs to be launched from sea, ground, or air; and building a large inventory of more-sophisticated naval mines.[289,290]

The IRGCN is geographically divided into five NDs, with the central IRGCN headquarters at Bandar Abbas.

- **1st ND:** Headquartered at Bandar Abbas (Shahid Bahonar); responsible for the Strait of Hormuz

- **2nd ND:** Headquartered at Bushehr; responsible for the north-central Persian Gulf

- **3rd ND:** Headquartered at Bandar Mahshahr; responsible for the northern Persian Gulf

- **4th ND:** Headquartered at Asaluyeh; responsible for the central Persian Gulf

- **5th ND:** Headquartered at Bandar Lengeh; responsible for the southern Persian Gulf, including the disputed islands of Lesser Tunb, Greater Tunb, and Abu Musa[291]

Many of Iran's NOBLE PROPHET exercises—the IRGC's typical large-scale annual exercise—are naval-focused with IRGCN elements leading the activities. IRGCN NOBLE PROPHETs are usually deterrent-themed events intended largely for strategic messaging, primarily aimed at the West and regional states.[292,293]

## *Major Naval Capabilities*

### *Fast Attack Craft and Fast Inshore Attack Craft*

The IRGCN is the primary operator of Iran's hundreds of fast attack craft (FAC) and fast inshore attack craft (FIAC). These platforms have been the mainstay of the IRGCN since its inception in the 1980s, although the Iranian FAC/FIAC inventory has grown significantly in terms of size and lethality since that time. Larger and more-capable, Iranian FAC are usually armed with ASCMs or torpedoes. The largest of these vessels are Iran's 10 Chinese-built Houdong missile boats acquired in the mid-1990s, which serve as the capital ships of the IRGCN fleet; these

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## IRGCN Order of Battle[294]

1805-17887

| Class | Type | Inventory |
| --- | --- | --- |
| Houdong (Thondor) | Fast attack craft, missile | 10 |
| Peykaap I | Patrol craft, coastal, torpedo | 15 |
| Peykaap II | Patrol craft, coastal, missile | 25 |
| Peykaap III | Patrol craft, coastal, missile | 5 |
| Mk 13 | Patrol craft, coastal, missile | 10 |
| C-14 | Patrol craft, coastal, missile | 5 |
| Tir | Patrol craft | 10 |
| Tarlan | Patrol craft, inshore | 15 |
| Kashdom II | Patrol craft, inshore | 15 |
| Ashoora | Patrol craft, inshore | Unknown* |
| Cougar | Patrol craft, inshore | Unknown* |
| FB RIB-33 | Patrol craft, inshore | Unknown* |
| Gashti | Patrol craft, inshore | Unknown* |
| Kuch | Patrol craft, inshore | Unknown* |
| Bladerunner (Siraj) | Patrol craft, inshore | Unknown* |
| Boghammar | Patrol craft, inshore | 20 |
| Hormuz 21 | Landing ship | 2 |
| Hormuz 24 | Landing ship | 3 |
| Harth 55 | Support ship | 1 |
| Safir Kish | Transport | 3 |
| Naser | Transport | 3 |

*Note: The exact numbers for many Iranian small boat types are unknown, but the IRGCN has hundreds of small boats throughout the Persian Gulf.

PX260

vessels are frequently used in Persian Gulf and Strait of Hormuz patrols. Originally equipped with C802 missiles, Iran has since upgraded the Houdongs with extended-range Ghader ASCMs. Iranian FIAC, which are smaller but far more numerous, are lightly armed and usually fitted with only machine guns or rockets. Used en masse, these vessels can harass merchant shipping and conduct swarm tactics during a force-on-force naval engagements.

### Surface Combatants

The IRIN operates Iran's larger surface combatants, which include three 1960s-era British-built Vosper Mk 5 class corvettes and several French-built Combattante class patrol craft acquired before the Islamic Revolution. To expand the IRIN fleet, Iran has since domestically built several of its own Combattante patrol craft and three new Jamaran class corvettes, which closely resemble Iran's Vospers with modifications, such as an added helicopter flight deck. Iran has commissioned three of the vessels, including one on the Caspian Sea, which was severely damaged in early 2018.[295] The IRIN has also expanded its number of missile combatants by upgrading older auxiliaries and patrol ships with short- and medium-range ASCMs.

### Submarines

Submarines are a critical component of the IRIN, which has undertaken an ambitious construction program to increase its subsurface production capabilities and expand its fleet. Iran has four classes of submarines in



An Iranian Yono class midget submarine.

Image Source: AFP

its order of battle. Iran's largest and most capable subsurface platforms are the three Kilo class attack submarines it purchased from Russia in the 1990s. The IRIN also has 14 North Korean-designed Yono class midget submarines, which it can arm with Iranian Valfajar heavy-weight torpedoes. In February 2019, Iran presented its first submarine-launched ASCM, the Jask-2, which can be launched from the Yono.[296] Iran also has a single domestically designed and produced Nahang midget submarine, which lacks torpedo tubes and may serve as a special operations platform.[297] Also in February 2019, the IRIN officially commissioned its first coastal submarine, the *Fateh*. Iran claims the Fateh class, Iran's largest domestically built submarine, can launch both torpedoes and ASCMs.[298]

### Naval Mines

Mine warfare has been an integral part of Iran's naval strategy since the Tanker War. Iran has an estimated inventory of more

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

than 5,000 naval mines, which include contact and influence mines. Both navies have devised strategies to rapidly deploy mines while improving force survivability. Iran has a variety of vessels that can lay mines, but the IRGCN has integrated its doctrine of using smaller, faster vessels into its mine-laying strategy. Iran has equipped many of its Ashoora small boats with mine rails capable of holding at least one mine.[299,300]

### Coastal Defense Cruise Missiles

CDCMs have been one of Iran's primary layers of defense for both navies to protect the country's littoral and maritime approaches. Iran initially gained experience with CDCMs using Chinese-built Silkworm missiles during the Tanker War. Both the IRGCN and IRIN operate CDCM forces, and Iran has invested greatly in developing and producing more-capable ASCMs, primarily based on Chinese

## *Iranian CDCM Ranges*



1805-17885

C704 Nasr ASCM (35km)
C802 Noor ASCM (120km)
Ghader ASCM (200km)
Ghadir ASCM (300km)
All ranges shown from mainland coast

0    150    300 Kilometers

Boundary representation is not necessarily authoritative.

Graphic Source: DIA, D3 Design

PX260

C802 and C700-series missiles. Based on its domestic copy of the C802, called the Noor, Iran has developed the 200-kilometer-range Ghader and the 300-kilometer-range Ghadir ASCMs.[301] Iran also domestically produces the 35-kilometer-range Chinese C704 ASCM as the Nasr.[302]



An Iranian C700-series CDCM is launched during an exercise in 2006.

Image Source: AFP

### Antiship Ballistic Missiles

The IRGCASF has publicly announced and tested its ability to target ships with several ballistic missile models—including the Khalij Fars, Hormuz 1, and Hormuz 2—based on the Fateh-110 SRBM. These antiship ballistic missiles (ASBMs) have ranges of up to 300 kilometers and are equipped with terminal seekers that steer the missile to its target. These systems use a variety of seekers, including electro-optical and antiradiation homing.[303]



Iran's Khalij Fars ASBM.

Image Source: AFP

PX260

# *Appendix C: Unconventional Forces*

### Islamic Revolutionary Guard Corps Qods Force

Iran depends on a variety of unconventional and proxy forces to bolster its conventional military. The IRGC-QF (*Qods* meaning "Jerusalem") is Iran's primary means for conducting unconventional operations abroad, with connections of varying degrees to state and nonstate actors globally. It was founded in 1990 in the aftermath of the Iran-Iraq War as the IRGC unit responsible for covert operations and unconventional warfare operations abroad. Before the IRGC-QF's creation, a variety of government organizations, including the IRGC's Office of Liberation Movements, handled Iran's support to Islamic militant, terrorist, and resistance groups. Since its establishment, the IRGC-QF has become an increasingly professional unit trusted by the supreme leader to conduct operations outside Iran, provide support to Islamic militants, and collect intelligence against Iran's enemies. IRGC-QF personnel number roughly 5,000, though some estimates are higher.

Tehran uses the IRGC-QF to provide financial, training, and materiel support—including facilitating terrorist attacks—mainly to regional Shia militant groups ideologically aligned with Iran. These partner and proxy groups provide Iran with a degree of plausible deniability, and their demonstrated capabilities and willingness to attack Iran's enemies serve as an additional deterrent.



IRGC-QF Commander Qasem Soleimani during Ten Days of Dawn celebrations in 2016.

Image Source: AFP

Major General Qasem Soleimani commands the IRGC-QF and has a close relationship with Supreme Leader Ali Khamenei, often communicating with and taking orders from him directly. Soleimani oversees all IRGC-QF external operations, including support for active combat missions and clandestine activities. In recent years, he has traveled frequently to Iraq and Syria to support Iran's involvement in battlefield operations against ISIS and Syrian opposition groups, and has become one of Iran's most visible—and popular—military leaders.

The IRGC-QF receives official funding from Iran's defense budget, but it augments its operating budget through a network of IRGC-QF-affiliated companies worldwide. The IRGC-QF and some affiliated companies have come under international sanctions because of their involvement in terrorist activities and weapons proliferation.[304,305,306,307,308]

DEFENSE INTELLIGENCE AGENCY

PX260

### *Partners, Proxies, and Affiliates*

The IRGC-QF maintains a wide and varied network of nonstate partners, proxies, and affiliates primarily in the Middle East. Iran provides a range of financial, political, training, and materiel support to these groups. Iran's provision of military hardware has included small arms, ammunition, explosives, improvised explosive devices (IEDs), explosively formed penetrators (EFPs), vehicles, antitank guided missiles (ATGMs), man-portable air defense systems (MANPADS), artillery, rockets, UAVs, and some more-advanced systems, such as ASCMs and ballistic missiles, despite UN resolutions prohibiting Iranian arms exports.[309]

*Selected Iranian Partners, Proxies, and Affiliates*

1805-17885



*Note: Numerous Iranian partners and proxies are active in Syria.*

Graphic Source: DIA, DS Design

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

Tehran's partners, proxies, and affiliates include Hizballah, Iraqi Shia militias, the Huthis, some Palestinian groups, the Taliban, and Bahraini militants. The level and type of support Iran provides to these groups depends on the nature of the relationship and the objectives Iran seeks to achieve. Stronger partners, such as Hizballah, are highly capable, reliable, and receptive to Tehran. Other groups, such as the Afghan Taliban, are less receptive to Iranian guidance but still help further Iran's regional objectives because they combat common enemies.[310,311,312]

### Hizballah

Hizballah is Iran's most important and longest-standing nonstate partner and a core member of Tehran's "Axis of Resistance." Shared goals, ongoing personal relationships, and enduring ideological, cultural, and religious ties have contributed to the strength of the partnership. The IRGC-QF has collaborated closely with Hizballah to grow Iran's influence and capacity throughout the region and beyond, using the group to help train and equip other proxies. Iran has attempted to help temper international perceptions of Hiz-



Supporters wave Hizballah flags in front of portraits of Hizballah Secretary General Hassan Nasrallah (left) and Supreme Leader Khamenei (right).

Image Source: AFP

DEFENSE INTELLIGENCE AGENCY

PX260

ballah as a terrorist organization and increase Hizballah's legitimate political standing in Lebanon. In recent years, both groups have focused their cooperation on immediate needs in Syria and Iraq.[313]

Hizballah, a highly adaptable and malleable organization, has evolved from its insular origins as a sectarian actor in Lebanon into a far more complex regional actor. Hizballah's role in Lebanon—in its formal political institutions, as a social provider for Shia society and as a self-proclaimed defender against Israeli aggression—primarily defines its reason for existence. However, the group has increasingly defined its other regional activities—including involvement in Syria, Iraq, and Yemen—as working in concert with its internal Lebanon-centric goals. This concept of Hizballah as a regional power directly contradicts Lebanon's policy of disassociation and has increased sectarian tensions at home.[314]

Hizballah has steadily grown as a military power during the past several decades. Asymmetric attacks against Israel in the 1980s and 1990s, followed by a major conflict in 2006, initially confirmed Hizballah's self-imposed title as a "resistance" force against Israel. Since the 2006 Israel-Hizballah War, Hizballah has steadily increased its military arsenal, promising that any future conflict will be more devastating. Hizballah's concentration of power has allowed it to transform from a hybrid guerilla force into a nascent conventional military, with the capacity to deploy an expeditionary force in Syria in support of the Asad regime and Iran. Hizballah maintains a stockpile of approximately 120,000–150,000 rockets, a massive expansion in capa-bility compared with the approximately 13,000 it had available during the 2006 conflict.[315] Hizballah has an estimated 45,000 fighters, divided between as many as 21,000 full-time personnel and a 24,000-person reserve force.[316]

### Iraqi Shia Militias

One of Tehran's strongest levers of influence in Iraq is through the many Iran-backed Shia militias. Iran has provided financial backing for some of these groups for decades. The Badr Organization, Asaib Ahl al-Haq, and Kataib Hizballah have long served as reliable partners for Tehran, including conducting attacks on U.S. military personnel in Iraq from 2003 to 2011 using Iranian-provided munitions. Following ISIS's widespread territorial gains in Iraq in mid-2014 and the subsequent formation of the Popular Mobilization Forces (PMF), Iran sent IRGC advisers, weapons, and other military support for the PMF and Iraqi counter-ISIS operations.[317]

Since 2011, the IRGC-QF has also deployed these Shia militants outside Iraq in support of Iranian interests. Since at least 2013, Iraqi Shia militias have greatly expanded their strength, influence, and combat capabilities, owing largely to Iranian support and their experience fighting in Iraq and Syria. Shia militias under the Popular Mobilization Committee (PMC) played a leading role in counter-ISIS operations in Iraq, and the majority of these groups have had elements fighting in Syria at Iran's behest as part of Syrian pro-regime forces. During the counter-ISIS campaign, Shia militias staffed more than 50 PMF brigades under the PMC. There are an esti-

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

### Shia Foreign Fighters

To support its operations in Syria, Iran has employed a variety of Shia foreign fighters from the region, including the Fatemiyun, Zeinabiyun, and Heidariyun, who are fighters of Afghan, Pakistan, and Iraqi origin, respectively. The Fatemiyun and Zeinabiyun are recruited primarily from refugee populations in Iran, while the Heidariyun generally come from established Iraqi Shia militias. These groups have served as a proxy force to fight alongside proregime forces in Syria under the direction of the IRGC-QF and Hizballah. Before being sent into combat, these foreign fighters receive basic training in military skills from Iran or Hizballah. Training usually lasts only 20–45 days, although some fighters reportedly receive additional specialized training, such as sniper courses. Tehran is likely to continue using these fighters in Syria, and it is unclear if there are plans to deploy them to other locations.[321,322,323,324]

mated 75,000–145,000 mainly Shia fighters active in more than 35 Iraqi militias.[318,319,320]

#### Huthis

Iran probably sees supporting the Huthi rebels in Yemen as a low-cost, high-reward opportunity to indirectly confront Saudi Arabia, embarrass Riyadh militarily, and establish an ally on the Arabian Peninsula.[325] Iran provides a wide range of support—including advisers, training, and lethal aid—to the Huthis to support their operations against the Saudi-led coalition in the Yemen conflict.[326] Tehran claims Riyadh is the aggressor and the cause of the humanitarian crisis in Yemen and has refuted accusations that it is supporting the Huthis with missiles and other advanced military equipment.[327]

Estimates of Huthi fighters range from 10,000 to 30,000 personnel consisting of core believers, tribal supporters, and familial alliances.[328,329] The Huthis seek to rule the northern Yemen region or, at a minimum, retain a dominant role in northern Yemen and sub-

stantial political and military influence in any future government.[330] Huthi leaders seek to use negotiations, international pressure, military operations, and ballistic missile and maritime attacks to pressure the Saudi-led coalition into accepting settlement terms favorable to the Huthis.



Debris from an Iranian Qiam SRBM provided by Iran to the Huthis that was fired into Saudi Arabia on display at Joint Base Anacostia-Bolling in Washington, DC. The numbered placards identify the unique positioning of valves on the missile's propellant tanks.

Image Source: DVIDS

DEFENSE INTELLIGENCE AGENCY

PX260

The Huthis depend on Iran for military equipment and support, including ballistic missiles, UAVs, and explosive boat technology. Tehran is using covert means to support this effort while publicly denying its military involvement in Yemen. Although the Huthis have always maintained a sense of identity as Shia Zaydis and Yemenis, they probably are receptive to further strengthening ties with Iran.

Huthi forces hold and defend territory in northern Yemen, disrupt Saudi-led coalition movement and supply efforts, and conduct retaliatory and offensive strikes against the coalition. Huthi fighters are armed with small arms, artillery, and tanks from preconflict Yemeni stockpiles.[331] Iranian-supported Huthi missile forces have conducted multiple ballistic missile attacks against Saudi Arabia—with targets including the capital, Riyadh, and a Saudi oil refinery—using Iranian SRBMs. Huthi maritime forces have ASCMs, naval mines, manned and unmanned explosive boats, and other small boats used for small-



Australian HMAS *Darwin* interdicts a dhow in the Gulf of Oman with Iranian arms intended for the Huthis.

Image Source: Commonwealth of Australia

arms attacks.[332,333] The Huthis possess most of the surface-to-air missiles (SAMs) from Yemen's prewar stockpiles and have modified air-to-air missiles (AAMs) for use as SAMs. In 2018, Saudi-led coalition forces also seized advanced Iranian SAMs en route to the Huthis during countersmuggling operations.[334] The Huthis have also used Iranian UAVs to attack Saudi-led coalition Patriot batteries.[335]

### Palestinian Militant Groups

Iran provides support—including training, funding, and military equipment—to HAMAS and other Palestinian groups because of their strategic location and shared hostility toward Israel. Tehran seeks to increase international support in favor of a Palestinian state and desires to be seen as a stronger champion of Palestinians than its Arab rivals, such as Saudi Arabia. However, these primarily Sunni groups are not always receptive to Iranian guidance. During the past year, some Palestinian militant groups, particularly HAMAS, have improved ties to Iran. Relations had deteriorated after 2011, as most Palestinian militant groups refused to support the Asad regime in the Syrian civil war.

HAMAS, the Palestine Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine–General Command (PFLP-GC) share some common capabilities to conduct both limited conventional military operations, such as cross-border ATGM attacks and rocket salvos, and terrorist attacks, such as kidnappings and suicide bombings. HAMAS is the best-armed Palestinian militant group with around 25,000 active members in its mil-

PX260

itary wing. PIJ has around 8,000 militants, and PFLP-GC numbers around 800 militants. These groups use a variety of small and heavy arms, including antiarmor weapons and small- to mid-range rockets.[336,337,338,339]

### Taliban

Iran's relationship with the Taliban has evolved over the years. Following the Taliban's rise to power in the 1990s, Iran refused to recognize the group as a legitimate government. In 1998, Iran nearly went to war with Afghanistan after the Taliban captured and killed nine Iranian diplomats. However, relations began to thaw after the U.S. invasion of Afghanistan. Since at least 2007, Iran has provided calibrated support—including weapons, training, and funding—to the Taliban to counter U.S. and Western influence in Afghanistan, combat ISIS-Khorasan, and increase Tehran's influence in any post-reconciliation government. Iran balances this support as part of its dual-track strategy for engaging both local groups and the Afghan government in Kabul to achieve its broader security goals. Tehran does not seek to return the Taliban to power but aims to maintain influence with the group as a hedge in the event that the Taliban gains a role in a future Afghan government.[340,341,342,343]

PX260

# *Appendix D: Air and Air Defense Forces*

Iran's air and air defense capabilities are split primarily across three services: the Islamic Republic of Iran Air Force (IRIAF) and the Islamic Republic of Iran Air Defense Force (IRIADF), both under the Artesh, and the IRGCASF. The Khatemolanbia Air Defense Headquarters (KADHQ) is the national-level command responsible for coordinating between the IRIADF and IRGCASF.

### Islamic Republic of Iran Air Force

Before the 1979 Islamic Revolution, the shah invested heavily in equipping the Imperial Iranian Air Force with modern combat air capabilities, viewing the service as a symbol of Iran's strength and security. After decades of international sanctions following the revolution and combat losses during the Iran-Iraq War, many of the U.S. aircraft Iran acquired during the 1960s and 1970s still



Iranian F-4s, which it acquired from the United States prior to the Islamic Revolution.

Image Source: AFP

constitute the most-capable platforms in the IRIAF today. Iran later acquired some Soviet-made aircraft during the early 1990s.

The IRIAF has proven adept at maintaining these outdated aircraft to sustain routine flight operations. Despite some domestic efforts to upgrade older airframes, Iran's combat aircraft remain significantly inferior to those of its regional adversaries equipped with modern Western systems. Nevertheless, the IRIAF maintains a basic capability to achieve its assigned missions.

The IRIAF has approximately 37,000 personnel and operates the majority of Iran's combat aircraft. The IRIAF operates multiple combat, transport, and tanker squadrons across 11 major fighter bases. The commander of the IRIAF is Brigadier General Aziz Nasirzadeh.

The IRIAF operates a wide range of aircraft sourced from the United States, Russia, and China, including the U.S. F-14 Tomcat, F-4 Phantom II, and F-5 Tiger II; the Russian MiG-29 Fulcrum and Su-24 Fencer; and the Chinese F-7 Airguard. Iran is the only country in the world still operating F-14s. IRIAF missions include air intercept, ground-attack, and close air support, and some aircraft are capable of mid-air refueling. The IRIAF's F-4s serve as Iran's primary attack aircraft, but it has increasingly incorporated use of its Su-24

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## *Iranian Fighter Bases*

1805-17885



Graphic Source: DIA, D3 Design

| 1st FB | MiG-29, C-130, B707 (cargo and tanker), B747 (cargo and tanker), Falcon 20, Jetstar, RC-707, RC-130, IL-76, An-74 | 8th FB | F-14A/AM, F-7/FT-7N, PC-7 |
|---|---|---|---|
| 2nd FB | MiG-29, F-5E/F, Saeghe I/II (Iranian F-5 variants) | 9th FB | F-4E, P-3 |
| 3rd FB | F-4E, RF-4E | 10th FB | F-4D, Mirage F1 |
| 4nd FB | F-5E/F | Omidiyeh Air Base | F-7N |
| 6th FB | F-4E | Mashhad Air Base | F-5E/F |
| 7th FB | Su-24MK, C-130, P-3, IL-76, Su-22, Y-12 | | |

DEFENSE INTELLIGENCE AGENCY

PX260

## *Major Iranian Combat Aircraft*[347]

1805-17887

| Platform | Delivered to Iran (Origin) | Role |
| --- | --- | --- |
| F-4D/E Phantom II | 1968-1978 (USA) | Multirole Fighter |
| F-5E/F Tiger II (and later Iranian variants) | 1973-1976 (USA) | Multirole Fighter |
| F-14A/AM Tomcat | 1976-1978 (USA) | Fighter |
| Su-22 Fitter | 1991 (Iraq) | Fighter-Bomber |
| Su-24MK Fencer | 1990 (Russia); 1991 (Iraq) | Fighter-Bomber |
| MiG-29 Fulcrum A | 1990 (Russia); 1991 (Iraq) | Multirole Fighter |
| Mirage F1 | 1991 (Iraq) | Multirole Fighter |
| F-7N Airguard | 1987-1996 (China) | Multirole Fighter |

fighter-bombers. Although less capable in an attack role, Iran's F-5s and F-7s have also served as multirole platforms.[344,345,346]

The IRIAF usually conducts one major national-level air power exercise each year, called DEVOTEES OF THE VELAYAT SKIES. The event traditionally entails a ground-attack competition among multiple fighter bases and features fighter intercept, air-to-air engagement, electronic warfare (EW), and intelligence, surveillance, and reconnaissance (ISR) training.[348,349]

Once the UN arms embargo ends, the IRIAF is likely to purchase advanced fourth-generation fighters, most likely from Russia. Tehran and Moscow have already discussed the sale of Su-30s to Iran.[350]

### *Islamic Revolutionary Guard Corps Aerospace Force*

The IRGCASF was founded in 1985 when Supreme Leader Khomeini established the IRGC's three distinct ground, air, and naval services.[351] Previously named the IRGC Air

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

Force, Iran renamed the service in 2009 to reflect its broader mission.[352] Dating back to the Iran-Iraq War, rivalries between the IRGCASF and IRIAF have historically hindered cooperation between the two air services.[353] The IRGCASF also operates Iran's ballistic missile force, the Al-Ghadir Missile Command. *[For more details on Iran's missile force, see Appendix A.]*

The IRGCASF is a relatively small force of around 15,000 personnel. It provides close air support and lift capabilities with military aircraft and helicopters as well as commercially owned aircraft under the IRGCASF's control. Although the IRGC's manned aviation component historically focused on airlift and logistic support, its mission evolved to include a squadron of its own combat aircraft after Iran began incorporating Iraqi aircraft evacuated to Iran in 1991 during the First Gulf War. The commander of the IRGCASF is Brigadier General Amir Ali Hajizadeh.

The aviation arm of the IRGCASF maintains a fleet that includes Su-22 Fitters, EMB-312

Tucanos, Y-12s, Dassault Falcon 20s, MFI-17s, IL-76s, and An-74s. In 2014, Iran supplied Iraq with most of the Su-25 Frogfoots that the IRGCASF had maintained since Iraq transferred them to Iran in 1991. Iran still maintains a small number of Su-25 aircraft.[354,355,356, 357]

UAVs are Iran's most rapidly advancing air capability. Iran uses these versatile platforms for a variety of missions, including ISR and air-to-ground strikes. The IRGCASF is the primary operator of Iran's growing fleet of UAVs, although most Iranian military services employ them. Iran regularly conducts ISR flights along its border and littoral, including the Persian Gulf and Strait of Hormuz. The IRGCASF has also deployed various armed and unarmed UAVs to Syria and Iraq for ISR and strike missions to support counter-ISIS operations and the Syrian regime. In 2018, Iran for the first time employed UAVs to conduct long-range, cross-border strike operations, using armed



An IRGCASF Su-25 during a naval exercise in 2006.

Image Source: AFP



Newly built Iranian Shahed-129 armed UAVs on display in September 2013.

Image Source: AFP

DEFENSE INTELLIGENCE AGENCY

**67**

PX260

## *Major Iranian UAVs*[363,364]

1805-17887

| Platform Family | System | Role |
|---|---|---|
| **Ababil** | Ababil-2 | Multirole |
| | Ababil-3 | ISR |
| | Qasef-1 | Multirole |
| **Shahed** | Shahed-129 | Multirole, including ISR and air-to-ground strike[365,366] |
| | Shahed-123 | ISR |
| **Mohajer** | Mohajer-2 | ISR |
| | Sadegh | Multirole |
| | Mohajer-4 | ISR |
| | Mohajer-6 | Multirole, including ISR and air-to-ground strike[367] |
| **Toufan** | Toufan 1 | One-way attack |
| **Fotros** | Fotros | Multirole, including ISR and air-to-ground strike[368,369] |
| **Karrar** | Karrar | Multirole |
| **Hemaseh** | Hemaseh | Multirole |
| **IRN-170** | IRN-170 variants | Multirole |

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

UAVs in concert with ballistic missiles as part of a retaliatory attack against ISIS in eastern Syria. Iran has also provided UAV platforms and technology to Hizballah and the Huthis to challenge its regional rivals.[358,359,360,361,362]

The IRGCASF also maintains its own air defense assets and mission—conducted in parallel, but coordinated with the IRIADF and KADHQ. The IRGC has been involved in the domestic development and production of many recent Iranian SAM systems—such as the Raad series, Sayyad series, Tabas, and Third of Khordad—which reportedly have multi-target capabilities and ranges up to 120 kilometers.[370,371] In June 2019, the IRGCASF used a Third of Khordad SAM system to shoot down a U.S. RQ-4 UAV in international airspace over the Strait of Hormuz.[372,373] This followed an Iranian attempt to shoot down a U.S. MQ-9 UAV in international airspace over the Gulf of Oman a week earlier.[374]

The IRGCASF sometimes participates in the IRGC's typical annual national-level exercise, NOBLE PROPHET, although these usually focus on demonstrating missile, naval, or ground forces capabilities.[375] In 2017, the IRGCASF conducted its own air defense exercise called DEFENDERS OF VELAYAT SANCTUM.[376]

### Islamic Republic of Iran Air Defense Force

Iran originally established the Artesh's air defense force in 2008 as the KADHQ and renamed it the IRIADF in 2019. In 2008, air defense personnel were separated from the



Iranian SA-20c mobile launcher on parade for Artesh Day in 2017.

Image Source: AFP

IRIAF to form an independent service within the Artesh, consistent with Tehran's goal to expand defense missions in response to a perceived increase in air threats. The IRIADF maintains and operates most of the country's air defense systems and has approximately 15,000 personnel.[377,378]

As the KADHQ, the force was previously responsible for overseeing Iran's air defenses at the national level and coordinating with the IRGCASF. In May 2019, Tehran elevated the KADHQ to a higher echelon command and rebranded the remaining Artesh air defense service as the IRIADF, separating the national C2 responsibilities from the force. The supreme leader appointed Artesh Commander Major General Abdolrahim Musavi to also serve as commander of the KADHQ, raising it to the Artesh HQ level. Former KADHQ Commander Brigadier General Alireza Sabahifard was retained as the IRIADF commander.[379]

### Khatemolanbia Air Defense Headquarters

The KADHQ maintains responsibility for overseeing and coordinating Iran's national-level air defenses across both the IRIADF and IRGCASF. It controls the country's air defense C2, air surveillance radars, SAM systems, and network of visual observation posts. KADHQ C2 is centralized during peacetime at the national Air Defense Operations Center and can be decentralized during crisis or conflict, transferring decisionmaking authority down to a network of fixed and mobile regional sector operations centers (SOCs). SOCs manage air defense operations within their areas of responsibility and coordinate with adjacent sectors.[380,381,382]

*Long-Range Air Defense Coverage*

1805-17885



SA-20c (200km)
SA-5 (300km)

0      200      400 Kilometers

Boundary representation is not necessarily authoritative.
*NOTE: Only standard and fixed sites shown.*

Graphic Source: DIA, DS Design

70

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## Iranian Air Defense Systems[391,392,393]

1805-17887

| Type | Systems |
|------|---------|
| Long-Range | SA-20c Gargolye (S-300 PMU2), SA-5 Gammon (S-200), Bavar-373, Sayyad-3 |
| Medium-Range | I-HAWK/Mersad, CSA-1, Third of Khordad, Raad, Talash, Sayyad-1, Sayyad-2 |
| Short-Range | SA-15 Gauntlet (Tor M1), Rapier |

The IRIADF operates Iran's most capable air defense system, the SA-20c, which Russia sold to Iran in 2016. This system is highly mobile and designed to defend against aircraft, ballistic missiles, and cruise missiles. Iran is most likely to use the SA-20c to protect its most critical infrastructure, such as its nuclear sites and Tehran. Most of Iran's other SAMs are a mix of U.S., Russian, and Chinese legacy systems, including the long-range SA-5, medium-range I-HAWK and CSA-1, and short-range SA-15 and Rapier.[383,384]

In addition to procurements from abroad, Iran has invested heavily in domestically developing and producing SAMs, radars, and C2 systems.[385] Iran is developing the long-range Bavar-373 SAM system, which it claims is more advanced than the Russian S-300.[386] Iran has also undertaken a number of projects to domestically improve its legacy SAMs, including the Mersad, a medium-range air defense system that improves the tracking and engagement range of the U.S.-made I-HAWK SAM.[387] Iran has also worked extensively to upgrade its legacy C2 systems to a modern, software-based system.[388]

Iran's typical annual national-level air defense exercise is called DEFENDERS OF THE VELAYAT SKIES. The event usually involves testing and live fires of variety of SAMs, radars, and ISR and EW equipment, along with a small contingent of aircraft, to exercise a large-scale defense of Iranian airspace.[389,390]

DEFENSE INTELLIGENCE AGENCY

PX260

# *Appendix E: Ground Forces*

Iran maintains two independent ground forces: the Islamic Republic of Iran Ground Force (IRIGF) under the Artesh and the IRGC Ground Force (IRGCGF) under the IRGC. Despite deploying some ground forces to Iraq and Syria in recent years, their mission continues to focus primarily on Iran's territorial defense and internal security.[394] The IRGC also oversees Iran's reserve paramilitary force, the Basij, which comprises some units aligned with the IRGCGF as well as the larger Basij Organization of the Oppressed. *[For more details on the Basij, see Appendix G.]*

## *Islamic Republic of Iran Ground Force*

The IRIGF maintains approximately 350,000 soldiers and serves as Iran's first line of defense against an invading force.[395] Many of its personnel consist of conscripts who serve for 2 years.[396] The IRIGF consists of about 50 combat arms brigades, many of which are light infantry units with a sizable contingent of armored and mechanized infantry units. The IRIGF also has its own special operations units and several artillery groups for fire support. Most units are concentrated along



IRIGF soldiers march in formation during the Artesh Day parade in 2018.

Image Source: AFP

PX260

## IRIGF Regional Headquarters

1805-17885



Graphic Source: DIA, DS Design
Boundary representation is not necessarily authoritative.

the Iran-Iraq border, reflecting the force's primary mission to defend against foreign invasion. The IRIGF commander is Brigadier General Kiomars Heidari.

For more than a decade, the IRIGF has focused on improving its abilities to defend against a technologically superior enemy. In 2011, the IRIGF began a service-wide reorganization, transitioning from a division-centric to a brigade-centric structure. This transformation was intended to decentralize C2 and enable main force units to operate with greater flexibility and mobility. Under

this model, the IRIGF is better postured to conduct counteroffensives against a superior invading adversary, giving brigade commanders the ability to act independently while decreasing response times. The IRIGF also has five regional headquarters, each of which is responsible for multiple provinces.[397,398,399]

IRIGF units generally are organized with three main subordinate units per higher echelon unit. For example, each infantry brigade usually consists of three infantry battalions, each armored brigade usually consists of two armored battalions and a mechanized infantry battalion, and

PX260

each mechanized infantry brigade generally consists of two mechanized infantry battalions and an armored battalion.[400,401]

The IRIGF also has an Army Aviation (AA) component, called Islamic Republic of Iran Army Aviation (IRIAA), which serves as Iran's primary helicopter force, with about 90 percent of the helicopters in the Iranian ground forces. The IRIAA has several hundred attack, transport, and reconnaissance helicopters in its inventory—including AH-1 Cobras, Bell 214s, CH-47 Chinooks, and AB 206s—nearly all of which are legacy U.S. platforms that predate the Islamic Revolution.[402]

In 2016, the IRIGF began deploying a small number of personnel to support combat operations in Syria. Although Iran claimed they were sent in an advisory capacity, press reports indicate they have played an active role in combat operations. This marked the first Artesh deployment abroad since the Iran-Iraq War.[403,404]



Iranian M-109 self-propelled artillery.

Image Source: Iranian Students News Agency (ISNA)

The IRIGF usually holds two major annual exercises each year. The MUHAMMAD RASULO-LLAH exercises occur along Iran's border and coastal regions, emphasizing either a defense against a conventional military invasion or counterterrorism operations.[405,406] The BEIT OL-MO-QADDAS exercises typically occur in May near Esfahan. The IRIGF often uses these events to unveil new ground forces equipment and as a capstone exercise for graduating cadets.[407]

## *Islamic Revolutionary Guard Corps Ground Force*

The IRGCGF is the largest component of the IRGC, consisting of approximately 150,000 personnel. In addition to its conventional military role of protecting Iranian territory against external threats, the IRGCGF along with the IRGC's paramilitary reserve component, the Basij, also have responsibilities to counter internal threats. For many years, the IRGCGF has regularly conducted counterinsurgency missions against Kurdish militants along Iran's northwest border and Baluchi militants in the southeast. Since as early as 2012, IRGCGF units have deployed to support combat operations in Syria and Iraq, with a surge of IRGCGF soldiers sent to Syria in 2015.[408,409,410] The commander of the IRGCGF is Brigadier General Mohammad Pakpur.[411]

The IRGCGF is structured with 31 provincial corps and a Tehran city corps, which are postured to counter ground invasion and internal unrest, along with independent conventional maneuver formations, such as infantry and armor. The IRGCGF consists of primarily light infantry and commando units, fairly evenly distributed around

PX260



An IRGCGF tank crew salutes from a T-72 during the annual Holy Defense Week parade in 2014.

Image Source: AFP

the country, particularly owing to the internal security aspects of its mission set. Its artillery batteries employ towed- and self-propelled guns and multiple rocket launchers (MRLs) while its air defense groups mainly use Soviet-origin mobile antiaircraft artillery. IRGCGF armored units use 1970s-era Soviet tanks and tracked vehicles, as well as pre-1979 U.S.-imported tanks. The IRGCGF also maintains special operations forces, called *Saberin* ("patient ones").[412] In 2016, the IRGCGF established its own AA component, transferring helicopters from the IRGCASF. The new unit provides the IRGCGF with its first organic helicopter support.[413]

Many iterations of the IRGC's main annual exercise series—NOBLE PROPHET—incorporate IRGCGF elements demonstrating defensive operations against a potential invading force. The IRGCGF also frequently uses these exercises to test or display new military hardware.[414,415]

### *Key Ground Forces Equipment*[416,417,418]

1805-17887

| System | Approx. Total | Most Capable | Source |
|---|---|---|---|
| **Tanks** | 1,900 | T-72S | Russia |
| **Armored Vehicles** | 2,600 | BMP-2 | Russia |
| **Self-Propelled Artillery** | 400 | M-109 | USA |
| **Towed Artillery** | 2,900 | GHN-45 | Austria |
| **Multiple Rocket Launchers** | 2,000 | Fajr-5 | Iran |

PX260

# *Appendix F: Special Operations Forces*

The Artesh and IRGC both maintain ground-based special operations forces (SOF) and maritime special operations forces (MAR-SOF) of varying levels of capability. Within the Artesh, IRIGF SOF include commando, airborne, and special forces brigades, and the IRIN operates a Special Boat Service (SBS) unit. Within the IRGC, IRGCGF SOF include commando and special forces brigades in addition to an elite special unit; the IRGCN also operates a MARSOF unit.

## Islamic Republic of Iran Ground Force SOF

The IRIGF has three types of SOF units—airborne, commando, and special forces. These include several commando brigades, the 55th Airborne Brigade, the 35th Special Forces Brigade, and the 65th Airborne Special Forces Brigade. Of these units, the 65th, also known as the *NOHED* (Persian abbreviation for "airborne special forces") brigade, is the most elite. The 55th and 65th are jump-qualified, and commando brigades deploy via airmobile insertion.[419] Several commando brigades have recently transitioned into special forces and rapid reaction brigades, including the 35th and 25th.[420,421]

Iran's first SOF units formed in the late 1950s under the tutelage of U.S. advisers. During the Iran-Iraq War, SOF units expanded to meet operational requirements. IRIGF SOF would regularly conduct reconnaisance of enemy lines to identify weak points and launch night attacks to initiate major offensive operations. Iranian airborne brigades also conducted airmobile operations in advance of Iranian offensives to seize key objectives and overrun enemy forces in rear areas.[422]

Based on their U.S. Army Special Forces lineage, IRIGF SOF share similar mission sets, probably including unconventional warfare, foreign internal defense, special reconnaissance, direct action, and hostage rescue. Some of these units also provide a quick-reaction force that can deploy rapidly anywhere inside Iran or potentially abroad.[423] As of April 2016, Iran had deployed personnel from the 65th Airborne Special Forces Brigade to Syria, part of the IRIGF's first external deployment since the Iran-Iraq War.[424]

## Islamic Republic of Iran Navy MARSOF

The IRIN operates an SBS based on the British Royal Navy SBS, which provided training for IRIN special forces personnel before the Islamic Revolution. The IRIN SBS probably is trained in a variety of capabilities, including combat diving, parachuting, amphibious assault, airborne assault, underwater demolitions, special reconnaisance, and maritime visit, board, search, and seizure (VBSS) operations. IRIN SBS personnel are also capable of covert insertion from the IRIN's midget submarines.[425,426,427]

PX260

### IRGC Ground Force SOF

The IRGCGF maintains several SOF units—called *Saberin* ("patient ones")—including the 110th Salman Farsi Commando Brigade, the 33rd Al Mahdi Airborne Special Forces Brigade, and the elite Saberin Special Forces Brigade (or Saberin Special Unit). Some regular IRGCGF divisions and brigades at the provincial level also have dedicated Saberin detachments directly subordinate to them.[428]

The IRGCGF is upgrading select SOF units, transforming commando units into special forces units. The 33rd Al Mahdi Brigade also transitioned from an airborne to a special forces brigade. With these changes, Iran is attempting to create a more agile and responsive force, particularly following the rise of ISIS and Iranian combat deployments to Syria.[429,430]

IRGCGF Saberin units are highly trained in specialized capabilities, such as raiding, hostage rescue, and heliborne assault. Some Saberin personnel use ultralight aircraft and are capable of conducting operations in a wide range of terrain and environmental conditions, including mountains, deserts, and swamps. Saberin have also deployed to Syria to support Iranian combat operations.[431,432,433]

### IRGC Navy MARSOF

The IRGCN has a MARSOF component known as the Sepah Navy Special Force (SNSF). The unit is based on Forur Island, strategically located near the Strait of Hormuz. SNSF personnel train in combat diving, direct action, counterterrorism, special reconnaissance, underwater demolitions, amphibious assault, hostage rescue, and maritime VBSS operations. Among the unit's missions is to protect Iranian commercial vessels, and SNSF personnel have deployed to the Gulf of Aden to assist with Iranian counterpiracy operations.[434]



IRGCGF SOF during an exercise in April 2006.

Image Source: AFP

PX260

# *Appendix G: Reserves*

Iran established its volunteer paramilitary reserve force, called the *Basij* ("mobilization" in Persian), in April 1980 after Supreme Leader Khomeini called for the creation of a 20 million-man army following the 1979 Islamic Revolution. During the Iran-Iraq War, the Basij deployed alongside the IRGC and regular forces. They became known for "human wave" assaults and martyrdom and suffered a large proportion of the total combat casualties during the war. It was incorporated into the IRGC structure in 1981, but it did not come under formal IRGC command until 2007. These changes brought about greater unit discipline and a formal rank structure. In 2009, Iran further integrated the more militarily capable components of the Basij with the IRGCGF, with the remaining personnel forming the much larger Basij Organization of the Oppressed (BOO), which focuses on domestic security and social outreach. The force is composed of mostly young male and female Iranians who volunteer often in exchange for official benefits.[435,436]



Basij personnel during an exercise in September 2015.

Image Source: AFP

Today, the Basij forms a core part of the regime's internal security apparatus. On multiple occasions, Tehran has used the Basij to help quell domestic unrest, including the widespread 2009 election protests. With branches in almost every Iranian city and town, Basij units aid internal security, law enforcement, suppression of dissent, and moral policing. The Basij has specialized branches for different segments of Iranian society, including the Labor Basij, Tribal Basij, Public Servants' Basij, Students' Basij, and Pupil Basij, which serves as a youth organization. In recent years, Basij personnel have also been part of the contingent of deployed Iranian forces supporting operations in Iraq and Syria.

There are five types of Basij members—potential, general, regular, active, and special—with increasing levels of capability and training, although the precise terms and descriptions for these tiers vary. Potential Basij are not formally enrolled in the BOO but are firm believers in the revolution who participate in Basij activities. General Basij are unpaid and receive a minimum level of training. Regular members are also unpaid part-time volunteers, but they receive more ideological indoctrination and rudimentary training to perform basic security duties during peacetime. Active Basij receive

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

## Basij Types

1805-17889



greater ideological training and are paid full-time members under temporary contracts. The Special Basij are the most highly trained and experienced members, comparable to full-time IRGC soldiers.[437,438]

The Basij has several core security components with specific missions, including the Ashura, Al Zahra, Beyt ol Moghaddas, Kowsar, Imam Ali, Imam Hossein, and Fatehin battalions. The Ashura (male) and Al Zahra (female) battalions provide local security, neighborhood defense, infrastructure protection, and low-level antiriot support. The Beyt ol Moghaddas (male) and Kowsar (female) battalions are rapid-reaction units, formed from the Ashura and Al Zahra battalions, intended to help defend cities and villages from potential invasion. The more-capable Imam Ali battalions are primarily set up to counter more significant internal security threats and domestic unrest. The Imam Hossein battalions train as light infantry and work closely with the IRG-CGF, including some deployments to Syria. Finally, the Fatehin are Basij special forces units, some of which have also deployed to Syria to assist the IRGCGF.

There are widely varying estimates for the size of the Basij, which are further complicated by the organization's different capability levels, unit types, and social groups. Some Iranian officials have claimed there are as many as 22 million Basij, which would constitute about a quarter of Iran's population. Such large estimates, if remotely accurate, would include the many men, women, and children who perform social service and outreach functions as part of the BOO and have little to no military or security training. These members probably significantly outnumber the militarized Basij components.

DEFENSE INTELLIGENCE AGENCY

**79**

PX260



Female Basij members during a ceremony in 2005.

Image Source: AFP

The Basij probably has around 450,000 active reserve personnel—those with military training who serve in operational units on a semi-regular basis and help staff much of the IRGC provincial corps throughout the country. The Basij may have another 500,000 to one million inactive reserve personnel—those with at least some military training who could be mobilized in wartime. There may be an additional 3–4 million Basij within the BOO with at most basic military training, making roughly 4–5 million a more realistic estimate of the total number of military-age Basij of all types. Estimates in the range of 10-20 million could be possible if they include all nonmilitary components of the BOO.[439,440,441,442,443]

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

# *Appendix H: Intelligence Services*

The Ministry of Intelligence and Security (MOIS) and the IRGC are the most robust intelligence services in Iran. The MOIS, as a government ministry, remains accountable to the president, while the IRGC remains accountable only to the supreme leader. This bifurcated intelligence structure is intended to ensure that no single organization becomes too powerful. However, tension between the IRGC and MOIS has been a constant fixture of their relationship because their duties overlap and their responsibilities are poorly delineated.[444]

### Ministry of Intelligence and Security

The MOIS was founded in 1984 to collect intelligence and lead Iran's domestic security and counterterrorism missions. Minister of Intelligence Mahmud Alavi leads the service, which has about 30,000 officers and support staff. The MOIS is the only Iranian intelligence and security service that reports to both the president and the supreme leader.

According to Iranian law, the MOIS's functions are to:

- Collect, analyze, produce, and categorize internal and external intelligence.
- Uncover acts of conspiracy, subversion, espionage, sabotage, and sedition against the independence, security, and territorial integrity of Iran.
- Protect the intelligence, news, documents, records, facilities, and personnel of the ministry.

- Train and assist organizations and institutions in protecting their significant records, documents, and objects.

Domestic activities are a priority for the MOIS, unless the Supreme Council for National Security (SCNS) or the supreme leader deem it necessary for the ministry to become involved directly with Iran's interests abroad. MOIS intelligence officers conduct the majority of their operations in the Middle East, Central Asia, Europe, and the United States. MOIS collection and influence operations beyond Iran's borders are typically embassy- and consulate-based under official, commercial, academic, or nongovernmental organization cover. The ministry liaises with other foreign intelligence agencies, as well as organizations such as Hizballah that protect and promote Iran's foreign agenda.[445,446] During the 1980s and 1990s, the MOIS was linked to an assas-



Iranian Minister of Intelligence Mahmud Alavi-Tabar.

Image Source: AFP

PX260

sination campaign that killed dozens of Iranian dissidents, many of them in Europe. More recently, it has been implicated in the murder of two dissidents in the Netherlands and a foiled plot last year against a People's Mujahedeen of Iran (MEK) rally in Paris.[447,448,449] The MOIS changed its organizational structure in 2017 by elevating its Bureau for Foreign Intelligence, providing the organization with a direct line of accounting in Iran's annual budget separate from the rest of the MOIS.[450]

### IRGC Intelligence Organization

The IRGC Intelligence Organization (IRGC-IO)—Iran's foremost military intelligence service, capable of all-source collection, analysis, and investigations—exercises primary dominance over internal Iranian military intelligence responsibilities. Hossein Taeb has led the organization since its inception in October 2009. Taeb reports directly to the supreme leader, although he must also coordinate with the IRGC commander. Regime critics claim the IRGC-IO includes more conservative and violent elements than the MOIS, its parallel intelligence and security organization. However, despite evidence of rivalries between the MOIS and IRGC-IO, both services share the common goal of preserving Iran's clerical regime.[451,452]

### IRGC Counterintelligence Organization

The IRGC Counterintelligence Organization (IRGC-CIO) was created in 1983 and is charged with protecting IRGC personnel, operations, and facilities from espionage, information leaks, and other counterrevolutionary threats. Brigadier General Mohammad Kazemi is the commander of the IRGC-CIO.[453]

### Artesh Intelligence

The Artesh maintains a joint military intelligence capability in the form of a Directorate for Intelligence (or J2).[454,455] It focuses on traditional tactical intelligence as well as intelligence and counterintelligence operations, security within the Artesh, and coordination with other intelligence bodies.[456]

### Law Enforcement Force

Iran's Ministry of Interior controls the Law Enforcement Force (LEF), created in 1991 to incorporate urban police, the rural gendarmerie, and various revolutionary committees.[457] One of the LEF's three main branches is the Counterintelligence Organization, and it maintains an operational unit charged with intelligence gathering, the Intelligence and Public Security Police.[458]

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

# Appendix I: Defense Industry and Modernization Programs

Since the 1979 Islamic Revolution—and the subsequent end of Western arms sales to Tehran—Iran has developed domestic capabilities and fostered new relationships to supply and equip its armed forces, as well as its partners and proxies in the region. During the past few decades Iran has built a domestic defense industry capable of developing and producing select categories of weapon systems, maintaining aging systems, retrofitting older-generation platforms, and reverse-engineering captured technology to meet Iranian military requirements.

## Key MODAFL Subordinates[459,460,461]

1805-17887

| Entity | Key Fields of Activity |
|---|---|
| Defense Industries Organization (DIO) | Tanks, armored vehicles, artillery, small arms, ammunition, explosives |
| Aerospace Industries Organization (AIO) | Ballistic missiles, cruise missiles, SAMs, AAMs, ATGMs |
| Iran Aviation Industries Organization (IAIO) | Light aircraft, UAVs |
| Marine Industries Organization (MIO) | Small boats, surface combatants, submarines |
| Iran Electronics Industries (IEI) | Radars, communications equipment, EW equipment |
| Defense Industries Research and Training Institute (DIRTI) | Oversees education and research to promote defense science and technology and achieve self-sufficiency in military industries |
| Malek-Ashtar University of Technology (MUT) | Military research and development, including in the fields of aerospace, marine, materials, and applied science and engineering |

DEFENSE INTELLIGENCE AGENCY

PX260

The Ministry of Defense and Armed Forces Logistics (MODAFL) oversees Iran's defense industry. MODAFL's mission is to arm and equip the armed forces through military research and development, production, acquisition, and personnel support. The major industrial organizations subordinate to MODAFL are responsible for the research, development, and production of nearly all types of military hardware, including ballistic and cruise missiles, SAMs, radars, armored vehicles, UAVs, naval vessels, small arms, ammunition, and communications equipment.[462]

Iranian officials and state media often exaggerate the capabilities of Iran's defense industries, stressing the country's self-sufficiency in military production in the face of international sanctions. Tehran often showcases its military capabilities, highlighting new weapon systems and platforms, with public displays that coincide with holidays and historic events.[463] The regime uses such propaganda to message its adversaries and build popular confidence in Iran's capabilities.[464]

## Major Modernization Programs

Through 2021, Iran has prioritized the development and production of missile, naval, air defense, UAV, and EW systems, based on priorities published in its sixth 5-year development plan (2017–2021). The plan lists specific defense and security objectives designed to increase Iran's military capabilities.[465] Tehran will also strive to develop its domestic technological base to rely less on foreign suppliers, mitigate the negative effect of sanctions, reduce costs, and enhance economic stability. Iran is slowly increasing the domestic content of its weapon systems and developing the ability to produce key components and materials.[466]

### Missile Sector

Within the Aerospace Industries Organization (AIO), the Shahid Hemmat Industries Group (SHIG) and Shahid Bakeri Industries Group (SBIG) are the primary entities responsible for ballistic missile development and production. Iran domestically develops and produces liquid- and solid-propellant CRBMs, SRBMs, and MRBMs and continues to improve the range, lethality, and accuracy of its missile systems. In recent years, Iran has unveiled SRBMs with increasingly greater range and precision as well as MRBMs with claimed accuracy and warhead improvements.[467]



An Ashura MRBM at a production facility in 2009.

Image Source: AFP

PX260

Iran is fielding an increasing number of theater ballistic missiles, improving its existing inventory, and developing technical capabilities that could enable it to produce an ICBM. Iran also continues to pursue development of more powerful SLVs. In July 2017 and January 2019, Iran launched its liquid-propellant Simorgh SLV, which could be capable of ICBM ranges if configured as a missile. Tehran also is pursuing long-range, precision LACMs, which present a new type of threat in the region.[468,469]

### Naval Sector

Iran's naval programs are primarily aimed at deterring adversaries from operating close to Iranian territorial waters. As such, Tehran's naval modernization efforts focus on providing the IRIN and IRGCN with increasingly lethal platforms and weapons—including advanced mines and torpedoes, small submarines, fast attack craft, and ship- and shore-based ASCMs—that further complicate freedom of navigation throughout Iran's littoral. Although a somewhat lesser focus, Tehran also aims to establish a more far-reaching, strategic naval force. In order to progress toward a "blue water" naval capability, Iran has also invested in developing and producing some larger surface and subsurface platforms.

The Marine Industries Organization (MIO) and its subsidiaries are the primary domestic producers of naval platforms for both of Iran's navies. These industries build a wide range of small high-speed boats equipped with guns, rockets, and missiles primarily for the IRGCN.



An Iranian ASCM-equipped FAC manufactured by MIO.

Image Source: AFP

Iran has built an inventory of hundreds of small boats, and Tehran continues to invest in producing increasingly faster and more-capable platforms armed with more-sophisticated weapons and equipment.

MIO also builds small submarines and surface combatants for the IRIN. After receiving at least one Yono class midget submarine from North Korea in 2004, Iran began domestic production of the platform. Iran has since developed the larger Fateh class coastal submarine, the first of which the IRIN commissioned in February 2019. Iran also domestically produces patrol craft and corvettes for the IRIN. Iran has completed three Jamaran class corvettes, including one on the Caspian Sea. The Jamaran is Tehran's largest naval construction project to date, and Iran has several more under construction.

Iran also produces a variety of naval weapon systems, including ASCMs, mines, and torpe-

PX260

does. Iran's domestically produced ASCMs are based on the Chinese C704 and C802. AIO produces the 35-kilometer-range C704 as the Nasr and the 120-kilometer-range C802 as the Noor. It has also developed extended-range variants of the C802/Noor. With these systems—the 200-kilometer-range Ghader and 300-kilometer-range Ghadir ASCMs—Iran has ASCM coverage for nearly the entire Persian Gulf and Gulf of Oman from its shores. In February 2019, Iran revealed footage of its first submarine-launched cruise missile, the Jask-2, a variant of the C704/Nasr ASCM, which can be launched from the IRIN's Yono class midget submarines.[470] During the next 5 years, new naval weapons probably will include additional submarine-launched ASCMs, the Hoot supercavitating torpedo, and potentially a supersonic ASCM.[471,472]

### Air Defense Sector

Iran can develop and produce SAM systems and radars, including those reverse-engineered from its legacy U.S. and Russian equipment. Iran continues to improve its integrated air defense system (IADS), which is concentrated around Tehran and the nuclear sites, with new air surveillance radars, SAMs, and C4ISR systems.

In recent years, Tehran has unveiled several domestically developed air defense systems, incorporating new SAMs and radars, including the medium-to-long-range Third of Khordad, the medium-range Sayyad-2, and the long-range Sayyad-3. Iran is also domestically developing a long-range air defense system called the Bavar-373 that it claims is more capable than the Russian SA-20c, which Iran acquired in 2016.[473,474] Iran has also announced it is producing more-capable long-range radars, including the Fath 14, with a reported range of 600 kilometers, and the Ghadir phased-array radar, with a reported range of 1,100 kilometers.[475,476]



An Iranian C704/Nasr ASCM at a production facility.

Image Source: AFP



An Iranian Sayyad-2 SAM at a production facility.

Image Source: AFP

PX260

### Aircraft Sector

Iran is unable to produce complete combat aircraft, but it has established a robust capability to maintain, upgrade, and modify its aging U.S. and Russian military aircraft. Iran has demonstrated its capability to overhaul fixed-wing transport and combat aircraft, including the U.S.-made F-4, F-5, F-14, and C-130 and the Russian Su-24 and MiG-29. Iran is similarly capable of maintaining and overhauling its helicopter fleet, such as the Russian Mi-17. Iran uses a combination of domestic and foreign components and seeks to modernize aircraft by procuring foreign technologies. Iran aims to be able to produce a modern jet aircraft but is unable to do so without significant foreign assistance. Iran has displayed what it claims are domestically built fighter aircraft, including platforms with low-observable technology, but these have been modifications to existing airframes or mock-ups of aspirational designs.[477]

Iran has steadily expanded its domestic UAV inventory by developing and producing a wide range of lethal and nonlethal UAV platforms. Iran has reverse-engineered many of these systems based on captured Western UAVs. Some of Iran's newer UAV platforms, such as the Shahed-129 and the Mohajer-6, can be armed and are capable of conducting precision air-to-ground strikes with small guided munitions.[478] However, despite advances in its UAV manufacturing capabilities, Iran remains reliant on Western manufactured engines and components to support its UAV production. Iran is developing a domestic UAV engine but is struggling with quality issues.[479]

### Ground Arms Sector

Since the end of the Iran-Iraq War, Tehran has invested relatively less in its ground arms sector compared with missile, naval, and air defense capabilities. Iran is unable to fully produce main battle tanks (MBTs), but it has proven able to maintain and upgrade its legacy armor equipment. Iran also produces a wide range of basic ground forces equipment, including small arms, artillery, ammunition, and ATGMs.[480,481]

PX260

# *Appendix J: Arms Transfers*

## Imports

Procurements for the IRGC and Artesh have largely served to maintain aging systems and modernize the military to be able to better defend against a technologically superior adversary. After the Iran-Iraq War, combat losses and a Western arms embargo made it difficult for Iran to replace its military materiel or obtain spare parts for equipment. However, during the 1990s, Tehran was able to purchase some tanks and armored vehicles, combat aircraft, ASCMs, and attack submarines from Russia, China, and North Korea.[482,483,484] Iran was also able to illicitly procure spare parts for some of its U.S.-origin equipment sold to the country under the shah.[485] More recent arms suppliers to Iran have included Russia, China, North Korea, Belarus, and Ukraine. In 2016, after canceling an earlier contract in 2010, Russia delivered the SA-20c air defense system to Iran—one of the most high-profile Iranian weapons acquisitions in many years.[486]

Tehran continues to face significant procurement obstacles as it remains under an international arms embargo, and many countries are unwilling to sell military equipment to Iran. Passed in 2015, UN Security Council Resolution (UNSCR) 2231, which endorses the Joint Comprehensive Plan of Action (JCPOA), extends ballistic missile and conventional arms restrictions on Iran. Although Tehran prefers to produce what it can domestically to meet military acquisition requirements, Iran remains reliant on countries such as Russia and China for procurement of advanced conventional capabilities.[487]

Under UNSCR 2231, the arms embargo on Iran is set to be lifted by October 2020, allowing Iran to purchase new advanced weapon systems from foreign suppliers to modernize its armed forces, including equipment it has largely been unable to acquire for decades. Iran will be permitted to purchase conventional systems it is unable to produce domestically, such as advanced fighter aircraft and main battle tanks. Iran is already evaluating and discussing military hardware for purchase primarily from Russia and, to a lesser extent, China. Iran's potential acquisitions after the lifting of UNSCR 2231 restrictions include Russian Su-30 fighters, Yak-130 trainers, and T-90 MBTs.[488,489] Iran has also shown interest in acquiring S-400 air defense systems and Bastian coastal defense systems from Russia.[490]

## Exports

Under UNSCR 2231, as with its predecessor resolutions, Iran is prohibited from exporting arms and related equipment without UN Security Council (UNSC) approval. Since UNSCR 2231 came into effect, no export proposals have been submitted to the UNSC. Since the Islamic Revolution, Iran has transferred a wide range of weapons and military equipment to state and

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

### UN Security Council Resolution 2231

UNSCR 2231 Annex B restricts Iranian ballistic missile activity and the provision of certain weapons and technology to Iran unless preapproved by the UNSC. UNSCR 2231 endorses the JCPOA but is separate from the nuclear agreement, which does not address ballistic missiles or conventional weapons. Unlike the JCPOA, Iran does not accept UNSCR 2231 Annex B restrictions as legitimate and has not agreed to abide by them. The various military-related restrictions apply for 5 or 8 years from JCPOA Adoption Day—18 October 2015—or when the International Atomic Energy Agency (IAEA) reaches a Broader Conclusion that all nuclear material in Iran is for peaceful purposes, whichever is earlier.[491,492]

- **Designated Entities:** All states are to freeze financial assets and economic resources and block travel of entities and individuals on the 2231 List, drawn from past UNSCRs on Iran. The 2231 List contains 23 individuals and 61 entities associated with Iran's nuclear, missile, and conventional arms programs. These restrictions last for 5 years (travel ban) and 8 years (asset freeze) absent a Broader Conclusion.

- **Conventional Arms Restrictions:** The UNSC must preapprove the supply, sale, or transfer to Iran of seven categories of arms as defined by the UN Register of Conventional Arms (UNROCA) and related materiel, spare parts, training, financial resources, advice, or other services. The seven UNROCA categories are battle tanks, armored combat vehicles, large-caliber artillery systems, combat aircraft, attack helicopters, warships, and missiles and missile systems, including MANPADS but excluding all other SAMs. All states are also to prevent the supply, sale, or transfer of arms or related materiel from Iran unless preapproved by the UNSC. These restrictions last for 5 years (October 2020) absent a Broader Conclusion.

- **Ballistic Missile Restrictions:** Iran is called upon not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches using such ballistic missile technology. The United States uses Missile Technology Control Regime (MTCR) Category I criteria to assert that missiles capable of delivering at least a 500-kg payload to a range of at least 300 kilometers are inherently capable of delivering nuclear weapons. The UNSC must also preapprove the supply, sale, or transfer to or from Iran of all items, materials, equipment, goods, and technology set out in the MTCR or that could contribute to the development of nuclear weapon delivery systems. These restrictions last for 8 years (October 2023) absent a Broader Conclusion.

*The MTCR is a 35-member voluntary, multilateral agreement that establishes export control standards for missiles and missile technology. The MTCR is not a treaty or legally binding, but UNSCR 2231 establishes it as a global standard for restricted transfers to and from Iran. Member states enforce the MTCR regardless of the status of UNSCR 2231.*

PX260

nonstate actors, including designated terrorist organizations. Iran has also provided technical assistance to help nonstate actors produce and assemble their own equipment. Although some Iranian shipments have been interdicted, Tehran is often able to get high-priority arms transfers to its customers.

Over the years, Iranian transfers to state and nonstate actors have included: communications equipment; small arms—such as assault rifles, sniper rifles, machine guns, mortars, and rocket-propelled grenades (RPGs)—and ammunition; ATGMs; MANPADS; artillery systems, including MRLs and battlefield rockets and launchers; armored vehicles; FAC; equipment for unmanned explosives boats; ASCMs; SAMs; UAVs, including ISR and attack platforms; ground-attack aircraft; and C/SRBMs and associated technology.

Iran's biggest customers include Syria, Hizballah in Lebanon, and Iraqi Shia militias, but Iran has also provided weapons to the Huthis in Yemen, Palestinian groups, and the Taliban in Afghanistan. Since UNSCR 1747, which first established the arms export ban on Iran, was adopted in 2007, other state customers of Iranian military equipment have included Iraq, Sudan, and Venezuela. In late 2013, Iran agreed to a $195-million deal to sell arms to the Iraqi government, including small arms, ammunition, artillery rounds, and communications equipment.[493,494,495,496,497,498,499] Significant quantities of Iranian small arms, light weapons, and ammunition can also be found on the international gray arms market and have been identified in various war zones, including throughout central Africa. However, it is difficult to determine if these are instances of direct transfers or sales from the Iranian government.[500]

*Recipients of Iranian Arms*

1805-17885



Graphic Source: DIA, D3 Design

■ State recipient
■ Nonstate recipient
▨ State and nonstate recipients
*Note: Does not include Iranian gray arms.*

PX260

INTENTIONALLY LEFT BLANK

PX260

# *GLOSSARY OF ABBREVIATIONS*

| | | | |
|---|---|---|---|
| **A2/AD** | antiaccess/area denial | **EW** | electronic warfare |
| **AA** | army aviation | **FAC** | fast attack craft |
| **AAM** | air-to-air missile | **FIAC** | fast inshore attack craft |
| **AEOI** | Atomic Energy Organization of Iran | **FTO** | foreign terrorist organization |
| **AFGS** | Armed Forces General Staff | **GDP** | gross domestic product |
| **AGMC** | Al-Ghadir Missile Command | **IADS** | integrated air defense system |
| **AIO** | Aerospace Industries Organization | **IAEA** | International Atomic Energy Agency |
| **ASBM** | antiship ballistic missile | **IAIO** | Iran Aviation Industries Organization |
| **ASCM** | antiship cruise missile | **ICBM** | intercontinental ballistic missile |
| **ATGM** | antitank guided missile | **IED** | improvised explosive device |
| **BOO** | Basij Organization of the Oppressed | **IEI** | Iran Electronics Industries |
| **BWC** | Biological and Toxin Weapons Convention | **IONS** | Indian Ocean Naval Symposium |
| **C2** | command and control | **IRBM** | intermediate-range ballistic missile |
| **C4ISR** | command, control, communications, computers, intelligence, surveillance, and reconnaissance | **IRGC** | Islamic Revolutionary Guard Corps |
| **CDCM** | coastal defense cruise missile | **IRGCASF** | Islamic Revolutionary Guard Corps Aerospace Force |
| **CHOD** | chief of defense | **IRGC-CIO** | Islamic Revolutionary Guard Corps Counterintelligence Organization |
| **CRBM** | close-range ballistic missile | | |
| **CWC** | Chemical Weapons Convention | **IRGCGF** | Islamic Revolutionary Guard Corps Ground Force |
| **D&D** | denial and deception | | |
| **DIO** | Defense Industries Organization | **IRGC-IO** | Islamic Revolutionary Guard Corps Intelligence Organization |
| **DIRTI** | Defense Industries Research and Training Institute | | |
| **DNG** | deployed naval group | **IRGCN** | Islamic Revolutionary Guard Corps Navy |
| **EFP** | explosively formed penetrator | **IRGC-QF** | Islamic Revolutionary Guard Corps Qods Force |

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

| | | | |
|---|---|---|---|
| **IRIADF** | Islamic Republic of Iran Air Defense Force | **NPDO** | National Passive Defense Organization |
| **IRIAF** | Islamic Republic of Iran Air Force | **NPT** | Nonproliferation Treaty |
| **IRIGF** | Islamic Republic of Iran Ground Force | **PFLP-GC** | Popular Front for the Liberation of Palestine–General Command |
| **IRIN** | Islamic Republic of Iran Navy | **PHRC** | Physics Research Center |
| **ISIS** | Islamic State of Iraq and ash-Sham | **PIJ** | Palestine Islamic Jihad |
| **ISR** | intelligence, surveillance, and reconnaissance | **PJAK** | Free Life Party of Kurdistan |
| **JAA** | Jaish ul-Adl | **PMC** | Popular Mobilization Committee |
| **JCPOA** | Joint Comprehensive Plan of Action | **PMF** | Popular Mobilization Forces |
| **KADHQ** | Khatemolanbia Air Defense Headquarters | **RPG** | rocket-propelled grenade |
| | | **SAM** | surface-to-air missile |
| **KCHQ** | Khatemolanbia Central Headquarters | **SBIG** | Shahid Bakeri Industries Group |
| **KDPI** | Kurdish Democratic Party of Iran | **SBS** | Special Boat Service |
| **LACM** | land-attack cruise missile | **SCNS** | Supreme Council for National Security |
| **LEF** | Law Enforcement Force | **SHIG** | Shahid Hemmat Industries Group |
| **MANPADS** | man-portable air defense system | **SLV** | space launch vehicle |
| **MARSOF** | maritime special operations forces | **SNSF** | Sepah Navy Special Force |
| **MARV** | maneuverable reentry vehicle | **SOC** | sector operations center |
| **MBT** | main battle tank | **SOF** | special operations forces |
| **MEK** | People's Mujahedeen of Iran | **SRBM** | short-range ballistic missile |
| **MFA** | Ministry of Foreign Affairs | **UAV** | unmanned aerial vehicle |
| **MIO** | Marine Industries Organization | **UF$_6$** | Uranium hexafluoride |
| **MODAFL** | Ministry of Defense and Armed Forces Logistics | **UGF** | underground facility |
| | | **UN** | United Nations |
| **MOIS** | Ministry of Intelligence and Security | **UNAMID** | African Union-United Nations Hybrid Operation in Darfur |
| **MRBM** | medium-range ballistic missile | **UNSC** | UN Security Council |
| **MRL** | multiple rocket launcher | **UNSCR** | UN Security Council Resolution |
| **MTCR** | Missile Technology Control Regime | **VBSS** | visit, board, search, and seizure |
| **MUT** | Malek-Ashtar University of Technology | **WMD** | weapons of mass destruction |

PX260

INTENTIONALLY LEFT BLANK

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

# *REFERENCES*

[1] Khamenei, Ali. "Iran has defeated all of US's vicious plans for the region." Supreme Leader's website, 10 September 2018, english.khamenei.ir/news/5935/Iran-has-defeated-all-of-US-s-vicious-plans-for-the-region. Accessed 22 March 2019.

[2] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Force*s. Georgetown University Press, 2009, pp. 125-150.

[3] Ferrokh, Kaveh. *Iran at War: 1500-1988*. Osprey Publishing, 2011, pp. 261-267.

[4] Keddie, Nikki. *Modern Iran: Roots and Results of Modern Revolution.* Yale University Press, 2006, pp. 88.

[5] U.S. Department of State, Office of the Historian, Bureau of Public Affairs. *Iran, 1951-1954.* Edited by James C. Van Hook. *Foreign Relations of the United States,* 1952-1965, Government Printing Office, 2017, history.state.gov/historicaldocuments/frus1951-54Iran. Accessed 30 May 2018.

[6] "Iran Profile." *BBC News,* 2 January 2018, www.bbc.com/news/world-middle-east-14541327. Accessed 30 May 2018.

[7] "Iran claims self-sufficiency as aircraft types granted domestic certification." *Jane's Defence Weekly,* 3 May 2012, vol. 049/021.

[8] Axe, David. "Iran's Air Force Flies American-Made F-14 Tomcats." *The National Interest,* 5 March 2018, nationalinterest.org/blog/the-buzz/irans-air-force-flies-american-made-f-14-tomcats-24750. Accessed 31 May 2018.

[9] Drennen, John. "Iranian Unmanned Systems." *International Institute for Strategic Studies,* 2017, www.iiss.org/-/media//documents/publications/gulf%20security%20after%202020/7%20drennan.pdf?la=en. Accessed 31 May 2018.

[10] Cordesman, Anthony H., and Michael Peacock. "The Arab-U.S. Strategic Partnership and the Changing Security Balance in the Gulf: Joint and Asymmetric Warfare, Missiles and Missile Defense, Civil War and Non-State Actors, and Outside Powers," *Center for Strategic and International Studies,* 13 July 2015, csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/150713_Cover_and__Report%20_Gulf_Military_Balance_2015.pdf, pp. 197-216. Accessed 30 May 2018.

[11] Ser, Kuang Keng Kuek. "Where did Iran get its military arms over the last 70 years?" *The World,* Public Radio International, 1 June 2016, www.pri.org/stories/2016-06-01/where-did-iran-get-its-military-arms-over-last-70-years. Accessed 30 May 2018.

[12] Ferrokh, Kaveh. *Iran at War: 1500-1988.* Osprey Publishing, 2011, pp. 304-309.

[13] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 203-205.

[14] Hughes, Geraint. "'Amateurs Who Play in League Division One'? Anglo-Iranian Military Relations During the Dhofar War in Oman." *British Journal for Military History,* vol. 4, no. 1, November 2017, bjmh.org.uk/index.php/bjmh/article/view/196/172. Accessed 30 May 2018.

[15] Hashim, Ahmed S. "The Iranian Military in Politics, Revolution and War, Part Two." *Middle East Policy Council,* www.mepc.org/iranian-military-politics-revolution-and-war-part-two. Accessed 15 February 2018.

[16] Keddie, Nikki. *Modern Iran: Roots and Results of Modern Revolution.* Yale University Press, 2006, pp. 214, 238-240.

[17] Wehrey, Frederic, et al. "The Rise of the Pasdaran: Assessing the Domestic Roles of Iran's Islamic Revolutionary Guards Corp." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG821.pdf, pp. 20-21. Accessed 30 May 2018.

[18] Axworthy, Michael. *Revolutionary Iran: A History of the Islamic Republic.* Oxford University Press, 2013, pp. 184-186.

[19] Murray, Williamson, and Kevin Woods. *The Iran Iraq War: A Military and Strategic History.* Cambridge University Press, 2014, p. 172.

[20] *Constitution of the Islamic Republic of Iran.* Government of Iran, 3 December 1979.

[21] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 244-245.

[22] Bruno, Greg, et al. "Iran's Revolutionary Guards." *Council on Foreign Relations,* 14 June 2013, www.cfr.org/backgrounder/irans-revolutionary-guards. Accessed 30 May 2018.

PX260

[23] "Iran Lawmakers Back Bill Seeking Compensation From U.S. For 'Damages'." *Radio Free Europe/Radio Liberty,* 28 December 2015, www.rferl.org/a/iran-lawmakers-back-bill-seeking-compensation-from-us-for-damages/27454082.html. Accessed 31 May 2018.

[24] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 258-259.

[25] Alfoneh, Ali. "Eternal Rivals? The Artesh and the IRGC." *Middle East Institute,* 15 November 2011, www.mei.edu/publications/eternal-rivals-artesh-and-irgc. Accessed 26 March 2019.

[26] "Annex 1: Chemical Agents." *Public Health Response to Biological and Chemical Weapons: WHO Guidance,* 2nd ed., World Health Organization, 2004, www.who.int/csr/delibepidemics/annex1.pdf?ua=1. Accessed 30 May 2018.

[27] Khateri, Shahriar. *Iraq's Use of Chemical Weapons against Iran: UN Documents 1984 – 1988.* 2014, www.tehranpeacemuseum.org/files/pdf%20resources/English%20Text-%20chemical%20warfare.pdf. Accessed 22 March 2019.

[28] "Iraq's Chemical Warfare Program." *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD,* Volume 3, Central Intelligence Agency, 30 September 2004, www.cia.gov/library/reports/general-reports-1/iraq_wmd_2004/chap5.html. Accessed 30 May 2018.

[29] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 271.

[30] Cordesman, Anthony H. *Iran's Military Forces in Transition: Conventional Threats and Weapons of Mass Destruction.* Praeger Security International, 1999, pp. 294-295.

[31] Zatarain, Lee Allen. *America's First Clash with Iran: The Tanker War, 1987–88.* Casemate, 2008.

[32] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 280-287, 294-295.

[33] Razoux, Pierre. *The Iran-Iraq War.* The Belknap Press of Harvard University Press, 2015, pp. 463-466.

[34] Hiro, Dilip. *The Longest War: The Iran-Iraq Military Conflict.* Routledge, 1991, p. 250.

[35] Kurzman, Charles. "Death Tolls of the Iran-Iraq War." 31 October 2013, kurzman.unc.edu/death-tolls-of-the-iran-iraq-war/. Accessed 4 June 2018.

[36] Hiro, Dilip. *The Longest War: The Iran-Iraq Military Conflict.*

Routledge, 1991, pp. 264-265.

[37] Wehrey, Frederic, et al. "Dangerous But Not Omnipotent: Exploring the Reach and Limitations of Iranian Power in the Middle East." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG781.pdf, p. 50. Accessed 30 May 2018.

[38] Connell, Michael. "Iran's Military Doctrine." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/irans-military-doctrine. Accessed 19 March 2018.

[39] Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, pp. 303, 320-321.

[40] Wehrey, Frederic, et al. "Dangerous But Not Omnipotent: Exploring the Reach and Limitations of Iranian Power in the Middle East." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG781.pdf, pp. 50-58, 81, 107. Accessed 30 May 2018.

[41] "Department Press Briefing - April 2, 2019." *U.S. Department of State,* 2 April 2019, https://www.state.gov/r/pa/prs/dpb/2019/04/290841.htm. Accessed 3 April 2019.

[42] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 36, 38-39, 42-43. Accessed 30 May 2018.

[43] Gilsinan, Kathy. "Trump Calls Iran's Revolutionary Guard Terrorist Organization." *The Atlantic,* 8 April 2019, www.theatlantic.com/politics/archive/2019/04/trump-iran-revolutionary-guard-terrorist-organization/586663/. Accessed 18 April 2019.

[44] Pompeo, Michael R. *Decision on Imports of Iranian Oil.* U.S. Department of State, 22 April 2019, www.state.gov/decision-on-imports-of-iranian-oil/. Accessed 31 July 2019.

[45] Lee, Matthew. "Trump's 'Maximum Pressure' Campaign on Iran Faces Key Test." *Associated Press,* 27 July 2019, www.apnews.com/e6bd6334ff4148f2985de059f93dc390. Accessed 31 July 2019.

[46] Sariolghalam, Mahmood. "Prospects for Change in Iranian Foreign Policy." *Carnegie Endowment for International Peace,* 20 February 2018, carnegieendowment.org/2018/02/20/prospects-for-change-in-iranian-foreign-policy-pub-75569. Accessed 31 May 2018.

[47] Wehrey, Frederic, et al. "Introduction: Saudi Araba and Iran - Between Confrontation and Cooperation." *Saudi-Iranian Relations Since the Fall of Iran: Rivalry, Cooperation, and*

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

*Implications of U.S. Policy,* Rand Corporation, 2009, www.jstor.org/stable/pdf/10.7249/mg840srf.7.pdf?refreqid=excelsior%3A462e386736ad280845c8787a233b861d, p. 2. Accessed 31 May 2018.

[48] "Ground Force Commander: Iran Ready To Confront US." *Jewish Business News,* 23 May 2016, jewishbusinessnews.com/2016/05/23/ground-force-commander-iran-ready-to-confront-us/. Accessed 31 May 2018.

[49] Erdbrink, Thomas, and William Branigin. "Iran's Supreme Leader Warns Against Negotiating with U.S." *Washington Post,* 4 November 2009, www.washingtonpost.com/wp-dyn/content/article/2009/11/03/AR2009110301397.html?noredirect=on. Accessed 31 May 2018.

[50] Erdbrink, Thomas. "For Many Iranians, the 'Evidence' Is Clear: ISIS Is an American Invention." *New York Times,* 10 September 2014, www.nytimes.com/2014/09/11/world/middleeast/isis-many-in-iran-believe-is-an-american-invention.html. Accessed 31 May 2018.

[51] Sharp, Jeb. "The US and Iran Part I - The 1953 Coup." *The World,* Public Radio International, 25 October 2004, www.pri.org/stories/2004-10-25/us-and-iran-part-i-1953-coup. Accessed 31 May 2018.

[52] Keck, Zachary. "Exposed: Iran's Super Strategy to Crush America in a War." *The National Interest,* 20 June 2015, nationalinterest.org/feature/exposed-irans-super-strategy-crush-america-war-13152?page=show. Accessed 31 May 2018.

[53] Piven, Ben. "Map: US Bases Encircle Iran." *Al Jazeera,* 1 May 2012, www.aljazeera.com/indepth/interactive/2012/04/2012417131242767298.html. Accessed 31 May 2018.

[54] McInnis, J. Matthew. "Iranian Concepts of Warfare: Understanding Tehran's Evolving Military Doctrines." *American Enterprise Institute,* 16 February 2017, www.aei.org/publication/iranian-concepts-of-warfare-understanding-tehrans-evolving-military-doctrines/. Accessed 31 May 2018.

[55] "Iran and Saudi Arabia: Friends and Foes in the Region." *BBC Monitoring,* 10 November 2017, www.bbc.com/news/world-middle-east-41945860. Accessed 31 May 2018.

[56] McInnis, J. Matthew. "The Strategic Foundations of Iran's Military Doctrine." *Gulf Security After 2020,* International Institute for Strategic Studies, 19 December 2017.

[57] Eisenstadt, Michael. "Iran After Sanctions: Military Procurement and Force-Structure Decisions." *Gulf Security After 2020,* International Institute for Strategic Studies, 19 December 2017.

[58] "Matn-e kaamel-e qanoon-e barnaameh-ye sheshom-e touseh" ["Complete Text of the Sixth Development Plan Law"]. *Tasnim News Agency,* 18 March 2017, www-tasnimnews-com/fa/news/1395/12/28/1360457/%D9%85%D8%AA%D9%86-%DA%A9%D8%A7%D9%85%D9%84-%D9%82%D8%A7%D9%86%D9%88%D9%86-%D8%A8%D8%B1%D9%86%D8%A7%D9%85%D9%87-%D8%B4%D8%B4%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87. Accessed 30 May 2018.

[59] "Iran approves the Sixth Development Plan to boost investment." *CMS Law Now,* 21 April 2017, www.cms-lawnow.com/ealerts/2017/04/iran-approves-the-sixth-development-plan-to-boost-investment. Accessed 31 May 2018.

[60] Wehrey, Frederic, et al. "Dangerous But Not Omnipotent: Exploring the Reach and Limitations of Iranian Power in the Middle East." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG781.pdf, pp. 11, 31-38, 39-42. Accessed 30 May 2018.

[61] Bruno, Greg. "Religion and Politics in Iran." *Council on Foreign Relations,* 19 June 2008, www.cfr.org/backgrounder/religion-and-politics-iran. Accessed 31 May 2018.

[62] Cunningham, Erin. "Islamic State threatens more bloodshed in Iran." *Washington Post,* 15 August 2017, www.washingtonpost.com/world/middle_east/iran-was-at-the-forefront-of-the-fight-against-isis-now-it-has-to-face-the-militants-at-home/2017/08/14/e4fb735a-7dfe-11e7-b2b1-aeba62854dfa_story.html. Accessed 31 May 2018.

[63] Tabatabai, Ariane, and Dina Esfandiary. "Cooperating with Iran to Combat ISIS." *Washington Quarterly,* vol. 40, no. 3, Fall 2017, www.belfercenter.org/publication/cooperating-iran-combat-isis-iraq. Accessed 31 May 2018.

[64] Newton. Creede. "Saudi-Iran Proxy Wars: In Pursuit of Regional Hegemony." *Al Jazeera,* 14 November 2017, www.aljazeera.com/news/2017/11/saudi-iran-proxy-wars-pursuit-regional-hegemony-171113110353492.html. Accessed 31 May 2018.

[65] Maloney, Suzanne. "The Roots and Evolution of Iran's Regional Strategy." *Atlantic Council,* September 2017, www.atlanticcouncil.org/publications/issue-briefs/the-roots-drivers-and-evolution-of-iran-s-regional-strategy. Accessed 31 May 2018.

[66] Etehad, Melissa. "Iran Cracks Down on Islamic State Suspects as the Extremist Group Intensifies Threats." *Los Angeles Times,* 3 September 2017, www.latimes.com/world/middleeast/la-fg-iran-islamic-state-20170829-story.html. Accessed 31 May 2018.

PX260

[67] Pollard, Dan. "Foreign Minister Mohammad Javad Zarif on U.S.-Iran Relations." *Council on Foreign Relations,* 23 April 2018, www.cfr.org/event/foreign-minister-mohammad-javad-zarif-us-iran-relations. Accessed 31 May 2018.

[68] "Iran's Rouhani Signals Expansion in Energy Cooperation with Russia." *Reuters,* 27 March 2017, www.reuters.com/article/us-iran-russia-rouhani/irans-rouhani-signals-expansion-in-energy-cooperation-with-russia-idUSKBN16Y0ZZ. Accessed 31 May 2018.

[69] Feldman, Nizan, and Sima Shine. "Iran's Economic Situation Two Years after the Removal of the Sanctions." *Institute for National Security Studies,* 4 January 2018, www.inss.org.il/publication/irans-economic-situation-two-years-removal-sanctions/. Accessed 31 May 2018.

[70] Salehi-Isfahani, Djavad. "Iran: Subsidy Reform amid Regional Turmoil." *Brookings Institution,* 3 March 2011, www.brookings.edu/opinions/iran-subsidy-reform-amid-regional-turmoil/. Accessed 31 May 2018.

[71] Hafezi, Parisa. "Iran's Khamenei Says Economic Progress Limited Despite Lifting Sanctions." *Reuters,* 9 March 2017, www.reuters.com/article/us-iran-khamenei-economy/irans-khamenei-says-economic-progress-limited-despite-lifting-sanctions-idUSKBN16G1PK. Accessed 31 May 2018.

[72] Toumaj, Amir. "Iran's Economy of Resistance: Implications for Future Sanctions." *Critical Threats Project,* American Enterprise Institute, 17 November 2014, www.aei.org/publication/irans-economy-resistance-implications-future-sanctions/. Accessed 31 May 2018.

[73] Johnson, Toni. "How Sanctions Affect Iran's Economy." *Council on Foreign Relations,* 22 May 2012, www.cfr.org/interview/how-sanctions-affect-irans-economy. Accessed 31 May 2018.

[74] Majidyar, Ahmad. "Iran's Intelligence Minister Says It Dismantled 30 'Terrorist Cells' inside Iran." *Middle East Institute,* 5 May 2017, www.mei.edu/content/io/iran-s-intelligence-minister-says-it-dismantled-30-terrorist-cells-inside-iran. Accessed 30 May 2018.

[75] "Iran Security Forces Bust Several Terrorist Cells Prior to Elections: Minister." *Tasnim News Agency,* 19 May 2017, www.tasnimnews.com/en/news/2017/05/19/1412671/iran-security-forces-bust-several-terrorist-cells-prior-to-elections-minister. Accessed 31 May 2018.

[76] Milani, Abbas. "Iran Primer: The Green Movement." *PBS Frontline,* 27 October 2010, www.pbs.org/wgbh/pages/frontline/tehranbureau/2010/10/iran-primer-the-green-movement.

html. Accessed 22 May 2018.

[77] Erdbrink, Thomas. "Deadly Iran Protests Prompt Warning of Harsher Response." *New York Times,* 1 January 2018, www.nytimes.com/2018/01/01/world/middleeast/iran-protests.html. Accessed 22 May 2018.

[78] "PJAK." *Uppsala Conflict Data Program.* Uppsala University, Department of Peace and Conflict Research, ucdp.uu.se/#/actor/309. Accessed 31 May 2018.

[79] Sharafedin, Bozorgmehr. "10 Iranian guards killed at Pakistani border, Tasnim news agency reports." *Reuters,* 26 April 2017, www.reuters.com/article/us-iran-security-pakistan/10-iranian-guards-killed-at-pakistani-border-tasnim-news-agency-reports-idUSKBN17S2MQ. Accessed 12 March 2019.

[80] Regencia, Ted. "Iran Warns Pakistan to Crack Down on Jaish al-Adl." *Al Jazeera,* 16 February 2019, www.aljazeera.com/news/2019/02/iran-warns-pakistan-crack-jaish-al-adl-190216071021469.html. Accessed 22 March 2019.

[81] Zahid, Farhan. "Jaish al-Adl's Reemergence Threatens Iran-Pakistan Relations." *Jamestown Foundation,* 14 July 2017, jamestown.org/program/jaish-al-adls-reemergence-threatens-iran-pakistan-relations/. Accessed 31 May 2018.

[82] Masters, Jonathan. "Mujahadeen-e-Khalq (MEK)." *Council on Foreign Relations,* 28 July 2014, www.cfr.org/backgrounder/mujahadeen-e-khalq-mek. Accessed 22 March 2019.

[83] Mohseni, Payam, and Hussein Kalout. "Iran's Axis of Resistance Rises: How It's Forging a New Middle East." *Foreign Affairs,* 24 January 2017, www.foreignaffairs.com/articles/iran/2017-01-24/irans-axis-resistance-rises. Accessed 29 May 2018.

[84] Mohseni, Payam, and Hussein Kalout. "Iran's Axis of Resistance Rises: How It's Forging a New Middle East." *Foreign Affairs,* 24 January 2017, www.foreignaffairs.com/articles/iran/2017-01-24/irans-axis-resistance-rises. Accessed 29 May 2018.

[85] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 17, 41. Accessed 30 May 2018.

[86] "Iran, Oman Ink Agreement on Defensive Cooperation." *Payvand News,* 4 August 2010, www.payvand.com/news/10/aug/1043.html. Accessed 30 May 2018.

[87] Panda, Ankit. "Iran, Afghanistan Approach Strategic Cooperation Pact." *The Diplomat,* 22 January 2015, thediplomat.com/2015/01/iran-afghanistan-approach-strategic-coopera-

PX260

IRAN MILITARY POWER | *Ensuring Regime Survival and Securing Regional Dominance*

tion-pact/. Accessed 30 May 2018.

88 "Sudan, Iran Sign Military Cooperation Agreement." *Sudan Tribune,* 7 March 2008, www.sudantribune.com/Sudan-Iran-sign-military,26294. Accessed 30 May 2018.

89 "Factbox: Venezuela's Ties with Iran." *Reuters,* 7 January 2012, www.reuters.com/article/us-venezuela-iran-idUSTRE-8060DO20120107. Accessed 31 May 2018.

90 "Iran, Iraq Sign MoU To Boost Defense, Military Cooperation." *Press TV,* 23 July 2017, www.presstv.com/Detail/2017/07/23/529419/Iran-Iraq-Hossein-Dehqan-Erfan-alHiyali-MoU. Accessed 1 June 2018.

91 Gady, Franz-Stefan. "Russia and Iran Sign Military Cooperation Agreement." *The Diplomat,* 21 January 2015, thediplomat.com/2015/01/russia-and-iran-sign-military-cooperation-agreement/. Accessed 30 May 2018.

92 Gady, Franz-Stefan. "Iran, China Sign Military Cooperation Agreement." *The Diplomat,* 15 November 2016, thediplomat.com/2016/11/iran-china-sign-military-cooperation-agreement/. Accessed 30 May 2018.

93 "Iran, South Africa Sign MoU to Boost Defense, Military Ties." *Press TV,* 13 December 2016, www.presstv.com/Detail/2016/12/13/497740/Iran-South-Africa-Hossein-Dehqan-Nosiviwe-Noluthando-MapisaNqakula-MoU-defense-military. Accessed 30 May 2018.

94 Fulton, Will. "Qatar-Iran Foreign Relation." *Critical Threats Project,* American Enterprise Institute, www.criticalthreats.org/analysis/qatar-iran-foreign-relations#_edn0cb342a5b0f0639c-834c252bf18da7e3ref41. Accessed 31 May 2018.

95 "Shamkhani in Lebanon to Discuss Defense Cooperation." *Iran Daily,* 30 September 2014, www.iran-daily.com/News/2507.html. Accessed 30 May 2018.

96 "Iran, Pakistan to Expand Defense Coop." *Mehr News Agency,* 17 January 2018, en.mehrnews.com/news/131371/Iran-Pakistan-to-expand-defense-coop. Accessed 30 May 2018.

97 "India, Iran to Boost Maritime, Defence Cooperation." *ANI News,* 17 February 2018, www.aninews.in/news/world/asia/india-iran-to-boost-maritime-defence-cooperation201802171916130001/. Accessed 30 May 2018.

98 "Iran and Turkey Agree to Increase Military Cooperation." *Arab News,* 18 August 2017, www.arabnews.com/node/1146561/middle-east. Accessed 30 May 2018.

99 Himes, Joshua. "Iran's Two Navies: A Maturing Maritime Strategy." *Institute for the Study of War,* Middle East Security Report I, October 2011, pp. 19-20.

100 Farrar-Wellman, Ariel. "Tanzania-Iran Foreign Relations." *Critical Threats Project,* American Enterprise Institute, 24 January 2010, www.criticalthreats.org/analysis/tanzania-iran-foreign-relations. Accessed 30 May 2018.

101 Shirinov, Rashid. "Baku hosts meeting of Azerbaijan-Iran Working Group on Military Cooperation." *AzerNews,* 25 October 2017, www.azernews.az/nation/121079.html. Accessed 30 May 2018.

102 "Iran, Kazakhstan Discuss Army Cooperation." *Iranian Students News Agency,* 14 August 2014, en.isna.ir/news/92052312911/Iran-Kazakhstan-discuss-army-cooperation. Accessed 30 May 2018.

103 Niayesh, Umid. "Iran, Turkmenistan to Boost Military Cooperation." *Trend News Agency,* 15 September 2014, en.trend.az/iran/politics/2311875.html. Accessed 30 May 2018.

104 "Iran, Bolivia Agree to Enhance Military Ties." *Press TV,* 12 May 2018, www.presstv.com/Detail/2018/05/12/561443/Iran-Bolivia-military-cooperation. Accessed 30 May 2018.

105 "Iran's Navy Commander Holds Military Talks in Italy." *Tasnim News Agency,* 18 October 2017, www.tasnimnews.com/en/news/2017/10/18/1549540/iran-s-navy-commander-holds-military-talks-in-italy. Accessed 30 May 2018.

106 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 17, 49, 55. Accessed 30 May 2018.

107 Faghihi, Rohallah. "Iranian Mistrust of Russia Surges As Syrian War Winds Down." *Al-Monitor,* 12 March 2018, www.al-monitor.com/pulse/originals/2018/03/iran-syria-russia-sentiment-reconstruction-spoils-safavi.html. Accessed 7 June 2018.

108 Ashley, LTG Robert P. *Statement for the Record: Worldwide Threat Assessment.* Defense Intelligence Agency, 6 March 2018, www.dia.mil/News/Speeches-and-Testimonies/Article-View/Article/1457815/statement-for-the-record-worldwide-threat-assessment/.

109 Gady, Franz-Stefan. "Iran, China Sign Military Cooperation Agreement." *The Diplomat,* 15 November 2016, thediplomat.com/2016/11/iran-china-sign-military-cooperation-agreement/. Accessed 28 May 2018.

110 "Iranian Navy Logistics Vessel Undergoing Repairs in Durban." *defenceWeb,* 16 January 2017, www.defence-web.co.za/index.php?option=com_content&view=arti-

PX260

cle&id=46452&catid=74&Itemid=30. Accessed 28 May 2018.

[111] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf, pp. 24-25.

[112] Himes, Joshua. "Iran's Two Navies: A Maturing Maritime Strategy." *Institute for the Study of War,* Middle East Security Report I, October 2011, pp. 19-20.

[113] "Iran, Italy Stage Joint Naval Wargames in Persian Gulf." *Fars News Agency,* 27 September 2016, en.farsnews.com/newstext.aspx?nn=13950706001053. Accessed 30 May 2018.

[114] "Iranian Navy Participating in Int'l Maritime Drills in Bangladesh." *Tasnim News Agency,* 27 November 2017, www.tasnimnews.com/en/news/2017/11/27/1585859/iranian-navy-participating-in-int-l-maritime-drills-in-bangladesh. Accessed 28 May 2018.

[115] Sheikhi, Marjohn. "6th Indian Ocean Naval Symposium Kicks Off in Tehran." *Mehr News Agency,* 23 April 2019, en.mehrnews.com/news/133545/6th-Indian-Ocean-Naval-Symposium-kicks-off-in-Tehran. Accessed 28 May 2018.

[116] "Laaiheh-ye budjeh-ye saal-e 1397 kol-e keshvar" ["General budget bill for 2018-2019"]. *Iran Data Portal,* Social Science Research Council/Princeton University/Syracuse University, irandataportal.syr.edu/wp-content/uploads/Budget-1397.pdf. Accessed 31 May 2018.

[117] "Laaiheh-ye budjeh-ye saal-e 1398 kol-e keshvar" ["General budget bill for 2019-2020"]. *Iran Data Portal, Social Science Research Council/Princeton University/Syracuse University,* irandataportal.syr.edu/wp-content/uploads/budget1398-1.pdf. Accessed 31 July 2019.

[118] "Rouhani Presents Budget Bill for Implementation in Next Fiscal Year." *Mehr News Agency,* 19 March 2019, en.mehrnews.com/news/143543/Rouhani-presents-budget-bill-for-implementation-in-next-fiscal. Accessed 31 July 2019.

[119] *Outlaw Regime: A Chronicle of Iran's Destructive Activities.* U.S. Department of State, Iran Action Group, 25 September 2018, www.state.gov/documents/organization/286410.pdf.

[120] "Iran Annual Budget Drains Special Fund, Saved For Future Generations." *Radio Farda,* 16 December 2018, en.radiofarda.com/a/iran-annual-budget-takes-money-from-national-development-fund/29659340.html. Accessed 22 Mar 2019.

[121] "Defying Pressure, Khatam al-Anbia Chief Defends IRGC's Economic Role." *Middle East Institute,* 9 February 2018, www.mei.edu/publications/defying-pressure-khatam-al-anbia-chief-defends-irgcs-economic-role. Accessed 22 Mar 2019.

[122] "Iran Cracks Down on Revolutionary Guards Business Network." *Financial Times,* 13 September 2017, www.ft.com/content/43de1388-9857-11e7-a652-cde3f882dd7b. Accessed 22 Mar 2019.

[123] "Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking through Iran," *U.S. Department of the Treasury,* 7 March 2012, www.treasury.gov/press-center/press-releases/pages/tg1444.aspx. Accessed 26 March 2019.

[124] Wehrey, Frederic, et al. "The Rise of the Pasdaran: Assessing the Domestic Roles of Iran's Islamic Revolutionary Guards Corp." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG821.pdf, pp. 20-21. Accessed 30 May 2018.

[125] "Matn-e kaamel-e qanoon-e barnaameh-ye sheshom-e touseh" ["Complete Text of the Sixth Development Plan Law"]. *Tasnim News Agency,* 18 March 2017, www-tas-nimnews-com/fa/news/1395/12/28/1360457/%D9%85%D8%AA%D9%86-%DA%A9%D8%A7%D9%85%D9%84-%D9%82%D8%A7%D9%86%D9%88%D9%86-%D8%A8%D8%B1%D9%86%D8%A7%D9%85%D9%87-%D8%B4%D8%B4%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87. Accessed 30 May 2018.

[126] *Global Nuclear Landscape 2018.* Defense Intelligence Agency, 2018, www.dia.mil/Portals/27/Documents/News/Military%20Power%20Publications/Global_Nuclear_Landscape_2018.pdf. Accessed 31 May 2018.

[127] *Implementation of the NPT Safeguards Agreement and relevant provisions of Security Council resolutions in the Islamic Republic of Iran.* International Atomic Energy Agency, Board of Governors, GOV/2011/65, 8 November 2011.

[128] United Nations Security Council. *Resolution 2231 (2015).* United Nations, 20 July 2015, www.un.org/en/sc/2231/. Accessed 31 May 2018.

[129] Bell, Melissa, et al. "Macron and Other European Leaders Pledge to Salvage Iran Deal." *CNN,* 9 May 2018, www.cnn.com/2018/05/09/europe/iran-deal-macron-rouhani-intl/index.html. Accessed 29 August 2018.

[130] Ward, Alex. "Rouhani: Iran to Stay in the Iran Nuclear Deal—for Now." *Vox,* 8 May 2018, www.vox.com/2018/5/8/17332830/iran-deal-rouhani-announce-

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

ment-trump-netanyahu. Accessed 29 August 2018.

131 "Iran's Top Leader Sets Conditions for Europe to Save Nuclear Deal." *Reuters,* 23 May 2018, www.reuters.com/article/us-iran-nuclear-khamenei-conditions/irans-top-leader-sets-conditions-for-europe-to-save-nuclear-deal-idUSKCN1IO331. Accessed 29 August 2018.

132 "Iran to Boost Uranium Enrichment if Nuclear Deal Fails." *BBC News,* 5 June 2018, www.bbc.co.uk/news/world-middle-east-44365078. Accessed 29 August 2018.

133 Panda, Ankit. "The Slow Death of the Iran Nuclear Deal." *The Atlantic,* 8 May 2019, www.theatlantic.com/international/archive/2019/05/rouhani-iran-nuclear-deal-us/589042/. Accessed 31 July 2019.

134 Board of Governors. *Verification and Monitoring in the Islamic Republic of Iran in light of United Nations Security Council Resolution 2231 (2015).* International Atomic Energy Agency, GOV/2019/8, 1 July 2019.

135 Board of Governors. *Verification and Monitoring in the Islamic Republic of Iran in light of United Nations Security Council Resolution 2231 (2015).* International Atomic Energy Agency, GOV/2019/9, 8 July 2019.

136 Kenyon, Peter. "What's the Deal with The Iran Deal Now?" *National Public Radio,* 11 July 2019, www.npr.org/2019/07/11/739943760/whats-the-deal-with-the-iran-deal-now. Accessed 31 July 2019.

137 Dehghanpisheh, Babak. "Iran's Khamenei Says Need to Boost Offensive Capabilities." *Reuters,* 31 August 2016, www.reuters.com/article/us-iran-politics-khamenei-idUSKCN1162CJ. Accessed 31 May 2018.

138 "Barnaameh: sartip setad amir hatami vazir-e pishnehaadi vezarat-e defaa va poshtibani-e niruha-ye mosalah" ["Plan by Brigadier General Amir Hatami, Proposed Minister for the Ministry of Defense and Armed Forces Logistics"]. Iranian government news website, 23 July 2017, media.dolat.ir/uploads/org/150217369479275300.pdf. Accessed 30 May 2018.

139 Eisenstadt, Michael. "The Strategic Culture of the Islamic Republic of Iran: Religion, Expediency, and Soft Power in an Era of Disruptive Change." *Middle East Studies Monographs,* Marine Corps University, no. 7, pp. 8-9, November 2015, www.washingtoninstitute.org/uploads/Documents/pubs/MESM_7_Eisenstadt.pdf. Accessed 22 March 2019.

140 Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, ch. 9-10.

141 Cordesman, Anthony H., and Martin Kleiber. *Iran's Military Forces and Warfighting Capabilities: The Threat in the Northern Gulf.* Center for Strategic and International Studies/Praeger Security International, 2007, p. 19.

142 Deep, Alex. "Balance of Power, Balance of Resolve: How Iran is Competing with the United States in the Middle East." *Modern War Institute,* United States Military Academy, 12 January 2018, mwi.usma.edu/balance-power-balance-resolve-iran-competing-united-states-middle-east/. Accessed 31 May 2018.

143 "Chehre-ye digar az jang ["The Other Face of War"]. *Saff* [Artesh publication], vol. 31, no. 626, September 2016.

144 Eisenstadt, Michael. "The Strategic Culture of the Islamic Republic of Iran: Religion, Expediency, and Soft Power in an Era of Disruptive Change." *Middle East Studies Monographs,* Marine Corps University, no. 7, p. 12, November 2015, www.washingtoninstitute.org/uploads/Documents/pubs/MESM_7_Eisenstadt.pdf. Accessed 22 March 2019.

145 "Iran Should Turn to Russia, China After Bolton Nomination: Senior MP." *Reuters,* 24 March 2018, www.reuters.com/article/us-usa-trump-bolton-iran/iran-should-turn-to-russia-china-after-bolton-nomination-senior-mp-idUSKBN1H009W. Accessed 31 May 2018.

146 "Iran's Threat to the Strait of Hormuz." *Congressional Research Service,* 23 January 2012, pp. 1-4.

147 Bozorgmehr, Najmeh. "Iran Commander Warns of ISIS Threat to its Security." *Financial Times,* 25 May 2015, www.ft.com/content/11402b44-02ce-11e5-b31d-00144feabdc0. Accessed 31 May 2018.

148 "Minister: Iran Strongest Power Fighting Terrorism in Region." *Fars News Agency,* 08 April 2018, en.farsnews.com/newstext.aspx?nn=13970119000848. Accessed 31 May 2018.

149 "DM: Iranian Armed Forces Capable of Defending Regional Security." *Fars News Agency,* 29 April 2018, en.farsnews.com/newstext.aspx?nn=13970209000608. Accessed 31 May 2018.

150 "Iranian Defense Minister on Iran's Defense Doctrine." *Middle East Media Research Institute,* 9 May 2003, www.memri.org/reports/iranian-defense-minister-irans-defense-doctrine. Accessed 31 May 2018.

151 "Iran's Khamenei Says Need to Boost Offensive Capabilities." *Reuters,* 31 August 2016, www.reuters.com/article/us-iran-politics-khamenei-idUSKCN1162CJ. Accessed 1 April 2019.

PX260

[152] "Iran's Military Doctrine is based on 'Active Deterrence': Rouhani." *Tehran Times,* 19 April 2015, www.tehrantimes. com/news/246197/Iran-s-military-doctrine-is-based-on-active-deterrence-Rouhani. Accessed 31 May 2018.

[153] "Deputy Top Commander: US Unable to Precisely Assess Iran's Defensive Capabilities." *Fars News Agency,* 15 May 2017, en.farsnews.com/newstext.aspx-?nn=13960225000597. Accessed 31 May 2018.

[154] Buchta, Willfried. *Who Rules Iran? The Structure of Power in the Islamic Republic.* Washington Institute for Near East Policy/Konrad Adenauer Stiftung, 2000, p. 46.

[155] "The Structure of Power in Iran." *PBS Frontline,* www.pbs. org/wgbh/pages/frontline/shows/tehran/inside/govt.html. Accessed 24 May 2018.

[156] Thaler, David E., et al. "Mullahs, Guards, and Bonyads: An Exploration of Iranian Leadership Dynamics." *Rand Corporation*, 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG878.pdf, pp. 52-54. Accessed 31 May 2018.

[157] Thaler, David E., et al. "Mullahs, Guards, and Bonyads: An Exploration of Iranian Leadership Dynamics." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG878.pdf, pp. 25, 32, 103. Accessed 31 May 2018.

[158] Bucala, Paul, and Marie Donovan. "A New Era for Iran's Military Leadership." *Critical Threats Project,* American Enterprise Institute, 1 December 2016, www.criticalthreats.org/analysis/a-new-era-for-irans-military-leadership. Accessed 23 May 2018.

[159] Aryan, Hossein. "The Artesh: Iran's Marginalized and Under-Armed Conventional Military." *Middle East Institute,* 15 November 2011, www.mei.edu/content/artesh-iran%E2%80%99s-marginalized-and-under-armed-conventional-military. Accessed 23 May 2018.

[160] Bruno, Greg, et al. "Iran's Revolutionary Guards." *Council on Foreign Relations,* 14 June 2013, www.cfr.org/backgrounder/irans-revolutionary-guards. Accessed 30 May 2018.

[161] "Treasury Sanctions Iranian Security Forces for Human Rights Abuses." *U.S. Department of the Treasury,* 9 June 2011, www.treasury.gov/press-center/press-releases/Pages/tg1204.aspx. Accessed 31 May 2018.

[162] Golkar, Saeid. "Iran's Coercive Apparatus: Capacity and Desire." *Washington Institute for Near East Policy,* 5 January 2018, www.washingtoninstitute.org/policy-analysis/view/irans-coercive-apparatus-capacity-and-desire. Accessed 31 May 2018.

[163] Chandler, Jennifer. "Decoding Iran's Defence Spending: Pitfalls and New Pointers." *Military Balance Blog,* International Institute for Strategic Studies, 13 November 2018, www.iiss.org/blogs/military-balance/2018/11/decode-iran-defence-spending. Accessed 26 March 2019.

[164] Wehrey, Frederic, et al. "The Rise of the Pasdaran: Assessing the Domestic Roles of Iran's Islamic Revolutionary Guards Corp." *Rand Corporation,* 2009.

[165] Golkar, Saeid. "The Evolution of Iran's Police Forces and Social Control in the Islamic Republic." *Middle East Brief,* Brandeis University, no. 120, July 2018.

[166] Wright, Galen. "Iran's Ministry of Defense and Armed Forces Logistics." *The Arkenstone,* 20 February 2015, thearkenstone.blogspot.com/2015/02/irans-ministry-of-defense-and-armed.html. Accessed 23 May 2018.

[167] "The Structure of Power in Iran." *PBS Frontline,* www.pbs. org/wgbh/pages/frontline/shows/tehran/inside/govt.html. Accessed 24 May 2018.

[168] Ostovar, Afshon. "6 Things You Need to Know About Iran's Powerful Islamic Revolutionary Guards Corps." *Vox,* 16 May 2016, www.vox.com/2016/5/16/11682458/iran-revolutionary-guards. Accessed 25 May 2018.

[169] Kagan, Frederick. "Security Structures of Iran." *Critical Threats Project,* American Enterprise Institute, 1 March 2009, www.criticalthreats.org/analysis/security-structures-of-iran. Accessed 31 May 2018.

[170] Bucala, Paul. "The Artesh in Syria: A Fundamental Shift In Iranian Hard Power." *Critical Threats Project,* American Enterprise Institute, 4 May 2016, www.criticalthreats.org/analysis/the-artesh-in-syria-a-fundamental-shift-in-iranian-hard-power. Accessed 31 May 2018.

[171] "Armed Forces." *Jane's Sentinel Security Assessment - The Gulf States,* Jane's, 1 February 2018.

[172] "Treasury Targets Iranian Individuals Providing Ballistic Missile Support to Yemen's Huthis." *U.S. Department of the Treasury,* 22 May 2018, home.treasury.gov/news/press-releases/sm0392. Accessed 31 May 2018.

[173] Nadimi, Frarzin. "Who is Iran's New Armed Forces Chief of Staff?" *Washington Institute for Near East Policy,* 5 July 2016, www.washingtoninstitute.org/policy-analysis/view/who-is-irans-new-armed-forces-chief-of-staff. Accessed 31 May 2018.

[174] Bucala, Paul, and Marie Donovan. "A New Era for Iran's Military Leadership." *Critical Threats Project,* American Enterprise Institute, 1 December 2016, www.criticalthreats.org/

PX260

analysis/a-new-era-for-irans-military-leadership. Accessed 23 May 2018.

175 Hafezi, Parisa. "Khamenei names new chief for Iran's Revolutionary Guards." *Reuters,* 21 April 2019, www.reuters.com/article/us-iran-guards/khamenei-names-new-chief-for-irans-revolutionary-guards-idUSKCN1RX0JN. Accessed 23 April 2019.

176 "Iran Army Chief Reiterates Support for IRGC." *Tasnim News Agency,* 21 April 2018, www.tasnimnews.com/en/news/2018/04/21/1705474/iran-army-chief-reiterates-support-for-irgc. Accessed 23 May 2018.

177 Filkins, Dexter. "The Shadow Commander." *The New Yorker,* 30 September 2013, www.newyorker.com/magazine/2013/09/30/the-shadow-commander. Accessed 23 May 2018.

178 Donovan, Marie, and Daniel Amir. "Iran News Round Up August 2, 2017." *Critical Threats Project,* American Enterprise Institute, 2 August 2017, www.criticalthreats.org/briefs/iran-news-round-up/iran-news-round-up-august-2-2017. Accessed 23 May 2018.

179 Ward, Stephen R. *Immortal: A Military History of Iran and its Armed Forces.* Georgetown University Press, 2009, p. 317.

180 Stewart, LtGen Vincent R. *Statement for the Record: Worldwide Threat Review.* Defense Intelligence Agency, 23 May 2017,www.dia.mil/News/Speeches-and-Testimonies/Article-View/Article/1189500/statement-for-the-record-worldwide-threat-assessment/.

181 Eisenstadt, Michael. "The Role of Missiles in Iran's Military Strategy." *Washington Institute for Near East Policy,* November 2016, www.washingtoninstitute.org/uploads/Documents/pubs/ResearchNote39-Eisenstadt.pdf. Accessed 31 May 2018.

182 Elleman, Michael. "Iran's Ballistic Missile Program." *The Iran Primer,* United States Institute of Peace, August 2015, iranprimer.usip.org/resource/irans-ballistic-missile-program. Accessed 31 May 2018.

183 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

184 Pasandideh, Shahryar. "Iran's Missile Forces Are Increasing in Range, Accuracy and Lethality." *World Politics Review,* 14 October 2015, www.worldpoliticsreview.com/articles/16942/iran-s-missile-forces-are-increasing-in-range-accuracy-and-le-

thality. Accessed 26 March 2019.

185 Delory, Stephane, and Can Kasapoglu. "Thinking Twice about Iran's Missile Trends: The Threat is Real but Different than Predicted." *Fondation pour la recherche strategique,* no. 12, 29 June 2017, www.frstrategie.org/en/publications/notes/thinking-twice-about-iran-s-missile-trends-the-threat-is-real-but-different-than-predicted-12-2017. Accessed 26 March 2019.

186 "Iran - Air Force." *Jane's,* 2018.

187 "Iran Admits To Conducting 700 Drone Attacks in Syria." *The New Arab,* 16 October 2018, www.alaraby.co.uk/english/news/2018/10/16/iran-admits-to-conducting-700-drone-attacks-in-syria/. Accessed 1 April 2019.

188 Gunzinger, Mark, and Chris Dougherty. "Outside-In: Operating from Range to Defeat Iran's Anti-Access and Area-Denial Threats." *Center for Strategic and Budgetary Assessments,* 2011, csbaonline.org/uploads/documents/CSBA_SWA_FNL_WEB.pdf, pp. 40-43.

189 Haghshenass, Fariborz. "Iran's Asymmetric Naval Warfare." *Washington Institute for Near East Policy,* September 2008, www.washingtoninstitute.org/uploads/Documents/pubs/PolicyFocus87.pdf, p. 6. Accessed 31 May 2018.

190 Haghshenass, Fariborz. "Iran's Asymmetric Naval Warfare." *Washington Institute for Near East Policy,* September 2008, www.washingtoninstitute.org/uploads/Documents/pubs/PolicyFocus87.pdf, p. 6. Accessed 31 May 2018.

191 Iranian Naval Forces: *A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf, pp. 27-37.

192 Cordesman, Anthony H., and Michael Peacock. "The Arab-U.S. Strategic Partnership and the Changing Security Balance in the Gulf: Joint and Asymmetric Warfare, Missiles and Missile Defense, Civil War and Non-State Actors, and Outside Powers," *Center for Strategic and International Studies,* 13 July 2015, csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/150713_Cover_and__Report%20_Gulf_Military_Balance_2015.pdf, pp. 158-161. Accessed 30 May 2018.

193 Eisenstadt, Michael. "The Role of Missiles in Iran's Military Strategy." *Washington Institute for Near East Policy,* November 2016, www.washingtoninstitute.org/uploads/Documents/pubs/ResearchNote39-Eisenstadt.pdf. Accessed 31 May 2018.

194 Gady, Franz-Stefan. "Iran: Russian-Made S-300 Air Defense Missile Systems Placed on 'Combat Duty'." *The Diplomat,* 11 July 2017, thediplomat.com/2017/07/iran-russian-made-s-300-air-defense-missile-systems-placed-on-combat-

PX260

duty/. Accessed 31 May 2018.

[195] Nadimi, Farzin. "The Counterintuitive Role of Air Defense in Iran's Anti-Status Quo Regional Strategy." *Washington Institute for Near East Policy,* 11 January 2017, www.washingtoninstitute.org/policy-analysis/view/the-counterintuitive-role-of-air-defense-in-irans-anti-status-quo-regional. Accessed 4 June 2018.

[196] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 15-17. Accessed 30 May 2018.

[197] McInnis, J. Matthew. "Iran at War: Understanding Why and How Tehran Uses Military Force." *American Enterprise Institute,* December 2016, www.aei.org/wp-content/uploads/2016/12/RPT-FP-McInnis-Iran-at-War-final-December-2016.pdf, pp. 15-22. Accessed 31 May 2018.

[198] McInnis, J. Matthew. *Iranian Deterrence Strategies and Use of Proxies: Statement before the Senate Committee on Foreign Relations on "Defeating the Iranian Threat Network: Options for Countering Iran Proxies".* U.S. Senate, 29 November 2016, www.foreign.senate.gov/imo/media/doc/112916_McInnis_Testimony.pdf. Accessed 31 May 2018.

[199] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 3-6, 15-17. Accessed 30 May 2018.

[200] Cordesman, Anthony H. "Lebanese Security and the Hezbollah." *Center for Strategic and International Studies,* 14 July 2006, www.csis.org/analysis/lebanese-security-and-hezbollah. Accessed 12 March 2019.

[201] Sullivan, Marisa. "Middle East Security Report 19: Hezbollah in Syria." *Institute for the Study of War,* April 2014, www.understandingwar.org/sites/default/files/Hezbollah_Sullivan_FINAL.pdf. Accessed 31 May 2018.

[202] Alaaldin, Ranj. "How will Iraq contain Iran's proxies?" *Brookings Institution,* 22 February 2018, www.brookings.edu/opinions/how-will-iraq-contain-irans-proxies/. Accessed 31 May 2018.

[203] Saul, Jonathan, et al. "Exclusive: Iran Steps Up Support for Houthis in Yemen's War - Sources." *Reuters,* 21 May 2017, www.reuters.com/article/us-yemen-iran-houthis/exclusive-iran-steps-up-support-for-houthis-in-yemens-war-sources-idUSKBN16S22R. Accessed 31 May 2018.

[204] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. i, 3-4, 46-47. Accessed 30 May 2018.

[205] Bucala, Paul. "Iran's New Way of War in Syria." *Critical Threats Project,* American Enterprise Institute, 3 February 2017, www.criticalthreats.org/analysis/irans-new-way-of-war-in-syria. Accessed 31 May 2018.

[206] Evans, Dominic, et al. "How Iran Closed the Mosul 'Horseshoe' and Changed Iraq War." *Reuters,* 7 December 2016, www.reuters.com/article/us-mideast-crisis-iraq-mosul-idUSKBN13W1H1. Accessed 31 May 2018.

[207] Dehghanpisheh, Babak. "Special Report: The Fighters of Iraq Who Answer to Iran." *Reuters,* 12 November 2014, www.reuters.com/article/us-mideast-crisis-militias-specialreport/special-report-the-fighters-of-iraq-who-answer-to-iran-idUSKCN0IW0ZA20141112. Accessed 31 May 2018.

[208] Knights, Michael. "Countering Iran's Missile Proliferation in Yemen." *Washington Institute for Near East Policy,* 8 November 2017, www.washingtoninstitute.org/policy-analysis/view/countering-irans-missile-proliferation-in-yemen. Accessed 31 May 2018.

[209] Stewart, Phil. "In First, U.S. Presents Its Evidence of Iran Weaponry from Yemen." *Reuters,* 14 December 2017, www.reuters.com/article/us-usa-iran-arms/in-first-u-s-presents-its-evidence-of-iran-weaponry-from-yemen-idUSKBN1E82J6. Accessed 31 May 2018.

[210] United Nations Peacekeeping. "Summary of Contributions to UN Peacekeeping by Country, Mission and Post." *Troop and Police Contributors,* United Nations, 30 June 2019, peacekeeping.un.org/sites/default/files/3-country_and_mission_1.pdf. Accessed 31 July 2019.

[211] "Envoy: Iran Ready to Help UN Peacekeepers." *Fars News Agency,* 14 February 2018, en.farsnews.com.org/newstext.aspx?nn=13961125000403. Accessed 31 May 2018.

[212] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf, pp. 24-25.

[213] Binnie, Jeremy. "Iranian Navy Flotilla Stuck in South Africa." *Jane's Defence Weekly,* 19 January 2017.

[214] Anderson, Colin, and Karim Sadjadpour. "Iran's Cyber Threat: Conclusions and Prescriptions." *Carnegie Endowment for International Peace,* 4 January 2018, carnegieendowment.org/2018/01/04/iran-s-cyber-threat-conclusion-and-prescriptions-pub-75143. Accessed 31 May 2018.

[215] Villeneuve, Nart, et al. "Operation Saffron Rose." *FireEye,* 2013, www.fireeye.com/content/dam/fireeye-www/global/en/current-threats/pdfs/rpt-operation-saffron-rose.pdf. Accessed 31 May 2018.

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

216 Herr, Tray, and Laura K. Bate. "The Iranian Cyber Threat is Real." *Foreign Policy,* 26 July 2017, foreignpolicy.com/2017/07/26/the-iranian-cyberthreat-is-real/. Accessed 31 May 2018.

217 Rugge, Fabbio. "Confronting an Axis of Cyber: China, Iran, North Korea, Russia in Cyberspace." *Italian Institute for International Political Studies,* October 2018, www.ispionline.it/sites/default/files/pubblicazioni/cyber_def_web2.pdf. Accessed 19 March 2019.

218 "Suspected Iranian Influence Operation Leverages Network of Inauthentic News Sites & Social Media Targeting Audiences in U.S., UK, Latin America, Middle East." *FireEye,* 21 August 2018, www.fireeye.com/blog/threat-research/2018/08/suspected-iranian-influence-operation.html. Accessed 19 March 2019.

219 Bahmani, Arash. "Iran Has 16 Intelligence Agencies." *Payvand,* 30 October 2014, www.payvand.com/news/14/oct/1171.html. Accessed 30 May 2018.

220 *Iran's Ministry of Intelligence and Security: A Profile.* Library of Congress, Federal Research Division, December 2012, archive.org/details/IransMinistryOfIntelligenceAndSecurityA-Profile. Accessed 31 May 2018.

221 "Special Series: Iranian Intelligence and Regime Preservation." *Stratfor,* 22 June 2010, worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation. Accessed 30 May 2018.

222 *Challenges to Security in Space.* Defense Intelligence Agency, 11 February 2019.

223 Clark, Stephen. "Iran Admits Failure in Satellite Launch Attempt." *Spaceflight Now,* 16 January 2019, spaceflightnow.com/2019/01/16/iran-admits-failure-in-satellite-launch-attempt/. Accessed 25 February 2019.

224 Coats, Daniel R. *Statement for the Record: Worldwide Threat Assessment of the U.S. Intelligence Community.* Senate Select Committee on Intelligence, 11 May 2017, www.dni.gov/files/documents/Newsroom/Testimonies/SSCI%20Unclassified%20SFR%20-%20Final.pdf. Accessed 31 May 2018.

225 "Satellite Jamming in Iran: A War Over Airwaves." *Small Media,* November 2012, smallmedia.org.uk/media/projects/files/satjam.pdf. Accessed 31 May 2018.

226 "Iran Plans to Join 2 APSCO Projects." *Financial Tribune,* 18 September 2017, financialtribune.com/articles/economy-sci-tech/72519/iran-plans-to-join-2-apsco-projects. Accessed 4 June 2018.

227 Porter, Gareth. "When the Ayatollah Said No to Nukes." *Foreign Policy,* 16 October 2014, foreignpolicy.com/2014/10/16/when-the-ayatollah-said-no-to-nukes/. Accessed 31 May 2018.

228 *Compliance with the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction Condition 10(C) Report.* U.S. Department of State, Bureau of Arms Control, Verification and Compliance, March 2017, www.state.gov/t/avc/rls/rpt/2017/270367.htm. Accessed 31 May 2018.

229 Ward, Kenneth. *Statement by H.E. Ambassador Kenneth D. Ward Permanent Representative of the United States of America to the OPCW at the Fourth Special Session of the Conference of States Parties to Review the Operation of the Chemical Weapons Convention.* Organization for the Prohibition of Chemical Weapons, 22 November 2018, www.opcw.org/sites/default/files/document/2018/11/rc4nat07(e).pdf. Accessed 17 December 2018.

230 Nabati, Ezatollah. *Passive Defense: Approach to the Threat Center.* Shahid Sayyad Shirazi Center for Education and Reserarch, Army of the Islamic Republic of Iran, Spring 2010, pp. 87-88.

231 Connell, Michael. "Iran's Military Doctrine." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/irans-military-doctrine. Accessed 4 June 2018.

232 Rubin, Michael. "Iran: Comprehensive Legal System for Internet and Cyberspace." *American Enterprise Institute,* 6 October 2017, www.aei.org/publication/iran-comprehensive-legal-system-for-internet-and-cyberspace/. Accessed 4 June 2018.

233 Eisenstadt, Michael. "The Role of Missiles in Iran's Military Strategy." *Washington Institute for Near East Policy,* November 2016, www.washingtoninstitute.org/uploads/Documents/pubs/ResearchNote39-Eisenstadt.pdf. Accessed 31 May 2018.

234 Wehrey, Frederic, et al. "Dangerous But Not Omnipotent: Exploring the Reach and Limitations of Iranian Power in the Middle East." *Rand Corporation,* 2009, www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG781.pdf, p. 51. Accessed 30 May 2018.

235 "Iran Ready to Nip Any Threat in Bud: Commander." *Press TV,* 27 October 2017, www.presstv.com/Detail/2017/10/27/540067/Iran-US-Passive-Defense-Gholam-Reza-Jalali-presermon-JCPOA-sanctions. Accessed 4 June 2018.

236 "Iran Setting Up 'Passive Defense' Plan." *Jerusalem Post,*

PX260

4 July 2008, www.jpost.com/Iranian-Threat/News/Iran-setting-up-passive-defense-plan. Accessed 4 June 2018.

[237] Czulda, Robert. "The Defensive Dimension of Iran's Military Doctrine: How Would They Fight?" *Middle East Policy Council,* vol. 23, no. 1, Spring 2016, www.mepc.org/journal/defensive-dimension-irans-military-doctrine-how-would-they.fight. Accessed 4 June 2018.

[238] Flynn, LTG Michael T. *Annual Threat Assessment: Statement before the Senate Armed Services Committee.* Defense Intelligence Agency, 11 February 2014, www.dia.mil/27/documents/news/2014_DIA_SFR_SASC_ATA_FINAL.pdf. Accessed 4 March 2019.

[239] Erdbrink, Thomas. "Ahmadinejad Vows Dramatic Expansion of Iran's Nuclear Program." *Washington Post,* 30 November 2009, www.washingtonpost.com/wp-dyn/content/article/2009/11/30/AR2009113001880.html. Accessed 4 June 2018.

[240] Broad, William J. "Iran Shielding Its Nuclear Efforts in Maze of Tunnels." *New York Times,* 5 January 2010, www.nytimes.com/2010/01/06/world/middleeast/06sanctions.html. Accessed 4 June 2018.

[241] Tanter, Raymond. "Iran's Terror Tunnels." *Foreign Policy,* 23 December 2014, foreignpolicy.com/2014/12/23/irans-terror-tunnels/. Accessed 4 June 2018.

[242] Kenyon, Peter. "Iran Offers A Rare Peek At An Underground 'Missile City.'" *National Public Radio,* 7 January 2016, www.npr.org/sections/parallels/2016/01/07/462248223/iran-offers-a-rare-peek-at-an-underground-missile-city. Accessed 4 June 2018.

[243] Binnie, Jeremy. "Analysis: Iran Shows Underground Ballistic Missile Launch Bases." *Jane's Defense Weekly,* 9 March 2016.

[244] "Kuwaiti Daily: Missile, Arms Factories Built By IRGC In Lebanon Have Recently Been Handed Over To Hizbullah." *Middle East Media Research Institute,* 14 March 2017, www.memri.org/reports/kuwaiti-daily-missile-arms-factories-built-irgc-lebanon-have-recently-been-handed-over. Accessed 4 June 2018.

[245] "Iran 'may adopt offensive military tactics to defend interests'." *Iran Daily,* 27 January 2019, www.iran-daily.com/News/238002.html?catid=3&title=Iran--may-adopt-offensive-military-tactics-to-defend-interests-. Accessed 1 April 2019.

[246] "Army Deputy Commander: Iran Not to Wait for Enemies to Attack." *Fars News Agency,* 27 January 2019, en.farsnews.com/newstext.aspx?nn=13971107000260. Accessed 1 April 2019.

[247] "IRGC holds major drills, debuts 'offensive' component." *Press TV,* 22 December 2018, www.presstv.com/Detail-Fr/2018/12/22/583611/Iran-military-drills-Persian-Gulf-Great-Prophet-IRGC-Ground-Force. Accessed 1 April 2019.

[248] "Matn-e kaamel-e qanoon-e barnaameh-ye sheshom-e touseh" ["Complete Text of the Sixth Development Plan Law"]. *Tasnim News Agency,* 18 March 2017, www-tasnimnews-com/fa/news/1395/12/28/1360457/%D9%85%D8%AA%D9%86-%DA%A9%D8%A7%D9%85%D9%84-%D9%82%D8%A7%D9%86%D9%88%D9%86-%D8%A8%D8%B1%D9%86%D8%A7%D9%85%D9%87-%D8%B4%D8%B4%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87. Accessed 30 May 2018.

[249] "Barnaameh: sartip setad amir hatami vazir-e pishnehaadi vezarat-e defaa va poshtibani-e niruha-ye mosalah" ["Plan by Brigadier General Amir Hatami, Proposed Minister for the Ministry of Defense and Armed Forces Logistics"]. Iranian government news website, 23 July 2017, media.dolat.ir/uploads/org/150217369479275300.pdf. Accessed 30 May 2018.

[250] "IRGC holds final stage of missile drill." *Press TV,* 8 March 2016, www.presstv.com/DetailFr/2016/03/08/454503/Iran-IRGC-Emad-Jafari-Dehqan-Zarif, accessed 9 September 2018.

[251] "Moushak-e durbord va baalistik-e khalij-e faars movafaqi-at shelik shod" ["Persian Gulf long-range ballistic missiles fired successfully"]. *Fars News Agency,* 23 February 2015, www.farsnews.com/printable.php?nn=13931206000285. Accessed 25 February 2015.

[252] "Iran Lobs Missiles in Day 2 of 'Great Prophet' Drill." *Jerusalem Post,* 3 July 2012, www.jpost.com/Iranian-Threat/News/Iran-lobs-missiles-in-day-2-of-Great-Prophet-drill. Accessed 25 February 2015.

[253] "Iran shows strong hand with strike + impact video." *Press TV,* 19 June 2017, www.presstv.com/Detail/2017/06/19/525758/IRGC-Syria-Daesh. Accessed 26 March 2017.

[254] "Photos Show IRGC Used Zolfaqar, Qiam Missiles in Deir Ezzur Attacks." *Fars News Agency,* 19 June 2017, en.farsnews.com/newstext.aspx?nn=13960329000502. Accessed 26 March 2019.

[255] "IRGC Launches Missile Strikes on Terrorists in Syria in Revenge for Ahwaz Attack." *Fars News Agency,* 1 October 2018, en.farsnews.com/newstext.aspx?nn=13970709000242.

PX260

Accessed 26 March 2019.

256 Wahab, Bilal. "Iran's Missile Attack in Iraqi Kurdistan Could Backfire." *Washington Institute for Near East Policy,* 11 September 2018, www.washingtoninstitute.org/policy-analysis/view/irans-missile-attack-in-iraqi-kurdistan-could-backfire. Accessed 26 March 2019.

257 Elleman, Michael. "Iran's Ballistic Missile Program." *The Iran Primer,* United States Institute of Peace, August 2015, iranprimer.usip.org/resource/irans-ballistic-missile-program. Accessed 31 May 2018.

258 Eisenstadt, Michael. "The Role of Missiles in Iran's Military Strategy." *Washington Institute for Near East Policy,* November 2016, www.washingtoninstitute.org/uploads/Documents/pubs/ResearchNote39-Eisenstadt.pdf. Accessed 31 May 2018.

259 Haley, Nikki. *Remarks at a Press Conference on Iranian Arms Exports.* U.S. Department of State, U.S. Mission to the United Nations, 14 December 2017, usun.state.gov/remarks/8215. Accessed 4 June 2018.

260 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

261 Ashley, LTG Robert P. *Statement for the Record: Worldwide Threat Assessment.* Defense Intelligence Agency, 6 March 2018, www.dia.mil/News/Speeches-and-Testimonies/Article-View/Article/1457815/statement-for-the-record-worldwide-threat-assessment/.

262 Haley, Nikki. *Remarks at a Press Conference on Iranian Arms Exports.* U.S. Department of State, U.S. Mission to the United Nations, 14 December 2017, usun.state.gov/remarks/8215. Accessed 4 June 2018.

263 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

264 Savelsberg, Ralph. "Houthi Missiles: The Iran Connection; Scuds Are Not Dead Yet." *Breaking Defense,* 7 May 2018, breakingdefense.com/2018/05/houthi-missiles-the-iran-connection-scuds-are-not-dead-yet/. Accessed 24 May 2018.

265 Belk, Clara. "Iran's Ballistic Missile Inventory." *Atlantic Council,* 3 December 2018, www.atlanticcouncil.org/blogs/iransource/iran-s-ballistic-missile-inventory. Accessed 30 August 2019.

266 "Iran Launches Mass Production of Missile with 700-Km Range." *Tehran Times,* 25 September 2016, www.tehrantimes.com/news/406706/Iran-launches-mass-production-of-missile-with-700-km-range. Accessed 4 June 2018.

267 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

268 Binnie, Jeremy, and Nick Hansen. "Iran Releases Khorramshahr Missile Test Video." *Jane's Defence Weekly,* 28 September 2017, www.janes.com/article/74455/iran-releases-khorramshahr-missile-test-video. Accessed 4 June 2018.

269 "Ballistic Missile Production Line Launched." *Financial Tribune,* 26 September 2016, financialtribune.com/articles/national/50494/ballistic-missile-production-line-launched. Accessed 4 June 2016.

270 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

271 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

272 "U.S. Says Iran Rocket Test Breaches U.N. Resolution." *Reuters,* 27 July 2017, www.reuters.com/article/us-iran-satellite/u-s-says-iran-rocket-test-breaches-u-n-resolution-idUSKBN1AC1YY. Accessed 4 June 2018.

273 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

274 "Iran - Navy." *Jane's Sentinel Security Assessment - The Gulf States,* Jane's, 10 April 2018.

275 *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

276 Werner, Bill. "UPDATED: Iran Says Speedboat Harassment Down Because U.S. Behavior Changes." *U.S. Naval Institute,* 31 January 2018, news.usni.org/2018/01/30/iran-speedboat-harassment-down-because-u-s-behavior-change-us-na-

PX260

vy-what-change. Accessed 21 August 2018.

[277] Coats, Daniel R. *Statement for the Record: Worldwide Threat Assessment of the U.S. Intelligence Community.* Office of the Director of National Intelligence, 11 May 2017, www.dni.gov/files/documents/Newsroom/Testimonies/SSCI%20Unclassified%20SFR%20-%20Final.pdf. Accessed 31 May 2018.

[278] McLeary, Paul. "Iranian Drone Missions on the Rise in the Persian Gulf as Small Boat Harassment Drops." *U.S. Naval Institute,* 26 January 2018, news.usni.org/2018/01/26/iranian-drone-missions-rise-persian-gulf-small-boat-harassment-drops. Accessed 4 June 2018.

[279] Wheelbarger, Katie, and VAdm Michael Gilday. *Department of Defense Briefing on Iran.* U.S. Department of Defense, 24 May 2019, dod.defense.gov/News/Transcripts/Transcript-View/Article/1857948/department-of-defense-briefing-on-iran/. Accessed 31 July 2019.

[280] Garamone, Jim. "Selva Details Iranian Oil Attacks, Need for International Efforts." *U.S. Department of Defense,* 19 July 2019, www.defense.gov/explore/story/Article/1879849/selva-details-iranian-oil-attacks-need-for-international-efforts/. Accessed 31 July 2019.

[281] Urban, CAPT Bill. *U.S. CENTCOM Statement on June 13 Limpet Mine Attack in the Gulf of Oman.* U.S. Central Command, 13 June 2019, www.centcom.mil/MEDIA/STATEMENTS/Statements-View/Article/1875666/us-central-command-statement-on-june-13-limpet-mine-attack-in-the-gulf-of-oman/. Accessed 31 July 2019.

[282] "Iran Tanker Seizure: 'Growing Concern' for Crew of British-flagged Vessel." *BBC News*, 30 July 2019,www.bbc.com/news/uk-49170648. Accessed 31 July 2019.

[283] Connell, Michael. "The Artesh Navy: Iran's Strategic Force." *Middle East Institute,* 31 January 2012, www.mei.edu/content/artesh-navy-irans-strategic-force. Accessed 4 June 2018.

[284] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[285] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[286] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[287] Shapiro, Jacob. "A Significant Iranian Military Exercise." *Geopolitical Futures,* 11 May 2017, geopoliticalfutures.com/significant-iranian-military-exercise/. Accessed 30 August 2018.

[288] "Iran Begins Naval Drills in Strait of Hormuz." *Al Jazeera,* 25 December 2011, www.aljazeera.com/news/middleeast/2011/12/201112256111744890.html. Accessed 30 August 2018.

[289] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[290] Connell, Michael. "The Artesh Navy: Iran's Strategic Force." *Middle East Institute,* 31 January 2012, www.mei.edu/content/artesh-navy-irans-strategic-force. Accessed 4 June 2018.

[291] "Iran - Navy." *Jane's Sentinel Security Assessment - The Gulf States,* Jane's, 10 April 2018.

[292] "IRGC Speedboats Parade in Great Prophet 9 Drill." *Islamic Republic News Agency,* 25 February 2018, www.irna.ir/en/News/81520366. Accessed 25 August 2018.

[293] Akbar Dareini, Ali, and Adam Schreck. "Fake US Aircraft Carrier the Target in Latest Iranian Drills." *Associated Press,* 25 February 2015, apnews.com/f032e35430d14051b11376690b4d31ea/irans-guard-begins-military-exercises-near-key-strait, accessed 29 August 2018.

[294] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[295] Binnie, Jeremy. "New Frigate Joins Iranian Navy." *Jane's Defence Weekly,* 5 December 2018, www.janes.com/article/85016/new-frigate-joins-iranian-navy. Accessed 31 January 2019.

[296] Binnie, Jeremy. "Iran shows submarine-launched missile." *Jane's Defence Weekly,* 27 February 2019, www.janes.com/article/86895/iran-shows-submarine-launched-missile. Accessed 26 March 2019.

[297] *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

[298] Binnie, Jeremy. "Iran commissions Fateh submarine." *Jane's Defence Weekly,* 20 February 2019, www.janes.com/article/86533/iran-commissions-fateh-submarine. Accessed 26 March 2019.

[299] Cordesman, Anthony H., and Michael Peacock. "The Arab-U.S. Strategic Partnership and the Changing Security Balance in the Gulf: Joint and Asymmetric Warfare, Missiles and Missile Defense, Civil War and Non-State Actors, and Outside Powers," *Center for Strategic and International Studies,* 13

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

July 2015, csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/publication/150713_Cover_and__Report%20_Gulf_Military_Balance_2015.pdf, pp. 158-161. Accessed 30 May 2018.

300 *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

301 *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

302 "C-704 (NASR-1)." *Military Edge,* militaryedge.org/armaments/c-704nasr-1/. Accessed 4 June 2018.

303 *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf.

304 Bruno, Greg, et al. "Iran's Revolutionary Guards," *Council on Foreign Relations,* 14 June 2013, www.cfr.org/backgrounder/irans-revolutionary-guards. Accessed 28 May 2018.

305 Nader, Alireza. "The Revolutionary Guards." *The Iran Primer,* United States Institute of Peace, August 2015, iranprimer.usip.org/resource/revolutionary-guards. Accessed 28 May 2018.

306 Ward, Stephen R. *Immortal: A Military History of Iran and Its Armed Forces.* Georgetown University Press, 2009, pp. 267, 303.

307 "Treasury Designates Large-Scale IRGC-QF Counterfeiting Ring." *U.S. Department of the Treasury,* 20 November 2017, www.treasury.gov/press-center/press-releases/Pages/sm0219.aspx. Accessed 29 May 2018.

308 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf. Accessed 30 May 2018.

309 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf. Accessed 30 May 2018.

310 Uskowi, Nader. "Examining Iran's Global Terrorism Network." *Washington Institute for Near East Policy, 17 April 2018, www.washingtoninstitute.org/uploads/Documents/testimony/UskowiTestimony20180417.pdf. Accessed 5 June 2018.*

311 Dehghanpisheh, Babak. "Special Report: The Fighters of Iraq Who Answer to Iran." *Reuters,* 12 November 2014, www.reuters.com/article/us-mideast-crisis-militias-specialreport/special-report-the-fighters-of-iraq-who-answer-to-iran-idUSKCN0IW0ZA20141112. Accessed 31 May 2018.

312 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 19, 31-32, 46. Accessed 30 May 2018.

313 McInnis, J. Matthew. *Iranian Deterrence Strategies and Use of Proxies: Statement before the Senate Committee on Foreign Relations on "Defeating the Iranian Threat Network: Options for Countering Iran Proxies".* U.S. Senate, 29 November 2016, www.foreign.senate.gov/imo/media/doc/112916_McInnis_Testimony.pdf. Accessed 31 May 2018.

314 "Lebanon Renews 'Dissociation Policy,' Hariri Withdraws Resignation." *Asharq Al-Awsat,* 6 December 2017, aawsat.com/english/home/article/1105091/lebanon-renews-dissociation-policy-hariri-withdraws-resignation. Accessed 5 June 2018.

315 Blanford, Nicholas. "Hezbollah unveils its military might in Syria." *Arab Weekly,* 20 November 2016, thearabweekly.com/hezbollah-unveils-its-military-might-syria. Accessed 5 June 2018.

316 Shay, Saul. "Ten Years After Second Lebanon War, Hezbollah at a Crossroad." *Jerusalem Post,* 28 May 2016, www.jpost.com/Jerusalem-Report/Hezbollah-at-a-crossroad-452309. Accessed 5 June 2018.

317 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, p. 31. Accessed 30 May 2018.

318 Dury-Agri, Jessa Rose, et al. "Iraqi Security Forces and Popular Mobilization Forces Order of Battle." *Institute for the Study of War,* December 2017, www.understandingwar.org/sites/default/files/Iraq%20-%20ISF%20PMF%20Orders%20of%20Battle_0_0.pdf. Accessed 5 June 2018.

319 Uskowi, Nader. "Examining Iran's Global Terrorism Network." *Washington Institute for Near East Policy,* 17 April 2018, www.washingtoninstitute.org/uploads/Documents/testimony/UskowiTestimony20180417.pdf, p. 3. Accessed 5 June 2018.

320 Alaaldin, Ranj. "What Iraq's election means for its Shiite militias." *Brookings Institution,* 15 May 2018, www.brookings.edu/blog/order-from-chaos/2018/05/15/what-iraqs-election-means-for-its-shiite-militias/. Accessed 5 June 2018.

321 Nadimi, Farzin. "Iran's Afgahn and Pakistani Proxies: In Syria and Beyond?" *Washington Institute for Near East Policy,*

DEFENSE INTELLIGENCE AGENCY

PX260

22 August 2016, www.washingtoninstitute.org/policy-analysis/view/irans-afghan-and-pakistani-proxies-in-syria-and-beyond. Accessed 26 March 2019.

322 Constable, Pamela. "Recruited by Iran to fight for Syrian regime, young Afghans bring home cash and scars." *Washington Post,* 29 July 2018; www.washingtonpost.com/world/asia_pacific/recruited-by-iran-to-fight-for-syrian-regime-young-afghans-bring-home-cash-and-scars/2018/07/29/ecf9e34c-64e0-11e8-81ca-bb14593acaa6_story.html. Accessed 26 March 2019.

323 Uskowi, Nader. "Examining Iran's Global Terrorism Network." *Washington Institute for Near East Policy,* 17 April 2018, www.washingtoninstitute.org/uploads/Documents/testimony/UskowiTestimony20180417.pdf. Accessed 5 June 2018.

324 Alfoneh, Ali. "Fractured Iraqi Shia Militias in Syria." *Arab Gulf States Institute in Washington,* 22 August 2018, agsiw.org/fractured-iraqi-shia-militias-in-syria/. Accessed 26 March 2019.

325 McInnis, J. Matthew. "What does Iran really want in Yemen?" *American Enterprise Institute,* 14 April 2015, www.aei.org/publication/what-does-iran-really-want-in-yemen/. Accessed 5 June 2018.

326 "U.S. Navy Says It Seized Weapons from Iran Likely Bound For Houthis in Yemen." *Reuters,* 4 April 2016, www.reuters.com/article/us-iran-usa-yemen-arms/u-s-navy-says-it-seized-weapons-from-iran-likely-bound-for-houthis-in-yemen-idUSKCN0X12DB. Accessed 5 June 2018.

327 Knights, Michael. "Countering Iran's Missile Proliferation in Yemen." *Washington Institute for Near East Policy,* 8 November 2017, www.washingtoninstitute.org/policy-analysis/view/countering-irans-missile-proliferation-in-yemen. Accessed 31 May 2018.

328 Winter, Lucas. "Yemen: The Huthi March to Sana'a." *Foreign Military Studies Office,* 5 April 2017, community.apan.org/wg/tradoc-g2/fmso/m/fmso-monographs/194878. Accessed 5 June 2018.

329 "Yemen (2004 – first combat deaths)." *Project Ploughshares,* 23 January 2018, ploughshares.ca/pl_armedconflict/yemen-2004-first-combat-deaths/. Accessed 5 June 2018.

330 Salmoni, Barak A., et al., "Regime and Periphery in Northern Yemen: The Huthi Phenomenon." *Rand Corporation,* 2010, www.rand.org/content/dam/rand/pubs/monographs/2010/RAND_MG962.pdf, pp. 121-124, 261-262, 277.

Accessed 5 June 2018.

331 Winter, Lucas. "Yemen: The Huthi March to Sana'a." *Foreign Military Studies Office,* 5 April 2017, community.apan.org/wg/tradoc-g2/fmso/m/fmso-monographs/194878. Accessed 5 June 2018.

332 Shay, Saul. "The Houthi Maritime Threats in the Red Sea." *Institute for Policy and Strategy,* September 2017, www.herzliyaconference.org/eng/_Uploads/dbsAttachedFiles/RedSeabasinShaulShay25_9_17.pdf. Accessed 5 June 2018.

333 Haley, Nikki. *Remarks at a Press Conference on Iranian Arms Exports.* U.S. Department of State, U.S. Mission to the United Nations, 14 December 2017, usun.state.gov/remarks/8215. Accessed 4 June 2018.

334 Nadimi, Farzin, and Michael Knights. "Iran's Support to Houthi Air Defense in Yemen." *Washington Institute for Near East Policy,* 4 April 2018, www.washingtoninstitute.org/policy-analysis/view/irans-support-to-houthi-air-defenses-in-yemen. Accessed 4 June 2018.

335 "Iranian Technology Transfers to Yemen." *Conflict Armaments Research,* March 2017, www.conflictarm.com/perspectives/iranian-technology-transfers-to-yemen/. Accessed 5 June 2018.

336 Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 20 March 2018, fas.org/sgp/crs/mideast/R44017.pdf, pp. 35-36. Accessed 30 May 2018.

337 "Hamas." *Jane's World Insurgency and Terrorism,* 10 October 2017.

338 "Palestinian Islamic Jihad (PIJ)." *Jane's World Insurgency and Terrorism,* 12 August 2014.

339 "Popular Front for the Liberation of Palestine - General Command (PFLP-GC)." *Jane's World Insurgency and Terrorism,* 12 September 2013.

340 Carlotta, Gail. "In Afghanistan, U.S. Exits, and Iran Comes in." *New York Times,* 5 August 2017, www.nytimes.com/2017/08/05/world/asia/iran-afghanistan-taliban.html. Accessed 5 June 2018.

341 Levokwitz, Joshua. "Iran's Taliban Gamble in Afghanistan." *Middle East Institute,* 17 May 2017, www.mei.edu/content/article/iran-s-taliban-gamble-afghanistan. Accessed 5 June 2018.

342 Milani, Mohsen. "Iran and Afghanistan." *The Iran Primer,* United States Institute of Peace, 2018, iranprimer.usip.org/resource/iran-and-afghanistan. Accessed 5 June 2018.

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

343 Nader, Alireza, et al. "Iran's Influence in Afghanistan: Implications for the U.S. Drawdown." *Rand Corporation,* 2014, www.rand.org/content/dam/rand/pubs/research_reports/RR600/RR616/RAND_RR616.pdf. Accessed 5 June 2018.

344 Barrie, Douglas. "Iran and the Challenge of Combat-Aircraft Recapitalization." *International Institute for Strategic Studies,* 19 December 2017, www.iiss.org/en/iiss%20voices/blogsections/iiss-voices-2017-adeb/december-aeac/gulf-security-after-2020-ffd9. Accessed 4 June 2018.

345 Aryan, Hossein. "The Artesh: Iran's Marginalized and Under-Armed Conventional Military." *Middle East Institute,* 15 November 2011, www.mei.edu/content/artesh-iran%E2%80%99s-marginalized-and-under-armed-conventional-military. Accessed 23 May 2018.

346 Mizokami, Kyle. "Why the World Should Fear Iran's Missiles." *The National Interest,* 24 June 2017, nationalinterest.org/blog/the-buzz/why-the-world-should-fear-irans-missiles-21297?page=show. Accessed 4 June 2018.

347 "Iran - Air Force." *Jane's,* 2018.

348 "Iran Air Force Begins Large-Scale Drills." *Press TV,* 17 October 2016, www.presstv.com/DetailFr/2016/10/17/489461/Iran-Air-Force-Isfahan. Accessed on 29 August 2018.

349 "IRIAF's 'Devotees of the Velayat Skies Air Power' Exercise Commences." *DEFA Press,* 31 October 2017, www.defapress.ir/fa/print/264204. Accessed 1 Nov 2017.

350 Barrie, Douglas. "Iran and the Challenge of Combat-Aircraft Recapitalization." *International Institute for Strategic Studies,* 19 December 2017, www.iiss.org/en/iiss%20voices/blogsections/iiss-voices-2017-adeb/december-aeac/gulf-security-after-2020-ffd9. Accessed 4 June 2018.

351 Katzman, Kenneth. "The Pasdaran: Institutionalization of Revolutionary Armed Force." *Iranian Studies,* vol. 26, no. 3-4, Summer-Autumn 1993, pp. 390-402.

352 Cordesman, Anthony H. "Iran's Rocket and Missile Forces and Strategic Options." *Center for Strategic and International Studies,* Decemnber 2014, p. 124.

353 Nadimi, Farzin. "Iran's Air Forces: Struggling to Maintain Readiness." *Washington Institute for Near East Policy,* 22 December 2005,www.washingtoninstitute.org/policy-analysis/view/irans-air-forces-struggling-to-maintain-readiness. Accessed 4 June 2016.

354 "Iran Air Force Modernization," *Global Security*, www.

globalsecurity.org/military/world/iran/airforce-equipment.htm. Accessed 22 May 2018.

355 "Iran - Air Force." *Jane's,* 2018.

356 Cordesman, Anthony H. "The Conventional Military." *The Iran Primer,* United States Institute of Peace, 2015, iranprimer.usip.org/resource/conventional-military. Accessed 4 June 2018.

357 Dempsey, Joseph. "Iraqi's Latest Su-25s Come from Iran." *International Institute for Strategic Studies,* 2 July 2014, www.iiss.org/en/militarybalanceblog/blogsections/2014-3bea/july-8d3b/iraqis-latest-su-25s-come-from-iran-889a. Accessed 4 June 2018.

358 "Iran Admits To Conducting 700 Drone Attacks in Syria." *The New Arab,* 16 October 2018, www.alaraby.co.uk/english/news/2018/10/16/iran-admits-to-conducting-700-drone-attacks-in-syria/. Accessed 1 April 2019.

359 "AP Explains: How Yemen's Rebels Increasingly Deploy Drones." *Associated Press,* 10 January 2019, www.voanews.com/a/ap-explains-how-yemen-s-rebels-increasingly-deploy-drones-/4737804.html. Accessed 1 April 2019.

360 Beaumont, Peter. "Israel: 'We Have Shot Down Iranian-Supplied Hezbollah Drone.'" *The Guardian,* 19 September 2017, www.theguardian.com/world/2017/sep/19/israel-we-have-shot-down-iranian-supplied-hezbollah-drone. Accessed 1 April 2019.

361 "Iran Building a Drone Force Based on Captured US, Israeli Tech -- Report." *Times of Israel,* 26 December 2018, www.timesofisrael.com/iran-building-a-drone-force-based-on-captured-us-israeli-tech-report/. Accessed 1 April 2019.

362 Gettinger, Dan. "Drones Operating in Syria and Iraq." *Center for the Study of the Drone,* Bard College, 13 December 2016, dronecenter.bard.edu/drones-operating-in-syria-and-iraq/. Accessed 1 April 2019.

363 "Iran - Air Force." *Jane's,* 2018.

364 "Shekast-e roubah-ye roos dar nabord ba gorbeh-ye iraani / tasmim be foroush-e taamkatha dar sakhttarin douraan-e nirou-ye havaai" ["Defeat of the Russian fox in a battle with the Iranian cat / Decision to sell the Tomcats in the air force's most difficult period"]. *Fars News Agency,* 10 February 2018, www.farsnews.com/news/13940703000776. Accessed 31 May 2018.

365 "Iran Admits Conducting Drone Strikes in Syria." *Business Insider,* 26 September 2016, www.businessinsider.com/iran-

drone-strikes-syria-2016-9. Accessed 1 June 2018.

366 "Iran's Shahed-129 Drone in Combat Operations in Syria." *Fars News Agency,* 4 February 2018, en.farsnews.com.org/newstext.aspx?nn=13941115000734. Accessed 1 June 2018.

367 "Iran Starts Mass-Production of Drones Equipped with Smart Bombs." *Fars News Agency,* 5 February 2018, en.farsnews.com.org/newstext.aspx?nn=13961116000956. Accessed 1 Jun 2016.

368 "Minister: Iran's New Drone Can Fly for 30 Hours Non-Stop." *Fars News Agency,* 18 November 2013, en.farsnews.com.org/newstext.aspx?nn=13920827000609. Accessed 1 Jun 2013.

369 Groll, Elias. "Iran Is Deploying Drones in Iraq. Wait, What? Iran Has Drones?" *Foreign Policy,* 25 June 2014, foreignpolicy.com/2014/06/25/iran-is-deploying-drones-in-iraq-wait-what-iran-has-drones/. Accessed 4 June 2018.

370 Nadimi, Farzin. "The Counterintuitive Role of Air Defense in Iran's Anti-Status Quo Regional Strategy." *Washington Institute for Near East Policy,* 11 January 2017, www.washingtoninstitute.org/policy-analysis/view/the-counterintuitive-role-of-air-defense-in-irans-anti-status-quo-regional. Accessed 4 June 2018.

371 Nadimi, Farzin, and Michael Knights. "Iran's Support to Houthi Air Defense in Yemen." *Washington Institute for Near East Policy,* 4 April 2018, www.washingtoninstitute.org/policy-analysis/view/irans-support-to-houthi-air-defenses-in-yemen. Accessed 4 June 2018.

372 Urban, CAPT Bill. U.*S. Central Command Statement: Iranians Shoot Down U.S. Drone.* U.S. Central Command, 20 June 2019, www.centcom.mil/MEDIA/STATEMENTS/State-ments-View/Article/1881682/us-central-command-statement-iranians-shoot-down-us-drone/. Accessed 31 July 2019.

373 Karimi, Nasser, and Jon Gambrell. "Iran Shoots Down US Surveillance Drone, Heightening Tensions." *Associated Press,* 20 June 2019, www.apnews.com/e4316eb989d5499c-9828350de8524963. Accessed 31 July 2019.

374 Brown, Lt Col Earl. *Statement from US Central Command on Attacks against U.S. Observation Aircraft.* U.S. Central Command, 16 June 2019, www.centcom.mil/MEDIA/STATE-MENTS/Statements-View/Article/1877252/statement-from-us-central-command-on-attacks-against-us-observation-air-craft/. Accessed 31 July 2019.

375 "The Ninth Noble Prophet Joint Military Exercise Has Begun." *Islamic Republic News Agency,* 23 February 2015,
www.irna.ir/fa/NewsPrint.aspx?ID=81519481. Accessed 26 Feb 2015.

376 "IRGC Stages Air Defense Drill." *Tasnim News Agency,* 4 February 2017, www.tasnimnews.com/en/news/2017/02/04/1317287/irgc-stages-air-defense-drill. Accessed on 18 July 2018.

377 Aryan, Hossein. "The Artesh: Iran's Marginalized and Under-Armed Conventional Military." *Middle East Institute,* 15 November 2011, www.mei.edu/content/ar-tesh-iran%E2%80%99s-marginalized-and-under-armed-con-ventional-military. Accessed 23 May 2018.

378 "Iran - Air Force." *Jane's,* 2018.

379 "Iran's New Air Defense Commanders Appointed." *Tasnim News Agency,* 29 May 2019, www.tasnimnews.com/en/news/2019/05/29/2021301/iran-s-new-air-defense-com-manders-appointed. Accessed 29 July 2019.

380 Aryan, Hossein. "The Artesh: Iran's Marginalized and Under-Armed Conventional Military." *Middle East Institute,* 15 November 2011, www.mei.edu/content/ar-tesh-iran%E2%80%99s-marginalized-and-under-armed-con-ventional-military. Accessed 23 May 2018.

381 "Iran - Air Force." *Jane's,* 2018.

382 Nadimi, Farzin. "The Counterintuitive Role of Air Defense in Iran's Anti-Status Quo Regional Strategy." *Washington Institute for Near East Policy,* 11 January 2017, www.washingtoninstitute.org/policy-analysis/view/the-counterintuitive-role-of-air-defense-in-irans-anti-status-quo-regional. Accessed 4 June 2018.

383 Gady, Franz-Stefan. "Iran: Russian-Made S-300 Air Defense Missile Systems Placed on 'Combat Duty.'" *The Diplomat,* 11 July 2017, thediplomat.com/2017/07/iran-russian-made-s-300-air-defense-missile-systems-placed-on-combat-duty/. Accessed 31 May 2018.

384 "Iran - Air Force." *Jane's,* 2018.

385 Nadimi, Farzin. "The Counterintuitive Role of Air Defense in Iran's Anti-Status Quo Regional Strategy." *Washington Institute for Near East Policy,* 11 January 2017, www.washingtoninstitute.org/policy-analysis/view/the-counterintuitive-role-of-air-defense-in-irans-anti-status-quo-regional. Accessed 4 June 2018.

386 "Commander: Iran to Launch Bavar 373 Missile Shield Early 2017." *Fars News Agency,* 19 October 2015, en.farsnews.com/newstext.aspx?nn=13940726000993. Accessed 31 May 2018.

PX260

**IRAN MILITARY POWER** | *Ensuring Regime Survival and Securing Regional Dominance*

[387] Binnie, Jeremy. "On the Radar: Iranian Air Defence Developments." *Jane's Defence Weekly,* 4 April 2018

[388] Cordesman, Anthony H. "Iran's Rocket and Missile Forces and Strategic Options." *Center for Strategic and International Studies,* December 2014, p. 124.

[389] "'Velayat Defenders' Military Drill Dominates Skies." *Mehr News Agency,* 17 October 2016, en.mehrnews.com/news/120600/Velayat-Defenders-military-drill-dominates-skies. Accessed on 22 July 2018.

[390] "Iran Army to Hold Major Air Defense Maneuvers: Commander." *Press TV,* 25 December 2016. www.presstv.ir/Detail/2016/12/25/503404/IranAirDefenseModafeanAseman-VelayatFarzadEsmailiKhatamalAnbiyamaneuvers. Accessed 1 Jan 2017.

[391] "Iran - Air Force." *Jane's,* 2018.

[392] "Missile Threat and Proliferation: Iran." *Missile Defense Advocacy Alliance,* 2018, missiledefenseadvocacy.org/missile-threat-and-proliferation/todays-missile-threat/iran/. Accessed 4 June 2018.

[393] Nadimi, Farzin, and Michael Knights. "Iran's Support to Houthi Air Defense in Yemen." *Washington Institute for Near East Policy,* 4 April 2018, www.washingtoninstitute.org/policy-analysis/view/irans-support-to-houthi-air-defenses-in-yemen. Accessed 4 June 2018.

[394] Byman, Daniel. "Iran's Security Policy in the Post Revolutionary Era." *Rand Corporation,* ch. 4, p. 33.

[395] Rowell, Alex. "Iranian Boots on the Ground." *NOW News,* 16 April 2016, now.mmedia.me/lb/en/reportsfeatures/566879-iranian-boots-on-the-ground. Accessed 4 June 2018.

[396] "Iran to Crack Down on Evaders of Military Service." *Middle East Eye,* 20 June 2016, www.middleeasteye.net/news/iran-arrest-more-dodgers-compulsory-military-service-1073666426. Accessed 4 June 2018.

[397] Connell, Michael. "Iran's Military Doctrine." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/irans-military-doctrine. Accessed 4 June 2018.

[398] Wright, Galen. "Iran's Disappearing Divisions." *The Arkenstone,* 22 October 2012, thearkenstone.blogspot.com/2012/10/irans-disappearing-divisions.html. Accessed 4 June 2018.

[399] Nadimi, Farzin. "Iran's National Army Reorganizes." *Washington Institute for Near East Policy,* 14 August 2017, www.washingtoninstitute.org/policy-analysis/view/irans-national-ar-

my-reorganizes. Accessed 4 June 2018.

[400] "Iran - Army." *Jane's Sentinel Security Assessment - The Gulf States,* Jane's, 23 May 2018.

[401] Wright, Galen. "Ground Forces." *Iranian Military Capability 2011,* March 2011, www.scribd.com/doc/50826129/Iranian-Military-Capability-2011-Ground-Forces-March-15th-2011. Accessed 11 September 2011.

[402] Taghvaee, Babak. *Desert Warriors: Iranian Army Aviation at War.* Helion and Company, 2016, pp. 108-130.

[403] "Iranian Army Commandos in Syria on Advisory Mission." *Tasnim News Agency,* 4 April 2016, www.tasnimnews.com/en/news/2016/04/04/1039280/iranian-army-commandos-in-syria-on-advisory-mission. Accessed 4 June 2018.

[404] Tomson, Chris. "Strategic Town of Al-Eis Recaptured During Night Raid Led By Iranian Troops." *Al-Masdar News,* 6 April 2016, www.almasdarnews.com/article/strategic-town-al-eis-recaptured-night-raid-led-iranian-troops-map-update/. Accessed 4 June 2018.

[405] "Iran Air Force Fully Prepared to Repel Possible Attacks: Spokesman." *The Iran Project,* 31 December 2014, theiran-project.com/blog/2014/12/31/iran-air-force-fully-prepared-to-repel-possible-attacks-spokesman/. Accessed 7 September 2018.

[406] "Iran Starts Second Day of Military Exercise." *Iranian Students News Agency,* 18 November 2015, en.isna.ir/news/94082716538/Iran-starts-second-day-of-military-exercise. Accessed 5 September 2018.

[407] "Iran Launches Artillery, Shoulder-Launched Missile System Simulators." *Fars News Agency,* 7 October 2015, en.farsnews.com/newstext.aspx?nn=13940715000748. Accessed 7 September 2018.

[408] Rowell, Alex. "Iranian Boots on the Ground." *NOW News,* 16 April 2016, now.mmedia.me/lb/en/reportsfeatures/566879-iranian-boots-on-the-ground. Accessed 4 June 2018.

[409] Cordesman, Anthony H., and Khalid R. Al-Rodhan. "The Gulf Military Forces in an Era of Asymmetric War Iran." *Center for Strategic and International Studies,* 2006, csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/media/csis/pubs/060728_gulf_iran.pdf. Accessed 4 June 2018.

[410] Bucala, Paul, and Frederick W. Kagan. "Iran's Evolving Way of War." *Critical Threats Project,* American Enterprise Institute, March 2016.

[411] "Iran Says Will Send More Military Advisors to Syria: IRGC

**113**

**PX260**

commander." *Pars Today,* 3 May 2017, parstoday.com/en/news/iran-i51834-iran_says_will_send_more_military_advisors_to_syria_irgc_commander. Accessed 4 June 2018.

[412] "Iran - Army." Jane's Sentinel Security Assessment - *The Gulf States,* Jane's, 23 May 2018.

[413] @BabakTaghvaee (Babak Taghvaee). "#IRGCAA (Islamic Rev Guard of Corps Army Av) will be formed by 48 helicopters as the second Army Aviation of #Iran." *Twitter,* 22 February 2016, 3:49 p.m., twitter.com/babaktaghvaee/status/701916873017790464.

[414] Nadimi, Farzin. "Policywatch 2768: Iran Keeps a Lid on Its Latest 'Great Prophet' Exercise." *Washington Institute for Near East Policy,* 28 February 2018, www.washingtoninstitute.org/policy-analysis/view/iran-keeps-a-lid-on-its-latest-great-prophet-exercise. Accessed 10 September 2018.

[415] "IRGC wraps up major drills south of Iran." *Press TV,* 27 February 2015, www.presstv.com/Detail/2015/02/27/399376/IRGC-start-third-day-of-drill. Accessed 7 September 2018.

[416] "Iran - Army." *Jane's,* 15 April 2019.

[417] Cordesman, Anthony, and Nicholas Harrington. "The Arab Gulf States and Iran: Military Spending, Modernization, and the Shifting Military Balance." *Center for Strategic and International Studies,* 12 December 2018.

[418] "Iran Military Strength." *Global Military Firepower,* www.globalfirepower.com/country-military-strength-detail.asp?country_id=iran. Accessed on 30 April 2019.

[419] "Iran - Special Operational Forces." *Jane's Amphibious and Special Forces,* 4 December 2017.

[420] Byman, Daniel, et al. "Iran's Security Policy in the Post Revolutionary Era." *Rand Corporation,* ch. 4, p. 33.

[421] "Iranian Army Stages Military Drills in Isfahan Province." *Tehran Times,* 25 January 2019, www.tehrantimes.com/news/432272/Iranian-army-stages-military-drills-in-Isfahan-Province. Accessed 26 March 2019.

[422] Razoux, Pierre. *The Iran-Iraq War.* The Belknap Press of Harvard University Press, 2015, pp. 195, 211-213, 251.

[423] Taghvaee, Babak. "Persian Providers." *Air Forces Monthly,* July 2016, pp. 36-40.

[424] Hawrey, Ken, and Alice Naghshineh. "Translation: The Deployment of Artesh Special Forces to Syria." *Critical Threats Project,* American Enterprise Institute, 11 April 2016, www.criticalthreats.org/analysis/translation-the-deployment-of-artesh-special-forces-to-syria. Accessed 29 May 2018.

[425] "Iran - Navy." *Jane's Sentinel Security Assessment - The Gulf States, Jane's,* 10 April 2018.

[426] "Iran Submarine Capabilities." *Nuclear Threat Initiative,* 21 August 2015, www.nti.org/analysis/articles/iran-submarine-capabilities/. Accessed 5 June 2018.

[427] "How do Iranian Commandos Train? From Eating Snakes and Grasshoppers to Producing Water in a Pit for Survival." *Sputnik Iran,* 28 September 2016, ir.sputniknews.com/iran/201609281876529/. Accessed 5 June 2018

[428] Bucala, Paul, and Frederick W. Kagan. "Iran's Evolving Way of War." *Critical Threats Project,* American Enterprise Institute, March 2016.

[429] "Iran - Special Operational Forces." *Jane's Amphibious and Special Forces,* 4 December 2017.

[430] Alfoneh, Ali. "Iran's Revolutionary Guards Transform into an Expeditionary Force." *Atlantic Council,* 4 April 2017, www.atlanticcouncil.org/blogs/menasource/iran-s-revolutionary-guards-transform-into-an-expeditionary-force. Accessed 5 August 2018.

[431] "Commander of Elite Iran Unit Killed in Syria." *NOW News,* 4 November 2015, now.mmedia.me/lb/en/NewsReports/566163-commander-of-elite-iran-unit-killed-in-syria. Accessed 5 June 2018.

[432] Rezaei, Farhad. "Iran Seeks Neo-Protectorate in Syria." *Atlantic Council,* 11 July 2017, www.atlanticcouncil.org/blogs/iransource/iran-seeks-neo-protectorate-in-syria. Accessed 5 June 2018.

[433] "Iran - Special Operational Forces." *Jane's Amphibious and Special Forces,* 4 December 2017.

[434] "Iran - Special Operational Forces." *Jane's Amphibious and Special Forces,* 4 December 2017.

[435] Alfoneh, Ali. "The Basij Resistance Force." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/basij-resistance-force. Accessed 19 March 2018.

[436] Kurzman, Charles. "Death Tolls of the Iran-Iraq War." 31 October 2013, kurzman.unc.edu/death-tolls-of-the-iran-iraq-war/. Accessed 4 June 2018.

[437] Alfoneh, Ali. "The Basij Resistance Force." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/basij-resistance-force. Accessed 19 March 2018.

[438] Golkar, Saeid. Captive Society: *The Basij Militia and Social Control in Iran.* Columbia University Press, 2015, pp. 47-53.

[439] Golkar, Saeid. Captive Society: *The Basij Militia and Social*

PX260

*Control in Iran.* Columbia University Press, 2015, pp. 100-103.

[440] Alfoneh, Ali. "The Basij Resistance Force." *The Iran Primer,* United States Institute of Peace, iranprimer.usip.org/resource/basij-resistance-force. Accessed 19 March 2018.

[441] Ostovar, Afshon. "Iran's Basij: Membership in a Militant Islamist Organization." *Middle East Journal,* vol. 67, no. 3, Summer 2013, pp. 345-361.

[442] Katzman, Kenneth. *Iran's Foreign and Defense Policies.* Congressional Research Service, 15 March 2019, fas.org/sgp/crs/mideast/R44017.pdf. Accessed 26 March 2019.

[443] Aryan, Hossein. "Iran's Basij Force -- The Mainstay Of Domestic Security." *Radio Free Europe/Radio Liberty,* 7 December 2008, www.rferl.org/a/Irans_Basij_Force_Mainstay_Of_Domestic_Security/1357081.html. Accessed 26 March 2019.

[444] "Special Series: Iranian Intelligence and Regime Preservation." *Stratfor,* 22 June 2010, worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation. Accessed 5 June 2018.

[445] *Iran's Ministry of Intelligence and Security: A Profile.* Library of Congress, Federal Research Division, December 2012, archive.org/details/IransMinistryOfIntelligenceAndSecurityA-Profile. Accessed 31 May 2018.

[446] Modell, Scott, and David Asher. "Pushback: Countering the Iran Action Network." *Center for a New American Security,* September 2013, pp. 5-6, 10-11.

[447] "No Safe Haven: Iran's Global Assassination Campaign." *Iran Human Rights Documentation Center,* 2008, www.iranhrdc.org/english/publications/reports/3152-no-safe-haven-iran-s-global-assassination-campaign.html. Accessed 5 June 2018.

[448] Rastgoo, H. "Decoding Iran's Politics: The Intelligence Ministry's Alleged Operations in the EU." *IranWire,* 18 January 2019, iranwire.com/en/features/5784. Accessed 31 May 2019.

[449] Levitt, Matthew. "Iran's Deadly Diplomats." *CTC Sentinel,* August 2018, ctc.usma.edu/irans-deadly-diplomats. Accessed 31 July 2019.

[450] "Call for Adequate Budget for Foreign, Intel Ministries." *Financial Tribune,* 11 December 2017, financialtribune.com/articles/national/77650/call-for-adequate-budget-for-foreign-intel-ministries. Accessed 5 June 2018.

[451] "Special Series: Iranian Intelligence and Regime Preservation." *Stratfor,* 22 June 2010, worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation. Accessed 5 June 2018.

[452] Bastani, Hossein. "Pichidegihaa-ye se saazmaan-e mojazaa: etela'at-e sepaah, hefaazat-e etela'at-e sepaah, va hefaazat-e sepah" ["The complexities of three separate organizations: Corps intelligence, Corps intelligence protection, and Corps protection"]. *BBC Persian,* 28 December 2016, www.bbc.com/persian/iran-38452352. Accessed 31 May 2018.

[453] Bastani, Hossein. "Pichidegihaa-ye se saazmaan-e mojazaa: etela'at-e sepaah, hefaazat-e etela'at-e sepaah, va hefaazat-e sepah" ["The complexities of three separate organizations: Corps intelligence, Corps intelligence protection, and Corps protection"]. *BBC Persian,* 28 December 2016, www.bbc.com/persian/iran-38452352. Accessed 31 May 2018.

[454] "Special Series: Iranian Intelligence and Regime Preservation." *Stratfor,* 22 June 2010, worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation. Accessed 5 June 2018.

[455] Byman, Daniel, et al. "Iran's Security Policy in the Post Revolutionary Era." *Rand Corporation,* ch. 4.

[456] "Special Series: Iranian Intelligence and Regime Preservation." *Stratfor,* 22 June 2010, worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation. Accessed 5 June 2018.

[457] Wege, Carl Anthony. "Iran's Intelligence Establishment." *Intelligencer Journal of U.S. Intelligence Studies,* Summer 2015, www.afio.com/publications/WEGE%20Iranian%20Intel%20Services%202015%20Sep%2001%20FINAL.pdf. Accessed 12 March 2018.

[458] "Iran: Political Opposition Groups, Security Forces, Selected Human Rights Issues, Rule of Law: COI Compilation." *Austrian Centre for Country of Origin & Asylum Research and Documentation,* 2015, p. 75.

[459] Wright, Galen. "Iran's Ministry of Defense and Armed Forces Logistics." *The Arkenstone,* 20 February 2015, thearkenstone.blogspot.com/2015/02/irans-ministry-of-defense-and-armed.html. Accessed 23 May 2018.

[460] "Education Research Institute (ERI)." *Institute for Science and International Security,* www.isisnucleariran.org/sites/by-type/category/weaponization-related-rd/. Accessed 31 May 2018.

[461] "Malek Ashtar University." *Iran Watch,* 27 August 2008, www.iranwatch.org. Accessed 2 May 2018.

[462] McInnis, J. Matthew. "Building the Iranian Military: Un-

PX260

derstanding Tehran's Defense Acquisition and Research and Development Decision-Making." *American Enterprise Institute,* April 2017, www.aei.org/wp-content/uploads/2017/04/Building-the-Iranian-Military.pdf. Accessed 16 March 2018.

463 Sharafedin, Bozorgmehr. "Iran Parades Missiles and Jets in a Veiled Threat to the US, UK, and France after Syria Strike." *Reuters,* 18 April 2018, www.businessinsider.com/iran-parades-missiles-and-jets-in-a-warning-to-us-uk-france-2018-4. Accessed 5 June 2018.

464 "Iran says unveils new homemade fighter jet." *Reuters,* 2 February 2013, www.reuters.com/article/us-iran-military/iran-says-unveils-new-homemade-fighter-jet-idUS-BRE91104G20130202. Accessed 5 June 2018.

465 "Matn-e kaamel-e qanoon-e barnaameh-ye sheshom-e touseh" ["Complete Text of the Sixth Development Plan Law"]. *Tasnim News Agency,* 18 March 2017, www-tasnimnews-com/fa/news/1395/12/28/1360457/%D9%85%D8%AA%D9%86-%DA%A9%D8%A7%D9%85%D9%84-%D9%82%D8%A7%D9%86%D9%88%D9%86-%D8%A8%D8%B1%D9%86%D8%A7%D9%85%D9%87-%D8%B4%D8%B4%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87. Accessed 30 May 2018.

466 McInnis, J. Matthew. "Building the Iranian Military: Understanding Tehran's Defense Acquisition and Research and Development Decision-Making." *American Enterprise Institute,* April 2017, www.aei.org/wp-content/uploads/2017/04/Building-the-Iranian-Military.pdf. Accessed 16 March 2018.

467 Hansen, Nick. "Iran's Missile and Space-Launch Ambitions Slow Under Political Pressure." *Jane's Intelligence Review,* 2 November 2017.

468 "Iranian Missile Launches: 1988-Present." *Missile Threat: CSIS Missile Defense Project,* 2018, missilethreat.csis.org/iranian-missile-launches-1988-present/. Accessed 5 June 2018.

469 Defense Intelligence Ballistic Missile Analysis Committee. *Ballistic and Cruise Missile Threat 2017.* National Air and Space Intelligence Center, 30 June 2017, www.nasic.af.mil/About-Us/Fact-Sheets/Article/1235024/2017-ballistic-and-cruise-missile-threat-report/.

470 Binnie, Jeremy. "Iran shows submarine-launched missile." *Jane's Defence Weekly,* 27 February 2019, www.janes.com/article/86895/iran-shows-submarine-launched-missile. Accessed 26 March 2019.

471 McInnis, J. Matthew. "Building the Iranian Military: Understanding Tehran's Defense Acquisition and Research and Development Decision-Making." *American Enterprise Institute,* April 2017, www.aei.org/wp-content/uploads/2017/04/Building-the-Iranian-Military.pdf. Accessed 16 March 2018.

472 *Iranian Naval Forces: A Tale of Two Navies.* Office of Naval Intelligence, February 2017, www.oni.navy.mil/Portals/12/Intel%20agencies/iran/Iran%20022217SP.pdf, pp. 27-37.

473 Nadimi, Farzin. "The Counterintuitive Role of Air Defense in Iran's Anti-Status Quo Regional Strategy." *Washington Institute for Near East Policy,* 11 January 2017, www.washingtoninstitute.org/policy-analysis/view/the-counterintuitive-role-of-air-defense-in-irans-anti-status-quo-regional. Accessed 4 June 2018.

474 "Iran - Air Force." *Jane's,* 2018.

475 "IRGC's Ghadir Radar Deployed in Southern Iran." *Iran Daily,* 4 July 2015, www.iran-daily.com/News/121603.html?catid=3&title=IRGC-s-Ghadir-radar-deployed-in-Southern-Iran. Accessed 5 June 2018.

476 "Iran Unveils 16 New Defense Electronic, Radar Projects." *Fars News Agency,* 26 October 2015, en.farsnews.com/newstext.aspx?nn=13940804001667. Accessed 5 June 2018.

477 "Iran - Air Force." *Jane's,* 2018.

478 Tabrizi, Aniseh Bassiri, and Justin Bronk. "Armed Drones in the Middle East: Proliferation and Norms in the Region." *Royal United Services Institute for Defense and Security Studies,* December 2018, drones.rusi.org/countries/iran/. Accessed 5 March 2019.

479 "Iran - Air Force." *Jane's,* 2018.

480 McInnis, J. Matthew. "Building the Iranian Military: Understanding Tehran's Defense Acquisition and Research and Development Decision-Making." *American Enterprise Institute,* April 2017, www.aei.org/wp-content/uploads/2017/04/Building-the-Iranian-Military.pdf. Accessed 16 March 2018.

481 "Iran - Army." *Jane's Sentinel Security Assessment - The Gulf States, Jane's,* 10 January 2018.

482 "Iran - Army." *Jane's Sentinel Security Assessment - The Gulf States, Jane's,* 10 January 2018.

483 "Iran - Air Force." *Jane's,* 2018.

484 "Iran - Navy." *Jane's Sentinel Security Assessment - The Gulf States, Jane's,* April 2018.

485 Salisbury, Daniel. "Tomcat and Mouse: Iranian Illicit Procurement of U.S. Legacy Military Technologies, 1979-2016." *Strategic Trade Review,* Belfer Center for Science and Interna-

tional Affairs, Harvard University, Autumn 2017, www.belfer-center.org/sites/default/files/files/publication/Salisbury%20 -%20Tomcat%20and%20Mouse.pdf. Accessed 5 June 2018.

[486] Capaccio, Anthony. "Iran's Russian Anti-Aircraft Missile Now Operational, U.S. Says." *Bloomberg,* 7 March 2018, www.bloomberg.com/news/articles/2018-03-07/iran-s-russian-anti-aircraft-missile-now-operational-u-s-says. Accessed 31 May 2018.

[487] McInnis, J. Matthew. "Building the Iranian Military: Understanding Tehran's Defense Acquisition and Research and Development Decision-Making." *American Enterprise Institute,* April 2017, www.aei.org/wp-content/uploads/2017/04/Building-the-Iranian-Military.pdf. Accessed 16 March 2018.

[488] "Russia and Iran in Talks over $10 billion Arms Deal: RIA." *Reuters,* 14 November 2016, www.reuters.com/article/us-russia-iran-arms/russia-and-iran-in-talks-over-10-billion-arms-deal-ria-idUSKBN1390UM. Accessed 5 June 2018.

[489] "Iran to Buy Su-30 Fighter Jets from Russia." *Tehran Times,* 26 November 2016, www.tehrantimes.com/news/408598/Iran-to-buy-SU-30-fighter-jets-from-Russia. Accessed 31 May 2018.

[490] "Russia Says Ready to Make T-90s in Iran." *Press TV,* 28 April 2016, www.presstv.com/Detail/2016/04/28/462973/Russia-says-ready-to-make-T90s-in-Iran/. Accessed 5 June 2018.

[491] UN Register of Conventional Arms. *The Global Reported Arms Trade.* United Nations, www.un-register.org/Heavy-Weapons/Index.aspx. Accessed 5 June 2018.

[492] United Nations Security Council. *Resolution 2231 (2015).* United Nations, 20 July 2015, www.un.org/en/sc/2231/. Accessed 31 May 2018.

[493] "Iranian Transfers of Major Weapons: Deals with Deliveries or Orders Made for 1979 to 2018." *Arms Transfers Database,* Stockholm International Peace Research Institute, 11 March 2019.

[494] United Nations Security Council. *Seventh Report of the Secretary-General on the Implementation of Security Council Resolution 2231 (2015).* United Nations, 13 June 2019, www.un.org/S/2019/492. Accessed 31 July 2019.

[495] Taghvaee, Babak. "Iran's Defense Mafia Makes Money." *Medium,* 8 January 2017, medium.com/@BabakTaghvaee/irans-defense-mafia-makes-money-e830950d3e7a. Accessed 27 August 2018.

[496] "Defence Production and R & D." *Jane's Sentinel Security Assessment - The Gulf States,* Jane's, 22 November 2016.

[497] Uskowi, Nader. "Examining Iran's Global Terrorism Network." *Washington Institute for Near East Policy,* 17 April 2018, www.washingtoninstitute.org/uploads/Documents/testimony/UskowiTestimony20180417.pdf. Accessed 5 June 2018.

[498] Kagan, Frederick W., et al. "Iranian Influence in the Levant, Iraq, and Afghanistan." *American Enterprise Institute,* 2 February 2008, www.understandingwar.org/sites/default/files/20080215_IranianInfluence.pdf. Accessed 5 June 2018.

[499] Rasheed, Ahmed. "Exclusive: Iraq Signs Deal to Buy Arms, Ammunition from Iran – documents." *Reuters,* 24 February 2014, www.reuters.com/article/us-iraq-iran-arms/exclusive-iraq-signs-deal-to-buy-arms-ammunition-from-iran-documents-idUSBREA1N10D20140224. Accessed 5 June 2018.

[500] *The Distribution of Iranian Ammunition in Africa.* Conflict Armament Research, December 2012, www.conflictarm.com/wp-content/uploads/2014/09/Iranian_Ammunition_Distribution_in_Africa.pdf. Accessed 26 March 2019.

DEFENSE INTELLIGENCE AGENCY

**117**

PX260

**INTENTIONALLY LEFT BLANK**

INTENTIONALLY LEFT BLANK

PX260



**WWW.DIA.MIL**



ISBN 978-0-16-095157-2

PX260

PX262

8/25/2021                          International - U.S. Energy Information Administration (EIA)



**U.S. Energy Information Administration**

Now out of beta and updated based on your feedback. Let us know what you think international@eia.gov

## Iran

### EXECUTIVE SUMMARY

**Last Updated:** July 20, 2021 | Previous years ▾
Summary | Notes | Background reference

## Overview

- Iran was the fifth-largest crude oil producer in OPEC in 2020 and the third-largest natural gas producer in the world in 2019.[1] It holds some of the largest deposits of proved oil and natural gas reserves, ranking as the world's third-largest and second-largest reserve holder of oil and natural ga respectively, in 2020. At the end of 2020, Iran accounted for 25% of oil reserves in the Middle East and 12% in the world (Figure 1).[2] Despite its  reserves, Iran's crude oil production has fallen since 2017 because the oil sector has been subject to underinvestment and international sanctions several years.

- Although Iran is a member of OPEC, it is exempt from the production cuts under the OPEC+ agreement⧉ because its crude oil production remain by U.S.-imposed nuclear-related sanctions. Iran's crude oil production reached a 30-year low in 2020 as a result of these sanctions and the impac global COVID-19 pandemic. EIA assesses that Iran's production could return to full capacity, at 3.8 million barrels per day (b/d), if the United State sector sanctions.

- Iran's economy is relatively diversified compared to many other Middle Eastern countries, but it still relies heavily on petroleum and other liquids re In FY 2016 (April 2016–March 2017), the latest year of available data, crude oil export revenue accounted for nearly 40% of Iraq's total governmen revenues, according to the International Monetary Fund (IMF).[3] In 2019, Iran earned $30 billion in net oil export revenues, down from $66 billion Export revenues fell in 2019 after U.S. sanctions were imposed on Iran's oil exports, which resulted in a decrease in both crude oil production and in Iran.[4] We estimate that oil price declines in 2020 further reduced Iran's revenues.

- Iran's economy consumed an estimated 11.7 quadrillion British thermal units of primary energy in 2019, making it the largest energy consumer in t Middle East. Natural gas and oil accounted for almost all of Iran's total primary energy consumption, with marginal contributions from hydropower, nuclear, and non-hydro power renewables (Figure 2).[5]



Figure 1. Largest proved reserve holders of total oil, 2020
billion barrels

| | |
|---|---|
| Nigeria | 37 |
| Libya | 48 |
| United States | 69 |
| Russia | 80 |
| United Arab Emirates | 98 |
| Kuwait | 102 |
| Iraq | 145 |
| Canada | 170 |
| Iran | 209 |
| Saudi Arabia | 259 |
| Venezuela | 304 |

Source: Graph by U.S. EIA based on data from *Oil & Gas Journal*, December 2020
Note: Oil reserves include crude oil, condensates, natural gas liquids, and oil sands.

figure data

PX262



Figure 2. Iran's total primary energy consumption, share by fuel, 2019

Source: Graph by U.S. EIA based on data from *BP Statistical Review of World Energy 2020*
Note: Chart does not include traditional biomass and waste, such as burning firewood and waste.

figure data

## Petroleum and other liquids

- Total oil production in Iran has declined since 2017, when output reached a high of 4.8 million b/d. Iran's production averaged 3.0 million b/d of pet and other liquids in 2020, and almost 2.0 million b/d was crude oil and the remainder was condensate and hydrocarbon gas liquids. Iran's crude oil and production have declined since the United States announced in May 2018 that it would withdraw from the Joint Comprehensive Plan of Action (JCPOA) and reinstate sanctions targeting Iran's oil exports (Figure 3). Crude oil production reached 2.6 million b/d during the first few months of 2 when the United States government granted sanctions waivers for some of Iran's key oil-importing countries. However, after these waivers expired 2019, output fell further to about 2.1 million b/d. Economic fallout from the COVID-19 pandemic, including lockdowns and mobility restrictions, resu Iran's crude oil production dipping below 2.0 million b/d in 2020. We assess that Iran's crude oil production could increase to 3.8 million b/d if glob demand continues to rise and sanctions on Iran's oil exports are lifted.

- Consumption of petroleum products in Iran remained steady in 2019 at 1.8 million b/d compared to 2018 levels, despite the economic downturn th occurred after U.S. sanctions were re-imposed. Sanctions limit Iran's ability to export crude oil, condensate, and petroleum products, and these liq replaced some of the natural gas used in the power sector, mainly diesel and fuel oil. In the wake of the COVID-19 pandemic, Iran's economy con less than 1.8 million b/d in 2020. Use of gasoline, the key transportation fuel in Iran, decreased considerably. Use of petroleum and petroleum pro likely face competition from natural gas, particularly in the power, residential, and commercial sectors, during the next several years, especially if c for exports of petroleum and petroleum products increases.

Figure 3. Iran's petroleum and other liquids production and consumption



Source: U.S. Energy Information Administration, *Short-Term Energy Outlook, June*
Note: Iran's petroleum and other liquids production includes crude oil, condensate, and hydrocarbon gas liquids (HGLs).

PX262

8/25/2021                                    International - U.S. Energy Information Administration (EIA)

figure data

---

## Oil trade

- We estimate Iran's crude oil and condensate exports fell from more than 2.5 million b/d in 2017, the year before the United States re-imposed san an average of less than 0.4 million b/d in 2020 (Figure 4). We base these estimates on tanker-tracking data reported by ClipperData, LLC. Iran's e began to rise in November 2020 and reached an average of nearly 0.7 million b/d in the last two months of the year as Iran sent more crude oil to Estimates based on ClipperData show that Iran's oil exports averaged more than 0.5 million b/d in the first few months of 2021. Other industry ana trade press vary in their range of estimates for Iran's oil exports from less than 0.6 million b/d to more than 0.8 million b/d during the first quarter of The use of ship-to-ship (STS) transfers and switching off Iranian ship identification transponders, have made it difficult to track Iran's crude oil exp

- Although Iran supplied crude oil and condensates to a variety of countries in Europe and Asia in 2017, Iran sent nearly all of its crude oil and cond exports to China and Syria in 2020 (Figure 5). Industry analysts assess that shipments of oil to several countries were transferred ship to ship and with crude oil grades that did not originate in Iran before the volumes were sent to China. According to analysis from ClipperData, much of the oil t shipped from Iran to China was relabeled from countries such as Malaysia, Singapore, the United Arab Emirates, Iraq, and Oman to escape detec customs authorities and compliance with sanctions.[8] Syria has been receiving small amounts of crude oil and oil products mostly through a line of with Iran and through barter deals.[9]

- Iran's exports of petroleum products were 680,000 b/d in 2020. LPG, fuel oil, and gasoline accounted for about 61% of total petroleum product exp according to FGE estimates, which was an increase from 2018 at 620,000 b/d.[10] Petroleum products are generally shipped on smaller vessels th been able to avoid detection more easily than crude oil cargoes. In addition, when the new Persian Gulf Star refinery was commissioned, the adde capacity resulted in Iran becoming a net exporter of gasoline in 2019.[11] Historically, Iran relied on petroleum product imports to meet domestic de

### Figure 4. Iran's monthly crude oil and condensate exports



Source: Graph by U.S. EIA, based on data from ClipperData, LLC

figure data

### Figure 5. Iran's crude oil and condensate exports by destination, 2020



Source: Graph by U.S. EIA, based on data from ClipperData, LLC

figure data

---

https://www.eia.gov/international/analysis/country/IRN                                              3/6

PX262

## Natural gas

- Iran's estimated proved natural gas reserves were 1,200 trillion cubic feet (Tcf) as of December 2020, second only to Russia, according to *Oil & Gas Journal* (Figure 6). Iran holds 16% of the world's proved natural gas reserves and almost half of OPEC's reserves.[12]

- Iran was the world's third-largest dry natural gas producer after the United States and Russia in 2019.[13] Dry natural gas production nearly doubled between 2009 and 2019, rising to 8.4 Tcf (Figure 7). Iran has brought online several phases of the offshore South Pars natural gas field since 2014. Iran continues to develop natural gas fields despite challenges posed by sanctions and a lack of foreign investment. Since 2018, domestic companies have been primarily developing the natural gas fields. However, while sanctions on Iran's oil exports are in place, the country's natural gas production growth, particularly from fields that produce condensate liquids, will remain limited because of condensate storage capacity constraints.

- In 2017, the National Iranian Oil Company (NIOC) reinjected 1.2 Tcf of natural gas into oil wells for enhanced oil recovery (EOR),[14] which plays an important role in Iran's oil production. Once sanctions resumed on Iran's oil exports in 2018, reinjected natural gas volumes fell significantly to an estimated 2020.

- In addition to the natural gas used for EOR, Iran vented or flared approximately 0.5 Tcf of natural gas in 2019, down from 0.6 Tcf in 2018, as a result of sanctions that indirectly depressed associated natural gas production from oil fields.[15] Plans are underway to capture more flared natural gas for power plants, refineries, and petrochemical plants. In early 2021, the Bid Boland-2 natural gas processing plant, one of the largest plants in Iran, was commissioned, which will increase natural gas processing capacity and reduce natural gas flaring.[16] The oil ministry plans to eliminate natural gas by 2023.[17] However, accomplishing this goal will depend on if sanctions are lifted, export markets are opened for natural gas liquids, and sufficient gas liquids processing capacity is added.[18]

- In 2019, Iran was the world's fourth-largest consumer of natural gas after the United States, Russia, and China.[19] Most of Iran's natural gas production was consumed domestically. Iran's natural gas consumption averaged 7.8 Tcf in 2019, about 2% higher than the 2018 level (Figure 7).[20] Growth in natural gas consumption slowed in 2019 as a result of the U.S. sanctions on exports of petroleum and other liquids. Iran reduced its supply of natural gas from the South Pars field because of insufficient storage for its associated condensate production. Iran substituted some natural gas with oil products, particularly in its electric power sector, as a result of the natural gas supply constraint.

- In 2019, the residential and commercial sectors consumed the most natural gas (35%), followed by the industrial (including petrochemicals) sector and the electric power sector (26%). Natural gas consumption in the residential and commercial sector and the industrial sector has increased significantly in the past decade as natural gas replaced some liquid fuels, Iran's natural gas pipeline system expanded, and the industrial sector expanded. Although Iran's natural gas consumption for electric power generation fell in 2019, once sanctions are lifted, we assess that natural gas share in this sector will increase, which would free up more crude oil and petroleum products for exports.[21] The petrochemical industry is slated to grow in Iran during the several years and will require more natural gas for fuel.

### Figure 6. Largest proved reserve holders of natural gas, 2020

trillion cubic feet



Source: Graph by U.S. EIA, based on data from *Oil & Gas Journal*, December 2020

figure data

PX262

Case 1:18-cv-02248-CRC   Document 85-4   Filed 05/06/22   Page 586 of 772



Figure 7. Natural gas production and consumption in Iran, 2007-2019

Source: U.S. Energy Information Administration

figure data

## Natural gas trade

- Iran exports natural gas by pipeline to Turkey, Armenia, Azerbaijan, and Iraq, and it receives imports from Azerbaijan. In 2020, Iran exported abou billion cubic feet (Bcf) and imported 7 Bcf of natural gas via pipelines (Figure 8). Iran's natural gas imports decreased substantially after 2015, but rose sharply because of Iran's increased natural gas production from several new South Pars projects since 2014 and increased exports to Iraq. Ir stopped importing natural gas from Turkmenistan in 2019 because higher production and more pipeline coverage made it possible for domestic su reach the northeastern region.

- In 2020, Iraq and Turkey accounted for 64% and 33%, respectively, of Iran's natural gas exports. Natural gas exports to Iraq increased substantia their trade contract was implemented in mid-2017. Iraq has been relying increasingly on electricity and natural gas exports from Iran to fuel its pov Iran's exports to Turkey dropped in 2020 because an explosion on the Iran-Turkey natural gas pipeline stopped flows for a few months.[22] Iran's Armenia and Azerbaijan are relatively small volumes and are traded on long-term agreements.



Figure 8. Iran's natural gas pipeline imports and exports

Source: Graph by U.S. EIA, based on data from Facts Global Energy

figure data

## Electricity

- In 2019, Iran's electric power generation was 306 terawatthours (TWh) of net electricity, with 88% of generation coming from fossil fuel sources.[2 gas is the largest source of fuel for electricity generation in Iran, accounting for nearly 73% of total generation. Oil fueled 15% of Iran's electric pov production in 2019, up from 9% in 2018. Because sanctions limited Iran's oil exports, more oil production was used domestically, therefore, diesel oil replaced some of the natural gas used in the power sector.

- Coal, hydropower, nuclear, and non-hydro power renewables are the remaining fuel sources used to generate electricity in Iran (Figure 9). Iran's hydroelectric power output doubled from almost 16 TWh in 2018 to 30 TWh in 2019, the highest increase of generation on record, because of hea widespread rains and flooding.[24] Hydropower rose to 10% of Iran's total generation, supplanting some oil-fired and natural gas-fired power in 20

PX262



Figure 9. Iran's electricity generation capacity by fuel, 2019

Source: U.S. EIA, based on data from the International Energy Agency
Note: Total may not add to 100% because of independent rounding.

figure data

## Notes

- In response to stakeholder feedback, the U.S. Energy Information Administration has revised the format of the *Country Analysis Briefs*. As of Dece 2018, updated briefs are available in two complementary formats: the Country Analysis Executive Summary provides an overview of recent develo in a country's energy sector and the Background Reference provides historical context. Archived versions will remain available in the original form
- Data presented in the text are the most recent available as of April 30, 2021.
- Data are EIA estimates unless otherwise noted.

## Endnotes

1. U.S. Energy Information Administration, *Short-Term Energy Outlook*, April 2020 and International Energy Statistics
2. *Oil & Gas Journal*, Worldwide look at reserves and production (December 2020).
3. IMF Country Report No. 17/62, page 4 and Islamic Republic of Iran (March 2018), IMF Country Report No. 18/93, page 31.
4. U.S. Energy Information Administration, OPEC Net Oil Export Revenues, January 13, 2021.
5. BP Statistical Review of World Energy 2020.
6. ClipperData LLC (data pulled May 10, 2021).
7. Reuters, "China's Iran oil imports seen hitting new high in March, curbing OPEC output options," March 30, 2021; FACTS Global Energy, Flash Alert, "How Much Iranian Oil Wil Enter the Market if the JCPOA Takes Effect by June? A Short-Term Perspective," May 10, 2021; FACTS Global Energy, Iran Oil and Gas Monthly, April 28, 2021, page 7; *Middle E Economic Survey*, "Will A Resurgent Iran Flood Oil Markets In 2021?," December 18, 2020; *Middle East Economic Survey*, "China Crude Imports: Bumper Volumes From 'Iran Surrogate' Suppliers," March 26, 2021; *Middle East Economic Survey*, "China Q1 Crude Imports: Iran Volumes Hiding in Plain Sight?," April 23, 2021.
8. ClipperData Geopolitical Report, Volume 4, Issue 13, March 31, 2021, pages 2-3; Middle East Institute, "Iranian sanctions evasion and the Gulf's complex oil trade," May 11, 20
9. Reuters, "Syria fuel crisis eases as Iran delivers new oil supplies," October 23, 2020.
10. Facts Global Energy, *Iran's Oil and Gas Annual Report 2020* (December 2020), page 82.
11. Reuters, "Sanctions choke Iran's crude sales, but oil product exports booming," September 2, 2019.
12. *Oil & Gas Journal*, Worldwide look at reserves and production (December 2020).
13. BP Statistical Review of World Energy 2020.
14. Facts Global Energy, *Iran's Oil and Gas Annual Report 2020*, (December 2020), page 118.
15. World Bank Global Gas Flaring Tracker 2020; *Middle East Economic Survey*, "Global Gas Flaring Gets Worse in 2019," July 24, 2020, page 3; Financial Tribune, "Gas Flaring Down 40%," July 19, 2020.
16. Tehran Times, "Major gas refinery goes operational in southwestern Iran," January 22, 2021.
17. Mehr News Agency, "Iran gas flaring zero by March 2023: Zanganeh," January 22, 2021; *Middle East Economic Survey*, "Gas Plant Inauguration Boosts Iran's Petchems Outlo January 29, 2021, page 12.
18. Facts Global Energy, *Iran's Oil and Gas Annual Report 2020*, (December 2020), pages 105-106.
19. BP Statistical Review of World Energy 2020.
20. U.S. Energy Information Administration, International Energy Statistics.
21. Facts Global Energy, *Iran's Oil and Gas Annual Report 2020*, (December 2020), pages 20-21, 31-34, and 110 and 118.
22. Facts Global Energy, *Iran Oil and Gas Monthly*, January 2021, page 14.
23. U.S. Energy Information Administration based on International Energy Agency, World Energy Statistics 2020.
24. U.S. Energy Information Administration; Caspian News, "In A Country Often Plagued By Drought, Dams Are Now Overflowing," June 6, 2019; Caspian News, "Iran Launches 1: Water & Power Projects," February 2, 2020.

PX262

PX264



Highlights

PX264

—— APRIL 26, 2022

## Department Press Briefing – April 26, 2022

—— APRIL 22, 2022

## Special Briefing via Telephone with Jennifer Gavito, Deputy Assistant Secretary for Iraq and Iran

—— APRIL 21, 2022

## Department Press Briefing – April 21, 2022

—— APRIL 18, 2022

## Department Press Briefing – April 18, 2022

—— APRIL 14, 2022

## Department Press Briefing – April 14, 2022

TOP TAGS

China    North Korea    Office of the Spokesperson    Russia    Ukraine

PX264

**VIEW ALL NEWS**

# U.S. Relationship

VIEW FACT SHEET

## U.S.-Iran Relations

As a result of the Iranian takeover of the American Embassy on November 4, 1979, the United States and Iran severed diplomatic relations in April 1980. The United States and the Islamic Republic of Iran have had no formal diplomatic relationship since that date. Switzerland is the U.S. protecting power and provides limited consular services to U.S. citizens in Iran.

Iran has no embassy in Washington, D.C.



**A D D I T I O N A L   R E S O U R C E S**

U.S. DEPARTMENT OF STATE

Bureau of Near Eastern Affairs

Department Reports and Publications

EXTERNAL RESOURCES

CIA World Factbook Iran Page

History of U.S. Relations With Iran

PX264



PX264

PX266

# Iraq: A Population Silenced

🌐 **2001-2009.state.gov**/g/drl/rls/15996.htm

Released by the Bureau of Democracy, Human Rights, and Labor
December 2002

### Executive Summary

In 1979, immediately upon coming to power, Saddam Hussein silenced all political opposition in Iraq and converted his one-party state into a cult of personality. Over the more than 20 years since then, his regime has systematically executed, tortured, imprisoned, raped, terrorized and repressed Iraqi people. Iraq is a nation rich in culture with a long history of intellectual and scientific achievement. Yet Saddam Hussein has silenced its scholars and doctors, as well as its women and children.

Iraqi dissidents are tortured, killed, or disappear in order to deter other Iraqi citizens from speaking out against the government or demanding change. A system of collective punishment tortures entire families or ethnic groups for the acts of one dissident. Women are raped and often videotaped during rape to blackmail their families. Citizens are publicly beheaded, and their families are required to display the heads of the deceased as a warning to others who might question the politics of this regime. Saddam Hussein was also the first leader to use chemical weapons against his own population, silencing more than 60 villages and 30,000 citizens with poisonous gas.

Saddam Hussein has tried to silence ethnic and religious minorities in Iraq as well. During the Anfal Campaign of 1987-88, Saddam Hussein's regime killed and tortured the Kurdish population. It eliminated many Kurdish villages, and forced surviving Kurds into zones where he could control them. His regime has suppressed the Shi'a religious community through killings and arrests and bans their Friday prayers and books in certain regions. He has also targeted the citizens of other nations in his region, killing and torturing Kuwaiti and Iranian citizens, among others.

The Iraqi people are not allowed to vote to remove the government. Freedom of expression, association and movement do not exist in Iraq. The media is tightly controlled – Saddam Hussein's son owns the daily Iraqi newspaper. Iraqi citizens cannot assemble except in support of the government. Iraqi citizens cannot freely leave Iraq.

The international community, including the U.N. and internationally-based nongovernmental organizations, has documented and repeatedly condemned this regime's horrific record of abuse. Saddam Hussein simply ignores the will of the rest of the world.

Saddam Hussein has given the Iraqi people a terrible choice – to remain silent - or face the consequences. But despite his regime's attempts to silence the Iraqi people, their voices are still being heard.

PX266

**Al-Shaikh Yahya Muhsin Ja'far al-Zeini**

On July 2, 1999, a young theology student in his late 20s named al-Shaikh Yahya returned home to find that his father and two brothers had been detained as substitute prisoners until Saddam's secret police could arrest him. Al-Shaikh Yahya was suspected of being a supporter of a prominent Shi'a cleric whose murder had set off protests six months before. The protests had been brutally suppressed by the regime's security forces but the subsequent crackdown continued.

Seeing no other option, al-Shaikh Yahya submitted, was arrested and blindfolded and taken to the Saddam Security Directorate building "for questioning." After being forced to watch one of his friends being tortured, the security officials took him to another room where he awaited his own torture. His recount of what happened next is chilling:

"[T]hey stripped me of my clothes and a security officer said "the person you saw has confessed against you". He said to me "You followers of [Ayatollah] al-Sadr have carried out acts harmful to the security of the country and have been distributing anti-government statements coming from abroad. He asked if I have any contact with an Iraqi religious scholar based in Iran who has been signing these statements. I said "I do not have any contacts with him" . . . I was then left suspended [naked and handcuffed, with a board between my elbows and knees on two high chairs]...My face was looking upward. They attached an electric wire on my penis and the other end of the wire is attached to an electric motor. One security man was hitting my feet with a cable. Electric shocks were applied every few minutes and were increased. I must have been suspended for more than an hour. I lost consciousness. . . . They repeated this method [of torture] a few times."

Al-Shaikh Yahya was regularly subjected to electric shocks and beating on his feet. For two months of his detention, he slept on the floor with his hands tied behind his back and his face on the floor. According to his testimony, this was more unbearable than the electric shocks. He was also suspended from a window non-stop for three days once, and at one point during this suspension, had a heavy weight attached to his genitals.

Five months later, al-Shaikh Yahya and 21 other detainees were transferred to a separate detention center also in Baghdad. He was detained without charge or trial for another four months, until April 14, 2000, when he was released.

[Account taken from Amnesty International, IRAQ Systematic torture of political prisoners, August 15, 2001]

Al-Shaikh Yahya's experience was not an isolated event, but just one example of how Saddam Hussein and his regime have systematically abused Iraqis in order to silence their beliefs.

**"Traitors" Are Silenced**

Since 1979, Saddam Hussein and his regime have systematically murdered, maimed, tortured, imprisoned, raped, terrorized and repressed the Iraqi people. For more than two decades, this "Republic of Fear," a term developed by noted Iraqi scholar Kanan Makiya, has targeted and preyed upon so-called enemies of the state in order to

2/10

PX266

maintain power, get rich, and acquire land. These enemies are most often innocent Iraqi citizens and include mothers, wives, school children, teachers, Muslims, Kurds, and intellectuals. His regime also routinely arrests, detains, tortures and kills the relatives of these so-called enemies. Saddam Hussein has also found enemies in neighboring Gulf States, such as Kuwait, Iran and Saudi Arabia.

> "[T]he political-legal order in Iraq is not compatible with respect for human rights and, rather, entails systematic and systemic violations throughout the country, affecting virtually the whole population." - Max van der Stoel, UN Special Rapporteur of the Commission on Human Rights in Iraq, 1999

The practice began immediately upon Saddam Hussein's becoming President in July 1979 when he ordered his security forces to publicly and forcibly remove, imprison and eventually kill several long-standing, distinguished members of the Iraqi National Assembly. He claimed that there were "traitors" in the National Assembly. Saddam Hussein calmly smoked a cigar in the Parliament as he videotaped 66 members of the Ba'th senior leadership being taken away. He later called upon other senior members of the Ba'th party leadership to participate in public "democratic executions" of their fallen comrades. Since then, the same tactics have been used to silence Iraqis of all walks of life. However you earn the title of "traitor," you will be silenced – one way or another.

> "Iraq under Saddam's regime has become a land of hopelessness, sadness, and fear. A country where people are ethnically cleansed; prisoners are tortured in more than 300 prisons in Iraq. Rape is systematic . . . congenital malformation, birth defects, infertility, cancer, and various disorders are the results of Saddam's gassing of his own people. . . the killing and torturing of husbands in front of their wives and children . . . Iraq under Saddam has become a hell and a museum of crimes."
> – Safia Al Souhail, Iraqi Citizen, Advocacy Director, International Alliance for Justice

Iraq is a nation with a rich cultural heritage. Its people have a history of intellectual and scientific achievement. Showing no respect for life, human dignity and fundamental freedoms, Saddam Hussein's totalitarian regime has turned back the clock on centuries of progress. His regime silences Iraqis who demand freedom and a normal life for themselves and their families.

## Silence by Murder

For more than 20 years, Saddam Hussein has executed perceived opponents without respect for rule of law. Saddam Hussein silences these alleged dissidents because he believes that their political beliefs, faith, ethnic background, family members or acquaintances are a threat to his power. Some are first taken as political prisoners before being executed. In February 1998, 400 prisoners at Abu Gharaib prison were executed summarily. Two months later, 100 detainees from Radwaniyah Prison were buried alive in a pit in Ramadi province. These killings were supposed to "clean out" the prisons. More than 3,000 people have been killed in a similar manner since 1997.

Summary executions in Iraq take many cruel forms. A quick yet effective method is to line up the entire male population of a village and shoot them systematically, one at a time, in order to eliminate the village. Saddam Hussein's regime, however, often prefers methods that take more time, and inflict more pain on the victim and the victim's family. His regime has poisoned political prisoners by giving them a slow-acting poison, thallium, which slowly infiltrates the system and takes several days to bring death. Iraqi citizens are often decapitated in front of family members, and at other times, they are shot in front of family members and the family is charged for the cost of the bullet. Saddam Hussein has perfected

PX266

many of these methods of murder on Kurds in Northern Iraq and religious leaders from the Shi'a community, claiming that they are disloyal to the Government. Once murdered, many Iraqis are buried in unmarked graves so that their family members cannot visit them.

> "It has been the Iraqi regime's policy to change the demography of Iraq, by eradicating the Kurdish population from areas that are deemed important in the north of the country. The regime has done this through forced deportation, arbitrary arrests, and systematic torture." – Paiman Halmat, teacher, former Iraqi citizen

As a particularly brutal example of silencing political opposition, it is estimated that at least 30,000 to 60,000 members of the Shi'a community were killed during their post-Gulf war political insurrection in southern Iraq.

### Silence Through Torture

Under Saddam Hussein's orders, the security apparatus in Iraq routinely and systematically tortures its citizens. Beatings, rape, breaking of limbs and denial of food and water are commonplace in Iraqi detention centers. Saddam Hussein's regime has also invented unique and horrific methods of torture including electric shocks to a male's genitals, pulling out fingernails, suspending individuals from rotating ceiling fans, dripping acid on a victim's skin, gouging out eyes, and burning victims with a hot iron or blowtorch.

Gwynne Roberts, a reporter for the London-based *Independent*, describes her experience in a torture center in Northern Iraq:

> In one cell pieces of human flesh – ear lobes – were nailed to the wall, and blood spattered the ceiling. A large metal fan hung from the ceiling and my guide told me prisoners were attached to the fan and beaten with clubs as they twirled. There were hooks in the ceiling used to suspend victims. A torture victim told me that prisoners were also crucified, nails driven through their hands into the wall. A favorite technique was to hang men from the hooks and attach a heavy weight to their testicles.
> – *Independent*, March 29, 1991

Foreign citizens are not spared the brutality either. Large numbers of Kuwaiti citizens were murdered, tortured and raped during the Gulf War. More than two dozen torture centers in Kuwait City have been discovered, and photographic evidence confirms reports of electric shocks, acid baths, summary execution and the use of electric drills to penetrate a victim's body. Many innocent civilian citizens were also used as human shields.

Branding and amputations have been routine in Iraqi hospitals. In 1994, the Iraqi government issued at least nine decrees that established cruel penalties such as branding. Amputation has been used against citizens convicted of military desertion. One citizen whose hand was cut off was paraded on national television as a method of instilling fear in the people.

In 1994 and 1995 alone, large numbers of soldiers had portions of their ears cut off for deserting the army. The government branded an "X" on the foreheads of these soldiers so that Iraqi citizens did not think that these soldiers were wounded war heroes. Doctors who refused to perform the operations were threatened with reprisals, and many have been arrested and detained. The Iraqi authorities also issued a decree in 1994 making it illegal for doctors to perform plastic or corrective surgery for victims of branding and amputation. In 2000, a new Iraqi decree was issued authorizing the government to amputate the tongues of citizens who criticize Saddam Hussein or his government.

PX266

**Torture Methods in Iraq**

Medical experimentation
- Beatings
- Crucifixion
- Hammering nails into the fingers and hands
- Amputating the penis or breasts with an electric carving knife
- Spraying insecticides into a victim's eyes
- Branding with a hot iron
- Committing rape while the victim's spouse is forced to watch
- Pouring boiling water into a rectum
- Nailing the tongue to a wooden board
- Extracting teeth with pliers
- Using bees and scorpions to sting naked children in front of their parents

## The Missing Are Silent

Many Iraqi citizens simply "disappear" never to be heard from again. Widespread disappearances are prevalent and occur regularly among Kurdish minorities. In 2001, Amnesty International claimed that Saddam Hussein's Government was responsible for the majority of the hundreds of thousands of persons that have disappeared in the Middle East and North Africa in recent decades.

"If you are arrested, your life is over."
- "Ahmed," an anonymous current Iraqi citizen tells Cameron W. Barr of The Christian Science Monitor (Oct. 31, 2002)

The UN Special Rapporteur on Iraq to the Commission on Human Rights has specifically documented 16,496 cases of disappearances, but states that the number of Kurds alone missing from the 1988 Anfal Campaign could reach tens of thousands. Human Rights Watch and Amnesty International place the number of disappeared between 70,000 and 150,000. According to the UN Special Rapporteur, the second largest targeted group for disappearances were the Shi'a Muslims.

## Chemical Weapons Silence Iraqi Citizens

Saddam Hussein became the first leader in the world to systematically and aggressively gas his own people. Between 1983 and 1988 alone, he murdered more than 30,000 Iraqi citizens with mustard gas and nerve agents. Several international organizations claim that he killed more than 60,000 Iraqi citizens with chemicals, including large numbers of women and children. During his two-year Anfal campaign against the Kurdish population, Saddam Hussein used these chemical weapons against more than 40 villages.

It was 6:20 PM on March 16, 1988, when a smell of apples descended on the town of Halabja. This Iraqi Kurdish town of 80,000 was instantly engulfed in a thick cloud of gas, as chemicals soaked into the clothes, mouths, lungs, eyes and skin of innocent civilians. For three days, Iraqi Air Force planes dropped mustard gas, nerve agents known as sarin and tabun, and VX, a newly manufactured and highly lethal gas. These chemicals murdered at least 5,000 civilians within hours of the initial attack, and killed and maimed thousands more over the next several years. Halabja has experienced staggering rates of aggressive cancer, genetic mutation, neurological damage, and psychiatric disorders since 1988. If you walk through the streets today, you will still see many diseased and disfigured citizens.

PX266

- Shaho was nine at the time. Within weeks, he began to suffer back pains and eventually was unable to stand or walk. 'Before the chemical attack, I was perfectly healthy ... I am certain that poison gas caused my illness. My mother lost her sight at the time, and I've got gradually worse ever since.' Shaho spends each day at home lying on his mattress, turned every thirty minutes by his devoted sister to avoid bedsores. [Gwynne Roberts, "Poisonous Weapons," Crimes of War, eds. Gutman and Rieff, (Singapore, 1999)].

- One citizen, Mr. Akra, was taken to a hospital in Iran before returning to Halabja to look for his family. "I saw over 200 bodies in just 100 meters. There was a terrible smell from the chemicals and the corpses. I went into the shelter. I first saw my grandmother. She had swollen up. Then I saw the blackened face of my mother and I lost consciousness."
  -- Guy Dinmore, Financial Times, July 10, 2002

**Women Silenced:**
**Saddam Hussein Acknowledges Violent Crimes Against Women**
Saddam does not deny the fact that his regime tortures and brutally murders women. The daily newspaper "Babel" owned by Uday, the eldest son of Saddam Hussein, contained a public admission on February 13, 2001of beheading women who are suspected of prostitution. The Iraqi Women's League in Damascus, Syria describes this practice as follows:

> "Under the pretext of fighting prostitution, units of 'Feda'iyee Saddam', the paramilitary organization led by Uday, have beheaded in public more than two hundred women all over the country, dumping their severed heads at their families door steps. Many of the victims were innocent professional women, including some who were suspected of being dissidents. Such barbaric acts were carried out in the total absence of any proper judicial procedures, even under Iraq's own Penal Code." (March 3, 2001).

**In Iraq, if you are a woman, you could face....**
- Beheading if you are accused of prostitution
- Rape, if you are related to someone the regime thinks is disloyal
- Torture, if you are related to a dissident


Reports show that many families have been required to display a victim's head on their outside fence for several days. These savage practices have been used against women of all professions. For example, an obstetrician was arrested for criticizing the corruption within the health services, but was subsequently beheaded for prostitution. Another woman with a husband and three children was beheaded without charge or trial. According to Amnesty International, her husband was wanted by the security authorities because of his alleged involvement in Islamist armed activities against the state. He managed to flee the country, but men belonging to Feda'iyye Saddam (the paramilitary unit) went to his house and found his wife, children, and mother-in-law. His wife was taken to the street and two men held her by the arms while a third pulled her head from behind and beheaded her in front of residents. The security men took the body and the head in a plastic bag and took away the children and the mother-in-law. Their fate remains unknown.

Women are often raped in order to blackmail their relatives. Men who leave Iraq and join Iraqi opposition groups regularly receive videotapes showing the rape of a female relative. These tapes are intended to discourage Iraqi nationals abroad from engaging in opposition activities. As shown below, some authorities carry personnel cards identifying their official "activity" as the "violation of women's honor."

PX266

**Statement made by Nidal Muhyi al-Shaikh Shallal, the wife of Shaikh Shallal Muhammed al-Shallal, tribal chief of the Grai'at Jibour on October 4, 2002**

… My brother was arrested in 1980. Since then, we have no idea what happened to him. The regime sent us a statement of his death in order to provoke us. My husband's brothers, who are also my cousins, were executed. They were Martyr Ra'ad Shallal Muhammed al'Shallal and Martyr Wa'd-Allah Muhammed al-Shallal. After that, our possessions were confiscated and we were expelled from our lands. Till now, one of our orchards has been turned into a secret factory for making chemical weapons. It is located in Grai'at (a suburb of Azamiyya in northern Iraq).

I was interrogated many times.  It was then that my husband fled away and went into hiding.  Then I was expelled from my government job.  Many attempts were undertaken to have my husband arrested because of his dissent.  His brothers were executed. In 1991, he participated in the Intifada (uprising), but he was captured and jailed for four months at the prison run by the Iraqi Military Intelligence.  His left rib and nose were fractured as he was being tortured, and he was exposed to several electric shocks the marks of which are still visible on his body.

Our tribe, the Jibour tribe, has been subjected to almost total extinction.  Al-Grai'at (branch of the Jibour tribe) is famous for its struggle against the Iraqi regime.  As many as 882(eight hundred and eighty-two) men from among my relatives and tribal members have been arrested and their fate is unknown.  The daughters of my uncle, namely Layla al-Jibouri, Fatima al-Jibouri, Tarfa al-Jibouri and Safa al-Jibouri, have all been executed.

## Government Betrays Children's Welfare

Saddam has no regard for the health and welfare of the children of Iraq. Since the Gulf War alone, Saddam Hussein has built 48 lavish palaces for himself. Meanwhile, pharmaceutical supplies intended for sick children are being exported for resale overseas. Medicine and medical supplies that are desperately needed by children are frequently delayed because regime members demand bribes from suppliers. The lack of healthcare in Iraq has led to the reemergence of diseases that had been exterminated years ago, including cholera and polio.

In addition, the regime takes minority children hostage to force their families to relocate, thereby increasing the Sunni Arab majority in particular regions. They also force children between the ages of 10 and 15 to attend 3-week training courses in weapons' use, hand-to-hand fighting, rappelling from helicopters, and infantry tactics. These children endure 14 hours of physical training and psychological pressure each day. Families that do not want their children to attend this rigorous training course are threatened with the loss of their food ration cards.

[M]illions of innocent people in Iraq are suffering. Their daily life has been significantly disrupted with respect to the distribution and quality of food, pharmaceuticals and sanitation supplies, as well as the lack of clean drinking water. All of these elements have severely interfered with the functioning of basic health and education systems and have undermined the right to work.
-- 1999 Report by the UN Special Rapporteur on the human rights situation in Iraq

**In Saddam's Iraq, if you are a child, you could face....**
- Inadequate nutrition or medicine because the Saddam limits imports and distributes much of those to his friends and allies

- Abduction, if you are a non-Arab living in an oil-producing area

- Having to report what your parents say about the regime

PX266

## The Silent Voice of Iraqi Voters

As the world community increasingly embraces individual liberties, pluralism and representative government, Iraqi citizens do not have the right to change their government. Saddam Hussein has silenced the political opposition and has not held true elections since his rise to power in 1979. The Iraqi Constitution also provides for freedom of association. However, Iraqi law makes past, present and future associations with parties other than the Ba'th party punishable by death. He relies on his 1995 and 2002 un-democratic "referenda" to legitimize his presidency. In the most recent referendum, "confidential ballots" were marked with a number so that the government could identify the voter. There was only one name on the ballot: "Saddam Hussein – Yes or No." Citizens understood the consequences of becoming one of Saddam Hussein's "enemies." He claimed a remarkable 100 percent victory, an increase over the 99.96% result in 1995.


The Ba'th Arab Socialist Party
One Arab Nation With An Eternal Message

-Decree of the Revolutionary Command Council-

Punishable by execution:

1- Any member of the Ba'th Arab Socialist Party who purposely conceals his previous political and party affiliations, and commitments.
2- Any current or former member of the Party who, under proof, is found to be linked during his membership to any other party or political [group] or of working for them and their interests.
3- Any current or former member of the Party who joined another party or political [group] or worked for them and their interests after terminating his relations with the Party.

I, Majid Arshad Mahmud, have been apprised of the Revolutionary Command Council's decree, and will be responsible before the law in the event that I violate the decree's provisions. Accordingly, I signed.

Name: Majid Arshad Mahmud
Residential Address: Irbil, al-'Arab
Work Address: Employee/Irbil hospital
Date:11 Jan 1979

[Signature]
Confirm veracity of signature by a cell.
Confirm veracity of signature by the command of a division.

[Signature]
Stamp of the Division


## Independent Thought or Beliefs are Silenced

Through history, Iraqi scholars have contributed to the development of political thought. Today, however, there is no political debate nor are there even articles in Iraqi newspapers that question the government. Those who have tried are now in exile or dead.

PX266

In September 1999, Hashem Hasan, a noted journalist and Baghdad University Professor, was arrested after he declined an appointment as editor of one of Uday Hussein's government-controlled publications. His fate is unknown. Press freedom is nonexistent because the government controls the media. Although the Iraqi Constitution provides for freedom of assembly, citizens of Iraq are not permitted to assemble for any purpose other than to express support for the Government. They are also not permitted to leave Iraq and travel like citizens living in free countries. Specific government authorization, expensive exit visas, and a requirement that the government must be paid collateral in order to travel are all examples of how Saddam Hussein holds Iraqi citizens hostage in a country many want to leave. Professors and journalists who are allowed to leave the country are interrogated upon their return to ensure that they are still "loyal" to the Iraqi government.

**In Saddam's Iraq, if you are an Iraqi who is Chaldean Christian, Turkmen or other ethnic minority, or if you are a member of the Shi'a majority, you could face...**

- Forced relocation if you live in an area the regime wants to control or clear
- Prohibitions on your religious study and practice
- Prohibitions on the study of your language, such as Syriac, and its use in religious practice
- No protection from mob violence
- Discrimination in school, work and government

The Iraqi Constitution also provides for freedom of religion which does not violate "morality and public order." However, freedom of religion is virtually nonexistent in Saddam Hussein's Iraq. The Iraqi Shi'a community makes up approximately 60 percent of the Iraqi population, yet the Ba'th party, comprised of Sunni Arabs, controls power and has outlawed most common methods of Shi'a prayer. In many areas, Shi'a Muslims are not allowed to participate in their Friday prayers. Shi'a programs are completely banned on the government-controlled radio and television, and Shi'a prayer books and guides cannot be published in Iraq. Thousands of Shi'a writings have been prohibited throughout Iraq.

## The International Community Speaks Out Against Saddam Hussein

Since 1945, the United Nations and regional organizations have come together to create a world where fundamental freedoms and human dignity are respected. For the past 20 years, Iraq has moved in the opposite direction. International law forbids torture, murder and the infliction of cruel, inhuman or degrading punishment; yet

PX266

Saddam Hussein has created a system flagrantly violating these international laws and parading abuses in front of the world community. Over the past 20 years, his attacks on the Iraqi people have been persistently recorded and denounced by the international community.

> The United Nations Security Council "condemns the attempts by Iraq to alter the demographic composition of the population of Kuwait. . . ." – UN Security Council Resolution 677 of 28 November 1990

> The United Nations Security Council "condemns the repression of the Iraqi civilian population in many parts of Iraq . . . " – UN Security Council Resolution 688 of 5 April 1991

>> After his 1999 trip to Iraq, Max Van Der Stoel, UN Special Rapporteur of the Commission on Human Rights in Iraq reported the following to the Chairperson of the Commission on Human Rights:

>> "I received their testimonies, ranging from individuals who showed me their scars and wounds from torture to the hundreds of Kurdish women who held up their fingers indicating the numbers of family members who had been taken by the Iraqi authorities and subsequently disappeared" .

> "the prevailing regime of systematic human rights violations is contrary to Iraq's many international obligations . . . ." – UN Special Rapporteur of the Commission on Human Rights in Iraq, 1999

> "Saddam Hussein remains a threat to stability in the Middle East . . . .He is still pursuing total control over the people of Iraq and is ready to engage in systematic repression. . . ." – Prime Minister of Great Britain, Tony Blair, 17 February 2001

> "The mere suggestion that someone is not a supporter of the President carries the prospect of the death penalty." – Andreas Mavrommatis, U.N. Special Rapporteur, U.N. Secretary General's Report , 2001

U.N. Security Council Resolution 1441 of November 8, 2002, gives Iraq another chance:

> "I urge the Iraqi leadership . . . to seize this opportunity and thereby begin to end the isolation and suffering of the Iraqi people." – U.N. Secretary General Kofi Annan, November 8, 2002

The international community stands behind the people of Iraq. Despite Saddam Hussein's many attempts to silence the Iraqi people, their voices and stories are being heard.

PX266

PX268

**DATE AND TIME:** February 13, 1984, 8:30 a.m. to 5 p.m.; and February 14, 1984, 8:30 a.m. to 12 noon.

**ADDRESS:** National Aeronautics and Space Administration, FB 10–B, February 13, Room 625–T, and February 14, Room 226–A, 600 Independence Ave. SW, Washington, D.C.

**FOR FURTHER INFORMATION CONTACT:** Henry V. Bielstein, M.D., Code EB, National Aeronautics and Space Administration, Washington, DC 20546 (202/453–1546).

**SUPPLEMENTARY INFORMATION:** The Life Sciences Advisory Committee consults with and advises the Council and NASA on the accomplishments and plans of NASA's Life Sciences Programs.

This meeting will be closed to the public from 4 p.m. to 5 p.m. on February 13 for a discussion of candidates being considered for Committee membership. During this session, the qualifications of proposed new members will be candidly discussed and appraised. Since this session will be concerned throughout with matters listed in 5 U.S.C. 552(c)(6), it has been determined that this session should be closed to the public. The remainder of the meeting will be open to the public up to the seating capacity of the room (approximately 35 persons including committee members and other participants).

*Type of Meeting*

Open—except for a closed session as noted in the agenda below.

*February 13, 1984*

8:30 a.m.—Committee Functions (Open session).

9 a.m.—SL-1 Preliminary Results (Open session).

10:30 a.m.—Review Life Sciences' Program Plan (Open session).

1 p.m.—Review of Space Station Plan (Open session).

4:00 p.m.—LSAC Membership (Closed session).

*February 14, 1984*

8:30 a.m.—Status of Space Biomedical Institute (Open session).

9:30 a.m.—Advocacy Paper (Open session).

12 noon—Adjourn.

Dated: January 17, 1984.

**Richard L. Daniels,**
*Director, Management Support Office, Office of Management.*

[FR Doc. 84-1748 Filed 1-20-84; 8:45 am]

**BILLING CODE 7510-01-M**

## PACIFIC NORTHWEST ELECTRIC POWER AND CONSERVATION PLANNING COUNCIL

### Hydropower Options Task Force; Regular Meeting Notice

**AGENCY:** Hydropower Options Task Force of the Pacific Northwest Electric Power and Conservation Planning Council (Northwest Power Planning Council).

**ACTION:** Notice of meeting.

Notice of meeting to be held pursuant to the Federal Advisory Committee Act, 5 U.S.C. Appendix I, 1–4. Activities will include:

- Review of Hydropower Options Task Force Charter
- Discussion of Bonneville proposal
- Discussion of Work Schedule
- Business
- Public Comment.

**STATUS:** Open.

**SUMMARY:** The Northwest Power Planning Council hereby announces a forthcoming meeting of its Hydropower Options Task Force.

**DATE:** Tuesday, January 31, 1984. 9 a.m.

**ADDRESS:** The meeting will be held at the Council Hearing Room at 700 SW. Taylor; Suite 200, in Portland, Oregon.

**FOR FURTHER INFORMATION CONTACT:** Tom Foley, (503) 222–5161.

**Edward Sheets,**
*Executive Director.*

[FR Doc. 84-1787 Filed 1-20-84; 8:45 am]

**BILLING CODE 0000-00-M**

## DEPARTMENT OF STATE

### Office of the Secretary

[Secretarial Determination 84–3]

### Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran

In accordance with Section 6(i) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(i), I hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism.

**George P. Shultz,**
*Secretary of State.*

[FR Doc. 84-1825 Filed 1-20-84; 8:45 am]

**BILLING CODE 4710-08-M**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### National Airspace Review; Meeting

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** National Airspace Review Plan Revision.

**SUMMARY:** On April 22, 1982, the National Airspace Review plan was published in the **Federal Register.** The plan encompassed a review of airspace use and the procedural aspects of the air traffic control system. Subsequent revisions to the schedule of various task groups have been made. This notice advises that Task Group 2–4.4, Helicopter Operations, Approach Procedures, which was scheduled to begin February 20, 1984, has been postponed until after April 30, 1984, in order to ensure availability of pertinent flight test data results to the task group. A specific date for this task group session will be provided in a subsequent notice in conjunction with other plan revisions.

**FOR FURTHER INFORMATION CONTACT:** National Airspace Review Program Management Staff, room 1005, Federal Aviation Administration, 800 Independence Avenue. SW., Washington, D.C. 20591, 202–426–3560.

Issued in Washington, D.C., on January 11, 1984.

**Karl D. Trautmann,**
*Manager, Special Projects Staff Air Traffic Service.*

[FR Doc. 84-1750 Filed 1-20-84; 8:45 am]

**BILLING CODE 4910-13-M**

### Radio Technical Commission For Aeronautics (RTCA), Special Committee 151—Airborne Microwave Landing System Area Navigation Equipment; Meeting

Pursuant to section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463; 5 U.S.C. App. I) notice is hereby given of a meeting of RTCA Special Committee 151 on Airborne Microwave Landing System (MLS) Area Navigation Equipment to be held on February 8–10, 1984, in the RTCA Conference Room, One McPherson Square, 1425 K Street NW., Suite 500, Washington, D.C. commencing at 9:30 a.m.

The Agenda for this meeting is as follows: (1) Chairman's Introductory Remarks; (2) Approval of Minutes of the

PX268

PX270



MIPT

5 0861 01001402 9

# PATTERNS
# OF GLOBAL
# TERRORISM:
# 1990

**MIPT**
**National Memorial Institute**
**for the Prevention of Terrorism**
**in Oklahoma City**

PX270

PX270

**Patterns of Global
Terrorism: 1990**

## Introduction

The continuing decline in the number of international terrorist incidents during 1990 is encouraging. From a peak of 856 in 1988, the number of incidents decreased to 455 in 1990. Even more encouraging are the increasing counterterrorist cooperation among governments and our numerous successes in bringing the rule of law to bear on terrorists.

As part of our overall counterterrorist strategy, the United States works with other governments to identify, apprehend, and prosecute terrorists. Many terrorist trials were successfully completed in 1990, and many more cases are still in progress.

Through training provided under the Department of State's Anti-Terrorism Training Assistance Program, we have improved the ability of other governments to preempt, or to investigate and prosecute, terrorist attacks. The program has been extremely successful, and in 1990 for the first time law enforcement officials from the newly democratic East European states participated.

Another important element of our counterterrorist effort, the Rewards for Terrorism Information Program, received a significant boost in 1990. This program provides rewards for information that leads to the ''prevention, frustration, or favorable resolution of terrorist acts against US persons or properties overseas.'' Late in 1989, Congress increased the ceiling for an individual reward to $2 million. Rewards of more than $500,000 have been paid under this program. In 1990, the Air Transport Association (ATA) and the Air Line Pilots' Association (ALPA) matched the reward ceiling with $2 million to create a potential $4 million reward for information about attacks on civil aviation.

Despite this good news, the threat of terrorism remains. Still, the progress we have made reinforces our conviction that our counterterrorist policy is working and that continued vigilance will increase the effectiveness of our efforts.

iii

PX270

**Legislative Requirements**

This report is submitted in compliance with Title 22 of the United States Code, Section 2656f (a) , which requires the Department of State to provide Congress with a full and complete annual report on terrorism for those countries and groups meeting the criteria of Section (a) (1) and (2) of the Act.

As required by legislation, the report includes detailed assessments of foreign countries where significant terrorist acts occurred and countries about which Congress was notified during the preceding five years pursuant to Section 6 ( j ) of the Export Administration Act of 1979 (the so-called terrorist list countries that have repeatedly provided support for international terrorism) . In addition, the report includes all relevant information about the previous year's activities of individuals, terrorist groups, or umbrella groups under which such terrorist groups fall, known to be responsible for the kidnapping or death of any American citizen during the preceding five years, and groups known to be financed by "terrorist list" countries.

**Definitions**

No one definition of terrorism has gained universal acceptance. For the purposes of this report, we use the definition of terrorism contained in Title 22 of the United States Code, Section 2656f (d) . That statute contains the following definitions:

• The term terrorism means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational or clandestine agents, usually intended to influence an audience. *

*For purposes of this definition, the term noncombatant target is interpreted to include, in addition to civilians, military personnel who at the time of the incident are unarmed and/or not on duty. For example, in past reports we have listed as terrorist incidents the murders of the following military personnel: Col. James Rowe, killed in Manilla in April 1989; Capt. William Nordeen, US defense attache, killed in Athens in June 1988; the two servicemen killed in the La Belle disco bombing in West Berlin in April 1986; and the four off-duty US Embassy Marine guards killed in a cafe in El Salvador in June 1985. We also consider as acts of terrorism attacks on military installations or on armed military personnel when a state of military hostilities does not exist at the site, such as bombings against US bases in Europe, the Philippines, or elsewhere.

PX270

- The term international terrorism means terrorism involving citizens or the territory of more than one country.
- The term terrorist group means any group practicing, or that has significant subgroups that practice, international terrorism.

The United States Government has employed this definition of terrorism for statistical and analytical purposes since 1983.

In a number of countries, domestic terrorism, or an active insurgency, has a greater impact on the level of political violence than does international terrorism. Although not the primary purpose of this report, we have attempted to indicate those areas where this is the case.

**Note**

Adverse mention in this report of individual members of any political, social, ethnic, religious, or national group is not meant to imply that all members of that group are terrorists. Indeed, terrorists represent a small minority of dedicated, often fanatical, individuals in most such groups. It is that small group—and their actions—that is the subject of this report.

> Ambassador Morris D. Busby
> Coordinator for Counterterrorism

v

PX270

**Contents**

|  |  | Page |
|---|---|---|
| Introduction |  | iii |
| The Year in Review |  | 1 |
| African Regional Overview |  | 2 |
|  | Angola | 2 |
|  | Djibouti | 2 |
|  | Ethiopia | 3 |
|  | Liberia | 3 |
|  | Mozambique | 3 |
|  | Somalia | 3 |
|  | South Africa | 3 |
|  | Sudan | 4 |
| Asian Regional Overview |  | 4 |
|  | Afghanistan | 4 |
|  | India | 4 |
|  | Japan | 5 |
|  | Papua New Guinea | 5 |
|  | Philippines | 6 |
|  | South Korea | 7 |
|  | Sri Lanka | 7 |
| European Regional Overview |  | 7 |
|  | Belgium | 8 |
|  | Cyprus | 8 |
|  | Eastern Europe | 8 |
|  | France | 9 |
|  | Germany | 10 |
|  | Greece | 11 |
|  | Ireland | 12 |
|  | Italy | 12 |
|  | Netherlands | 13 |
|  | Soviet Union | 13 |
|  | Spain | 14 |
|  | Sweden | 15 |

PX270

| | | |
|---|---|---|
| Switzerland | | 15 |
| Turkey | | 16 |
| United Kingdom | | 17 |
| Yugoslavia | | 17 |
| Latin American Regional Overview | | 18 |
| Bolivia | | 19 |
| Chile | | 19 |
| Colombia | | 21 |
| El Salvador | | 22 |
| Guatemala | | 22 |
| Honduras | | 23 |
| Nicaragua | | 23 |
| Panama | | 23 |
| Peru | | 24 |
| Trinidad and Tobago | | 24 |
| Middle Eastern Regional Overview | | 25 |
| Algeria | | 26 |
| Egypt | | 26 |
| Israel | | 26 |
| Jordan | | 28 |
| Kuwait | | 29 |
| Lebanon | | 29 |
| Saudi Arabia | | 29 |
| Yemen | | 32 |
| State-Sponsored Terrorism | | 32 |
| Cuba | | 33 |
| Iran | | 33 |
| Iraq | | 34 |
| Libya | | 35 |
| North Korea | | 35 |
| Syria | | 35 |

PX270

**Appendixes**

| | | |
|---|---|---|
| A. | Statistical Review | 37 |
| B. | Chronology of Significant Terrorist Incidents: 1990 | 43 |
| C. | Background Information on Major Groups Discussed in the Report | 49 |
| D. | International Terrorist Incidents, 1990 | 77 |

**Insets**

| | |
|---|---|
| Multinational Efforts To Counter Terrorism | 20 |
| The Palestinian Uprising | 28 |

**Tables**

| | |
|---|---|
| Foreign Political Hostages Believed Held in Lebanon, 1990 | 30 |
| Foreign Political Hostages Released in 1990 and January 1991 | 31 |

PX270

PX270

# Patterns of Global Terrorism: 1990

## The Year in Review

The year 1990 was one of the few in recent times in which there were no "spectacular" terrorist incidents resulting in the death or injury of a large number of victims. Despite this fact, there were a number of major terrorist developments, including a heightened international terrorist threat owing to Iraq's renewed association with terrorist groups worldwide.

Perhaps the most significant development occurred in the wake of the 2 August Iraqi invasion of Kuwait. A number of Palestinian groups, including the Palestine Liberation Front (PLF), the Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP), and the Popular Front for the Liberation of Palestine–General Command (PFLP-GC), pledged their support for Saddam Hussein, and most threatened terrorist attacks against the West, Israel, and moderate Arab targets in the event of war. Although by year's end no such attacks had taken place, the threat remained high.

Another significant development was the abortive 30 May attack on Israeli beaches by the PLF. The PLF is a member of the Palestine Liberation Organization (PLO) and is therefore subject to the PLO's "renunciation" of terrorism. Following the PLO's refusal to condemn the attack, the United States suspended its dialogue with the PLO, pending action by the PLO demonstrating that it abides by the conditions it accepted in December 1988.

Both of these events highlight the continuing importance of states that support terrorists and sponsor terrorist attacks. The PLF attack on Israel was planned and executed from Libya. In 1990 Iraq, which provides support for a growing number of terrorist allies, was returned to the US Government's list of state sponsors of terrorism. The other countries on that list—Cuba, Iran, Libya, North Korea, and Syria—continued to provide varying degrees of support—safehaven, travel documents, arms, training, and technical expertise—to terrorists.



Robert Polhill, one of eight Western hostages released in 1990. *UPI ©*

Latin America emerged in 1990 as the most frequent site for terrorist attacks against US interests. Most of these attacks took place in Chile, Peru, and Colombia. Latin American radical or guerrilla groups engaging in terrorism tended to attack domestic, rather than foreign, targets. Thus, although the number of international terrorist incidents was high, the escalating domestic political violence had an even greater impact on the region.

There was a marked increase in international terrorism in Asia in 1990, primarily because of increased activity by the Communist New People's Army (NPA) in the Philippines. At the same time, South Asia suffered from a notable upsurge in terrorism, particularly in Pakistan where the Afghan secret service was responsible for a rash of terrorist attacks.

There were several positive developments regarding terrorism in 1990. Eight Western hostages held in the Middle East—including Americans Robert Polhill and Frank Reed—were released from captivity. Furthermore, no

PX270

Westerners were taken hostage in Lebanon during 1990. Another positive development was the marked decline in terrorism in the Middle East and a reduction in Middle Eastern ''spillover'' terrorism in other regions.

The advent of democracy in Eastern Europe brought a change in East European states' attitudes toward terrorism. The new East European governments were eager to expose the support previous regimes had provided to terrorists, such as East German safehaven for Red Army Faction (RAF) terrorists and Czechoslovak sales of Semtex plastic explosives. Terrorists no longer find official support or safehaven in the emerging democracies of Eastern Europe.

The trend toward multinational cooperation on counterterrorist issues continued during the year. Following major terrorist attacks such as the Pan Am 103 and UTA 772 bombings, the United Nations directed the International Civil Aviation Organization (ICAO) to develop a method of ''marking'' plastic explosives for preblast detection. Substantial work was completed by ICAO members on a convention requiring all manufacturers of plastic explosives to add chemicals to the explosives that would make them easier to detect. An agreement, called the Convention on the Marking of Plastic Explosives for the Purpose of Detection, was signed in early 1991.

Continuing the trend of previous years, a number of important terrorist trials took place in 1990, as governments continued to impose the rule of law on terrorists.

## African Regional Overview

There were 52 international terrorist incidents in Africa in 1990, just slightly more than in the previous year. The most significant of these incidents occurred in Djibouti in September, when handgrenades thrown into two downtown cafes killed a child and wounded 17 persons. As in previous years, most acts of terrorism in Africa were conducted by local insurgents. In Liberia, Mozambique, and Somalia, for example, while a few international terrorist incidents took place in the context of bitter struggles against those governments, there were many more incidents of domestic terrorism. When foreigners were involved, they were usually targets of opportunity.

## Angola

On 27 April, the Front for the Liberation of the Enclave of Cabinda (FLEC), an Angolan separatist group, kidnapped 13 French nationals and a number of Congolese citizens at a French oil-prospecting company's site near the Congolese border with Cabinda. Cabinda is an Angolan enclave separated from the rest of the country by a narrow strip of Zaire. Nine French nationals and some of the Congolese were released within a few hours; the remaining hostages were released on 10 May. Two Portuguese aid workers were kidnapped by FLEC in September and released approximately two months later.

In October, an American was kidnapped in Cabinda Province by a different Cabindan separatist group, the Front for the Liberation of the Enclave of Cabinda–Military Position (FLEC-PM) . He was released in December.

Both the Angolan Government and the National Union for the Total Independence of Angola (UNITA) have publicly and repeatedly accused each other of practicing terrorism against their opponents, including the kidnapping, killing, torturing, or maiming of civilians, but few of these allegations could be independently verified. However, UNITA leader Jonas Savimbi publicly acknowledged that a French national captured by UNITA in a war zone had died while being marched to the Zairean border, where he was to have been released.

## Djibouti

There was one act of international terrorism in Djibouti in 1990. On 27 September, several grenades were thrown from a passing taxi into the Cafe de Paris, a sidewalk cafe in the capital, killing a 10-year-old French boy and injuring 17 other persons. Grenades also were thrown at the Cafe L'Historil, but they failed to explode. A previously unknown group, the Djibouti Youth Movement, claimed responsibility for the attacks. Four Djibouti youths were arrested and charged in early October. During arraignment, they recanted their earlier confessions, saying they had been tortured. Djiboutian authorities are continuing their investigations.

The Tunisian national charged in the 1987 bombing of the Cafe L'Historil, in which 11 persons were killed, remains imprisoned awaiting trial.

2

PX270

### Ethiopia

On 30 March, a bomb exploded at the Hilton Hotel in Addis Ababa, causing damage to one room. The following day the Ethiopian Government expelled two Libyans, apparently for their alleged involvement. An Israeli diplomat staying in the hotel may have been the intended target.

### Liberia

During much of 1990, Liberia was torn by a bitter civil war between the Armed Forces of Liberia (AFL), loyal to President Samuel Doe, and two factions—the National Patriotic Front of Liberia (NPFL), led by Charles Taylor, and the Independent National Patriotic Front of Liberia (INPFL), led by Prince Johnson. The battlelines were also drawn between ethnic groups, as members of rival groups sought out and massacred each other. A cease-fire has been in effect since 2 December.

In August, an American missionary was kidnapped by members of the Armed Forces of Liberia. Beaten and shot in the legs, he later died. His body was returned at the same time that another kidnapped American was released.

The NPFL ambushed a train and kidnapped two passengers—a British journalist and a Liberian national. The Englishman was released five days later. The NPFL has been accused of direct responsibility for the deaths of several Economic Community of West African States (ECOWAS) members, including two Nigerian journalists.

Prince Johnson's INPFL kidnapped a number of foreigners, including one American, ostensibly to force ECOWAS to intervene in the Liberian civil war. All of the hostages were released a few days later.

### Mozambique

The Mozambican National Resistance (RENAMO) movement continued its 16-year-old insurgency in 1990, conducting terrorist attacks mostly against peasants who refused to cooperate with them. Soft targets, such as schools and villages, continued to be attacked frequently, and as many as several thousand Mozambicans were killed by the group. In February, RENAMO kidnapped a Zimbabwean businessman and a British professor; the two were rescued by a joint Zimbabwean-Mozambican military operation. In June, the group kidnapped two Swiss Red Cross workers and held them for four days. There were indications in late 1990 that RENAMO leaders were attempting to reduce the number of attacks on civilians.

In addition to RENAMO, bandits and undisciplined government troops continued to raid and loot villages. Indiscriminate violence on both sides has led to near anarchy in much of the countryside. Under these conditions, apprehension and prosecution of domestic terrorists are not feasible.

Direct talks between the Government of Mozambique and RENAMO produced an agreement in late 1990 to designate two land transport routes as "peace corridors," which would not be attacked. These talks are expected to continue. Previous government offers of amnesty to RENAMO supporters were ineffective.

### Somalia

Antiregime elements were probably responsible for a series of bombing attacks throughout the year. Numerous attacks were carried out against Somali targets in an attempt to oust the government of President Siad Barre. Among the non-Somali targets were the mission of the European Community (EC) and the Libyan, Iraqi, and Chinese Embassies. The bombings caused only superficial damage to the three embassy buildings. A guard at the EC mission was injured by the blast. In May, a grenade exploded on the US Embassy compound in Mogadishu. No one claimed responsibility for the attack.

### South Africa

In 1990, the South African Government began preparations for a transition to nonracial democracy by lifting the ban on opposition organizations, releasing political prisoners—including Nelson Mandela—and entering into talks with the African National Congress (ANC). In August, the ANC agreed to suspend its armed struggle against the government.

These developments led to a virtual end to violent repression by the government and violent resistance by the opposition. There was, however, a major escalation in black factional violence. More than a thousand people were killed in this fighting. Some human rights observers alleged that rightwing extremist elements of the security forces were contributing to the factional violence.

White extremists, in protests against apartheid reforms, carried out a series of terrorist attacks against both domestic and foreign elements. On 4 February, shots were fired at the British Embassy in Pretoria. A previously

PX270

unknown group, the Order of the Boer People, claimed responsibility. Later in the year, the same group was responsible for the homemade bomb that exploded at the residence of US Ambassador William Swing, damaging a gatepost and a guardhouse. Three people were arrested in connection with this incident. On 6 July, an explosion at a crowded taxi and bus terminal used by black commuters in Johannesburg injured 23 people and damaged eight vehicles. The White Liberation Army—also previously unknown—claimed responsibility. On 12 September, a bomb exploded at the ruling National Party offices in Pretoria. A supporter of rightwing extremist Piet "Skiet" Rudolph claimed responsibility.

In November, the government released the findings of the Harms Commission investigation into charges of government-directed terrorism. The Commission concluded that the Civil Cooperation Bureau (CCB)—a covert element of the South African Defense Force—was involved in the murder of at least two people and conspired to kill at least three others. The CCB was found to have been responsible for at least one bombing as well. Antiapartheid activists criticized the Harms Commission report, particularly the narrow scope of its investigation and the Commission's inability to gain access to key witnesses and records. Many killings that have been linked to CCB "hit squads" remained unsolved, including the murders in 1989 of antiapartheid activist David Webster in Johannesburg and South-West Africa People's Organization (SWAPO) official Anton Lubowski in Namibia. In mid-1990 the government announced that the CCB would be disbanded.

### Sudan

The five Abu Nidal organization (ANO) terrorists tried and convicted for their roles in the bombings in 1988 at the Acropole Hotel and the Sudan Club remained imprisoned at year's end, but they were released in January 1991. The Sudanese courts had sentenced the five to death but later ruled that the families of the victims, who were all British or Sudanese, had the option of accepting cash payments as compensation—in which case the terrorists would not be executed. The British families refused to accept payment of "blood money" but also opposed the death penalty.

Khartoum has a close relationship with Iraq and increasingly warm ties to Iran. In 1990, Sudan signed an "integration agreement" with Libya that, among other things, permits the Libyans much easier access to Sudan.

### Asian Regional Overview

The number of international terrorist incidents in Asia increased dramatically in 1990, from 56 incidents in 1989 to 96. This increase was primarily due to greater activity by Afghan agents in Pakistan and Communist guerrillas in the Philippines. The greatest threat to Americans in the region remains in the Philippines, where Communist insurgents launched attacks against US facilities and killed five Americans. In South Korea, radical students conducted several attacks against US facilities. Domestic political violence including sectarian and communal violence in India, particularly in Kashmir and Punjab, and the festering insurgency in Sri Lanka were also of concern in 1990.

### Afghanistan

The number of international terrorist incidents reported in Pakistan increased sharply in 1990 because of a renewed bombing campaign by the Afghan secret police, WAD. The WAD is believed responsible for 35 of the 45 international terrorist incidents recorded in Pakistan. Dozens of people were killed and many more injured in WAD attacks. Although WAD attacks are ostensibly against Pakistan-based Afghan resistance fighters and refugees, the targeting of markets, movie theaters, train stations, and other public gathering places suggests the goal is to intimidate and undermine the Pakistani Government's willingness to host the Afghan refugees.

### India

Sectarian and ethnic conflicts within India resulted in the deaths of several thousand civilians at the hands of terrorist groups. Sikh extremists in Punjab continued to use terrorist tactics to advance their political agenda. Nearly 5,000 civilians died in the state, mostly as a result of indiscriminate violence by Sikh extremists. Although a majority of the victims were Sikhs, machinegun attacks on crowded markets in predominantly Hindu towns and bombings of buses and trains were commonplace. Central government rule, imposed in 1987, remained in effect at year's end.

In Kashmir, separatist groups capitalized on the popular perception among the state's Muslims that New Delhi has discriminated against them politically and economically.

4

Separatist groups stepped up their campaign of violence, bombing schools and other public buildings. By year's end, some 2,300 people had died in Kashmir as a result of the violence. On 6 April, the Jammu and Kashmir Liberation Front (JKLF), the most prominent separatist group, kidnapped the vice chancellor of Kashmir University, his secretary, and an official of the state-run Hindustan Machine Tools. Several days later, the three were murdered after the government refused to swap jailed militants for them. In July, the JKLF kidnapped the son of a Kashmiri government official and held him for three days.

Other Kashmiri separatist groups also conducted acts of terrorism. The Mujahidin Kashmir claimed responsibility for the 12 April bombing of a passenger train in Bombay, which injured 30 people. The Allah Tigers claimed responsibility for killing an Indian intelligence officer in early September.

The United Liberation Front of Assam (ULFA), which was banned by the government in November, has conducted assassinations and extortions as part of its drive for an independent Assamese state. Other tribal-based groups employed terrorism in their separatist struggles.

The Indian Government charges that Sikh and Kashmiri extremists have received training, arms, and sanctuary from Pakistan—charges denied by Pakistani authorities.

The ineffectiveness of local security services has hampered Indian attempts to counter domestic terrorism in areas of secessionist and communal violence. The Government of India frequently deploys paramilitary or military forces to restore basic law and order in terrorist-afflicted areas. In 1990, the government announced the creation of a paramilitary group called the National Rifles, whose task is to assist the security services in tumultuous areas like Punjab and Assam.

### Japan
In November, Chukaku-ha, Japan's most active ultraleftist group, threw two small homemade grenades over the wall of the US Consul General's home in Osaka, causing minor damage. This incident was part of a rash of relatively minor violence surrounding the enthronement ceremonies for the Emperor.

Throughout the year, ultraleftists opposed to the imperial system carried out a series of attacks against Japanese targets. In early January, homemade rockets caused minor damage to the Tokyo residence of Prince Hitachi, the Emperor's younger brother, and struck the Kyoto Imperial Palace but caused no damage. In late January, Chukaku-ha set fires on seven trains in several prefectures; there were no injuries and only minor damage.

Ultraleftist groups carried out approximately 40 attacks with homemade mortars and incendiary devices to protest the 12 November enthronement of Emperor Akihito. The radicals fired rockets at four Self-Defense Force facilities in Tokyo and neighboring prefectures but caused no damage or casualties. Rockets that veered off course hit several buildings in Tokyo, causing minor damage. The groups also set fire to several railway lines and Shinto shrines in and around Tokyo. Before the enthronement, the Kakurokyo Hazama-ha bombed a police dormitory in Tokyo, killing one officer and injuring six others.

The Japanese Red Army (JRA) did not conduct any terrorist operations in 1990. Its leadership remains based in the Bekaa Valley of Lebanon. The cases of JRA members Osamu Maruoka and Hiroshi Sensui—arrested in 1987 and 1988, respectively—are still under adjudication in Japan.

Radical rightwing groups carried out only one incident in 1990. A member of the minuscule Seikijuku (Righteous Spiritual School) shot and wounded the mayor of Nagasaki on 18 January.

### Papua New Guinea
The Free Papua Movement (OPM) kidnapped an American missionary, a New Zealand missionary, three Filipinos, and a Papua New Guinean near the Indonesian–Papua New Guinean border in November. The OPM, which has

PX270

been fighting for the independence of Irian Jaya since it was annexed by Indonesia in 1961, demanded that talks be arranged with officials of the Papua New Guinean Government. The captives were released in good condition after 12 days.

## Philippines

In the Philippines, the New People's Army (NPA), the military wing of the Communist Party of the Philippines (CPP), continued to target US personnel and installations as part of its campaign against US military bases:

- In January, a bomb exploded outside the United States Information Service (USIS) office in Davao, causing minor damage.

- In late February, the NPA killed an American geologist, his Filipino wife, and his father-in-law in an ambush in Bohol Province. The father-in-law, a prominent local official, is believed to have been the target of this attack.

- In early March, a US rancher in southern Luzon was slain by the NPA for refusing to pay Communist taxes.

- The NPA was responsible for the slaying of two US airmen near Clark Airbase on 13 May and may have been responsible for the assassination of a Marine sergeant on 4 May.

- On 18 May, two rifle grenades were fired at the USIS office in Manila; one exploded, causing minor damage.

- A US Peace Corps volunteer (PCV) was kidnapped and held by the NPA on Negros Island from mid-June until 2 August, when he was released unharmed. The volunteer's disappearance was not made known until two weeks after his abduction. By that time, the US Government had already decided to withdraw all PCVs from the Philippines because of the NPA threat. A Japanese aid worker, also kidnapped by the NPA, was released 2 August.

- Small-arms fire caused minor damage to the USIS building in Davao on 2 July.

- Communists bombed the Voice of America transmitter tower in Concepcion (Tarlac) on 17 September, causing limited damage.

- An American businessman was reportedly kidnapped by the NPA on 19 October in the northern Province of Cagayan. No claim of responsibility or demands were received, and he was still missing at the end of the year.

- Two rifle grenades were fired at the US Embassy on 10 November, but caused no damage or injuries.

The Aquino administration continues to press its international campaign against supporters of the Communists. The Philippines successfully lobbied the Dutch Government to reject CPP founder Jose Maria Sison's application for political asylum. Manila also continues to publicize the diversion of funds by the Communists' National Democratic Front to the CPP/NPA.

In April, the government arrested NPA Deputy Chief of Staff Antonio Cabardo upon his return from Hong Kong; Cabardo was involved in an international scheme to launder counterfeit money. In June and again in October, the government raided NPA safehouses in Manila and arrested additional members of the NPA leadership.

Manila has issued public statements condemning domestic terrorism and maintains a reward program for information leading to the arrest of key figures in the CPP/NPA apparatus in the Philippines and abroad. A verdict was expected in early 1991 in the trial of two NPA assassins accused of murdering US Army Col. James Rowe in April 1989. Reynaldo Bernardo, a senior official of the Alex Boncayao Brigade—the Communists' premier assassination squad in Manila—was arrested in early November. Bernardo is a suspect in the Rowe slaying and may be tried for that crime.

Dissident military officers were responsible for a bombing campaign against both Philippine and foreign businesses in Manila in August and September. The bombings, which caused no fatalities, apparently were designed to demonstrate President Aquino's inability to maintain law and order. The government has offered rewards for the capture of rebel military leaders, some of whom are accused of complicity in random bombing attacks. Several dissident military officers were captured in 1990.

The Government of the Philippines continues to be a willing participant in programs of bilateral cooperation with, and training in, the United States on counterterrorist issues.

6

PX270

### South Korea

In 1990, there was a handful of relatively minor attacks against US interests by radical students and other dissidents. In February, approximately 100 youths attempted to attack the residence of the head of the American Cultural Center in Kwangju. On 12 June, about 300 students attacked the US Cultural Center in Kwangju with firebombs; there were no injuries or damage. In August, radicals threw more than 50 firebombs at the rear door of a US Army office in Seoul, causing minor damage. On 18 October, 11 students attacked the US Embassy with firebombs and small explosive devices but caused no injuries or property damage.

In April, South Korean President Roh granted a special amnesty to Kim Hyun-Hui, the 28-year-old North Korean agent convicted of planting a bomb on a Korean Airlines flight in November 1987. Kim received the death penalty for the attack, in which 115 were killed, but she was pardoned because she confessed her crime and admitted to acting on behalf of North Korea. At her trial, Kim asserted that she had been told the bombing was directly ordered by Kim Chong-Il, son of North Korean President Kim Il-song.

### Sri Lanka

Domestic terrorism continued to wrack the nation. The Liberation Tigers of Tamil Eelam (LTTE) broke off talks with the government in June and launched a campaign of violence. On 22 July, government forces discovered a series of mass graves containing the bodies of up to 200 policemen near the village of Tirrukkovil in eastern Sri Lanka. The policemen, many of whom had been blindfolded and shot in the back of the head, had been captured by the LTTE in mid-June. The LTTE reportedly was responsible for a series of massacres of Moslems near the Batticaloa region in the first half of August. The LTTE also was responsible for the murder of rival Tamil politicians throughout the northeast.

The radical Sinhalese group Janatha Vimukhti Perumana (JVP) was crippled by the deaths and arrests of most of its senior leadership in 1989. As a result, it was capable of conducting only limited operations in 1990. The group's most notable attack occurred in July, when it seized and executed 15 members of a village committee in southern Matara who had been cooperating with the police. The government continues to arrest suspected JVP members, and at least 15,000 are in custody. The government intends to prosecute those believed responsible for acts of terrorism and will provide vocational rehabilitation for others.

In 1990, three individuals accused in the May 1986 bombing of an Air Lanka aircraft, which killed 28, were acquitted. Five persons accused in the August 1987 grenade attack on Parliament, which killed two officials, also were found to be innocent. The government is appealing the acquittal of the five, and they remain in custody.

### European Regional Overview

Two trends emerge in examining terrorist statistics for Western Europe in 1990. The first is the sharp decline in "spillover" terrorism from the Middle East as compared with previous years (in 1988 there were 29 such incidents, 31 in 1989, and only eight in 1990). The second is the persistence—and violence—of autonomist groups such as the Provisional Irish Republican Army (PIRA), Basque Fatherland and Liberty (ETA), and Corsican nationalists.

An alarming phenomenon is the continued attacks on Iranian political dissidents residing in Europe by official Iranian hit squads. Swiss authorities confirm official Iranian involvement in the murder of an Iranian dissident in Switzerland, and French authorities suspect that the November murder of an Iranian-American dissident in Paris was the work of Iranian hit men.

In Greece, domestic terrorist groups were responsible for several attacks on US and other targets. In September, Greece declined a US extradition request against Palestinian terrorist Muhammad Rashid, charged with involvement in the 1982 bombing of a Pan Am aircraft. Rashid will be prosecuted in Greece.

US interests continued to be targets of terrorism in Turkey, where domestic terrorism also increased during the year.

Perhaps the most dramatic changes in the last year have come in Eastern Europe, where the fall of Communist regimes has undermined the active or passive government support that terrorists had previously enjoyed in that region.

PX270

**Belgium**

In February, Enver Hadri, a leader of the local Albanian Committee for the Defense of Human Rights in Kosovo, was assassinated by two unidentified gunmen in Brussels. Hadri's colleagues have accused the Yugoslav intelligence service of his murder.

Belgian authorities scored several successes against the PIRA in 1990. Four suspected PIRA members were arrested in June. One of the four, Donna Maguire, was extradited to the Netherlands for her alleged role in the murder in Holland of two Australian citizens in May. In early December, the Belgian security forces arrested three alleged PIRA commandos during a raid on a safehouse in Antwerp. The suspects are scheduled to be tried in early 1991.

In April, the Belgian Government sent a special envoy to Beirut to seek information on Belgian citizens who had been seized from the yacht Silco in the Mediterranean and held by members of the Abu Nidal organization (ANO) since 1987. One of these hostages, along with his French girl friend and their baby, was released in April. The four remaining Belgian hostages were freed in January 1991 in an arrangement that included the release of an ANO terrorist jailed in Belgium, who had served 10 years of his life sentence.

**Cyprus**

There were no international terrorist incidents in Cyprus in 1990.

In January, the Government of Cyprus hosted a two-man delegation from the Kurdish Workers' Party (PKK), which was sponsored by the Cypriot Committee for Solidarity with Kurdistan. The PKK, known for its terrorist attacks in Turkey, met with senior Greek Cypriot legislators, and the Cypriot Government arranged for a PKK press conference. This meeting was followed by the equally controversial November visit of four Greek Cypriot legislators to the Bekaa Valley in Lebanon for meetings with PKK leaders.

**Eastern Europe**

Since the fall of their Communist regimes in 1989, the policy of many East European countries has shifted from tolerance of, or even support for, terrorist groups to active cooperation with the West on counterterrorist issues. An example of the new openness evident in the region is Czechoslovak President Havel's revelation in April that the former government had exported 1,000 tons of the plastic explosive Semtex to Libya. This was the first official acknowledgment that sales of such magnitude had taken place. In Hungary, the new government denounced the former regime's support for Illych Ramirez Sanchez, the international terrorist known as Carlos, and initiated investigations into the assistance previously offered to him and to members of the Baader-Meinhof group.

Ironically, democratization, the concomitant loosening of government control on society, and the resulting changes in government security structures may make some of the countries of the region more vulnerable to the threat of domestic terrorism. These countries may also, for the first time, find themselves targeted by international terrorists. Support for the international coalition aligned against the Iraqi invasion of Kuwait, the establishment of diplomatic relations with Israel, facilitating the transport of emigrating Soviet Jews to Israel, and the cessation of support for terrorist groups may make these new democracies the targets of terrorist attacks. The United States and other governments of the West are taking steps to help these countries deal with this challenge.

In June, a group calling itself the December 13 Independent Group claimed responsibility for an attempted firebombing against the Soviet Consulate in Gdansk, Poland. The group, named for the date in 1981 on which President Wojciech Jaruzelski declared martial law, claimed that the attack was in protest against Poland's role in the movement of Soviet Jews to Israel. The attack resulted in minor property damage and no casualties.

In October, an explosion destroyed the offices of the Rights and Freedoms movement, a political movement of ethnic Turks and Pomaks, in Shumen, Bulgaria. No injuries were reported. Unrest among ethnic Turks in Bulgaria is a continuing concern.

Terrorism in Yugoslavia and the former German Democratic Republic is discussed separately.

8

PX270

## France

In 1990, international terrorist incidents in France were largely limited to activities connected with separatist movements in Corsica and the Basque area. France maintains an active antiterrorist stance and cooperates bilaterally with the United States and with many other nations in the fight against terrorism.

In 1990, France continued its cooperation with Spain in the fight against Basque terrorism and scored several counter-terrorist successes. In April, French police dismantled an alleged ETA commando unit of 10 French nationals living in France. The group, believed to be headed by Henri Parot, has been charged with participating in criminal conspiracy on behalf of ETA. The group had reportedly been operating in Spain since the late 1970s. This roundup was the first large-scale arrest of French citizens charged with terrorist activities in Spain. A large cache of arms and explosives was also uncovered in connection with the arrest.

In September, alleged ETA leader Jose Zabaleta-Elosegui (alias Waldo), reputedly the second in command of ETA's military branch, was arrested in Biarritz on terrorist-related charges. In November, French police rounded up a four-man ETA cell in southwestern France and later that month arrested a three-man ETA cell in northern France.

The French Government's conciliatory approach toward the Corsican National Liberation Front (FLNC) appears to have generated a schism within the movement between hardliners and those seeking political concessions from Paris without resorting to violence. The truce declared in May 1988 between the FLNC and the government has been broken by a new faction, the Corsican National Liberation Army (ALNC), which claimed responsibility for several bombings in the summer and fall of 1990 directed principally against properties owned by foreigners. Despite Interior Minister Joxe's program of attempting to co-opt the dissidents by granting more political autonomy to Corsica, some hardliners appear determined to continue to use terrorism in the fight for complete autonomy.

The French investigation into the terrorist bombing of UTA Flight 772 over Niger in September 1989 received wide press coverage during the latter part of 1990. According to press accounts, two probable Congolese nationals—one

detained in Brazzaville, Congo, and the other in Kinshasa, Zaire—suspected of being active participants in the bombing, have been interviewed by French authorities. No charges have been filed in the case.

French authorities also continue their investigation into the bombings in the last three months of 1990 against US and French targets by the leftwing anarchist group Gracchus Babeuf. The bombings, which resulted in minor property damage and no injuries, were carried out in protest against the deployment of US forces in the Persian Gulf.

France has one of Europe's most experienced cadre of specialized counterterrorist magistrates, and during 1990 the courts handed down stiff sentences to international terrorists responsible for attacks dating back to 1982. In March, the French Correctional Court sentenced Fouad Saleh and eight other members of a Hizballah terrorist cell to sentences ranging from five to 20 years for their roles in a series of bombings in 1986. In addition, the court convicted eight other Lebanese Hizballah militants in absentia. The convictions and sentences of the Saleh group were confirmed by the Court of Appeals in October. In 1991, members of the Saleh group will be tried by the Criminal Court for the actual bombings.

In June, a French court condemned Lebanese Armed Revolutionary Faction member Jacqueline Esber in absentia to life imprisonment for her role in the slaying of an Israeli diplomat in 1982 and the attempted murder of a US consul in 1984. French authorities believe Esber is hiding in Libya. In June, the court also condemned an Iraqi, Haysayn Humary, in absentia to life imprisonment for taking part in the bombing of the Marks and Spencer department store in Paris in 1985. Humary, whose whereabouts are unknown, was a member of the Palestinian terrorist group 15 May Organization, which has now disbanded. Another member of the same group, Habib Maamar, was sentenced in absentia on similar charges to 20 years' imprisonment.

French courts sentenced a number of ETA terrorists including Arrospide-Sarasola (alias Santi-Potros), who is considered to be one of the group's top leaders. Santi-Potros will probably be extradited to Spain before complet-ing his 10-year sentence in France. Another leading ETA member, Jose-Antonio Urriticoechea (alias Ternera), was

9

**PX270**

sentenced to 10 years in prison for terrorist conspiracy and illegal possession of arms. In January, a member of the Basque terrorist organization Iparretarrak was sentenced to two years in prison.

In May, France extradited the Spaniard Jose Ramon Martinez de la Fuente to Spain on charges of committing ETA-sponsored terrorist activities. The French Council of State confirmed that two other suspected ETA members, Carmelo Garcia Merchan and Jose Felix Perez, can legally be extradited; their actual extradition awaits a final decision of the French Government. In early March, a French court approved the extradition of suspected Provisional Irish Republican Army members Patrick Murray, Donagh O'Kane, and Pauline Drumm to Germany, where they were wanted for assaults against British military installations, including a bombing that killed a British military officer. The three were captured in July 1989 while reportedly preparing to attack British interests in France.

At the same time, the French Government took controversial measures in its dealings with state sponsors of terrorism. In April, the government obtained the release of the last of the French hostages—Jacqueline Valente, her Belgian companion, and their young daughter—who had been held by the Abu Nidal organization. The French Government was criticized by several Western nations for praising the role of Libyan leader Qadhafi in obtaining the hostages' release. French press reports say they had been held in Libya.

On 27 July, French President Mitterrand pardoned pro-Iranian Lebanese terrorist Anis Naccache and four of his accomplices. Naccache had been sentenced to life imprisonment in 1982 for killing a French policeman and a passer-by and for wounding three others during a failed attempt to assassinate former Iranian Prime Minister Shahpur Bakhtiar. The government expelled all five terrorists after their release from prison. According to press reports, the French had made a deal with Iran to release the prisoners in exchange for the release of French hostages in Lebanon. Foreign Minister Dumas asserted that the Naccache release was part of France's efforts to obtain freedom for the remaining Western hostages in Lebanon.

**Germany**
International terrorist attacks decreased from 19 incidents in 1989 to 13 in 1990. None of these incidents were directed against US targets. The number of domestic

terrorist incidents increased, however, following the onset of a new Red Army Faction (RAF) offensive that began in late 1989.

On 3 October, the German Democratic Republic (GDR) merged with West Germany. Thus, West German law and authority were extended into the territory of the former GDR. The former Communist East German regime had maintained good relations with Libya and several terrorist groups. Information released from the files of the Stasi, the former East German secret police, and German press reports make clear the extent of East German support for German and international terrorist groups. Among the revelations:

- The Stasi, through monitoring of Libyans in East Germany, knew in advance of plans for the 1986 La Belle disco bombing in which two American servicemen were killed.

- Stasi officials provided training to Palestinian and Libyan terrorists. The Stasi also provided weapons to the Palestine Liberation Organization (PLO) in exchange for information on West German intelligence activities in Beirut.

- East Germany gave safehaven to Abu Daoud and Abu Hisham—two members of the PLO's Fatah organization who masterminded the murders at the 1972 Munich Olympics—and the notorious terrorist Illych Ramirez Sanchez, also known as Carlos.

- An East German foreign trade organization was involved in arms trading with the Abu Nidal organization.

- A number of Red Army Faction members were given new identities and safehaven by the East German Government.

The indulgent attitudes toward terrorism that characterized the Honecker regime were replaced by efforts to take a firm counterterrorist stand. In June, the GDR Government arrested 10 former RAF terrorists, most of whom voluntarily agreed to be turned over to West German authorities. Two of the suspects were released because the West German warrants for their arrest had expired. The other eight suspects—Susanne Albrecht, Inge Viett, Werner Lotze,

PX270

Sigrid Sternebeck, Silke Maier-Witt, Henning Beer, Monika Helbing, and Ralf-Baptiste Friedrich—remain in custody awaiting prosecution. Press reports indicate that these suspects have provided investigators with extensive information on RAF activities between 1977 and 1981, including the 1977 assassinations of Federal Prosecutor Siegfried Buback, Dresdener Bank Chief Juergen Ponto, and Employers' Association President Hans-Martin Schleyer.

The arrests of former RAF members in East Germany have had only limited impact on the activities of the current RAF hardcore. The group continued the terrorist offensive begun in November 1989 with a technically sophisticated bombing attack that killed Deutsche Bank Chairman Alfred Herrhausen and injured the driver of his armored car. The RAF aborted an attack against West German Agriculture Minister Ignatz Kiechle in April. The RAF claimed responsibility for the attempted assassination of Interior Ministry State Secretary Hans Neusel in July. The RAF also carried out arson attacks and vandalism against several Spanish automobile dealerships in Germany in support of the Spanish October 1st Antifascist Resistance Group (GRAPO).

There were several international terrorist attacks in Germany during 1990. The Provisional Irish Republican Army claimed responsibility for attempted bomb attacks in May against British military installations in Hannover and Muenster, for the assassination of a British Army officer in Dortmund and for the bombing in June of a military training facility in Hameln.

Several counterterrorist prosecutions took place in German courts in 1990. The trial of Popular Front for the Liberation of Palestine–General Command (PFLP-GC) members Hafiz Kassem Dalkamoni, a ranking official of the organization, and Abdel Fattah Ghandanfar for the failed attacks against US Army duty trains in 1987 and 1988 began in October. Dalkamoni was also indicted in April on charges of ''manslaughter as a result of negligence,'' stemming from an explosion that killed one German bomb-disposal technician and severely injured another in April 1989.

Ali Cetiner, a leading Kurdish Workers' Party member, was convicted in March of murdering another Kurd. In the first application of a new law that allows prosecution witnesses in certain terrorist cases to receive reduced sentences in exchange for testimony, Cetiner was sentenced to only five years' imprisonment, instead of the usual life term. Trials for murder and other serious crimes against 17 other alleged PKK members continued at year's end.

Suspected Provisional Irish Republican Army operatives Gerard McGeough and Gerard Hanratty were on trial in Duesseldorf at year's end. Both are implicated in the attempted bomb attacks during the summer of 1988 against British Army barracks in Duisburg. In addition, McGeough is charged in the March 1987 bombing of a British officers' mess in Rhein Dahlem that injured dozens of Germans.

There are no legal provisions that allow German citizens to be extradited. Moreover, since Germany does not have the death penalty, foreigners charged with capital offenses are unlikely to be extradited. The German Government's policy is that individuals not extradited for terrorist crimes will be tried in Germany, regardless of where the crime was committed.

The German press has noted police complaints that a number of legal safeguards hinder investigations. Generous provisions allowing asylum seekers and refugees to remain in Germany pending resolution of their cases have enabled some persons suspected of terrorist acts to remain in Germany. For instance, Bassim Makki, a Lebanese convicted in December 1989 of conspiracy to carry out bomb attacks against US and Israeli interests in Munich and Frankfurt, was released and deported to Syria in July. Makki agreed to drop his application for political asylum and to consent to deportation in exchange for an early release.

German officials continue to work closely with US, British, and other authorities to identify the individuals responsible for the bombing of Pan Am Flight 103 in 1988.

**Greece**
There were four international terrorist incidents in Greece in 1990. The most notable of these were the bombings in March of 11 vehicles belonging to non-Western embassies by the terrorist organization Social Resistance and the

PX270

bazooka attack in June against the offices of the US firm Proctor and Gamble by the Revolutionary Organization 17 November. A lesser known group, the Anticapitalist, Antiestablishment Struggle Organization, claimed responsibility for a February firebombing of a US Air Force vehicle in Patras. Greece also experienced a rash of anarchist and extreme leftist violence against government and political offices, as well as police stations. The Greek police believe a number of individuals suspected of past terrorist activity were involved in these attacks.

Greek terrorist groups focused the bulk of their attacks on domestic targets, in part a reflection of Greece's economic problems and political unrest during a period of national elections. These targets included government officials, prominent Greeks, and institutions. In addition to the bazooka attack on Proctor and Gamble, 17 November carried out a daring daylight theft of two bazookas from the National Military Museum in February, detonated some 23 incendiary devices in affluent neighborhoods of Athens, attempted to assassinate Greek shipping magnate Vardis Vardinogiannis, and attacked EC offices in downtown Athens with rockets in late December. In all but the incendiary attacks and the museum robbery, 17 November made use of a variety of military explosives and rockets it had stolen from a Greek military weapons depot in Larissa in December 1989.

The level of violence by Revolutionary People's Struggle (ELA) continued apace, as the organization conducted numerous independent bombings. In April, ELA carried out its first joint attacks, with the terrorist group 1 May, against Greek Government and labor offices in Athens and Thessaloniki. In early November, suspected terrorist Kyriakos Mazokopos inadvertently directed Greek police to a suspected ELA–1 May safehouse in a downtown Athens warehouse, when a device he was assembling in the warehouse exploded prematurely. Police later uncovered a large cache of military equipment, explosives, and original proclamations of ELA, 1 May, and Revolutionary Solidarity. Revolutionary Solidarity was responsible for the February 1990 murder of Greek prison psychiatrist Mario Manatos. Fingerprints of three suspects in the murder were found on different items in the warehouse. Mazokopos and others have been charged in the warehouse case, and investigations are continuing.

In 1990, the Greek Government decided to try suspected Palestinian terrorist Mohammad Rashid in Greece for his role in the 1982 bombing of a Pan Am aircraft, rather than extradite him to the United States.

At the same time, the Greek Parliament passed a new counterterrorist law that appears to expand the investigative authority of the security services in cases of terrorism, narcotics, and organized crime. The move is seen as part of Prime Minister Mitsotakis's growing commitment to combating international and domestic terrorism. The new government has taken significant steps to improve the training, equipment, and morale of the police. The government has also initiated a terrorist-tip hotline and passed legislation allowing a ban on the publication of communiques issued by terrorist organizations.

In August, Greek authorities detained in port the ship Tiny Star, which was used by Libyan-sponsored terrorists to launch an attack on Israel in May. The ship was later stripped of its registry by Panamanian authorities.

**Ireland**

Anglo-Irish counterterrorist relations faltered early in the year after the Irish Supreme Court upheld an appeal against the extradition of two PIRA members who had participated in the 1983 mass escape from Northern Ireland's Maze Prison. The two escapees had argued that, if they were returned, they would be subjected to assault by British prison officials. Dublin did, however, extradite PIRA member Desmond Ellis to the United Kingdom in November. Ellis was wanted in Britain on charges of possession of explosives with the intent to endanger life.

Irish-British dual national Brian Keenan, held hostage in Lebanon since April 1986, was released in August.

**Italy**

In 1990, there was only one international terrorist incident in Italy, as compared to five such incidents in 1989. There were three noteworthy terrorist-related developments in Italy during the year:

- In March, two well-known Red Brigades terrorists were formally charged with involvement in the 1984 assassination of Director General of Multinational Force and Observers (MFO) Leamon Hunt. The court later dismissed the charges because of lack of evidence.

PX270

- In July, Italian authorities issued an arrest warrant for Michael Rouphael and Waddud Al Turk, both reportedly members of the Abu Nidal organization, for their involvement in a 1984 attack in Rome in which a United Arab Emirates diplomat was wounded and his companion was killed.

- In October, the trial of four former Italian Intelligence Service officials began. They are charged with thwarting the investigation of a Palestine Liberation Organization arms shipment to Italy in 1979 that, in part, was destined for the Red Brigades.

The Italian courts presided over a number of other cases in 1990, some of which dealt with domestic terrorist incidents dating to 1980. As a result of several Italian court rulings, some 400 accused terrorist group members, including some Red Brigades cadres charged with armed insurrection against the state, were acquitted. Despite their acquittal, many of these individuals remained in prison for other offenses. In one case, 19 rightwing terrorists who had been accused in the 1980 bombing of the Bologna railroad station, in which 85 people died and 200 were wounded, were either acquitted or had their sentences reduced by an appeals court. Although the courts decided that the state's case was insufficient, the case is still under review appeal.

In February, Switzerland acceded to an Italian request to extradite Red Brigades terrorist Antonio De Luca. De Luca, who was apprehended in 1988, went through an extensive series of legal maneuvers in an unsuccessful attempt to obtain political asylum in Switzerland. In September, a second Italian request for the extradition from Greece of Red Brigades terrorist Maurizio Folini was rejected by an Athens court on the grounds of insufficient evidence. Folini has been convicted in absentia of various terrorist crimes.

The Italian Government continues to improve the effectiveness of its antiterrorist forces. Worries over Persian Gulf–related attacks prompted increased security measures at high visibility targets such as key embassies and Fiumicino International Airport. The United States and Italy have worked together on a series of cooperative investigations involving the Japanese Red Army, Hizballah, and the Abu Nidal organization.

## Netherlands

Incidents of international terrorism in the Netherlands decreased from eight in 1989 to three in 1990. In May, the Provisional Irish Republican Army claimed responsibility for the murder of two Australian tourists in Roermond, stating that it had mistaken the men for off-duty British soldiers. The Basque Fatherland and Liberty Organization claimed credit for two bombings against Spanish targets in Amsterdam in 1990. In June the group bombed a building housing the Iberia Airlines office, and in July it bombed the branch office of a Spanish bank; four passers-by were slightly injured in the second attack.

The trial of four suspects in the Roermond attack—Gerard Harte, Sean Hick, Paul Hughes, and Donna Maguire—was scheduled to begin in February 1991. Although charges against the four are pending in Belgium, the Netherlands decided to prosecute them first. In a separate case, the Netherlands extradited alleged Irish People's Liberation Organization member Anthony Kerr to Belgium on 8 June. Tried in late 1990 for the December 1989 shooting in Antwerp in which a policeman was wounded, Kerr was sentenced to four and a half years in prison.

The Dutch Government continues to work actively to enhance international efforts to fight terrorism and has promoted EC-wide counterterrorist cooperation. The Netherlands has been one of the strongest voices in the EC for taking a tough stand against state supporters of terrorism.

## Soviet Union

In 1990, the Soviet Union increased its efforts to combat international and domestic terrorism, both of which have become sources of increasing concern for Soviet authorities.

As in 1989, incidents of domestic violence and terrorism continued to rise in the USSR, especially in the Caucasus, Moldavia, and the Central Asian republics. In 1990, Soviet nationals also attempted at least 27 airplane hijackings, nine of which landed in Finland, Sweden, and Pakistan.

In general, Soviet authorities have made vigorous attempts to investigate incidents of violence and terrorism and to prosecute the individuals involved. The Soviets have requested and obtained the extradition of several hijackers,

13

PX270

and several other extradition requests are pending. Moscow has also sought to disband and disarm paramilitary groups, particularly in the Caucasus. In November 1990, Soviet authorities arrested and charged a man with attempted terrorism after he allegedly fired two shots on Red Square during the Revolution Day parade.

Soviet authorities continue to participate in bilateral exchanges with the United States and several West European governments on a broad range of counterterrorist issues. Moscow has taken an increasingly firm stand against terrorism in recent years.

Although the Soviet Union has publicly condemned terrorism, it has continued to provide military and economic assistance to several radical governments involved in terrorist activities, including Cuba, Libya, North Korea, Syria, and, until recently, Iraq. Soviet relations with these countries are not, however, uniformly cordial, due to changes in the Soviet Union's foreign policy orientation and to differences over economic assistance and ideological matters. In many cases, the Soviets have found that their traditional relationships with these radical governments are inconsistent with their new emphasis on increased economic and political ties to the West.

Nevertheless, the Soviets have exhibited a reluctance to confront some of these state sponsors regarding their support for terrorism. This reluctance is no doubt due in part to the advantageous economic relations that the Soviet Union continues to maintain with some of these countries. Perhaps because of this reluctance to disturb these bilateral relationships, the Soviet Union continues to exhibit a preference for broader multilateral approaches to the terrorist problem.

## Spain
Spain experienced an increase in international terrorist incidents in the past year—from 22 incidents in 1989 to 28 incidents in 1990. This is more than twice the number in any other European country. Terrorism in Spain resulted in at least 25 deaths and many more injuries. Most of these incidents were committed by either the Basque Fatherland and Liberty terrorist organization or the smaller, October 1st Antifascist Resistance Group. Spanish terrorism also spilled over into other parts of Europe. For example, ETA claimed responsibility for several terrorist attacks against Spanish installations in the Netherlands.

Spain's smaller terrorist groups were also active in 1990. These groups include Terra Lliure, which is a Catalan separatist group, and the Guerrilla Army of the Free Galician People.

The ETA organization suffered a setback in 1990 when a hitherto unknown ETA network in France called the Itinerant Command was uncovered. This group had operated for 12 years and was responsible for some 40 terrorist bombings and assassinations in Spain. The discovery led to several arrests. The network began to unravel with the apprehension in April of a French Basque, Henri Parot, in Seville before a planned ETA attack on the local headquarters of the National Police. Working together, French and Spanish security forces later rounded up other Itinerant Command terrorists in France. Parot was convicted of eight offenses—ranging from carrying out injurious attacks to possession of false identification—and in December was sentenced to prison terms totaling 86 years.

Although the Spanish courts continued to deal sternly with terrorist cases, few major prosecutions of international or domestic terrorists were concluded during 1990. As of September 1990, some 470 members of ETA were in prison in Spain awaiting trial. Madrid has also taken action against rightwing terrorists. Several persons, including a national police officer, are in preventive detention, pending prosecution for the Madrid assassination of a pro-ETA Basque legislator in late 1989; two other national police officers are awaiting trial on charges of organizing an extreme rightwing death squad that operated in southern France from 1983 to 1986. Authorities obtained court orders in July to extend their preventive detention period for two years. Spain is also pursuing the prosecution of three Hizballah terrorists arrested in November 1989 in Madrid and Valencia, despite reported warnings by Hizballah supporters in Lebanon of possible terrorist retaliation against Spanish targets. Following these arrests, Spain sponsored an international conference to discuss the Hizballah terrorist organization.

During 1990, Spain vigorously pursued efforts to extradite ETA terrorists from abroad. ETA terrorists reside in many countries including Cape Verde, Cuba, the Dominican Republic, Ecuador, France, Sao Tome and Principe, and Venezuela. French courts ordered the extradition of several ETA members to Spain.

14

PX270

In early 1990, Madrid instituted an intense domestic campaign for citizen assistance in apprehending six GRAPO members primarily responsible for the increased terrorist activity in late 1989 and early 1990. The government also dispersed ETA prisoners throughout the Spanish prison system in an effort to isolate them from each other and to deny them mutual support. The Spanish Government has offered a limited immunity program for terrorist prisoners who renounce the use of force. This so-called reinsertion program is designed not only to convince individual terrorists to renounce terrorism as a political tool but also to divide loyalties within the terrorist groups. Madrid passed a law in 1990 making it illegal for families and employers of kidnapped victims to ''collaborate'' with terrorists by paying a ransom. Several persons who acted as middlemen in the payment of ransom demands to ETA were charged with this offense in 1990.

Domestic counterterrorism, aimed primarily at ETA and GRAPO, is a high-priority effort. With the 1992 Olympic Games to be held in Barcelona and the World's Fair in Seville, Spain is increasingly concerned about the risk of terrorist attacks. In 1990, ETA threatened to disrupt the World's Fair and sent a package bomb to the executive offices of the Fair in Seville. In December, ETA set off a car bomb near the Olympic soccer stadium outside Barcelona, killing six policemen and two civilian bystanders.

### Sweden
In September, an Iranian Kurdish woman was killed by a letter bomb apparently intended for her husband, the chairman of the Kurdish Independence Party in Sweden. Swedish authorities have not officially determined responsibility for the attack. Before the bombing, the dead woman's husband had reportedly told the Swedish police that he was under constant threat from Iran. Other members of the local Kurdish community have also accused Iran of the assault.

In early 1990, Swedish courts upheld the December 1989 convictions of four Palestinians believed linked to the Popular Struggle Front (PSF) who were found guilty of involvement in bombings in Stockholm, Copenhagen, and Amsterdam in 1985 and 1986. Two of the Palestinians had received life sentences; the remaining two had received sentences of one year and six years. In June, Swedish police arrested 11 Palestinians, all of whom were relatives of the four alleged PSF members, on suspicion of ties to terrorist groups. Evidence was insufficient for prosecution, but the 11 Palestinians were expelled from Sweden or departed the country voluntarily because of immigration irregularities.

Although relatively few terrorist incidents have occurred in Sweden, in the past, members of radical Palestinian and Kurdish groups have used the country as a base for terrorist operations abroad. This remains an area of continuing concern for Swedish authorities. The Swedish National Police Board reported in July that there are about 30,000 refugees and asylum seekers residing in the country who arrived without identification papers. During certain periods, as many as 80 percent of refugees arriving in Sweden have no passports or identification documents. Swedish authorities are attempting to stop the influx.

### Switzerland
The lone international terrorist incident in Switzerland was the assassination of Kazem Radjavi, an Iranian dissident and brother of Iranian Mojahedin leader Massoud Radjavi. The investigating judge concluded in his report that evidence pointed to the direct involvement of one or more official Iranian services in the murder. He identified 13 suspects, all of whom had traveled to Switzerland on official Iranian passports. Most had traveled together, and their passports, as well as their airplane tickets, had been obtained at the same time. The Swiss Government condemned the assassination and summoned an Iranian Embassy officer in Bern to express its strong concern over the investigation findings. In October, the examining magistrate formally requested Iranian cooperation in investigating the assassination and submitted a series of questions regarding the case to judicial authorities in Tehran. There has been no known response. However, the Iranian Embassy has filed a complaint against the newspaper La Suisse under Article 296 of the Swiss Penal Code, which prohibits ''insults (to) a foreign state in the person of its chief executive, diplomatic representative, or its government.'' The Iranian Government objected to the way the publication had reported the murder and the implications of official Iranian involvement.

15

PX270

Two Swiss employees of the International Committee of the Red Cross (ICRC), who had been kidnapped in Lebanon in October 1989, were freed in August. Emmanual Christen was released in Beirut on 8 August, and his colleague Elio Erriquez was freed five days later. The Swiss Government had approached a number of governments in an effort to secure the release of its citizens, as did the ICRC. Upon the hostages' return to Switzerland, the Swiss Government expressed thanks to the Governments of Libya, Algeria, Syria, and Iran, as well as the Palestine Liberation Organization, for their assistance in gaining the release of the two captives. The Swiss Government declared that it did not negotiate with the kidnappers and that it paid no ransom or other favors in exchange for their release. The identity of the kidnappers remains unclear.

Aluaro Baragiola-Lojacano, a Red Brigades terrorist who was sentenced to life imprisonment in November 1989 for the assassination of an Italian judge, appealed his case to a higher court in April. The Ticino Cantonal Court of Appeals upheld the conviction but reduced his sentence to 17 years.

In October, the Swiss Federal Council issued a report and suggested specific measures that broaden the concept of national security to include nonmilitary threats such as terrorism. It is still unclear how this report will affect Switzerland's approach to counterterrorist issues.

**Turkey**

Terrorism in Turkey escalated in 1990 with more than a dozen major political assassinations as well as robberies and bombings associated with terrorist organizations. Most of these were domestic incidents directed against Turkish targets. All 12 international terrorist incidents were directed against US interests. Dev Sol, the separatist Kurdish Workers' Party (PKK), the Turkish Workers and Peasant Liberation Army (TIKKO), and other terrorist groups remain active throughout Turkey.

The terrorist organization Dev Sol, the most active of these groups, claimed responsibility for a number of terrorist attacks on Western and pro-Western interests, as well as domestic security officials. The most senior victim was the retired Deputy Chief of the National Intelligence Service, Hiram Abbas, murdered in Istanbul on 26 September. In early November, Dev Sol assassinated an Istanbul public prosecutor. Member discipline in Dev Sol, fostered by the threat of retribution against those who cooperate with the authorities, has hindered government efforts to prosecute terrorists. In October, Binbir Pembgul, a young woman who threw a pipe bomb at the US Consulate in Istanbul in 1989, was set free by a military court after the prosecutor claimed the military had no jurisdiction in the case. Charges against her are still pending in civil courts.

Radical Islamic fundamentalists are believed responsible for a number of murders in Turkey. Targets have included prominent defenders of Turkey's secularism, including Prof. Muammer Aksoy in January, in Ankara; journalist Cetin Emec in March, in Istanbul; journalist Turan Dursun in September, in Istanbul; and former deputy of the Turkish Parliament Bahriye Ucok in October, in Ankara. These murders have been claimed by several Islamic groups, including the so-called Islamic Movement Organization, of which little is known.

Terrorist activity by separatists, particularly by the PKK, continued in Turkey's southeastern region, with acts of murder, arson, and destruction against both officials and civilians. The PKK claims it is targeting government interests because of a lack of government response to continuing social and economic problems plaguing Kurds in the south-central provinces. PKK insurgency, abetted by Turkey's Middle Eastern neighbors, continues to present a significant challenge to government security forces. The PKK received safehaven in Iran, Iraq, and Syria.

The surge in terrorist activity resulted in a series of government measures designed to combat terrorism. Government forces mounted numerous offensive operations against the PKK resulting in significant numbers of

16

PX270

arrests and casualties. New counterterrorist measures went into effect in April following a summit involving the leaders of all parliamentary political parties. These comprehensive measures include doubling sentences for those convicted of cooperating with separatists and an expansion of the regional governor's powers to expel suspected terrorists from the region.

## United Kingdom

International terrorist incidents decreased in the United Kingdom from 10 attacks in 1989 to only one in 1990. However, deadly acts of domestic terrorism by the PIRA continued in the United Kingdom, especially in Northern Ireland.

In 1990, 76 lives were lost in sectarian and political violence in Northern Ireland, compared with 61 in 1989. More than 50 were killed in PIRA attacks, including six in England and on the European Continent. As a measure of PIRA ruthlessness, in several incidents this year, PIRA forced men to drive car bombs into military checkpoints by holding their families hostage and threatening to kill them.

PIRA conducted 19 attacks in mainland Britain in 1990, including the car-bomb assassination of Conservative Party member of Parliament Ian Gow and other attacks on current and former government figures. Several attacks in the United Kingdom and continental Europe demonstrated an increasing PIRA tendency toward indiscriminate violence. In June, PIRA claimed credit for a bomb attack against the Carlton Club in downtown London, a popular haunt of Conservative Party members of Parliament. Two people were seriously wounded, and several passers-by, including two Americans, were injured. In July, PIRA claimed responsibility for a bomb attack against the London Stock Exchange.

Semtex is the explosive of choice in bombings in Britain. PIRA is believed to have received large quantities of the Czechoslovak-made plastic explosive from Libya in the 1980s. Other explosives—including some ''homemade'' from agricultural chemicals—are also used in Northern Ireland.

''Loyalist'' or ''Unionist'' paramilitary groups in Northern Ireland also continued to commit terrorist acts. Nineteen deaths were attributed to Protestant paramilitaries in 1990.

Britain renewed diplomatic relations with the governments of Iran and Syria in 1990. The United Kingdom broke diplomatic relations with Iran in 1989 after Iran's death threat against author Salman Rushdie. Relations with Syria were severed after an April 1986 attempt to bomb an El Al aircraft, with the involvement of Syrian intelligence agents.

An Iranian student named Mehrdad Kokabi is under arrest and has been charged in connection with at least one of the several 1989 bookstore bombings in the United Kingdom related to the Salman Rushdie affair. Several others were deported from the United Kingdom in 1990 for their involvement in attempts to find and kill Rushdie.

In 1990, British investigators and their US and German counterparts continued the intensive investigation of the December 1988 bombing of Pan Am Flight 103 over Lockerbie, Scotland. British legal authorities continue to cooperate with their counterparts in Germany, Belgium, and the Netherlands in investigations of PIRA terrorist incidents there. Similarly, British officials continued to follow the investigation and the trial in France of the crew of the Eskund, a ship captured while en route to deliver Libyan arms to the PIRA in Ireland.

## Yugoslavia

The Yugoslav Government condemns international terrorism and has played a positive role within the UN and the Nonaligned Movement in issues relating to terrorism. In 1990, Yugoslavia continued to take a more active stance against international terrorism. This is due in part to a growing recognition that international terrorism represents a danger to Yugoslavia itself.

Yugoslavia has long suffered from sporadic and generally minor outbreaks of terrorism, mainly perpetrated by extremist emigre groups hostile to the Communist regime.

PX270

Although there were no significant terrorist actions in Yugoslavia in 1990 by such groups, Yugoslav interests abroad were attacked. Offices of Yugoslav Airlines in Brussels and Sydney and Yugoslav diplomatic missions in Germany and Belgium suffered bomb attacks. The perpetrators remain unknown, but Yugoslav officials charged that these actions were carried out by extremist emigre groups.

A new development in Yugoslavia in 1990 has been the appearance of armed groups, often connected with the tensions that are rampant among the various national groups in the country. The most conspicuous of these armed groups appeared in areas of Croatia that are primarily inhabited by Serbs. Armed bands of civilians established roadblocks, disrupted traffic, and on some occasions fired at or harassed travelers. Bomb explosions damaged some railroad lines. On two occasions persons were killed by gunfire in what appeared to be politically motivated violence. In one of these instances a police patrol car was ambushed by unknown persons; one police officer was killed and another wounded. Yugoslav authorities have charged that terrorist actions are being carried out or prepared in the Yugoslav Province of Kosovo, whose population is 90 percent Albanian. There are no indications that any terrorist actions took place in Kosovo in 1990, although press accounts suggest significant quantities of arms have been smuggled into the province.

In the Yugoslav Republic of Macedonia, a political party called the Internal Macedonian Revolutionary Organization (IMRO), which claims to trace its origins back to a notorious turn-of-the-century terrorist group, won the most seats in the first multiparty election in Macedonia since World War II. IMRO states that it has renounced terrorism, but it has made a number of extreme statements. Some IMRO members, according to press reports, have made "death threats" against politicians associated with other groups.

In the past, Yugoslavia's political ties to the Middle East have led it to take a tolerant stand toward the prosecution or extradition of international terrorists found on its soil, most notoriously in 1985 when it allowed Palestine Liberation Front leader Abu Abbas to leave Yugoslavia, following his role in the hijacking of the cruise ship Achille Lauro, in which an American citizen was murdered.

In more recent years, however, the Yugoslav authorities have become more aware of the threat posed by international terrorism, and they now appear to be more willing to act against international terrorists operating in or transiting Yugoslav territory. The Yugoslav security services act to prevent terrorism, and they have cooperated fully and actively in international terrorist investigations. Within the limits imposed by serious financial constraints, the decline of central authority in the country, and the large number of international visitors, the Yugoslav authorities have acted to reduce the abuse of Yugoslav territory by terrorists.

## Latin American Regional Overview

The number of international terrorist incidents in Latin America rose to 162 in 1990, higher than any other region. Even so, these figures represent only a small percentage of the total number of terrorist acts committed in Central and South America. In most Latin American countries, the primary targets of guerrillas, narcotics traffickers, and others who engage in terrorism have been domestic—government and law enforcement officials, opinionmakers, and politicians. This was especially true in Colombia, Peru, and El Salvador where the levels of violence have been extremely high. In Peru, for example, of the more than 3,400 terrorist-related deaths in 1990, only six were of foreigners.

Roughly two-thirds of all anti-US attacks worldwide took place in Latin America, where US citizens and interests were the principal foreign targets of terrorist groups. Various groups have been operating for years in Central and South America and share a radical leftist ideology that, combined with a visible US presence in the region and historical antipathy toward the United States, contributes to the large number of attacks against Americans. Two Americans were killed in 1990—one in Peru and one in Panama—and 31 were wounded. Chile was the most common site of anti-American attacks in Latin America. The number of anti-US attacks there increased from 21 in 1989 to 61 in 1990. Most of these were bombings of Mormon Church facilities in Santiago and other parts of the country.

18

PX270

Although narcoterrorist and guerrilla violence continued to plague Colombia, the number of anti-American incidents fell from 39 in 1989 to 25 in 1990. In Peru, with two murderous insurgent groups—Sendero Luminoso and the Tupac Amaru Revolutionary Movement (MRTA) —there were 22 anti-American incidents in 1990.

### Bolivia

Five of six international terrorist incidents in Bolivia were directed against US interests. Although the investigation continues, virtually no progress was made in the prosecution of Zarate Willka members charged with the 1989 murder of two US Mormon missionaries or the 1988 attack on then Secretary of State George Shultz. The government changed prosecutors five times and had not named a judge to hear the case by year's end.

The Nestor Paz Zamora Commission (CNPZ), a new Bolivian group named after the deceased brother of President Jaime Paz Zamora, conducted its first terrorist attacks in La Paz during 1990. The CPNZ claims to be part of a renovated National Liberation Army (ELN), the group led by Che Guevara during the 1960s. The CNPZ began with the abduction of Bolivian Coca-Cola President Jorge Lonsdale in June, later murdering him in December just as the Bolivian security forces were mounting a rescue attempt. The CNPZ also claimed responsibility for an assault in October on the US Marine house in La Paz that killed one Bolivian guard and wounded another. The group also took credit for a second bomb attack on the same day that destroyed a monument honoring John F. Kennedy.

During 1990 more evidence surfaced pointing to cooperation between Peruvian and Bolivian terrorist groups. The investigation of the Marine house assault revealed that Peru's Tupac Amaru Revolutionary Movement provided financial support and at least one member to counsel the Bolivian CNPZ terrorists in their operations. Two Sendero Luminoso members were captured in August near the border with Peru.

### Chile

Terrorism in Chile increased significantly in 1990, notably since the March inauguration of the country's first democratically elected government in 16 years. International terrorist incidents rose from 23 in 1989 to 64 in 1990. Despite the democratic transition, radical leftist Chilean splinter groups remain committed to armed struggle and have been responsible for virtually all of the incidents. The dissident faction of the Communist-affiliated Manuel Rodriguez Patriotic Front (FPMR) and the Lautaro Youth Movement (MJL) have been the primary assailants.

Chile topped the list of nations worldwide where anti-US attacks have occurred, with 61 incidents in 1990. Although most of these have been directed against US-related property, such as Mormon churches and US-Chilean binational centers, two incidents appear to have been intended to cause US casualties. The November bombing of an organized softball game killed a Canadian citizen and severely wounded a US Embassy officer. The bombing of a restaurant during the same month in the coastal city of Vina del Mar seriously injured three US sailors and five other people, including one British tourist. Both incidents were claimed by the dissident faction FPMR/D of the FPMR.

Despite the new government's efforts to address the issue of the repressive policies of the Pinochet regime, leftist Chilean terrorists conducted lethal assaults against former officers in the military government as part of their own campaign. Terrorists received a major boost in January when more than 40 suspected members of the FPMR and FPMR/D staged a mass jail break. Several of the escapees had been involved in the 1986 attempt against Pinochet and presumably have access to arms caches.

The FPMR conducted several acts of domestic terrorism in 1990, including the attempted assassination of former military junta member Gustavo Leigh and another general; the murder of a retired Carabinero colonel; and the daytime shooting of an Army officer assigned to General Pinochet's security detail. The MJL continued to conduct armed robberies that, on several occasions, resulted in the deaths of security personnel. In November, Lautaro killed four security personnel in an attack on a hospital aimed at freeing one of their comrades.

The disruption of the internal intelligence apparatus resulting from the democratic transition has hindered the new government's attempts to control terrorism. The National Information Center (CNI), which was responsible for investigating terrorism under the military regime, was disbanded by President Pinochet before he left office.

19

PX270

*Multinational Efforts To Counter Terrorism*

### United Nations
*Neither the United Nations Security Council nor the General Assembly debated terrorism during the 1990 session but will take it up in 1991. Specialized agencies of the United Nations, however, continued their work on conventions to combat terrorism in aviation and maritime navigation.*

### International Civil Aviation Organization
*The International Civil Aviation Organization (ICAO) was the focus in 1990 of a major international effort to develop an international convention requiring the marking of plastic and sheet explosives for preblast detection. This effort was an outgrowth of the tragic bombing of Pan Am Flight 103 in December 1988 and enjoyed broad support from nations that are the major producers of plastic and sheet explosives, as well as consumer nations. The objective of this international effort has been to identify particular chemical compounds that could be introduced into plastic explosives at the time of manufacture to improve their preblast detection by various existing technologies.*

*This process culminated in a Diplomatic Conference on Air Law under ICAO's auspices in early 1991. The US Government signed the Convention on the Marking of Plastic Explosives for the Purpose of Detection on 1 March 1991.*

*In other developments affecting ICAO, and following Senate ratification, the United States signed in March 1990 the Protocol for Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation (done at Montreal in 1988).*

### International Maritime Organization
*In March 1990, again following Senate ratification, the United States signed the Convention for the Suppression of Violence against the Safety of Maritime Navigation (done at Rome in 1988).*

### Summit 7
*At the 16th Economic Summit of Industrialized Nations, held 9-11 July in Houston, Texas, the Heads of Government and State adopted the following statement concerning terrorism:*

We, the Heads of State or Government, reaffirm our condemnation of terrorism in all forms, our commitment to make no concessions to terrorists or their sponsors, and our resolve to continue to cooperate in efforts to combat terrorism. We demand that those governments which provide support to terrorists end such support immediately. We are determined not to allow terrorists to remain unpunished, but to see them brought to justice in accordance with international law and national legislation.

We welcome the recent release of several hostages, but remain deeply concerned that hostages are still being held, some for more than five years. Their ordeal and that of their families must end. We call for the immediate, unconditional release of all hostages and for an accounting of all persons taken hostage who may have died while being held. We call on those with influence over hostage takers to use their influence to this end.

We note with deep concern the continuing threat presented to civil aviation by terrorist groups, as demonstrated by such outrages as the sabotage of civil aircraft over Lockerbie, Scotland, on December 21, 1988; above Niger on September 19, 1989; and over Colombia on November 27, 1989. We reiterate our determination to fight terrorist assaults against civil aviation.

Accordingly, we will continue our cooperation to negotiate a convention requiring the introduction of additives into plastic explosives to aid in their detection. We pledge to work to strengthen international civil aviation security standards. Consistent with this objective, we note the importance of making available training and technical assistance to other nations. We support initiatives undertaken through the International Civil Aviation Organization (ICAO) regarding this issue. We will work together with ICAO to expand such assistance.

PX270

Under President Aylwin, the civilian investigative police have been hampered by an ongoing reorganization aimed at rooting out corrupt elements. To compensate for the disruption in intelligence gathering, the Aylwin government sought to enhance the intelligence capability of the national uniformed police (Carabineros).

As part of its effort to combat terrorism, the new government sought a comprehensive package of legal reforms. These would address the alleged human rights abuses associated with the military jurisdiction and penalties for those accused of terrorist crimes under Pinochet. The government also requested the appointment of special judges to investigate the MJL and the more dramatic acts of terrorism.

The Chilean Government is cooperating with the US Government to resolve the murder of former Chilean Foreign Minister and Pinochet-critic Orlando Letelier and an American associate, Ronni Moffitt, who were killed in a car bombing in Washington, DC, in 1976. Legislation that permits the transfer of jurisdiction of the case from military to civilian courts was passed by the Chilean Congress in December 1990 and went into effect in February 1991.

**Colombia**

Colombia's democratic government faces opposition from active leftist guerrilla groups, well-financed narcotics trafficking organizations, and rightwing paramilitary groups. All three use terrorism, primarily against domestic targets.

International terrorist incidents in Colombia declined for the second consecutive year, down from 46 in 1989 to 27 in 1990.

The most significant terrorist attacks in Colombia during 1990 were committed by the loose conglomerate of narcotics traffickers known as the Medellin Cartel. The Cartel and other traffickers, primarily criminally motivated, continued their use of terrorist tactics to hamper government attempts to impede their activities. In August 1989, following a string of political assassinations attributed to the Cartel, the government launched a crackdown. The narcotics traffickers responded with a violent campaign of bombings and assassinations of political figures and policemen that continued until mid-1990, when the traffickers declared a truce.

Suspected narcoterrorists assassinated the two leading leftist presidential candidates in March and April 1990. In May, narcotics traffickers began a campaign to kill policemen in Medellin, inflicting more than 400 police deaths. Following the August inauguration of President Gaviria, narcotics traffickers focused on kidnapping prominent Colombians, many of whom were journalists. An abducted German journalist was released in late 1990 but, by year's end, the traffickers still held nearly a dozen hostages. One of them, the daughter of former Colombian President Julio Cesar Turbay, was killed in January 1991 during a police attempt to rescue her.

The leftist National Liberation Army (ELN) conducted virtually all of the attacks against US interests in Colombia. To protest President Bush's visit to the Cartagena Summit in February, the ELN kidnapped three US citizens living in Colombia but released them shortly thereafter. Three US petroleum engineers abducted in November in northern Colombia were still in captivity by year's end. The ELN also crossed the border into Venezuela to conduct operations, including the kidnapping of a Venezuelan farmer in January.

The Colombian Government enjoyed significant success during 1990 by continuing its firm policy toward the insurgents, demanding they demobilize before they could participate in the political process. A former M-19 leader, whose rebel group turned in its weapons in March 1990, finished third in the balloting during the nation's Presidential election. Another group, the Popular Liberation Army (EPL), agreed to refrain from military operations and to begin demobilization.

The Colombian armed forces maintained pressure on the two rebel groups—the Revolutionary Armed Forces of Colombia (FARC), Colombia's largest guerrilla group, and the ELN—that rejected the government's offer to disarm and join the political process. For the first time the military conducted a major assault on the FARC headquarters. In 1990, the Colombian Government also began implementing a judicial reform program it hopes will strengthen the government's ability to convict terrorists.

PX270

**El Salvador**

The number of international terrorist incidents in El Salvador declined from nine in 1989 to two in 1990. This decline is more indicative of terrorist targeting—the Farabundo Marti National Liberation Front (FMLN) has deliberately refrained from targeting foreigners—than of a decrease in overall political violence in the country.

The FMLN generally adhered to its pledge to halt attacks on civilian officials and the public transportation and telephone systems between March and October 1990. But in the last months of the year, during the rebels' so-called national maneuver, the FMLN consistently caused civilian casualties in attacks on Salvadoran armed forces positions. The group also attacked or sabotaged numerous economic targets of no military significance. The FMLN's indiscriminate use of firepower resulted in more than 100 civilian casualties.

The FMLN carried out numerous attacks on important economic targets. In November, the FMLN conducted more than 100 attacks on the electrical power grid and two on major hydroelectric plants. Terrorist attacks on the electrical power system alone caused more than $10 million in damage. In December, terrorist attacks disabled 10 percent of the country's telephone system.

The FMLN also attacked off-duty military personnel and military targets near civilian areas. Significant FMLN terrorist attacks include a drive-by attack on the home of an Army battalion commander; the assassination of an Army major as he returned from a class at the national university; and a mortar attack on the presidential office complex. In November, the FMLN hurled a bomb at a group of soldiers in San Salvador's crowded central market, wounding nine civilians—among them four children—and two soldiers.

Chronic and profound deficiencies in the country's judicial system continued to impede an effective counterterrorist policy during 1990. The government is hard pressed to effectively prosecute any case, whether it be an FMLN terrorist attack—such as the Zona Rosa killings in 1985—military abuses, or even nonpolitical crimes.

The case of Army officers and troops accused of murdering six Jesuit priests and two civilians in 1989 was remanded to trial. Although extrajudicial violence directed against suspected FMLN sympathizers by members of the military acting without official sanction is much less common than in the early 1980s, evidence indicates that such activity has not disappeared.

Military and public security forces kept up their efforts to preempt terrorist and insurgent activity by the FMLN. The armed forces captured more than 1,000 weapons and routinely provided security for many potential terrorist targets. The government also maintained a special counterterrorist unit for dealing with hostage rescue and other terrorist incidents.

**Guatemala**

Although the incidence of international terrorism rose, from four attacks in 1989 to seven in 1990, it was the escalating domestic political violence that continued to have the most impact on conditions in Guatemala. The three major Guatemalan guerrilla groups struck at many economic and nonmilitary targets, such as policemen, bridges, powerlines, government road repair facilities, telephone equipment, missionary medical facilities, and private farms. Guerrillas attacked an American missionary family living in the countryside, vandalized their home, and stole most of their personal property. Fortunately, none of the family members were injured.

Terrorism by rightwing extremists and members of the security forces also took many victims over the past year. Leftist politicians, students, unionists, journalists, members of human rights groups, and, above all, indigenous rural people suspected of proguerrilla sympathies were assassinated or disappeared. The nation's human rights ombudsman claims security forces were the main perpetrators of this violence. Security forces were suspected of involvement in the murder of a prominent leftwing Salvadoran politician who was visiting Guatemala in May. The government's investigation into the murder reached no credible conclusions.

22

PX270

The military continued its ongoing battle against the guerrillas, losing about 100 soldiers and civil defense members. The government also sought to end guerrilla access to sanctuaries by working more closely with its neighbor, Mexico. In an effort to end the domestic conflict, the government supported informal peace talks between representatives of the guerrillas and various political, economic, and social sectors.

### Honduras

Although the number of international terrorist incidents declined in Honduras from eight in 1989 to two in 1990, the attacks were no less serious. In recent years these incidents have been directed against US interests, often US servicemen. In the most serious attack during 1990, the leftist Morazanist Patriotic Front (FPM) claimed responsibility for the ambush of a US Air Force bus in March that wounded eight airmen, two of them seriously.

The Cubans, Nicaraguan Sandinistas, and Salvadoran FMLN guerrillas continue to support the Honduran Popular Liberation Movement—Cinchoneros. The FPM is also suspected of receiving Cuban assistance. The FMLN probably continues to use Salvadoran refugee camps in Honduras for infiltrating its guerrillas into El Salvador.

The Honduran Armed Forces conducted sweeps of known guerrilla operating areas during the year. In August, an interdiction team discovered a van carrying concealed weapons at the Nicaraguan border. The van was driven by a French citizen, and the contents of the van indicated that the arms and documents were destined for the FMLN in El Salvador. During the same month, nine Cinchoneros members attempting to rob a bank were killed in an ambush by the Armed Forces. The security forces suffered four fatalities in the firefight.

### Nicaragua

There were no international terrorist incidents in Nicaragua during 1990. The Sandinista government, which turned over power to the democratically elected government of Violeta Chamorro in April 1990, had supported a number of international terrorist groups during its 10 years in power. This support ranged from public statements in support of specific terrorist actions to allowing Nicaraguan territory to be used as a weapons transshipment route. Nicaragua was also used as a training and organization base for a variety of international terrorist groups. Despite the election of a

new government, the Salvadoran FMLN, Basque ETA, and various other groups that have engaged in international terrorism continued to operate in Nicaragua. These organizations established a presence in Nicaragua during the former Sandinista regime and appear to continue to rely on contacts with the Sandinistas, who retain full control of the police and armed forces.

The Chamorro government secured passage of tough legislation forbidding the use of Nicaraguan territory for the purposes of support for foreign subversion. Investigations of reported FMLN support bases in Nicaragua are a sign of government resolve to carry out this policy. However, President Chamorro allowed the FMLN to operate a political office in Managua, and supplies for Salvadoran insurgents continued to originate from or pass through Nicaraguan territory. The Sandinista-controlled military publicly admitted that four of its officers sold surface-to-air missiles to the FMLN without Nicaraguan Government approval.

### Panama

Since the ouster of General Noriega, most acts of violence in Panama have been attributed to a shadowy M-20 organization, purportedly dedicated to destabilizing the Panamanian Government. There were four international terrorist incidents in 1990. Domestic terrorism has tended to consist of low-level assaults and has included bank robberies, bombings, and threats against government officials.

In the most serious international incident in Panama during 1990, an unidentified individual threw a grenade into a crowded disco in Panama City in March that killed a US service member and injured 15 others. Fourteen Panamanians were also injured in the attack. M-20 claimed responsibility for this attack and for the drive-by shootings at the US Embassy and Marine security guard residence in June. In October, a grenade attack caused some property damage at the Austrian Consulate; the motive and perpetrators remain unknown.

The government has taken steps to end the support provided by the Noriega regime to the Colombian FARC and Salvadoran FMLN. Despite these efforts, FARC reportedly continues to operate in areas where the government

23

PX270

has little control, especially near the Colombian border. The government continued to study increased security measures at regional airports in response to the hijacking in mid-1990 of two Panamanian aircraft, allegedly by Colombian narcotics traffickers.

When an investigation revealed that a ship registered in Panama, the Tiny Star, was used to launch the Palestine Liberation Front's abortive attack on Israel in May, Panamanian authorities withdrew the ship's registration.

**Peru**
The number of international terrorist incidents increased in Peru from 21 in 1989 to 28 in 1990. An even greater cause for concern, the number of politically related deaths in 1990 climbed to more than 3,400—surpassing the nearly 3,200 deaths recorded in 1989. Peru also topped the list for foreign fatalities in the region in 1990. As many as six foreigners visiting Peru may have been killed by Sendero Luminoso (SL) during the year. In January, two French tourists traveling in the southern Sierra were taken off a bus and shot by SL. An American was shot near the city of Cuzco in February; his body showed signs of torture. Two British ornithologists were apparently kidnapped and killed by Sendero Luminoso in the northern coca producing Upper Huallaga Valley in June. In November, a Japanese citizen and five other people were killed in Lima's neighboring Junin department, an increasingly dangerous area.

Both Sendero Luminoso and the Tupac Amaru Revolutionary Movement (MRTA) conducted terrorist attacks against US interests, mostly property bombings designed to gain publicity. During 1990, SL detonated explosives at the US, Soviet, Chinese, German, and Japanese Embassies. In December, Sendero Luminoso was responsible for a driverless car with a bomb inside that rolled to a stop 100 yards from the US Embassy in Lima and exploded. No injuries or damage resulted.

The leftist MRTA carried out most of the anti-US incidents in 1990 with 11 attacks. It commemorated the group's anniversary in November by conducting a campaign against US targets that included bombings of US businesses, the US Consulate, and a US-Peruvian binational center. The MRTA also detonated a bomb in the park adjacent to the US Ambassador's residence. Immediately after the explosion, five rounds of gunfire struck the residence from a passing vehicle.

Insurgent violence in 1990 continued to expand throughout the country, mostly in rural areas, marking the most violent year since Sendero Luminoso launched its armed struggle in 1980. Terrorist gunmen killed the former Defense, Labor, and Social Security Ministers in Lima. There also was an upsurge in kidnappings of prominent Peruvians by Peru's smaller terrorist group, MRTA.

To combat the wave of political violence, the government expanded the territory under emergency zone status. Constitutional rights are suspended in these zones, and the military is responsible for internal security. Eleven of Peru's 24 departments were under state-of-emergency status during some part of 1990. However, both the military and the police suffer from a lack of adequate supplies, security training, and the coordination necessary to conduct effective counterterrorist operations.

President Fujimori, inaugurated in July, promised new reforms that include speedier trials of terrorist suspects. In December, the President sought a constitutional amendment to permit the trial of accused terrorists in military courts. Prosecution through the civilian courts moves slowly, and both prosecutors and judges have been threatened by terrorist organizations. Between 50 and 75 percent of all accused terrorists in Peruvian prisons have not yet been brought to trial.

After more than two years in court, Osman Morote, SL's number-two leader, was sentenced to 20 years in prison on terrorist charges. He is the most senior terrorist figure to be charged and convicted in Peru since Sendero Luminoso embarked on its violent campaign in 1980. Four other codefendants were sentenced to lesser, but lengthy, prison terms. The trial of MRTA leader Victor Polay was suspended in July when he and more than 40 other suspected MRTA members escaped from jail.

**Trinidad and Tobago**
Although there were no international terrorist incidents in Trinidad and Tobago during 1990, the government successfully suppressed a coup attempt that included the taking of hostages, including Prime Minister Robinson, in the Parliament and state television facilities. The government is prosecuting 114 members of the Jamaat Al Muslimeen (JAM), a local Muslim group, on charges of

24

PX270



*A JAM rebel surrendering to Trinidad soldiers after failed coup attempt.*    Agence France Presse ©

treason and murder for its 27 July–1 August attempt to overthrow the government. Several JAM members including its leader, Yasin Abu Bakr, had traveled on several occasions to Libya, one of several sources of funding for the JAM.

### Middle Eastern Regional Overview

The number of international terrorist incidents in the Middle East dropped sharply, from 193 in 1989 to 63 in 1990. The incidence of Middle Eastern terrorist "spillover" into other parts of the world also declined from 43 to 21 attacks.

International terrorism by Palestinians declined. Although Iraq encouraged many of the Palestinian terrorist groups to conduct operations against the international coalition opposing Baghdad's invasion of Kuwait, at year's end no such attacks had been carried out.

Following the abortive 30 May Palestine Liberation Front (PLF) attack on the beaches at Tel Aviv, President Bush announced his decision to suspend the 18-month-old dialogue between the United States and the Palestine Liberation Organization (PLO). The dialogue began in December 1988, after PLO Chairman Yasser Arafat publicly renounced terrorism, accepted UN Security Council resolutions 242 and 338, and affirmed Israel's right to exist.

The PLF is a constituent group of the PLO, and its leader, Abu Abbas, is a member of the PLO Executive Committee. After the attempted 30 May raid, the PLO refused US calls to condemn the attack, disassociate itself from the PLF, and take steps to discipline Abu Abbas.

A number of Palestinian groups, including the PLF and other members of the PLO, have made public statements supporting Iraq and opposing the multinational forces deployed to enforce the UN resolutions regarding Iraq's invasion of Kuwait. Saddam Hussein has attempted to portray his aggression against Kuwait as part of the struggle for a Palestinian homeland. Iraq's belligerence and promise of support have attracted those groups long favoring the use of force to solve the Arab-Israeli conflict. The United States rejects the linkage of these two issues. The PLF, Palestinian Islamic Jihad (PIJ), and the Palestinian Front for the Liberation of Palestine (PFLP) are among those who have threatened terrorist attacks against Western, Israeli, and moderate Arab targets in connection with the Gulf crisis.

No new Western hostages were kidnapped this year. Eight Western hostages—including two Americans, Robert Polhill and Frank Reed—were released. Although these are positive developments, Iranian-supported Hizballah members in Lebanon continue to hold some 14 Western hostages, six of them American citizens. Three of these hostages (Englishman Alec Collett, Italian Alberto Molinari, and American Lt. Col. William R. Higgins) are feared dead.

25

PX270

Despite the decline in the number of international terrorist incidents undertaken by Middle Eastern groups, domestic terrorism continued in Israel, the occupied territories and Lebanon (see inset on the Palestinian Uprising). The 8 October Temple Mount (Haram al-Sharif) incident claimed the lives of 17 Arab civilians, killed by Israeli security forces. Internecine conflicts within and between Palestinian and Lebanese terrorist groups added to the violence.

Iraq's sponsorship of Palestinian terrorist groups (discussed in detail in the section on State-Sponsored Terrorism) poses a great threat. Iran's links to Hizballah, other Islamic fundamentalist groups, and the Palestinians strengthened during the year, increasing the potential that these groups will continue to use terrorism to advance their political goals. The competition for influence in politically unstable Lebanon could also spawn terrorist attacks.

## Algeria

There were no acts of international terrorism in Algeria in 1990. As a longstanding policy, Algeria has permitted radical groups, some of whom engage in terrorism, to live and work in Algeria. Algeria draws a distinction between terrorism, which it condemns, and violence on the part of national liberation movements, which it believes can be legitimate. The ANO, for example, was allowed to keep a representative in Algiers even after Algerian officials condemned an attempt to kidnap an ANO defector. Algiers also allowed representatives of two terrorist groups—the Palestinian Islamic Jihad and Abu Abbas's Palestine Liberation Front—to appear on national television to rally popular support for Iraq.

Algerian officials are increasingly concerned that domestic groups may resort to terrorism. That concern has grown since August when Iraq's Saddam Hussein invaded Kuwait and since Islamic fundamentalist groups gained a majority of seats in local elections. However, at year's end no such incidents had been reported.

## Egypt

The most significant terrorist incident of 1990 was the assassination of Dr. Rif'at al Mahgoub, Speaker of the People's Assembly, on 12 October. Dr. Mahgoub's assassins are believed to be associated with radical Islamic elements linked to the assassination of President Anwar Sadat.

There were no terrorist attacks against US personnel in Egypt in 1990, but two attacks were carried out against Israeli citizens. In the first, an Israeli tour bus was ambushed on 4 February between Cairo and Ismailiya, Egypt. The attack, claimed by members of the PIJ, left 11 people, including nine Israelis, dead and 17 others injured. The second terrorist incident occurred 25 November when a lone gunman dressed in an Egyptian paramilitary uniform crossed the Egyptian-Israeli border near Eilat and opened fire on a bus and three vehicles carrying Israeli soldiers and workers. Four Israelis were killed, and 27 were wounded. The perpetrator fled back across the border where he was immediately arrested by Egyptian authorities. Egyptian officials also report the arrests of several suspects in the Mahgoub assassination and Israeli tour bus attack. Egypt has no specific laws dealing with terrorism as a separate issue, although the state of emergency dating from the assassination of President Sadat remains in effect.

The Egyptian Government has waged a campaign to limit the terrorist threat posed by Islamic extremists, Egyptian nationalist groups, and radical Palestinians. Twenty members of Egypt's Revolution—a radical group espousing the militant nationalism of former Egyptian President Nasser—are on trial for the May 1987 attack on US Embassy personnel and for earlier attacks on Israeli diplomats. The Egyptian prosecution has requested the death penalty for 10 members of the group and life sentences for the rest.

Khaled Abdel Nasser, son of the late president, returned to Egypt from Yugoslavia after three years in exile. He has been identified as the head of the Egypt's Revolution organization. He too is on trial for masterminding the group's attacks on US and Israeli interests.

## Israel

Israel remained the prime target of Palestinian terrorist attacks during 1990. Escalating tensions resulted in a number of serious incidents during the year.

On 30 May, Israeli forces foiled an attempted seaborne assault against the Tel Aviv beachfront. Four terrorists were killed and 12 captured. The attack was carried out by the Palestine Liberation Front, led by Abu Abbas, with substantial assistance from Libya. PLO Chairman Arafat's

PX270



*Israeli soldiers stand by the boat used by PLF terrorists to attack the beach at Tel Aviv.*    UPI ©

failure to take concrete actions against the PLF, a constituent PLO member, led to the suspension of US dialogue with the PLO.

Other terrorist attacks against Israel in 1990 include:

- A series of letter bombs addressed to Jewish and Christian community leaders were discovered at Tel Aviv's central post office in early January.

- Nine Israelis were killed and 17 wounded in Egypt on 4 February when their tour bus was ambushed by Arab terrorists. The Palestine Islamic Jihad claimed responsibility for the attack.

- On 28 May, one person was killed and nine others wounded when a pipe bomb exploded in a crowded Jerusalem market. Separate unconfirmed claims of responsibility were made by the Palestine Islamic Jihad, the Abu Musa group, and the General Command of Fatah's Al-Asifah Forces.

- On 23 June, a pipe bomb exploded at Ein Gedi on the Dead Sea. Two Israelis and two Germans were injured.

- On 28 July, a pipe bomb exploded on the beach in Tel Aviv, killing a Canadian tourist and injuring 20 other people.

- On 21 October, a Palestinian stabbed and killed three Israelis and wounded another in Jerusalem. The attack was claimed by two anonymous callers, one claiming to be a member of the Palestinian Islamic Jihad and another claiming to represent Fatah's Force 17 organization.

In early January, a Jewish extremist group known as the Sicarii claimed responsibility for planting a dummy grenade under the car of the wife of Israeli Deputy Prime Minister Peres. The Sicarii also threatened attacks on four Israeli members of Parliament because of their support for a Palestinian peace demonstration. Israeli authorities arrested a suspected leader of the group in June. Israeli peace activists and prominent Palestinian figures received a number of death threats from supporters of Israeli extremist leader Meir Kahane following his assassination on 5 November in New York.

Palestinian groups—both PLO hardliners and Syrian-backed factions outside the PLO—attempted more than a dozen cross-border raids from Lebanon, Jordan, and Egypt. In most cases, the precise targets of the attacks are unclear. Some border infiltrations were the work of disgruntled individuals acting alone or with a few colleagues, but with no discernible connection to any organized group. On 25 November, an Egyptian policeman, believed to have acted alone, ambushed a tour bus of Israelis near the Egyptian border and killed four Israelis.

Israel has consistently taken a strong stand against terrorism and has devoted significant resources to anti-terrorist planning and training.

Israel places strong emphasis on security measures designed to protect its citizens and visitors, the best known of which deal with protection for the Israeli national air carrier El Al at home and abroad. Public awareness of the terrorist threat is also stressed. Ordinary citizens are trained in counterterrorist tactics, and even schoolchildren receive instruction in bomb detection.

Israel also uses more forceful measures to thwart or deter attacks. Israeli military forces have launched preemptive and retaliatory airstrikes and commando raids against suspected terrorist installations in neighboring Lebanon. Israel continued to hold Sheikh Abdul Karim Obeid, a prominent Hizballah cleric from South Lebanon, whom Israeli forces abducted in July 1989, apparently in an effort to exchange him for Israeli hostages and POW's held by Lebanese and other groups.

27

PX270

A number of violent incidents in Israel in 1990, such as the 2 December stabbing of three Israelis on a bus near Tel Aviv, increased Israeli fears that the Palestinian uprising in the occupied territories is spilling over into Israel. During 1990, the West Bank and Gaza were sealed off from Israel on several occasions when the threat was deemed to be especially high. In December, Israeli authorities issued identity cards to a large number of Palestinian activists on the West Bank, barring them from entering Israel. Israel also issued deportation orders for four Arabs accused of being activists in the Islamic group Hamas.

Israeli courts generally hand out strict prison sentences to those convicted of terrorist attacks. The captured terrorists from the failed 30 May seaborne assault near Tel Aviv received 30-year prison sentences in December. In October, Mahmud Abed Atta, a US citizen who is a member of the Abu Nidal organization (ANO), was extradited from the United States to Israel where he will face trial for a 1984 attack on a civilian bus.

In December, an Israeli prison review panel released three convicted members of the Jewish Underground after they had served six years of their 10-year sentences. The three had been convicted of murdering three Arab students, wounding over 30 others, and planting explosives. They were originally given life sentences in 1985, but Israeli President Chaim Herzog commuted the sentences to 10 years in 1989.

### Jordan

Over the course of the year, a Jordan-based leader of the Palestine Islamic Jihad claimed responsibility for several attacks against Israel and repeatedly threatened US and Israeli interests. Jordanian authorities briefly detained five PIJ members in June. The PIJ has threatened Western interests and has targeted US and other officials for assassination.

Escalating Arab-Israeli tensions throughout 1990 raised concerns that the Palestinian uprising in the Israeli-occupied territories might spill over into Jordan. The number of armed infiltrations across the demarcation boundary with Israel increased in 1990. These infiltrations were carried out mainly by individuals with no known connection to any political organization. In July, Jordanian authorities intercepted an armed Palestinian guerrilla squad attempting to infiltrate from Syria.

### The Palestinian Uprising

*The Palestinian uprising, or intifadah, which has persisted in the Israeli-occupied West Bank and Gaza Strip since December 1987, continued throughout 1990. Clashes between Palestinian protestors and Israeli troops and settlers in the occupied territories resulted in hundreds of injuries and the deaths of 140 Palestinians and 10 Israelis. Seventeen Palestinians were killed in an 8 October clash on the Temple Mount (Haram al-Sharif), the worst incident of the year.*

*The intifadah as a whole is primarily a civil insurrection that contains elements of terrorism in specific instances. Acts of intifadah violence frequently go unclaimed and are not clearly tied to specific goals and objectives or organized groups.*

*Without an identifiable perpetrator or motive, it is difficult to apply the criteria of our working definition of terrorism to most intifadah events.*

*Intifadah casualties for 1990 were fewer than in 1989. Security authorities sought to reduce the levels of violence during the summer of 1990 by measures designed to avoid confrontation, and Palestinian and Israeli casualties declined during July, August, and September. During the last quarter of 1990, however, a series of incidents—including the immolation of an Israeli Defense Force reservist in the Gaza Strip and the killing of 17 Palestinians on the Temple Mount (Haram al-Sharif) in Jerusalem—and widespread Palestinian support for Iraqi President Saddam Hussein, led to an emotional heightening of tensions on both sides and an increase in incidents and casualties.*

*In 1990 there was an increase in violence by Palestinians against Palestinians, including 165 murders that appear to have been politically motivated.*

The Jordanian Government is committed to the fight against terrorism. Jordan has increased security along its borders to prevent infiltrations and has cooperated in international counterterrorist efforts.

28

PX270

## Kuwait

The Kuwaiti Government has opposed terrorism and has cooperated with other governments, including the United States, in this regard, both before and after the 2 August invasion. Despite pressure from terrorist groups in Lebanon, the Amir consistently refused to pardon 15 pro-Iranian Shia terrorists imprisoned in Kuwait for the December 1983 wave of bombings in which the US Embassy was attacked. After the Iraqi invasion, the prisoners, all members of the Dawa Party, either escaped or were released, according to press reports.

Before the Iraqi invasion, Kuwait was concerned about a terrorist threat from Iran, largely via Tehran's manipulation of Kuwaiti Shia. In May, four pro-Iranian Kuwaiti Shia were tried in Kuwait's State Security Court for numerous subversive acts, including attempting to blow up a Kuwait Airways building in 1988 and complicity in a failed bombing attempt in 1987. One of the accused was implicated in the 1989 Hajj bombing in Mecca. The defendants were acquitted on all counts on 18 June 1990. Iran had severely criticized the trial. Earlier in the year, a large number of Iranians, termed infiltrators by the Kuwaiti press, entered Kuwait illegally by sea. Most were captured within days of their entry.

## Lebanon

While the number of international terrorist incidents in Lebanon fell to nine in 1990, from 16 in 1989 and 28 in 1988, and the local security situation improved somewhat later in 1990, the country remains deeply fractured, as it has for most of the past 16 years.

Until the 13 October ouster of dissident Gen. Michel Awn, the Lebanese central government controlled only a small part of the country. The bulk of Lebanon came under the control of Syria, Israel, and militias owing allegiance to particular individuals, including General Awn. Many domestic terrorist incidents occurred in 1990, mainly as a result of internecine struggles between the Lebanese factions.

Iran, Iraq, Syria, and Libya continue to support radical groups who engage in terrorism in Lebanon. These countries offer varying degrees of financial, military, and other support to such groups.

In its efforts to rebuild the country, the Lebanese Government has attempted to disband militias, increased pressure on Israel to withdraw from the south, and tried to expand its control southward, but it has had only limited success. The government has not been able to apprehend or prosecute terrorists but has frequently condemned terrorist incidents and called for the release of foreign hostages.

Several international terrorist groups including radical Palestinians, the Japanese Red Army, the Kurdish Worker's Party, the Abu Nidal organization, and the Armenian Secret Army for the Liberation of Armenia (ASALA), maintain training facilities on Lebanese soil, chiefly in the Syrian-garrisoned Bekaa Valley. Hizballah continues to hold a number of Western hostages, including six Americans. All have been maltreated by their captors, and some were reportedly exposed to poisonous substances such as arsenic. Others were kept chained for long periods of time. The United States continues to urge countries with influence over the hostage holders to use that influence to effect the hostages' unconditional release and to secure an accounting of all hostages who may have died while in captivity.

An American who, with his wife, ran an orphanage in the Israeli self-declared security zone in South Lebanon, was assassinated by individuals believed to be local inhabitants, who apparently thought he was aiding the resettlement of East European Jews.

No Westerners were taken hostage in 1990. In fact, two Swiss hostages, Irish-British dual national Keenan, US hostages Polhill and Reed, one Belgian hostage, and two French hostages were released.

## Saudi Arabia

Saudi Government concern regarding terrorism deepened in the face of continued attacks from Iran and new threats from Iraq at the onset of the Gulf crisis. Pro-Iranian radical Shia terrorists were believed responsible for the assassination of three Saudi diplomats in Bangkok on 1 February and serious injury to another in the bombing of a Saudi Embassy vehicle in Ankara in January—undertaken in reaction to the Saudi execution of 16 Kuwaiti Shia in 1989

PX270

**Foreign Political Hostages Believed Held in Lebanon, 1990**

| Name/Nationality/Profession | Date/Place Kidnapped | Kidnapping Claimed by | Status |
|---|---|---|---|
| Terry Anderson, United States, AP Middle East Bureau Chief, journalist | 16 March 1985 West Beirut | Islamic Jihad | Still held |
| Alec Collett, United Kingdom, journalist, UNRWA | 26 March 1985 Khaldah | Revolutionary Organization of Socialist Muslims | Reported to have been killed in 1986, but information is inconclusive |
| Thomas Sutherland, United States, American University of Beirut (AUB), educator | 9 June 1985 West Beirut | Islamic Jihad | Still held |
| Alberto Molinari, Italy, businessman | 11 September 1985 West Beirut | No claim | Presumed dead, but evidence not conclusive |
| John McCarthy, United Kingdom, TV journalist | 17 April 1986 West Beirut | Arab Commando Cells | Still held |
| Joseph Cicippio, United States, AUB, comptroller | 12 September 1986 West Beirut | Revolutionary Justice Organization | Still held |
| Edward Tracy, United States, writer | 21 October 1986 West Beirut | Revolutionary Justice Organization | Still held |
| Terry Waite, United Kingdom, Church of England, envoy | 20 January 1987 West Beirut | No claim | Still held |
| Alann Steen, United States, Beirut University College (BUC), educator | 24 January 1987 West Beirut | Oppressed of the Earth; and Islamic Jihad for the Liberation of Palestine | Still held |
| Jesse Turner, United States, BUC, educator | 24 January 1987 West Beirut | Oppressed of the Earth; and Islamic Jihad for the Liberation of Palestine | Still held |
| William Richard Higgins, United States, Lt. Col., Marine Corps | 17 February 1988 near Tyre | Islamic Revolutionary Brigades; and Organization of the Oppressed on Earth | Presumed dead |
| Heinrich Struebig, Germany, relief worker | 16 May 1989 Lebanon | No claim | Still held |
| Thomas Kemptner, Germany, relief worker | 16 May 1989 Lebanon | No claim | Still held |
| Jack Mann, United Kingdom, retired | 6 October 1989 Sidon | Uncertain | Still held |

30

PX270

**Foreign Political Hostages Released in 1990 and January 1991**

| Name/Nationality/Profession | Date/Place Kidnapped | Kidnapping Claimed by | Status |
|---|---|---|---|
| Fernand Houtekins, Belgium | November 1987 Mediterranean | Fatah–Revolutionary Council | Released 10 April |
| Jacqueline Valente, France | November 1987 | Fatah–Revolutionary Council | Released 10 April |
| Sophie-Liberte Valente, France | Born in captivity | Fatah–Revolutionary Council | Released 10 April |
| Robert Polhill, United States, Beirut University College (BUC), educator | 24 January 1987 West Beirut | Oppressed of the Earth; and Islamic Jihad for the Liberation of Palestine | Released 22 April |
| Frank Reed, United States, Director, Lebanese International School | 9 September 1986 West Beirut | Ba'th Cells Organization; and Arab Revolutionary Cells | Released 30 April |
| Emmanual Christian, Switzerland, Red Cross official | 5 October 1989 Lebanon | No claim | Released 8 August |
| Elio Erriquez, Switzerland, Red Cross official | 5 October 1989 Lebanon | No claim | Released 13 August |
| Brian Keenan, Ireland/United Kingdom, American University of Beirut (AUB), educator | 11 April 1986 West Beirut | No claim | Released 24 August |
| Emmanuil Houtekins, Belgium | November 1987 Mediterranean | Fatah–Revolutionary Council | Released January 1991 |
| Laurent Houtekins, Belgium | November 1987 Mediterranean | Fatah–Revolutionary Council | Released January 1991 |
| Valire Houtekins, Belgium | November 1987 Mediterranean | Fatah–Revolutionary Council | Released January 1991 |
| Godlieve Kets, Belgium | November 1987 Mediterranean | Fatah–Revolutionary Council | Released January 1991 |

for their involvement in the Hajj bombings of that same year. Later in 1990, Iraq threatened to attack targets within the country, Saudi interests elsewhere in the Middle East and Europe, and Saudi officials and members of the royal family.

Terrorist acts are capital crimes under Saudi law. In addition to strong statements condemning several attacks against Saudis abroad, the Foreign Ministry published a rebuttal in April of Iranian accusations against Saudi Arabia, including a list of Iran's misdeeds over the past three years and specifically pinning responsibility for the 1989 Mecca bombings on the Iranian Government.

Saudi security officials continue to cooperate with US security agencies on information exchange and training programs. In March, the Saudis took steps to identify illegal residents and to either regularize their status or deport them. This process was accelerated during the Gulf crisis. The Saudis also put additional security measures in effect during the 1990 Hajj, which passed without a terrorist incident.

31

PX270

## Yemen

On 22 May 1990, the People's Democratic Republic of Yemen (PDRY) united with the Yemen Arab Republic (YAR) to form the Republic of Yemen (ROY).

The PDRY remained on the US Government's list of state sponsors of terrorism until unification. The new unified government was not placed on the terrorist list. However, regular discussions between the United States and Yemen, to ensure that the ROY provides no support to international terrorist groups, have continued since unification.

To address these concerns, the ROY put in place tighter procedures for issuing passports, particularly diplomatic passports, to non-Yemenis, including Palestinians. The government also stated that military training facilities would no longer be available to non-Yemenis. In the past, Palestinians were regularly issued PDRY passports and used a camp outside Aden for military training.

## State-Sponsored Terrorism

State sponsorship of terrorism remains one of the most important factors in fostering international terrorism. A number of governments afford terrorists safehaven, travel documents, arms, training, and technical expertise. In addition to support for terrorist groups, some governments engage directly in terrorism as a tool of their foreign and domestic policies. Other governments, though not direct sponsors of terrorist groups, contribute to such groups' capabilities by allowing them unimpeded transit, permitting them to operate commercial enterprises, and allowing them to carry out recruitment and other support activities. Any type of government support for terrorist groups makes law enforcement efforts to counter terrorism much more difficult. Thus, the United States and its allies in the fight against terrorism have focused on raising the costs for those governments who support, tolerate, and engage in terrorism.

The United States currently lists Cuba, Iran, Iraq, Libya, North Korea, and Syria as state supporters of terrorism. This list is maintained pursuant to Section 6 ( j ) of the Export Administration Act of 1979. This and related US statutes impose trade and other restrictions on countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism. The list is sent annually to Congress, though countries can be added or subtracted at any time that circumstances warrant. The People's Democratic Republic of Yemen was dropped from the list in 1990 after it merged with its northern neighbor to form the Republic of Yemen. Iraq was added to the list because of its renewed support for terrorist groups in 1990.

The international effort to eliminate state support for terrorism has achieved some notable results. International public opinion and cooperation among like-minded governments have generated great pressure on governments to change their behavior or, at a minimum, make significant efforts to hide their involvement in terrorism. This is reflected in the number of terrorist incidents attributable to governments on the United States list of state supporters of terrorism. The totals have declined from 176 in 1988 to 58 in 1989 and finally 54 in 1990. While these numbers are heartening, it should be noted that the investigations into the terrorist bombings of Pan Am Flight 103 in December 1988 and of UTA Flight 772 in September 1989 continue and could uncover involvement of state sponsors.

Indeed, the continuing danger posed by state sponsorship was demonstrated in 1990 by two developments. First, the 30 May abortive seaborne attack by the Palestine Liberation Front (PLF) on crowded Israeli beaches was made possible by Libyan Government support for the training, provision, and transportation of the PLF terrorists. While the operation was foiled without civilian casualties, the attack significantly raised tensions in the region and resulted in the termination of the US-PLO dialogue. Had the operation succeeded, it could have led to numerous casualties among bathers on the crowded Tel Aviv public beaches. Second, after Iraq's August invasion of Kuwait, the world saw Iraq assemble an impressive array of terrorist groups aimed at intimidating the international coalition opposed to the invasion.

Libya's involvement in terrorism during 1990 went beyond support for the 30 May attack on Israel. Tripoli continued to shelter and aid the notorious Abu Nidal organization (ANO), to fund other radical Palestinian groups such as the Popular Front for the Liberation of Palestine–General Command (PFLP-GC), and to support terrorist groups elsewhere in Africa, Latin America, and Asia.

PX270

Iran continued its use of and support for terrorism in 1990, targeting and assassinating Iranian dissidents overseas, attacking Saudi officials and interests, continuing to support the holders of the American and other Western hostages in Lebanon, and supporting radical Palestinian groups such as the Palestine Islamic Jihad (PIJ) and the PFLP-GC. Syria continued to give refuge and support to Lebanese, Palestinian, Turkish, Japanese, and Iranian terrorists while maintaining that all attacks on Israel and the occupied territories are legitimate ''national liberation'' efforts. North Korea continued to harbor some Japanese Red Army (JRA) terrorists and to provide some support to the New People's Army in the Philippines. Cuba continued to supply and support groups that use terrorism in El Salvador, Colombia, Peru, Honduras, and Chile, among others.

## Cuba

Cuba continues to serve as a haven for regional revolutionaries and to provide military training, weapons, funds, and guidance to radical subversive groups that use terrorism. The island today remains a major training center and transit point for Latin subversives and some international groups.

El Salvador's Farabundo Marti National Liberation Front (FMLN) has been the primary beneficiary of Cuba's clandestine support network over the last several years. Havana has been the point of origin for most of the weapons used by the FMLN for insurgent and terrorist operations in El Salvador. Other Central American groups, notably in Honduras and Guatemala, have also received Cuban aid. In South America, Chilean radical leftist groups have been the favored recipients of Cuban support, but their aid may have declined since Chile's peaceful transition to civilian rule in March 1990.

Several rebel organizations have offices and members stationed in Havana. Wounded rebels are often treated in Cuban hospitals. With the demise of the pro-Cuban governments in Panama and Nicaragua, Cuba's support has become even more important to radical groups.

## Iran

Iran's extensive support for terrorism continued during 1990, although the number of terrorist acts attributed to Iranian state sponsorship dropped to 10 in 1990 from 24 in 1989.

Iran has used its intelligence services extensively to facilitate and conduct terrorist attacks, particularly against regime dissidents. Intelligence officers in embassies have used the diplomatic pouch for conveyance of weapons and finances for terrorist groups. Iran continued to strengthen its relationship with Muslim extremists throughout the world, often providing them with advice and financial assistance. Over the past year, Iranian support for terrorism has included:

- Repeating the call for the death of the author of *The Satanic Verses*, Salman Rushdie.
- Assassinations of four antiregime dissidents—in Pakistan, Switzerland, Sweden, and France.
- Supporting radical Shia attacks on Saudi interests, including the assassinations of three Saudi diplomats, in retaliation for the execution of the Hajj bombers.
- Extensive support for Hizballah, the PFLP-GC, the PIJ, and other groups, including provision of arms, funding, and training.

Iranian-backed Shia groups are believed to be in control of Western hostages in Lebanon, and most observers believe that the key to releasing the hostages rests with Iran. One such group, Hizballah, is believed to hold all of the remaining American hostages. Iranian President Ali Akbar Hashemi-Rafsanjani, whose domestic political strength increased during 1990, is thought to favor a pragmatic approach to foreign policy and improved relations with the West, which would require resolution of the hostage problem. For example, *The Tehran Times,* a newspaper considered to reflect Rafsanjani's views, editorialized on 22 February that the hostages should be freed without preconditions. Two months later, US hostages Robert Polhill and Frank Reed were released. The hostage releases received some criticism from hardline elements both in Iran and within Hizballah who questioned whether Iran or the hostage holders had received any benefit for their actions in terms of a good will gesture from the West. No more US hostages were freed in 1990, and press reports indicated that Iran was seeking rewards before any further movement on the hostages was possible.

Major terrorist figures, including Ahmad Jabril of the PFLP-GC and various prominent members of Hizballah, frequently visit Iran. Iran hosted a World Conference on Palestine in Tehran in December in an effort to gain

PX270

increasing influence over Islamic affairs, in general, and over the Palestinian movement, in particular. Leaders of several radical Palestinian and Lebanese groups including Saiqa, Hamas, Hizballah, and the Palestinian Islamic Jihad attended.

**Iraq**

Iraq was returned to the terrorist list in September 1990 because of its increased contact with, and support for, terrorist groups. After the formation of an international coalition against the invasion of Kuwait, Iraqi officials issued public statements endorsing terrorism as a legitimate tactic.

Following its invasion of Kuwait on 2 August, the Government of Iraq systematically seized the citizens of the United States and many other nations. This occurred in both Kuwait and Iraq and continued for several months. Many of the hostages were moved to strategic sites in Iraq, including armaments factories, weapons research facilities, and major military bases.

This mass act of hostage taking was condemned by nations throughout the world, and the United Nations Security Council adopted Resolution 664, demanding that Iraq release these hostages.

Saddam Hussein eventually released the hostages, starting with women and children. By December, all the Western hostages were freed, but many Kuwaitis remained in captivity.

Hostage taking on the scale undertaken by Iraq is unprecedented in recent history. Saddam Hussein's operation represented a cynical and futile attempt to terrorize both foreign nationals and their governments and to weaken international resolve to oppose his occupation and annexation of Kuwait.

During 1990, and particularly after 2 August, the press reported increasing movement of terrorists to Baghdad, signaling the deepening relationship between these groups and Iraq. Even before the invasion of Kuwait, Iraq provided safehaven, training, and other support to Palestinian groups with a history of terrorist actions. The Arab Liberation Front (ALF) and Abu Abbas's PLF, responsible



*Saddam Hussein in a videotaped meeting with a young hostage.*  Reuter/CNN ©

for the 1985 Achille Lauro hijacking and the terrorist attack on Israeli beaches in May, are among these groups. The ANO is also reported to have reestablished its presence in Iraq in the first half of 1990. Abu Ibrahim, leader of the now-defunct 15 May terrorist organization and famed for his skill as a bombmaker, is also reportedly based in Baghdad.

With the end of the Iran-Iraq war, Iraq reduced its support for anti-Iranian dissident groups including the Mujahidin-e-Khalq (MEK). Speculation continues regarding increased Iraqi support for the terrorist Kurdish Worker's Party (PKK) in Turkey. This is coupled with the worsening of Turkish-Iraqi relations over Turkey's enforcement of UN mandated trade sanctions after the invasion of Kuwait and disputes over water rights.

Senior Iraqi Government officials, including Foreign Minister Tariq Aziz, made public statements justifying terrorism as a legitimate Iraqi response in the event of hostilities between Iraq and the multinational force deployed in the region. There were reports that Iraq planned to put these words into effect and that Iraqi officials, as well as Baghdad's Palestinian surrogates, conducted surveillance against various coalition targets.

PX270

## Libya

In 1990, Libya demonstrated its continued support for terrorism by supporting the Palestine Liberation Front's failed 30 May seaborne attack on crowded Israeli beaches. Tripoli helped the PLF plan, train for, supply, and carry out the seaborne operation.

Since 1986, Libyan leader Muammar Qadhafi has made public disclaimers about his support for terrorist groups. He continued to provide money, training, and other support to his terrorist clients. Qadhafi's claims of having expelled certain terrorist groups—the PLF, ANO, and PFLP-GC—remained unsubstantiated as of the end of 1990. Libya also resumed funding to the PFLP-GC, and possibly other Palestinian terrorist groups, in 1990.

Libya also continues its support for a variety of terrorist/insurgent groups worldwide. In the Philippines, Libya has supported the NPA, which carried out terrorist attacks against Americans that killed five persons in 1990. Costa Rican officials believe that all 15 members of the Santamaria Patriotic Organization (OPS) arrested in Costa Rica in February for grenade attacks against US facilities had undergone terrorist training in Libya. The group that attacked the Trinidad and Tobago Parliament on 27 July in a coup attempt, which killed several persons, received training and financial support from Libya, among others.

In April, Ethiopia expelled two Libyan diplomats for alleged involvement in the 30 March bombing at the Hilton Hotel in Addis Ababa.

Throughout 1990, indications of Libya's previous involvement in acts of terrorism emerged. According to German press reports, German officials uncovered evidence in the files of the now-defunct East German secret police, the Stasi, that demonstrated Libyan responsibility for the 1986 bombing of the La Belle Disco in West Berlin.

In addition, according to press reports, the investigation into the September 1989 bombing of the French UTA Flight 772—which killed 170 persons, including 7 Americans—indicates that the bomb was brought into Congo in the Libyan diplomatic pouch and delivered to three Libyan-trained Congolese terrorists by an official of the Libyan Embassy in Brazzaville. African and French press reports state that both the Congolese and Zairians are holding suspects who have implicated Libya in the bombing.

Press reports in late 1990 also laid much of the responsibility on the Libyans for the bombing in December 1988 of Pan Am Flight 103. According to American, British, and French press, investigators discovered that the detonator used in the Pan Am Flight 103 bombing was identical to one carried by two Libyan agents arrested in Dakar, Senegal, in February 1988. The official investigation into both of these cases was continuing through the end of 1990.

## North Korea

North Korea is not known to have sponsored a terrorist attack since members of its intelligence service planted a bomb on a South Korean airliner in 1987. However, it continues to provide safehaven to a small group of Japanese Red Army (JRA) members who hijacked a JAL airliner to North Korea in 1970. North Korea has provided some support to the New People's Army in the Philippines. It has not renounced the use of terrorism.

## Syria

There is no direct evidence of Syrian Government involvement in terrorist attacks outside Lebanon since 1987, although Syria continues to provide support and safehaven to groups that engage in international terrorism.

Syria has made some progress in moving away from support for some terrorist groups. Syria has also cooperated with Iran and others to obtain the release of Western hostages held by terrorist groups in Lebanon, including the successful release of American hostages Polhill and Reed in the spring of 1990. The government-controlled media has described the Abu Nidal organization as a terrorist organization, but the Syrian Government has failed to take concrete measures against the ANO in Syrian-controlled areas of Lebanon.

At the same time, Syria publicly supports the Palestinians' right to armed struggle for their independence. President Assad has publicly defended and supported Palestinian attacks in Israel and the occupied territories. Syria continues to provide political and material support for Palestinian groups who maintain their headquarters in Damascus and who have committed terrorist acts in the past, most notably the PFLP-GC whose propaganda radio station, al Quds, broadcasts from Syrian soil. It also hosts the Abu Musa

35

PX270

group, the Popular Struggle Front (PSF), the Popular Front for the Liberation of Palestine (PFLP), and Democratic Front for the Liberation of Palestine (DFLP). The leader of the PFLP had publicly stated that he would carry out attacks against US targets and others opposed to Iraq in the event of a military clash in the Gulf. At year's end, no such attacks had occurred.

The United States continued to express its serious concern to the Syrian Government—both publicly and privately—about terrorist groups supported by Syria. The Syrian Government has taken some positive steps, particularly since the beginning of the Gulf crisis in August 1990, to rein in terrorist groups based in Syria. They did not, however, take steps to close down these groups or expel them from Syria.

Syria has taken no steps to disband or eliminate the presence of other terrorist organizations, such as the Kurdish Worker's Party (PKK), the Armenian Secret Army for the Liberation of Armenia (ASALA), and the Japanese Red Army. A number of these groups have camps in Lebanon's Bekaa Valley, which is under the control of Syrian forces. Syria also tolerates the presence of a faction of the Palestinian Islamic Jihad that took responsibility for the massacre in February of nine Israeli civilians on a tour bus in Egypt. The PIJ statement was broadcast on the PFLP-GC–controlled radio station in southern Syria.

In 1990, and particularly since the Iraqi invasion of Kuwait, Syria has attempted to minimize its public association with terrorist activities and groups in the international arena, apparently in an attempt to improve its standing with the West. Syrian officials have said that Syria is committed to bring to justice and punish those individuals within Syria's jurisdiction accused of acts of terrorism, if given supporting evidence of their crimes. They have also repeated that any organization that is involved in terrorist crimes will have to bear the consequences. Following the September visit by Secretary of State James Baker, Syrian Foreign Minister Shara' stated publicly that Syria condemned all forms of terrorism, including hijacking and hostage taking. However, Syria continues to draw a distinction between "legitimate struggle against the occupation troops" and acts of terrorism—a fundamental difference between US and Syrian views.

PX270

## Appendix A

## Statistical Review

The number of international terrorist attacks dropped somewhat in 1990, from 533 incidents in 1989 to 455*. Unlike recent years, in 1990 there were more attacks in Latin America (162) and Asia (96) than in the Middle East (63). There were 82 incidents in Europe, including five in Eastern Europe, and 52 in Africa. There were no international terrorist incidents in North America in 1990.

Reflecting the absence of a "spectacular" terrorist incident in 1990, the number of victims killed dropped from 407 in 1989 to 193. However, the number of victims injured rose from 427 in 1989 to 675.

Following a significant drop in 1989, casualties in Asia increased sharply in 1990, from 212 to 482, primarily as a result of an intensified campaign by the Afghan secret police. There were 28 persons killed and 112 wounded in the Middle East; 30 were killed and 62 wounded in Latin America. Terrorist attacks claimed 63 lives and injured 69 in Africa. In Europe, there were nine deaths and 13 injured in terrorist violence.

Although the number of terrorist attacks against the United States was almost unchanged from the previous year, the United States remained, by far, the most popular target of

*Investigations into incidents sometimes yield evidence that necessitate a change in the information previously held true (such as whether the incident fits the definition of terrorism, which group or state sponsor was responsible, or the number of victims killed or injured). As a result of these adjustments, the statistics given in this report for incidents in 1989 and earlier years may vary slightly from numbers cited in previous reports.

international terrorists in 1990. In the 197 anti-US attacks, 10 Americans were killed and 34 injured. Fifteen Americans were killed and 19 injured in 1989. Most of the anti-US attacks occurred in Latin America (130). There were 37 in Asia, 17 in Europe, nine in Africa, and four in the Middle East.

International terrorists targeted the citizens and property of 73 countries. After Americans, the most frequently targeted nationalities were Israelis and Pakistanis. As in past years, increased security caused terrorists to avoid official interests and turn to soft targets. Seventy-five percent of all attacks worldwide were against businesses, tourists, and other nonofficial targets. Attacks on clergymen and religious facilities were up from six and 28, respectively, in 1989 to 19 and 57 in 1990.

Bombings represented 63 percent of all international terrorist attacks. Most bombings occured in Latin America (162) or Asia (96). There were 45 kidnappings, up from 27 in 1989; 21 in Africa, 13 in Latin America, 10 in Asia, and one in the Middle East.

The number of international terrorist incidents attributed to state sponsors dropped slightly, from 58 in 1989 to 54 in 1990.

37

PX270



## International Terrorist Incidents, 1990

### By Region

Africa
Asia
Eastern Europe/ USSR
Latin America
Middle East
Western Europe

0   50   100   150
*Number of incidents*

### By Type of Facility

*Percent*

Business 34.6
Other 40.1
Diplomat 14.4
Military 3.8
Government 7.1

### By Type of Victim

*Percent*

Business 10.9
Military 8.4
Diplomat 7.9
Other 65.3
Government 7.5

### By Type of Event

*Percent*

Sabotage/Vandalism 1.5
Assault 0.9
Arson 4.2
Barricade, Hijacking, Other 1.1
Firebombing 5.7
Kidnapping 9.9
Bombing 62.9
Armed attack 13.8

38

PX270



PX270



40

PX270



41

PX270

PX270

## Appendix B

## Chronology of Significant Terrorist Incidents: 1990

| | |
|---|---|
| *13 January* | **Peru** |
| | Sendero Luminoso (SL) terrorists singled out and shot two French tourists aboard a bus traveling in the Apurimac department. Peruvian passengers were forced to pay the terrorists money but were unharmed. |
| *15 January* | **Peru** |
| | Tupac Amaru Revolutionary Movement (MRTA) terrorists bombed the US Embassy in Lima, injuring three guards. |
| *19 January* | **The Philippines** |
| | Members of the Moro National Liberation Front killed two Swiss Red Cross workers and wounded a third during an ambush on Mindanao. |
| *1 February* | **Thailand** |
| | Three officials of the Saudi Arabian Embassy in Bangkok were assassinated in two separate attacks. One official was gunned down at his home, and the other two were shot in a car outside their residences. Iranian surrogates are believed to have been responsible. |
| *4 February* | **Egypt** |
| | Palestinian Islamic Jihad (PIJ) terrorists attacked an Israeli tour bus en route from Rafah to Cairo, killing 11 persons—including nine Israeli citizens—and wounding 17 others. |
| *8 February* | **Peru** |
| | An American tourist was shot and killed at an Inca fortress near Cuzco. Sendero Luminoso may have been responsible, although a criminal motive has not been ruled out. |
| *19 February* | **Greece** |
| | The Revolutionary Solidarity terrorist group shot and killed a Greek psychiatrist in Athens as he was walking to his car. In a letter, the group stated he was killed because of his work at the Korydallos prison. |

43

PX270

| | |
|---|---|
| *2 March* | **Panama**<br>An unidentified assailant tossed a grenade inside a bar frequented by Americans, killing one US serviceman and injuring 15 others. Fourteen Panamanians were also injured in the attack. |
| *6 March* | **The Philippines**<br>An American citizen was assassinated by members of the New People's Army (NPA) for refusing to pay ''revolutionary taxes'' levied against his ranch. |
| *30 March* | **Lebanon**<br>The Polish Ambassador and his Lebanese wife were shot and wounded in Beirut. A previously unknown Arab group claimed responsibility for the attack, threatening to strike again if Poland continued to assist the emigration of Soviet Jews to Israel. |
| *31 March* | **Honduras**<br>Four terrorists attacked a US Air Force bus near Tegucigalpa, injuring eight persons. The Morazanist Patriotic Front claimed responsibility. |
| *3 April* | **Pakistan**<br>A bomb concealed in a box of apples exploded in a crowded bazaar in Lahore, killing five persons and wounding 50. The Afghan secret police is believed responsible. |
| *14 April* | **Chile**<br>Suspected members of the Manuel Rodriguez Patriotic Front (FPMR) hurled explosive devices into the US Consular annex compound in Santiago, injuring one contract guard and damaging two vehicles. |
| *24 April* | **Switzerland**<br>An exiled Iranian political leader was shot and killed near Geneva while driving home. Agents of the Iranian Government are believed responsible. |
| *13 May* | **The Philippines**<br>NPA assassins shot and killed two US Air Force airmen near Clark Airbase. The killings came on the eve of the Philippines-US exploratory talks on the future of the US military bases in the Philippines. |

44

**27 May**

**The Netherlands**

Two Australian tourists were shot and killed in Roermond by members of the Provisional Irish Republican Army (PIRA). The claim letter acknowledged the group had killed the Australians by mistake, believing them to be British soldiers.

**28 May**

**Israel**

One person was killed and nine wounded in a pipe-bomb explosion at a market in Jerusalem. Several Palestinian groups claimed responsibility.

**30 May**

**Israel**

Israeli forces aborted a seaborne attack on the beaches at Tel Aviv mounted by the Palestine Liberation Front (PLF). Four PLF members were killed and 12 arrested.

**2 June**

**Germany**

A British Army artillery officer was shot and killed by three attackers in Dortmund while returning home from a social event with his wife. PIRA issued a statement in Dublin claiming responsibility.

**6 June**

**Lebanon**

A rocket was fired at the Romanian Embassy in Beirut, injuring one person. The ''Revolutionary Action Organization'' claimed the attack was to protest Romania's role in facilitating Jewish immigration to Israel.

**10 June**

**Bolivia**

A prominent Bolivian businessman was kidnapped in La Paz by the Nestor Paz Zamora Commission (CNPZ), which demanded payment of a ransom. In December he was shot and killed moments before local police stormed the building in which he was held.

**Greece**

A rocket fired from a bazooka was launched at the offices of Proctor and Gamble in Athens, causing extensive property damage but no injuries. Revolutionary Organization 17 November claimed responsibility for the attack.

**13 June**

**The Philippines**

An American Peace Corps worker was abducted from his home by NPA terrorists. No ransom was paid, and he was released unharmed on 2 August.

45

PX270

| | |
|---|---|
| **23 June** | ***Israel*** |
| | A pipe bomb exploded on a crowded beach at Ein Gedi, wounding two Israelis and two West Germans. |
| **18 July** | ***Peru*** |
| | MRTA exploded a dynamite bomb at the US Binational Center in Cuzco, injuring four students. |
| **27 July** | ***Germany*** |
| | The Red Army Faction attempted to kill Interior Ministry State Secretary Hans Neusel with a bomb attached to a guardrail on a highway exit ramp near the Interior Ministry. |
| **28 July** | ***Israel*** |
| | A pipe bomb exploded on a beach in Tel Aviv, killing a Canadian tourist and wounding 20 others. |
| **30 July** | ***United Kingdom*** |
| | Member of Parliament Ian Gow was killed in front of his home by a bomb planted by the Provisional Irish Republican Army. |
| **26 September** | ***Turkey*** |
| | Gunmen assassinated the former Deputy Director of the Turkish National Intelligence Agency in Istanbul. The Dev Sol group claimed responsibility. |
| **27 September** | ***Djibouti*** |
| | Grenades thrown from a passing car exploded in the Cafe de Paris, killing a French boy and injuring 15 other French citizens. At approximately the same time, grenades were also thrown at the Cafe L'Historil but did not explode. A previously unknown group, the Djibouti Youth Movement, claimed responsibility. |
| **10 October** | ***Bolivia*** |
| | Members of the Nestor Paz Zamora Commission exploded a bomb and fired automatic weapons at the US Embassy Marine Guard residence in La Paz, killing one Bolivian guard and wounding another. The explosion caused major structural damage to the building. |
| **12 October** | ***Egypt*** |
| | Local Islamic extremists killed Egypt's Assembly speaker during an assault on his motorcade in Cairo. |

PX270

| 23 October | **France** |
|---|---|
| | An Iranian dissident leader of the Flag of Freedom Organization was assassinated in his Paris apartment. Agents of the Iranian Government were probably responsible. |
| 24 October | **Northern Ireland** |
| | A PIRA car bomb, driven by a civilian whose family was being held hostage, killed five soldiers and the civilian driver at a Londonderry checkpoint. |
| 3 November | **Chile** |
| | A bomb exploded in front of a restaurant in Vina del Mar, injuring eight persons, including three US sailors. The Manuel Rodriguez Patriotic Front–Dissident Faction (FPMR/D) was probably responsible. |
| 8 November | **Peru** |
| | MRTA exploded a bomb in the park adjacent to the US Ambassador's residence and attacked his home with automatic weapons. No injuries resulted. |
| 17 November | **Chile** |
| | A bomb concealed in a softball bat exploded at the national stadium in Santiago during a softball game between the University of Chile and the American Chamber of Commerce. One Canadian was killed, and a US Embassy officer was wounded. The FPMR/D was probably responsible. |
| 20 November | **Greece** |
| | The car in which a Greek industrialist was riding narrowly missed being struck by three rockets fired at close range by the Revolutionary Organization 17 November. |
| 10 December | **Peru** |
| | Sendero Luminoso terrorists exploded a car bomb near the US Embassy in Lima. No injuries or damage resulted. |

PX270

**Peru**

Terrorists armed with dynamite destroyed a Mobil Oil Company exploration camp in the Upper Huallaga Valley. They also used the camp's helicopters to dynamite other nearby Mobil installations. Sendero Luminoso was probably responsible.

*16 December*

**Chile**

The Lautaro Youth Movement fired automatic weapons and threw incendiary bombs at a Mormon church in Santiago. The church was destroyed, but no injuries resulted.

48

PX270

## Appendix C

## Background Information on
## Major Groups
## Discussed in the Report

**Abu Nidal organization
(ANO)**
AKA: Fatah Revolutionary
Council, Arab Revolutionary
Council, Arab Revolutionary
Brigades, Black September,
Revolutionary Organization
of Socialist Muslims

**Description**
International terrorist organization led by Sabri al-Banna.
Split from PLO in 1974. Made up of various functional
committees, including political, military, and financial.

**Activities**
Has carried out over 90 terrorist attacks since 1974 in 20
countries, killing or injuring almost 900 people. Targets the
United States, the United Kingdom, France, Israel, moderate
Palestinians, the PLO, and various Arab countries, depend-
ing on which state is sponsoring it at the time. Major attacks
include: Rome and Vienna airports in December 1985, the
Neve Shalom synagogue in Istanbul and the Pan Am Flight
73 hijacking in Karachi in September 1986, and The City of
Poros day-excursion ship attack in July 1988 in Greece.
Suspected of carrying out assassination on 14 January 1991
in Tunis of PLO deputy chief Abu Iyad and PLO security
chief Abu Hul. ANO members also attacked and seriously
wounded a senior ANO dissident in Algeria in March 1990.

**Strength**
Several hundred plus "militia" in Lebanon and overseas
support structure.

**Location/Area of Operation**
Headquartered in Iraq (1974-83) and Syria (1983-87);
currently headquartered in Libya with substantial presence
in Lebanon (in the Bekaa Valley and several Palestinian
refugee camps in coastal areas of Lebanon). Some
elements of the ANO may have relocated to Iraq from Libya
in mid-1990. Also has presence in Algeria. Has demon-
strated ability to operate over wide area, including Middle
East, Asia, and Europe.

**External Aid**
Has received considerable support, including safehaven,
training, logistic assistance, and financial aid from Iraq and
Syria (until 1987); continues to receive aid from Libya, in
addition to close support for selected operations.

49

PX270

**Al-Fatah**
AKA: Al-'Asifa

**Description**

Headed by Yasser Arafat, Fatah joined the PLO in 1968 and won the leadership role in 1969. Its commanders were expelled from Jordan following violent confrontation with Jordanian forces in 1970-71, beginning with ''Black September'' in 1970. Israeli invasion of Lebanon in 1982 led to group's dispersal to several Middle Eastern countries, including Tunisia, Yemen, Algeria, Iraq, and others. Has been reinfiltrating southern Lebanon for several years. Maintains several military and intelligence wings that have carried out terrorist attacks, including Force 17 and the Hawari Special Operations Group. Two of its leaders, Abu Jihad and Abu Iyad, were assassinated within the last two years.

**Activities**

In the 1960s and the 1970s, Fatah offered training to wide range of European, Middle Eastern, Asian, and African terrorist and insurgent groups. Carried out numerous acts of international terrorism in Western Europe and Middle East in early-to-mid-1970s.

**Strength**

6,000 to 8,000.

**Location/Area of Operation**

Headquartered in Tunisia, with bases in Lebanon and other Middle Eastern countries.

**External Aid**

Has had close, longstanding political and financial ties to Saudi Arabia, Kuwait, and other moderate Persian Gulf states. These relations appear to have been disrupted by the Gulf crisis of 1990-91. Also has had links to Jordan. Received weapons, explosives, and training from the USSR and East European states. China and North Korea have reportedly provided some weapons.

**Armenian Secret Army for the Liberation of Armenia (ASALA)**
AKA: The Orly Group, 3rd October Organization

**Description**

Marxist-Leninist Armenian terrorist group formed in 1975 with stated intention to compel Turkish Government to acknowledge publicly its alleged responsibility for the deaths of 1.5 million Armenians in 1915, pay reparations, and cede territory for an Armenian homeland. Led by Hagop Hagopian until he was assassinated in Athens in April 1988.

50

PX270

**Activities**

Initial bombing and assassination attacks directed against Turkish targets. Later attacked French and Swiss targets to force release of imprisoned comrades. Made several minor bombing attacks against US airline offices in Western Europe in early 1980s. Bombing of Turkish airline counter at Orly Airport in Paris in 1983—eight killed and 55 wounded—led to split in group over rationale for causing indiscriminate casualties. Suffering from internal schisms, group has been relatively inactive over past four years.

**Strength**

Several hundred.

**Location/Area of Operation**

Lebanon; Western Europe, United States, and Middle East.

**External Aid**

Has received aid, including training and safehaven, from Syria. May also receive some aid from Libya. Has extensive ties to radical Palestinian groups, including the PFLP and PFLP-GC.

**Basque Fatherland and Liberty (ETA)**

**Description**

Founded in the late 1950s with the aim of creating an independent homeland in Spain's Basque region. Has muted commitment to Marxism. In 1974 split into two factions—ETA/Political-Military and ETA-Military; the former has been inactive since limited home rule granted in 1982.

**Activities**

Chiefly bombings, kidnappings, assassinations of Spanish Government targets and, recently, French targets in Spain; has not targeted US interests. Bombing attacks are sophisticated, lethal, and increasingly indiscriminate.

**Strength**

100 to 200, plus supporters.

**Location/Area of Operations**

Spain and France.

**External Aid**

Has received training at various times in Libya, Lebanon, and Nicaragua. Also has close ties to PIRA.

51

PX270

**Chukaku-Ha
(Nucleus or Middle-Core
Faction)**

**Description**

An ultraleftist / radical group with origins in the fragmenta-
tion of the Japanese Communist Party in 1957. Largest
domestic militant group; has political arm plus small, covert
action wing called Kansai Revolutionary Army. Funding
derived from membership dues, sales of its newspapers,
and fundraising campaigns.

**Activities**

Participates in mass protest demonstrations and snake-
dancing in streets; supports farmers' protest of construc-
tion of Narita airport, among other causes; sabotaged part
of Japanese railroad system in 1985 and 1986; sporadic
attacks usually designed to cause only property damage
through use of crude rockets and incendiary devices; anti-
US attacks include small-scale rocket attempts against US
military and diplomatic targets; no US casualties so far.

**Strength**
3,500.

**Location/Area of Operation**
Japan.

**External Aid**
None known.

**CNPZ**
 (see Nestor Paz Zamora
Commission)

**Democratic Front for the
Liberation of Palestine
(DFLP)**

**Description**

Marxist group that split from the PFLP in 1969. Currently
led by Nayif Hawatmah. Believes Palestinian national goals
can be achieved only through revolution of the masses. In
early 1980s, occupied political stance midway between
Arafat and the more radical rejectionists. Although a PLO
member group, differs with key elements of Arafat's
policies.

**Activities**

In the seventies, carried out numerous small bombings and
minor assaults and some more spectacular operations in
Israel and the occupied territories, concentrating on Israeli
targets such as the 1974 massacre in Ma'alot in which 27
Israelis were killed and over 100 wounded. Involved only in
border raids since 1988.

52

PX270

**Strength**
Estimated at 500.

**Location/Area of Operation**
Syria, Lebanon, and the Israeli-occupied territories; attacks occurred almost entirely in Israel and the occupied territories.

**External Aid**
Receives most financial and military aid from Syria and Libya.

**Devrimci Sol**
AKA: Dev Sol

**Description**
Formed in 1978 as a splinter faction of the radical leftist student movement. Espouses a Marxist ideology, intensely xenophobic, and virulently anti-US and anti-NATO; seeks to unify the proletariat to stage a national revolution. Finances its activities largely through armed robberies.

**Activities**
Conducted attacks against US, Turkish, and NATO targets until weakened by massive arrests during 1981-83. Has concentrated attacks on current and retired Turkish security and military officials since its reemergence in the late 1980s. Methods of attack include handgun assassinations and bombings. Operates primarily in Istanbul, but has also carried out attacks in Ankara, Izmir, and Adana.

**Strength**
Several hundred hardcore radicals, several dozen armed militants.

**Location/Area of Operation**
Turkey.

**External Aid**
Possible training and logistic support from radical Palestinians.

**ELA**
(see Revolutionary People's Struggle)

**ELN**
(see National Liberation Army)

**ETA**
(see Basque Fatherland and Liberty)

53

PX270

**Farabundo Marti National Liberation Front (FMLN)**

**Description**
Formed in 1980 with Cuban backing, the guerrilla umbrella organization is composed of five leftist groups: Central American Workers' Revolutionary Party (PRTC), People's Revolutionary Army (ERP), Farabundo Marti Popular Liberation Forces (FPL), Armed Forces of National Resistance (FARN), and the Communist Party of El Salvador's Armed Forces of Liberation (FAL). The Cuban-backed Marxist insurgents seek to defeat the democratically elected government through a war of attrition.

**Activities**
Bombings, assassinations, economic sabotage, arson, among other rural and urban operations. Since 1988 the FMLN increased urban terrorism in the capital.

**Strength**
6,000 to 7,000 combatants.

**Location/Area of Operation**
El Salvador, limited activity in Honduras.

**External Aid**
Receives direct support from Cuba and from the Sandinistas in Nicaragua, where it maintains an office. The FMLN also receives significant financial support from front groups and sympathetic organizations in the United States and Europe.

**FARC**
(see Revolutionary Armed Forces of Colombia)

**Fatah**
(see Al-Fatah)

**15 May Organization**

**Description**
Formed in 1979 from remnants of Wadi Haddad's Popular Front for the Liberation of Palestine–Special Operations Group (PFLP-SOG). Led by Muhammad al-Umari, who is known throughout Palestinian circles as Abu Ibrahim or "the bomb man." Group was never part of PLO. Reportedly disbanded in the mid-1980s when several key members joined Colonel Hawari's Special Operations Group of Fatah.

54

PX270

**Activities**

Claimed credit for several bombings in the early-to-mid-1980s, including hotel bombing in London (1980), El Al's Rome and Istanbul offices (1981), and Israeli Embassies in Athens and Vienna (1981). Anti-US attacks include a bombing on board Pan Am flight from Tokyo to Honolulu in August 1982 and attempted bombing of a Pan Am airliner in Rio de Janeiro in August 1981. (The accused bomber in the August 1982 Pan Am attack, Mohammed Rashid, is currently jailed in Greece awaiting trial.)

**Strength**

50 to 60 in early 1980s.

**Location/Area of Operation**

Baghdad until 1984. Before disbanding, operated in Middle East, Europe, and East Asia. Abu Ibrahim is reportedly in Iraq.

**External Aid**

Probably received logistic and financial support from Iraq until 1984.

**Force 17**

**Description**

Formed in early 1970s as a personal security force for Arafat and other PLO leaders.

**Activities**

According to press sources, in 1985 expanded operations to include terrorist attacks against Israeli targets. No confirmed international terrorist activity since September 1985, when it claimed responsibility for killing three Israelis in Cyprus, an incident that was followed by Israeli air raids on PLO bases in Tunisia.

**Strength**

Unknown.

**Location/Area of Operation**

Based in Beirut before 1982. Since then, dispersed in several Arab countries. Now operating in Lebanon, other Middle Eastern countries, and Europe.

**External Aid**

PLO is main source of support.

**FPM**

(see Morazanist Patriotic Front)

55

**FPMR**
(see Manuel Rodriguez
Patriotic Front)

**GRAPO**
(see October 1st
Antifascist Resistance
Group)

**Hawari Group**
AKA: Fatah Special
Operations Group, Martyrs
of Tal Al Za'atar, Amn
Araissi

**Description**
Part of Yasser Arafat's Fatah apparatus, the group is
named after its leader who is commonly known as Colonel
Hawari. The group has ties historically to Iraq. Membership
includes former members of the radical Palestinian 15 May
Organization, including Muhammad Rashid, who is await-
ing trial in Greece on terrorist charges.

**Activities**
Carried out several attacks in 1985 and 1986, mainly in
Europe and usually against Syrian targets. Has also
targeted Americans, most notably in the April 1986
bombing of TWA Flight 840 over Greece in which four
Americans were killed.

**Strength**
Unknown.

**Location/Area of Operation**
Middle Eastern countries and Europe.

**External Aid**
PLO is main source of support.

**Hizballah
(Party of God)**
AKA: Islamic Jihad,
Revolutionary Justice
Organization, Organization
of the Oppressed on Earth,
Islamic Jihad for the
Liberation of Palestine

**Description**
Radical Shia group formed in Lebanon; dedicated to
creation of Iranian-style Islamic republic in Lebanon and
removal of all non-Islamic influences from area. Strongly
anti-West and anti-Israel. Closely allied with, and largely
directed by, Iran in its activities.

**Activities**
Known or suspected to have been involved in numerous
anti-US terrorist attacks, including the suicide truck bomb-
ing on the US Marine barracks in Beirut in October 1983
and the US Embassy annex in September 1984. Elements
of the group are responsible for the kidnapping and
continuing detention of most, if not all, US and other
Western hostages in Lebanon.

56

PX270

**Strength**

Several thousand.

**Location/Area of Operation**

Operates in the Bekaa Valley, the southern suburbs of Beirut, and southern Lebanon; has established cells in Western Europe, Africa, and elsewhere.

**External Aid**

Receives substantial amounts of financial, training, weapons, explosives, political, diplomatic, and organizational aid from Iran.

**Japanese Red Army (JRA)**

AKA: Anti-Imperialist International Brigade (AIIB)

**Description**

An international terrorist group formed about 1970 after breaking away from Japanese Communist League Red Army Faction. Now led by Fusako Shigenobu, believed to be in the Syrian-garrisoned area of Lebanon's Bekaa Valley. Stated goals are to overthrow Japanese Government and monarchy and to help foment world revolution. Organization unclear, but may control or at least have ties to Anti-Imperialist International Brigade (AIIB); may also have links to Antiwar Democratic Front—an overt leftist political organization—inside Japan. Details released following November 1987 arrest of leader Osamu Maruoka indicate that JRA may be organizing cells in Asian cities, such as Manila and Singapore. In 1988, Japanese and Philippine authorities arrested JRA member Hiroshi Sensui in the Philippines, where he had successfully formed such a cell. Has had close and longstanding relations with Palestinian terrorist groups—based and operating outside Japan—since its inception.

**Activities**

Before 1977, JRA carried out series of brutal attacks over wide geographical area, including the massacre of passengers at Lod airport in Israel (1972) and two Japanese airliner hijackings (1973 and 1977). Anti-US attacks include attempted takeover of US Embassy in Kuala Lumpur (1975). Since mid-1980s has carried out several crude rocket and mortar attacks against US Embassy facilities in Jakarta (1986), Rome (1987), and Madrid (1988), probably timed to coincide with the annual economic summit meetings of the seven leading industrialized nations. In April 1988, JRA operative Yu Kikumura was arrested with explosives on New Jersey Turnpike, apparently planning an attack to coincide with the bombing of a USO Club in Naples, a suspected JRA operation that killed five, including a US servicewoman.

PX270

**Strength**
About 30 hardcore members; undetermined number of sympathizers.

**Location/Area of Operation**
Based in Lebanon with six members in North Korea (since 1970) and other locations worldwide.

**External Aid**
Receives aid, including training and base camp facilities, from radical Palestinian terrorists, especially the PFLP. May also receive aid from Libya. Suspected of having sympathizers and support apparatus in Japan.

**Kurdish Worker's Party (PKK)**
AKA: Kurdish Labor Party

**Description**
Marxist-Leninist terrorist group composed of Turkish Kurds established in mid-1970s. Seeks to set up Marxist state in southeastern Turkey, which has a large population of Kurds.

**Activities**
Primary targets are Turkish Government forces and civilians in southeastern Turkey, but is becoming increasingly active in Western Europe against Turkish targets and rival Kurdish groups. In 1986, attacked NATO target in Mardin, Turkey.

**Strength**
Unknown.

**Location/Area of Operations**
Syria and Iraq. Operates in Turkey and Western Europe; training facilities in Lebanon's Bekaa Valley.

**External Aid**
Probably still receives some aid and safehaven from Syria, possibly from Iran and Iraq as well.

**Lautaro Youth Movement (MJL)**
AKA: The Lautaro faction of the United Popular Action Movement (MAPU/L) or Lautaro Popular Rebel Forces (FRPL)

**Description**
Violent, anti-US, extremist group that advocates the overthrow of the Chilean Government. Leadership largely from leftist elements, but includes criminals and alienated youths. Recruits from poorer areas of cities. The leftist group became active in late 1980s, and its assaults during 1990 increased in number and sophistication.

58

PX270

**Activities**

Has been linked to several assassinations of policemen, bank robberies, and bombings and burnings of Mormon chapels.

**Strength**

Unknown.

**Location/Area of Operation**

Chile; mainly in Santiago.

**External Aid**

May have ties to Cuba and to Nicaraguan Sandinistas.

**Lebanese Armed Revolutionary Faction (LARF)**
AKA: Faction Armee Revolutionaire Libanaise (FARL)

**Description**

Marxist-Leninist terrorist group formed circa 1980 by George Ibrahim Abdallah, a pro-Palestinian Christian from northern Lebanon. Anti-''US imperialist,'' anti-Israel. Members recruited from two villages in northern Lebanon; many are related to each other. Some previously were members of the Syrian Social Nationalist Party—a Lebanese group closely aligned with Syria—or the PFLP.

**Activities**

Selected assassination and bombing attacks against Western targets, including attempted murder of US Charge in Paris (1981), murder of US military attache in Paris (1982), suspected involvement in murder of US head of Sinai Multinational Force and Observers in Rome (1984), and attempted murder of US Consul General in Strasbourg (1984). Georges Abdallah was arrested in France in 1984 and is currently serving a life sentence there.

**Strength**

20 to 30.

**Location/Area of Operation**

Northern Lebanon; operated in Lebanon and Western Europe.

**External Aid**

Press source claims that LARF has received both funding and direction from Syria and has links to several terrorist groups in Western Europe, including Action Directe, the Red Brigades, and the Red Army Faction.

PX270

**Manuel Rodriguez Patriotic Front (FPMR)**

**Description**

Founded in 1983 as the armed wing of the Chilean Communist Party. Named for a hero in Chile's war of independence against Spain. Is the largest Chilean Marxist-Leninist terrorist group. Splintered in 1987 into two factions, of which the dissident wing (FPMR/D) has remained violent.

**Activities**

Responsible for numerous bombing attacks against domestic and foreign targets and assassination attacks against domestic targets. Anti-US attacks include placing of bombs outside the US Ambassador's residence in 1986 and the US Consulate in 1985, both in Santiago. Also was responsible for numerous firebombings of Mormon churches during 1986-90 and attempted assassination of President Pinochet in 1986. Believed responsible for bomb concealed in a softball bat that killed a Canadian and injured a US Embassy officer in November 1990.

**Strength**

1,000 to 1,500.

**Location/Area of Operation**

Chile.

**External Aid**

Receives training and weapons support from Cuba.

**MJL**
(see Lautaro Youth Movement)

**Morazanist Patriotic Front (FPM)**

**Description**

A radical, leftist terrorist group that first appeared in the late 1980s. Attacks made in protest of US "intervention" in Honduran economic and political affairs.

**Activities**

Attacks on US, mainly military, personnel in Honduras. Claimed responsibility for attack on a bus in March 1990 that wounded seven US servicemen. Claimed bombing of Peace Corps office in December 1988, bus bombing that wounded three US servicemen in February 1989, attack on US convoy in April 1989, and grenade attack that wounded seven US soldiers in La Ceiba in July 1989.

60

PX270

**Strength**
Unknown, probably relatively small.

**Location/Area of Operation**
Honduras; North coast and central departments of Olancho and Yoro.

**External Aid**
Had ties to former Government of Nicaragua and possibly to Cuba.

**Mozambican National Resistance (Resistencia Nacional Mocambicana, or RENAMO)**

**Description**
Established in 1976 by the Rhodesian security services, primarily to operate against anti-Rhodesian guerrillas based in Mozambique. South Africa subsequently developed RENAMO into an insurgent group opposing the Front for the Liberation of Mozambique (FRELIMO) government.

**Activities**
Operates as a guerrilla insurgency against Mozambique Government and civilian targets; frequently and increasingly runs cross-border operations into Zimbabwe, Malawi, and Zambia, where it has murdered and kidnapped numerous civilians and destroyed property. RENAMO has not directly attacked US interests, but Americans who travel in Mozambique could become inadvertent victims.

**Strength**
20,000 guerrillas.

**Location/Area of Operation**
Mozambique; border areas of Zimbabwe, Malawi, and Zambia.

**External Aid**
Assistance previously from South Africa as well as from private individuals and groups in Europe and elsewhere.

**MRTA**
 (see Tupac Amaru Revolutionary Movement)

61

PX270

**National Liberation Army (ELN)**

**Description**
Rural-based, pro-Cuban, anti-US, Marxist-Leninist guerrilla group formed in 1963.

**Activities**
In 1990 kidnapped six Americans, including three US petroleum engineers in November. Extortion and bombing attacks against US and other foreign businesses in Colombia, particularly the oil industry. Has inflicted major damage on oil pipeline since it was completed in March 1986.

**Strength**
1,000 to 2,000.

**Location/Area of Operation**
Colombia.

**External Aid**
Has received limited arms and training from Cuba and may have received training from Nicaragua.

**Nestor Paz Zamora Commission (CNPZ)**

**Description**
Radical leftist terrorist organization that first appeared in October 1990. Named after deceased brother of President Jaime Paz Zamora. Claims to be a renewal of the National Liberation Army (ELN) that operated during the 1960s. Violent, extremely anti-US, Marxist-Leninist organization. Some members may be students at the University of San Andres in La Paz.

**Activities**
Graffiti appeared about one month before the group attacked the US Embassy Marine guardhouse on 10 October 1990 with automatic weapons and a bomb. One Bolivian policeman was killed and another seriously injured in the attack. Also bombed the John F. Kennedy statue in La Paz on the same day.

**Strength**
Unknown.

**Location/Area of Operation**
Bolivia; based in La Paz.

**External Aid**
Sophistication of 10 October attack and weapons used strongly suggest external support. Peru's MRTA provided CNPZ funding and assistance in the kidnapping of a Bolivian Coca-Cola executive.

62

PX270

**New People's Army (NPA)**

**Description**

The guerrilla arm of the Communist Party of the Philippines, an avowedly Maoist group formed in December 1969 with the aim of overthrowing the government through protracted guerrilla warfare. Although primarily a rural-based guerrilla group, the NPA has an active urban infrastructure to carry out terrorism; uses city-based assassination squads called sparrow units. Derives most of its funding from contributions of supporters and "taxes" extorted from local business.

**Activities**

In addition to guerrilla activities, has used urban terrorism, including attacks on government officials, police, and military officers in Manila and other major cities. Has vowed to kill US citizens who allegedly are involved in the government's counterinsurgency campaign. The NPA has killed several US military members and private American citizens in the Philippines since 1987. Attacked some US businesses located in rural areas who refused to pay so-called revolutionary taxes.

**Strength**

8,000 to 20,000, plus support groups.

**Location/Area of Operation**

The Philippines.

**External Aid**

Probably receives funding from overseas fundraisers in Western Europe and elsewhere; links to Libya. Also diverts some funding of humanitarian aid.

**October 1st Antifascist Resistance Group (GRAPO)**

**Description**

Small, Maoist urban terrorist group that recruited members from the Spanish Community Party–Reconstituted. Seeks to remove US military forces from Spain and set up revolutionary regime.

**Activities**

Carried out small-scale bombing attacks on US and NATO facilities in early 1980s. Since then, some of the members arrested in January 1985 have been released from jail and have returned to action, including killing a Spanish businessman in 1988. During 1990, GRAPO carried out bomb attacks in Madrid, Barcelona, and Tarragona; in March the group assassinated a doctor involved in force-feeding GRAPO prisoners on hunger strike.

PX270

**Strength**
Probably fewer than a dozen operatives.

**Location/Area of Operation**
Spain.

**External Aid**
Reported to have had ties to the French Action Directe and the Italian Red Brigades. GRAPO now appears to be developing ties to the German RAF.

**Palestine Liberation Front (PLF)**

**Description**
Terrorist group that broke away from the PFLP-GC in mid-1970s. Later split again into pro-PLO, pro-Syrian, and pro-Libyan factions. Pro-PLO faction led by Muhammad Abbas (Abu Abbas), who became member of PLO Executive Committee in 1984.

**Activities**
Abu Abbas–led faction carried out abortive seaborne attack staged from Libya against Israel on 30 May. Israelis intercepted two boatloads of PLF raiders en route to Tel Aviv beaches, killing four and capturing 12. Survivors confessed that they received extensive Libyan backing, including sea transport, training, and arms. Abbas' group was responsible for October 1985 attack on the cruise ship Achille Lauro and the murder of US citizen Leon Klinghoffer. A warrant for Abu Abbas' arrest is outstanding in Italy. Others who were involved in the hijacking are wanted elsewhere.

**Strength**
At least 50.

**Location/Area of Operation**
PLO faction based in Tunisia until Achille Lauro attack. Now based in Iraq.

**External Aid**
Receives logistic and military support mainly from PLO but also Libya and Iraq.

64

PX270

**Palestine Liberation Organization (PLO)**

**Description**

Founded in 1964 as a Palestinian nationalist umbrella organization dedicated to the establishment of an independent Palestinian state. After the 1967 Arab-Israeli war, control devolved to the leadership of the various fedayeen militia groups, the most dominant of which was Yasser Arafat's Al-Fatah. In 1969, Arafat became chairman of the PLO's Executive Committee, a position he still holds. In the early 1980s, became fragmented into several contending groups but remains the preeminent Palestinian organization. The United States considers the PLO an umbrella organization that includes several constituent groups and individuals holding differing views on terrorism. At the same time, US policy accepts that elements of the PLO have advocated, carried out, or accepted responsibility for acts of terrorism. PLO Chairman Arafat publicly renounced terrorism in December 1988 on behalf of the PLO. The United States considers that all PLO groups, including Al-Fatah, Force 17, Hawari Group, PLF, and PFLP, are bound by Arafat's renunciation of terrorism. The US-PLO dialogue was suspended after the PLO failed to condemn the 30 May PLF attack on Israeli beaches.

**Activities**

PLO Chairman publicly denies any foreknowledge of the 30 May seaborne raid against Israel by the PLF, even though Abbas is a member of the PLO Executive Committee and nominally subordinate to Arafat. In the early 1970s, several groups affiliated with the PLO carried out numerous international terrorist attacks. By the mid-1970s, under international pressure, the PLO claimed it would restrict attacks to Israel and the occupied territories. Several terrorist attacks were later carried out by groups affiliated with the PLO/Fatah, including the Hawari Group, the Palestine Liberation Front, and Force 17 against targets inside and outside Israel.

**Strength**

See numbers for affiliated groups.

**Location/Area of Operation**

Tunis, other bases in various countries in the Middle East.

**External Aid**

See affiliated groups. Accurate public information on financial support for the PLO by Arab governments is difficult to obtain.

65

PX270

**Palestinian Islamic Jihad (PIJ)**

**Description**

The PIJ originated from an organization of militant Palestinian fundamentalists in the Gaza Strip during the 1970s. The PIJ may be a series of loosely affiliated factions, rather than a cohesive group. The PIJ is committed to the creation of an Islamic Palestinian state and the destruction of Israel through holy war. Because of its strong support for Israel, the United States has been identified as an enemy of the PIJ. The PIJ also opposes moderate Arab governments that it believes have been tainted by Western secularism.

**Activities**

The PIJ demonstrated its terrorist credentials when it attacked a tour bus in Egypt in February 1990 and killed 11 people, including nine Israelis. The PIJ also has carried out cross-border raids against Israeli targets in the West Bank and Gaza Strip. A PIJ leader in Jordan has publicly threatened to attack US interests.

**Strength**

Unknown.

**Location/Area of Operations**

Primarily Israel and occupied territories, and other parts of the Middle East, including Jordan and Lebanon.

**External Aid**

Unknown, possibly Iran and Syria.

**PKK**
(see Kurdish Worker's Party)

**Popular Front for the Liberation of Palestine (PFLP)**

**Description**

Marxist-Leninist group that is a member of the PLO founded in 1967 by George Habbash. After Fatah, is the most important military and political Palestinian organization. Advocates a Pan-Arab revolution. Although remaining in the PLO, Habbash has publicly differed with Arafat, particularly since Arafat's statements accepting a dialogue with the United States. Has spawned several dangerous splinter groups.

**Activities**

Committed numerous international terrorist attacks between 1970 and 1977. Since death in 1978 of Wadi Haddad, its terrorist planner, PFLP has carried out numerous attacks against Israeli or moderate Arab targets.

66

PX270

**Strength**
800.

**Location/Area of Operation**
Syria, Lebanon, Israel, and the occupied territories.

**External Aid**
Receives most of its financial and military assistance from
Syria and Libya.

**Popular Front for the
Liberation of
Palestine–General
Command (PFLP-GC)**

**Description**
Split from the PFLP in 1968, claiming that it wanted to
focus more on fighting and less on politics. Violently
opposed to Arafat's PLO and leading efforts to form a rival
coalition. Led by Ahmad Jabril, a former captain in the
Syrian Army. Closely allied with, supported by, and
probably directed by Syria.

**Activities**
Claims to have specialized in suicide operations. Has
carried out numerous cross-border terrorist attacks into
Israel, using unusual means, such as hot-air balloons and
motorized hang gliders. Hafiz Kassem Dalkamoni, a rank-
ing PFLP-GC official, is under indictment in Germany for
bombing US troop trains and for other terrorist charges,
including manslaughter.

**Strength**
Several hundred.

**Location/Area of Operation**
Headquarters in Damascus with bases in Lebanon and
cells in Europe  (including a cell uncovered by West
German authorities in October 1988) .

**External Aid**
Receives logistic and military support from Syria, its chief
sponsor. Financial support from Libya. Safehaven in Syria.
Support also from Iran.

**Popular Front for the
Liberation of
Palestine–Special
Command (PFLP-SC)**

**Description**
Marxist-Leninist group formed by Abu Salim in 1979 after
breaking away from the now-defunct PFLP–Special Oper-
ations Group.

PX270

**Activities**
Has claimed responsibility for several notorious international terrorist attacks in Western Europe, including the bombing of a restaurant frequented by US servicemen in Torrejon, Spain, in April 1985. Eighteen Spanish civilians were killed in the attack.

**Strength**
50.

**Location/Area of Operation**
Operates out of southern Lebanon, in various areas of the Middle East and Western Europe.

**External Aid**
Probably receives financial and military support from Syria, Libya, and Iraq.

**Popular Struggle Front (PSF)**

**Description**
Radical Palestinian terrorist group that has been closely involved in the Syrian-dominated Palestinian National Salvation Front. Led by Dr. Samir Ghosheh.

**Activities**
Terrorist attacks against Israeli, moderate Arab, and PLO targets.

**Strength**
300.

**Location/Area of Operation**
Mainly Syria and Lebanon, and elsewhere in the Middle East.

**External Aid**
Syria was chief sponsor and supplier. Receives some aid from Libya.

**Provisional Irish Republican Army (PIRA)**
AKA: The Provos

**Description**
A radical irredentist terrorist group formed in 1969 as the clandestine armed wing of Sinn Fein, a legal political movement designed to remove British forces from Northern Ireland and then to unify Ireland. Also has a Marxist orientation. Organized into small, tightly knit cells under the leadership of the "Army Council."

68

PX270

### Activities

Bombings, assassinations, kidnappings, extortion, and robberies. Targets government and private-sector interests—including British military targets in Western Europe—and Northern Irish Protestant paramilitary organizations. Has become increasingly indiscriminate in its spectacular bombing attacks; for instance, in 1983, one US citizen was killed, along with four others, in bombing of Harrods department store in London. In November 1987, 11 civilians were killed when PIRA bombed a veterans memorial service in Enniskillen, Northern Ireland. PIRA has stepped up operations on mainland Britain over the past two years. In September 1989, 11 British servicemen were killed and 30 injured in a bombing attack against a Royal Marine Band barracks in Deal, United Kingdom. A British serviceman was killed during a bomb attack outside an Army recruiting office in Wembley, north London, in May 1990; and one soldier was killed and two others wounded in a shooting at a railway station in Lichfield in June. The bombing of London's Carlton Club in June resulted in serious injuries to two people, and in July Conservative Party member of Parliament Ian Gow was killed outside his home by a PIRA car bomb.

### Strength

Several hundred, plus several thousand sympathizers.

### Location/Area of Operation

Northern Ireland, Irish Republic, Great Britain, and Western Europe.

### External Aid

Has received aid from a variety of groups and countries and considerable training and arms from Libya and, at one time, the PLO. Also is suspected of receiving funds and arms from sympathizers in the United States. Maintains links to ETA.

## Red Army Faction (RAF)

### Description

The tightly knit and disciplined RAF is the successor to the Baader-Meinhof Gang, which originated in the student protest movement in the 1960s. Ideology is an obscure mix of Marxism and Maoism; committed to armed struggle. Organized into hardcore cadres that carry out terrorist attacks and a network of supporters who provide logistic and propaganda support. Has survived despite numerous arrests of top leaders over the years.

69

PX270

**Activities**
Bombings, kidnappings, assassinations, and robberies.
Targets German Government and private sector, and US
interests. Among the latter, attempted assassination in
Belgium of NATO Commander (1979); bombing of NATO
Air Force headquarters at Ramstein (1981); rocket attack
of USAREUR Commander in Heidelberg (1981); and
bombing, with French terrorist group, Action Directe, of
Rhein-Main Air Force Base (1985). An RAF bomb killed
Deutsche Bank Chairman Alfred Herrhausen in November
1989, and the group attempted to assassinate Interior
Ministry State Secretary Hans Neusel in July 1990.

**Strength**
10 to 20, plus several hundred supporters.

**Location/Area of Operations**
Mainly in western Germany.

**External Aid**
In Baader-Meinhof period, received support from Middle
Eastern terrorist groups; some loose ties may still exist. The
RAF now appears to be developing closer ties to GRAPO in
Spain. Recent revelations indicate assistance in the past
from the German Democratic Republic.

**Red Army for the Libera-
tion of Catalonia (ERCA)**

**Description**
A small terrorist group whose origin is obscure; ideology is
a mix of Catalonian separatism and Marxist-Leninism. May
be radical offshoot of the Terra Lliure.

**Activities**
Implicated in 1987 in a series of bombing attacks in
Barcelona against US interests, including a grenade attack
on a USO facility that killed a US sailor, an attack on the US
Consulate, and, probably, bombing attacks against US
businesses.

**Strength**
Unknown.

**Location/Area of Operation**
Spain.

**External Aid**
None known.

70

PX270

**Red Brigades (BR)**

**Description**

Formed in 1969, the Marxist-Leninist BR seeks to create a revolutionary state through armed struggle and to separate Italy from the Western Alliance. In 1984 split into two factions: the Communist Combatant Party (BR-PCC) and the Union of Combatant Communists (BR-UCC).

**Activities**

Concentrates on attacking Italian Government and private-sector targets through assassination and kidnapping. Murdered former Prime Minister Aldo Moro in 1978. After early successes, the kidnapping of US General Dozier in 1981 was turning point. Following his rescue, Italian police arrested hundreds of members and supporters, leading to a precipitous decline in the number of terrorist attacks. Remains capable of carrying out selected assassinations, however, and in 1984 claimed responsibility for murder in Rome of Leamon Hunt, US chief of the Sinai Multinational Force and Observer Group, although this attack may have been carried out in conjunction with the LARF. The group has been largely inactive since the arrests of many of its remaining members in Italy and France in 1989.

**Strength**

100 to 200 (down from 2,000 in late 1970s), plus several hundred supporters.

**Location/Area of Operation**

Based and operates in Italy. Some members may be living clandestinely in other European countries.

**External Aid**

Although basically self-sustaining, has probably received weapons from other West European terrorist groups and, in early days, from the PLO.

**RENAMO**
(see Mozambican National Resistance)

**Revolutionary Armed Forces of Colombia (FARC)**

**Description**

Established in 1966 as military wing of Colombian Communist Party; is largest guerrilla group there. Goal is to overthrow government and ruling class; anti-US. Organized along military lines, includes at least one urban front.

71

PX270

**Activities**
Armed attacks against Colombian targets, bombings of US
businesses, kidnappings of Colombians and foreigners for
ransom, and assassinations. Traffics in drugs and has well-
documented ties to drug traffickers.

**Strength**
Approximately 4,500 to 5,500 armed combatants and
10,000 supporters.

**Location/Area of Operation**
Colombia.

**External Aid**
FARC has ties to Cuba; amount of aid unknown.

**Revolutionary
Organization 17
November (17 November)**

**Description**
A radical leftist group established in 1975 and named for
the November 1973 student uprising protesting the military
regime. Anti-US, anti-Turkish, anti-NATO; committed to
violent overthrow of regime and ouster of US bases.
Organization is obscure, possibly an affiliate of the ELA.

**Activities**
Initial attacks were selected assassinations, including US
Embassy official Richard Welch in 1975 and US Navy
Captain Tsantes in 1983. Began assassinating Greek
officials and public figures in 1976; has added bombings,
including attacks on Greek police, to methods and, in April
and August 1987, carried out bombing attacks on US
military buses. Killed US defense attache in June 1988.
Wounded one Greek Supreme Court Deputy Public Pros-
ecutor and killed another in January 1989. Attempted to
assassinate former Minister of Public Order in May 1989
and assassinated member of Parliament Pavlos
Bakoyiannis in September 1989. The group launched a
bazooka attack against the offices of the US firm Proctor
and Gamble in June 1990 and attempted to assassinate a
prominent Greek shipping magnate in November.

**Strength**
Unknown, but presumed to be small.

**Location/Area of Operations**
Greece.

**External Aid**
May receive support from ELA, 1 May, and other terrorist
group cadres.

72

**PX270**

**Revolutionary People's
Struggle (ELA)**

**Description**

Formed in 1971 to oppose the Greek military junta; is a self-described leftwing revolutionary, anticapitalist, anti-imperialist group. Organization is unclear, but probably consists of a loose coalition of several very small and violent groups or affiliates, possibly including 17 November.

**Activities**

Before 1974, was nonviolent; turned to terrorism after removal of junta. Has targeted US military and business facilities and, since 1986, stepped up attacks on Greek Government and commercial interests; primary method has been bombings of buildings, apparently without intent to endanger life. During 1990, ELA conducted numerous bombings and, for the first time, a joint attack with the terrorist 1 May Organization against Greek economic and labor targets. Safehouse raid in November 1990 revealed weapons cache and direct contacts with 1 May and Revolutionary Solidarity.

**Strength**

Unknown, perhaps up to 20 or 30, plus supporters.

**Location/Area of Operation**

Greece.

**External Aid**

None known.

**Sendero Luminoso
(Shining Path, SL)**

**Description**

Peru's largest subversive organization; is among the world's most dangerous and ruthless terrorist groups. Was formed in late 1960s by university professor Abimael Guzman Reynoso as an Indian-based rural rebel organization. Name taken from a statement made by an early 20th century Peruvian radical that Marxism was ''shining path to the future.'' Declared aim is to destroy existing Peruvian institutions and replace them with a peasant revolutionary regime. The xenophobic SL criticizes Soviet Union and China as well as the United States.

PX270

**Activities**
Operated initially in rural areas as guerrilla force and continues to do so. Intimidates populace by executing civilians with government ties. Starting in 1986, however, turned increasingly to urban terrorism, particularly in Lima, where it has built a terrorist apparatus. Hampered in 1988 by arrests of key leaders. Attacks diplomatic missions (US, Soviet, and Chinese Embassies) and foreign businesses, in addition to Peruvian Government and private-sector targets. Attempted to car-bomb the US Embassy in December 1990. Killed several foreigners in 1990.

**Strength**
4,000 to 5,000 combatants.

**Location/Area of Operation**
Peru.

**External Aid**
No known foreign sponsors. Receives money from drug trade, including Colombian narcotics traffickers.

**17 November**
(see Revolutionary Organization 17 November)

**Sikh Groups**

**Description**
Sikh terrorism is carried out by several domestic and international groups seeking to establish an independent Sikh state called Khalistan. Sikh violence outside India is on the wane after surging in 1984 following the Indian Army attack on the Golden Temple in Amritsar. Groups that carry out terrorism include the Dashmesh, or 10th Regiment, (active in India, western Germany, and Canada), Dal Khalsa (hijacked an Indian airline to Pakistan in 1981), Babbar Khalsa (also operates in India, western Germany, and Canada), and the All-India Sikh Students Federation (militant student wing of the main Sikh party, Akali Dal).

74

PX270

**Activities**
Regular and bloody attacks against Hindus and against Indian official targets, particularly in the Punjab; desecration of Hindu holy places; assassinations; bombings; and aircraft hijackings. Although Sikhs have disclaimed responsibility, were probably responsible for bombing the Air India airliner downed over the Atlantic in June 1985, in which the crew and 329 passengers were killed, and for an explosion at Tokyo airport on the same day, when luggage from a flight from Vancouver blew up and killed two Japanese baggage handlers. Since then, Sikh terrorists overseas have been inactive, possibly because of the large international outcry. No US interests have been targeted. Sikh terrorism within India, ranging from kidnappings and bombings to assassinations, continues at a high level.

**Strength**
Unknown.

**Location/Area of Operation**
India, Western Europe, and North America.

**External Aid**
Unknown.

**Terra Lliure (TL)**
**(Free Land)**

**Description**
Leftwing Catalonian separatist terrorist group formed in the 1970s with the goal of establishing an independent Marxist state in the Spanish Provinces of Catalonia and Valencia.

**Activities**
Mainly small-scale bombing attacks against property in northeastern Spain. Targets include foreign banks and travel agencies.

**Strength**
Unknown.

**Location/Area of Operation**
Spain.

**External Aid**
None known.

**Tupac Amaru**
**Revolutionary Movement**
**(MRTA)**

**Description**
Marxist-Leninist terrorist group formed in 1983; chiefly urban based; led by Nestor Serpa. Objective is to rid Peru of ''imperialist'' influence and to establish Marxist regime.

PX270

**Activities**
Attacks often directed against US and other foreign targets. In 1990, attacked the US Ambassador's residence, bombed the US Consulate and US-Peruvian Binational Center, and assassinated a former Peruvian Defense Minister.

**Strength**
Several hundred.

**Location/Area of Operation**
Peru.

**External Aid**
Has received training in Cuba. May have ties to Libya.

PX270



**Appendix D**
**International Terrorist Incidents, 1990**

Appendix D

Number of incidents
- 40 and above
- 20-39
- 10-19
- 1-9

Robinson Projection
Scale 1:75,000,000
standard parallels 38 N and 38 S

77

PX270

PX274

# Iranian Resources and Shi`a Militant Cohesion: Insights from the Khazali Papers

ctc.usma.edu/iranian-resources-shia-militant-cohesion-insights-khazali-papers

January 16, 2019



PDF

Abstract: *In January 2007, an Iranian-backed Shi`a militant group known as Asa`ib Ahl al-Haqq (AAH) carried out an audacious attack on an Iraqi-American Provincial Joint Coordination Center in Karbala, Iraq. The head of AAH, a young cleric named Qais al-Khazali, was captured later that year. Declassified interrogation reports from al-Khazali's time in custody reveal new information about al-Khazali's rivalry with prominent Shi`a cleric Moqtada al-Sadr, suggesting that Iranian resources do not necessarily produce militant group cohesion. These intra-sectarian rifts are likely to persist and will complicate Iran's ability to project its influence in the future.*



On January 20, 2007, roughly a dozen Shi`a militants infiltrated an Iraqi-American Provincial Joint Coordination Center (PJCC) in Karbala, Iraq. Wearing uniforms resembling those of the U.S. Army, the militants immediately opened fire on the U.S. soldiers' living quarters, killing one and severely wounding three others. The

PX274

group fled the compound, eventually taking four other U.S. soldiers hostage and executing them in Babil later that evening.[1] The United States would eventually discover that the attack was the work of an Iranian-backed Shi`a militia group known as the League of the Righteous (Asa`ib Ahl al-Haqq or AAH), led by a relatively young cleric named Qais al-Khazali.[2] Al-Khazali was captured alongside his brother and a member of Lebanese Hezbollah and interrogated by U.S. forces later that year.[3] Today, al-Khazali not only continues to lead AAH, but has extended his reach into Iraqi politics. His Sadiqun political bloc garnered 15 of the 48 seats won by the Iranian-influenced Fatih Alliance in the May 2018 Iraqi parliamentary elections.[4]

Al-Khazali's political ascendance has deepened regional concerns about malign Iranian influences, from the Mediterranean coast in Beirut to Tehran through Iraq and Syria, that can destabilize the region.[5] Yet, the degree to which resources and direction from Tehran can effectively serve to consolidate what may be a diverse group of militia commanders representing a variety of political interests has considerable implications for U.S. policy. U.S. Central Command's declassification of al-Khazali's interrogation reports from his time in custody (March 2007-January 2010) and researcher access to these documents offer a unique opportunity to assess and evaluate the degree to which Iranian resources contribute to cohesion within the ranks of Shi`a militia groups.[6]

A closer look at al-Khazali's interrogation reports from his time in custody suggests that Tehran's influence may not always produce unity. Throughout the interrogation reports, al-Khazali discusses his personal disagreements with Muqtada al-Sadr, describing al-Sadr as an incompetent and deeply paranoid leader. Al-Khazali even offers to turn other prisoners against al-Sadr. Intra-sectarian divides like the one between al-Khazali and al-Sadr are likely to persist and may challenge Iran's ability to project its influence. Analysts advising the U.S. government on strategy toward Iranian-backed groups should avoid characterizing them as a monolithic bloc and instead show greater appreciation for factors that may lead these groups to diverge from one another.

**Qais al-Khazali and Iranian Support**

Al-Khazali once served as a trusted aide to Moqtada al-Sadr, the popular Shi`a religious cleric from Baghdad who won the highest number votes in the 2018 Iraqi election. They were once allied. Born in 1974, al-Khazali studied under Muhammad Sadiq al-Sadr—Muqtada al-Sadr's father—in the al-Najaf Hawza, a prominent religious seminary. After the elder al-Sadr's assassination in 1999, al-Khazali helped preserve the Sadrist movement in Iraq, and, after the 2003 U.S.-led invasion, he served as a trusted assistant to the young Muqtada al-Sadr.[7] Al-Khazali split from al-Sadr's movement after al-Sadr's Jaysh al-Mahdi's (JAM) poor performance during the 2004 uprisings in Najaf, which he criticized for not having "the plan, the power, or the weapons to sustain a fight." Al-Khazali then took on a leadership role managing the Iranian-backed "Special Groups," a particularly lethal group of Iranian-backed militias.[8]

Al-Khazali described accompanying a senior delegation of Sadrists to Tehran in 2003,[9] where they were hosted by senior Iranian officials, chief among them Islamic Revolutionary Guard Corps-Quds Force (IRGC-Quds Force) Commander Qassem Soleimani and Hajji

PX274

Yusif, a Quds Force deputy commander.[10] Al-Sadr facilitated the al-Khazali-Tehran link. "Self-conscious" about Iranian influence and seeking some distance between his movement and the Iranians, al-Sadr tasked al-Khazali to serve as a conduit for Iranian support.[11] At this point, Iranian backing for the Sadrists was primarily financial, consisting of $750,000-$1,000,000 but sometimes as much as $2-$3 million U.S. dollars per month.[12] During the 2004 Shi`a uprisings in Najaf, Yusif offered to train al-Sadr's JAM militia members so that they could be "more capable of fighting the occupiers."[13] Al-Sadr agreed, but asked al-Khazali to select individuals who would travel to Iran for training and identify regional commanders for what would become known as the Special Groups.[14]

During his late 2007 interrogations, al-Khazali also traced the finer points of Iranian support. He described Iranian and Lebanese Hezbollah training—to include courses on light, medium, and crew-served weapons and Explosive Formed Projectiles (EFPs)—as well as the extent of Iranian direction to the Special Groups.[15] Interestingly, al-Khazali claimed that Iran was sometimes selective in determining which groups received certain types of training. For example, Iran was restrictive in its provision of Surface to Air Missile (SAM) training but was willing to give EFP courses to "anyone."[16] Al-Khazali described how funding made its way into the Special Groups' coffers, as well as the process for smuggling weapons across the Iran-Iraq border.[17]

Critically, al-Khazali admitted during interrogations that he provided "approval and authorization" for the PJCC attack that killed five U.S. soldiers, while also claiming to have been the "sole authorizing authority for operations performed by the 'Special Groups.'"[18] Chiding the coalition for "making a bigger deal out of it [the PJCC attack] than it was meant to be,"[19] al-Khazali disclosed that "the Iranians planned it."[20]



*Qais al-Khazali, center, the leader of Asa`ib Ahl al-Haqq, or League of the Righteous, speaks to his followers during a campaign rally in Baghdad, Iraq, on May 7, 2018. (AP/Hadi Mizban)*

PX274

## Disputes between al-Sadr and al-Khazali

Analysis of these now publicly available interrogation files confirms Iranian efforts to disrupt U.S. stability operations in Iraq and kill U.S. soldiers, as U.S. General David Petraeus and Ambassador Ryan Crocker highlighted at the time.[21] But a deeper look into these files also reveals the limitations of Iranian resources and support in fostering unity amongst Shi`a militants in Iraq. Instead of pointing toward a cohesive bond between al-Khazali and other Iraqi Shi`a militia leaders based on a shared ideology and benefactors in Tehran, the documents expose deep divisions between fellow Shi`a group leaders.

Under interrogation, al-Khazali was quite critical of his former Iraqi Shi`a militant comrades. When he was questioned about whether al-Sadr's JAM members were fighting in Lebanon, he "laughed and said that a JAM member would not last a second in that fighting."[22] Beyond their lack of military acumen, al-Khazali also claimed that "the followers of al-Sadr are somewhat confused, unstable both religiously and politically."[23]

Al-Khazali also discussed his personal and often petty disagreements with al-Sadr. He described al-Sadr as an incompetent, mercurial, unqualified, and deeply paranoid leader, and even offered to turn other prisoners against al-Sadr. "Sadr is not stable … [and] he is constantly changing his mind," al-Khazali told his captors.[24] He also described al-Sadr as "not focused, organized, or competent" and a "self-centered" commander who is "famous for getting rid of his leaders as soon as they start to show a shred of competence."[25] In another instance, al-Khazali omitted the cleric from his list of top five "most respected Shi'a leaders."[26]

Al-Khazali further noted that personal enmity between him and al-Sadr, driven by what he perceived to be al-Sadr's jealousy of al-Khazali's apparently "growing popularity" and "gaining too much power," contributed to a rift between them.[27] The rift apparently boiled over when al-Khazali arranged for a prominent cleric to deliver a sermon at the al-Kufa Mosque that described an unqualified "calf"—presumably a metaphor for al-Sadr—running a country when a far more capable "bull"—presumably a metaphor for an Ayatollah—remained sidelined.[28] In the wake of this thinly veiled criticism of al-Sadr's qualifications, al-Khazali feared that al-Sadr was trying to have him assassinated.[29] The divide between al-Sadr and al-Khazali apparently led the latter to take more drastic steps to undermine al-Sadr's influence both prior to and during al-Khazali's incarceration. Al-Khazali told the coalition that before being captured, he had begun to form a committee to "end the dictatorship" of al-Sadr.[30] While in prison, he offered to "form a committee inside the prison to teach prisoners against MAS [Muqtada al-Sadr]."[31] Al-Khazali said he would speak with his fellow prisoners about how they remained imprisoned because of the "mistakes that Muqtada al-Sadr has made."[32]

The depth of this disagreement laid bare during interrogation belies al-Khazali's attempts in recent years to downplay his differences with the Sadr movement in public. When asked in a 2015 interview about conflicts between his forces and the Sadrists, for example, al-Khazali noted, "There is much more that brings us closer to the Sadrist movement than anything that separates us. It is true that there are some disagreements but we would never go so far as to

PX274

make them into real conflicts."[33] In an earlier interview, he had similarly claimed that "from our side we do not have a problem with his eminence Muqtada al-Sadr ... [We] will not, from our end, allow the dispute to ever expand."[34]

**Policy Implications**

Taken together and examined in context, the al-Khazali interrogation reports are noteworthy because they expose critical faultlines and fissures among Iraqi Shi`a militants in 2007. Iraqi Shi`a militants have their own parochial interests and rivalries that will likely shape their future behavior. Iraqi Shiite militia rivalries thus have implications for the development of Iraqi politics and for U.S. policy.

These disputes between al-Sadr and al-Khazali have continued to percolate after the latter's release from prison. In December 2011, al-Sadr called AAH a "group of religion-less killers."[35] In May 2017, al-Sadr also publicly accused al-Khazali and AAH of kidnapping and extorting Iraqi civilians.[36] Beyond these public statements, al-Sadr and al-Khazali's respective supporters have clashed in the streets. In the summer of 2013, fighting between the two groups escalated, with AAH members burning Sadrist-owned shops, followed by eventual gunfire.[37] These 2011-2017 episodes demonstrate that the rifts exposed during al-Khazali's interrogations endure. They are not merely relics of al-Khazali's period in detention.

Subsequent political maneuvers in 2018 suggest that al-Sadr will continue to resist the influence of al-Khazali and the Fatih alliance, at least in the short term. After the leader of Fatih, Hadi al-Amiri, nominated Falih al-Fayyadh, a chief of the pro-Iranian Popular Mobilization Units (PMU) militias, to Minister of Interior, al-Sadr in November 2018 publicly chastised al-Amiri for engaging in "deals ... to buy ministries ... with external support."[38] "I made an agreement with you, not the corrupt and militias," al-Sadr proclaimed.[39] Al-Sadr insisted on appointing independents as ministers of defense and interior—likely to the chagrin of al-Khazali and his Iranian-backed allies—in order to "preserve Iraq and its independence."[40] Taking passive aim at Iran, al-Sadr went on to proclaim that "our neighbors are our friends and not our masters."[41] This is not to argue that al-Sadr will be able to make a clean break from Fatih or even al-Khazali, however. The PMU remain militarily formidable, and al-Sadr will thus most likely need to engage his political rivals in dialogue and consider the effects his decisions may have on their behavior. Al-Sadr's consideration of these consequences, however, should not be confused as a warm embrace.

It may be analytically tempting to view recipients of Iranian support as uniform in their cooperation with one another. Yet, the al-Khazali interrogation documents reveal that foreign resources do little to preclude Iraqi Shi`a intra- and inter-group factionalism. If this is the case, the United States should consider a nuanced strategy toward Iranian-backed political and militant groups and avoid presupposing any unanimity in their outlook or cooperation with each other. These groups each face different sets of incentives and will thus not respond to U.S. policy instruments uniformly.

PX274

Understanding these differences and longstanding fissures among groups supported by Iran has significant implications for U.S. policies dealing with Iraq, Iran, and the Middle East. In May 2018, Secretary of State Mike Pompeo announced the Trump administration's policy toward Iran's nuclear program and destabilizing regional activities. The announcement included a list of desired changes in Iranian behavior, to include calling on Iran to respect Iraqi sovereignty and to allow for the disarmament, demobilization, and reintegration of Shi`a militias.[42] As the United States implements its Iran strategy, analysts advising the U.S. government should avoid overstating any unifying effect of Iranian support for Iraqi Shi`a political and militant "proxy" groups. Iranian support for Shi`a militias is certainly dangerous and worthy of U.S. policy makers' attention. However, the case of Qais al-Khazali suggests that external support from Tehran may have limited ability to resolve internecine disputes between Shi`a militias within and beyond Iraq's borders.   **CTC**

*Bryce Loidolt is a research fellow at the Institute for National Strategic Studies at the National Defense University in Washington, D.C., and a doctoral candidate in the Department of Political Science at the George Washington University. His research focuses on irregular warfare in the Middle East and North Africa. The views expressed here are his own and are not an official policy or position of the National Defense University, the Department of Defense, or any part of the U.S. Government.*

## Citations

[1] For details on the attack, see "Karbala Attackers User U.S. Army-Styled Uniforms to Gain Access," American Forces Press Service, January 26, 2007; Stanley A. McChrystal, *My Share of the Task: A Memoir* (London: Porfolio, 2014), pp. 565-566.

[2] For more information on the development of the Sadrist trend and its associated militia, Jaysh al-Mahdi (JAM), see Anthony Shadid, *Night Draws Near: Iraq's People in the Shadow of America's War* (New York: Henry Holt, 2005); Yusri Hazran, "The Rise of Politicized Shi'ite Religiosity and the Territorial State in Iraq and Lebanon," *Middle East Journal* 64:4 (Autumn 2010): pp. 521-541; Patrick Cockburn, *Muqtada Al-Sadr and the Battle for the Future of Iraq* (New York: Scribner, 2008); and Alec Worsnop, "Who Can Keep the Peace? Insurgent Organizational Control of Collective Violence," *Security Studies* 26:3 (2017): pp. 482-516.

[3] For details on the raid itself, see McChrystal, pp. 571-578.

[4] "Iraq: Manual Recount Shows Few Changes to May Election Results," Al Jazeera, August 10, 2018; Josh Rogin, "Iraqi Terrorist Turned Politician Told U.S. Interrogators he Worked with Iran to Kill Americans," *Washington Post*, August 30, 2018.

[5] See, for example, Jonathan Spyer, "Who is Qais al-Khazali, and Why Should You Care?" *Jerusalem Post*, December 15, 2017. See also Dexter Filkins, "Iran Extends its Reach in Syria," *New Yorker*, June 9, 2017, and "The Future of Iran's Presence in Syria," Israeli Defense Forces, undated.

[6] The declassified reports are all available via the American Enterprise Institute's website. See "The Qays al-Khazali Papers" at http://www.aei.org/spotlight/qayis-al-khazali-papers/. The papers were declassified for the U.S. Army's historical study of the Iraq War that is still pending release. See Michael Gordon, "The Army Stymied Its Own Study of the Iraq War," *Wall Street Journal*, October 22, 2018.

[7] Shadid, p. 204.

[8] Tactical Interrogation Report 42, April 13, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection. For more on the Special Groups, see Joseph Felter and Brian Fishman, *Iranian Strategy in Iraq: Politics and "Other Means,"* (West Point, NY: Combating Terrorism Center, 2008).

[9] Tactical Interrogation Report 4, March 23, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[10] Tactical Interrogation Report 1, March 21, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection. Qassem Suleimani and Hajji Yusif were later named in U.S. Treasury Department designations. See "Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," U.S. State Department, October 25, 2007, and "Treasury Designates Individuals and Entities Fueling Violence in Iraq," U.S. Department of Treasury, September 16, 2008.

[11] Tactical Interrogation Report 4.

[12] Tactical Interrogation Report 16, March 29, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[13] Tactical Interrogation Report 200243-038, November 27, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[14] Ibid.

[15] Tactical Interrogation Report 200243-008, June 18, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection; Tactical Interrogation Report 200243-015, June 1, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection; Tactical Interrogation Report 11, March 26, 2007, available via American Enterprise Institute's "Khazali Files" Collection.

[16] Tactical Interrogation Report 11.

[17] Tactical Interrogation Report 21, April 1, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection; Tactical Interrogation Report 18, March 30, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection. For more on Iranian training for Special Groups, see Fishman and Felter.

[18] Tactical Interrogation Report 6, March 24, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

PX274

[19] Tactical Interrogation Report 62, April 26, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[20] Tactical Interrogation Report 97, May 20, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection. Iran's role in the PJCC attack was also revealed in a U.S. Department of Defense press briefing after al-Khazali's capture. Brigadier General Kevin Bergner, then-U.S. spokesmen for the Multinational Force Iraq, briefed reporters in July 2007 that al-Khazali, along with his Lebanese Hezbollah associate, admitted that "senior leadership within the Quds Force knew of and supported planning for the eventual Karbala attack." See Jim Garamone, "Iran Arming, Training, Directing Terror Groups in Iraq, U.S. Official Says," American Forces Press Service, July 3, 2007.

[21] Robin Wright, "U.S. Starts Push for Tighter Sanctions on Iran," *Washington Post*, September 13, 2007.

[22] Tactical Interrogation Report 13, March 27, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[23] Tactical Interrogation Report 200243-007, June 18, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[24] Ibid.

[25] Tactical Interrogation Report 200243-041, December 21, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection; Tactical Interrogation Report 200243-045, January 3, 2008, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection; Tactical Interrogation Report 42.

[26] Tactical Interrogation Report 200243-008.

[27] Tactical Interrogation Report 1.

[28] Tactical Interrogation Report 200243-022, July 20, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[29] Ibid.

[30] Tactical Interrogation Report 200243-009, June 21, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[31] Tactical Interrogation Report 200243-010, June 23, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[32] Tactical Interrogation Report 200243-012, June 23, 2007, available via American Enterprise Institute's "The Qays al-Khazali Papers" Collection.

[33] Mohammad al-Zaidi, "Interview with Militia Leader, Qais al-Khazali: 'We Don't Deny Militias Have Committed Violations,'" Niqash, August 19, 2015.

PX274

[34] Ili Shalhub, "Qais al-Khazali's Interview: Hezbollah is the Most Prominent Resistance Movement in the Region and World," *Al-Akhbar* (Arabic), January 27, 2012.

[35] "Sadr Describes Assa`ib Ahl al-Haqq As a Group of Religion-less Killers," *Al-Sumaria* (Arabic), December 28, 2011.

[36] "Sadr Accuses al-Khaza`li's Militia of Committing Kidnapping Crimes in Iraq," *Yaqin* (Arabic), May 11, 2017.

[37] For an excellent round-up, see Joel Wing, "Sadrists-League of the Righteous Clash in Iraq During the Summer," Musings on Iraq, September 5, 2013.

[38] Al-Sadr, "My message to the mujahid brother: Hadi al-`Amiri … ," Twitter, November 19, 2018.

[39] Ibid.

[40] "Al-Sadr Denies His Role in Delaying Government Formation…and Insists on Independents for 'Interior' and 'Defense,'" *Al-Sharq al-Awsat* (Arabic), November 28, 2018.

[41] Ibid.

[42] Secretary of State Mike Pompeo, "After the Deal: A New Iran Strategy," remarks at The Heritage Foundation, May 21, 2018.

PX275



# IRAN'S MINISTRY OF INTELLIGENCE AND SECURITY: A PROFILE

*A Report Prepared by the Federal Research Division,*
*Library of Congress*
*under an Interagency Agreement with the*
*Combating Terrorism Technical Support Office's*
*Irregular Warfare Support Program*

*December 2012*

**Federal Research Division**
**Library of Congress**
**Washington, D.C.  20540–4840**
Tel:          202–707–3900
Fax:          202–707–3920
E-Mail:       frds@loc.gov
Homepage:  http://www.loc.gov/rr/frd/

★ **64 Years of Service to the Federal Government** ★
**1948 – 2012**

PX275

## PREFACE

This report presents an overview of Iran's Ministry of Intelligence and Security and attempts to provide an inclusive assessment of the organization, including characteristics such as its history and development, organizational structure, and recruitment.

The information in this report was collected mainly from Farsi and English journals, online news Web sites, and Iranian blogs. In conducting this analysis, an effort has been made to ensure the reliability of the information by comparing and contrasting all information across multiple sources. However, because of the secretive nature of the organization and its operations, information about the ministry is difficult to locate and evaluate.

Because of the extreme degree of control of the media and news by the government of the Islamic Republic of Iran, Iranians have to depend on alternative sources such as blogs to receive daily news. For example, in 2005 Iran had the third-largest number of bloggers in the world after the United States and China, an indication of the importance of the communication and dissemination of news through blogs and social media. Needless to say, the Ministry of Intelligence and Security does not publish information about its activities on Iranian Web sites. Consequently, in the absence of official government information, this report occasionally relies on social media, in particular blogs, as a source of information more than might ordinarily be warranted. The reliability of blog-based information may be questionable at times, but it seems prudent to evaluate and present it in the absence of alternatives.

In view of the secrecy that surrounds the ministry, many aspects of its organization, leadership, and activities are poorly understood. The role of the ministry outside of Iran and its cooperation with the Quds Force are topics that merit more careful study. In addition, knowledge of the ministry's cyber capabilities would give better insight into Iran's possible intentions in a cyber war.

As noted above, this report relies extensively on sources in Farsi. For the convenience of the reader, the bibliography and footnotes list those sources with English translations of their titles first, followed by the original Farsi titles in brackets. The Web addresses presented in the report were current as of November 2012.

PX275

# TABLE OF CONTENTS

PREFACE ................................................................................................................................. i

1. EXECUTIVE SUMMARY .................................................................................................. 1

2. GROUP NAMES AND ALIASES ....................................................................................... 2

3. GROUP TYPE ...................................................................................................................... 3

4. OBJECTIVES ....................................................................................................................... 3

5. ETHNIC, POLITICAL, AND RELIGIOUS ORIENTATION ............................................. 4
   5.1  Ethnic Composition ...................................................................................................... 4
   5.2  Political Affiliation and Religious and Ideological Orientation ..................................... 4

6. HISTORICAL BACKGROUND .......................................................................................... 5

7. ORGANIZATION ............................................................................................................... 10

8. PRINCIPAL LEADERS ..................................................................................................... 18

9. HEADQUARTERS ............................................................................................................. 23

10. COMMAND AND CONTROL ......................................................................................... 24

11. MEMBERSHIP SIZE ........................................................................................................ 24

12. MEMBERSHIP AND RECRUITMENT ........................................................................... 24

13. TRAINING AND INDOCTRINATION ............................................................................ 28

14. METHODS OF OPERATION AND TACTICS ................................................................ 29
   14.1 Operations .................................................................................................................. 29
   14.2 Control of Media ........................................................................................................ 31

15. INTELLIGENCE CAPABILITIES ................................................................................... 32
   15.1 Signals and Cyber Intelligence .................................................................................. 32
   15.2 Human Intelligence .................................................................................................... 33
   15.3 Counterintelligence .................................................................................................... 33

16. MOTIVATION AND PERFORMANCE ........................................................................... 36

17. PRINCIPAL AREAS OF OPERATION ........................................................................... 37

18. FINANCES AND FUND-RAISING ................................................................................. 40

19. FOREIGN AFFILIATIONS AND SUPPORT .................................................................. 40

20. USE OF COMMUNICATIONS MEDIA .......................................................................... 41

21. TERRORIST THREAT ASSESSMENT ........................................................................... 44

22. INFORMATION GAPS (IN SOURCES) .......................................................................... 45

23. KEY HISTORICAL EVENTS AND SETBACKS ............................................................ 45

24. CHRONOLOGY OF SIGNIFICANT TERRORIST ATTACKS ...................................... 48

PX275

25. BIBLIOGRAPHY ................................................................................................................. 52

26. APPENDIX. Charts, Maps, and Photos ................................................................................. 62

PX275

## 1.   EXECUTIVE SUMMARY

- The Ministry of Intelligence and Security (MOIS) uses all means at its disposal to protect the Islamic Revolution of Iran, utilizing such methods as infiltrating internal opposition groups, monitoring domestic threats and expatriate dissent, arresting alleged spies and dissidents, exposing conspiracies deemed threatening, and maintaining liaison with other foreign intelligence agencies as well as with organizations that protect the Islamic Republic's interests around the world.

- Although Islamist hard-liners in Iran are in charge of the ministry under the guidance of Supreme Leader Ayatollah Ali Khamenei, the organization encompasses a mixture of political ideologies.

- Every minister of intelligence must hold a degree in *ijtihad* (the ability to interpret Islamic sources such as the Quran and the words of the Prophet and imams) from a religious school, abstain from membership in any political party or group, have a reputation for personal integrity, and possess a strong political and management background.

- According to Iran's constitution, all organizations must share information with the Ministry of Intelligence and Security. The ministry oversees all covert operations. It usually executes internal operations itself, but the Quds Force of the Islamic Revolutionary Guards Corps for the most part handles extraterritorial operations such as sabotage, assassinations, and espionage. Although the Quds Force operates independently, it shares the information it collects with MOIS.

- The Iranian government considers Mojahedin-e-Khalq to be the organization that most threatens the Islamic Republic of Iran. One of the main responsibilities of the Ministry of Intelligence and Security is to conduct covert operations against Mojahedin-e-Khalq and to identify and eliminate its members. Other Iranian dissidents also fall under the ministry's jurisdiction.

- The ministry has a Department of Disinformation, which is in charge of creating and waging psychological warfare against the enemies of the Islamic Republic.

- Iran's ability to collect covert information is limited; specifically, its signals intelligence capability represents only a limited threat because it is still under development.

- Even though Iran has created a well-equipped counterintelligence system to protect its nuclear program, it appears that other countries' operatives still succeed in infiltrating the system, as well as some other parts of Iran's intelligence apparatus.

PX275

## 2.   GROUP NAMES AND ALIASES

The Iranian intelligence service is called the Ministry of Intelligence and Security (MOIS), or Vezarat-e Ettela'at va Amniat-e Keshvar (VEVAK) in Farsi. MOIS agents are known as "Unknown Soldiers of Imam Zaman,"[1] the name that Ayatollah Khomeini gave them.[2]



Previous MOIS Emblem
Source: http://www.
iranfocus.com



Current MOIS Emblem
Source: http://cyber-
army.blogfa.com

The above left image has been the ministry's emblem since its establishment. A graphic design of Allah (i.e., God) is located at the top. Below the Allah symbol are the words in Farsi for the Islamic Republic of Iran, and, on the bottom, the Ministry of Intelligence. The figure on the right shows the ministry's possible new emblem, which has appeared during news programs on national television. It forms a star with eight corners (a polygon). In Islamic culture, a polygon is a religious symbol. Two *la*s (*la* in Arabic means "no" or "not") on the right and left side (stylized as pointed salients) are interpreted as "Neither East, nor West, Islamic Republic." In the center of the star, an eye conveys the role of the ministry as a surveillant of the Islamic Republic of Iran.

---

[1] Twelver Shia Muslims believe that Imam Zaman (The Leader of the Age) was appointed by Allah to be the savior of mankind. Among his many other names, he is also known as "the Mahdi" (The Rightly Guided One). Iman Zaman is the Twelfth Imam in the succession of Islamic leaders of Shi'a Muslims.

[2] "Destruction of a Spy Network Linked to the CIA and Detention of 30 American Spies" [انهدام شبکه جاسوسی وابسته به سیا و بازداشت 30 جاسوس آمریکایی], Fars News Agency [Tehran], May 21, 2011, http://www.farsnews.com/newstext. php?nn=9002315207 (accessed March 20, 2012). Fars News is a semi-official news agency with ties to the Iranian government.

PX275

## 3.  GROUP TYPE

MOIS is the most powerful and well-supported ministry among all Iranian ministries in terms of logistics, finances, and political support. It is a non-military governmental organization that operates both inside and outside of Iran. Intelligence experts rank MOIS as one of the largest and most dynamic intelligence agencies in the Middle East.[3]

The current minister of intelligence and security has described his ministry as being uninfluenced by foreign intelligence services: "One of the characteristics of MOIS is that it formed from inside of the revolution; and in fact, this organization was formed on the basis of the needs of the revolution in contrast with other intelligence services around the world that imitate each other."[4]

## 4.  OBJECTIVES

Iran's constitution defines MOIS's functions as:

- collecting, analyzing, producing, and categorizing internal and external intelligence;

- uncovering conspiracy, subversion, espionage, sabotage, and sedition against the independence, security, and territorial integrity of the Islamic Republic of Iran;

- protecting intelligence, news, documents, records, facilities, and personnel of the ministry; and

- training and assisting organizations and institutions to protect their significant records, documents, and objects.[5]

---

[3] "Iran's Ministry of Intelligence and Security," *Iran Focus* [UK], May 6, 2005, http://www.iranfocus.com/en/?option=com_content&task=view&id=2020 (accessed January 31, 2012). Iran focus is a UK-based news Web site that provides news on Middle East countries; "Five Major Duties of VAVAK Inside and Outside of the Country," *Enghelab-e-Eslami*, 2011, http://enghelabe-eslami.com/ه-2880/5-گزارشات-و-تحلیل-ها----------.html (accessed May 22, 2012). This is the Web site of Abul Hassan Banisadr, the first president of Iran after the Revolution. He had to escape from Iran to save his life. He is now a critic of the Islamic Republic.

[4] "The Minister of Intelligence's Report of Successes / Outside Opponents and Internal Dissidents of 1388 [2009] Have Become Active Again" [گزارش وزیر اطلاعات از موفقیت ها/بخش خارجی و هادیان داخلی فتنۀ 88 مجدداً فعال شده اند], Raja News [Tehran] (probably 2010 or more recent), http://www.rajanews.com/detail.asp?id=95793 (accessed April 4, 2012). Raja News is a conservative Iranian news agency based in Iran that supports the Supreme Leader of Iran.

[5] "Intelligence and Law" [اطلاعات و قانون], *Jame Jam Online* [Tehran], February 11, 2009, http://www.jamejamonline.ir/papertext.aspx?newsnum=100898802936 (accessed April 4, 2012). This conservative Web site is the Web site of the Islamic Republic of Iran Broadcasting Service (IRIB), which advocates the Supreme Leader's policies.

PX275

MOIS's internal activities are a priority unless it is deemed necessary for MOIS to become involved directly in external operations. It is possible that the Supreme National Security Council or the Supreme Leader determines MOIS's external operations (see Organization, below).

MOIS has a proven record of accomplishment in the execution of these functions. In carrying out its constitutional duties, MOIS conducts liaison with other foreign intelligence agencies as well as with organizations such as Lebanese Hezbollah that protect and promote the Islamic Republic's foreign agenda.[6]

## 5.   ETHNIC, POLITICAL, AND RELIGIOUS ORIENTATION

### 5.1   Ethnic Composition

As an official Iranian government agency, MOIS is overwhelmingly staffed by Iranians. It does, however, recruit other nationalities for its missions. For example, Anne Singleton, who is British, allegedly works for MOIS (see Membership and Recruitment, below).

### 5.2   Political Affiliation and Religious and Ideological Orientation

Until the reelection of President Mahmoud Ahmadinejad in 2009, most MOIS personnel were not uniformly hard-line Islamists, although they were vetted for ideological conformity. For example, in an article on the Fars News Web site in July 2005, the former minister of intelligence and security, Ghorbanali Dorri Najafabadi, said that when he consulted the former foreign minister, Ali Akbar Velayati, about whether to accept an offer from President Mohammad Khatami (president, 1997–2005) to become head of MOIS, Velayati told him "the Ministry of Intelligence is like a city which is governed by various insights and trends."[7]

After the reelection of President Ahmadinejad, the country became divided between "reformists"—those Iranians who planned to keep the core values of Iran's Revolution and to change the system to include more freedom and democracy—and "hard-liners"—those who opposed any such changes. This division occurred even among officials who formerly held important and sensitive positions. The Ministry of Intelligence and Security was no exception.

---

[6] Cyrus Maximus, "The Ministry of Intelligence and Security," *Iran Channel*, September 16, 2010, http://iranchannel.org/archives/357 (accessed March 21, 2012); Iran Channel criticizes the Iranian government's policies. It is unclear where it is based.
[7] "Dorri Najafabadi Spoke About his Selection as the Minister of Intelligence" [ دری نجف آبادی دربارۀ چگونگی انتخاب خود
به عنوان وزیر اطلاعات سخن گفت ], Fars News Agency [Tehran], July 18, 2005, http://www.farsnews.com/newstext.php?
nn=8404270109 (accessed March 22, 2012); United Kingdom, Home Office, UK Border Agency, "IRAN: Country of Origin Information (COI) Report," June 28, 2011, 39, http://www.ukba.homeoffice.gov.uk/sitecontent/documents/policyandlaw/coi/iran/report-0611.pdf?view=Binary (accessed March 21, 2012).

PX275

Many high-ranking intelligence agents supported Mir Hossein Mousavi, President Ahmadinejad's rival and a reformist. However, the right wing immediately started to remove reformist supporters from the ministry. For example, Saeed Hajjarian, a reform theorist and strategist in Iran, was imprisoned after the 2009 election even though he had been one of the founders of MOIS after the Revolution.[8]

MOIS operates under the direct supervision of Iran's Supreme Leader, Ayatollah Khamenei, who claims to be the leader of the Muslim world. As noted above, MOIS agents are known as "Unknown Soldiers of Imam Zaman," who is the Twelfth Imam in the succession of Islamic leaders of Shi'a Muslims. However, the organization is not bound by Shi'a beliefs. To advance its goals, MOIS recruits individuals regardless of their beliefs, including Arabs or Jews to spy in Israel. For example, the deputy minister of MOIS, Saeed Emami, was appointed to a key position in the ministry because of his family record, despite allegedly being Jewish by birth.[9]

## 6.   HISTORICAL BACKGROUND

Iran's intelligence and security system is a difficult subject to study because so little information about it is publicly available. Nevertheless, a review of the history of Iran's intelligence agencies should lead to a better understanding and an improved assessment of the present-day Iranian intelligence apparatus. Iran's intelligence strategy must be understood in the historical context of the Cold War and Iran's 1979 Revolution. Iran's intelligence activities are best divided into two parts: before and after the Revolution.

After World War II, Iran became a major player on the side of the West in the Cold War. Consequently, Iran received assistance from Britain and the United States to conduct covert operations against the Soviet Union, its northern neighbor.

In 1957 the United States and Israel cooperated with the shah, Mohammad Reza Pahlavi, to create the National Security and Intelligence Organization known as SAVAK (Sazman-e Ettela'at va Amniat-e Keshvar). Its objective was to protect the regime from internal opposition.

---

[8] "Ahmadinejad Is Cleaning Up the Ministry of Intelligence" [احمدی نژاد وزارت اطلاعات را پاکسازی مینماید!], *Our South Azerbaijan* [Iranian blog], August 2009, http://www.oursouthazerbaijan.com/osa_at.htm (accessed April 15, 2012). The reliability of the blog is questionable. "Reza Malek's Letter, the Former Deputy of the Ministry of Intelligence from Evin: Chain, House Arrest, Unknown Graves Will Not Keep Dictatorship [In Power]," *Balatarin*,  May 1, 2012, http://balatarin.com/permlink/2012/5/2/3013377 (accessed May 21, 2012). Balatarin is a popular Iranian community Web site, which posts mostly anti-Iranian government news, blogs, etc.

[9] "A Man Called Saeed Emami," *Iran Terror Database*, January 22, 2006, http://www.iranterror.com/content/view/178/26/ (accessed March 21, 2012).

PX275

SAVAK was also responsible for ensuring that communists and other leftist party members did not penetrate the armed forces or other government organizations. Although the main responsibility of SAVAK was domestic intelligence, it also engaged in external activities. SAVAK was mostly run by military personnel. After the 1979 Revolution, a published pamphlet showed the scope of SAVAK activities, demonstrating that SAVAK was a full-scale intelligence agency with 15,000 full-time agents and thousands of part-time informants.[10]

SAVAK initially was created to counter the Tudeh Party (Communist Party in Iran supported by the former Soviet Union), but it gradually expanded its activities and became a sophisticated intelligence agency. SAVAK was directly in touch with the Office of the Prime Minister, and its director was assumed to be the deputy of the prime minister for national-security affairs. Many well-defined investigative methods were designed to monitor all types of political activity. SAVAK dedicated a censorship office to monitoring journalists, literary figures, and academics across the nation. Many organizations, including universities, labor unions, and peasant organizations, were under intense surveillance by SAVAK. Over time, SAVAK evolved into an organization above the law by acquiring legal authority to arrest assumed antiregime activists, some of whom remained in jail without any record for extended periods. As a result, SAVAK earned a worldwide reputation as a brutal intelligence agency.[11]

In the early 1960s, SAVAK's main concern was the Soviet-allied Tudeh Party and, to a lesser extent, other opposition groups, including nationalist, secular, and liberal parties. In the early 1950s, the Tudeh Party had supported Prime Minister Mohammad Mossadegh because of his effort to nationalize Iran's oil industry. However, this support vanished during the 1953 coup that was backed by the U.S. Central Intelligence Agency and the British to oust Mossadegh's popular government. Opposed to a takeover of their oil interests, the British supported Operation AJAX, which helped the shah regain power.[12]

In the early 1960s, the regime successfully suppressed increased protests by the opposition against the shah, with SAVAK silencing dissenters by penetrating their organizations and arresting them. Such was the case with many university students, who after 1963 waged guerrilla

---

[10] Oliver Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," UK Defence Forum, December 2011, 2, http://www.ukdf.org.uk/assets/downloads/RS84CIraninsightsIran%E2%80%99sintelligenceandsecurityapparatusx.pdf (accessed March 22, 2012); Helen Chapin Metz, ed., *Iran: A Country Study* (Washington, DC: GPO for the Federal Research Division, Library of Congress, 1989), http://lcweb2.loc.gov/frd/cs/irtoc.html (accessed May 2, 2012).
[11] Metz, ed., *Iran: A Country Study*.

PX275

warfare against the shah's regime. The same was true of the communist group "Fadayi Guerrilla," which received training from the Popular Front for the Liberation of Palestine and other groups affiliated with the Palestine Liberation Organization (PLO). SAVAK also closely monitored dissident students abroad and plotted assassinations of opposition figures in exile.[13]

After the 1979 Islamic Revolution, Iranian intelligence functioned like intelligence organizations in every other revolutionary country—it identified and eradicated opponents and defectors inside and outside of the country. Thus, collecting information was not the priority. At this time, the PLO was providing the most foreign information to the Iranian government. However, the Soviet KGB allegedly used this exchange of information to feed the revolutionary government inaccurate information as a way of complicating the United States–Iran relationship more than was already the case after the Revolution.[14]

From the beginning of the Revolution in 1979, internal security was in the hands of Islamic Revolutionary Kumitehs (literally, committees), which Ayatollah Khomeini ordered to be formed because of concerns that a police force might be more loyal to the shah than to the new revolutionary regime. People established Kumitehs in their neighborhoods in places such as police stations, mosques, and youth centers. In addition to having responsibility for security, each Kumiteh had a unit to gather information (intelligence) on its neighbors. Ayatollah Mohammad Reza Mahdavi Kani, who was one of the revolutionaries close to Ayatollah Khomeini, was in charge of the Kumitehs. Kumitehs may have operated under the Ministry of Interior.[15] Other groups were involved in gathering information as well, including judges who were in charge of cases dealing with sabotage by opposition groups and with counter-intelligence.

The interim government and the Revolutionary Council formed by Ayatollah Khomeini to lead the Revolution while he was exiled in Paris endeavored to revive parts of SAVAK, especially its eighth directorate, a counterintelligence unit in charge of monitoring foreign embassies and detecting espionage. This directorate focused on Eastern Bloc countries, in particular the Soviet Union, and Arab states. After the Revolution, Dr. EbrahimYazdi, the first

---

[12] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 2.
[13] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 3.
[14] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 4.
[15] "Untold [Incidents] About the Ministry of Intelligence" [ناگفته هایی از وزارت اطلاعات], *Aftab News* [Tehran], September 6, 2005, http://www.aftabnews.ir/vdcc4xqs.2bqii8laa2.html (accessed May 18, 2012). Aftab News is a news Web site based in Iran, with a pro-government viewpoint.

PX275

minister of the revolution, broadened the directorate's jurisdiction by focusing on more countries and by continuing to use SAVAK personnel.[16]

In 1979–80 the revolutionary government created a variety of small agencies, but the most distinctive and prestigious was the National Intelligence and Security Agency (Sazman Ettela'at va Amniat Melli Iran—SAVAMA). It was built on SAVAK's foundation. SAVAMA successfully used the same methods as SAVAK to collect foreign intelligence, while the Islamic Revolutionary Guards Corps (IRGC) was established to guard the Revolution and deal with domestic threats. Later, the IRGC became involved in foreign intelligence operations.[17]

The Iranian intelligence apparatus operated relatively successfully at the beginning of the revolutionary era. In July 1980, it uncovered the Nojeh Coup, an attempt to overthrow the new government by air force officers loyal to the shah. Then, the number of security and intelligence agencies increased dramatically, causing disorder in the intelligence system. As a consequence, Mohammad Ali Rajaei, the second president of the Islamic Republic of Iran, formed the Prime Minister's Intelligence Office (Daftar-e- Ettela'at Nokhostvaziri) in 1981. At this time, intelligence responsibilities were divided among the Prime Minister's Intelligence Office, the IRGC, the army, the Kumitehs, and the police force.[18]

In August 1983, parliament approved the formation of the Islamic Republic of Iran's Ministry of Intelligence and Security by merging three organizations that had had four continuous years of experience in dealing with foreign intelligence services and confronting antirevolutionary groups. The three intelligence organizations, which had been operating separately since 1979, were IRGC intelligence, the Kumitehs, and the Prime Minister's Intelligence Office. At that time, many former SAVAK agents were granted amnesty by religious leaders so that MOIS could benefit from their experience. Specifically, SAVAK agents were needed to boost Iran's intelligence capacity to deal with the war with Iraq in the 1980s.[19]

---

[16] "Untold [Incidents] About the Ministry of Intelligence," [ناگفته هایی از وزارت اطلاعات].
[17] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 4.
[18] "Untold [Incidents] About the Ministry of Intelligence," [ناگفته هایی از وزارت اطلاعات].
[19] "Untold [Incidents] About the Ministry of Intelligence," [ناگفته هایی از وزارت اطلاعات]; Amir Farshad Ebrahimi, "Who Is Saeed Emami?" [سعید اسلامی (امامی) کیست؟], *Hokoomat Nezami* [Iranian blog], May 10, 2008, http://gavras.wordpress.com/2008/05/10/% D8%B3%D8%B9%D9%8A%D8%AF-
%D8%A7%D8%B3%D9%84%D8%A7%D9%85%DB%8C-%D8%A7% D9%85%D8%A7%D9%85%DB%8C-
%DA%A9%D9%8A%D8%B3%D8%AA%D8%9F-%D8%A7%D9%85% DB%8C%D8%B1-
%D9%81%D8%B4%D8%A7%D8%AF-%D8%A7%D8%A8/ (accessed May 18, 2012).

PX275

The new ministry was charged with the development of a strong intelligence capability that could confront the intelligence agencies of Iran's enemies. These foreign agencies had penetrated antirevolutionary groups, and some had also infiltrated vital parts of the government during the Iran–Iraq war. Furthermore, the government had to deal with dissidents outside of the country who constantly opposed the Iranian government.[20]

Targeting externally based Iranian opponents of the Revolution was one of the main objectives of MOIS in the 1990s. The ministry was responsible for many terrorist attacks and assassinations of dissidents during this decade, such as the assassination of Shahpour Bakhtiar (the last prime minister under the shah). MOIS agents also were directly involved in the collection of information for the possible assassination of Salman Rushdie, an Indian-born author who wrote *The Satanic Verses*. Because of the alleged un-Islamic content of the book, Ayatollah Khomeini issued a fatwa in February 1989 calling on all good Muslims to kill Rushdie and his publishers. The assassination of four Iranian-Kurdish members of the Iranian Democratic Party of Kurdistan in Berlin at a Greek restaurant named "Mykonos" in 1992 received international attention. Kurds and other minority ethnic groups such as Baluchis, Turks, and Arabs come under MOIS's surveillance because these peoples seek independence from the central government.[21]

The "Chain Murders" in Iran were a series of assassinations that took place in the 1990s to silence Iranian dissident intellectuals. After an investigation, MOIS took responsibility for the murders by proclaiming that some of its agents committed these crimes without its awareness (see Key Historical Events and Setbacks, below). An Argentine court also blamed MOIS for enlisting Hezbollah to bomb the Israeli embassy and the Jewish center in Buenos Aires in 1992 and 1994.[22] However, the IRGC was responsible for these incidents, although MOIS certainly

---

[20] "How Did the Ministry of Intelligence Form?" [وزارت اطلاعات ایران چگونه شکل گرفت؟], *Khanevadeh Kooch* [Iranian blog, Tehran], March 1, 2011, http://www.koooch.com/thread1703.html (accessed March 22. 2012).

[21] "Five Major Duties of VAVAK Inside and Outside of the Country"; "Mostafa Poormohammadi: I Had No Role in Chain Murders" [مصطفی پورمحمدی: در قتل های زنجیره ای نقشی نداشتم.], *BBC Persian*, February 27, 2012), http://www.bbc.co.uk/persian/iran/2012/02/120227_l32_pourmohamadi_iranian_murder.shtml (accessed May 17 2012); Alison Flood, "Salman Rushdie Reveals Details of Fatwa Memoir," *Guardian* [Manchester], April 12, 2012, http://www.guardian.co.uk/books/2012/apr/12/salman-rushdie-reveals-fatwa-memoir (accessed May 19, 2012); "Secret Execution of Four Arab Political Prisoners" [ وزارت اطلاعات : خبر اجرای حکم به خانواده ها توسط چهار زندانی سیاس عرب: اعدام مخفیانه ], *Gooya News*, June 21, 2012, http://news.gooya.com/politics/archives/2012/06/142395.php  (accessed June 21, 2012). Gooya News is a popular news Web site. It presents articles and news about the Iranian government's opposition. The reliability of the content on this Web site is relatively high.

[22] Muhammad Sahimi, "The Chain Murders: Killing Dissidents and Intellectuals 1988-1998," *Tehran Bureau*, PBS, January 5, 2011, http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2011/01/the-chain-murders-killing-

PX275

had some role in these operations. MOIS provided logistics, communication among the operatives, as well as documents needed for the operations.[23]

For the past decade, Iran's nuclear program has brought increased scrutiny by Western intelligence operatives in Iran. In return, MOIS has become more focused on countering foreign intelligence activities. The creation of a special counterintelligence unit and the capture of a number of alleged spies through MOIS's counterintelligence unit have in effect engaged Iran and its adversaries in an intelligence war. (Activities of MOIS in the early 2000s will be discussed throughout this report.)

## 7.   ORGANIZATION

MOIS answers directly to the Supreme Leader of Iran. Although the president appoints the head of the ministry, the Supreme Leader must approve the appointment, and the president cannot remove the appointee without the Supreme Leader's approval. This principle was on display when President Ahmadinejad asked the current minister, Heydar Moslehi, to resign in April 2011 because of disagreements between Moslehi and the president's adviser, Rahim Mashaei, who was assumed to be the architect of the president's policies and has many critics among conservatives (hard-liners). Following Moslehi's resignation, Supreme Leader Ali Khamenei refused to endorse Ahmadinejad's request and the president was forced to keep Moslehi in his cabinet.[24]

The following figure shows the place of MOIS in the hierarchy of Iran's intelligence agencies (see also Appendix: Figure 4).

---

dissidents-and-intellectuals-1988-1998.html (accessed March 22, 2012). Tehran Bureau Web site claims to be an independent source of news on Iran and the Iranian diaspora; however, the tone of news published by this Web site is critical of the Islamic Republic of Iran. It started to collaborate with the Public Broadcasting Service (PBS) in the United States in September 2009; Muhammad Sahimi, "The Chain Murders," *Tehran Bureau*, PBS, December 14, 2009, http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2009/12/the-chain-murders-1988-1998.html (accessed March 22, 2012).

[23] "Iran, Argentina Clash over Jewish Center Bombing Iranian Cleric is Linked to Buenos Aires Bombing. That Killed 87 People in '94," *Baltimore Sun*, May 21, 1998, http://articles.baltimoresun.com/1998-05-21/news/1998141013_1_rabbani-iran-bombing (accessed March 22, 2012); "Five Major Duties of VAVAK Inside and Outside of the Country."

[24] "Moslehi Fired by Ahmadinejad at Cabinet Meeting," *Daneshjoo News*, May 4, 2011, http://www.daneshjoonews.com/news/politics/7174-1390-02-14-15-43-38.html (accessed March 22). Daneshjoo News seems to be based in Iran. "Economist: Rahim Mashei Was Wiretapped by Moslehi" [اکونومیست: مصلحی رحیم مشایی را شنود می کرد], *BBC Persian*, May 6, 2011, http://www.bbc.co.uk/persian/iran/2011/05/110506_u01_economist-moslehi.shtml (accessed May 18, 2012).

PX275



**Figure 1. Structure of Iran's Intelligence Agencies**
Source: Based on information from http://www.jerusalemreports.com/?m=201201 and
http://www.dolat.ir/NSite/Service/Cabine/?&Serv=6

PX275

The ministries that operate under the president are listed in the following chart:



**Figure 2. Ministries under President**
Source: Based on information from http://dolat.ir/

PX275

According to Iran's constitution, the Supreme Leader sets the direction of foreign and domestic policies. He is commander in chief of the armed forces and controls intelligence operations. Hence, both MOIS and IRGC Intelligence, including the Quds Force, report directly to the Supreme Leader.

The president is the second-highest-ranking official in Iran. However, the constitution limits his authority in such a way that it subordinates the entire executive branch—and specifically MOIS and a small number of other ministries including the foreign and oil ministries—to the Supreme Leader.[25]

Iran's intelligence apparatus is composed of a number of entities, one of which is MOIS. According to the Islamic Republic of Iran's constitution with regard to the establishment of the ministry, article 1, clause 1, requires military organizations to coordinate with MOIS on military intelligence. The same article, clause 2, requires all ministries, institutions, governmental companies, and military and police forces that gather specialized information to share it with MOIS and to provide MOIS with any other information it demands. The constitution also stipulates that MOIS is in charge of intelligence activities inside and outside of Iran. In addition, articles 5 and 6 define the responsibilities of the IRGC and the ministry and how they should cooperate. Article 5 requires the Islamic Revolutionary Guards Corps to comply with the policy of the Ministry of Intelligence and Security with regard to combating domestic antirevolutionary dissidents, and the IRGC is entitled to collect, analyze, and produce information to identify the antirevolutionaries by way of helping MOIS.[26]

Thus, the IRGC and its external operational wing, the Quds Force, are required to report their activities to MOIS as the highest intelligence authority in the Islamic Republic of Iran. In return, MOIS provides logistical support and handles the communications aspect of operations involving Quds Force operatives and foreign organizations that work with the Quds Force, such as Hezbollah.[27]

MOIS is the main organization involved in intelligence operations that protect national security by collecting information; however, the Supreme National Security Council (SNSC) determines national-security policies and makes sure the policies are aligned with the Supreme

[25] "The Structure of Power in Iran," *Iran Chamber Society*, n.d., http://www.iranchamber.com/government/articles/structure_of_power.php (accessed April 11, 2012).
[26] "Intelligence and Law."
[27] "Five Major Duties of VAVAK Inside and Outside of the Country."

PX275

Leader's views. Article 176 of Iran's constitution established the Supreme National Security Council and charges it with responsibility for "preserving the Islamic Revolution, Iran's territorial integrity, and national sovereignty." The members of the council include the president; the head of the legislative branch (speaker of parliament); the head of the judiciary; the chief of the combined general staff of the armed forces; the ministers of foreign affairs, interior, and intelligence; and two representatives of the Supreme Leader of Iran, one of whom usually becomes the secretary of the council. The council may have temporary members, including the commander(s) of the Islamic Revolutionary Guards Corps and the regular military (Artesh), as well as ministers or officials with responsibilities related to a specific issue. The Supreme Leader of Iran oversees the activities of the SNSC (see figure 3, below).[28]



**Figure 3. Organizational Chart of Iran's Supreme
National Security Council**
Source: Compiled from information on http://www.rferl.org

As mentioned previously, the IRGC is also involved in Iranian intelligence operations. The relationship between Supreme Leader Khamenei and IRGC leaders—established in 1980 at the

---

[28] "The Structure of Power in Iran"; "The Supreme National Security Council" [شورای عالی امنیت ملی], *Iran's Judicial Laws Bank* [Tehran], n.d., http://libc.ir/index.php?option=com_content&view=article&id=126:1391-01-17-05-56-

PX275

beginning of the Iran–Iraq war when Khamenei was minister of defense—has led to greater IRGC involvement in many aspects of the government. The uncompromising support of the Supreme Leader for the IRGC has turned this organization into the most powerful entity in the Iranian government in several sectors, including the military and economy, as well as in the political arena (for instance, in the current administration, more than half of the ministers are IRGC officers).[29] Consequently, in the intelligence field, the IRGC is highly active as well. The Quds Force (mainly in charge of extraterritorial operations beyond Iran's borders) and IRGC Intelligence are two other effective intelligence organizations of the Islamic Republic of Iran whose work parallels that of MOIS. IRGC Intelligence initially operated as a directorate called the IRGC Intelligence Directorate from the time of the establishment of the IRGC in 1980. After the 2009 presidential election, the IRGC Intelligence Directorate continued its activities in the form of an "organization" that receives orders from the Supreme Leader of Iran.[30]

The creation of yet other intelligence organization in Iran took place when Mohammad Khatami became president in 1997. Lack of trust in the new administration because of Khatami's more liberal views led the Supreme Leader to create and rely on other intelligence groups, such as the IRGC, the police, and judicial intelligence. After Ahmadinejad's election as president in 2005 and because of numerous disagreements between him and the Supreme Leader, Ayatollah Khamenei decided to keep the IRGC Intelligence Organization as an alternative organization that would work parallel to MOIS—because the president can influence the ministry's direction one way or another, whereas the IRGC is completely under the Supreme Leader's command.[31] Article 6 of the constitution indicates that IRGC Intelligence's duties are

- to supply military intelligence;

- to obtain the necessary information from the Ministry of Intelligence and Security before carrying out any operation ordered by judicial authorities (the IRGC is one of the organizations that acts as the executive arm of Iran's judicial system); and

---

00&catid=55:1391-01-14-11-53-01&Itemid=70 (accessed September 6, 2012).

[29] Elliot Hen-Tov and Nathan Gonzalez, "The Militarization of Post-Khomeini, Iran: Praetorianism 2.0" (Washington, DC: Center for Strategic and International Studies, Winter 2011), 50, https://csis.org/files/publication/twq11winterhentovgonzalez.pdf (accessed May 22, 2012).

[30] "Iran's Minister of Intelligence: The Intelligence [Forces] Working Parallel [with MOIS] Have to Be Stopped" [وزیر اطلاعات ایران: باید جلوی موازی کاری اطلاعاتی گرفته شود], BBC Persian, May 29, 2012, http://www.bbc.co.uk/persian/iran/2012/05/120529_l39_intelligence_parraller-activities.shtml (accessed May 29, 2012).

[31] "Iran's Minister of Intelligence: The Intelligence [Forces] Working Parallel [with MOIS] Have to Be Stopped."

PX275

- to deliver intelligence to the Ministry of Intelligence and Security.[32]

The Quds Force works closely with MOIS. In fact, it appears that the Quds Force operates as an external intelligence arm of Iran, whereas MOIS focuses more on internal affairs. However, MOIS is integral to operations outside of Iran in the following cases:

- infiltrating Iranian opposition groups;

- creating terrorist networks and military groups (also the Quds Force's area of interest);

- identifying external threats, specifically those aimed at Iran's nuclear activity, and countering foreign intelligence agencies such as the CIA and Mossad;

- disseminating of misinformation; and

- acquiring technology for Iran's military industry.[33]

There is no clear division of powers and responsibilities between MOIS and the IRGC Intelligence Organization, and analysts believe this lack of definition of their responsibilities and their overlapping jurisdictions have caused friction between them. Apparently in some cases, the IRGC's Quds Force and IRGC Intelligence do not share information with MOIS as they are supposed to do. This gap was wider when Khatami was president, and many reformists held key positions at the ministry. After the 2009 presidential election, the IRGC blamed MOIS for not fulfilling its duties, claiming that was why the disputed election (of Ahmadinejad) caused massive and unprecedented turmoil.[34]

In 1996 the Iranian government created an organization called the Supreme Council for Intelligence Affairs under the minister of intelligence and security to coordinate policies with the Supreme National Security Council. The minister of intelligence and security is in charge of the Supreme Council for Intelligence Affairs. The umbrella organization has 20,000 employees and 12 different departments.[35] The objective of creating this council is not clear; however, it may be assumed that the Islamic Republic is trying to create a system parallel to the SNSC to ensure that each council's functions are aligned with the views of the Supreme Leader.

---

[32] "Intelligence and Law."
[33] "Five Major Duties of VAVAK Inside and Outside of the Country."
[34] "Iran's Minister of Intelligence: The Intelligence [Forces] Working Parallel [with MOIS] Have to Be Stopped"; "Five Major Duties of VAVAK Inside and Outside of the Country."
[35] Carl Anthony Wege, "Iranian Intelligence Organizations," *Taylor Francis Online*, 1997, 288, http://www. tandfonline.com/doi/pdf/10.1080/08850609708435351 (accessed March 22, 2012).

PX275

According to available information, MOIS has 15 directorates: 1) Security, 2) Counterintelligence, 3) Foreign [Operations], 4) Security Investigation (Hefazat, which means "protection" in Farsi), 5) Technology, 6) Politics, 7) Evaluation and Strategic Affairs, 8) Education, 9) Research, 10) Archives and Documents, 11) Manpower, 12) Administration and Finance, 13) Legal-Parliamentary [Relations], 14) Economy, and 15) Cultural-Social.[36]

Little information is available about these directorates, but MOIS has multiple offices, which are shown below (see table 1). It is believed that the Security Directorate has a vital role in the organization, possibly because its responsibility is directly related to national security.[37]

There is a special section in MOIS called the Department of Disinformation that operates either as an independent directorate or under one of the following directorates (for more information, see Control of Media section, under Methods of Operation and Tactics, below).

| Table 1. MOIS Directorates and Subordinate Offices | |
|---|---|
| **Name of Directorate** | **Name of Office(s)** |
| Security | Office of Security, Office of Operations, Office of Protection |
| Counterintelligence | Office of Counterintelligence |
| Foreign [Operations] | Office of Europe, Office of Africa, Office of the Americas, Office of the United States, Office of the Middle East, Office of Palestine and Israel, Office of Asia and the Pacific |
| Security Investigation | Office of Security Investigations, Office of Complaints |
| Technology | Office of New Technology, Office of Spying Technology |
| Politics | Office of Politics |
| Evaluation and Strategic Affairs | Office of Evaluation |
| Education | Office of Education |
| Research | Office of Research |
| Archives and Documents | Office of Archives and Documents |
| Manpower | Office of Manpower, Office of  Welfare Service |

---

[36] "The Islamic Republic of Iran's Ministry of Intelligence and Security" وزارت اطلاعات جمهوری اسلامی [ایران], *Varzesh 11*[Iranian blog]*,* August 22, 2011, http://www.varzesh11.blogfa.com/cat-417.aspx (accessed May 21, 2012). The reliability of this blog is questionable; however, the information in this report from this blog is widely distributed on other blogs as well.

[37] Ebrahimi, "Who is Saeed Emami?";  "The Islamic Republic of Iran's Ministry of Intelligence and Security" [وزارت اطلاعات جمهوری اسلامی ایران], *Hokoomat Nezami* [Iranian blog], n.d., http://gavras.wordpress.com/ 2008/05/10/%D8%B3%D8%B9%D9%8A%D8%AF-%D8%A7%D8%B3%D9%84%D8%A7%D9%85%DB%8C- %D8%A7%D9%85%D8%A7%D9%85%DB%8C-%DA%A9%D9%8A%D8%B3%D8%AA%D8%9F-%D8%A7 %D9%85%DB%8C%D8%B1-%D9%81%D8%B1%D8%B4%D8%A7%D8%AF-%D8%A7%D8%A8/ (accessed May 18, 2012); Daniel M. Zucker, "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear," *Global Politician*, September 3, 2007, http://www.globalpolitician.com/23386-vevak-iran (accessed May 21, 2012).

PX275

| Table 1. MOIS Directorates and Subordinate Offices | |
|---|---|
| **Name of Directorate** | **Name of Office(s)** |
| Administration and Finance | Office of Finance, Office of Administration |
| Legal-Parliamentary Relations | Office of Legal Relations, Office of Parliamentary Relations |
| Economy | Office of Economy, Office of Fighting Corruption |
| Cultural-Social | Cultural Office, Social Office |

Source: http://www.varzesh11.blogfa.com/cat-417.aspx

## 8.   PRINCIPAL LEADERS

According to a 1983 act of parliament, the minister of intelligence and security must have the following qualifications:[38]

- possess a religious school degree in "*ijtihad*;"[39]

- not be a member of any party or group;

- have a reputation of personal integrity and piety; and

- have a history of integrity in politics and management.

The first minister of intelligence and security of the Islamic Republic of Iran was Mohammad Reyshahri. He was one of the founders of this organization who sought to develop its policies and practices (see fig. 4, below).

When Ali-Akbar Hashemi Rafsanjani became president in 1989, Ali Fallahian was appointed minister of intelligence and security, a position he held for eight years. Many terrorist attacks against the Islamic Republic's opponents took place after he became minister, including the 1992 attack on Iranian-Kurdish opposition leaders in Berlin, which is known as the "Mykonos Assassinations"; the bombing of an Israeli-Argentine community center in Buenos Aires, Argentina, in 1994; and the attack on the Khobar Towers in Saudi Arabia in 1996. Fallahian is still being sought under an international warrant issued for his arrest in 1996 by a German court because of his role in the deaths of the Iranian-Kurdish leaders.[40]

---

[38] "Intelligence and Law."

[39] The term *ijtihad* means to draw and infer religious opinion about matters not mentioned in Islamic sources such as the Quran, the words of the Prophet, and religious leaders (imams). The opinion must elucidate Islamic faith and practice.

[40] "Masters of Disinformation," *Iran Terror Database*; "Iran's Secretive Quds Force Has Terror Links," *Soldier of Fortune*, October 12, 2011, http://www.sofmag.com/iran%E2%80%99s-secretive-quds-force-has-terror-links (accessed March 22, 2012); Saeed Bayani, "Vali Faqih and Terror at Mikonos Restaurant" [ ولی فقیه و ترور در رستوران mikonos ], *Radio Zamaneh*, August 17, 2010, http://www.radiozamaneh.com/politics/2011/08/17/6276 (accessed March 22, 2012). Radio Zamaneh was founded by the Dutch Ministry of Foreign Affairs but in content is an independent broadcasting organization; however, the tone of the articles and news on this Web site is critical of the

PX275

After Mohammad Khatami became president in 1997, Ghorbanali Dorri Najafabadi succeeded Fallahian. When he was in charge of the ministry, "the Chain Murders of Iran" occurred. Because of the wide international publicity given to this event, he was forced to resign. Many Iranian analysts believe that Fallahian was actually behind all of the assassinations and that he plotted the terrorist attacks against dissident writers and intellectuals.[41]

The next minister, also during Khatami's presidency, was Ali Younesi. During his term, when the ministry became more involved in economic activities, he stopped the accumulation of power and wealth at the ministry in order to prevent corruption. He had many opponents among conservatives in Iran because of his more liberal views.[42]

After Ahmadinejad's election as president in 2005, he appointed Gholam-Hossein Mohseni Eje'i as minister of intelligence and security. However, because of a conflict between Eje'i and Ahmadinejad over presidential adviser Rahim Mashei, Eje'i resigned at the end of Ahmadinejad's first administration. Heydar Moslehi replaced Eje'i. Under Moslehi, the ministry captured Abdolmalek Rigi, the head of Jondollah, an opposition group active in southeast Iran, and arrested many operatives involved in espionage networks in Iran. His use of the media to publicize the success of the ministry made him popular among hard-liners in Iran.[43]

An examination of the backgrounds of the different ministers of intelligence and security leads to the following observations:

- Most graduated from the Qum-based Haghani School, a Shi'a school controlled by a group of hard-line right-wing clerics.

- All of them were educated in law, either in academic or religious schools.

- Many had served in posts (e.g., prosecutors, head of the Islamic Revolutionary Court, attorney general) in the judicial branch of the government.

---

Iranian government; Sahimi, "The Chain Murders," 2009; Sahimi, "The Chain Murders: Killing Dissidents and Intellectuals 1988–1998," 2011.

[41] Jamshid Barzegar, "Akbar Ganji: The Chain Murders Was a Government Project" [ اکبر گنجی: قتل های زنجیره ای پروژه ای حکومتی بود ], *BBC Persian*, December 7, 2010, http://www.bbc.co.uk/persian/iran/2010/12/101207_ganji_serial_murders.shtml (accessed March 22, 2012).

[42] "If Applicable Law Does Not Prohibit Money Laundering, the Government Will Be Charged" [ قانون منع پولشویی اجرا نشود، دولت متهم می‌شود ], *Khabar Online* [Tehran], December 14, 2008, http://www.khabaronline.ir/detail/755/ (accessed April 11, 2012). Khabar Online is a news Web site in Iran with a pro-Iranian government viewpoint.

[43] "Member of Parliament's Defense for Mohseni Eje'i" [ دفاع نمایندگان مجلس از محسنی اژه ای ], *Farda News* [Tehran], July 27, 2009, http://www.fardanews.com/fa/news/87456/%D8%AF%D9%81%D8%A7%D8%B9-%D9%86%D9%85%D8%A7%D9%8A%D9%86%D8%AF%DA%AF%D8%A7%D9%86-%D9%85%D8%AC%D9%84%D8%B3-%D8%A7%D8%B2-%D9%85%D8%AD%D8%B3%D9%86%DB%8C-%D8%A7%DA%98%D9%87-%D8%A7%DB%8C (accessed November 12, 2012).

PX275

- All had a conservative political and religious ideology.

- All were clerics (that is, they were required by law to possess a degree in *ijtihad* from a religious school.[44]

Moslehi, the current minister of intelligence and security, has stated on different occasions that most of the ministry's intelligence collection is based on information received from the public. The ministry has set up a three-digit number (113) for Iranians to call to report suspicious activities.[45]

---

[44] "Milani and Ashkevari Speak About the Haghani School," *YouTube*, November 14, 2011, http://www.youtube.com/watch?v=oabDKk49BzI (accessed April 11, 2012); on *ijtihad*, see footnote 39.

[45] "Yesterday, Today, Tomorrow—Heydar Moslehi, the Minister of Intelligence," *YouTube*, February 24, 2011, http://www.youtube.com/watch?v=Y9wT3ljkhf8 (accessed April 11, 2012); "Introduction to the Ministry of Intelligence Public Relations" [آشنایی با روابط عمومی وزارت اطلاعات], *Jame Jam Online* [Tehran], February 11, 2009, http://www.jamejamonline.ir/papertext.aspx?newsnum=100898806386 (accessed April 11, 2012).

PX275



**Figure 4. Iran's Ministers of Intelligence and Security in Successive Administrations, 1981–Present**
Source: Compiled from multiple sources used in the preparation of this report.

PX275



Saeed Hajjarian
Source: http://www.rferl.org

Many deputies have led the different directorates of MOIS since its establishment, but only a few were important figures in the organization. One of them was Saeed Hajjarian, one of the founders of the ministry. It is believed that he was the real brains of the Iranian intelligence system after the Revolution. He became the deputy of the first minister of intelligence and security (Reyshahri) after the ministry's establishment in 1984 and designed and organized the intelligence apparatus of the Islamic Republic. When Fallahian, the second minister, a hard-line cleric, came to office, Hajjarian left the ministry because he believed the new minister had a controversial reputation. Hajjarian and other leftist revolutionaries recognized that Iran needed a political opening; otherwise, the Islamic Republic would not last. Thus, he became the leading strategist for the reform movement in Iran. After Khatami's election as president in 1997, Khatami appointed Hajjarian as his adviser. In 2000 Hajjarian was assassinated by hard-liners.[46]

Saeed Emami (or Saeed Eslami) was the director of the Security Directorate and the most controversial MOIS deputy because he was in charge of the operation known as the "Chain Murders" that assassinated Iranian intellectuals in the 1990s. His scholarship to study in the United States in 1977 and his family's background (they were affiliated with the shah's regime) raised questions about his loyalty and suitability for employment by MOIS. Under Reyshahri's tenure, Emami held a key position in the Foreign Directorate. After Fallahian became minister of intelligence and security, Emami became director of the Security Directorate, the organization's main directorate. After a series of murders of Iranian intellectuals, which led President Khatami to conduct an investigation,



Saeed Emami
Source: http://www.iradj-shokri.blogspot.com/

---

[46] Muhammad Sahimi, "Reformist Strategist: Saeed Hajjarian," *Tehran Bureau*, PBS, July 8, 2009, http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2009/07/reformist-strategist-saeed-hajjarian.html (accessed 17 May, 2012).

PX275

Emami's role in those murders was exposed, and he was arrested. The ministry announced later that Emami committed suicide in prison.[47]



Mostafa Poormohammadi was the attorney general of the Islamic Revolutionary Court—a special court in Iran that tries those who are suspected of threatening the Revolution and Islam— in Khoozestan and Khorasan provinces before he became director of the MOIS Counterintelligence Directorate in 1987. In 1991 he became the deputy head of MOIS. In 1997–98 he held the position of director of the Foreign Directorate of MOIS. In 2005, after President Ahmadinejad's first election, he was the main candidate for minister of intelligence and security. However, he ended up as minister of interior. He was forced by Ahmadinejad to resign in 2008 because of serious disagreements with the president.[48]

Mostafa Poormohammadi
Source:
http://ar.electionsmeter.com/

At any given time, it is difficult to identify top personnel of MOIS other than the minister, but under the current administration, a man named Gerami seems to be the deputy head of the ministry, and another man named Ahangaran appears to run the Technology Directorate.[49]

## 9.   HEADQUARTERS

MOIS headquarters appears to be in North Tehran[50] (see map and photos in Appendix).

---

[47] Ebrahimi, "Who is Saeed Emami?"

[48] "Mostafa Poormohammadi's Biography" [زندگینامه: مصطفی پورمحمدی], *Hamshahri Online* [Tehran], February 25, 2008, http://hamshahrionline.ir/news-45214.aspx (accessed May 17, 2012); "Mostafa Poormohammadi: I Had No Role in the Chain Murders."

[49] "The Deputy of the Minister of Intelligence: Enemies' Aggression Is a Sign of Achievement by the Islamic Republic" [معاون وزیر اطلاعات: تهاجم دشمنان نشانۀ توفیقات بزرگ نظام اسلامی است], Islamic Republic News Agency [Tehran], September 5, 2011, http://irna.ir/NewsShow.aspx?NID=30550101 (accessed May 17, 2012). The Islamic Republic News Agency (IRNA) is the official news agency in Iran that speaks for the government. "The Ministry of Intelligence Deputy: The Internet Network Is a Spy" [معاون وزارت اطلاعات: شبکۀ اینترنت جاسوس است], *Aftab News* [Tehran], April 5, 2012, http://www.aftabnews.ir/vdcbg0b88rhba5p.uiur.html (accessed May 17, 2012); "The Ministry of Intelligence Deputy: We Have Identified Two New Viruses" [معاون وزارت اطلاعات: دو ویروس رایانه ای جدید شناسایی کردیم], *Aftab News* [Tehran], January 19, 2012, http://aftabnews.ir/vdcdos0ffyt0os6.2a2y.html (accessed May 17, 2012). The full name of the deputies as well as the names of other directors of MOIS could not be found.

[50] "Satellite Image of the Ministry of Intelligence Building" [عکس ماهواره ای از ساختمان اصلی وزارت اطلاعات], *Anti-Dictator* [Iranian blog], September 2009, http://zobin-cost.blogspot.com/2009/09/blog-post_03.html (accessed May 16, 2012). This is an Iranian blog, which posts pictures and articles from other Web sites criticizing the Iranian government.

PX275

## 10.  COMMAND AND CONTROL

MOIS has a secret budget and is not accountable to other governmental organizations, including the cabinet or the Majles (parliament). It remains above the law, accountable only to the Supreme Leader, at present Ayatollah Khamenei.[51]

As discussed above, the Supreme Leader of Iran determines the national-security policies of the Islamic Republic of Iran (see Organization). The president must have the Supreme Leader's approval to select his minister of intelligence and security because the Supreme Leader receives the minister's counsel and works with the minister directly for implementation of his policies.[52] In terms of procedure, it appears that the Supreme Leader discusses and passes his general policies on to the Supreme National Security Council (SNSC), and MOIS, as a member of the council, executes the policies with regard to intelligence activities. It also seems that the Supreme Leader may pass an order directly to the minister of intelligence and security for more secret and specific missions.

## 11.  MEMBERSHIP SIZE

With more than 30,000 officers and support personnel, MOIS is ranked by experts as one of the largest and most active intelligence agencies in the Middle East.[53]

## 12.  MEMBERSHIP AND RECRUITMENT

The Iranian constitution (article 12) prohibits MOIS agents from being members of any political group or party. MOIS agents go through an extremely stringent vetting process before they can become part of MOIS's missions and operations, which could implicate the highest government officials if exposed to the public.[54]

There are two ways to be recruited into MOIS. One way is to take the entrance examinations in specific majors requested by MOIS at Imam Mohammad Bagher University in Tehran. This university is associated with MOIS. MOIS accepts three times more candidates than it can accommodate and then puts them through physical, intelligence, and personality tests, as well as interviews and a background investigation. The physical examination at MOIS is less rigorous

---

[51] Zucker, "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear"; "Iran's Ministry of Intelligence and Security."
[52] "Five Major Duties of VAVAK Inside and Outside of the Country."
[53] Cyrus Maximus, "The Ministry of Intelligence and Security," *Iran Channel*, September 16, 2010, http://iranchannel.org/archives/357 (accessed April 11, 2012).
[54] Zucker, "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear"; "Intelligence and Law."

PX275

than at other governmental training facilities in the army or special forces. It is a requirement to be healthy, but the intelligence and personality tests are more important than the physical test. These tests are conducted at the Intelligence Bureau in Hamedan, a city in western Iran. Interviews take place in selection units within MOIS's provincial intelligence agencies.[55]

The Intelligence School of Imam Mohammad Bagher University in 2012 accepted students in the following majors for undergraduate degrees:[56]

| Major Orien | tation | Gender | Capacity |
|---|---|---|---|
| Political Science | Security Studies | Male | 100 |
| Social Science | Security Studies | Male | 100 |
| Management | Intelligence and Communications Management | Male | 100 |

It also accepted students for master's degrees in the following majors:[57]

| Group Major | | Orientation | Gender | Capacity |
|---|---|---|---|---|
| Liberal Arts | Political Science | Security Studies | Male | 38 |
| Technology and Engineering | Electronic-Telecommunications Engineering | Electronic Data | Male | 19 |
| Science | Forensic Science | Biology and chemical information | Male | |

Every year the ministry publicly announces opportunities for studies in various fields according to its needs.[58]

Another way to be recruited into MOIS is to obtain a recommendation from a MOIS employee. MOIS staff usually recommend their relatives and those with whom they have a close

---

[55] "How to Be Hired at the Islamic Republic of Iran's Ministry of Intelligence and Security" [چگونگی استخدام در وزارت اطلاعات جمهوری اسلامی ایران], *Efshagari* [Iranian blog], June 9, 2010, http://efshagary.wordpress.com/2010/06/09/%DA%86%DA%AF%D9%88%D9%86%DA%AF%D9%8A-%D8%A7%D8%B3%D8%AA%D8%AE%D8%AF%D8%A7%D9%85-%D8%AF%D8%B1-%D9%88%D8%B2%D8%A7%D8%B1%D8%AA-%D8%A7%D8%B7%D9%84%D8%A7%D8%B9%D8%A7%D8%AA-%D8%AC%D9%85%D9%87%D9%88%D8%B1%D9%8A/ (accessed April 10, 2012).

[56] "Introduction to the School of Intelligence Is Online" [معرفی دانشکده اطلاعات بر روی سایت قرار گرفت], *Bargh Arshad (Iranian blog)* [Tehran], July 16, 2012, http://bargharshad.blogfa.com/post/100 (accessed September 13, 2012).

[57] "Introduction to the School of Intelligence Is Online" [معرفی دانشکده اطلاعات بر روی سایت قرار گرفت].

PX275

relationship. The selection units send the candidates to the MOIS health centers in their home provinces. After confirmation of their health, the candidates go to Hamedan to take the intelligence and personality tests. If the candidates pass, MOIS officers interview them about Iranian cultural, economic, political, and social issues. The interviews and background investigations can take from nine months to more than two years. Successful candidates then enter Imam Mohammad Bagher University to receive intelligence training. After an assessment of their talents, the candidates will be assigned to one of the offices in their respective provinces of residence.  The salary scale depends on the location and the office to which the candidate is assigned. Employees in the Directorate of Security and agents who are active in the counterterrorism and intelligence sections of MOIS most likely receive the highest salaries. MOIS staff receive an alias when they enter the organization. [59]

The terms and conditions for applicants are:

- belief in Islam;

- Iranian citizenship and belief in *velayat faqih* and the Islamic Republic;

- sound mental and physical health as checked by MOIS physicians;

- no commitment to other governmental organizations;

- minimum high school grade of 12 (out of 20) for Science and Mathematics and 14 (out of 20) for other majors; and

- maximum 22 years of age for undergraduate and 27 for graduate students.[60]

MOIS also recruits outside of Iran. From 1990–93, MOIS recruited former members of Mojahedin-e-Khalq (MEK)—also known as the People's Mujahedin of Iran (PMOI) or MKO—in Europe and used them to launch a disinformation campaign against MEK. MEK is an anti–Islamic Republic group that has a mixed philosophy of Islam and Marxism. It was formed in the 1960s and had a major role in Iran's Revolution. However, after the Revolution and because of ideological differences with the government, the Islamic Republic recognized MEK as a threat to the Revolution. Beginning in late 1980, Saddam Hussein and his Ba'ath regime in Iraq became

---

[58] "Introduction to the School of Intelligence Is Online" [معرفی دانشکده اطلاعات بر روی سایت قرار گرفت].
[59] "How to Be Hired at the Islamic Republic of Iran's Ministry of Intelligence and Security"; "Five Major Duties of VAVAK Inside and Outside of the Country."
[60] "Introduction to the School of Intelligence Is Online" [معرفی دانشکده اطلاعات بر روی سایت قرار گرفت].

PX275

major supporters of the group. MEK has made numerous terrorist attacks on Iranian interests inside and outside of Iran. The Iranian government and its intelligence apparatus consider MEK the most serious dissident organization with regard to the Revolution.

MEK's main base is Camp Ashraf in Iraq. With the fall of the Ba'ath regime in Iraq in 2003, the group lost this major support. After the 1991 Persian Gulf War against Iraq, MOIS made anti-MEK psychological warfare one of its main objectives, but MEK nonetheless has remained a viable organization. Aside from MEK, MOIS assassins also targeted opposition figures in cities abroad such as Baghdad, Berlin, Dubai, Geneva, Istanbul, Karachi, Oslo, Paris, Rome, and Stockholm.[61]

The recruitment of a British subject, Anne Singleton, and her Iranian husband, Masoud Khodabandeh, provides a relevant example of how MOIS coerces non-Iranians to cooperate. She worked with MEK in the late 1980s. Masoud Khodabandeh and his brother Ibrahim were both members of MEK at the time. In 1996 Masoud Khodabandeh decided to leave the organization. Later, he married Anne Singleton. Soon after their

 

Anne Singleton and Masoud Khodabandeh
Source: http://www.mesconsult.com/

marriage, MOIS forced them to cooperate by threatening to confiscate Khodabandeh's mother's extensive property in Tehran. Singleton and Khodabandeh then agreed to work for MOIS and spy on MEK. In 2002 Singleton met in Tehran with MOIS agents who were interested in her background. She agreed to cooperate with MOIS to save her brother-in-law's life—he was still a member of MEK at the time. During her stay in Tehran, she received training from MOIS. After her return to England, she launched the *iran-interlink.org* Web site in the winter of 2002. After she made many trips to Iran and Singapore—the country where the agency contacts its foreign agents—MEK became doubtful of Singleton and Khodabandeh's loyalty to the organization. In 2004 Singleton finally met her brother-in-law, Ibrahim, who was sent from Syria to Iran after the

---

[61] "Masters of Disinformation," *Iran Terror Database*, November 22, 2005, 2, http://www.iranterror.com/index2.php?option=com_content&do_pdf=1&id=113 (accessed April 11, 2012); "Mujahedeen-e Khalq (MEK)," Federation of American Scientists, Intelligence Resource Program, July 13, 2004, http://www.fas.org/irp/world/para/mek.htm (accessed May 18, 2012).

PX275

Syrians arrested him (it appears that Syrians closely cooperate with MOIS). Eventually, MOIS forced him to cooperate as well.[62]

After Ahmadinejad became president, MOIS re-energized its Foreign Directorate for the recruitment of foreigners. Sizable budgets allow MOIS not only to recruit jihadists in Iraq and Afghanistan but also to hire spies and agents to conduct disinformation campaigns. The method of recruitment for foreigners is almost the same as for Iranians. MOIS agents identify potential candidates and then approach them. If the individuals respond positively, the Iranian embassy in their respective countries of residence contacts them and, before sending them to Iran, holds an informal interview under some pretext such as a visit or seminar. When candidates are in Iran, MOIS or the Quds Force examines their potential as agents. Candidates willing to cooperate are sent to bases around Tehran or to Qum for training. MOIS recruits its foreign agents mainly from Muslim countries, specifically Iraq and Lebanon, and then from other Shi'a countries. MOIS has centers of recruitment for foreigners in Persian Gulf countries, Yemen, Sudan, Lebanon, Palestine, Europe, East and South Asia, and North and South America (especially the Tri-border Area with its large population of Lebanese).[63]

## 13. TRAINING AND INDOCTRINATION

Selected candidates receive training in Tehran and Qum. The MOIS School of Intelligence, established in 1986 by Supreme Leader Ayatollah Khamenei, is responsible for training MOIS agents. The selection units of MOIS choose candidates for training and then hire them (see Membership and Recruitment, above). The political science department offers training in strategic studies and security studies to male and female students, although MOIS does not always admit female students. To be selected for training, one must be at most 27 years of age and have faith and a commitment to Islam and to the concept of *velayat faqih* (Guardianship of the Islamic Jurists), a Shi'a theory developed by the Iranian government that gives the *faqih* custodianship over Muslims. (Since the Revolution, Ayatollah Khomeini and currently Ayatollah Khamenei have both carried this title.) However, MOIS's recruitment of Christians, Sunnis, and,

---

[62] Zucker, "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear."
[63] "Five Major Duties of VAVAK Inside and Outside of the Country."

PX275

as previously mentioned, even Jews, shows that it is possible to hire agents who do not subscribe to *velayat faqih*.[64]

## 14. METHODS OF OPERATION AND TACTICS

### 14.1 Operations

The Ministry of Intelligence and Security operates through a variety of methods and tactics. Agents may operate undercover as diplomats in Iranian embassies or in other occupations in companies such as Iran Air, branches of Iranian banks, or even in private businesses. It is thought that many Iranians who are employed in foreign educational organizations such as universities also may work for MOIS; because they have to go back to Iran often—perhaps for immigration issues or scholarships given by the Iranian government or for other reasons—they may cooperate with MOIS. To transfer money for operations, MOIS usually uses state-controlled banks with branches in foreign countries.[65]

Lebanese Hezbollah and the Quds Force are also organizationally linked to MOIS (see fig. 1, above). Support for Hezbollah has been one of the main objectives of Iran's foreign policy. To counter threats from Israel, Iran provides Hezbollah with logistical and material support and uses Hezbollah as a proxy in Iran's intelligence operations. Such support is usually delivered under Iranian diplomatic auspices. An assessment of Iran's intelligence services in the 1990s stated: "The largest European Al-Qods [Quds] facility was in the Iranian embassy in Germany. The embassy's third floor had twenty Qods [Quds] employees coordinating terrorist activities in Europe… Recently, major operational centers were established in Bulgaria, and Al-Qods [Quds] has attempted to establish another operational facility in Milan."[66]

Most Iranian foreign officers and diplomats have worked with MOIS, the IRGC, or other security agencies. MOIS works in coordination with the Foreign Ministry in operations carried out abroad, using Iranian embassies for collecting intelligence. MOIS and Quds Force agents receive diplomatic passports through the embassies. Moreover, the Quds Force is believed to

---

[64] "Q&A About Majoring in Schools with the Prospect of Employment at MOIS," *Afkar-e-Now* [Tehran], n.d., http://www.afkarenow.com/barname/Etelaat.htm (accessed 12 January, 2012); "Five Major Duties of VAVAK Inside and Outside of the Country."

[65] "Operations Ministry of Intelligence and Security [MOIS] Vezarat-e Ettela'at va Amniat-e Keshvar VEVAK," Federation of American Scientists, Intelligence Resource Program, August 11, 1997, http://www.fas.org/irp/world/iran/vevak/org.htm (accessed April 11, 2012).

[66] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 6.

PX275

coordinate with the Ministry of Intelligence and Security through foreign embassies, charities, and cultural centers in targeted countries.[67]

The replacement of Iran's ambassador in Damascus in June 2011 provides a relevant example of the use of intelligence officers as diplomats. The new ambassador, Habib Taherian, is a former MOIS deputy. This move may have resulted from an increase in covert activities among the government's opposition in Syria and from Iran's determination to support Syria during a period of hardship. Taherian also used to be the ambassador of the Islamic Republic in Brazil, another area of interest for Iran. Iran's expansion of intelligence activities into Latin America, alongside its growing economic, political, and cultural involvement there, has concerned the United States.[68]

MOIS infiltrates Iranian communities outside of Iran using a variety of methods. For instance, a society called "Supporting Iranian Refugees" in Paris is used to recruit Iranian asylum seekers to spy on Iranians in France. MOIS also has agents who abduct individuals abroad, return them to Iran, and then imprison or kill them. MOIS's tactics of penetrating and sowing discord within the opposition abroad are discussed in an article on a Web site affiliated with the current Iranian government. The article ("How Do Iranian Intelligence Forces Operate Outside of the Country?") discusses how Iran uses different mechanisms to penetrate the foreign-based opposition. MOIS uses its former members and/or people willing to cooperate with the ministry. They are sent to prison temporarily and become known as activists opposed to the Islamic Republic. After some time, no one questions their previous political activities; being a political prisoner is enough to be acknowledged as an opposition figure. Activists abroad may help get such a prisoner out of the country with the assistance of an international organization, or MOIS may send the prisoner abroad, calling him/her an "escaped dissenter." This mechanism of releasing political prisoners to go abroad sows mistrust within the opposition in exile.[69]

---

[67] "Iran's Ministry of Intelligence and Security," *Iran Focus*; U.S. Congress, House of Representatives, Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence, "Hezbollah in Latin America: Implications for U.S. Security," July 7, 2011, 6 (statement of Douglas Farah),
http://homeland.house.gov/sites/homeland.house.gov/files/Testimony%20Farah.pdf (accessed April 11, 2012).
[68] معاون وزیر اطلاعات سفیر ایران در سوریه "The Minister of Intelligence Deputy Became Iran's Ambassador in Syria" [شد], *Iran Briefing (Human Rights Violation by Iran's Revolutionary Guards)*, June 20, 2011, http://farsi.iranbriefing.net/?p= 12051 (accessed May 19, 2012).
[69] "How Do Iranian Intelligence Forces Operate Outside of the Country?" نیروهای نفوذی اطلاعاتی ایران در خارج از کشور ] [چگونه عمل می کند؟, *Khabar Online* [Tehran], June 9, 2010, http://www.khabaronline.ir/news-67593.aspx (accessed April 4, 2012); Gholamali Bigdeli, "Condemnation of Two Ministry of Intelligence Agents at a Paris Court"

PX275

## 14.2  Control of Media

The ministry also engages in disinformation. The largest department within MOIS, the Department of Disinformation (Farsi: *nefaq*), uses psychological warfare and disinformation against the government's opponents. This department is also in charge of employing psychological warfare to manipulate the media and to mislead other intelligence agencies about Iran's intelligence and military capabilities. However, it is unclear exactly where this department is located in the ministry. As a matter of course, the department may spread news, which might be 80–90 percent reliable and 10–20 percent disinformation. Ali Younesi, the former minister of intelligence and security, reported on state television in October 2004 that the ministry's Department of Disinformation had hired thousands of agents, including some former MEK members, to boost the department's function.[70]

With respect to the Internet, for the past 10 years MOIS and two other governmental entities, the Ministry of Culture and Islamic Guidance and Islamic Republic of Iran Broadcasting (IRIB), have also sought to control Iranians' access to the Internet. This effort was intensified after the controversial presidential election in 2009. The government has imposed intelligence, technical, and cultural strategies to control access to the Internet. The head of the MOIS Counterintelligence Directorate has stated that "the Internet poses a danger to the world, and Iran is always on the lookout for spies."[71] These entities cooperate to block any sites that cause problems and to make sure that preferred sites continue to function.[72]

Control of the media and dealing with the opposition's internal and external media are additional MOIS responsibilities. The ministry targets television channels that advocate political and religious views antithetical to the Iranian government. MOIS also attempts to control domestic and foreign news and to pressure journalists in Iran. For instance, MOIS has requested

---

[محکومیت دو تَن از عوامل وزارت اطلاعات در دادگاه پاریس], *Radio Koocheh*, June 25, 2011, http://radiokoocheh.com/ article/113111 (accessed April 4, 2012). Radio Koocheh is an Iranian Radio station that seems to broadcast from outside of Iran. It has a critical view of Iranian social and political issues. The reliability of this Web site varies.
[70] Zucker, "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear"; "Five Major Duties of VAVAK Inside and Outside of the Country."
[71] Open Source Center, "Regime Using Increasingly Sophisticated Measures to Control Cyberspace," July 28, 2010, https://www.opensource.gov/portal/server.pt/gateway/PTARGS_0_0_200_203_0_43/content/Display/ 15438541/IAP20100728573001001.pdf (accessed March 22, 2012).
[72] Open Source Center, "When Did Filtration of Sites and Blogs Begin?" May 10, 2010, https://www.opensource. gov/portal/server.pt/gateway/PTARGS_0_0_200_203_121123_43/content/Display/IAP20100519338021#index=1& searchKey=7449847&rpp=10 (accessed March 22, 2012); Omeed Agilee, "The Islamic Republic of Iran's Anti-Opposition Strategies in Social Media," June 16, 2011 (paper submitted in the English for Heritage Language Speakers (EHLS) Program, Georgetown University, August 2011).

PX275

that the government limit and control the presence of foreign journalists in Iran during future presidential elections. MOIS has warned the government not to repeat the same mistake it made in the previous controversial presidential election, which received broad coverage across the world.[73]

## 15.  INTELLIGENCE CAPABILITIES

Iran's various intelligence activities, including signals intelligence, human intelligence, and counterintelligence, as well as other aspects of its intelligence apparatus, most likely operate under the auspices of MOIS. MOIS closely cooperates with the IRGC in this regard.

### 15.1 Signals and Cyber Intelligence

Iran appears to be trying to expand its intelligence capabilities in the Middle East and the Mediterranean. For instance, Iran seems to have developed a signals intelligence (SIGINT) capability. Two Iranian-Syrian SIGINT stations funded by the IRGC reportedly have been active since 2006, one in the al-Jazirah region in northern Syria and the other on the Golan Heights. Iranians reportedly planned to create two additional SIGINT stations in northern Syria, which were expected to be in operation by January 2007, but no information indicates that they are currently operating. The technology at the two established SIGNIT stations indicates that Iran's capabilities are still limited, with little scope for high-level strategic intelligence gathering. The intelligence stations appear to concentrate on supplying information to Lebanese Hezbollah.[74]

In June 2010, the Stuxnet virus successfully targeted Iran's uranium-enrichment infrastructure. The success of this virus is an indication of the weakness of Iran's cyber development. In the summer of 2011, Iran created a "cyber command" in order to block incoming cyber attacks and to carry out cyber attacks in reprisal.[75]

---

[73] "Intelligence Organizations Increase Their Control over Foreign Media in Iran" [ سازمان های اطلاعاتی کنترل خود را ] [بررسانه های خارجی در ایران افزایش می دهند], *Gooya News*, May 15, 2012, http://news.gooya.com/politics/archives/2012/05/140573.php (accessed May 17, 2012).
[74] Jones, "Iran Insights - Iran's Intelligence and Security Apparatus," 7.
[75] "Factbox: What Is Stuxnet?" Reuters, September 24, 2010, http://www.reuters.com/article/2010/09/24/us-security-cyber-iran-fb-idUSTRE68N3PT20100924 (accessed April 4, 2012); Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 7.

PX275

Iran also has the capacity to collect intelligence through reconnaissance aircraft. This capability, however, is limited to small military operations that use only a few reconnaissance planes.[76]

## 15.2 Human Intelligence

Iran has been extremely active in the area of human intelligence (HUMIT). Iran's ability to collect information is highly organized and focused on neighboring countries. As already noted, Iran has used diplomatic channels to carry out intelligence operations. There are numerous instances in which Iranian diplomats have carried weapons into other countries in diplomatic pouches. However, Iran has been careless about providing cover for its agents. Consequently, on various occasions, security officers of other countries have been able to detect Iranian agents.[77]

Despite Iran's noted strength in human intelligence, its technical capabilities are underdeveloped. Its HUMINT operations have previously shown weaknesses in neighboring countries with sophisticated intelligence systems. For instance, the intelligence officers sent to Iraq after the invasion of American-led coalition forces in 2003 took advantage of the instability there in order to engage in covert operations, and at least some of them were exposed. Iran has deployed many agents to Iraq to influence Iraqi elected officials and to train Iraqi rebel groups. Iran also has intelligence networks in other Middle Eastern countries, chiefly in Shi'a-majority countries and in countries with unpopular Sunni rulers. For instance, in 2010 and 2011 two Iranian networks were exposed in Kuwait and Bahrain.[78]

Iran's expansion of intelligence activities to Latin America, alongside its growing economic, political, and cultural involvement there, has been a source of concern for the United States. Iran's HUMINT has been successful through cooperation with the Quds Force and Lebanese Hezbollah, which help gather intelligence from the Shi'a population living in Latin American countries.

## 15.3  Counterintelligence

The United States obtained intelligence information about Iran's nuclear-warhead designs in 2004. Likewise, Western intelligence agencies obtained similar information from IRGC

---

[76] Jones, "Iran Insights - Iran's Intelligence and Security Apparatus," 7.
[77] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 12.
[78] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 8, 9.

PX275

officers who defected, such as General Ali Reza Asgari. Although there were many others as well, Asgari's defection was significant because he was deeply engaged in establishing Iranian links with Hezbollah. Asgari seems to have provided intelligence to the Israelis and may have been the source of the intelligence they used in Operation Orchard to strike Syria's nuclear reactor. Moreover, Western intelligence agencies managed to infiltrate Iran's intelligence networks with the help of the Kurds. Using the acquired intelligence, the United States managed to successfully damage Iran's uranium-enrichment program by intentionally providing defective tools, machines, and blueprints in 2000 and 2003.[79]

Following these developments, Tehran established a new intelligence force called "Oghab 2" (Eagle 2) in 2005. It most likely operates under MOIS's Counterintelligence Directorate. This force is a counterintelligence bureau exclusively responsible for protecting all relevant information about Iran's nuclear program, nuclear facilities, and the scientists working in nuclear facilities against threats, including threats from domestic opposition groups and foreign intelligence agencies. The creation of Oghab 2 goes back to the exposure of two secret nuclear facilities, Parshin and Lavizan, and the arrest of two spies who collected information about the nuclear facilities, in 2005. In a larger sense, however, the main reason for the establishment of this force was to counter covert activities of all kinds by foreign intelligence agents against the Islamic Republic.[80]

Following the discovery of various alleged spying networks in mid-April 2007, the commander of Oghab 2, General Gholam Reza Moghrabi, was replaced by Ahmad Vahidi, who was a former IRGC Quds Force commander and is the current minister of defense. Under his leadership and that of his deputies, General Akbar Dianatfar and General Ali Naghdi, Oghab 2 was enlarged by recruiting up to 10,000 agents. However, it is worth adding that Oghab 2 is still incapable of preventing major sabotage and assassinations. For instance, since 2007 several Iranian nuclear scientists have allegedly been assassinated by Israel's Mossad.[81]

---

[79] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 10.

[80] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 11.

[81] "Espionage in Iran" [جاسوسی در ایران], *Edalat* [Tehran], September 19, 2011, http://hoghoghszt.blogfa.com/post-2.aspx (accessed April 11, 2012); Mirjavedanfar, "Iran, Loser of the Intelligence War" [ایران، بازندهٔ نبرد اطلاعاتی], *Rooz Online*, January 13, 2010, http://www.roozonline.com/persian/archive/overallarchive/news/archive/2010/january/13/article/-bc64c2c377.html (accessed May 21, 2012); Ed Blanche, "Iran–Israel Covert War: The Mossad Is Said to Wage a Clandestine Campaign of Assassination and Sabotage Against Iran's Nuclear Programme, But This Could Backfire on President Obama's Efforts to Negotiate with Tehran," *The Middle East*, July 1, 2009, http://findarticles.com/p/articles/mi_m2742/is_402/ai_n32150834/pg_2/ (accessed April 11, 2012); Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 11.

PX275

Nonetheless, MOIS has accomplished several remarkably successful operations. In 2007 the Iranian intelligence service became suspicious about possible espionage and seized 15 British sailors in the Persian Gulf.  The seizure took place after a British television program on the nature of the Royal Navy's activities, which to some extent aimed at collecting intelligence on Iran, attracted Iranian attention. In 2011 the *Los Angeles Times* reported that the Iranians dismantled a 30-member network of individuals allegedly recruited by U.S. embassies in the United Arab Emirates, Turkey, and Malaysia to conduct espionage and sabotage against Iran.[82]

Iranian intelligence has also infiltrated foreign-based opposition groups. For instance, MEK's espionage activities against the Iranian government and its nuclear program declined in 2007 because of Iran's counterintelligence operations. MEK had revealed the existence of two nuclear facilities in Iran (Natanz and Arak) in 2002, and MEK has reportedly provided the United States with other intelligence on Iran's nuclear program. In 2007 *Le Figaro*, a French newspaper, stated: "Intelligence specialists are unanimous on one point: it is very difficult to infiltrate Iran. Foreign services traditionally have very few high level contacts in Iran."[83]

Further, on May 21, 2011, Iran broke up a spy network allegedly linked to the CIA, arresting 30 people in an operation inside Iran. This network was intended to obtain military and nuclear intelligence. MOIS announced that it was able to prove the connection of all operatives with the CIA. Likewise, MOIS announced in May 2011 that it had identified 42 more spies in various countries linked to the CIA. MOIS agents had reportedly monitored and videotaped meetings with those arrested spies over the course of a year. In a program broadcast by national TV, the minister of intelligence and security said: "It is inevitable that intelligence agencies get infiltrated. One of the good things we did was that we can identify the infiltrators and make use of them in the future. The enemy may eradicate them, but there are definitely other infiltrators whom we can use as well."[84] Later, MOIS announced that the network was operating under various guises, including job-finding centers. According to Iran, the CIA has created fake Web

---

[82] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 11.

[83] Nile Bowie, "CYBER TERRORISM: US-Supported Terrorist Group MEK Plants Stuxnet Virus Malware to Disable Iran's Nuclear Facilities," *Global Research* [Montreal], April 16, 2012, http://www.globalresearch.ca/ index.php?aid=30353&context=va (accessed June 15, 2012); Georges Malbrunot, "Comment les États-Unis espionnent l'Iran" [How the U.S. Spies on Iran], *Le Figaro* [Paris], December 5, 2007, http://www.lefigaro.fr/ international/2007/12/06/01003-20071206ARTFIG00006-comment-les-etats-unis-espionnent-liran.php (accessed June 15, 2012).

[84] "30 US spies arrested in Iran," *YouTube*, June 22, 2011, http://www.youtube.com/watch?v=uOCHnRyUUgQ (accessed April 11, 2012).

PX275

sites to offer jobs to Iranians and then has attempted to recruit them to collect intelligence on military and nuclear-energy industries.[85]

On November 24, 2011, MOIS arrested 12 other alleged CIA spies who were collecting information about Iran's nuclear plans. Iran has further claimed that Hezbollah has discovered a CIA espionage network and that the lives of those CIA agents are in danger.[86]

On April 10, 2012, MOIS announced the discovery of an Israeli network in central Iran that was allegedly trying to collect information about Iran's nuclear activities. Commenting on this issue, the Iranian government noted that MOIS has been capable of breaking up CIA and Mossad spy networks in the so-called "intelligence war." Consequently, MOIS has been working especially hard to identify and discover foreign intelligence networks.[87]

On June 15, 2012, MOIS announced that its agents had succeeded in identifying and arresting the assassins of two Iranian scientists. MOIS claimed that Israel plotted the assassinations and that it would find every "Zionist" operative that was involved in these assassinations.[88]

Iran has become more sensitive about U.S or foreign espionage, ostensibly because of its nuclear program. Acting on these sensibilities, Iran intercepted two unmanned U.S. spy planes operating outside Iranian airspace in January 2011. Furthermore, Iranians claim that they penetrated Mossad while they were looking for the assassins of Iran's nuclear scientists. These allegations may be unfounded.[89]

## 16. MOTIVATION AND PERFORMANCE

MOIS is devoted to extending the Iranian revolutionary idea throughout the world. This revolutionary enthusiasm, however, is tempered by pragmatism. At the time of its establishment,

---

[85] "30 US spies arrested in Iran."

[86] "Iran Arrests 12 'CIA Spies' for Targeting Nuclear Plans," *BBC*, November 24, 2011, http://www.bbc.co.uk/news/world-middle-east-15879086 (accessed April 5, 2012).

[87] "The Minister of Intelligence Announced: The Arrest of A Zionist Terrorist Network" [ وزارت اطلاعات خبر داد: دستگیری اعضای یک شبکه تروریستی رژیم صهیونیستی], Iranian Student's News Agency [ISNA; Tehran]*, April 10, 2012, http://isna.ir/fa/news/91012206786/وزارت-اطلاعات-خبر-داد-دستگیری-اعضای-یک-شبکه (accessed April 11, 2012). The Iranian Students' News Agency (ISNA) is a news organization run by Iranian university students. It is considered to be one of the most independent and moderate media organizations in Iran.

[88] "The Ministry of Intelligence: The Assassins of the Nuclear Scientists Are Arrested" [ اطلاعیه وزارت اطلاعات: عوامل ترور دانشمندان هسته ای دستگیر شدند], Iranian Students' News Agency [ISNA; Tehran], June 15, 2012, http://isna.ir/fa/news/91032514645/%D8%A7%D8%B7%D9%84%D8%A7%D8%B9%D9%8A%D9%87-%D9%88%D8%B2%D8%A7%D8%B1%D8%AA-%D8%A7%D8%B7%D9%84%D8%A7%D8%B9 %D8%A7%D8%AA-%D8%B9%D9%88%D8%A7%D9%85%D9%84-%D8%AA%D8%B1%D9%88%D8%B1-%D8%AF%D8%A7%D9%86%D8%B4%D9%85%D9%86%D8%AF%D8%A7%D9%86 (accessed June 15, 2012).

PX275

as well as prior to the formation of MOIS, the task of Iranian intelligence was to look for antirevolutionary groups and individuals inside and outside of the country in order to protect the Islamic Revolution. In the early years of the Revolution, many people who formerly supported the regime turned against it. It was the duty of SAVAMA (the intelligence service of Iran at the time) to identify those defectors. However, after the establishment of MOIS and the ascent of Ayatollah Ali Khamenei as the Supreme Leader, the ministry became more involved in implementing the Supreme Leader's policies, both internally and externally. The goal of Iranian foreign policy is to expand Iran's influence in the Middle East and throughout the world. In pursuit of this goal, Iranian leaders, conscious that Iranians are part of the Shi'a minority in the Muslim world, focus on anti-imperialism and on combating American hegemony as ways to influence not only Muslims, but also other people of different faiths. These principles motivate the Islamic Republic to operate outside of Iran through MOIS and even more so through its sister agency, the IRGC Quds Force.[90]

MOIS's performance has been steady and unswerving since its establishment after the Revolution. MOIS is focused on internal affairs and concentrates on protecting the current Islamic system. This goal has been implemented through covert operations inside and outside of the country.[91]

## 17.  PRINCIPAL AREAS OF OPERATION

MOIS is active wherever the Iranian government has interests. MOIS operates in Iran and cooperates with the Quds Force in the Middle East (Afghanistan, Iraq, Kuwait, and Lebanon), Central Asia, Africa, Europe (Austria, Azerbaijan, Croatia, France, Georgia, Germany, Turkey, the United Kingdom), and the Americas, including the United States. MOIS provides financial, material, technological, or other support services to Hamas, Hezbollah, and al-Qaeda in Iraq (AQI), all designated terrorist organizations under U.S. Executive Order 13224.[92]

---

[89] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 11.
[90] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 12.
[91] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 12.
[92] "Treasury Accuses Iran of Hacking," *Emptywheel,* February 16, 2012, http://www.emptywheel.net/tag/quds-force/ (accessed April 5, 2012); Ladan Firoozbakht, "The Capital City of Austria, A Nest for Tehran's Regime," Radio France International [France], February 21, 2010, http://www.persian.rfi.fr/%D9%BE%D8%A7%DB%8C%D8% AA%D8%AE%D8%AA-%D8%A7%D8%B7%D8%B1%DB%8C%D8%B4-%D9%84%D8%A7%D9%86%D9% 87-%D8%A7%DB%8C-%D8%A8%D8%B1%D8%A7%DB%8C-%D8%B1%DA%98%DB%8C%D9%85- %D8%AA%D9%87%D8%B1%D8%A7%D9%86-20100221/%D8%B9%D9%85%D9%88%D9%85%DB%8C (accessed September 6, 2012). MOIS has facilitated the movement of al-Qaeda operatives in Iran and has provided

PX275

Latin America is an area of major interest for the Iranians. The existence of Iranian intelligence activities in countries such as Argentina, Bolivia, Brazil, Ecuador, and Venezuela, where Iran has political and economic interests, is also part of Iran's strategy of establishing a presence in the backyard of the United States for purposes of expanding Shi'a and revolutionary ideology, establishing networks for intelligence and covert operations, and waging asymmetrical warfare against the United States. In Latin America, Iran's intelligence agencies— MOIS but mostly the Quds Force—use Hezbollah to achieve their goals.[93]

In the Middle East, Iran uses Hezbollah to pressure Israel and to threaten the United States in Iraq and Afghanistan by backing insurgent groups. The current uprising in Syria has significant implications for Iran's intelligence. Iranians are present in the form of the Quds Force in Syria to support President Bashar al-Assad's suppression of opposition protests. Iran's success in suppressing its own opposition after the disputed 2009 presidential election offers a useful model to the Syrian government. Iran specifically targets Bahrain and other countries with a majority Shi'a population, using MOIS to carry out operations in line with Iran's foreign policy.[94]

In Europe, MOIS maintains a significant network in Germany. In January 2011, Hans-Peter Friedrich, Germany's interior minister, and Heinz Fromm, head of the Federal Office for the Protection of the Constitution (the German equivalent of the FBI), reported that the main responsibility of MOIS is "monitoring the opposition groups in and out of Iran and fighting against them." According to their report, MOIS also has been collecting information on politics, economy, and science in Germany, and it adds, "Most intelligence activities against Germany are carried out by this ministry [MOIS]." The report also notes: "The Iranian Ministry of Intelligence

---

them with documents, identification cards, and passports. MOIS has also negotiated prisoner releases of AQI operatives.

[93] "Iran Increases Its Political and Economic Presence in Latin America…," Meir Amit Intelligence and Terrorism Information Center, Israeli Intelligence and Heritage Commemoration Center, April 19, 2009, http://www.terrorism-info.org.il/en/article/18291 (accessed March 7, 2012). This Israeli Web site provides reports on terrorist actions of anti-Israeli groups such as Hezbollah, the Quds Force, the Muslim Brotherhood, etc. The reports are detailed and informative. Readers interested in Iran's activities in Latin America may wish to consult a parallel study by the Federal Research Division for the Combating Terrorism Technical  Support Office entitled "The Quds Force of Iran's Islamic Revolutionary Guards Corps: A Profile" (2012), available on the Open Source Center's Web site.

[94] "Evidence Grows Iran Aiding Syria's Assad," UPI, June 2, 2011, http://www.upi.com/Top_News/Special/2011/06/02/Evidence-grows-Iran-aiding-Syrias-Assad/UPI-72061307024479/ (accessed March 13, 2012).

PX275

is seeking to attract German citizens to cooperate with the ministry. This applies to citizens who often travel to Iran for visiting their families or for business."[95]

Vienna, the capital city of Austria is allegedly full of MOIS agents. It is because of the continuous good relationship between Iran and Austria since the Revolution—after the U.S. hostage crisis, which resulted in condemnation of the Islamic Republic by many countries and secluded Iran in many ways, Austria was one of the few countries that was not concerned. It appears that Iran takes advantage of this relationship by deploying its intelligence officers in Austria. It has been reported that MOIS agents identify anti–Islamic Republic political activists and threaten to silence them.[96]

The historical backgrounds of Georgia and Azerbaijan, both previously part of Iran, make these two countries likely targets of the Iranian intelligence services. In Azerbaijan, 95 percent of the population is Muslim, and 85 percent of Muslims are Shi'a. This makes Azerbaijan one of the few countries with a majority Shi'a population. In addition, cultural similarities between Iranians and Azeris, along with a shared language between Iranian-Azeris and Azerbaijanis, bring the people of both countries closer and enable the Iranian government to exercise influence over Azerbaijan. However, a secret relationship between Azerbaijan and Israel has developed during the past decade. In effect, Azerbaijan has become a strategic ally of Israel because it has allegedly given Israel access to its air bases near Iran's border. Such an allegation carries serious implications because one of the main constraints on Israel's capability to strike Iran has been the issue of distance. This development also provides Israel with a possible platform for covert activities in Iran and induces Iran to engage in covert activities in Azerbaijan.[97]

The exposure of 11 alleged Iranian spies in Turkey in late August 2012 indicates the presence of MOIS in this country. A police investigation turned up documents and records of phone conversations that the operatives had had with Kurdistan Workers' Party (PKK) militants. Turkey's diplomatic relations with Iran have been strained for some time due in part to differing

---

[95] "Germany's Security Report on Iran's Intelligence Activities in Germany" [ گزارش امنیتی آلمان ازفعالیت های اطلاعاتی جمهوری اسلامی در آلمان], *Deutsche Welle* [Germany], January 7, 2011, http://www.dw.de/dw/article/0,,15204059,00. html (accessed May 30, 2012).
[96] Firoozbakht, "The Capital City of Austria, a Nst for Tehran's Regime."
[97] "Religion," *Azerbaijan Presidential Library*, August 20, 1992, 2, http://files.preslib.az/projects/remz/pdf_en/atr_din.pdf (accessed September 5, 2012); "Azerbaijani-Israeli Relations and the Iranian Threat," *Daily Motion*, March 30, 2012, http://www.dailymotion.com/video/xps339_azerbaijani-israeli-relations-and-the-iranian-threat_news (accessed September 10, 2012).

PX275

stances on the current Syrian crisis. The covert activities of the Iranian agents could be the cause of increased PKK military action against the Turkish government.[98]

## 18.  FINANCES AND FUND-RAISING

MOIS is a governmental organization. Therefore, its budget is provided by the Islamic Republic of Iran's government and is highly secretive. No public or reliable information is available about funding for MOIS.

## 19.  FOREIGN AFFILIATIONS AND SUPPORT

It is believed that MOIS cooperates with other intelligence agencies. One of these agencies is the Russian SVR, the KGB's replacement. Despite the two agencies' dissimilar doctrines and the complicated relationship between Iran and Russia in the past, they managed to cooperate in the 1990s, based not only on their intention of limiting U.S. political clout in Central Asia but also on their mutual efforts to stifle prospective ethnic turbulence. The SVR trained not only hundreds of Iranian agents but also numerous Russian agents inside Iran to equip Iranian intelligence with signals equipment in their headquarters compound. It is unclear whether this relationship is ongoing and whether the two intelligence agencies continue to cooperate. [99]

Besides the above-mentioned links, Iran has been cooperating with al-Qaeda as well, although the ideological differences between Iran and al-Qaeda limit their cooperation and make it potentially unstable. Cooperation between Iran and al-Qaeda is based on their shared opposition to U.S. hegemony in the region—Iraq and Afghanistan, chiefly—and dates to the 1990s. This relationship continued after 9/11, on the basis of which Iran allowed a number of al-Qaeda members to cross the border from Afghanistan into Iran. The fact that al-Qaeda operates in many countries helps Iran achieve its goal of diverting U.S. attention away from Iran's immediate neighborhood. In return, al-Qaeda uses Iran as a place where its facilitators connect al-Qaeda's senior leadership with regional affiliates. In 1995 and again in 1996, Osama Bin

---

[98] "Iranian Spy Ring Exposed in Turkey, Dealing Blow to Ties Between Neighbors," *Today's Zaman* [Turkey], August 29, 2012, http://www.todayszaman.com/news-290814-iranian-spy-ring-exposed-in-turkey-dealing-blow-to-ties-between-neighbors.html (accessed September 10, 2012); "Escalation of the Conflicts Between PKK and Turkish Military in South-Eastern Turkey," [تشدید درگیری میان پ ک ک ا کا با نظامیان در جنوب شرقی ترکیه] , *Euro News (Persian)*, August 14, 2012, http://persian.euronews.com/2012/08/14/upsurge-in-pkk-violence-as-anniversary-nears/ (accessed September 10, 2012).
[99] Wege, "Iranian Intelligence Organizations," 288; "Brief on Iran," *Iran-e-Azad*, September 12, 1995, http://www.iran-e-azad.org/english/boi/02500912.95 (accessed April 11, 2012). This Web site is affiliated with the

PX275



Laden approached MOIS and asked it to join forces against the United States. Bin Laden's phone records, obtained by U.S. investigators working on the U.S. embassy bombings in Kenya and Tanzania, show that 10 percent of phone calls made by Bin Laden and his lieutenants were to Iran. Seif al-Adl, one of al-Qaeda's top-ranking leaders at the time, was the liaison between Iranians and al-Qaeda; he coordinated meetings with the IRGC's leaders and MOIS officials.[100] Since Bin Laden's death in May 2011, al-Qaeda's new leadership has refrained from clarifying its position on cooperation with the Iranian government.

Seif al-Adl
Source:
http://www.nctc.gov/

## 20.  USE OF COMMUNICATIONS MEDIA

The Iranian government uses the media for domestic consumption and for dissemination of its propaganda. Given that MOIS operates covertly, it does not share information or discuss its missions with the public unless the regime seeks to publicize its efforts through the media to gain the public's support.

One way the Iranian government does this is through its Web site *Iran Didban* (Iran Watch) (www.irandidban.com). This Web site provides news in three languages—English, Farsi, and French. Another Web site allegedly affiliated with MOIS is *Habilian Foundation* (www.habilian.ir). This Web site presents its pro-Iranian government news in three languages, Arabic, English, and Farsi.[101]

---

MEK group. "Evidence of Intelligence Collaboration between KGB and Iranian Regime," *YouTube*, September 24, 2009, http://www.youtube.com/watch?v=eS3XbJ-rx1o (accessed May 29, 2012).
[100] Jones, "Iran Insights—Iran's Intelligence and Security Apparatus," 12; Matthew Levitt, "New Arenas for Iranian-Sponsored Terrorism: The Arab-Israeli Heartland," The Washington Institute, February 22, 2002, http://www.washingtoninstitute.org/policy-analysis/view/new-arenas-for-iranian-sponsored-terrorism-the-arab-israeli-heartland (accessed June 13, 2012); "The Al-Qa'ida-Qods Force Nexus," *Kronos Advisory,* April 29, 2011, 11 and 18, http://thomaspmbarnett.squarespace.com/storage/Kronos_AQ.QF.Nexus.globlogization.pdf (accessed June 13, 2012).
[101] "Hadi Ameri, the Leader of the Badr Brigade, Announced that the Mojahedin Must Get out of Iraq" [ هادی عامری سرکرده سپاه وبدر ادعا کرد، مجاهدین باید از خاک عراق اخراج شوند], People's Mojahedin Organization of Iran, November 21, 2007, http://www.mojahedin.org/pages/detailsNews.aspx?newsid=2231 (accessed September 10, 2012).

PX275



*Iran Didban*, the Web site of the Ministry of Intelligence and Security
Source: http://www.irandidban.com/



*Habilian Foundation*, a Web site allegedly affiliated with the
Ministry of Intelligence and Security.
Source: http://www.habilian.ir/fa/

MOIS cooperates with the Islamic Republic of Iran Broadcasting (IRIB) organization for its disinformation campaigns and for dissemination of its propaganda. The IRIB is a state-controlled television and radio organization whose head is appointed by the Supreme Leader of Iran. MOIS, through IRIB, produces and broadcasts documentary films of successful operations that MOIS then broadcasts on national television. For instance, after the capture of Abdolmalek Rigi, MOIS's coverage of the operation was unprecedented. The minister of intelligence and security appeared on national television to explain the effort undertaken by the ministry. He tied Rigi to the CIA by showing a picture of Rigi, allegedly at an American base in Afghanistan.[102]



Photo taken by MOIS of Rigi, allegedly at a U.S. military installation before capture.
Source: http://www.uskowioniran.com

An example of the use of the media by MOIS in a psychological operation for domestic consumption is a 2011 documentary film called "A Diamond for Deception."[103] This documentary is about an IRGC officer, Mohammad-Reza Madhi, who infiltrated the opposition outside Iran on behalf of MOIS and offered help to overthrow the government of Iran by using

---

[102] "The Jundullah Leader Abdolmalek Rigui [Rigi] Arrested by Iranian Authorities," *YouTube*, February 23, 2010, http://www.youtube.com/watch?v=ThPMpM96mgQ&feature=related (accessed June 11, 2012).

[103] To see the full version of A Diamond for Deception, see http://www.youtube.com/watch?v=4zsURpx0p-I&feature=related .

PX275



Mohammad-Reza Madhi
Source: http://www.rajanews.com/

former IRGC officers in Iran who had defected. As shown in the documentary, Madhi went back to Iran, and MOIS later publicly revealed the plan as a successful effect to infiltrate Iran's enemies.

The government took enormous advantage of this documentary to show how the United States and Israel conspired with Iranian dissidents abroad to oppose the Revolution. The documentary indicated that the MOIS agent met with U.S. Vice President Joe Biden and Secretary of State Hillary Clinton, as well as with Denis Ross, a special adviser for the Persian Gulf and Southwest Asia (including Iran). Iranian media claimed that the infiltration by MOIS proves Iran's intelligence superiority and demonstrates the failed attempts made by Western intelligence services to rally the Iranian opposition against the Islamic Republic. Broadcast on the eve of the second anniversary of Iran's 2009 presidential election, the "exposure" was used to portray the reformist opposition as being in league with the U.S. administration and Western intelligence services.[104]

Iran also arrested an alleged U.S. spy in December 2011. National television broadcast the confession of the U.S. agent, a Marine of Iranian ancestry. MOIS asserted that "this CIA agent with Iranian nationality began his mission after receiving training in weapons use." MOIS claims that the agent was supposed to start his mission from Bagram, an American military base in Afghanistan, but that Iranian intelligence agents tricked him into entering Iran and later arrested him. An Iranian court convicted him of spying and sentenced him to death. He is currently imprisoned in Iran.[105]

---

[104] "Iran's Ministry of Intelligence: U.S.-Led Exile Government Plot Foiled," Meir Amit Intelligence and Terrorism Information Center, Israeli Intelligence and Heritage Commemoration Center, June 16, 2011, http://www.terrorism-info.org.il/en/article/17889 (accessed May 29, 2012). This Israeli Web site provides reports in regards to terrorist actions of anti-Israeli groups such as Hezbollah, the Quds Force, Hamas, etc.

[105] Hashem Kalantari and Robin Pomeroy, "Iran Says Arrests Another CIA Spy," Reuters, December 17, 2011, http://www.reuters.com/article/2011/12/17/us-iran-usa-spy-idUSTRE7BG0CL20111217 (accessed April 11, 2012); "America's Special Effort for the Release of a Captured Spy"[تلاش های ویژه آمریکا برای آزادی جاسوس زندانی] Ghatreh [Tehran], August 31, 2012, http://www.ghatreh.com/news/nn10885851/%D8%AA%D9%84%D8%A7%D8%B4-%D9%87%D8%A7%DB%8C-%D9%88%DB%8C%DA%98%D9%87-%D8%A2%D9%85%D8%B1%DB%8C%DA%A9%D8%A7-%D8%A8%D8%B1%D8%A7%DB%8C-%D8%A2%D8%B2%D8%A7%D8%AF%DB%8C-%D8%AC%D8%A7%D8%B3%D9%88%D8%B3-%D8%B2%D9%86%D8%AF%D8%A7%D9%86%DB%8C (accessed September 6, 2012); "Amir Mirzaei Hekmati Is Sentenced to Death" [امیر میرزایی حکمتی به اعدام محکوم شد], Ghatreh [Tehran], January 10, 2012, http://www.ghatreh.

PX275

In yet another instance of efforts in the media, on August 5, 2012, IRIB broadcasted a program provided by MOIS on national television about the alleged Israeli operatives who had assassinated Iranian nuclear scientists. The program attempted to demonstrate the savagery of the operatives who were executing Moussad's plots. However, the identities of the operatives who confessed on national television is still questionable. By resorting to such a presentation, MOIS tries to deceive public opinion and to make the Islamic Republic look innocent in the eyes of the Iranian people and the world.[106]

The Iranian government's intention in using the media, as noted in the cases above, is most likely to gain public support, to create a sense of national unity among Iranians, and to rally them against the Western countries that are concerned about Iran's nuclear program and acts of terrorism.

It appears that MOIS does not have an official Web site. MOIS publicizes itself mostly on national television and on the radio or through press releases and news Web sites.

## 21.  TERRORIST THREAT ASSESSMENT

Iranians engage in two types of terrorist attacks. One type includes sabotage, espionage, and bombing of target locations, while the other involves the assassination of dissidents of the Islamic Republic of Iran. Both are perpetrated inside and outside of Iran.

Since the creation of the Quds Force in 1990, MOIS has mostly concentrated on monitoring and assassinating Iranian dissidents inside and outside of the country. The "Chain Murders" in Iran and the assassination of Iranian dissidents in the Mykonos incident in 1992, along with other assassinations, support this view. The Quds Force is in charge of covert military and paramilitary actions outside of Iran's territory, including the assassination of foreign individuals, such as Israeli officials, as well as training of militant groups and gathering of information in regions of interest to Iran.

---

com/news/nn9037978/%D8%A7%D9%85%DB%8C%D8%B1-%D9%85%DB%8C%D8%B1%D8%B2%D8%A7%DB%8C%DB%8C-%D8%AD%DA%A9%D9%85%D8%AA%DB%8C-%D8%A7%D8%B9%D8%AF%D8%A7%D9%85-%D9%85%D8%AD%DA%A9%D9%88%D9%85 (accessed September 6, 2012). To see the full version of the confession on Iranian national television, see http://www.youtube.com/watch?v=8lOiSj2QTt8&feature=related.

[106] Iraj Mesdaghi, "Pay Attention to the Innocent Suspects of  the 'Nuclear Experts' Assassination" [ به فریاد متهمان «متخصصان هستهای» برسید ], Gooya News, August 21, 2012, http://news.gooya.com/politics/archives/2012/08/145756.php (accessed September 12, 2012).

PX275

The responsibilities of MOIS and the Quds Force clearly overlap. Therefore, it is necessary for the two organizations to collaborate closely. For instance, the Quds Force is responsible for collecting intelligence in foreign countries. It is assumed that the Quds Force reports its intelligence-gathering activities and their results to MOIS.

It appears that the number of assassinations of dissidents has been reduced after exposure of the "Chain Murders" for which MOIS publicly took responsibility. Furthermore, the authorities strictly control disclosure of sensitive information about MOIS operations because any information about them might compromise the entire leadership of the Islamic Republic. Even so, MOIS can be expected to continue to target dissidents for assassination if it decides they constitute a real threat to the Islamic Republic.

## 22.  INFORMATION GAPS (IN SOURCES)

Because MOIS does not have an official Web site, collecting data about its organizational structure, its personnel and their duties, and how it operates is difficult. There is no information about some of the current high officials and directors of the various MOIS directorates in open-source materials, and it is not clear who issues directions to MOIS or how those directions are carried out.

Another important question about MOIS that is not well answered in open-source material is the ministry's relationship with the IRGC and how they interact. Observers speculate that MOIS and the IRGC have disagreements. If this allegation is true, available information does not clearly indicate the source or the degree of the disagreement.

## 23.  KEY HISTORICAL EVENTS AND SETBACKS

—**July 1980**: The discovery of a coup (Nojeh Coup) in 1980 by SAVAMA, the predecessor of MOIS, is considered one of the main operations of Iranian intelligence after the Revolution. Even though the intelligence structure of Iran was young at the time, agents had discovered that a number of air force officers where plotting to overthrow the Islamic government. SAVAMA, the intelligence service of Iran at that time, identified the officers involved and arrested them.[107]

—**September 1994**: A bombing at the Israeli-Argentine Mutual Association (Asociación Mutual Israelita-Argentina—AMIA) community center in Buenos Aires, Argentina, killed 85

---

[107] Amin Asadi, "The Nojeh Coup" [کودتای نوژه], *Day News* [Tehran], March 25, 2012, http://daynews.ir/news/24991 (accessed April 11, 2012); "Untold [Incidents] About the Ministry of Intelligence," [ناگفته هایی از وزارت اطلاعات].

PX275

and wounded 300. The attack was the deadliest terrorist attack in Argentine history. Responsibility for the attack was attributed to Iran. At the time, the Quds Force did not exist as an organized group. However, the involvement of the IRGC in this incident is undeniable, as the Argentine investigation showed. MOIS most likely was part of the operation.[108]



AMIA Bombing in Buenos Aires
Source: http://www.jpost.com



Mykonos Incident in Berlin
Source: http://www.radiozamaneh.com

—**March 1996**: After the investigation of the Mykonos incident in Berlin in September 1992, the German federal prosecutor issued an arrest warrant for Ali Fallahian, the Iranian minister of intelligence and security, because of his order to assassinate Iranian Kurdish dissidents. Later, in November 1996, Supreme Leader Ayatollah Khamenei, President Ali-Akbar Hashemi Rafsanjani, Fallahian, and Ali Akbar Velayati, Iran's foreign minister, were also charged. In April 1997, the German court issued its verdict and condemned the Iranian officials.[109]

—**1997–1998**: A series of murders of Iranian intellectuals who were opposed to or critical of the Islamic Republic shocked the Iranian public. The assassination of Dariush Forouhar, leader of Hezb-e-Mellat-e-Iran (Nation of Iran Party), and his wife along with two authors received significant attention and led the Iranian Association of Writers to ask the government to find and prosecute the perpetrators of the crime. After an investigation, then Deputy Minister of Intelligence and Security Saeed Emami was arrested and imprisoned along with a number of MOIS agents on charges of involvement in the assassinations. He reportedly committed suicide in prison. The ministry was forced to issue a statement admitting its own agents' involvement in

---

[108] "Investigation Finds Iranian, Hezbollah and Syrian Involvement in 1994 Bombing of Argentine Jewish Community Center," The Anti-Defamation League, October 2003, http://www.adl.org/Terror/terror_buenos_aries_attack.asp (accessed June 11, 2012).
[109] "Masters of Disinformation."

PX275

these cases— the first time that the Iranian security apparatus took responsibility for its actions.[110]

The ministry's statement ran partly as follows: "The despicable and abhorrent recent murders in Tehran are sign[s] of a chronic conspiracy and a threat to the national security. . . . Unfortunately, a small number of irresponsible, misguided, headstrong, and obstinate staff within the Ministry of Intelligence [and Security], who are no doubt under the influence of rogue undercover agents and acting towards the objectives of foreign and estranged sources, committed these criminal acts."[111]



Abdolmalek Rigi
Source:
http://tribune.com.pk/

—**February 2010**: One of the most successful operations by MOIS, which received widespread coverage inside and outside of Iran, was the capture of Abdolmalek Rigi, the leader of the Baluchi Jundollah, an Islamist Sunni militant organization, in February 2010. For years Rigi had masterfully eluded capture, staying for the most part in the lawless regions of western Pakistan. His brutal murders of local people in southeast Iran made him the Iranian government's most-wanted person. After killing one of the preeminent commanders of the IRGC, the Islamic Republic seriously undertook to capture him. MOIS tracked him and kept him under surveillance, and when he was on a flight from Dubai to Kyrgyzstan, flying over Iranian soil, MOIS agents forced the plane to land inside Iran and arrested Rigi. He confessed in a program broadcast on national television that he was cooperating with the CIA and Mossad and was subsequently executed.[112]

[110] Sahimi, "The Chain Murders: Killing Dissidents and Intellectuals 1988–1998," 2011.

[111] Sahimi, "The Chain Murders: Killing Dissidents and Intellectuals 1988-1998," 2011; Sahimi, "The Chain Murders," 2009.

[112] "Abdulmalek Rigi Is Killed in a Daring Intelligence Operation [ عبدالمالک ریگی در یک عملیات جسورانه اطلاعاتی دستگیر شد ], Raja News [Tehran], February 23, 2010, http://www.rajanews.com/detail.asp?id=45150 (accessed April 11, 2012); "Iran Arrests Jundallah Ringleader, Rigi," *Press TV* [Tehran], February 23, 2010, http://edition.presstv.ir/detail/119269.html (accessed April 11, 2012).

PX275

## 24.  CHRONOLOGY OF SIGNIFICANT TERRORIST ATTACKS

MOIS has been involved in a considerable number of assassinations. Only the most significant ones are included in the following tables. It appears that the number of assassinations declined in the 2000s.[113]

### Table 2. Assassinations Outside Iran

| Date | Name of Target | Location | Target's Background |
|---|---|---|---|
| December 1979 | Shahryar Shafiq | Paris, France | He was the shah's nephew. |
| July 1980 | Ali Tabatabaei | Bethesda, MD, U.S. | He was the press attaché in Iran's embassy in the United States under the shah. |
| February 1984 | Gholam-Ali Oveissi | Paris, France | He was a hard-line army commander and military governor of Tehran under the shah. He was assassinated with his brother Gholam-Hussein. |
| January 1987 | Ali Akbar Mohammadi | Hamburg, Germany | He was a former pilot for Ali-Akbar Hashemi Rafsanjani. |
| May 1987 | Hamidreza Chitgar | Vienna, Austria | He was first secretary of Hezb Kaar (Labor Party). |
| July 1989 | Abdulrahman Ghassemlou | Vienna, Austria | He was the leader of the Kurdish Democratic Party of Iran (KDPI). He was assassinated with three of his aides when he traveled to Vienna to meet with Iranian government representatives for negotiations. |
| August 1989 | Gholam Keshavarz | Cyprus | He was a communist and an opponent of the Islamic Republic. |
| April 1990 | Kazem Rajavi | Geneva, Switzerland | He was the brother of Massoud Rajavi, the leader of Mojahedin-e Khalgh Organization (MEK). |
| July 1990 | Ali Kashefpour | Turkey | He was a member of the Central Committee of the Kurdish Democratic Party of Iran (KDPI). |

---

[113] Sahimi, "The Chain Murders," 2009.

PX275

| Date | Name of Target | Location | Target's Background |
|---|---|---|---|
| September 1990 | Effat Qazi | Sweden | She was a daughter of Gazi Mohammed, the Kurdish leader and president of the Mahabad Republic (a short-lived Kurdish movement that sought Kurdish independence within the bounds of the Iranian state). |
| October 1990 | Cyrus Elahi | Paris, France | He was a member of the opposition monarchist group Derafsh-e Kaviani (Flag of Freedom). |
| April 1991 | Abdolrahman Boroumand | Paris, France | He was a member of the Executive Committee of the National Resistance Movement of Iran that Dr. Shapour Bakhtiar had founded in France. |
| August 1991 | Shapour Bakhtiar | Paris, France | He was the last prime minister under the shah. |
| September 1991 | Saeed Yazdanpanah | Iraq | He was a member of the Revolutionary Union of Kurdish People. He was stabbed to death along with his secretary, Cyrus Katibeh. |
| August 1992 | Fereydoun Farrokhzad, | Bonn, Germany | He was a popular Iranian singer and showman who openly criticized the Islamic Republic. |
| September 1992 | Sadeq Sharafkandi | Berlin, Germany | He was the leader of the KDPI, murdered along with three Kurdish aides, Homayoun Ardalan, Fattah Abdollahi, and Nouri Dehkordi (the Mykonos Incident). |
| March 1993 | Heybatollah Narou'i | Karachi, Pakistan | He and Delaviz Narou'i were two chiefs of the Narou'i tribe in Baluchistan Province. |
| May 1996 | Reza Mazlouman | Paris, France | He was a criminology professor at the University of Tehran before the 1979 Revolution and was deputy minister of education under the shah. |

PX275

Many writers, activists, and intellectuals who had been missing were later found dead. The table below contains information about some of these victims who are believed to have been killed by MOIS.

### Table 3. Assassinations Inside Iran

| Date | Name of Target | Target's Background |
|---|---|---|
| November 1988 | Kazem Sami | He was an Islamic nationalist and physician who had founded, before the Revolution, Jonbesh-e Enghelabi Mardom Iran (Revolutionary Movement of the Iranian People). |
| Fall of 1990 | Sayyed Khosro Besharati | He was a religious intellectual who was critical of certain Shi'a beliefs. |
| June 1994 | Father Mehdi Dibadj | He was a Muslim who had converted to Christianity before the 1979 Revolution. |
| Early 1994 | Father T. Mikaeilian | An explosion in July 1994 in the Shrine of Imam Reza (the 8th Shi'a Imam) was blamed on three MEK members. They were arrested and confessed on national TV that they murdered Father Mikaelian, who was the head of the Protestant Church in Iran. Many Iranians found those confessions hard to believe. |
| August 1994 | Shamseddin Amir-Alaei | He was a nationalist figure and opposition member. He died in a car accident, which is believed to have been intentional. |
| May 1994 | Zohreh Izadi | She was a political activist. |
| November 1994 | Ali Akbar Saidi Sirjani | He was a famous poet, writer, and journalist. |
| 1995 | Abdolaziz Bajd | He was a professor at Zahedan University (in the province of Sistan and Baluchistan), where he delivered a speech critical of the TV series "Imam Ali." |
| January 1995 | Hossein Barazandeh | He was an engineer and a close aide of Dr. Ali Shariati, the distinguished sociologist and Islamic scholar. |
| February 1995 | Molla Farough Farsad | He was a Sunni cleric in Sanandaj (capital of Kurdistan province). First he was exiled to Ardebil, and later his body was found showing signs of torture. |
| March 1995 | Ahmad Khomeini | He was the son of Ayatollah Khomeini. After the death of his father, Ahmad Khomeini had started criticizing the government. It is reported that Mohammad Niazi, the military prosecutor who handled Saeed Emami's case in 1999, told Hassan Khomeini, Ahmad's son, that Emami had killed his father.[114] |
| October 1995 | Ahmad Mir Alaei | He was a writer, translator, intellectual, and signatory of the writers' open letter.[115] |
| May 1996 | Ghazaleh Alizadeh | She was a novelist. |

---

[114] "Emami: Fallahian Gave Me the Order to Eliminate Seyyed Ahmad Khomeini" [امامی: فلاحیان به من دستور حذف سید احمد خمینی را داد], *Rah-e-Sabz (Jaras)* [U.S.], May 1, 2012, http://www.rahesabz.net/story/52633/ (accessed September 4, 2012). Jaras is the news Web site of the Iranian supporters of the Green Movement.
[115] On October 15, 1994, 134 writers published an open letter in the form of an article entitled "We Are the Writers." In it they demanded that the government end censorship and called for an autonomous writers' association.

PX275

| Date | Name of Target | Target's Background |
|------|----------------|---------------------|
| November 1996 | Molla Mohammad Rabiei | He was Kermanshah's Friday prayer leader who reportedly died of a heart attack. However, it turned out a few years later that he was injected with air, which caused him to have a heart attack.[116] |
| November 1996 | Siamak Sanjari | He was murdered on his wedding night. He had claimed that he was well-informed about former Minister of Intelligence and Security Ali Fallahian's alleged crimes. |
| November 1996 | Abdolaziz Kazemi | He was a Ph.D. student, a lecturer at the University of Sistan and Baluchestan, and a Sunni cleric who advocated for the rights of ethnic and religious minorities. |
| March 1997 | Ebrahim Zalzadeh | He was editor of the monthly literary magazine *Me'yaar* (Criterion). He was arrested by agents of MOIS and taken to a "safe house." His family was ordered not to reveal his arrest or he would be killed. His body was found half-buried outside Tehran. |
| August 1998 | Pirouz Davani | He was a writer and political activist who went missing. His body was never found. |
| November 1998 | Dariush and Parvaneh Forouhar | Dariush Forouhar was the leader of Mellat (Nation) Party, a small party that was part of the National Front, the political group of Dr. Mohammad Mosaddegh. |
| November 1998 | Majid Sharif | He was a writer and translator of books. |
| December 1998 | Mohammad Mokhtari | He was a writer, mythologist, journalist, and member of the organizing committee of the Iranian Writers' Association. |
| December 1998 | Mohammad Jafar Pouyandeh | He was a writer and translator. |

---

[116] Edris Amiri, "Azar 12, Anniversary of the Martyrdom of Allameh Mohammad Rabiei" [ شهادت سالگرد ماه آذر ١٢], علامه محمد ربیعی رحمة الله علیه], *Sistan & Baluchistan 88[i.e., 1388, Persian calendar] Economic Students* [Iranian blog], December 3, 2010 http://economic88usb.blogfa.com/post-61.aspx (accessed September 5, 2012).

PX275

## 25. BIBLIOGRAPHY

"Abdulmalek Rigi Is Killed in a Daring Intelligence Operation." Raja News [Tehran], February 23, 2010. http://www.rajanews.com/detail.asp?id=45150 (accessed April 11, 2012).

Agilee, Omeed. "The Islamic Republic of Iran's Anti-Opposition Strategies in Social Media." June 16, 2011. Paper submitted to English for Heritage Language Speakers (EHLS) Program, Georgetown University, Washington, DC, August 2011.

"Ahmadinejad Is Cleaning Up the Ministry of Intelligence" [ احمدی نژاد وزارت اطلاعات را پاکسازی مینماید!]. *Our South Azerbaijan* [Iranian blog], August 2009. http://www. oursouthazerbaijan.com/osa_at.htm (accessed April 15, 2012).

"The Al-Qa'ida-Qods Force Nexus." *Kronos Advisory*, April 29, 2011. http://thomaspmbarnett. squarespace.com/storage/Kronos_AQ.QF.Nexus.globlogization.pdf (accessed June 13, 2012).

"America's Special Effort for the Release of a Captured Spy" [ تلاش های ویژه آمریکا برای آزادی جاسوس زندانی]. *Ghatreh* [Tehran], August 31, 2012. http://www.ghatreh.com/news/nn10885851/%D8%AA%D9%84%D8%A7%D8%B4-%D9%87%D8%A7%DB%8C-%D9%88%DB%8C%DA%98%D9%87-%D8%A2%D9%85%D8%B1%DB%8C%DA%A9%D8%A7-%D8%A8%D8%B1%D8%A7%DB%8C-%D8%A2%D8%B2%D8%A7%D8%AF%DB%8C-%D8%AC%D8%A7%D8%B3%D9%88%D8%B3-%D8%B2%D9%86%D8%AF%D8%A7%D9%86%DB%8C (accessed September 6, 2012).

Amiri, Edris. "Azar 12, Anniversary of the Martyrdom of Allameh Mohammad Rabiei" [ ۱۲ آذر ماه سالگرد شهادت علامه محمد ربیعی رحمة الله علیه]. *Sistan & Baluchistan 88 Economic Students* [Iranian blog], December 3, 2010. http://economic88usb.blogfa.com/post-61.aspx (accessed September 5, 2012).

"Amir Mirzaei Hekmati Is Sentenced to Death" [ امیر میرزایی حکمتی به اعدام محکوم شد]. *Ghatreh* [Tehran], January 10, 2012. http://www.ghatreh.com/news/nn9037978/%D8%A7%D9%85%DB%8C%D8%B1-%D9%85%DB%8C%D8%B1%D8%B2%D8%A7%DB%8C%DB%8C-%D8%AD%DA%A9%D9%85%D8%AA%DB%8C-%D8%A8%D9%D8%AF%D8%A7%D9%85-%D9%85%D8%AD%DA%A9%D9%88%D9%85 (accessed September 6, 2012).

Asadi, Amin. "The Nojeh Coup" [ کودتای نوژه]. *Day News* [Tehran], March 25, 2012. http://daynews.ir/news/24991 (accessed April 11, 2012).

"Azerbaijani-Israeli Relations and the Iranian Threat." *Daily Motion*,  March 30, 2012. http://www.dailymotion.com/video/xps339_azerbaijani-israeli-relations-and-the-iranian-threat_news (accessed September 10, 2012).

PX275

Barzegar, Jamshid. "Akbar Ganji: The Chain Murders Was a Government Project" [اکبر گنجی: قتل های زنجیره ای پروژه ای حکومتی بود]. *BBC Persian,* December 7, 2010. http://www.bbc.co.uk/persian/iran/2010/12/101207_ganji_serial_murders.shtml (accessed March 22, 2012).

Bayani, Saeed. "Vali Faqih and Terror at Mikonos Restaurant" [ ولی فقیه و ترور در رستوران میکونوس]. *Radio Zamaneh* [Netherlands], August 17, 2011. http://www.radiozamaneh.com/politics/2011/08/17/6276 (accessed March 22, 2012).

Bigdeli, Gholamali. "Condemnation of Two Ministry of Intelligence Agents at a Paris Court" [محکومیت دو تن از عوامل وزارت اطلاعات دردادگاه پاریس]. *Radio Koocheh*, June 25, 2011. http://radiokoocheh.com/article/113111 (accessed April 4, 2012).

Blanche, Ed. "Iran-Israel Covert War: The Mossad Is Said to Wage a Clandestine Campaign of Assassination and Sabotage Against Iran's Nuclear Programme, But This Could Backfire on President Obama's Efforts to Negotiate with Tehran." *The Middle East,* July 1, 2009. http://findarticles.com/p/articles/mi_m2742/is_402/ai_ n32150834/pg_2/ (accessed April 11, 2012).

Bowie, Nile. "Iran CYBER TERRORISM: US-Supported Terrorist Group MEK Plants Stuxnet Virus Malware to Disable Iran's Nuclear Facilities." *Global Research* [Montreal], April 16, 2012. http://www.globalresearch.ca/index.php?aid=30353&context=va (accessed June 15, 2012).

"Brief on Iran." *Iran-e-Azad,* September 12, 1995. http://www.iran-e-azad.org/english/boi/02500912.95 (accessed April 11, 2012).

Dehghan, Saeed Kamali. "Iran Claims Agent Infiltrated Opposition and Foreign Intelligence Units." *Guardian* [Manchester], June 10, 2011. http://www.guardian.co.uk/world/2011/jun/10/iran-claims-agent-infiltrated-opposition (accessed May 18, 2012).

"The Deputy of the Minister of Intelligence: Enemies' Aggression Is a Sign of Achievement by the Islamic Republic" [تهاجم دشمنان نشانهٔ توفیقات بزرگ نظام اسلامی است :معاون وزیر اطلاعات]. Islamic Republic News Agency [IRNA; Tehran], September 5, 2011. http://irna.ir/NewsShow.aspx?NID=30550101 (accessed May 17, 2012).

"Destruction of a Spy Network Linked to the CIA and Detention of 30 American Spies" [ انهدام شبکه جاسوسی وابسته به سیا و بازداشت 30جاسوس آمریکایي. Fars News Agency [Tehran], May 21, 2011. http://www.farsnews.com/newstext.php?nn=9002315207 (accessed March 20, 2012).

"Dorri Najafabadi Spoke About his Selection as the Minister of Intelligence." Fars News Agency [Tehran], July 18, 2005. http://www.farsnews.com/newstext.php?nn=8404270109 (accessed March 22, 2012).

Ebrahimi, Amir Farshad. "Who Is Saeed Emami?" [ کیست؟ (امامی)سعید اسلامی]. *Hokoomat Nezami* [Iranian blog], n.d. http://gavras.wordpress.com/2008/05/10/%D8%B3%D8%B9%D9%8A%D8%AF-%D8%A7%D8%B3%D9%84%D8%A7%D9%85%DB%8C-%D8%A7%D9%85%D8%A7%D9%85%DB%8C%DA%A9%9%8A%D8%B3%D8%AA%D

PX275

8%9F-%D8%A7%D9%85%DB%8C%D8%B1-%D9%81%D8%B1%D8%B4%D8%
A7%D8%AF-%D8%A7%D8%A8/ (accessed May 18, 2012).

"Economist: Rahim Mashei Was Wiretapped by Moslehi" [اکونومیست: می شنود را مشایی رحیم مصلحی
کرد]. *BBC Persian,* May 6, 2011. http://www.bbc.co.uk/persian/iran/2011/05/110506_
u01_economist-moslehi.shtml (accessed May 18, 2012).

"Emami: Fallahian Gave Me the Order to Eliminate Seyyed Ahmad Khomeini" [ به فلاحیان: امامی
داد را خمینی احمد سید حذف دستور من]. *Rah-e-Sabz (Jaras)* [U.S.]*,* May 1, 2012.
http://www.rahesabz.net/story/52633/ (accessed May 18, 2012).

"Escalation of the Conflicts Between the PKK and the Turkish Military in South-Eastern
Turkey" [ترکیه شرقی جنوب در نظامیان با کا کا پ میان درگیری تشدید]. *Euro News (Persian),*
August 14, 2012. http://persian.euronews.com/2012/08/14/upsurge-in-pkk-violence-as-
anniversary-nears/ (accessed September 10, 2012).

 "Espionage in Iran" [ایران در جاسوسی]. *Edalat* [Tehran], September 19, 2011. http://hoghoghszt.
blogfa.com/post-2.aspx (accessed April 11, 2012).

"Evidence Grows Iran Aiding Syria's Assad." UPI*,* June 2, 2011. http://www.upi.com/Top_
News/Special/2011/06/02/Evidence-grows-Iran-aiding-Syrias-Assad/UPI-
72061307024479/ (accessed March 13, 2012).

"Evidence of Intelligence Collaboration between KGB and Iranian Regime." *YouTube,*
September 24, 2009. http://www.youtube.com/watch?v=eS3XbJ-rx1o (accessed May 29,
2012).

"Factbox: What Is Stuxnet?" Reuters*,* September 24, 2010. http://www.reuters.com/article/
2010/09/24/us-security-cyber-iran-fb-idUSTRE68N3PT20100924 (accessed April 4,
2012).

Firoozbakht, Ladan. "The Capital City of Austria, a Nest for Tehran's Regime." *Radio France
International* [France], February 21, 2010. http://www.persian.rfi.fr/%D9%BE%D8%
A7%DB%8C%D8%AA%D8%AE%D8%AA-%D8%A7%D8%B7%D8%B1%
DB%8C%D8%B4-%D9%84%D8%A7%D9%86%D9%87-%D8%A7%DB%8C-
%D8%A8%D8%B1%D8%A7%DB%8C-%D8%B1%DA%98%DB%8C%D9%85-
%D8%AA%D9%87%D8%B1%D8%A7%D9%86-20100221/%D8%B9%D9%
85%D9%88%D9%85%DB%8C (accessed September 6, 2012).

"Five Major Duties of VAVAK Inside and Outside of the Country." *Enghelab-e-Eslami*, 2011.
http://enghelabe-eslami.com/گزارشات-و-تحلیل-ها/2880-5----------.html (accessed May 22,
2012).

Flood, Alison. "Salman Rushdie Reveals Details of Fatwa Memoir." *Guardian* [Manchester],
April 12, 2012. http://www.guardian.co.uk/books/2012/apr/12/salman-rushdie-reveals-
fatwa-memoir (accessed May 19, 2012).

PX275

"Germany's Security Report on Iran's Intelligence Activities in Germany" [گزارش امنیتی آلمان ازفعالیت های اطلاعاتی جمهوری اسلامی در آلمان]. *Deutsche Welle* [Germany], January 7, 2011. http://www.dw.de/dw/article/0,,15204059,00.html (accessed May 30, 2012).

"Hadi Ameri, the Leader of the Badr Brigade, Announced that the Mojahedin Must Get out of Iraq" [هادی عامری سرکرده سپاه 9بدر ادعا کرد، مجاهدین باید از خاک عراق اخراج شوند]. *People's Mojahedin Organization of Iran*, November 21, 2007. http://www.mojahedin.org/pages/detailsNews.aspx?newsid=22313 (accessed September 10, 2012).

"Hajjarian Speaks About the Formation of the Ministry of Intelligence." *Sharif News* [Tehran], September 6, 2005. http://sharifnews.ir/?9448 (accessed March 22, 2012).

Hen-Tov, Elliot, and Nathan Gonzalez. "The Militarization of Post-Khomeini, Iran: Praetorianism 2.0." Washington, DC: Center for Strategic and International Studies, 2011. https://csis.org/files/publication/twq11winterhentovgonzalez.pdf (accessed May 22, 2012).

"How Did the Ministry of Intelligence Form?" [وزارت اطلاعات ایران چگونه شکل گرفت؟]. *Khanevadeh Kooch* [Iranian blog], March 1, 2011. http://www.koooch.com/thread1703.html (accessed March 22, 2012).

"How Do Iranian Intelligence Forces Operate Outside of the Country?" [نیروهای نفوذی اطلاعاتی ایران در خارج از کشور چگونه عمل می کند؟]. *Khabar Online* [Tehran], June 9, 2010. http://www.khabaronline.ir/news-67593.aspx (accessed April 4, 2012).

"How to Be Hired at the Islamic Republic of Iran's Ministry of Intelligence and Security?" [چگونگی استخدام در وزارت اطلاعات جمهوری اسلامی ایران]. *Efshagari* [Iranian blog], June 9, 2010. http://efshagary.wordpress.com/2010/06/09/%DA%86%DA%AF%D9%88%D9%86%DA%AF%D9%8A-%D8%A7%D8%B3%D8%AA%D8%AE%D8%AF%D8%A7%D9%85-%D8%AF%D8%B1-%D9%88%D8%B2%D8%A7%D8%B1%D8%AA-%D8%A7%D8%B7%D9%84%D8%A7%D8%B9%D8%A7%D8%AA-%D8%AC%D9%85%D9%87%D9%88%D8%B1/ (accessed April 10, 2012).

"If Applicable Law Does Not Prohibit Money Laundering, The Government Will Be Charged" [شودقانون منع پولشویی اجرا نشود، دولت متهم می]. *Khabar Online* [Tehran], December 14, 2008. http://www.khabaronline.ir/detail/755/ (accessed April 11, 2012).

"Intelligence and Law" [عات و قانوناطلا]. *Jame Jam Online* [Tehran], February 11, 2009. http://www.jamejamonline.ir/papertext.aspx?newsnum=100898802936 (accessed April 4, 2012).

"Intelligence Organizations Increase Their Control over Foreign Media in Iran" [سازمان های اطلاعاتی کنترل خود را بر رسانه های خارجی در ایران افزایش می دهند]. *Gooya News* [Belgium], May 15, 2012. http://news.gooya.com/politics/archives/2012/05/140573.php (accessed May 17, 2012).

PX275

"Introduction to the School of Intelligence Is Online" [معرفی دانشکده اطلاعات بر روی سایت قرار
گرفت]. *Bargh Arshad (Iranian blog)* [Tehran], July 16, 2012.
http://bargharshad.blogfa.com/post/100 (accessed September 13, 2012).

"Introduction to the Ministry of Intelligence Public Relations" [آشنایی با روابط عمومی وزارت
اطلاعات]. *Jame Jam Online* [Tehran], February 11, 2009. http://www.jamejamonline.ir/
papertext.aspx?newsnum=100898806386 (accessed April 11, 2012).

"Investigation Finds Iranian, Hezbollah and Syrian Involvement in 1994 Bombing of Argentine
Jewish Community Center." The Anti-Defamation League, October 2003.
http://www.adl.org/Terror/terror_buenos_aries_attack.asp (accessed June 11, 2012).

"Iran, Argentina Clash over Jewish Center Bombing; Iranian Cleric Is Linked to Buenos Aires
Bombing. That Killed 87 People in '94." *Baltimore Sun,* May 21, 1998. http://articles.
baltimoresun.com/1998-05-21/news/1998141013_1_rabbani-iran-bombing (accessed
March 22, 2012).

"Iran Arrests Jundallah Ringleader, Rigi." *Press TV* [Tehran], February 23, 2010.
http://edition.presstv.ir/detail/119269.html (accessed April 11, 2012).

"Iran Arrests 12 'CIA Spies' for Targeting Nuclear Plans." *BBC.* November 24, 2011.
http://www.bbc.co.uk/news/world-middle-east-15879086 (accessed April 5, 2012).

"Iranian Spy Ring Exposed in Turkey, Dealing Blow to Ties Between Neighbors." *Today's
Zaman* [Turkey]*,* August 29, 2012. http://www.todayszaman.com/news-290814-iranian-
spy-ring-exposed-in-turkey-dealing-blow-to-ties-between-neighbors.html (accessed
September 10, 2012).

"Iran Increases Its Political and Economic Presence in Latin America…." Meir Amit
Intelligence and Terrorism Information Center, Israeli Intelligence and Heritage
Commemoration Center*,* April 19, 2009. http://www.terrorism-info.org.il/en/
article/18291 (accessed March 7, 2012).

"Iran's Line of Tractor Production Is being Launched in Bolivia." Mehr News [Tehran],
September 14, 2011. http://www.mehrnews.com/fa/NewsDetail.aspx?NewsID=1407817
(accessed March 26, 2012).

"Iran's Minister of Intelligence: The Intelligence [Forces] Working Parallel [with MOIS] Have
to Be Stopped" [شود باید جلوی موازی کاری اطلاعاتی گرفته :وزیر اطلاعات ایران]. *BBC Persian.*
May 29, 2012. http://www.bbc.co.uk/persian/iran/2012/05/120529_l39_intelligence_
paraller-activities.shtml (accessed May 29, 2012).

"Iran's Ministry of Intelligence and Security." *Iran Focus* [UK], May 6, 2005.
http://www.iranfocus.com/en/?option=com_content&task=view&id=2020 (accessed
January 31, 2012 ).

"Iran's Ministry of Intelligence: U.S.-Led Exile Government Plot Foiled." Meir Amit
Intelligence and Terrorism Information Center, Israeli Intelligence and Heritage

PX275

Commemoration Center, June 16, 2011. http://www.terrorism-info.org.il/en/article/17889 (accessed May 29, 2012 ).

"Iran's Secretive Quds Force Has Terror Links." *Soldier of Fortune,* October 12, 2011. http://www.sofmag.com/iran%E2%80%99s-secretive-quds-force-has-terror-links (accessed March 22, 2012).`

"The Islamic Republic of Iran's Ministry of Intelligence and Security" [ وزارت اطلاعات جمهوری اسلامی] [Iranian blog]*,* August 22, 2011. http://www.varzesh11.blogfa.com/cat-417.aspx (accessed May 21, 2012).

Jones, Oliver. "Iran Insights—Iran's Intelligence and Security Apparatus." UK Defence Forum, December 2011. http://www.ukdf.org.uk/assets/downloads/RS84CIraninsights-Iran%E2%80%99sintelligenceandsecurityapparatusx.pdf (accessed March 22, 2012).

"The Jundullah Leader Abdolmalek Rigui [Rigi] Arrested by Iranian Authorities." *YouTube,* February 23, 2010 . http://www.youtube.com/watch?v=ThPMpM96mgQ&feature= related (accessed June 11, 2012).

Kalantari, Hashem, and Robin Pomeroy. "Iran Says Arrests Another CIA Spy." Reuters, December 17, 2011. http://www.reuters.com/article/2011/12/17/us-iran-usa-spy-idUSTRE7BG0CL20111217 (accessed April 11, 2012).

Levitt, Matthew. "New Arenas for Iranian-Sponsored Terrorism: The Arab-Israeli Heartland." The Washington Institute*,* February 22, 2002. http://www.washingtoninstitute.org/policy-analysis/view/new-arenas-for-iranian-sponsored-terrorism-the-arab-israeli-heartland (accessed June 13, 2012).

Malbrunot, George. "Comment les États-Unis espionnent l'Iran" [How the U.S. Spies on Iran]. *Le Figaro* [Paris], December 5, 2007. http://www.lefigaro.fr/international/2007/12/06/ 01003-20071206ARTFIG00006-comment-les-etats-unis-espionnent-liran.php (accessed June 15, 2012).

"A Man Called Saeed Emami." *Iran Terror Database,* January 22, 2006. http://www.iranterror. com/content/view/178/26/ (accessed March 21, 2012).

"Masters of Disinformation." *Iran Terror Database,* November 22, 2005. http://www.iranterror. com/index2.php?option=com_content&do_pdf=1&id=113 (accessed April 11, 2012).

Maximus, Cyrus. "The Ministry of Intelligence and Security." *Iran Channel,* September 16, 2010. http://iranchannel.org/archives/357 (accessed March 21, 2012).

"Member of Parliament's Defense for Mohseni Eje'i" [دفاع نمایندگان مجلس از محسنی اژه ای]. *Farda News* [Tehran], July 27, 2009. http://www.fardanews.com/fa/news/87456/%D8%AF% D9%81%D8%A7%D8%B9-%D9%86%D9%85%D8%A7%D9%8A%D9%86%D8% AF%DA%AF%D8%A7%D9%86-%D9%85%D8%AC%D9%84%D8%B3-%D8%A7% D8%B2-%D9%85%D8%AD%D8%B3%D9%86%DB%8C-%D8%A7%DA%98%D9% 87-%D8%A7%DB%8C (accessed November 12, 2012).

PX275

Metz, Helen Chapin, ed. *Iran: A Country Study*. Washington, DC: GPO for the Federal Research Division, Library of Congress, 1989. http://lcweb2.loc.gov/frd/cs/irtoc.html (accessed May 1, 2012).

"Milani and Ashkevari Speak About Haghani School." *YouTube,* November 14, 2011. http://www.youtube.com/watch?v=oabDKk49BzI (accessed April 11, 2012).

"The Minister of Intelligence Announced: The Arrest of A Zionist Terrorist Network" [ وزارت اطلاعات خبر داد :دستگیری اعضای یک شبکه تروریستی رژیم صهیونیستی]. *Iranian Students' News Agency* [ISNA; Tehran], April 10, 2012. http://isna.ir/fa/news/91012206786/, وزارت-اطلاعات-خبر-داد-دستگیري-اعضاي-يك-شبكه (accessed April 11, 2012).

"The Minister of Intelligence Deputy Became Iran's Ambassador in Syria" [ معاون وزیر اطلاعات سفیر ایران در سوریه شد]. *Iran Briefing,* June 20, 2011. http://farsi.iranbriefing.net/?p=12051 (accessed May 19, 2012).

"The Minister of Intelligence's Report of Successes / Outside Opponents and Internal Dissidents of 1388 [2009] Have Become Active Again." Raja News [Tehran], n.d. http://www.rajanews.com/detail.asp?id=95793 (accessed April 4, 2012).

"The Ministry of Intelligence: The Assassins of the Nuclear Scientists Are Arrested" [ اطلاعیه وزارت اطلاعات: عوامل ترور دانشمندان هسته ای دستگیر شدند]. Iranian Students' News Agency [ISNA; Tehran], June 15, 2012. http://isna.ir/fa/news/91032514645/%D8%A7%D8%B7%D9%84%D8%A8%D9%8A%D9%87%D9%88%D8%B2%D8%A7%D8%B1%D8%AA-%D8%A7%D8%B7%D9%84%D8%A7%D8%B9%D8%A7%D8%AA-%D8%B9%D9%88%D8%A7%D9%85%D9%84%D8%AA%D8%B1%D9%88%D8%B1-%D8%AF%D8%A7%D9%86%D8%B4%D9%85%D9%86%D8%AF%D8%A7%D9%86 (accessed June 15, 2012).

"The Ministry of Intelligence Deputy: The Internet Network Is a Spy" [ شبکه :معاون وزارت اطلاعات اینترنت جاسوس است]. *Aftab News* [Tehran], April 5, 2012. http://www.aftabnews.ir/vdcbg0b88rhba5p.uiur.html (accessed June 12, 2012).

"The Ministry of Intelligence Deputy: We Have Identified Two New Viruses" [ معاون وزارت اطلاعات: دو ویروس رایانه ای جدید شناسایی کردیم]. *Aftab News* [Tehran], January 19, 2012. http://aftabnews.ir/vdcdos0ffyt0os6.2a2y.html (accessed May 18, 2012).

Mirjavedanfar. "Iran, Loser of the Intelligence War" [ایران، بازندۀ نبرد اطلاعاتی]." *Rooz Online,* January 13, 2010. http://www.roozonline.com/persian/archive/overallarchive/news/archive/2010/january/13/article/-bc64c2c377.html (accessed May 21, 2012).

"Moslehi Fired by Ahmadinejad at Cabinet Meeting." *Daneshjoo News* [Tehran], May 4, 2011. http://www.daneshjoonews.com/news/politics/7174-1390-02-14-15-43-38.html (accessed March 22, 2012).

"Mostafa Poormohammadi: I Had No Role in the Chain Murders" [ در قتل های زنجیره ای نقشی نداشتم :مصطفی پورمحمدی]. *BBC Persian,* February 27, 2012. http://www.bbc.co.uk/persian/

PX275

iran/2012/02/120227_l32_pourmohamadi_iranian_murder.shtml (accessed May 17, 2012).

"Mostafa Poormohammadi's Biography" [مصطفی پورمحمدی :زندگینامه]. *Hamshahri Online* [Tehran],  February 25, 2008. http://hamshahrionline.ir/news-45214.aspx (accessed May 17, 2012).

"Mujahedeen-e Khalq (MEK)." Federation of American Scientists, Intelligence Resource Program, July 13, 2004. http://www.fas.org/irp/world/para/mek.htm (accessed May 18, 2012).

"NAM Reaffirms Support for Iran's Nuclear Energy Program." *Press TV* [Tehran], March 8, 2012. http://presstv.com/detail/230663.html (accessed March 26, 2012).

Open Source Center. "Regime Using Increasingly Sophisticated Measures to Control Cyberspace." July 28, 2010. https://www.opensource.gov/portal/server.pt/gateway/ PTARGS_0_0_200_203_0_43/content/Display/15438541/IAP20100728573001001.pdf (accessed May 10, 2012).

Open Source Center. "When Did Filteration of Sites and Blogs Begin?" May 10, 2010. https://www.opensource.gov/portal/server.pt/gateway/PTARGS_0_0_200_203_121123_ 43/content/Display/IAP20100519338021#index=1&searchKey=7449847&rpp=10 (accessed March 22, 2012).

"Operations Ministry of Intelligence and Security [MOIS] Vezarat-e Ettela'at va Amniat-e Keshvar VEVAK." Federation of American Scientists, Intelligence Resource Program, August 11, 1997. http://www.fas.org/irp/world/iran/vevak/org.htm (accessed April 11, 2012).

Mesdaghi, Iraj. "Pay Attention to the Innocent Suspects of  the 'Nuclear Experts' Assassination" [به فریاد متهمان بیگناه ترور «متخصصان هسته‌ای» برسید]. *Gooya News* [Belgium]*,* August 21, 2012. http://news.gooya.com/politics/archives/2012/08/145756.php (accessed September 12, 2012).

"Q&A About Majoring in Schools with the Prospect of Employment at MOIS." *Afkar-e-Now* [Tehran], n.d. http://www.afkarenow.com/barname/Etelaat.htm (accessed May 16, 2012).

"Religion." *Azerbaijan Presidential Library,* August 20, 1992. http://files.preslib.az/projects/ remz/pdf_en/atr_din.pdf (accessed September 5, 2012).

"Reza Malek's Letter, the Former Deputy of the Ministry of Intelligence from Evin: Chain, House Arrest, Unknown Graves Will not Save Dictatorship." *Balatarin,* May 1, 2012. http://balatarin.com/permlink/2012/5/2/3013377 (accessed May 21, 2012).

Sahimi, Muhammad. "The Chain Murders." *Tehran Bureau,* PBS*,* December 14, 2009. http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2009/12/the-chain-murders-1988- 1998.html (accessed March 22, 2012).

PX275

Sahimi, Muhammad. "The Chain Murders: Killing Dissidents and Intellectuals 1988–1998." *Tehran Bureau,* PBS, January 5, 2011. http://www.pbs.org/wgbh/pages/frontline/ tehranbureau/2011/01/the-chain-murders-killing-dissidents-and-intellectuals-1988-1998.html (accessed March 22, 2012).

Sahimi, Muhammad. "Reformist Strategist: Saeed Hajjarian." *Tehran Bureau,* PBS, July 8, 2009. http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2009/07/reformist-strategist-saeed-hajjarian.html (accessed May 17, 2012).

"Satellite Image of the Ministry of Intelligence Building" [ عکس ماهواره ای از ساختمان اصلی وزارت اطلاعات]. *Anti-Dictator* [Iranian blog]*,* September 2009. http://zobin-cost.blogspot. com/2009/09/blog-post_03.html (accessed May 16, 2012).

"Secret Execution of Four Arab Political Prisoners" [ اعدام مخفیانه چهار زندانی سیاس عرب: خبر اجرای حکم به خانواده ها توسط وزارت اطلاعات]. *Gooya News* [Belgium], June 21, 2012. http://news.gooya.com/ politics/archives/2012/06/142395.php. (accessed June 21, 2012).

"The Structure of Power in Iran." *Iran Chamber Society,* n.d. http://www.iranchamber.com/ government/articles/structure_of_power.php (accessed April 11, 2012).

"The Supreme National Security Council" [شورای عالی امنیت ملی]. *Iran's Judicial Laws Bank* [Tehran]*,* n.d. http://libc.ir/index.php?option=com_content&view=article&id=126:1391-01-17-05-56-00&catid=55:1391-01-14-11-53-01&Itemid=70 (accessed September 6, 2012).

"30 US spies arrested in Iran." *YouTube,* June 22, 2011. http://www.youtube.com/watch?v= uOCHnRyUUgQ (accessed April 11, 2012).

"Treasury Accuses Iran of Hacking." *Emptywheel,* February 16, 2012. http://www.emptywheel. net/tag/quds-force/ (accessed April 5, 2012).

United Kingdom. Home Office. UK Border Agency. "IRAN: Country of Origin Information (COI) Report." June 28, 2011. http://www.ukba.homeoffice.gov.uk/sitecontent/ documents/policyandlaw/coi/iran/report-0611.pdf?view=Binary (accessed March 21, 2012).

"Untold [Incidents] About the Ministry of Intelligence" [ناگفته هایی از وزارت اطلاعات]. *Aftab News* [Tehran]*,* September 6, 2005. http://www.aftabnews.ir/vdcc4xqs.2bqii8laa2.html (accessed May 18, 2012).

U.S. Congress. House of Representatives. Committee on Homeland Security. Subcommittee on Counterterrorism and Intelligence. "Hezbollah in Latin America: Implications for U.S. Security." (July 7, 2011). (Statement of Douglas Farah). http://homeland.house.gov/ sites/homeland.house.gov/files/Testimony%20Farah.pdf (accessed April 11, 2012).

Wege, Carl Anthony. "Iranian Intelligence Organizations." *Taylor Francis Online,* 1997. http://www.tandfonline.com/doi/pdf/10.1080/08850609708435351 (accessed March 22, 2012).

PX275

"Yesterday, Today, Tomorrow—Heydar Moslehi, the Minister of Intelligence." *YouTube,*
February 24, 2011. http://www.youtube.com/watch?v=Y9wT3ljkhf8, (accessed April 11,
2012).

Zucker, Daniel M. "Disinformation Campaign in Overdrive: Iran's VEVAK in High-Gear."
*Global Politician,* September 3, 2007. http://www.globalpolitician.com/23386-vevak-iran
(accessed April 17, 2012).

PX275

Library of Congress – Federal Research Division        Iran's Ministry of Intelligence and Security: A Profile

## 26.  APPENDIX. Charts, Maps, and Photos



**Figure 4. Government of Iran**
Source:http://www.iranchamber.com



Location of the Ministry of Intelligence and Security Headquarters
in Central Tehran
Source: http://maps.google.com

PX275



Satellite Photo of the Ministry of Intelligence and Security Headquarters
Source: http://www.zobin-cost.blogspot.com

PX275



One of the Ministry of Intelligence and Security's Buildings in Tehran
Source: http://www.zobin-cost.blogspot.com/2009/09/blog-post_10.html

PX275